# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------x
:
In re            :   Chapter 9
:
CITY OF DETROIT, MICHIGAN,   :   Case No. 13-53846
:
       Debtor.  :   Hon. _____
:
:
-------------------------------------------------------x

# DECLARATION OF KEVYN D. ORR IN SUPPORT OF CITY OF DETROIT, MICHIGAN'S STATEMENT OF QUALIFICATIONS PURSUANT TO SECTION 109(c) OF THE BANKRUPTCY CODE

## TABLE OF CONTENTS

OVERVIEW ................................................................................................4

DETROIT'S STEADY, PRECIPITOUS DECLINE ...........................................12

    Population Loss ...............................................................................12

    The Decline of Detroit Manufacturing.......................................13

    Bleak Employment Prospects.......................................................15

    Eroding Tax Bases & Declining Revenues ..................................16

    No Ability to Ameliorate Cash Losses by Raising Taxes ............20

CURRENT LEVELS OF MUNICIPAL SERVICES ARE INADEQUATE ........21

    High Crime Rates ...........................................................................22

    Non-Functioning Street Lights .....................................................24

    Blight ..............................................................................................25

    Aging, Dysfunctional Infrastructure and Equipment:
        Police, Fire & EMS .................................................................27

    Parks and Recreation .....................................................................29

    Information Technology .................................................................30

CERTIFICATE OF PARTICIPATION OBLIGATIONS
    & RELATED SWAP AGREEMENTS .......................................................33

GROWING BUDGET DEFICITS .......................................................................36

INSOLVENCY ......................................................................................................37

    Debt Service Requirements ...........................................................38

    Negative Cash Flow.......................................................................40

MEASURES TAKEN BY THE CITY TO
    ADDRESS FINANCIAL CHALLENGES ................................................41

    Execution of Consent Agreement/Creation of
        Financial Advisory Board .................................................42

    Employee Headcount Reductions..................................................46

    Reductions of Labor Costs Through Implementation of CETs....46

    Increased Corporate Tax Rate .......................................................47

    Enhanced Tax Collection Initiatives .............................................47

Increased Lighting Rates ...........................................................................48

Reductions in Vendor Costs ......................................................................48

Reduction in Subsidy to DDOT.................................................................48

Deferred Capital Expenditures ..................................................................48

Demolition Initiatives ...............................................................................49

APPOINTMENT OF THE EMERGENCY MANAGER ......................................50

PROPOSED FINANCIAL & OPERATIONAL RESTRUCTURING.................52

Negotiations with Swap Counterparties/Insurers .........................................57

Meetings with Respect to Employee Legacy Obligations............................59

Meetings with Funded Debt and Pension Representatives ..........................64

Establishment of Data Room......................................................................67

BARRIERS TO REACHING AGREEMENT ..................................................68

COMMENCEMENT OF CHAPTER 9 PROCEEDINGS .................................73

FACTS IN SUPPORT OF FIRST DAY PLEADINGS .......................................74

Motions Regarding Administrative and Procedural Matters.......................76

Notice of Commencement of the Case
and Objections to Eligibility ...............................................................76

Case Management and Noticing Procedures.....................................77

Appointment of Claims and Noticing Agent ....................................78

Motions Regarding Third Party Relations...................................................79

Confirmation of the Protections of the Automatic Stay....................79

Extension of the Automatic Stay to Certain Parties..........................80

Appointment of Official Committee of Retirees...............................81

Authorization of Compromise with Swap Counterparties.................82

CONCLUSION .......................................................................................83

# TABLE OF EXHIBITS

EXHIBIT A - June 14 Creditor Proposal

EXHIBIT B - Executive Summary of June 14 Creditor Proposal

EXHIBIT C - 2011 Treasury Report

EXHIBIT D - 2012 Financial Review Team Report

EXHIBIT E - 2012 Consent Agreement

EXHIBIT F - 2012 Treasury Report

EXHIBIT G - 2013 Financial Review Team Report

EXHIBIT H - Governor's Determination of Financial Emergency

EXHIBIT I - Press Release, Ambac Financial Group, July 8, 2013

EXHIBIT J - Emergency Manager Recommendation of Chapter 9 Filing

EXHIBIT K - Governor's Authorization of Chapter 9 Filing

EXHIBIT L - Emergency Manager Order Directing City to Commence
Chapter 9 Proceedings

I, Kevyn D. Orr, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am the emergency manager ("Emergency Manager") for the City of Detroit ("Detroit" or the "City"), the debtor in the above-captioned chapter 9 case, serving in accordance with Public Act 436 of 2012 of the State of Michigan, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws ("MCL") §§ 141.1541-141.1575 ("PA 436"). I was appointed "emergency financial manager" for the City by the Local Emergency Financial Assistance Loan Board (the "LEFALB") created under the Emergency Municipal Loan Act, MCL §§ 141.931-141.942, on March 15, 2013, pursuant to Public Act 72 of 1990 of the State of Michigan, also known as the Local Government Fiscal Responsibility Act, MCL §§ 141.1201-141.1291 ("PA 72"). I formally took office as the emergency financial manager for the City under PA 72 on March 25, 2013. On March 28, 2013, the effective date of PA 436, PA 72 was repealed, and I became the Emergency Manager of the City pursuant to sections 2(e) and 31 of PA 436 (MCL §§ 141.1542(e) and 141.1571).

2. As Emergency Manager, in accordance with PA 436, I act for, and in the place and stead of, the City's elected mayor (the "Mayor") and city council (the "City Council"), and I exercise authority over nearly all aspects of the City's government and management, including, but not limited to, budgeting,

operations, financial affairs, contracts, appropriations, collective bargaining and the use, sale and lease of assets. In the approximately four months since I became Emergency Manager, I have become familiar with the history, day-to-day functions and operations of the City and the financial affairs of the City. My tenure as Emergency Manager may be limited. Pursuant to section 9(6)(c) of PA 436 (MCL § 141.1549(6)(c)), after at least 18 months of service, I may be removed from my position as Emergency Manager by a two-thirds vote of the City Council approved by the Mayor. Accordingly, the City does not intend to tarry in chapter 9. Rather, our objective is to implement a plan of adjustment and conclude this case no later than September 2014.

3. As I have stated since my appointment, public health and safety is my top priority. Moreover, improving the quality of life of Detroiters is essential to the stabilization and revitalization of the City. Thus, the City's restructuring must provide a foundation for the City to begin to provide basic, essential services to its residents in a reliable fashion. Without this, the City's death spiral I describe herein will continue.

4. In this vein, where possible, I have already moved quickly to implement necessary reforms. For example, in the short four months since my appointment, I have taken several immediate steps designed to improve public health and safety in the short term, including: (a) undertaking a critical review of

-2-

police, fire, ambulance and other emergency medical and safety-related services to develop a comprehensive plan to upgrade outdated or poorly maintained emergency vehicles, equipment and facilities; (b) taking necessary steps to ensure that the City's new command center is operating in a timely fashion; (c) issuing an order accepting the donation of new vehicles for the police, fire and emergency response teams by private sector donors; (d) hiring a new police chief for the City; (e) developing a plan to fix street lights and address the City's power grid as promptly as possible; (f) issuing an order providing for the management and monitoring of the City's Community Development Block Grant and Neighborhood Stabilization programs (among others); and (g) taking substantial steps to streamline the process for demolition of blighted structures. Additional steps are necessary and will follow.

     5.    Contemporaneously with the filing of its petition and this Declaration, the City has filed its: (a) Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Statement of Qualifications"), certifying that the City satisfies each of the criteria set forth in section 109(c) of title 11 of the United States Code (the "Bankruptcy Code") for determining its eligibility to be a debtor under chapter 9 of the Bankruptcy Code; and (b) Memorandum of Law in Support of Statement of Qualifications (the "Memorandum of Law"). This Declaration (along with other declarations

contemporaneously filed by the City)[1] provides a factual foundation underlying the Statement of Qualifications and the Memorandum of Law.

6.     Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my discussions with City personnel and/or the City's advisors,[2] my review of relevant documents and sources and/or my opinion based upon my professional experience and knowledge of the City's history, operations and financial conditions.  If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents and sources and/or informed opinion.

## Overview

7.     After decades of fiscal mismanagement, plummeting population, employment and revenues, decaying City infrastructure, deteriorating City services and excessive borrowing that provided short term band-aids at the

---

[1]     Contemporaneously with the filing of this Declaration, the City has filed the: (a) Declaration of Gaurav Malhotra in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Malhotra Declaration"); and (b) Declaration of Charles M. Moore in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code.

[2]     The City has retained numerous advisors in connection with its restructuring efforts, including:  (a) Miller Buckfire & Co. LLC, as financial advisor and investment banker; (b) Jones Day, as primary restructuring counsel; (c) Ernst & Young LLP, as financial restructuring advisor; (d) Conway MacKenzie, as operational restructuring advisor; (e) Pepper Hamilton LLP, as special litigation counsel; and (f) Miller Canfield P.L.C., as corporation and local counsel.

cost of deepening insolvency, the City of Detroit today is a shadow of the thriving metropolis that it once was. The City does not provide basic and essential services to the residents who remain in the City. Crime is endemic. The City is infested with urban blight, which: (a) depresses property values; (b) provides a fertile breeding ground for crime and tinder for fires (with the attendant disproportionate devotion of police and firefighting resources to abandoned lots); and (c) compels the City to devote precious resources to demolition.

8. Significant additional resources are required to improve public safety before the City can begin its rehabilitation. City operations, policies and procedures must be streamlined and overhauled to implement best practices and eliminate waste and inefficiencies. Related to this, the City's technology systems are in desperate need of upgrades, as they have been neglected for years, and the City's systems are not integrated. In short, the City requires substantial investment to allow it to: (a) provide basic, essential services to current residents; (b) attract new residents and businesses to foster growth and redevelopment; and (c) ultimately begin what will be a long recovery.

9. The City's current financial obligations prevent this recovery. The City has over $18 billion in accrued obligations – approximately $11.9 billion

in unsecured obligations to lenders and retirees[3] and over $6.4 billion in

obligations backed by enterprise revenues or that are otherwise secured

(collectively, the "Revenue Bonds").[4]  Currently, more than $0.38 of every tax

dollar that the City collects goes to service legacy debt and other obligations rather

than toward providing services for the City's residents and businesses.  If nothing

---

[3]     On June 14, 2013, I, along with my advisors, met with representatives of all
creditor groups of the City to present information with respect to the state of
the City's finances and operations and a comprehensive proposal to provide
needed investment in the City and restructure the City's obligations.
See City of Detroit:  Proposal for Creditors, dated June 14, 2013
(hereinafter, "June 14 Creditor Proposal," attached hereto as Exhibit A and
incorporated herein by reference), at 23-29 (identifying obligations
consisting of approximately:  (a) $5.7 billion in other post-employment
benefit ("OPEB") accounting liabilities ($6.4 billion if the present value of
future expected benefits is used); (b) $3.5 billion in underfunding pension
liabilities; (c) $650.7 million in unsecured general obligation ("GO")
liabilities (consisting of $1.13 billion in total GO debt less $479.3 million in
secured GO debt); (d) $1.43 billion in liabilities under pension-related
certificates of participation ("COPs"); (e) $343.6 million in swap liabilities
related to the COPs (collectively, the "Swap Obligations"), which liabilities
were valued at $296.5 million as June 28, 2013; and (f) $300 million in other
liabilities).  An executive summary of the June 14 Creditor Proposal
(the "Executive Summary"), also presented at the June 14, 2013 meeting
with creditors, is attached hereto as Exhibit B and incorporated herein by
reference.

[4]     June 14 Creditor Proposal at 23, 27 (consisting of $5.85 billion in enterprise
fund debt, $479.3 million in secured GO debt and $87.8 million in
miscellaneous notes payable to the federal government).

changes, that number is expected to grow to almost $0.65 of every dollar in less than five years.[5]

      10.    For years, the City has spent more than it takes in and has borrowed and deferred paying certain obligations to make ends meet. The City is insolvent. Excluding the proceeds of debt issuances, the City has incurred operating deficits for each of the past six years through fiscal year 2013. As of the end of the City's 2012 fiscal year,[6] the City had an accumulated unrestricted general fund deficit of $326.6 million, an increase of $130.0 million over fiscal year 2011.[7] Excluding the impact of a recent debt issuance generating approximately $137 million in proceeds for the City, this deficit increased by an additional $47.4 million in fiscal year 2013.[8]

      11.    The City also has experienced negative cash flow for years, and that trend is expected to continue and accelerate if not addressed. The City had negative cash flows of $115.5 million in fiscal year 2012, excluding the impact of

---

[5]    Id. at 34.

[6]    References to the City's fiscal years in this Declaration are references to the 12-month period beginning on July 1st of the previous year and ending on June 30th of the referenced year. For example, the City's 2013 fiscal year began on July 1, 2012 and ended on June 30, 2013. The City's fiscal years are expressed herein as "fiscal year [year]" (e.g., the 2013 fiscal year is expressed as "fiscal year 2013").

[7]    June 14 Creditor Proposal at 6.

[8]    Quarterly Report with Respect to the Financial Condition of the City of Detroit, dated July 15, 2013 (the "Quarterly Report"), at 3.

proceeds from short term borrowings.[9]  In March 2012, to avoid running out of cash, the City borrowed $80 million on a secured basis.[10]  Absent ongoing cash conservation steps (primarily in the form of non-payment or deferral of obligations that are due and payable and cost-cutting), the City would have run out of cash before the end of fiscal year 2013 (i.e., June 30, 2013).[11]

12.    The City had a positive general fund cash balance net of accumulated property tax distributions of $36.0 million as of June 30, 2013, but only as a result of:  (a) deferring approximately $108 million of current and prior year pension contributions (including approximately $37 million in pension contributions for fiscal year 2012 and an estimated $71 million in such contributions for fiscal year 2013); (b) drawing $10 million of the escrowed proceeds of the recent $129.5 million debt issuance; and (c) the City's recent decision not to make the scheduled $39.7 million payments due to certain pension-related service corporations, among other cash conservation measures.[12]  Absent restructuring, the City is projecting cash flows of negative $198.5 million

---

[9]    June 14 Creditor Proposal at 7.

[10]   Id.

[11]   Quarterly Report at 2.

