UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| Debtor. | ) Hon. Steven W. Rhodes |

**LIMITED OBJECTION AND RESERVATION
OF RIGHTS REGARDING (1) MOTION OF DEBTOR, PURSUANT TO
SECTION 105(A) OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER
CONFIRMING THE PROTECTIONS OF SECTIONS 362, 365 AND 922 OF THE
BANKRUPTCY CODE AND (2) MOTION OF DEBTOR, PURSUANT TO SECTION
105(A) OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER EXTENDING
THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON-OFFICER
EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR**

TO THE HONORABLE STEVEN RHODES
UNITED STATES BANKRUPTCY JUDGE:

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "*Syncora*") file this limited objection and reservation of rights (this "*Limited Objection*") in response to: (1) *Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code* [ECF No. 53] (the "*Stay Confirmation Motion*") and (2) *Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor* [ECF No. 56] (the "*Stay Extension Motion*," and together with the Stay Confirmation Motion, the "*Motions*"),[1] filed by the above-captioned debtor (the "*Debtor*" or the "*City*") on July 19, 2013. In support of this Limited Objection, Syncora respectfully states as follows:

---

[1] Capitalized terms used but not defined herein have the meanings provided in the Motions and the *Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [ECF No. 11] (the "*Orr Declaration*"), as applicable.

**Preliminary Statement**

1. Syncora files this Limited Objection to the Motions to the extent the City seeks to extend the automatic stay to City employees, including officers, in their respective capacities other than as employees of the City (the "*Employees*"), and to Swap Counterparties, Service Corporations, and certain other non-debtor parties (collectively, the "*Non-Debtor Parties*") in connection with the Pension Systems and associated Swap Contracts. Any such extension would prejudice Swap Insurers' rights, as well as the rights of COP holders, relating to the Swap Contracts and COPs, and the City has shown no factual and legal bases to extend the automatic stay to the Employees or the Non-Debtor Parties. Syncora preserves all of its rights as against such parties.

**Background**

2. As explained in the Orr Declaration,[2] in 2005 and 2006, the City engaged in a series of funding transactions to remedy certain underfunded, accrued, actuarial liabilities. *See* Orr Decl. ¶ 45. The City arranged for the creation of two entities: the General Retirement System Service Corporation and the Police and Fire Retirement System Service Corporation, each a Michigan nonprofit corporation incorporated by the City. *Id.* The Service Corporations, in turn, entered into contracts with the City (each a "*Service Contract*,"), whereby the Service Corporations covenanted to facilitate the funding transactions in exchange for the City's promise to pay for ongoing obligations in connection therewith. *Id.* The Service Corporations then created certain trusts (the "*Funding Trusts*"), which issued the COPs that were then sold to investors. *Id.* at ¶¶ 45–47. In 2005 and 2006, Syncora entered into insurance policies with the

---

[2] Mr. Kevyn D. Orr is the City's Emergency Manager (the "*Emergency Manager*") appointed pursuant to Public Act 436 of 2012 of the State of Michigan, codified at Mich. Comp. Laws §§ 141.1201–141.1291. Orr Decl. ¶ 1.

Funding Trusts with respect to certain of the COPs and, as of July 23, 2013, has exposure thereon in the amount of approximately $352 million.

3. To hedge the interest rate exposure in respect of the floating-rate COPs that were issued in 2006, the Service Corporations entered into the several Swap Contracts with the Swap Counterparties. Orr Decl. ¶ 47. The City then arranged for monoline insurance polices with the Swap Insurers, which guaranteed certain payments to the Swap Counterparties. *Id.* ¶ 48. Syncora insures four of the Swap Contracts and, as of July 23, 2013, Syncora's current exposure on the Swap Contracts is approximately $100 million.

4. In January 2009, the Swap Counterparties notified the City and the Service Corporations that a termination event had occurred under the Swap Contracts that would have allowed the Swap Counterparties to terminate the Swap Contracts. If they had, it would have imposed on the Service Corporations an immediate obligation of approximately $300 million to $400 million. Instead of terminating, however, the Swap Counterparties sought and obtained additional assurance that the Service Corporations would be able to meet their obligations under the Swap Contracts. *Id.* at ¶ 49.

