## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-------------------------------------------------------x
                                        :
In re                                   : Chapter 9
                                        :
CITY OF DETROIT, MICHIGAN,              : Case No. 13- 53846
                                        :
                      Debtor.           : Hon. Steven W. Rhodes
                                        :
                                        :
-------------------------------------------------------x
```

## MOTION OF DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT RULE 9019, AND (III) GRANTING RELATED RELIEF

The City of Detroit, Michigan ("Detroit" or the "City"), as the debtor in the above-captioned case, hereby submits this motion (the "Motion") for entry of an order (i) authorizing the assumption of that certain Forbearance and Optional Termination Agreement (the "Forbearance Agreement"), dated as of July 15, 2013, by and among the City of Detroit, Michigan, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, and the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other, pursuant to section 365(a) of title 11 of the United States Code (the "Bankruptcy Code"), (ii) approving the

Forbearance Agreement pursuant to Bankruptcy Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and (iii) granting related relief.[1] As set forth in more detail below, the Forbearance Agreement will allow the City to access much needed cash flows, provides for a workable unwind of the City's swap obligations at a discounted price, and avoids potentially protracted litigation involving the swap transactions. In support of this Motion, the City respectfully represents as follows:

## Background

1. Incorporated in 1806, Detroit is the largest city in Michigan. As of December 2012, the City had a population of less than 685,000 (down from a peak population of nearly 2 million in 1950).

2. Over the past several decades, the City has experienced significant economic challenges that have negatively impacted employment, business conditions and quality of life. These challenges include, among other things, (a) a contraction of its historic manufacturing base, (b) a declining population, (c) high unemployment, (d) an erosion of the City's income and

---

[1] This Motion includes certain attachments that are labeled in accordance with Rule 9014-1(b)(1) of the Local Rules of the Bankruptcy Court for the Eastern District of Michigan (the "Local Rules"). Consistent with Local Rule 9014-1(b), a copy of the proposed form of order granting this Motion is attached hereto as Exhibit 1. A summary identifying each included attachment by exhibit number is appended to this Motion.

property tax bases, (e) a reduction in state revenue sharing and (f) a lack of adequate reinvestment in the City and its infrastructure.

3.      As of June 30, 2013 — the end of the City's 2013 fiscal year — the City's liabilities exceeded $18 billion (including, among other things, general obligation and special revenue bonds, unfunded actuarially accrued pension and other postemployment benefit liabilities, pension obligation certificate liabilities and related derivative liabilities).  Excluding the proceeds of debt issuances, the City has incurred large and unsustainable operating deficits for each of the past six years.  As of June 30, 2013, the City's accumulated unrestricted general fund deficit was approximately $237.0 million.  Excluding the impact of a recent debt issuance, this represents an increase of approximately $47.4 million over fiscal year 2012.

4.      On February 19, 2013, a review team appointed by Rick Snyder, Governor of the State of Michigan (the "Governor"), pursuant to Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, MCL § 141.1201, et seq. ("PA 72"), issued its report with respect to the City and its finances (the "Review Team Report").  The Review Team Report concluded that a local government financial emergency exists within the City.

5.      On March 14, 2013, in response to the Review Team Report and the declining financial condition of the City and at the request of the Governor,

the Local Emergency Financial Assistance Loan Board of the State of Michigan (the "Loan Board") appointed Kevyn D. Orr as emergency financial manager with respect to the City under PA 72, effective as of March 25, 2013.

6.     On March 28, 2013, upon the effectiveness of Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, et seq. ("PA 436"), Mr. Orr became, and continues to act as, emergency manager with respect to the City under PA 436 (in such capacity, the "Emergency Manager"). Pursuant to PA 436, the Emergency Manager acts "for and in the place and stead of the governing body and the office of chief administrative officer" of the City. MCL § 141.1549.  In addition, the Emergency Manager acts exclusively on behalf of the City with respect to the filing of a case under chapter 9 of the Bankruptcy Code upon receiving authorization from the Governor.  MCL § 141.1558.

7.     On July 18, 2013, the Governor issued his written decision (the "Authorization") approving the Emergency Manager's recommendation that the City be authorized to proceed under chapter 9 of the Bankruptcy Code. Thereafter, also on July 18, 2013, the Emergency Manager issued an order approving the filing of the City's chapter 9 case consistent with the Authorization (the "Approval Order").  True and correct copies of the Approval Order and the Authorization are attached as Exhibit A to the Statement of Qualifications Pursuant

to Section 109(c) of the Bankruptcy Code, filed contemporaneously with this Motion.

8.    In accordance with the Authorization and the Approval Order, on the date hereof (the "Petition Date"), the City commenced a case under chapter 9 of the Bankruptcy Code.  Additional details regarding the City and the events leading to the commencement of this chapter 9 case are set forth in the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code, filed contemporaneously with this Motion.

## Jurisdiction

9.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

10.    By this Motion, the City respectfully requests the entry of an order (i) authorizing the assumption of the Forbearance Agreement pursuant to section 365(a) of the Bankruptcy Code, (ii) approving the Forbearance Agreement pursuant to Bankruptcy Rule 9019, and (iii) granting related relief.

## Facts Relevant to This Motion

### *The COPs and Swap Transactions*

11.     In 2005 and 2006, the City entered into a series of financing transactions to fund the unfunded actuarial accrued liabilities ("UAAL") related to each of its two retirement systems—the General Retirement System (the "GRS") and the Police and Fire Retirement System (the "PFRS" and, together with the GRS, the "Systems")—through arranging for the issuance of certificates of participation supported by services contracts between the City and each of the General Retirement System Service Corporation and the Police and Fire Retirement System Service Corporation (the "Service Corporations"), i.e., specially created vehicles for each of the Systems.  (Malhotra Dec. ¶ 35).

12.     As of the end of fiscal year 2012, the aggregate outstanding amount of such certificates approximated $1.45 billion and, by series, are as follows:

- Series 2005-A in the aggregate amount of $503,365,000 bearing interest at 4.50-4.95% (the "2005 COPs");

- Series 2006-A in the aggregate amount of $148,540,000 bearing interest at 5.989% (the "2006-A COPs"); and

- Series 2006-B in the aggregate amount of $800,000,000 bearing interest at a floating rate (the "2006-B COPs" and, together with the 2006-A COPs, the "2006 COPs", and the 2006 COPS together with the 2005 COPs, the "COPs").

(Malhotra Dec. ¶ 36).

13.     Concurrently with the issuance of the 2006 B COPs, the Service Corporations entered into various pay fixed, receive variable interest rate swap transactions under eight separate 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) (collectively, the "Swap Contracts") with either (a) UBS AG or (b) SBS Financial Products Company LLC ("SBS" and, together with UBS AG, the "Swap Counterparties"), with Merrill Lynch Capital Services, Inc. ("MLCS") as credit support provider to SBS, with an aggregate notional amount equal to the outstanding amount of the 2006 B COPS, or $800 million. (Malhotra Dec. ¶ 37).

14.     Under these swaps, the Service Corporations and Swap Counterparties agreed to effectively convert the floating interest rate exposure of the Service Corporations into a fixed payment. (Mich. Aff. ¶ 9.)[2] This was done through an arrangement whereby, as part of agreeing to exchange floating rate obligations for fixed rate obligations, the Swap Counterparties agreed to make payments to the Service Corporations in the event the floating rates on the COPs exceeded certain levels.  (Mich. Aff. ¶ 9.)  Conversely, if interest rates fell below certain levels, the Service Corporations would be forced to make payments to the Swap Counterparties.  (Mich. Aff. ¶ 9.)

---

[2]     Affidavit in Support of the City's Verified Complaint for Declaratory and Injunctive Relief, Case No. 13-cv-12987-LPZ-MKM (E.D. Mich.) (Docket No. 20) (hereinafter, the "Mich. Aff."), at  ¶ 9.

15.     The Swap Counterparties required protection against the possibility that the Service Corporations might default on their quarterly swap payments.  (Mich. Aff. ¶ 10.)   The City arranged for insurance policies to guaranty certain of the payments on the Swap Contracts with the Financial Guaranty Insurance Company and Syncora Guarantee Inc. ("Syncora"), as successor to XL Capital Assurance Inc.  (Orr. Dec. ¶ 48.)   For instance, with respect to the policies issued by Syncora, if the Service Corporations fail to perform under the Swap Contracts, Syncora may be called upon to pay most of the quarterly swap payment, which is no more than, and can be significantly less than, approximately $12.6 million.   If the Swap Counterparty elects to terminate the Swap Contracts, Syncora is either not responsible for such payments or, if such terminations are premised on an additional termination event, then Syncora's total exposure with respect to the Swap Contracts is capped at a predetermined limit of $27 million.  (Orr Dec. ¶ 48.)

16.     As part of a 2009 restructuring of the City's swap obligations, the City entered into a "Collateral Agreement" with the Swap Counterparties, the Service Corporations, and U.S. Bank, N.A., which was to serve as the custodian for the new collateral arrangement. (Mich. Aff. ¶ 11.)  Under this agreement the City pledged a specific revenue stream: (i) payments from the developers of the City's casinos, and (ii) taxes upon each casino's gross receipts (together,

the "Casino Revenue") as collateral to secure the City's obligations under the swap agreements. (Mich. Aff. ¶ 11.)

17.     Under this new collateral arrangement, U.S. Bank oversees two accounts: the "General Receipts Subaccount" and the "Holdback Account." (Mich. Aff. ¶ 12.) Each day, on average, approximately $500,000 in Casino Revenue is deposited into the General Receipts Subaccount which, after 30 days, amounts to approximately $15 million. (Mich. Aff. ¶ 12.) Under the Collateral Agreement, U.S. Bank releases the Casino Revenue accumulating in the General Receipts Subaccount to the City *only after* it deposits approximately $4 million (one-third of its quarterly swap payment) into the Holdback Account. (Mich. Aff. ¶ 12.) Once the City makes this deposit into the Holdback Account, U.S. Bank gives the City complete access to the Casino Revenue that continues to accumulate in the General Receipts Subaccount, as it is deposited, until the beginning of the next payment period. (Mich. Aff. ¶ 12.)

18.     If the City fails to make a quarterly swap payment, the Swap Counterparties are empowered under the Collateral Agreement to notify U.S. Bank that it should not release—or should "trap"—the Casino Revenue owed to the City. (Mich. Aff. ¶ 13.)

19.     Approximately $45 million will be owed each year for the next ten years for payment on the Swap Contracts based on current interest rates. (Malhotra Dec. ¶ 38).

### *The Casino Revenues & the Restructuring*

20.     As set forth in the Ten-Year Projections attached as <u>Exhibit B</u> to the Malhotra Declaration, the City's wagering tax revenues are projected to remain steady at approximately $170 million to $180 million annually for the next ten years, which is similar to the City's gaming tax receipts for the past five years. (Malhotra Dec. ¶ 24).

21.     Eleven million dollars—the net monthly amount of casino revenues less the monthly swap payments—is roughly the equivalent of 30% of the City's total available cash on hand as of June 30, 2013. (Mich. Aff. ¶ 24.)  To illustrate, $11 million represents: (i) the salaries and wages for nearly two months of fire fighter services; or (ii) the salaries and wages for nearly one month of police officer services. (Mich. Aff. ¶ 24.)  Not having access to this significant percentage of the City's money of course adversely affects the City's current operations. (Mich. Aff. ¶ 24.)  With 4 of the top 10 most dangerous neighborhoods in the nation, the City needs access to that money immediately to ensure public safety and keep its police on the streets and its firefighters responding to fires.  (Mich. Aff. ¶ 24.)  Vital City operations such as these are functioning at a marginal level,

at best, and further constraints on the City's financial resources will only further degrade the health, safety and welfare of the City. (Mich. Aff. ¶ 24.)

22. The restructuring plan outlined by the Emergency Manager on June 14, 2013 contemplates a substantial investment in the City—$1.25 billion over the next 10 years—and includes spending approximately $500 million in the next 6 years to remediate urban blight and increase property values and the City's appearance and over $100 million in improvements to the performance and infrastructure of the City's public safety departments (police, fire, EMS). (Mich. Aff. ¶ 26.) Among others, the proposed plan provides for:

- Removing abandoned and blighted structures, which comprise 20% of the City's housing stock, to fundamentally transform the urban landscape and make the City a more attractive place to live, decrease crime and increase property values. Moreover, removing blight will allow public safety departments to allocate resources to more meaningful activities (60% of the 11,000 to 12,000 fires that the City experiences each year occur in blighted and unoccupied structures).

- Investing in new fire, police and EMS infrastructure, assets and personnel to address the chronically dilapidated buildings (average age of the City's fire stations is 80 years old with over $1 million in annual maintenance), fleet of vehicles (many with well over 250,000 miles and that break down frequently) and overworked employees (the fire department's apparatus division has a mechanic to vehicle ratio of 1 to 39 resulting in an inability to complete preventative maintenance on schedule).

The Emergency Manager's proposed restructuring plan cannot be effected if the Casino Revenue, which was greater than $180 million during the City's 2012 fiscal year or nearly 17% of the City's annual revenue, is trapped. (Mich. Aff. ¶ 26.)

*The Negotiation of the Forbearance Agreement*

23.    In March 2012, the City suffered ratings downgrades with respect to its unlimited tax GO bonds, which gave rise to the risk that the Swap Counterparties could terminate the Swap Contracts and seek a termination payment from the City.   (Orr Dec. ¶ 86.)   A termination payment could be in the range of hundreds of millions of dollars.  (Mich. Aff. ¶ 26.)   A recent marked-to-market valuation provided by a third party provider of valuation services for financial products estimated the negative net value of the Swap Contracts at approximately $296.5 million as of June 28, 2013. (Malhotra Dec. ¶ 37).  As reported in the 2012 CAFR, the City commenced negotiations with the Swap Counterparties to resolve issues arising in connection with the credit rating downgrade.  (Orr Dec. ¶ 86.)

24.    Following the appointment of the Emergency Manager, discussions with the Swap Counterparties intensified to find a resolution that would enable the City to exit the Swap Contracts with no impact on the Swap Insurers and assure the City continued access to the wagering tax revenues.  (Orr Dec. ¶ 87.)  The negotiations included (a) several in-person and telephonic meetings among the City, Swap Counterparties and their respective advisors,

(b) the exchange of various economic offers between the parties and (c) the generation of numerous draft agreements memorializing such offers. (Orr Dec. ¶ 87.)

26.    Despite the significant time and effort devoted to reaching a resolution that would permit the City access to the wagering tax revenues, following the assertion of alleged rights by Syncora, the City's access to funds was blocked, and the negotiations with the Swap Counterparties stalled. (Orr Dec. ¶ 88.) Accordingly, the City acted to protect its interests and preserve its access to its wagering tax revenues – a critical funding source for the City – by commencing litigation against Syncora (among others) in the Circuit Court for Wayne County, Michigan to seek (a) the release of revenues held by U.S. Bank as custodian and (b) the recovery of damages suffered by the City due to Syncora's interference with its banking relationships. (Orr Dec. ¶ 88.) On July 5, 2013, the City obtained a temporary restraining order against Syncora and U.S. Bank, thus temporarily preserving its access to wagering tax revenues. (Orr Dec. ¶ 88.)

26.    Following those activities, the City was able to make timely payment on its swap obligations, making the required deposit into the Holdback Account and triggering the release of wagering tax revenues to the City. (Orr Dec. ¶ 89.) Concurrently, the City was able to restart negotiations with the Swap Counterparties. Negotiations culminated in the Forbearance and Optional

Termination Agreement, dated as of July 15, 2013, by and among the City, the

Swap Counterparties and the Service Corporations. (Orr Dec. ¶ 89.)

      27. The key provisions of the Forbearance Agreement[3] are as

follows:

| | |
|---|---|
| *Forbearance.* (§ 1.1) | During the Forbearance Period, the Swap Counterparties will forbear from (a) terminating the Swap Agreements, and (b) instructing the Custodian to cease making payments of the casino revenues from the General Receipts Subaccount to the City in accordance with Section 5.4 of the Collateral Agreement or giving notice to the Custodian to cease making such payments. |
| *Affirmative Obligations of Swap Counterparties During Forbearance Period.* (§ 1.2) | During the Forbearance Period, if, among other things, the City has not received the casino revenues from the General Receipts Subaccount or has reasonable grounds to believe that the Custodian may not remit such payments, then the Swap Counterparties must, subject to certain exceptions, use their best efforts to take any action reasonably requested by the City to cure such non-payment or insecurity.<br><br>In the bankruptcy context, the Swap Counterparties also must generally (a) support the City's efforts to obtain turnover of the casino revenues, (b) consent to certain uses of cash collateral, and (c) consent to the remittance to the City of the casino revenues contemplated by the letter from the City to the Custodian. |

---

[3]     Capitalized terms in this section are accorded the meanings given to them in the Forbearance Agreement. This section of the Motion is a summary of the salient terms of the Forbearance Agreement and is qualified in its entirety by the terms of the Forbearance Agreement. If there are any inconsistencies between the summary contained herein and the Forbearance Agreement, the Forbearance Agreement shall control. Parties are strongly encouraged to read the Forbearance Agreement attached hereto as <u>Exhibit 6</u> in its entirety.

| | |
|---|---|
| **Forbearance Period Termination Events.** (§ 1.3) | The Forbearance Period may end upon: (a) June 30, 2014, (b) a payment default under the Swap Agreements or the voluntary bankruptcy filing of the Service Corporations, (c) the involuntary filing of the Service Corporations, (d) certain credit support defaults under the Swap Agreements, (e) certain Additional Termination Events under the Swap Agreements – specifically including third party challenges to validity or the City's attempt to reduce the casino taxes, (f) breach of the covenants or representations in the Agreement, (g) a judgment of a court rendering documents relating to the transaction invalid or holding the certain COPs should be paid prior to maturity, (h) certain legislative acts with similar effects, (i) the failure to obtain a final, non-appealable order, approving the settlement within 60 days of the filing, the denial of this Motion, the dismissal of the City's petition for relief (if not re-filed within 30 days), and a failure to include a stay waiver within the approval order, or (j) the occurrence of the effective date of the City's plan of adjustment.<br><br>In addition, the City may terminate the Forbearance Period if the City has not received the casino revenues from the General Receipts Subaccount or has reasonable grounds to believe that the Custodian may not remit such payments by July 31, 2013 or in certain situations where the Bankruptcy Court does not approve the Forbearance Agreement. |
| **Consequences of Forbearance Period Termination** (§ 1.4) | Upon a termination of the Forbearance Period, among other things, the Swap Counterparties are no longer obligated to forbear from exercising their rights and the City is no longer entitled to exercise its option to terminate the Swap Agreements. Further, the covenants of the City, the Service Corporations and the Emergency Manager survive in certain instances when the Swap Counterparties terminate the Forbearance Period based on certain occurrences. In other instances, a termination of the forbearance period reverts the parties' rights to the *status quo ante*. |
| **Covenants of the City and Service** | The City and the Service Corporations covenant to, among other things: (a) not take certain acts to set aside, avoid, |

| | |
|---|---|
| **Corporations**<br>(§ 2.1) | reject, modify, terminate, disapprove, limit or render ineffective the transaction documents or cause payment to certain of the COPs prior to the scheduled payment date, (b) defend against any litigation or other judicial action by a third party that may have the effect described immediately above, (c) ratify and agree to comply with all provisions of the transaction documents and take certain steps to assure that the transaction documents continue in full force and effect as binding obligation to the extent the failure would not have certain adverse effects on the Swap Counterparties, (d) file an assumption motion to assume the Agreement or a 9019 motion to authorize the settlement, and use best efforts to obtain a final non-appealable order granting the motion, (e) schedule any amounts due and owing to any Swap Counterparty as undisputed, fully secured claims, and (f) to the extent the forbearance period terminates in certain situations, support the reasonable actions of the Swap Counterparties in realizing upon the pledged collateral and having the Custodian make such payments. |
| **Covenants of the Emergency Manager**<br>(§ 2.2) | The Emergency Manager covenants to, among other things, (a) not take, or cause to be taken, certain acts to set aside, avoid, reject, modify, terminate, disapprove, limit or render ineffective the transaction documents or cause payment to certain of the COPs prior to the scheduled payment date,<br>(b) exercise all powers, authorities and privileges vested in the Emergency Manager under applicable law: (i) subject to certain exceptions, to cause the City and the Service Corporations to perform all covenants, obligations and duties of the City and the Service Corporations, under the transaction documents and to pay the City Payments (subject to Section 2.2(b)(iii) of the Agreement), (ii) to cause the City or the Service Corporations to avoid the occurrence of certain Forbearance Period Termination Events, (iii) to cause the City to make all City Payments as and when required under the Collateral Agreement and, to the extent necessary, to make one or more appropriations or make one or more amendments to then existing appropriations in amounts that are sufficient to pay in full, and which may be used exclusively for payment of, such City Payments, and |

| | |
|---|---|
| | (iv) following the occurrence of both the termination of the Forbearance Period and the Swap Agreements, to make one or more appropriations or make one or more amendments to then existing appropriations of the Pledged Property in amounts that are sufficient to pay in full, and which may be used exclusively for payment of, the obligations owing to the Swap Counterparties. |
| ***Optional Termination Right*** (§§ 3.1 – 3.5) | The City may direct UBS and MLCS to exercise their optional termination rights under the Swap Agreements, prior to the expiration of the Exercise Period, upon 7 business days to 10 business days prior notice (with evidence that the City will have the funds sufficient to pay in cash the optional termination amounts). Provided that no Event of Default or Termination Event is then occurring with respect to which any Swap Counterparty is the Defaulting Party, the Swap Counterparties will be obligated to deliver a written notice exercising their Optional Termination Rights.<br><br>The Service Corporations will be relieved of any payment obligations to the Swap Counterparties under the Swap Agreements. No Swap Counterparty will present any payment notice to a Swap Insurer as a result of the exercise of the Termination Rights and will irrevocably waive all future rights to do so. If the City has not exercised the Termination Rights on or prior to the termination of the Exercise Period, the Termination Rights shall expire.<br><br>The City will pay 75% of the then mid-market value of the swaps if the option is exercised between the date of the Agreement and October 31, 2013, 77% if the option is exercised after October 31, 2013 but on or before November 15, 2013, and 82% if exercised after November 15, 2013 and on or before March 13, 2014. In addition, the City will pay any unpaid amounts then owing under the Swap Agreements. |
| ***Waiver of Claims Against Insurers*** | If the City exercises its termination right and complies with the Agreement, the Swap Counterparties shall not present |

| (§ 3.2(c)) | any payment notice or other presentation of claim under a Swap Insurance Policy to a Swap Insurer as a result of the exercise of the Termination Rights, and each Swap Counterparty will irrevocably waive all future rights to do so. |
| --- | --- |
| *Representations* (§ 4) | Each of the City, the Service Corporations, the Swap Counterparties make certain representations to the other regarding such entity's existence, its power to enter into the Agreement, the execution, delivery and performance of the Agreement, the necessary consents for entering into the Agreement, and the legality and validity of the Agreement. |

## Basis for Relief Requested

## I.    Relevant Standards Governing The Relief Requested Herein

28.    The City seeks assumption of the Forbearance Agreement pursuant to section 365(a) of the Bankruptcy Code, the standards for which are set forth below.  In addition, the City seeks approval of the Forbearance Agreement pursuant to Bankruptcy Rule 9019, the standards for which are likewise set forth below.

29.    While the City does not believe it is required to seek approval of its agreements under Bankruptcy Rule 9019, it nonetheless believes that good reason exists under the circumstances to request approval of the Forbearance Agreement pursuant to Bankruptcy Rule 9019 and, thus, elects to seek such approval solely with respect to such agreement.

**A.  Standards Governing Assumption Of The Forbearance Agreement Pursuant To Section 365(a).**

30.     Section 365(a) of the Bankruptcy Code, which specifically applies to this proceeding pursuant to section 901(a) of the Bankruptcy Code, provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease."  11 U.S.C. § 365(a).   Courts apply the same "business judgment" test in chapter 9 proceedings as they do in proceedings under chapter 7 or 11 of the Bankruptcy Code.  See Moran v. City of Central Falls, 475 B.R. 323, 331-33 (D.R.I. 2012) (holding business judgment test applied in a chapter 9 proceeding).

31.     Under this test, courts routinely approve motions to assume or reject executory contracts or unexpired leases upon a showing that the debtor's decision is an exercise of sound business judgment and will benefit the debtor's estate or, in the chapter 9 context, the debtor.  See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993) (stating that section 365 of the Bankruptcy Code "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject.");  see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (stating that the traditional standard applied by courts under section 365 is that of "business

judgment"); <u>Edwin C. Levy Co. v. McLouth Steel Corp. (In re McLouth Steel Corp.)</u>, 20 B.R. 688, 692 (Bankr. E.D. Mich. 1982) ("In determining whether a certain contract should be assumed or rejected, the decision should rest on the business judgment of the debtor.").

32.     Courts generally will not second-guess a debtor's business judgment concerning the assumption or rejection of an executory contract or unexpired lease.  <u>See</u> <u>In re Riodizio, Inc.</u>, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997) ("[A] court will ordinarily defer to the business judgment of the debtor's management"); <u>accord</u> <u>Phar-Mor, Inc. v. Strouss Bldg. Assocs.</u>, 204 B.R. 948, 951-52 (Bankr. N.D. Ohio 1997) ("Whether an executory contract is 'favorable' or 'unfavorable' is left to the sound business judgment of the debtor . . . .  Courts should generally defer to a debtor's decision whether to reject an executory contract.").

33.     The "business judgment" test is not a strict standard; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor.  <u>See</u>, <u>e.g.</u>, <u>In re Greektown Holdings, L.L.C.</u>, No. 08-53104, 2009 WL 1653461, at *1 (Bankr. E.D. Mich. May 13, 2009) ("Courts initially apply a 'business judgment' and 'benefit to the estate' test under § 365(a) to determine whether or not a debtor should be allowed to assume an executory contract.").

**B.    Standards Governing Approval Of The Forbearance Agreement Pursuant To Bankruptcy Rule 9019.**

34.    Settlements and compromises are, likewise, "a normal part of the process of reorganization." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 130 (1939)).  Bankruptcy Rule 9019, which applies to this proceeding pursuant to Bankruptcy Rule 1001, provides the procedural mechanism for approval of such compromises.  It states, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  FED. R. BANKR. P. 9019(a).

35.    A chapter 9 debtor  is entitled—but not required—to seek approval of a compromise pursuant to this mechanism.  See Ass'n of Retired Employees of the City of Stockton v. City of Stockton, Ca. (In re City of Stockton, Ca.), 486 B.R. 194, 200 (Bankr. E.D. Cal. 2012) (finding that city, while it could not be obligated to seek approval pursuant to Bankruptcy Rule 9019, could choose to consent to judicial approval pursuant to that rule).  While requiring a chapter 9 debtor to seek the Court's approval of a compromise would impermissibly violate the terms of section 904 of the Bankruptcy Code by interfering with the municipality's property and revenues without its consent, a municipality may consent to judicial involvement.  See 11 U.S.C. § 904 ("Notwithstanding any

power of the court, *unless the debtor consents* . . . the court may not . . . interfere with . . . any of the property or revenues of the debtor . . . .") (emphasis added).

36.     The decision to approve a compromise or settlement is subject to the sound discretion of the bankruptcy court.  Engman v. Boyd, No. 09-cv-151, 2009 WL 1974460, at *2 (W.D. Mich. July 6, 2009) ("The bankruptcy court has wide discretion to approve or disapprove settlement agreements.").  Courts apply the same "fair and equitable" analysis in chapter 9 proceedings as in proceedings under other chapters of the Bankruptcy Code.  See In re Bamberg Cnty. Mem'l Hosp., No. 11-03877, 2013 WL 1686675, at *2 (Bankr. D.S.C. Apr. 18, 2013) (noting that the chapter 9 debtor "may not have been required to seek approval of the settlement" pursuant to Bankruptcy Rule 9019, but since it did, applying "fair and equitable" analysis and considering same four factors); In re Barnwell Cnty. Hosp., 491 B.R. 408, 417-18 (Bankr. D.S.C. Apr. 2013) (same).

37.     In exercising its discretion, a bankruptcy court must determine that the proposed settlement is fair and equitable and in the best interests of the debtor.  See Reynolds v. Comm'r, 861 F.2d 469, 473 (6th Cir. 1988) ("[T]he bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable."); see also Stark v. Moran (In re Moran), 385 B.R. 799, 2008 WL 1766874, at *4 (B.A.P. 6th Cir. Apr. 18, 2008) (unpublished

table decision) (applying "fair and equitable standard"), <u>appeal dismissed for lack</u> <u>of standing</u>, 408 B.R. 698 (B.A.P. 6th Cir. 2009); <u>Lyndon Prop. Ins. Co. v. Katz</u>, 196 Fed. Appx. 383, 387 (6th Cir. 2006) (same); <u>In re Bard</u>, 49 Fed. Appx. 528, 530 (6th Cir. 2002) (same); <u>Rankin v. Dault (In re Rankin)</u>, 396 B.R. 203, 209 (E.D. Mich. 2008) (same), <u>aff'd on other grounds</u>, 438 Fed. Appx. 420 (6th Cir. 2011).

38.     However, "[a] bankruptcy judge need not conduct a mini-trial or write an extensive opinion every time he approves or disapproves a settlement. The judge need only be apprised of the relevant facts and law so that he can make an informed and intelligent decision and set out the reasons for that decision." <u>Fishell v. Soltow (In re Fishell)</u>, 47 F.3d 1168, 1995 WL 66622, at *3 (6th Cir. Feb. 16, 1995) (unpublished table decision) (<u>quoting</u> <u>LaSalle Nat'l Bank v. Holland</u> <u>(In re Am. Reserve Corp.)</u>, 841 F.2d 159, 163 (7th Cir. 1987)).  Ultimately, "the obligation of the court is to 'canvas the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'" <u>In re Dow Corning</u>, 192 B.R. 415, 421 (Bankr. E.D. Mich. 1996) (<u>quoting</u> <u>In re Drexel Burnham Lambert</u>, 134 B.R. 493, 497 (Bankr. S.D. N.Y. 1991)).

39.     The bankruptcy judge's approval of a compromise is reviewed deferentially, and the "abuse of discretion standard allows the bankruptcy judge to consider myriad factors that may bear on his notion of fairness and equity."

Engman, 2009 WL 1974460, at *3.  In evaluating whether the proposed agreement

is fair and equitable, courts in this district generally consider four factors:  (a) the

probability of success in the litigation; (b) the difficulties, if any, to be encountered

in the matter of collection; (c) the complexity of the litigation involved, and the

expense, inconvenience and delay necessarily attending it; and (d) the paramount

interest of the creditors and a proper deference to their reasonable views in the

premises. Bard, 49 Fed. Appx. at 530; see also In re MQVP, Inc., 477 Fed. Appx.

310, 313 (6th Cir. 2012) (applying Bard factors).

## II.      Application Of The Relevant Standards

    40. The City submits that, in light of the factual circumstances and

reality of the City's condition, both assumption pursuant to section 365 of the

Bankruptcy Code and approval pursuant to Bankruptcy Rule 9019 are warranted.

In addition to assumption, the City has determined that its interests will be served

by submitting to judicial approval of the Forbearance Agreement and accordingly,

with the filing of this Motion, has consented to this Court passing on the approval

of the Forbearance Agreement pursuant to Bankruptcy Rule 9019.   See

Forbearance Agreement at § 2.1(d); see also Stockton, 486 B.R. at 199 (listing

reasons why a chapter 9 debtor may choose to seek Bankruptcy Rule 9019

approval, including the insistence of counterparties and a desire for transparency).

41.     The City respectfully submits that its assumption of the Forbearance Agreement is a sound exercise of its business judgment, and that the Forbearance Agreement should be approved under Bankruptcy Rule 9019 because it is fair, equitable and in the best interests of the City and its Creditors.  The Forbearance Agreement allows the City to access much needed cash flows, provides for a workable unwind of its swap obligations at a discounted price, and avoids potentially protracted litigation involving the swap transactions.

42.     The agreement provides that the Swap Counterparties will forbear from exercising remedies that would limit the City's ability to access much-needed cash.  As all parties are aware, the City is cash-starved and insolvent. Notwithstanding the aggressive actions of Syncora, the City submits that, with the Swap Counterparties consent to use of cash collateral, the City will be able to access a significant revenue stream going forward—the Casino Revenue.

43.     Even net of the amount of the City's monthly swaps payments—amounts the City would no longer be required to pay after termination—the stream of funds relating to the Casino Revenue is substantial, on average around $11 million each month.  $11 million is the equivalent of 30% of the City's available cash-on-hand as of June 30, 2013, and would allow the City to pay for nearly two months of fire fighter salaries and wages or nearly one month of police officer salaries and wages.  The agreement of the Swap Counterparties to

forbear from instructing the Custodian to "trap" these revenues will provide the City with crucial liquidity and cash flow going forward. This is a critical concession given the City's liquidity crisis and limited other sources of revenue at this time.

44.    The value to the City of continued access to the Casino Revenue cannot be understated. Promoting reinvestment in the City to improve Detroit residents' quality of life is an essential touchstone of any restructuring plan. Those critical reinvestments cannot happen without access to the City's Casino Revenue.

45.    In addition to the liquidity relief, the Forbearance Agreement also provides for a mechanism for the City to unwind the Swap Contracts at a discounted value. Absent the Forbearance Agreement, the City anticipates that the Swap Counterparties would terminate or seek to terminate the Swap Contracts, resulting in a termination payment obligation of hundreds of millions of dollars.[4]

---

[4]    Even if the Swap Counterparties did not terminate the Swap Contracts, it is unworkable that the Swap Contracts would continue to be in effect during the pendency of the case. As set forth above, the Swap Contracts were originally entered into in order to hedge interest rate exposure on certain variable interest rate COPs. Pursuant to section 502(b)(2) of the Bankruptcy Code, claims for unmatured interest are not allowable against the City. Thus, the original intent of the Swap Contracts, namely, to hedge interest rate exposure for the COPs, has disappeared. On a post-bankruptcy basis, the hedge the Swap Contracts were intended to provide is no longer needed.

The amount of any such termination payment fluctuates daily, but as of the end of June 2013, the City estimated the negative value of the swaps at $296.5 million.

46.     In contrast, the Forbearance Agreement allows the City to elect to terminate the Swap Contracts at an approximately 18% – 25% discount.  While the termination fee varies daily, the City estimated the savings associated with the discount, as of the end of June 2013, as in excess of $70 million.  Given that the Collateral Agreement provides that the City pledged the Casino Revenue to secure its obligations to the Swap Counterparties, this discount represents significant value to the City and its creditors.

47.     Further, while the City has examined whether there are viable actions to challenge the Swap Contracts or the City's pledge of the Casino Revenue to secure its obligations to the Swap Counterparties, litigation would be protracted, expensive and, in terms of success, uncertain.  The Swap Contracts and related documents are exceedingly complex, as is any determination of the amounts owing and the rights of the parties thereunder.  While certain creditors have informed the City of their views on these arrangements, regardless of the merits of these positions, the issues are extremely complicated and, accordingly, subject to a high degree of uncertainty.  Prior to commencing any litigation, the City would be required to engage in substantial additional legal and financial analysis, itself a costly and lengthy undertaking.  Further, even if the City made the decision to

pursue litigation, such litigation would be lengthy and expensive. The parties would be required to engage in extensive factual and expert discovery, together with briefing and testimony, with no guarantee of a positive result for the City. Given the amounts at issue, a lengthy appellate process is all but certain. The Forbearance Agreement obviates the need to pursue a litigation path and avoids the costs and risks associated therewith.

48.     The Forbearance Agreement will also moot the issues raised in the litigation brought by the City against Syncora and others in the Circuit Court for Wayne County, Michigan concerning the City's access to the Casino Revenue. The Forbearance Agreement assures that the City will continue to make payments under the Swap Contracts pending exercise of the termination option. Further, upon exercise of the termination option, the City's obligations under the Swap Contracts will be discharged and the Swap Counterparties will waive their claims against the insurers. Therefore, Syncora would have no payment obligation to the Swap Counterparties under the Swap Contracts.

49.     In a chapter 7 or chapter 11 case, certain creditors might favor "rolling the dice" on litigation, even if such litigation were commenced against well-funded and well-advised adversaries. Such creditors might even accept spending years in court proceedings with the hopes of a significant end-game payday, even if the chances of such payday were uncertain. However, the City's

paramount concern is the health and safety of its residents. There will be nothing left if literally hundreds of millions of dollars of the City's tax revenues are tied up during the course of a multi-year litigation. Accordingly, the relief afforded under the Forbearance Agreement is in the best interest of the City.

50. The Forbearance Agreement is the result of substantial good faith, arm's length negotiations between the City and the Swap Counterparties. Each of the parties was represented throughout these negotiations by sophisticated financial advisors and legal counsel. The result is an agreement that is fair and equitable to all parties, including the City's creditors. As described above, the ability to access, and use, the Casino Revenue will be essential to the City's continued ability to survive and ultimately to create value for all of its creditors. In addition, the ability to terminate the Swap Contracts in the short term, and at a discount, represents significant value to the City and its creditors.

51. The foregoing demonstrates that the City's decision to assume the Forbearance Agreement is an appropriate exercise of its business judgment, such that this Court should approve the assumption.[5] Likewise, in avoiding the

---

[5] Section 365(b)(1) of the Bankruptcy Code provides that "if there has been a default in an executory contract….the trustee may not assume such contract…unless, at the time of assumption of such contract…the trustee (A) cures…such default..." 11 U.S.C. § 365(b)(1). Here, there has not been a default under the Forbearance Agreement, and therefore the City is not obligated to pay any cure amounts.

uncertain and extremely complex litigation that would ensue, while simultaneously

serving the paramount interests of the City's creditors by bringing immediate relief

and value, the Forbearance Agreement easily satisfies the factors considered by

courts in connection with Bankruptcy Rule 9019, such that it should be approved.

## III.    Limited Waiver of the Automatic Stay

52.     In connection with the assumption and approval of the

Forbearance Agreement, the City respectfully seeks a waiver of the automatic stay

imposed under section 362 of the Bankruptcy Code as described herein.

53.     The Forbearance Agreement provides,  "in the event of

nonperformance under this Section 2, it is acknowledged that mandamus is an

appropriate remedy and the Emergency Manager shall not contest such mandamus

remedy, and if the City is then a debtor under the Bankruptcy Code, the

Emergency Manager shall promptly seek to waive the automatic stay with respect

to such remedy."  (Forbearance Agreement, § 2.3)  Section 1.3(j) of the

Forbearance Agreement also provides that it is a Forbearance Agreement

Termination Event if the court order authorizing and approving the Forbearance

Agreement "does not contain a waiver of the automatic stay as specified in Section

2.3 herein."

54.     The City respectfully submits that it is appropriate to grant a

limited waiver of the stay as contemplated by the Forbearance Agreement.  First, if

the waiver of the stay is not granted, the Swap Counterparties may seek to terminate the Forbearance Agreement. Second, the City believes the waiver of the stay is limited as it is only implicated if this Court approves the Forbearance Agreement and, thereafter, the City does not perform its obligations under Section 2 of the then-assumed agreement.

55. The City submits that a waiver of the automatic stay to allow the Swap Counterparties to seek the remedy of mandamus under that specific factual scenario is appropriate and consistent with section 365 of the Bankruptcy Code. See In re Multech Corp., 47 B.R. 747, 749 (Bankr. D. Iowa 1985) (court order provided for relief from the automatic stay upon non-compliance with court assumption order). Cf. U.S., Dept. of Air Force v. Carolina Parachute Corp., 907 F.2d 1469, 1475 (4th Cir. 1990) ("[I]ssuing an injunction that bars a party from exercising contractual rights provided in assumed executory contracts may conflict with the rule that executory contracts are assumed *cum onere*.").

## Notice

56. Notice of this Motion has been given to the following (or their counsel if known): (a) the trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d); (c) the unions representing certain of the City's employees and retirees; (d) the four

associations of which the City is aware representing certain retirees of the City; (e) the City's pension trusts; (f) the insurers of the City's bonds; (g) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (h) certain significant holders of the COPs; (i) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); and (j) the insurers of the Swaps.  In addition, a copy of the Motion was served on the Office of the United States Trustee.  The City submits that no other or further notice need be provided.

### No Prior Request

57.    No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the City respectfully requests that this Court: (a) enter an order substantially in the form attached hereto as <u>Exhibit 1</u> granting the relief sought herein; and (b) grant such other and further relief to the City as the Court may deem proper.

Dated: July 18, 2013                    Respectfully submitted,


 /s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# SUMMARY OF ATTACHMENTS

The following documents are attached to this Motion, labeled in accordance with Local Rule 9014-1(b).

| | |
|---|---|
| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Notice |
| Exhibit 3 | None [Brief Not Required] |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | Re-Submitted - Affidavit in Support of the City's Verified Complaint for Declaratory and Injunctive Relief, Case No. 13-cv-12987-LPZ-MKM (E.D. Mich.) |
| Exhibit 6 | Forbearance Agreement |

# **EXHIBIT 1**

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

```
-------------------------------------------------------x
                                      :
In re                                 : Chapter 9
                                      :
CITY OF DETROIT, MICHIGAN,            : Case No. 13- 53846
                                      :
                    Debtor.           : Hon. _____
                                      :
                                      :
-------------------------------------------------------x
```

## ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT RULE 9019, AND (III) GRANTING RELATED RELIEF

This matter coming before the Court on the motion (the "Motion")[1]
for entry of an order (i) authorizing the assumption of that certain forbearance
and optional termination agreement pursuant to section 365(a) of the Bankruptcy
Code, (ii) approving such agreement pursuant Bankruptcy Rule 9019, and (iii)
granting related relief; the Court having reviewed the Motion and having
considered the statements of counsel and the evidence adduced with respect to the
Motion at a hearing before the Court (the "Hearing"); and the Court having

---

[1]     Capitalized terms used herein are accorded the meanings given to them in
the Motion.

determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

## THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:

A. <u>Jurisdiction and Venue</u>. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B. <u>Notice</u>. Notice of the Motion and the Hearing was sufficient under the circumstances. As evidenced by the certificate of service, notice of the Motion and Hearing has been given to the following: (a) the trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d); (c) the unions representing certain of the City's employees and retirees; (d) the four associations of which the City is aware representing certain retirees of the City; (e) the City's pension trusts; (f) the insurers of the City's bonds; (g) the COPs; (h) certain significant holders of the COPs; (i) the Swaps; and (j) the insurers of the Swaps. In addition, a copy of the Motion was served on the Office of the United States Trustee. Cause exists to modify the requirement under Bankruptcy Rule 2002(a) that a hearing on approval

of a compromise or settlement shall be given to all creditors and, accordingly, no other or further notice is required under the circumstances.

C.  Assumption Appropriate.  The assumption of the Forbearance Agreement and other relief sought in the Motion will benefit the City and is a sound exercise of the City's business judgment, is in the best interest of the City, its creditors and other parties in interest and is based on good, sufficient and sound business purposes and justifications.  As of the date hereof, no defaults exist under the Forbearance Agreement and the City is not obligated to pay any cure amounts in connection with the assumption of the Forbearance Agreement.

D.  Rule 9019 Authorization. The City was authorized, but not required, to seek approval of the Forbearance Agreement pursuant to Bankruptcy Rule 9019.  The Forbearance Agreement is fair, reasonable and equitable.

E.  Consent to Use of Casino Revenues.  Pursuant to Section 1.2 of the Forbearance Agreement, UBS AG and MLCS consent to the City's use of the Casino Revenue as set forth in the Forbearance Agreement.   The consent of UBS AG and MLCS will allow the City immediate access to its Casino Revenue as set forth in Forbearance Agreement, and no other or further consents are required.

F.  Modification of Automatic Stay.  Good cause exists to modify the automatic stay, pursuant to section 362(d) of the Bankruptcy Code,  solely to

permit UBS AG and MLCS to petition for a writ of mandamus as a remedy for nonperformance under Section 2 of the Forbearance Agreement.

G. Arm's-Length Agreement. The Forbearance Agreement was negotiated at arm's length and in good faith by all parties. UBS AG and MLCS are not insiders of the City as that term is defined in Bankruptcy Code section 101(31). The parties' entry into and performance under the Forbearance Agreement does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against the parties thereto, except as may be expressly set forth in this Order or in such agreements.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The Motion is GRANTED as set forth herein.

2. Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3. Pursuant to section 365(a) of the Bankruptcy Code, the City is authorized to assume the Forbearance Agreement, attached as Exhibit 6 to the Motion.

4. The Forbearance Agreement is approved in its entirety. The City is authorized to perform its obligations that arise from the Forbearance

Agreement pursuant to Bankruptcy Rule 9019, and any actions taken heretofore in furtherance of these obligations are hereby ratified.

5.     The Custodian under the Collateral Agreement is hereby authorized to rely upon the terms of this Order and UBS AG and MLCS' consent to the use by the City of the Casino Revenue.

6.     The automatic stay imposed pursuant to section 362 of the Bankruptcy Code is modified solely to permit UBS AG and MLCS to petition a court of competent jurisdiction for a writ of mandamus as a remedy for nonperformance under Section 2 of the Forbearance Agreement.

7.     The City is authorized to take any and all actions necessary or appropriate to implement the terms of this Order and the Forbearance Agreement.

8.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, enforcement or interpretation of this Order.

# EXHIBIT 2

## *[NOTICE]*

Form B20A(Official Form 20A)
12/1/10

# UNITED STATES BANKRUPTCY COURT
## Eastern District of Michigan

In re:

**CITY OF DETROIT, MICHIGAN**

Chapter: 9

Case No.: 13- 53846

        **Debtor.**

Judge: Steven W. Rhodes

Address: <u>N/A</u>

Last four digits of Social Security or Employer's Tax Identification (EIN) No(s).(if any): <u>N/A</u>

### NOTICE OF MOTION OF DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT RULE 9019, AND (III) GRANTING RELATED RELIEF

The City of Detroit, Michigan ("<u>Detroit</u>" or the "<u>City</u>") has filed papers with the court seeking entry of an order (i) authorizing the assumption of that certain Forbearance and Optional Termination Agreement (the "<u>Forbearance Agreement</u>"), dated as of July 15, 2013, by and among the City of Detroit, Michigan, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, and the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other, pursuant to section 365(a) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), (ii) approving the Forbearance Agreement pursuant to Bankruptcy Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and (iii) granting related relief.

**<u>Your rights may be affected.</u>  You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case.  (If you do not have an attorney, you may wish to consult one.)**

If you do not want the court to grant the relief sought in the motion, or if you want the court to consider your views on the motion, within 21 days, you or your attorney must:

1.        File with the court a written response or an answer, explaining your position at:[1]

### United States Bankruptcy Court
United States Bankruptcy Court
211 W. Fort Street, Suite 2100
Detroit, MI 48226

If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above. All attorneys are required to file pleadings electronically.

You must also mail a copy to:

---

[1]        Any response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

2.      If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

Dated:    July 18, 2013                    Respectfully submitted,


 /s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
   STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# **EXHIBIT 4**

## *[CERTIFICATE OF SERVICE]*

## <u>CERTIFICATE OF SERVICE</u>

I, David G. Heiman, hereby certify that the foregoing Corrected Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief was filed and served via the Court's electronic case filing and noticing system on this 24th day of July, 2013.

/s/ David G. Heiman

# EXHIBIT 5

## *[AFFIDAVIT IN SUPPORT OF THE CITY'S VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF]*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

| | |
|---|---|
| CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan )<br><br>Plaintiff, )<br><br>v. )<br><br>SYNCORA GUARANTEE INC., a New York Corporation, )<br><br>and )<br><br>U.S. BANK, N.A., )<br><br>and )<br><br>MGM GRAND DETROIT, LLC, )<br><br>and )<br><br>DETROIT ENTERTAINMENT, LLC, d/b/a MOTORCITY CASINO HOTEL, )<br><br>and )<br><br>GREEKTOWN CASINO, LLC, )<br><br>Defendants. ) | Case No.: 2:13-cv-12987-LPZ-MKM<br><br>Hon. Lawrence P. Zatkoff |

**[RESUBMITTED]**
**AFFIDAVIT OF KEVYN D. ORR**
**EMERGENCY MANAGER FOR THE CITY OF DETROIT**

**STATE OF MICHIGAN**
**IN THE 3RD JUDICIAL CIRCUIT COURT**
**FOR THE COUNTY OF WAYNE**

CITY OF DETROIT, a Municipal
Corporation Organized and Existing
Under the Laws of the State of Michigan

      Case No.:    13-008858-CZ
      Hon.        Jeanne Stempien

        Plaintiff,

                                   13-008858-CZ

      v.

                            FILED IN MY OFFICE
                        WAYNE COUNTY CLERK

SYNCORA GUARANTEE INC., a New
York Corporation,
                        7/5/2013 12:02:00 PM
                        CATHY M. GARRETT

and

U.S. BANK, N.A.,

and

MGM GRAND DETROIT, LLC,

and

DETROIT ENTERTAINMENT, LLC
d/b/a MOTORCITY CASINO HOTEL,

and

GREEKTOWN CASINO, LLC,

        Defendants.

---

ROBERT S. HERTZBERG (P30261)
DEBORAH KOVSKY-APAP (P68258)
Pepper Hamilton LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
(248) 359-7300  -  Telephone
(248) 359-7700  -  Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

1

THOMAS F. CULLEN, JR.
GREGORY M. SHUMAKER
GEOFFREY S. STEWART
Jones Day
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

*Attorneys for Plaintiff*

_____

### AFFIDAVIT OF KEVYN D. ORR
### EMERGENCY MANAGER FOR THE CITY OF DETROIT

Now comes the Affiant, Kevyn D. Orr, a natural person, being first duly sworn and deposed and under the penalty of perjury states the following:

1.      I submit this Affidavit in support of the City of Detroit's Verified Complaint for Declaratory and Injunctive Relief (the "Complaint") filed contemporaneously herewith.[1]

2.      I am the Emergency Manager for the City of Detroit ("Detroit" or the "City").  I was appointed to the position of "emergency financial manager" for the City on March 15, 2013, by the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act, Michigan Complied Laws ("M.C.L.") §§ 141.931-141.942, pursuant to Public Act 72 of 1990 of the State of Michigan, also known as the Local Government Fiscal Responsibility Act, M.C.L. §§ 141.1201 141.1291 ("PA 72").  I formally took office as the emergency financial manager for the City under PA 72 on March 25, 2013.  On March 28, 2013, PA 72 was repealed and

---

[1]      Capitalized words not otherwise defined herein shall have the meaning given to them in the Complaint.

2

replaced by Public Act 436 of the State of Michigan, also known as the Local Financial

Stability and Choice Act, MCL 141.1541-141.1575 ("PA 436"), and I became the

Emergency Manager of the City pursuant to Section 2(e) of PA 436.

3.      In my capacity as Emergency Manager I act for, and in the place and stead

of, the City's elected Mayor and City Council.  Pursuant to PA 436, I exercise authority

over nearly all aspects of the City's government and management, including budgeting,

operations, financial affairs, contracts, appropriations, collective bargaining and the use,

sale and lease of assets.  In the nearly four months since assuming the position of

Emergency Manager, I have become familiar with the history, day-to-day functions and

operations, and financial affairs of the City.

<u>**History**</u>

4.      Since being named Emergency Manager, I have developed a

comprehensive plan to address the City's numerous financial and operational problems.

The primary goals of my proposed plan are to:  (i) ensure that the City is able to provide

or procure governmental services essential to the public health, safety and welfare of its

citizens; (ii) assure the fiscal accountability and stability of the City; and (iii) promote

private investment in the City and revitalization of the community in a sustainable

fashion.  In short, my proposed plan would enable the City to pay its employees and its

bills, live within its means, provide meaningful (but modest relative to the overall need)

reinvestment in the City, satisfy secured obligations and restructure unsecured

obligations.

5.      On June 14, 2013, I proposed this plan to approximately 150

representatives of the City's stakeholders at the Westin Detroit Metropolitan Airport (the

"June 14 Creditor Meeting").  A true and correct copy of the Proposal for Creditors

Executive Summary that was distributed at the June 14 Creditor Meeting is attached hereto as Exhibit A.  Those in attendance included, among others, representatives of:  (i) all of the City's unions; (ii) certain retiree associations; (iii) both of the City's pension trusts; (iv) all of the City's funded debt; (v) the insurers of such debt, including Syncora Guarantee Inc. or an affiliate ("Syncora") and its counsel and financial advisor; and (vi) many individual bondholders.

6.      During the June 14 Creditor Meeting, I outlined the City's desperate financial situation and my proposal to address the City's difficulties with the resources available to me.  I made clear that the City will not have the financial resources to pay all of its stakeholders in full.  My proposal reflected that the City would pay claims secured by specific revenue streams, but recoveries on other claims were going to be very limited.  I also made clear the urgency of the situation and the need for prompt discussions with the City's stakeholders.  I told the attendees that discussions with stakeholders would ensue but that the City had very limited time to stem the decline.  I also announced that the City would not be financing its unsecure debt and legacy obligations (including the COPs, which I will address later in this affidavit), but that such claims would be compromised.  At the conclusion of this meeting, with the help of my advisors, I tried to answer all of the questions posed by the attendees.  I also solicited feedback and input on, or alternatives to, my proposal that will achieve the City's goals in the same timeframe.

7.      Before and after the June 14 Creditor Meeting, my advisors and I have embarked on a series of meetings and engaged in substantive negotiations with various stakeholders in an effort to reach an out-of-court solution to the City's financial and operational problems.  Many of these conversations—with unions, pension funds,

4

bondholders, monoline insurers and other stakeholders—are ongoing.  The purpose of these negotiations is to restructure the City's obligations so that the City can resume providing basic and essential services to its residents and revitalize the City to reverse or stabilize its current downward trajectory.

8.      As detailed more fully in the Complaint being filed today, in 2005 and 2006, the City's two pension funds, the General Retirement System and the Police and Fire Retirement System, were terribly underfunded.  To remedy this situation, the City entered into a series of transactions to raise over $1.4 billion to fund the pension funds.  As part of this effort, the City organized two "Service Corporations" and entered into a "service contract" with each pursuant to which the City agreed to make certain payments in return for the Service Corporations' future assistance in funding transactions for the City's two pension funds.  The Service Corporations in turn created "Funding Trusts" that issued "Pension Obligation Certificates of Participation" (the so-called "COPs") to investors.  The COPs are not secured by any specific revenue stream of the City, but instead are funded as a general unsecured obligation of the City.

9.      Some of the COPs entered in 2006 paid a floating interest rate.  To contain the risk of these floating rates, the Service Corporations entered into hedging arrangements, commonly known as "swaps," with UBS A.G. and SBS Financial Products Company, LLC (the "Swap Counterparties").  Under these swaps, the Service Corporations and Swap Counterparties agreed to effectively convert the floating interest rate exposure of the Service Corporations into a fixed payment.  This was done through an arrangement whereby, in return for each side betting against the other on interest rates, the Swap Counterparties agreed to make payments to the Service Corporations in the

5

event the floating rates on the COPs exceeded certain levels.  Conversely, if interest rates fell below certain levels, the Service Corporations would be forced to make payments to the Swap Counterparties.

10.    The Swap Counterparties required protection against the possibility that the Service Corporations might default on their quarterly swap payments.  The parties agreed to purchase insurance to address this risk.  The predecessor to Syncora—XL Capital Assurance, Inc.—was one of two monoline insurers who were paid for, and provided, the swap default insurance.  Syncora continues to insure these swap payments.

11.    As part of a 2009 restructuring of the City's swap obligations, the City entered into a "Collateral Agreement" with the Swap Counterparties, the Service Corporations, and U.S. Bank, N.A., which was to serve as the custodian for the new collateral arrangement.  A true and correct copy of the Collateral Agreement is attached hereto as Exhibit B.  Under this agreement the City pledged a specific revenue stream: (i) payments from the developers of the City's casinos, and (ii) taxes upon each casino's gross receipts (together, the "Casino Revenue") as collateral to secure the City's obligations under the swap agreements.

12.    Under this new collateral arrangement, U.S. Bank oversees two accounts: the "General Receipts Subaccount" and the "Holdback Account."  Each day, on average, approximately $500,000 in Casino Revenue is deposited into the General Receipts Subaccount which, after 30 days, amounts to approximately $15 million.  Under the Collateral Agreement, U.S. Bank releases the Casino Revenue accumulating in the General Receipts Subaccount to the City *only after* it deposits approximately $4 million (one-third of its quarterly swap payment) into the Holdback Account.  Once the City

6

makes this deposit into the Holdback Account, U.S. Bank gives the City complete access to the Casino Revenue that continues to accumulate in the General Receipts Subaccount, as it is deposited, until the beginning of the next payment period.

13.     If the City fails to make a quarterly swap payment, the Swap Counterparties are empowered under the Collateral Agreement to notify U.S. Bank that it should not release—or should "trap"—the Casino Revenue owed to the City. The Swap Counterparties are permitted to do this even if the amounts in the General Receipts Subaccount are greater than the missed swap payment. Through the date of this Affidavit, the City has not defaulted on making any of its swap payments.

14.     Unlike the swaps, the COPs are not covered by the Collateral Agreement and are not secured by the Casino Revenue. Prior to June 17, 2013, the COPs were funded through an unsecured contract claim against the City.

15.     On June 13, 2013, to conserve the City's dwindling cash, I directed the City not to make the prescribed monthly payment due under the COPs agreements and consistent with that direction told U.S. Bank not to pay the unsecured interest obligation due on the floating rate COPs. A true and correct copy of this letter is attached hereto as Exhibit C.

16.     On June 17, 2013, Syncora sent a letter to U.S. Bank purportedly to direct the custodian to trap all funds in the General Receipts Subaccount. A true and correct copy of this letter is attached hereto as Exhibit D.

17.     On June 24, 2013, U.S. Bank emailed counsel to both Syncora and the City to inform each that "it expects to be in receipt of [C]asino [R]evenues in the General Receipts Subaccount equal to the" amount the City would pay on the monthly swap

7

payment.  In light of this fact, U.S. Bank asked if the City and Syncora wanted U.S. Bank to make the monthly swap payment and release the Casino Revenue to the City as "seemingly required in the ordinary course of business."  *Id*.  A true and correct copy of this email is attached hereto as Exhibit E.

18.    Later that same day, in an email and letter from its counsel to U.S. Bank's attorney, Syncora continued to assert that the Casino Revenue should be trapped and threatened to hold the U.S. Bank responsible for the release of any funds from the General Receipts Subaccount.  A true and correct copy of Syncora's email and letter are attached hereto as Exhibits E and F, respectively.

19.    In a letter dated June 25, 2013, I urged Syncora to take immediate corrective action and rescind its June 17, 2013 letter on the grounds that it is not a party to the Collateral Agreement and has no right whatsoever to direct U.S. Bank's conduct. A true and correct copy of this letter is attached hereto as Exhibit G.  Syncora responded the following day, June 26, 2013, disagreeing with my position. A true and correct copy of this letter is attached hereto as Exhibit H.  On June 27, 2013, the City's legal and financial advisors,  Syncora's legal and financial advisors and Syncora's Chief Financial Officer and Chief Restructuring Officer, and others, met in person in New York City and expressed their respective positions.  On Saturday, June 29, 2013, the City's financial advisor and Syncora's financial advisor conferred by telephone regarding our respective positions.  After the call, I was informed that there was no progress made towards resolving this dispute and that Syncora would not change its position.

20.    Despite my efforts to resolve this matter amicably, Syncora's calculated conduct requires that I initiate this litigation and ask for immediate equitable relief.  As I

8

2:13-cv-12987-LPZ-MKM   Doc # 20   Filed 07/17/13   Pg 10 of 169   Pg ID 685

outlined at the June 14 Creditor Meeting, Detroit is insolvent, both financially and operationally. Due to the City's precarious cash situation, every day that passes without my having access to the General Receipts Subaccount is another day that the City may have to delay or cut back on the provision of essential services and I cannot possibly negotiate and resolve creditors' claims with any degree of certainty. The situation is straightforward: as Emergency Manager I need every dollar available—including those that continue to accumulate in the General Receipts Subaccount—at my disposal to help restructure the City and continue to ensure that critical services are provided to Detroit's citizens.

### Immediate Consequences and Irreparable Harm

21.     As of May 31, 2013, the City had approximately $40 million in available cash on hand with outstanding deferrals and amounts due to other funds and entities of over $200 million. To preserve the City's limited cash, I did not make a required $39.7 million payment to the Service Corporations for payment to the COPs holders that was due on June 14, 2013. Absent near term intervention, the City is expected to run out of cash by the end of the 2013 calendar year, with a projected cash balance before required distributions of approximately negative $18 million. It has become abundantly clear to me that the City cannot make it through the next six months without immediate and fundamental changes to its finances and operations. These changes cannot be effected and implemented unless they are negotiated now. I cannot meaningfully negotiate with the necessary parties if the City does not have access to the trapped Casino Revenue that will continue to accumulate in the General Receipts Subaccount in the amount of approximately $170 million annually for the foreseeable future.

9

13-53846-tjt   Doc 157   Filed 07/24/13   Entered 07/24/13 17:50:27   Page 58 of 247

22.     Any delay in reaching negotiated settlements with the City's stakeholders could have disastrous consequences for the City.  The City is insolvent and is unable to pay its debts as they come due. Thus, it is imperative that I attempt to fundamentally alter the City's financial position through consensual agreements in the next few weeks because each day that passes without a restructuring of the City's balance sheet is a day closer to a bankruptcy filing.  Syncora's decision to interject itself into the Collateral Agreement and try to intimidate U.S. Bank into trapping the Casino Revenue—one of the City's largest revenue sources—hijacks my negotiations with certain other creditors.  I cannot commit resources in any meaningful way to settle or address certain creditors' claims because I have no idea how long the Casino Revenue might be trapped or how they might ultimately be distributed as a result of Syncora's deliberately disruptive conduct.  At this juncture, while an Emergency Manager is in place after the declaration of a financial emergency, the City has a unique opportunity to resolve various creditors' claims in an attempt to avoid bankruptcy.  Syncora's effort to assert rights to collateral it has no right to is preventing Detroit from seizing this critical opportunity.

23.     In addition to undermining my ability to negotiate with the City's other creditors, Syncora's decision to trap the City's Casino Revenue has other immediate consequences that will inflict irreparable harm on the City.  Currently, there are approximately $7.5 million in the General Receipts Subaccount.  If Syncora had not taken the position that U.S. Bank should trap the City's assets in the General Receipts Subaccount with its June 17, 2013 letter, I would have already authorized the City on or around June 24, 2013, to make the monthly swap payment under the Collateral Agreement of approximately $4 million.  This authorization and payment would have

10

allowed me to access, under the terms of the Collateral Agreement, the approximate $3 million over and above that was required for the monthly swap payment in the General Receipts Subaccount.  I would also now have access to the Casino Revenue deposited each day subsequent to June 24, 2013 in the General Receipts Subaccount until the next monthly payment cycle begins on or around July 16, 2013.  By July 15, 2013, the Casino Revenue deposited in the General Receipts Subaccount will have grown to approximately $15 million, of which approximately $11 million would otherwise have been available for the City to use after deducting the monthly swap payment.  The City cannot use these funds—or commit to using these funds in my negotiations with creditors—due to Syncora's actions.

24.     The $11 million I will not be able to use absent immediate relief from this Court is roughly the equivalent of 30% of the City's total available cash on hand as of June 30, 2013.  To illustrate, $11 million represents:  (i) the salaries and wages for nearly two months of fire fighter services; or (ii) the salaries and wages for nearly one month of police officer services.  Not having access to this significant percentage of the City's money of course adversely affects the City's current operations.  With 4 of the top 10 most dangerous neighborhoods in the nation, the City needs access to that money immediately to ensure public safety and keep its police on the streets and its firefighters responding to fires.  Vital City operations such as these are functioning at a marginal level, at best, and further constraints on the City's financial resources will only further degrade the health, safety and welfare of the City.

25.     Syncora's unauthorized and intentional actions above are preventing me from finalizing and implementing a settlement with one of the City's largest creditor

11

groups—the Swap Counterparties.  If a settlement can be reached with these creditors,

the City's exposure to the Swap Counterparties will be removed and the City will have

unimpaired use of the Casino Revenue.  I understand from my advisors that Syncora is

aware that the Swap Counterparties are amenable to releasing the Casino Revenue to the

City.  A concerted campaign (letters and emails) to arrest Casino Revenue has brought

negotiations with these groups, particularly the Swap Counterparties, to a virtual

standstill.  A settlement with the Swap Counterparties would assure the City of having

Casino Revenue to fund its operations, enable a negotiated resolution of the swaps with

no effect on Syncora and allow the City to avoid a termination payment in the hundreds

of millions of dollars.

      26.    The restructuring plan I outlined on June 14, 2013, contemplates a

substantial investment in the City—$1.25 billion over the next 10 years, and includes

spending approximately $500 million in the next 6 years to remediate urban blight and

increase property values and the City's appearance and over $100 million in

improvements to the performance and infrastructure of the City's public safety

departments (police, fire, EMS).  Among others, the proposed plan provides for:

- Removing abandoned and blighted structures, which comprise 20% of the City's housing stock, to fundamentally transform the urban landscape and make the City a more attractive place to live, decrease crime and increase property values.  Moreover, removing blight will allow public safety departments to allocate resources to more meaningful activities (60% of the 11,000 to 12,000 fires that the City experiences each year occur in blighted and unoccupied structures).

- Investing in new fire, police and EMS infrastructure, assets and personnel to address the chronically dilapidated buildings (average age of the City's fire stations is 80 years old with over $1 million in annual maintenance), fleet of vehicles (many with well over 250,000 miles and break down frequently) and overworked employees (the fire department's apparatus

12

> division has a mechanic to vehicle ratio of 1 to 39 resulting in an inability
> to complete preventative maintenance on schedule).

My proposed restructuring plan cannot be effected if Syncora's unauthorized actions

allow it to trap the Casino Revenue, which was greater than $180 million during the

City's 2012 fiscal year, nearly 17% of the City's annual revenue.  The trapping of

roughly $11 million a month at Syncora's urging makes it impossible to move forward

with a comprehensive restructuring plan for the City.  Syncora's actions have placed into

legal limbo all of the Casino Revenue that are now being deposited to the General

Receipts Subaccount.  Immediate access to this money is needed if the City's 139-square

mile footprint—one that is larger than Boston, Manhattan, and San Francisco

*combined*—is to be saved.

     27.     Detroit is in a state of crisis.  I am here to help avert this crisis and am

being constrained from doing so by a private party using an intentional and unauthorized

effort to hold the City's revenue hostage.  If there is any hope for a meaningful path

forward in the near term, the City must have immediate access to all of the funds

remaining funding sources it has.

Dated: July 4, 2013          By: _____
        Detroit, Michigan          Kevyn D. Orr
                                     Emergency Manager
                                     City of Detroit

Subscribed and sworn to before me this ___4th___ day of __July__, 20_13_.

_Maryellen Leopold_
Notary Public

My Commission Expires: _4/3/2019_

MARYELLEN LEOPOLD
Notary Public, State of Michigan
County of Oakland
My Commission Expires Apr. 03, 2019
Acting in the County of _____

13-008858-CZ

FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/5/2013 12:02:00 PM
CATHY M. GARRETT

# EXHIBIT A

CITY OF DETROIT

# PROPOSAL FOR CREDITORS

EXECUTIVE SUMMARY

JUNE 14, 2013



This proposal is based on numerous projections and assumptions concerning future uncertain events including estimates of tax revenues and forecasts of future business and economic conditions in the City, all of which are beyond the control of the City. Actual results may differ from the assumptions and projections presented herein, and such differences could be material.

Additional data are being gathered or developed, and various critical financial and operational analyses remain in process. Thus, this proposal remains subject to material change.



OFFICE OF THE EMERGENCY MANAGER

# Table of Contents

  I.  **Detroit Faces Strong Economic Headwinds**                                                 **3**

 II.  **Key Objectives for a Financial Restructuring and Rehabilitation of Detroit**              **33**

III.  **Current Financial Status**                                                                **34**

 IV.  **The City Has Taken Action to Address Its Financial Challenges**                           **39**

  V.  **Restructuring and Reinvesting in City Government**                                        **41**

 VI.  **Realization of Value of Assets**                                                          **46**

VII.  **Ten Year Projections (General Fund Only)**                                                **47**

VIII. **Restructuring Proposal**                                                                  **50**

 IX.  **Calendar and Contacts**                                                                   **61**



OFFICE OF THE EMERGENCY MANAGER

## I.  Detroit Faces Strong Economic Headwinds.

**Deteriorating Macroeconomic Conditions.**  During the past several decades, the City of Detroit (the "City") has experienced changes that have adversely affected the economic circumstances of the City and its residents.





## I.  Detroit Faces Strong Economic Headwinds.



**Unemployment Rate in Detroit**



## I.  Detroit Faces Strong Economic Headwinds.

- *Eroding Tax Base and Reductions in State Revenue Sharing.*
  - **Property Taxes.**  Property tax revenues have decreased by approximately 19.7% over the past six years as a result of declining assessed values ($1.6 billion from 2008 to 2012) and lower collection rates (from 76.6% in 2008 to 68.3% in 2012).
  - **Income Taxes.**  Income tax revenues have decreased by $91 million since 2002 (approximately 30%) and by $44 million (approximately 15%) since 2008.  The primary cause of these decreases has been high unemployment.
  - **The City is currently levying all taxes at or near statutory maximum rates.**



## I. Detroit Faces Strong Economic Headwinds.

**Residents and businesses are leaving Detroit to escape High Taxes and Insurance Costs.**

- *Comparative Tax Burden.*

  - **Per Capita Tax Burden.**  Detroit's per capita tax burden on City residents is the highest in Michigan.  This tax burden is particularly severe because it is imposed on a population that has relatively low levels of per capita income.

  - **Resident Income Tax.**  The income tax burden on Detroit residents is greater than that of residents in the surrounding area.  The City's income tax — 2.4% for residents, 1.2% for nonresidents and 2.0% for businesses — is the highest in Michigan.

  - **Property Taxes.**  Detroit residents pay the highest total property tax rates (inclusive of property taxes paid to all overlapping jurisdictions; e.g., the City, the State, Wayne County) of those paid by residents of Michigan cities having a population over 50,000.  The total property tax rate (including property taxes assessed by the City, the State and various special authorities) imposed on Detroit homeowners is approximately 67.07 mills; for businesses, the total property tax rate is approximately 85.35 mills.

    - **At more than 19.95 mills, the City's property tax rate for general operations is close to the statutory maximum of 20.00 mills.**

  - Utility Users Tax.  Detroit is the only city in Michigan that levies an excise tax on utility users (at a rate of 5%).



# I. Detroit Faces Strong Economic Headwinds.

## The City is Insolvent

**Continuing Budget Deficits**.

- Excluding the effect of recent debt issuances (e.g., $75 million in FY 2008, $250 million in FY 2010 and $129.5 million in FY 2013) that funded the City's operating deficits, the City's accumulated general fund deficit has grown continuously over an extended period.



- At the end of FY 2012, the City's accumulated general fund deficit was $326.6 million.
- **If not for the City's recent debt issuances, the projected accumulated deficit for FY 2013 would have been approximately $700 million.**



# I.  Detroit Faces Strong Economic Headwinds.

**Liquidity Crisis.**  The City is insolvent.  Absent ongoing cash intervention (primarily in the form of payment deferrals and cost cutting), the City would have run out of cash before the end of FY 2013.

- The City had negative cash flows of $115.5 million in FY 2012, excluding the impact of proceeds from short-term borrowings.  In March 2012, to avoid running out of cash, the City borrowed $80 million on a secured basis (of which the City spent $50 million in FY 2012).

- The City is projecting to have positive cash flows of $4.0 million in FY 2013 after deferring approximately $120 million of current and prior year pension contributions and other payments.

- Absent intervention and/or restructuring, the City is projecting to have negative cash flows of $198.5 million in FY 2014.

- As of the end of May 2013, the City had $68 million of cash before property tax distributions, but had outstanding deferrals and amount due to other funds and entities of approximately $216 million.  These are effectively borrowings and must be repaid.



# I.  Detroit Faces Strong Economic Headwinds.

**The City is Not Paying Its Debts as They Come Due**

- The City is not making its pension contributions as they come due.  The City has deferred payment of its year-end Police and Fire Retirement System ("PFRS") contributions (and finances such deferrals at a rate of 8%).   As of May 2013, the City had deferred approximately $54 million in pension contributions related to current and prior periods and will defer approximately $50 million on June 30, 2013 for current year PFRS pension contributions.  Therefore, by fiscal year end, the City will have deferred over $100 million of pension contributions.

- The City will not make the scheduled $39.7 million payments due on its pension-related certificates of participation on June 14, 2013.



# I. Detroit Faces Strong Economic Headwinds.

## FY 2013 Forecasted Cashflow to Year End

| $ in millions | Actual FY 2012 | Actual Jul-12 | Actual Aug-12 | Actual Sep-12 | Actual Oct-12 | Actual Nov-12 | Actual Dec-12 | Actual Jan-13 | Actual Feb-13 | Actual Mar-13 | Actual Apr-13 | Actual May-13 | Forecast Jun-13 | 11A + 1F FY 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | |
| Property taxes | $567.0 | $34.0 | $198.0 | $14.8 | $6.9 | $4.2 | $24.4 | $139.1 | $42.3 | $5.4 | $1.3 | $3.1 | $58.0 | $531.6 |
| Income & utility taxes | 276.2 | 23.1 | 25.1 | 21.5 | 25.8 | 23.6 | 21.9 | 25.4 | 23.9 | 20.4 | 30.2 | 30.8 | 18.4 | 290.1 |
| Gaming taxes | 177.5 | 12.4 | 15.2 | 17.2 | 12.4 | 20.8 | 11.0 | 11.5 | 19.6 | 14.4 | 12.8 | 16.5 | 9.2 | 173.0 |
| Municipal service fee to casinos | 19.8 | - | 7.6 | - | - | 4.0 | 4.0 | 1.8 | - | - | - | - | - | 17.4 |
| State revenue sharing | 194.3 | 28.5 | - | 28.7 | - | 30.9 | - | 30.4 | - | 30.6 | - | 29.7 | - | 178.9 |
| Other receipts | 480.8 | 26.1 | 37.8 | 26.0 | 22.5 | 26.6 | 31.7 | 16.7 | 58.0 | 25.6 | 29.3 | 41.4 | 19.4 | 361.2 |
| Refinancing proceeds | 50.0 | - | - | - | - | - | 10.0 | - | - | - | - | - | 20.0 | 30.0 |
| **Total operating receipts** | 1,765.5 | 124.2 | 283.8 | 108.2 | 67.5 | 110.1 | 103.1 | 225.0 | 143.9 | 96.5 | 73.6 | 121.4 | 125.0 | 1,582.2 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll, taxes, & deductions | (454.2) | (37.5) | (35.0) | (32.5) | (28.0) | (41.1) | (30.1) | (23.6) | (30.1) | (25.9) | (26.3) | (36.2) | (27.2) | (373.6) |
| Benefits | (203.4) | (18.3) | (21.0) | (20.4) | (16.7) | (16.2) | (19.5) | (9.7) | (15.8) | (17.7) | (4.7) | (14.9) | (16.0) | (191.0) |
| Pension contributions | (103.9) | - | (11.7) | (7.2) | - | (1.2) | (8.8) | (1.9) | - | - | - | - | - | (30.8) |
| Subsidy payments | (50.0) | (0.6) | (4.9) | (6.2) | (1.1) | - | (0.1) | (0.2) | (5.7) | (5.0) | (3.9) | (1.6) | (10.9) | (40.1) |
| Distributions - tax authorities | (374.4) | (0.9) | (110.1) | (34.3) | (2.1) | (4.2) | (1.5) | (8.1) | (79.4) | (14.7) | (0.6) | - | (27.2) | (283.2) |
| Distributions - UTGO | | - | (1.5) | (11.0) | (1.3) | - | - | - | (1.3) | (52.1) | (1.3) | - | - | (68.6) |
| Distributions - DDA increment | (8.6) | - | - | - | - | - | - | (5.9) | - | - | - | - | (5.5) | (11.4) |
| Income tax refunds | (16.9) | (1.9) | (3.3) | (0.6) | - | (1.8) | (1.0) | (0.5) | (0.4) | (0.4) | (1.9) | (1.6) | (3.8) | (17.2) |
| A/P and other disbursements | (477.5) | (43.8) | (48.1) | (34.5) | (31.4) | (37.1) | (25.2) | (24.3) | (34.7) | (29.3) | (27.7) | (36.9) | (32.2) | (405.3) |
| Professional fees | | - | - | - | - | - | - | - | - | - | - | - | - | |
| Sub-total operating disbursements | (1,688.9) | (103.1) | (235.7) | (146.8) | (80.6) | (101.7) | (86.1) | (74.1) | (167.4) | (145.0) | (66.5) | (91.3) | (122.8) | (1,421.1) |
| POC and debt related payments | (142.1) | (4.2) | (5.4) | (4.9) | (9.0) | (7.9) | (14.9) | (3.1) | (8.5) | (4.8) | (32.2) | (25.6) | (36.6) | (157.1) |
| **Total disbursements** | (1,831.0) | (107.3) | (241.1) | (151.7) | (89.6) | (109.6) | (101.0) | (77.2) | (175.9) | (149.8) | (98.8) | (116.9) | (159.4) | (1,578.2) |
| **Net cash flow** | (65.5) | 16.9 | 42.6 | (43.5) | (22.0) | 0.5 | 2.1 | 147.8 | (32.1) | (53.3) | (25.2) | 4.6 | (34.4) | 4.0 |
| Cumulative net cash flow | | 16.9 | 59.5 | 16.0 | (6.0) | (5.5) | (3.4) | 144.4 | 112.3 | 59.0 | 33.9 | 38.4 | 4.0 | |
| Beginning cash balance | 95.3 | 29.8 | 46.7 | 89.3 | 45.8 | 23.8 | 24.3 | 26.4 | 174.2 | 142.1 | 88.8 | 63.7 | 68.2 | 29.8 |
| Net cash flow | (65.5) | 16.9 | 42.6 | (43.5) | (22.0) | 0.5 | 2.1 | 147.8 | (32.1) | (53.3) | (25.2) | 4.6 | (34.4) | 4.0 |
| **Cash before required distributions** | $29.8 | $46.7 | $89.3 | $45.8 | $23.8 | $24.3 | $26.4 | $174.2 | $142.1 | $88.8 | $63.7 | $68.2 | $33.8 | $33.8 |
| Accumulated property tax distributions | (27.9) | (48.1) | (77.8) | (31.8) | (32.9) | (31.5) | (48.0) | (149.8) | (89.5) | (26.9) | (26.0) | (28.5) | (19.7) | (19.7) |
| **Cash net of distributions** | $1.9 | $(1.4) | $11.5 | $14.0 | $(9.1) | $(7.1) | $(21.5) | $24.4 | $52.6 | $61.9 | $37.6 | $39.7 | $14.1 | $14.1 |
| *Memo:* | | | | | | | | | | | | | | |
| Accumulated deferrals | (64.4) | (66.2) | (56.3) | (50.9) | (52.7) | (53.2) | (46.3) | (44.2) | (53.9) | (57.7) | (61.5) | (65.8) | (118.7) | (118.7) |
| Refunding bond proceeds in escrow | 28.6 | 28.6 | 81.7 | 81.7 | 81.7 | 81.7 | 71.7 | 71.7 | 71.7 | 71.7 | 71.7 | 51.7 | 51.7 | 51.7 |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd |

8

## I.  Detroit Faces Strong Economic Headwinds.

### FY 2014 Forecasted Cash Flow to Year End

| $ in millions | Forecast Jul 13 | Forecast Aug-13 | Forecast Sep-13 | Forecast Oct-13 | Forecast Nov-13 | Forecast Dec-13 | Forecast Jan-14 | Forecast Feb-14 | Forecast Mar-14 | Forecast Apr-14 | Forecast May-14 | Forecast Jun-14 | Forecast FY 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | |
| Property taxes | $37.8 | $166.6 | $13.0 | $6.6 | $3.1 | $21.5 | $139.1 | $20.8 | $4.8 | $1.3 | $2.5 | $51.1 | $468.4 |
| Income & utility taxes | 28.7 | 22.7 | 22.3 | 28.3 | 22.7 | 22.3 | 28.3 | 23.5 | 22.7 | 28.3 | 22.3 | 22.7 | 294.7 |
| Gaming taxes | 14.6 | 14.1 | 8.9 | 23.1 | 10.4 | 9.4 | 22.1 | 9.9 | 15.1 | 17.4 | 13.2 | 11.8 | 170.0 |
| Municipal service fee to casinos | - | 7.6 | - | - | 4.0 | 4.0 | 1.8 | - | - | - | - | - | 17.4 |
| State revenue sharing | 30.7 | - | 30.7 | - | 30.7 | - | 30.7 | - | 30.7 | - | 30.7 | - | 184.3 |
| Other receipts | 27.2 | 25.8 | 25.9 | 32.9 | 26.3 | 25.9 | 32.9 | 27.1 | 26.3 | 32.9 | 25.9 | 26.3 | 335.9 |
| Refinancing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total operating receipts** | **139.1** | **236.9** | **100.9** | **91.0** | **97.2** | **83.2** | **255.0** | **81.3** | **99.6** | **80.0** | **94.6** | **111.9** | **1,470.7** |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Payroll, taxes, & deductions | (31.0) | (26.6) | (26.6) | (35.5) | (26.6) | (26.6) | (31.0) | (26.6) | (26.6) | (35.5) | (26.6) | (26.6) | (345.6) |
| Benefits | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (14.0) | (14.0) | (14.0) | (14.0) | (14.0) | (178.6) |
| Pension contributions | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (175.9) |
| Subsidy payments | (7.6) | (5.0) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (75.6) |
| Distributions - tax authorities | (14.8) | (72.4) | (40.0) | (5.7) | (1.0) | (1.3) | (57.3) | (20.9) | (14.0) | (1.7) | - | (24.0) | (253.1) |
| Distributions - UTGO | - | (12.0) | - | - | - | - | - | - | (44.9) | - | - | - | (56.9) |
| Distributions - DDA increment | - | - | - | - | - | (8.0) | - | - | - | - | - | (1.0) | (9.0) |
| Income tax refunds | (2.5) | (2.7) | (.06) | (0.3) | (1.5) | (1.0) | (0.6) | (0.3) | (0.4) | (2.3) | (1.2) | (3.7) | (17.0) |
| A/P and other disbursements | (36.3) | (37.9) | (29.3) | (37.1) | (30.1) | (25.6) | (40.8) | (23.0) | (33.5) | (39.7) | (30.0) | (30.0) | (393.2) |
| Sub-total operating disbursements | (122.3) | (186.7) | (132.8) | (115.1) | (95.6) | (98.9) | (166.0) | (105.8) | (154.4) | (114.3) | (92.8) | (120.3) | (1,504.9) |
| POC and debt related payments | (7.4) | (4.2) | (5.8) | (8.5) | (7.3) | (15.4) | (7.3) | (4.2) | (5.7) | (51.9) | (7.3) | (39.1) | (164.2) |
| **Total disbursements** | **(129.6)** | **(191.0)** | **(138.6)** | **(123.5)** | **(102.9)** | **(114.3)** | **(173.4)** | **(110.0)** | **(160.2)** | **(166.1)** | **(100.1)** | **(159.3)** | **(1,669.1)** |
| **Net cash flow** | **9.5** | **45.9** | **(37.7)** | **(32.6)** | **(5.7)** | **(31.1)** | **(81.6)** | **(28.7)** | **(60.6)** | **(86.1)** | **(5.5)** | **(47.4)** | **(198.5)** |
| Cumulative net cash flow | 9.5 | 55.4 | 17.7 | (14.9) | (20.6) | (51.7) | 29.9 | 1.1 | (59.4) | (145.6) | (151.0) | (198.5) | |
| Beginning cash balance | 33.8 | 43.3 | 89.2 | 51.5 | 18.9 | 13.2 | (17.9) | 63.7 | 34.9 | 25.6 | (111.8) | (117.2) | 33.8 |
| Net cash flow | 9.5 | 45.9 | (37.7) | (32.6) | (5.7) | (31.1) | 81.6 | (28.7) | (60.6) | (86.1) | (5.5) | (47.4) | (198.5) |
| **Cash before required distributions** | **$43.3** | **$89.2** | **$51.5** | **$18.9** | **$13.2** | **$(17.9)** | **$63.7** | **$34.9** | **$(25.6)** | **$(111.8)** | **$(117.2)** | **$(164.7)** | **$(164.7)** |
| Accumulated property tax distributions | (29.8) | (55.4) | (24.0) | (22.7) | (23.7) | (38.6) | (86.5) | (82.2) | (27.1) | (26.5) | (28.5) | (19.7) | (19.7) |
| sh net of distributions | $13.5 | $33.8 | $27.4 | $(3.8) | $(10.5) | $(56.5) | $(22.8) | $(47.2) | $(52.7) | $(138.2) | $(145.7) | $(184.4) | $(184.4) |
| *mo:* | | | | | | | | | | | | | |
| Accumulated deferrals | (119.3) | (112.4) | (112.8) | (113.5) | (113.9) | (114.4) | (115.0) | (115.5) | (116.0) | (116.6) | (117.1) | (117.6) | (117.6) |
| Refunding bond proceeds in escrow | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd |

9

## I.  Detroit Faces Strong Economic Headwinds.

**Current Levels of Municipal Services to Residents and Businesses are Severely Inadequate.**

**The City Must Reduce Its High Crime Rates.**

- In 2012, the City had the highest rate of violent crime of any U.S. city having a population over 200,000.  The City's violent crime rate is five times the national average.

- EMS and Detroit Fire Department ("DFD") response times are extremely slow when compared to other cities (15 minutes and 7 minutes, respectively).

**The City Must Provide Functioning Street Lights.**

- As of April 2013, approximately 40% of the City's street lights were not functioning. The lights that are functioning are scattered across an outdated population footprint (and thus are not focused to meet the current population's actual needs).

**The City Must Overhaul Its Dysfunctional Operations.**

- Police Department ("DPD").

  - Over the last five years, the DPD has had five different police chiefs, all having varying approaches to DPD's operations.

  - DPD's efficiency (response times), effectiveness (case closure rate, crime reduction) and employee morale are extremely low.

  - Data driven policing has not been fully adopted within DPD.



## I.  Detroit Faces Strong Economic Headwinds.

- DPD receives over 700,000 calls for service annually.  DPD response times are extremely high.

- The DPD's extremely low 8.7% case clearance rate is driven by the DPD's lack of a case management system, lack of accountability for detectives, unfavorable work rules imposed by collective bargaining agreements and a high attrition rate in the investigative operations unit.

- The DPD's manpower has been reduced by approximately 40% over the last 10 years causing constant strain on the organization; the DPD needs to evaluate appropriate uniform staffing levels.

- Community policing efforts are underfunded, uncoordinated and have been deemphasized by the DPD.

- **Assessor's Office and Property Tax Division.**

  - The City lacks a state-required Level IV Assessor and currently has a former employee contractor in the position, whose contract expires in June 2013.  Due to inadequate compensation, among other things, there are no available candidates to fill this position.

  - The Assessor's Office has approximately 15,000 parcels per employee.  The State recommends 4,000 parcels per employee.

- **Other Departments.**

  - Many other City departments function suboptimally and inefficiently.



## I.  Detroit Faces Strong Economic Headwinds.

**The Physical Deterioration of the City Must be Addressed.**

- There are approximately (i) 78,000 abandoned and blighted structures in the City, nearly half of which are considered "dangerous" and (ii) 66,000 blighted and vacant lots within the City limits.

- The number of City parks is dwindling, and many are in poor or fair condition as a result of neglect due to lack of funding.

  - The closure of 210 parks in the 2008-09 fiscal year reduced the City's park portfolio by 66% — from 317 parks to 107 parks.

- Approximately 70 superfund sites have been established in Detroit.

- The City's electricity grid has not been adequately maintained and is deteriorating.

- The City's fire stations are old and are not adequately maintained.

- The vehicles and equipment employed by the City's police, fire, EMS and transportation personnel are aging, poorly maintained and lack adequate information technology.



## I.  Detroit Faces Strong Economic Headwinds.

**Detroit Has Endured Inadequate Investment in Infrastructure and Equipment for Years.**

**Fire Department.**

- **Fire Apparatus.**  The DFD fleet includes (i) 26 engines; (ii) 15 ladder trucks; (iii) six squads (specialized rescue vehicles); (iv) one hazardous material apparatus; (v) one TAC unit (a mini-pumper) and (vi) 36 ambulances and other light vehicles.

- DFD's fleet has "many mechanical issues," contains no reserve vehicles and lacks equipment ordinarily regarded as standard.
  - The Apparatus Division's mechanic to vehicle ratio of 1:39 (once staffed with 63 people; currently 26) results in an inability to complete preventative maintenance on schedule.
  - Detroit firefighters frequently operate shorthanded due to a lack of serviceable equipment.

- **EMS Fleet.**
  - During the first quarter of 2013, frequently only 10 to 14 of the City's 36 ambulances were in service.
  - Some of the City's EMS vehicles have been driven 250,000 to 300,000 miles, and break down frequently.



## I.  Detroit Faces Strong Economic Headwinds.

**Police Department.**

- **Age of Police Cars**
  - The DPD operates with an "extremely old fleet" of 1,291 vehicles.  Most DPD police cruisers lack necessary information technology.
  - A majority of vehicles in the fleet remain in service beyond a normal three-year replacement cycle.  Operating with an aged fleet drives up maintenance costs.
- **Facilities**
  - The DPD has not invested in or maintained its facility infrastructure for many years, contributing to low employee and citizen morale.

**Information Systems**

- **Challenges generally:**
  - Old and obsolete technology assets and applications must be upgraded.
  - IT infrastructure is not integrated within Departments (e.g., police precincts and districts cannot share information across IT systems) or between departments and functions (e.g., little to no integration between core City finance system and Department level systems).
  - City *urgently* needs to upgrade or replace the following IT systems, among others: payroll; financial; budget development; property information and assessment; income tax; and DPD operating system.



## I.  Detroit Faces Strong Economic Headwinds.

- **DPD, DFD and EMS**
  - DPD, DFD and EMS information technology systems are obsolete; vendors do not provide full support; core functions are sporadic.
    - DPD has no IT systems for jail management, electronic ticketing and activity logs. DPD vehicles lack necessary IT infrastructure.

- **Payroll System**
  - The City uses multiple, non-integrated payroll systems.  A majority of employees are on an archaic payroll system that has limited reporting capability and no ability to clearly track, monitor or report expenditures by category.
  - The cost of payroll administration for the City is significantly higher than for comparable entities – almost 3.5 times more costly than other public sector organizations, which average $18 per paycheck.

- **Income Tax Division**
  - Income tax collection and data management are highly manual.
  - The City's Income Tax System is outdated (purchased in the mid-1990s), has little to no automation capability and is "catastrophic" per an IRS audit completed in July 2012.



## I.  Detroit Faces Strong Economic Headwinds.

- **Budgeting, Accounting & Financial Reporting Systems**
  - Oracle-based Financial Reporting system was implemented in 1999.  It is not being utilized to its full capabilities and is no longer supported by its manufacturer.
  - Approximately 70% of journal entries are booked manually.
- **Grant Management System**
  - Grant tracking systems are fragmented.  Thus, the City is unable to comprehensively track citywide grant funds and status.
  - Grant reporting is not standardized, such that the City is unable to prevent disallowed costs.
- **Permitting**
  - The Buildings, Safety Engineering and Environmental Department's system for licensing and permitting is more than ten years old and needs to be upgraded.
  - The Fire Marshall Division's system for inspections and permitting is more than 20 years old and needs to be replaced.
  - Current information technology system deficiencies lead to bottlenecks in permit invoicing and collection of fees.
- **Department of Transportation.**  DDOT fleet is aged and maintenance is consistently deferred; approximately one-third of DDOT fleet is out of service.



## I.  Detroit Faces Strong Economic Headwinds.

**Electrical Transmission Grid and Fixtures**

- The City owned Mistersky power plant has been idle for approximately 2-3 years, but has not been decommissioned. In addition, the City has 31 sub-stations that would need to be decommissioned. The City is in the process of obtaining estimates for decommissioning costs.

- Approximately 40% of Detroit's 88,000 streetlights are not functioning due, in large part, to disrepair and neglect; outages exist on both DTE Energy Company ("DTE") and PLD-powered lights.



# I. Detroit Faces Strong Economic Headwinds.

## The City's Debt and Legacy Liabilities Have Grown Considerably Over Time.

### Balance Sheet Liabilities

- The City estimates that, as of the close of its 2013 fiscal year, the City will have liabilities reflected on its balance sheet of approximately $9.05 billion, including:

  - $5.85 billion in special revenue obligations;

  - $1.43 billion in pension-related Certificate of Participation ("COPs") liabilities;

  - $343.6 million in marked-to-market swap liabilities related to COPs (as of May 31, 2013 valuation);

  - $1.13 billion in unlimited and limited tax general obligation bond liabilities and notes and loans payable; and

  - $300 million in other liabilities.



# I.  Detroit Faces Strong Economic Headwinds.

**Off-Balance Sheet Liabilities**

- OPEB Liabilities.

  - Unfunded other post-employment benefit  ("OPEB") liabilities increased from $4.8 billion to $5.7 billion from June 30, 2007 through June 30, 2011 (the most recent actuarial data available).  99.6% of the City's OPEB liabilities are unfunded.

  - As of June 30, 2011 (the most recently published actuarial valuation), there were 19,389 retirees eligible to receive benefits under the City's OPEB plans.  The number of retirees receiving benefits from the City is expected to increase over time.

  - *Weiler* Class OPEB Benefits.

    - In July 2006, the City made a number of unilateral changes to the healthcare benefits for unionized police and firefighter retirees.  Alan Weiler filed a class action lawsuit on behalf of approximately 7,000 retirees alleging violations of collective bargaining agreements.

    - The City and the Weiler class settled before trial, and the court entered a Consent Judgment approving the parties' settlement agreement.

    - The Weiler class retirees/beneficiaries currently cost the City approximately $75 million per year, representing over 40% of retiree benefits costs under the Health and Life Insurance Plan.



## I. Detroit Faces Strong Economic Headwinds.

- **Pension Liabilities**
  - The City's reported pension UAAL (based on 2011 actuarial valuations) of $639,871,444 is **substantially** understated.  Further analysis using more realistic assumptions (including by reducing the discount rate by one percentage point) suggests that pension UAAL will be approximately $3.5 billion as of June 30, 2013.
  - UAAL under the City's two pension systems — the General Retirement System ("GRS") and the PFRS — increased by over $1 billion between June 30, 2007 and June 30, 2011, even (i) using actuarial assumptions used to calculate 2011 UAAL and (ii) after consideration of the contribution of the COPs proceeds in 2005 and 2006.
  - **For the five-year period ending on June 30, 2012, pension payments and costs of administration have exceeded contributions and investment income, resulting in liquidation of pension trust principal.  Continuing on this path will eventually lead to the pension plans' insolvency.**

| System | Benefit Payments | Contribution / Investment Income | Net Trust Loss |
|--------|------------------|----------------------------------|----------------|
| GRS | $1,601,193,045 | ($60,113,101) | $1,661,306,146 |
| PFRS | $1,445,581,026 | ($127,803,339) | $1,573,384,365 |



# I.  Detroit Faces Strong Economic Headwinds.

- **Increasing Legacy Liabilities as a Percentage of General Fund Revenue.**  During FY 2012, more than 38% of the City's actual revenue was consumed servicing legacy liabilities.  Going forward, legacy liabilities are expected to consume increasing portions of City revenues.

## Legacy Expenditures (Assuming No Restructuring)

| ($ in millions) | Fiscal year ended actual | | | | | Preliminary forecast | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| **Legacy expenditures** | | | | | | | | | | |
| Debt service (LTGO) | $ (66.6) | $ (106.2) | $ (63.5) | $ (64.5) | $ (62.6) | $ (70.8) | $ (70.9) | $ (61.8) | $ (61.8) | $ (38.5) |
| Debt service (UTGO) | (67.2) | (71.5) | (72.4) | (72.8) | (73.0) | (70.6) | (64.9) | (62.5) | (57.6) | (57.6) |
| POC - principal and interest (GF) | (24.6) | (20.9) | (23.6) | (33.5) | (33.0) | (46.8) | (51.4) | (53.3) | (55.0) | (56.9) |
| POC - principal and interest (EF, excl. DDOT) | (1.8) | (1.4) | (1.5) | (1.8) | (2.0) | (5.3) | (5.9) | (6.1) | (6.4) | (6.6) |
| POC - principal and interest (DDOT) | (3.5) | (2.8) | (3.0) | (3.6) | (4.0) | (3.3) | (3.7) | (3.8) | (3.9) | (4.1) |
| POC - swaps (GF) | (38.6) | (43.9) | (44.7) | (44.7) | (44.8) | (42.9) | (42.8) | (42.8) | (42.7) | (42.7) |
| POC - swaps (EF, excl. DDOT) | (2.3) | (2.0) | (2.0) | (2.0) | (2.0) | (4.8) | (4.8) | (4.8) | (4.9) | (4.9) |
| POC - swaps (DDOT) | (4.5) | (4.0) | (4.0) | (4.0) | (4.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) |
| Pension contributions - Public Safety | (58.9) | (31.4) | (32.8) | (81.6) | (49.8) | (46.1) | (139.0) | (163.0) | (180.0) | (198.0) |
| Pension contributions - Non-Public Safety | (10.6) | (27.0) | (11.1) | (28.3) | (25.4) | (19.9) | (36.9) | (42.5) | (47.7) | (53.1) |
| Pension contributions - DDOT | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (12.3) | (23.6) | (27.7) | (31.2) | (34.8) |
| Health benefits - retiree - Public Safety | (73.7) | (80.2) | (70.4) | (79.6) | (90.6) | (91.5) | (88.6) | (95.2) | (101.7) | (108.0) |
| Health benefits - retiree - Non-Public Safety | (47.4) | (51.6) | (50.6) | (49.0) | (49.2) | (49.7) | (38.8) | (41.5) | (44.6) | (47.7) |
| Health benefits - retiree - DDOT | (8.2) | (11.8) | (11.2) | (11.1) | (10.3) | (10.4) | (13.3) | (14.3) | (15.3) | (16.3) |
| **Total legacy expenditures** | $ (414.6) | $ (462.0) | $ (397.9) | $ (486.1) | $ (461.6) | $ (477.3) | $ (587.6) | $ (622.4) | $ (655.9) | $ (672.3) |
| | | | | | | | | | | |
| **Total revenues (excl. financing proceeds)** | $ 1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 |
| | | | | | | | | | | |
| **Total legacy expenditures as a % of total revenues** | 29.7% | 33.9% | 30.8% | 36.9% | 38.6% | 42.5% | 54.3% | 59.5% | 63.0% | 64.6% |



## I.  Detroit Faces Strong Economic Headwinds.

**Obligations Secured by Special Revenues**

- **The City estimates that, as of the end of FY 2013, it will have:**
  - $5.34 billion in outstanding principal amount of revenue bonds; and
  - $494 million in related state revolving loans.
- **The revenue bonds and the revolving loans are related to the following funds:**
  - **Sewage Disposal Fund**
    - $2.82 billion in outstanding principal amount of notes maturing July 1, 2013 through July 1, 2039, as of June 30, 2013.
    - $472.8 million in outstanding principal amount of state revolving loans, as of June 30, 2013.
    - Substantially all revenues of the sewage disposal system, net of operating expenses, pledged to secure payment of principal and interest.
    - Net system revenues of $227,447,337 versus debt service requirements of $199,990,125 in FY 2012.



## I.  Detroit Faces Strong Economic Headwinds.

- **Water Fund**
  - $2.52 billion in outstanding principal amount of various series of notes maturing July 1, 2013 through July 1, 2041, as of June 30, 2013.
  - $21.4 million in outstanding principal amount of state revolving loans, as of June 30, 2013.
  - Substantially all of the revenues of the City's water system, net of operating expenses, pledged to secure payment of principal and interest.
  - Net system revenues of $178,842,057 versus debt service requirements of $153,441,666 in FY 2012.

- **Automobile Parking Fund**
  - $9.3 million in outstanding principal amount of Detroit Building Authority Revenue Refunding Bonds: Parking System, Series 1998-A maturing July 1, 2010 through July 1, 2019, as of June 30, 2013.
  - Substantially all revenues of the parking system, net of operating expenses, pledged to secure payments of principal and interest.
  - Net system revenues of $2,708,223 versus debt service requirements of $2,923,454 in FY 2012.



## I.  Detroit Faces Strong Economic Headwinds.

**General Fund Obligations**

- **GO Bonds.**  The City estimates that, as of the close of FY 2013 (<u>i.e.</u>, June 30, 2013), it will have $1.01 billion in outstanding principal amount of limited and unlimited tax general obligation bonds, consisting of:

  - $469.1 million in outstanding principal amount of unlimited tax general obligation ("<u>UTGO</u>") bonds maturing from April 1, 2013 through November 1, 2035.

    - $100 million of the foregoing bonds are secured by a second lien on distributable state aid.

  - $540.3 million in outstanding principal amount of limited tax general obligation ("<u>LTGO</u>") bonds maturing April 1, 2013 through November 1, 2035.

    - Issuance of LTGO bonds do not require voter approval.  They are payable from general non-restricted funds.

    - $249.8 million of the LTGO bonds are secured by a first lien on distributable state aid.  $129.5 million of the LTGO bonds are secured by a third lien on distributable state aid.



## I.  Detroit Faces Strong Economic Headwinds.

- **Notes and Loans Payable.**  The City estimates that, as of June 30, 2013, the City will have $121.5 million in other outstanding installment notes and loans payable related to various public improvement projects.

  - $87.8 million in notes payable (which notes were issued in connection with the "Section 108" HUD Loan Guarantee Program and are secured by future "Block Grant" revenues).

  - $33.7 million in loans payable ($33.6 million of which is a non-interest bearing unsecured loan payable to the Downtown Development Authority as general operating funds become available).

- On August 23, 2012, the City issued $129.5 million of LTGO bonds at a $9.1 million premium (generating $137 million in proceeds after issuance costs) in part to defease short term bonds issued March 2012.  The remaining proceeds of these issuances were set aside with a trustee bank in an escrow account to provide funds for reforms and liquidity in FY 2013.   The current amount of the escrow is approximately $80 million.



## I. Detroit Faces Strong Economic Headwinds.

- **Certificates of Participation (Pension)**
  - In 2005, service corporations established by the GRS and PFRS created a trust that issued the COPs. The proceeds of the COPs were contributed to the City's pension trusts.
  - Principal and interest on the COPs is payable solely from payments made by the City to the service corporations pursuant to service contracts.
  - The City estimates that, as of the close of FY 2013, the following amounts were outstanding under the COPs:
    - $480.3 million in outstanding principal amount of $640,000,000 Certificates of Participation Series 2005 A maturing June 15, 2013 through 2025; and
    - $948.54 million in outstanding principal amount of $948,540,000 Certificates of Participation Series 2006 A and B maturing June 15, 2019 through 2035.
  - The City has identified certain issues related to the validity and/or enforceability of the COPs that may warrant further investigation.



## I.  Detroit Faces Strong Economic Headwinds.

- **Swap Liabilities Related to Certificates of Participation.**
  - In connection with the COPs, the City entered into eight pay-fixed, receive-variable interest rate swaps effective as of June 12, 2006 having a total notional amount of $800 million.
    - Recent valuations establish the negative fair value of the swaps at approximately $343.6 million (as of May 31, 2013).
    - January 2009 — The City received notice from the swap contract counterparties that downgrading of the COPs and certain swap insurers would constitute an "Additional Termination Event" under the swap contracts if not cured.
    - June 2009 — The City and the swap contract counterparties agreed on an amendment to the swap agreements, eliminating the Additional Termination Event and the potential for an immediate demand for payment.  Pursuant to the amendment, the swap counterparties waived their right to termination payments, and the City agreed to:
      - direct certain wagering tax revenues to a trust as collateral for the quarterly payments owing to the swap counterparties;
      - increase the interest rate of the swap agreements by 10 basis points effective July 1, 2010; and
      - include new termination events, including if COP ratings were withdrawn, suspended or downgraded.



## I.  Detroit Faces Strong Economic Headwinds.

- March 2012 — COPs were further downgraded which triggered another Termination Event; the City and the swap counterparties are in negotiations regarding the Termination Event.

- March 2013 – Appointment of Emergency Manager constitutes an event of default triggering another Termination Event.

- Although this proposal reflects treating the swap obligations as special revenue debt secured by the wagering tax revenues, that treatment is still being reviewed by the Emergency Manager.



## I.  Detroit Faces Strong Economic Headwinds.

**Other Liabilities.**

- The City estimates that, as of the end of FY 2013, the City will have $300 million in other liabilities outstanding.

- As of June 30, 2012, the City owed at least $264.6 million in other liabilities, consisting primarily of:

  - $101.2 million in accrued compensated absences, including unpaid, accumulated vacation and sick leave balances;

  - $86.5 million in accrued workers' compensation for which the City is self-insured;

  - $63.9 million in claims and judgments, including lawsuits and claims other than workers' compensation claims; and

  - $13.0 million in capital leases and accrued pollution remediation.



# I.  Detroit Faces Strong Economic Headwinds.

## Labor Costs and Restrictive Employment Terms

- The City is or was a party to 48 collective bargaining agreements ("CBAs") and has made great strides under the Consent Agreement in reducing costs imposed by its numerous active and expired CBAs between the City and various labor organizations representing City employees, many of which had been amended by interest arbitration awards issued by arbitrators appointed pursuant to Public Act 312.  Under the Consent Agreement, the City has unilaterally implemented City Employment Terms ("CETs"), which were approved by the Financial Advisory Board (the "FAB") appointed by the Governor, the Treasurer, the Mayor and City Council under former Public Act 4 (now repealed).  Currently, a substantial percentage of the City's employees are not governed by current CBAs, and many are working under CET terms and conditions of employment and/or those terms and conditions implemented or established through statutory interest arbitrations.

- During the last three years, the City has implemented compensation reductions to its work force in the form of budget-required furlough days ("BRF"), wage reductions and reductions in other wage related items, such as vacation days, sick days, longevity payments and overtime rules. The City implemented BRFs equivalent to 10% of wages (one furlough day every other week) to non-uniform employees in September 2009.  In August 2012, as part of the CET implementation, BRFs were eliminated for non-uniform employees and replaced with a permanent 10% wage reduction. Additional BRFs were implemented in February 2013 affecting certain non-uniformed employees.



## I.  Detroit Faces Strong Economic Headwinds.

- The CETs also imposed a 10% wage reduction on Detroit Police Officer Association ("DPOA") members in August 2012.   DPOA challenged the CETs as part of an Act 312 arbitration process; a decision in that arbitration reduces the 10% wage reduction to 5% effective January 2014.

- The CETs, implemented on all unions with contracts expired on or before June 30, 2012, also included compensation reductions, as follows:
    - Freezing sick leave banks and eliminating reserve sick leave accrual;
    - Eliminating sick time cash payouts for future earned time;
    - Eliminating the ability to reinstate furlough days;
    - Eliminating the $3-per-day allowance for daily car usage;
    - Eliminating four to six annual bonus vacation days; and
    - Reducing vacation accrual to 160 hours from 320 hours.

- The following additional CET changes were implemented on DPOA members:
    - Limiting paid time for court if less than two hours;
    - Eliminating educational reimbursement;
    - Requiring 80 hours to be worked in the prior work period to be eligible for overtime;
    - Changing payment of holiday earnings;



## I.  Detroit Faces Strong Economic Headwinds.

> - Suspending the 2% wage differential while on promotional roster;
>
> - Eliminating the option to receive pay for court and returning to banking the first 60 hours of court time;
>
> - Eliminating bonus vacation days; and
>
> - Delaying separation payments.

- Unilaterally implemented CETs imposed numerous concessions on City employees, including freezing, reducing or eliminating active employee benefits, reducing or eliminating pension and retiree medical benefits and reducing wages by 10%.  The CETs also negated seniority protections in various CBAs by expanding management rights, modifying methods and processes by which work is performed, changing shifts, hours of operation and overtime procedures; and revising or eliminating job classifications.  In addition to concessions imposed by the CETs, in some cases and as noted above, concessions have been granted through statutory interest arbitration processes.

- These labor cost concessions have not been uniformly applied to all bargaining units, and some City employees have not been affected by these measures.  The restructuring plan seeks to ensure that any concessions are equitably distributed across all bargaining units (as well as across unrepresented employees) and that the impact of these concessions on employees are mitigated to the extent possible.



## II.  Key Objectives for a Financial Restructuring and Rehabilitation of Detroit

**To the fullest extent possible under all of the circumstances:**

- Provide incentives (and eliminate disincentives) for businesses and residents to locate and/or remain in the City.
  - The City cannot stabilize or pay creditors meaningful recoveries if it continues to shrink.
  - Achieving this goal requires improvements in City services, particularly in the area of public safety and tax reform, to reduce the cost of living in the city to more closely approximate costs of living in nearby areas.
- Maximize recoveries for creditors.
  - Since the City will not generate sufficient cash to pay all liabilities, alternatives will have to be considered.
- Provide affordable pension and health insurance benefits, and restructure governance of pension arrangements.
- Eliminate blight to assist in stabilizing and revitalizing neighborhoods and communities within the City.
- Reform the City government operations to improve efficiency and reduce costs.
  - In many areas, longer term benefits will require immediate increases in capital investment.
- Maximize collection of taxes and fees that are levied or imposed.
- Generate value from City assets where it is appropriate to do so.



## III.  Current Financial Status

### General Fund Summary

| ($ in millions) | Fiscal year ended actual | | | | | Prelim. |
|---|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** |
| Total revenues | $ 1,397.7 | $ 1,363.3 | $ 1,291.0 | $ 1,316.8 | $ 1,196.9 | $ 1,121.9 |
| Operating expenditures | (1,111.1) | (1,025.3) | (964.7) | (887.5) | (857.1) | (692.0) |
| Legacy expenditures | (414.6) | (462.0) | (397.9) | (486.1) | (461.6) | (477.3) |
| Deficit (excl. financing proceeds) | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (47.4) |
| Financing proceeds | 75.0 | - | 250.0 | - | - | 137.0 |
| Total surplus (deficit) | $ (52.9) | $ (124.1) | $ 178.3 | $ (56.9) | $ (121.8) | $ 89.6 |
| | | | | | | |
| Accumulated unrestricted General Fund deficit | $ (219.2) | $ (331.9) | $ (155.7) | $ (196.6) | $ (326.6) | $ (237.0) |

- The City has made significant progress decreasing operating costs; however, revenues have declined more quickly and legacy costs have increased.

- Excluding proceeds from debt issuances, the City's expenditures have exceeded revenues from FY 2008 to FY 2012 by an average of $100 million annually.



# III.  Current Financial Status

## Revenues

($ in millions)

| | Fiscal year ended actual | | | | | Prelim. |
|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Municipal income tax | $ 276.5 | $ 240.8 | $ 216.5 | $ 228.3 | $ 233.0 | $ 238.7 |
| State revenue sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.3 | 182.8 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 173.0 |
| Sales and charges for services | 191.3 | 166.7 | 154.1 | 155.0 | 145.4 | 120.4 |
| Property taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 134.9 |
| Utility users' and other taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 54.8 |
| Other | 271.8 | 281.0 | 265.6 | 269.8 | 258.8 | 217.4 |
| Total revenues | $ 1,397.7 | $ 1,363.3 | $ 1,291.0 | $ 1,316.8 | $ 1,196.9 | $ 1,121.9 |

## Operating expenditures

($ in millions)

| | Fiscal year ended actual | | | | | Prelim. |
|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Salaries/overtime/fringe | $ (509.9) | $ (506.6) | $ (466.4) | $ (454.8) | $ (431.5) | $ (357.3) |
| Health benefits - active | (49.9) | (54.4) | (70.8) | (64.6) | (54.3) | (43.1) |
| Professional and contractual services | (66.9) | (73.5) | (54.2) | (48.5) | (43.1) | (42.7) |
| Materials & supplies | (85.8) | (70.9) | (60.1) | (67.1) | (62.2) | (63.6) |
| Utilities | (35.6) | (38.6) | (27.8) | (30.1) | (27.1) | (25.5) |
| Other | (362.9) | (281.2) | (285.4) | (222.4) | (238.9) | (159.8) |
| Operating expenditures | $ (1,111.1) | $ (1,025.3) | $ (964.7) | $ (887.5) | $ (857.1) | $ (692.0) |

## Legacy expenditures

($ in millions)

| | Fiscal year ended actual | | | | | Prelim. |
|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Debt service (LTGO & UTGO) | $ (133.8) | $ (177.6) | $ (135.9) | $ (137.3) | $ (135.6) | $ (141.4) |
| POC - principal and interest | (29.8) | (25.1) | (28.1) | (38.9) | (39.0) | (55.4) |
| POC swaps | (45.3) | (49.9) | (50.7) | (50.7) | (50.7) | (50.6) |
| Pension contributions | (76.3) | (65.7) | (50.8) | (119.5) | (86.1) | (78.3) |
| Health benefits - retiree | (129.3) | (143.7) | (132.3) | (139.7) | (150.1) | (151.6) |
| Legacy expenditures | $ (414.6) | $ (462.0) | $ (397.9) | $ (486.1) | $ (461.6) | $ (477.3) |



## III.  Current Financial Status

- **Pension contributions.**
  - City has consistently deferred year-end PFRS contributions by using a payment plan financing arrangement including accrual of 8% interest (~$50 million for FY 2012)
- **Health Benefits - Retiree.**
  - The total cost of healthcare benefits City-wide in FY 2012 was approximately $275 million, of which approximately $177 million related to retirees.
  - The General Fund's portion of healthcare costs in FY 2012 was approximately $204 million, of which approximately $150 million related to retirees.



## III. Current Financial Status

**In the Absence of a Comprehensive Financial Restructuring, Budget Deficits Will Continue for the Foreseeable Future.**

**The City Has Limited Options for Further Revenue Generation and, in the Absence of a Comprehensive Financial Restructuring, Cost-Saving Measures.**

- Legacy obligations continue to increase;
- Limited or no access to debt capital markets;
- Diminishing, if any, returns from further tax increases; and
- Minimal potential for further payroll related reductions.

**Absent Structural Changes, the City's Accumulated Deficit is Expected to Grow to Unprecedented Levels.**

- At the City's current run rate, its accumulated deficit could grow to 3-4 times its current level of $326.6 million to over $1.35 billion by FY 2017.



# III.  Current Financial Status

## A Look at the Future in the Absence of Restructuring Initiatives

*Note:  The following projections were prepared based solely on the City's current levels of operating expenses and capital expenditures and do not account for (i) increases in expenditures necessary to restore City services to adequate levels, (ii) additional investment by the City in services, assets or infrastructure or (iii) any changes to legacy liabilities.

| ($ in millions) | Fiscal year ended actual | | | | | Preliminary forecast | | | | | 5-year total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | |
| **Revenues** | | | | | | | | | | | |
| Municipal income tax | $ 276.5 | $ 240.8 | $ 216.5 | $ 228.3 | $ 233.0 | $ 238.7 | $ 243.4 | $ 247.3 | $ 249.0 | $ 250.7 | $ 1,229.1 |
| State revenue sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.3 | 182.8 | 184.3 | 186.1 | 187.9 | 189.5 | 930.4 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 173.0 | 170.0 | 168.3 | 170.0 | 171.7 | 853.0 |
| Sales and charges for services | 191.3 | 166.7 | 154.1 | 155.0 | 145.4 | 120.4 | 124.8 | 119.4 | 118.2 | 117.0 | 599.7 |
| Property taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 134.9 | 118.4 | 110.2 | 105.7 | 100.8 | 570.0 |
| Utility users' and other taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 54.8 | 47.2 | 40.9 | 40.9 | 41.3 | 225.0 |
| Other revenue | 156.9 | 142.7 | 134.2 | 152.4 | 125.5 | 93.4 | 75.6 | 55.8 | 55.8 | 55.9 | 336.4 |
| General Fund reimbursements | 34.7 | 55.7 | 47.6 | 32.3 | 47.6 | 31.2 | 30.3 | 30.3 | 30.3 | 30.3 | 152.2 |
| Transfers in (UTGO millage & non-General Fund | 80.1 | 82.5 | 83.8 | 85.1 | 85.8 | 92.8 | 89.0 | 87.9 | 83.8 | 84.4 | 438.0 |
| **Total revenues** | 1,397.7 | 1,363.3 | 1,291.0 | 1,316.8 | 1,196.9 | 1,121.9 | 1,082.8 | 1,046.2 | 1,041.5 | 1,041.4 | 5,333.8 |
| | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | |
| Salaries/overtime/fringe | (509.9) | (506.6) | (466.4) | (454.8) | (431.5) | (357.3) | (341.5) | (341.9) | (346.4) | (352.5) | (1,739.7) |
| Health benefits - active | (49.9) | (54.4) | (70.8) | (64.6) | (54.3) | (43.1) | (51.2) | (54.0) | (57.4) | (61.0) | (266.7) |
| Other operating expenses | (551.2) | (464.3) | (427.5) | (368.2) | (371.3) | (291.6) | (292.9) | (288.2) | (295.9) | (301.5) | (1,470.2) |
| Operating expenditures | (1,111.1) | (1,025.3) | (964.7) | (887.5) | (857.1) | (692.0) | (685.7) | (684.1) | (699.7) | (715.0) | (3,476.6) |
| | | | | | | | | | | | |
| **Net operating surplus** | 286.7 | 338.0 | 326.3 | 429.2 | 339.8 | 429.9 | 397.2 | 362.0 | 341.8 | 326.3 | 1,857.2 |
| | | | | | | | | | | | |
| Debt service (LTGO & UTGO) | (133.8) | (177.6) | (135.9) | (137.3) | (135.6) | (141.4) | (135.9) | (124.4) | (119.4) | (96.1) | (617.2) |
| POC - principal and interest | (29.8) | (25.1) | (28.1) | (38.9) | (39.0) | (55.4) | (61.0) | (63.2) | (65.4) | (67.6) | (312.6) |
| POC swaps | (45.3) | (49.9) | (50.7) | (50.7) | (50.7) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (253.1) |
| Pension contributions | (76.3) | (65.7) | (50.8) | (119.5) | (86.1) | (78.3) | (199.5) | (233.1) | (258.9) | (285.9) | (1,055.8) |
| Health benefits - retiree | (129.3) | (143.7) | (132.3) | (139.7) | (150.1) | (151.6) | (140.7) | (151.1) | (161.6) | (172.0) | (776.9) |
| Legacy expenditures | (414.6) | (462.0) | (397.9) | (486.1) | (461.6) | (477.3) | (587.6) | (622.4) | (655.9) | (672.3) | (3,015.6) |
| | | | | | | | | | | | |
| **Deficit (excl. financing proceeds)** | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (47.4) | (190.5) | (260.4) | (314.1) | (346.0) | (1,158.4) |
| | | | | | | | | | | | |
| Financing proceeds | 75.0 | - | 250.0 | - | - | 137.0 | - | - | - | - | 137.0 |
| **Total surplus (deficit)** | $ (52.9) | $ (124.1) | $ 178.3 | $ (56.9) | $ (121.8) | $ 89.6 | $ (190.5) | $ (260.4) | $ (314.1) | $ (346.0) | $ (1,021.4) |
| | | | | | | | | | | | |
| Accumulated unrestricted General Fund deficit | $ (219.2) | $ (331.9) | $ (155.7) | $ (196.6) | $ (326.6) | $ (237.0) | $ (427.5) | $ (687.9) | $ (1,002.0) | $ (1,348.0) | |

38

## IV.  The City Has Taken Action to Address Its Financial Challenges

**Headcount Reductions**

- Since 2011, the City has reduced its headcount by more than 2,700 employees (from 12,302 employees as of close of FY 2010 to approximately 9,560 as of May 31, 2013).

- The City's headcount reductions have resulted in ***annual savings of over $100 million***.

**Reductions of Labor Costs through Implementation of City Employment Terms ("CETs")**

- Implementation of the CETs provides for an ***estimated $102 million in annual savings***.

**Revenue Generating Initiatives**

- **Increased Corporate Tax Rate.**  In January 2012, the City's corporate income tax rate was raised to 2.0% from 1.0%.  This increased rate was projected to generate an estimated $6 million in additional annual revenue.

- **Enhanced Tax Collection Initiatives.**  The City has implemented, and is implementing, initiatives designed to (i) improve collection of past due taxes and (ii) enhance collection efforts on a prospective basis.  These efforts to enhance collection of taxes could generate an estimated $13 million in additional annual revenue.

- **Increased Lighting Rates.**  In January 2013, the City's Public Lighting Department increased its rates to more closely align with market rates/eliminate practice of charging customers less for power than the City itself was paying.  Increased PLD rates could generate an estimated $9 million in additional annual revenue.



## IV.  The City Has Taken Action to Address Its Financial Challenges

**Significantly Reduced Operating Expenses**

- **Reductions in Vendor Costs.**  The City is implementing an initiative to reduce its vendor-related costs by 10%.  Reductions in vendor costs are expected to save an estimated $10 million annually.

- **Reduction in Subsidy to DDOT.**  In 2012, the City undertook steps to improve the efficiency of the Detroit Dep't of Transportation (e.g., through route rationalization), thereby reducing the subsidy from the City's General Fund to the DDOT enterprise fund by approximately $15 million annually.

**Deferred Capital Expenditures**

- **The City has deferred capital expenditures.**

  - Average aggregate capital outlays for the fiscal years 2008 – 2012 were only $82.98 million.  Average aggregate capital outlays for the preceding fiscal years 2003 – 2007 were $151.94 million.

  - For fiscal years 2014 – 2023, it is estimated that General Fund necessary capital expenditures will average approximately $145 million.

**Demolition Initiative.**  Program launched in April 2010 with the goal of demolishing 10,000 vacant structures in three years.

- Over 5,000 structures have been demolished; the remaining portion of the 10,000 structures in the program are planned to be demolished by December 2013.



## V. Restructuring and Reinvesting in City Government

- To address the crises confronting the City and remedy the deficiencies in services addressed above (including, in particular, deficiencies in services relating to public safety), and to achieve a sustainable restructuring that promotes the long term health, safety and growth of the City, the City must aggressively pursue – and devote substantial resources to – the objectives described below.

- The City proposes to spend approximately $1.25 billion over the next ten years to, among other things, (i) improve the performance and infrastructure of its Police, Fire, EMS and Transportation Departments, (ii) comprehensively address and remediate urban blight, (iii) modernize its information technology systems on a City-wide basis and (iv) address lingering issues plaguing the City's electrical grid and lighting.



# V.  Restructuring and Reinvesting in City Government

**Public Safety**

- **Police**
  - **Objectives**
    - Reduce response times to the national average.
    - Improve closure rates and first responder investigations.
    - Update and overhaul police fleet and facilities.
    - Modernize the Department's information technology.
    - Achieve compliance with federal consent decrees.
    - Refine structure, staffing and organization of department to better serve citizens; hold all members (sworn and civilian) of the department accountable to effectively maintain core responsibilities of policing.

- **Fire/EMS**
  - **Objectives**
    - Modernize fleet and facilities to ensure that DFD has adequate and reliable infrastructure and equipment to perform its duties.
    - Modernize information technology.
    - Improve operating efficiency and cost structure.



## V.  Restructuring and Reinvesting in City Government

- **Street lights**
  - **Objectives**
    - Implement current population-based streetlight footprint.
    - Outsource operations and maintenance to the newly-created Public Lighting Authority structure (with oversight from the City).
    - Improve service to citizens and better cost management.

**Blight Removal.**
- **Objectives**
  - Stabilize and revitalize neighborhoods and communities within the City and improve quality of life.
  - Decrease incidence of crime and fire in blighted buildings and areas.
  - Increase property values.
  - Improvement in appearance of City.



# V. Restructuring and Reinvesting in City Government

**Electrical Transmission Grid**

- **Objectives**
  - Improvement in performance of grid and services to citizens.
  - Decommissioning of grid, sub-stations and idled power plant.
  - Increase revenue collection from customers.

**Information Systems Upgrades**

- Investment by the City in upgraded information technology is an indispensable aspect of the restructuring and reinvestment proposals and is critical to achieving almost all of the objectives described herein.

- **Objectives**
  - Enhance City-wide IT infrastructure to assist with effectuating change and augmenting workflows.
  - Increase integration between finance and operational systems City-wide resulting in lower labor costs and improved efficiencies.
  - Improve financial and operational reporting, resulting in:
    - Ability to monitor and improve operating performance.
    - More timely and accurate financial reporting to interested parties.
    - Improved revenue and collection efforts as a result of streamlined processes.



# V. Restructuring and Reinvesting in City Government

**Detroit Department of Transportation.**

- **Objectives**
  - Reduce general fund subsidy through increased revenue and reduced costs.
  - Determine best strategic direction for DDOT.



## VI.  Realization of Value of Assets

- The Emergency Manager currently is evaluating the City's assets to determine the most advantageous course of action to preserve or maximize the value of such assets for the long-term benefit of the City.  The City will evaluate all options, including preserving the status quo, entering into partnerships with other public entities, outsourcing of operations and transferring non-core assets to other private or public entities in sale, lease or other transactions.

- No decisions have been made regarding any particular asset, and the Emergency Manager will continue to evaluate options for inclusion in his comprehensive restructuring plan.



OFFICE OF THE EMERGENCY MANAGER

46

# VII.  Ten Year Projections (General Fund Only) (Steady State)

| ($ in millions) | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-year total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | | |
| Municipal income tax | $ 243.4 | $ 247.3 | $ 249.0 | $ 250.7 | $ 252.4 | $ 254.0 | $ 255.6 | $ 257.8 | $ 260.9 | $ 264.0 | $ 2,535.0 |
| State revenue sharing | 184.3 | 186.1 | 187.9 | 189.5 | 191.2 | 193.0 | 194.8 | 188.3 | 190.0 | 191.7 | 1,896.4 |
| Wagering taxes | 170.0 | 168.3 | 170.0 | 171.7 | 173.4 | 175.1 | 176.9 | 178.7 | 180.4 | 182.2 | 1,746.7 |
| Sales and charges for services | 124.8 | 119.4 | 118.2 | 117.0 | 115.7 | 114.5 | 113.4 | 112.3 | 113.2 | 114.2 | 1,162.6 |
| Property taxes | 118.4 | 110.2 | 105.7 | 100.8 | 100.5 | 99.6 | 99.7 | 100.2 | 100.8 | 102.1 | 1,038.0 |
| Utility users' and other taxes | 47.2 | 40.9 | 40.9 | 41.3 | 41.7 | 42.1 | 42.5 | 43.0 | 43.4 | 43.8 | 426.8 |
| Other revenue | 75.6 | 55.8 | 55.8 | 55.9 | 55.9 | 56.0 | 56.0 | 56.0 | 56.1 | 56.1 | 579.2 |
| General Fund reimbursements | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 302.6 |
| Transfers in (UTGO millage & non-General Fund | 89.0 | 87.9 | 83.8 | 84.4 | 83.9 | 81.2 | 80.6 | 80.0 | 65.0 | 61.2 | 797.1 |
| **Total revenues** | 1,082.8 | 1,046.2 | 1,041.5 | 1,041.4 | 1,045.0 | 1,045.7 | 1,049.8 | 1,046.3 | 1,040.1 | 1,045.7 | 10,484.5 |
| **Expenditures** | | | | | | | | | | | |
| Salaries/overtime/fringe | (341.5) | (341.9) | (346.4) | (352.5) | (358.8) | (365.1) | (371.4) | (378.4) | (386.0) | (393.7) | (3,635.7) |
| Health benefits - active | (51.2) | (54.0) | (57.4) | (61.0) | (64.5) | (67.9) | (71.2) | (74.6) | (78.4) | (82.3) | (662.5) |
| Other operating expenses | (292.9) | (288.2) | (295.9) | (301.5) | (309.7) | (313.5) | (320.0) | (326.5) | (335.3) | (339.7) | (3,123.2) |
| Operating expenditures | (685.7) | (684.1) | (699.7) | (715.0) | (733.1) | (746.5) | (762.5) | (779.5) | (799.6) | (815.7) | (7,421.5) |
| **Net operating surplus** | 397.2 | 362.0 | 341.8 | 326.3 | 311.9 | 299.2 | 287.2 | 266.8 | 240.5 | 230.0 | 3,063.0 |
| Debt service (LTGO & UTGO) | (135.9) | (124.4) | (119.4) | (96.1) | (95.0) | (92.5) | (91.8) | (91.5) | (74.8) | (70.9) | (992.4) |
| POC - principal and interest | (61.0) | (63.2) | (65.4) | (67.6) | (69.9) | (68.1) | (69.0) | (69.9) | (70.7) | (71.4) | (676.3) |
| POC swaps | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (49.8) | (48.9) | (48.1) | (47.4) | (498.0) |
| Pension contributions | (199.5) | (233.1) | (258.9) | (285.9) | (314.7) | (321.4) | (331.5) | (337.2) | (339.5) | (343.0) | (2,964.8) |
| Health benefits - retiree | (140.7) | (151.1) | (161.6) | (172.0) | (182.3) | (192.3) | (201.9) | (212.0) | (222.6) | (233.7) | (1,870.0) |
| Legacy expenditures | (587.6) | (622.4) | (655.9) | (672.3) | (712.6) | (725.0) | (744.0) | (759.5) | (755.8) | (766.4) | (7,001.5) |
| **Deficit (excl. financing proceeds)** | (190.5) | (260.4) | (314.1) | (346.0) | (400.7) | (425.8) | (456.8) | (492.6) | (515.3) | (536.4) | (3,938.5) |
| Financing proceeds | - | - | - | - | - | - | - | - | - | - | - |
| **Total surplus (deficit)** | $ (190.5) | $ (260.4) | $ (314.1) | $ (346.0) | $ (400.7) | $ (425.8) | $ (456.8) | $ (492.6) | $ (515.3) | $ (536.4) | $ (3,938.5) |
| Accumulated unrestricted General Fund deficit | (427.5) | (687.9) | (1,002.0) | (1,348.0) | (1,748.7) | (2,174.5) | (2,631.3) | (3,123.9) | (3,639.2) | (4,175.6) | |
| **Reinvestment in the City** | | | | | | | | | | | |
| Department revenue initiatives | $ 22.9 | $ 22.1 | $ 24.4 | $ 24.2 | $ 24.5 | $ 24.7 | $ 25.0 | $ 25.3 | $ 25.6 | $ 25.9 | $ 244.6 |
| Additional operating expenditures | (53.7) | (37.0) | (21.3) | (22.0) | (21.7) | (22.7) | (29.3) | (29.3) | (29.7) | (30.7) | (297.4) |
| Capital investments | (107.7) | (74.5) | (38.8) | (51.9) | (33.3) | (30.8) | (28.4) | (29.5) | (28.5) | (29.0) | (452.3) |
| Blight (excludes heavy commercial) | (50.0) | (50.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| Total reinvestment in the City | (188.5) | (139.3) | (135.7) | (149.7) | (130.5) | (128.8) | (32.8) | (33.4) | (32.6) | (33.8) | (1,005.2) |
| **Adjusted surplus (deficit)** | $ (379.0) | $ (399.7) | $ (449.8) | $ (495.6) | $ (531.2) | $ (554.6) | $ (489.6) | $ (526.1) | $ (547.9) | $ (570.2) | $ (4,943.7) |
| Adj. accumulated unrestricted General Fund deficit | (615.9) | (1,015.6) | (1,465.4) | (1,961.0) | (2,492.2) | (3,046.8) | (3,536.4) | (4,062.5) | (4,610.4) | (5,180.6) | |

# VII.  Ten Year Projections (General Fund Only)

## Restructuring Scenario.

| ($ in millions) | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-year total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Preliminary forecast | | | | | | |
| Total revenues | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 | $1,045.0 | $1,045.7 | $1,049.8 | $1,046.3 | $1,040.1 | $1,045.7 | $10,484.5 |
| Department revenue initiatives | 22.9 | 22.1 | 24.4 | 24.2 | 24.5 | 24.7 | 25.0 | 25.3 | 25.6 | 25.9 | 244.6 |
| Operating expenditures | (685.7) | (684.1) | (699.7) | (715.0) | (733.1) | (746.5) | (762.5) | (779.5) | (799.6) | (815.7) | (7,421.5) |
| Additional operating expenditures | (53.7) | (37.0) | (21.3) | (22.0) | (21.7) | (22.7) | (29.3) | (29.3) | (29.7) | (30.7) | (297.4) |
| **Net operating surplus** | **$366.4** | **$347.2** | **$344.9** | **$328.5** | **$314.6** | **$301.2** | **$282.9** | **$262.9** | **$236.4** | **$225.2** | **$3,010.2** |
| *Reinvestment expenditures/adjustments* | | | | | | | | | | | |
| Reorganization (Capital investments & Professional fees) | (167.0) | (111.7) | (38.8) | (51.9) | (33.3) | (30.8) | (28.4) | (29.5) | (28.5) | (29.0) | (548.8) |
| Blight (excludes heavy commercial) | (50.0) | (50.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| DC Pension contribution (10% Police/Fire, 5% other) | (25.4) | (25.7) | (26.2) | (26.6) | (27.2) | (27.7) | (28.2) | (28.7) | (29.3) | (29.9) | (274.8) |
| POC reimbursements | (24.1) | (25.4) | (26.2) | (26.8) | (27.5) | (27.1) | (27.3) | (27.4) | (27.4) | (27.4) | (266.7) |
| PLD decommission | - | (25.0) | (25.0) | (25.0) | | | | | | | (75.0) |
| Increased tax revenues | 7.4 | 12.2 | 16.4 | 23.8 | 28.3 | 36.0 | 42.0 | 48.5 | 56.3 | 63.8 | 334.5 |
| Total restructuring | (259.1) | (225.6) | (199.8) | (206.6) | (159.6) | (149.6) | (42.0) | (37.1) | (29.0) | (22.6) | (1,330.9) |
| **Funds available for legacy liabilities** | **107.3** | **121.6** | **145.2** | **122.0** | **155.0** | **151.6** | **240.9** | **225.7** | **207.4** | **202.6** | **1,679.3** |
| Payments to secured claims | | | | | | | | | | | |
| LTGO - secured | (18.7) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (281.6) |
| UTGO - secured | (8.0) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (96.4) |
| POC swaps (1) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (49.8) | (48.9) | (48.1) | (47.4) | (498.0) |
| Notes/loans payable | - | - | - | - | - | - | - | - | - | - | - |
| Total payments to secured claims | (77.3) | (89.7) | (89.7) | (89.7) | (89.7) | (89.7) | (88.9) | (88.0) | (87.2) | (86.4) | (876.0) |
| Funds available for unsecured claims | $30.0 | $31.9 | $55.5 | $32.3 | $65.4 | $62.0 | $152.1 | $137.7 | $120.2 | $116.2 | $803.3 |
| Asset monetization / revenue opportunities | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | - |
| Funds available for unsecured claims w/opportunities | $30.0 | $31.9 | $55.5 | $32.3 | $65.4 | $62.0 | $152.1 | $137.7 | $120.2 | $116.2 | $803.3 |

| Estimated unsecured claims | |
|---|---|
| Unsecured debt | |
| LTGO - unsecured | $161.0 |
| UTGO - unsecured | 369.1 |
| POC principal balance | 1,428.8 |
| Notes/loans payable | 33.6 |
| Sub-total: Unsecured debt | 1,992.5 |
| Unsecured pension & OPEB | |
| OPEB liability | 5,718.3 |
| Pension unfunded liability (PFRS) | 1,437.0 |
| Pension unfunded liability (DGRS) | 2,037.0 |
| Sub-total: Pension & OPEB | 9,192.3 |
| Other unsecured items | |
| Other liabilities (FY 2012 CAFR) | 264.6 |
| Other potential claims | tbd |
| Sub-total: Other | 264.6 |
| **Estimated total unsecured claims** | **$11,449.4** |

*Footnote:*
(1) Assumes continued payments as scheduled. Treatment to be determined.



## VII.  Ten Year Projections (General Fund Only)

**Conclusions Based Upon Projections**

- The City acknowledges that it must exert reasonable efforts to maximize recoveries for all creditors.

- As demonstrated by the 10-year projections, however, the City's expected revenues will fall significantly short of the levels required to fund the City's operations and fully satisfy its liabilities.

- Given the City's (i) substantial debt levels (LTGO; UTGO; COPs; Swaps), (ii) significant labor related liabilities and (iii) continuing operating expenses, shared sacrifice will be required from all stakeholders to achieve the City's dual (and complementary) goals of maximizing returns for its stakeholder constituencies while simultaneously establishing the framework for a healthy and growing Detroit moving forward.

- All of the City's stakeholders can benefit from a restructured and revitalized Detroit.



# VIII. Restructuring Proposal

**Summary of Treatment of Debt**

- **Secured Debt**
  - **DWSD Debt.** The existing DWSD water and sewer bond debt may be divided into two classes, *if applicable*:
    - **DWSD Class A Debt Claims**
      - DWSD Class A Debt Claims shall consist of claims under or evidenced by certain debt that may be paid prior to the effective date of the City's comprehensive restructuring plan without incurring a material premium or penalty.
      - On the effective date of the City's comprehensive restructuring plan, accrued principal and interest for DWSD Class A Debt Claims accrued through the restructuring plan's effective date will either (i) be repaid in full in cash or (ii) receive such treatment as may be agreed upon by the parties.



# VIII.  Restructuring Proposal

- *Source of funds for repayment*:  New long-term bond issuances with a newly-formed Metropolitan Area Water and Sewer Authority, or "MAWSA," as the issuer.

    i.   <u>New Series A Bond Principal</u>:  An amount equal to the sum of the principal of the outstanding debt that was issued to redeem the DWSD Class A Debt Bonds plus interest thereon accrued through the restructuring plan's effective date and fees incurred in connection with the new financings.

    ii.  <u>New Series A Bond Collateral</u>:  Lien on net revenues generated by MAWSA assets with the same priorities as the DWSD Class A Debt, but subordinate to the operating and maintenance costs of the system, including the Transaction Payment.

    iii. <u>New Series A Bond Interest Rate</u>:  Prevailing market rate for similar long-term municipal bonds at the time of issuance.

    iv.  <u>New Series A Bond Maturities</u>:  The various series of new municipal bonds would have long-term maturities determined at the time of issuance on the basis of then-existing market conditions.

- **DWSD Class B Debt Claims.**
    - DWSD Class B Debt Claims shall consist of all claims under or evidenced by each series of existing water or sewer bond debt (whether callable or not) that are not DWSD Class A Debt Claims.



# VIII.  Restructuring Proposal

    i.  On the effective date of the City's comprehensive restructuring plan, holders of DWSD Class B Debt Claims shall receive Series B Restructured Bonds or such treatment as may be agreed upon by the parties.

- ***Series B Restructured Bond Terms***:  Series B Restructured Bonds would be issued by MAWSA to holders of outstanding DWSD Class B Debt Claims.

    i.  <u>Series B Restructured Bond Principal</u>:  For each series of Series B Restructured Bonds, an amount equal to the sum of the principal of the outstanding DWSD Class B Debt Bonds for which such Series B Restructured Bonds are to be exchanged plus interest thereon accrued through the restructuring plan Effective Date.

    ii.  <u>Series B Restructured Bond Collateral</u>:  Lien on net revenues generated by MAWSA assets in the same priorities as currently exist for the DWSD Class B Debt Bonds for which such Series B Restructured Bonds are to be exchanged, subordinate to the operating and maintenance costs of the system, including the Transaction Payment.

    iii.  <u>Series B Restructured Bond Interest Rate</u>:  Prevailing market rate for similar long-term municipal bonds at the time of issuance.

    iv.  <u>Series B Restructured Bond Maturities</u>:  The same maturity dates as the DWSD Class B Debt Bonds for which the Series B Restructured Bonds will be exchanged.



# VIII.  Restructuring Proposal

- **Secured General Obligation Debt**
  - There are six series of secured General Obligation Debt:
    - $100,000,000 original principal amount Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds-Direct Payment).
    - $249,790,000 original principal amount Distributable State Aid General Obligation Limited Tax Bonds, Series 2010.
    - $38,865,000 original principal amount Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2).
    - $30,730,000 original principal amount Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2).
    - $6,405,000 original principal amount General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B).
    - $53,520,000 original principal amount Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A2-B).
  - Total annual debt service is approximately $39 million per year from FY 2015 through FY 2033.
  - Treatment:  Subject to negotiation with holders.



# VIII.  Restructuring Proposal

- **Secured Claims Arising in Connection with Installment Notes Payable**
  - The City has $87.8 million outstanding in connection with notes payable related to various public improvement projects, which notes were issued in connection with the "Section 108" HUD Loan Guarantee Program and are secured by future "Block Grant" revenues.
  - Treatment:  Subject to negotiation with holders.

- **Secured Claims Arising under Service Agreements Related to COP-Related Interest Rate Swaps**
  - Treatment:  Subject to negotiation with holders.

- **Secured Automobile Parking Fund Claims**
  - $9.3 million in outstanding principal amount of Detroit Building Authority Revenue Refunding Bonds: Parking System, Series 1998-A are secured by a pledge of all revenues of the parking system, net of operating expenses.
  - Treatment:  Principal and interest accrued through the effective date will be paid in full in cash using proceeds of sales of City's parking-related assets.  In the event that sales are not negotiated and consummated prior to the effective date, claims will be subject to negotiations with holders.



## VIII.  Restructuring Proposal

- ***Consideration for Unsecured Claims*:**  Holders of general unsecured claims will receive limited recourse participation notes (the "<u>Notes</u>").

  - <u>Claims Under Unsecured General Obligation Bonds/Notes</u>.

    - Aggregate amount:  Approximately $650 million.

    - Treatment:  Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

  - <u>Claims of Service Corporations (or affiliated trusts) on Account of COPs</u>.

    - Aggregate amount:  Approximately $1.4 billion.

    - Treatment:  Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

  - <u>Claims for Unfunded OPEB Liabilities</u>.

    - Current retirees will receive modified medical benefits plans utilizing either the exchanges to be created by January 1, 2014 under the Patient Protection and Affordable Care Act or Medicare, as applicable.  The proposed replacement program is preliminarily estimated to have a cost to the City of between $27.5 million and $40 million annually depending on choices to be made.

    - Claims will result from the modification of benefits.  The amount of such claims has not been finally determined.

    - Treatment for Allowed Claims:  Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.



## VIII.  Restructuring Proposal

- **-** Claims for Unfunded Pension Liabilities.

  - As set forth above, preliminary analysis indicates that the underfunding in the GRS and the PFRS is approximately $3.5 billion.  At this level of underfunding, the City would have to contribute approximately $200 million - $350 million annually to fully fund currently accrued, vested benefits.  Such contributions will not be made under the plan.

  - Claims for the underfunding will be exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

  - Because the amounts realized on the underfunding claims will be substantially less than the underfunding amount, there must be **significant** cuts in accrued, vested pension amounts for **both active and currently retired** persons.

- **-** Claims on account of Other Liabilities.

  - Aggregate Amount:  Approximately $300 million.

  - Treatment:  Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.



## VIII.  Restructuring Proposal

- **Description of Limited Recourse Participation Notes.**
  - **Relevant Definitions:**
    - "Adjusted Base Covered Revenues" means for a Fiscal Year following the Initial Revenue Participation Year, Base Covered Revenues adjusted for inflation for the period beginning on the first day of the Initial Revenue Participation Year and ending on the first day of the Fiscal Year using the positive change, if any, in the Consumer Price Index during such period.

    - "Base Covered Revenues" means one half of the sum of Covered Revenues for the first two Fiscal Years beginning after the Effective Date.

    - "Covered Revenues" means amounts actually collected by the City's General Fund in a Fiscal Year on account of (a) Property Taxes, Income Taxes and Gaming Taxes levied for such Fiscal Year and (b) Revenue Sharing Payments, determined based upon the City's audited financial statements.

    - "Dutch Auction" means a method for pricing the Notes whereby the price of the Notes offered by the City is the lowest price (the "Auction Price") at which there are bids to sell Notes for an aggregate purchase price equal to the amount the City is required to pay in respect of Revenue Participation Payments and/or Asset Disposition Proceeds then due and payable.  During bidding, each Noteholder will indicate how many Notes it is willing to sell to the City and the price such Noteholder is willing to accept.  All Notes offered at the Auction Price or at a lower price will be sold to the City at the Auction Price.



# VIII. Restructuring Proposal

- "Effective Date" means the closing date of a comprehensive restructuring of the City's finances on which the Notes shall be issued.

- "Final Participation Year" means the Fiscal Year beginning on the 20th anniversary of the first day of the Initial Participation Year.

- "Fiscal Year" means a period commencing on July 1 of a year and ending on June 30 of the following year.  For greater certainty, the Fiscal Year beginning on July 1, 2014 and ending on June 30, 2015 is the 2015 Fiscal Year.

- "Initial Participation Year" means the second full Fiscal Year following the Effective Date.

- "Trustee" means an indenture trustee or other agent for the Noteholders as defined in definitive documentation for the Notes.

- **Terms:**

  - Initial Principal Amount:  $2,000,000,000.00.

  - Interest Rate:  1.5% per annum on the outstanding principal amount of the Notes, payable semiannually.  No interest shall be paid or accrued for any period following the end of the Final Participation Year.

  - Maturity Date:  The first September 30 following the Final Participation Year.  The City shall have no obligation to pay any amounts other than the Revenue Participation Payment in respect of the Final Participation Year on the maturity date. The Notes may be prepaid in whole or in part at any time without premium or penalty.



## VIII. Restructuring Proposal

- On the September 30 after the end of each Fiscal Year beginning with the Initial Participation Year, an amount equal to the product of (a) 30% (0.30), multiplied by (b) (i) the amount by which Covered Revenues for such Fiscal Year exceed (ii) Adjusted Base Covered Revenues shall be applied to reduce the principal amount of the Notes. No Revenue Participation Payments shall be made for any Fiscal Year after the Final Participation Year.

- Grants and Other Amounts Received to Offset Costs of Addressing Blight: If the City receives any cash grants or other cash payments after the Effective Date and before the Maturity Date from the State of Michigan, the Federal government, or any other government or nonprofit entity not affiliated in any way with the City for the purpose of funding programs or activities to address blight that are included in the 10 Year Plan ("Blight Revenues") and that can be utilized in place of the General Fund sums in the 10 Year Plan projections, an amount equal to 75% of the General Fund revenues that would otherwise be spent on blight but for the outside funds shall be applied to reduce the principal amount of the Notes.

- Asset Disposition Proceeds: If the City receives cash consideration in connection with the transfer of Specified Assets after the Effective Date and before the Maturity Date, an amount equal to 75% of such cash shall be applied to reduce the principal amount of the Notes. For greater certainty, the assumption of indebtedness shall not constitute cash consideration.

- The City shall make distributions of Blight Revenues and Asset Disposition Proceeds when the amount of such payments that are due equal or exceed $50 million or at the time a Revenue Participation Payment is due, whichever is sooner.



## VIII.  Restructuring Proposal

- **Dutch Auctions:**  Any Revenue Participation Payment, Blight Revenues, Asset Disposition Proceeds and other amounts made available by the City may be used to fund offers to purchase Notes through a Dutch Auction process. The City shall give notice of its intent to conduct such a Dutch Auction using a Revenue Participation Payment on or before the July 15th following the end of the pertinent Fiscal Year and shall conclude the auction and purchase notes offered and accepted in the auction no later than the 90 days following the date such notice is given.  The City shall give notice of its intent to conduct such a Dutch Auction using Asset Disposition Proceeds or Blight Revenues on or before the 30 days following the date when the City becomes obligated to apply Asset Disposition Proceeds and shall conclude the auction and purchase notes offered and accepted in the auction no later than 90 days following the date such notice is given. The City may give notice of its intent to conduct a Dutch Auction using funds provided by the City which are not otherwise required to be applied to repayment of the Notes at any time.

- **Limited Recourse:**  The City's obligation to pay interest on the Notes shall be a general obligation of the City.  The City shall have no obligation to pay the principal amount of the Notes except to the extent that Revenue Participation Payments, Blight Revenues or Asset Disposition Proceeds become due in accordance with the terms hereof.

- **Requirements of Law.**  The terms of the Notes may be revised to conform with requirements of law.



# IX.  Calendar and Contacts

- Requests for additional information:  June 17, 2013 - June 24, 2013.

  - Please direct all requests for information and general inquiries to:
    Kyle Herman
    MILLER BUCKFIRE & CO., LLC
    601 Lexington Avenue, 22nd Floor
    New York, NY 10022
    (212) 895-1800
    kyle.herman@millerbuckfire.com

- Initial round of discussions with stake holders:  June 17, 2013 -July 12, 2013.

- Evaluation:  July 15, 2013 - July 19, 2013.



# IX.  Calendar and Contacts

- **Contacts:**
  - MILLER BUCKFIRE & CO., LLC
    601 Lexington Avenue, 22nd Floor
    New York, NY 10022
    (212) 985-1800

    - Kenneth Buckfire
      Co-President & Managing Director.

    - James Doak
      Managing Director.

  - JONES DAY

    David G. Heiman, Esq.
    901 Lakeside Avenue
    North Point
    Cleveland, Ohio 44114-1190
    (216) 586-3939

    Bruce Bennett, Esq.
    555 South Flower Street, 50th Floor
    Los Angeles, CA 90071
    (213) 489-3939

    Heather Lennox, Esq.
    222 East 41st Street
    New York, NY 10017
    (212) 326-3939



13-008858-CZ

FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/5/2013 12:02:00 PM
CATHY M. GARRETT

# EXHIBIT B

# Collateral Agreement

among

## The City of Detroit,

## Detroit General Retirement System Service Corporation
and
## Detroit Police and Fire Retirement System Service Corporation,
severally and not jointly,

## U.S. Bank National Association,
as Custodian

and the

## Other Persons Party Hereto

Dated as of June 15, 2009

## Table of Contents

Article I. Definitions and Related Matters ....................................................................1
Section 1.1.    Certain Definitions............................................................................1
Section 1.2.    Definitions in Authorizing Ordinance ..............................................8
Section 1.3.    Definition of *Counterparty* ...........................................................9
Section 1.4.    Definition of *Developer Payments* and Ancillary Definitions .........9
Section 1.5.    Definition of *Holdback Requirement* and Ancillary Definitions....11
Section 1.6.    Definition of *Wagering Tax Property* and Ancillary Definitions....12
Section 1.7.    Time 12
Section 1.8.    Business Days..................................................................................12
Section 1.9.    Interpretation..................................................................................12

Article II. Effectiveness of this Agreement................................................................13
Section 2.1.    Closing Date ...................................................................................13
Section 2.2.    Satisfaction of Conditions Precedent...............................................13
Section 2.3.    Factual Conditions Precedent ..........................................................13
Section 2.4.    Documentary Conditions Precedent .................................................13

Article III. General Provisions; Irrevocable Instructions........................................13
Section 3.1.    Appropriation..................................................................................13
Section 3.2.    No Indebtedness...............................................................................14
Section 3.3.    Contractual Obligations ..................................................................14
Section 3.4.    Irrevocable Instructions ..................................................................14
Section 3.5.    Payments from Accounts..................................................................15

Article IV. Pledges and Grant of Security Interests.................................................15
Section 4.1.    City Pledge.......................................................................................15
Section 4.2.    Service Corporation Grant of Security Interests...............................15
Section 4.3.    Alternative Service Corporation Pledge ...........................................16

Article V. Certain Payments.......................................................................................16
Section 5.1.    Payment of Revenues ......................................................................16
Section 5.2.    Monthly Payments by City ..............................................................17
Section 5.3.    Payments to City from General Receipts Subaccount........................17
Section 5.4.    When Payments from General Receipts Subaccount Prohibited....................18
Section 5.5.    Payments to City from Holdback Account ........................................18
Section 5.6.    Payments by City to Holdback Account............................................19
Section 5.7.    Payments to the Counterparties and the Custodian from Holdback Account .19
Section 5.8.    Payment Determinations..................................................................19

Article VI. Representations and Warranties of the City............................................20
Section 6.1.    General Representations and Warranties............................................20
Section 6.2.    Revenues..........................................................................................21
Section 6.3.    Developer Agreements and Guaranties .............................................21
Section 6.4.    No Other Liens, Charges or Encumbrances ......................................21
Section 6.5.    No Control Granted .........................................................................22

Article VII. Representations and Warranties of Service Corporations ...................22
Section 7.1.    General Representations and Warranties............................................22
Section 7.2.    Concerning the Security Interests....................................................23

**Article VIII. The Accounts**.................................................................................................**24**
    Section 8.1.    Establishment of Accounts ........................................................24
    Section 8.2.    Developer Subaccounts ............................................................25
    Section 8.3.    Receipt of Revenues ................................................................25
    Section 8.4.    Transfer of Revenues to General Receipts Subaccount.............25
    Section 8.5.    Receipt of City Payments ........................................................26
    Section 8.6.    General Receipts Account ........................................................26
    Section 8.7.    Holdback Account ...................................................................26
    Section 8.8.    Investments ..............................................................................26

**Article IX. City Covenants**..................................................................................................**26**
    Section 9.1.    No Senior or Parity Pledges or Liens ......................................26
    Section 9.2.    Junior Pledges or Liens............................................................26
    Section 9.3.    Further Assurances ...................................................................27
    Section 9.4.    No Control Granted ..................................................................27
    Section 9.5.    Excluded Property ....................................................................27
    Section 9.6.    No Development Agreement Amendments.................................27

**Article X. Service Corporation Covenants**.........................................................................**28**
    Section 10.1.    No Pledges of Liens of Service Corporation Property .............28
    Section 10.2.    No Control Granted ..................................................................28
    Section 10.3.    Excluded Property ....................................................................28
    Section 10.4.    Alternative Taxes......................................................................28
    Section 10.5.    Alternative Payment of Developer Payments.............................28
    Section 10.6.    Further Assurances ...................................................................28

**Article XI. Remedies**.........................................................................................................**29**
    Section 11.1.    Remedies under Hedges ..........................................................29
    Section 11.2.    Remedies as Secured Party ......................................................29
    Section 11.3.    Limitation on Remedies...........................................................30
    Section 11.4.    Failure to Appropriate..............................................................30
    Section 11.5.    Indemnity..................................................................................30
    Section 11.6.    *Specified Event* means any of the following events: .................31

**Article XII. The Custodian** ...............................................................................................**33**
    Section 12.1.    No Fiduciary Duties or Responsibilities...................................33
    Section 12.2.    Duties and Responsibilities.......................................................33
    Section 12.3.    Certain Rights of Custodian.....................................................34
    Section 12.4.    May Hold 2006 Pension Funding Securities. ...........................34
    Section 12.5.    Reporting of City Payments.....................................................35
    Section 12.6.    Weekly Reports .......................................................................35
    Section 12.7.    Monthly Holdback Compliance Notice ....................................35
    Section 12.8.    Quarterly Accounting ...............................................................35
    Section 12.9.    Coverage Reports.....................................................................35
    Section 12.10.  Compensation, Reimbursement and Indemnification.................36
    Section 12.11.  Prior Payment of Regular Custodian Payments.........................37
    Section 12.12.  Corporate Custodian Required; Eligibility. ..............................37
    Section 12.13.  Replacement of Custodian. ......................................................37
    Section 12.14.  Merger, Consolidation and Succession to Business. ................38

**Article XIII. Interest Rate Limitation** .......................................................................**38**

**Article XIV. Miscellaneous** ..........................................................................................**39**
    Section 14.1.    Addresses for Notices ........................................................................39
    Section 14.2.    Copies of Notices .............................................................................40
    Section 14.3.    Expenses ..........................................................................................40
    Section 14.4.    Termination......................................................................................40
    Section 14.5.    Amendment......................................................................................41
    Section 14.6.    Rights of Insurer .............................................................................41
    Section 14.7.    No Waiver ........................................................................................41
    Section 14.8.    Binding Obligation .........................................................................41
    Section 14.9.    Assignment .....................................................................................41
    Section 14.10.   Governing Law ................................................................................41
    Section 14.11.   Venue ..............................................................................................41
    Section 14.12.   WAIVERS OF JURY TRIAL...................................................................42
    Section 14.13.   Headings and Table of Contents......................................................42
    Section 14.14.   Entire Agreement ............................................................................42
    Section 14.15.   Counterparts....................................................................................42

1974.114.0093/425069
iii

THIS COLLATERAL AGREEMENT IS ENTERED INTO FOR SETTLEMENT PURPOSES

**Collateral Agreement**, dated as of June 15, 2009 (the *Agreement*), among the **City of Detroit**, a municipal corporation organized and existing under the laws of the State of Michigan (the *City*), the **Detroit General Retirement System Service Corporation** (the *GRS Service Corporation*) and the **Detroit Police and Fire Retirement System Service Corporation** (the *PFRS Service Corporation*), each a nonprofit corporation organized and existing under the laws of the State of Michigan, acting severally and not jointly, **U.S. Bank National Association**, a national banking association with its principal place of business in Minneapolis, Minnesota (the *Custodian*), **UBS AG** (*UBS*), **SBS Financial Products Company, LLC** (*SBS* and collectively with UBS, the *2006 Counterparties*) and **Merrill Lynch Capital Services, Inc.**, as credit support provider to SBS and, upon the occurrence of certain events, successor to SBS,.

## W I T N E S S E T H:

**Whereas**, in January 2009, the 2006 Counterparties notified the City, the GRS Service Corporation and the PFRS Service Corporation (each, a *Service Corporation* and collectively, the *Service Corporations*) that they believed that an event had occurred which entitled them to declare a certain "additional termination event" (the *2006 Additional Termination Event*) under the respective interest rate swap agreements (each, a *2006 Hedge* and collectively, the *2006 Hedges*) entered into by the Service Corporations and the 2006 Counterparties as part of the 2006 Transaction (the *2006 Transaction*) described in Ordinance No. 05-09 (the *Authorizing Ordinance*) undertaken by the City as part of its Pension System Funding Program described in therein;

**Whereas**, also as part of the 2006 Transaction the City entered into a Service Contract (a *2006 Service Contract*) with each Service Corporation (collectively, the *2006 Service Contracts*), which, among other things, provided for the City to make payments to the Service Corporations sufficient to pay amounts owing by the Service Corporations under their respective 2006 Hedges;

**Whereas**, the declaration of the 2006 Additional Termination Event could have resulted in the imposition of an immediate obligation on the City to make a combined payment to the Service Corporations in the range, estimated in January 2009, of $300 million to $400 million;

**Whereas**, the City Council adopted the Authorizing Ordinance on May 26, 2009, in contemplation of settlement with the Counterparties pursuant to the Definitive Documents;

**Now, Therefore,** in exchange for a waiver of the rights of each Counterparty to declare the 2006 Additional Termination Event and for a rescission of any declaration of the 2006 Additional Termination Event by a Counterparty made through the below defined Closing Date, and in the interest of avoiding fees and expenses of litigation and the delays that would result should litigation ensue, the parties hereto agree as follows:

## Article I. Definitions and Related Matters

### Section 1.1.   Certain Definitions

*Account* means an account established by **Section 8**.

*Accrued Service Charges* has the meaning given that term in the Service Contracts.

*Additional Termination Event* has the meaning given that term in the Hedges.

1974.114.0093/425069

*Additional Wagering Taxes* has the meaning given that term in **Section 1.6**.

*Affected Party* has the meaning given that term in the Hedges.

*Agreement* has the meaning given that term in the first paragraph of this instrument as it may be modified or amended pursuant to the terms hereof.

*Alternative Taxes* has the meaning given that term in **Section 1.6**.

*Article 9* has the meaning given that term in **Section 1.2**.

*Authorized Investments* means (i) Any of the following to the extent an authorized investment of City funds at the time of investment:

> (A)  full faith and credit obligations of the United States of America maturing (or subject to redemption at the option of the holder) on or before the first anniversary of the investment,

> (B)  shares or other undivided interests in First American U.S. Treasury Money Market Fund,

> (C)  shares or other undivided interests in First American Treasury Obligation Fund, and

> (ii)  such other investments to the extent authorized investments of City funds at the time of investment that are acceptable to the Counterparties.

*Authorizing Ordinance* has the meaning given that term in the preamble hereto.

*Business Day* means a day on which the Custodian is open for the transaction of business in the City and State of New York and the City is open for business in Detroit, Michigan.

*Casino Licensee* has the meaning given that term in **Section 1.2**.

*City* has the meaning given that term in the preamble hereto.

*City Charter* means the Charter of the City of Detroit, Michigan.

*City Hedge Payables Related Obligations* has the meaning given that term in **Section 1.2**.

*City Payment* has the meaning given that term in **Section 5.2**.

*City Pledge* has the meaning given that term in **Section 4.1**.

*Closing* means the satisfaction of the conditions precedent to the effectiveness of this Agreement as evidenced by the Closing Certificate.

*Closing Certificate* means the certificate identified as such in **Exhibit 2.4**.

*Closing Date* means the date on which the Closing occurs.

*Contract Administration Agreement* has the meaning given that term in the Service Contracts.

*Contract Administrator* has the meaning given that term in the Service Contracts.

*Counterparty* has the meaning given that term in **Section 1.3**.

**Custodian** means the Person identified in the first paragraph of this Agreement as the "Custodian" *unless and until* a successor is appointed successor Custodian pursuant to applicable provisions of this Agreement; *thereafter*, **Custodian** means such successor.

**Custodian Payment** means any amount to which the Custodian is entitled pursuant to **Section 12.10**.

**Defaulting Party** has the meaning given that term in the Hedges.

**Definitive Documents** means:

      (i)  this Agreement,

     (ii)  the Service Contract Amendments,

    (iii)  the Hedge Amendments and

    (iv)  the Irrevocable Instructions.

**Detroit Entertainment Subaccount** means the Developer Subaccount with respect to Detroit Entertainment, L.L.C.

**Developer** has the meaning given that term in **Section 1.4**.

**Developer Payments** has the meaning given that term in **Section 1.4**.

**Developer Subaccount** means a subaccount established in the Receipts Account with respect to a Developer.

**Development Agreement** has the meaning given that term in **Section 1.4**.

**Event of Default** has the meaning given that term in the Hedges.

**Excluded Indebtedness** means any obligations of the City payable from receipts derived from the ownership, operation or disposition of projects or systems (such as the City's Water Supply System or Sewerage Disposal System Bonds) or other special revenues as defined in Bankruptcy Code Section 902.

**Excluded Property** means:

      (i)  Revenues, and proceeds thereof, paid to the City from the General Receipts Subaccount, or released to the City from the Holdback Account, pursuant to this Agreement and

     (ii)  the right of the City to receive any such amounts as and when paid or released.

**Existing Casino** has the meaning given that term in **Section 1.4.**

**Existing Developer** has the meaning given that term in **Section 1.4.**

**Existing Development Agreement** has the meaning given that term in **Section 1.4.**

**Existing Payment Section** has the meaning given that term in **Section 1.4.**

**Final Payment** means, as of a Term Period End Date or the date that an Unqualified Hedge Event occurs, the sum of:

      (i)  any Custodian Payment then due and owing to the Custodian *plus*

(ii)  in the case of:

(A)  a Term Period End Date, the balance of any unpaid amounts (including, but not limited to, any Hedge Termination Payables) owing to the Counterparties under the Hedges and this Agreement *plus* an amount equal to any interest at the Interest Rate owing to the Counterparties under the Hedges; or

(B)  an Unqualified Hedge Event, the payment of any unpaid amounts (including, but not limited to, any Hedge Termination Payables) owing to the Counterparties under the Hedges and this Agreement.

***Finance Director*** means the Finance Director of the City or any other person authorized or permitted by law to fulfill functions of the Finance Director during any period of absence or incapacity of the Finance Director.

***Fiscal Year*** means the City's fiscal year, which currently commences on July 1 and ends on the following June 30.

***Fixed Amounts*** has the meaning given that term in the Hedges.

***Fixed Rate Payer Period End Date*** means a March 15, June 15, September 15 or December 15.

***Floating Amounts*** has the meaning given that term in the Hedges.

***General Receipts Subaccount*** means the subaccount established in the Receipts Account pursuant to **Section 8.1**.

***Greektown Subaccount*** means the Developer Subaccount with respect to Greektown Casino, L.L.C.

***GRS Service Corporation*** means the Person so defined in the first paragraph of this Agreement and the successors of such Person.

***Government Exception*** has the meaning given that term in **Section 4.3**.

***Guaranty*** means any agreement or form of credit enhancement that protects the City against loss by reason of the failure of a Developer to make Developer Payments, whether by guaranty, assurance, subrogation, setoff, indemnity, insurance, collateral, security or otherwise.

***Hedge*** means each of the 2006 Hedges as amended by the Hedge Amendments and as may be further amended in accordance with the terms thereof, including in the case of the 2006 Hedge with SBS, the Transaction Transfer Agreement and, upon a Transfer Party Accession Event, the related Transfer Hedge.

***Hedge Amendments*** means the amendments to the 2006 Hedges with an effective date that corresponds to the Closing Date.

***Hedge Event*** means the occurrence of a Termination Event or the continuance of an Event of Default under a Hedge (as such terms are defined in such Hedge) where the City is obligated to pay a termination payment to one or more Counterparties.

***Hedge Payables*** has the meaning given that term in **Section 1.2**.

***Hedge Periodic Payables*** has the meaning given that term in **Section 1.2**.

***Hedge Termination Payable*** has the meaning given that term in the Service Contracts.

*Holdback Account* means the Account by that name established pursuant to **Section 8.1**.

*Holdback Requirement* has the meaning given that term in **Section 1.5**.

*Insurer* means, as the context may require, Financial Guaranty Insurance Corporation or Syncora Guaranty Inc, or any successor of either of them to the insurance obligations of its predecessor with respect to the insurance of the payment obligations of a Service Corporation under a Hedge.

*Interest Rate* means the "Specified Default Rate" (as such term is defined in the Hedges).

*Irrevocable Instruction* has the meaning given that term in **Section 3.4**.

*Limitation on Remedies* has the meaning given that term in **Section 11.3**.

*MGM Grand Subaccount* means the Developer Subaccount established with respect to MGM Grand Detroit, L.L.C.

*Month* means one of three months of a Quarterly Period, each of which has substantially equal days and ends on the 15th day (whether or not a Business Day) of the corresponding calendar month.

*Monthly Coverage* has the meaning given that term in **Section 12.9**.

*Monthly Coverage Report* has the meaning given that term in **Section 12.9**.

*Monthly Holdback Compliance Notice* has the meaning given that term in **Section 12.7**.

*New Developer* has the meaning given that term in **Section 1.4**.

*New Development Agreement* has the meaning given that term in **Section 1.4**.

*New Payment Section* has the meaning given that term in **Section 1.4**.

*Notional Holdback Amount* means the amount that would have been payable under clause (ii) of the definition of Standard Holdback Requirement had a Termination Event not occurred.

*Obligor* has the meaning given that term in **Section 3.4(c)**.

*Outside Supplemental Appropriations Date* means the date which is the earlier to occur of:

> (i)  the 120th day following the date on which the termination of any Hedge occurs and

> (ii)  the expiration of the first 60 calendar days during which the City Council is in regular session following the date on which the termination of any Hedge occurs.

*Payment Date* means the earlier to occur of (i) second Business Day preceding the end of a Month or (ii) the Term Period End Date.

*Payment Section* has the meaning given that term in **Section 1.4**.

*Payment Time* means 2:00 p.m.

*Permitted Liens* has the meaning given that term in **Section 9.2**.

*Person* means any natural person, firm, association, corporation, trust, partnership, joint venture, joint-stock company, municipal corporation, public body or other entity, however organized.

*PFRS Service Corporation* means the Person so defined in the first paragraph of this Agreement and the successors of such Person.

*Pledged Property* has the meaning given that term in **Section 1.2**.

*Predecessor Developer* has the meaning given that term in **Section 8.2**.

*Public Act* means a statute of the State of Michigan.

*Qualified Hedge Event* means a Hedge Event that arises because of a Specified Additional Termination Event.

*Quarterly Accounting* has the meaning given that term in **Section 12.8**.

*Quarterly Coverage* has the meaning given that term in **Section 12.9**.

*Quarterly Coverage Report* has the meaning given that term in **Section 12.9**.

*Quarterly Payment* means, as to any Quarterly Period, the amount of all City Payments due and owing as of the last day of such Quarterly Period.

*Quarterly Period* means a period of days from and including each Fixed Rate Payer Period End Date but excluding the next succeeding Fixed Rate Payer Period End Date (whether or not such date is a Business Day).

*Ratings Downgrade* has the meaning given that term in **Section 1.5**.

*Ratings Upgrade* has the meaning given that term in **Section 1.5**.

*Ratings Upgrade Period* has the meaning given that term in **Section 1.5**.

*Receipts Account* means the Account by that name established pursuant to **Section 8.1** and includes the General Receipts Subaccount and each Developer Subaccount established pursuant to **Section 8.2**.

*Receipt Day* means a Business Day on which the Custodian receives an amount of money at or before the Payment Time *or if* the Custodian receives an amount of money on any day after the Payment Time, *then* the following Business Day.

*Reduced Holdback Requirement* has the meaning given that term in **Section 1.5**.

*Regular Custodian Payments* means any amount to which the Custodian is entitled pursuant to **Section 12.10(a)**.

*Regular Scheduled Payments* has the meaning given that term in the Service Contracts.

*Release Date* has the meaning given such term in **Section 5.5**.

*Relevant Amount* means, for any Month during the Term Payment Period, an amount equal to the sum of the following:

> (i)  any Regular Custodian Payment due and owing to the Custodian during such Month;

(ii)  *plus* the greater of:

    (A)  $4,228,081.30 and

    (B)   the Notional Holdback Amount;

(iii)  *plus*, subject to **Section 5.2(e)**, an amount equal to any interest at the Interest Rate owing to the Counterparties under the Hedges.

***Reporting Period*** has the meaning given that term in **Section 12.9.**

***Revenues*** has the meaning given that term in **Section 1.2.**

***SBS*** means SBS Financial Products Company, LLC and its successors and assigns.

***Service Charges*** has the meaning given that term in the Service Contracts.

***Service Contract*** means each of the 2006 Service Contracts as amended by the  Service Contract Amendments and as each may be further amended in accordance with the terms thereof.

***Service Contract Amendments*** means the amendments to the 2006 Service Contracts with an effective date that corresponds to the Closing Date.

***Service Corporation*** means the GRS Service Corporation or the PFRS Service Corporation, as the context may require.

***Service Corporation Pledge*** has the meaning given that term in **Section 4.3**.

***Service Corporation Property*** has the meaning given that term in **Section 4.2**.

***Service Corporation Security Interest*** has the meaning given that term in **Section 4.2**.

***Settlement Transaction*** means, collectively, the terms contained in each of the following agreements: this Agreement, the Hedge Amendments, the Service Contract Amendments and any other substantive agreement or documents (including, but not limited to, the Irrevocable Instructions and, to the extent not listed in the foregoing, the Definitive Documents) delivered as part of the Closing.  For the avoidance of doubt, "substantive agreement" does not include any certificate or opinion delivered as part of the Closing.

***Sinking Fund Installments*** has the meaning given that term in the Service Contracts.

***Specified Additional Termination Event*** means has the meaning given that term in each of the Hedges.

***Specified Event*** has the meaning given that term in **Section 11.6**.

***Standard Holdback Requirement*** has the meaning given that term in **Section 1.5**.

***Subject Month*** has the meaning given that term in **Section 12.9**.

***Subject Quarter*** has the meaning given that term in **Section 12.9**.

***Supplemental Appropriation*** means, with respect to any Fiscal Year in which a Qualified Hedge Event occurs, the amount necessary, when added to amounts previously appropriated and unexpended during such Fiscal Year, to pay the Relevant Amount each Month during such Fiscal Year.

***Termination Event*** has the meaning given that term in the Hedges.

*Term Payment Period* means a period beginning on the day that a Qualified Hedge Event occurs and ending on Term Period End Date.

*Term Period End Date* means, as to a Qualified Hedge Event and corresponding Term Payment Period, the earlier to occur of (i) the seventh anniversary of such Qualified Hedge Event and (ii) the date on which occurs a Specified Event.

*Threshold* means ad valorem property taxes levied by the City, whether pursuant to the City Charter or Section 6093 *et seq.* of Public Act 236 of 1961, as amended, of 3 mills in any Fiscal Year in excess of 19.952 mils of ad valorem taxes levied by the City for general City purposes pursuant to the City Charter for the Fiscal Year ending on June 30, 2009.

*Transfer Hedge* has meaning given that term in the Service Contracts.

*Transfer Party* has the meaning given that term in the Service Contracts.

*Transfer Party Accession Event* has the meaning given that term in the Contract Administration Agreement.

*2006 Funding Trust* means the Detroit Retirement Systems Funding Trust 2006 established by the Trust Agreement, dated June 12, 2006, among the Service Corporations and U.S. Bank National Association as trustee, as amended in accordance with its terms.

*2006 Hedge* has the meaning given that term in the preamble hereto.

*2006 Pension Funding Securities* means the Certificates of Participation issued by the 2006 Funding Trust.

*2006 Service Contract* has the meaning given that term in the preamble hereto.

*2006 Transaction* has the meaning given that term in the preamble hereto.

*UCC* means the Uniform Commercial Code as in effect in the State of Michigan.

*Unqualified Hedge Event* means a Hedge Event *other* than a Qualified Hedge Event.

*Wagering Tax Property* has the meaning given that term in **Section 1.6**.

*Wagering Tax Revenue Statute* has the meaning given that term in **Section 1.2**.

*Wagering Taxes* has the meaning given that term in **Section 1.6**.

## Section 1.2.   Definitions in Authorizing Ordinance

The following terms are defined in the <u>Authorizing Ordinance</u>, as in effect on the date hereof, and are used herein as therein defined as of the date hereof. Such terms are set forth below for convenience of reference:

*Article 9* means the Michigan Uniform Commercial Code – Secured Transactions, being MCL 440.9101 *et seq.*

*Casino Licensee* has the same meaning given such term in <u>Section 18-14-2</u> of the <u>Detroit City Code</u>.

*City Hedge Payables Related Obligations* mean the City's obligation, whether now existing or hereafter arising, to pay to each Service Corporation under the respective Service Contract

the amounts of the Hedge Payables as such amounts may now or hereafter become due and payable.

   **Hedge Payables** means, collectively, the Hedge Payables as defined in each Service Contract.

   **Hedge Periodic Payables** means, collectively, the Hedge Periodic Payables as defined in each Service Contract.

   **Pledged Property** means the Revenues, any investments made from time to time thereof, the Receipts Account and the Holdback Account, all amounts standing to the credit thereof from time to time, and any and all proceeds of any thereof.

   **Revenues** means, collectively, Developer Payments and Wagering Tax Property.

   **Wagering Tax Revenue Statute** means the Michigan Gaming Control and Revenue Act, being MCL 432.201 *et seq.*, MSA 18.969(201), *et seq.*, as amended.

### Section 1.3.    Definition of *Counterparty*

   (a) **Counterparty** means a Person designated as "Party A" in a Hedge, and any successor thereto or assignee of, or subrogee under, such Hedge pursuant to the terms thereof, except as otherwise provided in **this Section**.

   (b) The definition of Counterparty includes the Transfer Party:

      (i) for the purpose of executing and delivering this Agreement.

      (ii) for purposes of receiving notices and giving any consent that is provided to be given by the Counterparties hereunder and

      (iii) for all purposes of this Agreement on and after a Transfer Party Accession Event.

   (c) The definition of Counterparty does not include SBS for any purpose of this Agreement on and after a Transfer Party Accession Event *except* for the purpose of executing and delivering this Agreement.

   (d) The Custodian may conclusively presume in the absence of actual knowledge to the contrary that a Transfer Party Accession Event has not occurred unless and until it has received notice that a Transfer Party Accession Event has occurred from a Person entitled to give such notice under a Service Contract.

### Section 1.4.    Definition of *Developer Payments* and Ancillary Definitions

   The following terms are defined in the Authorizing Ordinance, as in effect on the date hereof, and are used herein as therein defined as of the date hereof.  Such terms are set forth below for convenience of reference:

   (a) **Developer Payments** means:

      (i) amounts payable under each Existing Payment Section,

      (ii) as of any particular date, the aggregate amounts payable under any New Payment Section up to but not exceeding the aggregate amounts that would have been payable under the applicable Existing Payment Section as of such date,

(iii)  any interest payable, in respect of amounts payable under each Payment Section, and

(iv)  any amounts payable under any Guaranty or  in respect of any amounts payable under any Payment Section.

For the avoidance of doubt, *Developer Payments* does not include any other payments or rights to reimbursement made or to be made under any Development Agreement.

(b)  Ancillary Definitions

*Developer* means any Existing Developer and any New Developer.

*Development Agreement* means any Existing Development Agreement and any New Development Agreement.

*Existing Casino* means any of the following casinos as the context may require:

(i)  the casino currently known as the Greektown Casino and currently located at 555 E. Lafayette Boulevard in Detroit, Michigan;

(ii)  the casino currently known as the MGM Grand Detroit Casino and currently located at 1300 John C. Lodge in Detroit, Michigan; and

(iii)  the casino currently known as the MotorCity Casino and currently located at 2901 Grand River Avenue in Detroit, Michigan.

*Existing Developer* means each of Detroit Entertainment, L.L.C., Greektown Casino, L.L.C., MGM Grand Detroit, L.L.C. and any successor to any of them or assignee of any of their respective Existing Development Agreements.

*Existing Development Agreement* means any of the Revised Development Agreements among the City, The Economic Development Corporation of the City of Detroit and an Existing Developer, as in effect on the effective date of the Authorizing Ordinance, as such Revised Development Agreement may be modified or revised from time to time thereafter, and any substitute for such Revised Development Agreement with an Existing Developer.

*Existing Payment Section* means each of the following sections and any substitute for any such section in an Existing Development Agreement:

(i)  Section 3.16(a)(iv) of the Existing Development Agreement with Greektown Casino, L.L.C. as the Existing Developer,

(ii)  Section 3.16(a)(iv) of the Existing Development Agreement with MGM Grand Detroit, L.L.C. as the Existing Developer, and

(iii)  Section 3.14(a)(iv) of the Existing Development Agreement with Detroit Entertainment, L.L.C. as the Existing Developer.

*New Developer* means a Person (that is not a public body) other than an Existing Developer.

*New Development Agreement* means an agreement with respect to an Existing Casino to which the City and a New Developer are parties and which contains a New Payment Section.

*New Payment Section* means a section in a New Development Agreement that provides for the calculation of payments similar to the calculation of payments made under an Existing Payment Section.

*Payment Section* means any Existing Payment Section and any New Payment Section.

**Section 1.5.   Definition of *Holdback Requirement* and Ancillary Definitions.**

(a) *Holdback Requirement* means:

(i)   for any Month *except* a Month occurring in a Ratings Upgrade Period, an amount equal to the Standard Holdback Requirement for such Month and

(ii)   for any Month occurring in a Ratings Upgrade Period, means an amount equal to the Reduced Holdback Requirement for such Month.

(b) Definitions Related to the Amount of the Holdback Requirement

*Reduced Holdback Requirement* means an amount equal to the Regular Custodial Payment for the applicable Month.

*Standard Holdback Requirement* means the sum of:

(i)   the Regular Custodian Payment payable during such Month *plus*

(ii)   one-third of the aggregate of the Fixed Amounts payable by the Service Corporations under the Hedges during the Quarterly Period in which such Month falls without giving effect to any netting for the Floating Amounts due from the Counterparties under the Hedges.

(c) Definitions Related to a Ratings Upgrade Period

*Ratings Downgrade* means, after a Ratings Upgrade, (i) a reduction of the unenhanced ratings of the 2006 Pension Funding Securities to below BBB by Standard & Poor's or to below Baa2 by Moody's Investors Service, or (ii) the unenhanced rating of the 2006 Pension Funding Securities has been withdrawn or suspended by either Standard & Poor's or Moody's Investors Service.

*Ratings Upgrade* means the reinstatement of the unenhanced ratings of the 2006 Pension Funding Securities to not less than A- by Standard & Poor's and to not less than A3 by Moody's Investors Service.

*Ratings Upgrade Period* means a period of days beginning on (and including) the day that a Ratings Upgrade occurs and ending on (and including) the day on which the earlier of the following occur:

(i)   a Ratings Downgrade or

(ii)   a Termination Event or Event of Default under a Hedge where the Counterparty is not the sole Affected Party or Defaulting Party.

**Section 1.6.    Definition of *Wagering Tax Property* and Ancillary Definitions**

The following terms are defined in the Authorizing Ordinance, as in effect on the date hereof, and are used herein as therein defined as of the date hereof. Such terms are set forth below for convenience of reference:

(a) *Wagering Tax Property* means, collectively, the Wagering Taxes, Additional Wagering Taxes and Alternative Taxes, including any interest and penalties thereon as provided for under Detroit City Code Section 18-14-6(c) and any and all proceeds of any thereof. For the avoidance of doubt, *Wagering Tax Property* does not include any municipal service fees authorized to be imposed by the City pursuant to Section 13 of the Wagering Tax Revenue Statute.

(b) Ancillary Definitions

*Additional Wagering Taxes* means taxes collected or to be collected by the City pursuant to Section 12(5) of the Wagering Tax Revenue Statute.

*Alternative Taxes* means all proceeds of taxes to which the City is at any time or from time to time entitled under Section 12(1) of the Wagering Tax Revenue Statute on account of the City rescinding or otherwise being unable to exercise its option to collect Wagering Taxes and all other amounts payable to the City pursuant to Section 12 of the Wagering Tax Revenue Statute.

*Wagering Taxes* means taxes levied or imposed or to be levied or imposed by Detroit City Code Section 18-14-3 pursuant to Section 12(4)(b) of the Wagering Tax Revenue Statute.

**Section 1.7.    Time**

*Unless* otherwise indicated, all references to time herein refer to such time in Detroit, Michigan.

**Section 1.8.    Business Days**

If this Agreement requires an act to be performed on a day that is not a Business Day then such act shall be performed on the first day thereafter that is a Business Day with the same effect as if such act were performed on the day that such act was otherwise required to be performed.

**Section 1.9.    Interpretation**

(a) Capitalized terms used herein have the meanings given or provided for such terms herein *unless* the context clearly otherwise requires.

(b) Words of the masculine gender include correlative words of the feminine and neuter genders.

(c) Unless the context otherwise indicates, words importing the singular include the plural and vice versa.

(d) Articles, Sections and Exhibits referred herein refer to the corresponding Articles and Sections of this Agreement and Exhibits to this Agreement *unless* otherwise provided.

(e) The terms *hereby, hereof, hereto, herein, hereunder* and any similar terms used in this Agreement refer to this Agreement as a whole and not to any particular portion thereof.

(f)  The word *or* is not exclusive.

(g)  The enumeration of things after the word *including* is to be interpreted as illustrative and not as restrictive.

(h)  References herein or in the preamble hereto to any Public Act, or codification thereof, or any section, subsection or paragraph thereof include any amendments to such Public Act, or codification thereof, or to any section, subsection or paragraph thereof and any substitute therefor.

(i)  References herein or in the preamble hereto to any section, subsection or paragraph of either the Wagering Tax Revenue Statute or the Detroit City Code include any amendments to such section, subsection or paragraph as the same may be amended from time to time and any substitute therefor.

## Article II. Effectiveness of this Agreement

### Section 2.1.   Closing Date

The Closing shall occur on a date on or before June 26, 2009.

### Section 2.2.   Satisfaction of Conditions Precedent

This Agreement shall become effective on and after the Closing Date.

### Section 2.3.   Factual Conditions Precedent

(a)  The Existing Developers shall have received the Irrevocable Instructions.

(b)  The Service Corporations and the Counterparties shall have entered into the Hedge Amendments.

(c)  The City, the Service Corporations and the Counterparties shall have entered into the Service Contract Amendments.

(d)  The Third Party Beneficiaries (as defined in the 2006 Service Contracts) shall have consented to the Service Contract Amendments and the Hedge Amendments.

(e)  The Custodian has established the Accounts.

(f)  The City Council shall have adopted a resolution to implement the Authorizing Ordinance and authorize the Definitive Documents.

### Section 2.4.   Documentary Conditions Precedent

The parties hereto shall have received and then hold such instruments, other documents and opinions in form and substance acceptable to each of the parties.

## Article III. General Provisions; Irrevocable Instructions

### Section 3.1.   Appropriation

(a)  The payment by the City of the City Payments and amounts payable pursuant to **Section 5.6** (if not appropriated at the time thereby required to be paid) are subject to appropriation by the City Council.

(b) The City Pledge, the Irrevocable Instructions and the deposit of Revenues in the Receipts Account are not subject to appropriation by the City Council.

### Section 3.2.   No Indebtedness

The obligations of the City under this Agreement shall not constitute or create any indebtedness of the City within the meaning of the limitation of The Home Rule City Act, being Act 279 of the Public Acts of Michigan of 1909, as amended, or any Michigan constitutional or other non-tax statute or City Charter limitation.

### Section 3.3.   Contractual Obligations

(a) The City Hedge Payables Related Obligations and all obligations of the City under this Agreement are contractual obligations, enforceable in the same manner as any other contract of the City and are not general obligations of the City to which the City has pledged its full faith and credit or ad valorem taxing power.

(b) **This Section** does not impair any lien or security interest in any Pledged Property.

### Section 3.4.   Irrevocable Instructions

(a) The City shall give effect to its obligations contained in **Section 5.1(a)** by means of the Irrevocable Instructions in the form attached hereto as **Exhibit 3.4** as modified with the consent of the Counterparties to take into account whether the addressee is a Casino Licensee, Developer or Obligor (the *Irrevocable Instructions*).

(b) The City shall deliver an Irrevocable Instruction to each Casino Licensee and each Existing Developer on or before the Closing Date. *If* a Casino Licensee and a Developer are the same Person *then* the Irrevocable Instruction as to Wagering Tax Property and Developer Payments may be combined in a single Irrevocable Instruction.

(c) The City shall deliver an Irrevocable Instruction on or before the Closing Date to each Person who is an obligor (an *Obligor*) under a Guaranty and from whom payment is required in lieu of or in substitution for an amount otherwise payable by a Developer as a Developer Payment

(d) The City shall deliver an Irrevocable Instruction to each New Developer on or before the date of effectiveness of each New Development Agreement.

(e) Upon reasonable request by any Counterparty during the term of this Agreement and in any event when requested by a Counterparty following the occurrence of a Hedge Event, the City also shall deliver or redeliver an Irrevocable Instruction to any Developer, Casino Licensee or Obligor, as identified by the Counterparty.

(f) Each Casino Licensee, Developer or Obligor owing any Revenues to the City, when notified by the Irrevocable Instructions, shall be discharged *pro tanto* by making payment in accordance with the Irrevocable Instructions.

(g) The City shall not revoke or otherwise act to effect any change to an Irrevocable Instruction without the prior written consent of each Counterparty.

(h) The City shall take all actions necessary to ensure that Irrevocable Instructions remain in effect during the term of this Agreement, including with respect to any Wagering Tax

Property or Developer Payments payable by any Developer or Obligor, whether or not an addressee of the Irrevocable Instructions.

(i) The failure of a Casino Licensee, Developer or Obligor to comply with an Irrevocable Instruction shall not relieve the City of its obligations contained in **Section 5.1**.

### Section 3.5.    Payments from Accounts

Any amount paid to the City from the General Receipts Subaccount or released to the City from the Holdback Account, in each case, pursuant to the terms of this Agreement shall be free and clear of any pledge or lien created by this Agreement.

## Article IV. Pledges and Grant of Security Interests

### Section 4.1.    City Pledge

(a) The City Pledge as set forth in the Authorizing Ordinance, as in effect on the Closing Date, and as set forth below is an essential term of this Agreement.

(b) The City pledges to the Service Corporations and creates a first priority lien upon all of the City's right, title and interest in, to and under the Pledged Property, whether received or to be received, in order to secure the payment of all City Hedge Payables Related Obligations (the *City Pledge*).

(c) The City Pledge shall be valid, binding and enforceable as of the Closing Date, and the Pledged Property and other property pledged pursuant to the City Pledge shall immediately be subject to the lien of the City Pledge without any physical delivery thereof or further act.

(d) The lien of the City Pledge shall be valid, binding and enforceable as against all parties having claims of any kind in tort, contract or otherwise against the City irrespective of whether such claims are voluntary or involuntary or any such claimants have notice of the City Pledge.

(e) Neither the Authorizing Ordinance nor this Agreement nor any other document or any statement, or instrument by which the City Pledge is created or evidenced nor any financing statement or other notice need be recorded or filed.

### Section 4.2.    Service Corporation Grant of Security Interests

(a) Each Service Corporation grants a security interest to the Counterparties in all of the Service Corporation's right, title and interest in, to and under the City Hedge Payables Related Obligations and the City Pledge (the *Service Corporation Property*), in order to secure the payment of the Hedge Payables as the same may now or hereafter become due and payable by such Service Corporation under its respective Hedge and all other amounts owing to the Counterparties under this Agreement (the *Service Corporation Security Interest*).

(b) The Service Corporation Security Interest is an essential term of this Agreement.

**Section 4.3.   Alternative Service Corporation Pledge**

(a) **This Section** is applicable *if and to the extent* that a Service Corporation is deemed a "governmental unit" or a "governmental subdivision or agency" as such terms are used in Article 9 (the *Government Exception*)

(b) The Service Corporation Pledge as set forth in the <u>Authorizing Ordinance</u>, as in effect on the Closing Date, and as set forth below is an essential term of this Agreement.

(c) Each Service Corporation pledges to the Counterparties and creates a first priority lien upon all of the Service Corporation's right, title and interest in, to and under the Service Corporation Property, in order to secure the payment of the Hedge Payables as the same may now or hereafter become due and payable by such Service Corporation under its respective Hedge (the *Service Corporation Pledge*).

(d) The Service Corporation Pledge shall be valid, binding and enforceable as of the Closing Date, and the Service Corporation Property shall immediately be subject to the lien of the Service Corporation Pledge without any physical delivery thereof or further act.

(e) The lien of the Service Corporation Pledge of each Service Corporation shall be valid, binding and enforceable as against all parties having claims of any kind in tort, contract or otherwise against such Service Corporation irrespective of whether such claims are voluntary or involuntary or any such claimants have notice of the Service Corporation Pledge.

(f) Neither the Authorizing Ordinance nor this Agreement nor any other document or any statement, or instrument by which the Service Corporation Pledge is created or evidenced nor any financing statement or other notice need be recorded or filed.

## Article V.  Certain Payments

**Section 5.1.   Payment of Revenues**

(a) The City shall pay all Revenues to the Custodian.

(b) The City shall not take any action to redirect the payment of the Revenues contrary to the Irrevocable Instructions.

(c) *If* the City shall receive any Revenues from or on behalf of a Casino Licensee or Developer or an Obligor under a Guaranty notwithstanding the giving of the Irrevocable Instructions, *then* the City shall transfer such Revenues to the Custodian for deposit to the credit of the Developer Subaccount within two Business Days following the earlier to occur of:

(i) the Finance Director having actual knowledge of such payment and

(ii) receipt by the City of notice from the Custodian that such payment was erroneously paid to the City.

(d) Until the Pledged Property has been released from the lien of the City Pledge, the City shall not transfer to the revenue division of the Michigan Department of Treasury, pursuant to <u>Detroit Code Section 18-14-6(a)</u>, the responsibility and function of administering and collecting Revenues on behalf of the City.

### Section 5.2.   Monthly Payments by City

(a)  Monthly, on or before the Payment Date of such Month, the City shall pay to the Custodian in one or more payments an aggregate amount from the City's general fund (collectively, a *City Payment*) for deposit to the credit of the Holdback Account as provided below:

(1) *Except* as provided in **paragraph (2)** or **(3)**, **below**, the City Payment shall equal the Holdback Requirement for the Month in which such City Payment is made.

(2) *Subject* to **Section 5.2(e)**, the City Payment shall equal the Relevant Amount for each Month during the Term Payment Period.

(3) The City Payment shall equal the amount of the Final Payment for the Month in which occurs an Unqualified Hedge Event or the Term Period End Date.

(b)  The City shall make the City Payment at or before the Payment Time on the date such payment is made.

(c)  The City has no obligation to make more than one City Payment in any Month *except* as otherwise provided in **subsection (d)**, **below**.

(d)  *If* the City has made a City Payment equal to the Holdback Requirement in any Month and after making such payment the City becomes obligated to make a City Payment equal to the Relevant Amount or Final Payment during such Month, *then* on or before the Payment Date of such Month, the City shall pay a City Payment equal to the difference between the Holdback Requirement already paid by the City during such Month and the amount of such Relevant Amount or Final Payment, as the case may be.

(e)  To the extent that, following the commencement of the Term Payment Period, payment of the amount referred to in **clause (iii)** of the **definition of "Relevant Amount"** requires a Supplemental Appropriation, the City may defer the payment of such amount until the earliest to occur of:

(i)  the date on which the Supplemental Appropriation is obtained,

(ii)  the Outside Supplemental Appropriations Date,

(iii)  the date on which an Unqualified Hedge Event occurs and

(iv)  the Term Period End Date.

For each Month in the deferral period, the amount so deferred shall not be included in the Relevant Amount, or as a City Payment, for that Month, *but* upon the expiration of the deferral period, an amount equal to the interest at the Interest Rate accrued and remaining unpaid to the Counterparties under the Hedges from the commencement of the deferral period shall be included in the Relevant Amount, and as a City Payment, in the Month in which the deferral period expires.

### Section 5.3.   Payments to City from General Receipts Subaccount

(a)  Payments shall be made to the City from the General Receipts Subaccount as follows *except* during a Ratings Upgrade Period or as provided in **Section 5.4**:

(1) For any Month in which the Custodian receives the full amount of a City Payment required by **Section 5.2**, the Custodian shall, without notice to or consent by the Coun-

terparties, pay to the City an amount from the General Receipts Subaccount equal to such City Payment.

(2) Beginning on the second Business Day following the date on which the Custodian gives its Monthly Holdback Compliance Notice to the City and the Counterparties, the Custodian shall remit daily to the City all amounts standing to the credit of the General Receipts Subaccount during the Month covered by such Monthly Holdback Compliance Notice.

(b) *Except* as provided in **Section 5.4**, the Custodian shall remit daily to the City all amounts standing to the credit of the General Receipts Subaccount during a Ratings Upgrade Period.

### Section 5.4.   When Payments from General Receipts Subaccount Prohibited

(a) No payment shall be made to the City from the General Receipts Subaccount

(i) on and after the Term Period End Date or

(ii) on or after the occurrence of a Termination Event under a Hedge where the related Counterparty is not the sole Affected Party *except* as otherwise permitted by **subsection (b), below** or

(iii) while an Event of Default is continuing under a Hedge where the related Counterparty is not the sole Defaulting Party.

(b) No payment shall be made to the City from the General Receipts Subaccount on or after a Qualified Hedge Event *unless and until* the (i) City enacts the correlative Supplemental Appropriation and (ii) the Finance Director delivers to the Custodian and the Counterparties a certification that such Supplemental Appropriation has been duly enacted and is in the amounts required by this Agreement.

### Section 5.5.   Payments to City from Holdback Account

(a) *Except* as otherwise provided in **subsection (b), below**, on each Release Date, the Custodian shall pay to the City the balance in excess of $5,000 standing to the credit of the Holdback Account at the end of the correlative Quarterly Period.

(b) No payment shall be made to the City from the Holdback Account if at the time a Final Payment is due and owing.

(c) ***Release Date*** means, as to any Quarterly Period, the latest to occur of:

(i) the date on which all payments to the Counterparties and the Custodian required by **Section 5.7** have been paid,

(ii) the date of the delivery by the Custodian, in accordance with **Section 12.9**, of the Quarterly Coverage Report for the immediately ended Quarterly Period and

(iii) the date of delivery by the Custodian, in accordance with **Section 12.9**, of the Monthly Coverage Report for the last Month in the immediately ended Quarterly Period.

**Section 5.6.   Payments by City to Holdback Account**

(a)  *If* a Quarterly Accounting shows that amounts standing to the credit of the Holdback Account are not sufficient to make all payments to the Counterparties and the Custodian required by **subsections (a)** through **(d) of Section 5.7**, then the City shall then pay to the Custodian an amount from its general fund equal to the amount of such insufficiency.

(b)  *If* at any time amounts standing to the credit of the Holdback Account are not sufficient to pay all Regular Custodian Payments and City Payments due at the time, then the City shall then pay to the Custodian an amount from its general fund equal to the amount of such insufficiency.

(c)  All amounts received by the Custodian from the City pursuant to **this Section** shall be deposited to the credit of the Holdback Account and applied to the insufficiency giving rise to the reason for such payment.

**Section 5.7.   Payments to the Counterparties and the Custodian from Holdback Account**

(a)  The Custodian shall pay to the Counterparties from the Holdback Account:

(i)  at the end of each Quarterly Period, except during the Term Payment Period or after the occurrence of an Unqualified Hedge Event or the Term Period End Date, an amount equal to all Hedge Periodic Payables payable for such Quarterly Period; and

(ii)  at the end of each Month during the Term Payment Period, an amount equal to the Relevant Amount for the Month, excluding the amount of any Regular Custodian Payment included in the Relevant Amount;

(b)  Upon the occurrence of an Unqualified Hedge Event or the Term Period End Date, the Custodian shall pay the Final Payment from the Holdback Account.

(c)  All amounts paid to the Counterparties pursuant to **Section 5.7(a)(ii)** shall be credited toward payment by the City of the amounts due and owing to the Counterparties under the Hedges as to which payment is deferred during the Term Payment Period due to the Limitation on Remedies.

(d)  At the end of the Quarterly Period or at such other time or times as the payments are then due and owing, the Custodian shall pay to itself from the Holdback Account all Regular Custodial Payments then due and owing.

(e)  If the funds in the Holdback Account are not sufficient to make the payments required by this **Section 5.7**, the amounts referred to in **Section 5.7(d)** shall be paid first, and any balance shall be paid to the Counterparties.

**Section 5.8.   Payment Determinations**

(a)  For purposes of the Custodian determining the amount or timing of payments to be made under this **Article V**, the Custodian may rely upon the written notice delivered by either Counterparty as to the occurrence of any Rating Upgrade, Rating Downgrade, Unqualified Hedge Event, Qualified Hedge Event, Outside Supplemental Appropriation Date, Term Period End Date or any other event affecting the determination of the amount or timing of payment under this **Article V**.

(b)  Any such notice or determination shall not affect the right of the City to seek a re-fund or other payment from the Counterparties based on the City's belief that the information contained in the notice was incorrect.

## Article VI. Representations and Warranties of the City

The City makes the representations and warranties contained in **this Article** for the bene-fit of the Custodian, the Service Corporations and the Counterparties on and as of the Closing Date.

### Section 6.1.   General Representations and Warranties

(a)  Organization and Existence

(1)  The City is a municipal corporation of the State of Michigan, with home rule powers, duly existing under the laws of the State of Michigan and pursuant to the City Char-ter.

(2)  The City Charter and all amendments thereto were duly approved by a majority of the City electors voting thereon, and the City Charter and any such amendments have not been rescinded in whole or in part.

(b)  Valid and Binding Agreement, Obligations and City Pledge

(1)  This Agreement and each other Definitive Document to which the City is a party, constitutes a valid and binding agreement of the City enforceable in accordance with its terms *except* as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(2)  The obligations of the City under the Authorizing Ordinance constitute a valid and binding agreement of the City enforceable in accordance with its terms except as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(3)  The City Pledge as set forth in the Authorizing Ordinance and herein is valid, binding and enforceable in accordance with its terms *except* as may be limited by bank-ruptcy, insolvency or similar laws affecting the rights of creditors generally.

(c)  Corporate and Governmental Authorization; No Contravention

(1)  The execution, delivery and performance by the City of this Agreement and each other Definitive Document to which the City is a party are within the City's powers, have been duly authorized by all necessary action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a de-fault under, any provision of applicable law or regulation or of the City Charter or of any agreement, judgment, injunction, order, decree or other instrument binding upon the City.

(2)  Article XIV of Chapter 18 of the Detroit City Code and the Authorizing Ordi-nance are in full force and effect in accordance with all applicable City Charter, constitu-tional and statutory requirements, are within the City's powers, require no action by or in re-spect of, or filing with any governmental body, agency or official, and do not contravene or constitute a default under any provision of applicable law or regulation or of the City Charter or of any agreement, judgment, injunction, order, decree or other instrument binding upon the City.

(3)  The representation regarding performance set forth in **paragraph (1)**, above is qualified to the extent that appropriations are required as set forth in **Section 3.1**.

(d)  No Litigation

There is no action, suit or proceeding pending against, or to the knowledge of the City threatened against, or affecting the City, the Authorizing Ordinance or the Pledged Property before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely the ability of the City to perform its obligations under this Agreement or any other Definitive Document to which the City is a party or the Authorizing Ordinance or which in any manner questions the validity of this Agreement or any other Definitive Document to which the City is a party, the Authorizing Ordinance or the City Pledge.

(e)  Conditions Precedent

All acts, conditions and things required by the Michigan Constitution, the City Charter, the Detroit City Code and laws of the State of Michigan to exist, to have happened and to have been performed precedent to and in the execution and delivery of this Agreement and the other Definitive Documents by the City exist, have happened and been performed in due time, form and manner required by the Michigan Constitution, the City Charter, the Detroit City Code or laws of the State of Michigan in order to make this Agreement a valid and binding obligation of the City.

**Section 6.2.   Revenues**

(a)  The use and application of the Revenues as provided in the Authorizing Ordinance and this Agreement are in compliance with the Development Agreements and the Wagering Tax Revenue Statute.

(b)  The statement of Revenues delivered with and as referenced in the Closing Certificate is a true and complete statement of all Revenues collected by the City for each year from 2003 − 2008 and for the year to date period in 2009 showing as to each Developer:  (1) Wagering Taxes, (2) Alternative Taxes, (3) Additional Wagering Taxes, and (4) Developer Payments.

**Section 6.3.   Developer Agreements and Guaranties**

(a)  A true and complete copy of each Development Agreement (including all amendments thereto) has been delivered with the Closing Certificate as referenced therein.

(b)  A true and complete copy of each Guaranty (including all amendments to each such Guaranty) has been delivered with the Closing Certificate as referenced therein.

(c)  There are no Guaranties or Development Agreements *except* the Guaranties and Development Agreements delivered with the Closing Certificate.

**Section 6.4.   No Other Liens, Charges or Encumbrances**

(a)  The Pledged Property is not subject to any lien, charge or encumbrance *except* the City Pledge and either the Service Corporation Pledge (if the Government Exception is applicable) or the Service Corporation Security Interest (if the Government Exception is not applicable) granted by this Agreement.

(b)  No financing statement is on file in any public office covering any of the Pledged Property *except* in favor of the Counterparties.

## Section 6.5.    No Control Granted

The City has not granted control (for purposes of Article 8 and, if applicable, Article 9 of the UCC) over the Pledged Property, or any account in which the Pledge Property is held, to any Person other than the Custodian.

# Article VII.  Representations and Warranties of Service Corporations

Each Service Corporation makes the representations and warranties contained in **this Article** for the benefit of the City, the Custodian, the other Service Corporation and the Counterparties on and as of the Closing Date.

## Section 7.1.    General Representations and Warranties

(a)  Corporate Existence and Power

The Service Corporation is a nonprofit corporation duly incorporated, validly existing and in good standing under the laws of the State of Michigan.

(b)  Corporate and Governmental Authorization; Contravention

The execution, delivery and performance by the Service Corporation of this Agreement and each other Definitive Document to which the Service Corporation is a party are within the Service Corporation's corporate powers, have been duly authorized by all necessary corporate action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of applicable law or regulation or of the articles of incorporation or bylaws of the Service Corporation or of any agreement, judgment, injunction, order, decree or other instrument binding upon the Service Corporation.

(c)  Valid and Binding Agreement and Service Corporation Pledge

(1)  This Agreement and each other Definitive Document to which the Service Corporation is a party, constitutes a valid and binding agreement of the Service Corporation enforceable in accordance with its terms *except* as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(2)  If the Government Exception is applicable, the Service Corporation Pledge as set forth in the Authorizing Ordinance and herein is valid, binding and enforceable in accordance with its terms *except* as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(d) <u>No Litigation</u>

There is no action, suit or proceeding pending against, or to the knowledge of the Service Corporation threatened against, or affecting the Service Corporation or the Service Corporation Property before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely the ability of the Service Corporation to perform its obligations under this Agreement or any other Definitive Document to which the Service Corporation is a party or which in any manner questions the validity of this Agreement or any other Definitive Document to which the Service Corporation is a party, the Service Corporation, the Service Corporation Security Interest, or the Service Corporation Pledge.

(e) <u>No Taxation</u>

The Service Corporation is not subject to federal income tax or taxation by the State of Michigan.

(f) <u>Not an Investment Company</u>

The Service Corporation is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(g) <u>Conditions Precedent</u>

All acts, conditions and things required by the Michigan Constitution, the City Charter, the Detroit City Code and laws of the State of Michigan to exist, to have happened and to have been performed precedent to and in the execution and delivery of this Agreement and the other Definitive Documents by the Service Corporation exist, have happened and been performed in due time, form and manner required by the Michigan Constitution, the City Charter, the Detroit City Code or laws of the State of Michigan in order to make this Agreement a valid and binding obligation of the Service Corporation.

## Section 7.2.   Concerning the Security Interests

(a) <u>Corporate Name</u>

The Service Corporation's name as indicated on the signature page of this Agreement is such Service Corporation's name as indicated on the public record of the Service Corporation's jurisdiction of organization which shows the Service Corporation to have been organized.

(b) <u>Registered Organization</u>

The Service Corporation is a "registered organization," within the meaning of Article 9 of the UCC, of the type and organized under the laws of the State of Michigan.

(c) <u>Place of Business</u>

<u>Section 9.04</u> of the respective <u>Service Contract</u> accurately sets forth the Service Corporation's place of business or, if more than one place of business, its chief executive office as well as such Service Corporation's mailing address if different and such Service Corporation has not had any other place of business or, if more than one place of business, any other chief executive office since its formation.

(d) Corporate Identification

Each Service Corporation represents only as to its own organizational identification number as follows:

(1) The organizational identification number of GRS Service Corporation is 793781.

(2) The organizational identification number of PFRS Service Corporation is 793782.

(e) Validity, Perfection and Priority of Security Interest

(1) As of the Closing Date, the security interest granted to the Counterparties in the Service Corporation Property is a valid security interest to the extent of the rights of such Service Corporation's interests therein, and such security interest is a perfected, first priority security interest.

(2) The Service Corporation Security Interest is valid, binding and enforceable as of the Closing Date, and the Service Corporation Property is immediately subject to the Service Corporation Security Interest without any physical delivery thereof or further act.

(3) The Service Corporation shall not be in breach of the representation contained in **paragraph (1) above** by reason of the Government Exception.

(f) No Other Liens, Charges or Encumbrances

(1) The Service Corporation's interest in the Service Corporation Property is not subject to any lien, charge or encumbrance *except* the Service Corporation Security Interest or, if the Government Exception is applicable, the Service Corporation Pledge.

(2) No financing statement is on file in any public office covering any Service Corporation Property.

(g) No Control Granted

The Service Corporation has not granted control (for purposes of Articles 8 and 9 of the UCC) over the Service Corporation Property, or any bank account or securities account in which the Service Corporation Property or any proceeds thereof are held, to any Person other than the Counterparties.

## Article VIII. The Accounts

### Section 8.1.   Establishment of Accounts

(a) There is established with the Custodian the following accounts to be held as custodial accounts:

- Receipts Account
- Holdback Account

(b) The Custodian shall establish the Developer Subaccounts as required by **Section 8.2** in the Receipts Account.

(c) The Custodian shall establish the General Receipts Subaccount in the Receipts Account.

(d) The Accounts shall be held at an office of the Custodian located in the City and State of New York.

## Section 8.2.    Developer Subaccounts

(a) The Custodian shall establish a Developer Subaccount in the Receipts Account with respect to each Developer.

(b) The initial Existing Developers and the initial Developer Subaccounts to be established with respect thereto are:

- Detroit Entertainment Subaccount with respect to Detroit Entertainment, L.L.C.
- Greektown Subaccount with respect to Greektown Casino, L.L.C.
- MGM Grand Subaccount with respect to MGM Grand Detroit, L.L.C.

(c) The Custodian shall establish a new Developer Subaccount in the Receipts Account for each assignee of an Existing Developer and for each New Developer.

(d) *Predecessor Developer* means, as the context may require, (i) an Existing Developer that is the assignor of an Existing Development Agreement or (ii) an Existing Developer of an Existing Casino for which there is a New Developer.

(e) Upon the establishment of a new Developer Subaccount, the Custodian shall take the following actions.

(1) All amounts, if any, standing to the credit of the Developer Subaccount established in respect of the Predecessor Developer shall be deposited to the credit of the General Receipts Subaccount.

(2) Upon making such deposit, if any, such Developer Subaccount established in respect of the Predecessor Developer shall be closed.

(f) For the avoidance of doubt, the Developer Subaccounts are established for the purpose of convenience of administering this Agreement, and the establishment thereof does not give the Developers any rights to the respective Developer Subaccount or the amounts or investments credited thereto.

## Section 8.3.    Receipt of Revenues

(a) Promptly upon receipt of any Revenues in respect of a Developer on a Receipt Day, the Custodian shall deposit the same to the credit of the Developer Subaccount established in respect of such Developer.

(b) Revenues that consist of investment earnings of amounts credited to the General Receipts Subaccount or Holdback Account shall be a part of, respectively, the General Receipts Subaccount or Holdback Account and shall not be deposited to the credit of any Developer Subaccount.

## Section 8.4.    Transfer of Revenues to General Receipts Subaccount

Upon the deposit of any Revenues to the credit of a Developer Subaccount, the Custodian shall promptly thereafter transfer the same to the General Receipts Subaccount.

### Section 8.5.   Receipt of City Payments

Whenever the Custodian receives an amount as a City Payment or portion thereof, the Custodian shall deposit the same to the credit of the Holdback Account.

### Section 8.6.   General Receipts Account

The Custodian shall make the payments to the City from the General Receipts Subaccount at the times and in the amounts provided in **Article V**.

### Section 8.7.   Holdback Account

(a) The Custodian shall not deposit any amounts to the credit of the Holdback Account other than amounts paid by the City from its general fund.

(b) The Custodian shall make the payments to the Counterparties from the Holdback Account at the times and in the amounts provided in **Section 5.7**.

(c) The Custodian shall make the payments to the City from the Holdback Account at the times and in the amounts provided in **Section 5.5**.

### Section 8.8.   Investments

(a) Amounts standing to the credit of either Account shall be held in cash *unless* invested in Authorized Investments as provided in **subsection (b)**, **below**.

(b) Amounts standing to the credit of either Account shall be invested by the Custodian at the direction of the Finance Director in Authorized Investments maturing on or before the date and in such amounts as will be needed to provide for amounts to be expended for the purposes for which the particular Account was established.

(c) The investment of amounts credited to an Account shall be held by the Custodian and shall be deemed at all times a part of such Account, and the interest accruing thereon and any profit realized therefrom shall be credited thereto, and any losses resulting from such investment shall be charged thereto.

(d) The Custodian may make such investments through its own investment or bond department.

## Article IX.  City Covenants

The City covenants with the other parties hereto as provided in **this Article**.

### Section 9.1.   No Senior or Parity Pledges or Liens

The City shall not grant or permit to exist any pledge of or other lien on, or security interest in, the Pledged Property that is senior to or of an equal priority with the City Pledge.

### Section 9.2.   Junior Pledges or Liens

The City may pledge or otherwise grant a lien on, or security interest in the Pledged Property that is junior to the pledge and lien granted by this Agreement *if, but only if,* (i) such pledge, lien or security interest is authorized by ordinance or resolution of the City Council and

(ii) as a condition to the grant, be subject to intercreditor arrangements satisfactory to the Counterparties (**Permitted Liens**).

**Section 9.3.   Further Assurances**

(a)  The City shall furnish to the Counterparties all information regarding the Pledged Property that any Counterparty from time to time may reasonably request.

(b)  To the extent permitted by law, the City shall sign, file, or record all agreements and documents and shall take all other actions, that either Service Corporation or a Counterparty reasonably considers necessary or appropriate to perfect, to continue perfection of, or to maintain first priority of, the Service Corporation's security interest in the Pledged Property.

(c)  In the event that the City receives conflicting instructions from the Counterparties regarding an action to be taken pursuant to **subsection (b), above**, the City may rely upon advice of counsel to the City whether such action is necessary or appropriate to perfect, to continue perfection of, or to maintain first priority of, the Service Corporation's security interest in the Pledged Property.

(d)  The City authorizes each of the Service Corporations to file in any Uniform Commercial Code recording office a financing statement in favor the Service Corporation as secured party and covering the collateral under the City Pledge.

**Section 9.4.   No Control Granted**

The City shall not grant control (for purposes of Article 8 and, if applicable, Article 9 of the UCC) over the Pledged Property or any Account other than to the Custodian or the Counterparties.

**Section 9.5.   Excluded Property**

(a)  For the avoidance of doubt, Excluded Property is not subject to **Sections 9.1** through **9.4**, inclusive.

(b)  No pledge of or other lien on, or security interest in, Excluded Property shall be granted by the City *except* pursuant to ordinance or resolution of City Council.

**Section 9.6.   No Development Agreement Amendments**

The City will not enter into any amendment, supplement or other modification of any Development Agreement without the consent of the Counterparties that:

(i)  changes the formula for calculating any Developer Payment, which change has the effect of reducing the amount of any Developer Payment or

(ii)  has the effect of changing the frequency of any Developer Payment or

(iii)  affects the making of Developer Payments in accordance with the Irrevocable Instructions.

## Article X. Service Corporation Covenants

Each Service Corporation covenants with the other parties hereto as provided in **this Article**.

### Section 10.1.  No Pledges of Liens of Service Corporation Property

(a)  No Service Corporation shall grant or permit to exist a pledge or lien on, or security interest in, any Service Corporation Property other than the Service Corporation Security Interest or, if the Government Exception is applicable, the Service Corporation Pledge.

(b)  For the avoidance of doubt, **this Section** does not apply to Excluded Property.

### Section 10.2.  No Control Granted

The Service Corporation shall not grant control (for purposes of Articles 8 and 9 of the UCC) over the Service Corporation Property, or any bank account or securities account in which the Service Corporation Property or any proceeds thereof are held, to any Person other than the Custodian or the Counterparties.

### Section 10.3.  Excluded Property

No Service Corporation shall grant a pledge of or lien on, or security interest in, Excluded Property *except* pursuant to ordinance or resolution of the City Council.

### Section 10.4.  Alternative Taxes

(a)  *If and when* Alternative Taxes become payable, the City shall, effective on or before the date of first payment, enter into an agreement with the State of Michigan providing for the payment of Alternative Taxes to the Custodian for deposit to the General Receipts Subaccount.

(b)  Such agreement shall be in form and substance acceptable to the Counterparties.

### Section 10.5.  Alternative Payment of Developer Payments

(a)  *If and when* a Developer begins to pay Additional Wagering Taxes to the State of Michigan, the City shall, effective on or before the date of first payment enter into an agreement with the State of Michigan providing for the payment of such Additional Wagering Taxes to the Custodian for deposit to the General Receipts Subaccount.

(b)  Such agreement shall be in form and substance acceptable to the Counterparties.

### Section 10.6.  Further Assurances

(a)  The Service Corporations shall furnish to the Counterparties all information regarding the Service Corporation Property that either Counterparty from time to time reasonably requests.

(b)  The Service Corporations shall sign, file or record all agreements and documents and shall take all other actions, that either Counterparty reasonably considers necessary or appropriate to perfect, to continue perfection of, or to maintain first priority of, the Counterparty's security interest in the Service Corporation Property.

(c) In the event that the Service Corporations receive conflicting instructions from the Counterparties regarding an action to be taken pursuant to **subsection (b), above**, the Service Corporations may rely upon advice of counsel to the City whether such action is necessary or appropriate to perfect, to continue perfection of, or to maintain first priority of, the Counterparties' security interest in the Service Corporation Property.

(d) Each of the Service Corporations authorizes each of the Counterparties to file in any Uniform Commercial Code recording office (i) a financing statement in favor the Counterparty as secured party and covering the collateral under the Service Corporation Pledge and the Service Corporation Security Interest and (ii) an assignment to the Counterparty of any financing statement in favor of the Service Corporation covering collateral under the City Pledge.

## Article XI. Remedies

### Section 11.1. Remedies under Hedges

Following the occurrence of a Termination Event or Event of Default under a Hedge, the respective Counterparty (or the Service Corporations, if a Counterparty is the sole Affected Party or Defaulting Party in respect of such Termination Event or Event of Default under such respective Hedge), has all remedies available to it under its Hedge or otherwise by contract or applicable law *except* with respect to the exercise of remedies against the Pledged Property as provided in **Section 11.3**.

### Section 11.2. Remedies as Secured Party

(a) In addition to a Counterparty's remedies under a Hedge, following the occurrence of a Termination Event or Event of Default under a Hedge where the Counterparty is not the sole Affected Party or Defaulting Party thereunder, each Counterparty has the remedies available to it as a secured party to enforce the Service Corporation Pledge, the Service Corporation Security Interest and the City Pledge. Such remedies of the Counterparties as secured parties under the Service Corporation Pledge and Service Corporation Security Interest shall include the exercise of all rights and remedies otherwise available to the Service Corporations as secured parties under the City Pledge, including the right to cause the Pledged Property to be applied to the obligations owing to the Counterparties under the Hedges up to the amounts then appropriated.

(b) Such remedies include the right to cause the Pledged Property to be applied to the obligations owing to the Counterparties under the Hedges up to the amounts then appropriated and, to the extent that not all amounts for all obligations owing to the Counterparties have been appropriated, the right to use judicial process to obtain appropriations and to exercise any other equitable remedies available to the Counterparties against the Service Corporations and the City, as a Michigan home rule city, in respect of such unappropriated amounts.

(c) *Subject* to such appropriation as may be required, judicial remedies shall be available to the extent necessary for the Counterparties to recognize all the rights and benefits of a first priority secured party with respect to the Service Corporation Property and the Pledged Property, including, as appropriate, by writ of mandamus or other equitable remedy that would result in release of funds from the Accounts to be applied to the obligations owing to the Counterparties under the Hedges and this Agreement.

(d) In exercising remedies the Counterparties may act jointly or independently of each other.

## Section 11.3.  Limitation on Remedies

(a) *If* any Hedge is terminated by the respective Counterparty on account of any Specified Additional Termination Event *then* such Counterparty shall forbear (such forbearance being hereinafter referred to as the ***Limitation on Remedies***) from exercising any remedies as a secured party against the Pledged Property during the Term Payment Period.

(b) The Limitation on Remedies does not apply on or after a Term Period End Date.

## Section 11.4.  Failure to Appropriate

In the event that the City fails to make an appropriation in the City's final annual budget adopted by the City Council pursuant to and in compliance with the City Charter for any Fiscal Year, and to maintain such provision without limitation, transfer or reduction throughout such Fiscal Year, on a line item basis and as a "first budget" obligation, an amount that is sufficient to pay in full, and which may be used exclusively for payment of, the City Payments for a particular Fiscal Year, mandamus may be an appropriate remedy for the Counterparties.

## Section 11.5.  Indemnity

(a) To the extent permitted by law, the City shall defend and hold harmless the Counterparties from and against any and all losses, damages, liabilities, and expenses incurred and paid (each, a liability) by either Counterparty arising out of or resulting from the commencement or continuation of any litigation, judicial action, or legislative action of the kind described in **paragraph 4** of **Section 11.6**.

(b) *If*, for so long as this Agreement is in effect, a Counterparty has actual notice or knowledge of any claim or loss for which indemnification by the City is asserted, the Counterparty shall give to the City written notice within such time as is reasonable under the circumstances, describing such claim or loss in reasonable detail. *However*, any delay or failure of the Counterparty to give the notice shall not affect the City's indemnification obligations except to the extent that the City was prejudiced by the delay or failure.

(c) *If* a demand or claim for indemnification is made hereunder with respect to losses the amount or extent of which is not yet known or certain, *then* the notice of demand for indemnification shall so state, and, where practicable, shall include an estimate of the amount of the losses.

(d) In the case of actual notice of indemnification hereunder involving any litigation, arbitration or legal proceeding, the City shall have responsibility to, and shall employ counsel, and shall assume all expense with respect to, the defense or settlement of such claim.

(e) *Notwithstanding* the City's assumption of the defense, the Counterparty shall have the right to employ separate counsel and to participate in the defense of such action, and the City shall bear the reasonable out of pocket fees, costs and expenses of such separate counsel *if*:

> (i) other than under **Paragraph (4)** of **Section 11.6**, a Termination Event or Event of Default under a Hedge has occurred other than or resulting from a Specified Event,

(ii)  other than under **Paragraph (4)** of **Section 11.6**, the Term Period End Date has occurred,

(iii)  the result of the use of counsel chosen by the City to represent the Counterparty would present such counsel with a conflict of interest;

(iv)  the actual or potential defendants in, or targets of, any such action include the Counterparty and the Counterparty shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the City,

(v)  the City shall not have employed counsel reasonably satisfactory to the Counterparty to represent the Counterparty within a reasonable time after notice of the institution of such action or

(vi)  the City, in its discretion, shall authorize the Counterparty to employ separate counsel at the City's expense.

The City shall not be liable under this Agreement for any amount paid by the Counterparty to settle any claims or actions if the settlement is entered into without the City's consent, which may not be unreasonably withheld or delayed.

**Section 11.6.   *Specified Event* means** any of the following events:

(1)  The City fails to pay any Relevant Amount to the Custodian as required by **Section 5.2**.

(2)  The City fails to make an appropriation by the Outside Supplemental Appropriations Date in the City's final annual budget for the then current Fiscal Year and to maintain such appropriation without limitation, transfer or reduction throughout the balance of such Fiscal Year, on a line item basis and as a "first budget" obligation, of any supplemental amount necessary to provide exclusively for the payment of the Relevant Amount each Month during the balance of such Fiscal Year to the extent that there is not an appropriation then in effect.

(3)  Commencing with the Fiscal Year beginning on July 1, 2009, the City fails to make an appropriation in the City's final annual budget adopted pursuant to and in compliance with the City Charter prior to the commencement of any Fiscal Year subsequent to the Fiscal Year in which the termination of the Hedges occurs and to maintain such appropriation without limitation, transfer or reduction throughout such Fiscal Year, on a line item basis authorizing exclusively payment of the City Payments and as a "first budget" obligation, of an amount at least equal to:

(i)  the *greater* of (x) \$50,736,975 and (y) the sum of the Notional Holdback Amounts for the Months ending in such Fiscal Year,

(ii)  *plus* an amount equal to interest at the Interest Rate to accrue and to be payable during such Fiscal Year to the Counterparties under the Hedges,

(iii)  *plus* the Regular Custodian Payments to be paid during such Fiscal Year.

(4)  The City, a Service Corporation, or a third party commences litigation or takes any other judicial action, or any legislative action is taken, to set aside or avoid or limit the

2006 Transaction, the City Pledge, the Service Corporation Security Interest, or the Service Corporation Pledge or any other part of the Definitive Documents or the Settlement Transaction. This **paragraph (4)** does not apply to the City challenging the release of funds from the General Receipts Subaccount for payment of the obligations owing to the Counterparties under the Hedges if such challenge (i) is based solely on the grounds that such amounts have not yet been appropriated by the City for such purpose and (ii) does not challenge the "first budget" obligation of the City to make such appropriation.

(5)  The Authorizing Ordinance or any part thereof is amended (without the consent of the Counterparties), revoked, rescinded, nullified or suspended for any reason.

(6)  The City rescinds, reduces or ceases to impose the tax imposed as of the Closing Date pursuant to Section 18-14-3 of the Detroit City Code or if the City, within two Business Days following the earlier to occur of (i) notice from the Custodian that a taxpayer has inadvertently or erroneously paid Wagering Tax Property directly to the City or (ii) the Finance Director learning of such payment, the City fails to transfer by wire transfer in same day funds to the Custodian for deposit to the credit of the General Receipts Subaccount such payment. *However*, the rescinding of such tax shall not cause the expiration of the Term Payment Period if the such tax is then collected by the State of Michigan pursuant to Section 12(1) of the Wagering Tax Revenue Statute and an amount of such collections equal to or greater than the tax currently imposed is paid to the Custodian under arrangements satisfactory to the Counterparties.

(7)  The City fails to pay any Service Charges, Accrued Service Charges, Regular Scheduled Payments and Sinking Fund Installments as and when due and payable under either Service Contract.

(8)  The City fails to pay when due any principal of, or interest on, any indebtedness for borrowed money, other than Excluded Indebtedness, aggregating $5,000,000 or more or any other event shall occur the effect of which is to cause, or to permit the holder or holders of such indebtedness (or a trustee or agent on behalf of such holder or holders) to cause such indebtedness to become due, or to be prepaid in full (whether by redemption, purchase, offer to purchase or otherwise), prior to its stated maturity, in each case after giving effect to any applicable grace period requiring notice or the lapse of time or both.

(9)  The City fails to pay any judgment or judgments aggregating $5,000,000 or more, *excluding* judgments:

(i)  on appeal and being contested in good faith or

(ii)  for which the City has reached an agreement with the judgment creditor as to the timing and manner of payment that does not involve the imposition of any additional ad valorem property taxes above the Threshold and with which agreement the City is in compliance or

(iii)  for which the City is diligently making arrangements for payment *and* the delay in payment will not result in the City being held in contempt of court for nonpayment or in the imposition of a lien on the City's general funds or the imposition of any additional ad valorem property taxes above the Threshold or

(iv)  in favor of the Counterparties on any unpaid amounts owing to the Counterparties under the Hedges and this Agreement.

(10)  The occurrence of an Unqualified Hedge Event.

(11)  The City:

(i)  commences a case or files a petition seeking relief under the Bankruptcy Code or any other insolvency law or procedure or

(ii)  consents to an order of relief in any such proceeding or to the filing of any such petition or

(iii)  seeks or is subject to the appointment of a receiver or an emergency financial manager for all or any substantial part of its assets or makes an assignment for the benefit of its creditors.

(12)  The Governor of the State of Michigan determines that a financial emergency exists in the City.

## Article XII.  The Custodian

### Section 12.1.  No Fiduciary Duties or Responsibilities

The Custodian has no fiduciary duty or responsibility to any other party hereto or to any other Person.

### Section 12.2.  Duties and Responsibilities

(a)  The Custodian undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against the Custodian and no permissive power or authority available to the Custodian shall be considered a duty.

(b)  In the absence of bad faith on its part, the Custodian may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, documents, other instruments or opinions furnished to the Custodian and conforming to the requirements of this Agreement; *but* in the case of any such certificates, documents, other instruments or opinions which by any provision hereof or thereof are specifically required to be furnished to the Custodian, the Custodian is under a duty to examine the same to determine whether or not they conform to the requirements of this Agreement.

(c)  No provision of this Agreement shall be construed to relieve the Custodian from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, *except* as provided below.

(1)  The Custodian is not be liable for any error of judgment made in good faith by an authorized officer of the Custodian, *unless* it is proved that the Custodian was negligent in ascertaining the pertinent facts;

(2)  The Custodian is not liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Counterparties and

(3)  No provision of this Agreement requires the Custodian to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for

believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

### Section 12.3.   Certain Rights of Custodian.

(a)  The Custodian may rely and is protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture. or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b)  Whenever in the administration of this Agreement the Custodian deems it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Custodian (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon a certificate of a representative of a Counterparty.

(c)  The Custodian may consult with counsel, and the written advice of such counsel is full and complete authorization and protection in respect of any action taken, suffered or omitted by the Custodian hereunder in good faith and in reliance thereon.

(d)  The Custodian is under no obligation to exercise any of the rights or powers vested in it by this Agreement at the request or direction of any of the Counterparties pursuant to this Agreement, *unless* such Counterparties shall have offered to the Custodian reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

(e)  The Custodian is not required to make any investigation into the existence or occurrence of any facts referred to herein but is entitled to rely upon a certificate delivered by a representative of a Counterparty.

(f)  The Custodian is not obligated to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, or other paper or document, *but* the Custodian, in its sole discretion, may make such further inquiry or investigation into such facts or matters as it may see fit.

(g)  The Custodian may execute any of its powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Custodian shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

(h)  The Custodian has no duty to see to the recording, filing or registration of any instrument or document (including financing or continuation statements or filings under tax or security laws) or any rerecording, refiling or re-registration.

(i)  The Custodian shall have the right at any time to seek instructions concerning the administration of this Agreement from any court of competent jurisdiction.

### Section 12.4.   May Hold 2006 Pension Funding Securities.

The Custodian, in its individual or any other capacity, may become the owner or pledgee of 2006 Pension Funding Securities with the same rights it would have if it were not Custodian.

**Section 12.5.  Reporting of City Payments**

Within one Business Day after the Custodian deposits the full amount of a City Payment to the credit of the Holdback Account, the Custodian shall notify the City and the Counterparties of such deposit.

**Section 12.6.  Weekly Reports**

On the second Business Day of a calendar week, the Custodian shall deliver to the City and the Counterparties a report setting forth the amount of Revenues received in the General Receipts Subaccount during the preceding calendar week.

**Section 12.7.  Monthly Holdback Compliance Notice**

On the Business Day in a Month on which the Holdback Requirement has been met for such Month, the Custodian shall give notice (a *Monthly Holdback Compliance Notice*) to the City and the Counterparties that such Holdback Requirement has been met.

**Section 12.8.  Quarterly Accounting**

By the second Business Day preceding the end of a Quarterly Period, the Custodian shall notify the Counterparties, the City and the Service Corporations whether the Custodian has on deposit in the Holdback Account an amount sufficient to pay the Quarterly Payment (a *Quarterly Accounting*).

**Section 12.9.  Coverage Reports**

(a)  The Custodian shall provide a report to the Counterparties and the City no later than 4:00 p.m. on the second Business Day following the last day (whether or not a Business Day) of each Month (a *Monthly Coverage Report*) and of each Quarterly Period (a *Quarterly Coverage Report*) and at such other time or times as are reasonably requested by any Counterparty or the City for an immediately prior Reporting Period.

(b)  *Reporting Period* means:

(i)  for a Monthly Coverage Report, the Month immediately ended (the *Subject Month*) and

(ii)  for a Quarterly Coverage Report, the Quarterly Period immediately ended (the *Subject Quarter*).

(c)  *Monthly Coverage* means, as to any Subject Month, the total amount of Revenues received by the Custodian during such Subject Month *divided* by the *sum* of:

(i)  one-third of the Hedge Periodic Payables (without giving effect to any netting) payable by the Service Corporations during the Quarterly Period in which such Subject Month falls and

(ii)  any Hedge Periodic Payables remaining unpaid from any Quarterly Period.

(d)  *Quarterly Coverage* means, as to any Subject Quarter, the total amount of Revenues received by the Custodian during the immediately preceding three Months *divided* by the *sum* of:

(i) Hedge Periodic Payables payable by the Service Corporations during such three month period (without giving effect to any netting) and

(ii) any Hedge Periodic Payables remaining unpaid from any prior Subject Quarter.

(e)  Each Monthly Coverage Report and each Quarterly Coverage Report shall meet the requirements of **this subsection**.

(1)  Each Monthly Coverage Report and Quarterly Coverage Report shall include:

(i)  the total Revenues received by the Custodian during the Reporting Period,

(ii)  the total amount of Wagering Tax Property received by the Custodian during the Reporting Period, with respect to each casino that provides such information,

(iii)  the total amount of Developer Payments received by the Custodian during the Reporting Period, with respect to each casino that provides such information,

(iv)  the balance of each Account as of the end of the Reporting Period and as of the end of the immediately preceding Reporting Period and

(v)  any disbursements from each Account made during the Reporting Period in reasonable detail.

(2)  In addition to the requirements of **paragraph (1), above**, each Monthly Coverage Report shall include:

(i)  the Monthly Coverage for the Subject Month and

(ii)  the Quarterly Coverage for the three immediately preceding three Months.

(3)  In addition to the requirements of **paragraph (1), above**, each Quarterly Coverage Report shall set forth any amounts to be released from the Holdback Account to the City or a Service Corporation in respect of the Subject Quarter.

(f)  The Custodian shall provide a copy of each Monthly Coverage Report and Quarterly Coverage Report to the Insurers concurrently with providing such Monthly Coverage Report and Quarterly Coverage Report to the Counterparties.

## Section 12.10. Compensation, Reimbursement and Indemnification

(a)  The Custodian is entitled to payment or reimbursement by the City:

(i)  from time to time for reasonable compensation for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a Custodian of an express trust); and

(ii)  *except* as otherwise expressly provided herein, upon its request, for all reasonable expenses, disbursements and advances incurred or made by the Custodian in accordance with any provision of this Agreement (including, without limitation, the reasonable compensation and the expenses and disbursements of its agents and counsel), *except* any such expense, disbursement or advance as may be attributable to the Custodian's negligence, willful misconduct or bad faith.

(b)  The Custodian is also entitled to indemnification by the City for, and to be held harmless by the City against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on its part, arising out of or in connection with the acceptance or administration of the this Agreement, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

## Section 12.11. Prior Payment of Regular Custodian Payments

The Custodian is entitled to payment for Regular Custodian Payments prior to any payment to the Counterparties from any Accounts.

## Section 12.12.  Corporate Custodian Required; Eligibility.

(a)  There shall at all times be a Custodian hereunder which is a bank eligible to be a depositary of City funds with (i) an office located in the City and State of New York and (ii) a combined capital and surplus of at least $50,000,000.  *If* such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of such supervising or examining authority, *then* for the purposes of **this Section**, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.

(b)  The Custodian shall resign promptly in the manner and with the effect specified in **this Article** if it becomes ineligible under **this Section**.

## Section 12.13.  Replacement of Custodian.

(a)  No Vacancy

No resignation or removal of the Custodian and no appointment of a successor Custodian pursuant to this Article shall be effective until the successor Custodian accepts its appointment as provided in **subsection (f), below**.

(b)  Resignation

The Custodian may resign at any time, but such resignation shall become effective only in accordance with **subsection (f), below**.  A resigning Custodian shall give notice of its resignation to each Insurer and each of the parties hereto.

(c)  Removal by Counterparties

(1)  The Counterparties acting together may remove the Custodian by so notifying the Custodian.

(2)  If the Custodian becomes ineligible under **Section 12.12**, any Counterparty may petition a court of competent jurisdiction for the appointment of a successor.

(d)  Appointment of Successor

(1)  The retiring Custodian or the City may appoint a successor at any time prior to the date on which a successor Custodian takes office *provided* that the Counterparties have provided their prior written consent to the appointment of such successor Custodian.

(2) If a successor Custodian does not take office within 45 days after the retiring Custodian resigns or is removed, the City or any Counterparty may petition a court of competent jurisdiction for the appointment of a successor Custodian.

(3) Within one year after a successor Custodian appointed by the retiring Custodian, the City or a court of competent jurisdiction takes office, the Counterparties acting together may appoint a successor Custodian to replace such successor Custodian.

(e) Acceptable to the City and the Counterparties

No appointment of a successor Custodian shall be effective *unless* such successor Custodian is acceptable to the Finance Director and to each Counterparty, as evidenced by prior written consent.

(f) Acceptance of Appointment

(1) A successor Custodian shall deliver written acceptance of its appointment to the retiring Custodian, each of the other parties hereto and to each Insurer. Thereupon the resignation or removal of the retiring Custodian shall be effective, and the successor Custodian shall have all the rights, powers and duties of the Custodian hereunder.

(2) Upon the appointment of a successor Custodian becoming effective as provided in **this subsection**, the retiring Custodian shall promptly transfer all property held by it as Custodian to the successor Custodian.

**Section 12.14. Merger, Consolidation and Succession to Business.**

If the Custodian consolidates, merges or converts into, or transfers all or substantially all its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Custodian *if* such successor corporation is eligible under **Section 12.12**.

## Article XIII.  Interest Rate Limitation

The following provisions apply only if any amount (a ***Stated Amount***) payable by the City under this Agreement is limited by a maximum rate of interest permitted to be paid by the City under applicable law:

(a) The term ***Permitted Amount***, as used in **this Article**, means the maximum amount that could be paid by the City during any Month without exceeding the interest rate limitation. The Permitted Amount in any Month may be greater or less than the Stated Amount.

(b) Subject to **subsections (c)** and **(d) below**, if the Permitted Amount payable by the City during any Month (the ***Current Month***) is less than the Stated Amount payable during the Current Month, the City may satisfy its obligation to pay the Stated Amount for the Current Month by paying the Permitted Amount.

(c) The amount payable by the City during the Current Month under **subsection (b)** shall be increased, to the extent permitted by the applicable law, by the lesser of:

(1) the difference between the Stated Amount for the Current Month and the Permitted Amount for the Current Month and

(2) the aggregate excess of the total of the Permitted Amounts for all prior Months over the aggregate of the Stated Amounts for the prior Months, minus the sum of all amounts that the City has previously paid pursuant to **this subsection (c)**.

(d) The amount payable by the City during all Months subsequent to the Current Month up to the time of determination shall be increased, to the extent permitted by the applicable law, by the lesser of:

(1) the difference between the Stated Amount for the Current Month and the Permitted Amount for the Current Month, and

(2) the aggregate excess of the total of the Permitted Amounts for all subsequent Months up to the time of determination over the aggregate of the Stated Amounts for the subsequent Months, minus the sum of all amounts that the City has previously paid pursuant to **subsection (c)** and **this subsection (d)**.

(e) **This Article** shall not affect the legal interpretation of whether any amount payable by the City hereunder is or is not "interest" to which any law limiting interest would apply.

## Article XIV.  Miscellaneous

### Section 14.1.  Addresses for Notices

(a) All notices and other communications provided for hereunder shall be in writing unless otherwise stated herein mailed, sent or delivered:

(1) if to the City, at its address set forth in a Service Contract

(2) if to the City Law Department, at

> City of Detroit Law Department
> First National Building, Suite 1650
> 660 Woodward Avenue
> Detroit, Michigan 48226
> Attention:  Corporation Counsel

(3) if to a Service Corporation, at its address set forth in the respective Service Contract

(4) if to the Custodian, at

> U.S. Bank National Association
> 535 Griswold, Suite 550
> Detroit, Michigan 48226
> Attention:  Susan T. Brown

(5) if to Financial Guaranty Insurance Company at

> 125 Park Avenue
> New York, NY 10017
> Attention: Risk Management

(6) if to Syncora Guaranty Inc. at

> 1221 Avenue of the Americas
> New York, NY 10020
> Attention: Surveillance

(7) if to a Counterparty, at its address shown beneath its signature on a signature page hereto,

or to such other address as such Person may specify to the other Person and shall be effective (i) if given by mail, three Business Days after such communication is deposited in the mails with first class postage prepaid or (ii) if given by any other means, when delivered at the address specified in or pursuant to **this Section**.

## Section 14.2.  Copies of Notices

A copy of each notice given hereunder shall be given contemporaneously to the City's Law Department.

## Section 14.3.  Expenses

(a)  Each of the City and the Counterparties shall pay its own fees and expenses in connection with consummating the Settlement Transaction, including outside legal fees and expenses and outside consulting fees.

(b)  *Except* in connection with consummating the Settlement Transaction, each of the City and the Counterparties shall continue to be responsible for the payment of any fees and expenses that it is required to pay under the Hedges, either Service Contract or the Contract Administration Agreement.

(c)  The City shall pay the fees and expenses of the Service Corporations in connection with consummating the Settlement Transaction, including outside legal fees and expense and outside consulting fees.

(d)  The City shall pay all of its fees and expenses and the fees and expenses of the Service Corporations (including outside legal fees and expense and outside consulting fees of any of them) in connection with the administration and enforcement of this Agreement.

(e)  The City shall pay all compensation, reimbursement and indemnification to which the Custodian is entitled pursuant to **Section 12.10.**

## Section 14.4.  Termination

(a)  This Agreement shall terminate upon the termination or expiration of the Hedges and each Counterparty's delivery of confirmation to the Custodian of the payment in full of all obligations of the Service Corporations and the City to each Counterparty thereunder and hereunder.

(b)  The City Pledge and, as applicable, the Service Corporation Security Interest or the Service Corporation Pledge shall terminate upon the termination of this Agreement.

(c)  Upon the termination of this Agreement, the Custodian shall:

(i)  pay to the City all amounts standing to the credit of each Account and

(ii)  give notice to the Developers and Obligors that the Irrevocable Instructions are no longer in effect.

(d)  The obligations of the City to pay amounts owing to the Service Corporations or the Custodian shall survive the termination of this Agreement.

**Section 14.5.  Amendment**

No amendment of this Agreement shall be effective for any purpose unless it is made by written instrument signed by all of the parties hereto and consented to by each Insurer *provided* that the consent of an Insurer shall only be required to the extent that an amendment affects the rights, remedies or obligations of such Insurer.

**Section 14.6.  Rights of Insurer**

An Insurer may exercise any right or power given it by this Agreement *only if* it is not then in default under its Credit Insurance (as defined in the Service Contracts).

**Section 14.7.  No Waiver**

No failure on the part of any party hereto to exercise, and no delay in exercising, any right hereunder shall be a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other further exercise thereof or the exercise of any other right.

**Section 14.8.  Binding Obligation**

This Agreement is binding upon the parties hereto and their successors and their assigns to the extent permitted by **Section 14.8**.

**Section 14.9.  Assignment**

(a) No transfer by any party of its interests herein without the consent of the other parties hereto shall be valid *except* that a Counterparty may assign its rights hereunder as provided in **subsection (b), below**.

(b) Any Counterparty may transfer its rights hereunder in connection with a transfer of its Hedge to the same extent and under the same conditions as the transfer of the Hedge is permitted by the terms thereof.

**Section 14.10. Governing Law**

(a) The rights and obligations of the parties under this Agreement shall be governed by and construed in accordance with the laws of the State of New York; provided, however, that the corporate powers and legal capacity of the City and each Service Corporation shall be governed by and construed in accordance with the laws of the State of Michigan.

(b) Notwithstanding anything to the contrary contain in **subsection (a), above**, the governing law for purposes of the UCC is the law of the State of Michigan determined without reference to its conflicts of law rules.

**Section 14.11. Venue**

With respect to any suit, action or proceedings relating to this Agreement, each party irrevocably submits to the extent permitted by law to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

**Section 14.12. Waivers of Jury Trial**

To the extent permitted by law, the parties hereto hereby irrevocably and unconditionally waive trial by jury in any legal action or proceeding relating to this agreement.

**Section 14.13. Headings and Table of Contents**

Article and Section headings herein and the table of contents hereto are included herein for convenience of reference only and do not constitute a part of this Agreement for any other purpose.

**Section 14.14. Entire Agreement**

(a) This Agreement, the Definitive Documents, and the Hedges, the Service Contracts and the Contract Administration Agreement, as modified by the Definitive Documents, contain the entire agreement among the parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous oral and written agreements and discussions with respect thereto, and none of the parties shall be bound by any conditions, inducements or representations with respect thereto other than as expressly provided for herein.

(b) There are no agreements, understandings, representations or warranties between the parties with respect to the subject matter hereof other than those set forth or referred to herein.

(c) All of the terms and conditions of the Definitive Documents and of the Hedges, the Service Contracts and the Contract Administration Agreement, as modified by the Definitive Documents, shall remain in full force and effect.

(d) This Section does not apply to any rights or obligations of the Insurers.

**Section 14.15. Counterparts**

(a) This Agreement may be executed in multiple counterparts, *but* all such counterparts taken together shall evidence one and the same original. It is not necessary in making proof of this Agreement to produce or account for more than one counterpart.

(b) Delivery of an executed counterpart of this Agreement by facsimile or other method of electronic transmission shall be equally effective as delivery of a manually executed counterpart.

**In Witness Whereof**, the parties hereto have set their respective hands on and as of the date first written above.

[*Signatures appear on pages S-1* et seq.]

*[Signature Page to the Collateral Agreement among the City of Detroit, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association and other Persons]*

**CITY OF DETROIT**

By _____

Norman L. White
Finance Director

*[Exhibit to the Collateral*
*Agreement among the City of*
*Detroit, the Detroit General*
*Retirement System Service*
*Corporation, the Detroit Police*
*and Fire Retirement System*
*Service Corporation, U.S. Bank*
*National Association and other*
*Persons]*

**U.S. Bank National Association,**
as Custodian

By _____

Susan T. Brown
Vice President

S - 2

*[Signature Page to the Collateral Agreement among the City of Detroit, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association and other Persons]*

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

By _____

Norman L. White
President

**DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION**

By _____

Norman L. White
President

*[**Signature Page** to the Collateral Agreement among the **City of Detroit**, the **Detroit General Retirement System Service Corporation**, the **Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association** and other Persons*

**UBS AG**

By _Mari-Anne Clauur_____
           Authorized Signatory

By _____
           Authorized Signatory

UBS notice address is:

UBS Securities LLC
677 Washington Boulevard
Stamford, CT 06901
Attn: Municipal Derivatives
Tel: 203-719-1689
Fax: 203-719-1417

and with a copy to:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, CT 06901
Attn: Legal Department
Fax: 203-719-0680

S-4

*[Signature Page to the Collateral Agreement among the City of Detroit, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association and other Persons]*

**SBS FINANCIAL PRODUCTS COMPANY, LLC**

By _____
                        Authorized Signatory

SBS Financial Products Company, LLC notice address is:

SBS Financial Products Company, LLC
100 Wall Street, 22ND Floor
New York, New York  10005
Attention:  John Carter
Facsimile:  (646) 576-9684

S - 5

*[Signature Page to the Collat-
eral Agreement among the City
of Detroit, the Detroit General
Retirement System Service
Corporation, the Detroit Police
and Fire Retirement System
Service Corporation, U.S. Bank
National Association and other
Persons]*

MERRILL LYNCH CAPITAL SERVICES, INC.

By _____
              Authorized Signatory

Merrill Lynch Capital Services, Inc. notice address is:

Merrill Lynch Capital Services, Inc.
Merrill Lynch World Headquarters
4 World Financial Center, 18TH Floor
New York, New York  10080
Attention:  Swap Group
Facsimile:  (646) 805-0218

with a copy to:

GMI Counsel
Merrill Lynch World Headquarters
4 World Financial Center, 12TH Floor
New York, New York  10080
Attention:  Swaps Legal
Facsimile:  (212) 449-6993

S - 6

Exhibit 3.4

## FORM OF IRREVOCABLE INSTRUCTIONS

June ●, 2009

[Developer]
[Developer's Address]
Attention: ●

**Re: Payments to be made to the City of Detroit (the *City*) in respect of the below identified Casino**

Dear Sir/Madam:

1. **References to *You* and *Your***

   1.1. [Name of Developer] is hereinafter referred to as *you*.  *Your* has the correlative meaning.

   1.2. As used herein, "you" and "your" also refer to your successors, if any, and any assigns of the below identified Development Agreement.

2. **Applicability of these Instructions**

   These Instructions are applicable with respect to the casino currently known as _____ and currently located at _____ in Detroit, Michigan.

3. **Certain Definitions**

   3.1. ***Development Agreement*** means the Revised Development Agreement, dated [_____,] among the City, The Economic Development Corporation of the City of Detroit and you, any amendments thereto and any substitute for such Development Agreement.

   3.2.   Gaming Act means the Michigan Gaming Control and Revenue Act, MCL 432.201, *et seq;* MSA 18.969(201), *et seq*., as amended.

   3.3. ***Wagering Tax Revenue Statute*** means Section 12 of the Gaming Act, being MCL 432.212, as amended.

4. **Payments Subject to these Instructions**

   4.1. The following payments (collectively, the ***Payments***)only are subject to these Instructions:

      4.1.1. taxes payable pursuant to Detroit City Code Section 18-14-3 pursuant to  the Wagering Tax Revenue Statute; and

      4.1.2. interest and penalties payable pursuant to Detroit City Code Section 18-14-6(c); and

4.1.3. amounts payable pursuant to <u>Section</u> **[3.14(a)(iv) for Detroit Entertainment, 3.16(a)(iv) for Greektown Casino, 3.16(a)(iv) for MGM]** of the <u>Development Agreement</u>

4.2. For the avoidance of doubt, ***Payments*** does not include:

4.2.1. any payments pursuant to any other section of the Development Agreement or rights to reimbursement made or to be made under any Development Agreement; and

4.2.2. any municipal service fees authorized to be imposed by the City pursuant to <u>Section 13</u> of the Gaming Act.

4.3. References to such sections of the Gaming Act, Wagering Tax Revenue Statute, Detroit City Code or the Development Agreement include any amendments thereto or any substitutes therefor.

## 5. Place and Manner of Payment

5.1. All Payments to be paid to the City shall be paid to U.S. Bank National Association (the ***Custodian***) for the benefit of the City by wire transfer in immediately available funds at the office of the Custodian in New York, New York, for credit to the below identified account.

Wiring Instructions: ●

Account Number: ●

## 6. Discharge of Liability

Payments made to the Custodian pursuant to these Instructions shall have the same force and effect as if made to the City, and you shall have no further liability with respect to such Payments if made as herein provided.

## 7. Changes to these Instructions

7.1. No change to these Instructions shall be effective for any purpose without the prior written consent of the Counterparties.

7.2. The initial Counterparties are:

7.2.1. UBS AG

7.2.2. SBS Financial Products Company, LLC

7.2.3. Merrill Lynch Capital Services, Inc.

7.3. As used herein, "Counterparties" includes any successors of the initial Counterparties and any assigns of certain interest rate swap agreements.

7.4. You are entitled to rely on any consent stating that it is signed by a financial institution stating that it is a "Counterparty" as such term is used herein without making any independent investigation.

## 8. Instructions are Irrevocable

These Instructions are irrevocable and shall continue in full force and effect unless changed in writing by the City with the prior written consent of the Counterparties as provided in **Section 7**

and you have received prior written notice of such change from the City and copies of the written consents of each Counterparty delivered as set forth in **Section 10**.

## 9. Termination

These Instructions shall terminate upon written notice of the Custodian to you as set forth in Section 10 stating that the Custodial Agreement has terminated.

## 10. Communications and Notices

All communications and Notices hereunder shall be in writing and, unless otherwise stated herein, mailed, sent or delivered:

>        (1)  if to the Custodian, at

>                          U.S. Bank National Association
>                          535 Griswold, Suite 550
>                          Detroit, Michigan 48226
>                          Attention:  Susan T. Brown

>        (2)  if to you at

>                          [Address]
>                          Detroit, Michigan ●[Zip Code]●
>                          Attention: ●

or to such other address as may be specified to the other in accordance with the provisions of this Section and shall be effective (i) if given by mail, three business days after such communication is deposited in the mail with first class postage prepaid or (ii) if given by overnight courier or personally delivered, when delivered to the person identified at the address specified in or pursuant to **this Section**.

## 11. Binding Effect

These Instructions are binding on you, your successors, if any, and any assigns of the Development Agreement.

## 12. Captions

The captions of the sections of these Instructions are for convenience of reference and do not affect the meaning of these Instructions.

**CITY OF DETROIT**

By _____

>                          Norman L. White
>                          Finance Director

Ex. 3.4 - Page 3

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313•224•3491
FAX 313•224•4466
WWW.DETROITMI.GOV

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION

June 23, 2009

MotorCity Casino Hotel
2901 Grand River
Detroit, MI 48201

Attn: Rhonda Cohen, Chief Operating Officer

Re: Payments to be made to the City of Detroit, Michigan (the *City*) pursuant
to the Revised Development Agreement, dated August 2, 2002 among the
City, Economic Development Corporation of the City of Detroit and
MotorCity Casino Hotel

Reference is made to the IRREVOCABLE INSTRUCTIONS, attached, that
payments to be paid to the City shall be paid to U.S. Bank N.A. (the Custodian)
for the benefit of the City.

**The new wire instructions should be used for wires beginning on
Wednesday, June 24, 2009.**

Should you have any questions, do not hesitate to call (313 224-3491.

Very truly yours,

Norman L. White
Finance Director

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313-224-3491
FAX 313-224-4466
WWW.DETROITMI.GOV

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION

**IRREVOCABLE INSTRUCTIONS**

June 23, 2009

MotorCity Casino Hotel
2901 Grand River
Detroit, MI  48201

Attention: Rhonda Cohen, Chief Operating Officer

**Re: Payments to be made to the City of Detroit (the *City*) in respect of the below identified Casino**

Dear Madam:

1. **References to *You* and *Your***

   1.1. MotorCity Casino Hotel is hereinafter referred to as *you*. *Your* has the correlative meaning.

   1.2. As used herein, "you" and "your" also refer to your successors, if any, and any assigns of the below identified Development Agreement.

2. **Applicability of these Instructions**

   These Instructions are applicable with respect to the casino currently known as MotorCity Casino Hotel and currently located at 2901 Grand River in Detroit, Michigan.

3. **Certain Definitions**

   3.1. ***Development Agreement*** means the Revised Development Agreement, dated August 2, 2002 among the City, The Economic Development Corporation of the City of Detroit and you, any amendments thereto and any substitute for such Development Agreement.

   3.2. ***Gaming Act*** means the Michigan Gaming Control and Revenue Act, MCL 432.201, *et seq;* MSA 18.969(201), *et seq.*, as amended.

   3.3. ***Wagering Tax Revenue Statute*** means Section 12 of the Gaming Act, being MCL 432.212, as amended.

4. **Payments Subject to these Instructions**

   4.1. The following payments (collectively, the ***Payments***)only are subject to these Instructions:

      4.1.1. taxes payable pursuant to Detroit City Code Section 18-14-3 pursuant to the Wagering Tax Revenue Statute; and

      4.1.2. interest and penalties payable pursuant to Detroit City Code Section 18-14-6(c); and

      4.1.3. amounts payable pursuant to Section 3.14(a)(iv) of the Development Agreement

   4.2. For the avoidance of doubt, *Payments* does not include:

4.2.1. any payments pursuant to any other section of the Development Agreement or rights to reimbursement made or to be made under any Development Agreement; and

4.2.2. any municipal service fees authorized to be imposed by the City pursuant to Section 13 of the Gaming Act.

4.3. References to such sections of the Gaming Act, Wagering Tax Revenue Statute, Detroit City Code or the Development Agreement include any amendments thereto or any substitutes therefor.

## 5. Place and Manner of Payment

5.1. All Payments to be paid to the City shall be paid to U.S. Bank National Association (the *Custodian*) for the benefit of the City by wire transfer in immediately available funds at the office of the Custodian in New York, New York, for credit to the below identified account.

> Wiring Instructions: ABA=U.S. BANK, Minneapolis (091000022)
> FBO=FOR FURTHER CREDIT TO U.S. BANK, N.A.
> AC=180121167365
> Trust # 132742003 Detroit (MotorCity) Revenues
> Contact: Renee Poradek (651) 495-4132

## 6. Discharge of Liability

Payments made to the Custodian pursuant to these Instructions shall have the same force and effect as if made to the City, and you shall have no further liability with respect to such Payments if made as herein provided.

## 7. Changes to these Instructions

7.1. No change to these Instructions shall be effective for any purpose without the prior written consent of the Counterparties.

7.2. The initial Counterparties are:

7.2.1. UBS AG

7.2.2. SBS Financial Products Company, LLC

7.2.3. Merrill Lynch Capital Services, Inc.

7.3. As used herein, "Counterparties" includes any successors of the initial Counterparties and any assigns of certain interest rate swap agreements.

7.4. You are entitled to rely on any consent stating that it is signed by a financial institution stating that it is a "Counterparty" as such term is used herein without making any independent investigation.

## 8. Instructions are Irrevocable

These Instructions are irrevocable and shall continue in full force and effect unless changed in writing by the City with the prior written consent of the Counterparties as provided in **Section 7** and you have received prior written notice of such change from the City and copies of the written consents of each Counterparty delivered as set forth in **Section 10**.

## 9. Termination

These Instructions shall terminate upon written notice of the Custodian to you as set forth in Section 10 stating that the Custodial Agreement has terminated.

## 10. Communications and Notices

All communications and Notices hereunder shall be in writing and, unless otherwise stated herein, mailed, sent or delivered:

(a) if to the Custodian, at

U.S. Bank National Association
535 Griswold, Suite 550
Detroit, Michigan 48226
Attention: Susan T. Brown

(b) if to you at

MotorCity Casino Hotel
2901 Grand River
Detroit, MI 48201
Attention: Chief Financial Officer

with copies to:

MotorCity Casino Hotel
2901 Grand River
Detroit, MI 48201
Attention: General Counsel

or to such other address as may be specified to the other in accordance with the provisions of this Section and shall be effective (i) if given by mail, three business days after such communication is deposited in the mail with first class postage prepaid or (ii) if given by overnight courier or personally delivered, when delivered to the person identified at the address specified in or pursuant to this Section.

## 11. Binding Effect

These Instructions are binding on you, your successors, if any, and any assigns of the Development Agreement.

## 12. Captions

The captions of the sections of these Instructions are for convenience of reference and do not affect the meaning of these Instructions.

City of Detroit,

By _____

Norman L. White
Finance Director

1122685_1.DOC

Page 3 of 3 Pages

**Receipt re:**
**Irrevocable Instructions**
**dated June 23, 2009**

TO:    Norman L. White, Finance Director
       City of Detroit

The undersigned hereby acknowledges receipt of certain Irrevocable Instructions dated

June 23, 2009, addressed to MotorCity Casino Hotel, a copy of which is attached hereto.

Dated: June 23, 2009

                              MOTORCITY CASINO HOTEL

                              By: _____, Paralegal
                                      signature
                              Beverly L. Cook
                              (please print name)

1122741_1.DOC

MUNICIPAL CENTER
WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313•224•3491
FAX 313•224•4466
WWW.DETROITMI.GOV

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION

June 23, 2009

Greektown Casino
555 East Lafayette
Detroit, MI  48226

Attn:  Cliff Vallier, Chief Financial Officer

Re:    Payments to be made to the City of Detroit, Michigan (the *City*) pursuant
       to the Revised Development Agreement, dated August 2, 2002 among the
       City, Economic Development Corporation of the City of Detroit and
       Greektown Casino

Reference is made to the IRREVOCABLE INSTRUCTIONS, attached, that
payments to be paid to the City shall be paid to U.S. Bank N.A. (the Custodian)
for the benefit of the City.

**The new wire instructions should be used for wires beginning on
Wednesday, June 24, 2009.**

Should you have any questions, do not hesitate to call (313 224-3491.

Very truly yours,

Norman L. White
Finance Director

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313•224•3491
FAX 313•224•4466
WWW.DETROITMI.GOV

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION                    **IRREVOCABLE INSTRUCTIONS**

June 23, 2009

Greektown Casino
555 East Lafayette
Detroit, MI 48226

Attention: Cliff Vallier, Chief Financial Officer

**Re: Payments to be made to the City of Detroit (the *City*) in respect of the below identified Casino**

Dear Sir:

**1. References to *You* and *Your***

    1.1. Greektown Casino is hereinafter referred to as *you*. *Your* has the correlative meaning.

    1.2. As used herein, "you" and "your" also refer to your successors, if any, and any assigns of the below identified Development Agreement.

**2. Applicability of these Instructions**

These Instructions are applicable with respect to the casino currently known as Greektown Casino and currently located at 555 East Lafayette in Detroit, Michigan.

**3. Certain Definitions**

    3.1. *Development Agreement* means the Revised Development Agreement, dated August 2, 2002 among the City, The Economic Development Corporation of the City of Detroit and you, any amendments thereto and any substitute for such Development Agreement.

    3.2. *Gaming Act* means the Michigan Gaming Control and Revenue Act, MCL 432.201, *et seq;* MSA 18.969(201), *et seq.*, as amended.

    3.3. *Wagering Tax Revenue Statute* means Section 12 of the Gaming Act, being MCL 432.212, as amended.

**4. Payments Subject to these Instructions**

    4.1. The following payments (collectively, the *Payments*)only are subject to these Instructions:

        4.1.1. taxes payable pursuant to Detroit City Code Section 18-14-3 pursuant to the Wagering Tax Revenue Statute; and

        4.1.2. interest and penalties payable pursuant to Detroit City Code Section 18-14-6(c); and

        4.1.3. amounts payable pursuant to Section 3.16(a)(iv) of the Development Agreement

    4.2. For the avoidance of doubt, *Payments* does not include:

        4.2.1. any payments pursuant to any other section of the Development Agreement or rights to reimbursement made or to be made under any Development Agreement; and

        4.2.2. any municipal service fees authorized to be imposed by the City pursuant to Section 13 of the Gaming Act.

    4.3. References to such sections of the Gaming Act, Wagering Tax Revenue Statute, Detroit City Code or the Development Agreement include any amendments thereto or any substitutes therefor.

## 5. Place and Manner of Payment

    5.1. All Payments to be paid to the City shall be paid to U.S. Bank National Association (the *Custodian*) for the benefit of the City by wire transfer in immediately available funds at the office of the Custodian in New York, New York, for credit to the below identified account.

        Wiring Instructions:    ABA=U.S. BANK, Minneapolis (091000022)
                              FBO=FOR FURTHER CREDIT TO U.S. BANK, N.A.
                              AC=180121167365
                              Trust # 132742002 Detroit (Greektown) Revenues
                              Contact: Renee Poradek (651) 495-4132

## 6. Discharge of Liability

Payments made to the Custodian pursuant to these Instructions shall have the same force and effect as if made to the City, and you shall have no further liability with respect to such Payments if made as herein provided.

## 7. Changes to these Instructions

    7.1. No change to these Instructions shall be effective for any purpose without the prior written consent of the Counterparties.

    7.2. The initial Counterparties are:

        7.2.1. UBS AG

        7.2.2. SBS Financial Products Company, LLC

        7.2.3. Merrill Lynch Capital Services, Inc.

    7.3. As used herein, "Counterparties" includes any successors of the initial Counterparties and any assigns of certain interest rate swap agreements.

    7.4. You are entitled to rely on any consent stating that it is signed by a financial institution stating that it is a "Counterparty" as such term is used herein without making any independent investigation.

## 8. Instructions are Irrevocable

These Instructions are irrevocable and shall continue in full force and effect unless changed in writing by the City with the prior written consent of the Counterparties as provided in Section 7 and you have received prior written notice of such change from the City and copies of the written consents of each Counterparty delivered as set forth in Section 10.

## 9. Termination

These Instructions shall terminate upon written notice of the Custodian to you as set forth in Section 10 stating that the Custodial Agreement has terminated.

## 10. Communications and Notices

All communications and Notices hereunder shall be in writing and, unless otherwise stated herein, mailed, sent or delivered:

(a) if to the Custodian, at

U.S. Bank National Association
535 Griswold, Suite 550
Detroit, Michigan 48226
Attention: Susan T. Brown

(b) if to you at

Greektown Casino
555 East Lafayette
Detroit, MI 48226

Attention: Cliff Vallier, Chief Financial Officer

with copies to:

Andrea Hansen, Esq.
222 N. Washington Square, Suite 400
Lansing, MI 48933

or to such other address as may be specified to the other in accordance with the provisions of this Section and shall be effective (i) if given by mail, three business days after such communication is deposited in the mail with first class postage prepaid or (ii) if given by overnight courier or personally delivered, when delivered to the person identified at the address specified in or pursuant to this Section.

## 11. Binding Effect

These Instructions are binding on you, your successors, if any, and any assigns of the Development Agreement.

## 12. Captions

The captions of the sections of these Instructions are for convenience of reference and do not affect the meaning of these Instructions.

City of Detroit,

By _____

Norman L. White
Finance Director

1122670_1.DOC

Page 3 of 3 Pages

**Receipt re:**
**Irrevocable Instructions**
**dated June 23, 2009**

TO:   Norman L. White, Finance Director
      City of Detroit


The undersigned hereby acknowledges receipt of certain Irrevocable Instructions dated

June 23, 2009, addressed to Greektown Casino, a copy of which is attached hereto.


Dated: June 23, 2009

GREEKTOWN CASINO

By: _____
          signature

_____
(please print name)

1122742_1.DOC

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313•224•3491
FAX 313•224•4466
WWW.DETROITMI.GOV

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION

June 23, 2009

MGM Grand Detroit, LLC
1777 3rd Street
Detroit, MI 48226

Attn: Ronald K. Holloway, V.P. and General Counsel

Re:   Payments to be made to the City of Detroit, Michigan (the *City*) pursuant
      to the Revised Development Agreement, dated August 2, 2002 among the
      City, Economic Development Corporation of the City of Detroit and MGM
      Grand Detroit, LLC.

Reference is made to the IRREVOCABLE INSTRUCTIONS, attached, that
payments to be paid to the City shall be paid to U.S. Bank N.A. (the Custodian)
for the benefit of the City.

**The new wire instructions should be used for wires beginning on
Wednesday, June 24, 2009.**

Should you have any questions, do not hesitate to call (313 224-3491.

Very truly yours,

Norman L. White
Finance Director

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313•224•3491
FAX 313•224•4466
WWW.DETROITMI.GOV

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION                    **IRREVOCABLE INSTRUCTIONS**

June 23, 2009

MGM Grand Detroit, LLC
1777 3rd Street
Detroit, MI  48226

Attention:  Ronald K. Holloway, Vice President and General Counsel

**Re: Payments to be made to the City of Detroit (the *City*) in respect of the below identified Casino**

Dear Sir:

### 1. References to *You* and *Your*

    1.1. MGM Grand Detroit, LLC is hereinafter referred to as *you*.  *Your* has the correlative meaning.

    1.2. As used herein, "you" and "your" also refer to your successors, if any, and any assigns of the below identified Development Agreement.

### 2. Applicability of these Instructions

These Instructions are applicable with respect to the casino currently known as MGM Grand Detroit, LLC and currently located at 1777 3rd Street in Detroit, Michigan.

### 3. Certain Definitions

    3.1. *Development Agreement* means the Revised Development Agreement, dated August 2, 2002 among the City, The Economic Development Corporation of the City of Detroit and you, any amendments thereto and any substitute for such Development Agreement.

    3.2. *Gaming Act* means the Michigan Gaming Control and Revenue Act, MCL 432.201, *et seq;* MSA 18.969(201), *et seq.*, as amended.

    3.3. *Wagering Tax Revenue Statute* means Section 12 of the Gaming Act, being MCL 432.212, as amended.

### 4. Payments Subject to these Instructions

    4.1. The following payments (collectively, the *Payments*)only are subject to these Instructions:

        4.1.1. taxes payable pursuant to Detroit City Code Section 18-14-3 pursuant to the Wagering Tax Revenue Statute; and

        4.1.2. interest and penalties payable pursuant to Detroit City Code Section 18-14-6(c); and

        4.1.3. amounts payable pursuant to Section 3.16(a)(iv) of the Development Agreement

    4.2. For the avoidance of doubt, *Payments* does not include:

      4.2.1. any payments pursuant to any other section of the Development Agreement or rights to reimbursement made or to be made under any Development Agreement; and

      4.2.2. any municipal service fees authorized to be imposed by the City pursuant to Section 13 of the Gaming Act.

  4.3. References to such sections of the Gaming Act, Wagering Tax Revenue Statute, Detroit City Code or the Development Agreement include any amendments thereto or any substitutes therefor.

## 5. Place and Manner of Payment

  5.1. All Payments to be paid to the City shall be paid to U.S. Bank National Association (the *Custodian*) for the benefit of the City by wire transfer in immediately available funds at the office of the Custodian in New York, New York, for credit to the below identified account.

      Wiring Instructions:  ABA=U.S. BANK, Minneapolis (091000022)
                       FBO=FOR FURTHER CREDIT TO U.S. BANK, N:A.
                       AC=180121167365
                       Trust # 132742001 Detroit (MGM Grand) Revenues
                       Contact: Renee Poradek (651) 495-4132

## 6. Discharge of Liability

Payments made to the Custodian pursuant to these Instructions shall have the same force and effect as if made to the City, and you shall have no further liability with respect to such Payments if made as herein provided.

## 7. Changes to these Instructions

  7.1. No change to these Instructions shall be effective for any purpose without the prior written consent of the Counterparties.

  7.2. The initial Counterparties are:

      7.2.1. UBS AG

      7.2.2. SBS Financial Products Company, LLC

      7.2.3. Merrill Lynch Capital Services, Inc.

  7.3. As used herein, "Counterparties" includes any successors of the initial Counterparties and any assigns of certain interest rate swap agreements.

  7.4. You are entitled to rely on any consent stating that it is signed by a financial institution stating that it is a "Counterparty" as such term is used herein without making any independent investigation.

## 8. Instructions are Irrevocable

These Instructions are irrevocable and shall continue in full force and effect unless changed in writing by the City with the prior written consent of the Counterparties as provided in **Section 7** and you have received prior written notice of such change from the City and copies of the written consents of each Counterparty delivered as set forth in **Section 10**.

## 9. Termination

These Instructions shall terminate upon written notice of the Custodian to you as set forth in Section 10 stating that the Custodial Agreement has terminated.

## 10. Communications and Notices

All communications and Notices hereunder shall be in writing and, unless otherwise stated herein, mailed, sent or delivered:

    (a) if to the Custodian, at

                U.S. Bank National Association
                535 Griswold, Suite 550
                Detroit, Michigan 48226
                Attention: Susan T. Brown

    (b) if to you at

                Mr. Ronald K. Holloway
                Vice President and General Counsel
                MGM Grand Detroit, LLC
                1777 3rd Street
                Detroit, MI 48226

or to such other address as may be specified to the other in accordance with the provisions of this Section and shall be effective (i) if given by mail, three business days after such communication is deposited in the mail with first class postage prepaid or (ii) if given by overnight courier or personally delivered, when delivered to the person identified at the address specified in or pursuant to this Section.

## 11. Binding Effect

These Instructions are binding on you, your successors, if any, and any assigns of the Development Agreement.

## 12. Captions

The captions of the sections of these Instructions are for convenience of reference and do not affect the meaning of these Instructions.

**City of Detroit,**

By _____

Norman L. White
Finance Director

1122690_1.DOC

Page 3 of 3 Pages

**Receipt re:**
**Irrevocable Instructions**
**dated June 23, 2009**

TO:   Norman L. White, Finance Director
      City of Detroit

The undersigned hereby acknowledges receipt of certain Irrevocable Instructions dated

June 23, 2009, addressed to MGM Grand Detroit, LLC, a copy of which is attached hereto.

Dated: June 23, 2009

MGM GRAND DETROIT, LLC

By: _____
        signature     LOIS GRECCO

       _____
       (please print name)
                        6-23-09

1122744_1.DOC



JENNIFER M. GRANHOLM
GOVERNOR

STATE OF MICHIGAN
**MICHIGAN GAMING CONTROL BOARD**
DETROIT

RICHARD S. KALM
EXECUTIVE DIRECTOR

June 18, 2009

Mr. Michael Shaller
Shefsky & Froelich, Ltd.
111 East Wacker Dr., Suite 2800
Chicago, IL  60601

     RE:    Irrevocable Instructions directing the three licensed Detroit casinos to
            electronically transfer City taxes to a custodial account

Dear Mr. Schaller:

     We are in receipt of a letter from Shefsky & Froelich Ltd., the City's outside gaming
counsel, (i) transmitting to and advising the Board of certain irrevocable instructions (the
"Irrevocable Instructions") directing the three licensed Detroit casinos to electronically transfer
(the "Transfer") the portion of the City's money due under the Gaming Act and the Revised
Development Agreement to a custodial account (the "Account") held by U.S. Bank National
Association (the "Custodian") in connection with a certain Collateral Agreement dated as of
June 15, 2009, by and among the City of Detroit, the Detroit General Retirement System
Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, the
Custodian and certain counterparties; and (ii) advising the Board that the City Council of the City
of Detroit has enacted an ordinance and taken all related action necessary to direct the three
licensed Detroit casinos to make the Transfer to the Account.

     Upon review of this matter, I do not find any compliance issues at this time and since no
goods or services are being provided to the casinos, no licensing is required.

                        Sincerely,

                        Richard S. Kalm
                        Executive Director

RSK/db

Cc: Cindy Bliss, MGM Grand Detroit, LLC
     Mike Roy & Cheryl Scott Dube, MotorCity Casino, LLC
     Olisaeloka Dallah, Greektown Casino, LLC
     John Page, MGCB
     Andrea Hansen, Honigman, Miller, Schwartz & Cohn, LLP
     Peter Ellsworth, Dickinson Wright, PLLC

13-008858-CZ

FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/5/2013 12:02:00 PM
CATHY M. GARRETT

# EXHIBIT C

WRITTEN INSTRUCTIONS TO CUSTODIAN UNDER COLLATERAL AGREEMENT

June 13, 2013

<u>Via Email, Facsimile and Courier</u>

U.S. Bank National Association
535 Griswold, Suite 550
Detroit, Michigan 48226
Attention: Susan T. Brown

To Whom It May Concern:

Reference is made to the Collateral Agreement dated as of June 15, 2009, among the City of Detroit, the Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation, severally and not jointly, U.S. Bank National Association, as Custodian and the Other Persons Party thereto (the "***Collateral Agreement***"). Capitalized terms used but not defined herein have the meanings assigned to such terms in the Collateral Agreement.

The City of Detroit hereby instructs the Custodian to pay the amounts due to UBS AG and the amounts due to SBS Financial Products Company, LLC with respect to the June 14, 2013 payment on account of the Hedges, which amounts are equal to approximately $5,710,084.38 with respect to each of UBS AG and SBS Financial Products Company, LLC. To the extent any amounts remain in the Holdback Account after such payments, the City hereby instructs the Custodian to refrain from acting with respect to such amounts until it receives further instruction from the City (other than Regular Custodial Payments due and owing to the Custodian).

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned has duly executed these Written Instructions to Custodian Under Collateral Agreement as of the date first above written.

THE CITY OF DETROIT

By: _____ 6/13/13
Name:
Title: Emergency Manager

cc:   City of Detroit Law Department
      First National Building, Suite 1650
      660 Woodward Avenue
      Detroit, Michigan 48226
      Attn: Corporation Counsel

      Cadwalader, Wickersham & Taft LLP
      One World Financial Center
      New York, New York 10281
      Attn: Lary Stromfeld

      Bingham McCutchen LLP
      399 Park Avenue
      New York, NY 10022-4689
      Attn: Edwin Smith

      McDermott Will & Emery
      227 West Monroe Street
      Chicago, IL 60606-5096
      Attn: William P. Smith

13-008858-CZ

FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/5/2013 12:02:00 PM
CATHY M. GARRETT

# EXHIBIT D

**Syncora Capital Assurance Inc.**
135 W 50th St – 20th Floor
New York, NY 10022
+1 212 478-3400    Phone
+1 212 478-3587    Fax
www.syncora.com



June 17, 2013


U.S. Bank National Association
535 Griswold, Suite 550
Detroit, Michigan 48226
Attention: Susan T. Brown

      RE:   Collateral Agreement dated June 15, 2009 regarding
            <u>Detroit Retirement Systems with U.S. Bank as Custodian</u>

Dear Ms. Brown,

    We write in reference to the General Receipts Subaccount under the captioned collateral agreement (the "Collateral Agreement").  Unless otherwise defined herein, capitalized terms have the meanings assigned to those terms in the Collateral Agreement.

    On June 14, 2013, the Service Corporations failed to make scheduled interest payments under service contracts in respect of certificates of participation issued by the Detroit Retirement Systems Funding Trust 2005 and the Detroit Retirement Systems Funding Trust 2006.  This failure constitutes an Event of Default under the Hedges in respect to the Cross-Default provision in Section 5(a)(vi) of the 1992 ISDA Master Agreement (the "Master Agreement") governing each of the Hedges and Part 1(c) of the Amended and Restated Schedule to each of the Master Agreements.

    We understand that you have informed our advisors in Detroit on Friday that you will not make any payment to the City from the General Receipts Subaccount while an Event of Default is continuing under a Hedge.  We would appreciate your sending to us written confirmation that no funds have been or will be released from the General Receipts Subaccount to the City on and after June 14, 2013 for so long as an Event of Default under the Hedges is continuing.  We note that our consent is required for any such release.

    We reserve all rights with respect to the previous operation of the General Receipts Subaccount.

Sincerely,


Claude LeBlanc
Chief Financial Officer & Chief Restructuring Officer


cc: Corporation Counsel, City of Detroit Law Department

13-008858-CZ

FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/5/2013 12:02:00 PM
CATHY M. GARRETT

# EXHIBIT E

| | |
|---|---|
| From: | "Bennett, Ryan Blaine" <rbennett@kirkland.com> |
| To: | "Smith, William" <wsmith@mwe.com> |
| Cc: | Corinne Ball <cball@JonesDay.com>, "Sprayregen, James H.M." <jsprayregen@kirkland.com>, "jtepler@jonesday.com" <jtepler@jonesday.com>, "Bennett, Ryan Blaine" <rbennett@kirkland.com>, "susan.jacobsen2@usbank.com" <susan.jacobsen2@usbank.com>, "Susan Brown (susan.brown5@usbank.com)" <susan.brown5@usbank.com>, "Rene' Poradek (Deniece.poradek@usbank.com)" <Deniece.poradek@usbank.com>, "Coco, Nathan" <ncoco@mwe.com>, "Eisenegger, Erich" <eeisenegger@mwe.com> |
| Date: | 06/24/2013 04:42 PM |
| Subject: | Re: USB - Detroit - Casino Revenue Collateral Account |

Bill,

Thank you for your email.   We will respond with a more fulsome letter later today.   Please understand, however, that  our position on the cash trap has not changed from that provided in our letter.   Pursuant to the Collateral Agreement, the cash should have been trapped and should continue to be trapped absent our consent.

RBB

Ryan Blaine Bennett
KIRKLAND & ELLIS LLP
300 North La Salle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2074
Facsimile:  (312) 862-2200

On Jun 24, 2013, at 11:45 AM, "Smith, William" <wsmith@mwe.com> wrote:

    Corrine and Jamie:

    By the close of business today, U.S. Bank as Custodian under the City of Detroit Collateral
    Agreement expects be in receipt of casino revenues in the General Receipts Subaccount equal
    to the Holdback Requirement Amount. In the normal course of events, U. S Bank as Custodian
    would advise the City of this fact, receive from the City a like amount which would be

credited to the Holdback Account (the monthly ''City Payment''), and then remit to the City the Holdback Requirement Amount from the General Receipts Subaccount. Thereafter,  as casino revenues are received, they are to be remitted to the City during the remainder of the month.

However, U.S. Bank as Custodian has received (i) an instruction letter from Syncora instructing U.S. Bank as Custodian not to remit any payments to the City from the General Receipts Subaccount pursuant to Section 5.4(a)(iii) of the Collateral Agreement (alleging an Event of Default under the Hedges due to a ''Cross-Default'' as defined in the Hedges), as well as (ii) an instruction letter from the City instructing U.S. Bank as Custodian not to remit any further payments from the Holdback Account (except Custodian Payments).

As U. S Bank as Custodian has advised each of you, it is a custodian, not a fiduciary, under this arrangement and is unclear what actions are required of it by virtue of the competing notices. In addition, it has been advised that the City is in active negotiations with the swap counterparties, and U.S. Bank as  Custodian is reluctant to interfere with that process.

Accordingly, please advise if each of you wish U. S Bank as Custodian to perform the notice and transfers seemingly required in the ordinary course of business or whether each of you wish U. S. Bank as custodian to hold and continue to gather casino revenues in the General Receipts subaccount pending clarification of the situation.  In that context, to the degree that you request U. S Bank as Custodian to deviate from the ordinary course of business, kindly explain the legal reasoning and support therefor, including the applicability and effect of Section 5.4(a) of the Collateral Agreement.


Regards, Bill


William P. Smith
McDermott Will & Emery LLP
312-984-7588 (o)
312-848-2141 (c)
Wsmith@mwe.com

```
***************************************************************************************************
**************
IRS Circular 230 Disclosure: To comply with requirements imposed by the IRS, we inform you that any
U.S. federal tax advice contained herein (including any attachments), unless specifically stated
otherwise, is not intended or written to be used, and cannot be used, for the purposes of (i)
avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to
another party any transaction or matter herein.

_____


This message is a PRIVILEGED AND CONFIDENTIAL communication. This message and all attachments are a
private communication sent by a law firm and may be confidential or protected by privilege. If you
are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or
use of the information contained in or attached to this message is strictly prohibited. Please notify
the sender of the delivery error by replying to this message, and then delete it from your system.
Thank you.
***************************************************************************************************
**************

Please visit http://www.mwe.com/ for more information about our Firm.
```

***********************************************************
IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
***********************************************************

13-008858-CZ

FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/5/2013 12:02:00 PM
CATHY M. GARRETT

# EXHIBIT F

# KIRKLAND & ELLIS LLP
#### AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois  60654

Ryan Blaine Bennett
To Call Writer Directly:
(312) 862-2074
ryan.bennett@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

June 24, 2013

William P. Smith, Esq.
McDermott Will & Emery LLP
227 West Monroe Street
Chicago, IL 60606-5096

> RE:  General Receipts Subaccount under the Collateral Agreement
> dated June 15, 2009 regarding the Detroit Retirement Systems
> with U.S. Bank as Custodian (the "Collateral Agreement")

Dear Bill:

We write regarding your email of this morning to Jamie Sprayregen and me, among others, titled "USB - Detroit - Casino Revenue Collateral Account" (the "6/24 Email")  Unless otherwise defined herein, capitalized terms have the meanings assigned to those terms in the Collateral Agreement.  In the 6/24 Email, you stated, in part, the following:

> In the normal course of events, U. S Bank as Custodian would advise the City of this fact, receive from the City a like amount which would be credited to the Holdback Account (the monthly "City Payment"), and then remit to the City the Holdback Requirement Amount from the General Receipts Subaccount. Thereafter, as casino revenues are received, they are to be remitted to the City during the remainder of the month.

and

> As U. S Bank as Custodian has advised each of you, it is a custodian, not a fiduciary, under this arrangement and is unclear what actions are required of it by virtue of the competing notices. In addition, it has been advised that the City is in active negotiations with the swap counterparties, and U.S. Bank as  Custodian is reluctant to interfere with that process.

Hong Kong       London       Los Angeles       Munich       New York       Palo Alto       San Francisco       Shanghai       Washington, D.C.

# KIRKLAND & ELLIS LLP

William P. Smith, Esq.
June 24, 2013
Page 2

Section 5.4(a)(iii) of the Collateral Agreement is clear on its face as to the obligation of U.S. Bank to hold casino revenues in the General Receipts Subaccount following an Event of Default under a Hedge.

On June 14, 2013, the Service Corporations failed to make scheduled interest payments under the Service Contracts in respect of the certificates of participation issued by the Detroit Retirement Systems Funding Trust 2005 and the Detroit Retirement Systems Funding Trust 2006.  It is unambiguous under the terms of the Hedges that an Event of Default (the "Cross Default EOD") has occurred and is continuing under the Hedges in respect of the Cross-Default provision in Section 5(a)(vi) of the 1992 ISDA Master Agreement governing each of the Hedges and Part 1(c) of the Amended and Restated Schedule to each of the Master Agreements as a result of the Service Corporations' failure to make scheduled interest payments.  Please advise us immediately if you (i) have a different view, (ii) are being instructed otherwise by any other party along with the basis for such a contrary position, or (iii) require additional information to confirm the existence of the Cross Default EOD.

U.S. Bank, in its capacity as Custodian, is clearly required by the unambiguous contractual terms of the Collateral Agreement, to retain all funds that were in the General Receipts Subaccount upon the occurrence of the Cross Default EOD, all funds that came into such account after such date and all funds that come into such account on and after the date hereof during the continuance of the Cross Default EOD.  As previously set forth in the letter to U.S. Bank from our client, Syncora Capital Assurance Inc. ("Syncora"), dated June 17, 2013 (the "Syncora June 17 Letter"), Syncora does not consent to any divergence by U.S. Bank from that duty.

Your 6/24 Email also refers to receipt by U.S. Bank of an instruction letter from the City instructing U.S. Bank, as Custodian, not to remit any further payments from the Holdback Account, except Custodian Payments.  Under the Collateral Agreement, the City does not have any authority to instruct the Custodian with respect to payments from the Holdback Account.  Furthermore, payments from (as opposed to "into") the  Holdback Account are unrelated to the Custodian's obligations to retain all funds in the General Receipts Subaccount.  Therefore, even if such a notice from the City was valid (which it is not) it would not be in contradiction with the Syncora June 17 Letter.

Syncora shared with you in the Syncora June 17 Letter, and we have repeated herein, the clear contractual basis under Section 5.4(a)(iii) of the Collateral Agreement for your requirement to retain all funds in the General Receipts Subaccount.  We are confused by your reference to the "ordinary course of business" since you are clearly aware of payment defaults by the City that have resulted in current circumstances that do not represent the "ordinary course of business." We expect U.S. Bank, as Custodian, with the assistance of its own advisors, to inform itself of its

## KIRKLAND & ELLIS LLP

William P. Smith, Esq.
June 24, 2013
Page 3

obligations under the terms of the Collateral Agreement, and to abide by those obligations without giving effect to third-party directions that are inconsistent with those terms.

We also note that, prior to June 14, 2013, U.S. Bank, as Custodian, should have already been retaining all funds in the General Receipts Subaccount as a result of the combination of (i) the occurrence of multiple Additional Termination Events under the Hedges with respect to the Service Corporations as the sole Affected Party (as defined in the Hedges) and (ii) the occurrence of a Financial Emergency with respect to the City.

Syncora reserves all of its rights with respect to extra-contractual actions that may have in the past been, or may in the future be, taken by U.S. Bank, as Custodian, in respect of the Collateral Agreement and related documents, and will hold U.S. Bank responsible for any release of funds from the General Receipts Subaccount in contravention of the plain terms of the Collateral Agreement.

Sincerely,

/s/ Ryan Blaine Bennett

13-008858-CZ

FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/5/2013 12:02:00 PM
CATHY M. GARRETT

# EXHIBIT G



CITY OF DETROIT
EMERGENCY MANAGER'S OFFICE

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVE., SUITE 1126
DETROIT, MICHIGAN 48226
PHONE 313•224•3400
FAX 313•224•4433
WWW.DETROITMI.GOV

June 25, 2013

**VIA E-MAIL AND OVERNIGHT COURIER**

Syncora Capital Assurance Inc. ("*Syncora*")
135 West 50th Street
New York, NY 10022
Attn: Claude LeBlanc

Re: <u>Instructions to Custodian under Collateral Agreement</u>

Dear Mr. LeBlanc:

I am in receipt of your letter dated June 17, 2013 to U.S. Bank National Association, as Custodian under the Collateral Agreement dated as of June 15, 2009, among the City of Detroit, the Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation, severally and not jointly, U.S. Bank National Association, as Custodian and the Other Persons Party thereto (the "*Collateral Agreement*"). Capitalized terms used but not defined herein have the meanings assigned to such terms in the Collateral Agreement.

As you are well aware, the City of Detroit suffers from a severe liquidity crisis and requires immediate access to its cash, including developer payments and wagering tax revenues. Your letter to the Custodian to withhold such amounts from the City was facially improper under the operative documents and was not constructive. Contrary to the statements that you and your representatives have made to the Custodian, no Event of Default exists with respect to section 5(a)(vi) of the Hedges. Moreover, Syncora is not a party to the Collateral Agreement, has no right whatsoever to instruct the Custodian thereunder, and the Custodian's release of funds in the General Receipts Subaccount is not subject to Syncora's consent.

If your behavior serves to delay the City's access to its cash at this critical juncture, the City intends to hold Syncora fully responsible for any and all resulting damages. I urge you to take immediate corrective action, including rescinding your June 17, 2013 letter to the Custodian.

The City fully reserves its rights with respect to these matters in all respects.

Very truly yours,

Kevyn D. Orr
Emergency Manager
City of Detroit

DAVE BING, MAYOR

13-008858-CZ

FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/5/2013 12:02:00 PM
CATHY M. GARRETT

# EXHIBIT H

**Syncora Guarantee Inc.**
135 West 50ᵗʰ Street
20ᵗʰ Floor
New York, NY 10020
+1 212 478 3400   Phone
+1 212 478 3587   Fax
www.syncora.com



June 26, 2013

City of Detroit Emergency Manager's Office
Coleman A. Young Municipal Center
Attn: Mr. Kevyn D. Orr
2 Woodward Ave., Suite 1126
Detroit, MI 48226

     Re: Instructions to Custodian Under Collateral Agreement

Dear Mr. Orr,

I am in receipt of your letter dated June 25, 2013, regarding the funds in the General Receipts Subaccount pursuant to the requirements of the Collateral Agreement dated as of June 15, 2009.

While we disagree with your assertions regarding the Collateral Agreement for the reasons we have communicated to U.S. Bank, we understand that the City of Detroit has concerns with respect to its own liquidity and that the developer payments and wagering tax receipts, which secure certain obligations, constitute a cash source for the City. As discussions between the City and its creditors are commencing, our intent is not to delay the City's access to its cash, but rather to notice the Custodian as to the plain requirements of the Collateral Agreement and to protect our contractual rights as an insurer of the swap obligations, due to, among other things, the City's decision not to make payments that were due to the Service Corporations on June 14, 2013, a portion of which were then funded by us.

As we have already communicated to your representatives, we are open to exploring the possibility of a mutually satisfactory resolution of the issues surrounding the revenues in the General Receipts Subaccount. However, given that the City has only recently begun to clarify its own position regarding its creditworthiness and the value of its debt and other obligations, Syncora continues to reserve all of its rights as a creditor of the City and insurer of certain of the City's obligations.

I look forward to seeing you at tomorrow morning's meeting.

Sincerely,

Claude LeBlanc
Chief Financial Officer & Chief Restructuring Officer

# **EXHIBIT 6**

## *[FORBEARANCE AGREEMENT]*

## FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT

This FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT (this "**Agreement**") is entered into as of this 15th day of July, 2013, by and among Detroit General Retirement System Service Corporation, a Michigan nonprofit corporation ("**DGRS**"), Detroit Police and Fire Retirement System Service Corporation, a Michigan nonprofit corporation ("**PFRS**" and, together with DGRS, each a "**Service Corporation**" and collectively the "**Service Corporations**"), the City of Detroit (the "**City**"), the Emergency Manager of the City (the "**Emergency Manager**"), and UBS AG ("**UBS**") and Merrill Lynch Capital Services, Inc. ("**MLCS**" and, together with UBS, each a "**Swap Counterparty**" and collectively the "**Swap Counterparties**").

Capitalized terms used herein and not otherwise defined have the meanings ascribed to them under the Swap Agreements (as defined below).

## RECITALS

WHEREAS, the Service Corporations and Swap Counterparties are party to swap transactions under certain ISDA Master Agreements (including, in the case of MLCS, pursuant to Transaction Transfer Agreements and, in any case, including the related Schedule and Credit Support Annex thereto and any Confirmations thereunder) as set forth in Schedule A attached to this Agreement (as applicable, the "**MLCS Swap Agreements**" and the "**UBS Swap Agreements**") and the Service Corporations are party to transactions under certain ISDA Master Agreements (including the related Schedule and Credit Support Annex thereto and any Confirmations thereunder) entered into with SBS Financial Products Company, LLC as set forth in Schedule A attached to this Agreement (the "**SBS Swap Agreements**" and together with the MLCS Swap Agreements, the "**MLCS/SBS Swap Agreements**"; the MLSC/SBS Swap Agreements and UBS Swap Agreements are referred to collectively herein as the "**Swap Agreements**");

WHEREAS, the City, the Service Corporations, U.S. Bank, National Association (as custodian) and the Swap Counterparties are party to a Collateral Agreement dated as of June 15, 2009 (the "**Collateral Agreement**");

WHEREAS, the City is obligated pursuant to the Service Contracts to make certain payments thereunder in an amount equal to the amount due from the Service Corporations to the Swap Counterparties;

WHEREAS, pursuant to the Collateral Agreement, the City has pledged to the Service Corporations a first priority lien upon all of the City's right, title and interest in the Pledged Property (as such term is defined in the Collateral Agreement) in order to secure the payment of all City Hedge Payables Related Obligations (as such term is defined in the Collateral Agreement);

WHEREAS, pursuant to the Collateral Agreement, the Service Corporations have

granted to the Swap Counterparties a security interest in all of their right, title and interest in, to and under the City Hedge Payable Related Obligations and the City Pledge (as such term is defined in the Collateral Agreement);

WHEREAS, the Governor of the State of Michigan determined on March 1, 2013 that a financial emergency existed in the City, and the Emergency Manager was appointed for the City on March 14, 2013;

WHEREAS, pursuant to the terms of each Swap Agreement, it is the view of the Swap Counterparties that one or more Events of Default and/or Additional Termination Events has occurred, with the Service Corporation as the Defaulting Party or sole Affected Party, and therefore each of SBS and UBS has the right to designate an Early Termination Date for the related Swap Agreements;

WHEREAS, pursuant to the terms of the UBS Swap Agreements, it is the view of UBS that UBS has the right (but not the obligation) to terminate the UBS Swap Agreements as described in Part 5(xx) of the Schedules to the UBS Swap Agreements;

WHEREAS, pursuant to the terms of the MLCS/SBS Swap Agreements, it is the view of MLCS that SBS has the right (but not the obligation) to terminate the SBS Swap Agreements as described in Part 5(t) of the Schedules to the SBS Swap Agreements; provided that SBS may not exercise such right without the consent of MLCS and is required to exercise such right at the direction of MLCS;

WHEREAS, the Service Corporations and City have asked each Swap Counterparty to forbear from exercising certain rights, including without limitation, rights under the Swap Agreements, during a certain period pursuant to this Agreement; and

WHEREAS, each Swap Counterparty is willing to do so upon the terms and subject to the conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     **Forbearance.**

1.1.     *Forbearance.*   During the period (the "**Forbearance Period**") commencing on the date hereof and terminating upon the occurrence of a Forbearance Period Termination Event (as defined in Section 1.3 below), each Swap Counterparty shall, subject to the terms and conditions hereof, forbear from:

(a)     issuing any notice designating an Early Termination Date with respect to any Swap Agreement; and

2

(b)     (i) instructing the Collateral Agreement Custodian to cease making payments to the City from the General Receipts Subaccount in accordance with Section 5.4 of the Collateral Agreement and (ii) giving notice to the Collateral Agreement Custodian pursuant to the Collateral Agreement of its obligation to cease making such payments.

**1.2.**     *Affirmative Obligations During Forbearance Period.*

(a)     During the Forbearance Period, if a Liquidity Event has occurred and is continuing, the Swap Counterparties shall (a) use their best efforts to take any action reasonably requested by the City to cure such Liquidity Event, including supporting any action by the City or Service Corporations to obtain a turnover to the City of all amounts that would be paid to the City under the Collateral Agreement but for the application, or alleged application, of Section 5.4 of the Collateral Agreement or but for any action by the Collateral Agreement Custodian, whether or not such action has been purported to have been taken pursuant to Section 5.4, to withhold or delay such payments, *provided, however,* such best efforts shall not include any act that would, in the commercially reasonable judgment of the Swap Counterparties, (i) impose material costs, expenses or burden on the Swap Counterparties, (ii) impose reputational risk or material liability on either Swap Counterparty, or (iii) have an Adverse Effect (as such term is defined in Section 1.3(d) below) on the Swap Counterparties, (b) in the event of a bankruptcy with respect to the City, (x) support a motion or adversary proceeding for turnover to the City of all amounts that would be paid to the City under the Collateral Agreement but for the application, or alleged application, of Section 5.4 of the Collateral Agreement or but for any action by the Collateral Agreement Custodian, whether or not such action has been purported to have been taken pursuant to Section 5.4, to withhold or delay such payments, and (y) consent to use of cash collateral by the City of any amounts held under the Collateral Agreement that would be paid to the City but for the application, or alleged application, of Section 5.4 of the Collateral Agreement or but for any action by the Collateral Agreement Custodian, whether or not such action has been purported to have been taken pursuant to Section 5.4, to withhold or delay such payments, and (c) consent to the remittance to the City of the funds contemplated by the letter from the City to the Collateral Agreement Custodian in the form attached as Schedule B hereto.

(b)     For purposes of this Agreement, a "**Liquidity Event**" shall mean that (i) the City has not received payment of any and all amounts under the Collateral Agreement that would have been paid to the City from the General Receipts Subaccount or Holdback Account under the Collateral Agreement but for the application, or alleged application, of Section 5.4 of the Collateral Agreement or but for any action by the Collateral Agreement Custodian, whether or not such action has been purported to have been taken pursuant to Section 5.4, to withhold or delay such payments, or (ii) the Collateral Agreement Custodian has stated that it will not, or the City has reasonable grounds to believe that the Collateral Agreement Custodian may not, (a) make payment to the City from the General Receipts

3

Subaccount equal to the City Payment for such Month if the City were to pay the Collateral Agreement Custodian for deposit to the credit of the Holdback Account an amount equal to the Standard Holdback Requirement, (b) issue a Monthly Holdback Compliance Notice, or (c) remit to the City daily all amounts standing to the credit of the General Receipts Subaccount after issuance of a Monthly Holdback Compliance Notice. The existence of an outstanding instruction or direction by any person to the Collateral Agreement Custodian to refrain from paying amounts under the Collateral Agreement to the City shall constitute reasonable grounds for such belief.

(c)     Upon termination of the Forbearance Period, any and all rights of the City and the Service Corporations under this Section 1.2 shall terminate immediately without notice and the Swap Counterparties shall have the right to revoke any consents described herein and otherwise exercise any rights or remedies they may have under the Transaction Documents except with respect to amounts previously used by or remitted to the City in accordance with the terms of this Section 1.2.

**1.3.**  *Forbearance Period Termination Events.*  Each of the following events constitutes a "**Forbearance Period Termination Event**" upon delivery by a Swap Counterparty to the City and each Service Corporation of written notice of the occurrence thereof (provided that in lieu of such notice, notice of the occurrence of the Forbearance Period Termination Events in Sections 1.3(a), 1.3(l) or 1.3(m) below shall be given as set forth therein):

(a)     Delivery to the City and each Service Corporation of a written notice from a Swap Counterparty (given in its sole discretion and with a copy to the other parties hereto) terminating the Forbearance Period; provided that such notice may not be given prior to June 30, 2014.

(b)     (i) The occurrence of any Event of Default under Section 5(a)(i) of any Swap Agreement, (ii) any Service Corporation seeks to become a debtor under title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), or (iii) a petition to cause a Service Corporation to become a debtor under the Bankruptcy Code is filed by a Controlled Entity (as such term is defined in Section 2.1(a) hereof) and the City or the Emergency Manager caused such filing to be made.

(c)     A petition to cause a Service Corporation to become a debtor under the Bankruptcy Code is filed by a third party (except as provided in Section 1.3(b)(iii) above).

(d)     Occurrence of any Event of Default under Section 5(a)(iii) of any Swap Agreement, provided that such occurrence has an Adverse Effect on the Swap Counterparties. For purposes of this Agreement, an "**Adverse Effect**" on the Swap Counterparties shall (i) mean the occurrence or existence of any act, event or condition that, in the reasonable judgment of the Swap Counterparties, is likely to adversely affect their rights or

interests under any of the Transaction Documents in any material respect and (ii) exclude (1) any failure or refusal to pay any amounts under the 2006 Pension Funding Securities when due, and (2) the filing of a petition for relief under the Bankruptcy Code by the City.

(e)     Occurrence of any Additional Termination Event under Part 1(i)(ii)(1), (2), (6), or (7) of the Schedule to any Swap Agreement; provided, however, (x) an Additional Termination Event under Part 1(i)(ii)(1) of the Schedule to any Swap Agreement shall not constitute a Forbearance Period Termination Event if it occurs during the continuation of a Liquidity Event and prior to July 31, 2013, (y) the occurrence of an Additional Termination Event under Part 1(i)(ii)(2) of the Schedule to any Swap Agreement shall not constitute a Forbearance Period Termination Event to the extent the appropriation referenced therein equals at least the amount specified in clause (X) of such Part 1(i)(ii)(2) and (z) the occurrence of an Additional Termination Event under Part 1(i)(ii)(6) of the Schedule to any Swap Agreement shall not constitute a Forbearance Period Termination Event to the extent any third party litigation does not have an Adverse Effect on the Swap Counterparties.

(f)     Breach of any of the covenants contained in Section 2.1(a), 2.1(b), 2.1(d) or 2.2(a) herein

(g)     Other than as set forth in Section 1.3(f) above, breach (other than breach solely by the Swap Counterparties) of any of the covenants contained in Section 2 herein or any representations contained in Section 4 herein.

(h)     Without prejudice to Section 1.3(f) or (g) above, issuance by any court of competent jurisdiction of a judgment or order that would (i) render unlawful or invalid any of the Swap Agreements, Collateral Agreement or this Agreement or the performance thereunder or hereunder by the Emergency Manager, the City or a Service Corporation or any party acting for or on behalf of the Swap Counterparties, (ii) render unlawful or invalid any other Transaction Documents or the performance thereunder by the City or a Service Corporation or any party acting for or on behalf of the Swap Counterparties, if the impact thereof would impair the ability of a Service Corporation to make any payments when due under any Swap Agreements or impair any arrangement securing such payments, or (iii) require or allow any payment of principal or interest on the 2006 Pension Funding Securities to be paid prior to the scheduled payment date therefor.

(i)     Proposal of an ordinance by the Emergency Manager or the giving of public notice of a meeting of the City Council of the City at which an ordinance will be considered for adoption (provided the City Council of the City had at such time the requisite power and authority for such adoption), or approval by either house of any federal or state legislature of legislation, that if enacted or adopted into law would (i) render unlawful or

5

invalid any of the Swap Agreements, Collateral Agreement or this Agreement or the performance thereunder or hereunder by the Emergency Manager, the City or a Service Corporation or any party acting for or on behalf of the Swap Counterparties, (ii) render unlawful or invalid any other Transaction Documents or the performance thereunder by the City or a Service Corporation or any party acting for or on behalf of the Swap Counterparties, if the impact thereof would impair the ability of a Service Corporation to make any payments when due under any Swap Agreements or impair any arrangement securing such payments, or (iii) require or allow any payment of principal or interest on the 2006 Pension Funding Securities to be paid prior to the scheduled payment date therefor.

(j)      The City files a petition for relief under the Bankruptcy Code and any one of the following occurs: (i) within 60 days of filing the City fails to obtain a Court Order (as defined in Section 2.1(d) hereof), (ii) the Assumption Motion (as defined in Section 2.1(d) hereof) is denied, (iii) the petition for relief is dismissed and a new petition is not filed within 30 days following such dismissal, or (iv) the Court Order does not contain a waiver of the automatic stay as specified in Section 2.3 herein.

(k)      The effective date of the confirmation of the plan of adjustment in connection with any bankruptcy proceedings of the City.

(l)      Delivery on or before July 31, 2013 to the Swap Counterparties of a written notice from the City (given in its sole discretion and with a copy to the other parties hereto) terminating the Forbearance Period; provided that on such date a Liquidity Event has occurred and is continuing.

(m)      Delivery to the Swap Counterparties of a written notice from the City (given in its sole discretion and with a copy to the other parties hereto) terminating the Forbearance Period; provided that (A) on such date an event described in 1.3(j)(ii) or (iii) has occurred or (B) the City files a petition for relief under the Bankruptcy Code and any one of the following occurs: (i) within 75 days of the filing the City fails to obtain a Non-Final Court Order or (ii) the City fails to obtain a Court Order prior to the Exercise Period End Date; provided further that the City has used its best efforts to obtain a Court Order in accordance with Section 2.1(d) hereof.

**1.4.**    *Rights Following Forbearance Period.*

(a)      Upon the occurrence of a Forbearance Period Termination Event pursuant to Section 1.3(a), 1.3(b) or 1.3(f) hereof, the parties hereto shall be restored to their original rights and positions as they existed immediately prior to the Forbearance Period, and each Swap Counterparty shall immediately be entitled to exercise any rights and remedies in respect of any Event of Default, Termination Event, or Additional Termination Event that has occurred under the applicable Swap Agreement together

with any rights and remedies under the Definitive Documents relating thereto and giving effect to Section 2 of this Agreement.

(b) If (i) the City has complied with Section 3.2 hereof but either Swap Counterparty is prohibited from exercising its Optional Termination Right (as defined in Section 3.5 hereof) because an Event of Default or Termination Event is then occurring with respect to which any Swap Counterparty is the Defaulting Party or sole Affected Party under any Swap Agreement or (ii) a Forbearance Period Termination Event (other than as set forth in Section 1.4(a) above) has occurred, the parties hereto shall be restored to their original rights and positions as they existed immediately prior to the Forbearance Period, and each Swap Counterparty shall immediately be entitled to exercise any rights and remedies in respect of any Event of Default, Termination Event, or Additional Termination Event that has occurred under the applicable Swap Agreement together with any rights and remedies under the Definitive Documents relating thereto *without* giving effect to Section 2 of this Agreement.

## 2. **Covenants of the Parties**.

**2.1.** *Covenants of the City and Service Corporations*. Each of the City and the Service Corporations hereby covenants and agrees, which covenants and agreements shall, except as otherwise provided in Section 1.4, survive the termination of the Forbearance Period, as follows:

(a) Unless the Swap Counterparties have given their express written consent, and so long as the Swap Counterparties are not in breach of their obligations hereunder, the City and each Service Corporation (i) shall not commence litigation, assert any defense in litigation or take any other judicial, legislative, or executive action that may have the effect of (A) setting aside, avoiding, rejecting, modifying, terminating, amending, revising, disapproving, limiting, or otherwise disrupting or rendering ineffective any of this Agreement, the Collateral Agreement, the Swap Insurance Policies, the Swap Agreements, the 2006 Transaction, the City Pledge, the Service Corporation Security Interest, the Service Corporation Pledge, the lien created by the Authorizing Ordinance, or any other part of the Definitive Documents or the Settlement Transaction (collectively, the "**Transaction Documents**") to the extent such litigation or action would have an Adverse Effect on the Swap Counterparties or (B) causing any payment of principal or interest on the 2006 Pension Funding Securities to be paid prior to the scheduled payment date therefor, it being agreed and understood that neither (1) any failure or refusal to pay any amounts under the 2006 Pension Funding Securities when due nor (2) the filing of a petition for relief under the Bankruptcy Code by the City shall constitute a breach or violation of this clause (B) and (ii) shall not cause the City, a Service Corporation or any entity or person under the control of the City

or the Emergency Manager (any such entity or person, a "**Controlled Entity**") to commence litigation, assert any defense in litigation or take any other judicial, legislative, or executive action that may have any of the effects referenced in Section 2.1(a)(i)(A) or (B).

(b)     Unless the Swap Counterparties have given their express written consent, and so long as the Swap Counterparties are not in breach of their obligations hereunder, the City and each Service Corporation shall timely and diligently defend against any litigation or other judicial action that is commenced by a third party (including, without limitation, any Controlled Entity), or any legislative action that is taken, that may have any of the effects referenced in Section 2.1(a)(i)(A) or (B).

(c)     Each of the City and each Service Corporation hereby ratifies and agrees to comply with all applicable provisions of the Transaction Documents to the extent that failure to do so would have an Adverse Effect on the Swap Counterparties.

(d)     If the City or a Service Corporation seeks to become or becomes a debtor under the Bankruptcy Code, the City and such Service Corporation (as applicable) shall (A) (i) file a motion, in form and substance reasonably satisfactory to the Swap Counterparties, to assume this Agreement (the "**Assumption Motion**") pursuant to section 365 of the Bankruptcy Code on the date of the filing of a petition for relief under the Bankruptcy Code and (ii) use best efforts to obtain entry of a final and non-appealable order, in form and substance reasonably satisfactory to the Swap Counterparties, granting the Assumption Motion (an "**Assumption Order**") or (B) use best efforts to obtain entry of a final and non-appealable order, in form and substance reasonably satisfactory to the Swap Counterparties, with respect to this Agreement pursuant to Rule 9019 under the Bankruptcy Code (a "**Rule 9019 Order**" and together with the Assumption Order, a "**Court Order**").

(e)     If the City or a Service Corporation seeks to become or becomes a debtor under the Bankruptcy Code, the City and such Service Corporation (as applicable) shall schedule any amounts due and owing to any Swap Counterparty (or its transferees or assigns) pursuant to or related to the Swap Agreements, the Collateral Agreement and this Agreement as undisputed, fully secured claims pursuant to section 506 of the Bankruptcy Code and treat any amounts due thereunder or hereunder as allowed, fully secured claims for any and all purposes under any plan for the City or such Service Corporation (as applicable).

(f)     The City and each Service Corporation shall provide each Swap Counterparty with immediate oral and written notice of the occurrence of any Forbearance Period Termination Event.

8

(g)     At the request of the Swap Counterparties following the occurrence of both (i) a Forbearance Period Termination Event described in Section 1.4(a) above and (ii) either a Termination Event or Event of Default under a Hedge where the Swap Counterparty is not the sole Affected Party or Defaulting Party, the City and each Service Corporation shall authorize, approve and consent to payment to the Swap Counterparties from the Pledged Property to meet the obligations owing to the Swap Counterparties under the Hedges and the Transaction Documents; subject to prior appropriation by either the City Council of the City (provided the City Council of the City had at such time the requisite power and authority for such appropriation) or by the Emergency Manager pursuant to Section 2.2 (b)(iv) of the Pledged Property in an amount sufficient to pay the obligations owing to the Swap Counterparties under the Hedges and the Transaction Documents.

(h)     At the request of the Swap Counterparties following the occurrence of a Forbearance Period Termination Event described in Section 1.4(a) above, if the Collateral Agreement Custodian refuses or fails to make a payment from the Pledged Property as provided in Section 2.1(g) above, the City and each Service Corporation shall support any reasonable action by the Swap Counterparties to obtain relief, including relief pursuant to the remedies specified in Section 11.2 of the Collateral Agreement.

2.2.    *Covenants of the Emergency Manager.* The Emergency Manager hereby covenants and agrees, which covenants and agreements shall, except as otherwise provided in Section 1.4, survive the termination of the Forbearance Period, as follows:

(a)     Unless the Swap Counterparties have given their express written consent, and so long as the Swap Counterparties are not in breach of their obligations hereunder, the Emergency Manager (i) shall not, and shall not authorize or permit the City to, commence litigation, assert any defense in litigation or take any other judicial, legislative, or executive action that may have any of the effects referenced in Section 2.1(a)(i)(A) or (B) and (ii) shall not cause the City, a Service Corporation or any Controlled Entity to commence litigation, assert any defense in litigation or take any other judicial, legislative, or executive action that may have any of the effects referenced in Section 2.1(a)(i)(A) or (B).

(b)     Unless the Swap Counterparties have given their express written consent, and so long as the Swap Counterparties are not in breach of their obligations hereunder, the Emergency Manager shall exercise all powers, authorities and privileges vested in the Emergency Manager under applicable law and, as required from time to time in the performance thereof, shall immediately execute and deliver each authorization, approval, appropriation, direction, instruction or consent by the

9

Emergency Manager, acting in the official capacity as Emergency Manager, that is necessary:

(i)      subject to Section 2.2(b)(iii) with respect to the City Payments, to cause the City and the Service Corporations to perform all covenants, obligations and duties of the City and the Service Corporations, respectively, under the Transaction Documents, unless the failure to perform will not have an Adverse Effect on the Swap Counterparties,

(ii)     to cause the City or the Service Corporations to avoid the occurrence of a Forbearance Period Termination Event described in Sections 1.3(b), 1.3(d), 1.3(e), 1.3(f), 1.3(g) or 1.3(i) of this Agreement,

(iii)    to cause the City to make all City Payments as and when required under the Collateral Agreement and, to the extent necessary, to make one or more appropriations or make one or more amendments to then existing appropriations in amounts that are sufficient to pay in full, and which may be used exclusively for payment of, such City Payments, and

(iv) following the occurrence of both (A) a Forbearance Period Termination Event described in Section 1.4(a) above and (B) either a Termination Event or Event of Default under a Hedge where the Counterparty is not the sole Affected Party or Defaulting Party thereunder, to make one or more appropriations or make one or more amendments to then existing appropriations of the Pledged Property in amounts that are sufficient to pay in full, and which may be used exclusively for payment of, the obligations owing to the Swap Counterparties under the Hedges and the Transaction Documents.

**2.3.**    *Specific Performance of Covenants*. The City, the Service Corporations and the Emergency Manager acknowledge and agree that the rights acquired by the Swap Counterparties under this Section 2 are unique and that irreparable damage to the Swap Counterparties would occur in the event that any of the provisions of this Section 2 were not performed in accordance with their specific terms as required by the Agreement or were otherwise breached. Accordingly, the Swap Counterparties shall be entitled to an injunction or injunctions to prevent any breach or nonperformance of this Section 2 and to an order or orders of specific performance of the terms and provisions of this Section 2. Furthermore, in the event of nonperformance under this Section 2, it is acknowledged that mandamus is an appropriate remedy and the Emergency Manager shall not contest such mandamus remedy, and if the City is then a debtor under the Bankruptcy Code, the Emergency Manager shall promptly seek to waive the automatic stay with respect to such remedy.

2.4.    *Further Assurances*.  Each party hereto hereby covenants and agrees, which covenant and agreement shall survive the termination of the Forbearance Period, that such party will execute such further documents and take such further actions

as reasonably necessary to implement and carry out the intent of this Agreement.

3. **Right to Direct Termination.**

    3.1. *Optional Termination Right.* Subject to the terms and conditions of this Agreement:

        (a)    UBS and the City hereby agree that the City shall have the right, but not the obligation, exercisable on any Business Day during the Exercise Period, to direct UBS to exercise its Optional Termination Right, under all (but not less than all) of the UBS Swap Agreements (the "**UBS Termination Right**").

        (b)    MLCS and the City hereby agree that the City shall have the right, but not the obligation, exercisable on any Business Day during the Exercise Period, to direct MLCS to exercise or cause to be exercised the Optional Termination Right under all (but not less than all) of the MLCS/SBS Swap Agreements (the "**MLCS Termination Right**" and together with the UBS Termination Right, the "**Termination Rights**"). MLCS hereby acknowledges that MLCS has the right to direct SBS to exercise the Optional Termination Right.

    3.2. *Exercise of Termination Rights.*

        (a)    The City may exercise the Termination Rights only once, by providing both UBS and MLCS with written notice (the "**Optional Termination Notice**") on a day (the "**Optional Termination Notice Date**") that is at least seven (7) Business Days and not more than ten (10) Business Days prior to the proposed date of termination set forth in the Optional Termination Notice (the "**Optional Termination Date**"). The Optional Termination Date must be the same date for both the UBS Termination Right and the MLCS Termination Right and shall occur prior to the Exercise Period End Date. Such Optional Termination Notice shall be accompanied by evidence reasonably satisfactory to each of UBS and MLCS that the City will have funds on the Optional Termination Date sufficient to pay in cash the Optional Termination Amounts as set forth in Section 3.3 below (the "**Supporting Information**"). Delivery of an Optional Termination Notice, if accompanied by proper Supporting Information, shall be irrevocable.

        (b)    Provided that an Optional Termination Notice and the Supporting Information are properly delivered pursuant to Section 3.2(a) above, and provided further that no Event of Default or Termination Event is then occurring with respect to which any Swap Counterparty is the Defaulting Party or sole Affected Party under any Swap Agreement (it being understood that, subject to Section 3.2(d) hereof, the Service Corporations may waive any such Event of Default or Termination Event), each of UBS

11

and MLCS shall (i) deliver or cause to be delivered written notice to each Service Corporation exercising its Optional Termination Right in accordance with the terms of its Optional Termination Provision as of the Optional Termination Date and (ii) take such other actions as may be necessary or required to give effect to the Optional Termination Provision.

(c)    If the City exercises the Termination Rights and complies with all the terms of this Agreement, (i) no Swap Counterparty will present any payment notice, notice of nonpayment, or other presentation of claim under a Swap Insurance Policy to a Swap Insurer as a result of the exercise of the Termination Rights and (ii) each Swap Counterparty will irrevocably waive all future rights to do so. In furtherance of the foregoing, each Swap Counterparty hereby agrees, severally and not jointly, to indemnify and hold harmless each Service Corporation and the City from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees (in each case, regardless of whether such rights arise by way of contribution, reimbursement, subrogation or otherwise), resulting directly from and caused by a breach by such Swap Counterparty of its obligations under this Section 3.2(c).

(d)    The City hereby agrees that if it exercises the Termination Rights with respect to any Swap Agreement, it must exercise the Termination Rights with respect to the full notional amount of all Swap Agreements with respect to the Swap Counterparties simultaneously.

(e)    If the City has not exercised the Termination Rights on or prior to the termination of the Exercise Period, the Termination Rights shall expire.

**3.3.**    *Payment of Optional Termination Amount.*

(a)    On or before the second Business Day following the Optional Termination Date, the City shall pay to UBS an amount in cash equal to the Optional Termination Amount with respect to all UBS Swap Agreements.

(b)    On or before the second Business Day following the Optional Termination Date, the City shall pay to MLCS an amount in cash equal to the Optional Termination Amount with respect to all MLCS/SBS Swap Agreements.

(c)    For the avoidance of doubt, each party hereto acknowledges that no Service Corporation will owe an amount to any Swap Counterparty under any Swap Agreement in connection with the election to exercise the Optional Termination Right other than any Unpaid Amounts (without duplication of Unpaid Amounts paid by the City as a component of the Optional Termination Amount).

(d)    If a third party (including, without limitation, any Controlled Entity) alleges through litigation, judicial action, or otherwise, that all or a portion of the Optional Termination Amount paid to UBS or MLCS hereunder

12

must be shared with other creditors of the City or of either Service Corporation (or any person acting for or on behalf of such creditors), then the City shall, at the request of the Swap Counterparties, support any reasonable action by the Swap Counterparties in defending against any such litigation or other judicial action that is threatened or commenced by such third party to the extent such action does not impose any further duty or liability on the City.

(e)     The City, the Service Corporations and the Swap Counterparties agree that the payment by the City and acceptance by the Swap Counterparties of the Optional Termination Amounts shall constitute the application of funds by the Swap Counterparties pursuant to the contract rights granted hereunder.

**3.4.** *Effect of Payment of Optional Termination Amount.*

Upon payment in full by the City of the Optional Termination Amount to each of the Swap Counterparties:

(a)     each of the Swap Counterparties and the Service Corporations shall be released and discharged from further obligations to each other under the Swap Agreements and their respective rights against each other thereunder shall be terminated;

(b)     the City Pledge, the Service Corporation Security Interest and the Service Corporation Pledge shall be satisfied and discharged;

(c)     this Agreement shall terminate *without* giving effect to Section 2 of this Agreement; *provided*, that such termination shall not affect the respective obligations of the parties under Sections 3.3(c), 3.3(d), 5, 8, 10 and 11 of this Agreement, which shall survive; and

(d)     in accordance with Section 14.4(a) of the Collateral Agreement, the Swap Counterparties shall deliver to the Collateral Agreement Custodian, and MLCS shall cause SBS to deliver to the Collateral Agreement Custodian, confirmation of the payment in full of all obligations of the Service Corporations and the City to the Swap Counterparties and SBS under the Swap Agreements and the Collateral Agreement.

**3.5.** *Definitions related to Optional Termination Right.*

"**Applicable Percentage**" shall mean, with regard to the delivery of an Optional Termination Notice by the City in accordance with Section 3.2, (i) if the Optional Termination Notice Date occurs on or prior to the First Payment Adjustment Date, 75%, (ii) if the Optional Termination Notice Date occurs after the First Payment Adjustment Date and on or prior to the Second Payment Adjustment Date, 77%, and (iii) if the Optional Termination Notice Date occurs after the Second Payment Adjustment Date and prior to the Exercise Period End Date, 82%; *provided*, *however*, that if the City shall have received a Non-Final Court Order and the Swap

Counterparties do not expressly waive the requirement of a Court Order to begin the Exercise Period, the Applicable Percentage shall be determined with respect to the Non-Final Court Order Date rather than the Optional Termination Notice Date.

"**Exercise Period**" shall mean the period from and including the Exercise Period Start Date to but excluding the Exercise Period End Date.

"**Exercise Period End Date**" shall mean the earlier to occur of (i) a Forbearance Period Termination Event and (ii) March 14, 2014.

"**Exercise Period Start Date**" shall mean the date of this Agreement; *provided, however*, that if the City shall have not exercised the Termination Rights and paid in full in cash to each Swap Counterparty its respective Optional Termination Amount prior to the City filing a petition for relief under the Bankruptcy Code, the Exercise Period Start Date shall mean the date on which the City obtains a Court Order, unless the requirement for such order is expressly waived in writing by each Swap Counterparty.

"**First Payment Adjustment Date**" shall mean October 31, 2013.

"**Mid-Market Amount**" shall mean an amount for each Swap Agreement determined by the Swap Counterparties as of the Optional Termination Date according to a methodology that is agreed to by the City and based upon the present value of amounts due under the Swap Agreement using a discount curve calculated from swap rates published on Reuters Screen Page "ISDAFIX3" at 11:30 a.m. New York Time on the Optional Termination Date, as adjusted to take into account three (3) basis points of breakage costs.

"**Non-Final Court Order**" shall mean an order from the Bankruptcy Court that, but for such order not being final and non-appealable, would constitute a Court Order.

"**Non-Final Court Order Date**" shall mean the date on which the Bankruptcy Court issues a Non-Final Court Order.

"**Optional Termination Amount**" shall mean the sum of (a) the product of the Mid–Market Amount and the Applicable Percentage and (b) all Unpaid Amounts due and owing to the Swap Counterparties under the Swap Agreements.

"**Optional Termination Provision**" shall mean (i) with respect to the MLCS/SBS Swap Agreements, Part 5(t) of the Schedule to such Swap Agreements and (ii) with respect to the UBS Swap Agreements, Part 5(xx) of the Schedule to such Swap Agreements.

"**Optional Termination Right**" shall mean a Swap Counterparty's right to optionally terminate all transactions, in whole, pursuant to the applicable Optional Termination Provision.

"**Second Payment Adjustment Date**" shall mean November 15, 2013.

**4.    Representations and Agreements of the Parties.**

(a)    Each Service Corporation represents to the Swap Counterparties (which representations shall be deemed to be repeated as of the date on which the City delivers an Optional Termination Notice and on the Optional Termination Date) that:

    i.    It is duly organized and validly existing under the laws of Michigan;

    ii.    It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken all necessary action to authorize such execution, delivery and performance;

    iii.    Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    iv.    All governmental (including, without limitation, from the Treasurer of the State of Michigan) and Emergency Manager consents and approvals except as otherwise contemplated by Section 2.1(d) hereof that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with; and

    v.    Its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject to enforceability to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)    The City represents to the Swap Counterparties (which representations shall be deemed to be repeated as of the date on which the City delivers an Optional Termination Notice and on the Optional Termination Date) that:

    i.    It is a municipal corporation of the State of Michigan;

    ii.    It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken all necessary action to authorize such execution, delivery and performance;

15

iii.    Such execution, delivery and performance do not violate or conflict with any applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets; and

iv.    All governmental (including, without limitation, from the Treasurer of the State of Michigan) and Emergency Manager consents and approvals except as otherwise contemplated by Section 2.1(d) hereof that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with; and

v.    Its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject to enforceability to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(c)    Each Swap Counterparty represents to the Service Corporations and the City (which representations shall be deemed to be repeated as of the Optional Termination Date) that:

i.    It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and in good standing;

ii.    It has the power to execute this Agreement, to deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary action to authorize such execution, delivery and performance;

iii.    Such execution, delivery and performance do not violate or conflict with any applicable to it, any provision of its constitutional documents, any order or judgment of any court o other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

iv.    All governmental consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

v.   Its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject to enforceability to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(d)   Each of the parties hereto acknowledges that the representations contained herein relate solely to this Agreement and that nothing contained herein shall be or be deemed to be a representation with respect to any other agreement or transaction.

**5.    Forbearance not a waiver.**

Except as expressly provided herein, each party hereby expressly reserves the right to exercise at any time any rights and/or remedies such party has and/or to which such party is entitled under the Transaction Documents. The parties acknowledge and agree that one or more Event(s) of Default, Potential Event(s) of Default and/or Termination Event(s) may have occurred under the Transaction Documents, and may occur from time to time after the date hereof, and this Agreement (except to the limited extent expressly provided herein) preserves, and does not constitute a waiver of any right, power or privilege that the parties to this Agreement are entitled to exercise as a result of any such Event of Default, Potential Event of Default or Termination Event under the Transaction Documents. The failure of a party to exercise at any time any rights and/or remedies it has and/or to which it is entitled under the Transaction Documents, including any right to designate an Early Termination Date or to give notice under, or to insist on the strict performance of the Transaction Documents by any other party to, such Transaction Document (including, without limitation, the Collateral Agreement Custodian) will not be construed as an estoppel, waiver, modification or limitation on any right (including, without limitation, any right to designate in the future an Early Termination Date based upon the occurrence of any Event of Default or Termination Event).

**6.    Public Disclosure.**   The City agrees to make the terms of this Agreement publicly available not later than July 19, 2013 and shall not object to or interfere with the public disclosure of such terms by the Swap Counterparties on or after such date.

**7.    Time is of the Essence**Time is of the essence as to the performance of all obligations herein.

**8.    Governing Law and Jurisdiction**THIS AGREEMENT, AS WELL AS ANY MATTER ARISING OUT OF, RELATING TO OR INCIDENTAL TO THIS AGREEMENT, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY PRINCIPLES OF CONFLICTS OF LAW THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION, PROVIDED, HOWEVER, THAT THE CORPORATE POWERS AND LEGAL CAPACITY OF THE CITY AND EACH SERVICE CORPORATION SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN.

With respect to any suit, action or proceedings relating to this Agreement, each party irrevocably submits to the extent permitted by law the non-exclusive jurisdiction of the courts of the State of New York and United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

9.      **Notices**Any notice provided for hereunder shall be given in accordance with Section 14.1 of the Collateral Agreement and shall be effective within the time periods set forth therein.  A copy of each notice given hereunder shall be given contemporaneously to all other parties to this Agreement.  Nothing in this Agreement (including any reference to the Collateral Agreement or otherwise) shall require any notice hereunder to be given to any person not a party to this Agreement.

10.     **Successors and Assigns**Prior to the expiration of the Forbearance Period, neither Swap Counterparty may assign its rights or obligations under this Agreement to another party without the prior written consent of the City and the other Swap Counterparty.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective, successors transferees and assigns.

11.     **WAIVERS OF JURY TRIAL**TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

12.     **Counterpart Execution**This Agreement may be executed in one or more counterparts, including electronically transmitted counterparts, which when taken together, shall constitute one and the same original.  Facsimile or other forms of electronic signatures shall be binding, the same of as the original of such document.

13.     **Miscellaneous**(a)      This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supercedes all oral communications with respect thereto.

(b)      No modification, amendment or waiver of this Agreement shall be effective for any purpose unless it is made by written instrument signed by all of the parties hereto; provided that the Emergency Manager shall not be required to be a party to such amendment at any time that the City has full power and authority to sign such amendment without any authorization or approval of the Emergency Manager.

(c)      No person or entity, other than the parties who have signed this Agreement, shall have any rights or interests hereunder, regardless of whether such person or entity is a party to, or has any rights or interests under, any agreement or instrument referenced herein, whether as third party beneficiary or otherwise.

(d)      A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and (except as expressly provided herein) a single or partial exercise of any right, power or privilege will not be presumed to

18

preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

USActive 27967693.30

DETROIT GENERAL RETIREMENT
SYSTEM SERVICE CORPORATION

By: _____
    Name: Cheryl R. Johnson
    Title: President

DETROIT POLICE AND FIRE RETIREMENT
SYSTEM SERVICE CORPORATION

By: _____
    Name: Cheryl R. Johnson
    Title: President

THE CITY OF DETROIT

By: _____
    Name:
    Title:

EMERGENCY MANAGER OF THE CITY OF
DETROIT

By: _____
    Name:

DETROIT GENERAL RETIREMENT
SYSTEM SERVICE CORPORATION


By:_____

    Name:
    Title:


DETROIT POLICE AND FIRE RETIREMENT
SYSTEM SERVICE CORPORATION


By:_____

    Name:
    Title:


THE CITY OF DETROIT


By:_____

    Name: KEVYN D. ORR
    Title: EMERGENCY MANAGER


EMERGENCY MANAGER OF THE CITY OF
DETROIT


By:_____

    Name: KEVYN D. ORR

USActive 27967693.30

MERRILL LYNCH CAPITAL SERVICES,
INC.

By: _____
Name: James Nacus
Title: Authorized Signatory

UBS AG

By: _____
    Name: William W. Chandler
    Title: Managing Director


By: _____
    Name: James Fuqua
    Title: Managing Director

SCHEDULE A

SCHEDULE OF SWAP AGREEMENTS

1.    ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005, between PFRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0010) and the related Transaction Transfer Agreement by and among PFRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

2.    ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between PFRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0011) and the related Transaction Transfer Agreement by and among PFRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

3.    ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between DGRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0009) and the related Transaction Transfer Agreement by and among DGRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

4.    ISDA Master Agreement (including the Schedule thereto) dated as of June 7, 2006 between DGRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0012) and the related Transaction Transfer Agreement by and among DGRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

5.    ISDA Master Agreement between DGRS and UBS, dated as of June 7, 2006, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380291 (as amended, modified or supplemented to the date hereof).

6.    ISDA Master Agreement between PFRS and UBS, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380351 as amended, modified or supplemented to the date hereof).

7.    ISDA Master Agreement between PFRS and UBS, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS Reference No. 37380313 as amended, modified or supplemented to the date hereof).

8.    ISDA Master Agreement between DGRS and UBS, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations

thereunder, dated June 7, 2006, bearing UBS Reference No. 37380341 as amended, modified or supplemented to the date hereof).

USActive 27967693.30

SCHEDULE B

WRITTEN INSTRUCTIONS TO CUSTODIAN UNDER COLLATERAL AGREEMENT

July [_], 2013

<u>Via Email, Facsimile and Courier</u>

U.S. Bank National Association
535 Griswold, Suite 550
Detroit, Michigan 48226
Attention: Susan T. Brown

To Whom It May Concern:

     Reference is made to the Collateral Agreement dated as of June 15, 2009, among the City of Detroit, the Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation, severally and not jointly, U.S. Bank National Association, as Custodian and the Other Persons Party thereto (the "***Collateral Agreement***"). Capitalized terms used but not defined herein have the meanings assigned to such terms in the Collateral Agreement.

     The City of Detroit hereby instructs the Custodian to release the amounts in the General Receipts Subaccount to the City in the amount of the City Payment for each Month and, after receipt by the Custodian of the City Payment for that Month and beginning on the second Business Day following the date on which the Custodian gives its Monthly Holdback Compliance Notice to the City and the Counterparties for that Month, remit to the City daily all amounts standing to the credit of the General Receipts Subaccount during that Month.

     IN WITNESS WHEREOF, the undersigned has duly executed these Written Instructions to Custodian Under Collateral Agreement as of the date first above written.

THE CITY OF DETROIT


By:_____
    Name:
    Title:

[Counterparties' Signature Page Follows]

The Counterparties consent to the remittance to the City of the funds contemplated by the above instructions, subject to the Counterparties' right to withdraw such consent prospectively upon notice to the City and the Custodian.

MERRILL LYNCH CAPITAL SERVICES, INC.

By:_____
    Name:
    Title:

UBS AG

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

cc:   City of Detroit Law Department
First National Building, Suite 1650
660 Woodward Avenue
Detroit, Michigan 48226
Attn: Corporation Counsel

Jones Day
222 East 41st Street
New York, NY 10017
Attn: Corinne Ball
     Joel Telpner

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Attn: Lary Stromfeld

Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022-4689
Attn: Edwin Smith

McDermott Will & Emery
227 West Monroe Street
Chicago, IL 60606-5096
Attn: William P. Smith

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attn: Ryan Blaine Bennett
     James H.M. Sprayregen

Syncora Capital Assurance Inc.
135 West 50th Street
New York, NY 10022
Attn: Claude LeBlanc