# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-------------------------------------------------------x
                        :

In re                       :          Chapter 9
                        :

CITY OF DETROIT, MICHIGAN,   :          Case No. 13-53846
                        :

             Debtor.          :          Hon. Steven W. Rhodes
                        :
                        :
-------------------------------------------------------x

## DEBTOR'S RESPONSE TO MOTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. FOR LEAVE TO CONDUCT "LIMITED" DISCOVERY REGARDING MOTION OF DEBTOR FOR AUTHORIZATION AND APPROVAL OF FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT

On July 18, 2013, the same day the Debtor filed its voluntary petition, the

Debtor filed its Motion for Entry of an Order (I) Authorizing the Assumption of

that Certain Forbearance and Optional Termination Agreement Pursuant to Section

365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule

9019, and (III) Granting Related Relief [Docket No. 17] (the "Assumption Mot.").

In support of the Assumption Motion, the Debtor provided an analysis of why the

Debtor entered into the Forbearance Agreement with certain third party banks and

proffered an affidavit from Kevyn D. Orr, the Emergency Manager of the City of

Detroit demonstrating that the agreement was fair, equitable and in the Debtor's

best interest.

After the Court set a hearing on the Assumption Motion for August 2, 2013, Syncora Guarantee, Inc. and Syncora Capital Assurance, Inc. (collectively, "Syncora") filed a motion for clarification of the Court's order (the "Motion to Clarify"). In that motion, Syncora indicated that it would be filing an objection to the Assumption Motion and requested additional time to conduct "limited" discovery on the matter.

The Court granted Syncora's Motion to Clarify on July 26, 2013 and indicated that the hearing on August 2, 2013 will be a status conference on the Assumption Motion, at which a schedule for resolving the motion will be set. The Court indicated that it will also address at the status conference "whether and the extent to which discovery will be allowed." July 26, 2013 Order at 2.

The Debtor submits this response to Syncora's motion in order to assist the Court and place Syncora's anticipated objection and discovery requests in the proper context at tomorrow's hearing. Syncora insists that it needs to take seven depositions and acquire thousands of documents to test whether the Debtor has exercised sound business judgment in entering the Forbearance and Optional Termination Agreement, and whether that agreement is fair and equitable. Not only are depositions of multiple third parties unnecessary to make this determination, Syncora also fails to mention that it has had access to most of the information that is relevant to the Assumption Motion since July 11, 2013 when it

was provided access to the Debtor's electronic data room. Allowing Syncora to take the broad discovery it now seeks would do little to advance this Court's understanding of the Forbearance Agreement and would place a substantial burden on the Debtor at a time when it cannot afford such unnecessary disruption.

Particularly in light of the nature of the objection, if the Court is inclined to grant any additional discovery, the Debtor submits that it should be limited to half-day depositions of any witnesses that the Debtor and the objectors intend to call at the hearing on the merits.

## FACTUAL BACKGROUND

### A. The COPs and Swaps Transactions

The Forbearance Agreement and the Debtor's interest in settling the costly hedging agreements at issue here trace back to complex financings the Debtor closed in 2005 and 2006 to fund its obligations to two retirement systems. Assumption Mot. Ex. 5 at ¶ 8. The financings culminated in the sale to the public of "Pension Obligation Certificates of Participation," or "COPs." *Id.*

### 1. The COPs

The contractual arrangements underlying the COPs transactions hinge upon promises by the City to make periodic payments to two non-profit Service Corporations it established in 2005. *Id.* The Service Corporations in turn created Funding Trusts, to which they assigned their interests in these periodic payments from the City. *Id.* Finally, the Funding Trusts sold Certificates of Participation in

the income stream to the public, in 2005 and again in 2006, with each certificate representing a proportional right to the City's payments. *Id*.

To make the COPs attractive to investors, the Service Corporations purchased insurance against a default by the Debtor on payments of interest or principal. The predecessor of objector Syncora -- an entity known as XL Capital Assurance, Inc. -- was one of two monoline insurers that sold this insurance to the Service Corporations.

### 2. The Swaps

Some of the COPs paid floating interest rates. *Id*. at ¶ 9. Fearing the prospect of rising interest rates, the City hedged its risk by having the Service Corporations enter into interest rate "swap" agreements with two banks, or the "Swap Counterparties."[1] *Id*. Under the swaps, the Service Corporations and the Swap Counterparties agreed to a transaction that effectively converted each Service Corporation's floating interest rate exposure into a fixed payment. *Id*. Essentially, as part of each side "betting" against the other on interest rates, the Service Corporations agreed to pay periodic, fixed amounts to the Swap Counterparties, and the Counterparties agreed to make payments to the Service

---

[1] The banks were UBS A.G. and SBS Financial Products Company, LLC. SBS had a credit support arrangement with Merrill Lynch Capital Services. Attached as Exhibit A hereto is an example of a swap agreement between one of the Service Corporations and SBS, styled "1992 ISDA Master Agreement Local Currency Single Jurisdiction Dated as of June 7, 2006."

Corporations in the event that floating interest rates exceeded certain levels. *Id.* While the arrangement provided a certain degree of protection to the Service Corporations (and derivatively to the Debtor) against rising interest rates, the netting under these hedges stood to benefit the Counterparties by large sums if interest rates fell. *Id.*

As part of the swaps transactions, the Swap Counterparties also required that the Service Corporations purchase insurance against any default on their swaps payments. *Id.* at ¶10. The Service Corporations bought the insurance from the same two sureties -- including Syncora's predecessor, XL Capital -- that they had used for the insurance on the COPs. *Id.* Thus, Syncora is the surety for both the COPs and swaps. These, however, are two different sets of insurance policies; they are separately documented; and Syncora's obligations and rights under the two policies are separate and independent.

**B.    The 2009 Collateral Agreement**

The swaps documents gave the Swap Counterparties the right to terminate the swaps agreements and demand a large termination payment under certain conditions. Circumstances in January 2009 arguably gave the Swap Counterparties the right to demand early termination of the swap agreements and a termination payment then estimated to be between $300 and $400 million.

The Debtor lacked the resources to make this termination payment, so it renegotiated the swaps with the Swap Counterparties. The renegotiated deal resulted in a Collateral Agreement between the Debtor, the Service Corporations, the Swap Counterparties, and U.S. Bank as custodian that was signed in June 2009. Assumption Mot. Ex. 5 at ¶ 11, Ex. B. The essence of the Collateral Agreement was to secure the Debtor's obligations to the Swap Counterparties by pledging the tax revenues and developer payments the Debtor collected from Detroit's three casinos (collectively the "Casino Revenues"). Assumption Mot. Ex. 5 at ¶ 11.

The Collateral Agreement created a "lockbox" arrangement to hold these pledged revenues until the Debtor made its swaps payment each month. *Id*. at ¶¶ 12-13. Two bank accounts were created, a "Holdback Account" and a "General Receipts Subaccount," with U.S. Bank as custodian of both. *Id*.; *see also* Assumption Mot. Ex. 5 at Ex. B § 8.1. The casinos were instructed to remit every day to the General Receipts Subaccount all Casino Revenues they owed the City, where the revenues would sit until the conditions for releasing them to the City had been met. Assumption Mot. Ex. 5 at ¶¶ 12-13.

The swaps contracts required the Service Corporations to make fixed payments to the Swap Counterparties on a quarterly basis. *Id*. The Collateral Agreement, however, provided that the Debtor would fund those quarterly payments directly, and would do so by depositing one-third of the Service

Corporations' quarterly payment into the Holdback Account each month.[2]  *Id*.

Once the City put this money into the Holdback Account, U.S. Bank would (a)

release to the City the Casino Revenues that had already accumulated in the

General Receipts Subaccount and (b) for the rest of the month continue to remit

Casino Revenues to the City as they were deposited every day.  *Id*.  If, however,

there were an event of default or a termination event under the swap transactions,

the Collateral Agreement gave the Swap Counterparties -- and only the Swap

Counterparties -- the right to serve a notice requiring U.S. Bank to hold, or "trap,"

in the General Receipts Subaccount the monies that had accumulated there and not

disburse them to the City.  Assumption Mot. Ex. 5 at ¶¶ 12-13.

Syncora was not a party to the Collateral Agreement, did not sign it, and has

no general rights under it and no lien on the Casino Revenues.  Instead, Syncora's

rights under the document are limited to those one would expect of a third-party

insurer and potential subrogee, namely, that the Debtor and the Swap

Counterparties could not amend the Collateral Agreement without Syncora's

consent, and even then only when the amendment would affect Syncora's interests.

Assumption Mot. Ex. 5 at Ex. B § 14.5.  Moreover, the Collateral Agreement did

---

[2] At the end of each quarter, U.S. Bank would transfer funds from the
Holdback Account to the Swap Counterparties to satisfy the Service Corporations'
obligations under the swaps.

not purport to affect in any way the structure of, or rights under, the COPs transaction. As before, these transactions were separate, distinct and unentangled.

## C. Negotiations Between the City and the Swap Counterparties

On March 14, 2013, Kevyn D. Orr was appointed Emergency Financial Manager for the City of Detroit pursuant to Public Act 72 of 1990, *replaced and repealed by* Public Act 436 of 2012, MCL 141.1541 *et seq*. Assumption Mot. Ex. 5 at ¶ 2. Under the swap contracts, Orr's appointment arguably was an event of default and possibly gave the Swap Counterparties the right to terminate the swaps, demand a termination payment in the hundreds of millions of dollars, and direct U.S. Bank to trap the Casino Revenues in the General Receipts Subaccount. However, despite the Emergency Manager's appointment and its difficult financial situation, the Debtor never defaulted on its monthly payments into the Holdback Account and never failed to make its required swaps payments. *Id*. at ¶ 13. As a result, since March 2013, the Swap Counterparties have not declared an event of default under the swap contracts, have not sought to terminate the swap contracts, have not sought to trap the cash in the General Receipts Subaccount, and have not sought to make any claims for payment from Syncora or the other swap insurer. Instead, the Swap Counterparties chose to pursue a negotiated solution.

These negotiations commenced in earnest in early June 2013 and were productive. *Id*. at ¶¶ 21-22, 25. By mid-June the parties had agreed in principle to

a settlement under which the Swap Counterparties would agree not to seek to have U.S. Bank trap the Casino Revenues in return for the Debtor's promise to continue making swaps payments. *Id*. at ¶ 25. In addition, the Debtor would be given an option to buy out its swaps obligations at a discount. This buyout would be a major step forward in the Debtor's restructuring effort, since the Swap Counterparties are among the Debtor's largest secured creditors. *Id*. More fundamentally, the settlement would give the Debtor continued access to one of the very few income streams available to it -- the Casino Revenues. *Id*.

## D. Syncora's Efforts to Trap Casino Revenues

As described before, the COPs and the swaps were two different and distinct transactions. They had separate documentation and dealt with different issues. Because of the 2009 Collateral Agreement, the City's obligations under the swaps were collateralized; by contrast, its obligations under the COPs were unsecured.

On June 14, 2013, the Debtor failed to make a payment of approximately $40 million due to the Service Corporations for payment to holders of the COPs. *Id*. at ¶¶ 15, 21. This meant that Syncora became liable for a portion of this amount and thus became subrogated to that extent to the Service Corporations' rights against the Debtor. However, on June 14, 2013, the Debtor did ***not*** default on its swaps payments, and instead continued to make timely payments to the Holdback Account as required by the Collateral Agreement. *Id*. at ¶ 13. As a

result, there has been no payment default under the swaps, Syncora has incurred no payment obligations as insurer of the swaps, and Syncora is not subrogated to the rights of the Swap Counterparties. *Id.*

Nonetheless, on June 17, 2013, Syncora sent a letter to U.S. Bank, notifying the bank that Syncora believed there was an event of default under the swaps and demanding that U.S. Bank therefore trap the monies in the General Receipts Subaccount. Assumption Mot. Ex. 5 at ¶ 16, Ex. D. Syncora further indicated that its consent was required before any further Casino Revenues could be released to the Debtor. *Id.*

U.S. Bank's counsel responded that the bank would have released Casino Revenues but for Syncora's letter and inquired as to the basis for Syncora's "letter of instruction" to trap Casino Revenues rather than release them to the Debtor. Assumption Mot. Ex. 5 at ¶ 17, Ex. E. Counsel for Syncora replied with another letter to U.S. Bank on June 24, 2013, repeating their prior demands and threatening to hold U.S. Bank responsible for any release of funds from the Subaccount. Assumption Mot. Ex. 5 at ¶¶ 17-18, Ex. F.

On June 25, 2013, the Emergency Manager objected to Syncora's notice. Assumption Mot. Ex. 5 at ¶ 19, Ex. G. He reemphasized to the insurer the City's severe liquidity crisis and need for unimpeded access to the Casino Revenues in the General Receipts Subaccount. *Id.* He also made clear that no payment default

had occurred under the swaps and, because it was not a party to the Collateral Agreement, Syncora had no right to instruct U.S. Bank regarding the Casino Revenues.  *Id*.

Syncora rejected the Emergency Manager's request on June 26, 2013, continuing to insist that U.S. Bank trap the monies.  Assumption Mot. Ex. 5 at ¶ 19, Ex. H.  Syncora asserted that its purpose was to protect its contractual rights as insurer of the swaps, due to the Debtor's default on the ***COPs*** payment and Syncora's possible payment as a COPs insurer.  *Id*.  The Debtor's advisors met with Syncora on June 27 and 29, 2013, to resolve the crisis, but made no progress.

**E.    The City's Temporary Restraining Order and the Syncora Litigation**

Syncora's conduct had severe consequences.  Faced with competing demands from the Debtor and Syncora, U.S. Bank opted to withhold the Casino Revenues from the Debtor.  Without access to these funds, the Debtor could not guarantee essential services to its residents, and the cloud over the Debtor's continuing access to its Casino Revenues had a severe chilling effect on its negotiations with creditors, including the ongoing negotiations of its settlement with the Swap Counterparties.  Assumption Mot. Ex. 5 at ¶¶ 23-25.  Because of Syncora's intransigence, the Debtor had little choice but to take immediate legal action.  *Id*. at ¶ 20.  On July 5, 2013, it sued Syncora, U.S. Bank and the casinos in the Circuit Court for Wayne County and moved for entry of a TRO.

After considering the Debtor's papers, reviewing Mr. Orr's accompanying affidavit, and hearing argument from counsel, the Wayne County Circuit Court issued a TRO enjoining Syncora and the other defendants from further withholding Casino Revenues from the Debtor, unless directed to do so by the Swap Counterparties. U.S. Bank then remitted to the Debtor the monies that had accumulated in the General Receipts Subaccount, which totaled about $15 million.

Syncora removed the case to the Eastern District of Michigan on July 11, 2013, where it was assigned to Judge Lawrence P. Zatkoff. The next day, Syncora made an emergency motion to dissolve the state court TRO and requested massive discovery from the Debtor on an expedited schedule. The Debtor responded to Syncora's motion on July 17, 2013 and moved for a protective order against Syncora's oppressive requests. The next day, July 18, 2013, the Debtor filed its voluntary petition for bankruptcy under Chapter 9. The Debtor advised Judge Zatkoff of this development on July 19, 2013 and requested that the case be transferred to this Court as provided by local rule.[3]

**F.      Forbearance Agreement**

On July 15, 2013, the City executed the Forbearance Agreement with the Swap Counterparties, which is the subject of the Assumption Motion. The

---

[3] On July 22, 2013, Judge Zatkoff issued an order to show cause as to whether the district court has subject matter jurisdiction. The Debtor filed its response on July 25, 2013. The case remains pending in district court.

13-53846-tjt   Doc 244   Filed 08/01/13   Entered 08/01/13 13:35:04   Page 12 of 119

Forbearance Agreement gives the Debtor the right to direct the Swap Counterparties to exercise their unilateral Optional Termination rights under the swap agreements -- termination rights as to which there is no requirement of swap insurer consent -- in exchange for a cash payment reflecting the equivalent of a discounted valuation of a termination payment under the swaps. As indicated in the Assumption Motion and supporting materials, the termination value of the swaps is approximately $300 million of *secured* debt. *See* Assumption Mot. at 12. The Debtor's ability to eliminate that debt at a substantial discount, as well as the resulting access to millions of dollars of Casino Revenues needed immediately for basic operating expenses going forward, will provide innumerable benefits to the Debtor. *Id.* at 24-30. A copy of the Forbearance Agreement has been provided to the Court, along with a summary of its material terms. *Id*. at 14-18.

The Debtor filed the Assumption Motion on July 18, 2013, on the same day it filed the voluntary petition. On July 22, 2013, the Court issued an ex parte order setting an initial hearing in this case for July 24, 2013, and scheduling a hearing on the Assumption Motion for August 2, 2013. On July 26, 2013, the Court issued an order granting Syncora's motion to clarify, in part, and confirming that the August 2, 2013 hearing will be a status conference at which further questions on schedule, including whether discovery will be permitted at all, will be addressed.

**G.    Syncora's Objections and Litigation Against the Swap Counterparties.**

On the same day this Court conducted its initial hearing in the Debtor's Chapter 9 case and issued its rulings regarding the existence and extent of the Chapter 9 stay, Syncora filed a lawsuit against the Swap Counterparties in New York state court challenging their right to terminate the Swap Agreements as contemplated by the Forbearance Agreement. Complaint attached as Ex. B (hereinafter "Syncora Compl."). Syncora seeks declaratory and injunctive relief from the New York court prohibiting the Swap Counterparties from exercising the termination rights in the Forbearance Agreement without Syncora's express consent. Syncora Compl. ¶¶ 6, 32.

On July 31, 2013, the Debtor filed a Notice of Pendency of Bankruptcy in the New York state court and the Swap Counterparties removed the Syncora lawsuit to the Southern District of New York. The parties are now briefing the question of transfer to the Eastern District of Michigan.

## ARGUMENT

**I.    SYNCORA'S OBJECTION TO THE FORBEARANCE AGREEMENT IS BASELESS.**

### A.    Syncora Is Not a Party to the Swap Agreements and Has No Consent Rights in Their Optional Termination.

Syncora is not a party to the Swap Agreements. Its only connection to the swaps is as surety to the Service Corporation's payment obligations to the Swap Counterparties. As long as the Service Corporations make those payments -- and

the Service Corporations have never failed to make a scheduled payment -- it has no exposure or interest in the transactions whatsoever.

While Syncora as the swaps insurer may have certain consent rights under the swap agreements, those rights are well-defined and limited. Syncora does not have consent rights to every early termination scenario under the swap agreements as it suggests.

Syncora claims that it "negotiated extensive consent rights as a condition precedent to any termination" of the swap agreements, and that a swap termination pursuant to the Forbearance Agreement would be an abridgement of its consent rights. Syncora Compl. ¶¶ 21, 25, 31.[4] Syncora relies principally on Part 5 of the June 26, 2009 Amended and Restated Schedule to the Swap Agreements for the proposition that its consent to any termination is required. Syncora Compl. ¶¶ 23, 29. *See also* Amended and Restated Schedule Dated as of June 26, 2009 to the 1992 ISDA Master Agreement Local Currency Single Jurisdiction Dated as of June 7, 2006, attached as Ex. C.[5] According to Syncora, Part 5(a) of the Amended and Restated Schedule provides that swap insurer consent is required before the parties can seek Early Termination under Section 6 of the swap agreements. Syncora

---

[4] While Syncora has not yet filed a formal objection to the Assumption Motion, the basis for its opposition to the Forbearance Agreement -- and the massive discovery it now seeks in these proceedings -- is surely foreshadowed in its New York complaint.

[5] A sample Amended and Restated Schedule suffices for purposes of this motion because the relevant terms of the swap schedules do not differ.

Compl. ¶ 22.  Syncora then attempts to characterize the termination permitted by the Forbearance Agreement as termination under Section 6 of the swap agreements.  *Id.* ¶¶ 24-25.

Syncora misreads its rights and the Forbearance Agreement.  The termination that is contemplated under the Forbearance Agreement would not take place under Section 6, as Syncora pretends, but rather under a separate provision that Syncora fails to mention.  According to the express terms of the Forbearance Agreement, if the swaps are terminated, they will be terminated pursuant to Part 5(t) of the Amended and Restated Schedules captioned "Optional Early Termination."  Indeed, the document's full title, "Forbearance *And Optional Termination* Agreement," makes plain that this is how the Agreement operates, and the agreement itself expressly refers to party Part 5(t) of the Schedule in defining Optional Termination Provision.  Forbearance Agreement at 14; *see also*, Ex. C at Part 5(t).  And pursuant to that Optional Early Termination provision, the Swap Counterparties have a unilateral right under Part 5(t) to cancel the hedges at any time.  There is no requirement of an event of default or termination event under Section 6, and more importantly, no requirement for swap insurer consent in connection with an Optional Termination.

Unlike Early Termination under Section 6 of the Swap Agreements, which allows the Swap Counterparties to collect a substantial termination fee from the

Debtor Service Corporations as a remedy for default, an Optional Termination provides for no such automatic payment and thus no possible claim against the swap insurers, so it is not surprising that insurer consent is unnecessary. It would therefore be highly unlikely that the Swap Counterparties would ever be inclined to exercise their Optional Termination rights in today's interest rate environment, where the netting under the hedges is projected to yield $45 million annually to them for the next 10 years. Instead, the Swap Counterparties would only proceed with an Optional Termination if they received a separate financial inducement from the Debtor. The Forbearance Agreement accomplishes precisely this.

What the Forbearance Agreement does after weeks of negotiating by the Debtor and Swap Counterparties is permit the Debtor to contractually direct the Swap Counterparties to exercise their Optional Termination rights in exchange for a substantial cash payment. The amount of that payment, which changes over time, approximates the value of the Early Termination fee that would be available to the Swap Counterparties as if there was a termination under Section 6, but reflects a substantial discount to the Debtor. As previously indicated, not only will the Debtor benefit from this discount, but the Debtor will also benefit from the unwinding of the Swap Agreements and unfettered access to $180 million of annual Casino Revenue that is currently tied up in the complex "lockbox" collateral arrangement.

In sum, any termination of the swaps that might take place under the Forbearance Agreement would be authorized under a provision of the swap agreements in which Syncora has no rights of consent. This fact can be determined from a simple reading of the documents.

