# EXHIBIT F

STATE OF MICHIGAN

IN THE SUPREME COURT

MICHAEL BEYDOUN,

      Plaintiff-Appellee,

v

CHARLES BENJAMIN WILLS JR.,

      Defendant,

and

CITY OF DETROIT,

      Defendant-Appellant.

Supreme Court No. 147332
Court of Appeals No. 304729

Lower Court No. 09-026647-NI
Wayne County Circuit Court
Hon. Robert J. Colombo, Jr.

_____/

Raymond Guzall III (P60980)
RAYMOND GUZALL III, P.C.
Attorney for Plaintiff-Appellee
31555 W. Fourteen Mile Rd., Suite 320
Farmington Hills, MI 48334
(248)702-6122

Sheri L. Whyte (P41858)
Assistant Corporation Counsel
Attorney for Defendant-Appellant
City of Detroit
660 Woodward Avenue, Suite 1650
Detroit, Michigan 48226
(313) 237-3076

_____/

## PLAINTIFF/APPELLEE'S MOTION FOR IMMEDIATE CONSIDERATION OF DEFENDANT/APPELLANT'S APPLICATION FOR LEAVE TO APPEAL

NOW COMES, Appellee Michael Beydoun by and through his attorney, Raymond Guzall III, P.C. by Raymond Guzall III, and for his Motion For Immediate Consideration, pursuant to MCR 7.302(G) and other applicable law, states as follows:

1. Appellee Michael Beydoun obtained a jury verdict, attorney fees, costs and interest against the Appellant City of Detroit in the amount of $2,195,079.83.

2. Appellant City of Detroit has set forth publicly the real threat of filing for bankruptcy. (Exhibit 1, June 15, 2013 Detroit Free Press Article).

3. Appellant City of Detroit's Corporate Counsel stated privately within the past few weeks to Appellee's Counsel, the fact that Appellee will receive little or no compensation when Appellant Detroit files for bankruptcy.

4. The intent of Appellant City of Detroit's Corporate Counsel in contacting Appellee's Counsel in the past few weeks, as expressed in two phone conversations (June 19, 2013 at 2:00 pm and June 25, 2013 at 2:37 pm), was an attempt to force Appellee to settle for a "substantial" lesser amount than the judgment in this case, otherwise they would file their application for leave to appeal this matter to delay it further so that they could discharge Appellees judgment in bankruptcy. (Exhibit 3, affidavit of Raymond Guzall III).

5. Appellant City of Detroit currently operates under an Emergency Financial Manager, Kevyn Orr. (Exhibits 1 and 2).

6. Given the fact that the Appellant City of Detroit currently operates under an Emergency Financial Manager, Appellee's current Motion should be granted as such falls squarely within the Michigan Court Rule, MCR 7.302 (G), entitled

"Emergencies".

7. If this Court does not rule upon this matter in an expedited manner, Appellee faces receiving no monetary compensation for the damages incurred from the auto accident involved in this case, as an unsecured creditor.

8. No bond has been filed by Appellant.

9. Appellant's filed their application for leave to appeal with this Court on July 1, 2013, with a Notice of Hearing for July 23, 2013, providing this Court jurisdiction.

WHEREFORE, Appellee Michael Beydoun requests this Honorable Court grant his Motion for Immediate Consideration, immediately Deny Appellant's Application for Leave To Appeal, and grant Appellee all other relief deemed appropriate in his favor. In the alternative, should this Court not grant Appellee's Motion immediately denying Appellant's Application for Leave To Appeal, Appellee requests this Court immediately order the Appellant City of Detroit to post a bond with the Court in the amount of $2,195,079.83 so that Appellee may be assured that those monies will be readily available to make good upon the judgment in this Case at the time of decision by this Court upon Appellant's application for Leave to Appeal.

PLAINTIFF/APPELLEE'S BRIEF IN SUPPORT OF HIS MOTION FOR IMMEDIATE CONSIDERATION OF DEFENDANT/APPELLANT'S APPLICATION FOR LEAVE TO APPEAL

"Missing bill payments is a key precondition for a Chapter 9 filing. Detroit has met that condition." (Exhibit 1, page 1, 3rd sentence). "Detroit's financial crisis: City teeters on edge of bankruptcy". (Exhibit 2, page 1).

Several related news articles at Exhibits 1 and 2 attached hereto illustrate the 'emergency' situation in the City of Detroit, and the emergency situation facing Appellee if this matter is not settled immediately. If usual procedures are followed in this case, and the matter takes several months or longer to be determined by this Court, Appellee will suffer irreparable injury should the Appellant City of Detroit file bankruptcy, as he will likely then receive little or no compensation at all for his injuries. (Exhibits 1, 2, 3, 11 USCA 507, 11 USCA 523, 11 USCA 524, *In re Pattison*, 305 BR 685, 686 (ED Mich 2003).

I.   THE QUESTIONS PRESENTED BY APPELLANT CLEARLY DO NOT WARRANT REVIEW BY THE MICHIGAN SUPREME COURT, AND IT IS CLEAR THAT APPELLANT'S APPLICATION HAS BEEN FILED WITH THIS COURT SOLELY TO DELAY PAYMENT TO APPELLEE IN ORDER TO DISCHARGE THE JUDGMENT IN THIS CASE IN BANKRUPTCY

Appellant states that, "...the Court of Appeals' decision is clearly erroneous and will cause material injustice." (Appellant's Application for Leave to Appeal at p. 2). Up to page 8 of Appellant's Application for Leave to Appeal to this Court, Appellant argues only facts. There is no citation in the Application of Appellant to any portion of the Michigan Court of Appeals Opinion, attached at Appellant's exhibit F.

At page 8 of Appellant's Application for Leave to Appeal to this Court, Appellant

states that, "[t]he Court of Appeals' decision is clearly erroneous and will cause material injustice to Defendant City." (Appellant's Application for Leave to Appeal at p. 2). Yet, Appellant fails to advise this Court how the Court of Appeals clearly erred. In addition, Appellant fails to set forth to this Court their claimed material injustice.

This matter is not one that should be reviewed by this Court. The Court of Appeals in this Case reasoned and found as follows:

> "Defendant argues that the trial court erred by not granting its motions for directed verdict or JNOV because evidence admitted at trial supports a finding that plaintiff "jumped the light" and that Officer Wills complied with MCL 257.603. Defendant had the burden, however, of establishing that no factual question existed upon which reasonable minds could differ regarding Officer Wills's negligence and that there was insufficient evidence of Officer Wills's negligence to create an issue of fact for the jury. Review of the record reveals that plaintiff offered sufficient evidence to establish that Officer Wills acted negligently. Eyewitness testimony and a digital video of the accident captured by a camera mounted to the windshield of Officer Wills's vehicle supported a finding that Officer Wills ran the red light and that the light was red for a period of time before Officer Wills entered the intersection. Therefore, it is reasonable to conclude that plaintiff did not jump the green light as defendant alleges. It is also a reasonable inference that Officer Wills did not properly activate either his siren or his emergency lights as required by MCL 257.603(4) before proceeding through the red light. MCL 257.603(4) requires that the driver of the emergency vehicle use an audible signal "as may be reasonably necessary." Although Officer Wills testified that he chirped his siren, both plaintiff and another victim of the accident, Kyishin Shiah, testified that they did not hear a siren or see emergency lights.[3] Therefore, the trial court properly denied defendant's motions for a directed verdict and a JNOV." (Appellant's Exhibit F, Appellate Court Opinion, at page 3).

Footnote 3 states:

> "In addition to eyewitness testimony and the video of the accident, the trial court admitted into evidence an "Official Remand" [SIC - 'Reprimand'] of Officer Wills issued by the Detroit Police Department. The Detroit Police Department investigated the accident and determined that Officer Wills disobeyed the red light. Further, it classified the accident as "preventable" and officially reprimanded Officer Wills." (Appellant's Exhibit F, Appellate Court Opinion, at page 3).

In the second portion of Appellant's Application for Leave to Appeal to this Court, Appellant states that, "[t]he jury award was violative of logic and appears to have been influenced by passion or prejudice." (Appellant's Application for Leave to Appeal at p. 9). Appellant does not set forth any facts to support such a claim, nor cites to any portion of the Appellate Court Opinion where a claimed clear error occurred.

Appellant also states that, "[t]he judge misunderstood the law, and the verdict was contrary to law." Appellant does not set forth any facts to support such a claim, nor cites to any portion of the Appellate Court Opinion where a claimed clear error occurred.

Appellant next argues that they are entitled to a new trial. After setting forth the law and facts, the Court of Appeals in this case reasoned and found:

> "We conclude that the trial court did not abuse its discretion by denying defendant's motion for a new trial on the basis that the verdict was against the great weight of the evidence. There was competent evidence showing that Officer Wills was negligent. The video of the accident and testimony from Officer Wills, plaintiff, and Shiah confirm that Officer Wills ran the red light. There was also competent evidence that Officer Wills did not properly activate his siren or lights: both plaintiff and Shiah testified that they did not hear or see Officer Wills's siren or emergency lights. Therefore, the verdict was not against the great weight of the evidence." (Appellant's Exhibit F, Appellate Court Opinion, at page 5).

Appellant again failed to cite to any claimed clear error by the Court of Appeals. Appellant next argues that Appellee's tax records should not have been admitted into evidence at trial. The Court of Appeals in this Case reasoned and found as follows:

> "The trial court's admission of the tax records was consistent with substantial justice. First, defense counsel repeatedly, in front of the jury, used the absence of the tax records against plaintiff to suggest that plaintiff did not have proof of lost income. In fact, defense counsel challenged plaintiff to produce documentation of his lost income, stating that "the jury would like to see something to verify what you're saying

5

because so far you have presented nothing." The trial court properly allowed plaintiff to respond to defense counsel's claim by presenting the tax records. Second, defendant cannot claim that he was surprised by the introduction of the tax records. Defense counsel knew that the tax records likely existed and that there was a chance that plaintiff would introduce them once he repeatedly questioned plaintiff regarding their absence.[4]" (Appellant's Exhibit F, Appellate Court Opinion, at page 4).

Appellant again failed to cite to any claimed clear error by the Court of Appeals.

Appellant next argues that the jury award was excessive. The Court of Appeals in this Case reasoned and found as follows:

"We also conclude that the jury's award of damages was supported by plaintiff's evidence and, therefore, was not excessive. The jury awarded plaintiff $250,000 in past and future noneconomic damages. Plaintiff's attorney presented testimony from plaintiff and his doctor regarding plaintiff's continuing chronic pain, his inability to sleep, and his inability to drive or practice martial arts. Therefore, plaintiff's evidence substantiated the noneconomic-damage amount.

The jury also awarded plaintiff past economic damages of $542,405. Plaintiff, who designs and builds in the field of construction, testified that he lost more than $540,000 in jobs that he had begun but could not complete after the accident. Although the trial court never officially admitted the first of plaintiff's business-records exhibits, plaintiff discussed the contents of the proposed exhibit at length. On the second day of trial, plaintiff submitted a second business-records exhibit that also supported his lost income. Plaintiff's exhibits included both a list of projects that he was unable to either complete or complete on time after the accident and supporting documentation. This evidence substantiated the past economic-damages award.

