**Exhibit 6(D)**

**City's Brief in Opposition to Emergency Motion to Dissolve TRO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

_____

| | |
|---|---|
| **CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan** )<br>)<br>) | **Case No.: 2:13-cv-12987-LPZ-MKM** |
| **Plaintiff,** )<br>) | |
| **v.** ) | **Hon. Lawrence P. Zatkoff** |
| **SYNCORA GUARANTEE INC., a New York Corporation,** )<br>) | |
| **and** ) | |
| **U.S. BANK, N.A.,** ) | |
| **and** ) | |
| **MGM GRAND DETROIT, LLC,** ) | |
| **and** ) | |
| **DETROIT ENTERTAINMENT, LLC, d/b/a MOTORCITY CASINO HOTEL,** )<br>) | |
| **and** ) | |
| **GREEKTOWN CASINO, LLC,** ) | |
| **Defendants.** ) | |

**CITY OF DETROIT'S BRIEF IN OPPOSITION TO DEFENDANT SYNCORA GUARANTEE INC.'S EMERGENCY MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER AND CONDUCT EXPEDITED DISCOVERY**

1

This case arises from Syncora's improper interference with the City of Detroit's banking relationships. Those relationships, which were established in June 2009, operated smoothly for years despite the City's financial challenges. Last month, Syncora—whose only involvement in those relationships is that of an insurer upon whom no claim has yet been made—saw fit to threaten the custodian bank in order to freeze (or "trap") money that the City desperately needed. Syncora's admitted motive was to exert leverage upon the City to obtain concessions on a different front, and it offered a flimsy legal justification for its actions. Unable to negotiate a solution with Syncora, the City brought this action on July 5 in the Circuit Court for Wayne County. Upon an extensive record, Judge Annette Berry determined that the City was likely to prevail upon its claims that Syncora had acted illegally and entered a temporary restraining order ("TRO") that gave the City access to the trapped money to prevent the immediate and irreparable harm facing the City if it could not access these funds. She also set July 26 for a hearing on a preliminary injunction.

The TRO permitted the City to have uninterrupted access—as it had for the previous four years—to the $15 million or so that accumulates each month in a bank account known as the General Receipts Subaccount. On Friday, July 12, Syncora demanded that the City agree to dissolve the TRO and adjourn the preliminary injunction hearing indefinitely. When counsel for the City unexpectedly agreed to do so, Syncora's counsel added a new demand, namely, that the City return to the General Receipts Subaccount the money it had been paid during the pendency of the TRO. The City refused, and a few hours later Syncora served lengthy emergency motion papers and extensive discovery demands.

There obviously is no emergency. The City has consented to dissolution of the TRO and adjournment of the preliminary injunction hearing. Although the City's declaratory judgment

action and tort claims remain pending, those claims can and should proceed on the normal schedule called for by this Court's procedures and the Rules of Civil Procedure.  Syncora's sole argument for exigency is the claim it devised for the first time late Friday afternoon that the City should pay $15 million into the General Receipts Subaccount.  Yet this claim for monetary damages, is clearly not emergent, and Syncora's claim is procedurally and substantively defective for many reasons.

## ISSUES PRESENTED

1.  Whether good cause exists for expedited proceedings, given the fact that the City has consented to the dissolution of the State Court's TRO and an indefinite adjournment of the preliminary injunction hearing and that the monies in the General Receipts Subaccount are fully replenished each month?

2.  Whether defendant Syncora may properly make a claim for disgorgement of money in motion papers without filing a counterclaim as required by Federal Rule of Civil Procedure 13?

3.  Whether preservation of the *status quo* should involve protecting the City of Detroit's rights to casino tax revenues as they were exercised for the four years between June 2009 and June 2013 or instead permitting Syncora to cause the freezing of this money as it did between June 17 and July 5, 2013?

4.  Whether Syncora has the rights of a secured party under the Collateral Agreement between the City and the swap counterparties?

5.  Whether Syncora has met the requirements for entry of injunctive relief?

## RELEVANT AUTHORITY

### A. Syncora's Request That The Court Order The City To Return Funds Is Procedurally Improper

Federal Rule of Civil Procedure 13(a) provides that "[a] pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim:  (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction."  Rule 13(c) provides that "[a] counterclaim need not diminish or defeat the recovery sought by the opposing party.  It may request relief that exceeds in amount or differs in kind from the relief sought by the opposing party."

### B. Syncora Cannot Meet The Traditional Standards For Injunctive Relief

"When considering a motion for preliminary injunction, a district court must balance four factors:  (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction."  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007).

