# Exhibit 6(I)

**Syncora's Response to Motion for Protective Order**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**CITY OF DETROIT,**
**a Municipal Corporation Organized**
**and Existing Under the Laws of the**
**State of Michigan,**

**Plaintiff,**

**v.**

**SYNCORA GUARANTEE INC.,**
**a New York Corporation,**

**and**

**U.S. BANK, N.A.,**

**and**

**MGM GRAND DETROIT, LLC,**

**and**

**DETROIT ENTERTAINMENT, LLC,**
**d/b/a MOTORCITY CASINO**
**HOTEL,**

**and**

**GREEKTOWN CASINO, LLC,**

**Defendants.**

**Case No.: 2:13-cv-12987-LPZ-MKM**

**Hon. Lawrence P. Zatkoff**

### SYNCORA GUARANTEE INC.'S RESPONSE IN OPPOSITION
### TO CITY OF DETROIT'S MOTION FOR A PROTECTIVE ORDER

The City of Detroit's (the "City") Motion for a Protective Order has, at its core, one central argument: Syncora Guarantee Inc. ("Syncora") should not be permitted to conduct expedited discovery because "the City has agreed to dissolve the temporary restraining order at issue here and withdraw its request for a preliminary injunction." (Mot. at 4.) Relying on its agreement to dissolve the TRO, the City argues that Syncora no longer has good cause to conduct discovery on an expedited basis. This argument, however, suffers from a fundamental flaw — *there is no such agreement*. While it is true that, on numerous occasions, the City has expressed its willingness to enter into a stipulated order dissolving the TRO, when Syncora asked the City to do so, the City abruptly reversed course and refused to enter into such a stipulation. The City's about-face continued when it took the position that the TRO is of "indefinite duration" — a position that is directly contrary to its prior statements and federal law.

Given the City's unwillingness to dissolve the TRO, the central argument in its Motion for a Protective Order — that the existence of an agreement to dissolve the TRO moots the need for expedited discovery — no longer applies. In fact, because the TRO is still effective, good cause exists for this Court to order expedited discovery relating to Syncora's *Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedited Discovery* ("Emergency Motion"). Accordingly, the City's Motion for a Protective Order should be denied

2

or, in the alternative, the Court should dissolve the TRO and deny the City's request for a preliminary injunction.

3

**BRIEF IN SUPPORT OF**
**SYNCORA GUARANTEE INC.'S RESPONSE IN OPPOSITION**
**TO CITY OF DETROIT'S MOTION FOR PROTECTIVE ORDER**

**ISSUE PRESENTED**

Whether good cause exists for expedited discovery where the City has refused to dissolve a temporary restraining order that it obtained *ex parte* and under false pretenses and which, according to the City, is of "indefinite duration."

4

## MOST APPROPRIATE AUTHORITIES

**Good Cause Exists for Expedited Discovery in Injunctive Proceedings**

Federal Rule of Civil Procedure 26(d)(1) states that "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order."

The 1993 advisory committee notes to Rule 26 state that orders authorizing expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction."

*Ellsworth Associates, Inc. v. United States*, 917 F. Supp. 841, 844 (D. D.C 1996), states that "[e]xpedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *See also U.S. Securities and Exchange Commission v. Wilson*, 2012 WL 5874456, at *4 (E.D. Mich. Nov. 20, 2012).[1]

---

[1] Unpublished opinions cited herein are attached as Exhibit 1.

5

## ARGUMENT

Tellingly, the City's Motion for a Protective Order does not dispute that expedited discovery is appropriate where, as here, a party has obtained a TRO and is seeking injunctive relief. Rather, the thrust of the City's argument is that Syncora no longer requires expedited discovery because the City has agreed to dissolve the TRO and withdraw its request for injunctive relief. There is, however, a significant flaw in this argument — *the City has not agreed to dissolve the TRO or withdraw its request for injunctive relief.* As a result, the entire factual premise underlying the City's Motion for a Protective Order fails, and Syncora should therefore be permitted to conduct limited discovery surrounding its pending *Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedited Discovery.*

Given that the fundamental argument in the City's Motion for a Protective Order no longer applies, the only issue presented by the City's motion is the scope of Syncora's discovery requests. The City claims that it need not provide *any* discovery because of the purported burden of Syncora's discovery requests. The City cannot, however, escape *all* of its discovery obligations simply because it perceives certain requests to be overly broad or unduly burdensome. Furthermore,

6

as described below, Syncora's requests are relevant to the issues necessary to resolve Syncora's Emergency Motion to dissolve the TRO.

## I.   Until the City Abides by its Representations and Agrees to Dissolve the TRO, Good Cause Exists for Expedited Discovery.

Upon a showing of good cause, courts allow a party to conduct expedited discovery prior to a *Rule 26(f)* conference. *Dassault Systemes, S.A. v. Keith Childress d/b/a Practical Catia Training*, case no. 09-10534, 2009 U.S. Dist. LEXIS 99708, at *10 (E.D. Mich. Oct. 27, 2009). "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Ellsworth Associates, Inc. v. United States*, 917 F. Supp. 841, 844 (D. D.C. 1996); *see also U.S. Securities and Exchange Commission v. Wilson*, case no. 12-cv-15062, 2012 U.S. Dist. LEXIS 165248, at *11 (E.D. Mich. Nov. 20, 2012).

In this case, the City sought and obtained an *ex parte* TRO. (*Ex Parte Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue*.) Recognizing that the City obtained the TRO under false pretenses, Syncora promptly moved to dissolve the TRO and obtain limited discovery regarding the allegations supporting the City's claim for injunctive relief. (Emergency Motion.) Because the City had already reaped the benefits of this improper TRO (*i.e.*, the release of the $15 million in casino gaming revenues), it informed Syncora and the Court that it was willing to dissolve the TRO and enter

7

into a stipulated order effectuating that dissolution.  (*Preliminary Response to Motion and Notification of the City's Consent to Dissolution of Temporary Restraining Order and Withdrawal of Request for Hearing on Preliminary Injunction*, ¶ 1.)  Yet, when Syncora requested that the City do just that, the City quickly changed course and refused to dissolve the TRO.  (*Plaintiff City of Detroit's Response to Defendant Syncora's Notice of Proposed Order Dissolving the July 5, 2013 Temporary Restraining Order*.)  Worse still, the City asserted — contrary to its prior representations — that the TRO was of "indefinite duration." (*Id*. ¶ 1.)

