## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

------------------------------------------------------x
                                 :

In re                            : Chapter 9
                                 :

CITY OF DETROIT, MICHIGAN,   : Case No. 13-53846
                                 :

                    Debtor.     : Hon. Steven W. Rhodes
                                 :

------------------------------------------------------x

## DEBTOR'S OBJECTION  TO MOTION FOR RELIEF
## FROM AUTOMATIC STAY FILED BY SHIRLEY A. SCOTT

The City of Detroit, Michigan (the "City"), as the debtor in the above-captioned case, hereby objects to the Motion for Relief from Automatic Stay (Docket No. 268) (the "Stay Relief Motion") filed by Shirley A. Scott (the "Plaintiff").  In support of this Objection, the City incorporates in their entirety the arguments set forth in the Brief in Opposition to Motion for Relief from Automatic Stay Filed by Shirley A. Scott filed contemporaneously herewith (the "Brief in Opposition") and respectfully represents as follows:

### Background

1.      On July 18, 2013 (the "Petition Date"), the City commenced this case under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code").

2.     Prior to the Petition Date, on September 12, 2012, the Plaintiff, proceeding pro se, filed a Complaint and Jury Demand (the "Original Complaint") against the City, Mayor Dave Bing, Marja Winters and Valeria Miller (collectively, the "Defendants" and, collectively with the Plaintiff, the "Parties") in the United States District Court for the Eastern District of Michigan (the "District Court"), thereby commencing civil action number 12-cv-14048 (the "Lawsuit"). A copy of the Original Complaint (with exhibits omitted) is attached hereto as Exhibit A.  The Original Complaint alleged counts of discrimination, job interference and intentional infliction of emotional distress arising from the Plaintiff's employment with the City.  See Original Complaint at 20-23.

3.     On April 2, 2013, the Plaintiff filed a document in the Lawsuit that the District Court later construed as an amended complaint (the "Amended Complaint").  A copy of the Amended Complaint is attached hereto as Exhibit B.[1] The Amended Complaint alleges a single count of retaliation under Section 3 of the Housing and Urban Development Act of 1968 ("HUD"), based on the defendants' alleged failure to promote the Plaintiff to the level of general manager or to offer her out-of-class compensation during her employment with the City. See Amended Complaint at 7-9.  In the Amended Complaint, the Plaintiff demands

---

[1]     A copy of the District Court's order construing the document as an amended complaint and striking the Original Complaint at the request of the Parties is attached hereto as Exhibit C.

monetary damages, apparently consisting of the difference between her salary for a three-year period and the combined salary of a general manager and two compliance officers for the same period.  Id. at 10-11.  In addition, the Plaintiff demands unspecified medical benefits.  Id. at 11.

4.     On June 20, 2013, the City and the other Defendants jointly filed the Defendants' Motion for Judgment on the Pleadings for Failure to State a Claim in *Lieu* of Answer to Complaint (the "Motion for Judgment on the Pleadings").  A copy of the Motion for Judgment on the Pleadings is attached hereto as Exhibit D.  In the Motion for Judgment on the Pleadings, the Defendants argued that the Plaintiff failed to state a claim against them because an unbroken line of federal authority establishes that HUD does not confer a private right of action on the Plaintiff.  See Motion for Judgment on the Pleadings at 11-12.  In addition, even if HUD were found to create a private right of action, the Plaintiff failed to allege either any failure to obtain a HUD-funded position based on her income level or any other action against her taken by any of the Defendants that would be impermissible under HUD.  Id. at 12.  As of the Petition Date, the Motion for Judgment on the Pleadings remained pending before the District Court.  Stay Relief Motion at ¶ 3.

5.     On August 2, 2013, following the Petition Date, the Plaintiff filed the Stay Relief Motion in this chapter 9 case.  By the Stay Relief Motion, the

Plaintiff seeks relief from the automatic stay of section 362 of the Bankruptcy Code (the "Automatic Stay"), as made applicable in this chapter 9 case by section 901 of the Bankruptcy Code, to allow her to pursue the Lawsuit in the District Court. Stay Relief Motion at ¶ 7. By way of justification for the requested relief, the Plaintiff contends that the City would not be harmed by the requested relief because any money damages awarded to the Plaintiff allegedly could take the form of a professional services contract in favor of the Plaintiff, apparently at the expense of the federal government. Id.

## Objection

6.    For all of the reasons set forth in the attached Brief in Opposition, which is incorporated herein by reference, cause does not exist warranting relief from the Automatic Stay with respect to the Lawsuit, and the Stay Relief Motion should be denied.[2]

WHEREFORE, for the reasons set forth herein and in the Brief in Opposition, the City respectfully requests that this Court: (a) deny the Stay Relief Motion; and (b) grant such other and further relief to the City as the Court may deem proper.

---

[2]    In the alternative, if the Court is inclined to lift the Automatic Stay, the City requests that the Court do so solely to the extent necessary to allow the District Court to hear and rule on the Motion for Judgment on the Pleadings.

Dated: August 16, 2013   Respectfully submitted,


/s/ Heather Lennox     
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
 STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# EXHIBIT A

133
1

DET 047198

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

SHIRLEY A. SCOTT,

                              Plaintiff

                                          Case:2:12-cv-14048
                                          Judge: Cox, Sean F.
                                          MJ: Randon, Mark A.
                                          Filed: 09-12-2012 At 02:38 PM
                                          CMP Scott v. Detroit, City of, et a
v.                                        l (tam)

CITY OF DETROIT, A Michigan Municipal
Corporation, MAYOR DAVE BING, Individually,
MARJA WINTERS, Individually, and VALERIA
MILLER, Individually,

                              Defendants.

_____/

COMPLAINT AND JURY DEMAND

There is no other pending or resolved civil action arising out
of the transaction or occurrence alleged in the Complaint.

*Shirley A. Scott*

Shirley A. Scott, in Pro-se

Plaintiff, Shirley A. Scott, in Pro-se, complain of Defendants for the following

reasons:

(General Allegations)

1.    Plaintiff Shirley A. Scott ("Plaintiff") is a Wayne County, Michigan

resident.

2.      Defendant City of Detroit is a municipal corporation organized and existing under the laws of the State of Michigan, and Located in Wayne County, Michigan.

3.      Defendant Mayor Dave Bing ("Defendant Mayor Bing") is a Wayne County, Michigan resident and is Mayor and an agent of the City of Detroit.

4.      Defendant Marja Winters ("Defendant Winters") is a Wayne County, Michigan resident and currently holds the appointed title of Deputy Director of the Planning and Development Department and is an agent of the City of Detroit.

5.      Defendant Valeria Miller ("Defendant Miller") is a Wayne County, Michigan resident and currently holds the title of Manager II and is an agent of the City of Detroit.

6.      All the events in controversy occurred in Wayne County, Michigan; and the amount in controversy exceeds $25,000.00, exclusive of interest, and court costs.

7.      Plaintiff has been employed with the City of Detroit for 27 years, serving in various capacities including a Section 3 Coordinator, Principal Development Specialist, Senior Development Specialist, Associate Development Specialist, and Clerical Support.  Plaintiff holds a Bachelor's of Business Administration Degree from Davenport University, and a Master's of Business Administration Degree from the University of Phoenix.

8.      The Plaintiff obtained a position in the professional series in 1995 and was transferred to the Management and Information Systems (MIS) Unit in the Financial and Resources Management (FRM) Division of Planning and Development.  The MIS Unit was managed by Elaine Leslie.  Upon Ms. Leslie's retirement (approximately 1998), the

management position was transferred to the Labor Standards Unit of FRM and given to an employee with 20+ years of seniority, Ms. Orpah Harvey. The MIS Unit merged with the Grants Management Unit managed by John Lowe. Plaintiff had to perform her duties, the duties of Ranna Trivedi (senior accountant), and Ms. Leslie's duties with no out-of-class pay. Plaintiff accomplished what historically had not been done in the past by eight (8) employees--submitted the Consolidated Annual Performance and Evaluation Report (CAPER) by the due date to the department of Housing and Urban Development (HUD), and achieved FRM's goal of submitting reports when due. Plaintiff received recognition from former Mayor Archer and Employee of the Month from former Mayor Kilpatrick, but no promotional opportunities. Management promoted Ms. Trivedi, an Asian, to a manager within eight (8) years of employment in Planning. The experience taught the Plaintiff to take a stand and speak up for her rights.

9.       The Plaintiff was transferred from the MIS Unit to the Contract Compliance Unit of FRM in 2006, and in 2007 Plaintiff was transferred to the Labor Standards Unit of FRM. On February 20, 2008, Plaintiff requested out-of-class pay and was denied the same by Defendant Miller. Defendant Miller stated "there was no money" with which to pay Plaintiff out-of-class. Defendant Miller's statement was witnessed by Demsey Addison and Cecily McCullen, APTE Union representatives. (Plaintiff believes it is relevant to report the past in order to demonstrate a history of discrimination, harassment, and hostility.) Defendant Miller became Manager by: The clerical staff had a Principal Clerk supervising them; the Principal Clerk had a Principal Accounting managing the Principal Clerk; and the Principal Accountant had Defendant

Miller managing the Principal Accountant. The Manager position was created for
Defendant Miller.

     10.     Prior to retiring, Ms. Harvey promoted Shirley Williams to Manager of
Labor Standards. Ms. Williams lacked the necessary skills to plan and administer a
monitoring program for an essential City service that would uplift Detroit residents and
businesses, Section 3 of the Housing and Urban Development (HUD) Act of 1968. (In
order for the City of Detroit to accomplish this objective, HUD requires recipients of
HUD funding to provide job training, employment, and contracting opportunities to low-
and very low-income residents and eligible businesses.) Ms. Williams had received
training, but could not provide any guidance to Plaintiff (See Exhibit "A"). Another
employee was assigned the task of submitting the annual Section 3 Summary and
Contract and Subcontract Reports to HUD on the Section 3 program prior to the
Plaintiff's assignment, Rochelle Collins. Plaintiff discovered that the Contract and
Subcontract Activity Report was completed incorrectly because all the businesses listed
on the report were reported as Section 3 businesses. Ms. Collins only reported what she
was told to report by the former Executive Manager, Thomasina Tucker, and that was
that all the businesses the City contracted with were Section 3 businesses. If all the
businesses used were in fact Section 3 businesses, the City of Detroit would have 100%
compliance with the federal law. Plaintiff was given the same information; but instead of
reporting false information, Plaintiff decided to contact another City for assistance.
Plaintiff contacted Michael Bell, Section 3 Coordinator for the City of Philadelphia, and
Mr. Bell provided guidance. (Proof can be documented if requested). In 2009 Ms.

Collins received a promotional opportunity and transferred to the Mayor's office as an Executive Assistant to the Mayor II.

11. In June 2009, Plaintiff asked Defendant Miller, again, for out-of-class pay and was denied. Plaintiff recalled Defendant Miller stating Plaintiff and Ms. Williams were "old enough to be her mother" in a previous meeting with APTE Union representatives, Ms. Addison and Ms. McCullen, when Ms. Williams and Defendant Miller tried to enforce disciplinary action against the Plaintiff. The Plaintiff believed she had been denied promotional opportunities because of her age and because Thomasina Tucker, retired Executive Manager of FRM, and Defendant Miller's behavior have always been bias towards the Plaintiff. Employees noticed the hostile behavior directed at the Plaintiff by Ms. Tucker and Defendant Miller and would not associate with the Plaintiff in the presence of either Ms. Tucker or Defendant Miller for fear they would also be treated badly. Because of Plaintiff's belief that she was being discriminated against, Plaintiff filed an age discrimination complaint (Case #471-2009-02823) on July 8, 2009, with EEOC against the City of Detroit. Defendant Miller affectionately called Ms. Williams "Mama Shirley," and Defendant Miller would undermine Plaintiff's credibility and integrity with regard to implementing a Section 3 program because Defendant Miller did not want Ms. Williams or "Mama Shirley" to appear incompetent.

A. Towards the end of July 2009, Plaintiff's retina detached, and Plaintiff had to have emergency surgery. Plaintiff had not received a blow to the head or been in an accident and believed stress to be the cause of the detachment. Ms. Williams and Defendant Miller retaliated against the Plaintiff for filing the EEOC charge and docked the Plaintiff's pay by a

week. Defendant Miller stated that Ms. Williams docked Plaintiff's pay because Ms. Williams could not determine a return date for Plaintiff. As a common courtesy, Ms. Williams could have called the Plaintiff and requested the information. Instead, Ms. Williams chose to dock the Plaintiff. Plaintiff had to bring in documentation with double vision and provide the required proof to Ms. Williams. The process took about a month for Human Resources to correct. Employees in FRM have run out their entire sick banks without management knowing what the employee's intentions were and whether or not they would be returning to work, and none have experienced being docked other than the Plaintiff. Plaintiff has been the only employee in FRM subjected to inhumane treatment by management.

12.     Lisa Gering and Defendant Miller, who Plaintiff believed were not in a protected class, received out-of-class pay as a Manager I and Manager II. The EEOC case was dismissed because Defendant Miller and Ms. Gering were 40+ years of age.

13.     Defendant Winters wanted to double promote a female employee under the age of 40 to a manager, but rescinded the promotion when employees started complaining, informing union representatives of potential discrimination, and when an anonymous letter, dated April 13, 2009, circulated in Planning (Plaintiff did not write the letter, See Exhibit "B"). To Plaintiff's knowledge, no one was selected to fill the manager position.

14.     Thomasina Tucker, Orpah Harvey, Ranna Trivedi, Defendant Miller, Shirley Williams, Dorian Walker, Angela Thompson, and Rochelle Collins were either in

the Labor Standards Unit of FRM or assigned to perform tasks associated with compliance of federal laws; and the above named staff persons were not coerced into performing their job duties or prevented from effectively performing assigned duties by employees and Planning Administration. The aforementioned employees' positions ranged from Administrative Assistant to Executive Manager. When Ms. Tucker asked Ms. Thompson to come up with a plan for Section 3, she refused to do so without any disciplinary action charged, and 10 years less seniority than Plaintiff. Ms. Thompson received out-of-class pay as Manager of Labor Standards when Ms. Williams retired. Plaintiff was not even offered six (6) months of out-of-class pay since now funds were available to offer Plaintiff out-of-class pay. Defendant Miller once again denied Plaintiff out-of-class pay. Defendant Miller gave notice to employees in the FRM Division that Ms. Thompson was the interim manager of Labor Standards, effective April 19, 2010.

