# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                          Case No. 13-53846

CITY OF DETROIT, MICHIGAN                        In Proceedings Under
                                                 Chapter 9
                    Debtor.

                                                 Hon. Steven W. Rhodes

_____/

### OBJECTION OF AMBAC ASSURANCE CORPORATION TO MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO RULE 9019, AND (III) GRANTING RELATED RELIEF

Ambac Assurance Corporation ("Ambac"), a creditor and/or party in interest in the above-captioned case, hereby files this objection (the "Objection") to the Motion of Debtor (the "City") for entry of an Order (I) authorizing the assumption of that certain forbearance and optional termination agreement pursuant to Section 365(a) of the Bankruptcy Code, (II) approving such agreement pursuant to Rule 9019, and (III) granting related relief [ECF No. 17] (the "Motion").[1]  In support of the Objection, Ambac respectfully submits as follows:

_____

[1] Ambac is a creditor and/or interested party because it is the bond insurer of certain general obligation bonds issued by the City.  As the bond insurer, Ambac is responsible to Ambac-insured bondholders for the scheduled principal and interest

1

# **Background**[2]

1. On July 18, 2013, the City filed its petition commencing this case under chapter 9 of the Bankruptcy Code.

2. On the same date, the City filed the Motion, which seeks court approval and authorization of the Forbearance Agreement pursuant to Section 365(a) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure. The Forbearance Agreement purports to settle disputed claims between the City and certain allegedly secured creditors, the Swap Counterparties.

3. Ambac objects to the Motion on the grounds that the Forbearance Agreement is not a product of reasonable business judgment and is not fair and equitable.

4. The Motion is scheduled for a status conference on August 21, 2013, following the City's disclosure of its proposed witnesses and exhibits by August 16, 2013. An evidentiary hearing on the Motion is scheduled for September 9,

---

payments when due as required by its policy to the extent the City does not make those payments under the insured bonds. Under relevant provisions of the applicable bond documents, insurance policy, and applicable law, to the extent Ambac makes payments under its policy, it is subrogated to the rights of bondholders and effectively steps into the shoes of such bondholders.

[2] Capitalized terms in this Objection that are not defined have the definitions ascribed to them in the Motion.

2013.

## **Introduction**

5.      The proposed settlement of the obligations to the Swap Counterparties meets none of the requirements of § 365(a) or Rule 9019. The validity and enforceability of the City's obligations relating to the swaps (the "Swap Obligations") and the Swap Counterparties' purported liens are highly dubious, and the City has provided the Court with no basis whatsoever on which to assess the potential risks and rewards of litigation. An objective evaluation of the necessary factors simply cannot support a compromise so heavily weighted in the Swap Counterparties' favor. Because the City has meritorious arguments that would result in voiding its Swap Obligations in their entirety and/or establishing that the Swap Counterparties are unsecured, settlement on the terms embodied in the Forbearance Agreement is not to the City's economic advantage, and cannot be deemed a product of reasonable business judgment. It also cannot be deemed to be fair and equitable vis-à-vis the City's other creditors, because the City is overpaying one set of creditors at the expense of other similarly-situated creditors.

6.      First, there is a compelling argument that the Swap Obligations are void *ab initio*. While the Swap Contracts are structured so that it appears the Swap Obligations are obligations of the Service Corporations, they are quite clearly the City's. The City recognizes this in its Motion, as it discusses *"the City's"*

3

obligations and corresponding exposure. Michigan law preemptively regulates the City's authority to enter into financing transactions, however, and expressly dictates when and how municipalities may engage in swap transactions. Here, the City did not meet the requirements of the state statutory and regulatory scheme – a fact it cannot deny. Because there is no authority for the City to engage in a swap transaction outside the parameters imposed by the State, the City's Swap Contracts are invalid, and its Swap Obligations are void.

7. Second, while the Swap Counterparties maintain that the City's Swap Obligations are secured by Casino Revenue, this is not the case. To the contrary, the Casino Revenue was pledged in support of the Swap Obligations in violation of state law. Michigan's Gaming Act prescribes the permitted uses of Casino Revenue and does not permit it to be used to collateralize a financial obligation as the City has attempted to do here. The Swap Counterparties' lien is thus invalid.

8. Third, to the extent the Swap Counterparties had any valid lien pre-petition, that lien is cut off with respect to Casino Revenue acquired by the City post-petition. While the City's Motion asserts that the lien on Casino Revenue satisfies the "Special Revenues" exception of the Bankruptcy Code, this is incorrect. The legislative history of the relevant Code sections makes clear that the "Special Revenues" exception was designed to apply only in the context of special revenue bond financing – which is not the circumstance here.

4

9.     Finally, the proposed settlement, at this juncture in the case, is both premature and possibly unnecessary.  In view of the significant issues that exist with regard to the validity of the swaps and the lien of the Swap Counterparties, the City cannot demonstrate that the settlement will satisfy the Bankruptcy Code's priority scheme.  Indeed, the settlement will likely provide treatment to the Swap Counterparties that is not consistent with the treatment that will be provided to similarly-situated creditors under the City's plan of adjustment.  The City also has no current need to enter into this settlement; it could meet its liquidity needs through means other than the excess Casino Revenue it fears will be trapped by the Swap Counterparties.  As there has been no evidence put forward that other funding means are unavailable, the settlement cannot be justified at this time.

## Standard of Review

10.     The City has filed this Motion under § 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019.  As the City recognizes (Motion ¶ 36), it must meet the standards under both § 365(a) and Rule 9019 to achieve this Court's approval.

11.     To obtain approval for assumption of the Forbearance Agreement as an executory contract under 11 U.S.C. § 365(a), the City bears the burden of demonstrating that the Forbearance Agreement benefits the debtor and that its assumption is an exercise of reasonable business judgment.  *See*, *e.g.*, *In re Greektown Holdings, L.L.C.*, No. 08-53104, 2009 WL 1653461, *1 (Bankr. E.D.

5

Mich. May 13, 2009); *In re Rachels Indus., Inc.,* 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990). Under this standard, the Court must determine whether the proposed assumption would serve the reorganization or whether it would take away funds that would otherwise be available to creditors. *In re Evans Coal Corp.*, 485 B.R. 162, 167 (Bankr. E.D. Tenn. 2013) (citing *In re UAL Corp.,* 635 F.3d 312, 319 (7th Cir. 2011)). The Forbearance Agreement must therefore be demonstrably to the City's "economic advantage." *Evans,* 485 B.R. at 167 (citations omitted).

