ATION

mark.angelov@arentfox.com
Detroit/13.08.2013  17:08

# GRS Service Contract 2006

between the

## Detroit General Retirement System Service Corporation

and the

## City of Detroit

---

**Dated June 7, 2006**

---

|974|14906940150
13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 1 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 28 of 1589]

## Table of Contents

**Section 1.** Definitions; Identification of Schedules ........................................... 1

**Section 2.** Constituent Parts of the Service Contract and Incorporation by Reference ....................................................................................... 4

**Section 3.** Purpose of Initial Funding; How Accomplished .............................. 4

**Section 4.** Certain Particulars of the Initial Funding ........................................ 4

**Section 5.** Provision of Initial Funding ............................................................ 6

**Section 6.** Optional Prepayment – Fixed Rate Portion ...................................... 6

**Section 7.** Optional Prepayment – Variable Rate Portion ................................. 7

**Section 8.** Stated Hedges .................................................................................. 7

**Section 9.** Special Provisions Concerning the Transfer Party ........................... 8

**Section 10.** Termination of 2005 Hedges ........................................................ 9

**Section 11.** Non-Tender Escrow ...................................................................... 9

**Section 12.** Tender Account ........................................................................... 10

**Section 13.** Notice of Prepayment ................................................................. 12

**Signature Pages** .......................................................................................... S-1

**Attachments**

Interest Rate Funding Cost Supplement
Schedule 1 – Stated Amounts Funding Schedule
Schedule 1A – Schedule of 2005 Hedges to be Terminated
Schedule 1B-NTS –Non-Tender Schedule
Schedule 1B-TS – Tender Schedule
Schedule 2 – Scheduled Payments Attachment
Schedule 3 – Sinking Fund Installments Attachment
Schedule 4 – Schedule of Credit Insurance
Schedule 5 – Schedule of Stated Hedges
General Terms and Conditions

1974114.0069/401750

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 2 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 29 of 1589]

TIAL INFORMATION
mark.angelov@arentfox.com

**GRS Service Contract 2006**, dated June 7, 2006, between the **Detroit General Retirement System Service Corporation**, a Michigan nonprofit corporation (the *Corporation*), and the **City of Detroit**, Michigan (the *City*),

## W I T N E S S E T H:

**Whereas**, this Service Contract is a "2006 Service Contract", under the Resolution adopted by the City Council on April 26, 2006 (the *Act of Council*), entered into for the purpose of implementing the Act of Council by enabling the Corporation to meet obligations in respect of the Additional Funding the Corporation agreed, if requested by the City and approved by the City Council, to provide in Section 4.01 of its 2005 Service Contract (as defined in the Act of Council, the *2005 Service Contract*);

**Whereas**, the maximum amount of the Additional Funding that the City has requested that the Corporation provide pursuant to its agreement under the 2005 Service Contract is equal to $779,530,000, the amount of the Scheduled Payments that the City is obligated to pay under the 2005 Service Contract (as defined in the Act of Council, the *2005 Scheduled Payments*);

**Whereas**, the Act of Council provides for the Additional Funding to be accomplished in one or more Additional Funding Transactions;

**Whereas**, this Service Contract provides for an Additional Funding Transaction with respect to 2005 Scheduled Payments in the amount of $331,475,000 (the *Subject 2005 Scheduled Payments* as more specifically identified herein); and

**Whereas**, in anticipation of the Additional Funding Transaction to be undertaken pursuant to this Service Contract, the Corporation entered into the agreement dated June 7, 2006, with UBS Securities LLC (the *Dealer Manager Agreement*) to act as the Corporation's dealer manager for purposes of conducting the tender (the *Dealer Manager*) for the purchase of the herein defined Tender Certificates;

**Now, Therefore**, in consideration of the premises and the mutual promises contained here, the parties hereto agree as follows:

## Section 1. Definitions; Identification of Schedules

(a) Undefined capitalized terms used herein and defined in the first paragraph hereof or the preamble hereto are used herein as therein defined, such terms include:

| | |
|---|---|
| Act of Council | Dealer Manager Agreement |
| City | 2005 Scheduled Payments |
| Corporation | 2005 Service Contract |
| Dealer Manager | Subject 2005 Scheduled Payments |

(b) The following are the subsections of **this Section** where terms are defined or where the locations are given where terms defined in other sections of these Specific Terms:

Subsection (c) ...................... Terms used generally
Subsection (d) ...................... Terms defined elsewhere in these Specific Terms

1974114.0069/401750

13-53846-tjt   Doc 348-5   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 3 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 30 of 1589]

Subsection (e)........................Terms used primarily with respect to the Prepayment Scheduled Payments

Subsection (f) ......................Terms used primarily with respect to the Tender Scheduled Payments

Subsection (h)......................Names given to numbered or alpha/numerically designated Schedules

(c)     The following terms have the following respective meanings for the purpose of this Service Contract *unless* the context otherwise clearly requires:

*Business Day* means a day on which both the City and the Trustee are open for the transaction of business.

*Trust Agreement* means the trust agreement, to be dated the Closing Date, between the Corporation and the Trustee establishing the Funding Trust and providing for the issuance of the Certificates.

*2005 Contract Administrator* means the Person serving as "Contract Administrator" under the 2005 Contract Administration Agreement.

*2005 Contract Administration Agreement* means the Contract Administration Agreement, dated May 25, 2005, under which the 2005 Service Contract is administered.

*2005 Hedge* means any Authorized Hedge entered into by the Corporation pursuant to the 2005 Service Contract.

*2005 Hedge Counterparties* means the Hedge Counterparties listed in the **Schedule of 2005 Hedges to be Terminated**.

*2005 Hedge Termination Receivables* means the amounts to become due to the Corporation from the 2005 Hedge Counterparties by reason of the termination, in whole or in part, of the 2005 Hedges to be Terminated in connection with the payment or prepayment of Subject 2005 Scheduled Payments.  The amounts of the 2005 Hedge Termination Receivables are set forth in the **Schedule of 2005 Hedges to he Terminated** as the "Hedge Termination Receivables".

*2005 Hedge to be Terminated* means any 2005 Hedge identified in the **Schedule of 2005 Hedges to be Terminated**.

*2005 Scheduled Payment Dates* means Scheduled Payment Dates provided for in the 2005 Service Contract.

*2005 Service Charge Payment Date* means a date on which 2005 Service Charges become due pursuant to the 2005 Service Contract.

*2005 Service Charges* means Service Charges to become due pursuant to the 2005 Service Contract on 2005 Scheduled Payments.

*2005 Service Contract* means the Service Contract, dated May 25, 2005, between the Corporation and the City.

*Subject 2005 Scheduled Payments* means the 2005 Scheduled Payments identified in the Tender Schedule and in the Non-Tender Schedule.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 13-08-2013 17:08

*Trustee* means U.S. Bank National Association and its successors as trustee under the Trust Agreement.

*Underwriting Agreement* means the Underwriting Agreement, dated the date hereof, among the Corporation, the City and the Representative on behalf of the Underwriters.

(d)     Certain of the terms generally used in these Specific Terms are defined elsewhere and include the following:

| Term | Location |
|------|----------|
| Certificates ....... ............................................................. | Section 5 |
| General Terms ............................................................ | Section 1 |
| Non-Tender Escrow........................ .. ..... ............... .... | Section 11 |
| Prepayment Date........................................ ................ ....... | Section 6 |
| Prepayment Premium......................................................... | Section 6 |
| Stated Funding Amount ............ Stated Amounts Funding Schedule | |
| Specific Terms................................................................ | Section 1 |
| Tender Account ........................................................... | Section 12 |
| Transaction Amount ....................................................... | Section 3 |

(e)     Certain of the terms used primarily with respect to the Prepayment Scheduled Payments are defined in **Section 11** and include the following:

| | |
|---|---|
| Non-Tender Amount | 2005 Prepayment Dates |
| Non-Tender Escrow Supplement | 2005 Prepayment Premiums |
| Prepayment Scheduled Payments | |

(f)     Certain of the terms used primarily with respect to Tender Scheduled Payments are defined in **Section 12** and include the following:

| | |
|---|---|
| Accrued Tender Service Charges | Tender Payment |
| Beneficial Owner | Tender Payment Date |
| Relevant 2005 Owners | Tender Period |
| Tender Amount | Tender Premium |
| Tender Account | Tender Scheduled Payments |
| Tender Account Supplement | 2005 Trust Agreement |
| Tender Certificates | 2005 Trustee |

2

    (g)    Certain other terms used herein are defined in the General Terms

    (h)    The following schedules to these Specific Terms are herein identified by the following respective names:

| Schedule | Name |
|---|---|
| Schedule 1 ............................... | Stated Amounts Funding Schedule |
| Schedule 1A ................ | Schedule of 2005 Hedges to be Terminated |
| Schedule 1B-NTS ......................................... | Non-Tender Schedule |
| Schedule 1B-TS .................................................... | Tender Schedule |
| Schedule 2 .................................. | Scheduled Payments Attachment |
| Schedule 3 ......................... | Sinking Fund Installments Attachment |
| Schedule 4 ......................................... | Schedule of Credit Insurance |
| Schedule 5 .......................................... | Schedule of Stated Hedges |

## Section 2.    Constituent Parts of the Service Contract and Incorporation by Reference

    The GRS Service Contract 2006 consists of this instrument (the *Specific Terms*) and the **Restated General Terms and Conditions of GRS Service Contract 2006**, dated as of June 1, 2006 (the *General Terms*), which is incorporated by reference and made a part hereof as if set forth in full in this instrument.

## Section 3.    Purpose of Initial Funding; How Accomplished

    (a)    The purpose of the Initial Funding is to provide an Additional Funding Transaction by funding the Subject 2005 Scheduled Payments pursuant to this Service Contract.

    (b)    The Corporation shall accomplish the Additional Funding Transaction as provided in **this subsection**. The amount necessary to accomplish the Additional Funding Transaction (the *Transaction Amount*), to be applied to the below purposes, is set forth in the Stated Amounts Funding Schedule.

    (1)    2005 Hedge Termination Receivables shall be applied as provided in **Section 10**.

    (2)    The Corporation shall establish the Non-Tender Escrow and deposit therein its proceeds from the sale of the Certificates equal to the Non-Tender Amount to be applied in accordance with the Non-Tender Escrow Supplement (as to which, see **Section 11**).

    (3)    The Corporation shall establish the Tender Account and deposit therein its proceeds from the sale of the Certificates equal to the Tender Amount to be applied in accordance with the Tender Account Supplement in conjunction with the Dealer Manager Agreement (as to each of which, see **Section 12**).

## Section 4.    Certain Particulars of the Initial Funding

    (a)    <u>Stated Funding Amount</u>

    The *Stated Funding Amount* consists of the Transaction Amount and the Ancillary Amounts, all as set forth in the **Stated Amounts Funding Schedule**.

1974114.0069/401750

4

13-53846-tjt   Doc 348-5   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 6 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 33 of 1589]

(b)    Funding Rate Portions

The **Funding Rate Portions** of the Transaction Amount and their respective amounts are as follows:

| **Funding Rate Portion** | **Amount** |
|---|---|
| Fixed Rate | $68,950,000[1] |
| Variable Rate | $283,746,000[2] |

(c)    Scheduled Payment Dates and Amounts, Service Charge Classes

The Scheduled Payment Dates, the amounts of Scheduled Payments of the Funding Rate Portions due on their respective Scheduled Payment Dates and the respective Service Charge Classes are set forth in the **Scheduled Payments Attachment**.

(d)    Sinking Fund Installments

The Scheduled Payments subject to Sinking Fund Installments, the amount of the respective Sinking Fund Installments and Scheduled Payment Dates on which the Sinking Fund Installments are due are set forth in the **Sinking Fund Installments Attachment**.

(e)    Fixed Rate Funding Portion

(1)    The Fixed Rate Service Charges applicable to the Fixed Rate Funding Portion are set forth in the **Scheduled Payments Attachment** opposite the Scheduled Payments comprising the Fixed Rate Funding Portion.

(2)    The **Fixed Rate Service Charge Payment Dates** are the fifteenth day of each June and December, commencing December 15, 2006.

(f)    Variable Rate Funding Portion

(1)    Index Rate Service Charges are the only Type of Variable Rate Service Charges.

(2)    The Index Rate Service Charges and the defined terms relative to determining the Index Rate Service Charges are set forth in the **Index Rate Funding Supplement**.

(g)    Credit Insurance

The Corporation shall enter into the Credit Insurance described in the **Schedule of Credit Insurance** for, respectively, all Service Charge Classes and the Stated Hedges.

(h)    Stated Hedges

The Corporation shall enter in the Hedges described in the **Schedule of Stated Hedges** with respect to the Index Rate Service Charge Class. The Stated Hedges are acceptable to the Finance Director.

---

[1] The total of the Scheduled Payments for the Fixed Rate Service Charge Class set forth in the **Scheduled Payments Attachment**.

[2] The total of the Scheduled Payments for the Variable Rate Service Charge Class set forth in the **Scheduled Payments Attachment**.

1974114.0069/401750                                      5

    (i)    <u>Representative</u>

The ***Representative*** is UBS Securities LLC.

    (j)    <u>Closing Date</u>

The ***Closing Date*** is provided for in the Underwriting Agreement.

    (k)    <u>Contract Administration Agreement</u>

The ***Contract Administration Agreement*** is the Contract Administration Agreement 2006, dated the Closing Date among the Corporation and the other Persons named therein, for the administration, *inter alia*, of this Service Contract.

**Section 5.    Provision of Initial Funding**

The Corporation shall enter into the Trust Agreement on the Closing Date in order to establish Detroit Retirement Systems Funding Trust 2006 (the ***Funding Trust***) for the purpose of issuing Certificates of Participation captioned as provided therein (the ***Certificates***) to provide the Initial Funding.

**Section 6.    Optional Prepayment – Fixed Rate Portion**

    (a)    The City may prepay the Scheduled Payments (each, a ***Selected Scheduled Payment***) of the Fixed Rate Portion in whole or in part on any date by paying the Corporation an amount equal to the greater of:

    (i)    100 percent of the outstanding balance of the particular Selected Scheduled Payment being prepaid; *or*

    (ii)    the sum of the present values of the remaining Sinking Fund Installments of such Selected Scheduled Payment and related Service Charges that would have accrued after the date fixed for prepayment (the ***Prepayment Date***) discounted to the Prepayment Date on a semiannual basis (assuming a 360-day year consisting of 12, 30-day months) at the Treasury Rate (defined below) *plus* 12.5 basis points (0.125%),

*plus*, in either case, Service Charges accrued from the last Service Charge Payment Date to which Service Charges were paid in full on the particular Selected Scheduled Payment to the Prepayment Date. The ***Prepayment Premium*** is the amount by which **clause (ii)**, above, exceeds **clause (i)** above.

