CONFIDENTIAL INFORMATION
mark.arderoy@arentfox.com
Detroit/11/19/2013 11:32

**New Issue – Book-Entry Only**                                    *D*A*C* Bond

*This Offering Circular provides information about the 2006 Certificates. Information on this cover page is for ready reference. A prospective investor should read the entire Offering Circular to make an informed investment decision.*

$948,540,000

# TAXABLE CERTIFICATES OF PARTICIPATION SERIES 2006

issued by the DETROIT RETIREMENT SYSTEMS FUNDING TRUST 2006

evidencing undivided proportionate interests
in the rights to receive certain payments
pursuant to two Service Contracts between

## CITY OF DETROIT, MICHIGAN

and

### DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION

and

### DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION

$148,540,000 SERIES 2006-A (FIXED RATE)
$800,000,000 SERIES 2006-B (FLOATING RATE)

**Dated: Date of Delivery**                **Due: June 15 as shown on the inside cover**

| | |
|---|---|
| *Ratings* | *See pages 22-23* |
| *Interest Payment Dates* | *Series 2006-A:* December 15, 2006 and each June 15 and December 15 thereafter |
| | *Series 2006-B:* September 15, 2006 and the 15th day of each December, March , June and September thereafter |
| *Redemption* | Series 2006-A Certificates maturing in 2035 are subject to *pro rata* mandatory sinking fund redemption at par. |
| | Series 2006-A Certificates are subject to optional redemption on any date with a make-whole premium.—*See pages 11-12* |
| | Series 2006-B Certificates maturing in 2029 and 2034 are subject to *pro rata* mandatory sinking fund redemption at par. |
| | Series 2006-B Certificates are subject to optional redemption on any Interest Payment Date at par, beginning June 15, 2011.—*See page 12-16* |
| *Source of Payment* | Principal of and interest on the 2006 Certificates are payable, when due, solely from 2006 COP Service Payments to be paid by the City under the 2006 Service Contracts.—*See pages 9-10* |
| *Insurance* | The scheduled payment of principal of and interest on 2006 Certificates will be guaranteed under insurance policies (as specifically indicated on the inside cover of this Offering Circular with respect to particular 2006 Certificates) to be issued concurrently with delivery of the 2006 Certificates by Financial Guaranty Insurance Company and XL Capital Assurance Inc. |
| | FGIC                    XL CAPITAL ASSURANCE |
| *Tax Matters* | Interest on the 2006 Certificates is subject to U.S. federal income tax and State of Michigan income tax. |
| *Purpose* | The 2006 Certificates are being issued to provide moneys to fund the optional redemption of certain certificates of participation and the purchase and cancellation of certain other certificates of participation that were issued in 2005 to fund certain then existing unfunded accrued actuarial liabilities of each Retirement System of the City.—*See pages 5-9* |
| *Denominations* | *Series 2006-A:* Multiples of $5,000 |
| | *Series 2006-B:* $25,000 and multiples of $1,000 in excess thereof |
| *Closing* | On or about June 12, 2006 |
| *Global Book-Entry System* | Clearance is expected to be available through The Depository Trust Company (the depository for the 2006 Certificates), Clearstream, and Euroclear. |
| *Global Offering* | The 2006 Certificates are offered globally for sale in jurisdictions where it is lawful to make such offers.—*See page 22* |
| *Stock Exchange Listing* | Application will be made for the 2006 Certificates to be listed on the Luxembourg Stock Exchange. There can be no assurance that this listing will be obtained. The issuance and settlement of the 2006 Certificates is not conditioned on the listing of the 2006 Certificates on the Luxembourg Stock Exchange. |
| *2006 Certificate Counsel* | Lewis & Munday, A Professional Corporation—*See page 23* |
| *Trustee* | U.S. Bank National Association |

---

**UBS Investment Bank**                    **Siebert Brandford Shank & Co., LLC**

---

*Co-Managers for Series 2006-A Certificates Only*

**Bear, Stearns & Co. Inc.**    **Citigroup Global Markets**    **M.R. Beal & Company**    **Popular Securities**

This Offering Circular is dated June 7, 2006.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 1 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/ ... 3 11:32

**MATURITIES, PRINCIPAL AMOUNTS, INTEREST RATE, YIELDS, AND PRICES**

**$948,540,000**
**TAXABLE CERTIFICATES OF PARTICIPATION SERIES 2006**
issued by the DETROIT RETIREMENT SYSTEMS FUNDING TRUST 2006
evidencing undivided proportionate interests
in the rights to receive certain payments
pursuant to two Service Contracts between
**CITY OF DETROIT, MICHIGAN**
and
**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**
and
**DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION**
$148,540,000 SERIES 2006-A (FIXED RATE)
$800,000,000 SERIES 2006-B (FLOATING RATE)

**$148,540,000 Series 2006-A Certificates**

| CUSIP† | ISIN† | Euroclear and Clearstream Common Code† | Maturing (June 15) | Principal Amount | Interest Rate | Yield at Issuance | Price at Issuance |
|---|---|---|---|---|---|---|---|
| 251228AA0 | US251228AA03 | 025779533 | 2035* | $148,540,000 | 5.989% | 5.989% | 100% |

**$800,000,000 Series 2006-B Certificates**

| CUSIP† | ISIN† | Euroclear and Clearstream Common Code† | Maturing (June 15) | Principal Amount | Interest Rate | Price at Issuance |
|---|---|---|---|---|---|---|
| 251228AB8 | US251228AB85 | 025766539 | 2029** | $299,155,000 | Three-month LIBOR plus 0.30% | 100% |
| 251228AC6 | US251228AC68 | 025766610 | 2034* | 500,845,000 | Three-month LIBOR plus 0.34% | 100% |

The Series 2006-A Certificates maturing in 2035 are subject to *pro rata* mandatory sinking fund redemption. For a schedule of the mandatory sinking fund redemption payments, see "THE 2006 CERTIFICATES – The Series 2006-A Certificates (Fixed Rate) - Mandatory Sinking Fund Redemption."

The Series 2006-B Certificates maturing in 2029 and 2034 are subject to *pro rata* mandatory sinking fund redemption. For a schedule of the mandatory sinking fund redemption payments, see "THE 2006 CERTIFICATES – The Series 2006-B Certificates (Floating Rate) - Mandatory Sinking Fund Redemption."

_____

\*    Insured by Financial Guaranty Insurance Company.

\*\*   Insured by XL Capital Assurance Inc.

†    CUSIP, ISIN and Euroclear and Clearstream Common Code data herein are set forth herein for convenience of reference only.  Neither the 2006 Funding Trust, the Service Corporations, the City nor the Underwriters assume responsibility for the accuracy of such information.

CONFIDENTIAL INFORMATION

mark.spencelow@quantfour.com

Detroit/13.08.2013 - 11:32

This document, the Offering Circular, contains the only authorized information about the offering of the 2006 Certificates. This document is not an offer or solicitation for the 2006 Certificates, and no unlawful offer, solicitation, or sale may occur through the use of this document or otherwise. This document is not a contract, and it provides no investment advice. Prospective investors should consult their advisors and legal counsel with questions about this document, the 2006 Certificates, and anything else related to the offering.

This document provides prospective investors with information that may be important in making an investment decision. It may not be used for any other purpose without the City's permission. The City is the author of this document and is responsible for its accuracy and completeness. The Underwriters are not the authors of this document. In accordance with their responsibilities under the securities laws of the United States of America, the Underwriters are required to review the information in this document and must have a reasonable basis for their belief in the accuracy and completeness of its key representations.

The estimates, forecasts, projections, and opinions in this document are not hard facts, and no one guarantees them. Some of the people who prepared, compiled or reviewed this information had specific functions that covered some aspects of the offering but not others. For example, financial staff focused on quantitative financial information, and legal counsel focused on specific documents or legal issues assigned to them.

No dealer, broker, sales representative, or other person has been authorized to give any information or to make any representations about the 2006 Certificates other than what is in this document. The information and expressions of opinion in this document may change without notice. Neither the delivery of this document nor any sale of the 2006 Certificates implies that there has been no change in the other matters contained in this document since its date. Material referred to in this document is not part of this document unless expressly included.

Other than information concerning Financial Guaranty Insurance Company contained in APPENDIX E, none of the information in this Offering Circular has been supplied or verified by Financial Guaranty Insurance Company, and it makes no representation or warranty, express or implied, as to the accuracy or completeness of such information or the validity of the 2006 Certificates.

Other than information concerning XL Capital Assurance Inc. contained in the APPENDIX F, none of the information in this Offering Circular has been supplied or verified by XL Capital Assurance Inc., and it makes no representation or warranty, express or implied, as to the accuracy or completeness of such information or the validity of the 2006 Certificates.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 3 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................................ 1
    No Pledge of Retirement System Assets or of Proceeds of the 2006 Certificates ......................................... 2
    Investment Considerations .............................................................................................................................. 3
    Defined Terms ................................................................................................................................................. 3
    Underlying Documents .................................................................................................................................... 3
THE CITY ................................................................................................................................................... 3
    Governmental Structure .................................................................................................................................. 3
    Economic Characteristics ................................................................................................................................ 3
    Current Fiscal Situation .................................................................................................................................. 4
    Financial Controls and Accounting ................................................................................................................ 5
PLAN OF FINANCE ................................................................................................................................... 5
    Constitutional, Statutory and Ordinance Authority for Payment of UAAL and Issuance of the 2006 Certificates ........ 6
    Swap Agreements ............................................................................................................................................ 8
    Sources and Uses of Funds ............................................................................................................................. 9
SOURCES OF PAYMENT AND SECURITY FOR THE 2006 CERTIFICATES ..................................... 9
THE 2006 CERTIFICATES ....................................................................................................................... 10
    The Series 2006-A Certificates (Fixed Rate) ............................................................................................... 10
    The Series 2006-B Certificates (Floating Rate) ........................................................................................... 12
    Selection of 2006 Certificates for Redemption ............................................................................................ 15
    Notice of Redemption .................................................................................................................................... 16
    Global Book-Entry System ............................................................................................................................ 16
    Registration and Payment of 2006 Certificates ............................................................................................ 16
2006 COP SERVICE PAYMENTS ............................................................................................................ 16
2006 CERTIFICATE INSURANCE .......................................................................................................... 18
2006 SERVICE CONTRACT ADMINISTRATION ................................................................................. 18
THE SERVICE CORPORATIONS AND THE 2006 FUNDING TRUST ................................................ 20
UNDERWRITING ...................................................................................................................................... 21
    Global Plan of Distribution ............................................................................................................................ 22
    Reference Information about the 2006 Certificates ....................................................................................... 22
RATINGS .................................................................................................................................................... 22
FINANCIAL ADVISORS ........................................................................................................................... 23
INDEPENDENT ACCOUNTANTS ........................................................................................................... 23
TRUSTEE AND CONTRACT ADMINISTRATOR .................................................................................. 23
LEGAL MATTERS .................................................................................................................................... 23
LITIGATION .............................................................................................................................................. 24
UNITED STATES FEDERAL TAX CONSIDERATIONS ........................................................................ 26
    Tax Status of the 2006 Funding Trust ........................................................................................................... 27
    Tax Status of the 2006 COP Service Payments under the 2006 Service Contracts ...................................... 27
    Agreements Regarding Tax Status of the 2006 Funding Trust and 2006 COP Service Payments under the 2006
        Service Contracts ...................................................................................................................................... 27
    Tax Status of the Service Corporations ......................................................................................................... 28
    U.S. 2006 Certificateholders ......................................................................................................................... 28
    Non-U.S. 2006 Certificateholders ................................................................................................................. 29
    Information Reporting and Backup Withholding ........................................................................................... 30
    State and Other Tax Considerations ............................................................................................................... 30
    ERISA Considerations .................................................................................................................................... 31
CONTINUING DISCLOSURE ................................................................................................................... 33
APPENDIX A:  Summary of Certain Provisions of the 2006 Service Contracts, the Contract Administration Agreement and
            the Trust Agreement ................................................................................................................................ A-1
APPENDIX B:  Information Concerning the City of Detroit, Michigan ...................................................................... B-1
APPENDIX C:  Comprehensive Annual Financial Report of the City of Detroit, Michigan for the Fiscal Year Ended June 30, 2005,
            including Audited Basic Financial Statements of the City for Such Fiscal Year ..................................... C-1
APPENDIX D:  Global Book-Entry System .................................................................................................................. D-1
APPENDIX E:  Information about Financial Guaranty Insurance Company, including Form of its 2006 Certificate Insurance
            Policy ....................................................................................................................................................... E-1
APPENDIX F:  Information about XL Capital Assurance Inc., including Form of its 2006 Certificate Insurance Policy ....... F-1
APPENDIX G:  Expected Form of Legal Opinion of 2006 Certificate Counsel ........................................................... G-1
APPENDIX H:  Continuing Disclosure Undertaking .................................................................................................... H-1

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08.2013   11:32

**OFFERING CIRCULAR**

**$948,540,000**

# TAXABLE CERTIFICATES OF PARTICIPATION SERIES 2006

**issued by the DETROIT RETIREMENT SYSTEMS FUNDING TRUST 2006**

evidencing undivided proportionate interests
in the rights to receive certain payments
pursuant to two Service Contracts between

## CITY OF DETROIT, MICHIGAN

and

### DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION

and

### DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION

**$148,540,000 SERIES 2006-A (FIXED RATE)**
**$800,000,000 SERIES 2006-B (FLOATING RATE)**

## INTRODUCTION

This Offering Circular sets forth information concerning the Certificates of Participation Series 2006-A in the original aggregate principal amount of $148,540,000 (**Series 2006-A Certificates**) and the 2006 Certificates of Participation Series 2006-B in the original aggregate principal amount of $800,000,000 (**Series 2006-B Certificates**, and collectively with the Series 2006-A Certificates, **2006 Certificates**) issued by the Detroit Retirement Systems Funding Trust 2006 (**2006 Funding Trust**) to be formed under the Trust Agreement described below.

The 2006 Certificates evidence individual undivided proportionate interests in the rights to receive certain payments (**2006 COP Service Payments**) to be made by the City of Detroit, Michigan (**City**) under two Service Contracts of the City, namely, its (i) Detroit General Retirement System Service Contract 2006 (**2006 GRS Service Contract**) with the Detroit General Retirement System Service Corporation, and (ii) Detroit Police and Fire Retirement System Service Contract 2006 with the Detroit Police and Fire Retirement System Service Corporation (**2006 PFRS Service Contract**, and together with the 2006 GRS Service Contract, **2006 Service Contracts**).

As authorized by Ordinance No. 05-05 of the City (**Funding Ordinance**), the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation (each a **Service Corporation**) were incorporated in 2005. They were created for the purposes of providing services to assist the City in meeting its obligation to provide funding, over an applicable period of years, of unfunded accrued actuarial liabilities (**UAAL**) of the City's General Retirement System (**GRS**) and Police and Fire Retirement System (**PFRS,** and collectively with the GRS, **Retirement Systems**).

On May 25, 2005 (**2005 Contract Date**) and pursuant to the Funding Ordinance, the City entered into its first service contract with each Service Corporation (together, **2005 Service Contracts**), and certificates of participation (**2005 COPs**) were issued on June 2, 2005 evidencing undivided proportionate interests in the rights to receive certain payments (**2005 COP Service Payments**) to be made by the City under those 2005 Service Contracts through June 15, 2025. The 2005 COPs were issued to provide moneys to fund specific amounts of UAAL of the GRS and the PFRS (**2005 Subject UAAL**) and to pay certain related ancillary amounts set forth in the 2005 Service Contracts. The 2005 Subject UAAL was irrevocably funded in full on June 2, 2005 from proceeds of the 2005 COPs, and the 2005 COPs, the 2005 Service Contracts and the City's contractual obligation thereunder to pay the 2005 COP Service Payments, when due, all remain currently in effect.

Michigan law entitles each Retirement System to have its UAAL funded over a specified period (**Amortization Period**), which may be duly changed up to a 30-year maximum. Each 2005 Service Contract required the City to make 2005 COP Service Payments over a period that was limited to the PFRS or GRS

1

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 13.06.2013 11:32

Amortization Period then applicable (13 years for the PFRS and 20 years for the GRS). The Funding Ordinance anticipated the possible future extension of the PFRS and GRS Amortization Periods and authorized the Service Corporations, in that event, to assist the City in gaining the financial benefits of making its 2005 COP Service Payments over a similarly lengthened period.

On February 8, 2006, the governing board of the GRS (**GRS Board**) extended the Amortization Period for GRS UAAL from 20 to 30 years. On March 30, 2006, the governing board of the PFRS (**PFRS Board**) extended the Amortization Period for PFRS UAAL from 13 to 30 years. Accordingly, as part of the services that the Service Corporations agreed in their 2005 Service Contracts to provide, the 2006 Certificates are being issued to enable the City to replace certain scheduled payment obligations that it incurred to provide funding for the 2005 Subject UAAL with new scheduled payment obligations payable over the extended 30-year periods under the 2006 Service Contracts, and to provide moneys to pay costs of issuance of the 2006 Certificates and related amounts. This will enable the City to achieve financial benefits such as would have been available under the 2005 Service Contracts if it could have utilized then the now longer Amortization Period of each Retirement System.

In their respective 2006 Service Contracts, the Service Corporations have agreed to perform the above-described services, to assist the City in extending the period for its scheduled payments incurred to provide funding of the 2005 Subject UAAL, in the current year and in future years. In return for such present and future services, the City has agreed in the 2006 Service Contracts to make the 2006 COP Service Payments and certain additional payments.

The 2006 Certificates are issued pursuant to the Funding Ordinance, an authorizing Resolution adopted by the Detroit City Council on April 26, 2006 (the **Resolution**), the 2006 Service Contracts and the Trust Agreement, dated the date of original delivery of the 2006 Certificates (**2006 Closing Date**), among the Service Corporations and U.S. Bank National Association, as Trustee (**Trust Agreement**). U.S. Bank National Association will also serve as the Contract Administrator under the Contract Administration Agreement described below.

On the 2006 Closing Date, the Service Corporations, severally and not jointly, will enter into the Trust Agreement with the Trustee, establishing the 2006 Funding Trust and irrevocably selling and assigning to it all of their rights under the 2006 Service Contracts to receive, collect and enforce all 2006 COP Service Payments to become due thereunder. On the 2006 Closing Date, the 2006 Funding Trust will issue and sell the 2006 Certificates and then apply the proceeds in part to optionally redeem certain outstanding 2005 COPs, Series 2005-A (**Series 2005-A COPs**) and in part to purchase and cancel certain outstanding 2005 COPs, Series 2005-B (**Series 2005-B COPs**).

THE PAYMENT OBLIGATIONS OF THE CITY UNDER THE 2006 SERVICE CONTRACTS ARE UNSECURED CONTRACTUAL OBLIGATIONS OF THE CITY. NEITHER THE FAITH AND CREDIT, THE TAXING POWER NOR ANY SPECIAL REVENUES OF THE CITY ARE PLEDGED TO THE 2006 COP SERVICE PAYMENTS COMING DUE UNDER THE 2006 SERVICE CONTRACTS. THE 2006 SERVICE CONTRACTS AND THE PAYMENT OBLIGATIONS OF THE CITY UNDER THE 2006 SERVICE CONTRACTS DO NOT CONSTITUTE "INDEBTEDNESS" WITHIN THE MEANING OF ANY LIMITATION CONTAINED IN THE CONSTITUTION AND NON-TAX STATUTES OF THE STATE OF MICHIGAN OR IN THE CITY CHARTER.

**No Pledge of Retirement System Assets or of Proceeds of the 2006 Certificates**

No Retirement System assets and no proceeds of the 2006 Certificates will either secure or be available to pay the 2006 Certificates. See "PLAN OF FINANCE" and "SOURCES OF PAYMENT AND SECURITY FOR THE 2006 CERTIFICATES."

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

**Investment Considerations**

This is a relatively new financing structure which is being used for the second time in the State of Michigan (**State**). The City's unconditional contractual obligation to make 2006 COP Service Payments is <u>not</u> "subject to appropriation" (*i.e.*, the contractual obligation is <u>not</u> subject to termination if the City were to fail to appropriate sufficient amounts for the required payments in any single year). The City is legally bound to make all 2006 COP Service Payments for the full term of both 2006 Service Contracts, and statutory remedies exist to enforce the City's obligations. See "PLAN OF FINANCE" and its first subheading "Constitutional, Statutory and Ordinance Authority for Payment of UAAL and Issuance of the 2006 Certificates."

**Defined Terms**

All capitalized terms used in this Offering Circular, unless otherwise defined or the context otherwise indicates, have the same meaning as in the 2006 Service Contracts, the Trust Agreement and the Contract Administration Agreement. See "DEFINITIONS OF CERTAIN TERMS" in APPENDIX A.

**Underlying Documents**

The descriptions and summaries of various documents set forth below do not purport to be comprehensive or definitive, and reference is made to each document for the complete details of all terms and conditions. All statements herein are qualified in their entirety by reference to each such document. Copies of the 2006 Service Contracts, the Trust Agreement and the Contract Administration Agreement are available in reasonable quantities upon request to the Contract Administrator.

## THE CITY

**Governmental Structure**

Pursuant to the Michigan Constitution of 1963, as amended (**State Constitution**), and the Home Rule City Act (Act No. 279 of the Michigan Public Acts of 1909, as amended), the City is a home rule city with significant independent powers. The City provides the following services: public protection, public works, cultural and recreational, civic center, health, physical and economic development, public lighting, transportation, water supply and sewage disposal, human services, airport, and parking. In accordance with the City Charter (**Charter**), the governance of the City is organized into two branches: an Executive Branch, which is headed by the Mayor, and the Legislative Branch, which is comprised of the City Council and its agencies. The Mayor and the members of the City Council are elected every four years. The last regular election for these positions was on November 8, 2005, in which Kwame M. Kilpatrick was re-elected as Mayor, and five incumbent members and four new members of the City Council were elected. There are no limits as to the number of terms that may be served by City elected officials. In addition, the City is the District Control Unit responsible for certain duties relating to the judicial branch of State government.

The Charter provides that the voters of the City reserve the power to enact City ordinances by initiative and to nullify certain ordinances enacted by the City by referendum. The period within which voters of the City could, under the Charter, petition for a referendum to nullify the Funding Ordinance or either of the Alternative Funding Mechanism Ordinances (referred to below under *"PLAN OF FINANCE - Constitutional, Statutory and Ordinance Authority for Payment of UAAL and Issuance of the 2006 Certificates"*) lapsed without any such petitions being filed.

**Economic Characteristics**

Detroit is located in Wayne County, which is in the southeastern section of the lower peninsula of Michigan. The City covers approximately 138 square miles and is the largest city in Michigan, accounting for nearly half of the population of the County. According to the U.S. Census Bureau, the City is now the nation's eleventh largest city and is the center of the nation's eighth largest consolidated metropolitan statistical area. The City is internationally known for its automobile manufacturing and trade. The southeastern border of the City is on the Detroit River, an international waterway, which is linked via the St. Lawrence Seaway to

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/13.08.2013  11:32

seaports around the world.  The City is the commercial capital of Michigan and a major economic and industrial center of the nation.  The City has eight diverse industrial parks, and more than 50 firms have world headquarters within the City.  See  APPENDIX B - "Information Concerning the City of Detroit, Michigan" for information about the City's economic condition and outlook.

**Current Fiscal Situation**

Similar to many large urban governmental units, the City has faced and continues to face fiscal challenges. In the past three fiscal years (having a June 30 fiscal year-end), the five major revenue categories of the City's General Fund decreased 3.1% from $965 million to $935 million while the five major expenditure categories of the General Fund increased 18.0% from $832 million to $982 million (fiscal 2003 compared to fiscal 2005). This contributed to the City reporting year-end General Fund deficits for fiscal 2001, 2003, 2004 and 2005. The primary causes for these past results include a declining population base and its adverse effects on tax revenues, increases in health care and pension benefit costs, and a disproportionate number of City employees compared to the population served. The City has consistently sought to reduce expenditures and increase revenues in any fiscal year in which estimates and actual results may not coincide with budgeted assumptions.  The City also has utilized various one-time revenue enhancement strategies in an attempt to balance year-end deficits (e.g., issuance of fiscal stabilization bonds and exhausting the remaining balance in the Budget Stabilization Fund). In addition, the City has taken steps to significantly reduce budgeted positions by over 5,500 employees since fiscal 2002, including 3,300 in its General Fund to reverse the disproportion of the number of employees to resident population. The reductions represent 26% and 39% overall and in the General Fund respectively.

For the fiscal year ended June 30, 2004, the City recorded an unexpected unreserved General Fund deficit of $95 million that it carried, as required, into fiscal 2005. The fiscal 2004 deficit was primarily attributable to below budgeted income tax and utility users tax collections; tax penalties and interest for remitting payroll withholding taxes late to the Internal Revenue Service; capital costs for an 800-megahertz communication system; and payment resulting from the loss of a lawsuit to the PFRS.  In March 2005, the City administration implemented mid-year layoffs, salary reductions for certain employees and other expenditure reductions.  Such actions were taken to bring the budget into balance.

The Fiscal Year 2006 Budget was built upon significant cuts in existing City departments, broad-based expenditure reductions and provisions for a then anticipated carryover of undesignated General Fund deficit from fiscal 2005 estimated at $101.7 million.  As required, the estimated fiscal 2005 deficit was appropriated as an expenditure in the balanced Fiscal Year 2006 Budget. The City's actual carryover fiscal 2005 deficit was $155.4 million.

As a result of the higher than expected fiscal 2005 deficit and not gaining its unions' approval of proposed health care benefit reductions that the City had expected would generate approximately $47 million of cost savings, the City administration implemented further reductions to the City's work force and other cost saving initiatives during the current fiscal year.    See "FINANCIAL OPERATIONS - Recent Budget Results of the General Fund – Fiscal Year 2006" in APPENDIX B for more detail and assumptions regarding the budgeted figures.

The City administration believes that the steps the City has already taken together with those outlined in the Fiscal Year 2007 Executive Budget will correct the structural imbalance between its current level of revenues and expenditures.  This involves gaining additional permanent revenue sources, such as the refuse collection fee discussed under the heading "Fiscal 2007 Budget" in "FINANCIAL OPERATIONS - Recent Budget Results of the General Fund" in APPENDIX B.  In addition, the City administration believes that the City must continue to control its basic level of ongoing General Fund expenditures.  Such expenditure control measures will be accomplished through reducing the number of employees and their employee benefits, additional efficiency measures and reducing or terminating certain services.

The City administration currently estimates that it will complete fiscal 2006 with a reported $63 million deficit.  This is a significant reduction from the $155.4 million deficit it reported in fiscal 2005.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 8 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

While the City is pursuing steps to reduce this deficit even further, the estimated $63 million deficit has been appropriated as an expenditure, as required, in the balanced Fiscal Year 2007 Executive Budget. See "FINANCIAL OPERATIONS - Recent Budget Results of the General Fund – Fiscal 2007 Budget" in APPENDIX B.

**Financial Controls and Accounting**

Prior to the start of each fiscal year the City prepares an annual budget which constitutes the financial plan for such fiscal year. Reference to a fiscal year refers to the fiscal year ended or ending on June 30 of the year indicated. The budget is required to set forth estimated revenues from all sources and all appropriations. The appropriation for every function of each City department is a fixed expenditure and may not exceed the original appropriation without City Council approval. The City estimates a prior year surplus or deficit for the General Fund that reflects the projected ending financial position for the prior year. Subject to certain limitations, one half of any surplus realized at the end of any fiscal year is credited to a Budget Stabilization Fund with the remainder being included as revenue available for appropriation in the budget for the next succeeding fiscal year. Any deficit realized at the end of any fiscal year is entered into the budget for the next succeeding fiscal year as an appropriation in accordance with the Charter. The total of proposed expenditures cannot exceed the total of estimated revenues so that the budget as submitted by the Mayor and adopted by City Council is a balanced budget. See "FINANCIAL PROCEDURES - Budget Process" and "- Budget Stabilization Fund" in APPENDIX B.

The City's financial statements are prepared in conformity with accounting principles generally accepted in the United States of America and, except for entity-wide statements and the enterprise and pension funds, reflect the modified accrual basis of accounting. See "FINANCIAL PROCEDURES - Accounting System" and "- Accounting Methods" in APPENDIX B. The audited basic financial statements of the City as of and for the year ended June 30, 2005, are included in APPENDIX C.

## PLAN OF FINANCE

The 2006 Certificates are being issued to provide moneys to fund the optional redemption of $104,055,000 aggregate principal amount of Series 2005-A COPs of certain maturities and the purchase and cancellation of $800,000,000 aggregate principal amount of Series 2005-B COPs of certain maturities, as shown in the table below. This is the second issuance of certificates of participation in connection with the City's use of its alternative funding mechanism authorized last year for meeting its State constitutional and statutory obligation to fund an approximately $1.37 billion portion of outstanding unfunded accrued actuarial liabilities (**2005 Subject UAAL**) of its two Retirement Systems. In using the alternative funding mechanism last year, rather than paying the 2005 Subject UAAL in annual installments, with interest, directly to the Retirement Systems over the ensuing 13-20 years (the UAAL Amortization Periods then in effect for the PFRS and GRS, respectively), the City instead entered into a separate 2005 Service Contract with each of two Service Corporations it had caused to be formed for this purpose and contractually obligated itself to make periodic 2005 COP Service Payments to them over the same 13-20 years in return for their agreeing to perform the services in the current year and in future years of reducing the financial burden of the 2005 Subject UAAL.

As part of the services the Service Corporations agreed in their 2005 Service Contracts to provide if the existing UAAL Amortization Periods of the PFRS and GRS were later extended and if requested by the City and approved by the City Council, the 2006 Certificates will be issued to enable the City to replace certain scheduled payment obligations it originally incurred to provide funding for the 2005 Subject UAAL with new scheduled payment obligations payable under the 2006 Service Contracts over the recently extended 30-year Amortization Periods, and to pay costs of issuance of the 2006 Certificates and related amounts. This will enable the City to achieve financial benefits as would have been available originally under the 2005 Service Contracts if it could have utilized the now longer Amortization Period of each Retirement System on the 2005 Contract Date.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

The Service Corporations will form the 2006 Funding Trust under the Trust Agreement on the 2006 Closing Date and irrevocably sell, assign and convey to the 2006 Funding Trust all their rights to receive, collect and enforce all 2006 COP Service Payments to become due under the 2006 Service Contracts. The 2006 Funding Trust and the Service Corporations will enter into the Contract Administration Agreement with U.S. Bank National Association, as Contract Administrator (**Contract Administrator**), and other parties. See "2006 SERVICE CONTRACT ADMINISTRATION." The Service Corporations are not expected to have a significant active role with regard to any outstanding 2006 Certificates after the 2006 Closing Date. The Retirement Systems will not be a party to the 2006 Service Contracts, the Trust Agreement or the Contract Administration Agreement.

The 2006 Funding Trust will issue and sell the 2006 Certificates on the 2006 Closing Date and apply the proceeds, with other available funds, in part to optionally redeem certain outstanding Series 2005-A COPs and in part to purchase and cancel certain outstanding Series 2005-B COPs. The Series 2005-B COPs to be purchased will be procured by a tender offer conducted by the Service Corporations. All such purchased Series 2005-B COPs of the same maturity will be purchased at the same price in relation to their principal amount, but no minimum principal amount of Series 2005-B COPs is required to be either tendered or purchased.

Upon issuance of the 2006 Certificates and such optional redemption of certain Series 2005-A COPs and such purchase and cancellation of Series 2005-B COPs which are tendered by their holders to the Service Corporations for that purpose, some 2005 COPs will still remain outstanding concurrently with the 2006 Certificates. The 2005 COPs and the 2006 Certificates are wholly independent of each other. The City's contractual payment obligations underlying the 2006 Certificates are totally separate and distinct from its contractual payment obligations underlying the 2005 COPs. Holders of 2006 Certificates will have no rights or interests in the City's payment obligations under the 2005 Service Contracts, and holders of 2005 COPs will have no rights or interests in the City's payment obligations under the 2006 Service Contracts.

The following Series 2005-A COPs will be optionally redeemed, and the following tendered Series 2005-B COPs will be purchased and canceled, from proceeds of the 2006 Certificates.

| Series 2005-A COPs Optionally Redeemed | | Series 2005-B COPs Purchased and Canceled | |
|---|---|---|---|
| Maturity (June 15) | Principal Amount | Maturity (June 15) | Principal Amount |
| 2007 | $10,845,000 | 2014 | $250,615,000 |
| 2008 | 13,905,000 | 2025 | 549,385,000 |
| 2009 | 17,310,000 | | |
| 2010 | 16,200,000 | | |
| 2011 | 13,925,000 | | |
| 2012 | 12,220,000 | | |
| 2013 | 10,615,000 | | |
| 2014 | 9,035,000 | | |

*Constitutional, Statutory and Ordinance Authority for*
*Payment of UAAL and Issuance of the 2006 Certificates*

Pursuant to the Funding Ordinance, the City and Service Corporations entered into the 2005 Service Contracts and 2005 COPs were issued as a means of enabling the City to fulfill its State constitutional and statutory obligations to provide funding for the 2005 Subject UAAL of its Retirement Systems. The periods for the City's scheduled payment obligations under the 2005 PFRS Service Contract and 2005 GRS Service Contract were limited to 13 and 20 years, respectively, the Amortization Periods then in effect for the PFRS and GRS. The Funding Ordinance anticipated the possible future extension of the PFRS and GRS Amortization Periods and authorized the Service Corporations, in that event, to assist the City in gaining the financial benefits of making its 2005 COP Service Payments over a similarly lengthened period. Now that the PFRS and GRS Amortization Periods have been extended to 30 years currently, the City and Service Corporations are entering into the 2006 Service Contracts and the 2006 Certificates are being issued, as

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 10 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

anticipated and authorized in the Funding Ordinance, as a means of enabling the City to utilize the permitted longer payment period for the obligations it incurred to fulfill its constitutional and statutory obligations to provide such funding for the 2005 Subject UAAL.

The constitutional, statutory and ordinance authority for the funding of the 2005 Subject UAAL through issuance of the 2005 COPs, and for funding the optional redemption of certain 2005 COPs and the purchase and cancellation of other 2005 COPs through issuance of the 2006 Certificates to enable the City to extend its payment period for the obligations it incurred for funding the 2005 Subject UAAL, is described below.

The Home Rule City Act permits the City to provide in its Charter for the establishment and maintenance of a pension plan for its employees. Pursuant to that authority, the City has established by Charter and maintains pursuant to ordinances two employee pension systems – its General Retirement System (**GRS**) and Police and Fire Retirement System (**PFRS**). The two Retirement Systems were established in 1938 and 1941, respectively, by amendments to the 1918 Detroit City Charter, and exist for the purpose of providing retirement allowances and death and survivor benefits for eligible City employees and their beneficiaries. Each Retirement System is governed by its own Board, which invests and administers the System's assets as trust funds solely for the benefit of its participants, retirees and their beneficiaries. The assets of each Retirement System are separate and distinct from assets of the City, are outside the City's control and are not available to pay any obligation or expense of the City. See "RETIREMENT SYSTEMS" in APPENDIX B.

Article 9, Section 24 of the State Constitution obligates the City to contribute sufficient funds to the GRS and PFRS to maintain their actuarial integrity. The Michigan Supreme Court has held that this constitutionally obligates a Michigan municipality to fund its employee retirement systems to a level which includes pension benefit liabilities incurred in the current year and any existing unfunded accrued actuarial liabilities (**UAAL**). *Shelby Township Police and Fire Retirement Board* v. *Shelby Township*, 438 Mich. 247 (1991). The Court noted that the State Constitution does not provide specifics for how a municipality must meet its constitutionally-imposed UAAL funding obligations.

Michigan's Public Employees Retirement System Investment Act provides more specificity. That statute, which applies to both the GRS and PFRS, prescribes (in MCL §38.1140m) that a Michigan municipality's required annual contribution to its employee retirement system must be an actuarially determined contribution amount, consisting of (1) a current service cost payment, (2) a payment of at least the annual accrued amortized interest on any UAAL and (3) a payment of the annual accrued amortized portion of the unfunded principal liability.

The City's GRS and PFRS ordinances have long specified a traditional funding mechanism for the City to meet its constitutional and statutory obligation to provide funding for each System's UAAL through required annual payments. The City last year authorized an alternative funding mechanism for such UAAL through new enabling legislation duly enacted by the Detroit City Council, Ordinances No. 03-05 and 04-05 (**Alternative Funding Mechanism Ordinances**) amending the City's GRS and PFRS ordinances. The Alternative Funding Mechanism Ordinances, together with the Funding Ordinance (No. 05-05), enabled the City, the Service Corporations and a corporate trustee to provide for the issuance and sale of the 2005 COPs and the use of the 2005 COPs proceeds to fund the 2005 Subject UAAL of both Retirement Systems on the date of delivery of the 2005 COPs (**2005 Closing Date**).

Each Retirement System receives an annual actuarial report from its consulting actuary as of each June 30, providing actuarial valuations of its vested benefits, prior service costs and unfunded accrued liabilities. Each Retirement System Board uses those actuarial valuations, together with certain actuarial assumptions, to determine the annual contribution amounts requested from the City to fulfill its constitutional and statutory pension funding obligations. As part of their regular, periodic review of the actuarial assumptions used to administer their respective Retirement Systems, the GRS and PFRS Boards may receive recommendations from time to time to increase or decrease the interest rate and to change other actuarial assumptions.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 11 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

The most recent annual actuarial reports available for the Retirement Systems when the 2005 Service Contracts were entered into were as of June 30, 2004.  Although the GRS and PFRS had assets actuarially valued at $2,470,243,470 and $3,074,516,589, respectively, as of that date, they also had estimated UAAL of $913,683,202 and $782,976,693, respectively, as of that date, as determined by their actuary.  $739,793,898 of GRS UAAL and $630,829,189 of PFRS UAAL were designated the "Subject UAAL" that was funded in full from 2005 COPs proceeds on the 2005 Closing Date.

The 2005 Subject UAAL was a major part, but not all, of the existing UAAL of the Retirement Systems on the 2005 Closing Date. The funding of the 2005 Subject UAAL from 2005 COPs proceeds was not intended to and did not fund the entire then existing UAAL of either or both Retirement Systems.

When the 2005 Service Contracts were entered into on May 25, 2005, under the Boards' current actuarial assumptions and the traditional funding mechanism, the City would have been required to amortize the 2005 Subject UAAL over a remaining period of 13 years for the PFRS and 20 years for the GRS.  In each year that the City has outstanding UAAL, it is assessed interest thereon (in May 2005 and still currently, at annual rates of 7.9% on GRS UAAL and 7.8% on PFRS UAAL).

By arranging through the alternative funding mechanism for the 2005 Subject UAAL to be funded (in effect, prepaid) on the 2005 Closing Date, the City avoided further interest accrual on the amount thus funded; and the Retirement Systems gained complete possession and control of those funds (including the exclusive right to invest and receive all investment earnings on those funds) sooner than they would under the traditional funding mechanism.  The Alternative Funding Mechanism Ordinances impose certain technical restrictions on the Retirement Systems' uses of those funds, but neither rescind any substantive rights, entitlements or obligations with respect to benefits earned or accrued of members, retirees or beneficiaries of the Retirement Systems nor affect the validity or enforceability of the 2005 Service Contracts or the 2006 Service Contracts or the City's payment obligations thereunder.

The financing plan for the first use of the alternative funding mechanism on the 2005 Closing Date reflected the expectation that by prepaying the 2005 Subject UAAL, the City reduced its costs and better ensured the timely and full payment of retirement benefits.  As a practical matter, it also was expected that amounts that otherwise would have been expended by the City for the annual amortization of the 2005 Subject UAAL (under the traditional funding mechanism) would be sufficient to offset all the contractual payments to be made by the City under the 2005 Service Contracts.  Those contractual payments in effect replaced payments the City would have otherwise had to make to meet its constitutional obligation to amortize the 2005 Subject UAAL.

Apart from the 2005 Subject UAAL, other UAAL of the Retirement Systems may exist and arise in the ordinary course of the City's operations, which the City may elect to fund by utilizing the traditional funding mechanism or the alternative funding mechanism.   Any utilization of the alternative funding mechanism for such other UAAL would, however, require (i) separate authorization by a future enabling ordinance or resolution of the City enacted for that purpose; (ii) a new funding trust separate and distinct from the 2006 Funding Trust and the different funding trust which exists with respect to the 2005 Service Contracts and the 2005 COPs; (iii) one or more new service contracts separate and distinct from the 2006 Service Contracts and the 2005 Service Contracts; and (iv) issuance of new certificates of participation unrelated to the 2006 Certificates and the 2005 COPs.

### Swap Agreements

The Service Corporations are parties to interest rate exchange agreements **(2005 Swap Agreements)** they entered into to hedge variable-rate exposure under the 2005 Service Contracts in regard to the Series 2005-B COPs.  The Service Corporations expect to terminate, in whole or in part, the 2005 Swap Agreements corresponding to the Series 2005-B COPs purchased and canceled as described under "PLAN OF FINANCE" above.  Such 2005 Swap Agreement terminations are expected to entitle the Service Corporations to receive certain termination payments from the 2005 Swap Agreement counterparties.  A portion of the proceeds of

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Date: 11/15-08-2013 11:33

such termination receivables will be used as shown under "Sources and Uses of Funds" below. The balance of such termination receivables will be paid to the City in accordance with the 2005 Service Contracts.

It also is expected that the Service Corporations will enter into interest rate exchange agreements or similar agreements **(2006 Swap Agreements)** before or at the time of issuance of the Series 2006-B Certificates, to hedge variable-rate exposure under the 2006 Service Contracts, and they may do so from time to time with respect to any rate exposure under the 2006 Service Contracts. Each Service Corporation will enter into one or more 2006 Swap Agreements with each of UBS AG and with SBS Financial Products Company, LLC, as the counterparties. Payments under a 2006 Swap Agreement may include net payments based on the interest rates exchanged. Under the 2006 Swap Agreements, the Service Corporations will be obligated in certain instances to make periodic payments to the 2006 Swap Agreement counterparty, and should a 2006 Swap Agreement be terminated, under certain circumstances the Service Corporations may be required to pay a termination payment. The Service Corporations' obligation to make all payments under the 2006 Swap Agreements will be payable from moneys paid by the City under the 2006 Service Contracts. In applying moneys so received from the City, the Contract Administrator will be required to treat any termination payment owing to a 2006 Swap Agreement counterparty as subordinated in right of payment to the prior payment in full of any Scheduled Payments and Service Charges (corresponding to principal of and interest on 2006 Certificates) then due and unpaid.

### *Sources and Uses of Funds*

The proceeds from the sale of the 2006 Certificates are expected to be used as follows:

**Sources of Funds**

| | |
|---|---|
| Principal Amount of Series 2006-A Certificates ......................................... | $148,540,000.00 |
| Principal Amount of Series 2006-B Certificates ......................................... | 800,000,000.00 |
| Swap Termination Receivables ................................................................. | 36,051,234.67 |
| TOTAL SOURCES ......................................................................... | $984,591,234.67 |

**Uses of Funds**

| | |
|---|---|
| Optional redemption of certain 2005-A COPs [1] ........................................ | $107,149,970.44 |
| Purchase (for cancellation) of tendered Series 2005-B COPs [2] .................. | 815,594,283.37 |
| Premiums of insurance policies on 2006 Certificates and 2006 Swap Agreements | 50,642,427.28 |
| Costs of Issuance [3] ................................................................................ | 11,204,553.58 |
| TOTAL USES ................................................................................ | $984,591,234.67 |

---

[1] Includes prepayment premiums, Service Charges due after closing and prior to optional redemption date, and accrued interest to the date of redemption.
[2] Includes tender premiums, accrued interest to the date of purchase, and tender fees and expenses.
[3] Includes underwriters' discount and costs for legal counsel, financial and swap advisors, rating agencies, trustee, offering circular distribution and miscellaneous expenses incidental to issuance of the 2006 Certificates.

## SOURCES OF PAYMENT AND SECURITY FOR THE 2006 CERTIFICATES

The 2006 Certificates are payable solely from all 2006 COP Service Payments which may be received by the Trustee pursuant to the 2006 Service Contracts. Such 2006 COP Service Payments will include all Scheduled Payments and Service Charges payable by the City under the 2006 Service Contracts, corresponding to the principal of and interest on the 2006 Certificates, respectively. The City's obligations to make 2006 COP Service Payments are unsecured contractual obligations of the City, enforceable in the same manner as any other contractual obligation of the City. **Such payment obligations of the City are not general obligations of the City, and neither the faith and credit, taxing power nor any specific revenues of the City are pledged to the 2006 COP Service Payments coming due under the 2006 Service Contracts.**

The City's unconditional contractual obligation to pay all 2006 COP Service Payments is not "subject to appropriation," as is customary with many certificate of participation transactions entered into by

CONFIDENTIAL INFORMATION

mark.angelov@arentfox.com

Detroit:13.08:2013 11:32

municipalities in the United States. The City's 2006 Service Contracts are not subject to termination if the City were to fail to appropriate sufficient amounts for the required payments in any single year. The City is legally bound to make all 2006 COP Service Payments for the full term of both 2006 Service Contracts, and statutory remedies exist to enforce the City's obligations.

To secure the payment of the 2006 Certificates, the Service Corporations will irrevocably sell, assign and convey to the 2006 Funding Trust all of their rights to receive, collect and enforce all 2006 COP Service Payments to become due under the 2006 Service Contracts. As further security for the payment of the 2006 Certificates, although the parties intend that such sale, assignment and conveyance be an absolute transfer of those rights under the 2006 Service Contracts, in the Trust Agreement the Service Corporations will additionally grant a security interest in their right to receive 2006 COP Service Payments to the 2006 Funding Trust for the benefit of the 2006 Certificateholders. That security interest will be a perfected first security interest in such property under the Michigan Uniform Commercial Code.

The 2006 Service Contracts additionally require the City to make certain other payments, such as general corporate expenses of the Service Corporations, fees and expenses of the Trustee and the Contract Administrator, and certain amounts payable to one or more 2006 Swap Agreement counterparties. The amounts paid by the City for such additional purposes do not constitute part of the 2006 COP Service Payments and are not pledged for the payment of the 2006 Certificates.

If the City were to fail to pay any 2006 COP Service Payment when due, the Contract Administrator could file a lawsuit against the City to enforce that contractual obligation, a right that is available to all parties entering into valid enforceable contracts with the City. The City would be required to pay any resulting judgment against it, the same as any other. If the City were to fail to provide for payment of any such judgment, a court can compel the City to raise the payment through the levy of taxes, as provided in the Revised Judicature Act of 1961, Act No. 236 of the Michigan Public Acts of 1961, as amended (Michigan Compiled Laws Section 600.6093), without limit as to rate or amount. This is the same remedy that the Retirement Systems would have against the City if it failed to make its required annual payment to fund UAAL under the traditional funding mechanism described above under "PLAN OF FINANCE - Constitutional, Statutory and Ordinance Authority for Payment of UAAL and Issuance of the 2006 Certificates." It also is the same remedy that the contract administrator with respect to the 2005 Service Contracts would have against the City if it were to fail to pay any 2005 COP Service Payment when due.

The Contract Administrator has no duty under the Contract Administration Agreement to pursue any remedy against the City for nonpayment of 2006 COP Service Payments except at the request of 2006 Certificateholders representing at least 25% of the outstanding principal amount of 2006 Certificates, the payments on which have not been made when due, or at least 50% of the outstanding principal amount of all 2006 Certificates. See "2006 SERVICE CONTRACT ADMINISTRATION – Enforcement."

## THE 2006 CERTIFICATES

The 2006 Certificates are being issued in two series, as described below.

### The Series 2006-A Certificates (Fixed Rate)

The Series 2006-A Certificates will be dated the date of their issuance. Interest from that date will be payable on each Series 2006-A Certificate on December 15, 2006 and semiannually thereafter on each June 15 and December 15 until its maturity or earlier redemption. The interest on the Series 2006-A Certificates will be computed at the rates shown on the inside cover of this Offering Circular, on the basis of a 30-day month and a 360-day year. The Series 2006-A Certificates are issued as fully registered 2006 Certificates, in principal denominations of $5,000 or multiples thereof.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

<u>Mandatory Sinking Fund Redemption</u>

All Series 2006-A Certificates maturing in 2035 are subject to *pro rata* mandatory redemption prior to maturity, at a redemption price equal to par (100% of the principal amount to be redeemed), together with accrued interest to the redemption date, on June 15 of each of the years, and in the respective amounts, specified below, except that the principal amount of the Series 2006-A Certificates to be redeemed on each such redemption date will be reduced by a *pro rata* portion of the principal amount of any Series 2006-A Certificates that have been purchased by the Trustee and canceled by the Trustee, or redeemed as described below under "THE 2006 CERTIFICATES – The Series 2006-A Certificates (Fixed Rate) - Optional Redemption with Make-Whole Premium," at least 45 days before the redemption date:

| Redemption Date (June 15) | Principal Amount |
|---|---|
| 2034 | $ 36,255,000 |
| 2035 [(a)] | 112,285,000 |

[(a)] Stated Maturity

<u>Optional Redemption with Make-Whole Premium</u>

The Series 2006-A Certificates are subject to optional redemption prior to their maturity from Scheduled Payments prepaid by the City, in whole or in part (and if in part, as described below under "THE 2006 CERTIFICATES – Selection of 2006 Certificates for Redemption") on any date, at a redemption price equal to the greater of:

- 100% of the principal amount of the Series 2006-A Certificates to be redeemed, or

- the sum of the present values of the remaining scheduled payments of principal and interest on the Series 2006-A Certificates to be redeemed (exclusive of interest accrued to the date fixed for redemption) discounted to the date of redemption on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate (defined below) plus 12.5 basis points,

plus in each case, accrued and unpaid interest on the Series 2006-A Certificates being redeemed to the date fixed for redemption.

For the purpose of determining the Treasury Rate, the following definitions apply:

**Treasury Rate** means, with respect to any redemption date for a particular Series 2006-A Certificate, the rate per annum, expressed as a percentage of the principal amount, equal to the semiannual equivalent yield to maturity or interpolated maturity of the Comparable Treasury Issue, assuming that the Comparable Treasury Issue is purchased on the redemption date for a price equal to the Comparable Treasury Price, as calculated by the Designated Treasury Dealer.

**Comparable Treasury Issue** means, with respect to any redemption date for a particular Series 2006-A Certificate, the U.S. Treasury security or securities selected by the Designated Treasury Dealer which has an actual or interpolated maturity comparable to the remaining average life of the Series 2006-A Certificate to be redeemed, and that would be utilized in accordance with customary financial practice in pricing new issues of debt securities of comparable maturity to the remaining average life of the Series 2006-A Certificate to be redeemed.

**Comparable Treasury Price** means, with respect to any redemption date for a particular Series 2006-A Certificate, (1) if the Designated Treasury Dealer receives at least four Reference Treasury Dealer Quotations, the average of such quotations for such redemption date, after excluding

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08.2013 11.32

the highest and lowest Reference Treasury Dealer Quotations, or (2) if the Designated Treasury Dealer obtains fewer than four Reference Treasury Dealer Quotations, the average of all such quotations.

**Designated Treasury Dealer** means one of the Reference Treasury Dealers designated by the Contract Administrator.

**Reference Treasury Dealer** means UBS Securities LLC or its successor, and four other firms, selected by the Contract Administrator from time to time, that are primary U.S. Government securities dealers in the City of New York (each a **Primary Treasury Dealer**); *provided, however,* that if any of them ceases to be a Primary Treasury Dealer, the Contract Administrator will substitute another Primary Treasury Dealer.

**Reference Treasury Dealer Quotations** means, with respect to each Reference Treasury Dealer and any redemption date for a particular Series 2006-A Certificate, the average, as determined by the Designated Treasury Dealer, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Designated Treasury Dealer by such Reference Treasury Dealer at 3:30 p.m., New York City time, on the third business day preceding such redemption date.

### The Series 2006-B Certificates (Floating Rate)

The Series 2006-B Certificates will be dated the date of their issuance and mature on the dates set forth on the inside cover of this Offering Circular. The amount of interest for each day that the Series 2006-B Certificates are outstanding will be calculated by dividing the Interest Rate in effect for such day by 360 and multiplying the result by the outstanding principal amount of the Series 2006-B Certificates. The Series 2006-B Certificates are issued as fully registered 2006 Certificates, in principal denominations of $25,000 and integral multiples of $1,000 in excess thereof.

Interest will be payable on the Series 2006-B Certificates from the delivery date at a floating rate determined in the manner provided below, payable on September 15, 2006 and the 15th day of each December, March, June and September thereafter (each an **Interest Payment Date**) to the persons in whose name the Series 2006-B Certificates were registered at the close of business on the 15th day (whether or not a business day) preceding the respective Interest Payment Date, subject to certain exceptions.

The per annum interest rate on the Series 2006-B Certificates (**Interest Rate**) in effect during an Interest Period (as defined below) will be equal to the Three Month LIBOR plus the margin indicated on the inside cover of this Offering Circular, and interest on the Series 2006-B Certificates will accrue on the outstanding principal balance of the Series 2006-B Certificates as shown below. The outstanding principal balance is computed based upon the reduction of the principal balance of each Series 2006-B Certificate by the amount of the mandatory sinking fund prepayment on the specific dates set forth under the next subheading "Mandatory Sinking Fund Redemption" below.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.0 06/20/13 11:32

| Dates | 2029 Maturity Outstanding Principal Balance (Weighted Average Life: 19.945 Years) | 2034 Maturity Outstanding Principal Balance (Weighted Average Life: 25.949 Years) |
|---|---|---|
| June 12, 2006 – June 15, 2007 | $299,155,000 | $500,845,000 |
| June 16, 2007 – June 15, 2008 | 299,155,000 | 500,845,000 |
| June 16, 2008 – June 15, 2009 | 299,155,000 | 500,845,000 |
| June 16, 2009 – June 15, 2010 | 299,155,000 | 500,845,000 |
| June 16, 2010 – June 15, 2011 | 299,155,000 | 500,845,000 |
| June 16, 2011 – June 15, 2012 | 299,155,000 | 500,845,000 |
| June 16, 2012 – June 15, 2013 | 299,155,000 | 500,845,000 |
| June 16, 2013 – June 15, 2014 | 299,155,000 | 500,845,000 |
| June 16, 2014 – June 15, 2015 | 299,155,000 | 500,845,000 |
| June 16, 2015 – June 15, 2016 | 299,155,000 | 500,845,000 |
| June 16, 2016 – June 15, 2017 | 299,155,000 | 500,845,000 |
| June 16, 2017 – June 15, 2018 | 299,155,000 | 500,845,000 |
| June 16, 2018 – June 15, 2019 | 299,155,000 | 500,845,000 |
| June 16, 2019 – June 15, 2020 | 284,526,000 | 500,845,000 |
| June 16, 2020 – June 15, 2021 | 270,722,000 | 500,845,000 |
| June 16, 2021 – June 15, 2022 | 257,875,000 | 500,845,000 |
| June 16, 2022 – June 15, 2023 | 246,107,000 | 500,845,000 |
| June 16, 2023 – June 15, 2024 | 235,569,000 | 500,845,000 |
| June 16, 2024 – June 15, 2025 | 226,419,000 | 500,845,000 |
| June 16, 2025 – June 15, 2026 | 218,827,000 | 500,845,000 |
| June 16, 2026 – June 15, 2027 | 153,696,000 | 500,845,000 |
| June 16, 2027 – June 15, 2028 | 84,511,000 | 500,845,000 |
| June 16, 2028 – June 15, 2029 | 11,020,000 | 500,845,000 |
| June 16, 2029 – June 15, 2030 | | 433,799,000 |
| June 16, 2030 – June 15, 2031 | | 350,849,000 |
| June 16, 2031 – June 15, 2032 | | 262,705,000 |
| June 16, 2032 – June 15, 2033 | | 169,041,000 |
| June 16, 2033 – June 15, 2034 | | 69,512,000 |

For the initial Interest Period which begins on the 2006 Closing Date and ends on (but does not include) September 15, 2006, the Contract Administrator will set the Interest Rate on the 2006 Closing Date and will determine the LIBOR rate by reference to straight line interpolation between Three Month LIBOR and four month LIBOR based on the actual number of days in the initial Interest Period. The Interest Rate for each subsequent Interest Period for the Series 2006-B Certificates will be set on September 15, 2006 and the 15th day of each December, March, June and September thereafter (each an **Interest Rate Adjustment Date**) until the principal on the Series 2006-B Certificates is paid or made available for payment. If any Interest Rate Adjustment Date (other than the initial Interest Rate Adjustment Date occurring on the 2006 Closing Date) and Interest Payment Date for the Series 2006-B Certificates would otherwise be a day that is not a LIBOR Business Day, such Interest Rate Adjustment Date and Interest Payment Date shall be the next succeeding LIBOR Business Day.

**LIBOR Business Day** means any day on which the City, the Trustee and banks in both London and New York City are open for the transaction of business. **Interest Period** means the period from and including the 2006 Closing Date or the most recent Interest Payment Date to but excluding the next succeeding Interest Payment Date on which interest on the outstanding Series 2006-B Certificates was paid in full.

The **Three Month LIBOR** for each Interest Period means the rate determined in accordance with the following provisions:

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

(i)     On the second LIBOR Business Day before the 2006 Closing Date and each subsequent Interest Rate Adjustment Date (each such date an **Interest Determination Date** for the ensuing Interest Period), the Contract Administrator will determine the Three Month LIBOR which shall be the London interbank offered rate for deposits in U.S. dollars with a three-month maturity that appears on Telerate Page 3750 as of 11:00 a.m., London time, on such Interest Determination Date.  **Telerate Page 3750** means the display page so designated on Moneyline Telerate, Inc. (or such other page as may replace that page on that service or such other service or services as may be nominated by the British Bankers' Association for the purpose of displaying London interbank offered rates for U.S. dollar deposits.  If the Three Month LIBOR on such Interest Determination Date does not appear on the Telerate Page 3750, the Three Month LIBOR will be determined as described in paragraph (ii) below.

(ii)     With respect to an Interest Determination Date for which the Three Month LIBOR does not appear on Telerate Page 3750 as specified in paragraph (i) above, the Three Month LIBOR will be determined on the basis of the rates at which deposits in U.S. dollars for a three-month maturity and in a principal amount of at least U.S. $1,000,000 are offered at approximately 11:00 a.m., London time, on such Interest Determination Date to prime banks in the London interbank market by at least three leading banks engaged in transactions in Eurodollar deposits in the international Eurocurrency market (the **Reference Banks**) selected by the Contract Administrator.  The Contract Administrator shall request the principal London office of each of such Reference Banks to provide a quotation of its rate.  If at least two such quotations are provided, the Three Month LIBOR on such Interest Determination Date will be the arithmetic mean of such quotations.  If fewer than two quotations are provided, the Three Month LIBOR on such Interest Determination Date will be the arithmetic mean of the rates quoted by three major banks in New York City, selected by the Contract Administrator, at approximately 11:00 a.m., New York City time, on such Interest Determination Date for loans in U.S. dollars to leading European banks in a principal amount of at least U.S. $1,000,000 having a three-month maturity; provided, however, that if the banks in New York City selected by the Contract Administrator are not then quoting rates for such loans, the relevant Interest Rate for the Interest Period commencing on the Interest Rate Adjustment Date following such Interest Determination Date will be the Interest Rate in effect on such Interest Determination Date.

The amount of interest for each day that the Series 2006-B Certificates are outstanding (the **Daily Interest Amount**) will be calculated by dividing the Interest Rate in effect for such day by 360 and multiplying the result by the outstanding principal amount of the Series 2006-B Certificates.  The amount of interest to be paid on the Series 2006-B Certificates for any Interest Period will be calculated by adding the Daily Interest Amounts for each day in such Interest Period.

The Interest Rate on the Series 2006-B Certificates will in no event be higher than the maximum rate permitted by Michigan law as the same may be modified by United States law of general application.

The Interest Rate and amount of interest to be paid on the Series 2006-B Certificates for each Interest Period will be determined by the Contract Administrator.  All calculations made by the Contract Administrator shall in the absence of manifest error be conclusive for all purposes and binding on the 2006 Funding Trust and the Holders of the Series 2006-B Certificates.

<u>Mandatory Sinking Fund Redemption</u>

All Series 2006-B Certificates maturing in 2029 are subject to *pro rata* mandatory redemption prior to maturity, at a redemption price equal to par (100% of the principal amount to be redeemed), together with accrued interest to the redemption date, on June 15 of each of the years, and in the respective amounts specified below, except that the principal amount of the Series 2006-B Certificates to be redeemed on each such redemption date will be reduced by a *pro rata* portion of the principal amount of any Series 2006-B Certificates that have been purchased by the Trustee and canceled by the Trustee, or redeemed as described below under "*The Series 2006-B Certificates (Floating Rate)* - Optional Redemption," at least 45 days before the redemption date:

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 5:08:2013 11:32

| Redemption Date (June 15) | Principal Amount |
|---|---|
| 2019 | $14,629,000 |
| 2020 | 13,804,000 |
| 2021 | 12,847,000 |
| 2022 | 11,768,000 |
| 2023 | 10,538,000 |
| 2024 | 9,150,000 |
| 2025 | 7,592,000 |
| 2026 | 65,131,000 |
| 2027 | 69,185,000 |
| 2028 | 73,491,000 |
| 2029[a] | 11,020,000 |

[a] Stated Maturity

All Series 2006-B Certificates maturing in 2034 are subject to *pro rata* mandatory redemption prior to maturity, at a redemption price equal to par (100% of the principal amount to be redeemed), together with accrued interest to the redemption date, on June 15 of each of the years, and in the respective amounts, specified below, except that the principal amount of the Series 2006-B Certificates to be redeemed on each such redemption date will be reduced by a *pro rata* portion of the principal amount of any Series 2006-B Certificates that have been purchased by the Trustee and canceled by the Trustee, or redeemed as described below under "*The Series 2006-B Certificates (Floating Rate) - Optional Redemption*," at least 45 days before the redemption date:

| Redemption Date (June 15) | Principal Amount |
|---|---|
| 2029 | $67,046,000 |
| 2030 | 82,950,000 |
| 2031 | 88,144,000 |
| 2032 | 93,664,000 |
| 2033 | 99,529,000 |
| 2034[a] | 69,512,000 |

[a] Stated Maturity

Optional Redemption

The Series 2006-B Certificates are subject to optional redemption on any Interest Payment Date at par, beginning June 15, 2011, in whole or in part (and if in part, as described below under "THE 2006 CERTIFICATES – *Selection of 2006 Certificates for Redemption*") .

### Selection of 2006 Certificates for Redemption

If some but less than all of the 2006 Certificates of either Series 2006-A or Series 2006-B are to be redeemed on any date, the Contract Administrator, at the direction of the City, will select the maturity or maturities to be redeemed. Within a maturity, the particular 2006 Certificates of a Series to be redeemed shall be redeemed *pro rata* as described below.

So long as the 2006 Certificates of either Series are in the book-entry-only system, the securities depository will administer the prorating of partial redemptions among beneficial owners of the 2006 Certificates of that Series. See "THE 2006 CERTIFICATES - Global Book-Entry System."

15

13-53846-tjt   Doc 348-7   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 19 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 19 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

### Notice of Redemption

The Trustee will mail a notice to the registered owner of each 2006 Certificate to be redeemed in whole or in part at the address for the registered owner shown in the registration books (the securities depository so long as the book-entry-only system is in effect). The notice will be mailed at least 30 days but not more than 45 days prior to the redemption date. Failure to give a notice of redemption or a defect in it will not affect the validity of the proceedings for the redemption of any 2006 Certificates for which proper notice was given.

### Global Book-Entry System

Payments of principal and interest for each 2006 Certificate will be paid to the registered owner of the 2006 Certificates. The 2006 Certificates are being issued initially in book-entry-only form, so the registered owner will be a securities depository, a nominee of The Depository Trust Company (**DTC**). Clearance is expected to be available through DTC and also through Clearstream and Euroclear, which will hold omnibus positions on behalf of their participants in the books of their respective depositories. For more information about the global book-entry system, see APPENDIX D. Under certain conditions the 2006 Certificates may be issued in certificated form.

The Trustee is the registrar and paying agent for the 2006 Certificates and may be contacted as follows:

| | |
|---|---|
| *Contact:* | U.S. Bank National Association |
| *Attn:* | Trust Finance Management |
| *Phone:* | 651-495-3713 |
| *Mail:* | Corporate Trust Services |
| | U.S. Bank National Association |
| | 60 Livingston Avenue |
| | St. Paul, MN 55107 |
| | Mail Station EP-MN-WS3T |

### Registration and Payment of 2006 Certificates

How the 2006 Certificates are paid depends on whether or not they are in book-entry-only form.

While the 2006 Certificates are in book-entry-only form (as they are initially), payment of principal will be made by wire transfer to the securities depository or its nominee. Payment of interest will be made by wire transfer to the securities depository or its nominee on the payment date.

If the 2006 Certificates are not in book-entry-only form, payment of principal will be made by check or draft issued upon the presentation and surrender of the 2006 Certificates at the designated office of the Trustee. Payment of interest due on the 2006 Certificates will be made by check or draft mailed to the registered owner shown in the registration book at the close of business on the 15th day (whether or not a business day) preceding the respective interest payment date.

## 2006 COP SERVICE PAYMENTS

The following table sets forth the contractual obligations of the City under the 2006 Service Contracts in each fiscal year for payment of Scheduled Payments and Service Charges, corresponding to the principal of and interest on the 2006 Certificates, respectively.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

**2006 COP SERVICE PAYMENTS SCHEDULE**

| Maturity (June 15) | Series 2006-A | | | Series 2006-B | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Principal | Interest | Total | Principal | Interest[1] | Total[1] | Principal | Interest[1] | Total[1] |
| 2007 | $– | $ 8,970,194 | $ 8,970,194 | $ – | $ 40,260,733 | $ 40,260,733 | $ – | $ 49,230,928 | $ 49,230,928 |
| 2008 | – | 8,896,061 | 8,896,061 | | 45,328,000 | 45,328,000 | | 54,224,061 | 54,224,061 |
| 2009 | – | 8,896,061 | 8,896,061 | | 49,936,975 | 49,936,975 | | 58,833,035 | 58,833,035 |
| 2010 | – | 8,896,061 | 8,896,061 | | 49,936,975 | 49,936,975 | | 58,833,035 | 58,833,035 |
| 2011 | – | 8,896,061 | 8,896,061 | – | 49,936,975 | 49,936,975 | | 58,833,035 | 58,833,035 |
| 2012 | – | 8,896,061 | 8,896,061 | – | 49,936,975 | 49,936,975 | | 58,833,035 | 58,833,035 |
| 2013 | – | 8,896,061 | 8,896,061 | – | 49,936,975 | 49,936,975 | | 58,833,035 | 58,833,035 |
| 2014 | – | 8,896,061 | 8,896,061 | – | 49,936,975 | 49,936,975 | | 58,833,035 | 58,833,035 |
| 2015 | – | 8,896,061 | 8,896,061 | – | 49,936,975 | 49,936,975 | | 58,833,035 | 58,833,035 |
| 2016 | – | 8,896,061 | 8,896,061 | – | 49,936,975 | 49,936,975 | | 58,833,035 | 58,833,035 |
| 2017 | – | 8,896,061 | 8,896,061 | – | 49,936,975 | 49,936,975 | | 58,833,035 | 58,833,035 |
| 2018 | – | 8,896,061 | 8,896,061 | – | 49,936,975 | 49,936,975 | – | 58,833,035 | 58,833,035 |
| 2019 | – | 8,896,061 | 8,896,061 | 14,629,000 | 49,936,975 | 64,565,975 | 14,629,000 | 58,833,035 | 73,462,035 |
| 2020 | – | 8,896,061 | 8,896,061 | 13,804,000 | 49,026,612 | 62,830,612 | 13,804,000 | 57,922,673 | 71,726,673 |
| 2021 | – | 8,896,061 | 8,896,061 | 12,847,000 | 48,167,589 | 61,014,589 | 12,847,000 | 57,063,650 | 69,910,650 |
| 2022 | – | 8,896,061 | 8,896,061 | 11,768,000 | 47,368,120 | 59,136,120 | 11,768,000 | 56,264,181 | 68,032,181 |
| 2023 | – | 8,896,061 | 8,896,061 | 10,538,000 | 46,635,798 | 57,173,798 | 10,538,000 | 55,531,858 | 66,069,858 |
| 2024 | – | 8,896,061 | 8,896,061 | 9,150,000 | 45,980,018 | 55,130,018 | 9,150,000 | 54,876,079 | 64,026,079 |
| 2025 | – | 8,896,061 | 8,896,061 | 7,592,000 | 45,410,613 | 53,002,613 | 7,592,000 | 54,306,674 | 61,898,674 |
| 2026 | – | 8,896,061 | 8,896,061 | 65,131,000 | 44,938,163 | 110,069,163 | 65,131,000 | 53,834,224 | 118,965,224 |
| 2027 | – | 8,896,061 | 8,896,061 | 69,185,000 | 40,885,061 | 110,070,061 | 69,185,000 | 49,781,122 | 118,966,122 |
| 2028 | – | 8,896,061 | 8,896,061 | 73,491,000 | 36,579,679 | 110,070,679 | 73,491,000 | 45,475,739 | 118,966,739 |
| 2029 | – | 8,896,061 | 8,896,061 | 78,066,000 | 32,006,334 | 110,072,334 | 78,066,000 | 40,902,394 | 118,968,394 |
| 2030 | – | 8,896,061 | 8,896,061 | 82,950,000 | 27,127,818 | 110,077,818 | 82,950,000 | 36,023,878 | 118,973,878 |
| 2031 | – | 8,896,061 | 8,896,061 | 88,144,000 | 21,940,436 | 110,084,436 | 88,144,000 | 30,836,496 | 118,980,496 |
| 2032 | – | 8,896,061 | 8,896,061 | 93,664,000 | 16,428,241 | 110,092,241 | 93,664,000 | 25,324,301 | 118,988,301 |
| 2033 | – | 8,896,061 | 8,896,061 | 99,529,000 | 10,570,845 | 110,099,845 | 99,529,000 | 19,466,906 | 118,995,906 |
| 2034 | 36,255,000 | 8,896,061 | 45,151,061 | 69,512,000 | 4,346,675 | 73,858,675 | 105,767,000 | 13,242,735 | 119,009,735 |
| 2035 | 112,285,000 | 6,724,749 | 119,009,749 | – | – | – | 112,285,000 | 6,724,749 | 119,009,749 |
| Totals | $148,540,000 | $255,888,579 | $404,428,579 | $800,000,000 | $1,152,307,457 | $1,952,307,457 | $948,540,000 | $1,408,196,036 | $2,356,736,036 |

---

[1]  Series 2006-B interest calculated at fixed swap rates.

17

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Doc ID: IV/15-08-2019 11:00

## 2006 CERTIFICATE INSURANCE

The scheduled payment of principal of and interest on the particular 2006 Certificates specifically identified on the inside cover of this Offering Circular as the "FGIC-insured 2006 Certificates" will be guaranteed under an insurance policy to be issued concurrently with the delivery of the FGIC-insured 2006 Certificates by Financial Guaranty Insurance Company (**Financial Guaranty**). Information provided by Financial Guaranty about its operations and financial condition is included as APPENDIX E, as is the form of its insurance policy.

The scheduled payment of principal of and interest on the particular 2006 Certificates specifically identified on the inside cover of this Offering Circular as the "XLCA-insured 2006 Certificates" will be guaranteed under an insurance policy to be issued concurrently with the delivery of the XLCA-insured 2006 Certificates by XL Capital Assurance Inc. (**XLCA**). Information provided by XLCA about its operations and financial condition is included as APPENDIX F, as is the form of its insurance policy.

In addition, Financial Guaranty and XLCA are expected to provide insurance policies that cover payments required to be made by the Service Corporations under the 2006 Swap Agreements that the Service Corporations are expected to enter into before or at the time of issuance of the Series 2006-B Certificates.

## 2006 SERVICE CONTRACT ADMINISTRATION

On the 2006 Closing Date, the 2006 Funding Trust, the Service Corporations, severally and not jointly, and the 2006 Swap Agreement counterparties and a guarantor for one of them, will enter into the Contract Administration Agreement (**Administration Agreement**) with U.S. Bank National Association, as Contract Administrator. U.S. Bank National Association will also be the Trustee under the Trust Agreement. The Administration Agreement will permit the substitution of a different Contract Administrator if a conflict of interest were to arise from the same institution serving in both roles.

Under the Administration Agreement, each of the Service Corporations and the Trustee on behalf of the 2006 Funding Trust will appoint the Contract Administrator as its respective agent to collect 2006 COP Service Payments, as well as periodic or termination payment amounts received from the City under the 2006 Service Contracts (**Hedge Payables**) or received from a 2006 Swap Agreement counterparty (**Hedge Receivables**), and will require the Contract Administrator to determine in accordance with prescribed priorities and prorating provisions to whom they must be disbursed. Also under the Administration Agreement, the Trustee on behalf of the 2006 Funding Trust will appoint the Contract Administrator as its agent to enforce the payment of 2006 COP Service Payments. Additionally, under the Administration Agreement, each Service Corporation will appoint the Contract Administrator as its agent if directed by the Service Corporation to enforce the payment of Hedge Receivables and Hedge Payables.

Although (i) another contract administration agreement and another trust agreement, which created another funding trust, exist with respect to the 2005 Service Contracts and the 2005 COPs, (ii) U.S. Bank National Association also is both the contract administrator under that contract administration agreement and the trustee under that trust agreement and (iii) that other trust agreement, funding trust and contract administration agreement, as well as the 2005 Service Contracts and certain of the 2005 COPs, will continue to exist after the 2006 Closing Date, all of the foregoing are totally separate and distinct from the 2006 Certificates, the 2006 Funding Trust, the 2006 Service Contracts, the related new Trust Agreement and Administration Agreement, and U.S. Bank National Association's serving as Trustee under the new Trust Agreement and as Contract Administrator under the new Administration Agreement. Similarly all funds paid, received, held or disbursed under the 2006 Service Contracts, Administration Agreement, Trust Agreement and 2006 Certificates are totally separate and distinct from all funds paid, received, held or disbursed under the 2005 Service Contracts, the related 2005 contract administration agreement and trust agreement and the 2005 COPs.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Redacted in its 2016 Trust

*Payments to the Trustee or Others*

On any date that principal or interest is due and payable on any 2006 Certificates, the applicable 2006 Certificateholders are entitled to receive the amount due from the Trustee in accordance with the Trust Agreement. The Trustee is dependent on receiving from the Contract Administrator, as the agent of each Service Corporation, the proceeds of 2006 COP Service Payments collected by the Contract Administrator for that purpose. In the event that on such date the Trustee has insufficient moneys to pay the full aggregate amount thus due, the Trustee is required by the Trust Agreement to disburse all of the available moneys it then holds to the entitled 2006 Certificateholders on a *pro rata* basis.

The Contract Administrator is required to distribute the moneys it receives from the City as Service Payments (which term includes not only 2006 COP Service Payments but also payments for fees, expenses and indemnification of the Contract Administrator and amounts in respect of periodic Hedge Payables and termination Hedge Payables) in accordance with the following priorities of payment among specific categories of payments, as prescribed in each 2006 Service Contract:

**First:** any fees, expenses and indemnification then owing to the Contract Administrator under the Contract Administration Agreement, including reasonable fees and expenses of its counsel, in connection with any waiver or consent thereunder or any amendment thereof or of a 2006 Service Contract, or in connection with the enforcement thereof, are payable to it,

**Second:** all theretofore due and unpaid Service Charges (corresponding to interest due and unpaid to 2006 Certificateholders) and amounts in respect of periodic Hedge Payables due and unpaid to a 2006 Swap Counterparty are payable on a parity, before the Contract Administrator can pay any available moneys then held by it to the next priority, namely,

**Third:** all then due and about to become due Service Charges (corresponding to interest to 2006 Certificateholders) and amounts in respect of periodic Hedge Payables to a 2006 Swap Counterparty are payable on a parity, before the Contract Administrator can pay any available moneys then held by it to the next priority, namely,

**Fourth:** all theretofore due and unpaid regular Scheduled Payments and Sinking Fund Installments (corresponding to principal due and unpaid to 2006 Certificateholders) are payable on a parity, before the Contract Administrator can pay any available moneys then held by it to the next priority, namely,

**Fifth:** all then due or about to become due regular Scheduled Payments and Sinking Fund Installments (corresponding to principal to 2006 Certificateholders) are payable on a parity, before the Contract Administrator can pay any available moneys then held by it to the next priority, namely,

**Sixth:** all theretofore due and unpaid amounts in respect of termination Hedge Payables to a 2006 Swap Counterparty are payable before the Contract Administrator can pay any available moneys then held by it to the next priority, namely,

**Seventh:** all then due and about to become due amounts in respect of termination Hedge Payables to a 2006 Swap Counterparty are payable before the Contract Administrator can pay any available moneys then held by it to the final priority, namely,

**Eighth:** all then due and about to become due Optional Prepayment Amounts (corresponding to optional prepayments of principal to 2006 Certificateholders) and Accrued Service Charges.

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 23 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 23 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

For purposes of the above priorities, an amount is "about to become due" (i) in the case of amounts which are payable not more frequently than once each calendar week, when there are six or fewer days before its due date, or (ii) for amounts which are payable more frequently than once each calendar week, the day after its most recent due date.

The Administration Agreement requires the Contract Administrator, before paying any 2006 COP Service Payment proceeds to the Trustee for pass through to 2006 Certificateholders on any payment date, to determine which priorities are then due and owing, whether on that date or in arrears, and to apply those moneys according to the priorities described above. Thus, if after satisfying the First priority, the Contract Administrator has insufficient moneys to pay all amounts then owing among the next priorities, it shall use the available moneys first to pay amounts owing in the Second priority on a parity between Service Charges (payable by the Contract Administrator to the Trustee) and periodic Hedge Payables (payable to a 2006 Swap Counterparty); and in that event, 2006 Certificateholders may receive on that date less than the full amount then owing to them. If that occurred, however, the affected 2006 Certificateholders would have the benefit of the applicable 2006 Certificate insurance. See "2006 CERTIFICATE INSURANCE."

*Enforcement*

Promptly after any failure of the City to pay any 2006 COP Service Payment when due, the Contract Administrator is required to give written notice by mail to all 2006 Certificateholders and others, except that such notice shall be given to the insurer of particular 2006 Certificates rather than those 2006 Certificateholders as long as the insurer is not in default under its insurance policy. The Contract Administrator has no duty under the Contract Administration Agreement to pursue any remedy against the City for nonpayment of 2006 COP Service Payments except at the request of 2006 Certificateholders representing at least 25% of the outstanding principal amount of 2006 Certificates, the payments on which have not been made when due, or at least 50% of the outstanding principal amount of all 2006 Certificates, and only if they shall have offered to the Contract Administrator reasonable security or indemnity against the costs, expenses and liabilities which might by incurred by it in compliance with such request.

**THE SERVICE CORPORATIONS AND THE 2006 FUNDING TRUST**

The two Service Corporations are Michigan nonprofit corporations incorporated by the City pursuant to the Home Rule City Act, the Funding Ordinance and the Michigan Nonprofit Corporation Act. They are organized primarily for the purpose of assisting the City in carrying out its constitutionally mandated obligation to maintain the actuarial integrity of its two Retirement Systems through performing the services of reducing the financial burden of the unfunded accrued actuarial liabilities of the GRS or PFRS, as applicable, by funding specified amounts thereof and by funding a reduction or rescheduling (or both) of certain related contractual payment obligations of the City as contemplated by the Funding Ordinance. They did this with respect to the 2005 Subject UAAL by entering into and undertaking their obligations under the two respective 2005 Service Contracts and related agreements including a trust agreement, a contract administration agreement and certain swap agreements. Similarly, they will do this again by entering into and performing their obligations under the two respective 2006 Service Contracts, the Trust Agreement, the Contract Administration Agreement and the 2006 Swap Agreements. The Service Corporations are not expected to have a significant active role with regard to any outstanding 2006 Certificates after the 2006 Closing Date.

The governing body of each respective Service Corporation is its Board of Directors, comprised of five directors. The Articles of Incorporation of each Service Corporation prescribe that its Board of Directors shall consist of three officials of the City – the Finance Director, the Budget Director and the Corporation Counsel – plus two members of the Detroit City Council appointed by the City Council. The current Board of Directors of each Service Corporation is comprised of these same five individuals:

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 24 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 2015-08-27 11:32

| Roger Short | Interim Finance Director of the City |
| Pamela Scales | Budget Director of the City |
| John E. Johnson, Jr. | Corporation Counsel of the City |
| Kenneth V. Cockrel, Jr. | City Council member |
| Alberta Tinsley-Talabi | City Council member |

The officers of both Service Corporations are: Mr. Short, President; Ms. Scales, Treasurer; and Mr. Johnson, Secretary.

Detroit Retirement Systems Funding Trust 2006 (the **2006 Funding Trust**) is a grantor trust that will be established and existing under Michigan law beginning on the 2006 Closing Date. It will be created by the Service Corporations, severally and not jointly, by their entering into the Trust Agreement on that date with U.S. Bank National Association, as Trustee. The purposes of the 2006 Funding Trust are to purchase and accept from the Service Corporations their assignment of the rights to receive all 2006 COP Service Payments payable by the City under the 2006 Service Contracts, to issue and sell the 2006 Certificates in accordance with the Trust Agreement and, acting through the Trustee, to pay all received 2006 COP Service Payments to the 2006 Certificateholders. In the event that at any future time either Service Corporation enters into a service contract with the City to provide for funding a particular amount of unfunded accrued actuarial liabilities of the City other than the 2005 Subject UAAL, the 2006 Funding Trust will have nothing to do with those transactions and the Service Corporation would have to create one or more other funding trusts to issue any certificates of participation for those transactions.

## UNDERWRITING

The Series 2006-A Certificates are being purchased by certain underwriters (**Series 2006-A Underwriters**), and UBS Securities LLC is serving as representative for the Series 2006-A Underwriters. The Series 2006-A Underwriters have agreed, subject to certain conditions, to purchase the Series 2006-A Certificates from the 2006 Funding Trust at an aggregate purchase price of $147,333,422.10 (reflecting underwriters' discount of $1,206,577.90).

The Series 2006-B Certificates are being purchased by certain underwriters (**Series 2006-B Underwriters**), and UBS Securities LLC is serving as representative for the Series 2006-B Underwriters. The Series 2006-B Underwriters have agreed, subject to certain conditions, to purchase the Series 2006-B Certificates from the 2006 Funding Trust at an aggregate purchase price of $793,501,667.42 (reflecting underwriters' discount of $6,498,332.58).

The Underwriters have agreed to reoffer the 2006 Certificates at the public offering prices or yields set forth on the inside cover of this Offering Circular. The 2006 Certificates may be offered and sold to certain dealers (including dealers depositing the 2006 Certificates into investment trusts) at prices lower than such public offering prices, and such prices may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions, and they will be obligated to purchase all the 2006 Certificates if any 2006 Certificates are purchased.

The Underwriters may engage in over-allotment, stabilizing transactions, syndicate covering transactions, and penalty bids in accordance with Regulation M under the Securities Exchange Act of 1934. Over-allotment involves syndicate sales in excess of the offering size, which creates a syndicate short position. Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specific maximum. Syndicate covering transactions involve purchases of the 2006 Certificates in the open market after the distribution has been completed in order to cover syndicate short positions. Penalty bids permit an Underwriter to reclaim a selling concession from a syndicate member when the 2006 Certificates originally sold by such syndicate member are purchased in a syndicate covering transaction to cover syndicate

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

short positions. Such stabilizing transactions, syndicate covering transactions, and penalty bids may cause the price of the 2006 Certificates to be higher than it would otherwise be in the absence of such transactions. Such transactions, if commenced, may be discontinued at any time.

Affiliates of one or more of the Underwriters may also be counterparties in 2006 Swap Agreements entered into by the Service Corporations in connection with the 2006 Service Contracts.

### *Global Plan of Distribution*

The 2006 Certificates are offered by the Underwriters for sale in those jurisdictions in the United States, Europe, Asia, and elsewhere where it is lawful to make such offers. Each Underwriter has undertaken that it will not offer, sell, or deliver, directly or indirectly, any of the 2006 Certificates or distribute this Offering Circular or any other material relating to the 2006 Certificates, in or from any jurisdiction except under circumstances that will, to the best of its knowledge and belief, result in compliance with the applicable laws and regulations thereof and not impose any obligations on the City, the Service Corporations or the Funding Trust except as contained in the underwriting agreement among the City, the Service Corporations and the Underwriters. Persons who receive this Offering Circular are required to comply with all applicable laws and regulations in each country or jurisdiction in which they purchase, offer, sell, or deliver the 2006 Certificates or have in their possession, distribute, or publish any offering material relating to the 2006 Certificates, in all cases at their own expense.

### *Reference Information about the 2006 Certificates*

The table on the inside cover of this Offering Circular provides information about the 2006 Certificates. The CUSIP, ISIN and Euroclear and Clearstream Common Code numbers for each maturity have been obtained from sources the City and the Service Corporations believe to be reliable, but the City, the Service Corporations, the Trustee and the Underwriters are not responsible for the correctness of the CUSIP, ISIN and Euroclear and Clearstream Common Code numbers or other identifying numbers assigned to the 2006 Certificates. The Underwriters have provided the reoffering yields and prices. The yield at issuance is the yield to maturity.

### RATINGS

At the City's and the Service Corporations' request, several rating agencies have rated the 2006 Certificates as set forth in the table below with the understanding that, upon delivery of the 2006 Certificates, the insurance policies described under "2006 CERTIFICATE INSURANCE" will be issued.

| Insured Rating | | Rating Agency |
|---|---|---|
| Series 2006-A Certificates | Series 2006-B Certificates | |
| AAA | AAA | Fitch Ratings |
| Aaa | Aaa | Moody's Investors Service, Inc. |
| AAA | AAA | Standard & Poor's Ratings Services |

In addition, at the City's request, several rating agencies have assigned an underlying rating to the 2006 Certificates (the rating that would apply to the 2006 Certificates if the insurance policies were not issued) as set forth in the table below.

| Underlying Rating | | Rating Agency |
|---|---|---|
| Series 2006-A Certificates | Series 2006-B Certificates | |
| BBB | BBB | Fitch Ratings |
| Baa2 | Baa2 | Moody's Investors Service, Inc. |
| Aa2 | Aa2 | Moody's Investors Service, Inc. (corporate equivalent rating) |
| BBB- | BBB- | Standard & Poor's Ratings Services |

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

Any explanation of what a rating means may only be obtained from the rating agency assigning the rating. There is no assurance that a rating assigned to the 2006 Certificates will continue for any period of time. A rating agency may lower or withdraw the rating it assigns if in its judgment circumstances so warrant. Any downward revision or withdrawal of a rating may have an adverse effect on the trading value and the market price of the 2006 Certificates. The 2006 Funding Trust, the Service Corporations and City make no representations as to the appropriateness of the ratings.

## FINANCIAL ADVISORS

Robert W. Baird & Co. and Scott Balice Strategies, LLC each have been employed by the City to perform professional services in the capacity of financial advisors with respect to the 2006 Service Contracts and the 2006 Certificates.

## INDEPENDENT ACCOUNTANTS

The basic financial statements of the City, as of and for the fiscal year ended June 30, 2005, included in APPENDIX C, have been audited by the firm of KPMG LLP, independent accountants, to the extent indicated in their report thereon, which also appears in APPENDIX C.

KPMG LLP's qualified report dated May 13, 2006, which is based on the reports of other auditors, states that the financial statements of the Detroit Housing Commission Component Unit (**Housing**) included in the City's basic financial statements have not been audited and that KPMG LLP was not engaged to audit the financial statements of Housing as part of the City's basic financial statements. Housing's financial activities are included in the City's financial statements as a discretely presented component unit and represent 3.1%, 37.8% and 1.2% of the assets, net assets and revenues, respectively, of the City's aggregate discretely presented component units.

## TRUSTEE AND CONTRACT ADMINISTRATOR

U.S. Bank National Association will be the Trustee under the Trust Agreement which creates the 2006 Funding Trust pertaining to the 2006 Certificates and also the Contract Administrator under the Administration Agreement pertaining to the 2006 Service Contract, the 2006 Swap Agreements and related matters. U.S. Bank National Association also is the trustee under another trust agreement which created another funding trust pertaining to the 2005 COPs and also the contract administrator under another contract administration agreement pertaining to the 2005 Service Contracts, the 2005 Swap Agreements and related matters. See "2006 SERVICE CONTRACT ADMINISTRATION."

## LEGAL MATTERS

Legal matters incident to the authorization, issuance, and sale of the 2006 Certificates are subject to the approval of Lewis & Munday, A Professional Corporation, Detroit, Michigan, 2006 Certificate Counsel, whose approving opinion, substantially in the form shown in APPENDIX G, will be delivered on the date of issuance of the 2006 Certificates. In the event certificated 2006 Certificates are issued, the opinion will be printed on the reverse side of each 2006 Certificate.

Certain legal matters will be passed upon for the Underwriters by their counsel, Honigman Miller Schwartz and Cohn LLP, Detroit, Michigan.

A legal opinion addressing certain labor law matters will be delivered by Sullivan, Ward, Asher & Patton, P.C., of Southfield, Michigan, as special labor counsel to the City.

A legal opinion addressing the United States federal income tax characterization of the 2006 Funding Trust, the Scheduled Payments and Service Charges to be received by the 2006 Funding Trust under the 2006

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 27 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 27 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

Service Contracts, and the income to be earned by the Service Corporations pursuant to the transactions described in this Offering Circular will be delivered by Mayer, Brown, Rowe & Maw LLP, New York, New York, as special U.S. federal tax counsel. A legal opinion on certain State of Michigan tax considerations relating to the transactions described in this Offering Circular will be delivered by Honigman Miller Schwartz and Cohn LLP, as special Michigan tax counsel.

## LITIGATION

The City is a defendant in numerous lawsuits and is also subject to other claims. Among these are the following matters which relate to the administration of the City's pension plans.

*Trustees of the Policemen and Firemen Retirement System of the City of Detroit v City of Detroit.* The governing board (**PFRS Board**) of the City's Police and Fire Retirement System (**PFRS**) filed this action in June 2004 for a declaratory judgment that the PFRS Board can impose a shorter amortization period for the City's funding of the unfunded accrued actuarial liabilities (**UAAL**) of the PFRS than set forth in a 1974 City ordinance, codified in the City Code. That ordinance and City Code section prescribed a 30-year amortization period, to be reduced by one year each subsequent year until reaching, and thereafter maintaining, a 20-year amortization period. The PFRS Board alleged that such ordinance provision is permissive only, and that under an agreement entered into in 1992, the PFRS Board has the authority to establish amortization periods of less than 20 years. The PFRS Board, accordingly, had adopted a declining amortization policy such that the amortization period for computing the City's annual contribution for PFRS UAAL due June 30, 2006 would be 13 years. The City denied that there was such an agreement, and argued that under the City Code there cannot be an amortization period shorter than 20 years. Both sides moved for summary disposition, and on May 16, 2005, the Court granted summary disposition to the City. The PFRS Board appealed to the Michigan Court of Appeals, which on February 28, 2006 reversed the lower court decision and granted "the Board's declaratory judgment that it has the authority under applicable law to set the amortization period." On April 11, 2006, the City applied for leave to appeal this decision to the Michigan Supreme Court, which has not yet ruled on the application.

After such lower court decision in the City's favor and before such Michigan Court of Appeals decision in the PFRS Board's favor, the City Council adopted an ordinance which became effective on February 8, 2006, establishing a 30-year amortization period for the funding of PFRS UAAL. After the Michigan Court of Appeals decision, on March 30, 2006, the PFRS Board adopted a resolution also establishing a 30-year amortization period for the funding of PFRS UAAL (the **Board Amortization Resolution**).

*Detroit Police Officers Association, Charging Party, and City of Detroit, Respondent (*Employment Relations Commission, Michigan Department of Labor & Economic Growth (**MERC**)). An unfair labor practice charge was filed against the City by the Detroit Police Officers Association (**DPOA**) on April 19, 2006, with the Employment Relations Commission. The DPOA in its charge asserts that the establishment of the PFRS amortization schedule is a mandatory subject of bargaining and that the City engaged in an unfair labor practice by representatives of the City, acting as trustees of the PFRS Board, voting in favor of the Board Amortization Resolution. The period over which the City's scheduled payment obligations are payable under the 2006 PFRS Service Contract is determined with reference to action of the PFRS Board in its Board Amortization Resolution.

The City's special labor counsel, Sullivan, Ward, Asher & Patton, P.C., of Southfield, Michigan (**Labor Counsel**), has reviewed the DPOA's charge, the Board Amortization Resolution and applicable MERC and court decisions. While recognizing that the outcome of any litigation or administrative proceeding cannot be predicted with certainty, Labor Counsel will deliver its opinion that the establishment of the PFRS amortization schedule is not a mandatory subject of bargaining and that the DPOA's charge is wholly without merit. Certificate Counsel will deliver its approving opinion, substantially in the form shown in APPENDIX G, on the date of issuance of the 2006 Certificates.

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 28 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 28 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

The following are significant General Fund litigation matters which remain pending or have arisen since June 30, 2005. It has been the City's experience that lawsuits and claims are settled for amounts less than the stated demand. While it is not possible to determine the final outcome of these lawsuits and claims exactly, the City and its Law Department have estimated that the liability for all such litigation and claims approximates $132.9 million for governmental activities as of June 30, 2005.

*City of Detroit v Detroit Plaza Limited Partnership*. This is a condemnation action that was filed in September of 2000. The property owners in this case initially challenged the necessity of the acquisition. The City and the property owners ultimately reached an agreement for withdrawal of the necessity challenge, which allowed the case to proceed only on the question of valuation of the property. The respective appraised values for the property have served as the basis for the City's estimated just compensation and the property owners claims, and would indicate that a material expense to the City might result from any adverse verdict. The matter was tried in April 2004. A verdict of $25,000,000 was rendered by the jury. The City's estimated just compensation was $13,712,500, which had been previously paid by the City. The increase was approximately $11,287,500. A judgment was entered in May 2004. Motions for new trial, judgment notwithstanding the verdict and remittitur, along with the property owners' motion for attorneys fees, costs and case evaluation sanctions have been heard by the trial court. The trial court denied the City's motions for new trial and judgment notwithstanding the verdict, and granted the property owners motions for attorneys' fees and costs. A claim of appeal was timely filed on October 12, 2004, and the parties have filed their briefs on appeal. The City intends to continue to vigorously prosecute this matter through appeal. The City believes that the trial court made a number of evidentiary rulings that were in error, but the ultimate outcome is difficult to assess at this time.

*Estate of Lamar Grable v Eugene Brown*. The suit arises out of a shooting incident in which the plaintiff's decedent died after being shot by Officer Brown. Both Officer Brown and his partner testified at trial that the decedent fired his weapon twice and struck Brown twice in his abdominal area. Judgment was entered on a jury verdict of $4,000,000 plus taxable costs of $18,510 and attorney fees of $255,055, against City police officer Eugene Brown and in favor of the plaintiff. The Michigan Court of Appeals upheld the judgment. An application for leave to appeal to the Michigan Supreme Court has been filed and is pending before that Court.

*HRT Enterprises, et al v City of Detroit*. These consolidated inverse condemnation cases have two plaintiffs: HRT Enterprises, a Michigan partnership, the fee owner of the industrial property in question; and Merkur Steel Supply, Inc., a sub-tenant. The fee owner of the property seeks to compel the City to purchase the subject buildings. After the trial court granted the City's summary disposition motion against HRT Enterprises and Merkur Steel Supply, Inc, they filed on December 23, 2003, a timely claim of appeal of right to the Michigan Court of Appeals from the trial court's grant of summary disposition in favor of the City. On May 12, 2005, the Court of Appeals reversed the trial court's decision on the HRT claim and affirmed its decision on the Merkur claim. The HRT matter proceeded to trial on September 6, 2005 and the jury returned a verdict in favor of the City. HRT filed post-judgment motions, which were denied by the trial court on January 19, 2006. HRT's appeal to the Michigan Court of Appeals, filed on February 8, 2006, is pending in that Court.

*Trustees of the Policemen and Firemen Retirement System of the City of Detroit v City of Detroit, et al*. The PFRS Board filed this lawsuit in August 2005 seeking payment of $53 million for the City's unpaid contribution obligation to the PFRS due June 30, 2005. The PFRS Board has since adopted a resolution approving the City's proposed settlement terms, and the lawsuit has been inactive by mutual agreement of the parties pending completion of the settlement. Under the approved settlement terms, the balance of the June 30, 2005 required City contributions to the PFRS will be paid with interest at 7.8% per annum no later than June 30, 2006, and the required City contributions to the PFRS due June 30, 2006 will be paid with interest at 7.8% per annum no later than June 30, 2007.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

*George Marshall Grace, et al v City of Detroit.* This is a class action lawsuit filed in April 1990 arising from the City's residency requirement. The United States District Court held that the City unconstitutionally discriminated against applicants for employment who were not residents of the City at the time they made application. The City ceased requiring residency upon application for employment and subsequently state law enacted in March 2000 now prohibits residency requirements in most respects. The claims of over four hundred class members have been adjudicated with a finding of liability in ninety-four of those claims. The Court ruled in favor of the City on the issue of mitigation of damages, but permitted the class to file an interlocutory appeal to the Sixth Circuit Court of Appeals, pursuant to 28 U.S.C. §1292b. This relief is permissive and may or may not be granted by the Court of Appeals. In the interim, the District Court has ordered the parties to continue resolving the liability claimants, pending the outcome of the potential appeal. Because the Court found liability pursuant to 42 U.S.C. §1983, the Court will award attorneys fees and costs to class counsel and the court-appointed special master.

*800-Megahertz Communication System Cost Allocation Lawsuit.* This is litigation brought by three southeastern Michigan counties (Wayne, Oakland and Macomb Counties (collectively **Counties**)) against the City in late 2005, within the proceedings of a longstanding case in the U.S. District Court involving the City and its Detroit Water and Sewerage Department (**DWSD**), an enterprise fund department of the City. The Counties are wholesale sewerage customers of DWSD and claim that the allocation to DWSD of 60% of the $64.4 million capital (*i.e.*, infrastructure) costs of the City's 800-megahertz communication system (**800-MHz System**), passed on, in part, to the Counties through DWSD's rates, is improper. The City recently completed construction of the 800-MHz System, which provides communication capabilities to all City departments for both day-to-day operations and emergency response. The total cost of the 800-MHz System was approximately $128 million. In May 2003, the City Budget Department, on behalf of all General Fund departments, and the DWSD entered into a Memorandum of Understanding under which (a) DWSD took the lead in contracting for and overseeing the construction of the 800-MHz System, and (b) DWSD paid 60% of the project's infrastructure costs and the General Fund departments paid the other 40%. The 60/40 allocation was based on DWSD's larger service area (approximately 1,000 square miles, including the City) compared to the approximately 100 square-mile area of the City served by the General Fund departments, and on the understanding that 15 of the 29 communications towers needed to support the 800-MHz System would be constructed outside the City. Accordingly, of the total infrastructure costs of $64.4 million, DWSD paid $38.6 million and the General Fund departments paid the balance. The Counties argue in their court briefs that DWSD's allocated share of the infrastructure costs should have been closer to 6-8%, rather than 60%, based on DWSD's actual air time use of the 800-MHz System. The City intends to vigorously defend the original allocation, but cannot predict the outcome of the litigation.

### UNITED STATES FEDERAL TAX CONSIDERATIONS

**NOTICE PURSUANT TO IRS CIRCULAR 230: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, YOU ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX CONSIDERATIONS IN THIS OFFERING CIRCULAR IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE UNITED STATES INTERNAL REVENUE CODE; (B) THIS OFFERING CIRCULAR IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN; AND (C) YOU SHOULD SEEK ADVICE BASED ON YOUR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
mark.angelov@arentfox.com

The following is a general discussion of certain U.S. federal tax considerations relating to the purchase, ownership and disposition of the 2006 Certificates. The discussion below does not deal with all U.S. federal tax considerations applicable to all categories of investors, some of which may be subject to special rules. In addition, this discussion is generally limited to investors who will hold 2006 Certificates as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the U.S. Internal Revenue Code of 1986, as amended (the **Code**), and who would be treated as holding the 2006 Funding Trust's right to receive 2006 COP Service Payments under the 2006 Service Contracts as a capital asset if they held such right directly. This discussion is limited to initial purchasers of 2006 Certificates. **Investors (including subsequent purchasers of 2006 Certificates) are strongly urged to consult their own tax advisors about the U.S. federal, state (including State of Michigan), local and other tax consequences of the purchase, ownership and disposition of 2006 Certificates.**

This discussion is based on the Code, administrative pronouncements, judicial decisions and existing and proposed U.S. Department of Treasury regulations. Prospective purchasers should note that no rulings have been or will be sought from the Internal Revenue Service (**IRS**) with respect to any of the U.S. federal tax considerations discussed below, and no assurance can be given that the IRS will not take contrary positions. Mayer, Brown, Rowe & Maw LLP has opined on none of the tax considerations discussed below except as expressly indicated below.

As used below, the term "**U.S. 2006 Certificateholder**" means a beneficial owner of a 2006 Certificate who is a citizen or resident of the United States or a U.S. domestic corporation, or a 2006 Certificateholder who otherwise will be subject to U.S. federal income taxation on a net basis in respect of the 2006 Certificates; and the term "**Non-U.S. 2006 Certificateholder**" means a beneficial owner of a 2006 Certificate other than a U.S. 2006 Certificateholder. Except as stated below, the following discussion does not address any tax considerations that apply specifically to a Non-U.S. 2006 Certificateholder.

### Tax Status of the 2006 Funding Trust

In the opinion of Mayer, Brown, Rowe & Maw LLP, the 2006 Funding Trust will be treated as a grantor trust under Subpart E, Part I of Subchapter J of the Code, and each 2006 Certificateholder will be treated for U.S. federal income tax purposes as the owner of an undivided *pro rata* interest in the payments in respect of the 2006 Service Contracts received by the 2006 Funding Trust that are attributable to the specific maturity of such 2006 Certificateholder's 2006 Certificate.

### Tax Status of the 2006 COP Service Payments under the 2006 Service Contracts

In the opinion of Mayer, Brown, Rowe & Maw LLP, payments in respect of the 2006 Service Contracts received by the 2006 Funding Trust will constitute payments in respect of indebtedness for U.S. federal income tax purposes. Accordingly, the Service Charges received by the 2006 Funding Trust under the 2006 Service Contracts will constitute interest in respect of indebtedness for U.S. federal income tax purposes.

### Agreements Regarding Tax Status of the 2006 Funding Trust and 2006 COP Service Payments under the 2006 Service Contracts

The City. In a written agreement the City agrees that, for all federal, state and local income, business, franchise and modified value added tax purposes, the City shall treat Scheduled Payments and Services Charges as payments in respect of indebtedness for all such tax purposes (but the City expressly acknowledges and agrees that the Service Charges and Scheduled Payments made by the City under the 2006 Service Contracts do not constitute indebtedness of the City for purposes of any State of Michigan constitutional or non-tax statutory or Charter limitation).

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 31 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

The Service Corporations. In the Trust Agreement each Service Corporation agrees, for U.S. federal, state and local income, business, franchise and modified value added tax purposes, to treat the 2006 Funding Trust, the 2006 Certificates and the 2006 COP Service Payments in accordance with the Service Corporation's intention that (i) the 2006 Funding Trust will qualify as a grantor trust under the Code, (ii) each 2006 Certificateholder will be treated as the owner of an undivided *pro rata* interest in the portion of the grantor Trust Estate attributable to such 2006 Certificateholder's 2006 Certificate(s), and (iii) the 2006 COP Service Payments will constitute payments in respect of indebtedness (but the Service Corporations expressly acknowledge and agree that the 2006 Funding Trust and the 2006 COP Service Payments do not constitute or create any indebtedness of the City for purposes of any State of Michigan constitutional or non-tax statutory or Charter limitation).

2006 Certificateholders. By purchasing or acquiring a 2006 Certificate, each 2006 Certificateholder agrees that for all U.S. federal, state and local income, business, franchise and modified value added tax purposes, (i) 2006 Certificateholder will treat the 2006 Funding Trust as a grantor trust under the Code, (ii) each 2006 Certificateholder will be treated as the owner of an undivided *pro rata* interest in the portion of the grantor Trust Estate attributable to such 2006 Certificateholder's 2006 Certificate(s), and (iii) 2006 Certificateholder will treat the 2006 COP Service Payments as payments in respect of indebtedness (and will thereby also acknowledge that the Services Charges and Scheduled Payments made by the City under the 2006 Service Contracts do not constitute indebtedness of the City for purposes of any State of Michigan constitutional or non-tax statutory or Charter limitation).

### Tax Status of the Service Corporations

In the opinion of Mayer, Brown, Rowe & Maw LLP, the Service Corporations will either be treated as an integral part of the City or their gross income from the transactions described in this Offering Circular will constitute gross income described in Section 115 of the Code, and the Service Corporations will not be subject to U.S. federal income tax in respect of any income derived by the Service Corporations from the transactions described in this Offering Circular.

### U.S. 2006 Certificateholders

Interest Income. A U.S. 2006 Certificateholder will be required to recognize its allocable share of the Service Charges payable under the 2006 Service Contracts as interest income in accordance with the 2006 Certificateholder's method of tax accounting. Accordingly, a cash method U.S. 2006 Certificateholder will recognize its allocable share of the Service Charges as interest income at the time the Service Charges are received by the 2006 Funding Trust. An accrual method U.S. 2006 Certificateholder will recognize its allocable share of the Service Charges at the time the Service Charges are accrued by the 2006 Funding Trust.

Original Issue Discount. In the event that the face amount of a 2006 Certificate exceeds its issue price, the excess constitutes original issue discount (**OID**) provided that such excess equals or exceeds 0.25% of the face amount of the 2006 Certificate multiplied by the number of complete years to maturity from the issue date of the 2006 Certificate (such 2006 Certificates being **OID 2006 Certificates**). The issue price of 2006 Certificates of a particular maturity is the first price at which a substantial amount of the 2006 Certificates of that maturity are sold (excluding, without limitation, sales to bond houses, brokers or underwriters). The issue price of Series 2006-A Certificates of each maturity is expected to be the amount set forth on the inside cover of this Offering Circular, but is subject to change based on actual sales.

With respect to a U.S. 2006 Certificateholder that purchases in the initial offering an OID 2006 Certificate, the amount of OID that accrues in respect of the OID 2006 Certificate during any accrual period equals (i) the adjusted issue price of the OID 2006 Certificate at the beginning of the accrual period, multiplied by (ii) the yield to maturity of the OID 2006 Certificate, less (iii) the amount of any stated interest payable on the OID 2006 Certificate allocable to the accrual period. The "accrual periods" of an OID 2006 Certificate generally correspond to the six-month intervals ending on the June 15 and December 15 interest payment dates on the OID 2006 Certificate, with a first long accrual period from the 2006 Closing Date to December 15,

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

2006. The "adjusted issue price" of an OID 2006 Certificate at the beginning of any accrual period equals the issue price of the OID 2006 Certificate, plus the amount of OID that has accrued on the OID 2006 Certificate on a constant-yield basis in all prior accrual periods, minus the amount of any Scheduled Payments received on the OID 2006 Certificate in prior accrual periods. The "yield to maturity" of an OID 2006 Certificate is determined on the basis of compounding at the end of each accrual period and properly adjusted for the length of the accrual period.

The amount of OID so accrued on an OID 2006 Certificate during a particular accrual period will be divided by the number of days in the accrual period to derive a "daily portion." A U.S. 2006 Certificateholder who owns an OID 2006 Certificate must include as ordinary income the daily portions of OID that accrue on the OID 2006 Certificate for each day during the taxable year on which the U.S. 2006 Certificateholder owns the OID 2006 Certificate. Such an inclusion in advance of receipt of the cash attributable to the income is required even if the U.S. 2006 Certificateholder is on the cash method of accounting for U.S. federal income tax purposes. The amount of OID includible in a U.S. 2006 Certificateholder's income will increase the U.S. 2006 Certificateholder's tax basis in the OID 2006 Certificate for purposes of determining the U.S. 2006 Certificateholder's gain or loss upon a sale, exchange or redemption of the OID 2006 Certificate.

Trustee's Fees and Expenses. In general, each U.S. 2006 Certificateholder will be entitled to deduct, consistent with its method of tax accounting, its *pro rata* share of fees and expenses, if any, paid or incurred by the 2006 Funding Trust as provided in Sections 162 or 212 of the Code. The U.S. federal income tax treatment of the Trustee's fees is unclear, and prospective U.S. 2006 Certificateholders should consult their own tax advisors regarding such treatment, including the effect of the possible treatment of the Trustee's fees as having been constructively received by the 2006 Funding Trust from the City (followed by the constructive payment of such fees by the 2006 Funding Trust).

If a U.S. 2006 Certificateholder is an individual, estate or trust, the deduction for the 2006 Certificateholder's share of the fees and expenses, if any, paid or incurred by the 2006 Funding Trust, including the Trustee's fees, will be allowed only to the extent that all of the 2006 Certificateholder's miscellaneous itemized deductions exceed 2% of the 2006 Certificateholder's adjusted gross income. In addition, in the case of U.S. 2006 Certificateholders who are individuals, certain otherwise allowable itemized deductions will be subject generally to additional limitations on itemized deductions under the applicable provisions of the Code.

Sale or Other Disposition of a 2006 Certificate. Upon the sale, exchange or redemption of a 2006 Certificate owned by a U.S. 2006 Certificateholder, the 2006 Certificateholder will recognize gain or loss in an amount generally equal to the difference between the amount realized by the 2006 Certificateholder on the sale, exchange or redemption and the 2006 Certificateholder's adjusted tax basis in its 2006 Certificate. A U.S. 2006 Certificateholder's adjusted tax basis in its 2006 Certificate will equal the price paid by the 2006 Certificateholder for the 2006 Certificate (excluding the portion of such price, if any, attributable to accrued interest on the 2006 Certificate), increased by any amounts includible in income by the 2006 Certificateholder as OID on the 2006 Certificate, and reduced by the 2006 Certificateholder's allocable share of Scheduled Payments received by the 2006 Funding Trust under the 2006 Service Contracts. In general, any such gain or loss recognized by a U.S. 2006 Certificateholder would be capital gain or loss, and will be long-term capital gain or loss if the 2006 Certificateholder held the 2006 Certificate for more than one year.

### Non-U.S. 2006 Certificateholders

A Non-U.S. 2006 Certificateholder that has no connection with the United States other than holding a 2006 Certificate will not be subject to U.S. withholding or income tax with respect to the 2006 Certificate; provided, with respect to interest (including OID), that the 2006 Funding Trust's rights to receive 2006 COP Service Payments under the 2006 Service Contracts are considered "portfolio debt investments" (as defined in Sections 871(h) and 881(c) of the Code) and that such 2006 Certificateholder provides an appropriate statement (generally on IRS Form W-8BEN), signed under penalties of perjury, identifying the Non-U.S. 2006 Certificateholder and stating, among other things, that such 2006 Certificateholder is a non-U.S. person.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 33 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

Special certification rules may apply to non-U.S. partnerships or trusts (or entities that are so treated for U.S. federal tax purposes). If these conditions are not met, a 30% withholding tax will apply to interest (including OID) unless an income tax treaty reduces or eliminates such tax or unless the interest is effectively connected with the conduct of a trade or business within the United States by such 2006 Certificateholder and certain other requirements are met. In the latter case, the Non-U.S. 2006 Certificateholder will be subject to U.S. federal income tax with respect to all income attributable to the 2006 Certificate at regular rates then applicable to U.S. taxpayers (and, in the case of corporations, possibly also the branch profits tax). A Non-U.S. 2006 Certificateholder will not be considered engaged in a United States trade or business solely by reason of holding a 2006 Certificate.

***Information Reporting and Backup Withholding***

Information reporting to the IRS generally will be required with respect to amounts distributed by the 2006 Funding Trust to 2006 Certificateholders other than corporations and other exempt recipients. A "backup" withholding tax at the rates described below will apply to those payments if such 2006 Certificateholder fails to provide certain identifying information (such as the 2006 Certificateholder's taxpayer identification number) to the Trustee. Non-U.S. 2006 Certificateholders generally will be required to comply with applicable certification procedures to establish that they are not U.S. 2006 Certificateholders in order to avoid the application of such information reporting requirements and backup withholding. Any amount withheld under the backup withholding rules will be allowable as a credit against the 2006 Certificateholder's U.S. federal income tax, provided that the required information is provided to the IRS. The current backup withholding rate of 28% applies to payments made through the year 2010. For payments made after the year 2010, the backup withholding rate will be increased to 31%.

***State and Other Tax Considerations***

In addition to the U.S. federal income tax considerations described above, potential investors should consider the state, local and foreign tax consequences of the acquisition, ownership and disposition of the 2006 Certificates offered under this Offering Circular. Such other tax laws may differ substantially from the corresponding U.S. federal income tax law, and the discussion above does not purport to describe any aspect of the tax laws of any state, local, foreign or other jurisdiction.

Under existing Michigan law, the State's single business tax (**SBT**) act will be automatically repealed for tax years that begin after December 31, 2009. The SBT is a general tax on business activity conducted in Michigan. In 2005, the State Governor announced an SBT reform proposal to amend and continue the SBT beyond December 31, 2009. The State Legislature has passed alternative tax reforms, some of which the Governor has signed into law. Such recent enacted State tax reforms did not amend or change any provisions of the SBT applicable to the issuance, purchase, holding or disposition of the 2005 COPs or the 2006 Certificates.

On May 30, 2006, petitions were filed with the Michigan Secretary of State for a proposal to be placed on the ballot for the State-wide general election in November 2006, to initiate legislation to repeal the SBT on December 31, 2007 and to encourage the State Legislature to enact unspecified replacement taxes on business. The State Senate Majority Leader and the State House Speaker have established a Senate-House committee to recommend a replacement State business tax proposal by December 1, 2006, with plans for a vote on the replacement proposal in the State Legislature before the year-end. They announced plans for the State Legislature to enact the petitioners' proposed December 31, 2007 repeal of the SBT after the petitions are certified by the Secretary of State, which legislation would not be subject to the Governor's veto. It is not possible to predict whether the petitions will be certified, whether or when such or other SBT reform legislation will be enacted into law in the State, whether or when a replacement State tax on business conducted in Michigan will be enacted into law, or the provisions and effect of any such potential legislation.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

**Each 2006 Certificateholder is strongly urged to consult its own tax advisor with respect to all aspects of the U.S. federal, state (including State of Michigan), local and foreign tax treatment of the purchase, ownership and disposition of a 2006 Certificate.**

### *ERISA Considerations*

The Employee Retirement Income Security Act of 1974, as amended (**ERISA**), imposes certain fiduciary and prohibited transaction restrictions on employee pension and welfare benefit plans subject to ERISA (**ERISA Plans**). Section 4975 of the Code imposes essentially the same prohibited transaction restrictions on, among other things, tax-qualified retirement plans described in Section 401(a) of the Code (**Qualified Retirement Plans**) and on Individual Retirement Accounts described in Sections 408(a) and (b) and 408A of the Code (collectively, **Tax-Favored Plans**).

Certain employee benefit plans, such as governmental plans (as defined in Section 3(32) of ERISA) and, if no election has been made under Section 410(d) of the Code, church plans (as defined in Section 3(33) of ERISA), are not subject to ERISA requirements. Accordingly, assets of such plans may be invested in 2006 Certificates without regard to the ERISA considerations described below, subject to the provisions of applicable federal and state law. Any such plan which is a Qualified Retirement Plan and exempt from taxation under Sections 401(a) and 501(a) of the Code, however, is subject to the prohibited transaction rules set forth in the Code.

In addition to the imposition of general fiduciary requirements (including those of investment prudence and diversification, and the requirement that a plan's investment be made in accordance with the documents governing the plan), Section 406 of ERISA and Section 4975 of the Code prohibit a broad range of transactions involving assets of ERISA Plans, Tax-Favored Plans and entities whose underlying assets include plan assets by reason of ERISA Plans or Tax-Favored Plans investing in such entities (collectively, **Benefit Plans**) and persons who have certain specified relationships to the Benefit Plans (**Parties in Interest** or **Disqualified Persons**), unless a statutory or administrative exemption is available. Certain Parties in Interest (or Disqualified Persons) that participate in a prohibited transaction may be subject to a penalty (or an excise tax) imposed pursuant to Section 502(i) of ERISA (or Section 4975 of the Code) unless a statutory or administrative exemption is available.

Certain transactions involving the purchase, holding, or transfer of 2006 Certificates might be deemed to constitute prohibited transactions under ERISA and the Code if assets of the City or the 2006 Funding Trust were deemed to be assets of a Benefit Plan. Under a regulation issued by the United States Department of Labor (**Plan Asset Regulation**), the assets of the City, the Service Corporations or the 2006 Funding Trust would be treated as plan assets of a Benefit Plan for the purposes of ERISA and the Code only if the Benefit Plan acquires an "equity interest" in the City, the Service Corporations or the 2006 Funding Trust and none of the exceptions contained in the Plan Assets Regulation is applicable.

An equity interest is defined under the Plan Asset Regulation as an interest in an entity other than an instrument which is treated as indebtedness under applicable local law and which has no substantial equity features. Although there can be no assurances in this regard, it appears that the 2006 Certificates should be treated as debt without substantial equity features for purposes of the Plan Asset Regulation. Although also not free from doubt, it also appears that, so long as the 2006 Certificates retain a rating of at least investment grade, they should continue to be treated as indebtedness without substantial equity features for the purposes of the Plan Asset Regulation.

However, without regard to whether the 2006 Certificates are treated as an equity interest for such purposes, the acquisition or holding of 2006 Certificates by or on behalf of a Benefit Plan could be considered to give rise to a prohibited transaction if the City, the Service Corporations or the 2006 Funding Trust, or any of their affiliates, is or becomes a Party in Interest or a Disqualified Person with respect to such Benefit Plan. A prohibited transaction could also occur in the event that a Benefit Plan transfers a 2006 Certificate to a Party in Interest or a Disqualified Person. In such case, certain exemptions from the prohibited transaction rules

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 35 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

could be applicable depending on the type and circumstances of the plan fiduciary making the decision to acquire a 2006 Certificate. Included among these exemptions are: Prohibited Transaction Class Exemption (**PTCE**) 96-23, regarding transactions effected by "in-house asset managers;" PTCE 90-1, regarding investments by insurance company pooled separate accounts; PTCE 95-60, regarding transactions effected by "insurance company general accounts;" PTCE 91-38, regarding investments by bank collective investment funds; and PTCE 84-14, regarding transactions effected by "qualified professional assets managers."

A transferee (including any purchaser in the initial transfer of the 2006 Certificates) of the 2006 Certificates or any interest therein, who is a trustee of or is acting on behalf of a Benefit Plan or who is using Benefit Plan assets to effect such transfer, will be deemed to represent that: (i) at the time of such transfer the 2006 Certificates are rated at least investment grade and such transferee believes that the 2006 Certificates are properly treated as indebtedness without substantial equity features for purposes of the Plan Asset Regulation, and agrees to so treat the 2006 Certificates, or (ii) such transferee's acquisition and holding of the 2006 Certificates do not result in a violation of the prohibited transaction rules of Section 406 of ERISA or Section 4975 of the Code because the transaction is covered by an applicable exemption, including PTCE 96-23, 95-60, 91-38, 90-1 or 84-14. In addition such transferee will be deemed to represent that neither the City, either Service Corporation or any provider of credit support nor any of their affiliates is a Party in Interest with respect to such Benefit Plan.

Alternatively, a prospective transferee of the 2006 Certificates or any interest therein who is a trustee of, or who is acting on behalf of, a Benefit Plan, or who is using Benefit Plan assets to effect such transfer, may provide the City, the Service Corporations or the 2006 Funding Trust, as applicable, an opinion of counsel satisfactory to such trustee, which opinion will not be at the expense of the City, the Service Corporations or the 2006 Funding Trust, that the purchase, holding and transfer of the 2006 Certificates or interests therein is permissible under applicable law, and will not constitute or result in any non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code and will not subject the City, the Service Corporations or the 2006 Funding Trust to any obligation in addition to those undertaken in the 2006 Service Contracts or the Trust Agreement, as applicable.

Any ERISA Plan fiduciary considering whether to purchase 2006 Certificates on behalf of an ERISA Plan should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code to such investment and the availability of any of the exemptions referred to above. Persons responsible for investing the assets of Tax-Favored Plans that are not ERISA Plans should seek similar counsel with respect to the prohibited transaction provisions of the Code. Moreover, each Benefit Plan fiduciary should take into account, among other considerations:

- whether the fiduciary has the authority to make the investment;

- whether the investment constitutes a direct or indirect transaction with a Party in Interest or Disqualified Person;

- the diversification by type of the assets in the Benefit Plan's portfolio;

- the Benefit Plan's funding objectives;

- the tax effect of the investment; and

- whether under the general fiduciary standards of investment procedure and diversification an investment in the securities is appropriate for the Benefit Plan, taking into account the overall investment policy of the Plan and the composition of the Benefit Plan's investment portfolio.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

**CONTINUING DISCLOSURE**

The City will undertake, for the benefit of the beneficial owners of the 2006 Certificates, pursuant to a Continuing Disclosure Undertaking to be delivered on the 2006 Closing Date (**Disclosure Undertaking**), to provide an annual report presenting certain financial information and operating data about the City (**Annual Report**). The City will agree to send the Annual Report, by about January 26 of each year, to each nationally recognized municipal securities information repository (**NRMSIR**) and Michigan's State Information Depository (**SID**), in each case as designated from time to time by the United States Securities and Exchange Commission (the **SEC**). The City will also agree to provide notices of the occurrence of certain events specified in the undertaking to each NRMSIR, or the Municipal Securities Rulemaking Board (**MSRB**), and to any SID. A copy of the undertaking is set forth in APPENDIX H.

In order to provide continuing disclosure with respect to the 2006 Certificates in accordance with such undertaking and with Rule 15c2-12 promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, the City has entered into a Disclosure Dissemination Agent Agreement (**Disclosure Dissemination Agreement**) for the benefit of the beneficial owners of the 2006 Certificates with Digital Assurance Certification, L.L.C. (**DAC**), under which the City has designated DAC as Disclosure Dissemination Agent.

The Disclosure Dissemination Agent has only the duties specifically set forth in the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent's obligation to deliver the information at the times and with the contents described in the Disclosure Dissemination Agreement is limited to the extent that the City has provided such information to the Disclosure Dissemination Agent as required by the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent has no duty with respect to the contents of any disclosures made or notice given pursuant to the terms of the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent has no duty or obligation to review or verify any information in the Annual Report, any audited financial statements, notice or voluntary report, or any other information, disclosures or notices provided to it by the City and shall not be deemed to be acting in any fiduciary capacity for the City, the beneficial owners of the 2006 Certificates or any other party. The Disclosure Dissemination Agent has no responsibility for the City's failure to report to the Disclosure Dissemination Agent any specified event or a duty to determine the materiality thereof. The Disclosure Dissemination Agent shall have no duty to determine or liability for failing to determine whether the City has complied with the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent may conclusively rely upon certifications of the City at all times.

Copies of the notices may be obtained from:

| | |
|---|---|
| *Mail:* | DAC Digital Assurance Certification |
| | 390 N. Orange Avenue, 17th Floor |
| | Orlando, FL 32801 |
| *Attn:* | Jenny Emami |
| | Client Service Manager |
| *Phone:* | 407-515-1100 |
| *E-mail:* | jemami@dacbond.com |
| *Web site:* | www.dacbond.com |

The undertaking also describes the consequences if the City fails to provide any required information. A failure by the City to comply with the undertaking must be reported by the City in accordance with Rule 15c2-12 and must be considered by any broker, dealer or municipal securities dealer before recommending the purchase or sale of the 2006 Certificates in the secondary market. Consequently, such failure may adversely affect the marketability and liquidity of the 2006 Certificates and the market price therefor.

33

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

Since its fiscal year ended June 30, 1999, the City has been unable to meet its obligation to provide annual financial information within the periods specified in the applicable continuing disclosure agreements. Annual financial information for fiscal 1999 through 2004 was filed on May 10, 2000, May 28, 2001, May 31, 2002, March 10, 2003, February 9, 2004 (for water supply system bonds and sewage disposal system bonds), March 1, 2004 (for other bonds), February 16, 2005 (for water supply system bonds and sewage disposal system bonds), May 5, 2005 (for other bonds) and June 1, 2006.

Dated:  June 7, 2006                         **CITY OF DETROIT**


                                             By     /s/ Roger Short
                                                    Roger Short
                                             Its:   Interim Finance Director


                                             **DETROIT GENERAL RETIREMENT SYSTEM
                                             SERVICE CORPORATION**


                                             By     /s/ Roger Short
                                                    Roger Short
                                             Its:   President


                                             **DETROIT POLICE AND FIRE RETIREMENT
                                             SYSTEM SERVICE CORPORATION**


                                             By     /s/ Roger Short
                                                    Roger Short
                                             Its:   President

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Docket #15-08-2013-11:32

APPENDIX A

## SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS, THE CONTRACT ADMINISTRATION AGREEMENT AND THE TRUST AGREEMENT

The summaries of certain provisions of the Service Contracts, the Contract Administration Agreement and the Trust Agreement set forth below do not purport to be complete and are qualified by reference to the complete text of such documents. All capitalized terms used in this APPENDIX A, unless otherwise defined or the context otherwise indicates, have the same meaning as in the Service Contracts, the Trust Agreement, the Contract Administration Agreement and the forepart of this Offering Circular.

### DEFINITIONS OF CERTAIN TERMS

All capitalized terms that are defined in the Offering Circular which precedes this APPENDIX A have the same meaning in this Appendix, unless the context otherwise indicates. All other capitalized terms used in this Appendix, unless otherwise defined or the context otherwise indicates, have the same meaning as in the Service Contracts, the Trust Agreement and the Contract Administration Agreement. Certain of those terms are defined as follows, unless the context clearly otherwise requires.

**Additional Service Payments** means such periodic amounts as may be necessary to provide for the general administrative expenses of the Service Corporations as authorized or permitted by the Act of Council plus compensation, expenses and indemnification due the Trustee under the Trust Agreement and certain amounts payable by the Corporation to the Enforcement Officer and the Insurers under the Contract Administration Agreement.

**Authorized Denominations** means (a) for Series 2006-A Certificates, denominations of $5,000 and any multiple thereof; and (b) for Series 2006-B Certificates, denominations of $25,000 and multiples of $1,000 in excess thereof.

**Authorized Investments** means direct obligations of, or obligations unconditionally guaranteed by, the United States of America (**US Governments**) and repurchase agreements whereby the counterparty agrees to repurchase US Governments so long as the obligations to be repurchased are under the exclusive "control" (as defined in Article 8 of the applicable Uniform Commercial Code or correlative Treasury Regulations) of the Service Corporation. STRIPS issued by the United States Treasury are **Authorized Investments**, but private proprietary stripped US Governments, whether interest or principal strips, are not Authorized Investments.

**Beneficial Owner** means any Person who indirectly owns Certificates pursuant to Part 5 of Article 8 of the Michigan Uniform Commercial Code.

**Certificates** or **Certificates of Participation** mean the Certificates of Participation issued by the 2006 Funding Trust representing beneficial interests in the Service Payments other than Hedge Payables, Contract Administrator Payments and Additional Service Payments (*i.e.*, beneficial interests in the Funding Trust Receivables only).

**Contract Administrator Payments** means amounts equal to amounts payable as fees, expenses and indemnification of the Contract Administrator in accordance with the Contract Administration Agreement, including reasonable fees and expenses of its counsel, in connection with any waiver or consent thereunder or any amendment thereof or of a Service Contract, or in connection with the enforcement thereof.

**Credit Insurance** means any insurance intended to protect owners of Certificates from loss arising from a failure of the City to timely pay Service Charges or Scheduled Payments. **Credit Insurance** also means any financial arrangement intended to protect a Hedge Counterparty from a failure of a Service Corporation to timely pay any Hedge Payable.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 39 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

**Creditor Lien** means any lien or security interest granted by the Contract Administration Agreement in the amounts payable by the City under the Service Contracts in respect of Hedge Payables, including rights to proceeds and rights of enforcement, and granted by the Trust Agreement in Funding Trust Receivables.

**Enforcement Officer** means the same entity who is acting as the Contract Administrator but in its separate capacity as the Enforcement Officer under provisions of the Contract Administration Agreement which apply only if and when all Insurers are in default under their respective Credit Insurance.

**Fixed Rate Funding Portion** means all the portion, if any, of the Stated Funding Amount to be funded in a particular Funding equal to the total of the Scheduled Payments set forth for Fixed Rate Service Charges.

**Fixed Rate Service Charge Class** means all Scheduled Payments that have related Service Charges determined by a fixed rate methodology.

**Funding** means the Service Corporation's funding the Stated Funding Amount by the provision of money through the issuance of Certificates.

**Funding Costs** has the meaning given within the definition of "Service Charges" below.

**Funding Rate Portion** means the Fixed Rate Funding Portion or the Variable Rate Funding Portion as the context may require.

**Funding Trust Receivables** means any Principal Related Receivables or Interest Related Receivables. (This corresponds to the right to receive 2006 COP Service Payments payable by the City under each Service Contract.)

**Hedge Amount** means, in connection with any Optional Prepayment of Scheduled Payments, the amount, if any, of any Hedge Termination Payable that will be owed by the Service Corporation pursuant to any Stated Hedge relating to the Scheduled Payments being prepaid as a result of any required reduction in the notional amount of such Stated Hedge due to such prepayment and the Hedge Periodic Payable, if any, accrued to the date of termination.

**Hedge Counterparty** means the particular counterparty as to any Stated Hedge.

**Hedge Payable** means, after giving effect to any netting under the particular Stated Hedge, any Hedge Periodic Payable or any Hedge Termination Payable as the context may require.

**Hedge Periodic Payable** means, after giving effect to any netting under the particular Stated Hedge, a periodic amount owing by a Service Corporation under a Stated Hedge to the respective Hedge Counterparty.

**Hedge Periodic Receivables** means, after giving effect to any netting under the particular Stated Hedge, periodic payments owing by the Hedge Counterparty under a Stated Hedge.

**Hedge Receivable** means any Hedge Periodic Receivable or Hedge Termination Receivable as the context may require.

**Hedge Termination Payable** means, after giving effect to any netting under the particular Stated Hedge, any termination payment owing by a Service Corporation under a Stated Hedge to the respective Hedge Counterparty.

**Hedge Termination Receivable** means, after giving effect to any netting under the particular Stated Hedge, any termination payment owing by the Hedge Counterparty under a Stated Hedge.

**Insurer** means the Person obligated under Credit Insurance to make payments with respect to Certificates or a Stated Hedge.

**Interest Related Receivable** means an amount owing by the City as a Service Charge, including any Accrued Service Charges. (This corresponds to interest on the Certificates.)

A-2

13-53846-tjt   Doc 348-7   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 40 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 40 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit15 08 2019 PH 32

**Non-Tender Amount** means an amount sufficient to pay to all entitled beneficial owners of the Series 2005-A COPs being optionally prepaid by the Service Corporation: (i) all of the Scheduled Payments and any applicable premiums that the City is obligated to pay under the 2005 Service Contract with respect to the optional prepayment of such Series 2005-A COPs, and (ii) accrued Service Charges to the prepayment date.

**Participant** means any Person whose ownership of Certificates and other securities is shown on books of the Securities Depository.

**Payment Time** means 12:00 noon, Detroit, Michigan time.

**Principal Related Receivable** means an amount owing by the City as a Scheduled Payment (whether a Regular Scheduled Payment or a Sinking Fund Installment) or an Optional Prepayment Amount exclusive on any prepayment premium. (These correspond to principal of the Certificates.)

**Scheduled Payments** means the payments specified and so defined in each Service Contract Specific Terms. (These correspond to principal of the Certificates.)

**Service Charge Class** means all Scheduled Payments that have the same methodology for determining related Service Charges..

**Service Charges** means the amounts payable under the Service Contract by the City to the Service Corporation on Service Charge Payment Dates sufficient to pay the periodic costs of capital (**Funding Costs**) incurred by the 2006 Funding Trust for the particular Funding. (This corresponds to interest on the Certificates.) **Service Charges** do not include Hedge Payables.

**Service Contract Deficiency** means any unsatisfied amount under the following clauses set forth under "SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS - Satisfaction of Service Payments - *Preservation of Parity among Service Contracts*" below in this Appendix: **First, Second, Fourth** and **Sixth**.

**Service Contract Priority Sections** means those particular numbered clauses set forth under "SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS - Satisfaction of Service Payments - *Preservation of Parity among Service Contracts*" below in this Appendix.

**Service Payments** has the meaning given under "SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS - Satisfaction of Service Payments - *Service Payments*" below.

**Stated Funding Amount** means the total amount to be funded by the Service Corporation in the Initial Funding or in an Additional Funding, as applicable.

**Stated Hedge** means a variable to fixed interest rate swap agreement permitted by the Act of Council and specified in a Service Contract, entered into between a Service Corporation and a Hedge Counterparty.

**Tender Amount** means an amount sufficient to pay to all entitled beneficial owners of the tendered Series 2005-B COPs being purchased by the Service Corporation: (i) all of the Scheduled Payments and accrued Service Charges that the City is obligated to pay under the 2005 Service Contract with respect to such tendered Series 2005-B COPs, and (ii) any applicable premiums.

**Trust Estate** means the Funding Trust Receivables arising under the GRS Service Contract, the Funding Trust Receivables arising under the PFRS Service Contract, and all proceeds of the foregoing.

**2005 Trustee** means the trustee under the Trust Agreement dated June 2, 2005, under which the Series 2005-A COPs were issued.

**Variable Rate Funding Portion** means all the portion, if any, of the Stated Funding Amount to be funded in a particular Funding equal to the total of the Scheduled Payments set forth for Variable Rate Service Charges.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08.2013 11.32

**Variable Rate Service Charge Class** means all Scheduled Payments that have related Service Charges determined by a variable rate methodology.

## SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS

There are two separate and distinct Service Contracts. One is called the General Retirement System Service Contract 2006, between Detroit General Retirement System Service Corporation (the **GRS Service Corporation**) and the City. The other is called the Police and Fire Retirement System Service Contract 2006, between Detroit Police and Fire Retirement System Service Corporation (the **PFRS Service Corporation**) and the City. Each Service Contract is comprised of its own two documents, called the General Terms (dated as of June 1, 2006) and the Specific Terms (dated June __, 2006), which operate together as if they were combined in a single document.

Although separate and distinct, the two Service Contracts are similar in form and substance, and the summary below fits each Service Contract. The ways in which the two Service Contracts differ from each other (*e.g.,* they have different Service Corporations as a party and different Funding Amounts) are not affected by the generality of the summary below. This summary should be read in the context of describing either one of the two Service Contracts, and not in the context of describing both of them collectively. Thus, for example, the term "the Service Corporation" when used in the summary below means the GRS Service Corporation if the summary is read in the context of describing its Service Contract, or otherwise means the PFRS Service Corporation if the summary is read in the context of describing its Service Contract.

**The two Service Contracts mentioned and summarized in this Appendix A are called the "2006 Service Contracts" in the forepart of this Offering Circular. They should be distinguished from two different service contracts which are called the "2005 Service Contracts" in the forepart of this Offering Circular. All references to a "Service Contract" or "Service Contracts" in this Appendix A are always to such 2006 Service Contracts and never to such 2005 Service Contracts.**

**Service and Funding Arrangements**

*Provision of Services*

The services of the Service Corporation consist of further relieving the financial burden of the 2005 Subject UAAL to the City in the current and in future years by assisting the City in realizing financial benefits that would have been available on the effective date of the 2005 Service Contracts if the City could have then utilized a 30-year period for payment of its scheduled 2005 COP Service Payments rather than a 13-year period under the 2005 PFRS Service Contract and a 20-year period under the 2005 GRS Service Contract, corresponding to the amortization periods then in effect for amortization of PFRS UAAL and GRS UAAL respectively. Given that each such amortization period has since been extended to 30 years, the Service Corporation agrees in the Service Contract to provide its services through taking the following actions: (a) the Service Corporation shall fund the Stated Funding Amount on the Closing Date (the **Initial Funding**), (b) the Service Corporation shall fund any Hedge Termination Payable in whole or in part as requested of the City and approved by the City Council, and (c) the Service Corporation shall fund payment of some or all Service Payments as requested by the City and approved by City Council (funding pursuant to this clause (c) or the preceding clause (b), an **Additional Funding**). An Additional Funding shall be accomplished under one or more other service contracts, not under the Service Contract. An Additional Funding may include such things in the nature of Costs of Issuance, Prepaid Service Charges and Underwriters' Discount as authorized or permitted by the approval of the City Council of the Additional Funding.

"**Funding**" as used above means the provision of money through the issuance of Certificates and does not mean or imply any further authorization of the City to make any Contract Payment other than Contract Payments in connection with any Additional Funding.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 42 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

*Payment Obligation*

The City agrees to make Contract Payments to the Service Corporation in return for the present and future services of the Service Corporation as and when Contract Payments become due and payable. The obligations of the City under the Service Contract, including its obligation to make Contract Payments, are contractual obligations of the City, enforceable in the same manner as any other contractual obligation of the City, and are not general obligations of the City to which the City has pledged its full faith and credit.

*Funding Obligation*

The obligation of the Service Corporation to provide the Initial Funding or any Additional Funding is subject to the receipt by the Service Corporation of proceeds sufficient for the Funding from the sale of Certificates. The Service Corporation shall use its best efforts to cause the consummation of the offering and sale by the Underwriters of Certificates to provide sufficient proceeds for the particular Funding. For the Initial Funding, the Service Corporation shall cause a portion of the proceeds of the sale of Certificates in an amount equal to the Tender Amount to be irrevocably deposited on the Closing Date in the Tender Account, an escrow account held by the Contract Administrator and invested in US Governments, and cause a portion of the proceeds of the sale of Certificates in an amount equal to the Non-Tender Amount to be irrevocably deposited on the Closing Date in the Non-Tender Escrow Account, an escrow account held by the Contract Administrator and invested in US Governments, and shall apply the balance of such proceeds to pay costs of issuance of the Certificates and other Ancillary Amounts.

**Scheduled Payments**

*Scheduled Payments*

The City agrees to pay the Scheduled Payments of each Funding Rate Portion to the Service Corporation on the respective Scheduled Payment Dates for such Funding Rate Portion. (Scheduled Payments do not include Hedge Payables.)

*Mandatory Prepayment by Sinking Fund Installments*

The City agrees to prepay Scheduled Payments of each Funding Rate Portion in specified amounts (**Sinking Fund Installments**) and on specified dates (**Sinking Fund Installment Dates**).

*Optional Prepayment of Scheduled Payments*

The City shall not voluntarily prepay any Scheduled Payments of a Funding Rate Portion (an **Optional Prepayment**) in whole or in part except as expressly permitted in the Service Contract. The City shall exercise its option to make any Optional Prepayment by delivering a prior written **Prepayment Notice** at least 45 days (or fewer days as acceptable to the Service Corporation) before the Optional Prepayment Date on which the City shall pay the Total Prepayment Amount to the Service Corporation in connection with such Optional Prepayment**,** stating: (a) the Scheduled Payments of the particular Funding Rate Portion to be prepaid in whole or in part by such Optional Prepayment and the date on which such Scheduled Payments are to be prepaid (**Optional Prepayment Date**), subject to the following:

    (1)    a Scheduled Payment may be selected by the City only if it is permitted by the Service Contract to be prepaid on the particular Optional Prepayment Date and

    (2)    a Scheduled Payment may be selected by the City for partial prepayment only in an amount of at least $100,000 unless otherwise provided in the Service Contract;

(b) the amount of prepayment premium, if any, required by the Service Contract in connection with the prepayment of any selected Scheduled Payments (such prepayment premium, if any, together with the amount of Scheduled Payments selected to be prepaid, the **Optional Prepayment Amount**); (c) if an Optional

A-5

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

Prepayment Date is not a Service Charge Payment Date, the amount of Service Charges accrued on the amount of the Scheduled Payment to be prepaid from the last Service Charge Payment Date before the Optional Prepayment Date to the Optional Prepayment Date (**Accrued Service Charges**); (d) the Hedge Amount, if any, and (e) such information in tabular or other form so as to readily permit the Service Corporation to identify (i) the Scheduled Payments of the particular Funding Rate Portion selected for prepayment, (ii) the provisions of the Service Contract authorizing or permitting such prepayment, (iii) the prepayment premium, if any, required to be paid in connection with the prepayment of each such Scheduled Payment, (iv) Accrued Service Charges, if any due in connection with such prepayment, and (v) the Hedge Amount, if any, due in connection with such prepayment.

If a Hedge Amount would be due in connection with an Optional Prepayment, it is a condition precedent to the City giving an Optional Prepayment Notice that the City provide reasonable evidence satisfactory to the Service Corporation that such Hedge Amount will be paid when due and such prepayment will not cause the Service Corporation to be in default under any agreement to which it is a party in connection with the particular Funding.

The delivery by the City of a Prepayment Notice to the Service Corporation is a statement of the City's intention to pay the Total Principal Amount to the Corporation on the day before the Optional Prepayment Date stated therein (**Prepayment Receipt Day).** The City is prohibited from paying the Total Prepayment Amount to the Service Corporation on any day prior to the Prepayment Receipt Day. Its delivery of a Prepayment Notice does not obligate the City to pay the Total Prepayment Amount, and no default shall occur by its not paying the Total Prepayment Amount or by the Optional Prepayment not otherwise being effected on the Prepayment Receipt Date.

*Satisfaction of Scheduled Payments by Delivery of Certificates*

The City may deliver or cause to be delivered Certificates to the Service Corporation in satisfaction (whether in whole or in part) of Scheduled Payments at any time and in any denomination upon 45 day's prior notice to the Service Corporation (or fewer days as acceptable to the Service Corporation) (a **Delivery Notice**) subject to the following limitations. A Scheduled Payment may be satisfied by delivery of Certificates entitled to payment from such Scheduled Payment (**Eligible Certificates**). The amount of a Scheduled Payment deemed paid shall be equal to the denominations of the particular Eligible Certificates.

No Certificate shall be delivered in payment in whole or in part of the respective Scheduled Payment (whether as payment of a Sinking Fund Installment or as other prepayment) more than 45 days before the respective due date if at the time of such delivery the City has not paid all Service Payments then and theretofore due. No Scheduled Payment shall be satisfied by the delivery of Certificates until such Certificates have been delivered to the Trustee.

If Sinking Fund Installments are to be satisfied (whether in whole or in part) by the delivery of Eligible Certificates, the City shall indicate in the respective Delivery Notice the particular Sinking Fund Installments and amounts thereof to be so satisfied. All Certificates so received by the Service Corporation in payment of Scheduled Payments shall be immediately delivered to the Trustee for cancellation.

**Service Charges**

*Agreement to Pay Service Charges; Funding Costs*

The City agrees to pay Service Charges to the Service Corporation on Service Charge Payment Dates sufficient to pay the Funding Costs incurred by the 2006 Funding Trust for the particular Funding. (Service Charges do not include Hedge Payables.) Funding Costs shall be determined by the particular Funding Rate Methodology (fixed or variable). Funding Costs for a Variable Rate Funding Portion shall be periodically

A-6

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 44 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 44 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08.2013 11:32

determined in accordance with the Variable Rate Funding Methodology, and the corresponding periodic Service Charges shall be **Variable Rate Service Charges**.

*Prepaid Service Charges; Hedge Receivables*

Prepaid Service Charges shall be used to meet the City's obligation to pay the first occurring Service Charges and Hedge Periodic Payables of the Service Corporation except as otherwise may be provided in the Service Contract Specific Terms. Hedge Receivables received by the Service Corporation shall be used to satisfy the City's obligation in respect of then existing Deficiencies or then current Service Charges not otherwise paid.

**Fixed Rate Funding Methodology**

The provisions summarized under this heading constitute the **Fixed Rate Funding Methodology**. The particular Service Contract Specific Terms shall state the dates (**Fixed Rate Service Charge Payment Dates**) on which the Fixed Rate Service Charges are payable. The Fixed Service Charge Rates applicable to the Fixed Rate Funding Portion shall be set forth for the respective Scheduled Payments comprising the Fixed Rate Funding Portion (**Fixed Rate Scheduled Payments**). Fixed Service Charge Rates may be different for different Scheduled Payment Dates in the Fixed Rate Funding Portion.

Fixed Rate Service Charges shall be computed as if the Fixed Rate Scheduled Payments bore interest at the respective rates at which Fixed Rate Service Charges are determined and computed on the basis of a 360-day year consisting of twelve 30-day months. On each Fixed Rate Service Charge Payment Date, the City shall pay a Fixed Rate Service Charge equal to the Fixed Rate Service Charge accrued on the respective unpaid Fixed Rate Scheduled Payments from the later of the Closing Date or the last Fixed Rate Service Charge Payment Date on which Fixed Rate Service Charges were paid in full by the City.

**Variable Rate Funding Methodology**

The provisions summarized under this heading constitute the **Variable Rate Funding Methodology**. The periodic Variable Rate Service Charge for each Scheduled Payment specified for a particular type of Service Charge Class in the Variable Rate Funding Portion (**Variable Rate Scheduled Payments**) shall be determined in accordance with the particular Variable Rate Funding Type. Each Service Contract Specific Terms shall provide for a procedure by which the Variable Rate Service Charges are determined for the particular Variable Rate Funding Type and shall further provide:

- **Variable Rate Service Charge Payment Dates**: the dates on which the Variable Rate Service Charges are payable for such Type;

- **Service Charge Determination Dates**: the dates on which the Variable Rate Service Charges of such Type are determined;

- **Service Charge Adjustment Dates**: the dates on which the Variable Rate Service Charges of such Type are adjusted; and

- **Day Count Convention**: the number of days in a month and in a year used to determine the amount of the Variable Rate Funding Service Charges of such Type.

Variable Rate Service Charges for each Variable Rate Funding Type in the Variable Rate Funding Portion shall be computed as if the Variable Rate Scheduled Payments of the particular Variable Rate Type bore interest at a rate (i) determined as of each Service Charge Determination Date for such Type and effective as of the respective Service Charge Adjustment Date for such Type and (ii) computed using the applicable Day Count Convention for such Type. On each Variable Rate Service Charge Payment Date for a particular Type the City shall pay a Variable Rate Service Charge equal to the applicable Variable Rate Funding Costs accrued

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

on the unpaid Variable Rate Funding Scheduled Payments of that Type from the later of the Closing Date or the last applicable Variable Rate Funding Service Charge Payment Date on which the Variable Rate Funding Service Charges of that Type were paid in full by the City.

**General Provisions Governing Service Payments**

*City's Payment Times*

The City shall make all Service Payments other than Contract Administrator Payments by the Payment Time on the day before the date when due. The City shall make all Contract Administrator Payments on the date when due. The City shall pay the amount of any Hedge Payable to the Service Corporation promptly upon receipt of notice thereof from the Service Corporation; provided, that the City is not required to pay such amount before the Payment Time on the day before the due date of the particular Hedge Payable.

*Subrogation*

No payment of any amount to a Certificateholder or a Hedge Counterparty made from an amount paid by an Insurer under its Credit Insurance (a **Credit Insurance Payment**) shall discharge the City's obligation to pay any Service Payment in respect of which such Credit Insurance Payment was paid (a **Related Service Payment**). An Insurer making a Credit Insurance Payment shall be subrogated to the rights of Certificateholders or a Hedge Counterparty, as the case may be, to receive the Related Service Payment and shall be entitled to exercise all rights that the Person to which it is the subrogee would have otherwise been entitled to exercise.

*Investment*

The Service Corporation shall not invest any amounts received by it under the Service Contract except as summarized under this heading. **Invest** means the transfer, disposition or other use of such amounts in expectation of gain. **Investable Funds** (being amounts representing Costs of Issuance and Prepaid Service Charges) shall be invested by the Service Corporation in Authorized Investments that mature in the amounts and at the times the related Investable Funds are needed to make the payments for which such funds were received by the Service Corporation. Investments shall be made by Funding Rate Portion but may be commingled for investment purposes so long as records are kept showing each particular Funding Rate Portion and the gain and loss attributable to it. No Investment shall be sold prior to its maturity.

All Investments shall be made directly by the Service Corporation having exclusive "control" over the related "securities entitlement" (as such terms are defined in Article 8 of the applicable Uniform Commercial Code or correlative Treasury Regulations) except that Investments may also be made through one or more investment companies registered under the Investment Companies Act of 1940, as amended, if (i) such investment company has a rating by Standard & Poor's Corporation or any national statistical ratings organization (as defined by the Securities and Exchange Act of 1934, as amended, or any successor to it) at least equal to the rating of the Authorized Investment and (ii) such registered investment company invests only in debt instruments.

Gain and loss from Investments shall be attributed to the type of Investable Funds giving rise to it. Gain shall be paid to the City when realized to the extent it is not needed to satisfy any then existing Service Contract Deficiency or satisfy any then current Service Payment. The City is responsible for all such loss and shall reimburse the Service Corporation for such loss upon its demand.

*Binding Obligation*

The Service Contract is a continuing obligation of the City and shall until the date on which all amounts due and owing thereunder are paid in full (a) be binding upon the City and its successors and (b) inure

A-8

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 46 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 46 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 15:08:2013  11:32

to the benefit of and be enforceable by the Service Corporation, its successors and permitted assigns, and by Third Party Beneficiaries.

**Satisfaction of Service Payments**

*Service Payments*

**Service Payments** consist of the following components (each a separate **Component** or **Service Payment Component**):

- Contract Administrator Payments
- Service Charges (regardless of the Funding Rate Methodology)
- Regular Scheduled Payments
- Sinking Fund Installments
- amounts in respect of Hedge Periodic Payables
- amounts in respect of Hedge Termination Payables
- Optional Prepayments
- Accrued Service Charges

*Preservation of Parity among Service Contracts*

As used in the summary under this heading:

- **all Service Contracts** means the Service Contract and the Other Service Contract (referring always to the "2006 Service Contracts" and never to the "2005 Service Contracts," as those terms are defined in the forepart of this Offering Circular);

- **each Service Contract** means the Service Contract or the Other Service Contract as the context may require;

- **each Service Corporation** means the Service Corporation or the Other Service Corporation as the context may require;

- **the Other Service Contract** means the service contract between the City and the Other Service Corporation, certain payments under which Other Service Contract are part of the Trust Estate;

- **the Other Service Corporation** means the service corporation party to the Other Service Contract (*i.e.*, if "the Service Corporation" is the GRS Service Corporation, then "the Other Service Corporation" is the PFRS Service Corporation, and *vice versa*); and

- an amount is **about to become due** on the Business Day before its due date.

All Service Payments payable under a Service Contract shall be made and each Service Corporation shall be entitled to receive such payments on a *pro rata* basis with the Service Payments under the Other Service Contract so that each Service Contract Component having a specified priority (described below) is made on a *pro rata* basis with the Service Payment Components having the same defined term under the Other Service Contract, and no Service Payment Component shall be satisfied until all Service Payment Components under all Service Contracts having the same defined term but having a greater priority under each Service Contract are first satisfied in full.

Service Payments under all Service Contracts shall be satisfied in the following order and priority (the **Service Contract Priority Sections**):

**First:**     Contract Administrator Payments; then

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/145.08.2013 11.32

**Second:** all theretofore due and unpaid Service Charges (regardless of the Funding Rate Methodology) and amounts in respect of Hedge Periodic Payables; then

**Third:** all then due and about to become due Service Charges and amounts in respect of Hedge Periodic Payables; then

**Fourth:** all theretofore due and unpaid Regular Scheduled Payments and Sinking Fund Installments; then

**Fifth:** all then due or about to become due Regular Scheduled Payments and Sinking Fund Installments; then

**Sixth:** all theretofore due and unpaid amounts in respect of Hedge Termination Payables; then

**Seventh:** all then due and about to become due amounts in respect of Hedge Termination Payables; then

**Eighth:** all then due and about to become due Optional Prepayment Amounts and Accrued Service Charges.

**Acceleration on Bankruptcy**

If the City shall (i) commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, (ii) consent to the institution of any such proceeding or the filing of any such petition or (iii) make a general assignment for the benefit of creditors, then all payments due under the Service Contract shall become immediately due and payable without presentment, demand, protest or notice of any kind.

**Termination or Assignment of Stated Hedges**

At the request of the City and with the prior written consent of the Insurer that has Credit Insurance in respect of the particular Stated Hedge, the Service Corporation shall terminate any Stated Hedge or assign its interest in any Stated Hedge to a Person that agrees to perform and observe all of the duties and obligations of the Hedge Counterparty to such Stated Hedge. Any such substitute Hedge Counterparty shall have at least the rating required by Act 34 of the Michigan Public Acts of 2001, as amended, as if the City were a party to the particular Stated Hedge. No such termination or substitution of a Hedge Counterparty shall take effect unless each Rating Agency that at the time has a rating of the Certificates in effect confirms its rating of the particular Certificates.

**Required Ratings of Hedge Counterparties**

The Service Corporation shall only enter into Hedges with Persons who have, on the date the Hedge is entered into, or whose Hedge obligations are guaranteed by a Person who has on that date, a rating of its long-term, senior secured debt at least "A-" by Standard & Poor's Corporation and at least "A3" by Moody's Investors Service.

**Amendment of the Service Contract**

The Service Contract may be amended only by written instrument signed by the parties thereto except that no amendment shall be valid: (a) if such amendment diminishes the rights and remedies of any Third Party Beneficiary without the prior written consent of such Third Party Beneficiary; (b) unless the Trustee of the 2006 Funding Trust that is a transferee of or successor to any rights or entitlements under the Service Contract and that received an opinion of counsel in connection with the organization of the 2006 Funding Trust to the effect that the 2006 Funding Trust will qualify as a grantor trust under Subpart E, Part I of Subchapter J of the Internal Revenue Code of 1986, as amended, shall have received an opinion reasonably

A-10

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

acceptable in form and substance to the Trustee of counsel reasonably acceptable to the Trustee to the effect that such amendment shall not result in the 2006 Funding Trust being treated as other than such a grantor trust; (c) unless the Trustee has received an opinion in form and substance reasonably satisfactory to the Trustee of counsel reasonably acceptable to the Trustee to the effect that such amendment shall not result in the Funding Trust Receivables failing to constitute payments in respect of indebtedness for U.S. federal income tax purposes; and (d) unless every Insurer who is not in default under its Credit Insurance at the time has consented to the amendment.

**Expenses Payable by the City and the Service Corporation**

The City shall pay such periodic amounts as may be necessary to provide for the general administrative expenses of the Service Corporation as authorized or permitted by the Act of Council, as and when they become due. The Service Corporation shall pay compensation due the Trustee in accordance with the Trust Agreement, including reasonable fees and expenses of counsel, in connection with any waiver or consent thereunder or any amendment thereof, or in connection with the enforcement thereof. The Service Corporation also shall pay compensation, expenses and indemnification due the Contract Administrator and due the Enforcement Officer, if any, in accordance with the Contract Administration Agreement, including reasonable fees and expenses of counsel, in connection with any waiver or consent under the Service Contract or any amendment of the Contract Administration Agreement or of the Service Contract, or in connection with the enforcement of the Service Contract.

**Permitted Assignment.**

The Service Contract shall be binding upon the parties thereto and their respective successors and permitted assigns. No assignment by either party of its interests therein shall be valid except as follows. The Service Corporation may transfer the Scheduled Payments and Service Charges to the 2006 Funding Trust in accordance with the Service Contract. No assignment of the Service Contract or any amounts receivable thereunder shall include the right to receive Additional Service Payments, Contract Administrator Payments or Hedge Payables, except that the Service Corporation may assign or grant a security interest in amounts received by it as payment of amounts in respect of Hedge Payables to the Hedge Counterparties.

**Third Party Beneficiaries**

The Persons, including the Trustee and the Contract Administrator, originally entitled to Additional Service Payments or Contract Administrator Payments and their respective successors are third party beneficiaries of the Service Contract as to the City's promises to pay Additional Service Payments or Contract Administrator Payments to them. Hedge Counterparties, and their respective successors and subrogees, are third party beneficiaries of the Service Contract as to the City's promises to pay amounts in respect of Hedge Payables to the Service Corporation. Insurers are third party beneficiaries of the Service Contract. The 2006 Funding Trust is a third party beneficiary of the Corporation's promises in respect of Service Charges and Scheduled Payments. Third Party Beneficiaries have the right to enforce the respective promises made in the Service Contract as if such promises were made directly to them.

A-11

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 49 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 49 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

## SUMMARY OF CERTAIN PROVISIONS OF
## THE CONTRACT ADMINISTRATION AGREEMENT

**Application of Tender Account**

The Contract Administrator shall pay the moneys held in the Tender Account to the Service Corporation's tender agent for the purchase of the tendered Series 2005-B COPs being purchased by the Service Corporation, in such amounts and at such times as necessary for the tender agent to pay the purchase price for such purchased Series 2005-B COPs to the sellers entitled thereto, and all such purchased Series 2005-B COPs shall be delivered to the 2005 Trustee for cancellation.

**Notice of Redemption of Certain Series 2005-A COPs; Application of Non-Tender Escrow Account**

On the Closing Date, on behalf of the Service Corporation, the Contract Administrator shall direct the 2005 Trustee to give notice to the registered holders of the Series 2005-A COPs to be optionally redeemed from proceeds of the Certificates of the call for redemption of such Series 2005-A COPs.  The Contract Administrator shall pay the moneys held in the Non-Tender Escrow Account to the contract administrator for the Series 2005-A COPs in such amounts and at such times as necessary for such contract administrator to effectuate the optional redemption of such Series 2005-A COPs in accordance with their terms.

**Collection of Receivables**

Each of the Service Corporations, the Specified Hedge Counterparties and the 2006 Funding Trust appoints the Contract Administrator as its respective agent and attorney-in-fact to receive Service Payments.

**Appointment by 2006 Funding Trust**

The 2006 Funding Trust appoints the Contract Administrator as its agent and attorney-in-fact to take such actions and exercise such rights and remedies as to Funding Trust Receivables as the 2006 Funding Trust is or may become entitled to exercise under law and in equity to enforce the payment thereof and otherwise realize Funding Trust Receivables.

**Appointment by Each Service Corporation**

Each Service Corporation appoints the Contract Administrator as its agent and attorney-in-fact to enforce such Service Corporation's rights and remedies under the Stated Hedges, including the collection of Hedge Receivables from the Specified Hedge Counterparties under the respective Stated Hedges, and to take all such actions and exercise such rights and remedies as the respective Service Corporation is or may become entitled to exercise under the particular Stated Hedge  and otherwise at law or in equity.  Each Service Corporation further appoints the Contract Administrator to invest amounts received by the Contract Administrator as Costs of Issuance and Prepaid Service Charges in Authorized Investments in accordance with the Service Contract.

**Distributions of Service Payments**

On each Distribution Date, the Contract Administrator shall distribute the amount of the Service Payment Components satisfied since the last such Distribution Date to the respective Entitled Persons.  If the Entitled Person is the 2006 Funding Trust, the amounts of satisfied Components shall be distributed to the 2006 Funding Trust to be applied in accordance with the Trust Agreement.

As used in this Appendix:

- references to "clause **Second**," "clause **Third**," "clause **Fourth**," "clause **Fifth**" or "clause **Eighth**" mean those particular clauses set forth in the Service Contract Priority Sections (see "SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS - Satisfaction of Service Payments - *Preservation of Parity among Service Contracts*" above in this Appendix);

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 - 11:32

- amounts distributed to the Trustee representing satisfied Components constituting Service Charges and Accrued Service Charges described in clause **Second** shall be identified to the Trustee as **_Deficit Interest Related Payments_**;

- amounts distributed to the Trustee representing satisfied Components constituting Regular Scheduled Payments described in clause **Fourth** shall be identified to the Trustee as **_Deficit Principal Related Payments_**;

- amounts distributed to the Trustee representing satisfied Components constituting Sinking Fund Installments described in clause **Fourth** shall be identified to the Trustee as **_Deficit Principal Related Payments_**;

- amounts distributed to the Trustee representing satisfied Components constituting Service Charges described in clause **Third** shall be identified to the Trustee as **_Interest Related Payments_**;

- amounts distributed to the Trustee representing satisfied Components constituting Regular Scheduled Payments and Sinking Fund Installments described in clause **Fifth** shall be identified to the Trustee as, respectively, **_Principal Related Payments_** and **_Sinking Fund Related Payments_**; and

- amounts distributed to the Trustee representing satisfied Components constituting Optional Prepayment Amounts and Accrued Service Charges described in clause **Eighth** shall be identified to the Trustee as **_Redemption Related Payments_**.

If the Entitled Persons are the Specified Hedge Counterparties, the amounts of satisfied Components constituting amounts in respect of Hedge Payables shall be paid to the Specified Hedge Counterparties to whom such amounts are owing in proportion to the amounts owed to each under the respective Stated Hedges. If distributions are to be made on the same Distribution Date for two or more different priorities of Components (pursuant to clauses **First** through **Eighth**), no distribution shall be made in respect of a lower priority to the extent that each of the higher priorities is not satisfied in full.

**Service Corporation Covenants**

Each Service Corporation covenants with the Contract Administrator, the 2006 Funding Trust, the Specified Hedge Counterparties and the Other Corporation as follows:

(a)     The Service Corporation shall not convey, transfer or assign Funding Trust Receivables under its Service Contract or any interest therein to any Person other than the 2006 Funding Trust as provided in the Trust Agreement;

(b)     the Service Corporation shall not convey, transfer or assign Hedge Payables under its Service Contract or any interest therein to any Person other than the Specified Hedge Counterparties as provided in the Contract Administration Agreement; and

(c)     the Service Corporation shall not convey, transfer or assign any Stated Hedge or any interest therein to any Person other than as provided in the Service Contract.

**Events of Default; Remedies**

It will be an "Event of Default" under the Contract Administration Agreement if the City: (a) fails to pay any 2006 Funding Trust Receivable as and when the same shall become due, (b) commences any proceeding or files any petition seeking relief under Title 11 of the United States Code, (c) consents to the institution of any such proceeding or the filing of any such petition or (d) makes a general assignment for the benefit of creditors.

Upon the occurrence and during the continuance of an Event of Default, the Contract Administrator may and shall, at the request of the Certificateholders representing either (i) 25% in principal amount of

A-13

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 51 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 51 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

Outstanding Certificates, the payments on which have not been made as a result of such Event of Default (**Affected Certificates**), or (ii) at least 50% in principal amount of all Outstanding Certificates, enforce the Service Contract under which the Event of Default occurred by such remedies as are available to the Contract Administrator. Any money collected or received by the Contract Administrator from pursuing such remedies shall be applied in the order of the Service Contract Priority Sections, subject to any Creditor Lien.

**No Duty of Inquiry**

The Contract Administrator has no duty to inquire into the performance by a Service Corporation of its obligations under its Service Contract, but if the Contract Administrator receives notice (a **Default Notice**) from Holders of either (i) at least 25% in principal amount of the Outstanding Affected Certificates or (ii) at least 50% in principal amount of all Outstanding Certificates, specifying the failure of the City to pay Funding Trust Receivables, then the Contract Administrator shall give notice of such failure to the City and demand that such failure be remedied. Upon receipt of any Default Notice, the Contract Administrator shall give notice to all Certificateholders and the Specified Hedge Counterparties that did not join in such Default Notice.

**Notice of Defaults**

Promptly upon obtaining actual knowledge of the occurrence of any Event of Default, the Contract Administrator shall give written notice of such Event of Default by mail to all Certificateholders, Specified Hedge Counterparties and Rating Agencies unless such Event of Default has been cured or waived.

Any Insurer who is not then in default under its Credit Insurance shall be entitled to receive all notices in respect of Certificates insured by it, and no notices under the prior paragraph shall be sent to the Holders of such Certificates.

**Limitation on Suits by Certificateholders**

No Certificateholder shall have any right to institute any proceeding, judicial or otherwise, under or with respect to the Service Contract unless:

(a) such Holder has previously given written notice to the Contract Administrator of an Event of Default that is then continuing;

(b) the Holders of either (i) at least 25% in principal amount of the Outstanding Affected Certificates or (ii) at least 50% in principal amount of all Outstanding Certificates have made written request to the Contract Administrator to institute proceedings in respect of such Event of Default in its own name as Contract Administrator;

(c) such Holder or Holders have offered to the Contract Administrator satisfactory indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(d) the Contract Administrator for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(e) in the case of a written request from the Holders of at least 25% in principal amount of the Outstanding Affected Certificates, no direction inconsistent with such written request has been given to the Contract Administrator during such 30-day period by the Holders of a greater percentage in principal amount of the Outstanding Affected Certificates;

it being understood and intended that no one or more Holders of Certificates shall have any right in any manner to affect, disturb or prejudice the interest of the parties to the Contract Administration Agreement or the rights of any other Certificateholders, or to obtain or to seek to obtain priority or preference over any other Certificateholders or to enforce any right under any Service Contract, except in the manner therein provided and for the equal and ratable benefit of all Entitled Persons.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

**Control by Majority**

The Holders of a majority in principal amount of the Outstanding Certificates have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Contract Administrator to exercise any power exercisable by the Contract Administrator, provided that such direction is not in conflict with any rule of law or the Contract Administration Agreement.

Any Insurer not then in default under its Credit Insurance shall be treated as the Holder of Outstanding Certificates equal to the principal amount of Certificates insured by it for the purposes of actions thus permitted to be taken by Certificateholders and for the purpose of giving all other consents, directions and waivers that Certificateholders may give.

**Actions by Beneficial Owners**

For the purpose of providing any consent, waiver or instruction to the Contract Administrator, the terms **Holder** and **Certificateholder** include a Person who provides the Contract Administrator an affidavit of beneficial ownership of a Certificate together with satisfactory indemnity against any loss, liability or expense to the Contract Administrator to the extent that it acts on the affidavit of beneficial ownership (including any consent, waiver or instruction given by a Person providing such affidavit and indemnity). The principal amount of Outstanding Certificates owned by a Beneficial Owner satisfying the preceding sentence shall be deemed held by such Beneficial Owner and not held by Certificateholders for the purposes of providing any consent, waiver or instruction to the Contract Administrator.

**Concerning the Contract Administrator**

The Contract Administrator undertakes to perform such duties and only such duties as are specifically set forth in the Contract Administration Agreement, and no implied covenants or obligations shall be read into that Agreement against the Contract Administrator. In the absence of bad faith on its part, the Contract Administrator may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, documents, other instruments or opinions furnished to the Contract Administrator and conforming to the requirements of the Contract Administration Agreement or the Service Contract; but in the case of any such certificates, documents, other instruments or opinions which by any provision thereof are specifically required to be furnished to the Contract Administrator, the Contract Administrator is under a duty to examine the same to determine whether or not they conform to the requirements of the Contract Administration Agreement.

If an Event of Default occurs and is continuing, the Contract Administrator shall exercise such of the rights and powers in respect of Funding Trust Receivables and use the same degree of care and skill in their exercise as a prudent corporate trustee would exercise or use under the circumstances.

No provision of the Contract Administration Agreement shall be construed to relieve the Contract Administrator from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that: (a) the Contract Administrator shall not be liable for any error of judgment made in good faith by an authorized officer of the Contract Administrator, unless it is proved that the Contract Administrator was negligent in ascertaining the pertinent facts; (b) the Contract Administrator shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in Outstanding principal amount of the Certificates relating to the time, method and place of conducting any proceeding for any remedy available to the Contract Administrator, or exercising any trust or power conferred upon the Contract Administrator, by or under the Contract Administration Agreement; and (c) no provision of the Contract Administration Agreement shall require the Contract Administrator to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties thereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 53 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

The Contract Administrator may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, opinion, notice, request, consent, or other document believed by it to be genuine and to have been signed or presented by the proper party or parties. The Contract Administrator may consult with counsel, and the written advice of such counsel is full and complete authorization and protection in respect of any action taken, suffered or omitted by the Contract Administrator in good faith and in reliance thereon.

The Contract Administrator is under no obligation to exercise any of the rights or powers vested in it by the Contract Administration Agreement at the request or direction of any of the Certificateholders pursuant to that Agreement, unless such Certificateholders shall have offered to the Contract Administrator reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

**Compensation and Reimbursement**

The Contract Administrator is entitled to payment or reimbursement from time to time for reasonable compensation for all services rendered by it under the Contract Administration Agreement. The Contract Administrator is also entitled to indemnification for, and to be held harmless against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on its part, arising out of or in connection with the acceptance or administration of that Agreement or the exercise of it powers thereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties thereunder. The compensation of the Contract Administrator shall constitute Contract Administrator Payments, a Component of Service Payments under the Service Contracts.

The Contract Administrator shall not have any lien on any funds held by it under the Contract Administration Agreement.

**Enforcement of Rights**

Every provision of the Contract Administration Agreement relating to the enforcement of rights and remedies by any of the parties thereto is subject to particular provisions in the Contract Administration Agreement that would apply if, but only if, all Insurers are then in default under their respective Credit Insurance.

**Third Party Beneficiaries**

The covenants of each Service Corporation made in the Contract Administration Agreement are also made for the benefit of each of the Third Party Beneficiaries, each of whom may enforce the same as if it were a party thereto.

## SUMMARY OF CERTAIN PROVISIONS OF THE TRUST AGREEMENT

The Trust Agreement is comprised of two documents, called the General Terms (dated as of May 1, 2005) and the Specific Terms (dated the Closing Date), which operate together as if they were combined in a single document. The parties to the Trust Agreement are the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation (each a **Service Corporation**), severally and not jointly, and U.S. Bank National Association, as Trustee (in such capacity, the **Trustee**). The Trust Agreement establishes the Detroit Retirement Systems Funding Trust 2006 (the ***2006 Funding Trust***) for the purpose of funding the optional redemption of certain Series 2005-A COPs and the purchase and cancellation of certain tendered Series 2005-B COPs.

**Conveyance of Funding Trust Receivables; Grant of Security Interest**

Effective the Closing Date, each Service Corporation transfers, assigns and conveys to the 2006 Funding Trust all of its right, title and interest in and to the Funding Trust Receivables under its respective Service Contract, all monies due or to become due with respect thereto and all proceeds of such Funding Trust

A-16
13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 54 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 54 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/13.06.2013    11:32

Receivables.  Each Service Corporation intends that such sale, assignment and conveyance be an absolute transfer of such property for all purposes.  However, to preserve rights if such sale, assignment and conveyance is deemed a pledge of such property, each Service Corporation also grants a security interest in such property to the 2006 Funding Trust for the benefit of the Certificateholders.

The Trust Estate consists of the Funding Trust Receivables arising under the GRS Service Contract, the Funding Trust Receivables arising under the PFRS Service Contract, and all  proceeds of the foregoing.

**Contract Administration Agreement**

The Trustee is directed in the Trust Agreement to enter into the Contract Administration Agreement in the name and on behalf of the 2006 Funding Trust.  See "Summary of Certain Provisions of the Contract Administration Agreement" in this APPENDIX A.

**No City Indebtedness**

The 2006 Funding Trust and the Funding Trust Receivables paid to the 2006 Funding Trust do not constitute or create any indebtedness of the City within the meaning of the limitation of The Home Rule City Act or any Michigan constitutional or other non-tax statutory or City charter limitation.

**Tax Treatment Agreed to by Certificateholders; Restriction on Trustee's Powers**

Except to the extent otherwise provided in the Trust Agreement, each Service Corporation has entered into the Trust Agreement, the Certificates will be issued and the 2006 Funding Trust will acquire the Funding Trust Receivables, with the intention that for federal, state and local income, business, franchise and modified value added tax purposes:  (a) the 2006 Funding Trust will qualify as a grantor trust under Subpart E, Part I of Subchapter J of the Internal Revenue Code of 1986, as amended; (b) each Beneficial Owner of Certificates will be treated as the owner of an undivided *pro rata* interest in the portion of the Trust Estate attributable to such Beneficial Owner's Certificates; and (c) the Funding Trust Receivables constitute payments in respect of indebtedness.  In furtherance of such intention, except to the extent otherwise provided in the Trust Agreement, the Trustee shall not have the power to vary the investment of the Beneficial Owners of the Certificates within the meaning of U.S. Treasury regulations §301.7701-4(c) or to engage in any business unless the Trustee shall have received an opinion in form and substance reasonably satisfactory to the Trustee of counsel reasonably acceptable to the Trustee to the effect that such activity will not cause the 2006 Funding Trust to fail to be treated as such a grantor trust.

Each Service Corporation and the Trustee by entering into the Trust Agreement and each Certificateholder by its acceptance of its Certificate agrees to treat the 2006 Funding Trust, the Certificates and the Funding Trust Receivables in accordance with the intention expressed in the preceding paragraph (or any alternative intention expressed in the Trust Agreement) for federal, state and local income, business, franchise and modified value added tax purposes.

**Authentication and Delivery of Certificates by Trustee; Disposition of Certificate Proceeds**

The 2006 Funding Trust shall issue Certificates as fully registered securities in the form prescribed by the Trust Agreement.  The Trustee shall authenticate and deliver the Certificates in accordance with a written order of each Service Corporation stating the amount of Certificate proceeds to be received by the Trustee in respect of that Service Corporation and providing for the disposition of such proceeds as provided in its Service Contract (in major part into the Tender Account for application to purchase tendered Series 2005-B COPs and into the Non-Tender Escrow Account for application to optionally redeem certain Series 2005-A COPs).  The Certificates evidence the entire beneficial interest in the Trust Estate.

A-17
13-53846-tjt   Doc 348-7   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 55 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 55 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Printed 15.08.2013 - 11:32

**Payment of Interest on Certificates**

Interest payable on any Certificate and paid on an Interest Payment Date shall be paid to the Person in whose name that Certificate (or a Predecessor Certificate) is registered at the close of business on the Regular Record Date for such Series.

Interest payable on any Certificate and not paid on an Interest Payment Date when due shall be not be paid to the registered Holder on the relevant Regular Record Date by virtue of being such Holder, but rather shall be payable as a Deficit Interest Related Payment to the Person in whose name such Certificate (or a Predecessor Certificate) is registered at the close of business on a Special Record Date for the payment of such Deficit Interest Related Payment.

If an amount is payable as all or part of a Deficit Interest Related Payment received by the Trustee, the Trustee shall establish a day for the payment of such amount to Certificateholders not less than 10 days after its receipt of such amount and establish a Special Record Date which shall be not more than 15 nor fewer than 10 days before the date set for payment of such amount. The Trustee shall mail notice of a Special Record Date to the Certificateholders at least 10 days before such Special Record Date.

Subject to the foregoing three paragraphs, each Certificate delivered under the Trust Agreement upon transfer of, in exchange for or in lieu of any other Certificate shall carry all the rights to Interest accrued and unpaid, and to accrue, which were carried by such other Certificate.

**Registration, Exchanges and Transfers**

The Trustee shall keep at its designated corporate trust office a register for the registration of Certificates and for the registration of transfers of Certificates, subject to such reasonable regulations as the Trustee may prescribe. Upon surrender of any Certificate for transfer of the registration thereof, the Trustee shall authenticate and register in the name of the designated transferee(s) one or more new Certificates of the same tenor in any Authorized Denomination in like aggregate principal amount.

At the option of the Holder, Certificates may be exchanged for other Certificates of the same tenor in any Authorized Denomination in like aggregate principal amount, upon surrender of the Certificates to be exchanged at the designated corporate trust office of the Trustee. Whenever any Certificates are surrendered for exchange, the Trustee shall authenticate and deliver the Certificates that the Certificateholder making the exchange is entitled to receive.

All Certificates issued upon any transfer of registration or exchange of Certificates shall constitute valid evidences of beneficial interests in the Trust Estate evidencing the same beneficial interests and entitled to the same benefits under the Trust Agreement as the Certificates surrendered in such transfer or exchange.

No service charge may be made for any transfer of registration or exchange of Certificates, but the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect such transfer or exchange. The Trustee may make the payment of such tax, fee or other governmental charge and the cost of preparing each new Certificate delivered in such transfer or exchange a condition precedent to making any transfer of registration or exchange of any Certificate, to be paid by the Person requesting such transfer or exchange, unless otherwise provided in the Trust Agreement.

The Trustee shall not be required (a) to transfer or exchange any Certificate during a period beginning at the opening of business 15 days before the day of the mailing of a notice of redemption of such Certificate and ending at the close of business on the day of such mailing, or (b) to transfer or exchange any Certificate selected for redemption in whole or in part, during a period beginning at the opening of business on any Regular Record Date for such Certificates and ending at the close of business on the relevant Interest Payment Date therefor.

A-18

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 56 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 56 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Demonstrative Exhibit - No. 92

**Persons Deemed Owners**

The Trustee may treat the Person in whose name any Certificate is registered as the owner of such Certificate, whether payments with respect to such Certificate shall be overdue or not, for the purpose of receiving payment of the principal thereof, premium, if any, and (except as otherwise provided in the Trust Agreement) Interest thereon and for all other purposes whatsoever.

**Book-Entry Certificates; Securities Depository**

While Certificates are registered in the name of a Securities Depository or its nominee, the Trustee shall not have any responsibility or obligation to any Participant or to any Beneficial Owner with respect to: (a) the accuracy of the records of the Securities Depository, its nominee or any Participant with respect to any ownership Interest in the Certificates; (b) the delivery to any Participant, any Beneficial Owner or any other Person, other than the Securities Depository of any notice with respect to the Certificates, including any notice of redemption; or (c) the payment to any Participant, any Beneficial Owner or any other Person, other than the Securities Depository of any amount with respect to the principal of or premium, if any, or Interest on the Certificates.

The Trustee shall pay all principal (and premium, if any) of and Interest on such Certificates only to or upon the order of the Securities Depository, and all such payments shall be valid and effective fully to satisfy and discharge the 2006 Funding Trust's obligations with respect to the principal (and premium, if any) of, and Interest on such Certificates to the extent of the sum or sums so paid.

Upon discontinuance of the use of the Book-Entry Only System maintained by the Securities Depository and upon receipt of notice from the Securities Depository containing sufficient information, the Trustee shall authenticate and deliver Certificates in certificated form to Beneficial Owners in exchange for the beneficial interests of such Beneficial Owners in corresponding principal amounts and in any Authorized Denomination.

Notwithstanding anything to the contrary in the Trust Agreement, so long as any Certificate is registered in the name of the Securities Depository or its nominee: (a) all payments with respect to the Principal and Interest on such Certificate and all notices of redemption and otherwise with respect to such Certificate shall be made and given, respectively, to the Securities Depository as provided in the representation letter with respect to such Certificates; (b) if less than all such Certificates of a maturity and series are to be redeemed *pro rata*, then the particular Certificates or portions of Certificates of such maturity and series to be redeemed shall be so determined by the Securities Depository; and (c) all payments with respect to Principal of such Certificate and premium, if any, and Interest on such Certificate shall be made in such manner as shall be prescribed by the Securities Depository.

**Redemption of Certificates**

*Selection of Certificates to be Redeemed*

Whenever any Certificates of a series are to be redeemed, the Trustee shall select the maturity or maturities that correspond to the prepaid Scheduled Payments giving rise to such redemption. Whenever Certificates of less than all of a maturity are to be redeemed, the Trustee shall select the particular Certificates to be redeemed from the Outstanding Certificates of such maturity and series that have not previously been called for redemption in such manner as results in *pro rata* redemption among all Holders of Certificates of the maturity being redeemed. All Certificates of the same series and having the same maturity shall constitute a class for purposes of *pro rata* redemption. The Trustee shall select Certificates for redemption *pro rata* within each class. In the case of any maturity of Certificates for which Sinking Fund Installments have been established, any optional redemption of such Certificates shall be credited among such Sinking Fund Installments *pro rata* in accordance with the unpaid amounts thereof.

A-19

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

*Notice of Redemption*

When any Certificates are to be redeemed, notice of any such redemption shall be given by the Trustee by first class mail, no fewer than 30 days and no more than 45 days before the Redemption Date to each Holder of Certificates to be redeemed at his/her last address in the Registry.  All notices of redemption shall be dated and shall state:  (a) the Redemption Date; (b) the Redemption Price; (c) if less than all Outstanding Certificates are to be redeemed, the identification number, maturity dates and, in the case of a partial redemption of Certificates, the respective principal amounts of the Certificates to be redeemed; (d) that on the Redemption Date the Redemption Price will become due and payable upon each such Certificate or portion thereof called for redemption, and that interest thereon shall cease to accrue from and after said date; (e) the place where the Certificates to be redeemed are to be surrendered for payment of the Redemption Price, which place of payment shall be the designated corporate trust office of the Trustee or other Paying Agent; and (f) the proposed redemption (except in the case of a redemption from Sinking Fund Installments) is conditioned on the Trustee having received a Redemption Related Payment on the Prepayment Receipt Day sufficient to pay the full Redemption Price of the Certificates to be redeemed.

The failure of the Holder of any Certificate to receive notice of redemption given as provided above, or any defect therein, shall not affect the sufficiency of the proceedings for the redemption of any Certificates as to which no failure or deficiency occurred.

The Trustee shall provide additional notice that provides material compliance with Securities Exchange Act Release No. 34-23856 (Dec. 3, 1985) as the same may be amended or supplemented from time to time by the Securities and Exchange Commission or by generally accepted practice of corporate trustees. No failure to give such additional notice or defect therein or in the manner in which given shall affect the sufficiency of the proceedings for the redemption of any Certificates.

*Certificates Payable on Redemption Date*

Notice of redemption having been given as aforesaid, the Holders of the Certificates so to be redeemed shall be entitled, on the Redemption Date, to payment of an amount equal to the Redemption Price therein specified and from and after such date (unless the full amount of the Redemption Price is not distributed) the Holders of such Certificates shall cease to be entitled to any further payment in respect of Interest.  Upon surrender of any such Certificate for redemption in accordance with said notice, the Holder of such Certificate shall be paid by the Trustee an amount equal to the Redemption Price.  Installments of Interest with a due date on or prior to the Redemption Date shall be payable to the Holders of the Certificates as of the relevant Record Dates.

If any Certificate called for redemption shall not be so paid upon surrender thereof for redemption, the principal (and premium, if any) shall, until paid, bear Interest from the Redemption Date at the rate prescribed in the Certificate.

*Certificates Redeemed in Part*

Any Certificate which is to be redeemed only in part may, at the option of the Holder:  (a) be presented for notation thereon by the Trustee of the payment as of the Redemption Date of the redeemed portion of the principal thereof; or (b) be surrendered at the place of payment therefor (with, if the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Trustee duly executed by, the Holder or his attorney or legal representative duly authorized in writing), and the Trustee shall authenticate and deliver to such Holder, without service charge, a new Certificate or Certificates of the same maturity and series of any Authorized Denomination or Authorized Denominations as requested by such Holder in aggregate principal amount equal to and in exchange for the unredeemed portion of the principal of the Certificate so surrendered.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013   11:32

**Payments to Certificateholders**

*Deficiency Payments*

On the day the Trustee receives a <u>Deficit Interest Related Payment</u> from the Contract Administrator, the Trustee shall establish a Special Record Date and pay the same to the Certificateholders entitled thereto in accordance with their respective Percentage Interests.  On the day the Trustee receives a Deficiency Payment, other than a Deficit Interest Related Payment, from the Contract Administrator, the Trustee shall pay the same to the Certificateholders entitled thereto in accordance with their respective Percentage Interests.

*Other Payments*

On each <u>Interest Payment Date</u> for which the Trustee has received an Interest Related Payment from the Contract Administrator, the Trustee shall pay the same to the Holders of Outstanding Certificates entitled to such Interest by the terms of their Certificates as of the Regular Record Date in accordance with their relative Percentage Interests.  On each <u>Principal Payment Date</u> for which the Trustee has received a Principal Related Payment from the Contract Administrator, the Trustee shall pay the same to the Certificateholders entitled to such Principal Related Payment by the terms of their Certificates in accordance with their relative Percentage Interests.  On each <u>Sinking Fund Installment Date</u> for which the Trustee has received a Sinking Fund Related Payment from the Contract Administrator, the Trustee shall pay the same to Holders of Outstanding Certificates entitled to such Sinking Fund Related Payment by reason of the redemption of their Certificates in accordance with their relative Percentage Interests of Certificates being redeemed.

On each <u>Redemption Date</u> that is also an Interest Payment Date for which the Trustee has received a Redemption Related Payment from the Contract Administrator, the Trustee shall pay the same to Holders of Outstanding Certificates entitled to such Redemption Related Payment by reason of the redemption of their Certificates in accordance with their relative Percentage Interests of Certificates being redeemed.  On each <u>Redemption Date</u> that is not also an Interest Payment Date for which the Trustee has received a Redemption Related Payment that includes associated Accrued Service Charges from the Contract Administrator, the Trustee shall pay the same to the Holders of Outstanding Certificates entitled to such Redemption Related Payment and Accrued Service Charges by reason of the redemption of their Certificates in accordance with their relative Percentage Interests of Certificates being redeemed.

**The Trustee**

*Certain Duties and Responsibilities*

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Trust Agreement, and no implied covenants or obligations shall be read into the Trust Agreement against the Trustee.  In the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, documents, other instruments or opinions furnished to the Trustee and conforming to the requirements of the Trust Agreement or the Service Contract; but in the case of any such certificates, documents, other instruments or opinions which by any provision thereof or of the Trust Agreement are specifically required to be furnished to the Trustee, the Trustee is under a duty to examine the same to determine whether or not they conform to the requirements of the Trust Agreement.

No provision of the Trust Agreement or the Service Contract shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that (a) the Trustee shall not be liable for any error of judgment made in good faith by an authorized officer of the Trustee, *unless* it is proved that the Trustee was negligent in ascertaining the pertinent facts; (b) the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in principal amount of the Outstanding Certificates

A-21

13-53846-tjt   Doc 348-7   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 59 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 59 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under the Trust Agreement or the Service Contract; and (c) no provision of the Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties thereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

*Certain Rights of Trustee*

The Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, opinion, notice, request, consent, order, or other document believed by it to be genuine and to have been signed or presented by the proper parties.  Whenever in the administration of the Trust Agreement the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action under the Trust Agreement, the Trustee (unless other evidence is specifically prescribed) may, in the absence of bad faith on its part, rely upon a certificate of the Contract Administrator.  The Trustee may consult with counsel, and the written advice of such counsel is full and complete authorization and protection in respect of any action taken, suffered or omitted by the Trustee thereunder in good faith and in reliance thereon.

The Trustee is under no obligation to exercise any of the rights or powers vested in it by the Trust Agreement at the request or direction of any of the Certificateholders pursuant to the Trust Agreement, unless such Certificateholders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, opinion, notice, request, consent, order, or other document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit.  The Trustee may execute any of its trusts or powers or perform any of its duties either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it.

The Trustee shall not have any lien on any funds held by it under the Trust Agreement.

*Not Responsible for Recitals or Issuance of Certificates*

The Trustee assumes no responsibility for the correctness of the recitals contained in the Trust Agreement, in a Service Contract or in the Certificates except the certificate of authentication on the Certificates.  The Trustee makes no representations as to the value or condition of the Trust Estate or any part thereof, or as to the title thereto or as to the security afforded thereby, or as to the validity or sufficiency of the Trust Agreement or of the Certificates.

*Corporate Trustee Required; Eligibility*

There shall at all times be a Trustee under the Trust Agreement which is a trust company or bank with trust powers organized under the laws of the United States of America or of any state of the United States with a combined capital and surplus of at least $50,000,000.  If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of such supervising or examining authority, then the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  The Trustee shall resign immediately in the manner and with the effect specified in the Trust Agreement if it becomes ineligible under this paragraph.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 60 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

### *Replacement of Trustee*

No resignation or removal of the Trustee and no appointment of a successor Trustee shall be effective until the successor Trustee accepts its appointment. The Trustee may resign at any time, but such resignation shall become effective only in accordance with the preceding sentence. The Holders of a majority in principal amount of Outstanding Certificates may remove the Trustee by so notifying the Trustee and any Insurer. If the Trustee becomes ineligible, any Certificateholder may petition a court of competent jurisdiction for the appointment of a successor. The retiring Trustee or the Service Corporations may appoint a successor at any time prior to the date on which a successor Trustee takes office. If a successor Trustee does not take office within 45 days after the retiring Trustee resigns or is removed, any Certificateholder may petition a court of competent jurisdiction for the appointment of a successor Trustee. Within one year after a successor Trustee appointed by the Service Corporations or a court of competent jurisdiction takes office, the Holders of a majority in principal amount of Outstanding Certificates may appoint a successor Trustee to replace such successor Trustee.

### *Acceptance of Appointment*

A successor Trustee shall deliver written acceptance of its appointment to the retiring Trustee and to each Service Corporation. Thereupon the resignation or removal of the retiring Trustee shall be effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under the Trust Agreement. The successor Trustee shall mail a notice of its succession to the Certificateholders. Upon the appointment of a successor Trustee becoming effective, the retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee.

### *Merger, Consolidation and Succession to Business*

If the Trustee consolidates, merges or converts into, or transfers all or substantially all its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Trustee if such successor corporation is eligible under the Trust Agreement. The successor Trustee may adopt the authentication of Certificates authenticated by the predecessor Trustee and deliver such Certificates with the same effect as if the successor Trustee had authenticated such Certificates.

### *ERISA*

The Trustee acknowledges and agrees that, in the event that assets of the 2006 Funding Trust are deemed to be plan assets of a Certificateholder that is an employee benefit plan subject to Title I of ERISA (an **ERISA Plan**), the Trustee is a fiduciary to such ERISA Plan with respect to such ERISA Plan's undivided interests in the Trust Estate, and the Trust Agreement shall be deemed to be the management agreement between the Trustee and such ERISA Plan.

**Supplemental Trust Agreements**

### *Supplemental Trust Agreements without Consent of Certificateholders*

Without the consent of any Certificateholders, the Service Corporations and the Trustee may from time to time enter into one or more Trust Agreements supplemental to the Trust Agreement (a **Supplemental Trust Agreement**) for any of the following purposes:

b) to correct or amplify the description of Trust Estate, or better to assure, convey and confirm unto the Trustee any of the Trust Estate or the lien of the Trust Agreement thereon, or to add to the Trust Estate subject to the lien of the Trust Agreement additional property;

c) to add to the conditions, limitations and restrictions on the authorized amount, terms or purposes of the issue, authentication and delivery of the Certificates, thereafter to be observed;

d) to evidence a successor trustee under the Trust Agreement;

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 61 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 61 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08.2013 11:32

e) to add to rights, powers and remedies of the Trustee for the benefit of the Certificateholders;

f) to cure any ambiguity, or correct or supplement any provision in the Trust Agreement which may be inconsistent with any other provision;

g) to provide for the issuance of Additional Certificates; or

h) to make any other change that does not adversely affect the rights of Certificateholders.

*Supplemental Trust Agreements with Consent of Certificateholders*

With the consent of the Holders of not less than a majority in principal amount of the Certificates then Outstanding, the Trustee may enter into one or more Supplemental Trust Agreements for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Trust Agreement or of modifying in any manner the rights of Certificateholders under the Trust Agreement; provided, however, that no such Supplemental Trust Agreement shall, without the consent of the Holder of each Outstanding Certificate affected thereby, change any Principal Payment Date or Interest Payment Date of any Certificate, or reduce the principal amount thereof or Sinking Fund Installment or the Interest thereon or any premium payable upon the redemption thereof, or change any place of payment where any Certificate or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity thereof (or, in the case of redemption, on or after the Redemption Date), or reduce the percentage in principal amount of the Outstanding Certificates, the consent of whose Holders is required for any such Supplemental Trust Agreement, or the consent of whose Holders is required for any waiver of compliance with certain provisions of the Trust Agreement or certain defaults thereunder and their consequences; or modify any provisions summarized under the above subheadings "No City Debt or Other Obligation" or "Tax Treatment Agreed to by Certificateholders; Restriction on Trustee's Powers" under the heading "SUMMARY OF CERTAIN PROVISIONS OF THE TRUST AGREEMENT" or certain other provisions, except to increase any percentage provided thereby or to provide that certain other provisions of the Trust Agreement cannot be modified or waived without the consent of each Holder affected thereby.

*Execution of Supplemental Trust Agreements*

Prior to executing, or accepting the additional trusts created by, any permitted Supplemental Trust Agreement or the modification thereby of the trusts created by the Trust Agreement, the Trustee shall be entitled to receive and be fully protected in relying upon an opinion of counsel addressed to the Trustee to the effect that the execution of such Supplemental Trust Agreement is authorized or permitted by the Trust Agreement and the Supplemental Trust Agreement will be a valid and binding agreement of each Service Corporation upon the execution and delivery thereof.

*Preconditions to Effectiveness*

If the Trustee received a Qualifying Opinion in connection with the formation of the 2006 Funding Trust, then no Supplemental Trust Agreement shall become effective unless and until the Trustee receives an opinion in form and substance reasonably satisfactory to it of counsel reasonably acceptable to the Trustee to the effect that such supplement will not cause the 2006 Funding Trust to fail to be treated as such a grantor trust. Each Supplemental Trust Agreement is subject to the prior written consent of any Insurer.

**Miscellaneous Provisions**

*Notices to Certificateholders; Waiver*

Where the Trust Agreement provides for the publication of notice to Certificateholders, such notice shall be sufficiently given (unless otherwise expressly provided in the Trust Agreement) if in writing and mailed, first-class postage prepaid, to each Certificateholder at his address as it last appears in the Registry, no

A-24
13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 62 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 62 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

later than the latest date and no earlier than the earliest date permitted for the first publication of such notice. Where the Trust Agreement provides for notice in any manner, such notice may be waived by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance on the waiver.

<u>*Payments Due on Saturdays, Sundays and Holidays*</u>

In any case where the date fixed for payment of the Certificates shall not be a Business Day, then such payment need not be made on such date but may be made on the next succeeding Business Day with the same force and effect as if made on the date fixed for such payment.

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 63 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 63 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

# APPENDIX B

## INFORMATION CONCERNING THE CITY OF DETROIT, MICHIGAN

## TABLE OF CONTENTS

Page

GOVERNMENTAL STRUCTURE ...................................................................................................2
   Executive Branch ...........................................................................................................................2
   Legislative Branch .........................................................................................................................3
   District Court .................................................................................................................................4
   Principal Governmental Services and Work Force ........................................................................4
   Related City Entities .....................................................................................................................7
   Other Governmental Entities.........................................................................................................8
FINANCIAL PROCEDURES .........................................................................................................8
   Accounting System ........................................................................................................................8
   Accounting Methods ......................................................................................................................8
   Cash Management ..........................................................................................................................9
   Budget Process .............................................................................................................................10
   Budget Stabilization Fund ...........................................................................................................10
FINANCIAL OPERATIONS .........................................................................................................11
   Overview ......................................................................................................................................11
   Revenues and Expenditures of the General Fund .......................................................................11
   Fund Balance of the General Fund ..............................................................................................14
   Components of Fund Balance ......................................................................................................15
   General Fund Revenue Categories ..............................................................................................15
   Recent Budget Results of the General Fund ...............................................................................21
   Other Funds of the City................................................................................................................28
   Risk Management .........................................................................................................................31
ASSESSED VALUATION AND PROPERTY TAXES .................................................................32
   Property Valuation and Tax Rate ................................................................................................32
   Industrial Facilities Tax ...............................................................................................................33
   Payment and Lien ........................................................................................................................33
   Personal Property Tax Assessments and Appeals .......................................................................33
   Valuations ....................................................................................................................................34
   Valuation by Type of Property ....................................................................................................34
   Tax Rates and Levies...................................................................................................................34
   Tax Levies and Collections .........................................................................................................36
   Largest Taxpayers .......................................................................................................................37
   Tax-Exempt Property ...................................................................................................................37
   Legal Debt Margin.......................................................................................................................37
INDEBTEDNESS OF THE CITY AND RELATED ENTITIES ...................................................38
   Capital Financing Policies ..........................................................................................................38
   Overlapping Debt.........................................................................................................................40
   Summary of Debt Statement .......................................................................................................41
   Short-Term Indebtedness.............................................................................................................44
   Prospective Indebtedness.............................................................................................................44
EMPLOYEE BARGAINING UNITS.............................................................................................45
RETIREMENT SYSTEMS .............................................................................................................45
   In General.....................................................................................................................................45
   Payment Obligations under Retirement System Service Contracts ............................................48
   Constitutional, Statutory and Ordinance Authority for Payment of UAAL and Issuance of the 2006
   Certificates ...................................................................................................................................48
   Recent Pension Litigation ...........................................................................................................49
CERTAIN ECONOMIC AND DEMOGRAPHIC INFORMATION.............................................50
   General .........................................................................................................................................50
   Population.....................................................................................................................................50
   Employment and Economic Base ................................................................................................52
   Construction .................................................................................................................................54
   Housing Characteristics ...............................................................................................................54
   Largest Employers .......................................................................................................................55
   Port of Detroit .............................................................................................................................56
   Transportation Network ...............................................................................................................57
   Major Projects and Developments ..............................................................................................57

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 65 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Doc: IW/45-02-2012-12-03

## GOVERNMENTAL STRUCTURE

Pursuant to the provisions of the Constitution of the State of Michigan (the "State"), the City is a home rule city with significant independent powers.  In accordance with the City Charter (the "Charter"), the governance of the City is organized in two branches:  the Executive Branch, which is headed by the Mayor, and the Legislative Branch, which is composed of the City Council and its agencies.  The Charter provides that the voters of the City reserve the power to enact City ordinances by initiative and to nullify ordinances enacted by the City by referendum.  However, these powers do not extend to the budget or any ordinance for the appropriation of money, and the referendum power does not extend to an emergency ordinance.  The Mayor and the members of the City Council are elected every four years.  During the most recent general election that was conducted on November 8, 2005, Kwame M. Kilpatrick was re-elected for a second term as Mayor, and five incumbent members were re-elected and four new members were elected to the City Council.  There are no limits as to the number of terms that may be served by City elected officials.  In addition, the City is the District Control Unit responsible for certain duties relating to the 36th District Court.   See "GOVERNMENTAL STRUCTURE – District Court."   Following is a description of the duties and responsibilities of the branches of the City government.

### *Executive Branch*

The Mayor is the chief executive of the City and has control of and is accountable for the Executive Branch of City government.  The Charter grants the Mayor broad managerial powers, including the authority to appoint all department directors and deputy directors.  The Charter also delegates the responsibility for the implementation of most programs, services and activities solely to the Executive Branch.

Financial operations of the City are carried out through the appointed positions of Finance Director and Budget Director.   The Finance Director oversees most financial functions of the City, including coordinating debt issuance activities, collecting and disbursing funds, investing City funds (excluding pensions), directing accounting procedures and financial reporting, purchasing goods and services, and assessing property in the City.   The Budget Director is responsible for controlling and supervising the expenditure of funds and assisting the Mayor in the preparation of the City's annual budget and long-term capital agenda.

**Kwame M. Kilpatrick, Mayor**, assumed office January 1, 2002. He was re-elected Mayor on November 8, 2005 for a second four-year term commencing on January 1, 2006.  Prior to his election as Mayor, he served two terms representing Detroit's 9th District in the Michigan House of Representatives, including serving as House Democratic Leader.  Prior to his tenure as a State legislator, he served as a teacher, mentor and basketball coach in the Detroit Public Schools and also taught high school in Tallahassee, Florida.  Mayor Kilpatrick is chair of the Democratic Leadership Council's locally elected officials' network.  Mayor Kilpatrick graduated from Florida A&M University with a Bachelor of Science degree in Political Science, as well as his teacher certification.  He received his Juris Doctor degree from Detroit College of Law.

**Anthony Adams, Deputy Mayor,** was appointed in January 2005.  Mr. Adams has the role of Chief Operating Officer along with his other duties.  Prior to his appointment, he was General Counsel for the School District of the City of Detroit (the "District") since January 2003, with responsibilities for supervising a staff of 20 and managing more than 25 outside firms to coordinate the legal defense of the District and serving as its Chief Legal Compliance Officer.  Before that, he served as Chief Development Attorney for the District since July 2002, with responsibilities for coordinating all development projects and business contracts for the District, including its $1.5 billion capital improvement program.   Earlier, he had a private law practice primarily in real estate development and finance.  From 1991 to 1993, Mr. Adams was of counsel to the Dykema Gossett law firm in Detroit.  From 1985 to 1991, he served as an Executive Assistant to the Mayor of Detroit.  He has a Bachelor of Science degree in Urban Management and Planning from the University of Cincinnati, and a Juris Doctor degree from Georgetown University Law Center.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
mark.angelov@arentfox.com

**Roger Short, Interim Finance Director**, was appointed in February 2006. Prior to this appointment, he served the City as Budget Director for six years. His current responsibilities include providing the Mayor and the City Council with long-term and short term financial planning data, assisting in the preparation of the City's operating and capital budgets, monitoring City financial operations and supervising and controlling the expenditure of funds. Previously, Mr. Short served the City as Chief Accounting Officer/Deputy Finance Director for four years, Auditor General for ten years and in other positions. Mr. Short is a Certified Public Accountant and holds a Masters degree in Public Policy Studies and a Bachelor of Arts degree from the University of Michigan. Currently he is an adjunct instructor at the University of Phoenix and Wayne County Community College. He is a member of the Government Finance Officers Association. Mr. Short also serves on the boards of the Detroit Building Authority, Detroit Transportation Corporation, the Downtown Development Authority and the Greater Detroit Resource Recovery Authority.

**Pamela C. Scales, Budget Director**, was appointed in February 2006. Prior to her current appointment, Ms. Scales served as Deputy Budget Director. She has more than 19 years of service with the City. During her service as Deputy Budget Director, the City has received nine Distinguished Budget Awards from the Government Finance Officers Association. Ms. Scales is a faculty member of the University of Phoenix, teaching graduate and undergraduate Finance courses. She holds a Bachelor of Arts degree in Economics from the University of Michigan and a Master of Business Administration degree from the University of Detroit–Mercy. She is a member of the Government Finance Officers Association, the Michigan Municipal Finance Officers Association and the Association of Government Accountants.

**George W. Jackson, Jr., Chief Development Officer**, was appointed in March 2006. He also has served as President & CEO of the Detroit Economic Growth Corporation (DEGC) since February 2002. Previously he had been Director of Customer Marketing for DTE Energy, where he worked for 27 years. His additional prior experience includes personnel and human resources responsibilities in the U.S. Navy and teaching on the adjunct faculty at Lawrence Technological University School of Management  Mr. Jackson has a Bachelor of Science degree in Human Resource Development from Oakland University and a Master of Arts degree in Management – Business Management from Central Michigan University.

**John E. Johnson, Corporation Counsel**, was appointed in February 2006 and heads a staff of more than 90 lawyers, with responsibilities for City contracts, advising the Mayor and City Council on legal issues, supervising preparation of ordinances and resolutions, and defending and prosecuting all City lawsuits. From 1999 to 2005, he was Deputy Executive Director and Chief Operating Officer of Legal Aid & Defender Association, Inc. in Detroit. He served as Executive Director of the Detroit Branch of the National Association for the Advancement of Colored People (NAACP) from 1997 to 1999. His previous employers included Wayne County Neighborhood Legal Services, the National Consumer Law Center, and UAW Legal Services Plans. Mr. Johnson has a Bachelor of Arts degree in Political Science and Journalism from Howard University and a Juris Doctor degree from Valparaiso University School of Law.

*Legislative Branch*

The City Council, composed of nine members elected at large for four-year terms, is the City's legislative body. The City Council has the power to override the Mayor's veto of City Council changes to the annual budget with a two-thirds majority of its members. The three agencies that aid the City Council in the performance of its duties are described below.

The Auditor General is appointed for a term of 10 years by a majority of City Council members and may be removed for cause by a two-thirds majority. Any person who has held the position of Auditor General is not eligible for reappointment. By Charter, the principal duty of the Auditor General is to audit the financial transactions of all City agencies. However, since 1980 the City has retained independent accounting firms to perform that function. As required by State law, audits are performed annually; they are only required every two years by the Charter. The Auditor General may investigate the administration and operation of any City agency and prepares various reports, including an annual analysis for the City Council of the Mayor's proposed budget.

B-3

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15-08-2013 11:32

The Ombudsman is appointed for a term of 10 years by a two-thirds majority of City Council members for the purpose of investigating any official act of any agency (except elected officers) which aggrieves any person.

The City Planning Commission, consisting of nine members appointed by the City Council for three-year terms, advises the City Council on such matters as the annual capital agenda, certain development or renewal projects and proposals for the demolition, disposition or relinquishment of, or encroachment upon, public real property or public interests in real property.

### District Court

The 36th District Court is responsible for adjudicating certain legal matters that arise within the City, including State felony arraignments and preliminary examinations, State misdemeanor and City ordinance violations, civil litigation for claims of $25,000 or less, and landlord / tenant disputes.  The City is responsible for all funding of the 36th District Court in excess of fines collected by the Court, except for judicial salaries, which are funded by the State.

### Principal Governmental Services and Work Force

The following table sets forth the major services provided to City residents and businesses, the governmental unit responsible for providing that service, and the revenue source of City-provided services as indicated in the proposed Executive Budget for the fiscal year ending June 30, 2007.  The City's budget contains both operating revenues and expenditures, and capital sources and expenditures.

**(Balance of this page intentionally left blank)**

B-4

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2012 11:32

**Table 1 – Services Provided: Governmental Unit and Revenue Sources**

### Services Provided and Funded by the City in Whole or in Part

| | Responsibility | Percent Supported by: | | | | |
|---|---|---|---|---|---|---|
| | | General Fund(1) | Self-Supported(2) | State Grants(3) | Federal Grants(3) | Other Sources(4) |
| Police and fire .................. | City | 79.0% | 14.7% | 1.1% | 1.0% | 4.2% |
| Sanitation and streets ........ | City | 59.1 | 8.3 | 31.5 | - | 1.1 |
| Parks and recreation.......... | City | 75.2 | 8.5 | 0.9 | - | 15.4 |
| Water and Sewer (5)(6)..... | City | - | 100.0 | - | - | - |
| Court ................................. | City/State | 43.0 | 53.5 | 3.5 | - | - |
| Transportation: | | | | | | |
|   Port (7)........................... | City/County/State | 25.0 | - | 50.0 | - | 25.0 |
|   Bus (6) ........................... | City | - | 67.3 | 26.8 | - | 5.9 |
|   City Airport (6).............. | City | - | 100.0 | - | - | - |
| Planning and | | | | | | |
| Development (8) .............. | City | - | 12.5 | - | 85.8 | 1.7 |
| Health................................ | City | 17.9 | 10.1 | 24.7 | 47.3 | - |
| Public Lighting (9)............ | City | 23.5 | 67.5 | 5.0 | - | 4.0 |
| Parking (6) ........................ | City | - | 100.0 | - | - | - |

### Services Provided and Totally Funded Other than by the City

| | |
|---|---|
| Education ........................... | School District of the City of Detroit |
| Detroit/Wayne County Metropolitan Airport......... | County |
| Housing (10) ...................... | Independent |
| Hospital............................. | Private |
| Welfare ............................. | State |

SOURCE: Budget Department. Totals may not add up to 100% due to rounding. See "Fiscal 2007 Budget" under "FINANCIAL OPERATIONS - Recent Budget Results of the General Fund" herein for further discussion of the Fiscal Year 2007 Executive Budget.

_____
(1) Represents the net tax cost to the City.
(2) Includes revenues derived from sale of services to other City departments, self-supporting agencies and outside users.
(3) Includes mass transportation, health and other grant revenues.
(4) Includes both bond proceeds and Federal project note borrowings.
(5) Provides water supply and sewage disposal services for the southeastern Michigan region. Accounted for separately in two enterprise funds.
(6) Accounted for in an enterprise fund.
(7) Although the Port facilities are privately owned, the Detroit/Wayne County Port Authority's budget is funded by City, Wayne County and State contributions.
(8) Department revenues exceed appropriations resulting in net contributions to the General Fund
(9) Provides power through a City-owned public utility for City-owned buildings, streets, certain other governmental units and some private customers. Revenues are derived from the sale of power to these governmental units and private customers.
(10) See "FINANCIAL OPERATIONS-Other Funds of the City–Enterprise Funds" herein. Starting in fiscal 2004, the Detroit Housing Commission ("DHC") became an autonomous enterprise separate from the City. Therefore, the proposed Fiscal Year 2007 Executive Budget does not include funding for the DHC.


The following table sets forth the City's budgeted employee positions for fiscal 2003 through 2007, according to those positions that are tax-supported and those positions that are supported by other revenues.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15-08-2013 11:32

**Table 2 – City of Detroit Budgeted Employee Positions**

| | Fiscal Year Ended or Ending June 30, | | | | | | | | | |
| | **2003** | | **2004** | | **2005** | | **2006** | | **2007** | |
| | **Number** | **%** | **Number** | **%** | **Number** | **%** | **Number** | **%** | **Number** | **%** |
| Tax supported: | | | | | | | | | | |
| General City.................. | 8,104 | 40% | 7,929 | 40% | 7,448 | 40% | 6,139 | 39% | 5,467 | 37% |
| Police and fire.............. | 5,694 | 28 | 5,704 | 29 | 5,695 | 30 | 4,508 | 29 | 4,422 | 30 |
| Library ........................ | 475 | 2 | 476 | 2 | 485 | 3 | 465 | 3 | 465 | 3 |
| Total tax supported ........... | 14,273 | 70 | 14,109 | 72 | 13,628 | 73 | 11,112 | 71 | 10,354 | 69 |
| Revenue supported: | | | | | | | | | | |
| Transportation.............. | 1,838 | 9% | 1,838 | 9% | 1,716 | 9% | 1,534 | 10% | 1,534 | 10% |
| Water ........................... | 2,411 | 12 | 2,097 | 11 | 2,097 | 11 | 1,916 | 12 | 1,900 | 13 |
| Sewage........................ | 1,477 | 7 | 1,301 | 7 | 1,302 | 7 | 1,189 | 8 | 1,176 | 8 |
| Housing (1) ................. | 442 | 2 | 357 | 2 | - | - | - | - | - | - |
| Total revenue supported.... | 6,168 | 30 | 5,593 | 28 | 5,115 | 27 | 4,639 | 29 | 4,610 | 31 |
| Total............................ | 20,441 | 100% | 19,702 | 100% | 18,743 | 100% | 15,751 | 100% | 14,964 | 100% |

SOURCE: City's Budgets for fiscal 2003 through 2005 and Amended Budget for fiscal 2006. Fiscal 2007 data reflect the proposed Executive Budget for fiscal 2007. Totals may not add up to 100% due to rounding. See "FINANCIAL OPERATIONS - Recent Budget Results of the General Fund" herein.

_____
(1)       Housing, through the DHC, is no longer a City Department. Its separation was finalized through judicial action in fiscal 2004.

The following table sets forth the departmental budgeted appropriations as a percentage of total General Fund appropriations for fiscal 2003 through 2007.

**Table 3 – Departmental Appropriations**

| | Fiscal Year Ended or Ending June 30, | | | | |
| | **2003** | **2004** | **2005** | **2006** | **2007** |
| Police............................................... | 20% | 23% | 25% | 22% | 23% |
| Fire ................................................... | 9 | 10 | 11 | 10 | 10 |
| Public works (sanitation and streets). | 12 | 11 | 11 | 10 | 10 |
| Public lighting ................................... | 4 | 4 | 4 | 4 | 4 |
| Health ............................................... | 5 | 5 | 5 | 5 | 5 |
| Recreation......................................... | 3 | 3 | 3 | 2 | 1 |
| Planning and development ................ | 4 | 4 | 3 | 3 | 3 |
| Other departments ............................. | 25 | 24 | 22 | 16 | 21 |
| Non-departmental: | | | | | |
| Enterprise fund contributions ........ | 5 | 4 | 4 | 5 | - |
| Other (1) ...................................... | 12 | 11 | 13 | 23 | 23 |
| General agency budget (millions) ..... | $1,816.0 | $1,877.3 | $1,935.1 | $1,764.9 | $1,812.9 |

SOURCE: City's Budgets for fiscal 2003 through 2005, Amended Budget for fiscal 2006 and proposed Executive Budget for fiscal 2007. Totals may not add up to 100% due to rounding. See "FINANCIAL OPERATIONS - Recent Budget Results of the General Fund" herein.

_____
(1) Includes contributions to the Transportation Fund.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 70 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

*Related City Entities*

Other entities have been established by the City, in certain cases with the County of Wayne (the "County") and with the City of Highland Park, or by the State, principally for the purpose of providing capital financing (normally through the sale of bonds or through special tax levies) for various improvements, services or major construction projects. See "INDEBTEDNESS OF THE CITY AND RELATED ENTITIES – Tax Supported and Revenue Debt" and "-Overlapping Debt." Below is a description of certain entities and their functions.

**Detroit Brownfield Redevelopment Authority** ("DBRA"). The DBRA was created by a City Council resolution and approved by the Mayor in April 1998, under the provisions of Act 381, Public Acts of Michigan, 1996. The DBRA was established to create Brownfield redevelopment zones and promote the revitalization, redevelopment, and reuse of certain property, including, but not limited to, tax-reverted, blighted or functionally obsolete property. This is the first year of substantial financial activity for this authority.

**Detroit Public Library** ("DPL"). The DPL is a statutory body created by the State. The DPL was created to provide reference materials, research information, and publications to residents of the City and the County. Funding is provided by an *ad valorem* tax of 3.63 mills in real and personal property taxes in the City. In addition, DPL receives grants and endowments from private organizations. City Council is responsible for approving DPL's annual budget.

**Downtown Development Authority** ("DDA"). The DDA was created to promote and develop economic growth in the City's downtown business district. Funding is provided by an *ad valorem* tax of 1.0 mill on real and personal property in the downtown development district, a levy on the increased assessed value of the tax increment district, and issuance of revenue and tax increment bonds.

**Economic Development Corporation** ("EDC"). The EDC was established to create and implement project plans for designated project areas within the City, and thus encourage the location and expansion of industrial and commercial enterprises within the City. The EDC is primarily funded by means of grants from the City.

**Detroit Housing Commission** ("DHC"). The DHC was established in 1933 under the authority of the Housing Facilities Act, Act 18, Public Acts of Michigan, 1933 (Ex. Sess.), Section 2 of the act provided that any city or incorporated village with population of over 500,000 was authorized "to purchase, acquire, construct, maintain, operate, improve, extend, and/or repair housing facilities and to eliminate housing conditions which are detrimental to the public peace, health, safety, morals, and/or welfare." The DHC is an autonomous enterprise separate from the City.

**Local Development Finance Authority** ("LDFA"). The LDFA was created to finance certain improvements for local public roads in the vicinity of the Chrysler Jefferson Avenue Assembly Plant. Incremental portions of the City and the County property taxes funded LDFA.

**Charles H. Wright Museum of African American History** ("MAAH"). The MAAH was created to provide research, compilation, presentation, publication, and dissemination of knowledge relating to the history, growth, development, heritage and culture of people of African descent and the human struggle for freedom. The MAAH is primarily funded by means of private grants and grants from the City.

**School District of the City of Detroit** ("District"). The District is a statutory body created by the State and functions under the provisions of the Michigan School Code. Funding is provided by an *ad valorem* tax of 13.19 mills (homestead properties) and 31.19 mills (non-homestead) on real and personal property in the City and a "foundation allowance" provided by the State.

B-7

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

**Tax Increment Finance Authority** ("TIFA"). The TIFA was created to acquire property and provide financing for residential and commercial development programs through issuance of long-term debt secured by tax increment financing.

**Detroit Transportation Corporation** ("DTC"). The DTC was established in 1985 to oversee construction and operation of the Central Automated Transit System (People Mover) in downtown Detroit. The DTC is primarily funded by means of grants from the City.

**Greater Detroit Resource Recovery Authority** ("GDRRA"). The GDRRA was established by the Cities of Detroit and Highland Park for the acquisition, construction and operation of a waste-to-energy facility. The financing was provided by the issuance of revenue bonds.

### *Other Governmental Entities*

Services are provided to residents and businesses of the City by other governmental entities such as the County, the School District of the City of Detroit, Wayne County Community College and the Wayne County Regional Educational Service Agency. All of these entities are funded through their own taxing powers and other sources independent of the City.

## FINANCIAL PROCEDURES

### *Accounting System*

The City's fiscal year begins on July 1 and ends on June 30. The City uses a computer software financial management system which provides general ledger, purchasing, accounts payable, accounts receivable, fixed assets and project accounting applications. These core financial applications are integrated with third-party software providers for budget preparation, work order and inventory applications to provide a complete financial reporting system.

The City uses a legacy human resources/payroll application for employee compensation. Preliminary funding has been approved to begin planning the replacement of the legacy system with computer software human resources/payroll modules. The complete integration of these applications with the core financial applications is expected to be completed in late 2007.

The City's financial statements are prepared based substantially upon the financial information contained in the financial management system. The City's basic financial statements and entity-wide financial statements for fiscal 2005 were audited by independent accountants hired by the Auditor General's Office, and are the most recent audited City financial statements available.

### *Accounting Methods*

The City's financial statements are prepared in conformity with accounting principles generally accepted in the United States of America. Except for the City's Enterprise Funds and Pension Funds (which are accounted for on the accrual basis), the City's funds and accounts (General, Special Revenues and Debt Service Funds) are maintained and reported on the modified accrual basis of accounting. Under the modified accrual basis of accounting, revenues are recognized when they are susceptible to accrual, *i.e.*, measurable and available to finance expenditures of the current fiscal year. Accrued municipal income taxes are estimated by the City as collected (*i.e.*, withheld) by employers but not yet remitted to the City. Estimated refunds for income tax returns received and in process, on which payment has not yet been made, are recorded as a reduction of revenues. The City establishes reserves against certain of the revenues so recognized, to reflect its judgment of collectibility.

The City records expenditures when goods and services are received and encumbers the amounts required by purchase orders and contracts at the time the purchase orders and contracts are issued. The encumbrances are liquidated when the goods and services are received. While the City is not required to carry

B-8

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

unliquidated encumbrances past the end of the fiscal year, it sets aside, within each respective fund balance, an amount equal to the unliquidated encumbrances that it plans to carry forward. In the succeeding fiscal year, the budget is increased by an amount sufficient to cover the unliquidated encumbrances and those encumbrances are reinstated. Unliquidated appropriations represent amounts appropriated for encumbrances and for other commitments not liquidated by year-end and carried forward to the succeeding year's budget. Any remaining balance constitutes an unappropriated surplus (see "Budget Stabilization Fund" below). Any unappropriated deficit is funded in the succeeding fiscal year.

The Capital Projects Funds account for all funds used for the construction, acquisition and renovation of capital facilities. The City maintains 12 sub-funds within the Capital Projects Funds, which account for all capital improvements (other than water supply and sewage disposal facilities) including those financed by the City's general obligation bond issues, gifts, governmental grants, transfers from other funds and special assessments. The City maintains detailed accounting records by individual projects within these funds. Revenues and expenditures are recorded in specific cost centers which list the sources of revenue and type of expenditure. Uncollected estimated revenues and unexpended appropriations are brought forward until completion of a capital project. Revenues must be used on the specific capital projects for which they were designated.

Included as APPENDIX C is the comprehensive annual financial report ("CAFR") of the City for the fiscal year ended June 30, 2005, which includes the audited financial statements of the City for that fiscal year.

### *Cash Management*

A cash flow forecast is prepared annually to assist in formulating cash management strategy and is revised as necessary. The City maintains one bank account for General Fund receipts and disbursements, excluding general obligation bond proceeds, which are kept in a separate account. Capital Projects Funds moneys are also maintained in separate accounts.

All funds are invested in accordance with State law. The City may invest in direct obligations of the U.S., obligations of an agency or instrumentality of the U.S., certain grades of commercial paper, bankers acceptances of U.S. banks, certificates of deposit, savings accounts or depository receipts of savings and loan associations or member banks of the Federal Deposit Insurance Corporation, and certain municipal bonds.

The City's investment policy is to provide for effective cash management. The goal of the City's investment policy is to maintain and protect invested principal while striving to maximize total return on the portfolio consistent with limitations pursuant to guidelines set forth in Act 20, Public Acts of Michigan, 1943, as amended ("Act 20"). The City has not experienced material investment-related losses in any City-managed funds. As of April 1, 2006, the composition of the City's investment portfolio was as follows:

### Table 4 – Composition of General Fund Investment Portfolio
### April 1, 2006

| | |
|---|---|
| Pooled investment funds (1) ............................................................................ | 57.30% |
| U.S. Government securities ............................................................................ | 42.70 |
| Total................................................................................................ | 100.00% |

_____
(1) Consists only of permitted investments.

In accordance with Act 20, no investments may have a maturity longer than 10 years from the date of investment. As of April 1, 2006, the longest investment of the City's General Fund had a maturity of August 15, 2011.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 73 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit006 2013.3.32

**Table 5 – General Fund Investments (1)**

| | |
|---|---|
| Average monthly investment balance, Fiscal Year 2006 | $149,503,164 |
| Investment earnings, Fiscal Year 2005 | $ 3,353,721 |
| Investment earnings, Fiscal Year 2004 | $ 1,467,561 |

(1) Includes an average monthly balance of approximately $70 million which is considered restricted.

### *Budget Process*

The general content and process of developing the City's annual budget are prescribed by the Charter. The City's annual budget constitutes a financial plan for the next fiscal year which is required to set forth estimated revenues from all sources and all appropriations, including proposed capital appropriations. Any deficit during the preceding year is entered into the budget for the next fiscal year as an appropriation in accordance with the Charter. The total of proposed expenditures cannot exceed the total of estimated revenues so that the budget as submitted is a balanced budget.

The adoption of the budget provides for: (1) appropriations of specified amounts from funds indicated, (2) a specified levy of the property tax and (3) provision for the issuance of bonds specified in the capital agenda. The budget document, as adopted, becomes the basis for establishing revenues and expenditures for the fiscal year. The appropriation for every function of each City department is fixed, and expenditures may not exceed the original appropriation without City Council approval. If, during the fiscal year, the Mayor advises the City Council that there are available for appropriation revenues in excess of those estimated in the budget, the City Council may make supplemental appropriations up to the amount of the excess. In the case of revenue shortfalls, the Mayor may request that the City Council decrease certain appropriations. The Mayor is under no obligation to spend an entire appropriation. Also, at any time, upon written request by the Mayor, the City Council may transfer all or part of any unencumbered appropriation balance among programs, services or activities within an agency or from one agency to another.

Prior to the December submission of budget requests to the Budget Director, seven departments are required to attend a public meeting where input is received on programs and objectives for the coming fiscal year are addressed. These departments include Police, Fire, Public Works, Public Lighting, Health, Recreation, and Water and Sewerage. The initial budget proposal, which includes all department estimates of revenues and expenditures for the next fiscal year, is submitted to the Mayor by the Budget Department on or before the preceding February 22. The Mayor may revise the budget prior to submitting it to the City Council on or before April 12, the date for budget submission to the City Council established by City ordinance.

Prior to approval of the budget, the City Council holds hearings with various department and agency heads and also holds a public hearing. In addition, the Auditor General prepares an analysis of the proposed budget for the City Council. The City Council may amend the budget as presented by the Mayor on or before May 24. The Mayor may veto any City Council amendment, but must do so by the third business day after May 27. Any Mayoral veto of City Council amendments to the budget may be overridden by the City Council by a two-thirds vote of the members serving; provided, however, that the Council must act on or before the third calendar day or the second business day (whichever will provide the greater number of business days) following the maximum return date of the budget by the Mayor.

### *Budget Stabilization Fund*

In 1978, the State Legislature authorized municipalities to establish budget stabilization funds for the purpose of providing a method to stabilize financial operations. Prior to that time, municipalities were required to allocate any budget surplus to the following fiscal year. Accordingly, in 1979, the City by ordinance established the Budget Stabilization Fund to cover General Fund deficits, to restore a reduction in the number of employees (under certain circumstances) and to cover expenses arising because of a natural disaster.

B-10

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

In accordance with a City ordinance, one-half of any unappropriated General Fund surplus, up to the lesser of either 15% of the City's most recent General Fund budget or 15% of the average of the City's five most recent General Fund budgets, is transferred to the Budget Stabilization Fund in each fiscal year that a surplus is experienced, with the balance being available for other appropriations in the following fiscal year. The Budget Stabilization Fund had a balance of $8.5 million as of June 30, 2003, which was used to reduce the City's General Fund deficit in fiscal 2004, and the Budget Stabilization Fund has had a zero balance since that time. See "FINANCIAL OPERATIONS – Overview" and " – Recent Budget Results of the General Fund."

## FINANCIAL OPERATIONS

### *Overview*

This section contains a detailed description of various important financial matters. See especially "FINANCIAL OPERATIONS – Recent Budget Results of the General Fund" and "–Other Funds of the City."

### *Revenues and Expenditures of the General Fund*

The following tables set forth a comparison of revenues, expenditures and other financing sources and uses of the General Fund by major classification.

**(Balance of this page intentionally left blank)**

B-11

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08.201?:0?1.32

**Table 6 - Revenues and Expenditures of the General Fund**

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005** |
| | | | (in millions) | | |
| **REVENUES:** | | | | | |
| Taxes, assessments, interest and penalties: | | | | | |
| Property taxes................................................... | $ 152.8 | $ 169.7 | $ 166.3 | $ 184.8 | $ 179.0 |
| Municipal income tax ...................................... | 341.0 | 323.5 | 310.9 | 290.6 | 282.5 |
| Utility users tax ............................................... | 54.3 | 52.1 | 55.3 | 50.5 | 52.9 |
| Wagering taxes ................................................. | 85.8 | 109.4 | 111.3 | 116.1 | 138.0 |
| Other taxes....................................................... | 12.5 | 13.4 | 13.5 | 12.0 | 11.0 |
| Assessments, interest and penalties on taxes.............. | 8.0 | 10.8 | 9.3 | 14.0 | 11.5 |
| Total taxes, assessments, interest and penalties......... | 654.4 | 678.9 | 666.6 | 668.0 | 674.9 |
| Total licenses, permits and inspection charges.......... | 10.1 | 9.2 | 8.4 | 9.4 | 11.1 |
| Shared taxes: | | | | | |
| State revenue sharing....................................... | 333.3 | 333.8 | 319.1 | 286.5 | 282.9 |
| Other shared taxes .......................................... | 0.5 | 0.5 | 0.5 | 0.5 | 0.6 |
| Total shared taxes....................................... | 333.8 | 334.3 | 319.6 | 287.0 | 283.5 |
| Grants: | | | | | |
| State equity grant............................................. | 3.6 | 3.6 | 2.1 | 1.0 | 1.1 |
| Other grants ..................................................... | 73.7 | 70.7 | 63.9 | 78.6 | 66.4 |
| Total grants................................................. | 77.3 | 74.3 | 66.0 | 79.6 | 67.5 |
| Sales and charges for services ......................................... | 185.9 | 198.0 | 171.1 | 176.0 | 178.1 |
| Other revenues ............................................................... | 107.4 | 175.8 | 148.2 | 155.0 | 141.9 |
| Total revenues .......................................... | 1,368.9 | 1,470.5 | 1,379.9 | 1,375.0 | 1,357.0 |
| **OTHER FINANCING SOURCES:** | | | | | |
| Debt proceeds-General Obligation Limited Tax.............. | - | 50.3 | 56.0 | 209.9 | 248.4 |
| Transfer from Community Development Block Grants... | 16.6 | 21.4 | - | - | - |
| Transfer from Major & Local Street Funds .................... | 41.3 | 44.8 | 48.9 | 56.2 | 33.1 |
| Transfer from Capital Projects Funds ............................ | - | 0.8 | - | - | - |
| Transfer from Trust and Agency Funds........................... | 0.3 | - | - | - | - |
| Transfer from Component Units .................................... | 32.2 | - | - | - | - |
| Total Other Financing Sources.................................. | 90.4 | 117.3 | 104.9 | 266.1 | 281.5 |
| **Special Item**-Casino Development Revenue*................. | - | - | 63.8 | 38.3 | - |
| **TOTAL REVENUES AND OTHER FINANCING SOURCES**............................................... | $1,459.3 | $1,587.8 | $1,548.6 | $1,679.4 | $1,638.5 |

_____
\* Nonrecurring

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 76 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

| EXPENDITURES: | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** (in millions) | **2004** | **2005** |
| Executive agencies: | | | | | |
| Public Works ................................................. | $ 203.5 | $ 226.9 | $ 188.0 | $ 168.1 | $ 185.2 |
| Fire................................................................... | 155.4 | 151.2 | 161.2 | 182.2 | 202.2 |
| Health............................................................... | 89.0 | 97.9 | 102.2 | 88.9 | 87.9 |
| Police ............................................................... | 382.5 | 362.5 | 362.4 | 462.6 | 454.6 |
| Public Lighting ............................................... | 70.8 | 64.4 | 61.9 | 61.4 | 69.1 |
| Recreation ....................................................... | 48.1 | 53.9 | 59.3 | 53.6 | 67.5 |
| All other .......................................................... | 231.8 | 254.4 | 237.2 | 274.5 | 193.6 |
| Total executive agencies............................. | 1,181.1 | 1,211.2 | 1,172.2 | 1,291.3 | 1,260.1 |
| Legislative agencies ............................................. | 14.3 | 16.3 | 16.0 | 18.1 | 21.3 |
| Judicial agencies................................................... | 44.8 | 47.0 | 47.7 | 45.4 | 45.5 |
| Non-departmental(1) ............................................. | 82.6 | 167.0 | 227.8 | 222.8 | 165.6 |
| Total expenditures......................................... | 1,322.8 | 1,441.5 | 1,463.7 | 1,577.6 | 1,492.5 |
| | | | | | |
| **OTHER FINANCING USES:** | | | | | |
| Transfer to Community Dev. Block Grant Fund ........... | - | - | 1.3 | - | - |
| Transfer to Construction Code Fund ............................. | 6.4 | 3.0 | 6.0 | 4.0 | 0.5 |
| Transfer to Detroit Building Authority ......................... | 0.5 | 0.5 | 0.4 | 0.3 | 1.0 |
| Transfer to Human Services Fund ................................. | 4.5 | 4.0 | 6.5 | 5.7 | 4.3 |
| Transfer to Federal Employment & Training Funds...... | 0.1 | - | - | - | - |
| Transfer to Targeted Business Development Fund | - | - | - | - | 2.5 |
| Transfer to Debt Service Funds .................................... | 46.0 | 40.3 | 44.2 | 51.3 | 38.8 |
| Transfer to Capital Projects Funds ............................... | 6.6 | 1.7 | - | - | - |
| Transfer to Airport Fund (2) ......................................... | 1.9 | 3.6 | 2.5 | 2.8 | 2.6 |
| Transfer to Housing Fund ............................................. | - | 2.1 | 1.3 | - | - |
| Transfer to Transportation Fund (2) ............................. | 74.2 | 79.3 | 75.5 | 74.3 | 77.4 |
| Transfer to Municipal Parking Fund (2) ....................... | - | - | - | - | 9.6 |
| Transfer to Component Units ........................................ | 25.7 | - | - | - | - |
| Payment to Refunded Debt Escrow (3) ......................... | - | 49.4 | - | 41.4 | 96.8 |
| Total Other Financing Uses .................................... | 165.9 | 183.9 | 137.7 | 179.8 | 233.5 |
| | | | | | |
| **TOTAL EXPENDITURES AND OTHER FINANCING USES** ............................................ | $1,488.7 | $1,625.4 | $1,601.4 | $1,757.4 | $1,726.0 |

SOURCE: Derived by the Finance Department from audited financial statements. Totals may not add up exactly due to rounding.

_____

(1) Non-departmental includes items such as payment of damage claims, self-insurance fund contributions and other expenses that are not allocated on a departmental basis.
(2) The City has made transfers to certain enterprise funds for operating purposes. See "FINANCIAL OPERATIONS – Other Funds of the City – Enterprise Funds."
(3) Reflects refunding of certain limited tax obligations. See "FINANCIAL OPERATIONS – General Fund Revenue Categories."

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 77 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 77 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

*Fund Balance of the General Fund*

An analysis of changes in Fund Balance of the General Fund for fiscal 2001 through 2005 is as follows:

**Table 7 - General Fund Balance**

| | **Fiscal Year Ended June 30,** | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005** |
| Fund balance at beginning of year previously reported before restatement........................... | $ 217.1 | $ 218.1 | $ 206.2 | $ 140.3 | $ 69.2 |
| Fund balance restatement [1] ............................ | 32.9 | 19.7 | - | - | - |
| Fund balance at beginning of year, as restated | 250.0 | 237.8 | 206.2 | 140.3 | 69.2 |
| Revenues and other financing sources ............ | 1,459.3 | 1,587.8 | 1,548.6 | 1,679.5 | 1,638.5 |
| Expenditures and other financing uses............ | (1,488.7) | (1,625.4) | (1,601.4) | (1,757.4) | (1,726.0) |
| Increase (decrease) in reserve for other assets | (2.5) | 6.0 | (13.1) | 6.9 | (15.4) |
| Fund balance at end of year............................ | $ 218.1 | $ 206.2 | $ 140.3 | $ 69.2 | $ (33.6) |

SOURCE: Derived by the Finance Department from audited financial statements.

---

1  The General Fund has been restated to reflect the adoption of Governmental Accounting Standards Board ("GASB") Interpretation Number 6, "Recognition and Measurement of Certain Liabilities and Expenditures in Governmental Fund Financial Statements."

**(Balance of this page intentionally left blank)**

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 78 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

*Components of Fund Balance*

An analysis of the components of Fund Balance of the General Fund for fiscal 2001 through 2005 is as follows:

**Table 8 - Components of General Fund Balance**

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** (in millions) | **2004** | **2005** |
| Reserved Fund balance: | | | | | |
| Reserved for Encumbrances............................. | $ 98.0 | $ 59.2 | $ 96.8 | $48.9 | $35.3 |
| Reserved for the Budget Stabilization Fund..... | 34.1 | 7.7 | 8.5 | - | - |
| Reserved for Risk Management Operations..... | 44.8 | 51.8 | 50.5 | 35.9 | 29.2 |
| Reserved for BC/BS Insured Program (1)........ | - | - | 21.7 | - | - |
| Reserved for Motor Vehicle Operations .......... | - | - | - | 39.3 | 23.4 |
| Reserved for Inventory.................................... | 36.7 | 42.8 | 29.7 | 36.5 | 21.2 |
| Reserved for Short-Term Loans and Advances to Other Funds .......................... | 6.0 | 2.2 | 2.2 | 3.6 | 12.7 |
| Total Reserved Fund balance .................. | 219.6 | 163.7 | 209.4 | 164.2 | 121.8 |
| Unreserved Fund balance: | | | | | |
| Designated: | | | | | |
| For Accrued Compensated Absences.......... | - | 17.5 | - | - | - |
| For BC/BS Insured Program ...................... | 24.8 | 23.4 | - | - | - |
| Total Designated Fund Balance ............... | 24.8 | 40.9 | - | - | - |
| Undesignated: | | | | | |
| Total Undesignated Fund Balance........... | (26.4) | 1.6 | (69.1) | (95.0) | (155.4) |
| Total Unreserved Fund Balance (Deficit) ........ | (1.6) | 42.5 | (69.1) | (95.0) | (155.4) |
| Total Fund Balance | $218.1 | $206.2 | $140.3 | $69.2 | $( 33.6) |

SOURCE:   Derived by the Finance Department from audited financial statements.

_____

(1) The Blue Cross/Blue Shield Reserve component of the General Fund decreased from $21.7 million at June 30, 2003 to $-0- at June 30, 2004 as the result of a settlement agreement with the City's Retirement Systems, with $15.7 transferred to the Employee Benefit Fund (a fiduciary fund), and the remaining $6.0 million used to defray heath care costs during fiscal 2004.

*General Fund Revenue Categories*

The City's General Fund derives revenues from various sources.  The following table shows the percentage that various sources of General Fund revenues have contributed to total General Fund revenues for fiscal 2001 through 2005.

**(Balance of this page intentionally left blank)**

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 79 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:20

**Table 9 – Major General Fund Revenue and Other Financing Sources**

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005** |
| | (Percentage of Total) | | | | |
| Property taxes ............................................. | 11.2% | 11.5% | 12.1% | 13.4% | 13.2% |
| Municipal income tax ................................. | 24.9 | 22.0 | 22.5 | 21.1 | 20.8 |
| Utility users tax .......................................... | 4.0 | 3.5 | 4.0 | 3.7 | 3.9 |
| Wagering taxes ........................................... | 6.3 | 7.4 | 8.1 | 8.4 | 10.2 |
| State shared revenues ................................. | 24.3 | 22.7 | 23.1 | 20.8 | 20.8 |
| State equity grant ....................................... | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 |
| Sales and charges for services..................... | 13.6 | 13.5 | 12.4 | 12.8 | 13.1 |
| Other revenue, grants and financing sources (1)....... | 15.4 | 19.2 | 17.6 | 19.7 | 17.9 |
| Total ...................................................... | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

SOURCE:     Derived by the Finance Department from audited financial statements.

_____

(1)  See "FINANCIAL OPERATIONS – General Fund Revenue Categories – Other Revenue, Grants and Other Financing Sources" for a discussion of the sources of revenue included in this category.

The following is a description of the major General Fund revenue sources of the City.

Property Taxes

The City reports revenue from real and personal property taxes when measurable and available. Available is defined as "due and receivable within the current period, and collected within the current period or expected to be collected within sixty days thereafter."

The City's Taxable Value (defined in "ASSESSED VALUATION AND PROPERTY TAXES – Property Valuation and Tax Rate" below) has increased an average of 4.0% during each of the last five fiscal years ending June 30, 2007. The City contracted with a nationally recognized collection agency to collect certain real property tax delinquencies existing prior to March 1, 2004. The contract expires in fiscal 2006 and will not be renewed. Beginning March 1, 2004, the County began collection of the City's delinquent real property taxes. Act 246, Public Acts of Michigan, 2003, effective December 29, 2003, allows for the Treasurer of a city with a first class school district to return (transfer) all uncollected delinquent taxes levied on real property after December 31, 2004 to the county Treasurer on the March 1st immediately following the year in which the taxes are levied. On March 1, 2004, the City transferred to the County Treasurer the uncollected 2003 real property taxes. In June 2004, the City began receiving annual payments from the County for the General Fund and the Debt Service Fund which represent 2003 and later real property taxes that had been turned over to the County as delinquent. Taxes which remain uncollected are ultimately charged to the City as an offset against future payments and are reserved in accordance with City management estimates. See "ASSESSED VALUATION AND PROPERTY TAXES – Tax Levies and Collections." Since 1994, the State Legislature has enacted various statutes pertaining to assessments and assessment procedures. These changes have restricted the rate of growth on Taxable Value of property throughout the State. See "ASSESSED VALUATION AND PROPERTY TAXES." During fiscal 2001, the State Tax Commission issued new valuation multipliers that may be used by local assessors to value personal property, including certain contested utility personal property assessments in the City. See "ASSESSED VALUATION AND PROPERTY TAXES – Personal Property Tax Assessments and Appeals."

Municipal Income Taxes

The City levies an annual income tax, pursuant to State enabling legislation. The maximum rate consists of a tax of 2.5% on income earned and received (investment income included) by residents of the City,

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013   11:32

1.2% on corporate income earned in the City and 1.25% on income earned in the City by non-residents. The City has contracted with an outside collection firm to collect certain income tax delinquencies. The contract expires in fiscal 2006 and will not be renewed. See "ASSESSED VALUATION AND PROPERTY TAXES – Tax Levies and Collections."

Effective January 12, 1999, Act 500, Public Acts of Michigan, 1998 ("Act 500"), required a reduction in both resident and non-resident City income tax rates. The City's resident income tax rate of 3% was required to be reduced by 0.1% on each July 1, beginning July 1, 1999, until reaching 2%. The non-resident income tax rate was required to be reduced to maintain it at one-half of the resident income tax rate. Act 500 permits this statutory rate reduction schedule to be suspended under certain circumstances if at least three of the following four conditions exist: (1) funds have been withdrawn from the City's Budget Stabilization Fund for two or more consecutive fiscal years or the City's Budget Stabilization Fund balance falls to zero; (2) the City's inflation adjusted income tax revenue growth rate over the prior year is 0.95% or less; (3) the City's tax base growth rate is 80% or less of the State-wide tax base growth rate over a two-year period; or (4) the City's unemployment rate is 10% or higher. If three of these four conditions exist, the next scheduled rate reduction will be suspended until the following July 1, and the suspension may be extended if these conditions continue. Accordingly, the full implementation of the rate reduction may be delayed past July 1, 2008.

Act 500 also reduced the population threshold for levying local income taxes at rates in excess of 2% from 1,000,000 to 750,000. In addition, the then current Mayor proposed to City Council a phase-out of the corporate income tax over a similar 10-year period at the end of calendar 1999. The reduction of 0.2% became effective on January 1, 2000, with subsequent reductions on each January 1 following the scheduled July 1 reduction in the individual income tax rate, until the City's corporate income tax is eliminated by January 1, 2009, or such later date as may be applicable. Under City ordinance, the income tax rate reduction for corporations is also suspended whenever a suspension is granted by the State for resident and non-resident rates. Because of two successive one-year suspensions of the 0.1% resident income tax rate reduction granted to the City by the State pursuant to Act 500, the City corporate income tax rate for fiscal 2004 and 2005 remained the same at 1.2%. The scheduled reduction for fiscal 2005 was frozen and did not take effect. The City income tax rate for fiscal 2005 and 2006 is 2.5% for residents and 1.25% for non-residents. In December 2005, the City received a third suspension of its income tax rate reduction, effective for the period July 1, 2006 through June 30, 2007.

Utility Users Tax

The Utility Users Tax is a 5% excise tax on utility bills within the City, and may be levied only by cities with a population in excess of 750,000. The City recognizes Utility Users Tax revenues collected during the fiscal year and accrues cash received within 60 days of the fiscal year end, which is related to utility usage during the fiscal year. Act 197, Public Acts of Michigan, 2005, provides that all Utility Users Tax revenues shall be used to hire and retain police officers.

Wagering Taxes

There currently are three casino licensees operating casinos in the City. As permitted by Act 69, Public Acts of Michigan, 1997, in November 1997 the City's voters approved the imposition of a local tax of 9.9% on adjusted gross receipts from casino operations ("AGR") in the City. Also pursuant to Act 69, the City has imposed a municipal service fee of 1.25% of AGR, or $4 million per licensee, whichever is greater, to pay for the provision of municipal services. Act 306, Public Acts of Michigan, 2004, effective September 2, 2004, imposed an additional wagering tax of 6% of AGR, which is allocated one-third to the City and two-thirds to the State. Thus, the City currently collects a total of 11.9% on AGR as the wagering taxes in addition to such municipal service fee.

As a result of the taxes and fees described above, the City collected revenues from gaming facilities of $85.8 million in fiscal 2001, $109.4 million in fiscal 2002, $111.3 million in fiscal 2003, $116.1 in fiscal 2004 and $138.0 in fiscal 2005. Effective January 1, 2006, pursuant to an agreement with the three casinos in the

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 81 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.06.2013  11:52

City, an additional payment to the City of 1% of each casino's AGR was imposed on the casinos.  Also pursuant to the same agreement and effective January 1, 2006, an additional payment to the City of 1% of AGR was imposed on casinos that achieve at least $400 million in annual AGR  The City's Amended Fiscal Year 2006 Budget anticipated total revenues of $153 million from gaming facilities, which is expected to be realized.

Certain litigation which challenged the system by which the City had granted three casino licenses continued over several years, delaying both the finalization of the permanent casino development agreements and the construction of three permanent casinos and related hotel facilities in the City.  The litigation was finally resolved in 2005, and two of the three casinos have now commenced such construction.  See "CERTAIN ECONOMIC AND DEMOGRAPHIC INFORMATION – Major Projects and Developments."

Following a settlement with the State reached in 2002, the Sault Ste. Marie Tribe of Chippewa Indians sought U.S. Congressional approval of a casino, resort and convention center in Romulus, Michigan, approximately 20 miles from downtown Detroit (the "Romulus Casino").  Legislative efforts to secure federal approval of a casino license for the Tribe have been  pursued, but no action has been taken in the Congress. The potential effect, if any, of competition from the Romulus Casino on the City's existing gaming facilities, and the resulting effect on the City's revenues from gaming facilities, are unknown.

In the November 2004 election, Michigan voters approved a constitutional amendment which requires approval of any form of gaming, other than Indian tribal gaming and gaming in up to three casinos in the City, by a majority of State voters as well as a majority of voters in the city or township where the gaming will take place.

<u>State Revenue Sharing</u>

The City receives State revenue sharing payments from the State under the State Constitution and the State Revenue Sharing Act of 1971, as amended (the "Revenue Sharing Act").  State revenue sharing payments are State-shared revenues that can be used by a local unit of government for any purpose it deems appropriate.  As permitted by State law, the City has secured certain debt obligations with a pledge of its revenue sharing payments (sometimes called "Distributable Aid").  As of May 2, 2006, the City had approximately $36.76 million of such secured debt outstanding, the maximum aggregate annual debt service on which is approximately $13.6 million.  The City also has certain contingent obligations and expects to issue additional debt obligations in the future, including short-term debt for cash flow purposes, which will be secured by Distributable Aid both on a parity or subordinate basis.  See "FINANCIAL OPERATIONS – Other Funds of the City" and "INDEBTEDNESS OF THE CITY AND RELATED ENTITIES."

The City's receipts under the State revenue sharing program are based upon components as shown in the table below.  Of the components, only the sales tax distribution is mandated by the State Constitution.  The other components are authorized by legislative action and distribution is subject to annual State appropriation by the State Legislature, and may be reduced or delayed by Executive Order during any fiscal year in which the Governor, with the approval of the Legislature's appropriation committees, determines that actual revenues will be less than the revenue estimates on which appropriations were based.  See "FINANCIAL OPERATIONS – Recent Budget Results of the General Fund."

The table below shows State revenue sharing distributions received by the City during fiscal 2001 through 2005.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 82 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08.2011 11:32

**Table 10 – State Revenue Sharing**

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003**<br>(in millions) | **2004** | **2005** |
| Revenue sharing | | | | | |
| Sales tax-constitutional.............................. | $ 61.2 | $ 61.8 | $ 62.9 | $ 62.7 | $ 63.7 |
| Sales tax-statutory .................................... | 270.7 | 270.2 | 255.0 | 223.8 | 219.2 |
| Total State revenue sharing ....................... | $331.9 | $332.0 | $317.9 | $286.5 | $282.9 |

SOURCE:  Derived by the Finance Department from audited financial statements.

The State's ability to make revenue sharing payments to the City in the amounts and at the times anticipated in the City's budgets could be affected by the State's financial condition and its ability to finance any temporary cash flow deficiencies.  The distribution of sales tax revenues to the City may also be affected by changes in the City's population after 2007.  It is also possible that future legislative changes could reduce revenue sharing distributed to the City.

State Equity Grant

The Detroit Main Library received substantially reduced funding in fiscal 2005, compared to prior years, from a State equity grant program which is phasing out.  The Detroit Main Library received $0.8 million from such program in fiscal 2005, compared to grant amounts of $7.8 million, $8.3 million, $7.7 million and $6.6 million received in fiscal 2001, 2002, 2003 and 2004, respectively.

Sales and Charges for Services

Receipts for sales and charges for services include such items as maintenance and construction charges, electrical fees, recreation fees, property tax collection fees and personal service fees.  Actual receipts decreased from $185.9 million in fiscal 2001 to $178.1 million in fiscal 2005.

Other Revenue, Grants and Other Financing Sources

Other revenue and other financing sources generally consist of fines, inspection fees, interest on investments, real estate rentals, sales of property and transfers.

General Fund expenditures include the federal share of the cost of services for personnel employed in various General Fund agencies.  The Community Development Block Grants and a small amount under the Job Training Partnership Act fund the federal share.

The grants listed under "Other Grants" (which are usually for health-related activities or community development projects) are generally received on a drawdown basis.  Increases or decreases in expenditures would not have a direct effect on fund balances, since revenues would likewise be increased or decreased.  The annual budget contains the full amount of an expected grant even though total expenditures may not be realized.

The following table compares budgeted and actual revenues and expenditures for certain major General Fund categories for fiscal 2003 though 2005.  Also included are the budget amounts for fiscal 2006 and 2007.

B-19

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08.2013 11:32

**Table 11 – Comparison of Major Budget Classifications-General Fund**

**Fiscal Year Ended or Ending June 30,**

| Category | 2003 Budget | 2003 Actual | 2004 Budget | 2004 Actual | 2005 Budget | 2005 Actual | 2006 Budget (1) | 2007 Budget (2) |
|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | |
| Property tax | $ 174.7 | $ 166.3 | $ 188.2 | $ 184.8 | $ 215.7 | $179.0 | 188.2 | $ 168.8 |
| Municipal income tax | 323.5 | 310.9 | 300.4 | 290.6 | 319.0 | 282.5 | 275.1 | 271.4 |
| State revenue sharing | 332.0 | 319.1 | 310.8 | 286.5 | 286.1 | 282.9 | 283.5 | 282.6 |
| Utility Users Tax | 54.7 | 55.3 | 54.6 | 50.5 | 55.0 | 52.9 | 49.7 | 56.0 |
| Wagering taxes | 105.0 | 111.3 | 110.0 | 116.1 | 117.6 | 138.0 | 153.0 | 178.2 |
| State equity grant | 2.5 | 2.1 | 0.2 | 0.2 | 1.2 | 1.1 | 0.8 | 0.0 |
| Total | $ 992.4 | $ 965.0 | $ 964.2 | $ 928.7 | $ 994.6 | $ 936.4 | $950.3 | $957.0 |
| Total General Fund Revenues | $1,419.4 | $1,379.9 | $1,497.8 | $1,375.1 | $1,587.5 | $1,357.0 | $1,400.4 | $1,435.1 |
| % of Total General Fund | 69.9% | 69.9% | 64.4% | 67.5% | 62.7% | 69.0% | 67.9% | 66.7% |
| **Expenditures** | | | | | | | | |
| Police | $349.5 | $362.4 | $ 418.0 | $462.6 | $475.2 | 454.6 | $337.1 | $394.8 |
| Department of Public Works | 203.3 | 188.0 | 171.6 | 168.1 | 183.4 | 185.2 | 125.4 | 112.8 |
| Fire | 147.2 | 161.2 | 182.7 | 182.2 | 207.4 | 202.2 | 162.9 | 170.8 |
| Public Lighting | 66.1 | 61.9 | 64.7 | 64.5 | 65.9 | 69.1 | 67.5 | 66.5 |
| Recreation | 73.1 | 59.3 | 51.6 | 53.6 | 50.0 | 67.5 | 32.7 | 18.5 |
| Total | $ 839.2 | $ 832.8 | $ 888.6 | $ 931.0 | $ 981.9 | $ 978.6 | $ 725.6 | $ 763.4 |
| Total General Fund Revenues | $1,419.4 | $1,463.6 | $1,497.8 | $1,577.6 | $1,587.5 | $1,492.5 | $1,400.4 | $1,435.1 |
| % of Total General Fund | 59.1% | 56.9% | 59.3% | 59.0% | 61.9% | 65.6% | 51.8% | 53.2% |

SOURCE:   Budget Department and Finance Department.

_____

(1) City's Budget as adopted.  The City's Budget is revised from time to time to reflect carry-forward amounts, as well as amendments during the course of the year.  Property Taxes budget was amended in fiscal 2005 to reflect the revenues from the County as current instead of delinquent property tax revenues.

(2) City's Fiscal Year 2007 Executive Budget.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 84 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

*Recent Budget Results of the General Fund*

The General Fund results for fiscal 2003, 2004 and 2005 and the General Fund Budget for fiscal 2006 are discussed below. The proposed Fiscal Year 2007 Executive Budget submitted by the Mayor for City Council consideration on April 12, 2006 also is discussed below.

Fiscal Year 2003

The Fiscal Year 2003 Budget of $1.4 billion represented a 5.9% decrease over the Fiscal Year 2002 budget. The Budget was based on conservative revenue estimates due to a downturn in the economy, continuation of the cap on State Revenue Sharing (the City's largest revenue source) and controlled spending assumptions. Detroit's State Revenue Sharing payment, including the Library's share, set by statute at $333.9 million, was cut with the passage of Act 679, Public Acts of Michigan, 2002, to $322.2 million and was further reduced by passage of Act 168 to $319.1 million.

Income tax was budgeted at $323.5 million, a less than 1% decrease from fiscal 2002 projections. This was due to an anticipated stabilization in the economy and the 0.1% decrease in the income tax rate. The actual income tax collected was $310.9 million.

Property tax was budgeted at $174.7 million, an increase of 11.02% over the fiscal 2002 estimates. This was based on a 4.4% increase on the *ad valorem* roll and assumed a 5.1% overall increase when industrial facilities and neighborhood enterprise zone rolls were included. The actual property tax receipts were $166.3 million.

The wagering taxes were budgeted at $105.0 million, which was 9.6% higher than the fiscal 2002 projections. Actual wagering taxes receipts for fiscal 2003 amounted to $111.3 million, a 1.6% increase over fiscal 2002 results. The City also received an additional payment from the casinos aggregating $63.8 million in fiscal 2003 related to the renegotiation of the location (no longer on the riverfront) and hotel size of the permanent casino facilities (each reduced to 400, instead of 800, rooms).

The Fiscal Year 2003 Budget did not include provisions for a wage adjustment with the City's bargaining units. In general, vacant positions were eliminated from the Budget, reflecting 549 fewer budgeted positions than for fiscal 2002. The Airport budget reflected a reduction of 17 positions due to the loss of an air carrier. The Police Department budget reflected a net reduction of 121 uniform positions, primarily due to loss in grant funding. The Library Department lost 61 positions due to reduction in State funding.

The Fiscal Year 2003 Budget again included contributions to some enterprise funds. The Airport subsidy was $2.4 million, a $360,000 increase over fiscal 2002, also due to the loss of a major carrier. The subsidy to the Detroit Department of Transportation ("DDOT") was $4.6 million less, at $69.4 million, than in fiscal 2002, due primarily to an increase in fares of 25 cents. The Detroit People Mover subsidy also decreased by $568,000, to $10.8 million.

The City's Housing Fund accounted for the public housing function administered through the Detroit Housing Commission ("DHC"). In June 2003, the Michigan Supreme Court unanimously affirmed the opinion of the Michigan Court of Appeals in ruling that the 1996 amendments to the Michigan Housing Facilities Act severed by operation of law the City's employment relationship with personnel assigned to and employed by the DHC, to be effective July 1, 2003. This confirmed DHC's status as a separate and autonomous entity without need for legislative action by the Detroit City Council.

Two post-year end events contributed $55 million of the $69 million deficit: a write-off of $18 million of accounts receivable owed by the DHC, which was then an enterprise fund of the City, and an additional $37 million contribution (representing a $35 million judgment plus $2 million in interest) to the Police and Fire Retirement System Funds as a result of a lawsuit. The City filed a deficit elimination plan with the State and took action in fiscal 2004 to eliminate the deficit.

B-21

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

Fiscal Year 2004

The Fiscal Year 2004 Budget of $1.5 billion represented a 5.5% increase over the Fiscal Year 2003 Budget. The Fiscal Year 2004 Budget was based on assumptions of continuing slow growth in the local economy, cuts in State Revenue Sharing and controlled spending. The City's total revenue sharing payments for fiscal 2004 were expected to amount to $290.3 million. This was a $43.6 million or 13.1% reduction from the prescribed amount pursuant to the 1998 Amendments. Actual payments received for fiscal 2004 were $286.5 million.

Income tax collections for fiscal 2004 were budgeted at $300.4 million, representing a 7.1% decrease from the prior year, reflecting once again the economic challenges in the City's and State's economies, as well as the 0.1% reduction in the income tax rate. In December 2003, the City requested and received approval from the State to suspend its income tax rate reduction for a one-year period concluding July 1, 2005. Actual income taxes received for fiscal 2004 were $290.6 million.

Property tax was budgeted at $188.2 million, a 7.7% increase over fiscal 2003. The City contracted with an outside collection firm to collect delinquent property taxes owed for years prior to fiscal 2003, income taxes and water/sewerage bills. Although actual collections were less than expected, property tax collections for fiscal 2004 amounted to $184.8 million, which included the payment of $37.4 million received from the County upon the transfer of fiscal 2003 delinquent real property taxes to the County for collection.

The wagering taxes were budgeted for a small increase of $5 million or 4.8% over the Fiscal Year 2003 Budget. Actual wagering taxes collections for fiscal 2004 were $116.1 million, a $4.8 million (4.3%) increase from actual collections in fiscal 2003. The City also received a nonrecurring additional payment from the casinos aggregating $38.3 million in fiscal 2004 related to the renegotiation of the location (no longer on the riverfront) and hotel size of the permanent casino facilities (each reduced to 400, instead of 800, rooms).

While budget expenditures were reduced in a number of major categories, there were some significant adjustments related to personnel costs. The Fiscal Year 2004 Budget included a proposed wage increase of 5% for uniformed employees, a 2% increase for civilian employees and special pay adjustments for certain employee categories. Employee benefits experienced a significant increase due to higher health insurance costs and pension contributions for both uniform and civilian employees. Offsetting these increases was the overall reduction of 138 General Fund budgeted positions.

The Fiscal Year 2004 Budget again included contributions to some enterprise funds. The Airport subsidy was $2.8 million, a $258,000 increase over fiscal 2003, reflecting increased personnel costs. The subsidy to the DDOT remained at $68.2 million. The Detroit People Mover subsidy decreased by $0.5 million to $10.3 million.

The Fiscal Year 2004 Budget contained a number of management initiatives. A Program Management Office was established to assist the City administration in managing large projects as well as restructuring City operations in order to improve efficiency and effectiveness of City services. The Grants Acquisition Office was established to help coordinate and improve the City's efforts in identifying, applying for and securing grants.

For fiscal 2004, the City administration withdrew $8.5 million from its Budget Stabilization Fund, reducing its balance to zero, sold $61 million in Fiscal Stabilization Bonds and reported a budget deficit of $95 million. This fiscal 2004 deficit amount was $26 million larger than the deficit reported in fiscal 2003. The deficit increase was a result of revenue shortfalls in income tax, utility users' tax and state revenue sharing collections, in addition to unexpected increases in pension and employee benefits, and unbudgeted expenses related to the 800-megahertz communication system. The City filed a deficit elimination plan with the State and took action in fiscal 2005 to eliminate the deficit.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 86 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

<u>Fiscal Year 2005</u>

The Fiscal Year 2005 Budget of $1.6 billion reflected the continuing slow growth in the local economy, cuts in State revenue sharing and controlled spending assumptions. The City's total revenue sharing payments for fiscal 2005 were budgeted at $286.1 million, actual payments totaled $282.9 million. The Fiscal Year 2005 Budget included a $61.1 million financing to fund a payment to the Risk Management Fund and an $80.1 million benefit from the issuance of pension certificates of participation during fiscal 2005.

Income tax collections for fiscal 2005 were budgeted at $319 million, a 6.2% increase over the prior fiscal year. This increase was due to a one-year suspension of the 0.1% rate reduction permitted under Act 500, Public Acts of Michigan, 1998 ("Act 500"), if the City met three out of four conditions set forth in such Act for the year. However, income tax collections continued to decline and yielded $282.5 million for fiscal 2005.

Property tax revenues were budgeted at $215.7 million, an increase of 14.6% over fiscal 2004. This increase was due primarily to the transfer of delinquent real property taxes to the County. See "FINANCIAL OPERATIONS – General Fund Revenue Categories: Property Taxes." Fiscal 2005 Taxable Value increased by 6.3% on the *ad valorem* roll and decreased 5.9% on the industrial facilities and neighborhood enterprise zone tax rolls. Actual property tax receipts totaled $179.0 million. The Fiscal Year 2005 Budget included an additional $3.5 million from a personal property tax audit. The audit was the result of a two-year grant program funded by the State. The outcome of the program was an increase in personal property taxable valuations beginning with the 2005 tax year.

The wagering taxes were budgeted at $117.6 million, a $7.6 million increase over the prior fiscal year, but yielded approximately $138.0 million in fiscal 2005. This significantly increased wagering taxes revenue was primarily due to tax rate increases enacted in Act 306, Public Acts of Michigan, 2004, from which the City received a 2% increase in its wagering taxes rate, bringing the City's total wagering taxes rate to 11.9%.

Based on a comparative study by consultants hired by the City, which recommended increases in various user fees charged by the City, the Fiscal Year 2005 Budget included an increase of $4 million in user fees.

On the expenditure side, the Fiscal Year 2005 Budget reflected a reduction of 997 positions, including 377 layoffs, elimination of 263 vacant positions, and 357 DHC positions no longer reported in the City's budget. The Fiscal Year 2005 Budget included a pay raise of 2% for civilian employees and 5% for uniform employees. Pension and health care costs increased. Contractual services, operating supplies and capital equipment were reduced by a total of $14.2 million (9.6%) from the prior fiscal year. The Fiscal Year 2005 Budget included contributions to certain Enterprise Funds. The Airport subsidy was $2.5 million, a reduction of $200,000 from fiscal 2004. The Buildings and Safety Engineering Department subsidy of $1.9 million was eliminated. The DDOT subsidy was $71.2 million, an increase of $3.4 million.

The Fiscal Year 2005 Budget also included many new initiatives. The Department of Administrative Hearings was established to strengthen code enforcement efforts by assessing and collecting civil fines and costs for blight violations. This Budget implemented a reduction of 57% in City employee take-home vehicles through a new policy that provided vehicles to employees on an economic and business basis rather than as a fringe benefit. Professional facility managers conducted a review of City-wide leases with a view toward consolidation and renegotiation.

In response to the recognition of a projected deficit for fiscal 2005, additional mid-year layoffs of 686 employees were implemented in March 2005, as well as the elimination of 237 vacant positions. Additional cuts in salary expenses were instituted beginning with a 10% reduction in salary for mayoral appointees and non-union employees. The 10% salary reduction for non-union employees was put into effect beginning July 1, 2005. Vendors were asked to take a 10% reduction in contractual costs, with limited success. Other

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 87 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

expenditure reductions were made, including overtime costs, the elimination of non-essential purchases and restrictions on travel. In addition, $71 million from the sale of bonds was applied to fund capital expenditures accrued in fiscal 2004 and 2005 on the 800-megahertz communication system. The City estimated for Fiscal Year 2006 Budget purposes that it would finish fiscal 2005 with a General Fund deficit of approximately $101.7 million. The actual fiscal 2005 deficit was $155.4 million, or $60.4 million higher than the deficit reported in fiscal 2004. This deficit was a result of revenue shortfalls principally in property tax, income tax, sales and charges for services and sale of real property offset somewhat by increase in wagering taxes. The City addressed these shortfalls by reducing expenditures by $91.4 million (net of grant receipts and expenditures). The City filed a deficit elimination plan with the State and took action in fiscal 2006 to eliminate the deficit.

Fiscal Year 2006

On May 24, 2005, City Council adopted a balanced budget for fiscal 2006 that built upon significant cuts in existing City departments, broad-based expenditure reductions and provisions for an anticipated carryover of undesignated General Fund deficit from fiscal 2005 estimated at $101.7 million, which was required to be funded by an appropriation in the Fiscal Year 2006 Budget. The actual carryover 2005 deficit was $155.4 million.

The Fiscal Year 2006 Budget of $1.4 billion represents a 11.79% decrease from the Fiscal Year 2005 Budget. The Fiscal Year 2006 Budget assumed continued slow growth in the local economy, lower estimated tax revenues and continued controlled spending assumptions. The City budgeted $283.5 million in revenue sharing payments, based on the State projected payments. The City currently estimates that revenue sharing payments will total $280.8 million.

Income tax collections for fiscal 2006 were budgeted at $275.1 million, an 11.5% decrease from the prior fiscal year. This decrease reflects actual fiscal 2005 income tax collections and the continued decline in the local economy and employment. The City was again granted by the State a one-year suspension of the 0.1% income tax rate reduction permitted under Act 500. The City estimates that income tax collections will total $273.5 million in fiscal 2006. The City will continue to petition the State to suspend additional income tax reductions in future years as allowed. Under City ordinance, the income tax rate reduction for corporations is also suspended whenever a suspension is granted for resident and non-resident rates. Also included in the fiscal 2006 income tax revenue estimate is a reduction of the personal exemption from $750 to $600 that was approved by City Council.

General Property taxes were budgeted at $188.2 million, a decrease of 12.7% from fiscal 2005 due to a reduction in estimated delinquent tax collections. Taxable valuation estimates have increased by 5.0% on the *ad valorem* tax roll, decreased by 11.5% on the industrial facilities roll and increased by 19.3% on the neighborhood enterprise zone tax roll. The Fiscal Year 2006 Budget includes delinquent tax collections from the County and from an outside collection firm. Actual property tax collections for fiscal 2006 are now estimated at $185.1 million.

The wagering taxes were budgeted at $153 million, a $35 million increase over the prior fiscal year's budgeted amount. The budgeted increase was due to a State increase in the wagering taxes rate of 2% as of September 1, 2004, and the City's receipt of 1% of all AGR plus an additional 1% of AGR of individual casinos reaching $400 million in annual AGR, commencing January 1, 2006, pursuant to agreements between the City and the three casinos in the City. See "FINANCIAL OPERATIONS - General Fund Revenue Categories – Wagering Taxes" above. Two of the three casinos are expected to reach $400 million of AGR by November or December 2006. The City estimates that the wagering taxes for fiscal 2006 will total $157.1 million.

The Fiscal Year 2006 Budget included plans for sweeping reductions of expenditures. A total of 2,992 budgeted positions, including 686 mid-fiscal 2005 layoffs, were eliminated in the Fiscal Year 2006

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

Budget in addition to a proposed 10% reduction in salary costs for non-uniformed employees. The 10% salary reduction was to be achieved for the City's unionized civilian employees by requiring days off without pay. While the non-union reduction was achieved, the City was unable to reach agreements with its unions for that portion of the reduction. No wage increases were included in the Fiscal Year 2006 Budget for either civilian or uniformed employees.

A study of health care benefits was performed by a nationally recognized consulting firm, which identified cost savings in the areas of hospitalization, dental and vision benefits. The renegotiation of employee health care benefits was expected to generate significant cost savings of $47 million. The City's unions have not approved salary and health care reductions and an agreement has not yet been reached with all of them. In January, the City administration determined that because the proposals were not approved, further reductions to the City's work force were required to realize the necessary savings and it implemented an additional 414 layoffs to help meet this savings goal.

The Fiscal Year 2006 Budget continued reductions in take-home vehicles; a total of 62 general assigned vehicles were eliminated, as well as 100 police general assigned vehicles. All eliminated vehicles were sold at auction. In addition, no appropriations were recommended in the General Fund for vehicle fleet replacement.

Also included in the Fiscal Year 2006 Budget was business process redesign involving a new centralized mailroom to achieve savings in postage costs across the City, centralization of document production and the elimination of bulk refuse collection during slow winter months based on a best practices study. On January 31, 2006, the City eliminated all bulk pick up, resulting in an annual savings of $20 million.

The Fiscal Year 2006 Budget anticipated the reduction of the subsidy for the Detroit Zoological Institute. On March 1, 2006, the City Council approved an operating agreement transferring Detroit Zoological Institute operations to the Detroit Zoological Society, eliminating an estimated $5 million annual net cost to the City. The City also transferred operations of the Detroit Historical Museum to the Detroit Historical Society, eliminating another $1.6 million annual subsidy.

The Fiscal Year 2006 Budget included contributions to certain Enterprise Funds. The DDOT subsidy was $83.5 million, an increase of $4.1 million from the fiscal 2005 budgeted amount. Also included was a $2.6 million subsidy for the Detroit City Airport.

Five of the 10 Neighborhood City Halls under the Mayor's Office and other expenses of the Mayor's Office were eliminated in fiscal 2006 for a reduction of $2.4 million. An additional $2.1 million was reduced from the fiscal 2006 budgets for certain of the City's planning and development agencies.

Additional reductions in fiscal 2006 expenditures were adopted by City Council for the Police and Fire Departments. The City Council approved a $22.9 million (10%) reduction in wage costs for uniformed police and fire personnel. These wage reductions required approval of the police and fire unions and are further subject to arbitration under the State compulsory arbitration act. In addition to the foregoing, the City Council approved reduced funding of $53.7 million in the Police Department budget and $15.1 million in the Fire Department budget, which does not require approval by the police or fire unions.

In June 2005, the Mayor proposed amendments to the Fiscal Year 2006 Budget to restore $23.4 million in cuts to the Police and Fire Departments. This $23.4 million cut would have resulted in the layoff of 182 police officers and 73 firefighters. To maintain a balanced budget, the restoration of funding for the Police and Fire Department cuts were provided from a reduction to the payment to the Risk Management Fund of $12.5 million. In addition, the Utility Users Tax revenue was increased by $6.3 million. The State passed legislation in October 2005 that eliminated the staffing requirements for officers which would have required a reduction in the Utility Users Tax rate if required staffing levels were not maintained. The General

B-25

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

Fund subsidy of $2.6 million to the Detroit City Airport was eliminated, as well as $2 million for 36th District Court operations at the same time.

On June 27, 2005, City Council approved the Mayor's proposed amendments. The amendment also restored funding of $540,000 for the Department of Homeland Security that was initially cut in the Adopted 2006 budget.

At the end of August 2005 the Mayor and the Chief of Police presented a plan to reorganize the Police Department. The plan recommended 150 layoffs. In addition, the Mayor and the Fire Commissioner presented a plan for the Fire Department that resulted in 75 layoffs. The Fire Department layoffs were delayed by the Firefighters' Union which obtained an injunction to prevent implementation. Ultimately, the City layed off 61 firefighters.

Both reorganization plans proposed by the Mayor called for fewer layoffs than the City Council had contemplated when it passed the Fiscal Year 2006 Budget, resulting in a funding shortfall for both the Police and Fire Departments, which the Mayor addressed along with other negative variances by a series of budget amendments and several initiatives that impacted a significant number of the General Fund departments, excluding the Police and Fire Departments. The most significant was the closing of nine Recreation facilities with about 150 accompanying layoffs. A second significant item reduced the General Fund subsidy to the DDOT by $8 million. This is the same amount that the City Council provided in additional funding to the DDOT during its budget deliberations.

The Fiscal Year 2006 Budget contained salary and health related concessions from employee unions which have failed to receive union approval. As a result, in July 2005 the City issued layoff notices to 209 employees, representing an annualized savings of $8.3 million. Because of this failure to reach agreement, the City will incur $17.5 million in unbudgeted costs by the end of fiscal 2006. In addition, the health care concessions are not expected to be approved by fiscal year-end, which will cost the City an additional $42 million. The adopted Fiscal Year 2006 Budget also contained an increase of $15 million for pension funding obligations, which will be eliminated by the fiscal 2006 year-end as a result of the transaction described in the next paragraph.

The governing boards of the City's two pension systems voted on February 8 and March 30, 2006 to extend the amortization periods for funding their respective unfunded actuarial accrued liabilities ("UAAL") to 30 years (instead of 20 and 12 years, respectively). As a result, the City will replace certain scheduled contractual payment obligations that it incurred to provide funding for UAAL of the pension systems with new contractual obligations payable over a longer period to match their extended amortization periods. The transaction will result in a fiscal 2006 benefit to the General Fund of approximately $20 million.

To further address the above fiscal challenges, the City administration implemented $23.5 million of budget initiatives including additional departmental cuts and other initiatives. The Municipal Parking Department, an enterprise fund of the City, sold its Greektown Parking Garage to the Greektown Casino owners. The net proceeds to the General Fund from this sale, after providing for the retirement of related bond obligations, were approximately $28 million. The City is currently exploring other opportunities to divest itself of non-core assets.

The City has experienced a reduction in risk management expenditures as a result of changes in risk management practices resulting in the ability to reduce transfers to the Risk Management Fund by $30 million.

As a result of the reduction in City staff, the City is in the process of selling excess inventory and expects to realize $10 million from such sales.

The City's grant-funded departments have identified $2 million in General Fund costs that are eligible for reimbursement from grant dollars. Utilizing a matching grant from the State and a consulting firm with

B-26

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

expertise in the personal property tax area, the City engaged in a two year study to identify unreported personal property in order to collect the related personal property taxes. Another major initiative is the City's decision to proceed through a "fact finding" process relating to employee pay. This process, which is provided for in State law, will allow the City to impose on its civilian unions the City's last best offer of a 10% pay cut. While the City strongly feels it will be successful, this process will take several months, as a result it is estimated that it cannot be implemented until after the end of fiscal 2006.

The City now estimates that it will complete fiscal 2006 with a deficit of $63.0 million which it has budgeted for elimination in fiscal 2007. This represents a reduction of over $90 million from the fiscal 2005 deficit of $155.4 million. The City continues to pursue expenditure controls, property sales, collection of delinquent taxes, revenue securitization and other initiatives in order to reduce this deficit further.

Fiscal 2007 Budget

On April 12, 2006, the Mayor submitted a balanced Fiscal Year 2007 Executive Budget for consideration by the City Council that included a provision for an estimated $63 million deficit carryover from fiscal 2006. The City administration believes that Fiscal Year 2007 Executive Budget is based upon management's conservative revenue and expenditure assumptions.

The proposed Fiscal Year 2007 Executive Budget of $1.4 billion is essentially unchanged in the total from the Fiscal Year 2006 Budget. The City's total revenue sharing payments are budgeted at $282.6 million, a decrease of $0.3 million versus fiscal 2005 revenue sharing receipts of $282.9 million.

Income tax collections for fiscal 2007 are budgeted at $271.4 million, a $3.6 million decrease from the amount budgeted budgeted for fiscal 2006 and a decrease of $2.1 million from estimated fiscal 2006 income tax receipts. Fiscal 2007 collections assume the continuing suspension by the State of a statutory 0.1% income tax rate reduction as permitted under Act 500.

General Property Tax receipts are budgeted at $168.5 million, a decrease of $19.5 million from the amount budgeted in fiscal 2006. This reflects taxable valuation growth offset by the implementation of the Mayor's initiative to change the way refuse collection and disposal is funded. Under this initiative, the City will cease collecting three mills of its property taxes which are dedicated to refuse collection and instead begin charging a fee for service of $300 annually per home with provisions for hardships and senior discounts. Billing is expected to occur on a quarterly basis and any delinquent accounts will be added to the property tax bill and become a lien on real property. The City estimates that $67.2 million will be generated by the fee, $40 million more than had been collected from the three mills.

The wagering taxes receipts are budgeted at $178.3 million versus a Fiscal Year 2006 Budget amount of $153.0 million reflecting a full year of collections of the additional 1% under the City's agreements with the three casinos in the City, as well as additional revenues based on an increase in casino gross receipts.

Significant savings are anticipated in the Fiscal Year 2007 Executive Budget from three initiatives. First, the administration expects to impose days off without pay on union employees in July pursuant to provisions in State law which allow it to impose its last best offer after fact finding and the lapse of a 60-day "cooling off" period, which will lapse in July 2006. This initiative is budgeted to save $11.0 million. Second, the City has budgeted $58 million in savings through changes in health care design, employee contribution increases and reduction in administrative fees and rates. These plan changes will be imposed pursuant to the provisions of State law. Third, approximately $20 million in savings are expected to result from the City's replacing certain scheduled contractual payment obligations that it incurred to provide funding for unfunded accrued actuarial liabilities of its pension systems with new contractual obligations payable over a longer period to match the recent extensions of the amortization periods for funding the systems' UAAL.

B-27

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

Other budget items include an additional 77 layoffs to take place on July 1, 2006 and the expenditure of $20 million to replace vehicles throughout the fleet. The Detroit Historical Society will be granted an operational subsidy of $500,000 and the Detroit Zoological Society will receive $900,000 for insurance and security pursuant to its operating agreement with the City. The Charles H. Wright Museum of African American History will receive a $1.4 million subsidy increased from $1.0 million. Public Lighting will save a net $8 million in reduced fuel costs by implementing a VAR (Volt Amphere Reactive) program, which will reduce fuel utilization.  The DDOT subsidy will be reduced by $7.1 million and revenues increase by $2.7 million through the imposition of a $0.75 fare for disabled riders. The Greater Detroit Resource Recovery Authority ("GDRRA") tipping fee of $85.5 million reflects a $5.2 million increase including $2.8 million toward reducing a prior year deficit. The budget includes no subsidy for the airport.

Another of the Mayor's initiatives is the establishment of the General Services Department through the transfer of 629 positions from various agencies including DPW, Recreation, Public Lighting, Health, Civic Center and Elections. The department consolidates fleet management, skilled trades, security, building and grounds maintenance, and inventory management. This consolidation is expected to save $4.5 million through such things as coordinated purchasing and inventory management.

The City believes that the annualized effect of cuts it has already implemented combined with initiatives proposed in the Fiscal Year 2007 Budget will bring its financial operations into structural balance.

On May 24, 2006 the City Council, by a 6-3 vote, approved a balanced Fiscal Year 2007 Budget with certain amendments to the Fiscal Year 2007 Executive Budget. The resulting Fiscal Year 2007 Budget, as amended, is currently in effect. The principal amendment restored quarterly bulk trash pick-up at an estimated $9 million cost to the City. This additional expenditure was offset by increasing the estimate of wagering taxes receipts by $4 million, reducing deposits to the Targeted Business Fund by $5 million and increasing user charges in the Police Department and the Department of Public Works by $1.5 million.  The City Council also reduced the Mayor's proposed $0.75 bus fare for disabled riders to $0.50, and offset that change by adding a $0.50 bus fare for seniors.  Together with other minor changes, the City Council's amendments increased the total Fiscal Year 2007 Executive Budget by less than 1%.

***Other Funds of the City***

Debt Service Funds

The City, by State law, must provide a separate fund for debt retirement moneys.  Debt service on unlimited tax general obligation bonds is funded from *ad valorem* property taxes levied without limitation as to rate or amount specifically for that purpose.  Debt service on limited tax general obligation bonds is funded from property taxes levied within constitutional, statutory and Charter limitations or other unrestricted moneys of the City.  All City property taxes are collected by the Treasurer and deposited in the appropriate funds according to the proper distribution percentage.

Enterprise Funds

The City currently has five enterprise funds.  The revenues of the enterprise funds are not available to pay principal of and interest on bonds other than those issued by or on behalf of a particular enterprise operation.  Individual financial statements for the enterprise funds described below have not been included in this Official Statement.  The fiscal 2005 CAFR of the City (which contains audited financial results for the enterprise funds) is available on the City's web site.

The Sewage Disposal and Water Supply Systems, which serve a significant portion of southeastern Michigan, have an aggregate of approximately $4.7 billion in outstanding revenue bonds (net revenue pledge). The General Fund bears no liability for funding any expenses not covered by self-generated revenues for these systems and has never made a subsidy payment to the Sewage Disposal or Water Supply Systems.

B-28

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

The City's Parking System is intended to be, but during fiscal 2003 and 2004 was not, self-sufficient. The City is legally responsible for payment of operation and maintenance expenses of the system, and the General Fund is reimbursed for payment of such expenses from funds generated from the system, if available. System revenues were inadequate to make such reimbursement in full in fiscal 2003 and 2004; and as a result, the City was not in compliance with its continuing bond covenant to maintain parking system rates at a level sufficient to pay or reimburse the City for payment of Parking System operating, maintenance and repair expenses, but was complying with the related remedial bond covenant. The City is now in compliance with all of its bond covenants.

Other enterprise funds which have received General Fund support are DDOT and Detroit City Airport. The Transportation Fund accounts for the operation of the DDOT that operates the bus-oriented mass transit system, and receives a substantial portion of its operating revenues from regional allocation of federal and State moneys and from self-generated revenues. However, as a result of a continuing gap between operating revenues and rising expenses, the fund has received General Fund subsidies. The following table indicates the amount of General Fund subsidy since fiscal 2001.

**Table 12 - Transportation Fund Subsidies**

| Fiscal Year ended June 30, | Subsidy (in millions) |
|---|---|
| 2001 | $74.2 |
| 2002 | $79.4 |
| 2003 | $75.5 |
| 2004 | $74.3 |
| 2005 | $77.4 |

SOURCE: Finance Department.

The City's Airport Fund accounts for the operations of Detroit City Airport. The Airport is capable of accommodating commercial jet carrier service although no commercial airline currently provides passenger service. The Airport has not been self-sufficient and has required General Fund subsidies ranging between $1 million and $2.5 million per year. The Mayor has proposed no operating subsidy for the Airport in his Fiscal 2007 Executive Budget.

### Component Units of the City

In addition, the General Fund provides significant financial support to two discretely presented component units: the GDRRA and the Detroit Transportation Corporation ("DTC"). The GDRRA receives moneys from the General Fund through tipping fees paid for disposal of waste collected by the City. The City's obligation to pay such tipping fees is a full faith and credit, limited tax, general obligation of the City. It is also secured by Distributable Aid. See "FINANCIAL PROCEDURES - Other Funds of the City." The GDRRA is responsible for disposal of essentially all residential solid waste and a small fraction of commercial waste collected in the City.

Since 1991, the GDRRA waste incineration facility (the "Facility") has been operating in conformance with its operating permits. Previous to that time, however, the Facility experienced certain operational problems during the start up and testing phase. The Facility was originally scheduled to be complete and fully operational in 1989. Additional pollution control equipment was financed from proceeds of revenue bonds issued by the EDC, and the outstanding balance was refinanced in the first quarter of fiscal 2002. The retrofit was completed in 1996 and the Facility is operating well within all permit restrictions.

The GDRRA has approximately $145.5 million of bonds outstanding as of May 2, 2006, which were issued to refund bonds originally issued to finance construction of the Facility. The GDRRA is responsible for

B-29

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 93 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Docket 11/15-02-2019 11:03

making payments to the EDC for debt service on $49.8 million of bonds outstanding as of May 2, 2006, which were issued to refund bonds originally issued to finance additional pollution control equipment.

The Facility essentially covers operating expenses through the sale of steam and electricity and from revenue sources other than the City.  The City's tipping fee payments have been, and are expected to remain, approximately equal to the debt service requirements on the outstanding GDRRA bonds and the GDRRA-related EDC bonds.  The operations and performance of the Facility are guaranteed in certain respects by the lessee of the Facility; however, the City assumes the risk of environmental law changes and of insufficient quantity of, and in certain circumstances the composition of, waste.  Approximately half of the expenses of the GDRRA are currently being supported from revenue sources other than the City.  The gross future tipping fees to be paid by the City are expected to be stable and, if the GDRRA's revenues remain stable, approximately equal to debt service on the GDRRA bonds.

While the City has no reason to believe that the Facility will not operate as designed in the future, additional restrictions could be imposed by regulatory agencies and those restrictions could adversely impact financial operations of the Facility.  Under certain extraordinary circumstances (such as the Facility being permanently closed or destroyed beyond repair), the GDRRA (and therefore the City) could be subject to special annual payment obligations.  While such an event is thought to be very remote, the amount of such annual payments that are secured by the City's State revenue sharing payments could be as high as approximately $10.2 million at an assumed annual interest rate of 18%. The Facility is currently operating as expected.

In 1986, the City, through the DTC, took over responsibility for the Downtown People Mover.  Construction of the project was funded primarily through a combination of federal and State transportation moneys.  At this time, the project is not self-supporting and approximately $6.2 million was budgeted for fiscal 2006 to support its operations.

<u>Other Funds</u>

The following table lists the other funds of the City and their revenues and expenditures for fiscal 2005.  For audited basic financial information as of and for the fiscal year ended June 30, 2005, see APPENDIX B.

**(Balance of this page intentionally left blank)**

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 94 of 248]

**Table 13 - Revenues and Expenditures of Other Funds**

**Fiscal Year Ended June 30, 2005**

| Funds | Revenues/ Expenditures ($ in millions) | Purpose | Major Funding Sources ($ in millions) |
|---|---|---|---|
| **Special Revenue Funds** | | | |
| Community Development Block Grant | 64.9 / 55.5 | Economic Development | Federal Government - 59.8 |
| Construction Code Fund | 24.5 / 35.4 | Building Permit and Inspections | User Fees – 23.9 |
| Detroit Building Authority | 2.2 / 2.0 | Special Maintenance | Other Income – 2.2 |
| Drug Law Enforcement | 4.2 / 2.7 | Narcotics Law Enforcement | Fines and Forfeitures - 3.7 |
| Empowerment Zone | 11.5 / 11.5 | Economic Development | Federal Government – 11.5 |
| Detroit Workforce Development Department | 73.8 / 73.8 | Work Force Development | Federal Government – 73.8 |
| Targeted Business Development | - / - | Casino Agreements | Casinos - 30.0 |
| Major and Local Streets | 75.3 / 46.3 | Infrastructure Improvements | Gas and Weight Tax – 63.5 |
| Human Services | 77.5 / 81.8 | Social Welfare Programs | Federal Government – 74.3 |
| Supportive housing and homeless initiatives | 5.8 / 5.8 | Help of the Homeless | Federal Government – 5.8 |
| **Capital projects** (including Urban Renewal) | 60.4 / 160.1 | Capital Projects | Other Revenues – 26.1 |
| **Fiduciary Funds** | | | |
| Pension Funds | 2,346.3 / 848.1 | Employee Retirement and Benefits | City Contributions – 1,743.6 Plan Member Contributions – 54.1 |

SOURCE:   Derived by Finance Department from audited fiscal 2005 financial statements.

### *Risk Management*

The City is self-insured with respect to property damage, liability risks and workers' compensation claims.  The City assumes the risk for loss exposures, using generally accepted standards with regard to self-assumption of risk.  Provisions are made for assumed losses by a combination of annual budgetary appropriations and liquid reserve funds.  Insurance has been obtained for catastrophic loss exposures when insurance has been a feasible alternative.  Contract liability losses and tort and negligence liability losses are covered by a combination of a Public Liability Reserve Fund and a Risk Management Fund.  The City issued self-insurance bonds in fiscal 2003 and 2004 to make loss payments.

The following schedule indicates the amounts paid from appropriations for the fiscal years ended June 30, 2001 through 2005.  The schedule reflects both General Fund and Transportation Fund payments.  As discussed under "FINANCIAL OPERATIONS - Other Funds of the City – Enterprise Funds," the General Fund has typically made substantial transfers to the Transportation Fund, in part to cover liability claims payable from that fund.

B-31

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/10306201314:3

**Table 14 – Liability Claims Paid**

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005** |
| Damage and liability claims ..... | $22,984,376 | $26,079,282 | $31,902,082 | $31,471,943 | $47,292,944 |
| Vehicle claims .......................... | 5,973,490 | 8,235,563 | 8,784,362 | 27,963,846 | 8,696,371 |
| Worker compensation claims ... | 21,363,664 | 17,876,181 | 14,695,446 | 16,042,338 | 12,657,646 |
| Total..................................... | $50,321,530 | $52,191,026 | $55,381,890 | $75,478,127 | $68,646,961 |

SOURCE:  Finance Department.

## ASSESSED VALUATION AND PROPERTY TAXES

### *Property Valuation and Tax Rate*

Article IX, Section 3, of the Michigan Constitution provides that the proportion of true cash value at which property shall be assessed shall not exceed 50% of true cash value.  The Michigan Legislature, by statute, has provided that property shall be assessed at 50% of its true cash value.  The Michigan Legislature or the electorate may at some future time reduce the percentage below 50% of true cash value.

On March 15, 1994, the electors of the State approved an amendment to the Michigan Constitution permitting the Legislature to authorize *ad valorem* taxes on a non-uniform basis.  The legislation implementing this constitutional amendment added a new measure of property value known as "Taxable Value."  Beginning in 1995, taxable property has two valuations–State Equalized Valuation ("SEV") and Taxable Value.  Property taxes are levied on Taxable Value.  Generally, Taxable Value of property is the lesser of (a) the Taxable Value of the property in the immediately preceding year, adjusted for losses, multiplied by the lesser of the net percentage change in the property's SEV, or the inflation rate, or 5%, plus additions, or (b) the property's current SEV.  Therefore, the Taxable Value of property is likely to differ from the same property's SEV.

This constitutional amendment and the implementing legislation based the Taxable Value of existing property for the year 1995 on the SEV of that property in 1994.  Beginning with the taxes levied in 1995, an increase, if any, in Taxable Value of existing property is limited to the lesser of the percentage net change in SEV from the preceding year to the current year, 5% or the inflation rate.  When property is sold or transferred, Taxable Value is adjusted to the SEV, which under existing law is 50% of the current true cash value.  The Taxable Value of new construction is equal to current SEV.  Taxable Value and SEV of existing property are also adjusted annually for additions and losses.

Responsibility for assessing taxable property rests with the City Assessor.  Any property owner may appeal the assessment to the City Assessor, the Board of Review and ultimately to the Michigan Tax Tribunal.

The Michigan Constitution also mandates a system of equalization for assessments.  Although the City Assessor is responsible for actually assessing at 50% of true cash value, adjusted for Taxable Value purposes, the final SEV and Taxable Value are arrived at through several steps.   The City Assessor establishes assessments initially.  City assessments are then equalized to the 50% levels as determined by the County's department of equalization. Thereafter, the State equalizes the various counties in relation to each other.  SEV is important, aside from its use in determining Taxable Value of real estate for the purpose of levying *ad valorem* property taxes, because of its indirect measure of total true cash value contained in the City, its role in the spreading of taxes between overlapping jurisdictions, the distribution of various State aid programs, State revenue sharing and in the calculation of debt limits.   Property that is exempt from property taxes, *e.g.*, churches, government property and public schools, is not included in the SEV and Taxable Value.  Property granted tax abatements under Act 198, Public Acts of Michigan, 1974, as amended ("Act 198"), is recorded on separate tax rolls while subject to tax abatement.  The valuation of tax-abated property is based upon SEV but is not included in either the SEV or Taxable Value data in the Official Statement except as noted.   The assessments of, and the tax levies on abated properties are not reflected in Table 17, "Tax Rates and Levies," below.

B-32

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

### Industrial Facilities Tax

Act 198 provides significant property tax incentives to industry to renovate and expand aging industrial facilities and to build new industrial facilities in Michigan. Under the provisions of Act 198, qualifying cities, villages and townships may establish districts in which industrial firms are offered certain property tax incentives to encourage restoration or replacement of obsolete industrial facilities and to attract new industrial facilities.

Property owners situated in such districts pay an Industrial Facilities Tax ("IFT") in lieu of *ad valorem* property taxes on plant and equipment for a period of up to 12 years. For rehabilitated plant and equipment, the IFT is determined by calculating the product of the state equalized valuation of the replacement facility in the year before the effective date of the abatement certificate multiplied by the total mills levied by all taxing units in the current year. New plants and equipment that received an abatement certificate prior to January 1, 1994 are taxed at one-half the total mills levied by all taxing units, other than mills levied for local school district operating purposes or under the State Education Tax Act, plus one-half of the number of mills levied for local school district operating purposes in 1993. For new facility tax abatements granted after 1993, new plants and equipment are taxed at one-half of the total mills levied as *ad valorem* property taxes by all taxing units except mills levied under the State Education Tax Act, plus the number of mills levied under the State Education Tax Act. For new facility tax abatements granted after 1993, the State Treasurer may permit abatement of all, none or one-half of the mills levied under the State Education Tax Act. *Ad valorem* property taxes on land are not reduced in any way since land is specifically excluded under Act 198.

### Payment and Lien

Property taxes are due on July 1 of the fiscal year and are payable in full without penalty either on or before August 31 or, at the taxpayer's option, one-half may be paid on or before August 15, with the other half paid on or before January 15. For taxes levied prior to December 31, 2002, the City collected its own delinquent property taxes. Pursuant to Act 246, Public Acts of Michigan, 2003, the City began returning uncollected delinquent property taxes levied after December 31, 2002 to the County for collection on each March 1. The City receives full funding for such taxes from the County's delinquent tax revolving fund. If such delinquent real property taxes remain uncollected after three years from the date on which such taxes become delinquent, the County may charge the respective amount of such taxes back to the City. Thus, delinquent real property taxes for tax year 2003 will be collected in accordance with Act 123, Public Acts of Michigan, 1999, which may result in foreclosure if not paid by March 31, 2006. Tangible personal property may also be seized and sold to satisfy a personal property tax lien.

As shown in Table 17, "Tax Levies and Collections" below, the rate of current collections to the adjusted levy has increased from 87.60% in fiscal 2001 to 95.01% in fiscal 2005 primarily as a result of the change in tax collections described above. The City has taken steps designed to improve collections, including a more aggressive foreclosure policy and the implementation of a program that offers negotiated payment plans to delinquent taxpayers. Additionally, the City may attach personal property of real property owners to satisfy real property delinquencies of such owners.

### Personal Property Tax Assessments and Appeals

Since the 1960s, Michigan personal property tax assessments have been based, among other things, on the use of one or more depreciation schedules formulated by the State Tax Commission. The schedule used against the taxpayer-reported cost depends upon the assessor's view of the appropriate depreciation table to adopt for valuation of the affected personal property. The State Tax Tribunal revised its depreciation scheules beginning with the 2000 tax year. The revisions had the effect of reducing personal property tax revenues in some jurisdictions. The revisions were effective beginning with City's fiscal year ended June 30, 2001.

B-33

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08.2013  11:32

*Valuations*

The following table shows SEV and Taxable Valuations for the most recent five fiscal years.  Because the State has applied an equalization factor of 1.0x for each of these years, SEV is equal to the valuations as determined by City assessing officials.

**Table 15 – State Equalized Valuations and Taxable Valuations**

| Fiscal Year | State Equalized Valuation | | | | Taxable Valuation(1) | |
|---|---|---|---|---|---|---|
| | Real Property | Personal Property | Total | % Annual Change | Total Valuation | % Annual Change |
| 2003 | $10,298,344,200 | $1,749,983,210 | $12,048,327,410 | 9.8% | $7,976,048,523 | 4.4% |
| 2004 | $10,668,533,845 | $1,391,662,381 | $12,060,196,226 | 0.1% | $7,844,209,593 | -1.7% |
| 2005 | $11,267,123,205 | $1,563,037,762 | $12,830,160,967 | 6.4% | $8,435,770,261 | 7.5% |
| 2006 | $11,757,967,595 | $1,654,260,635 | $13,412,228,230 | 4.5% | $8,872,251,228 | 5.2% |
| 2007 | $11,799,821,408 | $1,637,281,517 | $13,437,102,925 | 0.2% | $9,280,134,952 | 4.6% |

SOURCE:  Finance Department, Assessments Division.

_____
(1) Limited by State law.  See "ASSESSED VALUATION AND PROPERTY TAXES - Property Valuation and Tax Rate."

*Valuation by Type of Property*

**Table 16 – Components of State Equalized Valuation**

| | Fiscal Year Ended or Ending June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006** |
| By Use (Real Property only) | | | | | |
| Residential ............................... | 65.6% | 65.8% | 65.6% | 64.5% | 72.7% |
| Commercial............................. | 24.3% | 24.1% | 21.9% | 22.0% | 19.4% |
| Industrial ................................. | 10.1% | 10.1% | 12.5% | 13.5% | 7.9% |
| Total....................................... | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| By Class (Total State Equalized Valuation) | | | | | |
| Real property ........................... | 85.0% | 85.5% | 88.5% | 87.9% | 87.8% |
| Personal property .................... | 15.0% | 14.5% | 11.5% | 12.1% | 12.2% |
| Total....................................... | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

SOURCE:  Finance Department, Assessments Division.

*Tax Rates and Levies*

The following table shows the tax rates and levies in the City for City, School and County purposes for the last five fiscal years.

B-34

boilerplate watermark:

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

**Table 17 – Tax Rates and Levies**

| TAXING ENTITY: CITY OF DETROIT | Fiscal 2007 Millage | Fiscal 2007 Levy | Fiscal 2006 Millage | Fiscal 2006 Levy | Fiscal 2005 Millage | Fiscal 2005 Levy | Fiscal 2004 Millage | Fiscal 2004 Levy | Fiscal 2003 Millage | Fiscal 2003 Levy |
|---|---|---|---|---|---|---|---|---|---|---|
| General Fund | 19.952 | $ 181,184,272 | 19.952 | $ 174,576,611 | 19.962 | $ 166,399,036 | 19.962 | $ 156,586,112 | 19.962 | $ 159,217,881 |
| Debt Service | 8.3951 | 76,235,970 | 7.0753 | 61,907,673 | 7.4796 | 62,348,373 | 7.9245 | 62,161,439 | 7.9217 | 63,183,864 |
| Garbage Levy | - | - | 2.9928 | 26,186,492 | 2.9943 | 24,959,855 | 2.9943 | 23,487,917 | 2.9943 | 23,882,682 |
| Library | 4.6307 | 42,051,424 | 4.6307 | 40,517,839 | 3.6331 | 30,284,758 | 3.6331 | 28,498,798 | 3.6331 | 28,977,782 |
| Total City | 32.9778 | $ 299,471,666 | 34.6508 | $ 303,188,615 | 34.069 | $ 283,992,022 | 34.5139 | $ 270,734,265 | 34.5111 | $ 275,262,208 |
| **SCHOOLS** | | | | | | | | | | |
| Debt Service | NA | NA | 13.000 | $ 113,747,792 | 13.000 | $ 108,365,267 | 13.000 | $ 101,974,725 | 12.990 | $ 103,608,870 |
| Judgement | NA | NA | 0.070 | 583,505 | 0.000 | - | 0.800 | 6,275,368 | 0.200 | 1,595,210 |
| Non-Homestead Tax | NA | NA | 17.554 | 146,323,120 | 18.000 | 150,044,216 | 18.000 | 141,195,773 | 18.000 | 143,568,873 |
| Total Schools | NA | NA | 30.624 | 267,951,299 | 31.000 | $ 258,409,484 | 31.800 | $ 249,445,865 | 31.19 | $ 248,772,953 |
| **STATE EDUCATION TAX** | 6.000 | 54,486,048 | 6.000 | 52,498,981 | 6.000 | 50,014,739 | 6.000 | 47,065,258 | 6.000 | 47,856,291 |
| **WAYNE COUNTY** | | | | | | | | | | |
| General Fund | NA | NA | 4.7552 | $ 41,607,192 | 6.6380 | $ 55,332,973 | 6.6380 | $ 52,069,863 | 6.6380 | 52,945,010 |
| Regional Educational Service | NA | NA | | 0 | | 0 | | | | |
| Operational Agency | NA | NA | 3.4643 | 30,312,037 | 3.4643 | 28,877,677 | 3.4643 | 27,174,695 | 3.4643 | 27,631,425 |
| Community College | NA | NA | 2.4769 | 21,672,454 | 2.4844 | 20,709,436 | 2.4862 | 19,502,274 | 2.4862 | 19,830,052 |
| Wayne County Parks | NA | NA | 0.2459 | 2,151,583 | 0.2459 | 2,049,771 | 0.2459 | 1,928,891 | 0.2459 | 1,961,310 |
| Huron-Clinton Metro Authority | NA | NA | 0.2146 | 1,877,714 | 0.2154 | 1,795,529 | 0.2161 | 1,695,134 | 0.2170 | 1,730,803 |
| Public Safety | NA | NA | 0.9381 | 8,208,216 | 0.9381 | 7,819,804 | 0.9381 | 7,358,653 | 0.9381 | 7,482,331 |
| Total Wayne County | NA | NA | 12.0950 | $ 105,829,196 | 13.9861 | $ 116,585,190 | 13.9886 | $ 109,729,510 | 13.9895 | 111,580,931 |
| Total Levy | | NA | | $ 729,468,091 | | $ 709,001,434 | | $ 676,974,898 | | $ 683,472,384 |
| Total Homestead Rate | | NA | | 55.6036 | | 67.0551 | | 68.303 | | 67.691 |
| Total non-Homestead Rate | | NA | | 73.1572 | | 85.0551 | | 86.303 | | 85.691 |

SOURCE: Finance Department, Assessments Division and Wayne County Treasurer's Office.

B-35

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

The following table shows tax collections of current taxes during each fiscal year and collections of current and delinquent taxes, penalties and interest for City operating, refuse collection and disposal, debt service and library purposes for each of the past five fiscal years.

**Table 18 – Tax Levies and Collections–Fiscal Years 2001 to 2005**

| Fiscal Year Ended June 30, | Adjusted Tax Levy(1) | Collections of Current Levy During Year | | Total Collections Through Fiscal Year Ended June 30, 2005 | |
|---|---|---|---|---|---|
| | | Amount | Ratio to Adj. Levy | Amount | Ratio to Adj. Levy |
| | | (all dollars in thousands) | | | |
| 2001 ............... | $249,917 | $218,915 | 87.60% | $237,892 | 95.19% |
| 2002 ............... | $238,517 | $212,435 | 89.06% | $225,277 | 94.45% |
| 2003 ............... | $241,183 | $207,628 | 86.09% | $218,474 | 90.58% |
| 2004 ............... | $241,824 | $231,696 | 95.81% | $231,696 | 95.81% |
| 2005 ............... | $250,556 | $238,059 | 95.01% | $238,059 | 95.01% |

SOURCE: Finance Department, Treasury Division.

_____

(1) The levy is adjusted from the original levy for cancellations and assessment adjustments.

In an effort to increase its realization of tax revenues, the City entered into a three-year contract with an outside collection firm to collect its delinquent property taxes, and income taxes. The contract expires in fiscal 2006 and will not be renewed. The same firm also collects City water and sewer receivables. The collection of City real property taxes was transferred to the County in fiscal 2003 for collection of fiscal 2003 and future taxes. See "FINANCIAL OPERATIONS – General Fund Revenue Categories: Property Taxes."

**(Balance of this page intentionally left blank)**

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 100 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

### *Largest Taxpayers*

Listed below are the ten largest property taxpayers in the City and their Taxable Valuations.

**Table 19 – Ten Largest Taxpayers**

**Fiscal Year Ended June 30, 2005**

| | Taxable Valuation | | |
| | Real Estate | Personal Property | Total |
|---|---|---|---|
| DaimlerChrysler AG (1) ........................................... | $ 128,767,660 | $ 610,099,600 | $ 738,867,260 |
| DTE Energy .............................................................. | 51,269,238 | 308,229,060 | 359,498,298 |
| General Motors Corporation (1) ............................. | 49,134,783 | 129,078,070 | 178,212,853 |
| Michigan Consolidated Gas..................................... | 1,655,473 | 145,681,702 | 147,337,175 |
| Riverfront Holdings Inc. .......................................... | 123,150,856 | - | 123,150,856 |
| American Axle & Manufacturing ............................ | 16,901,259 | 75,052,600 | 91,953,859 |
| One Detroit Center.................................................... | 53,207,221 | 108,030 | 53,315,251 |
| Cingular Wireless ..................................................... | - | 47,738,424 | 47,738,424 |
| Kewadin Greektown Casino ..................................... | 28,426,871 | 11,949,480 | 40,376,351 |
| Detroit Entertainment LLC....................................... | 16,854,374 | 20,290,190 | 37,144,564 |
| Total........................................................................... | $ 469,367,735 | $ 1,348,227,156 | $ 1,817,594,891 |
| Total City Taxable Valuation ................................... | $6,828,590,407 | $ 1,507,199,386 | $ 8,335,789,793 |
| Ten Largest Taxpayers as a % of Total City Taxable Valuation ................................................ | 6.87% | 89.45% | 21.80% |

SOURCE:  Derived by the Finance Department from audited financial statements.

_____

(1)  Includes Rehabilitation Districts.

### *Tax-Exempt Property*

A significant amount of real property (such as government facilities, schools, churches and hospitals) located within the City is exempt from taxation.  In addition to tax-exempt real property, much personal property is also exempt, including household property, licensed motor vehicles, manufacturing tools held for use, mechanic's tools, pollution control facilities, property stored while in transit and business inventory, as well as the property of publicly owned and tax-exempt private institutions.  The only major items of personal property subject to property taxation in the City are commercial and industrial furniture, fixtures and equipment.

### INDEBTEDNESS OF THE CITY AND RELATED ENTITIES

### *Legal Debt Margin*

Article VII, Section 21 of the State Constitution establishes the authority, subject to constitutional and statutory prohibitions, for municipalities to incur debt for public purposes.  In accordance with the authority granted to the State Legislature, Act 279, Public Acts of Michigan, 1909, as amended  ("Act 279" or the "Home Rule City Act") was enacted.  Pursuant to the power conferred by Act 279, the electorate of the City adopted the Charter.  The Charter provides that the City may borrow money for any purpose within the scope of its power, may issue bonds or other evidence of indebtedness therefor, and may, when permitted by law, pledge the full faith, credit and resources of the City for the payment of those obligations.  Act 279 limits the debt a city may have outstanding at any time by providing that the net indebtedness incurred for all public purposes may

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 101 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

not exceed the greater of 10% of the assessed value of all the real and personal property in the City or 15% of the assessed value of all the real and personal property in the City if that portion of the total amount of indebtedness incurred which exceeds 10% is or has been used solely for the construction or renovation of hospital facilities.  The definition of assessed value for the debt limit computation under Act 279 includes certain assessed value equivalents not otherwise included in assessed valuation.

Pursuant to Act 279, significant exclusions to the debt limitations have been permitted for the following purposes: special assessment bonds and motor vehicle highway fund bonds, even though they are a general obligation of the City; revenue bonds payable from revenues only, whether or not secured by a mortgage; bonds, contract obligations or assessments incurred to comply with an order of the Water Resources Commission of the State or a court of competent jurisdiction; obligations incurred for water supply, sewage, drainage, refuse disposal or resource recovery projects necessary to protect the public health by abating pollution; bonds issued to acquire housing for which certain rent subsidies will be received by the City or an agency thereof; bonds issued to refund money advanced or paid for certain special assessments; and self-insurance bonds.

The maximum amount of general obligation debt (both unlimited tax and limited tax) the City may have outstanding at any time is limited by State law.  The limit is set at 10% of the City's SEV (adjusted for certain assessed value equivalents) or 15% if that portion which exceeds 10% is used solely for construction or renovations of hospital facilities.  However, certain general obligation debt (including the GDRRA and Self-Insurance Bonds debt) is excluded from this limit.  The limit and the outstanding general obligation debt subject to the limit are shown in the following table:

**Table 20 – Legal Debt Margin Subject to State Limitation**
**As of May 2, 2006**

| | | |
|---|---:|---:|
| SEV Fiscal Year 2006-07 ........................................................ | $13,437,102,925 | |
| Add:  Allowance under Act 228, Mich. Public Acts, 1975 ..... | 718,498,590 | |
| Allowance under Act 198, Mich. Public Acts, 1974..... | 291,589,256 | |
| Allowance under Act 147, Mich. Public Acts, 1992..... | 42,671,942 | |
| Allowance under Act 146, Mich. Public Acts, 2000..... | 27,430,736 | |
| | 14,517,293,449 | |
| General Purpose Limit (10% x $14,517,293,449) ................... | | $1,451,729,345 |
| | | |
| Less Outstanding Debt: | | |
| General Obligation Bonds............................................. | $564,480,000 | |
| Distributable State Aid Bonds...................................... | 36,775,000 | |
| Limited Tax Bonds........................................................ | 205,445,000 | |
| Detroit Building Authority (District Court Madison Center Bonds) ............................................................. | 8,322,163 | 815,002,163 |
| General Debt Margin ................................................................ | | 636,727,182 |
| Additional Hospital Limit (5% x $14,152,525,671)................ | | 707,626,284 |
| Total Legal Debt Margin (General and Hospital).................... | | $1,344,353,466 |

SOURCE:  Finance Department.

***Capital Financing Policies***

Unlimited Tax Bonds

In accordance with the State Constitution, unlimited tax general obligation bonds must be voter-approved before issuance.  General Fund departments have traditionally relied on unlimited tax general obligation bonds of the City for capital programs.  In accordance with State law, the City is obligated to levy and collect taxes without regard to any constitutional, statutory or Charter tax rate

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 102 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Dentonm.onge 2011 11A 32

limitations for payment of such obligations. The City has followed a policy of scheduling bond referenda to coincide with regularly scheduled elections. The City has issued and expects to continue to issue unlimited tax general obligation bonds annually as described in "INDEBTEDNESS OF THE CITY AND RELATED ENTITIES–Prospective Indebtedness" below. The following table shows the City's authorized but unissued unlimited tax general obligation debt for capital programs as of May 2, 2006.

### Table 21 – Authorized but Unissued Debt
### As of May 2, 2006

| General Obligation (Unlimited Tax) Bonds | Date of Voter Approval | Remaining Authorization |
|---|---|---|
| Sewer Construction (1) | 08/02/1960 | $24,000,000 |
| Public Safety | 11/02/2004 | 99,025,000 |
| Municipal Facilities | 11/07/2000 | 3,120,000 |
| Neighborhood/Economic Development | 11/07/2000 | 3,105,000 |
| Neighborhood/Economic Development | 11/02/2004 | 19,000,000 |
| Public Lighting | 11/07/2000 | 5,135,000 |
| Public Lighting | 11/02/2004 | 22,000,000 |
| Recreation, Zoo, and Cultural | 11/07/2000 | 12,395,000 |
| Recreation, Zoo, and Cultural | 11/02/2004 | 22,000,000 |
| Detroit Institute of Arts | 11/07/2000 | 150,000 |
| Detroit Historical Museum | 11/06/2001 | 17,200,000 |
| MAAH | 04/29/2003 | 500,000 |
| Transportation | 11/02/2004 | 22,000,000 |
| | | $249,630,000 |

SOURCE: Finance Department.
_____
(1) Not expected to be issued.

Limited Tax Bonds

The City may issue limited tax general obligation bonds or other obligations without the vote of the electors. However, taxes may not be levied in excess of constitutional, statutory or Charter limitations for the payment thereof. Such bonds are payable from general non-restricted moneys of the City. Certain of such limited tax obligations are secured with a first lien on specific revenues such as Distributable Aid. The City has utilized limited tax obligations to finance vehicle purchases, general capital improvements, deficit elimination and the City's Risk Management Fund. See "INDEBTEDNESS OF THE CITY AND RELATED ENTITIES – Tax Supported and Revenue Debt" below.

Revenue Bonds

There are generally no voter approval requirements for the issuance of revenue bonds. The City issues revenue bonds to finance and refinance various capital projects for water supply, sewage disposal and convention facilities and, through the City of Detroit Building Authority, parking facilities. Additional revenue bonds may be issued for these systems provided certain specific additional bonds tests are met under applicable bond documents.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 103 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

<u>Other Capital Financing Sources</u>

        The City also receives State and federal funds which finance certain construction and capital projects. These include State Gas and Motor Vehicle Registration for street improvements, federal Community Development Block Grant revenues largely for continuing urban renewal projects and funds through the State and federal government for transportation purposes. In addition, the City periodically receives capital grants as a result of certain tax supported and revenue debt.

        The following table sets forth the outstanding direct tax-supported and revenue indebtedness of the City.

### Table 22 – Statement of Direct Tax-Supported and Revenue Indebtedness
### May 2, 2006

| | | |
|---|---:|---:|
| **Tax Supported Debt:** | | |
| Unlimited Tax | | |
|   General Obligation Bonds (general purpose) | $ 564,480,000 | |
|   Distributable State Aid General Obligation Bonds | 36,755,000 | $ 601,235,000 |
| Limited Tax | | |
|   Self-Insurance Bonds | 146,595,000 | |
|   General Obligation Bonds (limited tax) | 205,445,000 | |
|   Greater Detroit Resource Recovery Authority Bonds | 145,485,000 | |
|   Detroit Building Authority Bonds (Madison Center) | 8,322,163 | |
|   Economic Development Corporation (Resource Recovery) | 49,805,000 | 555,652,163 |
|     Total tax supported debt | | $1,156,887,163 |
| **Revenue and Other Debt:** | | |
|   Water Supply System Bonds | $ 1,967,020,000 | |
|   Sewage Disposal System Bonds | 2,698,719,306 | |
|   Detroit Building Authority Bonds (Parking & Arena System) | 54,230,000 | |
|   Federal Section 108 Loans (1) | 26,515,000 | |
|   Convention Facility Revenue Bonds (Cobo Hall Expansion) | 114,183,138 | |
|   DDA Tax Increment Bonds | 155,293,198 | |
|   LDFA Tax Increment Bonds (Chrysler Project) | 82,840,000 | |
|     Total revenue and other projects | | 5,098,800,642 |
| **Gross Direct Debt** | | 6,255,687,805 |
| Deductions | | |
|   Revenue and Other Debt | 5,098,800,642 | |
|   Greater Detroit Resource Recovery Authority | | |
|     Bonds–Reserve Account Balance (1) | 26,251,172 | |
|     Total Deductions | | 5,125,051,814 |
| **Net Direct Debt** | | $1,130,635,991 |

  SOURCE:   Finance Department.

_____
(1) As of April 3, 2006.

### *Overlapping Debt*

        Property in the City is taxed for a proportionate share of outstanding general obligation debt of overlapping governmental entities including the School District of the City of Detroit, Wayne County, Regional Educational Service Agency, Wayne County Community College and the Detroit-Wayne Joint Building Authority. The table below shows the City's share of outstanding tax-supported overlapping debt as of May 31, 2006. See "GOVERNMENTAL STRUCTURE – Other Governmental Entities."

B-40

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

**Table 23 – City's Share of Overlapping Debt**
**As of May 31, 2006**

| Issuer | Outstanding Debt | Detroit's Share | |
|---|---|---|---|
| | | Percentage | Amount |
| School District of the City of Detroit.............................. | $1,409,709,975 | 100.00% | $1,409,709,975 |
| Wayne County (1) ......................................................... | 105,142,320 | 18.37 | 19,314,644 |
| Wayne County Community College................................ | 59,165,000 | 29.06 | 17,193,349 |
| Net Overlapping Debt.................................................... | | | $1,466,217,968 |

SOURCE: Municipal Advisory Council of Michigan.

_____
(1) This debt is a general obligation of the County but is payable from assessments against municipalities in the County, other than the City, as well as from the County General Fund.

*Summary of Debt Statement*

The following table shows the City's net direct as of May 2, 2006 and overlapping debt as of May 31, 2006.

**Table 24 – Direct and Overlapping Debt**

| | | |
|---|---|---|
| Direct debt: | | |
| Gross principal amount............................................ | $6,255,687,805 | |
| Less amount payable from other sources ................ | 5,125,051,814 | |
| Net direct debt ......................................................... | | $1,130,635,991 |
| Overlapping debt: | | |
| Net overlapping debt ................................................ | | 1,466,217,968 |
| Net direct and overlapping debt...................................... | | $2,596,853,959 |

SOURCE:    Finance Department and Municipal Advisory Council of Michigan.

**(Balance of this page intentionally left blank)**

B-41

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

**Table 25 – General Obligation Cumulative Principal Amortization**
**As of May 2, 2006**

| Fiscal Year Ending June 30, | Unlimited Tax GO | | Limited Tax GO | | Total GO Debt | |
|---|---|---|---|---|---|---|
| | Principal ($) | Percent Retired | Principal ($) | Percent Retired | Principal ($) | Percent Retired |
| 2007 | 34,330,000 | 5.71% | 95,007,163 | 17.10% | 129,337,163 | 11.18% |
| 2008 | 38,230,000 | 12.07% | 99,970,000 | 35.09% | 138,200,000 | 23.13% |
| 2009 | 42,515,000 | 19.14% | 135,380,000 | 59.45% | 177,895,000 | 38.50% |
| 2010 | 44,825,000 | 26.60% | 31,015,000 | 65.04% | 75,840,000 | 45.06% |
| 2011 | 44,345,000 | 33.97% | 32,365,000 | 70.86% | 76,710,000 | 51.69% |
| 2012 | 41,920,000 | 40.94% | 33,850,000 | 76.95% | 75,770,000 | 58.24% |
| 2013 | 41,350,000 | 47.82% | 35,360,000 | 83.32% | 76,710,000 | 64.87% |
| 2014 | 35,130,000 | 53.66% | 18,420,000 | 86.63% | 53,550,000 | 69.50% |
| 2015 | 32,700,000 | 59.10% | 5,695,000 | 87.66% | 38,395,000 | 72.82% |
| 2016 | 29,435,000 | 64.00% | 5,925,000 | 88.72% | 35,360,000 | 75.87% |
| 2017 | 30,950,000 | 69.15% | 6,195,000 | 89.84% | 37,145,000 | 79.08% |
| 2018 | 31,370,000 | 74.36% | 6,475,000 | 91.00% | 37,845,000 | 82.36% |
| 2019 | 30,960,000 | 79.51% | 6,800,000 | 92.23% | 37,760,000 | 85.62% |
| 2020 | 31,830,000 | 84.81% | 7,130,000 | 93.51% | 38,960,000 | 88.99% |
| 2021 | 32,700,000 | 90.25% | 7,865,000 | 94.92% | 40,565,000 | 92.49% |
| 2022 | 24,400,000 | 94.30% | 6,570,000 | 96.11% | 30,970,000 | 95.17% |
| 2023 | 16,570,000 | 97.06% | 6,840,000 | 97.34% | 23,410,000 | 97.19% |
| 2024 | 12,675,000 | 99.17% | 7,210,000 | 98.64% | 19,885,000 | 98.91% |
| 2025 | 5,000,000 | 100.00% | 7,580,000 | 100.00% | 12,580,000 | 100.00% |
| | $601,235,000 | | $555,652,163 | | $1,156,887,163 | |

SOURCE:   Finance Department.

(Balance of this page intentionally left blank)

CONFIDENTIAL INFORMATION
mark.angelo@arentfox.com
Detroit 15 08 2013 11 3

**Table 26 – Total Outstanding Debt Service Requirement Schedule**

General Obligation Bonds

| Fiscal Year Ending June 30, | Unlimited Tax | | | Limited Tax | | | Revenue and Other Bonds[1][2] | | | Total General Obligation, Revenue and other Bonds |
|---|---|---|---|---|---|---|---|---|---|---|
| | Principal | Interest | Total | Principal | Interest | Total | Principal | Interest | Total | |
| 2007 | $ 34,330,000 | $ 30,535,102 | $ 64,865,102 | $ 95,007,163 | $ 26,805,766 | $ 121,812,929 | $ 110,554,128 | $ 225,671,195 | $ 336,225,323 | $ 239,891,291 |
| 2008 | 38,230,000 | 28,804,747 | 67,034,747 | 99,970,000 | 21,842,585 | 121,812,585 | 120,365,000 | 218,904,071 | 339,269,071 | 258,565,000 |
| 2009 | 42,515,000 | 26,851,072 | 69,366,072 | 135,380,000 | 16,159,700 | 151,539,700 | 126,052,471 | 213,352,549 | 339,405,020 | 303,947,471 |
| 2010 | 44,825,000 | 24,676,382 | 69,501,382 | 31,015,000 | 10,593,881 | 41,608,881 | 131,386,483 | 207,816,658 | 339,203,141 | 207,226,483 |
| 2011 | 44,345,000 | 22,459,252 | 66,804,252 | 32,365,000 | 9,231,399 | 41,596,399 | 127,626,694 | 203,427,938 | 331,054,632 | 204,336,694 |
| 2012 | 41,920,000 | 20,331,984 | 62,251,984 | 33,850,000 | 7,789,943 | 41,639,943 | 128,627,224 | 201,818,199 | 330,445,423 | 204,397,224 |
| 2013 | 41,350,000 | 18,226,250 | 59,576,250 | 35,360,000 | 6,220,816 | 41,580,816 | 131,240,242 | 194,241,637 | 325,481,879 | 207,950,242 |
| 2014 | 35,130,000 | 16,109,301 | 51,239,301 | 18,420,000 | 4,533,172 | 22,953,172 | 131,075,954 | 193,950,743 | 325,026,697 | 184,625,954 |
| 2015 | 32,700,000 | 14,305,916 | 47,005,916 | 5,695,000 | 3,667,022 | 9,362,022 | 135,839,826 | 189,215,725 | 325,055,551 | 174,234,826 |
| 2016 | 29,435,000 | 12,614,269 | 42,049,269 | 5,925,000 | 3,408,287 | 9,333,287 | 134,964,562 | 179,575,459 | 314,540,021 | 170,324,562 |
| 2017 | 30,950,000 | 11,088,398 | 42,038,398 | 6,195,000 | 3,135,894 | 9,330,894 | 140,144,293 | 174,189,721 | 314,334,014 | 177,289,293 |
| 2018 | 31,370,000 | 9,523,170 | 40,893,170 | 6,475,000 | 2,835,920 | 9,310,920 | 145,804,899 | 168,444,389 | 314,249,288 | 183,649,899 |
| 2019 | 30,960,000 | 7,888,679 | 38,848,679 | 6,800,000 | 2,522,326 | 9,322,326 | 150,461,533 | 162,834,863 | 313,296,396 | 188,221,533 |
| 2020 | 31,830,000 | 6,313,866 | 38,143,866 | 7,130,000 | 2,192,926 | 9,322,926 | 154,728,035 | 156,192,572 | 310,920,607 | 193,688,035 |
| 2021 | 32,700,000 | 4,695,891 | 37,395,891 | 7,865,000 | 1,847,470 | 9,712,470 | 159,175,788 | 151,191,357 | 310,367,145 | 199,740,788 |
| 2022 | 24,400,000 | 3,047,191 | 27,447,191 | 6,570,000 | 1,445,873 | 8,015,873 | 166,194,137 | 136,846,498 | 303,040,635 | 197,164,137 |
| 2023 | 16,570,000 | 1,743,073 | 18,313,073 | 6,840,000 | 1,109,018 | 7,949,018 | 174,225,495 | 129,753,343 | 303,978,838 | 197,635,495 |
| 2024 | 12,675,000 | 897,835 | 13,572,835 | 7,210,000 | 758,318 | 7,968,318 | 181,054,111 | 122,379,574 | 303,433,685 | 200,939,111 |
| 2025 | 5,000,000 | 250,000 | 5,250,000 | 7,580,000 | 388,645 | 7,968,645 | 189,149,770 | 113,856,172 | 303,005,942 | 201,729,770 |
| 2026 | | | | | | | 197,960,000 | 102,898,594 | 300,858,594 | 197,960,000 |
| 2027 | | | | | | | 207,325,000 | 93,054,621 | 300,379,621 | 207,325,000 |
| 2028 | | | | | | | 217,465,000 | 83,011,964 | 300,476,964 | 217,465,000 |
| 2029 | | | | | | | 222,240,000 | 72,311,886 | 294,551,886 | 222,240,000 |
| 2030 | | | | | | | 230,425,000 | 62,469,443 | 292,894,443 | 230,425,000 |
| 2031 | | | | | | | 239,630,000 | 52,667,436 | 292,297,436 | 239,630,000 |
| 2032 | | | | | | | 249,885,000 | 41,625,607 | 291,510,607 | 249,885,000 |
| 2033 | | | | | | | 260,920,000 | 31,632,074 | 292,552,074 | 260,920,000 |
| 2034 | | | | | | | 206,495,000 | 20,516,180 | 227,011,180 | 206,495,000 |
| 2035 | | | | | | | 216,820,000 | 10,353,970 | 227,173,970 | 216,820,000 |
| | $601,235,000 | $260,362,378 | $861,597,378 | $555,652,163 | $126,488,961 | $682,141,124 | $4,987,835,645 | $3,914,204,438 | $8,902,040,083 | $6,144,722,808 |

(1)   Includes debt service for the Water and Sewerage Systems and for the Detroit Building Authority (Parking System), DDA, LDFA, Cobo Hall revenue debt.  Includes SRF debt calculated at the amount approved and not at the actual amount borrowed.
(2)   The Water and Sewerage system revenue bond debt service is presented in a manner consistent with the respective bond ordinances.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 107 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15-07-2013 11:5

**Table 27 – Per Capita Debt and Debt Ratios**

| As of June 30, | Population Estimate[1] | Net Direct Debt | | | | Net Direct and Overlapping Debt | |
|---|---|---|---|---|---|---|---|
| | | Net Amount (000) | Per Capita Net Amount | Ratio to True Cash Value[2] | Total (000) | Per Capita | Ratio to True Cash Value[2] |
| 2001 | 933,827 | $ 983,080 | $1,005 | 4.8% | $1,427,995 | $1,529 | 7.3% |
| 2002 | 921,759 | 962,133 | 1,044 | 4.4 | 1,452,048 | 1,575 | 6.6 |
| 2003 | 911,402 | 909,624 | 998 | 3.8 | 2,717,110 | 2,981 | 11.3 |
| 2004 | 900,198 | 1,104,034 | 1,226 | 4.6 | 2,625,218 | 2,916 | 10.9 |
| 2005 | 900,198 | 1,209,104 | 1,343 | 4.8 | 1,253,998 | 1,393 | 4.9 |

SOURCE:   Finance Department.

_____
(1)   Population estimates are from the U.S. Department of Commerce, Bureau of Census, Current Population Reports. The 2004 population estimate is the latest available from the U.S. Census Bureau.
(2)   By law, SEV represents 50% of True Cash Value.  True Cash Value used is based on the SEV set on December 31 of the fiscal year which determines property taxes levied in the following year, and is referred to as the following year's SEV.   See "ASSESSED VALUATION AND PROPERTY TAXES."

### *Short-Term Indebtedness*

Under the provisions of State law, a municipality, by resolution of its governing body and without a vote of its electors, but subject to the prior approval of the Michigan Department of Treasury or an exception therefrom, may borrow money and issue its notes in anticipation of the collection of the taxes and certain other revenues for its current fiscal year or its next succeeding fiscal year.  In addition, a municipality, by resolution of its governing body and without a vote of its electors, may borrow money and issue its notes in anticipation of the receipt of payments under the provisions of the State Revenue Sharing Act for its current fiscal year or its next succeeding fiscal year.  Tax anticipation notes and revenue sharing anticipation notes issued under this Act are limited tax general obligations of a municipality.  The City did not issue short-term debt in fiscal 2000 through 2004.  In fiscal 2005 the City issued $54,445,000 of revenue sharing anticipation notes secured by Distributable Aid for cash flow purposes. In fiscal 2006, the City expects to issue approximately $47 million in revenue sharing anticipation notes secured by Distributable Aid and $82 million in tax anticipation notes secured by property tax receipts for cash flow purposes.

### *Prospective Indebtedness*

*Unlimited and Limited Tax Obligations*.  The City expects to issue unlimited tax general obligation bonds in future years to finance its continuing capital improvement program.  The City currently plans an annual unlimited tax bonding program averaging approximately $50 million.  The City also expects to issue approximately $40 million of limited tax bonds in fiscal 2007.  See "INDEBTEDNESS OF THE CITY AND RELATED ENTITIES–Capital Financing Policies" and "–Legal Debt Margin."

*Revenue Obligations*.  The City intends to issue revenue bonds periodically to finance improvements to self-supporting systems, including its Water Supply System and its Sewage Disposal System.

**(Balance of this page intentionally left blank)**

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

**EMPLOYEE BARGAINING UNITS**

The City budgeted 15,750 employees (including part-time and seasonal employees) for fiscal 2006. Approximately 10% of these employees are non-union, and the remaining 90% are represented by one of the City's 49 bargaining units. The largest bargaining units are: The American Federation of State, County and Municipal Employees ("AFSCME"); the Detroit Police Officers Association ("DPOA"); the Detroit Fire Fighters Association ("DFFA"); the Teamsters; and the Amalgamated Transit Union ("ATU"). The collective bargaining agreements for AFSCME and the other non-uniform unions and nearly all other City bargaining units expired on June 30, 2005, and the City has been engaged in negotiations toward successor contracts. The City is seeking to reduce its labor costs, particularly in the area of health care, and has reached agreement with two of its unions on a successor three-year agreement. The City has recently engaged in a non-binding fact finding proceeding with AFSCME, its largest union. Historically, the City's other non-uniform (*i.e.*, not police or fire) unions have followed the AFSCME contract, with only minor variations.

The City's most recent agreement with DPOA expired on June 30, 2004. As the parties did not reach a new agreement, the City and DPOA are in the final stages of an Act 312 binding arbitration proceeding for a successor agreement. Meanwhile, they continue to operate in accordance with the expired DPOA agreement. (Act 312, Public Acts of Michigan, 1969 ("Act 312"), provides for compulsory arbitration of labor disputes in municipal police and fire departments when negotiations reach an impasse, since the options of a strike or lockout are forbidden with respect to such workers essential to public safety.)

Historically, the DFFA agreements provide for automatic parity of DFFA with DPOA with respect to wages and benefits. Accordingly, although there has been no effective DFFA agreement since June 30, 2001, DFFA members continue to receive the same wage and health care and pension benefits as in the DPOA agreement that expired June 30, 2004. The City and DFFA also are in an Act 312 mandatory binding arbitration proceeding for a successor agreement. The Lieutenants and Sergeants Association ("LSA") agreement expires June 30, 2006.

The City has no reason to believe that its outstanding labor negotiations will result in any interruption of service from the unionized work force.

**RETIREMENT SYSTEMS**

*In General*

The City has two retirement systems. The General Retirement System ("GRS") covers all employees other than policemen and firemen, who are covered by the Police and Fire Retirement System ("PFRS"). Each system is governed by its own Retirement Board ("GRS Board" and "PFRS Board," respectively), which invests and administers the system's assets as trust funds solely for the benefit of its participants, retirees and their beneficiaries. The assets of each Retirement System are separate and distinct from assets of the City, are outside the City's control and are not available to pay any obligation or expense of the City.

Each Retirement System receives an annual actuarial report from its consulting actuary as of each June 30, providing actuarial valuations of its vested benefits, prior service costs and UAAL. Each Retirement Board uses those actuarial valuations, together with certain actuarial assumptions, to determine the annual contribution amounts requested from the City to fulfill its constitutional and statutory pension funding obligations. As part of their regular, periodic review of the actuarial assumptions used to administer their respective Retirement Systems, the GRS Board and the PFRS Board may receive recommendations from time to time to increase or decrease the interest rate and to change other actuarial assumptions.

The most recent annual actuarial reports available for the Retirement Systems are as of June 30, 2005. As of June 30, 2005, the two Systems had combined total net assets held for benefits of approximately $6.98 billion and covered 14,619 active employees and 19,772 retirees and their beneficiaries. According to

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 109 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/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 11:33

the actuarial study of Gabriel, Roeder, Smith and Company ("Actuary") the GRS and PFRS also had estimated combined UAAL of $147.55 million as of June 30, 2005.

Actuarial studies are done annually by the Actuary, and the Charter provides that the assumptions used to value the liabilities of both Systems are to be studied in depth every five years. Actuarial assumptions were revised following the 1997-2002 in-depth experience study. Both Systems use the entry age normal actuarial cost methodology to determine age and service liabilities, vested liabilities, casualty liabilities and normal cost. As of the June 30, 2005 actuarial reports, the following significant assumptions are utilized in calculating the present value of vested benefits and the actuarially determined prior service cost: (1) the future investment return rate is assumed to be 7.9% per annum for the GRS and 7.8% per annum for the PFRS; (2) the GRS assumes that total active member payroll expense will increase 4% annually, while the PFRS assumes that payroll expense will increase 4.8% annually; and (3) the GRS UAAL and the PFRS UAAL both are amortized over a period of 30 years. Both Systems amortize their respective UAAL to produce contribution amounts (principal and interest) which are a level percentage of payroll contributions.

The GRS Board has historically established or changed the amortization period for the funding of GRS UAAL by resolution from time to time. On February 8, 2006, the GRS Board adopted a resolution establishing a 30-year amortization period for funding GRS UAAL. The City Council adopted an ordinance which became effective on February 8, 2006, establishing a 30-year amortization period for funding PFRS UAAL. In an appeal over whether the City or the PFRS Board has authority to determine the appropriate amortization period for funding PFRS UAAL, the Michigan Court of Appeals ruled in the PFRS Board's favor on February 28, 2006, granting a declaratory judgment that the PFRS Board has the authority under applicable law to set the amortization period for the PFRS. On March 30, 2006, the PFRS Board adopted a resolution establishing a 30-year amortization period for funding PFRS UAAL. On April 11, 2006, the City applied for leave to appeal the Michigan Court of Appeals decision to the Michigan Supreme Court, which has not yet ruled on the application. See "Recent Pension Litigation" below.

The mortality table for both Systems is 90% of the 1983 Group Annuity Mortality Table (adopted June 30, 1998 for the PFRS, and June 30, 2003 for the GRS), and the probabilities of retirement and separation from service (including death in service and disability) were revised (based on the 1997-2002 in-depth experience study) for the June 30, 2003 valuations for both Systems. Valuation assets recognize investment returns above or below the actuarial assumed rate over a three-year period.

The following table sets forth the contributions of the City to the GRS and the PFRS for fiscal 2001 through 2005.

**Table 28 – Annual City Contributions to Retirement Systems**

| | For the Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005**[1] |
| **GRS** | $68,139,535 | $67,791,488 | $72,859,246 | $95,876,076 | $781,483,426 |
| **PFRS** | 14,443,382 | 8,449,645 | 66,843,029 | 69,475,202 | 682,431,785 |

---

[1] The City's increased contributions to the GRS and PFRS in fiscal 2005 as compared to fiscal 2004 resulted from its funding nearly all of the existing UAAL of both the GRS and the PFRS on June 2, 2005. See "Payment Obligations under Retirement System Service Contracts" below.

SOURCE: Finance Department

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08.2013 11:32

The following table sets forth the actuarial valuation results for the GRS and the PFRS for the 2001 through 2005 actuarial valuations by the City's consulting actuary.

**Table 29 – Summary of Retirement System Actuarial Valuation Results**

| | Actuarial Valuation Date – June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005** |
| **General Retirement System:** | | | | | |
| Number of Active Employees | 12,744 | 12,639 | 12,833 | 11,791 | 9,820 |
| Number of Retirees and Beneficiaries | 11,450 | 11,363 | 11,322 | 11,311 | 11,396 |
| Number of Deferred Vested Beneficiaries | 1,635 | 1,439 | 1,424 | 1,442 | 1,109 |
| Accrued Actuarial Liabilities (Millions) | $3,179.6 | $3,276.6/$3,250.5[3] | $3,270.6 | $3,383.9 | $3,347.4 |
| Available for Benefits (Millions) | 2,912.1 | 2,761.2 | 2,537.7 | 2,470.2 | 3,222.4 |
| Assets as % of Accrued Actuarial Liabilities | 91.6% | 84.3%/84.9%[3] | 77.6% | 73.0% | 96.3%[1] |
| City Contributions (% of Payroll) | | | | | |
| - Applicable Fiscal Year[2] | 2003 | 2004 | 2005 | 2006 | 2007 |
| - Normal Cost | 9.2% | 9.2%/8.7%[3] | 8.8% | 9.0% | 9.3% |
| - UAAL Amortization Amount | 5.1% | 9.8%/9.3%[3] | 13.9% | 14.2%/11.1%[4] | 1.8% |
| - Total % of Payroll City Contribution | 14.3% | 19.1%/18.1%[3] | 22.7% | 23.2%/20.1%[4] | 11.1% |
| **Police and Fire Retirement System:** | | | | | |
| Number of Active Employees | 5,585 | 5,382 | 5,257 | 5,060 | 4,799 |
| Number of Retirees and Beneficiaries | 8,166 | 8,179 | 8,277 | 8,328 | 8,376 |
| Number of Deferred Vested Beneficiaries | 41 | 35 | 35 | 32 | 24 |
| Accrued Actuarial Liabilities (Millions) | $3,463.2 | $3,523.4/$3,632.0[3] | $3,721.6 | $3,857.5 | $3,780.4 |
| Available for Benefits (Millions) | 3,900.0 | 3,635.1 | 3,205.5 | 3,074.5 | 3,757.9 |
| Assets as % of Accrued Actuarial Liabilities | 112.6% | 103.2%/100.1%[3] | 86.1% | 79.7% | 99.4%[1] |
| City Contributions (% of Payroll) | | | | | |
| - Applicable Fiscal Year[2] | 2003 | 2004 | 2005 | 2006 | 2007 |
| - Normal Cost | 27.2% | 27.7%/23.4%[3] | 24.8% | 24.8% | 25.0% |
| - UAAL Amortization Amount | (14.2%) | (3.9%)/(0.1%)[3] | 19.1% | 29.6%/15.9%[4] | 0.5% |
| - Total % of Payroll City Contribution | 13.0% | 23.8%/23.3%[3] | 43.9% | 54.4%/40.7%[4] | 25.5% |

_____

[1] The increase in Assets as a % of Accrued Actuarial Liabilities as of June 30, 2005 compared to June 30, 2004 resulted from the City's funding nearly all of the existing UAAL on June 2, 2005. See "Payment Obligations under Retirement System Service Contracts" below.

[2] City contribution percentages calculated and published in each annual actuarial valuation apply to the second following fiscal year.

[3] Due to a change in actuarial assumptions during the fiscal year, the first and second numbers represent the values under the prior assumptions and the new assumptions, respectively.

[4] Due to a change in UAAL amortization periods, the first and second numbers represent the contribution rates assuming the previously-effective amortization periods of 20/13 years for GRS/PFRS and the newly-adopted 30-year amortization periods, respectively.

SOURCE:   Derived by Finance Department from annual actuarial reports.

B-47

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

The City is a party to two Service Contracts, dated May 25, 2005 and June __, 2006, with the Detroit General Retirement System Service Corporation, and two other Service Contracts, dated May 25, 2005 and June __, 2006, with the Detroit Police and Fire Retirement System Service Corporation. Those two Service Contracts dated May 25, 2005 are called the "2005 Service Contracts" below, and those two Service Contracts dated June __, 2006 are called the "2006 Service Contracts" below. The GRS and the PFRS are not parties to any of the Service Contracts.

Pursuant to Ordinance No. 05-05 of the City (the "Funding Ordinance"), the City entered into the 2005 Service Contracts as a means to fulfill its State constitutional and statutory obligations to provide funding for an approximately $1.37 billion portion of outstanding unfunded accrued actuarial liabilities (the "2005 Subject UAAL") of the City's two retirement systems, the GRS and the PFRS. On June 2, 2005, a funding trust created by the two Service Corporations issued and sold Certificates of Participation Series 2005-A and 2005-B ("Series 2005-A COPs" and "Series 2005-B COPs," respectively, and collectively "2005 COPs"), evidencing undivided proportionate interests in the rights to receive certain payments ("2005 Scheduled Payments" and "2005 Service Charges," and collectively "2005 COP Service Payments") to be made by the City under the 2005 Service Contracts. A portion of the proceeds of the 2005 COPs was irrevocably paid to the GRS and the PFRS, fully funding the 2005 Subject UAAL on June 2, 2005.

The periods for payment of the City's scheduled 2005 COP Service Payments under the 2005 Service Contracts were limited to 13 and 20 years in regard to the PFRS and GRS, respectively, the amortization periods then in effect for PFRS UAAL and GRS UAAL. Pursuant to the Funding Ordinance and an authorizing resolution of the City Council adopted on April 26, 2006, the City will enter into the 2006 Service Contracts, as anticipated and authorized in the Funding Ordinance, as a means of enabling the City to utilize a now permitted longer payment period for the obligations it incurred to fulfill its constitutional and statutory obligations to provide such funding for the 2005 Subject UAAL. A new funding trust to be created by the two Service Corporations will issue and sell Certificates of Participation Series 2006-A and 2006-B ("Series 2006-A Certificates" and "Series 2006-B Certificates," respectively, and collectively "Series 2006 Certificates"), evidencing undivided proportionate interests in the rights to receive certain payments ("2006 Scheduled Payments" and "2006 Service Charges," and collectively "2006 Certificate Service Payments") to be made by the City under the 2006 Service Contracts. A portion of the proceeds of the 2006 Certificates will be used to optionally redeem certain outstanding Series 2005-A COPs and to purchase and cancel certain outstanding Series 2005-B COPs, thereby extinguishing the City's obligations to pay the 2005 COP Service Payments related to the 2005 COPs thus redeemed or purchased and canceled. The Series 2005-B COPs to be purchased will be procured by a tender offer conducted by the Service Corporations.

Upon issuance of the 2006 Certificates and such optional redemption of certain Series 2005-A COPs and such purchase and cancellation of Series 2005-B COPs which are tendered by their holders to the Service Corporations, some 2005 COPs will still remain outstanding concurrently with the 2006 Certificates. The 2005 COPs and the 2006 Certificates are wholly independent of each other. The City's contractual payment obligations underlying the 2006 Certificates are totally separate and distinct from its contractual payment obligations underlying the 2005 COPs. Holders of 2006 Certificates will have no rights or interests in the City's payment obligations under the 2005 Service Contracts, and holders of 2005 COPs will have no rights or interests in the City's payment obligations under the 2006 Service Contracts.

The following table sets forth the combined annual amounts of 2005 Scheduled Payments and 2005 Service Charges (*i.e.*, 2005 COP Service Payments) that the City that will be obligated to pay under the 2005 Service Contracts, and the combined annual amounts of 2006 Scheduled Payments and 2006 Service Charges (*i.e.*, 2006 Certificate Service Payments) that the City that will be obligated to pay under the 2006 Service Contracts, upon the issuance of the 2006 Certificates and the optional redemption of the Series 2005-A COPs to be redeemed from proceeds of the 2006 Certificates and the purchase and cancellation of the tendered Series 2005-B COPs to be purchased from proceeds of the 2006 Certificates.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 112 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15-08-2013 11:32

**Table 30 – 2005 COP Service Payments and 2006 Certificate Service Payments**

| Twelve months ending June 15, | 2005 COP Service Payments | 2006 Certificate Service Payments [1] | Total [1] |
|---|---|---|---|
| 2007 | $25,762,441 | $49,230,928 | $74,993,368 |
| 2008 | 25,762,441 | 54,224,061 | 79,986,501 |
| 2009 | 25,762,441 | 58,833,035 | 84,595,476 |
| 2010 | 30,512,441 | 58,833,035 | 89,345,476 |
| 2011 | 36,512,526 | 58,833,035 | 95,345,561 |
| 2012 | 41,950,067 | 58,833,035 | 100,783,103 |
| 2013 | 47,428,624 | 58,833,035 | 106,261,659 |
| 2014 | 52,928,206 | 58,833,035 | 111,761,241 |
| 2015 | 55,205,504 | 58,833,035 | 114,038,540 |
| 2016 | 57,345,528 | 58,833,035 | 116,178,564 |
| 2017 | 59,582,125 | 58,833,035 | 118,415,160 |
| 2018 | 61,915,480 | 58,833,035 | 120,748,515 |
| 2019 | 45,501,634 | 73,462,035 | 118,963,670 |
| 2020 | 47,237,920 | 71,726,673 | 118,964,593 |
| 2021 | 49,053,745 | 69,910,650 | 118,964,395 |
| 2022 | 50,931,865 | 68,032,181 | 118,964,046 |
| 2023 | 52,894,682 | 66,069,858 | 118,964,540 |
| 2024 | 54,938,837 | 64,026,079 | 118,964,915 |
| 2025 | 57,065,475 | 61,898,674 | 118,964,149 |
| 2026 | – | 118,965,224 | 118,965,224 |
| 2027 | – | 118,966,122 | 118,966,122 |
| 2028 | – | 118,966,739 | 118,966,739 |
| 2029 | – | 118,968,394 | 118,968,394 |
| 2030 | – | 118,973,878 | 118,973,878 |
| 2031 | – | 118,980,496 | 118,980,496 |
| 2032 | – | 118,988,301 | 118,988,301 |
| 2033 | – | 118,995,906 | 118,995,906 |
| 2034 | – | 119,009,735 | 119,009,735 |
| 2035 | – | 119,009,749 | 119,009,749 |
| Totals | $878,291,981 | $2,356,736,036 | $3,235,028,017 |

---

[1] Series 2006-B COPs' interest calculated at fixed swap rates.

### *Recent Pension Litigation*

In May 2005, the Wayne County Circuit Court granted summary disposition in the City's favor in a lawsuit with the PFRS Board over whether that Board or the City has authority to determine the appropriate amortization period for funding PFRS UAAL. On February 28, 2006, the Michigan Court of Appeals reversed the lower court decision and granted the PFRS Board a declaratory judgment that it has the authority under applicable law to set the amortization period for the PFRS. On April 11, 2006, the City applied for leave to appeal that decision to the Michigan Supreme Court, which has not yet ruled on the application. After the lower court decision and before the Michigan Court of Appeals decision, the City Council adopted an ordinance which became effective on February 8, 2006, establishing a 30-year amortization period for funding PFRS UAAL. On March 30, 2006, the PFRS Board adopted a resolution also establishing a 30-year amortization period for funding PFRS UAAL. Thus, a 30-year amortization period is currently in effect for funding PFRS UAAL, supported by a duly adopted PFRS Board resolution and a duly adopted City ordinance.

The City has a pending application seeking leave to appeal to the Michigan Supreme Court from a recent Michigan Court of Appeals decision that arose from an Act 312 arbitration involving the City and one

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

of its employee unions, the Detroit Police Officers Association ("DPOA"). The arbitration ruling, in 2003, required changing the composition of the PFRS Board by replacing two of its 11 members and adding a twelfth. Before those changes, the prescribed PFRS Board composition had been six union representatives and five City representatives. The City argued in the arbitration proceeding that the police and fire unions used their majority status on the 11-member PFRS Board to obtain benefits that could not be gained through the standard collective bargaining process. The changes under the arbitration decision resulted in a PFRS Board equally divided between City and union representatives, as required of jointly managed boards under the federal Taft-Hartley Act. Though the arbitration involved only the DPOA, the contract governing the Detroit Police Lieutenants and Sergeants Association expressly adopted the conditions of the DPOA agreement, to maintain parity with it. However, the two other unions whose members also are participants in the PFRS have contracts with other language. The City filed this suit to seat a 12-member PFRS Board that would be binding on all four unions whose members are participants in the PFRS. The trial court granted the defendants' motion for summary disposition, concluding that it would deny due process to the two unions that did not participate in the Act 312 arbitration to bind them by it. The City appealed, and the Michigan Court of Appeals affirmed the lower court decision that application of the arbitration ruling to the two non-participating unions would be a violation of their constitutional right to due process of law because their contracts did not require parity with the DPOA agreement. The City has applied for leave to appeal that decision to the Michigan Supreme Court, which has not yet ruled on the application.

The PFRS Board filed a lawsuit in August 2005 seeking payment of $53 million for the City's unpaid contribution obligation to the PFRS due June 30, 2005. The PFRS Board has since adopted a resolution approving the City's proposed settlement terms, and the lawsuit has been inactive by mutual agreement of the parties pending completion of the settlement. Under the approved settlement terms, the balance of the June 30, 2005 required City contributions to the PFRS will be paid with interest at 7.8% per annum no later than June 30, 2006, and the required City contributions to the PFRS due June 30, 2006 will be paid with interest at 7.8% per annum no later than June 30, 2007.

## CERTAIN ECONOMIC AND DEMOGRAPHIC INFORMATION

### *General*

Detroit is located in Southeastern Michigan and is the nation's 11th largest city. It is the central city of a metropolitan area that has a population of over four million people. Detroit is the largest city in Michigan and comprises almost one-half of Wayne County's population. Established in 1701 and incorporated in 1815, Detroit encompasses an area of 138 square miles. Like many other older, major cities in the Northeast, Detroit has experienced a significant decline in population since 1950, and an erosion of its economic base. Since the mid-1970s, the City, as well as private interests, have made substantial investments which have led to additional economic diversification and development during the last several years. The City is a major manufacturing center for the United States, and a regional center of finance, commerce and tourism. The City is located in a regional economy that, although diversifying, remains susceptible to swings in the national economy due to its concentration of employment in the durable goods industries, particularly the automobile industry.

Economically, Detroit relates primarily to the Tri-County area of Wayne, Oakland and Macomb counties. Officially, however, it is a part of a Primary Metropolitan Statistical Area (the "Detroit PMSA") that includes the Tri-County area, plus Monroe, Livingston, Lapeer and St. Clair counties.

### *Population*

The City's population count (established by U.S. Census) determines its legislative apportionment in Congress and in the State Legislature, and has a direct impact on Federal and State programs allocated in whole or in part on a *per capita* basis. While population growth in the Detroit PMSA significantly outpaced the national rate in the 1950s, the region's total population expanded more slowly in the 1960s and contracted (reflecting a significant net out-migration) in the 1970s and 1980s. Net population losses in the region were

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 114 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 13.08.2013 11:32

primarily concentrated in the City.  The remainder of the Detroit PMSA continued to experience population growth throughout the 1970s and 1980s.  Originally consisting of the Tri-County Area, the region considered the metropolitan area was expanded geographically for U.S. statistical purposes, as population and industry dispersed, to add Lapeer, Livingston and St. Clair counties in 1973 and Monroe County in 1983.

Between 1950 and 2000, the City experienced substantial changes in the characteristics of its population, with differing migration patterns resulting in a net decline of 49% of its total population during the 50-year period.   Detroit's share of total State and metropolitan area population also fell significantly.

### Table 31 – Population Trends,  1950-2000

| Year | City of Detroit Population | % Change | Wayne County Population | % Change | Detroit PMSA[1] Population | % Change | U.S. % Change |
|------|------------|----------|------------|----------|------------|----------|----------|
| 1950 | 1,849,568 | - | 2,435,235 | - | 3,169,649 | - | - |
| 1960 | 1,670,144 | -9.70% | 2,666,297 | 9.49% | 4,050,840 | 27.80% | 18.50% |
| 1970 | 1,511,482 | -9.50 | 2,666,751 | 0.02 | 4,549,869 | 12.32 | 13.40 |
| 1980 | 1,203,339 | -20.39 | 2,337,891 | -12.33 | 4,488,072 | -1.36 | 11.40 |
| 1990 | 1,027,974 | -14.57 | 2,111,687 | -9.68 | 4,382,299 | -2.36 | 10.20 |
| 2000 | 951,270 | -7.46 | 2,061,162 | -2.39 | 4,441,551 | 1.35 | 13.20 |

SOURCE:   U.S.  Department of Commerce, Bureau of the Census.

_____
(1)  Consists of Lapeer, Livingston, Macomb, Monroe, Oakland, St. Clair and Wayne counties in Michigan.

### Table 32 – Distribution of Population by Age, 2000

| Age in Years | Population | % of Total |
|--------------|-----------|-----------|
| Under 5 ...................... | 76,232 | 8.0% |
| 5 to 9 ......................... | 93,882 | 9.9 |
| 10 to 14 ..................... | 83,361 | 8.8 |
| 15 to 19 ..................... | 68,707 | 7.2 |
| 20 to 24 ..................... | 65,654 | 6.9 |
| 25 to 34 ..................... | 144,323 | 15.2 |
| 35 to 44 ..................... | 136,695 | 14.4 |
| 45 to 54 ..................... | 115,971 | 12.2 |
| 55 to 59 ..................... | 38,045 | 4.0 |
| 60 to 64 ..................... | 29,344 | 3.1 |
| 65 to 74 ..................... | 52,863 | 5.6 |
| 75 to 84 ..................... | 35,213 | 3.7 |
| 85 years and over ...... | 10,980 | 1.2 |
| Total ......................... | 951,270 | 100.0% |

SOURCE:  U.S.  Department of Commerce, Bureau of the Census.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 13-53846-tjt

**Table 33 – Households by Type, 1970-2000**

| Type of Household | 1970 No. of Households | 1970 % of Total | 1980 No. of Households | 1980 % of Total | 1990 No. of Households | 1990 % of Total | 2000 No. of Households | 2000 % of Total |
|---|---|---|---|---|---|---|---|---|
| | | | (number of households in thousands) | | | | | |
| Family | 370.0 | 74.3% | 289.3 | 66.7% | 244.3 | 65.3% | 218.5 | 64.9% |
| Married-couple | 286.8 | 57.6 | 173.2 | 40.0 | 109.8 | 29.4 | 89.7 | 26.7 |
| Single male head | 16.4 | 3.3 | 18.4 | 4.2 | 21.2 | 5.7 | 22.4 | 6.6 |
| Single female head | 66.8 | 13.4 | 97.7 | 22.5 | 113.2 | 30.3 | 106.4 | 31.6 |
| Non-family | 127.8 | 25.7 | 144.2 | 33.3 | 129.7 | 34.7 | 117.9 | 35.1 |
| Living alone | N.A. | N.A. | 125.3 | 28.9 | 111.3 | 29.8 | 99.9 | 29.7 |
| Total households | 497.8 | 100% | 433.5 | 100% | 374.1 | 100% | 336.4 | 100% |

SOURCE:   U.S.  Department of Commerce, Bureau of the Census.

NOTE:  N.A. = Not Available.  Family households consist of two or more related persons.  Data may not add
up to totals due to rounding.

### *Employment and Economic Base*

The economy of the City is influenced by trends in the durable goods industry and in particular the domestic automobile industry.  Over the past two decades, all three major automotive companies have, at times, experienced financial problems adversely affecting the economy of the Detroit area.  General Motors and DaimlerChrysler represent over 11% of the City's Taxable Valuation and are major employers in the City. Among the complex factors affecting the automotive industry are: national consumer spending patterns (related, among other things, to consumer confidence and perception, disposable income, credit availability and interest rates); the value of the U.S. dollar relative to foreign currencies; foreign trade restrictions; federal and state regulatory policies with respect to auto imports, safety, fuel efficiency and pollution emissions; the availability and price of gasoline; and organizational demand for fleet or specialized vehicles.

The following table sets forth certain information on total employment by industry group for the Detroit PMSA and the U.S.  The region has in the past consistently maintained a greater percentage of persons employed in the manufacturing sector of the economy than the nation as a whole, which reflected the area's dependence on the automotive industry.  The high percentage, however, has shown a decline in recent years such that the PMSA employment breakdown now is more similar to national statistics.

**(Balance of this page intentionally left blank)**

B-52

**Table 34 – Annual Average Wage and Salary Employment
by Place of Work (Non-Agricultural)**

### Detroit-Warren-Livonia MSA

| Industry Group | 2002 (000s) | % | 2003 (000s) | % | 2004 (000s) | % | 2005 (000s) | % |
|---|---|---|---|---|---|---|---|---|
| Natural Resources & Mining | 90 | 4.3 | 85 | 4.1 | 86 | 4.2 | 85 | 4.1 |
| Construction | 12 | 0.6 | 11 | 0.5 | 11 | 0.5 | 11 | 0.5 |
| Manufacturing | 329 | 15.6 | 309 | 14.9 | 298 | 14.4 | 285 | 13.9 |
| Trade, Transportation & Utilities | 396 | 18.8 | 388 | 18.6 | 383 | 18.6 | 380 | 18.5 |
| Information | 38 | 1.8 | 37 | 1.8 | 36 | 1.8 | 35 | 1.7 |
| Financial Activities | 117 | 5.6 | 119 | 5.7 | 117 | 5.7 | 118 | 5.7 |
| Professional and Business Service | 368 | 17.5 | 364 | 17.5 | 358 | 17.3 | 372 | 18.1 |
| Educational & Health Services | 250 | 11.9 | 253 | 12.1 | 256 | 12.4 | 264 | 12.8 |
| Leisure & Hospitality | 178 | 8.4 | 181 | 8.7 | 182 | 8.8 | 182 | 8.8 |
| Other Services | 96 | 4.6 | 97 | 4.6 | 99 | 4.8 | 91 | 4.4 |
| Government | 232 | 11.0 | 238 | 11.4 | 237 | 11.5 | 234.0 | 11.4 |
| Totals | 2,104 | 100.0 | 2,083 | 100.0 | 2,062 | 100 | 2,057 | 100 |

### U.S.

| Industry Group | 2002 (000s) | % | 2003 (000s) | % | 2004 (000s) | % | 2005 (000s) | % |
|---|---|---|---|---|---|---|---|---|
| Natural Resources & Mining | 583 | 0.4 | 572 | 0.4 | 591 | 0.4 | 625 | 0.5 |
| Contruction | 6,716 | 5.2 | 6,735 | 5.2 | 6976 | 5.3 | 7,277 | 5.5 |
| Manufacturing | 15,259 | 11.7 | 14,510 | 11.2 | 14315 | 10.9 | 14,232 | 10.7 |
| Trade, Transportation & Utilities | 25,497 | 19.6 | 25,287 | 19.5 | 25533 | 19.4 | 25,909 | 19.4 |
| Information | 3,395 | 2.6 | 3,188 | 2.5 | 3118 | 2.4 | 3,066 | 2.3 |
| Financial Activities | 7,847 | 6.0 | 7,977 | 6.1 | 8031 | 6.1 | 8,141 | 6.1 |
| Professional and Business Service | 15,997 | 12.3 | 15,985 | 12.3 | 16395 | 12.5 | 16,882 | 12.6 |
| Educational & Health Services | 16,199 | 12.4 | 16,588 | 12.8 | 16953 | 12.9 | 17,342 | 13.0 |
| Leisure & Hospitality | 11,986 | 9.2 | 12,173 | 9.4 | 12493 | 9.5 | 12,802 | 9.6 |
| Other Services | 5,372 | 4.1 | 5,401 | 4.2 | 5309 | 4.0 | 5,386 | 4.0 |
| Government | 21,513 | 16.5 | 21,583 | 16.6 | 21621 | 16.5 | 21,803 | 16.3 |
| Totals | 130,364 | 100 | 129,999 | 100 | 131335 | 100 | 133,465 | 100 |

Notes: Totals may not addd due to rounding.

SOURCE: Michigan Department of Labor & Economic Growth, Office of Labor Market Informantion for Detroit-Warren-Livonia MSA; U.S. Department of Labor, Bureau of Labor Statistics for U.S.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08.2013    11:32

The following table shows the annual average unemployment rates for the City, the Detroit-Warren-Livonia CBSA, and the U.S. from 2001 to 2005.

### Table 35 – Civilian Unemployment Rates, 2001 to 2005

|  | City of Detroit | Detroit-Warren-Livonia CBSA | U.S. |
|---|---|---|---|
| 2001 ............. | 9.8% | 5.4% | 4.8% |
| 2002 ............. | 11.9% | 6.4% | 5.8% |
| 2003 ............. | 14.6% | 7.2% | 6.0% |
| 2004 ............. | 14.0% | 7.1% | 5.5% |
| 2005 ............. | 14.1% | 7.2% | 4.9% |

SOURCE:   Michigan Department of Labor & Economic Growth; U.S. Department of Labor, Bureau of Labor Statistics.

The following table shows a breakdown of manufacturing wage and salary employment by type for the Detroit-Warren-Livonia MSA for calendar years 2001 through 2005.

### Table 36 – Manufacturing Wage and Salary Employment

| Industry Group: | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
|  | (In Thousands) | | | | |
| Durable goods industries............................... | 305.1 | 280.8 | 262.6 | 253.0 | 244.6 |
| Nondurable goods industries | 50.8 | 48.6 | 46.8 | 44.7 | 44.2 |
| Total manufacturing employment ................. | 355.9 | 329.4 | 309.4 | 297.7 | 288.8 |

SOURCE:  Michigan Department of Labor & Economic Growth, Office of Labor Market Information.

### Construction

The following data shows trends in construction permits in the City.

### Table 37 – Trends in Construction Permits, 2001 to 2005

|  | Value (in millions) | | | |
|---|---|---|---|---|
|  | New Construction | | Alterations/Additions | |
|  | Residential | Non-Residential | Residential | Non-Residential |
| 2001 ..................... | $ 34.3 | $ 336.6 | $ 122.9 | $  575.3 |
| 2002 ..................... | $ 10.6 | $ 385.8 | $ 75.9 | $  622.2 |
| 2003 ..................... | $ 55.2 | $ 339.8 | $ 86.9 | $  467.4 |
| 2004 ..................... | $ 71.0 | $ 280.1 | $124.0 | $  330.8 |
| 2005 ..................... | $ 81.4 | $ 243.4 | $ 92.2 | $  398.1 |

SOURCE:  City of Detroit Department of Buildings and Safety Engineering.

_____

NOTE:  Residential includes single and multiple family dwellings.

### Housing Characteristics

Trends in the housing stock of the City have a direct impact on the City's levy and collection of *ad valorem* property taxes, because residential real property accounts for more than two-thirds of the valuation of

B-54

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

all real property in the City (see "ASSESSED VALUATION AND PROPERTY TAXES–Valuation by Type of Property" above).

The number of housing units in the City fell 29% between 1970 and 2000. Net losses have been concentrated in owner-occupied units, 16% of which were lost to the housing market in the 1970s, 21% of which were lost in the 1980s and 7% lost in the 1990s. Owner occupancy rates in the City declined from 60.0% in 1970 to 49% in 2000. Since 1990, the City has experienced a significant increase in the construction of new housing units. See "CERTAIN ECONOMIC AND DEMOGRAPHIC INFORMATION – Major Projects and Developments." Trends in the housing stock of the City have a direct impact on the City's collection of *ad valorem* property taxes, because residential real property accounts for more than two-thirds of the valuation of all real property in the City (see "ASSESSED VALUATION AND PROPERTY TAXES – Valuation by Type of Property" above).

### Table 38 – Housing Inventory, 1970 to 2000

| Occupancy Status | 1970 | 1980 | 1990 | 2000 |
|---|---|---|---|---|
| | | (in thousands) | | |
| Owner-occupied | 298.6 | 250.9 | 197.9 | 184.6 |
| Renter-occupied | 199.1 | 182.6 | 176.1 | 151.8 |
| Vacant | 31.3 | 37.7 | 36.0 | 38.7 |
| Total housing units | 529.0 | 471.2 | 410.0 | 375.1 |

SOURCE: U.S. Department of Commerce, Bureau of the Census.

NOTE: Data may not add up due to independent recording. Excludes seasonal housing.

### Table 39 – Housing Characteristics, 2000

| | City of Detroit | Wayne County | Detroit PMSA | United States |
|---|---|---|---|---|
| Percent owner-occupied | 54.9% | 66.6% | 72.4% | 66.2% |
| Rental vacancy | 8.3% | 7.2% | 6.4% | 6.8% |
| Median value of owner-occupied units | $ 63,600 | $ 96,200 | $ 127,800 | $119,600 |
| Median contract rent | $ 486 | $ 428 | $ 502 | $ 602 |
| Persons per household | 2.77 | 2.64 | 2.58 | 2.59 |

SOURCE: U.S. Department of Commerce, Bureau of Census.

NOTE: Value of Owner-Occupied Units is a self-reported estimate of the then-current market value, and therefore is not directly comparable to the SEV.

### *Largest Employers*

Below is a listing of the largest private sector employers by company and by number of employees actually or estimated to be employed within the City at the end of calendar year 2005. The City and the School District are each major Detroit employers, employing approximately 14,619 and 20,162, respectively, as of June 30, 2005.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 119 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

**Table 40 – Largest Private Employers**

**June 30, 2005**

| Company | Detroit Employment |
|---|---|
| Detroit Medical Center ........................................... | 10,617 |
| DaimlerChrysler AG............................................... | 9,900 |
| Henry Ford Health System ..................................... | 7,404 |
| General Motors Corporation.................................... | 6,311 |
| St. John Health System........................................... | 4,821 |
| American Axle & Manufacturing Holdings Inc. .... | 4,309 |
| DTE Energy Co. ...................................................... | 3,987 |
| Compuware Corp...................................................... | 3,946 |
| Motor City Casino .................................................. | 2,800 |
| Blue Cross and Blue Shield of Michigan ............... | 2,694 |

SOURCE:  Crain's *Book of Lists, 2006 Edition*, December 2005.

### *Port of Detroit*

The Detroit/Wayne County Port Authority ("DWCPA") is a public agency responsible for promoting trade and freight transportation through the Port of Detroit (the "Port"), which provides direct water service to world markets via the Great Lakes/St. Lawrence Seaway.  The Port has five privately-owned and operated full-service terminals, a liquid bulk terminal and bulk facility, and a single dock facility with capacity for 14 ocean-going vessels.  In addition, more than 30 industries located on the Detroit and Rouge Rivers have their own port facilities.  A variety of ship repair services are available.  The Detroit area, which is the largest foreign trade zone in the United States, provides financial advantages related to federal taxes and customs duties at subzones throughout the City and region.  The Port is a principal port of entry for trade with Canada via bridge, vehicular tunnel, rail tunnel and barge service.  Steel and scrap steel are the principal export products of the Port, handled for the three local steel mills.  General cargo constitutes a minor portion of total tonnage due to the lack of regularly scheduled shipping service.  See "CERTAIN ECONOMIC AND DEMOGRAPHIC INFORMATION - Major Projects and Developments."

**Table 41 – Waterborne Commerce of the Port of Detroit**
**(millions of short tons of 2,000 pounds)**

| FISCAL YEARS | Foreign | | | Domestic | Grand |
|---|---|---|---|---|---|
| | Canadian | Overseas | Total | Total | Total |
| 1993 .............. | 2.4 | 0.9 | 3.3 | 13.9 | 17.2 |
| 1994 .............. | 4.5 | 1.5 | 6.0 | 12.7 | 18.7 |
| 1995 .............. | 2.6 | 1.0 | 3.7 | 15.2 | 18.9 |
| 1996 .............. | 4.6 | 1.7 | 6.3 | 12.3 | 18.6 |
| 1997 .............. | 4.8 | 1.3 | 6.1 | 12.0 | 18.1 |
| 1998 .............. | 5.0 | 1.9 | 6.9 | 12.5 | 19.4 |
| 1999 .............. | 3.5 | 1.1 | 4.6 | 12.3 | 16.9 |
| 2000 .............. | 4.1 | 1.1 | 5.2 | 12.0 | 17.2 |
| 2001 .............. | 4.3 | 0.4 | 4.7 | 12.3 | 17.0 |
| 2002 .............. | 3.7 | 0.7 | 4.4 | 12.9 | 17.3 |
| 2003 .............. | 3.5 | 0.4 | 3.9 | 10.4 | 14.3 |

SOURCE:        Detroit/Wayne County Port Authority.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

*Transportation Network*

Five major rail lines provide direct service to the Detroit area by such railroad companies as Conrail, Norfolk Southern, Grand Trunk Western, Canadian Pacific and CSX Transportation. Major cargoes handled by the rail lines in the Detroit area include automobiles, auto parts, steel, chemicals and food products.

Air transportation service is provided to the City at the Detroit City Airport, with general aviation, cargo and scheduled passenger services, and at the Detroit Metropolitan Wayne County Airport, the nation's 10th largest international airport and the largest hub for Northwest Airlines. More than 30 other scheduled airlines provided domestic and international service with more than 1 million annual passenger enplanements and 137,000 tons of annual enplaned cargo.

This area's extensive toll-free highway system, which includes the I-94, I-75, I-96 and I-696 interstate highways and Canadian 401, provides one-day access, based on a 500-mile day, to 48% (by population) of the U.S. market and to the Province of Ontario, Canada.

### *Major Projects and Developments*

A number of major developments have been completed during the past three years, and others are in various stages of construction in the City. Most of the projects represent joint efforts between the public and private sectors Below are brief descriptions of the major developments, including announced financing sources.

#### Merchants Row

Merchants Row, a $30 million redevelopment project of eight 1910 era buildings adjacent to the corporate offices of Compuware Corporation, includes 163 loft condominiums, a 264-space parking garage and 28,400 square feet of retail and restaurant space.

#### 1001 Woodward

This 26-story, twin office tower, adjacent to the Campus Martius project, has undergone a $20 million renovation, along with the addition of a $10 million 500-space parking structure.

#### Downtown YMCA

The YMCA of Metropolitan Detroit recently completed the construction of the 5-story Boll Family YMCA at a cost of $35 million. The new facility houses an auditorium, two swimming pools, a health and fitness center, a wellness center and a childcare center.

#### Woodward Millennium

A $37 million mixed-use development is nearing completion in the medical center area. The development will include 180 units of loft–style condominiums and garden-style apartments, a parking garage and retail space.

#### St. Anne's Gate

This new housing development is located in southwest Detroit near the Ambassador Bridge and consists of new single and multi-family homes. The total project cost is expected to be $41 million.

#### Tri-Centennial Village

A $19 million housing development is being constructed on Detroit's west side. The development will include 165 single-family homes, 85 of which will be constructed by Habitat for Humanity.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

### Woodward Place at Brush Park

Woodward Place at Brush Park – Phase II. Construction will continue over the next three years, ultimately adding up to 700 new housing units. The project also involves the renovation of several historic homes for residential use. The total cost of the project is $75 million.

### Brush Park Manor

A 91,000 square foot senior apartment residence on 3.3 acres of land on Brush Street was recently completed. The 3-story complex consists of 113 apartments. The estimated cost of the project is $9.9 million.

### Greyhaven Marina Village

Greyhaven Marina Village is being constructed in phases on a 15-acre site on the Detroit River. Phase one consisted of 190 apartments and town homes overlooking the Detroit River. Phase two consists of 144 condominium units. The total cost of the development was $21 million. A third phase under development is the $25 million Shorepoint Village consisting of 57 single-family homes.

### Woodbridge Estates

The $98 million project includes 247 rental units, 101 new homes, town homes and duplex condominiums and 297 enhanced service units on a former public site. In addition, the project will include retail space and a community center. The project is being funded with both public and private funds.

### Federal Reserve Bank

The $79.5 million, 220,000-square foot Detroit branch northeast of downtown was recently completed to handle check clearing, currency processing, economic analysis and conferences, and serves Michigan's Lower Peninsula.

### New Center Lofts

This $14.28 million residential project includes 102 loft-style, two-story townhouses located in northwest Detroit. Later phases will include three-story townhouses.

### Morningside Commons

Located on the City's east side, this $30 million housing development is being constructed in phases. The first phase of the development consisted of 40 new single-family homes. The second phase consisted of a 64-unit multi-family townhouse development. Currently under construction, phase three will consist of the construction of 50 new single-family homes and the rehabilitation of 10 existing single-family homes.

### Lombardo Heritage

A $197.7 million housing complex is being constructed in phases on a 10.5-acre parcel on the City's east side. Upon completion, the complex will include 126 condominium homes with basements.

### Palmer Street Redevelopment

Located near the Wayne State University district, this $10 million project consists of the rehabilitation of nine existing buildings and the construction of new townhouses into a total of 115 housing units.

### River Park Village Senior Apartments

The 15-story Whittier building will be converted into a $66 million development of 80 senior apartments, other loft-style apartments and retail space.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

The PricewaterhouseCoopers Building

The accounting firm PricewaterhouseCoopers is nearing completion of a $26 million 115,000-square foot, five-story office building adjacent to Ford Field football stadium. PricewaterhouseCoopers will occupy the first four floors of the building, with the fifth floor available for lease to a future tenant. A 1,200-stall parking garage has been constructed immediately north of the building on an adjacent parcel of land.

St. John Hospital and Medical Center

St. John Hospital is constructing a $12 million, 62,000-square foot medical office building on its Riverview hospital campus. The health care provider will also build a $141 million hospital tower and a $15 million emergency department expected to open in 2008 at its eastside location in the City.

The Salvation Army Southeast Adult Rehabilitation Center

The Salvation Army Southeast Adult Rehabilitation Center in downtown Detroit completed a $26 million renovation that added 100 beds, renovated offices, added a dining room and moved its thrift store.

Detroit-Wayne County Port Authority

The Detroit/Wayne County Port Authority ("DWCPA") financed a $43 million mixed-use facility on the east riverfront in downtown Detroit. The project consists of 18,000 square feet of ground floor retail space and upper floors and a parking garage with 1,174 parking spaces.

Kennedy Square Office Building

This $54 million project is being built on top of an existing underground garage in the downtown area. Expected to be completed in June 2006, the 10-story, 240,000-square foot office building will offer ground floor retail space and house up to 1,300 workers.

Casino Development

A recent court settlement has paved the way for the construction of three permanent casinos in the City. Each casino will expand in or near its current temporary location at a cost of about $200 million each. Each casino will have a minimum of 100,000 square feet of gaming space, a 400-room hotel and additional parking and restaurants. See "FINANCIAL OPERATIONS - General Fund Revenue Categories."

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 123 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

[THIS PAGE INTENTIONALLY LEFT BLANK]

13-53846-tjt   Doc 348-7   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 124 of
248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 124 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 5.08.2013 11:33

**CITY OF DETROIT, MICHIGAN**
Comprehensive Annual Financial Report
For the Fiscal Year Ended
June 30, 2005

City of Detroit, Michigan
Comprehensive Annual Financial Report
For the Fiscal Year Ended June 30, 2005

**Kwame M. Kilpatrick**
*Mayor*



**FINAL**
See attached KPMG
OPINION

C-1

APPENDIX C

**Kwame M. Kilpatrick**
**Mayor**

Prepared by the Finance Department
**Roger Short, CPA**
*Interim Finance Director / Chief Financial Officer*

13-53846-tjt   Doc 348-7   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 125 of
248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 125 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 15:08:2013 11:32



SPERAMVS MELIORA · RESVRGET CINERIBVS

THE CITY OF DETROIT

MICHIGAN

"We hope for better things"

"It shall rise again from the ashes"

C-2

**FOUNDED 1701**
**INCORPORATED 1806**
**AREA (Square Miles) 137.9**
**POPULATION 911,402**

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| **I.   INTRODUCTORY SECTION** |  |
| LETTER OF TRANSMITTAL | I-1 |
| GFOA CERTIFICATE OF ACHIEVEMENT | I-10 |
| AUDITOR GENERAL'S LETTER | I-11 |
| LIST OF CITY OF DETROIT PRINCIPAL OFFICIALS | I-12 |
| CITY OF DETROIT ORGANIZATION CHART | I-14 |
| **II.  FINANCIAL SECTION** |  |
| INDEPENDENT AUDITORS' REPORT | 3 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS (MD&A) (UNAUDITED) | 5 |
| BASIC FINANCIAL STATEMENTS: |  |
| A. GOVERNMENT-WIDE FINANCIAL STATEMENTS: |  |
| Statement of Net Assets | 28 |
| Statement of Activities | 30 |
| B. FUND FINANCIAL STATEMENTS: |  |
| Governmental Funds Financial Statements: |  |
| Balance Sheet | 32 |
| Reconciliation of the Balance Sheet of Governmental Funds to the Statement of Net Assets | 34 |
| Statement of Revenues, Expenditures, and Changes in Fund Balances | 35 |
| Reconciliation of the Statement of Revenues, Expenditures, and Changes in Fund Balances of Governmental Funds to the Statement of Activities | 36 |
| Proprietary Funds Financial Statements: |  |
| Statement of Net Assets | 38 |
| Statement of Revenues, Expenses, and Changes in Fund Net Assets | 42 |
| Statement of Cash Flows | 44 |
| Fiduciary Fund Financial Statements: |  |
| Statement of Fiduciary Net Assets | 48 |
| Statement of Changes in Fiduciary Net Assets | 49 |
| Component Units Financial Statements: |  |
| Statement of Net Assets | 50 |
| Statement of Activities | 52 |
| C. NOTES TO BASIC FINANCIAL STATEMENTS: |  |
| I.   Summary of Significant Accounting Policies | 58 |
| A.   Reporting Entity | 58 |
| B.   Joint Venture | 61 |
| C.   Basis of Presentation | 61 |
| D.   Basis of Accounting | 63 |
| E.   Budgetary Data | 63 |
| F.   Assets, Liabilities and Fund Equity | 64 |
| II.  Stewardship, Compliance, and Accountability | 68 |
| A.   Compliance with Finance Related Legal and Contractual Provisions | 68 |
| B.   Excess of Expenditures Over Appropriations in Individual Funds | 68 |
| C.   Deficit Fund Equity | 69 |
| III. Detailed Notes on all Funds | 69 |
| A. Assets | 69 |
| B. Liabilities | 85 |
| IV.  Subsequent Events | 109 |
| BUDGET TO ACTUAL COMPARISON-GENERAL FUND: |  |
| Statement of Revenues, Expenditures and Changes in Fund Balances-Budget and Actual-General Fund | 112 |
| REQUIRED SUPPLEMENTARY INFORMATION OTHER THAN MD& A: |  |
| Pension Schedules (Unaudited) |  |
| Schedules of Employer Contributions | 117 |
| Schedules of Funding Progress | 117 |

i

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013   11:32

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| COMBINING NONMAJOR FUNDS FINANCIAL STATEMENTS: | |
| Non-Major Governmental Funds: | |
| Combining Balance Sheet | 122 |
| Combining Statement of Revenues, Expenditures, and | |
| Changes in Fund Balances | 123 |
| Special Revenue Funds: | |
| Combining Balance Sheet | 124 |
| Combining Statement of Revenues, Expenditures, and | |
| Changes in Fund Balances | 126 |
| Capital Projects Funds: | |
| Combining Balance Sheet | 128 |
| Combining Statement of Revenues, Expenditures, | |
| and Changes in Fund Balances | 129 |
| Permanent Funds: | |
| Combining Balance Sheet | 130 |
| Statement of Revenues, Expenditures, and Changes in | |
| Fund Balances | 131 |
| Agency Funds: | |
| Combining Statement of Net Assets and Liabilities | 132 |
| Combining Statement of Changes in Assets and Liabilities — Agency Funds | 133 |

**III. STATISTICAL SECTION (Unaudited):**

|  | Table |
|---|---|
| General Governmental Revenues — by Source — Last Ten Fiscal Years | 1 | 136 |
| General Governmental Expenditures — by Function — Last Ten Fiscal Years | 2 | 136 |
| Property Tax Levies and Collections — Last Ten Fiscal Years | 3 | 138 |
| Adjusted Tax Levies and Tax Collections by Levies — Last Ten Fiscal Years | 4 | 138 |
| Assessed and Estimated Actual Value of Taxable | | |
| Property — Last Ten Fiscal Years | 5 | 140 |
| Property Tax Rates and Levies — All Overlapping | | |
| Governments-Last Ten Fiscal Years | 6 | 141 |
| Special Assessments Additions and Deductions — Last Ten Fiscal Years | 7 | 142 |
| Ratio of Net General Bonded Debt to Assessed Value and | | |
| Net Bonded Debt per Capita — Last Ten Fiscal Years | 8 | 143 |
| Legal Debt Margin | 9 | 144 |
| Computation of Direct and Overlapping Debt | 10 | 145 |
| Ratio of Annual Debt Service Expenditures for General Bonded Debt to | | |
| Total General Governmental Expenditures — Last Ten Fiscal Years | 11 | 146 |
| Revenue Bond Coverage — Last Ten Fiscal Years | 12 | 147 |
| Real Property Value, Construction Permits and | | |
| Bank Deposits — Last Ten Fiscal Years | 13 | 148 |
| Principal Taxpayers | 14 | 149 |
| Largest Private Employers | 15 | 150 |
| Miscellaneous Statistics | 16 | 152 |

**PHOTO CREDITS:**

All photographs courtesy of City of Detroit – Communications and Creative Services Department.

| Museum of African American History | 54 |
|---|---|
| Car Tune | 54 |
| The Bond Buyer's Midwest Deal of the Year Award | 55 |
| Kid's Kingdom | 56 |
| Metro Youth Day | 56 |
| Homeland Security | 134 |
| Heat the Streets Run and Walk for Warmth | 135 |
| Maryann Mahaffey | 154 |

CITY OF DETROIT
FINANCE DEPARTMENT

1200 COLEMAN A. YOUNG MUNICIPAL CENTER
DETROIT, MICHIGAN 48226

May 13, 2006

The City of Detroit,
The Honorable Mayor Kwame M. Kilpatrick and
The Honorable City Council

The management and staff of the Finance Department is pleased to present the City of Detroit's (the "City") Comprehensive Annual Financial Report (CAFR) for the fiscal year ending June 30, 2005 along with the Independent Auditor's Report. The CAFR is prepared by the City's Finance Department in accordance with the financial reporting principles and standards of the Governmental Accounting Standards Board.

Responsibility for both the accuracy of the data and the completeness and fairness of the presentation, including all disclosures, rests with the City. Accordingly, we believe that the information, as presented, is accurate in all material respects. We also believe that the financial statement presentation accurately depicts the financial position and the results of operations as measured by the financial activity of our various funds. Finally, the notes and disclosures included provide the reader with a more comprehensive understanding of the City's financial position.

**Independent Audit**

The City's Charter requires the Auditor General of the City to audit the transactions of all City agencies at least once every two years. The Auditor General is appointed by the City Council for a 10-year term.

Additionally, state laws require the City to have its financial statements audited by an independent, outside auditor once every five years. However, beginning with the fiscal year 1980, the Mayor and City Council agreed to have an annual financial statement audit by an independent auditor. The independent auditor's report on the financial statements is included in the financial section of this report. The City must also comply with the requirements of the U.S. Office of Management and Budget Circular A-133, *Audits of States, Local Governments and non-profit organizations*.

I-1

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08.2013 11:42

C-4

**CITY OF DETROIT GOVERNANCE STRUCTURE**

The City was incorporated in 1806, and is a home rule city under State law. The organizational structure of the City is as follows:

**The Executive Branch**

- The Mayor heads the executive branch. The citizens of Detroit elect the Mayor to a four-year term. The City Charter grants the Mayor broad managerial powers including the authority to appoint department directors, deputy directors, and other executive branch officials. The responsibility to implement most programs, provide services, activities, and manage day-to-day operations is delegated by the Charter to the executive branch.

**The Legislative Branch**

- The legislative branch is comprised of the City Council and its agencies. The nine members of City Council are also elected to a four-year term. Many significant decisions, including budget appropriations, procurement of goods and services, and certain policy matters must be approved by the City Council.

**Other Agencies**

- The City Clerk's Office and the Election Commission are not classified under either of the two branches mentioned above.

**Background and Overview**

Detroit, Michigan's largest city is located in the County of Wayne in the southeastern section of the state's lower peninsula. The City covers approximately 140 square miles and accounts for nearly half of the population of Wayne County. The City is internationally known for automotive manufacturing and trade. Detroit is located on an international waterway, which is linked via the St. Lawrence Seaway to seaports around the world.

**MAJOR INITIATIVES AND ACCOMPLISHMENTS**

A number of significant initiatives, outlined below, are underway in the City that will have a positive effect on the City's economic health and its ability to provide services to residents and businesses.

**City of Detroit Call Centers**

**911**

- The administration successfully opened a state of the art Computer Aided Dispatch Communications Center, which for the first time links 911 operators with Fire/EMS and Police Department Dispatchers. This new system replaced the City's 32 year-old 911 system.

**One Call to City Hall**

- The City developed and implemented an extensive overhaul of Detroit's 311 system. The new one stop shop for City services provides "ONE CALL TO CITY HALL", information about City programs, hours of operation or locations, and one place to call to request a service from any of the City's 42 Agencies.

**Detroit Department of Administrative Hearings**

- In January 2005, code violations that were formerly processed as criminal misdemeanors began to be prosecuted as civil cases by the newly created Detroit Department of Administrative Hearings (DAH). By taking such cases out of the backlogged 36th District Court and moving them to the DAH, more cases can be resolved by hearing officers who are licensed attorneys. Cases that come before the department include violations of property maintenance, zoning, solid waste, and illegal dumping ordinances.

**Issuance of Pension Obligation Certificates**

- **Midwest Regional Deal of the Year Award**
  On December 6, 2005, the Mayor accepted the Midwest Regional Deal of the Year Award from The Bond Buyer on behalf of the City of Detroit during an awards banquet in New York City. The City of Detroit received the award for its landmark pension obligation certificate transaction. The Detroit Retirement Systems Funding Trust 2005 issued $1,440,000,000 of taxable Pension Obligation Certificates of Participation ($640 million of taxable fixed rate, Series A and $800 million of taxable floating rate, Series B), which represents:
  - The first pension financing in the State of Michigan (state or local)
  - The largest municipal offering ever completed in City and State
  - The largest sale by a U.S. local-level government entity of taxable or tax-exempt floating rate notes in the asset-backed securities market
  - A highly intricate and creative legal, tax and credit framework
  - Protection of the City and pension systems through integrating the pension funding transaction with the funding and operational mechanisms of the pension systems.

**City of Detroit Hurricane Katrina Relief Program**

- On September 1, 2005, Detroit Mayor Kwame M. Kilpatrick made Detroit the first major city not adjacent to New Orleans to extend its resources to the victims of Hurricane Katrina. Working with hotels, businesses, and human service agencies throughout the region, Mayor Kilpatrick made several resources available to those who sought refuge in Detroit and the Detroit Metro Area. The City and Wayne County activated the Hurricane Katrina Evacuees Reception and Assistance Center. The Coleman A. Young International Airport Passenger Terminal became the designated site for Homeland Security and became the official location

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

for the Reception Center. On September 14, 2005, the Reception Center opened and started processing evacuees. Over 300 evacuees were served over the first four days.

**Build Detroit Program**

- Build Detroit is a public information campaign that the Mayor established to coordinate, manage, and communicate construction projects throughout the City. The Build Detroit campaign is a unique partnership with the business community and the media. Build Detroit helps keep metropolitan Detroit residents informed about construction delays or detours on a weekly basis. With more than 100 projects planned for the next two years, Build Detroit has proven to be a welcome addition for residents and the media.

**Department of Transportation**

- The Department added 121 new buses with low floors to its fleet. The low floor feature eliminates steps and wheelchair lifts and is considered a major customer service improvement.

**Detroit Water and Sewerage Department**

- Continuing operational efficiencies enabled the department to hold rate increases for 2005-06 to the lowest amount in 12 years.

**Recreation Department**

- More than 20 parks were renovated during Summer 2005 including:
    - *Butler Playfield and Playscape* -- Renovations to the 5.66-acre playfield include a large new barrier-free playscape, three youth soccer fields, a ball diamond with backstop and bleachers, picnic tables, benches, trees, sidewalk, and fencing.
    - *Fargo-Fenton Playfield* -- Renovations to the 2 ¾ - acre playfield include two new play structures with swing sets, under which a protective rubber surfacing was installed, a new ¼ - mile walking trail, landscaping along the walking trail and throughout the park, which includes flowering shrubs and trees, new benches, and bike racks.
    - *Peterson Playfield* -- The 17-acre playfield, the only park of its size in the area, received $1.3 Million in renovations thanks in part to a grant award of $950,000 from the Urban Park and Recreation Recovery (UPARR) Program. Renovations include a new playground area, water spray area, walking trail, two basketball courts, six tennis courts, three softball diamonds, baseball diamond, football/soccer field, comfort station, picnic shelter, picnic tables, grills, flag pole, peace pole, parking lot, and landscaping.
    - *Skinner Playfield* -- Renovations to the seven-acre playfield include a new play structure with a protective rubber surfacing, football/soccer field, volleyball court, and new walking trail. Other amenities include benches and picnic tables.

- The Jayne/Lasky Baseball Family Fun Center opened. This is the City's first family entertainment complex. This unique facility offers a wide variety of fun and challenging recreation and sports activities for all ages.

**Economic Development**

To spur Detroit's growth and build stronger neighborhoods, the Mayor has dramatically streamlined the economic development process while forming groundbreaking partnerships with the private sector and community organizations. In just three years, the results have been impressive. The City currently has more than 7,400 housing starts in the pipeline including the unprecedented Far Eastside project, which envisions a neighborhood with 3,000 homes.

- *1001 Woodward*

  This 26-story, twin office tower, adjacent to Campus Martius, is undergoing a $20 million renovation, along with the addition of a $10 million 500-space parking structure.

- *GM Global headquarters*

  General Motors completed a $100 million hotel renovation to its global headquarters including the addition of 10,000 square feet of meeting space and improvements to the main entrance of the facility. A riverside promenade is currently under construction.

- *Downtown YMCA*

  Construction was completed on a $38 million five-story YMCA recreational facility located in the City's downtown area. The new facility houses an auditorium, a swimming pool, health and fitness center, wellness center, parking garage, and childcare center.

- *Woodward Millennium*

  A $37 million mixed-use development in the medical center area was completed last summer. The development includes 180 units of loft-style condominiums and garden-style apartments, a parking garage, and retail space.

- *St. Anne's Gate*

  This new housing development is being built in southwest Detroit near the Ambassador Bridge and consists of new single and multi-family homes. The total project cost is expected to be $41 million.

- *Tri-Centennial Village*

  A $19 million housing development is being constructed on Detroit's west side. The development will include 165 single-family homes, 85 of which will be constructed by Habitat for Humanity.

C-5

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
2013 1

- *Woodward Place at Brush Park*

Phase 1 construction of 100 town homes is complete. Construction will continue over the next three years, ultimately adding up to 700 new housing units to Brush Park. The condominiums average 1,800 square feet. The project also involves the renovation of several historic homes for residential use. The total cost of the project is $75 million.

- *Brush Park Manor*

A 91,000 square foot senior apartment residence on 3.3 acres of land on Brush Street was recently completed. The 3-story complex consists of 113 apartments. The estimated cost of the project is $9.9 million.

- *Greyhaven Shorepoint Village*

Greyhaven Marina Village is being constructed in phases on a 15-acre site on the Detroit River. Phase one consisted of 190 apartments and town homes overlooking the Detroit River. Phase two consists of 144 condominium units. The total cost of the development was $21 million. A third phase under development is the $25 million Shorepoint Village consisting of 57 single-family homes.

- *Woodbridge Estates*

The $98 million project includes 247 rental units, 101 new homes, town homes, and duplex condominiums and 297 enhanced service units on a former public site. In addition, the project will include retail space and a community center. The project is being funded with both public and private funds.

- *Federal Reserve Bank*

The 220,000 square foot $79.5 million reserve branch located northeast of downtown is expected to employ 275 workers handling check clearing, currency processing, economic analysis, and conferences. Its state-of-the-art design and equipment will allow the Detroit Branch's operations to be among the most efficient in the Federal Reserve System.

- *American Axle*

American Axle is completing a second building phase in its $30 million research and training center complex next to its headquarters.

- *Morningstar Commons*

Located on the City's east side, this $30 million housing development is being constructed in phases. The first phase of the development consisted of 40 new single-family homes. The second phase consisted of a 64-unit multi-family townhouse development. Currently under construction, phase three will consist of the construction of 50 new single-family homes and the rehabilitation of 10 existing single-family dwellings.

- *The PricewaterhouseCoopers Building*

The accounting firm, PricewaterhouseCoopers, constructed a five-story, 115,000 square foot office building adjacent to the Ford Field at a cost estimated at $26 million. PricewaterhouseCoopers will occupy the first four floors of the building with the fifth floor available for lease to a future tenant. A 1,200 stall-parking garage will be constructed immediately north of the building on an adjacent parcel of land.

- *Kennedy Square Office Building*

This $54 million project is being built on top of an existing underground garage in the downtown area. The 10-story 240,000 square foot building will offer ground floor retail space and house up to 1,000 workers. The building will be ready for occupancy in June 2006.

- *West Town Homes*

This west side revitalization project is the first of a two-phase project. This project will create a total of 150 single-family homes. Phase I creates 33 scattered, single-family affordable homes constructed on a 40-foot frontage lots. The total development cost for Phases II and I is approximately $26 million.

- *Core City Neighborhoods*

The project includes Core City II, a 66-unit townhouse rental project; Core City West Village, a 60 unit single-family project; and Riverside Estates, a 67-unit rental apartment complex. The projects are all financed with tax credits. Together, these projects account for more than $37 million dollars in public/private investment in the City of Detroit.

There is another $50 million in planned commercial investment that will be located along Grand River Avenue to service residents of these housing units and the residents of the Woodbridge Historical District. The commercial portion is called Core City Town Center and has already solicited several retails outlet stores. Phases two through five will include a development of single-family, market-rate housing, consisting of approximately 170 units; a live work loft complex and specialty retail shops.

- *Circle of Life Health Care Center*

The former Saratoga Hospital on Detroit's east side is being refurbished into the Circle of Life Health Care Center, a private 90-bed facility that would serve mentally ill adults and children. The project represents an investment of $2 million.

- *Far East Side Project*

The project consists of an ambitious eight to 12 year strategic plan to redevelop 1,200 acres with approximately 400 building sites stretching from Jefferson Avenue to Warren Avenue and from Conner Road to Alter Road. No viable homes will be torn down: the development will grow block by block. Some of the housing will be affordable, built with large subsidies

C-6

I-6

I-7

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:33

from the Michigan State Housing Development Authority and some will be market rate. In addition, retail, housing, churches, recreational facilities, public spaces, and schools are to be built in the area to complete the neighborhood.

*Merchants Row*

The $30-million residential transformation of eight 1910-era buildings is located on Woodward across from Campus Martius and the site of the former Hudson's department store. Once-vacant buildings are being demolished or renovated into 163 loft apartments together with restaurants, retail outlets and offices.

- *Forest Park III*

  A $7.8 million residential complex is currently under construction on Detroit's near west side. The project will include 100 senior citizen units.

**Economic Considerations**

The State Economy continues to rank at the bottom nationally in performance. The Bureau of Labor Statistics reports that the August 2005 unemployment rate for the nation was 4.9% while the State had a rate of 6.7% and the City's rate was close to 15%. The economy of the City is very dependent on automobile manufacturing which is undergoing a dramatic restructuring. The City is taking steps to aggressively pursue wireless communications, fuel cell technology, health technology and health care, and the entertainment industries to diversify the City's economy.

**BUDGETARY INITIATIVES**

To address fiscal year 2004-05 General Fund deficit of $155 million, the City's budgetary initiatives in fiscal year 2005-06 include:

- An appropriation of $101.7 million to offset the prior year deficit
- Departmental cuts (January layoffs) to reduce payroll costs – $23.5 million.
- Sales of excess Inventory – $10.0 million.
- Reduction of non essential purchases

**OUR VIEW OF THE FUTURE**

Financial position is one of the key indicators of an organization's strength. While financial statements are an objective measure of the strength of the City, there are other factors, which taken together, provide the framework for our view of the City.

Since taking office in 2002, Kwame M. Kilpatrick has led tremendous growth in the City including the biggest housing and commercial construction boom in 50 years, the largest road and infrastructure improvement program in decades, and a $2-billion overhaul of Detroit's riverfront. After decades of decline, Detroit is experiencing a revival thanks to Mayor Kilpatrick's leadership that has been recognized by media including the New York Times, USA Today, the Los Angeles Times, and the Financial Times of London.

- **Certificate of Achievement for Excellence in Financial Reporting**

The City is pleased that the Government Finance Officers Association (GFOA) recognized Detroit with the prestigious award for excellence in financial reporting for our 2003-04 CAFR.

This is the third consecutive year that the City has achieved this award. In order to be awarded a Certificate of Achievement, a government must publish a well-organized and easily understandable CAFR in accordance with Generally Accepted Accounting Principles (GAAP). A certificate is valid for a period of one year only.

We believe our current CAFR continues to meet the Certificate of Achievement Program requirements, and we are submitting it to the GFOA to determine eligibility for another certificate.

**ACKNOWLEDGEMENTS**

I wish to express my appreciation to the entire staff of all accountants and fiscal staff within the City of Detroit, the City's Finance Department, and the fiscal staff at each of our component units whose professionalism, dedication and efficiency contributed to the preparation of this report. Also, thanks to the Mayor's Office, members of City Council and the Auditor General for their interest and support in planning and conducting the City's financial affairs.

Respectfully submitted,

Roger Short, CPA
*Interim Chief Financial Officer/Finance Director*

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

OFFICE OF THE AUDITOR GENERAL
2 WOODWARD AVE, ROOM 208
DETROIT, MICHIGAN 48226
PHONE 313.224.3101
FAX 313.224.4091

LOREN E. MONROE, CPA, JD
AUDITOR GENERAL
CITY OF DETROIT

Certificate
of
Achievement
for Excellence
in Financial
Reporting

Presented to

City of Detroit,
Michigan

For its Comprehensive Annual
Financial Report
for the Fiscal Year Ended
June 30, 2004

A Certificate of Achievement for Excellence in Financial
Reporting is presented by the Government Finance Officers
Association of the United States and Canada to
government units and public employee retirement
systems whose comprehensive annual financial
reports (CAFRs) achieve the highest
standards in government accounting
and financial reporting.

C-8



*Carla E. Purdy*

President

*Jeffry R. Ener*

Executive Director

I-10

**AUDITOR GENERAL'S LETTER**

May 13, 2006

The Honorable Mayor Kwame M. Kilpatrick
and Members of the City Council
City of Detroit, Michigan

The basic financial statements included in the City's Comprehensive Annual Financial
report for the fiscal year ended June 30, 2005, were audited by KPMG LLP, and Alan C.
Young Associates, P.C., under contract with the City of Detroit, Auditor General. The
audit of these financial statements and the resulting Auditors' opinion satisfies the
requirements of the City Charter under Section 4-205.

Based on the results of their audit, KPMG LLP has issued their report on the
aforementioned financial statements, dated May 13, 2006.

Respectfully,

*Loren E. Monroe*

Loren E. Monroe
Auditor General

I-11

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

C-9

**PRINCIPAL OFFICIALS**
Of The
**CITY OF DETROIT, MICHIGAN**

**Executive**
(Elected)



**Mayor**
KWAME M. KILPATRICK

**Legislative**
(Elected)
City Council



KENNETH V. COCKREL, JR.
President



MONICA CONYERS
President Pro Tem



SHEILA M. COCKREL



BARBARA-ROSE COLLINS



BRENDA JONES



KWAME KENYATTA

I-12

**PRINCIPAL OFFICIALS**
Of The
**CITY OF DETROIT, MICHIGAN**



MARTHA REEVES



ALBERTA TINSLEY-TALABI



JOANN WATSON



**City Clerk**
JANICE WINFREY

**Other Executive Officials**
(Appointed)



ANTHONY ADAMS, ESQ.
Deputy Mayor



ROGER SHORT
Interim Finance Director



MIKE D. BRIDGES, CPA
Chief Accounting Officer

I-13

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 15:08:2013 11:32



**CITY OF DETROIT ORGANIZATION CHART**

June 30, 2005



**ESTABLISHED UNDER:**
A- STATE ACT
C- CITY CHARTER
M- MAYOR'S EXECUTIVE
   ORGANIZATION PLAN
O- CITY ORDINANCE

C-10

I-14

# FINANCIAL

## *The Financial Section contains:*

**Independent Auditors' Report**
**Management's Discussion and Analysis**
**Basic Financial Statements**
**Notes to Basic Financial Statements**
**Required Supplementary Information**

City of Detroit, Michigan
COMPREHENSIVE ANNUAL FINANCIAL REPORT
FOR THE YEAR ENDED JUNE 30, 2005

City of Detroit, Michigan
COMPREHENSIVE ANNUAL FINANCIAL REPORT
FOR THE YEAR ENDED JUNE 30, 2005

# INDEPENDENT

# AUDITORS'

# REPORT

**THIS PAGE LEFT BLANK INTENTIONALLY**

C-11

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

KPMG

**KPMG LLP**
Suite 1200
150 West Jefferson
Detroit, MI 48226-4429

KPMG

**Independent Auditors' Report**

To the Honorable Mayor Kwame Kilpatrick
and Members of the City Council
City of Detroit, Michigan:

We have audited the accompanying financial statements of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of the City of Detroit, Michigan (the City) as of and for the year ended June 30, 2005, which collectively comprise the City's basic financial statements, as listed in the table of contents. These financial statements are the responsibility of the City's management. Our responsibility is to express opinions on these financial statements based on our audit. We did not audit the financial statements of the School District of the City of Detroit, the Downtown Development Authority, the Economic Development Corporation, the Museum of African American History, the Detroit Transportation Corporation, the Detroit Housing Commission, and the Greater Detroit Resource Recovery Authority, which represent 96.9% and 96.6%, respectively, of the assets and revenues of the discretely presented component units. We also did not audit the financial statements of the Retirement Systems, which represent 95.1% and 36.7%, respectively, of the assets and expenses/expenditures/deductions of the aggregate remaining fund information. Those financial statements were audited by other auditors whose reports thereon have been furnished to us, and our opinions, insofar as they relate to the amounts included for the aggregate discretely presented component units and the aggregate remaining fund information, are based on the reports of the other auditors.

Except as discussed in the following paragraph, we conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the City's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and the significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit and the reports of other auditors provide a reasonable basis for our opinions.

The financial statements of the Detroit Housing Commission Component Unit (Housing) have not been audited, and we were not engaged to audit Housing's financial statements as part of our audit of the City's basic financial statements. Housing's financial activities are included in the City's financial statements as a discretely presented component unit and represent 3.1%, 37.8%, and 1.2% of the assets, net assets, and revenues, respectively, of the City's aggregate discretely presented component units.

In our opinion, based on our audit and the reports of other auditors, except for the effects of such adjustments, if any, as might have been determined to be necessary had Housing's financial statements been audited, the financial statements referred to above present fairly, in all material respects, the financial position of the aggregate discretely presented component units for City of Detroit, Michigan as of June 30, 2005, and the changes in financial position thereof for the year then ended, in conformity with U.S. generally accepted accounting principles.

In addition, in our opinion, based on our audit and the reports of other auditors, the financial statements referred to above present fairly, in all material respects, the respective financial position of the governmental activities, the business-type activities, each major fund, and the aggregate remaining fund information of the City of Detroit, Michigan as of June 30, 2005, and the respective changes in financial position and, where applicable, cash flows thereof for the year then ended, in conformity with U.S. generally accepted accounting principles.

In accordance with *Government Auditing Standards*, we have also issued our report dated May 13, 2006 on our consideration of the City's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* and should be considered in assessing the results of our audit.

The Management's Discussion and Analysis on pages 7 through 26, the budgetary comparison information on pages 113 through 115, and the schedules of employer contributions and the schedules of funding progress on page 117 are not a required part of the basic financial statements, but are supplementary information required by U.S. generally accepted accounting principles. We and the other auditors have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

Our audit was conducted for the purpose of forming opinions on the financial statements that collectively comprise the City of Detroit's basic financial statements. The introductory section, combining nonmajor fund financial statements, and statistical section are presented for purposes of additional analysis and are not a required part of the basic financial statements. The combining nonmajor fund financial statements have been subjected to the auditing procedures applied by us and the other auditors in the audit of the basic financial statements and, in our opinion, based on our audit and the reports of other auditors, are fairly stated in all material respects in relation to the basic financial statements taken as a whole. The introductory and statistical sections have not been subjected to the auditing procedures applied by us and other auditors in the audit of the basic financial statements, and accordingly, we express no opinion on them.

*KPMG LLP*

Detroit, Michigan
May 13, 2006

C-12

3

KPMG LLP, a U.S. limited liability partnership, is the U.S.
member firm of KPMG International, a Swiss cooperative.

4

MANAGEMENT'S

DISCUSSION

AND ANALYSIS

(MD & A)

C-13

THIS PAGE LEFT BLANK INTENTIONALLY

5

6

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

City of Detroit, Michigan
MANAGEMENT'S DISCUSSION AND ANALYSIS
FOR THE YEAR ENDED JUNE 30, 2005
(UNAUDITED)

City of Detroit, Michigan
MANAGEMENT'S DISCUSSION AND ANALYSIS
FOR THE YEAR ENDED JUNE 30, 2005
(UNAUDITED)

As management of the City of Detroit, Michigan (City) we offer readers of the City's Comprehensive Annual Financial Report (CAFR) this narrative overview and analysis of the financial activities of the City for the fiscal year ended June 30, 2005. We encourage the readers to consider the information presented here in conjunction with information that we have furnished in our letter of transmittal, contained within this report.

## FISCAL 2005 FINANCIAL HIGHLIGHTS

- The assets of the City, in the government-wide financial statements, exceeded its liabilities at June 30, 2005 by $1.6 billion (*net assets*). Of this amount, $306 million is an unrestricted deficit, while $1.6 billion is invested in capital assets, net of related debt and $318 million is restricted for specific purposes.

- The City's total net assets decreased by $114 million over the previous year's net asset of $1.7 billion.

- The City's total governmental activities' assets increased by $1.2 billion since June 30, 2004 to $3.1 billion at June 30, 2005, due mainly from the net pension asset created from the issuance of $1.4 billion of pension obligation certificates (POCs) and the subsequent contribution to the pension systems. The City's increase in liabilities from $1.8 billion at June 30, 2004, to $3.2 billion at June 30, 2005, occurred mostly from the issuance of the $1.4 billion pension obligation certificates.

- The General Fund Revenues and Other Financing Sources, in the fund financial statements, available for general governmental operations during 2005 were $1.6 billion, a decrease of $2.6 million (0.16 percent) from 2004.

- The General Fund, also in the fund financial statements, ended 2005 with a total fund deficit of $33.6 million. Total Fund Balance decreased from 2004 primarily because Expenditures and Other Financing Uses exceeded Revenues and Other Financing Sources by $87 million. Fund Balance at June 30, 2005 of $122 million was reserved for commitments. Unreserved Fund Balance was $155 million deficit at June 30, 2005, compared to a $95 million deficit at the end of June 2004.

- The City's general obligation bonds and notes outstanding increased by $776 million during the current fiscal year. The key factor in this increase was the issuance of additional general obligation bonds to fund the City's capital plan.

## OVERVIEW OF THE FINANCIAL STATEMENTS

This discussion and analysis is intended to serve as an introduction to the City's basic financial statements, which include the following components: 1) government-wide financial statements, 2) fund financial statements, and 3) notes to the basic financial statements. This report also contains other supplementary information in addition to the basic financial statements. These components are described below:

### Government-wide Financial Statements

The *government-wide financial statements* are designed to provide readers with a broad overview of the City's finances, using accounting methods similar to those used by private-sector companies. The statements provide both short-term and long-term information about the City's financial position, which assists in assessing the City's economic condition at the end of the fiscal year. These financial statements are prepared using the flow of economic resources measurement focus and the accrual basis of accounting, similar to that used by most businesses. They take into account all revenues and expenses connected with the fiscal year even if cash involved has not been received or paid. The government-wide financial statements include two statements:

- *The statement of net assets* - presents information on all of the City's assets and liabilities, with the difference between the two reported as *net assets*. Over time, increases or decreases in net assets may serve as a useful indicator of whether the financial position of the City is improving or deteriorating.

- *The statement of activities* - presents information showing how the City's net assets changed during each fiscal year. All changes in net assets are reported as soon as the underlying event giving rise to the change occurs, *regardless of the timing of the related cash flows*. Thus, revenues and expenses are reported in this statement for some items that will only result in cash flows in future fiscal periods (for example, uncollected taxes and earned but unused vacation). This statement also presents a comparison between direct expenses and program revenues for each major function of the City.

C-14

7

8

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

Both of the government-wide financial statements distinguish functions of the City that are principally supported by taxes and intergovernmental revenues (*governmental activities*) from other functions that are intended to recover a significant portion of their costs through user fees and charges (*business-type activities*).  The governmental activities of the City include public protection, health, recreation and culture, education development, economic development, housing supply and conditions, physical environment, transportation and development and management functions.  The business-type activities of the City include an airport, automobile parking, water and sewage disposal operations, and transportation.

The government-wide financial statements reflect not only the activities of the City itself (known as the primary government), but also legally separate organizations and agencies for which the City is financially accountable.  Financial information for these component units is reported separately from the financial information presented for the primary government.

The government-wide financial statements can be found immediately following this management's discussion and analysis.

### Fund Financial Statements

A fund is a grouping of related accounts that is used to maintain control over resources that have been segregated for specific activities or objectives.  The City, like other state and local governments, uses fund accounting to ensure and demonstrate compliance with finance-related legal requirements.  All of the funds of the City can be divided into three categories: *governmental funds*, *proprietary funds*, and *fiduciary* funds.

*Governmental funds*

*Governmental funds* are used to account for essentially the same functions reported as *governmental activities* in the government-wide financial statements.  However, unlike the government-wide financial statements, governmental fund financial statements focus on *near-term inflows and outflows of spendable resources*, as well as on *balances of spendable resources* available at the end of a fiscal year.  Such information may be useful in evaluating a government's near-term financing requirements.

Because the focus of governmental funds is narrower than that of the government-wide financial statements, it is useful to compare the information presented for governmental funds with similar information presented for *governmental activities* in the government-wide financial statements.  By doing so, readers may better understand the long-term impact of the government's near-term financing decisions.  Both the governmental fund balance sheet and the governmental fund statement of revenues, expenditures, and changes in fund balances provide reconciliation to facilitate the comparison between *governmental funds and governmental activities*.

9

The City maintains several individual governmental funds organized according to their type (special revenue, debt service, capital projects, and permanent funds). Information for three funds that qualify as major is presented separately in the governmental fund statement of revenues, expenditures, and changes in fund balances.  The three major governmental funds are as follows:  the General Fund, the General Retirement System Service Corporation, and the Police and Fire Retirement System Service Corporation.  Data from the remaining governmental funds are combined into a single, aggregated presentation.  Individual fund data for each of the non-major governmental funds is provided in the form of combining statements elsewhere in this report.

The City adopts an annual appropriation budget for its general fund.  A budgetary comparison statement has been provided for the General Fund to demonstrate compliance with this budget.

The basic governmental fund financial statements can be found immediately following the government-wide statements.

*Proprietary funds*

These funds are generally used to show activities that operate more like those of commercial enterprises.  Because these funds charge user fees for services provided to outside customers including local governments, they are known as enterprise funds.  Proprietary funds, like government-wide statements, use the accrual basis of accounting and provide both long and short-term financial information.  There is no reconciliation needed between the government-wide financial statements for business-type activities and the proprietary fund financial statements.  The City uses five enterprise funds to account for its water, sewer, transportation, parking, and airport operations.

Proprietary funds provide the same type of information as the government-wide financial statements, but provide more detail.  The proprietary fund financial statements provide separate information for the Water Fund, Sewage Disposal Fund, Transportation Fund, Automobile Parking Fund and Airport Fund.

The basic proprietary fund financial statements can be found immediately following the governmental fund financial statements.

*Fiduciary funds*

Fiduciary funds are used to account for resources held for the benefit of parties outside of primary government.  The City is trustee, or fiduciary, for its employees' pension plans.  It is responsible for other assets that, because of a trust arrangement can be used only for the trust beneficiaries.  The City also uses fiduciary funds to account for transactions for assets held

10

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
2013 11:00

by the City as agent for various entities. The City is responsible for ensuring that the assets reported in these funds are used for their intended purposes. Fiduciary funds are *not* reflected in the government-wide financial statements because the resources of those funds are not available to support the City's own programs. All of the City's fiduciary activities are reported in a separate statement of fiduciary net assets and a statement of changes in fiduciary net assets. The accounting used for fiduciary funds is much like that used for proprietary funds.

*Notes to the Basic Financial Statements*

The notes provide additional information that is essential to a full understanding of data provided in the government-wide and fund financial statements. The notes to the basic financial statements can be found immediately following the fiduciary fund financial statements.

*Additional Information*

The combining statements, which include nonmajor funds, for governmental and trust and agency funds are presented immediately following the notes to the financial statements.

**FINANCIAL ANALYSIS OF THE CITY AS A WHOLE**

*Net assets*

As noted earlier, net assets may serve over time as a useful indicator of a government's financial position. In the case of the City, assets exceeded liabilities by $1.6 billion at June 30, 2005.

By far the largest portion of the City's net assets reflects its investment in capital assets (land, buildings, roads, bridges, etc.), less any related debt used to acquire those assets that is still outstanding which is $1.6 billion. The City uses these capital assets to provide services to citizens; consequently, these assets are not available for future spending. Although the City's investment in its capital assets is reported net of related debt, it should be noted that the resources needed to repay this debt must be provided from other sources, since the capital assets themselves cannot be used to liquidate these liabilities.

An additional portion of the City's net assets in the amount of $318 million represent resources that are subject to external restrictions on how they may be used.

**City of Detroit, Michigan**
**Summary of Net Assets**
**(in thousands of dollars)**

| | Governmental Activities | | Business-type Activities | | Total | |
|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 | 2005 | 2004 |
| Assets: | | | | | | |
| Current and other assets | $ 1,792,486 | $ 781,052 | $ 1,797,712 | $ 1,384,886 | $ 3,590,198 | $ 2,165,938 |
| Capital assets | 1,403,043 | 1,194,050 | 5,105,722 | 4,593,455 | 6,508,765 | 5,787,505 |
| Total assets | 3,195,529 | 1,975,102 | 6,903,434 | 5,978,341 | 10,098,963 | 7,953,443 |
| Liabilities: | | | | | | |
| Other liabilities | 671,375 | 481,145 | 329,035 | 354,373 | 1,000,410 | 943,659 |
| Long-term liabilities | 2,517,648 | 1,300,807 | 4,955,407 | 4,077,927 | 7,473,055 | 5,270,593 |
| Total liabilities | 3,189,023 | 1,781,952 | 5,284,442 | 4,432,300 | 8,473,465 | 6,214,252 |
| Net assets: | | | | | | |
| Invested in capital assets, net of related debt | 562,312 | 423,119 | 1,050,443 | 1,063,418 | 1,612,755 | 1,486,537 |
| Restricted | 30,488 | 85,250 | 287,779 | 199,037 | 318,268 | 284,287 |
| Unrestricted | (586,294) | (315,219) | 280,770 | 283,586 | (305,524) | (31,633) |
| Total net assets | $ 6,506 | $ 193,150 | $ 1,618,992 | $ 1,546,041 | $ 1,625,498 | $ 1,739,191 |

C-16

11

12

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 15:08:2013 11:32

**City of Detroit, Michigan**
**Changes in Net Assets**
**Years Ended June 30**
**(in thousands of dollars)**

| | Governmental Activities | | Business-type Activities | | Total | |
|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 | 2005 | 2004 |
| Revenues: | | | | | | |
| Program Revenues: | | | | | | |
| Charges for Services | $ 407,969 | $ 318,536 | $ 486,073 | $ 464,344 | $ 894,042 | $ 782,880 |
| Operating Grants and Contributions | 246,249 | 315,322 | 88,111 | 89,345 | 334,360 | 404,667 |
| Capital Grants and Contributions | 135,505 | 115,529 | 15,081 | 33,759 | 150,586 | 149,288 |
| General Revenues: | | | | | | |
| Property Taxes | 239,508 | 253,881 | - | - | 239,508 | 253,881 |
| Municipal Income Tax | 282,502 | 290,615 | - | - | 282,502 | 290,615 |
| Utility User Tax | 52,940 | 47,423 | - | - | 52,940 | 47,423 |
| Wagering Tax | 137,970 | 116,146 | - | - | 137,970 | 116,146 |
| Hotel and Liquor Tax | 16,311 | 16,217 | - | - | 16,311 | 16,217 |
| Shared Taxes | 282,914 | 286,479 | - | - | 282,914 | 286,479 |
| Other Local Taxes | 11,713 | 18,118 | - | - | 11,713 | 18,118 |
| Investment Earnings | 14,465 | 4,500 | 22,809 | 12,516 | 37,274 | 17,016 |
| Miscellaneous | 6,432 | 13,173 | (6,850) | 3,813 | (418) | 16,986 |
| Total Revenues | 1,834,478 | 1,795,939 | 605,224 | 603,777 | 2,439,702 | 2,399,716 |
| | | | | | | |
| Expenses: | | | | | | |
| Public Protection | 876,157 | 755,816 | - | - | 876,157 | 755,816 |
| Health | 170,040 | 172,602 | - | - | 170,040 | 172,602 |
| Education | 73,771 | 95,655 | - | - | 73,771 | 95,655 |
| Recreation and Culture | 75,145 | 82,149 | - | - | 75,145 | 82,149 |
| Economic Development | 114,865 | 102,680 | - | - | 114,865 | 102,680 |
| Transportation | 46,272 | 49,858 | - | - | 46,272 | 49,858 |
| Housing Supply and Conditions | 17,981 | 21,190 | - | - | 17,981 | 21,190 |
| Physical Environment | 277,306 | 267,233 | - | - | 277,306 | 267,233 |
| Development and Management | 214,747 | 350,970 | - | - | 214,747 | 350,970 |
| Interest on Long-term Debt | 65,253 | 58,080 | - | - | 65,253 | 58,080 |
| Sewage Disposal | - | - | 192,421 | 186,980 | 192,421 | 186,980 |
| Transportation | - | - | 204,914 | 206,320 | 204,914 | 206,320 |
| Water | - | - | 195,086 | 198,120 | 195,086 | 198,120 |
| Automobile Parking | - | - | 26,296 | 21,991 | 26,296 | 21,991 |
| Airport | - | - | 3,141 | 4,031 | 3,141 | 4,031 |
| Total Expenses | 1,931,537 | 1,956,233 | 621,858 | 617,442 | 2,553,395 | 2,573,675 |
| | | | | | | |
| Decrease in Net Assets before Transfers | (97,059) | (160,294) | (16,634) | (13,665) | (113,693) | (173,960) |
| Transfers | (89,585) | (77,108) | 89,585 | 77,108 | - | - |
| Change in Net Assets | (186,644) | (237,402) | 72,951 | 63,443 | (113,693) | (173,960) |
| Net Assets, July 1 | 193,150 | 430,522 | 1,546,041 | 1,482,592 | 1,739,190 | 1,913,150 |
| Net Assets, June 30 | $ 6,506 | $ 193,150 | $ 1,618,992 | $ 1,546,041 | $ 1,625,497 | $ 1,739,190 |

13

*Governmental Activities*

Net assets of the City's governmental activities decreased $187 (97%) to reflect a balance of $6 million. A significant portion of those net assets are either restricted as to the purpose they can be used for or they are invested in capital assets (buildings, roads, bridges, etc.). Consequently, unrestricted net assets showed a $586 million deficit at the end of this fiscal year.

The deficit is the result of having long-term commitments that are greater than currently available resources. Specifically, in accordance with its budgetary policies, the City did not include in past annual budgets the full amounts needed to finance future liabilities arising from, long term commitments. The City will include these amounts in future years' budgets as they come due.

Over 40 % of the City's revenue comes from taxes. Total taxes decreased by 0.5 %. Total taxes include a decrease in property taxes of $14 million (6 % percent) is primarily due to a flat property tax growth coupled with population decline. Wagering taxes increased by $22 million (19 %) due to enactment of State of Michigan House Bill 4612 and an increase in activity. The bill was effective September 1, 2004. The bill raised the tax on Detroit's three casinos adjusted gross receipts received to 24 percent from 18 percent. The new additional tax of 6 percent generated roughly $75 million per year of which one-third is earmarked for the City. Thus, the City's share was $25 million.

Federal and State grants vary from year to year depending primarily on the level of spending for programs, construction, and other projects.

Expenses for governmental activities in 2005 were $1.9 billion. This reflects a decrease of $24 million (1.22 %) over 2004. Public protection (police and fire protection) was the largest component of current expenses, accounting for 45 % of total expenses. Public protection expenses increased $120 million (16 %) over 2004 due to increased payouts for litigation, workmans compensation and rising health expenses for retired police and fire employees. Development and Management decreased $136 million (39%) below 2004 as a result of cost reductions and restructuring of related services.

Revenues for governmental activities were $1.8 billion.

- The amount that taxpayers paid for these activities through City taxes was only $729 million. Other funding for governmental activities was provided from the following sources:

  o User fees were paid by those who directly benefited from certain programs ($408 million),

  o Other governments and organizations subsidized certain programs with grants and contributions ($382 million).

  o Other revenues such as state aid, interest, and miscellaneous income funded the "public benefit" portion of various programs ($315 million)

14

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

**Expenses by Function Type - Governmental Activities**



**Revenues by Source - Governmental Acivities**



C-18

15

*Business-type Activities*

Total revenues of the City's business-type activities increased by $1.4 million in 2005 generally due to higher charges for services revenue.

- The Sewage Disposal Fund's operating revenues for 2005 increased by 8.2 % due to an increase in sewage rates. Offsetting the increase in sewer rates was a reclass for this year's bad debt expense, which was charged directly against gross service revenue. However, net sewer revenue still increased over the previous year.

- The Transportation Fund's operating revenues decreased by 7.6 % during fiscal year 2005. Capital contributions in 2005 decreased by 75.8% due to a significant decrease in projects planned for 2004-2005.

- The Water Fund's operating revenues for 2005 increased by 6.4 % due to an increase in water rates. More than offsetting the increase in water rates was reclass for this year's bad debt expense, which was charged directly against gross service revenue.

- The Automobile Parking Fund's operating revenues for 2005 decreased 30 % due to garages not being filled to capacity. Also, the Detroit Red Wings (the local National Hockey League team) did not play during the 2005 season because of the players strike which significantly reduced utilization of municipal parking facilities. Operating expenses in 2005 increased by 22.5 % due to an increase in operating expenses (i.e., expenses associated with salaries and benefits, and contractual services) and depreciation.

- The Coleman A. Young Municipal Airport's operating revenues for 2005 increased 21.4%. Operating expenses in 2005 increased by 22 % percent due to an increase in personnel and related fringe benefits, materials, supplies, and other expenses, and depreciation.

16

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

Expenses by Function Type - Business-type Activities



- Airport
- Automobile Parking
- Sewage Disposal
- Transportation
- Water

Revenues by Source - Business-type Activities



- Charges for Services
- Operating Grants and Contributions
- Capital Grants/Contributions
- Investment Earnings
- Other

C-19

## FINANCIAL ANALYSIS OF THE CITY'S FUNDS

As noted earlier, the City uses fund accounting to ensure and demonstrate compliance with finance-related legal requirements.

### Governmental Funds

The focus of the City's *governmental funds* is to provide information on near-term inflows, outflows, and balances of spendable resources. Such information is useful in assessing the City's financing requirements. In particular, *unreserved fund balance* may serve as a useful measure of a government's net resources available for spending at the end of the fiscal year.

At June 30, 2005, the City's governmental funds reported combined ending fund balances of $275 million, a decrease of $113 million in comparison with the prior year. The combined fund balance includes an *unreserved fund deficit* of $78 million. The remainder of fund balance is reserved to indicate that it is not available for spending because it has already been committed 1) to liquidate contracts and purchase orders of the prior period ($49 million), 2)

17

18

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 5.08.2013 11:32

to pay debt service ($52 million) and 3) for a variety of other restricted purposes ($252 million).

The General Fund is the chief operating fund of the City. At the end of the current fiscal year, the unreserved fund balance was a $155 million deficit with a combined (reserved and unreserved) total fund deficit of $33 million.

The fund deficit of the City's General Fund increased by $103 million during the current year due to Expenditures and Other Financing Uses exceeded Revenues and Other Financing Sources by $87 million. As a result of the City's population decline and economic downturn cut into the City's two primary revenue sources: 1) income taxes and 2) state sharing funds are directly connected to the health of the economy. Also, the City continues to experience rising health care costs and pension costs.

With the issuance of the POCs this fiscal year, two Special Revenue Funds, the Detroit General Retirement System Service Corp. (DGRS) and the Detroit Police and Fire Retirement System Service Corp. (DPFRS), were created to account for the proceeds and service payments related to the issuance of the POCs. The DGRS has a total fund balance of $36.2 million, of which $23.8 million is reserved for advances and $12.4 million is reserved for debt service. The DPFRS has a total fund balance of $10.6 million, which is reserved, for debt service.

The Other Governmental Funds has a total fund balance of $262 million, of which $185 million is reserved for advances, inventory, encumbrances, endowments and trusts, debt service, and capital projects, while there was an unreserved, undesignated balance of $77 million.

### Changes in fund balance

The City's governmental fund revenues (excluding other financing sources) decreased by 1.4 percent or $27 million.

### Proprietary funds

The City's proprietary funds provide the same type of information found in the government-wide financial statements, but in more detail.

Unrestricted net assets of the Sewage Disposal, Transportation, Water, Automobile Parking, and Coleman A. Young Municipal Airport Funds at the end of the year amounted to $1.6 billion. The total increase in unrestricted net assets related to the $1 billion of net assets invested in capital assets, net of related debt and the $288 million of net assets restricted is primarily due to assets being reserved for debt service and a transfer in of governmental-type activities of $89 million to business-type activities. Other factors concerning the finances of these five funds have already been addressed in the discussion of the City's business-type activities.

19

### General Fund Budgetary Highlights

The City's 2005 General Fund Budget is $1.7 billion. The budget reflects an increase of $98 million (6%) over the 2004 Budget. The City's 2005 General Fund Budget contains no additions or material changes to existing taxes and fees and was approved by the City Council in June 2004.

The General Fund revenues and expenditures in 2005 ended the current year with an unreserved fund balance deficit of $155 million, which is a $60 million increase (63%) over 2004. Within the 2005-2006 adopted budget, the City Council appropriated $101 million for the prior year deficit.

During the year, the estimated revenues in the budget exceeded actual revenues and other resources by $216.2 million. The majority of this amount is attributable to actual property taxes, municipal income tax, grant revenues, sales and charges for services, and sale of real property being somewhat less than the final budgets. However, expenditures were less than budgeted estimates. Budgeted expenditures were approximately $1.7 billion but actual expenditures were $1.5 billion, a favorable variance of $200 million.

Differences between the original budget and the final amended budget consisted of a total net increase in estimated revenues of $161.4 million and a total net increase in appropriations of $238.7 million. The difference was offset by a total net increase in Other Financing Sources and Uses of $77 million.

A major reason for the increase in estimated revenues can be briefly summarized as follows:

- $133.2 million increase in grants (Federal, State and other)
- $10.9 million increase in sales and charges for services

Some major reasons for the increase in appropriations can be briefly summarized as follows:

- $68.5 million in increases for the Police department
- $53 million in increases for the Health department
- $84.8 million in increases for Sale of General Obligation Bonds

### CAPITAL ASSETS AND DEBT ADMINISTRATION

#### Capital Assets

The City's capital assets for its governmental and business-type activities as of June 30, 2005 amount to $6.5 billion (net of accumulated depreciation). These capital assets include land,

20

C-20

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15-08:2013 11:32

buildings and improvements, machinery and equipment, vehicles, park facilities, roads, streets, and bridges.

Major capital projects during the current fiscal year included the following:

- The Recreation department expended $17 million on capital activities for the construction and improvement of parks, playgrounds, and recreation facilities.
- The Department of Public Works expended $66 million on capital activities for road paving and resurfacing including the modernization of traffic signals.
- The Police Department expended $30 million on capital activities for construction of communication center, acquisition of electronic equipment and software, renovation of precincts, and the purchase of police vehicles.
- The Detroit Institute of Arts expended $35 million on capital activities for expansion and renovation.
- The City expended $25 million to acquire land for the waterfront redevelopment and the casino development project.
- The Fire Department expended $19 million on capital activities to acquire fire trucks and renovate fire stations.
- The Transportation Department expended $32 million on capital activities to acquire 102 buses through a capital lease purchase.

**City of Detroit, Michigan**
**Capital Assets (net of depreciation)**
**(in thousands of dollars)**

|  | Governmental Activities | | Business-type Activities | | Total | |
|---|---|---|---|---|---|---|
|  | 2005 | 2004 | 2005 | 2004 | 2005 | 2004 |
| Land and Land Rights | $ 383,014 | $ 355,512 | $ 36,702 | $ 36,702 | $ 419,716 | $ 392,214 |
| Land Improvements | - | - | 47,747 | 43,371 | 47,747 | 43,371 |
| Building and Structures | 506,428 | 434,835 | 1,539,650 | 1,058,727 | 2,046,078 | 1,493,562 |
| Sewer and water lines | - | - | 900,236 | 879,131 | 900,236 | 879,131 |
| Machinery, Equipment, Fixtures and Vehicles | 91,775 | 80,405 | 937,817 | 681,482 | 1,029,592 | 761,887 |
| Works of Art | 29,788 | 29,788 | - | - | 29,788 | 29,788 |
| Infrastructure | 185,041 | 140,403 | - | - | 185,041 | 140,403 |
| Construction-in-Progress | 206,997 | 153,107 | 1,643,568 | 1,894,041 | 1,850,565 | 2,047,148 |
| **Total** | $ 1,403,043 | $ 1,194,050 | $ 5,105,722 | $ 4,593,454 | $ 6,508,765 | $ 5,787,504 |

Information on the City's capital assets can be found in Note III A 7 to the basic financial statements.

*Debt*

At the end of the current fiscal year, the City had total long-term obligations of $ 7.4 billion outstanding. Of this amount, $931 million are general obligation bonds backed by the full faith and credit of the City and $ 5.7 billion are revenue bonds, commercial paper, loans, and other obligations of the City's business enterprises. The remainder includes other types of long-term obligations.

In August 2004, the City issued $41.3 million of General Obligation Unlimited Tax Bonds for capital improvements to various General City Agencies. Approximately $70.4 million in refunding bonds were issued to refund prior debt. The bonds mature beginning April 1, 2009 with an average yield of 4.22 percent.

In August 2004, the City issued $62.2 million of Self-Insurance Bonds Limited Tax to fund payment of claims. The bonds mature beginning April 1, 2009 with an average yield of 4 percent.

In January 2005, the City issued $81 million in General Obligation Unlimited Tax Refunding Bonds to refinance prior debt. The bonds mature beginning April 1, 2006 with an average yield of 4 percent.

In June 2005, the City issued $87 million of Capital Improvement Limited Tax Bonds to acquire, construct, and equip several 800 MHz radio frequency towers and related communication facilities. In addition, $11.8 million in refunding bonds were issued to

C-21

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 145 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
etro 1 15 0 f 2013 11:32

refinance prior debt. The bonds mature beginning April 1, 2006 with an average yield of 4.11 percent.

In June 2005, the Detroit Retirement System Funding Trust (DRSFT) issued $1,440,0000 ($640 million of taxable fixed rate, Series A and $800 million of taxable floating rate, Series B) of taxable Pension Obligation Certificates of Participation (POCs). The Trust was created by the General Retirement System Service Corporation (GRSSC) and the Police and Fire Retirement System Service Corporation (PFRSSC), both blended component units of the City. The City entered into service contracts with the GRSSC and the PFRSSC to facilitate the transaction. The POCs represent undivided proportionate interests in the rights to receive the payments from the City under its service contracts with the GRSSC and the PFRSSC.

The POCs were issued for the purpose of providing money to pay down certain unfunded accrued actuarial liabilities (UAAL) of each Retirement System of the City of Detroit: 1) the General Retirement System (GRS) and 2) the Police & Fire Retirement System (PFRS). The UAAL is a liability of the City of Detroit (COD) for past services rendered by its employees that must be paid. Michigan State Law and the Michigan Constitution require the city to annually pay down a portion of this UAAL liability. The GRS also include employees and retirees of certain proprietary funds (i.e., The Department of Transportation (DDOT) and the Department of Water and Sewerage) and The Detroit Public Library, which is a component unit of the city.

The City contributed $739,793,897 of the proceeds were to the GRS, which included $52,503,654 of annual required contributions for June 30, 2005. The remaining amount of $687,290,243 resulted in a net pension asset. $630,829,188 of the proceeds were contributed to the PFRS, which included $98,842,261 of annual required contributions for June 30, 2005. The remaining amount of $531,986,927 resulted in a net pension asset.

Interest payments for Series A will commence on December 15, 2005 and are due semi-annually while the first principal payment is payable June 15, 2007, due annually, and are payable through 2025. Interest payments for Series B will commence on September 15, 2005 and are due quarterly through 2025 while the first principal payment is payable June 15, 2007, due annually, and are payable through 2025. The interest rates on the outstanding obligations range from 4.004% and 4.948

In June 2005, the City issued $54.4 million in Revenue Anticipation Notes to pay necessary operating expenditures. The notes mature April 2006 with a yield of 2.63 percent.

The ratio of net general obligation bonded debt to taxable valuation and the amount of bonded debt per capita are useful indicators of the City's debt position to management, citizens, and investors. Note - the following ratios do not include the Pension Obligation Certificates. A comparison of these indicators follows:

| | FY 2005 | FY 2004 |
|---|---|---|
| Net General Bonded debt | $1,209,104 | $1,104,034 |
| Net General Bonded debt per capita | $1,271.05 | $1,211.37 |
| Ratio of net General Bonded debt to net assessed value (50% of present market value) | 14.50 % | 13.24% |
| Ratio of debt to present market value | 7.25 % | 6.62% |

The Michigan Constitution established the authority, subject to constitutional and statutory prohibition, for municipalities to incur debt for public purposes. The City is subject to the Home Rule Act, ACT 279 Public Acts of Michigan, 1909, as amended, which limits the net indebtedness incurred for all public purposes to as much as, but not to exceed, the greater of the following: (a) 10% of the assessed value of all the real and personal property in the City; or (b) 15% of the assessed value of all the real and personal property in the City if that portion of the total amount of indebtedness incurred which exceeds 10% is, or has been, used solely for the construction or renovation of hospital facilities. Not all the General Bonded debt is subject to the general debt limitation, which is $728.2 million. The City's legal debt limitation at June 30, 2005 was $1.3 billion of which $582 million is available for use.

The City's ratings on uninsured general obligation bonds as of June 30, 2005 were:

| | |
|---|---|
| Moody's Investors Service, Inc. | Baa1 |
| Standard and Poor's Corporation | BBB+ |
| Fitch IBCA, Inc. | BBB+ |

Subsequent to June 30, 2005, the Moody's Investors Service, Inc. reduced the City's uninsured bond ratings to Baa2.

Subsequent to June 30, 2005, the Standard and Poor's Corporation reduced the City's uninsured bond ratings to BBB.

Subsequent to June 30, 2005, the Fitch IBCA, Inc. reduced the City's uninsured bond ratings to BBB.

Additional information on the City's long-term debt can be found in Notes III B 4,5 and 6 to the basic financial statements.

The City's ratings were reduced primarily due to less favorable revenues for Property Taxes and Municipal Income Tax and the City's inability to identify new revenue sources. In addition, the City was under increasing financial pressure due to rising health care and pension costs.

C-22

23

24

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

**ECONOMIC FACTORS AND NEXT YEARS BUDGET**

The City made several strategic budget cuts in 2005-2006 that did not impact City services:

- The Detroit People Mover subsidy was reduced by $1.5 million.

- The Zoo subsidy was reduced by $1.5 million.

- The Center Computing Services Department was eliminated. The function was consolidated with the City's Information Technology Services Department to increase efficiency for agencies.

- The Department of Culture, Arts & Tourism was eliminated. The function (including Eastern Market and arts grants management) was consolidated with the Recreation Department.

- The City eliminated 205 take home vehicles (62 general, 43 executive, and 100 police). The vehicles are to be sold at auction for projected proceeds of $1.3 million.

- The City initiated a 10 percent reduction in non-union and appointees salary.

The City is currently experiencing a less favorable economic environment resulting from the continued decline in the manufacturing sector of the economy, partially offset by modest increases in leisure and hospitality, professional and business services, educational and health services, and construction. Detroit's unemployment rate decreased from 15.1 percent in June 2004 to 14.8 percent by June 2005. As of November 2005, the rate had decreased to 13.3 percent.

The 2005-06 Budget has 2,992 fewer positions including layoffs:

| Description | FY 2005-2006 | FY 2004-2005 | Variance |
|---|---|---|---|
| General City | 10,203 | 12,668 | 2,465 |
| Enterprise Agencies | 5,548 | 6,075 | 527 |
| Total Budgeted Positions | 15,751 | 18,743 | 2,992 |

**Requests for Information**

This financial report is designed to provide a general overview of the City's finances for all of those with an interest in the government finances. Questions concerning any of the information provided in this report or requests for additional financial information should be addressed to City of Detroit Finance Department, Coleman A. Young Municipal Center, Suite 801, 2 Woodward Avenue, Detroit, Michigan 48226.

C-23

BASIC

FINANCIAL

STATEMENTS

(BFS)

**THIS PAGE LEFT BLANK INTENTIONALLY**

C-24

27

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

**City of Detroit, Michigan**
STATEMENT OF NET ASSETS
June 30, 2005

C-25

| | Primary Government | | | Component |
| | Governmental Activities | Business-type Activities | Total | Units |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current Assets:** | | | | |
| Cash and Cash Equivalents | $ 50,307,208 | $ 2,208,061 | $ 52,515,269 | $ 7,040,534 |
| Investments | 265,697,802 | 60,216,610 | 325,914,412 | 220,845,055 |
| Escrow Deposits | - | - | - | 16,888,051 |
| Accounts and Contracts Receivable: | | | | |
| Internal Balances | (40,465,211) | 40,465,211 | - | - |
| Due from Primary Government | - | - | - | 16,763,769 |
| Due from Component Units | 5,035,254 | - | 5,035,254 | - |
| Due from Other Governmental Agencies | 200,132,033 | 7,311,200 | 207,443,233 | 274,715,217 |
| Other Receivables | 64,005,862 | 171,196,549 | 235,202,411 | 181,454,081 |
| Total Accounts and Contracts Receivable - Net | 228,707,938 | 218,972,960 | 447,680,898 | 472,933,067 |
| Inventories | 22,102,413 | 24,423,946 | 46,526,359 | 8,585,441 |
| Prepaid Expenses | 127,636 | 1,418,433 | 1,546,069 | 3,551,895 |
| Total Unrestricted Assets | 566,942,997 | 307,240,010 | 874,183,007 | 729,844,043 |
| **Restricted Assets:** | | | | |
| Cash and Cash Equivalents | 88,805,837 | 48,602,256 | 137,408,093 | 24,633,915 |
| Investments | 45,599,567 | 687,583,173 | 733,182,740 | 446,073,664 |
| Total Restricted Assets | 134,405,404 | 736,185,429 | 870,590,833 | 470,707,579 |
| Total Current Assets | 701,348,401 | 1,043,425,439 | 1,744,773,840 | 1,200,551,622 |
| **Non-Current Assets:** | | | | |
| Restricted Investments | - | 376,045,765 | 376,045,765 | - |
| Long-Term Receivable | - | 44,946,430 | 44,946,430 | - |
| Loans and Notes Receivable | - | - | - | 26,010,604 |
| Net Pension Asset | 1,011,722,816 | 256,308,295 | 1,268,031,111 | 22,653,538 |
| Bonds, Notes and POC Issuance Costs | 55,581,562 | 76,336,302 | 131,917,864 | 4,642,547 |
| Advance to Component Unit | 23,819,934 | - | 23,819,934 | - |
| Deferred Charges | - | - | - | 1,929,376 |
| Capital Assets: | | | | |
| Non-Depreciable | 619,799,106 | 1,680,270,437 | 2,300,069,543 | 564,320,508 |
| Depreciable, Net | 783,243,729 | 3,425,451,196 | 4,208,694,925 | 1,540,635,308 |
| Total Capital Assets, Net | 1,403,042,835 | 5,105,721,633 | 6,508,764,468 | 2,104,955,816 |
| Other Assets | 14,014 | 650,000 | 664,014 | 11,307,571 |
| Total Non-Current Assets | 2,494,181,161 | 5,860,008,425 | 8,354,189,586 | 2,171,499,432 |
| Total Assets | 3,195,529,562 | 6,903,433,864 | 10,098,963,426 | 3,372,051,074 |

The accompanying notes are an integral part of the financial statements.

| | Primary Government | | | Component |
| | Governmental Activities | Business-type Activities | Total | Units |
|---|---|---|---|---|
| **LIABILITIES** | | | | |
| **Current Liabilities:** | | | | |
| Accounts and Contracts Payable | $ 175,494,769 | $ 38,831,271 | $ 214,326,040 | $ 162,020,841 |
| Due to Other Governmental Agencies | 44,834,866 | - | 44,834,866 | - |
| Due to Primary Government | - | - | - | 5,035,256 |
| Due to Component Units | 14,999,010 | 1,764,760 | 16,763,770 | - |
| Deposits and Refunds | 29,153,581 | 95,324 | 29,248,905 | - |
| Accrued Interest Payable | 16,226,059 | 78,671,369 | 94,897,428 | 23,365,150 |
| Loans and Advances from Primary Government | - | - | - | 334,229 |
| Accrued Salaries and Wages | 47,996,848 | 6,567,446 | 54,564,294 | 99,584,154 |
| Deferred Revenue | 8,475,533 | 3,821,205 | 12,296,738 | 22,553,351 |
| Other Current Liabilities | 61,598,795 | 12,056,140 | 73,654,935 | 16,081,657 |
| Restricted Liabilities: | | | | |
| Accounts Payable | 2,323,943 | 82,621,279 | 84,945,222 | - |
| Accrued Public Liability and Worker's Compensation | 17,115,917 | - | 17,115,917 | - |
| Other Liabilities | 723,944 | 718,363 | 1,442,307 | - |
| Total Restricted Liabilities | 20,163,804 | 83,339,642 | 103,503,446 | - |
| Bonds, Notes and Other Debt Payable - Current | 140,031,083 | 81,245,000 | 221,276,083 | 283,463,363 |
| Accrued Compensated Absences | 112,401,028 | 17,262,561 | 129,663,589 | 6,750,759 |
| Accrued Public Liability and Workers' Compensation | - | 5,379,974 | 5,379,974 | 16,743,169 |
| Total Current Liabilities | 671,375,376 | 329,034,692 | 1,000,410,068 | 635,931,929 |
| **Long-Term Liabilities:** | | | | |
| Bonds, Notes and Other Debt Payable | 1,090,408,971 | 4,654,089,820 | 5,744,498,791 | 2,277,840,783 |
| Unamortized Premium/(Discount) and Loss (Gain) on Defeasances | 31,508,983 | (48,239,486) | (16,730,503) | 29,990,243 |
| Bonds, Notes and Other Debt Payable -Net | 1,121,917,954 | 4,605,850,334 | 5,727,768,288 | 2,307,831,026 |
| Pension Obligation Certificates Payable | 1,170,607,422 | 269,392,578 | 1,440,000,000 | - |
| Deferred Swap Termination Fees | - | 19,084,051 | 19,084,051 | - |
| Advance Payable to Primary Government | - | - | - | 23,819,934 |
| Accrued Compensated Absences | 44,597,266 | 19,796,809 | 64,394,075 | 117,897,488 |
| Accrued Public Liability and Workers' Compensation | 180,525,495 | 23,100,987 | 203,626,482 | 25,342,576 |
| Other Long -Term Obligations | - | 18,182,314 | 18,182,314 | - |
| Total Long-Term Liabilities | 2,517,648,137 | 4,955,407,073 | 7,473,055,210 | 2,474,891,024 |
| Total Liabilities | 3,189,023,513 | 5,284,441,765 | 8,473,465,278 | 3,110,822,953 |
| **NET ASSETS** | | | | |
| Invested in Capital Assets, Net of Related Debt | 562,311,648 | 1,050,443,297 | 1,612,754,945 | 531,905,048 |
| Restricted for: | | | | |
| Endowments and Trust (Non-Expendable) | 1,253,623 | - | 1,253,623 | 15,913,126 |
| Capital Projects | - | - | - | 39,196,460 |
| Debt Service | 29,234,972 | 287,778,927 | 317,013,899 | (21,944,952) |
| Unrestricted (Deficit) | (586,294,194) | 280,769,875 | (305,524,319) | (303,841,561) |
| Total Net Assets | $ 6,506,049 | $ 1,618,992,099 | $ 1,625,498,148 | $ 261,228,121 |

28

29

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

**City of Detroit**
**STATEMENT OF ACTIVITIES**
**For the Year Ended June 30, 2005**

| Functions/Programs | Expenses | Charges for Services | Operating Grants and Contributions | Capital Grants and Contributions | Governmental Activities | Business-type Activities | Total | Component Units |
|---|---|---|---|---|---|---|---|---|
| **Primary Government:** | | | | | | | | |
| **Governmental Activities:** | | | | | | | | |
| Public Protection | $ 876,156,606 | $ 90,825,019 | $ 418,374 | $ - | $ (784,913,213) | $ - | $ (784,913,213) | $ - |
| Health | 170,039,930 | 13,026,677 | 133,521,803 | - | (23,491,450) | - | (23,491,450) | - |
| Recreation and Culture | 75,145,276 | 11,474,294 | 1,373,670 | - | (62,297,312) | - | (62,297,312) | - |
| Economic Development | 114,865,586 | 5,427,118 | 11,464,565 | 59,785,281 | (38,188,622) | - | (38,188,622) | - |
| Education | 73,770,757 | - | 73,837,899 | - | 67,142 | - | 67,142 | - |
| Housing Supply and Conditions | 17,980,767 | 6,700,117 | 5,795,925 | 1,148,369 | (4,336,356) | - | (4,336,356) | - |
| Physical Environment | 277,305,834 | 81,944,899 | 130,053 | - | (195,230,882) | - | (195,230,882) | - |
| Transportation | 46,272,594 | - | - | 74,571,099 | 28,298,505 | - | 28,298,505 | - |
| Development and Management | 214,746,647 | 198,570,684 | 19,706,576 | - | 3,530,613 | - | 3,530,613 | - |
| Interest on Long-Term Debt | 65,252,896 | - | - | - | (65,252,896) | - | (65,252,896) | - |
| Total Government Activities | 1,931,536,893 | 407,968,808 | 246,248,865 | 135,504,749 | (1,141,814,470) | - | (1,141,814,470) | |
| **Business-type Activities:** | | | | | | | | |
| Sewage Disposal | 192,421,480 | 254,350,136 | - | - | - | 61,928,656 | 61,928,656 | - |
| Transportation | 204,913,780 | 22,959,490 | 88,110,603 | 7,120,491 | - | (86,723,196) | (86,723,196) | - |
| Water | 195,085,657 | 193,954,987 | - | 6,938,882 | - | 5,808,212 | 5,808,212 | - |
| Automobile Parking | 26,295,677 | 13,627,650 | - | - | - | (12,668,027) | (12,668,027) | - |
| Airport | 3,140,746 | 1,180,584 | - | 1,021,347 | - | (938,815) | (938,815) | - |
| Total Business-type Activities | 621,857,340 | 486,072,847 | 88,110,603 | 15,080,720 | - | (32,593,170) | (32,593,170) | - |
| Total Primary Government | $ 2,553,394,233 | $ 894,041,655 | $ 334,359,468 | $ 150,585,469 | $ (1,141,814,470) | $ (32,593,170) | $ (1,174,407,640) | $ - |
| **Component units:** | | | | | | | | |
| Brownfield Redevelopment Authority | $ 276,975 | $ 225,000 | $ 154,341 | $ - | $ - | $ - | $ - | $ 102,366 |
| Detroit Public Library | 35,649,358 | 267,492 | 5,387,912 | - | - | - | - | (29,993,954) |
| Downtown Development Authority | 45,468,502 | 9,311,503 | - | - | - | - | - | (36,156,999) |
| Economic Development Corporation | 7,959,886 | 12,289,457 | - | - | - | - | - | 4,329,571 |
| Detroit Housing Commission | 20,691,453 | 4,622,167 | 17,601,668 | - | - | - | - | 1,532,382 |
| Local Development Finance Authority | 7,014,282 | - | - | - | - | - | - | (7,014,282) |
| Museum of African American History | 9,832,615 | 1,609,275 | 4,718,423 | - | - | - | - | (3,504,917) |
| Detroit Public Schools | 1,676,862,532 | 9,044,337 | 533,266,746 | - | - | - | - | (1,134,551,449) |
| Tax Increment Finance Authority | 11,210,975 | - | - | - | - | - | - | (11,210,975) |
| Detroit Transportation Corporation | 18,317,364 | 443,669 | 11,694,950 | - | - | - | - | (6,178,745) |
| Greater Detroit Resource Recovery Authority | 113,778,556 | 46,176,830 | 67,693,792 | - | - | - | - | 92,066 |
| Total Component units | $ 1,947,062,498 | $ 83,989,730 | $ 640,517,832 | $ - | $ - | $ - | $ - | $ (1,222,554,936) |

| | | Governmental Activities | Business-type Activities | Total | Component Units |
|---|---|---|---|---|---|
| **General Revenues:** | | | | | |
| **Taxes:** | | | | | |
| Property taxes, levied for general purposes | | $ 179,694,260 | $ - | $ 179,694,260 | $ 155,300,085 |
| Property taxes, levied for debt service | | 59,813,679 | | 59,813,679 | 99,454,576 |
| Municipal income tax | | 282,501,875 | | 282,501,875 | - |
| Utility Users tax | | 52,939,839 | | 52,939,839 | - |
| Wagering tax | | 137,970,347 | | 137,970,347 | - |
| Hotel and Liquor tax | | 16,310,767 | | 16,310,767 | - |
| Other taxes | | - | | - | 12,928,065 |
| Shared taxes | | 282,914,217 | | 282,914,217 | 853,218,402 |
| Interest and Penalty on taxes | | 11,712,960 | | 11,712,960 | 530,439 |
| Investment earnings | | 14,464,802 | 22,808,775 | 37,273,577 | 17,175,813 |
| Miscellaneous revenue (expense) | | 9,984,374 | (6,850,110) | 3,134,264 | 12,102,431 |
| Loss on disposal of capital assets | | (3,551,036) | | (3,551,036) | - |
| Transfers | | (89,585,306) | 89,585,306 | - | - |
| Total general revenues, and transfers | | 955,170,778 | 105,543,971 | 1,060,714,749 | 1,150,709,811 |
| Change in net assets | | (186,643,692) | 72,950,801 | (113,692,891) | (71,845,125) |
| Net assets - beginning, as Restated | | 193,149,741 | 1,546,041,298 | 1,739,191,039 | 333,073,246 |
| Net assets - ending | | $ 6,506,049 | $ 1,618,992,099 | $ 1,625,498,148 | $ 261,228,121 |

**The accompanying notes are an integral part of the financial statements.**

C-26

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 5:08:2013 11:32

**City of Detroit, Michigan**
**BALANCE SHEET**
**GOVERNMENTAL FUNDS**
**June 30, 2005**

| | Primary Government | | | | |
|---|---|---|---|---|---|
| | General Fund | General Retirement System Service Corporation | Police and Fire Retirement System Service Corporation | Other Governmental Funds | Total |
| **ASSETS** | | | | | |
| Cash and Cash Equivalents | $ 27,423,073 | $ - | $ - | $ 22,884,135 | $ 50,307,208 |
| Investments | 38,688,891 | - | - | 227,008,911 | 265,697,802 |
| Accounts and Contracts Receivable: | | | | | |
| Due from Other Funds | 33,125,485 | - | - | 6,629,195 | 39,754,680 |
| Due from Fiduciary Funds | 4,910,736 | - | - | - | 4,910,736 |
| Due from Component Units | 5,835,254 | - | - | - | 5,835,254 |
| Due from Other Governmental Agencies | 169,596,534 | - | - | 30,535,501 | 200,132,035 |
| Estimated Withheld Income Taxes Receivable | 28,381,590 | - | - | - | 28,381,590 |
| Utility Users' Taxes Receivable | 6,241,469 | - | - | - | 6,241,469 |
| Property Tax Receivable | 58,093,679 | - | - | 20,478,737 | 78,572,416 |
| Land Contracts Receivable | 4,672,578 | - | - | - | 4,672,578 |
| Income Tax Assessments | 38,617,652 | - | - | - | 38,617,652 |
| Special Assessments | 25,697,431 | - | - | 347,225 | 26,044,656 |
| Interest and Penalties | 5,685,000 | - | - | 2,005,000 | 7,690,000 |
| Other Receivables | 21,342,143 | - | - | 1,236,024 | 22,578,167 |
| Total Accounts and Contracts Receivable | 401,399,551 | - | - | 61,231,682 | 462,631,233 |
| Allowance for Uncollectible Accounts | (136,611,870) | - | - | (17,091,532) | (153,703,402) |
| Total Accounts and Contracts Receivable - Net | 264,787,681 | - | - | 44,140,150 | 308,927,831 |
| Inventory-Forfeited Property | - | - | - | 250,875 | 250,875 |
| Inventories | 21,174,330 | - | - | 677,208 | 21,851,538 |
| Prepaid Expenditures | - | - | - | 127,636 | 127,636 |
| Working Capital Advances to Other Funds | 12,692,905 | - | - | - | 12,692,905 |
| **Restricted Assets:** | | | | | |
| Cash and Cash Equivalents | 2,242,749 | 12,422,045 | 10,592,394 | 63,548,649 | 88,805,837 |
| Investments | 45,549,815 | 26,854 | 22,898 | - | 45,599,567 |
| Total Restricted Assets | 15,309,676 | - | - | - | 15,309,676 |
| Total Restricted Assets | 63,102,240 | 12,448,899 | 10,615,292 | 63,548,649 | 149,715,080 |
| Advances to Component Units | - | 23,819,934 | - | - | 23,819,934 |
| Other Advances | 5,000 | - | - | - | 5,000 |
| Other Assets | 9,014 | - | - | - | 9,014 |
| Total Assets | $ 427,883,134 | $ 36,268,833 | $ 10,615,292 | $ 358,637,564 | $ 833,404,823 |

The accompanying notes are an integral part of the financial statements.

C-27

**City of Detroit, Michigan**
**BALANCE SHEET**
**GOVERNMENTAL FUNDS**
**June 30, 2005**

| | Primary Government | | | | |
|---|---|---|---|---|---|
| | General Fund | General Retirement System Service Corporation | Police and Fire Retirement System Service Corporation | Other Governmental Funds | Total |
| **LIABILITIES** | | | | | |
| Accounts and Contracts Payable | $ 11,718,789 | $ - | $ - | $ 43,353,996 | $ 55,072,785 |
| Due to Other Funds | 90,405,875 | - | - | 16,414,741 | 106,820,616 |
| Due to Fiduciary Funds | 71,335,032 | - | - | - | 71,335,032 |
| Loans and Other Advances from Other Funds | - | - | - | 995,674 | 995,674 |
| Due to Other Governmental Agencies | 24,696,649 | - | - | 5,901,271 | 30,597,920 |
| Due to Component Units | 14,999,010 | - | - | - | 14,999,010 |
| Accrued Salaries and Wages | 24,050,537 | - | - | 1,937,814 | 25,988,351 |
| Fringes Benefits Payable | 8,099,667 | - | - | - | 8,099,667 |
| Payroll Deductions Payable | 13,908,830 | - | - | - | 13,908,830 |
| Accrued Compensated Absences | 1,286,116 | - | - | - | 1,286,116 |
| Income Tax Refunds Payable | 10,142,447 | - | - | - | 10,142,447 |
| Deposits from Vendors and Customers | 16,163,494 | - | - | 2,847,640 | 19,011,134 |
| Accrued Liabilities | 35,522,203 | - | - | 13,564,749 | 49,086,952 |
| Revenue Anticipation Notes Payable | 54,445,000 | - | - | - | 54,445,000 |
| Other Liabilities | 59,927,572 | - | - | 1,671,223 | 61,598,795 |
| **Liabilities Payable from Restricted Assets:** | | | | | |
| Accounts and Contracts Payable | 2,323,943 | - | - | - | 2,323,943 |
| Accrued Public Liability | 5,035,133 | - | - | - | 5,035,133 |
| Accrued Workers' Compensation Payable | 2,013,464 | - | - | - | 2,013,464 |
| Due to Other Funds | 406,184 | - | - | - | 406,184 |
| Other Liabilities | 723,944 | - | - | - | 723,944 |
| Total Liabilities Payable from Restricted Assets | 10,502,668 | - | - | - | 10,502,668 |
| Deferred Revenue | 14,273,679 | - | - | 9,979,270 | 24,252,949 |
| Total Liabilities | 461,477,568 | - | - | 96,666,378 | 558,143,946 |
| **FUND BALANCES** | | | | | |
| **Reserved Fund Balance:** | | | | | |
| Reserved for Advances to Component Units | - | 23,819,934 | - | - | 23,819,934 |
| Reserved for Inventory | 21,174,330 | - | - | 928,083 | 22,102,413 |
| Reserved for Encumbrances | 35,336,469 | - | - | 14,018,549 | 49,355,018 |
| Reserved for Short-Term Loans and Advances to Other Funds | 12,699,231 | - | - | - | 12,699,231 |
| Reserved for Risk Management Operations | 29,169,120 | - | - | - | 29,169,120 |
| Reserved for Motor Vehicle Operations | 23,430,451 | - | - | - | 23,430,451 |
| Reserved for Endowments and Trusts | - | - | - | 1,253,623 | 1,253,623 |
| Reserved for Debt Service | - | 12,448,899 | 10,615,292 | 29,061,404 | 52,125,595 |
| Reserved for Capital Projects | - | - | - | 139,812,882 | 139,812,882 |
| Total Reserved Fund Balance | 121,809,601 | 36,268,833 | 10,615,292 | 185,074,541 | 353,768,267 |
| **Unreserved Fund Balance (Deficit):** | | | | | |
| **Undesignated, Reported In:** | | | | | |
| General Fund Operations (Deficit) | (155,404,035) | - | - | - | (155,404,035) |
| Special Revenue Funds | - | - | - | 76,896,645 | 76,896,645 |
| Total Unreserved Fund Balance (Deficit) | (155,404,035) | - | - | 76,896,645 | (78,507,390) |
| Total Fund Balances (Deficit) | (33,594,434) | 36,268,833 | 10,615,292 | 261,971,186 | 275,260,877 |
| Other Credits | - | - | - | - | - |
| Total Liabilities, and Fund Balances | $ 427,883,134 | $ 36,268,833 | $ 10,615,292 | $ 358,637,564 | $ 833,404,823 |

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 15:08:2013  11:32

**City of Detroit, Michigan**
**RECONCILIATION OF THE BALANCE SHEET OF GOVERNMENTAL FUNDS**
**TO THE STATEMENT OF NET ASSETS**
**June 30, 2005**

| | | |
|---|---:|---:|
| Fund balances - total governmental funds | $ | 275,260,877 |
| Amounts reported for governmental activities in the statement of net assets are different because | | |
| Capital assets used in governmental activities are not financial resources and therefore are not reported in the governmental fund | | |
| Governmental capital asset | $  2,656,306,017 | |
| Less accumulated depreciation | (1,253,263,182) | 1,403,042,835 |
| Other assets used in governmental activities are not financial resources and therefore are not reported in the governmental fund | | |
| Bond and Pension Obligation Certificate issuance costs | $  72,060,986 | |
| Less accumulated amortization | (16,479,424) | 55,581,562 |
| Receivables applicable to governmental activities are not due and collectible in the current period and therefore are deferred in governmental funds | | 15,777,416 |
| Issuance of Pension Obligation Certificates created a Net Pension Asset: | | 1,011,722,816 |
| Long term liabilities, including bonds payable are not due and payable in the current period and therefore are not reported in the governmental fund | | |
| Governmental long term debt payable | $ (1,175,995,054) | |
| Pension Obligation Certificates Payable | (1,170,607,422) | |
| Bond Premium | (32,426,664) | |
| Loss on advance refunding | 917,681 | |
| Grant Audit Amount Due to Other Governments | (14,236,946) | |
| Accrued interest payable | (16,226,059) | |
| Compensated absences | (155,712,178) | |
| Public Liability and Workers Compensation | (190,592,815) | (2,754,879,457) |
| Net assets of governmental activities | $ | 6,506,049 |

The accompanying notes are an integral part of the financial statements.

34

---

**City of Detroit, Michigan**
**STATEMENT OF REVENUES, EXPENDITURES, AND CHANGES IN FUND BALANCES**
**GOVERNMENTAL FUNDS**
**For the Year Ended June 30, 2005**

| | General Fund | General Retirement System Service Corporation | Police and Fire Retirement System Service Corporation | Other Governmental Funds | Total |
|---|---:|---:|---:|---:|---:|
| **REVENUES:** | | | | | |
| Taxes: | | | | | |
| Property Taxes | $ 178,957,663 | $ - | $ - | $ 59,813,679 | $ 238,771,142 |
| Municipal Income Tax | 282,501,875 | - | - | - | 282,501,875 |
| Utility Users' Tax | 52,939,839 | - | - | - | 52,939,839 |
| Wagering Taxes | 137,970,347 | - | - | - | 137,970,347 |
| Gas and Weight Tax | - | - | - | 63,476,425 | 63,476,425 |
| Other Taxes and Assessments | 10,962,886 | - | - | 2,602,232 | 13,565,118 |
| State Hotel and Liquor Tax | - | - | - | 16,310,767 | 16,310,767 |
| State Shared Taxes | 282,914,217 | - | - | - | 282,914,217 |
| Shared Taxes-Liquor and Beer Licenses | 602,582 | - | - | - | 602,582 |
| Licenses and Penalties on Taxes | 11,491,470 | - | - | - | 11,491,470 |
| Licenses, Permits and Inspection Charges | 11,061,055 | - | - | 23,945,463 | 35,006,518 |
| Intergovernmental: | | | | | |
| Federal | 26,522,887 | - | - | 249,849,587 | 276,372,474 |
| State | 23,511,241 | - | - | 13,356,134 | 36,867,375 |
| State Equity Grant | 1,076,931 | - | - | - | 1,076,931 |
| Other | 16,346,773 | - | - | - | 16,346,773 |
| Sales and Charges for Services | 178,109,203 | - | - | 5,185,630 | 183,294,833 |
| Ordinance Fines | 23,273,726 | - | - | 4,207,916 | 27,481,642 |
| Revenue from Use of Assets | 16,265,923 | - | - | 516,134 | 16,782,057 |
| Earnings on Investments | 2,380,653 | 62,217 | 22,898 | 11,999,034 | 14,464,802 |
| Other Revenue | 100,134,090 | - | - | 31,523,802 | 131,657,892 |
| Total Revenues | 1,357,023,161 | 62,217 | 22,898 | 482,786,803 | 1,839,895,079 |
| **EXPENDITURES:** | | | | | |
| Current: | | | | | |
| Public Protection | 716,727,017 | 37,865,367 | 630,829,188 | 38,159,175 | 1,423,581,547 |
| Health | 87,862,830 | 27,828,763 | - | 81,781,875 | 197,473,468 |
| Recreation and Culture | 67,498,395 | 31,797,784 | - | - | 99,296,179 |
| Economic Development | 23,541,123 | 3,010,981 | - | 73,103,489 | 99,655,593 |
| Educational Development | - | 3,421,113 | - | 73,837,899 | 77,259,012 |
| Housing Supply and Conditions | 12,486,977 | 9,580,394 | - | 5,795,925 | 27,863,296 |
| Physical Environment | 256,619,913 | 45,164,714 | - | - | 301,784,627 |
| Transportation Facilitation | - | - | - | 46,272,594 | 46,272,594 |
| Development and Management | 197,808,776 | 297,540,121 | - | - | 495,348,897 |
| Debt Service: | | | | | |
| Principal | - | - | - | 73,544,336 | 73,544,336 |
| Interest | - | - | - | 51,462,415 | 51,462,415 |
| Bond Issuance Costs | 5,192,781 | - | - | 2,299,818 | 7,492,519 |
| Costs of Issuance of POC's | - | 15,431,660 | 21,338,326 | - | 36,769,986 |
| Capital Outlay | 124,712,800 | - | - | 157,832,908 | 282,545,708 |
| Total Expenditures | 1,492,451,332 | 471,640,897 | 652,167,514 | 604,090,434 | 3,220,350,177 |
| Excess (Deficiency) of Revenues Over (Under) Expenditures | (135,428,171) | (471,578,680) | (652,144,616) | (121,303,631) | (1,380,455,098) |
| **OTHER FINANCING SOURCES (USES):** | | | | | |
| Sources: | | | | | |
| Transfers In | 33,051,546 | - | - | 108,024,243 | 141,075,789 |
| Pension Obligation Certificates Issued | - | 507,847,513 | 662,759,908 | - | 1,170,607,421 |
| Proceeds of Section 108 Federal Note | - | - | - | 7,789,000 | 7,789,000 |
| Proceeds of Capital Leases | 315,351 | - | - | - | 315,351 |
| Proceeds from Debt Issuance | 242,150,000 | - | - | 111,680,000 | 353,830,000 |
| Premium from Debt Issuance | 5,974,832 | - | - | 7,039,843 | 13,014,675 |
| Uses: | | | | | |
| Discount on Pension Obligation Certificates | - | - | - | - | - |
| Transfers Out | 136,651,053 | - | - | 94,010,042 | 230,661,095 |
| Principal Paid to Bond Agent for Refunded Bonds | 92,640,000 | - | - | 69,160,000 | 161,800,000 |
| Interest Paid to Bond Agent for Refunded Bonds | 4,213,845 | - | - | 6,651,575 | 10,865,420 |
| Total Other Financing Sources (Uses) | 47,986,831 | 507,847,513 | 662,759,908 | 64,711,469 | 1,283,305,721 |
| Net Change in Fund Balances | (87,441,340) | 36,268,833 | 10,615,292 | (56,592,162) | (97,149,377) |
| Fund Balance at Beginning of Year | 69,216,269 | - | - | 318,648,926 | 387,865,195 |
| Decrease in Inventories | (15,369,363) | - | - | (85,578) | (15,454,941) |
| Fund Balance (Deficit) at End of Year | $ (33,594,434) | $ 36,268,833 | $ 10,615,292 | $ 261,971,186 | $ 275,260,877 |

35

---

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 152 of 248]

C-28

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 15:08:2013 11:32

Change in fund balances - total governmental funds $ (97,149,377)

Amounts reported for governmental activities in the statement
of net assets are different because

Governmental funds report capital outlays as expenditures.
However, in the statement of activities, the cost of those assets
is depreciated over their estimated useful lives

| | | |
|---|---:|---:|
| Expenditures for capital assets | $ 282,545,708 | |
| Less current year depreciation | (70,001,642) | 212,544,066 |

Gain on sale of capital assets is reported in the statement of activities,
whereas in the governmental funds, the gain from the sale increases
financial resources.  Thus, the change in net assets differs from the
change in fund balance by the cost of assets sold (3,551,036)

Some revenues reported in the statement of activities do not
require the use of current financial resources and therefore are
not reported as revenues in governmental funds 958,287

Some expenditures reported in governmental funds are to be
collected on a long-term basis and therefore are not reported
as expenses in the statement of activities

Inventory (15,454,941)

Repayment of bond principal and other debt is an expenditure in the governmental
funds, but the repayment reduces long term liabilities in the statement
of net assets. 235,344,336

Bond and note proceeds and provide current financial resources to governmental funds,
but issuing debt increases long-term liabilities in the statement of
net assets.  The amount represents the proceeds received net of bond
issuance cost and premiums that must be amortized over the life of the bond (374,949,026)

Pension Obligation Certificates provides current financial resources to governmental funds,
but issuing POC's increases long-term liabilities in the statement of
net assets.  The amount represents the proceeds received net of certificate
issuance cost and premiums that must be amortized over the life of the certificates (1,170,607,422)

Payments to The Pension Systems created a Net Pension Asset: 1,011,722,816

Some expenses recorded in the statement of activities do not require the use of current
financial resources and therefore are not reported as expenditures in the governmental
funds:

| | | |
|---|---:|---:|
| Increase in Bond and POC Issuance Cost | 44,262,505 | |
| Increase in accrued interest expense on governmental debt | (1,254,187) | |
| Increase in accrued interest on POC's | (1,670,874) | |
| Increase in accrued compensated absences | (15,947,268) | |
| Increase in accrued public liability and workers compensation | (12,107,879) | |
| Amortization of current year bond premium and defeasances | 4,121,498 | |
| Amortization of current year bond cost | (2,905,190) | 14,498,605 |

Change in net assets of governmental activities $ (186,643,692)

The accompanying notes are an integral part of the financial statements.

**THIS PAGE LEFT BLANK INTENTIONALLY**

C-29

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 153 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
...roit/15:08:2013 11:32

**City of Detroit, Michigan**
STATEMENT OF NET ASSETS
PROPRIETARY FUNDS
June 30, 2005

C-30

| ASSETS | Sewage Disposal Fund | Transportation Fund | | Business-Type Activities Water Fund | Automobile Parking Fund | Non-Major Fund | Total |
|---|---|---|---|---|---|---|---|
| **Current Assets:** | | | | | | | |
| Cash and Cash Equivalents | $ - | $ 113,569 | $ | 870,259 | $ 331,775 | $ 892,458 | $ 2,208,061 |
| Investments | 47,948,538 | 4,742,114 | | 7,520,716 | 5,242 | | 60,216,610 |
| Accounts and Contracts Receivable: | | | | | | | |
| Due from Other Funds | 66,388,078 | 760,432 | | 53,149,298 | 389,636 | 1,430,941 | 122,118,385 |
| Due from Other Governmental Agencies | - | 7,297,850 | | - | - | 13,350 | 7,311,200 |
| Other Receivables- Trade | 165,158,307 | 975,621 | | 105,859,302 | 342,165 | 1,000,408 | 273,335,803 |
| Total Accounts and Contracts Receivable | 231,546,385 | 9,033,903 | | 159,008,600 | 731,801 | 2,444,699 | 402,765,388 |
| Allowance for Uncollectible Accounts | (64,482,340) | (383,531) | | (36,887,901) | - | (385,482) | (102,139,254) |
| Total Accounts and Contracts Receivable - Net | 167,064,045 | 8,650,372 | | 122,120,699 | 731,801 | 2,059,217 | 300,626,134 |
| Inventories | 11,173,380 | 6,920,401 | | 6,330,165 | - | - | 24,423,946 |
| Prepaid Expenses | 381,847 | - | | 568,211 | 381,923 | 86,452 | 1,418,433 |
| Restricted Cash and Cash Equivalents | 12,289,108 | 11,261,008 | | 25,052,140 | - | - | 48,602,256 |
| Restricted Investments | 275,424,204 | - | | 412,158,969 | - | - | 687,583,173 |
| Restricted Due from Other Funds | 37,638,549 | - | | 40,475,299 | - | - | 78,113,848 |
| Total Current Assets | 551,919,671 | 31,687,464 | | 615,096,458 | 1,450,741 | 3,038,127 | 1,203,192,461 |
| **Noncurrent Assets:** | | | | | | | |
| **Restricted:** | | | | | | | |
| Investments | 308,770,507 | - | | 30,072,332 | 37,202,926 | - | 376,045,765 |
| **Capital Assets:** | | | | | | | |
| Land | 13,876,751 | 4,114,574 | | 6,527,438 | 7,014,113 | 5,169,374 | 36,702,250 |
| Land Improvements | - | - | | 103,323,777 | 214,908 | 8,020,718 | 111,559,403 |
| Buildings and Structures | 1,143,914,922 | 69,910,255 | | 707,846,651 | 207,288,512 | 5,853,773 | 2,134,814,113 |
| Water and Sewer Lines | 542,769,689 | - | | 714,856,603 | - | - | 1,257,626,292 |
| Equipment, Machinery, and Fixtures | 708,031,859 | 50,730,624 | | 630,635,010 | 2,391,206 | 1,770,642 | 1,393,559,341 |
| Vehicles and Buses | - | 166,837,062 | | - | - | 1,576,778 | 168,413,840 |
| Construction Work in Progress | 1,219,986,063 | 5,050,781 | | 418,027,160 | 504,183 | - | 1,643,568,187 |
| Total Capital Assets | 3,628,579,284 | 296,643,296 | | 2,581,216,639 | 217,412,922 | 22,391,285 | 6,746,243,426 |
| Less: Accumulated Depreciation | (681,127,715) | (143,845,060) | | (688,863,364) | (114,187,803) | (12,497,851) | (1,640,521,793) |
| Net Capital Assets | 2,947,451,569 | 152,798,236 | | 1,892,353,275 | 103,225,119 | 9,893,434 | 5,105,721,633 |
| Total Restricted Noncurrent Assets | 3,256,222,076 | 152,798,236 | | 1,922,425,607 | 140,428,045 | 9,893,434 | 5,481,767,398 |
| **Other Long -Term Assets:** | | | | | | | |
| Long-Term Receivable | 44,946,430 | - | | - | - | - | 44,946,430 |
| Bond and Pension Obligation Certificate Issuance Costs | 35,719,846 | 3,372,800 | | 37,243,656 | - | - | 76,336,302 |
| Net Pension Asset | 7,850,281 | 98,005,506 | | 150,452,508 | - | - | 256,308,295 |
| Other Assets | - | 650,000 | | - | - | - | 650,000 |
| Total Noncurrent Assets | 3,344,738,633 | 254,826,542 | | 2,110,121,771 | 140,428,045 | 9,893,434 | 5,860,008,425 |
| Total Assets | $ 3,896,658,304 | $ 286,514,006 | | $ 2,725,218,229 | $ 141,878,786 | $ 12,931,561 | $ 7,063,200,886 |
| (Continued) | | | | | | | |

The accompanying notes are an integral part of the financial statements.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 154 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

**City of Detroit, Michigan**
**STATEMENT OF NET ASSETS**
**PROPRIETARY FUNDS**
**June 30, 2005 (Continued)**

C-31

|  | Sewage Disposal Fund | Transportation Fund | Water Fund | Automobile Parking Fund | Non-Major Fund | Total |
|---|---|---|---|---|---|---|
| **LIABILITIES AND NET ASSETS** | | | | | | |
| **Liabilities:** | | | | | | |
| **Current Liabilities:** | | | | | | |
| Book Cash Overdraft | 758,762 | - | - | - | 141,486 | 758,762 |
| Accounts and Contracts Payable | 7,683,870 | 10,323,683 | 16,543,893 | 3,117,197 | 141,486 | 37,810,129 |
| Due to Other Funds | 52,871,340 | 10,949,562 | 65,882,639 | 565,470 | 211,202 | 130,480,213 |
| Due to Fiduciary Funds | 262,382 | - | - | - | - | 262,382 |
| Due to Component Units | - | 1,764,760 | - | - | - | 1,764,760 |
| Refundable Deposits | - | - | - | - | 95,324 | 95,324 |
| Accrued Salaries and Wages | 1,629,152 | 2,601,179 | 2,171,724 | 123,101 | 42,290 | 6,567,446 |
| Accrued Compensated Absences | 5,556,011 | 3,039,331 | 8,604,763 | 251,636 | 62,456 | 17,514,197 |
| Accrued Public Liability and Workers Compensation | 895,155 | 992,272 | 3,470,751 | - | 21,796 | 5,379,974 |
| Other Liabilities | 5,693,347 | 2,577,808 | 3,053,509 | - | 93,342 | 11,418,006 |
| Bonds and Notes Payable | 50,035,000 | - | 24,595,000 | 6,615,000 | - | 81,245,000 |
| Accrued Interest on Bonds and Notes Payable | 38,654,433 | 743,151 | 38,521,332 | 905,717 | - | 78,824,633 |
| Restricted Accounts and Contracts Payable | 62,465,874 | - | 20,117,305 | - | 38,100 | 82,621,279 |
| Restricted Due to Other Funds | 11,074,002 | - | 6,515,574 | - | - | 17,589,576 |
| Restricted Other Liabilities | 89,017 | - | 629,346 | - | - | 718,363 |
| Deferred Revenue | - | 117,630 | - | 3,702,050 | 1,525 | 3,821,205 |
| **Total Current Liabilities** | 237,668,345 | 33,109,376 | 190,105,836 | 15,280,171 | 707,521 | 476,871,249 |
| **Noncurrent Liabilities:** | | | | | | |
| Bonds and Notes Payable | 2,603,791,572 | 29,533,118 | 1,967,020,000 | 54,230,000 | - | 4,654,574,690 |
| Unamortized Discount and Gain on Defeasances | 5,212,683 | - | (51,725,621) | (1,726,548) | - | (48,239,486) |
| Bonds and Notes Payable - Net | 2,609,004,255 | 29,533,118 | 1,915,294,379 | 52,503,452 | - | 4,606,335,204 |
| Deferred Swap Termination Fees | 2,286,256 | - | 16,797,795 | - | - | 19,084,051 |
| Accrued Compensated Absences | 8,361,795 | 759,833 | 9,808,909 | 307,555 | 307,081 | 19,545,173 |
| Accrued Public Liability and Workers' Compensation | 3,832,814 | 3,969,088 | 15,240,595 | - | 58,490 | 23,100,987 |
| Advance From Other Funds | - | 10,447,231 | - | 1,250,000 | - | 11,697,231 |
| Pension Obligation Certificates Payable | 8,760,811 | 103,083,553 | 157,548,214 | - | - | 269,392,578 |
| Other Long Term Liabilities | 7,054,465 | 11,037,009 | - | 90,840 | - | 18,182,314 |
| **Total Noncurrent Liabilities** | 2,639,300,396 | 158,829,832 | 2,114,689,892 | 54,151,847 | 365,571 | 4,967,337,538 |
| **Total Liabilities** | 2,876,968,741 | 191,939,208 | 2,304,795,728 | 69,432,018 | 1,073,092 | 5,444,208,787 |
| **Net Assets:** | | | | | | |
| Invested in Capital Assets, Net of Related Debt | 646,808,681 | 120,687,310 | 204,520,234 | 68,533,638 | 9,893,434 | 1,050,443,297 |
| Restricted for Debt Service | 166,369,102 | - | 121,409,825 | - | - | 287,778,927 |
| Unrestricted (Deficit) | 206,511,780 | (26,112,512) | 94,492,442 | 3,913,130 | 1,965,035 | 280,769,875 |
| **Total Net Assets** | $ 1,019,689,563 | $ 94,574,798 | $ 420,422,501 | $ 72,446,768 | $ 11,858,469 | $ 1,618,992,099 |

The accompanying notes are an integral part of the financial statements.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
roit/15:08:2013 11:32

**City of Detroit, Michigan**
**STATEMENT OF REVENUES, EXPENSES AND CHANGES IN FUND NET ASSETS**
**PROPRIETARY FUNDS**
For the Year Ended June 30, 2005

|  | Sewage Disposal Fund | Transportation Fund | | Water Fund | Automobile Parking Fund | Non-Major Fund | Total |
|---|---|---|---|---|---|---|---|
| **Operating Revenues:** | | | | | | | |
| Sales and Charges for Services | $ 310,491,707 | $ 22,959,490 | | $ 258,971,833 | $ - | $ 98,801 | $ 592,521,831 |
| Rentals, Fees and Surcharges | 281,062 | - | | - | 13,627,651 | 1,006,314 | 14,915,027 |
| Miscellaneous | 2,815,506 | - | | 1,641,252 | - | 75,552 | 4,532,310 |
| Total Operating Revenues | 313,588,275 | 22,959,490 | | 260,613,085 | 13,627,651 | 1,180,667 | 611,969,168 |
| **Operating Expenses:** | | | | | | | |
| Salaries, Wages and Benefits | 37,441,707 | 121,359,201 | | 48,753,131 | 5,550,516 | 1,472,526 | 214,577,081 |
| Contractual Services | - | 26,046,086 | | - | 6,293,134 | - | 32,339,220 |
| Operating | 113,609,989 | - | | 105,956,032 | 2,933,107 | 780,166 | 223,279,294 |
| Repairs and Maintenance | 12,348,658 | - | | - | 1,196,435 | 214,121 | 13,759,214 |
| Materials, Supplies and Other Expenses | - | 40,757,327 | | 2,244,535 | 32,200 | 280,929 | 43,314,991 |
| Depreciation and Amortization | 44,053,316 | 16,919,222 | | 41,529,608 | 6,287,158 | 393,089 | 109,182,393 |
| Total Operating Expenses | 207,453,670 | 205,081,836 | | 198,483,306 | 22,292,550 | 3,140,831 | 636,452,193 |
| Total Operating Income (Loss) | 106,134,605 | (182,122,346) | | 62,129,779 | (8,664,899) | (1,960,164) | (24,483,025) |
| **Non-Operating Revenues (Expenses):** | | | | | | | |
| Earnings on Investments | 14,930,952 | 296,527 | | 7,175,672 | 405,624 | - | 22,808,775 |
| Grants-Federal | - | 3,226,017 | | - | - | 1,021,349 | 4,247,366 |
| Contributions | - | 72,670,780 | | - | - | - | 72,670,780 |
| Amortization of Bond Premium | - | - | | - | 181,992 | - | 181,992 |
| Interest on Bonds and Notes Payable | (44,205,957) | (589,887) | | (63,260,449) | (4,185,120) | - | (112,241,413) |
| Other Revenue | - | - | | (62,246) | - | - | (62,246) |
| Other Expenses | (7,038) | - | | - | 6,190,931 | - | 6,183,893 |
| Total Non-Operating Revenues (Expenses) | (29,282,043) | 75,603,437 | | (56,147,023) | 2,593,427 | 1,021,349 | (6,210,853) |
| Net Income (Loss) Before Contributions and Transfers | 76,852,562 | (106,518,909) | | 5,982,756 | (6,071,472) | (938,815) | (30,693,878) |
| Capital Contributions | - | 7,120,491 | | 6,938,882 | - | - | 14,059,373 |
| Transfers In | - | 77,441,898 | | - | 9,575,006 | 2,568,402 | 89,585,306 |
| Increase (Decrease) in Net Assets | 76,852,562 | (21,956,520) | | 12,921,638 | 3,503,534 | 1,629,587 | 72,950,801 |
| Net Assets - Beginning of Year | 942,837,001 | 116,531,318 | | 407,500,863 | 68,943,234 | 10,228,882 | 1,546,041,298 |
| Net Assets - End of Year | $ 1,019,689,563 | $ 94,574,798 | | $ 420,422,501 | $ 72,446,768 | $ 11,858,469 | $ 1,618,992,099 |

The accompanying notes are an integral part of the financial statements.

C-32

42

43

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

**City of Detroit, Michigan**
STATEMENT OF CASH FLOWS
PROPRIETARY FUNDS
For the Year Ended June 30, 2005

|  | Sewage Disposal Fund | Transportation Fund | Business-Type Activities | | | |
|---|---|---|---|---|---|---|
|  |  |  | Water Fund | Automobile Parking Fund | Non-Major Fund | Total |
| **Cash Flows from Operations:** |  |  |  |  |  |  |
| Receipts from Customers | $ 326,617,651 | $ 22,665,516 | $ 260,740,367 | $ 14,383,275 | $ 614,205 | $ 625,021,014 |
| Advances from Other Funds | - | - | - | 1,310,000 | - | 1,310,000 |
| Repayments from Other Funds | - | - | - | 389,962 | - | 389,962 |
| Loans to Other Funds | (18,598,461) | - | (28,698,398) | 934,068 | - | (46,362,791) |
| Deposits Refunded to Customers | - | - | - | - | 2,257 | 2,257 |
| Payments to Suppliers | (124,639,909) | (23,458,578) | (115,305,031) | (6,499,865) | (1,785,571) | (271,688,954) |
| Payments to Employees | (76,204,371) | (221,025,500) | (204,140,836) | (5,067,693) | (1,583,127) | (508,021,527) |
| Net Cash Provided by (Used in) Operating Activities | 107,174,910 | (221,818,562) | (87,403,898) | 5,449,747 | (2,752,236) | (199,350,039) |
| **Cash Flows from Non-Capital Financing Activities:** |  |  |  |  |  |  |
| Proceeds from Pension Obligation Certificates | 8,760,811 | 103,083,533 | 157,548,214 | - | - | 269,392,558 |
| Issuance Costs - Pension Obligation Certificates | (286,646) | (3,372,800) | (5,154,834) | - | - | (8,814,280) |
| Bank Overdraft | 758,762 | - | - | - | - | 758,762 |
| Grants and Contributions from Other Governments | - | 75,896,797 | - | - | 1,021,349 | 76,918,146 |
| Transfers from Other Funds | - | 76,943,880 | - | 9,575,006 | 2,568,402 | 89,087,288 |
| Net Cash Provided by Non-Capital Financing Activities | 9,232,927 | 252,551,410 | 152,393,380 | 9,575,006 | 3,589,751 | 427,342,474 |
| **Cash Flows from Capital and Related Financing Activities:** |  |  |  |  |  |  |
| Capital Contributions | - | 20,308,094 | 6,938,882 | - | - | 27,246,976 |
| Acquisition and Construction of Capital Assets | (364,680,084) | (39,231,417) | (134,448,175) | (2,897,037) | (717,474) | (541,974,187) |
| Proceeds from Bond and Note Issuances | 429,391,224 | - | 429,966,584 | - | - | 859,357,808 |
| Principal Paid on Bonds and Notes | (32,590,000) | - | (22,440,000) | (6,615,000) | - | (61,645,000) |
| Interest Paid on Bonds - Net | (82,010,501) | - | (85,928,089) | (5,502,077) | - | (173,440,667) |
| Principal Paid on Refunded Debt | (108,765,000) | - | (125,985,000) | - | - | (234,750,000) |
| Swap Termination Fees | (11,750,000) | - | - | - | - | (11,750,000) |
| Net Cash Provided by (Used in) Capital Financing Activities | (170,404,361) | (18,923,323) | 68,104,202 | (15,014,114) | (717,474) | (136,955,070) |
| **Cash Flows from Investing Activities:** |  |  |  |  |  |  |
| Proceeds from Sales and Maturities of Investments | 651,726,904 | 103,221,800 | 309,876,577 | 35,897,510 | - | 1,100,722,791 |
| Purchase of Investments | (632,143,250) | (106,320,328) | (449,752,017) | (37,208,168) | - | (1,225,423,763) |
| Interest on Investment Securities | 14,930,952 | 296,527 | 7,175,672 | 405,624 | - | 22,808,775 |
| Net Cash Provided by (Used in) Investing Activities | 34,514,606 | (2,802,001) | (132,699,768) | (905,034) | - | (101,892,197) |
| Net Increase (Decrease) in Cash and Cash Equivalents | (9,481,918) | 9,007,524 | 393,916 | (894,395) | 120,041 | (10,854,832) |
| Cash and Cash Equivalents at Beginning of Year | 31,771,026 | 2,367,033 | 25,528,483 | 1,226,170 | 772,417 | 61,665,129 |
| Cash and Cash Equivalents at End of Year | $ 12,289,108 | $ 11,374,557 | $ 25,922,399 | $ 331,775 | $ 892,458 | $ 50,810,297 |

(Continued)

**The accompanying notes are an integral part of the financial statements.**

C-33

44

45

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

**City of Detroit, Michigan**
**STATEMENT OF CASH FLOWS**
**PROPRIETARY FUNDS (Continued)**
**For the Year Ended June 30, 2005**

| | Sewage Disposal Fund | Transportation Fund | | Water Fund | Automobile Parking Fund | Non-Major Fund | Total |
|---|---|---|---|---|---|---|---|
| **Reconciliation of Operating Income (Loss) to Net Cash Provided by (Used in)** | | | | Business-Type Activities | | | |
| **Operating Activities:** | | | | | | | |
| Operating Income (Loss) | $ 106,134,605 | $ (182,122,346) | | $ 62,129,779 | $ (8,664,899) | $ (1,960,164) | $ (24,483,025) |
| **Adjustments to Operating Income (Loss):** | | | | | | | |
| Depreciation and Amortization | 44,053,316 | 16,919,222 | | 41,529,608 | 6,287,158 | 393,089 | 109,182,393 |
| Allowance for Uncollectible Accounts | 21,580,685 | 339,241 | | 6,650,637 | - | - | 28,570,563 |
| **Changes in Assets and Liabilities:** | | | | | | | |
| Other Receivables - Trade | (19,337,158) | (293,974) | | (10,919,185) | - | 169,345 | (30,380,972) |
| Inventories | (282,877) | 2,977,217 | | 501,841 | - | - | 3,196,181 |
| Increase in Net Pension Asset | (7,850,281) | (99,710,753) | | (150,452,508) | - | - | (258,013,542) |
| Prepaid Expenses | (375,967) | - | | (461,392) | 254,802 | 2,241 | (580,316) |
| Accounts Receivable | - | - | | - | 755,624 | - | 755,624 |
| Due from Other Funds | - | - | | (28,698,398) | 389,962 | (389,265) | (28,697,701) |
| Accounts and Contracts Payable | (20,085,947) | (4,155,308) | | (13,787,881) | 1,435,430 | (41,066) | (36,634,772) |
| Due to Other Funds | (18,598,461) | 3,384,553 | | - | 934,068 | (681,590) | (14,961,430) |
| Due to Component Units | - | (3,762,064) | | - | - | - | (3,762,064) |
| Other Liabilities | 482,844 | 43,301,199 | | (7,669) | 2,512,403 | (120,211) | 46,168,566 |
| Accrued Compensated Absences | 1,759,543 | 69,004 | | 2,824,151 | 112,098 | (97,741) | 4,667,055 |
| Accrued Public Liability and Worker Compensation | (478,715) | 1,413,261 | | 2,933,092 | - | (42,363) | 3,825,275 |
| Advances from Other Funds | - | - | | - | 1,310,000 | - | 1,310,000 |
| Refundable Deposits | - | - | | - | - | 2,257 | 2,257 |
| Prepaid Revenue | - | - | | - | - | (3,176) | (3,176) |
| Accrued Salaries and Wages | 173,323 | (177,814) | | 354,027 | 123,101 | 16,408 | 489,045 |
| **Net Cash Provided by (Used in) Operating Activities** | $ 107,174,910 | $ (221,818,562) | | $ (87,403,898) | $ 5,449,747 | $ (2,752,236) | (199,350,039) |

The accompanying notes are an integral part of the financial statements.

C-34

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 158 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 05.08:2013 11:3

**City of Detroit, Michigan**
**STATEMENT OF FIDUCIARY NET ASSETS**
**FIDUCIARY FUNDS**
**June 30, 2005**

| ASSETS | Pension and Other Employee Benefit Funds | Agency Funds | Total |
|---|---:|---:|---:|
| Cash and Cash Equivalents................................... | $ 32,226,333 | $ 2,510,627 | $ 34,736,960 |
| Investments at Fair Value: | | | |
| Short-Term Investments.................................. | 1,311,852,696 | - | 1,311,852,696 |
| Commercial Paper........................................... | 15,579,446 | - | 15,579,446 |
| U. S. Government Obligations.......................... | 39,733 | - | 39,733 |
| Bonds and Stocks............................................ | 4,543,538,820 | - | 4,543,538,820 |
| Mortgage-Backed Securities............................ | 182,055,771 | - | 182,055,771 |
| Mortgage and Construction Loans................... | 152,136,711 | - | 152,136,711 |
| Equity Interest in Real Estate.......................... | 174,797,372 | - | 174,797,372 |
| Real Estate Investment Trusts Held by Custodian...... | 35,450,553 | - | 35,450,553 |
| Pooled Investments.......................................... | 470,829,154 | 8,639,787 | 479,468,941 |
| Private Placements........................................... | 302,198,121 | - | 302,198,121 |
| Total Investments.......................................... | 7,188,478,377 | 8,639,787 | 7,197,118,163 |
| Accrued Interest Receivable.................................. | 28,321,019 | - | 28,321,019 |
| Accounts Receivable: | | | |
| Due from Primary Government......................... | 71,412,133 | 185,281 | 71,597,414 |
| Due from Component Units.............................. | 14,207 | - | 14,207 |
| Other Receivables............................................ | 152,939,255 | - | 152,939,255 |
| Total Accounts Receivable............................ | 224,365,595 | 185,281 | 224,550,876 |
| Cash and Investments Held as Collateral for Securities Lending ... | 1,103,131,232 | - | 1,103,131,232 |
| Other Assets.......................................................... | 920,108 | - | 920,108 |
| Total Assets.................................................. | 8,577,442,664 | 11,335,695 | 8,588,778,359 |

| LIABILITIES AND NET ASSETS | | | |
|---|---:|---:|---:|
| Accounts and Contracts Payable....................... | 6,342,883 | 1,488,321 | 7,831,204 |
| Due to Broker.................................................. | 195,337,141 | - | 195,337,141 |
| Benefits and Claims Payable............................ | 21,225,025 | - | 21,225,025 |
| Due to Primary Government............................. | 4,672,331 | 238,405 | 4,910,737 |
| Due to Component Units.................................. | 787,815 | - | 787,815 |
| Amount Due to Broker for Securities Lending...... | 1,103,131,232 | - | 1,103,131,232 |
| Other Liabilities.............................................. | 59,619,625 | 9,608,969 | 69,228,594 |
| Total Liabilities........................................... | 1,391,116,052 | 11,335,695 | 1,402,451,747 |
| Net Assets: | | | |
| Net Assets Held in Trust for Pension and Employee Benefits.......... | $ 7,186,326,612 | $ - | $ 7,186,326,612 |

(An unaudited Schedule of Employer Contributions and Funding Progress is presented on page 117)

The accompanying notes are an integral part of the financial statements.

---

**City of Detroit, Michigan**
**STATEMENT OF CHANGES IN FIDUCIARY NET ASSETS**
**FIDUCIARY FUNDS**
**For the Year Ended June 30, 2005**

| | Pension and Other Employee Benefit Funds |
|---|---:|
| ADDITIONS: | |
| Employer Contributions............................... | $ 1,743,795,825 |
| Plan Member Contributions.......................... | 54,099,017 |
| Other Income................................................ | 10,470,273 |
| Total Contributions.................................. | 1,808,365,115 |
| Investment Gain............................................ | 538,048,281 |
| Total Additions........................................ | 2,346,413,396 |
| DEDUCTIONS: | |
| Pension and Annuity Benefits....................... | 381,246,326 |
| Premiums to Insurers and Damage Claims........ | 316,409,428 |
| Benefits......................................................... | 2,080,792 |
| Refunds......................................................... | 140,439,687 |
| General and Administrative Expenses............ | 8,038,436 |
| Total Deductions...................................... | 848,214,669 |
| Net Increase.................................................. | 1,498,198,727 |
| Net Assets Held in Trust for Pension and Employee Benefits, Beginning of Year.......... | 5,688,127,885 |
| Net Assets Held in Trust for Pension and Employee Benefits, End of Year.......... | $ 7,186,326,612 |

The accompanying notes are an integral part of the financial statements.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

**City of Detroit, Michigan**
**STATEMENT OF NET ASSETS**
**COMPONENT UNITS**
June 30, 2005

C-36

| | Detroit Brownfield Redevelopment Authority | Detroit Public Library | Downtown Development Authority | Economic Development Corporation | Detroit Housing Commission (Unaudited) | Local Development Finance Authority | Museum of African American History | School District of the City of Detroit | Tax Increment Finance Authority | Detroit Transportation Corporation | Greater Detroit Resource Recovery Authority | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS:** | | | | | | | | | | | | |
| Cash and Cash Equivalents | $ 114,129 | $ 89,905 | $ 1,027,619 | $ 1,725,472 | $ 740,334 | $ 4,521 | $ 218,697 | $ 2,102,119 | | $ 1,017,738 | $ | $ 7,040,534 |
| Escrow Deposits-Cash | | | 140,251 | 16,747,800 | | | | | | | | 16,888,051 |
| Investments, including Accrued Interest | | 1,806,129 | 83,233,758 | 24,050,508 | | | 395,412 | 105,865,783 | | 5,493,665 | | 220,845,055 |
| Accounts and Contracts Receivable: | | | | | | | | | | | | |
| Due from Primary Government | | 7,901,457 | 5,732,524 | | 1,257,000 | 108,028 | | | 1,764,760 | | | 16,763,769 |
| Due from Other Governments | | 7,467,059 | | | | 3,303,543 | | 263,944,615 | | | | 274,715,217 |
| Other Receivables | 150,000 | 8,803,070 | 31,418,950 | 1,113,741 | 3,744,440 | 7,759 | 2,110,824 | 12,708,776 | | 3,060,615 | 5,844,532 | 68,962,707 |
| Total Accounts and Contracts Receivable | 150,000 | 24,171,586 | 37,151,474 | 1,113,741 | 5,001,440 | 3,419,330 | 2,110,824 | 276,653,391 | | 4,825,375 | 5,844,532 | 360,441,693 |
| Allowance for Doubtful Accounts | | (7,300,000) | (36,661) | | (201,028) | | | | | | | (7,537,689) |
| Total Accounts and Contracts Receivable - Net | 150,000 | 16,871,586 | 37,114,813 | 1,113,741 | 4,800,412 | 3,419,330 | 2,110,824 | 276,653,391 | | 4,825,375 | 5,844,532 | 352,904,004 |
| Inventory | | 3,224,483 | | | | | 125,809 | 1,755,951 | | 3,479,198 | | 8,585,441 |
| Prepaid Expenditures/Expenses | | | 109,206 | | 699,837 | | 4,804 | | | 565,304 | 2,172,744 | 3,551,895 |
| Taxes, Interest, and Penalties Receivable - Net | | 830,000 | 11,626,196 | | | | | 107,572,867 | | | | 120,029,063 |
| Loans and Notes Receivable | | | 24,120,792 | 1,889,812 | | | | | | | | 26,010,604 |
| Unamortized Bond and Note Issue Costs- Net | | | 3,469,960 | | | | | | | 1,172,587 | | 4,642,547 |
| Net Pension Asset | | 22,653,538 | | | | | | | | | | 22,653,538 |
| Restricted Cash | | 1,604,760 | | | 590,912 | | | | | 22,438,243 | | 24,633,915 |
| Restricted Investments | | 7,238,503 | | | | 26,778,339 | | 269,316,268 | | 9,800,637 | 132,939,917 | 446,073,664 |
| Capital Assets: | | | | | | | | | | | | |
| Land | | 1,371,996 | 7,544,670 | | 15,119,876 | | | 69,811,599 | | 5,122,237 | 8,873,234 | 107,843,612 |
| Artwork | | 1,230,175 | | | | | | | | 1,986,000 | | 3,216,175 |
| Plant and Equipment | | 165,365,967 | 26,833,841 | | 144,474,267 | | 12,773,292 | 1,486,985,633 | | 201,057,612 | 513,623,297 | 2,551,113,909 |
| Construction Work in Progress | | | | | 32,631 | | | 446,989,551 | | 6,238,539 | | 453,260,721 |
| Less: Depreciation | | (150,200,884) | (2,196,500) | | (63,881,637) | | (2,635,511) | (468,378,233) | | (135,990,456) | (187,195,380) | (1,010,478,601) |
| Total Capital Assets, Net | | 17,767,254 | 32,182,011 | | 95,745,137 | | 10,137,781 | 1,535,408,550 | | 78,413,932 | 335,301,151 | 2,104,955,816 |
| Other | | 778,209 | | 10,021,003 | 343,085 | 943,483 | | | | | 1,151,167 | 11,307,571 |
| Deferred Charges | | | | | | | | | | | | 1,929,376 |
| **Total Assets** | 264,129 | 72,864,367 | 203,045,609 | 45,870,418 | 103,520,115 | 30,202,190 | 12,993,327 | 2,298,674,929 | | 103,595,649 | 501,020,341 | 3,372,051,074 |
| **LIABILITIES:** | | | | | | | | | | | | |
| Current Liabilities: | | | | | | | | | | | | |
| Accounts Payable and Contracts Payable | 15,747 | 471,665 | 2,347,361 | 15,543,777 | 830,634 | 69,514 | 2,428,845 | 116,820,995 | | 1,654,715 | 21,837,588 | 162,020,841 |
| Interest Payable | | | 6,287,196 | 232,740 | | 799,868 | | 14,807,260 | | 1,238,086 | | 23,365,150 |
| Due to Primary Government | | 1,116,151 | 86,096 | | | | 3,195 | 3,279,147 | | 256,331 | 294,336 | 5,035,256 |
| Due to Other Government | | 311,305 | | 22,924 | | | | | | | | 334,229 |
| Accrued Salaries and Wages | | 1,026,504 | | | 2,130,838 | | 146,087 | 95,841,190 | | 439,535 | | 99,584,154 |
| Deferred Revenues | | | | 298,133 | | | | 21,378,301 | | 876,917 | | 22,553,351 |
| Other Current Liabilities | | 829,534 | 7,444,120 | | | | | 4,439,917 | | 3,368,086 | | 16,081,657 |
| State Aid Anticipation and Other Notes Payable | | | | | | | | 161,515,039 | | | | 161,515,039 |
| Bonds, Notes, and Other Debt Payable-Current | | | 11,180,000 | 1,382,398 | | 3,370,000 | 1,222,125 | 47,733,281 | | | 51,690,000 | 116,577,804 |
| Unamortized Premiums and Discounts | | | (70,303) | | | | | 5,440,823 | | | | 5,370,520 |
| Bonds, Notes and Other Debt Payable-Current-Net | | | 11,109,697 | 1,382,398 | | 3,370,000 | 1,222,125 | 214,689,143 | | | 51,690,000 | 283,463,363 |
| Accrued Compensated Absences | | 253,571 | | | 288,311 | | | 6,208,877 | | | | 6,750,759 |
| Accrued Public Liability and Workers Compensation | | 5,347 | | | 146,909 | | | 16,590,913 | | | | 16,743,169 |
| Non-current Liabilities: | | | | | | | | | | | | |
| Bonds, Notes, and Other Debt Payable-Noncurrent | | | 158,163,501 | 980,000 | | 82,840,000 | | 1,663,542,462 | | | 372,314,820 | 2,277,840,783 |
| Unamortized Premiums and Defeasances | | | (1,492,731) | | | | | 34,823,980 | | | (3,341,006) | 29,990,243 |
| Bonds, Notes and Other Debt Payable-Non-current-Net | | | 156,670,770 | 980,000 | | 82,840,000 | | 1,698,366,442 | | | 368,973,814 | 2,307,831,026 |
| Advance Payable to Primary Government for POC's | | 23,819,934 | | | | | | | | | | 23,819,934 |
| Accrued Compensated Absences | | 4,478,003 | | | 1,001,012 | | | 112,210,414 | | 208,059 | | 117,897,488 |
| Accrued Public Liability and Workers Compensation | | 122,643 | | | | | | 25,219,933 | | | | 25,342,576 |
| **Total Liabilities** | 15,747 | 32,434,657 | 183,945,240 | 18,161,839 | 4,695,837 | 87,079,382 | 3,800,252 | 2,329,852,532 | | 6,303,643 | 444,033,824 | 3,110,822,953 |
| **NET ASSETS:** | | | | | | | | | | | | |
| Invested in Capital Assets, Net of Related Debt | | 17,767,254 | 32,182,011 | | 95,745,136 | | 9,137,781 | 208,705,250 | | 78,413,932 | 89,953,684 | 531,905,048 |
| Restricted for: | | | | | | | | | | | | |
| Restricted (Non-Expendable) | | 10,093,263 | | | 590,912 | 5,228,951 | | | | | | 15,913,126 |
| Capital Projects | 86,395 | | | 27,532,628 | | | | | | 11,577,437 | | 39,196,460 |
| Debt Service | | | (13,081,642) | | | 24,103,857 | | | | | (32,967,167) | (21,944,952) |
| Unrestricted (Deficit) | 161,987 | 12,569,193 | | 175,951 | 2,488,230 | (86,210,000) | 55,294 | (239,882,853) | | 6,800,637 | | (303,841,561) |
| **Total Net Assets (Deficit)** | $ 248,382 | $ 40,429,710 | $ 19,100,369 | $ 27,708,579 | $ 98,824,278 | $ (56,877,192) | $ 9,193,075 | $ (31,177,603) | $ - | $ 96,792,006 | $ 56,986,517 | $ 261,228,121 |

The accompanying notes are an integral part of the financial statements.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

**City of Detroit, Michigan**
STATEMENT OF ACTIVITIES
COMPONENT UNITS
For the Year Ended June 30, 2005

| | Detroit Brownfield Redevelopment Authority | Detroit Public Library | Downtown Development Authority | Economic Development Corporation | Detroit Housing Commission (Unaudited) | Local Development Finance Authority | Museum of African American History | School District of the City of Detroit | Tax Increment Finance Authority | Detroit Transportation Corporation | Greater Detroit Resource Recovery Authority | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Expenses .............. | $ (276,975) | $ (35,649,358) | $ (45,468,502) | $ (7,959,886) | $ (20,691,453) | $ (7,014,282) | $ (9,832,615) | $ (1,676,862,532) | $ (11,210,975) | $ (18,317,364) | $ (113,778,556) | $ (1,947,062,498) |
| **Program Revenues:** | | | | | | | | | | | | |
| Charges for Services ............... | 225,000 | 267,492 | 9,311,503 | 12,289,457 | 4,622,167 | - | 1,609,275 | 9,044,337 | - | 443,669 | 46,176,830 | 83,989,730 |
| Operating Grants and Contributions ... | 154,341 | 5,387,912 | - | - | 17,601,668 | - | 4,718,423 | 533,266,746 | - | 11,694,950 | 67,693,792 | 640,517,832 |
| Total Program Revenues ........ | 379,341 | 5,655,404 | 9,311,503 | 12,289,457 | 22,223,835 | - | 6,327,698 | 542,311,083 | - | 12,138,619 | 113,870,622 | 724,507,562 |
| Net Program (Expenses) Revenue ... | 102,366 | (29,993,954) | (36,156,999) | 4,329,571 | 1,532,382 | (7,014,282) | (3,504,917) | (1,134,551,449) | (11,210,975) | (6,178,745) | 92,066 | (1,222,554,936) |
| **General Revenues:** | | | | | | | | | | | | |
| Property Taxes - Levied for General Purposes ... | 73,353 | 28,262,818 | 18,238,362 | - | - | 8,985,583 | - | 88,528,994 | 11,210,975 | - | - | 155,300,085 |
| Property Taxes - Levied for Debt Service ... | - | - | - | - | - | - | - | 99,454,576 | - | - | - | 99,454,576 |
| Investment Income ... | - | 167,376 | - | 3,172 | 121,042 | 484,718 | (6,327) | 9,798,478 | - | 1,532,144 | 5,075,210 | 17,175,813 |
| Interest and Penalties on Taxes ... | 2,043 | 528,396 | - | - | - | - | - | - | - | - | - | 530,439 |
| Shared Taxes ... | - | 2,697,049 | - | - | - | - | - | 850,521,353 | - | - | - | 853,218,402 |
| Other Taxes and Assessments ... | - | 1,263,994 | - | - | - | 285,393 | - | 11,378,678 | - | - | - | 12,928,065 |
| Other Non Operating ... | - | 1,415,751 | 872,073 | 300,000 | 312,342 | 3,001,533 | 7,499,369 | (5,582,523) | - | 2,283,886 | - | 12,102,431 |
| General Revenues ... | 75,396 | 34,335,384 | 19,110,435 | 303,172 | 433,384 | 12,757,227 | 7,493,042 | 1,056,099,556 | 11,210,975 | 3,816,030 | 5,075,210 | 1,150,709,811 |
| Change in Net Assets ... | 177,762 | 4,341,430 | (17,046,564) | 4,632,743 | 1,965,766 | 5,742,945 | 3,988,125 | (78,451,893) | - | (2,362,715) | 5,167,276 | (71,845,125) |
| Net Assets(Deficit) - Beginning of Year, as Restated ... | 70,620 | 36,088,280 | 36,146,933 | 23,075,836 | 96,858,512 | (62,620,137) | 5,204,950 | 47,274,290 | - | 99,154,721 | 51,819,241 | 333,073,246 |
| Net Assets (Deficit) - End of Year ... | $ 248,382 | $ 40,429,710 | $ 19,100,369 | $ 27,708,579 | $ 98,824,278 | $ (56,877,192) | $ 9,193,075 | $ (31,177,603) | $ - | $ 96,792,006 | $ 56,986,517 | $ 261,228,121 |

The accompanying notes are an integral part of the financial statements.

C-37

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:03:2013 11:32

C-38



In April, musicians and dancers perform at the celebration of the **40th anniversary of the Charles H. Wright Museum of African-American History**. The museum has taken great strides in expanding its membership, and its exhibits have struck a deep chord with visitors from across the country.






Mayor Kilpatrick receives the **Midwest Regional Deal of the Year Award** from The Bond Buyer in New York City on December 6, 2005.



One of the fabulously imaginative **CarTune** car sculptures that were displayed on streets throughout downtown Detroit and Windsor during the summer of 2005.

The cars were later sold to raise funds for local charities.




CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

CITY OF DETROIT

C-39



Children relish a warm spring day at Belle Isle Park's **Kids' Kingdom**. People of all ages enjoy the many attractions and natural beauty of Belle Isle, Detroit's 980-acre island Gem.



Children create their own crafts at **Metro Youth Day**. Hundreds of children participated in the many activities at the annual event on Belle Isle.



# NOTES

## TO BASIC

## FINANCIAL

## STATEMENTS

57

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
2015-08-2013

**NOTE I. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

The City of Detroit (the City), incorporated in 1806, is a home rule city under State of Michigan law. The City is organized into two separate branches: (1) the executive branch, which is headed by the Mayor, and (2) the legislative branch, which is composed of the City Council and its agencies. Other agencies (City Clerk and Election) are not classified under the two branches. The City provides the following services as authorized by its charter: public protection, public works, recreation and culture, health, economic development, public lighting, transportation, water and sewage, airport, and parking.

**A. REPORTING ENTITY**

As required by Governmental Accounting Standards Board (GASB) Statement No. 14, *The Financial Reporting Entity*, the financial statements of the reporting entity include those of the City (the primary government) and its component units. Component units are legally separate organizations for which the elected officials of the City are financially accountable, or the relationship to the City is such that exclusion would cause the City's financial statements to be misleading or incomplete. The thirteen component units discussed below are included in the City's reporting entity because of the significance of their operational or financial relationships with the City.

**1. Blended Component Units:**

**Detroit Building Authority (DBA):** The City of Detroit Building Authority (DBA) is included in the operations and activities of the City because it was incorporated for the purpose of acquiring, furnishing, equipping, owning, improving, enlarging, operating, or maintaining a building or buildings (including but not limited to health and public safety facilities), automobile parking lots or structures (independently or adjunct to other buildings), recreational facilities, and the necessary site or sites, together with appurtenant properties and facilities necessary or convenient for the effective use thereof, all for the use of any legitimate public purpose of the City. Financing is provided by the issuance of bonds secured by lease agreements with the City and from grants received by the City.

**Detroit General Retirement System Service Corporation (DGRSSC) and Police and Fire Retirement System Service Corporation (DPFRSSC):**

The Detroit General Retirement System Service Corporation (DGRSSC) and the Detroit Police and Fire Retirement System Service Corporation (DPFRSSC) are Michigan nonprofit corporations incorporated by the City pursuant to State Law. The DGRSSC and DPFRSSC were formed to assist the City in maintaining the actuarial integrity of the City's two pension systems. The governing body of each corporation is its Board of Directors, each of which consists of three officials of the City, the Finance Director, the Budget Director and the Corporation Counsel, plus two members of the City Council, selected and appointed by the City Council.

In May 2005, the City entered into a separate service contract with each of the DGRSSC and the DPFRSSC, in which the City contractually obligated itself to make periodic payments to the corporations in return for their service of reducing the financial burden of the City's pension costs. The DGRSSC and the DPFRSSC, severally and not jointly, entered into a Trust Agreement with U.S. Bank National Association, as Trustee, which created the Detroit Retirement Systems Funding Trust 2005 (DRSFT), a grantor trust established and existing under Michigan law. The DGRSSC and DPFRSSC sold and assigned to the DRSFT their rights to receive certain of the payments to be received from the City under the service contracts.

**2. Discretely Presented Component Units:**

Component units, which are not blended as part of the primary government, are discretely presented by reporting component unit financial data in a column separate from the financial data of the primary government. These units are reported in a separate column to emphasize that they are legally separate from the City. The component units presented in this manner are the following:

**Detroit Brownfield Redevelopment Authority (DBRA):** The DBRA was created by a City Council resolution and approved by the Mayor in April 1998, under the provisions of Act 381, Public Acts of Michigan of 1996. DBRA was established to create Brownfield redevelopment zones and promote the revitalization, redevelopment, and reuse of certain property, including, but not limited to, tax-reverted, blighted, or functionally obsolete property. This is the first year of substantial financial activity for this authority.

**Detroit Public Library (DPL):** The DPL is a statutory body created by the State. The DPL was created to provide reference materials, research information, and publications to residents of the City and the County. Funding is provided by an ad valorem tax of 3.63 mills in real and personal property taxes in the City. In addition, DPL receives grants and endowments from private organizations. City Council is responsible for approving DPL's annual budget.

**Downtown Development Authority (DDA):** The DDA was created to promote and develop economic growth in the City's downtown business district. Funding is provided by an ad valorem tax of 1.0 mill on real and personal property in the downtown development district, a levy on the increased assessed value of a tax increment district, and issuance of revenue and tax increment bonds.

**Economic Development Corporation (EDC):** The EDC was established to create and implement project plans for designated project areas within the City, and thus encourage the location and expansion of industrial and commercial enterprises within the City. The EDC is primarily funded by means of grants from the City.

**Detroit Housing Commission (DHC):** The DHC was established in 1933 under the authority of the Housing Facilities Act, 1933 PA18 (Ex. Sess.), MCL 125.651 et. seq. Section 2 of the act provided that any city or incorporated village with population of over 500,000 was authorized "to purchase, acquire, construct, maintain, operate, improve, extend, and/or repair housing facilities and to eliminate housing conditions which are detrimental to the public peace, health, safety, morals, and/or welfare."

**Local Development Finance Authority (LDFA):** The LDFA was created to finance certain improvements for local public roads in the vicinity of the Chrysler Jefferson Avenue Assembly Plant. Incremental portions of the City and the County of Wayne (the County) property taxes fund LDFA.

**Museum of African American History (MAAH):** The MAAH was created to provide research, compilation, presentation, publication, and dissemination of knowledge relating to the history, growth, development, heritage, and culture of people of African descent and the human struggle for freedom. The MAAH is primarily funded by means of private grants and grants from the City.

**School District of the City of Detroit (the District):** The District is a statutory body created by the State and functions under the provisions of the Michigan School Code. Funding is provided by an ad valorem tax of 13.19 mills (homestead properties) and 31.19 mills (non-homestead) on real and personal property in the City and a "foundation allowance" provided by the State.

**Tax Increment Finance Authority (TIFA):** The TIFA was created to acquire property and provide financing for residential and commercial development programs through issuance of long-term debt secured by tax increment financing.

**Detroit Transportation Corporation (DTC):** The DTC was established in 1985 to oversee construction and operation of the Central Automated Transit System (People Mover) in downtown Detroit. The DTC is primarily funded by means of grants from the City.

**Greater Detroit Resource Recovery Authority (GDRRA):** The GDRRA was established by the cities of Detroit and Highland Park for the acquisition, construction, and operation of a waste-to-energy facility. The financing was provided by the issuance of revenue bonds.

C-40

58

59

(Continued)

(Continued)

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 17:13

Complete financial statements of the individual blended and discretely presented component units can be obtained directly from the following administrative offices:

Detroit Building Authority
2800 Cadillac Tower
65 Cadillac Square
Detroit, MI 48226
(313) 224-7242

Detroit General Retirement System
Service Corporation
Coleman A. Young Municipal Center, Room 1200
2 Woodward Avenue
Detroit, Michigan 48226
(313) 224-3380

Detroit Police & Fire Retirement System
Service Corporation
Coleman A. Young Municipal Center, Room 1200
2 Woodward Avenue
Detroit, Michigan 48226
(313) 224-3380

Brownfield Redevelopment Authority
500 Griswold, Suite 2200
Detroit, Michigan 48226
(313) 237-4616

Detroit Public Library
5201 Woodward Avenue
Detroit, MI 43202
(313) 833-1000

Downtown Development Authority
211 Fort Street, Suite 900
Detroit, MI 48226
(313) 963-2940

Economic Development Corporation
211 West Fort Street, Suite 900
Detroit, Michigan 44226
(313) 963-2940

Detroit Housing Commission
2211 Orleans Street
Detroit, MI 48207
(313) 877-8557

Local Development Finance Authority
211 West Fort Street 900
Detroit, MI 48226
(313) 963-2940

Museum of African American History
315 East Warren Avenue
Detroit, MI 48201
(313) 494-5800

School District of the City of Detroit
3011 West Grand Blvd.
11th Floor
Detroit, MI 48202
(313) 873-4147

Tax Increment Finance Authority
211 West Fort Street Avenue, Suite 900
Detroit, MI 48226
(313) 963-2940

Detroit Transportation Corporation
1420 Washington Blvd., 3rd Floor
Detroit, MI 48226
(313) 224-2160

Greater Detroit Resource Recovery Authority
5700 Russell Street
Detroit, MI 48211
(313) 876-0449

C-41

60

(Continued)

**B. JOINT VENTURE**

A joint venture is a legal entity or other organization that results from a contractual agreement and that is owned, operated or governed by two or more participants as a separate and specific activity, subject to joint control in which the participants retain (a) an ongoing financial interest or (b) an ongoing financial responsibility. The City participates in the following joint venture:

The Detroit-Wayne Joint Building Authority (DWJBA) was created as a corporate instrumentality in 1948 by agreement between the City and the County. All revenues or other monies received by the DWJBA must be disbursed for specific purposes in accordance with agreements with the incorporating units and the holders of the bonds. In March 1988, the City and County agreed to a consent judgment whereby the County's equity in the ownership of a portion of the space in the Coleman A. Young Municipal Center was transferred to the City. As a result, the fixed asset costs are recorded within the City's government-wide financial statements.

The DWJBA is party to a lease agreement that extends to March 1, 2028 for rental of the Coleman A. Young Municipal Center to the City and the County. The lease provides that the DWJBA shall maintain and operate the building, the expenditures of which are to be reimbursed by the City and County on the basis of the building space allocations specified in the lease. Also, the extended lease agreement identified the intention to renovate space occupied by the County and provided the commitment of the County to enter into a separate supplemental lease for the repayment for the debt used in the renovations. Therefore, the County has an ongoing financial responsibility.

Complete financial statements of the DWJBA may be obtained by writing the DWJBA at the following address:

Detroit-Wayne Joint Building Authority
1316 Coleman A. Young Municipal Center (CAYMC)
Detroit, MI 48226

**C. BASIS OF PRESENTATION**

The basic financial statements include both government-wide and fund financial statements.

**1. Government-wide Financial Statements**

The government-wide statement of net assets and statement of activities report the overall financial activity of the primary government (the City), excluding fiduciary activities, and its component units. Eliminations have been made to minimize the double counting of internal activities of the City. These statements distinguish between the governmental and business-type activities of the City. Governmental activities generally are financed through taxes, intergovernmental revenues, and other nonexchange transactions. Business-type activities are financed in whole or in part by fees charged to external parties.

The statement of activities presents a comparison between direct expenses and program revenues for each business-type activities of the City and for each function of the City's governmental activities. Direct expenses are those that are clearly identifiable with a specific function. Program revenues include (a) charges paid by the recipients of goods or services offered by the programs, and (b) grants and contributions that are restricted to meeting the operational or capital requirements of a particular program. Revenues that are not classified as program revenues, including all taxes, are presented as general revenues.

**2. Fund Financial Statements**

The fund financial statements provide information about the City's funds, including its fiduciary fund types. Separate statements for each fund category (governmental, proprietary, and fiduciary) are presented. The emphasis on fund financial statements is on major governmental and enterprise funds, each displayed in a separate column. All remaining governmental and enterprise funds are aggregated and reported as nonmajor funds.

61

(Continued)

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
v.1.0.2013_11_22

Proprietary fund operating revenues, such as charges for services primarily result from exchange transactions associated with the principal activity of the fund. Exchange transactions are those in which each party receives and gives up essentially equal values. Non-operating revenues, such as subsidies and investment earnings, result from non-exchange transactions or ancillary activities.

The City uses the following major funds:

**Governmental Funds:**

    **a.** **General Fund** accounts for several of the City's primary services (Police, Fire, Public Works, Community and Youth Services, etc.) and is the primary operating unit of the City.

    **b.** **Detroit General Retirement System Service Corporation** accounts for the proceeds and service payments related to the issuance of the Pension Obligation Certificates in June of 2005.

    **c.** **Police & Fire Retirement System Service Corporation** accounts for the proceeds and service payments related to the issuance of the Pension Obligation Certificates in June of 2005.

**Proprietary Funds:**

    **a.** **Sewage Disposal Fund** accounts for the operations of the wastewater treatment plant, sewers, including sanitary and combined sewers, combined sewer outfalls, and interceptors. The facility provides service to Detroit and 75 other communities in southeastern Michigan.

    **b.** **Transportation Fund** accounts for the City's mass transit system with a fleet of over 572 coaches. The fund operates three light repair garages and terminals.

    **c.** **Water Fund** accounts for the operations of five water treatment plants, 20 booster stations, a transmission and distribution system and reservoirs. The fund provides service to Detroit and 125 other communities in southeastern Michigan.

    **d.** **Automobile Parking Fund** accounts for the activity of the City's Auto Parking and Arena System, but does not include parking fine revenues.

The City reports the following additional fund types:

**Fiduciary Funds:**

    **a.** **Pension and Other Employee Benefit Funds** account for moneys held in trust by the City for pension benefits and other employee benefits. The City uses pension trust funds to account for the retirement plans for civilian employees, firefighters and police officers. The Employee Benefit funds accounts for various health and long-term disability benefits for employees and retirees.

    **b.** **Agency Funds** account for transactions for assets held by the City as agent for certain activities or for various entities. Payroll deductions and special deposits are the primary transactions accounted for in these funds.

C-42

**D. BASIS OF ACCOUNTING**

The government-wide, proprietary, and fiduciary fund financial statements are reported using the economic resources measurement focus and the accrual basis of accounting. Revenues are recorded when earned and expenses are recorded at the time liabilities are incurred, regardless of when the related cash flow takes place. Non-exchange transactions, in which the City gives (or receives) value without directly receiving (or giving) equal value in exchange, include income taxes, sales taxes, property taxes, grants, entitlements, and donations. On an accrual basis, revenue from property taxes is recognized in the fiscal year in which the taxes are levied. Revenue from self-assessed taxes, including income taxes and sales tax, is recognized in the fiscal year in which the underlying exchange transaction occurs. Revenue from grants, entitlements, and similar items is recognized in the fiscal year in which all eligibility requirements imposed by the provider have been met.

Financial Accounting Standards Board (FASB) Statements and Interpretations, APB opinions and ARB'S of the Committee on Accounting Procedure issued prior to December 1, 1989, generally are followed in both the government-wide and proprietary fund financial statements to the extent that those standards do not conflict with or contradict guidance of the GASB. The City also has the option of following subsequent FASB guidance for their business-type activities and enterprise funds, subject to this same limitation. The City has elected not to follow subsequent FASB guidance.

Governmental funds are reported using the current financial resources measurement focus and the modified accrual basis of accounting. Revenues are recognized as soon as they are both measurable and available. Revenues are considered to be available when they are collectible within the current period or soon enough thereafter to pay liabilities of the current period. For this purpose, the City considers revenues to be available if they are collected within 60 days of the end of the current fiscal year, except for grants and trade receivables, which are 180 and 90 days, respectively. Expenditures generally are recorded when the liability is incurred, as under accrual accounting. However, principal and interest on general long-term debt, claims and judgments, compensated absences and other long term obligations are recorded only when payment is due. General capital asset acquisitions are reported as expenditures in governmental funds. Proceeds of general long-term debt, pension obligation certificates and acquisitions under capital leases are reported as other financing sources. Significant revenue sources, which are susceptible to accrual, include property taxes, income taxes, utility taxes, and interest. All other revenue sources are considered to be measurable and available only when cash is received.

**E. BUDGETARY DATA**

**Budgeting Policy:**

The City's annual budget constitutes a financial plan for the next fiscal year, which is required to set forth estimated revenues from all sources and all appropriations. Proposed capital appropriations are included in separate sections of the budget. Any surplus or deficit during the preceding year is entered into the budget for the next fiscal year as either revenue (surplus) or appropriation (deficit), in accordance with the City Charter. The total of proposed expenditures cannot exceed the total of estimated revenues, so that the budget as submitted is a balanced budget. Budgets are prepared for all agencies of the City.

**Budgetary Compliance Report:**

The Finance Department has prepared a Budgetary Compliance Report for the fiscal year ended June 30, 2005. This report shows the Original and Final Budgets amounts and the (non-GAAP) budgetary-basis expenditures for each appropriation in of the Governmental Funds. The report is in Adobe PDF format and is available on the Finance Department home page of the City's website at **www.ci.detroit.mi.us**

On or before April 12 each year, the Mayor submits to the City Council a proposed annual budget for the next fiscal year. A public hearing in the manner provided by law or ordinance is held on the proposed budget before adoption. After the public hearing, the City Council adopts the budget with or without amendment. Consideration of the budget is completed by the City Council no later than May 24. If the Mayor disapproves of amendments made by the City Council, the Mayor, within seven days, submits to the City Council in writing the reasons for the disapproval. The City Council proceeds to reconsider any budget item so disapproved. If, after reconsideration, a two-thirds majority of the City Council

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 166 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
2013

serving agrees to sustain any of the City Council's amendments to the budget, those amendments so sustained are of full force and effect. The City Council's reconsideration of the budget must be concluded within three business days after receipt of the Mayor's disapproval.

The adoption of the budget provides for: (1) appropriations of specific amounts from funds indicated, (2) a specific levy of property tax, and (3) provision for the issuance of bonds specified in the capital program. The budget as adopted becomes the basis for establishing revenues and expenditures for the fiscal year. The appropriations for the functions of each City department are fixed. Expenditures may not exceed the original appropriations without City Council approval. If during the fiscal year the Mayor advises the City Council that there are available appropriations and revenues in excess of those estimated in the budget, the City Council may make supplemental appropriations for the year up to the amount of the excess. In the case of estimated revenue shortfalls, the Mayor may request that the City Council decrease certain appropriations. In any case, the Mayor is under no obligation to spend an entire appropriation. Also, at any time during the fiscal year, the City Council, upon written request by the Mayor, may transfer all or part of any unencumbered appropriation balance among programs, services, or activities within an agency or from one agency to another.

F.  **ASSETS, LIABILITIES, AND FUND EQUITY**

1.  **Cash and Investments:**  Cash and cash equivalents include cash on hand, demand deposits, and short-term investments with original maturities of three months or less from the date of acquisition. Investments are reported at fair value based on quoted market prices.

2.  **Interfund Transactions:**

    The City has the following types of interfund transactions:

    a.  **Loans** – amounts provided with a requirement for repayment. Interfund loans are reported as due from other funds in lender funds and due to other funds in borrower funds.

    b.  **Services provided and used** – sales and purchases of goods and services between funds for a price approximating their external exchange value. Interfund services provided and used are reported as revenues in seller funds and expenditures or expenses in purchaser funds. Unpaid amounts are reported as interfund receivables and payables in the fund balance sheets or fund statements of net assets.

    c.  **Reimbursements** – repayments from the funds responsible for particular expenditures or expenses to the funds that initially paid for them. Reimbursements are reported as expenditures in the reimbursing fund and as a reduction of expenditures in the reimbursed fund.

    d.  **Transfers** – flows of assets (such as cash or goods) without equivalent flows of assets in return and without a requirement for repayment. In governmental funds, transfers are reported as other financing uses in the funds making transfers and as other financing sources in the funds receiving transfers. In proprietary funds, transfers are reported after non-operating revenues and expenses.

3.  **Inventories:**  Cost of inventories of the governmental-type funds is recorded as expenditures at the time of purchase. Inventories at year-end for the General, Construction Code, Drug Law Enforcement Fund, and Major and Local Street funds are recorded in the balance sheet at cost or market, whichever is lower, based on a physical inventory, with a reserve for inventories in fund balance by the related fund. Inventories of the Enterprise Funds are stated at the lower of cost or market and expensed when used.

4.  **Capital Assets:**  Capital assets, which include land, buildings, improvements, equipment, and infrastructure assets (e.g., roads, bridges, sidewalks, and similar items), are reported in the applicable governmental or business-type activities column in the government-wide financial statements. Capital assets purchased or acquired are reported at historical cost or estimated historical cost. Donated assets are recorded at fair market value as of the date received. The City's capitalization levels are $5,000 on tangible personal property and for improvements other than buildings, and $50,000 on infrastructure, including sewer and storm water lines. All acquisitions of land and land improvements will be capitalized regardless of cost. Interest incurred during the construction phase of capital assets of business-type activities is reflected in the capitalized value of the asset constructed, net of interest earned on the invested proceeds over the same period. Capitalized interest, net of related debt, for the year ended June 30, 2005 for the Sewage

Disposal and Water Funds was $50,767,951 and $31,567,774 respectively. Costs of assets sold or retired (and related amounts of accumulated depreciation) are eliminated from the accounts in the year of sale or retirement, and the resulting gain or loss is included in the operating statement of the related fund. In governmental funds, the sale of general capital assets is included in the statement of revenues, expenditures, and changes in fund balances as proceeds from sale. Other costs incurred for repairs and maintenance are expensed as incurred. Depreciation on all assets is provided on the straight-line basis over the following estimated useful lives:

| | Years |
|---|---|
| Land improvements | 5 – 20 |
| Buildings and building improvements | 5 – 50 |
| Improvements other than buildings | 5 – 50 |
| Machinery and equipment | 5 – 20 |
| Vehicles other than buses | 3 – 10 |
| Buses | 12 |
| Stormwater and wastewater lines and pump stations | 10 – 65 |
| Other infrastructure | 7 – 60 |

The City has a collection of artwork presented both in buildings and public outdoor spaces. The true value of the art is expected to either be maintained at cost or appreciate over time, and thus, the art is not depreciated. If individual pieces are lost or destroyed, the loss is recorded.

5.  **Bond Premiums, Discounts, and Issuance Costs:**  In the government-wide and proprietary fund financial statements, bond premiums and discounts, as well as issuance costs are deferred and amortized over the life of the bonds using the effective interest method. Bonds payable are reported net of the applicable bond premium or discount and gains (losses) on defeasance. Bond premiums, discounts and issuance gains and costs are reported as deferred charges and amortized over the term of the related debt.

    In the financial statements, governmental fund types recognize bond premiums or discounts and gains or losses on defeasance, as well as bond issuance costs, during the current period. The face amount of debt issued is reported as other financing sources. Premiums on debt issuances are reported as other financing sources, while discounts on debt issuances are reported as other financing uses. Issuance costs, whether or not withheld from the actual debt proceeds received, are reported as debt service expenditures.

6.  **Encumbrances:**  Encumbrances outstanding for governmental funds at year-end do not represent GAAP expenditures or liabilities, but represent budgetary accounting controls. All governmental fund budgets are maintained on the modified accrual basis of accounting, except budgetary-basis expenditures include purchase orders and contracts (encumbrances) issued for goods or services not received at year-end.

7.  **Compensated Absences:**  For funds other than the Transportation Fund, unused vacation pay and banked overtime accumulate up to a maximum level until termination of employment, while there is no vesting of sick pay until an employee reaches age 60 or completes 25 years of service. Furlough time is awarded to uniformed police and fire employees at the beginning of two semi-annual periods. Any unused furlough time remaining at the end of each semi-annual period is forfeited. For the Transportation Fund, unused vacation pay accumulates for each employee up to a maximum level. Once this level is attained, unused vacation must be used or the employee loses a portion of the vacation pay.

    The liability for compensated absences reported in the government-wide and proprietary fund statements consists of unpaid, accumulated vacation and sick leave balances. A liability for these amounts is reported in governmental funds only if they have matured.

8.  **Property Taxes:**  The State Constitution limits the proportion of true cash value at which real property can be uniformly assessed to 50%. The Michigan Constitution also mandates a system of equalization for assessments. Although the assessors for each local unit of government are responsible for actually assessing at 50% of true cash value, the final State equalized assessment against which local property tax rates are applied is derived through several steps. County equalization is brought about by adjustments of the various local unit assessment ratios to the

C-43

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

same level; then the State equalizes the various counties in relation to each other. State equalized values are important; aside from their use for local property tax levy purposes, because of their role in distribution of State school aid and in the calculation of debt limits. The only major items of personal property subject to property taxation in the City are commercial and industrial furniture, fixtures, and equipment. Though comprehensive authority is granted by the State to Michigan municipalities for governmental purposes, the Constitution and general laws of the State limit the municipal rate of taxation and restrict the amount of debt a municipality may incur. At the present time, the general ad valorem taxing power of the City is generally limited by State law and the City Charter to 20 mills. The City is levying at its current maximum rate limit. In addition, the City is authorized to levy additional taxes within specified amounts for specific purposes under specific legislation. At the present time, under such an authorization, the City is levying 3 additional mills for the purpose of garbage and rubbish collection. These millage limitations, however, do not apply to taxes levied by the City for payment of principal and interest on presently outstanding unlimited tax-supported bonds, nor do they apply to payment of principal and interest on tax-supported bonds issued in anticipation of presently outstanding contractual obligations of the City or presently outstanding assessments in the City.

The City's property tax is levied each July 1 of the fiscal year and is payable without penalty either on or before August 31 in full, or one-half on or before August 15, with the balance then being payable on or before the following January 15. Property taxes attach as a lien on the property as of July 1 of the year of levy. Property owners may appeal their assessments to the local Board of Review and ultimately to the Michigan Tax Tribunal.

In the government-wide financial statements, property tax revenue is recorded in the period in which the tax is levied. In the governmental fund financial statements, the City records property tax revenue when available. Available is defined as due and receivable within the current fiscal year and collected within the current fiscal year or expected to be collected within 60 days thereafter.

9. **Municipal Income Taxes:** The City levies an annual income tax. The rate for the calendar year 2005 consists of an annualized tax of 2.50% on income of resident individuals, 1.25% on income earned in the City by non-residents and for corporations the annual rate for 2005 is 1.0%. These rates are being lowered over a 10-year period starting July 1, 1999. The resident rate will decrease by 1/10 of a percentage point, the non-resident rate by 1/20 of a percentage point, and the corporate rate by 2/10 of a percentage point over the same period. After the 10-year period, the calendar 2009 resident rate will be 2%, the non-resident rate will be 1%, and the corporate rate will be zero. However, due to current economic conditions there was a temporary rate freeze of the tax rates for the calendar year 2005. The rates were as follows: residents 2.5%, non-residents 1.25% and corporations 1%. The City has re-applied for, and received, approval for the rate freeze to remain in effect for calendar year 2006. Municipal income taxes are accrued for income tax withholdings collected by employers but not yet remitted to the City. In the government-wide financial statements, income tax revenue is recorded in the period in which the underlying compensation is earned by the taxpayer. In the governmental fund financial statements, the City records municipal income tax revenues when they become available. Available is defined as due and receivable within the current fiscal year or expected to be collected within 60 days thereafter. Estimated refunds for income tax returns received and in process, in which payment has not been made, are recorded as a reduction of revenues. Income tax assessment receivable represents estimated additional taxes assessed as a result of tax return audits or failure to file a return.

10. **Fund Balances:** In the fund financial statements, governmental funds report reservations of fund balance for amounts that are not available for appropriation or are legally restricted by outside parties for use for specific purposes. Designations of fund balances represent tentative City plans that are subject to change.

11. **Net Assets:** The government-wide and proprietary fund financial statements utilize a net asset presentation. Net assets are categorized as follows:

   a. **Invested in Capital Assets Net of Related Debt** – consists of capital assets, net of accumulated depreciation. The outstanding balances of bonds, mortgages, notes, or other borrowing that are attributable to the acquisition, construction, or improvement of those assets would further reduce this component. If there were significant unspent related debt proceeds at year-end, the portion of the debt attributable to the unspent proceeds would be offset by the outstanding debt.

   b. **Restricted Assets** – consist of constraints placed on net asset use through external constraints imposed by grantors, contributors, or laws. When both restricted and unrestricted resources are available,

generally it is the City's policy to use restricted resources first, and then unrestricted resources, when they are needed.

   c. **Unrestricted Assets** – Consist of net assets that do not meet the definition of "Restricted" or "Invested in Capital Assets, net of related debt".

12. **Use of Estimates:** The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

13. **Detroit Housing Commission (DHC) Restatement:** On July 7, 2005, the United States Department of Housing and Urban Development (HUD) signed a cooperative endeavor agreement with the Mayor. The agreement calls for the City to transfer all of DHC's assets, projects, and programs to HUD and for HUD to manage the day-to-day operations and reporting requirements of the DHC. The agreement has a two-year term and is renewable annually thereafter. DHC's net assets at June 30, 2004 are restated based on their unaudited financial statements.

The Basic Financial Statements contain the Detroit Housing Commission's unaudited financial statements for fiscal year ended June 30, 2005.

These unaudited financial statements represent the best data available as of April 15, 2006.

| | |
|---|---:|
| Net Assets of DHC at June 30, 2004, as previously reported | $ 126,581,588 |
| Net Assets of DHC at June 30, 2004, as restated | 96,858,512 |
| Net DHC restatement | $ 29,723,076 |

14. **New Accounting Pronouncements:** The City adopted GASB Statement No. 40, *Deposit and Investment Risk Disclosures—an Amendment of GASB Statement No. 3*, for the year ended June 30, 2005. This pronouncement requires additional disclosures presented in these notes, but has no impact on fund balance or net assets. These disclosures address common deposit and investment risks related to credit risk, concentration of credit risk, interest risk, and foreign currency risk.

In November 2003, GASB issued Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries*. This Statement establishes accounting and financial reporting standards for impairment of capital assets. The City will implement Statement No. 42 beginning with the year ended June 30, 2006. The City is currently evaluating the impact of adopting Statement No. 42.

In July 2004, GASB issued Statement No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions*. This Statement establishes accounting and financial reporting standards for employers that participate in a defined benefit "other postemployment benefit" (OPEB) plan. Specifically, the City will be required to measure and disclose an annual OPEB cost on the accrual basis for health and insurance benefits that will be provided to retired City employees in future years. The City is also required to record a net OPEB obligation which is defined as the cumulative difference between annual OPEB cost and the employers contributions to a plan, including the OPEB liability or asset at transition, if any. The City is currently evaluating the impact that this standard will have on the financial statements when adopted. The City will implement Statement No. 45 beginning with the year ended June 30, 2008.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 168 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013

## NOTE II. STEWARDSHIP, COMPLIANCE, AND ACCOUNTABILITY

### A. COMPLIANCE WITH FINANCE-RELATED LEGAL AND CONTRACTUAL PROVISIONS

The City has no material violations of finance-related legal and contractual provisions.

### B. EXCESS OF EXPENDITURES OVER APPROPRIATIONS

The legal level of budget control is maintained at the appropriation level, which is more detailed than the budget in the Required Supplemental Information. Listed below are expenditures that exceeded its corresponding appropriation for the year ended June 20, 2005:

| Department Name | Appropriation No. | Appropriation Description | Final Budget | Actual Expenditure | Actual/Over Appropriation |
|---|---|---|---|---|---|
| Public Works | 00035 | Refuse Collection | 25,848,672 | 27,240,817 | (1,392,145) |
| | 00037 | Street Cleaning | 2,812,494 | 4,242,270 | (1,429,776) |
| | 00040 | Refuse Disposal | 76,548,620 | 82,768,373 | (6,219,753) |
| | 00041 | Street Maintenance | 5,213,828 | 6,386,796 | (1,172,968) |
| | 00052 | Stores and Supplies | 10,144,002 | 12,233,477 | (2,089,475) |
| | | **Total Public Works** | 120,567,616 | 132,871,733 | (12,304,117) |
| Fire | 00718 | Fire Fighting Operations | 146,748,964 | 147,713,662 | (964,698) |
| Non Departmental | 10828 | Tax Support-Bldgs and Safety Eng | 112,106 | 461,106 | (349,000) |
| | 11177 | Program Management Office | 446,342 | 1,674,004 | (1,227,662) |
| | 11426 | Office of Targeted Business Development | 469,273 | 786,498 | (317,225) |
| | 11915 | ITS - Unisys Project | - | 6,612,615 | (6,612,615) |
| | | **Total Non Departmental** | 1,027,721 | 9,534,223 | (8,506,502) |
| Police | 00112 | Police Executive | 4,973,659 | 5,319,436 | (345,777) |
| | 00115 | Human Resources Bureau | 10,303,321 | 10,649,572 | (346,251) |
| | 00116 | Eastern Operations Bureau | 128,255,851 | 137,173,079 | (8,917,228) |
| | 00363 | Office of Executive Deputy Chief | - | 4,357,611 | (4,357,611) |
| | 10164 | COPS UHP-DDOT (3601) | 4,095,456 | 5,748,893 | (1,653,437) |
| | | **Total Police** | 147,628,287 | 163,248,591 | (15,620,304) |
| Public Lighting | 00131 | Heat and Power Production | 37,175,546 | 44,221,515 | (7,045,969) |
| Recreation | 10544 | North District Operations | 6,991,443 | 8,374,769 | (1,383,326) |
| | 10547 | East District Operations | 4,463,085 | 4,865,580 | (402,495) |
| | 10548 | Belle Isle District | 6,343,673 | 9,331,838 | (2,988,165) |
| | | **Total Recreation** | 17,798,201 | 22,572,187 | (4,773,986) |

### C. DEFICIT FUND EQUITY

General Fund had a deficit fund balance of $33,594,434. The Detroit Public Schools (DPS) and Local Development Finance Authority (both Component units) had fund deficits of $31,177,603 and $56,877,192 respectively. Each fund has a deficit reduction plan, which includes, among other things, changes in how and what level of services are to be provided, perhaps additional subsidies and in the case of DPS additional State appropriations.

## NOTE III. DETAILED NOTES ON ALL FUNDS

### A. ASSETS

#### 1. Deposits and Investments

##### a. Primary Government

The following is a complete listing of deposits and investments held by the City at June 30, 2005:

| | Governmental Activities | Business - Type Activities | Total |
|---|---|---|---|
| Deposits | $ 152,481,046 | $ 71,120,511 | $ 223,601,557 |
| Investments | 297,929,368 | 1,103,535,354 | 1,404,464,722 |
| Total | $ 450,410,414 | $ 1,174,655,865 | $ 1,625,066,279 |

The Deposits and Investments of the City at June 30, 2005 are reflected in the financial statements as follows:

| | Governmental Activities | Business - Type Activities | Total |
|---|---|---|---|
| Unrestricted | | | |
| Cash and Cash Equivalents | $ 50,307,208 | $ 2,208,061 | $ 52,515,269 |
| Investments | 265,697,802 | 60,216,610 | 325,914,412 |
| Restricted | | | |
| Cash and Cash Equivalents | 88,805,837 | 48,602,256 | 137,408,093 |
| Investments | 45,599,567 | 1,063,628,938 | 1,109,228,505 |
| Total | $ 450,410,414 | $ 1,174,655,865 | $ 1,625,066,279 |

State laws authorize the City to make deposits in the accounts of federally insured financial institutions. Cash held by fiscal agents or by trustees is secured in accordance with the requirements of the agency or trust agreement.

The City is authorized to invest in obligations of the U.S. government or its agencies, certificates of deposit, savings and depository accounts of insured institutions, commercial paper of certain investment quality, repurchase agreements, banker's acceptances, mutual funds of certain investment quality, and investment pools authorized by state law.

*Custodial Credit Risk of Bank Deposits*

Custodial credit risk is the risk that in the event of bank failure, the bank may not return the City's deposits. The City does not have a deposit policy for custodial credit risk. As of June 30, 2005, the governmental and business-type activities had deposits of $204,454,712 that were exposed to custodial credit risk as they were uninsured and uncollateralized.

*Custodial Credit Risk of Investments*

C-45

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
7/31/2013  11:32

Custodial credit risk is the risk that, in the event of failure of the counterparty, the City will not be able to recover the value of its investments or collateral securities that are in the possession of an outside party. The City does not have a policy for custodial credit risk. As of June 30, 2005, the City had no investments subject to custodial credit risk.

*Interest Rate Risk*

Interest rate risk is the risk that, over time, the value of investments will decrease as a result of a rise in interest rates. The City's investment policy does not specifically restrict investment maturities other than commercial paper, which can only be purchased with a 270-day maturity. The City policy minimizes interest rate risk by requiring that the Fund attempt to match its investments with anticipated cash flow requirements. Unless related to a specific cash flow, the City is generally not permitted to directly invest in securities maturing more than 10 years from original date of purchase.

As of June 30, 2005, the City had the following investments and maturities:

| Governmental Activities | Fair Value | Less Than 1 Year | 1-5 Years | 6-10 Years |
|---|---|---|---|---|
| US Treasury | $ 12,689,389 | $ 2,446,448 | $ 7,583,266 | $ 2,659,675 |
| US Government Agency Securities | 84,887,117 | 18,024,779 | 66,862,338 | - |
| Repurchase Agreement | 1,005,222 | 1,005,222 | - | - |
| Money Market | 154,347,640 | 154,347,640 | - | - |
| **Total-Unrestricted** | 252,929,368 | 175,824,089 | 74,445,604 | 2,659,675 |
| Money Market | 45,000,000 | 45,000,000 | - | - |
| **Total -Restricted** | 45,000,000 | 45,000,000 | - | - |
| **Total Investments** | $ 297,929,368 | $ 220,824,119 | $ 74,445,604 | $ 2,659,675 |

Investment Maturities in Years

| Business Type Activities | Fair Value | Less Than 1 Year | 1-5 Years | 6-10 Years | Over 10 Years |
|---|---|---|---|---|---|
| Money Market | $ 54,216,611 | $ 54,216,611 | - | - | - |
| **Total-Unrestricted** | 54,216,611 | 54,216,611 | - | - | - |
| US Treasury | 12,976,157 | 12,976,157 | - | - | - |
| US Government Agency Securities | 454,132,713 | 251,440,514 | 199,784,590 | 2,907,609 | - |
| Repurchase Agreement | 93,256,654 | 42,332,654 | 14,924,000 | - | 36,000,000 |
| Money Market | 488,953,219 | 488,953,219 | - | - | - |
| **Total -Restricted** | 1,049,318,743 | 795,702,544 | 214,708,590 | 2,907,609 | 36,000,000 |
| **Grand Total** | $ 1,103,535,354 | $ 849,919,155 | $ 214,708,590 | $ 2,907,609 | $ 36,000,000 |

*Credit Risk*

The City's investment policy complies with state law which limits its investments in commercial paper, mutual funds and external investment pools which purchase commercial paper to the top two rating classifications issued by two nationally recognized statistical rating organizations (NRSROs).

As of June 30, 2005, the City's investments have the following ratings:

70          (Continued)

Governmental Activities:

| | U.S. Treasury | U.S. Government Agency Securities | Repurchase Agreements | Money Market |
|---|---|---|---|---|
| **S&P** | | | | |
| AAA | $ 12,689,389 | $ 58,059,229 | $ - | $ - |
| **Moodys** | | | | |
| Aaa | - | - | - | 732,658 |
| AAA | - | 26,827,888 | 1,005,222 | 198,614,982 |
| **Total** | $ 12,689,389 | $ 84,887,117 | $ 1,005,222 | $ 199,347,640 |

Business-Type Activities:

| | U.S. Treasury | U.S. Government Agency Securities | Repurchase Agreements | Money Market |
|---|---|---|---|---|
| **S&P** | | | | |
| AAA | $ 12,976,157 | $ 395,844,561 | $ 28,442,000 | $ 10,645,531 |
| AA- | - | 40,074,500 | - | - |
| A+ | - | - | 9,816,154 | - |
| A- | - | - | 14,924,000 | - |
| **Moodys** | | | | |
| Aaa | - | 58,288,152 | - | 38,010,950 |
| Aa3 | - | - | - | 1,014,385 |
| **Not Rated** | - | - | - | 493,498,964 |
| **Total** | $ 12,976,157 | $ 454,132,713 | $ 93,256,654 | $ 543,169,830 |

*Concentration of Credit Risk*

Concentration of credit risk is the risk of loss attributed to the magnitude of the city's investment in a single issuer. The city's policy specifies a number of limitations to minimize concentration of credit risk include prohibiting investing more than 5% of the portfolio in securities (excluding U.S. government, mutual funds, external investment pools, and other pooled investments) of any one issuer. More than 5% of the primary government's investments are in Federal Home Loan Bank, Federal Home Loan Mortgage, and Federal National Mortgage Association. These investments are 18.5%, 6.1%, and 13.9%, respectively, of the primary governments investments.

b.   **Fiduciary Activities**

The Fiduciary activities consist of the Pension funds (General Retirement System and Police and Fire Retirement System) and Other Employee Benefit and Agency Funds.

71          (Continued)

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
detroit/15-08-2013 ...32

**Pension Funds**

State laws authorize the Pension Funds to make deposits in the accounts of federally insured financial institutions. Cash held by fiscal agents or by trustees is secured in accordance with the requirements of the agency or trust agreement.

The Pension Funds are authorized to invest in obligations of the U.S. government or its agencies, certificates of deposit, savings and depository accounts of insured institutions, commercial paper of certain investment quality, repurchase agreements, banker's acceptances, mutual funds of certain investment quality, equity securities and investment pools authorized by state law.

*Custodial Credit Risk of Bank Deposits*

Custodial credit risk is the risk that in the event of bank failure, the Pension Funds' deposits may not be returned by the bank. The Pension Funds do not have a deposit policy for custodial credit risk. At June 30, 2005, the General Retirement System and Police and Fire Retirement System had deposits of $11,267,228 and $9,672,771, respectively, that were exposed to custodial credit risk as they were uninsured and uncollateralized.

*Custodial Credit Risk of Investments*

Custodial credit risk is the risk that, in the event of failure of the counterparty, the Pension Funds will not be able to recover the value of its investments or collateral securities that are in the possession of an outside party. The Pension Funds do not have a policy for custodial credit risk. As of June 30, 2005, the Pension Funds had no investments subject to custodial credit risk.

*Interest Rate Risk*

Interest rate risk is the risk that, over time, the value of investments will decrease as a result of a rise in interest rates. The Pension funds' investment policy does not restrict investment maturities.

As of June 30, 2005, the Pension Funds had the following investments and maturities:

| General Retirement System | Fair Value | | | | |
|---|---|---|---|---|---|
| | Fair Value | Less than 1 | 1 – 5 | 6 – 10 | more than 10 |
| Asset Backed | 83,953,543 | 753,194 | 59,361,622 | 1,252,924 | 22,585,800 |
| CMO | 24,876,956 | - | 799,965 | 272,038 | 23,804,953 |
| Corporate Bonds | 231,628,740 | 15,904,350 | 82,989,282 | 118,588,374 | 14,146,734 |
| FHLMC | 24,969,252 | - | 1,247,691 | 2,044,374 | 21,677,187 |
| FNMA | 69,064,833 | - | 1,938,653 | 2,844,399 | 64,281,781 |
| GNMA | 4,743,387 | - | 534,423 | 204,094 | 4,004,870 |
| Government Issues | 509,386,179 | 28,110,142 | 452,530,960 | 8,833,505 | 19,911,572 |
| Municipals | 702,496 | 653,242 | 49,254 | - | - |
| Foreign Government Issues | 33,112,342 | 4,028,477 | 6,725,441 | 19,353,419 | 3,005,005 |
| STIF-Type Instrument | 797,103,222 | 89,304,981 | - | - | 707,798,241 |
| Mortgages | 46,263,663 | 31,383,209 | 14,880,454 | - | - |
| Construction loans | 23,920,529 | 15,305,065 | 8,615,464 | - | - |
| Private Placement | 5,000,000 | - | 5,000,000 | - | - |
| Total | 1,854,725,142 | 168,785,116 | 28,495,918 | 19,353,419 | 710,803,246 |

| Police and Fire Retirement System | Fair Value | Investment Maturities (in years) | | | |
|---|---|---|---|---|---|
| | Fair Value | Less than 1 | 1 – 5 | 6 – 10 | More than 10 |
| U.S. Government | $129,475,028 | $14,431,714 | $75,458,000 | $20,558,190 | $19,027,124 |
| Mortgage Backed | 54,371,713 | - | 270,134 | 2,174,714 | 51,926,865 |
| Collateralized Mortgage Obligation | 24,833,936 | - | - | - | 24,833,936 |
| Corporate | 439,208,985 | 23,656,048 | 187,021,254 | 143,788,865 | 84,742,818 |
| Yankee Bonds | 12,463,030 | - | 1,231,416 | 315,066 | 10,916,548 |
| Non-U.S. Fixed Income | 31,155,584 | 3,979,259 | 15,788,814 | 8,525,486 | 2,862,025 |
| Convertible Bonds | 8,204,662 | 149,044 | 1,020,885 | - | 7,034,733 |
| Treasury Bills | 3,439,095 | 3,439,095 | - | - | - |
| Mortgages | 19,331,504 | - | - | - | 19,331,504 |
| Construction Loans | 62,621,015 | 51,305,516 | 11,315,499 | - | - |
| Total | 785,104,552 | 96,960,676 | 292,106,002 | 175,362,321 | 220,675,553 |

*Credit Risk*

State law limits investments in commercial paper to the top two ratings issued by nationally recognized statistical rating organizations. The system has no investment policy that would further limit its investment choices.

As of June 30, 2005, the Pension Funds' investments have the following ratings:

**General Retirement System**

| S&P | | Moody | |
|---|---|---|---|
| Amount | Rating | Amount | Rating |
| 227,955 | A | 3,609,067 | A1 |
| 2,184,833 | A+ | 10,746,815 | A2 |
| 275,673 | A-1+ | 2,448,851 | A3 |
| 89,828 | AA | 1,682,295 | AA1 |
| 542,621 | AA- | 3,530,682 | AA2 |
| 152,974 | AA+ | 914,947 | AA3 |
| 11,684,542 | AAA | 246,131,696 | AAA |
| 3,255,949 | B | 18,169,725 | B1 |
| 380,147 | B- | 21,017,424 | B2 |
| 4,625,130 | B+ | 25,387,322 | B3 |
| 1,061,020 | BB | 9,453,732 | BA1 |
| 60,738 | BB- | 15,725,284 | BA2 |
| 2,822,961 | BB+ | 15,975,582 | BA3 |
| 1,764,783 | BBB | 6,043,284 | BAA1 |
| 239,755 | BBB+ | 9,005,332 | BAA2 |
| 104,162 | D | 11,017,052 | BAA3 |
| | | 8,750 | C |
| | | 3,598,138 | CA |
| | | 11,218,333 | CAA1 |
| | | 4,612,680 | CAA2 |

C-47

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
detroit/15.08.2013

**Police and Fire Retirement System**

| Investment Type and Fair Value ($000s) | TSY | AGY | AAA | AA | A | BBB | BB | B | CCC & Below | NR |
|---|---|---|---|---|---|---|---|---|---|---|
| U.S. Government | $82,490 | 82,944 | | $43,395 | $956 | | | | | |
| Mortgage Backed | | 54,372 | | | | | | | | |
| Collateralized Mortgage Obligations | | 15,679 | 9,555 | | | | | | | |
| Corporate | | 479 | 12,403 | 19,150 | 130,774 | 127,786 | 52,032 | 68,657 | | 9,904 |
| Yankee Bonds | | | | | | 3,148 | 1,757 | 940 | | |
| Non-U.S. Fixed Income | | | | 6,384 | 14,739 | 2,934 | 3,037 | 4,061 | | |
| Convertible Bonds | | | | 885 | | 1,829 | 2,635 | 753 | 1,950 | 153 |
| Treasury Bills | | 3,439 | | | | | | | | |
| Mortgages | | | | | | | | | | 19,332 |
| Construction Loans | | | | | | | | | | 62,621 |
| **Total** | $ 82,490 | $ 73,574 | $ 26,490 | $ 150,490 | $ 139,973 | $ 57,579 | $ 75,608 | $ 18,424 | | $ 93,610 |

*Quality Ratings of TSY and AGY have been assigned by The Bank of New York.*

**Foreign Currency Risk**

Foreign currency risk is the risk that an investment denominated in a foreign currency could lose U.S. dollar value because of changes in foreign currency exchange rates. State law and the city's investment policy do not permit investments in foreign currency. However, the General Retirement System and Police and Firemen Retirement System (Pension Funds) do not restrict the amount of investments in foreign currency. Their foreign currency investments are as follows:

| | Equity | Corporate Bonds | Cash and Cash Equivalents | Government Securities | Derivative |
|---|---|---|---|---|---|
| Australian Dollar | $ 7,595,112 | $ - | $ 163,535 | $ 8,282,550 | $ - |
| Brazilian Real | | | 3,992 | | |
| British Pound Sterling | 41,313,013 | - | 1,562,280 | 3,005,005 | (3,271) |
| Canadian Dollar | 1,811,619 | | 31,272 | 9,893,994 | 9,486 |
| Danish Krone | 2,689,232 | | 49,056 | | |
| Euro Currency | 84,064,927 | | 2,165,338 | 8,040,295 | (11,791) |
| Hong Kong Dollar | 2,944,461 | | 51,139 | | (1,868) |
| Hungarian Forint | 3,169,711 | | | | |
| Indionesian Rupiah | 534,819 | | 3,616 | | |
| Japanese Yen | 45,406,763 | | 7,100,605 | 6,384 | (11,491) |
| Malaysian Ringgit | 621 | | | | |
| Mexican Nuevo Peso | 938,989 | | 11,277 | 34,180 | |
| New Russian Ruble | | | 2 | | |
| New Zealand Dollar | 297,023 | 1,374,483 | 3,752 | 1,360,650 | |
| Norwegian Krone | 6,246,851 | | 12,685 | | |
| Philippine Peso | 168,797 | | 2,229 | | |
| Polish Zloty | 6,901,247 | | | 5,003,345 | |
| Singapore Dollar | 1,578,579 | | 16,976 | 4,028,477 | (1,216) |
| South African Rand | 537,065 | | 9,615 | | |
| South Korean Won | 2,247,933 | | 272 | | |
| Swedish Krona | 12,071,842 | | 430,400 | | (1,385) |
| Swiss Franc | 16,031,622 | | 535,465 | | |
| Thai Baht | 22,541 | | 569 | | |
| | $ 236,572,767 | $ 1,374,483 | $ 12,154,075 | $ 39,654,880 | $ (21,536) |

**Securities Lending**

As permitted by State statutes and under the provisions of a securities lending authorization agreement, the Pension Funds lend securities to broker-dealers and banks for collateral that will be returned for the same securities in the future. The Pension Funds custodial bank manages the securities lending program and receives cash, government securities, or irrevocable bank letters of credit as collateral. The custodial banks do not have the ability to pledge or sell collateral securities unless the borrower defaults. Borrowers are required to deliver collateral for each loan equal to not less than 100 percent of the market value of the loaned securities.

The Pension Funds did not impose any restrictions during the fiscal year on the amount of loans made on its behalf by the custodial bank. There were no failures by any borrowers to return loaned securities or pay distributions thereon during the fiscal year. Moreover, there were no losses during the fiscal year resulting from a default of the borrowers or custodial bank.

The General Retirement System had lent no securities to broker-dealers or banks.

The Police and Fire Retirement System and the borrower maintain the right to terminate all securities lending transaction on demand. The cash collateral received on each loan was invested together with the cash collateral of other lenders in an investment pool. The average duration of this investment pool as of June 30, 2005 was 27 days. Because the loans are terminable on demand, their duration did not generally match the duration of the investments made with cash collateral. On June 30, 2005, the Police and Fire Retirement System had no credit risk exposure to borrowers. The collateral held and the fair market value of underlying securities on loan for the Police and Fire Retirement System as of June 30, 2005 was $1,103,131,232 and $1,072,327,690, respectively.

**Other Employee Benefit and Agency Funds**

State laws authorize the City to make deposits in the accounts of federally insured financial institutions. Cash held by fiscal agents or by trustees is secured in accordance with the requirements of the agency or trust agreement.

The City is authorized to invest in obligations of the U.S. government or its agencies, certificates of deposit, savings and depository accounts of insured institutions, commercial paper of certain investment quality, repurchase agreements, banker's acceptances, mutual funds of certain investment quality, and investment pools authorized by state law.

*Custodial Credit Risk of Bank Deposits*

Custodial credit risk is the risk that in the event of bank failure, the Other Employee Benefit and Agency Funds (Other Funds) deposits may not be returned by the bank. The City does not have a deposit policy for custodial credit risk. At June 30, 2005, the Other Funds had deposits of $13,811,612 that were exposed to custodial credit risk as they were uninsured and uncollateralized.

*Custodial Credit Risk of Investments*

Custodial credit risk is the risk that, in the event of failure of the counterparty, the Other Funds will not be able to recover the value of its investments or collateral securities that are in the possession of an outside party. The City does not have a policy for custodial credit risk. As of June 30, 2005, the Other Funds had no investments subject to custodial credit risk.

*Interest Rate Risk*

Interest rate risk is the risk that, over time, the value of investments will decrease as a result of a rise in interest rates. The City's investment policy does not specifically restrict investment maturities other than commercial paper, which can only be purchased with a 270-day maturity. The City policy minimizes interest rate risk by requiring that the Fund attempt to match its investments with anticipated cash flow requirements. Unless related to a specific cash flow, the City is generally not permitted to directly invest in securities maturing more than 10 years from original date of purchase.

C-48

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 2013-08-2013

As of June 30, 2005, the Other Funds had the following investments and maturities:

| Employe Benefit/ Agency Funds | Fair Value | Less than 1 yr |
|---|---|---|
| Money Market | $ 34,354,890 | $ 34,354,890 |
| Mutual Funds | 18,429,867 | 18,429,867 |
| U.S. Gov't Agency Securities | 39,733 | 39,733 |
| Equity | 4,436,139 | 4,436,139 |
| Total-Unrestricted | 57,260,629 | 57,260,629 |
| Restricted-Mutual Funds | 2,200,862 | 2,200,862 |
| **Grand Total** | $ 59,461,491 | $ 59,461,491 |

*Credit Risk*

The City's investment policy complies with state law which limits its investments in commercial paper, mutual funds and external investment pools which purchase commercial paper to the top two rating classifications issued by two nationally recognized statistical rating organizations (NRSROs).

As of June 30, 2005, the Other Funds investments in debt securities are with money market funds and mutual funds, which have no rating.

**c.  Component Units**

**School District of the City of Detroit.**

State statues and the School District of the City of Detroit (School District) investment policy authorize the School District to make deposits in the accounts of federally insured banks, credit unions, and savings and loan associations that have offices in Michigan.  The School District is allowed to invest in U.S. Treasury or agency obligations, U.S. government repurchase agreements, bankers' acceptances, commercial paper rated prime at the time of purchase that matures not more than 270 days after the date of purchase, mutual funds, and investment pools that are composed of authorized investment vehicles.  The School District deposits are in accordance with statutory authority.

The School District has designated three banks and one credit union for the deposit of its funds.

The investment policy adopted by the School District has authorized investments as listed in the State statutory authority as listed above.

The School District's cash and investments are subject to several types of risk, which are examined in more detail below:

*Custodial Credit Risk of Bank Deposits* – Custodial credit risk is the risk that in the event of a bank failure, the School District's deposits may not be returned to it.  The School District's investment policy requires that financial institutions be evaluated and only those with an acceptable risk level are used for the School District's deposits for custodial credit risk.  At year end, the School District's deposit balance of $9,098,466 had $8,880,646 of bank deposits (certificates of deposit, checking and savings accounts) that were uninsured and uncollateralized.

*Custodial Credit Risk of Investments* – Custodial credit risk is the risk that, in the event of the failure of the counterparty, the School District will not be able to recover the value of its investments or collateral securities that are in the possession of an outside party.  The School District's policy for custodial credit states that custodial credit risk will be minimized by limiting investments to the types of securities allowed by state law, and by pre-qualifying the financial institutions, broker/dealers, intermediaries, and advisors with which the School District will do business using the criteria established in the investment policy.  The School District does not have investments with custodial credit risk.

*Interest Rate Risk* – Interest rate risk is the risk that the value of investments will decrease as a result of a rise in interest rates.  The School District's investment policy does not restrict investment maturities, other than commercial paper which can only be purchased with a 270-day maturity.  The School District's policy minimizes interest rate risk by requiring the structuring

76                    (Continued)

the investment portfolio so that securities mature to meet cash requirements for ongoing operations, thereby avoiding the need to sell securities in the open market; and investing operating funds primarily in shorter-term securities, liquid asset funds, money market mutual funds; or similar investment pools and limiting the average maturity in accordance with the School District's cash requirements.

*Credit Risk* – State law limits investments in commercial paper to the top two ratings issued by nationally recognized statistical rating organizations.  The School District's investment policy does not further limit it investment choices.

At year-end, the maturities of investments and the credit quality ratings of debt securities (other than the U.S. government) are as follows:

| Investment | Fair Value | Maturities | Rating | Rating Organization |
|---|---|---|---|---|
| Federal Home Loan Mortgage Corporation Discount Note | $ 15,043,980 | 7/5/2005 | AAA | S&P |
| Bank America Tri Party Repurchase Agreement | 70,000,000 | 7/1/2005 | AAA | S&P |
| Goldman Sachs Tri Party Repurchase Agreement | 21,000,000 | 7/1/2005 | AAA | S&P |
| Morgan Stanley Tri Party Repurchase Agreement | 70,000,000 | 7/1/2005 | AAA | S&P |
| ING US FDG LLC Commercial Paper | 1,994,380 | 8/1/2005 | A1/P1 | S&P/Moody's |
| JP Morgan US Government Money Market Fund Capital Class | 82,980,549 | N/A | AAAm/Aaa | S&P/Moody's |
| Dreyfus Corporation Dreyfus Government Cash Management | 871,449 | N/A | N/A | Not Rated |
| Citicorp Discount Commercial Paper | 1,996,760 | 7/19/2005 | A1/P1 | S&P/Moody's |
| AIG FDG Inc Discount Commercial Paper | 8,693,451 | 7/22/2005 | A1/P1 | S&P/Moody's |
| Ciesco LLC Discount Commercial Paper | 6,287,778 | 7/22/2005 | A1/P1 | S&P/Moody's |
| Citigroup Global Markets Holdings Inc. Discount Commercial Paper | 5,487,075 | 7/27/2005 | A1/P1 | S&P/Moody's |
| General Electric CAP Corporation Discount Commercial Paper | 1,994,380 | 8/1/2005 | A1/P1 | S&P/Moody's |
| ING US FDG LLC Discount Commercial Paper | 12,963,470 | 8/1/2005 | A1/P1 | S&P/Moody's |
| Barclays US FDG LLC Discount Commercial Paper | 5,866,193 | 8/31/2005 | A1/P1 | S&P/Moody's |
| Barclays US FDG LLC Discount Commercial Paper | 4,968,950 | 9/6/2005 | A1/P1 | S&P/Moody's |
| UBS Financial Del LLC Discount Commercial Paper | 3,776,098 | 9/6/2005 | A1/P1 | S&P/Moody's |
| Citigroup Global Markets Holdings Inc. Discount Commercial Paper | 4,968,100 | 9/7/2005 | A1/P1 | S&P/Moody's |
| Dexia Del LLC Discount Commercial Paper | 4,669,450 | 9/9/2005 | A1/P1 | S&P/Moody's |
| Federal Home Loan Bank Discount Note | 8,990,100 | 7/13/2005 | AAA | S&P |
| Federal National Mortgage Association Discount Note | 9,862,313 | 7/15/2005 | AAA | S&P |
| Federal Home Loan Bank Discount Note | 8,989,200 | 7/15/2005 | AAA | S&P |
| Federal National Mortgage Association Discount Note | 4,982,000 | 8/10/2005 | AAA | S&P |
| Federal Home Loan Mortgage Corporation Medium Term Note | 2,000,160 | 10/7/2005 | AAA | S&P |
| Federal Home Loan Bank Discount Note | 5,443,900 | 10/18/2005 | AAA | S&P |
| Amstel Funding Corporation Commercial Paper | 250,200 | 7/15/2005 | A1/P1 | S&P/Moody's |
| Asset One Sec LLC Commercial Paper | 250,495 | 7/8/2005 | A1/P1 | S&P/Moody's |
| Atlantis One Funding Corporation Commercial Paper | 246,340 | 8/11/2005 | A1+/P1 | S&P/Moody's |
| Beethoven Funding Corporation Commercial Paper | 246,373 | 11/9/2005 | A1/P1 | S&P/Moody's |
| Beethoven Funding Corporation Commercial Paper | 319,970 | 11/1/2005 | A1/P1 | S&P/Moody's |
| Coca-Cola Company Commercial Paper | 198,598 | 7/5/2005 | A1/P1 | S&P/Moody's |
| Coop Association Tractor Commercial Paper | 98,931 | 7/25/2005 | A1/P1 | S&P/Moody's |
| Coop Association Tractor Commercial Paper | 390,884 | 9/27/2005 | A1/P1 | S&P/Moody's |
| Dealers Capital Access Commercial Paper | 147,704 | 10/12/2005 | A1/P1 | S&P/Moody's |
| Edison Asset Securitization Commercial Paper | 245,940 | 10/3/2005 | A1+/P1 | S&P/Moody's |
| Fairway Finance Corporation Commercial Paper | 246,663 | 7/7/2005 | A1/P1 | S&P/Moody's |
| Fairway Finance Corporation Commercial Paper | 245,884 | 11/7/2005 | A1/P1 | S&P/Moody's |
| GE Capital Corporation Commercial Paper | 118,470 | 7/1/2005 | A1+/P1 | S&P/Moody's |
| GE Capital Corporation Commercial Paper | 197,314 | 9/8/2005 | A1+/P1 | S&P/Moody's |
| Starbird Funding Corporation Commercial Paper | 248,729 | 8/10/2005 | A1/P1 | S&P/Moody's |

77                    (Continued)

C-49

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 173 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
...roit/8/20/2013 11:32...

| | | | | |
|---|---|---|---|---|
| Sydney Capital Corporation Commercial Paper | 246,878 | 7/14/2005 | A1+/P1 | S&P/Moody's |
| Three Crowns FDG LLC Commercial Paper | 246,539 | 7/21/2005 | A1/P1 | S&P/Moody's |
| Three Crowns FDG LLC Commercial Paper | 273,183 | 9/29/2005 | A1/P1 | S&P/Moody's |
| Windmill Funding Corporation Commercial Paper | 398,415 | 7/27/2005 | A1+/P1 | S&P/Moody's |
| Repurchase agreement | 5,677,299 | 7/1/2005 | Not rated | Not rated |
| MILAF MIMAX | 1,057,506 | N/A | AAAm | AAA |
| Total investments | $ 375,182,051 | | | |

*Concentration of Credit Risk* – The School District places no limit on the amount the School District may invest in any one issuer. The School District's policy minimizes concentration of credit risk by requiring diversification of the investment portfolio so that the impact of potential losses from any one type of security or issuer will be minimized. More than 5 percent of the School District 's investments are invested in the following.

| Investment | Fair Value | Percentage of Total Investments |
|---|---|---|
| JP Morgan US Government Money Market Fund Capital Class | $ 82,980,549 | 22.12% |
| Bank America Tri Party Repurchase Agreement | 70,000,000 | 18.66% |
| Morgan Stanley Tri Party Repurchase Agreement | 70,000,000 | 18.66% |
| Goldman Sachs Tri Party Repurchase Agreement | 21,000,000 | 5.60% |
| Federal Home Loan Bank Discount Note | 23,423,200 | 6.24% |
| | $ 267,403,749 | 71.27% |

**2. Other Receivables:** Other receivables in the statement of net assets for governmental activities are shown in the aggregate. The following details the other receivable balance at June 30, 2005:

| | General | Other Governmental | Total |
|---|---|---|---|
| Estimated Withheld Income Tax Receivable | 28,381,590 | — | 28,381,590 |
| Trade Accounts Receivable | 21,342,143 | 1,236,024 | 22,578,167 |
| Land Contracts Receivable | 4,672,578 | — | 4,672,578 |
| Property Taxes | 58,093,679 | 20,478,737 | 78,572,416 |
| Income Taxes | 38,617,652 | — | 38,617,652 |
| Special Assessments | 25,697,431 | 347,225 | 26,044,656 |
| Interest and Penalties | 5,685,000 | 2,005,000 | 7,690,000 |
| Utility Users Tax | 6,241,469 | — | 6,241,469 |
| Due from Fiduciary Funds | 4,910,736 | — | 4,910,736 |
| Allowance for Doubtful Accounts | (136,611,870) | (17,091,532) | (153,703,402) |
| Total Other Receivables, Net | $ 57,030,408 | $ 6,975,454 | $ 64,005,862 |

**3. Due from/to Other Governmental Agencies:** Due from/to other governmental agencies consists primarily of sales and charges for services to/from the County, the State, and the Federal Government.

**4. Interfund Receivables and Payables:** During the course of operations, numerous transactions occur between the City funds for goods provided and services rendered and for the reimbursement of expenditures. Related interfund receivables and payables are classified as "due from other funds" and "due to other funds" on the Balance Sheet and Statement of Net Assets and will be settled within one year. Interfund receivables and payables at June 30, 2005 are as follows:

| | | | | Due From | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | General Fund | Non-Major Governmental Funds | Sewage Disposal Fund | Transportation Fund | Water Fund | Auto Parking Fund | Non-Major Proprietary Funds | Fiduciary Funds | Total |
| Due to: | | | | | | | | | |
| General Fund | $    - $ | 14,819,187 | $  4,307,202 | $  10,781,506 | $  17,376,000 | $  538,137 | $  211,119 | $  4,910,736 | $  53,345,897 |
| Non-Major Governmental Funds | 5,176,131 | 1,389,209 | — | — | 236,522 | 27,333 | — | — | 6,829,195 |
| Sewage Disposal Fund | 49,242,946 | — | — | 54,783,681 | — | — | — | — | 104,026,627 |
| Transportation Fund | 560,346 | 200,086 | — | — | — | — | — | — | 760,432 |
| Water Fund | 34,037,321 | 18,069,344 | 59,238,140 | 168,056 | — | — | — | — | 93,624,597 |
| Automobile Parking Fund | 364,374 | 25,179 | — | — | — | — | 83 | — | 389,636 |
| Non-Major Proprietary Fund | 1,430,941 | — | — | — | — | — | — | — | 1,430,941 |
| Fiduciary Funds | 71,335,032 | — | 262,382 | — | — | — | — | — | 71,597,414 |
| Total | $ 162,147,091 | $ 16,414,741 | $ 64,207,724 | $ 10,949,562 | $ 72,398,213 | $ 565,470 | $ 211,202 | $ 4,910,736 | $ 331,804,739 |

**5. Advances:** Advances represent interfund receivables and payables that will not be paid within one year. Advances between funds at June 30, 2005 are as follows:

| Receivable Fund | Amount | | Payable Fund | Amount |
|---|---|---|---|---|
| General Fund | $   12,692,905 | | Detroit Workforce Development Department (Non-Major Governmental Fund) | $   145,674 |
| | | | Capital Projects Fund (Non-Major Governmental Fund) | 850,000 |
| | $   12,692,905 | | Transportation Fund (Proprietary Fund) | 10,447,231 |
| | | | Automobile Parking Funds (Proprietary Fund) | 1,250,000 |
| | | | | $   12,692,905 |

**6. Transfers:** During the course of the fiscal year transactions occur between the City funds for operating subsidies. Related interfund receipts and disbursements are classified as "transfers in" and "transfers out" on the Statement of Revenues, Expenditures/Expenses, and Changes in Fund Balance/Net assets. The transfers are routine and consistent with the activities of the funds. Transfers between funds at June 30, 2005 are as follows:

| | | | Transfers In | | | |
|---|---|---|---|---|---|---|
| | General Fund | Non-major Governmental Funds | Transportation Fund | Automobile Parking Fund | Non-major Enterprise Fund | Total |
| Transfers Out | | | | | | |
| General Fund | $          — | 47,065,747 | $  77,441,898 | $  9,575,006 | $  2,568,402 | $  136,651,053 |
| Non-Major Governmental | 33,051,546 | 60,958,496 | — | — | — | 94,010,042 |
| | $  33,051,546 | $ 108,024,243 | $  77,441,898 | $  9,575,006 | $  2,568,402 | $  230,661,095 |

The General Fund transferred $136.6 million to other funds. The largest transfer was made to the Transportation Fund for $77.4 million to maintain bus operations. The General Fund also rendered $38.8 million to the Debt Service Fund for principal and interest payments. A transfer of $9.6 million was made to the Automobile Parking Fund to support operations due the union lockout in the 2004-2005 NHL hockey season.

The Non-Major Governmental Funds transferred $94 million to other funds. The Debt Service Fund transferred $37.5 million of unspent bond proceeds to the Capital Projects Fund to be reserved for the future Cobo Hall construction costs.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 1:32

The Major and Local Street Fund transferred $30.3 million to the General Fund to reimburse General Fund for street construction costs.

**7. Capital Asset Activity for the Year Ended June 30, 2005:**

**Primary Government**

| | Beginning Balance | Additions | Retirements | Ending Balance |
|---|---|---|---|---|
| **Governmental Activities:** | | | | |
| Non-Depreciable Assets: | | | | |
| Land | $ 355,511,574 | $ 27,536,453 | $ (34,400) | $ 383,013,627 |
| Works of Arts | 29,788,133 | - | - | 29,788,133 |
| Construction in Progress | 153,106,957 | 75,251,114 | (21,360,725) | 206,997,346 |
| Total Non-Depreciable Assets | 538,406,664 | 102,787,567 | (21,395,125) | 619,799,106 |
| Depreciable Assets: | | | | |
| Buildings and Improvements | 698,160,966 | 106,885,999 | (3,671,389) | 801,375,576 |
| Machinery and Equipment | 377,848,919 | 34,168,607 | (4,287,368) | 407,730,158 |
| Infrastructure | 767,336,917 | 60,064,260 | - | 827,401,177 |
| Total Depreciable Assets | 1,843,346,802 | 201,118,866 | (7,958,757) | 2,036,506,911 |
| Less Accumulated Depreciation for : | | | | |
| Buildings and Improvements | 263,325,399 | 31,805,821 | (183,754) | 294,947,466 |
| Machinery and Equipment | 297,444,161 | 22,770,003 | (4,258,367) | 315,955,797 |
| Infrastructure | 626,934,101 | 15,425,818 | - | 642,359,919 |
| Total Accumulated Depreciation | 1,187,703,661 | 70,001,642 | (4,442,121) | 1,253,263,182 |
| Governmental Activities | | | | |
| Capital Assets, Net | $ 1,194,049,805 | $ 233,904,791 | $ (24,911,761) | $ 1,403,042,835 |

**Depreciation Expense was charged to the Governmental functions as follows:**

| | |
|---|---|
| Public Protection | $ 12,196,755 |
| Health | 1,830,351 |
| Education | 109,285 |
| Recreation and Culture | 9,286,687 |
| Economic Development | 18,376,250 |
| Housing Supply and Condition | 191,925 |
| Physical Environment | 23,015,059 |
| Development and Management | 4,995,330 |
| Total: | $ 70,001,642 |

**Business-type Activities:**

**Major Funds:**

| | Beginning Balance | Increase | Decrease | Ending Balance |
|---|---|---|---|---|
| **Sewage Disposal Fund:** | | | | |
| Non-Depreciable Assets: | | | | |
| Land and Land Rights | $ 13,876,751 | $ - | $ - | $ 13,876,751 |
| Construction in Progress | 1,203,738,078 | 439,665,001 | (423,417,016) | 1,219,986,063 |
| Total Non-Depreciable Assets | 1,217,614,829 | 439,665,001 | (423,417,016) | 1,233,862,814 |
| Depreciable Assets: | | | | |
| Buildings and Structures | 891,488,855 | 252,665,492 | (239,425) | 1,143,914,922 |
| Sewer Lines | 532,455,750 | 10,313,939 | - | 542,769,689 |
| Machinery, Equipment and Fixtures | 572,095,371 | 136,220,745 | (284,257) | 708,031,859 |
| Total Depreciable Assets | 1,996,039,976 | 399,200,176 | (523,682) | 2,394,716,470 |
| Total Capital Assets | 3,213,654,805 | 838,865,177 | (423,940,698) | 3,628,579,284 |
| Less Accumulated Depreciation: | | | | |
| Buildings and Structures | 227,878,813 | 24,164,324 | (213,185) | 251,829,952 |
| Sewer Lines | 96,278,191 | 5,635,113 | - | 101,913,304 |
| Machinery, Equipment and Fixtures | 313,414,031 | 14,253,879 | (283,451) | 327,384,459 |
| Total Accumulated Depreciation | 637,571,035 | 44,053,316 | (496,636) | 681,127,715 |
| Net Capital Assets | $ 2,576,083,770 | $ 794,811,861 | $ (423,444,062) | $ 2,947,451,569 |
| **Transportation Fund:** | | | | |
| Non-Depreciable Assets: | | | | |
| Land and Land Rights | $ 4,114,574 | $ - | $ - | $ 4,114,574 |
| Construction in Progress | 4,699,876 | 3,892,509 | (3,541,604) | 5,050,781 |
| Total Non-Depreciable Assets | 8,814,450 | 3,892,509 | (3,541,604) | 9,165,355 |
| Depreciable Assets: | | | | |
| Buildings and Structures | 65,498,463 | 4,411,792 | - | 69,910,255 |
| Machinery, Equipment and Fixtures | 48,489,640 | 2,240,984 | - | 50,730,624 |
| Vehicle and Buses | 148,970,549 | 32,227,735 | (14,361,222) | 166,837,062 |
| Total Depreciable Assets | 262,958,652 | 38,880,511 | (14,361,222) | 287,477,941 |
| Total Capital Assets | 271,773,102 | 42,773,020 | (17,902,826) | 296,643,296 |
| Less Accumulated Depreciation: | | | | |
| Buildings and Structures | 45,764,174 | 1,377,739 | - | 47,141,913 |
| Machinery, Equipment and Fixtures | 28,840,860 | 3,412,179 | - | 32,253,039 |
| Vehicle and Buses | 66,682,027 | 12,129,304 | (14,361,223) | 64,450,108 |
| Total Accumulated Depreciation | 141,287,061 | 16,919,222 | (14,361,223) | 143,845,060 |
| Net Capital Assets | $ 130,486,041 | $ 25,853,798 | $ (3,541,603) | $ 152,798,236 |

C-51

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08.2013 11:32

**Business-type Activities (continued)**

| | Beginning Balance | Increase | Decrease | Ending Balance |
|---|---|---|---|---|
| **Water Fund:** | | | | |
| Non-Depreciable Assets: | | | | |
| Land and Land Rights | $ 6,527,438 | $ - | $ - | 6,527,438 |
| Construction in Progress | 679,745,387 | 171,715,631 | (433,433,858) | 418,027,160 |
| Total Non-Depreciable Assets | 686,272,825 | 171,715,631 | (433,433,858) | 424,554,598 |
| | | | | |
| Depreciable Assets: | | | | |
| Land Improvements | 96,834,157 | 6,489,620 | - | 103,323,777 |
| Buildings and Structures | 453,406,152 | 254,440,499 | - | 707,846,651 |
| Water Lines | 689,057,547 | 25,799,056 | - | 714,856,603 |
| Machinery, Equipment and Fixtures | 492,782,490 | 138,004,268 | (151,748) | 630,635,010 |
| Total Depreciable Assets | 1,732,080,346 | 424,733,443 | (151,748) | 2,156,662,041 |
| Total Capital Assets | 2,418,353,171 | 596,449,074 | (433,585,606) | 2,581,216,639 |
| | | | | |
| Less Accumulated Depreciation: | | | | |
| Land Improvements | 55,574,268 | 1,935,202 | - | 57,509,470 |
| Buildings and Structures | 172,328,105 | 7,660,215 | - | 179,988,320 |
| Water Lines | 246,104,133 | 9,566,224 | (193,610) | 255,476,747 |
| Machinery, Equipment and Fixtures | 173,646,239 | 22,367,967 | (125,379) | 195,888,827 |
| Total Accumulated Depreciation | 647,652,745 | 41,529,608 | (318,989) | 688,863,364 |
| Net Capital Assets | $ 1,770,700,426 | $ 554,919,466 | $ (433,266,617) | $ 1,892,353,275 |
| | | | | |
| **Automobile Parking Fund:** | | | | |
| Non-Depreciable Assets: | | | | |
| Land and Land Rights | $ 7,014,113 | $ - | $ - | 7,014,113 |
| Construction in Progress | 5,858,056 | 1,282,871 | (6,636,744) | 504,183 |
| Total Non-Depreciable Assets | 12,872,169 | 1,282,871 | (6,636,744) | 7,518,296 |
| | | | | |
| Depreciable Assets: | | | | |
| Land Improvements | 214,908 | - | - | 214,908 |
| Buildings and Structures | 199,088,852 | 8,199,660 | - | 207,288,512 |
| Machinery, Equipment and Fixtures | 2,339,955 | 51,251 | - | 2,391,206 |
| Total Depreciable Assets | 201,643,715 | 8,250,911 | - | 209,894,626 |
| Total Capital Assets | 214,515,884 | 9,533,782 | (6,636,744) | 217,412,922 |
| | | | | |
| Less Accumulated Depreciation: | | | | |
| Land Improvements | 166,368 | 10,745 | - | 177,113 |
| Buildings and Structures | 105,978,636 | 6,103,469 | - | 112,082,105 |
| Machinery, Equipment and Fixtures | 1,755,641 | 172,944 | - | 1,928,585 |
| Total Accumulated Depreciation | 107,900,645 | 6,287,158 | - | 114,187,803 |
| Net Capital Assets | $ 106,615,239 | $ 3,246,624 | $ - (6,636,744) | $ 103,225,119 |

**Business-type Activities (continued)**

| | Beginning Balance | Increase | Decrease | Ending Balance |
|---|---|---|---|---|
| **Non-Major Fund:** | | | | |
| Non-Depreciable Assets: | | | | |
| Land and Land Rights | $ 5,169,374 | $ - | $ - | $ 5,169,374 |
| Total Non-Depreciable Assets | 5,169,374 | - | - | 5,169,374 |
| | | | | |
| Depreciable Assets: | | | | |
| Land Improvements | 8,020,718 | - | - | 8,020,718 |
| Buildings and Structures | 5,272,287 | 581,486 | - | 5,853,773 |
| Machinery, Equipment and Fixtures | 1,729,316 | 41,326 | - | 1,770,642 |
| Vehicle and Buses | 1,482,115 | 94,663 | - | 1,576,778 |
| Total Depreciable Assets | 16,504,436 | 717,474 | - | 17,221,910 |
| Total Capital Assets | 21,673,810 | 717,474 | - | 22,391,284 |
| | | | | |
| Less Accumulated Depreciation: | | | | |
| Land Improvements | 5,958,411 | 167,098 | - | 6,125,509 |
| Buildings and Structures | 4,078,141 | 43,462 | - | 4,121,603 |
| Machinery, Equipment and Fixtures | 1,437,656 | 80,809 | - | 1,518,465 |
| Vehicle and Buses | 630,554 | 101,719 | - | 732,273 |
| Total Accumulated Depreciation | 12,104,762 | 393,088 | - | 12,497,851 |
| Net Capital Assets | $ 9,569,048 | $ 324,386 | $ - | $ 9,893,434 |

C-52

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 11/15 08 2013 1

**Component Units**

| School District of the City of Detroit: | | Beginning Balance | Additions | Retirements | Ending Balance |
|---|---|---|---|---|---|
| Non-Depreciable Assets: | | | | | |
| Land and Land Rights | $ | 55,427,603 | $ 14,394,596 | $ (10,600) | $ 69,811,599 |
| Construction in Progress | | 432,500,072 | 15,192,146 | (702,667) | 446,989,551 |
| Total Non-Depreciable Assets | | 487,927,675 | 29,586,742 | (713,267) | 516,801,150 |
| Depreciable: | | | | | |
| Buildings and Structures | | 1,009,762,305 | 139,599,832 | (5,171,000) | 1,144,191,137 |
| Land Improvements | | 63,406,679 | 38,037,657 | — | 101,444,336 |
| Buses and Other Vehicles | | 43,313,438 | 8,746,862 | (7,350,000) | 44,710,300 |
| Machinery, Equipment, and Fixtures | | 166,063,632 | 30,591,220 | (14,992) | 196,639,860 |
| Total Depreciable Assets | | 1,282,546,054 | 216,975,571 | (12,535,992) | 1,486,985,633 |
| Total Capital Assets | | 1,770,473,729 | 246,562,313 | (13,249,259) | 2,003,786,783 |
| Less Accumulated Depreciation: | | | | | |
| Building and Structures | | 339,377,994 | 26,409,305 | (1,180,711) | 364,606,588 |
| Land Improvements | | 10,918,892 | 3,748,108 | — | 14,667,000 |
| Buses and Other Vehicles | | 27,172,099 | 3,791,281 | (7,350,000) | 23,613,380 |
| Machinery, Equipment, and Fixtures | | 37,963,026 | 27,530,654 | (2,415) | 65,491,265 |
| Total Accumulated Depreciation | | 415,432,011 | 61,479,348 | (8,533,126) | 468,378,233 |
| Net Capital Assets | $ | 1,355,041,718 | $ 185,082,965 | $ (4,716,133) | $ 1,535,408,550 |

**Other Component Units:**

| | | Beginning Balance | Additions | Retirements | Ending Balance |
|---|---|---|---|---|---|
| Non-Depreciable Assets: | | | | | |
| Land and Land Rights | $ | 38,032,013 | $ — | $ — | $ 38,032,013 |
| Works of Art | | 3,216,175 | | | 3,216,175 |
| Construction in Progress | | 29,507,376 | 673,354 | (23,909,560) | 6,271,170 |
| Total Non-Depreciable Assets | | 70,755,564 | 673,354 | (23,909,560) | 47,519,358 |
| Depreciable: | | | | | |
| Land and Leasehold Improvements | | 188,444 | — | — | 188,444 |
| Buildings and Structures | | 236,345,291 | — | — | 236,345,291 |
| Facility and Steamline | | 513,623,297 | — | — | 513,623,297 |
| Machinery, Equipment and Fixtures | | 300,137,378 | 13,578,861 | (128,019) | 313,588,220 |
| Vehicles and Buses | | 383,024 | — | — | 383,024 |
| Total Depreciable Assets | | 1,050,677,434 | 13,578,861 | (128,019) | 1,064,128,276 |
| Total Capital Assets | | 1,121,432,998 | 14,252,215 | (24,037,579) | 1,111,647,634 |
| Less Accumulated Depreciation | | 514,836,000 | 27,264,368 | — | 542,100,368 |
| Net Capital Assets | $ | 606,596,998 | $ (13,012,153) | $ (24,037,579) | $ 569,547,266 |

8. **Deferred Revenue:** Deferred revenue represents revenue received, but for which the revenue recognition criteria have not been met. Accordingly, these revenues are deferred until such time as the revenue recognition criteria are met.

9. **Due from/to Component Units:** Due from/to component units consists of sales, charges for services, and property tax revenue to the District, DPL, EDC, and DTC.

**B. LIABILITIES**

**1. Commitments and Contingencies**

a. **Lawsuits and Claims:** The City is a defendant in numerous lawsuits and is also subject to other claims. It has been the City's experience that lawsuits and claims are often settled for amounts less than the stated demand. While it is not possible to determine the final outcome of these lawsuits and claims exactly, the City and its Legal Department have estimated that the liability for all such litigation and claims approximates $116.5 million for governmental activities.

b. **Grant Audits:** Several of the City's funds participate in a number of federally assisted grant programs, principally, the Community Development Block Grant, Low Income Housing Subsidies, Head Start, Job Training Partnership Act, DDS Work First/Edge, and Substance Abuse Programs. These programs are subject to program compliance audits by the grantors or their representatives. The audits of these programs prior to and/or including the year ended June 30, 2005 have not been conducted and/or completed. Accordingly, the funds' compliance with applicable grant requirements will be established at some future date. The amount, if any, of expenditures that may be disallowed by the granting agencies cannot be determined as of June 30, 2005. Since the City believes such adjustments, if any, will not be material, no provision for possible adjustments has been made.

c. **Detroit Housing Commission Grant Audits (DHC):** Effective July 1, 2003, the City changed its presentation of the DHC to a discretely presented component unit of the City. In April of 2003, HUD issued a Management Review of the Detroit Housing Commission. This report outlined questioned costs and unsupported expenses amounting to $14,236,946. These amounts are summarized below:

| Grant Name | Amount |
|---|---|
| Low Income Housing Grant | $ 5,722,600 |
| PHDEP | 5,359,891 |
| Capital Projects Grant | 4,577,932 |
| Total | 15,660,423 |
| Less: Amount not drawn down from HUD | (1,423,477) |
| | $ 14,236,946 |

On May 16, 2001, the HUD Office of the Inspector General issued an Audit report concerning the HOPE VI Program. The report outlined $18,291,476 in questioned costs due to HUD. Due to on-going negotiations, the balance of this liability is $6,480,057 at June 30, 2005.

These liabilities were incurred while the DHC was reported as a department of the City; therefore, both of the contested amounts of $14,236,946 and $6,480,057 have been recorded in the City's government-wide financial statements. The City is in the process of vigorously defending these questioned costs.

d. **Rate Matters:** The Sewage Disposal Fund is a party to certain challenges and disputes related to its wastewater treatment rates by various groups and governmental entities. The challenges address the reasonableness of the overall revenue requirement to be attained, certain cost allocation methods, and ultimate amounts billed. Settlement discussions are ongoing and the ultimate resolution is not currently known.

C-53

84 (Continued)

85 (Continued)

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 177 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
013 1

**e. Block Grant Funds:** Several revitalization projects in the City have used a combination of financing from governmental and private sources. One of the sources of governmental financing has been Section 108 loan notes from the Federal Government. As of June 30, 2005, future Block Grant Funds of $22,523,000 were pledged as collateral for the amounts owed to the Federal Government under Section 108 of the Housing and Community Development Act of 1974, as amended. In addition, the City was previously authorized to use Block Grant Funds totaling $66,962,000 for the Central Industrial Park Project. At June 30, 2005, $2,807,435 is outstanding against this advance.

**f. Greater Detroit Resource Recovery Authority (GDRRA):** In 1991, the GDRRA sold its waste-to-energy facility to private investors in a sale-leaseback transaction for $634.9 million. The purchase price was paid with $127 million in cash, mortgage notes of $342.7 million, and future assumption of revenue bonds payable in the amount of $165.2 million. The purchasers agreed to lease the facility to an outside contractor for an initial lease term of 18 years. The outside contractor will continue to operate the facility under a supplemental operating agreement with the GDRRA, which results in the GDRRA assuming most of the lease obligations. Upon expiration of the initial lease term, the GDRRA has options to renew the lease or to repurchase the facility. The City, under the supplemental service contract, has agreed to pay supplemental tipping fees to the GDRRA sufficient to, among other things, meet these obligations. The lease payments approximate the amortization of the mortgage notes. The cash proceeds from the sale of the facility will be reported as a finance obligation until the GDRRA's repurchase option is exercised or expires, at which time the gain on the sale will be recognized. Additionally, in 1991 the GDRRA distributed $54 million of the cash proceeds to the City, which was reflected as a reduction of the GDRRA's equity.

Future minimum lease payments for each of the next four years for the initial lease term are as follows: 2006 – $51,419,062; 2007 – $52,521,466; 2008 – $34,719,333 and 2009 – $34,719,333 (expiration year).

**g. Other Contingencies:** The General Fund has a contingent liability for the obligations of all other City funds should such funds be unable to generate sufficient funds to liquidate their liabilities. In particular, the Airport, Detroit Transportation Corporation, and Transportation Fund have received varying levels of subsidy from the General Fund to fund operating requirements.

**h. Construction Commitments:** The City has commitments for future construction contracts. Construction in progress and remaining commitments at June 30, 2005 are as follows:

| | Spent to June 30, 2005 | | Remaining |
|---|---|---|---|
| Public protection | $ | 62,171,273 | $ 95,565,766 |
| Municipal facilities | | 46,023,951 | 6,347,120 |
| Cultural and recreational | | 111,813,976 | 7,397,933 |
| Human services | | 1,288,329 | 2,465,326 |
| Municipal services | | 1,755,560 | 1,089,108 |
| | $ | 223,053,089 | $ 112,865,253 |

**i. Risk Management:** The City is exposed to various risks of losses related to torts; theft of, damage to, and destruction of assets; injuries to employees; and natural disasters. During fiscal 1995, the City issued $100 million of Self-insurance Bonds, and a portion of proceeds were used to reimburse the General Fund for all of its fiscal 1995 legal judgments and workers' compensation claim payments ($41million.) The bonds require that remaining funds be used for self-insurance activities. The City is self-insured for losses such as workers' compensation, legal and disability benefits. The City currently reports the risk management activities of non-Enterprise Funds and Transportation Fund in its General Fund. Each fund pays insurance premiums to the General Fund based on past claims activities. Amounts remaining related to self-insurance have been reserved. Because Transportation fund is included in the General Fund's risk management activities, it does not record a liability in its financial statements.

Risk management activities for the other Enterprise Funds are recorded and reported separately in those funds. The Library, a discretely presented component unit, reimburses the City for all costs incurred related to workers' compensation. The Library records the liability in its financial statements.

(Continued)

---

At June 30, 2005, the amount of the workers' compensation, legal claims and judgments, and disability benefits was estimated at $181.2 million for the primary government. The City has recognized a liability that approximated $7.0 million in the General Fund as of June 30, 2005 for public liability and workers compensation claims that were due as of year-end. All other claims liabilities are considered to be long-term liabilities and are recognized in the government-wide financial statements. This liability is the City's best estimate based on available information. Changes in the reported liability for the years ended June 30, 2005 and 2004 were as follows:

| | | (In Millions) | | |
|---|---|---|---|---|
| | | June 30, 2005 | | June 30, 2004 |
| Balance at Beginning of Year | $ | 187.3 | $ | 178.8 |
| Current Year Claims and Changes in Estimates | | 60.8 | | 117.7 |
| Claims Payments | | (66.9) | | (109.2) |
| Balance at End of Year | $ | 181.2 | $ | 187.3 |

Claims, expenditures, and liabilities are reported in accordance with GASB No. 10, *Accounting and Financial Reporting for Risk Financing and Related Insurance Issues* (as amended by GASB No. 17), when it is probable that an asset has been impaired or a liability has been incurred and the amount of that loss can be reasonably estimated. These losses include an estimate of claims that have been incurred but not reported.

As a result of the issuance of the Self-insurance Bonds and the operations of the Self-insurance Reserve Fund, at June 30, 2005 the General Fund has reserved $29.2 million for the purpose of funding the City's future claims liabilities.

**2. Other Commitments:** The City has entered into various noncancelable-operating leases for various equipment. The commitments under such lease agreements provide for minimum annual rental payments as follows:

| Fiscal Year Ending: | | |
|---|---|---|
| 2006 | $ | 8,415,372 |
| 2007 | | 5,486,898 |
| 2008 | | 4,716,654 |
| 2009 | | 2,748,140 |
| 2010 | | 1,799,707 |
| Total Minimum Payments | $ | 23,166,771 |

Rental expense for all operating leases approximated $18.4 million for the year ended June 30, 2005.

The various bond indentures contain significant limitations and restrictions on annual debt service requirements, maintenance of and flow of monies through various restricted accounts, minimum amounts to be maintained in various sinking funds, and minimum revenue bond coverage.

**3. Short-Term Revenue Anticipation Notes:** In June 2005, the City issued $54,445,000 (Series 2005) in Revenue Anticipation Notes (RANS). The notes are due on April 3, 2006 and bear interest at 4.00% per year. The notes are not subject to redemption prior to maturity. The Notes were issued to pay necessary operating expenditures and to pay the costs of issuance with respect to the Notes.

**4. Long-Term Obligations**

**Governmental Activities:**

The Michigan Constitution established the authority, subject to constitutional and statutory prohibition, for municipalities to incur debt for public purposes. The City is subject to the Home Rule Act, Act 279 Public Acts of Michigan, 1909, as amended, which limits the net indebtedness incurred for all public purposes as much as, but not to exceed, the greater of the following: (a) 10% of the assessed value of all the real and personal property in the City, or (b) 15% of the assessed value of all the real and personal property in the City if that portion of the total amount of indebtedness incurred which exceeds 10% is, or has been, used solely for the construction or renovation of hospital facilities.

(Continued)

C-54

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
0013 1222

In August 2004, the City issued $41,325,000 of Unlimited Tax General Obligation Bonds to finance various capital projects; the bonds are fully matured in April 2024, with an average yield of 4.22%. Refunding Bonds were issued in the amount of $70,355,000 to advance refund $69,160,000 of previously issued Unlimited Tax General Obligation Bonds. The advance refunding resulted in a difference between the reacquisition price and net carrying amount of the old debt of $1,195,000. This difference, reported in the financial statements as a deduction from bonds payable, is being charged through the year 2018 using the straight-line method.

In August 2004, the City issued $62,285,000 of Limited Tax General Obligation Bonds to fund the Risk Management Fund. The bonds fully mature in April 2014, with an average yield of 4.70%.

In January 2005, the City issued $81,050,000 in Refunding Bonds that were issued to advance refund $81,230,000 of previously issued Unlimited Tax General Obligation Bonds. The bonds fully mature in April 2011, with an average yield of 3.51%. The refunding resulted in a difference between the reacquisition price and net carrying amount of the old debt of $180,000. This difference, reported in the financial statements as an increase to bonds payable, is being charged through the year 2011 using the straight-line method.

In June 2005, the City issued $87,030,000 of Limited Tax General Obligation Bonds to finance capital improvement projects. The bonds fully mature in April 2025, with an average yield of 3.24%. Refunding Bonds in the amount of $11,785,000 were issued to advance refund $11,410,000 of previously issued Limited Tax General Obligation Bonds. The advance refunding resulted in a difference between the reacquisition price and net carrying amount of the old debt of $375,000. This difference, reported in the financial statements as a deduction from bonds payable, is being charged through the year 2021 using the straight-line method.

The net savings (loss) from refundings and the related economic gains are as follows:

| | Series 2004 -B | Series 2005-A | Series 2005-B |
|---|---|---|---|
| | $70,355,000 | $81,050,000 | $11,785,000 |
| Cash flow requirements to service old debt | $ 96,358,370 | $ 96,578,645 | $ 18,433,130 |
| Less cash flow requirements for new debt | 102,618,911 | 93,009,489 | 17,795,183 |
| Net savings (loss) from refunding | (6,260,541) | 3,569,156 | 637,947 |
| Economic Gain | $ 423,241 | $ 2,988,078 | $ 728,146 |

In prior years, the City defeased certain bonds by placing the proceeds of new debt in an irrevocable trust to provide for all future debt service payments on the old debt. Accordingly, the trust account assets and the liability for the defeased debt are not included in the City's financial statements. The amount of defeased debt outstanding at June 30, 2005 approximated $193.0 million.

In June 2005, the city issued Pension Obligation Certificates of Participation (POC's) to fund certain unfunded accrued actuarial obligations. The Governmental Activities was allocated an obligation of $1,170,607,422 out of the total obligation of $1,440,000,000. See the Pension Obligation Certificates of Participation Footnote B.4.F for further disclosure.

C-55

**Business-type Activities:**

**Sewage Disposal Fund:**

The outstanding indebtedness of the Sewage Disposal Fund was $2,653,826,572 at June 30, 2005. The interest rates on the outstanding bonds range from 4.2% to 6%. Net revenues of the Sewerage Disposal Fund are pledged to repayment of bonds. In fiscal 2005, the Fund issued $273,355,000 of City of Detroit, Michigan Sewage Disposal System Revenue Second Lien Bonds, Series 2005-A; $40,215,000 of City of Detroit, Michigan Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2005-B; $63,160,000 of City of Detroit Michigan Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2005-C. The net proceeds were used to refund a portion of the City's outstanding Sewage Disposal Systems Revenue Bonds and Revenue Refunding Bonds and to pay cost of issuance associated with the 2005 Bonds.

The net proceeds of the Sewage Disposal System Revenue Second Lien Bond, Series 2005-A will be used (a) to deposit into the Construction Fund, and (b) for the payment of the related costs of issuance, including the premium for the municipal bond insurance.

The net proceeds of the Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2005-B were used (a) to advance-refund $22,355,000 principal amount of the City's Sewage Disposal System Senior Lien Bonds, Series 1997-A comprised of serial bonds maturing in the year 2022; (the "Advance Refunded 1997-A Bonds") with an average interest rate of 5%, (b) to advance refund $ 115,000, 1999-A Sewage Disposal system Senior Lien Bonds, maturing 2011 and $3,425,000, 1999-B Sewage Disposal System Senior Lien Bonds, maturing 2012, ( the "Advance Refunded 1999-A Bonds") with an average interest rate of 5.20% and 5.25% respectively, (c) to advance refund $8,215,000, 2003-A Sewage Disposal system Senior Lien Bonds maturing 2014 and $ 8,470,000 Sewage Disposal System Senior Lien Bonds maturing 2015 ( the Advance Refunded 2003 –A Bonds") with an average interest rate of 5.0%, and (d) to pay the related costs of issuance, including the premium for the bond insurance.

The proceeds of the Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2005-C will be used (a) to advance refund $ 6,770,000 principal amount of the City's Sewage Disposal System Senior Lien Bonds, Series 1995-A bonds maturing in the year 2025 (the Current Refunded Bonds 1995A) with an average interest rate of 5.0% (the "Refunded 1997-A Bonds") with an average interest rate of 5.0%, (b) to refund principal amounts of the City's Sewage Disposal System Senior Lien Bonds, Series 1995-B bonds with principal amounts of $ 2,400,000 maturing in the year 2008, Series 1995-B bonds with principal amounts of $ 20,410,000 maturing in the year 2015 , and Series 1995-B bonds with principal amount of $ 36,605,000 maturing in the year 2021. ) With average interest rate of 5.25% (the "Advance Refunded Bonds") and, collectively with the Refunded 1995-A Bonds, the "Refunded Bonds"), and (c) for the payment of the related costs of issuance, including the premium for the municipal bond insurance

Those refunded securities were deposited to an irrevocable trust with an escrow agent to provide for all future debt service payments on the Currently Refunded 1995-A/B Bonds when due to and including July 1, 2005, the refunded 1997-A Bonds, due July 1, 2007, the 1999-A bonds due January 1, 2010 and the Refunded 2003-A bonds due July 1, 2013 at 100%-101%.

The advance refunding resulted in a difference between the reacquisition price and net carrying amount of the old debt of $8,987,394. This difference, reported in the financial statements as a deduction from bonds payable, is being charged to operations through the year 2024 using the straight-line method. The fund completed the advance refunding to reduce its total debt service payments over the next 20 years and to obtain an economic gain (difference between the present values of the old and new debt service payments) of $6,143,299.

In prior years, the Sewer Fund defeased certain bonds by placing the proceeds of new bonds in an irrevocable trust to provide for all future debt service payment on the old bonds. Accordingly, the trust account's assets and liabilities for the defeased bonds are not included in its financial statements. Similarly, the interest expense related to the defeased bonds and the related interest income earned on the escrow fund investments have not been recognized in the statements of Revenues, Expenses, and Changes in Fund Net Assets. As of June 30, 2005, approximately $593,330,000 of bonds outstanding are considered defeased.

Bonds outstanding at June 30, 2005 include $2,318,471,573 of bonds callable at various dates after June 30, 2005. These bonds are callable at varying premiums, depending on the issue and length of time to maturity.

88 (Continued)

89 (Continued)

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Produced 3.1.2013

In June 2005, the City issued Pension Obligation Certificates of Participation (POC's) to fund certain unfunded accrued actuarial liabilities. The Sewerage Disposal Fund was allocated an obligation of $8,760,811 out of the total obligation of $1,440,000,000. See the Pension Obligation Certificates of Participation Footnote B.4.F. for further disclosure.

**Transportation Fund:**

In June 2005, the City issued Pension Obligation Certificates of Participation (POC's) to fund certain unfunded accrued actuarial liabilities. The Transportation Fund was allocated an obligation of $103,083,553 out of the total obligation of $1,440,000,000. See the Pension Obligation Certificates of Participation Footnote B.4.F. for further disclosure.

**Capital Leases:** During the year ended June 30, 2005 the Fund entered into a capital lease agreement with GE Capital Public Finance, Inc. to lease 121 buses and received 102 of the 121 buses. The book value of the 102 buses under capital lease was $31,005,862 as of June 30, 2005. The annual interest rate of the lease is 4.12% for 19 buses and 4.22% for 83 buses. The capital lease has been recorded at the present value of the future minimum lease payments as of the date of their inception. The present value of future minimum capital lease payments, interest, and the minimum annual lease payment for the 102 uses received as of June 30, 2005 is as follows:

| | Year | Minimum Lease Payment Includes (principal and interest) |
|---|---|---|
| Fiscal year ending June 30: | 2006 | $ 3,977,397 |
| | 2007 | 3,977,397 |
| | 2008 | 3,977,397 |
| | 2009 | 3,977,397 |
| | 2010 | 3,977,397 |
| | 2011-2015 | 19,847,056 |
| Total minimum lease payments | | 39,734,041 |
| Less: Amount representing interest | | (7,623,115) |
| Present value of minimum capital lease payments | | $ 32,110,926 |

The actual purchase price of the 102 buses, leased by the fund, is $31,438,223, a total of $672,703 less than above lease amount. City's Finance Department will amend the lease agreement and return the $672,703 plus interest to the lessor, which is recorded as a liability.

The Fund is required to hold $11.3 million, equal to the lease proceeds not spent on the buses as of June 30, 2005.

**Water Fund:**

The outstanding indebtedness of the Water Fund for revenue bonds was $1,991,615,000 at June 30, 2005. The interest rates on the outstanding fixed-rate revenue bonds range from 4.30% to 6.38%. Net revenues of the Fund are pledged to repayment of bonds.

In fiscal 2005, the Fund issued $105,000,000 of City of Detroit, Michigan Water Supply System Revenue Senior Lien Bonds, Series 2005-A; $195,000,000 of City of Detroit, Michigan, Water Supply System Revenue Refunding Second Lien Bonds (Variable Rate Demand), Series 2005-B; and $126,605,000 of City of Detroit, Michigan, Water Supply System Revenue Refunding Senior Lien Bonds, Series 2005 C. The net proceeds were used to refund a portion of the City's outstanding Water Supply Systems Revenue Bonds and Revenue Refunding Bonds and to pay costs of issuance associated with the 2005 Bonds.

The net proceeds of the Water Supply System Revenue Second Lien Bond; Series 2005-A of $97,314,500 (net of Capitalized Interest of $8,611,516 and Bond underwriting fees, insurance and other costs of issuance of $2,119,542) were used to purchase US Government Securities.

The net proceeds of the Water Supply System Revenue Senior Lien Bond (variable rate demand), series 2005-B of $176,783,879 (net of capitalized interest of $16,096,578 and underwriting fees, insurance and other issuance cost of $2,119,542) were used to purchase U.S. Government Securities.

The proceeds of the Revenue Refunding Senior Lien Bonds, Series 2005-C will be used to (a) advance-refund $69,285,000 principal amount of the City's Water Supply Revenue Senior Lien Bonds, Series 1997-A comprised of serial bonds maturing in the years 2010, 2016 and 2017: the 2018 through 2021 mandatory redemption payment for serial 1997-A term bonds maturing July 1, 2027 (the Refunded 1997-A Bonds") with an average interest rate of 5.5% (b) to refund $56,700,000 principal amount of the City's Water Supply System Revenue Senior Lien Bonds, Series 1999-A bonds maturing in the years 2011 through 2018 with interest rate of 7.48% ( the "Refunded 1999-A bonds" and collectively with the Refunded 1997-A Bonds, the Refunded bonds") and (c) for payment of the related costs of issuance, including the premium for the municipal bond insurance.

Those refunded securities were deposited in an irrevocable trust with an escrow agent to provide for all future debt service payments on the Refunded 1999-A Bonds when due to including July 1, 2010 and redeem the Refunded 1997-A Bonds on July 1, 2007 at 101%.

The advance refunding resulted in a difference between the reacquisition price and the net carrying amount of the old debt of $5,640,081. This difference, reported in the financial statements as a deduction from bonds payable, is being charged to operations through the year 2024 using the straight-line method. The Water Fund completed the advance refunding to reduce its total debt service payments over the next 20 years and to obtain an economic gain (difference between the present values of the old and new debt service payments) of $4,567,184.

In prior years, the Water Fund defeased certain bonds by placing the proceeds of new bonds in an irrevocable trust to provide for all future debt service payments on the old bonds. Accordingly, the trust account assets and the liability for the defeased bonds are not included in the Water Fund's financial statements. Similarly, the interest expenses related to the defeased bonds and the related interest income earned on the escrow fund investments have not been recognized in the Statements of Revenues, Expenses, and Changes in Fund Net Assets. As of June 30, 2005 approximately $511,265,000 of bonds outstanding are considered defeased.

Bonds outstanding at June 30, 2005 include $1,792,485,000 of bonds callable at various dates after June 30, 2005. These bonds are callable at varying premiums, depending on the issue and length of time to maturity.

In June 2005, the City issued Pension Obligation Certificates of Participation (POC's) to fund certain unfunded accrued actuarial liabilities. The Water Fund was allocated an obligation of $157,548,214 out of the total obligation of $1,440,000,000. See the Pension Obligation Certificates of Participation Footnote B.4.F. for further disclosure.

Subsequent to year-end, the Fund received loans from the Michigan Municipal Bond Authority State Revolving Loan Fund Program in the amount of $25,975,000 for the construction of facilities.

**Automobile Parking Fund:**

The outstanding indebtedness of the Parking Fund was $60.8 million at June 30, 2005. The interest rates on the outstanding fixed-rate revenue refunding bonds range from 4.50% to 7.75%.

**Component Units:**

As of June 30, 2005, the School District had $1.711 billion in bonds outstanding, plus $40.3 million in unamortized bond premium, for a total of $1.751 billion.

In April 2005 the School District refinanced Series 2005B bonds of $210 million in short-term State Aid Anticipation Notes outstanding as of June 30, 2004 with a multi-year payment agreement with a lending institution as allowed by State law (Section 1225 of the Michigan Code). This refinancing was part of an overall deficit elimination plan approved by the State in February 2005. The terms of the issuance of this long-term debt require among other things, that the School District maintain a positive General Fund balance. As of June 30, 2005, the School District is in full compliance with all related debt covenants.

In prior years, the District defeased certain bonds by placing the proceeds of refunding bonds in an irrevocable trust to provide for all future debt service payments on the refunded bonds. Accordingly, the trust accounts assets and liabilities for the defeased bonds are not included in the financial statements. The amount of defeased debt outstanding at June 30, 2005 approximated $63.3 million.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 05-09-2013 11:32

**a.** The following is the schedule of the Bonds Payable at June 30, 2005:

### Governmental Activities:

**General Obligation Bonds - Unlimited Tax**

| | Bond Date | Amount Issued | Retired Year Ended June 30, 2005 | | Outstanding at June 30, 2005 | | |
|---|---|---|---|---|---|---|---|
| | | | Interest Rate % | Amount | Range of Interest Rates | Maturity Date | Amount |
| Series 1995-B | 8-1-95 | $ 183,450,000.0 | Various | $ 99,470,000 | | | $ - c |
| Series 1996-A | 11-1-96 | 22,195,000 | Various | 14,840,000 | 5.20 to 5.375% | 4/1/08-11 | 5,990,000 c |
| Series 1996-B | 11-1-96 | 1,350,000 | 4.90 | 170,000 | 5.50 | 4/1/2006 | 180,000 |
| Series 1996-B | 11-1-96 | 21,975,000 | - | | 5.10 to 5.50 | 4/1/07-15 | 21,975,000 c |
| Series 1997-A | 12-15-97 | 29,605,000 | - | | 5.10 to 5.50 | 4/1/08-18 | 29,120,000 |
| Series 1997-B | 12-15-97 | 12,860,000 | Various | 8,350,000 | 5.50 | 5/1/07 | 515,000 |
| Series 1997-B | 12-15-97 | 22,945,000 | 5.50 | 3,700,000 | 5.00 to 5.38 | 4/1/08-14 | 19,245,000 c |
| Series 1999-A | 4-1-99 | 44,100,000 | - | | 5.00 to 5.25 | 4/1/08-19 | 32,130,000 c |
| Series 1999-A | 11-15-99 | 14,725,000 | Various | - | 5.00 | 4/1/08 | 3,825,000 |
| Series 1999-B | 11-15-99 | 30,275,000 | Various | 20,800,000 | 5.125 to 5.875 | 4/1/10-14 | 9,475,000 c |
| Series 2000-AMT | 2-15-00 | 9,270,000 | Various | 4,425,000 | 5.75 | 4/1/09 | 1,255,000 |
| Series 2000-AMT | 2-15-00 | 1,335,000 | - | | 5.75 | 4/1/10 | 1,335,000 c |
| Series 2001 A (1) | 7-15-01 | 16,800,000 | Various | 8,405,000 | 3.80 to 5.50 | 4/1/07-11 | 8,395,000 |
| Series 2001 A (1) | 7-15-01 | 83,200,000 | - | | 5.00 to 5.375 | 4/1/12-21 | 83,200,000 c |
| Series 2001-A(2) | 7-15-01 | 5,000,000 | - | | Variable | 4/1/22 | 5,000,000 |
| Series 2001-B | 7-15-01 | 23,560,000 | Various | 4,650,000 | 5.50 | 4/1/09-11 | 17,660,000 c |
| Series 2001-B | 7-15-01 | 23,235,000 | - | | 5.375 | 4/1/12-14 | 23,235,000 |
| Series 2002 | 8-2-02 | 13,840,000 | Various | 8,540,000 | 4.00 | 4/1/10 | 1,880,000 |
| Series 2002 | 8-2-02 | 31,160,000 | - | | 4.00 to 5.50 | 4/1/11-22 | 31,160,000 c |
| Series 2003A | 10-21-03 | 7,065,000 | - | | 4.00 to 5.25 | 4/1/10-12 | 7,065,000 |
| Series 2003A | 10-21-03 | 36,955,000 | - | | 4.00 to 5.25 | 4/1/13-23 | 36,955,000 c |
| Series 2003B | 10-21-03 | 10,770,000 | - | | 3.0 / 5.00 | 4/1/06 | 10,770,000 |
| Series 2004-A(1) | 9-9-04 | 39,270,000 | - | | 4.25 to 5.25 | 4/1/19-24 | 39,270,000 |
| Series 2004-A(2) | 9-9-04 | 2,055,000 | - | | 4.57 | 4/1/12 | 2,055,000 |
| Series 2004-B(1) | 9-9-04 | 7,545,000 | - | | 3.75 to 5.00 | 4/1/12 | 7,545,000 |
| Series 2004-B(1) | 9-9-04 | 45,540,000 | - | | 3.75 to 5.24 | 4/1/13-18 | 45,540,000 |
| Series 2004-B(2) | 9-9-04 | 17,270,000 | - | | 3.92 to 5.25 | 4/1/09 | 17,270,000 |
| Series 2005-A | 1/5/05 | 81,050,000 | - | | 5.00 | 4/1/06-11 | 81,050,000 |

**Distributable State Aid Bonds:**

| | Bond Date | Amount Issued | Interest Rate % | Amount | Range of Interest Rates | Maturity Date | Amount |
|---|---|---|---|---|---|---|---|
| Series 1993 | 12-1-93 | 136,675,000 | 5.00 | 10,540,000 | 5.20 to 5.25 | 5/1/07-09 | 36,755,000 |
| Total General Bonds - Unlimited Tax | | | | | | | $ 579,850,000 |

1 - interest rate equal to the Dutch Auction Rate.
2 - interest rate equal to 1 1/4% in excess of the cost of funds. The cost of funds shall be the rate quoted by the registered holder of the bonds.
c -indicates bonds are callable under terms specified in the indenture; all other bonds are noncallable.

---

### Governmental Activities:

**General Obligation Bonds - Limited Tax:**

| | Bond Date | Amount Issued | Retired Year Ended June 30, 2005 | | Outstanding June 30, 2005 | | |
|---|---|---|---|---|---|---|---|
| | | | Interest Rate | Amount | Range of Interest Rates | Maturity Date | Amount |
| **Self-Insurance Bonds:** | | | | | | | |
| Series 2003 | 10-2-03 | $ 98,895,000 | - % | $ | 2.42 to 4.97% | 5/1/06-13 | $ 98,895,000 |
| Series 2004 | 9-9-04 | 62,285,000 | - | | 3.92 to 4.85 | 4/1/09-14 | 62,285,000 |
| **General Obligation:** | | | | | | | |
| Series 1997 | 5-1-97 | 3,300,000 | 5.05 | 560,000 | 5.15 to 5.20 | 7/15/05-06 | 1,210,000 |
| Series 1997 | 5-1-97 | 13,665,000 | 5.625 | 1,375,000 | 5.25 to 6.25 | 7/15/07-19 | 880,000 |
| Series 2002A | 6-27-02 | 52,725,000 | 5.00 | 12,550,000 | 5.00 | 4/1/06-07 | 27,010,000 |
| Series 2004A | 3-12-04 | 41,760,000 | 2.00 | 3,880,000 | 2.00 to 5.00 | 4/1/06-09 | 37,880,000 |
| Series 2004Fiscal Stabilization | 6-24-04 | 61,070,000 | - | | 3.00 to 5.00 | 4/1/06-09 | 61,070,000 |
| Series 2005-A(1) | 6-24-05 | 21,325,000 | - | | 4.27 to 4.53 | 4/1/06-15 | 21,325,000 |
| Series 2005-A(1) | 6-24-05 | 52,175,000 | - | | 4.61 to 5.15 | 4/1/16-25 | 52,175,000 |
| Series 2005-A(2) | 6-24-05 | 4,055,000 | - | | 3.50 to 4.50 | 4/1/10-15 | 4,055,000 |
| Series 2005-A(2) | 6-24-05 | 9,475,000 | - | | 4.00 to 5.00 | 4/1/16-25 | 9,475,000 |
| Series 2005-B | 6-24-05 | 4,845,000 | - | | 3.25 to 5.00 | 4/1/06-15 | 4,845,000 |
| Series 2005-B | 6-24-05 | 6,940,000 | - | | 5.00 | 4/1/16-21 | 6,940,000 |
| Total General Bonds- Limited Tax | | | | | | | 388,045,000 |
| Total General Bonds | | | | | | | 967,895,000 |

**Detroit Building Authority Bonds:**
District Court Madison Center

| | Bond Date | Amount Issued | Interest Rate | Amount | Range of Interest Rates | Maturity Date | Amount |
|---|---|---|---|---|---|---|---|
| Project, Series 1996 A | 9-1-96 | 2,770,000 | 6.15 | 945,000 | 6.15 | 2/1/2006 | 1,045,000 |
| | 9-1-96 | 7,230,000 | - | | 6.15 | 2/1/07-11 | 7,230,000 |
| | 9-1-96 | 1,000,000 | - | | Variable | 2/1/11 | 1,000,000 |
| Series 1996 B | 9-1-96 | 6,910,000 | 7.97 | 546,872 | 7.97 | 7/1/05-06 | 646,953 |
| Total Detroit Building Authority Bonds | | | | | | | 9,921,953 |
| Total General Obligation Bonds | | | | | | | 977,816,953 |

**Revenue Bonds:**

Convention Facility Limited Tax Revenue Bonds- Cobo Hall Expansion:

| | Bond Date | Amount Issued | Interest Rate | Amount | Range of Interest Rates | Maturity Date | Amount |
|---|---|---|---|---|---|---|---|
| Series 1993 | 9-1-93 | 167,050,000 | 5.10 | 10,300,000 | 5.125 to 5.25 | 9/30/05-07 | 34,185,000 |
| Series 2003 | 9-18-03 | 90,883,138 | 2.00 | 55,000 | 3.00 to 5.00 | 9/30/08-15 | 90,828,138 |
| Total Conventional Facility Limited Tax Revenue Bonds-Cobo Hall Expansion | | | | | | | 125,013,138 |
| Total Bonds | | | | | | | $ 1,102,830,091 |

c – indicates bonds are callable under terms specified in the indenture; all other bonds are noncallable

C-57

**Business type Activities:**

Sewage Disposal Fund

Sewage Disposal System Revenue Bonds (note B):

| | Bond Date | Amount Issued | Interest Rate | Retired Year Ended June 30, 2005 Amount | Range of Interest Rates | Maturity Date | Outstanding June 30, 2005 Amount |
|---|---|---|---|---|---|---|---|
| Series 1992-A-SRF (5044-01).... | 6-25-92 | $ 4,360,000 | 2.00% | $ 220,000 | 2.00% | 4/1/06-13 | $ 1,955,000 |
| Series 1992-B-SRF (5070-01)...... | 9-10-92 | 1,915,000 | 2.00 | 95,000 | 2.00 | 10/1/05-13 | 955,000 |
| Series 1993-B-SRF (5091 & 5092).... | 9-30-93 | 6,603,996 | 2.00 | 320,000 | 2.00 | 10/1/05-14 | 3,590,000 |
| Series 1995-A........ | 11-1-95 | 132,430,000 | 5.00 | 6,770,000 | 6.00 | 7/105 | 2,885,000 |
| Series 1995-B........ | 11-1-95 | 65,880,000 | Various | 61,375,000 | 4.80 to 6.25 | 7/1/05-21 | 20,840,000 |
| Series 1997-A........ | 6-15-97 | 55,625,000 | 4.60 | 4,490,000 | 6.00 | 7/1/05-06 | 31,375,000 |
| Series 1997-A........ | 6-15-97 | 206,869,000 | Various | 22,355,000 | 5.00 to 6.00 | 7/1/07-27 | 84,444,128 |
| Series 1997-B-SRF (5125-01)...... | 9-30-97 | 5,430,174 | 2.25 | 240,000 | 2.25 | 10/1/05-18 | 4,005,000 |
| Series 1998-A........ | 12-10-98 | 69,000,000 | 4.51 | 400,000 | 4.512 | 7/1/05-23 | 68,000,000 |
| Series 1998-B........ | 12-10-98 | 68,955,000 | 4.51 | 300,000 | 4.512 | 7/1/05-23 | 67,900,000 |
| Series 1999-SRF-1 (5143-01)...... | 6-24-99 | 21,475,000 | 2.50 | 925,000 | 2.50 | 4/1/06-20 | 17,060,000 |
| Series 1999-SRF-2 (5143-01)....... | 9-30-99 | 46,000,000 | 2.50 | 1,840,000 | 2.50 | 10/1/05-20 | 42,365,000 |
| Series 1999-SRF-3 (5144-01)....... | 9-30-99 | 31,030,000 | 2.50 | 1,305,000 | 2.50 | 10/1/05-20 | 26,000,000 |
| Series 1999-SRF-4 (5175-01)....... | 9-30-99 | 40,655,000 | 2.50 | 1,710,000 | 2.50 | 10/1/05-20 | 34,065,000 |
| Series 1999-A........ | 12-1-99 | 7,225,000 | - | | 4.625 to 5.00 | 7/1/05-09 | 1,515,000 |
| Series 1999-A........ | 12-1-99 | 295,770,178 | Various | 3,540,000 | 5.125 to 5.25 | 7/1/10-21 | 34,080,179 |
| Series 2000-SRF-1 (5143-02)...... | 9-28-00 | 53,475,000 | 2.50 | 2,140,000 | 2.50 | 10/1/04-22 | 42,368,275 |
| Series 2000-SRF-2 (5175-02)....... | 9-28-00 | 65,000,000 | 2.50 | 2,600,000 | 2.50 | 10/1/05-22 | 50,941,582 |
| Series 2001-SRF-1 (5175-03)....... | 6-28-01 | 82,200,000 | - | | 2.50 | 10/1/05-24 | 82,200,000 |
| Series 2001-SRF-2 (5175-04)....... | 6-28-01 | 57,195,868 | - | | 2.50 | 10/1/05-24 | 59,850,000 |
| Series 2001-A........ | 9-15-01 | 76,375,000 | - | | 5.00 to 5.13 | 7/1/11-31 | 76,375,000 |
| Series 2001-A........ | 9-15-01 | 110,550,000 | - | | 5.50 | 7/1/23-29 | 110,550,000 |
| Series 2001-C(1)....... | 9-23-01 | 159,970,000 | Variable | 360,000 | Variable | 7/1/04-27 | 156,500,000 |
| Series 2001-C(2)....... | 9-23-01 | 127,165,000 | Variable | 235,000 | Variable | 7/1/04-24 | 124,500,000 |
| Series 2001-D....... | 9-23-01 | 92,450,000 | - | | Variable | 7/1/32 | 92,450,000 |
| Series 2001-E....... | 9-23-01 | 139,080,000 | - | | Variable | 7/1/31 | 139,080,000 |
| Series 2002-SRF-1 (5204-01)....... | 10-27-01 | 18,985,000 | 2.50 | 760,000 | 2.50 | 4/1/05-23 | 17,480,000 |
| Series 2002-SRF-2 (5204-02)....... | 10-27-01 | 1,970,000 | 2.50 | 80,000 | 2.50 | 4/1/05-23 | 1,390,369 |
| Series 2002-SRF-3 (5175-05)....... | 12-19-02 | 43,740,000 | - | | 2.50 | 10/1/05-33 | 12,255,979 |
| Series 2003-A....... | 5-22-03 | 158,000,000 | 3.00 | 21,560,000 | 5.00 | 7/1/04-33 | 135,555,000 |
| Series 2003-A....... | 5-22-03 | 441,380,000 | 5.00 | 16,685,000 | 5.00 | 7/1/14-32 | 424,695,000 |
| Series 2003-A....... | 5-22-03 | 150,000,000 | - | | Variable | 7/1/32-33 | 150,000,000 |
| Series 2003-SRF-1(5204-01)....... | 6-28-03 | 48,520,000 | - | | 2.50 | 10/1/06-25 | 29,529,874 |
| Series 2003-SRF-2(5204-03)....... | 9-25-03 | 25,800,000 | - | | 2.50 | 4/1/06-26 | 18,208,014 |
| Series 2004-A....... | 1-9-04 | 101,435,000 | 2.00 | 570,000 | 3.00 to 5.25 | 7/1/04-24 | 100,865,000 |
| Series 2004 SRF-1(5204-05)....... | 6-24-04 | 2,910,000 | - | | 2.125 | 10/1/05-24 | 510,152 |
| Series 2004 SRF-2(5204-06)....... | 6-24-04 | 18,690,000 | - | | 2.125 | 7/1/04-25 | 6,064,547 |
| Series 2004 SRF-3(5228-01)....... | 6-24-04 | 12,920,000 | - | | 2.125 | | 4,693,474 |
| Series 2005-A....... | 3-17-05 | 3,765,000 | - | | 2.75 to 3.70 | 7/1/08-15 | 3,765,000 |
| Series 2005-A....... | 3-17-05 | 269,590,000 | - | | 3.75 to 5.125 | 7/1/16-35 | 269,590,000 |
| Series 2005-B....... | 3-17-05 | 40,215,000 | - | | 3.40 to 5.50 | 7/1/12-22 | 40,215,000 |
| Series 2005-C....... | 3-17-05 | 22,065,000 | - | | 2.40 to 5.00 | 7/1/16-26 | 22,065,000 |
| Series 2005-C....... | 3-17-05 | 41,095,000 | - | | 5.00 | 7/1/16-26 | 41,095,000 |
| Total Sewage Disposal System Revenue Bonds.... | | | | | | | $ 2,653,826,573 |

c - indicates bonds are callable under terms specified in the indenture; all other bonds are noncallable

**Business type Activities:**

Water Fund

Water Supply System Revenue Bonds (Note A)

| | Bond Date | Amount Issued | Interest Rate | Retired Year Ended June 30, 2005 Amount | Range of Interest Rates | Maturity Date | Outstanding June 30, 2005 Amount |
|---|---|---|---|---|---|---|---|
| Series 1993............ | 10-15-93 | $ 38,225,000 | 4.70% | $ 2,455,000 | 6.50% | 7/1/14-15 | $ 24,725,000 |
| Series 1995-A........ | 10-15-95 | 102,100,000 | 4.80 | 2,455,000 | 5.00-5.55 | 7/1/05-12 | 24,690,000 A |
| Series 1995-B........ | 10-15-95 | 60,485,000 | 4.80 | 335,000 | 5.00-5.55 | 7/1/05-12 | 54,800,000 |
| Series 1997-A........ | 8-1-97 | 29,080,000 | 5.00 | 4,010,000 | 5.25 | 7/1/05-06 | 8,645,000 A |
| Series 1997-A........ | 8-1-97 | 186,220,000 | - | 69,235,000 | 4.80 to 5.25 | 7/1/07-27 | 116,935,000 |
| Series 1997-B........ | 8-1-97 | 30,555,000 | 6.00 | 6,985,000 | 5.25 | 7/1/05-06 | 15,055,000 A |
| Series 1999-A........ | 11-1-99 | 18,000,000 | 4.50 | 2,000,000 | 4.75 to 5.25 | 7/1/05-09 | 10,000,000 |
| Series 1999-A........ | 11-1-99 | 238,340,000 | Various | 56,700,000 | 5.125 | 7/1/10 | 2,000,000 |
| Series 2001-A........ | 5-1-01 | 302,485,000 | - | - | 4.50 to 5.75 | 7/1/11-33 | 167,675,000 A |
| Series 2001-B........ | 5-1-01 | 108,985,000 | - | - | 4.50 to 5.50 | 7/1/12-33 | 108,985,000 A |
| Series 2001-C....... | 6-7-01 | 192,290,000 | Variable | 385,000 | Variable | 7/1/05-29 | 191,905,000 A |
| Series 2003-A....... | 1-28-03 | 234,805,000 | - | - | 4.75 to 5.25 | 7/1/14-34 | 234,805,000 |
| Series 2003-B....... | 1-28-03 | 172,945,000 | - | - | 2.00 to 5.25 | 7/1/05-33 | 172,945,000 A |
| Series 2003-C....... | 1-28-03 | 46,335,000 | 2.00 | 3,410,000 | 2.00 to 5.25 | 7/1/05-22 | 40,280,000 A |
| Series 2003-D....... | 1-28-03 | 151,370,000 | Variable | 405,000 | Variable | 7/1/05-33 | 150,965,000 A |
| Series 2004-A....... | 5-04-04 | 77,010,000 | - | - | Variable | 7/1/05-24 | 77,010,000 A |
| Series 2004-B....... | 5-04-04 | 163,590,000 | - | - | Variable | 7/1/06-23 | 163,590,000 |
| Series 2005-A....... | 3-11-05 | 18,735,000 | - | - | 3.00 to 5.00 | 7/1/08-14 | 18,735,000 |
| Series 2005-A....... | 3-11-05 | 86,265,000 | - | - | 3.85 to 5.00 | 7/1/15-35 | 86,265,000 |
| Series 2005-B....... | 3-11-05 | 195,000,000 | - | - | Variable | 7/1/10-35 | 195,000,000 |
| Series 2005-B....... | 3-11-05 | 26,670,000 | - | - | 3.00-5.00 | 7/1/10-35 | 26,670,000 |
| Series 2005-C....... | 3-11-05 | 126,605,000 | - | - | 5.00 | 7/1/15-22 | 99,935,000 |
| Total Water Supply System Revenue Bonds.... | | | | | | | $ 1,991,615,000 |

Automobile Parking Fund

Detroit Building Authority Bonds - Revenue Refunding Bonds:

| | Bond Date | Amount Issued | Interest Rate | Retired Amount | Range of Interest Rates | Maturity Date | Outstanding Amount |
|---|---|---|---|---|---|---|---|
| Parking & Arena System-Series 1997 | 2-15-97 | $ 3,050,000 | 4.60% | $ 355,000 | 4.70 to 4.80% | 7/1/05-06 | $ 755,000 |
| Parking & Arena System-Series 1997 | 2-15-97 | 37,695,000 | 6.68 | 4,535,000 | 6.68 to 6.79 | 7/1/05-06 | 10,000,000 |
| Parking & Arena System-Series 1998 | 7-1-98 | 8,385,000 | 4.50 | 965,000 | 4.50 to 5.25 | 7/1/05-08 | 3,175,000 |
| Parking & Arena System-Series 1999 | 7-1-98 | 18,615,000 | - | - | 4.70 to 5.25 | 7/1/08-19 | 18,615,000 A |
| Parking & Arena System-Series 1999 | 10-22-99 | 29,900,000 | Variable | 400,000 | Variable | 7/27/05-29 | 28,300,000 |
| Total Detroit Building Authority Revenue Refunding Bonds.... | | | | | | | 60,845,000 |
| Total Business-type Bonds.... | | | | | | | $ 4,708,886,573 |

Note A - Stated Principal amount of State Revolving Fund Bonds issued as part of the State of Michigan's Revolving Fund Loan Program. As the System draws additional amount from time to time hereafter, the outstanding principal amounts of such Bonds will correspondingly increase.

C-58

94 (Continued)

95 (Continued)

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 182 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
etroit/15/08 2013 11:32

C-59

**b.** The following is the schedule of Notes Payable at June 30, 2005:

| Governmental Activities Notes Payable | Issue Date | Range of Interest Rates | Maturity Date | Amount Outstanding June 30, 2005 |
|---|---|---|---|---|
| Urban Renewal Fund: | | | | |
| Loans Pharmaceutical Project (Secured by Future Block Grant Revenue) | 8/1/2002 | 1.75 to 4.16 % | 8/1/2008 | $ 4,266,000 |
| Ferry Street Project (Secured by Future Block Grant Revenue) | 4/28/1999 | 5.58 to 6.72 | 8/1/04-19 | 2,815,000 |
| Garfield Project (Secured by Future Block Grant Revenue) | 6/5/1996 | 6.67 to 7.66 | 8/1/03-15 | 1,840,000 |
| Riverbend Project (Secured by Future Block Grant Revenue) | 6/5/1996 | 6.59 to 7.66 | 8/1/03-15 | 665,000 |
| Riverbend Project (Secured by Future Block Grant Revenue) | 10/28/1997 | 6.11 to 7.08 | 8/1/03-16 | 405,000 |
| Stuberstone Project (Secured by Future Block Grant Revenue) | 10/28/1997 | 6.11 to 7.10 | 8/1/03-16 | 315,000 |
| New Amsterdam Project (Secured by Future Block Grant Revenue) | 8/1/2002 | 4.16 to 6.12 | 8/1/08-23 | 9,700,000 |
| Mexicantown Welcome Center Project (Secured by Future Block Grant Revenue) | 1/13/2000 | LIBOR Plus 2% | 8/1/08-24 | 7,789,000 |
| Total Notes Payable | | | | $ 27,795,000 |

**c.** The following is the schedule of Loans Payable at June 30, 2005:

| Governmental Activities Loans Payable | Issue Date | Range of Interest Rates | Maturity Date | Amount Outstanding June 30, 2005 |
|---|---|---|---|---|
| Downtown Development Authority | 1991-1997 | - % | - | $ 33,600,000 |
| Loans Payable GE Capital Schedule - 009 | 10/30/2003 | 3.50 | 7/1/05-2/1/09 | 1,892,182 |
| Loans Payable GE Capital Schedule - 010 | 10/30/2003 | 3.80 | 7/1/05-11-1-08 | 141,246 |
| Loans Payable GE Capital Schedule - 011 | 11/15/2003 | 3.65 | 7/1/05-4/15/0/ | 7,459,520 |
| Loans Payable GE Capital Schedule - 012 | 4/2/2004 | 3.61 | 8/1/05-4/1/09 | 384,501 |
| Loans Payable GE Capital Schedule - 013 | 4/9/2004 | 4.07 | 7/1/05-6/1/14 | 1,178,881 |
| Loans Payable GE Capital Schedule - 014 | 5/14/2004 | 4.07 | 7/1/05-6/1/09 | 438,896 |
| Loans Payable GE Capital Schedule - 015 | 5/14/2004 | 4.07 | 7/1/05-11/1/07 | 121,556 |
| Loans Payable GE Capital Schedule - 021 | 3/1/2005 | 4.08 | 7/1/05-3/1/08 | 153,181 |
| Total Loans Payable | | | | $ 45,369,963 |

**d.** The following is the schedule of Bonds Authorized and Unissued at June 30, 2005:

| | | | Authorized (Note A) | | Unissued Amount |
|---|---|---|---|---|---|
| General Obligation Bonds (Tax Supported): | Authority | Date | Amount | | |
| Sewer Construction * | Electorate | 8/2/1960 | $ 50,000,000 | $ | 24,000,000 |
| Public Safety | Electorate | 11/4/1997 | 15,000,000 | | 625,000 |
| Public Safety | Electorate | 11/7/2000 | 12,000,000 | | 1,500,000 |
| Public Safety | Electorate | 11/2/2004 | 120,000,000 | | 120,000,000 |
| Municipal Facilities | Electorate | 11/2/2004 | 18,000,000 | | 5,120,000 |
| Neighborhood/Economic Development | Electorate | 11/7/2000 | 30,000,000 | | 4,105,000 |
| Neighborhood/Economic Development | Electorate | 11/2/2004 | 19,000,000 | | 19,000,000 |
| Public Lighting | Electorate | 11/7/2000 | 30,000,000 | | 7,935,000 |
| Public Lighting | Electorate | 11/2/2004 | 22,000,000 | | 22,000,000 |
| Recreation, Zoo, Cultural | Electorate | 11/7/2000 | 25,000,000 | | 19,195,000 |
| Recreation, Zoo, Cultural | Electorate | 11/2/2004 | 22,000,000 | | 22,000,000 |
| Institute of Arts | Electorate | 11/7/2000 | 25,000,000 | | 4,850,000 |
| Historical | Electorate | 11/6/2001 | 20,000,000 | | 17,250,000 |
| Museum of African American History | Electorate | 4/29/2003 | 6,000,000 | | 500,000 |
| Transportation | Electorate | 11/2/2004 | 32,000,000 | | 32,000,000 |
| Total Bonds Authorized - Unissued | | | | $ | 300,030,000 |

Note A - The electorate approved an amendment to the State Constitution (the Headlee Amendment) November 7, 1978 that requires voter approval for the issuance of general obligation bonds effective December 22, 1978. The authority to issue bonds approved by the electors continues until revoked by the electors.

**e.** Summary of Annual Principal and Interest Requirements for Bonds, Notes, and Other Debt Payable:

**Primary Government**

**Principal**

| | | | Business-type Activities | | | |
|---|---|---|---|---|---|---|
| Year Ending | Governmental Activities | Sewage Disposal Fund | Water Fund | Automobile Parking Fund | | Total |
| 2006 | $ 85,586,083 | $ 50,035,000 | $ 24,595,000 | $ 6,615,000 | $ | 166,831,083 |
| 2007 | 86,524,015 | 53,205,000 | 25,535,000 | 7,105,000 | | 172,369,015 |
| 2008 | 91,540,094 | 51,180,000 | 25,970,000 | 1,610,000 | | 170,300,094 |
| 2009 | 119,403,236 | 59,449,128 | 35,070,000 | 1,670,000 | | 215,592,364 |
| 2010 | 120,440,746 | 59,685,152 | 34,655,000 | 1,830,000 | | 216,610,898 |
| 2011-2015 | 378,447,684 | 312,548,398 | 211,425,000 | 10,515,000 | | 912,936,082 |
| 2016-2020 | 186,118,196 | 352,125,636 | 261,685,000 | 14,200,000 | | 814,128,832 |
| 2021-2025 | 107,935,000 | 391,963,259 | 318,665,000 | 7,000,000 | | 825,563,259 |
| 2026-2030 | - | 568,030,000 | 427,670,000 | 10,300,000 | | 1,006,000,000 |
| 2031-2035 | - | 660,365,000 | 504,765,000 | - | | 1,165,130,000 |
| 2036 | - | 95,240,000 | 121,580,000 | - | | 216,820,000 |
| Total | $ 1,175,995,054 | $ 2,653,826,573 | $ 1,991,615,000 | $ 60,845,000 | $ | 5,882,281,627 |

**Interest**

| | | | Business-type Activities | | | |
|---|---|---|---|---|---|---|
| Year Ending | Governmental Activities | Sewage Disposal Fund | Water Fund | Automobile Parking Fund | Interest Rate Swaps, Net | Total |
| 2006 | $ 59,480,874 | $ 90,736,074 | $ 65,004,412 | $ 3,931,479 | $ 27,326,622 | $ 246,479,460 |
| 2007 | 57,343,723 | 102,210,480 | 67,891,173 | 3,287,590 | 27,923,238 | 258,656,204 |
| 2008 | 52,753,115 | 100,677,322 | 67,256,676 | 3,215,252 | 27,836,714 | 251,739,079 |
| 2009 | 47,939,128 | 98,022,005 | 66,688,555 | 2,906,261 | 27,736,183 | 243,292,132 |
| 2010 | 41,913,993 | 95,677,200 | 66,052,355 | 2,809,513 | 27,642,121 | 234,094,782 |
| 2011-2015 | 136,000,958 | 443,768,627 | 317,597,299 | 12,921,991 | 127,663,667 | 1,037,952,541 |
| 2016-2020 | 54,823,895 | 412,230,438 | 278,601,025 | 9,127,908 | 113,826,880 | 868,610,146 |
| 2021-2025 | 9,952,322 | 330,014,842 | 230,487,594 | 5,673,842 | 89,468,827 | 665,597,427 |
| 2026-2030 | - | 221,539,046 | 173,388,743 | 2,500,303 | 54,714,582 | 452,142,674 |
| 2031-2035 | - | 89,278,407 | 68,708,680 | - | 28,443,403 | 186,430,490 |
| 2036 | - | 4,642,000 | 1,462,380 | - | 1,393,605 | 7,497,985 |
| Total | $ 460,207,608 | $ 1,988,796,441 | $ 1,403,138,892 | $ 46,374,138 | $ 553,975,841 | $ 4,452,492,920 |

The City entered into a loan payable with the Downtown Development Authority, a component unit, for $33.6 million. The loan was used to cover cost related to the Cobo Hall Expansion Project and operations of the Downtown People Mover System. The loan is unsecured and bears no interest and will be repaid by the City as general operating funds become available. As such, the loan payable has not been included in either of the governmental activities annual principle or interest requirements.

| | Component Units | |
|---|---|---|
| Year Ending | Principal | Interest |
| 2006 | 116,577,804 | 107,883,461 |
| 2007 | 135,525,384 | 108,668,671 |
| 2008 | 132,601,967 | 107,418,962 |
| 2009 | 145,140,178 | 101,697,757 |
| 2010-2014 | 543,089,865 | 411,828,129 |
| 2015-2019 | 347,780,530 | 332,276,523 |
| 2020-2024 | 278,641,666 | 258,029,213 |
| 2025-2029 | 417,259,572 | 168,157,185 |
| 2030-2034 | 281,221,362 | 39,506,246 |
| 2035 | - | - |
| | $ 2,397,838,324 | $ 1,635,466,147 |

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

**f. Pension Obligation Certificates of Participation (POC's)**

On June 2, 2005, the Detroit Retirement Systems Funding Trust issued $1,440,000 ($640 million of taxable fixed rate, Series A and $800 million of taxable floating rate, Series B) of taxable Pension Obligation Certificates of Participation (POCs). The Trust was created by the General Retirement System Service Corporation (GRSSC) and the Police and Fire Retirement System Service Corporation (PFRSSC), both blended component units of the City. The City entered into service contracts with the GRSSC and the PFRSSC to facilitate the transaction. The POCs represent undivided proportionate interests in the rights to receive the payments from the City under its service contracts with the GRSSC and the PFRSSC.

The POCs were issued for the purpose of the funding certain unfunded accrued actuarial liabilities (UAAL) of the two retirement systems of the City, which include the General Retirement System (GRS), and the Police & Fire Retirement Systems (PFRS), and a portion of the current normal contribution. The UAAL is a liability of the City for past services rendered by its employees in which Michigan state law and the Michigan Constitution require that a portion be annually paid. The GRS includes employees and retirees of certain governmental funds, proprietary funds and the Detroit Public Library, a discretely presented component unit.

The amount of $46,362,475 out of the total proceeds of $1,440,000,000 relates to issuance costs that are recorded as an asset on the government wide and the proprietary fund financial statements and will be amortized over 20 years, the life of the POCs. $739,793,897 of the proceeds were contributed to the GRS, which included $52,503,654 of annual required contributions for June 30, 2005. The remaining amount of $687,290,243 resulted in a net pension asset. $630,829,188 of the proceeds were contributed to the PERS, which included $98,842,261 of annual required contributions for June 30, 2005. The remaining amount of $531,986,927 resulted in a net pension asset.

Interest payments for Series A will commence on December 15, 2005 and are due semi-annually while the first principal payment is payable June 15, 2007, due annually, and are payable through 2025. Interest payments for Series B will commence on September 15, 2005 and are due quarterly through 2025 while the first principal payment is payable June 15, 2007, due annually, and are payable through 2025. The interest rates on the outstanding obligations range from 4.004% and 4.948%.

The redemption dates and aggregate principal and interest amounts for each such redemption date are as follows:

Summary of Annual Principal and Interest Requirements for Pension Obligation Certificates:

| | | Primary Government | | | |
|---|---|---|---|---|---|
| | | Principal | | | |
| | | Business-type Activities | | | |
| Maturity (June 15) | Governmental Activities | Sewer Disposal Fund | Transportation Fund | Water Fund | Totals |
| 2006 | $ - | $ - | $ - | $ - | $ - |
| 2007 | 23,571,654 | 179,948 | 2,117,344 | 3,236,054 | 29,105,000 |
| 2008 | 28,856,952 | 220,296 | 2,592,102 | 3,961,650 | 35,631,000 |
| 2009 | 34,776,390 | 265,486 | 3,123,820 | 4,774,304 | 42,940,000 |
| 2010 | 41,090,241 | 313,686 | 3,690,967 | 5,641,106 | 50,736,000 |
| 2011-2015 | 319,477,917 | 2,438,918 | 28,697,386 | 43,859,779 | 394,474,000 |
| 2016-2020 | 396,445,178 | 3,026,492 | 35,611,038 | 54,426,291 | 489,509,000 |
| 2021-2025 | 326,389,090 | 2,315,985 | 27,250,896 | 41,649,030 | 397,605,001 |
| Total | $ 1,170,607,422 | $ 8,760,811 | $ 103,083,553 | $ 157,548,214 | $ 1,440,000,000 |

| | | Primary Government | | | |
|---|---|---|---|---|---|
| | | Interest | | | |
| | | Business Type Activities | | | |
| Maturity (June 15) | Governmental Activities | Sewer Disposal Fund | Transportation Fund | Water Fund | Totals |
| 2006 | 39,784,138 | $ 303,729 | $ 3,573,619 | $ 5,461,769 | $ 49,123,255 |
| 2007 | 56,386,921 | 430,462 | 5,065,005 | 7,741,123 | 69,623,511 |
| 2008 | 55,349,057 | 422,539 | 4,971,778 | 7,598,639 | 68,342,013 |
| 2009 | 54,064,825 | 412,735 | 4,856,421 | 7,422,332 | 66,756,313 |
| 2010 | 52,508,118 | 400,851 | 4,716,588 | 7,208,619 | 64,834,176 |
| 2011-2015 | 227,884,204 | 1,739,685 | 20,469,900 | 31,285,264 | 281,379,053 |
| 2016-2020 | 132,202,950 | 1,009,247 | 11,875,247 | 18,149,587 | 163,237,031 |
| 2020-2025 | 51,751,425 | 395,075 | 4,648,617 | 7,104,735 | 63,899,852 |
| Total | $ 669,931,638 | $ 5,114,323 | $ 60,177,175 | $ 91,972,069 | $ 827,195,204 |

C-60

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit15-02-2013 11:32

g. Long-term Obligations activity for the Year Ended June 30, 2005:

| Governmental Activities: | Balance June 30, 2004 | Increase | Decrease | Balance June 30, 2005 | Amount Due Within One Year |
|---|---|---|---|---|---|
| **Long-Term Obligations, Notes, Loans and POC's:** | | | | | |
| Convention Facility-Cobo Center | | | | | |
| Expansion Revenue Bonds | $ 135,368,138 | $ – | $ 10,355,000 | $ 125,013,138 | $10,830,000 |
| Detroit Building Authority Bonds | | | | | |
| Madison Center Project | 11,413,826 | – | 1,491,873 | 9,921,953 | 1,599,790 |
| Distributable State Aid Bonds | 47,295,000 | – | 10,540,000 | 36,755,000 | – |
| Self-Insurance Limited Tax Bonds | 98,895,000 | 62,285,000 | – | 161,180,000 | 14,585,000 |
| General Obligation Tax Bonds | 523,355,000 | 192,730,000 | 184,400,000 | 531,685,000 | 30,855,000 |
| General Obligation Limited Tax Bonds | 157,825,000 | 98,815,000 | 18,365,000 | 238,275,000 | 22,795,000 |
| Total general fund bonds | 974,151,964 | 353,830,000 | 225,151,873 | 1,102,830,091 | 80,664,790 |
| Federal Note — Caraco Pharmaceutical Project | 5,208,000 | – | 942,000 | 4,266,000 | 990,000 |
| Federal Note — Ferry Project | 2,900,000 | – | 85,000 | 2,815,000 | 90,000 |
| Federal Note — Garfield Project | 1,945,000 | – | 105,000 | 1,840,000 | 105,000 |
| Federal Note — Michigan Repacking Project | 1,290,000 | – | 1,290,000 | – | – |
| Federal Note — Riverbend Project | 1,150,000 | – | 80,000 | 1,070,000 | 80,000 |
| Federal Note — Stubenrose Project | 330,000 | – | 15,000 | 315,000 | 15,000 |
| Federal Note — New Amsterdam Project | 9,700,000 | – | – | 9,700,000 | – |
| Federal Note — Mexicantown Welcome Center | – | 7,789,000 | – | 7,789,000 | – |
| Loan Payable to Downtown | | | | | |
| Development Authority | 33,600,000 | – | – | 33,600,000 | – |
| Loans Payable-GE Capital - Schedule-009 | 2,327,537 | – | 435,355 | 1,892,182 | 492,242 |
| Loans Payable-GE Capital - Schedule-010 | 176,130 | – | 34,884 | 141,246 | 39,464 |
| Loans Payable-GE Capital - Schedule-011 | 14,320,318 | – | 6,860,798 | 7,459,520 | 2,697,231 |
| Loans Payable-GE Capital - Schedule-012 | 491,400 | – | 106,899 | 384,501 | 95,235 |
| Loans Payable-GE Capital - Schedule-013 | 1,285,029 | – | 106,148 | 1,178,881 | 111,474 |
| Loans Payable-GE Capital - Schedule-014 | 529,661 | – | 90,765 | 438,896 | 103,018 |
| Loans Payable-GE Capital - Schedule-015 | – | 149,320 | 27,764 | 121,556 | 48,902 |
| Loans Payable-GE Capital - Schedule-021 | – | 166,031 | 12,850 | 153,181 | 53,728 |
| Total Governmental Notes and Loans | 75,253,075 | 8,104,350 | 10,192,463 | 73,164,963 | 4,921,293 |
| Pension Obligation Certificates | – | 1,170,607,422 | – | 1,170,607,422 | – |
| Total Long-Term Bonds, Notes, Loans, and Pension Obligation Certificates | 1,049,405,039 | 1,532,541,772 | 235,344,336 | 2,346,602,476 | 85,586,083 |
| **Other Long-Term Obligations:** | | | | | |
| Accrued Compensated Absences | 140,471,015 | 19,527,492 | 3,000,213 | 156,998,294 | 112,401,028 |
| Claims and Judgments | 121,872,574 | 20,419,251 | 9,349,644 | 132,942,181 | 5,035,133 |
| Workers' Compensation | 65,417,378 | 11,939,499 | 12,657,646 | 64,699,231 | 12,080,784 |
| Total Other Long-Term Obligations | 327,760,967 | 51,886,242 | 25,007,503 | 354,639,706 | 129,516,945 |
| Total General Long-Term Obligations | $ 1,377,166,006 | $ 1,584,428,014 | $ 260,351,839 | $ 2,701,242,182 | $ 215,103,028 |

---

| Business-type Activities | Balance June 30, 2004 | Increase | Decrease | Balance June 30, 2005 | Amount Due Within One Year |
|---|---|---|---|---|---|
| **Major Funds:** | | | | | |
| **Long-term Debt and Obligations:** | | | | | |
| **Sewage Disposal Fund:** | | | | | |
| Bonds Payable | 2,375,152,599 | 420,028,974 | (141,355,000) | 2,653,826,573 | 50,035,000 |
| Pension Obligation Certificates Payable | – | 8,760,811 | – | 8,760,811 | – |
| Accrued Compensated Absences | 12,158,263 | 2,255,076 | (495,533) | 13,917,806 | 5,556,011 |
| Accrued Public Liability and Workers' Compensation | 5,206,684 | 475,827 | (954,542) | 4,727,969 | 895,155 |
| **Transportation Fund:** | | | | | |
| Capital Lease for Buses | – | 32,110,926 | – | 32,110,926 | 2,577,808 |
| Pension Obligation Certificates Payable | – | 103,083,553 | – | 103,083,553 | – |
| Accrued Compensated Absences | 3,730,161 | 69,003 | – | 3,799,164 | 3,039,331 |
| Accrued Public Liability and Workers' Compensation | 3,548,100 | 1,731,846 | (318,586) | 4,961,360 | 992,272 |
| **Water Fund:** | | | | | |
| Bonds Payable | 1,713,435,000 | 426,605,000 | (148,425,000) | 1,991,615,000 | 24,595,000 |
| Pension Obligation Certificates Payable | – | 157,548,214 | – | 157,548,214 | – |
| Accrued Compensated Absences | 15,589,521 | 4,203,965 | (1,379,814) | 18,413,672 | 8,604,763 |
| Accrued Public Liability and Workers' Compensation | 15,778,254 | 7,193,612 | (4,260,520) | 18,711,346 | 3,470,751 |
| **Automobile Parking Fund:** | | | | | |
| Bonds Payable | 67,100,000 | 360,000 | (6,615,000) | 60,845,000 | 6,615,000 |
| Accrued Compensated Absences | 447,093 | 112,098 | – | 559,191 | 251,636 |
| **Non-Major Fund:** | | | | | |
| Accrued Compensated Absences | 467,278 | 11,154 | (108,895) | 369,537 | 62,456 |
| Accrued Public Liability and Workers' Compensation | 122,649 | 10,863 | (53,226) | 80,286 | 21,796 |
| Total Bonds and Leases Payable | 4,155,687,599 | 879,104,900 | (296,395,000) | 4,738,397,499 | 83,822,808 |
| Total POC's Payable | – | 269,392,578 | – | 269,392,578 | – |
| Total Accrued Compensated Absences | 32,992,316 | 6,651,296 | (1,984,242) | 37,059,370 | 17,514,197 |
| Total Public Liability and Workers' Compensation | 24,655,687 | 9,412,148 | (5,586,874) | 28,480,961 | 5,379,974 |
| Total Long-Term Debt and Obligations | 4,212,735,602 | 1,164,560,922 | (303,966,116) | 5,073,330,408 | 106,716,979 |
| **Component Units** | | | | | |
| **School District of the City of Detroit:** | | | | | |
| Bonds, Notes and Leases Payable | $ 1,589,256,609 | $ 210,932,243 | $ (88,913,109) | $ 1,711,275,743 | $ 47,733,281 |
| Accrued Compensated Absences | 147,692,684 | 3,883,000 | (33,156,393) | 118,419,291 | 6,208,877 |
| Accrued Public Liability and Workers' Compensation | 56,401,699 | 140,476,611 | (155,067,464) | 41,810,846 | 16,590,913 |
| | 1,793,350,992 | 355,291,854 | (277,136,966) | 1,871,505,880 | 70,533,071 |
| **Other Component Units:** | | | | | |
| Bonds, Notes and Leases Payable | 759,152,416 | – | (72,589,831) | 686,562,585 | 68,844,523 |
| Accrued Compensated Absences | 5,185,104 | 1,043,852 | – | 6,228,956 | 541,882 |
| Accrued Public Liability and Workers' Compensation | 587,812 | – | (312,913) | 274,899 | 152,256 |
| | $ 764,925,332 | $ 1,043,852 | $ (72,902,744) | $ 693,066,440 | $ 69,538,661 |

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
11/15/08 2013 11:32

**5. Derivatives not reported at fair value**

The City is party to derivative financial instruments consisting of interest rate swaps that are intended to effectively convert variable-rate financings to fixed-rate financings. These are not reported at fair value on the Statement of Net Assets at June 30, 2005.

*Objective of the swaps.* In order to better manage its interest rate exposure and to reduce the overall costs of its financings the City has entered into 31 separate fixed-payor interest rate swaps.

*Terms, fair values, and credit risk.* Certain key terms, fair market values, and counterparty credit ratings relating to the outstanding swaps as of June 30, 2005, are presented below. The notional amounts of the swaps, except those with effective dates of 9/1/06, and 3/1/07 match the principal amounts of the outstanding financings. The swaps with effective dates of 9/1/06, and 3/1/07, were entered into to hedge future interest rate risk and will be associated with financings expected to be issued prior to the effective dates. Except as discussed under rollover risk, the City's swap agreements contain scheduled reductions to outstanding notional amounts that match scheduled or anticipated amortization of associated financings.

*Market access risk.* The City is exposed to market access risk on its hedge swaps or forward starting swaps in the event that it will not be able to enter credit markets or in the event that the credit will become more costly.

| Associated Financing Issue | Notional Amounts (1) | Effective Date | Fixed Rate Paid | Variable Rate Received | Fair Values | Swap Termination Date | Final Maturity of Bonds | Counterparty Credit Rating |
|---|---|---|---|---|---|---|---|---|
| Building Authority Series 1999-A | $28,300,000 | 10/22/1999 | 7.48% | LIBOR BBA IMT+.28% | $ -12,994,248 | 7/1/2029 | 7/1/2029 | Aa1/AA-/AA+ |
| Sewage 1998-A | 68,000,000 | 12/10/1998 | 4.51% | BMA (2) | -8,544,876 | 7/1/2023 | 7/1/2023 | Aa2/AA-/NR |
| Sewage 1998-B | 67,900,000 | 12/10/1998 | 4.51% | BMA | -8,570,700 | 7/1/2023 | 7/1/2023 | Aa2/AA-/NR |
| Water 2001-C (3) | 47,723,000 | 6/7/2001 | 4.07% | BMA | -699,037 | 1/1/2006 | 7/1/2029 | Aaa/AA+/NR |
| Water 2001-C (3) | 30,032,000 | 6/7/2001 | 4.70% | BMA | -2,620,915 | 7/1/2011 | 7/1/2029 | Aaa/AA+/NR |
| Water 2001-C (3) | 47,628,000 | 1/1/2006 | 5.42% | BMA | -4,882,486 | 7/1/2011 | 7/1/2029 | Aaa/AA+/NR |
| Water 2001-C | 114,150,000 | 6/7/2001 | 4.90% | BMA | -20,866,778 | 7/1/2026 | 7/1/2026 | Aa3/A+/AA- |
| Sewage 2001 C-1 | 156,500,000 | 10/23/2001 | 4.43% | BMA | -21,294,528 | 7/1/2027 | 7/1/2027 | Aa2/AA+/AAA |
| Sewage 2001 C-2 | 124,500,000 | 10/23/2001 | 4.47% | BMA | -18,778,403 | 7/1/2029 | 7/1/2029 | Aa2/AA+/AAA |
| Water 2003-B | 1,980,000 | 1/30/2003 | 3.02% | CPI + 1.01% | 48,504 | 7/1/2009 | 7/1/2009 | Aa3/A+/AA- |
| Water 2003-B | 2,290,000 | 1/30/2003 | 3.31% | CPI+ 1.12% | 37,687 | 7/1/2010 | 7/1/2010 | Aa3/A+/AA- |
| Water 2003-B | 2,500,000 | 1/30/2003 | 3.55% | CPI + 1.25% | 36,136 | 7/1/2011 | 7/1/2011 | Aa3/A+/AA- |
| Water 2003-B | 2,175,000 | 1/30/2003 | 3.74% | CPI + 1.33% | 16,814 | 7/1/2012 | 7/1/2012 | Aa3/A+/AA- |
| Water 2003-B | 2,800,000 | 1/30/2003 | 3.87% | CPI + 1.34% | 22,993 | 7/1/2013 | 7/1/2013 | Aa3/A+/AA- |
| Water 2003-B | 2,505,000 | 1/30/2003 | 4.00% | CPI + 1.36% | 20,815 | 7/1/2014 | 7/1/2014 | Aa3/A+/AA- |
| Water 2003-C | 2,005,000 | 1/30/2003 | 3.87% | CPI + 1.34% | 15,887 | 7/1/2013 | 7/1/2013 | Aa3/A+/AA- |
| Water 2003-C | 2,330,000 | 1/30/2003 | 4.00% | CPI + 1.36% | -961 | 7/1/2014 | 7/1/2014 | Aa3/A+/AA- |
| Water 2003-D | 150,965,000 | 2/6/2003 | 4.06% | BMA | -15,909,265 | 7/1/1933 | 7/1/1933 | Aa2/AA-/NR |
| Sewage 2003-B | 150,000,000 | 5/22/2003 | 4.14% | BMA | 4,737,686 | 7/1/2013 | 7/1/1933 | Aa2/AA+/AAA |
| Water 2004-A | 77,010,000 | 5/13/2004 | 3.94% | BMA | -6,144,865 | 7/1/2025 | 7/1/2025 | Aa2/AA-/NR |
| Water 2004-B | 163,590,000 | 5/13/2004 | 3.85% | BMA | -10,637,688 | 7/1/2023 | 7/1/2023 | Aa2/AA-/NR |
| Sewage Hedge Swap | 125,000,000 | 9/1/2006 | 4.96% | BMA | 21,213,900 | 7/1/2036 | N/A | Aa2/AA+/AAA |
| Pension Obligation Certicates-GRS | 161,400,000 | 6/2/2005 | 5.12% | 3 MTH LIBOR + .28% | 6,185,075 | 6/15/2025 | 6/15/2025 | Aa2/AA+/AAA |
| Pension Obligation Certicates-PFRS | 150,369,000 | 6/2/2005 | 4.64% | 3 MTH LIBOR + .18% | 2,096,842 | 6/15/2014 | 6/15/2014 | Aa2/AA+/AAA |
| Pension Obligation Certicates-PFRS | 168,231,000 | 6/2/2005 | 4.98% | 3 MTH LIBOR + .28% | 4,783,333 | 6/15/2018 | 6/15/2018 | Aa2/AA+/AAA |
| Pension Obligation Certicates-GRS | 53,800,000 | 6/2/2005 | 5.12% | 3 MTH LIBOR + .28% | -2,027,204 | 6/15/2025 | 6/15/2025 | Aa2/AA+/AAA |
| Pension Obligation Certicates-PFRS | 50,123,000 | 6/2/2005 | 4.64% | 3 MTH LIBOR + .18% | -700,403 | 6/15/2014 | 6/15/2014 | Aa2/AA+/AAA |
| Pension Obligation Certicates-PFRS | 56,077,000 | 6/2/2005 | 4.98% | 3 MTH LIBOR + .28% | -1,581,174 | 6/15/2018 | 6/15/2018 | Aa2/AA+/AAA |
| Pension Obligation Certicates-GRS | 53,800,000 | 6/2/2005 | 5.12% | 3 MTH LIBOR + .28% | -2,023,307 | 6/15/2025 | 6/15/2025 | Aa2/AA+/AAA |
| Pension Obligation Certicates-PFRS | 50,123,000 | 6/2/2005 | 4.64% | 3 MTH LIBOR + .18% | -659,624 | 6/15/2014 | 6/15/2014 | Aa2/AA+/AAA |
| Pension Obligation Certicates-PFRS | 56,077,000 | 6/2/2005 | 4.98% | 3 MTH LIBOR + .28% | -1,553,680 | 6/15/2018 | 6/15/2018 | Aa2/AA+/AAA |

1. Notional amount balance as of July 1, 2005
2. The Bond Market Association Municipal Swap Index [TM]
3. Denotes that the swap termination date does not match the final maturity of the financings.

**Fair Value:** Because interest rates have generally declined since the time the swaps were negotiated, many of the City's swaps have a negative fair value as of June 30, 2005. The negative fair values may be countered by lower total interest payments required under the variable-rate financing, creating lower synthetic interest rates.

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 186 of 248

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 186 of 248]

CONFIDENTIAL INFORMATION

**Credit Risk:**  As of June 30, 2005, the City was not significantly exposed to net credit risk as the majority of the swaps had net negative fair values.  However, should interest rates change and fair values of the swaps become positive, the City would be exposed to credit risk in the amount of the derivatives' positive fair value.

The swap agreements contain varying collateral agreements with the counterparties.  The swaps require full collateralization of the fair value of the swap should the counterparty's credit rating fall below certain rating levels by Fitch Ratings, Standard & Poor's, and/or Moody's Investors Service.  Collateral on all swaps is to be in the form of U.S. government securities held by a third-party custodian.

**Basis Risk:**  The City is not exposed to significant basis risk on its swaps because most of the variable payments received are based on the BMA index.  The CPI indexed swaps are associated with CPI indexed financings and thus create no basis risk.  The LIBOR based swap has basis risk on $28.3 million of swaps.

**Termination Risk:**  The City or counterparty may terminate any of the swaps if the other party fails to perform under the terms of the contract.  In such cases, the City may owe or be due a termination payment depending on the value of the swap at that time.  In addition, the City is exposed to termination risk, but not termination payments, on certain of the City's swaps related to Water Series 2001C, Water Series 2003D, Water Series 2004-A, Water Series 2004-B, Sewer Series 1998A, Sewer Series 1998B, Sewer Series 2001-C-1, Sewer Series 2001C-2, and Sewer Series 2003-B.  These swaps provide the counterparty with the option to terminate the swap agreement beginning on 1/01/2010, 7/02/2011, 7/01/2005, 7/01/2005, 7/01/2008, 7/01/2008, 1/01/2010, 1/01/2010, and 7/01/2013, respectively, upon the passing of certain BMA thresholds.  If any of these swaps are terminated, the associated variable-rate financings would no longer carry synthetic interest rates, but there would be no termination payment.

**Rollover Risk:**  The City is exposed to rollover risk on swaps that mature or may be terminated prior to the maturity of the associated financings.  When these swaps terminate, or in the case of the termination option, if the counterparty exercises its option, the City will not realize the synthetic rate offered by the swaps on the underlying issues.

**Swap Termination Payment:**  During the year ended June 30, 2005, the Sewage Disposal Fund and its counterparty terminated a forward starting swap agreement related to the issuance of debt in fiscal year 2005.  The Fund paid a termination payment in the amount of $11,750,000 that has been reserved to offset future debt service.  The payment will be recognized over the life of the debt using the straight-line method.

**6.  Other Information**

**Automobile Parking Fund**

The City has covenanted in bond authorizing documents to charge for the use of and services provided by the City of Detroit Building Authority Parking Arena System (the System) for each fiscal year of the City such that the gross revenues collected and remitted to the trustee (1) will be at least sufficient to at all times pay when due the principal, interest, and sinking fund installments on the revenue bonds without recourse to the Debt Reserve Account, to pay or provide for all operating expenses, to maintain the System in good repair without recourse to the Operating and Contingency Reserve Fund, and to replenish the Debt Reserve Account (so as to satisfy the corresponding reserve requirement) and the Operating and Maintenance Reimbursement Fund, and (2) will, after replenishment of any deficit in the Debt Reserve Account, Operating and Contingency Reserve Fund, and the Operating and Maintenance Reimbursement Fund, be equal to or greater than 175% of the amount payable in such fiscal year as the principal of sinking fund installments for the interest on all revenue bonds, net of amounts capitalized for interest payable during the construction period.

The City has covenanted further that if the fees and charges collected in any fiscal year are not sufficient to produce such revenues, the City will employ a consulting expert to submit recommendations as to revision of the schedule of fees then in effect and the City will thereafter charge and collect fees in accordance with such recommendation.  The schedule of charges for the System may not be revised for a period of two years unless (1) such revision is for purpose of complying with the aforesaid rate covenant or, simultaneous with such revision, there is filed with the trustee a certificate of the consulting expert stating the opinion that if such revision had been in effect during the whole of the fiscal year immediately prior thereto, the revenues collected during such fiscal year would not have been diminished, and (2) at the time of any reduction in charges, the amounts in the Debt Reserve Account and Operating and Contingency Reserve Fund equal or exceed the reserve requirements.

The revenue bond documents specify that additional bonds may be issued by the Fund for the purpose of financing additions, replacements, and improvements to the City of Detroit Building Authority Parking Arena System, provided that the trustee shall have received all legally required authorized opinions and certificates and that the estimated gross revenues (as defined in the bond authorizing documents) for the five years following completion of the facilities will be at least (1) 175% of annual debt service on all parity outstanding bonds, or (2) the sum of annual debt service on all parity outstanding bonds (including the Additional Bonds) plus the amount necessary to make all required payments to the various funds maintained by the trustee, whichever is greater. Other than as described above, the Parking Fund may not issue any obligations secured by gross revenues from the System unless any resulting lien on the System's gross revenues is expressly subordinate to liens for the bondholders' or bank's benefit as described above.

**Sewage Disposal and Water Funds Construction Programs**

The Sewage Disposal Fund is engaged in a variety of projects that are part of a five-year Capital Improvement Program (the Program).  The total cost of this Program is anticipated to be approximately $2.1 billion through fiscal year 2007.  The Program is being primarily financed from revenues of the Sewer Fund and proceeds from the issuance of revenue bonds.

The Sewage Disposal Fund total construction contract commitments outstanding at June 30, 2005 were approximately $453 million.

The Water Fund is engaged in a variety of projects that are part of its Program.  The total cost of this Program is anticipated to be approximately $1.6 billion through fiscal year 2007.  The Program is being primarily financed from revenues of the Water Fund and proceeds from the issuance of revenue bonds.

The Water Fund total construction contract commitments outstanding at June 30, 2005 were approximately $101 million.

**Pension Plans:**

The City of Detroit Retirement System consists of the General Retirement System (GRS) and the Policemen and Firemen Retirement System (PFRS).  Each system is a single-employer plan composed of a Defined Benefit Plan and a Defined Contribution Annuity Plan.  The plans provide retirement, disability, and death benefits to plan members and beneficiaries.  The Systems issued publicly available financial reports that include financial statements and the required supplementary information.  The reports can be obtained from City of Detroit Retirement Systems, 2 Woodward Avenue, Coleman A. Young Municipal Center, Room 908, and Detroit, Michigan 48226.

These plans are administered in accordance with the City Charter and union contracts, which assign the authority to establish and amend contributions and benefit provisions to each plan's Board of Trustees.  The Systems' investment policies are governed in accordance with the State Public Act 314 of 1965, as amended.

The plans' financial statements are prepared using the accrual basis of accounting.  Plan member contributions are recognized in the period in which the contributions are due.  Employer contributions are recognized when due and the City has made a formal commitment to provide the contributions.  Benefits and refunds are recognized when due and payable, in accordance with the terms of each plan.

Plan investments are reported at fair value.  Short-term investments are reported at cost, which approximates fair value.  Securities traded on a national or international exchange are valued at last reported sales price at current exchange rates.  Mortgages are valued on the basis of future principal and interest payments and are discounted at prevailing interest rates for similar investments.  Investments that do not have an established market are reported at estimated fair value.

The City's policy is to fund normal costs and amortization of prior service costs.  The City is required to contribute at an actuarially determined rate.  The current rate is up to 27.34% of active annual payroll for the General Retirement System (depending on the bargaining unit) and 27.68% of active annual payroll for the Policemen and Firemen Retirement System.  Contributions from City funds and the Detroit Public Library fund, including accounts receivable for the year ended June 30, 2005, amounted to $776,281,025 and $693,967,089 for the General Retirement System and the Policemen and Firemen Retirement System, respectively.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
7/15/08 2013 11:32

Employee contributions for annuity savings are as follows:

• General Retirement System — Employees may elect to contribute 3%, 5%, or 7% of the first $87,900 of annual compensation and 5% or 7 % of any excess over $87,900. Contributions are voluntary for all union and non-union employees.

• Policemen and Firemen Retirement System — Mandatory contributions are 5% of base compensation until eligibility for retirement is reached.

Contributions received from employees during the year ended June 30, 2005 amounted to $22,648,662 and $10,430,854 respectively.

The contribution requirements of plan members and the City are established and may be amended by the Board of Trustees in accordance with the City Charter, union contracts, and plan provisions.

Members may retire with full benefits after attaining 30 years of service; age 55 with 30 years of service if hired after January 1, 1996; age 60 with 10 years of service; or age 65 with 8 years of service. Employees may retire after 25 years of service and collect an actuarially reduced retirement benefit. Monthly pension benefits, which are subject to certain minimum and maximum amounts, are determined according to fixed rates per year of credited service.

Members of the General Retirement System who separated prior to July 1, 1981, met the age and service requirements, and who did not withdraw their accumulated annuity contributions are generally eligible for a pension at the time they would have been eligible had they continued in City employment. Members who separate after July 1, 1981 are not required to leave their accumulated annuity contributions in the System. Pension benefits for all members of the GRS are increased annually by 2.25% of the original pension.

Police officers and firefighters hired prior to January 1, 1969 may retire after 25 years of service with full benefits and an escalator clause for future increases. Police officers and firefighters hired after January 1, 1969 may retire after 25 years of service with full benefits and a yearly cost-of-living adjustment of 2.25%. For those members of the PFRS who were hired after January 1, 1969, pension benefits are increased annually by 2.25% of the original pension. Police officers and firefighters hired before January 1, 1969 may elect at retirement increases based upon pay increases of active members or annual increases of 2.25% of the original pension.

Members of the Policemen and Firemen Retirement System who separated prior to July 1, 1982, met the age and service requirements, and who did not withdraw their accumulated annuity contributions are generally eligible for a pension at the time they would have been eligible had they continued in City employment. Members who separate after July 1, 1982 and meet the age and service requirements are able to withdraw their accumulated contributions and remain eligible for a benefit.

Employee contributions to both systems for annuity savings may be withdrawn upon separation from the City. At retirement, members have the option to withdraw all or part of their accumulated annuity contributions plus interest in either a lump sum or to receive monthly annuity payments. Employees in both systems may withdraw their annuity balance if they have accumulated 25 years of service. The following details the schedule of employer contributions (in millions):

| | General Retirement System | | | | Policemen and Firemen Retirement System | | | |
|---|---|---|---|---|---|---|---|---|
| Year Ended June 30 | Annual Pension Costs | Percentage Contributed | Net Pension Asset | | Year Ended June 30 | Annual Pension Costs | Percentage Contributed | Net Pension Asset |
| 2003 | 72.9 | 100 | — | | 2003 | 66.8 | 100 | — |
| 2004 | 95.9 | 100 | — | | 2004 | 69.5 | 100 | — |
| 2005 | 106.4 | 754 | $695.6 | | 2005 | 98.8 | 754 | $595.1 |

C-64

---

The annual pension costs and net pension assets as of the City June 30, 2005 are as follows:

| | | GRS | | | | |
|---|---|---|---|---|---|---|
| | | | Business-Type Activities | | | |
| | P&FRS Governmental Activities | Governmental Activities | Transportation Fund | Sewage Disposal Fund | Water Fund | Total Primary Government |
| Annual required contributions (ARC) | $ 98,842,261 | $ 63,450,814 | $ 15,992,663 | $ 6,359,722 | $ 17,571,543 | $ 202,217,003 |
| Annual pension cost | 98,842,261 | 63,450,814 | 15,992,663 | 6,359,722 | 17,571,543 | 202,217,003 |
| Contributions made (employer) | 693,967,089 | 480,048,802 | 113,998,169 | 14,210,003 | 168,024,051 | 1,470,248,114 |
| Changes in net pension asset | 595,124,828 | 416,597,988 | 98,005,506 | 7,850,281 | 150,452,508 | 1,268,031,111 |
| Net pension asset, beginning of year | — | — | — | — | — | — |
| Net pension asset, end of year | $ 595,124,828 | $ 416,597,988 | $ 98,005,506 | $ 7,850,281 | $ 150,452,508 | $ 1,268,031,111 |

The annual pension costs and net pension assets of the component units of the City as of June 30, 2005 are as follows:

| | Component Unit Detroit Public Library (GRS) |
|---|---|
| Annual required contributions | $ 2,990,354 |
| Annual pension cost | 2,990,354 |
| Contributions made (employer) | 25,643,892 |
| Changes in net pension asset | 22,653,538 |
| Net pension asset, beginning of year | — |
| Net pension asset, end of year | $ 22,653,538 |

| | Defined Benefit | | Defined Annuity Contributions | |
|---|---|---|---|---|
| | GRS | PFRS | GRS | PFRS |
| Retirees and beneficiaries receiving benefits | 11,396 | 8,465 | 1,521 | 1,335 |
| Terminated plan members entitled to but not yet receiving benefits | 1,109 | 25 | 231 | 46 |
| Active plan members | 9,820 | 4,652 | 9,249 | 4,195 |

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 188 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013

Significant actuarial assumptions used in preparing the accompanying Systems' financial statements for the year ended June 30, 2005 (the latest date available) are as follows:

| | General Retirement System | Policemen and Firemen Retirement System |
|---|---|---|
| Valuation Date (latest date available) | June 30, 2005 | June 30, 2005 |
| Actuarial Cost Method | Entry Age | Entry Age |
| Amortization Method | Level Percent | Level Percent |
| Remaining Amortization Period | 20 years | 12 years closed |
| Asset Valuation Method | 3-year Smoothed Market | 3-year Smoothed Market |
| Actuarial Assumptions: | | |
| Investment Rate of Return | 7.9% | 7.8% |
| Projected Salary Increases | 4.0% - 9.5% | 5.8% - 10.8% |
| Includes Inflation at | 4.0% | 4.8% |
| Cost-of-Living Adjustments | 2.25% | 2.25% |

Factors that significantly affect the identification of trends in the amounts reported include, for example, changes in benefit provisions, the size or composition of the population covered by the plans, or the actuarial methods and assumptions used.

Investment loss presented in the Statements of Net Assets in Fiduciary Funds for the Retirement Systems consist of interest income, dividend income, net depreciation, and investment expenses. GRS and PFRS were unable to break down each component by reserve fund as required in GASB Statement No. 25, *Financial Reporting for Defined Benefit Pension Plans and Note Disclosures for Defined Contribution Plans*; however, the Systems were able to present components in total:

| | GRS | PFRS |
|---|---|---|
| Investment Gain, Net: | | |
| Dividend Income | $ 18,472,422 | $ 33,856,957 |
| Interest Income | 110,870,114 | 97,801,386 |
| Net Apppreciation | 160,852,269 | 140,792,494 |
| Investment Expense | (13,780,153) | (12,581,933) |
| Total | $ 276,414,652 | $ 259,868,904 |

**Other Post-employment Benefits:** In addition to the pension benefits described above, the City provides post-retirement benefits to its retirees, which include hospitalization, dental care, eye care, and life insurance. The number of City retirees at June 30, 2005 is 22,451. Costs are accounted for in accordance with GASB Statement No. 12, *Disclosures of Information on Post-retirement Benefits Other Than Pension Benefits by State and Local Governmental Employers*. The benefits are provided in accordance with the City Charter and union contracts. The costs of benefits, which are financed on a pay-as-you-go basis, for the year ended June 30, 2005, are as follows:

| Benefit | City Cost | Retiree Cost | Total Cost |
|---|---|---|---|
| Hospitalization | $ 137,864,782 | $ 13,960,235 | $ 151,825,017 |
| Dental | 5,547,455 | — | 5,547,455 |
| Eye Care | 2,134,951 | — | 2,134,951 |
| Life Insurance | 167,444 | — | 167,444 |
| Total | $ 145,714,632 | $ 13,960,235 | $ 159,674,867 |

**Component Units**

The GDRRA is authorized to charge user fees for services provided to residents in the event either the tipping fees or supplemental tipping fees paid by the City and other revenues generated are not sufficient in each operating year to produce revenues equal to at least 100% of the maximum annual debt service requirement, lease obligations, and operating costs.

Supplemental tipping fees are provided from certain taxes collected by the State of Michigan which are payable to the City (Distributable Aid). The City's obligation to pay tipping fees and supplemental tipping fees is a full faith and credit limited tax general and unconditional obligation whether or not the facility is operating. For the year ended June 30, 2005, tipping fees and supplemental tipping fees paid by the City to the GDRRA are as follows:

| | | |
|---|---|---|
| Tipping Fees | $ | 65,693,555 |
| Supplemental Tipping Fees | | 16,530,000 |
| Total | $ | 82,223,555 |

**NOTE IV.  SUBSEQUENT EVENTS**

On July 7, 2005, the Mayor signed a Cooperative Endeavor Agreement with the United States Department of Housing and Urban Development (HUD) for the benefit of the Detroit Housing Commission (DHC). The agreement calls for the City to transfer all of DHC's assets, projects, and programs to HUD and for HUD to manage the day-to-day operations and reporting requirements of the DHC. The agreement dissolves the DHC 's Board of Commissioners. The agreement has an initial term of two years, and is renewable in one year increments thereafter. The Detroit Housing Commission will not be presented in the City's CAFR for the fiscal year ending June 30, 2006.

On September 22, 2005 the Water Supply System issued $25,975,000 SRF Junior Lien Revenue Bonds. The bonds begin to mature October 1, 2007 and will be fully matured in the year 2026.

In November 2005, Standard & Poor's revised the City's Unlimited Tax General Obligation Bond rating from BBB+ to BBB, the City's Limited Tax General Obligation Bond rating from BBB to BBB- and revised the outlook from stable to negative.

In November 2005, Moody's Investors Service revised the City's Unlimited Tax General Obligation Bonds rating from Baa1 to Baa2, the City's Limited Tax General Obligation Bond rating from Baa2 to Baa3 and revised the outlook from negative to stable.

In November 2005, a general election referendum was passed which transfers control of the School District of City of Detroit to a newly elected eleven (11) member School Board, effective January 1, 2006. The 11 Board members will consist of 7 members, one from each district, who will serve 2-year terms, and 4 at-large members representing the entire city who will serve 4-year terms. Thus the District will not be presented in the City's CAFR for June 30, 2006.

In December 2005, Fitch Ratings revised the City's Unlimited Tax General Obligation Bond rating from BBB+ to BBB, the City's Limited Tax General Obligation Bond rating from BBB+ to BBB and revised the outlook from stable to negative.

In December 2005, the City issued $82,565,000 Unlimited Tax General Obligation Bonds and Unlimited Tax General Obligation Refunding Bonds. Proceeds of $29.9 million were used to refund previously issued debt, resulting in present value savings of $913,916 or 3.0% of the refunded par amount. The bonds mature beginning April 1, 2006 and will be fully matured in the year 2025.

On March 1, 2006 the City entered into an agreement with the Detroit Zoological Society, a Michigan nonprofit corporation, to manage the operations of the Detroit Zoological Institute through June 30, 2020, a period of fifteen (15) years, with an option to renew of ten (10) years. The City retains ownership of all assets of the Detroit Zoological Institute, which includes the Detroit Zoological Park and the Belle Isle Nature Zoo. The agreement between the City and Zoological Society provides for the payment of capital funds in the amount of Five million dollars ($5,000,000) in fiscal year 2006 and an additional Five million dollars ($5,000,000) in fiscal year 2007. Upon transfer of the $5,000,000 payment in fiscal year 2006, the Zoological Society will transfer ownership of the new Ford Education Center to the City. The City also agreed to pay an operating subsidy for certain operating costs, insurance and security, totaling $900,000 per year for the first 2-years of the agreement, fiscal year 2006 and fiscal year 2007.

On March 22, 2006, the City entered into an agreement with the Detroit Historical Society, a Michigan nonprofit corporation, to manage the operations of the Detroit Historical Museums through June 30, 2015, a period of ten (10) years, with an option to renew of ten years. The City retains ownership of all the assets of the Detroit Historical Museums, which includes the

C-65

108                              (Continued)

109                              (Continued)

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 189 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
2013 11:32

City of Detroit, Michigan
NOTES TO BASIC FINANCIAL STATEMENTS
June 30, 2005

City of Detroit, Michigan
COMPREHENSIVE ANNUAL FINANCIAL REPORT
FOR THE YEAR ENDED JUNE 30, 2005

Detroit Historical Museum, the Dossin Great Lakes Museum and Historic Fort Wayne (including the Collections Resource Center). The City will retain the management of the operations of Historic Fort Wayne. The agreement between the City and Society provides for an annual operating subsidy of five hundred thousand dollars ($500,000) for the first three fiscal years of the agreement, fiscal years 2006, 2007 and 2008. For fiscal year 2006, the City agreed to pay all outstanding contractual obligations for operating services at the time of the transfer. The City also grants the Historical Society access to capital funds through the City's annual capital budget process. Currently, the City has authorization from the electorate to sell up to $20.02 million in general obligation bonds for capital improvements to the Detroit Historical Museum facilities.

C-66

REQUIRED

SUPPLEMENTARY

INFORMATION

OTHER THAN

MANAGEMENT'S

DISCUSSION &

ANALYSIS

(MD&A)

111

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

REQUIRED

SUPPLEMENTARY

INFORMATION-

GENERAL FUND

STATEMENT OF REVENUES

AND EXPENDITURES

-BUDGET TO ACTUAL

C-67

**City of Detroit**
**STATEMENT OF REVENUES, EXPENDITURES, AND**
**CHANGES IN FUND BALANCE — BUDGET AND ACTUAL**
**GENERAL FUND**
**For the Year Ended June 30, 2005**

| | Budgeted Amounts | | Actual Amounts | Variance Actual Over (Under) Budget |
|---|---|---|---|---|
| | Original | Final | | |
| **REVENUES:** | | | | |
| **Taxes:** | | | | |
| Property Taxes | $  215,696,948 | $  215,696,948 | $  178,957,463 | $  (36,739,485) |
| Municipal Income Tax | 319,008,000 | 319,008,000 | 282,501,875 | (36,506,125) |
| Utility Users' Tax | 55,000,000 | 55,000,000 | 52,939,839 | (2,060,161) |
| Wagering Taxes | 117,600,000 | 117,600,000 | 137,970,347 | 20,370,347 |
| Other Taxes and Assessments | 11,569,766 | 11,569,766 | 10,962,886 | (606,880) |
| Interest and Penalties on Taxes | 9,800,000 | 9,800,000 | 11,491,470 | 1,691,470 |
| Total Taxes, Assessments, Interest and Penalties | 728,674,714 | 728,674,714 | 674,823,880 | (53,850,834) |
| **Licenses, Permits and Inspection Charges:** | | | | |
| Business Licenses | 1,595,585 | 1,839,155 | 1,892,283 | 53,128 |
| Permits | 1,255,832 | 1,255,832 | 1,697,773 | 441,941 |
| Inspection Charges | 9,866,419 | 9,866,419 | 7,442,358 | (2,424,061) |
| Other Licenses | 96,157 | 96,157 | 28,641 | (67,516) |
| Total Licenses, Permits and Inspection Charges. | 12,813,993 | 13,057,563 | 11,061,055 | (1,996,508) |
| **Shared Taxes:** | | | | |
| Liquor and Beer License | 545,000 | 545,000 | 602,582 | 57,582 |
| State Shared Tax | 286,938,418 | 286,938,418 | 282,914,217 | (4,024,201) |
| Total Shared Taxes | 287,483,418 | 287,483,418 | 283,516,799 | (3,966,619) |
| **Intergovernmental:** | | | | |
| Federal | 5,402,963 | 5,029,661 | 26,522,887 | 21,493,226 |
| State | 54,495,391 | 12,735,431 | 23,511,241 | 10,775,810 |
| State Equity Grant | 1,170,400 | 1,170,400 | 1,076,931 | (93,469) |
| Other Grants | 3,739,549 | 179,117,798 | 16,346,773 | (162,771,025) |
| Total Grants | 64,808,303 | 198,053,290 | 67,457,832 | (130,595,458) |
| **Sales and Charges for Services:** | | | | |
| Maintenance and Construction | 1,234,846 | 1,234,846 | 1,509,134 | 274,288 |
| Other Labor and Materials | 300,000 | 300,000 | 347,868 | 47,868 |
| Electrical | 47,840,000 | 47,840,000 | 40,506,888 | (7,333,112) |
| Steam | 955,000 | 955,000 | 851,310 | (103,690) |
| Sanitation Charges | 823,897 | 823,897 | 662,841 | (161,056) |
| Recreation Fees | 7,020,797 | 7,020,797 | 5,175,375 | (1,845,422) |
| Collection Fees | 7,264,190 | 7,314,190 | 7,076,021 | (238,169) |
| Other Fees | 39,440,796 | 42,990,796 | 40,107,965 | (2,882,831) |
| Personal Services | 61,801,228 | 62,138,133 | 57,761,903 | (4,376,230) |
| Sales of Non-Capital Assets | - | - | - | - |
| Other Departmental Sales | 30,047,894 | 37,317,941 | 24,109,898 | (13,208,043) |
| Total Sales and Charges for Services | 196,748,648 | 207,935,600 | 178,109,203 | (29,826,397) |
| **Ordinance Fines** | 29,504,878 | 27,219,663 | 23,273,726 | (3,945,937) |
| **Revenue from Use of Assets:** | | | | |
| Earnings on Investments | 3,087,000 | 2,801,531 | 2,380,653 | (420,878) |
| Real Estate Rentals | 9,160,886 | 9,160,886 | 7,414,207 | (1,746,679) |
| Concessions | 5,054,456 | 5,054,456 | 2,837,924 | (2,216,532) |
| Sale of Real Property | 33,410,000 | 33,410,000 | 6,013,792 | (27,396,208) |
| Total Revenue from Use of Assets | 50,712,342 | 50,426,873 | 18,646,576 | (31,780,297) |
| **Other Revenue** | 40,813,259 | 60,388,979 | 100,134,090 | 39,745,111 |
| Total Revenues | 1,411,559,555 | 1,573,240,100 | 1,357,023,161 | (216,216,939) |

(Continued)

**City of Detroit**
**STATEMENT OF REVENUES, EXPENDITURES, AND**
**CHANGES IN FUND BALANCE — BUDGET AND ACTUAL**
**GENERAL FUND**
**For the Year Ended June 30, 2005**

| | Original | Final | Actual Amounts | Variance Actual Over (Under) Budget |
|---|---|---|---|---|
| **EXPENDITURES:** | | | | |
| **Public Protection:** | | | | |
| Consumer Affairs | 1,314,854 | 1,556,813 | 1,210,811 | (346,002) |
| Fire | 207,441,391 | 209,926,211 | 202,172,068 | (7,754,143) |
| Human Rights | 2,359,312 | 2,352,587 | 2,081,368 | (271,219) |
| Ombudsperson | 1,457,978 | 1,452,093 | 1,457,015 | 4,922 |
| Parking Enforcement | 9,793,095 | 9,700,247 | 9,074,181 | (626,066) |
| Police | 475,234,439 | 507,793,222 | 454,600,253 | (53,192,969) |
| Detroit Office of Homeland Security | 620,254 | 8,664,317 | 677,940 | (7,986,377) |
| 36th District Court | 49,470,064 | 49,511,893 | 45,454,181 | (4,057,712) |
| Total Public Protection | 747,691,387 | 790,957,383 | 716,727,817 | (74,229,566) |
| Department of Health | 97,473,647 | 100,732,152 | 87,862,830 | (12,869,322) |
| **Recreation and Culture:** | | | | |
| Culture, Arts and Tourism | 1,681,885 | 2,398,072 | 1,152,913 | (1,245,159) |
| Historical | 3,579,640 | 3,566,321 | 2,995,693 | (570,628) |
| Recreation | 50,042,927 | 47,416,336 | 44,924,914 | 2,508,578 |
| Senior Citizens | 1,294,920 | 2,138,068 | 932,042 | (1,206,026) |
| Zoological Institute | 14,029,400 | 14,357,011 | 12,492,833 | (1,864,178) |
| Total Recreation and Culture | 70,628,772 | 69,875,808 | 67,498,395 | (2,377,413) |
| Economic Development — Civic Center | 26,863,409 | 25,310,350 | 23,541,123 | (1,769,227) |
| **Housing Supply and Conditions:** | | | | |
| Planning and Development | 11,433,365 | 23,773,549 | 12,486,977 | (11,286,572) |
| Total Housing Supply and Conditions | 11,433,365 | 23,773,549 | 12,486,977 | (11,286,572) |
| **Physical Environment:** | | | | |
| Environmental Affairs | 2,594,658 | 4,503,223 | 2,319,583 | (2,183,640) |
| Public Lighting | 65,907,104 | 65,462,349 | 69,060,774 | 3,598,425 |
| Public Works | 183,411,745 | 183,717,019 | 185,239,556 | 1,522,537 |
| Total Physical Environment | 251,913,507 | 253,682,591 | 256,619,913 | 2,937,322 |
| **Development and Management:** | | | | |
| Auditor General | 3,299,800 | 3,298,236 | 2,669,338 | (628,898) |
| Budget | 3,426,505 | 3,423,757 | 3,084,852 | (338,905) |
| City Clerk | 4,417,596 | 4,373,775 | 3,770,777 | (602,998) |
| City Council | 18,019,661 | 18,083,380 | 14,780,744 | (3,302,636) |
| Communications & Creative Services | 2,906,588 | 2,899,883 | 2,467,503 | (432,380) |
| Elections | 10,773,348 | 10,704,128 | 10,551,156 | (152,972) |
| Finance | 48,900,999 | 49,876,483 | 40,501,832 | (9,374,651) |
| Law | 27,121,937 | 28,396,285 | 26,884,967 | (1,511,318) |
| Mayor's Office | 11,356,692 | 11,595,397 | 9,653,665 | (1,941,732) |
| Human Resources | 32,330,117 | 32,291,316 | 25,904,262 | (6,387,054) |
| Information Technology Services | 31,361,734 | 31,385,622 | 24,294,443 | (7,091,179) |
| Board of Zoning Appeals | 973,677 | 971,884 | 844,025 | (127,859) |
| Detroit Workforce Development Department | 2,000 | 605,311 | 1,124 | (604,187) |
| Dept. of Administrative Hearings | 2,265,667 | 2,266,167 | 898,772 | (1,367,395) |
| Non Departmental | 14,164,289 | 171,392,092 | 31,501,316 | (139,890,776) |
| Total Development and Management | 211,320,610 | 371,563,716 | 197,808,776 | (173,754,940) |
| Capital Outlay | 69,436,133 | 97,531,721 | 124,712,800 | 27,181,079 |
| (Continued) | | | | |

**City of Detroit**
**STATEMENT OF REVENUES, EXPENDITURES, AND**
**CHANGES IN FUND BALANCE — BUDGET AND ACTUAL**
**GENERAL FUND**
**For the Year Ended June 30, 2005**

| | Original | Final | Actual Amounts | Variance Actual Over (Under) Budget |
|---|---|---|---|---|
| **Debt Service:** | | | | |
| Bond Issuance Costs | 24,000 | 24,000 | 5,192,701 | 5,168,701 |
| Total Debt Service | 24,000 | 24,000 | 5,192,701 | 5,168,701 |
| Total Expenditures | 1,486,784,830 | 1,733,451,270 | 1,492,451,332 | (240,999,938) |
| Excess (Deficiency) of Revenues Over (Under) Expenditures | (75,225,275) | (160,211,170) | (135,428,171) | 24,782,999 |
| **OTHER FINANCING SOURCES (USES):** | | | | |
| **Sources:** | | | | |
| **Transfers from Other Funds:** | | | | |
| Transfers In | 119,091,664 | 121,743,983 | 33,051,546 | (88,692,437) |
| Proceeds of Capital Leases | 315,351 | 315,351 | 315,351 | - |
| Premium on Capital Related Debt | 5,974,832 | 5,974,832 | 5,974,832 | - |
| Sale of General Obligation Bonds | 141,215,335 | 223,167,013 | 242,150,000 | 18,982,987 |
| Total Other Financing Sources | 266,597,182 | 351,201,179 | 281,491,729 | (69,709,450) |
| **Uses:** | | | | |
| **Transfers to Other Funds:** | | | | |
| Transfers Out | 182,677,300 | 182,377,868 | 136,651,053 | (45,726,815) |
| Principal Paid to Bond Agent for Refunded Bonds | 57,357,145 | 57,357,145 | 92,640,000 | 35,282,855 |
| Interest Paid On Refunded Bonds | 4,213,845 | 4,131,379 | 4,213,845 | 82,466 |
| Total Other Financing Uses | 244,248,290 | 243,866,392 | 233,504,898 | (10,361,494) |
| Total Other Financing Sources and Uses | 22,348,892 | 107,334,787 | 47,986,831 | (59,347,956) |
| Net Change in Fund Balance | (52,876,383) | (52,876,383) | (87,441,340) | (34,564,957) |
| Fund Balance at Beginning of Year | 52,876,383 | 52,876,383 | 69,216,269 | 16,339,886 |
| Increase (Decrease) in Inventories | - | - | (15,369,363) | (15,369,363) |
| Fund Balance at End of Year | $ - | $ - | $ (33,594,434) | $ (33,594,434) |

See accompanying independent auditors' report

C-68

114
115

13-53846-tjt   Doc 348-7   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 192 of 248

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 192 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

**City of Detroit, Michigan**
COMPREHENSIVE ANNUAL FINANCIAL REPORT
FOR THE YEAR ENDED JUNE 30, 2005

REQUIRED SUPPLEMENTAL INFORMATION
HISTORIC PENSION DATA - UNAUDITED

REQUIRED

SUPPLEMENTARY

INFORMATION-

HISTORIC PENSION DATA

C-69

Schedule of Employer Contributions (In millions):

| General Retirement System | | | | | Policemen and Firemen Retirement System | | | |
|---|---|---|---|---|---|---|---|---|
| Year Ended June 30 | Annual Required Contributions | Percentage Contributed | Net Pension Asset | | Year Ended June 30 | Annual Required Contributions | Percentage Contributed | Net Pension Asset |
| 2001 | $68.1 | 100% | | | 2001 | 14.4 | 100% | |
| 2002 | 67.8 | 100 | | | 2002 | 8.4 | 100 | |
| 2003 | 72.9 | 100 | | | 2003 | 66.8 | 100 | |
| 2004 | 95.9 | 100 | | | 2004 | 69.5 | 100 | |
| 2005 | 106.4 | 754 | $695.6 | | 2005 | 98.8 | 702 | $595.1 |

Schedule of Funding Progress (In millions):

General Retirement System:

| Actuarial Valuation Date June 30 | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Funded Ratio | Unfunded AAL (UAAL) | Covered Payroll | UAAL as a Percentage of Payroll |
|---|---|---|---|---|---|---|
| 2001 (a) (b) | $2,912.1 | $3,179.6 | 91.6% | $267.5 | $439.6 | 60.8% |
| 2002 | 2,761.2 | 3,276.6 | 84.3 | 515.4 | 440.7 | 117.0 |
| 2003 | 2,537.7 | 3,270.6 | 77.6 | 733.0 | 448.6 | 163.4 |
| 2004 | 2,470.2 | 3,383.9 | 73.0 | 913.7 | 444.6 | 205.5 |
| 2005 | 3,222.4 | 3,347.4 | 96.3 | 125.0 | 390.6 | 32.0 |

Policemen and Firemen Retirement System:

| Actuarial Valuation Date June 30 | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Funded Ratio | Unfunded AAL (UAAL) | Covered Payroll | UAAL as a Percentage of Payroll |
|---|---|---|---|---|---|---|
| 2001 (a) (b) | $3,900.0 | $3,463.2 | 112.6% | $(436.8) | $253.3 | - |
| 2002 (a) | 3,635.1 | 3,523.4 | 103.2 | (111.7) | 248.7 | - |
| 2003 | 3,205.5 | 3,721.6 | 86.1 | 516.1 | 248.7 | 207.5 |
| 2004 | 3,074.5 | 3,857.5 | 79.7 | 783.0 | 258.7 | 302.7 |
| 2005 | 3,757.9 | 3,780.4 | 99.0 | 22.6 | 250.5 | 9.0 |

a) After changes in actuarial assumptions.
b) Plan amended.

See accompanying independent auditors' report.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:33

# COMBINING

# FINANCIAL

# INFORMATION —

# NON-MAJOR

# GOVERNMENTAL

# FUNDS

C-70

## SPECIAL REVENUE FUNDS

**ARE ESTABLISHED TO ACCOUNT FOR THE PROCEEDS OF SPECIFIC REVENUE SOURCES (OTHER THAN CERTAIN MAJOR CAPITAL FACILITIES) THAT ARE RESTRICTED BY LAW AND ADMINISTRATIVE ACTION TO EXPENDITURES FOR SPECIFIED PURPOSES**

| | |
|---|---|
| Community Development Block Grant Funds | To account for activities financed by Federal Government Grants under Title I of the Housing and Community Development Act of 1974. |
| Construction Code Fund | In accordance with State of Michigan Public Act No. 245 of 1999, to account for financing activities related to the acts and services performed by the Building and Safety Fund including, without limitation, issuance of building permits, examination of plans and specifications, inspection of construction undertaken pursuant to a building permit, the issuance of certificates of use and occupancy, and hearing appeals in accordance with this act. |
| Detroit Building Authority Fund | To account for financing activities associated with acquiring, improving, operating and maintaining buildings and other structures for public purposes. |
| Drug Law Enforcement Fund | To account for forfeited narcotics proceeds that are used for the enhancement of narcotics enforcement. |
| Empowerment Zone Fund | To account for activities financed by Federal Government Grants under provision of Section 2007 of Title XX of the Social Security Act as amended. |
| Detroit Workforce Development Department | To account for employment and training program grants received from government sources. |
| Human Services Fund | To account for Federal and State Grant revenues that are used to finance certain social service programs. |
| General Retirement Systems Service Corporation | To account for the proceeds and service payments related to the issuance of the Pension Obligation Certificates in June of 2005. |
| Police and Fire Retirement Systems Service Corporation | To account for the proceeds and service payments related to the issuance of the Pension Obligation Certificates in June of 2005. |
| Major and Local Street Funds | To account for Michigan State Gas and Weight Tax revenues and other related grants used for the construction and maintenance of major and local streets. |
| Supportive Housing Programs and Homeless Initiatives Funds | To account for financing activities of Supportive Housing Programs for the Homeless received from the Federal Government. |
| Targeted Business Development Fund | To account for revenues received via the casino development agreements earmarked to foster the presence of minority businesses in the City. |

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

### CAPITAL PROJECTS FUNDS

**CAPITAL PROJECTS FUNDS ARE ESTABLISHED TO ACCOUNT FOR FINANCIAL RESOURCES TO BE USED FOR THE ACQUISITION OR CONSTRUCTION OF MAJOR CAPITAL FACILITIES (OTHER THAN THOSE FINANCED BY SPECIAL REVENUE FUNDS AND PROPRIETARY FUNDS)**

**Capital Projects Fund** — To account for all funds used for the construction, acquisition and renovation of Capital facilities by the General Fund.

**Urban Renewal Fund** — To account for funding received from the City of Detroit and the Federal Government earmarked for the acquisition and site preparation of property for future development.

### DEBT SERVICE FUND

**DEBT SERVICE FUND IS ESTABLISHED TO ACCOUNT FOR THE ACCUMULATION OF RESOURCES FOR THE PAYMENT OF DEBT AND PRINCIPAL AND INTEREST OF CERTAIN PROPRIETARY FUNDS' GENERAL OBLIGATIONS**

### PERMANENT FUNDS

**ACCOUNT FOR PRINCIPAL TRUST AMOUNTS RECEIVED AND RELATED INTEREST INCOME. THE INTEREST PORTION OF THE TRUST IS USED TO MAINTAIN THE COMMUNITY CEMETERY.**

**PERPETUAL CARE — BEQUEST FUND**
**TO ACCOUNT FOR INCOME AND DISBURSEMENTS OF BEQUESTS ACCEPTED BY THE CITY.**

C-71

**THIS PAGE LEFT BLANK INTENTIONALLY**

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 5.08:2013 11:3...

**City of Detroit, Michigan**
**COMBINING BALANCE SHEET**
**NON-MAJOR GOVERNMENTAL FUNDS**
**June 30, 2005**

| ASSETS | Special Revenue Funds | Debt Service Fund | Capital Projects Funds | Permanent Funds Bequest Fund | Total |
|---|---|---|---|---|---|
| **Current Assets** | | | | | |
| Cash | $ 20,607,161 | $ 7,688 | $ 2,221,942 | $ 47,344 | $ 22,884,135 |
| Investments | 88,647,226 | 1,200,865 | 136,063,006 | 1,097,814 | 227,008,911 |
| **Accounts and Contracts Receivable:** | | | | | |
| Due from Other Funds | 4,651,893 | - | 1,977,302 | - | 6,629,195 |
| Due from Other Governmental Agencies | 29,968,385 | - | 567,116 | - | 30,535,501 |
| General Taxes Receivable on Real and Personal Property (Net) | - | 20,478,737 | - | - | 20,478,737 |
| Other Receivables | 881,466 | - | 354,558 | - | 1,236,024 |
| Total Accounts and Contracts Receivable | 35,501,744 | 20,478,737 | 2,898,976 | - | 58,879,457 |
| Allowance for Uncollectible Accounts | (428,532) | (16,475,000) | (188,000) | - | (17,091,532) |
| Total Accounts and Contracts Receivable - Net | 35,073,212 | 4,003,737 | 2,710,976 | - | 41,787,925 |
| Taxes, Interest and Penalties--Net | - | 2,005,000 | - | - | 2,005,000 |
| Current Special Assessments Receivable | - | - | 347,225 | - | 347,225 |
| Prepaid Expenditures | 127,636 | - | - | - | 127,636 |
| Inventory--Forfeited Property | 250,875 | - | - | - | 250,875 |
| Other Inventory | 677,208 | - | - | - | 677,208 |
| Total Current Assets | 145,383,318 | 7,217,290 | 141,343,149 | 1,145,158 | 295,088,915 |
| **Restricted Assets:** | | | | | |
| Cash | 1,001,831 | 32,203,497 | 30,234,856 | 108,465 | 63,548,649 |
| Total Assets | $ 146,385,149 | $ 39,420,787 | $ 171,578,005 | $ 1,253,623 | $ 358,637,564 |
| **Liabilities:** | | | | | |
| Accounts and Contracts Payable | $ 17,001,472 | $ - | $ 26,352,524 | $ - | $ 43,353,996 |
| Due to Other Funds | 9,902,480 | 2,328,825 | 4,183,436 | - | 16,414,741 |
| Advances from Other Funds | 145,674 | - | 850,000 | - | 995,674 |
| Due to Other Governmental Agencies | 5,196,450 | 704,821 | - | - | 5,901,271 |
| Deposits from Vendors and Customers | 2,847,640 | - | - | - | 2,847,640 |
| Accrued Salaries and Wages Payable | 1,937,814 | - | - | - | 1,937,814 |
| Accrued Liabilities | 13,564,749 | - | - | - | 13,564,749 |
| Accrued Liabilities | 1,547,110 | - | 124,113 | - | 1,671,223 |
| Deferred Revenue | 2,398,483 | 7,325,737 | 255,050 | - | 9,979,270 |
| Total Liabilities | 54,541,872 | 10,359,383 | 31,765,123 | - | 96,666,378 |
| **Fund Balances:** | | | | | |
| Reserved for Inventory | 928,083 | - | - | - | 928,083 |
| Reserved for Encumbrances | 14,018,549 | - | - | - | 14,018,549 |
| Reserved for Endowments and Trusts | - | - | - | 1,253,623 | 1,253,623 |
| Reserved for Debt Service | - | 29,061,404 | - | - | 29,061,404 |
| Reserved for Capital Projects | - | - | 139,812,882 | - | 139,812,882 |
| Undesignated | 76,896,645 | - | - | - | 76,896,645 |
| Total Fund Balances | 91,843,277 | 29,061,404 | 139,812,882 | 1,253,623 | 261,971,186 |
| Total Liabilities and Fund Balances | $ 146,385,149 | $ 39,420,787 | $ 171,578,005 | $ 1,253,623 | $ 358,637,564 |

See accompanying independent auditors' report.

C-72

122

---

**City of Detroit, Michigan**
**COMBINING STATEMENT OF REVENUES, EXPENDITURES AND**
**CHANGES IN FUND BALANCES**
**NON-MAJOR GOVERNMENTAL FUNDS**
**For the Year Ended June 30, 2005**

| | Special Revenue Funds | Debt Service Fund | Capital Projects Funds | Permanent Funds Bequest Fund | Total |
|---|---|---|---|---|---|
| **REVENUES:** | | | | | |
| **Taxes:** | | | | | |
| Property Taxes | $ - | $ 59,813,679 | $ - | $ - | $ 59,813,679 |
| Other Taxes and Assessments | - | 2,602,232 | - | - | 2,602,232 |
| State Hotel and Liquor Tax | - | 16,310,767 | - | - | 16,310,767 |
| Licenses, Permits and Inspection Charges | 23,945,463 | - | - | - | 23,945,463 |
| **Intergovernmental:** | | | | | |
| Federal | 225,212,352 | - | 24,637,235 | - | 249,849,587 |
| State | 13,356,134 | - | - | - | 13,356,134 |
| Gas and Weight Tax | 63,476,425 | - | - | - | 63,476,425 |
| Sales and Charges for Services | 5,185,630 | - | - | - | 5,185,630 |
| Ordinance Fines | 4,207,916 | - | - | - | 4,207,916 |
| Revenue from Use of Assets | - | 516,134 | - | - | 516,134 |
| Earnings on Investments | 1,028,610 | 1,276,054 | 9,673,567 | 20,803 | 11,999,034 |
| Other Revenue | 3,337,774 | 2,065,164 | 26,120,864 | - | 31,523,802 |
| Total Revenues | 339,750,304 | 82,584,030 | 60,431,666 | 20,803 | 482,786,803 |
| **EXPENDITURES:** | | | | | |
| **Current:** | | | | | |
| Public Protection | 38,159,175 | - | - | - | 38,159,175 |
| Health | 81,781,875 | - | - | - | 81,781,875 |
| Economic Development | 68,937,989 | 4,165,500 | - | - | 73,103,489 |
| Educational Development | 73,837,899 | - | - | - | 73,837,899 |
| Housing and Conditions | 5,795,925 | - | - | - | 5,795,925 |
| Transportation | 46,272,594 | - | - | - | 46,272,594 |
| **Debt Service:** | | | | | |
| Principal | - | 73,544,336 | - | - | 73,544,336 |
| Interest | - | 51,462,415 | - | - | 51,462,415 |
| Bond Issuance Costs | - | - | 2,299,818 | - | 2,299,818 |
| Capital Outlay | - | - | 157,832,908 | - | 157,832,908 |
| Total Expenditures | 314,785,457 | 129,172,251 | 160,132,726 | - | 604,090,434 |
| Excess (Deficiency) of Revenues Over (Under) Expenditures | 24,964,847 | (46,588,221) | (99,701,060) | 20,803 | (121,303,631) |
| **OTHER FINANCING SOURCES (USES):** | | | | | |
| **Sources:** | | | | | |
| **Transfers In:** | | | | | |
| General Fund | 8,234,889 | 38,830,859 | - | - | 47,065,748 |
| General Debt Service Fund | - | - | 37,469,125 | - | 37,469,125 |
| Special Revenue Funds | 19,668,260 | 3,821,110 | - | - | 23,489,370 |
| Total Transfers In | 27,903,149 | 42,651,969 | 37,469,125 | - | 108,024,243 |
| Proceeds of Refund Debt | 7,789,000 | - | - | - | 7,789,000 |
| Proceeds from Capital Related Debt Issuance | - | - | 111,680,000 | - | 111,680,000 |
| Premium on General Obligation Bonds Issued | - | - | 7,039,843 | - | 7,039,843 |
| Total Other Financing Sources | 35,692,149 | 42,651,969 | 156,188,968 | - | 234,533,086 |
| **Uses:** | | | | | |
| **Transfers Out:** | | | | | |
| General Fund | 33,051,547 | - | - | - | 33,051,547 |
| Capital Projects Fund | - | 37,469,125 | - | - | 37,469,125 |
| Debt Service Fund | 3,821,110 | - | - | - | 3,821,110 |
| Special Revenue Funds | 19,668,260 | - | - | - | 19,668,260 |
| Total Transfers Out | 56,540,917 | 37,469,125 | - | - | 94,010,042 |
| Principal Paid to Bond Agent for Refunded Bonds | - | - | 69,160,000 | - | 69,160,000 |
| Interest Paid to Bond Agent for Refunded Bonds | - | - | 6,651,575 | - | 6,651,575 |
| Total Other Financing Sources (Uses) | 56,540,917 | 37,469,125 | 75,811,575 | - | 169,821,617 |
| Total Other Financing Sources (Uses) | (20,848,768) | 5,182,844 | 80,377,393 | - | 64,711,469 |
| Net Change in Fund Balances | 4,116,079 | (41,405,377) | (19,323,667) | 20,803 | (56,592,162) |
| Fund Balances at Beginning of Year | 87,812,776 | 70,466,781 | 159,136,549 | 1,232,820 | 318,648,926 |
| Decrease in Inventories | (85,578) | - | - | - | (85,578) |
| Fund Balances at End of Year | $ 91,843,277 | $ 29,061,404 | $ 139,812,882 | $ 1,253,623 | $ 261,971,186 |

See accompanying independent auditors' report.

123

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08:2013 11:32

**City of Detroit, Michigan**
**COMBINING BALANCE SHEET**
**NON-MAJOR GOVERNMENTAL FUNDS – SPECIAL REVENUE FUNDS**
June 30, 2005

C-73

| ASSETS | Community Development Block Grant Funds | Construction Code Fund | Detroit Building Authority Fund | Drug Law Enforcement Fund | Empowerment Zone Fund | Detroit Workforce Development Department | Human Services Fund | Street Funds | Supportive Housing Programs and Homeless Initiatives Funds | Targeted Business Development Fund | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current Assets:** | | | | | | | | | | | |
| Cash | $ 1,388,485 | $ 3,002,515 | $ 2,146,303 | $ 355,187 | $ 1,157,520 | $ 5,472,405 | $ 5,613,144 | $ 1,371,702 | $ 99,900 | $ - | $ 20,607,161 |
| Investments | - | - | - | 17,147,226 | - | 39,000,000 | - | - | - | 32,500,000 | 88,647,226 |
| **Accounts and Contracts Receivable:** | | | | | | | | | | | |
| Due from Other Funds | 2,087,629 | 348,209 | 179,985 | - | 61,189 | 206,080 | 1,674,934 | 93,867 | - | - | 4,651,893 |
| Due from Other Governmental Agencies | 7,522,442 | 58,077 | - | - | 4,802,196 | 5,183,204 | - | 11,936,751 | 465,715 | - | 29,968,385 |
| Other Receivables | 401,667 | 419,357 | - | - | - | - | - | 60,442 | - | - | 881,466 |
| Total Accounts and Contracts Receivable | 10,011,738 | 825,643 | 179,985 | - | 4,863,385 | 5,389,284 | 1,674,934 | 12,091,060 | 465,715 | - | 35,501,744 |
| Allowance for Uncollectible Accounts | (37,608) | (345,200) | - | - | - | - | - | (45,724) | - | - | (428,532) |
| Total Accounts and Contracts Receivable - Net | 9,974,130 | 480,443 | 179,985 | - | 4,863,385 | 5,389,284 | 1,674,934 | 12,045,336 | 465,715 | - | 35,073,212 |
| Prepaid Expenditures | - | - | - | - | - | 127,636 | - | - | - | - | 127,636 |
| Inventory–Forfeited Property | - | - | - | 250,875 | - | - | - | - | - | - | 250,875 |
| Other Inventory | - | 48,009 | - | - | - | - | - | 629,199 | - | - | 677,208 |
| Total Current Assets | 11,362,615 | 3,530,967 | 2,326,288 | 17,753,288 | 6,020,905 | 10,989,325 | 7,288,078 | 53,046,237 | 565,615 | 32,500,000 | 145,383,318 |
| **Restricted Assets:** | | | | | | | | | | | |
| Cash | 1,001,831 | - | - | - | - | - | - | - | - | - | 1,001,831 |
| **Total Assets** | 12,364,446 | 3,530,967 | 2,326,288 | 17,753,288 | 6,020,905 | 10,989,325 | 7,288,078 | 53,046,237 | 565,615 | 32,500,000 | 146,385,149 |
| **LIABILITIES, AND FUND BALANCES** | | | | | | | | | | | |
| **Liabilities:** | | | | | | | | | | | |
| Accounts and Contracts Payable | 2,056,612 | 34,212 | 341,170 | 496,565 | 68,898 | 7,765,575 | 2,980,772 | 3,101,578 | 156,090 | - | 17,001,472 |
| Due to Other Funds | 4,757,090 | 1,233,248 | 912,027 | 31,670 | 953,677 | 863,213 | 628,102 | 499,743 | 23,710 | - | 9,902,480 |
| Advances from Other Funds | - | - | - | - | - | 145,674 | - | - | - | - | 145,674 |
| Due to Other Governmental Agencies | - | - | - | - | - | 1,363,974 | 427,962 | 3,404,514 | - | - | 5,196,450 |
| Deposits from Vendors and Customers | - | 4,487 | - | 2,843,153 | - | - | - | - | - | - | 2,847,640 |
| Accrued Salaries and Wages Payable | 571,927 | 622,145 | - | 21,199 | 29,397 | 412,607 | 280,539 | - | - | - | 1,937,814 |
| Accrued Liabilities | 3,654,544 | 1,378,968 | - | 300,246 | 4,968,933 | 438,282 | 572,220 | 1,865,741 | 385,815 | - | 13,564,749 |
| Other Liabilities | 1,324,273 | - | 222,837 | - | - | - | - | - | - | - | 1,547,110 |
| Deferred Revenue | - | - | - | - | - | - | 2,398,483 | - | - | - | 2,398,483 |
| Total Liabilities | 12,364,446 | 3,273,060 | 1,476,034 | 3,692,833 | 6,020,905 | 10,989,325 | 7,288,078 | 8,871,576 | 565,615 | - | 54,541,872 |
| **Fund Balances:** | | | | | | | | | | | |
| Reserved for Inventory | - | 48,009 | - | 250,875 | - | - | - | 629,199 | - | - | 928,083 |
| Reserved for Encumbrances | - | 208,969 | - | 13,809,580 | - | - | - | - | - | - | 14,018,549 |
| Undesignated | - | 929 | 850,254 | - | - | - | - | 43,545,462 | - | 32,500,000 | 76,896,645 |
| Total Fund Balances | - | 257,907 | 850,254 | 14,060,455 | - | - | - | 44,174,661 | - | 32,500,000 | 91,843,277 |
| **Total Liabilities and Fund Balances** | $ 12,364,446 | $ 3,530,967 | $ 2,326,288 | $ 17,753,288 | $ 6,020,905 | $ 10,989,325 | $ 7,288,078 | $ 53,046,237 | $ 565,615 | $ 32,500,000 | $ 146,385,149 |

See accompanying independent auditors' report.

124

125

13-53846-tjt   Doc 348-7   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 197 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 197 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
08/15/2013 11:32

**City of Detroit, Michigan**
**COMBINING STATEMENT OF REVENUES, EXPENDITURES AND**
**CHANGES IN FUND BALANCES**
**NON-MAJOR GOVERNMENTAL FUNDS - SPECIAL REVENUE FUNDS**
For the Year Ended June 30, 2005

C-74

| | Community Development Block Grant Fund | Construction Code Fund | Detroit Building Authority | Drug Law Enforcement Fund | Empowerment Zone Fund | Detroit Workforce Development Department | Human Services Fund | Street Funds | Supportive Housing Programs and Homeless Initiatives Funds | Targeted Business Development Fund | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUES:** | | | | | | | | | | | |
| Licenses, Permits and Inspection Charges | $ - | $ 23,945,463 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 23,945,463 |
| Intergovernmental: | | | | | | | | | | | |
| Federal | 59,785,281 | - | - | - | 11,464,565 | 73,837,899 | 74,328,682 | - | 5,795,925 | - | 225,212,352 |
| State | - | - | - | - | - | - | 2,885,506 | 10,470,628 | - | - | 13,356,134 |
| Gas and Weight Tax | - | - | - | - | - | - | - | 63,476,425 | - | - | 63,476,425 |
| Sales and Charges for Services | 5,112,710 | 72,920 | - | - | - | - | - | - | - | - | 5,185,630 |
| Ordinance Fines and Forfeitures | - | 504,880 | - | 3,703,036 | - | - | - | - | - | - | 4,207,916 |
| Earnings on Investments | - | - | - | 306,083 | - | - | - | 722,527 | - | - | 1,028,610 |
| Other Revenue | - | - | 2,189,455 | 224,273 | - | - | 300,000 | 624,046 | - | - | 3,337,774 |
| **Total Revenues** | 64,897,991 | 24,523,263 | 2,189,455 | 4,233,392 | 11,464,565 | 73,837,899 | 77,514,188 | 75,293,626 | 5,795,925 | - | 339,750,304 |
| **EXPENDITURES:** | | | | | | | | | | | |
| Current: | | | | | | | | | | | |
| Public Protection | - | 35,413,572 | - | 2,745,603 | - | - | - | - | - | - | 38,159,175 |
| Health | - | - | - | - | - | - | 81,781,875 | - | - | - | 81,781,875 |
| Economic Development | 55,495,894 | - | 1,977,530 | - | 11,464,565 | - | - | - | - | - | 68,937,989 |
| Educational Development | - | - | - | - | - | 73,837,899 | - | - | - | - | 73,837,899 |
| Housing and Conditions | - | - | - | - | - | - | - | - | 5,795,925 | - | 5,795,925 |
| Transportation Facilitation | - | - | - | - | - | - | - | 46,272,594 | - | - | 46,272,594 |
| **Total Expenditures** | 55,495,894 | 35,413,572 | 1,977,530 | 2,745,603 | 11,464,565 | 73,837,899 | 81,781,875 | 46,272,594 | 5,795,925 | - | 314,785,457 |
| Excess (Deficiency) of Revenues Over (Under) Expenditures | 9,402,097 | (10,890,309) | 211,925 | 1,487,789 | - | - | (4,267,687) | 29,021,032 | - | - | 24,964,847 |
| Other Financing Sources: | | | | | | | | | | | |
| Proceeds of Federal Note | 7,789,000 | - | - | - | - | - | - | - | - | - | 7,789,000 |
| Transfers In: | | | | | | | | | | | |
| General Fund | - | 461,106 | 1,006,096 | - | - | - | 4,267,687 | - | - | 2,500,000 | 8,234,889 |
| Community Development Block Grant Fund | - | 10,668,260 | - | - | - | - | - | - | - | - | 10,668,260 |
| Major Street Fund | - | - | - | - | - | - | - | 9,000,000 | - | - | 9,000,000 |
| Total Transfers In | - | 11,129,366 | 1,006,096 | - | - | - | 4,267,687 | 9,000,000 | - | 2,500,000 | 27,903,149 |
| Total Other Financing Sources | 7,789,000 | 11,129,366 | 1,006,096 | - | - | - | 4,267,687 | 9,000,000 | - | 2,500,000 | 35,692,149 |
| Other Financing Uses: | | | | | | | | | | | |
| Transfers Out: | | | | | | | | | | | |
| Construction Code Fund | 10,668,260 | - | - | - | - | - | - | - | - | - | 10,668,260 |
| General Fund | 2,701,727 | - | - | - | - | - | - | 30,349,820 | - | - | 33,051,547 |
| General Debt Service Funds | 3,821,110 | - | - | - | - | - | - | - | - | - | 3,821,110 |
| Local Street Fund | - | - | - | - | - | - | - | 9,000,000 | - | - | 9,000,000 |
| Total Transfers Out | 17,191,097 | - | - | - | - | - | - | 39,349,820 | - | - | 56,540,917 |
| Total Other Financing Uses | 17,191,097 | - | - | - | - | - | - | 39,349,820 | - | - | 56,540,917 |
| Total Other Financing Sources (Uses) | (9,402,097) | 11,129,366 | 1,006,096 | - | - | - | 4,267,687 | (30,349,820) | - | 2,500,000 | (20,848,768) |
| Net Change in Fund Balances | - | 239,057 | 1,218,021 | 1,487,789 | - | - | - | (1,328,788) | - | 2,500,000 | 4,116,079 |
| Fund Balances (Deficits) at Beginning of Year | - | - | (367,767) | 12,894,359 | - | - | - | 45,286,184 | - | 30,000,000 | 87,812,776 |
| Increase (Decrease) in Inventory | - | 18,850 | - | (321,693) | - | - | - | 217,265 | - | - | (85,578) |
| Fund Balances at End of Year | $ - | $ 257,907 | $ 850,254 | $ 14,060,455 | $ - | $ - | $ - | $ 44,174,661 | $ - | $ 32,500,000 | $ 91,843,277 |

See accompanying independent auditors' report.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 3.08:2013 11:3...

**City of Detroit, Michigan**
**COMBINING BALANCE SHEET**
**NON-MAJOR CAPITAL PROJECTS FUNDS**
**June 30, 2005**

| ASSETS | Capital Projects | Urban Renewal | Total |
|---|---|---|---|
| Cash............................................................. | $ 1,111,215 | $ 1,110,727 | $ 2,221,942 |
| Investments.................................................. | 120,122,776 | 15,940,230 | 136,063,006 |
| **Accounts and Contracts Receivable:** | | | |
| Due from Other Funds............................ | 1,973,651 | 3,651 | 1,977,302 |
| Due from Other Governmental Agencies... | 567,116 | - | 567,116 |
| Other Receivables - Trade........................ | 354,558 | - | 354,558 |
| **Total Accounts and Contracts** | | | |
| **Receivable -** | 2,895,325 | 3,651 | 2,898,976 |
| Allowance for Uncollectible Accounts....... | (188,000) | - | (188,000) |
| **Total Accounts and Contracts Receivable - Net.....** | 2,707,325 | 3,651 | 2,710,976 |
| Current Special Assessments Receivable..... | 347,225 | | 347,225 |
| Restricted Cash and Cash Equivalents....... | 30,234,856 | - | 30,234,856 |
| **Total Assets.....** | $ 154,523,397 | $ 17,054,608 | $ 171,578,005 |

**LIABILITIES AND FUND BALANCES**

| | Capital Projects | Urban Renewal | Total |
|---|---|---|---|
| **Liabilities:** | | | |
| Accounts and Contracts Payable............... | $ 25,845,179 | $ 507,345 | $ 26,352,524 |
| Due to Other Funds................................. | 3,261,705 | 921,731 | 4,183,436 |
| Advance from General Fund...................... | 850,000 | - | 850,000 |
| Other Liabilities...................................... | 34,376 | 89,737 | 124,113 |
| Deferred Revenue.................................... | 243,335 | 11,715 | 255,050 |
| **Total Liabilities.....** | 30,234,595 | 1,530,528 | 31,765,123 |
| **Fund Balances:** | | | |
| Undesignated Fund Balance..................... | 124,288,802 | 15,524,080 | 139,812,882 |
| **Total Fund Balances.....** | 124,288,802 | 15,524,080 | 139,812,882 |
| **Total Liabilities and Fund Balances.....** | $ 154,523,397 | $ 17,054,608 | $ 171,578,005 |

See accompanying independent auditors' report.

C-75

128

**City of Detroit, Michigan**
**COMBINING STATEMENT OF REVENUES,**
**EXPENDITURES AND CHANGES IN FUND BALANCES**
**NON-MAJOR CAPITAL PROJECTS FUNDS**
**For the Year Ended June 30, 2005**

| | Capital Projects | Urban Renewal | Total |
|---|---|---|---|
| **Revenues:** | | | |
| Grants.................................................... | $ 967,891 | $ 23,669,344 | $ 24,637,235 |
| Earnings on Investments.......................... | 1,808,745 | 7,864,822 | 9,673,567 |
| Other Revenues....................................... | 26,120,864 | - | 26,120,864 |
| **Total Revenues.....** | 28,897,500 | 31,534,166 | 60,431,666 |
| **Expenditures:** | | | |
| Bond Issuance Cost.................................. | 2,299,818 | | 2,299,818 |
| Capital Outlay......................................... | 123,390,637 | 34,442,271 | 157,832,908 |
| **Total Expenditures.....** | 125,690,455 | 34,442,271 | 160,132,726 |
| **Excess (Deficiency) of Revenues** | | | |
| **Over (Under) Expenditures.....** | (96,792,955) | (2,908,105) | (99,701,060) |
| **Other Financing Sources:** | | | |
| **Transfers in:** | | | |
| General Debt Service Fund....................... | 37,469,125 | - | 37,469,125 |
| Proceeds from Bonds............................... | 111,680,000 | | 111,680,000 |
| Premium on Bonds Issued........................ | 7,039,843 | - | 7,039,843 |
| **Total Other Financing Sources.....** | 156,188,968 | - | 156,188,968 |
| **Other Financing Uses:** | | | |
| Principal Paid to Bond Agent for Refunded Bonds... | 69,160,000 | - | 69,160,000 |
| Interest Paid to Bond Agent for Refunded Bonds... | 6,651,575 | - | 6,651,575 |
| **Total Other Financing Uses.....** | 75,811,575 | - | 75,811,575 |
| **Total Other Financing Sources (Uses).....** | 80,377,393 | - | 80,377,393 |
| **Net Change in Fund Balance.....** | (16,415,562) | (2,908,105) | (19,323,667) |
| Fund Balances at Beginning of Year.......... | 140,704,364 | 18,432,185 | 159,136,549 |
| **Fund Balances at End of Year.....** | $ 124,288,802 | $ 15,524,080 | $ 139,812,882 |

See accompanying independent auditors' report.

129

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 199 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 5.08:2013 11.3

**City of Detroit, Michigan**
**COMBINING BALANCE SHEET**
**NON-MAJOR PERMANENT FUNDS**
**BEQUEST FUNDS**
**June 30, 2005**

|  | Permanent Funds Bequest Funds | | |
|---|---|---|---|
|  | Other Trust | Cemetery Trust | Total |
| ASSETS |  |  |  |
| Cash........................................... | $ - | $ 47,344 | $ 47,344 |
| Restricted Cash........................... | - | 108,465 | 108,465 |
| Investments................................. | 42,958 | 1,054,856 | 1,097,814 |
| Total Assets........................ | $ 42,958 | $ 1,210,665 | $ 1,253,623 |
| LIABILITIES, AND FUND BALANCES |  |  |  |
| Liabilities: |  |  |  |
| Total Liabilities...................... | $ - | $ - | $ - |
| Fund Balances: |  |  |  |
| Reserved for Restricted Assets........... | 42,958 | 1,210,665 | 1,253,623 |
| Total Fund Balances............... | 42,958 | 1,210,665 | 1,253,623 |
| Total Liabilities and Fund Balances... | $ 42,958 | $ 1,210,665 | $ 1,253,623 |

See accompanying independent auditors' report.

**City of Detroit, Michigan**
**STATEMENT OF REVENUES, EXPENDITURES, AND**
**CHANGES IN FUND BALANCES**
**NON-MAJOR PERMANENT FUNDS**
**BEQUEST FUNDS**
**For the Year Ended June 30, 2005**

|  | Permanent Funds Bequest Funds | | |
|---|---|---|---|
|  | Other Trust | Cemetery Trust | Total |
| Revenues: |  |  |  |
| Investment Income .................... | $ 814 | $ 19,989 | $ 20,803 |
| Total Revenues...................... | 814 | 19,989 | 20,803 |
| Expenditures: |  |  |  |
| Total Expenditures................. | - | - | - |
| Total Revenues Over Expenditures.......... | 814 | 19,989 | 20,803 |
| Fund Balance, Beginning................. | 42,144 | 1,190,676 | 1,232,820 |
| Fund Balance, Ending................. | $ 42,958 | $ 1,210,665 | $ 1,253,623 |

See accompanying independent auditors' report.

C-76

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 15.08.2013 11:32

**City of Detroit**
**COMBINING STATEMENT OF NET ASSETS AND LIABILITIES**
**AGENCY FUNDS**
**For the Year Ended June 30, 2005**

| | Condemnation Awards Fund | Fire Insurance Escrow Fund | Other Agency Funds | Total |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash | $ 1,425,578 | $ 351,826 | $ 733,223 | $ 2,510,628 |
| Investments | - | 8,639,787 | - | 8,639,787 |
| Due from Other Funds | - | 185,281 | - | 185,281 |
| Total Assets | $ 1,425,578 | $ 9,176,894 | $ 733,223 | $ 11,335,695 |
| **LIABILITIES** | | | | |
| Accounts Payable | $ - | $ 62,743 | $ - | 62,743 |
| Awards Payable | 1,425,578 | | | 1,425,578 |
| Advances from Outside Sources | - | 8,875,746 | | 8,875,746 |
| Escrow Payable | - | - | 733,223 | 733,223 |
| Due to Other Funds | - | 238,405 | - | 238,405 |
| Total Liabilities | $ 1,425,578 | $ 9,176,895 | $ 733,223 | $ 11,335,695 |

See accompanying independent auditors' report.

C-77

**City of Detroit**
**COMBINING STATEMENT OF CHANGES IN ASSETS AND LIABILITIES**
**AGENCY FUNDS**
**For the Year Ended June 30, 2005**

| | Balance June 30, 2004 | Additions | Deductions | Balance June 30, 2005 |
|---|---|---|---|---|
| **Condemnation Award Fund** | | | | |
| Assets | | | | |
| Cash | $ 1,464,630 | $ - | $ 39,052 | $ 1,425,578 |
| Total Assets | $ 1,464,630 | $ - | $ 39,052 | $ 1,425,578 |
| Liabilities | | | | |
| Accounts and Contracts Payable | $ 1,464,630 | $ - | $ 39,052 | $ 1,425,578 |
| Total Liabilities | $ 1,464,630 | $ - | $ 39,052 | $ 1,425,578 |
| **Fire Insurance Escrow Fund** | | | | |
| Assets | | | | |
| Cash | $ 203,890 | $ 4,596,809 | $ 4,448,873 | $ 351,826 |
| Investments | 7,108,506 | 2,816,281 | 1,285,000 | 8,639,787 |
| Due from Other Funds | 185,281 | - | - | 185,281 |
| Total Assets | $ 7,497,677 | $ 7,413,090 | $ 5,733,873 | $ 9,176,894 |
| Liabilities | | | | |
| Accounts and Contracts Payable | $ 294,185 | $ 1,737,667 | $ 1,969,109 | $ 62,743 |
| Due to Other Funds | 117,215 | 167,377 | 46,186 | 238,405 |
| Other Liabilities | 7,086,276 | 3,538,731 | 1,749,261 | 8,875,746 |
| Total Liabilities | $ 7,497,676 | $ 5,443,775 | $ 3,764,556 | $ 9,176,895 |
| **Other Agency Funds** | | | | |
| Assets | | | | |
| Cash | $ 730,208 | $ 3,014 | $ - | $ 733,222 |
| Total Assets | $ 730,208 | $ 3,014 | $ - | $ 733,222 |
| Liabilities | | | | |
| Other Liabilities | $ 730,208 | $ 3,014 | $ - | $ 733,222 |
| Total Liabilities | $ 730,208 | $ 3,014 | $ - | $ 733,222 |
| **Total Agency Funds** | | | | |
| Assets | | | | |
| Cash | $ 2,398,728 | $ 4,599,823 | $ 4,487,924 | $ 2,510,627 |
| Investments | 7,108,506 | 2,816,281 | 1,285,000 | 8,639,787 |
| Due from Other Funds | 185,281 | - | - | 185,281 |
| Total Assets | $ 9,692,515 | $ 7,416,104 | $ 5,772,924 | $ 11,335,695 |
| Liabilities | | | | |
| Accounts and Contracts Payable | $ 1,758,815 | $ 1,737,667 | $ 2,008,161 | 1,488,321 |
| Due to Other Funds | 117,215 | 167,377 | 46,186 | 238,405 |
| Other Liabilities | 7,816,484 | 3,541,745 | 1,749,261 | 9,608,968 |
| Total Liabilities | $ 9,692,514 | $ 5,446,789 | $ 3,803,608 | 11,335,695 |

**See accompanying independent auditors' report.**

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

CITY OF DETROIT

**S T A T I S T I C A L**



In preparation for the Major League All-Star Game in July, emergency responders participate in a **homeland security** emergency response exercise in May at Comerica Park.

C-78

*The Statistical Section contains:*

General Governmental Revenues by Source— Last Ten Fiscal Years
General Governmental Expenditures by Function—
    Last Ten Fiscal    Years
Property Tax Levies and Collections — Last Ten Fiscal Years
Adjusted Tax Levies and Tax Collections by Levies —
    Last Ten Fiscal Years
Assessed and Estimated Actual Value of Taxable Property —
    Last Ten Fiscal Years
Property Tax Rates and Levies — All Overlapping Governments —
    Last Ten Fiscal Years
Special Assessment Additions and Deductions — Last Ten
    Fiscal Years
Ratio of Net General Bonded Debt to Assessed Value and Net Bonded Debt
    per Capita —Last Ten Fiscal Years
Legal Debt Margin
Computation of Direct and Overlapping Debt—
    General Obligation Bonds
Ratio of Annual Debt Service Expenditures for
    General Bonded Debt to Total General Governmental Expenditures
    —Last Ten Fiscal Years
Revenue Bond Coverage — Last Ten Fiscal Years
Real Property Value, Construction Permits and Bank Deposits —
    Last Ten Fiscal Years
Principal Taxpayers
Largest Private Employers
Miscellaneous Statistics



CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013   11:32

CITY OF DETROIT

C-79



Shoppers marvel at the breathtaking array of flowers at Eastern Market's **Flower Day** in May. Flower Day is a much-anticipated annual rite of spring for thousands of metro Detroiters.



Runners speed to the finish line at the **Heat the Streets Run and Walk for Warmth** last February to raise money to assist low-income residents with their utility costs.



**THIS PAGE LEFT BLANK INTENTIONALLY**

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

Table 1        Table 1

**City of Detroit, Michigan**
**GENERAL GOVERNMENTAL REVENUES BY SOURCE (1)**
**Last Ten Fiscal Years**
(Amounts Expressed in Thousands)
**Unaudited**

| Revenue Classification (2) | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |
|---|---|---|---|---|---|---|---|---|---|---|
| Taxes, Assessments, Interest and Penalties | $ 826,722 | $ 817,511 | $ 728,223 | $ 748,723 | $ 716,014 | $ 728,077 | $ 636,191 | $ 622,937 | $ 592,515 | $ 580,149 |
| Licenses, Permits, and Inspection Charges | 35,007 | 29,464 | 24,881 | 24,857 | 28,824 | 29,829 | 24,426 | 23,727 | 20,722 | 17,960 |
| Shared Taxes and Grants | 618,949 | 642,535 | 737,126 | 759,365 | 747,085 | 747,033 | 687,086 | 640,242 | 617,585 | 615,803 |
| Sales and Charges for Services | 183,295 | 190,928 | 174,533 | 203,322 | 185,732 | 176,948 | 150,482 | 148,217 | 141,088 | 131,684 |
| Ordinance Fines | 27,482 | 28,238 | 24,147 | 28,374 | 22,151 | 23,573 | 20,032 | 19,885 | 17,314 | 18,356 |
| Revenues from Use of Assets | 16,782 | 33,196 | 37,574 | 39,918 | 60,541 | 45,220 | 39,487 | 48,476 | 43,186 | 42,647 |
| Other Revenues | 131,658 | 124,788 | 102,386 | 142,977 | 79,140 | 60,261 | 74,701 | 90,673 | 97,715 | 73,345 |
| **Total Revenues** | $ 1,839,895 | $ 1,866,660 | $ 1,828,870 | $ 1,947,536 | $ 1,839,487 | $ 1,802,941 | $ 1,632,405 | $ 1,594,157 | $ 1,529,925 | $ 1,479,944 |

(1) Includes general, special revenue, debt service, capital projects, and permanent funds.
(2) Library revenues have been removed for all years. Prior to 2002 the Detroit Public Library was included in the
    Special Revenue Funds of the City. It is now being reported as a Component Unit.

Table 2        Table 2

**City of Detroit, Michigan**
**GENERAL GOVERNMENTAL EXPENDITURES BY FUNCTION (1)**
**Last Ten Fiscal Years**
(Amounts Expressed in Thousands)
**Unaudited**

| Expenditure Classification (2) | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |
|---|---|---|---|---|---|---|---|---|---|---|
| Public Protection | $ 1,423,582 | $ 738,331 | $ 609,580 | $ 601,014 | $ 598,723 | $ 531,140 | $ 502,980 | $ 516,516 | $ 519,304 | $ 498,620 |
| Health | 197,473 | 172,301 | 194,570 | 177,826 | 170,703 | 164,662 | 140,777 | 146,389 | 146,563 | 131,142 |
| Recreation and Culture | 99,296 | 73,770 | 78,478 | 79,787 | 67,393 | 68,699 | 65,077 | 70,908 | 68,494 | 67,437 |
| Economic Development | 99,656 | 96,272 | 96,998 | 80,957 | 40,949 | 45,687 | 31,344 | 23,960 | 20,188 | 17,734 |
| Educational Development | 77,259 | 95,579 | 85,854 | 85,516 | 96,271 | 87,190 | 52,563 | 43,505 | 53,179 | 40,927 |
| Housing Supply and Conditions | 27,863 | 21,150 | 18,535 | 16,747 | 96,393 | 85,720 | 74,866 | 74,809 | 63,262 | 77,210 |
| Physical Environment | 301,785 | 232,269 | 252,006 | 292,579 | 275,369 | 282,840 | 242,809 | 274,824 | 259,858 | 225,414 |
| Transportation | 46,273 | 49,858 | 44,218 | 21,087 | 15,787 | 9,808 | 38,892 | 21,735 | 12,398 | 10,540 |
| Development and Management | 495,549 | 387,713 | 399,418 | 354,175 | 250,912 | 328,475 | 322,395 | 246,876 | 193,005 | 204,305 |
| Debt Service | 169,268 | 140,118 | 132,184 | 124,583 | 126,981 | 126,169 | 116,679 | 116,249 | 123,472 | 92,047 |
| Capital Outlay | 282,546 | 162,594 | 69,605 | 117,575 | 145,426 | 65,852 | 91,740 | 75,326 | 83,452 | 63,332 |
| **Total Expenditures** | $ 3,220,550 | $ 2,169,955 | $ 1,981,446 | $ 1,951,846 | $ 1,884,907 | $ 1,796,242 | $ 1,680,122 | $ 1,611,097 | $ 1,534,175 | $ 1,428,708 |

(1) Includes general, special revenue, debt service, capital projects, and permanent funds.
(2) Library expenses have been removed for all years. Prior to 2002 the Detroit Public Library was included in the
    Special Revenue Funds of the City. It is now being reported as a Component Unit.

C-80

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

Table 3                                                                                                                                 Table 3

**City of Detroit, Michigan**
**Property Tax Levies and Collections**
**Last Ten Fiscal Years**
**(Amounts Expressed in Thousands)**
Unaudited

| Fiscal Year | Total Tax Levy | Current Tax Collections | Percent of Levy Collected | Delinquent Tax Collections | Total Tax Collections | Percent of Total Tax Collections to Tax Levy | Current and Prior Years' Adjustments (2) | Outstanding Delinquent Taxes | Percent of Delinquent Taxes to Tax Levy |
|---|---|---|---|---|---|---|---|---|---|
| 1996 (1) | 201,028 | 180,615 | 89.85 | 11,949 | 192,564 | 95.79 | (13,380) | 77,780 | 38.69 |
| 1997 (1) | 208,546 | 189,097 | 90.67 | 15,028 | 204,125 | 97.88 | (3,559) | 78,642 | 37.71 |
| 1998 (1) | 218,533 | 193,536 | 88.56 | 15,968 | 209,504 | 95.87 | (6,108) | 79,267 | 36.27 |
| 1999 (1) | 224,248 | 199,594 | 89.01 | 14,302 | 213,896 | 95.38 | (8,761) | 80,858 | 36.06 |
| 2000 (1) | 231,310 | 210,805 | 91.14 | 17,606 | 228,411 | 98.75 | (6,939) | 76,896 | 33.24 |
| 2001 (1) | 254,397 | 218,915 | 86.05 | 15,854 | 234,769 | 92.28 | (1,349) | 95,285 | 37.46 |
| 2002 (3) | 243,710 | 212,435 | 87.17 | 23,433 | 235,868 | 96.78 | (15,928) | 79,136 | 32.47 |
| 2003 (3) | 246,284 | 207,628 | 84.30 | 16,663 | 224,291 | 91.07 | (10,925) | 90,204 | 36.63 |
| 2004 (3) | 242,235 | 231,696 | 95.65 | 17,677 | 249,373 | 102.95 | (2,945) | 80,121 | 33.08 |
| 2005 (3) | 254,533 | 238,059 | 93.53 | 8,942 | 247,001 | 97.04 | (6,088) | 81,565 | 32.04 |

(1) includes General, Library and Debt Service Funds
(2) includes additions, deductions, cancellations and adjustments
(3) Fiscal Years 2002-2004 do not include Library amounts.

Table 4                                                                                                                                 Table 4

**City of Detroit, Michigan**
**Adjusted Tax Levies and Tax Collections by Levies**
**Last Ten Fiscal Years**
**(Amounts Expressed in Thousands)**
Unaudited

| Fiscal Year | Total Tax Levy | Net Additions Deductions to (from) Tax Levy | Less Cancellations and Adjustments | Net Taxes Receivable | Collections to June 30, 2005 Amount | Ratio to Adjusted Tax Levy |
|---|---|---|---|---|---|---|
| 1996 (1) | 201,028 | - | (5,922) | 195,106 | 193,450 | 99.15 |
| 1997 (1) | 208,546 | - | (4,995) | 203,551 | 201,330 | 98.91 |
| 1998 (1) | 218,533 | - | (6,416) | 212,117 | 209,368 | 98.70 |
| 1999 (1) | 224,248 | - | (5,227) | 219,021 | 215,165 | 98.24 |
| 2000 (1) | 231,310 | - | 4,508 | 235,818 | 229,885 | 97.48 |
| 2001 (1) | 254,397 | - | (4,480) | 249,917 | 237,892 | 95.19 |
| 2002 (2) | 243,710 | - | (5,193) | 238,517 | 225,277 | 94.45 |
| 2003 (2) | 246,284 | - | (5,101) | 241,183 | 218,474 | 90.58 |
| 2004 (2) | 242,235 | - | (411) | 241,824 | 231,696 | 95.81 |
| 2005 (2) | 254,533 | - | (3,977) | 250,556 | 238,059 | 95.01 |

(1) includes General, Library and Debt Service Funds
(2) Fiscal Years 2002-2005 do not include Library amounts.

C-81

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 4/15:08:2013 11:32

Table 5

## City of Detroit, Michigan
### ASSESSED AND ESTIMATED ACTUAL VALUE OF TAXABLE PROPERTY
#### Last Ten Fiscal Years
(Amounts Expressed in Thousands)
Unaudited

| Fiscal Year | Real Property (Notes A and B) | | | Personal Property (Notes A, B and C) | | | Total (Notes A, B and C) | | |
|---|---|---|---|---|---|---|---|---|---|
| | State Equalized Value (Notes D and E) | Taxable Value | Estimated Actual Value | State Equalized Value (Notes D and E) | Taxable Value | Estimated Actual Value | State Equalized Value (Notes D and E) | Taxable Value | Estimated Actual Value |
| 1997 | $ 4,943,227 | $ 4,783,635 | $ 9,886,454 | $ 1,443,983 | $ 1,443,983 | $ 2,887,966 | $ 6,387,210 | $ 6,147,618 | $ 12,774,420 |
| 1998 | 5,351,875 | 4,847,236 | 10,703,750 | 1,603,341 | 1,603,341 | 3,206,682 | 6,955,216 | 6,450,577 | 13,910,432 |
| 1999 | 5,940,201 | 5,005,031 | 11,880,402 | 1,626,585 | 1,626,585 | 3,253,170 | 7,566,786 | 6,631,616 | 15,133,572 |
| 2000 | 6,990,962 | 5,219,200 | 13,981,924 | 1,637,482 | 1,637,482 | 3,274,964 | 8,628,444 | 6,856,682 | 17,256,888 |
| 2001 | 8,106,178 | 5,486,262 | 16,212,356 | 1,718,119 | 1,718,119 | 3,436,238 | 9,824,297 | 7,204,381 | 19,648,594 |
| 2002 | 9,319,364 | 5,983,367 | 18,638,728 | 1,656,438 | 1,656,438 | 3,312,876 | 10,975,802 | 7,639,805 | 21,951,604 |
| 2003 | 10,298,344 | 6,226,065 | 20,596,688 | 1,749,983 | 1,749,983 | 3,499,966 | 12,048,327 | 7,976,048 | 24,096,654 |
| 2004 | 10,668,533 | 6,470,987 | 21,337,066 | 1,373,222 | 1,373,222 | 2,746,444 | 12,041,755 | 7,844,209 | 24,083,510 |
| 2005 | 11,177,226 | 6,828,591 | 22,354,452 | 1,507,199 | 1,507,199 | 3,014,398 | 12,684,425 | 8,335,790 | 25,368,850 |
| 2006 | 11,645,064 | 7,168,723 | 23,290,128 | 1,611,481 | 1,581,107 | 3,222,962 | 13,256,545 | 8,749,830 | 26,513,090 |

Note A — Excludes qualified real and personal properties exempted from ad valorem property taxes but subject to a specific Industrial Facilities tax under the State Plant Rehabilitation and Industrial Development Districts Act of 1974.

Note B — Beginning with fiscal year 1995/1996 taxable values cannot exceed the statewide rate of inflation of the prior year on a per parcel basis, except where increases are due to physical changes in the parcel (P.A.415 of 1994). This represents the taxable amount of the state equalized value.

Note C — Excludes inventories which are exempted from the assessed values by the State Single Business Tax Act of 1974.

Note D — State Equalized Value (50% of true cash value).

Note E — Assessment Date -December 31 preceding year of levy.

C-82

Table 6

## City of Detroit, Michigan
### PROPERTY TAX RATES AND LEVIES — ALL OVERLAPPING GOVERNMENTS
#### Last Ten Fiscal Years
(Amounts Expressed in Thousands)
Unaudited

| Fiscal Year | Tax Rates — Mills | | | | | |
|---|---|---|---|---|---|---|
| | City (Note A) | Library | School | County (Note B) | State | Total |
| 1997 | 31.2830 | 2.6400 | 25.5000 | 11.3800 | 6.0000 | 76.8030 |
| 1998 | 31.2380 | 2.6400 | 25.5900 | 11.3700 | 6.0000 | 76.8380 |
| 1999 | 31.1750 | 2.6400 | 24.4500 | 11.3200 | 6.0000 | 75.5850 |
| 2000 | 31.0950 | 2.6400 | 23.9000 | 11.1390 | 6.0000 | 74.7740 |
| 2001 | 31.6783 | 3.6331 | 25.0000 | 11.0565 | 6.0000 | 77.3679 |
| 2002 | 31.9000 | 3.6331 | 28.5000 | 12.5395 | 6.0000 | 82.5726 |
| 2003 | 30.8780 | 3.6331 | 31.1900 | 13.9895 | 6.0000 | 85.6906 |
| 2004 | 30.8808 | 3.6331 | 31.8000 | 13.9886 | 6.0000 | 85.3025 |
| 2005 | 30.4359 | 3.6331 | 31.0000 | 13.9861 | 6.0000 | 85.0551 |
| 2006 | 30.0201 | 4.6307 | 30.6236 | 12.0950 | 6.0000 | 83.3694 |

| Fiscal Year | Tax Levies | | | | | |
|---|---|---|---|---|---|---|
| | City (Note A) | Library | School | County (Note B) | State | Total |
| 1997 | $ 192,316 | $ 16,230 | $ 116,328 | $ 69,960 | $ 36,885 | $ 431,719 |
| 1998 | 201,503 | 17,030 | 123,999 | 73,343 | 38,703 | 454,578 |
| 1999 | 206,741 | 17,507 | 119,113 | 75,070 | 39,790 | 458,221 |
| 2000 | 213,208 | 18,102 | 119,281 | 76,375 | 41,140 | 468,106 |
| 2001 | 228,223 | 26,174 | 132,788 | 79,655 | 43,226 | 510,066 |
| 2002 | 243,710 | 27,756 | 166,268 | 95,799 | 45,839 | 579,372 |
| 2003 | 246,284 | 28,977 | 193,401 | 111,581 | 47,856 | 628,099 |
| 2004 | 242,235 | 28,498 | 192,090 | 109,730 | 39,221 | 611,774 |
| 2005 | 254,533 | 30,284 | 258,409 | 116,585 | 50,015 | 709,826 |
| 2006 | 262,670 | 40,518 | 267,951 | 105,829 | 52,499 | 729,467 |

Note A — Includes millage to pay cash rentals to the City of Detroit Building Authority to cover principal and interest on authority bonds issued to finance construction of a new Detroit General Hospital and to pay Wayne County for debt service on County Drainage District Bonds issued for Detroit N0. 1 firm 1994.

Note B — The County tax rates and tax levies shown are against properties situated within the City of Detroit. The total assessed valuation used in determining the County tax rate recognizes adjustments in assessed valuation made after the City tax rate is determined.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 4/15:08:2013  11:32

Table 7

**City of Detroit, Michigan**
**SPECIAL ASSESSMENTS  ADDITIONS AND DEDUCTIONS**
**Last Ten Fiscal Years**
**Unaudited**

| Fiscal Year | Beginning Balance | Additions | Deductions | | Ending Balance |
|---|---|---|---|---|---|
| | | | Collections | Cancellations and Adjustments | |
| 1996 | 2,065,651 | - | 149,976 | 58,180 | 1,857,495 |
| 1997 | 1,857,495 | - | 213,336 | 105,500 | 1,538,659 |
| 1998 | 1,538,659 | 231,733 | 84,970 | 22,655 | 1,662,767 |
| 1999 | 1,662,767 | 4,897,716 | 250,378 | 473,697 | 5,836,408 |
| 2000 | 5,836,408 | 39,622 | 19,811 | 152,117 | 5,704,102 |
| 2001 | 5,704,102 | - | 80,553 | 362,034 | 5,261,515 |
| 2002 | 5,261,515 | 19,427 | 118,793 | 184,202 | 4,997,947 |
| 2003 | 4,977,947 | 23,865,681 | 360,457 | 75,529 | 28,407,642 |
| 2004 | 28,407,642 | 529,869 | 340,692 | 800,396 | 27,796,423 |
| 2005* | 27,796,423 | - | 176,851 | 1,574,915 | 26,044,657 |

C-83

Table 8

**City of Detroit, Michigan**
**RATIO OF NET GENERAL BONDED DEBT TO ASSESSED**
**VALUE AND NET BONDED DEBT PER CAPITA**
**Last Ten Fiscal Years**
**(Dollars Expressed in Thousands)**
**Unaudited**

| Fiscal Year | Net Debt | Taxable Assessed Value (Note A) | Ratio of Net Debt to Taxable Assessed Value | Population (Note B) | Net Debt Per Capita |
|---|---|---|---|---|---|
| 1996 (C) | $ 1,120,872 | $ 5,887,324 | 19.04 | 1,000,272 | $ 1,121 |
| 1997 (C) | 1,101,020 | 6,147,618 | 17.91 | 1,000,272 | 1,100.72 |
| 1998 (C) | 1,068,048 | 6,450,576 | 16.56 | 1,000,272 | 1,067.76 |
| 1999 (C) | 1,042,641 | 6,631,616 | 15.72 | 1,000,272 | 1,042.36 |
| 2000 (C) | 1,021,005 | 6,856,682 | 14.89 | 951,270 | 1,073.31 |
| 2001 (C) | 938,080 | 7,204,381 | 13.02 | 951,270 | 986.13 |
| 2002 (C) | 962,133 | 7,639,805 | 12.59 | 951,270 | 1,011.42 |
| 2003 (C) | 909,624 | 7,976,048 | 11.40 | 951,270 | 956.22 |
| 2004 (C) | 1,104,034 | 7,844,210 | 14.07 | 951,270 | 1,160.60 |
| 2005 (C) | 1,209,104 | 8,335,790 | 14.50 | 951,270 | 1,271.05 |

Note A - Assessed Values are the State equalized valuations.

Note B - Population estimates are from U.S. Department of Commerce, Bureau of Census, Current Population Reports.  The population count for the City released by the U.S. Bureau of census figure for 2000 was 951,270. Subsequent years are from the U.S. Census Bureau March census estimates.  The 2005 population count not available.

Note C - Beginning with Fiscal Year 1995-96, taxable values cannot exceed the statewide rate of inflation of the prior year on a parcel basis, except where increases are due to physical changes in the parcel (P.A. 415 of 1994).

142

143

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

Table 9

**City of Detroit, Michigan**
**LEGAL DEBT MARGIN**
**June 30, 2005**
**Unaudited**

| | Net Debt | Percent of Assessed Value | Amount | Legal Debt Margin |
|---|---|---|---|---|
| | | **Legal Limitation** | | |
| Assessed Value Fiscal Year 2004-05 (State Equalized)............. $ 12,713,648,477 | | | | |
| Add: Allowance under Act 198, Mich. 1974........................ 361,731,928 | | | | |
| Allowance under Act 228, Mich. 1975......................... 718,498,590 | | | | |
| Allowance under Act 147, Mich. 1992......................... 26,933,794 | | | | |
| Allowance under Act 147, Mich. 1996......................... 86,672,803 | | | | |
| Total Assessed Value Fiscal Year 2004-05.................... $ 13,907,485,592 | | 10.00% | $ 1,390,748,559 | |
| Net Direct Debt Subject to General Debt Limitation: | | | | |
| General Obligation Bonds (Note A)............................ $ 579,850,000 | | | | |
| General Bonds - Limited Tax................................ 139,040,000 | | | | |
| Limited Obligation Economic Development Bonds - District | | | | |
| Court, Madison Center Project............................. 8,918,510 | | | | |
| Total Net Direct Debt Subject to General Debt Limitation.... | $ 728,228,510 | | $ 1,390,748,559 | $ 662,520,049 |
| Net Direct Debt Not Subject to General Debt Limitation (Note B): | | | | |
| Direct Debt: | | | | |
| General Obligations: | | | | |
| General Detroit Resource Recovery Bonds...................... $ 156,900,986 | | | | |
| Limited Obligation Economic Development Bonds- | | | | |
| Resource Recovery Project.................................... 63,980,000 | | | | |
| Self-Insurance Bonds - Limited Tax.......................... 98,895,000 | | | | |
| Revenue Bonds: | | | | |
| Convention Facility - Cobo Center Expansion................. 95,003,208 | | | | |
| Detroit Building Authority - Parking and Arena System....... 52,606,236 | | | | |
| Local Development Finance Authority Tax Increment Bonds- | | | | |
| Jefferson/Conner Revitalization Project..................... 78,929,502 | | | | |
| Sewage Disposal System..................................... 2,489,065,975 | | | | |
| Tax Increment Finance Authority Bonds - DDA................ 142,828,501 | | | | |
| Water Supply System......................................... 1,845,116,314 | | | | |
| Downtown Development Authority - Trapper's Alley Project...... 2,800,000 | | | | |
| Federal Note - Caraco Pharmaceutical Project................ 4,266,000 | | | | |
| Federal Note - Ferry Street.................................. 2,815,000 | | | | |
| Federal Note - Garfield  Project............................ 1,840,000 | | | | |
| Federal Note - Riverbend Project............................ 1,070,000 | | | | |
| Federal Note - Stuberstone Project.......................... 315,000 | | | | |
| Federal Note - Mexicantown Welcome Center................... 7,789,000 | | | | |
| Federal Note - New Amsterdam Project........................ 9,700,000 | | | | |
| Revenue Anticipation Notes, Series 2005..................... 54,445,000 | | | | |
| Total Net Subject to General Debt Limitation................ | $ 5,053,920,722 | | | |

Note A — General Obligation Bonds are subject to the general debt limitation, as established under State Law.  After the effective date (December 22,1978) of an amendment to the State Constitution, the City may not issue general obligation bonds payable from taxes levied for debt service without a vote of the electorate.

Note B — Pursuant to State Law, certain exclusions to the debt limitations are permitted for the following purposes: special assessment bonds and motor vehicle highway fund bonds, even though they are a general obligation of the City; revenue bonds payable from revenues only, whether secured by a mortgage or not; bonds, contract obligations or assessments incurred to comply with an order of the Water Resources Commission of the State of Michigan or a court of competent jurisdiction; obligations incurred for water supply, sewage, drainage, refuse disposal or resource recovery projects necessary to protect the public health by abating pollution; bonds issued to acquire housing for which certain rent subsidies will be received by the City or an agency thereof; and bonds issued to refund money advanced or paid for certain special assessments.

C-84

144

---

TABLE 10

**City of Detroit, Michigan**
**COMPUTATION OF DIRECT AND OVERLAPPING DEBT**
**June 30, 2005**
**Unaudited**

| | Gross Debt | Less Redemption Funds | Net Debt | % Applicable To Detroit | Detroit Share |
|---|---|---|---|---|---|
| **Direct Debt:** | | | | | |
| General Obligation: | | | | | |
| General Bonds - Unlimited Tax................... $ | 579,850,000 | $ - | $ 579,850,000 | | |
| General Bonds - Limited Tax.................... | 399,455,000 | - | 399,455,000 | | |
| Detroit Building Authority Bonds - | | | | | |
| Madison Center Project....................... | 9,921,954 | 1,003,444 | 8,918,510 | | |
| Greater Detroit Resource Recovery Authority Bonds.. | 183,000,000 | 26,099,014 | 156,900,986 | | |
| Limited Obligation Economic Development Bonds - | | | | | |
| Resource Recovery Project...................... | 63,980,000 | - | 63,980,000 | | |
| Total General Obligation................... | 1,236,206,954 | 27,102,458 | 1,209,104,496 | 100.00% | $ 1,209,104,496 |
| Revenue Bonds: | | | | | |
| Convention Facility - Cobo Center Expansion........ | 125,013,138 | 30,009,930 | 95,003,208 | | |
| Detroit Building Authority - Parking and Arena System.. | 60,845,000 | 8,238,764 | 52,606,236 | | |
| Local Development Finance Authority Tax Increment | | | | | |
| Bonds - Jefferson/Conner Revitalization Project..... | 86,210,000 | 7,280,498 | 78,929,502 | | |
| Sewage Disposal System (Note A)................. | 2,656,426,573 | 167,360,598 | 2,489,065,975 | | |
| Tax Increment Finance Authority Bonds - DDA........ | 166,473,198 | 23,644,697 | 142,828,501 | | |
| Water Supply System (Note C).................. | 1,991,615,000 | 146,498,686 | 1,845,116,314 | | |
| Total Revenue Bonds..................... | 5,086,582,909 | 383,033,173 | 4,703,549,736 | 100.00% | 4,703,549,736 |
| Total Direct Debt......................... | 6,322,789,863 | 410,135,631 | 5,912,654,232 | | |
| **Overlapping Debt:** | | | | | |
| School District of the City of Detroit General | | | | | |
| Obligation Bonds and Notes................... | 1,477,035,000 | 1,466,816,577 | 10,218,423 | 100.00% | 10,218,423 |
| Wayne County Bonds (Note A)................... | 122,525,993 | 20,709,666 | 101,736,327 | 18.10% | 18,414,275 |
| Wayne County Community College Bonds (Note A)...... | 76,105,000 | 19,779,228 | 56,325,772 | 28.87% | 16,261,251 |
| Total Overlapping Debt.................... | 1,675,665,993 | 1,507,385,471 | 168,280,522 | | 44,893,951 |
| Debt Not Pledging the Faith and Credit of the City: | | | | | |
| Federal Note - Caraco Pharmaceutical Project (Note A)..... | 4,266,000 | - | 4,266,000 | | |
| Federal Note - Ferry Street (Note A)................. | 2,815,000 | - | 2,815,000 | | |
| Federal Note - Garfield Project (Note A).............. | 1,840,000 | - | 1,840,000 | | |
| Federal Note - Riverbend Project (Note A)............. | 1,070,000 | - | 1,070,000 | | |
| Federal Note - Mexicantown Welcome Center (Note A)...... | 7,789,000 | - | 7,789,000 | | |
| Federal Note - Stuberstone Project (Note A)........... | 315,000 | - | 315,000 | | |
| Federal Note - New Amsterdam Project (Note A)......... | 9,700,000 | - | 9,700,000 | | |
| Revenue Anticipation Notes, Series 2005.............. | 54,445,000 | - | 54,445,000 | | |
| Loans Payable to GE Capital - Schedule-009........... | 1,892,181 | - | 1,892,181 | | |
| Loans Payable to GE Capital - Schedule-010........... | 141,246 | - | 141,246 | | |
| Loans Payable to GE Capital - Schedule-012........... | 7,459,520 | - | 7,459,520 | | |
| Loans Payable to GE Capital - Schedule-013........... | 384,501 | - | 384,501 | | |
| Loans Payable to GE Capital - Schedule-014........... | 1,186,746 | - | 1,186,746 | | |
| Loans Payable to GE Capital - Schedule-015........... | 438,896 | - | 438,896 | | |
| Loans Payable to GE Capital - Schedule-016........... | 121,556 | - | 121,556 | | |
| Loans Payable to GE Capital - Schedule-017........... | 11,333,268 | - | 11,333,268 | | |
| Loans Payable to GE Capital - Schedule-017........... | 14,796,211 | - | 14,796,211 | | |
| Loans Payable to GE Capital - Schedule-018........... | 6,925,886 | - | 6,925,886 | | |
| Loans Payable to GE Capital - Schedule-019........... | 5,037,008 | - | 5,037,008 | | |
| Loans Payable to GE Capital - Schedule-021........... | 153,181 | - | 153,181 | | |
| Total Debt Not Pledging the Faith and Credit of the City.. | 132,110,200 | - | 132,110,200 | | |
| Total Debt.......................... $ | 8,130,566,056 | $ 1,917,521,102 | $ 6,213,044,954 | | $ 5,957,548,183 |

Note A — Note is secured by future Block Grant Revenues.
Note B — Amount shown is Cash funded redemption funds; additionally secured by surety bonds.

145

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 15:08:2013 11:32

Table 11

**City of Detroit, Michigan**
**RATIO OF ANNUAL DEBT SERVICE EXPENDITURES FOR**
**GENERAL BONDED DEBT TO TOTAL GENERAL GOVERNMENTAL EXPENDITURES**
**Last Ten Fiscal Years**
**(Dollars Expressed in Thousands)**
**Unaudited**

| Year Ending June 30, | Principal | Interest | Other Expenditures | Total Debt Service | Total General Governmental Expenditures | Ratio of Total Debt Service to Total General Governmental Expenditures |
|---|---|---|---|---|---|---|
| 1996 | $ 44,219 | $ 47,828 | $ - | $ 92,047 | $ 1,365,376 | 6.74% |
| 1997 | 71,736 | 51,736 | - | 123,472 | 1,450,723 | 8.51% |
| 1998 | 56,375 | 59,774 | 100 | 116,249 | 1,535,771 | 7.57% |
| 1999 | 58,842 | 57,737 | 100 | 116,679 | 1,588,382 | 7.35% |
| 2000 | 71,061 | 55,008 | 100 | 126,169 | 1,730,390 | 7.29% |
| 2001 | 79,319 | 47,584 | 78 | 126,981 | 1,739,481 | 7.30% |
| 2002 | 79,569 | 42,443 | 2,571 | 124,583 | 1,951,846 | 6.38% |
| 2003 | 86,770 | 43,761 | 1,652 | 132,183 | 1,981,446 | 6.67% |
| 2004 | 86,898 | 47,444 | 4,546 | 138,888 | 2,169,955 | 6.40% |
| 2005 | 73,544 | 51,462 | 5,193 | 130,199 | 2,072,153 | 6.28% |

C-85

Table 12

**City of Detroit, Michigan**
**REVENUE BOND COVERAGE**
**Last Ten Fiscal Years**
**Unaudited**

| Type | Fiscal Year | Gross Revenue | Direct Operating Expenses (1) | Net Revenue Available for Debt Service | Debt Service Requirements Principal | Interest | Total | Coverage |
|---|---|---|---|---|---|---|---|---|
| Automobile Parking | 1996 | $ 15,227,762 | $ 7,972,813 | $ 7,254,949 | $ 2,875,000 | $ 3,056,467 | $ 5,931,467 | 1.22 |
| | 1997 | 15,996,228 | 7,825,610 | 8,170,618 | 1,925,000 | 2,924,314 | 4,849,314 | 1.68 |
| | 1998 | 17,001,259 | 8,036,833 | 8,964,426 | 2,725,000 | 2,517,277 | 5,242,277 | 1.71 |
| | 1999 | 17,879,662 | 8,512,116 | 9,367,546 | 3,420,000 | 3,638,052 | 7,058,052 | 1.33 |
| | 2000 | 19,407,117 | 9,406,799 | 10,000,318 | 4,840,000 | 4,411,302 | 9,251,302 | 1.08 |
| | 2001 | 18,220,185 | 9,621,295 | 8,598,890 | 5,140,000 | 5,588,135 | 10,728,135 | 0.80 |
| | 2002 | 20,682,973 | 9,654,607 | 11,028,366 | 5,245,000 | 5,269,153 | 10,514,153 | 1.05 |
| | 2003 | 19,253,924 | 11,155,995 | 8,097,929 | 5,505,000 | 5,165,605 | 10,670,605 | 0.76 |
| | 2004 | 19,478,139 | 18,195,938 | 1,282,201 | 5,915,000 | 4,595,219 | 10,510,219 | 0.12 |
| | 2005 | 13,627,651 | 16,005,392 | (2,377,741) | 6,615,000 | 4,185,120 | 10,800,120 | (0.22) |
| Sewerage | 1996 | $ 191,437,994 | $ 129,940,772 | $ 61,496,822 | $ 9,495,000 | $ 26,160,558 | $ 35,655,558 | 1.72 |
| | 1997 | 203,577,524 | 148,367,972 | 55,209,552 | 19,145,000 | 30,955,529 | 50,100,529 | 1.10 |
| | 1998 | 213,156,570 | 152,103,431 | 61,053,139 | 19,960,000 | 30,888,895 | 50,848,895 | 1.20 |
| | 1999 | 216,030,409 | 156,676,750 | 59,353,659 | 19,975,000 | 28,348,056 | 48,323,056 | 1.23 |
| | 2000 | 222,923,491 | 160,848,641 | 62,074,850 | 20,035,000 | 48,018,523 | 68,053,523 | 0.91 |
| | 2001 | 252,378,530 | 172,283,255 | 80,095,275 | 21,221,008 | 47,640,877 | 68,861,885 | 1.16 |
| | 2002 | 267,993,505 | 179,184,870 | 88,808,635 | 24,880,174 | 59,013,182 | 83,893,356 | 1.06 |
| | 2003 | 288,111,143 | 167,746,804 | 120,364,339 | 33,600,000 | 75,313,586 | 108,913,586 | 1.11 |
| | 2004 | 319,809,741 | 182,983,983 | 136,825,758 | 38,745,000 | 97,681,676 | 136,426,676 | 1.00 |
| | 2005 | 313,588,275 | 163,400,354 | 150,187,921 | 32,590,000 | 82,510,501 | 115,100,501 | 1.30 |
| Water | 1996 | $ 156,540,046 | $ 113,227,862 | $ 43,312,184 | $ 7,675,000 | $ 21,973,576 | $ 29,648,576 | 1.46 |
| | 1997 | 162,897,412 | 123,272,350 | 39,625,062 | 10,115,000 | 27,269,396 | 37,384,396 | 1.06 |
| | 1998 | 171,159,391 | 134,202,605 | 42,956,786 | 11,135,000 | 26,904,834 | 38,039,834 | 1.13 |
| | 1999 | 185,962,699 | 125,855,197 | 60,107,502 | 11,135,000 | 27,607,083 | 38,742,083 | 1.55 |
| | 2000 | 193,345,324 | 146,559,155 | 46,786,169 | 15,775,000 | 50,669,173 | 66,444,173 | 0.70 |
| | 2001 | 194,445,009 | 146,794,104 | 47,650,905 | 17,775,000 | 44,669,855 | 62,444,855 | 0.76 |
| | 2002 | 209,227,939 | 155,246,936 | 53,981,003 | 18,140,000 | 59,848,300 | 77,988,300 | 0.69 |
| | 2003 | 244,781,888 | 159,314,200 | 85,467,688 | 19,400,000 | 68,404,598 | 87,804,598 | 0.97 |
| | 2004 | 255,417,183 | 152,561,771 | 102,855,412 | 20,145,000 | 67,214,950 | 87,359,950 | 1.18 |
| | 2005 | 260,613,085 | 156,953,698 | 103,659,387 | 22,440,000 | 85,928,089 | 108,368,089 | 0.96 |

(1) Operating Expenses-Excluding Depreciation.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 15:08:2013 11:32

Table 13

## City of Detroit, Michigan
### REAL PROPERTY VALUE, CONSTRUCTION PERMITS AND BANK DEPOSITS
#### Last Ten Fiscal Years
(Dollars Expressed in Millions)
Unaudited

| Fiscal Year | Real Property Value (Note 1) | | | New Construction (Note 2) | | | | Alterations/Additions (Note 2) | | | | Commercial Bank Deposits (Note 3) |
| | Residential | Commercial | Exempt | Residential | | Non-Residential | | Residential | | Non-Residential | | |
| | | | | No. of Bldg. | Value | No. of Bldg. | Value | No. of Bldg. | Value | No. of Bldg. | Value | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1996 | $ 3,119 | $ 1,488 | N/A | 53 | $ 17.40 | 313 | $ 237.91 | 2,119 | $ 37.66 | 685 | $ 255.53 | 10.51 |
| 1997 | 3,145 | 1,559 | N/A | 69 | 7.99 | 370 | 223.10 | 3,416 | 91.49 | 890 | 253.46 | 10.30 |
| 1998 | 3,237 | 1,610 | N/A | 90 | 33.32 | 343 | 256.17 | 4,093 | 77.02 | 815 | 431.88 | 10.38 |
| 1999 | 3,328 | 1,677 | N/A | 129 | 47.00 | 370 | 287.64 | 4,726 | 53.46 | 823 | 381.65 | 11.80 |
| 2000 | 3,440 | 1,780 | N/A | 140 | 29.78 | 331 | 475.38 | 5,593 | 91.17 | 864 | 592.39 | 12.70 |
| 2001 | 3,530 | 1,956 | N/A | 116 | 34.31 | 292 | 336.62 | 5,126 | 122.93 | 884 | 575.30 | N/A |
| 2002 | 3,925 | 2,058 | N/A | 84 | 10.63 | 340 | 385.82 | 5,087 | 75.88 | 1,053 | 622.18 | N/A |
| 2003 | 4,197 | 2,028 | N/A | 244 | 55.18 | 290 | 339.78 | 5,516 | 86.90 | 1,141 | 467.36 | N/A |
| 2004 | 4,329 | 2,140 | N/A | 483 | 70.96 | 338 | 280.09 | 5,308 | 123.96 | 1,087 | 330.84 | N/A |
| 2005 | 4,943 | 2,304 | N/A | 411 | 81.36 | 268 | 243.39 | 5,418 | 92.24 | 975 | 398.09 | N/A |

Note 1 Source: City of Detroit 2004-2005 Budget

Note 2 Source: City of Detroit Department of Buildings and Safety Engineering

Note 3 Source: The Sheshunoff Data Report for all years prior to 2001. N/A - Data not available.

C-86

Table 14

## City of Detroit, Michigan
### PRINCIPAL TAXPAYERS
#### For the Year Ended June 30, 2005
Unaudited

| Taxpayer | Type of Business | Real Estate | | Personal Property | | Total | |
| | | Taxable Valuation | % of Total | Taxable Valuation | % of Total | Taxable Valuation | % of Total |
|---|---|---|---|---|---|---|---|
| Daimler-Chrysler Corporation | Automotive | $ 128,767,660 | 1.89 % | $ 610,099,600 | 40.48 % | $ 738,867,260 | 8.86 % |
| Detroit Edison | Utility | 51,269,238 | 0.75 | 308,229,060 | 20.45 | 359,498,298 | 4.31 |
| General Motors Corporation | Automotive | 49,134,783 | 0.72 | 129,078,070 | 8.56 | 178,212,853 | 2.14 |
| Michigan Consolidated Gas | Utility | 1,655,473 | 0.02 | 145,681,702 | 9.67 | 147,337,175 | 1.77 |
| Riverfront Holdings Inc | Real Estate | 123,150,856 | 1.80 | - | 0.00 | 123,150,856 | 1.48 |
| American Axle | Auto Supplier | 16,901,259 | 0.25 | 75,052,600 | 4.98 | 91,953,859 | 1.10 |
| One Detroit Center LP | Real Estate | 53,207,221 | 0.78 | 108,030 | 0.01 | 53,315,251 | 0.64 |
| Cingular Wireless LLC | Utility | - | 0.00 | 47,738,424 | 3.17 | 47,738,424 | 0.57 |
| Greektown Casino LLC | Gaming | 28,426,871 | 0.42 | 11,949,480 | 0.79 | 40,376,351 | 0.48 |
| Detroit Entertainment LLC | Casino | 16,854,374 | 0.25 | 20,290,190 | 1.35 | 37,144,564 | 0.45 |
| Total | | $ 469,367,735 | 6.87 % | $ 1,348,227,156 | 89.45 % | $ 1,817,594,891 | 21.80 % |

| Total City Taxable Value Fiscal Year 2004-05 | $ 6,828,590,407 | $ 1,507,199,386 | $ 8,335,789,793 |
|---|---|---|---|

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 15:08:2013 11:32

Table 15

**City of Detroit, Michigan**
**LARGEST PRIVATE EMPLOYERS**
**June 30, 2005**
**Unaudited**

| Company | Detroit Employment |
|---|---|
| Detroit Medical Center | 10,617 |
| DaimlerChrysler AG | 9,900 |
| Henry Ford Health System | 7,404 |
| General Motors Corporation | 6,311 |
| St. John Health System | 4,821 |
| American Axle & Manufacturing Holdings Inc | 4,309 |
| DTE Energy Co | 3,987 |
| Compuware Corp | 3,946 |
| Motor City Casino | 2,800 |
| Blue Cross and Blue Shield of Michigan | 2,694 |

SOURCE:  Crain's Book of Lists, 2006 Edition, December 2005.

C-87

**THIS PAGE LEFT BLANK INTENTIONALLY**

151

150

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 15:08:2013 11:32

Table 16

**City of Detroit, Michigan**
**MISCELLANEOUS STATISTICS**
**June 30, 2005**
**Unaudited**

Table 16

| | |
|---|---|
| Year Founded | 1701 |
| Year of Incorporation | 1806 |
| Year of Adoption of Present City Charter | 1996 |
| Form of Government: Nonpartisan - Mayor and Nine-Member Council | |
| Area in Square Miles | 137.9 |
| Miles of Shore Line on Detroit River (Excluding Belle Isle) | 10.66 |
| Population (United States Census): | |
| 1930 | 1,568,662 |
| 1940 | 1,623,452 |
| 1950 | 1,849,568 |
| 1960 | 1,670,144 |
| 1970 | 1,511,482 |
| 1980 | 1,203,339 |
| 1990 | 1,027,974 |
| 2000 | 951,270 |
| Building Permits: | |
| Number of Building Permits Issued | 7,233 |
| Estimated Cost of Construction | $ 815,077,078 |
| Election of November 2005: | |
| Number of Registered Voters | 637,870 |
| Number of Ballots Cast | 328,530 |
| Percentage of Registered Voters Voting | 51.50 % |
| Fire Department: | |
| Number of Fire Stations | 49 |
| Number of Employees | 1,796 |
| Number of Fire Fighting Vehicles | 238 |
| Number of Fire Hydrants | 38,000 |
| Responses to Fire Alarms (Including 12,454 False Alarms) | 34,160 |
| Responses to Special Calls and Emergency Medical Service Calls | 151,285 |
| Estimated Fire Loss of Property (FYE 6/30/2002) | $ 1,921,197,050 |
| Health Department: | |
| Number of Employees | 568 |
| Birth Rate per Thousand (2003) | 14.8 |
| Death Rate per Thousand (2003) | 9.5 |
| Infant Mortality Rate per Thousand Live Births (2003) | 16.5 |
| Libraries: | |
| Number of Libraries (Including Two Bookmobiles) | 27 |
| Estimated Number of Books | 3,497,342 |
| Circulation | 981,689 |
| Number of City Owned Vehicles (Excluding 548 Transportation Department Revenue Vehicles) | |
| Fire Department Vehicles (Includes 48 EMS Vehicles) | 276 |
| Police Department Vehicles | 2,342 |
| Transportation Department non- revenue vehicles | 213 |
| All Other Departments (Passenger Vehicles, Commercial Vehicles and Trucks) | 833 |
| Police Department: | |
| Number of Stations (Including 16 Mini-Stations) | 28 |
| Number of Employees (Uniform) | 4,673 |
| Number of Traffic Violations Issued (including 507,573 Parking Tickets) | 736,131 |
| Number of Traffic Ordinance Violations Issued | 45,121 |
| Number of Arrests (Traffic 16,415) + (Other 48,124) | 79,852 |
| Public Works Department: | |
| Number of Employees | 1,316 |
| Miles of Streets (Paved 2,769) + (Unpaved 15) | 2,784 |
| Miles of Alleys (Paved 598.12) + (Unpaved 685.46) | 1,284 |
| Miles of Sidewalks | 4,265 |

(Continued)

| | |
|---|---|
| Public Lighting: | |
| Electric Plant: | |
| Number of Street Lights | 87,500 |
| Number of Revenue Customers | 179 |
| Size of Generating Station in Kilowatts | 184,000 |
| Kilowatt Hours Generated (Net) | 308,391,000 |
| Kilowatt Hours Delivered to System | 567,529,080 |
| Steam Heating Plants - Steam Produced in Pounds | 71,852,887 |
| Recreation Department: | |
| Number of Parks, Ornamental Areas, Playfields and Playgrounds Owned (5,108 Acres) | 391 |
| Number of Summer Camps (199 Acres) | 1 |
| Number of Recreation Centers, Playgrounds and School Facilities Operated | 30 |
| Number of Skating Rinks | 1 |
| Number of Swimming Pools | 17 |
| Number of Municipal Beaches | 1 |
| Total Playing Permits Issued at 6 Municipal Golf Courses | 269,870 |
| Sewage Disposal System: | |
| Number of Sewage Disposal Plants | 1 |
| Number of Pumping Stations | 12 |
| Miles of (Trunk Line 1,125) + (Lateral 2,258) Sewers | 3,383 |
| Transportation Department: | |
| Number of Employees | 1,750 |
| Number of Revenue Vehicles | 561 |
| Seating Capacity | 22,065 |
| Number of Route Miles | 1,198 |
| Total Number of Passengers (Estimated) | 36,000,000 |
| Regular Fare | $ 1.50 |
| Tickets | 5 for $6.50 |
| Transfers | $ 0.25 |
| Water System: | |
| Number of Customer Accounts | 281,104 |
| Average Pumpage - Millions of Gallons per Day | 640.0 |
| Greatest Pumpage for a Single Day During Fiscal Year (6-30-04) - July 31, 2003 Gallons | 1,060,500,000 |
| Greatest Pumpage for a Single Hour During Fiscal Year (6-30-04) - July 31, 2003 9 pm Gallons | 52,208,000 |
| Filtration Plant Rated Capacity - Millions of Gallons per Day | 1,670.0 |
| Number of Miles of Water Mains | 3,840 |
| Average Cost (Includes Domestic, Industrial and Commercial) per 1,000 Cubic Feet | 11.49 |
| Employees on Payroll on June 30, 2005: | |
| Classified (Tax Supported 5,420) + (Revenue Supported 4,243) | 9,663 |
| Elective (Tax Supported 41) + (Revenue Supported 0) | 41 |
| Appointive (Tax Supported 320) + (Revenue Supported 6) | 326 |
| Uniform Police (Tax Supported 5,237) + (Revenue Supported 0) | 5,237 |
| Total Employees (Tax Supported 13,187) + (Revenue Supported 5,742) | 15,267 |
| Total Pensioners as of June 30, 2005 | 20,290 |

The miscellaneous statistics are for the most part compiled by the respective City Departments.

C-88

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit 15 Oct 2013   11:32



**Honorable Maryann Mahaffey**
**Member Detroit City Retires**

C-89

In September 2005, Detroit Council Member Maryann Mahaffey, A.C.S.W announced that she would not run for another term to begin January 2006.  Mrs. Mahaffey was elected to Detroit City Council in 1974.  She served as Council President Pro Tem (1978-1982 and 1998-2001) and as President (1990-1998) and (2002-2005). She is a Professor Emeritus at the School of Social Work, Wayne State University where she taught from 1965 to 1990.  Maryann served 8 terms on City Council.

A native of Burlington, Iowa, she received her undergraduate degree from Cornell College, Iowa, and her Masters of Social Work degree from the University of Southern California. She has been awarded an honorary Doctor of Humane Letters Degree from Cornell College.

As a Detroit City Council member, Maryann designed the first Rape Crisis Center in the Police Department and chaired the City Council Housing Task Force with an emphasis on housing for low-income people. Some of the ordinances she is responsible for include: Emergency Homeless Shelter Licensing Ordinance, Family Child Care Zoning Laws, Home Rental Registration, Repair to Own Home Ordinance, Handgun Safety Training Ordinance, Sexual Harassment Ordinance, and an ordinance barring smoking in city-owned buildings.  She authored the Policy on Homelessness for New Detroit, Inc. and the American Orthopsychiatric Association.

The City of Detroit sincerely thanks Councilmember Maryann Mahaffey for her many contributions and untiring years of faithfully serving the citizens of Detroit.

THIS PAGE LEFT BLANK INTENTIONALLY

154

Our Special Thanks To:

## City of Detroit, Michigan
*www.ci.detroit.mi.us*

### Finance Department

**Financial Reporting and
Grants Management Sections**
and Staff
Almon G. Turner Jr, MSA, Manager II

Wolinski and Company, CPA's
and Staff

**General Accounting Section**
and Staff
Richard E. Williams, Manager II
Saied S. Rouhani, Manager I
David Capobres Jr. Manager I
Cynthia Lampkin, Manager I
and all Finance Department staff for their commitment and
dedicated service in the preparation of this report

**City of Detroit - Agencies**
for their full cooperation in providing all the necessary
information needed to compile this report

**Detroit Resource Management System**
and staff
Joan Moss, General Manager

### Communications and Creative Services Department
Chris Kopicko, Supervising Publicist
Kwabea Shabu, Supervising Photographer

**KPMG LLP**
and staff

**Alan C. Young & Associates, P.C.**
and Staff

**BOWNE of Detroit**
for printing this report



**CITY OF DETROIT**

**Kwame M. Kilpatrick**
Mayor

**DETROIT CITY COUNCIL**

**Kenneth V. Cockrel Jr.,** President
**Monica Conyers,** President Pro Tem
**JoAnn Watson**
**Sheila M. Cockrel**
**Barbara-Rose Collins**
**Kwame Kenyatta**
**Alberta Tinsley-Talabi**
**Martha Reeves**
**Brenda Jones**

**Janice M. Winfrey,** City Clerk

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08.2013   11:32

APPENDIX D

**GLOBAL BOOK-ENTRY SYSTEM**

*General*

The description that follows of the procedures for record keeping about beneficial ownership of the Certificates, payment of principal of and interest on the Certificates, confirmation and transfer of beneficial ownership interests in the Certificates, and other securities-related transactions is based solely on information furnished by The Depository Trust Company (**DTC**), Clearstream and Euroclear and has not been independently verified by the City, the Service Corporations, the 2006 Funding Trust or the Underwriters.

Beneficial owners of the Certificates may hold their certificates through DTC, which is located in the United States (**U.S.**), or Clearstream or Euroclear, which are in Europe, if they are participants of one of those systems, or indirectly through organizations that are participants in any of those systems.

DTC will act as a securities depository for the Certificates.  Clearstream and Euroclear will hold omnibus positions, on behalf of their respective participants, through customers' securities accounts in Clearstream's and Euroclear's names on the books of their respective depositories, which in turn will hold such positions in customers' securities accounts in the names of their respective depositories on the books of DTC.

*DTC*

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the U.S. Securities Exchange Act of 1934. DTC holds securities that DTC's participants (**Direct Participants**) deposit with DTC.  DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts.  This eliminates the need for physical movement of securities certificates.  Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations.  DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("**DTCC**").  DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation and Emerging Markets Clearing Corporation, (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly (**Indirect Participants**).  The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission.

Transfers between DTC Participants will occur in accordance with DTC rules. Transfers between Clearstream Participants and Euroclear Participants will occur in the ordinary way in accordance with their applicable rules and operating procedures.

Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Clearstream Participants or Euroclear Participants, on the other, will be effected in DTC in accordance with DTC rules on behalf of the relevant European international clearing system by its depository; however, such cross-market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in such system in accordance with its rules and procedures and within its established deadlines based on European time.  The relevant European

D-1

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

international clearing system will, if the transaction meets its settlement requirements, deliver instructions to its depository to take action to effect final settlement on its behalf by delivering or receiving securities in DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Clearstream Participants and Euroclear Participants may not deliver instructions directly to the depositories.

Because of time-zone differences, credits of securities in Clearstream or Euroclear as a result of a transaction with a DTC Participant will be made during the subsequent securities settlement processing, dated the business day following the DTC settlement date, and such credits or any transactions in such securities settled during such processing will be reported to the relevant Clearstream Participant or Euroclear Participant on such business day. Cash received in Clearstream or Euroclear as a result of sales of securities by or through a Clearstream Participant or a Euroclear Participant to a DTC Participant will be received with value on the DTC settlement date but will be available in the relevant Clearstream or Euroclear cash account only as of the business day following settlement in DTC. Day traders who use Clearstream or Euroclear and who purchase the Certificates from DTC Participants for delivery to Clearstream Participants or Euroclear Participants should note that these trades may fail on the sale side unless affirmative actions are taken. Participants should consult with their clearing system to confirm that adequate steps have been taken to assure settlement.

Purchases of Certificates under the DTC system must be made by or through DTC Participants, which will receive a credit for the Certificates on DTC's records. The ownership interest of each actual owner of a Certificate (**Beneficial Owner**) is in turn to be recorded on the Direct Participants' and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase, but Beneficial Owners are expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct Participant or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Certificates are to be accomplished by entries made on the books of Direct or Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interest in Certificates, except when use of the book-entry system for the Certificates is discontinued.

To facilitate subsequent transfers, all Certificates deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of Certificates with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Certificates; DTC's records reflect only the identity of the Direct Participants to whose accounts such Certificates are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Certificates may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Certificates, such as redemptions, tenders, defaults, and proposed amendments to the Certificate documents. For example, Beneficial Owners of Certificates may wish to ascertain that the nominee holding the Certificates for their benefit has agreed to obtain and transmit notices to Beneficial Owners. Any failure of DTC to advise any Direct Participant, or of any Direct Participant or Indirect Participant to advise a Beneficial Owner, of any notice of redemption or its content or effect will not affect the validity of the redemption of Certificates called for redemption or any other action premised on such notice.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Certificates unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the issuer as soon as possible after the record date. The Omnibus

D-2
13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 216 of
248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 216 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Det unit/15-08-2013 14:38

Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Certificates are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Because DTC can only act on behalf of DTC Participants, who in turn act on behalf of Indirect Participants and some other banks, the Beneficial Owner of a Certificate may be limited in its ability to pledge Certificates to persons or entities that do not participate in the DTC system, or to otherwise take actions with respect to those Certificates due to the lack of a physical certificate for those Certificates.

Principal and interest payments on the Certificates will be made to DTC. DTC's practice is to credit the accounts of the DTC Participants, upon DTC's receipt of funds and corresponding detail information from the Trustee, on payment dates in accordance with their respective holdings shown on the records of DTC. Payments by DTC Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name" and will be the responsibility of such DTC Participant and not of DTC, the Trustee or the 2006 Funding Trust, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest to DTC is the responsibility of the Trustee, disbursement of such payments to DTC Participants will be the responsibility of DTC, and disbursement of such payments to Beneficial Owners will be the responsibility of DTC Participants and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Certificates at any time by giving reasonable notice to the Trustee. Under such circumstances, if a successor securities depository is not obtained, Certificate certificates are required to be prepared and delivered. The 2006 Funding Trust may decide to discontinue use of the system of book-entry transfers through DTC, or a successor Securities depository. In that event, Certificate certificates will be delivered to the Beneficial Owners of the Certificates.

### Clearstream

Clearstream Banking, société anonyme (**Clearstream**) is a limited liability company organized under Luxembourg law and is registered as a bank in Luxembourg. Clearstream holds securities for its Participants and facilitates the clearance and settlement of securities transactions between Clearstream Participants through electronic book-entry changes in accounts of Clearstream Participants, thereby eliminating the need for physical movement of certificates. Clearstream provides to Clearstream Participants, among other things, services for safekeeping, administration, clearance, and settlement of internationally traded securities and securities lending and borrowing. Clearstream Participants are financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies, and clearing corporations. Indirect access to Clearstream is also available to others, such as banks, brokers, dealers, and trust companies that clear through or maintain a custodial relationship with a Clearstream Participant, either directly or indirectly.

### Euroclear

Euroclear was created in 1968 to hold securities for its participants and to clear and settle transactions between its participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash. The Euroclear System is owned by Euroclear plc and operated through a license agreement by Euroclear Bank S.A./N.V., a bank incorporated under the laws of the Kingdom of Belgium (**Euroclear Operator**).

The Euroclear Operator holds securities and book-entry interests in securities for participating organizations and facilities the clearance and settlement of securities transactions between Euroclear Participants, and between Euroclear Participants and Participants of certain other securities intermediaries through electronic book-entry changes in accounts of such Participants or other securities intermediaries.

D-3
13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 217 of
248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 217 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08.2013 11.32

The Euroclear Operator provides Euroclear Participants, among other things, with safekeeping, administration, clearance and settlement, securities lending and borrowing, and related services. Non-Participants of Euroclear or any other securities intermediary that holds a book-entry interest in the Certificates through one or more securities intermediaries standing between such other securities intermediary and the Euroclear Operator.

The Euroclear Operator is regulated and examined by the Belgian Banking and Finance Commission and the National Bank of Belgium.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System, and applicable Belgian law (collectively, **Terms and Conditions**). The Terms and Conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Terms and Conditions only on behalf of Euroclear Participants and has no record of or relationship with Persons holding through Euroclear Participants.

### Initial Settlement

All global securities will be held in book-entry form by DTC in the name of Cede & Co. as nominee of DTC. Investors' interests in the global securities will be represented through financial institutions acting on behalf of their participants through their respective depositaries, which in turn will hold such positions in accounts as participants of DTC.

Investors electing to hold their global securities through DTC will follow the settlement practices applicable to prior asset-backed certificates issues. Investor securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold their global securities through Clearstream, Luxembourg or Euroclear accounts will follow the settlement procedures applicable to conventional Eurobonds, except that there will be no temporary global security and no "lock-up" or restricted period. Global securities will be credited to the securities custody accounts on the settlement date against payment in same-day funds.

### Secondary Market Trading

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

*Trading between Participants of DTC.* Secondary market trading between participants of DTC will be settled using the procedures applicable to prior asset-backed certificates issues in same-day funds.

*Trading between Clearstream, Luxembourg and/or Euroclear Participants.* Secondary market trading between Clearstream, Luxembourg or Euroclear participants will be settled using the procedures applicable to conventional Eurobonds in same-day funds.

*Trading between DTC Seller and Clearstream, Luxembourg or Euroclear Purchaser.* When global securities are to be transferred from the account of a participant of DTC to the account of a Clearstream, Luxembourg or Euroclear participant, the purchaser will send instructions to Clearstream, Luxembourg or Euroclear through a Clearstream, Luxembourg or Euroclear participant at least one business day prior to settlement. Clearstream, Luxembourg or Euroclear will instruct the respective depositary, as the case may be, to receive the global securities against payment. Payment will include interest accrued on the global securities from and including the last coupon payment date to and excluding the settlement date, on the basis of the

D-4

13-53846-tjt   Doc 348-7   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 218 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 218 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

actual number of days in such accrual period and a year assumed to consist of 360 days, or a 360-day year of twelve 30-day months, as applicable. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. Payment will then be made by the respective depositary of the account of the participant of DTC against delivery of the global securities. After settlement has been completed, the global securities will be credited to the respective clearing system and by the clearing system, in accordance with its usual procedures, to the Clearstream, Luxembourg or Euroclear participant's account. The securities credit will appear the next day (European time) and the cash debt will be back-valued to, and the interest on the global securities will accrue from, the value date (which would be the preceding day when settlement occurred in New York). If settlement is not completed on the intended value date (*i.e.*, the trade fails), the Clearstream, Luxembourg or Euroclear cash debt will be valued instead as of the actual settlement date.

Clearstream, Luxembourg and Euroclear participants will need to make available to the respective clearing systems the funds necessary to process same-day funds settlement. The most direct means of doing so is to preposition funds for settlement, either from cash on hand or existing lines of credit, as they would for any settlement occurring within Clearstream, Luxembourg or Euroclear. Under this approach, they may take on credit exposure to Clearstream, Luxembourg or Euroclear until the global securities are credited to their accounts one day later.

As an alternative, if Clearstream, Luxembourg or Euroclear has extended a line of credit to them, Clearstream, Luxembourg or Euroclear participants can elect not to preposition funds and allow that credit line to be drawn upon the finance settlement. Under this procedure, Clearstream, Luxembourg or Euroclear participants purchasing global securities would incur overdraft charges for one day, assuming they cleared the overdraft when the global securities were credited to their accounts. However, interest on the global securities would accrue from the value date. Therefore, in many cases the investment income on the global securities earned during that one-day period may substantially reduce or offset the amount of such overdraft charges, although this result will depend on each Clearstream, Luxembourg or Euroclear participant's particular cost of funds.

Since the settlement is taking place during New York business hours, participants of DTC can employ their usual procedures for sending global securities to the respective European depositary for the benefit of Clearstream, Luxembourg or Euroclear participants. The sale proceeds will be available to DTC seller on the settlement date. Thus, to participants of DTC a cross-market transaction will settle no differently than a trade between two participants of DTC.

*Trading between Clearstream, Luxembourg or Euroclear Seller and DTC Purchaser.* Due to time zone differences in their favor, Clearstream, Luxembourg and Euroclear participants may employ their customary procedures for transactions in which global securities are to be transferred from the respective clearing system, through the respective depositary, to a participant of DTC. The seller will send instructions to Clearstream, Luxembourg or Euroclear through a Clearstream, Luxembourg or Euroclear participant at least one business day prior to settlement. In these cases, Clearstream, Luxembourg or Euroclear will instruct the depositary, as appropriate, to deliver the global securities to the account of the participant of DTC against payment. Payment will include interest accrued on the global securities from and including the last coupon payment to and excluding the settlement date on the basis of the actual number of days in such accrual period and a year assumed to consist of 360 days, or a 360-day year of twelve 30-day months, as applicable. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. The payment will then be reflected in the account of the Clearstream, Luxembourg or Euroclear participant the following day, and receipt of the cash proceeds in the Clearstream, Luxembourg or Euroclear participant's account would be back-valued to the value date (which would be the preceding day when settlement occurred in New York). Should the Clearstream, Luxembourg or Euroclear participant have a line of credit with its respective clearing system and elect to be in debt in anticipation of receipt of the sale proceeds in its account, the back-valuation will extinguish any overdraft incurred over that one-day period. If settlement is not completed on the intended value date (*i.e.*, the trade fails), receipt of the

D-5

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

cash proceeds in the Clearstream, Luxembourg or Euroclear participant's account would instead be valued as of the actual settlement date.

Finally, day traders that use Clearstream, Luxembourg or Euroclear and that purchase global securities from participants of DTC for delivery to Clearstream, Luxembourg or Euroclear participants should note that these trades would automatically fail on the sale side unless affirmative action were taken. At least three techniques should be readily available to eliminate this potential problem:

- Borrowing through Clearstream, Luxembourg or Euroclear for one day (until the purchase side of the day trade is reflected in their Clearstream, Luxembourg or Euroclear accounts) in accordance with the clearing system's customary procedures;

- Borrowing the global securities in the U.S. from a participant of DTC no later than one day prior to settlement, which would give the global securities sufficient time to be reflected in their Clearstream, Luxembourg or Euroclear accounts in order to settle the sale side of the trade; or

- Staggering the value dates for the buy and sell sides of the trade so that the value date for the purchase from the participant of DTC is at least one day prior to the value date for the sale to the Clearstream, Luxembourg or Euroclear participant.

### *Certain U.S. Federal Income Tax Documentation Requirements*

**NOTICE PURSUANT TO IRS CIRCULAR 230: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, YOU ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX CONSIDERATIONS IN THIS OFFERING CIRCULAR IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE UNITED STATES INTERNAL REVENUE CODE; (B) THIS OFFERING CIRCULAR IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN; AND (C) YOU SHOULD SEEK ADVICE BASED ON YOUR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**This summary does not deal with all aspects of U.S. Federal income tax withholding that may be relevant to foreign holders of the global securities. Investors are advised to consult their own tax advisors for specific tax advice concerning their holding and disposing of the global securities as well as the application of the U.S. Treasury regulations relating to tax documentation requirements.**

A beneficial owner of global securities holding securities through Clearstream, Luxembourg or Euroclear (or through DTC if the holder has an address outside the U.S.) will be subject to the 30% U.S. withholding tax that generally applies to payments of interest (including original issue discount) on registered debt issued by U.S. Persons, unless (i) each clearing system, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business in the chain of intermediaries between such beneficial owner and the U.S. entity required to withhold tax complies with applicable certification requirements and (ii) such beneficial owner takes one of the following steps to obtain an exemption or reduced tax rate.

*Exemption for Non-US. Persons (Form W-8BEN).* Beneficial owners of global securities that are non-U.S. Persons can obtain a complete exemption from the withholding tax by filing a signed Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Withholding Tax). If the information shown on Form W-8BEN changes, a new Form W-8BEN must be filed within 30 days of such change.

*Exemption for Non-U.S. Persons with Effectively Connected Income (Form W-8ECI). A* non-U.S. Person including a non-U.S. corporation or bank with a U.S. branch, for which the interest income is effectively connected with its conduct of a trade or business in the U.S., can obtain an exemption from the

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 220 of 248

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 220 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/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-11-08

withholding tax by filing Form W-8ECI (Exemption from Withholding of Tax on Income Effectively Connected with the Conduct of a Trade or Business in the United States).

*Exemption or Reduced Rate for Non-U.S. Persons Resident in Treaty Countries (Form W-8BEN).* Non-U.S. Persons that are security owners residing in a country that has a tax treaty with the U.S. can obtain an exemption or reduced tax rate (depending on the treaty terms) by filing Form W-8BEN (including Part II thereof).

*Exemption for U.S. Persons (Form W-9).* U.S. Persons can obtain a complete exemption from the withholding tax by filing Form W-9 (Payer's Request for Taxpayer Identification Number and Certification).

*U.S. Federal Income Tax Reporting Procedure.* The owner of a global security files by submitting the appropriate form to the person through whom it holds (the clearing agency, in the case of persons holding directly on the books of the clearing agency). Form W-8BEN and Form W-8ECI are effective until the third calendar year from the date the form is signed.

The term "**U.S. Person**" means:

- a citizen or resident of the U.S.;

- a corporation or partnership, or other entity taxable as such, organized in or under the laws of the U.S. or any state (including the District of Columbia);

- an estate the income of which is includible in gross income for U.S. tax purposes, regardless of its source; or

- a trust, if a court within the U.S. is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all substantial decisions of the trust.

*Custody*

Investors who are Euroclear Participants may acquire, hold, or transfer interests in the securities by book-entry to accounts with Euroclear Operator. Investors who are not Participants of Euroclear may acquire, hold, or transfer interests in the securities by book-entry to accounts with a securities intermediary who holds a book-entry interest in the securities through accounts with Euroclear.

*Custody Risks*

Investors that acquire, hold, and transfer interest in the securities by book-entry through accounts with the Euroclear Operator or any other securities intermediary are subject to the laws and contractual provisions governing their relationship with their intermediary, as well as the laws and contractual provisions governing the relationship between such an intermediary and each other intermediary, if any, standing between themselves and the individual securities.

The Euroclear Operator has advised as follows:

Under Belgian law, investors that are credited with securities on the records of the Euroclear Operator have a co-property right in the fungible pool of interests in securities on deposit with the Euroclear Operator in an amount equal to the amount of interests in securities credited to their accounts. In the event of the solvency of the Euroclear Operator, Euroclear Participants would have a right under Belgian law to the return of the amount and type of interests in securities credited to their accounts with the Euroclear Operator. If the Euroclear Operator did not have a sufficient amount of interests in securities on deposit of a particular type to cover the claims of all Euroclear Participants credited with such interests in securities on the Euroclear Operator's records, all Euroclear Participants having an amount of interests in securities of such type credited to their accounts with the Euroclear Operator would have the right under Belgian law to the return of their *pro rata* share of the amount of interests in securities actually on deposit.

Under Belgian law, the Euroclear Operator is required to pass on the benefits of ownership in any interests in securities on deposit with it (such as dividends, voting rights, and other entitlements) to any person credited with such interests in securities on its records.

### *Distributions*

Distributions with respect to Certificates held through Clearstream or Euroclear will be credited to the cash accounts of Clearstream Participants or Euroclear Participants in accordance with the relevant system's rules and procedures, to the extent received by its depository. Such distributions will be subject to tax reporting in accordance with relevant U.S. tax laws and regulations. See "UNITED STATES FEDERAL TAX CONSIDERATIONS - Information Reporting and Backup Withholding" in the Offering Circular which precedes this Appendix. Clearstream or the Euroclear Operator, as the case may be, will take any other action permitted to be taken by a beneficial owner of the Certificates under the Trust Agreement on behalf of a Clearstream Participant or Euroclear Participant only in accordance with its relevant rules and procedures and subject to its depository's ability to effect such actions on its behalf through DTC.

DTC, Clearstream, and Euroclear are under no obligation to perform or continue to perform the foregoing procedures, and such procedures may be discontinued at any time.

No one can give any assurance that DTC, Clearstream, or Euroclear, or any of their direct or indirect Participants, will promptly transfer payments or notices received with respect to the Certificates. The 2006 Funding Trust, the Trustee, the Service Corporations and the City are not responsible for the failure of any of those parties to transfer to the Beneficial Owner payments or notices received with respect to the Certificates.

Similarly, no one can give any assurance that any depository will abide by its procedures or that its procedures will not be changed. In the event the 2006 Funding Trust designates a successor securities depository for the Certificates, the successor may establish different procedures

D-8

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 222 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08.2019  11:32

**INFORMATION ABOUT FINANCIAL GUARANTY**

*Financial Guaranty has supplied the following information for inclusion in this APPENDIX E.  No representation is made by the 2006 Funding Trust, the Service Corporations, the City or the Underwriters as to the accuracy or completeness of this information.*

**Payments Under the FGIC Policy**

Concurrently with the issuance of the FGIC-insured Certificates, Financial Guaranty Insurance Company ("Financial Guaranty") will issue its Municipal Certificate New Issue Insurance Policy for the FGIC-insured Certificates (the "FGIC Policy").  The FGIC Policy unconditionally guarantees the payment of that portion of the principal and interest on the FGIC-insured Certificates which has become due for payment, but shall be unpaid by reason of nonpayment of the FGIC-insured Certificates by the 2006 Funding Trust (the "Issuer").  Financial Guaranty will make such payments to U.S. Bank Trust National Association, or its successor as its agent (the "Fiscal Agent"), on the later of the date on which such principal or interest (as applicable) is due or on the business day next following the day on which Financial Guaranty shall have received notice (in accordance with the terms of the FGIC Policy) from an owner of FGIC-insured Certificates or the trustee or paying agent (if any) of the nonpayment of such amount by the Issuer.  The Fiscal Agent will disburse such amount due on any FGIC-insured Certificate to its owner upon receipt by the Fiscal Agent of evidence satisfactory to the Fiscal Agent of the owner's right to receive payment of the principal or interest (as applicable) due for payment and evidence, including any appropriate instruments of assignment, that all of such owner's rights to payment of such principal or interest (as applicable) shall be vested in Financial Guaranty.  The term "nonpayment" in respect of a FGIC-insured Certificate includes any payment of principal or interest (as applicable) made to an owner of a FGIC-insured Certificate which has been recovered from such owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

Once issued, the FGIC Policy is non-cancellable by Financial Guaranty.  The FGIC Policy covers failure to pay principal of the FGIC-insured Certificates on their stated maturity dates and their mandatory sinking fund redemption dates, and not on any other date on which the FGIC-insured Certificates may have been otherwise called for redemption, accelerated or advanced in maturity.  The FGIC Policy also covers the failure to pay interest on the stated date for its payment.  In the event that payment of the FGIC-insured Certificates is accelerated, Financial Guaranty will only be obligated to pay principal and interest in the originally scheduled amounts on the originally scheduled payment dates.  Upon such payment, Financial Guaranty will become the owner of the FGIC-insured Certificate, appurtenant coupon or right to payment of principal or interest on such FGIC-insured Certificate and will be fully subrogated to all of the FGIC-insured Certificateholder's rights thereunder.

The FGIC Policy does not insure any risk other than Nonpayment by the Issuer, as defined in the FGIC Policy.  Specifically, the FGIC Policy does not cover: (i) payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity; (ii) payment of any redemption, prepayment or acceleration premium; or (iii) nonpayment of principal or interest caused by the insolvency or negligence or any other act or omission of the trustee or paying agent, if any.

As a condition of its commitment to insure FGIC-insured Certificates, Financial Guaranty may be granted certain rights under the FGIC-insured Certificate documentation.  The specific rights, if any, granted to Financial Guaranty in connection with its insurance of the FGIC-insured Certificates may be

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Date: 07/15 08.2013 11:32

set forth in the description of the principal legal documents appearing elsewhere in the Offering Circular which precedes this Appendix, and reference should be made thereto.

The FGIC Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

**Financial Guaranty Insurance Company**

Financial Guaranty is a New York stock insurance corporation that writes financial guaranty insurance in respect of public finance and structured finance obligations and other financial obligations, including credit default swaps. Financial Guaranty is licensed to engage in the financial guaranty insurance business in all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands and the United Kingdom.

Financial Guaranty is a direct, wholly owned subsidiary of FGIC Corporation, a Delaware corporation. At March 31, 2006, the principal owners of FGIC Corporation and the approximate percentage of its outstanding common stock owned by each were as follows: The PMI Group, Inc. – 42%; affiliates of The Blackstone Group L.P. – 23%; and affiliates of The Cypress Group L.L.C. – 23%. Neither FGIC Corporation nor any of its stockholders or affiliates is obligated to pay any debts of Financial Guaranty or any claims under any insurance policy, including the FGIC Policy, issued by Financial Guaranty.

Financial Guaranty is subject to the insurance laws and regulations of the State of New York, where Financial Guaranty is domiciled, including New York's comprehensive financial guaranty insurance law. That law, among other things, limits the business of each financial guaranty insurer to financial guaranty insurance (and related lines); requires that each financial guaranty insurer maintain a minimum surplus to policyholders; establishes limits on the aggregate net amount of exposure that may be retained in respect of a particular issuer or revenue source (known as single risk limits) and on the aggregate net amount of exposure that may be retained in respect of particular types of risk as compared to the policyholders' surplus (known as aggregate risk limits); and establishes contingency, loss and unearned premium reserve requirements. In addition, Financial Guaranty is also subject to the applicable insurance laws and regulations of all other jurisdictions in which it is licensed to transact insurance business. The insurance laws and regulations, as well as the level of supervisory authority that may be exercised by the various insurance regulators, vary by jurisdiction.

At March 31, 2006, Financial Guaranty had net admitted assets of approximately $3.603 billion, total liabilities of approximately $2.454 billion, and total capital and policyholders' surplus of approximately $1.149 billion, determined in accordance with statutory accounting practices ("SAP") prescribed or permitted by insurance regulatory authorities.

The unaudited consolidated financial statements of Financial Guaranty and subsidiaries, on the basis of U.S. generally accepted accounting principles ("GAAP"), as of March 31, 2006, and the audited consolidated financial statements of Financial Guaranty and subsidiaries, on the basis of GAAP, as of December 31, 2005 and 2004, which have been filed with the Nationally Recognized Municipal Securities Information Repositories ("NRMSIRs"), are hereby included by specific reference in this Appendix. Any statement contained herein under the heading "APPENDIX E" in the Offering Circular, or in any documents included by specific reference herein, shall be modified or superseded to the extent required by any statement in any document subsequently filed by Financial Guaranty with such NRMSIRs, and shall not be deemed, except as so modified or superseded, to constitute a part of this Appendix or the Offering Circular. All financial statements of Financial Guaranty (if any) included in documents filed by Financial Guaranty with the NRMSIRs subsequent to the date of the Offering Circular

CONFIDENTIAL INFORMATION

mark.angelov@arentfox.com

Detroit/15:08:2013   11:32

and prior to the termination of the offering of the FGIC-insured Certificates shall be deemed to be included by specific reference into this Appendix and to be a part hereof from the respective dates of filing of such documents.

**The New York State Insurance Department recognizes only SAP for determining and reporting the financial condition and results of operations of an insurance company, for determining its solvency under the New York Insurance Law, and for determining whether its financial condition warrants the payment of a dividend to its stockholders.  Although Financial Guaranty prepares both GAAP and SAP financial statements, no consideration is given by the New York State Insurance Department to financial statements prepared in accordance with GAAP in making such determinations.  A discussion of the principal differences between SAP and GAAP is contained in the notes to Financial Guaranty's SAP financial statements.**

Copies of Financial Guaranty's most recently published GAAP and SAP financial statements are available upon request to: Financial Guaranty Insurance Company, 125 Park Avenue, New York, NY 10017, Attention: Corporate Communications Department.  Financial Guaranty's telephone number is (212) 312-3000.

**Financial Guaranty's Credit Ratings**

The financial strength of Financial Guaranty is rated "AAA" by Standard & Poor's, a Division of The McGraw-Hill Companies, Inc., "Aaa" by Moody's Investors Service, and "AAA" by Fitch Ratings. Each rating of Financial Guaranty should be evaluated independently.  The ratings reflect the respective ratings agencies' current assessments of the insurance financial strength of Financial Guaranty.  Any further explanation of any rating may be obtained only from the applicable rating agency.  These ratings are not recommendations to buy, sell or hold the FGIC-insured Certificates, and are subject to revision or withdrawal at any time by the rating agencies.  Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the FGIC-insured Certificates.  Financial Guaranty does not guarantee the market price or investment value of the FGIC-insured Certificates nor does it guarantee that the ratings on the FGIC-insured Certificates will not be revised or withdrawn.

**Neither Financial Guaranty nor any of its affiliates accepts any responsibility for the accuracy or completeness of the Offering Circular which precedes this Appendix or any information or disclosure that is provided to potential purchasers of the FGIC-insured Certificates, or omitted from such disclosure, other than with respect to the accuracy of information with respect to Financial Guaranty or the FGIC Policy herein under the heading "APPENDIX E" in the Offering Circular.  In addition, Financial Guaranty makes no representation regarding the FGIC-insured Certificates or the advisability of investing in the FGIC-insured Certificates.**

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

## FGIC

**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

## Municipal Bond
## New Issue Insurance Policy

| Issuer: | | Policy Number: | |
|---|---|---|---|
| | | **Control Number:** | 0010001 |
| **Bonds:** | | **Premium:** | |

Financial Guaranty Insurance Company ("Financial Guaranty"), a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably agrees to pay to U.S. Bank Trust National Association or its successor, as its agent (the "Fiscal Agent"), for the benefit of Bondholders, that portion of the principal and interest on the above-described debt obligations (the "Bonds") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

Financial Guaranty will make such payments to the Fiscal Agent on the date such principal or interest becomes Due for Payment or on the Business Day next following the day on which Financial Guaranty shall have received Notice of Nonpayment, whichever is later. The Fiscal Agent will disburse to the Bondholder the face amount of principal and interest which is then Due for Payment but is unpaid by reason of Nonpayment by the Issuer but only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it, of (i) evidence of the Bondholder's right to receive payment of the principal or interest Due for Payment and (ii) evidence, including any appropriate instruments of assignment, that all of the Bondholder's rights to payment of such principal or interest Due for Payment shall thereupon vest in Financial Guaranty. Upon such disbursement, Financial Guaranty shall become the owner of the Bond, appurtenant coupon or right to payment of principal or interest on such Bond and shall be fully subrogated to all of the Bondholder's rights thereunder, including the Bondholder's right to payment thereof.

This Policy is non-cancellable for any reason. The premium on this Policy is not refundable for any reason, including the payment of the Bonds prior to their maturity. This Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Bond.

As used herein, the term "Bondholder" means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof. "Due for Payment" means, when referring to the principal of a Bond, the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity and means, when referring to interest on a Bond, the stated date for payment of interest. "Nonpayment" in respect of a Bond means the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of all

---

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form 9000 (10/93)

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

**FGIC**

Financial Guaranty Insurance Company
125 Park Avenue
New York, NY 10017
T 212-312-3000
T 800-352-0001

## Municipal Bond
## New Issue Insurance Policy

principal and interest Due for Payment on such Bond. "Notice" means telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a Bondholder or a paying agent for the Bonds to Financial Guaranty. "Business Day" means any day other than a Saturday, Sunday or a day on which the Fiscal Agent is authorized by law to remain closed.

In Witness Whereof, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                                    **Authorized Representative**

U.S. Bank Trust National Association, acknowledges that it has agreed to perform the duties of Fiscal Agent under this Policy.

**Authorized Officer**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form 9000 (10/93)

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

**FGIC**

Financial Guaranty Insurance Company
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

## Endorsement

To Financial Guaranty Insurance Company
Insurance Policy

| Policy Number: | | Control Number: | 00I0001 |
|---|---|---|---|

It is further understood that the term "Nonpayment" in respect of a Bond includes any payment of principal or interest made to a Bondholder by or on behalf of the issuer of such Bond which has been recovered from such Bondholder pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

President

Effective Date:                                        Authorized Representative

Acknowledged as of the Effective Date written above:

Authorized Officer
U.S. Bank Trust National Association, as Fiscal Agent

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form E-0002 (10/93)                                                                                    Page 1 of 1

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Deposit/15:08:2013 11:32

## FGIC

**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212-312-3000
T 800-352-0001

## Endorsement
To Financial Guaranty Insurance Company
Insurance Policy

| Policy Number: | Control Number: | 0010001 |
| --- | --- | --- |

Notwithstanding the terms and provisions contained in this Policy, it is further understood that the term "Bondholder" shall not include the _____ [Conduit Obligor] (as such term is defined in the bond documentation).

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                                     **Authorized Representative**

**Acknowledged as of the Effective Date written above:**

**Authorized Officer**
**U.S. Bank Trust National Association, as Fiscal Agent**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form E-0018                                                                 Page 1 of 1

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 229 of
248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 229 of 248]
E-7

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

## INFORMATION ABOUT XL CAPITAL ASSURANCE INC.

The following information has been supplied by XL Capital Assurance Inc. for inclusion in this APPENDIX F.  No representation is made by the 2006 Funding Trust, the Service Corporations, the City or the Underwriters as to the accuracy or completeness of the information.

XLCA accepts no responsibility for the accuracy or completeness of THE Offering Circular which precedes this Appendix or any other information or disclosure contained therein, or omitted therefrom, other than with respect to the accuracy of the information regarding XLCA and its affiliates set forth in this APPENDIX F.  In addition, XLCA makes no representation regarding the XLCA-insured Certificates or the advisability of investing in the XLCA-insured Certificates.

**General**

XL Capital Assurance Inc. ("XLCA") is a monoline financial guaranty insurance company incorporated under the laws of the State of New York.  XLCA is currently licensed to do insurance business in, and is subject to the insurance regulation and supervision by, all 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and Singapore.

XLCA is an indirect wholly owned subsidiary of XL Capital Ltd, a Cayman Islands exempted company ("XL Capital Ltd").  Through its subsidiaries, XL Capital Ltd is a leading provider of insurance and reinsurance coverages and financial products and services to industrial, commercial and professional service firms, insurance companies and other enterprises on a worldwide basis.  The ordinary shares of XL Capital Ltd are publicly traded in the United States and listed on the New York Stock Exchange (NYSE: XL).  **XL Capital Ltd is not obligated to pay the debts of or claims against XLCA.**

XLCA was formerly known as The London Assurance of America Inc. ("London"), which was incorporated on July 25, 1991 under the laws of the State of New York.  On February 22, 2001, XL Reinsurance America Inc. ("XL Re") acquired 100% of the stock of London.  XL Re merged its former financial guaranty subsidiary, known as XL Capital Assurance Inc. (formed September 13, 1999) with and into London, with London as the surviving entity.  London immediately changed its name to XL Capital Assurance Inc.  All previous business of London was 100% reinsured to Royal Indemnity Company, the previous owner at the time of acquisition.

XL Capital Ltd announced on April 7, 2006 that Security Capital Assurance Ltd ("SCA"), a newly-created holding company for XL Capital Ltd's financial guaranty insurance and reinsurance businesses conducted through XLCA and XL Financial Assurance Ltd. ("XLFA"), had filed a registration statement on Form S-1 with the U.S. Securities and Exchange Commission relating to a proposed initial public offering of a portion of its common shares. Through its operating subsidiaries of XLCA and XLFA, SCA will provide credit enhancement

F-1

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 - 11:32

products to the public finance and structured finance markets throughout the U.S. and internationally.

Under the registration statement, a portion of SCA's shares will be issued and sold by SCA and a portion will be sold by SCA's parent, XL Insurance (Bermuda) Ltd, as selling shareholder. After the consummation of the offering, XL Capital Ltd is expected to beneficially own approximately 65% of SCA's outstanding shares.

SCA expects to use the proceeds it receives from the offering primarily for capital contributions to its financial guaranty subsidiaries to support future business growth. SCA intends to apply to have its shares listed on the New York Stock Exchange under the ticker symbol "SCA".

A copy of the registration statement is available on the U.S. Securities and Exchange Commission website at www.sec.gov under Filings & Forms (EDGAR).

**Reinsurance**

XLCA has entered into a facultative quota share reinsurance agreement with XLFA, an insurance company organized under the laws of Bermuda, and an affiliate of XLCA. Pursuant to this reinsurance agreement, XLCA expects to cede up to 90% of its business to XLFA. XLCA may also cede reinsurance to third parties on a transaction-specific basis, which cessions may be any or a combination of quota share, first loss or excess of loss. Such reinsurance is used by XLCA as a risk management device and to comply with statutory and rating agency requirements and does not alter or limit XLCA's obligations under any financial guaranty insurance policy. With respect to any transaction insured by XLCA, the percentage of risk ceded to XLFA may be less than 90% depending on certain factors including, without limitation, whether XLCA has obtained third party reinsurance covering the risk. As a result, there can be no assurance as to the percentage reinsured by XLFA of any given financial guaranty insurance policy issued by XLCA, including its XLCA Policy (as defined below).

Based on the audited financials of XLFA, as of December 31, 2005, XLFA had total assets, liabilities, redeemable preferred shares and shareholders' equity of $1,394,081,000, $704,007,000, $39,000,000 and $651,074,000, respectively, determined in accordance with generally accepted accounting principles in the United States ("US GAAP"). XLFA's insurance financial strength is rated "Aaa" by Moody's and "AAA" by S&P and Fitch Inc. In addition, XLFA has obtained a financial enhancement rating of "AAA" from S&P.

The obligations of XLFA to XLCA under the reinsurance agreement described above are unconditionally guaranteed by XL Insurance (Bermuda) Ltd ("XLI"), a Bermuda exempted company and one of the world's leading excess commercial insurers. XLI is a wholly owned indirect subsidiary of XL Capital Ltd. In addition to A.M. Best's financial strength rating of "A+" and issuer credit rating of "aa-", XLI's insurance financial strength rating is "Aa3" (Stable Outlook) by Moody's, "A+" by Standard & Poor's and "AA-" (Outlook Stable) by Fitch.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

The rating agencies have taken certain actions with respect to XL Capital Ltd and various insurance operating subsidiaries of XL Capital Ltd, as described below. On November 22, 2005, Moody's downgraded the senior debt rating of XL Capital Ltd from "A2" to "A3" and downgraded the other insurance financial strength ratings of various insurance operating subsidiaries of XL Capital Ltd (other than XLCA and XLFA) from "Aa2" to "Aa3". On November 28, 2005, Standard & Poor's downgraded the senior debt rating of XL Capital Ltd from "A" to "A-" and downgraded the counterparty credit and financial strength ratings of various insurance operating subsidiaries of XL Capital Ltd (other than XLCA and XLFA) from "AA-" to "A+". On February 28, 2006, Fitch revised the long term issuer rating of XL Capital Ltd from "A-" to "A". On October 26, 2005, Fitch downgraded the insurer financial strength ratings of various insurance operating subsidiaries of XL Capital Ltd (other than XLCA and XLFA) from "AA" to "AA-".

The ratings of XLFA, XLI or any other member of the XL Capital Ltd group of companies are not recommendations to buy, sell or hold securities, including the XLCA-insured Certificates and are subject to revision or withdrawal at any time by Moody's, Standard & Poor's or Fitch.

Notwithstanding the capital support provided to XLCA described in this section, the XLCA-insured Certificateholders will have direct recourse against XLCA only, and neither XLFA nor XLI will be directly liable to the XLCA-insured Certificateholders.

**Financial Strength and Financial Enhancement Ratings of XLCA**

XLCA's insurance financial strength is rated "Aaa" by Moody's and "AAA" by Standard & Poor's and Fitch, Inc. ("Fitch"). In addition, XLCA has obtained a financial enhancement rating of "AAA" from Standard & Poor's. These ratings reflect Moody's, Standard & Poor's and Fitch's current assessment of XLCA's creditworthiness and claims-paying ability as well as the reinsurance arrangement with XLFA described under "Reinsurance" above.

The above ratings are not recommendations to buy, sell or hold securities, including the XLCA-insured Certificates and are subject to revision or withdrawal at any time by Moody's, Standard & Poor's or Fitch. Any downward revision or withdrawal of these ratings may have an adverse effect on the market price of the XLCA-insured Certificates. XLCA does not guaranty the market price of the XLCA-insured Certificates nor does it guaranty that the ratings on the XLCA-insured Certificates will not be revised or withdrawn.

**Capitalization of XLCA**

Based on the audited financials of XLCA, as of December 31, 2005, XLCA had total assets, liabilities, and shareholder's equity of $953,706,000, $726,758,000, and $226,948,000, respectively, determined in accordance with U.S. GAAP.

Based on the unaudited statutory financial statements for XLCA as of December 31, 2005 filed with the State of New York Insurance Department, XLCA has total admitted assets of $328,231,000, total liabilities of $139,392,000, total capital and surplus of $188,839,000 and total contingency reserves of $13,031,000 determined in accordance with statutory accounting

CONFIDENTIAL INFORMATION

mark.angelov@arentfox.com

practices prescribed or permitted by insurance regulatory authorities ("SAP"). Based on the audited statutory financial statements for XLCA as of December 31, 2004 filed with the State of New York Insurance Department, XLCA had total admitted assets of $341,937,000, total liabilities of $143,494,000, total capital and surplus of $198,443,000 and total contingency reserves of $7,342,000 determined in accordance with SAP.

**Incorporation by Reference of Financials**

For further information concerning XLCA and XLFA, see the financial statements of XLCA and XLFA, and the notes thereto, incorporated by reference in this APPENDIX F. The financial statements of XLCA and XLFA are included as exhibits to the periodic reports filed with the Securities and Exchange Commission (the "Commission") by XL Capital Ltd and may be reviewed at the EDGAR website maintained by the Commission. All financial statements of XLCA and XLFA included in, or as exhibits to, documents filed by XL Capital Ltd pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 on or prior to the date of this Offering Circular, or after the date of this Offering Circular but prior to termination of the offering of the XLCA-insured Certificates, shall be deemed incorporated by reference in this APPENDIX F. Except for the financial statements of XLCA and XLFA, no other information contained in XL Capital Ltd's reports filed with the Commission is incorporated by reference. Copies of the statutory quarterly and annual statements filed with the State of New York Insurance Department by XLCA are available upon request to the State of New York Insurance Department.

**Regulation of XLCA**

XLCA is regulated by the Superintendent of Insurance of the State of New York. In addition, XLCA is subject to regulation by the insurance laws and regulations of the other jurisdictions in which it is licensed. As a financial guaranty insurance company licensed in the State of New York, XLCA is subject to Article 69 of the New York Insurance Law, which, among other things, limits the business of each insurer to financial guaranty insurance and related lines, prescribes minimum standards of solvency, including minimum capital requirements, establishes contingency, loss and unearned premium reserve requirements, requires the maintenance of minimum surplus to policyholders and limits the aggregate amount of insurance which may be written and the maximum size of any single risk exposure which may be assumed. XLCA is also required to file detailed annual financial statements with the New York Insurance Department and similar supervisory agencies in each of the other jurisdictions in which it is licensed.

The extent of state insurance regulation and supervision varies by jurisdiction, but New York and most other jurisdictions have laws and regulations prescribing permitted investments and governing the payment of dividends, transactions with affiliates, mergers, consolidations, acquisitions or sales of assets and incurrence of liabilities for borrowings.

**THE FINANCIAL GUARANTY INSURANCE POLICIES ISSUED BY XLCA, INCLUDING THE INSURANCE POLICY, ARE NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.**

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15.08.2013 11:32

The principal executive offices of XLCA are located at 1221 Avenue of the Americas, New York, New York 10020 and its telephone number at this address is (212) 478-3400.

### XLCA-insured Certificate Insurance Policy

Concurrently with the issuance of the particular Certificates specifically identified on the inside cover of the Offering Circular which precedes this Appendix (the "XLCA-insured Certificates"), XLCA will issue a financial guaranty insurance policy (the "XLCA Policy") for the XLCA-insured Certificates. The XLCA Policy guarantees the scheduled payment of principal of and interest on the XLCA-insured Certificates when due as set forth in the form of the policy included in this Appendix on the following pages.

CONFIDENTIAL INFORMATION

## XL CAPITAL ASSURANCE

1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 478-3400

**MUNICIPAL BOND
INSURANCE POLICY**

| | | | |
|---|---|---|---|
| **ISSUER:** [      ] | | **Policy No:** [      ] |
| **BONDS:** [      ] | | **Effective Date:** [      ] |

**XL Capital Assurance Inc. (XLCA),** a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy (which includes each endorsement attached hereto), hereby agrees unconditionally and irrevocably to pay to the trustee (the "Trustee") or the paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the benefit of the Owners of the Bonds or, at the election of XLCA, to each Owner, that portion of the principal and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment.

XLCA will pay such amounts to or for the benefit of the Owners on the later of the day on which such principal and interest becomes Due for Payment or one (1) Business Day following the Business Day on which XLCA shall have received Notice of Nonpayment (provided that Notice will be deemed received on a given Business Day if it is received prior to 10:00 a.m. New York time on such Business Day; otherwise it will be deemed received on the next Business Day), but only upon receipt by XLCA, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in XLCA. Upon such disbursement, XLCA shall become the owner of the Bond, any appurtenant coupon to the Bond or the right to receipt of principal and interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by XLCA hereunder. Payment by XLCA to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of XLCA under this Policy.

In the event the Trustee or Paying Agent has notice that any payment of principal or interest on a Bond which has become Due for Payment and which is made to an Owner by or on behalf of the Issuer of the Bonds has been recovered from the Owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such Owner within the meaning of any applicable bankruptcy law, such Owner will be entitled to payment from XLCA to the extent of such recovery if sufficient funds are not otherwise available.

The following terms shall have the meanings specified for all purposes of this Policy, except to the extent such terms are expressly modified by an endorsement to this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment", when referring to the principal of Bonds, is when the stated maturity date or a mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity, unless XLCA shall elect, in its sole discretion, to pay such principal due upon such acceleration; and, when referring to interest on the Bonds, is when the stated date for payment of interest has been reached. "Nonpayment" means the failure of the Issuer to have provided sufficient funds to the Trustee or Paying Agent for payment in full of all principal and interest on the Bonds which are Due for Payment. "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to XLCA which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

XLCAP-005 Form of Municipal Policy [Specimen]

CONFIDENTIAL INFORMATION

XLCA may, by giving written notice to the Trustee and the Paying Agent, appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy. From and after the date of receipt by the Trustee and the Paying Agent of such notice, which shall specify the name and notice address of the Insurer's Fiscal Agent, (a) copies of all notices required to be delivered to XLCA pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to XCLA and shall not be deemed received until received by both and (b) all payments required to be made by XLCA under this Policy may be made directly by XLCA or by the Insurer's Fiscal Agent on behalf of XLCA. The Insurer's Fiscal Agent is the agent of XLCA only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of XLCA to deposit or cause to be deposited sufficient funds to make payments due hereunder.

Except to the extent expressly modified by an endorsement hereto, (a) this Policy is non-cancelable by XLCA, and (b) the Premium on this Policy is not refundable for any reason. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Bond, other than at the sole option of XLCA, nor against any risk other than Nonpayment. This Policy sets forth the full undertaking of XLCA and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto.

THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, XLCA has caused this Policy to be executed on its behalf by its duly authorized officers.

_____                                    _____
Name:                                                      Name:
Title:                                                     Title:

XLCAP-005
Form of Municipal Policy [Specimen]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

[THIS PAGE INTENTIONALLY LEFT BLANK]

13-53846-tjt   Doc 348-7   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 238 of
248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 238 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

**APPENDIX G**

Upon the issuance and delivery of the Certificates, Certificate Counsel, Lewis & Munday, A Professional Corporation, proposes to deliver its opinion in substantially the following form.

June ●, 2006

Detroit Retirement Systems Funding Trust 2006
    c/o U.S. Bank National Association, as trustee
Detroit, Michigan

Ladies and Gentlemen:

We acted as Certificate Counsel in connection with the issuance by the Detroit Retirement Systems Funding Trust 2006 (the *Funding Trust*) of the Certificates of Participation Series 2006-A and the Certificates of Participation Series 2006-B, (collectively, the *Certificates*) and in that capacity we examined a transcript of the proceedings relating to the issuance of the Certificates.

The Funding Trust was created by the Trust Agreement, dated June ●, 2006 (the *Trust Agreement*), between the Detroit General Retirement System Service Corporation (the *GRS Service Corporation*) and the Detroit Police and Fire Retirement System Service Corporation (the *PFRS Service Corporation*), severally and not jointly, and U.S. Bank National Association, as trustee (the *Trustee*).  Each of the GRS Service Corporation and the PFRS Service Corporation is herein called a *Service Corporation* and collectively the *Service Corporations*.

The Certificates are issued pursuant to the below defined Resolution and the Service Contracts and under the Trust Agreement.  The Certificates evidence undivided, proportionate interests in the rights to receive certain payments (*Funding Trust Receivables*) to be made by the City of Detroit, Michigan (the *City*), under (i) the Detroit General Retirement System Service Contract 2006, dated June 7, 2006, between the City and the GRS Service Corporation and (ii) the Detroit Police and Fire Retirement System Service Contract 2006, dated June 7, 2006, between the City and the PFRS Service Corporation (each, a *Service Contract* and collectively, the *Service Contracts*).  The Service Corporations were created pursuant to Ordinance No. 05-05 of the City.  The Service Contracts, the formation of the Funding Trust by the Service Corporations and the issuance of certificates of participation thereunder were authorized by resolution of the City Council of the City, adopted on April 26, 2006 (the *Resolution*).

The Service Contracts are administered for the Service Corporations and the Funding Trust by U.S. Bank National Association (the *Contract Administrator*), separately and not as Trustee, pursuant to the Contract Administration Agreement, dated June ●, 2006 (the *Contract Administration Agreement*), among the Funding Trust, each of the Service Corporations, severally and not jointly, and the Contract Administrator and other parties named therein.

[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 239 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com

The Certificates are issued for the purpose of funding (i) the prepayment of certain payments otherwise required to be made by the City under the service contracts it entered into with the Service Corporations on May 25, 2005 (the *2005 Service Contracts*), and (ii) the purchase of certain certificates of participation issued on June 2, 2005 (the *2005 Certificates*). The 2005 Certificates evidence undivided, proportionate interests in certain payments to be made under the 2005 Service Contracts.

The 2005 Service Contracts were entered into by the City with the Service Corporations for the purpose of funding specific amounts of the unfunded accrued actuarial liabilities (*Subject UAAL*) of each of the City's General Retirement System (the *GRS*) and Police and Fire Retirement System (the *PFRS* and with the GRS, the *Retirement Systems*). The effect of funding the Subject UAAL under the 2005 Service Contract was to reduce the financial burden of the Retirement Systems to the City in the present and future years. The 2006 Certificates are intended to have effect of restructuring certain payments under the 2005 Service Contracts and thereby assist the City in fulfilling its constitutional obligations with respect to the Retirement Systems. In consideration for such assistance by the Service Corporations, the City agreed in each Service Contract to pay the Funding Trust Receivables, which include, as service charges, the funding costs of the Service Corporations in obtaining the capital represented by the Certificates.

The City's special labor counsel, Sullivan Ward Asher & Patton PC, rendered an opinion on certain matters of labor law relative to the opinions expressed herein. That opinion is included in the transcript of proceedings.

Based on our examination of the transcript of the proceedings, we are of the opinion that:

1.      Each Service Corporation validly exists as a nonprofit corporation under the laws of the State of Michigan and has the corporate power to enter into its Service Contract and the Trust Agreement. The City has the power to enter into the Service Contracts.

2.      Each Service Contract was validly authorized, executed and delivered by the respective Service Corporation and the City and is a valid and binding agreement of such Service Corporation and the City and is enforceable in accordance with its terms. Neither the faith and credit nor the taxing power nor any special revenues of the City are pledged to the payment of Funding Trust Receivables, and the obligation of the City to pay Funding Trust Receivables does not constitute indebtedness within the meaning of any limitation of Michigan law applicable to the City.

3.      The Contract Administration Agreement was validly authorized, executed and delivered by each of the Service Corporations and, assuming valid authorization, execution and delivery by the Trustee on behalf of the Funding Trust and by the Contract Administrator, is a valid and binding agreement of each of the Service Corporations, enforceable in accordance with its terms.

4.      The Trust Agreement was validly authorized, executed and delivered by each of the Service Corporations and, assuming valid authorization, execution and delivery by the Trustee, is a valid and binding agreement of each of the Service Corporations, enforceable in accordance with its terms.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/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-11-32

5. The Funding Trust was validly created by the Trust Agreement and has the power to issue and deliver the Certificates.

6. The Certificates were validly issued and delivered by the Funding Trust and represent undivided interests in the Funding Trust Receivables in accordance with their terms.

The enforceability of the Service Contracts, the Contract Administration Agreement and the Trust Agreement may be limited or affected by bankruptcy, insolvency, reorganization, moratorium, and other similar laws affecting creditors' rights generally heretofore or hereafter enacted to the extent constitutionally applicable and may also be subject to the exercise of judicial discretion in accordance with general principles of equity.

Very truly yours,

G-3

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

[THIS PAGE INTENTIONALLY LEFT BLANK]

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 242 of
248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 242 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013   11:32

**APPENDIX H**

**CONTINUING DISCLOSURE UNDERTAKING**

This Continuing Disclosure Undertaking ("**Undertaking**") is executed and delivered by the City of Detroit, County of Wayne, State of Michigan ("**City**") in connection with the issuance of the $148,540,000 Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A and $800,000,000 Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B (collectively, "**Certificates**"). The City covenants and agrees for the benefit of the Certificateholders (as defined below) as follows:

(a) **Definitions**. The following terms used in this Undertaking have the following meanings:

"***Audited Financial Statements***" means the City's audited financial statements prepared by an individual or firm of independent certified public accountants as required by Act 2, Public Acts of Michigan, 1968, as amended, which presently requires preparation in accordance with generally accepted accounting principles.

"***Certificateholder***" means the registered owner of any Certificate or any person (a) with the power, directly or indirectly, to vote or consent with respect to, or to dispose of ownership of, any Certificate (including any person holding a Certificate through a nominee, depository or other intermediary) or (b) treated as the owner of any Certificate for federal income tax purposes.

"***Disclosure Representative***" means the Finance Director of the City or his designee, or such other officer, employee or agent as the City shall so designate from time to time in writing.

"***MSRB***" means the Municipal Securities Rulemaking Board.

"***NRMSIR***" means each nationally recognized municipal securities information repository as designated by the SEC in accordance with the Rule.

"***Rule***" means Rule 15c2-12 promulgated by the SEC pursuant to the Securities Exchange Act of 1934, as amended.

"***SEC***" means the United States Securities and Exchange Commission.

"***SID***" means the state information depository for the State of Michigan, if any, then designated by the SEC in accordance with the Rule, being the Michigan Municipal Advisory Council as of the date of this Undertaking.

(b) **Continuing Disclosure**. The City hereby agrees, in accordance with the provisions of the Rule, to provide or cause to be provided to each NRMSIR and to the SID, on or before the 210th day after the end of the fiscal year of the City, commencing with the fiscal year ended June 30, 2006, the Audited Financial Statements, and updates of certain financial and operating data of the City appearing under the headings and tables in the Offering Circular for the Certificates, as follows: Tables 1 through 31,inclusive in Appendix B to the Offering Circular.

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/45-08-2013 11:32

Such annual financial information described above is expected to be provided directly by the City and in subsequent Official Statements of the City filed with the MSRB.

In the event that the Audited Financial Statements are not available by the date specified above, they will be provided when available and unaudited financial statements in a format similar to the financial statements contained in the Offering Circular will be filed by such date and the Audited Financial Statements will be filed as soon as available.

If the fiscal year of the City is changed, the City shall send notices of such change to each NRMSIR or the MSRB, and to the SID, prior to the earlier of the ending date of the fiscal year prior to such change or the ending date of the fiscal year as changed.

(c) **Notice of Failure to Disclose**. The City agrees to provide or cause to be provided, in a timely manner, to (i) each NRMSIR or the MSRB and (ii) the SID, notice of a failure by the City to provide the annual financial information with respect to the City described in subsection (b) above on or prior to the dates set forth in subsection (b) above.

(d) **Occurrence of Events**. The City agrees to provide or cause to be provided, in a timely manner, to (i) each NRMSIR or the MSRB and (ii) the SID, notice of the occurrence of any of the following events listed in (b)(5)(i)(C) of the Rule with respect to the Certificates, if applicable, if material:

      (1)    principal and interest payment delinquencies;
      (2)    non-payment related defaults;
      (3)    unscheduled draws on debt service reserves reflecting financial difficulties;*
      (4)    unscheduled draws on credit enhancements reflecting financial difficulties;
      (5)    substitution of credit or liquidity providers, or their failure to perform;
      (6)    adverse tax opinions or events affecting the tax-exempt status of the Certificates;*
      (7)    modifications to rights of holders of the Certificates;
      (8)    Certificate calls;
      (9)    defeasances;
     (10)    release, substitution, or sale of property securing repayment of the Certificates; and
     (11)    rating changes.

_____

\* (Events listed in clauses (3) & (6) above are not applicable to the Certificates.)

(e) **Materiality Determined Under Federal Securities Laws**. The City agrees that its determination of whether any event listed in subsection (d) is material shall be made in accordance with federal securities laws.

(f) **Termination of Reporting Obligation**. The obligation of the City to provide annual financial information and notices of material events, as set forth above, shall be terminated if and when the City no longer remains an "obligated person" with respect to the Certificates within the meaning of the Rule, specifically <u>not</u> including upon economic (as distinct from legal) defeasance of all Certificates.

H-2

13-53846-tjt   Doc 348-7   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 244 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 244 of 248]

(g)     **Benefit of Certificateholders**.  The City agrees that its undertaking pursuant to the Rule set forth in this Section is intended to be for the benefit of the Certificateholders and shall be enforceable by any Certificateholder; *provided,* that the right to enforce the provisions of this Undertaking shall be limited to a right to obtain specific enforcement of the City's obligations hereunder and any failure by the City to comply with the provisions of this Undertaking shall not constitute a default or an event of default with respect to the Certificates or under the Trust Agreement or Service Contracts mentioned in the Certificates.

(h)     **Amendments to the Undertaking**.   Amendments may be made in the specific types of information provided or the format of the presentation of such information to the extent deemed necessary or appropriate in the judgment of the Disclosure Representative on behalf of the City; *provided*, that the City agrees that any such amendment will be adopted procedurally and substantively in a manner consistent with the Rule, including any interpretations thereof by the SEC, which, to the extent applicable, are incorporated herein by reference.   Such interpretations currently include the requirements that (a) the amendment may only be made in connection with a change in circumstances that arises from a change in legal requirements, change in law or change in the identity, nature or status of the City or the type of activities conducted by it, (b) the undertaking, as amended, would have complied with the requirements of the Rule at the time of the primary offering of the Certificates, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances, and (c) the amendment does not materially impair the interests of Certificateholders, as determined by parties unaffiliated with the City (such as independent legal counsel), *but* such interpretations may be changed in the future.  If the accounting principles to be followed by the City in preparing the Audited Financial Statements are modified, the annual financial information for the year in which the change is made shall present a comparison between the financial statements as prepared on the prior basis and the statements as prepared on the new basis, and otherwise shall comply with the requirements of the Rule, in order to provide information to investors to enable them to evaluate the ability of the City to meet its obligations.  A notice of the change in accounting principles shall be sent to each NRMSIR or the MSRB and the SID.

    IN WITNESS WHEREOF, the City of Detroit has caused this Undertaking to be executed by its authorized officer.

                    CITY OF DETROIT
                    County of Wayne
                    State of Michigan


                    By _____
                            Roger Short
                    Its:  Interim Finance Director


Dated as of _____, 2006

H-3

13-53846-tjt    Doc 348-7    Filed 08/16/13    Entered 08/16/13 17:13:58    Page 245 of 248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 245 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

[THIS PAGE INTENTIONALLY LEFT BLANK]

13-53846-tjt   Doc 348-7   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 246 of
248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 246 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013 11:32

13-53846-tjt   Doc 348-7   Filed 08/16/13   Entered 08/16/13 17:13:58   Page 247 of
248
[2.2.3.3] [POCs 2006 Offering Circular.pdf] [Page 247 of 248]

CONFIDENTIAL INFORMATION
mark.angelov@arentfox.com
Detroit/15:08:2013  11:32

Recycled Paper - Printed by