IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re:<br><br>**CITY OF DETROIT,<br>MICHIGAN**<br><br>                      **Debtor.** | Chapter 9<br><br>Case No.: 13-53846<br><br>Hon. Steven W. Rhodes |

**JOINDER OF ASSURED GUARANTY MUNICIPAL CORP. IN
OBJECTION OF AMBAC ASSURANCE CORPORATION TO
MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING
THE ASSUMPTION OF THAT CERTAIN FORBEARANCE
AND OPTIONAL TERMINATION AGREEMENT PURSUANT
TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II)
APPROVING SUCH AGREEMENT PURSUANT TO
RULE 9019, AND (III) GRANTING RELATED RELIEF**

Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc. ("Assured"), a creditor and party in interest[1] in the chapter 9 case of the City of Detroit, Michigan (the "City"), respectfully submits this joinder (the

---

[1] Assured is a creditor and/or interested party as it is the bond insurer of certain of the City's general obligation, sewer system, and water system bonds. Specifically, Assured and its affiliates insure or reinsure on a net basis, in amounts outstanding as of June 30, 2013, approximately $1,000,000,000 of the City's sewer bonds, $793,000,000 of the City's water bonds, and $321,000,000 of the City's general obligation and general fund bonds. As bond insurer, Assured is obligated to pay to bondholders the full principal and interest when due as required by its bond insurance policy to the extent the City does not satisfy its obligations under the insured bonds. Under relevant provisions of the applicable bond documents, insurance policies, and applicable law, to the extent Assured makes payments under its policies, it is subrogated to the rights of bondholders and effectively steps into the shoes of such bondholders.

"Joinder") to that certain Objection of Ambac Assurance Corporation ("Ambac") to the City's Motion (the "Motion") for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief [Docket No. 348] ("Ambac's Objection") and states as follows:

## PRELIMINARY STATEMENT AND JOINDER

1. To the extent set forth herein, Assured joins Ambac's Objection. It is clear that the settlement terms in the Forbearance Agreement[2] are unreasonably favorable to the Swap Counterparties, particularly in light of the infirmities in their alleged secured claims against the City. As stated in Section II of Ambac's Objection, the Gaming Act does not authorize the use of Casino Revenues as collateral under any circumstances, nor is the pledge of the Casino Revenues to satisfy the City's financial obligations to the Service Corporations who pledged such revenues to the Swap Counterparties a purpose contemplated by the Gaming Act. As the security for the Swap Counterparties' claims is based on the City's unauthorized pledge of Casino Revenues and, thus, is invalid, the Swap Counterparties' alleged claims against the City amount to no more than general

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in Ambac's Objection or the Forbearance Agreement, as applicable.

2

unsecured claims, if such claims exist at all,[3] entitling the Swap Counterparties to no more of the amount anticipated to be distributed to other similarly-situated general unsecured creditors of the City. Even assuming, *arguendo*, that the pledge of Casino Revenues was valid, as set forth in Section III of Ambac's Objection, such revenues clearly do not constitute "special revenues" as defined by section 902(2) of title 11 of the United States Code (the "Bankruptcy Code"), and, thus, the Swap Counterparties are not entitled to be treated any better than creditors holding general unsecured claims against the City.

2. Additionally, for the reasons set forth below and in Section IV of Ambac's Objection, the settlement contained in the Forbearance Agreement is at best, premature. Without any indication that it has the funding, the City cannot demonstrate it will even be able to make the discounted payment touted by the City as a "significant value," *see* Motion at ¶ 46, much less the required full payment after the discount period has ended. Thus, without sufficient proof that this settlement is even viable, it is clear that the City has not provided sufficient information for the Court to make a determination whether (a) the City exercised its reasonable business judgment in seeking to assume the Forbearance Agreement pursuant to section 365 of the Bankruptcy Code, or that (b) such

---

[3] Assured submits that the Swap Counterparties' claims are, in fact, claims against the Service Corporations and <u>not</u> against the City and, thus, reserves all rights to seek a determination as to the validity and extent of the Swap Counterparties' claims against the City. *See*, *infra*, ¶¶ 19-22.

settlement is reasonable, and thus satisfies Federal Rule of Bankruptcy Procedure ("Fed. R. Bankr. P.") 9019.

