# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-------------------------------------------------------------x
                                          :
 In re                                    : Chapter 9
                                          :
CITY OF DETROIT, MICHIGAN,                : Case No. 13-53846
                                          :
                     Debtor.              : Hon. Steven W. Rhodes
                                          :
                                          :
-------------------------------------------------------------x
```

## LIMITED OBJECTION OF FINANCIAL GUARANTY INSURANCE COMPANY TO MOTION OF DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT <u>PURSUANT TO RULE 9019, AND (III) GRANTING RELATED RELIEF</u>

US_ACTIVE:\44300397\8\65320.0003

## Table of Contents

PRELIMINARY STATEMENT ................................................1

FACTUAL BACKGROUND ..................................................2

THE COURT SHOULD DEFER
CONSIDERATION OF THE FORBEARANCE AGREEMENT ................................11

    A.        The Alleged Benefits of the Forbearance
                Agreement to the City Are Speculative and Unsubstantiated....................12

    B.        Termination of the Swap Contracts May Result in Harm to FGIC ...........18

RESERVATION OF RIGHTS ................................................19

CONCULSION................................................20

US_ACTIVE:\44300397\8\65320.0003

Financial Guaranty Insurance Company ("**FGIC**") files this limited objection (the "**Objection**") in response to *Motion of Debtor for Entry of an Order (i) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (ii) Approving Such Agreement Pursuant to Rule 9019, and (iii) Granting Related Relief* [Docket No. 17] filed by the City of Detroit (the "**City**") in the above-captioned case (the "**Chapter 9 Case**") on July 18, 2013 and corrected on July 24, 2013 [Docket No. 157] (the "**Motion**") and requests that the Court defer consideration of the Motion. In support of this Objection, FGIC respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The City has asked this Court to approve and authorize the City's assumption of an agreement that, in exchange for a substantial lump sum payment (amounting to a 75-82% recovery, far in excess of what has been projected for other creditors) to two of the City's creditors, purports to save the City from a liquidity crunch and having to deal with allegedly lengthy and expensive litigation.  While these certainly are noble goals, echoed in virtually every bankruptcy case where a debtor seeks to compromise claims, they should not be blindly accepted.  Upon closer examination, it becomes evident that it is simply too early in this Chapter 9 Case to determine whether the City's statements about the benefits of and harms avoided by this agreement are realistic.  In fact, there is evidence and legal argument that suggests otherwise.  And layered on top of this is a risk that consummating the transaction contemplated by the agreement may harm the City's other creditors.  Generally speaking, creditors do not get paid by a debtor until distributions are made pursuant to a Court approved plan.  There is no present basis justifying deviation from this standard.

2.      By filing this Objection, FGIC does not seek to completely derail this negotiated deal.  FGIC merely is asking this Court to defer consideration of the City's request;

essentially, take a step back and wait until facts are developed to permit a realistic assessment of the City's arguments in favor of the agreement and appropriate steps are taken to legally effectuate the agreement. In doing so, the Court will avoid a rash decision and will ensure that this Chapter 9 Case proceeds in a manner consistent with principles underlying the Bankruptcy Code.[1]

### FACTUAL BACKGROUND[2]

3. In 2005, by its Ordinances No. 03-05 and No. 04-05 (Pérez Decl. Exs. A, B),[3] the City provided an alternative funding mechanism (each, an "**Alternative Funding Mechanism**") for each, respectively, of its General Retirement System (the "**GRS**") and its Police and Fire Retirement System (the "**PFRS**" and, together with the GRS, the "**Retirement Systems**"), for funding of unfunded actuarial liability ("**UAAL**") of the GRS and the PFRS. *See* Ordinance No. 05-05 (Pérez Decl. Ex. C). In connection therewith, the City formed two Michigan nonprofit corporations, the Detroit General Retirement System Service Corporation (the "**GRS Service Corporation**") and the Detroit Police and Fire Retirement System Service Corporation (the "**PFRS Service Corporation**" and, together with the GRS Service Corporation, the "**Service Corporations**"), each for the purposes of (i) assisting the City in maintaining the actuarial integrity of its respective Retirement Systems by funding the particular Retirement System's UAAL through the respective Alternative Funding Mechanism and (ii) acting as an instrumentality and enterprise of the City and constituting an integral (although separate) part of

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

[2] Although the City sets forth some of the relevant factual background information in its Motion, a more expansive description of the background is warranted.

[3] Declaration of Alfredo R. Pérez in Support of the Objection, filed contemporaneously herewith (hereinafter, the "**Pérez Declaration**" or the "**Pérez Decl**.").

the City. *See* Articles of Incorporation of GRS Service Corporation (the "**GRS Service Corporation Articles of Incorporation**") Rider to Certificate of Amendment (Pérez Decl. Ex. D); Articles of Incorporation of PFRS Service Corporation (the "**PFRS Service Corporation Articles of Incorporation**") Rider to Certificate of Amendment (Pérez Decl. Ex. E); City Ordinance No. 05-05 (Pérez Decl. Ex. C).

