UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

------------------------------------------------------------x
:
In re : Chapter 9
:
CITY OF DETROIT, MICHIGAN, : Case No. 13-53846
:
Debtor. : Hon. Steven W. Rhodes
:
:
------------------------------------------------------------x

**DECLARATION OF STEPHEN SPENCER IN SUPPORT
OF LIMITED OBJECTION OF FINANCIAL GUARANTY
INSURANCE COMPANY TO MOTION OF DEBTOR FOR ENTRY OF
AN ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN
FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT
TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH
AGREEMENT PURSUANT TO RULE 9019, AND (III) GRANTING RELATED RELIEF**

I, Stephen Spencer, hereby declare that the following is true to the best of my knowledge, information and belief:

1. I am a Managing Director in the Financial Restructuring Group at Houlihan Lokey ("**HL**"), which currently serves as financial advisor to Financial Guaranty Insurance Company ("**FGIC**") in connection with the above-captioned chapter 9 case (the "**Chapter 9 Case**").

2. I submit this declaration (the "**Declaration**") in support of the *Limited Objection of Financial Guaranty Insurance Company to Motion of Debtor for Entry of an Order (i) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (ii) Approving Such Agreement Pursuant to Rule 9019, and (iii) Granting Related Relief* (the "**Objection**"), filed contemporaneously herewith.

3. Except as otherwise indicated, all facts and statements in this Declaration are based on my personal knowledge and information derived from my involvement in HL's representation of FGIC in connection with the Chapter 9 Case.

4. In 1989, I received my undergraduate degree from the University of Wisconsin – Madison. I have over 15 years of experience advising companies in executing distressed recapitalizations. Prior to joining HL in 2001, I worked for GE Capital, where I was a founding member of GE Capital's debtor-in-possession lending practice. I have a particular expertise in executing out-of-court restructuring transactions involving consensual impairment of one or more creditor constituencies. I also have experience advising companies executing bankruptcy-related reorganizations or sale transactions. Beyond the corporate sector, I have an expertise in municipal distress and chapter 9 insolvency issues. I have researched and consulted with various municipalities throughout the United States, and I authored a comprehensive chapter 9 case study entitled "Restructuring the Troubled Municipality."

5. In the context of complex corporate restructurings and distressed recapitalizations, I have performed detailed liquidity and debt capacity analyses for dozens of clients. In connection with analyzing the financial conditions of various distressed municipalities, I have performed similar analyses, recognizing appropriate modifications reflecting the different financial structures that often distinguish municipalities from corporate entities.

**The Termination Payment Amount Under the Swap Contracts is Decreasing**

6. In connection with HL's representation of FGIC in the Chapter 9 Case, I reviewed the Swap Contracts.[1] The Swap Contracts are typical pay-fixed, receive variable

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Objection.

interest rate swap contracts that issuers use to hedge interest rate risk with respect to securities they issue that pay interest at a floating rate, like the Series 2006-B COPs. Under these types of interest rate swap contracts, the issuer will make certain periodic payments to the swap counterparty, in exchange for the counterparty's obligation to make payments to the issuer in amounts equal to the floating interest payments due on the securities. In this way, the interest rate swap contracts create a "synthetic" fixed rate on the underlying securities, leaving the issuer with no un-hedged interest rate risk. As is often the case with similar types of securities, the floating interest rates on the Series 2006-B COPs are tied to the London Interbank Offered Rate, referred to as "LIBOR".

7. Interest rate swap contracts also typically include certain "termination events" that allow the issuer or the swap counterparty, depending on the event, to terminate the contract and collect a termination payment. The termination payment amount is meant to reflect the value of the swap under the then-current market conditions (often referred to as "marked-to-market" or "MTM" valuation) so as to compensate the party that was "in the money" at the time of the early termination of the swap. For example, when LIBOR (which, as I indicated above, is often used as the referenced market variable interest rate) is low, as it is today, the fixed payments the issuer owes to the swap counterparty may be greater than the floating interest payments due on the covered securities. In that case, the swap counterparty would be "in the money," and the issuer would be obligated to pay the swap counterparty a termination payment upon early termination of the swap contract. By contrast, when LIBOR is high and thus the floating interest payments due on the covered securities exceed the fixed rate under the swap contract, the issuer would be "in the money" and, accordingly, entitled to a payment upon termination from the swap counterparty.

