UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:   Chapter 9
　　　　　Case No. 13-53846

City of Detroit, Michigan,

　　　Debtor.
_____/

**OBJECTION BY PARTY IN INTEREST DAVID SOLE
TO DEBTOR CITY OF DETROIT'S MOTION FOR
ORDER (I) AUTHORIZING ASSUMPTION OF THAT CERTAIN FORBEARANCE AND
OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT
<u>PURSUANT TO RULE 9019, AND (III) GRANTING RELATED RELIEF</u>**

Now comes Party in Interest David Sole, by and through his attorneys Jerome D. Goldberg, PLLC, and for his Objection to Debtor City of Detroit's Motion for Entry of an Order (I) Authorizing the Assumption of That Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant Rule 9019, and (III) Granting Related Relief [Docket No. 157], states as follows:

**INTRODUCTION**

The Interest Rate Swaps on Pension Obligation Certificates entered into by the City of Detroit with UBS and SBS/Bank of America constitute a drain of hundreds of millions of dollars to the banks from the City's budget with nothing positive for the City in return.

Basically, the Interest Rate Swaps obligate the City of Detroit to pay UBS and Bank of America 6.323% interest on $800 million in bonds, when the actual rate on the bonds is only 0.6056%. (**Exhibit 1, affidavit of David Sole, with exhibits attached to the affidavit**). The banks, who on information and belief presented this "deal" as a beneficial one for the City, pocket the difference between the interest paid to them and the actual interest rate on the bonds, as clear

1

profit, amounting to at least $45.1 million according to Emergency Manager Kevyn Orr's May 12, 2013 Financial and Operating Report (**Exhibit 1, Exhibit H attached to Exhibit 1**) or $160 million since 2009.  (**See Exhibit 1).**

While Interested Party Sole does not yet have direct evidence of fraud or other irregularities in the mechanisms by which UBS and Bank of America locked the City of Detroit into these losing deals to their benefit, it must be noted that recently executives from UBS's municipal bond division were sentenced to prison terms for their activities in connection with the municipal bond market.  A former Bank of America executive was also indicted for participating in a conspiracy to defraud municipal bond investments.  (**See Exhibit 1, Exhibit L attached to Exhibit 1**)

Both Bank of America and UBS have been implicated in the Libor scandal, which potentially affects the amounts the City of Detroit actually should have been paying on the bonds and swaps, as well as the "ISDA fix" which potentially affects the calculations for termination fees associated with the Interest Rate Swaps.  (**See Exhibit 1, Exhibit K attached to Exhibit 1**). In addition, both Bank of America and UBS, as documented in countless lawsuits and consent judgments with the federal government and state governments including Michigan, and UBS (See Exhibit 2, attached) were major subprime lenders and participants in the illicit mortgage activity that precipitated a virtual financial collapse in 2008, and that especially implicated cities with large African-American populations like Detroit.  (**See Exhibit 3, excerpts from Senate Select Committee Report on Wall Street and the Financial Crisis**).  The financial crisis that precipitated this Chapter 9 bankruptcy filing was in large part a result of the effects of predatory lending by the banks against the residents of Detroit, which resulted in tens of thousands of foreclosures in the city, a massive population decline and a precipitous decline in property values

2

with the ensuing decline in the city's tax base. Seventy-three percent of new mortgages in Detroit from 2004-2006 were subprime, leading to 67,000 bank foreclosures from 2005-2009 (and tens of thousands since that date). **Exhibit 4, City of Detroit Planning and Development Report dated January 2009.** The City of Detroit pension funds along with pension funds across the U.S. have been directly impacted by these mortgage practices. Attached is a copy of a lawsuit filed by the Detroit Police and Fire Retirement System against many financial institutions, including UBS, for losses suffered as a result of being sold allegedly fraudulent mortgage securities. **Exhibit 5, attached.**

