**EXHIBIT D**

137768v4

# CONFIRMATION
## (General Retirement System/FGIC)

To:    Detroit General Retirement System Service Corporation
Detroit, Michigan
Attention: Roger Short

Date:  June 7, 2006

Our Reference No. SBSFPC-0009

      The purpose of this letter agreement (the "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between us on the Trade Date specified below. This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below.

      The definitions and provisions contained in the 2000 ISDA Definitions (the "Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern. Each party represents and warrants to the other that (i) it is duly authorized to enter into this Transaction and to perform its obligations hereunder, (ii) the Transaction and the performance of its obligations hereunder do not violate any material obligation of such party, and (iii) the person executing this Confirmation is duly authorized to execute and deliver it.

      **1.**    This Confirmation supplements, forms part of, and is subject to, the 1992 ISDA Master Agreement between us, dated May 25, 2005, as amended and supplemented from time to time (the "Agreement"). All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

      **2.**    The terms of the particular Transaction to which this Confirmation relates are as follows:

| | |
|---|---|
| Party A: | SBS Financial Products Company, LLC |
| Party B: | Detroit General Retirement System Service Corporation |
| Insurer | Financial Guaranty Insurance Company ("Insurer") |
| Notional Amount: | Initially $96,621,000, thereafter amortizing as set forth on Exhibit A hereto. |
| Trade Date: | June 7, 2006 |
| Effective Date: | June 12, 2006, provided that the Effective Date |

shall automatically extend to June 13, 2006 as provided in Section 7 hereof.

| | |
|---|---|
| Termination Date: | June 15, 2034, or such earlier date upon which the Agreement terminates. |
| Business Days | New York and London |

FIXED AMOUNTS:

| | |
|---|---|
| Fixed Rate Payer: | Party B |
| Fixed Rate Payer Payment Dates: | Each March 14, June 14, September 14 and December 14, from and including September 14, 2006 up to and including the June 14, 2032, subject to adjustment in accordance with the Business Day Convention specified below. |
| Period End Dates: | March 15, June 15, September 15 and December 15, from and including September 15, 2006 up to and including the Termination Date, with No Adjustment. |
| Fixed Rate: | In accordance with the following schedule: |

| From and Including | To and Excluding | Rate (per annum) |
|---|---|---|
| Effective Date | June 15, 2007 | 4.991% |
| June 15, 2007 | June 15, 2008 | 5.666% |
| June 15, 2008 | Termination Date | 6.256% |

| | |
|---|---|
| Fixed Rate Day Count Fraction: | 30/360 |
| Business Day Convention: | Preceding. |

FLOATING AMOUNTS:

| | |
|---|---|
| Floating Rate Payer: | Party A |
| Floating Rate Payer Payment Dates: | Each March 14, June 14, September 14 and December 14, from and including September 14, |

2

2006 up to and including the June 14, 2032, subject to adjustment in accordance with the Preceding Business Day Convention.

| | |
|---|---|
| Floating Rate Option: | USD – LIBOR – BBA. |
| Period End Dates: | Each March 15, June 15, September 15 and December 15, from and including September 15, 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Day Count Fraction: | Actual/360 |
| Designated Maturity: | Three Months, except that in respect to the initial Calculation Period, Linear Interpolation shall apply |
| Method of Averaging: | Inapplicable. |
| Spread: | 0.340 percent per annum. |
| Reset Date: | Initially, the Effective Date and thereafter, on each March 15, June 15, September 15 and December 15, from and including the September 15, 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Compounding: | Inapplicable. |

### 3. Swap Advisor Fees

| | |
|---|---|
| Swap Advisor: | Scott Balice Strategies LLC |
| Swap Advisor Fee: | On behalf of Party B, a fee of USD 84,631.30 is being paid by Party A in respect of this Transaction to the Swap Advisor. Such fee is equal to the present value of 0.65 basis points per annum on the Notional Amount of this Transaction taking into account the amortization schedule set forth herein, to the Termination Date, discounted to the Trade Date using the LIBOR swap curve. This fee is reflected in, and has increased, the Fixed Rate payable by Party B hereunder. |

3

Swap Advisor Fee Payment Date:            Upon closing of the Certificates

4.    **Account Details**

**Payments to Party A:**
Account for payments in USD:
Favour: Deutsche Bank, NY
ABA/Bank No.: 021-001-033
Account No.: 01419647
Reference: SBS Swap
Attention: Safet Kalabovic

**Payments to Party B:**
ABA=U.S. BANK, Minneapolis
(091000022)
FBO=FOR FURTHER CREDIT
TO U.S. BANK, N.A.
AC=180121167365
REF: Detroit COPS GRS
Trust #: 794367001
Contact: Jill Ling 651-495-3712

5.    **Optional Termination.** With the prior consent of the Insurer, Party B shall have the right to terminate this Transaction (provided that no Event of Default or Termination Event has occurred) by providing (i) at least five (5) Business Days' prior written notice to Party A of its election to terminate this Transaction and (ii) evidence reasonably satisfactory to Party A that any and all amounts owed to Party A in connection with such early termination shall be paid on the due date thereof. On the Optional Termination Date set forth in such notice, an amount, determined by Party A, shall be payable by Party A or the Party B, as the case may be, in respect of such termination. If such amount is not acceptable to Party B, then Party A shall determine such amount in accordance with Section 6 of the Agreement, assuming Market Quotation and Second Method apply and Party B is the sole Affected Party. For purposes of the Transaction Transfer Agreement by and between Party A, Party B and Merrill Lynch Capital Services, Inc., as Credit Support Provider of Party A, dated as of May 25, 2005 (the "Transaction Transfer Agreement"), any partial optional termination pursuant to this Paragraph 5 shall not constitute an Event of Default or a Termination Event or result in the designation of an Early Termination Date with respect to this Transaction.

6.    **Adjustment Event** If on the Effective Date or any date thereafter (an "Adjustment Event Date") the Notional Amount of this Transaction is greater than the Related Principal Amount, an Adjustment Event shall occur and the Notional Amount shall be reduced to the extent necessary to make such Notional Amount as of the Adjustment Event Date equal to the Related Principal Amount. As used herein:

(a)    the term "Related Principal Amount" means Party A's Swap Percentage of Party B's Allocable Share of the aggregate principal amount of the outstanding FGIC-Insured Floating Rate Certificates;

4

(b)     the term "Party A's Swap Percentage" means at any time 50 percent;

(c)     the term "Party B's Allocable Share" means (1) the outstanding Scheduled Payments (as such term is defined in the GRS Service Contract 2006 between the Detroit General Retirement System Service Corporation and the City of Detroit) to be made by Party B in respect of FGIC-Insured Floating Rate Certificates divided by (2) the sum of such Scheduled Payments to be made by Party B and the outstanding Schedule Payments (as such term is defined in the GRS Service Contract 2006 between the Detroit General Retirement System Service Corporation and the City of Detroit) to be made by Detroit General Retirement System Service Corporation in respect of FGIC-Insured Floating Rate Certificates, in each case after giving effect to any prepayments of Scheduled Payments in connection with the circumstances of the Adjustment Event; and

(d)     the term "FGIC-Insured Floating Rate Certificates" means any Detroit Retirement System Funding Trust 2006 Taxable Certificates of Participation Series 2006-B that bear interest at a floating rate and the scheduled principal of and interest on which are insured under a financial guaranty insurance policy issued by Financial Guaranty Insurance Company.

(e)     Upon an adjustment to the Notional Amount, a payment (an "Adjustment Payment") will be due and owing by one party to the other equal to the Market Quotation for this Transaction determined by Party A as if (i) a Termination Event occurred in respect of Party B, (ii) Party B was the only Affected Party with respect to such Termination Event, Party A was the party entitled to calculate the Market Quotation, and the Transaction is the Affected Transaction, (iii) the relevant Adjustment Event Date was designated as the Early Termination Date, (iv) the Notional Amount of the Transaction was an amount equal to the difference between (X) the Notional Amount and (Y) the Related Principal Amount on the Adjustment Event Date, and (v) the requirement set forth in the definition of Market Quotation that quotations be obtained from four Reference Market-makers was met by having Party A provide a single quotation, provided, however, if Party B disputes such quotation, Party A shall seek bids from Reference Market-makers consistent with the provisions of Section 6 of the Agreement.  If an Adjustment Payment is a positive number, Party B will pay an amount equal to such Adjustment Payment to Party A; if an Adjustment Payment is a negative number, Party A will pay an amount equal to the absolute value of such Adjustment Payment to Party B.  An Adjustment Payment shall be paid by the relevant party on the date on which the Adjustment Event occurs.

(f)     Notwithstanding anything to the contrary in this Agreement, Party B will not optionally cause an Adjustment Event if, in connection with such Adjustment Event, an Adjustment Payment would be payable by Party B to Party A unless Party B provides evidence reasonably satisfactory to Party A and the Swap Insurer that (i) such Adjustment Payment will be made by Party B on the Adjustment Event Date and (ii) such Adjustment Payment will not cause Party B to be in violation of, or in default under the documentation relating to the Certificates (as defined below).

(g)     For purposes of the Transaction Transfer Agreement, an Adjustment Event pursuant to this Paragraph 6 shall not constitute an Event of Default or a Termination Event or result in the designation of an Early Termination Date with respect to this Transaction.

