**EXHIBIT E**

*This Offering Circular provides information about the 2006 Certificates. Information on this cover page is for ready reference. A prospective investor should read the entire Offering Circular to make an informed investment decision.*

**$948,540,000**
## TAXABLE CERTIFICATES OF PARTICIPATION SERIES 2006
issued by the DETROIT RETIREMENT SYSTEMS FUNDING TRUST 2006
evidencing undivided proportionate interests
in the rights to receive certain payments
pursuant to two Service Contracts between
### CITY OF DETROIT, MICHIGAN
and
### DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION
and
### DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION
**$148,540,000 SERIES 2006-A (FIXED RATE)**
**$800,000,000 SERIES 2006-B (FLOATING RATE)**

**Dated: Date of Delivery**                                          **Due: June 15 as shown on the inside cover**

| | |
|---|---|
| **Ratings** | *See pages 22-23* |
| **Interest Payment Dates** | *Series 2006-A:* December 15, 2006 and each June 15 and December 15 thereafter<br>*Series 2006-B:* September 15, 2006 and the 15th day of each December, March , June and September thereafter |
| **Redemption** | Series 2006-A Certificates maturing in 2035 are subject to *pro rata* mandatory sinking fund redemption at par.<br>Series 2006-A Certificates are subject to optional redemption on any date with a make-whole premium.—*See pages 11-12*<br>Series 2006-B Certificates maturing in 2029 and 2034 are subject to *pro rata* mandatory sinking fund redemption at par.<br>Series 2006-B Certificates are subject to optional redemption on any Interest Payment Date at par, beginning June 15, 2011.—*See page 12-16* |
| **Source of Payment** | Principal of and interest on the 2006 Certificates are payable, when due, solely from 2006 COP Service Payments to be paid by the City under the 2006 Service Contracts.—*See pages 9-10* |
| **Insurance** | The scheduled payment of principal of and interest on 2006 Certificates will be guaranteed under insurance policies (as specifically indicated on the inside cover of this Offering Circular with respect to particular 2006 Certificates) to be issued concurrently with delivery of the 2006 Certificates by Financial Guaranty Insurance Company and XL Capital Assurance Inc.<br>FGIC                                                      XL CAPITAL ASSURANCE |
| **Tax Matters** | Interest on the 2006 Certificates is subject to U.S. federal income tax and State of Michigan income tax. |
| **Purpose** | The 2006 Certificates are being issued to provide moneys to fund the optional redemption of certain certificates of participation and the purchase and cancellation of certain other certificates of participation that were issued in 2005 to fund certain then existing unfunded accrued actuarial liabilities of each Retirement System of the City.—*See pages 5-9* |
| **Denominations** | *Series 2006-A:* Multiples of $5,000<br>*Series 2006-B:* $25,000 and multiples of $1,000 in excess thereof |
| **Closing** | On or about June 12, 2006 |
| **Global Book-Entry System** | Clearance is expected to be available through The Depository Trust Company (the depository for the 2006 Certificates), Clearstream, and Euroclear. |
| **Global Offering** | The 2006 Certificates are offered globally for sale in jurisdictions where it is lawful to make such offers.—*See page 22* |
| **Stock Exchange Listing** | Application will be made for the 2006 Certificates to be listed on the Luxembourg Stock Exchange. There can be no assurance that this listing will be obtained. The issuance and settlement of the 2006 Certificates is not conditioned on the listing of the 2006 Certificates on the Luxembourg Stock Exchange. |
| **2006 Certificate Counsel** | Lewis & Munday, A Professional Corporation—*See page 23* |
| **Trustee** | U.S. Bank National Association |

**UBS Investment Bank**                                 **Siebert Brandford Shank & Co., LLC**

*Co-Managers for Series 2006-A Certificates Only*

**Bear, Stearns & Co. Inc.**      **Citigroup Global Markets**      **M.R. Beal & Company**      **Popular Securities**

This Offering Circular is dated: June 7, 2006

such termination receivables will be used as shown under "Sources and Uses of Funds" below. The balance of such termination receivables will be paid to the City in accordance with the 2005 Service Contracts.

It also is expected that the Service Corporations will enter into interest rate exchange agreements or similar agreements **(2006 Swap Agreements)** before or at the time of issuance of the Series 2006-B Certificates, to hedge variable-rate exposure under the 2006 Service Contracts, and they may do so from time to time with respect to any rate exposure under the 2006 Service Contracts. Each Service Corporation will enter into one or more 2006 Swap Agreements with each of UBS AG and with SBS Financial Products Company, LLC, as the counterparties. Payments under a 2006 Swap Agreement may include net payments based on the interest rates exchanged. Under the 2006 Swap Agreements, the Service Corporations will be obligated in certain instances to make periodic payments to the 2006 Swap Agreement counterparty, and should a 2006 Swap Agreement be terminated, under certain circumstances the Service Corporations may be required to pay a termination payment. The Service Corporations' obligation to make all payments under the 2006 Swap Agreements will be payable from moneys paid by the City under the 2006 Service Contracts. In applying moneys so received from the City, the Contract Administrator will be required to treat any termination payment owing to a 2006 Swap Agreement counterparty as subordinated in right of payment to the prior payment in full of any Scheduled Payments and Service Charges (corresponding to principal of and interest on 2006 Certificates) then due and unpaid.

### Sources and Uses of Funds

The proceeds from the sale of the 2006 Certificates are expected to be used as follows:

**Sources of Funds**

| | |
|---|---:|
| Principal Amount of Series 2006-A Certificates | $148,540,000.00 |
| Principal Amount of Series 2006-B Certificates | 800,000,000.00 |
| Swap Termination Receivables | 36,051,234.67 |
| TOTAL SOURCES | $984,591,234.67 |

**Uses of Funds**

| | |
|---|---:|
| Optional redemption of certain 2005-A COPs [1] | $107,149,970.44 |
| Purchase (for cancellation) of tendered Series 2005-B COPs [2] | 815,594,283.37 |
| Premiums of insurance policies on 2006 Certificates and 2006 Swap Agreements | 50,642,427.28 |
| Costs of Issuance [3] | 11,204,553.58 |
| TOTAL USES | $984,591,234.67 |

---

[1] Includes prepayment premiums, Service Charges due after closing and prior to optional redemption date, and accrued interest to the date of redemption.

[2] Includes tender premiums, accrued interest to the date of purchase, and tender fees and expenses.

[3] Includes underwriters' discount and costs for legal counsel, financial and swap advisors, rating agencies, trustee, offering circular distribution and miscellaneous expenses incidental to issuance of the 2006 Certificates.

## SOURCES OF PAYMENT AND SECURITY FOR THE 2006 CERTIFICATES

The 2006 Certificates are payable solely from all 2006 COP Service Payments which may be received by the Trustee pursuant to the 2006 Service Contracts. Such 2006 COP Service Payments will include all Scheduled Payments and Service Charges payable by the City under the 2006 Service Contracts, corresponding to the principal of and interest on the 2006 Certificates, respectively. The City's obligations to make 2006 COP Service Payments are unsecured contractual obligations of the City, enforceable in the same manner as any other contractual obligation of the City. **Such payment obligations of the City are not general obligations of the City, and neither the faith and credit, taxing power nor any specific revenues of the City are pledged to the 2006 COP Service Payments coming due under the 2006 Service Contracts.**

The City's unconditional contractual obligation to pay all 2006 COP Service Payments is not "subject to appropriation," as is customary with many certificate of participation transactions entered into by

municipalities in the United States. The City's 2006 Service Contracts are not subject to termination if the City were to fail to appropriate sufficient amounts for the required payments in any single year. The City is legally bound to make all 2006 COP Service Payments for the full term of both 2006 Service Contracts, and statutory remedies exist to enforce the City's obligations.

To secure the payment of the 2006 Certificates, the Service Corporations will irrevocably sell, assign and convey to the 2006 Funding Trust all of their rights to receive, collect and enforce all 2006 COP Service Payments to become due under the 2006 Service Contracts. As further security for the payment of the 2006 Certificates, although the parties intend that such sale, assignment and conveyance be an absolute transfer of those rights under the 2006 Service Contracts, in the Trust Agreement the Service Corporations will additionally grant a security interest in their right to receive 2006 COP Service Payments to the 2006 Funding Trust for the benefit of the 2006 Certificateholders. That security interest will be a perfected first security interest in such property under the Michigan Uniform Commercial Code.

The 2006 Service Contracts additionally require the City to make certain other payments, such as general corporate expenses of the Service Corporations, fees and expenses of the Trustee and the Contract Administrator, and certain amounts payable to one or more 2006 Swap Agreement counterparties. The amounts paid by the City for such additional purposes do not constitute part of the 2006 COP Service Payments and are not pledged for the payment of the 2006 Certificates.

If the City were to fail to pay any 2006 COP Service Payment when due, the Contract Administrator could file a lawsuit against the City to enforce that contractual obligation, a right that is available to all parties entering into valid enforceable contracts with the City. The City would be required to pay any resulting judgment against it, the same as any other. If the City were to fail to provide for payment of any such judgment, a court can compel the City to raise the payment through the levy of taxes, as provided in the Revised Judicature Act of 1961, Act No. 236 of the Michigan Public Acts of 1961, as amended (Michigan Compiled Laws Section 600.6093), without limit as to rate or amount. This is the same remedy that the Retirement Systems would have against the City if it failed to make its required annual payment to fund UAAL under the traditional funding mechanism described above under "PLAN OF FINANCE - Constitutional, Statutory and Ordinance Authority for Payment of UAAL and Issuance of the 2006 Certificates." It also is the same remedy that the contract administrator with respect to the 2005 Service Contracts would have against the City if it were to fail to pay any 2005 COP Service Payment when due.

