# EXHIBIT 5

09 CIV 4583

POLICE AND FIRE RETIREMENT SYSTEM OF
THE CITY OF DETROIT,  Individually And On
Behalf Of All Others Similarly Situated,

Plaintiff,

vs.

INDYMAC MBS, INC., RESIDENTIAL ASSET
SECURITIZATION TRUST 2006-A5CB;
INDYMAC INDX MORTGAGE LOAN TRUST
2006-AR9; INDYMAC INDX MORTGAGE LOAN
TRUST 2006-AR11; INDYMAC INDX
MORTGAGE LOAN TRUST 2006-AR6;
RESIDENTIAL ASSET SECURITIZATION
TRUST 2006-A6; RESIDENTIAL ASSET
SECURITIZATION TRUST 2006-A7CB;
INDYMAC INDX MORTGAGE LOAN TRUST
2006-AR13; INDYMAC INDB MORTGAGE LOAN
TRUST 2006-1; INDYMAC HOME EQUITY
MORTGAGE LOAN ASSET-BACKED TRUST,
SERIES 2006-H2; INDYMAC INDX MORTGAGE
LOAN TRUST 2006-AR21; RESIDENTIAL ASSET
SECURITIZATION TRUST 2006-A8; INDYMAC
INDX MORTGAGE LOAN TRUST 2006-AR19;
INDYMAC INDA MORTGAGE LOAN TRUST
2006-AR1; INDYMAC INDX MORTGAGE LOAN
TRUST 2006-AR23; RESIDENTIAL ASSET
SECURITIZATION TRUST 2006-A10; INDYMAC
INDX MORTGAGE LOAN TRUST 2006-AR12;
INDYMAC INDX MORTGAGE LOAN TRUST
2006-AR25; INDYMAC INDX MORTGAGE
LOAN TRUST 2006-R1; RESIDENTIAL ASSET
SECURITIZATION TRUST 2006-A11; INDYMAC
INDA MORTGAGE LOAN TRUST 2006-AR2;
INDYMAC INDX MORTGAGE LOAN TRUST
2006-AR27; INDYMAC HOME EQUITY
MORTGAGE LOAN ASSET-BACKED TRUST,
SERIES 2006-H3; RESIDENTIAL ASSET
SECURITIZATION TRUST 2006-A12; INDYMAC
INDX MORTGAGE LOAN TRUST 2006-AR29;
INDYMAC INDX MORTGAGE LOAN TRUST
2006-AR31; INDYMAC INDX MORTGAGE
LOAN TRUST 2006-FLX1; RESIDENTIAL ASSET

Civil Action:

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

RECEIVED
MAY 14 2009
U.S.
D. N.Y.
CASHIERS

SECURITIZATION TRUST 2006-A13;
RESIDENTIAL ASSET SECURITIZATION
TRUST 2006-R2; INDYMAC INDA MORTGAGE
LOAN TRUST 2006-AR3; INDYMAC INDX
MORTGAGE LOAN TRUST 2006-AR14 (AND 5
ADDITIONAL GRANTOR TRUSTS FOR THE
CLASS 1-A1A, CLASS 1-A2A, CLASS 1-A3A,
CLASS 1-A3B AND CLASS 1-A4A
CERTIFICATES, TO BE ESTABLISHED BY THE
DEPOSITOR, INDYMAC MBS, INC.);
RESIDENTIAL ASSET SECURITIZATION
TRUST 2006-A14CB; INDYMAC INDX
MORTGAGE LOAN TRUST 2006-AR33;
RESIDENTIAL ASSET SECURITIZATION
TRUST 2006-A15; INDYMAC INDX MORTGAGE
LOAN TRUST 2006-AR35; INDYMAC INDX
MORTGAGE LOAN TRUST 2006-AR37;
RESIDENTIAL ASSET SECURITIZATION
TRUST 2006-A16; INDYMAC INDX MORTGAGE
LOAN TRUST 2006-AR41; INDYMAC INDX
MORTGAGE LOAN TRUST 2006-AR39;
RESIDENTIAL ASSET SECURITIZATION
TRUST; INDYMAC INDX MORTGAGE LOAN
TRUST; INDYMAC INDA MORTGAGE LOAN
TRUST 2007-AR1; RESIDENTIAL ASSET
SECURITIZATION TRUST 2007-A1; INDYMAC
INDX MORTGAGE LOAN TRUST 2007-FLX1;
RESIDENTIAL ASSET SECURITIZATION
TRUST 2007-A2; INDYMAC INDX MORTGAGE
LOAN TRUST 2007-AR1; INDYMAC INDX
MORTGAGE LOAN TRUST 2007-FLX2;
RESIDENTIAL ASSET SECURITIZATION
TRUST 2007-A3; INDYMAC INDA MORTGAGE
LOAN TRUST; INDYMAC INDX MORTGAGE
LOAN TRUST 2007-AR5; RESIDENTIAL ASSET
SECURITIZATION TRUST 2007-A5; INDYMAC
INDX MORTGAGE LOAN TRUST 2007-AR7;
INDYMAC INDX MORTGAGE LOAN TRUST
2007-AR9; INDYMAC INDA MORTGAGE LOAN
TRUST 2007-AR2; INDYMAC INDX MORTGAGE
LOAN TRUST 2007-FLX3; INDYMAC INDX
MORTGAGE LOAN TRUST 2007-AR11;
RESIDENTIAL ASSET SECURITIZATION
TRUST 2007-A6; INDYMAC IMSC MORTGAGE
LOAN TRUST 2007-F1; RESIDENTIAL ASSET
SECURITIZATION TRUST 2007-A7; INDYMAC

INDX MORTGAGE LOAN TRUST 2007-AR13;
INDYMAC INDA MORTGAGE LOAN TRUST
2007-AR3; INDYMAC INDX MORTGAGE LOAN
TRUST 2007-FLX4; INDYMAC IMJA
MORTGAGE LOAN TRUST 2007-A1; INDYMAC
IMJA MORTGAGE LOAN TRUST 2007-A2; JOHN
OLINSKI; S. BLAIR ABERNATHY; RAPHAEL
BOSTIC; SAMIR GROVER; SIMON HEYRICK;
VICTOR H. WOODWORTH; BANC OF AMERICA
SECURITIES LLC; J.P. MORGAN SECURITIES
INC. *as successor-in-interest to* BEAR, STEARNS &
CO. INC.; CITIGROUP GLOBAL MARKETS INC.;
COUNTRYWIDE SECURITIES CORPORATION;
CREDIT SUISSE SECURITIES (USA) LLC;
DEUTSCHE BANK SECURITIES INC.;
DEUTSCHE BANK NATIONAL TRUST
COMPANY; GOLDMAN, SACHS & CO.;
GREENWICH CAPITAL MARKETS, INC.; HSBC
SECURITIES (USA) INC.; INDYMAC
SECURITIES CORPORATION; J.P. MORGAN
SECURITIES INC.; LEHMAN BROTHERS INC.;
BANK OF AMERICA CORPORATION *as
successor-in-interest to* MERRILL LYNCH,
PIERCE, FENNER & SMITH INC.; MORGAN
STANLEY & CO. INC.; UBS SECURITIES LLC.,
MOODY'S INVESTOR SERVICES, INC.; THE
MCGRAW-HILL COMPANIES and, FITCH
RATINGS,

Defendants.

## CLASS ACTION COMPLAINT FOR VIOLATIONS
## OF THE FEDERAL SECURITIES LAWS

Plaintiff, individually and on behalf of all others similarly situated (the "Class"), by Plaintiff's undersigned attorneys, makes the following allegations on information and belief based upon the investigation of counsel, except as to the allegations pertaining specifically to Plaintiff and Plaintiff's counsel, which are based on personal knowledge. The investigation conducted by Plaintiff's counsel included, *inter alia*, a review and analysis of: (i) publicly-available news articles and reports; (ii) public filings including, but not limited to, IndyMac MBS, Inc.'s ("IndyMac" or the "Company") Securities and Exchange Commission ("SEC") filings and prospectuses; (iii) securities analysts' reports and advisories about the Company; and (iv) press releases issued by Defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF ACTION

1.      This action arises under Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l and 77o, which imposes liability on a company's directors, officers and underwriters, among others, for failure to draft a registration statement that fully and accurately informs investors of all material facts and industry trends affecting the issuer company. Here, the registration statements did not disclose IndyMac's failure to abide by its underwriting standards. The issuer itself is held strictly liable for any material misrepresentations or omissions found in its registration Statements and prospectuses. Additionally, every person in a position of control over the issuer is held liable.

