# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## OBJECTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. TO MOTION OF DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT RULE 9019, AND (III) GRANTING RELATED RELIEF

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora") file this objection to the *Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief*, dated July 18, 2013, [Docket No. 17] (the "Assumption Motion").  In support of the objection, Syncora respectfully states as follows:

### Preliminary Statement

1.    In June 2013, the City of Detroit (the "City") made an ill-fated strategic decision to negotiate in secret with the counterparties to certain swap agreements (the "Swaps") — and only with those counterparties.  The City's goal in entering into these secretive and exclusive negotiations with the Swap Counterparties (as defined herein) was to achieve unfettered access to the $180 million annual stream of casino tax revenues that stood to be trapped in a collateral account.  Viewed from this perspective, the City's negotiating strategy was doomed to fail from the start for the simple reason that insurers of the Swaps (the "Swap Insurers"), such as Syncora, possess critical consent and direction rights under the relevant transaction documents.  In short,

no amendment to the Collateral Agreement (as defined herein) or the Swaps (or a host of the other agreements comprising this integrated transaction) is possible without the consent of Syncora. And when Syncora pointed this fact out to the City on numerous occasions and implored it to open negotiations, these requests fell on deaf ears or, worse, led to sharp tactics by the City in its dealings with Syncora. In short, rather than recognizing Syncora's control rights and inviting it into the negotiations, the City made the questionable decision to double down on its original strategy of proceeding solely with the Swap Counterparties.

2. The Forbearance and Optional Termination Agreement (the "Forbearance Agreement") at the heart of the Assumption Motion is the end result of the City's negotiations with the Swap Counterparties. Despite its name, the Forbearance Agreement is no mere "forbearance" agreement. Instead, the agreement represents a transparent effort to amend the transaction documents comprising the COPs/Swaps structure to eliminate Syncora's consent and direction rights. At its core, the Forbearance Agreement purports to (a) grant the City the right to access the casino tax revenues on an interim basis; (b) grant the Swap Counterparties a right to terminate the Swaps upon direction from the City; and (c) "unwind" the Swaps for a "discounted" payment of $220 million. But each of these pieces of consideration is illusory as they run directly contrary to the operative agreements — agreements that cannot be amended without Syncora's consent. In this fashion, the Swap Counterparties — who have already *made* hundreds of millions of dollars off the City over the last seven years — stand to make hundreds of millions more in one fell swoop.

3. Notably though, the bargain is not even a good one for the City. After all, the Swap Counterparties have no right to terminate and receive a termination payment without Syncora's consent — consent that it will not grant because to do so would expose Syncora to

2

liability and facilitate the elimination of the valuable hedge embodied in the Swaps — a hedge that protects Syncora against rising interest rates on the COPs.  So the City is <u>not</u> staring down the gun barrel of an imminent termination payment.  Nor does the City gain any benefit from the Forbearance Agreement — especially where, as here, the Collateral Agreement in question will automatically trap the casino tax revenues notwithstanding the Swap Counterparties' agreement to "forbear" from giving any direction that the revenues be trapped.  In its zeal to gain access to the casino tax revenues without giving consideration to Syncora's objections, the City has generated multiple litigations and entered into an unenforceable agreement that does not achieve what it purports to achieve.

4.     The Swap Counterparties and the City are aware of the problems with the proposed Forbearance Agreement.  That is why neither of them has dared perform under that agreement without the Court's blessing.  The Proposed Order (as defined herein) they have submitted operates as a request that the Court provide them with judicial immunity as they seek to violate Syncora's rights.  The Court should decline to grant them that protection and should instead deny the Assumption Motion.

5.     It is important to remember that Syncora's potential exposure to losses under the COPs/Swap structure is massive.  Syncora is a participant in every facet of the structure.  It is a Swap Insurer.  It is a COP insurer with current net exposure of $176 million.  It is a COP-holder of approximately $152 million in COPs.  As a result, it will come as no surprise that Syncora has rights in every agreement comprising the structure.  It has the right to bar amendments to the Collateral Agreement that operate to the detriment of <u>any</u> of its rights, obligations, or remedies. (CA § 14.5.)  It has the right under the Swaps to consent to any "waivers, modifications, or amendments" to the Swaps <u>or</u> the Collateral Agreement.  (A&R § 8(b).)  It has the right to bar

terminations of the Swap without its consent where, as here, there are termination events and events of default in existence. (A&R Part 5(i).) It has the right under the Contract Administration Agreement to direct the actions of the Swap Counterparties and the Service Corporations — and to give notice to the Contract Administrator. (CAA §§ 6.9.2(2), 10.2.) And these agreements form one integrated transaction, as the Collateral Agreement took pains to specify. (CA § 14.14(a) ("This Agreement, the Definitive Documents, and the Hedges, the Service Contracts and the Contract Administration Agreement, as modified by the Definitive Documents, contain the entire agreement among the parties with respect to the subject matter hereof . . . .").)

6. This legal integration is underscored by the obvious <u>economic</u> purpose of the agreements — the Swaps are designed to hedge against rising interest rates on the floating-rate COPs and insure that Syncora is not forced to pay COP-holders more than the 6% fixed interest rate set by the hedge. The City's repeated argument that the Swaps are somehow separate agreements that can be hived off from the rest of the structure is thus belied by the contracts in question and common sense. And the City's argument that "Syncora is not a party to the Collateral Agreement" ignores that Syncora is not only a party-in-interest to the Collateral Agreement with rights thereunder, but also a clear third-party beneficiary of <u>all</u> the agreements comprising the structure. (A&R Part 5(xi); Service Contracts § 9.12(a)(3); CAA § 10.2.) No insurer subjects itself to the risk that the parties can change the economic structure without its consent, and Syncora did not do so here. Indeed, the City's and the Swap Counterparties' repeated efforts to effect a material alteration to the economic structure insured risks voiding Syncora's insurance obligations entirely — on the Swaps <u>and</u> the COPs.

7.      Syncora therefore objects to the Assumption Motion and respectfully requests that the Court deny the motion for two reasons.  *First*, the Forbearance Agreement creates significant legal and factual disputes and seeks to directly impair third-party rights.  These disputes and impairments cannot properly be addressed via a motion under section 365 and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  *Second*, the City fails to satisfy the requirements of settlement under Bankruptcy Rule 9019 and assumption under section 365.  The Forbearance Agreement is not fair and equitable, or in the best interests of the creditors.  In addition, the Forbearance Agreement is not the type of contract that a debtor can properly assume because it, *inter alia*, does not satisfy the business judgment standard, is not being assumed *cum onere*, and has material defaults.  Finally, in the event the Court finds that the Forbearance Agreement may be approved and assumed, it should stay its order approving the assumption and settlement pending the resolution of litigation regarding the operation and validity of the Forbearance Agreement.

### Background

## I.      The COPs, Swaps, and Service Corporations

8.      The City has historically failed to keep current on its accrued pension obligations. By 2005, two of the City's pension funds — the General Retirement System ("GRS") and the Police and Fire Retirement System ("PFRS") — were underfunded by approximately $1.4 billion. (Detroit, MI, Code § 18-15-120(g) (2005).)  To fund this shortfall, the City issued instruments known as certificates of participation ("COPs").  (*Id.*)  In addition to its status as an insurer of the COPs with a net exposure of approximately $176 million, Syncora also directly owns approximately $152 million in COPs.  (Ex. 1, LeBlanc Dec.¶ 2.)

9.      In connection with the COP issuance, the City entered into a series of interconnected financing transactions and contracts (the "Integrated Agreements").  Specifically,

the City created two non-profit entities (the "Service Corporations") intended to serve as intermediaries in the financing. (Detroit, MI, Code § 18-15-125 (2005).) Service contracts (the "Service Contracts") between the City and each of the Service Corporations, together with an agreement regarding the administration of the Service Contracts (discussed below), govern the relationship between the parties. (*Id*. at § 18-15-140.) The Service Corporations' boards of directors are each comprised of three City officers and at least one City Council member. (*Id*. at § 18-5-126.) The Service Corporations created two funding trusts (the "Funding Trusts") to issue and sell the COPs.[1] (*Id*. at § 18-5-129.)

10.    The following diagram shows the relationship between the City, the Service Corporations, and the Funding Trusts under the Service Contracts and the Trust Agreements:[2]



---

[1] In 2005, the Funding Trusts issued a series of COPs (the "2005 COPs"). In 2006, the City refinanced the 2005 COPs by exchanging the 2005 COPs for two new series of COPs — one with a fixed interest rate (the "Fixed-Rate COPs") and one with a floating interest rate (the "Floating-Rate COPs"). (Assumption Mot. ¶ 14.)

[2] Syncora has broken down the structure into artificial steps to facilitate explanation. In reality, the entire transaction forms an integrated structure, as the various legal agreements confirm. (Service Contracts § 9.17; CAA § 11.10.)

11.    To fix the interest rate on the Floating-Rate COPs, the Service Corporations entered into the Swaps (payments on account thereof, the "Swap Payments") with UBS A.G. and SBS Financial Products Company, LLC (together, and with Merrill Lynch Capital Services, Inc., as credit support provider to SBS, the "Swap Counterparties").  (Detroit, MI, Code § 18-5-140 (2005); CA Preamble at 1.)  Under the Swaps, if interest rates fall below a certain fixed rate, the Service Corporations pay the Swap Counterparties the difference between the lower rate and the higher rate.  Conversely, if interest rates exceed the fixed rate, the Swap Counterparties pay the Service Corporations the difference between the higher rate and the lower fixed rate.[3]  The City is not a party to the Swaps.

12.    The following diagram shows the relationship between the Service Corporations and the Swap Counterparties:



---

[3] For example, if the agreed-upon fixed rates were 6% and the prevailing interest rates were 4%, the Service Corporations would, in effect, pay 4% to the COP-holders and 2% to the Swap Counterparties, setting the Service Corporations' exposure at 6%. On the other hand, if prevailing interest rates rose to 9%, the Service Corporations would pay 9% on the COPs, but would receive funds equal to 3% from the Swap Counterparties, ensuring that the Service Corporations' net payment would remain at 6%.

13. The City arranged for insurance on both the COPs and the Swaps in the event of the City's nonpayment. Syncora is one of several insurers that agreed to provide insurance on the COPs and the Swaps. To date, Syncora has complied with all of its related insurance obligations. (Ex. 1, LeBlanc Dec. ¶ 4.)

14. The Swaps are obviously critical to Syncora's COP insurance obligations. If interest rates rise above 6%, Syncora would be obligated to pay those amounts in the absence of the Swaps. The Swaps insure that Syncora's interest rate exposure is limited to 6%. Thus, the City's repeated statements that Syncora is simply trying to maintain the Swaps as a "negotiating tactic" or to gain "leverage" ignores the principled, economic reason Syncora has for seeing the hedge remain in place — as well as for seeing the proper operation of the Collateral Agreement, discussed below.

