## Exhibit 8

**Forbearance Agreement (FA)**

## FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT

This FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT (this "**Agreement**") is entered into as of this 15th day of July, 2013, by and among Detroit General Retirement System Service Corporation, a Michigan nonprofit corporation ("**DGRS**"), Detroit Police and Fire Retirement System Service Corporation, a Michigan nonprofit corporation ("**PFRS**" and, together with DGRS, each a "**Service Corporation**" and collectively the "**Service Corporations**"), the City of Detroit (the "**City**"), the Emergency Manager of the City (the "**Emergency Manager**"), and UBS AG ("**UBS**") and Merrill Lynch Capital Services, Inc. ("**MLCS**" and, together with UBS, each a "**Swap Counterparty**" and collectively the "**Swap Counterparties**").

Capitalized terms used herein and not otherwise defined have the meanings ascribed to them under the Swap Agreements (as defined below).

## RECITALS

WHEREAS, the Service Corporations and Swap Counterparties are party to swap transactions under certain ISDA Master Agreements (including, in the case of MLCS, pursuant to Transaction Transfer Agreements and, in any case, including the related Schedule and Credit Support Annex thereto and any Confirmations thereunder) as set forth in Schedule A attached to this Agreement (as applicable, the "**MLCS Swap Agreements**" and the "**UBS Swap Agreements**") and the Service Corporations are party to transactions under certain ISDA Master Agreements (including the related Schedule and Credit Support Annex thereto and any Confirmations thereunder) entered into with SBS Financial Products Company, LLC as set forth in Schedule A attached to this Agreement (the "**SBS Swap Agreements**" and together with the MLCS Swap Agreements, the "**MLCS/SBS Swap Agreements**"; the MLSC/SBS Swap Agreements and UBS Swap Agreements are referred to collectively herein as the "**Swap Agreements**");

WHEREAS, the City, the Service Corporations, U.S. Bank, National Association (as custodian) and the Swap Counterparties are party to a Collateral Agreement dated as of June 15, 2009 (the "**Collateral Agreement**");

WHEREAS, the City is obligated pursuant to the Service Contracts to make certain payments thereunder in an amount equal to the amount due from the Service Corporations to the Swap Counterparties;

WHEREAS, pursuant to the Collateral Agreement, the City has pledged to the Service Corporations a first priority lien upon all of the City's right, title and interest in the Pledged Property (as such term is defined in the Collateral Agreement) in order to secure the payment of all City Hedge Payables Related Obligations (as such term is defined in the Collateral Agreement);

WHEREAS, pursuant to the Collateral Agreement, the Service Corporations have

granted to the Swap Counterparties a security interest in all of their right, title and interest in, to and under the City Hedge Payable Related Obligations and the City Pledge (as such term is defined in the Collateral Agreement);

WHEREAS, the Governor of the State of Michigan determined on March 1, 2013 that a financial emergency existed in the City, and the Emergency Manager was appointed for the City on March 14, 2013;

WHEREAS, pursuant to the terms of each Swap Agreement, it is the view of the Swap Counterparties that one or more Events of Default and/or Additional Termination Events has occurred, with the Service Corporation as the Defaulting Party or sole Affected Party, and therefore each of SBS and UBS has the right to designate an Early Termination Date for the related Swap Agreements;

WHEREAS, pursuant to the terms of the UBS Swap Agreements, it is the view of UBS that UBS has the right (but not the obligation) to terminate the UBS Swap Agreements as described in Part 5(xx) of the Schedules to the UBS Swap Agreements;

WHEREAS, pursuant to the terms of the MLCS/SBS Swap Agreements, it is the view of MLCS that SBS has the right (but not the obligation) to terminate the SBS Swap Agreements as described in Part 5(t) of the Schedules to the SBS Swap Agreements; provided that SBS may not exercise such right without the consent of MLCS and is required to exercise such right at the direction of MLCS;

WHEREAS, the Service Corporations and City have asked each Swap Counterparty to forbear from exercising certain rights, including without limitation, rights under the Swap Agreements, during a certain period pursuant to this Agreement; and

WHEREAS, each Swap Counterparty is willing to do so upon the terms and subject to the conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Forbearance.**

    **1.1.** *Forbearance.* During the period (the "**Forbearance Period**") commencing on the date hereof and terminating upon the occurrence of a Forbearance Period Termination Event (as defined in Section 1.3 below), each Swap Counterparty shall, subject to the terms and conditions hereof, forbear from:

        (a) issuing any notice designating an Early Termination Date with respect to any Swap Agreement; and

2

(b)  (i) instructing the Collateral Agreement Custodian to cease making payments to the City from the General Receipts Subaccount in accordance with Section 5.4 of the Collateral Agreement and (ii) giving notice to the Collateral Agreement Custodian pursuant to the Collateral Agreement of its obligation to cease making such payments.