[12]   Id.  In addition, the City for many years has deferred critical reinvestment in the City and its infrastructure due to lack of financial resources.

in the current 2014 fiscal year and negative $260.4 million in fiscal year 2015.[13]

This cash depletion would leave the City in a net cash position (after required

property tax distributions) of negative $11.6 million as early as December 2013.[14]

In the absence of restructuring, the City's net negative cash position (after required

property tax distributions) will continue its downward spiral, reaching negative

$143.3 million as of the end of the current 2014 fiscal year and negative

$404.5 million as of the end of fiscal year 2015.[15]

        13.    As noted above, the City has not been – and currently is not –

paying its debts as they come due.  For example, the City has deferred payment of

pension funding contributions to both its General Retirement System ("GRS") and

Police and Fire Retirement System ("PFRS" and, together with the GRS,

the "Pension Systems"), and it accrues interest on such deferrals at a rate of 8%.

As of June 30, 2013, the City had deferred approximately $108 million in

contributions to the Pension Systems in the aggregate.  In addition, to conserve

cash for City operations, including payroll, the City did not make the scheduled

---

[13]    June 14 Creditor Proposal at 50.

[14]    Quarterly Report at 3.

[15]    June 14 Creditor Proposal at 50.

$39.7 million payments under certain pension-related service contracts that were due on June 14, 2013.[16]

14.     Faced with several years of expenditures exceeding revenues, the City has taken aggressive steps to address its financial distress.  These measures included:  (a) entering into a consent agreement with the State of Michigan and the resulting creation of a financial advisory board to oversee the City's operations and conduct limited reforms; (b) reducing the number of City employees by more than 22% since fiscal year 2010;[17] (c) implementing revised City employment terms ("CETs") for non-union employees and union employees under expired collective bargaining agreements; (d) increasing certain tax and utility rates; (e) enhancing tax collection initiatives; and (f) reducing other expenditures.  By these reforms, the City estimates that it has been able to realize more than $200 million in annual savings.[18]

15.     Unfortunately, these savings have not been sufficient to balance the City's budget or improve its cash position.  Moreover, as a practical matter, the City cannot meaningfully increase revenues by raising taxes.  Citizens of Detroit already pay significantly more taxes than citizens of surrounding communities.

---

[16]     Id. at 8.

[17]     Id. at 53.

[18]     Id.

The City's current tax rates are at their statutory maximums and, even if the City could raise taxes, its residents lack the financial wherewithal to bear them. Nor can the City significantly reduce expenditures at this time by further reducing employee headcount or cutting services beyond the skeleton coverage currently provided given the archaic state of the City's technological systems and certain mandates in the City's Charter. Further cuts would only further jeopardize public health, safety and welfare.

16. If left unchecked, the City's deteriorating financial condition will only get worse. The time to stop the downward spiral is now. Along with my team of advisors, I have crafted a plan to permit the City to pay its employees and its bills, live within its means, provide meaningful (but modest relative to the overall need) reinvestment in the City of approximately $125 million annually for the next 10 years,[19] satisfy secured obligations and restructure unsecured obligations. That proposed plan, the negotiations around it, the challenges confronting the City and past attempts to meet them are described in more detail below. Unfortunately, despite good faith efforts by the City to negotiate with its creditors (where such negotiations could be had), no reasonable alternative for the restructuring of the City's operations and obligations exists other than through this chapter 9 case.

---

[19] Id. at 61.

## Detroit's Steady, Precipitous Decline

17.     The financial decline that has led Detroit to this debt adjustment case is not of recent origin.  Rather, Detroit's decline is the product of a confluence of demographic and economic forces that have been mounting for decades.

18.     In 1952, at the height of its prosperity and prestige, Detroit – rightfully referred to as the cradle of the American automobile industry – had a population of approximately 1.85 million,[20] a 600% increase from the population in 1900.[21]  Detroit's population explosion coincided with the rise of the automakers.  From 1900 to 1930, Detroit was the fastest-growing city in the world and by 1929 it was the fourth-largest city in America.[22]  In 1950, Detroit was building half of the world's cars.[23]  During that time, half a million people came to Detroit looking for work.[24]

19.     Population Loss.  Since its peak in the 1950s, however, Detroit has been losing both people and jobs.  Detroit's population declined by nearly 45%

---

[20]     Julia Vitullo-Martin, Detroit Fights Back, 5 City Journal 55 (Summer 1995).

[21]     Kevin Boyle, The Ruins of Detroit:  Exploring the Urban Crisis in the Motor City, 27 Michigan Historical Review 109 (Spring 2001).

[22]     Tom Bethell, Detroit's Fate:  Intransigent Unions, Declining Automakers, and Poor Public Policy Have Wrecked Both Michigan and Its Largest City, 2 The American 36 (2008).

[23]     Julia Vitullo-Martin, Detroit Fights Back, 5 City Journal 55 (Summer 1995).

[24]     David Lepeska, The Historical Roots of Detroit's Ruin, The Atlantic (Mar. 12, 2012).

to just over one million as of June 1990.[25]  In the 23 years since, this population

decline has continued unabated.  Detroit's population stands at 684,799 as of

December of 2012, an astonishing 63% decline from its postwar peak of

1.85 million residents.[26]  Detroit has gone from the fifth largest city in America in

1950 to the eighteenth largest today.[27]  No other American city has experienced a

comparable decline in population over a similar period of time.[28]

      20.   <u>The Decline of Detroit Manufacturing</u>.  A considerable amount

of migration out of the City has been, and continues to be, a result of economic

dislocation.  In particular, changes in the auto industry over the years have had an

outsized impact on Detroit's economy.  Almost immediately after World War II,

Detroit began to lose manufacturing jobs as the auto companies automated their

---

[25]    <u>Compare</u> *Population of the 100 Largest Urban Places: 1950*, U.S. BUREAU OF THE CENSUS tbl.18 (June 15, 1998), http://www.census.gov/population/www/documentation/twps0027/tab18.txt (stating that the City had a population of 1,849,568 in 1950) <u>with</u> *City of Detroit Fast Facts: 1990*, U.S. BUREAU OF THE CENSUS, http://www.census.gov/history/www/through_the_decades/fast_facts/1990_new.html (stating that the City had a population of 1,027,974 in 1990).

[26]    Population and Household Estimates for Southeast Michigan, Southeast Michigan Conference of Governments (December 2012) (available at http://www.semcog.org/uploadedFiles/Population_and_Household_Estimates_for_December_2012.pdf) (last accessed April 30, 2012).

[27]    Kate Linebaugh, Detroit's Population Crashes, The Wall Street Journal (Mar. 23, 2011), *available at* http://online.wsj.com/article/SB10001424052748704461304576216850733151470.html.

[28]    Bruce Katz & Jennifer Bradley, The Detroit Project:  A Plan for Solving America's Greatest Urban Disaster, The New Republic 29 (Dec. 2, 2009).

facilities and moved their remaining jobs out of the City.[29]  Between 1947 and

1963, Detroit lost approximately 150,000 manufacturing jobs as smaller auto

manufacturers disappeared (e.g., Packard and Studebaker), and the "Big Three"

began to move operations to the suburbs and out of the state.[30]

21.    These trends only accelerated as the Detroit automakers began

to lose ground to international competitors.  Foreign automakers entered the U.S.

market during the 1950s with fuel-efficient vehicles and, when the oil crisis of

1973 hit, U.S. automakers were unprepared.  Automobile production fell nearly

30% in the next two years,[31] and the market share of U.S. automobile companies

declined from 95% in 1955 to 75% in 1980.[32]  By 2008, Detroit's share of

U.S. auto sales had declined to 47%.[33]

22.    The collapse of Detroit's manufacturing industry during the

second half of the 20th century was not limited to the automobile sector.  Non-auto

---

[29]    Kevin Boyle, The Ruins of Detroit:  Exploring the Urban Crisis in the Motor
        City, 27 Michigan Historical Review 114 (Spring 2001).

[30]    Tom Bethell, Detroit's Fate:  Intransigent Unions, Declining Automakers,
        and Poor Public Policy Have Wrecked Both Michigan and Its Largest City,
        2 The American 36 (2008).

[31]    David Lepeska, The Historical Roots of Detroit's Ruin, The Atlantic
        (Mar. 12, 2012).

[32]    Thomas H. Klier & James Rubenstein, Federal Reserve Bank of Chicago,
        Detroit Back from the Brink?  Auto Industry Crisis and Restructuring,
        2008-11, 36 Economic Perspectives 35 (2012).

[33]    Id.

companies also shuttered operations. In the 1970s and 1980s, companies such as Uniroyal, Vernor's Ginger Ale and Revere Copper closed their plants and left abandoned sites behind.[34] From 1972 to 2007, the City lost approximately 80% of its manufacturing establishments and 78% of its retail establishments.[35]

     23.   <u>Bleak Employment Prospects</u>. The demise of Detroit's industrial sector has proven catastrophic for its citizens' employment prospects. The number of jobs in Detroit (for residents and non-residents) declined from 735,104 in 1970, to 562,120 in 1980, to 412,490 in 1990, to 346,545 in 2012.[36] The "Great Recession" of the past decade dealt an especially punishing blow. Detroit's unemployment rate already stood at an alarming 16% as of June 2008.[37] When the recession took hold, the production and sales of automobiles in the U.S. cratered. Combined sales for Detroit's automakers fell from 8.1 million in 2007 to 4.6 million in 2009, with two of the Big Three and numerous parts suppliers filing

---

[34]    Julia Vitullo-Martin, Detroit Fights Back, 5 City Journal 55 (Summer 1995).

[35]    Detroit City Government Revenues, Citizens Research Council of Michigan, Report 382 (April 2013) ("<u>CRC Report</u>"), at 19.

[36]    http://library.semcog.org/InmagicGenie/DocumentFolder/ HistoricalPopulationSEMI.pdf.

[37]    City of Detroit Comprehensive Annual Report for the Fiscal Year Ended June 30, 2008, at 23 ("For June 2008, Detroit's jobless rate was 16.5%....").

for bankruptcy in 2009.[38]  The decline in production and restructuring of Detroit's auto industry resulted in massive job cuts.[39]  Detroit's unemployment rate skyrocketed to 23.4% as of June 2010 and remained above 18% well into 2012.[40] The number of employed Detroit residents fell sharply, from approximately 353,000 in 2000 to less than 280,000 in 2012.[41]

24.     Eroding Tax Bases & Declining Revenues.  Declines in both population and the economy are mutually reinforcing trends.  As more people leave the City, there is less economic activity and, thus, a decreased need for workers.  Less economic activity and fewer jobs induce even more people to leave, thus further reducing economic activity and exacerbating job losses.  Detroit has been in the grip of this vicious spiral for decades, and it has taken a tremendous toll on the City's ability to generate revenue.  Detroit's municipal income tax receipts – traditionally the City's largest source of revenue – have decreased by

---

[38]    Thomas H. Klier & James Rubenstein, Federal Reserve Bank of Chicago, Detroit Back from the Brink?  Auto Industry Crisis and Restructuring, 2008-11, 36 Economic Perspectives 35 (2012).

[39]    Id.

[40]    Population and Household Estimates for Southeast Michigan, Southeast Michigan Conference of Governments (December 2012) (available at http://www.semcog.org/uploadedFiles/Population_and_Household_ Estimates_for_December_2012.pdf) (last accessed April 30, 2012).

[41]    Bureau of Labor Statistics, Local Area Unemployment Statistics, Data Chart ID: LAUPS26025003, LAUPS26025004, LAUPS26025005, LAUPS26025006.

approximately $95 million (or 30%) since 2002 and by $43 million (or more than 15%) since 2008, driven lower primarily by high unemployment and declining *per capita* income.[42]

   25. Detroiters' average *per capita* annual income from 2007 to 2011 was $15,261; the median household income for that same period was $27,862.[43] During that period, an estimated 36% of Detroiters were living below the poverty line.[44] Only 54% of Detroiters owned a home, the median value of which was $71,100.[45] To put these numbers in perspective, the average *per capita* annual income in Michigan from 2007 to 2011 was $25,482,[46] the median household income was $48,669[47] and only 16% of Michigan citizens lived below the poverty

---

[42] CRC Report, at vi. <u>See</u> June 14 Creditor Proposal at 52 (showing municipal income tax revenue of $276.5 million in fiscal year 2008 and $233 million in fiscal year 2012).

[43] U.S. Census Bureau, State & County QuickFacts, Detroit, Michigan, http://quickfacts.census.gov/qfd/states/26/2622000.html.

[44] <u>Id.</u>

[45] <u>Id.</u>

[46] <u>Id.</u> Per capita annual income for residents of the surrounding communities of Dearborn, Livonia and Southfield are $22,816, $31,959 and $29,228, respectively. <u>Id.</u>

[47] <u>Id.</u>

line.[48]  The state-wide homeownership rate was 74%, and the median home value was $137,300.[49]

26.    Detroit's property tax receipts likewise have suffered.  Between 1970 and 1990, the real value of the City's property tax base declined by nearly two-thirds.[50]  This trend has reasserted itself in earnest in the wake of the Great Recession.  According to the Citizens' Research Council of Michigan, over the last five years, Detroit's assessed property values have decreased by approximately $1.6 billion.[51]  Property tax revenues for the City's 2013 fiscal year were $134.9 million, a $12.9 million (or approximately 10%) reduction from the prior fiscal year and $23.6 million (or approximately 15%) lower than the average property tax revenue for the preceding five fiscal years.[52]

27.    Ancillary taxes imposed by the City likewise have either declined or are expected to decline on a prospective basis.  Detroit is the only city in Michigan to impose a "utility users' tax" on its citizens.  The City's receipts from this utility users' tax have decreased approximately 28% over the last decade (from approximately $55.3 million in fiscal year 2003 to approximately $39.8 million in

---

[48]    Id.

[49]    Id.

[50]    Julia Vitullo-Martin, Detroit Fights Back, 5 City Journal 55 (Summer 1995).

[51]    CRC Report, at vi.

[52]    June 14 Creditor Proposal at 52, 90; Quarterly Report at Appendix B.

fiscal year 2012).[53]  Detroit is also the only municipality in Michigan authorized to

levy a casino wagering tax.[54]  Although these wagering tax revenues recently have

remained steady, the City estimates that such revenues will decrease in fiscal

year 2013 by approximately 5% and fail to recover to their fiscal year 2012 level

until fiscal year 2023 due to expected loss of market share to casinos opening in

nearby locations (e.g., Toledo and Cleveland, Ohio).[55]

      28.    Detroit receives unrestricted aid from the State of Michigan in

connection with constitutional and statutory sharing of sales tax revenue and

"economic vitality incentive payments."  Due to the City's declining population

and significant cuts by the State, Detroit's share of distributed state revenue for

fiscal year 2012 had decreased by more than $161 million (or approximately 48%)

since fiscal year 2002 and by approximately $76 million (or approximately 31%)

since 2008.[56]  Although higher projected tax revenues collected by the State are

expected to halt the decline in the City's receipt of shared revenue over the coming

fiscal years, revenue sharing payments:  (a) remain at risk of further decrease given

---

[53]    CRC Report, at vi.