5. Specifically, the parties entered into the Collateral Agreement pursuant to which the City agreed to pledge (and subject to a lock-box arrangement) millions of dollars in receivables it was owed from various casinos (the "*Wagering Tax Revenues*") operating in the City as security for its payment obligations to the Service Corporations for amounts due under the Swap Contracts. *Id.* The City granted a lien on its Wagering Tax Revenues in favor of the Service Corporations to secure those payments. *Id.* In turn, the Service Corporations granted a security interest over those Wagering Tax Revenues. *Id.*

6. On June 14, 2013, at a meeting among certain of the City's creditors and advisors (the "*June 14 Meeting*"), the Emergency Manager stated that the City would not make $39.7 million in payments due and owing to the Service Corporations on account of the City's obligations thereto. *See id.* at ¶ 56.

7. On June 17, 2013, Syncora sent a letter to U.S. Bank, as Custodian under the Collateral Agreement, memorializing a prior conversation between Syncora and U.S. Bank in which U.S. Bank expressed its independent view that the Service Corporation's default in not making a $40 million payment to the COP holders—which flowed from the City's failure to make the above-mentioned payment to the Service Corporations—triggered a cross-default under the Swap Contracts that led to *automatic* cash trapping under the Collateral Agreement. *See Decl. of Todd R. Snyder* filed in *City of Detroit v. Syncora Guarantee Inc.*, Case No. 13-cv-12987 (LPZ) (E.D. Mich. July 12, 2013) [ECF No. 10-3] and attached hereto at **Exhibit 1** (the "*Snyder Declaration*"). Thus, as a result of the cross-default, approximately $15 million in Wagering Tax Revenue was trapped in the General Receipts Subaccount.

8. Over the course of the last two weeks in June and first week in July, Syncora attempted to engage the City in good-faith negotiations in an effort to reach a consensual resolution regarding the trapped cash. Snyder Decl. ¶¶ 4–11. These negotiations failed to progress, however, because the City was unwilling to agree to an industry-standard term of a vanilla non-disclosure agreement. *Id.* And, without any formal or informal notice, on July 5, 2013, the City filed a civil complaint in the Circuit Court for the County of Wayne against Syncora, U.S. Bank, and three casinos (the "*State Court Action*") seeking, among other things, a temporary restraining order to obtain the release of the trapped cash. *Id.* at ¶ 12. That same afternoon, the City requested an immediate *ex parte* hearing for its temporary restraining order.

4

13-53846-tjt    Doc 122    Filed 07/23/13    Entered 07/23/13 15:42:25    Page 4 of 20

The City claimed that it did not have time to notify Syncora, a known party in interest with which the City was negotiating, of the hearing. *See Ex Parte Restraining Order and Order to Show Cause Why A Preliminary Injunction Should Not Issue* ¶ 6, attached hereto at **Exhibit 2** (the "*Ex Parte Restraining Order*").

9. Thereafter, Syncora filed a notice of removal to remove the State Court Action to the United States District Court for the Eastern District of Michigan on July 11, 2013. And on the following day, Syncora filed a motion to dissolve the *Ex Parte* Restraining Order—an order that allowed the approximately $15 million of Wagering Tax Revenue held in the General Receipts Subaccount to escape. After Syncora filed its motion to dissolve, the City agreed to a dissolution of the *Ex Parte* Restraining Order; however, the City refused to return $15 million into the General Receipts Subaccount.

10. On July 18, 2013, the City commenced this case under chapter 9 of the Bankruptcy Code (the "*Chapter 9 Case*").

## Limited Objection

### I. The Stay Confirmation Motion Must be Denied to the Extent the City Seeks to Expand the Scope of the Automatic Stay.

11. The City seeks in the Stay Confirmation Motion an order confirming that the automatic stay applies to "any action or proceeding against a City Officer that seeks to enforce a claim against the City, in whatever capacity the applicable City Officer is serving." Stay Confirmation Mot. ¶ 26. This request goes beyond the text of section 922(a), which extends the protections afforded under section 362 to "an officer or inhabitant of the debtor," 11 U.S.C. § 922(a), because it applies to City Officers "in whatever capacity the applicable City Officer is serving." Stay Confirmation Mot. ¶ 26. Thus, the City's request covers Employees acting in a capacity other than for the City. In fact, certain City Officers and members of the City Council

5

are directors of the non-debtor Service Corporations and, in such capacity, owe fiduciary duties to such corporations and their stakeholders. As described above, the Service Corporations play a critical roll in the funding structure related to the COPs, Swap Contracts, and Collateral Agreement (the "*Funding Structure*").