**B.      Syncora Has Never Paid on Any Claim Under the Swap Agreements and the Forbearance Agreement Will Eliminate Any Future Risk.**

The great irony of Syncora's objection to the Forbearance Agreement is that the termination of the Swap Agreements will *eliminate* any further risk that Syncora will ever have to pay out any money as surety on those transactions. The Forbearance Agreement contains a provision that expressly absolves Syncora from any further liability on the Swaps as soon as the Debtor exercises its rights:

> If the City exercises the Termination Rights and complies with all the terms of this Agreement, (i) no Swap Counterparty will present any payment notice, notice of nonpayment, or other presentation of claim under a Swap Insurance Policy to a Swap Insurer as a result of the exercise of the Termination Rights and (ii) each Swap Counterparty will irrevocably waive all future rights to do so.

Forbearance Agreement § 3.2(c).

That Syncora would want to retire a policy -- which could only be regarded as a liability in light of the one-way stream of payments from the Debtor to the Swap Counterparties -- would seem to be self-evident. Syncora's effort to interfere with the negotiations between the Debtor and the Swap Counterparties and litigate

at every turn reveals its true motivation: to exert as much leverage as possible in connection with its looming exposure on the ***unsecured COPs*** in the hope that the Debtor will capitulate in some way. The fact that Syncora will have a multi-million dollar potential liability erased and will only benefit from the termination of the Swap Agreements calls into question the extensive discovery it seeks, ostensibly to help this Court determine whether the Forbearance Agreement is fair and equitable and in the best interests of the debtor.

## II. SYNCORA HAS HAD ACCESS TO THE NECESSARY DOCUMENTS SINCE JULY 11 AND NO ADDITIONAL DOCUMENT DISCOVERY IS NEEDED.

In its discovery motion, Syncora neglects to advise the Court that the Debtor has already provided Syncora with voluminous information. On July 11, 2013, Syncora received access to the Debtor's confidential data room, which includes hundreds of documents -- nearly 70,000 pages of information -- that would allow Syncora to understand virtually everything about these transactions that would be relevant to the Assumption Motion. This data room was set up in June 2013 as part of the Debtor's efforts to negotiate with its many creditors in good faith. All of the supporting and related agreements that constitute the complex financings that took place in 2005 and 2006, and renegotiated with Syncora's full participation in 2009, are contained in the data room. Over 5,600 pages of documents relating to the 2005, 2006 and 2009 financings at the heart of this dispute have been available to

Syncora since July 11, 2013 when it signed a non-disclosure agreement to gain access.  Ex. D.[6]  An index of the entire data room is provided as Exhibit E hereto.

Notwithstanding this access to the data room, Syncora now requests permission to conduct broad discovery into the Forbearance Agreement and a range of other topics.  Specifically, Syncora seeks a substantial document production from the Debtor, as well as seven depositions from: the Debtor, both of the two Service Corporations, U.S. Bank, and all of the Swap Counterparties, UBS AG, SBS Financial Products Company, and Merrill Lynch Capital Services, Inc.

The Assumption Motion can be resolved, however, without any further discovery from the parties.  In fact, the very purpose of a settlement under Fed. R. Bankr. P. 9019 is to allow the debtor to avoid the expenses and burdens associated with litigating sharply contested claims.  *In re Bard*, 49 F. App'x 528, 530 (6th Cir. 2002).  Indeed, "[c]ompromises are favored in bankruptcy because they minimize litigation and expedite the administration of a bankruptcy estate."  *In re Novak*, 383 B.R. 660, 669 (Bankr. W.D. Mich. 2008) citing *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting from 9 Collier on Bankruptcy, ¶ 9019.03[1] (15th ed. 1993)).  Thus, "[a] court may consider the objections of other creditors or parties in interest, but the objections are 'not controlling and will not prevent approval by the Court.'"

---

[6] Drafts of the Forbearance Agreement are not in the data room but the Debtor is willing to add those drafts to the data room if the Court believes that is necessary.

*In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 239 (Bankr. S.D. Ohio 2008)

quoting *In re Carson*, 82 B.R. 847, 852 (Bankr. S.D. Ohio 1987).

In connection with approving a settlement, "[i]t is within a court's discretion to control discovery and the presentation of evidence in determining whether the settlement is fair." *In re Joint E. & S. Dist. Asbestos Litig*., 129 B.R. 710, 775 (E.D.N.Y. 1991), *vacated*, 982 F.2d 721 (2d Cir. 1992), *opinion modified on reh'g*, 993 F.2d 7 (2d Cir. 1993). Accordingly, to approve a Rule 9019 settlement, a judge "need not hold a mini-trial or write an extensive opinion every time he approves or disapproves a settlement." *Fishell v. Soltow* (*In re Fishell*), 47 F.3d 1168, 1995 WL 66622, at *3 (6th Cir. Feb. 16, 1995) (unpublished table decision) (quoting *LaSalle Nat'l Bank v. Holland* (*In re Am. Reserve Corp*.), 841 F.2d 159, 163 (7th Cir. 1987)). Further, "[t]he temptation to convert a settlement hearing into a full trial on the merits must be resisted." *Mars Steel Corp. v. Cont'l Illinois Nat. Bank & Trust Co. of Chicago*, 834 F.2d 677, 684 (7th Cir. 1987).

Here, the anticipated objection raised by Syncora sounds almost entirely in contractual construction and raises no substantial issues of fact. Whether Syncora has a consent right that would be abrogated by approval of the Forbearance Agreement, which is at the core of Syncora's objection, is a question that can be analyzed under the plain terms of the documents. In fact, just yesterday Syncora filed a motion to dismiss the Debtor's lawsuit against Syncora before Judge

Zatkoff under Federal Rule 12(b)(6), arguing that its consent and other applicable rights under these agreements can be determined from the terms of the documents.

Thus, there is little basis for allowing Syncora to subject the Debtor to burdensome discovery of little, if any, relevance between now and the hearing. Syncora's track record, particularly before Judge Zatkoff, suggests that it will not hesitate to deploy overreaching discovery practices in order to entirely preoccupy the Debtor and its counsel for the period of time before the hearing.

To illustrate, Syncora seeks documents and wants depositions in the following topics:

- The negotiations between the City and the Swap Counterparties;
- The impact of the Forbearance Agreement on the Swap Agreements, the Service Contracts, and the Collateral Agreement;
- The City's current and potential uses of the funds in the General Receipts Subaccount;
- The City's ability to exercise its Optional Termination Rights;
- The validity of the COPs; and
- Communications with U.S. Bank regarding the Holdback Account and/or the General Receipts Subaccount.

Motion to Clarify at 6-7.

The negotiations between the Debtor and the Swap Counterparties are not at issue here, however, nor are communications with U.S. Bank. The Forbearance Agreement speaks for itself, and its operation and effect can be determined from a simple reading of the document. Asking witnesses for the narrative as to how the

parties arrived at their final bargain has little conceivable relevance to whether entering into this agreement, on these terms, was a legitimate exercise of sound business judgment, or whether the agreement is fair and equitable. This is a question of pure contractual construction on which no fact discovery or parol evidence is required. Allowing Syncora to depose a witness from the Debtor on "[t]he terms of the Collateral Agreement" -- a topic listed in Syncora's Rule 30(b)(6) notice – can serve little, if any, useful purpose. None of the other discovery topics regarding subjects such as the current and potential use of the Debtor's funds are material to the Court's analysis of the Assumption Motion.[7]

Nor are the specific requests as "limited" as Syncora professes. For example, there are no date restrictions on the requests whatsoever. The requests themselves are likewise framed in the broadest of terms. Syncora requests "[a]ll documents relating to the Forbearance Agreement," "all documents relating to the General Receipts Subaccount" at U.S. Bank, and "all documents relating to the

---

[7] For example, Syncora seeks "[a]ll documents relating to the City's ability to pay the Optional Termination Amount." Proposed Document Request No. 2. This has no bearing on whether the Forbearance Agreement should be approved. Syncora similarly seeks "[a]ll documents relating to communications with U.S. Bank regarding the Holdback Account and/or the General Receipts Subaccount. Proposed Request No. 5. Syncora is in possession of the correspondence in June and July of this year, however, insofar as it relates to this dispute. It is not at all clear what else is being requested, and far less clear why that would be relevant. Additional requests seeking "[a]ll documents relating to the validity of the COPs" and "any non-disclosure agreement between the City and the Swap Counterparties" are similarly off base. Proposed Request Nos. 6, 7.

Swap Agreements." *See* Proposed Request Nos. 1, 2, 4. These requests in some instances relate to documents that are over 8 years old and would call for the production of a massive amount of information, all with no relevance to the Assumption Motion, in an exceedingly compressed time period.

Moreover, Syncora seems equally interested in using its objection to the Assumption Motion as a discovery vehicle for other litigation in which it finds itself entangled. Syncora seeks to depose a Debtor representative, for example, on "[t]he City's Motion for a Temporary Restraining Order" and "the irreparable harm the City would suffer if not granted access to the funds in the General Receipts Subaccount." *See* Notice of Rule 30(b)(6) Deposition to the Debtor at 5. These topics are irrelevant to the Assumption Motion and to the extent they have any relevance, it could only be to the litigation currently pending before Judge Zatkoff.

The document discovery sought by Syncora is therefore irrelevant, oppressive and vexatious. Any information that Syncora could reasonably require can be provided by permitting the parties to conduct limited depositions of witnesses who are designated to testify live at the ultimate merits hearing. Such depositions, if permitted at all, should be limited to 3 hours in length.

## III. THIS MOTION SHOULD BE HEARD AS EXPEDITIOUSLY AS POSSIBLE.

The Forbearance Agreement contains certain timing provisions that make it a matter of some urgency to the Debtor. Specifically, the forbearance period will

lapse without final Court approval of the Agreement within 60 days of the filing of the Assumption Motion, namely by September 16, 2013.  *See* Forbearance Agreement at 1.3(j).  By the time of tomorrow's hearing, 15 days will have passed, and compliance with Syncora's proposed discovery requests would appear to threaten any schedule seeking to have the Assumption Motion resolved in a timely manner.

The Debtor therefore proposes that the Assumption Motion proceed on the following schedule:

- Objections to be filed by August 6;
- Hearing witnesses identified by August 7;
- Depositions of hearing witnesses to take place from August 12-16;
- Briefs in support of Objections to be filed by August 16;
- The Debtor's reply to be filed by August 19; and
- A hearing to take place on a date acceptable to the Court.

A schedule along these lines would properly balance the Debtor's need for an expeditious outcome against any objector's legitimate request for discovery that is truly relevant.

## **CONCLUSION**

The Debtor respectfully requests that Syncora's discovery motion be denied, or that any discovery on the Assumption Motion be limited to 3-hour depositions of witnesses on whose testimony the parties will rely at trial.

## NOTICE

Notice of this Motion has been given to the following (or their counsel if known): (a) the trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d); (c) the unions representing certain of the City's employees and retirees; (d) the four associations of which the City is aware representing certain retirees of the City; (e) the City's pension trusts; (f) the insurers of the City's bonds; (g) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (h) certain significant holders of the COPs; (i) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); and (j) the insurers of the Swaps. In addition, a copy of the Motion was served on the Office of the United States Trustee. The City submits that no other or further notice need be provided.

Dated: August 1, 2013            Respectfully submitted,


  /s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
   STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

**EXHIBIT A**

139083v1
**(Local Currency-Single Jurisdiction)**

# ISDA®

**International Swaps and Derivatives Association, Inc.**

# MASTER AGREEMENT

dated June 7, 2006

SBS Financial Products Company, LLC and Detroit General Retirement System Service Corporation have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement (the "Master Agreement"), which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

## 1. Interpretation

(a) *Definitions*. The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b) *Inconsistency*. In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c) *Single Agreement*. All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

## 2. Obligations

(a) General Conditions.

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other

(b) *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c) *Netting*. If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d) *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that:—

(a) *Basic Representations*.

    (i)    *Status*. It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

    (ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support

Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance;

(iii)    *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b) *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c) *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d) *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

## 4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a) *Furnish Specified Information.* It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b) *Maintain Authorizations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c) *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

## 5. Events of Default and Termination Events

(a) *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i) *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii) *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default*.

(1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3) the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv) *Misrepresentation*. A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v) *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi) *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to

Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)    *Bankruptcy*.  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)    is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)    *Merger Without Assumption*.  The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1)    the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)    the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)  *Termination Events*.  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below

constitutes an Illegality if the event is specified in (i) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below:——

(i) *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):——

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(iii) *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

## 6. Early Termination

(a) *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b) **Right to Terminate Following Termination Event.**

(i)     **Notice.** If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)     **Two Affected Parties.** If an Illegality under Section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iii)     **Right to Terminate.** If:—

(1)     an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)     an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) **Effect of Designation.**

(i)     If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)     Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) **Calculations.**

(i)     **Statement.** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)     **Payment Date.** An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the

amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss," and a payment method, either the "First Method" or the "Second Method." If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method," as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i) *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties:—

(A)     if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

(B)     if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)     *Adjustment for Bankruptcy.*  In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)     *Pre-Estimate.*  The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty.  Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.     **Transfer**

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a) a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b) a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.     **Miscellaneous**

(a) *Entire Agreement*.  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b) *Amendments*.  No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c) *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d) *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e) *Counterparts and Confirmations.*

    (i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

    (ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f) *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g) *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 9. Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 10. Notices

(a) *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)    if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)    if sent by telex, on the date the recipient's answerback is received;

    (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery ) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b) *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 11.    Governing Law and Jurisdiction

(a) *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b) *Jurisdiction.*    With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c) *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 12.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

      (a)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

      (b)     in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

      (c)     in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

      (d)     in all other cases, the Termination Rate.

*"consent"* includes a consent, approval, action, authorization, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iii).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"law"* includes any treaty, law, rule or regulation and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is

to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)     the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)     such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Event"* means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early

Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

SBS FINANCIAL PRODUCTS COMPANY, LLC, a Delaware limited liability company

By: _____
    Name: John Carter
    Title:  President

DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION

By: _____
    Name:
    Title:

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

SBS FINANCIAL PRODUCTS COMPANY, LLC, a Delaware limited liability company

By: _____
     Name: John Carter
     Title:  President

DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION

By: _____
     Name: Roger Short
     Title:  President

**EXHIBIT B**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

SYNCORA GUARANTEE INC.,

Plaintiff,

v.

UBS AG, SBS FINANCIAL PRODUCTS
COMPANY, LLC, and MERRILL LYNCH
CAPITAL SERVICES, INC.,

Defendants.

---

Index No. _____

**COMPLAINT**

Plaintiff Syncora Guarantee Inc. ("Syncora"), by and through its undersigned attorneys, brings this complaint on knowledge as to its own acts and on information and belief as to all other matters.

### Nature of this Action

1.      Syncora brings this action for declaratory and injunctive relief against UBS AG ("UBS"), SBS Financial Products Company, LLC ("SBS"), and Merrill Lynch Capital Service, Inc. ("MLCS") as successor to SBS pursuant to certain Transaction Transfer Agreements (collectively, the "Swap Counterparties"), the counterparties to the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation (collectively, the "Corporations") in certain interest-rate swap contracts and associated agreements (the "Swap Agreements"). Syncora is an express third party beneficiary of the Swap Agreements, and it insures the Corporations' payment of amounts due under the Swap Agreements to the Swap Counterparties.

2.     The Swap Counterparties and the Corporations entered into the Swap Agreements—and Syncora insured the Swap Agreements—as part of an integrated series of transactions under which the Corporations issued Pension Obligation Certificates of Participation ("COPs") in order to increase the funding of the City of Detroit's (the "City") primary public pension funds.  Syncora also insures the Corporations' payment of amounts due on the COPs.

3.     Because the COPs were originally issued primarily with floating rate debt, the Corporations entered into the Swap Agreements in order to fix the amount of interest they would have to pay, providing the Corporations (and Syncora as insurer) with cost-certainty and, accordingly, a more manageable level of risk.  For this very reason, Syncora negotiated numerous contractual provisions that require the Swap Counterparties and Corporations to obtain Syncora's written consent to any amendment, modification, waiver or early termination of the Swap Agreements.  Indeed, the Swap Agreements provide that any action taken without Syncora's consent is void and of no effect.

4.     On July 15, 2013, the Swap Counterparties, the Corporations, and the City entered into an agreement (the "Forbearance Agreement") that, *inter alia*, grants the City the option to issue a direction to the Swap Counterparties to terminate the Swap Agreements at any time prior to March 13, 2014.  The Swap Counterparties represent in the Forbearance Agreement that is their "view" that "each of SBS and UBS has the right to designate an Early Termination Date for the related Swap Agreements."  The Swap Counterparties have also asserted in the Forbearance Agreement that SBS "is required to exercise [the right to terminate its Swap Agreements] at the direction of MLCS."

5.     The Swap Counterparties' representation in the Forbearance Agreement that they have the right to terminate the Swap Agreements is inconsistent with the terms of the Swap

2

Agreements themselves which provide that Syncora's prior written consent is required prior to the designation of any Early Termination Date for the Swap Agreements. The Forbearance Agreement cannot amend, modify or waive Syncora's rights under the Swap Agreements as any such amendment, modification or waiver would require Syncora's consent which was never sought nor given. Therefore, any termination of the Swap Agreements by the Swap Counterparties—including any designation of an Early Termination Date—would require that they first obtain Syncora's consent as the Swap Agreements expressly provide.

6. In light of the statements by the Swap Counterparties in the Forbearance Agreement, Syncora has serious and well-founded concern that the Swap Counterparties will soon purport to terminate the Swap Agreements without having obtained Syncora's required consent. If the Swap Agreements were permitted to be terminated without Syncora's consent, it would eliminate the cost certainty that the Corporations currently enjoy and, consequently, expose Syncora—as the insurer of the COPs obligations—to substantial interest rate risk for which it did not bargain. That risk to Syncora is acute in the current interest rate environment.

7. Accordingly, by this action Syncora seeks (i) a declaration that (A) the Swap Counterparties may not terminate the Swap Agreements without Syncora's consent, (B) any purported termination of the Swap Agreements by the Swap Counterparties without Syncora's prior written consent will be void *ab initio* and of no force or effect, and (ii) a permanent injunction preventing the Swap Counterparties from terminating the Swap Agreements without obtaining Syncora's prior written consent.

### The Parties

8. Plaintiff Syncora Guarantee Inc. (formerly known as XL Capital Assurance, Inc.) is a New York corporation with its principal place of business in New York, New York, is a

monoline financial guarantee insurer that provides insurance and credit enhancement for various debt issuers.

9.  Defendant UBS AG is a Swiss joint-stock company with its principal place of business in Switzerland.

10.  Defendant SBS Financial Products Company, LLC is a Delaware limited liability corporation with its principal place of business in New York, New York.

11.  Defendant Merrill Lynch Capital Services, Inc. is a Delaware corporation with its principal place of business in New York, New York.

## Jurisdiction and Venue

12.  This Court has jurisdiction over the Swap Counterparties because they consented to jurisdiction in New York State Court, are authorized to do business in New York, and are doing substantial business in New York with permanence and continuity. Additionally, SBS and MLCS are headquartered in New York.

13.  Venue in this county is proper pursuant to CPLR § 503 because at least one of the parties resides in New York County at the time this action is being commenced.

## The Facts

### *The Corporations Enter Into The COPs Transactions And Swap Agreements*

14.  Beginning in 2005, facing a large shortfall in the funding of its public pensions, the City arranged to enter into a series of transactions designed to raise more than $1.4 billion through a series of off-balance-sheet transactions. To do so, the City first arranged to have the Corporations organized as Michigan non-profit corporations. The Corporations then created and used two funding trusts as vehicles through which the Corporations could issue and sell debt obligations, known as COPs, to the investing public.

4

15. In very basic terms, investors paid the Corporations for the COPs, and the Corporations forwarded those investment proceeds to the City. At the same time, the City entered into a "service contract" with each of the Corporations, pursuant to which the City paid to the Corporations the amounts owed under the COPs (the "Service Contracts").

16. In return for their investment proceeds, the COPs investors were promised payments of principal and interest, with a floating interest rate. The Corporations' ability to pay the COPs is totally dependent on the Service Contracts with, and revenue assignments from, the City. If the City fails to honor those contracts or assignments, the Corporations have no ability to pay COPs holders. To make the COPs more attractive to investors, the Corporations arranged for the purchase of insurance against a payment default on the COPs. Syncora provides this insurance.

17. To protect against what could have been uncapped interest rate exposure on the COPs depending on the movement of interest rates over time, the Corporations hedged that risk by entering into the Swap Agreements with UBS and SBS (with MLCS subsequently assuming certain of the rights and duties of SBS pursuant to certain Transaction Transfer Agreements). The Swap Agreements were structured such that the Corporations were obligated to make quarterly fixed payments to the Swap Counterparties while the Swap Counterparties, in exchange, were obligated to make quarterly floating payments tied to a LIBOR interest rate index, with a net payment being due to either the Corporations or the Swap Counterparties depending on the prevailing interest rates.

18. The basic idea of the Swap Agreements was to set the Corporations' overall interest rate obligations in respect of the COPs at a fixed amount, regardless of whether the

5

Corporations paid some or all of that interest amount to the COPs investors or to the Swap Counterparties.

19.    So, for example, if the agreed upon fixed amount were 6% and if prevailing interest rates were 4%, the Corporations would, in effect, pay 4% to the COPs investors and 2% to the Swap Counterparties, setting the Corporations' exposure at 6%. On the other hand, if prevailing interest rates rose to 9%, while the Corporations would pay 9% on the COPs, they would receive funds equal to 3% from the Swap Counterparties, ensuring that the Corporations net payment would still be only 6%. As an insurer of the COPs, Syncora also benefits from this arrangement.

20.    For the benefit of the Swap Counterparties, the Corporations also acquired from Syncora insurance against the Corporations' non-payment of amounts due under the Swap Agreements.

***Syncora's Protections Relating to the Swap Agreements***

21.    Wary of losing the valuable protection that the Swap Agreements provided against the impact of interest rate movements on the Corporation's COP obligations and thus Syncora's potential insurance liabilities, Syncora ensured in the Amended and Restated Schedules to the Swap Agreements (the "Swap Schedules") that it "shall be an express third-party beneficiary … of this Agreement" with the power to enforce and police the Swap Agreements. *See* UBS Swap Schedules at Part 5(xi); SBS Swap Schedules at Part 5(k). Syncora also negotiated extensive consent rights as a condition precedent to any termination of the Swap Agreements by either the Swap Counterparties or the Corporations.