Finally, the jury awarded plaintiff future economic damages of $1,493,250. Plaintiff's properly admitted tax records indicated that he earned about $200,000 to $300,000 a year in the three years before the accident. After the accident, plaintiff's tax records indicate that he lost about $115,000 a year. Given these numbers, the damage award for plaintiff's future income was supported by the evidence and reasonable. Plaintiff was 50 years old during trial, and it is a reasonable assumption that he had another 10 or 15 years of work before he retired. The jury awarded plaintiff approximately $100,000 to $150,000 a year in lost income. This yearly income loss accounts for the downturn of the economy and plaintiff's continued, but limited, ability to work. Plaintiff's damage award was neither

excessive nor obviously influenced by passion or prejudice.

Accordingly, the trial court did not abuse its discretion by denying defendant's motion for a new trial or remittitur on this basis." (Appellant's Exhibit F, Appellate Court Opinion, at pages 5-6).

Appellant failed to present any issue that should be reviewed by this Court. The trial in this matter was factually and legally sufficient. Appellant failed to demonstrate an abuse of discretion by Judge Colombo or the Court of Appeals.

Appellant here only attempts to further delay payment to Appellee to avoid it's obligation in paying upon the judgment in this Case. Appellant's application to this Court is devoid of merit.

In the alternative, should this Court not grant Appellee's Motion, Appellee requests this Court immediately order the Appellant City of Detroit to post a bond with the Court in the amount of $2,195,079.83 (Exhibits A & B of Appellant's Application to this Court) so that Appellee may be assured that those monies will be readily available to make good upon the judgments in this Case at the time of decision by this Court upon Appellant's application for Leave to Appeal.

"In any suit or proceeding in which the state, or any state officer duly authorized for that purpose, or any corporate body in charge of any state institution, or any municipal corporation, is a party, no bond shall be required to be given by any such party as a prerequisite to the taking of an appeal, or the making of an order staying proceedings." *MCL 600.2611*

While the Statute, MCL 600.2611, states that a municipal corporation is not required to post a bond, nothing in the Statute prevents this Court from ordering that a bond be posted. Given the facts and circumstances in this Case, if Appellant's Application is not immediately denied, this Court should immediately order the Appellant City of Detroit to post a bond with this Court in the amount of $2,195,079.83

in the interest of justice and to ensure justice.

WHEREFORE, Appellee Michael Beydoun requests this Honorable Court grant his Motion for Immediate Consideration, immediately Deny Appellant's Application for Leave To Appeal, and grant Appellee all other relief deemed appropriate in his favor. In the alternative, should this Court not grant Appellee's Motion immediately denying Appellant's Application for Leave To Appeal, Appellee requests this Court immediately order the Appellant City of Detroit to post a bond with the Court in the amount of $2,195,079.83 so that Appellee may be assured that those monies will be readily available to make good upon the judgment in this Case at the time of decision by this Court upon Appellant's application for Leave to Appeal.

Respectfully Submitted

Raymond Guzall III P60980
Attorney for Plaintiff/Appellee
31555 W. Fourteen Mile Rd., Suite 320
Farmington Hills, MI 48334
(248) 702-6122

### PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing instrument with all exhibits was served upon the attorney of record Sheri L. Whyte, to the above cause at her respective business addresses as disclosed by the pleadings of record herein on July 5, 2013. I declare under penalty of perjury that the statement above is true to the best of my information, knowledge and belief.

By: __X__ U.S. Mail _____ FAX _____ Hand Delivered _____ Email registered with Court

Raymond Guzall III

# EXHIBIT G

STATE OF MICHIGAN
IN THE SUPREME COURT

**MICHAEL BEYDOUN,**

      Plaintiff-Appellee,

v

**CHARLES BENJAMIN WILLS, JR.,**

      Defendant, and

**CITY OF DETROIT,**

      Defendant-Appellant.

Supreme Court No. 147332
Court of Appeals No. 304729

Wayne County Circuit Court
Case No. 09-026647 NI
Hon. Robert J. Colombo, Jr.

_____ /

| **RAYMOND GUZALL (P-60980)** | **SHERI L. WHYTE (P-41858)** |
|---|---|
| Law Offices of Raymond Guzall III | Assistant Corporation Counsel |
| Attorney for Plaintiff-Appellee | Attorney for Defendant-Appellant |
| 31555 W. Fourteen Mile Rd., Suite 320 | 2 Woodward Avenue, Suite 500 |
| Farmington Hills, Michigan 48334 | Detroit, Michigan 48226 |
| (248) 702-6122 | (313) 237-3076 |

_____ /

_____

## NOTICE OF SUGGESTION OF PENDENCY OF
## BANKRUPTCY CASE AND APPLICATION OF THE AUTOMATIC STAY

**PLEASE TAKE NOTICE THAT,** on July 18, 2013 (the "Petition Date"), the City of

Detroit, Michigan (the "City") filed a petition for relief under chapter 9 of title 11 of the United

States Code (the "Bankruptcy Code"). The City's bankruptcy case is captioned *In re City of Detroit,*

*Michigan,* Case No. 13-53846, (Bankr. E.D. Mich.) (the "Chapter 9 Case"), and is pending in the

United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). A

copy of the voluntary petition filed with the Bankruptcy Court commencing the Chapter 9 Case is

attached hereto as Exhibit A.

**PLEASE TAKE FURTHER NOTICE THAT,** in accordance with the automatic stay

imposed by operation of sections 362 and 922 of the Bankruptcy Code (the "Stay"), from and after

the Petition Date, no act to (i) exercise control over property of the City or (ii) collect, assess or

recover a claim against the City that arose before the commencement of the Chapter 9 Case may be

commenced or continued against the City without the Bankruptcy Court first issuing an order lifting

or modifying the Stay for such specific purpose.

**PLEASE TAKE FURTHER NOTICE THAT**, in accordance with the Stay, from and after

the Petition Date, no cause of action arising prior to, or relating to the period prior to, the Petition

Date may be commenced or continued against (i) the City, in any judicial, administrative or other

action or proceeding, or (ii) an officer or inhabitant of the City, in any judicial, administrative or

other action or proceeding that seeks to enforce a claim against the City, and no related judgment or

order may be entered or enforced against the City outside of the Bankruptcy Court without the

Bankruptcy Court first issuing an order lifting or modifying the Stay for such specific purpose.

**PLEASE TAKE FURTHER NOTICE THAT** actions taken in violation of the Stay, and

judgments or orders entered or enforced against the City, or its officers or inhabitants to enforce a

claim against the City, while the Stay is in effect, are void and without effect.

**PLEASE TAKE FURTHER NOTICE THAT** neither the Bankruptcy Court nor the United

States District Court for the Eastern District of Michigan has issued an order lifting or modifying the

Stay for the specific purpose of allowing any party to the above-captioned proceeding to commence

or continue any cause of action against the City or its officers or inhabitants. As such, the above-

captioned proceeding may not be prosecuted, and no valid judgment or order may be entered or

enforced against the City or its officers or inhabitants.

**PLEASE TAKE FURTHER NOTICE THAT**, in light of the foregoing, the City will not

K:\DOCS\APPEALS\whyts\a37000\misc\WM9152.WPD

defend against, or take any other action with respect to, the above-captioned proceeding while the Stay remains in effect.

**PLEASE TAKE FURTHER NOTICE THAT** the City hereby expressly reserves all rights with respect to the above-captioned proceeding, including, but not limited to, the right to move to vacate any judgment entered in the above-captioned proceeding as void.

Respectfully submitted,

CITY OF DETROIT LAW DEPARTMENT

Portia L. Roberson (P-49858)
Corporation Counsel

By: _____

Sheri L. Whyte (P-41858)
Assistant Corporation Counsel
City of Detroit Law Department
Attorney for Defendant-Appellant City
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226
(313) 237-3076

Dated: July 23, 2013

# EXHIBIT H

# Order

July 31, 2013

147332 & (51)

MICHAEL BEYDOUN,
    Plaintiff-Appellee,

v

CHARLES BENJAMIN WILLS, JR.,
    Defendant,

and

CITY OF DETROIT,
    Defendant-Appellant.
_____/

**Michigan Supreme Court**
**Lansing, Michigan**

Robert P. Young, Jr.,
*Chief Justice*

Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano,
*Justices*

SC: 147332
COA: 304729
Wayne CC: 09-026647-NI

On order of the Court, the motion for immediate consideration is GRANTED. On further order of the Court, it appearing that proceedings in this case are stayed by the filing of a petition in bankruptcy, *In re City of Detroit, Michigan*, U.S. Bankruptcy Court, Eastern District of Michigan Case No. 13-53846, the case is administratively CLOSED without prejudice and without decision on the merits. Once the stay is no longer in effect, this case may be reopened on the motion of any party filed within 42 days after the date of the order removing the stay.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

July 31, 2013



Clerk

t0731

# EXHIBIT I



### Governor Rick Snyder
# REINVENTING MICHIGAN
### Getting It Right. Getting It Done.



MICHIGAN.GOV
Michigan's
Official
Website

close print view

## Five Facts about Emergency Financial Managers

March 1, 2013
By Mike Brownfield

The news that Governor Snyder has declared that a financial emergency exists in Detroit has raised questions about emergency manager laws in Michigan. The fact is, emergency manager laws have been around for years, and the tool has been used by Democrat and Republican governors alike to solve problems in cities and school districts across Michigan.

### Fact 1: Emergency Financial Managers Aren't New

Michigan has had an emergency financial manager law on the books since 1990. The original law, Public Act 101, was signed by Democrat governor James Blanchard.

### Fact 2: Democrat and Republican Governors Have Used Emergency Financial Managers

Under Democrat Governor James Blanchard, two emergency managers were appointed, and under Democrat Governor Jennifer Granholm, seven emergency managers were appointed. In fact, Governor Granholm appointed the first emergency manager for Detroit Public Schools in 2009. See the full list below.

### Fact 3: Detroit Isn't the Only City to Have An Emergency Financial Manager

Emergency Financial Managers have been appointed in Royal Oak Township, Hamtramck, Highland Park, Flint, the Village of Three Oaks, Detroit Public Schools, Pontiac, Ecorse, Benton Harbor, Highland Park Schools, Muskegon Heights Schools and Allen Park.

### Fact 4: Emergency Financial Managers Are Held Accountable

State Treasurer Andy Dillon, who previously served as the Democrat Speaker of the House, leads the effort to ensure that emergency financial managers are properly trained.

Emergency financial managers are then accountable to both the governor and the Legislature, which in turn are both accountable to voters.