## FACTUAL BACKGROUND

### A. The COPs and Swaps Transactions

This case has its origins in complex financings the City of Detroit closed in 2005 and 2006 to fund its obligations to two retirement systems.  The financing culminated in the sale to the public of "Pension Obligation Certificates of Participation" ("COPs").[1]

### 1. The COPs

The contractual arrangements underlying the COPs transactions hinge upon promises by the City to make periodic payments to two non-profit Service Corporations it established.  The Service Corporations in turn created Funding Trusts, to which they assigned their interests in this income stream.  Finally, the Funding Trusts sold "Certificates Of Participation" in the income stream to the public, with each certificate representing a proportional right to the City's payments.

To make the COPs attractive to investors, the Service Corporations purchased insurance against a default by the City on payments of interest or principal.  The predecessor of defendant Syncora—an entity known as XL Capital Assurance, Inc.—was one of two monoline insurers that sold this insurance to the Service Corporations.

### 2. The Swaps

Some of the COPs had floating interest rates.  Fearing rising interest rates, the City hedged its risk by having the Service Corporations enter into interest rate "swap" agreements

---

[1] Details of the transactional documents are set forth with particularity at Detroit City Code §§ 18-16-1 through 18-16-7, attached as Exhibit A to the City of Detroit's Motion and Brief in Support Of Its Motion For An Ex Parte Temporary Restraining Order And An Order To Show Cause Why A Preliminary Injunction Should Not Issue ("State Court Motion for a TRO"), included as Exhibit 2 to the Declaration of Christopher J. DiPompeo ("DiPompeo Decl."), filed concurrently herewith.

6

with two banks, commonly known as the "swap counterparties."[2]  Under the swaps, the Service Corporations and the swap counterparties agreed to a transaction that effectively converted each Service Corporation's floating interest rate exposure into a fixed payment.  This was done through an arrangement whereby, in return for each side "betting" against the other on interest rates, the Service Corporations agreed to pay periodic, fixed amounts to the swap counterparties, and the counterparties agreed to make payments to the Service Corporations in the event that floating interest rates exceeded certain levels.

As part of the swaps transaction, the swap counterparties required the Service Corporations to buy insurance against any default on their swaps payments.  The Service Corporations bought the insurance from the same two sureties—including Syncora's predecessor, XL Capital—that they had used for the insurance on the COPs.  Thus, Syncora is the surety for both the COPs and swaps.  These, however, are two different sets of insurance policies; they are separately documented; and Syncora's obligations and rights under the two policies are separate and independent.

### B.  2009 Collateral Agreement

The swaps documents gave the swap counterparties the right to terminate the swaps agreements and demand a large termination payment under certain conditions.  One such event was (a) if the rating on the COPs were ever reduced to below investment grade (b) at the same time the credit ratings of the two insurers fell below certain levels.  In January 2009, this happened, giving the swap counterparties the right to demand early termination of the swap agreements and a termination payment then estimated to be between $300 and $400 million.

---

[2] The banks were UBS A.G. and SBS Financial Products Company, LLC.  SBS had a credit support arrangement with Merrill Lynch Capital Services.

The City lacked the resources to make this termination payment, so it renegotiated the swaps with the swap counterparties. The renegotiated deal resulted in a Collateral Agreement between the City, the Service Corporations, the swap counterparties, and U.S. Bank as custodian that was signed in June 2009.[3] The essence of the Collateral Agreement was to secure the City's obligations to the swap counterparties by pledging the tax revenues and developer payments the City collected from Detroit's three casinos (collectively the "Casino Revenues"). The Collateral Agreement created a "lockbox" system to hold these pledged revenues until the City made its swaps payment each month.[4]

The Collateral Agreement created two bank accounts—a "Holdback Account" and a "General Receipts Subaccount," with U.S. Bank as custodian of both. *See* Collateral Agreement § 8.1 (Orr Aff., Ex. B). The casinos were instructed to remit every day to the General Receipts Subaccount all casino revenues they owed the City, where the revenues would sit until the conditions for releasing them to the City had been met.

The swaps contracts required the Service Corporations to make fixed payments to the swap counterparties on a quarterly basis. The Collateral Agreement, however, provided that the City would fund those quarterly payments directly, and would do so by depositing one-third of the Service Corporations' quarterly payment into the Holdback Account each month.[5] Once the City put this money into the Holdback Account, U.S. Bank would (a) release to the City the casino revenues that had already accumulated in the General Receipts Subaccount and (b) for the

---

[3] See Exhibit B to the Affidavit of Kevyn D. Orr, Emergency Manager for the City of Detroit ("Orr Aff."), filed concurrently herewith. The Orr Affidavit originally was filed with the Circuit Court, but for the convenience of the Court the City has resubmitted it with its present papers.

[4] A schematic of this lockbox arrangement is attached as Exhibit B to the City of Detroit's State Court Motion for a TRO (DiPompeo Decl., Ex. 2).