Though the City's current position is that the TRO should remain in place indefinitely, this reversal undercuts the arguments in its Motion for Protective Order.  In that motion, the City claims that Syncora no longer requires expedited discovery because the City has agreed to dissolve the TRO and withdraw its request for a preliminary injunction.  (Mot. at 4.)  As noted, however, the City has since reneged on that agreement and now refuses to dissolve the TRO.  Thus, by the City's own logic, Syncora has good cause to conduct expedited discovery.

In short, the City cannot have it both ways.  It must either (a) agree to dissolve the TRO or (b) allow Syncora to conduct expedited discovery.  Because the City is now unwilling to dissolve the TRO, Syncora should be entitled to conduct limited discovery relating to its Emergency Motion to dissolve the TRO.

Or, in the alternative, the Court should dissolve the TRO and the City's request for a preliminary injunction.

## II.    The Expedited Discovery Proposed by Syncora is Specific and Narrowly Tailored to Obtain Information Relevant to Syncora's Request for Dissolution of the TRO.

Where good cause for expedited discovery exists, courts allow discovery that is narrowly tailored and reasonably calculated to lead to the discovery of relevant evidence.    *Dassault Systemes,* 2009 U.S. Dist. LEXIS 99708, *10 (Granting expedited discovery where "[t]he Court finds that Plaintiff's request is narrowly tailored to include evidence that is available through civil discovery and relevant to its allegations[.]").

Because this dispute involves the propriety of the City's request for injunctive relief, the Court will likely need to balance and consider four factors: (1) the likelihood of success on the merits; (2) whether the City will suffer irreparable injury without the injunction; (3) the harm to others that will occur if the injunction is granted; and, (4) whether the injunction would serve the public interest. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F. 3d 535, 540 (6th Cir. 2007).    To that end, Syncora's proposed discovery is narrowly tailored to address each of these factors.    The City refuses, however, to provide *any* discovery, claiming that the discovery Syncora seeks is irrelevant, overbroad, and unduly burdensome.    Yet, as demonstrated below, the discovery that Syncora

9

requested is relevant to the propriety of the TRO and Syncora's pending Emergency Motion.

Syncora's emergency motion [DE10] attached the specific discovery Syncora will be seeking. (*Emergency Motion* [DE 10], exhibits E-S). In its Motion for a Protective Order, the City attached a summary of Syncora's discovery requests. This exhibit groups Syncora's proposed discovery into nine categories. As explained below, each of these categories relates to at least one of the factors the City must establish to obtain injunctive relief and is therefore relevant to Syncora's pending emergency motion to dissolve the TRO:

### i.     City Finances

Discovery relating to the City's finances is relevant to the City's claims of irreparable harm. Though the City's claims of irreparable harm are conclusory and amorphous, they appear to fall into two categories: (1) The financial harm the City will allegedly suffer if it is unable to obtain money from the General Receipts Subaccount; and (2) the harm that the City will allegedly suffer if it cannot complete its negotiations with creditors. Thus, discovery relating to the City's finances will allow Syncora to better understand how and why the City will — or will not — suffer irreparable harm if the TRO is lifted.

### ii. General Creditor Negotiations

Discovery relating to the general creditor negotiations is relevant to the City's claims of irreparable harm. As noted above, the City alleges that it was likely to suffer irreparable harm if it could not complete its negotiations with creditors. The City further argued that the $15 million from the General Receipts Subaccount was a necessary part of these negotiations. Syncora therefore seeks discovery relating to these negotiations.

### iii. Rights and Obligations Under Different Agreements

Discovery relating to the parties' rights and obligations under the various transaction documents is relevant to the City's likelihood of success on the merits. These various transaction documents set forth the rights and obligations of the parties and thus are essential to the present dispute, which hinges on Syncora's rights under these agreements.

### iv. Certificates of Participation ("COPs")

Discovery relating to the COPs is relevant to the City's likelihood of success on the merits. As explained in Syncora's *Emergency Motion* [DE 10] and *Syncora Guarantee Inc.'s Motion to Dismiss Plaintiff City of Detroit's Verified Complaint* [DE 38] ("*Motion to Dismiss*"), which is fully incorporated and relied on herein, the Service Corporations' failure to make a $40 million payment to the COP-holders triggered a cross-default under the Swap Agreement that led to automatic

11

cash trapping under the Collateral Agreement.  This discovery therefore directly relates to the present dispute.

### v.        Negotiations and Settlement with Swap Counterparties

Discovery relating to the City's negotiations and settlement with the Swap Counterparties is relevant the City's likelihood of success on the merits, the City's allegations of irreparable harm, and the potential harm that Syncora suffered as a result of the injunction.  The City claims that it needed an *ex parte* temporary restraining order because the cash trapping in the General Receipts Subaccount was allegedly harming its negotiations with creditors, including the swap counterparties.  The City does not, however, describe in any detail how these negotiations were harmed.

### vi.       Use of Casino Revenues

Discovery relating to use of Casino Revenues is relevant to the harm that Syncora will experience as a result of the TRO.  In particular, Syncora seeks discovery relating to the use of the casino revenues — *i.e.*, Syncora's collateral — that should, under the Collateral Agreement, be trapped and yet, because of the TRO, are currently being released to the City.

### vii.      Cash Trap Conduct

Discovery relating to the decision by U.S. Bank to trap the funds in the General Receipts Subaccount is relevant to the City's likelihood of success on the

12

merits.  This category of discovery goes directly to Syncora's alleged wrongdoing, which includes the City's allegation that Syncora tortiously interfered with the Collateral Agreement and caused U.S. Bank to improperly trap the cash in the General Receipts Subaccount.

### viii.   The City's Harm

Discovery relating to the City's claims of the harm that it suffered as a result of Syncora's actions is relevant to the City's irreparable harm and likelihood of success on the merits.

### ix.   Miscellaneous

The City includes five subcategories under its miscellaneous heading, requiring consideration of each separately.

**a.** "All documents or communications relating to the allegations in paragraphs 53-61, 63-68, 70-73, and 74-79 of the Complaint."  This request is relevant to the City's likelihood of success on the merits.  As the City explains in its Motion for Protective Order, "[t]hese are references to all of the substantive paragraphs pled in connection with each of the City's counts against Syncora." This is a standard discovery request directed specifically at the allegations in the Verified Complaint that form the basis for the City's request for injunctive relief.