15.    Defendant Mayor Bing and Defendant Winters were advised of the importance of compliance with Section 3 when Council Member Watson sent out a memo and City Council passed a resolution, November 23, 2010, urging Defendant Mayor Bing's Administration to establish a Section 3 Compliance Office (See Exhibit "C"). Defendant Mayor Bing elected to staff the compliance office with contractual staff. The City of Detroit currently does not have a job classification for a Section 3 Coordinator. Plaintiff does not have the official title, staff, or salary associated with the position.

16.    In June 2011, Guy Stockard, Section 3 Coordinator for the State of Michigan, decided to hold a meeting to contract Plaintiff's position out when Mr. Stockard learned the Plaintiff had no power or authority to exercise enforcement of compliance with Section 3 in Planning and Development. The meeting was held June 24, 2011, and hosted by Boysie Jackson, Deputy Director of Finance-Purchasing. The

federal government sponsored a NOFA for Section 3 Coordinators. The recipients of the lottery would receive $50,000 towards the salary of a Section 3 Coordinator. Funds awarded under the NOFA were to be used to cover the salary, fringe benefits, and other expenses associated with hiring a Section 3 Coordinator for one year. Salaries, fringe benefits, and other expenses were to be based on local comparables. Applicants must possess the financial ability to finance the remaining salary, fringe benefits, and other expenses associated with hiring a Section 3 Coordinator that are not covered by the funds provided under the NOFA (See Exhibit "D"). The Plaintiff's salary is $53,700 annually, and Plaintiff would have received a promotional opportunity had Defendant Mayor Bing elected to promote the Plaintiff and provide at least one civil service staff person to assist with compliance monitoring. Instead of providing Plaintiff with assistance, Defendants elected to interfere with Plaintiff's progress by lack of support. Without the support of the Defendant Mayor Bing, compliance of Section 3 will remain an impossible task to perform in Planning and Development. Plaintiff has requested assistance from directors and executive level staff persons for five (5) years, but requests have fallen on deaf ears making it even more difficult for Plaintiff to perform her duties. Plaintiff believes Defendant Mayor Bing's Administration wants the Plaintiff to give up and quit.

17. In July 2011, Defendant Mayor Bing's Administration created a HUD Section 3 Compliance Office in Finance-Purchasing, and Plaintiff was not allowed to transfer to Purchasing. Plaintiff was informed by Defendant Winters that the two (2) positions created were tied to a temporary federal funding source—NSP. Council Member JoAnn Watson transferred her staff person, Elizabeth Johnson, in one of the vacant positions. Planning and Development has the following federal funding sources: Community Development Block Grant (CDBG), HOME, and NSP funding, and no one

was assigned to assist the Plaintiff with monitoring compliance. Plaintiff has demanded promotions from former and current directors of Planning, and APTE union representatives have attempted to meet with Robert Anderson, Director of Planning and Human Resources (HR) to discuss a management position (See Exhibit "E"). Also included in the above Exhibit is a memo from the former director of Planning, Doug Diggs, dated September 1, 2011, congratulating Plaintiff on her push for compliance; however, Mr. Diggs should have assisted with compliance when he was the director of planning. The meeting with HR and the current director, Rob Anderson, never took place.

18. The Program Manager of the Compliance Office is Felicia Andrews. Ms. Andrews is not in a protected class, and she has staff persons assisting her with compliance. The Compliance Office should have been created in Planning and Development, and Plaintiff should have been in charge of managing the office since Plaintiff is more qualified, experienced, and knowledgeable about Section 3. Instead, Plaintiff was subjected to individuals with no experience or expertise advising Plaintiff's supervisor, Defendant Miller, what Plaintiff's job responsibilities will be as if Plaintiff is inferior to them (See Exhibit "F"). Defendant Miller has been Plaintiff's timekeeper for the past three (3) years, and unless City Council makes a request, Defendant Miller does not interact with the Plaintiff at all. (See Exhibit "F"). What perplexes Plaintiff even more is why Defendant Mayor Bing would put a Compliance Office in the Department that assisted former Mayor Kilpatrick with the sludge contracts and the highly publicized Synagro Scandal and expect compliance? The chief procurement officer that assisted former Mayor Kilpatrick is the same chief procurement officer, Andre DuPerry, or

appointee of Defendant Mayor Bing.  Plaintiff believes it is business as usual, and nothing has changed because Defendant Mayor Bing's Administration is no different than former Mayor Kilpatrick.  The Chief Procurement Officer has supported the efforts of the former director of BS&EE, Karla Henderson, by awarding contracts to Ferguson Enterprise in 2010 and 2011 even though the case was highly publicized and revealed Mr. Ferguson was indicted by the FBI (See Exhibit "G").  Integrity and due diligence should have come into play with respect to the appropriate action to take when contracting with companies that are no longer "qualified" to do business with the City of Detroit, which is why Plaintiff has been requesting to be included at the forefront of the contract process for five (5) years.

19.     On November 29, 2011, Plaintiff filed another discrimination charge with EEOC, No. 471-2012-00507C.  Plaintiff charged discrimination because she was not given an opportunity to transfer to the Compliance Office as a compliance officer.  Even though Plaintiff has the qualifications and experience to manage the Section 3 Compliance Office, Plaintiff would have accepted the compliance officer position, at that particular time, if it were a civil service position because of the salary increase.  The Case was dismissed in March 2012 because it was determined that Plaintiff was not denied an opportunity to apply for the position; Plaintiff would have had to quit her civil service position in order to apply.  Plaintiff was in attendance at a City Council hearing when Boysie Jackson, Deputy Director of Purchasing falsely stated that there was no one qualified to monitor Section 3 compliance in other City departments.  Council Members Jones and Spivey stated that they wanted to give the opportunity to City employees first before contracting the position out.  Plaintiff is not allowed to speak at City Council

Hearings and, therefore, assumed Plaintiff would have an opportunity to apply because the salary was $62,400 a year. Mr. Jackson knew about the Plaintiff, and in a brief telephone conversation, Mr. Jackson stated that Plaintiff would have an opportunity to apply. Plaintiff was stunned when she discovered the position was contracted out. Plaintiff can understand contracting positions out when there is no one qualified to do the job. However, when you have a qualified civil service staff person, preference should be given to that employee first before contracting out the position.

20.     Plaintiff believes the following individuals were promoted to managers without posting the positions prior to June 18, 2012: Lisa Gering, Aida Colon, Norberto Valina, and Angela Thompson. Again, Plaintiff was not given an opportunity to advance. Plaintiff asked Demsey Addison, APTE Union President, if the above named individuals received promotions, and Ms. Addison claimed she did not know. The above mentioned employees would be former members of APTE and as the union president, Ms. Addison should know if the employees were promoted or not (See Exhibit "H"). The FRM Division was advised when Ms. Thompson became the interim manager, why was the division not informed of Ms. Thompson and the other employees' promotion? Plaintiff believes Defendant Miller and Defendant Winters did not announce the promotions because they knew Plaintiff had just recently filed an EEOC complaint, and putting through the promotions without giving Plaintiff an opportunity to apply was retaliation against the Plaintiff for filing the EEOC Charge. The ethnicity of the above mentioned employees are White, Hispanic, Asian, and Black/African American—all have less than 20 years seniority. Plaintiff believes Defendant Miller was assisted by Bridget Lamar in HR with the promotions without posting. Ms. Lamar and Defendant Miller are graduates

of Cass Technical High School, and Ms. Lamar is the niece of Jeanette Harris, former CPD Director of HUD's local field office. Ms. Lamar has climbed up rather swiftly in City government. Ms. Lamar was never available to meet on Plaintiff's behalf, but acted quickly to promote two (2) individuals to managers with the lowest seniority in the APTE Union, Aida Colon and Angela Thompson.

21.     In the case of *Tamara Harmon v. The City of Detroit*, Circuit Court Case LC No. 97-711880-NZ and State of Michigan Court of Appeals Case No 217820, Ms. Harmon sued for age and race discrimination against the City of Detroit, former Mayor Archer, and former director of Planning, Gloria Robinson and won. Ms. Harmon was demoted from deputy director and experienced an economic loss. The former Planning director, Gloria Robinson, created the executive manager position and would not put Ms. Harmon in one of the positions even though Ms. Harmon qualified for the position. Ms. Robinson did not want the Plaintiff to test for the professional series because of Plaintiff's clerical background. Ms. Robinson even questioned why Plaintiff went to Davenport University as opposed to Wayne State. Plaintiff cannot determine or explain why Defendant Miller and Defendant Winters have behaved so harsh towards the Plaintiff; therefore, Plaintiff believes it is because they are sitting in seats of authority. Plaintiff tried to seek the assistance of legal counsel, but could not find anyone to represent her because Plaintiff was not fired or laid off.  Plaintiff is protected by the Whistleblowers' Protection Act, MCL 15.361 *et seq*. an employer may not discharge or otherwise discriminate against an individual who reports or is about to report a violation or suspected violation of a law or regulation or rule promulgated pursuant to a political subdivision of the State of Michigan.  Plaintiff may not have been fired or laid off work,

but Plaintiff has also experienced an economic loss because for the past three (3) years, Defendants have intentionally not promoted Plaintiff to the appropriate management level (Management level to be determined by the judicial officer).

22.    Plaintiff has been constantly subjected to discriminatory behavior, hostility, harassment, and job interference for trying to advance within Planning as stated above.

23.    When Plaintiff provided management with a Section 3 Guidebook in 2009, Ms. Williams, Defendant Miller, and Defendant Winters retaliated against the Plaintiff for providing guidance and filing the EEOC Charge. Plaintiff was transferred to the Neighborhood Services Division of Planning by Ms. Williams. Defendant Miller and Defendant Winters approved the move. Plaintiff had just returned to work after having had eye surgery. Plaintiff was taunted and humiliated by staff, but what disturbed Plaintiff even more so is the fact that the City of Detroit failed to provide emergency services to its residents in need under Defendant Mayor Bing's Administration (See Exhibit "I"). Defendant Miller would not allow Plaintiff to answer HUD's request for additional information. Plaintiff reported the incident to the Mayor's Office, Ms. Darcelle Stricklen-Love, and Council Member Jo Ann Watson, but no action was taken to support the Plaintiff. Plaintiff advised Ms. Tucker and Defendant Winters that she blew the whistle to the Mayor's Office and City Council just to inform them that Plaintiff was aware that she was involved in a Whistleblower, compliance of a federal law (Included in Exhibit "I"). Plaintiff believes Ms. Williams retired in 2010 because she was intimidated by the Plaintiff, and Defendant Miller became even more hostile making it more difficult for Plaintiff to perform her job duties. Defendant Miller has rejected

vacation requests, and Plaintiff has had to go to the former Executive Manager for approval.

24.     On June 24, 2010, Ms. Tucker instructed Plaintiff to prepare a package of information for the former director of BS&EE, Karla Henderson.  Defendant Miller informed Warren Palmer, former director of planning, the information Plaintiff provided was basically nothing, and the director would not sign the letter Plaintiff prepared. Plaintiff went to BS&EE anyway because Plaintiff knew it was a federal requirement and met with the former deputy director, Kim James.  Plaintiff discovered that BS&EE had awarded approximately $14,000,000 in contracts without a Section 3 Clause included in the demolition contracts creating noncompliance for BS&EE.  David Demps, Assistant Corporation Counsel contacted Plaintiff and stated he would make the necessary corrections.  Plaintiff also tried to seek the assistance of the Labor Standards Unit with reporting documentation, and Defendant Miller intervened and stated the Labor Standards staff would assist Plaintiff when they had the time.  Defendant Miller also stated that management would finalize other Section 3 policies two (2) years ago, and to date there has been no additional revisions made by Planning management (See Exhibit "J").  Plaintiff believes she is being set up to fail.

25.     After attending one (1) Quality of Life Task Force Meeting hosted by Council Member Watson, Plaintiff was barred from attending and representing Planning at additional meetings.  Plaintiff found it to be interesting that when Plaintiff knew nothing about Section 3, Plaintiff was allowed to attend and represent Planning at Council meetings; however, when Plaintiff took the initiative to educate herself on the regulation, Plaintiff was not allowed to represent the department without authorization.

Council Member Watson was made aware Plaintiff could not represent the department on Section 3 (See Exhibit "K").

26.     In January 2011, Plaintiff filed a complaint against the City of Detroit for failure to comply with Section 3:

- February 2011, Mr. Bailey acknowledged receipt of the complaint.

- April 2011, Plaintiff received a call from Ms. Nievels stating that Plaintiff needed to complete the necessary Section 3 Complaint Form.

- June 2011, Plaintiff received the formal complaint from HUD.

- Plaintiff was harassed into training contractual employees to duplicate services provided by the Plaintiff; and

- Plaintiff was coerced into answering the complaint filed by Plaintiff (See Exhibit "L").

The Complaint is still an open case, and the Administration will have to address the complaint.

27.     In a non-management position and without enforcement power, project mangers, directors, and contractors ignore Plaintiff's requests and concerns. On January 9, 2012, Plaintiff tried to direct Barry Ellentuck, Project Manager of Buildings and Safety Engineering and Environment (BS&EE) Department, not to increase the contract of one of the demolition contractors by $2,000,000, but Elizabeth Johnson, HUD Section 3 Compliance Officer, instructed Mr. Ellentuck to present a notice of intent to comply with the federal law to City Council so that the contract could be approved. (Because of being barred from Council, Plaintiff cannot inform Council members of potential Section 3 violations). Increasing the contract to pay for the invoices violated the procurement

process because contracts are awarded based on the lowest responsive bid. Plaintiff advised Mr. Ellentuck not to increase the contract, but Mr. Ellentuck proceeded as planned. Ms. Johnson referred the contractor back to Mr. Ellentuck when the contractor posed the question of his contract being terminated for noncompliance. If Ms. Johnson is the compliance officer, why did she refer the contractor back to Mr. Ellentuck about a compliance issue? (See Exhibit "M") Plaintiff became aware that BS&EE had spent money from the NSP2 funding source prior to the RFQs and RFPs going out for bids on demolition. BS&EE will not have the funds with which to pay the contractors if the funding source is spent on contract amendments and executive level contractual employees. The Compliance Office is contracting another HUD Compliance Officer to start work presumably by the end of September. Ms. Andrews is able to request and acquire additional staff, Plaintiff is not. As of September 7, 2012, Plaintiff has not received any information from the Compliance Office indicating the dollar amount expended for contracts awarded during the report period ending June 30, 2012. Plaintiff cannot prepare the report without the proper information, and the report is due to HUD by September 28, 2012.