12.     To obtain authorization under Rule 9019, the City must establish that the Forbearance Agreement represents a fair and equitable settlement. *See*, *e.g.*, *In re MQVP, Inc.*, 477 Fed. App'x. 310, 313 (6th Cir. 2012); *In re Lavan*, 438 Fed. App'x 420, 426 (6th Cir. 2011). Of primary importance under Rule 9019, because the Motion seeks to compromise a disputed claim, the Court must objectively evaluate the "probabilities of ultimate success should the claim be litigated." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424-25 (1968). The Sixth Circuit has distilled four factors from the Supreme Court's guidance in *TMT* that bankruptcy courts should consider in this evaluation: (1) the probability of success in the litigation; (2) the difficulties, if any, to be encountered in the matter of collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of the creditors and a proper deference

6

to their reasonable views. *MQVP*, 477 Fed. App'x at 312-313 (citing *In re Bard*, 49 Fed. App'x. 528, 530 (6th Cir. 2002)).

13. When examining a proposed settlement under Rule 9019, the Court cannot accept without question a debtor's conclusions as to reasonableness and fairness – it must perform an independent analysis of the facts and circumstances. *See, e.g., Bard*, 49 Fed. App'x at 530*; Reynolds v. Comm'r. ,* 861 F.2d 469, 473 (6th Cir. 1988). An order authorizing a settlement under 9019 must contain "well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors." *TMT,* 390 U.S. at 434. "The need for this safeguard is obvious. Any settlement between the debtor and one of his individual creditors necessarily affects the rights of other creditors by reducing the assets of the estate available to satisfy other creditors' claims." *Reynolds,* 861 F.2d at 473.

## Argument

14. The City has strong arguments that the Swap Obligations are unauthorized and void and that the Swap Counterparties do not have valid liens. Prevailing on these arguments would relieve the City of the responsibility to make the hefty periodic swap payments and a significant termination payment, *and* release the City from the potential "cash trap" threatened by the Swap Counterparties that would tie up the Casino Revenue needed by the City. The proposed Forbearance Agreement, which converts what were at best shaky grounds

7

for secured creditor status into a 75% (or more) cash recovery, is entirely

unreasonable.

## I.    The Swap Obligations Are Unauthorized Under State Law and Therefore Void

15.    The strongest argument against the Swap Obligations is that the Swap

Contracts are wholly unauthorized and impermissible under Michigan law and,

thus, void *ab initio.*

16.    Municipalities are created and governed by state law.  Michigan, like

many other States, regulates the financial transactions that may be entered into by

its municipalities, including specifically swap transactions.  The Michigan Revised

Municipal Finance Act ("Act 34"), Mich. Comp. Laws Ann. § 141.2101 *et seq.,*

dictates the conditions under which municipalities are permitted to engage in swap

transactions.  *See* § 141.2317.  Moreover, the State, through its broad and detailed

regulatory scheme under Act 34, has manifested its intent to "occupy the field"

such that any attempt by a municipality to engage in a swap transaction outside the

parameters of Act 34 is not permitted.  Here, the City side-stepped Michigan law,

and entered into swap transactions that did not meet the conditions of Act 34.  The

Swap Contracts are thus unauthorized, and the Swap Obligations void.

8

## A.    The Swap Obligations Are the City's Obligations

17.    The Swap Contracts and the enabling ordinances create an illusion that the Swap Obligations are owed by the Service Corporations, and not the City. *See* Ex. 1, Detroit City Code § 18-5-129(a).  Therefore, the City will argue that the Swap Contracts were permissible under state law because Act 34 regulates only municipalities, not the Service Corporations.

18.    This argument transparently elevates form over substance, which no court should countenance.  Michigan law is clear that when financial transactions are to be analyzed, courts must look to the substance of the transaction, not mere labels or form.  *See, e.g.*, *Alan v. Wayne Cnty.*, 200 N.W.2d 628, 667 & 677 (Mich. 1972) (bonds issued purportedly as revenue bonds excluded from the definition of debt, were invalid because in substance they constituted debt); *People v. Doyle & Assocs., Inc.*, 132 N.W.2d 99, 102 (Mich. 1965) (transaction formulated as lease was in substance a sale, and thus court treated purported rental payments as purchase payments).  In fact, courts uniformly analyze the facts and circumstances of a transaction in lieu of taking ascribed labels at face value in various financial contexts.  *See, e.g.*, *Commercial Money Ctr. v. Illinois Union Ins. Co.*, 508 F.3d 327, 338-42 (6th Cir. 2007) (purported insurance contracts, analyzed as a whole, established a surety relationship); *S.E.C. v. Zada*, No. 10-CV-14498, 2013 WL 3945993, at *3 (E.D. Mich. July 31, 2013) (when "consider[ing] the substance of

9

the transactions and not the terminology used to classify [it]," Ponzi scheme fell

within the definition of securities under the Securities and Exchange Act and was

not a mere loan).

19.     Here, the Swap Obligations are formulated to look as though they are

owed by independent Service Corporations that operate free from municipal

regulation.  But in truth, the Service Corporations are mere creations of the City,

hardly independent or private entities.  In fact, the Service Corporations' respective

articles of incorporation state expressly that each of them constitutes "an integral

part of the City."  *See* Ex. 2, GRS Articles of Incorporation, Art. II, Sec. 2; Ex. 3,

PFRS Articles of Incorporation, Art. II, Sec. 2.[3]  The clear intent of the transaction

is, moreover, to obligate *the City*.  The City agreed to be responsible for all of the

Service Corporations' payment obligations under the swaps pursuant to the Service

Contracts, *see* Ex. 4, GRS Service Contract 2006, §§ 8(a), (c), General Terms §§

4.02(a), (b), 7.06; Ex. 5, PFRS Service Contract 2006, §§ 8(a), (c), General Terms

§§ 4.02(a), (b), 7.06.  The Service Contracts also specify that the City's payment of

the Swap Obligations may be compelled if unpaid when due.  For example, Section

_____

[3] Significantly, the City controls the Service Corporations; their Boards of
Directors are composed of three officials of the City plus two members of the
Detroit City Council.  *See* Ex. 6, Offering Circular at 20-21.