    (b)    The following definitions are used to determine the Treasury Rate:

***Treasury Rate*** means, with respect to the Prepayment Date for any particular Selected Scheduled Payment, the rate per annum, expressed as a percentage of the principal amount, equal to the semiannual equivalent yield to maturity or interpolated maturity of the Comparable Treasury Issue, assuming that the Comparable Treasury Issue is purchased on the Prepayment Date for a price equal to the Comparable Treasury Price, as calculated by the Designated Treasury Dealer.

1974114.0069/401750    6

13-53846-tjt   Doc 348-5   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 8 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 35 of 1589]

*Comparable Treasury Issue* means, with respect to the Prepayment Date for any particular Selected Scheduled Payment, the United States Treasury security or securities selected by the Designated Treasury Dealer which has an actual or interpolated maturity comparable to the remaining average life of such Selected Scheduled Payment, and that would be utilized in accordance with customary financial practice in pricing new issues of debt securities of comparable maturity to the remaining average life of such Selected Scheduled Payment.

*Comparable Treasury Price* means, with respect to the Prepayment Date for any particular Selected Scheduled Payment, (i) *if* the Designated Treasury Dealer receives at least four Reference Treasury Dealer Quotations, the average of such quotations for such Prepayment Date, after excluding the highest and lowest Reference Treasury Dealer Quotations, or (ii) *if* the Designated Treasury Dealer receives fewer than four such Reference Treasury Dealer Quotations, the average of all Reference Treasury Dealer Quotations received by it.

*Designated Treasury Dealer* means one of the Reference Treasury Dealers appointed by the Contract Administrator.

*Reference Treasury Dealer* means UBS Securities LLC or its successors, and four other firms, selected by the Contract Administrator from time to time, that are primary U.S. Government securities dealers in the City of New York (each, a *Primary Treasury Dealer*); *if* any Reference Treasury Dealer ceases to be a Primary Treasury Dealer, *then* the City will select a replacement Reference Treasury Dealer that is a Primary Treasury Dealer.

*Reference Treasury Dealer Quotations* means, with respect to each Reference Treasury Dealer and any Prepayment Date for a particular Selected Scheduled Payment, the average, as determined by the Designated Treasury Dealer, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Designated Treasury Dealer by such Reference Treasury Dealer at 3:30 p.m., New York City time, on the third business day preceding such Prepayment Date.

**Section 7.** **Optional Prepayment – Variable Rate Portion**

The City may prepay any Scheduled Payment payable on and after June 15, 2011, in the Variable Rate Portion in whole or in part on any Variable Rate Service Charge Payment Date at the amount thereof *plus* Service Charges accrued from the last Service Charge Payment Date to which Service Charges were paid in full on the particular Scheduled Payment to the Prepayment Date.

**Section 8.** **Stated Hedges**

(a) The City acknowledges that it derives a direct benefit from the Stated Hedges by reducing the Funding Cost volatility of the Index Rate Service Charges.

(b) Stated Hedges may provide that the rights and obligations of the parties thereunder shall be governed by the laws of a State of the United States other than Michigan.

1974114 0069/401750      7

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 9 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 36 of 1589]

Such governing law provision may exclude the conflicts of law rules of the particular jurisdiction.

(c)    The City understands that the Corporation intends to follow customary practice to mitigate possible interest rate risk and enter into the Stated Hedges prior to the Closing Date.  As a consequence, the City will be obligated to make Service Payments in respect of Hedge Payables thereunder even though the Stated Funding Amount is not funded from the proceeds of the anticipated COPs.  The City understands and accepts the risk that the Stated Funding Amount will not be so funded and that it will be nonetheless obligated to make such Service Payments.

**Section 9.    Special Provisions Concerning the Transfer Party**

(a)    The following terms have the following respective meanings:

*Siebert* means SBS Financial Products Company, LLC and its permitted successors and assigns under the Transfer Agreement.

*Siebert Swap* means, as applicable: (i) the ISDA Master Agreement (FGIC), dated May 25, 2005, between the Corporation and Siebert, together with the Schedule thereto and the Confirmation of the Swap Transaction thereunder dated June 7, 2006; or (ii) the ISDA Master Agreement (XL) dated June 7, 2006, between the Corporation and Siebert, together with the Schedule thereto and the Confirmation of the Swap Transaction thereunder dated June 7, 2006.

*Transfer Agreement* means, as applicable: (i) the Transaction Transfer Agreement (FGIC) dated May 25, 2005, among Siebert, the Corporation and the Transfer Party; and (ii)  the Transaction Transfer Agreement (XL) dated June 7, 2006, among Siebert, the Corporation and the Transfer Party, as each of the same may be amended from time to time with the consent of each Insurer not then in default under its respective Credit Insurance.

*Transfer Event* means the occurrence of (i) an Early Termination Date (as defined in a Siebert Swap) with respect to the respective Siebert Swap and all Transactions thereunder and the entering into of Transfer Transactions (as defined in the Transfer Agreement) in accordance with Paragraph 2(a) of the Transfer Agreement or (ii) an assignment to the Transfer Party pursuant Section 6(c) of the Schedule that forms a part of the Siebert Swap.

*Transfer Hedge* means the Transfer Swap Agreement identified in the respective Transfer Agreement.

*Transfer Party* means Merrill Lynch Capital Services, Inc. and its permitted successors and assigns under the respective Transfer Agreement.

(b)    As between Siebert and the Transfer Party, the exercise by Siebert or the Transfer Party of any right or remedy under this Service Contract shall be governed by the Transfer Agreement.

1974114.0069/401750                          **8**

(c)     Upon the occurrence of a Transfer Event:

(i)     the Transfer Hedge shall constitute a Stated Hedge; and

(ii)    the Transfer Party shall be a "Specified Hedge Counterparty" for purposes of the Contract Administration Agreement and shall accede to all the rights and remedies, and be bound by the obligations, of Siebert as a Specified Hedge Counterparty thereunder and shall also accede to all the rights and remedies of Siebert under this Service Contract.

(d)     Siebert and the Transfer Party shall give prompt written notice to the Contract Administrator of the occurrence of a Transfer Event (and the Insurer may give such a written notice to the Contract Administrator); provided, however, the failure to give such notice shall not affect the operation of **subsection (c) above**.  Until the Contract Administrator receives such a notice and in the absence of actual knowledge to the contrary, it shall be entitled to assume that no Transfer Event has occurred and Siebert is the Specified Hedge Counterparty under the Contract Administration Agreement.

## Section 10.     Termination of 2005 Hedges

(a)     On or after the date hereof, the Corporation shall timely take such action as is necessary to terminate the 2005 Hedges to be Terminated on the Closing Date in the respective Amounts to be Terminated set forth in the **Schedule of 2005 Hedges to be Terminated**.

(b)     The Corporation shall apply the 2005 Hedge Termination Receivables in the amounts, if any, set forth in the **Schedule of 2005 Hedges to be Terminated** as provided in the **Stated Amounts Funding Schedule** with the remaining balance of the 2005 Hedge Termination Receivables, if any, to be paid to the City

## Section 11.     Non-Tender Escrow

(a)     The following terms have the following respective meanings with respect to the Non-Tender Escrow Supplement *unless* the context clearly otherwise requires·

*Non-Tender Amount* is the amount sufficient to pay the Prepayment Scheduled Payments and applicable, estimated, 2005 Prepayment Premiums, together with the 2005 Service Charges accrued from the immediately preceding 2005 Service Charge Payment Date to the 2005 Prepayment Date.

*Non-Tender Escrow* means the escrow established pursuant to the Non-Tender Escrow Supplement.

*Non-Tender Escrow Supplement* means supplemental provisions in or to the Contract Administration Agreement with respect to the holding and application of the Non-Tender Amount.

*Prepayment Scheduled Payments* means the Subject 2005 Scheduled Payments set forth in the **Non-Tender Schedule**.  The 2005 Scheduled Payment Dates set forth opposite the Prepayment Scheduled Payments are only for purposes of distinguishing the particular Prepayment Scheduled Payment from other 2005 Scheduled Payments.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
December 08, 2013 17:08

*2005 Prepayment Date* means the date set forth in the **Non-Tender Schedule** as the "2005 Prepayment Date".

*2005 Prepayment Premiums* means the 2005 Prepayment Premiums identified in the **Non-Tender Schedule**.

*2005 Scheduled Payment Dates* means Scheduled Payment Dates provided for in the 2005 Service Contract.

(b)     For the avoidance of doubt, it is expressly agreed that the Non-Tender Amount is the property of the Corporation.   The Corporation agrees to apply the Non-Tender Amount in accordance with the Non-Tender Escrow Supplement.

(c)     The Non-Tender Escrow Supplement shall contain payment provisions set forth in **this subsection**.

(1)     The Non-Tender Escrow Supplement shall provide that amounts for the payment of the Prepayment Scheduled Payments and applicable 2005 Prepayment Premiums, together with accrued 2005 Service Charges, shall be paid to the 2005 Contract Administrator no later than the Payment Time on the Prepayment Receipt Day for the 2005 Prepayment Date set forth in the **Non-Tender Schedule**.

(2)     The Non-Tender Escrow Supplement shall also contain a provision to the effect that any amount remaining in the Non-Tender Escrow after making the payment provided for in **paragraph (1), above** shall be paid to the City. Thereupon, any such amount shall be the property of the City.

(d)     The Non-Tender Escrow Supplement shall provide that the Non-Tender Amount may only be invested in securities that are within the meaning of "government securities" as defined by the Investment Company Act of 1940, as amended.

**Section 12.     Tender Account**

(a)     The following terms have the following respective meanings with respect to the Tender Account and extinguishment of Tender Scheduled Payments *unless* the context clearly otherwise requires:

*Accrued Tender Service Charges* means 2005 Service Charges accruing on Tender Scheduled Payments from the last 2005 Service Charge Payment Date before the Tender Payment Date to (but not including) the Tender Payment Date *if* such Tender Payment Date is not also a 2005 Service Charge Payment Date.

*Beneficial Owner* means a Person who is an "entitlement holder" of a Tender Certificate under Article 8 of the applicable Uniform Commercial Code or a Person with comparable status under comparable foreign law.

*Relevant 2005 Owners* means the Beneficial Owners of 2005 Tender Certificates.

*Tender Account* means an account established with the Contract Administrator for the purpose of paying Tender Payments.

*Tender Account Supplement* means supplemental provisions in or to the Contract Administration Agreement with respect to the holding and application of the Tender Amount.

*Tender Amount* means the amount sufficient to pay (i) all Relevant 2005 Owners the amount of Tender Scheduled Payments together with the Tender Premiums and Accrued Tender Service Charges and (ii) the fees and expenses payable pursuant to the Dealer Manager Agreement or otherwise in connection with the tender of the Tender Certificates.

*Tender Certificate* means a 2005 Certificate, or portion thereof, representing an interest in any Tender Scheduled Payment.

*Tender Payment* means, as to any tendering Relevant 2005 Owner, the amount of the Tender Scheduled Payment, Tender Premium and Accrued Tender Service Charges owing to such Relevant 2005 Owner on the Tender Payment Date.

*Tender Payment Date* means the date identified in the Tender Account Supplement as the "Tender Date".

*Tender Premium* means the amount of the premium (expressed as a percentage of the principal amount of a Tender Certificate) to be paid to a Relevant 2005 Beneficial Owner in connection with the purchase of its Tender Certificate in accordance with the Dealer Manager Agreement.

*Tender Scheduled Payments* means the Subject 2005 Scheduled Payments set forth in the **Tender Schedule**. The 2005 Scheduled Payment Dates set forth opposite the Tender Scheduled Payments are only for purposes of distinguishing the particular Tender Scheduled Payment from other 2005 Scheduled Payments.

*2005 Certificates* means the certificates of participation evidencing interests in 2005 Scheduled Payments.

*2005 Trust Agreement* means the Trust Agreement, dated June 2, 2005, to which the Corporation is a party.

*2005 Trustee* means the Person serving as trustee under the 2005 Trust Agreement.

(b)     For the avoidance of doubt, it is expressly agreed that the Tender Amount is the property of the Corporation. The Corporation agrees to apply the Tender Amount in accordance with the Tender Account Supplement.

(1)     The Tender Account Supplement shall contain provisions to the effect that the Contract Administrator shall pay the Tender Payments at the direction of the Dealer Manager in such amounts and at such times as is necessary to timely make the Tender Payments to the Relevant 2005 Owners entitled to the same.

1974114.0069/401750                11

13-53846-tjt   Doc 348-5   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 13 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 40 of 1589]

(2)      The Tender Account Supplement shall also contain provisions to the effect that the Contract Administrator will pay each Tender Payment at the direction of the Dealer Manager on a delivery vs. payment basis with respect to the related Tender Certificate.

(3)      The Tender Account Supplement shall further contain provisions to the effect that:

(i)      all Tender Certificates received by the Contract Administrator shall be delivered to the 2005 Trustee for cancellation;

(ii)      unless all Tender Certificates have been tendered on the date hereof;

(A)      as to any Tender Certificate received by the Contract Administrator as being tendered in part, the Contract Administrator shall direct the 2005 Trustee to authenticate a new 2005 Certificate in the principal amount of the untendered portion of such Tender Certificate; and

(B)      upon receipt, the Contract Administrator shall transfer each such new 2005 Certificate to the Dealer Manager for re-transfer to the Relevant 2005 Owner entitled thereto.

(4)      Provision shall be made in the Tender Account Supplement for the payment of all fees and expenses in connection with the tender.

(5)      The Corporation shall provide in the Tender Account Supplement that any amount remaining in the Tender Account after making all Tender Payments and payment of all fees and expenses due in connection with the tender shall be paid to the City.  Thereupon, any such amount shall be the property of the City.

## Section 13.      Notice of Prepayment

(a)      The City hereby states its intention to prepay the Subject 2005 Scheduled Payments on the 2005 Prepayment Date.  Set forth in the Non-Tender Schedule are the particulars required by Section 5.03(c) of the 2005 Service Contract (*2005 Section 5.03(c)* and Section 5.03(d) of the 2005 Service Contract, *2005 Section 5.03(d)*).