3. As set forth in this Joinder, Assured joins Ambac's Objection with respect to arguments in objection to the Motion set forth in Section II through Section IV,[4] presents supplemental arguments regarding the sufficiency of information to adjudicate the Motion and the standard applied to the settlement pursuant to Fed. R. Bankr. P. 9019, and otherwise reserves its rights to (a) object to confirmation of the City's chapter 9 plan of adjustment, (b) object to the City's proposed financing to make the settlement payments under the Forbearance Agreement and (c) challenge the validity of the Swap Counterparties' liens against the City.

**SUPPLEMENTAL ARGUMENTS AND RESERVATION OF RIGHTS**

**I. The Motion Lacks Sufficient Information for the Court to Adjudicate the Reasonableness of the Forbearance Agreement Because the Lynchpin of the Settlement Requires Substantial Financing Which Does Not Exist.**

4. To grant the Motion, the City must have exercised its reasonable business judgment in seeking to assume the Forbearance Agreement pursuant to section 365 of the Bankruptcy Code, *see In re Greektown Holdings, L.L.C.*, 2009

---

[4] Assured agrees with the argument set forth in Section I of Ambac's Objection to the extent that the only way the City was authorized to obligate itself under the swap transaction was in compliance with Act 34, which the City did not do.

4

WL 1653461 (Bankr. E.D. Mich. May 13, 2009); *Edwin C. Levy Co., Inc. v. McLouth Steel Corp. (In re McLouth Steel Corp.)*, 20 B.R. 688 (Bankr. E.D. Mich. 1982), and settlements pursuant to Fed. R. Bankr. P. 9019 must be, among other things, reasonable. *See Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424-25 (1968); *William Hindelandg and Global Online Certifications, Inc. v. Mid-State Aftermarket Body Parts, Inc. (In re MQVP, Inc.)*, 477 F. App'x 310, 313 (6th Cir. 2012); *Rankin v. Lavan & Assocs. (In re Rankin)*, 438 F. App'x 420, 426 (6th Cir. 2011). "[T]he bankruptcy court is charged with an affirmative obligation to apprise itself of all facts necessary to evaluate the settlement and make an informed and independent judgment as to whether the compromise is fair and equitable. . . ." *Bard v. Sicherman (In re Bard)*, 49 F. App'x 528, 530 (6th Cir. 2002). Absent description of any proposed financing, the City has not, and cannot, provide information necessary to determine whether the settlement contained in the Forbearance Agreement is either (a) an exercise of the City's reasonable business judgment pursuant to section 365(a) of the Bankruptcy Code or (b) reasonable under the circumstances pursuant to Fed. R. Bankr. P. 9019.

5. Section 3.1 of the Forbearance Agreement provides that the City may exercise the right to terminate at a discount of between 18%-25% below the termination payment that would otherwise be payable up until either (i) the

occurrence of one of a certain list of Forbearance Period Termination Events or (ii) March 14, 2014. *See* Forbearance Agreement § 3.1. Should the City be unable to acquire funds sufficient to pay the discounted termination payment within the specified period of time, absent the occurrence of any other Forbearance Period Termination Event, after June 30, 2014, the Swap Counterparties may, upon notice to the City and each Service Corporation, terminate the Forbearance Period. *See* Forbearance Agreement §§ 1.3(a) & 1.4(a). Upon termination of the Forbearance Period, the parties:

> . . . shall be restored to their original rights and positions as they existed immediately prior to the Forbearance Period, and each Swap Counterparty shall immediately be entitled to exercise any rights and remedies in respect of any Event of Default, Termination Event, or Additional Termination Event that has occurred under the applicable Swap Agreement together with any rights and remedies under the Definitive Documents relating thereto and **giving effect to Section 2 of this Agreement**.