4.     The Alternative Funding Mechanism was initially structured in 2005 and then again in 2006. For purposes of this Objection, the transactions and documents from 2006 (as later amended) are relevant. Specifically, in 2006, pursuant to the provisions of that certain Trust Agreement, dated June 12, 2006, by and among the Service Corporations and U.S. Bank National Association as Trustee (the "**2006 Trust Indenture**"), the Service Corporations established the Detroit Retirement Systems Funding Trust 2006 (the "**2006 Trust**"). The 2006 Trust issued two series of certificates of participation ("**COPs**") – the Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A in the original aggregate principal amount of $148,540,000 (the "**Series 2006-A COPs**"), and the Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B in the original aggregate principal amount of $800,000,000 (the "**Series 2006-B COPs**" and, together with the Series 2006-A COPs, the "**Series 2006 COPs**"). 2006 Trust Indenture §§ 4, 6.4 (Pérez Decl. Ex. F).[4]

---

[4] The proceeds of the sale of the Series 2006 COPs were used, in large part, to fund the optional redemption and cancellation of similar COPs that had been issued in 2005 as part of the Alternative Funding Mechanism. Currently there remains outstanding $503,365,000 in principal amount of certain series of these 2005 COPs. (Mot. ¶ 12.) In addition, in connection with the issuance of the Series 2006 COPs and the redemption and cancellation of a portion of the outstanding 2005 COPS, with the consent of FGIC, the Service Corporations terminated certain swap contracts that had been entered into with respect to such COPs. *See* GRS Service Contract 2006 (defined herein) § 10 (Pérez Decl. Ex. G) and PFRS Service Contract 2006 (defined herein) § 10 (Pérez Decl. Ex. H) ("[T]he [Service Corporation[s]] shall timely take such action as is necessary to terminate the [2005 Swap Contracts]"); *see also* Letter from the Service Corporations to FGIC, dated June 1, 2006 and signed by FGIC on June 7, 2006 (Pérez Decl. Ex. I) (evidencing FGIC's consent to the termination of the 2005 Swap Contracts).

Each of the Series 2006 COPs evidence individual, undivided proportionate interests in the rights to receive certain payments to be made by the City to the Service Corporations under (i) that certain GRS Service Contract 2006 dated June 7, 2006 by and between the GRS Service Corporation and the City, as amended on June 15, 2009 (the "**GRS Service Contract 2006**") and (ii) that certain PFRS Service Contract 2006 dated June 7, 2006 between the PFRS Service Corporation and the City, as amended on June 15, 2009 (the "**PFRS Service Contract 2006**" and, together with the GRS Service Contract 2006, the "**2006 Service Contracts**").  *See* 2006 Trust Indenture § 6.2.2 and Ex. 6.2 (Pérez Decl. Ex. F).  FGIC issued two insurance policies to guarantee the scheduled payment of principal and interest on $148,540,000 in aggregate principal amount of the Series 2006-A COPs and $500,845,000 in aggregate principal amount of Series 2006-B COPs.  *See* Municipal Bond New Issue Insurance Policy Number 06010249, dated June 12, 2006 (the "**2006-A Policy**") (Pérez Decl. Ex. J) and Municipal Bond New Issue Insurance Policy Number 06010250, dated June 12, 2006 (the "**2006-B Policy**" and, together with the 2006-A Policy and the 2006-B Swap Surety Policies (defined below), the "**2006 Policies**") (Pérez Decl. Ex. K).

5.      While the Series 2006-A COPs have a fixed rate of interest, the Series 2006-B COPs were structured to have a "synthetic" fixed rate.  (Spencer Decl. ¶ 6).[5]  In order to create the "synthetic" rate of interest, the floating rate interest payable on the Series 2006-B COPs (which is tied to the London Interbank Offered Rate, or "LIBOR") (*Id*.) required the Service Corporations to enter into certain pay-fixed, receive variable interest rate swap contracts (as amended in 2009, the "**Swap Contracts**") with UBS, SBS and Merrill Lynch Capital

---

[5] Declaration of Stephen Spencer in Support of the Objection, filed contemporaneously herewith (herein after, the "**Spencer Decl**.").

Services, Inc. ("**MLCS**") as credit supporter of SBS[6] (collectively, the "**Swap Counterparties**").[7]  The net result was that the Series 2006-B COPs interest rate was fixed, leaving the City (and FGIC) with no un-hedged interest rate risk with respect to the Series 2006-B COPs.  (*See* Spencer Decl. ¶ 6.)