8. The Swap Contracts include the types of termination provisions described in paragraph 7 *supra*. The City has publicly disclosed annual marked-to-market valuations of the Swap Contracts as of June of each year, beginning in 2006, through and including 2013. These valuations are reflected in the chart attached hereto as **Exhibit 1** (the "**MTM Valuation Chart**"). HL has reviewed the City's valuations and, in HL's opinion, they are reasonable estimations of the marked-to-market values of the Swap Contracts at each point in time.

9. As the MTM Valuation Chart demonstrates, the market value of the Swap Contracts peaked in June 2012 at $439.3 million, when LIBOR was at an all-time low. In the years prior to 2012, when LIBOR was higher, the value of the Swap Contracts was substantially lower - $236.2 million in 2011, $280.5 million in 2010, $213.6 million in 2009, $108.8 million in 2008, $10.9 million in 2007 and $1.3 million in 2006.

10. Since June 2012, LIBOR has been steadily on the rise, resulting in a corresponding decrease in the value of the Swap Contracts (and, consequently, a lower payment amount that would be owed to the Swap Counterparties upon termination). As set forth in the MTM Valuation Chart, based on the City's calculations, if the Swap Counterparties had terminated the Swap Contracts on June 28, 2013, the Service Corporations would have owed the Swap Counterparties a termination payment in the amount of approximately $296.5 million, a $142.8 million decrease from the prior year. (*See also* Motion ¶23).

11. This trend is expected to continue, particularly in light of the Federal Reserve's recent announcement that it may begin pulling back from its $85 billion a month bond purchases as early as September 2013. Accordingly, there is a substantial likelihood that the termination payment amount that would be owed to the Swap Counterparties under the Swap Contracts will continue to decrease, potentially substantially, over the next few months. Current

30-year projections for the 3-month LIBOR curve suggest a steady increase from current rates of 0.26% to 4.00% in 2043.[2] If the LIBOR curve used to calculate the termination payment increased by 1.00 percentage point at each quarterly swap interest payment date, the termination payment amount would decrease by approximately $100 million, and if the LIBOR curve increased by an additional 1.00 percentage point at each quarterly swap interest payment date, the termination amount would decrease further by another approximately $90 million. Given that current LIBOR curve trends suggest that the termination payment amount is expected to continue to decline, the City would not be harmed by deferring consideration of the Motion.

**The City's Liquidity Has Significantly Increased
as a Result of the Commencement of the Chapter 9 Case**

12. In connection with HL's representation of FGIC in the Chapter 9 Case, I reviewed the City's Proposal for Creditors dated June 14, 2013, a copy of which is attached hereto as **Exhibit 2** (the "**Proposal**"). According to the Proposal, the City projected owing aggregate legacy expenditures for the fiscal year 2014 in the following amounts: (i) general obligation principal and interest payments in the amount of approximately $109.1 million,[3] (ii) COPs principal and interest payments in the amount of approximately $61.0 million[4] and (iii) pension contributions in the amount of approximately $199.5 million.[5] Assuming the City

---

[2] Per August 13, 2013 Bloomberg "ICVS" curve builder function, #23: 3-Month LIBOR.

[3] This amount consists of $70.9 million of "Debt service (LTGO)" and $64.9 million of "Debt service (UTGO)" less the secured portion of such debt that the City intends to pay ($18.7 million with respect to LTGO and $8.0 million with respect to UTGO). Proposal at 34, 98.

[4] This amount consists of $51.4 million of "POC – principal and interest (GF)," $5.9 million "POC – principal and interest (EF, excl. DDOT)" and $3.7 million "POC principal and interest (DDOT)." *Id.* at 34.

[5] This amount consists of $139.0 million of "Pension contributions – Public Safety," $36.9 million "Pension contributions – Non-Public Safety" and $23.6 million of "Pension contributions – DDOT." *Id.* at 34.

discontinues payment of these legacy obligations during the pendency of the Chapter 9 Case (*see* Proposal at 97-98), and assuming the Chapter Case is pending through at least July 1, 2014 (the close of the fiscal year), based on the City's own projections, the City will have available to it over the course of the next year an additional approximately *$369.6 million* of cash**.**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge, information and belief, the foregoing is true and correct.

Executed this 16th day of August 2013

/s/ Stephen Spencer
Stephen Spencer
Managing Director
Houlihan Lokey