The forbearance agreement negotiated between the City of Detroit and UBS and Bank of America removes any examination of these interest rate swaps and pension obligation certificates from the potential adjustments under the Chapter 9 bankruptcy. It mandates that the City of Detroit will continue to pay UBS and Bank of America $4 million each month based on the negative hedges the City was locked into by the banks. It offers the City of Detroit an opportunity to terminate the interest rate swaps based on reducing the termination fees 75% to 82%. However, based on the City of Detroit's figures of an estimated termination amount of $300 million, the cost to the City would be at least $225 million (if exercised by October of this year) and more if exercised later – money the City simply does not have. And the City has not shown the basis for its estimated termination amount of $300 million, which is less than other estimates which have pegged termination fees as high as $473 million. (**See Exhibit 1, Exhibit I attached to Exhibit 1).**

Party of Interest Sole concurs with City of Detroit's position that pre-petition funds held by U.S. Bank must be released to the City in light of the lack of authority of Syncora to direct U.S. Bank to withhold those banks. In addition, Party of Interest Sole asserts that any post-

3

petition funds are not subject to a security lien on casino tax dollars pursuant to 11 USC 922 and 11 USC 928.

Party of Interest Sole believes that if the City of Detroit's Emergency Manager exercised his statutory mandate under PA 436, Section 16, to conduct a criminal investigation of activities of the swap counterparties, especially in light of the federal prosecutions of UBS and Bank of America municipal bond executives noted above, the City of Detroit may have been in a much better position to negotiate with the banks to resolve the interest rate swaps which have cost the City tens of millions of dollars in desperately needed revenues and which will cost the City hundreds of millions more, even under the forbearance agreement which the City seeks to implement.

At the minimum, Emergency Manager Orr could invite the Securities and Exchange Commission ("SEC") to conduct an investigation of the City's bonds with UBS and Bank of America. It should be noted that UBS has already entered into a judgment with the SEC relative to illicit activity involving the City of Detroit Water Department bonds. (**See Exhibit 1, Exhibit M attached to Exhibit 1**). Emergency Manager Orr could also invite the SEC to intervene in this bankruptcy proceeding pursuant to Section 1109(a) of the Bankruptcy Code which is incorporated into Section 901. The SEC could bring the expertise and information gained by their extensive examination of illicit activity in the municipal bond markets into this Chapter 9 proceeding. Interested Party Sole and several other City of Detroit retirees have taken the initiative to enlist the support of United States Senator Carl Levin in prompting SEC involvement in this case. (**See Exhibit 1, Exhibit N attached to Exhibit 1**)

Interested Party Sole respectfully requests that this honorable Court exercise its equitable jurisdiction to insure that claims of UBS and SBS relative to the Pension Obligation Certificates

and Interest Rate Swaps are properly examined in this proceeding, and that the claims be adjusted or subordinated in line with these equitable findings. The forbearance agreement which is the subject of the City's motion precludes this examination at the cost of hundreds of millions of dollars to the City, its pensioners and its residents.

**Factual and Procedural Background**

Interested Party David Sole calls this honorable Court's attention to the factual background as enunciated in the City of Detroit's Motion for Assumption of the Forbearance Agreement for a recitation of much of the detail surrounding this transaction for which it is seeking Court approval and to which Interested Party Sole is objecting. However, to substantiate the factual background for his objection, Interested Party Sole states as follows:

1. Interested party David Sole is a retired City of Detroit chemist and former president of UAW 2334-SCATA. His spouse is a retired City of Detroit bus driver. **See Exhibit 1.**

2. Mr. Sole has a Master's degree from the University of Michigan in Biological Chemistry, and has extensive studies in mathematics. **See Exhibit 1.**

3. Mr. Sole filed an appearance as an interested party in the City of Detroit bankruptcy case, 13-53846. **See Exhibit 1.**

4. On January 2, 2013, Mr. Sole filed a Freedom of Information Request with the City of Detroit in which he requested copies of all bond agreements including interest rate swaps between the City of Detroit and any banks and financial institutions, as well as all correspondence, emails, notes, etc., associated with the procurement of the bonds. **See Exhibit 1, Exhibit A, attached to Exhibit 1.**