7.     **Issuance of Certificates.**  Notwithstanding anything contained herein or in the Agreement to the contrary, the parties ·shall have no rights or obligations with respect to this Transaction, and the representations of the parties contained herein and in the Agreement shall

5

not be deemed to be made until the $946,230,000 Detroit Retirement Systems Funding Trust 2006 Taxable Certificates of Participation Series 2006 (the "Certificates") have been duly issued by Party B. In the event that the Certificates are not issued on or prior to the Effective Date (provided that the Effective Date shall automatically extend to June 13, 2006 in the event that the Certificates are not yet issued), this Transaction shall automatically terminate and shall be of no further force or effect and the parties shall have no further obligations hereunder.

8. **Relationship between Parties** Each party will be deemed to represent to the other party on the date on which it enters into this Transaction that (in the absence of a written Agreement between the parties which expressly imposes affirmative obligations to the contrary for this Transaction):

(a) Non-Reliance. Each party is acting for its own account, and has made its own independent decisions to enter into this Transaction and this Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. Each party is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanation relating to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(b) Assessment and Understanding. Each party is capable of assessing the merits of and understands (on its own behalf or through independent professional advice), and accepts, the terms, conditions and risks of this Transaction. Each party is also capable of assuming and assumes, the risks of this Transaction.

(c) Status of the Parties. Neither party is acting as a fiduciary for or as an adviser to the other in respect of this Transaction.

9. **Agreement to Deliver Documents**

For the purpose of Sections 3(d) and 4(a) of the Agreement and in addition to the documents to be delivered pursuant to Part 2 of the Schedule, each party agrees to deliver the following documents:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A | Opinion of legal counsel to Party A in a form reasonably satisfactory to Party B. | On or before execution of this Confirmation. | No |
| Party B | Covered Indenture. | On or before execution of this Confirmation. | Yes |

6

| Party B | Certified copy of the resolution of Party B's Board of Directors (or equivalent authorizing documentation) authorizing the execution and delivery of the Agreement and each Confirmation and performance of its obligation hereunder. | On or before execution of this Confirmation. | Yes |
|---|---|---|---|
| Party B | Opinion of legal counsel to Party B substantially in the form and substance acceptable to Party A. | On or before execution of this Confirmation. | No |
| Party B | Commitment to issue each Swap Insurance Policy (as such term is defined in Part 4 of the Schedule). | On or before the execution of this Confirmation with respect to the Insured Rate Swap Transaction. | No |
| Party B | Swap Insurance Policy and the Opinion of counsel to the Insurer with respect to such Swap Insurance Policy. | On or before the delivery of the related Certificates to the underwriters with respect to the Insured Rate Swap Transaction. | No |
| Party B | Confirmations, updates and additional documentation concerning the opinion of counsel, board resolutions and certificates delivered pursuant to each of the foregoing documents to be delivered as Party A may reasonably request. | Prior to the Effective Date of the Transaction. | Yes |
| Party B | Certified copy of the Service Contract together with an opinion of Certificate Counsel in form and substance satisfactory to Party A which | On or before execution of the Service Contract. | No |

7

addresses each of the Sources
of Payment set forth in Part
4(b)(ii)(g) of the Schedule.

**10.  Amendment to the Schedule.**

(a)    The definitions of "Certificates", "Contract Administration Agreement", "Detroit General Retirement System Service Contract", and "Detroit Police and Fire Retirement System Service Contract" set forth in Part 4(i) of the Schedule are hereby amended and restated, respectively, in their entirety to read, and for all purposes of the Agreement shall have the respective meanings, as follows:

"Certificates" means the $946,230,000 Taxable Certificates of Participation Series 2006 issued by the Detroit Retirement Systems Funding Trust 2006.

"Contract Administration Agreement" means the Contract Administration Agreement 2006 dated June 12, 2006 among Detroit Retirement Systems Funding Trust 2006, Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation, severally and not jointly, U.S. Bank National Association, separately and not as Trustee of the Detroit Retirement Systems Funding Trust 2006 and the Hedge Counterparties Named Therein.

"Detroit General Retirement System Service Contract" means the GRS Service Contract dated June 7, 2006 between the Detroit General Retirement System Service Corporation and the City of Detroit.

"Detroit Police and Fire Retirement System Service Contract" means the PFRS Service Contract dated June 7, 2006 between the Detroit Police and Fire Retirement System Service Corporation and the City of Detroit.

(b)    Each and every reference to "Part 4(b)(ii)(h)" in the Schedule is hereby deleted in its entirety and replaced with "Part 4(b)(ii)(g)"

(c)    Each and every reference to "Insured Transaction" in the Schedule is hereby deleted in its entirety and replaced with "Insured Rate Swap Transaction".

(d)    Each and every reference to "Swap Policy" in the Schedule is hereby deleted in its entirety and replaced with "Swap Insurance Policy".

(e)    Part 5(f) is hereby amended to delete "Notwithstanding Section 7 of the Agreement, neither" at the beginning of the first sentence and inserting in replacement thereof "Notwithstanding Section 7 of the Agreement, except as set forth in Part 6© hereof, neither."

8

11. **Risk Considerations**.

Party B acknowledges receipt from Party A, at or prior to the time of Party B's final approval of the Transaction evidenced by this Confirmation, of a document entitled "Risk Considerations".

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter substantially similar to this letter, which letter sets forth the material terms of the Transaction to which this Confirmation relates and indicates agreement to those terms.

Yours sincerely,

**SBS FINANCIAL PRODUCTS COMPANY, LLC**, a Delaware limited liability company

By:_____
Name: John Carter
Title: President

Accepted and Confirmed as of the
date first above written:

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

By:_____
Name:
Title:

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter substantially similar to this letter, which letter sets forth the material terms of the Transaction to which this Confirmation relates and indicates agreement to those terms.

Yours sincerely,

**SBS FINANCIAL PRODUCTS COMPANY, LLC,** a Delaware limited liability company

By:_____
Name:  John Carter
Title:   President

Accepted and Confirmed as of the
date first above written:

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

By:_____
Name:  Roger Short
Title:   President

Detroit General (FGIC)/Confirmation Letter

## Exhibit A

| Period Start Date (From and Including) | Period End Date (Unadjusted, to and Excluding) | Outstanding Notional During Period |
|---|---|---|
| Effective Date | June 15, 2029 | 96,621,000 |
| June 15, 2029 | June 15, 2030 | 83,804,000 |
| June 15, 2030 | June 15, 2031 | 66,954,500 |
| June 15, 2031 | June 15, 2032 | 49,049,500 |
| June 15, 2032 | June 15, 2033 | 30,023,500 |
| June 15, 2033 | Termination Date | 9,806,000 |

A-1

 **UBS**

| | |
|---|---|
| Date: | 07 June 2006 |
| To: | Detroit General Retirement System Service Corporation ("Counterparty") |
| Attn: | Roger Short, President |
| Fax No: | 313-224-4466 |
| From: | UBS AG, Stamford Branch ("UBS AG") |
| Subject: | Swap Transaction |
| | UBS AG Ref:  37380341 |
| | Counterparty Ref:  GRS - FGIC |

Dear Mr. Short:

The purpose of this communication is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Master Agreement or Agreement specified below.

UBS AG and the Counterparty have entered into a Master Agreement, dated as of 25 May 2005, which sets forth the general terms and conditions, as well as amendments, applicable to this Transaction (together with any future Schedule and any other future Confirmation, the "Agreement"). This Confirmation supplements, forms part of and is subject to the Agreement. All provisions contained in, or incorporated by reference to, such Agreement shall govern this Confirmation except as expressly modified below. In the event of any inconsistency between the provisions of the Agreement and this Confirmation, this Confirmation will prevail for purposes of this Transaction.

The definitions contained in the 2000 ISDA Definitions (the "2000 Definitions"), (the "Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between of the definitions listed above and this Confirmation, this Confirmation will govern.

The terms of the particular Swap Transaction to which this Confirmation relates are as follows:

**General Terms**

| | |
|---|---|
| Insurer: | Financial Guaranty Insurance Company |
| Trade Date: | 07 June 2006 |
| Effective Date: | 12 June 2006 |
| Termination Date: | 15 June 2034 |
| Notional Amount: | Initially USD 96,621,000 thereafter amortizing per the Amortization Schedule below. |
| Calculation Agent: | UBS AG |
| Business Days: | New York and London |

**Fixed Amounts**

Fixed Rate Payer:                    Counterparty

Fixed Rate:                          In accordance with the following schedule:

| From (and including) | To (but excluding) | Fixed Rate |
|---|---|---|
| Effective Date | 15 June 2007 | 4.991 |
| 15 June 2007 | 15 June 2008 | 5.666 |
| 15 June 2008 | Termination Date | 6.256 |

Fixed Rate Day Count Fraction:       30/360

Fixed Rate Payer Payment Dates:      Quarterly, on each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2034, subject to adjustment in accordance with the Preceding Business Day Convention.

Period End Dates:                    Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention, with No Adjustment.

**Floating Amounts**

Floating Rate Payer:                 UBS AG

Floating Rate Option:                USD-LIBOR-BBA

Designated Maturity:                 Three months, except that in respect to the initial Calculation Period, Linear Interpolation shall apply

Spread:                              Plus 34 Basis Points

Floating Rate Day Count Fraction:    Actual/360

Floating Rate Payer Payment Dates:   Each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2034, subject to adjustment in accordance with the Preceding Business Day Convention.

Period End Dates:                    Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

Reset Dates:                         Initially, the Effective Date and thereafter on each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to but excluding the

UBS AG Ref   37380341
C/P Ref:     GRS - FGIC

Termination Date, subject to adjustment in accordance with
the Modified Following Business Day Convention.