The Contract Administrator has no duty under the Contract Administration Agreement to pursue any remedy against the City for nonpayment of 2006 COP Service Payments except at the request of 2006 Certificateholders representing at least 25% of the outstanding principal amount of 2006 Certificates, the payments on which have not been made when due, or at least 50% of the outstanding principal amount of all 2006 Certificates. See "2006 SERVICE CONTRACT ADMINISTRATION – Enforcement."

## THE 2006 CERTIFICATES

The 2006 Certificates are being issued in two series, as described below.

### *The Series 2006-A Certificates (Fixed Rate)*

The Series 2006-A Certificates will be dated the date of their issuance. Interest from that date will be payable on each Series 2006-A Certificate on December 15, 2006 and semiannually thereafter on each June 15 and December 15 until its maturity or earlier redemption. The interest on the Series 2006-A Certificates will be computed at the rates shown on the inside cover of this Offering Circular, on the basis of a 30-day month and a 360-day year. The Series 2006-A Certificates are issued as fully registered 2006 Certificates, in principal denominations of $5,000 or multiples thereof.

**ISDA**
**CREDIT SUPPORT ANNEX**
to the Schedule

to the Master Agreement

dated as of June 7, 2006

between

| | | |
|---|---|---|
| UBS AG<br>("Party A") | and | DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION, a not-for-profit corporation organized under the laws of the State of Michigan ("Party B") |

**Paragraph 13. Elections and Variables**

(a)  *Security Interest for "Obligations."*  The term *"Obligations"* as used in this Annex includes the following additional obligations:

With respect to Party A:  None
With respect to Party B:  None

(b)  *Credit Support Obligations.*

(i)  *Delivery Amount, Return Amount and Credit Support Amount.*

(A)  *"Delivery Amount"* has the meaning specified in Paragraph 3(a).
(B)  *"Return Amount"* has the meaning specified in Paragraph 3(b).
(C)  *"Credit Support Amount"* has the meaning specified in Paragraph 3.

(ii)  *Eligible Collateral.*  The following items will qualify as *"Eligible Collateral"* for the party specified:

| | | Party A | Party B | Valuation Percentage |
|---|---|---|---|---|
| (A) | Cash | X | N/A | 100% |
| (B) | negotiable debt obligations (other than interest-only securities) issued by the U.S. Treasury Department having a remaining maturity of not more than one year | X | N/A | 98% |
| (C) | negotiable debt obligations (other than interest-only securities) issued by the U.S. Treasury Department having a remaining maturity of more than one year but not more than 5 years | X | N/A | 96% |

**EXHIBIT F**

 **UBS**

| | |
|---|---|
| Date: | 26 June 2009 |
| To: | Detroit Police and Fire Retirement System Service Corporation ("Counterparty") |
| Attn: | Norman L White, President |
| Fax No: | 313-224-4466 |
| From: | UBS AG, Stamford Branch ("UBS AG") |
| Subject: | Swap Transaction |
| | UBS AG Ref:   37380351 |
| | Counterparty Ref:   PFRS - Syncora |

Dear Mr. White:

The purpose of this communication is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below. This Revised Confirmation constitutes a "Confirmation" as referred to in the Master Agreement or Agreement specified below. This Revised Confirmation shall replace and supersede all previous Confirmations relating to the Transaction documented herein

UBS AG and the Counterparty have entered into a Master Agreement, dated as of 25 May 2005, which sets forth the general terms and conditions, as well as amendments, applicable to this Transaction (together with any future Schedule and any other future Confirmation, the "Agreement"). This Revised Confirmation supplements, forms part of and is subject to the Agreement. All provisions contained in, or incorporated by reference to, such Agreement shall govern this Revised Confirmation except as expressly modified below. In the event of any inconsistency between the provisions of the Agreement and this Revised Confirmation, this Revised Confirmation will prevail for purposes of this Transaction.

The definitions contained in the 2000 ISDA Definitions (the "2000 Definitions"), (the "Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Revised Confirmation. In the event of any inconsistency between of the definitions listed above and this Revised Confirmation, this Revised Confirmation will govern.

The terms of the particular Swap Transaction to which this Revised Confirmation relates are as follows:

## General Terms

| | |
|---|---|
| Insurer: | Syncora Guarantee Inc. (formerly known as XL Capital Assurance Inc.) |
| Trade Date: | 07 June 2006 |
| Effective Date: | 12 June 2006 |
| Termination Date: | 15 June 2029 |
| Notional Amount: | Initially USD 104,325,500 thereafter amortizing per the Amortization Schedule below |
| Calculation Agent: | UBS AG |
| Business Days: | New York and London |

**Fixed Amounts**

Fixed Rate Payer:                     Counterparty

Fixed Rate:                          In accordance with the following schedule.

| From (and including) | To (but excluding) | Fixed Rate |
|---|---|---|
| Effective Date | 15 June 2007 | 4.991 |
| 15 June 2007 | 15 June 2008 | 5.666 |
| 15 June 2008 | 1 July 2010 | 6.223 |
| 1 July 2010 | Termination Date | 6.323 |

Fixed Rate Day Count Fraction.    30/360

Fixed Rate Payer Payment Dates.    Quarterly, on each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2029, subject to adjustment in accordance with the Preceding Business Day Convention.

Period End Dates:    Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention, with No Adjustment.

**Floating Amounts**

Floating Rate Payer:    UBS AG

Floating Rate Option:    USD-LIBOR-BBA

Designated Maturity:    Three months, except that in respect to the initial Calculation Period, Linear Interpolation shall apply.

Spread:    Plus 30 Basis Points

Floating Rate Day Count Fraction:    Actual/360

Floating Rate Payer Payment Dates:    Each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2029, subject to adjustment in accordance with the Preceding Business Day Convention.

Period End Dates:    Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

Reset Dates.    Initially, the Effective Date and thereafter on each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to but excluding the Termination Date, subject to adjustment in

OHS East 160571704 5

Compounding                      Inapplicable

## Amortization Schedule

| Period From (and including) | Period To (but excluding) | Notional Amount (USD) |
|---|---|---|
| Effective Date | 15-Jun-2019 | 104,325,500 |
| 15-Jun-2019 | 15-Jun-2020 | 97,011,000 |
| 15-Jun-2020 | 15-Jun-2021 | 90,109,000 |
| 15-Jun-2021 | 15-Jun-2022 | 83,685,500 |
| 15-Jun-2022 | 15-Jun-2023 | 77,801,500 |
| 15-Jun-2023 | 15-Jun-2024 | 72,532,500 |
| 15-Jun-2024 | 15-Jun-2025 | 67,957,500 |
| 15-Jun-2025 | 15-Jun-2026 | 64,161,500 |
| 15-Jun-2026 | 15-Jun-2027 | 44,825,500 |
| 15-Jun-2027 | 15-Jun-2028 | 24,286,500 |
| 15-Jun-2028 | Termination Date | 2,469,500 |

## Optional Termination by Counterparty

With the prior consent of the Insurer, Counterparty shall have the right to terminate this Transaction (provided that no Event of Default or Termination Event has occurred) by providing (i) at least five (5) Business Days' prior written notice to UBS AG of its election to terminate this Transaction and (ii) evidence reasonably satisfactory to UBS AG that any and all amounts owed to UBS AG in connection with such early termination shall be paid on the due date thereof. On the Optional Termination Date set forth in such notice, an amount, determined by UBS AG, shall be payable by UBS AG or the Counterparty, as the case may be, in respect of such termination. If such amount is not acceptable to Counterparty, then UBS AG shall determine such amount in accordance with Section 6 of the Agreement, assuming Market Quotation and Second Method apply and Counterparty is the sole Affected Party.

## Adjustment Event

If on the Effective Date or any date thereafter (an "Adjustment Event Date") the Notional Amount of this Transaction is greater than the Related Principal Amount, an Adjustment Event shall occur and the Notional Amount shall be reduced to the extent necessary to make such Notional Amount as of the Adjustment Event Date equal to the Related Principal Amount. As used herein

    (a)      the term "Related Principal Amount" means UBS AG's Swap Percentage of Counterparty's Allocable Share of the aggregate principal amount of the outstanding Syncora-Insured Floating Rate Certificates,

    (b)      the term "UBS AG's Swap Percentage" means at any time **50 percent**,

    (c)      the term "Counterparty's Allocable Share" means (1) the total Scheduled Payments (as such term is defined in the PFRS Service Contract 2006 between the Detroit Police and Fire Retirement System Service Corporation and the City of Detroit) to be made by Counterparty in respect of Syncora-Insured Floating Rate Certificates divided by (2) the total Scheduled Payments to be made by Counterparty and Detroit General Retirement System Service Corporation in respect of Syncora-Insured Floating Rate Certificates, in each case after giving effect to any prepayments of Scheduled Payments in connection with the circumstances of the Adjustment Event, and

(d)    the term "Syncora-Insured Floating Rate Certificates" means any Detroit Retirement System Funding Trust 2006 Taxable Certificates of Participation Series 2006-B (the "Related Certificates") that bear interest at a floating rate and the scheduled principal of and interest on which are insured under a financial guaranty insurance policy issued by Syncora Guarantee Inc (formerly known as XL Capital Assurance Inc.)