2.      This action is prosecuted on behalf of purchasers of mortgage pass-through certificates ("Certificates") that were issued by the IndyMac Trusts (collectively, the "Offerings").

3. The IndyMac Trusts issued the Certificates pursuant to or traceable to a registration statement filed by IndyMac with the SEC on form S-3 on February 24, 2006 (as amended on March 29, 2006 and April 13, 2006), collectively, the "Registration Statement").

4. Annexed to the Registration Statement was a Prospectus. The Prospectus was amended from time to time ("Supplemental Prospectuses") whenever the IndyMac trusts issued a new series of Certificates that were traceable the Registration Statement.

5. Where appropriate, the Registration Statement, the Prospectus, and Supplemental Prospectuses will be referred to as the "Offering Materials".

6. These claims are brought against IndyMac, the IndyMac Trusts, the signatories to the Registration Statements, and the underwriters of the Offerings, (collectively, "Defendants").

7. This action arises from Defendants' sale of mortgage pass-through certificates, issued pursuant to the Offering Materials, which negligently omitted material information.

8. The Offering Materials explained the structure of the IndyMac Trusts and provided a description of the Certificates. The Offering Materials further explained the structure of the IndyMac Trusts and provided a description of the Certificates.

9. The Offering Materials state that the Company intended to sell $40 billion in mortgage pass-through Certificates through a yet-to-be-determined number of individual entities created solely to issue the Certificates (the "IndyMac Trusts"). The Certificates would be issued pursuant to the Offering Materials and each series of Certificate was floated pursuant to a Supplemental Prospectus that referred back the Registration Statement.

10. Each Prospectus Supplement included a detailed description of the particular IndyMac Trust and its respective Certificates.

2

11.     This Complaint asserts that the Offering Materials contained both material misstatements and omissions, which Plaintiff and the Class relied upon to their detriment. The Offering Materials negligently omitted certain information because IndyMac was suffering from several adverse factors that were not revealed, or adequately disclosed in the Offering Materials. These factors include, but are not limited to, (i) the failure to disclose the Company's actual underwriting practices; (ii) the retention of biased appraisers that delivered appraisals in excess of the actual property value, which in turn distorted the reported loan-to-value ratio; and (iii) the failure to prevent and remedy such improper and harmful actions that resulted in the decline in the Certificates' value.

12.     The Underwriters were obligated to conduct meaningful due diligence to ensure that the Offering Materials contained no material misstatements or omissions, including the stated manner in which the mortgages had been originated. The Underwriters received massive fees for their work in connection with the Offerings. Based on, *inter alia*, the Underwriters' alleged due diligence and the representations in the Offering Materials relating to the underwriting of the Certificate collateral, rating agencies such as Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's ("S&P"), and Fitch Ratings ("Fitch") (collectively, the "Underwriter Ratings Agencies" and are included in the term "Underwriter Defendants") assigned the Certificates among the highest ratings applicable to such debt issues.

13.     Following the issuance of the Certificates, disclosures began to emerge revealing that IndyMac routinely disregarded the underwriting guidelines in its mortgage loan origination. These disclosures were confirmed by substantially higher rates of delinquencies and foreclosures on collateral for such highly-rated debt issues. These disclosures, and the poor performance of the collateral, caused the Underwriter Rating Agencies to review and revise the ratings assigned

3

to the Certificates due to the fact that the true nature of the collateral had not been properly assessed at the time of the Offerings. The Underwriter Rating Agencies downgraded the Certificates causing a substantial decline in the value of the Certificates. Plaintiff's investment has suffered losses as a result.

14.     The Defendants could have – and should have – discovered the material misstatements and omissions in the Offerings Documents prior to its filing them with the SEC, and its distribution to the investing public. Defendants, instead, failed to do so as a result of a negligent and grossly inadequate due diligence investigation.

15.     Plaintiff and the Class have suffered serious financial damage as a result of Defendants' material misstatements and omissions in the Offerings Documents, and bring this action to recover damages incurred thereby as well as the costs and expenses of this litigation and any further relief as may be just and proper.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l and 77o.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a).

18.     Venue is proper in this Judicial District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and 28 U.S.C. § 1391(b), because many of the alleged acts, transactions, and conduct constituting violations of law, including the issuance and dissemination of materially false and misleading information to the investing public, occurred, at least in part, in this District. Additionally, Defendants reside, maintain their headquarters or conduct substantial business in this District.

4

19. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

20. Plaintiff Police and Fire Retirement System of the City of Detroit purchased the Certificates issued pursuant to the Offerings, as shown on the attached Certification, and was damaged thereby.

### IndyMac Bank

21. IndyMac Bank, F.S.B. ("IndyMac Bank") was the sponsor of the IndyMac Trusts. IndyMac is a federal savings bank located at 888 East Walnut Street, Pasadena, California 91101. IndyMac Bank is not named as a defendant herein because it filed for Chapter 7 bankruptcy protection on August 2, 2008.

### The Company Defendant

22. IndyMac MBS, Inc. ("IndyMac") was the Depositor of the IndyMac Trusts. IndyMac is a Delaware corporation and a limited purpose finance subsidiary of IndyMac Bank, F.S.B. It is located at 155 North Lake Avenue, Pasadena, California 91101.

### The Trust Defendants

23. Defendant Deutsche Bank National Trust Company ("Deutsche Bank Trust") was the trustee for the IndyMac Trusts issued pursuant to the Registration Statements. It is located at 1761 East St. Andrew Place, Santa Ana, California 92705.

24. Defendants, the IndyMac Trusts, were created and structured by IndyMac to issue billions of dollars worth of Certificates pursuant to the Offerings Documents. The trusts are common law trusts formed under the laws of the state of New York. The following chart

5

identifies the IndyMac Trusts and states: (1) the date of the Prospectus Supplement; (2) the Underwriters of the deal; and (3) the stated value of the Certificates issued.

| IndyMac Trust | Date | Underwriters | Stated Value |
|---|---|---|---|
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A5CB | 4/25/2006 | Lehman Brothers Inc./Goldman, Sachs & Co. | $446,643,993 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR9 | 4/27/2006 | Deutsche Bank Securities Inc. | $680,619,100 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR11 | 4/27/2006 | Bear, Stearns & Co. Inc. | $860,883,100 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR6 | 4/27/2006 | Greenwich Capital Markets, Inc. | $1,856,334,000 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A6 | 5/30/2006 | HSBC Securities (USA) Inc. | $395,667,541 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A7CB | 5/30/2006 | Deutsche Bank Securities Inc./ Lehman Brothers Inc. | $444,574,597 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR13 | 5/30/2006 | Deutsche Bank Securities Inc. | $393,668,812 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A7CB | 6/12/2006 | Deutsche Bank Securities Inc./ Lehman Brothers Inc. | $444,574,597 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A6 | 5/30/2006 | HSBC Securities (USA) Inc. | $395,667,541 |
| INDYMAC INDB MORTGAGE LOAN TRUST 2006-1 | 6/22/2006 | Goldman, Sachs & Co. | $382,579,000 |
| INDYMAC HOME EQUITY MORTGAGE LOAN ASSET-BACKED TRUST, SERIES 2006-H2 | 6/26/2006 | Lehman Brothers Inc./Bear, Stearns & Co. Inc./UBS Securities LLC/ IndyMac Securities Corporation | $486,654,000 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR21 | 6/27/2006 | Deutsche Bank Securities Inc. | $256,243,100 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A8 | 6/28/2006 | Credit Suisse Securities (USA) LLC/Lehman | $632,676,943 |

6

| IndyMac Trust | Date | Underwriters | Stated Value |
|---|---|---|---|
| | | Brothers Inc. | |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR19 | 6/29/2006 | Merrill Lynch, Pierce, Fenner & Smith Inc./IndyMac Securities Corporation | $1,078,198,100 |
| INDYMAC INDA MORTGAGE LOAN TRUST 2006-AR1 | 6/28/2006 | Deutsche Bank Securities Inc. | $198,613,100 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR23 | 7/25/2006 | Deutsche Bank Securities Inc. | $195,628,100 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A10 | 7/27/2006 | Goldman, Sachs & Co. | $248,503,651 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR12 | 7/27/2006 | Merrill Lynch, Pierce, Fenner & Smith Inc. | $304,376,000 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR25 | 7/27/2006 | Morgan Stanley & Co. Inc. | $1,213,813,100 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-R1 | 7/28/2006 | Credit Suisse First Boston LLC | $247,006,126 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR19 | 8/2/2006 | Merrill Lynch, Pierce, Fenner & Smith Inc./IndyMac Securities Corporation | $1,078,198,100 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A11 | 8/29/2006 | Credit Suisse Securities (USA) LLC/UBS Securities LLC | $322,473,374 |
| INDYMAC INDA MORTGAGE LOAN TRUST 2006-AR2 | 8/29/2006 | Credit Suisse Securities (USA) LLC | $494,399,100 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR27 | 8/29/2006 | Deutsche Bank Securities Inc. | $957,606,100 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A10 | 9/22/2006 | Goldman, Sachs & Co. | $248,503,651 |