15. The following diagram illustrates Syncora's role as insurer:



16.    Ultimately, the proceeds of the COP issuance flow through the Service Corporations to the City in exchange for the City's agreement to fund future payments of principal and interest (the "Service Payments") to the Service Corporations.  (Detroit, MI, Code § 18-5-120 (2005).)  The Service Corporations in turn promised to pay forward to the Funding Trusts, via a Contract Administrator (as defined herein), the City's Service Payments under the Service Contracts.  (TA § 201(b).)  The Service Corporations' ability to pay the Service Payments and the Swap Payments therefore depends on the City's performance under the Service Contracts.

17.    Payment under the Service Contracts is made according to a priority hierarchy. (Service Contracts § 8.03.)  This hierarchy provides, in part, for payments in the following order: interest on COPs and period Swap Payments; payments of COP principal; finally, Swaps termination payments.  (*Id.*)  Importantly, Swaps termination payments are junior to the payment of the outstanding principal and interest on the COPs.

## II.    The Agreements

### A.    The Service Contracts, Contract Administration Agreement, and Master Swap

18.    Governing the COPs and the Swaps transactions are a series of interrelated and interconnected agreements that set out the parties' respective rights.  In 2006, the Integrated Agreements included the Service Contracts, the Swaps (cited hereinafter as ISDA MA), the Trust Agreement ("Trust Agreement") (cited hereinafter as TA), and the Contract Administration Agreement ("Contract Administration Agreement") (cited hereinafter as CAA).[4]

---

[4] The Service Contracts, Swaps, Contract Administration Agreement, and Trust Agreement are summarized in Exhibit 15 and are available in their entirety as Exhibits 2, 3, 4, and 5 respectively.

19.     These Integrated Agreements, all of which were executed in June 2006, cover the COPs and the Swaps.  The Service Contracts establish and govern the City's obligation to provide the Service Corporations with the funds necessary to pay the amounts due under the COPs and the Swaps.  They establish Syncora as a third-party beneficiary (§ 9.12) with multiple rights, including the right of consent to any termination of the Swaps by the Service Corporations (§ 9.02) and amendment of the Service Contracts (§ 9.05).  The Service Contracts are binding obligations that can be enforced by Syncora as third-party beneficiary.  (*See* Service Contracts § 9.07.)  Syncora is also an explicit third-party beneficiary of the Swaps, with the right to "enforce the [Swaps] and the terms of any such Insured Rate Swap against such party on its own behalf and otherwise shall be afforded all remedies available hereunder . . . ."  (Schedule to ISDA MA  § (5xii).)

20.     The Contract Administration Agreement was created to appoint an administrator (the "Contract Administrator") to collect amounts due under the Service Contracts and Swaps, to allow the Service Corporations to make pledges, and to describe the parties' control rights following an Event of Default.  The Contract Administration Agreement grants Syncora broad rights and names it a party-in-interest that may notify the Contract Administrator of Events of Default and request that the Contract Administrator intervene in proceedings.  (CAA § 10.2.)

21.     Syncora also has broad control and amendment rights under the Integrated Agreements.  For example, the Contract Administration Agreement cannot be amended without Syncora's consent pursuant to section 10.3.  Further, Syncora is treated as a COP-holder for the COPs it insures under section 6.9.2(1) *and* has the right to control all actions taken by any Swap Counterparty, including directions, consents, and waivers under section 6.9.2(2).  The Trust Agreement, established to appoint U.S. Bank as Trustee and provide for issuance of the COPs,

also contains important rights of COP-holders, of which Syncora is one, including the right to consent to (a) changes to the payments or amounts of payments, (b) a reduction in the principal amount of certificates, and (c) modifications of the Service Corporations' grant of a security interest to the Funding Trust in the Funding Trust Receivables (*i.e.*, payments by the Service Corporations for the benefit of the COP-holders).  (TA §§ 702, 802.)

22.     Thus, as the Integrated Agreements demonstrate, the parties agreed to provide Syncora with broad rights — both as a third-party beneficiary and as a party-in-interest — to, *inter alia*, (a) enforce the terms of the agreements; (b) direct the actions of the COP-holders and the Swap Counterparties; and (c) consent to any waivers, amendments, or modifications of the agreements.  Furthermore, the Integrated Agreements were entered into at the same time to govern the same series of transactions by the same parties.  Significantly, the purpose of the Swaps in the original transaction was to hedge against the possibility of rising interest rates. Syncora, as the party ultimately liable for any payments owed by the Service Corporations, views the Swaps as critical protection against the possibility of rising interest rates.  The Swaps and the COPs are thus intimately connected, both legally and economically.  Given its financial incentives in seeing the City and Service Corporations perform under the Service Contracts, Syncora negotiated for itself the direct right to sue to enforce those agreements.  (*See* Service Contracts § 9.07.)

### B.     The 2009 Amendments and the Collateral Agreement

23.     After entering into the integrated COPs and Swaps transactions, the City's financial health continued to deteriorate to the point where, in 2009, a potential Termination Event (as defined in the Swaps) under the Swaps occurred.  A Termination Event, in practical terms, allows the Swap Counterparties to "fix" the interest rate at current rates and demand immediate payment of the net present value of all future payments, calculated at the fixed

11

interest rate.  Given the low prevailing interest rates in 2009, the termination payment would have been between $300 million and $400 million.

24.      To avoid a significant termination payment, the City, the Service Corporations, the Swap Counterparties, and Syncora[5] entered into a series of interrelated agreements that restructured the Swaps, one of which was a collateral pledge (the "Collateral Agreement")[6] (cited hereinafter as CA).  (CA p 1.)  Under the Collateral Agreement, the City agreed to fund the Service Corporations' Swap Payments through a "lockbox" arrangement and to pledge certain casino revenues as collateral to certain of its obligations under the Service Contracts.  (*See* CA § 4.1.)  The Service Corporations in turn granted a security interest in these casino revenues to the Swap Counterparties.  (*Id*. § 4.2.)

25.      Pursuant to this arrangement, the City provided instructions (the "Irrevocable Instructions") to three Detroit casinos that require the casinos to deposit tax funds (the "Casino Revenues") into a specified account (the "General Receipts Subaccount" or "GRSA").  (*Id*. § 3.4.)  At the start of each month, Casino Revenues are trapped in the General Receipts Subaccount until the City deposits one-third of the Service Corporations' quarterly Swap Payment into a custodial account (the "Holdback Account").  (*Id*. § 5.)  Once the City deposits these funds, U.S. Bank, as custodian (the "Custodian"), releases to the City for the remainder of the month the Casino Revenues deposited in the General Receipts Subaccount.  (*Id*.)  If, however, certain events occur, section 5.4 of the Collateral Agreement requires U.S. Bank —

---

[5] Though Syncora is not a signatory to the Collateral Agreement, its consent was required before the Collateral Agreement could be executed, it is mentioned in the Collateral Agreement, and has rights under the Collateral Agreement.

[6] A summary of the Collateral Agreement is included in Exhibit 15.  A copy of the Collateral Agreement is also attached as Exhibit 6.

automatically and without notice from any party — to "trap" the money in the General Receipts Subaccount, even if the City has already deposited its monthly payment.  (*Id*. § 5.4.)

26.     Several events that trigger the automatic trapping of funds in the General Receipts Subaccount under section 5.4 of the Collateral Agreement have occurred.  These events include the Governor's declaration of a financial emergency in Detroit, the appointment of an Emergency Manager, and a credit rating downgrade in March 2012.  (A&R Part 1(i); ISDA MA § 5; CA § 11.6.)  Then, on June 14, 2013, the City failed to fund a $40 million Service Payment. The Service Corporations in turn failed to make their regularly scheduled payments to the Funding Trust.  Under section 5.4, the Service Corporations' payment default constituted an Event of Default under the Swaps that is another trigger of the automatic trapping of the funds in the General Receipts Subaccount.  (CA § 5.4(a)(iii); ISDA MA § 5(vi).)  The City's failure to pay the Service Payments also rendered the Service Corporations insolvent, which is another Event of Default under the Swaps.  (ISDA MA § 5(a)(i).)

27.     In addition to the above cash-trapping provisions, the Collateral Agreement also states that it cannot be amended in a fashion that affects any of Syncora's rights, remedies, or obligations without Syncora's consent.  (CA § 14.5.)  Further, the Collateral Agreement provides that the City cannot divert or redirect the payment of the Casino Revenues.  (CA § 5.1)   The Collateral Agreement also integrates the provisions of the Swaps, the Service Contracts, and the Contract Administration Agreement.  (CA § 14.14.)  Syncora as insurer may exercise any right granted to it in the Collateral Agreement — and obviously retains the significant rights granted to it in the other agreements comprising the structure.  (CA § 14.6.)

28.     In connection with the Collateral Agreement, the parties also amended the Swaps (such amendments cited as A&R).[7]  In particular, the Swaps were modified to incorporate the Collateral Agreement and expand Syncora's consent rights to include any waiver, modification, and amendment of the Swaps or the Collateral Agreement.  (A&R, Part 3(d), 5(iv).)  This amendment allowed Syncora to rest easy in the knowledge that it would be able to enforce the Swaps and the Collateral Agreement according to their terms, including the automatic cash trapping provision in section 5.4 of the Collateral Agreement.

29.     Importantly, the amended Swaps maintained Syncora's right to block efforts to designate an early termination of the Swaps so long as a Termination Event or Event of Default was outstanding.  Put another way, after the Termination Events and Events of Default described above took place, Syncora's consent became a necessary pre-requisite to a Swap Counterparty's effort to terminate.  This provision provided important protection to Syncora and the COP-holders.  After all, Syncora, as insurer of the Swaps and the COPs, would have no interest in permitting an early termination if interest rates appeared likely to rise.  Syncora's consent rights thus gave it the power to decide whether the Swaps should stay in place even if the Swap Counterparties wanted the Swaps terminated.  It also provides the City with a powerful incentive to cure defaults under the Service Contracts in order to untrap the cash in the General Receipts Subaccount.

## III.   The City's Default and Suit against Syncora

30.     As stated above, the Service Corporations' failure on June 14, 2013 to make the $40 million regularly-scheduled payment to the Funding Trusts constituted an Event of Default under the Swaps.  (ISDA MA § 5(vi).)  So did the fact that the Service Corporations were now

---

[7] A summary of the amended Swaps is available in Exhibit 15. A copy of the amended Swap is attached as Exhibit 7.

insolvent in light of the City's refusal to pay the amounts it owed under the Service Contracts. (ISDA MA § 5(a)(i).)  On June 17, 2013, Syncora sent a letter to U.S. Bank, as Custodian, memorializing a prior conversation between Syncora and U.S. Bank wherein U.S. Bank informed Syncora that it would not release any funds from the General Receipts Subaccount. (Ex. 11, Ex. A to Def's Emer. Mot. to Dissolve TRO, Dec. of Todd Snyder ¶ 3.)  When questions arose over the propriety of the automatic cash-trapping, Syncora sent another letter to U.S. Bank re-iterating that an Event of Default had occurred and noting that U.S. Bank was required by the unambiguous terms of the Collateral Agreement to retain all funds in the General Receipts Subaccount.  Though the City expressed a contrary view regarding the operation of the cash trap, U.S. Bank ceased remitting funds to the City and trapped the Casino Revenues in the General Receipts Subaccount.  (Ex. 10, Ex. E–H to Orr Aff.)  The City's letter to Syncora, expressing the view that the Casino Revenues should be remitted to the City, did not explain why the automatic cash-trapping provisions in the Collateral Agreement should not apply.  (Ex. 10, Ex. G to Orr Aff.)