**1.2.**  *Affirmative Obligations During Forbearance Period.*

(a)  During the Forbearance Period, if a Liquidity Event has occurred and is continuing, the Swap Counterparties shall (a) use their best efforts to take any action reasonably requested by the City to cure such Liquidity Event, including supporting any action by the City or Service Corporations to obtain a turnover to the City of all amounts that would be paid to the City under the Collateral Agreement but for the application, or alleged application, of Section 5.4 of the Collateral Agreement or but for any action by the Collateral Agreement Custodian, whether or not such action has been purported to have been taken pursuant to Section 5.4, to withhold or delay such payments, *provided, however*, such best efforts shall not include any act that would, in the commercially reasonable judgment of the Swap Counterparties, (i) impose material costs, expenses or burden on the Swap Counterparties, (ii) impose reputational risk or material liability on either Swap Counterparty, or (iii) have an Adverse Effect (as such term is defined in Section 1.3(d) below) on the Swap Counterparties, (b) in the event of a bankruptcy with respect to the City, (x) support a motion or adversary proceeding for turnover to the City of all amounts that would be paid to the City under the Collateral Agreement but for the application, or alleged application, of Section 5.4 of the Collateral Agreement or but for any action by the Collateral Agreement Custodian, whether or not such action has been purported to have been taken pursuant to Section 5.4, to withhold or delay such payments, and (y) consent to use of cash collateral by the City of any amounts held under the Collateral Agreement that would be paid to the City but for the application, or alleged application, of Section 5.4 of the Collateral Agreement or but for any action by the Collateral Agreement Custodian, whether or not such action has been purported to have been taken pursuant to Section 5.4, to withhold or delay such payments, and (c) consent to the remittance to the City of the funds contemplated by the letter from the City to the Collateral Agreement Custodian in the form attached as Schedule B hereto.

(b)  For purposes of this Agreement, a **"Liquidity Event"** shall mean that (i) the City has not received payment of any and all amounts under the Collateral Agreement that would have been paid to the City from the General Receipts Subaccount or Holdback Account under the Collateral Agreement but for the application, or alleged application, of Section 5.4 of the Collateral Agreement or but for any action by the Collateral Agreement Custodian, whether or not such action has been purported to have been taken pursuant to Section 5.4, to withhold or delay such payments, or (ii) the Collateral Agreement Custodian has stated that it will not, or the City has reasonable grounds to believe that the Collateral Agreement Custodian may not, (a) make payment to the City from the General Receipts

3

Subaccount equal to the City Payment for such Month if the City were to pay the Collateral Agreement Custodian for deposit to the credit of the Holdback Account an amount equal to the Standard Holdback Requirement, (b) issue a Monthly Holdback Compliance Notice, or (c) remit to the City daily all amounts standing to the credit of the General Receipts Subaccount after issuance of a Monthly Holdback Compliance Notice. The existence of an outstanding instruction or direction by any person to the Collateral Agreement Custodian to refrain from paying amounts under the Collateral Agreement to the City shall constitute reasonable grounds for such belief.

(c)      Upon termination of the Forbearance Period, any and all rights of the City and the Service Corporations under this Section 1.2 shall terminate immediately without notice and the Swap Counterparties shall have the right to revoke any consents described herein and otherwise exercise any rights or remedies they may have under the Transaction Documents except with respect to amounts previously used by or remitted to the City in accordance with the terms of this Section 1.2.

**1.3.**      *Forbearance Period Termination Events.*    Each of the following events constitutes a "**Forbearance Period Termination Event**" upon delivery by a Swap Counterparty to the City and each Service Corporation of written notice of the occurrence thereof (provided that in lieu of such notice, notice of the occurrence of the Forbearance Period Termination Events in Sections 1.3(a), 1.3(l) or 1.3(m) below shall be given as set forth therein):

(a)      Delivery to the City and each Service Corporation of a written notice from a Swap Counterparty (given in its sole discretion and with a copy to the other parties hereto) terminating the Forbearance Period; provided that such notice may not be given prior to June 30, 2014.

(b)      (i) The occurrence of any Event of Default under Section 5(a)(i) of any Swap Agreement, (ii) any Service Corporation seeks to become a debtor under title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), or (iii) a petition to cause a Service Corporation to become a debtor under the Bankruptcy Code is filed by a Controlled Entity (as such term is defined in Section 2.1(a) hereof) and the City or the Emergency Manager caused such filing to be made.

(c)      A petition to cause a Service Corporation to become a debtor under the Bankruptcy Code is filed by a third party (except as provided in Section 1.3(b)(iii) above).

(d)      Occurrence of any Event of Default under Section 5(a)(iii) of any Swap Agreement, provided that such occurrence has an Adverse Effect on the Swap Counterparties. For purposes of this Agreement, an "**Adverse Effect**" on the Swap Counterparties shall (i) mean the occurrence or existence of any act, event or condition that, in the reasonable judgment of the Swap Counterparties, is likely to adversely affect their rights or

4

interests under any of the Transaction Documents in any material respect and (ii) exclude (1) any failure or refusal to pay any amounts under the 2006 Pension Funding Securities when due, and (2) the filing of a petition for relief under the Bankruptcy Code by the City.

(e)    Occurrence of any Additional Termination Event under Part 1(i)(ii)(1), (2), (6), or (7) of the Schedule to any Swap Agreement; provided, however, (x) an Additional Termination Event under Part 1(i)(ii)(1) of the Schedule to any Swap Agreement shall not constitute a Forbearance Period Termination Event if it occurs during the continuation of a Liquidity Event and prior to July 31, 2013, (y) the occurrence of an Additional Termination Event under Part 1(i)(ii)(2) of the Schedule to any Swap Agreement shall not constitute a Forbearance Period Termination Event to the extent the appropriation referenced therein equals at least the amount specified in clause (X) of such Part 1(i)(ii)(2) and (z) the occurrence of an Additional Termination Event under Part 1(i)(ii)(6) of the Schedule to any Swap Agreement shall not constitute a Forbearance Period Termination Event to the extent any third party litigation does not have an Adverse Effect on the Swap Counterparties.

(f)    Breach of any of the covenants contained in Section 2.1(a), 2.1(b), 2.1(d) or 2.2(a) herein

(g)    Other than as set forth in Section 1.3(f) above, breach (other than breach solely by the Swap Counterparties) of any of the covenants contained in Section 2 herein or any representations contained in Section 4 herein.