[54]    Id.

[55]    June 14 Creditor Proposal at 52, 90.

[56]    CRC Report at vii.

the City's declining population; and (b) are projected to remain approximately 20%

below fiscal year 2011 levels for the foreseeable future.[57]

       29.    <u>No Ability to Ameliorate Cash Losses by Raising Taxes</u>.  A

number of factors render the challenges posed by the City's declining tax revenue

essentially intractable.  The *per capita* tax burden on Detroit residents is the

highest in Michigan, which burden is made heavier still by the residents' relative

inability to pay given their level of *per capita* income.[58]  The City's income tax –

2.4% for residents, 1.2% for non-residents and 2.0% for businesses – is the highest

in Michigan,[59] and Detroiters pay the highest total property tax rates of residents of

Michigan cities with a population over 50,000 (inclusive of property taxes paid to

overlapping jurisdictions (<u>e.g.</u>, the State; Wayne County)).[60]

       30.    In any event, the City is currently levying all taxes at the

statutory maximums.[61]  In particular:  (a) Public Act 394 of 2012 of the State of

Michigan fixed the City's maximum income tax rates at their current levels;[62]

---

[57]     June 14 Creditor Proposal at 52, 90 (showing state revenue sharing of $239.3 million in 2011 and projected revenue sharing between $184.3 million and $193.0 million through 2023).

[58]     <u>Id.</u> at 4.

[59]     CRC Report, at 21.

[60]     <u>Id.</u> at vi.

[61]     June 14 Creditor Proposal at 4.

[62]     MCL § 141.503(2).

(b) State law limits municipalities' property tax rates to 20 mills[63] and a constitutionally-required "Headlee rollback" further limits that rate to 19.952 mills (which is the rate charged by the City);[64] and (c) the utility users' tax and casino wagering tax are fixed at their current 5% and 10.9% levels, respectively, by the State statutes authorizing these Detroit-specific taxes.[65] See Exhibit A at 5 (comparing Detroiters' tax burden to comparable local municipalities).

### Current Levels of Municipal Services are Inadequate

31.  The severe demands on the City's financial resources have left it unable to render proper services to its citizens over a 139-square mile municipal footprint that is nearly 20% larger than that of Boston, Manhattan and San

---

[63]  MCL § 117.3 ("Each city charter shall provide for all of the following:" … (g) The annual laying and collecting taxes in a sum, except as otherwise provided by law, not to exceed 2% of the taxable value of the real and personal property in the city."); MCL § 117.5 ("(1) A city does not have power to do any of the following:  (a) To increase the rate of taxation now fixed by law, unless the authority to do so is given by a majority of the electors of the city voting at the election at which the proposition is submitted, but the increase in any case shall not be in an amount as to cause the rate to exceed 2%, except as provided by law, of the assessed value of the real and personal property in the city.").

[64]  CRC Report, at 15.

[65]  MCL § 141.1152(1) ("[t]he governing body shall set the rate of tax in increments of 1/4 of 1% that shall not exceed 5%"); MCL § 432.212(4),(6), (7) (providing for an aggregate maximum wagering tax in the amount of 10.9%).

Francisco *combined*.[66]  The City's core services (u.g., police; fire; EMS; public

lighting; transportation; parks and recreation) generally are underfunded and

inadequate.  Drastic cost-cutting actions taken over the years (as described in

further detail below) have gutted many City departments, resulting in the deferral

of many necessary investments and decreasing levels of services to Detroiters.

Indeed, departments accounted for in separate funds are not self-sufficient and rely

heavily on subsidies from the general fund (u.g., Department of Transportation

(fiscal year 2013 subsidy estimated to be $60-$70 million); Public Lighting

Department (fiscal year 2013 subsidy estimated to be $20-$30 million)).  Lack of

adequate funding further results in leadership and staff positions within City

departments often going unfilled or under-filled, in part because the compensation

offered by the City often does not allow for the hiring of top talent.

     32.   <u>High Crime Rates</u>.  During calendar year 2011, approximately

136,000 crimes were reported in the City; 15,245 of these were violent crimes

(u.g., homicide, forcible rape, robbery, aggravated assault).[67]  In 2012, ***the City's***

---

[66]    Financial Advisory Board Discussion Document, June 15, 2012, at 4.  The
combined area of Boston, Manhattan and San Francisco is 116.96 square
miles.

[67]    United States Department of Justice, Federal Bureau of Investigation,
Uniform Crime Report 2011: Master File excerpts - Return A Record Cards
for Group 1 and Group 3 cities (provided upon request by Criminal Justice
Information Services); June 14 Creditor Proposal at 9.

*violent crime rate was five times the national average and the highest of any city*

*with a population in excess of 200,000.*[68]  In 2011, the number of murders,

non-negligent manslaughters and aggravated assaults in Detroit exceeded that of

Cleveland, Pittsburgh, St. Louis and Milwaukee *combined*.[69]  See Exhibit A at 9

(comparing 2011 crime data across major categories of crime for selected national

and local municipalities).  The City's case clearance rates for violent crimes and all

crimes (18.6% and 8.7%, respectively) are substantially below that of comparable

municipalities nationally and surrounding local municipalities,[70] and the response

times of the Detroit Police Department are far in excess of comparable and

surrounding cities.[71]  See Exhibit A at 10-11 (comparing clearance rates for

comparable national municipalities and certain Michigan municipalities) and 13

---

[68]  United States Department of Justice, Federal Bureau of Investigation,
Uniform Crime Report 2011: Master File excerpts - Return A Record Cards
for Group 1 and Group 3 cities (provided upon request by Criminal Justice
Information Services); "Detroit Tops The 2012 List Of America's Most
Dangerous Cities," Forbes,
http://www.forbes.com/sites/danielfisher/2012/10/18/detroit-tops-the-2012-
list-of-americas-most-dangerous-cities/; June 14 Creditor Proposal at 9.

[69]  United States Department of Justice, Federal Bureau of Investigation,
Uniform Crime Report 2011: Master File excerpts - Return A Record Cards
for Group 1 and Group 3 cities (provided upon request by Criminal Justice
Information Services)**;** June 14 Creditor Proposal at 9.

[70]  City of Detroit, Detroit Police Department – Criminal Investigations
Division; June 14 Creditor Proposal at 10-11.

[71]  City of Detroit, Detroit Police Department – Computer Aided Dispatch
System; Federal Bureau of Investigation.

(identifying response times for the Detroit Police Department ("DPD") in 2012 and 2013). Certain business owners have taken the extraordinary step of hiring off-duty police officers and renting police cruisers to patrol certain sections of the City underserved by the DPD.[72]

33. <u>Non-Functioning Street Lights</u>. As of April 2013, about 40% of the approximately 88,000 street lights operated and maintained by the City's Public Lighting Department ("PLD") were not working, primarily due to disrepair and neglect.[73] Many outages are attributable to burned-out bulbs, but others are the result of the obsolescence of the distribution-only electrical grid maintained by the PLD.[74] The total of functioning street lights per square mile in Detroit generally is less than half that of comparable national municipalities.[75] This failure in the provision of basic municipal service – the City is literally struggling to keep the

---

[72]   http://online.wsj.com/article/
       SB10001424127887323916304578407662589454102.html (last accessed
       May 27, 2013).

[73]   June 14 Creditor Proposal at 12.

[74]   Id.

[75]   Id.; see also http://northcity.fox2now.com/content/st-louis-tests-new-street-
       lighting-option;
       http://www.lafollette.wisc.edu/publications/workshops/2009/lights.pdf;
       http://www.cmu.edu/rci/images/projects/led-updated-web-report.pdf;
       http://www.bloomberg.com/news/2012-05-24/half-of-detroit-s-streetlights-
       may-go-out-as-city-shrinks.html;
       http://www.cleveland.com/cityhall/index.ssf/2013/04/
       cleveland_public_power_to_test.html.

lights on – is compounded by the fact that many of the street lights that *are*

working do not meet the residents' actual needs.  Functioning street lights often

serve under-populated sections of the City's historical population footprint, and

there is a backlog of approximately 3,300 complaints related to the City's

lighting.[76]

    34.  <u>Blight</u>.  Perhaps no issue is as fundamental to – or emblematic

of – Detroit's decline as urban blight.  The City's long-term population decline and

falling property values have resulted in large numbers of abandoned, forfeited or

foreclosed land and structures within the City.  These decrepit eyesores

dramatically undermine Detroit's efforts to maintain public safety (as they

contribute to the proliferation of crime and arson) and contribute to declines in

property values.

    35.  There are approximately 78,000 abandoned and blighted

structures in the City (approximately 20% of the City's housing stock),[77] nearly

half of which are considered dangerous.   This number increases steadily due to

---

[76]    June 14 Creditor Proposal at 12.

[77]    Kate Linebaugh, Detroit's Population Crashes, The Wall Street Journal
        (Mar. 23, 2011), *available at*
        http://online.wsj.com/article/SB1000142405274870446130457621685073331
        51470.html; June 14 Creditor Proposal at 15.

vacancy (particularly foreclosures) and fires, among other things.[78] Approximately

60% of the 11,000 to 12,000 fires that the City has experienced each year for the

past decade occur in blighted and unoccupied buildings, forcing the Detroit Fire

Department ("DFD") to expend a disproportionate amount of time and resources

fighting fires in vacant structures.[79] Similarly, there are approximately

66,000 blighted and vacant parcels of real property within the City limits.[80]

        36.    Compounding this problem is the fact that removing blight is an

expensive, time-consuming and highly-regulated endeavor. The average cost to

demolish a residential structure (accounting for surveys and abatements, utility

disconnection costs, administrative costs and the demolition itself) is

---

[78]    As of April 2013, 16,700 structures within the City have been inspected and classified as dangerous, 14,263 have open complaints of being dangerous, 6,657 were scheduled to go before City Council for an order of demolition and 1,159 are considered "emergency demolitions." See Financial Advisory Board Discussion Document, October 8, 2012, at 57; Jillian Kay Melchior, Battling Blight in Detroit, National Review Online, March 6, 2013 (available at http://www.nationalreview.com/articles/342267/battling-blight-detroit-jillian-kay-melchior) (last accessed July 16, 2013).

[79]    Financial Advisory Board Discussion Document, November 12, 2012, at 24; Jillian Kay Melchior, Battling Blight in Detroit, National Review Online, March 6, 2013 (available at http://www.nationalreview.com/articles/342267/battling-blight-detroit-jillian-kay-melchior) (last accessed July 16, 2013); June 14 Creditor Proposal at 16.

[80]    June 14 Creditor Proposal at 16.

approximately \$8,500.[81]  The current regulatory framework – involving multiple codes and regulations and a number of jurisdictions – increases costs and slows the process.[82]

37.    Aging, Dysfunctional Infrastructure and Equipment:  Police, Fire & EMS.  Numerous City assets are in states of neglect and disrepair.  The infrastructure and equipment for the City's police, fire and EMS departments, in particular, are aged and inadequately maintained.

38.    The average age of the City's 35 fire stations is 80 years, and maintenance costs often exceed \$1 million annually.[83]  Due to lack of funding, Detroit's firefighters are often forced to make necessary repairs to the fire stations themselves.[84]  The DFD's fire apparatus fleet is plagued with mechanical issues, contains no reserve vehicles and lacks equipment ordinarily regarded as standard.[85]

---

[81]    Financial Advisory Board Discussion Document, October 8, 2012, at 61.  See also Third Quarterly Report on Demolition Projects, February 28, 2013, issued by the Michigan State Housing Development Authority in cooperation with the Department of Human Services (identifying \$8,500 as the per-structure cost for demolitions to date); June 14 Creditor Proposal at 17.

[82]    June 14 Creditor Proposal at 27.

[83]    June 14 Creditor Proposal at 18.

[84]    Financial Advisory Board Discussion Document, November 12, 2012, at 28.

[85]    Detroit Public Safety Foundation, Department Needs, http://www.detroitpublicsafetyfoundation.org/dfd-fire/department-needs/ (last visited Apr. 22, 2013).

Once staffed with 63 people and now down to 26, the DFD's Apparatus Division has a mechanic to vehicle ratio of 1 to 39, resulting in an inability to complete preventative maintenance on schedule.[86] Detroit firefighters frequently operate shorthanded due to a lack of serviceable equipment. The City has recently accepted donations towards the inspections of fire ladders on trucks and ground ladders because the City could not afford required inspections.[87] Indeed, in February 2013, Detroit Fire Commissioner Donald Austin ordered firefighters not to use hydraulic ladders on DFD ladder trucks except in cases involving an "immediate threat to life" because the ladders had not received safety inspections "for years."[88]

39. The City's EMS vehicles suffer from similar problems. During the first quarter of 2013, frequently only 10 to 14 of the City's 36 ambulances were

---

[86] Financial Advisory Board Discussion Document, November 12, 2012, at 22; June 14 Creditor Proposal at 18.

[87] Detroit Free Press, "Detroit's New Police Chief: 'I've Come Home'", May 15, 2013 (available at http://www.freep.com/article/20130515/NEWS01/305150098/; last accessed May 17, 2013). These donations fall well short of redressing the City's chronic inability to perform required maintenance.

[88] Elisha Anderson, Detroit Firefighters Ordered Off Ladders on Aerial Trucks; Fleet Hasn't Been Inspected in Years, Detroit Free Press (Feb. 4, 2013), http://www.freep.com/article/20130204/NEWS01/302040035/Detroit-firefighters-ordered-off-ladders-on-aerial-trucks-fleet-hasn-t-been-inspected-in-years; June 14 Creditor Proposal at 18.

in service.[89]  Some of the City's EMS vehicles have been driven 250,000 to

300,000 miles and break down frequently.[90]  Again, the City has been forced to

accept charitable donations to upgrade its EMS fleet.  In March 2013, a group of

corporations pledged to donate approximately $8 million to the City, a portion of

which will be used to upgrade the city's fleet of EMS vehicles.[91]  Similarly, the

DPD operates with an extremely old fleet of 1,291 vehicles, a majority of which

have reached replacement age and lack modern information technology.[92]

      40.   <u>Parks and Recreation</u>.  The number of City parks is dwindling,

and many are in poor or fair condition due to lack of funding.[93]  The City closed

210 parks during fiscal year 2009, reducing its total by 66% (from 317 to 107), and

---

[89]    Steve Neavling, Major U.S. Automakers Come to the Aid of Destitute Detroit, reuters.com (Mar. 25, 2013, 10:35 AM), http://www.reuters.com/article/2013/03/25/usa-detroit-manager-idUSL2N0CH0ED20130325; June 14 Creditor Proposal at 18.