12. Section 922(a) does not stay actions against officers or inhabitants of the debtor that do not seek to enforce a claim against the debtor. *See* 11 U.S.C. § 922(a); *see also In re Jefferson Cnty., Ala.*, 484 B.R. 427, 447 (Bankr. N.D. Ala. 2012) (stating that the stay of section 922(a) only applies to actions brought to enforce a claim against the debtor). And the City has shown no cause to extend the automatic stay to Employees in their respective capacities other than as employees of the City and on account of claims against the City. Accordingly, to the extent the City seeks impermissibly to expand the automatic stay to Employees and Non-Debtor Parties, Syncora objects and the Stay Confirmation Motion should be denied. Syncora further objects to any attempt by the City to extend the automatic stay to actions against the Service Corporations, Swap Counterparties, or any Non-Debtor Parties and Employees for which the City has not shown the requisite factual and legal bases.

**II.     The Stay Extension Motion Must be Denied to the Extent the City Seeks to Expand the Scope of the Automatic Stay as to the Employees and Non-Debtor Parties.**

13. The City has also sought an order extending the automatic stay to certain non-debtor State Entities, Non-Officer Employees, and the City's Agents and Representatives pursuant to section 105(a) of the Bankruptcy Code and this Court's equitable powers. Stay Extension Mot. ¶¶ 19, 20–27. Understandably, the City is concerned that "certain parties [] are, or are likely to become, the targets of claims, lawsuits and other enforcement actions prosecuted by parties in interest that have the direct or practical effect of denying the City the protections of the automatic stay . . . ." Stay Extension Mot. ¶ 15. As discussed above, however, section

6

13-53846-tjt    Doc 122    Filed 07/23/13    Entered 07/23/13 15:42:25    Page 6 of 20

922(a)(1) only applies to actions or proceedings that seek "to enforce a claim *against the debtor*." 11 U.S.C. § 922(a)(1) (emphasis added). To the extent the City seeks to expand the scope of the automatic stay in addition to merely extending the automatic stay, Syncora objects and the Court should deny the Stay Extension Motion.

14. Further, extend-stay motions pursuant to section 105(a) are commonly treated as requests for preliminary injunctions, as modified for the bankruptcy context. *See In re Eagle-Picher*, 963 F.2d at 858 ("When issuing a preliminary injunction pursuant to its powers set forth in section 105(a), a bankruptcy court must consider the traditional factors governing preliminary injunctions . . . ."); *see also In re Storozhenko*, 459 B.R. 697, 708 *reconsideration denied,* 458 B.R. 905 (Bankr. E.D. Mich. 2011) (denying a request to extend the automatic stay pursuant to section 105(a) where, among other things, the debtor failed to address traditional preliminary injunction factors); *Collins & Aikman Corp. v. Eglesston* (*In re Collins & Aikman Corp.*), Adversary Case No. 06-4211(SWR), Hr'g Tr. 61–65, May 4, 2006 (Bankr. E.D. Mich. 2005) (denying a request to extend the automatic stay where the debtor failed to satisfy its burden under the preliminary injunction factors); *accord In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007) (applying preliminary injunction factors). The City did not even attempt to satisfy the preliminary injunction factors in either the Stay Extension Motion or in those portions of the Stay Confirmation Motion that seek relief pursuant to section 105(a). *See* Stay Extension Mot. ¶ 19; Stay Confirmation Mot. nn. 5, 6.

15. In fact, the City has only made a cursory attempt—at best—to satisfy its burden under applicable case law. *See* Stay Extension Mot. ¶ 19 (citing *Eagle-Picher* for the proposition that the City must only show "unusual circumstances" to extend the stay to non-debtor persons or entities). Also, as the court observed in *Storozhenko*, Federal Rule of Bankruptcy Procedure

(the "*Bankruptcy Rules*") 7001(7) provides that a debtor must initiate an adversary proceeding "to obtain an injunction or other equitable relief . . . ." Fed. R. Bankr. P. 7001(7); *see also Storozhenko*, 459 B.R. at 708. The City has failed to initiate an adversary proceeding here. In sum, the City has ignored procedure and a vast amount of bankruptcy case law regarding extension of the automatic stay under section 105(a).[3] That case law weighs heavily against the City. Therefore, because the City has not supported the relief sought with law and facts, and because the City has not complied with the Bankruptcy Rules, the Court should deny the Stay Extension Motion.