22.    For example, the Swap Schedules provide that, if there is a Termination Event or an Event of Default (as those terms are defined in the Swap Agreements), neither the Corporations nor the Swap Counterparties "shall designate an Early Termination Date pursuant

6

to Section 6 of this Agreement … without the prior written consent of the Swap Insurer." Syncora is the only Swap Insurer under the Swap Agreements. *See* UBS Swap Schedules at Part 5(i); SBS Swap Schedules at Part 5(a). The Swap Schedules go on to confirm that even if the Swap Counterparties were to designate an Early Termination Date as to other transactions, that designation shall not apply to the Swap Agreements "unless expressly provided in such designation and agreed to in writing by the Swap Insurer." *See* UBS Swap Schedules at Part 5(xiv); SBS Swap Schedules at Part 5(n).

23.     Similarly, Paragraph 8(b) of the Swap Agreements, as amended, provides that "[n]o amendment, modification or waiver in respect of this Agreement or any Credit Support Document will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties and the Swap Insurer." Accordingly, the Swap Agreements also may not be amended, modified or waived without Syncora's consent.

24.     There have been multiple Termination Events and/or Events of Default under the Swap Agreements arising from recent events in the City of Detroit, including continuing cross defaults caused by the City's failure on June 17, 2013 to make a $40 million payment to the Corporations that was necessary for them, in turn, to meet their obligations in connection with the COPs. The existence of these Events of Default and/or Termination Events are not in dispute by any of the parties to this action. Indeed, the Swap Counterparties themselves represented in the Forbearance Agreement that "one or more Events of Default and/or Additional Termination Events has occurred" under the Swap Agreements.

25.     Thus, under the plain language of the Swap Agreements, neither the Swap Counterparties nor the Corporations may designate an Early Termination Date for the termination of the Swap Agreements unless they first obtain Syncora's prior written consent.

7

*Agreement To Terminate The Swap Agreements*

26.    On July 15, 2013, the Swap Counterparties, the Corporations and the City entered into the Forbearance Agreement.  Among other things, the Forbearance Agreement provides the City with the option to issue an "Optional Termination Notice" to the Swap Counterparties that would direct them to exercise their so-called "Optional Termination Right" to terminate the Swap Agreements as of a termination date set forth in the Notice.  The City must exercise the option on or before March 13, 2014.

27.    At the time the City exercises the option, the Forbearance Agreement provides that it must pay to the Swap Counterparties a specified buy-out amount that is either 75%, 77% or 82% of the value of the Swap Agreements, depending on when the option is exercised.  The earlier that the City issues its Optional Termination Notice directing the Swap Counterparties to terminate the Swap Agreements, the lower the buy-out amount, rendering it likely that the City will issue such a notice shortly.

28.    As part of the Forbearance Agreement, the Swap Counterparties represent that it is "the view of the Swap Counterparties that … each of SBS and UBS has the right to designate an Early Termination Date for the related Swap Agreements" and that they have "the right (but not the obligation) to terminate the Swap Agreements as described in" enumerated sections of the Swap Schedules. The Swap Counterparties have also asserted in the Forbearance Agreement that SBS "is required to exercise [the right to terminate its Swap Agreements] at the direction of MLCS."

29.    However, the Swap Counterparties representations in the Forbearance Agreement that they have the right to designate an Early Termination Date for the Swap Agreements is contradicted by the terms of the Swap Agreements themselves which provide, as described above, that neither the Swap Counterparties nor the Corporations "shall designate an Early

8

Termination Date … without the prior written consent of the Swap Insurer [*i.e.,* Syncora]." The existence of Syncora's consent right is not mentioned in the Forbearance Agreement nor do any of the enumerated provisions from the Swap Agreements referenced in the Forbearance Agreement include the sections that provide for Syncora's consent rights.

30.     Nor can the Forbearance Agreement be interpreted as amending, modifying or waiving Syncora's consent right under the Swap Agreements.    As described above, any amendment, modification or waiver of the Swap Agreements would require Syncora's consent. No such consent was sought or provided in connection with the Swap Counterparties entry into the Forbearance Agreement.

31.     Syncora thus has immediate and serious concerns that the Swap Counterparties will imminently purport to designate an Early Termination Date and terminate the Swap Agreements without first obtaining Syncora's written consent.

32.     Syncora would suffer serious and irreparable harm if the Swap Agreements were terminated without its consent.   Termination of the Swap Agreements would eliminate the cost certainty that the Corporations currently enjoy and, consequently, expose Syncora—as the insurer of the COPs obligations—to substantial interest rate risk for which it did not bargain. That risk to Syncora is particularly acute in the current environment when interest rates are on the rise and the protection against rising interest rates is thus of paramount importance.

33.     Syncora therefore brings this action seeking a declaratory judgment and permanent injunction to protect its important and valuable contractual rights under the Swap Agreements.

9

## Causes of Action

### First Cause of Action
### (Declaratory Judgment)

34.     Syncora repeats and re-alleges the allegations in paragraphs 1 through 33.

35.     An actual and justiciable controversy exists amongst the parties.

36.     The Swap Counterparties have asserted in the Forbearance Agreement that "each of SBS and UBS has the right to designate an Early Termination Date for the related Swap Agreement" and that they have "the right (but not the obligation) to terminate the Swap Agreements." The Swap Counterparties have also asserted in the Forbearance Agreement that SBS "is required to exercise [the right to terminate its Swap Agreements] at the direction of MLCS."

37.     In contrast, it is Syncora's position that, as set forth in the express terms of the Swap Agreements, the Swap Counterparties may not "designate an Early Termination Date … without the prior written consent of the Swap Insurer [*i.e.,* Syncora]." Syncora has never consented to an amendment, modification or waiver of this consent right and it therefore remains in force and effect.

38.     Upon information and belief, the Swap Counterparties will shortly purport to designate an Early Termination Date and terminate the Swap Agreements in contravention of the express terms requiring Syncora's prior consent.

39.     Accordingly, Syncora respectfully seeks a judgment declaring that (A) the Swap Counterparties may not terminate the Swap Agreements without Syncora's consent, (B) any purported termination of the Swap Agreements by the Swap Counterparties without Syncora's prior written consent will be void *ab initio* and of no force or effect.

10

## Second Cause of Action
### (Permanent Injunctive Relief)

40.    Syncora repeats and re-alleges the allegations in paragraphs 1 through 39.

41.    The Swap Counterparties have asserted in the Forbearance Agreement that "each of SBS and UBS has the right to designate an Early Termination Date for the related Swap Agreement" and that they have "the right (but not the obligation) to terminate the Swap Agreements." The Swap Counterparties have also asserted in the Forbearance Agreement that SBS "is required to exercise [the right to terminate its Swap Agreements] at the direction of MLCS."

42.    In contrast, it is Syncora's position that, as set forth in the express terms of the Swap Agreements, the Swap Counterparties may not "designate an Early Termination Date … without the prior written consent of the Swap Insurer [*i.e.,* Syncora]." Syncora has never consented to an amendment, modification or waiver of this consent right and it therefore remains in force and effect.

43.    Upon information and belief, the Swap Counterparties will shortly purport to designate an Early Termination Date and terminate the Swap Agreements in contravention of the express terms requiring Syncora's prior consent.

44.    Syncora would suffer irreparable harm if the Swap Agreements were terminated without its consent. Termination of the Swap Agreements would eliminate the cost certainty that the Corporations currently enjoy and, consequently, expose Syncora—as the insurer of the COPs obligations—to substantial interest rate risk for which it did not bargain.

45.    Accordingly, Syncora respectfully seeks an order permanently enjoining the Swap Counterparties from terminating the Swap Agreements without obtaining Syncora's prior written consent.

11

## Prayer for Relief

Syncora respectfully requests a judgment:

(a) declaring that the Swap Counterparties may not terminate the Swap Agreements without Syncora's consent;

(b) declaring that any purported termination of the Swap Agreements by the Swap Counterparties without Syncora's prior written consent will be void *ab initio* and of no force or effect;

(c) permanently enjoining the Swap Counterparties from terminating the Swap Agreements without obtaining Syncora's prior written consent; and

(d) providing such other relief as this Court deems just and proper.

DATED:   New York, New York
July 24, 2013

> QUINN EMANUEL URQUHART &
> SULLIVAN, LLP
>
> By: _____
> Jonathan E. Pickhardt
> Susheel Kirpalani
> Jake M. Shields
> Nicholas J. Calamari
> 51 Madison Avenue, 22nd Floor
> New York, New York 10038
> (212) 849–7000
>
> *Attorneys for Syncora Guarantee Inc.*

**EXHIBIT C**

**AMENDED AND RESTATED SCHEDULE**
**DATED AS OF JUNE 26, 2009**
**TO THE**
**1992 ISDA MASTER AGREEMENT**
**LOCAL CURRENCY SINGLE JURISDICTION**
**DATED AS OF**
**JUNE 7, 2006**

(General Retirement System/Syncora)

**BETWEEN**

| | | |
|---|---|---|
| **SBS FINANCIAL PRODUCTS COMPANY, LLC,** a Delaware limited liability company | and | **DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION,** a not-for-profit corporation organized under the laws of the State of Michigan |
| ("Party A") | | ("Party B") |

**Part 1.**

**Termination Provisions**

In this Agreement:

(a)     "*Specified Entity*" means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | NONE |
| Section 5(a)(vi), | NONE |
| Section 5(a)(vii), | NONE |
| Section 5(b)(ii), | NONE |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | NONE |
| Section 5(a)(vi), | NONE |
| Section 5(a)(vii), | NONE |
| Section 5(b)(ii), | NONE |

(b)     "*Specified Transaction*" will have the meaning specified in Section 12 of this Agreement.

(c)     The "*Cross Default*" provisions of Section 5(a)(vi) of this Agreement, as modified below, will apply to Party A and to Party B.  Section 5(a)(vi) of this Agreement is hereby amended by the addition of the following at the end thereof:

*"provided, however*, that notwithstanding the foregoing, an Event of Default shall not occur under either (1) or (2) above if, as demonstrated to the reasonable satisfaction of the other party, (a) the event or condition referred to in (1) or the failure to pay referred to in (2) is a failure to pay caused by an error or omission of an administrative or operational nature; and (b) funds were available to such party to enable it to make the relevant payment when due; and (c) such relevant payment is made within three Business Days following receipt of written notice from an interested party of such failure to pay."

If such provisions apply:

***"Specified Indebtedness"*** means any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) for the payment or repayment of any money.

***"Threshold Amount"*** means:

(i)     with respect to Party A, an amount equal to 2% of shareholders' equity (howsoever described) of Party A as shown on the most recent annual audited financial statements of Party A and

(ii)     with respect to Party B, $10,000,000.

(d)     *The **"Credit Event Upon Merger"*** provisions of Section 5(b)(ii) will apply to Party A and Party B, amended as follows:

"Credit Event Upon Merger" shall mean that a Designated Event (as defined below) occurs with respect to a party, any Credit Support Provider of the party or any applicable Specified Entity (any such party or entity, "X"), and such Designated Event does not constitute an event described in Section 5(a)(viii) but the creditworthiness of X, or, if applicable, the successor, surviving or transferee entity of X, is materially weaker than that of X immediately prior to such event. In any such case the Affected Party shall be the party with respect to which, or with respect to the Credit Support of which, the Designated Event occurred, or, if applicable, the successor, surviving or transferee entity of such party. For purposes hereof, a Designated Event means that, after the date hereof:

(i)     X consolidates, amalgamates with or merges with or into, or transfers all or substantially all its assets to, or receives all or substantially all the assets or obligations of, another entity; or

(ii)     any person or entity acquires directly or indirectly the beneficial ownership of equity securities having the power to elect a majority of the board of directors of X or otherwise acquires directly or indirectly the power to control the policy-making decisions of X."

(e)     *The **"Automatic Early Termination"*** provision of Section 6(a) will not apply to Party B and will apply to Party A; *provided, however*, that with respect to a party, where the Event of Default specified in Section 5(a)(vii)(1), (3), (4), (5), (6) or to the extent analogous thereto, (8) is governed by a system of law which does not permit termination to take place after the occurrence

of the relevant Event of Default, then the Automatic Early Termination provisions of Section 6(a) will apply to such party or Party B.

(f)     ***"Payments on Early Termination".***  For the purpose of Section 6(e) of this Agreement:

     (i)     Market Quotation will apply.

     (ii)     The Second Method will apply, except as modified as provided in Parts 6 and 7 hereof.

(g)     "Termination Currency" means U.S. Dollars.

(h)     There shall be added to Section 5(a) of the Agreement the following Events of Default:

     "(ix)     Authority; Repudiation.  Party B shall cease to have authority to make payments under this Agreement or any Transaction subject to this Agreement, or any government entity having jurisdiction over Party B shall enact any legislation which would have the effect of repudiating this Agreement or any Transaction subject to this Agreement."

     "(x)     Amounts payable by Party B to Party A hereunder shall cease to be payable and secured in accordance with the terms specified in Part 4(b)(ii)(g) of this Schedule."

(i)     ***"Additional Termination Event"*** will apply to Party A and to Party B.  In addition to the Additional Termination Events set forth in Part 5 of this Schedule, the following shall constitute Additional Termination Events.

     (i)     ***Party A Additional Termination Events.***  Party A or its Credit Support Provider's long-term senior unsecured debt rating from (a) S&P is withdrawn, suspended or falls below "BBB-", or (b) Moody's is withdrawn, suspended or falls below "Baa3".

     For purposes of the foregoing Termination Event in this Part 1(i)(i), the sole Affected Party shall be Party A and all Transactions shall be Affected Transactions.

     (ii)     ***Party B Additional Termination Events.***

          (1)     The City Payments made in any Month, in aggregate, are less than the Holdback Requirement for such Month; or

          (2)     The City fails to make an appropriation in the City's final annual budget adopted pursuant to and in compliance with the City Charter prior to the commencement of any Fiscal Year and to maintain such appropriation without limitation, transfer or reduction throughout such Fiscal Year, on a line item basis authorizing exclusively payment of the City Payments and as a "first budget" obligation, of an amount at least equal to the Regular Custodian Payments scheduled to become due during the Fiscal Year plus an amount equal to *the greater* of (X) the amount of the Hedge Periodic Payables under the Hedges scheduled to become due during the Fiscal Year without giving effect to any netting and (Y) for the first Fiscal Year

commencing July 1, 2009, $49,936,975 and, for each subsequent Fiscal Year thereafter, $50,736,975; or

(3)     The Quarterly Coverage as of the end of any Month is less than 1.75; or

(4)     Either (1) the unenhanced rating on the 2006 Pension Funding Securities assigned by S&P falls below "BB" or the unenhanced rating on the 2006 Pension Funding Securities assigned by Moody's falls below "Ba2" and as of the immediately preceding Month's end the Quarterly Coverage is 2.15 or less, or (2) the unenhanced rating on the 2006 Pension Funding Securities assigned by S&P is withdrawn, suspended or reduced below "BB-" or the unenhanced rating on the 2006 Pension Funding Securities assigned by Moody's is withdrawn, suspended or reduced below "Ba3"; or

(5)     At any time following a Ratings Upgrade, the unenhanced rating on the 2006 Pension Funding Securities is withdrawn, suspended or reduced below "BBB-" by S&P or withdrawn, suspended or reduced below "Baa3" by Moody's; or

(6)     The City, a Service Corporation, or a third party shall commence litigation or take any other judicial action, or any legislative action is taken, to set aside or avoid or limit the 2006 Transaction, the City Pledge, the Service Corporation Security Interest, or the Service Corporation Pledge or any other part of the Definitive Documents or the Settlement Transaction (other than with respect to a Developer Agreement), or if the Authorizing Ordinance or any part thereof shall be amended (without the consent of Party A), revoked, rescinded, nullified or suspended for any reason; or

(7)     The City shall rescind, reduce or cease to impose the tax currently imposed as of the Amendment Effective Date by Section 18-14-3 of the Detroit City Code or the City, within two Business Days following the earlier to occur of notice from the Collateral Agreement Custodian that a taxpayer has inadvertently or erroneously paid the Wagering Tax Property directly to the City or the Finance Director learning of such payment, shall fail to transfer by wire transfer in same day funds to the Collateral Agent Custodian for deposit into the General Receipts Subaccount such payment. However, the rescinding of such tax shall not result in a Termination Event hereunder if such tax is then collected by the State of Michigan pursuant to Section 12(1) of the Wagering Tax Revenue Statute and an amount of such collections equal to or greater than the tax imposed as of the Amendment Effective Date is paid to the Collateral Agreement Custodian under arrangements satisfactory to Party A; or

(8)     The City fails to pay any Service Charges, Accrued Service Charges, Regular Scheduled Payments or Sinking Fund Installments as and when due and payable under either Service Contract; or

(9) The City fails to pay when due any principal of, or interest on, any indebtedness for borrowed money, other than Excluded Indebtedness, aggregating $1,000,000 or more or any other event shall occur the effect of which is to cause, or to permit the holder or holders of such indebtedness (or a trustee or agent on behalf of such holder or holders) to cause such indebtedness to become due, or to be prepaid in full (whether by redemption, purchase, offer to purchase or otherwise), prior to its stated maturity, in each case after giving effect to any applicable grace period requiring notice or the lapse of time or both; or

(10) The City fails to pay any judgment or judgments aggregating $1,000,000 or more, excluding judgments (1) on appeal and being contested in good faith, (2) for which the City has reached an agreement with the judgment creditor as to the timing and manner of payment that does not involve the imposition of any additional ad valorem property taxes above the Property Tax Threshold and with which agreement the City is in compliance or (3) for which the City is diligently making arrangements for payment and the delay in payment will not result in the City being held in contempt of court for nonpayment or in the imposition of a lien on the City's general funds or the imposition of any additional ad valorem property taxes in excess of the Property Tax Threshold; or

(11) The City commences a case or files a petition seeking relief under the Bankruptcy Code or any other insolvency law or procedure, consents to an order of relief in any such proceeding or to the filing of any such petition, seeks or is subject to the appointment of a receiver or an emergency financial manager for all or any substantial part of its assets or makes an assignment for the benefit of its creditors, or if the Governor of the State of Michigan determines that a financial emergency exists in the City.

For purposes of the foregoing Termination Events in this Part 1(i)(ii), the sole Affected Party shall be Party B and all Transactions shall be Affected Transactions.

(j)    *Default Rate.*  Notwithstanding anything to the contrary in the Agreement, the Default Rate applicable to any amount owed by Party B to Party A during the Term Payment Period shall be LIBOR plus 9% (the "Specified Default Rate"), where "LIBOR" is determined (i) with respect to the remainder of the first Fiscal Year following a Specified Additional Termination Event, as the arithmetic average of USD-LIBOR-BBA (as defined in the 2006 ISDA Definitions, with a Designated Maturity of three months) as of the close of business on the fifteenth (15th) day of the three calendar months immediately preceding such Specified Additional Termination Event and, (ii) with respect to each subsequent Fiscal Year, as the arithmetic average of USD-LIBOR-BBA (as defined in the 2006 ISDA Definitions, with a Designated Maturity of three months) as of the close of business on the fifteenth (15th) day of March, April and May of the immediately preceding Fiscal Year.

(k)     **Remedies.**  In addition to all other remedies available hereunder and which remain unaffected hereby, following the designation of an Early Termination Date hereunder resulting from an Event of Default or Termination Event with respect to which Party B is the Defaulting Party or sole Affected Party, as the case may be, Party A shall have the remedies available to it as a secured party to enforce the Service Corporation Pledge, the Service Corporation Security Interest and the City Pledge.  Such remedies of Party A as a secured party under the Service Corporation Pledge and Service Corporation Security Interest shall include the exercise of all rights and remedies otherwise available to the Service Corporations as secured parties under the City Pledge, including the right to cause the Pledged Property to be applied to the obligations owing to Party A hereunder up to the amounts then appropriated.  Furthermore, such remedies include the right to cause the Pledged Property to be applied to the obligations owing to the Swap Counterparties under the Hedges up to the amounts then appropriated and, to the extent that not all amounts for all obligations owing to the Swap Counterparties have been appropriated, the right to use judicial process to obtain appropriations and to exercise any other equitable remedies available to the Swap Counterparties against the Service Corporations and the City, as a Michigan home rule city, in respect of such unappropriated amounts; provided, however, that if an Early Termination Date is designated by Party A hereunder as a result of a Specified Additional Termination Event, Party A shall forbear from exercising any remedies as a secured party against the Pledged Property during the Term Payment Period.

(l)     **Waiver and Rescission.**  As of the Amendment Effective Date, Party A waives its right to declare an Early Termination Date, and hereby rescinds any previously delivered notice of Termination Event and/or designation of an Early Termination Date, in connection with the Additional Termination Event set forth, prior to the Amendment Effective Date, in Part 5(b)(ii)(3) of the Schedule to this Agreement.

(m)     **Amendment Effective Date Representations of Party B.**  Party B hereby further represents that, as of the Amendment Effective Date:

>       (i)     The City has given an Irrevocable Instruction to each Casino Licensee and Developer.

>       (ii)     No action, proceeding or investigation has been instituted, nor has any order, judgment or decree been issued or proposed to be issued by any court, agency or authority to set aside, restrain, enjoin or prevent the consummation of any transaction contemplated hereby or seeking material damages against the City, a Service Corporation or either Swap Counterparty in connection with the amendment and restatement of the Schedule to this Agreement or the Settlement Transaction.

(n)     **Indemnification.**

>       (i)     To the extent permitted by law, Party B shall defend and hold harmless Party A from and against any and all losses, damages, liabilities, and expenses incurred and paid (each, a "liability") by Party A arising out of or resulting from the commencement or continuation of any litigation, judicial action, or legislative action of the kind described in Part 1(i)(ii)(6) hereof.

(ii)    If, for so long as this Agreement is in effect, Party A has actual notice or knowledge of any claim or loss for which indemnification by Party B is asserted, Party A shall give to Party B written notice within such time as is reasonable under the circumstances, describing such claim or loss in reasonable detail. However, any delay or failure of Party A to give the notice shall not affect Party B's indemnification obligations except to the extent that Party B was prejudiced by the delay or failure.

(iii)    If a demand or claim for indemnification is made hereunder with respect to losses the amount or extent of which is not yet known or certain, then the notice of demand for indemnification shall so state, and, where practicable, shall include an estimate of the amount of the losses.