### Fact 5: Emergency Financial Managers Cannot Eliminate Collective Bargaining

Though an emergency financial manager can take actions to void contracts to prevent a local government from going bankrupt, new agreements with workers could still be reached through the collective bargaining process.

| Statute | Local Unit | EFM/EM | Appointment Date | Administration | Appointed By |
|---------|-----------|--------|------------------|----------------|--------------|
| Act 101 | Royal Oak Township | Steve Smaka | January 1990 | Gov. Blanchard | ELB |
|  |  | George Smith | July 2, 1990 | Gov. Blanchard | ELB |
| Act 72 | Hamtramck | Louis Schimmel | November 16, 200 | Gov. Engler | ELB |
|  | Highland Park | Ramona Henderson Pearson | June 19, 2001 | Gov. Engler | ELB |
|  |  | Art Blackwell | March 17, 2005 |  |  |
|  |  | Robert Mason | April 17, 2009 |  |  |
|  | Flint | Ed Kurtz | July 8, 2002 | Gov. Engler | ELB |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | Village of Three Oaks | Pamela Amato | December 1, 2008 | Gov. Granholm | ELB |
|  | Detroit Public Schools | Robert Bobb<br>Roy Roberts | March, 2009<br>May 4, 2011 | Gov. Granholm<br>Gov. Snyder | Gov. Granholm<br>Gov. Snyder |
|  | Pontiac | Fred Leeb<br>Michael Stampfler<br>Louis Schimmel | March 19, 2009<br>July 1, 2010<br>September | Gov. Granholm<br>Gov. Granholm<br>Gov. Granholm | ELB<br>ELB<br>ELB |
|  | Ecorse | Joyce Parker | October 30, 2009 | Gov. Granholm | ELB |
|  | Benton Harbor | Joseph Harris | April 1, 2010 | Gov. Granholm | ELB |
| Act 4 | Flint | Mike Brown | November 28, 2011 | Gov. Snyder | Gov. Snyder |
|  | Highland Park Schools | Joyce Parker<br>Don Weatherspoon | May 9, 2012<br>October 29, 2012 | Gov. Snyder<br>Gov. Snyder | Gov. Snyder<br>Gov. Snyder |
|  | Muskegon Heights Schools | Don Weatherspoon | April 23, 2012 | Gov. Snyder | Gov. Snyder |
|  | Allen Park | Joyce Parker | October 26, 2012 | Gov. Snyder | Gov. Snyder |

ELB = Emergency Loan Board
EM = Emergency Manager
EFM = Emergency Financial Manager



# EXHIBIT J

# JOYCE A. PARKER
## P.O. Box 3086
## Ann Arbor, Michigan 48103
## (734) 730-9526

---

## CAREER SUMMARY

Thirty years experience in City Management for full service communities in the States of Michigan and Illinois. Developed and managed budgets up to $250 million and organizations up to 800 employees. Diversified experience included the management of suburban and urban cities and charter townships that experienced rapid growth and development.

## EXPERIENCE

September 2004-     **CITY MANAGER**
October 2008        **City of Inkster, Michigan (population 32,000)**

230 employees; $50 million budget; full service City including water, wastewater treatment, public safety and senior services.

- Directly responsible for planning and construction of a $3 million new city hall and for planning construction for an $8 million new police and district court facility.
- Oversaw the construction of 34 miles of local and major street construction funded with $50 million from dedicated millage, special legislative allocations, and annual state and federal funds.
- Established an Administrative Hearings Bureau and Demolition Construction Division to address code enforcement and blight issues.
- Responsible for project compliance and construction projects to address Combined Sewer Overflow issues in the City. Was directly responsible for projects totaling $40 million.

November 2002-    COMMUNITY DEVELOPMENT DIRECTOR
August 2004      City of Flint, Michigan (population 120,000)

Responsible for community and economic development, planning and zoning, real estate disposition and acquisition, building inspection and code enforcement. Also responsible for federal, state and local grant and loan programs.

- Wrote several grant applications for foundation and federal funds. Received foundation grants totaling $2,800,000. Received Community Development Block Grants from the federal government totaling $8 million annually.
- Worked with two major housing developers to develop housing subdivisions in revitalization area. The two developments added over three hundred new single family homes in the city. Also received a grant from a local foundation to address infrastructure for the development.
- Several Section 8 loans were received to address multifamily and business development opportunities in the City. Eight Section 108 loans were approved by the Department of Housing and Urban Development.
- Reorganized and combined the Major Grant and Building Inspection Department in order to reach higher efficiency and staffing standards for the departments.
- Resolved over 25 federal findings related to the City's Community Development Block Grant Program. The findings were outstanding for more than five years prior to my employment with the City.


December 2002-   PRESIDENT & CEO
Present          The Municipal Group

Responsible for marketing, promotion, consulting and general administration for The Municipal Group. The group provides organization assessments, recruitment and training, community and economic development, personnel and interim staff services to cities, townships, and counties nationwide to include the City of Flint, Monroe

County Road Commission, the Michigan Township Association and the City of Inkster.

November 1997-   CITY MANAGER
February 2002    City of Elgin, Illinois (population 95,000)

A full service unit of local government with 600 employees, five labor unions and 22 city departments including police, fire, public works, library, DDA, TIFA . Total budget was $250 million including a Riverboat Fund related to gaming activities.

- Developed and administered a balanced budget and five year financial plan on an annual basis.
- Responsible for several capital improvement projects to include a $34 million Family Recreation Center, two Aquatic Centers totaling $35 million and a 27 hole golf course totaling $13 million.
- Responsible for the Coordination and Implementation of a Downtown Development and Riverfront Development Plan.
- Provided staff recommendations and implementation regarding a 635 acre, upscale subdivision built on property annexed by the City.
- Negotiated development agreements for several housing, and industrial developments in the City.
- During my tenure with the City, the crime rate was substantially reduced.

February 1992-   CITY MANAGER/ASSISTANT CITY MANAGER
November 1997   City of Saginaw, Michigan (population 69,700)

Responsible for the operation of a full service city with 800 employees and a budget of $100 million. Also served the City as Assistant City Manager for Employee Services and Assistant City Manager for Special Services.

- Responsible for the development of a Downtown Development Plan and the implementation of the plan. The plan included a target area in the downtown for retail, commercial and housing development.

- During my tenure with the City of Saginaw, the City was faced with serious financial problems. As City Manager, I was responsible for creating a Financial Advisory Committee that included the public and staff, to address the financial condition of the City. As a result of this effort, a deficit in the amount $5 million was eliminated within two years. The City had a $1.8 million fund balance at the end of the two year period.
- Was responsible for developing and implementing a re-organization plan for the City. The plan resulted in savings and organizational efficiencies for the City resulting from reclassifying, combining and eliminating positions. The reorganization was also based on a reassessment of services provided by the City.

February 1989-     TOWNSHIP MANAGER/PERSONNEL MANAGER
February 1992      Buena Vista Charter Township, Saginaw Michigan

Full service Charter Township with a population of 12,728; total budget of $15 million and 65 employees. Services provided included police, fire, water, wastewater treatment, community development, zoning, code enforcement, parks and recreation, budget and accounting, information management, personnel and labor relations.

- Had oversight responsibility for renovation of township hall over a six month period. Renovation occurred while township services were taking place in the building.

February 1979-     ASSISTANT CITY MANAGER
February 1989      City of Jackson, Michigan (population 39,200)

Assisted with preparation, monitoring of city budget totaling $25 million, purchasing and information management departments. Served as Acting City Manager in the absence of the City Manager. Provided staff services to the City Commission and served as Director and staff for the Human Relations Commission. During the initial seven years with the City, I worked in the Department of Community Development as Financial Analyst and later as an Administrative Analyst for the City. Duties included direct responsibility for federal and state funded programs and economic development projects.

- Worked with the City Manager and a diverse group of residents and businesses to compete for the All America City Award.
- Worked with the City of Jackson and United Way of Jackson County to develop a needs assessment that was used to identify the allocation of federal, state and local grants to non profit organizations.
- Conducted a Cost Allocation and User Fee Study that was used to establish rates for Enterprise Funds and to determine the full cost of providing city services.

## EDUCATIONAL BACKGROUND

| 1991-1993 | Master of Public Administration<br>University of Michigan | Flint/Ann Arbor<br>Michigan |
|---|---|---|
| 1971-1974 | BBA in Marketing<br>Kent State University<br>ICMA Credentialed City Manager | Kent, Ohio |

## CLUBS, ORGANIZATIONS and AWARDS

- Business and Professional Women's Club
- Michigan Local Government Management Association
- Rotary International
- International City/County Management Association
- President of the Elnora V. Moorman Community Help Center
- 1985 Recipient of the Susan B. Anthony Award from the YMCA
- 1990 Recipient of the Business and Professional Women Club's Woman of the Year Award
- 1996 Recipient of the Spirit of Saginaw Award from the Saginaw County Chamber of Commerce

## REFERENCES AND SALARY INFORMATION

Available upon request

# EXHIBIT K

Larry Summers Is Also Lousy At Crisis Management



Louis Schimmel
RSS Feed
GET UPDATES FROM Louis Schimmel
Like

On September 12, 2011 Louis Schimmel was appointed the City of Pontiac Emergency Manager by Governor Rick Snyder. Prior to his becoming the city's Emergency Manager Mr. Schimmel was the Executive Administrator in the City of Warren.

In February 2001, Mr. Schimmel retired as the Executive Director of the Municipal Advisory Council of Michigan (MAC), a statistical clearing house for investment bankers located throughout the United States who underwrite and/or invest in Michigan municipal bond issues. Mr. Schimmel has a vast background in municipal finance, has served on numerous boards and commissions, has authored several articles and trade publications and continually advised state and local officials on fiscal matters. He is recognized in the municipal bond industry as an authority on the creditworthiness of Michigan municipal debt issues.

In December, 1986 the Wayne County Michigan Circuit Court appointed Schimmel to be the Receiver for the debt-ridden City of Ecorse. He served as the City's Receiver for nearly 4 years during which period he completely eliminated the City's $6,000,000 deficit. In November 2000, the State of Michigan appointed Schimmel to be the Emergency Financial Manager of City of Hamtramck. During his 5 years in Hamtramck he sold unused assets, out sourced services, resolved numerous long standing legal matters and streamlined city government operations.

Mr. Schimmel is a graduate of Michigan State University.
Hide full bio

# Blog Entries by Louis Schimmel

## Public Act 4's Enhanced Powers Are Necessary for Recovery

0 Comments | Posted March 16, 2012 | 11:40 AM

I believe it is important to understand that without the enhanced powers of Public Act 4 of 2011, compared to the powers of Act 72, it would not have been possible for an emergency manager to make the changes that have been made in the City of Pontiac that are...

Read Post

## Pontiac emergency financial manager reinstates pay for mayor, council

*By Melanie Scott Dorsey Detroit Free Press Staff Writer Filed Under Local News Oakland County Pontiac Aug. 01*                                    freep.com

The Pontiac Mayor and City Council will be compensated again after Emergency Financial Manager

☐ Louis Schimmel announced today that he is authorizing pay for elected officials effective March 28.

Compensation for the mayor and city council had been eradicated after a financial emergency was declared in 2009 and the state appointed an emergency financial manager to oversee the city's finances.

"I decided to compensate the elected officials in anticipation of my departure and the return to local control this summer," Schimmel said in a written statement.

Mayor Leon Jukowski said he was upbeat about the city's future.

"We have made a lot of progress and if we avoid temptation and do the right thing, we will have a bright future," said Jukowski.