[5] At the end of each quarter, U.S. Bank would transfer funds from the Holdback Account to the swap counterparties to satisfy the Service Corporations' obligations under the swaps.

8

rest of the month continue to remit casino revenues to the City as they were deposited every day. If, however, there were an event of default or a termination event under the swaps transactions, the Collateral Agreement gave the swap counterparties—and only the swap counterparties—the right to serve a notice requiring U.S. Bank to hold—or "trap"—in the General Receipts Subaccount the monies that had accumulated there and not disburse them to the City.

Syncora was not a party to the Collateral Agreement, did not sign it, and has no general rights under it. Instead, Syncora's rights under the document are limited to those one would expect of a third-party insurer and potential subrogee, namely, that the City and the swap counterparties could not amend the Collateral Agreement without Syncora's consent, and even then only when the amendment would affect Syncora's interests. Collateral Agreement § 14.5 (Orr. Aff., Ex. B). Moreover, the Collateral Agreement did not purport to affect in any way the structure of, or rights under, the COPs transaction. As before, the two transactions were separate, distinct and unentangled.

## C. Negotiations Between the City and the Swap Counterparties

On March 14, 2013, Kevyn D. Orr was appointed Emergency Financial Manager for the City of Detroit pursuant to Public Act 72 of 1990, *replaced and repealed by* Public Act 436 of 2012, MCL 141.1541 *et seq.* Under the swaps contracts, Orr's appointment arguably was an Event of Default and possibly gave the swap counterparties the right to terminate the swaps, demand a termination payment, and direct U.S. Bank to trap the Casino Revenues in the General Receipts Subaccount. However, despite the Emergency Manager's appointment and its difficult financial situation, the City never defaulted on its monthly payments into the Holdback Account and never failed to make its required swaps payments. As a result, since March 2013, the swap counterparties have not declared an event of default under the swap contracts, have not sought to

9

terminate the swap contracts, have not sought to trap the cash in the General Receipts

Subaccount, and have not sought to make any claims for payment from the swap insurers.

Instead the swap counterparties have pursued a negotiated solution with the City.

These negotiations were productive and by June 17 the parties had agreed in principle to

a settlement under which the swap counterparties would agree not to seek to have U.S. Bank trap

the Casino Revenues in return for the City's promise to continue making swaps payments. In

addition, the City would be given an option to buy out its swaps obligations at a discount. This

buyout would be a major step forward in the City's restructuring effort, since the swap

counterparties are among the City's largest secured creditors.  More fundamentally, the

settlement would give the City continued access to the Casino Revenues.

### D.  Syncora's Efforts to Trap Casino Revenues

As described before, the COPs and the swaps were two different and distinct transactions.

They had separate documentation and dealt with different things.  Because of the 2009 Collateral

Agreement, the City's obligations under the swaps were collateralized; by contrast, its

obligations under the COPs were unsecured.

On June 14, the City failed to make a payment of approximately $40 million due to the

Service Corporations for payment to holders of the COPs.  This meant that Syncora became

liable for a portion of this amount and thus became subrogated to that extent to the Service

Corporations' rights against the City.  However, the City did ***not*** default on its swaps payments,

and instead continued to make timely payments to the Holdback Account as required by the

Collateral Agreement.  As a result, there has been no payment default under the swaps, Syncora

has incurred no payment obligations as insurer of the swaps, and Syncora is not subrogated to the

rights of the swap counterparties.

Nonetheless, on June 17, Syncora sent a letter to U.S. Bank, notifying the bank that Syncora believed there was an event of default under the swaps and demanding that U.S. Bank therefore trap the monies in the General Receipts Subaccount. *See* Orr Aff., Ex. D. U.S. Bank's counsel responded that the bank would have released Casino Revenues but for Syncora's letter and inquiring as to the basis for Syncora's "letter of instruction" to trap Casino Revenues rather than release them to the City. *Id.*, Ex. E. U.S. Bank also informed Syncora that release of the funds in the General Receipts Subaccount would have been "the normal course of events" and asked for Syncora's explanation why U.S. Bank should "deviate from the ordinary course of business." *Id.* Counsel for Syncora replied with another letter to U.S. Bank on June 24, repeating their prior demands and threatening to hold U.S. Bank responsible for any release of funds from the Subaccount. *See id.*, Ex. F.

 On June 25, the Emergency Manager objected to Syncora's notice. *See id.*, Ex. G. He reemphasized the City's severe liquidity crisis and need for unimpeded access to the casino revenues in the General Receipts Subaccount. He also made clear that no payment default had occurred under the swaps and, because it was not a party to the Collateral Agreement, Syncora had no right to instruct U.S. Bank regarding the Casino Revenues.