13

**b.**     "All documents or communications relating to any termination events or events of default under the Collateral Agreement."  This request is relevant to the City's likelihood of success on the merits.

**c.**     "All documents or communications relating to the City's allegation that Syncora acted in bad faith and without legal justification."  One of the City's main claims in this dispute is that Syncora tortiously interfered with the City's contractual and advantageous relations.  Discovery related to the intent element of this claim is therefore relevant to the City's likelihood of success on the merits.

**d.**     "All documents the City intends to introduce at the preliminary injunction hearing."  This is a standard request that should pose no burden to the City.

**e.**     "All documents or communications relating to Kevyn Orr's authority over the Service Corporations."  This request is intended to explore the scope of Mr. Orr's powers and thus is relevant to the City's likelihood of success on the merits, Syncora's potential harm, and the potential harm to the public interest.

14

## <u>CONCLUSION</u>

For the foregoing reasons, Syncora respectfully requests that the Court deny the City's Motion for a Protective Order or, in the alternative, dissolve the TRO and deny the City's request for a preliminary injunction.

Dated:  August 5, 2013

Respectfully submitted,

By:  /s/ Gerard V. Mantese

Stephen C. Hackney
Ryan Blaine Bennett
William E. Arnault
Lally A. Gartel
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*ATTORNEYS FOR DEFENDANT
SYNCORA GUARANTEE, INC.*

Gerard V. Mantese
Mantese Honigman Rossman and
Williamson, P.C.
1361 East Big Beaver Road
Troy, Michigan 48083
Phone: 248-457-9200
Fax: 248-457-9201

*ATTORNEYS FOR DEFENDANT
SYNCORA GUARANTEE, INC.*

15

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2013, I caused the foregoing papers to be electronically filed with the Clerk of the Court using the ECF system which will send electronic notices of same to all counsel of record.

I declare under the penalty of perjury that the foregoing statements are true to the best of my knowledge, information, and belief.

/s/ Gerard V. Mantese
Gerard V. Mantese

16





1 of 50 DOCUMENTS

**U.S. SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v. JOEL WILSON et al., Defendants.**

**Case Number 12-cv-15062**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, NORTHERN DIVISION**

*2012 U.S. Dist. LEXIS 165248*

**November 20, 2012, Decided**
**November 20, 2012, Filed**

**COUNSEL:** [*1] For **U.S. Securities** and **Exchange Commission,** Plaintiff: Steven L. Klawans, John E. Birkenheier, **U.S. Securities** and **Exchange Commission,** Chicago, IL.

**JUDGES:** Honorable THOMAS L. LUDINGTON, United States District Judge.

**OPINION BY:** THOMAS L. LUDINGTON

**OPINION**

**OPINION AND ORDER GRANTING IN PART AND HOLDING IN ABEYANCE IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION, ASSET FREEZE, AND OTHER EMERGENCY RELIEF**

"The mission of the **U.S. Securities** and **Exchange Commission** is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation."[1] The principal way that the SEC fulfills its mission is by enforcing federal **securities** laws, including by bringing civil lawsuits.

> 1   **Securities** and **Exchange Commission,** *The Investor's Advocate: How the SEC Protects Investors, Maintains Market Integrity, and Facilitates      Capital      Formation,* http://www.sec.gov/about/whatwedo.shtml   (last visited November 20, 2012).

This is such a case. On November 15, 2012, Plaintiff **Securities** and **Exchange Commission** filed suit in this Court against Defendant Joel **Wilson** and two of his

companies, Defendants Diversified Group Partnership Management, LLC, and American Realty. Plaintiff alleges that Defendants violated [*2] several federal **securities** laws, including making an unregistered offer and sale of **securities** in violation of *15 U.S.C. § 77e,* and committing fraud in the offer and sale of **securities** in violation of *15 U.S.C. § 77q.*

The same day as Plaintiff filed its complaint, it filed a motion for a preliminary injunction, asset freeze, and other emergency relief. For reasons detailed below, the motion will be granted in part and held in abeyance in part. The request for expedited discovery will be granted. The request for a preliminary injunction and an asset freeze will be held in abeyance pending a hearing, which will be scheduled for December 10, 2012, at 10 am.

**I**

The following allegations are taken from the complaint and are recounted here by way of background. No presumption of truth should be inferred from their inclusion here.

**A**

**Wilson** is in the business of flipping houses in Bay City, Michigan. Compl. ¶ 2. His business model is straightforward. Buy a property. Fix it up. Resell it via land contract for a profit. Simple enough. The manner that he organizes and funds his business, however, is far less simple.

**Wilson** conducts his business through at least four companies -- W R Rice; Diversified [*3] Group Advi-

2:13-cv-12987-LPZ-MKM   Doc # 42-1   Filed 08/05/13   Pg 3 of 11   Pg ID 1810

Page 2
2012 U.S. Dist. LEXIS 165248, *

sory Firm; Defendant Diversified Group Partnership Management, LLC; and Defendant American Realty Funds Corporation -- and as many as 17 limited partnerships. *Id.* ¶¶ 2, 10.

W R Rice is a registered broker-dealer. *Id.* ¶ 10. Diversified Group Advisory Firm is a registered investment advisor. *Id.* Diversified Group Partnership Management, a Michigan limited liability company, serves as the general partner of each of the 17 limited partnerships. *Id.*

**Wilson** funds his business through soliciting investments. Compl. ¶ 3. It is this public involvement that has brought the scrutiny of Plaintiff and the Financial Industry Regulatory Authority (FINRA).

**B**

Since 2009, **Wilson** has obtained about $6.7 million from 120 investors. Compl. ¶ 3. Diversified Group Partnership Management has raised about $900,000; American Realty, $5.8 million. *Id.*

Diversified Group Partnership Management raised the funds by selling debentures, a type of unsecured promissory note. Compl. ¶ 3. Prospective investors were told that the debentures would carry a ten year term and offer a 10 percent interest payment disbursed semi-annually. *Id.* ¶ 27. They were also told "that their money would be used for the purchase, renovation, [*4] and sale of Michigan real estate, and that the proceeds from the sale of these properties would be used to pay investors their interest payments." *Id.* ¶ 32.