28.     As a Compliance Manager, you are going to be subjected to resistance from all parties involved with federal compliance. City Officials want federal regulations to conform to them rather than they conform to the regulations. Andre DuPerry, Chief Procurement Officer sent out a memo dated December 3, 2010, stating that HES Stallings was suspended from doing business with the City until December 2012; However, Plaintiff noticed that HES Stallings in still being awarded contracts by Finance; April 12, 2012, Ms. Bachelor of Finance-Purchasing sent out a letter identifying qualified

demolition contractors. Ms. Bachelor also indicated in the letter that businesses without wrecking licenses were rejected. Clark Construction was identified as a "Qualified" demolition contractor; however, Clark Construction does not have a wrecking license; DMC Group and not DMC Consultants is listed as "Qualified," but the wrecking license is listed under Donald Stevens and unless DMC can provide proof that Mr. Stevens had an active license prior to March 21, 2012, DMC would not be "Qualified" because Mr. Stevens' builder's license is suspended; Joy Construction has Wilfred Moore listed on their wrecking license as the Qualifying Officer, but Mr. Moore is not licensed to do so, (the individual holding the license is responsible for the work, therefore, it is important to hold that individual accountable—corrections need to be made); Glo Wrecking is listed as "Qualified," but this Honorable Court has or had a case pending, *United States of America v. Badhwar, et al* Case No. 2:11-cr-20362, for violation of the Clean Air Act. Plaintiff informed Ms. Clement, Manager of Grants Management on May 12th (Plaintiff's last day of work) and Defendant Winters of the violation finding on June 18, 2012 (when Plaintiff returned to work and rescinded the early retirement). Ms. Winters informed Plaintiff to make a note of her findings and put it in the files. Plaintiff has noticed that Finance-Purchasing has pulled the contracts for Glo Wrecking (See Exhibit 'N'). In this particular instance, someone listened and withdrew Glo's contracts.

29.     HUD issued monitoring findings in a letter to Karla Henderson dated September 12, 2011. One of the findings was a Lack of Debarment Verification. (#5 Lack of Debarment Verification-The BS&EE Department could not produce evidence that awards were not made to any contractors or subcontractors excluded, disqualified, or otherwise ineligible.) If the City of Detroit contracts with individuals or businesses with

invalid licenses, The City will have contracted with disqualified contractors and/or businesses, resulting in noncompliance. As a manager of compliance, Plaintiff believes it to be her responsibility to inform City officials of noncompliance issues when federal dollars are involved. If HUD reduces the funding because of the City of Detroit's noncompliance with federal requirements, the employees and the residents of Detroit will be impacted and not necessarily the Defendants. When Ms. Johnson was notified that Plaintiff had requested information from the demolition contractors, Ms. Johnson contacted the Plaintiff, July 26, 2012, and stated that the deputy director of Purchasing, Mr. Jackson, did not want Plaintiff requesting information from the demolition contractors, because their monitoring was being performed by the Compliance Office. If that was truly the case, the Compliance Office should have found the above mentioned violations and requested the necessary corrections.

30.     On May 12, 2012, Plaintiff took the early retirement option and retired because she was not getting the necessary support from Defendant Mayor Bing's Administration to effectively perform her job duties, and as a result of lack of support Plaintiff cannot perform her duties. Plaintiff was contacted by the FBI, and Agent Leone wanted to know if the City had forced Plaintiff to retire early. Plaintiff stated that no one had verbally requested Plaintiff to retire. Plaintiff retired because she could not do her job due to lack of support from Defendants.

31.     Plaintiff rescinded the early retirement and reported back to Planning on June 18, 2012. Plaintiff tried requesting that she be moved to the Development Division, and Defendant Winters denied Plaintiff's request. Defendant Miller had locked Plaintiff out of her computer and physically removed all the files and information pertaining to

Section 3 from Plaintiff's Office upon Plaintiff's return to work. Defendant Miller had also allowed Ms. Elizabeth Johnson of the Compliance Office to go through Plaintiff's files prior to Plaintiff officially retiring. Plaintiff cannot determine what was in the files or in Plaintiff's office because Defendant Miller and Ms. Johnson have tampered with Plaintiff's files.

32.     Plaintiff informed Defendant Miller on July 16, 2012, that she had not received the Notification of Contract Awards for the July 2012 Quarter from Labor Standards, and as of the date of filing this complaint, Plaintiff still has not received the same. Last year when Ms. Thompson presented the Plaintiff with the October 2011 quarterly report, the report contained documentation needed for the report period ending June 30, 2011. Plaintiff informed Defendant Miller, but the process has not changed. Because Plaintiff is not involved in the forefront, Plaintiff cannot report incomplete information or account for any activity that has taken place over the reporting period beginning July 1, 2011 and ending June 30, 2012. Last year, Robert Anderson, Director of Planning would not sign the annual report because he did not know the City would have a noncompliance finding if he did not sign the report. Defendant Miller stated in a memo dated November 9, 2011, that Mr. Anderson should sign the report for "good measure" and not to prevent a monitoring finding of noncompliance (See Exhibit "O").

33.     Plaintiff had requested a meeting with the Defendant Mayor Bing on July 31, 2012, and as of the date of filing this complaint, Defendant Mayor Bing has not responded, but Defendant Mayor Bing's Administration will request other staff members to speak on Section 3 (See Exhibit "P").

34.     Plaintiff has not received any information from Finance-Purchasing, Detroit Land Bank Authority, Recreation, DPW, and Planning and Development staff. Defendant Winters sits on the Board for Land Bank Authority, and has not assisted Plaintiff with compliance.  Plaintiff believes she has reported inaccurate information in the past because Plaintiff was not provided all the information with which to report. Plaintiff can, therefore, no longer perform the assigned task by Planning Administration.

## COUNT I

## DISCRIMINATION

Plaintiff hereby restates, realleges and incorporates by reference, each and every paragraph above, as though fully set forth herein, and further states the following:

35.     Plaintiff has filed EEOC charges and because charges have been dismissed against the Defendants, Defendants Miller and Winters believe they can continue their discriminatory practices.  The EEOC charges against hiring the contractual employees was dropped, but Defendant Miller and Defendant Winters have created a new charge of discrimination by promoting individuals in Planning and not the Plaintiff, Plaintiff cannot verify the date because the promotions were not announced.  Plaintiff would have easily qualified for the lower tier level of management based on merit.  Plaintiff believes Planning has vacant manager positions available, but Defendants are unwilling to put the Plaintiff in one.  Plaintiff believes the Defendants would rather contract the position out. If that is the case, the Defendants have an opportunity to offer an early retirement package with benefits for the Plaintiff.  Plaintiff is tired of the constant retaliation, and respectfully wants the inhumane treatment to end.

WHEREFORE, Plaintiff, Shirley Scott, respectfully requests that judgment be rendered against the above-named Defendants in whatever amount above Twenty-Five Thousand Dollars ($25,000.00) which the judicial officer of fact deems appropriate, together with interest and court costs.

## COUNT II

## JOB INTERFERENCE

Plaintiff hereby restates, realleges and incorporates by reference, each and every paragraph above, as though fully set forth herein, and further states the following:

36.     Plaintiff cannot do her duties because Defendant Mayor Bing does not support Plaintiff's efforts. Defendant Mayor Bing would have to direct the Planning Administration to adhere to Plaintiff's recommendations with regard to Section 3 Compliance. Plaintiff has given Planning Administration policies and procedures with regard to Section 3 and even complained to HUD, but the Planning Administration will not respond. Plaintiff has given the same policies and plans to the Section 3 Compliance Office. The Section 3 Compliance Office was more receptive of the information than Planning Administration. Defendant Mayor Bing believes that if the Section 3 Compliance Office can prove compliance with NSP funds, the City of Detroit will be compliant with Section 3. As stated above, Planning has federal funds, and there is no compliance efforts put in place. Plaintiff cannot even inform or share her ideas with her immediate supervisor, Defendant Miller, because Plaintiff's work will be belittled or put down by Defendant Miller. Defendant Miller has a financial background, and FRM is considered Planning's financial banker. FRM informs its customers of federal requirements associated with HUD sourced funding. However, every year there appears

to be a problem with the spending of funds, and miraculously the funding is spent just prior to the deadline. Plaintiff attended a pre-construction conference on 8-29-12, and the Recreation Department has a deadline of September 30, 2012 to spend the funds. Labor Standards held the pre-construction meeting without receiving a copy of the executed contract approved by Council because Defendant Winters approved the meeting. The goal was to insure that the funds were expended prior to the deadline, and federal requirements will not take precedence over the spending when there is a deadline to meet. Plaintiff cannot document or keep track of similar instances because Plaintiff is not made aware of all the pre-construction conferences. Plaintiff is very uncomfortable with the reporting of federal dollars because Plaintiff is not in the loop and information is often bypassed the Plaintiff. Defendant Winters had the opportunity to place the Plaintiff where she could function properly and deliberately chose not to do so. Defendant Mayor Bing, Defendant Winters, and Defendant Miller have rendered the Plaintiff powerless to perform her job duties.

WHEREFORE, Plaintiff, Shirley Scott, respectfully requests that judgment be rendered against the above-named Defendants in whatever amount above Twenty-five Thousand Dollars ($25,000) which the judicial officer deems appropriate, together with interest and court costs.

## COUNT III

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff hereby realleges and incorporates by reference, each and every paragraph above, as though fully set forth herein, and further state, in the alternative, the following:

37.    Defendants Mayor Bing, Winters, and Millers' above actions constitute extreme and outrageous conduct, with the intent to cause Plaintiff severe emotional distress and/or were so reckless as to cause Plaintiff severe emotional distress. Plaintiff would not have retired early had she not been forced to do so by the Defendants lack of support. Defendant Winters could have easily moved the Plaintiff to alleviate some of the stress Plaintiff has been subjected to but refused to do so.

38.    As a direct and proximate result of the actions of the Defendants, the hostile work environment they created, and acts of retaliation against Plaintiff, Plaintiff has suffered the following damages, including, but not limited to:

      a.    Mental anguish and emotional distress;

      b.    Humiliation, outrage, and embarrassment;

      c.    Other damages as determined by the judicial officer

39.    When Plaintiff lost her youngest daughter May 4, 2008, Plaintiff rushed to her daughter's home and found her face blistered and burned beyond recognition; and her body already placed in a body bag, Plaintiff was not allowed to take the two weeks leave of absence prescribed by Plaintiff's physician. Plaintiff noticed when she returned to work on June 18, 2012, that Angela Thompson had been off work from June 18 to July 23, 2012 after experiencing the loss of a loved one. Ms. Thompson would have had to have her time approved by Defendant Miller in order to be off. Plaintiff would like to know what kind of time did Ms. Thompson use and did Ms. Thompson receive a Family Medical Leave (FMLA)?

WHEREFORE, Plaintiff, Shirley Scott, respectfully requests that judgment be rendered against the above-named Defendants in whatever amount above Twenty-five

Thousand Dollars ($25,000.00) which the judicial officer deems appropriate, together with interest and court costs.

## DEMAND FOR JURY TRIAL

NOW COMES the above-captioned Plaintiff, Shirley Scott, in Pro-se, and hereby demands a trial by jury in the above-entitled cause of action.  Should Plaintiff need the assistance of an attorney to represent her, she will respectfully do so.

Dated:  September 11, 2012

Shirley Scott in Pro-se
Cadillac Towers Building
65 Cadillac Square, Ste. 1200
Detroit, MI  48226
(313) 224-2378

# EXHIBIT B

ATI-2574119

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHIRLEY A. SCOTT,

         Plaintiff,

                                   Case No.: 2:12-cv-14048

v.

CITY OF DETROIT, a Michigan Municipal
Corporation, MAYOR BING, Individually,
MARJA WINTERS, Individually, and VALERIA
MILLER, Individually,

                 Defendants.

| | |
|---|---|
| Shirley A. Scott<br>In Pro Se<br>15654 Spring Garden St,<br>Detroit, MI 48205<br>(313) 469-3984 | Christine M. Greig (P58116)<br>City of Detroit Law Dept.<br>Attorney for Defendants<br>Coleman A. Young Municipal Center<br>2 Woodward Ave., Ste. 500<br>Detroit, Michigan 48226<br>(313) 237-5037<br>greic@detroitmi.gov |

PLAINTIFF'S MOTION TO RE-ENTER AND REVISE PLAINTIFF'S
( FIRST) ANSWER TO ORDER TO SHOW CAUSE [Docket 11]
AS PLAINTIFF'S FIRST AMENDED COMPLAINT AND STRIKE
PLAINTIFF'S (SECOND) ANSWER TO ORDER TO SHOW CAUSE [Docket No.15]

Now comes the above Plaintiff, in Pro se, and states:

JURISDICTION AND VENUE

1.     Defendants are governmental employees/agents of the City of Detroit.

2.     Plaintiff is a governmental employee/Representative of the City of Detroit,

Section 3 Businesses, and Section 3/ Low-Income Residents.

3.      The Defendants and Plaintiff are residents of the State of Michigan.

4.      The events giving rise to this case concern a federal law, Section 3 of the HUD Act of 1968.

5.      This is an action for appropriate relief, including, but not necessarily limited to, compensatory damages or whatever damages this Honorable Court awards Plaintiff to redress the deprivation of Plaintiff's rights secured by 24 C.F.R. Parts 135 and 146.

6.      This case was scheduled for hearing on January 31, 2013, but the hearing was dismissed. Plaintiff would have had the opportunity to request an amendment of Plaintiff's (First) Answer to Order to Show Cause [Docket 11] at the hearing. Plaintiff had to wait on a response from this Honorable Court before she filed anything else prematurely or incorrectly. On February 20, 2013, this Honorable Court granted Plaintiff's (Second) Answer to Order to Show Cause [Docket No. 15], which Plaintiff asked this Honorable Court to grant prior to confirmation that she could charge retaliation of Section 3.

7.      Under *24 C.F.R. 146.41 Prohibition against intimidation or retaliation.* "*A recipient may not engage in acts of intimidation or retaliation against any person who: (a) Attempts to assert a right protected by this part,*" which was unclear to the Plaintiff when she filed the (First) Answer to Order to Show Cause. Plaintiff knew that she had been retaliated against in connection with her job assignment, but she did not know which law was applicable with retaliation in Plaintiff's case. This is a rare case, and to Plaintiff's knowledge no one has filed a prevailing retaliation case against an employer under Section 3 of the HUD Act of 1968. An attorney informed Plaintiff, after Plaintiff filed the (Second) Answer, that Plaintiff could file suit under Section 3, but the attorney was too busy to take Plaintiff's case. The federal

government does not get involved with employment issues; however, HUD has now revised their Complaint Form to state a city or county can be charged with violating Section 3 and charged with retaliation because the municipality "Retaliated against the complainant because complainant sought to enforce Section 3 requirements," which is a clearer statement.