8 of each Service Contract provides that the City is a "direct" beneficiary of the swaps and "*the City* will be *obligated to make*" the swap payments.  *See* <u>Ex. 4</u>, GRS Service Contract 2006, §§ 8(a), (c) (emphasis added); <u>Ex. 5</u>, PFRS Service Contract 2006, §§ 8(a), (c) (emphasis added).  The Offering Circular issued with the 2006 COPs confirms the enforceability of the obligations against the City – noting that the City's obligations under the Service Contracts, including the Swap Obligations, "are unsecured contractual obligations of the City" that may be reduced to a money judgment against the City and enforced pursuant to the Revised Judicature Act of 1961 by compelling the City to levy taxes.  <u>Ex. 6</u>, Offering Circular at 9-10.  And the City's financial statements not only reflect the Swap Obligations as the City's obligations, they even state that the City "entered into" each of the Swap Contracts."  *See* <u>Ex. 7</u>, City of Detroit 2012 Comprehensive Annual Fiscal Report at 118.

20.    The City itself concedes that it is obligated under the Swap Contracts and that the Swap Obligations are enforceable against it.  *See* Motion ¶¶ 45-46 (alleging that the Forbearance Agreement would reduce *the City's* Swap Obligations by 18%-25%), ¶ 41 ("The Forbearance Agreement allows *the City* to . . . avoid[] potentially protracted litigation involving the swap transactions" (emphasis added)), ¶ 43 (Swap Obligations are "amounts *the City* would no longer be required to pay" if the transaction is terminated as contemplated by the Motion

11

(emphasis added)).  As the City admits, "[u]nder [the Collateral Agreement] *the City* pledged a specific revenue stream . . . as collateral to secure *the City's obligations* under the swap agreements."  *Id.* ¶ 16 (emphasis added); *see also* Ex. 8, Detroit City Code § 18-16-4(b) ("a termination of the swaps 'could have resulted in the imposition of an immediate obligation *on the city* to make a combined payment to the service corporations'" (emphasis added)).

21.    Indeed, if the Swap Obligations were unenforceable against the City, there would be no need for the Forbearance Agreement or the Motion.  The Service Corporations are a mere subterfuge, which allowed the City, wittingly or unwittingly, to evade state regulation.

**B.    Municipal Swap Obligations Are Regulated by the State Under Act 34, Which Does Not Permit the City's Swap Contracts**

22.    While it is clear that the Swap Obligations are obligations of the City, it is equally clear that the City was not authorized to incur them.

23.    Act 34 governs municipal borrowing and dictates when and how municipalities may engage in swap transactions.  *See* Mich. Comp. Laws Ann. § 141.2317.  This is the only state statute that authorizes municipalities to enter into swaps.  Pursuant to § 317 of Act 34, if the swap transaction is entered into "in connection with a refunding of a debt not originally approved by the voters of the municipality," as is the case here, it can be entered into only in the event the

12

obligation to make swaps payments is a limited tax full faith and credit pledge of the municipality, *id.* § 141.2317(4)(a), or if the swap was entered into in connection with a municipal security and was secured by the same money or revenue source that secured the municipal security, *id.* § 141.2317(4)(b). Because the City did not meet either requirement, it was not authorized to undertake the Swap Obligations under Act 34.

24. The City's own ordinances are unambiguous that the swap payments are not payable pursuant to a limited tax full faith and credit pledge. *See, e.g.,* Ex. 8, Detroit City Code §§ 18-16-12 ("The city hedge payables related obligations . . . are not general obligations of the city to which the city has pledged its full faith and credit."); 18-16-9 ("Nothing in this ordinance … shall create a full faith and credit, general obligation of the city."). The Service Contracts also expressly disclaim a full faith and credit pledge. *See* Ex. 4, GRS Service Contract 2006, General Terms § 4.02 (b); Ex. 5, PFRS Service Contract 2006, General Terms § 4.02 (b).

25. The swaps were also not entered into "in connection with" a "municipal security" pursuant to § 317(4)(b). Act 34 defines a municipal security as follows:

> "Municipal security" means a *security* that when issued was not exempt from this act or former 1943 PA 202 . . . *and that is payable from or secured by any of the following*:

13

(*i*)     Ad valorem real and personal property taxes.
(*ii*)    Special assessments.
(*iii*)   The limited or unlimited full faith and credit pledge of the municipality.
(*iv*)   Other sources of revenue described in this act for debt or securities authorized by this act.[4]

Mich. Comp. Laws Ann. § 141.2103(l) (emphasis added). A security, in turn, is

defined as:

> an evidence of debt such as a bond, note, contract, obligation, refunding obligation, certificate of indebtedness, or other similar instrument issued by a municipality, *which pledges payment of the debt by the municipality from an identified source of revenue*.

Mich. Comp. Laws Ann. § 141.2103(r) (emphasis added). The documents in

connection with which the swaps were entered into – the Service Contracts and the

COPs – do not constitute "municipal securities" under the foregoing definitions.

The COPs are not "securities" at all, let alone "municipal securities," as they were

not "issued by" the City. *Id.* § 141.2103(r). The Service Contracts, although

municipal obligations in nature, are not "securities" because they do not "pledge[]

payment . . . from an identified source of revenue." *Id.* The Service Contracts are

---

[4] Act 34 is very specific about "other sources of revenue" that are permitted pursuant to this subsection. *See, e.g., id.* §§ 401(2) (authorizing the issuance of short-term securities secured by revenues to be received within 1 year of the issuance of the security), 407 (same), 415 (authorizing the issuance of short-term securities secured by federal or state grants), 601(6)(f) (authorizing the issuance of refunding securities secured by the revenues pledged for the outstanding securities being refunded).

also not "municipal securities" because they are not payable from or secured by any of the revenue sources identified in the definition of "municipal securities." *Id.* § 141.2103(l).[5]

26.     Finally, even if the Service Contracts were municipal securities, which they are not, the City's pledge of the Casino Revenue to secure the Swap Obligations under the circumstances here would independently violate § 317(4)(b). Because the Casino Revenue did not also secure the COPs-related payment obligations under the Service Contracts, the pledge solely with respect to the swap payments does not meet the security requirement of § 317(4)(b).  *See id.* § 141.2317(4)(b) (swap payments "shall be payable from any available money or revenue sources . . . *securing the municipal security* in connection with which the [swap] is entered into.").

### C.     Because Act 34 Preempts the Field, Municipal Swap Transactions Outside of Act 34 Are Not Permissible

27.     Having failed to undertake the Swap Obligations consistent with Act 34, the City was left with no authority to enter into the Swap Contracts at all.  This is because the Michigan legislature put in place an extensive and multifaceted

_____

[5] Not only do the Service Contracts fail to meet these definitions under Act 34, but there is no evidence that the City satisfied the qualifications or received the approval of the Michigan Department of Treasury, which are statutory prerequisites for the issuance of municipal securities.  *See id*. § 141.2303.

statutory and regulatory scheme governing municipal borrowing generally and municipal swap transactions in particular. The State thereby preempted any ability the City may otherwise have had to regulate or authorize the execution and delivery by the City of swaps. The City could enter into swap transactions only in strict compliance with Act 34, and could *not* enter into swaps under other terms.