(b)      The Corporation accepts **Section 13(a)** and the information contained in **Non-Tender Schedule** as being in full compliance with the Prepayment Notice provisions of 2005 Section 5.03(c) and waives the 45 day notice period provided for therein.

(c)      Because, as set forth in the Non-Tender Schedule, the Hedge Amount is $0, the City is not required to give any evidence pursuant to 2005 Section 5.03(d) regarding the availability of the Hedge Amount.

(d)      The City represents and warrants to the Corporation that the prepayment of the Subject 2005 Scheduled Payments will not cause it to default under any agreement to which it is a party in connection with the Funding represented by the Subject 2005 Scheduled Payments.

The Corporation states that such representation and warranty is satisfactory for the purposes of 2005 Section 5.03(d).

(e)    The prepayment of the 2005 Scheduled Payments shall be accomplished by the Corporation acting in accordance with **Section 3(b)(2)**.

**In Witness Whereof,** the parties hereto have set their respective hands on the date first set forth above.

*[Signatures appear on pages S-1 et seq.]*

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/13:08:2013  17:08

CONFIDENTIAL INFORMA

mark.angelov@arentfox.com

Detroit/13:08:2013   17:08

[Signature Page Detroit General Retirement System Service Contract 2006 between the **Detroit General Retirement System Service Corporation** and the City of Detroit]

**City of Detroit**

By _____

Roger Short
Interim Finance Director

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/13:08:2013 17:08

[Signature Page Detroit General Retirement System Service Contract 2006 between the Detroit General Retirement System Service Corporation and the City of Detroit]

**Detroit General Retirement System Service Corporation**

By _____

Roger Short
President

CONFIDENTIAL INFORMATION
k.angelov@arentfox.com
Detroit 7/08/2013 17:08

**Index Rate Funding Cost Supplement**
to
**GRS Service Contract 2006**

**Section 1.    Determination of Index Rate Service Charges**

(a)    The *Index Rate Service Charges* for any Index Rate Service Charge Period are equal to Three-Month LIBOR plus the applicable Margin determined by the Contract Administrator on the Index Rate Service Charge Determination Date immediately preceding such Index Rate Service Charge Period and computed using the Index Rate Day Count Convention.

(b)    Index Rate Service Charges determined for any Index Rate Service Charge Period are effective on the Index Rate Service Charge Adjustment Date for such Index Rate Service Charge Period.

**Section 2.    Defined Terms – Generally**

The following terms have the respective meanings for the purpose of determining Index Rate Service Charges *unless* the context clearly otherwise requires:

*Index Rate Day Count Convention* is the actual number of days elapsed in a year of 12, 30-day months.

*Index Rate Service Charge Determination Dates* are the LIBOR Rate Determination Dates.

*Index Rate Service Charge Adjustment Dates* are the first day of each Index Rate Service Charge Period.

*Index Rate Service Charge Payment Dates* are the 15th day of each calendar quarter (or, if such day is not a Business Day, the immediately following Business Day), commencing with September 2006.

*Index Rate Service Charge Period* is the period beginning on (and including) the Closing Date or the most recent Index Rate Service Charge Payment Date and ending on (but not including) the Index Rate Service Charge Payment Date on which Index Rate Service Charges were paid in full by the City.

*Margin* means (i) for Scheduled Payments due on June 15, <u>2029</u>, 30 basis points (0.30%) and (ii) for Scheduled Payments due on June 15, <u>2034</u>, 34 basis points (0.34%).

**Section 3.    Defined Terms – Determination of Three-Month LIBOR**

The following terms have the respective meanings for the purpose of determining Three-Month LIBOR *unless* the context clearly otherwise requires:

*LIBOR Business Day* means a Business Day on which banks in both London and New York City also are open for the transaction of business.

*LIBOR Rate Determination Date* means, with respect to a particular Index Rate Service Charge Adjustment Date, the second LIBOR Business Day immediately before such Index Rate Service Charge Adjustment Date.

*Reference Bank* means a leading bank other than the Contract Administrator engaged in transactions in Eurodollar deposits in the international Eurocurrency market *and* not controlled by or under common control with the Contract Administrator.

CIAL INFORMATION
mark.angelov@arentfox.com

***Three-Month LIBOR*** means for a particular LIBOR Rate Determination Date, the London Interbank Offered Rate for deposits in U.S. dollars with a three-month maturity that appears on Telerate Page 3750 as of 11:00 a.m., London time. *If* such rate does not appear on Telerate page 3750, *then* the rate for that day shall be determined by the alternative method described in **Section 4**.

## Section 4.     Alternative Method of Determining Three-Month LIBOR

The following constitutes the alternative method for determining Three-Month LIBOR when a rate for a London Interbank Offered Rate for deposits with a three-month maturity in U.S. dollars *does not* appear on Telerate Page 3750 as of 11:00 a.m., London time, for a particular LIBOR Rate Determination Date.

(1)     The rate for such LIBOR Rate Determination Date shall be determined on the basis of the rates at which deposits in U.S. dollars for a three-month maturity and in a principal amount of at least US$1,000,000 are offered at approximately 11:00 a.m., London time, on such LIBOR Rate Determination Date to prime banks in the London interbank market by at least three Reference Banks selected by the Contract Administrator. The Contract Administrator shall request the principal London office of each Reference Bank to provide a quotation of its rate. *If* at least two quotations are provided *then* ***Three-Month LIBOR*** for such LIBOR Rate Determination Date shall be the arithmetic mean of such quotations.

(2)     *If* fewer than two quotations are provided, *then* ***Three-Month LIBOR*** for such LIBOR Rate Determination Date shall be the arithmetic mean of the rates quoted by three major banks in New York City, selected by the Contract Administrator, at approximately 11:00 a.m., New York City time, on such LIBOR Rate Determination Date, for loans to leading European banks in U.S. dollars in a principal amount of at least US$ 1,000,000 having a three-month maturity.

(3)     *If* banks selected by the Contract Administrator for the purposes of **paragraph (2) above**, are not quoting rates for such loans, *then* ***Three-Month LIBOR*** for such LIBOR Rate Determination Date shall be the Three-Month LIBOR for the immediately preceding LIBOR Rate Determination Date.

*[End of Index Rate Funding Cost Supplement]*

1974.114.0069\401747                                     2
13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 19 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 46 of 1589]

CONFIDENTIAL INFORMATION
mark.angolov@arentfox.com
Detroit/13:08:2013   17:08

**Schedule 1**
**Stated Amounts Funding Schedule**
**to**
**GRS Service Contract 2006**

The Corporation is obligated to fund the amounts (which constitute the *Stated Funding Amount*) set forth opposite the respective payment purposes.  Such amounts shall be disposed of as provided below.

| Payment Purpose | Amount | Disposition |
|---|---|---|
| **Transaction Amount** | | |
| Non-Tender Amount | $64,342,975.99 | To be applied as provided in Section 11. |
| Tender Amount | $274,363,848.80 | To be applied as provided in Section 12. |
| *Less:* 2005 Hedge Termination Receivables | ($9,178,382.27) | To be applied to the reduction of the Tender Amount[1] |
| **Total Transaction Amount** | $329,528,442.52 | |
| **Ancillary Amounts** | | |
| Costs of Issuance | $20,302,637.59 | To be paid to the Persons entitled thereto |
| Underwriters' Discount | 2,864,919.89 | Paid as a discount from the purchase price of the Certificates |
| Total Ancillary Amounts | $23,167,557.48 | |
| **Stated Funding Amount** | $352,696,000.00 | |

---

[1] **Section 10** provides that the balance of the 2005 Hedge Termination Receivables is to be paid to the City.  The total amount of 2005 Hedge Termination Receivables (from the Schedule of 2005 Hedges to be Terminated) is $19,999,130.00.  This amount *less* $9,178,382.27, the amount to be applied to the reduction of the Tender Amount, leaves a balance of $10,820,747.73 to be paid to the City pursuant to **Section 10**.

1974114.0069/401675

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 20 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 47 of 1589]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/13.08.2013    17:08

**Schedule 1A**
**Schedule of 2005 Hedges to be Terminated**
**to**
**GRS Service Contract 2006**

| Hedge Counterparty | Notional Amount | Amount to be Terminated | Hedge Termination Receivable |
|---|---|---|---|
| UBS AG | $161,400,000 | $161,400,000 | $12,130,515 |
| Citibank, N.A. | $53,800,000 | $53,800,000 | $3,825,110 |
| SBS Financial Products Company, LLC | $53,800,000 | $53,800,000 | $4,043,505 |

1974114 0069/401675
13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 21 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 48 of 1589]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Exhibit/13:08:2013 17:08

**Schedule 1B-NTS**
**Non-Tender Schedule**
**to**
**GRS Service Contract 2006**

**2005 Prepayment Date:  July, 13, 2006**
**Funding Rate Portion:  Fixed**

| Subject 2005 Scheduled Payment | 2005 Scheduled Payment Dates (June 15 of each Year) For Reference Purposes Only | 2005 Prepayment Premium[1] | Service Charge Rate | Service Charges due 06/15/06 | Service Charges Accrued to 2005 Prepayment Date |
|---|---|---|---|---|---|
| $5,055,000 | 2007 | $24,290.04 | 4.004% | $101,201.10 | $15,742.39 |
| 7,435,000 | 2008 | 35,726.30 | 4.154% | 154,424.95 | 24,021.66 |
| 10,095,000 | 2009 | 48,508.00 | 4.234% | 213,711.15 | 33,243.96 |
| 8,180,000 | 2010 | 39,306.14 | 4.314% | 176,442.60 | 27,446.63 |
| 7,340,000 | 2011 | 35,269.81 | 4.404% | 161,626.80 | 25,141.95 |
| 7,720,000 | 2012 | 37,095.77 | 4.453% | 171,885.80 | 26,737.79 |
| 8,115,000 | 2013 | 38,993.80 | 4.503% | 182,709.23 | 28,421.44 |
| 8,535,000 | 2014 | 41,011.97 | 4.563% | 194,726.03 | 30,290.72 |
| $62,475,000 | | $300,201.82 | | $1,356,727.65 | $211,046.52 |

**Summary**
Subject 2005 Scheduled Payments ............... $62,475,000.00
Service Charges due 06/15/06 ........................... 1,356,727.65
Accrued Service Charges to
  2005 Prepayment Date ............. ...................211,046.52
2005 Prepayment Premiums ...............................300,201.82[1]
Non-Tender Amount ................. ..............  $64,342,975.99

**For the purposes of 2005 Section 5.03(c):**
- The Optional Prepayment Amount is the sum of the Subject 2005 Scheduled Payments and the 2005 Prepayment Premiums.
- The Accrued Service Charges are the sum of the Service Charges due 06/15/06 and the Accrued Service Charges to the 2005 Prepayment Date.
- The Hedge Amount is $0, there being Hedge Termination Receivables due the Corporation.
- The Total Prepayment Amount is the Non-Tender Amount.

---

[1] Includes $300,201.82 contingency since actual Prepayment Premiums cannot be determined until 3 business days prior to 2005 Prepayment Date.

1974114 0069/401675
13-53846-tjt   Doc 348-5   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 22 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 49 of 1589]

CONFIDENTIAL INFORMATION
mark.angelos@arentfox.com
Detroit/13:08:2013 17:08

**Schedule 1B-TS**
**Tender Schedule**
**to**
**GRS Service Contract 2006**

**Tender Payment Date:** June 12, 2006
**Funding Rate Portion:** Variable Rate

| Subject 2005 Scheduled Payment | 2005 Scheduled Payment Dates (June 15 of each Year) For Reference Purposes Only | Tender Scheduled Payments | Tender Premiums | Service Charge Rate | Service Charges Accrued to Tender Payment Date |
|---|---|---|---|---|---|
| $269,000,000 | 2025 | $269,000,000 | $1,076,000 | 3M LIBOR + 0.28% | $3,451,494.17 |

Tender Scheduled Payments.....................$269,000,000.00
Tender Premiums ...........................................1,076,000.00
Accrued Service Charges to
    Tender Payment Date...............................3,451,494.17
Tender Fees and Expenses.............. .................. 836,354.63
**Tender Amount** ....................................**$274,363,848.80**

CONFIDENTIAL INFORMATION
mark.angelo@arentfox.com
Detroit/13.00.2013  17:08

**Schedule 2**
**Scheduled Payments Attachment**
to
**GRS Service Contract 2006**

Scheduled Payments are due on the following Scheduled Payment Dates in the respective amounts set forth opposite such dates

| Scheduled Payment Dates (June 15 of each year) | Service Charge Class | | | |
|---|---|---|---|---|
| | Fixed Rate Scheduled Payments | Fixed Rate Service Charge Rates | Index Rate Scheduled Payments | Index Rate Service Charge Rates |
| 2029 | - | - | $90,504,000 | 3M LIBOR + 0.30%* |
| 2030 | - | - | - | - |
| 2031 | - | - | - | - |
| 2032 | - | - | - | - |
| 2033 | - | - | - | - |
| 2034 | - | - | $193,242,000 | 3M LIBOR + 0.34%* |
| 2035 | $68,950,000 | 5.989% | - | - |
| Totals | $68,950,000 | | $283,746,000 | |

* Index Rate Service Charge Rates are determined in accordance with the **Index Rate Funding Cost Supplement**

1974114.0069/401675

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 24 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 51 of 1589]

FIDENTIAL INFOR
mark.angl @ entfox.com
Detr 17.08

**Schedule 3**
**Sinking Fund Installments Attachment**
**To GRS Service Contract 2006**

Scheduled Payments due on the following Scheduled Payment Dates are subject to mandatory prepayment on the following Scheduled Payment Dates in the respective amounts set forth opposite such dates, each of which constitutes the Sinking Fund Installment due on the respective Sinking Fund Installment Date.