*See* Forbearance Agreement, § 1.4(a) (emphasis added). Notably, Section 2 of the Forbearance Agreement binds the City and Emergency Manager to forbear from commencing or defending any litigation or other adjudication to render the swap transaction documents invalid. *See* Forbearance Agreement §§ 2.1(a), (b), and

6

2.2(a). Thus, should the City be unable to obtain financing sufficient to pay the discounted settlement amount within the period specified in the Forbearance Agreement, the City will likely be forever barred from attacking the Swap Counterparties' claims within its chapter 9 case, under its plan of adjustment, or in any other manner.

6. Pursuant to the *First Order Establishing Dates and Deadlines*, dated August 2, 2013, the Court established March 1, 2014 as the deadline by which the City must file its chapter 9 plan of adjustment. *See* Docket No. 280. Under the Forbearance Agreement, absent the occurrence of any other Forbearance Period Termination Event, the City would be prohibited from challenging the Swap Counterparties' alleged claims until at least June 30, 2014, thus requiring the City to leave the Swap Counterparties unimpaired in its chapter 9 plan of adjustment. *See* Forbearance Agreement §§ 1.3(a) & 2.1. If the City sought to impair the Swap Counterparties' claims under its plan, such impairment would violate the terms of the Forbearance Agreement, triggering a Forbearance Period Termination Event, and entitling the Swap Counterparties to exercise their alleged rights to trap the City's cash flow under the swap transaction documents. *See* Forbearance Agreement § 1.3(f) & 1.4(a). Thus, it appears that, under the Forbearance Agreement, if the City is unable to acquire financing sufficient to pay the Swap Counterparties on account of their alleged claims, the City is in a

no-win scenario, forced to either pay the Swap Counterparties' claims in full under its chapter 9 plan or risk the inevitable exercise of the Swap Counterparties' "cash trap," further deepening the City's financial despair. This no-win scenario is simply unreasonable and cannot be the result of an exercise of the City's reasonable business judgment or said to be a reasonable settlement of the Swap Counterparties' substantive claims.

7. The City has not stated whether it even intends to exercise its Optional Termination Right at any one of the discounted rates provided in the Forbearance Agreement. The City makes no mention of a timeline or steps by which it intends to take advantage of the discounted settlement rates set forth in the Forbearance Agreement. Notably, the City has not even determined the method by which it will finance the potential settlement payment. Whether through diversion of unencumbered assets or generation of revenues from a post-petition financing facility, the Motion contains no reference to the source of funds intended to be used to finance the settlement with the Swap Counterparties. Although counsel to the City has indicated that the City may seek to fund the settlement through a post-petition financing facility, the City has not announced any actions to solidify such funding. Without an intention to utilize the discounted settlement rates, and without funding, the relief requested in the Motion amounts to no more than (a) a request of the Court to approve a *potential*

settlement that may or may not benefit the City and (b) a permanent determination of the City's treatment of the Swap Counterparties' questionable claims outside of a plan of adjustment. Because of these terms alone, the proposed settlement is wholly unreasonable and the Motion must be denied.

8. At the very least, Assured reserves all rights to object to any financing that the City may propose in connection with making the proposed settlement payment, including the sources, terms and conditions of any such financing.

**II. The Factors in Evaluating the Proposed Settlement Weigh Against Granting the Motion.**

9. "The United States Supreme Court [in *TMT Trailer Ferry*, 390 U.S. 414] has instructed bankruptcy courts engaged in [determinations under Fed. R. Bankr. P. 9019] to form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *In re Bard*, 49 F. App'x at 530; *see also In re MQVP, Inc.*, 477 F. App'x at 313 (6th Cir. 2012); *In re Rankin*, 438 F. App'x at 426.

10. In *Bard*, the Sixth Circuit distilled the four factors for bankruptcy courts to consider in approving a proposed settlement under Fed. R. Bankr. P.

9

9019:

> (a) the probability of success in the litigation;
>
> (b) the difficulties, if any, to be encountered in the matter of collection;
>
> (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
>
> (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

49 F. App'x at 530 (citing *TMT Trailer Ferry*); *see also*, *In re MQVP, Inc.*, 477 F. App'x at 313; *In re Rankin*, 438 F. App'x at 426.