       6.     Pursuant to the Swap Contracts, the Service Corporations are required to (i) make certain fixed, quarterly payments to the Swap Counterparties, in exchange for the Swap Counterparties' obligation to make certain payments to the Service Corporations in amounts equal to the floating rate interest payments due on the Series 2006-B COPs, and (ii) under certain circumstances, make termination payments to the Swap Counterparties.  *See, e.g,.* Confirmation at 2 (Pérez Decl. Ex. O) (setting forth the quarterly, fixed payments owed by the GRS Service Corporation, on the one hand, and the floating amounts owed by UBS, on the other); ISDA §6 (Pérez Decl. Ex. M).  The Service Corporations' sole source of funding for payments owed under the Swap Contracts is payments owed by the City under the 2006 Service Contracts.  *See* Section 7.02 of each of the 2006 Service Contracts (Pérez Decl. Exs. G, H).  The Swap Contracts provide that, in the event of early termination, the party that is "out of the money" is obligated to pay the other party a termination payment to reflect the value of the swap under then-current market conditions, often referred to as "marked-to-market" or "MTM" valuation (e.g., if the party is a

---

[6] On July 19, 2013, SBS transferred to MLCS all of its rights, interests and obligations in, to and under two of the Swap Contracts.  *See* Letters from MLCS to SBS, the Service Corporations and U.S. Bank, National Association, dated July 19, 2013 (Pérez Decl. Ex. L).

[7] *See* GRS Service Contract 2006 Schedule 5 and PFRS Service Contract 2006 Schedule 5 (listing the Swap Contracts) (Pérez Decl. Exs. G, H); 1992 ISDA Master Agreement Local Currency Single Jurisdiction, dated as of May 25, 2005 between UBS and the GRS Service Corporation (the "**ISDA**") (Pérez Decl. Ex. M); Amended and Restated Schedule, dated as of June 26, 2009, to the ISDA between UBS and the GRS Service Corporation (the "**Schedule**") (Pérez Decl. Ex. N); and Confirmation to the GRS Service Corporation from UBS, dated June 26, 2009 (the "**Confirmation**") (Pérez Decl. Ex. O).  Each of the Swap Contracts consists of an ISDA Master Agreement, a schedule and a confirmation thereto, each of which are substantially identical to the ISDA, the Schedule and the Confirmation attached to the Pérez Declaration.  (Perez Decl. ¶¶ 16-18.) (*See also* Spencer Decl. ¶ 6.)

fixed rate payer and LIBOR has declined below the fixed rate, that party is "out of the money").

*See* ISDA § 6(d)-(e) (Pérez Decl. Ex. M); (Spencer Decl. ¶¶ 7-8).[8] Currently, LIBOR is low and,

therefore, the Swap Counterparties are "in the money."  (Spencer Decl. ¶¶ 7, 10.)  However,

since June 2012, LIBOR has been increasing, resulting in a corresponding decrease in the value

of the Swap Contracts (and, consequently, a lower payment amount that would be owed to the

Swap Counterparties upon termination).  *Id*. at ¶ 10.

       7.     As an integral part of the overall transaction, FGIC also issued certain

swap surety policies associated with the Series 2006-B COPs (the "**2006-B Swap Surety**

**Policies**") that insured the fixed, quarterly payments and certain termination payments owed by

the Service Corporations to the Swap Counterparties under the 2006 Swap Contracts up to a

specified amount.[9]  However, FGIC did not require the Service Corporations to pay any

additional premiums in connection with the FGIC's issuance of the 2006-B Swap Surety

Policies, and instead included such issuance under the single premium that FGIC charged for

issuance of the 2006-B Policy.[10]

---

[8] For example, in 2005, when the original COPs series were redeemed (in part) and the related swap agreements were terminated, because the variable interest rate at that time exceeded the fixed referenced interest rate upon which the amounts owed by the Service Corporations under the 2005 swap agreements were calculated, the early termination of such 2005 swap agreements entitled the Service Corporations to receive termination payments from the swap counterparties.  *See* GRS Service Contract 2006 Schedule 1A and PFRS Service Contract 2006 Schedule 1A (listing the termination amounts receivable by the Service Corporations from the 2005 swap counterparties) (Pérez Decl. Exs. G, H).

[9] The relevant swap surety policies are Swap Surety Policy Numbers 06010252, 06010253, 06010254 and 06010255 (collectively, the "**2006-B Swap Surety Policies**").  Swap Surety Policy Number 06010252 is attached to the Pérez Declaration as Exhibit P; each of the other 2006-B Swap Surety Policies is substantially identical thereto.  (Perez Decl. ¶ 19.)

[10] Each of 2006-B Swap Surety Policies provided for "[n]o additional premium paid in connection herewith – premium for Obligations Insured paid in connection with [the 2006-B Policy]."  (*See*, *e.g.*, Pérez Decl. Ex. P at 1.)