5. When the City of Detroit did not timely respond to his FOIA request, on February 21, 2013, Mr. Sole filed a lawsuit pursuant to the FOIA, Wayne County Circuit Court case No. 13-002121-CZ. **Exhibit 1, Exhibit B, attached to Exhibit 1.**

6. In response to this lawsuit, the City of Detroit produced over 3,200 pages of documents, mostly copies of bond documents and interest rate swap agreements. However, the City of Detroit failed to produce all letters, emails, memos and/or other materials associated with the negotiations for these bonds and swaps. **See Exhibit 1.**

7. Mr. Sole was beginning to enter the discovery phase of his FOIA case, when the case was administratively dismissed due to the pending bankruptcy proceeding. **See Exhibit 1.**

8. After receiving the bond documents from the City of Detroit, Mr. Sole began a thorough review of the documents. **See Exhibit 1.**

9. To aid in that review, he read numerous articles relating to the mechanism of municipal bond financing and especially of interest rate swaps. Many of the articles he reviewed, and the City of Detroit bond documents, are posted on the website, DetroitDebtMoratorium.org. **See Exhibit 1.**

10. Based on that review, it is clear that the City of Detroit issued pension obligation certificates ("POC"s) (through the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation) accompanied with interest rate swaps, to aid in meeting its pension obligations in May 2005. The POCs and swaps were with UBS, SBS, with Merrill Lynch (a unit of Bank of America) standing behind the SBS bonds, as well as Citibank. **See Exhibit 1.**

11. The 2005 bonds and swap agreements were for nine- and 20-year terms. They provided that the actual interest rate to be paid on the bonds was a margin of 0.28 plus the 3-month Libor (Interbank) index. **See Exhibit 1, Exhibit C, attached to Exhibit 1.**

12. However, pursuant to the swap agreements, the City of Detroit, through the service corporations, was to pay a fixed interest rate of 5.123%. **Id**.

13. Under the swaps, the City was responsible for paying the difference between the actual floating interest rate on the bond (0.28% plus Libor) and the 5.123% fixed rate to the counterparties, UBS and SBS/Merrill Lynch, if the floating interest rate was less than the fixed rate. If the floating rate exceeded the fixed rate, the bank would have to pay that difference back to the City of Detroit. **Id**.

14. In June 2006, the 2005 bond and swap agreements between the City of Detroit through the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation were terminated and replaced with new pension obligation certificates and interest rate swaps. **See Exhibit 1.**

15. The 2006 POCs and swaps provided for a 28-year term for the bonds and swaps, with an actual floating rate of 0.34 margin plus the three-month Libor index rate payable on the bonds, and a fixed interest rate of 4.991% through June 2007, 5.666% from June 2007 to June 2008, and 6.256% payable from the City of Detroit to the banks (UBS and SBS/Merrill Lynch). **See Exhibit 1, Exhibit D, attached to Exhibit 1.**

16. Again, under the swaps, the City was responsible for paying the difference between the actual floating interest rate on the bond and the fixed rate to the counterparties, UBS and SBS/Merrill Lynch, if the floating interest rate was less than the fixed rate. If the floating rate

exceeded the fixed rate, the banks would have to pay that difference back to the City of Detroit. **See Exhibit 1.**

17. The 2006 POCs and swaps were considered unsecured debt, not backed by any specific revenues or even the full faith and credit of the City of Detroit. **See Exhibit 1, Exhibit E, attached to Exhibit 1**.