Compounding:                    Inapplicable

## Amortization Schedule

| Period From (and including) | Period To (but excluding) | Notional Amount (USD) |
|---|---|---|
| Effective Date | 15-Jun-2029 | 96,621,000 |
| 15-Jun-2029 | 15-Jun-2030 | 83,804,000 |
| 15-Jun-2030 | 15-Jun-2031 | 66,954,500 |
| 15-Jun-2031 | 15-Jun-2032 | 49,049,500 |
| 15-Jun-2032 | 15-Jun-2033 | 30,023,500 |
| 15-Jun-2033 | Termination Date | 9,806,000 |

## Optional Termination by Counterparty

With the prior consent of the Insurer, Counterparty shall have the right to terminate this Transaction (provided that no Event of Default or Termination Event has occurred) by providing (i) at least five (5) Business Days' prior written notice to UBS AG of its election to terminate this Transaction and (ii) evidence reasonably satisfactory to UBS AG that any and all amounts owed to UBS AG in connection with such early termination shall be paid on the due date thereof. On the Optional Termination Date set forth in such notice, an amount, determined by UBS AG, shall be payable by UBS AG or the Counterparty, as the case may be, in respect of such termination. If such amount is not acceptable to Counterparty, then UBS AG shall determine such amount in accordance with Section 6 of the Agreement, assuming Market Quotation and Second Method apply and Counterparty is the sole Affected Party.

## Adjustment Event

If on the Effective Date or any date thereafter (an "Adjustment Event Date") the Notional Amount of this Transaction is greater than the Related Principal Amount, an Adjustment Event shall occur and the Notional Amount shall be reduced to the extent necessary to make such Notional Amount as of the Adjustment Event Date equal to the Related Principal Amount. As used herein:

(a)     the term "Related Principal Amount" means UBS AG's Swap Percentage of Counterparty's Allocable Share of the aggregate principal amount of the outstanding FGIC-Insured Floating Rate Certificates;

(b)     the term "UBS AG's Swap Percentage" means at any time **50 percent**;

(c)     the term "Counterparty's Allocable Share" means (1) the total Scheduled Payments (as such term is defined in the GRS Service Contract 2006 between the Detroit General Retirement System Service Corporation and the City of Detroit) to be made by Counterparty in respect of FGIC-Insured Floating Rate Certificates divided by (2) the total Scheduled Payments to be made by Counterparty and Detroit Police and Fire Retirement System Service Corporation in respect of FGIC-Insured Floating Rate Certificates, in each case after giving effect to any prepayments of Scheduled Payments in connection with the circumstances of the Adjustment Event; and

(d)     the term "FGIC-Insured Floating Rate Certificates" means any Detroit Retirement System Funding Trust 2006 Taxable Certificates of Participation Series 2006-B (the "Related Certificates") that bear interest at a floating rate and the scheduled principal of and interest on which are insured under a financial guaranty insurance policy issued by Financial Guaranty Insurance Company.

UBS AG Ref     37380341
C/P Ref:          GRS - FGIC

(e) Upon an adjustment to the Notional Amount, a payment (an "Adjustment Payment") will be due and owing by one party to the other equal to the Market Quotation for this Transaction determined by UBS AG as if (i) a Termination Event occurred in respect of Counterparty, (ii) Counterparty was the only Affected Party with respect to such Termination Event, UBS AG was the party entitled to calculate the Market Quotation, and the Transaction is the Affected Transaction, (iii) the relevant Adjustment Event Date was designated as the Early Termination Date, (iv) the Notional Amount of the Transaction was an amount equal to the difference between (X) the Notional Amount and (Y) the outstanding principal amount of the Related Certificates on the Adjustment Event Date, and (v) the requirement set forth in the definition of Market Quotation that quotations be obtained from four Reference Market-makers was met by having UBS AG provide a single quotation, provided, however, if Counterparty disputes such quotation, UBS AG shall seek bids from Reference Market-makers consistent with the provisions of Section 6 of the Agreement. If an Adjustment Payment is a positive number, Counterparty will pay an amount equal to such Adjustment Payment to UBS AG; if an Adjustment Payment is a negative number, UBS AG will pay an amount equal to the absolute value of such Adjustment Payment to Counterparty. An Adjustment Payment shall be paid by the relevant party on the date on which the Adjustment Event occurs.

(f) Notwithstanding anything to the contrary in this Agreement, Counterparty will not optionally cause an Adjustment Event if, in connection with such Adjustment Event, an Adjustment Payment would be payable by Counterparty to UBS AG unless Counterparty provides evidence reasonably satisfactory to UBS AG and the Swap Insurer that (i) such Adjustment Payment will be made by Counterparty on the Adjustment Event Date and (ii) such Adjustment Payment will not cause Counterparty to be in violation of, or in default under the documentation relating to the Related Certificates.

## Issuance of Certificates

Notwithstanding anything contained herein or in the Agreement to the contrary, the parties shall have no rights or obligations with respect to this Transaction, and the representations of the parties contained herein and in the Agreement shall not be deemed to be made until the Detroit Retirement Systems Funding Trust 2006 Taxable Certificates of Participation Series 2006 (the "Certificates") have been duly issued by Counterparty. In the event that the Certificates are not issued on or prior to the Effective Date, this Transaction shall automatically terminate and shall be of no further force or effect and the parties shall have no further obligations hereunder.

## Swap Advisor Fee

| | |
|---|---|
| Swap Advisor: | Scott Balice Strategies LLC |
| Swap Advisor Fee: | On behalf of the Counterparty, a fee of USD 84,696.30 is being paid by UBS AG in respect of this Transaction to the Swap Advisor. Such fee is equal to the present value of 0.65 basis points per annum on the Notional Amount of this Transaction taking into account the amortization schedule set forth herein, to the Termination Date, discounted to the Trade Date using the LIBOR swap curve. This fee is reflected in, and has increased, the Fixed Rate payable by the Counterparty hereunder. |
| Swap Advisor Fee Payment Date: | Upon closing of the Related Certificates |

UBS AG Ref   37380341
C/P Ref:       GRS - FGIC

**Relationship between Parties**

Each party will be deemed to represent to the other party on the date on which it enters into this Transaction that (in the absence of a written Agreement between the parties which expressly imposes affirmative obligations to the contrary for this Transaction):

(a) Non-Reliance. Each party is acting for its own account, and has made its own independent decisions to enter into this Transaction and this Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. Each party is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanation relating to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(b) Assessment and Understanding. Each party is capable of assessing the merits of and understands (on its own behalf or through independent professional advice), and accepts, the terms, conditions and risks of this Transaction. Each party is also capable of assuming and assumes, the risks of this Transaction.

(c) Status of the Parties. Neither party is acting as a fiduciary for or as an adviser to the other in respect of this Transaction.

References in this clause to "a party" shall, in the case of UBS AG and where the context so allows, include references to any affiliate of UBS AG.

**Agreement to Deliver Documents**

For the purpose of Sections 3(d) and 4(a) of the Agreement and in addition to the documents to be delivered pursuant to Part 2 of the Schedule, each party agrees to deliver the following documents:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| UBS | Opinion of legal counsel to UBS in a form reasonably satisfactory to Counterparty. | On or before the delivery of the related Certificates to the underwriters with respect to the Insured Rate Swap Transaction. | No |
| Counterparty | Covered Indenture. | On or before execution of this Confirmation. | Yes |
| Counterparty | Certified copy of the resolution of Counterparty's Board of Directors (or equivalent authorizing documentation) authorizing the execution and delivery of the Agreement and each Confirmation and performance of its obligation hereunder. | On or before execution of this Confirmation. | Yes |

Page 5

| | | | |
|---|---|---|---|
| Counterparty | Opinion of legal counsel to Counterparty substantially in the form and substance acceptable to UBS. | On or before the delivery of the related Certificates to the underwriters with respect to the Insured Rate Swap Transaction. | No |
| Counterparty | Commitment to issue each Swap Insurance Policy (as such term is defined in Part 4 of the Schedule). | On or before the execution of this Confirmation with respect to the Insured Rate Swap Transaction. | No |
| Counterparty | Swap Insurance Policy and the Opinion of counsel to the Insurer with respect to such Swap Insurance Policy. | On or before the delivery of the related Certificates to the underwriters with respect to the Insured Rate Swap Transaction. | No |
| Counterparty | Confirmations, updates and additional documentation concerning the opinion of counsel, board resolutions and certificates delivered pursuant to each of the foregoing documents to be delivered as UBS may reasonably request. | Prior to the Effective Date of the Transaction. | Yes |
| Counterparty | Certified copy of the Service Contract together with an opinion of Certificate Counsel in form and substance satisfactory to UBS which addresses each of the Sources of Payment set forth in Part 4(b)(ii)(g) of the Schedule. | On or before execution of the Service Contract. | No |

## Amendments to Schedule to Agreement

1.    The definitions of "Certificates", "Contract Administration Agreement", "Detroit General Retirement System Service Contract", and "Detroit Police and Fire Retirement System Service Contract" set forth in Part 4(i) of the Schedule are hereby amended and restated, respectively, in their entirety to read, and for all purposes of the Agreement shall have the respective meanings, as follows:

"Certificates" means the $948,540,000 Taxable Certificates of Participation Series 2006 issued by the Detroit Retirement Systems Funding Trust 2006.