(e)    Upon an adjustment to the Notional Amount, a payment (an "Adjustment Payment") will be due and owing by one party to the other equal to the Market Quotation for this Transaction determined by UBS AG as if (i) a Termination Event occurred in respect of Counterparty, (ii) Counterparty was the only Affected Party with respect to such Termination Event, UBS AG was the party entitled to calculate the Market Quotation, and the Transaction is the Affected Transaction, (iii) the relevant Adjustment Event Date was designated as the Early Termination Date, (iv) the Notional Amount of the Transaction was an amount equal to the difference between (X) the Notional Amount and (Y) the outstanding principal amount of the Related Certificates on the Adjustment Event Date, and (v) the requirement set forth in the definition of Market Quotation that quotations be obtained from four Reference Market-makers was met by having UBS AG provide a single quotation, provided, however, if Counterparty disputes such quotation, UBS AG shall seek bids from Reference Market-makers consistent with the provisions of Section 6 of the Agreement. If an Adjustment Payment is a positive number, Counterparty will pay an amount equal to such Adjustment Payment to UBS AG; if an Adjustment Payment is a negative number UBS AG will pay an amount equal to the absolute value of such Adjustment Payment' to Counterparty  An Adjustment Payment shall be paid by the relevant party on the date on which the Adjustment Event occurs.

(f)    Notwithstanding anything to the contrary in this Agreement, Counterparty will not optionally cause an Adjustment Event if, in connection with such Adjustment Event, an Adjustment Payment would be payable by Counterparty to UBS AG unless Counterparty provides evidence reasonably satisfactory to UBS AG and the Swap Insurer that (i) such Adjustment Payment will be made by Counterparty on the Adjustment Event Date and (ii) such Adjustment Payment will not cause Counterparty to be in violation of, or in default under the documentation relating to the Related Certificates

## Swap Advisor Fee

| | |
|---|---|
| Swap Advisor: | Scott Balice Strategies LLC |
| Swap Advisor Fee: | On behalf of the Counterparty, a fee of USD 78,389.35 is being paid by UBS AG in respect of this Transaction to the Swap Advisor. Such fee is equal to the present value of 0.65 basis points per annum on the Notional Amount of this Transaction taking into account the amortization schedule set forth herein, to the Termination Date, discounted to the Trade Date using the LIBOR swap curve  This fee is reflected in, and has increased, the Fixed Rate payable by the Counterparty hereunder |
| Swap Advisor Fee Payment Date | Upon closing of the Related Certificates |

OHS East 160571704 5

## Relationship between Parties

Each party will be deemed to represent to the other party on the date on which it enters into this Transaction that (in the absence of a written Agreement between the parties which expressly imposes affirmative obligations to the contrary for this Transaction).

(a)  Non-Reliance.  Each party is acting for its own account, and has made its own independent decisions to enter into this Transaction and this Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.  Each party is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanation relating to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction.  No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(b)  Assessment and Understanding.  Each party is capable of assessing the merits of and understands (on its own behalf or through independent professional advice), and accepts, the terms, conditions and risks of this Transaction.  Each party is also capable of assuming and assumes, the risks of this Transaction.

(c)  Status of the Parties.  Neither party is acting as a fiduciary for or as an adviser to the other in respect of this Transaction.

References in this clause to "a party" shall, in the case of UBS AG and where the context so allows, include references to any affiliate of UBS AG.

## Risk Considerations

The Counterparty acknowledges receipt from UBS, at or prior to the time of Counterparty's final approval of the Transaction evidenced by this Revised Confirmation, of a document entitled "Risk Considerations".

## Custodian

At least two (2) Local Business Days prior to each Payment Date for the Transaction to which this Confirmation relates, Party A, as Calculation Agent, shall notify the Collateral Agreement Custodian of the net amount payable and the Party owing such payment as of the immediately following Payment Date.

## Account Details

UBS Account Details

Account for payments in USD:

| | |
|---|---|
| Bank: | UBS AG, Stamford |
| ABA/Bank No.: | 026-007-993 |
| Account No.: | 101-WA-860050-025 |

Counterparty Account Details

| | |
|---|---|
| Bank: | U.S. Bank, Minneapolis |
| FBO: | For further credit to U.S. Bank, N.A. |
| ABA/Bank No : | 091000022 |
| Account No : | 180121167365 |
| Ref: | Detroit COPS PFRS |

OHS East 160571704 5

UBS AG Ref 37380351
C/P Ref:  PFRS - Syncora

| Trust #: | 789710000 |
|---|---|
| Contact: | Jill Ling 651-495-3712 |

## Offices

The office of UBS AG for the Swap Transaction is Stamford, CT; and the office of the Counterparty for the Swap Transaction is Detroit, MI.

Contact Names at UBS AG

| Settlements: | Hotline: | (203) 719 1110 |
|---|---|---|
| Confirmation Queries: | Jennifer McCandless | (212) 713 1212 |
| ISDA Documentation: | Legal Department – Documentation: | (203) 719 6249 |
| Swift: | UBSWUS33 | |
| Fax: | (203) 719-5771 | |
| Address: | UBS AG | |
| | 677 Washington Boulevard | |
| | Stamford, CT 06901 | |

[Intentionally left blank. Signature page follows.]

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by executing a copy of this Revised Confirmation and returning it to us by facsimile to **(212) 373-6491**.

Yours Faithfully
For and on Behalf of
UBS AG, Stamford Branch

By *Marie-Anne Clarke*          By

| | |
|---|---|
| Name : Marie-Anne Clarke | Name: James B. Fuqua |
| Title: Executive Director and Counsel | Title : Managing Director and Counsel |
| Region Americas Legal | Region Americas Legal |
| Fixed Income Section | |

Acknowledged and agreed by the Detroit Police and Fire Retirement System Service Corporation as of the Trade Date specified above:

By:

Name        Norman L. White
Title :       President

---

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by executing a copy of this Revised Confirmation and returning it to us by facsimile to **(212) 373-6491**.

Yours Faithfully
For and on Behalf of
UBS AG, Stamford Branch

By                                         By

Name :                                    Name:
Title:                                    Title :

Acknowledged and agreed by the Detroit Police and Fire Retirement System Service Corporation as of the Trade Date specified above:

By:

Name          Norman L. White
Title :       President

OHS East 160571704 5

**AMENDED AND RESTATED SCHEDULE**
**DATED AS OF JUNE 26, 2009**
to the
1992 ISDA Master Agreement
Local Currency Single Jurisdiction

dated as of
May 25, 2005
between

UBS AG                          and          **DETROIT GENERAL RETIREMENT**
**SYSTEM SERVICE CORPORATION,**
("Party A")                                  a not-for-profit corporation organized
under the laws of the State of Michigan
("Party B")

**Part 1.**
**Termination Provisions**

In this Agreement:

(a)      *"Specified Entity"* means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | NONE |
| Section 5(a)(vi), | NONE |
| Section 5(a)(vii), | NONE |
| Section 5(b)(ii), | NONE |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | NONE |
| Section 5(a)(vi), | NONE |
| Section 5(a)(vii), | NONE |
| Section 5(b)(ii), | NONE |

(b)      *"Specified Transaction"* will have the meaning specified in Section 12 of this Agreement.

(c)      The *"Cross Default"* provisions of Section 5(a)(vi) of this Agreement, as modified below, will apply to Party A and to Party B. Section 5(a)(vi) of this Agreement is hereby amended by the addition of the following at the end thereof:

"provided, however, that notwithstanding the foregoing, an Event of Default shall not occur under either (1) or (2) above if, as demonstrated to the reasonable satisfaction of the other party, (a) the event or condition referred to in (1) or the failure to pay referred to in (2) is a failure to pay caused by an error or omission of an administrative or operational nature; and (b) funds were available to such party to enable it to make the relevant payment when due; and (c)

such relevant payment is made within three Business Days following receipt of written notice from an interested party of such failure to pay."

If such provisions apply:

*"Specified Indebtedness"* means any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) for the payment or repayment of any money.

*"Threshold Amount"* means:

(i)    with respect to Party A, an amount equal to 2% of shareholders' equity (howsoever described) of Party A as shown on the most recent annual audited financial statements of Party A and

(ii)    with respect to Party B, $10,000,000.

(d)    *The "Credit Event Upon Merger"* provisions of Section 5(b)(ii) will apply to Party A and Party B. amended as follows:

"'Credit Event Upon Merger shall mean that a Designated Event (as defined below) occurs with respect to a party, any Credit Support Provider of the party or any applicable Specified Entity (any such party or entity, "X"), and such Designated Event does not constitute an event described in Section 5(a)(viii) but the creditworthiness of X, or, if applicable, the successor, surviving or transferee entity of X, is materially weaker than that of X immediately prior to such event. In any such case the Affected Party shall be the party with respect to which, or with respect to the Credit Support of which, the Designated Event occurred, or, if applicable, the successor, surviving or transferee entity of such party. For purposes hereof, a Designated Event means that, after the date hereof:

(i)    X consolidates, amalgamates with or merges with or into, or transfers all or substantially all its assets to, or receives all or substantially all the assets or obligations of, another entity; or

(ii)    any person or entity acquires directly or indirectly the beneficial ownership of equity securities having the power to elect a majority of the board of directors of X or otherwise acquires directly or indirectly the power to control the policy-making decisions of X,"

(e)    *The "Automatic Early Termination"* provision of Section 6(a) will not apply to Party A or Party B.

(f)    *"Payments on Early Termination"*. For the purpose of Section 6(e) of this Agreement:

(i)    Market Quotation will apply.

(ii)    The Second Method will apply.

(g)    *"Termination Currency"* means U.S. Dollars.

(h)      There shall be added to Section 5(a) of the Agreement the following Events of Default:

> "(ix)      Authority; Repudiation. Party B shall cease to have authority to make payments under this Agreement or any Transaction subject to this Agreement, or any government entity having jurisdiction over Party B shall enact any legislation which would have the effect of repudiating this Agreement or any Transaction subject to this Agreement,"

> "(x)      Amounts payable by Party B to Party A hereunder shall cease to be payable and secured in accordance with the terms specified in Part 4(b)(ii)(g) of this Schedule."