7

| IndyMac Trust | Date | Underwriters | Stated Value |
|---|---|---|---|
| INDYMAC HOME EQUITY MORTGAGE LOAN ASSET-BACKED TRUST, SERIES 2006-H3 | 9/27/2006 | Lehman Brothers Inc./Bear, Stearns & Co. Inc./Goldman, Sachs & Co./Credit Suisse Securities (USA) LLC/IndyMac Securities Corporation | $496,786,000 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A12 | 9/27/2006 | Bear, Stearns & Co. Inc./UBS Securities LLC/Lehman Brothers Inc. | $367,716,400 |
| IndyMac INDX MORTGAGE LOAN TRUST 2006-AR29 | 9/28/2006 | J.P. Morgan Securities Inc. | $827,274,100 |
| IndyMac INDX MORTGAGE LOAN TRUST 2006-AR31 | 9/27/2006 | Merrill Lynch, Pierce, Fenner & Smith Inc. | $296,217,100 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-FLX1 | 9/27/2006 | Deutsche Bank Securities Inc. | $352,225,100 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR31 | 10/16/2006 | Merrill Lynch, Pierce, Fenner & Smith Inc. | $296,217,100 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR27 | 10/25/2006 | Deutsche Bank Securities Inc. | $957,606,100 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A13 | 10/26/2006 | Citigroup Global Markets Inc./UBS Securities LLC/ Lehman Brothers Inc. | $395,268,634 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-R2 | 10/30/2006 | Morgan Stanley & Co. Inc. | $187,059,513 |
| INDYMAC INDA MORTGAGE LOAN TRUST 2006-AR3 | 10/30/2006 | Goldman, Sachs & Co. | $351,738,100 |

| IndyMac Trust | Date | Underwriters | Stated Value |
|---|---|---|---|
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR14 (and 5 additional grantor trusts for the the Class 1-A1A, Class 1-A2A, Class 1-A3A, Class 1-A3B and Class 1-A4A Certificates, to be established by the depositor, INDYMAC MBS, INC.) | 10/30/2006 | Lehman Brothers Inc. | $1,097,063,000 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A14CB | 11/2/2006 | Greenwich Capital Markets, Inc. | $360,282,735 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR33 | 11/28/2006 | Credit Suisse Securities (USA) LLC | $511,242,100 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A15 | 11/28/2006 | Countrywide Securities Corporation/UBS Securities LLC | $470,624,488 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR35 | 11/29/2006 | Greenwich Capital Markets, Inc. | $1,057,392,100 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR37 | 12/27/2006 | Credit Suisse Securities (USA) LLC | $358,634,100 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A16 | 12/27/2006 | Lehman Brothers Inc./Goldman, Sachs & Co. | $664,784,022 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR41 | 12/28/2006 | Credit Suisse Securities (USA) LLC | $444,228,100 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR39 | 12/28/2006 | Banc of America Securities LLC | $691,487,100 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A16 | 1/10/2007 | Lehman Brothers Inc./Goldman, Sachs & Co. | $664,784,022 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2006-FLX1 | 1/12/2007 | Deutsche Bank Securities Inc. | $352,225,100 |
| INDYMAC INDA MORTGAGE LOAN TRUST 2007-AR1 | 1/29/2007 | Credit Suisse Securities (USA) LLC | $458,961,100 |

9

| IndyMac Trust | Date | Underwriters | Stated Value |
|---|---|---|---|
| RESIDENTIAL ASSET SECURITIZATION TRUST 2007-A1 | 1/30/2007 | HSBC Securities (USA) Inc./Deutsche Bank Securities Inc. | $380,779,045 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2007-FLX1 | 1/30/2007 | Goldman, Sachs & Co. | $398,989,300 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A14CB | 2/20/2007 | Greenwich Capital Markets, Inc. | $360,282,735 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2007-A2 | 2/27/2007 | HSBC Securities (USA) Inc. | $673,531,813 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2007-AR1 | 2/27/2007 | Citigroup Global Markets Inc. | $700,665,100 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2007-FLX2 | 2/27/2007 | Merrill Lynch, Pierce, Fenner & Smith Inc. | $344,400,100 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2007-A3 | 2/27/2007 | Lehman Brothers Inc. | $366,188,961 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2007-AR5 | 3/29/2007 | Credit Suisse Securities (USA) LLC | $1,248,775,100 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2007-A5 | 3/29/2007 | Citigroup Global Markets, Inc./UBS Securities LLC | $790,635,415 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2007-AR7 | 4/26/2007 | Citigroup Global Markets Inc. | $501,138,100 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2007-AR9 | 4/26/2007 | Credit Suisse Securities (USA) LLC | $412,730,100 |
| INDYMAC INDA MORTGAGE LOAN TRUST 2007-AR2 | 4/26/2007 | Morgan Stanley & Co. Inc. | $237,504,100 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2007-FLX3 | 4/27/2007 | Credit Suisse Securities (USA) LLC | $401,225,100 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2007-AR11 | 4/26/2007 | HSBC Securities (USA) Inc. | $271,232,100 |

| IndyMac Trust | Date | Underwriters | Stated Value |
|---|---|---|---|
| RESIDENTIAL ASSET SECURITIZATION TRUST 2007-A6 | 4/27/2007 | HSBC Securities (USA) Inc. | $501,532,009 |
| INDYMAC IMSC MORTGAGE LOAN TRUST 2007-F1 | 5/29/2007 | Credit Suisse Securities (USA) LLC | $274,865,070 |
| INDYMAC IMSC MORTGAGE LOAN TRUST 2007-F1 | 6/1/2007 | Credit Suisse Securities (USA) LLC | $274,865,070 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2007-A7 | 5/30/2007 | Merrill Lynch, Pierce, Fenner & Smith Inc./HSBC Securities (USA) Inc. | $446,734,942 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2007-AR13 | 5/30/2007 | HSBC Securities (USA) Inc. | $525,736,100 |
| INDYMAC INDA MORTGAGE LOAN TRUST 2007-AR3 | 5/30/2007 | Merrill Lynch, Pierce, Fenner & Smith Inc. | $315,775,000 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2007-FLX4 | 5/30/2007 | Merrill Lynch, Pierce, Fenner & Smith Inc. | $507,020,100 |
| INDYMAC IMSC MORTGAGE LOAN TRUST 2007-F1 | 6/11/2007 | Credit Suisse Securities (USA) LLC | $274,865,070 |
| INDYMAC INDX MORTGAGE LOAN TRUST 2007-FLX2 | 6/13/2007 | Merrill Lynch, Pierce, Fenner & Smith Inc. | $344,400,100 |
| INDYMAC IMJA MORTGAGE LOAN TRUST 2007-A1 | 6/28/2007 | UBS Securities LLC/HSBC Securities (USA) Inc. | $260,408,578 |
| INDYMAC IMJA MORTGAGE LOAN TRUST 2007-A2 | 8/30/2007 | Credit Suisse Securities (USA) LLC | $373,251,009 |
| RESIDENTIAL ASSET SECURITIZATION TRUST 2007-A5 | 9/11/2007 | Citigroup Global Markets, Inc./UBS Securities LLC | $790,635,415 |

| IndyMac Trust | Date | Underwriters | Stated Value |
|---|---|---|---|
| INDYMAC INDA MORTGAGE LOAN TRUST 2006-AR3 | 3/24/2008 | Goldman Sachs & Co. | N/A (it was $351,738,100 in original prospectus supplement) |

25.     The trusts with the prefix, "Residential Assets Securitization Trust" are referred to herein as "RAST", the trusts with the prefix, "IndyMac INDX Mortgage Loan Trust" are referred to herein as "INDX", the trusts with the prefix "IndyMac INDB Mortgage Loan Trust" are referred to herein as "INDB", the trusts with the prefix "IndyMac INDA Mortgage Loan Trust" are referred to herein as "INDA", the trusts with the prefix "IndyMac Home Equity Mortgage Loan Asset Backed Trust" are referred to herein as "HEMLABT", the trusts with the prefix "IndyMac IMSC Mortgage Loan Trust" are referred to herein as "IMSC" and the trusts with the prefix "IndyMac IMJA Mortgage Loan Trust" are referred to herein as "IMJA".