31.     On July 5, 2013, the City sued Syncora in the Circuit Court for the County of Wayne seeking (a) damages for interference with contractual and advantageous business relations; (b) declaratory judgment regarding Syncora's rights under the Collateral Agreement; and (c) injunctive relief restraining Syncora from taking any actions to trap the funds in the General Receipts Subaccount (the "Michigan Litigation").  Though the City had been in frequent communication with Syncora, the City also sought and obtained an *ex parte* temporary restraining order (the "TRO") of purportedly indefinite duration that enjoined Syncora and U.S. Bank from taking any action to limit the City's access to the funds in the General Receipts Subaccount.  (*See* Assumption Mot. ¶ 25.)

32.     In its complaint, the City alleged that Syncora's letters caused U.S. Bank to trap the funds in the General Receipts Subaccount.  (Ex. 9, Compl. ¶ 31.)  The City further alleged that Syncora's communications were a deliberate and malicious attempt to interfere with the City's ongoing negotiations with the Swap Counterparties.  (*Id*. ¶¶ 39–42.)  According to the City, Syncora had no right to send such letters or attempt to direct U.S. Bank's actions.  (*Id*.)

33.     The City's position in its complaint runs contrary to the explicit terms of the governing agreements regarding the automatic trapping of cash and Syncora's rights to direct U.S. Bank, which the City failed to reference in its complaint.  Indeed, the City failed in its complaint to reference any specific provisions in the governing agreements that ran contrary to its position.  Additionally, in the event that the court could not fashion "appropriate" relief against Syncora, the City also requested that the court direct the casinos to pay the Casino Revenues directly into the City's general fund, even though such a direction clearly violates the terms of the Collateral Agreement and the Irrevocable Instructions, which prohibit the redirection of such funds.  (Ex. 9, Compl. pp 21–22; *see* CA § 5.4, Ex. 3.4 to CA.)

34.     On July 11, 2013, Syncora removed the Michigan Litigation to the Eastern District of Michigan.  A day later, Syncora filed an emergency motion asking the court to dissolve the TRO on the grounds that it was obtained improperly and was legally deficient on its face.  (Ex. 11 Def's Emer. Mot. to Dissolve TRO.)  In response to this motion, the City claimed that it had reached an agreement with the Swap Counterparties that would "moot" the need for the TRO.  (Ex 12, Pl's Brief in Opp. to Def.'s Emer. Mot. to Dissolve TRO at p 13.)  In light of this agreement, the City repeatedly expressed a willingness to stipulate to the dissolution of the TRO.  (*See, e.g.*, Ex 13, Prelim. Resp. to Mot. and Not. of City's Consent to Diss. of TRO).)  However, when asked by Syncora to enter into such a stipulation, the City refused to do so.  (Ex

14, Pl's Resp. to Def.'s Prop. Order Diss. TRO ¶ 3.)  As a result, the TRO that the City obtained on July 5, 2013 — that should have expired after 14 days under federal law — remains in effect more than 40 days later.

35.    On August 9, 2013, the District Court transferred the Michigan Litigation to this Court.

## IV.    The City's Bankruptcy and the Forbearance Agreement

36.    The instant dispute is the result of an ill-fated strategic decision made by the City in June 2013.  At that time, the City elected to enter into secret negotiations with the Swap Counterparties.  Syncora was not told of these negotiations, nor was it invited to attend.  Given that Syncora is a party with extensive consent and control rights, the City's exclusion of Syncora from its negotiations with the Swap Counterparties placed the parties on a collision course that is now being made manifest.

37.    On July 15, 2013, the City, the Service Corporations, and the Swap Counterparties executed the Forbearance Agreement.[8]  On July 18, 2013, the City filed for bankruptcy under chapter 9 of the Bankruptcy Code.  (Assumption Mot. ¶ 8.)  That same day, the City filed the Assumption Motion.  (*Id.*)

38.    The Forbearance Agreement represents a transparent effort by the parties thereto to write Syncora out of the Integrated Agreements.  At its core, the Forbearance Agreement does three things.  First, it purports to grant the City the right to direct the Swap Counterparties to terminate the Swaps.  (FA § 1.)  Second, it obligates the Swap Counterparties to waive their right to enforce the cash trap under the Collateral Agreement.  (FA § 3.1.)  Finally, it provides for a reduced Swap termination payment to be made directly to the Swap Counterparties.  (FA § 3.5.)

---

[8] A summary of the Forbearance Agreement is available in Exhibit 15. A copy of the Forbearance Agreement is attached as Exhibit 8.

39.     The Forbearance Agreement contains multiple violations of Syncora's explicit contractual rights, including the following:

- It allows each Swap Counterparty to designate an Early Termination Date for the Swaps without the consent of Syncora. (FA § 3.1.) It does this contrary to Part 5(i) of the amended Swaps, which requires Syncora's consent where, as here, there are pending Termination Events and Events of Default in existence. (A&R Part 5(i).)

- It permits a reduced termination payment to be made directly by the City to the Swap Counterparties upon early termination. (FA § 3.5.) This is contrary to the operation of the payment structure in section 8.03 of the Service Contracts, which provides for payment from the Service Corporations pursuant to the priority scheme.

- It prohibits the Swap Counterparties from taking any action to trap the funds in the General Receipts Subaccount even though the operation of the cash trapping provision of the Collateral Agreement, section 5.4, is automatic. (FA § 1.1.) This is, again, without Syncora's consent, and contrary to Syncora's right to direct the actions of the Swap Counterparties in section 6.9.2(2) of the Contract Administration Agreement. It is also a waiver of the Swap Counterparties' rights under the Collateral Agreement, despite the fact that the amended Swaps make clear that Syncora must consent to any waivers, modifications, or amendments of the Collateral Agreement.

- It allows the City to direct the Swap Counterparties to terminate the Swaps without Syncora's consent contrary to Part 5(iv) of the amended Swaps. (FA § 3.1.) The City does not have such termination rights, nor the power to direct the Service Corporations to exercise any such rights, in the underlying agreements. As noted above, the right to direct the Swap Counterparties is reserved to insurers like Syncora.

40.     If the City and the Swap Counterparties are allowed to perform under the Forbearance Agreement, Syncora will suffer significant harm. First, it will be deprived of the protections of the interest rate hedge just as interest rates are on the rise, which will negatively affect it as both a COP-holder and COP-insurer. Second, the elimination of the Collateral Agreement will remove the City's incentive to cure Events of Default under the Service Contracts — further diminishing COP-holder recoveries, and correspondingly driving up Syncora's insurance obligations. Though the City has repeatedly accused Syncora of seeking to

18

enforce the Collateral Agreement merely to obtain "leverage" on the City, the Integrated Agreements clearly reveal the principled, economic reasons Syncora has for seeing the Swaps and the Collateral Agreement remain in place.

41.     The City's goal is to use section 365 and Bankruptcy Rule 9019 to obtain judicial immunity for actions taken pursuant to the improper Forbearance Agreement.  This purpose is made manifest in the proposed order ("Proposed Order") the City submitted.  In the Proposed Order, the City does not merely ask the Court to authorize the assumption of the Forbearance Agreement "for what it is worth."  Instead, the City seeks sweeping findings aimed at abrogating Syncora's rights, as demonstrated by the following:

- The City asks the Court to find that "[t]he consent of UBS AG and MLCS will allow the City immediate access to its Casino Revenues as set forth in [the] Forbearance Agreement, and no other further consents are required."  (Proposed Order ¶ E.)

- The City asks the Court to find that "[t]he parties' entry into and performance under the Forbearance Agreement does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against the parties thereto, except as may be set forth in this Order or in such agreements." (*Id*. ¶ G.)

- The City asks the Court to order that "[t]he City is authorized to perform its obligations that arise from the Forbearance Agreement pursuant to Bankruptcy Rule 9019, and actions taken heretofore in furtherance of these obligations are hereby ratified."  (*Id*. ¶ 4.)

- The City asks the Court to order that "[t]he Custodian under the Collateral Agreement is hereby authorized to rely upon the terms of this Order and UBS AG and MLCS' consent to the use by the City of the Casino Revenue."  (*Id* ¶ 5.)

- The City asks the Court to order that "[t]he City is authorized to take any and all actions necessary or appropriate to implement the terms of this Order and the Forbearance Agreement."  (*Id*. ¶ 7.)

42.     At the August 2, 2013 status hearing, the Court expressed the view that "my decision will be nothing more than to approve the decision of the city to assume this contract and enter into the settlement or disapprove of it."  (Status Hr'g. Trn. 124:15-18, Aug. 2, 2013.)  The

Court further noted, "[I]f the motion to assume is granted, it's granted with all of the [warts] and questions about the contract. There's nothing about the assumption process that improves a debtor's position vis-à-vis other parties . . . ." (*Id*. at 127:13-17.) Notwithstanding these admonitions, the City has not modified either the Forbearance Agreement or the Proposed Order.

## V.     Syncora Guarantee's Suit Against the Swap Counterparties

43.     On July 24, 2013, Syncora Guarantee filed an action for declaratory and injunctive relief against the Swap Counterparties in the Supreme Court of the State of New York (the "<u>New York Litigation</u>"). Syncora Guarantee's complaint sought declaratory and injunctive relief barring the Swap Counterparties from acting inconsistently with Syncora Guarantee's rights.

44.     Specifically, Syncora Guarantee seeks, in the New York Litigation, (i) a declaration that (A) the Swap Counterparties may not terminate the Swaps without Syncora Guarantee's consent, (B) any purported termination of the Swaps by the Swap Counterparties without Syncora Guarantee's prior written consent will be void *ab initio* and of no force or effect, and (ii) a permanent injunction preventing the Swap Counterparties from terminating the Swaps without obtaining Syncora Guarantee's prior written consent.

45.     On July 31, 2013, the Swap Counterparties filed a joint motion for an order directing Syncora Guarantee to show cause why the New York Litigation should not be transferred to the Eastern District of Michigan.

46.     The New York and Michigan Litigations demonstrate that there are substantial Article III controversies between the parties that cannot be resolved by motion under section 365 or Bankruptcy Rule 9019.