(h)    Without prejudice to Section 1.3(f) or (g) above, issuance by any court of competent jurisdiction of a judgment or order that would (i) render unlawful or invalid any of the Swap Agreements, Collateral Agreement or this Agreement or the performance thereunder or hereunder by the Emergency Manager, the City or a Service Corporation or any party acting for or on behalf of the Swap Counterparties, (ii) render unlawful or invalid any other Transaction Documents or the performance thereunder by the City or a Service Corporation or any party acting for or on behalf of the Swap Counterparties, if the impact thereof would impair the ability of a Service Corporation to make any payments when due under any Swap Agreements or impair any arrangement securing such payments, or (iii) require or allow any payment of principal or interest on the 2006 Pension Funding Securities to be paid prior to the scheduled payment date therefor.

(i)    Proposal of an ordinance by the Emergency Manager or the giving of public notice of a meeting of the City Council of the City at which an ordinance will be considered for adoption (provided the City Council of the City had at such time the requisite power and authority for such adoption), or approval by either house of any federal or state legislature of legislation, that if enacted or adopted into law would (i) render unlawful or

5

USActive 27967693.30

invalid any of the Swap Agreements, Collateral Agreement or this Agreement or the performance thereunder or hereunder by the Emergency Manager, the City or a Service Corporation or any party acting for or on behalf of the Swap Counterparties, (ii) render unlawful or invalid any other Transaction Documents or the performance thereunder by the City or a Service Corporation or any party acting for or on behalf of the Swap Counterparties, if the impact thereof would impair the ability of a Service Corporation to make any payments when due under any Swap Agreements or impair any arrangement securing such payments, or (iii) require or allow any payment of principal or interest on the 2006 Pension Funding Securities to be paid prior to the scheduled payment date therefor.

(j)     The City files a petition for relief under the Bankruptcy Code and any one of the following occurs: (i) within 60 days of filing the City fails to obtain a Court Order (as defined in Section 2.1(d) hereof), (ii) the Assumption Motion (as defined in Section 2.1(d) hereof) is denied, (iii) the petition for relief is dismissed and a new petition is not filed within 30 days following such dismissal, or (iv) the Court Order does not contain a waiver of the automatic stay as specified in Section 2.3 herein.

(k)     The effective date of the confirmation of the plan of adjustment in connection with any bankruptcy proceedings of the City.

(l)     Delivery on or before July 31, 2013 to the Swap Counterparties of a written notice from the City (given in its sole discretion and with a copy to the other parties hereto) terminating the Forbearance Period; provided that on such date a Liquidity Event has occurred and is continuing.

(m)     Delivery to the Swap Counterparties of a written notice from the City (given in its sole discretion and with a copy to the other parties hereto) terminating the Forbearance Period; provided that (A) on such date an event described in 1.3(j)(ii) or (iii) has occurred or (B) the City files a petition for relief under the Bankruptcy Code and any one of the following occurs: (i) within 75 days of the filing the City fails to obtain a Non-Final Court Order or (ii) the City fails to obtain a Court Order prior to the Exercise Period End Date; provided further that the City has used its best efforts to obtain a Court Order in accordance with Section 2.1(d) hereof.

**1.4.**     *Rights Following Forbearance Period.*

(a)     Upon the occurrence of a Forbearance Period Termination Event pursuant to Section 1.3(a), 1.3(b) or 1.3(f) hereof, the parties hereto shall be restored to their original rights and positions as they existed immediately prior to the Forbearance Period, and each Swap Counterparty shall immediately be entitled to exercise any rights and remedies in respect of any Event of Default, Termination Event, or Additional Termination Event that has occurred under the applicable Swap Agreement together

6

with any rights and remedies under the Definitive Documents relating thereto and giving effect to Section 2 of this Agreement.

(b)     If (i) the City has complied with Section 3.2 hereof but either Swap Counterparty is prohibited from exercising its Optional Termination Right (as defined in Section 3.5 hereof) because an Event of Default or Termination Event is then occurring with respect to which any Swap Counterparty is the Defaulting Party or sole Affected Party under any Swap Agreement or (ii) a Forbearance Period Termination Event (other than as set forth in Section 1.4(a) above) has occurred, the parties hereto shall be restored to their original rights and positions as they existed immediately prior to the Forbearance Period, and each Swap Counterparty shall immediately be entitled to exercise any rights and remedies in respect of any Event of Default, Termination Event, or Additional Termination Event that has occurred under the applicable Swap Agreement together with any rights and remedies under the Definitive Documents relating thereto *without* giving effect to Section 2 of this Agreement.

2.      **Covenants of the Parties**.

2.1.    *Covenants of the City and Service Corporations*. Each of the City and the Service Corporations hereby covenants and agrees, which covenants and agreements shall, except as otherwise provided in Section 1.4, survive the termination of the Forbearance Period, as follows:

(a)     Unless the Swap Counterparties have given their express written consent, and so long as the Swap Counterparties are not in breach of their obligations hereunder, the City and each Service Corporation (i) shall not commence litigation, assert any defense in litigation or take any other judicial, legislative, or executive action that may have the effect of (A) setting aside, avoiding, rejecting, modifying, terminating, amending, revising, disapproving, limiting, or otherwise disrupting or rendering ineffective any of this Agreement, the Collateral Agreement, the Swap Insurance Policies, the Swap Agreements, the 2006 Transaction, the City Pledge, the Service Corporation Security Interest, the Service Corporation Pledge, the lien created by the Authorizing Ordinance, or any other part of the Definitive Documents or the Settlement Transaction (collectively, the "**Transaction Documents**") to the extent such litigation or action would have an Adverse Effect on the Swap Counterparties or (B) causing any payment of principal or interest on the 2006 Pension Funding Securities to be paid prior to the scheduled payment date therefor, it being agreed and understood that neither (1) any failure or refusal to pay any amounts under the 2006 Pension Funding Securities when due nor (2) the filing of a petition for relief under the Bankruptcy Code by the City shall constitute a breach or violation of this clause (B) and (ii) shall not cause the City, a Service Corporation or any entity or person under the control of the City

7

or the Emergency Manager (any such entity or person, a "**Controlled Entity**") to commence litigation, assert any defense in litigation or take any other judicial, legislative, or executive action that may have any of the effects referenced in Section 2.1(a)(i)(A) or (B).