[90]    Dave LewAllen, Businesses to Donate $8 million for Detroit Police, EMS Vehicle Fleet, wxyz.com (Mar. 25, 2013), http://www.wxyz.com/dpp/news/region/detroit/businesses-to-donate-8-million-for-detroit-police-ems-vehicle-fleet; June 14 Creditor Proposal at 29.

[91]    <u>Id.</u>; June 14 Creditor Proposal at 18.  Again, these donations are not sufficient to fund all needed upgrades to the City's vehicle fleet.

[92]    June 14 Creditor Proposal at 19.

[93]    Detroit Recreation Department Strategic Master Plan, Volume II, May 2006, at 14-15, 17, http://www.detroitmi.gov/Portals/0/docs/recreation/pdf/PDF%20files/Final%20Report/Volume%20II.pdf; Detroit Free Press, Bing to announce parks and recreation cuts, closures following collapse of Belle Isle deal, January 31, 2013; June 14 Creditor Proposal at 15.

recently announced that 50 of its remaining 107 parks would be closed, another 38 would shift to limited maintenance and the already under-served Belle Isle would receive decreased services.[94]

41.     <u>Information Technology</u>.   Nearly all of the City's departments are saddled with obsolete and non-integrated information technology ("<u>IT</u>") infrastructure and software.  The IT systems employed by the DPD and DFD: (a) are outdated to the point that vendors no longer provide full support; and (b) lack integrated solutions, resulting in redundant data entry, no meaningful reporting and limited query capabilities.[95]  DPD's IT systems, in particular, are highly manual, poorly implemented and non-integrated, resulting in highly inefficient DPD operations; the DPD has no IT systems in place *at all* for such functions as jail management, electronic ticketing and activity logs.[96]

42.     The City's payroll systems are similarly anachronistic, resulting in massive inefficiencies and excessive costs.  The City currently uses multiple, non-integrated payroll systems that are highly manual and prone to human error

---

[94]     Huffington Post, Detroit Parks Closing: Mayor Dave Bing to Abandon 50 Recreation Areas After Belle Isle Deal Collapses, February 1, 2013, available at http://www.huffingtonpost.com/2013/02/01/detroit-parks-closing-dave-bing_n_2598938.html (last accessed July 15, 2013); June 14 Creditor Proposal at 15.

[95]     City of Detroit, Detroit Police Department Information Technology – Statement of Need, April 10, 2013, at 4.

[96]     June 14 Creditor Proposal at 20.

and erroneous payments. A majority of the City's employees are on an archaic payroll system that has limited reporting capabilities and no way to clearly track, monitor or report expenditures by category.[97] Accordingly, the City's cost of payroll administration is significantly higher than for comparable entities.[98] Current cost to process payroll is $62 per check ($19.2 million per year), which is more than four times more costly than the general average of $15 per paycheck, and almost 3.5 times more costly than other public-sector organizations, which average $18 per paycheck.[99] The payroll process involves 149 full-time employees, 51 of which are uniformed officers – meaning that highly and expensively trained and high cost personnel are performing clerical duties.[100]

43. Similar IT issues handicap the City's tax collection systems. The City's highly manual income tax collection and data management systems are simply outdated (having been purchased in the mid-1990s) with little to no automation capability; in July 2012, they were characterized as "catastrophic" by the IRS.[101] The billing, processing and collection of property taxes are likewise

---

[97] Financial Advisory Board Discussion Document, July 26, 2012, at 17.

[98] Id.

[99] Id. at 18; June 14 Creditor Proposal at 20.

[100] Financial Advisory Board Discussion Document, July 26, 2012, at 18; June 14 Creditor Proposal at 20.

[101] Financial Advisory Board Discussion Document, July 26, 2012, at 21, 23; June 14 Creditor Proposal at 20.

inefficient.  Recommendations recently received from a third-party consultant designed to increase the efficiency of the City's property tax collection process have not been implemented, and the City must rely on Wayne County for funding and the collection of delinquent property taxes.[102]

44.    The City's core financial, accounting and budgeting systems similarly suffer from the lack of modern IT.  The City's financial reporting and budget development systems:  (a) are 10 to 15 years old; (b) require a manual interface (70% of journal entries are booked manually); (c) lack reliable fail-over and back-up systems; and (d) lack a formal, documented IT governance structure, all of which impairs the reporting, efficiency and accuracy of the data and the accountability of the systems.[103]  The City's grant tracking systems are fragmented and unstandardized to the extent that the City is unable to comprehensively track citywide grant funds and status or prevent disallowed costs.[104]  Aged IT infrastructure within the City's Buildings, Safety Engineering and Environmental Department ("BSEED") and the DFD leads to bottlenecks in permit invoicing and

---

[102]    Financial Advisory Board Discussion Document, August 13, 2012, at 12; Financial Advisory Board Discussion Document, October 8, 2012, at 14.

[103]    Financial Advisory Board Discussion Document, October 8, 2012, at 17, 43; June 14 Creditor Proposal at 21.

[104]    Financial Advisory Board Discussion Document, October 8, 2012 at 42; June 14 Creditor Proposal at 21.

collection.[105] Finally, to improve both service and safety, the Detroit Department of Transportation ("DDOT") requires funding for technology updates (e.g., GPS/bus cameras) both on its buses and at DDOT facilities.[106]

### Certificate of Participation Obligations & Related Swap Agreements

45.    In 2005 and 2006, the City entered into a series of financing transactions to fund the unfunded actuarial accrued liabilities ("UAAL") related to each of the Pension Systems through arranging for the issuance of certificates of participation supported by services contracts between the City and each of the General Retirement System Service Corporation and the Police and Fire Retirement System Service Corporation (together, the "Service Corporations"), i.e., specially created vehicles for each of the Pension Systems.[107]

46.    As of the end of fiscal year 2012, the aggregate outstanding amount of such certificates approximated $1.45 billion and, by series, are as follows:

- Series 2005-A in the aggregate amount of $503,365,000 bearing interest at 4.50 - 4.95% (the "2005 COPs");

---

[105]    Financial Advisory Board Discussion Document, October 8, 2012 at p. 17, 37; June 14 Creditor Proposal at 22.

[106]    Financial Advisory Board Discussion Document, October 8, 2012 at p. 27; June 14 Creditor Proposal at 22.

[107]    Comprehensive Annual Financial Report of the City of Detroit, Michigan for Fiscal Year Ended June 30, 2012 (the "2012 CAFR") at 111.

- Series 2006-A in the aggregate amount of $148,540,000 bearing interest at 5.989% (the "2006-A COPs"); and

- Series 2006-B in the aggregate amount of $800,000,000 bearing interest at a floating rate (the "2006-B COPs" and, together with the 2006-A COPs, the "2006 COPs," and the 2006 COPS together with the 2005 COPs, the "COPs").[108]

47.     Concurrently with the issuance of the 2006-B COPs, the Service Corporations entered into various pay-fixed, receive-variable interest rate swap transactions under eight separate 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) (collectively, the "Swap Contracts") with either (a) UBS AG or (b) SBS Financial Products Company LLC ("SBS" and, together with UBS AG, the "Swap Counterparties"), with Merrill Lynch Capital Services, Inc. as credit support provider to SBS, with an aggregate notional amount equal to the outstanding amount of the 2006-B COPS, or $800 million.[109]

48.     The City arranged for insurance policies to guaranty certain of the payments on the Swap Contracts with the Financial Guaranty Insurance Company ("FGIC") and Syncora Guarantee Inc., as successor to XL Capital Assurance Inc. ("Syncora" and, together with FGIC, the "Swap Insurers").[110]  For instance, with respect to the policies issued by Syncora, if the Service Corporations

---

[108]     2012 CAFR at 111; 2005 COPs Offering at cover pages.

[109]     2012 CAFR at 33; June 14 Creditor Proposal at 28.

[110]     See Swap Contracts; 2005 COPs Offering Circular at 16; 2006 COPs Offering Circular at 18.

fail to perform under the Swap Contracts, Syncora may be called upon to pay most

of the quarterly swap payment, which is no more than, and can be significantly less

than, $12.6 million.[111]  If the Swap Counterparty elects to terminate, Syncora is

either not responsible for such payments or, if such terminations are premised on

an additional termination event, then Syncora's total exposure with respect to the

Swap Contracts is capped at a predetermined limit of $27 million.[112]

        49.    As part of a 2009 restructuring of the City's swap obligations,

the City provided collateral to the Swap Counterparties for amounts owed to them

under the Swap Contracts pursuant to a Collateral Agreement dated as of

June 15, 2009 (the "Collateral Agreement"), among the City, the Service

Corporations, the Swap Counterparties and U.S. Bank National Association, as

Custodian (the "Custodian").[113]  To secure the obligations to the Swap

Counterparties, the City agreed to direct its wagering tax revenues into a lockbox

account (the "General Receipts Account") pending payment each month into a

---

[111]    See XL Capital Assurance Financial Guaranty Insurance Policy
Nos. CA03049B, CA03049C, CA03049D and CA03049E.

[112]    See XL Capital Assurance Financial Guaranty Insurance Policy
Nos. CA03049B, CA03049C, CA03049D and CA03049E.

[113]    City Ordinance No. 18-16; 2012 CAFR at 33; Custodian's Certificate
executed by U.S. Bank National Association, dated June 26, 2009.

second lockbox account (the "Holdback Account") of one-third of the quarterly payment next due to the Swap Counterparties.[114]

### Growing Budget Deficits

50.     The City has run substantial deficits (excluding financing proceeds) for the last six fiscal years of approximately $128 million (2008), $124 million (2009), $72 million (2010), $57 million (2011), $122 million (2012) and $47 million (2013).[115]  Including the effect of recent debt issuances (e.g., $75 million in fiscal year 2008; $250 million in fiscal year 2010; $129.5 million in fiscal year 2013) (the "Recent Debt Issuances"), the City's accumulated general fund deficit stood at approximately $327 million as of the end of fiscal year 2012 and $237 million as of the end of fiscal year 2013.[116]  *Excluding* the effect of the Recent Debt Issuances (which, as an accounting matter, reduce the amount of the accumulated deficit by an amount equal to the funds borrowed), the City's accumulated general fund deficit:  (a) has grown continuously over an extended period; and (b) would have been over $650 million for fiscal year 2012 and approximately $700 million for fiscal year 2013.[117]  See Exhibit A at 6 (showing the growth of the City's accumulated deficit).  Absent structural changes,

---

[114]     City Ordinance No. 18-16; 2012 CAFR at 33.

[115]     June 14 Creditor Proposal, at 52.

[116]     Quarterly Report, at 3; June 14 Creditor Proposal at 6.

[117]     June 14 Creditor Proposal at 6.

at its current run rate, the City's accumulated deficit could grow to approximately $1.3 billion by fiscal year 2017.[118]

51.     The City has funded its continuing deficits in a variety of ways, including: (a) deferral of pension contributions (resulting in larger funding deficits and requirements for additional contributions in later periods); (b) issuance of short term and long term debt; (c) deferral of trade payments; and (d) borrowing by the general fund from other funds, deferrals and cash pooling. As of June 30, 2013, the City's general fund had outstanding deferrals and amounts due to other funds and entities of approximately $274.3 million: (a) approximately $53.8 million owed to other funds; (b) approximately $77.2 million of other funds' cash held in the general fund's operating account; (c) approximately $35.3 million owed to other taxing authorities; and (d) approximately $108 million in deferred pension contributions owing for the current and prior fiscal years.

**Insolvency**

52.     As a result of the City's recurring operating deficits, the City has continued to experience liquidity problems as it has depleted all cash reserves. For years, the City's cash shortfalls have been addressed through the issuance of short term and long term debt. As noted above, the City's Recent Debt Issuances

---

[118]     <u>Id.</u> at 91.

provided the City with approximately $460 million in proceeds.[119]  To avoid

running out of cash, in March 2012, the City borrowed $80 million on a short term,

secured basis (of which the City spent $50 million in fiscal year 2012).[120]  More

recently, the shortfalls have been addressed with deferrals of payments on current

obligations, wage cuts, employee furloughs/layoffs, cash pooling, borrowings from

other City funds and other working capital tactics.

53.     Further, the City's ability to access the credit markets to satisfy

its cash needs is compromised by its plummeting credit ratings.  The City's credit

ratings have reached historic lows and currently are below investment grade.  No

major U.S. city has a lower credit rating than Detroit.[121]  As of June 17, 2013, S&P

and Moody's had lowered Detroit's credit ratings to CC and Caa3, respectively.[122]

54.     <u>Debt Service Requirements</u>.  Debt service for the City's general

fund related to limited tax and unlimited tax GO debt and the COPs was

$225.3 million for fiscal year 2012, and is projected to exceed $247 million in

---

[119]     <u>Id.</u> at 6.

[120]     <u>Id.</u> at 7.

[121]     <u>Id.</u> at 8.