### Reservation of Rights

16. Syncora respectfully reserves its rights to (a) amend, supplement, or otherwise modify this Limited Objection, (b) assert or raise such other and further objections or responses to the Motions based on additional information received from the Debtor or other sources, and (c) assert all rights and remedies under the Bankruptcy Code and applicable non-bankruptcy state and federal law against the Service Corporations, Swap Counterparties, Funding Trusts, Employees, Non-Debtor Parties, and any other party in connection with, or under, agreements governing the Funding Structure.

[*Remainder of page intentionally left blank.*]

---

[3] *See, e.g.*, *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 315 (6th Cir. 2000) (holding that a contractual agency relationship was not an unusual circumstance that warranted extending the automatic stay); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 861 (6th Cir. 1992) (holding that a debtor must show unusual circumstances before a injunction pursuant to section 105(a) may issue); *Saginaw Prop., LLC v. Value City Dep't Stores*, LLC, 08-13782-BC, 2009 WL 189963 (E.D. Mich. Jan. 27, 2009) (declining to extend the stay where a judgment against the non-debtor would not have an effect on the property of the bankruptcy estate); *see also In re Calpine Corp.*, No. 05-60200 (BRL), 2007 WL 1302604, at *2 (Bankr. S.D.N.Y. Apr. 30, 2007) ("The debtor bears the burden of demonstrating that circumstances warrant extending the stay.").

WHEREFORE, Syncora respectfully requests that the Court deny the Stay Motions to the extent set forth in this Limited Objection and grant to Syncora such other and further relief as may be just and proper.

Dated: July 23, 2013                /s/ *Ryan Blaine Bennett*
                                    James H.M. Sprayregen, P.C.
                                    Ryan Blaine Bennett
                                    Stephen C. Hackney
                                    KIRKLAND & ELLIS LLP
                                    300 North LaSalle
                                    Chicago, Illinois 60654
                                    Telephone:   (312) 862-2000
                                    Facsimile:   (312) 862-2200

                                            - and -

                                    Stephen M. Gross
                                    David A. Agay
                                    Joshua Gadharf
                                    **MCDONALD HOPKINS PLC**
                                    39533 Woodward Ave.
                                    Suite 318
                                    Bloomfield Hills, Michigan 48304
                                    Telephone:   (248) 646-5070
                                    Facsimile:   (248) 646-5075

                                    *Counsel to Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

**Exhibit 1
Snyder Declaration**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan,<br><br>    Plaintiff,<br><br>v.<br><br>SYNCORA GUARANTEE INC., a New York Corporation<br><br>and<br><br>U.S. BANK, N.A.,<br><br>and<br><br>MGM GRAND DETROIT, LLC,<br><br>and<br><br>DETROIT ENTERTAINMENT, LLC, d/b/a MOTORCITY CASINO HOTEL,<br><br>and<br><br>GREEKTOWN CASINO, LLC,<br><br>    Defendants. | Case No.: 2:13-cv-12987-LPZ-MKM<br><br>Hon. Lawrence P. Zatkoff |

### DECLARATION OF TODD R. SNYDER

I, Todd R. Snyder, hereby declare that I am an adult and have personal knowledge of the following:

1.  I am the Executive Vice Chairman of Rothschild Inc. and Co-Chair of its North American Debt Advisory and Restructuring Group.

2.  I was involved in the discussions between Syncora Guarantee Inc. ("Syncora") and the City of Detroit (the "City") regarding U.S. Bank's decision to trap the funds in the

General Receipts Subaccount. My declaration describes these discussions and the events surrounding them.