(iv)    In the case of actual notice of indemnification hereunder involving any litigation, arbitration or legal proceeding, Party B shall have responsibility to, and shall employ counsel, and shall assume all expense with respect to, the defense or settlement of such claim.

(v)    Notwithstanding Party B's assumption of the defense, Party A shall have the right to employ separate counsel and to participate in the defense of such action, and Party B shall bear the reasonable out of pocket fees, costs and expenses of such separate counsel if:

(1)    other than under Part 1(i)(ii)(6) hereof, a Termination Event or Event of Default has occurred hereunder, other than a Specified Additional Termination Event;

(2)    other than under Part 1(i)(ii)(6) hereof, the Term Period End Date has occurred;

(3)    the result of the use of counsel chosen by Party B to represent Party A would present such counsel with a conflict of interest;

(4)    the actual or potential defendants in, or targets of, any such action include Party A and Party A shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to Party B;

(5)    Party B shall not have employed counsel reasonably satisfactory to Party A to represent Party B within a reasonable time after notice of the institution of such action; or

(6)    Party B, in its discretion, shall authorize Party A to employ separate counsel at Party B's expense.

Party B shall not be liable under this Agreement for any amount paid by Party A to settle any claims or actions if the settlement is entered into without Party B's consent which

may not be unreasonably withheld or delayed. Each of Party A and Party B hereby agrees and acknowledges that any amount in respect of indemnification payable by Party B to Party A in accordance with this Part 1(n) is an expense that may not be claimed and is not payable under the Swap Insurance Policy.

## Part 2.

### Agreement to Deliver Documents

For the purpose of Sections 3(d) and 4(a) of this Agreement, each party agrees to deliver the following documents:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Evidence of the authority and true signatures of each official or representative signing this Agreement or, as the case may be, a Confirmation, on its behalf. | On or before execution of this Agreement and each Confirmation forming a part of this Agreement. | Yes |
| Party A | Opinion of Counsel to Party A in a form reasonably satisfactory to Party B. | On or before execution of this Agreement. | No |
| Party B | Covered Indenture as hereinafter defined. | On or before execution of this Agreement. | Yes |
| Party B | Certified copy of the resolution of Party B's Board of Directors (or equivalent authorizing documentation) authorizing the execution and delivery of this Agreement and each Confirmation and performance of its obligation hereunder. | On or before execution of this Agreement. | Yes |
| Party B | A copy of Party B's audited annual financial statements prepared in accordance with generally accepted accounting principles within the United | On or before the 365th day after the end of Party B's fiscal year. | Yes |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | States. | | |
| Party B | A copy of the City's audited annual financial statements prepared in accordance with generally accepted accounting principles within the United States. | Within 15 days of public availability, but in any case no later than 365 days after the end of the City's fiscal year. | Yes |
| Party B | A copy of the City's quarterly financial statements. | If and when the City prepares such quarterly reports, when such quarterly reports become publicly available. | Yes |
| Party B | Opinion of legal counsel to Party B in form and substance satisfactory to Party A. | On or before execution of this Agreement. | No |
| Party B | Commitment to issue each Swap Insurance Policy (as such term is defined in Part 4 hereof). | On or before the execution of this Agreement with respect to the initial Insured Rate Swap Transaction hereunder, and thereafter on or before the Trade Date of each subsequent Insured Rate Swap Transaction. | No |
| Party B | Swap Insurance Policy and the Opinion of counsel to the Swap Insurer with respect to such Swap Insurance Policy in form and substance satisfactory to Party A. | On or before the delivery of the related 2006 Pension Funding Securities to the underwriters with respect to the initial Insured Rate Swap Transaction hereunder, and | No |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | | thereafter on or before execution of the Confirmation evidencing each subsequent Insured Rate Swap Transaction. | |
| Party B | Confirmations, updates and additional documentation concerning the opinion of counsel, board resolutions and certificates delivered pursuant to each of the foregoing documents to be delivered as Party A may reasonably request. | Prior to the Effective Date of each Transaction after the initial Transaction hereunder. | Yes |
| Party B | Certified copy of the Service Contract together with an opinion of Certificate Counsel in form and substance satisfactory to Party A which addresses each of the Sources of Payment set forth in Section 3(g) of this Agreement. | On or before execution of the Service Contract. | No |
| Party B | Authorizing Ordinance | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of Lewis & Munday, a Professional Corporation, special counsel to the City and Party B, in form and substance satisfactory to Party A, including customary opinions given in connection with municipal financing transactions and addressing the items identified on Exhibit | On or prior to the Amendment Effective Date | No |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | A hereto next to such counsel's name | | |
| Party B | An opinion of the City Corporation Counsel, in form and substance satisfactory to Party A, addressing the items identified on Exhibit A hereto next to such counsel's name. | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of Orrick, Herrington & Sutcliffe LLP, special counsel to the City, in form and substance satisfactory to Party A, addressing the items identified on Exhibit A hereto next to such counsel's name. | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of special tax counsel to the City, in form and substance satisfactory to Party A, addressing the items identified on Exhibit A hereto next to such counsel's name. | On or prior to the Amendment Effective Date | No |
| Party B | To the extent not duplicative with any other document to be delivered in this Part 2, each document required to be delivered under Section 2.4 of the Collateral Agreement. | On or prior to the Amendment Effective Date | Yes |

## Part 3.

## Miscellaneous

(a) *Addresses for Notices.* For the purposes of Section 10(a) of this Agreement:

(i) All notices or communications to Party A shall, with respect to a particular Transaction, be sent to the address, telex number, or facsimile number reflected in the Confirmation of that Transaction, and any notice for purposes of Sections 5 or 6 shall be sent to:

SBS Financial Products Company, LLC
Wall Street, 22nd Floor
New York, NY 10005
Attention: John Carter
Telephone: (646) 775-4880
Facsimile: (646) 576 - 9684

(ii)     All notices or communications to Party B shall be sent in care of the Contract Administrator to the address as set forth in Section 10.1 of the Contract Administration Agreement.

(iii)     A copy of all notices or communications to either Party A or Party B shall be sent to the address, or facsimile number reflected below:

Syncora Guarantee Inc.
(formerly known as XL Capital Assurance Inc.)
1221 Avenue of the Americas
New York, New York  10020
Attention:  Surveillance
Telephone: (212) 478-3400
Facsimile:  (212) 478-3597

(b)     **Offices.**  Party A, if it enters into a Transaction through an Office other than its head or home office represents to Party B that, notwithstanding the place of booking office or jurisdiction of incorporation or organization, the obligations of Party A are the same as if it had entered into the Transaction through its head or home office.  This representation will be deemed to be repeated by Party A on each date on which a Transaction is entered into.

(c)     **Calculation Agent.**  The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(d)     **Credit Support Document.**  With respect to Party A: (i) the Credit Support Annex dated the date hereof between Party B and Merrill Lynch Capital Services, Inc. ("MLCS"); (ii) the Transaction Transfer Agreement (the "Transfer Agreement") dated the date hereof between Party A, Party B and MLCS; and (iii) the Guarantee of Merrill Lynch & Co., Inc. ("ML&Co.") with respect to the Transfer Agreement.  With respect to Party B: (i) the Service Contracts and the Contract Administration Agreement (collectively, the "Covered Indenture") and (ii) the Collateral Agreement.

(e)     **Credit Support Provider.**  Credit Support Provider means:  With respect to Party A, MLCS and ML&Co. and with respect to Party B, none.

(f)     **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of New York; *provided, however,* that the corporate powers and legal capacity of Party B shall be governed by and construed in accordance with the laws of the State of Michigan.

(g) **_Jurisdiction._** Section 11(b)(i) of this Agreement is deleted in its entirety and replaced by the following:

    (i)     submits to the extent permitted by law to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

(h) **_Waiver of Immunities._** Section 11(c) of this Agreement is deleted in its entirety and replaced by the following:

    "**_Waiver of Immunities._** Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues, all immunity on the grounds of sovereignty or other similar grounds from (i) suit in a breach of contract action, (ii) relief by way of injunction, order for specific performance or for recovery of property and (iii) execution or enforcement of any judgment to which it or its revenues might otherwise be entitled in any Proceedings, and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any such Proceedings."

(i) **_Netting of Payments._** Subparagraph (ii) of Section 2(c) of this Agreement will apply.

(j) **_"Affiliate"_** will have the meaning specified in Section 12 of this Agreement.

## Part 4.

## Other Provisions

(a) **_Intentionally Omitted._**

(b) **_Additional Representations._**

    (i)     The first sentence of Section 3 is amended to read in its entirety as follows:

    "Each party represents to each other party (which representations will be deemed to be repeated on each date on which a Transaction is entered into and, in the case of the representations in Section 3(a), (e) and (f) of this Agreement, at all times until the termination of this Agreement) the following:"

    (ii)    Section 3 is amended by adding the following subsections (e), (f) and (g) thereto:

    (e)    <u>Non-Speculation</u>. Party B represents and warrants to Party A that this Agreement has been, and each Transaction hereunder will be, entered into for purposes of managing of its borrowings or investments or in connection with a line of

business and not for the purpose of speculation;

(f)    <u>Eligible Contract Participant.</u>  Each party is an "eligible contract participant" under, and as defined in, Section 1a(12) of the Commodity Exchange Act, as amended (7 U.S.C. § 1a(12)); and

(g)    <u>Sources of Payment.</u>  As provided in the Contract Administration Agreement, all payments due under this Agreement from Party B to Party A are payable from and secured by amounts owing by the City to Party B pursuant to the Service Contract in respect of Hedge Payables. Such amounts are payable by the City from all available revenues of the City's General Fund (as delineated in the City's audited financial statements). If the City were to fail to pay any amount owing in respect of a Hedge Payable when due, Party A (or the Contract Administrator, if authorized by Party A to so act on Party A's behalf) could pursue remedies against the City to enforce that contractual obligation and the City would be required to pay any resulting judgment against it. If the City were to fail to provide for payment of any such judgment, a court can compel the City to raise the payment through the levy of taxes, as provided in the Revised Judicature Act of 1961, Act No. 236 of the Michigan Public Acts of 1961, as amended (Michigan Compiled Laws Section 600.6093), without limit as to rate or amount. In addition, all amounts due from Party B hereunder are secured by and payable from the Pledged Property (including, but not limited to, amounts held in the Holdback Account) in accordance with the terms of the Collateral Agreement.

(c)    ***Additional Agreements.***

<u>Compliance with Covered Indenture.</u> Party B will observe, perform and fulfill each provision in the Covered Indenture applicable to Party B. Party B hereby agrees not to amend, supplement, modify or waive any provision of the Covered Indenture without the consent of Party A if such amendment, supplement, modification or waiver would: (i) change any of the payment times, amounts, obligations, terms or any other payment-related provision in any Service Contract applicable to the City; (ii) impair any right Party B may have under the Service Contract to enforce payments from the City, or impair any right Party A may have under the Covered Indenture to enforce its security interest granted therein or any other right thereunder; or (iii) permit the creation of any new lien ranking prior to or on a parity with, or terminate, or deprive Party A of the security afforded to it by Sections 8.02 and 8.03 of the Service Contracts or Section

2.4 of the Contract Administration Agreement (collectively, the "Incorporated Provisions"). The Incorporated Provisions are hereby incorporated by reference and made a part of this Agreement to the same extent as if such provisions were set forth herein. Any amendment, supplement, modification or waiver of any of the Incorporated Provisions without the prior written consent of the other party hereto shall have no force and effect with respect to this Agreement. Any amendment supplement or modification for which such consent is obtained shall be part of the Incorporated Provisions for purposes of this Agreement. Party B shall not assign or transfer its right or obligations under the Covered Indenture without the prior written consent of the other party hereto and the Swap Insurer.

(d) **Relationship Between Parties.** Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i) Non-Reliance. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii) Assessment and Understanding. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii) Status of Parties. The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(e) **Waiver of Jury Trial. EACH PARTY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS RELATING TO THIS AGREEMENT OR ANY CREDIT SUPPORT DOCUMENT.**

(f) **Consent to Recording.** Each party (i) consents to the recording of all telephone conversations between trading, operations and marketing personnel of the parties and their Affiliates in connection with this Agreement or any potential Transaction; (ii) agrees to give notice to such personnel of it and its Affiliates that their calls will be recorded; and (iii) agrees that in any Proceedings, it will not object to the introduction of such recordings in evidence on grounds that consent was not properly given.

(g)     **Scope of Agreement.**  The Transactions entered into between the parties June 6, 2006 and June 2, 2005 and any other specific Specified Transactions designated in writing by the parties hereto after the date hereof, shall be subject to the terms hereof.

(h)     **Indemnification Limited to Extent of Applicable Law.**  The parties acknowledge that Party B's authority to indemnify Party A, as required by Section 9 of the Agreement, for expenses, fees and taxes may be limited by Michigan law and Party B's obligation to indemnify Party A could be limited to the extent of applicable law.

(i)     **Additional Definitions.**  Section 12 is hereby amended by adding the following definitions:

"2006 Funding Trust" shall have the meaning specified in the Collateral Agreement.

"2006 Pension Funding Securities" shall have the meaning specified in the Collateral Agreement.

"2006 Transactions" shall have the meaning specified in the Collateral Agreement.

"Accounts" shall have the meaning specified in the Collateral Agreement.

"Accrued Service Charges" shall have the meaning specified in the Service Contracts.

"Amendment Effective Date" means June 26, 2009.

"Authorizing Ordinance" shall have the meaning specified in the Collateral Agreement.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

"Casino Licensee" shall have the meaning specified in the Collateral Agreement.

"City" means the City of Detroit, Michigan.

"City Charter" means the Charter of the City of Detroit, Michigan.

"City Clerk" means the Clerk of the City of Detroit, Michigan.

"City Council" means the Council of the City of Detroit, Michigan.

"City Payment" shall have the meaning specified in the Collateral Agreement.

"City Pledge" shall have the meaning specified in the Collateral Agreement.

"Closing Date" shall have the meaning specified in the Collateral Agreement.

"Collateral Agreement" means that certain Collateral Agreement dated as of June 15, 2009, among Party A, Party B, PFRS, UBS, the City, U.S. Bank National Association and Merrill Lynch Capital Services, Inc.

"Collateral Agreement Custodian" means the person identified as the "custodian" under the Collateral Agreement and any successor thereto.

"Contract Administration Agreement" means the Contract Administration Agreement 2006 dated June 12, 2006 among Detroit Retirement Systems Funding Trust 2006, Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation, severally and not jointly, U.S. Bank National Association, separately and not as Trustee of the Detroit Retirement Systems Funding Trust 2006 and the Hedge Counterparties Named Therein.

"Counterparty(ies)" shall have the meaning specified in the Collateral Agreement.

"Covered Indenture" means the Service Contracts together with the Contract Administration Agreement.

"Definitive Documents" shall have the meaning specified in the Collateral Agreement.

"Detroit General Retirement System Service Contract" means the Detroit General Retirement System Service Contract dated June 7, 2006 between Party B and the City.

"Detroit Police and Fire Retirement System Service Contract" means the PFRS Service Contract dated June 7, 2006 between the Detroit Police and Fire Retirement System Service Corporation and the City.

"Developer" shall have the meaning specified in the Collateral Agreement.

"Developer Agreement" shall have the meaning specified in the Collateral Agreement.

"Excluded Indebtedness" shall have the meaning specified in the Collateral Agreement.

"Finance Director" shall have the meaning specified in the Collateral Agreement.

"Fiscal Year" shall have the meaning specified in the Collateral Agreement.

"General Receipts Subaccount" shall have the meaning specified in the Collateral Agreement.

"Hedge" shall have the meaning specified in the Collateral Agreement.

"Hedge Payable" shall have the meaning specified in the Service Contracts.

"Hedge Periodic Payables" shall have the meaning specified in the Service Contracts.

"Holdback Account" shall have the meaning specified in the Collateral Agreement.

"Holdback Requirement" shall have the meaning specified in the Collateral Agreement.

"Irrevocable Instructions" shall have the meaning specified in the Collateral Agreement.

"MCL" means the Michigan Compiled Laws.

"Month" shall have the meaning specified in the Collateral Agreement.

"Moody's" means Moody's Investors Service, Inc.

"Office" means a branch or office of a party, which may be such party's head or home office.

"PFRS" means the Detroit Police and Fire Retirement System Service Corporation.

"Pledged Property" shall have the meaning specified in the Collateral Agreement.

"Property Tax Threshold" shall have the meaning specified for the "Threshold" in the Collateral Agreement.

"Quarterly Coverage" shall have the meaning specified in the Collateral Agreement.

"Ratings Upgrade" shall have the meaning specified in the Collateral Agreement.

"Regular Custodian Payment" shall have the meaning specified in the Collateral Agreement.

"Regular Scheduled Payments" shall have the meaning specified in the Service Contracts.

"Revenues" shall have the meaning specified in the Collateral Agreement.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Service Charges" shall have the meaning specified in the Service Contracts.

"Service Contracts" means the Detroit General Retirement System Service Contract and the Detroit Police and Fire Retirement System Service Contract.

"Service Corporations" means Party B and PFRS.

"Service Corporation Pledge" shall have the meaning specified in the Collateral Agreement.

"Service Corporation Security Interest" shall have the meaning specified in the Collateral Agreement.

"Settlement Transaction" shall have the meaning specified in the Collateral Agreement.

"Sinking Fund Installments" shall have the meaning specified in the Service Contracts.

"Specified Additional Termination Event" means each of the Additional Termination Events specified in Parts 1(i)(ii)(3), 1(i)(ii)(4), 1(i)(ii)(5), 1(i)(ii)(9) and 1(i)(ii)(10) of this Amended and Restated Schedule.

"Specified Event" shall have the meaning specified in the Collateral Agreement.

"Swap Counterparties" means, collectively, Party A and UBS and their respective successors and assigns.

"Swap Insurance Policy" means the Syncora Guarantee Inc. Insurance Policy issued by the Swap Insurer with respect to the Transaction(s) between Party A and Party B entered into pursuant to this Agreement.

"Swap Insurer" means Syncora Guarantee Inc. (formerly known as XL Capital Assurance Inc).

"Term Payment Period" shall have the meaning specified in the Collateral Agreement.

"Term Period End Date" shall have the meaning specified in the Collateral Agreement.

"UBS" means UBS AG.

"Wagering Taxes" shall have the meaning specified in the Collateral Agreement.

"Wagering Tax Property" shall have the meaning specified in the Collateral Agreement.

"Wagering Tax Revenue Statute" means the Michigan Gaming Control and Revenue Act, being MCL 432.201 et seq., MSA 18.969(201), et seq., as amended.

## Part 5.

### Insurer Provisions

The following provisions shall apply to any Transactions for which the Swap Insurance Policy has been issued by the Swap Insurer, for the account of Party B, as principal, and Party A, as beneficiary (the "Insured Rate Swap Transactions"):

(a)  ***Designation of Early Termination Date.*** Notwithstanding anything to the contrary in Section 6 of this Agreement, if any:

(i)  Event of Default in respect of any Insured Rate Swap Transaction under this Agreement occurs; or

(ii)  Termination Event (other than the Additional Termination Events set forth in Part 5(b) below) in respect of any Insured Rate Swap Transaction under this Agreement occurs;

then, in either such case, neither Party A nor Party B shall designate an Early Termination Date pursuant to Section 6 of this Agreement in respect of any such Insured Rate Swap Transaction without the prior written consent of the Swap Insurer.

(b)  ***Party B Additional Termination Events.*** The following shall each constitute an Additional Termination Event:

(i)     the Swap Insurer fails to meet its payment obligations under the Swap Insurance Policy and such failure is continuing with respect to the Swap Insurer under the Swap Insurance Policy; or

(ii)    the Swap Insurer fails to have a claims-paying ability rating of at least "A-" from S&P or a financial strength rating of at least "A3" from Moody's; *provided*, *however*, that additionally:

> (1)     an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party; or

> (2)     a Termination Event has occurred or is continuing with respect to Party B as the Affected Party; or

(iii)   An Insurer Event has occurred and is continuing; *provided*, *however*, that additionally:

> (1)     an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party; or

> (2)     a Termination Event has occurred or is continuing with respect to Party B as the Affected Party.

Any of the following shall be considered an "Insurer Event":

> (1)     the Swap Insurer is in conservation, liquidation or receivership under the New York Insurance Laws; or

> (2)     the Swap Insurer (a) fails to have (1) a claims-paying ability rating of at least "AAA" from S&P, or (2) a financial strength rating of at least "Aaa" from Moody's; and (b) fails to pay obligations for indebtedness for money borrowed or to meet then-current policy obligations for which claims have been properly presented in a aggregate amount in excess of $100,000,000, which failure to make payment (in whole or in part) is not due to: (u) administrative error; (v) Swap Insurer action to contest a claim; (w) an order from, or action by, a regulator of the Swap Insurer which forbids, delays or impedes such payment, except in connection with a Swap Insurer insolvency, conservation or receivership; (x) the occurrence of an act of God which prevents such payment; (y) the usual mechanisms or channels employed to make such payment being unavailable to the Swap Insurer through no fault of the Swap Insurer; (z) a statute, rule or order (including, but not limited to exchange controls) which forbids, delays or impedes either (i) such payment, other than in connection with a Swap Insurer insolvency, conservation or receivership, or (ii) the acquisition of, or payment in, a currency required in order to make such payment.

For purposes of any Additional Termination Event described under this Part 5(b), the sole "Affected Party" shall be Party B.

(c)     ***Insurer Directed Termination.*** Notwithstanding anything in this Agreement, if an Event of Default under this Agreement occurs with respect to Party B as the Defaulting Party or any Termination Event under this Agreement occurs with respect to Party B as the Affected Party, then the Swap Insurer (so long as it has not failed to make any payment under the terms and conditions of the Swap Insurance Policy) shall have the right (but not the obligation) upon notice to Party A to designate an Early Termination Date with respect to Party B with the same effect as if such designation were made by Party A. For purposes of the foregoing sentence, an Event of Default with respect to Party B shall be considered to be continuing, notwithstanding any payment by the Swap Insurer under the Swap Insurance Policy. Party A and Party B acknowledge that, except as the Swap Insurance Policy may be otherwise endorsed, unless (x) the Swap Insurer designates an Early Termination Date (as opposed to merely consenting to such designation by one of the parties) or (y) an Additional Termination Event specified in Part 5(b)(i) or (ii) has occurred, payments due from Party B because an Early Termination Date has been designated will not be insured. In any event, the parties acknowledge that pursuant to the Swap Insurance Policy that (i) the amount payable by the Swap Insurer in respect of payments due from Party B because an Early Termination Date has been designated by the Swap Insurer shall not be limited in amount, and (ii) the amount payable by the Swap Insurer in respect of payments due from Party B because an Early Termination Date has been designated by Party A shall not exceed the amount specified in the Swap Insurance Policy.