Under Schimmel's authorization, Jukowski will be paid $100,000 a year and will receive health, dental and life insurance benefits. Jukowski will not be entitled to participate in the city's pension plan or any other benefits after he leaves office.

Jukowski had been paid as a consultant when Schimmel took over as the city's emergency financial manager. Jukowski said he was initially paid $30,000 under the agreement. Jukowski said he was later paid $50,000 and most recently $100,000.

As a result of authorizing pay for elected officials, Schimmel terminated Jukowski's consulting arrangement.

City Council members

☐ will be paid $100 per regular meeting they attend with a limit of $5,200 per year. The city charter mandates weekly city council meetings.

Council members will also be paid $50 for each subcommittee meeting they attend, with a limit of being paid for only one subcommittee meeting per month unless a member

☐ serves on two subcommittees. In order to receive the $50, council members have to make an oral report or file a written report at the first regular meeting held after the subcommittee meeting.

# EXHIBIT L



## Fred Leeb
Winner of the Turnaround of the Year Award/ Managing Director of Leeb Partners LLC
Greater Detroit Area   Management Consulting

### Join LinkedIn and access Fred Leeb's full profile. It's free!

As a LinkedIn member, you'll join 225 million other professionals who are sharing connections, ideas, and opportunities.

- See who you and **Fred Leeb** know in common
- Get introduced to **Fred Leeb**
- Contact **Fred Leeb** directly

**View Fred's full profile**

## Fred Leeb's Overview

| | |
|---|---|
| Current | Managing Director at Leeb Partners LLC |
| Past | COO at Michigan Jewish Institute |
| | Owner/Managing Director at Fred Leeb & Associates, LLC and Nonprofit Management Group, LLC |
| | Emergency Financial Manager at City of Pontiac |
| | see all |
| Education | University of Pennsylvania - The Wharton School |
| | University of Wisconsin-Madison |
| Connections | 500+ connections |
| Websites | LeebPartners.com |
| | LeebPartners Blog |
| | Huffington Post Blog |

## Fred Leeb's Summary

Fred Leeb has been the head of his own turnaround consulting firms since 1994. He won the Turnaround of the Year Award in 2008 from the Turnaround Management Association ("TMA") for outstanding work.

Fred Leeb was appointed by the Governor of Michigan to be the Emergency Financial Manager for the City of Pontiac for a 15 month period that ended June 30, 2010. He led the city to two years of surplus after many years of deficits, upgraded the City's bond rating, negotiated successfully with six unions and generated over $115 million in multi-year benefits. At that time, the City of Pontiac had about 65,000 people, a budget of about $100 million and 450 employees.

Fred also has worked on over a dozen multi-billion dollar companies (e.g., Ford, Occidental Petroleum, Xerox, Oracle and Unisys) and on numerous small and medium-sized local businesses. This has included both extremely successful companies and those with tremendous challenges.

Fred's turnaround consulting career also has included what are now PriceWaterhouseCoopers and AlixPartners, two of the most successful consulting firms in the country. He has acted as a trusted advisor, financial consultant, interim CEO, liquidator, negotiator, and vice president of a debtor-in-possession management team. He has worked on many turnarounds, complex transactions, sales of multiple subsidiaries to generate cash, detailed analyses of related party transactions, negotiations with secured and unsecured creditors, large capital spending budgets, mergers and acquisitions, litigation support, fraud investigations, and creating new, practical strategies for the future.

Specialties
His business background includes an MBA from Wharton and solid groundings in manufacturing, automotive, oil and gas, specialty and commodity chemicals, foreign investments, pension funds, real estate, retail, high-tech, clothing manufacturing, conglomerates, distribution, nonprofits, construction, telecom, engineering services, food processing, computer hardware, construction scaffolding, excess and surplus insurance, plastic blow molding, screw machines, stamping and many others.

## Fred Leeb's Experience

**Managing Director**
**Leeb Partners LLC**
December 2012 – Present (9 months)

We provide turnaround consulting services to corporations, governments and nonprofits. We also work on a wide variety of special projects.

**COO**
**Michigan Jewish Institute**
Nonprofit; 11-50 employees; Higher Education industry
2012 – 2013 (1 year)

**Owner/Managing Director**
**Fred Leeb & Associates, LLC and Nonprofit Management Group, LLC**
Nonprofit; 1-10 employees; Nonprofit Organization Management industry
December 1994 – December 2012 (18 years 1 month)

Fred Leeb & Associates, LLC and The Nonprofit Management Group, LLC are now doing business as Leeb Partners LLC.

**Emergency Financial Manager**
**City of Pontiac**
March 2009 – June 2010 (1 year 4 months)

After being appointed by the Governor, I just finished a very successful 15 months as the Emergency Financial Manager for the City of Pontiac. We were

13-53846-tjt    Doc 308-1    Filed 08/08/13    Entered 08/08/13 13:24:31    Page 30 of 66

able to turn deficits into surpluses, upgrade Pontiac's bond rating and take it off the Fitch negative watch list, help to bring a new major movie studio to the city, sell the idled Silverdome to eliminate $2.4 million of annual maintenance spending and convert it to a privately-held vibrant venue, negotiate to have 6 unions contribute 20% of their medical benefit costs, etc.

I am now back, as of 7/1/10, to working in my consulting firms that I have headed for 15 years: Fred Leeb & Associates for for-profit turnarounds and the Nonprofit Management Group for nonprofit and government turnarounds.

**Turnaround Consultant**
**AlixPartners**
Privately Held; 1001-5000 employees; Management Consulting industry
September 1990 – January 1995 (4 years 5 months)

## Fred Leeb's Skills & Expertise

Turnaround Specialist    Nonprofit Consulting    Emergency Financial Management    Business Strategy    Interim CEO

Government Financial Consulting    Government Turnarounds    Profit Improvement    Succession Planning    Small Business Development

Turnaround Consulting    Business Advisory    Financial Management    Non-profits    Real Estate    Automotive

Management Consulting    Government    Strategic Planning    Mergers

View All (50) Skills

## Fred Leeb's Publications

**Articles, Interviews and Presentations**
Authors: Fred Leeb
Fred has written over 20 articles and has given over 40 presentations and interviews to the New York Times, the Wall Street Journal, the Washington Post, the Los Angeles Times, Channel 7, the Detroit Free Press, the Detroit News, the MACPA, BIG, the Turnaround Management Association, Comerica Bank, WJR/PNC Bank, the Michigan Association of Municipal Attorneys, NPR, the Detroit Area Grantmakers... more

## Fred Leeb's Education

**University of Pennsylvania - The Wharton School**
MBA, Finance
1974 – 1976

**University of Wisconsin-Madison**
BA, Economics
1970 – 1974

## Fred Leeb's Additional Information

| | |
|---|---|
| Websites: | • LeebPartners.com<br>• LeebPartners Blog<br>• Huffington Post Blog |
| Interests: | Turnaround consulting for both for-profits and nonprofits. |
| Groups and Associations: | Turnaround Management Association Board Member of the Frankel Jewish Academy |

 Alliance for Nonprofit Management

 Association of Government Accountants

Banking Connects

BoardSource

 Bridge Magazine

Bridgestar Nonprofit Board Members Network logo    Bridgestar Nonprofit Board Members Network

 Business Restructuring Professionals

Consultants Network    Consultants Network

Detroit Economic Club

 Executive Roundtable

Family Business Network

 Friends of Public Finance



# EXHIBIT M

# Tony Saunders II replaces Joseph Harris at Benton Harbor emergency financial manager

*Associated Press Filed Under Local News Michigan news Jennifer Granholm Rick Snyder*
*Aug. 01*                                                                    freep.com

BENTON HARBOR, Mich. — Joseph Harris is out as Benton Harbor's emergency financial manager

☑ .

The Local Emergency Financial

☑ Assistance Loan Board on Friday voted to appoint Tony Saunders II to replace Harris. Saunders' appointment is effective Feb. 1.

Saunders had been working as an adviser on behalf of state Treasury officials with cash-strapped Highland Park, a Detroit enclave.

Then-Gov. Jennifer Granholm placed Harris in charge of Benton Harbor's finances in 2010. The southwestern Michigan city's cumulative general fund

☑ deficit was about $3.4 million that year.

Harris was reappointed to the job in 2011 by Gov. Rick Snyder.

Harris is a certified public accountant and former chief financial officer for the City of Detroit. He angered some in Benton Harbor in 2011 when he stripped decision-making authority from elected officials.

# EXHIBIT N


Goldman Sachs is committed to helping
10,000 Small Businesses create jobs and
drive economic growth.


PROGRESS IS EVERYONE'S BUSINESS


LEARN MORE

August 2, 2013

# HUFFPOST DETROIT

# Belle Isle State Park Plan Appears Dead After Michigan Withdraws Proposed Lease Of Detroit Park

**The Huffington Post** | By David Sands
Posted: 01/29/2013 2:25 pm EST | Updated: 01/30/2013 10:50 am EST

The state of Michigan has said it will withdraw its offer to lease Detroit's Belle Isle as a state park, the Detroit Free Press reports.

The Department of Natural Resources expected a decision on the proposal that would let the state agency operate the city's island park for 30 years with two optional 30-year extensions by the end of January. A vote on the plan was tabled by City Council Tuesday, and they were not expected to return to the matter until February.

"As we stated in the past, the end of January is a crucial time for the DNR to be able to effectively plan and marshal resources for this season," Governor Rick Snyder spokesman Caleb Buhs told the Free Press. "The governor was hopeful that this would be a partnership that would allow the island to return to its former status as one of the best parks in the nation."

A contentious vote to lease the city's island park out as a state park managed by the DNR had been scheduled for Tuesday. But the council's Neighborhood and Community Services Committee decided Monday to table the issue for another two weeks. Committee members Kwame Kenyatta and Joanne Watson outvoted third member James Tate.

"As a committee we've asked for an additional two weeks. I don't mess around with anyone else's committee," Kenyatta said Tuesday. "So, if you have the votes to approve this, then fine. But history will be on our side."

Tate responded that he respected committee process, but said that the issue had "been floating for far too long."

A supermajority of six council members could have put the vote back up for discussion Tuesday, but members voted 6-3 to not bring the issue up as new business on the day's agenda. Only Tate, Saunteel Jenkins and Council President Pro Tem Gary Brown voted in favor of putting the state lease up for a vote. Earlier in the meeting, the council voted 5-4 to take the issue out of committee, so they could consider putting it on the agenda.

Under the deal, the DNR would have managed operations and expenses for the park for 30 years, with two optional 60-year renewals. Pedestrians and bicyclists would be able to access Belle Isle for free, but those driving motor vehicles would have to purchase an $11 pass good for all state parks. The statewide Recreation Passport fee was raised a dollar for 2013.

Backers have said the plan would save Detroit $277 million over 30 years, but some council members have expressed skepticism about the plan.

During a brief discussion on the lease, Jenkins noted that the leasing agreement had been amended to encourage the hiring of Detroit residents for work on the island. In turn, her colleague JoAnn Watson expressed reservations about the deal.

"You don't give this one up," she said. "It's not related to the deficit. It has relations to people in high places who want a playground for the rich in the center of Detroit."