Syncora rejected the Emergency Manager's request on June 26, continuing to insist that U.S. Bank trap the monies. *See id.*, Ex. H. Syncora asserted that its purpose was to protect its contractual rights as insurer of the swaps, due to the City's default on the ***COPs*** payment and Syncora's possible payment as a COPs insurer. The City's advisors met with Syncora on June 27 and 29, but made no progress.

### E.  The City's Temporary Restraining Order

Syncora's conduct had severe consequences.  Faced with competing demands from the City and Syncora, U.S. Bank, opted to withhold the Casino Revenues from the City.  Without access to these funds, the City could not guarantee essential services to its residents, and the cloud over the City's continuing access to its casino revenues had a severe chilling effect on the City's negotiations with its creditors, including its negotiations of its settlement with the swap counterparties.  Because of Syncora's intransigence, the City had little choice but to take legal action.  On July 5, it brought this lawsuit in the Circuit Court for Wayne County and moved for entry of a TRO.  After considering the City's papers, reviewing Mr. Orr's accompanying affidavit, and hearing argument from the City's counsel, Judge Annette Berry issued a TRO enjoining Syncora and the other defendants from further withholding casino revenues from the City, unless directed to do so by the swap counterparties.  Judge Berry also set a hearing on preliminary injunctive relief for July 26, 2013.

In the ten days since the entry of the TRO, U.S. Bank remitted to the City the monies in the General Receipts Subaccount, which have totaled about $15 million.

### F.  Proceedings Before This Court

Syncora removed the case to this Court on July 11, 2013.  That evening, Syncora's counsel notified us that they wished to confer about their demand for dissolution of the TRO and scheduling of expedited discovery relating to the preliminary injunction hearing.  There were two conference calls the next afternoon.  During the first call, the City agreed to dissolution of the TRO and adjournment of the preliminary injunction hearing indefinitely on the ground that the City was not in a position to shoulder the burdens of the extensive discovery Syncora had

demanded.[6]  In addition—although counsel for the City were not free to disclose it to Syncora's

counsel that day—the City's counsel were aware that the City was close to a final settlement

agreement with the swap counterparties that would moot much of the case.

 After learning that the City would consent to its demands, Syncora's counsel quickly

added a new condition on the  second call, namely, that the City should return to the General

Receipts Subaccount the monies it had been paid in the previous week.  The City rejected this

condition.  At 5:17 p.m., Syncora's counsel served an emergency motion to dissolve the TRO

and conduct expedited discovery.  Accompanying the motion were extensive document requests

and deposition notices.

### G.  Forbearance Agreement

 The City executed a forbearance agreement with the swap counterparties as of July 15.

Although the terms of the agreement are not public, it provides that, so long as the City continues

to make its monthly payments to the Holdback Account, it will continue to have access to the

Casino Revenues that accumulate in the General Receipts Subaccount.  In addition, the

agreement provides that the City can buy out the swaps in the coming years at attractive values

and, when it does so, the swap counterparties agree that they will make no claims against

Syncora relating to the swaps.  In other words, the forbearance agreement will have the effect of

completely relieving Syncora of its potential liability for insuring the swaps.

 Thus, the posture of the case now is that the City has (a) agreed to dissolve the TRO, (b)

agreed to adjourn the preliminary injunction hearing indefinitely and (c) entered into an

---

 [6]  This was confirmed in an email we sent to Syncora's counsel at 2:18 pm.  Syncora
misstates the record in saying that the City's counsel stated that they "would probably be
amenable" to dissolving the TRO.  *See* Syncora Motion at 3.  Instead, counsel wrote that its offer
was subject to the consent of our client, which we expected to (and did) receive promptly.  *See*
Email Communications Between the City of Detroit's Counsel and Syncora's Counsel (July 11-
12, 2013) (DiPompeo Decl., Ex. 4).

agreement with the swap counterparties that should protect Syncora from exposure on its swaps insurance.  Nevertheless, Syncora believes there is a present emergency, has moved to dissolve the TRO, seeks injunctive relief ordering the City to return up to $15 million to the General Receipts Subaccount, and asks for an expedited schedule for the extensive discovery it has served.[7]

## ARGUMENT

### I.    THERE IS NO EMERGENCY TO JUSTIFY EXPEDITED RESOLUTION OF THIS CASE

A lynchpin of Syncora's motion is that there is an emergency that the Court must immediately address and that the ordinary provisions and procedures of the Federal Rules of Civil Procedure, this Court's own rules, and standard practices should be ignored.  This clearly is not the case:  Syncora's emergency is self-created.