American Realty raised the funds by selling limited partnership interests. Prospective investors were given an "offering document" claiming to describe both "the use to be made of investor funds" and "the Diversified Group's financial condition." Compl. ¶ 35. The investor funds would be used, the offering document explained, to facilitate land contracts on the refurbished houses. Specifically, the funds would be given by the limited partnerships to Diversified Group Partnership Management. *Id.* ¶ 38. In return, the limited partnerships would receive "(1) a secured interest in the underlying property in the event of a default through a repurchase agreement executed by Diversified Group, and (2) the monthly payment stream received from the homebuyers." *Id.* Thus, the investment promised a steady, secured revenue stream.

The offering document went on, however, to caution that the funds could be put to another use "if no suitable land contracts were available." Compl. ¶ 44. The offering document specified: "Diversified Group may loan the [*5] proceeds to American Realty via a nine month note at an annual interest rate of 9.9% amortized over 30 years in order to mimic the return on a land contract." *Id.*

(brackets and quotation marks omitted). Rather than a backup plan, however, **Wilson** soon made this the primary use of the investors' funds. *Id.* ¶ 45.

**C**

The first three limited partnerships, as promised in the offering document, invested in land contracts. Compl. ¶ 45. These partnerships were dissolved in 2011. *Id.* The next fourteen limited partnerships "did not purchase any land contract servicing rights but instead entered into promissory notes under which the investors' money was loaned to either Diversified Group or American Realty." *Id.* ¶ 46. For limited partnerships 4 through 17, that is, "unsecured loans to **Wilson's** companies had become the exclusive use of investor money." *Id.* ¶ 47. **Wilson** has since "admitted that he decided in April or May 2011 to change the structure of the LP investments from purchasing land contract revenue for the LPs to making unsecured loans to [Diversified Group Partnership Management and American Realty] via promissory notes." *Id.* ¶ 83.

**D**

Despite this repurposing, however, **Wilson** was not able "generate [*6] enough income to make the monthly payments owed to investors." Compl. ¶ 52. Presently, the principal and accrued interest due to **Wilson's** investors is $6.7 million. *Id.* ¶ 56. **Wilson** does not have it. "As of October 31, 2012, the known bank accounts for **Wilson's** companies, Diversified Group, American Realty and W R Rice, held only $42,528." *Id.* ¶ 57.

A challenging market and unsuccessful business model is only partly to blame for the shortfall. Compl. ¶ 60. **Wilson** has also diverted at least $582,000 of investor money to his own personal benefit. To take three examples, "**Wilson** spent approximately $352,653 from an account containing investor money to pay bonuses to himself and his Diversified Group co-owner." *Id.* ¶ 61. "**Wilson** spent approximately $46,780 from an account containing investor money on personal travel, including $4,472 he paid for a birthday trip to Las Vegas in May 2012." *Id.* ¶ 63. And "**Wilson** spent approximately $7,914 from an account containing investor money to buy tickets to Red Wings games." *Id.* ¶ 68.

To conceal the shortfall, **Wilson** tried to convince the limited partnership investors "to roll over their accrued monthly income and to use that income to acquire additional [*7] units in the LPs." Compl. ¶ 50. Most agreed. He then sent them monthly account statements that "misrepresented that the real estate business had earned sufficient income to make the payments." *Id.* 54.

In the fall 2011, **Wilson** realized that even this was not going to be sufficient to conceal the shortfall. Compl.

¶ 74. So he unilaterally changed the terms of the promissory notes, deferring repayment to the investors. Specifically, Diversified Group Partnership Management, acting as the general partner for each of the 17 limited partnerships, extended the maturity of the promissory notes that Diversified Group and American Realty had executed in favor of the limited partnerships (which, in turn, would repay the investors). *Id.* ¶¶ 76-80. **Wilson** has since "admitted that he extended the maturity dates on some of the promissory notes held by the LPs because the business had insufficient funds to repay the principal on the notes." *Id.* ¶ 89. Investors were not told of the change until Plaintiff and FINRA commenced their investigations. *Id.* ¶ 78.

**E**

American Realty is a publicly traded corporation, and it is therefore required to file quarterly reports with Plaintiff (SEC Form 10-Q reports).   [*8] Compl. ¶ 93. On its Form 10-Q for the first quarter of 2012, American Realty reported that it "had entered into promissory notes with Diversified LPs 5 through 11 and that American Realty is obligated to make interest payments to the LPs on a monthly basis." *Id.* ¶ 100. The report was filed on March 31, 2012. *Id.* Bank records reveal that American Realty missed making its monthly interest payment in March 2012. *Id.* This missed payment was not disclosed on the Form 10-Q. *Id.* ¶ 102.

American Realty's finances experienced continued strain in the months that followed. April 2012, another missed interest payment. Compl. ¶ 101. *Id.* May, June, July, August, and September 2012, more missed payments. *Id.* Collectively, American Realty missed making payments of about $140,000.

**F**

Still searching for capital, **Wilson** hit upon a stock offering. In August 2012, he filed with Plaintiff a notice of intent to offer 2.5 million shares of American Realty stock. Compl. ¶ 103. The notice (filed on SEC Form S-11) specifies that "the proceeds from its stock offering would not be used to pay off . . . any of American Realty's existing promissory notes." *Id.* ¶ 104. **Wilson** has since "admitted under oath that contrary   [*9] to the statement in the Form S-11, he actually intended to use the offering proceeds to pay down or buy out the promissory notes his companies issued to the Diversified LPs." *Id.* ¶ 105.

**G**

After Plaintiff and FINRA began investigating his activities, **Wilson** sent a packet to his investors notifying them of changes he was going to make to their invest-

ments. Compl. ¶ 111. Effective October 1, 2012, **Wilson** informed them, the promissory notes that Diversified Group Partnership Management and American Realty had executed in their favor would be "forgiven." *Id.* In **exchange, Wilson** explained, "investors were going to receive shares in American Realty stock plus a promissory note that would make quarterly interest payments at an annual rate of 8.5% with a termination date in 30 years." *Id.* Investors were not given the opportunity to opt out of this modification. Id. ¶ 113. The practical effect of this change was an investment haircut -- it shaved 30 to 40 percent off the investment's value. *Id.*

**H**

On November 15, 2012, Plaintiff filed suit against Defendants in this Court alleging violations of federal **securities** laws. The complaint alleges that Defendants: (1) made an unregistered offer and sale   [*10] of **securities** in violation of *15 U.S.C. § 77e*; (2) committed fraud in the offer and sale of **securities** in violation of *15 U.S.C. § 77q*; (3) committed fraud in the purchase and sale of **securities** in violation of *15 U.S.C. § 78j*; (4) filed false and misleading reports with Plaintiff in violation of *15 U.S.C. § 78m*; (5) filed false certifications with Plaintiff in violation of *15 U.S.C. § 78m*; and (6) committed investment advisor fraud in violation of *15 U.S.C. § 80b-6*.