8.     In paragraph 2 of Plaintiff's Motion to Strike [Docket 14], Plaintiff stated "The federal statue is not applicable because Plaintiff has not been discriminated or retaliated against as a private citizen" (because Plaintiff did not consider herself to be a private citizen).  Paragraph 3 stated "Private citizens can file suit under the federal statue if they experience discrimination and retaliation and not an employee of a municipal city or contractual employee of said city receiving federal financial assistance."  Plaintiff has sought to enforce Section 3 requirements for the past five (5) years, and as a representative of Section 3 Businesses and Residents, Plaintiff can now charge Retaliation of Section 3 of the HUD Act of 1968 against the Defendants.

## RETALIATION OF SECTION 3 OF THE HUD ACT OF 1968

9.     For approximately 17 years, the City of Detroit (Recipient), former mayors, and current Defendant Mayor Bing have violated compliance with Section 3.  Plaintiff has been retaliated against for seeking to enforce Section 3 requirements for five (5) years.  In order for a Recipient to be compliant with Section 3:

- Recipient would have to notify Section 3 businesses about contracting opportunities. Plaintiff is not informed of upcoming contractual opportunities and, therefore, cannot inform Section 3 businesses.  Plaintiff has been retaliated against for seeking to enforce Section 3 requirements.  Defendant Winters is the Deputy Director of the department and Defendant Miller is the divisional manager of the FRM Division, Plaintiff's assigned

division.  Neither, Defendant Winters nor Defendant Miller supported Plaintiff in her

efforts to enforce Section 3 requirements.  Defendant Miller and Plaintiff both received

training on Section 3 in April 2009.

- Recipient must incorporate the Section 3 Clause into covered Section 3 bid solicitations

  or contracts.  Plaintiff is not informed or invited to attend pre-bid conferences and as a

  result of non-compliance; in June 2010, the former executive manager asked Plaintiff to

  prepare a package of information required for Buildings and Safety (BS&E) for

  Demolition Contracts.  Defendant Miller informed the former director, Mr. Palmer, not to

  disseminate the Section 3 Guidebook prepared by the Plaintiff.  Defendant Miller stated

  "we will revisit next steps, including strategies for engaging other city departments in this

  initiative, once P&DD management finalizes other Section 3 policies."  Plaintiff was

  retaliated against for seeking to enforce Section 3 requirements.  BS&E had awarded

  approximately $12 million in Demolition Contracts without the Section 3 Clause

  included in the contract.  Plaintiff informed David Demps, Assistant Corporation

  Counsel, and he addressed the issue; and as of September 2012, neither Defendant Miller

  nor Defendant Winters had come up with other Section 3 policies.

- Recipient failed to provide priority consideration to Section 3 businesses for covered

  contracting opportunities.  Plaintiff would have had to be included in the pre-bid and

  selection process to insure that priority was given to Section 3 businesses, but the

  Defendants chose not to include Plaintiff, in violation of Section 3 because Plaintiff

  sought to enforce Section 3 requirements.

- Recipient failed to select Section 3 businesses in accordance with the order of priority

  consideration as set forth in 24 C.F.R 135.36.  Plaintiff would have to be included in the

pre-bid and selection process to insure that the order of priority is considered. The
Housing Services Division contracts with a law firm to close on their development
projects. The former Chief of Housing Services was given a packet to disseminate to
contractors for compliance with Section 3; but as of September 2012, Housing Services
has not supplied Plaintiff with the forms needed to prepare the Section 3 annual report.
The male managers have retaliated against the Plaintiff because Plaintiff sought to
enforce Section 3 requirements, and not professional (consultant) service contracts for
former directors of Planning.

- Recipient failed to award contracts to Section 3 businesses. Plaintiff would have to be
included in the pre-bid and selection process. However, there is nothing that Plaintiff
could do to enforce Section 3 requirements if Defendant Mayor Bing takes control of
NSPII federal funds for Demolition and Project 14, and gives control of approximately
$40,000,000 to the State of Michigan so that the City would not have to comply with
Section 3 requirements.

- Recipient failed to ensure that its contractors/subcontractors comply with Section 3
requirements. Defendant Winters sits on the Board of Detroit LandBank Authority.
Detroit LandBank Authority acquired property at a minimum of $10,000 per parcel; sold
approximately 13 parcels to a developer for a $1.00; contracted with the developer's
general to rehabilitate the property for approximately $100,000 per parcel; and then the
developer has the opportunity to sell the property for $75,000 with the use of federal
funds. Political preference interferes with Section 3 compliance requirements.

- Recipient knowingly entered into contracts with contractors/subcontractors that failed to
comply with Section 3 requirements. Plaintiff informed Defendant Winters of a

contractor found to be non-compliant with Section 3 on June 18, 2012. Defendant

Winters stated that the Plaintiff should just "put the information in the file because the

contractor was the one in violation with the law." The City would have violated the law

if the contracts were not cancelled. The contracts were cancelled as of July 24, 2012.

- Recipient failed to notify Section 3 residents about training and/or employment

  opportunities. Plaintiff would have to have information relative to the number of

  permanent staff a company has; and if there will be a need for additional staff prior to

  signing a contract in order to insure Section 3 residents are notified of training and

  employment opportunities. The information would be included in a company's Section 3

  and Utilization Plans. The Defendants have not required Plans before a contract is

  entered into although Plaintiff has provided Defendants Miller and Winters with Section

  3 Plans and Policies, in violation of Section 3 because Plaintiff sought to enforce Section

  3 requirements.

- Recipient failed to provide priority consideration to Section 3 residents for employment

  or training opportunities. Plaintiff would have had to obtained commitment from the

  contractor prior to entering into a contract to insure priority consideration is given to

  Section 3 residents, but Plaintiff had not seen or reviewed a contract in five (5) years; and

  Plaintiff was not included in the contract process in violation of Section 3 because

  Plaintiff sought to enforce Section 3 requirements.

- Recipient failed to select Section 3 residents for training or employment opportunities in

  accordance with the order of priority consideration set forth in 24 CFR 135.34.

  Defendants Miller and Winters would have had to assist in getting the information at the

  beginning of the contract process. The City spent approximately $30,000,000 in federal

funds in the 2011-12 fiscal year, and Plaintiff could only report approximately 10 new hires for the federal funds expended.

- Recipient failed to hire Section 3 residents for new employment opportunities. Detroit Workforce Development received thousands of dollars in federal funds to train low-income Detroiters, but the residents were not used on the projects funded with the federal dollars.

- Recipient retaliates against the complainant because complainant sought to enforce Section 3 requirements or participated in an investigation or proceeding regarding Section 3.

    A.    The Plaintiff was transferred to the Neighborhood Services Division of Planning for presenting the executive staff with a Section 3 Guidebook in 2009;

    B.    In 2010 former director, Warren Palmer, falsely stated that Planning did not have anyone capable of monitoring for Section 3 Compliance in a Quality of Life Task Force Meeting sponsored by Council member Watson, and when Plaintiff raised her hand because HUD representatives were present and Plaintiff had sought to enforce Section 3 compliance, Plaintiff discredited the director's statement; Plaintiff was barred from having anything to do with Council Members without the approval of the director or deputy director;

    C.    In April 2011, Plaintiff filed a Section 3 Complaint. Defendants retaliated and created a HUD Section 3 Compliance Office in July 2011 and would

not let Plaintiff manage the office because Plaintiff sought to enforce
Section 3 requirements.  The job Announcement for the Compliance
Officer indicated that the "Compliance Officer would develop, collect, and
maintain overall program data for the HUD Section 3 program and prepare
and submit annual reporting information for inclusion in the **State's
Consolidated Plan,** as required by HUD."  The City of Detroit has a
Consolidated Plan, but the newly created office designated the State's
Consolidated Plan; and the Plaintiff was coerced into answering the
complaint she filed.  Defendant Mayor Bing was already aligning
processes in place to be taken over by the State including Section 3
compliance for the City of Detroit.  Setting up the job assignment to
appear to comply with Section 3 was initiated by former executive
manager, Thomasina Tucker.  Political preferences in Defendant Mayor
Bing's Administration prevented Section 3 Compliance from effectively
being carried out in the administrative offices of Planning and
Development because Defendant Mayor Bing did not want Section 3
compliance to be effectively carried out by the City of Detroit;

D.      Plaintiff could not get promoted or paid out-of-class as a general manager
in retaliation of compliance with Section 3; and

E.      Plaintiff was not allowed to have staff to assist with Section 3 compliance
requirements.  The FRM Division has five (5) manager I positions, and
each manager has a minimum of two (2) staff persons to assist them with
their assignments.

10.    The Section 3 Complaint was filed within the required timeframe of 180 days and in accordance with 24 C.F.R. 146.43 "(a) A complainant may file a civil action following the exhaustion of administrative remedies under the Act.  Administrative remedies are exhausted if: (1) 180 days have elapsed since the complainant filed the complaint and HUD had made no finding with regard to the complaint."  The Chicago office of HUD turned the matter over to the local field office in Detroit, and they have not ruled a finding in favor of the Recipient (City of Detroit).  Plaintiff, therefore, has a right to bring civil action in this Honorable Court because Plaintiff is located within the eastern district of Michigan, southern division.

11.    The Plaintiff is seeking out-of-class compensation as a general manager for directing, planning, managing, coordinating, and administering the programs and activities of an essential service area of a city department.  Plaintiff provided critical administrative, technical , professional, operational, and service provision activities central to the success of the department's mission to "provide for the socio and economic well-being of Detroit residents." The Plaintiff deemed it appropriate to seek the maximum class of the position because the former general manager of housing services and former administrative services coordinator (equivalent to a manager II) of FRM were asked to develop an action plan to assist the federal government with their Section 3 Compliance goals in 1995, and no one took the initiative to seek compliance with Section 3 until Plaintiff received the assignment in 2007.

12.    Plaintiff incorporates by reference paragraphs 1 through 11.

13.     Defendants retaliated against Plaintiff for having sought enforcement requirements for Section 3 as described above, and Plaintiff seeks appropriate relief and remedies under federal law pursuant to Retaliation and Retaliation of Section 3 of the HUD Act of 1968.

14.     Defendants actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities as well as the residents of Detroit.

15.     Defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, so as to be atrocious and utterly intolerable in a civilized community constituting the tort of intentional infliction of emotional distress, Plaintiff put in for an early retirement on March 26, 2013. Defendant Miller wanted Plaintiff to illegally report Section 3 Contractor and Subcontractor Activity using the Notification of Contract Award (N.O.C.A.) forms provided by the contractor as opposed to financial information reported to the Finance Department, and drawn down by the managers in FRM.  Plaintiff's mail from this Honorable Court and Defendants' attorney's office has not been received by the Plaintiff.  The Plaintiff had to get a copy of Defendants' Answer, dated March 7, 2013, from the Clerk's Office almost a week later.

WHEREFORE,  Plaintiff respectfully requests the following relief and remedies:

1.     The City of Detroit enter into a Voluntary Compliance Agreement with HUD;

2.     The adjustment in Plaintiff's salary and that of the general manager's salary for three years ($95,100 - $53,700 = $41,400 annually for three years);

3.      The salaries of the two (2) compliance officers for three years at $124,800

annually because Defendants had federal funding available to provide

Plaintiff with staff and chose not to do so;

4.      Medical benefits because Plaintiff has a deteriorated tail bone from 27 ½

years of services and additional loss of vision from the detached retina in

2009.

Dated:  March 29, 2013

Shirley A. Scott, Plaintiff in Pro se

15654 Spring Garden St.

Detroit, MI  48205

(313) 469-3984

I hereby certify that on April 2, 2013, the Plaintiff's Response to Defendants Special and
Affirmative Defenses and the foregoing document were served upon the Clerk of this Court,
hand delivered, and counsel of record by First Class Mail at the address below:

Christine M. Greig, Attorney at Law
City of Detroit Law Department
Coleman A. Young Municipal Center
2 Woodward Ave., Ste. 500
Detroit, Michigan 48226
(313) 237-5037

Dated:  April 2, 2013

Shirley A. Scott, Plaintiff in Pro se

# **EXHIBIT C**

ATI-2574119

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Shirley A. Scott,

     Plaintiff,

                                       Case No.: 2:12-cv-14048

v.

                                       Honorable Sean F. Cox

City of Detroit, *et. al*.                   United States District Court Judge

     Defendants.
_____/

## <u>ORDER–AMENDED COMPLAINT [DOCKET ENTRY NO. 24]</u>

Before the Court is Plaintiff Shirley A. Scott's ("Scott") "Motion to Re-enter and Revise Plaintiff's (First) Answer to Order to Show Cause [Docket 11] as Plaintiff's First Amended Complaint and Strike Plaintiff's (Second) Answer to Order to Show Cause [Docket No. 15]" (hereinafter referred to as "Scott's Motion to Amend the Complaint"). (Docket Entry No. 24.)

The Defendants filed a response stipulating to Scott's "request to strike the First Amended Complaint [Docket No. 15] and allow Plaintiff's first Answer to Order to Show Cause [Docket No. 11] with revision to serve as Plaintiff's Amended Complaint." (Docket Entry No. 26.)

On May 30, 2013, this Court held a motion hearing to address Scott's Motion to Amend the Complaint. At that hearing, the parties requested that this Court (1) construe Scott's Motion to Amend the Complaint [Docket Entry No. 24] as Scott's second amended complaint and (2) strike Plaintiff's Answer to Order to Show Cause [Docket Entry No. 15] from the docket.