28. A municipality's power is delineated by the State that bestows it. Michigan is a "Home Rule" State that allows its municipalities significant autonomy and power. *See generally* Home Rule City Act, Mich. Stat. Ann. § 117.1 *et seq.* However, the power of the municipalities to issue resolutions and ordinances is expressly "subject[] to constitutional and statutory limitations." *Mack v. City of Detroit*, 649 N.W.2d 47, 52 (Mich. 2002); *see also* Mich. Const. art 7, § 22. Where the State has already spoken on an issue through a statute, the authority of the municipalities is restricted such that they may not take any action in contravention of the State's dictates. *See* Home Rule City Act, Mich. Comp. Laws § 117.36. State statutes thus "preempt" any municipal ordinance that lies in conflict. *See, e.g. People v. Llewellyn*, 257 N.W.2d 902, 904 (Mich. 1977); *Mich. Coal. for Responsible Gun Owners v. City of Ferndale*, 662 N.W.2d 864, 868 (Mich. Ct. App. 2003). Likewise, where a state statutory scheme "occup[ies] the field of regulation which the municipality seeks to enter," municipal ordinances purporting to govern the same issue will also be preempted. *Llewellyn*, 257

16

N.W.2d at 322; *see also Capital Area Dist. Lib. v. Mich. Open Carry, Inc.*, 826 N.W.2d 736, 743 (Mich. Ct. App. 2012) (calling this latter preemption, "field preemption").

29.     To determine whether a state statutory or regulatory scheme "occupies the field" and preempts municipal ordinances attempting to cover the same subject matter, Michigan courts apply the "Llewellyn test," which evaluates four factors: (1) whether state law expressly provides that the State's authority to regulate in a specified area is exclusive; (2) whether preemption of a field of regulation can be implied from legislative history; (3) whether the state regulatory scheme is so pervasive as to support a finding of preemption; and (4) whether the nature of the regulated subject matter may demand exclusive state regulation to achieve the uniformity necessary to serve the State's purpose. *Llewellyn*, 257 N.W.2d at 905; *Capital Area Dist. Lib.*, 826 N.W.2d at 726; *City of Ferndale*, 662 N.W.2d at 407; *City of Brighton v. Twp. of Hamburg*, 677 N.W.2d 349, 358 (Mich. Ct. App. 2004). If *either* of the first two factors is present, field preemption applies and the analysis ends. *See City of Brighton*, 677 N.W.2d at 352-53 (field preemption may be implied from legislative history alone). Alternatively, the consideration of the last two factors in the absence of the first two may also support a determination of field preemption. *See Llewellyn*, 257 N.W.2d at 906 (finding field preemption based on "the comprehensiveness of the [state] statutory scheme" and the fact that "the

17

nature of the regulated subject matter demands uniform, statewide treatment.")
Here, both the legislative history (factor 2) and the combination of factors 3 and 4
independently warrant the application of field preemption.

30.     Legislative history makes clear that Act 34 was put in place to address
a state-wide concern and "protect the credit of the State and its municipalities."
Senate Fiscal Agency Bill Analysis of SB 29/0102 (Substitute S-3) (Apr. 16, 2001)
at 1 ("The bill would create [Act 34] to regulate borrowing by municipalities, and
their issuance of obligations, and prescribe the powers and duties of the
Department of Treasury *to protect the credit of the State and its municipalities*.")
(emphasis added) (internal quotations omitted).  The legislative intent was for Act
34 to "prohibit a municipality from *issuing debt or obligations except in
accordance with* [Act 34]."  *Id.* (emphasis added).  It is thus unmistakable from the
legislative history that the State intended to regulate municipal borrowing to the
exclusion of municipal home rule.

31.     Additionally, because Act 34 presents a comprehensive legislative
scheme regulating virtually all aspects of municipal borrowing, the third factor of
the Llewellyn test is also readily satisfied – the State has regulated in the area so
pervasively as to confirm legislative intent to occupy the field.  *See Llewellyn*, 257
N.W.2d at 905-06.

18

32.     Municipal securities may be issued only in accordance with Act 34, which is a substantial piece of legislation.  Mich. Comp. Laws § 141.2301. Additionally, Act 34 designates the Michigan Department of Treasury as the regulatory body and vests it with the power to "adopt rules as necessary to carry out the purposes of" Act 34.  Mich. Comp. Laws Ann. § 141.2201.  And, in fact, the Department of Treasury has promulgated numerous regulations supporting Act 34.  *See, e.g.,* Mich. Admin. Code R. 388.15, 132.1122, 132.1705.  Under Act 34, "[t]he department is authorized and *directed to protect the credit of this state and its municipalities*."  Mich. Comp. Laws Ann. § 141.2201 (emphasis added).  The department must qualify or approve municipal borrowing.  *See* Mich. Comp. Laws Ann. §§ 141.2303(2), 141.2303(3).  The State thus requires each municipality to file an annual audit report in a form prescribed by the department.  Mich. Comp. Laws § 141.2303.  The department also has the power to examine the books and records of municipalities and take testimony under oath to enforce compliance with state law.  Mich. Comp. Laws § 141.2201(c).

33.     Section 317 of the Act, governing swap transactions, is itself all-encompassing.  That section imposes numerous prerequisites to entry into interest rate swaps, including certain specified terms as well as approval by the governing body and adoption of debt and swap management plans that incorporate an analysis of risk, costs, and benefits.  Mich. Comp. Laws § 141.2317(7), (9).  A

19

proposed swap agreement must also be disclosed in the municipality's annual audit report. Mich. Comp. Laws § 141.2317(8). And, § 317 establishes the required security and source of repayment of the swap obligations. Mich. Comp. Laws §§ 141.2317(4), (5).

34. This regulatory scheme, which is both broad and detailed, clearly was not intended to be an optional means of engaging in swaps for municipalities that could otherwise engage in swaps on their own terms. The Michigan legislature deliberately constrained the authority of municipalities, requiring them to enter swaps only on the conditions laid out by the State in this Act.