### Sinking Fund Installments of Scheduled Payments Due 2029

| Scheduled Payment Dates (June 15 of each year) | Service Charge Class Index Rate |
|---|---|
| 2026 | $26,459,000 |
| 2027 | 28,107,000 |
| 2028 | 29,857,000 |
| 2029* | 6,081,000 |
| Total | $90,504,000 |

*Final maturity, not a Sinking Fund Installment Date

### Sinking Fund Installments of Scheduled Payments Due 2034

| Scheduled Payment Dates (June 15 of each year) | Service Charge Class Index Rate |
|---|---|
| 2029 | $25,634,000 |
| 2030 | 33,699,000 |
| 2031 | 35,810,000 |
| 2032 | 38,052,000 |
| 2033 | 40,435,000 |
| 2034* | 19,612,000 |
| Total | $193,242,000 |

*Final maturity, not a Sinking Fund Installment Date

### Sinking Fund Installments of Scheduled Payments Due 2035

| Scheduled Payment Dates (June 15 of each year) | Service Charge Class Fixed Rate |
|---|---|
| 2034 | $23,355,000 |
| 2035* | 45,595,000 |
| Total | $68,950,000 |

*Final maturity, not a Sinking Fund Installment Date

1974114.0069/401675

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 25 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 52 of 1589]

FIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/13:08:2013 17:08

**Schedule 4**

**Schedule of Credit Insurance**

to

**GRS Service Contract 2006**

| Service Charge Class/ Scheduled Payment Date | Financial Agreement | Provider |
|---|---|---|
| Index Rate/2029 | Bond Insurance Policy | XL Capital |
| Index Rate/2034 | Bond Insurance Policy | FGIC |
| Fixed Rate/2035 | Bond Insurance Policy | FGIC |

1974114.0069/401675

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 26 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 53 of 1589]

**Schedule 5**

**Schedule of Stated Hedges**

to

**GRS Service Contract 2006**

| Service Charge Class | Type of Hedge | Hedge Counterparty | Notional Amount | Termination Date |
|---|---|---|---|---|
| Index Rate | Variable to Fixed: Corporation pays fixed; Counterparty pays 3 month LIBOR + 0.30% | UBS AG | $45,252,000 | 2029 |
| Index Rate | Variable to Fixed: Corporation pays fixed; Counterparty pays 3 month LIBOR + 0.30% | SBS Financial Products Company. LLC[1] | $45,252,000 | 2029 |
| Index Rate | Variable to Fixed: Corporation pays fixed: Counterparty pays 3 month LIBOR + 0.34% | UBS AG | $96,621,000 | 2034 |
| Index Rate | Variable to Fixed: Corporation pays fixed: Counterparty pays 3 month LIBOR + 0.34% | SBS Financial Products Company. LLC[2] | $96,621,000 | 2034 |

---

[1] Merrill Lynch Capital Services, Inc. ("*MLCS*"), the credit support provider of SBS, shall obtain the rights and be subject to the obligations of a Stated Hedge Counterparty hereunder upon the occurrence of a Transfer Party Accession Event (as defined in the Contract Administration Agreement), as a Stated Hedge Counterparty pursuant to the Transaction Transfer Agreement dated as of June 7, 2006 among the Corporation, SBS and MLCS. In no event shall SBS and MLCS simultaneously have the same rights hereunder.

[2] Merrill Lynch Capital Services, Inc. ("*MLCS*"), the credit support provider of SBS, shall obtain the rights and be subject to the obligations of a Stated Hedge Counterparty hereunder upon the occurrence of a Transfer Party Accession Event (as defined in the Contract Administration Agreement), as a Stated Hedge Counterparty pursuant to the Transaction Transfer Agreement dated as of May 25, 2005 among the Corporation, SBS and MLCS. In no event shall SBS and MLCS simultaneously have the same rights hereunder.

TIAL INFORMATION

mark.angelov@arentfox.com

Detroit/13.08.2013 - 17:08

# General Terms and Conditions

of the

## GRS Service Contract 2006

between the

## Detroit General Retirement System Service Corporation

and the

## City of Detroit

Dated as of June 1, 2006

## Table of Contents

Article I — Definitions and Related Matters ........................................................... 1
   Section 1.01. Certain Definitions ................................................................................. 1
   Section 1.02. Other Definitions ................................................................................... 5
   Section 1.03. Service Payment Components ................................................................ 6
   Section 1.04. Business Days ........................................................................................ 6
   Section 1.05. Certificates Held in Book-Entry Form ................................................. 6
   Section 1.06. Interpretation ......................................................................................... 6

Article II — Terms of Service Contract ................................................................. 7
   Section 2.01. Particulars of Specific Terms ............................................................... 7
   Section 2.02. Variation of General Terms; Conflict with General Terms ................. 8

Article III — Representations and Warranties........................................................ 8
   Section 3.01. Representations of the Corporation........................................................ 8
   Section 3.02. Representations of the City ................................................................... 9
   Section 3.03. Labor Related Representations of City and Corporation ..................... 10

Article IV — Service and Funding Arrangements ............................................... 10
   Section 4.01. Provision of Services............................................................................ 10
   Section 4.02. Payment Obligation.............................................................................. 11
   Section 4.03. Funding Obligation .............................................................................. 11
   Section 4.04. Disposition of Certificate Proceeds..................................................... 11

Article V — Scheduled Payments.......................................................................... 11
   Section 5.01. Scheduled Payments............................................................................. 11
   Section 5.02. Mandatory Prepayment by Sinking Fund Installments ....................... 11
   Section 5.03. Optional Prepayment of Scheduled Payments ..................................... 12
   Section 5.04. Satisfaction of Scheduled Payments by Delivery of Certificates........ 14

Article VI — Service Charges................................................................................ 14
   Section 6.01. Agreement to Pay Service Charges; Funding Costs ............................ 14
   Section 6.02. Prepaid Service Charges; Hedge Receivables...................................... 15
   Section 6.03. Fixed Rate Funding Methodology ....................................................... 15
   Section 6.04. Variable Rate Funding Methodology................................................... 15
   Section 6.05. Accreted Value Funding Methodology................................................ 16

Article VII — General Provisions Governing Service Payments and Contract
               Administrator Payments ........................................................................ 17
   Section 7.01. Time of Service Payments.................................................................... 17
   Section 7.02. Hedge Payables .................................................................................... 17
   Section 7.03. Subrogation .......................................................................................... 17
   Section 7.04. Investment ............................................................................................ 18
   Section 7.05. Satisfying Service Contract Deficiencies............................................. 18
   Section 7.06. No Set-Off............................................................................................. 19

1974114 0069\401794

i

13-53846-tjt Doc 348-5 Filed 08/16/13 Entered 08/16/13 17:13:58 Page 29 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 56 of 1589]

NFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/13_08_2013_17_03

**Article VIII — Satisfaction of Service Payments and Contract Administrator Payments**................................................................................... 19

  **Section 8.01.** Certain Defined Terms ........................................................................... 19
  **Section 8.02.** Preservation of Parity among Service Contracts............................... 19
  **Section 8.03.** Satisfaction of Service Payments ......................................................... 20

**Article IX — Miscellaneous** ......................................................................................... 20

  **Section 9.01.** Acceleration on Bankruptcy.................................................................. 20
  **Section 9.02.** Termination or Assignment of Stated Hedges ................................... 20
  **Section 9.03.** Required Ratings of Hedge Counterparties........................................ 21
  **Section 9.04.** Addresses for Notices............................................................................ 21
  **Section 9.05.** Amendment ............................................................................................. 21
  **Section 9.06.** No Waiver; Remedies............................................................................. 22
  **Section 9.07.** Binding Obligation................................................................................. 22
  **Section 9.08.** General Corporate Expenses ................................................................ 22
  **Section 9.09.** Fees and Expenses.................................................................................. 22
  **Section 9.10.** Permitted Assignment. .......................................................................... 23
  **Section 9.11.** Direct Payment of Service Payments; "Successor" Defined ............ 24
  **Section 9.12.** Third Party Beneficiaries ..................................................................... 24
  **Section 9.13.** Reliance on Representations and Warranties .................................... 25
  **Section 9.14.** Contract Administration........................................................... ........... 25
  **Section 9.15.** Governing Law........................................................................................ 25
  **Section 9.16.** Headings.................................................................................................. 25
  **Section 9.17.** Integration ................................................................... ................... . 25
  **Section 9.18.** Counterparts ........................................................................................... 26

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 30 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 57 of 1589]

AL INFORMATION
mark.angelov@arentfox.com
Detroit/13.06.2013 17:08

GENERAL TERMS AND CONDITIONS
OF THE
GRS SERVICE CONTRACT 2006
OF THE
DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION
Dated as of June 1, 2006
(the *General Terms*)

The General Terms govern the 2006 GRS Service Contract between the Detroit General Retirement System Service Corporation (the *Corporation*) and the City of Detroit (the *City*).

### Article I — Definitions and Related Matters

#### Section 1.01. Certain Definitions

In addition to terms elsewhere defined in this Service Contract, the following terms shall have the following respective meanings *unless* the context otherwise clearly indicates:

*Accreted Value Funding Portion* means the portion, if any, of the amount to be funded pursuant to the particular Specific Terms equal to the total of the Accreted Value Scheduled Payments, in any, set forth in the Specific Terms.

*Accreted Value Scheduled Payments* means those Scheduled Payments identified as such in the Specific Terms.

*Act of Council* means the ordinance or resolution of the City Council identified in the Specific Terms as the "Act of Council".

*Additional Service Payment* means an amount payable as General Corporate Expenses or pursuant to **Section 9.09** *other* than Contract Administrator Payments.

*Ancillary Amounts* means the Costs of Issuance, Prepaid Service Charges and Underwriter's Discount.

*Authorized Investments* means

    (i)   direct obligations of, or obligations unconditionally guaranteed by, the United States of America (*US Governments*) and

    (ii)   repurchase agreements whereby the counterparty agrees to repurchase obligations described in **clause (i)** *so long as* the obligations to be repurchased are under the exclusive "control" (as defined in Article 8 of the applicable Uniform Commercial Code or correlative Treasury Regulations) of the Corporation.

STRIPS issued by the United States Treasury are Authorized Investments for the purposes of **clause (i),** *but* private proprietary stripped US Governments, whether interest or principal strips, are not Authorized Investments.

*Business Day* means any day on which both City and the Trustee are open for the transaction of business and in respect of any Service Charge Class has the meaning given in accordance with the Funding Rate Methodology for such Service Charge Class for actions taken in respect of such Funding Rate Methodology.

1974114 0069\401794

1

*Certificates* or *Certificates of Participation* mean the Certificates of Participation issued by the Funding Trust representing beneficial interests in the Service Payments *other* than Hedge Payables, Contract Administrator Payments and Additional Service Payments.

*Closing* means the delivery of particular Certificates to the Underwriters upon receipt of payment therefor and the other actions contemplated by the Underwriting Agreement to occur in connection therewith.

*Closing Date* means, with respect to particular Certificates, the date provided for in the particular Specific Terms on which the Closing occurs pursuant to the Underwriting Agreement.

*Contract Payments* means Service Payments and Additional Service Payments.

*Contract Administration Agreement* means the agreement identified in the Specific Terms as the "Contract Administration Agreement".

*Contract Administrator* means the Person serving as the "Contract Administrator" under the Contract Administration Agreement.

*Contract Administrator Payments* means amounts equal to amounts payable as fees, expenses and indemnification of the Contract Administrator pursuant to **Section 9.09**.

*Costs of Issuance* means the amount set forth in the particular Specific Terms as the "Costs of Issuance".

*Credit Insurance* means any insurance intended to protect owners of Certificates from loss arising from a failure of the City to timely pay Service Charges or Scheduled Payments. *Credit Insurance* also means any financial arrangement intended to protect a Hedge Counterparty from a failure of the Corporation to timely pay any Hedge Payable.

*Disclosure Document* means any preliminary or final offering document or other disclosure document prepared for use by the Underwriters in connection with the initial public offering of Certificates.

*Finance Director* has the meaning given that term in the Act of Council.

*Fixed Rate Funding Portion* means that the portion, if any, of the amount to be funded pursuant to the particular Specific Terms equal to the total of the Scheduled Payments set forth for Fixed Rate Service Charges.

*Funding Cost Supplement* means the document or particular provisions, if any, identified in the particular Specific Terms as a "Funding Cost Supplement".

*Funding* means the Initial Funding or an Additional Funding.

*Funding Rate Methodology* means the Fixed Rate Funding Methodology, any Variable Rate Funding Methodology or the Accreted Value Funding Methodology, as the context may require.

*Funding Rate Portion* means the Fixed Rate Funding Portion, the Variable Rate Funding Portion or the Accreted Value Funding Portion as the context may require.

*Funding Trust* means the trust established by the Trust Agreement.

*General Corporate Expenses* means such periodic amounts as may be necessary to provide for the general administrative expenses of the Corporation as authorized or permitted by Ordinance No. 05-05, as in effect on the date hereof.

*Hedge* means an interest rate swap or other derivative instrument authorized or permitted by the Act of Council.

*Hedge Counterparty* means, as to any Stated Hedge, the Person identified in the particular Specific Terms as the "Hedge Counterparty".

*Hedge Payable* means, after giving effect to any netting under the particular Stated Hedge, any Hedge Periodic Payable or any Hedge Termination Payable as the context may require.

*Hedge Periodic Payable* means, after giving effect to any netting under the particular Stated Hedge, a periodic amount owing by the Corporation under a Stated Hedge to the respective Hedge Counterparty.

*Hedge Periodic Receivables* means, after giving effect to any netting under the particular Stated Hedge, periodic payments owing by the Hedge Counterparty under a Stated Hedge.

*Hedge Receivable* means any Hedge Periodic Receivable or Hedge Termination Receivable as the context may require.

*Hedge Termination Payable* means, after giving effect to any netting under the particular Stated Hedge, any termination payment owing by the Corporation under a Stated Hedge to the respective Hedge Counterparty.

*Hedge Termination Receivable* means, after giving effect to any netting under the particular Stated Hedge, any termination payment owing by the Hedge Counterparty under a Stated Hedge.

*Insurer* means the Person obligated under Credit Insurance to make payments with respect to Certificates or a Stated Hedge.

*Investable Funds* means amounts representing Costs of Issuance and Prepaid Service Charges.

*Payment Time* means noon (12:00), Detroit time.

*Person* means any natural person, firm, association, corporation, trust, partnership, joint venture, joint-stock company, municipal corporation, public body or other entity, however organized.

*Prepaid Service Charges* means the amount set forth in the particular Specific Terms as the "Prepaid Service Charges".

*Regular Scheduled Payment* means the amount of a Scheduled Payment due on its Scheduled Payment Date.

*Representative* means the Person identified in the particular Specific Terms as the "Representative".

*Scheduled Payment Dates* means the dates set forth in the particular Specific Terms as the "Scheduled Payment Dates".

1974114 0069\401794

3

13-53846-tjt   Doc 348-5   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 33 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 60 of 1589]

*Scheduled Payments* means the amounts set forth in the particular Specific Terms as the "Scheduled Payments".

*Service Charge Payment Date* means a Fixed Rate Service Charge Payment Date or a Variable Rate Service Charge Payment Date for a particular Variable Rate Funding Type, as the context may require.