11. Here, of the relevant *Bard* factors, the analysis weighs against approval of the proposed settlement set forth in the Forbearance Agreement. Specifically, given the strength of the arguments relating to the impropriety of the pledge of Casino Revenues to secure the Swap Counterparties' alleged claims against the City, there is a high probability that such arguments, upon litigation, would be successful to invalidate the Swap Counterparties' secured claims against the City (*see* Ambac's Objection at Section II & III, *see also*, *supra*, ¶ 1). The litigation issues underlying the settlement primarily involve issues of the interpretation and application of state law (i.e. the Gaming Act and related enabling statutes) to determine the validity of the Swap Counterparties' alleged claims: either the Gaming Act authorizes a valid pledge of the Casino Revenues

10

to satisfy amounts payable under the swap transaction or it does not. Such analysis will likely be straightforward for the Court to determine and, thus, involve relatively little time, expense or inconvenience for the parties.

12. Finally, and most importantly, the interests of the creditors and deference thereon weighs the heaviest in favor of denying the Motion. As the Swap Counterparties' claims amount to general unsecured claims of the City, (*see* Ambac's Objection at Section II & III, *see also*, *supra*, ¶ 1), should the City settle the Swap Counterparties' claims for 75% to 100 % of their face value, such treatment is likely to be greater than the amount to be distributed to the City's other general unsecured creditors under its chapter 9 plan of adjustment. Settling such claims would also result in approximately $225 million of the City's funds leaving the City's estate, a significant amount, which would otherwise be available for distribution to the City's other creditors. Thus, it is paramount to the interests of the creditors not to approve such a faulty settlement.

### III. Assured Reserves All Rights to Object to the City's Proposed Plan of Adjustment.

13. Should the proposed settlement be approved and, thus, be incorporated in the City's proposed chapter 9 plan of adjustment, Assured reserves all rights to object to confirmation of the City's plan.

14. In the chapter 9 context, Judge Klein's decisions relating to two proposed settlements in the case of *In re City of Stockton, California*, Case No.

12-32118 (Bankr. E.D. Cal. 2013) are particularly instructive. Upon the City of Stockton's motion relating to a settlement of a pending damages suit, the *Stockton* court held that, although a chapter 9 debtor is not obligated to seek bankruptcy court approval of settlements pursuant to Fed. R. Bankr. P. 9019, any settlements made by the debtor throughout its bankruptcy case would be subject to review and objection in connection with the confirmation of a chapter 9 plan of adjustment, stating that "in any event, the day of reckoning comes at the plan confirmation hearing." 486 B.R. 194, 199 (Bankr. E.D. Cal. 2013).

15. Additionally, at a hearing in which the City of Stockton sought approval of a proposed settlement with Ambac Assurance Corporation, Judge Klein made clear that:

> [Approval of the proposed compromise is], of course, without prejudice to me taking another look at it in the Plan of Adjustment. . . . I realize that it is a building block in a Plan. And with that reservation, I'm going to look at it again in the context of an actual Plan of Adjustment, where I see the entire landscape and who's doing what.

*See* Transcript of Hearing at 9:11-12, 14-18, *In re City of Stockton, California*, Case No. 12-32118 (Bankr. E.D. Cal. Apr. 23, 2013). A copy of the April 23, 2013 transcript of hearing in *Stockton* is appended hereto as **Exhibit A.**

16. Thus, as plainly observed by Judge Klein, irrespective of the City's settlement of claims pre-confirmation, any issues relating to the treatment of creditors may be properly litigated in the context of confirmation of the City's chapter 9 plan of adjustment.

17. Specifically, pursuant to sections 1129(a)(3) and (b)(1), made applicable by section 901(a) of the Bankruptcy Code, bankruptcy courts may only confirm a chapter 9 plan of adjustment that has "been proposed in good faith and not by any means forbidden by law" and "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. §§ 1129(a)(3) & (b)(1). Additionally, in order to confirm a chapter 9 plan of adjustment, the plan must be "in the best interests of creditors and . . . feasible." 11 U.S.C. § 943(b)(7).