8.      In 2009, as a result of, among other things, ratings downgrades of the Series 2006 COPs and FGIC, the Swap Counterparties notified the Service Corporations that they believed an Additional Termination Event (as defined in the Swap Contracts) had occurred, providing the Swap Counterparties the right to terminate the Swap Contracts.  *See* Ordinance No. 05-09 at Sec. 18-6-4(a) (Pérez Decl. Ex. Q).[11]  The parties negotiated a resolution of this dispute, pursuant to which the City agreed to provide the Swap Counterparties with collateral securing the Service Corporations' obligations pursuant to the Swap Contracts.  Accordingly, the Swap Counterparties, the Service Corporations, the City, and U.S. Bank, N.A. as custodian (the "**Custodian**") entered into a Collateral Agreement, dated as of June 15, 2009, (the "**Collateral Agreement**"),[12] pursuant to which the City pledged the Casino Revenues (as defined in the Motion) to the Service Corporations and the Service Corporations, in turn, granted the Swap Counterparties a security interest in this pledge.  Collateral Agreement §§ 4.1, 4.2 (Orr Aff. Ex. B) (Mot. Ex. 5).  As set forth in the Motion, pursuant to the Collateral Agreement, each month the Custodian releases to the City the Casino Revenues that accumulate in the General Receipts Subaccount, only after the City deposits approximately $4 million into the Holdback Account. (Mot. ¶ 17).  However, in certain circumstances, Section 5.4 of the Collateral Agreement prohibits the Custodian from paying such revenues to the City.[13]  As parties to the Collateral

---

[11] On March 20, 2012, Moody's downgraded the Series 2006 COPs again, from Ba3 to B2.  *See* Moody's Investors Service, *Rating Action:  Moody's Downgrades Detroit (MI)'s General Obligation Unlimited Tax and Certificate of Participation Debt to B2 and GOLT Debt to B3*, March 20, 2012, available at http://www.moodys.com/research/MOODYS-DOWNGRADES-DETROIT-MIs-GENERAL-OBLIGATION-UNLIMITED-TAX-AND-CERTIFICATE--PR_241052 (Pérez Decl. Ex. R).

[12] The Collateral Agreement is attached as Exhibit B to the *Affidavit of Kevyn D. Orr in Support of the City's Verified Complaint for Declaratory and Injunctive Relief*, Case No. 13-cv-23987-LPZ-MKM (E.D. Mich.) (Docket No. 20) (the "**Orr Aff.**") (Mot. Ex. 5).

[13] Section 5.4 of the Collateral Agreement provides, in relevant part:  "No payment shall be made to the City from the General Receipts Subaccount (i) on and after the Term Period End Date or (ii) on or after the occurrence of a Termination Event under a Hedge where the related Counterparty is not the sole

Agreement, the Swap Counterparties maintain the right to enforce Section 5.4 of the Collateral Agreement, yet they have never done so. Similarly, FGIC has never attempted to enforce Section 5.4 of the Collateral Agreement to trap the revenues, and there was a TRO issued against Syncora that has maintained the City's access to the funds. *Ex Parte Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, City of Detroit v. Syncora Gurantee Inc.*, Case No. 13-008858-CZ (Mich. Cir. Ct. July 5, 2013) (the "**TRO**") (Pérez Decl. Exhibit S).[14]

9.     Each of the Swap Contracts provides that no amendment, modification or waiver with respect to such Swap Contract or any Credit Support Document (as defined in the Swap Contracts) will be effective unless in writing executed by each of the Swap Counterparties and the swap insurers, which includes FGIC. *See* ISDA § 8(b) (Pérez Decl. Ex. M) and Schedule Part 5(iv) (Pérez Decl. Ex. N). Accordingly, on June 26, 2009, with the written consent of FGIC, the Swap Counterparties and the Service Corporations agreed to certain amendments to the Swap Contracts. *See* Waiver and Consent of Insurer, dated June 26, 2009 (Pérez Decl. Ex. T). One of

---

Affected Party . . . ." Collateral Agreement § 5.4(a) (Orr Aff. Ex. B) (Mot. Ex. 5). Each of the financial events described in note 11 *supra* (Moody's downgrade of the Series 2006 COPs below Ba3) and paragraph 12 *infra* (the Governor declaring a financial emergency in the City, the appointment of the Emergency Manager, the City's failure to pay amounts due under the Service Contracts and the commencement of the Chapter 9 Case) constitutes a "Termination Event" for which the Service Corporation is the sole Affected Party. *See* ISDA §§ 5(b)(iii), 12 (definition of "Termination Event") (Pérez Decl. Ex. M), Schedule Part 1(i)(ii)(4), (8), (11) (Pérez Decl. Ex. N). In addition, each of the four events described in paragraph12 *infra* constitutes the "Term Period End Date" if the unenhanced rating on the Series 2006 COPs assigned by Moody's has been reduced below Ba3, which occurred on March 20, 2012. *See* Collateral Agreement (Orr. Aff. Ex. B) (Mot. Ex. 5), §§ `1.1 (Definitions of "Term Period End Date," "Qualified Hedge Event," and "Specified Additional Termination Event"), 11.6(7), (11), (12) and Schedule Part 4(i) (Definition of "Specified Additional Termination Event"), Part 1(i)(ii)(4) (Pérez Decl. Ex. N); note 11 *supra*.

[14] The Court scheduled a hearing to consider Syncora's *Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedited Discovery* for August 21, 2013 at 10:00 a.m. *See Order Granting Syncora Guarantee Inc's Ex Parte Motion for Expedited Hearing re: Defendant's Syncora Guarantee Inc.'s Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedites Discovery* [Docket No. 319].