18. However, the swap agreement did provide for termination events, at which time the party against whom the swap was terminated would be immediately liable for payment of the derivative amount, the difference between the floating interest amount and fixed interest rate amount projected over the term of the bond and the swap. **See Exhibit 1.**

19. In 2009, when the rating agencies, Moody's and Standard and Poor's, downgraded the City of Detroit's bond rating, UBS and SBS/Merrill Lynch declared a termination event. Amended swap agreements were negotiated at that time. **See Exhibit 1.**

20. Pursuant to the amended swap agreements, the fixed interest rate payable by the City of Detroit to the banks was raised to 6.323% effective July 1, 2010, the termination date was moved up to 2029, and casino tax dollars were pledged as a security for the swap payments. **See Exhibit 1, Exhibit F, attached to Exhibit 1.**

21. Beginning in 2008, the three month Libor began a precipitous drop. Mr. Sole pulled the three month Libor figures from the Internet. The three month Libor rate fell from 4.7025% in January 2008 to 1.425% in January 2009, to rates between 0.25% to a maximum of 0.58% from January 2010 to the present. The current three month Libor rate is 0.2656%. **See Exhibit 1, Exhibit G, attached to Exhibit 1.**

22. This means that while the City of Detroit is paying a 6.323% interest rate to UBS and Bank of America, based on the interest rate swaps associated with the POCs, the actual

8

13-53846-tjt    Doc 361    Filed 08/16/13    Entered 08/16/13 18:34:29    Page 8 of 19

interest rate being paid on the bonds is only 0.6056% for this month (0.34 margin plus the 0.2625 Libor rate). **The difference between the 6.323% interest rate paid to the banks and the 0.6056% interest which is the actual interest rate on the bonds, is pocketed by UBS and Bank of America as clear profit extracted from the people of Detroit. See Exhibit 1.**

23. According to Emergency Manager Orr's May 12, 2013, Financial and Operating Plan, this drop in the Libor rate is costing the City of Detroit approximately $45.1 million a year in payments to UBS and Bank of America, for which the City receives no benefit whatsoever. **See Exhibit 1, Exhibit H, attached to Exhibit 1.**

24. UBS and Bank of America have already netted at least $160 million in clear profit off the City of Detroit based on the interest rate swaps they sold to the City on the pension obligation certificates, excluding fees also associated with the financial deals. **See Exhibit 1.**

25. According to an article in Bloomberg News, if UBS and Bank of America were to declare a termination event based on the City of Detroit's declaration of bankruptcy, these financial entities would claim another $473 million from the City of Detroit's citizens. **See Exhibit 1, Exhibit I, attached to Exhibit 1.**

26. UBS is one of several banks that have been implicated in rigging the Libor, the Interbank index to which the interest rate on Detroit's pension obligation certificates are linked. **See Exhibit 1, Exhibit J, attached to Exhibit 1.**

27. Based on a method to calculate the effect of Libor manipulation which Mr. Sole utilized, this Libor manipulation has cost the City of Detroit approximately $11 million between 2007 and 2010 (this is based on a 0.0025 yearly Libor understatement). **See Exhibit 1.**

28. In addition, articles and studies recently published have pointed to the "ISDA" fix. This entails involvement of banks in rigging the indexes utilized to calculate termination fees on

9

hedging derivatives like the interest rate swaps between the City of Detroit and UBS and Bank of America. According to the attached study, Bank of America and UBS are implicated in both the Libor and ISDA fix. **See Exhibit 1, Exhibit K, attached to Exhibit 1.**

29. Three former UBS executives were recently convicted of criminal conspiracy for deceiving cities and towns by rigging bids to invest municipal bond proceeds. A former Bank of America executive was also indicted for participating in a conspiracy to defraud municipal bond investments. **See Exhibit 1, Exhibit L, attached to Exhibit 1.**

30. The SEC has filed complaints against both UBS and Bank of America for their involvement in illegal activities with regard to the municipal bond market. The SEC judgment with UBS includes the Detroit Water Department among others for fraudulent municipal bond activity. **See Exhibit 1, Exhibit M, attached to Exhibit 1.**

31. Along with several other retirees, Mr. Sole has sent a letter to U.S. Senator Carl Levin requesting that he aid in securing the SEC's intervention in Detroit's Chapter 9 bankruptcy case, so a proper light can be shed on the banks' practices relative to the issuance of municipal bonds. **Exhibit 1, Exhibit N, attached to Exhibit 1.**