"Contract Administration Agreement" means the Contract Administration Agreement 2006 dated June 12, 2006 among Detroit Retirement Systems Funding Trust 2006, Detroit General Retirement System Service Corporation and Detroit Police

UBS AG Ref    37380341
C/P Ref:      GRS - FGIC

and Fire Retirement System Service Corporation, severally and not jointly, U.S. Bank National Association, separately and not as Trustee of the Detroit Retirement Systems Funding Trust 2006 and the Hedge Counterparties Named Therein.

"Detroit General Retirement System Service Contract" means the GRS Service Contract dated June 7, 2006 between the Detroit General Retirement System Service Corporation and the City of Detroit.

"Detroit Police and Fire Retirement System Service Contract" means the PFRS Service Contract dated June 7, 2006 between the Detroit Police and Fire Retirement System Service Corporation and the City of Detroit.

2.      Each and every reference to "Part 4(b)(ii)(h)" in the Schedule is hereby deleted in its entirety and replaced with "Part 4(b)(ii)(g)".

3.      Each and every reference to "Insured Transaction" in the Schedule is hereby deleted in its entirety and replaced with "Insured Rate Swap Transaction".

4.      Each and every reference to "Swap Policy" in the Schedule is hereby deleted in its entirety and replaced with "Swap Insurance Policy".

<u>Risk Considerations</u>

The Counterparty acknowledges receipt from UBS, at or prior to the time of Counterparty's final approval of the Transaction evidenced by this Confirmation, of a document entitled "Risk Considerations".

<u>Account Details</u>

UBS Account Details

Account for payments in USD:
Bank:                                      UBS AG, Stamford
ABA/Bank No.:                              026-007-993
Account No.:                               101-WA-860050-025

Counterparty Account Details

Bank:              U.S. Bank, Minneapolis
FBO:               For further credit to U.S. Bank, N.A.
ABA/Bank No.:      091000022
Account No.:       180121167365
Ref:               Detroit COPS GRS
Trust #:           789710000
Contact:           Jill Ling 651-495-3712

<u>Offices</u>

The office of UBS AG for the Swap Transaction is Stamford, CT; and the office of the Counterparty for the Swap Transaction is Detroit, MI.

<u>Contact Names at UBS AG</u>

| Settlements: | Hotline: | (203) 719 1110 |
| Confirmation Queries: | Jennifer McCandless | (212) 713 1212 |

UBS AG Ref   37380341
C/P Ref:     GRS - FGIC

| ISDA Documentation: | Legal Department – Documentation: | (203) 719 6249 |
| Swift: | UBSWUS33 | |
| Fax: | (203) 719-5771 | |
| Address: | UBS AG | |
| | 677 Washington Boulevard | |
| | Stamford, CT 06901 | |

[Intentionally left blank. Signature page follows.]

UBS AG Ref    37380341
C/P Ref:      GRS - FGIC

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by executing a copy of this Confirmation and returning it to us by facsimile to (212) 373-6491.

Yours Faithfully
For and on Behalf of
UBS AG, Stamford Branch


By                                                    By

Name :    Jonathan McTernan          Name :    Jonathan Moss
Title :    Associate Director             Title :    Director


Acknowledged and agreed by the Detroit General Retirement System Service Corporation as of the Trade Date specified above:

By:

Name :    Roger Short
Title :    President

UBS AG Ref    37380341
C/P Ref:        GRS - FGIC

**CONFIRMATION**
(General Retirement System/FGIC)

To:    Detroit General Retirement System Service Corporation
Detroit, Michigan
Attention: Roger Short

Date: June 7, 2006

Our Reference No. SBSFPC-0009

      The purpose of this letter agreement (the "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between us on the Trade Date specified below. This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below.

      The definitions and provisions contained in the 2000 ISDA Definitions (the "Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern. Each party represents and warrants to the other that (i) it is duly authorized to enter into this Transaction and to perform its obligations hereunder, (ii) the Transaction and the performance of its obligations hereunder do not violate any material obligation of such party, and (iii) the person executing this Confirmation is duly authorized to execute and deliver it.

    **1.**    This Confirmation supplements, forms part of, and is subject to, the 1992 ISDA Master Agreement between us, dated May 25, 2005, as amended and supplemented from time to time (the "Agreement"). All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

    **2.**    The terms of the particular Transaction to which this Confirmation relates are as follows:

| | |
|---|---|
| Party A: | SBS Financial Products Company, LLC |
| Party B: | Detroit General Retirement System Service Corporation |
| Insurer | Financial Guaranty Insurance Company ("Insurer") |
| Notional Amount: | Initially $96,621,000, thereafter amortizing as set forth on Exhibit A hereto. |
| Trade Date: | June 7, 2006 |
| Effective Date: | June 12, 2006, provided that the Effective Date |

shall automatically extend to June 13, 2006 as provided in Section 7 hereof.

| | |
|---|---|
| Termination Date: | June 15, 2034, or such earlier date upon which the Agreement terminates. |
| Business Days | New York and London |

FIXED AMOUNTS:

| | |
|---|---|
| Fixed Rate Payer: | Party B |
| Fixed Rate Payer Payment Dates: | Each March 14, June 14, September 14 and December 14, from and including September 14, 2006 up to and including the June 14, 2032, subject to adjustment in accordance with the Business Day Convention specified below. |
| Period End Dates: | March 15, June 15, September 15 and December 15, from and including September 15, 2006 up to and including the Termination Date, with No Adjustment. |
| Fixed Rate: | In accordance with the following schedule: |

| From and Including | To and Excluding | Rate (per annum) |
|---|---|---|
| Effective Date | June 15, 2007 | 4.991% |
| June 15, 2007 | June 15, 2008 | 5.666% |
| June 15, 2008 | Termination Date | 6.256% |

| | |
|---|---|
| Fixed Rate Day Count Fraction: | 30/360 |
| Business Day Convention: | Preceding. |

FLOATING AMOUNTS:

| | |
|---|---|
| Floating Rate Payer: | Party A |
| Floating Rate Payer Payment Dates: | Each March 14, June 14, September 14 and December 14, from and including September 14, |

2006 up to and including the June 14, 2032, subject to adjustment in accordance with the Preceding Business Day Convention.

| | |
|---|---|
| Floating Rate Option: | USD – LIBOR – BBA. |
| Period End Dates: | Each March 15, June 15, September 15 and December 15, from and including September 15, 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Day Count Fraction: | Actual/360 |
| Designated Maturity: | Three Months, except that in respect to the initial Calculation Period, Linear Interpolation shall apply |
| Method of Averaging: | Inapplicable. |
| Spread: | 0.340 percent per annum. |
| Reset Date: | Initially, the Effective Date and thereafter, on each March 15, June 15, September 15 and December 15, from and including the September 15, 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Compounding: | Inapplicable. |

### 3. Swap Advisor Fees

| | |
|---|---|
| Swap Advisor: | Scott Balice Strategies LLC |
| Swap Advisor Fee: | On behalf of Party B, a fee of USD 84,631.30 is being paid by Party A in respect of this Transaction to the Swap Advisor. Such fee is equal to the present value of 0.65 basis points per annum on the Notional Amount of this Transaction taking into account the amortization schedule set forth herein, to the Termination Date, discounted to the Trade Date using the LIBOR swap curve. This fee is reflected in, and has increased, the Fixed Rate payable by Party B hereunder. |

3

Swap Advisor Fee Payment Date:       Upon closing of the Certificates

    **4.**    **Account Details**

      **Payments to Party A:**
      Account for payments in USD:
      Favour: Deutsche Bank, NY
      ABA/Bank No.: 021-001-033
      Account No.: 01419647
      Reference: SBS Swap
      Attention: Safet Kalabovic

      **Payments to Party B:**
      ABA=U.S. BANK, Minneapolis
      (091000022)
      FBO=FOR FURTHER CREDIT
      TO U.S. BANK, N.A.
      AC=180121167365
      REF: Detroit COPS GRS
      Trust #: 794367001
      Contact: Jill Ling 651-495-3712

    **5.**    **Optional Termination.** With the prior consent of the Insurer, Party B shall have the right to terminate this Transaction (provided that no Event of Default or Termination Event has occurred) by providing (i) at least five (5) Business Days' prior written notice to Party A of its election to terminate this Transaction and (ii) evidence reasonably satisfactory to Party A that any and all amounts owed to Party A in connection with such early termination shall be paid on the due date thereof. On the Optional Termination Date set forth in such notice, an amount, determined by Party A, shall be payable by Party A or the Party B, as the case may be, in respect of such termination. If such amount is not acceptable to Party B, then Party A shall determine such amount in accordance with Section 6 of the Agreement, assuming Market Quotation and Second Method apply and Party B is the sole Affected Party. For purposes of the Transaction Transfer Agreement by and between Party A, Party B and Merrill Lynch Capital Services, Inc., as Credit Support Provider of Party A, dated as of May 25, 2005 (the "Transaction Transfer Agreement"), any partial optional termination pursuant to this Paragraph 5 shall not constitute an Event of Default or a Termination Event or result in the designation of an Early Termination Date with respect to this Transaction.