(i)      *"Additional Termination Event"* will apply to Party A and to Party B. In addition to the Additional Termination Events set forth in Part 5 of this Schedule, the following shall constitute Additional Termination Events.

     (i)      *Party A Additional Termination Events.* Party A or its Credit Support Provider's long-term senior unsecured debt rating from (a) S&P is withdrawn, suspended or falls below "BBB-", or (b) Moody's is withdrawn, suspended or falls below "Baa3".

For purposes of the foregoing Termination Event in this Part 1(i)(i), the sole Affected Party shall be Party A and all Transactions shall be Affected Transactions.

     (ii)      *Party B Additional Termination Events.*

         (1)      The City Payments made in any Month, in aggregate, are less than the Holdback Requirement for such Month; or

         (2)      The City fails to make an appropriation in the City's final annual budget adopted pursuant to and in compliance with the City Charter prior to the commencement of any Fiscal Year and to maintain such appropriation without limitation, transfer or reduction throughout such Fiscal Year, on a line item basis authorizing exclusively payment of the City Payments and as a "first budget" obligation, of an amount at least equal to the Regular Custodian Payments scheduled to become due during the Fiscal Year plus an amount equal to *the greater* of (X) the amount of the Hedge Periodic Payables under the Hedges scheduled to become due during the Fiscal Year without giving effect to any netting and (Y) for the first Fiscal Year commencing July 1, 2009, $49,936,975 and, for each subsequent Fiscal Year thereafter, $50,736,975; or

         (3)      The Quarterly Coverage as of the end of any Month is less than 1.75; or

         (4)      Either (1) the unenhanced rating on the 2006 Pension Funding Securities assigned by S&P falls below "BB" or the unenhanced rating on the 2006 Pension Funding Securities assigned by Moody's falls below "Ba2" and as of the immediately preceding Month's end the Quarterly Coverage is 2.15

or less, or (2) the unenhanced rating on the 2006 Pension Funding Securities assigned by S&P is withdrawn, suspended or reduced below "BB-" or the unenhanced rating on the 2006 Pension Funding Securities assigned by Moody's is withdrawn, suspended or reduced below "Ba3"; or

(5)     At any time following a Ratings Upgrade, the unenhanced rating on the 2006 Pension Funding Securities is withdrawn, suspended or reduced below "BBB-" by S&P or withdrawn, suspended or reduced below "Baa3" by Moody's; or

(6)     The City, a Service Corporation, or a third party shall commence litigation or take any other judicial action, or any legislative action is taken, to set aside or avoid or limit the 2006 Transaction, the City Pledge, the Service Corporation Security Interest, or the Service Corporation Pledge or any other part of the Definitive Documents or the Settlement Transaction (other than with respect to a Developer Agreement), or if the Authorizing Ordinance or any part thereof shall be amended (without the consent of Party A), revoked, rescinded, nullified or suspended for any reason; or

(7)     The City shall rescind, reduce or cease to impose the tax currently imposed as of the Amendment Effective Date by Section 18-14-3 of the Detroit City Code or the City, within two Business Days following the earlier to occur of notice from the Collateral Agreement Custodian that a taxpayer has inadvertently or erroneously paid the Wagering Tax Property directly to the City or the Finance Director learning of such payment, shall fail to transfer by wire transfer in same day funds to the Collateral Agent Custodian for deposit into the General Receipts Subaccount such payment. However, the rescinding of such tax shall not result in a Termination Event hereunder if such tax is then collected by the State of Michigan pursuant to Section 12(1) of the Wagering Tax Revenue Statute and an amount of such collections equal to or greater than the tax imposed as of the Amendment Effective Date is paid to the Collateral Agreement Custodian under arrangements satisfactory to Party A; or

(8)     The City fails to pay any Service Charges, Accrued Service Charges, Regular Scheduled Payments or Sinking Fund Installments as and when due and payable under either Service Contract; or

(9)     The City fails to pay when due any principal of, or interest on, any indebtedness for borrowed money, other than Excluded Indebtedness, aggregating $1,000,000 or more or any other event shall occur the effect of which is to cause, or to permit the holder or holders of such indebtedness (or a trustee or agent on behalf of such holder or holders) to cause such indebtedness to become due, or to be prepaid in full (whether by redemption, purchase, offer to purchase or otherwise), prior to its stated maturity, in each case after giving effect to any applicable grace period requiring notice or the lapse of time or both; or

(10)     The City fails to pay any judgment or judgments aggregating $1,000,000 or more, excluding judgments (1) on appeal and being contested in good faith, (2) for which the City has reached an agreement with the judgment creditor as to the timing and manner of payment that does not involve the imposition of any additional ad valorem property taxes above the Property Tax Threshold and with which agreement the City is in compliance or (3) for which the City is diligently making arrangements for payment and the delay in payment will not result in the City being held in contempt of court for nonpayment or in the imposition of a lien on the City's general funds or the imposition of any additional ad valorem property taxes in excess of the Property Tax Threshold; or

(11)     The City commences a case or files a petition seeking relief under the Bankruptcy Code or any other insolvency law or procedure, consents to an order of relief in any such proceeding or to the filing of any such petition, seeks or is subject to the appointment of a receiver or an emergency financial manager for all or any substantial part of its assets or makes an assignment for the benefit of its creditors, or if the Governor of the State of Michigan determines that a financial emergency exists in the City.

For purposes of the foregoing Termination Events in this Part 1(i)(ii), the sole Affected Party shall be Party B and all Transactions shall be Affected Transactions.

(j)     **Default Rate.**  Notwithstanding anything to the contrary in the Agreement, the Default Rate applicable to any amount owed by Party B to Party A during the Term Payment Period shall be LIBOR plus 9% (the "Specified Default Rate"), where "LIBOR" is determined (i) with respect to the remainder of the first Fiscal Year following a Specified Additional Termination Event, as the arithmetic average of USD-LIBOR-BBA (as defined in the 2006 ISDA Definitions, with a Designated Maturity of three months) as of the close of business on the fifteenth (15th) day of the three calendar months immediately preceding such Specified Additional Termination Event and, (ii) with respect to each subsequent Fiscal Year, as the arithmetic average of USD-LIBOR-BBA (as defined in the 2006 ISDA Definitions, with a Designated Maturity of three months) as of the close of business on the fifteenth (15th) day of March, April and May of the immediately preceding Fiscal Year.

(k)     **Remedies.**  In addition to all other remedies available hereunder and which remain unaffected hereby, following the designation of an Early Termination Date hereunder resulting from an Event of Default or Termination Event with respect to which Party B is the Defaulting Party or sole Affected Party, as the case may be, Party A shall have the remedies available to it as a secured party to enforce the Service Corporation Pledge, the Service Corporation Security Interest and the City Pledge. Such remedies of Party A as a secured party under the Service Corporation Pledge and Service Corporation Security Interest shall include the exercise of all rights and remedies otherwise available to the Service Corporations as secured parties under the City Pledge, including the right to cause the Pledged Property to be applied to the obligations owing to Party A hereunder up to the amounts then appropriated. Furthermore, such remedies include the right to cause the Pledged Property to be applied to the obligations owing to the

Swap Counterparties under the Hedges up to the amounts then appropriated and, to the extent that not all amounts for all obligations owing to the Swap Counterparties have been appropriated, the right to use judicial process to obtain appropriations and to exercise any other equitable remedies available to the Swap Counterparties against the Service Corporations and the City, as a Michigan home rule city, in respect of such unappropriated amounts; provided, however, that if an Early Termination Date is designated by Party A hereunder as a result of a Specified Additional Termination Event, Party A shall forbear from exercising any remedies as a secured party against the Pledged Property during the Term Payment Period.

(l)     *Waiver and Rescission.* As of the Amendment Effective Date, Party A waives its right to declare an Early Termination Date, and hereby rescinds any previously delivered notice of Termination Event and/or designation of an Early Termination Date, in connection with the Additional Termination Event set forth, prior to the Amendment Effective Date, in Part 5(ii)(b)(Z) of the Schedule to this Agreement.

(m)    *Amendment Effective Date Representations of Party B.* Party B hereby further represents that, as of the Amendment Effective Date:

    (i)     The City has given an Irrevocable Instruction to each Casino Licensee and Developer.

    (ii)    No action, proceeding or investigation has been instituted, nor has any order, judgment or decree been issued or proposed to be issued by any court, agency or authority to set aside, restrain, enjoin or prevent the consummation of any transaction contemplated hereby or seeking material damages against the City, a Service Corporation or either Swap Counterparty in connection with the amendment and restatement of the Schedule to this Agreement or the Settlement Transaction.

(n)    *Indemnification.*

    (i)     To the extent permitted by law, Party B shall defend and hold harmless Party A from and against any and all losses, damages, liabilities, and expenses incurred and paid (each, a "liability") by Party A arising out of or resulting from the commencement or continuation of any litigation, judicial action, or legislative action of the kind described in Part 1(i)(ii)(6) hereof.

    (ii)    If, for so long as this Agreement is in effect, Party A has actual notice or knowledge of any claim or loss for which indemnification by Party B is asserted, Party A shall give to Party B written notice within such time as is reasonable under the circumstances, describing such claim or loss in reasonable detail. However, any delay or failure of Party A to give the notice shall not affect Party B's indemnification obligations except to the extent that Party B was prejudiced by the delay or failure.

    (iii)   If a demand or claim for indemnification is made hereunder with respect to losses the amount or extent of which is not yet known or certain, then the notice of demand for indemnification shall so state, and, where practicable, shall include an estimate of the amount of the losses.