**Director and Officer Defendants**

26.     Defendant John Olinski ("Olinski") was the Chairman of the Board and Chief Executive Officer of the Company at the time the Company filed the Offerings Documents. Mr. Olinksi is a director responsible for issuing the Offerings Documents.

27.     Defendant S. Blair Abernathy ("Abernathy") was a Director and Executive Vice President of the Company at the time the Company filed the Offerings Documents. Mr. Abernathy is a director responsible for issuing the Offerings Documents.

28.     Defendant Raphael Bostic ("Bostic") was a Director of the Company at the time the Company filed the Offerings Documents. Mr. Bostic is a director responsible for issuing the Offerings Documents.

12

29.     Defendant Samir Grover ("Grover") was the Chief Financial Officer of the Company at the time the Company filed the Offerings Documents. Mr. Grover is an officer responsible for issuing the Offerings Documents.

30.     Defendant Simon Heyrick ("Heyrick") was the Chief Financial Officer of the Company at the time the Company filed the Offerings Documents. Mr. Heyrick is an officer responsible for issuing the Offerings Documents.

31.     Defendant Victor H. Woodworth ("Woodworth") was the Vice President and Assistant Secretary of the Company at the time the Company filed the Offerings Documents. Mr. Olinksi is a director responsible for issuing the Offerings Documents.

32.     Defendants Olinski, Abernathy, Bostic, Grover, Heyrick and Woodworth are collectively referred to hereinafter as the "Director and Officer Defendants."

**The Underwriter Defendants**

33.     Defendant Banc of America Securities LLC ("Banc of America") is an investment banking firm with its headquarters located at 100 North Tryon Street, 25th Floor, Charlotte, North Carolina 28255. Banc of America was an underwriter for the INDX 2006-AR39 Offering.

34.     Defendant JPMorgan Chase, Inc. ("JPMorgan") *as successor-in-interest to* Bear, Stearns & Co. Inc. ("Bear Stearns") was an underwriter for the INDX 2006-AR11, HEMLABT 2006-H2, HEMLABT 2006-H3 and RAST 2006-A12 Offerings. Bear Stearns was a wholly owned subsidiary of The Bear Stearns Companies, Inc. ("BSCI"). Pursuant to a Merger Agreement effective May 30, 2008, BSCI merged with BSC Merger Corporation, a wholly owned subsidiary of Defendant JPMorgan, upon which BSCI became a wholly owned subsidiary of JPMorgan.

35.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a subsidiary of Citigroup Inc., a Delaware corporation that is headquartered at 339 Park Avenue, New York,

13

New York 10043. Citigroup was an underwriter for the RAST 2006-A13, INDX 2007-AR1, RAST 2007-A5 and INDX 2007-AR7 Offerings.

36.     Defendant Countrywide Securities Corporation ("Countrywide") is an investment banking firm principally located at 4500 Park Granada, Calabasas, CA 91302-1613. Defendant Countrywide was an underwriter for the RAST 2006-A15 Offering.

37.     Defendant Credit Suisse Securities (USA) LLC, formerly Credit Suisse First Boston, LLC ("Credit Suisse"), is a corporation principally located at 11 Madison Avenue, 7th Floor, New York, New York 10010. Defendant Credit Suisse was an underwriter for the RAST 2006-A8, INDX 2006-R1, RAST 2006-A11, INDA 2006-AR2, HEMLABT 2006-H3, INDX 2006-AR33, INDX 2006-AR37, INDX 2006-AR41, INDA 2007-AR1, INDX 2007-AR5, INDX 2007-AR9, INDX 2007-FLX3, IMSC 2007-F1 and IMJA 2007-A2 Offerings.

38.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is an investment banking firm principally located at 60 Wall Street, New York, New York 10005. Defendant Deutsche Bank was an underwriter for the INDX 2006-AR9, RAST 2006-A7CB, INDX 2006-AR13, RAST 2006-A7CB, INDX 2006-AR21, INDA 2006-AR1, INDX 2006-AR23, INDX 2006-AR27, INDX 2006-FLX1, INDX 2006-AR27 and RAST 2007-A1 Offerings.

39.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") is an investment banking firm principally located at 85 Broad Street, New York, New York 10004. Defendant Goldman Sachs was an underwriter for the RAST 2006-A5CB, INDB 2006-1, RAST 2006-AR23, RAST 2006-A10, RAST 2006-A10, HEMLABT 2006-H3, INDA 2006-AR3, RAST 2006-A16, RAST 2006-A16 and INDX 2007-FLX1 Offerings.

40.     Defendant Greenwich Capital Markets, Inc. ("Greenwich") is a wholly owned subsidiary of Greenwich Capital Holdings, Inc. The Royal Bank of Scotland Group plc is the

14

45.     Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a subsidiary of Morgan Stanley, a Delaware corporation that is headquartered at 1585 Broadway, New York, New York 10036. Morgan Stanley was an underwriter for the INDX 2006-AR25, RAST 2006-R2 and INDA 2007-AR2 Offerings.

46.     Defendant UBS Securities LLC. ("UBS") is a subsidiary of UBS AG, a Swiss corporation headquartered at Bahnhofstrasse 45, Zurich, Switzerland, and Aeschenvorstadt 1, Basel, Switzerland. UBS is an investment banking firm principally located at 1285 Avenue of the Americas, 19th Floor, New York, New York 10019. UBS was an underwriter for the HEMLABT 2006-H2, RAST 2006-A11, RAST 2006-A12, RAST 2006-A13, RAST 2006-A15, RAST 2007-A5 and IMJA 2007-A1 Offerings.

47.     Defendants Banc of America, JPMorgan, Citigroup, Countrywide, Credit Suisse, Deutsche Bank, Goldman Sachs, Greenwich, HSBC, IndyMac, JPMorgan Securities, Lehman, Bank of America, Morgan Stanley and UBS are collectively referred to hereinafter as the "Underwriter Defendants."

48.     The Underwriter Defendants were obligated to conduct meaningful due diligence to ensure that the Offering Materials contained no material misstatements or omissions, including the stated manner in which the mortgages had been originated. The Underwriters received massive fees for their work in connection with the Offerings. Each was intimately involved in the aforementioned Offerings and failed to perform the requisite level of due diligence in connection with these Offerings. The Prospectus Supplements disseminated in connection with these Offerings contained material misstatements and omissions of material fact relating to the underwriting practices employed in originating the underlying subprime mortgage loans.

16

**The Underwriter Ratings Agency Defendants**

49.     Defendant Moody's Investors Services ("Moody's") is a credit rating agency with its principal offices located at 7 World Trade Center at 250 Greenwich Street, New York, New York 10007.     Moody's performs financial research and analysis for commercial and governmental entities and holds a 40 percent share of the world's credit ratings market.  As a condition to the issuance of the Certificates, Moody's purportedly analyzed each Offering to address the likelihood of the receipt of all distributions on the Certificates and assigned credit ratings for each tranche of the Offerings, which was integral in establishing pricing, interest rates and a market for the Certificates.  Moody's was an "Underwriter" of the Certificates within the meaning of the Securities Act.

50.     Defendant The McGraw-Hill Companies, Inc., through its business division Standard & Poor's Ratings Services ("S&P" shall refer to The McGraw-Hill Companies and its business division Standard & Poor's Ratings Services), is a credit rating agency with its headquarters located at 55 Water Street, New York, New York 10041.  S&P performs financial research and analysis for commercial and governmental entities and holds a 40 percent share of the world's credit ratings market. As a condition to the issuance of the Certificates, S&P purportedly analyzed each Offering to address the likelihood of the receipt of all distributions on the Certificates and assigned credit ratings for each tranche of the Offerings, which was integral in establishing pricing, interest rates and a market for the Certificates.   S&P was an "Underwriter" of the Certificates within the meaning of the Securities Act.

51.     Defendant Fitch Ratings ("Fitch) is a credit rating agency with its principal offices at One State Street Plaza, New York, New York 10004.  Fitch performs financial research and analysis for commercial and governmental entities and holds a 10 percent share of the world's

credit ratings market. As a condition to the issuance of the Certificates, S&P purportedly analyzed each Offering to address the likelihood of the receipt of all distributions on the Certificates and assigned credit ratings for each tranche of the Offerings, which was integral in establishing pricing, interest rates and a market for the Certificates. S&P was an "Underwriter" of the Certificates within the meaning of the Securities Act.

52.     As set forth above, Moody's, S&P and Fitch are collectively referred to herein as the "Underwriter Ratings Agencies" and are included in the term "Underwriter Defendants."