47.     The Assumption Motion asks the Court to approve the City's assumption of the Forbearance Agreement under section 365 of the Bankruptcy Code and the "settlement" purportedly embodied in the Forbearance Agreement under Bankruptcy Rule 9019.  In support thereof, the City states that the Forbearance Agreement satisfies the standards of section 365 and Bankruptcy Rule 9019 because it purportedly "allows the City to access much needed cash flows, provides for a workable unwind of the City's swap obligations at a discounted price, and avoids potentially protracted litigation involving the swap transactions."  (Assumption Mot. ¶ 41.)  Based on these alleged benefits, the City claims that "its assumption of the Forbearance Agreement is a sound exercise of its business judgment, and that the Forbearance Agreement should be approved under Bankruptcy Rule 9019 because it is fair, equitable, and in the best interests of the City and its Creditors."  (*Id*.)  In fact, the City has not satisfied the standards of section 365 or Bankruptcy Rule 9019, and it cannot do so.

48.     In the Assumption Motion, the City fails to disclose the complicated contractual issues underlying the Forbearance Agreement and the far-reaching negative implications of the agreement's assumption and approval on the rights of third-parties — all of which require the denial of the Assumption Motion.  The Court should deny the Assumption Motion for three principal reasons.

49.     *First*, the Forbearance Agreement purports to impair significant third-party rights and seeks to moot state-law contractual disputes with third parties.  Neither section 365 nor Bankruptcy Rule 9019 allow the Court to adjudicate complicated state-law issues that bear on third-parties who are not parties to the settlement or the contract.  Instead, the impairment of third-party rights is a clear basis to deny the Assumption Motion.

50.     *Second*, the Forbearance Agreement does not satisfy the standards for approval under Bankruptcy Rule 9019 and section 365 because the agreement is not fair and equitable (as required under Bankruptcy Rule 9019), or to the economic advantage of the estate (as required by section 365). Nor is it the type of contract that a debtor can assume under section 365, given that the City has failed, *inter alia*, to seek assumption of the agreement *cum onere* and cure all defaults under the agreement.

51.     *Third*, if the Court allows the City to assume the Forbearance Agreement, the Court should stay its order pending resolution of the various contract disputes relating to the COPs/Swaps structure. A stay is appropriate in this case given that the Forbearance Agreement conflicts with numerous provisions of the Integrated Agreements and its assumption or approval is thus a prescription for confusion and additional litigation.

**I.     Bankruptcy Rule 9019 and Section 365 Are Not the Proper Procedural Vehicles to Adjudicate and Resolve the Issues Raised in the Forbearance Agreement.**

52.     Bankruptcy Rule 9019 and section 365(a) of the Bankruptcy Code are procedural vehicles that allow bankruptcy courts to approve settlements and authorize the assumption of contracts. The Court is, however, limited in the issues it may resolve under Bankruptcy Rule 9019 and section 365.

53.     For example, under Bankruptcy Rule 9019, a bankruptcy court does not have the authority to approve a settlement that impairs or extinguishes contractual rights of third parties. Similarly, under section 365(a), a bankruptcy court does not have the authority to decide disputed contractual issues in the context of an assumption hearing.

54.     Notwithstanding these limitations, the Forbearance Agreement and Proposed Order require the Court to exercise authority that it does not have — namely, to resolve complex

contractual issues relating to Syncora's third-party rights under the Integrated Agreements. The Court must therefore deny the Assumption Motion.

**A.    Bankruptcy Rule 9019 and Section 365 Prohibit a Bankruptcy Court from Approving Relief that Resolves Contractual Issues or Impairs Third-Party Rights.**

**1.    Bankruptcy Rule 9019 Does Not Allow a Bankruptcy Court to Approve a Settlement Agreement that Impairs Third-Party Rights.**

55.    Under Bankruptcy Rule 9019, a bankruptcy court may approve a settlement only if that settlement is fair and equitable and in the best interests of the estate. *In re SportStuff, Inc.*, 430 B.R. 170, 177 (B.A.P. 8th Cir. 2010); *see also In re Bard*, 49 Fed. App'x. 528, 530 (6th Cir. 2002); *In re Martin*, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997) (stating that the standard for compromise and approval of a settlement is whether the settlement is fair and equitable and in the best interests of the estate) *citing In re Apex Oil Co.*, 92 B.R. 847, 867 (Bankr. E.D. Mo. 1988). Before embarking on that analysis, however, the bankruptcy court must first be certain that the proposed settlement does not impair or extinguish the independent contractual rights of third parties. *In re Sportstuff, Inc.*, 430 B.R. at 177. If the settlement does so, the bankruptcy court lacks the authority to approve the settlement-at-issue. *Id.* at 178; *see also In re Forty-Eight Insulations*, 133 B.R. 973, 979 (Bankr. N.D. Ill. 1991) (finding that court lacked authority under bankruptcy and non-bankruptcy law to approve a settlement and enter an order that impaired a non-debtor's contractual rights against another non-debtor).

56.    *SportStuff* illustrates this well-established principle. In that case, a debtor manufacturer was the subject of multiple personal injury claims relating to one of its defective products. 430 B.R. 170, 174 (B.A.P. 8th Cir. 2010). The debtor brought an adversary proceeding seeking injunctive and declaratory relief against claimants who had suits against the debtor, its insurers, its vendors, and other indemnitees. *Id.* After the filing of this adversary

proceeding, the debtor executed several settlements with its insurers that it submitted for approval under Bankruptcy Rule 9019. *Id.* The settlement agreements contained provisions, *inter alia*, releasing the insurer from any obligation to defend and indemnify the third-party vendors — none of whom were parties to the settlement agreements. *Id.* at 175. The vendors objected to the settlement agreements on the grounds that they would abrogate the separate contractual rights and state law causes of action the vendors possessed against the insurers. *Id.* The bankruptcy court overruled these objections and approved the settlements. *Id.*

57. On appeal, the Eighth Circuit Bankruptcy Appellate Panel reversed the bankruptcy court. Analyzing the various insurance contracts and the relationships between the parties, the appellate panel found that the settlements impaired the vendors' independent contractual rights to assert claims against the insurer. *Id.* at 178-79. Because the settlements deprived the vendors of contractual rights without their compensation or consent, the appellate panel held that the bankruptcy court did not have jurisdiction to approve the settlement. *Id.* at 179 ("The bankruptcy court did not have the jurisdiction or authority to impair or extinguish these independent contractual rights.").

### 2. Section 365 Similarly Does Not Allow a Bankruptcy Court to Resolve Disputed Factual and Legal Contractual Issues.

58. A motion to assume under section 365 is a summary proceeding intended for the efficient review of a debtor's decision to assume or reject a particular executory contract. *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098-99 (2d Cir. 1993). As such, it is not the time or place for prolonged discovery or a lengthy trial with disputed issues. *Id.* Rather, motions to assume have the limited purpose of ensuring that valuable property is preserved and that burdensome property is discarded. *Id.* As a result, bankruptcy courts are not authorized to resolve disputed factual or legal issues in the context of

24

an assumption motion. *Id*.; *see also In re BankVest Capital Corp.*, 360 F.3d 291, 302 (1st Cir. 2004) (emphasizing that an "assumption proceeding itself is not the place to resolve" claims and defenses arising out of the contract proposed to be assumed); *In re 611 Sixth Avenue Corp.*, 191 B.R. 295, 301 (Bankr. S.D.N.Y. 1996) ("Presumably, *Orion* permits the bankruptcy court to take evidence in connection with its threshold inquiry into whether there is a lease or contract to assume or reject . . . [but] *Orion* makes clear . . . that the court should not engage in extensive, lengthy litigation to resolve factual disputes, and its decision does not have preclusive effect in the plenary litigation of the underlying dispute."). And, where such disputes relate to the assumption of a contract, courts allow ongoing proceedings to conclude before granting or denying assumption. *See In re ExpressTrak, L.L.C.*, 2004 WL 3735126, at *6 (Bankr. E.D. Mich. 2004) (declining to rule on the debtor's motion to assume a contract until parties concluded previously-initiated litigation relating to termination of contract).

59. *Orion* is a good example of the limited purpose of an assumption hearing. In that case, a debtor motion picture distributor filed an adversary proceeding claiming that a creditor anticipatorily breached a licensing agreement. 4 F.3d 1095 (2d Cir. 1993). The debtor also simultaneously filed a motion to (a) assume the licensing agreement and (b) strike the creditor's jury demand. *Id.* at 1097-98. The bankruptcy court granted the debtor's motion to assume and dismissed the adversary proceeding as "moot." *Id.* at 1098. At the same time, the bankruptcy court also denied the creditor's jury demand on the grounds that the proceedings were in equity and thus did not create a jury trial right. *Id*.

60. On appeal, the Second Circuit explained that, "[a]t heart, a motion to assume should be considered a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift

administration of the bankruptcy estate." *Id*. at 1098-99. Based on this reasoning, the Second Circuit found that the bankruptcy court erred because it (a) decided a disputed factual issue regarding the enforceability and validity of the license agreement and (b) did not treat the adversary proceeding and the motion to assume as "conceptually separate" proceedings. *Id*. at 1099 ("[A]dversary proceedings are not to be decided as part of a motion to assume."). The Second Circuit further found that "allowing a bankruptcy court to decide a disputed *legal* contract issue in the course of deciding a motion to assume could usurp litigants' Seventh Amendment jury-trial rights." *Id.* (emphasis in original). As a result, the court held that "contract issues may not be decided as part of a motion to assume." *Id*.

**B.**    **The Forbearance Agreement and Proposed Order Abridge Syncora's Rights and Attempt to Resolve Factual and Legal Disputes Regarding State-Law Contract Claims.**

61.     The Forbearance Agreement and Proposed Order ask the Court to do precisely what *Sportstuff* and *Orion* say it should not. As discussed below, Syncora maintains that the Forbearance Agreement impairs and extinguishes Syncora's rights under the Integrated Agreements.

62.     To determine that the Forbearance Agreement is a valid executory contract capable of assumption or approval, however, the Court would need to resolve significant legal and factual disputes regarding the validity and impact of the Forbearance Agreement. Under *Orion* though, an assumption hearing is not the proper context to decide these issues. And, as *Sportstuff* teaches, the Court does not have the authority to decide an approval motion under Bankruptcy Rule 9019 if doing so would impair or extinguish third-party rights.

### 1. The Forbearance Agreement and Proposed Order Abridge Syncora's Rights under the Integrated Agreements.

63.     As noted above, the Assumption Motion describes the alleged benefits that will inure to the City should the Court approve the settlement contained therein.   Significantly though, the City fails to account for — or even mention — the effect that this settlement will have on Syncora's rights under the Integrated Agreements.   Indeed, the Forbearance Agreement extinguishes or impairs the following rights that Syncora, as the insurer of the COPs and the Swaps, bargained for and obtained:

- The Forbearance Agreement allows each Swap Counterparty to designate an Early Termination Date for the Swaps without Syncora's consent.  (FA Recitals.)  This provision directly conflicts with the provisions under the Amended Swaps that require the Swap Counterparties to obtain Syncora's prior written consent before designating an Early Termination Date.  (A&R §§ 5(xiv), 5(n); *see also* CAA § 6.9.2(2), discussed below.)