(b)    Unless the Swap Counterparties have given their express written consent, and so long as the Swap Counterparties are not in breach of their obligations hereunder, the City and each Service Corporation shall timely and diligently defend against any litigation or other judicial action that is commenced by a third party (including, without limitation, any Controlled Entity), or any legislative action that is taken, that may have any of the effects referenced in Section 2.1(a)(i)(A) or (B).

(c)    Each of the City and each Service Corporation hereby ratifies and agrees to comply with all applicable provisions of the Transaction Documents to the extent that failure to do so would have an Adverse Effect on the Swap Counterparties.

(d)    If the City or a Service Corporation seeks to become or becomes a debtor under the Bankruptcy Code, the City and such Service Corporation (as applicable) shall (A) (i) file a motion, in form and substance reasonably satisfactory to the Swap Counterparties, to assume this Agreement (the "**Assumption Motion**") pursuant to section 365 of the Bankruptcy Code on the date of the filing of a petition for relief under the Bankruptcy Code and (ii) use best efforts to obtain entry of a final and non-appealable order, in form and substance reasonably satisfactory to the Swap Counterparties, granting the Assumption Motion (an "**Assumption Order**") or (B) use best efforts to obtain entry of a final and non-appealable order, in form and substance reasonably satisfactory to the Swap Counterparties, with respect to this Agreement pursuant to Rule 9019 under the Bankruptcy Code (a "**Rule 9019 Order**" and together with the Assumption Order, a "**Court Order**").

(e)    If the City or a Service Corporation seeks to become or becomes a debtor under the Bankruptcy Code, the City and such Service Corporation (as applicable) shall schedule any amounts due and owing to any Swap Counterparty (or its transferees or assigns) pursuant to or related to the Swap Agreements, the Collateral Agreement and this Agreement as undisputed, fully secured claims pursuant to section 506 of the Bankruptcy Code and treat any amounts due thereunder or hereunder as allowed, fully secured claims for any and all purposes under any plan for the City or such Service Corporation (as applicable).

(f)    The City and each Service Corporation shall provide each Swap Counterparty with immediate oral and written notice of the occurrence of any Forbearance Period Termination Event.

8

(g) At the request of the Swap Counterparties following the occurrence of both (i) a Forbearance Period Termination Event described in Section 1.4(a) above and (ii) either a Termination Event or Event of Default under a Hedge where the Swap Counterparty is not the sole Affected Party or Defaulting Party, the City and each Service Corporation shall authorize, approve and consent to payment to the Swap Counterparties from the Pledged Property to meet the obligations owing to the Swap Counterparties under the Hedges and the Transaction Documents; subject to prior appropriation by either the City Council of the City (provided the City Council of the City had at such time the requisite power and authority for such appropriation) or by the Emergency Manager pursuant to Section 2.2 (b)(iv) of the Pledged Property in an amount sufficient to pay the obligations owing to the Swap Counterparties under the Hedges and the Transaction Documents.

(h) At the request of the Swap Counterparties following the occurrence of a Forbearance Period Termination Event described in Section 1.4(a) above, if the Collateral Agreement Custodian refuses or fails to make a payment from the Pledged Property as provided in Section 2.1(g) above, the City and each Service Corporation shall support any reasonable action by the Swap Counterparties to obtain relief, including relief pursuant to the remedies specified in Section 11.2 of the Collateral Agreement.

**2.2.** *Covenants of the Emergency Manager.* The Emergency Manager hereby covenants and agrees, which covenants and agreements shall, except as otherwise provided in Section 1.4, survive the termination of the Forbearance Period, as follows:

(a) Unless the Swap Counterparties have given their express written consent, and so long as the Swap Counterparties are not in breach of their obligations hereunder, the Emergency Manager (i) shall not, and shall not authorize or permit the City to, commence litigation, assert any defense in litigation or take any other judicial, legislative, or executive action that may have any of the effects referenced in Section 2.1(a)(i)(A) or (B) and (ii) shall not cause the City, a Service Corporation or any Controlled Entity to commence litigation, assert any defense in litigation or take any other judicial, legislative, or executive action that may have any of the effects referenced in Section 2.1(a)(i)(A) or (B).

(b) Unless the Swap Counterparties have given their express written consent, and so long as the Swap Counterparties are not in breach of their obligations hereunder, the Emergency Manager shall exercise all powers, authorities and privileges vested in the Emergency Manager under applicable law and, as required from time to time in the performance thereof, shall immediately execute and deliver each authorization, approval, appropriation, direction, instruction or consent by the

9

Emergency Manager, acting in the official capacity as Emergency Manager, that is necessary:

(i)     subject to Section 2.2(b)(iii) with respect to the City Payments, to cause the City and the Service Corporations to perform all covenants, obligations and duties of the City and the Service Corporations, respectively, under the Transaction Documents, unless the failure to perform will not have an Adverse Effect on the Swap Counterparties,

(ii)    to cause the City or the Service Corporations to avoid the occurrence of a Forbearance Period Termination Event described in Sections 1.3(b), 1.3(d), 1.3(e), 1.3(f), 1.3(g) or 1.3(i) of this Agreement,

(iii)   to cause the City to make all City Payments as and when required under the Collateral Agreement and, to the extent necessary, to make one or more appropriations or make one or more amendments to then existing appropriations in amounts that are sufficient to pay in full, and which may be used exclusively for payment of, such City Payments, and

(iv)    following the occurrence of both (A) a Forbearance Period Termination Event described in Section 1.4(a) above and (B)  either a Termination Event or Event of Default under a Hedge where the Counterparty is not the sole Affected Party or Defaulting Party thereunder, to make one or more appropriations or make one or more amendments to then existing appropriations of the Pledged Property in amounts that are sufficient to pay in full, and which may be used exclusively for payment of,  the obligations owing to the Swap Counterparties under the Hedges and the Transaction Documents.