[122]     <u>See</u> Press Release, Standard & Poor's, "Detroit GO Debt Rating Lowered to
'CC' from 'CCC-' on Announced Cessation of Debt Service Payments"
(June 14, 2013); Press Release, Moody's, "Rating Action:  Moody's
Downgrades Detroit's GOULT Rating to Caa3" (June 17, 2013).

fiscal year 2013.[123]  Payments related to the COPs are forecast to increase substantially over the next two years due to a back-loaded amortization schedule. As set forth in the following chart, when combined with retiree legacy obligations, these obligations consumed over 38% of revenues in fiscal year 2012 and are projected to increase to 65% of revenues by 2017 if not stemmed.

| ($ in millions) | Fiscal year ended actual | | | | | Preliminary forecast | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| **Legacy expenditures** | | | | | | | | | | |
| Debt service (LTGO) | $ (66.6) | $ (106.2) | $ (63.5) | $ (64.5) | $ (62.6) | $ (70.8) | $ (70.9) | $ (61.8) | $ (61.8) | $ (38.5) |
| Debt service (UTGO) | (67.2) | (71.5) | (72.4) | (72.8) | (73.0) | (70.6) | (64.9) | (62.5) | (57.6) | (57.6) |
| POC - principal and interest (GF) | (24.6) | (20.9) | (23.6) | (33.5) | (33.0) | (46.8) | (51.4) | (53.3) | (55.0) | (56.9) |
| POC - principal and interest (EF, excl. DDOT) | (1.8) | (1.4) | (1.5) | (1.8) | (2.0) | (5.3) | (5.9) | (6.1) | (6.4) | (6.6) |
| POC - principal and interest (DDOT) | (3.5) | (2.8) | (3.0) | (3.6) | (4.0) | (3.3) | (3.7) | (3.8) | (3.9) | (4.1) |
| POC - swaps (GF) | (38.6) | (43.9) | (44.7) | (44.7) | (44.8) | (42.9) | (42.8) | (42.8) | (42.7) | (42.7) |
| POC - swaps (EF, excl. DDOT) | (2.3) | (2.0) | (2.0) | (2.0) | (2.0) | (4.8) | (4.8) | (4.8) | (4.9) | (4.9) |
| POC - swaps (DDOT) | (4.5) | (4.0) | (4.0) | (4.0) | (4.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) |
| Pension contributions - Public Safety | (58.9) | (31.4) | (32.8) | (81.6) | (49.8) | (46.1) | (139.0) | (163.0) | (180.0) | (198.0) |
| Pension contributions - Non-Public Safety | (10.6) | (27.0) | (11.1) | (28.3) | (25.4) | (19.9) | (36.9) | (42.5) | (47.7) | (53.1) |
| Pension contributions - DDOT | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (12.3) | (23.6) | (27.7) | (31.2) | (34.8) |
| Health benefits - retiree - Public Safety | (73.7) | (80.2) | (70.4) | (79.6) | (90.6) | (91.5) | (88.6) | (95.2) | (101.7) | (108.0) |
| Health benefits - retiree - Non-Public Safety | (47.4) | (51.6) | (50.6) | (49.0) | (49.2) | (49.7) | (38.8) | (41.5) | (44.6) | (47.7) |
| Health benefits - retiree - DDOT | (8.2) | (11.8) | (11.2) | (11.1) | (10.3) | (10.4) | (13.3) | (14.3) | (15.3) | (16.3) |
| **Total legacy expenditures** | $ (414.6) | $ (462.0) | $ (397.9) | $ (486.1) | $ (461.6) | $ (477.3) | $ (587.6) | $ (622.4) | $ (655.9) | $ (672.3) |
| **Total revenues (excl. financing proceeds)** | $ 1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 |
| **Total legacy expenditures as a % of total revenues** | 29.7% | 33.9% | 30.8% | 36.9% | 38.6% | 42.5% | 54.3% | 59.5% | 63.0% | 64.6% |

See also Exhibit A at p. 52 (chart summarizing growth over time, and projected levels, of legacy liabilities).

---

[123]    June 14 Creditor Proposal at 52; Quarterly Report at Appendix B.

55.     Going forward, amounts required to service legacy liabilities are expected to more than double.[124]  Required pension contributions are projected to increase in light of:  (a) an increasingly mature population already in pension pay status; (b) the anticipated revision of aggressive and unrealistic actuarial assumptions used in the past; (c) updated actuarial calculations; and (d) past deferrals of contributions.[125]

56.     Negative Cash Flow.  The City had negative cash flows of $115.5 million in fiscal year 2012.[126]  The City's preliminary estimates show positive cash flows of $31.5 million (excluding the impact of borrowings) for fiscal year 2013, but only as a result of, among other things, the deferral of nearly $108 million in pension contributions and the City's recent decision, on June 14, 2013, not to make $39.7 million in payments due and owing to the Service Corporations.[127]  As of June 30, 2013, the City had only $36 million in cash on hand (net of accumulated property tax distributions), but had outstanding deferrals (including the $108 million in deferred pension contributions referenced

---

[124]     June 14 Creditor Proposal at 52.

[125]     Id.

[126]     Id. at 7.

[127]     Quarterly Report at Appendix A**.**

above) and amounts due to other funds and entities of approximately $274.3 million.[128]

57.     Absent restructuring, the City is projecting cash flows of negative $198.5 million in the current 2014 fiscal year and negative $260.4 million in fiscal year 2015.[129]  This cash depletion would leave the City in a net cash position (after required property tax distributions) of negative $11.6 million as early as December 2013.[130]  In the absence of restructuring, the City's net negative cash position (after required property tax distributions) will continue its downward spiral, reaching negative $143.3 million as of the end of the current 2014 fiscal year and negative $404.5 million as of the end of fiscal year 2015.[131]  Accordingly, the City (a) is not paying its debts as they come due and (b) is unlikely to be able to service its debts in the foreseeable future.  The City is insolvent.

**Measures Taken by the City to Address Financial Challenges**

58.     The City already has taken numerous steps prior to commencing this chapter 9 case to improve its financial position, including the adoption of various measures to reduce expenses and increase revenues.  These initiatives save the City an estimated $200 million per year, but they also impose

---

[128]     Quarterly Report at 2, Appendix A.

[129]     June 14 Creditor Proposal at 50; Malhotra Declaration, at 21.

[130]     Quarterly Report at 3.

[131]     June 14 Creditor Proposal at 50; Malhotra Declaration, at 22.

substantial burdens on the City's workforce and residents.  The following paragraphs provide detail with respect to certain of the key actions taken by the City to alleviate its liquidity pressures and redress its lopsided balance sheet in the period leading up to the commencement of this chapter 9 case.

59.     Execution of Consent Agreement/Creation of Financial Advisory Board.  On December 6, 2011, the Michigan Department of the Treasury (the "Treasury") initiated a preliminary review of the City's financial condition pursuant to former Public Act 4 of 2011 of the State of Michigan, also known as the "Local Government and School District Fiscal Accountability Act," MCL §§ 141.1501-1531 ("PA 4").  On December 21, 2011, having completed its preliminary review, the Treasury reported to the Governor of the State of Michigan (the "Governor") that "probable financial stress" existed in Detroit and recommended the appointment of a "Financial Review Team" pursuant to PA 4. See Treasury Report on Financial Condition of Detroit (the "2011 Treasury Report"), at 1 (copy attached hereto as Exhibit C and incorporated herein by reference).

60.     The Treasury's finding of "probable financial stress" was based upon the following considerations (among others):

- Violation of Uniform Budget and Accounting Act.  Detroit arguably had violated Section 17 of the Uniform Budget and Accounting Act (Public Act 2 of 1968 of the State of Michigan) by failing to amend the City's general appropriations act when it became apparent that various line

items in the City's budget for fiscal year 2010 exceeded appropriations by an aggregate of nearly $58 million (and that unaudited fiscal year 2011 figures indicated that expenditures would exceed appropriations by $97 million).  Id. at 1-2.

- Inadequate Deficit Elimination Efforts.  City officials did not file an adequate or approved "deficit elimination plan" with the Treasury for fiscal year 2010.  The Treasury found that the City's recent efforts at deficit reduction had been "unrealistic" and that "[c]ity officials either had been incapable or unwilling to manage the finances of the City."  Id. at 2.

- Mounting Debt Problems.  The City had a "mounting debt problem" with debt service requirements exceeding $597 million in 2010 and long term debt exceeding $8 billion as of June 2011 (excluding the City's then-estimated $615 million in unfunded actuarial pension liabilities, $4.9 billion in OPEB liability and other "discretely presented component" debt).  The ratio of the City's total long term debt to total net assets for 2010 was 32.64 to 1.  Id. at 3-4.

- Risk of Termination Payment Under Swap Contracts.  The Treasury identified a significant risk that the City would become subject to a demand for a termination payment (estimated at the time to be in the range of $280 million to $400 million) under its Swap Contracts.  Id. at 4-5.

- Falling Credit Ratings.  The City's long term bond rating had fallen below the BBB category and was considered "junk," speculative or highly speculative.  Id. at 5.

- Cash Flow Shortages.  The City was experiencing significant cash flow shortages.  The City projected that its cash balance of $96.1 million as of October 28, 2011 (which was nearly $20 million lower than the City's previous estimates) would be quickly eroded and that the City would experience a cash shortage of $1.6 million in April 2012 and would end fiscal year 2012 with a cash shortfall of $44.1 million absent remedial action.  Id.

61.     On March 26, 2012, the Financial Review Team appointed by

the Governor pursuant to PA 4 submitted its report to the Governor, finding that

"the City of Detroit is in a condition of severe financial stress … and that a consent agreement has not been adopted [pursuant to PA 4]." See Financial Review Team Report on Financial Condition of Detroit (the "2012 Financial Review Team Report"), at 1 (attached hereto as Exhibit D and incorporated herein by reference).

62.   The Financial Review Team's finding of "severe financial stress" was based upon the following considerations (among others):

- Increasing Budget Deficit. Owing primarily to transfers to other funds, the City's cumulative general fund deficit for fiscal year 2011 had increased from $91 million to $148 million and the City had not experienced a positive year-end fund balance since 2004. The City was predicting a $270 million general fund deficit for fiscal year 2012. Id. at 7.

- Variances from Budgets. Audits for the City's previous nine fiscal years reflected significant variances between budgeted and actual revenues and expenditures, owing primarily to the City's admitted practice of knowingly overestimating revenues and underestimating expenditures. Id. at 7-9.

- Cash Crisis. The City was continuing to experience significant cash depletion. The City had proposed adjustments to collective bargaining agreements ("CBAs") to save $102 million in fiscal year 2012 and $258 million in fiscal year 2013, but the tentative CBAs negotiated as of the date of the report were projected to yield savings of only $219 million. Id. at 9-10.

- Debt Downgrades. The City's existing debt had suffered significant downgrades. Id. at 10.

- Failure to File Adequate Deficit Elimination Plans. The City had not filed adequate or approvable deficit elimination plans for the 2010 or 2011 fiscal years. Id. at 12.

63.     Contemporaneously with the investigation and review of

Detroit's financial condition by the Financial Review Team, in early 2012, the City

and the State of Michigan negotiated a "Financial Stability Agreement"

(the "Consent Agreement") in an effort to achieve:  (a) financial stability for the

City; and (b) a stable platform for the City's future growth.  The City Council

approved the Consent Agreement on April 4, 2012.  The Consent Agreement

subsequently was executed by the Mayor, the members of the Financial Review

Team, the Treasurer of the State of Michigan (the "Treasurer") and the Governor as

of April 5, 2012.  See Exhibit E attached hereto and incorporated herein by

reference (copy of the Consent Agreement).  Having negotiated and executed a

"consent agreement" within the meaning of PA 4, no emergency manager was

appointed for the City despite the Financial Review Team's finding of "severe

financial stress."

64.     The Consent Agreement created a "Financial Advisory Board"

(the "FAB") of nine members selected by the Governor, the Treasurer, the Mayor

and City Council.[132]  The Consent Agreement granted the FAB an oversight role

and limited powers over certain City reform and budget activities.[133]  The FAB has

held, and continues to hold, regular public meetings and to exercise its oversight

---

[132]     Consent Agreement, at §§ 1.1; 1.2.

[133]     Id. at § 1.5.

functions consistent with the Consent Agreement.  To implement the reform efforts set forth in the Consent Agreement,[134] the positions of "Chief Financial Officer" and "Program Management Director" were established, each reporting to the Mayor.[135]

65.    Employee Headcount Reductions.  Since 2010, the City has reduced its employee headcount by more than 2,700 (from 12,302 employees as of the close of fiscal year 2010 to approximately 9,591 as of June 30, 2013).[136]  The City estimates that its headcount reductions have resulted in annual savings of over $100 million.[137]

66.    Reductions of Labor Costs Through Implementation of CETs. On July 12, 2012, the Financial Advisory Board approved the CETs[138] for: (a) employees in unions with expired CBAs; and (b) non-union employees, effective as of July 17, 2012.  Among other things, the CETs provide for:  (a) wage

---

[134]    Specific reform efforts are identified on Annex D to the Consent Agreement.

[135]    Consent Agreement, at §§ 2.2; 2.3.

[136]    June 14 Creditor Proposal at 53; Quarterly Report at 3.

[137]    Id.

[138]    The CETs were imposed on union employees with expired CBAs pursuant to the Consent Agreement between the City and State.  Then-in-effect PA 4 suspended the City's obligation to engage in collective bargaining upon entry of the Consent Agreement.  CBAs for approximately 80% of union employees expired as of June 30, 2012; the remaining CBAs were expired as of June 13, 2013.

reductions (implemented through the imposition of furlough days);

(b) caps/reductions on vacation/holiday pay/overtime/sick days; (c) the reduction

of pension multipliers; and (d) changes to healthcare coverage.  The City estimates

that implementation of the CETs has resulted in $102 million in annual savings

($25 million in savings attributable to wage reductions; $59 million in savings

attributable to reduced active and retiree benefits; $9 million in savings attributable

to reduced pension costs; $8 million in savings attributable to changes to work

rules).[139]

      67.    <u>Increased Corporate Tax Rate</u>.  In January 2012, the City's

corporate income tax rate was raised to 2.0% from 1.0%.  This increased rate was

projected to generate an estimated $6 million in additional annual revenue for the

City.[140]

      68.    <u>Enhanced Tax Collection Initiatives</u>.  The City has

implemented – and continues to implement – initiatives designed to:  (a) improve

collection of past due taxes; and (b) enhance collection efforts on a prospective

basis.  These efforts to enhance collection of taxes are expected to generate an

estimated $13 million in additional annual revenue for the City.[141]

---

[139]    June 14 Creditor Proposal at 53.

[140]    <u>Id.</u> at 54.

[141]    <u>Id.</u>

69.     Increased Lighting Rates.  In January 2013, the PLD increased its rates to more closely align with market rates and eliminate the practice of charging customers less for power than the City itself was paying.  Increased PLD rates are expected to generate an estimated $9 million in additional annual revenue for the City.[142]

70.     Reductions in Vendor Costs.  The City currently is implementing an initiative to reduce its vendor related costs by 10%.  Reductions in vendor costs are expected to save the City an estimated $10 million annually.[143]

71.     Reduction in Subsidy to DDOT.  In 2012, the City undertook steps to improve the efficiency of DDOT (e.g., through route rationalization), thereby reducing the subsidy from the City's general fund to the DDOT enterprise fund by approximately $15 million annually.[144]

72.     Deferred Capital Expenditures.  The City has deferred capital expenditures on a number of its assets (notably its public lighting and its water and sewer system).  Compare the City's average aggregate capital outlays for the last five fiscal years 2008 – 2012 ($82.98 million) with the significantly larger average

---

[142]    Id.