3. On June 17, 2013, Syncora sent U.S. Bank a letter memorializing a prior conversation between Syncora and U.S. Bank in which U.S. Bank expressed the view that it would not make any payment to the City from the General Receipts Subaccount while an Event of Default is continuing under a Hedge. (*See* Ex. D to Orr. Aff., 6/17/13 letter from C. LeBlanc to S. Brown.) I was personally a party to the referenced conversation, which took place in Detroit on June 14, 2013, and involved myself, William Smith (counsel to U.S. Bank N.A.), and Ryan Bennett (counsel to Syncora). During that conversation, which was witnessed by a number of individuals, including representatives of U.S. Bank, Mr. Bennett expressed his understanding that the City's failure to make the $40 million payment to the Service Corporations, would cause the Service Corporation's to default on their interest payment to the Certificates of Participation and would also constitute a cross-default under the Swap Agreement, triggering automatic cash trapping under the Collateral Agreement. Neither Mr. Smith nor his client disagreed with Mr. Bennett, and Mr. Smith added words to the effect of "The cash ain't going anywhere until there is resolution."

4. After several communications between Syncora, the City, and U.S. Bank regarding the propriety of trapping the cash under the Collateral Agreement, representatives from Syncora and the City held an in-person meeting on June 27, 2013. We understood that the primary purpose of this meeting was to discuss the statements made by the City's Emergency Manager during his June 14, 2013 creditors' meeting. It soon became clear, however, that the City's representatives were most interested in discussing U.S. Bank's recent decision to trap the funds in the General Receipts Subaccount.

5. Initially, the City maintained that Syncora was solely responsible for the U.S. Bank's decision. While Syncora explained that the City was mistaken in its view, given the automatic aspects of the cash trapping provisions in the Collateral Agreement, Syncora stated that it was willing to work with the City to craft a mutually satisfactory resolution to the issues surrounding the funds in the General Receipts Subaccount. As the parties continued to discuss this issue, we reiterated our desire to engage in constructive discussions surrounding a potential settlement — a point that I personally communicated to City representatives during a break in the meeting.

6. During the meeting, the City representatives seemed amenable to such discussions and asked Syncora to provide the City with a proposal. The City further explained that this issue presented immediate concerns and asked us to put together our proposal as quickly as possible.

7. The next morning I contacted one of the City's representatives and informed him that we had started to create a settlement proposal. I explained, however, that we could not provide the City with anything more than a rough outline of our proposal unless we better understood what the City and the Swap Counterparties had been discussing about a discounted payoff of the termination liability for the Collateral Agreement. As we had only recently discovered, the City had been negotiating with the Swap Counterparties, who, it appears, were secretly purporting to waive the cash trapping requirements of section 5.4 of the Collateral Agreement. However, the City had never notified us of these negotiations or explained what the parties had been discussing. The City representative stated that he understood why we needed that information but would need to speak with Ken Buckfire, the individual conducting the negotiations with the Swap Counterparties on behalf of the City.

8. At that time, we tried calling Mr. Buckfire but were unable to reach him. He was unavailable for the rest of the business day. As a result, we set up a conference call for the following day.

9. During my June 29, 2013 conference call with Mr. Buckfire, I explained that we needed one or two data inputs from the City in order to complete our proposal. Mr. Buckfire stated that he was not willing to share the data I requested and instead requested details of our proposal. I described, at a high level, the structure of our proposal. In response, he asked for greater financial detail regarding our proposal. I explained, though, that it was impossible to provide greater financial detail unless we first received some limited data from the City — which is exactly why we had made such a request.

10. Despite this explanation, Mr. Buckfire remained unwilling to provide the requested information. He stated, however, that he would consider providing the requested data after the parties executed a non-disclosure agreement ("NDA").

11. Accordingly, that day, attorneys for Syncora and the City began negotiating the terms of this NDA. My understanding is that over the next few days Syncora and the City exchanged a draft of a proposed NDA and held numerous discussions regarding its terms.

12. While these discussions were still ongoing, on July 5, 2013, the City filed its Motion for an *Ex Parte* Temporary Restraining Order and an Order to Show Cause Why a Preliminary Injunction Should Not Issue (the "Motion"). Though representatives for the City and Syncora had been talking almost daily, the City never notified Syncora that it intended to file a Motion. Instead, Syncora first learned of the Motion when the City emailed Syncora the temporary restraining order minutes after it was entered.

4

_____
Todd R. Snyder

Executed this 12 day of July, 2013.

5

**Exhibit 2**
*Ex Parte* **Restraining Order**

CITY OF DETROIT, a Municipal
Corporation Organized and Existing
Under the Laws of the State of Michigan,

      Plaintiffs,

v.