(d)     ***Amendments.*** Section 8(b) of the Agreement is hereby amended by (A) adding the words "or any Credit Support Document" after the word "Agreement" in the first line thereof and (B) adding the phrase "and the Swap Insurer" following the words "parties" in the third line thereof.

(e)     ***Transfers/Assignments.*** Notwithstanding Section 7 of the Agreement, except as provided in Part 6(c) hereof, neither party may transfer, assign or delegate its rights or duties with respect to an Insured Rate Swap Transaction under the Agreement, unless it receives the prior written consent of the Swap Insurer; *provided, however*, that Party A may assign or delegates its rights and duties without the Swap Insurer's prior written consent to a party (a) that meets the definition of "Reference Market Maker" (other than the ratings requirement set forth therein) and that has long-term senior unsecured debt ratings at least in the single –A category from Moody's and S&P or the Credit Support Provider of such party has claims paying ability ratings or financial strength ratings at least in the single –A category from Moody's and S&P and (b) that assumes the rights and duties of Party A pursuant to a master agreement that is substantially similar to this Agreement and in form and substance satisfactory to the Swap Insurer; and *provided, further*, that Party A may make such an assignment or delegation to an affiliate of Party A if Party A or its Credit Support Provider, provides a guarantee of the Insured Rate Swap Transaction that is reasonably acceptable in form and substance to the Swap Insurer.

(f)     ***No Suspension of Payments.*** Notwithstanding Section 2(a)(iii) of this Agreement, Party A shall not suspend any payments due under an Insured Rate Swap Transaction under Section 2(a)(iii) of the Agreement unless Party A has designated an Early Termination Date pursuant to the terms hereof.

(g) **No Netting.** Notwithstanding Section 2(c) of this Agreement, in no event shall either Party A or Party B be entitled to net its payment obligations in respect of the Insured Rate Swap Transactions against the payment obligations of the other party in respect of other Transactions under this Agreement if such Transactions are not Insured Rate Swap Transactions, nor may either Party A or Party B net the payment obligations of the other party under Transactions that are not Insured Rate Swap Transactions against the payment obligations of such party under Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under Insured Rate Swap Transactions be treated separate and apart from all other Transactions. Section 6(e) of this Agreement shall apply to all Insured Rate Swap Transactions with the same effect as if the Insured Rate Swap Transactions constituted a single master agreement. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Rate Swap Transactions shall be determined without regard to any Transactions other than the Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under the Insured Rate Swap Transactions be treated separate and apart from all other Transactions unless otherwise agreed to in writing by the Swap Insurer.

(h) **No Set-off for Counterclaim.** In no event shall either Party A or Party B be entitled to set-off its payment obligations in respect of an Insured Rate Swap Transaction against the payment obligations of the other party (whether by counterclaim or otherwise) under any other agreement(s) between Party A and Party B or instrument(s) or undertaking(s) issued or executed by one party to, or in favor of, the other party, if such obligations are not Insured Rate Swap Transactions, or net the payment obligations of the other party that are not with respect to Insured Rate Swap Transactions against the payment obligations of such party under Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under Insured Rate Swap Transactions be treated separate and apart from all other obligations. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Rate Swap Transaction shall be determined without regard to any obligation other than those under the Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under the Insured Rate Swap Transactions be treated separate and apart from all other obligations unless otherwise specified in such other obligation and agreed to in writing by the Swap Insurer.

(i) **Party A – Notice of Rating Downgrade, Suspension or Withdrawal.** Party A shall provide written notice to Party B and to the Swap Insurer of any downgrade, withdrawal or suspension of Party A's Credit Support Provider's long-term senior unsecured debt rating, within 15 Business Days of the occurrence of such event. Failure of Party A to provide such notice shall not constitute an Event of Default under this Agreement.

(j) **Representations and Agreements.** Each party agrees that each of its representations and agreements in this Agreement is expressly made to and for the benefit of the Swap Insurer.

(k) **Third-party Beneficiary.** Party A and Party B hereby each acknowledge and agree that the Swap Insurer shall be an express third-party beneficiary (and not merely an incidental third-party beneficiary) of this Agreement and of the obligations of each such party under any Insured Rate Swap Transaction, and as such, entitled to enforce the Agreement and the terms of any such

Insured Rate Swap Transaction against such party on its own behalf and otherwise shall be afforded all remedies available hereunder or otherwise afforded by law against the parties hereto to redress any damage or loss incurred by the Swap Insurer including, but not limited to, fees (including professional fees), costs and expenses incurred by the Swap Insurer which are related to, or resulting from any breach by such party of its obligations hereunder.

(l)    *Policy Coverage.* Party A and Party B hereby acknowledge and agree that the Swap Insurer's obligation with respect to Insured Rate Swap Transactions shall be limited to the terms of the Swap Insurance Policy. Notwithstanding Section 2(d) or any other provision of this Agreement, the Swap Insurer shall not have any obligation to pay interest on any amount payable by Party B under this Agreement.

(m)    *Subrogation.* Party A and Party B hereby acknowledge that to the extent of payments made by the Swap Insurer to Party A under the Swap Insurance Policy, the Swap Insurer shall be fully subrogated to the rights of Party A against Party B under the Insured Rate Swap Transaction to which such payments relate, including, but not limited to, the right to receive payment from Party B and the enforcement of any remedies. Party A hereby agrees to assign to the Swap Insurer its right to receive payment from Party B under any Insured Rate Swap Transaction to the extent of any payment thereunder by the Swap Insurer to Party A. Party B hereby acknowledges and consents to the assignment by Party A to the Swap Insurer of any rights and remedies that Party A has under any Insured Rate Swap Transaction or any other document executed in connection herewith.

(n)    *Isolation of Insured Rate Swap Transactions in Designating an Early Termination Date.*

    (i)    Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of non-Swap Insurer Insured Rate Swap Transactions by Party A or Party B shall not apply to any Insured Rate Swap Transactions under this Agreement, unless expressly provided in such designation and agreed to in writing by the Swap Insurer.

    (ii)    Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of the Insured Rate Swap Transactions by the Swap Insurer or by Party A or Party B shall apply only to the Insured Rate Swap Transactions and not to any other Transaction under this Agreement, unless expressly provided in such designation and agreed to in writing by the Swap Insurer. Nothing contained in this Part 5(n) shall affect the rights of Party A under this Agreement to designate an Early Termination Date in respect of any Transaction that is not an Insured Rate Swap Transaction, which designation shall not apply to the Insured Rate Swap Transactions.

(o)    *Expenses.* Party B agrees to reimburse the Swap Insurer immediately and unconditionally upon demand for all reasonable expenses incurred by the Swap Insurer in connection with the issuance of the Swap Insurance Policy and the enforcement by the Swap Insurer of Party B's obligations under this Agreement and any other documents executed in connection with the execution and delivery of this Agreement, including, but not limited to, fees (including

professional fees), costs and expenses incurred by the Swap Insurer which are related to, or resulting from, any breach by Party B of its obligations hereunder.

(p)     *Notices.* A copy of each notice or other communication between the parties with respect to this Agreement must be forwarded to the Swap Insurer by the party distributing such notice or other communication and any such notice or other communication shall not be effective as to the parties hereto until it has been received by the Swap Insurer.

(q)     *Reference Market-makers.* The definition of "Reference Market-makers" set forth in Section 12 of the Agreement shall be amended in its entirety to read as follows:

> "Reference Market-makers" means four (4) leading dealers in the relevant swap market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time of deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among dealers having an office in the same metropolitan area. The rating classification assigned to any outstanding long-term senior debt securities of such dealers shall be at least (1) "A1" or higher as determined by Moody's, (2) "A+" or higher as determined by S&P or if not rated by one of S&P or Moody's, (3) an equivalent investment grade rating determined by a nationally-recognized rating service acceptable to both parties; *provided, however,* that in any case, if Market Quotations cannot be determined by four (4) such dealers, the party making the determination of the Market Quotation may designate, with the consent of the other party and the Swap Insurer, one (1) or more leading dealers whose long-term senior debt bears a lower investment grade rating or the parties may agree, with the consent of the Swap Insurer, to use fewer than four (4) leading dealers.

(r)     *Party A Delivery of Legal Opinion.* Party A will be required to deliver a legal opinion with respect to its power and authority to enter into the Agreement and to the enforceability of the Agreement, satisfactory in form and substance to the Swap Insurer, with the Swap Insurer as an addressee.

(s)     *Additional Representations of Party B.* Party B hereby further represents to Party A (which representations will be deemed to be repeated by Party B at all times until the termination of this Agreement) that:

> (i)     This Agreement has been, and each Transaction hereunder will be (and, if applicable, has been), entered into for the purposes of managing its borrowings and not for purposes of speculation.

> (ii)     Party B has taken all steps necessary or advisable to create the security and source of payment for Party B's obligations hereunder described in Section 4(f) of the Agreement.

> (iii)     Any Transaction entered into pursuant to this Agreement together with any transactions that Party B has or may enter into with Party A and/or with any or all other parties does not and will not violate or exceed any limits or restrictions contained in any

authorizations, approvals or resolutions of the board of directors, shareholders or other authorized body of Party B.

(iv)    The execution and delivery by Party B of this Agreement, each Confirmation and any other documentation relating hereto, and the performance of Party B of its obligations hereunder and thereunder, are in furtherance, and not in violation, of the municipal purposes for which Party B is organized pursuant to the laws of the State of Michigan.

(v)    This Agreement and each Transaction hereunder do not constitute any kind of investment by Party B that is proscribed by any constitution, charter, law, rule, regulation, government code, constituent or governing instrument, resolution, guideline, ordinance, order, writ, judgment, decree, charge, or ruling to which Party B (or any of its officials in their respective capacities as such) or its property is subject.

(t)    ***Optional Early Termination.***    Party A shall have the right to terminate one or more Transactions hereunder, either in whole or in part, on any Business Day; *provided* that no Event of Default or Termination Event is then occurring with respect to which Party A is the Defaulting Party or sole Affected Party, by providing at least five (5) Business Days' prior written notice to Party B of its election to terminate and its designation of the effective date of termination (the "Party A Optional Early Termination Date"). On the Party A Optional Early Termination Date, Party A shall determine the amount payable in connection with such termination as the greater of (i) zero and (ii) the amount calculated in accordance with Section 6(e) of the Agreement, as if (A) the Party A Optional Early Termination Date were the Early Termination Date with respect to the terminated Transaction(s) or portion thereof, (B) the terminated Transaction(s) were the sole Affected Transaction(s), (C) Party B were the sole Affected Party and (D) Second Method and Loss applied. For the avoidance of doubt, in no event will Party B owe any amount to Party A in connection with an election by Party A to exercise its option under this Part 5(t), other than any Unpaid Amounts.

## Part 6.

## Transaction Transfer Provisions.

(a)    ***Bankruptcy Code.***    It is the express intention of Party A, Party B and each Credit Support Provider of any party that (i) this Agreement and all Transactions hereunder, the Transaction Transfer Agreement (including, without limitation, the option granted therein), and any Credit Support Annex that may be entered into between Party B and the Credit Support Provider shall collectively constitute a single agreement; (ii) the foregoing, together with the Transfer Swap Agreement and Transfer Transactions thereunder (as such terms are defined in the Transaction Transfer Agreement) shall each constitute a "swap agreement" as defined in section 101(53B) of Title 11 of the United States Code, Sections 101-1330 (the "Bankruptcy Code"); and (iii) each of the parties constitutes a "swap participant" under section 101(53C) of the Bankruptcy Code, in each case subject to and entitled to the exemptions and protections afforded by, among other things, sections 362(b)(17), 546(g), 548(d) and 560 of the Bankruptcy Code.

(b)    ***Transaction Transfer Agreement.***    Notwithstanding anything contained herein to the contrary, neither Credit Support Provider shall have any obligations under this Agreement (other

than as a result of the operation of Part 6(c) below, if applicable) and shall only have such obligations as are expressly provided for in the Transaction Transfer Agreement. The parties hereto agree that the Credit Support Providers shall be express third party beneficiaries of this Agreement, including but not limited to all of the representations, covenants, agreements and other obligations of the parties to this Agreement. Additionally, notwithstanding anything contained herein to the contrary, the parties hereby agree that in the event Credit Support Providers are replaced as the "Credit Support Provider" by a Substitute Credit Support Provider (as defined in the Transaction Transfer Agreement) under the Transaction Transfer Agreement in accordance with the terms thereof, then the Substitute Credit Support Provider shall be deemed to be the Credit Support Provider hereunder and all references herein to either Credit Support Provider or both shall be deemed to be references to such Substitute Credit Support Provider.

(c)  ***Assignment.***

    (i)    Notwithstanding Part 5 of this Agreement, Party B, Party A and the Swap Insurer (by its delivery of the Swap Insurance Policy is deemed to have agreed) each hereby acknowledges and agrees that (A) provided that Party A is not a Defaulting Party or the sole Affected Party, Party A shall have at any time, other than following the occurrence of an Event of Default under this Agreement where Party B is the Defaulting Party or a Termination Event under this Agreement where Party B is the Affected Party or any event which with the giving of notice and/or the passage of time would constitute an Event of Default under this Agreement where Party B is the Defaulting Party or a Termination Event under this Agreement where Party B is the Affected Party, the right to transfer and assign all of Party A's rights, interests and obligations in, to and under this Agreement and all Transactions hereunder to MLCS by written notice to Party B and the Credit Support Providers specifying the effective date (such effective date, the "<u>Assignment Date</u>") of such transfer and assignment (and such transfer and assignment shall automatically occur as of the Assignment Date without the need for further action by any party), and (B) MLCS shall have the right, at any time and for any reason in its sole discretion, to request that Party A transfer and assign all of Party A's rights, interests and obligations in, to and under this Agreement and all Transactions hereunder to MLCS by written notice to Party B and Party A specifying the Assignment Date of such transfer and assignment (and such transfer and assignment shall automatically occur as of the Assignment Date without the need for further action by any party).

    (ii)    Upon the Assignment Date of any transfer and assignment specified in accordance with Part 6(c)(i) above, (A) the Provider shall be deemed to have transferred and assigned all of its rights, interests and obligations in, to and under this Agreement and all Transactions hereunder to MLCS, (B) MLCS shall have all the rights that the Provider would have under this Agreement and all Transactions hereunder, (C) MLCS shall be obligated to perform all existing and unperformed obligations of the Provider under this Agreement and all Transactions hereunder, including those obligations arising before the Assignment Date but not yet performed, (D) Party B shall remain obligated to perform all of its existing and unperformed

obligations under this Agreement and all Transactions hereunder, including those obligations arising before the Assignment Date but not yet performed, (E) the Provider and Party B shall be released and discharged from all obligations to each other with respect to this Agreement and all Transactions hereunder, and their respective rights and obligations hereunder and thereunder shall be cancelled with no payments owed by either party to the other, (F) on and after the Assignment Date, the provisions set forth in Exhibit B to the Transaction Transfer Agreement shall be applicable to this Agreement and all Transactions hereunder, (G) the Transaction Transfer Agreement shall simultaneously automatically terminate without the need for further action by any party thereto, and (H) the guarantee of ML & Co. (as set forth in the Transaction Transfer Agreement) shall apply to the Agreement as assigned (and shall no longer apply to the terminated Transaction Transfer Agreement).

(iii)     Party B, Party A and Credit Support Provider shall execute such instruments of assignment, assumption and release or discharge, of a ministerial nature, as any of them may reasonably request to evidence or effectuate the provisions in this Part 6(c).

### Part 7.

### Credit Support Provisions.

(a)     In the event that a Settlement Amount would be payable by Party A to Party B, Party B agrees that (i) the termination of this Agreement concurrently with the entry by MLCS into a Transfer Swap Agreement (as defined in Paragraph 2 of the Transaction Transfer Agreement) with Party B in accordance with Paragraph 2 of the Transaction Transfer Agreement, (ii) the agreement by Party A to pay such Settlement Amount to MLCS in consideration of MLCS entering into such Transfer Swap Agreement (and Party A hereby agrees to pay such Settlement Amount); *provided,* that the Transaction Transfer Agreement shall be effective irrespective of the nonpayment of such Settlement Amount by Party A to MLCS, and (iii) the payment by MLCS to Party B of any net Unpaid Amounts owing to Party B (which MLCS agrees to pay pursuant to the Transaction Transfer Agreement), shall constitute full satisfaction of any payment otherwise owing from Party A to Party B pursuant to Section 6(e) of this Agreement, and that Party A shall be fully discharged from any and all obligations under Section 6(e) of this Agreement. In the event that any net Unpaid Amounts would be owing by Party B to Party A (such that clause (iii) of the preceding sentence would not be applicable), Party A hereby assigns to MLCS, absolutely and not for purposes of security, all of Party A's right to receive any such net Unpaid Amounts from Party B, and Party A agrees that only MLCS shall be entitled to receive any such net Unpaid Amounts from Party B, and that Party A shall have no recourse to Party B with respect thereto.

(b)     In the event that a Settlement Amount would be payable by Party B to Party A, Party A agrees that (i) the termination of this Agreement concurrently with the entry by MLCS into a Transfer Swap Agreement with Party B in accordance with Paragraph 2 of the Transaction Transfer Agreement, (ii) the agreement by MLCS to pay such Settlement Amount to Party B in

consideration of Party B entering into such Transfer Swap Agreement (which MLCS agrees to pay pursuant to the Transaction Transfer Agreement), (iii) the absolute assignment by Party B to Party A of Party B 's right to receive such Settlement Amount from Credit Support Provider, and (iv) the payment by MLCS to Party B of any net Unpaid Amounts owing to Party B (which MLCS agrees to pay pursuant to the Transaction Transfer Agreement) shall constitute full satisfaction of any payment otherwise owing from Party B to Party A pursuant to Section 6(e) of this Agreement, and that Party B shall be fully discharged from any and all obligations under Section 6(e) of this Agreement. In accordance with clause (iii) of the preceding sentence, Party B hereby assigns to Party A, absolutely and not for purposes of security, all of Party B's right to receive any such Settlement Amount from MLCS pursuant to clause (ii) of the preceding sentence, and Party A agrees that only MLCS shall be obligated to pay such Settlement Amount to Party A, and that Party A shall have no recourse to Party B with respect thereto. In the event that any net Unpaid Amounts would be owing by Party B to Party A (such that clause (iv) of the first sentence of this Part 7(b) would not be applicable), Party A hereby assigns to MLCS, absolutely and not for purposes of security, all of Party A's right to receive any such net Unpaid Amounts from Party B, and Party A agrees that only MLCS shall be entitled to receive any such net Unpaid Amounts from Party B, and that Party A shall have no recourse to Party B with respect thereto.

(c) In the event that a Settlement Amount is to be determined, the parties agree that such Settlement Amount shall be determined by MLCS on behalf of, and for the benefit of, the Non-defaulting Party or the party which is not the Affected Party (as applicable), and that such Settlement Amount shall be conclusive. For purposes of determining such Settlement Amount, MLCS shall not be obligated to obtain quotations from more than one Reference Market-maker, which Reference Market-maker may be MLCS. Notwithstanding the foregoing, if an Event of Default or Termination Event shall have occurred with respect to which Party A is the Defaulting Party or an Affected Party, and such Event of Default or Termination Event (x) is triggered by the occurrence of an event which, by definition of such Event of Default or Termination Event, occurs with respect to MLCS or the Credit Support Document, and (y) arises solely by reason of an event or condition that is directly attributable to MLCS under this Agreement or the Transaction Transfer Agreement, then Party B, and not Credit Support Provider, shall determine such Settlement Amount.

Please confirm your agreement to the terms of the foregoing Schedule by signing below.

**DETROIT GENERAL RETIREMENT
SYSTEM SERVICE CORPORATION**

By:_____

    Name:  Norman L. White

    Title:   President


**SBS FINANCIAL PRODUCTS COMPANY,
LLC**, a Delaware limited liability company


By:_____

    Name:

    Title:

Please confirm your agreement to the terms of the foregoing Schedule by signing below.

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

By:_____

    Name: Norman L. White
    Title: President


**SBS FINANCIAL PRODUCTS COMPANY, LLC**, a Delaware limited liability company

By:_____

    Name: John Carter
    Title: President

SCHEDULE OF OPINIONS

| | |
|---|---|
| Lewis & Munday,<br>a Professional Corporation | • The Settlement Transaction will not cause the City to violate or exceed any applicable debt limit or constitute or create any "indebtedness" of the City within the meaning of any limitation of the Home Rule City Act (Act 279 of the Public Acts of Michigan of 1909, as amended) or any Michigan constitutional or other non-tax statutory or City Charter limitation, |
| | • the Authorizing Ordinance was duly adopted in accordance with state law and City Charter requirements, is in effect as of the Closing Date, has not been amended, and is valid, binding, and enforceable (subject, in each case, to bankruptcy and other customary exceptions), |
| | • the City Pledge, including the lien of the City Pledge established pursuant to the Authorizing Ordinance, is valid, binding and enforceable and the Service Corporation Pledge is valid, binding, enforceable and perfected (subject, in each case, to bankruptcy and other customary exceptions), |
| | • the definitive agreements entered into in connection with the Settlement Transaction are valid, binding and enforceable (subject, in each case, to bankruptcy and other customary exceptions), |
| | • the pledge and use of Pledged Property as contemplated in the Settlement Transaction will constitute authorized purposes under the Wagering Tax Revenue Statute (including, if applicable at the time, any regulation or ordinance, other than the Authorizing Ordinance, relating thereto), the Authorizing Ordinance and Section 18-14-1 et seq. of the Detroit City Code, |
| | • the pledge and use of the Pledged Property as contemplated by the Settlement Transaction does not and shall not "supplant existing...local expenditures" as prohibited by Section 12(14) of the Wagering Tax Revenue Statute, |
| | • the Settlement Transaction and any other transactions to be consummated in connection therewith are not subject to approval by vote of the electors of the City and are not subject to any right of referendum by City electors; and |

| | |
|---|---|
| | • any actions taken by the City Council, in connection with the Settlement Transaction, by resolution, in lieu of ordinance, are fully valid, binding and enforceable against the City, notwithstanding that such actions were taken by resolution instead of by ordinance (subject, in each case, to bankruptcy and other customary exceptions). |
| Orrick, Herrington & Sutcliffe LLP | The Wagering Tax Property constitute "special revenues" as defined in Bankruptcy Code §902(2) with respect to any case under Chapter 9 of the Bankruptcy Code in which the City or a Service Corporation is the debtor (subject to assumptions, qualifications, and limitations as are customary for bankruptcy opinions). |
| Special tax counsel to the City | Consummation of the Settlement Transaction (including any amendments of the Service Contracts in connection therewith) will not result in (i) the 2006 Funding Trust being treated as other than a grantor trust under Subpart E, Part I of Subchapter J of the Internal Revenue Code of 1986, as amended, (ii) the Service Charges and Regular Scheduled Payments failing to constitute payments in respect of indebtedness for U.S. federal income tax purposes, or (iii) otherwise any modifications, adverse to the City, the Service Corporations, the holders of the 2006 Pension Funding Securities or the Counterparties, to the conclusions reached in the tax opinions given in connection with the outstanding transactions. |
| City Corporation Counsel | Relying upon certifications of the City Clerk, the City Charter and any amendments thereto were duly approved by a majority of the City electors voting thereon and the City Charter and any such amendments have not been rescinded in whole or in part as of the Closing Date (subject to bankruptcy and other customary exceptions). |

Capitalized terms used but not otherwise defined in this Exhibit A shall have the meanings ascribed to them in them in the Collateral Agreement.