Council Member Ken Cockrel voiced concern that the Belle Isle issue was overshadowing more important matters.

"We need to bring the focus back to where it belongs," he said. "The reality is, if we fix the city's finances, Belle Isle will fix itself. Then we don't have to entertain the idea of making it a state park."

# EXHIBIT O

MEMBER CENTER: Create Account | L



# Detroit Mayor Bing
Lansing

*Posted: Jul 22, 2013 9:42 PM EST*
*Updated: Jul 22, 2013 9:42 PM EST*

**By Charlie LeDuff, Fox 2 News - email**

DETROIT (WJBK) - Was Mayor Dave Bing being a two-faced liar when he told you this Detroit?

"The governor has made his decision, and it was his decision to make. While I respect it, I've said all along that I do not favor an emergency manager for the City of Detroit," Bing said in March of this year.

While Bing was telling us that we could work it out without an emergency manager, he was working out a deal with Gov. Rick Snyder and Kevyn Orr to save ⊠ his and his executive team's paychecks a month before Orr was even appointed emergency manager, according to a raft of confidential emails obtained by Robert Davis, the thorn to all things Snyder.

On February 20, 2013, Richard Baird, the governor's right hand man, wrote to Orr, who was at the time a lawyer at Jones Day, "FYI -- The Summary of Partnership prepared by the mayor from the outline I gave him last week told him that there were certain things I would not think we could agree to without your review... (such as keeping the executive team in its entirety)..."

"Clearly shows that the mayor of the City of Detroit lied to the citizens of the City of Detroit. While he was trying to put on this charade in front of the cameras here locally to say that he was against the EM, he was flying back and forth between here and Washington negotiating with Kevyn Orr and the governor privately saying keep my salary, keep my perks, keep my executive staff on the payroll, and I will agree to bringing you on as your appointment as the emergency financial manager," Davis said.

In fact, Bing flew to Orr's D.C. offices three weeks before Orr was even appointed emergency manager.

"It only seems to reason that you would meet with the emergency manager and the mayor of a city coming in before you agree to put that person into the final steps for hiring for that job. If it's not going to be a fit, you need to look elsewhere. I mean, that's just good business practice," said Bill Nowling, Orr's spokesperson.

On February 22, Orr wrote to Baird, "Rich, thanks for the revised draft. I spoke with the mayor this morning, and we're all set to meet Monday morning. I will provide a visiting VIP office for him here at the firm, as well."

That meeting was kept secret by arranging it through Bing's personal secretary. That way it was not a public record that the media is entitled to see under the Freedom of Information Act.

On February 20, Baird wrote to Orr, "Will broker a meeting via note between you and the mayor's personal assistant, who is not FOIA-able."

Whether you think the bankruptcy is a good idea or not, most can probably agree that if we are going to do it, we are going to need the government to be honest and transparent about its dealings.

We received the following statement from Mayor Dave Bing:

I did not cut any type of secret deal with Lansing. Throughout this process, I have been very vocal about being against an Emergency Manager.

When it became obvious that Lansing had made the decision to bring in an Emergency Manager, I thought the best choice was for the City to work in partnership with Lansing to protect ⊠ the interests of the citizens of Detroit.

To that end, I thought it very important to keep my Executive Team in place to carry out the day-to-day operations and continue to implement our restructuring initiatives.

I wanted to maintain my key executives at their existing salaries, since they, along with other city employees, already had taken a 20-percent pay reduction.

Our intent was to develop an understanding for a working partnership between the City, State and EM. There was never any intent to create a formal, signed agreement.

To underscore the fact that this was not a formal agreement, note that the State has not kept my executive team intact; they did not support maintaining the federal transit funding for DDOT; there is no lease deal for Belle Isle; and the State has not released the necessary funding to move our initiatives forward, as outlined in the e-mail document.

**RECOMMENDED VIDEOS**

by Taboola

# EXHIBIT P

STATE OF MICHIGAN

IN THE SUPREME COURT

MICHAEL BEYDOUN,

            Plaintiff-Appellee,

v

CHARLES BENJAMIN WILLS JR.,

            Defendant,

and

CITY OF DETROIT,

            Defendant-Appellant.

Supreme Court No. 147332
Court of Appeals No. 304729

Lower Court No. 09-026647-NI
Wayne County Circuit Court
Hon. Robert J. Colombo, Jr.

_____/

Raymond Guzall III (P60980)
RAYMOND GUZALL III, P.C.
Attorney for Plaintiff-Appellee
31555 W. Fourteen Mile Rd., Suite 320
Farmington Hills, MI 48334
(248)702-6122

Sheri L. Whyte (P41858)
Assistant Corporation-Counsel
Attorney for Defendant-Appellant
City of Detroit
660 Woodward Avenue, Suite 1650
    Detroit, Michigan 48226
(313) 237-3076

_____/

**PLAINTIFF/APPELLEE'S OPPOSING BRIEF
IN RESPONSE TO DEFENDANT/APPELLANT'S APPLICATION FOR LEAVE TO
APPEAL**

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii, iii

TABLE OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STANDARD OF REVIEW AND JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . v

I.   THE CITY OF DETROIT WAS NOT ENTITLED TO A DIRECTED VERDICT OR
     JUDGMENT NOTWITHSTANDING THE VERDICT . . . . . . . . . . . . . . . . . . . 1

     A.   Trial testimony of Kyishin Shiah . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.   The lower court's ruling was proper . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  APPELLANT IS NOT ENTITLED TO A NEW TRIAL . . . . . . . . . . . . . . . . . . . 3

     A.   Trial testimony of Officer Wills . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     B.   Trial testimony of Appellee Michael Beydoun . . . . . . . . . . . . . . . . . 7

          i.   There cannot be reversible error as to the admission of
               Appellee's tax records, as there was no error . . . . . . . . . . . . 9

          ii.  Case law claimed as support for Appellant's position of
               reversible error is not applicable to the case at Bar . . . . . . . 10

III. THE AWARD IN THIS CASE WAS NOT EXCESSIVE, AS MR. BEYDOUN SET
     FORTH PROOF OF DAMAGES WELL ABOVE $4 MILLION, AND THE JURY
     AWARDED JUST OVER $2 MILLION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     A.   The case law cited by Appellant does not support their position . 14

     B.   The jury verdict was not excessive as Mr. Beydoun was seriously
          injured, and testified as shown below . . . . . . . . . . . . . . . . . . . . . . 15

IV.  APPELLANT WAS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW,
     AND THEREFORE, COSTS, INTEREST AND ATTORNEY FEES CANNOT BE
     REVERSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

V.   CONCLUSION: THE RELIEF REQUESTED BY APPELLANT CANNOT BE
     GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VI.  RELIEF REQUESTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i

# TABLE OF AUTHORITIES

## CASE LAW

*Abkev v. Vandenberg*, 239 Mich App 359, 608 N. W.2d 73 (2000) . . . . . . . . . . . . . . . 1

*Alar v. Mercy Memorial Hospital*, 208 Mich App 518, 529 N.W.2d, 318 (1995) . . . . . . 2

*Begin v. Michigan Bell Tel. Co.*, 284 Mich. App. 581, 773 N.W. 2d 271 (2009) . . . 4, 14

*Bishop v. St. John Hosp.*, 140 Mich. App. 720, 364 N.W.2d 290 (1984) . . . . . . . . . . 11

*Border v. Henning*, 270423, 2007 WL 2781022 (Mich. Ct. App. Sept, 25, 2007) . . . . . 9

*Diamond v Witherspoon*, 265 Mich App 673, 696 N.W.2d 770 (2005) . . . . . . . . . . . 15

*Dybas v. Madziar*, 295512, 2011 WL 1327868 (Mich. Ct. App. Apr. 7, 2011) . . . . . . 10

*Farm Bureau Ins v. Sears, Roebuck & Co*, 99 Mich. App 763, 298 NW2d 634
(1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Frisch v. State Farm Fire & Cas. Co.*, 263939, 2007 WL 101208
(Mich. Ct.App. Jan.16,2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Guerrero v. Smith*, 208 Mich App 647, 761 NW 2nd 723 (2008) . . . . . . . . . . . . . . . . 3

*Hes v. Haviland Products Co*, 6 Mich. App 163, 173-174; 148 NW2d 509 (1967) . . . . 1

*Precopio v City of Detroit Department of Transportation*, 415 Mich 457,
330 NW 2d  802 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Shaw v Ecorse*, 263 Mich App 1, 17; 770 N.W.2d31(2009) . . . . . . . . . . . . . . . . . . . 14

*Syzmanski v Brown*, 221 Mich App 423, 562 N.W.2d 212 (1997) . . . . . . . . . . . . . . . 13

*Tempo, Inc, v. Rapid Elec. Sales & Serv., Inc.*, 132 Mich. App. 93,347 N.W.2d 728,
(1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Unibar Maintenance Services, Inc. v Saigh*, 283 Mich App 609, 769 N.W.2d 911
(2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Warner v. Gen. Motors Corp.*, 137 Mich. App. 340,348,357 N.W.2d 689 . . . . . . . . . 10

## STATUTES

MCL 691.1405 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MCL 691.1405 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## COURT RULES

MCR 2.611 (A) (1) (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

MCR 7.302(B)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

# TABLE OF EXHIBITS

1.   Disciplinary report

2.   Testimony excerpts at trial of Kyishin Shiah

3.   Transcript of June 3, 2011 hearing, p. 4

4.   Testimony excerpts at trial of Officer Charles Benjamin Wills

5.   *Border v. Henning*, 270423, 2007 WL 2781022 (Mich. Ct. App. Sept. 25, 2007)

6.   Testimony excerpts at trial of Appellee Michael Beydoun

7.   Appellee's medical records produced at trial, Exhibit 2 at trial

8.   Documented proof of monies lost by Mr. Beydoun, Exhibit 5 at trial

9.   Hand written statement by Defendant Wills as to accident, dated 5-18-08, Exhibit 7 at trial

10.  Relevant portions of tax records used at trial

11.  Videotape of auto accident (not attached hereto)

## STANDARD OF REVIEW and JURISDICTION

Appellant's cite to MCR 7.302(B)(5) as to the standard of review and claim of jurisdiction at page 2 of their Brief on Appeal is correct.

v

I.    THE CITY OF DETROIT WAS NOT ENTITLED TO A DIRECTED VERDICT OR JUDGMENT NOTWITHSTANDING THE VERDICT

Appellant seemingly argues that because the lower court ruled that the police officer was not grossly negligent, that the City should have been dismissed from the case. However, Appellant's argument here is improper by law. The standard for Appellant City is "negligent operation", not gross negligence.

"Governmental agencies shall be liable for bodily injury and property damage resulting from the negligent operation by any officer, agent, or employee of the governmental agency, of a motor vehicle of which the governmental agency is owner, as defined in Act No. 300 of the Public Acts of 1949, as amended, being sections 257.1 to 257.923 of the Compiled Laws of 1948." *MCL 691.1405.*

The videotape and testimony of the witnesses established the negligence in this case. The jury award was based upon the law and facts properly, as shown herein.