The main relief Syncora seeks is dissolution of the Circuit Court's TRO and entry of an order enjoining the City to return to the General Receipts Subaccount the $15 million or so the City has received since the Circuit Court entered its TRO on July 5.  *See* Defendant Syncora Guarantee Inc.'s Emergency Motion To Dissolve The Temporary Restraining Order And Conduct Expedited Discovery ("Syncora Motion"), at 2.  The City already has consented to the first part of this—dissolution of the TRO—since it believes this week's settlement between the City and the swap counterparties is likely to moot much of the case anyway.  Yet even if the Court were persuaded to treat Syncora's request as a cross-motion for the return of funds and that Syncora had somehow established a right to this relief, Syncora still would have failed to explain why resolution of this dispute requires *expedited* consideration.  Syncora asserts that expedited

---

[7] We have separately moved under Federal Rule of Civil Procedure 26(c) for entry of a protective order against Syncora's discovery requests.  *See* City Of Detroit's Motion For Protective Order, dated July 17, 2013.

resolution of this request is necessary "before all of the funds are dissipated, never to be recovered."  *See* Defendant Syncora Guarantee Inc.'s Reply To The City's Preliminary Response To Its Emergency Motion at 2 ("Syncora Reply").  However, as noted below, *see infra*, at 23, even the dissipation of these funds will cause Syncora no harm because the amounts taken from the General Receipts Subaccount to the City are replenished every month.  And Syncora's harm is entirely hypothetical, since it has never had to pay on account of the swaps and is unlikely to ever have to do so.

Moreover, the contracts and other documents underlying this dispute are complex and the consequences to the City of a mistake are severe.  This is not a dispute that should be resolved in a few days, as Syncora seems to insist.  Instead, Syncora should be required to file a competent counterclaim, the City should be given the opportunity to answer or move with regard to it, and the case should proceed like any other civil case for money damages.  Without a strong justification for expedited review, there is no reason to truncate an important and complex case.

There similarly is no emergency requiring expedited discovery and disregard of the requirements of Federal Rules of Civil Procedure 26(a) and 26(f) and the normal periods for responding to discovery under Rule 30.  The evident purpose of this discovery was to allow Syncora to prepare for the preliminary injunction hearing originally scheduled for July 26, but that is now adjourned indefinitely.  This is an invented crisis.

## II.   SYNCORA'S REQUEST FOR THE RETURN OF FUNDS FROM THE CITY IS PROCEDURALLY IMPROPER

In essence,  Syncora seeks disgorgement of money received by the City as a result of the City's allegedly improper actions in obtaining the TRO.  Syncora has not, however, filed a counterclaim for this relief as required by Federal Rule of Civil Procedure 13.  Instead, Syncora asserts that the Court should grant this relief "as a condition of its order dissolving the temporary

restraining order." Syncora Reply at 2. Recognizing the procedural deficiency of its request, Syncora asserts that "a court has the inherent authority to treat a motion to dissolve as a cross-motion for injunctive relief." Syncora Reply at 4. However, even if a federal court *may* do so, Syncora has presented no compelling reason *why* the court should treat its improper request as a cross-motion for injunctive relief rather than enforcing the requirements of the Federal Rules of Civil Procedure. The City should have, and does have, the right to demand that Syncora's claims be properly presented and the opportunity to move against those claims upon proper papers under Rules 12(b) and (c).

Syncora also invokes the equitable power of the court to fashion an appropriate remedy and suggests that "a court that dissolves a temporary restraining order has broad authority to return parties to the status quo," either upon a motion by the parties or *sua sponte*. Syncora Reply at 2-3, 5. For support, Syncora cites *Taylor v. Taylor*, 2013 WL 1183290 (N.D.N.Y. Mar. 21, 2013), and *Moore v. State Farm Mutual Automobile Ins. Co.*, 2005 WL 399395 (E.D. La. Feb. 14, 2005), but neither of these cases stands for the proposition Syncora asserts.

In *Taylor*, the plaintiff sought a TRO and preliminary injunction after the plaintiff's bank transferred $71,000 from the plaintiff's account to the IRS under a tax levy. The state court issued a TRO prohibiting the bank from transferring any of the plaintiff's remaining $100,000 to the IRS under the tax levy, as well as an order to show cause why the court should not grant a preliminary injunction ordering the return of the $71,000. Before an order to return the funds was entered, however, the IRS removed the case, and the federal court determined that the TRO was improper because of a jurisdictional defect. But the court did not order any "affirmative steps to restore the status quo" as Syncora suggests. *See* Syncora Reply at 3-4. Rather, it simply dissolved the TRO and order to show cause "insofar as those orders in any way interfere with the

IRS's levy against Defendant–Movant Taylor, including prohibiting [the bank] from disbursing assets to the IRS," *id.* at *5.  Far from ordering any affirmative actions, the Court's order actually removed the only impediment to the bank's ability to resume transferring funds to the IRS.