The same day, Plaintiff filed a motion for a preliminary injunction, asset freeze, and other emergency relief (ECF No. 2) and a motion for the appointment of a receiver (ECF No. 6). No proof of service on Defendants has yet been filed.

**II**

The motion for a preliminary injunction, asset freeze, and other emergency relief seeks five types of relief in two stages. The five types of relief sought are: (1) a preliminary injunction and temporary restraining order; (2) a freeze of Defendants' assets; (3) an accounting; (4) a prohibition on the alteration or destruction of documents; and (5) expedited discovery.

Plaintiff does not, however, request that the relief all be granted immediately. Rather, Plaintiff explains that it "seeks   [*11] to depose witnesses, subpoena bank and brokerage records and other documents, and take other discovery on an expedited basis prior to a preliminary injunction hearing." Pl.'s Br. Supp. Preliminary Inj. Mot. 15, ECF No. 3. Similarly, regarding the preservation of documents, Plaintiff explains: "Several courts have entered document preservation directives at the inception of SEC enforcement actions." *Id.* at 15 (collecting cases). Plaintiff thus seeks a stepped remedial approach -- some types of relief immediately, others after the hearing.

2012 U.S. Dist. LEXIS 165248, *

**A**

*Federal Rule of Civil Procedure 26* provides: "A party may not seek discovery from any source before the parties have conferred as required by *Rule 26(f)*, except . . . when authorized by these rules, by stipulation, or by court order." *Fed. R. Civ. P. 26(d)(1)*. The advisory committee notes explain that orders authorizing expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction." *Fed. R. Civ. P. 26* advisory committee notes (1993).

This is such a case. Accordingly, following the filing of proof of service on Defendants, the parties will be granted leave to immediately schedule depositions, issue [*12] subpoenas, and serve interrogatories, requests for documents, and requests for admissions. The time to respond to such discovery requests will be shortened to seven calendar days after a request is served. Service of all discovery, including subpoenas, may be effected via overnight mail, facsimile, or electronic means. Additionally, Defendants will be prohibited from the alteration or destruction of documents or other information relating to Plaintiff's allegations in the complaint.

**B**

Plaintiff's motion does not expressly specify whether it seeks an asset freeze prior to the preliminary injunction hearing. But Plaintiff does specify what it would like frozen. In a proposed order submitted by Plaintiff with its motion, Plaintiff proposes that this Court order

that until otherwise ordered by this Court any and all assets of defendants Joel I. **Wilson**, Diversified Group Partnership Management, LLC, and American Realty Funds Corporation (referred to below as "Defendants"), in whatever form such assets may presently exist and wherever located (including funds, accounts, insurance policies, real estate, automobiles, marine vessels, contents of safe deposit boxes, precious metals, other personal [*13] property, cash, **securities**, free credit balances, fully paid-for **securities**, and/or property pledged or hypothecated as collateral for loans, and all other assets), held in the name of the Defendants, and/or held for the Defendants' benefit or on their behalf, including through corporations, companies, trusts, partnerships, agents, nominees, friends or relatives; and all other funds, accounts, and other assets to which proceeds from the Defendants' violations can be traced or which were

acquired with proceeds of the Defendants' violations are hereby frozen.

One condition precedent to depriving Defendants of their property in this manner, however, is Defendants having notice and an opportunity to be heard. *See Warren v. City of Athens, 411 F.3d 697, 708 (6th Cir. 2005)* ("Procedural due process generally requires that the state provide a person with notice and an opportunity to be heard before depriving that person of a property or liberty interest."); *Elliott v. Kiesewetter, 98 F.3d 47, 60 (3d Cir. 1996)* (discussing due process in asset freeze context). Moreover, the Second Circuit cautions, "the decision to order a temporary freeze on defendants' assets as ancillary relief in an SEC [*14] enforcement action requires particularly careful consideration by the district court." *SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1105 (2d Cir. 1972)*.

Here, Plaintiff has not demonstrated that it has provided Defendants notice of Plaintiff's demands. Likewise, Defendants have not yet been afforded an opportunity to be heard on those demands. Thus, any demand for an asset freeze is premature. Accordingly, the request for an asset freeze, like the request for a preliminary injunction and accounting, will be held in abeyance pending a hearing on the motion.

**III**

Accordingly, it is **ORDERED** that Plaintiff's motion for a temporary injunction, asset freeze, and other emergency relief is **GRANTED IN PART AND HELD IN ABEYANCE IN PART.**

It is further **ORDERED** that Plaintiff is directed to serve a copy of this opinion and order on Defendants and file proof of service on this Court's docket.

It is further **ORDERED** that following the filing of proof of service on Defendants, the parties are granted leave to immediately schedule depositions, issue subpoenas, and serve interrogatories, requests for documents, and requests for admissions. The time to respond to such discovery requests is shortened to [*15] seven calendar days after a request is served. Service of all discovery, including subpoenas, may be effected via overnight mail, facsimile, or electronic means.

It is further **ORDERED** that Defendants are prohibited from altering or destroying documents or other information regarding Plaintiff's allegations in the complaint.

It is further **ORDERED** that Plaintiff's request for a preliminary injunction, asset freeze, and accounting are

2012 U.S. Dist. LEXIS 165248, *

**HELD IN ABEYANCE** pending a hearing on the motion.

It is further **ORDERED** that a hearing will be held on the motion on **Monday, December 10, 2012, at 10 am.**

Dated: November 20, 2012

/s/ Thomas L. Ludington

THOMAS L. LUDINGTON

United States District Judge



DASSAULT SYSTEMES, S.A., Plaintiff, v. KEITH CHILDRESS d/b/a PRAC-
TICAL CATIA TRAINING, Defendant.