Accordingly, **IT IS ORDERED** that the Court hereby construes Scott's Motion to Amend

1

the Complaint [Docket Entry No. 24] as Scott's second amended complaint;

      **IT IS FURTHER ORDERED** that Plaintiff's Answer to Order to Show Cause [Docket Entry No. 15] is **STRICKEN** from the docket;

      **IT IS SO ORDERED**.


Dated:  May 31, 2013                 s/ Sean F. Cox
                                       Sean F. Cox
                                       U. S. District Court Judge


I hereby certify that on May 31, 2013, the foregoing document was served upon counsel of record by electronic means and upon Shirley A. Scott by First Class Mail at the address below:

Shirley A Scott
15654 Spring Garden St.
Detroit, MI 48205

Dated:  May 31, 2013                 s/ J. McCoy
                                       Case Manager

# EXHIBIT D

ATI-2574119

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SHIRLEY A. SCOTT,

     **Plaintiff,**         **Case No. 12-cv-14048**
                   **Hon. Sean A. Cox**

**-vs-**

**THE CITY OF DETROIT, a municipal corporation,**
**MAYOR DAVE BING, Individually, MARJA WINTERS,**
**Individually, and VALERIA MILLER, Individually.**

      **Defendants.**

_____/

| Shirley A. Scott | **CITY OF DETROIT LAW DEPARTMENT** |
|---|---|
| In Pro Se | **By: Christine M. Greig (P58116)** |
| 15654 Spring Garden St. | Attorney for Defendants |
| Detroit, MI 48205 | Coleman A. Young Municipal Center |
| (313) 469-3984 | 2 Woodward Avenue, Ste. 500 |
| | Detroit, MI 48226 |
| | (313) 237-5037 |
| | greic@detroitmi.gov |

_____/

### DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADING FOR FAILURE TO STATE A CLAIM IN LIEU OF ANSWER TO COMPLAINT

   Defendants City of Detroit, Mayor Dave Bing, Marja Winters, and Valeria Miller, submit their

Motion for Judgment on the Pleadings For Failure to State A Claim pursuant to F.R.Civ.P. Rules

12(b), 12© and 56, through their attorney, Christine M. Greig, and states the following:

1.   On September 12, 2012, Plaintiff initiated this civil action seeking money damages.

2.   Plaintiff's complaint alleged a host of unclearly articulated claims and named  Mayor Dave

    Bing and two (2) City of Detroit Employees, as individual Defendants along with the City of

    Detroit..

K:\DOCS\LABOR\greic\a36000\mot\C_G1494.WPD

3.      On October 1, 2012, Defendants  responded with a Motion for Judgment on the Pleading or in the Alterative for a More Definite Statement in Lieu of Answer to Complaint.

4.      On October 2, 2012, this Honorable Court issued an Order to Show Cause directing Plaintiff to respond in writing on or before October 16, 2012 with a statement establishing the subject matter jurisdiction of the Court.

5.      On October 11, 2012, Plaintiff filed a Motion to Adjourn Order to Show Cause Dated October 16, 2012 asking for additional time.

6.      On October 15, 2012, Defendant's filed a response to the motion to adjourn the Court's show cause order.

7.      On the same date, Plaintiff filed an Answer to the Order to Show Cause.

8.      On October 16, 2012, this Honorable Court granted her motion to Adjourn Order to Show Cause until November 2, 2012.  (Docket No. 12)

9.      On October 23, 2012, Defendants filed a Motion to Dismiss alleging that no private cause of action upon which relief can be granted is conferred by 24 C.F.R. §§ 135-146. (Docket No. 13.)

10.     On November 1, 2012, Plaintiff filed Plaintiff's [Second] Answer to Order to Show Cause. (Docket No. 15.)

11.     Also on November 1, 2012, Plaintiff filed a Motion to Strike Order to Show Cause Entered on October 15, 2012 claiming that "[t]he federal statute is not applicable in Plaintiff's case because Plaintiff has not been discriminated or retaliated against as a private citizen." (Docket No. 14 at 2, § 2.)

12.     On November 29, 2012, this Honorable Court issued an Order to Show Cause, in writing, no

K:\DOCS\LABOR\greic\a36000\mot\C_G1494.WPD

later than December 13, 2012 as to why the unopposed motion to dismiss should not be granted. (Docket No. 18.)

13.   On February 20, 2013, this Honorable Court entered an order Construing Docket No. 15 as an Amended Complaint: Granting Plaintiff's Motion to Strike Docket No. 14: Denying Defendants Motion to Dismiss Without Prejudice: and Denying Defendant's Motion for Judgment on the Pleading or in the Alternative for a More Definite Statement. (Docket No. 20.)

14.   On March 7, 2013, Defendants filed their Answer to Complaint (Docket No. 21.)

15.   On April 2, 2013, Plaintiff filed a Motion to Re-Enter and Revise Plaintiff's (First) Answer to Order to Show Cause (Docket No. 11.) As Plaintiff's First Amended Complaint and Strike Plaintiff's (Second) Answer to Order to Show Cause (Docket No.15.)

16.   On April 5, 2013, Defendants Filed a Response to Plaintiff's Motion (Docket No. 26) which concurred with the relief sought, but reserved the right to file a motion to dismiss.

17.   On May 30, 2013, parties appeared for oral argument on Plaintiff's Motion.

18.   On May 31, 2013, this Honorable Court issued a written order allowing Docket entry No. 24 to serve as Plaintiff's Amended Complaint. (Docket No. 30.)

19.   Plaintiff  avers that subject matter jurisdiction is conferred on this Honorable Court by "24 CFR 135 through 146." **(Pl.'s Answer to Order to Show Cause, pg. 1-2)**

20.   Plaintiff pleads for money damages in the excess of two-hundred-thousand dollars ($200,000.00) and health insurance benefits.

21.   Plaintiff alleges a cause of action under Section 3 of the HUD Act of 1968 which is cited in her Amended Complaint (Docket No. 30.) as "24 CFR 135 through 146." (Docket No. 30 §5-

7)

11.    Plaintiff fails to state a claim upon which relief may granted.  Section 3 of the HUD

Act does not provide a private citizen a cause of action to sue for money damages.

Defendants respectfully requests the court grant their motion to dismiss, with prejudice,

and with an award of costs and attorney fees.

Respectfully submitted,

*/s/Christine M. Greig*
Christine M. Greig
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Coleman A. Young Municipal Center
Detroit, Michigan  48226
(313) 237-5037
greic@law.ci.detroit.mi.us
P-58116

Dated: June 20, 2013

K:\DOCS\LABOR\greic\a36000\mot\C_G1494.WPD

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**SHIRLEY A. SCOTT,**

**Plaintiff,**                                          **Case No. 12-cv-14048**
                                                        **Hon. Sean A. Cox**

**-vs-**

**THE CITY OF DETROIT, a municipal corporation,**
**MAYOR DAVE BING, Individually, MARJA WINTERS,**
**Individually, and VALERIA MILLER, Individually.**

               **Defendants.**
_____/

| | |
|---|---|
| **Shirley A. Scott** | **CITY OF DETROIT LAW DEPARTMENT** |
| In Pro Se | **By: Christine M. Greig (P58116)** |
| 15654 Spring Garden St. | Attorney for Defendants |
| Detroit, MI 48205 | Coleman A. Young Municipal Center |
| (313) 469-3984 | 2 Woodward Avenue, Ste. 500 |
| | Detroit, MI 48226 |
| | (313) 237-5037 |
| | greic@detroitmi.gov |

_____/

## DEFENDANTS' BRIEF IN SUPPORT OF IT'S MOTION FOR JUDGMENT ON THE PLEADING FOR FAILURE TO STATE A CLAIM IN LIEU OF ANSWER TO <u>COMPLAINT</u>

K:\DOCS\LABOR\greic\a36000\mot\C_G1494.WPD

## CONTROLLING AUTHORITIES

1.   Anderson v. Liberty Lobby, 477 U.S. 242, 91 L.Ed. 2d 202, 106 S. Ct. 2505 (1986)

2.   Bovee v. Coopers & Lybrand C.P.A.,  272 F.3d 356 (6th Cir. 2001)

3.   Celotex Corporation v. Catrett, 477 U.S. 317, 91 L.Ed. 2d 265, 106 S. Ct. 2548 (1986)

4.   City of Ranhos Palos Verdes v Abramson, 544 U.S. 113, 120; 125 S. Ct. 1453; 161 L. Ed. 2d 316 (2005)

5.    EEOC v. J.H. Routh Packing Co., 246 F.3d 850, 851 (6th Cir. 2001)

6.   Jackson v. City of Columbus, 194 F.3d 737 (6th Cir. 1999)

7.   Kottmyer v. Maas, 436 F.3d 684, 688 (6th Cir. 2006)

8.   Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp, 475 U.S. 574 (1986)

9.   Marcel v. Donovan, 201 U.S. Dist. LEXIS 34493 (E.D. NY 2012)

10.   McQuade v The City of St. Paul, 2007 U.S. Dist. LEXIS 8905 (D. Minn 2007).

11.   Mezibov v. Allen, 411 F.3d 712, 716 (6th Cir. 2005)

12.   Nails Construction Company, et. al. v The City of St. Paul, 2007 U.S. Dist. LEXIS 8905, (D. Minn. 2007).

13.   Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)

14.   Section 3 of the HUD Act, 12 U.S.C. 1701u, 24 C.F.R. 135 through 146

15.   Fed. R. Civ. P. 12(b), 12 © and 56 ©

K:\DOCS\LABOR\greic\a36000\mot\C_G1494.WPD

2:12-cv-14048-SFC-MAR   Doc # 31   Filed 06/20/13   Pg 7 of 13   Pg ID 328

## STATEMENT OF FACTS

The instant litigation was initiated by Plaintiff on September 12, 2012.  Plaintiff's complaint contains a litany of unclearly articulated allegations regarding her employment with the City of Detroit's Planning and Development Department.  In the complaint, Plaintiff admitted that she "cannot determine or explain why Defendant Miller and Defendant Winters have behaved so harsh towards the Plaintiff; therefore, Plaintiff believes it is because they are sitting in seats of authority." **(Docket No. 1, pg. 12, para. 21)** Plaintiff further contends that she has experienced economic loss based on a failure to promote to a manager position within the City of Detroit.  **(Docket No. 1, pg. 13, ln. 21)** Plaintiff expressly states in her complaint that she believes any discriminatory treatment was based on her actions in "trying to advance within Planning.**" (Docekt No. 1, pg. 13, ln. 22)** Plaintiff initially alleged three (3) claims against the Defendants; (1) Discrimination; (2) Job Interference; and (3) Intentional Infliction of Emotion Distress. **(Docket No. 1, pgs. 20-24)**

In Plaintiff's Answer to Order to Show Cause, she "states that 24 CFR 135 through 146 gives federal question jurisdiction to this Honorable court."  (Docket No. 11**, pg. 1-2)** In her request for money damages, Plaintiff seeks this Honorable Court to promote her to a "General Manager's position" which is a Civil Service Classified position in the City of Detroit Planning and Development Department, not a contract position funded by Housing and Urban Development grant money.   **(Docket No. 11, pg. 9, ln. 16-17)**

Plaintiff admits in her "Amended Complaint" **(Docket No. 24, pg. 2, ln. 7)** that "to Plaintiff's knowledge no one has filed a prevailing retaliations case against an employer under Section of the HUD Act of 1968."  Furthermore, Plaintiff reiterates her prior contention that "[t]he federal statute is not applicable because Plaintiff has not been discriminated or retaliated against as a private citizen. **(Docket No. 24, pg. 3, ln. 8)**

K:\DOCS\LABOR\greic\a36000\mot\C_G1494.WPD

13-53846-tjt   Doc 340   Filed 08/16/13   Entered 08/16/13 15:42:22   Page 53 of 78

The City maintains that they are entitled to Summary Judgment as to all Plaintiff's claims under Section 3 of the HUD Act, or as stated by Plaintiff "24 CFR 135 through 146." Plaintiff fails to state a claim upon which relief can be granted as the Federal Regulations pertaining to HUD fail to confer a right of private citizens to file suit for money damages.

## STANDARD OF REVIEW

A motion for summary judgment based on Federal Rule of Civil Procedure 12(b)(6) and 12© tests whether a legally recognizable claim has been pleaded in the complaint. Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988). EEOC v. J.H. Routh Packing Co., 246 F.3d 850, 851 (6th Cir. 2001) (the standard of review applicable to a Rule 12© motion for judgment on the pleadings is nearly identical to that employed under a Rule 12(b)(6) motion to dismiss). The court must construe the complaint in the light most favorable to the plaintiff, accept all well-pled factual allegations as true and determine whether the plaintiff undoubtedly can prove no set of facts in support of their claims that would entitle them to relief. Kottmyer v. Maas, 436 F.3d 684, 688 (6th Cir. 2006). The Court is not required, however, to accept as true unwarranted legal conclusions, summary allegations, or factual inferences. Jackson v. City of Columbus, 194 F.3d 737, 745 (6th Cir. 1999). This standard requires more than bare assertions of legal conclusions. Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 361 (6th Cir. 2001). Conclusory allegations and legal conclusions masquerading as factual conclusions are not sufficient. Mezibov v. Allen, 411 F.3d 712, 716 (6th Cir. 2005). To state a valid claim, "a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." Id.

With reference to rule 56 ©, it is significant that the issue raised in the motion goes to the

plaintiff's case in chief rather than an affirmative defense and that the plaintiff accordingly bears the

burden of proof on that issue. In <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 91 L.Ed.2d 265, 106

S.Ct. 2548 (1986) the Supreme Court noted that:

> ... the plain language of Rule 56© mandates the entry of summary judgment, after
> adequate time for discovery and upon motion, against a party, who **fails to make a
> showing sufficient to establish the existence of an element essential to that
> party's case, and on which that party will bear the burden of proof at the trial.**
> In such a case there can be no 'genuine issue as to any material fact,' since a
> complete failure of proof concerning an essential element of the nonmoving party's
> case necessarily renders all other facts immaterial.  The moving party is 'entitled to
> judgment as a matter of law' because the non-moving party has failed to make a
> sufficient showing on an essential element of her case with respect to which she has
> the burden of proof.'  [T]h[e] standard [for granting summary judgment] mirrors the
> standard for a directed verdict under Federal Rule of Civil Procedure 50(a)...' [cite
> omitted]

91 L.Ed.2d at 273 - 274 (Emphasis added)

Once the movant in a Rule 56© motion identifies the issue as to which it maintains there is no

genuine issue of material fact, the non-movant must come forward with specific facts showing that

there is a genuine issue for trial. <u>Matsushita Electric Industrial Co., Ltd. V. Zenith Radio Corp.</u>, 475

U.S. 574, 587 (1986).

   The <u>Celotex</u> holding was followed and developed in <u>Anderson v. Liberty Lobby</u>, 477 U.S.