35. Finally, the fourth Llewellyn factor also indicates State preemption of the field, in that the subject matter being regulated by the State – municipal financing – demands exclusivity of state regulation in order to achieve uniformity. The very purpose of Act 34 and its regulatory scheme was to protect the credit of the State of Michigan as a whole by insuring the solvency of *all* of its individual municipalities. The security protections built into the swap requirements of Act 34 were designed to avoid credit risks to the municipalities individually as well as the State as a whole. The legislation was plainly adopted to prevent municipalities from legislating their own borrowing or taking on swap obligations under any terms other than those dictated by Act 34.

36.     Because the legislative intent is unambiguous and the State's statutory

and regulatory scheme so pervasive, it is beyond dispute that the State has

occupied the field.  Municipal borrowing – and in particular, swap transactions –

must be accomplished, and can *only* be accomplished, consistent with Act 34.

Where, as here, a municipality acts outside of the statutory scheme to legislate its

own complex interest rate hedging transaction, its action conflicts with the

preemptive state requirements and must, therefore, be deemed void.

**II.     State Law Does Not Authorize the City to Pledge Casino Revenue to Secure Swap Obligations**

37.     That the Swap Obligations were unauthorized and void is not the only

issue that renders the Swap Counterparties' position critically vulnerable.  The

Swap Counterparties' alleged liens on the Casino Revenue pursuant to the 2009

Collateral Agreement were also unauthorized under state law, and thus invalid.  If

the City successfully litigated this argument, the Swap Counterparties would be

general unsecured creditors, even if the swap transactions themselves were upheld

as valid.

38.     The City is authorized to collect Casino Revenue by the Michigan

Gaming Control and Revenue Act (the "Gaming Act").  Mich. Comp. Laws

§ 432.201 *et seq*.  The Gaming Act imposes an 18% tax on a casino's adjusted

gross receipts.  Mich. Comp. Laws § 432.212(1).  Fifty-five percent of this tax

revenue goes to the City, and the rest goes to the state. Mich. Comp. Laws § 432.212(1), (3), (4). In addition to the 18% tax, the state also levies a 6% wagering tax, one third of which goes to the city. Mich. Comp. Laws § 432.212(5).

39. Section 12 of the Gaming Act prescribes the permissible uses of Casino Revenue. Mich. Comp. Laws § 432.212(3). The portion allocated to the City may be used only for one of the following purposes:

(i) The hiring, training, and deployment of street patrol officers.

(ii) Neighborhood and downtown economic development programs designed to create local jobs.

(iii) Public safety programs such as emergency medical services, fire department programs, and street lighting.

(iv) Anti-gang and youth development programs.

(v) Other programs that are designed to contribute to the improvement of the quality of life in the city.

(vi) Relief to the taxpayers of the city from 1 or more taxes or fees imposed by the city.

(vii) The costs of capital improvements.

(viii) Road repairs and improvements.

Mich. Comp. Laws § 432.212(3)(a). The City may not use any of the funds it collects under the Gaming Act for a purpose not specifically enumerated in Section 12. *See* Mich. Comp. Laws § 432.212(11) ("Payments to a city . . . shall be used by the city for the purposes listed in subsection(3)(a).").

22

40.    In the Collateral Agreement, the City pledged its Casino Revenue to secure its Swap Obligations, purportedly pursuant to the Gaming Act.  Ex. 8, Detroit City Code § 18-16-4.  However, the Gaming Act does not authorize the use of Casino Revenue as collateral; in fact, nothing in the itemized list of permissible purposes so much as hints that the Casino Revenue may be used for this purpose.

41.    Even if the Gaming Act authorized the use of Casino Revenue for collateral, it plainly does not authorize its use to collateralize a financial obligation. The City recited at the time the pledge was made that it "will improve the quality of life in the city beyond what it would be in the absence of such action," – a reference to subsection 3(a)(v) of the Gaming Act – and that it "will reduce taxes levied or imposed by the city or to be levied or imposed by the city from what they would be in the absence of such action" – a reference to subsection 3(a)(vi) of the Gaming Act.  Ex. 8, Detroit City Code § 18-16-4(k).

42.    Neither of these attempts to bring the pledge in line with the Gaming Act's ambit succeeds.  Subsection 3(a)(v) permits the use of the Casino Revenue for "*other programs* that are designed to contribute to the improvement of the quality of life in the city."  Mich. Comp. Laws § 432.212(3)(a)(v) (emphasis added).  However, Michigan follows the well-known principal of *ejusdem generis* – that where "a statute in which general words follow a designation of particular subjects, the meaning of the general words will ordinarily be . . . restricted by the

23

particular designation and as including only things of the same kind, class,

character or nature as those specifically enumerated." *Sands Appliance Servs., Inc.*

*v. Wilson*, 615 N.W.2d 241, 242 (Mich. 2000) (citation omitted); *see also Huggett*

*v. Dep't of Natural Res.*, 629 N.W. 2d 915, 920 (Mich. 2001) (same); *People v.*

*Hall*, 215 N.W. 2d 166, 197 (Mich. 1974) (finding the vague phrase "*other*

instrument" contemplated instruments of the same class as those preceding it in a

statute, including "any note, certificate, bond, [and] warrant" (emphasis added)).

43.    Thus, the phrase "other programs" in the subsection 3(a)(v) of the

Gaming Act must be interpreted by reference to the specific provisions preceding

it, which are (1) hiring, training, and deployment of street patrol officers, (2)

neighborhood and downtown economic development programs designed to create

local jobs, (3) public safety programs such as emergency medical services, fire

department programs, and street lighting, and (4) anti-gang and youth development

programs. Mich. Comp. Laws §§ 432.212(3)(a)(i)-(iv). The legislative history of

the Gaming Act likewise explains that the tax revenues were intended to be used

for crime prevention, public safety, and economic development. *See History of*

*Gaming in Michigan*, Michigan Gaming Control Board, http://www.michigan.gov/

mgcb/0,4620,7-120-1382_1453-11371--,00.html (last visited Aug. 8, 2013)

(purpose of taxes raised from casinos was "crime prevention and economic

development"); *see also* House Bill 4612: Senate Enrolled Summary (Aug. 23,

24

2004) (wagering tax to be used for "hiring and training of street patrol officers; neighborhood and downtown economic development programs; and public safety programs).

44.     The pledge of the Casino Revenue to secure the City's financial obligations is not even a "program," much less the type of city betterment program contemplated by the Gaming Act.  It does not support emergency service personnel, create jobs, improve public safety, or involve anti-gang and youth development efforts.  There is no community interaction, and no service provided to Detroit residents.  Instead, it merely satisfies the City's financial obligations to the Swap Counterparties under the Service Contracts, a purpose not encompassed by the Gaming Act.