*Service Charge Class* means all Scheduled Payments that have the same Funding Rate Methodology.

*Service Contract* means the 2006 Service Contract between the City and the Corporation consisting of these General Terms and the 2006 Specific Terms.

*Service Contract Deficiency* means any unsatisfied amount under a Service Contract Deficiency Clause.

*Service Contract Deficiency Clause* means the following **clauses** set forth in **Section 8.03: First** (to the extent any fees, expenses and indemnity is at the time due and unpaid to the Contract Administrator), **Second**, **Fourth** and **Sixth**.

*Service Payment* means any Contract Administrator Payment, Service Charge (regardless of Funding Rate Methodology), Regular Scheduled Payment or Sinking Fund Installment, amounts in respect of any Hedge Payable, Optional Prepayment or Accrued Service Charge as the context may require.

*Specific Terms* means that part of the Service Contract that provides the particulars of the a Funding.

*Stated Funding Amount* means the amount identified in the particular Specific Terms as the "Stated Funding Amount".

*Stated Hedge* means a Hedge identified in the particular Specific Terms as a "Stated Hedge".

*Third Party Beneficiary* means any Person so identified in **Section 9.12**.

*Transaction Amount* means the amount set forth in the Specific Terms as the "Transaction Amount".

*Trust Agreement* means the Trust Agreement identified in the particular Specific Terms.

*Trust Estate* means the property identified as the "Trust Estate" in the Trust Agreement.

*Trustee* means the Person acting as trustee under the Trust Agreement.

*Type* as in *Variable Rate Funding Type* (and correlative usages) means a method by which Variable Funding Rates are determined, such as by Dutch auction, by reference to an identified index (such as the London Interbank Offered Rate or "LIBOR") or by remarketing or any other means customarily used to determine variable rates in municipal or corporate finance. "Type" when used with respect to a Service Charge Class has the correlative meaning.

*Underwriters* means the Representative and the other Persons identified in the Underwriting Agreement as the "Underwriters".

*Underwriters' Discount* means the amount set forth in the particular Specific Terms as the "Underwriters' Discount".

1974114 0069\401794

4

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 34 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 61 of 1589]

*Underwriting Agreement* means the agreement among the Corporation, the City and the Underwriters providing for the public offering of Certificates to fund a Funding.

*Variable Rate Funding Portion* means all or that portion, if any, of the Stated Funding Amount equal to the total of the Scheduled Payments set forth for all types of Variable Rate Service Charge Classes.

### Section 1.02. Other Definitions

Terms defined elsewhere in these General Terms include the following:

| Term | Defined In |
| --- | --- |
| Accreted Value | Section 6.05 |
| Accreted Value Day Count Convention | Section 6.05 |
| Accreted Value Funding Rate Methodology | Section 6.05 |
| Accreted Value Service Charge Rates | Section 6.05 |
| Accreted Value Service Charges | Section 6.01 |
| Accrued Service Charges | Section 5.03 |
| Additional Funding | Section 4.01 |
| Component | Section 1.03 |
| Corporation | General Terms, First Paragraph |
| Day Count Convention | Section 6.04 |
| Delivery Notice | Section 5.04 |
| Eligible Certificates | Section 5.04 |
| Fixed Rate Funding Methodology | Section 6.03 |
| Fixed Rate Scheduled Payments | Section 6.03 |
| Fixed Rate Service Charge Payment Date | Section 6.03 |
| Fixed Rate Service Charges | Section 6.01 |
| Funding Costs | Section 6.01 |
| Hedge Amount | Section 5.03 |
| Initial Funding | Section 4.01 |
| Initial Funding Contract Payments | Section 3.02 |
| Invest | Section 7.04 |
| Investment | Section 7.04 |
| Labor Law or Regulations | Section 3.03 |
| Maturity Value | Section 6.05 |
| Optional Prepayment Amount | Section 5.03 |
| Optional Prepayment Dates | Section 5.03 |
| Optional Prepayment Notice | Section 5.03 |
| Optional Prepayments | Section 5.03 |
| Prepayment Notice | Section 5.03 |
| Prepayment Receipt Day | Section 5.03 |
| Rating Agency | Section 9.02 |
| Related Service Payment | Section 7.03 |
| Service Charges | Section 6.01 |
| Service Charge Determination Dates | Section 6.04 |
| Service Payment | Section 1.01 |
| Service Payment Component | Section 1.03 |

1974114 0069\401794

5

13-53846-tjt   Doc 348-5   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 35 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 62 of 1589]

| Term | Defined In |
|------|------------|
| Sinking Fund Installment Dates | Section 2.01 |
| Sinking Fund Installments | Section 2.01 |
| Total Prepayment Amount | Section 5.03 |
| Valuation Dates | Section 6.05 |
| Variable Rate Funding Methodology | Section 6.04 |
| Variable Rate Scheduled Payments | Section 6.04 |
| Variable Rate Service Charge Payment Dates | Section 6.04 |
| Variable Rate Service Charges | Section 6.01 |

### Section 1.03. Service Payment Components

Service Payments consist of the following components (each, a *Component* or *Service Payment Component*):

- Contract Administrator Payments
- Service Charges (regardless of Funding Rate Methodology)
- Regular Scheduled Payments
- Sinking Fund Installments
- amounts in respect of Hedge Periodic Payables
- amounts in respect of Hedge Termination Payables
- Optional Prepayments
- Accrued Service Charges

### Section 1.04. Business Days

If the Service Contract requires an act to be performed on a day that is not a Business Day then such act shall be performed on the first day thereafter that is a Business Day with the same effect as if such act were performed on the day that such act was otherwise required to be performed.

### Section 1.05. Certificates Held in Book-Entry Form

(a) Actions under the Service Contract to be taken with regard to a Certificate in physical form include analogous actions under Article 8 of the applicable Uniform Commercial Code with respect the indirect holding system (commonly referred to as "book-entry system").

(b) Any such analogous action shall be full satisfaction of its physical analogue.

(c) The Corporation and the City may conclusively presume that any such action analogous to a physical action has been taken in due time and manner as required by law, and neither of them has any duty to enquire with respect thereto.

### Section 1.06. Interpretation

(a) Words of the masculine gender include correlative words of the feminine and neuter genders.

(b) Unless the context otherwise indicates, words importing the singular include the plural and vice versa.

19741140069401794

6

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 36 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 63 of 1589]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/13:08:2013  17:08

(c)    Articles, Sections, Schedules and Attachments referred to by number or name refer to the corresponding Articles, Sections, Schedules and Attachments of the Service Contract unless otherwise provided.

(d)    The terms *hereby, hereof, hereto, herein, hereunder* and any similar terms used in the Service Contract refer to the Service Contract as a whole and not to any particular portion thereof.

(e)    The word *or* is not exclusive.

(f)    The enumeration of things after the word *including* is to be interpreted as illustrative and not as restrictive.

(g)    References to sections of a Public Act, or to a Public Act as a whole, also include any amendments thereto unless otherwise indicated and analogous sections or Public Acts enacted as substitutes therefor.

## Article II — Terms of Service Contract

### Section 2.01.  Particulars of Specific Terms

(a)    The Specific Terms for the Initial Funding shall:

(1)    Incorporate by reference these General Terms;

(2)    State the Stated Funding Amount and the Transaction Amount and Ancillary Amount components thereof;

(3)    Set forth the Scheduled Payments to be made pursuant to the Service Contract and classify the Scheduled Payments by Service Charge Class;

(4)    Set forth any Scheduled Payments subject to mandatory prepayment (***Sinking Fund Installments***), the amount of the Sinking Fund Installments and the Scheduled Payment Dates on which such Sinking Fund Installments are due (***Sinking Fund Installment Dates***);

(5)    Provide for the terms required by **Section 6.03** if the particular Specific Terms provides for Fixed Funding Rate Portion;

(6)    Identify the Funding Cost Supplement (which shall include the terms required by **Section 6.04**) for each Type of Variable Funding Rate Service Charge Class if the particular Specific Terms provides for a Variable Rate Funding Portion;

(7)    Identify the Funding Trust for Certificates and the Trust Agreement establishing such Funding Trust;

(8)    Identify any Hedge and any Credit Insurance to be entered into by the Corporation with respect to one or more Service Charge Classes and state that any such Hedge or Credit Insurance is acceptable to the Finance Director;

(9)    Identify the Representative;

(10)    Provide for the Closing Date and the disposition of the proceeds of the particular funding;

1974114 0069\401794

7

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 37 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 64 of 1589]

[GRS Service Contract General Terms]
[Final - GRS]

(11)     Identify the Contract Administration Agreement, if any; and

(12)     Contain such other particulars as agreed to by the Corporation and the City.

(b)     The Specific Terms for an Additional Funding shall contain particulars to the same effect as the Initial Funding so far as necessary or appropriate and such other particulars as shall relate to the particular Additional Funding.

(c)     Specific Terms for an Additional Funding do not constitute an amendment of the Service Contract to provide new services but rather an implementation of services agreed to be provided on the date of the Service Contract. The Service Contract may be restated to include the Specific Terms for an Additional Funding for convenience of reference.

## Section 2.02.  Variation of General Terms; Conflict with General Terms

(a)     Specific Terms may not change **this Section** of these General Terms.

(b)     *Except* as provided above, Specific Terms may delete, modify or otherwise vary these General Terms *but only* as related to a particular Funding *and then only* so long as such does not adversely affect any of the rights of successors to any interest of the Corporation or the rights of any Third Party Beneficiary arising in any prior Funding.

(c)     Any conflict between these General Terms and the terms set forth in any Specific Terms of the Service Contract shall be resolved in favor of the particular Specific Terms so far as not in conflict with **this Section**.

## Article III — Representations and Warranties

Each of the Corporation and the City represent and warrant as set forth in this Article for the mutual benefit of each other and for the benefit of the Funding Trust and the holders from time to time of the Certificates.

## Section 3.01.  Representations of the Corporation

The Corporation makes the following representations and warranties on the date hereof and shall make the same on and as of the Closing Date:

(a)     <u>Corporate Existence and Power</u>.  The Corporation is a nonprofit corporation duly incorporated, validly existing and in good standing under the laws of the State of Michigan.

(b)     <u>Corporate and Governmental Authorization; Contravention</u>.  The execution, delivery and performance by the Corporation of the Service Contract are within the Corporation's corporate powers, have been duly authorized by all necessary corporate action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of applicable law or regulation or of the articles of incorporation or bylaws of the Corporation or of any agreement, judgment, injunction, order, decree or other instrument binding upon the Corporation.

(c)     <u>Binding Effect</u>.  The Service Contract constitutes a valid and binding agreement of the Corporation enforceable in accordance with its terms *except* as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(d)     <u>Litigation</u>.  There is no action, suit or proceeding pending against, or to the knowledge of the Corporation threatened against or affecting the Corporation before any court or

1974114.0069\401794

8

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 38 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 65 of 1589]

arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely the ability of the Corporation to perform its obligations under the Service Contract or which in any manner questions the validity of the Service Contract.

(e)    <u>No Taxation.</u>  The Corporation is not subject to federal income tax or taxation by the State of Michigan.

(f)    <u>Not an Investment Corporation</u>.  The Corporation is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

## Section 3.02.  Representations of the City

The City makes the following representations and warranties on the date hereof and shall make the same on and as of the Closing Date:

(a)    <u>Corporate and Governmental Authorization; Contravention</u>.    The execution, delivery and performance by the City of the Service Contract are within the City's powers, have been duly authorized by all necessary action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of applicable law or regulation or of the City Charter or of any agreement, judgment, injunction, order, decree or other instrument binding upon the City.

(b)    <u>Conditions Precedent</u>.  All acts, conditions and things required by the Constitution and laws of the State of Michigan or the Act of Council to exist, to have happened and to have been performed precedent to and in the execution and delivery of the Service Contract by the City and the authorization of the Contract Payments in connection with the Initial Funding (**Initial Funding Contract Payments**) exist, have happened and been performed in due time, form and manner required by the Constitution or law in order to make the Service Contract a valid and binding obligation of the City, including the obligation to make the Initial Funding Contract Payments.

(c)    <u>No Indebtedness</u>.  The obligation of the City to make Contract Payments does not constitute or create any indebtedness of the City within the meaning of the limitation of The Home Rule City Act or any Michigan constitutional or other non-tax statutory or City charter limitation.

(d)    <u>Valid and Binding Agreement</u>.    The Service Contract constitutes a valid and binding agreement of the City enforceable in accordance with its terms *except* as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(e)    <u>Transaction Amount</u>.  The amount of the Transaction Amount does not exceed the amount for which City is authorized by the Act of Council to engage the services of the Corporation by entering into the Service Contract.

(f)    <u>Ancillary Amounts</u>.    The Costs of Issuance, Prepaid Service Charges and Underwriters' Discount represent the costs, fees and expenses that the City is authorized to pay by the Act of Council for the respective purposes and do not exceed the amounts permitted by the Act of Council.

1974114 0069\401794

9

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 39 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 66 of 1589]

## Section 3.03.  Labor Related Representations of City and Corporation

Each of the City and the Corporation respectively represents and warrants as to itself, severally and not jointly, that none of the

(1)     execution, delivery and performance of the Service Contract by the City or the Corporation;

(2)     the execution, delivery and performance of the Trust Agreement by the Corporation;

(3)     the conveyance of the Corporation's interests in the Service Charges and Scheduled Payments to the Funding Trust (or the granting of a security interest therein to the Funding Trust) and the issuance and sale of the Certificates; or

(4)     the performance by the Trustee of its duties under the Trust Agreement in respect of the Certificates

requires any action by or in respect of, or filing with any labor union or any governmental body, agency or official responsible for enforcing federal or State of Michigan labor laws or regulations (collectively, ***Labor Laws or Regulations***), or contravenes or constitutes a default under, any provision of applicable Labor Laws or Regulations or any collective bargaining agreement (as the same may have been modified by custom or practice) or other labor agreement, or any judgment, injunction, order or decree or other instrument in respect of any Labor Laws or Regulations.

## Article IV  —  Service and Funding Arrangements

## Section 4.01.  Provision of Services

(a)     The services of the Corporation are described in the preamble to the Act of Council.  The Corporation shall provide its services through taking the actions set forth below.

(1)     The Corporation shall fund the Stated Funding Amount on the Closing Date in the manner set forth in the Specific Terms (the ***Initial Funding***).

(2)     The Corporation shall fund any Hedge Termination Payable in whole or in part as requested of the City and approved by the City Council.