18. As previously stated in this Joinder and in Ambac's Objection, the Swap Counterparties' alleged claims against the City amount to no more than general unsecured claims (if such claims exist at all). *See* Ambac's Objection at Section II & III; *see also*, *supra*, at ¶ 1. Should the settlement contained in the Forbearance Agreement be approved, to the extent the City pays the Swap Counterparties between 75% to 100% of their alleged claims, such settlement proposes to treat the Swap Counterparties better than that of similarly situated creditors, i.e. other general unsecured creditors. Moreover, even if the settlement

amount is never paid and the Forbearance Period is terminated, the City will likely be bound to honor the Swap Counterparties' dubious claim to secured status under its chapter 9 plan of adjustment which, again, proposes to treat the Swap Counterparties better than other general unsecured creditors. Thus, such settlement, as necessarily incorporated in the City's chapter 9 plan of adjustment, would be patently unconfirmable in that it would violate the requirements that a plan "not discriminate unfairly" and be "fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted the plan," *See* 11 U.S.C. § 1129(b)(1).

### IV. Assured Reserves all Rights to Seek a Determination as to the Validity and Enforceability of the Swap Counterparties' Purported Liens.

19. As further described in Ambac's Objection, based on the infirmities in such claims, as evidenced by the unauthorized pledge of Casino Revenues under the Gaming Act and the failure of such Casino Revenues to constitute special revenues of the City, the Swap Counterparties hold claims of no greater priority than general unsecured claims. *See* Ambac's Objection at Section II & III; *see also*, *supra*, at ¶ 1.

20. Fed. R. Bankr. P. 7001, which establishes the matters ripe for adjudication through an adversary proceeding, requires a party seeking "to determine the validity, priority, or extent of a lien or other interest in property," to

14

commence an adversary proceeding to seek such relief. *See* Fed. R. Bankr. P. 7001(2).

21. Thus, Assured reserves all rights to commence an action, pursuant to Fed. R. Bankr. P. 7001(2) or otherwise, to determine the validity, priority, or extent of the Swap Counterparties' lien or other interest in City property.

22. In light of the aforementioned arguments and those contained in Ambac's Objection, absent settlement, the Swap Counterparties face, and would be unable to overcome, significant challenges to the validity and nature of their claims. Based on this undervaluing of the Swap Counterparties' risk and the general overvaluing of their claims—which would, in turn, render any subsequent plan of adjustment unconfirmable—the relief requested in the Motion should be denied.

## CONCLUSION

23. Assured submits this Joinder to Ambac's Objection (1) requesting that the Court deny the relief requested in the Motion due to, *inter alia*, (a) the rich settlement terms in light of the infirmities in the Swap Counterparties' claims and substantial value leaving the City's estate early in the case, and (b) the lack of information sufficient for the Court to make a determination as to the reasonableness of the City's business judgment in seeking to assume the Forbearance Agreement pursuant to section 365 of the Bankruptcy Code and

reasonableness of the settlement pursuant to Fed. R. Bankr. P. 9019, and (2) reserving all rights to (a) object to the confirmation of the City's chapter 9 plan of adjustment, (b) object to any financing that the City may propose in connection with making the proposed settlement payment, including the sources, terms and conditions of any such financing, and (c) commence an action to determine the validity, priority, or extent of the Swap Counterparties' lien or other interest in City property.

This the 16th day of August, 2013.

Respectfully submitted,
**Winston & Strawn LLP**

By: /s/ Lawrence A. Larose
Lawrence A. Larose, Esq.
Samuel S. Kohn, Esq.
Carrie V. Hardman, Esq.
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile. (212) 294-4700
Email: llarose@winston.com
skohn@winston.com
chardman@winston.com

Sarah T. Foss, Esq.
1111 Louisiana, 25th Floor
Houston, Texas 77002-5242
Telephone: (713) 651-2600
Facsimile: (713) 651-2700
Email: sfoss@winston.com

*Attorneys for Assured Guaranty Municipal Corp.*

16