the amendments provided for the addition in each of the Swap Contracts of what is referred to in the Forbearance Agreement (that is the subject of the Motion) as the "Optional Termination Provisions." These provisions each provide in relevant part that:

> [The Swap Counterparty] shall have the right to terminate one or more Transactions hereunder . . . on any Business Day; *provided* that no Event of Default or Termination Event is then occurring with respect to which [the Swap Counterparty] is the Defaulting Party or sole Affected Party, by providing at least five (5) Business Days' prior written notice to [the Service Corporation] of its election to terminate and its designation of the effective date of termination (the "[Swap Counterparty] Optional Early Termination Date") . . . For the avoidance of doubt, in no event will [the Service Corporation] owe any amount to [the Swap Counterparty] in connection with an election by [the Swap Counterparty] to exercise its option under this [provision], other than any Unpaid Amounts.[15]

Any other early termination designation explicitly requires FGIC's consent.[16]

10.     Without giving notice to FGIC, on July 15, 2013, the City, the Service Corporations and the Swap Counterparties entered into the Forbearance Agreement. Pursuant to the Forbearance Agreement, the Swap Counterparties have agreed to forbear from terminating any of the Swap Contracts or instructing the Custodian to withhold Casino Revenues from the City. Forbearance Agreement § 1.1 (Mot. Ex. 6). The Swap Counterparties have also granted the City the right to direct the Swap Counterparties to exercise their termination rights pursuant to the Optional Termination Provisions. *Id*. § 3 (Mot. Ex. 6). Under the terms of the Forbearance Agreement, if the City exercises this right, the Swap Counterparties would

---

[15] As set forth in the Forbearance Agreement, "Optional Termination Provision" refers to, with respect to the MLCS/SBS Swap Contracts, Part 5(t) of the Schedule to such Swap Contracts and, with respect to the UBS Swap Contracts, Part 5(xx) of the Schedule to such Swap Contracts. The Optional Termination Provisions in each of the Swap Contracts are identical. (Perez Aff. ¶ 17, Ex. N). Accordingly, all references herein to Part 5(xx) of the Schedule are equally applicable to Part 5(t) of the Schedule to the MLCS/SBS Swap Contracts.

[16] Part 5(i) of the Schedule explicitly provides that "neither [the Swap Counterparty] nor [the Service Corporation] shall designate an Early Termination Date . . . without the prior written consent of [FGIC]." (Pérez Decl. Ex. N.)

presumably be obligated to terminate the Swaps Contracts, without seeking or obtaining the consent of FGIC, and the City would presumably be obligated to pay to the Swap Counterparties the Optional Termination Amount, which is equal to between 75% and 82% of the mid-market value of the Swap Contracts (approximately $222 million to $243 million, as of June 2013). (Mot. ¶¶ 45-46).

11. Although the Forbearance Agreement provides that, upon receipt of the Optional Termination Amount, the Swap Counterparties will irrevocably waive their rights to assert claims against FGIC under 2006-B Swap Surety Policies, the Swap Counterparties' exercise of their Optional Termination Rights pursuant to the Forbearance Agreement may expose FGIC to liability for floating interest claims pursuant to the 2006-B Policy for the remaining 22-year life of the Series 2006-B COPs.

12. Three days after executing the Forbearance Agreement, on July 18, 2013, the City commenced the Chapter 9 Case. (Mot. ¶ 8). The commencement of the Chapter 9 Case was the culmination of a chain of events that began on March 1, 2013, when the Governor declared a financial emergency in the City. MICHIGAN.GOV, *Governor determines Detroit in financial emergency*, March 1, 2013, http://www.michigan.gov/snyder/0,4668,7-277-57577-296124--,00.html ("**Michigan.gov Article**") (Pérez Decl. Ex. U). Two weeks later, on March 14, 2013, Kevyn D. Orr was appointed as the emergency manager of the City (the "**Emergency Manager**"), effective as of March 25, 2013. (Mot. ¶ 5). On June 14, 2013, the City failed to pay $39.7 million owed to the Service Corporations under the Service Contracts. *See* Orr Aff. at ¶ 21 ("To preserve the City's limited cash, I did not make a required $39.7 million payment to the Service Corporations for payment to the COPs holders that was due on June 14, 2013") (Mot. Ex. 5).

## THE COURT SHOULD DEFER
## CONSIDERATION OF THE FORBEARANCE AGREEMENT

13.     The Court should defer consideration of the City's request to assume the Forbearance Agreement pursuant to section 365(a) of the Bankruptcy Code and for approval of the Forbearance Agreement pursuant to Bankruptcy Rule 9019 on the basis that, at this early stage in the Chapter 9 Case, it is simply impossible to assess whether the Forbearance Agreement, including the Termination Transaction provided therein, would be in the best interests of the City and its creditors, particularly given the risk of harm to creditors.

14.     Although bankruptcy courts generally defer to a debtor's business judgment concerning the assumption of an executory contract, "it is within the discretion of the bankruptcy court to approve or disapprove assumption . . . and the bankruptcy court may deny a motion to assume . . . where [the] Debtor fails to demonstrate a benefit to the estate." *In re Crystalin, L.L.C.*, 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003).  In addition, "[w]hen determining whether to approve a proposed settlement, the bankruptcy court may not rubber stamp the agreement or merely rely upon the [debtor's] word that the settlement is reasonable." *In re MQVP, Inc.*, 477 Fed.Appx. 310, 313 (6th Cir. 2012).  Instead, "the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable." *Id.* quoting *Reynolds v. C.I.R.*, 861 F.2d 469, 473 (6th Cir. 1988).  As acknowledged in the Motion, this includes taking into account factors such as the probability of success in the litigation, potential difficulties in collection, the complexity and expense associated with the litigation and the "*paramount interest of the creditors* and a proper deference to their reasonable views in the premises."  *In re Bard*, 49 Fed. Appx. 528, 530 (6th Cir. 2002) (emphasis added).