32. As a retiree, Mr. Sole is especially concerned that funds available to pay pension benefits for himself and his wife are being siphoned out of the City's Treasury because of the illicit activity of the banks, and particularly UBS and Bank of America, as outlined above. **See Exhibit 1.**

33. In addition, both Bank of America and UBS, as documented in countless lawsuits and consent judgments with the federal government and state governments including Michigan, and UBS (**See Exhibit 2, attached**) were major subprime lenders and participants in the illicit mortgage activity that precipitated a virtual financial collapse in 2008, and that especially

10

implicated cities with large African-American populations like Detroit. (**See Exhibit 3, excerpts from Senate Select Committee Report on Wall Street and the Financial Crisis**).

34. The financial crisis that precipitated this Chapter 9 bankruptcy filing was in large measure a result of the effects of predatory lending by the banks against the residents of Detroit, that resulted in tens of thousands of foreclosures in the city, massive population decline and a precipitous decline in property values with the ensuing decline in the city's tax base. Seventy-three percent of new mortgages in Detroit from 2004-2006 were subprime, leading to 67,000 bank foreclosures from 2005-2009 (and tens of thousands since that date). **Exhibit 4, City of Detroit Planning and Development Report dated January 2009.**

35. The City of Detroit pension funds along with pension funds across the U.S. have been directly, negatively impacted by these mortgage practices. Attached is a copy of a lawsuit filed by the Detroit Police and Fire Retirement System against many financial institutions, including UBS, for losses suffered as a result of being sold allegedly fraudulent mortgage securities. **Exhibit 5, attached.**

36. The forbearance agreement negotiated between the City of Detroit and UBS and Bank of America removes any examination of these interest rate swaps and pension obligation certificates from the potential adjustments under the Chapter 9 bankruptcy. It mandates that the City will continue to pay UBS and Bank of America $4 million each month based on the negative hedges the City was locked into by the banks. It offers the City an opportunity to terminate the swaps early based on reducing the termination fees 75% - 82%. However, based on the City's figures of an estimated termination amount of $300 million, the cost to Detroit would be at least $225 million (if exercised by October of this year) and more if exercised later, which the City simply does not have. And the City of Detroit has not shown the basis for its estimated

11

termination amount of $300 million, which is less than other estimates which have pegged termination fees as high as $473 million. (**See Exhibit 1, Exhibit I attached to Exhibit 1).**

37. Party of Interest Sole concurs with City of Detroit's position that pre-petition funds held by U.S. Bank must be released to the City in light of the lack of authority of Syncora to direct U.S. Bank to withhold those banks. In addition, Mr. Sole asserts that any post-petition funds are not subject to a security lien on casino tax dollars pursuant to 11 USC 922 and 11 USC 928.

38. Party of Interest Sole believes that if the City of Detroit's Emergency Manager exercised his statutory mandate under PA 436, Section 16, to conduct a criminal investigation of activities of the swap counterparties, especially in light of the federal prosecutions noted above, the City may have been in a much better position to negotiate with the banks to resolve the interest rate swaps which have cost the City tens of millions of dollars in desperately needed revenues and which will cost the City hundreds of millions more, even under the forbearance agreement which the City seeks to implement.

39. Emergency Manager Orr could at minimum invite the SEC to intervene in this bankruptcy proceeding pursuant to Section 1109(a) of the Bankruptcy Code which is incorporated into Section 901. It should be noted that UBS has already entered into a judgment with the SEC relative to illicit activity involving the City of Detroit Water Department bonds. (**See Exhibit 1, Exhibit M attached to Exhibit 1**). The SEC could bring the expertise and information gained by their extensive examination of illicit activity in the municipal bond markets into this Chapter 9 proceeding. Mr. Sole and several other City of Detroit retirees have taken the initiative to enlist the support of Senator Carl Levin in prompting SEC involvement in this case. (**See Exhibit 1, Exhibit N attached to Exhibit 1**)

40. Interested Party Sole respectfully requests that this honorable Court exercise its equitable jurisdiction to insure that claims of UBS and SBS relative to the Pension Obligation Certificates and Interest Rate Swaps are properly examined in this proceeding, that the claims be adjusted or subordinated in line with these equitable findings. The forbearance agreement which is the subject of the City of Detroit's motion precludes this examination at the cost of hundreds of millions of dollars to the City of Detroit, its pensioners and its residents.