    **6.**    **Adjustment Event**   If on the Effective Date or any date thereafter (an "Adjustment Event Date") the Notional Amount of this Transaction is greater than the Related Principal Amount, an Adjustment Event shall occur and the Notional Amount shall be reduced to the extent necessary to make such Notional Amount as of the Adjustment Event Date equal to the Related Principal Amount. As used herein:

      (a)    the term "Related Principal Amount" means Party A's Swap Percentage of Party B's Allocable Share of the aggregate principal amount of the outstanding FGIC-Insured Floating Rate Certificates;

4

(b)    the term "Party A's Swap Percentage" means at any time 50 percent;

(c)    the term "Party B's Allocable Share" means (1) the outstanding Scheduled Payments (as such term is defined in the GRS Service Contract 2006 between the Detroit General Retirement System Service Corporation and the City of Detroit) to be made by Party B in respect of FGIC-Insured Floating Rate Certificates divided by (2) the sum of such Scheduled Payments to be made by Party B and the outstanding Schedule Payments (as such term is defined in the GRS Service Contract 2006 between the Detroit General Retirement System Service Corporation and the City of Detroit) to be made by Detroit General Retirement System Service Corporation in respect of FGIC-Insured Floating Rate Certificates, in each case after giving effect to any prepayments of Scheduled Payments in connection with the circumstances of the Adjustment Event; and

(d)    the term "FGIC-Insured Floating Rate Certificates" means any Detroit Retirement System Funding Trust 2006 Taxable Certificates of Participation Series 2006-B that bear interest at a floating rate and the scheduled principal of and interest on which are insured under a financial guaranty insurance policy issued by Financial Guaranty Insurance Company.

(e)    Upon an adjustment to the Notional Amount, a payment (an "Adjustment Payment") will be due and owing by one party to the other equal to the Market Quotation for this Transaction determined by Party A as if (i) a Termination Event occurred in respect of Party B, (ii) Party B was the only Affected Party with respect to such Termination Event, Party A was the party entitled to calculate the Market Quotation, and the Transaction is the Affected Transaction, (iii) the relevant Adjustment Event Date was designated as the Early Termination Date, (iv) the Notional Amount of the Transaction was an amount equal to the difference between (X) the Notional Amount and (Y) the Related Principal Amount on the Adjustment Event Date, and (v) the requirement set forth in the definition of Market Quotation that quotations be obtained from four Reference Market-makers was met by having Party A provide a single quotation, provided, however, if Party B disputes such quotation, Party A shall seek bids from Reference Market-makers consistent with the provisions of Section 6 of the Agreement. If an Adjustment Payment is a positive number, Party B will pay an amount equal to such Adjustment Payment to Party A; if an Adjustment Payment is a negative number, Party A will pay an amount equal to the absolute value of such Adjustment Payment to Party B. An Adjustment Payment shall be paid by the relevant party on the date on which the Adjustment Event occurs.

(f)    Notwithstanding anything to the contrary in this Agreement, Party B will not optionally cause an Adjustment Event if, in connection with such Adjustment Event, an Adjustment Payment would be payable by Party B to Party A unless Party B provides evidence reasonably satisfactory to Party A and the Swap Insurer that (i) such Adjustment Payment will be made by Party B on the Adjustment Event Date and (ii) such Adjustment Payment will not cause Party B to be in violation of, or in default under the documentation relating to the Certificates (as defined below).

(g)    For purposes of the Transaction Transfer Agreement, an Adjustment Event pursuant to this Paragraph 6 shall not constitute an Event of Default or a Termination Event or result in the designation of an Early Termination Date with respect to this Transaction.

7.    **Issuance of Certificates.** Notwithstanding anything contained herein or in the Agreement to the contrary, the parties shall have no rights or obligations with respect to this Transaction, and the representations of the parties contained herein and in the Agreement shall

not be deemed to be made until the $946,230,000 Detroit Retirement Systems Funding Trust 2006 Taxable Certificates of Participation Series 2006 (the "Certificates") have been duly issued by Party B. In the event that the Certificates are not issued on or prior to the Effective Date (provided that the Effective Date shall automatically extend to June 13, 2006 in the event that the Certificates are not yet issued), this Transaction shall automatically terminate and shall be of no further force or effect and the parties shall have no further obligations hereunder.

       8.     **Relationship between Parties** Each party will be deemed to represent to the other party on the date on which it enters into this Transaction that (in the absence of a written Agreement between the parties which expressly imposes affirmative obligations to the contrary for this Transaction):

       (a)     Non-Reliance. Each party is acting for its own account, and has made its own independent decisions to enter into this Transaction and this Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. Each party is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanation relating to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

       (b)     Assessment and Understanding. Each party is capable of assessing the merits of and understands (on its own behalf or through independent professional advice), and accepts, the terms, conditions and risks of this Transaction. Each party is also capable of assuming and assumes, the risks of this Transaction.

       (c)     Status of the Parties. Neither party is acting as a fiduciary for or as an adviser to the other in respect of this Transaction.

       9.     **Agreement to Deliver Documents**

       For the purpose of Sections 3(d) and 4(a) of the Agreement and in addition to the documents to be delivered pursuant to Part 2 of the Schedule, each party agrees to deliver the following documents:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A | Opinion of legal counsel to Party A in a form reasonably satisfactory to Party B. | On or before execution of this Confirmation. | No |
| Party B | Covered Indenture. | On or before execution of this Confirmation. | Yes |

| Party B | Certified copy of the resolution of Party B's Board of Directors (or equivalent authorizing documentation) authorizing the execution and delivery of the Agreement and each Confirmation and performance of its obligation hereunder. | On or before execution of this Confirmation. | Yes |
|---|---|---|---|
| Party B | Opinion of legal counsel to Party B substantially in the form and substance acceptable to Party A. | On or before execution of this Confirmation. | No |
| Party B | Commitment to issue each Swap Insurance Policy (as such term is defined in Part 4 of the Schedule). | On or before the execution of this Confirmation with respect to the Insured Rate Swap Transaction. | No |
| Party B | Swap Insurance Policy and the Opinion of counsel to the Insurer with respect to such Swap Insurance Policy. | On or before the delivery of the related Certificates to the underwriters with respect to the Insured Rate Swap Transaction. | No |
| Party B | Confirmations, updates and additional documentation concerning the opinion of counsel, board resolutions and certificates delivered pursuant to each of the foregoing documents to be delivered as Party A may reasonably request. | Prior to the Effective Date of the Transaction. | Yes |
| Party B | Certified copy of the Service Contract together with an opinion of Certificate Counsel in form and substance satisfactory to Party A which | On or before execution of the Service Contract. | No |

7

addresses each of the Sources
of Payment set forth in Part
4(b)(ii)(g) of the Schedule.

### 10.  Amendment to the Schedule.

(a)    The definitions of "Certificates", "Contract Administration Agreement", "Detroit General Retirement System Service Contract", and "Detroit Police and Fire Retirement System Service Contract" set forth in Part 4(i) of the Schedule are hereby amended and restated, respectively, in their entirety to read, and for all purposes of the Agreement shall have the respective meanings, as follows:

"Certificates" means the $946,230,000 Taxable Certificates of Participation Series 2006 issued by the Detroit Retirement Systems Funding Trust 2006.

"Contract Administration Agreement" means the Contract Administration Agreement 2006 dated June 12, 2006 among Detroit Retirement Systems Funding Trust 2006, Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation, severally and not jointly, U.S. Bank National Association, separately and not as Trustee of the Detroit Retirement Systems Funding Trust 2006 and the Hedge Counterparties Named Therein.

"Detroit General Retirement System Service Contract" means the GRS Service Contract dated June 7, 2006 between the Detroit General Retirement System Service Corporation and the City of Detroit.

"Detroit Police and Fire Retirement System Service Contract" means the PFRS Service Contract dated June 7, 2006 between the Detroit Police and Fire Retirement System Service Corporation and the City of Detroit.

(b)    Each and every reference to "Part 4(b)(ii)(h)" in the Schedule is hereby deleted in its entirety and replaced with "Part 4(b)(ii)(g)"

(c)    Each and every reference to "Insured Transaction" in the Schedule is hereby deleted in its entirety and replaced with "Insured Rate Swap Transaction".

(d)    Each and every reference to "Swap Policy" in the Schedule is hereby deleted in its entirety and replaced with "Swap Insurance Policy".

(e)    Part 5(f) is hereby amended to delete "Notwithstanding Section 7 of the Agreement, neither" at the beginning of the first sentence and inserting in replacement thereof "Notwithstanding Section 7 of the Agreement, except as set forth in Part 6© hereof, neither."

11.   **<u>Risk Considerations</u>**.

Party B acknowledges receipt from Party A, at or prior to the time of Party B's final approval of the Transaction evidenced by this Confirmation, of a document entitled "Risk Considerations".

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter substantially similar to this letter, which letter sets forth the material terms of the Transaction to which this Confirmation relates and indicates agreement to those terms.

Yours sincerely,

SBS FINANCIAL PRODUCTS COMPANY, LLC, a Delaware limited liability company

By: _____

Name: John Carter

Title: President

Accepted and Confirmed as of the date first above written:

DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION

By: _____

Name:

Title:

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter substantially similar to this letter, which letter sets forth the material terms of the Transaction to which this Confirmation relates and indicates agreement to those terms.