(iv)   In the case of actual notice of indemnification hereunder involving any litigation, arbitration or legal proceeding, Party B shall have responsibility to, and shall employ counsel, and shall assume all expense with respect to, the defense or settlement of such claim.

(v)   Notwithstanding Party B's assumption of the defense, Party A shall have the right to employ separate counsel and to participate in the defense of such action, and Party B shall bear the reasonable out of pocket fees, costs and expenses of such separate counsel if:

(1)   other than under Part 1(i)(ii)(6) hereof, a Termination Event or Event of Default has occurred hereunder other than a Specified Additional Termination Event;

(2)   other than under Part 1(i)(ii)(6) hereof, the Term Period End Date has occurred;

(3)   the result of the use of counsel chosen by Party B to represent Party A would present such counsel with a conflict of interest;

(4)   the actual or potential defendants in, or targets of, any such action include Party A and Party A shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to Party B;

(5)   Party B shall not have employed counsel reasonably satisfactory to Party A to represent Party B within a reasonable time after notice of the institution of such action; or

(6)   Party B, in its discretion, shall authorize Party A to employ separate counsel at Party B's expense.

Party B shall not be liable under this Agreement for any amount paid by Party A to settle any claims or actions if the settlement is entered into without Party B's consent which may not be unreasonably withheld or delayed. Each of Party A and Party B hereby agrees and acknowledges that any amount in respect of indemnification payable by Party B to Party A in accordance with this Part 1(n) is an expense that may not be claimed and is not payable under the Swap Insurance Policy.

### Part 2.
### Agreement to Deliver Documents

For the purpose of Sections 3(d) and 4(a) of this Agreement, each party agrees to deliver the following documents:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Evidence of the authority and true signatures of each official or representative signing this Agreement or, as the case may be, a Confirmation, on its behalf. | On or before execution of this Agreement and each Confirmation forming a part of this Agreement. | Yes |
| Party A | Opinion of legal counsel to Party A in a form reasonably satisfactory to Party B. | On or before execution of this Agreement. | No |
| Party B | Covered Indenture. | On or before execution of this Agreement. | Yes |
| Party B | Certified copy of the resolution of Party B's Board of Directors (or equivalent authorizing documentation) authorizing the execution and delivery of the Agreement and each Confirmation and performance of its obligation hereunder. | On or before execution of this Agreement. | Yes |
| Party B | A copy of Party B's audited annual financial statements prepared in accordance with generally accepted accounting principles within the United States. | On or before the 365th day after the end of Party B's fiscal year. | Yes |
| Party B | A copy of the City's audited annual financial statements prepared in accordance with generally accepted accounting principles within the United States. | Within 15 days of public availability, but in any case no later than 365 days after the end of the City's fiscal year. | Yes |
| Party B | A copy of the City's quarterly financial statements. | If and when the City prepares such quarterly reports, when such quarterly reports become | Yes |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | | publicly available. | |
| Party B | Opinion of legal counsel to Party B substantially in the form and substance acceptable to Party A | On or before the delivery of the related 2006 Pension Funding Securities to the underwriters with respect to the Insured Rate Swap Transaction. | No |
| Party B | Commitment to issue each Swap Insurance Policy | On or before the execution of this Agreement with respect to the Insured Rate Swap Transaction. | No |
| Party B | Swap Insurance Policy and the Opinion of counsel to the Insurer with respect to such Swap Insurance Policy. | On or before the delivery of the related 2006 Pension Funding Securities to the underwriters with respect to the Insured Rate Swap Transaction. | No |
| Party B | Confirmations, updates and additional documentation concerning the opinion of counsel, board resolutions and certificates delivered pursuant to each of the foregoing documents to be delivered as Party A may reasonably request. | Prior to the Effective Date of each Transaction after the initial Transaction hereunder. | Yes |
| Party B | Certified copy of the Service Contract together with an opinion of Certificate Counsel in form and substance satisfactory to Party A which addresses each of the Sources of Payment set forth in | On or before execution of the Service Contract. | No |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | Section 3(g) of this Agreement. | | |
| Party B | Authorizing Ordinance | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of Lewis & Munday, a Professional Corporation, special counsel to the City and Party B, in form and substance satisfactory to Party A, including customary opinions given in connection with municipal financing transactions and addressing the items identified on Exhibit A hereto next to such counsel's name | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of the City Corporation Counsel, in form and substance satisfactory to Party A, addressing the items identified on Exhibit A hereto next to such counsel's name. | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of Orrick, Herrington & Sutcliffe LLP, special counsel to the City, in form and substance satisfactory to Party A, addressing the items identified on Exhibit A hereto next to such counsel's name. | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of special tax counsel to the City, in form and substance satisfactory to Party A, addressing the items identified on Exhibit A hereto next to such counsel's name. | On or prior to the Amendment Effective Date | No |
| Party B | To the extent not duplicative with any other document to be delivered in this Part 2, each | On or prior to the Amendment Effective Date | Yes |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | document required to be delivered under Section 2.4 of the Collateral Agreement. | | |

### Part 3.
### Miscellaneous

(a)   *Addresses for Notices.* For the purposes of Section 10(a) of this Agreement:

(i)   All notices or communications to Party A shall, with respect to a particular Transaction, be sent to the address, telex number, or facsimile number reflected in the Confirmation of that Transaction, and any notice for purposes of Sections 5 or 6 shall be sent to:

UBS Securities LLC
677 Washington Boulevard
Stamford, Connecticut 06901
Attn: Municipal Derivatives
Tel: 203-719-1689
Fax: 203-719-1417

and

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, Connecticut 06901
Attn: Legal Department
Fax: 203-719-0680

(ii)   All notices or communications to Party B shall be sent in care of the Contract Administrator to the address as set forth in Section 11.1 of the Contract Administration Agreement.

(iii)   A copy of all notices or communications to either Party A or Party B shall be sent to the address, or facsimile number reflected below:

Financial Guaranty Insurance Company
125 Park Avenue
New York, New York 10017
Attention: Risk Management
Facsimile: (212) 312-3206

(b)   *Offices.* Party A, if it enters into a Transaction through an Office other than its head or home office represents to Party B that, notwithstanding the place of booking office or

jurisdiction of incorporation or organization, the obligations of Party A are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by Party A on each date on which a Transaction is entered into.

(c)     *Calculation Agent.* The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(d)     *Credit Support Document.* The Credit Support Annex attached hereto is a Credit Support Document with respect to Party A for all purposes hereunder and is incorporated herein by this reference. The Service Contracts and the Contract Administration Agreement (collectively, the "Covered Indenture") and the Collateral Agreement are Credit Support Documents with respect to Party B.

(e)     *Credit Support Provider.* Credit Support Provider means: None.

(f)     *Governing Law.* **This Agreement will be governed by and construed in accordance with the laws of the State of New York; provided, however, that the corporate powers and legal capacity of Party B shall be governed by and construed in accordance with the laws of the State of Michigan.**

(g)     *Jurisdiction.* Section 11(b)(i) of this Agreement is deleted in its entirety and replaced by the following:

> "submits to the extent permitted by law to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan; and"

(h)     *Waiver of Immunities.* Section 11(c) of this Agreement is deleted in its entirety and replaced by the following:

> *"Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues, all immunity on the grounds of sovereignty or other similar grounds from (i) suit in a breach of contract action, (ii) relief by way of injunction, order for specific performance or for recovery of property and (iii) execution or enforcement of any judgment to which it or its revenues might otherwise be entitled in any Proceedings, and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any such Proceedings."

(i)     *Netting of Payments.* Subparagraph (ii) of Section 2(c) of this Agreement will apply.

(j)     *"Affiliate"* will have the meaning specified in Section 12 of this Agreement.

### Part 4.
### Other Provisions

(a)     <u>*Set-off.*</u> Without affecting the provisions of the Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without set-off or

counterclaim; provided, however, that upon the designation of any Early Termination Date, in addition to and not in limitation of any other right or remedy (including any right to set off, counterclaim, or otherwise withhold payment or any recourse to any Credit Support Document) under applicable law the Non-defaulting Party or Non-affected Party (in either case, "X") may without prior notice to any person set off any sum or obligation (whether or not arising under this Agreement and whether matured or unmatured, whether or not contingent and irrespective of the currency, place of payment or booking office of the sum or obligation) owed by the Defaulting Party or Affected Party (in either case, "Y") to X or any Affiliate of X against any sum or obligation (whether or not arising under this Agreement, whether matured or unmatured, whether or not contingent and irrespective of the currency, place of payment or booking office of the sum or obligation) owed by X or any Affiliate of X to Y and, for this purpose, may convert one currency into another at a market rate determined by X. If any sum or obligation is unascertained, X may in good faith estimate that sum or obligation and set-off in respect of that estimate, subject to X or Y, as the case may be, accounting to the other party when such sum or obligation is ascertained.