53.     The Company Defendant named in paragraph 22, the Trust Defendants named in paragraphs 23-24, each of the individuals named in paragraphs 26-32 and each of the defendants named in paragraphs 33-51 (the Underwriter Defendants) participated in the drafting, preparation, or approval of various false and misleading statements contained in the Offerings Documents, as complained of herein. Each of the Defendants was responsible for ensuring the truth and accuracy of the statements contained in the Offerings Documents.

54.     Each of the Defendants, owed to the purchasers, including Plaintiff and the Class (defined below), the duty to make a reasonable and diligent investigation of the statements contained in the Offerings Documents at the time they became effective. This duty included performing an appropriate investigation to ensure that the statements contained therein were true, and that there were no omissions of material fact required to be stated in order to make the statements contained in the Offerings Documents not misleading. As herein alleged, each of the Defendants violated these specific duties and obligations. As a result of these violations, the market price of the securities issued by the IndyMac Trusts was artificially inflated, causing injury to Plaintiff and the class.

18

ultimate parent company of Greenwich Capital Holdings, Inc. Greenwich is a US company and has its principal place of business at 600 Steamboat Road, Greenwich, CT 06830. Greenwich was an underwriter for the INDX 2006-AR6, RAST 2006-A14CB, INDX 2006-AR35 and RAST 2006-A14CB Offerings.

41. Defendant HSBC Securities (USA) Inc. ("HSBC") is an investment banking firm with its headquarters located at 452 Fifth Avenue, New York, New York 10018. Defendant HSBC was an underwriter for the RAST 2006-A6, RAST 2007-A1, RAST 2007-A2, INDX 2007-AR11, RAST 2007-A6, RAST 2007-A7, INDX 2007-AR13 and IMJA 2007-A1 Offerings.

42. Defendant IndyMac Securities Corporation ("IndyMac") is a corporation located at 888 E. Walnut Street, 4th Floor, Pasadena, CA 91101. Defendant IndyMac was an underwriter for the HEMLABT 2006-H2, INDX 2006-AR19, INDX 2006-AR19 and HEMLABT 2006-H3 Offerings.

43. Defendant J.P. Morgan Securities Inc. ("JPMorgan Securities") is an investment banking holding company incorporated in Delaware, and principally located at 270 Park Avenue, New York, New York 10017. Defendant JPMorgan Securities was an underwriter for the INDX 2006-AR29 Offering.

44. Defendant Bank of America Corporation ("Bank of America") *as successor-in-interest to* Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a Delaware corporation that is headquartered 100 North Tryon Street Charlotte, North Carolina 28255. Bank of America was an underwriter for the INDX 2006-AR19, INDX 2006-AR12, INDX 2006-AR19, INDX 2006-AR31, INDX 2006-AR31, INDX 2007-FLX2, RAST 2007-A7, INDA 2007-AR3 and INDX 2007-FLX4 Offerings.

45. Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a subsidiary of Morgan Stanley, a Delaware corporation that is headquartered at 1585 Broadway, New York, New York 10036. Morgan Stanley was an underwriter for the INDX 2006-AR25, RAST 2006-R2 and INDA 2007-AR2 Offerings.

46. Defendant UBS Securities LLC. ("UBS") is a subsidiary of UBS AG, a Swiss corporation headquartered at Bahnhofstrasse 45, Zurich, Switzerland, and Aeschenvorstadt 1, Basel, Switzerland. UBS is an investment banking firm principally located at 1285 Avenue of the Americas, 19th Floor, New York, New York 10019. UBS was an underwriter for the HEMLABT 2006-H2, RAST 2006-A11, RAST 2006-A12, RAST 2006-A13, RAST 2006-A15, RAST 2007-A5 and IMJA 2007-A1 Offerings.

47. Defendants Banc of America, JPMorgan, Citigroup, Countrywide, Credit Suisse, Deutsche Bank, Goldman Sachs, Greenwich, HSBC, IndyMac, JPMorgan Securities, Lehman, Bank of America, Morgan Stanley and UBS are collectively referred to hereinafter as the "Underwriter Defendants."

48. The Underwriter Defendants were obligated to conduct meaningful due diligence to ensure that the Offering Materials contained no material misstatements or omissions, including the stated manner in which the mortgages had been originated. The Underwriters received massive fees for their work in connection with the Offerings. Each was intimately involved in the aforementioned Offerings and failed to perform the requisite level of due diligence in connection with these Offerings. The Prospectus Supplements disseminated in connection with these Offerings contained material misstatements and omissions of material fact relating to the underwriting practices employed in originating the underlying subprime mortgage loans.

16

## The Underwriter Ratings Agency Defendants

49. Defendant Moody's Investors Services ("Moody's") is a credit rating agency with its principal offices located at 7 World Trade Center at 250 Greenwich Street, New York, New York 10007. Moody's performs financial research and analysis for commercial and governmental entities and holds a 40 percent share of the world's credit ratings market. As a condition to the issuance of the Certificates, Moody's purportedly analyzed each Offering to address the likelihood of the receipt of all distributions on the Certificates and assigned credit ratings for each tranche of the Offerings, which was integral in establishing pricing, interest rates and a market for the Certificates. Moody's was an "Underwriter" of the Certificates within the meaning of the Securities Act.

50. Defendant The McGraw-Hill Companies, Inc., through its business division Standard & Poor's Ratings Services ("S&P" shall refer to The McGraw-Hill Companies and its business division Standard & Poor's Ratings Services), is a credit rating agency with its headquarters located at 55 Water Street, New York, New York 10041. S&P performs financial research and analysis for commercial and governmental entities and holds a 40 percent share of the world's credit ratings market. As a condition to the issuance of the Certificates, S&P purportedly analyzed each Offering to address the likelihood of the receipt of all distributions on the Certificates and assigned credit ratings for each tranche of the Offerings, which was integral in establishing pricing, interest rates and a market for the Certificates. S&P was an "Underwriter" of the Certificates within the meaning of the Securities Act.

51. Defendant Fitch Ratings ("Fitch) is a credit rating agency with its principal offices at One State Street Plaza, New York, New York 10004. Fitch performs financial research and analysis for commercial and governmental entities and holds a 10 percent share of the world's

credit ratings market. As a condition to the issuance of the Certificates, S&P purportedly analyzed each Offering to address the likelihood of the receipt of all distributions on the Certificates and assigned credit ratings for each tranche of the Offerings, which was integral in establishing pricing, interest rates and a market for the Certificates. S&P was an "Underwriter" of the Certificates within the meaning of the Securities Act.

52.     As set forth above, Moody's, S&P and Fitch are collectively referred to herein as the "Underwriter Ratings Agencies" and are included in the term "Underwriter Defendants."

53.     The Company Defendant named in paragraph 22, the Trust Defendants named in paragraphs 23-24, each of the individuals named in paragraphs 26-32 and each of the defendants named in paragraphs 33-51 (the Underwriter Defendants) participated in the drafting, preparation, or approval of various false and misleading statements contained in the Offerings Documents, as complained of herein. Each of the Defendants was responsible for ensuring the truth and accuracy of the statements contained in the Offerings Documents.

54.     Each of the Defendants, owed to the purchasers, including Plaintiff and the Class (defined below), the duty to make a reasonable and diligent investigation of the statements contained in the Offerings Documents at the time they became effective. This duty included performing an appropriate investigation to ensure that the statements contained therein were true, and that there were no omissions of material fact required to be stated in order to make the statements contained in the Offerings Documents not misleading. As herein alleged, each of the Defendants violated these specific duties and obligations. As a result of these violations, the market price of the securities issued by the IndyMac Trusts was artificially inflated, causing injury to Plaintiff and the class.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action alleging violations of Sections 11, 12 and 15 of the Securities Act, on behalf of a class consisting of all persons who purchased or acquired the Certificates (the "Class") pursuant and/or traceable to the Offerings Documents issued in connection with the Offerings from the effective date through the date of the filing of this action. Excluded from the Class are Defendants, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded.

56.     The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiff at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of IndyMac or its transfer agent or the underwriters for the Offerings. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions.

57.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation to further ensure such protection and to prosecute this action vigorously.

58.     Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff and all of the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

19

59.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

60.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)     Whether the Offering Materials issued by Defendants to the investing public omitted and/or misrepresented material facts about IndyMac and its business; and

(c)     The extent of injuries sustained by the Class and the appropriate measure of damages.


## FACTUAL ALLEGATIONS

**Red Flags in the Housing Market**

61.     Prior to and during the relevant period, a prolonged and consistent stream of announcements concerning the housing market and related impact on the financial markets began:

- May 27, 2005: Economist Paul Krugman of the *New York Times* said he saw "signs that America's housing market, like the stock market at the end of the last decade, is approaching the final, feverish stages of a speculative bubble."