- The Forbearance Agreement prohibits the Swap Counterparties from taking any actions to trap the funds in the General Receipts Subaccount and requires the Swap Counterparties to use their best efforts to ensure that the funds are disbursed to the City.  (FA § 1.)  This provision directly conflicts with the provisions in the Collateral Agreement that (a) require cash-trapping to occur <u>automatically</u> upon a Termination Event or an Event of Default and (b) state that this protection cannot be waived, altered, or amended without Syncora's consent.  (CA §§ 5.4(a), 14.5.)  In addition, this provision is antithetical to Syncora's right to enforce the City's pledge of Casino Revenues, (CA § 11.2; CAA § 6.9.2(2)), as well as the prohibition on the City from attempting to re-route the Casino Revenues.  (CA § 5.1(b).)

- The Forbearance Agreement creates a right of the City to direct the Swap Counterparties to terminate the Swaps.  (FA § 3.1.)  The Swap Counterparties and Service Corporations may not grant the City a new right without Syncora's consent.  (A&R Part 5(iv).)  Further, this provision directly conflicts with the provision in the Contract Administration Agreement that provides *Syncora* with the right to direct the actions of the Swap Counterparties.  (CAA § 6.9.2(2).)

64.     Additionally, the Forbearance Agreement impairs the rights of COP-holders such as Syncora.   First, as noted above, it deprives them of the protections of the valuable Swap Agreement and thus exposes Syncora to rising interest rates.   Second, it eliminates Syncora's

ability to "lock down the structure" until the City brings current its obligations to the Service Corporations. Third, under the Service Contracts, the City must make all Swap Payments directly to the Service Corporations in accordance with the priority scheme set forth in those contracts. (Service Contracts § 8.03; A&R Part 4(b)(ii)(g).) Under the priority scheme, all then due or about to become due payments to COP-holders are senior to any termination payments to the Swap Counterparties. (*Id.*) Under the Forbearance Agreement, the City will pay the Swap Counterparties over $220 million as a termination payment. The City proposes to pay that amount directly to the Swap Counterparties and outside of the payment hierarchy set forth in the Service Contracts. (FA § 3.)

65. Accordingly, here, as in *SportsStuff*, the City is asking this Court to approve a settlement that impermissibly affects Syncora's third-party rights in multiple respects. *See Sportstuff*, 430 B.R. at 180.

> **2. Resolving the Issues Surrounding the Forbearance Agreement and Proposed Order Would Require this Court to Resolve Factual and Legal Disputes Relating to State-Law Contract Claims.**

66. If the City disputes that the Forbearance Agreement purports to extinguish or impair Syncora's rights as an insurer and COP-holder, the Court must resolve this threshold question before determining whether approval and assumption of the Forbearance Agreement is proper. To do so, however, the Court will necessarily need to resolve a number of factual and legal issues relating to the provisions of the Forbearance Agreement and the Integrated Agreements that bear on Syncora's rights.

67. *First*, the Court must determine the proper operation of section 5.4 of the Collateral Agreement. In contrast to the City's claims that cash-trapping occurs only when the Swap Counterparties instruct U.S. Bank to retain the Casino Revenues in the General Receipts Subaccount, Syncora maintains that cash-trapping occurs automatically upon a Termination

Event or Event of Default. Even though this feature of the cash trap is clear based on the plain meaning of section 5.4, assuming *arguendo* that the cash trap is not automatic, the Court would need to determine whether Syncora may enforce the cash trap if the Custodian fails to act. Once the Court makes that determination it would need to determine whether the cash-trapping mechanism could be waived or altered without Syncora's written consent. Accordingly, resolution of the effect of section 5.4 is necessary given that the Forbearance Agreement prohibits the Swap Counterparties from taking any actions to trap, and requires the Swap Counterparties to support the release to the City of, the funds in the General Receipts Subaccount.

68.     *Second*, the Court must determine whether the Swap Counterparties have the right to designate an Early Termination Date for the Swaps without Syncora's consent, as the Forbearance Agreement provides. Syncora maintains that the Swap Counterparties may not designate an Early Termination Date without its prior written consent. The City, on the other hand, claims that Optional Termination Rights under the Forbearance Agreement are not subject to Syncora's consent. Resolution of this issue is necessary given that the Forbearance Agreement grants the Swap Counterparties the right to designate an Early Termination Date for the Swaps.

69.     Significantly, the above issues are central to the state-law claims in the Michigan Litigation and New York Litigation. Because these issues must be resolved by an Article III court — and, at least in the Michigan Litigation, a jury — the City's attempt to put them in front of the Court through the Forbearance Agreement and Proposed Order is improper. *In re Orion*, 4 F.3d at 1099 (holding that "contract issues may not be decided as part of a motion to assume").

70.     Nor should the Court approve the Forbearance Agreement "warts and all." Here, the conflicts between the Forbearance Agreement and the Integrated Agreements are patent and go to the core of the consideration exchanged. Approval of the Forbearance Agreement, whether by assumption under section 365 or Bankruptcy Rule 9019, is a prescription for additional confusion and litigation — and may tempt the Swap Counterparties and the City to treat that approval as judicial permission to perform. Where, as here, the agreement-at-issue is designed with the specific purpose to frustrate or, at worst, cloud the rights of third parties, the Court should decline to give its blessing.

## II.    The Court Should Deny the City's Motion Because it Fails to Meet the Requirements for Approval and Assumption Under Bankruptcy Rule 9019 and Section 365.

### A.    The Court Should Deny the Debtor's Request for Approval of the Forbearance Agreement under Bankruptcy Rule 9019.

71.     Bankruptcy Rule 9019 provides that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019. Under this rule, a court may approve a settlement only if the debtor is able to establish that the settlement-at-issue is both fair and equitable, and in the best interests of the estate. *See Reynolds v. Comm'r*, 861 F.2d 469, 473 (6th Cir. 1988); *In re Del Grosso*, 106 B.R. 165, 168 (Bankr. N.D. Ill. 1989) (noting that the debtor has the burden of establishing that a settlement is fair and equitable).

72.     To determine whether a settlement-at-issue is fair and equitable, a bankruptcy court has "an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable." *Reynolds*, 861 F.2d at 473; *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("[T]here can be no informed and independent judgment as to whether a

proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated."). Based on the underlying facts, a court must then evaluate four factors relating to the settlement: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views. *In re High Tech Packaging, Inc.*, 397 B.R. 369, 372 (Bankr. N.D. Ohio 2008) (citing *In re Fishell*, 47 F.3d 1168 (6th Cir. 1995)).[9]

73. The City claims that the following three reasons support approval under Bankruptcy Rule 9019:

74. *First*, the City claims that the Forbearance Agreement provides the City with crucial liquidity and access to much-needed cash flows. (Assumption Mot. ¶¶ 41, 43.) The City submits that "[t]his is a critical concession given the City's liquidity crisis and limited other sources of revenue at this time." (*Id*. ¶ 43.)

75. *Second*, the City claims that the Forbearance Agreement "provides for a workable unwind of its [sic] Swaps obligations at a discounted price." (*Id*. ¶¶ 41, 45.) The City asserts that the discount associated with this option exceeds $70 million and represents significant value to the City and its creditors. (*Id*. ¶ 46.)

---

[9] A bankruptcy court must subject a proposed settlement between "insiders" to a higher level of scrutiny. *Spradlin v. Williams* (*In re Alma Energy, LLC*), 2010 WL 4736905, at *5 (Bankr. E.D. Ky. Nov. 16, 2010). An "insider" includes an individual or entity that has a relationship with the debtor "close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties." *In re HyLoft*, 451 B.R. 104, 113 (Bankr. D. Nev. 2011). Here, because each director of the Service Corporations is also a City officer or a City council member, the Forbearance Agreement is an agreement between insiders. (*See supra*, ¶ 9.) As a result, the Court should evaluate the proposed settlement with a higher level of scrutiny.

76. *Third*, the City submits that the Forbearance Agreement allows the City to "avoid[] potentially protracted litigation involving the Swaps transactions" and moots the issues in the Michigan Litigation. (*Id*. ¶¶ 41, 48.) Though the City concedes that viable options may exist to challenge the validity of the Swaps, it recognizes that the Integrated Agreements "are exceedingly complex, as is any determination of the amounts owing and the rights of the parties thereunder." (*Id*. ¶ 47.) Given the purported risks and costs associated with this litigation, the City claims that its decision to not challenge the validity of the Swaps is in the best interests of its creditors. (*Id*. ¶ 49.)

77. In actuality, the Forbearance Agreement (a) does not actually settle any claims and (b) is not in the best interests of the City's creditors or fair and equitable. Thus, the City has not satisfied the Bankruptcy Rule 9019 standard.

### 1. The Forbearance Agreement Does Not Constitute a Compromise or Settlement.

78. As noted above, the Forbearance Agreement purportedly settles several potential or pending legal claims relating to the Integrated Agreements — namely, the Swap Counterparties' claims relating to the Events of Default and Termination Events, the City's claims regarding the invalidity of the Swaps and the security interest in the Casino Revenues, and the City's claims against Syncora in the Michigan Litigation. Upon closer examination, however, it is clear that the Forbearance Agreement does not — and, in some instances, cannot — actually settle these claims.

79. For example, the City claims that the Swap Counterparties have agreed to waive any right to trap the Casino Revenues or demand a termination payment. (*Id*. ¶ 43.) But this benefit is ephemeral because the Collateral Agreement automatically traps cash whether the Swap Counterparties want it to or not. (CA § 5.4(a).) Moreover, the Swap Counterparties do not

have the independent right to waive the trapping of the Casino Revenues or terminate the Swaps. Rather, Syncora has the right to control the Swap Counterparties' actions under the Collateral Agreement. (CAA § 6.9.2(2).) In addition, Syncora must consent before the Swap Counterparties waive the provisions of the Collateral Agreement and Swaps relating to cash-trapping and termination. (CA § 14.5; A&R Part 5(iv), 5(d).) Because Syncora has not provided its consent, the Swap Counterparties cannot actually settle their claims arising out of the Events of Default and Termination Events.

80.     The City also claims that the Forbearance Agreement allows the parties to avoid protracted and expensive litigation regarding the validity of the Swaps. (Assumption Mot. ¶ 47.) But the City fails to provide any discussion regarding the merits of such litigation or even the basis thereof. And it fails to show that the City will not have to litigate these issues *anyway* against Syncora or other COP-holders. As a result, the City's claims of compromise or settlement are unavailing.