**2.3.**    *Specific Performance of Covenants.* The City, the Service Corporations and the Emergency Manager acknowledge and agree that the rights acquired by the Swap Counterparties under this Section 2 are unique and that irreparable damage to the Swap Counterparties would occur in the event that any of the provisions of this Section 2 were not performed in accordance with their specific terms as required by the Agreement or were otherwise breached.   Accordingly, the Swap Counterparties shall be entitled to an injunction or injunctions to prevent any breach or nonperformance of this Section 2 and to an order or orders of specific performance of the terms and provisions of this Section 2. Furthermore, in the event of nonperformance under this Section 2, it is acknowledged that mandamus is an appropriate remedy and the Emergency Manager shall not contest such mandamus remedy, and if the City is then a debtor under the Bankruptcy Code, the Emergency Manager shall promptly seek to waive the automatic stay with respect to such remedy.

2.4.    *Further Assurances.*   Each party hereto hereby covenants and agrees, which covenant and agreement shall survive the termination of the Forbearance Period, that such party will execute such further documents and take such further actions

10

as reasonably necessary to implement and carry out the intent of this Agreement.

3. **Right to Direct Termination.**

    3.1. *Optional Termination Right.* Subject to the terms and conditions of this Agreement:

        (a) UBS and the City hereby agree that the City shall have the right, but not the obligation, exercisable on any Business Day during the Exercise Period, to direct UBS to exercise its Optional Termination Right, under all (but not less than all) of the UBS Swap Agreements (the "**UBS Termination Right**").

        (b) MLCS and the City hereby agree that the City shall have the right, but not the obligation, exercisable on any Business Day during the Exercise Period, to direct MLCS to exercise or cause to be exercised the Optional Termination Right under all (but not less than all) of the MLCS/SBS Swap Agreements (the "**MLCS Termination Right**" and together with the UBS Termination Right, the "**Termination Rights**"). MLCS hereby acknowledges that MLCS has the right to direct SBS to exercise the Optional Termination Right.

    3.2. *Exercise of Termination Rights.*

        (a) The City may exercise the Termination Rights only once, by providing both UBS and MLCS with written notice (the "**Optional Termination Notice**") on a day (the "**Optional Termination Notice Date**") that is at least seven (7) Business Days and not more than ten (10) Business Days prior to the proposed date of termination set forth in the Optional Termination Notice (the "**Optional Termination Date**"). The Optional Termination Date must be the same date for both the UBS Termination Right and the MLCS Termination Right and shall occur prior to the Exercise Period End Date. Such Optional Termination Notice shall be accompanied by evidence reasonably satisfactory to each of UBS and MLCS that the City will have funds on the Optional Termination Date sufficient to pay in cash the Optional Termination Amounts as set forth in Section 3.3 below (the "**Supporting Information**"). Delivery of an Optional Termination Notice, if accompanied by proper Supporting Information, shall be irrevocable.

        (b) Provided that an Optional Termination Notice and the Supporting Information are properly delivered pursuant to Section 3.2(a) above, and provided further that no Event of Default or Termination Event is then occurring with respect to which any Swap Counterparty is the Defaulting Party or sole Affected Party under any Swap Agreement (it being understood that, subject to Section 3.2(d) hereof, the Service Corporations may waive any such Event of Default or Termination Event), each of UBS

11

and MLCS shall (i) deliver or cause to be delivered written notice to each Service Corporation exercising its Optional Termination Right in accordance with the terms of its Optional Termination Provision as of the Optional Termination Date and (ii) take such other actions as may be necessary or required to give effect to the Optional Termination Provision.

(c)     If the City exercises the Termination Rights and complies with all the terms of this Agreement, (i) no Swap Counterparty will present any payment notice, notice of nonpayment, or other presentation of claim under a Swap Insurance Policy to a Swap Insurer as a result of the exercise of the Termination Rights and (ii) each Swap Counterparty will irrevocably waive all future rights to do so.  In furtherance of the foregoing, each Swap Counterparty hereby agrees, severally and not jointly, to indemnify and hold harmless each Service Corporation and the City from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees (in each case, regardless of whether such rights arise by way of contribution, reimbursement, subrogation or otherwise), resulting directly from and caused by a breach by such Swap Counterparty of its obligations under this Section 3.2(c).

(d)     The City hereby agrees that if it exercises the Termination Rights with respect to any Swap Agreement, it must exercise the Termination Rights with respect to the full notional amount of all Swap Agreements with respect to the Swap Counterparties simultaneously.

(e)     If the City has not exercised the Termination Rights on or prior to the termination of the Exercise Period, the Termination Rights shall expire.

**3.3.**    *Payment of Optional Termination Amount.*

(a)     On or before the second Business Day following the Optional Termination Date, the City shall pay to UBS an amount in cash equal to the Optional Termination Amount with respect to all UBS Swap Agreements.