[143]    Id.

[144]    Id.

aggregate capital outlays for the five fiscal years preceding that period (2003 to 2007; $151.94 million).[145]

73. <u>Demolition Initiatives</u>. In April 2010, the City launched a program to take initial steps towards addressing the critical issue of urban blight within the City limits.[146] This program had the goal of demolishing 10,000 vacant structures (<u>i.e.</u>, approximately 13% of the vacant structures within the City and 26% of such buildings classified as dangerous) within three years.[147] Over 5,000 structures have been demolished, but the City lacks sufficient funding to complete the project by its target date of December 2013.[148] The City has also commenced an ancillary demolition initiative in partnership with the State of Michigan, pursuant to which $10 million has been allocated to the targeted demolition of 1,234 structures located in the vicinity of schools.[149] As of February 28, 2013, 179 structures had been demolished pursuant to this ancillary initiative (and another 56 were under contract to be demolished).[150]

---

[145] 2012 CAFR, at 194-95; June 14 Creditor Proposal at 55.

[146] June 14 Creditor Proposal at 55.

[147] <u>Id.</u>

[148] <u>Id.</u>

[149] <u>Id.</u>

[150] <u>Id.</u>

## Appointment of the Emergency Manager

74.     In 1990, the Michigan Legislature enacted PA 72, which empowered the State to intervene with respect to municipalities facing financial crisis through the appointment of an emergency manager who, once appointed, would assume many of the powers ordinarily held by local elected officials. Effective March 16, 2011, the Legislature repealed PA 72 and enacted PA 4. Thereafter, Michigan voters rejected PA 4 by referendum on November 5, 2012, which rejection automatically revived PA 72.

75.     On December 11, 2012, because of the City's diminishing liquidity, the FAB requested that the State initiate a preliminary review of the City's financial condition pursuant to PA 72.  The Treasury reported to the Governor on December 14, 2012 that, based on its preliminary review, a "serious financial problem" existed within the City.  See Treasury Report on Financial Condition of Detroit (the "2012 Treasury Report"), at 1 (copy attached hereto as Exhibit F and incorporated herein by reference).

76.     On December 18, 2012, pursuant to PA 72, the Governor appointed another Financial Review Team to review the City's financial condition. On February 19, 2013, the Financial Review Team submitted its report to the Governor, concluding "in accordance with [PA 72], that a local government financial emergency exists with the City of Detroit because no satisfactory plan

exists to resolve a serious financial problem." <u>See</u> Financial Review Team Report

on Financial Condition of Detroit (together with "Supplemental Documentation of

the Detroit Financial Review Team," also dated February 19, 2013,

the "<u>2013 Financial Review Team Report</u>"), at 1 (attached hereto as <u>Exhibit G</u> and

incorporated herein by reference).

77.    The Financial Review Team's finding of a "local government

financial emergency" was based primarily upon the following considerations:

- <u>Cash Crisis</u>:  The City continued to experience a significant depletion of its cash, with a projected $100 million cumulative cash deficit as of June 30, 2013.  Cost-cutting measures undertaken by the Mayor and City Council were characterized as too heavily weighted to one-time savings and non-union personnel.  <u>Id.</u>

- <u>General Fund Deficits</u>.  The City's cumulative general fund deficit had not experienced a positive year-end fund balance since 2004 and stood at $326.6 million as of June 30, 2012.  If the City had not issued substantial debt to reduce the cumulative fund balance over the last ten years, the accumulated general fund deficit would have been $936.8 million for fiscal year 2012.  <u>Id.</u> at 2.

- <u>Long-Term Liabilities</u>.  The City's long-term liabilities exceeded $14 billion as of June 30, 2013, with approximately $1.9 billion coming due over the next five years.  The City had not devised a satisfactory plan to address these liabilities.  <u>Id.</u>

- <u>Bureaucratic Structure</u>.  The City Charter contains numerous restrictions and structural details that make it extremely difficult to restructure the City's operations in a meaningful or timely manner.  <u>Id.</u>

- <u>Variances from Budgets</u>.  Audits for the City's last six fiscal years reflected significant variances between budgeted and actual revenues and expenditures, owing primarily to the City's admitted practice of

knowingly overestimating revenues and underestimating expenditures. Id. at pages 5 and 6 of Supplemental Documentation.

- Weaknesses in Internal Controls. The management letter accompanying the City's fiscal year 2012 financial audit report identified numerous material weaknesses and significant deficiencies in the City's financial and accounting operations. Id. at Attachment 1 to Supplemental Documentation.

78.    On March 1, 2013, in response to the 2013 Financial Review Team Report, the Governor announced his determination that a "financial emergency" existed within the City. See Exhibit H at 1 (Governor's determination of financial emergency, incorporated herein by reference). After a public hearing to consider the City Council's appeal of the Governor's determination, on March 14, 2013, the Governor confirmed his determination of a "financial emergency" within the City and requested that the LEFALB appoint an emergency manager pursuant to PA 72. I was appointed as the emergency financial manager by the LEFALB on March 14, 2013 and formally took office on March 25, 2013. On March 28, 2013, upon the effectiveness of PA 436, I became the Emergency Manager under PA 436.

## Proposed Financial & Operational Restructuring

79.    Immediately upon my appointment as Emergency Manager, I began to focus on developing a comprehensive restructuring plan to: (a) ensure that the City is able to provide or procure governmental services essential to the public health, safety and welfare of its citizens; (b) assure the fiscal accountability

13-53846    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 56 of 88

and stability of the City; and (c) promote investment in the City and revitalization of the community in a sustainable fashion.  In tandem with my advisors, I have developed such a restructuring proposal, which is reflected in the June 14 Creditor Proposal.

80.     On June 14, 2013 (i.e., less than three months after formally assuming the position of Emergency Manager), at a meeting in the Detroit area, I presented the June 14 Creditor Proposal to approximately 150 invited representatives of the City's creditors, including representatives of:  (a) all of the City's funded debt; (b) the insurers of such debt; (c) all of the City's unions; (d) certain retiree associations; (e) the Pension Systems; and (f) many individual bondholders.

81.     At this meeting, my advisors and I presented the Executive Summary and attendees received the full proposal as they exited.  I also caused the full proposal and the Executive Summary to be posted publicly on the City's website the same day.[151]  The meeting lasted approximately two hours, and my advisors and I answered all questions posed by attendees.  At the conclusion of the meeting, we invited all creditor representatives to meet and engage in a dialogue with the City representatives regarding the proposal.  I indicated that I would

---

[151]    http://www.detroitmi.gov/Portals/0/docs/EM/Reports/City%20of%20 Detroit%20Proposal%20for%20Creditors1.pdf

welcome proposed modifications and alternative ideas consistent with the City's: (a) urgent need for reinvestment to improve essential City services; and (b) current and projected cash flows.[152]

82.    In addition to describing the economic circumstances and headwinds that resulted in Detroit's current financial condition, the 128-page June 14 Creditor Proposal described a thorough overhaul and restructuring of the City's operations, finances and capital structure, as well as proposed recoveries for each creditor group.

83.    Among other things, the June 14 Creditor Proposal included and/or identified:

- the City's plans to achieve a sustainable restructuring through investing over $1.25 billion over ten years to improve basic and essential City services to citizens, including: (a) substantial investment in, and/or the restructuring of, various City departments (e.g., DPD; DFD/EMS; DDOT; the Assessor's office/property tax division; BSEED; and the 36th District Court); (b) substantial investment in the City's blight removal efforts; (c) the transition of the City's electricity transmission business to an alternative provider; (d) the implementation of a population-based streetlight footprint and the outsourcing of lighting operations to the newly-created Public Lighting Authority; (e) substantial investments in upgraded information technology for police, fire, EMS, transportation, payroll, grant management, tax collection, budgeting and accounting and the City's court system; (f) a comprehensive review of the

---

[152]    At the City's meeting with creditors on June 14, 2013, the City also announced its decision:  (a) not to make the scheduled $39.7 million payments due to certain pension related service corporations; and (b) to impose a moratorium on principal and interest payments related to unsecured debt.

City's leases and contracts; and (g) a proposed overhaul of the City's labor costs and related work rules (see June 14 Creditor Proposal, at 61-78);

- the City's intention to expand its income and property tax bases, rationalize and adjust its nominal tax rates and various initiatives to improve and enhance its tax and fee collection efforts (see June 14 Creditor Proposal, at pp. 79-82);

- the City's intention to potentially realize value from the Detroit Water and Sewer Department ("DWSD") through the creation of a new metropolitan area water and sewer authority that will conduct the operations currently conducted by the DWSD pursuant to the City's concession or lease of the DWSD's assets in exchange for a recurring (and unrestricted) payment in lieu of taxes, lease payment or other form of payment (the "Proposed DWSD Transaction") (see June 14 Creditor Proposal, at pp. 83-86);

- the potential realization of value from City-owned assets currently exhibited and/or housed at the Detroit Institute of Arts (see June 14 Creditor Proposal, at pp. 88);[153]

---

[153] The City has made no decisions regarding the treatment of any particular asset. The City's intentions with respect to the City-owned assets exhibited and/or stored at the Detroit Institute of Arts and managed by the non-profit DIA Corporation has generated a significant amount of controversy and media attention. The Attorney General for the State of Michigan has issued a formal opinion expressing his belief that such assets are held in a public trust for the benefit of the City's residents. The City's creditor constituencies have expressed contrary views, taking the position that all non-essential City assets should be made available for their recoveries. The City reiterates its intention (previously expressed in the June 14 Creditor Proposal) to continue to: (a) engage all interested parties in dialogue regarding the City-owned art collection; (b) attempt to reconcile the competing positions expressed by such parties; and (c) reach a resolution with respect to such assets that will maximize the long term benefits to the City and the prospects for a successful restructuring.

- the City's commitment to evaluate what value may be realized from other City assets (<u>e.g.</u>, City-owned real property; municipal parking operations; the Detroit-Windsor Tunnel; and Belle Isle Park) (<u>see</u> June 14 Creditor Proposal, at pp. 87-89);

- the City's projected financial statements over a ten-year period and the assumptions underlying those projections (<u>see</u> June 14 Creditor Proposal, at pp. 90-100); and

- the City's actual and forecasted cash flows for the 2013 and 2014 fiscal years in the absence of restructuring (<u>see</u> June 14 Creditor Proposal, at pp. 49-50).

84.     The June 14 Creditor Proposal further suggested the City's good faith view of stakeholders' recoveries upon their various claims based upon the City's actual and projected financial condition.  The City proposed:  (a) treatment of secured debt commensurate with the value of the collateral securing such debt, including the repayment or refinancing of its Revenue Bonds, secured unlimited and limited tax GO bonds, secured installment notes and liabilities arising in connection with the Swap Obligations; and (b) the *pro rata* distribution of $2 billion in principal amount of interest-only, limited recourse participation notes to holders of unsecured claims (<u>i.e.</u>, holders of unsecured unlimited and limited tax GO bonds; the Service Corporations (on account of the COPs); the Pension Systems (in account of pension underfunding); retirees (on account of OPEB benefits); miscellaneous other unsecured claimants) with the potential for amortization of the principal of such notes in the event that, <u>e.g.</u>, future City

revenues exceeded certain thresholds, certain assets were monetized and/or certain grants were received.  See June 14 Creditor Proposal, at pp. 101-109.

85.     Having provided the facts and strategies contained in the presentation to its creditor body *en masse*, the City followed up with individual meetings with attendees during the period between June 14, 2013 and the commencement of this case.  At these meetings, further data and legal viewpoints were exchanged and many questions were answered; however, no meaningful progress toward a comprehensive resolution of the City's obligations occurred. Importantly, following the June 14 presentation, the City:  (a) sought a resolution of various issues related to its pension-related Swap Contracts through extensive negotiations with the Swap Counterparties thereto and the insurers of the Swap Obligations; and (b) held several follow-up meetings with various creditor representatives.

86.     Negotiations with Swap Counterparties/Insurers.  In March 2012, the City suffered ratings downgrades with respect to its unlimited tax GO bonds, which again gave rise to the risk that the Swap Counterparties could terminate the Swap Contracts and seek a termination payment from the City. As reported in the 2012 CAFR, the City commenced negotiations with the Swap Counterparties to resolve issues arising in connection with the credit rating downgrade.

87.     Following my appointment, discussions with the Swap Counterparties intensified to find a resolution that would enable the City to exit the Swap Contracts with no impact on the Swap Insurers and assure the City continued access to the wagering tax revenues.  The negotiations included:  (a) several in-person and telephonic meetings among the City, Swap Counterparties and their respective advisors; (b) the exchange of various economic offers between the parties; and (c) the generation of numerous draft agreements memorializing such offers.

88.     Despite the significant time and effort devoted to reaching a resolution that would permit the City access to the wagering tax revenues, following the assertion of alleged rights by Syncora, the City's access to funds was blocked, and the negotiations with the Swap Counterparties stalled.  Accordingly, the City acted to protect its interests and preserve its access to its wagering tax revenues – a critical funding source for the City – by commencing litigation against Syncora (among others) in the Circuit Court for Wayne County, Michigan to seek:  (a) the release of revenues held by U.S. Bank as custodian; and (b) the recovery of damages suffered by the City due to Syncora's interference with its banking relationships.  In connection with that proceeding, I submitted an affidavit in support of the City's Verified Complaint for Declaratory and Injunctive Relief, which contains additional factual background concerning the Swap Contracts,

Collateral Agreement and related matters.  On July 5, 2013, the City obtained a

temporary restraining order against Syncora and U.S. Bank, thus temporarily

preserving its access to wagering tax revenues.

89.     Following those activities, the City was able to make timely

payment on the Swap Obligations, making the required deposit into the Holdback

Account and triggering the release of wagering tax revenues to the City.

Concurrently, the City was able to restart negotiations with the Swap

Counterparties.  Negotiations culminated in the Forbearance and Optional

Termination Agreement, dated as of July 15, 2013, by and among the City, the

Swap Counterparties and the Service Corporations, which agreement is the subject

of a motion, filed contemporaneously with this Declaration, seeking approval to

assume such agreement and compromise the issues regarding the validity and

enforceability of the pledge and lockbox arrangements with respect to the wagering

tax revenues.

90.     <u>Meetings with Respect to Employee Legacy Obligations</u>.  Both

prior to and after my appointment, many of the City's financial and legal advisors

have been analyzing the City's retiree healthcare and pension obligations.  These

advisors have been developing ideas for restructured programs that would preserve

healthcare and retirement benefits for retirees, to the extent feasible, in a structure

that the City will be able to afford in light of its projected cash flows and other critical needs over the next decade.