SYNCORA GUARANTEE INC., a New
York Corporation; U.S. BANK, N.A.;
MGM GRAND DETROIT, LLC; DETROIT
ENTERTAINMENT, LLC d/b/a
MOTORCITY CASINO HOTEL; and
GREEKTOWN CASINO, LLC,

      Defendants.
_____/

Case No.: 13-008858-CZ
Honorable: Jeanne Stempien

13-008858-CZ
FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/5/2013 2:46:52 PM
CATHY M. GARRETT
/s/ Unique Thomas

ROBERT S. HERTZBERG (P30261)
DEBORAH KOVSKY-APAP (P68258)
4000 Town Center, Suite 1800
Southfield, MI 48075
(248) 359-7300 - Telephone
(248) 359-7700 - Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

THOMAS F. CULLEN, JR. (*pro hac vice* pending)
GREGORY M. SHUMAKER (*pro hac vice* pending)
GEOFFREY S. STEWART (*pro hac vice* pending)
Jones Day
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

*Attorneys for Plaintiff*
_____/

**EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE
WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

At a session of said Court, held in the
County of Wayne, State of Michigan on
<u>7/5/2013</u>

PRESENT: <u>Annette J. Berry a/f Jeanne Stempien</u>
Wayne County Circuit Court Judge

This matter came before the Court on Plaintiff's Verified Complaint and Motion for an Ex Parte Temporary Restraining Order and Order to Show Cause Why A Preliminary Injunction Should Not Issue (the "Motion").

Upon review of the Motion, the allegations set forth in the Verified Complaint, and the Affidavit of Kevyn D. Orr (the "Affidavit") the Court has determined the following:

1. Pursuant to MCR 3.310(A) and (B), it clearly appears from the specific facts shown by Plaintiff's Verified Complaint that immediate and irreparable injury, loss or damage will result to Plaintiff from the delay required to effect notice. Defendant Syncora has demanded that Defendant U.S. Bank, as custodian under a collateral agreement, trap certain casino revenues owing to Plaintiff under the collateral agreement. Plaintiff alleges that if it cannot gain immediate access to these revenues, it will be unable to successfully negotiate with its stakeholders during a critical timeframe in its efforts to effect a financial restructuring, that an existing cash crisis will be exacerbated, and that this cash crisis will lead to the further deterioration of police, fire, emergency medical, and other important city services, endangering the health and welfare of its citizens. The Verified Complaint and the Affidavit establish these specific facts.

2. Plaintiff has shown a likelihood of success on the merits of the claims asserted in the Verified Complaint.

3. Plaintiff will suffer greater injury from the denial of temporary injunctive relief than Defendants will suffer from the granting of such relief.

4. The granting of this Order will further the public interest.

5. Immediate relief is required to preserve Plaintiff's ability to access needed funds at a critical time in its financial restructuring, and to avoid substantial irreparable harm that would result in the absence of injunctive relief.

6. Plaintiff's attorney has certified to the Court in writing that the delay required to give notice of the request for a temporary restraining order would cause plaintiff immediate and irreparable harm.

Upon review of the Verified Complaint, the Affidavit, and the Motion, the Court being otherwise fully advised in the premises:

**IT IS ORDERED** that Defendants, and anyone acting in concert or cooperation with Defendants who receives actual notice of this Order, are enjoined from and shall immediately cease and desist from taking any action to limit the City's access to casino revenues or the funds in the General Receipts Subaccount.

**IT IS FURTHER ORDERED** that Defendant U.S. Bank is enjoined from refusing to make payments to the City from the General Receipts Subaccount, unless instructed to do otherwise by the Counterparties to the Collateral Agreement, attached as Exhibit B to the Affidavit of Kevyn D. Orr, pursuant to its terms, without regard to any assertion of rights by Defendant Syncora. This Order shall remain in full force and effect until this Court specifically orders otherwise.

**IT IS FURTHER ORDERED** that Defendants shall appear before this Court for a hearing on July 26, 2013 at 9:00 o'clock a.m. to show cause why a preliminary injunction should not be issued upon the terms set forth above.

**IT IS FURTHER ORDERED** that no security is required of Plaintiff at this time, pursuant to MCR 3.301(D)(2), as Plaintiff is a municipal corporation organized and existing under the laws of the State of Michigan.

/s/ Annette J. Berry
Wayne County Circuit Court Judge

Date and time of issuance:
July 5, 2013 at 1:30 p.m o'clock