**EXHIBIT D**

*2005 Transactions*
**Information below is derived from Data Room Folder 2.2.3.2 – 06-02-05 Retirement Trust Complete Closing Memorandum and 2.2.3.1 – POCs 2005 Offering Circular.**

1. GRS Service Contract 2005
2. PFRS Service Contract 2005
3. Contract Administration Agreement
4. Trust Agreement
5. Certificates
      A. Series A
      B. Series B
6. Preliminary Offering Circular
7. Final Offering Circular
8. Underwriting Agreement
9. Continuing Disclosure Undertaking
10. Disclosure Dissemination Agent Agreement
11. Funding Ordinance Certified, with Affidavit of Publication
12. GRS Alternative Funding Mechanism Ordinance Certified, with Affidavit of Publication
13. PFRS Alternative Funding Mechanism Ordinance Certified, with Affidavit of Publication
14. City Clerk's Incumbency and Signature Identification Certificate
15. Finance Director' s Certificate
16. City Budget Director's Certificate
17. Labor Director's Certificate
18. Letter Agreement
      A. Letter Agreement re Intended Tax Consequences
      B. Reliance Letters
19. Letter Agreement with Insurers
20. GRS Service Corporation Certified Articles of Incorporation with Amendment
21. GRS Service Corporation Good Standing Certificate
22. GRS Service Corporation Organizational Instrument of the Incorporator, including Bylaws
23. GRS Service Corporation Organizational Meeting Extract of Minutes with Authorizing Resolutions
24. GRS Service Corporation Secretary's Incumbency Certificate with certifications of documents
25. GRS Service Corporation President's Certificate
26. GRS Service Corporation Secretary's No-litigation Certificate
27. GRS Service Corporation Notice of Appointment of Contract Administrator
28. GRS Service Corporation Perfection Certificate
29. GRS Service Corporation No Fraudulent Transfer Certificate
30. GRS Service Corporation UCC Search
31. GRS Service Corporation Charitable Registration
32. PFRS Service Corporation Certified Articles of Incorporation with Amendment
33. PFRS Service Corporation Good Standing Certificate
34. PFRS Service Corporation Organizational Instrument of the Incorporator, including Bylaws
35. PFRS Service Corporation Organizational Meeting Extract of Minutes with Authorizing Resolutions

36. PFRS Service Corporation Secretary's Incumbency Certificate with certifications of documents
37. PFRS Service Corporation President's Certificate
38. PFRS Service Corporation Secretary's No-litigation Certificate
39. PFRS Service Corporation Notice of Appointment of Contract Administrator
40. PFRS Service Corporation Perfection Certificate
41. PFRS Service Corporation No Fraudulent Transfer Certificate
42. PFRS Service Corporation UCC Search
43. PFRS Service Corporation Charitable Registration
44. Certificate of UAAL
     A. GRS
     B. PFRS
45. Letter of Retirement Systems' Auditor
46. Trustee's Authentication, Authorization, Incumbency and Signature Certificate
47. Contract Administrator's Authorization, Incumbency and Signature Certificate
48. Corporation Notice to City of Assignment of Scheduled Payments and Service Charges
     A. GRS Service Corporation
     B. PFRS Service Corporation
49. Delivery Order with attached Closing Memorandum
50. Financing Statements with respect to Funding Trust Receivables
     A. GRS Service Corporation
     B. PFRS Service Corporation
51. Financing Statements with respect to Hedge Receivables
     A. GRS Service Corporation
     B. PFRS Service Corporation
52. Financing Statements with respect to Hedge Payables
     A. GRS Service Corporation
     B. PFRS Service Corporation
53. Cross Receipts of Underwriters and Funding Trust
     A. Series A
     B. Series B
54. Receipts for Funding Trust Receivables
     A. GRS Service Corporation
     B. PFRS Service Corporation
55. Receipts of Retirement Systems for Subject UAAL
     A. GRS Service Corporation
     B. PFRS Service Corporation
56. DTC Representation Letter
     A. Series A
     B. Series B
57. UBS AG and GRS Service Corporation - FGIC Insured
     A. ISDA Master Agreement
     B. Schedule
     C. Credit Support Annex
     D. Confirmation
     E. Evidence of UBS AG Rating

58. UBS AG and PFRS Service Corporation - FGIC Insured
    A. ISDA Master Agreement
    B. Schedule
    C. Credit Support Annex
    D. Confirmation
    E. Evidence of UBS AG Rating
59. UBS AG and PFRS Service Corporation - XL Insured
    A. ISDA Master Agreement
    B. Schedule
    C. Credit Support Annex
    D. Confirmation
    E. Evidence of UBS AG Rating
60. Citibank and GRS Service Corporation - FGIC Insured
    A. ISDA Master Agreement
    B. Schedule
    C. Credit Support Annex
    D. Confirmation
    E. Evidence of Citibank Rating
61. Citibank and PFRS Service Corporation - FGIC Insured
    A. ISDA Master Agreement
    B. Schedule
    C. Credit Support Annex
    D. Confirmation
    E. Evidence of Citibank Rating
62. Citibank and PFRS Service Corporation - XL Insured
    A. ISDA Master Agreement
    B. Schedule
    C. Credit Support Annex
    D. Confirmation
    E. Evidence of Citibank Rating
63. SBS Financial Products and GRS Service Corporation - FGIC Insured
    A. ISDA Master Agreement
    B. Schedule
    C. Confirmation
    D. Shortfall Agreement
    E. Transaction Transfer Agreement of Merrill Lynch Capital Services, Inc. (Merrill CSI)
    F. Credit Support Annex of Merrill CSI
    G. Guaranty of Merrill Lynch & Co., Inc.
    H. Evidence of Merrill Lynch & Co. Rating
64. SBS Financial Products and PFRS Service Corporation - FGIC Insured
    A. ISDA Master Agreement
    B. Schedule
    C. Confirmation
    D. Shortfall Agreement
    E. Transaction Transfer Agreement of Merrill CSI
    F. Credit Support Annex of Merrill CSI

G. Guaranty of Merrill Lynch & Co., Inc.

H. Evidence of Merrill Lynch & Co. Rating

65. SBS Financial Products and PFRS Service Corporation - XL Insured

    A. ISDA Master Agreement

    B. Schedule

    C. Confirmation

    D. Shortfall Agreement

    E. Transaction Transfer Agreement of Merrill CSI

    F. Credit Support Annex of Merrill CSI

    G. Guaranty of Merrill Lynch & Co., Inc.

    H. Evidence of Merrill Lynch & Co. Rating

66. Intercreditor Agreement

67. FGIC Certificate Insurance

    A. Insurance Policy

    B. Opinion

    C. No Default Certificate

68. XL Certificate Insurance

    A. Series A Policy

    B. Series B Policy

    C. Series A Opinion

    D. Series B Opinion

    E. Series A No Default Certificate

    F. Series B No Default Certificate

    G. Series A Disclosure Certificate

    H. Series B Disclosure Certificate

    I. Series A Bond Insurer's Certificate

    J. Series B Bond Insurer's Certificate

69. FGIC Swap Surety Bond

    A. UBS AG - GRS

    B. UBS AG - PFRS

    C. Citibank - GRS

    D. Citibank - PFRS

    E. SBS Financial Products - GRS

    F. SBS Financial Products - PFRS

    G. Swap Opimon - USB AG - GRS

    H. Swap Opinion - USB AG - PFRS

    I. Swap Opinion - Citibank - GRS

    J. Swap Opinion - Citibank - PFRS

    K. Swap Opinion - SBS Financial Products - GRS

    L. Swap Opinion - SBS Financial Products - PFRS

70. XL Swap Insurance

    A. UBS AG - PFRS

    B. Citibank - PFRS

    C. SBS Financial Products - PFRS

    D. Swap Opinion - UBS AG

    E. Swap Opinion - Citibank

F. Swap Opinion - SBS Financial Products
71. Opinion of Counsel to UBS as Swap Counterparty
    A. Swiss Counsel Opinions
    B. NY Counsel Opinions
72. Opinion of Counsel to Citibank as Swap Counterparty
73. Opinion of Counsel to SBS Financial Products as Swap Counterparty
74. Opinion of Counsel to Merrill CSI and to Merrill Lynch & Co. as Guarantor
75. Opinions of Labor Counsel
    A. GRS
    B. PFRS
76. Opinion of Counsel to Trustee and Contract Administrator
77. Opinion of Corporation Counsel
78. Opinion of Underwriters' Counsel
79. Opinion of Special Federal Tax Counsel
80. Opinion of Special Michigan Tax Counsel
81. Certificate Counsel - Approving Opinion
82. Reliance Letters of Certificate Counsel
83. Certificate Counsel - Supplemental Opinions
84. Certificate Counsel - Swap Opinion
85. KPMG Consent Letters
    A. Preliminary Offering Circular
    B. Final Offering Circular
86. Blue Sky Survey
87. Rating Letters
    A. S&P( insured and uninsured)
    B. Moody'(insured; muni-uninsured; corporate equivalent uninsured)
    C. Fitch (insured and uninsured)
88. 2005 Offering Circular


*2006 Transactions*
**Information below is derived from Data Room Folder 2.2.3.4 – 06-12-06 Retirement Trust
Complete Closing Memo and 2.2.3.3 – POCs 2006 Offering Circular.**

1. GRS Service Contract 2006, dated June 7, 2006
2. PFRS Service Contract 2006, dated June 7, 2006
3. Contract Administration Agreement 2006, dated June 12, 2006 (See two Supplements attached
as Document Nos. 8 and 16)
4. Trust Agreement, dated June 12, 2006
5. Certificates of Participation Series 2006, issued June 12, 2006
    A. Series A, Denomination: $148,540,000
    B. Series B, Denomination: $500,845,000
    C. Series B, Denomination: $299,155,000
6. Invitation to Tender Certificates, dated May 25, 2006
7. Dealer Manager Agreement
    A. Dealer Manager Letter, dated May 25, 2006
    B. Dealer Manager Agreement, dated May 25, 2006

8. Tender Account Supplement to Contract Administration Agreement, dated June 12, 2006
9. Cancellation Letters

    A. GRS Service Corporation (FGIC), Swap Transaction with UBS AG maturing June 15, 2025, dated June 7, 2006

    B. PFRS Service Corporation (FGIC), Swap Transaction with UBS AG maturing June 15, 2018, dated June 7, 2006

    C. PFRS Service Corporation (XL), Swap Transaction with UBS AG maturing June 15, 2014, dated June 7, 2006

    D. UBS AG Incumbency Certificate, dated June 9, 2006

    E. GRS Service Corporation (FGIC), Swap Transaction with Citibank maturing June 15, 2025, dated June 7, 2006

    F. PFRS Service Corporation (FGIC), Swap Transaction with Citibank maturing June 15, 2018, dated June 7, 2006

    G. PFRS Service Corporation (XL), Swap Transaction maturing June 15, 2014, dated June 7, 2006

    (See also SBS cancellation Document Nos. 50A., 50E., 51A., 51E., 52A. and 52E.)

10. Insurer Termination Letters of Swap Transactions

    A. FGIC, dated June 1, 2006

    B. XL, dated June 1, 2006

11. Preliminary Offering Circular, dated May 31, 2006
12. Final Offering Circular, dated June 7, 2006
13. Underwriting Agreement, dated June 7, 2006
14. Continuing Disclosure Undertaking, dated June 12, 2006
15. Disclosure Dissemination Agent Agreement, dated June 12, 2006
16. Non-Tender Escrow Account Supplement to the Contract Administration Agreement, dated June 12, 2006
17. Notice of Optional Redemption, dated June 12, 2006
18.     A. Resolution by City Council to Provide an Additional Funding Contemplated by Ordinance No. 05-05, dated April 26, 2006, Certified

    B . Affidavit of Publication on May 4, 2006

19. City Clerk's Incumbency and Signature Identification Certificate, dated June 12, 2006
20. Interim Finance Director's Certificate, dated June 12, 2006
21. City Budget Director's Certificate, dated June 12, 2006
22. Interim Labor Relations Director's Certification, dated June 8, 2006
23. Tax Treatment Letters

    A. Reliance Letter, dated June 12, 2006

    B. Letter Agreement re Intended Tax Consequences (Exhibit I to Reliance Letter), dated June 12, 2006

24. Letter Agreement with Insurers, dated June 12, 2006
25. GRS Service Corporation Secretary's Certificate, certifying as to Articles of Incorporation, By-Laws, No Litigation and Extract of Minutes of Special Meeting, dated June 12, 2006
26. GRS Service Corporation Good Standing Certificate, dated May 30, 2006
27. GRS Service Corporation Notice of Appointment of Contract Administrator, dated June 12, 2006

28. GRS Service Corporation and PFRS Service Corporation Perfection Certificate, dated June 12, 2006

29. GRS Service Corporation No Fraudulent Transfer Certificate, dated June 12, 2006

30. UCC Search Reports
    A. GRS Service Corporation Search Report, dated June 25, 2006
    B. PFRS Service Corporation Search Report, dated June 25, 2006

31. PFRS Service Corporation Secretary's Certificate, certifying as to Articles of Incorporation, By-Laws, No Litigation and Extract of Minutes of Special Meeting, dated June 12, 2006

32. PFRS Service Corporation Good Standing Certificate, dated May 30, 2006

33. PFRS Service Corporation Notice of Appointment of Contract Administrator, dated June 12, 2006

34. GRS Service Corporation and PFRS Service Corporation Perfection Certificate, dated June 12, 2006 (See Document No. 28)

35. PFRS Service Corporation No Fraudulent Transfer Certificate, dated June 12, 2006

36. Resolutions Extending Amortization Periods
    A. General Retirement System, approved on February 8, 2006
    B. Police & Fire Retirement System, approved on March 30, 2006

37. Trustee's Authentication, Authorization, Incumbency and Signature Certificate, dated June 12, 2006

38. Contract Administrator's Authentication Authorization, Incumbency Certificate and Signature Certificate, dated June 12, 2006

39. Corporation Notice to City of Assignment of Scheduled Payments and Service Charges
    A. GRS Service Corporation, dated June 12, 2006
    B. PFRS Service Corporation, dated June 12, 2006

40. Delivery Order with attached Closing Memorandum

41. Financing Statements with respect to Funding Trust Receivables, filed June 12, 2006

42. Financing Statements with respect to Hedge Periodic Receivables and Hedge Termination Receivables, filed June 12, 2006

43. Financing Statements with respect to Hedge Periodic Payables and Hedge Termination Payables, filed June 12, 2006

44. Cross Receipts of Underwriters and Funding Trust
    A. Series A, dated June 12, 2006
    B. Series B, dated June 12, 2006

45. DTC Issuer Letter of Representations
    A. $148,540,000 Certificates of Participation Series 2006A (Fixed Rate), dated June 6, 2006
    B. $800,000,000 Certificates of Participation Series 2006B (Floating Rate), dated June 6, 2006

46. UBS AG and GRS Service Corporation – FGIC Insured
    A. Confirmation Letter, dated June 7, 2006
    B. Evidence of UBS AG Ratings (See Document Nos. 73A., 73B. and 73C.)

47. UBS AG and PFRS Service Corporation – FGIC Insured
    A. Confirmation Letter, dated June 7, 2006
    B. Evidence of UBS AG Ratings (See Document Nos. 73A., 73B. and 73C)

48. UBS AG and PFRS Service Corporation – XL Insured
    A. Confirmation Letter, dated June 7, 2006

B. Evidence of UBS AG Ratings (See Document Nos. 73A., 73B. and 73C)
49. UBS AG and GRS Service Corporation
    A. Master Agreement, dated June 7, 2006
    B. Schedule to Master Agreement, dated June 7, 2006
    C. Confirmation Letter, dated June 7, 2006
    D. Credit Support Annex, dated June 7, 2006
    E. Evidence of UBS AG Ratings (See Document Nos. 73A., 73B. and 73C.)
    F. Proof of Authorized Signatures
50. SBS Financial Products and GRS Service Corporation – FGIC Insured
    A. Unwind Confirmation Letter, dated June 7, 2006
    B. Confirmation Letter, dated June 7, 2006
    C. First Amendment to Credit Support Annex, dated June 7, 2006
    D. Transaction Transfer Agreement, dated June 7, 2006
    E. Mutual Release Agreement, dated June 7, 2006
    F. Escrow Agreement, dated June 8, 2006
    G. Secretary's and Incumbency Certificate, dated June 7, 2006
    H. Evidence of Merrill Lynch & Co. Ratings (See Document Nos. 73A., 73B. and 73C.)
51. SBS Financial Products and PFRS Service Corporation – FGIC Insured
    A. Unwind Confirmation Letter, dated June 7, 2006
    B. Confirmation Letter, dated June 7, 2006
    C. First Amendment to Credit Support Annex, dated June 7, 2006
    D. Transaction Transfer Agreement, dated June 7, 2006
    E. Mutual Release Agreement, dated June 7, 2006
    F. Escrow Agreement, dated June 8, 2006
    G. Secretary's and Incumbency Certificate, dated June 7, 2006
    H. Evidence of Merrill Lynch & Co. Ratings (See Document Nos. 73A., 73B. and 73C.)
52. SBS Financial Products and PFRS Service Corporation – XL Insured
    A. Unwind Confirmation Letter, dated June 7, 2006
    B. Confirmation Letter, dated June 7, 2006
    C. First Amendment to Credit Support Annex, dated June 7, 2006
    D. Transaction Transfer Agreement, dated June 7, 2006
    E. Mutual Release Agreement, dated June 7, 2006
    F. Escrow Agreement, dated June 8, 2006
    G. Secretary's and Incumbency Certificate, dated June 7, 2006
    H. Evidence of Merrill Lynch & Co. Ratings (See Document Nos. 73A., 73B. and 73 C.)
53. SBS Financial Products and GRS Service Corporation - XL Insured
    A. Master Agreement, dated June 7, 2006
    B. Schedule to Master Agreement, dated June 7, 2006
    C. Confirmation Letter, dated June 7, 2006
    D. Credit Support Annex, dated June 7, 2006
    E. Transaction Transfer Agreement, dated June 7, 2006
    F. Shortfall Agreement, dated June 7, 2006
    G. Guarantee of Merrill Lynch & Co., Inc., dated June 7, 2006

H. Secretary's and Incumbency Certificate, dated June 7, 2006

I. Evidence of Merrill Lynch & Co. Ratings (See Document Nos. 73A., 73B. and 73C.)

54. Intercreditor Agreement, dated June 7, 2006

55. FGIC Insurance

    A. Insurance Policy - $148,540,000 Certificates of Participation Series 2006A, dated June 12, 2006

    B. Insurance Policy - $500,845,000 Certificates of Participation Series 2006B, dated June 12, 2006

    C. Opinion of Counsel, dated June 12, 2006

    D. No Default Certificate, dated June 12, 2006

56. XL Insurance

    A. Series 2006-B Policy, effective June 12, 2006

    B. Series 2006-B Opinion of Counsel, dated June 12, 2006

    C. No Default Certificate, dated June 12, 2006

    D. Disclosure Certificate, dated June 12, 2006

    E. Series 2006-B Bond Insurer's Certificate, dated June 12, 2006

57. FGIC Swap Surety Bond

    A. UBS AG – GRS, dated June 12, 2006

    B. UBS AG – PFRS, dated June 12, 2006

    C. UBS AG – GRS Opinion of Counsel, dated June 12, 2006

    D. UBS AG – PFRS Opinion of Counsel, dated June 12, 2006

58. XL Swap Insurance

    A. UBS AG – GRS, dated June 12, 2006

    B. UBS AG – PFRS, dated June 12, 2006

    C. SBS Financial Products – GRS, dated June 12, 2006

    D. SBS Financial Products – PFRS, dated June 12, 2006

    E. UBS AG - GRS Opinion of Counsel, dated June 12, 2006

    F. UBS AG – PFRS Opinion of Counsel, dated June 12, 2006

    G. SBS Financial Products – GRS Opinion of Counsel, dated June 12, 2006

    H. SBS Financial Products – PFRS Opinion of Counsel, dated June 12, 2006

59. Opinions of Counsel to UBS as Swap Counterparty

    A. Swiss Counsel Opinion, GRS-FGIC, dated June 12, 2006

    B. Swiss Counsel Opinion, GRS-XL, dated June 12, 2006

    C. Swiss Counsel Opinion, PFRS-FGIC, dated June 12, 2006

    D. Swiss Counsel Opinion, PFRS-XL, dated June 12, 2006

    E. NY Counsel Opinion, GRS-FGIC, dated June 12, 2006

    F. NY Counsel Opinion, GRS-XL, dated June 12, 2006

    G. NY Counsel Opinion, PFRS-FGIC, dated June 12, 2006

    H. NY Counsel Opinion, PFRS-XL, dated June 12, 2006

60. Opinions of Counsel to SBS Financial Products as Swap Counterparty

    A. GRS-FGIC, dated June 12, 2006

    B. GRS-XL, dated June 12, 2006

    C. PFRS-FGIC, dated June 12, 2006

    D. PFRS-XL, dated June 12, 2006

61. Opinions of Counsel to Merrill CSI and Merrill Lynch & Co. as Guarantor

      A. GRS, dated June 12, 2006
      B. PFRS, dated June 12, 2006
62. Opinions of Labor Counsel
      A. GRS, dated June 12, 2006
      B. PFRS, dated June 12, 2006
63. Opinion of Special Labor Counsel, dated June 12, 2006
64. Opinion of Counsel to Trustee and Contract Administrator, dated June 12, 2006
65. Opinion of Corporation Counsel, dated June 12, 2006
66. Opinion of Underwriters' Counsel, dated June 12, 2006
67. Opinion of Special Federal Tax Counsel, dated June 12, 2006
68. Opinion of Special Michigan Tax Counsel, dated June 12, 2006
69. Certificate Counsel Opinions
      A. Approving Opinion, dated June 12, 2006
      B. Supplemental Opinion, dated June 12, 2006
      C. Swap Opinion, dated June 12, 2006
      D. MERC Opinion, dated June 12, 2006
      E. Security Interest Opinion, dated June 12, 2006
      F. Citibank, N.A. Swap Transactions Opinion, dated June 12, 2006
      G. True Sale Opinion, dated June 12, 2006
70. Reliance Letter of Certificate Counsel, dated June 12, 2006
71. KPMG Consent Letters
      A. Preliminary Offering Circular, dated May 31, 2006
      B. Final Offering Circular, dated June 7, 2006
72. Blue Sky Survey Memorandum dated May 31, 2006
73. Rating Letters
      A. Standard & Poor's (insured and uninsured)
      B. Moody's Investors Service (insured and uninsured)
      C. Fitch Ratings (insured and uninsured)
74. 2006 Offering Circular


*2009 Transactions*
**Information below is derived from Data Room Folder 2.2.4.4 – Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).**

1 (a) City Ordinance 05-09, adopted May 26, 2009 and (b) Affidavit of Publication.
2. (a) Resolution by City Council, adopted June 23, 2009 as contemplated by Ordinance No. 05-09 and (b) Affidavit of Publication.
3. (a) GRS Service Contract 2006, dated June 7, 2006 and (b) amendment, dated June 15, 2009.
4. (a) PFRS Service Contract 2006, dated June 7, 2006 and (b) amendment, dated June 15,2009.
5. Contract Administration Agreement, dated June 12, 2006.
6. (a) Collateral Agreement, dated as of June 15, 2009, among the City, the Service Corporations, acting severally and not jointly, U.S. Bank National Association, as Custodian, and the Counterparties; (b) Irrevocable Instructions, together with evidence of delivery to each agreed-upon recipient; and (c) Letter of Michigan Gaming Control Board.
7. City Clerk's General Incumbency Certificate and Signature Identification Certificate, dated June 26, 2009.