"Judgment notwithstanding the verdict is proper only when the movant would have been entitled to a directed verdict." *Farm Bureau Ins v. Sears, Roebuck & Co,* 99 Mich.App 763, 767; 298 NW2d 634 (1980). "If the trial court could not have directed a verdict for the defendant before submission of the case to the jury, he cannot direct that judgment notwithstanding the jury's verdict." *Hes v. Haviland Products Co,* 6 Mich.App 163, 173-174; 148 NW2d 509 (1967).

In addition, questions of fact existed at trial, providing another reason for the Michigan Court of Appeals in the Case to deny the relief requested by Appellant. (Appellant's Exhibit F, Appellate Court Opinion, at page 3). "This question of fact provided an alternative basis for the trial court to deny Defendant's motion for a directed verdict and his motion for post judgement relief." *Abkev v Vandenberg,* 239 Mich App

359, 364; 608 N.W.2d 73 (2000), citation omitted.

"In reviewing a motion for a directed verdict, this court views the testimony and legitimate inference drawn there from in a light most favorable to the non-moving party. Directed verdicts are appropriate **only when no factual question exists upon which reasonable minds could differ**." *Alar v Mercy Memorial Hospital*, 208 Mich App 518, 524; 529 N.W.2d, 318 (1995), citation omitted, emphasis added.

In the case at Bar, there were at a minimum, material fact questions at trial which reasonable minds could differ. The City of Detroit however admitted in writing that the accident was avoidable and they disciplined Officer Wills. (Exhibit 1, disciplinary report). In addition, testimony of an independent eye witness was that the Defendant Officer did not have his lights or siren on when he traveled through the red light and crashed into Mr. Beydoun, contrary to Appellants claimed facts. Therefore, Defendant's request for a judgment notwithstanding the verdict was properly denied.

A.    **Trial testimony of Kyishin Shiah**

Q. "When Mr. Beydoun went through the light, was it green?
**A. Yeah, it was green"**
(Exhibit 2, testimony of Kyishin Shiah, Tr. 161, lines 6-7).

Q. "And did you hear any police siren at the time?
**A. No".**
Q. "No siren at all?
**A. No siren."**
*Id.,* lines 15-18.

Q. "Did you see the police officer run into Mr. Beydoun's car?
**A. Yeah. Yeah."**
*Id.,* lines 10-12.

Q. "Did you see any police lights flashing at the time?
**A. No, I didn't see that either."**

2

*Id.*, lines 19-20.

Q. "So at the time that you saw the police officer's vehicle, it was a little bit before it ran into Mr. Beydoun's vehicle, that be [sic, is that right] right?
**A. Yes. That's right.**
Q. And you heard no siren and you saw no lights; correct?
**A. No."**
(Exhibit 2, testimony of Kyishin Shiah, Tr. 162, lines 4-9, answers bolded).

### B.    The lower court's ruling was proper

"Motion's denied. The verdict was not against the great weight of the evidence. There was more than sufficient evidence to support the verdict. You don't even discuss what facts demonstrate that the evidence is against the great weight of the verdict. The verdict was not excessive. The damages supported the claim. I'm denying the remitter. I'm denying a new trial. I'm denying a judgment notwithstanding the verdict." (Exhibit 3, Tr. of June 3, 2011 hearing, p. 4).

The lower court decided Defendant's Motions properly. Appellant's Brief does not change the facts in this case nor the proper application of law, and fails to outline any clear error on the part of the trial court or the court of appeals.

## II.    APPELLANT IS NOT ENTITLED TO A NEW TRIAL

Appellant requests a new trial pursuant to MCR 2.611(A)(1)(e), which indicates that a new trial may be granted if, "a verdict or decision against the great weight of the evidence or contrary to law." *MCR 2.611(A)(1)(e)*. Appellant however failed to outline any factual support for such a claim.

"With respect to a motion for new trial, the trial court's function is to determine whether the overwhelming weight of the evidence favors the losing party." *Guerrero vs. Smith,* 208 Mich App 647, 666; 761 NW 2nd 723 (2008), citation omitted. The claims made within Appellant's Brief are not supported by the facts that came forth at trial.

In fact, Appellant's cite to no factual support at this argument section of their

3

Appeal Brief, yet refers this Court back to facts at Section I of it's brief. Appellant also argues that the jury award was, "...violative of logic and appears to have been influenced by passion or prejudice." (Appellant's Brief on Appeal, p. 9). Appellant offers no facts or record statements to support their claim. "A party may not leave it to this Court to search for the factual basis to sustain or reject its position, but must support its position with specific references to the record." *Begin v. Michigan Bell Tel. Co.*, 284 Mich. App. 581, 590, 773 N.W.2d 271, 278 (2009).

The only error seemingly claimed by Appellant is that the lower court did not apply a 'gross negligence' standard to the City of Detroit. As discussed above however, the standard is 'negligence' and not 'gross negligence'. *MCL 691.1405.*

Defendant Officer Wills testified that he ran the red light, only after he saw the video footage again at trial. (Video of the accident was attached as Exhibit 3 at trial, and is attached in the Record on Appeal at Exhibit 11).

A.    **Trial testimony of Officer Wills**

Q.    "Okay. Now, do you see the red light there, Officer?
A.    **Yes, sir.**
Q.    You can actually see another truck in the right-hand lane, is that accurate?
       Okay. So at least you're, at a minimum, one car length away from the intersection, is that accurate?
A.    **Yes, at least one car length.**
Q.    So, now it's your testimony that when you entered the intersection, the light was red?
A.    **Yes, sir."**
(Exhibit 4, April 7, 2011, Testimony of Defendant Wills, Tr., p. 113 line 22 through p. 114, line 7, answers of Mr. Wills are bolded).

Officer Wills credibility was further called into question when he testified that his own handwritten portion of the report did not state that he had his "siren" on. The

4

words "and siren" were added by the Redford Police Officer who came to the scene, according to Officer Wills.

> Q.    Now was that written in your handwriting?
> **A.    Most of it was.**
> Q.    Well, there's a word above emergency lights that says – there's tow words that say and siren; correct?
>
> **A.    Yes, sir.**
> Q.    You didn't – the words and siren are not your words; right?
> **A.    No, sir.**
> Q.    Okay. So when you filled this police – when you filled this report our for Redford, you didn't write on her that you had your siren on, did you?
> **A.    No, sir.**
>
> Q.    Do you know who put the words and siren on this document?
> **A.    It would have to be the Redford officer.**
>
> Q.    You're saying at the time of the impact your siren was not on?
> **A.    No, not at the point of impact. No.**
> (Exhibit 4, April 7, 2011, Testimony of Defendant Wills, Tr., p. 125, lines 19-25, p. 126, lines 1-5 and 8-10, p. 127, lines 1-3 answers of Mr. Wills are bolded).

Officer Wills credibility was again called into question when he testified that he stops at all stop signs and obeys the rules of the road when he is not 'on a run', yet he ran a stop sign on his very own street, several minutes before he ran into Mr. Beydoun, and before he was dispatched to a scene that he was traveling to.

> Q.    If you're not on a run, do you normally then obey all the traffic signals
> **A.    I stop.**
> Q.    And if you're not on a run, you don't see a street light—you see a street light turns red, you're going to stop; right?
> **A.    You know, actually I drive my car the same way I ride the Harley-Davidson. Even if there is an open sign–an open intersection with a yield sign, I will still stop my vehicle because I anticipate a fool with his car flying through or a police chase coming from elsewhere. There have been**

5

times that I've run into a Redford police chase in Detroit and was unaware of it. So, I'll either slow my car down to a good minimum at a yield sign. But I stop at all stop signs, especially in neighborhoods because I don't know what's coming off those side streets.

Q.    Now, on this time and date it shows May 19th, 2008, it's 6:19:15 p.m.; correct?

(Page 118, lines 4-25)

A.    **Yes, sir.**

Q.    And you said you got the call sometime when you–after you left your house, turned off your street, and got onto Six Mile; right?

A.    **Yes, sir.**

Q.    So between the time you left your house and the time you got onto Six Mile, you weren't on a run; correct?

A.    **No.**

Q.    No?

A.    **No. I didn't get the run until I got to Six and Telegraph.**

Q.    Okay. So, you would have no reason to disregard any street lights or stop signs during the time you left your home until you got closer to Telegraph on Six Mile; right?

A.    **Yes, sir.**

Okay. Can we go to the number two video, please. This is the one right next to this one.

(Page 119, lines 1-18)

Q.    Is that photograph of your car near—at your house?

A.    **Yes, sir.**

Q.    On the video?

A.    **Yes, sir.**

Q.    Is that you leaving your home on that day, May 19th, 2008, before the accident?

A.    **Yes, sir.**

Q.    It shows 6:15 p.m.; right? And it took you what, about four, five minutes to get to the accident scene?

A.    **I wouldn't say four or five.**

Q.    So this is the street you turned down and then you said you went to Six Mile; correct?

A.    **That's correct.**

Q.    And then you turned left; right?

A.    **Yes, sir.**

Q.    You're not on a run as you testified. And then there's one intersection you went by there; right?

6

A.      Yes, sir.

Q.      You see the stop sign on the right there, sir?

A.      Yes, sir.

Q.      And so your testimony is you're not on a run, you're going to stop at this stop sign; right?

(Page 120, lines 1-18; 22-25)


A.      Yes, sir.

Q.      Do you see your car stop at that stop sign?

A.      No, sir.

Q.      Why not? Why didn't you stop at that stop sign?

A.      I know. I could have been wrong. Maybe I didn't get —I don't recall the exact time I got the run. But I was assuming that I got the run at Six Mile and Telegraph.

Q.      How are we going to assume that your testimony is accurate that you obey all the street signs and stop signs when you're not on a run and then you ran into Mr. Beydoun at a red light?

A.      Okay, sir, this was almost three years ago. I received numerous runs.

(Page 121, lines 1-16)


Q.      Can we assume from that photograph—from that video, sir, with the 12 vehicles that went past you, that you did not chirp your siren at that point because you didn't get the call until you got on Telegraph or until you got on Six Mile?

A.      I'm not sure. I'm not sure.

(Page 123, lines 3-8)

(Exhibit 4, April 7, 2011, Testimony of Defendant Wills)


Officer Wills also admits that the City of Detroit and it's police department found

that he acted negligently. That admission goes against the Appellant City.

Q.      So, in this case, the City of Detroit and the police department found that you acted negligently; correct?

A.      That's what they're stating, yes.

(Exhibit 4, April 7, 2011, Testimony of Defendant Wills, Tr., p. 129, lines 21-23,, answer of Mr. Wills is bolded).