In *Moore*, the defendant sought and obtained a TRO to seal certain documents entered into the record by the plaintiff on the ground that they contained confidential trade secrets.  The plaintiff eventually sought to dissolve the TRO on the ground that the documents did not actually contain protected trade secrets.  The court reviewed the documents and determined that only two exhibits contained trade secrets.  As a result, the court dissolved the TRO as to the unprotected documents and ordered "that documents 31, 34, 35, 36, 38, 39, 40, 42, 43, 45, and 46 be UNSEALED and placed in the record, and that document 27 be UNSEALED and placed in the record with the exception of Exhibits 'C' and 'D' which shall remain sealed." *Id.* at *9.  Syncora curiously asserts that the court's decision to unseal the documents was a form of affirmative relief similar to their request for disgorgement from the City.  But the *Moore* court's routine decision to clarify that dissolution of a TRO sealing certain documents meant that that those documents would now be unsealed is a far cry from the extraordinary relief Syncora seeks here.

Neither *Moore* nor *Taylor* contemplated anything like Syncora's request for the disgorgement of up to $15 million from a cash-strapped city after a state court judge determined on a competent record that a TRO was necessary to avoid immediate and irreparable harm.  Syncora has failed to identify any case even remotely supporting the relief it now seeks.  The court should decline Syncora's invitation to depart from the requirements of the Federal Rules of Civil Procedure, and should require Syncora, if it desires to pursue relief against the City, to do so in accordance with the Rules.

III.   **SYNCORA'S REQUEST FOR THE RETURN OF FUNDS FROM THE CITY IS SUBSTANTIVELY IMPROPER**

Besides the procedural irregularities, Syncora's motion also fails substantively.  Thus, even if this Court were to treat Syncora's request as a motion or cross-claim, the request should fail because Syncora mischaracterizes the *status quo ante*, seeks to assert rights Syncora does not have, and cannot satisfy the factors necessary for injunctive relief to issue.

**A.   Syncora Mischaracterizes The *Status Quo Ante***

The premise of Syncora's request is a claim that the Court should return the parties to the *status quo ante*, which, in Syncora's view, consists of funds being trapped in the General Receipts Subaccount.  According to Syncora, "Syncora never instructed or demanded that U.S. Bank take any action" with respect to the money in the General Receipts Subaccount, and "the *status quo* just prior to filing of the Motion [for a TRO] was that U.S. Bank was properly trapping cash under section 5.4 of the Collateral Agreement."  *See* Syncora Motion at 12.  These assertions are simply not supportable by the documented facts and blatantly mischaracterize the *staus quo ante*.

Prior to Syncora's letters, U.S. Bank had for years paid the funds in the General Receipts Subaccount to the City after the City made its monthly payment to the Holdback Account, because of the swap counterparties' decision not to declare an event of default.  When U.S. Bank received Syncora's June 17 letter, however, it began for the first time to trap the funds because it had received conflicting instructions.  According to U.S. Bank, as a custodian it was not entitled to determine whether Syncora's actions were proper and thus was compelled to trap the funds until the matter could be resolved.  *See* Orr Aff., Ex. E.  The City, however, could not remain in this state of limbo and thus sought a TRO to preserve its ability to access the Casino Revenues.

Satisfied that the preservation of the *status quo* meant that the funds would freely flow to the City as they always had, the state court issued a TRO to that effect.

That the parties—including Syncora—recognized that the *status quo* involved the release of funds from U.S. Bank to the City is confirmed by the communications between Syncora and U.S. Bank's counsel, Bill Smith, on June 24, 2013.  U.S. Bank responded to Syncora's June 17 letter by informing Syncora that,

> *[i]n the normal course of events*, U.S. Bank as Custodian would advise the City [that the funds in the General Receipts Subaccount exceeded the City's monthly swaps payment], receive from the City a like amount which would be credited to the Holdback Account (the monthly 'City Payment'), and then remit to the City the Holdback Requirement Amount from the General Receipts Subaccount.  Thereafter, as casino revenues are received, they are to be remitted to the City during the remainder of the month.

Orr Aff., Ex. E (emphasis added).  Smith instructed Syncora and the City that "to the degree that you request U.S. Bank as Custodian *to deviate from the ordinary course of business*, kindly explain the legal reasoning and support therefore . . . ."  *Id.* (emphasis added).  And Syncora's counsel then renewed its unequivocal demand that the money in the General Receipts Subaccount be trapped:  "Please understand . . . that our position on the cash trap has not changed from that provided in our letter.  Pursuant to the Collateral Agreement, *the cash should have been trapped and should continue to be trapped absent our consent*."  *Id.* (emphasis added).