Case No. 09-10534

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION

*2009 U.S. Dist. LEXIS 99708*

October 27, 2009, Argued
October 27, 2009, Decided
October 27, 2009, Filed

**SUBSEQUENT HISTORY:** Motion denied by, Motion
granted by, in part *Dassault Systemes, S.A. v. Childress,
2010 U.S. Dist. LEXIS 3180 ( E.D. Mich., Jan. 15, 2010)*
Affirmed by *Dassault Systemes, SA v. Childress, 2011
U.S. App. LEXIS 24582 (6th Cir.) (6th Cir. Mich., 2011)*

**PRIOR HISTORY:** *Dassault Systemes, S.A. v. Chil-
dress, 2009 U.S. Dist. LEXIS 43478 ( E.D. Mich., May
22, 2009)*

**COUNSEL:** [*1] For Dassault Systemes, SA, Plaintiff:
Douglas P. LaLone, Rader, Fishman, Bloomfield Hills,
MI.

Keith Childress, Doing business as Practical Catia, De-
fendant, Pro se, Algonac, MI.

**JUDGES:** PRESENT: THE HONORABLE LAW-
RENCE P. ZATKOFF, UNITED STATES DISTRICT
JUDGE.

**OPINION BY:** LAWRENCE P. ZATKOFF

**OPINION**

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United
States Courthouse, in the City of Port Huron, State of
Michigan, on October 27, 2009

PRESENT: THE HONORABLE LAWRENCE P.
ZATKOFF UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on Plaintiff's "Mo-
tion for Protective Order and Privacy Act Order and for
Leave to Serve Subpoena on FBI" [dkt 12]; Defendant's
"Motion for Protective Order and to Strike Certain In-
formation from Complaint" [dkt 16]; and Plaintiff's mo-
tion for default judgment [dkt 19]. The parties have fully
briefed the motions. [1] The Court finds that the facts and
legal arguments are adequately presented in the parties'
papers such that the decision process would not be sig-
nificantly aided by oral argument. Therefore, pursuant to
E.D. Mich. L.R. 7.1(e)(2), it is hereby ORDERED that
the motions be resolved on the briefs submitted. For the
following reasons, Plaintiff's Motion [*2] for Protective
Order and Privacy Act Order and for Leave to Serve
Subpoena on FBI [dkt 12] is GRANTED; Defendant's
Motion for Protective Order and to Strike Certain Infor-
mation from Complaint [dkt 16] is DENIED; and De-
fendant is ordered to SHOW CAUSE as to why Plain-
tiff's motion for default judgment [dkt 19] should not be
granted.

1   The Court DENIES Defendant's motion to
exceed the 5-page limit on reply briefs [dkt 22]
and has considered only the first 5 pages of that
brief. The Court also DENIES Defendant's mo-
tions for leave to file sur-replies [dkts 24 & 27],
as such filings are not anticipated by the local
pleading rules. Finally, the Court ORDERS that
Defendant's sur-replies [dkts 24 & 27] be
STRICKEN from the record.

**II. BACKGROUND**

Plaintiff, a French corporation, is the developer of a
computer software design program known as CATIA.

2009 U.S. Dist. LEXIS 99708, *

Plaintiff has held a registered trademark, U.S. Reg. No. 1,274,136, on its CATIA software since 1984. *See* Compl. Ex. A. Plaintiff also holds a registered copyright on CATIA Version 5, Release 12 ("Release 12"), Registration No. 5-856-769, and has a pending copyright registration for its most recent release, CATIA Version 5, Release 14 ("Release 14"). *See* [*3] Compl. Ex. C; P16.

Defendant, appearing *pro se*, is a design engineer. Defendant, along with some familial assistance, operates a business under the name of Practical CATIA Training. Practical CATIA Training provides its customers instruction in the use of CATIA software.

CATIA software requires a license and Target ID in order to execute the program on a computer. Plaintiff alleges that Defendant purchased one license for Release 12 and was assigned a corresponding Target ID. Plaintiff further contends that Defendant cloned the software and Target IDs onto 20 computers, which Defendant used to operate his business. Plaintiff maintains that these actions infringe its copyright and trademark rights and violate the Michigan Consumer Protection Act, *Mich. Comp. Laws. § 445.901*.

Defendant responded to Plaintiff's complaint by filing a motion for a more definite statement, stay of the proceedings, and evidentiary hearing. In that motion, Defendant alleged that Plaintiff was in possession of secret grand jury information and had used said information in its complaint, all in violation of *Fed. R. Crim. P. 6(e)(2)*. The Court denied the motion, finding that Defendant had not adequately explained [*4] how the information contained in the complaint implicated matters occurring before a grand jury or how Plaintiff was subject to discipline under *Fed. R. Crim. P. 6(e)(2)*.

While Defendant's motion was pending, Defendant became aware that Plaintiff had served a subpoena on the Federal Bureau of Investigation (FBI) seeking access to evidence that the FBI had seized from Defendant. Defendant filed a motion to quash the subpoena [dkt 10], arguing that the subpoena was untimely under *Fed. R. Civ. P. 26* and that the information sought by Plaintiff was protected under *Fed. R. Crim. P. 6(e)(2)*. The parties stipulated [dkt 11] that Plaintiff would withdraw its subpoena and Defendant would withdraw his motion to quash, and the Court entered a corresponding order [dkt 13].

Plaintiff has now moved for the Court's permission to serve its subpoena prior to a *Rule 26(f)* conference and for a protective order and Privacy Act order. Defendant challenges this motion and has filed his own motion for a protective order, and he seeks to strike certain information from the complaint. Plaintiff also seeks a default judgment because Defendant has not yet filed an answer to the complaint.

## III. ANALYSIS

### A. Plaintiff's  [*5] Motion for Leave to File Subpoena

Plaintiff seeks leave pursuant to *Fed. R. Civ. P. 26(d)* to serve a subpoena on the FBI to procure computers and documents seized from Defendant. Plaintiff also seeks the entry of a protective order under *Rule 26(c)(1)*, and a Privacy Act order pursuant to a FBI request. Defendant continues to insist that this evidence is protected by *Fed. R. Crim. P. 6(e)(2)*.

#### i. *Fed. R. Crim. P. 6(e)*

This analysis requires a detailed discussion of *In re Grand Jury Proceedings, 851 F.2d 860 (6th Cir. 1988)*, this circuit's seminal case on the subject. In that case, the Sixth Circuit adopted a "rebuttable presumption" approach to issues of grand jury secrecy:

> The general rule, however, must be that confidential documentary information not otherwise public obtained by the grand jury by coercive means is presumed to be "matters occurring before the grand jury" just as much as testimony before the grand jury. The moving party may seek to rebut that presumption by showing that the information is public or was not obtained through coercive means or that disclosure would be otherwise available by civil discovery and would not reveal the nature, scope, or direction of the grand jury  [*6] inquiry, but it must bear the burden of making that showing, just as it bears the burden of showing that there is a "particularized need."