242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986), which was decided the same day as <u>Celotex</u>. In

<u>Anderson</u> the Court emphasized that not just any issue of fact is sufficient to avoid summary

judgment. Rather, the issue must be both material and genuine. A fact issue is material only if "it

might affect the outcome of the suit under the governing law." 477 U.S. 248. "Factual disputes that

are irrelevant or unnecessary will not be counted." <u>Id</u>. A fact issue is genuine only if "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id</u>.

## LAW AND ARGUMENT

**(A)**
**SECTION 3 OF HUD ACT OF 1968 FAILS TO PROVIDE A PRIVATE RIGHT OF ACTION, THUS PLAINTIFF'S CAUSE OF ACTION IS SUBJECT TO DISMISSAL**

Section 3 of the HUD ("Housing and Urban Development") Act of 1968 was enacted to ensure that economic opportunities generated by certain HUD financial assistance, to the greatest extent feasible under all applicable law, be offered to low and very low income persons, particularly recipients of government assistance for housing and businesses that provide income opportunities to low and very low income persons.  **12 U.S.C. § 1701u.**

In the recent case of <u>Marcel v. Donovan</u>, 201 U.S. Dist. LEXIS 34493 (E.D. NY 2012), Plaintiff sued for violations of Section 3 of the HUD Act.  Specifically, Plaintiff alleged that he was terminated from his HUD funded contract position with the New York City Housing Authority due to his failure to reside in public housing.  Plaintiff sought reinstatement of his position, lost wages and injunctive relief.  The suit was filed against the Secretary of HUD and the chairman of the New York City Housing Authority.  The Court held that Section 3 of the HUD Act does not create a private right of action.  <u>Marcel</u>, 201 U.S. Dist. LEXIS at 14-15.  The Court cited authority from other federal jurisdictions in support of its position.  <u>Id</u>.  It was noted that no persuasive Authority exists that Section 3 of the HUD Act confers "an individual right to sue for hiring preference."  <u>Id</u>.**,** *quoting* <u>City of Ranhos Palos Verdes v Abramson</u>, 544 U.S. 113, 120; 125 S. Ct. 1453; 161 L. Ed. 2d 316 (2005).  The Court also based it's holding on the fact that federal regulations exist that provide for administrative enforcement of the Act, not the conferment of private rights.  <u>Id</u>., *referencing* 24 C.F.R. 135.76 (a) (1).

The United State Supreme Court in <u>City of Ranhos Palos Verdes v Abramson</u>, 544 U.S. 113, 120; 125 S. Ct. 1453; 161 L. Ed. 2d 316 (2005)**,** held that the 47 U.S.C.S. §332 (c)(7) of the Telecommunications Act of 1996 (TCA) 110 Stat. 56 does not confer on private citizens a right to

sue for money damages.  The Court was persuaded that the "comprehensive enforcement scheme"

of the Federal Act contravenes any claim of a private right of action.  Id. at 325.

Since 2006, two (2) federal unpublished federal court opinions have addressed the issue of

the existence of a private remedy under Section 3 of HUD[1].  In each case, the federal courts

concluded that their was no congressional intent to allow individuals to enforce the statutory

provisions and obtain the remedies under Section 3 of HUD.

In the case at bar, Plaintive has asserted that the City is liable to Plaintiff for money

damages based on "24 CFR 135 through 146."  **(Pl.'s Answer to Order to Show Cause, pg. 1-2)**

The citation is to the Code of Federal Regulations.  However, the applicable statute, as referenced

by Plaintiff throughout her Complaint and Answer to Order to Show Cause, is Section 3 of the

HUD Act of 1968, whose authority stems from 12 U.S.C. 1701u.  In a series of disjointed

paragraphs, Plaintiff seems to assert that the City of Detroit should have promoted her to a

position of "General Manager" in the Planning and Development Department.  However, Plaintiff

also argues at times that she has applied for a HUD funded contract position as a compliance

officer. Plaintiff admits that, in order to accept the contract position, she would need to resign

from her Civil Service position with the City of Detroit.  She chose not to resign.  Plaintiff is now

retired from her classified position with the City of Detroit, and receiving all applicable retirement

benefits.

Plaintiff has failed to state a claim that would entitle her to the relief requested.  The

abundance of persuasive and binding law holds that Section 3 of the HUD Act does not confer a

---

[1]See Nails Construction Company, et. al. v The City of St. Paul, 2007 U.S. Dist. LEXIS
8905, (D. Minn. 2007); McQuade v The City of St. Paul, 2007 U.S. Dist. LEXIS 8905 (D. Minn
2007).

K:\DOCS\LABOR\greic\a36000\mot\C_G1494.WPD                 11

private right of action.  The Act creates administrative procedures and guidelines to attempt to direct HUD funded opportunities to low and very low income persons.  The Act contains a detailed means of redress and complaint if the provisions of the Act are not upheld.  Moreover, even if a private right of action existed under Section 3 of the HUD Act, Plaintiff makes no allegation of failure to obtain a HUD funded position based on her income level, or any other improper reason.

In sum, the City of Detroit is entitled to Summary Judgment as to all Plaintiff's claims under Section 3 of the HUD Act of 1968, or as cited by Plaintiff 24 CFR 13 through 146 due to failure to state a claim upon which relief may be granted.

## CONCLUSION

For the forgoing reasons, Defendants respectfully request this Honorable Court enter an Order dismissing all claims against them with prejudice.

Respectfully submitted,

/s/Christine M. Greig
Christine M. Greig
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Coleman A. Young Municipal Center
Detroit, Michigan  48226
(313) 237-5037
greic@law.ci.detroit.mi.us
P-58116

Dated: June 20, 2013

K:\DOCS\LABOR\greic\a36000\mot\C_G1494.WPD                12

<u>**CERTIFICATE OF SERVICE**</u>

STATE OF MICHIGAN          )
                           )ss.
COUNTY OF WAYNE            )

      I hereby certify that on <u>June 20, 2013</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record and I hereby certify that I have served via US First Class Mail to :  Shirley A. Scott, 15654 Spring Garden St., Detroit, MI 48205.

Date:   June 20, 2013

                                                */s/Christine M. Greig*
                                                Christine M. Greig
                                                City of Detroit Law Department
                                                2 Woodward Avenue, Suite 500
                                                Coleman A. Young Municipal Center
                                                Detroit, Michigan  48226
                                                (313) 237-5037
                                                greic@law.ci.detroit.mi.us
                                                P-58116

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SHIRLEY A. SCOTT,

                Plaintiff,                    Case No. 12-cv-14048
                                                      Hon. Sean A. Cox

-vs-

THE CITY OF DETROIT, a municipal corporation,
MAYOR DAVE BING, Individually, MARJA WINTERS,
Individually, and VALERIA MILLER, Individually.

                Defendants.
_____/

| Shirley A. Scott | CITY OF DETROIT LAW DEPARTMENT |
|---|---|
| In Pro Se | By: Christine M. Greig (P58116) |
| 15654 Spring Garden St. | Attorney for Defendants |
| Detroit, MI 48205 | Coleman A. Young Municipal Center |
| (313) 469-3984 | 2 Woodward Avenue, Ste. 500 |
| | Detroit, MI 48226 |
| | (313) 237-5037 |
| | greic@detroitmi.gov |

_____/

## EXHIBIT LIST

EXHIBIT 1 - *Nails Construction Company, Newell Abatement Services, Inc., Lead Investigative Services, Inc., Derrick Woodson, and Frederick Newell, on behalf of themselves and all others similarly situated v. the City of St. Paul*; 2007 U.S. Dist. LEXIS 8905

EXHIBIT 2 - *Robert R. McQuade; Dixie Borchers v. King County Housing Authority and King Authority*; 203 Fed. Appx. 823; 2006 U.S. App. LEXIS 26692

EXHIBIT 3 - *Jerry W. Williams v. Department of Housing and Urban Development*; 263 Fed. Appx. 905; 2008 U.S. App. LEXIS 3136

K:\DOCS\LABOR\greic\a36000\lst\WM9090.WPD



# Exhibit

# 1

K:\DOCS\LABOR\winkm\a32000\form\WM1787.WPD

Switch Client | Preferences | Help | Sign Out

| **Search** | **Get a Document** | ***Shepard's*®** | **More** | | **History** | **Alerts** |
|---|---|---|---|---|---|---|

**FOCUS™** Terms                                      Search Within  Original Results (1 - 99)                View
Advanced...                                                                                                  Tutorial

Source: **Legal > Cases - U.S. > Federal & State Cases, Combined** ⓘ
Terms: **"Nails Construction" "City of Saint Paul"**  (Suggest Terms for My Search | Feedback on Your
        Search)

✦Select for FOCUS™ or Delivery
☐

*2007 U.S. Dist. LEXIS 8905, \**

⚓ View Available Briefs and Other Documents Related to this Case

**Nails Construction** Company, Newell Abatement Services, Inc., Lead Investigative Services,
Inc., Derrick Woodson, and Frederick Newell, on behalf of themselves and all others similarly
situated, Plaintiffs, v. The City of St. Paul, Defendant.

Civ. No. 06-2657 (JNE/SRN)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA

2007 U.S. Dist. LEXIS 8905

February 6, 2007, Decided
February 6, 2007, Filed

**SUBSEQUENT HISTORY:** Related proceeding at United States ex rel. Newell v. City of St.
Paul, 2012 U.S. Dist. LEXIS 100799 (D. Minn., July 20, 2012)

**CORE TERMS:** right of action, housing, abatement, feasible, local laws, low-income,
contractors, very-low, financial assistance, community development, best efforts, training,
housing agencies, summary judgment, individual rights, contracting, favorable, preliminary
injunction, private cause of action, genuine issue, subcontractors, entitlement, enforceable,
reporting, recipients, case law, housing construction, standing to challenge, private rights,
employment opportunities

⩨**Available Briefs and Other Documents Related to this Case:**

U.S. District Court Motion(s)
U.S. District Court Pleading(s)

**COUNSEL: [\*1]** For **Nails Construction** Company, Newell Abatement Services, Inc, Lead
Investigative Services, Inc, Derrick Woodson, on behalf of themselves and all others similarly
situated, Frederick Newell, Plaintiff: Thomas F DeVincke ᴛ, LEAD ATTORNEY, Bonner & Borhart
LLP, Mpls, MN.

For Saint Paul, City of, Defendant: Eric Douglas Larson, LEAD ATTORNEY, St Paul City Attorney,
St Paul, MN.

**JUDGES:** JOAN N. ERICKSEN, United States District Judge.

**OPINION BY:** JOAN N. ERICKSEN ⌄

**OPINION**

ORDER

This is a putative class action brought by **Nails Construction** Company, Newell Abatement
Services, Inc. (Newell Abatement), Lead Investigative Services, Inc. (Lead Investigative),
Derrick Woodson, and Frederick Newell (collectively, Plaintiffs) against the City of St. Paul
(City). Plaintiffs seek declaratory, injunctive, and monetary relief to redress the City's alleged
violations of Section 3 of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1701u
(2000)(amended 2006). The case is before the Court on Plaintiffs' motion for a preliminary
injunction and the City's motion for summary judgment. The City contends that Plaintiffs lack
standing and that no private right of action to enforce section 1701u **[*2]** exists. For the
reasons set forth below, the Court denies Plaintiffs' motion and grants the City's motion.

## I. BACKGROUND

Plaintiffs include three Minnesota corporations owned in part by Newell. **Nails Construction**
provides carpentry services. Newell formed **Nails Construction** in 2004 and owns 50% of its
shares. Newell Abatement was established in 1995 and has been a Minnesota corporation since
1999. It engages in lead and asbestos abatement, demolition services, and lead-risk
assessment. Lead Investigative was formed in 2001, and it engages in hazardous waste
remediation, Brownfield clean-up, and lead-risk assessment. Newell and his two brothers own
both Newell Abatement and Lead Investigative.

The purpose of Section 3 is "to ensure that the employment and other economic opportunities
generated by Federal financial assistance for housing and community development programs
shall, to the greatest extent feasible, be directed toward low- and very low-income persons." 12
U.S.C. § 1701u(b). The City receives assistance covered by Section 3.

Plaintiffs claim to be business concerns or low-income or very low-income persons within the
meaning of Section 3. **[*3]** See id. § 1701u(e). As such, Plaintiffs assert that they are entitled
to enjoy the economic benefits set forth in Section 3. See id. § 1701u(c)-(d). They allege that
the City has failed to comply with Section 3 in numerous ways: (1) failure to award a sufficient
percentage of contracts to Section 3 business concerns; (2) failure to exercise oversight over
contractors hired with Section 3 funds to assure that the contractors provide training,
employment, and contracting opportunities to Section 3 persons and business concerns; (3)
failure to meet Section 3's reporting requirements; (4) failure to "seek out and identify Section
3 [b]usiness [c]oncerns about contracting opportunities"; (5) failure to notify Section 3 persons
about training and employment opportunities; (6) failure to train and employ Section 3
persons; (7) failure to provide preferences to Section 3 persons in training and contracting
opportunities; (8) failure to provide preferences to Section 3 business concerns in contracting
opportunities; and (9) failure to file form HUD-60002.

## II. DISCUSSION

### A. The City's motion

Summary judgment is proper "if the pleadings, depositions, answers **[*4]** to interrogatories,
and admissions on file, together with the affidavits, if any, show that there is no genuine issue
as to any material fact and that the moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district
court of the basis for its motion," and must identify "those portions of [the record] which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## 1. Standing

The Court first **[\*5]** considers whether Plaintiffs lack standing. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."); *Young Am. Corp. v. Affiliated Computer Servs. (ACS), Inc.,* 424 F.3d 840, 843 (8th Cir. 2005)(stating that plaintiff's lack of standing leaves district court without subject matter jurisdiction). To satisfy constitutional requirements of standing, a plaintiff must establish three elements:

> First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th [e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

**[\*6]** *Lujan,* 504 U.S. at 560-61 (citations and footnote omitted); *see Young Am.,* 424 F.3d at 843. "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan,* 504 U.S. at 561. The Court turns to whether Plaintiffs have submitted evidence to demonstrate their standing.