45.     As noted above, the City also recited that pledging the Casino Revenue would relieve the City's taxpayers from one or more taxes or fees – ostensibly because the City *may* be liable to the Swap Counterparties should a "trigger event" terminate the Swap Agreements, which in turn *may* result in the City raising taxes.  Ex. 8, Detroit City Code §§ 18-16-4(c)-(e),(k).  This strained attempt to come within subsection 3(a)(vi) of the Gaming Act is equally flawed.  That provision, which requires that the Casino Revenue provide "relief to the taxpayers of the city from 1 or more taxes or fees imposed by the city," Mich. Code Ann. § 432.212(3)(a)(vi), plainly contemplates a use of the Casino Revenue

that would relive taxpayers of one or more *existing* taxes or fees. It does not

contemplate a use of the Casino Revenue that *may*, upon the occurrence of a future

speculative event, relieve the City of having to raise taxes.

46. The simple reality is that the City pledged the Casino Revenue to

benefit the Swap Counterparties, and to avoid triggering a large termination

payment to the Swap Counterparties. These are not permitted purposes under the

Gaming Act, and accordingly, the pledge was invalid, rendering the Swap

Counterparties unsecured.[6]

47. As general unsecured creditors of the City, the Swap Counterparties

should receive no more in settlement of their claims than the amount anticipated to

---

[6] The City and the Swap Counterparties may contend that the arguments in Sections I and II are barred by Bankruptcy Code § 546(g), which protects from avoidance transfers made under or in connection with swap agreements. However, because the City was unauthorized to incur the Swap Obligations or grant the Swap Counterparties liens on the Casino Revenue in the first instance, the Swap Obligation and pledge are void *ab initio*, *i.e.*, complete nullities of no legal force. Section 546(g) does not apply where the transaction at issue is void, rather than merely voidable. *See*, *e.g.*, *In re Trigem America Corp.*, 431 B.R. 855, 865 (Bankr. C.D. Cal. 2010) ("Congress []had no intent to shield transactions illegal under local law under the cover of a 'swap' label"); *In re Enron Corp.*, 323 B.R. 857, 876-78 (Bankr. S.D.N.Y. 2005) (where a corporation's unlawful and ultra vires transaction was void under state law, the entire transaction was a nullity and had no legal effect and thus there was no transfer to protect from avoidance under § 546(g)). As a result, § 546(g) has no bearing on these claims.

be distributed to other similarly-situated general unsecured creditors under the City's plan of adjustment. Because the City has proposed to pay other creditors substantially less than the Swap Counterparties will receive under the settlement, the settlement is neither fair and equitable nor a reasonable exercise of the City's business judgment, and should not be approved.

## III. The Casino Revenue Does Not Constitute "Special Revenues" and Accordingly, the Swap Counterparties Do Not Have a Lien on Post-Petition Casino Revenue

48. Even if the pledge of the Casino Revenue as security was valid – and it was not – the Swap Counterparties could not, under any circumstances, have a lien on post-petition Casino Revenue. This would again make the Swap Counterparties general unsecured creditors.

49. Bankruptcy Code § 552(a) provides that "property acquired by the estate or the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a).[7] Section 928(a) provides an

---

[7] Pursuant to § 552(b), a "statutory lien" *is* enforceable with respect to post-petition property; however, a statutory lien is a lien that arises "*solely* by force of a statute on specified circumstances or conditions." 11 U.S.C. § 101(53) (emphasis added). A lien that arises solely as a result of an agreement between the parties, like the pledge of the Casino Revenue here, does not constitute a statutory lien.

exception to that rule for "special revenues:" "special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 928(a). Further, § 922(d) provides that a chapter 9 petition "does not operate as a stay of pledged special revenues in a manner consistent with section [928] of this title to payment of indebtedness secured by such revenues." 11 U.S.C. § 922(d).[8] The term "special revenues" is defined in § 902(2) to include "special excise taxes imposed on particular activities or transactions." 11 U.S.C. § 902(2)(B).

50.     At first blush, the Casino Revenue would appear to fall within the definition of "special excise taxes" and §§ 922(d) and 928(a) would appear to encompass all "special revenues" – thus, the Swap Counterparties would argue this exception allows them to be secured by post-petition Casino Revenue. However, closer scrutiny reveals that the Casino Revenue is not "special revenues" within the meaning of these provisions, and that § 928(a) encompasses only special revenues relating to revenue bonds. Consequently, § 922(d) does not save the Swap

---

[8] Section 922(d) actually refers to "section 927 of this title" but this reference is in error, and should be to section 928. *See* Collier on Bankruptcy, ¶ 922.05[3] n.20 (16th ed. 2013).

Counterparties from the operation of the stay, § 928(a) does not save the Swap

Counterparties from the operation of § 552(a), and the Swap Counterparties' lien

does not attach to the City's post-petition Casino Revenue.

51.     The provisions in chapter 9 relating to "special revenues" were added

by the 1988 amendments to the Bankruptcy Code.  Entitled "An Act to Amend the

Bankruptcy Law to Provide for Special Revenue Bonds, and for Other Purposes,"

Pub. L. No. 100-597, § 4 (the "1988 Amendments"), the 1988 Amendments were

enacted in recognition of the fact that revenue bonds were playing an increasingly

major role in municipal finance.  *See* Collier on Bankruptcy ¶ 902.03[1] (16th ed.

2013).  Congress was concerned that access to the municipal bond market would

not be available to financially troubled municipalities unless the law was changed,

and the legislative history states that the "current difficulties with the Bankruptcy

Code are most readily apparent when analyzing the potential consequences to

revenue bond financing."  S. Rep. 100-506, 100th Cong. 2d Sess. at 4 (1988).

Accordingly, "[t]he amendments protect the future effectiveness of revenue bond

financing against the possibility of an adverse judicial determination in connection

with a municipal bankruptcy."  *Id.* at 12.

52.     The term "special revenues" in §§ 902(2)(B), 922(d), and 928(a)

must, therefore, be interpreted by reference to the purpose of the 1988

Amendments:

29

One of the principal purposes behind the 1988 Amendments was the desire to protect liens on special revenues granted under revenue bonds, a subject on which the 1978 Act had been silent. This purpose of the legislation helps mark the contours of the definition of special revenues. Thus, the *definition should not be given an expansive reading, but should be restricted to the purposes behind the principal operative section of chapter 9 added by the 1988 Amendments that uses the definition, section 928.*

Collier on Bankruptcy § 902.03[1] (16th Ed. 2013) (emphasis added).