(3)     The Corporation shall fund payment of some or all Service Payments as are requested by the City and approved by City Council to provide future financial benefits to the City (funding pursuant to **this paragraph** or **paragraph (2), above,** an ***Additional Funding***).  An Additional Funding shall be accomplished under one or more other service contracts and not under this Service Contract.

(4)     An Additional Funding may include such things in the nature of Costs of Issuance, Prepaid Service Charges and Underwriters' Discount as authorized or permitted by the approval of the City Council of the Additional Funding.

(b)     "Funding", as used above, means the provision of money through the issuance of Certificates and does not mean or imply any further authorization of the City to make any Contract Payment *other than* Contract Payments in connection with any Additional Funding.

1974114 0069401794

10

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 40 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 67 of 1589]

## Section 4.02.  Payment Obligation

(a)     The City agrees to make Contract Payments to the Corporation in return for the present and future services of the Corporation under **Section 4.01** as and when Contract Payments become due and payable.

(b)     The obligations of the City hereunder, including its obligation to make Contract Payments, are contractual obligations of the City, enforceable in the same manner as any other contractual obligation of the City, and are *not* general obligations of the City to which the City has pledged its full faith and credit.

## Section 4.03.  Funding Obligation

(a)     The obligation of the Corporation to provide the Initial Funding or any Additional Funding is subject to the receipt by the Corporation of proceeds sufficient for the Funding from the sale of Certificates.

(b)     The Corporation shall use its best efforts to cause the consummation of the offering and sale by the Underwriters of Certificates to provide sufficient proceeds for the particular Funding.

(c)     The City agrees to provide such information about the City of Detroit as may be reasonably required by the Underwriters for inclusion in the Disclosure Document and to otherwise reasonably cooperate in the offering and sale of Certificates by the Underwriters.

(1)     The City agrees to become a party to the Underwriting Agreement if the Underwriting Agreement is satisfactory in form and substance to the Finance Director.

(2)     The City agrees to enter into a continuing disclosure agreement and take such other actions as shall be necessary or appropriate to assist the Underwriters in meeting their obligations under Rule 15c2-12 of the Securities and Exchange Commission.

## Section 4.04.  Disposition of Certificate Proceeds

The Corporation shall apply the proceeds of the sale of Certificates as provided in the Specific Terms for the particular Funding.

## Article V — Scheduled Payments

## Section 5.01.  Scheduled Payments

The City agrees to pay the Scheduled Payments of each Funding Rate Portion to the Corporation on the respective Scheduled Payment Dates for such Funding Rate Portion.  For the avoidance of doubt, Scheduled Payments do not include Hedge Payables.

## Section 5.02.  Mandatory Prepayment by Sinking Fund Installments

The City agrees to prepay such Scheduled Payments as Sinking Fund Installments of each Funding Rate Portion on such Sinking Fund Installment Dates as shall be set forth in the Specific Terms.

19741140069\401794

11

13-53846-tjt   Doc 348-5   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 41 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 68 of 1589]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

**Section 5.03.   Optional Prepayment of Scheduled Payments**

(a)     The City shall not voluntarily prepay any Scheduled Payments of a Funding Rate Portion (an *Optional Prepayment*) in whole or in part *unless* (i) such voluntary prepayment is expressly permitted in the Service Contract, (ii) it concurrently pays the Hedge Amount to the Corporation and (iii) it has met the condition precedent contained in **subsection (d)**, below.

(b)     The following terms have the following respective meanings:

*Accrued Service Charges* means, *if* an Optional Prepayment Date is *not* a Service Charge Payment Date, the amount of Service Charges accrued on the amount of the Scheduled Payment to be prepaid from the last Service Charge Payment Date before the Optional Prepayment Date to the Optional Prepayment Date.

*Hedge Amount* means the amount, if any, of any Hedge Termination Payable that will be owed by the Corporation pursuant to any Stated Hedge relating to the Scheduled Payments being prepaid as a result of any required reduction in the notional amount of such Stated Hedge due to such prepayment and the Hedge Periodic Payable, if any, accrued to the date of termination.

*Optional Prepayment Amount* means the sum of (i) the amount of the prepayment premium, if any, required by the Service Contract in connection with the prepayment of any selected Scheduled Payments *and* (ii) the amount of Scheduled Payments selected to be prepaid.

*Optional Prepayment Notice* means a notice of the City to the Corporation stating its intention to prepay the Scheduled Payments specified therein by the Payment Time on the Prepayment Receipt Date for the Optional Prepayment Date specified in such notice.

*Prepayment Receipt Day* means the day before the Optional Prepayment Date.

*Total Prepayment Amount* means, as to any Optional Prepayment, the amount of the Optional Prepayment Amount, Accrued Service Charges, if any, and the Hedge Amount, if any.

(c)     If the City elects to make an Optional Prepayment that is permitted by **subsection (a)**, above to be made, the City shall deliver an Optional Prepayment Notice *at least* 45 days (or such fewer days as is acceptable to the Corporation) before the Prepayment Receipt Date on which the City shall pay the Total Prepayment Amount to the Corporation in connection with such Optional Prepayment.  Such Optional Prepayment Notice shall state:

(1)     The Scheduled Payments of the particular Funding Rate Portion to be prepaid in whole or in part by such Optional Prepayment and the date on which such Scheduled Payments are to be prepaid (*Optional Prepayment Date*) *subject* to the following:

(i)     a Scheduled Payment may be selected by the City *only if* it is permitted by the Service Contract to be prepaid on the particular Optional Prepayment Date and

(ii)     a Scheduled Payment may be selected by the City for partial prepayment only in an amount of at least $100,000 *unless* otherwise provided in the Service Contract;

(2)     the Optional Prepayment Amount;

1974114 0069\401794

12

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 42 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 69 of 1589]

(3)    the Accrued Service Charges, if any;

(4)    the Hedge Amount, if any;

(5)    such information in tabular or other form so as to readily permit the Corporation to identify:

(i)    the Scheduled Payments of the particular Funding Rate Portion selected for prepayment,

(ii)    the provisions of the Service Contract authorizing or permitting such prepayment,

(iii)    the prepayment premium, if any, required to be paid in connection with the prepayment of each such Scheduled Payment;

(iv)    Accrued Service Charges, if any, due in respect of the prepayment of the particular Scheduled Payments; and

(v)    the Hedge Amount, if any, due in respect of the prepayment of the particular Scheduled Payments.

(d)    It is a condition precedent to the City giving an Optional Prepayment Notice to the Corporation with respect to any Optional Prepayment that would obligate the Corporation to pay a Hedge Amount that the City provide reasonable evidence satisfactory to the Corporation that such Hedge Amount will be paid when due and such prepayment will not cause the Corporation to be in default under any agreement to which it is party in connection with the particular Funding.

(e)    The "reasonable evidence satisfactory to the Corporation" in **subsection (d)**, above, shall be such evidence as the Corporation is informed by the Hedge Counterparty or Counterparties and the Insurer (if the Insurer is not in default under its Credit Insurance at the time) is reasonably satisfactory to them.

(f)    The delivery by the City of an Optional Prepayment Notice to the Corporation is a statement of the intention of the City to pay the Total Prepayment Amount to the Corporation by the Payment Time on the Prepayment Receipt Day for the Optional Prepayment Date stated therein but does not obligate the City to so pay the Total Prepayment Amount to the Corporation, and no default shall occur by the City not so paying the Total Prepayment Amount or by the Optional Prepayment not otherwise being effected on the Prepayment Receipt Day.

(g)    The City may not make any Optional Prepayment that it is otherwise entitled to make under **this Section** *unless* it pays the Total Payment Amount in respect of such Optional Prepayment to the Corporation by the Payment Time (or such later time as may be acceptable to the Corporation) on the Prepayment Receipt Date.

(h)    Any Total Prepayment Amount received by the Corporation shall be used by the Payment Time (or as soon thereafter as is practicable) on the Prepayment Receipt Date to the satisfaction of each of the priorities set forth in **Section 8.03** higher than **clause Eighth**.

(1)    *If* none of the Total Prepayment Amount is used as provided above, *then* the Optional Prepayment shall be effectuated by using such Total Prepayment Amount to satisfy the Optional Prepayment Amount, the Accrued Service Charges, if any, and the Hedge Amount, if any.

1974114 0069401794

13

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 43 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 70 of 1589]

(2)    *If* any part of the Total Prepayment Amount is used as provided above, *then* the Optional Prepayment shall *not* be effectuated, and the balance, if any of the Total Prepayment Amount shall be returned to the City on the Prepayment Receipt Date.

(3)    Use of the Total Prepayment Amount is subject to **Section 8.02**.

(i)    The City shall *not* pay the Total Prepayment Amount to the Corporation on any day prior to the particular Prepayment Receipt Day.

### Section 5.04.  Satisfaction of Scheduled Payments by Delivery of Certificate*s*

(a)    The City may deliver or cause to be delivered Certificates to the Corporation in satisfaction (whether in whole or in part) of Scheduled Payments at any time and in any denomination upon 45 day's prior notice to the Corporation (or such fewer days as is acceptable to the Corporation) (a *Delivery Notice*) subject to the following limitations.

(1)    A Scheduled Payment may be satisfied by delivery of Certificates entitled to payment from such Scheduled Payment (*Eligible Certificates*).

(2)    The amount of a Scheduled Payment deemed paid shall be equal to the denominations of the particular Eligible Certificates.

(3)    No Certificate shall be delivered in payment in whole or in part of the respective Scheduled Payment (whether as payment of a Sinking Fund Installment or as other prepayment) more than 45 days before the respective due date *if* at the time of such delivery the City has not paid all Service Payments then and theretofore due.

(4)    No Scheduled Payment shall be satisfied by the delivery of Certificates until such Certificates have been delivered to the Trustee.

(b)    If Sinking Fund Installments are to be satisfied (whether in whole or in part) by the delivery of Eligible Certificates, the City shall indicate in the respective Delivery Notice the particular Sinking Fund Installments and amounts thereof to be so satisfied.

(c)    All Certificates received by the Corporation in payment of Scheduled Payments pursuant to **this Section** shall be immediately delivered to the Trustee for cancellation.

### Article VI — Service Charges

### Section 6.01.  Agreement to Pay Service Charges; Funding Costs

(a)    The City agrees to pay amounts (*Service Charges*) to the Corporation on Service Charge Payment Dates sufficient to pay the costs of capital (*Funding Costs*) for the particular Funding. For the avoidance of doubt, it is acknowledged that Service Charges do not include Hedge Payables.

(b)    Funding Costs shall be determined by the particular Funding Rate Methodology.

(1)    Funding Costs for any Fixed Rate Funding Portion shall be determined and paid in accordance with the Fixed Rate Funding Methodology described in **Section 6.03**, and the corresponding Service Charges shall be *Fixed Rate Service Charges*.

(2)    Funding Costs for a Variable Rate Funding Portion shall be periodically determined and paid in accordance with the Variable Rate Funding Methodology described in **Section 6.04**, and the corresponding periodic Service Charges shall be *Variable Rate*

1974114 0069\401794

14

13-53846-tjt   Doc 348-5   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 44 of 61

[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 71 of 1589]

*Service Charges* and may be referred to by the particular Type of Variable Rate Service Charges; e.g., Index Rate Service Charges.

(3)    Funding Costs for an Accreted Value Funding Portion shall be determined and paid in accordance with **Section 6.05** and the corresponding Service Charges shall be *Accreted Value Service Charges* (as to which, see also **Section 6.05**).

### Section 6.02.  Prepaid Service Charges; Hedge Receivables

(a)    Prepaid Service Charges shall be used to meet the City's obligation to pay the first occurring Service Charges and Hedge Periodic Payables of the Corporation *except* as otherwise may be provided in the Specific Terms.

(b)    Hedge Receivables received by the Corporation shall be used to satisfy the City's obligation in respect of then existing Service Contract Deficiencies in accordance with **Section 7.05** or then current Service Charges not otherwise paid.

### Section 6.03.  Fixed Rate Funding Methodology

(a)    The provisions of **this Section** constitute the *Fixed Rate Funding Methodology.*

(b)    The particular Specific Terms shall state the rates (*Fixed Service Charge Rates*) at which the Fixed Rate Service Charges are computed for the respective Scheduled Payments comprising the Fixed Rate Funding Portion (*Fixed Rate Scheduled Payments*). Fixed Service Charge Rates may be different for different Fixed Rate Scheduled Payments.

(c)    The particular Specific Terms shall also state the dates (*Fixed Rate Service Charge Payment Dates*) on which the Fixed Rate Service Charges are payable.

(d)    Fixed Rate Service Charges shall be computed as if the Fixed Rate Scheduled Payments bore interest at the respective Fixed Rates and computed on the basis of a 360-day year consisting of 12, 30-day months.

(e)    On each Fixed Rate Service Charge Payment Date the City shall pay a Fixed Rate Service Charge equal to the Fixed Rate Service Charge accrued on the respective unpaid Fixed Rate Scheduled Payments from the later of the Closing Date or the last Fixed Rate Service Charge Payment Date on which Fixed Rate Service Charges were paid in full by the City.

### Section 6.04.  Variable Rate Funding Methodology

(a)    The provisions of **this Section** constitute the *Variable Rate Funding Methodology*.

(b)    The periodic Variable Rate Service Charge for each Scheduled Payment set forth under a particular type of Service Charge Class in the Variable Rate Funding Portion (*Variable Rate Scheduled Payments*) shall be determined in accordance with the particular Type of Variable Rate Funding.

(c)    Each Funding Cost Supplement for a Type of Variable Rate shall provide for a procedure by which the Variable Rate Service Charges are determined for the particular Variable Rate Funding Type and shall further provide:

(1)    The *Variable Rate Service Charge Payment Dates*: the dates on which the Variable Rate Service Charges are payable for such Type;

1974114 0069401794

15

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 45 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 72 of 1589]

(2)     The *Service Charge Determination Dates*: the dates on which the Variable Rate Service Charges of such Type are determined;

(3)     The *Service Charge Adjustment Dates*: the dates on which the Variable Rate Service Charges of such Type are adjusted; and

(4)     The *Day Count Convention*: the number of days in a month and in a year used to determine the amount of the Variable Rate Funding Service Charges of such Type.

(d)     Variable Rate Service Charges for each Variable Rate Funding Type in the Variable Rate Funding Portion shall be computed as if the Variable Rate Scheduled Payments of the particular Variable Rate Type bore interest at a rate (the *Variable Service Charge Rate*) (i) determined as of each Service Charge Determination Date for such Type and effective as of the respective Service Charge Adjustment Date for such Type and (ii) computed using the applicable Day Count Convention for such Type.