15. At this juncture – less than a month into the Chapter 9 Case, with no plan of adjustment on file, and prior to the Court having an opportunity to adjudicate the serious challenges that have been and will be raised questioning the City's eligibility as a chapter 9 debtor – it is not appropriate for the Court to consider an arrangement that would permit the City to make a $222 to $243 million payment to two of its many creditors. The City's request for assumption and approval of the Forbearance Agreement, and effectively permission to consummate the Termination Transaction, is a use of powers bestowed on a chapter 9 debtor by the Bankruptcy Code before the Court has determined the City's eligibility, and otherwise is premature. Given the timing and circumstances, it is unfeasible to assess what, if any, benefit the City will derive from the Termination Transaction or what, if any, harm to the City will be avoided through the Forbearance Agreement. Moreover, any purported benefit of the Forbearance Agreement is outweighed by the potential harm that consummation of the Termination Transaction would cause to FGIC and the City's other creditors. Accordingly, deference to the City's business judgment is not warranted and deferral of the Court's consideration of the Motion is appropriate.

A. **The Alleged Benefits of the Forbearance
Agreement to the City Are Speculative and Unsubstantiated**

16. The City alleges three benefits to be derived from the Forbearance Agreement: (1) continued access to the Casino Revenues; (2) resolution of the Swap Contracts at a discounted price; and (3) avoidance of litigation over the Swap Contracts and the pledge to the Swap Counterparties. It is too soon in the Chapter 9 Case to test the veracity of these purported benefits and, to the extent these factors can be evaluated, they are subject to challenge.

*The City's Liquidity Argument is a Red Herring*

17.     The City claims that the Swap Counterparties' agreement in the Forbearance Agreement to refrain from instructing the Custodian to "trap" Casino Revenues is a "critical concession" that will enable the City to access cash.  (Mot. ¶ 43).  The City, however, has not demonstrated that the Swap Counterparties would take action to "trap" the Casino Revenues absent the Forbearance Agreement.

18.     The events of the seventeen months have presented five separate bases for the Custodian to "trap" the Casino Revenues in the General Receipts Subaccount:  (i) on March 20, 2012, Moody's downgraded the Series 2006 COPs below Ba3 (*see supra* note 11]) (ii) on March 1, 2013, the Governor declared a financial emergency in the City (*See* Michigan.gov Article) (Pérez Decl. Ex. U); (iii) on March 14, 2013, the Emergency Manager was appointed, effective as of March 25, 2013 (Mot. ¶ 5), (iv) on June 14, 2013, the City failed to pay Service Charges and Regular Scheduled Payments due under the Service Contracts (Orr Aff. at ¶ 21) (Mot. Ex. 5) and (v) on July 18, 2013, the City commenced the Chapter 9 Case.  (Mot. ¶ 8).  *See supra* note 13.  Yet, throughout this period, the Swap Counterparties – who, as parties to the agreement, maintain the right to enforce Section 5.4 of the Collateral Agreement and prohibit the Custodian from paying Casino Revenues to the City – have declined to do so.[17]  The City has presented no evidence that the Swap Counterparties would suddenly change course now.  To the contrary, the Swap Counterparties' behavior to date suggests that they would continue to engage with the City regarding a global resolution of the City's financial obligations.  Even if there was a real concern that the Swap Counterparties would take action to "trap" the Casino Revenues

---

[17] Although the commencement of the Chapter 9 Case provided a basis for the Custodian to trap the Casino Revenues pursuant to Section 5.4 of the Collateral Agreement, as of July 15, 2013, the Swap Counterparties agreed to forbear from instructing or notifying the Custodian of its obligation to do so. *See* Forbearance Agreement § 1.1(b) (Mot. Ex. 6).

following the commencement of the Chapter 9 Case, the City has not demonstrated that it was not possible to reach agreement on a more narrowly tailored forbearance that did not also include a hasty and potentially risky option to terminate the Swap Contracts. Similarly, FGIC has never attempted to enforce Section 5.4 of the Collateral Agreement to trap the revenues, and there was a TRO issued against Syncora that has maintained the City's access to the funds. TRO (Pérez Decl. Exhibit S).