## LAW AND ANALYSIS

### I. THIS HONORABLE COURT IS CHARGED WITH MAKING AN INDEPENDENT JUDGMENT AS TO WHETHER THE FORBEARANCE AGREEMENT IN FAIR AND EQUITABLE

In *Reynolds v. Commissioner*, 861 F.2d 469, 473 (6th Cir. 1988), the Court held:

> In bankruptcy proceedings, as distinguished from ordinary [**12] civil cases, any compromise between the debtor and his creditors must be approved by the court as fair and equitable. Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson, 390 U.S. 414, 424, 20 L. Ed. 2d 1, 88 S. Ct. 1157 (1968); In re A & C Properties, 784 F.2d 1377, 1381 (9th Cir.), cert. denied, 479 U.S. 854, 107 S. Ct. 189, 93 L. Ed. 2d 122 (1986). In considering a proposed compromise, the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable. In re American Reserve Corp., 841 F.2d 159, 162-63 (7th Cir. 1987). The court is not permitted to act as a mere rubber stamp or to rely on the trustee's word that the compromise is "reasonable." Id. at 162.
> The need for this safeguard is obvious. Any settlement between the debtor and one of his individual creditors necessarily affects the rights of other creditors by reducing the assets of the estate available to satisfy other creditors' claims.

As outlined above and below, in the present case, the equities clearly favor this honorable Court using its independent judgment and not rubberstamping this forbearance agreement which serves to guarantee UBS and Bank of America hundreds of millions of dollars for doing nothing, while denying pensioners, who have worked all their lives to benefit the people of Detroit, access to benefits that they earned and were promised. The present case at least merits an examination of the banks' practices with regard to municipal bidding and creation, and with regard to mortgage

13

lending practices which created the financial crisis in Detroit, to determine if there existed fraud or other illegalities that could result in their claims being disallowed, reduced or subordinated.

**II.     THIS HONORABLE COURT HAS THE AUTHORITY TO ADJUST AND/OR SUBORDINATE CLAIMS BASED ON EQUITABLE CONSIDERATIONS**

It is well established that bankruptcy courts are courts of equity and retain the power of allowance of claims or at least the subordination of claims based on equitable considerations.

In *In RE: Madeline Marie Nursing Homes, State of Ohio v Collins,* 694 F2d 433, 436, (6th Cir 1982), the Court held, "As courts of equity, bankruptcy courts 'will look through the form to the substance of any particular transaction and may contrive new remedies where those in law are inadequate. Where the Bankruptcy Act is silent, equitable principles will govern.'" Collier on Bankruptcy, para. 2.09 at 173-175 (14th ed. 1974)

11 USC 510(c) states:

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may
(1) Under principles of equitable subordination, subordinate for purposes of distribution all of part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
(2) order than any lien securing such a subordinated claim be transferred to the estate.

In *Pepper v Litton*, 308 US 295, 304 (1939), the U.S. Supreme Court held:

Consequently this Court has held that for many purposes courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity. . . The bankruptcy courts have exercised these equitable powers in passing on a wide range of problems arising out of the administration of bankrupt estates. They have been invoked to that end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done. . . . A claim which has been allowed may be later rejected in part, according to the equities of the case, disallowance or subordination in light of equitable considerations may originally be made.

In Collier on Bankruptcy, Section, 502.03[2][b], p 502-21, 2012, ed., the authors noted:

> The effect of section 502(b)(1) is to make available to the trustee any defense to a claim that might have been available to the debtor. For example, if a claim would be unenforceable against the debtor or against the property of the debtor, because, under applicable non-bankruptcy law, the debtor could raise the defense of usury, fraud, lack of consideration, unconscionability or the expiration of a statute of limitations, such defense affords the trustee a basis for the disallowance of the claim in bankruptcy.