Yours sincerely,

**SBS FINANCIAL PRODUCTS COMPANY, LLC**, a Delaware limited liability company

By: _____
Name:  John Carter
Title:    President

Accepted and Confirmed as of the
date first above written:

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

By: _____
Name:  Roger Short
Title:   President

## Exhibit A

| Period Start Date (From and Including) | Period End Date (Unadjusted, to and Excluding) | Outstanding Notional During Period |
|---|---|---|
| Effective Date | June 15, 2029 | 96,621,000 |
| June 15, 2029 | June 15, 2030 | 83,804,000 |
| June 15, 2030 | June 15, 2031 | 66,954,500 |
| June 15, 2031 | June 15, 2032 | 49,049,500 |
| June 15, 2032 | June 15, 2033 | 30,023,500 |
| June 15, 2033 | Termination Date | 9,806,000 |

A-1

 **UBS**

| | |
|---|---|
| Date: | 07 June 2006 |
| To: | Detroit General Retirement System Service Corporation ("Counterparty") |
| Attn: | Roger Short, President |
| Fax No: | 313-224-4466 |
| From: | UBS AG, Stamford Branch ("UBS AG") |
| Subject: | Swap Transaction |
| | UBS AG Ref:      37380291 |
| | Counterparty Ref:   GRS - XLCA |

Dear Mr. Short:

The purpose of this communication is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Master Agreement or Agreement specified below.

UBS AG and the Counterparty have entered into a Master Agreement, dated as of 7 June 2006, which sets forth the general terms and conditions, as well as amendments, applicable to this Transaction (together with any future Schedule and any other future Confirmation, the "Agreement"). This Confirmation supplements, forms part of and is subject to the Agreement. All provisions contained in, or incorporated by reference to, such Agreement shall govern this Confirmation except as expressly modified below. In the event of any inconsistency between the provisions of the Agreement and this Confirmation, this Confirmation will prevail for purposes of this Transaction.

The definitions contained in the 2000 ISDA Definitions (the "2000 Definitions"), (the "Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between of the definitions listed above and this Confirmation, this Confirmation will govern.

The terms of the particular Swap Transaction to which this Confirmation relates are as follows:

**General Terms**

| | |
|---|---|
| Insurer: | XL Capital Assurance Inc. |
| Trade Date: | 07 June 2006 |
| Effective Date: | 12 June 2006 |
| Termination Date: | 15 June 2029 |
| Notional Amount: | Initially USD 45,252,000 thereafter amortizing per the Amortization Schedule below. |
| Calculation Agent: | UBS AG |
| Business Days: | New York and London |

## Fixed Amounts

| | |
|---|---|
| Fixed Rate Payer: | Counterparty |
| Fixed Rate: | In accordance with the following schedule: |

| From (and including) | To (but excluding) | Fixed Rate |
|---|---|---|
| Effective Date | 15 June 2007 | 4.991 |
| 15 June 2007 | 15 June 2008 | 5.666 |
| 15 June 2008 | Termination Date | 6.223 |

| | |
|---|---|
| Fixed Rate Day Count Fraction: | 30/360 |
| Fixed Rate Payer Payment Dates: | Quarterly, on each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2029, subject to adjustment in accordance with the Preceding Business Day Convention. |
| Period End Dates: | Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention, with No Adjustment. |

## Floating Amounts

| | |
|---|---|
| Floating Rate Payer: | UBS AG |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | Three months, except that in respect to the initial Calculation Period, Linear Interpolation shall apply |
| Spread: | Plus 30 Basis Points |
| Floating Rate Day Count Fraction: | Actual/360 |
| Floating Rate Payer Payment Dates: | Each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2029, subject to adjustment in accordance with the Preceding Business Day Convention. |
| Period End Dates: | Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Reset Dates: | Initially, the Effective Date and thereafter on each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to but excluding the |

UBS AG Ref    37380291
C/P Ref:      GRS - XLCA

Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

Compounding:                         Inapplicable

**Amortization Schedule**

| Period From (and including) | Period To (but excluding) | Notional Amount (USD) |
|---|---|---|
| Effective Date | 15-Jun-2025 | 45,252,000 |
| 15-Jun-2025 | 15-Jun-2026 | 45,252,000 |
| 15-Jun-2026 | 15-Jun-2027 | 32,022,500 |
| 15-Jun-2027 | 15-Jun-2028 | 17,969,000 |
| 15-Jun-2028 | Termination Date | 3,040,500 |

**Optional Termination by Counterparty**

With the prior consent of the Insurer, Counterparty shall have the right to terminate this Transaction (provided that no Event of Default or Termination Event has occurred) by providing (i) at least five (5) Business Days' prior written notice to UBS AG of its election to terminate this Transaction and (ii) evidence reasonably satisfactory to UBS AG that any and all amounts owed to UBS AG in connection with such early termination shall be paid on the due date thereof. On the Optional Termination Date set forth in such notice, an amount, determined by UBS AG, shall be payable by UBS AG or the Counterparty, as the case may be, in respect of such termination. If such amount is not acceptable to Counterparty, then UBS AG shall determine such amount in accordance with Section 6 of the Agreement, assuming Market Quotation and Second Method apply and Counterparty is the sole Affected Party.

**Adjustment Event**

If on the Effective Date or any date thereafter (an "Adjustment Event Date") the Notional Amount of this Transaction is greater than the Related Principal Amount, an Adjustment Event shall occur and the Notional Amount shall be reduced to the extent necessary to make such Notional Amount as of the Adjustment Event Date equal to the Related Principal Amount. As used herein:

(a)     the term "Related Principal Amount" means UBS AG's Swap Percentage of Counterparty's Allocable Share of the aggregate principal amount of the outstanding XLCA-Insured Floating Rate Certificates;

(b)     the term "UBS AG's Swap Percentage" means at any time **50 percent**;

(c)     the term "Counterparty's Allocable Share" means (1) the total Scheduled Payments (as such term is defined in the GRS Service Contract 2006 between the Detroit General Retirement System Service Corporation and the City of Detroit) to be made by Counterparty in respect of XLCA-Insured Floating Rate Certificates divided by (2) the total Scheduled Payments to be made by Counterparty and Detroit Police and Fire Retirement System Service Corporation in respect of XLCA-Insured Floating Rate Certificates, in each case after giving effect to any prepayments of Scheduled Payments in connection with the circumstances of the Adjustment Event; and

(d)     the term "XLCA-Insured Floating Rate Certificates" means any Detroit Retirement System Funding Trust 2006 Taxable Certificates of Participation Series 2006-B (the "Related Certificates") that bear interest at a floating rate and the scheduled principal of and interest on which are insured under a financial guaranty insurance policy issued by XL Capital Assurance Inc.

(e)     Upon an adjustment to the Notional Amount, a payment (an "Adjustment Payment") will be due and owing by one party to the other equal to the Market Quotation for this Transaction determined by UBS

UBS AG Ref   37380291
C/P Ref:        GRS - XLCA

AG as if (i) a Termination Event occurred in respect of Counterparty, (ii) Counterparty was the only Affected Party with respect to such Termination Event, UBS AG was the party entitled to calculate the Market Quotation, and the Transaction is the Affected Transaction, (iii) the relevant Adjustment Event Date was designated as the Early Termination Date, (iv) the Notional Amount of the Transaction was an amount equal to the difference between (X) the Notional Amount and (Y) the outstanding principal amount of the Related Certificates on the Adjustment Event Date, and (v) the requirement set forth in the definition of Market Quotation that quotations be obtained from four Reference Market-makers was met by having UBS AG provide a single quotation, provided, however, if Counterparty disputes such quotation, UBS AG shall seek bids from Reference Market-makers consistent with the provisions of Section 6 of the Agreement. If an Adjustment Payment is a positive number, Counterparty will pay an amount equal to such Adjustment Payment to UBS AG; if an Adjustment Payment is a negative number, UBS AG will pay an amount equal to the absolute value of such Adjustment Payment to Counterparty. An Adjustment Payment shall be paid by the relevant party on the date on which the Adjustment Event occurs.

(f) Notwithstanding anything to the contrary in this Agreement, Counterparty will not optionally cause an Adjustment Event if, in connection with such Adjustment Event, an Adjustment Payment would be payable by Counterparty to UBS AG unless Counterparty provides evidence reasonably satisfactory to UBS AG and the Swap Insurer that (i) such Adjustment Payment will be made by Counterparty on the Adjustment Event Date and (ii) such Adjustment Payment will not cause Counterparty to be in violation of, or in default under the documentation relating to the Related Certificates.

## Issuance of Certificates

Notwithstanding anything contained herein or in the Agreement to the contrary, the parties shall have no rights or obligations with respect to this Transaction, and the representations of the parties contained herein and in the Agreement shall not be deemed to be made until the Detroit Retirement Systems Funding Trust 2006 Taxable Certificates of Participation Series 2006 (the "Certificates") have been duly issued by Counterparty. In the event that the Certificates are not issued on or prior to the Effective Date, this Transaction shall automatically terminate and shall be of no further force or effect and the parties shall have no further obligations hereunder.

## Swap Advisor Fee

| | |
|---|---|
| Swap Advisor: | Scott Balice Strategies LLC |
| Swap Advisor Fee: | On behalf of the Counterparty, a fee of USD 36,273.25 is being paid by UBS AG in respect of this Transaction to the Swap Advisor. Such fee is equal to the present value of 0.65 basis points per annum on the Notional Amount of this Transaction taking into account the amortization schedule set forth herein, to the Termination Date, discounted to the Trade Date using the LIBOR swap curve. This fee is reflected in, and has increased, the Fixed Rate payable by the Counterparty hereunder. |
| Swap Advisor Fee Payment Date: | Upon closing of the Related Certificates |

UBS AG Ref  37380291
C/P Ref:    GRS - XLCA

## Relationship between Parties

Each party will be deemed to represent to the other party on the date on which it enters into this Transaction that (in the absence of a written Agreement between the parties which expressly imposes affirmative obligations to the contrary for this Transaction):

(a) Non-Reliance. Each party is acting for its own account, and has made its own independent decisions to enter into this Transaction and this Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. Each party is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanation relating to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(b) Assessment and Understanding. Each party is capable of assessing the merits of and understands (on its own behalf or through independent professional advice), and accepts, the terms, conditions and risks of this Transaction. Each party is also capable of assuming and assumes, the risks of this Transaction.