(b) *Additional Representations.*

    (i) The first sentence of Section 3 is amended to read in its entirety as follows:

"Each party represents to each other party (which representations will be deemed to be repeated on each date on which a Transaction is entered into and, in the case of the representations in Section 3(a), 3(e) and 3(f) of this Agreement, at all times until the termination of this Agreement) the following:"

    (ii) Section 3 is amended by adding the following subsections (e), (f) and (g) thereto:

(e) Non-Speculation. Party B represents and warrants to Party A that this Agreement has been, and each Transaction hereunder will be, entered into for purposes of managing its borrowings or investments or in connection with a line of business and not for the purpose of speculation;

(f) Eligible Contract Participant. Each party is an "eligible contract participant" under, and as defined in, Section 1a(12) of the Commodity Exchange Act, as amended (7 U.S.C. § 1a(12)); and

(g) Sources of Payment. As provided in the Contract Administration Agreement, all payments due under this Agreement from Party B to Party A are payable from and secured by amounts owing by the City to Party B pursuant to the Service Contract in respect of Hedge Payables. Such amounts are payable by the City from all available revenues of the City's General Fund (as delineated in the City's audited financial statements). If the City were to fail to pay any amount owing in respect of a Hedge Payable when due, Party A (or the Contract Administrator, if authorized by Party A to so act on Party A's behalf) could pursue remedies against the City to enforce that contractual obligation and the City would be required to pay any resulting judgment against it. If the City were to fail to provide for payment of any such judgment, a court can compel the City

to raise the payment through the levy of taxes, as provided in the Revised Judicature Act of 1961, Act No. 236 of the Michigan Public Acts of 1961, as amended (Michigan Compiled Laws Section 600.6093), without limit as to rate or amount. In addition, all amounts due from Party B hereunder are secured by and payable from the Pledged Property (including, but not limited to, amounts held in the Holdback Account) in accordance with the terms of the Collateral Agreement.

(c) _Additional Agreement._

Compliance with Covered Indenture. Party B will observe, perform and fulfill each provision in the Covered Indenture applicable to Party B. Party B hereby agrees not to amend, supplement, modify or waive any provision of the Covered Indenture without the consent of Party A if such amendment, supplement, modification or waiver would: (i) change any of the payment times, amounts, obligations, terms or any other payment-related provision in any Service Contract applicable to the City; (ii) impair any right Party B may have under the Service Contract to enforce payments from the City, or impair any right Party A may have under the Covered Indenture to enforce its security interest granted therein or any other right thereunder; or (iii) permit the creation of any new lien ranking prior to or on a parity with, or terminate, or deprive Party A of the security afforded to it by Sections 8.02 and 8.03 of the Service Contracts or Section 2.4 of the Contract Administration Agreement (collectively, the "Incorporated Provisions"). The Incorporated Provisions are hereby incorporated by reference and made a part of this Agreement to the same extent as if such provisions were set forth herein. Any amendment, supplement, modification or waiver of any of the Incorporated Provisions without the prior written consent of the other party hereto shall have no force and effect with respect to this Agreement. Any amendment supplement or modification for which such consent is obtained shall be part of the Incorporated Provisions for purposes of this Agreement. Party B shall not assign or transfer its right or obligations under the Covered Indenture without the prior written consent of the other party hereto and the Swap Insurer.

(d) _Relationship Between Parties._ Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i) Non-Reliance. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii) <u>Assessment and Understanding</u>. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii) <u>Status of Parties</u>. The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(e) ***Waiver of Jury Trial.*** EACH PARTY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS RELATING TO THIS AGREEMENT OR ANY CREDIT SUPPORT DOCUMENT

(f) ***Consent to Recording.*** Each party (i) consents to the recording of all telephone conversations between trading, operations and marketing personnel of the parties and their Affiliates in connection with this Agreement or any potential Transaction; (ii) agrees to give notice to such personnel of it and its Affiliates that their calls will be recorded; and (iii) agrees that in any Proceedings, it will not object to the introduction of such recordings in evidence on grounds that consent was not properly given.

(g) ***Scope of Agreement.*** The Transactions entered into between the parties between May 24 and June 2, 2005 and any other specific Specified Transactions designated in writing by the parties hereto after the date hereof, shall be subject to the terms hereof.

(h) ***Indemnification Limited to Extent of Applicable Law.*** The parties acknowledge that Party B's authority to indemnify Party A, as required by Section 9 of the Agreement, for expenses, fees and taxes may be limited by Michigan law and Party B's obligation to indemnify Party A could be limited to the extent of applicable law.

(i) ***Additional Definitions.*** Section 12 is hereby amended by adding the following definitions:

"2006 Funding Trust" shall have the meaning specified in the Collateral Agreement.

"2006 Pension Funding Securities" shall have the meaning specified in the Collateral Agreement.

"2006 Transactions" shall have the meaning specified in the Collateral Agreement.

"Accounts" shall have the meaning specified in the Collateral Agreement.

"Accrued Service Charges" shall have the meaning specified in the Service Contracts.

"Amendment Effective Date" means June 26, 2009.

"Authorizing Ordinance" shall have the meaning specified in the Collateral Agreement.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, <u>et seq</u>.

"Casino Licensee" shall have the meaning specified in the Collateral Agreement.

"City" means the City of Detroit, Michigan.

"City Charter" means the Charter of the City of Detroit, Michigan.

"City Clerk" means the Clerk of the City of Detroit, Michigan.

"City Council" means the Council of the City of Detroit, Michigan.

"City Payment" shall have the meaning specified in the Collateral Agreement.

"City Pledge" shall have the meaning specified in the Collateral Agreement.

"Closing Date" shall have the meaning specified in the Collateral Agreement.

"Collateral Agreement" means that certain Collateral Agreement dated as of June 15, 2009, among Party A, Party B, PFRS, SBS, the City, U.S. Bank National Association and Merrill Lynch Capital Services, Inc.

"Collateral Agreement Custodian" means the person identified as the "custodian" under the Collateral Agreement and any successor thereto.

"Contract Administration Agreement" means the Contract Administration Agreement 2006 dated June 12, 2006 among Detroit Retirement Systems Funding Trust 2006, Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation, severally and not jointly, U.S. Bank National Association, separately and not as Trustee of the Detroit Retirement Systems Funding Trust 2006 and the Hedge Counterparties Named Therein.

"Counterparty(ies)" shall have the meaning specified in the Collateral Agreement.

"Covered Indenture" means the Service Contracts together with the Contract Administration Agreement.

"Definitive Documents" shall have the meaning specified in the Collateral Agreement.

"Detroit General Retirement System Service Contract" means the Detroit General Retirement System Service Contract dated June 7, 2006 between Party B and the City.

"Detroit Police and Fire Retirement System Service Contract" means the PFRS Service Contract dated June 7, 2006 between the Detroit Police and Fire Retirement System Service Corporation and the City.

"Developer" shall have the meaning specified in the Collateral Agreement.

"Developer Agreement" shall have the meaning specified in the Collateral Agreement.

"Excluded Indebtedness" shall have the meaning specified in the Collateral Agreement.

"Finance Director" shall have the meaning specified in the Collateral Agreement.

"Fiscal Year" shall have the meaning specified in the Collateral Agreement.

"General Receipts Subaccount" shall have the meaning specified in the Collateral Agreement.

"Hedge" shall have the meaning specified in the Collateral Agreement.

"Hedge Payable" shall have the meaning specified in the Service Contracts.

"Hedge Periodic Payables" shall have the meaning specified in the Service Contracts.

"Holdback Account" shall have the meaning specified in the Collateral Agreement.

"Holdback Requirement" shall have the meaning specified in the Collateral Agreement.

"Irrevocable Instructions" shall have the meaning specified in the Collateral Agreement.

"MCL" means the Michigan Compiled Laws.

"Month" shall have the meaning specified in the Collateral Agreement.

"Moody's" means Moody's Investors Service, Inc.

"Office" means a branch or office of a party, which may be such party's head or home office.

"PFRS" means the Detroit Police and Fire Retirement System Service Corporation.

"Pledged Property" shall have the meaning specified in the Collateral Agreement.

"Property Tax Threshold" shall have the meaning specified for the "Threshold" in the Collateral Agreement.

"Quarterly Coverage" shall have the meaning specified in the Collateral Agreement.

"Ratings Upgrade" shall have the meaning specified in the Collateral Agreement.

"Regular Custodian Payment" shall have the meaning specified in the Collateral Agreement.

"Regular Scheduled Payments" shall have the meaning specified in the Service Contracts.

"Revenues" shall have the meaning specified in the Collateral Agreement.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"SBS" means SBS Financial Products Company, LLC.

"Service Charges" shall have the meaning specified in the Service Contracts.

"Service Contracts" means the Detroit General Retirement System Service Contract and the Detroit Police and Fire Retirement System Service Contract.

"Service Corporations" means Party B and PFRS.

"Service Corporation Pledge" shall have the meaning specified in the Collateral Agreement.

"Service Corporation Security Interest" shall have the meaning specified in the Collateral Agreement.

"Settlement Transaction" shall have the meaning specified in the Collateral Agreement.

"Sinking Fund Installments" shall have the meaning specified in the Service Contracts.

"Specified Additional Termination Event" means each of the Additional Termination Events specified in Parts 1(i)(ii)(3), 1(i)(ii)(4), 1(i)(ii)(5), 1(i)(ii)(9) and 1(i)(ii)(10) of this Amended and Restated Schedule.

"Specified Event" shall have the meaning specified in the Collateral Agreement.

"Swap Counterparties" means, collectively, Party A and SBS and their respective successors and assigns.

"Swap Insurance Policy" means the Financial Guaranty Insurance Policy issued by the Swap Insurer with respect to the Transaction(s) between Party A and Party B entered into pursuant to this Agreement.

"Swap Insurer" means Financial Guaranty Insurance Company.

"Term Payment Period" shall have the meaning specified in the Collateral Agreement.

"Term Period End Date" shall have the meaning specified in the Collateral Agreement.

"Wagering Taxes" shall have the meaning specified in the Collateral Agreement.

"Wagering Tax Property" shall have the meaning specified in the Collateral Agreement.

"Wagering Tax Revenue Statute" means the Michigan Gaming Control and Revenue Act, being MCL 432.201 et seq., MSA 18.969(201), et seq., as amended.