- June 9, 2005: Federal Reserve Chairman Alan Greenspan, while

20

downplaying risk of a national housing bubble, acknowledged in testimony to the Joint Economic Committee that he saw "signs of froth in some local markets where home prices seem to have risen to unsustainable levels."

- June 16, 2005: *The Economist* print edition: "Perhaps the best evidence that America's house prices have reached dangerous levels is the fact that house-buying mania has been plastered on the front of virtually every American newspaper and magazine over the past month. Such bubble-talk hardly comes as a surprise to our readers. We have been warning for some time that the price of housing was rising at an alarming rate all around the globe, including in America. Now that others have noticed as well, the day of reckoning is closer at hand. It is not going to be pretty. How the current housing boom ends could decide the course of the entire world economy over the next few years." (Emphasis added).

- July 26 2005: *The Wall Street Journal* reported that "Mortgage lenders are continuing to loosen their standards, despite growing fears that relaxed lending practices could increase risks for borrowers and lenders in overheated housing markets." The article cited increases in novel loan products, including interest-only mortgages, option adjustable-rate mortgages and no documentation loans.

- December 2005: Some CDO traders warned the bubble could burst. Jason Schechter, then head of CDO trading at Lehman Brothers, echoed other participants at the Opal Financial Group CDO Summit when he said: "What concerns me though is: is this liquidity here to stay, or are we at risk for a sizable downturn?" (*Asset Securitization Report*, December 12, 2005).

## The Importance of Underwriting Standards

62.     The Registration Statements purported to describe IndyMac's underwriting guidelines. Nevertheless, IndyMac failed to abide by its own stated guidelines, a conduct that eventually caused IndyMac Bank to go bankrupt and the purchasers of the Certificates to lose a substantial portion of their investments.

63.     Underwriting guidelines are standards that lenders put in place to ensure that a borrower can afford to make their monthly mortgage payments. Typically a bank considers a potential borrower's income, debt, savings, and credit score, among other things, to determine whether or not they are credit-worthy. When banks enter into "prime" loans with borrowers, they require documentation of the aforementioned items. However, when banks, such as

21

IndyMac enter into "Alt-A loans", they do not require documentation, instead basing the decision on whether to provide the loan based upon an applicant's credit score. For that reason, Alt-A loans are inherently more risky to lenders than prime loans.

64. As alleged in further detail below, IndyMac did not follow its own stated guidelines, instead, as reported in the Center for Responsible Lending Report entitled, "INDYMAC: WHAT WENT WRONG? How an "Alt-A Leader Fueled its Growth with Unsound and Abusive Mortgage Lending" by Mike Hudson (the "CRL Report"), the Company operated with an eye towards pushing through loans at all costs, without even considering an applicant's ability to repay these loans. This unwritten policy was instituted by the Company's top officials and forced down the chain of command. Indeed, the report contained accounts from former employees who stated that their decisions to deny loans were often overturned by management.

65. The Office of Inspector General Report entitled "SAFETY AND SOUNDNESS: Material Loss Review of IndyMac Bank, FSB" dated February 26, 2009 (the "Safety and Soundness Report") confirms the findings of the CRL Report. The report states that the Company's insufficient underwriting, among other things led to its ultimate demise. Instances of inadequate underwriting included making loans without verification of borrower's income or assets, approval of loans to applicants with poor credit histories, and passing through loans despite receiving appraisals on the underlying collateral that were questionable.

66. As a result of IndyMac's failure to abide by its own guidelines, the borrowers were unable to pay back their loans and a large portion of the mortgages that backed the Certificates went into default. In turn, the Trusts could no longer make payments to the purchasers of the Certificates and the Certificate holders lost the majority of their investments.

22

## The Offerings

67. The structure of each Offering was generally identical: IndyMac filed the Registration Statement with the SEC, in connection with the issuance of various series and classes of debt securities which would be governed by said Registration Statement.

68. At some time or subsequent to each Offering, an IndyMac Trust was then formed under the laws of the State of New York, *i.e.*, RAST 2007-A5, for which a Supplemental Prospectus was filed on behalf of RAST 2007-A5, as the entity responsible for issuing the Certificates at issue herein.

69. Typically, the loans are originated by the Sponsor, in this case IndyMac Bank, who then disposes of its loans primarily by selling them to third parties and through securitizations. The Sponsor works with the Underwriters and the rating agencies to select the pool of mortgage loans and structure the securitization transaction. The Sponsor or subsidiary thereof also services the mortgage loans. On the closing date of any given Offering, the Sponsor conveys the initial mortgage loans and the related mortgage insurance policies to the Depositor (in this case, IndyMac), who will in turn convey the initial mortgage loans and the related mortgage insurance policies to the Trust, by way of the Trustee. The Certificates are backed by the Issuer, and consist of, *inter alia*, the mortgage loans; collections in respect of principal and interest of the mortgage loans received; and the amounts on deposit in the collection account, including the payment account in which amounts are deposited prior to payment to the certificate holders. On the payment date, the certificate holders receive payments from the Trustee based on the particular tranche purchased; typically, available funds for each distribution date will equal the amount received by the trustee and available in the payment account on that distribution date, including interest which differs depending upon the tranche held.

23

70.     In connection with the Offerings, IndyMac, the IndyMac Trusts and the various Underwriter Defendants prepared and disseminated the Offering Materials that contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading that were reasonably relied upon by Plaintiff and the Class to their own detriment.

## The Materially Misleading Statements and Omissions of Fact in the Offering Materials

71.     The Registration Statements represented that all of the loans which made up the pool of mortgages used to support the Certificates were subject to certain underwriting guidelines which assessed the borrower's creditworthiness, including multi-level reviews of loan applications and appraisals with only "case-by-case" exceptions to guidelines.

72.     The Registration Statements disclosed that the underlying loans were originated and/or acquired by IndyMac. The Registration Statements represented that all the underlying loans were subject to underwriting guidelines set by IndyMac and depended largely on factors such as credit score as follows:

Underwriting Process

Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines, which also accept mortgage loans meeting Fannie Mae or Freddie Mac guidelines regardless of whether such mortgage loans would otherwise meet IndyMac Bank's guidelines, or pursuant to an exception to those guidelines based on IndyMac Bank's procedures for approving such exceptions. Conventional mortgage loans are loans that are not insured by the FHA or partially guaranteed by the VA. Conforming mortgage loans are loans that qualify for sale to Fannie Mae and Freddie Mac, whereas non-conforming mortgage loans are loans that do not so qualify. Non-conforming mortgage loans originated or purchased by IndyMac Bank pursuant to its underwriting programs typically differ from conforming loans primarily with respect to loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent that these programs reflect underwriting standards different from those of Fannie Mae and

24

Freddie Mac, the performance of loans made pursuant to these different underwriting standards may reflect higher delinquency rates and/or credit losses.

IndyMac Bank has two principal underwriting methods designed to be responsive to the needs of its mortgage loan customers: traditional underwriting and e-MITS (Electronic Mortgage Information and Transaction System) underwriting. E-MITS is an automated, internet-based underwriting and risk-based pricing system. IndyMac Bank believes that e-MITS generally enables it to estimate expected credit loss, interest rate risk and prepayment risk more objectively than traditional underwriting and also provides consistent underwriting decisions. IndyMac Bank has procedures to override an e-MITS decision to allow for compensating factors.

IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral. Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines.

In determining a borrower's FICO Credit Score, IndyMac Bank generally selects the middle credit score of the scores provided by each of the three major U.S. credit repositories (Equifax, TransUnion and Experian) for each borrower, and then selects the lowest of these scores. In some instances, IndyMac Bank selects the middle score of the borrower with the largest amount of qualifying income among all of the borrowers on the mortgage loan. A FICO Credit Score might not be available for a borrower due to insufficient credit information on file with the credit repositories. In these situations, IndyMac Bank will establish a borrower's credit history through documentation of alternative sources of credit such as utility payments, auto insurance payments and rent payments. In addition to the FICO Credit Score, other information regarding a borrower's credit quality is considered in the loan approval process, such as the number and degree of any late mortgage or rent payments within the preceding 12-month period, the age of any foreclosure action against any property owned by the borrower, the age of any bankruptcy action, the number of seasoned tradelines reflected on the credit report and any outstanding judgments, liens, charge-offs or collections.

*See* Second Amended Registration Statement, April 13, 2006, p. S-40-41.