81.     In addition, the City claims that the Forbearance Agreement moots the issues raised in the Michigan Litigation. Nothing in the Forbearance Agreement, however, dismisses the City's claims against Syncora. As a result, the issues raised in the Michigan Litigation must still be resolved even if the Court approves the City's settlement.

82.     Finally, it is unclear what claims the City and the Swap Counterparties are purporting to settle. After all, the City has no payment obligations under the Swaps — and its Swaps-related payment obligations to the Service Corporations are not released under the Forbearance Agreement. Nor does the Forbearance Agreement address the claims by the Service Corporation against the City for non-payment of the $40 million Service Payment missed in June. The Swap Counterparties have not articulated a tort or breach of contract claim that could

subject the City to liability. In short, the purported "compromise" is no compromise at all, but rather a modification of the COPs/Swaps structure, as described above.

83. Accordingly, because the settlement purported to be embodied in the Forbearance Agreement is illusory, the Court should deny the City's motion to approve the settlement. *See In Shankman*, Case No. 08-36327, at *2 (Bankr. S.D. Tex. Mar. 2, 2010) (refusing to approve a settlement where the "purported benefits to the estate are illusory").

  **2. The Forbearance Agreement is Not Fair or Equitable, or in the Best Interests of the City's Creditors.**

84. Under *Fishell*, a bankruptcy court must evaluate four factors to determine whether a settlement is fair and equitable, and in the best interests of the City and its creditors. In this case, these factors demonstrate that the settlement is not fair and equitable, or in the best interests of the creditors, and therefore the Court should not approve the settlement.

The Probability of Success in the Litigation

85. When evaluating a settlement, bankruptcy courts first assess a debtor's likelihood of success should it decide to litigate the claim. *In re Fishell*, 47 F.3d 1168, at *4 ("The first factor directs the court's attention to the merits of the adversary proceeding."). When the claims of the parties lack substantial merit — but are nevertheless likely to lead to costly litigation — compromise or settlement may be a suitable option for the debtor. *Id*. The City presents no evidence or information that could allow the Court to assess the merits of the allegedly-settled claims.

86. The City claims that it "has examined whether there are viable actions to challenge the Swap Contracts or the City's pledge of the Casino Revenue to secure its obligations to the Swap Counterparties." (Assumption Mot. ¶ 47.) But the City presents no evidence of an analytical process or the results of any such examination. Instead, the City simply

notes that "certain creditors have informed the City of their views on these arrangements." (*Id.*) The City then abruptly concludes that the "litigation would be protracted, expensive and, in terms of success, uncertain." (*Id.*) Given that the City is proposing to pay $220 million it does not owe, it is difficult to imagine that even "protracted and uncertain" litigation would be worse.

87. Moreover, even if the Swaps are valid, the City presents no analysis of the Swap Counterparties' ability to assert a claim directly against the City. This omission is particularly glaring because (a) the City is not a party to the Swaps; and (b) there are significant questions surrounding the Swap Counterparties' ability to terminate the Swaps.

88. Additionally, the City does not address its likelihood of success in any litigation involving the trapping of the cash in the General Receipts Subaccount. But this issue is fundamental to the core consideration claimed by the City under the Forbearance Agreement, namely, the access to the casino wagering revenues.

89. The City's failure to provide any supporting information or analysis means that the Court cannot possibly apprise itself of the underlying facts and make an independent judgment whether the City's alleged compromise is fair and equitable. *In re Del Grosso*, 106 B.R. 165, 167 (Bankr. N.D. Ill. 1989) ("The requirement that adequate information be set forth in sufficient detail to enable approval of a settlement parallels the same requirement applicable to consideration of settlements in class actions or derivative actions pursuant to Rules 23 or 23.1 of the Federal Rules of Civil Procedure."). Because the burden is on the City to prove that the settlement is fair and equitable, the City's failure to provide the requisite information supports denial of the Assumption Motion. *See id.* at 168.

The Difficulties In the Matter of Collection

90. The second factor bankruptcy courts evaluate in connection with a settlement is the difficulties, if any, to be encountered in the matter of collection. In its Assumption Motion,

the City does not claim that it would encounter any difficulties in the matter of collection if it obtained a judgment invalidating either the Swaps or the City's pledge of the Casino Revenues to secure its obligations to the Swap Counterparties. Thus, this factor does not favor approval of the settlement.

The Complexity of the Litigation, and the Related Expense, Inconvenience, and Delay

91.    The third factor bankruptcy courts evaluate in connection with a settlement is the complexity of the litigation and the related expense, inconvenience, and delay. In particular, courts look at the time and money that the debtor could save as a result of the settlement.

92.    Here, all of the pending and potential litigation relates to the interpretation and validity of the Integrated Agreements, which are, as the City claims, "exceedingly complex," as would be any related litigation. Given the complexity of this litigation, the City is correct to suggest that the resolution of the parties' rights under the Integrated Agreements would be fact-intensive and require a lengthy proceeding. The flaw in the City's position is that the Forbearance Agreement does not materially reduce the cost, inconvenience, or delay associated with resolving these issues. Most of the "resolved" issues remain the subject of active, parallel litigation. In fact, because of the City's efforts to moot third-party rights under the Integrated Agreements via the Forbearance Agreement, the City's agreement with the Swap Counterparties is certain to materially increase the City's costs and delay progress in this case.

The Paramount Interest of the Creditors and a Proper Deference to their Reasonable Views

93.    The final factor that bankruptcy courts must evaluate in connection with a settlement is the interest of the creditors. The interest of the creditors is of "paramount" importance and a "major consideration" when evaluating a proposed settlement. *In re Del Grosso*, 106 B.R. at 168-69. In this case, the interests of the creditors weigh heavily against

approving the settlement contained within the Forbearance Agreement and demonstrate that it does not meet the fair and equitable standard.

94. *First*, as described at length *supra*, the Forbearance Agreement impairs and extinguishes the rights of third-party creditors such as Syncora. The City cannot, however, use a motion to approve a settlement to unfairly prejudice the rights of those who are not parties to the settlement. *In re High Tech Packaging, Inc.*, 397 B.R. at 373 ("A proposed settlement agreement will not be approved as fair and equitable if the rights of others, who are not parties to the settlement agreement, are unduly prejudiced."). Nevertheless, the Forbearance Agreement ignores Syncora's numerous bargained-for rights under the Integrated Agreements and bypasses the priority scheme in the Service Contracts intended to protect COP-holders.

95. The Forbearance Agreement's disregard for and destruction of the rights of third-parties is not surprising given the bad-faith conduct of the City surrounding the negotiation of this agreement. Though the rights of various third-parties, including Syncora, were affected by the settlement, none of these third-parties were invited to participate. Where, as here, a heightened standard of review applies because the transaction occurred between insiders, courts interpret creditor opposition and exclusion from negotiations as evidence that the settlement is not fair and equitable. *See In re Foster Mortgage Corp.*, 68 F.3d 914, 919 (5th Cir. 1995) (noting that under heightened review the bankruptcy court should "consider the amount of creditor support for a compromise settlement as a 'factor bearing on the wisdom of the compromise,' as a way to show deference to the reasonable views of the creditors"); *see also In re HyLoft*, 451 B.R. at 117 (finding a settlement agreement failed to meet the heightened standard applicable to insider transactions because outside creditors holding a majority of the debt and claims opposed the agreement and were not given a chance to participate in

negotiations); *In re Present Co., Inc.*, 141 B.R. 18, 24 (Bankr. W.D.N.Y. 1992) (citing a lack of arms-length negotiations as one of several reasons for rejecting a settlement agreement under Bankruptcy Rule 9019).

96.     *Second,* the City's economic argument for the Forbearance Agreement is flawed. The Forbearance Agreement allows the City to terminate the Swaps at a "discounted value" between $220 million and $250 million.  In exchange, the City would obtain $11 million per month, net, of Casino Revenues.  Thus, holding all else constant, the City will require approximately two years to break-even on its trade — and that assumes (a) that the Swap Counterparties even have the right to terminate; and (b) that the cash will not be trapped by automatic operation of the Collateral Agreement.

97.     In addition, the City will need to finance the payment to the Swap Counterparties. However, the terms of any financing may significantly erode the $11 million monthly Casino Revenue payment.  On top of these costs, the Forbearance Agreement is likely to generate substantial litigation and related cost if approved.  As a result, the settlement is economically imprudent both for the City and the City's unsecured creditors — who will bear the brunt of such imprudence.

98.     *Third*, as matters currently sit, the Swap Counterparties' rights to receive payments are (over time) collateralized by a special revenue stream not presently available to general unsecured creditors.  This is so because, under section 922(d) of the Bankruptcy Code, the Casino Revenues are not generally available to pay claims of other creditors.  11 U.S.C.A. § 922(d).

99.     The proposed Forbearance Agreement purports to free up these revenues — but does not propose to distribute them to creditors.   Instead, the City indicates that the Casino Revenues are necessary for "critical reinvestments."  (Assumption Mot. ¶ 44.)

100.    Worse, the price for freeing up special revenues not currently available to creditors is at least a $220 million payment, presumably from funds or assets that *are* currently available to unsecured creditors.

101.    Thus, in one fell swoop, the City takes a creditor in the form of the Swap Counterparties who (a) have no current right to a termination payment but (b) have access to special revenues in the event such a right arises and (c) pays them with amounts presumably available to unsecured creditors but without any corresponding benefit.   Along the way, it destroys the hedge, which is a critical asset of the Service Corporations that protects the COP-holders and COP-insurers.   Thus, the proposed Forbearance Agreement, even if allowed to operate in violation of Syncora's rights, ultimately redounds to the detriment of the City's creditors.

102.    Perhaps realizing that the Forbearance Agreement is both economically imprudent and a flagrant violation of Syncora's rights, the City argues that Syncora's consent is not actually required for the termination contemplated by the Forbearance Agreement.   (*Debtor's Response to Motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. for Leave to Conduct "Limited" Discovery Regarding Motion of Debtor for Authorization and Approval of Forbearance and Optional Termination Agreement*, [Dkt. 244], at 16.)   Under the Forbearance Agreement, the City can purportedly direct the Swap Counterparties to exercise their Optional Termination Rights in exchange for a substantial cash payment.   (*Id.* at 17.)   According to the City, Part 5(xx) of the Amended Swaps allows the Swap Counterparties to unilaterally exercise

their Optional Termination Rights without obtaining Syncora's consent.[10] (*Id.*)  There are, however, several significant flaws in this argument — namely, the City and the Swap Counterparties do not have the rights contemplated by the Forbearance Agreement.

103.    To begin, the Forbearance Agreement and the City ignore that, under section 6.9.2(2) of the Contract Administration Agreement, Syncora — not the City — has the right to direct the actions of the Swap Counterparties.  Thus, even if the Swap Counterparties have the right to terminate the Swaps without Syncora's consent (which they do not), Syncora still has the ability to direct the actions of the Swap Counterparties.  Accordingly, the Swap Counterparties may not — as the City claims — *unilaterally* terminate the Swaps where, as here, Syncora has clearly expressed its objections to such an approach.