(b)     On or before the second Business Day following the Optional Termination Date, the City shall pay to MLCS an amount in cash equal to the Optional Termination Amount with respect to all MLCS/SBS Swap Agreements.

(c)     For the avoidance of doubt, each party hereto acknowledges that no Service Corporation will owe an amount to any Swap Counterparty under any Swap Agreement in connection with the election to exercise the Optional Termination Right other than any Unpaid Amounts (without duplication of Unpaid Amounts paid by the City as a component of the Optional Termination Amount).

(d)     If a third party (including, without limitation, any Controlled Entity) alleges through litigation, judicial action, or otherwise, that all or a portion of the Optional Termination Amount paid to UBS or MLCS hereunder

12

must be shared with other creditors of the City or of either Service Corporation (or any person acting for or on behalf of such creditors), then the City shall, at the request of the Swap Counterparties, support any reasonable action by the Swap Counterparties in defending against any such litigation or other judicial action that is threatened or commenced by such third party to the extent such action does not impose any further duty or liability on the City.

(e)     The City, the Service Corporations and the Swap Counterparties agree that the payment by the City and acceptance by the Swap Counterparties of the Optional Termination Amounts shall constitute the application of funds by the Swap Counterparties pursuant to the contract rights granted hereunder.

**3.4.**     *Effect of Payment of Optional Termination Amount.*

Upon payment in full by the City of the Optional Termination Amount to each of the Swap Counterparties:

(a)     each of the Swap Counterparties and the Service Corporations shall be released and discharged from further obligations to each other under the Swap Agreements and their respective rights against each other thereunder shall be terminated;

(b)     the City Pledge, the Service Corporation Security Interest and the Service Corporation Pledge shall be satisfied and discharged;

(c)     this Agreement shall terminate *without* giving effect to Section 2 of this Agreement; *provided*, that such termination shall not affect the respective obligations of the parties under Sections 3.3(c), 3.3(d), 5, 8, 10 and 11 of this Agreement, which shall survive; and

(d)     in accordance with Section 14.4(a) of the Collateral Agreement, the Swap Counterparties shall deliver to the Collateral Agreement Custodian, and MLCS shall cause SBS to deliver to the Collateral Agreement Custodian, confirmation of the payment in full of all obligations of the Service Corporations and the City to the Swap Counterparties and SBS under the Swap Agreements and the Collateral Agreement.

**3.5.**     *Definitions related to Optional Termination Right.*

"**Applicable Percentage**" shall mean, with regard to the delivery of an Optional Termination Notice by the City in accordance with Section 3.2, (i) if the Optional Termination Notice Date occurs on or prior to the First Payment Adjustment Date, 75%, (ii) if the Optional Termination Notice Date occurs after the First Payment Adjustment Date and on or prior to the Second Payment Adjustment Date, 77%, and (iii) if the Optional Termination Notice Date occurs after the Second Payment Adjustment Date and prior to the Exercise Period End Date, 82%; *provided, however*, that if the City shall have received a Non-Final Court Order and the Swap

13

Counterparties do not expressly waive the requirement of a Court Order to begin the Exercise Period, the Applicable Percentage shall be determined with respect to the Non-Final Court Order Date rather than the Optional Termination Notice Date.

"**Exercise Period**" shall mean the period from and including the Exercise Period Start Date to but excluding the Exercise Period End Date.

"**Exercise Period End Date**" shall mean the earlier to occur of (i) a Forbearance Period Termination Event and (ii) March 14, 2014.

"**Exercise Period Start Date**" shall mean the date of this Agreement; *provided, however*, that if the City shall have not exercised the Termination Rights and paid in full in cash to each Swap Counterparty its respective Optional Termination Amount prior to the City filing a petition for relief under the Bankruptcy Code, the Exercise Period Start Date shall mean the date on which the City obtains a Court Order, unless the requirement for such order is expressly waived in writing by each Swap Counterparty.

"**First Payment Adjustment Date**" shall mean October 31, 2013.

"**Mid-Market Amount**" shall mean an amount for each Swap Agreement determined by the Swap Counterparties as of the Optional Termination Date according to a methodology that is agreed to by the City and based upon the present value of amounts due under the Swap Agreement using a discount curve calculated from swap rates published on Reuters Screen Page "ISDAFIX3" at 11:30 a.m. New York Time on the Optional Termination Date, as adjusted to take into account three (3) basis points of breakage costs.

"**Non-Final Court Order**" shall mean an order from the Bankruptcy Court that, but for such order not being final and non-appealable, would constitute a Court Order.

"**Non-Final Court Order Date**" shall mean the date on which the Bankruptcy Court issues a Non-Final Court Order.

"**Optional Termination Amount**" shall mean the sum of (a) the product of the Mid-Market Amount and the Applicable Percentage and (b) all Unpaid Amounts due and owing to the Swap Counterparties under the Swap Agreements.

"**Optional Termination Provision**" shall mean (i) with respect to the MLCS/SBS Swap Agreements, Part 5(t) of the Schedule to such Swap Agreements and (ii) with respect to the UBS Swap Agreements, Part 5(xx) of the Schedule to such Swap Agreements.

"**Optional Termination Right**" shall mean a Swap Counterparty's right to optionally terminate all transactions, in whole, pursuant to the applicable Optional Termination Provision.

"**Second Payment Adjustment Date**" shall mean November 15, 2013.