91.     On June 20, 2013, certain of these advisors met in Detroit with representatives of all of the City's unions and four retiree associations.  These meetings were conducted in discrete morning and afternoon sessions (addressing "non-uniformed" and "uniformed" personnel/retirees, respectively) at which the City:  (a) presented a more in-depth look at its analysis of its retiree health and pension obligations; and (b) suggested proposals for the modification thereof that the City could fund within its means going forward.  Representatives and advisors of the Pension Systems attended both meetings.

92.     Approximately 100 union and retiree representatives attended the two-hour morning session for non-uniformed employees and retirees.  Questions were solicited, and the City's advisors answered as many of them as could be answered before the meeting time concluded.  Approximately 35 union and retiree representatives attended the afternoon session for uniformed employees and retirees, which lasted approximately 90 minutes.  Questions were solicited, and the City's advisors answered all questions posed.  The City provided handouts of the presentations at both meetings and, after the meetings, posted such presentations in the Data Room (as such term is defined below) that the City has

established as a repository for information that creditors may find relevant in their evaluation of the City's proposals.

93.    Both at the beginning and at the conclusion of each meeting, the City's advisors stressed that the City welcomed the unions' and retirees' views. Because the modifications proposed by the City are dramatic (albeit necessary), the City clearly expressed its desire to engage in a dialogue regarding the unions' and the retirees' preferred approach to address the required changes that are expected to be severely dislocating for retirees.

94.    Understandably, the employees' and retirees' reactions to these meetings were less than enthusiastic; there were expressions of distress and, in some cases, anger.[154] Certain union representatives publicly called for litigation and swore that they would not countenance discussions over proposals to modify either retiree healthcare or pensions.[155] Others took a more constructive

---

[154]    See, e.g., See, e.g., <u>Detroit Free Press</u>, "Kevyn Orr orders corruption probe of pensions, benefits; unions vow fight against cuts," June 20, 2013 (quoting a district clerk for the City's Department of Public Works and a member of the Association of City of Detroit Supervisors; "That was the biggest crock of crap I've ever heard in my life.  They're talking about freezing our pensions.  I just feel like crying."); <u>Bloomberg News</u>, "Detroit Manager Outlines Pension-Cut Plans for Workers," June 21, 2013 (quoting union official:  "People are angry because it's the same old horse crap - it's their way or the highway.").

[155]    See, e.g., <u>Detroit Free Press</u>, "Kevyn Orr orders corruption probe of pensions, benefits; unions vow fight against cuts," June 20, 2013 (quoting the president of Amalgamated Transit Union Local 26: "We'll fight you in

approach.[156]  On June 27, 2013, the City's advisors contacted all union

representatives that had attended any prior presentations by, or meetings with, the

City and/or its advisors to invite additional requests for information and diligence

from such parties.

95.    On July 10, 2013, the City and certain of its advisors held

separate meetings with:  (a) representatives and advisors of the GRS, as well as

representatives and counsel for certain non-uniformed unions and retiree

associations; and (b) representatives and advisors of the PFRS, as well as

representatives and counsel for certain uniformed unions and retiree associations.

Each meeting lasted approximately two hours.  The purposes of each meeting were

to:  (a) provide additional information on the City's pension restructuring proposal;

and (b) discuss a process for reaching a consensual agreement on (i) pension

---

court.  We'll probably stand a better chance, because one thing about a
bankruptcy judge, he's not going to feed into all this nonsense stuff…. If
you're going to come, you're going to have to come correct in bankruptcy
court"; quoting union official:  "This is not a bargaining session.  We're not
bargaining with them at this point.  They really didn't have a legitimate
proposal.").

[156]   See, e.g., Bloomberg News, "Detroit Manager Outlines Pension-Cut Plans
for Workers," June 21, 2013 (quoting the President of the Detroit Fire
Fighters Association:  "We have to go back and deliberate and come back
with some form of unified response.  This is reality, we're trying to find the
best way, if possible, to work together and come to a solution for the city.").

underfunding issues and (ii) the treatment of any related claims.[157]  At each

meeting, the parties generally discussed:  (a) the actuarial assumptions underlying

the Pension Systems' claims related to underfunding (and that will be used for

funding purposes going forward); (b) the City's prospective ability to make

contributions to the Pension Systems; and (c) adjustments to pension benefit design

necessary to reduce liabilities, and consequent underfunding, to a level that will

allow the City to fund the Pension Systems going forward.

96.    On July 11, 2013, the City and its advisors held separate

follow-up meetings with representatives and advisors for:  (a) select non-uniform

unions and retiree associations and the GRS; and (b) certain uniformed unions and

retiree associations and the PFRS to discuss retiree health issues.  At each of these

meetings, the City's advisors reviewed the proposals for the modification of retiree

health benefits that previously had been presented and discussed at the prior

---

[157]    In light of certain lawsuits recently filed against the Governor and the
Treasurer in which the City has an interest (described in further detail at
paragraph 109 below), the City requested, at each meeting, that any
statements made during the respective meetings, and the conduct of the
parties at such meetings, not be introduced in any court proceeding in
accordance with Rule 408 of the Federal Rules of Evidence ("FRE") and
Rule 408 of the Michigan Rules of Evidence ("MRE").  Representatives of
the United Auto Workers and its counsel – who attended the City's meeting
with the GRS – refused to comply with this request and were asked to, and
did, leave that meeting.  All other attendees at each meeting agreed to adhere
to FRE 408 and MRE 408, but reserved all rights to argue that the meetings
could not be protected from disclosure to a court under those rules.

meetings on June 20, 2013. Further information describing, among other things, the premium costs of proposed replacement health insurance (which costs would be an obligation of the City) and key benefit plan design terms was distributed to all attendees. The meeting with uniformed unions and PFRS personnel involved an extensive (and relatively heated) question and answer session, which session primarily addressed retiree concerns over: (a) the lack of replacement coverage in the City's proposal for retirees under the age of 55; and (b) the vesting of certain pensions in the event the PFRS were frozen.

97.     <u>Meetings with Funded Debt and Pension Representatives</u>.  On June 25, 2013, the City's advisors and my Senior Advisor staff member held meetings in New York for representatives and advisors for: (a) all six of the insurers of the City's funded bond debt (any such insurer, a "<u>Bond Insurer</u>"); (b) the Pension Systems; and (c) U.S. Bank, the trustee or paying agent on all of the City's bond issuances. Approximately 70 individuals attended this meeting. At this five-hour meeting, the City's advisors discussed: (a) the 10-year financial projections and cash flows presented in the June 14 Creditor Proposal (together with the assumptions and detail underlying those projections and cash flows); (b) the City's contemplated reinvestment initiatives and related costs; and (c) the retiree benefit and pension information and proposals that had been presented to

the City's unions and pension representatives on June 20, 2013. All questions asked were answered.

98.    Also on June 25, 2013, the City's advisors held a discrete meeting with U.S. Bank and its advisors to discuss: (a) the City's intentions with respect to the DWSD (and the special revenue bond debt related thereto); (b) the City's proposed treatment of its general obligation debt (including the COPs); and (c) various other issues raised by U.S. Bank.

99.    In addition, on June 26, 2013, and June 27, 2013, the City's advisors held individual follow-up meetings with each Bond Insurer that requested one.[158] On June 26, 2013, the City team met with business people, lawyers and financial advisors from NPFGC in a two-hour meeting and Ambac Assurance Corporation ("Ambac") in a 90-minute meeting. Financial Guaranty Insurance Corporation ("FGIC") had originally requested a meeting for June 26, 2013 but subsequently cancelled. On June 27, 2013, the City team met with business people, lawyers and financial advisors from Syncora in a 90-minute meeting and Assured Guaranty Municipal Corporation ("Assured Guaranty") in a 90-minute meeting.

---

[158]    In addition, at the request of National Public Finance Guarantee Corporation ("NPFGC"), the City's restructuring counsel and investment banker met with NPFGC's advisors on June 20, 2013.

100.    At these various meetings with the Bond Insurers, the City's advisors discussed many aspects of the June 14 Creditor Proposal, including but not limited to:  (a) the treatment of GO debt; (b) legal issues related to the Swap Contracts; (c) the City's contemplated restructuring and reinvestment initiatives; (d) urban blight; and (e) potential asset dispositions.  The City team answered all questions posed by the Bond Insurers.  The City team invited counterproposals or alternative views on the June 14 Creditor Proposal that were consistent with the City's current and projected financial condition.

101.    On July 9-10, 2013, the City and its advisors held follow-up diligence sessions in Detroit with representatives and/or advisors of NPFGC, Ambac, FGIC, Assured Guaranty, Syncora and the Pension Systems.  At these sessions, the City generally addressed its baseline 10-year business plan and its proposed restructuring and reinvestment initiatives.  Key discussion points included:  (a) the City's revenue forecasts (and the assumptions and detail underlying the same); (b) alternatives with respect to taxation and increasing the City's attractiveness to private investment; (c) the restructuring of, and reinvestment in, key City departments, the cost of such reinvestment and the assumptions and detail underlying the City's proposal; (d) the City's proposal for addressing its urban blight; (e) the structure of the limited recourse participation notes proposed to be provided to unsecured creditors by the City; (f) the City's

knowledge of the State's position with respect to the City's restructuring; and

(g) logistical matters (e.g., timing; access to information). The City answered all

questions posed by the attendees and invited requests for further diligence and

analyses.

102. On July 12, 2013, the City's advisors met with advisors to the

Pension Systems to discuss: (a) the Proposed DWSD Transaction (and,

particularly, the amount of any recurring payment that would be received by the

City in connection therewith); and (b) the implications of such transaction for the

Pension Systems.

103. On July 17, 2013, the City and its advisors held separate

meetings with representatives and advisors for NPFGC and Assured Guaranty to

discuss: (a) the Proposed DWSD Transaction (and, particularly, the amount of any

recurring payment that would be received by the City in connection therewith);

(b) the City's proposed restructuring of the special revenue debt related to the

DWSD (as set forth at pages 101-102 of the June 14 Creditor Proposal); and (c) the

insurers' response to the foregoing. Each meeting lasted approximately two hours.

104. <u>Establishment of Data Room</u>. In early June 2013, Miller

Buckfire & Co., LLC ("<u>Miller Buckfire</u>"), the City's financial advisor and

investment banker, established an online database (the "<u>Data Room</u>") to facilitate

creditors' timely access to documents containing information relevant to the City's

proposed restructuring actions, as well as the City's past, present and projected financial performance. Shortly thereafter, beginning on June 21, 2013, Miller Buckfire began issuing usernames and passwords to creditors' representatives and advisors so that they could view the documents posted to the Data Room. As of July 15, 2013, the Data Room contained 320 documents and over 68,000 pages of information. Since that time, the City has continued to upload documents that address a range of issues, including information relating to current and former employees and retirees. The City will continue to populate the Data Room as additional documents become available or specific information requests are received.

### Barriers To Reaching Agreement

105.  The City cannot practicably negotiate a consensual restructuring with any of its key constituencies in an out-of-court setting. The pool of potential creditors in this chapter 9 case is vast. The City estimates that the number of employees, retirees, vendors, bondholders, insurers and other parties in interest in this case reaches into the many tens of thousands (and that many of these creditors are presently unknown and unidentified). Collectively, these parties hold claims against the City in the amount of more than $18 billion. Moreover, some of the largest components of the City's debt — including, for example, the City's actuarially accrued $6.4 billion in unfunded other post employment benefit

obligations[159] — are fragmented among numerous individuals as opposed to being centralized with a single entity.

106.   With respect to the City's retirees, many of the unions have taken the position that they do not and cannot represent their former members who are current retirees.  It is my understanding that, absent their consent, the approximately 20,000 retirees entitled to receive retiree healthcare and pension benefits from the City cannot be bound by out-of-court negotiations between the City and the 47 discrete bargaining units of the 28 unions that might represent these retirees.[160]  Moreover, even if such retirees were willing to be bound by the City's negotiations with its various bargaining units (which is unlikely), the majority of those units have expressly refused to represent such retirees.[161]  Despite

---

[159]   June 14 Creditor Proposal at 35.

[160]   At least four retiree associations also provide voluntary membership to retirees of the City's unions.

[161]   Prior to the commencement of this chapter 9 case, the City sent letters to each of its unions to determine whether they are willing to represent their respective retirees in connection with the City's restructuring.  As of the date hereof, eight unions (comprising ten bargaining units) offered to represent their retirees in restructuring discussions.  Thirteen unions (comprising 28 bargaining units) have expressly indicated that they are *unwilling* to represent their retirees.  Another seven unions (comprising nine bargaining units) have neither explicitly agreed nor refused to represent their retirees.  The City also sent letters to each of the retiree associations to determine whether they are willing to represent union retirees in connection with the City's restructuring.  Two associations – the Detroit Retired City Employees Association and the Retired Detroit Police and Fire Fighters Association –

the City's best efforts to organize the retirees prior to the commencement of this chapter 9 case, most retirees remained unrepresented in negotiations. Accordingly, the negotiation of changes to pension and retiree benefits with the City's retiree constituency – changes that are critical to any restructuring of the City given the approximately $9 billion owed to these constituencies – is impracticable (if not impossible) outside of the chapter 9 context.

107. With respect to the City's bond debt, certain of the City's bond issuances permit a majority of holders to agree to certain amendments to the terms of such bonds. However, in many, if not all, cases, an extension of the maturity date of the indebtedness or an agreement to reduce its principal amount requires the consent of all outstanding bondholders. In many instances, the City is unable to negotiate with a single contact with the authority to bind bondholders of a particular series of debt, thus rendering negotiations regarding the out-of-court restructuring of such bonds impracticable. Either: (a) U.S. Bank acts solely as a paying agent (and not as a trustee) with respect to a given series of bonds (e.g., the City's Series 1999-A unlimited tax bonds and Series 2003-A unlimited tax bonds); (b) the debt is uninsured, such that no Bond Insurer has the right to control an out-of-court restructuring of the debt (e.g., the City's Series 2008A-(1) and 2008

offered to represent retirees in these discussions, while the other two associations have expressly indicated that they will not represent retirees.

A(2) limited tax bonds); or (c) the debt is insured but the Bond Insurer has no control rights (provided that the Bond Insurer has not made a payment under its respective policy) (e.g., Series 1999-A unlimited tax bonds and Series 2003-A unlimited tax bonds).  To date, no bondholder group holding a majority of any of the 60 series of debt issued by the City has organized so that the City could negotiate with it.