8. Certificate of Finance Director, dated June 26, 2009.
9. Closing Certificate of the Finance Director.
10. GRS Service Corporation Secretary's Certificate, certifying as to Articles of Incorporation, By-Laws, and Extract of Minutes of Special Meeting, dated June 24, 2009.
11. GRS Service Corporation Good Standing Certificate, dated June 23, 2009.
12. PFRS Service Corporation Secretary's Certificate, certifying as to Articles of Incorporation, By-Laws, and Extract of Minutes of Special Meeting, dated June 24, 2009.
13. PFRS Service Corporation Good Standing Certificate, dated June 23, 2009.
14. UBS AG and GRS Service Corporation - Syncora Insured
    (a) Amended and Restated Schedule, dated June 26, 2009.
    (b) Confirmation Letter, dated June 26, 2009.
15. UBS AG and PFRS Service Corporation - Syncora Insured
    (a) Amended and Restated Schedule, dated June 26, 2009.
    (b) Confirmation Letter, dated June 26, 2009.
16. UBS AG and GRS Service Corporation - FGIC Insured
    (a) Amended and Restated Schedule, dated June 26, 2009.
    (b) Confirmation Letter, dated June 26, 2009.
17. UBS AG and PFRS Service Corporation - FGIC Insured
    (a) Amended and Restated Schedule, dated June 26, 2009.
    (b) Confirmation Letter, dated June 26, 2009.
18. Proof of Authorized Signatures.
19. SBS Financial Products and GRS Service Corporation - Syncora Insured
    (a) Amended and Restated Schedule, dated June 26, 2009.
    (b) Confirmation Letter, dated June 26, 2009.
    (c) Revised Exhibit A to Transaction Transfer Agreement.
20. SBS Financial Products and PFRS Service Corporation - Syncora Insured
    (a) Amended and Restated Schedule, dated June 26, 2009.
    (b) Confirmation Letter, dated June 26, 2009.
    (c) Revised Exhibit A to Transaction Transfer Agreement
21. SBS Financial Products and GRS Service Corporation - FGIC Insured.
    (a) Amended and Restated Schedule, dated June 26, 2009.
    (b) Confirmation Letter, dated June 26, 2009.
    (c) Revised Exhibit A to Transaction Transfer Agreement.
22. SBS Financial Products and PFRS Service Corporation - FGIC Insured
    (a) Amended and Restated Schedule, dated June 26, 2009.
    (b) Confirmation Letter, dated June 26, 2009.
    (c) Revised Exhibit A to Transaction Transfer Agreement.
23. Secretary and Incumbency Certificate of SBS Financial Products and Merrill Lynch.
24. Syncora Waiver and Consent relating to the 2006 Service Contracts and Swap Agreements, dated June 26, 2009.
25. FGIC Waiver and Consent relating to the 2006 Service Contracts and Swap Agreements, dated June 26, 2009.
26. Certificate responsive to § 9.12(c) of the General Terms of the 2006 Service Contracts.
27. Syncora Surety Bond Endorsements and Receipts.
    (a) CA03049B
    (b) CA03049C

   (c) CA03049D
   (d) CA03049E
28. FGIC Surety Bond Endorsements and Receipts,
   (a) 06010252
   (b)06010253
   (c) 06010254
   (d)06010255
29. Custodian's Authentication, Authorization, Incumbency and Signature Certificate, dated June 26, 2009.
30. Opinion of Counsel to Custodian.
31. Opinion of Counsel to City.
32. Opinion of Corporation Counsel.
33. Opinions of Federal Tax Counsel required by § 9.05(ii) and § 9.05(iii) of 2006 Service Contracts.
34. Opinion of Michigan Tax Counsel.
35. Opinion of Swap Counsel to City regarding bankruptcy matters.
36. UCC Search Reports for Michigan and New York: (a) GRS Service Corporation Search Report, dated June 23, 2009, (b) PFRS Service Corporation Search Report, dated June 23, 2009 and (c) the City of Detroit Search Report, dated June 24, 2009.
37. Perfection Certificate for GRS Service Corporation and PFRS Service Corporation.
38. Notice to Rating Agencies pursuant to § 10.3 of the Contract Administration Agreement.
39. Statement of Revenues pursuant to § 6.2 of the Collateral Agreement.


### *Select Financial Information*
**Information below is derived from Data Room Folder 4 – Financials**

1. Cash Flow Variance Report (June 2013)
2. Cash Flow Forecast (including Restructuring Scenario)
3. Cash Flow Forecast - Monthly (FY 2013, FY 2014, FY 2015)
4. Ten Year Plan (including Restructuring Scenario) (summary)
5. Ten Year Plan (Details)
6. Ten Year Property & Income Tax Revenue Support
7. 50-State Property Tax Comparison Study
8. Consolidated (10 Year) General Fund – Consolidated Summary Schedules
9. Consolidated (10 Year) General Fund – Headcount
10. Consolidated (10 Year) General Fund – All Departments All Summaries
11. Cash Positions Dashboard
12. City of Detroit Swap Valuation 28-June-2013
13. City of Detroit Swap Valuation 31-May-2013
14. City of Detroit Swap Valuation 30-April-2013
15. Draft Detroit Debt Service Model
16. POC Reimbursements
17. Link to Emergency Manager Reports

**EXHIBIT E**

# Index for Detroit as of 7/29/2013 12:36:52 PM

📁 Detroit

   📁 1 - City Organization

      📄 1.1 - City of Detroit Org Chart.pdf

      📄 1.2 - Detroit City Charter.pdf

      📄 1.3 - Fully Executed Financial Stability Agreement.pdf

      📄 1.4 - City of Detroit Departments.pdf

   📁 2 - Legal Documents

      📁 2.1 - CBAs

         📁 2.1.1 - CBAs

            📁 2.1.1.1 - DWSD CBAs

               📄 2.1.1.1.1 - 12-13 TEAMSTERS.pdf

               📄 2.1.1.1.2 - 12-13 UAW 2200.pdf

               📄 2.1.1.1.3 - 12-18 AFSCME 2920.pdf

               📄 2.1.1.1.4 - 13-16 BTC.pdf

               📄 2.1.1.1.5 - 13-16 BTC Foremen.pdf

               📄 2.1.1.1.6 - 13-16 UWA 488-531.pdf

               📄 2.1.1.1.7 - 13-16 UWA 504.pdf

               📄 2.1.1.1.8 - 13-20 APCI.pdf

               📄 2.1.1.1.9 - 13-22 IUOE 324.pdf

               📄 2.1.1.1.10 - CET.pdf

               📄 2.1.1.1.11 - Contract Comparison.pdf

            📄 2.1.1.2 - 01) DPLSA 11-20-74 to 06-30-77.pdf

            📄 2.1.1.3 - 02) DPLSA 08-20-79 to 06-30-80.pdf

            📄 2.1.1.4 - 03) DPLSA 1980 - 1983.pdf

            📄 2.1.1.5 - 04) DPLSA 11-06-87 to 06-30-89.pdf

            📄 2.1.1.6 - 05) DPLSA 1998-2001.pdf

            📄 2.1.1.7 - 6) DPLSA TA 10-21-2010.pdf

            📄 2.1.1.8 - 7a) DPCOA Unit I 07-1-96 to 6-30-04.pdf

            📄 2.1.1.9 - 7b) DPCOA Unit II 07-1-96 to 6-30-04.pdf

            📄 2.1.1.10 - 8) DPOA 06-26-73 to 06-25-76.pdf

            📄 2.1.1.11 - 9) DPOA 07-01-80 to 06-30-83.pdf

            📄 2.1.1.12 - 10) DPOA Collective Bargaining Agreement 1986-1989.pdf

            📄 2.1.1.13 - 11) DPOA 1998-2001.pdf

            📄 2.1.1.14 - 12) Michigan District Council 77 AFSCME AFL-CIO 1971-1974.pdf

2.1.1.15 - 13) Michigan District Council 77 AFSCME AFL-CIO 1974-1977.pdf

2.1.1.16 - 14) AFSCME Michigan Council 25 (Non-supervisory) 1977-1980 .pdf

2.1.1.17 - 15) AFSCME Michigan Council 25 (Non-supervisory) 1980-1983.pdf

2.1.1.18 - 16) AFSCME Michigan Council 25 (Non-supervisory) 1983-1986.PDF

2.1.1.19 - 17) AFSCME Michigan Council 25 (Non-Supervisory) 1986-1989.pdf

2.1.1.20 - 18) AFSCME Michigan Council 25 (Non-supervisory) 1989-1992 .pdf

2.1.1.21 - 19) AFSCME Michigan Council 25 (Non-supervisory) 1995-1998.pdf

2.1.1.22 - 20) AFSCME Michigan Council 25 (Non-supervisory) 1998-2001.pdf

2.1.1.23 - 21) AFSCME Michigan Council 25 (Non-supervisory) 2001-2005.pdf

2.1.1.24 - 22) AFSCME Michigan Council 25 (Non-supervisory) 2005-2008 Draft.pdf

2.1.1.25 - 23) AFSCME Local 2394 MI Council 25 Supervisory Unit 1998-2001.pdf

2.1.1.26 - 24) AFSCME Local 2394 MI Council 25 Supervisory Unit 2001-2005.pdf

2.1.1.27 - 25) AFSCME Forestry and Landscape 2001-2005.pdf

2.1.1.28 - 26) AFSCME DPW Paving Forepersons 2001-2005.pdf

2.1.1.29 - 27) AFSCME ESO 2005-2009.pdf

2.1.1.30 - 28) AFSCME Seasonal Workers 1998-2001.pdf

2.1.1.31 - 29) DFFA Local 344 IAFF 07-01-77 to 06-30-80.pdf

2.1.1.32 - 30) DFFA Local 344 IAFF 07-01-80 to 06-30-83.pdf

2.1.1.33 - 31) DFFA Local 344 IAFF 07-01-86 to 06-30-89.pdf

2.1.1.34 - 32) DFFA Local 344 IAFF 07-01-92 to 06-30-98.pdf

2.1.1.35 - 33) DFFA Local 344 IAFF 07-01-98 to 06-30-01.pdf

2.1.1.36 - 34) DFFA 2001-2008.pdf

2.1.1.37 - 35) EMSOA Master Agreement 1998-2001.pdf

2.1.1.38 - 36) POAM 2005-2009 Draft.pdf

2.1.1.39 - 37) Teamsters State County and Municipal Workers Local 214 1986-1989.pdf

2.1.1.40 - 38) Teamsters State County and Municipal Workers Local 214 2008-2012.pdf

2.1.1.41 - 39) DoT and Division 26 ATU AFL-CIO 1980-83.pdf

2.1.1.42 - 40) DoT and Division 26 ATU AFL-CIO 1983-1986.pdf

2.1.1.43 - 41) DoT and Division 26 ATU AFL-CIO 1986-1989.pdf

2.1.1.44 - 42) DoT and Division 26 ATU AFL-CIO 2005-2008.pdf

2.1.1.45 - 43) DoT Foremen's Assn (Supervisors) 2001-2005.pdf

2.1.1.46 - 44) DOT Foremen's Assn (Non-Supervisory) 2005-2008.pdf

2.1.1.47 - 45) AFSCME Michigan Council 25 (Non-Supervisory) 2008-2012.pdf

2.1.1.48 - 46) 09-13 DPLSA(20257896_1)_Dot_.pdf

2.1.1.49 - 47) 08-13 DFFA(20999316_1).pdf

2.1.1.50 - 48) AFSCME ESO Agreemt.2009-2013. 7-8-2011(20252220_1).PDF

📁 2.1.2 - CETs (City Employment Terms)

📄 2.1.2.1 - DPCOA CET Articles FAB approved 7-12-12(20310612_1) (3).PDF

📄 2.1.2.2 - DPCOA CET Summary FAB approved 7-12-12(20310613_1).PDF

📄 2.1.2.3 - DPOA CET Articles FAB approved 7-12-12(20311010_1) (3).PDF

📄 2.1.2.4 - DPOA CET Summary FAB approved 7-12-12(20310615_1).PDF

📄 2.1.2.5 - EMSOA CET Articles FAB approved 7-12-12(20310616_1) (3).PDF

📄 2.1.2.6 - EMSOA CET Summary FAB approved 7-12-12(20310617_1).PDF

📄 2.1.2.7 - Non-Uniform CET Articles FAB approved 7-12-12(20310618_1) (3).PDF

📄 2.1.2.8 - Non-Uniform CET Summary FAB approved 7-12-12(20310619_1).PDF

📄 2.1.2.9 - POAM CET Articles FAB approved 7-12-12(20310620_1) (3).PDF

📄 2.1.2.10 - POAM CET Summary FAB approved 7-12-12(20310621_1).PDF

📁 2.1.3 - Act 312 arbitration

📄 2.1.3.1 - DFFA Local 344 Partial Interim Award.pdf

📄 2.1.3.2 - DPLSA Act 312 Award (Block) 2003.pdf

📄 2.1.3.3 - DPLSA Act 312 Award (Brookover) 2011.pdf

📄 2.1.3.4 - DPLSA Act 312 Award (Glazer) 2000.pdf

📄 2.1.3.5 - DPLSA Act 312 Award (Long) 2008.pdf

📄 2.1.3.6 - DPOA Letter Summarizing TA 07-14-11.pdf

📄 2.1.3.7 - DPOA Act 312 Award (Long) 2003.pdf

📄 2.1.3.8 - DPOA Act 312 Award (Block) 2007.pdf

📁 2.2 - Debt and Related Obligations

📁 2.2.1 - UTGO Debt

📄 2.2.1.1 - UTGO Series 1999-A (Closing Memorandum).pdf

📄 2.2.1.2 - UTGO Series 1999-B (Offering Memorandum).pdf

📄 2.2.1.3 - UTGO Series 2000-A (Offering Memorandum).pdf

📄 2.2.1.4 - UTGO Series 2001-A(1), (2), 2001-B (Closing Memorandum).pdf

📄 2.2.1.5 - UTGO Series 2002 (Offering Memorandum).pdf

📄 2.2.1.6 - UTGO Series 2003-A, 2003-B, 2005-A (Offering Memorandum).pdf

📄 2.2.1.7 - UTGO Series 2004 (Offering Memorandum).pdf

📄 2.2.1.8 - UTGO Series 2004-A(1) 2004-A(2), 2004-B(1), 2004-B(2).pdf

📄 2.2.1.9 - UTGO Series 2005-A (Closing Memorandum).pdf

📄 2.2.1.10 - UTGO Series 2005-B, 2005-C (Closing Memorandum).pdf

📄 2.2.1.11 - UTGO Series 2005-B and C (Offering Memoranda).pdf

📄 2.2.1.12 - UTGO Series 2008-A, 2008-B(1), 2008-B(2) (Closing Memorandum).pdf

📄 2.2.1.13 - UTGO Series 2010E (Closing Memorandum).pdf

📄 2.2.1.14 - UTGO Series 2010E (Offering Memoranda).pdf

2.2.1.15 - UTGO Series 2002 (Closing Memorandum).PDF

2.2.1.16 - UTGO Series 2003-A, 2003-B (Closing Memoranda).pdf

2.2.1.17 - City of Detroit Downtown Development Authority $122,520,000.pdf

📁 2.2.2 - LTGO Debt

2.2.2.1 - LTGO Series 1997 (Offering Memorandum).pdf

2.2.2.2 - LTGO Self-Insurance Bonds Series 2003 (Closing Memorandum).pdf

2.2.2.3 - LTGO Series 2003 (Offering Memorandum).pdf

2.2.2.4 - LTGO Series 2004 (Offering Memorandum).pdf

2.2.2.5 - LTGO Self-Insurance Bonds Series 2004 (Closing Memorandum).pdf

2.2.2.6 - LTGO Series 2005-A(1), A(2), B (Closing Memorandum).pdf

2.2.2.7 - LTGO Series 2005 (Offering Memorandum).pdf

2.2.2.8 - LTIC Series 2008-A(1), (2) (Closing Memorandum).pdf

2.2.2.9 - LTGO Series 2008 (Offering Memorandum).pdf

2.2.2.10 - LTGO Series 2010 (Closing Memorandum).pdf

2.2.2.11 - LTGO Series 2010 (Offering Memorandum).pdf

2.2.2.12 - LTGO Distributable State Aid Series 2010 (Offering Memorandum).pdf

2.2.2.13 - LTGO Series 2012A (Closing Memorandum).pdf

2.2.2.14 - LTGO Series 2012C (Closing Memorandum).pdf

2.2.2.15 - LTGO Series 2012C (Offering Memorandum).pdf

📁 2.2.3 - Pension Obligation Certificates

2.2.3.1 - POCs 2005 Offering Circular.pdf

2.2.3.2 - 06-02-05 Retirement Trust Complete Closing Memorandum.pdf

2.2.3.3 - POCs 2006 Offering Circular.pdf

2.2.3.4 - 06-12-06 Retirement Trust Complete Closing Memo.pdf

📁 2.2.4 - Swaps

2.2.4.1 - Sewage Disposal System Bond Swap - Closing Documents.pdf

2.2.4.2 - Water System Bond Swap - Closing Documents_Dot_.pdf

2.2.4.3 - POC Swap Collateral Agreement.pdf

2.2.4.4 - Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf

2.2.4.5 - CA Insurance Policy Effective June 12, 2006 (General Retirement)- Swap Agreement May 25, 2005.pdf

2.2.4.6 - CA Insurance Policy Effective June 12, 2006 (Police, Fire)- Swap Agreement May 25, 2005.pdf

2.2.4.7 - FGIC Insurance Policy Effective June 2, 2005- Swap Agreement May 25, 2005.pdf

2.2.4.8 - FGIC Insurance Policy Effective June 12, 2006- Swap Agreement May 25, 2005.pdf