B.      **Trial testimony of Appellee Michael Beydoun**

Questions by Defense Counsel, Mr. Jenkins to Mr. Beydoun:


7

Q. Were you here this afternoon?

**A. Oh, what we saw lately?**

Q. Yes, sir.

**A. Yes, the police car proceeding through the red light. Yes.**

Q. Did you see the video?

**A. Yes.**

Q. Okay. And when you saw the video, you saw the officer approaching the light; right?

**A. Yes.**

Q. You saw the light change in color?

**A. No, I saw a red light.**

Q. You didn't see the light go from yellow to red?

(Page 199, lines 13-25)

**A. No, I saw red light.**

Q. I'm sorry?

**A. I saw red light.**

Q. And when you saw the red light, you saw — that was right before the impact; right?

**A. The red light for the officer , yeah, was before the impact.**

(Page 200, lines 1-7)

Q. Okay. That's part of your conspiracy theory?

**A. There's no sirens on the video either.**

(Page 203, lines 24-25)

Q. Pardon me?

**A. There is no siren. The audio is gone. It disappeared from the video.**

(Page 204, lines 1-3)

Q. Would it be fair for me to say, sir, you did not hear the police car before the accident?

**A. No, I didn't**

(Page 205, lines 10-12)

Q. Did the officer— you ever make any observations of the officer once he was out of the car?

**A. Yeah, he was crying.**

Q. Pardon me?

**A. He was crying.**

(Page 207, lines 21-25)

Q. He was crying?

**A. Correct.**

8

Q. And did you tell— did he tell you why he was crying?
A. **He was going to get a ticket.**
Q. Pardon me?
A. **He's going to have – he's going to get a ticket. He's going to be issued a ticket.**

A. **He was crying at the time. When I approached him, he was crying. And the first thing he told me, "Oh, my God, I'm going to get a ticket. I'm going to get a ticket."**
(Page 208, lines 1-7, lines 12-14)

Q. We'll just do one at a time. What did you say to that particular officer?
A. **I said, "You crossed the red right."**
Q. Did he say something to you?
A. **He said, "It's just an accident." I told him, "Actually you could have killed me."**
Q. He said it's just an accident?
A. **Yeah. I told him, "You could have killed me." He said, "I'm sorry. It's just an accident."**
(Page 209, lines 10-18)
(Exhibit 6, Testimony of Michael Beydoun, April 7, 2011, pp. 199, 200, 203, 204, 205, 207, 208, 209, answers of Mr. Beydoun are bolded).

i. **There cannot be reversible error as to the admission of Appellee's tax records, as there was no error**

Even without the actual tax records being admitted into evidence, Mr. Beydoun could testify as to his earnings over the years, as he did at trial. (Tr. of April 6, 2011, pp. 173-193). The Final Pretrial Order in this case specifically lists nearly $4,000,000.00 in claimed damages. (See, Appellant's Exhibit C, pp. 6-7). There was no surprise here that Mr. Beydoun was going to set forth proofs to meet that number.

The tax records were not a requirement at trial. The tax records encompassed hundred's of pages, and were not planned to be introduced into evidence, as correctly stated by Appellant. Appellant cites to no case law indicating that a person cannot simply testify as to their damages. Documentary evidence is not required.

9

"Contrary to defendants' assertion, plaintiff was not required to present any independent documentary evidence to support her testimony." *Border v. Henning*, 270423, 2007 WL 2781022 (Mich. Ct. App. Sept. 25, 2007) at *4, unpublished opinion attached hereto at Exhibit 5).

However, Defense Counsel made such a big deal about there being no tax records, that Mr. Beydoun brought all of his tax records in the next day of trial, and they were properly admitted by Judge Robert J. Colombo, Jr. (Appellant's Brief at p. 11 citing to Judge Colombo). A judge has discretion to admit evidence, and there was no abuse of that discretion shown by Appellant here.

"Admissibility of evidence is within the trial judge's discretion, and his determination will not be set aside by this Court unless there has been an abuse of that discretion." *Warner v. Gen. Motors Corp.*, 137 Mich. App. 340, 348, 357 N.W.2d 689, 694 (1984). A person is allowed to present their evidence.

> "Finally, plaintiffs argue that these damages could have been caused by factors other than Tempo's actions. We find that Lindberg's testimony was sufficient for the jury to conclude that these damages were the natural and proximate result of Tempo's breach. *Sattler v. Fisher Contracting Co.*, 30 Mich.App. 617, 622, 186 N.W.2d 875 (1971). Plaintiffs were free to present their own evidence and to argue that other factors were in fact the cause of these damages." *Tempo, Inc. v. Rapid Elec. Sales & Serv., Inc.*, 132 Mich. App. 93, 103, 347 N.W.2d 728, 733 (1984).

Given the fact that no error has been shown here by Appellant, there can be no reversible error argument. Therefore, the relief requested by Appellant cannot be granted. (Appellant's Exhibit F, Appellate Court Opinion, at page 4).

ii. **Case law claimed as support for Appellant's position of reversible error is not applicable to the case at Bar**

Upon review of the unpublished opinion cited by Appellant here, *Dybas v.*

10

*Madziar*, the facts in that case completely differ from the case at Bar. In *Dybas v. Madziar*, the attorney began showing evidence to a witness that was not entered into evidence, and with no advance warning to the court. (Appellant's Exhibit D).

"Without any advance warning to plaintiff's counsel or the trial court, defense counsel began showing photographs to plaintiff at trial and questioning him about them. Defense counsel also referred to a videotape, which was in his briefcase, which allegedly showed plaintiff mowing the grass for two hours." *Dybas v. Madziar*, 295512, 2011 WL 1327868 (Mich. Ct. App. Apr. 7, 2011) at *14 - *15, attached at Appellant's Exhibit D. Therefore, Appellant's argument fails here.

Upon review of the unpublished opinion cited by Appellant here, *Frisch v. State Farm Fire & Cas. Co.* the facts in that case completely differ from the case at Bar. In *Frisch, supra,* the trial court ordered that certain evidence not be allowed, and that <u>order was violated</u>. (attached at Appellant's Exhibit E). Those facts are completely different from the case at Bar, where Defense Counsel himself opened the door, as stated by Judge Colombo. (See Appellant's Brief, p. 11).

"In sum, we find that plaintiffs were well aware of the trial court's orders regarding Sanderson and the parties' exhibit lists, and that plaintiffs attempted to admit the photograph in violation of those orders. Under these circumstances, the trial court did not abuse its discretion in its initial decision to exclude the photograph." *Frisch v. State Farm Fire & Cas. Co.*, 263939, 2007 WL 101208 (Mich. Ct. App. Jan. 16, 2007), at *11.

"...plaintiffs had no right to complain about trial court's decision to admit hospital's incident report, proffered by defendant, into evidence, where plaintiffs' counsel had "opened the door" to admission of such report by inquiring about report during cross-examination of three of defendant's

witnesses prior to defendant's decision to offer report into evidence."
*Bishop v. St. John Hosp.*, 140 Mich. App. 720, 364 N.W.2d 290
(1984).

The case law proffered by Appellant on the issue of reversible error is not on point, nor applicable to the facts in the case at Bar. Therefore, the relief requested by Appellant's was properly denied by the trial court and Court of Appeals in this Case.

III. **THE AWARD IN THIS CASE WAS NOT EXCESSIVE, AS MR. BEYDOUN SET FORTH PROOF OF DAMAGES WELL ABOVE $4 MILLION, AND THE JURY AWARDED JUST OVER $2 MILLION.**

Mr. Beydoun produced written and testimonial proofs as to his lost wages. His documented proofs indicated that he lost $543,405.00 over nearly a 3 year period. (Exhibit 8, documented proof of monies lost by Mr. Beydoun). Mr. Beydoun however, testified that he sustained more monetary damage, and had more jobs that he had lost, however, in an attempt to be more than reasonable, he only listed the $543,405.00 amount. (Ex. 6., Tr., April 6, 2011, p. 187, lines 1-13).

The evidence at trial showed that at a minimum, Mr. Beydoun's average income loss was $181,135.00 per year (most recently), and over a 15 year period, which would get him to the age of 65, his future wage loss would equate to $2,717,025.00. (Ex. 6., Tr., April 6, 2011, p. 187, lines 1-13). The jury therefore could have awarded that amount in future economic damages.

Furthermore, Mr. Beydoun produced his tax records indicating that in the year 2005, he earned $355,808.00. In the year 2006, his tax records indicated that he earned $323,410.00, and in the year 2007, the tax records indicated he earned $197,320.00. (Exhibit 10, relevant portions of tax records used at trial, along with the 2009 taxes showing the devastating loss of income. Also, Appellant's testimony

12

confirming the facts above is attached hereto at Ex. 6, pp. 23-35).

The average over that three year period equates to $292,179.00 per year in income. Over the next 15 years to reach the age of 65, Mr. Beydoun's damages equated to $4,382,685.00. Therefore, the jury could have come to an award amount of $4,382,685.00 given the tax records he produced at the time of trial. (Tr. of April 7, 2011, pp. 20-37).

The jury awarded Mr. Beydoun $1,493,250.00 in future economic losses, and clearly contemplated and determined the fact that he would suffer future economic loss. In addition, he treated with approximately six doctors, and that evidence was provided to the jury at the time of trial. (Exhibit 7, Appellee's medical records produced at trial, Ex. 2 at trial and, Tr. of April 7, 2011, testimony of Dr. Raad Toma, pp. 155-208). Further, the testimony at trial, along with the medical records, indicated that Mr. Beydoun was at his maximum improvement and was not likely to improve his physical condition. (Tr. of April 7, 2011, testimony of Dr. Raad Toma, p. 170, lines 22-25 through p. 171, lines 1-3). Therefore, remittitur was not a viable option as Appellant requested.

It is clear that based upon Mr. Beydoun's tax records, multiplying the average amount over a 15 year period until he would reach the age of 65, his future economic damages would be $4,382,685.00. The jury also could have determined that Mr. Beydoun would have worked longer than the age of 65 and awarded more than that four million dollar plus amount.

However, the four million dollar plus amount proffered by Appellee does not include the non-economic damages. Therefore, because the amount awarded by the

13

jury is much less than the highest amount that the evidence would support, remittitur was not appropriate. (Exhibit 10, relevant portions of tax records used at trial).

### A. The case law cited by Appellant does not support their position

Appellant cites the case of *Syzmanski v Brown*, 221 Mich App 423, 562 N.W.2d 212 (1997) at page 13-14 of it's Brief on Appeal for claimed support. That case however, does not support Defendant's position.

The Court in *Syzmanski* held, "...remittitur would be required to adjust $37,000.00 verdict of jury down to $27,500.00 market value assigned by real estate appraiser, as that was **only evidence of damages in record**...". *Id.*, emphasis added. The facts in the case at Bar are far different from those in *Syzmanski*, and therefore *Syzmanksi* is not applicable here.

"The power of remittitur should be exercised with restraint." *Shaw v Ecorse*, 263 Mich App 1, 17; 770 N.W.2d 31 (2009), citation omitted. "If the award falls reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation, it should not be disturbed." *Id*, citation omitted.

In the case of *Precopio v City of Detroit Department of Transportation*, 415 Mich 457 (1982), as cited to by Appellant at page 13 of it's brief, that case dealt with a <u>judge</u> ruling on the award, <u>not a jury</u> award. In addition, the Michigan Supreme Court indicated that the Court could do a comparison of previous cases in determining sufficiency of awards. "Even so, the award amounts to almost eight times the highest awards in analogous non-jury cases affirmed on appeal." *Id.*, at 479.