There can be no question that Syncora instructed U.S. Bank to withhold the funds from the City.  Syncora elides this uncomfortable fact, focusing exclusively on its June 17 letter and failing even to mention the parties' subsequent communications.  But as the City made clear to

the state court, there was no question that Syncora repeatedly and clearly instructed U.S. Bank not to release funds and threatened to sue if U.S. Bank ignored those instructions.[8]

Moreover, Syncora's assertion that U.S. Bank "expressed its independent view that the Service Corporation's default . . . led to *automatic* cash trapping under the Collateral Agreement," Syncora Motion at 7, is flatly untrue.  In fact, U.S. Bank has made an appearance in this case specifically to respond to Syncora's "inaccurate[]" portrayal of its actions in response to the Syncora letters, and to make clear that it has never taken a position on whether funds should be trapped in the General Receipts Subaccount.  *See* U.S. Bank National Association's Brief In Response To Syncora Guarantee Inc.'s Emergency Motion To Dissolve The Temporary Restraining Order And Conduct Expedited Discovery at 3.

The relief Syncora now seeks is thus not a return to the *status quo ante*, but rather a judicial imprimatur on its effort to deviate from the *status quo* to serve its unrelated interests as an insurer of the COPs.  Indeed, Syncora's entire assertion that the funds must be returned to make it whole seems to be a contrived platform for its burdensome and unnecessary discovery demands.  It was not until the City consented to dissolution of the TRO that Syncora first raised this condition, and Syncora continues to make this demand even though this week's settlement between the City and the swap counterparties is likely to relieve Syncora of any exposure on the swaps at all.

---

[8] *See* Orr Aff., Ex. E  ("Pursuant to the Collateral Agreement, the cash should have been trapped and should continue to be trapped absent [Syncora's] consent."); *id.*, Ex. F (directing that "U.S. Bank, in its capacity as Custodian, is clearly required by the unambiguous terms of the Collateral Agreement, to retain all funds that were in the General Receipts Subaccount upon the occurrence of the Cross Default EOD" and that "Syncora does not consent to any divergence by U.S. Bank from that duty"); *id.* ("[Syncora] will hold U.S. Bank responsible for any release of funds from the General Receipts Subaccount in contravention of the plain terms of the Collateral Agreement.").

**B. Syncora Has No Rights Over The Collateral In The General Receipts Subaccount**

Syncora does not now have—and never has had—any right to the funds in the General Receipts Subaccount.  Syncora is not a party to the Collateral Agreement, which establishes the rights of the parties to the Casino Revenues that secure the City's swaps obligations.  Nor does the Collateral Agreement otherwise give Syncora the right to direct the custodian's conduct with respect to the collateral.  Syncora is merely an insurer on the swaps agreements, and, like any insurer, has no rights until it is called upon to make a payment.[9]  Syncora has never made any such payment on the swaps and, indeed, under the terms of the settlement with the swap counterparties, it probably will never be required to do so.  Syncora thus cannot override the swap counterparties' decision to forbear from enforcing rights they may have under the Collateral Agreement.

Syncora has been unable to identify any argument to the contrary.  Early on, Syncora asserted in its letters to U.S. Bank that its rights arose on account of a cross-default under the swaps (*see* Orr Aff., Ex. F at 2), but Syncora now appears to have abandoned that argument.  And for good reason:  the cross-default provision in the swaps is triggered only upon certain circumstances not present here.  *See* 1992 ISDA Master Agreement § 5(a)(vi), attached as Exhibit D to the Syncora Motion.  And the Collateral Agreement also is of no help to Syncora, since Syncora is not a party to it and the Agreement has no cross-default provision.  Moreover, as the City has stated before, Syncora cannot rely upon the cross-default provision of the swap contracts because Syncora has never been called upon to make a payment under the swap

---

[9] The only right Syncora possesses under the Collateral Agreement before having paid under its insurance policy is the right to consent to any amendment of the Collateral Agreement that affects its rights, remedies, or obligations.  *See* Collateral Agreement § 14.5 (Orr Aff., Ex. B).

insurance policies.  Until it makes such a payment Syncora has no rights as a subrogee and does not stand in the shoes of the swap counterparties.

Syncora's new argument is that the swap counterparties' decision to forbear from demanding that U.S. Bank trap funds amounted to a waiver or amendment of the Collateral Agreement, and that this trespassed the Agreement's provision that it could not be amended without Syncora's consent.  *See* Syncora Motion at 14-15; Collateral Agreement § 14.5 (Orr Aff., Ex. B).  The right to consent to amendment is indeed the only right Syncora possesses under the Collateral Agreement, but this argument goes no further.  The Collateral Agreement specifically distinguishes between forbearance on rights under the contract and waiver or amendment of the contract, expressly providing "[n]o failure on the part of any party hereto to exercise, and no delay in exercising, any right hereunder shall be a waiver thereof."  *Id.* § 14.7.  Clearly, the swap counterparties' decision to refrain from exercising their rights to order the trapping of the City's Casino Revenues was an act of forbearance, and not an amendment of the Collateral Agreement.  Thus, even under Syncora's own argument, it has no right to direct U.S. Bank's control of the collateral.