*Id.* at 866-67.

The Court denied Defendant's original motion because Defendant had not presented any evidence that the alleged secret grand jury information was procured through the grand jury's coercive powers. Defendant now presents evidence strongly suggesting that the FBI and grand jury investigations are intertwined. Attached to Defendant's response to Plaintiff's motion are three grand jury subpoenas to produce documents, along with a search warrant for Defendant's business address. *See* Def.'s Resp. Br. Exs. 1-4. All four documents bear the same date of issuance. The search warrant was issued to the same FBI special agent who is listed as the investigative agent on the subpoenas. Thus, the Court finds that Defendant's computers and documents were procured by

2009 U.S. Dist. LEXIS 99708, *

the grand jury's coercive powers as defined by the Sixth Circuit.

As the evidence Plaintiff seeks was not public information, and Defendant has proffered evidence suggesting that his computers were seized by the coercive powers of the grand jury, the Court is constrained by the Sixth Circuit's [*7] holding in *In re Grand Jury Proceedings*--a rule more stringent than those of its sister circuits. *Compare id. with United States v. Dynavac, Inc.*, 6 F.3d 1407, 1412 (9th Cir. 1993) ("[W]e think that the disclosure of business records independently generated and sought for legitimate purposes would not 'seriously compromise the secrecy of the grand jury's deliberations'") (citations omitted); *DiLeo v. C.I.R.*, 959 F.2d 16, 20 (2d Cir. 1992) ("The records . . . were sought for their own sake and not to learn what took place before the grand jury and clearly did not compromise the secrecy of the grand jury's deliberations."). Accordingly, the presumption of non-disclosure applies.

"Mere contact with a grand jury, however, does not change every document into a matter 'occurring before a grand jury' within the meaning of *Rule 6*," and the seeking party has the opportunity to rebut the presumption of non-disclosure. *United States v. Rutherford*, 509 F.3d 791, 795 (6th Cir. 2007); *see also In re Grand Jury Proceedings*, 196 F.R.D. 57, 64 (S.D. Ohio 2000) (moving party met burden that subpoenaed documents were available through civil discovery and did not reveal the scope or direction of the grand   [*8] jury's inquiry).

Plaintiff contends that the evidence which it seeks is otherwise discoverable because it consists of Defendant's business records and was prepared prior to any grand jury action. Further, Plaintiff disputes that the evidence at issue would reveal the nature, scope, or direction of the grand jury's inquiry.

The Court agrees that the seized evidence is otherwise available through civil discovery. Defendant's business records are undoubtedly discoverable evidence. *See, e.g., In re Grand Jury Proceedings*, 196 F.R.D. at 64 (holding that presumption of grand jury secrecy was rebutted because business records were otherwise available through discovery). Furthermore, inspection of a computer's contents is frequently permitted in cases involving copyright infringement of computer files or programs. *See, e.g., Capitol Records, Inc. v. Alaujan*, Nos. 03CV11661-NG, 07cv11446-NG, 2009 U.S. Dist. LEXIS 110626, 2009 WL 1292977, at *2 (D. Mass. May 6, 2009) (ordering inspection of computer that had a "sufficiently close" connection to the alleged copyright violation); *Fharmacy Records v. Nassar*, 248 F.R.D. 507, 516 (E.D. Mich. 2008) (noting that magistrate judge had granted motion to compel production of computers [*9] in music copyright case); *Xpel Techs. Corp. v. Amer.*

*Filter Film Distribs., No. SA-08-CV-0175, 2008 U.S. Dist. LEXIS 111837, 2008 WL 744837, at *1 (W.D. Tex. Mar. 17, 2008)* (granting order for expedited computer forensic imaging in copyright case). Finally, the Court cannot conceive how allowing Plaintiff access to this evidence would reveal anything about the nature, direction, or scope of the grand jury's inquiry.

Therefore, Plaintiff has overcome the presumption of non-disclosure, and the evidence at issue is not protected by *Fed. R. Civ. P. 6(e)(2)*. *See In re Grand Jury Subpoenas*, 454 F.3d 511, 522 (6th Cir. 2006) (noting that the "discovery exception to grand jury secrecy has been interpreted somewhat broadly"). To hold otherwise would allow Defendant to use the shield of *Fed. R. Crim. P. 6(e)(2)* as a sword to prevent Plaintiff from obtaining evidence that would be discoverable but for the grand jury proceedings.

### ii. *Fed. R. Civ. P. 26(d)(1)*

Plaintiff maintains that Defendant refuses to participate in a *Rule 26(f)* conference until the outstanding motions have been decided. Plaintiff insists that expedited discovery is necessary to obtain access to the computers before they are returned to Defendant in order to [*10] "preserve the integrity of the original material that was seized by the FBI." Plaintiff's proposed subpoena seeks "[a]ll computers, materials, and documents that were seized at Keith Childress' business, Practical Catia."

*Rule 26(d)(1)* prevents a party from seeking discovery materials "from any source before the parties have conferred as required by *Rule 26(f)* except . . . when authorized by these rules, by stipulation, or by court order." A party must show good cause when seeking expedited discovery prior to a *Rule 26(f)* conference. *See Arista Records, LLC v. Does 1-4, No. 1:07-cv-1115, 2007 U.S. Dist. LEXIS 85652, 2007 WL 4178641, at *1 (W.D. Mich. Nov. 20, 2008)*.

The Court finds that Plaintiff has shown good cause for expedited discovery in this matter. Defendant's refusal to file an answer or participate in a *Rule 26(f)* conference has greatly impeded discovery. Further, Defendant's argument that Plaintiff's proposed subpoena is not "narrowly tailored" is without merit. The Court finds that Plaintiff's request is narrowly tailored to include evidence that is available through civil discovery and relevant to its allegations of copyright infringement.

Therefore, Plaintiff's motion for leave to serve subpoena on [*11] the FBI is GRANTED. The Court also GRANTS Plaintiff's motion for a protective order and Privacy Act order, and it will enter Plaintiff's proposed protective order contemporaneously with this order. In addition to the requirements and limitations contained in the protective order, Plaintiff shall not in any manner

2009 U.S. Dist. LEXIS 99708, *

destroy, alter, or otherwise tamper with Defendant's computers and other materials, and the evidence shall be returned in the same condition as it was received.