The Court first considers the corporate plaintiffs. **Nails Construction,** Newell Abatement, and Lead Investigative do not identify any opportunities covered by Section 3 that they sought or will seek from the City. [1] Nor is there any evidence that **Nails Construction,** Newell Abatement, and Lead Investigative asked the City to recognize them as Section 3 business concerns. Finally, **Nails Construction,** Newell Abatement, and Lead Investigative do not explain how the City's alleged violations of Section 3's reporting requirements injured them. Viewed in the light most favorable to **Nails Construction,**Newell Abatement, and Lead Investigative, the record reveals that they have not experienced an injury in fact that **[\*7]** is fairly traceable to the City. The Court therefore concludes that they lack standing. *Cf. id.* at 573-74 (stating that plaintiff's assertion of a "generally available grievance about government -- claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large -- does not state an Article III case or controversy"); *Madsen v. Boise State Univ.,* 976 F.2d 1219, 1220 (9th Cir. 1992)(per curiam)("There is a long line of cases . . . that hold that a plaintiff lacks standing to challenge a rule or policy to which he has not submitted himself by actually applying for the desired benefit."); *Albuquerque Indian Rights v. Lujan,* 289 U.S. App. D.C. 164, 930 F.2d 49, 55-57 (D.C. Cir. 1991)(holding organizational plaintiff lacked standing to challenge government's alleged failure to extend Indian hiring preference to positions for which members did not apply).

## FOOTNOTES

1 The Court notes that Newell's affidavits repeatedly attribute conduct by the St. Paul Public
Housing Agency (PHA) to the City. The PHA is not the City, but rather an independent
governmental unit created by the state legislature in 1977. See Act of May 20, 1977, ch.
228, 1977 Minn. Laws 368, 368-69.

[*8]  The same conclusion is warranted with regard to the individual plaintiffs. Neither
Woodson nor Newell identifies any opportunities covered by Section 3 that he sought or will
seek from the City. There is no evidence that Woodson or Newell sought the City's recognition
as a Section 3 person. 2 Finally, there is no evidence that the City's alleged reporting violations
injured Woodson or Newell. Viewed in the light most favorable to Woodson and Newell, the
record reveals that they have not experienced an injury in fact that is fairly traceable to the
City. The Court therefore concludes that they lack standing.

## FOOTNOTES

2 In one of Newell's affidavits, Newell asserts that he attended a meeting in June 2000 that
the City held to identify lead-abatement contractors to work on a program using funds from
the Department of Housing and Urban Development. At that meeting, the City allegedly
responded to Newell's expressed interest in working with the City by declining to add to its
list of contractors. There is no evidence that the June 2000 meeting related to a program
covered by Section 3. See 24 C.F.R. § 135.3 (2006). In addition, there is no evidence that
Newell was a Section 3 person at the time of the June 2000 meeting.

[*9]  *2. Private cause of action*

If Plaintiffs were able to demonstrate standing, the City would be entitled to summary judgment
because no private right to enforce section 1701u exists. Plaintiffs contend that they may
enforce section 1701u under 42 U.S.C. § 1983 (2000) or an implied right of action. Different
inquiries determine whether a statute may be enforced pursuant to section 1983 and whether a
statute implies a private right of action. *Gonzaga Univ. v. Doe,* 536 U.S. 273, 283, 122 S. Ct.
2268, 153 L. Ed. 2d 309 (2002). The inquiries, however, "overlap in one meaningful respect":

> [I]n either case [a court] must first determine whether Congress *intended to create
> a federal right.* Thus, [the Supreme Court has] held that "[t]he question whether
> Congress . . . intended to create a private right of action [is] definitively answered
> in the negative" where a "statute by its terms grants no private rights to any
> identifiable class." For a statute to create such private rights, is text must be
> "phrased on terms of the persons benefited."

*Id.* at 283-84 (citation omitted). "[W]here the text and structure of a statute provide no
indication **[*10]** that Congress intends to create new individual rights, there is no basis for a
private suit, whether under § 1983 or under an implied right of action." *Id.* at 286.

In *Gonzaga,* the Supreme Court offered Title VI of the Civil Rights Act of 1964 and Title IX of
the Education Amendments of 1972 as examples of statutes that create individual rights
"because those statutes are phrased 'with an *unmistakable focus* on the benefited class.'" *Id.* at
284 (quoting *Cannon v. Univ. of Chicago,* 441 U.S. 677, 691, 99 S. Ct. 1946, 60 L. Ed. 2d 560
(1979)). Title VI provides: "*No person* in the United States *shall* . . . be subjected to
discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §
2000d (2000)(emphasis added). Title IX states: "*No person* in the United States *shall,* on the
basis of sex, . . . be subjected to discrimination under any education program or activity
receiving Federal financial assistance. . . ." 20 U.S.C. § 1681(a)(2000)(emphasis added). Where
a statute lacks "this sort of explicit 'right -- or duty-creating language,' [a court] rarely impute

[s] **[*11]** to Congress an intent to create a private right of action." *Gonzaga,* 536 U.S. at 284 n.3; *see Lankford v. Sherman,* 451 F.3d 496, 508-09 (8th Cir. 2006)("[T]he statute must focus on an individual entitlement to the asserted federal right, rather than on the aggregate practices or policies of a regulated entity, like the state."). The Court turns to whether section 1701u creates private rights.

Section 1701u begins with congressional findings. 12 U.S.C. § 1701u(a). Briefly summarized, Congress found that certain federal assistance produces significant employment and other economic opportunities that should be directed to low- and very-low income persons. *Id.* Section 1701u continues with an announcement of congressional policy:

> It is the policy of the Congress and the purpose of this section to ensure that the employment and other economic opportunities generated by Federal financial assistance for housing and community development programs shall, to the greatest extent feasible, be directed toward low- and very-low income persons, particularly those who are recipients of government assistance for housing.

**[*12]** *Id.* § 1701u(b). To carry out that policy, section 1701u repeatedly directs the Secretary of Housing and Urban Development to take certain actions with regard to recipients of certain assistance. In general terms, section 1701u directs the Secretary (1) to require that housing agencies, and their contractors and subcontractors, make their best efforts, consistent with other laws and regulations, to give opportunities generated by certain assistance to low- and very-low income persons, and (2) to ensure that recipients and beneficiaries of certain assistance, to the greatest extent feasible and consistent with other laws and regulations, extend opportunities to low- and very-low income persons. [3]

### FOOTNOTES

[3] Section 1701u(c)(1)(A) states:

> The Secretary shall require that public and Indian housing agencies, and their contractors and subcontractors, make their best efforts, consistent with existing Federal, State, and local laws and regulations, to give to low -- and very low-income persons the training and employment opportunities generated by development assistance . . ., operating assistance . . ., and modernization grants

. . . .

The efforts required under section 1701u(c)(1)(A) must be directed in the order set forth in section 1701u(c)(1)(B).

Section 1701u(c)(2)(A) provides:

> In other programs that provide housing and community development assistance, the Secretary shall ensure that, to the greatest extent feasible, and consistent with existing Federal, State, and local laws and regulations, opportunities for training and employment arising in connection with a housing rehabilitation (including reduction and abatement of lead-based paint hazards), housing construction, or other public construction project are given to low -- and very low-income persons residing within the metropolitan area (or nonmetropolitan county) in which the project is located.

Section 1701u(c)(2)(B) directs that priority should be given "[w]here feasible" to certain low

-- and very-low income persons.

Section 1701u(d)(1)(A) states:

> The Secretary shall require that public and Indian housing agencies, and their contractors and subcontractors, make their best efforts, consistent with existing Federal, State, and local laws and regulations, to award contracts for work to be performed in connection with development assistance . . ., operating assistance . . ., and modernization grants . . ., to business concerns that provide economic opportunities for low -- and very low-income persons.

The efforts required under section 1701u(d)(1)(A) must be directed in the order set forth in section 1701u(d)(1)(B).

Section 1701u(d)(2)(A) states:

> In providing housing and community development assistance pursuant to other programs, the Secretary shall ensure that, to the greatest extent feasible, and consistent with existing Federal, State, and local laws and regulations, contracts awarded for work to be performed in connection with a housing rehabilitation (including reduction and abatement of lead-based paint hazards), housing construction, or other public construction project are given to business concerns that provide economic opportunities for low -- and very low-income persons residing within the metropolitan area (or nonmetropolitan county) in which the assistance is expended.

Section 1701u(d)(2)(B) directs that priority should be given "[w]here feasible" to certain business concerns.

**[*13]** Section 1701u seeks to benefit low -- and very-low income persons, but "it is *rights,* not the broader or vaguer 'benefits' or 'interests,' that may be enforced" pursuant to section 1983 or an implied right of action. *Gonzaga,* 536 U.S. at 283. Section 1701u focuses not on an individual entitlement to the opportunities generated by federal financial assistance for housing and community development programs, but rather on the Secretary of Housing and Urban Development. *See* 12 U.S.C. § 1701u(f)(directing Secretary to consult with other agencies "to carry out" section 1701u). Again, the Secretary is charged with ensuring that "best efforts, consistent with existing Federal, State, and local laws and regulations" are made and that opportunities are extended "to the greatest extent feasible, and consistent with existing Federal, State, and local laws and regulations." Thus, the focus of section 1701u is at least two steps removed from the interests of individual low -- or very-low income persons. Accordingly, Section 1701u does not create individual rights. *See Gonzaga,* 536 U.S. at 287; *Alexander v. Sandoval,* 532 U.S. 275, 289, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001) **[*14]** ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" (quoting *California v. Sierra Club,* 451 U.S. 287, 294, 101 S. Ct. 1775, 68 L. Ed. 2d 101 (1981)). Moreover, the standards set forth in section 1701u -- "best efforts, consistent with existing Federal, State, and local laws and regulations"; "to the greatest extent feasible, and consistent with existing Federal, State, and local laws and regulations"; and "[w]here feasible" -- are too general to confer individual rights. [4] *Cf. Lankford,* 451 F.3d at 509 ("The only guidance Congress provides in the reasonable-standards provision is that the state establish standards 'consistent with [Medicaid] objectives' -- an inadequate guidepost for judicial enforcement.").

**FOOTNOTES**

4 Plaintiffs rely on *Ramirez, Leal & Co. v. City Demonstration Agency,* 549 F.2d 97 (9th Cir.

1976), to support their assertion that section 1701u "creates sufficiently specific and mandatory requirements to support a private cause of action." *Ramirez* remarked that "greatest extent feasible" is "strong language" and that "'greatest extent' means what it says, the maximum." The version of section 1701u interpreted in *Ramirez* did not contain the qualification "consistent with existing Federal, State, and local laws and regulations." 549 F.2d at 99-100.

**[*15]** In short, section 1701u does not contain language that creates rights. Rather than focusing on individual entitlements, its provisions focus on the Secretary and set forth broad standards. Accordingly, the Court concludes that section 1701u does not create rights enforceable under either section 1983 or an implied right of action. [5] *See Gonzaga,* 536 U.S. at 290 ("In sum, if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms -- no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action.").

### FOOTNOTES

[5] Plaintiffs contend that this conclusion should not control because Congress amended Section 3 in 1994 without repudiating cases that had found a private right of action in section 1701u. Plaintiffs' contention is generally entitled to little, if any, weight. *See Alexander,* 532 U.S. at 292. Plaintiffs' argument is further undermined by their acknowledgement that case law interpreting section 1701u is, even now, "sparse." Moreover, the case law that existed when Congress amended Section 3 included conflicting decisions as to the existence of a private right of action to enforce section 1701u. *Compare Milsap v. U.S. Dep't of HUD,* Civ. No. 4-89-635, 1990 WL 157516, at *9 (D. Minn. Oct. 18, 1990)("Case law interpreting the parameters of Section 1701u is extremely sparse. That law indicates, however, that some private cause of action may exist.), *with Concerned Members Comm. of Chatham Park Vill. Corp. v. Bd. of Dirs. of Chatham Park Vill. Coop.,* No. 81 C 2699, 1981 U.S. Dist. LEXIS 13608, at *8 (N.D. Ill. July 13, 1981)("[P]laintiffs have failed to suggest any reason why the court should imply a private cause of action on behalf of these plaintiffs. Under these circumstances, the court holds that § 1701u does not provide a private right of action for these particular plaintiffs.").

### [*16] B. Plaintiffs' motion

Because Plaintiffs lack standing, the Court denies their motion for a preliminary injunction. If Plaintiffs were able to establish standing, the Court would deny their motion because they may not enforce section 1701u under either section 1983 or an implied right of action. *See Newton County Wildlife Ass'n v. United States Forest Serv.,* 113 F.3d 110, 113 (8th Cir. 1997)("If a plaintiff's legal theory has no likelihood of success on the merits, preliminary injunctive relief must be denied.").

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

    1. Plaintiffs' motion for a preliminary injunction [Docket No. 7] is DENIED.

    2. The City's motion for summary judgment [Docket No. 9] is GRANTED.

    3. This case is DISMISSED for lack of subject matter jurisdiction.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: February 6, 2007

s/ JOAN N. ERICKSEN

United States District Judge

Source: **Legal > Cases - U.S. > Federal & State Cases, Combined**
Terms: **"Nails Construction" "City of Saint Paul"** (Suggest Terms for My Search | Feedback on Your Search)
View: Full
Date/Time: Friday, June 14, 2013 - 11:11 AM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.

In          About LexisNexis  | Privacy Policy   | Terms & Conditions   | Contact Us
Copyright © 2013 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.



# Exhibit
# 2

K:\DOCS\LABOR\winkm\a32000\form\WM1787.WPD

Switch Client | Preferences | Help | Sign Out

| Search | Get a Document | *Shepard's®* | More | | History | Alerts |
|---|---|---|---|---|---|---|

**FOCUS™ Terms**                        Search Within  Original Results (1 - 97)        View
Advanced...                                                                             Tutorial
   Source: **Legal > Cases - U.S. > Federal & State Cases, Combined** ⓘ
   Terms: **"McQuade" "King County"**  (Suggest Terms for My Search)

   ➔Select for FOCUS™ or Delivery
   ☐

*203 Fed. Appx. 823, *; 2006 U.S. App. LEXIS 26692, ***

ROBERT R. **MCQUADE;** DIXIE BORCHERS, Plaintiffs-Appellants, v. **KING COUNTY** HOUSING
AUTHORITY, a municipal corporation; **KING COUNTY,** Defendants-Appellees.

No. 05-35037

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

203 Fed. Appx. 823; 2006 U.S. App. LEXIS 26692

September 13, 2006, Argued and Submitted, Seattle, Washington
October 25, 2006, Filed

**NOTICE: [**1]** RULES OF THE NINTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO
UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF
APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** As Amended November 15, 2006.

**PRIOR HISTORY:** Appeal from the United States District Court for the Western District of
Washington. D.C. No. CV-04-00607-TSZ. Thomas S. Zilly, District Judge, Presiding.