53.     The legislative history to § 902(2)(B) explains that special revenue "excise taxes" are intended to include excise taxes levied by a municipality to support a specific project or program and not to fund unrelated general city obligations. *See* S. Rep. 100-506, 100th Cong., 2d Sess., at 13 (1988). As the Senate further explained in enacting the special revenue provisions of chapter 9:

At the same time the municipality approves financing through a revenue bond project or program . . . it has made the assumption that the project or program will generate adequate revenues to repay the bondholders and operate the project or program without any general financial obligation on the part of the municipality. Thus, unlike GO bonds, the general taxpayers are usually not committed to repaying the bonds or funding operational deficits through general tax revenues.

S. Rep. 100-506, 100th Cong., 2d Sess., at 5.

54.     The House stated, similarly:

Special revenue bonds . . . are usually backed by and repaid only from the revenues generated from the physical asset built with the money raised by the bond offering . . . In the event of a default, bondholders cannot look to any other assets of the municipality for repayment. Only the income stream generated by the asset or the income

30

specifically pledged as security by the municipality can be used. Special revenue bonds are issued so that if the asset financed fails, repayment will not come out of general treasury funds – meaning the taxpayer will not have to foot the bill.

H.R. Rep. 100-1011, 100th Cong., 2d Sess., at 4 (1988).

55.     The Casino Revenue does not constitute "special revenues" for the purposes of § 902(2)(B) and the 1988 Amendments.  The tax producing the Casino Revenue is not assessed to finance any particular project, nor is Casino Revenue associated with special revenue bonds, as is clearly contemplated by the legislative history.  To the contrary, the Casino Revenue authorized by the Gaming Act is intended to be generally available to the City for the list of programs identified in § 432.212(3)(a), none of which include satisfaction of the City's financial obligations to the Swap Counterparties.  In short, the Casino Revenue simply does not constitute the kind of revenues that qualify as "special revenues" under the Code.

56.     Even if the Casino Revenue were deemed to be special revenues generally, they are not the kind of special revenues encompassed by §§ 922(d) and 928(a), which were intended solely to protect special revenues relating to revenue bonds.   "[S]ection 922(d) carries out one of the main goals of the 1988 Amendments, the protection in chapter 9 cases of a pledge of special revenues under revenue bonds."  Collier on Bankruptcy, § 922.05[1]; *see also* H.R. Rep. No.

31

100-1011, 100th Cong., 2d Sess. at 7 (1988) ("To help achieve a primary goal of the bill, new subsection (d) to section 922 states that the automatic stay of Bankruptcy Code section 362 does not operate to stay paying pledged revenues, consistent with new section [928] of the Bankruptcy Code, to the revenue bondholders holding liens on such revenues).

57. According to the Senate Report, § 922(d) was enacted because "reasonable assurance of timely payment is essential to the orderly marketing of municipal bonds and notes and continued municipal financing." S. Rep. No. 100-506, 100th Cong., 2d Sess. at 21 (1988). And the language of § 922(d) itself reflects this; its reference to the "indebtedness secured by such revenues" is a clear reference to revenue bonds.

58. Similarly, "Section 928 was narrowly crafted to apply *only to special revenue bonds*." *In re County of Orange*, 179 B.R. 185, 191-92 (Bankr. C.D. Cal. 1995) (emphasis added), *rev'd on other grounds*, 189 B.R. 499 (C.D. Cal. 1995). The purpose of the provision was "to continue the isolation of industrial revenue bond financing from general municipal bond financing." *In re Las Vegas Monorail Co.*, 429 B.R. 770, 782 (Bankr. D. Nev. 2010). As explained in Collier, "[i]n general, its effect is to prevent special revenues that secure an issue of revenue bonds from being diverted to be available for the municipality's general expenses or obligations." Collier on Bankruptcy, ¶ 928.01 (16th ed. 2013).

32

59.     The Senate Report further clarifies that § 928 "preserves the lien on special revenues to secure bonds or notes, subject to payment of necessary operating expenses."  S. Rep. No. 100-506, 100th Cong., 2d Sess. 22 (1988). Elaborating, the Senate Report states:

> To eliminate the confusion and to confirm various state laws and constitutional provisions regarding the rights of bondholders to receive the revenues pledged to them in payment of debtor obligations of a municipality, a new section is provided in the amendments to ensure that *revenue bondholders* receive the benefit of their bargain with the municipal issuer and that they will have unimpaired rights.

S. Rep. No. 100-506, 100th Cong., 2d Sess. 12-13 (1988) (emphasis added).

60.     The foregoing legislative history establishes unequivocally that the provisions of §§ 922(d) and 928(a) apply only to special revenues pledged in connection with special revenue bonds.  Here, it is indisputable that none of the Collateral Agreement, the Service Contracts, or the COPs issued with the support of the Service Contracts, qualifies as special revenue bonds.  To the contrary, the obligations of the City under the Service Contracts are expressly characterized as unsecured general fund obligations, and the subsequent pledge of the Casino Revenue did not transform these general fund obligations into special revenue bonds.

61.     Because the Casino Revenue is not pledged in connection with special revenue bonds, the provisions of §§ 922(d) and 928(a) do not exempt the Swap

33

Counterparties from the operation of § 552(a). Accordingly, their pre-petition lien does not extend to post-petition Casino Revenue, making the Swap Counterparties general unsecured creditors. As a result, the settlement, which treats them significantly better than other general unsecured creditors are likely to be treated in the City's plan of adjustment, is not fair and equitable and does not reflect a reasonable exercise of the City's business judgment.

## IV.    The Settlement Is Premature

62.    The substantial arguments discussed above demonstrate just how fragile is the Swap Counterparties' position – and just how unsupportable is the rich settlement they are getting in the Forbearance Agreement. Beyond these arguments, other issues reveal that, at a very minimum, the proposed settlement is premature.

63.    The courts recognize an inherent risk in pre-plan settlements such as this one, *i.e.*, that the parties to the settlement may collude to favor one class of creditors over another in violation of the Bankruptcy Code's priority scheme. In order to address that risk, the Court of Appeals for the Second Circuit held in *Iridium* that "whether a pre-plan settlement's distribution plan complies with the Bankruptcy Code's priority scheme will be the most important factor for a bankruptcy court to consider in approving a settlement under Bankruptcy Rule

9019." *In re Iridium Operating, LLC*, 478 F.3d 452, 455 (2d Cir. 2007). "In most cases," the court added, "it will be dispositive." *Id.*

64.     Accordingly, the City must demonstrate that its request for approval of the Forbearance Agreement, which involves paying the Swap Counterparties large cash sums outside of a plan, does not violate the absolute priority rule. *See id.; see also Matter of AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984) ("a bankruptcy court abuses its discretion in approving a settlement with a junior creditor unless the court concludes that priority of payment will be respected as to objecting senior creditors"). Until such a showing is made, settlement approval would be premature.