(e)     Variable Rate Funding Costs for any Variable Rate Funding Type may be tranched such that not all Variable Rate Funding Scheduled Payments of the particular Type are computed in the same manner; e.g., some may be determined on a weekly basis and others may be determined on a monthly basis.

(f)     On each Variable Rate Service Charge Payment Date for a particular Type the City shall pay a Variable Rate Service Charge equal to the applicable Variable Rate Funding Costs accrued on the unpaid Variable Rate Funding Scheduled Payments of that Type from the later of the Closing Date or the last applicable Variable Rate Funding Service Charge Payment Date on which the Variable Rate Funding Service Charges of that Type were paid in full by the City.

## Section 6.05.  Accreted Value Funding Methodology

(a)     The provisions of **this Section** constitute the *Accreted Value Funding Methodology*.  The *Accreted Value Day Count Convention* for purposes of the Accreted Value Funding Rate Methodology is 12, 30-day months in a year of 360 days *unless* otherwise stated in the particular Specific Terms.

(b)     The particular Specific Terms shall state:

(1)     the Accreted Value Scheduled Payments,

(2)     the rates at which the Accreted Values will be computed (the *Accreted Value Service Charge Rates*),

(3)     Accreted Value Day Count Convention *if* the convention to be applied is different than the Accreted Value Day Count Convention defined in **subsection (a) above**.

(4)     the dates on which the Accreted Values (the *Valuation Dates*) are to be computed and

(5)     the Accreted Value for each $5,000 (*unless* a different amount is set forth in the particular Specific Terms) of Maturity Value of each Accreted Value Scheduled Payment on each Valuation Date.

1974114 0069\401794

16

13-53846-tjt   Doc 348-5   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 46 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 73 of 1589]

(c)     The Accreted Value Funding Methodology consists of computing the future value (*Maturity Value*) of the Accreted Value Scheduled Payments from the particular Closing Date to their respective Scheduled Payment Dates using their respective Accreted Value Service Charge Rates and computed on the basis of compounding on each of the Valuation Dates and the Accreted Value Day Count Convention.

(1)     The result obtained by application of the Accreted Value Funding Methodology to any Accreted Value Scheduled Payment is its *Accreted Value*.

(2)     The Accreted Value of any Accreted Value Service Payment between any two, consecutive Valuation Dates shall be determined by interpolation between such Valuation Dates using the Accreted Value Day Count Convention.

(3)     The Accreted Values set forth in the particular Specific Terms shall be conclusive in the absence of manifest error for all purposes of the Service Contract.

(d)     *Accreted Value Service Charges* on any date of determination with respect to any Accreted Value Service Payment are equal to the Accreted Value of such Accreted Value Service Payment *less* such Accreted Value Scheduled Payment.

(1)     Accreted Value Service Charges are due and payable on the Scheduled Payment Dates for the respective Accreted Value Scheduled Payments.

(2)     Accreted Value Service Charges are not payable prior to their respective due dates *except* as in accordance with **Section 9.01**.

## Article VII — General Provisions Governing Service Payments and Contract Administrator Payments

### Section 7.01.  Time of Service Payments

The City shall make all Service Payments other than Contract Administrator Payments by the Payment Time on the day immediately before the date when due.  The City shall make all Contract Administrator Payments on the date when due.

### Section 7.02.  Hedge Payables

The City agrees to pay the amount of any Hedge Payable to the Corporation promptly upon receipt of notice thereof from the Corporation; *provided* that the City is not required to pay such amount before the Payment Time on the day before the due date of the particular Hedge Payable.

### Section 7.03.  Subrogation

(a)     No payment of any amount to a holder of Certificates or a Hedge Counterparty made from an amount paid by an Insurer under its Credit Insurance (a *Credit Insurance Payment*) shall discharge the City's obligation to pay any Service Payment in respect of which such Credit Insurance Payment was paid (a *Related Service Payment*).

(b)     An Insurer making a Credit Insurance Payment shall be subrogated to the rights of Certificateholders or a Hedge Counterparty, as the case may be, to receive the Related Service Payment and shall be entitled to exercise all rights and remedies that the Person to which it is the subrogee would have otherwise been entitled to exercise.

1974114 0069\401794

17

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 :
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing M

**Section 7.04. Investment**

(a)     The Corporation shall not invest any amounts received by it under the Service Contract *except* as provided in **this Section**. *Invest* means the transfer, disposition or other use of such amounts in expectation of gain, and *Investment* means any investment of Investable Funds.

(b)     Investable Funds shall be invested by the Corporation as directed by the City in Authorized Investments that mature in the amounts and at the times the related Investable Funds are needed to make the payments for which such Investable Funds were received by the Corporation.

(c)     Investments shall be made by Funding Rate Portion but may be commingled for investment purposes *so long as* records are kept showing each particular Funding Rate Portion and the gain and loss attributable to it.

(d)     No Investment shall be sold prior to the maturity thereof.

(e)     All Investments shall be made directly by the Corporation having exclusive control over the related securities entitlement (as "control" and "security entitlement" are defined in Article 8 of the applicable Uniform Commercial Code or correlative Treasury Regulations) *except* that Investments may also be made through one or more investment companies registered under the Investment Companies Act of 1940, as amended, *if* (i) such investment company has a rating by Standard & Poor's Corporation or any national statistical ratings organization (as defined by the Securities and Exchange Act of 1934, as amended, or any successor to it) at least equal to the rating of the Authorized Investment *and* (ii) such registered investment company invests only in debt instruments.

(f)     Gain and loss from Investments shall be attributed to the type of Investable Funds giving rise to it.

(1)     Gain shall be paid to the City when realized to the extent it is not needed to satisfy any then existing Service Contract Deficiency in accordance with **Section 7.05** or satisfy any then current Service Payment.

(2)     The City is responsible for all such loss and shall reimburse the Corporation for such loss upon demand by the Corporation.

**Section 7.05. Satisfying Service Contract Deficiencies**

(a)     **This Section** governs the use of certain amounts to satisfy Service Contract Deficiencies. *If* the City has not provided funds sufficient to satisfy the requirements of **Section 8.03**, *then* the amounts subject to this Section, in an amount not exceeding any Service Contract Deficiency, shall be applied in accordance with **Section 8.03**.

(b)     The amounts subject to this Section and the order of use are (1) Hedge Receivables and (ii) gain from Investments

(c)     Such amounts are subject to **Section 8.02**.

1974114 0069\401794

18

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 48 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 75 of 1589]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

## Section 7.06.   No Set-Off

The obligation of the City to make payments hereunder shall be absolute and uncondi-tional, irrespective of any defense or any rights of set-off, recoupment or counterclaim or deduc-tion and without any rights of suspension, deferment, diminution or reduction it might otherwise have against the Corporation, the Trustee, any holder or beneficial owner of any Certificate or any other person whether in connection herewith or with any unrelated transaction and the obli-gation of the City to make such payments shall not be conditioned on its receipt of future ser-vices of the Corporation under **Sections 4.01(a)(2)** through **(4)**.   The City will not suspend or discontinue its obligation to make any such payment for any cause whatsoever, and, to the extent permitted by law, the City waives all rights now or hereafter conferred by statute or otherwise to quit, terminate, cancel or surrender any such obligation of the City under the Service Contract or to any abatement, suspension, deferment, diminution or reduction in such payments.

## Article VIII  — Satisfaction of Service Payments and Contract Administrator Payments

## Section 8.01.   Certain Defined Terms

An amount is ***about to become due*** for the purposes of **Section 8.03** on the Busi-ness Day before its due date *except* when the amount is payable daily, in which case the term "about to become due" is inapplicable.

***all Service Contracts*** means the Service Contract and the Other Service Contract.

***each Service Contract*** means the Service Contract or the Other Service Contract as the context may require.

***each Service Corporation*** means the Service Corporation or the Other Service Corporation as the context may require.

***Other Service Contract*** means a service contract between the City and the Other Service Corporation, certain payments under which Other Service Contract are part of the Trust Estate.

***Other Service Corporation*** means the nonprofit corporation party to the Other Service Contract.

***pro-rata*** for the purposes of **this Article** means for any priority class under **Sec-tion 8.03** and as of any computation date, a fraction, the numerator of which is the amount owing to any particular Person who is entitled to a payment in such priority class and the denominator of which is the total of all such payments owing to all such Persons in such priority class.

## Section 8.02.   Preservation of Parity among Service Contracts

All Service Payments payable under this Service Contract shall be made and the Corpora-tion shall be entitled to receive such payments on a pro-rata basis with the Service Payments un-der the Other Service Contract so that each Service Payment Component having a specified pri-ority under **Section 8.03** is made on a pro-rata basis with the Service Payment Components hav-ing the same defined term under Section 8.03 of the Other Service Contract, and no Service Pay-ment Component shall be satisfied *until* all Service Payment Components under all Service Con-tracts having the same defined term but having a greater priority under **Section 8.03** of each Service Contract are first satisfied in full.



### Section 8.03.   Satisfaction of Service Payments

Service Payments under all Service Contracts shall be satisfied in the following order and priority:

**First:**   Contract Administrator Payments; *then*

**Second:**   all theretofore due and unpaid Service Charges (regardless of the Funding Rate Methodology, including any Accreted Value Funding Methodology) and amounts in respect of Hedge Periodic Payables; *then*

**Third:**   all then due or about to become due Service Charges (regardless of the Funding Rate Methodology, including any Accreted Value Funding Methodology) and amounts in respect of Hedge Periodic Payables; *then*

**Fourth:**   all theretofore due and unpaid Regular Scheduled Payments and Sinking Fund Installments; *then*

**Fifth:**   all then due or about to become due Regular Scheduled Payments and Sinking Fund Installments; *then*

**Sixth:**   all theretofore due and unpaid amounts in respect of Hedge Termination Payables; *then*

**Seventh:**   all then due or about to become due amounts in respect of Hedge Termination Payables; *then*

**Eighth:**   all then due or about to become due Optional Prepayment Amounts and Accrued Service Charges.

## Article IX — Miscellaneous

### Section 9.01.   Acceleration on Bankruptcy

*If* the City shall (i) commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, (ii) consent to the institution of any such proceeding or the filing of any such petition or (iii) make a general assignment for the benefit of creditors, *then* all payments due hereunder shall become immediately due and payable without presentment, demand, protest or notice of any kind, all of which are expressly waived notwithstanding anything to the contrary herein.

### Section 9.02.   Termination or Assignment of Stated Hedges

(a)   At the request of the City and with the prior written consent of the Insurer that has Credit Insurance in respect of the particular Stated Hedge, the Corporation shall terminate any Stated Hedge or assign its interest in any Stated Hedge to a Person that agrees to perform and observe all of the duties and obligations of the Counterparty to such Stated Hedge.

(b)   Any such substitute Hedge Counterparty shall have the rating required by Public Act 34 of the Public Acts of 2001, as amended, *as if* the City were a party to the particular Stated Hedge.

(c)   No such termination or substitution of a Hedge Counterparty shall take effect unless each Rating Agency confirms its rating of the particular Certificates.

I 974 I 14 0069\401 794

20

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 50 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 77 of 1589]

(d)     *Rating Agency* means each national statistical rating organization (as defined in the Securities and Exchange Act of 1934, as amended) that at the time has a rating of the Certificates in effect.

## Section 9.03.  Required Ratings of Hedge Counterparties

(a)     The Corporation shall only enter into Hedges with Persons who have, on the date the Hedge is entered into, or, alternatively, whose Hedge obligations are guaranteed by a Person who has on the date the Hedge is entered into, a rating of its long-term, senior secured debt at least A- by Standard & Poor's Corporation and at least A3 by Moody's Investment Service.

(b)     It is not a breach of **subsection (a)**, above if the Hedge is subject to an Insurer approved transaction transfer agreement with a Person who qualifies, or whose Hedge obligations are guaranteed by a Person who qualifies, under **subsection (a)**, above.

## Section 9.04.  Addresses for Notices.

All notices and other communications provided for hereunder shall be in writing unless otherwise stated herein mailed, sent or delivered

if to the City, at

City of Detroit, Michigan – Finance Department
1200 Coleman A. Young Municipal Center
2 Woodward Avenue
Detroit, Michigan 48226
Attention: Finance Director

if to the Corporation, at

c/o Lewis & Munday, P.C.
Suite 2490
660 Woodward Avenue
Detroit, Michigan
Attention: President

or to such other address as such Person may specify to the other Person and shall be effective (i) if given by mail, 3 Business Days after such communication is deposited in the mails with first class postage prepaid or (ii) if given by any other means, when delivered at the address specified in or pursuant to **this Section**.

## Section 9.05.  Amendment

The Service Contract may be amended only by written instrument signed by the parties hereto *except* that no amendment shall be valid:

(i)     *if* such amendment diminishes the rights and remedies of any Third Party Beneficiary without the prior written consent of such Third Party Beneficiary;

(ii)    *unless* the Trustee of any Funding Trust that is a transferee of or successor to any rights or entitlements hereunder and that received an opinion of counsel in connection with the organization of the Funding Trust to the effect that such Funding Trust will qualify as a grantor trust under Subpart E, Part I of Sub-

1974114 0069\401794
21
13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 51 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 78 of 1589]

chapter J of the Internal Revenue Code of 1986, as amended, shall have received an opinion reasonably acceptable in form and substance to such Trustee of counsel reasonably acceptable to such Trustee to the effect that such amendment shall not result in such Funding Trust being treated as other than such a grantor trust;

(iii) *unless* the Trustee has received an opinion in form and substance reasonably satisfactory to the Trustee of counsel reasonably acceptable to the Trustee to the effect that such amendment will not result in the Service Charges and Scheduled Payments failing to constitute payments in respect of indebtedness for U.S. federal income tax purposes; and

(iv) *unless* every Insurer who is not in default under its Credit Insurance at the time has consented to the amendment, including such prior written consent as may be set forth in the Contract Administration Agreement or any other agreement to which the Corporation is a party.

## Section 9.06. No Waiver; Remedies.

No failure on the part of the Corporation or any permitted successor or assign or any Third Party Beneficiary to exercise, and no delay in exercising, any right hereunder shall be a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other further exercise thereof or the exercise of any other right.

## Section 9.07. Binding Obligation.

The Service Contract is a continuing obligation of the City and shall until the date on which all amounts due and owing hereunder are paid in full (i) be binding upon the City and its successors and (ii) inure to the benefit of and be enforceable by the Corporation, its successors and permitted assigns, and by Third Party Beneficiaries.