19. In addition, the City's alleged liquidity emergency may not be as grim as described. Indeed, as a result of the bankruptcy filing, the City has other sources of cash it can use– namely, cash the City would otherwise use to make payments with respect to its prepetition obligations, such as the Service Contracts or general obligations bonds. For example, on June 14, 2013, the City declined to pay $39.7 million owed to the Service Corporations under the Service Contracts, which is over three times the approximately $11 million of Casino Revenues the City collects from the General Receipts Subaccount each month. (Orr Aff. at ¶ 21.) (Mot. Ex. 5.) According to the City's calculations, $39.7 million is the equivalent of over 90% of the City's available cash-on-hand as of June 30, 2013, and would allow the City to pay for nearly six months of fire fighter salaries and wages or nearly three months of police officer salaries and wages. (Mot. ¶ 43.) Over the next year, it appears that the City will avoid making payments with respect to another $61.0 million owed to the Service Corporations under the Service Contracts with respect to principal and interest payments on the COPs, as well as $109.1 million on account of general obligation principal and interest payments and $199.5 million of pension contributions, for a total savings of approximately $369.6 million. (Spencer Decl. ¶ 12.) While FGIC does not deny that the City needs access to liquidity during the Chapter 9 Case, it is far

from clear that the Casino Revenues are the only, or even the most crucial, source of funds for the City.[18]

*The Termination Transaction Is Not a "Workable Unwind" of the Swap Contracts*

20.  The City's second justification to support the Forbearance Agreement is even less convincing.  The City contends the Forbearance Agreement is a necessary settlement of the Swap Contracts that avoids protracted litigation at a reasonable price.  (Mot. ¶¶ 45-49.) However, because the City and the Swap Counterparties cannot consummate the Termination Transaction without the prior consent of FGIC, the Forbearance Agreement does not in fact provide a "workable unwind" of the Swap Contracts.  *Id.* at ¶ 41.

21.  Section 3 of the Forbearance Agreement entitles the City to direct the Swap Counterparties to exercise their Optional Termination Rights under the Optional Termination Provisions of the Swap Contracts, which will trigger the payment of the Optional Termination Amounts (approximately $222 million to $243 million) by the City to the Swap Counterparties.  However, contrary to the Swap Counterparties' representations,[19] they do not have the ability to exercise their Optional Termination Rights *and* collect the Optional Termination Amounts.  The Optional Termination Provisions provide that "in no event will [the Service Corporation] owe any amount to [the Swap Counterparty] in connection with an election by [the Swap Counterparty] to exercise its option under this [Optional Termination Provision]." Schedule Part 5 (xx) (Pérez Decl. Ex. N).  The Optional Termination Provisions clearly are

---

[18] Interestingly, it appears that there is no funding mechanism in place now that would enable  the "cash-starved" City to make the payment to the Swap Counterparties contemplated by the Termination Transaction, further underscoring the premature nature of the relief requested.

[19] *See* Forbearance Agreement § 4(c)(ii) ("Each Swap Counterparty represents . . . [i]t has the power to . . . perform obligations under this Agreement and has taken all necessary action to authorize such . . . performance") (Mot. Ex. 6).

operative only in a context where the Swap Counterparties are not owed a termination payment as a result of the early termination. The City and the Swap Counterparties have attempted to maneuver around this limitation by having the City, as opposed to the Service Corporations, pay the Optional Termination Amounts to the Swap Counterparties.[20] To adopt this interpretation does not make sense because the Service Corporations have no source of funding except the City.

        22. The Service Corporations are entities acting as instrumentalities and enterprises of the City. *See* GRS Service Corporation Articles of Incorporation Rider to Certificate of Amendment (Pérez Decl. Ex. D); PFRS Service Corporation Articles of Incorporation Rider to Certificate of Amendment (Pérez Decl. Ex. E); City Ordinance No. 05-05 (Pérez Decl. Ex. C).. Indeed, pursuant to Section 7.02 of each of the 2006 Service Contracts, the City agreed to pay to the Service Corporations the amount of any termination payment owing by any Service Corporation to a Swap Counterparty under a Swap Contract, promptly upon receipt of notice. (Pérez Decl. Exs. G, H.) These payments promised by the City are the Service Corporations' sole source of funding for any termination payment owed pursuant to the Swap Contracts. *See* Section 7.02 of each of the 2006 Service Contracts (Pérez Decl. Exs. G, H). Accordingly, amounts owed by the Service Corporations in connection with the Swap Counterparties' exercise of termination rights under the Swap Contracts are contractually amounts payable by the City. As a result, providing for the Optional Termination Amounts to

---

[20] Presumably in an effort to highlight the parties' purported compliance with the Optional Termination Provisions, Section 3.3(c) of the Forbearance Agreement provides that "[f]or the avoidance of doubt, each party hereto acknowledges that no Service Corporation will owe an amount to any Swap Counterparty under any Swap Contract in connection with the election to exercise the Optional Termination Right other than any Unpaid Amounts." (Mot. Ex. 6.)

come directly from the City, instead of from the City through the Service Corporations, conflicts with the terms of the Swap Contracts.