In addition, in Collier on Bankruptcy, Section 510.5-05, p 510-17, 2012 ed., the authors noted:

> Section 510(c) permits the court to subordinate claims under principles of equitable subordination. . . .Secured as well as unsecured claims may be subordinated. All or part of a claim may be subordinated. Under subsection (c)(2), when a claim that is subordinated is secured by a lien, the line is transferred to the debtor's estate under sectin 541. In essence, the subordinated claim becomes unsecured and the property securing such claim becomes part of the debtor's estate.

**Exhibit 6, attached**.

In the present case, Interested Party Sole contends that there are numerous issues that must be examined, based on (1) the criminal indictments of several UBS and Bank of America executives who dealt in the banks' municipal bond departments; (2) issues concerning potential fraud with regard to calculations of interest using the Libor as an index as well as the "ISDA fix" with regard to the setting of termination fees; (3) the huge differential the banks are netting from the City of Detroit relative to the meager interest rate actually being paid on the bonds; and (4) the role the banks played in issuing massive quantities of subprime mortgages to Detroit's population which created the current financial crisis, that at least rate examination by the Court before it okays a forbearance agreement that removes the POCs and connected Interest Rate Swaps from the bankruptcy proceedings.

The potential exists that this honorable Court may find the claims by UBS and Bank of America ripe for disallowance or equitable subordination. The potential that this could occur, especially in light of the cost to the City of Detroit of hundreds of millions of dollars in payments

to the banks for doing what amounts to nothing, and thus depriving pensioners, city workers and community residents of compensation for the years of labor and years of paying taxpayers, should weigh heavily in favor of the Court denying the City of Detroit's Motion for Approval of the Forbearance Agreement and allowing the interest rate swaps to remain part of the bankruptcy.

## III. BANK OF AMERICA AND UBS' SECURITY LIEN ON THE CASINO TAX DOLLARS CANNOT BE ASSERTED POST PETITION

11 USCS § 902 defines "special revenues" as:

   (A) receipts derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used or intended to be used primarily to provide transportation, utility, or other services, including the proceeds of borrowings to finance the projects or systems;
   (B) special excise taxes imposed on particular activities or transactions;
   (C) incremental tax receipts from the benefited area in the case of tax-increment financing;
   (D) other revenues or receipts derived from particular functions of the debtor, whether or not the debtor has other functions; or
   (E) taxes specifically levied to finance one or more projects or systems, excluding receipts from general property, sales, or income taxes (other than tax-increment financing) levied to finance the general purposes of the debtor.

11 USCS § 928 -- Post petition effect of security interest, states

(a) Notwithstanding section 552(a) of this title [11 USCS § 552(a)] and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.
 (b) Any such lien on special revenues, other than municipal betterment assessments, derived from a project or system shall be subject to the necessary operating expenses of such project or system, as the case may be.

Even if it is accepted that the 2009 amendments to the Interest Rate Swaps created a security interest on the City of Detroit's casino tax dollars, for that lien to be asserted on casino tax dollars collected post bankruptcy filing, they must constitute "special revenues" under Section 902.

The banks might contend with regard to this issue that the casino tax dollars are "excise taxes" because they are referenced as such in the Collateral Agreement. However, in Collier on Bankruptcy, Section 902.03[2], p 902-6, 2010 ed., the authors examined under what circumstances an excise tax would be considered "special revenues" and thus be collectible post-petition. The authors cited to the Senate Report for the Congressional intent on this issue, stating:

> The second category of the definition is: "(B) Special excise taxes imposed on particular activities or transactions. The Senate Report gives examples: An excise tax on hotel and motel rooms or the sale of alcoholic beverages would be a special excise tax under clause (B). "Special excise taxes" are taxes specifically identified and pledged in bond financing documents and are not "generally" available to all creditors under state law. A general state sales tax would not be a special excise tax."