(c) Status of the Parties. Neither party is acting as a fiduciary for or as an adviser to the other in respect of this Transaction.

References in this clause to "a party" shall, in the case of UBS AG and where the context so allows, include references to any affiliate of UBS AG.

## Risk Considerations

The Counterparty acknowledges receipt from UBS, at or prior to the time of Counterparty's final approval of the Transaction evidenced by this Confirmation, of a document entitled "Risk Considerations".

## Account Details

UBS Account Details

Account for payments in USD:

| | |
|---|---|
| Bank: | UBS AG, Stamford |
| ABA/Bank No.: | 026-007-993 |
| Account No.: | 101-WA-860050-025 |

Counterparty Account Details

| | |
|---|---|
| Bank: | U.S. Bank, Minneapolis |
| FBO: | For further credit to U.S. Bank, N.A. |
| ABA/Bank No.: | 091000022 |
| Account No.: | 180121167365 |
| Ref: | Detroit COPS GRS |
| Trust #: | 789710000 |
| Contact: | Jill Ling 651-495-3712 |

## Offices

| | |
|---|---|
| UBS AG Ref | **37380291** |
| C/P Ref: | GRS - XLCA |

The office of UBS AG for the Swap Transaction is Stamford, CT; and the office of the Counterparty for the Swap Transaction is Detroit, MI.

Contact Names at UBS AG

| | | |
|---|---|---|
| Settlements: | Hotline: | (203) 719 1110 |
| Confirmation Queries: | Jennifer McCandless | (212) 713 1212 |
| ISDA Documentation: | Legal Department – Documentation: | (203) 719 6249 |
| Swift: | UBSWUS33 | |
| Fax: | (203) 719-5771 | |
| Address: | UBS AG | |
| | 677 Washington Boulevard | |
| | Stamford, CT 06901 | |

[Intentionally left blank. Signature page follows.]

UBS AG Ref   **37380291**
C/P Ref:     GRS - XLCA

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by executing a copy of this Confirmation and returning it to us by facsimile to **(212) 373-6491**.

Yours Faithfully
For and on Behalf of
UBS AG, Stamford Branch

By                                                      By

Name :    Jonathan McTernan                Name :    Jonathan Moss
Title :      Associate Director                   Title :      Director

Acknowledged and agreed by the Detroit General Retirement System Service Corporation as of the Trade Date specified above:

By:

Name :    Roger Short
Title :      President

UBS AG Ref    37380291
C/P Ref:          GRS - XLCA

 **UBS**

| | |
|---|---|
| Date: | 07 June 2006 |
| To: | Detroit Police and Fire Retirement System Service Corporation ("Counterparty") |
| Attn: | Roger Short, President |
| Fax No: | 313-224-4466 |
| From: | UBS AG, Stamford Branch ("UBS AG") |
| Subject: | Swap Transaction |

| | |
|---|---|
| UBS AG Ref: | 37380351 |
| Counterparty Ref: | PFRS - XLCA |

Dear Mr. Short:

The purpose of this communication is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Master Agreement or Agreement specified below.

UBS AG and the Counterparty have entered into a Master Agreement, dated as of 25 May 2005, which sets forth the general terms and conditions, as well as amendments, applicable to this Transaction (together with any future Schedule and any other future Confirmation, the "Agreement"). This Confirmation supplements, forms part of and is subject to the Agreement. All provisions contained in, or incorporated by reference to, such Agreement shall govern this Confirmation except as expressly modified below. In the event of any inconsistency between the provisions of the Agreement and this Confirmation, this Confirmation will prevail for purposes of this Transaction.

The definitions contained in the 2000 ISDA Definitions (the "2000 Definitions"), (the "Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between of the definitions listed above and this Confirmation, this Confirmation will govern.

The terms of the particular Swap Transaction to which this Confirmation relates are as follows:

## General Terms

| | |
|---|---|
| Insurer: | XL Capital Assurance Inc. |
| Trade Date: | 07 June 2006 |
| Effective Date: | 12 June 2006 |
| Termination Date: | 15 June 2029 |
| Notional Amount: | Initially USD 104,325,500 thereafter amortizing per the Amortization Schedule below. |
| Calculation Agent: | UBS AG |
| Business Days: | New York and London |

## Fixed Amounts

Fixed Rate Payer:

Counterparty

Fixed Rate:

In accordance with the following schedule:

| From (and including) | To (but excluding) | Fixed Rate |
|---|---|---|
| Effective Date | 15 June 2007 | 4.991 |
| 15 June 2007 | 15 June 2008 | 5.666 |
| 15 June 2008 | Termination Date | 6.223 |

Fixed Rate Day Count Fraction:

30/360

Fixed Rate Payer Payment Dates:

Quarterly, on each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2029, subject to adjustment in accordance with the Preceding Business Day Convention.

Period End Dates:

Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention, with No Adjustment.

## Floating Amounts

Floating Rate Payer:

UBS AG

Floating Rate Option:

USD-LIBOR-BBA

Designated Maturity:

Three months, except that in respect to the initial Calculation Period, Linear Interpolation shall apply

Spread:

Plus 30 Basis Points

Floating Rate Day Count Fraction:

Actual/360

Floating Rate Payer Payment Dates:

Each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2029, subject to adjustment in accordance with the Preceding Business Day Convention.

Period End Dates:

Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

Reset Dates:

Initially, the Effective Date and thereafter on each 15 March, 15 June, 15 September and 15 December, from and

UBS AG Ref   37380351
C/P Ref:     PFRS - XLCA

including 15 September 2006 up to but excluding the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

Compounding:                                    Inapplicable

## Amortization Schedule

| Period From (and including) | Period To (but excluding) | Notional Amount (USD) |
|---|---|---|
| Effective Date | 15-Jun-2019 | 104,325,500 |
| 15-Jun-2019 | 15-Jun-2020 | 97,011,000 |
| 15-Jun-2020 | 15-Jun-2021 | 90,109,000 |
| 15-Jun-2021 | 15-Jun-2022 | 83,685,500 |
| 15-Jun-2022 | 15-Jun-2023 | 77,801,500 |
| 15-Jun-2023 | 15-Jun-2024 | 72,532,500 |
| 15-Jun-2024 | 15-Jun-2025 | 67,957,500 |
| 15-Jun-2025 | 15-Jun-2026 | 64,161,500 |
| 15-Jun-2026 | 15-Jun-2027 | 44,825,500 |
| 15-Jun-2027 | 15-Jun-2028 | 24,286,500 |
| 15-Jun-2028 | Termination Date | 2,469,500 |

## Optional Termination by Counterparty

With the prior consent of the Insurer, Counterparty shall have the right to terminate this Transaction (provided that no Event of Default or Termination Event has occurred) by providing (i) at least five (5) Business Days' prior written notice to UBS AG of its election to terminate this Transaction and (ii) evidence reasonably satisfactory to UBS AG that any and all amounts owed to UBS AG in connection with such early termination shall be paid on the due date thereof. On the Optional Termination Date set forth in such notice, an amount, determined by UBS AG, shall be payable by UBS AG or the Counterparty, as the case may be, in respect of such termination. If such amount is not acceptable to Counterparty, then UBS AG shall determine such amount in accordance with Section 6 of the Agreement, assuming Market Quotation and Second Method apply and Counterparty is the sole Affected Party.

## Adjustment Event

If on the Effective Date or any date thereafter (an "Adjustment Event Date") the Notional Amount of this Transaction is greater than the Related Principal Amount, an Adjustment Event shall occur and the Notional Amount shall be reduced to the extent necessary to make such Notional Amount as of the Adjustment Event Date equal to the Related Principal Amount. As used herein:

(a)    the term "Related Principal Amount" means UBS AG's Swap Percentage of Counterparty's Allocable Share of the aggregate principal amount of the outstanding XLCA-Insured Floating Rate Certificates;

(b)    the term "UBS AG's Swap Percentage" means at any time **50 percent**;

(c)    the term "Counterparty's Allocable Share" means (1) the total Scheduled Payments (as such term is defined in the PFRS Service Contract 2006 between the Detroit Police and Fire Retirement System Service Corporation and the City of Detroit) to be made by Counterparty in respect of XLCA-Insured Floating Rate Certificates divided by (2) the total Scheduled Payments to be made by Counterparty and Detroit General Retirement System Service Corporation in respect of XLCA-Insured Floating Rate

UBS AG Ref    37380351
C/P Ref:      PFRS - XLCA

Certificates, in each case after giving effect to any prepayments of Scheduled Payments in connection with the circumstances of the Adjustment Event; and

(d)  the term "XLCA-Insured Floating Rate Certificates" means any Detroit Retirement System Funding Trust 2006 Taxable Certificates of Participation Series 2006-B (the "Related Certificates") that bear interest at a floating rate and the scheduled principal of and interest on which are insured under a financial guaranty insurance policy issued by XL Capital Assurance Inc.