## Part 5.
### Insurer Provisions

The following provisions shall apply to any Transactions for which the Swap Insurance Policy has been issued by the Swap Insurer, for the account of Party B, as principal, and Party A, as beneficiary (the "Insured Rate Swap Transactions"):

*(i)* *Designation of Early Termination Date.* Notwithstanding anything to the contrary in Section 6 of this Agreement, if any:

(a)    Event of Default in respect of any Insured Rate Swap Transaction under this Agreement occurs; or

(b)    Termination Event (other than the Additional Termination Events set forth in Part 5(ii) below) in respect of any Insured Rate Swap Transaction under this Agreement occurs;

then, in either such case, neither Party A nor Party B shall designate an Early Termination Date pursuant to Section 6 of this Agreement in respect of any such Insured Rate Swap Transaction without the prior written consent of the Swap Insurer.

*(ii)* *Party B Additional Termination Events.* The following shall each constitute an Additional Termination Event:

(a)    the Swap Insurer fails to meet its payment obligations under the Swap Insurance Policy and such failure is continuing with respect to Insurer under the Swap Insurance Policy; or

(b)    the Swap Insurer fails to have a claims-paying ability rating of at least "A-" from S&P or a financial strength rating of at least "A3" from Moody's; provided, however, that additionally:

(X)    an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party; or

(Y)    a Termination Event has occurred or is continuing with respect to Party B as the Affected Party; or

(c)    An Insurer Event has occurred and is continuing provided, however, that additionally:

(X)    an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party; or

(Y)    a Termination Event has occurred or is continuing with respect to Party B as the Affected Party.

Any of the following shall be considered an "Insurer Event":

(1)    the Swap Insurer is in conservation, liquidation or receivership under the New York Insurance Laws; or

(2)    the Swap Insurer (a) fails to have (1) a claims-paying ability rating of at least "AAA" from S&P, or (2) a financial strength rating of at least "Aaa" from Moody's; and (b) fails to pay obligations for indebtedness for money borrowed or to meet then-current policy obligations for which claims have been properly presented in a aggregate amount in excess of $100,000,000,

which failure to make payment (in whole or in part) is not due to: (u) administrative error; (v) Swap Insurer action to contest a claim; (w) an order from, or action by, a regulator of the Swap Insurer which forbids, delays or impedes such payment, except in connection with a Swap Insurer insolvency, conservation or receivership; (x) the occurrence of an act of God which prevents such payment; (y) the usual mechanisms or channels employed to make such payment being unavailable to the Swap Insurer through no fault of the Swap Insurer; (z) a statute, rule or order (including, but not limited to exchange controls) which forbids, delays or impedes either (i) such payment, other than in connection with a Swap Insurer insolvency, conservation or receivership, or (ii) the acquisition of, or payment in, a currency required in order to make such payment.

For purposes of any Additional Termination Event described under this Part 5(ii), the sole "Affected Party" shall be Party B.

***(iii)*** ***Insurer Directed Termination.*** Notwithstanding anything in this Agreement, if an Event of Default under this Agreement occurs with respect to Party B as the Defaulting Party or any Termination Event under this Agreement occurs with respect to Party B as the Affected Party, then the Swap Insurer (so long as it has not failed to make any payment under the terms and conditions of the Swap Insurance Policy) shall have the right (but not the obligation) upon notice to Party A to designate an Early Termination Date with respect to Party B with the same effect as if such designation were made by Party A. For purposes of the foregoing sentence, an Event of Default with respect to Party B shall be considered to be continuing, notwithstanding any payment by the Swap Insurer under the Swap Insurance Policy. Party A and Party B acknowledge that, except as the Swap Insurance Policy may be otherwise endorsed, unless (x) the Swap Insurer designates an Early Termination Date (as opposed to merely consenting to such designation by one of the parties) or (y) an Additional Termination Event specified in Part 5(ii)(a) or (b) has occurred, payments due from Party B because an Early Termination Date has been designated will not be insured. In any event, the parties acknowledge that pursuant to the Swap Insurance Policy that (i) the amount payable by the Swap Insurer in respect of payments due from Party B because an Early Termination Date has been designated by the Swap Insurer shall not be limited in amount, and (ii) the amount payable by the Swap Insurer in respect of payments due from Party B because an Early Termination Date has been designated by Party A shall not exceed the amount specified in the Swap Insurance Policy.

***(iv)*** ***Amendments.*** Section 8(b) of the Agreement is hereby amended by (A) adding the words "or any Credit Support Document" after the word "Agreement" in the first line thereof and (B) adding the phrase "and the Swap Insurer" following the words "parties" in the third line thereof.

***(v)*** ***Transfers/Assignments.*** Notwithstanding Section 7 of the Agreement, neither party may transfer, assign or delegate its rights or duties with respect to an Insured Rate Swap Transaction under the Agreement, unless it receives the prior written consent of the Swap Insurer; provided, however, that Party A may assign or delegates its rights and duties without the Swap Insurer's prior written consent to a party (a) that meets the definition of "Reference Market Maker" (other than the ratings requirement set forth therein) and that has long-term senior unsecured debt ratings at least in the single –A category from Moody's and S&P or the Credit Support Provider

of such party has claims paying ability ratings or financial strength ratings at least in the single – A category from Moody's and S&P and (b) that assumes the rights and duties of Party A pursuant to a master agreement that is substantially similar to this Agreement and in form and substance satisfactory to the Swap Insurer; and provided, further, that Party A may make such an assignment or delegation to an affiliate of Party A if Party A or its Credit Support Provider, provides a guarantee of the Insured Rate Swap Transaction that is acceptable in form and substance to the Swap Insurer.

*(vi)* *No Suspension of Payments.* Notwithstanding Section 2(a)(iii) of this Agreement, Party A shall not suspend any payments due under an Insured Rate Swap Transaction under Section 2(a)(iii) of the Agreement unless Party A has designated an Early Termination Date pursuant to the terms hereof.

*(vii)* *No Netting.* Notwithstanding Section 2(c) of this Agreement, in no event shall either Party A or Party B be entitled to net its payment obligations in respect of the Insured Rate Swap Transactions against the payment obligations of the other party in respect of other Transactions under this Agreement if such Transactions are not Insured Rate Swap Transactions, nor may either Party A or Party B net the payment obligations of the other party under Transactions that are not insured Rate Swap Transactions against the payment obligations of such party under Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under Insured Rate Swap Transactions be treated separate and apart from all other Transactions. Section 6(e) of this Agreement shall apply to all Insured Rate Swap Transactions with the same effect as if the Insured Rate Swap Transactions constituted a single master agreement, Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Rate Swap Transactions shall be determined without regard to any Transactions other than the Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under the Insured Rate Swap Transactions be treated separate and apart from all other Transactions unless otherwise agreed to in writing by the Swap Insurer.

*(viii)* *No Set-off for Counterclaim.* In no event shall either Party A or Party B be entitled to set-off its payment obligations in respect of an Insured Rate Swap Transaction against the payment obligations of the other party (whether by counterclaim or otherwise) under any other agreement(s) between Party A and Party B or instrument(s) or undertaking(s) issued or executed by one party to, or in favor of, the other party, if such obligations are not Insured Rate Swap Transactions, or net the payment obligations of the other party that are not with respect to Insured Rate Swap Transactions against the payment obligations of such party under Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under Insured Rate Swap Transactions be treated separate and apart from all other obligations. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Rate Swap Transaction shall be determined without regard to any obligation other than those under the insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under the Insured Rate Swap Transactions be treated separate and apart from all other obligations unless otherwise specified in such other obligation and agreed to in writing by the Swap Insurer.

*(ix)*  *Party A — Notice of Rating Downgrade, Suspension or Withdrawal.* Party A shall provide written notice to Party B and to the Swap Insurer of any downgrade, withdrawal or suspension of Party A's long-term senior unsecured debt rating, within 15 Business Days of the occurrence of such event. Failure of Party A to provide such notice shall not constitute an Event of Default under this Agreement.

*(x)*  *Representations and Agreements.* Each party agrees that each of its representations and agreements in this Agreement is expressly made to and for the benefit of the Swap Insurer.

*(xi)*  *Third-party Beneficiary.* Party A and Party B hereby each acknowledge and agree that the Swap Insurer shall be an express third-party beneficiary (and not merely an incidental third-party beneficiary) of this Agreement and of the obligations of each such party under any Insured Rate Swap Transaction, and as such, entitled to enforce the Agreement and the terms of any such Insured Rate Swap Transaction against such party on its own behalf and otherwise shall be afforded all remedies available hereunder or otherwise afforded by law against the parties hereto to redress any damage or loss incurred by the Swap Insurer including, but not limited to, fees (including professional fees), costs and expenses incurred by the Swap Insurer which are related to, or resulting from any breach by such party of its obligations hereunder.

*(xii)*  *Policy Coverage.* Party A and Party B hereby acknowledge and agree that the Swap Insurer's obligation with respect to Insured Rate Swap Transactions shall be limited to the terms of the Swap Insurance Policy. Notwithstanding Section 2(d) or any other provision of this Agreement, the Swap Insurer shall not have any obligation to pay interest on any amount payable by Party B under this Agreement.

*(xiii)*  *Subrogation.* Party A and Party B hereby acknowledge that to the extent of payments made by the Swap Insurer to Party A under the Swap Insurance Policy, the Swap Insurer shall be fully subrogated to the rights of Party A against Party B under the Insured Rate Swap Transaction to which such payments relate, including, but not limited to, the right to receive payment from Party B and the enforcement of any remedies. Party A hereby agrees to assign to the Swap Insurer its right to receive payment from Party B under any Insured Rate Swap Transaction to the extent of any payment thereunder by the Swap Insurer to Party A. Party B hereby acknowledges and consents to the assignment by Party A to the Swap Insurer of any rights and remedies that Party A has under any Insured Rate Swap Transaction or any other document executed in connection herewith.