25

73.     The statements in the preceding paragraph contained misstatements and material omissions including statements made in connection with the underwriting of the collateral mortgages. As set forth below, a material portion of the underlying collateral for the Certificates originated by IndyMac were not in accordance with the stated credit, appraisal and underwriting standards set forth above, and in fact, were part of IndyMac's systematic practice of steering less creditworthy borrowers, without the necessary loan documentation, into mortgages based on inflated property values.

74.     Indeed, the CRL Report illustrates why these statements were misleading. IndyMac management pushed its personnel to approve loans regardless of an applicant's income, assets or ability to repay the lown. When the underwriters refused to comply with management's mandates, the loans were often approved by IndyMac's senior employees.

75.     In addition, the Registration Statement represented that the credit review process varied in the levels of scrutiny depending on the documentation programs. Yet, all of these programs stressed that

> IndyMac Bank purchases loans that have been originated under one of seven documentation programs: Full/Alternate, FastForward, Limited, Stated Income, No Ratio, No Income/No Asset and No Doc. In general, documentation types that provide for less than full documentation of employment, income and liquid assets require higher credit quality and have lower loan-to-value ratios and loan amount limits.
>
> Under the Full/Alternate Documentation Program, the prospective borrower's employment, income and assets are verified through written documentation such as tax returns, pay stubs or W-2 forms. Generally, a two-year history of employment or continuous source of income is required to demonstrate adequacy and continuance of income. Borrowers applying under the Full/Alternate Documentation Program may, based on certain loan characteristics and higher credit quality, qualify for IndyMac Bank's FastForward program and be entitled to income and asset documentation relief.

26

Borrowers who qualify for FastForward must state their income, provide a signed Internal Revenue Service Form 4506 (authorizing IndyMac Bank to obtain copies of their tax returns), and state their assets; IndyMac Bank does not require any verification of income or assets under this program.

The Limited Documentation Program is similar to the Full/Alternate Documentation Program except that borrowers generally must document income and employment for one year (rather than two, as required by the Full/Alternate Documentation Program). Borrowers under the Limited Documentation Program may use bank statements to verify their income and employment. If applicable, written verification of a borrower's assets is required under this program.

The Stated Income Documentation Program requires prospective borrowers to provide information regarding their assets and income. Information regarding a borrower's assets, if applicable, is verified through written communications. Information regarding income is not verified and employment verification may not be written.

The No Ratio Program requires prospective borrowers to provide information regarding their assets, which is then verified through written communications. The No Ratio Program does not require prospective borrowers to provide information regarding their income, but employment may not be written.

Under the No Income/No Asset Documentation Program and the No Doc Documentation Program, emphasis is placed on the credit score of the prospective borrower and on the value and adequacy of the mortgaged property as collateral, rather than on the income and the assets of the prospective borrower. Prospective borrowers are not required to provide information regarding their assets or income under either program, although under the No Income/No Asset Documentation Program, employment is orally verified.

IndyMac Bank generally will re-verify income, assets, and employment for mortgage loans it acquires through the wholesale channel, but not for mortgage loans acquired through other channels.

Maximum loan-to-value and combined loan-to-value ratios and loan amounts are established according to the occupancy type, loan purpose, property type, FICO Credit Score, number of previous late mortgage payments, and the age of any bankruptcy or

27

foreclosure actions. Additionally, maximum total monthly debt payments-to-income ratios and cash-out limits may be applied. Other factors may be considered in determining loan eligibility such as a borrower's residency and immigration status, whether a non-occupying borrower will be included for qualification purposes, sales or financing concessions included in any purchase contract, the acquisition cost of the property in the case of a refinance transaction, the number of properties owned by the borrower, the type and amount of any subordinate mortgage, the amount of any increase in the borrower's monthly mortgage payment compared to previous mortgage or rent payments and the amount of disposable monthly income after payment of all monthly expenses.

*See* Second Amended Registration Statement, April 13, 2006, p. S-41-42.

76.     The statements in the preceding paragraph contained misstatements and material omissions including statements made in connection with the underwriting of the collateral mortgages. As set forth below, a material portion of the underlying collateral for the IndyMac Certificates were not in accordance with the stated credit, appraisal and underwriting standards. Moreover, the Safety and Soundness Report found that IndyMac Bank conducted little, if any review of borrower qualifications, including income, assets and employment.

77.     The Registration Statement further described its process for appraising the properties underlying the collateral mortgages:

To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession Appraisal Practice. The appraiser generally inspects the property, analyzes data including the sales prices of comparable properties and issues an opinion of value using a Fannie Mae/Freddie Mac appraisal report form, or other acceptable form. In some cases, an automated valuation model (AVM) may be used in lieu of an appraisal. AVMs are computer programs that use real estate information, such as demographics, property characteristics, sales prices, and price trends to calculate a value for the specific property. The value of the property, as indicated by the appraisal or AVM, must support the loan amount.

28

*See* Second Amended Registration Statement, April 13, 2006, p. S-42.

78.     The statements in the preceding paragraph contained misstatements and material omissions including statements made in connection with the underwriting of the collateral mortgages. Indeed, as detailed in the Safety and Soundness Report, the OTS found appraisals that were not in compliance with the Uniform Standard of Professional Appraisal Practice. It also found evidence of multiple appraisals with vastly different values and appraisals where the property valuation was made without physical site inspection of the subject property or comparable properties.

79.     The Registration Statement further stated that IndyMac would disclose any deviation from its underwriting standards:

> The underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the mortgagor's income and credit history, may be varied in appropriate cases where factors as low Loan-to-Value Ratios or other favorable credit factors exist. In the event a lender underwrites mortgage loans under programs less restrictive than the one described above, a description of those programs will be set forth in the related prospectus supplement.

*See* Second Amended Registration Statement, April 13, 2006, p. 36.

80.     The statements in the preceding paragraph contained misstatements and material omissions including statements made in connection with the underwriting of the collateral mortgages. IndyMac never disclosed any deviations from its underwriting standards, yet as s et forth below, a material portion of the underlying collateral for the IndyMac Certificates were not in accordance with the stated credit, appraisal and underwriting standards.

**The Prospectus Stated that the Issuance of the Certificates was Tied to Credit Ratings**

81.     The Certificates were rated by the Underwriter Ratings Agencies, which purported to take into account, *inter alia*, the underwriting standards used in originating the

29

underlying mortgages to address the likelihood of the receipt of all distributions on the mortgage loans by the Certificate holders:

> It is a condition to the issuance of the securities of each series offered by this prospectus and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement.
>
> Ratings on mortgage pass-through securities address the likelihood of receipt by security holders of all distributions on the underlying mortgage loans. These ratings address the structural, legal and issuer-related aspects associated with the securities, the nature of the underlying mortgage loans and the credit quality of the credit enhancer or guarantor, if any. Ratings on mortgage pass-through securities do not represent any assessment of the likelihood of principal prepayments by mortgagors or of the degree by which the prepayments might differ from those originally anticipated. As a result, securityholders might suffer a lower than anticipated yield, and, in addition, holders of stripped pass-through securities in extreme cases might fail to recoup their underlying investments.
>
> A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Each security rating should be evaluated independently of any other security rating.

*See*, Prospectus, April 25, 2006, p. 122.

82.    Each Supplemental Prospectus set forth the initial ratings of the Certificates. *See, e.g.* RAST 2007-A5 Prospectus Supplement, March 29, 2007, p. S-115.

83.    The statements contained in the preceding paragraphs – and the initial ratings themselves, as set forth below – contained material misstatements of fact and omitted facts necessary to make the statements not misleading since the Underwriter Ratings Agencies issued the ratings based on an outdated credit rating methodology designed in or about 2002 and because the Underwriter Ratings Agencies presumed that the loans were of high credit quality

30

issued in compliance with the stated underwriting guidelines when in fact, IndyMac Bank had systematically disregarded its stated underwriting guidelines, as set forth herein.

## Disclosures Relating to IndyMac Bank's Deficient Lending Practices

84. IndyMac Bank operated as one of the nation's largest and most successful mortgage finance companies until its massive exposure to Alt-A mortgage loans placed the company in the midst of the growing crisis in United States mortgage lending in 2007 and 2008.

85. Indeed, the Safety and Soundness Report detailed the reasons for IndyMac Bank's failures:

> IndyMac's aggressive growth strategy, use of Alt-A and other nontraditional loan products, insufficient underwriting, credit concentrations in residential real estate in the California and Florida markets ... led to its demise when the mortgage market declined in 2007. IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories. Appraisals obtained by IndyMac on underlying collateral were often questionable as well. As an Alt-A lender, IndyMac's business model was to offer loan products to fit the borrower's needs, using an extensive array of risky option-adjustable-rate-mortgages (option ARMS), subprime loans, 80.20 loans, and other nontraditional products. Ultimately loans were made to many borrowers who simply could not afford to make their payments. Regardless, the thrift remained profitable as long as it was able to sell those loans in the secondary mortgage market.