104.    Similarly, the Forbearance Agreement and the City ignore that the Swap Counterparties may not exercise their Optional Termination Rights if (a) an Event of Default is occurring and (b) the Swap Counterparty is the defaulting party.  (A&R Part 5(xx).)  Here, the parties to the Forbearance Agreement needed to obtain Syncora's consent before amending the Swaps or the Collateral Agreement.  (A&R Part 5(iv).)  However, the Swap Counterparties did not obtain Syncora's consent before agreeing to (a) redirect the casino revenues directly to the City; (b) provide the City with the right to direct the Swap Counterparties to terminate the Swaps; and (c) reduce the termination amount — all of which constitute amendments to the Swaps and Collateral Agreement.  As a result, the Swap Counterparty is a defaulting party and, as such, does not have the ability to exercise its Optional Termination Right.

105.    Finally, the contemplated operation of the Forbearance Agreement further highlights the economic imprudence of that agreement.  Under the normal operation of Part

---

[10] In the SBS Swap, the relevant provision is Part 5(t).

5(xx) of the amended Swaps, the Swap Counterparties are not entitled to receive any type of termination payment. Here, however, the City has agreed to pay the Swap Counterparties at least $220 million, which, again, is presumably sourced from funds or assets that *are* currently available to unsecured creditors.

106. Accordingly, the Forbearance Agreement prejudices creditors' rights and the Court should deny the Assumption Motion.

### B. The Court Should Deny the City's Request for Authorization to Assume the Forbearance Agreement under Section 365.

107. Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a). Generally, a debtor's decision to assume or reject a contract under section 365 of the Bankruptcy Code is reviewed under the "business judgment" standard. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993). If, however, a transaction occurs between insiders, the transaction must satisfy the heightened scrutiny standard, which requires the debtor to show that (a) the process and price of the proposed transaction was, in fact, fair and (b) insiders complied with their fiduciary obligations. *See In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

108. Additionally, under section 365, the debtor:

- must assume the contract *cum onere*;

- must cure all material defaults on the assumed contracts; and

- must assume a contract that is valid and enforceable.

109. As described below, the City has failed to satisfy the standard and additional requirements for assumption under section 365, and the Court should deny the Assumption Motion.

### 1. The City is Not Assuming the Forbearance Agreement *Cum Onere*.

110. It is well-established that a debtor must assume an executory contract *cum onere*, "that is, subject to existing burdens. In other words, a debtor may not assume [just] the favorable aspects of the contract . . . ." *U.S. Dept. of Air Force v. Carolina Parachute Corp.*, 907 F.2d 1469, 1472 (4th Cir. 1990) (internal citations and quotations omitted); *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531-32 (1984) ("Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere*."). Consistent with this principle, a debtor must assume the *entire* agreement, including any amendments or underlying contracts that make up that agreement. *In re Ritchey*, 84 B.R. 474, 476 (Bankr. N.D. Ohio 1988) ("[A]n executory contract or unexpired lease must be rejected *in toto* . . . Consequently, if this Court finds that the agreement . . . is one contract, the Debtors must assume or reject the entire agreement."). To determine whether multiple agreements are "separate" or "entire," courts evaluate whether the terms, nature, and purpose of those agreements "contemplate[] that all of [their] parts are interdependent and common to one another." *Mun. Capital Appreciation Partners, I, L.P. v. Page*, 181 F. Supp. 2d 379, 394 (S.D.N.Y. 2002); *City of Lansing v. Lansing Twp.*, 356 Mich. 641, 658 (1959). In this case, the terms, nature, and purpose of the Forbearance Agreement demonstrate that it is, at minimum, an amendment to the Collateral Agreement, the amended Swaps, the Contract Administration Agreement, and the Service Contracts.

111. The Collateral Agreement and Forbearance Agreement are both governed by New York law. (CA § 14.10(a); FA § 8.) Under New York law, a contract is entire — even if formed of multiple agreements — where, "by its terms and purposes, it contemplates that all of its parts are interdependent and common to one another." *Ginett v. Computer Task Grp., Inc.*, 962 F.2d 1085, 1091 (2d Cir. 1992). The primary factor in determining whether a contract is entire is the intent of the parties. *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 237 (2d Cir. 2006). In

addition to examining the intent of the parties, courts applying New York law have considered other factors including: (a) mutual dependence among the agreements; (b) identity of the parties of the two agreements; (c) presence of cross provisions within the agreements; and (d) similar purposes among the agreements. *See id*.

112. The parties to the Collateral Agreement and Forbearance Agreement are the same: they are the City, the Service Corporations, and the Swap Counterparties. The Forbearance Agreement explicitly references the obligations of the Collateral Agreement and does not state that the Collateral Agreement ceases to operate or exist; in fact, it depends on the Collateral Agreement to define terms. (*See* CA Recitals.) This strongly evidences an intent for the Forbearance Agreement to operate in concert with the Collateral Agreement in an integrated fashion. The Forbearance Agreement's terms are in fact dependent on the terms of the Collateral Agreement — in section 1.2 alone the Forbearance Agreement references the Collateral Agreement at least 19 times. The Collateral Agreement, in turn, is integrated into the entire transaction structure, including the Service Contracts, Contract Administration Agreement, and the Swaps:

> This Agreement, the Definitive Documents, and the Hedges, the Service Contracts and the Contract Administration Agreement, as modified by the Definitive Documents, **contain the entire agreement among the parties with respect to the subject matter hereof**, and supersedes all prior and contemporaneous oral and written agreements and discussions with respect thereto, and none of the parties shall be bound by any conditions, inducements or representations with respect thereto other than as expressly provided for herein.

(CA § 14.14(a) (emphasis added).)

113. The assumption of the Forbearance Agreement, therefore, entails the assumption of multiple underlying agreements which together form one integrated transaction.

114.     Despite the fact that the Forbearance Agreement is an amendment to the Collateral Agreement and the other Integrated Agreements, the Forbearance Agreement attempts to retain the beneficial aspects of the Collateral Agreement while rejecting many of its burdens, including, critically, third-party consent rights and the City's pledge of Casino Revenues. Accordingly, the City fails to seek assumption of the Forbearance Agreement *cum onere* as required by law.

### 2.     The City Has Not Cured All Material Defaults in the Integrated Agreements.

115.     Under section 365(b)(1)(A) of the Bankruptcy Code, a debtor may not assume an executory contract under which material defaults exist unless, at the time of the assumption, the debtor cures, or provides adequate assurance, that it will promptly cure any defaults.  11 U.S.C. § 365(b)(1)(A).   Read together with the principle that assumption of a contract requires assumption of the entire contract, a debtor must cure any defaults that exist under the entire agreement.  *See In re FPSDA I, LLC*, 450 B.R. 392, 398 (Bankr. E.D.N.Y. 2011) leave to appeal denied, 470 B.R. 257 (E.D.N.Y. 2012).

116.     In *In re FPSDA I, LLC*, a debtor attempted to assume only one of a set of two agreements.   450 B.R. 392, 398 (Bankr. E.D.N.Y. 2011).   These two agreements — a lease agreement and franchise agreement — existed in tandem to set the terms for the operation of a franchise.  *Id.*  The court found that assumption of one necessarily entailed assumption of the other because they operated as an integrated whole.   As such, the court held that any defaults in either agreement must be cured even if the debtor wanted to assume only one of the agreements. *Id.* at 397 ("[S]hould the Debtors wish to assume the Dunkin' Brands Leases, they would also need to assume the related franchise agreements and cure the defaults thereunder.").

117.    As discussed *supra*, the Forbearance Agreement is an amendment to the Collateral Agreement because it modifies the terms and is derivative thereof.  In addition, the Collateral Agreement's integration clause states that it is part of an entire agreement that includes the Swaps, the Service Contracts, and the Contract Administration Agreement.  (CA § 14.14.) Moreover, the Forbearance Agreement also works material amendments to the Service Contracts, the Contract Administration Agreement, and the amended Swaps.  Accordingly, the Forbearance Agreement may not be assumed until each default under any of the Integrated Agreements has been cured.

118.    In this case, a number of defaults under the Integrated Agreements have occurred, such as:

- In March 2012, the COP ratings were downgraded. (Ex. A to Orr. Aff., Proposal for Creditors Executive Summary, at 28 ("COPs were further downgraded which triggered another Termination Event . . . .").)

- On March 14, 2013, Mr. Orr was appointed Emergency Financial Manager for the City and assumed control of the major operations of the City.  (*Id*. ("Appointment of Emergency Manager constitutes an event of default triggering another Termination Event.").)

- On June 14, 2013, the Service Corporations failed to make scheduled Service Payments.  (Ex. 9 Compl. ¶ 26.)

- The Service Corporations have become insolvent in virtue of their continued inability to make payments under the COP obligations. (ISDA MA § 5(a)(i).)

- The City, the Service Corporations, and the Swap Counterparties have attempted to redirect the Casino Revenues via a temporary restraining order and the provisions in the Forbearance Agreement.  (Ex. 9 Compl. pp. 21-22; FA § 3.3; CA § 5.1(b).)

119.    The City has not, however, cured or provided *any* assurance that it intends to cure the above defaults.  Thus, the City may not assume the Forbearance Agreement.

3. **The City's Request for Authorization to Assume the Forbearance Agreement Fails under Both the Heightened Scrutiny Standard and the Business Judgment Standard.**

a. **The City Has Not Demonstrated that Assumption of the Forbearance Agreement Satisfies the Heightened Scrutiny Standard.**

120. As discussed above, the directors of the Service Corporations constitute insiders of the City. 11 U.S.C. § 101(31); *supra* n.9. If insiders are involved in a transaction, courts assess the assumption of a contract under a "heightened scrutiny" standard. *See In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010). When applying this standard, courts evaluate the integrity and "entire fairness" of the transaction that is at issue, and examine whether (a) the process and price of the proposed transaction is, in fact, fair (and does not just appear fair) and (b) fiduciary duties were properly exercised. *In re Innkeepers*, 442 B.R. at 231. Consequently, the Court may not approve assumption of the Forbearance Agreement unless the City can demonstrate that the process and price behind the Forbearance Agreement were fair and that the directors of the Service Corporations — who are also officers and council members of the City — satisfied their fiduciary duties. *Id.*; *In re Adelphia Commc'ns Corp.*, 323 B.R. 345, 385 (Bankr. S.D.N.Y. 2005) (noting that when directors are involved in a self-dealing transaction that is not approved by an independent board, the transaction is unlawful unless the proponents thereof justify the transaction under a two-pronged inquiry into the fair process and fair price of the transaction). The City has made no attempt to, and cannot, satisfy the heightened scrutiny standard.