14

**4.**     <u>Representations and Agreements of the Parties.</u>

(a)     Each Service Corporation represents to the Swap Counterparties (which representations shall be deemed to be repeated as of the date on which the City delivers an Optional Termination Notice and on the Optional Termination Date) that:

      i.     It is duly organized and validly existing under the laws of Michigan;

      ii.     It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken all necessary action to authorize such execution, delivery and performance;

      iii.     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

      iv.     All governmental (including, without limitation, from the Treasurer of the State of Michigan) and Emergency Manager consents and approvals except as otherwise contemplated by Section 2.1(d) hereof that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with; and

      v.     Its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject to enforceability to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)     The City represents to the Swap Counterparties (which representations shall be deemed to be repeated as of the date on which the City delivers an Optional Termination Notice and on the Optional Termination Date) that:

      i.     It is a municipal corporation of the State of Michigan;

      ii.     It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken all necessary action to authorize such execution, delivery and performance;

15

     iii.     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets; and

     iv.     All governmental (including, without limitation, from the Treasurer of the State of Michigan) and Emergency Manager consents and approvals except as otherwise contemplated by Section 2.1(d) hereof that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with; and

     v.     Its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject to enforceability to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

    (c)    Each Swap Counterparty represents to the Service Corporations and the City (which representations shall be deemed to be repeated as of the Optional Termination Date) that:

     i.     It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and in good standing;

     ii.     It has the power to execute this Agreement, to deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary action to authorize such execution, delivery and performance;

     iii.     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court o other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

     iv.     All governmental consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

16

USActive 27967693.30
13-53846   Doc 17   Filed 07/18/13   Entered 07/18/13 23:47:19   Page 232 of 245
13-53846-tjt   Doc 366-9   Filed 08/16/13   Entered 08/16/13 20:59:58   Page 17 of 30

> v.   Its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject to enforceability to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(d)   Each of the parties hereto acknowledges that the representations contained herein relate solely to this Agreement and that nothing contained herein shall be or be deemed to be a representation with respect to any other agreement or transaction.

**5.    Forbearance not a waiver.**

Except as expressly provided herein, each party hereby expressly reserves the right to exercise at any time any rights and/or remedies such party has and/or to which such party is entitled under the Transaction Documents. The parties acknowledge and agree that one or more Event(s) of Default, Potential Event(s) of Default and/or Termination Event(s) may have occurred under the Transaction Documents, and may occur from time to time after the date hereof, and this Agreement (except to the limited extent expressly provided herein) preserves, and does not constitute a waiver of any right, power or privilege that the parties to this Agreement are entitled to exercise as a result of any such Event of Default, Potential Event of Default or Termination Event under the Transaction Documents. The failure of a party to exercise at any time any rights and/or remedies it has and/or to which it is entitled under the Transaction Documents, including any right to designate an Early Termination Date or to give notice under, or to insist on the strict performance of the Transaction Documents by any other party to, such Transaction Document (including, without limitation, the Collateral Agreement Custodian) will not be construed as an estoppel, waiver, modification or limitation on any right (including, without limitation, any right to designate in the future an Early Termination Date based upon the occurrence of any Event of Default or Termination Event).

**6.    Public Disclosure.**  The City agrees to make the terms of this Agreement publicly available not later than July 19, 2013 and shall not object to or interfere with the public disclosure of such terms by the Swap Counterparties on or after such date.

**7.    Time is of the Essence**Time is of the essence as to the performance of all obligations herein.

**8.    Governing Law and Jurisdiction**THIS AGREEMENT, AS WELL AS ANY MATTER ARISING OUT OF, RELATING TO OR INCIDENTAL TO THIS AGREEMENT, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY PRINCIPLES OF CONFLICTS OF LAW THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION, PROVIDED, HOWEVER, THAT THE CORPORATE POWERS AND LEGAL CAPACITY OF THE CITY AND EACH SERVICE CORPORATION SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN.

17

With respect to any suit, action or proceedings relating to this Agreement, each party irrevocably submits to the extent permitted by law the non-exclusive jurisdiction of the courts of the State of New York and United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

9.      **Notices**Any notice provided for hereunder shall be given in accordance with Section 14.1 of the Collateral Agreement and shall be effective within the time periods set forth therein.  A copy of each notice given hereunder shall be given contemporaneously to all other parties to this Agreement.  Nothing in this Agreement (including any reference to the Collateral Agreement or otherwise) shall require any notice hereunder to be given to any person not a party to this Agreement.

10.     **Successors and Assigns**Prior to the expiration of the Forbearance Period, neither Swap Counterparty may assign its rights or obligations under this Agreement to another party without the prior written consent of the City and the other Swap Counterparty.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective, successors transferees and assigns.

11.     **WAIVERS OF JURY TRIAL**TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

12.     **Counterpart Execution**This Agreement may be executed in one or more counterparts, including electronically transmitted counterparts, which when taken together, shall constitute one and the same original.  Facsimile or other forms of electronic signatures shall be binding, the same of as the original of such document.

13.     **Miscellaneous**(a)    This   Agreement   constitutes   the   entire   agreement   and understanding of the parties with respect to its subject matter and supercedes all oral communications with respect thereto.

        (b)     No modification, amendment or waiver of this Agreement shall be effective for any purpose unless it is made by written instrument signed by all of the parties hereto; provided that the Emergency Manager shall not be required to be a party to such amendment at any time that the City has full power and authority to sign such amendment without any authorization or approval of the Emergency Manager.

        (c)     No person or entity, other than the parties who have signed this Agreement, shall have any rights or interests hereunder, regardless of whether such person or entity is a party to, or has any rights or interests under, any agreement or instrument referenced herein, whether as third party beneficiary or otherwise.