108.   Although the City could not practicably negotiate with its entire creditor body, as described above, it has nevertheless attempted, in good faith, to negotiate with many key creditors, presenting its proposals to all known constituencies and soliciting feedback and engaging in meetings with all parties willing to come to the table.  However, the fragmented and often non-binding nature of these negotiations has frustrated the City's ability to negotiate a consensual restructuring of its debt.

109.   Moreover, the City's restructuring proposals have met with resistance from a number of its creditor constituencies.  For example, on July 3, 2013, multiple lawsuits were filed by certain of the City's employees (both active and retired) against the Governor and Treasurer seeking, among other things:  (a) a declaratory judgment that PA 436 violated the Constitution of the State of Michigan to the extent that it purported to authorize chapter 9 proceedings within which vested pension benefits might be compromised; and (b) an injunction

preventing the defendants from authorizing any chapter 9 proceeding for the City within which vested pension benefits might be adjusted. On July 17, 2013, the Pension Systems commenced a similar lawsuit against me, in my capacity as Emergency Manager, and the Governor, seeking declaratory judgments that PA 436: (a) does not authorize the defendants to take any action that may result in the compromise of the City's pension obligations; and (b) when read in conjunction with the Michigan Constitution, requires the defendants to refrain from attempting to compromise pension obligations within a chapter 9 proceeding (or, alternatively, that PA 436 violates the Michigan Constitution).[162]

110. Further, on July 8, 2013, a Bond Insurer serving as surety for approximately $170 million of the City's limited and unlimited tax general obligation debt issued a public statement declaring that the June 14 Creditor Proposal was "harmful to Detroit and the interests of the taxpayers in Michigan" and "necessarily imperiled" the City's access to cost effective financing. See Press Release, Ambac Financial Group, dated July 8, 2013, attached hereto as Exhibit I.

111. Although the City believes that (a) its discussions with its various creditor constituencies were constructive, (b) significant data was

---

[162]    See Complaints filed in: (a) Flowers v. Snyder, No. 13-729-CZ (Ingham Cnty. Circuit Court), dated July 3, 2013; (b) Webster v. Snyder, No. 13-734-CZ (Ingham Cnty. Circuit Court), dated July 3, 2013; and (c) General Retirement System of the City of Detroit v. Orr, No. 13-768-CZ (Ingham Cnty. Circuit Court), dated July 17, 2013.

conveyed or made available to such creditors, (c) the negotiations were conducted

in good faith on the City's part and (d) the City achieved a limited amount of

success (e.g., the forbearance agreement with the Swap Counterparties and Service

Corporations), the City ultimately has not been able to reach a comprehensive

agreement for the restructuring of its outstanding obligations.  Moreover, the

feedback received from creditors has led the City to determine that such a

comprehensive agreement is unlikely in the near term or without this filing.

Further negotiations with all of the City's various stakeholders is impracticable in

light of the City's cash crisis and the urgent need to move forward with its

restructuring.  The City requires a clear and centralized forum within which parties

may negotiate and ultimately be bound.

## Commencement of Chapter 9 Proceedings

112.    Unable to negotiate an out-of-court resolution that

simultaneously addressed the City's dire financial situation while laying the

foundation for a strong and prosperous City going forward (and with no prospect

of such a resolution), on July 16, 2013, and in accordance with section 18(1) of

PA 436, I recommended to the Governor and the Treasurer in writing that the City

file for chapter 9 relief.  A copy of my recommendation is attached hereto as

Exhibit J and incorporated herein by reference.  This recommendation was based

on my judgment that no reasonable alternative to rectifying the financial

emergency of the City existed because the City cannot adopt a feasible financial plan that can satisfactorily rectify the financial emergency in a timely manner. On July 18, 2013, in accordance with section 18(1) of PA 436, I received the written authorization of the Governor to commence chapter 9 relief. A copy of the Governor's written approval is attached hereto as <u>Exhibit K</u> and incorporated herein by reference. On July 18, 2013, consistent with the Governor's written approval, I issued an order directing the City to commence this chapter 9 case. A copy of this order is attached hereto as <u>Exhibit L</u> and incorporated herein by reference.

## **Facts in Support of First Day Pleadings**

113. To preserve the City's ability to function efficiently within chapter 9 and provide uninterrupted services to its citizens, a number of pleadings (the "<u>First Day Pleadings</u>")[163] designed to achieve a seamless transition into chapter 9 will be filed contemporaneously with this Declaration. Generally, the First Day Pleadings seek to: (a) establish procedures for the smooth and efficient administration of this chapter 9 case (the largest chapter 9 case in history); (b) ensure that the City receives the benefit of certain protections afforded under the Bankruptcy Code; and (c) lay the groundwork for a successful restructuring of

---

[163]    Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have the meanings given to them in the applicable First Day Pleadings.

the City's liabilities. I have reviewed each of the First Day Pleadings with the City's outside counsel, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will promote the City's ability to complete the chapter 9 process and confirm a plan of adjustment.

114. The City seeks the entry of an order scheduling a hearing to consider the First Day Pleadings on shortened notice (the "First Day Hearing"). I believe that an expedited First Day Hearing is necessary to, among other things: (a) establish procedures for the prompt notification of the tens of thousands of potential creditors and other parties in interest of the commencement of this chapter 9 case and other procedures to promote the efficient administration of the City's case; (b) promptly clarify and confirm certain rights afforded to the City and the Emergency Manager in this chapter 9 case to eliminate potential uncertainty for the City's creditors, vendors, residents and other parties in interest and thereby minimize potential disruptions to the City's operations and restructuring efforts from the outset of this case; and (c) lay the groundwork for other restructuring activities to allow the City to move forward as promptly and efficiently as possible in this case.

***Motions Regarding Administrative and Procedural Matters***

115.  <u>Notice of Commencement of the Case and Objections to</u> <u>Eligibility</u>.  To provide expedient and effective notice of the commencement of the City's chapter 9 case to known and potential creditors as well as other parties in interest, the City is seeking the entry of an order approving a form of notice that provides due and proper notice of:  (a) the commencement of the case; (b) the opportunity for parties in interest to file objections to eligibility and the schedule and procedures for addressing any such objections; (c) the automatic stay, as it applies in chapter 9; and (d) the Emergency Manager's continued authority to act exclusively on behalf of the City pursuant to section 904 of the Bankruptcy Code. In addition to sending such notice to each party identified on the City's list of creditors and as required by section 923 of the Bankruptcy Code, the City proposes to publish such notice for three consecutive weeks in:  (a) the *Detroit Free Press*, a newspaper of general circulation in Detroit and surrounding communities; and (b) *The Bond Buyer*, a newspaper of general circulation among bond dealers and bondholders.  In addition, the City proposes to post notice of the commencement of the case on the Electronic Municipal Market Access database at www.emma.msrb.com, which will provide further notice to bondholders.

116.  The City also requests that the Court fix a deadline of approximately 30 days after the Petition Date for the filing of any objections to

eligibility (any such objection, an "Eligibility Objection").  Setting a prompt

deadline for Eligibility Objections will:  (a) promote the efficient administration of

the City's case; (b) eliminate any uncertainty created by the absence of an express

timing provision in the Bankruptcy Code for such objections in chapter 9 cases;

and (c) expedite the Court's consideration of any Eligibility Objections and the

entry of an order for relief in this case.  Further, the City requests that the Court

establish a schedule and certain procedures for the consideration of Eligibility

Objections, as described in the motion.

      117.  Case Management and Noticing Procedures.  The City has filed

a motion seeking an order providing for certain notice, hearing and other case

management procedures in this chapter 9 case.  The City has tens of thousands of

creditors and expects that numerous other parties in interest will request notice in

this chapter 9 case.  Requiring that hard copy service of every filing in this

chapter 9 case be made upon all notice parties would be a waste of the City's

limited resources.

      118.  The City proposes instead to serve documents filed in this

chapter 9 case on most parties by electronic mail while requiring paper service of

certain pleadings only upon certain primary parties in interest.  The primary parties

in interest that the City proposes should receive paper service of all documents

includes, among other parties:  (a) the City; (b) the City's largest secured and

unsecured creditors; (c) counsel to the trustee and contract administrator for the COPs; (d) certain significant holders of the COPs; (e) counsel to the Swap Counterparties; (f) counsel to the insurers of the City's bonds, COPs and Swap Contracts; and (g) counsel to the unions and retiree associations representing certain of the City's employees and/or retirees. I believe that authorizing service in this manner will promote efficiency and save the City significant time and expense during this chapter 9 case.

119. In addition, due to the anticipated number of motions and other pleadings that will be filed in this chapter 9 case, the City believes that special hearing procedures should be established to assist in administering the case docket and avoid constant (and unpredictable) hearings before this Court. These procedures will permit the Court, the City and the other primary parties in interest in this chapter 9 case to address groups of motions at regular omnibus hearings, thereby avoiding the substantial time and expense of scheduling separate hearings on each discrete matter. The motion further seeks the establishment of a number of other case management procedures to be utilized in this chapter 9 case for the benefit of the Court, the City and other parties in interest.

120. Appointment of Claims and Noticing Agent. The City recognizes that the large number of creditors and other parties in interest involved in its chapter 9 case may impose heavy administrative and other burdens upon the

Court and the Clerk's Office. To relieve the Court and the Clerk's Office of these burdens, the City will seek the entry of an order appointing Kurtzman Carson Consultants ("KCC") as the City's claims and noticing agent in its chapter 9 case. KCC may, among other things: (a) serve as the Court's agent to mail notices to creditors of the City and other parties in interest, including notice of the commencement of the case; (b) provide computerized claim and objection database services; and (c) provide expertise, consultation and assistance in claim processing and with other administrative tasks as necessary to conduct the City's chapter 9 case and complete its restructuring expeditiously. The City obtained and reviewed engagement proposals from four claims and noticing agents before selecting KCC based on its capability and experience.

**Motions Regarding Third Party Relations**

121. <u>Confirmation of the Protections of the Automatic Stay</u>. The City seeks an order confirming the application of two key protections afforded to the City under the Bankruptcy Code to: (a) aid in the administration of the City's bankruptcy case; (b) protect and preserve the City's property for the benefit of citizens and stakeholders; and (c) ensure that the City has the breathing space it needs to focus on negotiating a plan for adjusting its debts. These bankruptcy protections are: (a) the automatic stay provisions of sections 362 and 922 of the Bankruptcy Code (together, the "<u>Chapter 9 Stay</u>"); and (b) the anti-termination and

anti-modification provisions of section 365 of the Bankruptcy Code (together, the "Contract Protections").

122.    Although the Chapter 9 Stay and Contract Protections are self-executing, the City believes that, due to the historically limited use of chapter 9, some parties may not appreciate the full significance and impact of these provisions or how they apply in chapter 9.  In addition, the City also requests that the Court's order granting the relief requested in the motion confirm the application of the Chapter 9 Stay to:  (a) the Emergency Manager; and (b) city officers in whatever capacity they serve.

123.    Extension of the Automatic Stay to Certain Parties.  The City also requests that the Chapter 9 Stay be extended to stay any actions or proceedings against (a) employees of the City that are neither officers nor inhabitants of the City and (b) the Governor, the Treasurer, the members of the LEFALB and the staff members of these entities (collectively, the "State Entities"), that seek, directly or indirectly, to enforce claims against the City or interfere with the City's activities in this chapter 9 case.  Because the State Entities are closely connected to the City and the Emergency Manager, and because parties in interest already have initiated lawsuits against certain of the State Entities seeking to block the commencement of this chapter 9 case and interfere with the Emergency Manager's administration of the City under PA 436, I believe that this relief is

necessary and appropriate to: (a) foreclose attempts by creditors to circumvent the protections of the Chapter 9 Stay through collateral attacks on the State Entities; and (b) provide the City with the breathing spell it needs at the outset of this case.

124. <u>Appointment of Official Committee of Retirees</u>. The City also requests that the Court direct the United States trustee to appoint an official committee of retired employees of the City (a "<u>Retiree Committee</u>"). As previously stated, the City's post-employment obligations are a crushing burden on the City's financial well being, and a restructuring of these obligations is a critical component of the City's rehabilitation. The City expects that most of its approximately 23,500 retirees are not familiar with chapter 9 and lack the means to obtain sophisticated representation in this case on an individual basis. Absent the appointment of a Retiree Committee, only a minority of the City's retirees stand to receive any form of collective representation in this chapter 9 case, and, perhaps more importantly, it appears that the small number of unions and retiree associations that have offered to represent retirees possess no legal authority to bind those individuals to restructure pension and retiree health benefits. In addition, the appointment of a Retiree Committee will provide the City with a centralized point of contact, and the retirees with sophisticated representation, to engage in negotiations regarding the restructuring of the City's retirement benefit obligations. I believe, therefore, that the appointment of a Retiree Committee is

necessary to provide adequate representation to these individuals and to facilitate the City's restructuring of its pension and other post-employment benefit liabilities.

125. <u>Authorization of Compromise with Swap Counterparties</u>. The City also requests that the Court authorize the assumption of the City's Forbearance and Optional Termination Agreement with the Swap Counterparties and approve such agreement as a compromise under Rule 9019 of the Federal Rules of Bankruptcy Procedure. As discussed herein, shortly prior to the Petition Date, the City reached a resolution with the Swap Counterparties, whereby: (a) the Swap Counterparties will forbear from seeking a termination of the Swap Contracts and allow the City continued access to its Casino Revenues; and (b) the City is granted an option to terminate the Swap Contracts for a period of time at a favorable discount. In exchange, the City has agreed to, among other things: (a) perform certain of its obligations under the Swap Contracts, Collateral Agreement and other agreements; (b) refrain from challenging the validity of the Swap Contracts, Collateral Agreement and other agreements; and (c) take certain steps to assist the Swap Counterparties in realizing upon the pledged property should the City default on its obligations. I believe that the assumption and approval of the compromise is fair, reasonable, equitable and in the best interests of the City and its creditors. The compromise, if approved, will allow the City access to much needed cash flows, provide for a workable unwind of its unfavorable swap obligations at a

discounted price and avoid potentially protracted litigation involving the swap transactions.

## **Conclusion**

126.    I respectfully request that all of the relief requested in the First Day Pleadings be granted along with such other relief as is just.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated: July 18, 2013        By:  /s/  Kevyn D. Orr
                                 Kevyn D. Orr
                                 Office of Emergency Manager
                                 City of Detroit