📁 2.2.5 - Revenue Bonds and Revolving Loans

📁 2.2.5.1 - Water

2.2.5.1.1 - Water Series 1995-A, B (Offering Memorandum).pdf

2.2.5.1.2 - Water Series 2001-A, B (Offering Memorandum).pdf

2.2.5.1.3 - Water Series 2001A,B,C - final pricing.PDF

2.2.5.1.4 - Water Series 2003A (Closing Memorandum).pdf

2.2.5.1.5 - Water Series 2005-A, B, C (Offering Memorandum).pdf

2.2.5.1.6 - Water Series 2005-B (Closing Memorandum).pdf

2.2.5.1.7 - Water Series 2006(A), (B), (C), (D) (Offering Memorandum).pdf

2.2.5.1.8 - Water Series 2006(B) (Remarketing Circular).pdf

2.2.5.1.9 - Water Series 2006(A), (B), (C), (D) (Closing Memorandum).pdf

2.2.5.1.10 - Water Series 2011-A, B, C (Closing Memorandum).pdf

2.2.5.1.11 - Water Series 2011(A), (B), (C) (Offering Memorandum).pdf

2.2.5.1.12 - Water Series 1993 Closing Memorandum.pdf

2.2.5.1.13 - 8.14.1997 Closing Transcript Water Series 1997, 1992.PDF

2.2.5.1.14 - 5.23-24.2001 Closing Transcript Water Series 2001-A, B.PDF

2.2.5.1.15 - 5.14.2008 Closing Transcript Water Series 2001-C, 2005-B.PDF

2.2.5.1.16 - 2.06.2003 Closing Transcript Water Series 2003D.pdf

2.2.5.1.17 - 5.13.2004 Closing Transcript Water Series 2004A.pdf

2.2.5.1.18 - 9.22.2005 SRF1 Closing Transcript Water Series 2005.PDF

2.2.5.1.19 - 9.22.2005 SRF2 Closing Transcript Water Series 2005.PDF

2.2.5.1.20 - 3.23.2005 Closing Transcript Water Series 2005B.pdf

2.2.5.1.21 - 9.21.2006 Closing Transcript Water Series 2006.PDF

2.2.5.1.22 - Water Series 2006A, B, C, D Closing Memorandum.pdf

2.2.5.1.23 - 9.29.2008 Closing Transcript Water Series 2008.PDF

2.2.5.2 - Sewerage

2.2.5.2.1 - Sewer Series 1998 Offering Memorandum.pdf

2.2.5.2.2 - Sewer Series 1998-A, 1998-B.pdf

2.2.5.2.3 - Sewer Series 2001C Fixed Offering Memorandum.pdf

2.2.5.2.4 - Sewer Series 2001C Variable Offering Memorandum.pdf

2.2.5.2.5 - Sewer Series 2001D Offering Memorandum.pdf

2.2.5.2.6 - Sewer Series 2001, 2003 Closing Memorandum.pdf

2.2.5.2.7 - Sewer Series 2003(A) Offering Memorandum.pdf

2.2.5.2.8 - Sewer Series 2003B Offering Memorandum.pdf

2.2.5.2.9 - Index and Closing Papers (Complete) Series 2004 A 101,435,000.pdf

2.2.5.2.10 - Sewer Series 2005 Offering Memorandum.pdf

2.2.5.2.11 - Closing Transcript - Sewer Series 2005(A), (B).pdf

2.2.5.2.12 - Closing Transcript - Sewer Series 2005(C) Part 1 of 2.pdf

2.2.5.2.13 - Closing Transcript - Sewer Series 2005(C) Part 2 of 2.pdf

2.2.5.2.14 - Sewer Series 2006 Offering Memorandum.pdf

2.2.5.2.15 - Sewer Series 2006A, B, C.pdf

2.2.5.2.16 - Sewer Series 2006D.pdf

2.2.5.2.17 - Sewer Series 2006D Offering Memorandum.pdf

2.2.5.2.18 - Sewer Series 2012A Offering Memorandum.pdf

2.2.5.2.19 - 12.20.1999 Closing Transcript. Series 1999-A.pdf

2.2.5.2.20 - 12.20.2001 Closing Transcript I Sewer Series 2001.PDF

2.2.5.2.21 - 10.23.2001 Closing Transcript II Sewer Series 2001(A), (B), (C-1), (C-2).PDF

2.2.5.2.22 - 10.23.2001 Closing Transcript III Sewer Series 2001(D-1), (D-2), (E).PDF

2.2.5.2.23 - 2001 Findings (Final) Transcript Sewer Series 2001.PDF

2.2.5.2.24 - 6.27.2002 SRF1 Closing Transcript Sewer 2002.PDF

2.2.5.2.25 - 6.27.2002 SRF2 Closing Transcript Sewer 2002.PDF

2.2.5.2.26 - 12.19.2002 Closing Transcript Sewer Series 2002.PDF

2.2.5.2.27 - 6.26.2003 Closing Transcript Sewer 2003.PDF

2.2.5.2.28 - 5.22.2003 Closing Transcript Sewer Series 2003(A), (B).pdf

2.2.5.2.29 - 9.25.2003 Closing Transcript Sewer Series 2003.PDF

2.2.5.2.30 - 9.20.2007 Closing Transcript Sewer Series 2007.PDF

2.2.5.2.31 - 4.17.2009 Closing Transcript Sewer Series 2009.PDF

2.2.5.2.32 - 5.7-8.2008 Closing Transcript Sewer Series 2001(C-2), (E), 2006(A).pdf

2.2.5.2.33 - Sewer Series 2010. 1.22.2010 Closing Transcript.PDF

2.2.5.2.34 - 8.30.2012 Closing Transcript Sewer Series 2012.PDF

2.2.5.2.35 - 6.26.2012 Closing Transcript Sewer Series 2012(A).pdf

2.2.5.2.36 - 3.30.2000 Closing Transcript Sewer Series 2000.PDF

📁 2.2.5.3 - Parking

2.2.5.3.1 - Parking and Arena Systems Series 1998A (Offering Memorandum).pdf

2.2.5.3.2 - Parking and Arena Systems Series 1998A (Closing Memorandum).pdf

📁 2.2.5.4 - DDOT

📁 2.2.6 - Installment Loans

📁 2.3 - Contracts

📁 2.3.1 - Outsourcing

📁 2.3.2 - Purchasing

📁 2.3.3 - Information Technology

📁 2.3.4 - Maintenance

📂 3 - Employees and Retirees

📁 3.1 - Organizational Charts

📁 3.2 - Employee and Retiree Census

    📄 3.2.1 - Union Member Count May 2013.pdf

    📄 3.2.2 - Retirees - Medical Benefits Only.xls

    📄 3.2.3 - Retirees - Pension and Medical.xls

📁 3.3 - Compensation and Benefits

    📁 3.3.1 - Compensation Data

    📁 3.3.2 - Pension

        📁 3.3.2.1 - GRS

            📁 3.3.2.1.1 - City Actuarial Reports

                📄 3.3.2.1.1.1 - GRS Actuarial Valuation June 30 2007.pdf

                📄 3.3.2.1.1.2 - GRS Actuarial Valuation June 30 2008.pdf

                📄 3.3.2.1.1.3 - GRS Actuarial Valuation June 30 2009.pdf

                📄 3.3.2.1.1.4 - GRS Actuarial Valuation June 30 2010.pdf

                📄 3.3.2.1.1.5 - GRS Actuarial Valuation June 30 2011.pdf

                📄 3.3.2.1.1.6 - Detroit General 2012-06-30 74th (Preliminary Draft) Annual Pension Valuation[1].pdf

                📄 3.3.2.1.1.7 - Detroit General Experience Study 2002-2007.pdf

                📄 3.3.2.1.1.8 - Detroit General June 30 2009 Asset Valuation Method Review.pdf

                📄 3.3.2.1.1.9 - Detroit General June 30 2010 Alternative Smoothing and Investment Return Review.pdf

                📄 3.3.2.1.1.10 - Detroit General June 30 2011 Projections.pdf

        📁 3.3.2.2 - PFRS

            📁 3.3.2.2.1 - City Actuarial Reports

                📄 3.3.2.2.1.1 - Actuarial Valuation June 30 2007.pdf

                📄 3.3.2.2.1.2 - Actuarial Valuation June 30 2008.pdf

                📄 3.3.2.2.1.3 - Actuarial Valuation June 30 2009.pdf

                📄 3.3.2.2.1.4 - Actuarial Valuation June 30 2010.pdf

                📄 3.3.2.2.1.5 - Actuarial Valuation June 30 2011.pdf

                📄 3.3.2.2.1.6 - DRAFT Police and Fire Actuarial Results June 30 2012.PDF.pdf

                📄 3.3.2.2.1.7 - Detroit Police and Fire Experience Study 2002-2007.pdf

                📄 3.3.2.2.1.8 - Detroit Police and Fire June 30 2009 Asset Valuation Method Review.pdf

                📄 3.3.2.2.1.9 - Detroit Police and Fire June 30 2010 Alternative Smoothing and Investment Return Review.pdf

                📄 3.3.2.2.1.10 - Detroit Police and Fire June 30 2011 Projections.pdf

        📁 3.3.2.3 - Milliman Reports

            📄 3.3.2.3.1 - DGRS_Baseline_7Pct30yearamort_6.14.13.pdf

            📄 3.3.2.3.2 - DGRS_CETChangesProj_1.28.13.pdf

            📄 3.3.2.3.3 - DGRS_NC_And_UALproj_1.25.13.pdf

3.3.2.3.4 - DGRS_freeze_noCola_5.20.13.pdf

3.3.2.3.5 - DGRS_freeze_noCola_altamort_6.4.13.pdf

3.3.2.3.6 - DGRS projection_exhinmillions_11.16.12.pdf

3.3.2.3.7 - PFRS_Baseline_7Pct30yearamort_6.14.13.pdf

3.3.2.3.8 - PFRS_NCUALDCproj_1.25.13.pdf

3.3.2.3.9 - PFRS_freeze_noCola_5.21.13.pdf

3.3.2.3.10 - PFRS_freeze_noCola_altamort_6.4.13.pdf

3.3.2.3.11 - PFRS projection_exhinmillions_12.12.12.pdf

3.3.2.3.12 - 2011FundedStatusReflectingPOCs_4.18.13.pdf

3.3.2.3.13 - 2012FundedStatusReflectingPOCs_6.9.13.pdf

3.3.2.3.14 - GabrielRoederProjections-reformat_6.14.13.pdf

3.3.2.3.15 - one-year-svc-cancel_5.15.13.pdf

3.3.2.4 - Milliman Release (with Instructions).pdf

3.3.3 - Healthcare and OPEB

3.3.3.1 - Health and Life Insurance Plans

3.3.3.2 - Supplemental Death Benefit Plan

3.3.3.3 - Weiler Class

3.3.3.3.1 - Weiler Consent Judgment and Order of Dismissal.PDF

3.3.3.3.2 - Weiler Consent Judgment.PDF

3.3.3.3.3 - Weiler Exhibit 01.pdf

3.3.3.3.4 - Weiler Exhibit 01a.pdf

3.3.3.3.5 - Weiler Exhibit 02.pdf

3.3.3.3.6 - Weiler Exhibit 03.pdf

3.3.3.3.7 - Weiler Exhibit 04.pdf

3.3.3.3.8 - Weiler Exhibit 05.pdf

3.3.3.3.9 - Weiler Exhibit 06.pdf

3.3.3.3.10 - Weiler Exhibit 07-A.pdf

3.3.3.3.11 - Weiler Exhibit 07-B.pdf

3.3.3.3.12 - Weiler Exhibit 07-C.pdf

3.3.3.3.13 - Weiler Exhibit 07.pdf

3.3.3.3.14 - Weiler Exhibit 08-A.pdf

3.3.3.3.15 - Weiler Exhibit 08-B.pdf

3.3.3.3.16 - Weiler Exhibit 08.pdf

3.3.3.3.17 - Weiler Exhibit 09-A.pdf

3.3.3.3.18 - Weiler Exhibit 09-B.pdf

3.3.3.3.19 - Weiler Exhibit 09-C.pdf

3.3.3.3.20 - Weiler Exhibit 09-D.pdf

3.3.3.3.21 - Weiler Exhibit 09.pdf

3.3.3.3.22 - Weiler Exhibit 10.pdf

3.3.3.3.23 - Weiler Exhibit 11.pdf

3.3.3.3.24 - Weiler Exhibit 12.pdf

3.3.3.3.25 - Weiler Exhibit 13.pdf

3.3.3.3.26 - Weiler Exhibit 14.pdf

3.3.3.3.27 - Weiler Exhibit 15.pdf

3.3.3.3.28 - Weiler Exhibit 16.pdf

📁 3.3.3.4 - OPEB Actuarial Reports

3.3.3.4.1 - OPEB Valuation as of June 30, 2011 (final).pdf

📁 3.3.3.5 - Milliman Reports

3.3.3.5.1 - DETREPLttrFinal.pdf

📁 3.3.4 - Other benefits

📁 3.4 - Labor Presentations

3.4.1 - Non-Uniform 2013-06-20.pdf

3.4.2 - Uniform 2013-06-20.pdf

📁 3.5 - Employee Headcount

3.5.1 - City of Detroit Headcount 6.30.13.pdf

📊 3.6 - Retiree by City.xlsx

📁 4 - Financials

📁 4.1 - Historical Financials

4.1.1 - June 2013 variance report (DRAFT) v1.pdf

📁 4.2 - Short Term (Through June 2015) Cash Flow Forecast

4.2.1 - Cash Flow Forecast (including restr scen) v1.3.pdf

4.2.2 - Monthly Cash Flows (base and rest) v1.3.pdf

📁 4.3 - Ten Year Financial Projections and Restructuring Model

📁 4.3.1 - Ten Year Plan

4.3.1.1 - Project Piston_Version 1.0_summary (6.21.13).pdf

4.3.1.2 - Project Piston_Version 1.0_detail (6.21.13).pdf

📊 4.3.1.3 - Project Piston_Version 1.0_summary.xlsx

📊 4.3.1.4 - Project Piston_Version 1.0_detail.xlsx

📁 4.3.2 - Revenue Detail

4.3.2.1 - Minnesota Taxpayers Association-Lincoln Institute - 50-State Property Tax Comparison Study - April 2012.pdf

4.3.2.2 - Project Piston_10 Yr Prop. _And_ Inc. Tax Rev Support.pdf

📊 4.3.2.3 - Project Piston_10 Yr Prop. _And_ Inc. Tax Rev Support.xlsx

📁 4.3.3 - Roll-up of Department Restructuring

  📄 4.3.3.1 - Consolidated (10 Year) General Fund - 6.12.13 Consolidated Summary Schedules.pdf

  📄 4.3.3.2 - Consolidated (10 Year) General Fund - 6.12.13 Headcount.pdf

  📄 4.3.3.3 - Consolidated (10 Year) General Fund - 7.1.13 All Departments All Summaries.pdf

📁 4.3.4 - Impact of Restructuring Actions To-Date

📁 4.4 - Balance Sheet Items

  📁 4.4.1 - Cash

    📄 4.4.1.1 - Cash Position Dashboard - 2013-05-31.pdf

  📁 4.4.2 - Swap Valuations

    📄 4.4.2.1 - City of Detroit POC swap valuation 28-Jun-2013.pdf

    📄 4.4.2.2 - City of Detroit POC swap valuation 31-May-2013.pdf

    📄 4.4.2.3 - City of Detroit _ 30-Apr-2013[1]_1.pdf

  📁 4.4.3 - Debt

    📊 4.4.3.1 - Draft Detroit Debt Service Model 7.19.2013.xlsx

📁 4.5 - Other

  📄 4.5.1 - POC Reimbursements.pdf

📁 5 - Fund and Departmental Overviews and Restructuring Plans

  📁 5.1 - 36th District Court

    📄 5.1.1 - Consolidated (10 Year) General Fund - 6.12.13 36th District Court.pdf

  📁 5.2 - CAY Airport

    📄 5.2.1 - Consolidated (10 Year) General Fund - 6.12.13 Airport.pdf

  📁 5.3 - Auditor General

  📁 5.4 - Board of Zoning Appeals

    📄 5.4.1 - Consolidated (10 Year) General Fund - 6.12.13 Board of Zoning Appeals.pdf

  📁 5.5 - Budget Department

  📁 5.6 - BSEED

    📄 5.6.1 - Consolidated (10 Year) General Fund - 6.12.13 Building Safety Engineering Environmental Dept.pdf

    📄 5.6.2 - Superfund Site Summary 7 10 13.pdf

  📁 5.7 - City Clerk

    📄 5.7.1 - Consolidated (10 Year) General Fund - 6.12.13 City Clerk.pdf

  📁 5.8 - City Council

    📄 5.8.1 - Consolidated (10 Year) General Fund - 6.12.13 City Council.pdf

    📄 5.8.2 - April CM FAB Discussion Document Draft 04.05.13 - City Council Presentation.pdf

  📁 5.9 - Department of Administrative Hearings

    📄 5.9.1 - Consolidated (10 Year) General Fund - 6.12.13 Dept of Administrative Hearings.pdf

📁 5.10 - Department of Elections

📄 5.10.1 - Consolidated (10 Year) General Fund - 6.12.13 Elections.pdf

📁 5.11 - Department of Health and Wellness

📄 5.11.1 - Consolidated (10 Year) General Fund - 6.12.13 Dept Health and Wellness Promotion.pdf

📁 5.12 - Detroit Department of Transportation

📄 5.12.1 - Consolidated (10 Year) General Fund - 6.12.13 Dept of Transportation.pdf

📄 5.12.2 - CM Initial Observations 130318 - Department of Transportation.pdf

📁 5.13 - Detroit Water and Sewerage Department

📄 5.13.1 - Links to Public DWSD Documents.pdf

📁 5.14 - Finance Department

📄 5.14.1 - Consolidated (10 Year) General Fund - 6.12.13 Finance Dept.pdf

📁 5.15 - Fire Department

📄 5.15.1 - Consolidated (10 Year) General Fund - 6.12.13 Fire Dept.pdf

📄 5.15.2 - CM Initial Observations 130318 - Fire Department.pdf

📄 5.15.3 - Incremental Fire Labor Summary.pdf

📁 5.16 - General Services Department

📄 5.16.1 - Consolidated (10 Year) General Fund - 6.12.13 General Services Dept.pdf

📄 5.16.2 - CM Initial Observations 130318 - General Services Department.pdf

📁 5.17 - Information Technology Services Department

📁 5.18 - Inspector General

📁 5.19 - Law Department

📄 5.19.1 - Consolidated (10 Year) General Fund - 6.12.13 Law Dept.pdf

📁 5.20 - Mayor's Office

📁 5.21 - Municipal Parking Department

📄 5.21.1 - Consolidated (10 Year) General Fund - 6.12.13 Municipal Parking.pdf

📄 5.21.2 - AUTOMOTI.PDF

📁 5.22 - Ombudsperson

📄 5.22.1 - Consolidated (10 Year) General Fund - 6.12.13 Ombudsperson.pdf

📁 5.23 - Planning and Development Department

📄 5.23.1 - Consolidated (10 Year) General Fund - 6.12.13 Planning and Development Dept.pdf

📁 5.24 - Police Department

📄 5.24.1 - Consolidated (10 Year) General Fund - 6.12.13 Police Dept.pdf

📄 5.24.2 - April CM FAB Discussion Document 04.05.13 - Police Department Presentation.pdf

📄 5.24.3 - CM Initial Observations 130318 - Police Department.pdf

📁 5.25 - Public Lighting Department

📄 5.25.1 - Consolidated (10 Year) General Fund - 6.12.13 Public Lighting Dept.pdf

5.25.2 - CM Initial Observations 130318 - Public Lighting Department.pdf

📁 5.26 - Public Works Department

📁 5.27 - Recreation Department

📁 5.27.1 - Belle Isle

5.27.1.1 - Belle Isle - Estimated Expenses.pdf

5.27.1.2 - Revised Belle Isle Lease Analysis between City and State January 24, 2013.pdf

5.27.1.3 - Belle Isle Lease _And_ Exhibits 1.18.13 (15)_2 FINAL to CC.pdf

5.27.2 - Consolidated (10 Year) General Fund - 6.12.13 Recreation Dept.pdf

📁 5.28 - Other Funds and Departments

5.28.1 - Consolidated (10 Year) General Fund - 6.12.13 Grant Management.pdf

5.28.2 - Consolidated (10 Year) General Fund - 6.12.13 Human Resources Dept.pdf

5.28.3 - Consolidated (10 Year) General Fund - 6.12.13 Human Rights Dept.pdf

5.29 - CM Initial Observations 130318 - Initial Observations.pdf

📁 6 - Reinvestment Initiatives

📁 6.1 - Public Safety

📁 6.2 - Blight Removal

6.2.1 - Consolidated (10 Year) General Fund - 6.12.13 Blight.pdf

6.2.2 - Detroit Future City - Detroit Strategic Framework Plan - December 2012.pdf

📁 6.3 - Information Technology

6.3.1 - Consolidated (10 Year) General Fund - 6.12.13 IT Summary.pdf

📁 6.4 - Public Lighting Authority

📁 6.5 - Regional Transit Authority

📁 6.6 - Vehicle Purchases

6.6.1 - Consolidated (10 Year) General Fund - 7.1.13 Other Infrastructure Cost Summary.pdf

📁 6.7 - Capital Spending

6.7.1 - Consolidated (10 Year) General Fund - 6.12.13 Capex Summary.pdf

📁 6.8 - Asset Monetization

📁 6.8.1 - Real Estate

📁 6.8.1.1 - Appraisals

6.8.1.1.1 - 1113 Coplin - fire station .pdf

6.8.1.1.2 - 1625 W. Lafayette-fire station.pdf

6.8.1.1.3 - 3396 Vinewood -fire station .pdf

6.8.1.1.4 - 3810 Mt. Elliott-fire station .pdf

6.8.1.1.5 - 6900 Miller -fire station .pdf

6.8.1.1.6 - 12511 Grand River-fire station .pdf

6.8.1.1.7 - Brodhead Draft 3-20-13.pdf

6.8.1.1.8 - Fire HQ Draft.pdf

6.8.1.1.9 - Ford CBRE Appraisal Vets.pdf

6.8.1.1.10 - GSD Appraisal 151 W Jefferson Draft 1-5-12.pdf

6.8.1.1.11 - GSD Lipke Appraisal.pdf

6.8.1.1.12 - Livernois Yard Appraisal.pdf

6.8.1.1.13 - Lugar Playground_2.713 ac_18904 Lesure.pdf

6.8.1.1.14 - Police Beaubien HQ Draft.pdf

6.8.1.1.15 - SA Appraisal 1 Lipke.pdf

6.8.1.1.16 - SA Appraisal 2 Lipke.pdf

6.8.1.1.17 - SA Market Opinion Lipke.pdf

6.8.1.1.18 - Stone Pool.pdf

📁 6.8.1.2 - City Owned Properties from Foreclosure

6.8.1.2.1 - City Owned Properties from Foreclosure.pdf

6.8.1.2.2 - 2013 City of Detroit Foreclosure Property List.pdf

6.8.1.2.3 - City of Detroit Historical Auction-Foreclosure Data 2002 to 2012.pdf

📁 6.8.1.3 - Real Estate and Infrastructure Properties Summary

6.8.1.3.1 - Real Estate and infrastructure Properties Summary.pdf

📁 6.8.2 - Machinery and Equipment Summary

6.8.2.1 - Machinery and Equipment Summary Part 1.pdf

6.8.2.2 - Machinery and Equipment Summary Part 2.pdf

6.8.2.3 - Machinery and Equipment Sale List - Master Auction list 7 23 13 Summary.xlsx

📁 7 - Restructuring Plan Communication

📁 7.1 - Emergency Manager Reports

7.1.1 - Link to Emergency Manager Reports.docx

📁 8 - Detroit Water and Sewerage Department