Appellant has not provided this Court with any jury awards that would be

14

analagous to the Appellee's case. Given the fact that Appellant City of Detroit has not supplied this Court with any reason or any proofs by which this Court may grant relief as to remittitur, such relief must be denied. See, *Begin, supra,* at 590.

"It is sufficient if Plaintiff presents a reasonable basis for computation." *Unibar Maintenance Services, Inc. v Saigh*, 283 Mich App 609, 634; 769 N.W.2d 911 (2009), citation omitted. "Further, the certainty necessary to establishing the amount of damages is less once the fact of damages is established." *Id.*, citation omitted.

Appellee established damages on the record through his medical records, testimony of a medical doctor, and through his own testimony and documented proofs as well. (Exhibit 7, Appellee's medical records produced at trial). "A verdict should not be set aside simply because the method of computation used by the jury in assessing damages cannot be determined, unless it is not within the range of evidence presented at trial." *Diamond v Witherspoon*, 265 Mich App 673, 694; 696 N.W.2d 770 (2005).

Here, the verdict was clearly not excessive, nor against the great weight of the evidence. In addition to the testimony at trial, the video of the accident speaks volumes. (Ex. 11 of the Record at the Court of Appeals, videotape, not attached here).

   **B.     The jury verdict was not excessive as Mr. Beydoun was seriously injured, and testified as shown below**

   Q.     Page one of your medical exhibits, what does that indicate in terms of any injury that you had?
   **A.     Left arm pain and numbness. And there was CT scan of the cervical spine with the third reconstruction and then also impression at the end. It says diffuse disc bulge at 5 and 6.**
   (Page 41, lines 23-25; Page 42, lines 1-3)

   Q.     Diffuse disc bulge at C5, C6; correct?
   **A.     Correct.**

Q.  And that's what you testified to earlier; correct?
A.  **Correct.**
Q.  Okay. If we turn the page—and this will be the last one we'll look at here. This is a letter from the doctor you saw, Dr. Toma; correct?
A.  **Correct.**
Q.  And what is —that's dated May 25th, 2010, what does that letter indicate?
A.  **Well, it says that Mr. Beydoun is under my care. He has been seen in my office today for neck pain, cervical disc disease, and left upper extremities, C7 radiculopathy, due to MVA in May 2008. His condition is deteriorating. He has muscle weakness and atrophy.**
Q.  Atrophy?
A.  **Atrophy of the left hand.**
Q.  Interossei—
A.  **Interossei muscles, which leads to a very weak grip. He can lift only one to two pounds of weight and has to shift work to the right hand due to the weakness. He needs continuous medical attention. At present, he needs to repeat EMG of the upper extremities and follow up with Dr. Claybrook, a spinal surgeon.**

(Page 42, lines 4-25; Page 43, lines 1-2)

Q.  Can you tell the jury and talk to me back here because these people back here want to hear you. How were you injured?
A.  **I was basically injured, I had like—I went through a long process to find out what's going on through so many tests. And finally I found out that there is—or I have nerve damage in C6 and 7 and also a bulge in 4 and 5. And I also have some traumatic stress. I went through depression. I cannot—physically I cannot do exactly what I used to do before. It limited my ability to do exactly what I used to do before.**
Q.  Well, let's start with doctors. Did you treat with any doctors after the accident?
A.  **Yes.**
Q.  Okay. Do you recall any of the names specifically of the doctors who you treated with?
A.  **Actually I went straight to Dr. Raad Toma. And Dr. Raad Toma referred me to another specialist.**

(Page 169, lines 2-19)

Q.  Where did he give you the shots?
A.  **Right in my neck. Right in the spine in the 6 and 7.**

16

Q. And how long after the accident did you get these shots approximately?

A. This shot wasn't too long after the accident. And then Dr. Michael Haenick actually referred me to another specialist. He specialized in bone manipulations and join manipulations, that's Dr. Eric Kovan.

Q. And what did you do with Dr. Kovan?

A. Well, Dr. Kovan asked me if I'm going through therapy before that. And I said yes, Dr. Raad Toma did actually send me to therapy. And that's for about six month. But during the time I'm going through the therapy, I was also seeing Dr. Kovan.

Q. Okay. What did you do in regards to the therapy?

A. Six month didn't help.

Q. And how often did you go for this therapy?

(Page 170, lines 4-11; 14-21 & 25)

A. As far I remember probably three to four days a week.

Q. Did you have any other—did you have any tests, any scans, MRIs, things of that nature?

A. Yes, I did. After the six month of therapy nothing actually worked. It didn't help. And my limitation to what I can do, I did not go back to the way I was before. So Dr. Kovan actually ordered a CT scan. And I went through a CT scan. I went through EMG test. I've done MRIs probably twice also.

Q. So where—can you tell the jury what—do you still have the injury that you had from the accident today?

A. Yes, I do.

Q. Can you tell the jury specifically where in your body—what's the problem? Can you tell?

A. The problem basically it's—I got—I don't know how I explain this. The two bones in my neck, they call them 6- - C6 and 7.

(Page 171, line 1; 11-25, p. 172, line 1)

Q. Can you tell the jury what's wrong with you without using medical terminology, please.

A. I've got nerve damage.

Q. Okay. And where?

A. It's actually C6 and 7.

Q. In your neck?

A. In my spine, yes. In my neck.

Q. And what part of your body does it affect, if any?

A. The pain actually goes straight through my shoulders and affect my left arm completely.

Q. And did you have any problem like that prior to the accident with

17

the Defendant, Mr. Willis?

A.    I never did.

Q.    Did you ever have any treatment before the accident in regards to the treatment you received after the accident?

A.    No. The only time I went to my doctor actually is just for allergy and allergy times. That's it. Allergy season.

(Page 172, line 1; 8-25)

Q.    And you still have the problems today; is that correct?

A.    Still up to now, yes.

Q.    Have the injuries that you sustained in May of 2008 affected your ability to do your job at all?

A.    It did, big time.

Q.    Can you tell the jury how?

A.    I'm a work alcoholic. I work seven days a week. Started my business 25 years ago. And I built it up, for the last 25 years. To come to have like 25,000 square foot shop, with cranes, 14 trucks on the road, 40 employees also. And it did affect me big time. I cannot—basically I cannot concentrate on work. I can't do any physical work anymore. I'm limited to my ability. I don't even sleep at night. I have tremendous amount of headache, chronic pain. I've never took any of those medications, the drugs like in my life like I did with my injury right now, from Ibuprofen to Oxycodone, to all kind of drugs. That affected actually what I can do on a daily—day-to-day basis with my life.

Q.    Do you have—since May of 2008, I understand—I think How did you lose the building?

(Page 173, lines 6-25)

A.    After the accident I—I basically couldn't even concentrate on anything.

Q.    Was it repossessed? How did you lose the building?

A.    It was repossessed. I lost my house. I ended up in divorce. I couldn't even—I couldn't even provide for my kids.

Q.    You need a minute?

A.    My wife said I'm useless after 25 years of working too hard. My oldest son, the only reason he went through civil engineering just to work with me in my own company. He finally graduated and he can't even find a job. He's working as a busboy in a restaurant. My other son also went into architecture school. I can't even do anything for them. I lost it all, 25 years of my life, just with a flash. It's all gone.

(Page 183, lines 1-16)

18

(Exhibit 6, Testimony of Michael Beydoun, April 7, 2011, pp. 41, 42, 43, 169, 170, 171, 172, 173, 183, answers of Mr. Beydoun are bolded).

## IV. APPELLANT WAS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW, AND THEREFORE, COSTS, INTEREST AND ATTORNEY FEES CANNOT BE REVERSED

Pursuant to the law and argument cited herein, Appellant was not entitled to judgment as a matter of law, and therefore, the lower courts ruling as to costs, interest and attorney fees cannot be reversed. The Court of Appeals did not err.

## V. CONCLUSION: THE RELIEF REQUESTED BY APPELLANT CANNOT BE GRANTED

Appellant failed to provide this Court with any factual evidence to support their claims. In some instances, Appellants failed to supply this Court with any facts at all, and it is not for this Court to search the record for such claimed support.

The law cited by Appellant is not applicable to the case at Bar, as shown herein. In addition, the law as cited by Appellee clearly illustrates the fact that the relief requested by Appellant cannot be granted. No clear error was shown by Appellant.

The facts and evidence in this case allowed for a verdict of over $4 million. The jury awarded just over $2 million, well within the range of proffered proofs as to damages and injury sustained. No manifest injustice was shown by Appellant.

Appellant here only attempts to delay payment to Appellee further to avoid it's obligation in paying upon the judgment in this Case. (See Appellee's Motion For Immediate Consideration). Appellant's application to this Court is devoid of merit.

## VI. RELIEF REQUESTED

Appellee, Michael Beydoun respectfully requests that the relief requested by

Appellant be immediately denied and his Judgment as awarded by the jury and Order

of the lower court and of the court of appeals as to interest, costs and attorney fees

remain in tact. Appellant further requests all other relief the Court deems appropriate,

including but not limited to this Court immediately ordering the Appellant City of Detroit

to post a bond with the Court in the amount of $2,195,079.83 so that Appellee may be

assured that those monies will be readily available to make good upon the judgment in

this Case at the time of decision by this Court upon Appellant's application for Leave to

Appeal.

Respectfully Submitted

Raymond Guzall III R60980
Attorney for Plaintiff/Appellee
31555 W. Fourteen Mile Rd., Suite 320
Farmington Hills, MI 48334
(248) 702-6122

## PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing instrument with all exhibits was served upon the attorney of record Sheri L. Whyte, to the above cause at her respective business addresses as disclosed by the pleadings of record herein on July 5, 2013. I declare under penalty of perjury that the statement above is true to the best of my information, knowledge and belief.

By:___X___U.S. Mail _____ FAX _____ Hand Delivered _____ Email registered with Court

Raymond Guzall III

20

# EXHIBIT 4

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

City of Detroit, Michigan,

      Debtor.

Chapter 9

Case No. 13-53846

Hon. Steven W. Rhodes

_____/

RAYMOND GUZALL III (P60980)
RAYMOND GUZALL III, P.C.
Attorney for Creditor Michael Beydoun
31555 W. Fourteen Mile Rd., Suite 320
Farmington Hills, MI 48334
(248) 702-6122
Fax: (248) 702-6124
rayguzall@attorneyguzall.com

_____/

## CERTIFICATE OF SERVICE

      I hereby certify that on August 8, 2013, I electronically filed **CREDITOR MICHAEL BEYDOUN'S MOTION FOR RELIEF FROM AUTOMATIC STAY and BRIEF IN SUPPORT** with the Clerk of the Court using the Court Authorized electronic filing system which will send electronic notification of such filing to the attorneys of record and I hereby certify that I know of no manual recipients on the Notice List.

               /s/ Raymond Guzall III
               Raymond Guzall III  (P60980)

               Attorney for Creditor Michael Beydoun
               31555 W. Fourteen Mile Rd., Suite 320
               Farmington Hills, Michigan 48334
               Phone:    (248) 702-6122
               Fax:      (248) 702-6124
               Rayguzall@attorneyguzall.com