## C.  Syncora Cannot Establish The Factors Necessary For Injunctive Relief

Syncora asserts that to the extent the Court treats its request as a cross-motion for injunctive relief, it can satisfy the traditional factors for such relief—a likelihood of success on the merits, irreparable harm absent the injunction, the harm to others if the injunction is granted, and the public interest.  *See* Syncora Reply at 4 n.1 (citing *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007)).  Even apart from the obvious fact that a state court has already found otherwise, Syncora's arguments should fail.

First, as Syncora's shifting arguments regarding its rights under the Collateral Agreement demonstrate, Syncora has been unable to identify any persuasive argument in favor of its ability to control U.S. Bank's handling of funds in the General Receipts Subaccount. Thus, as the state court found, Syncora is unlikely to prevail on the merits of this dispute.

Second, even if Syncora had any rights in the Casino Revenues collateral, the likelihood that it would suffer irreparable harm from the dissipation of the money received by the City is extremely remote. The City has never defaulted on its swap payments and, indeed, would face severe consequences if it were to do so, including the loss of its recent settlement with the swap counterparties and the payment of an enormous termination fee. Unless the City defaults, Syncora is not required to pay out under its insurance policies, is not subrogated to the swap counterparties' rights and has no claim of need for the money in the General Receipts Subaccount. Moreover, the Casino Revenues are a steady, replenishing stream of money that will be unchanged by the City's financial restructuring. Every month, on average, an additional $15 million of Casino Revenues accumulates in the Subaccount and this is expected to continue for at least the next ten years. *See* Orr Aff., Ex. A at 47. Thus, if Syncora were ever called upon to pay a missed quarterly swaps payment—which is now even more unlikely given the recent settlement—there will be sufficient cash in the General Receipts Subaccount to reimburse it.

Third, balanced against the extremely remote possibility that Syncora will suffer any harm, let alone irreparable harm, the City detailed before the state court the immediate and irreparable consequences that would result from the monthly loss of up to $15 million in revenue. Indeed, the consequences of losing that amount of money to a large city with only $40 million cash on hand at the end of May are not difficult to imagine. As the state court recognized, and as the Emergency Manager has averred in his affidavit, *see* Orr Aff. ¶¶ 21-24,

such a loss would put at risk the City's ability to adequately provide police, fire, and other public services to its residents and to successfully negotiate with key stakeholders. Although, as a result of the TRO, the City has been able to complete negotiations with the swap counterparties, an order to disgorge up to $15 million would have severe repercussions for the City's already precarious financial condition.

Finally, there can be little doubt that the public interest weighs strongly against the relief sought by Syncora. Granting Syncora's request would put at risk the health and welfare of the citizens of Detroit and erect a significant road block to a successful financial restructuring. The immediate and irreparable harm that the City of Detroit and its residents would suffer if the City were not given uninterrupted access to these funds significantly outweighs any potential interest of a private insurance company that has a hypothetical claim of monetary damages in the future.

**CONCLUSION**

For the reasons set forth above, plaintiff City of Detroit respectfully submits that Syncora's motion should be denied in its entirety.

Dated:      July 17, 2013

/s/ Deborah Kovsky-Apap
_____
Robert S. Hertzberg
Deborah Kovsky-Apap
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
(248) 359-7300  -  Telephone
(248) 359-7700  -  Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com


Thomas F. Cullen, Jr.
Gregory M. Shumaker
Geoffrey S. Stewart
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

*Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 17, 2013, I electronically filed the foregoing *City of Detroit's Brief In Opposition to Defendant Syncora Guarantee Inc.'s Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedited Discovery* and this *Certificate of Service* with the clerk of the court using the ECF system, which will send electronic notice to the following ECF participants:

Andrea L. Hansen      ahansen@honigman.com

Brendan H. Frey      bfrey@manteselaw.com, ssikorski@manteselaw.com

Dirk H. Beckwith      dbeckwith@fosterswift.com, jdickinson@fosterswift.com

Gerard V. Mantese      gmantese@manteselaw.com, bren@manteselaw.com

Ian M. Williamson      iwilliamson@manteselaw.com, ssikorski@manteselaw.com

Jennifer Z. Belveal      jbelveal@honigman.com, mjohnson@honigman.com

Robert S. Hertzberg      hertzbergr@pepperlaw.com


Dated:  July 17, 2013                    /s/ Deborah Kovsky-Apap
                                         Deborah Kovsky-Apap
                                         PEPPER HAMILTON LLP
                                         4000 Town Center, Suite 1800
                                         Southfield, MI  48075
                                         (248) 359-7300  -  Telephone
                                         (248) 359-7700  -  Fax
                                         kovskyd@pepperlaw.com

1