## B. Defendant's Motion for Protective Order and to Strike

Defendant has moved (1) for a protective order barring Plaintiff from acquiring secret grand jury information; and (2) to strike certain paragraphs of Plaintiff's complaint pursuant to *Fed. R. Civ. P. 12(f)*. Plaintiff challenges the motion on several procedural grounds.

### 1. Motion for Protective Order

The Court construes Defendant's motion for a protective order as a request to protect the evidence currently in the possession of the FBI. As discussed *supra*, the seized evidence is not protected by *Fed. R. Civ. P. 6(e)(2)* as matters occurring before a grand jury. Therefore, Defendant's motion for a protective order is DENIED.

### 2. Motion to Strike

Defendant also requests [*12] that the Court strike paragraphs 17, 18, 19, and 21 from Plaintiff's complaint. These paragraphs state as follows:

> 17. In 2003, Defendant Keith Childress, purchased one license for CATIA(R) Version 5, Release 12. On information and belief, Defendant Childress and his company were able to crack and clone the Target IDs on the license and clone the software on twenty machines on order to train students on the software.
>
> 18. On October 30, 2006, Defendant Childress and his company Practical Catia were raided by the Federal Bureau of Investigation. The Federal Bureau of Investigation confiscated 20 computers with the cloned software which are reproductions of, or derivations of, Plaintiff's CATIA(R); software. The raid took place at Defendants' office which continues to be located in Algonac, Michigan.
>
> 19. Following the raid in Defendants' office, the FBI discovered that computers that were confiscated at Defendants' office had installed thereon Plaintiff's CATIA(R); Version 5, Release 14 software. Each computer had the same license information and Target ID for the one license Defendants had purchased. The same Target ID on each of the machines

indicates that the software was cloned and is [*13] a bootlegged copy.

> 21. On or about April 2007, Defendants requested a license to use the CATIA(R); software on multiple machines. The request was denied because of the FBI's investigation of Defendant's illegal usage of Plaintiff's software.

In support of his motion to strike, Defendant cites *Finn v. Schiller, 72 F.3d 1182 (4th Cir. 1996)*, and he avers that many similarities exist between information withdrawn from the record in that case and the information Defendant seeks to strike.

Defendant fails to note a detail of great importance, however, that distinguishes *Finn* from the present case. In *Finn*, the defendant was an Assistant United States Attorney (*i.e.*, a party subject to *Rule 6(e)(2)*). Plaintiff here is a private corporation not implicated by the restrictions of *Rule (6)(e)(2)*. "No obligation of secrecy can be imposed on any person except those listed in the Rule []." 1 Charles Alan Wright and Andrew D. Leipold, *Federal Practice and Procedure*, § 106 pp. 362-63 (4th ed. 2008). That is, Plaintiff cannot be sanctioned under *Rule 6(e)(2)* for further dissipating secret grand jury material even if the complaint contained such information. *See United States v. Jeter, 775 F.2d 670, 675 (6th Cir. 1985)*; [*14] *In re Polypropylene Carpet Antitrust Litig., 181 F.R.D. 680, 689 (N.D. Ga. 1998)*.

Defendant also contends that the allegations in the complaint are "immaterial" and "scandalous" within the meaning of *Fed. R. Civ. P. 12(f)*. Defendant argues that the paragraphs at issue are immaterial because any evidence relating to the FBI search and grand jury investigation is undiscoverable and inadmissible. Pleadings are immaterial when the material contained within "has no essential or important relationship to the claim for relief . . ." 5C Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure*, § 1382 p. 458 (4th ed. 2008). The referenced allegations form the basis of Plaintiff's claim for relief and are therefore material to the pleadings.

Nor are the allegations scandalous within the meaning of *Rule 12(f)*. Under the Rule, "[i]t is not enough that the matter offends the sensibilities of the objecting party of the person who is the subject of the statement in the pleading, if the challenged allegations describe acts or events that are relevant to the action." *Id.* at 466-67. The allegations in the challenged paragraphs are highly relevant to Plaintiff's claim; in fact, striking [*15] the paragraphs would eviscerate Plaintiff's cause of action. Therefore, the allegations are not scandalous.

2009 U.S. Dist. LEXIS 99708, *

Plaintiff cites other procedural violations to support a denial of Defendant's motion, including Defendant's alleged failure to seek concurrence pursuant to *Fed. R. Civ. P. 26(c)(1)* and *E.D. Mich. L.R. 7.1*, and it observes that Defendant is barred from seeking further relief by *Fed. R. Civ. P. 12(g)(2)* (limiting further *Rule 12* motions). The Court finds that the above reasons fully justify the denial of Defendant's motion, and Plaintiff's additional arguments need not be addressed.

**C. Plaintiff's Motion for Default Judgment**

Plaintiff has requested that the Court enter a default judgment, noting that Defendant did not comply with the Court's May 22, 2009, order requiring Defendant to file an answer to Plaintiff's complaint within 30 days. Defendant maintains that he did not file his answer because of the outstanding issues that necessitated the current motions.

Defendant violated the Court's direct order that he file his answer within 30 days of the May 22, 2009, order. Accordingly, it is **HEREBY ORDERED** that Defendant **SHOW CAUSE**, in writing, no later than 5 p.m. on Tuesday, November **[*16]** 3, 2009, as to why the Court should not grant Plaintiff's motion for default judgment. Failure to comply with this order may result in the entry of a default judgment and/or the imposition of sanctions. Defendant's response shall contain specific

and accurate legal support, including pinpoint citations to authority relied on and shall be limited to five pages and comply with *E.D. Mich. L.R. 5.1*. Additionally, Defendant shall fax his response to Judge Zatkoff's Chambers in Port Huron, at 810-984-1480.

**IV. CONCLUSION**

Accordingly, and for the above reasons, IT IS HEREBY ORDERED that Plaintiff's Motion for Protective Order and Privacy Act Order and for Leave to Serve Subpoena on FBI [dkt 12] is GRANTED;

IT IS FURTHER ORDERED that Defendant's Motion for Protective Order and to Strike Certain Information from Complaint [dkt 16] is DENIED;

IT IS FURTHER ORDERED that Defendant SHOW CAUSE by 5 p.m. on Tuesday, November 3, 2009, as to why Plaintiff's motion for default judgment [dkt 19] should not be granted.

IT IS SO ORDERED.

/s/ Lawrence P. Zatkoff

LAWRENCE P. ZATKOFF

UNITED STATES DISTRICT JUDGE

Dated: October 27, 2009