**DISPOSITION:** AFFIRMED.

 **CORE TERMS:** housing authority, housing, causes of action, low-income, seat

**COUNSEL:** For ROBERT R. **MCQUADE,** Plaintiff-Appellant: Robert R. **McQuade,** Renton, WA.

For DIXIE BORCHERS, Plaintiff-Appellant: Dixie Borchers, Renton, WA.

For **KING COUNTY** HOUSING AUTHORITY, a municipal corporation, Defendant-
Appellee: John Thomas Kugler, Esq. ✉, BURGESS FITZER, PS, Tacoma, WA.

For **KING COUNTY,** Defendant-Appellee: Margaret A. Pahl, Esq., **KING COUNTY**
COURTHOUSE, Seattle, WA.

**JUDGES:** Before: SCHROEDER, Chief Judge, KLEINFELD and BEA, Circuit Judges.

 **OPINION**

**[*823]** MEMORANDUM *

**FOOTNOTES**

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3.

Robert **McQuade** and Dixie Borchers appeal the **[**2]** district court's summary judgment in favor of **King County** Housing Authority and **King County,** Washington. **McQuade** and Borchers filed this action pro se seeking damages for being refused the single seat that is set aside for a resident of low-income housing on the **[*824]** Board of **King County** Housing Authority. They rely on Section 3 of the Housing and Urban Development Act, codified at 12 U.S.C. § 1701u. The Act recites Congress's finding that "employment and other economic opportunities generated by projects and activities that receive Federal housing and community development assistance offer an effective means of empowering low- and very low-income persons, particularly . . . recipients of government assistance for housing." 12 U.S.C. § 1701u (a)(3). While plaintiffs do not contend that this statute directly required the Housing Authority to appoint one of them to the seat, they do contend that the refusal to do so was discrimination in violation of a HUD regulation promulgated pursuant to Section 3. See 24 C.F.R. § 135.76(i).

**[**3]** Federal causes of action must be expressly provided for by Congress. See Alexander v. Sandoval, 532 U.S. 275, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001). The district court correctly granted judgment for the defendants. However, no private cause of action exists under Section 3 because positions on the board of a public housing authority are not 'training and employment opportunities generated by development assistance.' 12 U.S.C. § 1701u(c)(1)(A).

The district court also properly denied the motions for new trial under Rules 59 and 60 as these motions were not based upon any newly discovered evidence in existence at the time of the district court's original ruling. See Fed. R. Civ. P. 59, 60(b)(2).

Appellants present no reasoned argument for reversing the district court's dismissal of the state law claims.

AFFIRMED.

Source: **Legal > Cases - U.S. > Federal & State Cases, Combined** i
Terms: **"McQuade" "King County"** (Suggest Terms for My Search)
View: Full
Date/Time: Friday, June 14, 2013 - 11:06 AM EDT

In                          About LexisNexis  | Privacy Policy  | Terms & Conditions  | Contact Us
Copyright © 2013 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.



# Exhibit 3

K:\DOCS\LABOR\winkm\a32000\form\WM1787.WPD

Switch Client | Preferences | Help | Sign Out

| **Search** | **Get a Document** | *Shepard's®* | **More** | | **History** | **Alerts** |
| --- | --- | --- | --- | --- | --- | --- |

**FOCUS™ Terms** [                    ]  Search Within  Original Results (1 - 97)   [  ]  View Tutorial
Advanced...

Source: **Legal > Cases - U.S. > Federal & State Cases, Combined** ⓘ
Terms: **Williams "HUD" 2006**  (Suggest Terms for My Search)

☙Select for FOCUS™ or Delivery
☐

*263 Fed. Appx. 905, \*; 2008 U.S. App. LEXIS 3136, \*\**

⬇ View Available Briefs and Other Documents Related to this Case

JERRY W. **WILLIAMS,** Petitioner, v. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Respondent.

2007-3270

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

263 Fed. Appx. 905; 2008 U.S. App. LEXIS 3136

February 13, 2008, Decided

**NOTICE:** THIS DECISION WAS ISSUED AS UNPUBLISHED OR NONPRECENDENTIAL AND MAY NOT BE CITED AS PRECEDENT. PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**SUBSEQUENT HISTORY:** Rehearing denied by **Williams** v. **HUD,** 2008 U.S. App. LEXIS 8517 (Fed. Cir., Mar. 17, 2008)

**PRIOR HISTORY: [\*\*1]**
Appealed from: Merit Systems Protection Board. Petition for review of the Merit Systems Protection Board in DA0752010446-C-2.
**Williams** v. **HUD,** 106 M.S.P.R. 141, 2007 MSPB LEXIS 7922 (2007)

**DISPOSITION:** Affirmed.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Petitioner employee challenged a decision from the Merit Systems Protection Board, which denied his second request for enforcement of the Board's order directing his employing agency to terminate an indefinite suspension and to reinstate him. The employee also sought review of the denials of his applications for attorney fees and costs and consequential and compensatory damages.

**OVERVIEW:** Following an indictment, the agency indefinitely suspended the employee without pay. Almost ten months after conviction, the agency removed the employee from service. In the employee's first petition for enforcement, the Board found that the employee had advised an administrative judge that the agency had complied with Board's order directing the termination of the indefinite suspension. In the second petition for enforcement,

the court concluded that the Board's order directing termination of the indefinite suspension
occurred because the suspension continued too long after the agency knew of the
employee's conviction. That order did not prohibit the agency from taking the removal
action. The Board did not commit reversible error in denying the employee's second petition
for enforcement because he failed to allege that the agency took or failed to take any action
that resulted in non-compliance with its original order. As to the denial of the requests for
fees, costs, and damages, those decisions were already reviewed and the denial was res
judicata. As to the Board's denial of the second enforcement petition, the employee was not
a prevailing party under 5 U.S.C.S. § 7701(g).

**OUTCOME:** The court affirmed the Board's decision.

**CORE TERMS:** removal, suspension, attorney fees, non-compliance, indefinite,
compensatory damages, consequential, indictment, untimely, complied, judicial review,
prevailing, removing, notice, status conference, noncompliance, terminate

### LEXISNEXIS® HEADNOTES                                          ◁ **Hide**

Administrative Law > Judicial Review > Standards of Review > General Overview 🔍

Governments > Federal Government > Employees & Officials 🔍

*HN1* A decision of the Merit Systems Protection Board must be affirmed unless it is (1)
arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with
law; (2) obtained without procedures required by law, rule, or regulation having
been followed; or (3) unsupported by substantial evidence. 5 U.S.C.S. § 7703
(c). More Like This Headnote

Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards 🔍

Governments > Federal Government > Employees & Officials 🔍

*HN2* 5 U.S.C.S. § 7701(g) provides for payment of reasonable attorney fees to a
prevailing employee when warranted in the interest of justice. More Like This Headnote

### ⩨Available Briefs and Other Documents Related to this Case:

U.S. Circuit Court Brief(s)

**COUNSEL:** Jerry W. **Williams,** of Missouri City, Texas, Pro se.

Michael N. O'Connell, Trial Attorney, Commercial Litigation Branch, Civil Division, United States
Department of Justice, of Washington, DC, for respondent. With him on the brief were
Jeanne E. Davidson ▾, Director, and Mark A. Melnick ▾, Assistant Director.

**JUDGES:** Before NEWMAN ▾, SCHALL ▾, and MOORE, Circuit Judges.

### OPINION

**[\*906]** PER CURIAM.

Petitioner Jerry Wernard **Williams,** *pro se*, appeals the decision of the Merit Systems Protection

Board, which denied his second petition for enforcement of the Board's order of June 26, 2002. **Williams** v. Dep't of Housing & Urban Dev., 106 M.S.P.R. 141 (M.S.P.B. 2007). Mr. **Williams** also challenges earlier rulings with respect to his applications for attorney fees and costs and for consequential and compensatory damages. We affirm the Board's decision.

BACKGROUND

Mr. **Williams** was employed by the United States Department of Housing and Urban Development ("**HUD**") as a Community Planning and Development Specialist, in Beaumont, Texas. On April 20, 2000 a federal grand jury indicted him on **[\*\*2]** fourteen counts of making false travel voucher claims in violation of 18 U.S.C. §1001. Following the indictment, **HUD** indefinitely suspended Mr. **Williams** without pay, effective May 17, 2000, and on January 8, 2001 a jury convicted him on all counts of the indictment. **HUD** then removed him from service, effective October 12, 2001.

Mr. **Williams** has brought a series of petitions related to these events, with varying success. First, he challenged the indefinite suspension following his indictment. The Board found that **HUD** did not terminate the suspension within a reasonable time after his conviction, and by order dated June 26, 2002 the Board directed **HUD** to terminate the indefinite suspension retrospectively as of January 28, 2001, and to reinstate Mr. **Williams** as of that date with back pay, interest, and appropriate benefits. Mr. **Williams** did not appeal that order. On November 6, 2003, he filed a petition for enforcement, stating that **HUD** had not complied with the June 26, 2002 order. The Board found that Mr. **Williams** had advised the administrative judge in a January 12, 2004 telephone conference that the agency had complied with the order, and that the petition was therefore moot; this **[\*\*3]** decision became final on February 20, 2004 and was not appealed.

On April 19, 2004 Mr. **Williams** filed a motion at the Board for litigation costs and expenses and for consequential and compensatory damages relating to the Board's review of his indefinite suspension. The Board treated the motion as one for attorney fees pursuant to 5 U.S.C.§ 7701(g), and denied the motion; this court dismissed Mr. **Williams'** petition on appeal as untimely filed. **Williams** v. Merit Systems Protection Bd., 117 Fed. Appx. 734 (Fed. Cir. 2004). A separate Board decision denied the motion for consequential and compensatory damages, and this court similarly dismissed a petition on appeal as untimely filed. **Williams** v. Merit Systems Protection Bd., 117 Fed. Appx. 109 (Fed. Cir. 2004).

Meanwhile, on January 21, 2004 Mr. **Williams** had filed an appeal with the **[\*907]** Board, challenging **HUD's** action of removing him from employment as of October 12, 2001, after his conviction. The Board dismissed that appeal as untimely, but this court reversed and remanded, finding that the notice that **HUD** had provided Mr. **Williams** was "materially flawed" because it did not properly inform him of his appeal rights. **Williams** v. Merit Systems Protection Bd., 176 Fed. Appx. 136, 137, 140 (Fed. Cir. **2006**). **[\*\*4]** On remand, the Board affirmed **HUD's** removal of Mr. **Williams.** On August 23, 2007, Mr. **Williams** filed a complaint seeking judicial review of that decision in the District Court for the Southern District of Texas, **Williams** v. Jackson, Case No. 4:07-cv-02764, which remains pending. These issues are not before us.

On August 11, **2006,** Mr. **Williams** filed a second petition for enforcement with the Board, directed to the Board's June 26, 2002 order. The administrative judge issued an order to show cause advising Mr. **Williams** that the second petition would be dismissed unless he identified an act of noncompliance that occurred after his January 12, 2004 statement that **HUD** was then in compliance with the June 26, 2002 order. Mr. **Williams** responded that **HUD** had complied through his October 12, 2001 removal date, but that the Federal Circuit's remand of the Board's decision on the removal action called into question whether his removal constituted further non-compliance. On September 22, **2006,** following a telephonic status conference held on that date, the administrative judge issued a Summary of Status Conference and Notice of Dismissal stating that during the conference, she informed Mr. **Williams** **[\*\*5]** that she intended to dismiss the petition because he had failed to identify any act of noncompliance that occurred

after January 12, 2004. Mr. **Williams** filed a written objection on September 27, **2006,** after which the administrative judge denied the petition, and the full Board denied review. Mr. **Williams** appeals from this decision.

DISCUSSION

*HN1*A decision of the Board must be affirmed unless it is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c); Cheeseman v. Office of Pers. Mgmt., 791 F.2d 138, 140 (Fed. Cir. 1986).

The only issue before us is the denial of the second petition for enforcement. Mr. **Williams** argues that **HUD** violated the June 26, 2002 order by removing him from his position rather than reinstating him, resulting in a "continuing non-compliance." He points out that the removal action is still under judicial review, and he states that he should have been reinstated after the June 26, 2002 order, pending final decision on his removal.

The June 26, 2002 order related to his indefinite **[\*\*6]** suspension, and the Board granted relief because the suspension continued too long after **HUD** knew of his conviction. The June 26, 2002 order did not prohibit **HUD** from taking the removal action. Mr. **Williams** appealed his removal to the Board, and after a remand the Board affirmed **HUD's** action. This Board decision was appealed to the Southern District of Texas; it is not properly brought to us as an act of non-compliance with the June 26, 2002 order.

On January 12, 2004, Mr. **Williams** told the administrative judge that **HUD** was in compliance. Thus the AJ did not err in limiting the inquiry to any asserted non-compliance after January 12, 2004. Reversible error has not been shown in the Board's decision denying Mr. **Williams'** second petition for enforcement, on the **[\*908]** Board's finding that Mr. **Williams** had "failed to allege that the agency took, or failed to take, any action on or after January 12, 2004 which resulted in non-compliance with the Board's Order dated June 26, 2002."

Mr. **Williams** also states that the Board erred in denying his request for fees, costs and legal expenses, and for damages. To the extent that he may be referring to the earlier decisions denying his motions for attorney **[\*\*7]** fees and for damages, these decisions have already been reviewed, see **Williams**, 117 Fed. Appx. 109; **Williams**, 117 Fed. Appx. 734, and their denial is *res judicata*. As to the Board's May 4, 2007 decision, which concerned Mr. **Williams's** second petition for enforcement, he was not a prevailing party and thus does not meet a threshold requirement for attorney fees. See *HN2*5 U.S.C.§ 7701(g) (providing for payment of reasonable attorney fees to a prevailing employee when warranted in the interest of justice).

No costs.

   Source: **Legal > Cases - U.S. > Federal & State Cases, Combined** ⓘ
   Terms: **Williams "HUD" 2006**  (Suggest Terms for My Search)
   View: Full
Date/Time: Friday, June 14, 2013 - 11:09 AM EDT

* Signal Legend:
 ● -  Warning: Negative treatment is indicated
 ▣ -  Questioned: Validity questioned by citing refs
 ⚠ -  Caution: Possible negative treatment
 ◆ -  Positive treatment is indicated
 Ⓐ -  Citing Refs. With Analysis Available
 ⓘ -  Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

In

About LexisNexis  | Privacy Policy  | Terms & Conditions  | Contact Us
Copyright © 2013 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.