65.     As discussed above, there are significant challenges to the Swap Counterparties' purported "secured" claims. A hasty settlement of these claims without first resolving these issues is a reckless end-run around key bankruptcy protections afforded the creditor body. At this juncture, the Forbearance Agreement may violate the absolute priority rule, and otherwise unfairly discriminate against similarly-situated creditors. In the absence of any analysis by the City of these important issues, or the articulation of any basis on which the Court may evaluate the merits of the litigation, the Motion cannot be approved.

## V.    The Settlement Is Not Necessary to Preserve the City's Liquidity

66.    The City contends that it was required to settle at a high percentage of the Swap Counterparties' claims because an event of default had occurred under the Collateral Agreement and the cash trap arrangement would have otherwise given rise to a serious liquidity problem for the City.  Ambac believes facts could be developed in discovery that would demonstrate otherwise.

67.    As discussed above, the City has compelling arguments to win in litigation – including arguments which, if successful, would totally eliminate the Swap Counterparties' claims.  The City could have decided to fund its liquidity needs through other means during the period it litigated these issues with the Swap Counterparties.  Funding could have been obtained by providing a lien on other unencumbered City revenue.

68.    In the event the City secured such funding, it could have either obtained a materially better settlement, or litigated the many issues surrounding the Swap Counterparties' claims, to the benefit of all other creditors.  At a minimum, proceeding temporarily with alternative funding would have allowed both the City and the Court the time needed to evaluate objectively and resolve the underlying issues of the Swap Counterparties' purported security.

## VI.  The *TMT* Factors Do Not Support Approval of the Settlement

69.     As discussed at the outset, the Court is required to make an informed

and independent decision regarding the *TMT* factors distilled by the Court of

Appeals in *Bard*, 49 Fed. App'x at 530, and then set out the reasons for its decision

on those factors.  *TMT,* 390 U.S. at 434.  A review of those factors here, in light of

the foregoing discussion, makes clear that the settlement should not be approved.

70.     The first *TMT* factor is the probability of success in the litigation.  The

formidable arguments outlined above are firmly rooted in unambiguous legal

constructs.  The probability is thus very high that the City will succeed on the

merits in challenging the validity of the Swaps Obligations and the Swap

Counterparties' liens.  The second factor – the difficulties of collection – is not

relevant here.  The third factor is the complexity of the litigation involved, as well

as the expense, inconvenience and delay necessarily attending it.  Here, the

underlying financial transactions and the issues surrounding the validity of the

swaps and the liens are, to be sure, exceedingly complex.[9]  But they are largely

*pure legal issues*, which could be resolved on the papers alone, and therefore

litigating them would require very little expense, inconvenience, or delay.  Finally,

---

[9] However complex, these issues should have already been analyzed by the City in evaluating and negotiating its settlement position vis-à-vis the Swap Counterparties.

the fourth factor – the paramount interest of the creditors – undeniably militates against approval of this very rich settlement in which the Swap Counterparties would receive a substantial portion of their claims, while other, similarly-situated creditors have been proposed to receive far less.

## VII.   Reservation of Rights

71.     In the event the Court nevertheless approves the Forbearance Agreement, Ambac reserves its right to object to the City's plan of adjustment if the plan fails to treat creditors similarly situated with the Swap Counterparties similarly.

72.     The Swap Counterparties' claims are secured by invalid liens but will be receiving 75%-82% of their claims under the settlement.  Motion ¶ 27.  In contrast, the City has insisted it has limited funds to pay its unsecured creditors and has proposed in its Proposal that unsecured creditors be paid in the range of 8% of their unsecured claims.  Unless the City is going to change its Proposal and also pay creditors similarly-situated to the Swap Counterparties 75%-82% of their unsecured claims in its plan of adjustment, the Court should not authorize or permit the assumption of the Forbearance Agreement.  The Court should also consider whether paying all unsecured claims at 75-82% would raise serious feasibility issues.  Accordingly the Court should wait until there is a resolution of

the issues regarding whether the Swap Obligations of the City are valid and secured obligations.[10]

## Conclusion

73.     The settlement is not an exercise of reasonable judgment and is not fair and equitable because there are compelling arguments that, if successfully litigated, would either totally eliminate the Swap Counterparties' claims or render them unsecured claims.  Paying 75%-82% of these claims is unfair to other creditors.

74.     The City has insisted it has limited funds to pay its unsecured creditors and has proposed in its Proposal that unsecured creditors be paid around 8% of their unsecured claims.  Consequently, fairness and equity dictate either:

    a)  litigation of these claims so that the Court can determine their validity and status; or

    b)  settlement with the Swap Counterparties for a materially lower amount significantly closer to the proposed 8% for unsecured claims.

_____

[10] At plan confirmation, the Court will have to evaluate whether the Swap Counterparty claims were unauthorized or unsecured, in order to determine whether the treatment of other similarly-situated creditors is similar.  Although the settlement could not be unwound, other creditors would be entitled to challenge whether their treatment was fair and equitable, and not unfair discrimination.

If the Court approves the Forbearance Agreement, Ambac and all other creditors should have an explicit reservation of rights to object to a plan of adjustment in the event the plan fails to treat similarly-situated creditors in a similar manner to the Swap Counterparties.

75.     For all of the foregoing reasons, the City is not entitled to assume the Forbearance Agreement as an executory contract, and the Court should not approve the Forbearance Agreement as a fair and equitable settlement.

Respectfully Submitted,

**ARENT FOX LLP**

Dated:  August 16, 2013

By:  /s/ Carol Connor Cohen
CAROL CONNOR COHEN
CAROLINE TURNER ENGLISH
(admission pending)
1717 K Street, NW
Washington, DC  20036-5342
(202) 857-6054
Carol.Cohen@arentfox.com

DAVID L. DUBROW
MARK A. ANGELOV
1675 Broadway
New York, NY 10019
(212) 484-3900

and

40

**SCHAFER AND WEINER, PLLC**
DANIEL J. WEINER (P32010)
BRENDAN G. BEST (P66370)
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI  48304
(248) 540-3340
bbest@schaferandweiner.com

Counsel for Ambac Assurance Corporation