## Section 9.08. General Corporate Expenses

The City shall pay the General Corporate Expenses of the Corporation as and when they become due.

## Section 9.09. Fees and Expenses.

(a) The Corporation shall pay compensation, expenses and indemnification due the Trustee in accordance with the Trust Agreement, including reasonable fees and expenses of counsel, in connection with any waiver or consent thereunder or any amendment thereof, or in connection with the enforcement thereof.

(b) The Corporation shall pay compensation, expenses and indemnification due the Contract Administrator and the Enforcement Officer (defined in the Contract Administration Agreement), if any, in accordance with the Contract Administration Agreement, including reasonable fees and expenses of counsel, in connection with any waiver or consent hereunder or any amendment hereof or thereof, or in connection with the enforcement hereof.

(c) The Corporation shall pay the fees of remarketing agents, auction agents and broker-dealers, or any of them, as provided for any particular Variable Rate Funding Type.

1974114 0069401794
22
13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 52 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 79 of 1589]

(d)     The Corporation shall pay the expenses and other amounts due each Insurer in accordance with **Section 10.5** of the **Contract Administration Agreement**;

(e)     The Corporation shall pay all amounts due the Enforcement Officer under **Section 8.19** of the **Contract Administration Agreement** and not otherwise paid by an Affected Party (as such terms defined in the Contract Administration Agreement), *but* the Corporation shall have no obligation to pay any indemnity required by the Enforcement Officer;

(f)     The Corporation shall pay all other payments required to be paid by the Corporation under Contract Administration Agreement and not otherwise paid.

**Section 9.10.   Permitted Assignment.**

(a)     The Service Contract shall be binding upon the parties hereto and their respective successors and permitted assigns.  No assignment by either party of its interests herein shall be valid *except* as provided in this Section.

(b)     The Corporation may transfer (as defined below in **this subsection**) the Scheduled Payments and Service Charges to the Funding Trust, *provided* that the Corporation shall not do so without:

(1)     delivering prior written notice thereof to the City,

(2)     listing the Funding Trust as the owner of the Scheduled Payments and Service Charges on the registration book (described below), and

(3)     obtaining the agreement of the Funding Trust not to effect any subsequent transfer of any Scheduled Payments and/or the Service Charges without

(i)     delivering to the City prior written notice of any such transfer(s) of the Scheduled Payments and/or the Service Charges and

(ii)    obtaining the agreement of the transferee ($x$) not to effect any further transfer without prior delivery to the Corporation of notice thereof in the manner of the notice described in **clause (i)** above, and ($y$) to obtain the same agreement of any further transferee (i.e., to give such notice and obtain such agreement of further transferees).

For the avoidance of doubt, the prior written notice referred to in **this subsection** only applies to the holder of legal title to the Scheduled Payments and the Service Charges and not to owners of Certificates.

A provision in the Trust Agreement to the effect, "For the avoidance of doubt, the Trustee acknowledges that it has no power to transfer, assign or otherwise convey legal title to the Funding Trust Receivables and that beneficial interests in the Funding Trust Receivables may be transferred as transfers of Certificates." shall satisfy the agreement referred to in **clause (ii)**, above.

1974114 0069401794

23

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 53 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 80 of 1589]

The City shall record each such transfer of the Scheduled Payments and/or the Service Charges for which it receives any such notice in its official records (which shall constitute the "registration book" referred to in **this subsection**), and such recording shall identify the subsequent transferee.

The term ***transfer*** in **this subsection** means a sale, assignment, transfer or conveyance.

(c)     No assignment of the Service Contract or any amounts receivable thereunder shall include the right to receive Additional Service Payments, Contract Administrator Payments or Hedge Payables except that the Corporation may assign or grant a security interest in amounts received by it as payment of Hedge Payables to the Hedge Counterparties.

**Section 9.11.   Direct Payment of Service Payments; "Successor" Defined**

(a)     Additional Service Payments shall be payable by the City to the Persons originally entitled to receive them or their successors on the dates when due.

(b)     The term ***successor*** in **this Article** means either a successor to a particular Person by law (e.g., the surviving corporation in a merger) or a successor to the particular office for which Additional Service Payments or Contract Administrator Payments are payable (e.g., a new Person, not by operation of law, becomes successor Trustee). ***Successor*** does *not* include any other Person without the written consent of the City.

**Section 9.12.   Third Party Beneficiaries**

(a)     <u>Persons that are Third Party Beneficiaries</u>

(1)     The Persons, including the Trustee and the Contract Administrator, originally entitled to Additional Service Payments or Contract Administrator Payments and their respective successors are third party beneficiaries of the Service Contract as to the City's promises to pay Additional Service Payments or Contract Administrator Payments to the Service Corporation.

(2)     Hedge Counterparties, and their respective successors and subrogees, are third party beneficiaries of the Service Contract as to the City's promises to pay amounts in respect of Hedge Payables to the Corporation.

(3)     Insurers are third party beneficiaries of the Service Contract.

(4)     The Funding Trust is a third party beneficiary of the Corporation's promises in respect of Service Charges and Scheduled Payments.

(5)     The Contract Administrator and the Enforcement Officer (as defined in the Contract Administrator Agreement) are third party beneficiaries as to the Corporation's promises in **Section 9.09**.

(b)     <u>Rights of Third Party Beneficiaries</u>

Third Party Beneficiaries have the right to enforce the respective promises made in the Service Contract as if such promises were made directly to them.  As between the Insurers, any Insurer that has the right, pursuant to **Section 6.9** of the **Contract Administration Agreement**, to control enforcement proceedings instituted pursuant to the Contract Administration Agree-

1974114 0069\401794

24

13-53846-tjt    Doc 348-5    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 54 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 81 of 1589]

ment shall also have the right to control enforcement proceedings instituted by an Insurer pursuant to the Service Contract.

(c)     Effect of Amendments on Third Party Beneficiaries

Any amendment that diminishes the rights and remedies of any Third Party Beneficiary without the prior written consent of such Third Party Beneficiary is acknowledged to have the effect in fact of hindering, delaying and defrauding such Third Party Beneficiary in the collection of an obligation owed to it.

**Section 9.13.  Reliance on Representations and Warranties**

(a)     Each permitted assignee and any subrogee of any rights hereunder and Third Party Beneficiary shall have the benefit of the representations and warranties of the City and the Corporation made herein as if such representations and warranties had been made directly to it.

(b)     Each permitted assignee and any subrogee of any rights hereunder and Third Party Beneficiary shall be conclusively presumed to have relied upon such representations and warranties, and such reliance shall survive any investigation made by such permitted assignee or Third Party Beneficiary.

**Section 9.14.  Contract Administration**

(a)     Nothing in the Service Contract shall prohibit the Corporation from employing one or more agents and attorneys-in-fact to collect Service Payments or to otherwise administer the Contract.

(b)     The City agrees to make Service Payments due the Corporation to any such agent or attorney-in-fact upon receipt of notice of its appointment.

**Section 9.15.  Governing Law**

The rights and obligations of the parties hereunder shall be governed by and construed in accordance with the law of the State of Michigan exclusive of its conflicts of law rules.

**Section 9.16.  Headings**

Article and Section headings in the Service Contract are included herein for convenience of reference only and do not constitute a part of the Service Contract for any other purpose.

**Section 9.17.  Integration**

The Service Contract is intended by the parties as the final, complete and exclusive statement of the transactions evidenced by the Service Contract.  All prior contemporaneous promises, agreements and understandings relating to such transaction, whether oral or written, are deemed to be superseded by the Service Contract, and no party is relying on any promise, agreement or understanding not set forth or referred to in the Service Contract.

1974114 0069\401794
25
13-53846-tjt   Doc 348-5   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 55 of 61
[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 82 of 1589]

### Section 9.18. Counterparts

The Service Contract may be executed in multiple counterparts, *but* all such counterparts taken together shall evidence by one and the same original.

*[End of General Terms]*

[2.2.4.4] [Amending of Service Contracts and Interest Rate Exchange Agreements, Series 2006 (Closing Memorandum).pdf] [Page 83 of 1589]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/13:08:2013 17:08

THIS AMENDMENT IS ENTERED INTO FOR SETTLEMENT PURPOSES

**First Amendment to GRS Service Contract 2006** (the *Amendment*), dated as of June 15, 2009, between the **Detroit GRS Retirement System Service Corporation**, a Michigan nonprofit corporation (the *Service Corporation*), and the **City of Detroit**, a municipal corporation organized and existing under the laws of the State of Michigan (the *City*),

## W I T N E S S E T H:

**Whereas**, the Service Corporation entered into the GRS Service Contract 2006, dated as of June 7, 2006 (the *Service Contract*), with the City as part of the 2006 Transaction (the *2006 Transaction*) described in Ordinance No. 05-09 (the *Authorizing Ordinance*) undertaken by the City as part of its Pension System Funding Program (the *Pension System Funding Program*) described therein;

**Whereas**, also as part of the 2006 Transaction the Service Corporation entered into certain interest rate swap agreements (each, a *2006 Hedge* and collectively, the *2006 Hedges*) with **UBS AG** (*UBS*), **SBS Financial Products Company, LLC** (*SBS* and collectively with UBS, the *2006 Counterparties*) and **Merrill Lynch Capital Services, Inc.**, as credit support provider to SBS as part of the 2006 Transaction;

**Whereas**, the Service Contract, among other things, provided for the City to make payments to the Service Corporation sufficient to pay amounts owing by the Service Corporation under the 2006 Hedges;

**Whereas**, in January 2009, the 2006 Counterparties notified the City and the Service Corporation that they believed that an event had occurred which entitled them to declare a certain "additional termination event" (the *2006 Additional Termination Event*) under the 2006 Hedges;

**Whereas**, the declaration of the 2006 Additional Termination Event could have resulted in the imposition of an immediate obligation on the City to make a combined payment to the Service Corporations in the range, estimated in January 2009, of $300 million to $400 million;

**Whereas**, the City Council adopted the Authorizing Ordinance on May 26, 2009, in contemplation of settlement with the Counterparties;

**Whereas**, this amendment to the Service Contract is one of the documents contemplated by the Authorizing Ordinance;

**Whereas**, the Corporation was created as part of the Pension System Funding Program to reduce the City's burdens of government by meeting and managing the City's obligations under the Michigan Constitution to maintain the actuarial integrity of the GRS Retirement System of the City of Detroit (the *GRS Retirement System*), in respect of which the Corporation was established;

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/13:08:2013 17:08

**Whereas,** the declaration of the 2006 Additional Termination Event would substantially impair the City's ability to meet its constitutional obligations with respect to the GRS Retirement System;

**Now, Therefore,** in exchange for a waiver of the rights of each Counterparty to declare the 2006 Additional Termination Event and for a rescission of any declaration of the 2006 Additional Termination Event by a Counterparty made through the date on which the transaction of which this Amendment is a part closes (the ***Closing Date***), and in the interest of avoiding fees and expenses of litigation and the delays that would result should litigation ensue, the parties hereto agree as follows:

### Section 1. Definitions

Capitalized terms not defined in this Amendment and defined in the Service Contract are used herein as therein defined.

### Section 2. Amendments to Service Contract

(a) Amendments to Section 1.01 of the General Terms

(1) The following definition is added to Section 1.01 of the General Terms in proper alphabetical order:

***Collateral Agreement*** means the Collateral Agreement, dated as of June 15, 2009, among the City, the Corporation and the other parties thereto.

(2) The definition of "Service Payment" appearing in Section 1.01 of the General Terms is amended by adding the language indicated thus and as amended shall read as follows:

***Service Payment*** means any Contract Administrator Payment, Service Charge (regardless of Funding Rate Methodology), Regular Scheduled Payment or Sinking Fund Installment, amounts in respect of any Hedge Payable, Optional Prepayment or Accrued Service Charge as the context may require. ***Service Payment*** does not include any amounts payable or paid under the Collateral Agreement.

(3) The definition of "Stated Hedge" appearing in Section 1.01 of the General Terms is amended to read as follows:

***Stated Hedge*** means a Hedge identified in the Specific Terms as a "Stated Hedge" as amended by the amendments to the 2006 Hedges with an effective date that corresponds to the Closing Date.

(b) Amendments to Section 7.02 of the General Terms

Section 7.02 of the General Terms is amended by adding the subsection designation and language indicated thus and as amended shall read as follows:

### Section 7.02 Hedge Payables

(a) The City agrees to pay the amount of any Hedge Payable to the Corporation promptly upon receipt of notice thereof from the Corporation; *provided* that the City is not required to pay such amount before the Payment Time on the day before the due date of the particular Hedge Payable.

(b) The City's obligation to pay the amount of any Hedge Payable to the Corporation includes an obligation to pay to the Corporation the amount of any interest, enforcement costs or expenses and indemnification payments for which the Corporation may be liable to the Hedge Counterparty or any successor under the Stated Hedge or the Collateral Agreement.

(c) The City shall receive a credit for any Hedge Payable to the extent of any amount paid in respect of such Hedge Payable under the Collateral Agreement.

## Section 3. Validity of Amendments

The validity of the amendments set forth in **Section 2** hereof are subject to Section 9.05 of the General Terms.

## Section 4. Ratification of Service Contract

The Service Contract as amended by **Section 2** hereof is ratified and confirmed.

## Section 5. Governing Law

The rights and obligations of the parties hereunder shall be governed by and construed in accordance with the law of the State of Michigan exclusive of its conflicts of law rules.

## Section 6. Headings

The Section and subsection headings herein are included for convenience of reference only and do not constitute a part of the this Amendment for any other purpose.

## Section 7. Counterparts

This Amendment may be executed in multiple counterparts, *but* all such counterparts taken together shall evidence by one and the same original.

**In Witness Whereof**, the parties hereto have set their respective hands on the date first set forth above.

[*Signatures appear on pages S-1* et seq.]

CONFIDENTIAL INFORMATION
maslovgelov@arentfox.com
Detroit/13:08:2013 17:08

*[Signature Page to the First Amendment to the XRS Service Contract 2006 between the City of Detroit and the GRS Retirement System Service Corporation]*

City of Detroit,

By _____

Norman L. White
Finance Director

CONFIDENTIAL INFORMATION
markiangelov@arentfox.com
Detroit/13:08:2013 17:08

*[[Signature Page to the First Amendment to the XRS Service Contract 2006 between the City of Detroit and the GRS Retirement System Service Corporation]*

**GRS Retirement System Service Corporation**

By _____

Norman L. White
President

S-2