23.     In attempting to shoehorn the termination contemplated by the Forbearance Agreement within the terms of the Optional Termination Provisions, the City and Swap Counterparties are clearly trying to avoid having to approach FGIC for its consent, as all of the Swap Counterparties' other applicable termination rights under the Swap Contracts require insurer consent.  *See supra* note 16.  The parties simply cannot circumvent this requirement and, in trying to do so, have negotiated a Forbearance Agreement with an ineffective termination option.  The only alternative interpretation would be to suggest that the Forbearance Agreement effectively amended the Optional Termination Provisions to remove the last sentence precluding payment to the Swap Counterparties, but any such amendment would also require FGIC's consent.  *See* ISDA § 8(b) (Pérez Decl. Ex. M) and Schedule Part 5(iv) (Pérez Decl. Ex. N).  To date, FGIC's consent has not been solicited or obtained.  Thus, the Forbearance Agreement cannot be relied upon to unwind the Swap Contracts, and the City is left with whatever alleged lengthy, costly and complex litigation it sought to avoid.

24.     Putting aside the foregoing, it is impossible to assess whether the purported discounted termination payment that the City negotiated is reasonable or even necessary.  The city contends that "[a]bsent the Forbearance Agreement . . . the Swap Counterparties would terminate or seek to terminate the Swap Contracts, resulting in a termination payment obligation of hundreds of millions of dollars.  (Mot. ¶ 45).  This statement is directly contradicted by the City's own admission that "it would . . . be highly unlikely that the Swap Counterparties would ever be inclined to exercise their Optional Termination [R]ights in today's interest rate environment, where the netting under the hedges is projected to yield $45

million annually to them for the next 10 years."[21]  In addition, the City ignores the fact that interest rates are increasing, and, accordingly, the termination amount that would be payable to the Swap Counterparties under the terms of the Swap Contracts is *decreasing*.  (*See* Spencer Decl. ¶¶ 10-11.)  Accordingly, there is no basis to lock in a termination payment amount at this point.  Furthermore, there is no information regarding the treatment the Swap Counterparties would receive on account of a termination claim in the absence of a settlement.

**B.    Termination of the Swap Contracts May Result in Harm to FGIC**

25.    Not only are the proposed benefits of the Forbearance Agreement suspect, but such alleged benefits may be outweighed by the potential negative impact to the City's creditors that could result from consummation of the Forbearance Agreement.  The City has failed to demonstrate why the Court should allow it to assume the Forbearance Agreement and set in stone now the treatment of two of the City's thousands of creditors, before eligibility has been determined and the City has developed a chapter 9 plan.  FGIC does not yet know what its anticipated recoveries will be from the City; therefore, it is too soon for FGIC to meaningfully assess how the termination contemplated by the Forbearance Agreement will affect FGIC economically on its variable rate exposure.

26.    At the very least, FGIC can assume that without the Swap Contracts in place (which appear to be fully secured obligations that would otherwise continue for the term of the Series 2006-B COPs), FGIC may be exposed to liability for floating interest rate claims under the 2006-B Policy for the remaining 22-year life of the Series 2006-B COPs.  Given that interest rates may rise significantly over the next two decades, consummation of the Termination

---

[21] *Debtors' Response to Motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. for Leave to Conduct "Limited" Discovery Regarding Motion of Debtor for Authorization and Approval of Forbearance and Optional Termination Agreement* [Docket No. 244] at 17.

Transaction could expose FGIC to significant potential additional liability. FGIC underwrote and issued the policies insuring the Series 2006-B COPs and the Swap Contracts on the basis that they were one, integrated transaction, allowing for only very limited circumstances in which the Series 2006-B COPs could remain outstanding, un-hedged, without FGIC's consent. *See supra* ¶ 9. This is most clearly demonstrated by the fact that FGIC did not charge a separate premium for the policies insuring the Swap Contracts. *See supra* note 10. To separate the two without FGIC's consent would deprive FGIC the benefit of its bargain with respect to the overall transaction.

## RESERVATION OF RIGHTS

27. FGIC expressly reserves all rights and remedies that it has now or may in the future have under or with respect to the COPs or the Swap Contracts, or any of the transaction documents related thereto, including but not limited to the Service Contracts, the Contract Administration Agreements (as defined in the Service Contracts), the 2006 Trust Indenture, the 2006 Policies or the Collateral Agreement. FGIC respectfully requests that any order entered by the Court in connection with Forbearance Agreement include the following language:

> Notwithstanding any other provision hereof or any provision in the Forbearance Agreement, this Order shall not prejudice the rights of any third party against any other non-Debtor party. Nothing in this Order or the Forbearance Agreement shall be deemed to waive, modify or otherwise impair (or enhance) the rights of any third party against any non-Debtor party, including with respect to the COPs or the Swap Contracts or any of the transaction documents or insurance policies related thereto, and all rights and remedies that any third party has now, or may have in the future, under such documents and/or applicable law are expressly reserved.

## CONCULSION

28.     Based upon the foregoing, FGIC urges the Court to defer consideration of

the Forbearance Agreement until further evidence and support is developed regarding the merits

of the agreement, and appropriate steps are taken to obtain all requisite approvals.

Dated: August 16, 2013
       Birmingham, Michigan

/s/  Mark R. James
Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone:  (248) 642-0333
Facsimile:  (248) 642-0856
Email:  EJEssad@wwrplaw.com
Email:  mrjames@wwrplaw.com

 – and –

Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:  alfredo.perez@weil.com

*Attorneys for Financial Guaranty Insurance Company*