**Exhibit 7, attached.**

*In Heffernan Memorial Hospital d/b/a Calexico Hospital*, 202 BR 147, 149 (US Bankr Ct So. Dist. CA), the Court held the following in discussing Section 902:

> To meet the requirement of a "special revenue" under this provision, taxes must be restricted in use to a specific project or system. In other words, the focus is on the nature and scope of the restrictions placed the use of the tax receipts. Taxes available for general municipal purposes do not constitute "special revenues".

In the present case, the casino tax dollars do not meet the definition of "special revenues" under Section 902, as the statutes creating the casino tax dollars specifically note they are to be utilized for a set of general public purposes. Thus they do not qualify as special revenues despite the subsequent lien asserted.

The Collateral Agreement providing for the lien on casino tax dollars pursuant to the Amended Interest Rate Swaps, pledges the Wagering Taxes, Additional Wagering Taxes and Alternative Taxes, including any interest and penalties thereon as provided for under the Detroit City Code Section 18-4-6(c) and any and all proceeds thereof. The wagering taxes are collected pursuant to MCL 432.201 et seq., the Michigan Gaming Control and Revenue Act.

Section 12(1) of the Wagering Tax Revenue Statute allows the state to collect an 18% wagering tax from casinos and Section 12(3)(a) allows the state to allocate 55% thereof to the city in which the casino is located for use in connection with the following:

> (i) The hiring, training, and deployment of street patrol officers.
> (ii) Neighborhood and downtown economic development programs designed to create local jobs.
> (iii) Public safety programs such as emergency medical services, fire department programs, and street lighting.
> (iv) Anti-gang and youth development programs.
> (v) Other programs that are designed to contribute to the improvement of the quality of life in the city.
> (vi) Relief to the taxpayers of the city from 1 or more taxes or fees imposed by the city.
> (vii) The costs of capital improvements.
> (viii) Road repairs and improvements.

Detroit City Code Section 18-14-10 provides that wagering tax proceeds shall be used by the City for the purposes authorized by the Wagering Tax Revenue Statute. Section (12)(11) of the Wagering Tax Revenue Statute provides that payments used by a city when the tax is imposed by a development agreement with the casino or levied by ordinance shall be used by the city for the purposes enumerated in Section 12(3)(a) set forth above.

Thus pursuant to both Michigan law and City of Detroit ordinances which incorporate the law, casino tax revenues are for general public purposes, and specifically are not to be appropriated for the payment of Interest Rate Swaps. While it may or may not be legitimate for the banks to assert a security lien contractually on the casino tax revenues, these revenues clearly do not constitute "special revenues" under the Bankruptcy Code, as the taxes are not levied for that purpose.

Because the casino tax revenues do not constitute a "special excise tax" under Section 902 of the Bankruptcy Code, pursuant to Section 928 casino tax dollars collected post petition are subject to the bankruptcy stay and not payable to the banks.

18

13-53846-tjt    Doc 361    Filed 08/16/13    Entered 08/16/13 18:34:29    Page 18 of 19

This is another reason why the forbearance agreement which is the subject of this motion should be rejected.  The agreement actually guarantees the payments to the banks post petition, depriving the City of Detroit of $4 million in revenue which the City desperately needs.

WHEREFORE:  Interested Party David Sole respectfully requests that this honorable Court deny the City of Detroit's Motion for Entry of an Order (I) Authorizing the Assumption of That Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code (II) Approving Such Agreement Pursuant Rule 9019, and (III) Granting Related Relief [Docket No. 157].

Respectfully submitted,

JEROME D. GOLDBERG, PLLC

By:  */s/ Jerome D. Goldberg*
Jerome D. Goldberg (P61678)
Attorney for David Sole, Party in Interest
2921 East Jefferson, Suite 205
Detroit, MI 48207
Phone: 313-393-6001
Fax: 313-393-6007
Email: apclawyer@sbcglobal.net

DATED:  August 16, 2003