(e)  Upon an adjustment to the Notional Amount, a payment (an "Adjustment Payment") will be due and owing by one party to the other equal to the Market Quotation for this Transaction determined by UBS AG as if (i) a Termination Event occurred in respect of Counterparty, (ii) Counterparty was the only Affected Party with respect to such Termination Event, UBS AG was the party entitled to calculate the Market Quotation, and the Transaction is the Affected Transaction, (iii) the relevant Adjustment Event Date was designated as the Early Termination Date, (iv) the Notional Amount of the Transaction was an amount equal to the difference between (X) the Notional Amount and (Y) the outstanding principal amount of the Related Certificates on the Adjustment Event Date, and (v) the requirement set forth in the definition of Market Quotation that quotations be obtained from four Reference Market-makers was met by having UBS AG provide a single quotation, provided, however, if Counterparty disputes such quotation, UBS AG shall seek bids from Reference Market-makers consistent with the provisions of Section 6 of the Agreement. If an Adjustment Payment is a positive number, Counterparty will pay an amount equal to such Adjustment Payment to UBS AG; if an Adjustment Payment is a negative number, UBS AG will pay an amount equal to the absolute value of such Adjustment Payment to Counterparty. An Adjustment Payment shall be paid by the relevant party on the date on which the Adjustment Event occurs.

(f)  Notwithstanding anything to the contrary in this Agreement, Counterparty will not optionally cause an Adjustment Event if, in connection with such Adjustment Event, an Adjustment Payment would be payable by Counterparty to UBS AG unless Counterparty provides evidence reasonably satisfactory to UBS AG and the Swap Insurer that (i) such Adjustment Payment will be made by Counterparty on the Adjustment Event Date and (ii) such Adjustment Payment will not cause Counterparty to be in violation of, or in default under the documentation relating to the Related Certificates.

## Issuance of Certificates

Notwithstanding anything contained herein or in the Agreement to the contrary, the parties shall have no rights or obligations with respect to this Transaction, and the representations of the parties contained herein and in the Agreement shall not be deemed to be made until the Detroit Retirement Systems Funding Trust 2006 Taxable Certificates of Participation Series 2006 (the "Certificates") have been duly issued by Counterparty. In the event that the Certificates are not issued on or prior to the Effective Date, this Transaction shall automatically terminate and shall be of no further force or effect and the parties shall have no further obligations hereunder.

## Swap Advisor Fee

| | |
|---|---|
| Swap Advisor: | Scott Balice Strategies LLC |
| Swap Advisor Fee: | On behalf of the Counterparty, a fee of USD 78,389.35 is being paid by UBS AG in respect of this Transaction to the Swap Advisor. Such fee is equal to the present value of 0.65 basis points per annum on the Notional Amount of this Transaction taking into account the amortization schedule set forth herein, to the Termination Date, discounted to the Trade Date using the LIBOR swap curve. This |

UBS AG Ref   37380351
C/P Ref:     PFRS - XLCA

fee is reflected in, and has increased, the Fixed
Rate payable by the Counterparty hereunder.

Swap Advisor Fee Payment Date:                    Upon closing of the Related Certificates

## Relationship between Parties

Each party will be deemed to represent to the other party on the date on which it enters into this Transaction that (in the absence of a written Agreement between the parties which expressly imposes affirmative obligations to the contrary for this Transaction):

(a) Non-Reliance. Each party is acting for its own account, and has made its own independent decisions to enter into this Transaction and this Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. Each party is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanation relating to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(b) Assessment and Understanding. Each party is capable of assessing the merits of and understands (on its own behalf or through independent professional advice), and accepts, the terms, conditions and risks of this Transaction. Each party is also capable of assuming and assumes, the risks of this Transaction.

(c) Status of the Parties. Neither party is acting as a fiduciary for or as an adviser to the other in respect of this Transaction.

References in this clause to "a party" shall, in the case of UBS AG and where the context so allows, include references to any affiliate of UBS AG.

## Agreement to Deliver Documents

For the purpose of Sections 3(d) and 4(a) of the Agreement and in addition to the documents to be delivered pursuant to Part 2 of the Schedule, each party agrees to deliver the following documents:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| UBS | Opinion of legal counsel to UBS in a form reasonably satisfactory to Counterparty. | On or before the delivery of the related Certificates to the underwriters with respect to the Insured Rate Swap Transaction. | No |
| Counterparty | Covered Indenture. | On or before execution of this Confirmation. | Yes |
| Counterparty | Certified copy of the resolution of Counterparty's Board of Directors (or equivalent authorizing | On or before execution of this Confirmation. | Yes |

Page 5

UBS AG Ref    37380351
C/P Ref:       PFRS - XLCA

| | | | |
|---|---|---|---|
| | documentation) authorizing the execution and delivery of the Agreement and each Confirmation and performance of its obligation hereunder. | | |
| Counterparty | Opinion of legal counsel to Counterparty substantially in the form and substance acceptable to UBS. | On or before the delivery of the related Certificates to the underwriters with respect to the Insured Rate Swap Transaction. | No |
| Counterparty | Commitment to issue each Swap Insurance Policy (as such term is defined in Part 4 of the Schedule). | On or before the execution of this Confirmation with respect to the Insured Rate Swap Transaction. | No |
| Counterparty | Swap Insurance Policy and the Opinion of counsel to the Insurer with respect to such Swap Insurance Policy. | On or before the delivery of the related Certificates to the underwriters with respect to the Insured Rate Swap Transaction. | No |
| Counterparty | Confirmations, updates and additional documentation concerning the opinion of counsel, board resolutions and certificates delivered pursuant to each of the foregoing documents to be delivered as UBS may reasonably request. | Prior to the Effective Date of the Transaction. | Yes |
| Counterparty | Certified copy of the Service Contract together with an opinion of Certificate Counsel in form and substance satisfactory to UBS which addresses each of the Sources of Payment set forth in Part 4(b)(ii)(g) of the Schedule. | On or before execution of the Service Contract. | No |

UBS AG Ref   37380351
C/P Ref:      PFRS - XLCA

## Amendments to Schedule to Agreement

1.      The definitions of "Certificates", "Contract Administration Agreement", "Detroit General Retirement System Service Contract", and "Detroit Police and Fire Retirement System Service Contract" set forth in Part 4(i) of the Schedule are hereby amended and restated, respectively, in their entirety to read, and for all purposes of the Agreement shall have the respective meanings, as follows:

"Certificates" means the $948,540,000 Taxable Certificates of Participation Series 2006 issued by the Detroit Retirement Systems Funding Trust 2006.

"Contract Administration Agreement" means the Contract Administration Agreement 2006 dated June 12, 2006 among Detroit Retirement Systems Funding Trust 2006, Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation, severally and not jointly, U.S. Bank National Association, separately and not as Trustee of the Detroit Retirement Systems Funding Trust 2006 and the Hedge Counterparties Named Therein.

"Detroit General Retirement System Service Contract" means the GRS Service Contract dated June 7, 2006 between the Detroit General Retirement System Service Corporation and the City of Detroit.

"Detroit Police and Fire Retirement System Service Contract" means the PFRS Service Contract dated June 7, 2006 between the Detroit Police and Fire Retirement System Service Corporation and the City of Detroit.

2.      Each and every reference to "Part 4(b)(ii)(h)" in the Schedule is hereby deleted in its entirety and replaced with "Part 4(b)(ii)(g)".

3.      Each and every reference to "Insured Transaction" in the Schedule is hereby deleted in its entirety and replaced with "Insured Rate Swap Transaction".

4.      Each and every reference to "Swap Policy" in the Schedule is hereby deleted in its entirety and replaced with "Swap Insurance Policy".

## Risk Considerations

The Counterparty acknowledges receipt from UBS, at or prior to the time of Counterparty's final approval of the Transaction evidenced by this Confirmation, of a document entitled "Risk Considerations".

## Account Details

UBS Account Details

Account for payments in USD:
Bank:                          UBS AG, Stamford
ABA/Bank No.:                  026-007-993
Account No.:                   101-WA-860050-025

UBS AG Ref    37380351
C/P Ref:      PFRS - XLCA

Counterparty Account Details

Bank::                  U.S. Bank, Minneapolis
FBO:                    For further credit to U.S. Bank, N.A.
ABA/Bank No.:           091000022
Account No.:            180121167365
Ref:                    Detroit COPS PFRS
Trust #:                789710000
Contact:                Jill Ling 651-495-3712

## Offices

The office of UBS AG for the Swap Transaction is Stamford, CT; and the office of the Counterparty for the Swap Transaction is Detroit, MI.

Contact Names at UBS AG

| | | |
|---|---|---|
| Settlements: | Hotline: | (203) 719 1110 |
| Confirmation Queries: | Jennifer McCandless | (212) 713 1212 |
| ISDA Documentation: | Legal Department – Documentation: | (203) 719 6249 |
| Swift: | UBSWUS33 | |
| Fax: | (203) 719-5771 | |
| Address: | UBS AG | |
| | 677 Washington Boulevard | |
| | Stamford, CT 06901 | |

[Intentionally left blank. Signature page follows.]

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by executing a copy of this Confirmation and returning it to us by facsimile to **(212) 373-6491**.

Yours Faithfully
For and on Behalf of
UBS AG, Stamford Branch

By                                          By

Name :    Jonathan McTernan          Name :    Jonathan Moss
Title :    Associate Director          Title :    Director

Acknowledged and agreed by the Detroit Police and Fire Retirement System Service Corporation as of the Trade Date specified above:

By:

Name :    Roger Short
Title :    President

---

UBS AG Ref    37380351
C/P Ref:    PFRS - XLCA