*(xiv)*  *Isolation of insured Rate Swap Transactions in Designating an Early Termination Date.*

(a)  Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of non-Swap Insurer Insured Rate Swap Transactions by Party A or Party B shall not apply to any Insured Rate Swap Transactions under this Agreement, unless expressly provided in such designation and agreed to in writing by the Swap Insurer.

(b)  Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of the Insured Rate Swap Transactions by the Swap Insurer or by Party A or Party B shall apply only to the Insured Rate Swap Transactions and not to any other

Transaction under this Agreement, unless expressly provided in such designation and agreed to in writing by the Swap Insurer. Nothing contained in this Part 5(xiv) shall affect the rights of Party A under this Agreement to designate an Early Termination Date in respect of any Transaction that is not an Insured Rate Swap Transaction, which designation shall not apply to the Insured Rate Swap Transactions.

*(xv)* *Expenses.* Party B agrees to reimburse the Swap Insurer immediately and unconditionally upon demand for all reasonable expenses incurred by the Swap Insurer in connection with the issuance of the Swap Insurance Policy and the enforcement by the Swap Insurer of Party B's obligations under this Agreement and any other documents executed in connection with the execution and delivery of this Agreement, including, but not limited to, fees (including professional fees), costs and expenses incurred by the Swap Insurer which are related to, or resulting from, any breach by Party B of its obligations hereunder.

*(xvi)* *Notices.* A copy of each notice or other communication between the parties with respect to this Agreement must be forwarded to the Swap Insurer by the party distributing such notice or other communication and any such notice or other communication shall not be effective as to the parties hereto until it has been received by the Swap Insurer.

*(xvii)* *Reference Market-makers.* The definition of "Reference Market-makers" set forth in Section 12 of the Agreement shall be amended in its entirety to read as follows:

"Reference Market-makers" means four (4) leading dealers in the relevant swap market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time of deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among dealers having an office in the same metropolitan area. The rating classification assigned to any outstanding long-term senior debt securities of such dealers shall be at least (1) "A1" or higher as determined by Moody's, (2) "A+" or higher as determined by S&P or if not rated by one of S&P or Moody's, (3) an equivalent investment grade rating determined by a nationally-recognized rating service acceptable to both parties, provided, however, that in any case, if Market Quotations cannot be determined by four (4) such dealers, the party making the determination of the Market Quotation may designate, with the consent of the other party and the Swap Insurer, one (1) or more leading dealers whose long-term senior debt bears a lower investment grade rating or the parties may agree, with the consent of the Swap Insurer, to use fewer than four (4) leading dealers.

*(xviii)* *Party A Delivery of Legal Opinion.* Party A will be required to deliver a legal opinion with respect to its power and authority to enter into the Agreement and to the enforceability of the Agreement, satisfactory in form and substance to the Swap Insurer, with the Swap Insurer as an addressee.

*(xix)* *Additional Representations of Party B.* Party B hereby further represents to Party A (which representations will be deemed to be repeated by Party B at all times until the termination of this Agreement) that:

(i)     This Agreement has been, and each Transaction hereunder will be (and, if applicable, has been), entered into for the purposes of managing its borrowings and not for purposes of speculation.

(ii)    Party B has taken all steps necessary or advisable to create the security and source of payment for Party B's obligations hereunder described in Section 3(g) of the Agreement.

(iii)   Any Transaction entered into pursuant to this Agreement together with any transactions that Party B has or may enter into with Party A and/or with any or all other parties does not and will not violate or exceed any limits or restrictions contained in any authorizations, approvals or resolutions of the board of directors, shareholders or other authorized body of Party B.

(iv)    The execution and delivery by Party B of this Agreement, each Confirmation and any other documentation relating hereto, and the performance of Party B of its obligations hereunder and thereunder, are in furtherance, and not in violation, of the municipal purposes for which Party B is organized pursuant to the laws of the State of Michigan.

(v)     This Agreement and each Transaction hereunder do not constitute any kind of investment by Party B that is proscribed by any constitution, charter, law, rule, regulation, government code, constituent or governing instrument, resolution, guideline, ordinance, order, writ, judgment, decree, charge, or ruling to which Party B (or any of its officials in their respective capacities as such) or its property is subject.

*(xx)*    *Optional Early Termination.*  Party A shall have the right to terminate one or more Transactions hereunder, either in whole or in part, on any Business Day; *provided* that no Event of Default or Termination Event is then occurring with respect to which Party A is the Defaulting Party or sole Affected Party, by providing at least five (5) Business Days' prior written notice to Party B of its election to terminate and its designation of the effective date of termination (the "Party A Optional Early Termination Date"). On the Party A Optional Early Termination Date, Party A shall determine the amount payable in connection with such termination as the greater of (i) zero and (ii) the amount calculated in accordance with Section 6(e) of the Agreement, as if (A) the Party A Optional Early Termination Date were the Early Termination Date with respect to the terminated Transaction(s) or portion thereof, (B) the terminated Transaction(s) were the sole Affected Transaction(s), (C) Party B were the sole Affected Party and (D) Second Method and Loss applied. For the avoidance of doubt, in no event will Party B owe any amount to Party A in connection with an election by Party A to exercise its option under this Part 5(xx), other than any Unpaid Amounts.

[Intentionally left blank. Signature page follows.]

Please confirm your agreement to the terms of the foregoing Schedule by signing below.

**UBS AG**

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

By: _Marie-Anne Clarke_
Name: Marie-Anne Clarke
Title: Executive Director and Counsel
        Region Americas Legal
Date: June 26, 2009
        Fixed Income Section

By: _____
Name: Norman L. White
Title: President
Date: June 26, 2009

By: _____
Name:
Title:
Date: June 26, 2009   James B. Fuqua
        Managing Director and Counsel
        Region Americas Legal

Please confirm your agreement to the terms of the foregoing Schedule by signing below.

**UBS AG**

By:_____
    Name:
    Title:
    Date:

By:_____
    Name:
    Title:
    Date:

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

By:_____
    Name:
    Title:
    Date:

SCHEDULE OF OPINIONS

| Lewis & Munday,<br>a Professional Corporation | <ul><li>The Settlement Transaction will not cause the City to violate or exceed any applicable debt limit or constitute or create any "indebtedness" of the City within the meaning of any limitation of the Home Rule City Act (Act 279 of the Public Acts of Michigan of 1909, as amended) or any Michigan constitutional or other non-tax statutory or City Charter limitation,</li><li>the Authorizing Ordinance was duly adopted in accordance with state law and City Charter requirements, is in effect as of the Closing Date, has not been amended, and is valid, binding, and enforceable (subject, in each case, to bankruptcy and other customary exceptions),</li><li>the City Pledge, including the lien of the City Pledge established pursuant to the Authorizing Ordinance, is valid, binding and enforceable and the Service Corporation Pledge is valid, binding, enforceable and perfected (subject, in each case, to bankruptcy and other customary exceptions),</li><li>the definitive agreements entered into in connection with the Settlement Transaction are valid, binding and enforceable (subject, in each case, to bankruptcy and other customary exceptions),</li><li>the pledge and use of Pledged Property as contemplated in the Settlement Transaction will constitute authorized purposes under the Wagering Tax Revenue Statute (including, if applicable at the time, any regulation or ordinance, other than the Authorizing Ordinance, relating thereto), the Authorizing Ordinance and Section 18-14-1 et seq. of the Detroit City Code,</li><li>the pledge and use of the Pledged Property as contemplated by the Settlement Transaction does not and shall not "supplant existing...local expenditures" as prohibited by Section 12(14) of the Wagering Tax Revenue Statute,</li><li>the Settlement Transaction and any other transactions to be consummated in connection therewith are not subject to approval by vote of the electors of the City and are not subject to any right of referendum by City electors; and</li></ul> |
| --- | --- |

| | |
|---|---|
| | • any actions taken by the City Council, in connection with the Settlement Transaction, by resolution, in lieu of ordinance, are fully valid, binding and enforceable against the City, notwithstanding that such actions were taken by resolution instead of by ordinance (subject, in each case, to bankruptcy and other customary exceptions). |
| Orrick, Herrington & Sutcliffe LLP | The Wagering Tax Property constitute "special revenues" as defined in Bankruptcy Code §902(2) with respect to any case under Chapter 9 of the Bankruptcy Code in which the City or a Service Corporation is the debtor (subject to assumptions, qualifications, and limitations as are customary for bankruptcy opinions). |
| Special tax counsel to the City | Consummation of the Settlement Transaction (including any amendments of the Service Contracts in connection therewith) will not result in (i) the 2006 Funding Trust being treated as other than a grantor trust under Subpart E, Part I of Subchapter J of the Internal Revenue Code of 1986, as amended, (ii) the Service Charges and Regular Scheduled Payments failing to constitute payments in respect of indebtedness for U.S. federal income tax purposes, or (iii) otherwise any modifications, adverse to the City, the Service Corporations, the holders of the 2006 Pension Funding Securities or the Counterparties, to the conclusions reached in the tax opinions given in connection with the outstanding transactions. |
| City Corporation Counsel | Relying upon certifications of the City Clerk, the City Charter and any amendments thereto were duly approved by a majority of the City electors voting thereon and the City Charter and any such amendments have not been rescinded in whole or in part as of the Closing Date (subject to bankruptcy and other customary exceptions). |

Capitalized terms used but not otherwise defined in this Exhibit A shall have the meanings ascribed to them in them in the Collateral Agreement.