86. Since the Offerings were consummated, IndyMac Bank's true deficient lending practices have come to light.

## Disclosures of True Nature of Certificate Collateral Lead to Downgrades

87. As set forth above, subsequent to the issuance of the Prospectus, IndyMac's true underwriting practices became known to the public. During this time, the Company was forced to take significant write-downs due to its massive exposure to the Alt-A market.

88. Over these concerns, Moody's, S&P and Fitch have revised their ratings on a significant portion of the Certificates.

89. As a result of these disclosures and the Underwriter Ratings Agencies' reassessment of the appropriate ratings to be assigned to the Certificates, the value of the Certificates has substantially collapsed. Plaintiff's investment in the Certificates suffered a substantial decline in value.

90. The rewards that Defendants reaped in connection with the Offerings were unlawfully obtained because Defendants violated Section 11 of the Securities Act. Under Section 11, directors and officers, among others, are liable in negligence for failure to craft a Prospectus which fully and accurately informs investors of all material facts and industry trends affecting the issuer company. The issuer itself is held strictly liable for any material misrepresentations or omissions from the Prospectus.

91. A key policy underlying Section 11 liability is to enable prospective investors, like Plaintiff and the Class, to make informed investment decisions based on the disclosure of adequate and truthful information regarding the issuer, its associated persons, and the offering. This policy is frustrated when a prospectus contains materially false and misleading statements.

## FIRST CLAIM FOR RELIEF
### (Against All Defendants for Violations of Section 11 of the Securities Act)

92. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

93. This claim is brought by Plaintiff against all of the Defendants. This claim does not allege fraud and is based exclusively on the strict liability and negligence standards of § 11 of the Securities Act.

32

94. The Company issued the Certificates and Plaintiff and the members of the Class acquired such Certificates, pursuant to the Offering Materials.

95. The Registration Statements and Prospectus contained numerous material misrepresentations and omissions including, among other things: (i) the failure to disclose the Company's actual underwriting practices; (ii) the retention of biased appraisers who delivered appraisals in excess of the actual property value, which in turn distorted the reported loan-to-value ratio; (iii) the failure to adequately write-down bad assets; and (iv) the failure to prevent and remedy such improper and harmful actions that resulted in the decline of the Certificates' value.

96. The Individual Defendants failed to exercise reasonable diligence and/or had no reasonable grounds to believe, that the Offering Materials issued by the Company were free of material misstatements and omissions at the time those documents were filed, and they are therefore also liable to Plaintiff and the members of the Class under § 11.

97. The Underwriter Defendants served as co-managing underwriters for the issuance of the Certificates and are also liable for misstatements and omissions in the Registration Statements and Prospectus and are therefore also liable to Plaintiff and the members of the Class under § 11.

98. The Offering Materials, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above. The facts misstated and omitted would have been material to a reasonable person reviewing the Offering Materials.

33

99.     The Defendants did not make a reasonable investigation or perform due diligence and did not possess reasonable grounds for believing that the statements contained in the Offering Materials were true, did not omit any material fact, and were not materially misleading.

100.    Plaintiff and the other Class members did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions contained in the Offering Materials.

101.    Plaintiff and other Class members sustained damages as a result of misstatements and omissions in the Offering Materials, for which they are entitled to compensation.

102.    Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offerings.

103.    Plaintiff and the members of the Class acquired their Certificates pursuant or traceable to the Company's Offering Materials which was rendered false and misleading as a result of Defendants' misrepresentations and omissions.

104.    At the time they acquired their Certificates, Plaintiff and the members of the Class were without knowledge of Defendants' misconduct.

### SECOND CLAIM FOR RELIEF
**(Against All Defendants**
**for Violations of Section 12(a)(2) of the Securities Act)**

105.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

106.    This claim is brought by Plaintiff against the all Defendants. This claim does not allege fraud and is based exclusively on the negligence standards of § 12(a)(2) of the Securities Act.

107.    Each of the Defendants was a seller, offerer or solicitor of sales of the Certificates by means of the Company's Offering Materials, all as alleged more fully above. The Defendants

34

were substantial factors and took affirmative steps to induce Plaintiff and the members of the Class to acquire the Certificates.

108.    Defendants as "sellers" owed to the purchasers of the IndyMac Trusts, including Plaintiff and other Class members, the duty to perform due diligence and make a reasonable and diligent investigation of the statements contained in the Offering Materials, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the materials as set forth above.

109.    But for the Defendants' selling and/or solicitation activities by means of the false and misleading Offering Materials, Plaintiff and the members of the Class would not have purchased or otherwise acquired the Certificates, or would have acquired their Certificates at a price less than they actually paid.

110.    The Defendants are liable for issuing numerous false and misleading statements which were incorporated in the Prospectus pursuant to which Plaintiff and the members of the Class acquired their Certificates. Those misstatements and omissions concerned, among other things (i) the failure to disclose the Company's actual underwriting practices; (ii) the retention of biased appraisers who delivered appraisals in excess of the actual property value, which in turn distorted the reported loan-to-value ratio; (iii) the failure to adequately write-down bad assets; and (iv) the failure to prevent and remedy such improper and harmful actions that resulted in the decline of the Certificates' value.

111.    None of the false and misleading statements or omissions alleged herein was known to Plaintiff and the members of the Class at the time they purchased or otherwise acquired

their Certificates. Plaintiff and the members of the Class did not know, and in the exercise of reasonable diligence could not have known, of the misstatements and omissions alleged herein.

112. By reason of their misconduct alleged herein, the Company and the Underwriter Defendants violated and/or controlled a person who violated § 12(a)(2) of the Securities Act. As a direct and proximate result of these violations, Plaintiff and the members of the Class have sustained damages.

**THIRD CLAIM FOR RELIEF**
(Against IndyMac, The IndyMac Trusts and
the Individual Defendants for Violations of Section 15 of the Securities Act)

113. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

114. The Individual Defendants at all relevant times participated in the operation and management of IndyMac, and conducted and participated, directly and indirectly, in the conduct of the IndyMac Trusts' business affairs.

115. As officers and/or directors of IndyMac, the Individual Defendants had a duty to disseminate accurate and truthful information in the Offering Materials.

116. Defendant IndyMac is the parent corporation and sole owner of the IndyMac Trusts, and at all relevant times participated in the operation and management of the IndyMac Trusts, and conducted and participated, directly and indirectly, in the conduct of the Trusts' business affairs.

117. As set forth above, it is alleged that the Offering Materials issued in connection with the Offerings contained material misstatements of fact, and omitted facts necessary to make the facts contained therein not misleading, in violation of Sections 11 and 12 of the Securities Act.

118. Because of their positions of control and authority as senior officers and directors of IndyMac, the Individual Defendants were able to, and did, control the contents of the Offering Materials which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. The Individual Defendants were therefore "controlling persons" of IndyMac within the meaning of Section 15 of the Securities Act.

119. In addition, because of its sole ownership of the IndyMac Trusts and its control and authority as its parent corporation, Defendant IndyMac was able to, and did, control the contents of the Registration Statements and the Prospectuses which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. Defendant IndyMac was therefore a "controlling person" of the IndyMac Trusts within the meaning of Section 15 of the Securities Act.

120. Plaintiff and other Class members purchased the Certificates issued pursuant to the Offerings. The Offerings were conducted pursuant to the Offering Materials.

121. The Offering Materials, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the Offering Materials.

122. Plaintiff and the Class did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions in the Offering Materials.

123. Plaintiff and the Class have sustained damages as a result of the misstatements and omissions of the Registration Statements and the Prospectuses, for which they are entitled to compensation.

124. Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offerings.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

(a)    declaring this action to be a Class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the Class, and certifying their counsel as Class Counsel;

(b)    awarding Plaintiff and other members of the Class damages against Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

(d)    awarding Plaintiff and the Class such other and further relief as may be just and proper under the circumstances.

Dated: May 14, 2009

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By: _David L. Wales_

Gregory M. Nespole
David L. Wales
Rachel S. Poplock
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653
Email: Nespole@whafh.com
Email: Wales@whafh.com
Email: Poplock@whafh.com

38

**KOHN, SWIFT, & GRAF, P.C.**
Joseph C. Kohn
Denis F. Sheils
William Hoese
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968
Email: DSheils@kohnswift.com

*Attorneys for Plaintiff Police and Fire Retirement System of the City of Detroit*

/535900v2

39