121. *First*, the City has provided no evidence that it engaged in a fair process when entering into the Forbearance Agreement. After all, Syncora was excluded entirely from these negotiations and its request for discovery into the negotiations was rejected by the Court. Thus, it is impossible to assess the fairness of the process. What is clear, however, is that the process

46

does not have the appearance of fairness given that third-parties like Syncora — whose rights were thereby diminished — were intentionally excluded from the negotiations. Accordingly, the City fails the first aspect of the heightened scrutiny standard.

122. *Second*, the price agreed upon under the Forbearance Agreement is not fair. The City seeks to terminate the Swaps for approximately $250 million. This represents an implied 70% likelihood of success by Swap Counterparties who are subject to an unambiguous Swap Agreement which bars them from terminating *at all* without Syncora's consent. Moreover, because of rising interest rates, the Service Corporations will likely soon be the net beneficiary of the Swaps — making it unlikely that Syncora would grant its consent. It is similarly disconcerting that nowhere in the Assumption Motion does the City disclose how it will pay for the Swaps termination, even though financing the settlement payment is certain to erode the monthly inflow to the City.

123. The City also fails to acknowledge that the Forbearance Agreement is certain to encourage litigation with Syncora and other creditors — all at a high cost to the City and its stakeholders. Consequently, not only are the terms of the Forbearance Agreement objectively unfair to third-parties, but the costs associated with the transaction are also imprudent. Accordingly, the City fails the second aspect of the heightened scrutiny standard.

### b. The City Has Not Satisfied the "Business Judgment Standard" for the Assumption of the Forbearance Agreement.

124. The heightened scrutiny standard aside, the City's decision to assume the Forbearance Agreement cannot even satisfy the "business judgment" standard. The business judgment standard "presupposes that the estate will assume a contract only where doing so will be to its economic advantage . . . ." *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008). To satisfy this standard, "[t]he act of assumption must be grounded, at least in part, in the

conclusion that maintenance of the contract is . . . beneficial to the estate." *In re Great Atlantic & Pacific Tea Co., Inc.*, 472 B.R. 666, 672 (S.D.N.Y. 2012) (quoting *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.*), 208 F.3d 498, 505 (5th Cir. 2000).).

125.    As discussed above, the transaction at the heart of the Forbearance Agreement is economically imprudent.  At a minimum, the City provides no disclosure permitting the Court and parties-in-interest to determine that the transaction is actually economically sound.  What is clear, however, is that the Forbearance Agreement harms certain creditors — namely COP-holders and insurers — by, among other things, impermissibly taking value away from such creditors in contravention of the priority scheme set forth in the Service Contracts.  (Service Contracts § 8.03; ¶ 17 *supra*.)

### 4.    The City Cannot Assume the Forbearance Agreement Because it is Not Valid or Enforceable.

126.    Assumption of a contract pursuant to section 365 is improper where the parties do not have a valid, enforceable contract.  *In re III Enterprises, Inc. V*, 163 B.R. 453, 459 (Bankr. E.D. Pa. 1994) *aff'd sub nom. Pueblo Chem., Inc. v. III Enterprises, Inc. V*, 169 B.R. 551 (E.D. Pa. 1994).  In such a situation, there is no contract for the debtor to assume.  Here, there are two reasons why the Forbearance Agreement is invalid and unenforceable.

127.    *First*, the Forbearance Agreement is missing one of the fundamental elements of a contract — consideration.  *Broder v. Cablevision Sys. Corp.*, 329 F. Supp. 2d 551, 556 (S.D.N.Y. 2004) *aff'd*, 418 F.3d 187 (2d Cir. 2005).  Without consideration, a contract is invalid.  *In re Vargas Realty Enterprises, Inc.*, 440 B.R. 224, 236 (S.D.N.Y. 2010).  To constitute legally sufficient consideration, mutual promises may not be "merely empty formal words, incapable of performance." *Nassau Supply Co., Inc. v. Ice Serv. Co., Inc.*, 252 N.Y. 277, 280 (1929).

48

128. Under the Forbearance Agreement, the only consideration that the Swap Counterparties provided to the City was (a) an Optional Termination Right and (b) a promise to forbear from taking any action to prevent the release of funds from the General Receipts Subaccount. The Swap Counterparties do not, however, have the independent right to grant an Optional Termination Right or waive the automatic cash trapping provision. Lacking these rights, the Swap Counterparties' promises to do so were empty promises that cannot constitute consideration.

129. *Second*, the Forbearance Agreement — which is an amendment of the Collateral Agreement and the other Integrated Agreements — was executed without the consent of Syncora. Under New York law, if a contract prohibits amendment without the express consent of a particular party, then any amendment without such consent is invalid. *BNP Paribas Mortgage Corp. v. Bank of America., N.A.*, 778 F. Supp. 2d 375, 411 (S.D.N.Y. 2011) ("Where a contract provides a procedure for amending contract provisions, that procedure must be followed to execute a valid amendment."); *see also Deutsche Bank AG v. JPMorgan Chase Bank*, 2007 WL 2823129, at *23-24 (S.D.N.Y. Sept. 27, 2007), *aff'd* 331 Fed. App'x 39 (2d Cir. 2009) (finding that if a contract provides that no amendment is valid "unless in writing and signed" by certain required parties, the absence of such signatures invalidated a purported amendment). This is true even if the party with the consent right is a third-party beneficiary of the contract. *Purchase Partners II, LLC v. Westreich*, 14 Misc. 1228(A) (N.Y. Sup. Ct. 2007), *aff'd as modified* 50 A.D.3d 499 (N.Y. Sup. Ct. 2008) (discussing a subsequent modification of a contract entered into for the benefit of a third party, the court acknowledges "the general rule that after third party beneficiary adopts contract entered into for his benefit, the parties thereto cannot rescind the same without his consent.") (quotation marks omitted); *Stein v. Severino*, 245

N.Y.S.2d 624, 637 (Sup. Ct. 1963) (holding that "after the third [party] accepts, adopts or acts upon the contract entered into for his benefit, the parties thereto cannot rescind the same without his consent, so as to deprive him of its benefits.").

130.    In this case, Syncora is explicitly named as a third-party beneficiary of the Swaps. (A&R Parts 5(xi), 5(k).)  Under New York law, Syncora is also a third-party beneficiary of the Collateral Agreement where, as here, the language of the contract "clearly evidences an intent to permit enforcement by the third party." [11]  *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.*, 66 N.Y.2d 38, 45 (1985).

131.    In this case, the language of the Collateral Agreement and the Swaps clearly evidences an intent to permit enforcement by Syncora.  For example, Section 14.5 of the Collateral Agreement provides that Syncora's consent is required before any parties may amend the agreement.

132.    In addition to the provisions in the Collateral Agreement, the Integrated Agreements also demonstrate that Syncora was meant to be a third-party beneficiary or possess rights akin to a party-in-interest:

- Part 5(xi) of the Amended Swaps expressly states that the Swap Insurer (*i.e.*, Syncora) is a third-party beneficiary.

- Section 9.12(a)(3) of the Service Contracts expressly states that the Insurer (*i.e.*, Syncora) is a third-party beneficiary.

- Section 10.2 of the Contract Administration Agreement states that the Insurer (*i.e.*, Syncora) is a Party-in-Interest, which provides Syncora with rights akin to that of a third-party beneficiary.  As a Party-in-Interest, Syncora is entitled to (i) notify the Service Corporations and the Contract Administrator of an Event of Default and (ii) request that the Contract Administrator intervene in judicial proceedings.  The Contract Administrator is required to accept notice of an Event of Default from Syncora.

---

[11] The provisions of the Collateral Agreement are properly interpreted under New York law, as required by Section 14.10 of that agreement.

- Section 6.9.2 of the Contract Administration Agreement permits Syncora to direct the actions of the Swap Counterparties. Section 6.9.2 also states that Syncora is treated the same as the COP-holders it insures and has the right to provide the same consents, directions, and waivers as those COP-holders.

133.　Because each of these provisions is integrated into the Collateral Agreement, it follows that Syncora has the same third-party beneficiary and party-in-interest rights under the Collateral Agreement. Given these rights, the amendment of the Collateral Agreement — here, the Forbearance Agreement — was invalid without Syncora's consent.

134.　In addition to its rights as a third-party beneficiary, Syncora also has consent rights that prevent the City or the Swap Counterparties from modifying the Swaps or the Collateral Agreement without Syncora's consent. Despite these rights, however, Syncora did not consent to any of the modifications that the Forbearance Agreement affected on the Collateral Agreement and the Swaps (*e.g.,* the City's unilateral termination right). Because the City and the Swap Counterparties failed to obtain Syncora's consent before amending the Collateral Agreement, the Forbearance Agreement is invalid.

### III. The Court Should Stay Its Order Granting the Debtor's Motion to Assume the Forbearance Agreement.

135.　In the event the Court approves the Assumption Motion, Syncora requests that the Court use its equitable powers under section 105(a) of the Bankruptcy Code to stay its order approving the motion pending resolution of breach of contract claims arising out of the Forbearance Agreement. A stay pending resolution of the contract claims is appropriate because the operation of the Forbearance Agreement under the auspices of assumption or settlement threatens to completely eviscerate Syncora and other creditors' rights. Absent a stay of the Court's order allowing the City to assume the Forbearance Agreement, it will be of little practical effect that the Court declined to rule on contractual disputes arising out of the Forbearance Agreement. Once the City is allowed to assume the Forbearance Agreement and

51

terminate the Swaps in accordance therewith, third parties will not have a way to reinstate the transaction or regain their collateral. Because Syncora has straightforward and explicit rights in the Integrated Agreements, it is likely to satisfy the factors required for issuance of a stay.

## **Conclusion**

136.    For the foregoing reasons, Syncora respectfully respects that the Court deny the City's motion to approve and assume the Forbearance Agreement pursuant to Bankruptcy Rule 9019 and section 365.

*[Remainder of this page intentionally left blank]*

Dated: August 16, 2013                    /s/ *Ryan Blaine Bennett*
                                          James H.M. Sprayregen, P.C.
                                          Ryan Blaine Bennett
                                          Stephen C. Hackney
                                          KIRKLAND & ELLIS LLP
                                          300 North LaSalle
                                          Chicago, Illinois 60654
                                          Telephone:    (312) 862-2000
                                          Facsimile:    (312) 862-2200

                                          *Attorneys for Syncora Holdings Ltd., Syncora Guarantee*
                                          *Inc., and Syncora Capital Assurance Inc.*

                                                    - and -

                                          David A. Agay
                                          Joshua Gadharf
                                          MCDONALD HOPKINS LLC
                                          300 North LaSalle
                                          Suite 2100
                                          Chicago, Illinois 60654
                                          Telephone:    (312) 280-0111
                                          Facsimile:    (312) 280-8232

                                          *Local Counsel to Syncora Holdings Ltd., Syncora*
                                          *Guarantee Inc., and Syncora Capital Assurance Inc.*