        (d)     A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and (except as expressly provided herein) a single or partial exercise of any right, power or privilege will not be presumed to

18

preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

USActive 27967693.30

DETROIT GENERAL RETIREMENT
SYSTEM SERVICE CORPORATION

By: _____
   Name: Cheryl R. Johnson
   Title: President

DETROIT POLICE AND FIRE RETIREMENT
SYSTEM SERVICE CORPORATION

By: _____
   Name: Cheryl R. Johnson
   Title: President

THE CITY OF DETROIT

By: _____
   Name:
   Title:

EMERGENCY MANAGER OF THE CITY OF
DETROIT

By: _____
   Name:

USActive 27967693.30

13-53846   Doc 17   Filed 07/18/13   Entered 07/18/13 23:47:19   Page 236 of 245
13-53846-tjt   Doc 366-9   Filed 08/16/13   Entered 08/16/13 20:59:58   Page 21 of 30

DETROIT GENERAL RETIREMENT
SYSTEM SERVICE CORPORATION

By: _____
    Name:
    Title:

DETROIT POLICE AND FIRE RETIREMENT
SYSTEM SERVICE CORPORATION

By: _____
    Name:
    Title:

THE CITY OF DETROIT

By: _____
    Name: *KEVYN D. ORR*
    Title: *EMERGENCY MANAGER*

EMERGENCY MANAGER OF THE CITY OF
DETROIT

By: _____
    Name: *KEVYN D. ORR*

USActive 27967693.30

13-53846   Doc 17   Filed 07/18/13   Entered 07/18/13 23:47:19   Page 237 of 245
13-53846-tjt   Doc 366-9   Filed 08/16/13   Entered 08/16/13 20:59:58   Page 22 of 30

MERRILL LYNCH CAPITAL SERVICES,
INC.

By: _____
Name: James Nacus
Title: Authorized Signatory

UBS AG

By: _____
Name: William W. Chandler
Title: Managing Director


By: _____
Name: James Fagan
Title: Managing Director

*[SIGNATURE PAGE - FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT]*

13-53846   Doc 17   Filed 07/18/13   Entered 07/18/13 23:47:19   Page 239 of 245
13-53846-tjt   Doc 366-9   Filed 08/16/13   Entered 08/16/13 20:59:58   Page 24 of 30

SCHEDULE A

SCHEDULE OF SWAP AGREEMENTS

1.  ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005, between PFRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0010) and the related Transaction Transfer Agreement by and among PFRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

2.  ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between PFRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0011) and the related Transaction Transfer Agreement by and among PFRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

3.  ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between DGRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0009) and the related Transaction Transfer Agreement by and among DGRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

4.  ISDA Master Agreement (including the Schedule thereto) dated as of June 7, 2006 between DGRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0012) and the related Transaction Transfer Agreement by and among DGRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

5.  ISDA Master Agreement between DGRS and UBS, dated as of June 7, 2006, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380291 (as amended, modified or supplemented to the date hereof).

6.  ISDA Master Agreement between PFRS and UBS, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380351 as amended, modified or supplemented to the date hereof).

7.  ISDA Master Agreement between PFRS and UBS, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS Reference No. 37380313 as amended, modified or supplemented to the date hereof).

8.  ISDA Master Agreement between DGRS and UBS, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations

thereunder, dated June 7, 2006, bearing UBS Reference No. 37380341 as amended, modified or supplemented to the date hereof).

USActive 27967693.30

SCHEDULE B

WRITTEN INSTRUCTIONS TO CUSTODIAN UNDER COLLATERAL AGREEMENT

July [  ], 2013

Via Email, Facsimile and Courier

U.S. Bank National Association
535 Griswold, Suite 550
Detroit, Michigan 48226
Attention: Susan T. Brown

To Whom It May Concern:

  Reference is made to the Collateral Agreement dated as of June 15, 2009, among the City of Detroit, the Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation, severally and not jointly, U.S. Bank National Association, as Custodian and the Other Persons Party thereto (the "*Collateral Agreement*"). Capitalized terms used but not defined herein have the meanings assigned to such terms in the Collateral Agreement.

  The City of Detroit hereby instructs the Custodian to release the amounts in the General Receipts Subaccount to the City in the amount of the City Payment for each Month and, after receipt by the Custodian of the City Payment for that Month and beginning on the second Business Day following the date on which the Custodian gives its Monthly Holdback Compliance Notice to the City and the Counterparties for that Month, remit to the City daily all amounts standing to the credit of the General Receipts Subaccount during that Month.

  IN WITNESS WHEREOF, the undersigned has duly executed these Written Instructions to Custodian Under Collateral Agreement as of the date first above written.

THE CITY OF DETROIT


By:_____
   Name:
   Title:

USActive 28305513.1

13-53846 Doc 17 Filed 07/18/13 Entered 07/18/13 23:47:19 Page 242 of 245
13-53846-tjt Doc 366-9 Filed 08/16/13 Entered 08/16/13 20:59:58 Page 27 of 30

[Counterparties' Signature Page Follows]

The Counterparties consent to the remittance to the City of the funds contemplated by the above instructions, subject to the Counterparties' right to withdraw such consent prospectively upon notice to the City and the Custodian.

MERRILL LYNCH CAPITAL SERVICES, INC.

By:_____
    Name:
    Title:

UBS AG

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

cc:   City of Detroit Law Department
First National Building, Suite 1650
660 Woodward Avenue
Detroit, Michigan 48226
Attn: Corporation Counsel

Jones Day
222 East 41st Street
New York, NY 10017
Attn: Corinne Ball
     Joel Telpner

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Attn: Lary Stromfeld

Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022-4689
Attn: Edwin Smith

McDermott Will & Emery
227 West Monroe Street
Chicago, IL 60606-5096
Attn: William P. Smith

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attn: Ryan Blaine Bennett
     James H.M. Sprayregen

Syncora Capital Assurance Inc.
135 West 50th Street
New York, NY 10022
Attn: Claude LeBlanc