**<u>Exhibit 9</u>**

**City's Verified Complaint (Compl.)**

| STATE OF MICHIGAN<br>3rd JUDICIAL CIRCUIT<br>COUNTY OF WAYNE | NOTICE OF ASSIGNMENT TO THE<br>BUSINESS COURT | CASE NO. |
|---|---|---|

**Court address**
2 Woodward Ave.    Detroit, MI 48226

| Plaintiff's name(s), address(es), and telephone number(s) | | Defendant's name(s), address(es), and telephone number(s) |
|---|---|---|
| City of Detroit, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan | v | Syncora Guarantee Inc., U.S. Bank, N.A., MGM Grand Detroit, LLC, Detroit Entertainment, LLC d/b/a Motorcity Casino Hotel and Greektown Casino, LLC |

| Plaintiff's attorney, bar no., address, telephone no., and email address | Defendant's attorney, bar no., address, telephone no., and email address |
|---|---|
| Pepper Hamilton LLP<br>Robert S. Hertzberg (P30261)<br>Deborah Kovsky-Apap (P68258)<br>4000 Town Center, Ste 1800, Sfld, MI 48075<br>248.359.7300 | |

13-008858-CZ

FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/5/2013 11:01:23 AM
CATHY M. GARRETT

The [X] Plaintiff [ ] Defendant requests assignment of the above captioned matter to the Business Court as one that qualifies for the Business Court pursuant to MCL 600.8031 and MCL 600.8035 as indicated below.

***Both 1 and 2 must be completed for the case to be accepted by the Court. Check all that apply.***

1) The case is a qualifying business or commercial dispute as defined at MCL 600.8031(c) because:

   [X] All of the parties are business enterprises;

   [ ] One or more of the parties is a business enterprise and the other parties are its or their present or former owners, managers, shareholders, members, directors, officers, agents, employees, suppliers, or competitors, and the claims arise out of those relationships;

   [ ] One of the parties is a nonprofit organization and the claims arise out of that party's organizational structure, governance, or finances; or

   [ ] the case involves the sale, merger, purchase, combination, dissolution, liquidation, structure, governance, or finances of a business enterprise.

**AND**

2) The business or commercial dispute involves:

   [ ] Information technology, software, or website development, maintenance or hosting;

   [ ] The internal organization of business entities and the rights or obligations of shareholders, partners, members, owners, officers, directors, or managers;

   [x] Contractual agreements or other business dealing, including licensing, trade secrets, intellectual property, antitrust issues, securities, non-compete agreements, non-solicitation agreements, and confidentiality agreements, if all available administrative remedies are completely exhausted, including, but not limited to alternative dispute resolution processes prescribed in the agreements;

   [x] Commercial transactions, including commercial bank transactions;

   [X] Business or commercial insurance policies; and/or

   [ ] Commercial real property

   [ ] Other:(Please explain)

3) List any and all cases currently **pending** involving the same transaction and/or occurrence (if none, state "none"):

   None

**Providing false or inaccurate information on this form may result in the imposition of sanctions.**

| July 5, 2013 | /s/ Robert S. Hertzberg |
|---|---|
| Date | Name |
| | City of Detroit |
| | Attorney for: _____ |

WCBC01 (06/13) NOTICE OF ASSIGNMENT TO THE BUSINESS COURT

CITY OF DETROIT, a Municipal
Corporation Organized and Existing
Under the Laws of the State of Michigan

Case No.:        -CZ
Hon.

       Plaintiff,

   v.

SYNCORA GUARANTEE INC., a New
York Corporation,

and

U.S. BANK, N.A.,

and

MGM GRAND DETROIT, LLC,

and

DETROIT ENTERTAINMENT, LLC
d/b/a MOTORCITY CASINO HOTEL,

and

GREEKTOWN CASINO, LLC,

       Defendants.

_____

ROBERT S. HERTZBERG (P30261)
DEBORAH KOVSKY-APAP (P68258)
Pepper Hamilton LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
(248) 359-7300  -  Telephone
(248) 359-7700  -  Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

THOMAS F. CULLEN, JR. (*pro hac vice* pending)
GREGORY M. SHUMAKER (*pro hac vice* pending)
GEOFFREY S. STEWART (*pro hac vice* pending)
Jones Day
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

*Attorneys for Plaintiff*

_____

There is no other civil action between these parties arising
out of the same transaction or occurrence as alleged in this
Complaint pending in this Court, nor has any such action
been previously filed and dismissed or transferred after
having been assigned to a judge.

## VERIFIED COMPLAINT

Plaintiff, the City of Detroit, for its complaint seeking declaratory relief,

compensatory and exemplary damages, and preliminary, temporary, and permanent

injunctive relief says:

## PARTIES

1. The City of Detroit is a Michigan municipal corporation located in Wayne

County. The City is a home rule city organized under PA 279 of 1909, as amended, the

Home Rule City Act, MCL 117.1, *et seq.* The City has comprehensive home rule power

under the State Constitution of 1963, PA 279, and the 2012 Charter of the City of Detroit,

2

subject to the limitations on the exercise of that power contained in the Constitution, Charter, or imposed by statute.

2. Defendant Syncora Guarantee Inc. is a New York corporation headquartered at 135 W. 50th Street, New York, N.Y. Syncora is a monoline financial guarantee insurance provider that insures and provides credit enhancement for the obligations of debt issuers. Syncora has provided credit insurance to instrumentalities of the City in connection with the so-called COPs and swaps transactions detailed below.

3. Nominal defendant U.S. Bank, N.A., is a nationally chartered bank with its principal place of business at 800 Nicollet Mall, Minneapolis, Minnesota. U.S. Bank is a wholly-owned subsidiary of U.S. Bancorp. U.S. Bank has served as the custodian under the Collateral Agreement detailed below, and as the trustee and contract administrator in connection with the COPs and swaps transactions.

4. MGM Grand Detroit, LLC ("MGM") is a Delaware limited liability company with a principal place of business at 1300 John C. Lodge, Detroit, Michigan. MGM is a casino licensed and operating in the City.

5. Detroit Entertainment, LLC d/b/a MotorCity Casino Hotel ("MotorCity") is a Michigan limited liability company with a principal place of business at 2901 Grand River Avenue, Detroit, Michigan. MotorCity is a casino licensed and operating in the City.

6. Greektown Casino, LLC ("Greektown" and, together with MGM and MotorCity, the "Casino Defendants") is a Michigan limited liability company with a principal place of business at 555 East Lafayette, Detroit, Michigan. Greektown is a casino licensed and operating in the City.

3

## VENUE AND JURISDICTION

7.  The Court has subject matter jurisdiction over this complaint for damages, declaratory, and injunctive relief pursuant to MCL 600.605, MCR 2.605, and MCR 3.310.  The amount in controversy exceeds $25,000.

8.  The Court has personal jurisdiction over Syncora for purposes of this complaint pursuant to MCL 600.715 because Syncora contracted to insure the City's obligations under the Collateral Agreement within the State of Michigan.  The Court has personal jurisdiction over U.S. Bank and MGM under MCL 600.711 because they carry on a continuous and systemic part of their respective businesses within the State of Michigan, and because U.S. Bank consented to the jurisdiction of this Court in § 14.11 of the Collateral Agreement.  The Court has personal jurisdiction over MotorCity and Greektown under MCL 600.711 because they were incorporated under the laws of the State of Michigan and because they carry on a continuous and systemic part of their respective businesses within the State of Michigan.

9. Venue is properly laid in this County pursuant to MCL 600.1621 and MCL 600.1629 because plaintiff City of Detroit is located in Wayne County, Michigan, each of the defendants conducts business with the City in Wayne County, defendant U.S. Bank has consented to venue here, the Casino Defendants do business here and are found here, and the injuries complained of by the City occurred in Wayne County.

10.  This case is uniquely well-suited for resolution in Michigan because it involves issues critical to the City of Detroit and the State of Michigan, tort claims under Michigan law, and events occurring within the City of Detroit and the State of Michigan.

4

11. Because this action involves a business or commercial dispute and an amount in controversy that is greater than $25,000, assignment to the Business Court is appropriate.

## GENERAL ALLEGATIONS

### Certificates of Participation

12. In 2005 and 2006, the City arranged to enter into a series of transactions for the purpose of raising over $1.4 billion to remedy the underfunding of the City's two pension funds—the General Retirement System and the Police and Fire Retirement System. The transactions were structured as follows:

(a) The City arranged for the organization of two non-profit "Service Corporations" to serve as intermediaries in the financing. One Service Corporation was associated with the General Retirement System and the other with the Police and Fire Retirement System.

(b) The City entered into a "service contract" with each Service Corporation, in 2005 and again in 2006, pursuant to which the City agreed to make certain payments in return for that Service Corporation's assistance in transactions designed to fund the City's unfunded liabilities to the retirement systems.

(c) The Service Corporations arranged for the creation of Funding Trusts in 2005 and 2006, and assigned to the Funding Trusts their right to receive the City's payments.

(d) The Funding Trusts issued debt obligations called "Pension Obligation Certificates of Participation" ("COPs") to investors, each of which

5

represented an undivided proportionate interest in the payments to be made by the City to the Service Corporations pursuant to the service contracts.

(e) The two Funding Trusts issued and sold COPs to investors in 2005 and 2006.

13. To make the COPs more attractive to investors, the City arranged for the purchase of insurance against a payment default on the COPs by the Funding Trusts, caused by a failure of the City to make payments to the Service Corporations under the service contracts. The predecessor of defendant Syncora (an entity then known as XL Capital Assurance, Inc.) was one of two monoline insurers who were paid for, and provided, this insurance. Syncora continues to be the surety for these payments.

**Swaps**

14. Some of the 2006 COPs paid a floating interest rate. To protect themselves from the risk of fluctuating interest rates on these floating rate 2006 COPs, the Service Corporations entered into hedging arrangements with UBS A.G. and SBS Financial Products Company, LLC (together, and with Merrill Lynch Capital Services, Inc., as credit support provider to SBS, the "Counterparties"). Under the hedges—which are commonly called "swaps"—the Service Corporations and the Counterparties agreed to a transaction that effectively converted each Service Corporation's floating interest rate exposure into a fixed payment. This was done through an arrangement whereby, in return for each side "betting" against the other on interest rates, the Counterparties agreed to make payments to the Service Corporations in the event the floating interest rates on the COPs exceeded certain levels. Conversely, if interest rates fell below certain levels, the Service Corporations would be forced to make payments to the Counterparties.

6

15. The swaps transaction has been very expensive for the City. When interest rates fell—which they did dramatically after 2008—the Service Corporations and the City did not benefit with lower payments on the COPs. They remained obligated under the terms of the swaps to make substantial quarterly fixed payments to the Counterparties while continuing to receive lower floating rate payments in return. Moreover, the City remained vulnerable in the event there were an "event of default" or a "termination event" under the swaps agreements, including for those that it did not cause. If there were an event of default or a termination event, the swaps documents gave the Counterparties the right to terminate the swaps and demand a potentially enormous termination payment. As of May 31, 2013, the City faced a termination obligation to the Counterparties exceeding $340 million if an event of default were declared and the Counterparties exercised their right to terminate.

16. As part of the swaps transactions, the Counterparties required protection against the possibility that the Service Corporations might default on their quarterly swaps payments. Accordingly, the parties arranged to purchase insurance to protect the Counterparties against a default of a payment on the swaps. The predecessor of defendant Syncora—XL Capital Assurance, Inc.—was one of two monoline insurers who were paid for, and provided, this swaps default insurance. Syncora continues to be the surety for swaps payments, however its payment liability in the event that the Counterparties terminate the swaps is capped, in aggregate, at $50 million, notwithstanding the fact that the Counterparties' claims will be in the hundreds of millions of dollars.

17.  The insurance purchased to protect against a default under the swaps was entirely separate from and independent of the insurance purchased to protect against a default under the COPs.

**Casino Revenues**

18.  In 1996, Michigan voters authorized, and in 1997 the City approved, the development and operation of gambling casinos within the City limits.  *See* Initiated Law 1 of 1996, codified as amended by PA 69 of 1997 as the Michigan Gaming Control and Revenue Act, MCL 432.201, *et seq.*; Detroit City Council Ordinance 17-97 (June 18, 1997).  Ultimately, defendants MGM, MotorCity, and Greektown built casinos within the City limits.

19.  Michigan law authorizes the City to impose and collect taxes upon the casinos' gross receipts and also to require the casino developers to make periodic "developer payments" to the City.  These amounts have proven to be substantial.  In fiscal year 2012, the City received over  $180 million in casino taxes and developer payments from the casinos.  The City projects that it will receive a similar amount annually in each of the next ten years.  *See* Affidavit of Kevyn D. Orr, Emergency Manager for the City of Detroit, Ex. A at 47 (hereinafter "Orr Aff.").

**2009 Restructuring of the Swaps**

20.  As the City's financial health continued to deteriorate and the 2008 financial crisis worsened, a potential termination event under the swaps contracts occurred.

21.  To avoid payment of the significant termination amount, the City, the Service Corporations, and the Counterparties entered into a series of interlocking agreements in June 2009.  One of these documents was the Collateral Agreement, which

was executed by the City, the Service Corporations, the Counterparties, and U.S. Bank as custodian.[1] Under the Collateral Agreement, the City agreed to make the swaps payments to the Counterparties through a "lockbox" arrangement, and to pledge certain Casino Revenues as collateral to secure the City's obligations under the swaps agreements, as follows:

(a) U.S. Bank was appointed custodian of two accounts: a "Holdback Account" and a "General Receipts Subaccount."

(b) The casinos were instructed to pay developer payments and casino tax payments (collectively, "Casino Revenues") daily to the General Receipts Subaccount.

(c) The City was obligated each month to deposit into the Holdback Account one-third of the quarterly payment owed by the Service Corporations to the Counterparties. Once the City did so, U.S. Bank would release to the City the Casino Revenues that had accumulated in the General Receipts Subaccount—which on a monthly basis would far exceed the amount of the monthly swaps obligation—and would continue to remit Casino Revenues to the City as they were deposited, until the beginning of the next payment period.

(d) If there were an event of default by the City or a termination event under the contract, the Collateral Agreement gave the Counterparties—UBS and SBS/Merrill Lynch—the right to serve a notice upon U.S. Bank. Upon receiving a notice from the Counterparties, U.S. Bank would be required to

---

[1] The validity of the Collateral Agreement is not at issue in this case. It is therefore assumed for purposes of this complaint that the Collateral Agreement is valid and enforceable.

9

hold—or "trap"—in the General Receipts Subaccount the monies that had

accumulated there and not disburse them to the City.

22.  Syncora was not a party to the Collateral Agreement and had no independent

rights under it.  The Collateral Agreement did not change Syncora's obligations as an

insurer on the swaps.  Nor did the Collateral Agreement in any way purport to secure

payment under the COPs.

**Detroit's Financial Emergency**

23.  The City's financial distress is well known.  On March 14, 2013, Kevyn Orr

was appointed Emergency Financial Manager for the City of Detroit, to assume control of

major operations of the City.  The Emergency Manager took office on March 25, 2013.

24.  The Emergency Manager has been working for nearly four months to bring

order to the City's finances and operations and to resolve claims and disputes with the

many claimants against the City.  Nonetheless, the City is currently insolvent and unable

to pay its debts when they become due.

25.  On June 14, 2013, the Emergency Manager met with representatives of the

City's stakeholders, including the City's unions, retiree associations, pension trusts, debt

holders, and insurers.  Representatives of Syncora attended this meeting.  The Emergency

Manager outlined the City's financial distress, and the fact that the City did not have the

money to pay all stakeholders in full.  The Emergency Manager underscored the urgent

need for quick action to address the financial emergency and made clear that recoveries

would be limited on unsecured debt and legacy obligations, such as the COPs, but that

the City would pay obligations secured by specific revenue streams.  The Emergency

Manager shared the City's ten-year projections detailing the revenues—including the

10

Casino Revenues—necessary to support the City's operations, provide full payment of secured debt, and permit the non-payment of unsecured debt and legacy obligations (other than health care). The Emergency Manager underscored the urgent need for quick action to address the financial emergency. Given the urgency facing the City, the Emergency Manager has publicly stated that he has extremely limited time in which to engage in discussions. These discussions are currently pending, but the City is approaching the end of the timeframe envisioned by the Emergency Manager for such discussions.

26. That same day, the City's liquidity crisis made it unable to make a payment of approximately $40 million due to the Service Corporations for onward payment to holders of the COPs.

27. It is the City's understanding that, as one of the two sureties for these payments, Syncora is now responsible to make payments to some holders of the COPs issues that Syncora insured. Syncora's exposure will continue to grow if and when the City is unable to make future payments with regard to the COPs.

28. Notwithstanding its inability to make the June 14, 2013, payment related to the COPs, through the date of this Complaint, the City has made all of its required payments on the swaps to the Counterparties through the Holdback Account.

29. The Counterparties have not served a notice of default under the swaps upon U.S. Bank.

30. Thus, Syncora currently has no liability to the Counterparties or to anyone else with respect to the swaps and no rights under the Collateral Agreement.

**Syncora's Letters to U.S. Bank**

31.  On June 17, 2013, Syncora sent a letter to U.S. Bank, as custodian of the General Receipts Subaccount under the Collateral Agreement.  Counsel to U.S. Bank responded, advising Syncora that in the ordinary course it would have released Casino Revenues, and inquiring as to the basis for Syncora's "letter of instruction" to hold Casino Revenues.  U.S. Bank made clear to Syncora that the City and the Counterparties had been in settlement discussions, and that U.S. Bank was reluctant to interfere. Despite the facts that there had been no payment default on the swaps and that Syncora was not a party to, and had no rights under, the Collateral Agreement, its counsel responded to U.S. Bank that Syncora believed there was an event of default under the swaps and repeated Syncora's demand that U.S. Bank therefore trap in the General Receipts Subaccount all monies that otherwise would flow to the City under the Collateral Agreement.  Counsel for Syncora then sent a letter to U.S. Bank on June 24, 2013, threatening to hold U.S. Bank responsible for any release of funds from the General Receipts Subaccount.

32.  On June 25, 2013, the Emergency Manager objected to Syncora's notice.  On June 26, 2013, however, Syncora refused to withdraw its letter and continued to insist that U.S. Bank trap the monies in the General Receipts Subaccount.

33.  On June 27, the City's advisors met with Syncora, urging it to rescind its demands, making clear that the Counterparties were willing to release the Casino Revenues, and again advising Syncora that its actions were clearly injuring the City.

34.  Advisors for Syncora and the City held a teleconference on June 29, 2013, during which no progress in this dispute was made.  It then became apparent to the

Emergency Manager that further discussions with Syncora would not have been productive.

35. As a result of the letters Syncora has sent, U.S. Bank has trapped the monies in the General Receipts Subaccount and refused to disburse them to the City, even though Syncora is not a party to the Collateral Agreement, has no right to direct U.S. Bank's handling of the collateral, and has no rights in that collateral.

### Lack of Privilege or Justification for Syncora's Actions

36. Although Syncora has taken intentional and deliberate steps to trap money in the General Receipts Subaccount, Syncora has no rights in that collateral unless and until the City fails to make a payment to the swaps Counterparties, which it has not done.

37. Similarly, although Syncora is the insurer of both the COPs payments and the swaps payments, it has no right to interfere with the Collateral Agreement's custodial arrangement for the swaps payments because of the City's default on its COPs payments. Put differently, the City's obligations to the Service Corporations with respect to the COPs are independent of, and not secured under, the Collateral Agreement.

38. No document or doctrine of law or equity permits Syncora to use its contractual rights as surety to the swaps to bootstrap its position as surety to the COPs.

39. Syncora's letters to U.S. Bank have been sent in an illegal and improper attempt to exert leverage upon the City and force it to make concessions to Syncora with respect to the COPs default by (a) sabotaging ongoing negotiations and proposed settlements between the City and its stakeholders, (b) forcing the City to default on the swaps, and (c) thwarting the City's efforts to deliver essential fire, police, EMS, and other municipal services, causing harm to the health and welfare of the citizens of Detroit.

13

40. In particular, as Syncora was aware, prior to its letters that the Emergency Manager had been in serious discussions with the Counterparties for a negotiated termination of the swaps contracts, which would have reduced the City's exposure to the Counterparties and removed any cloud upon the City's ability to rely upon an uninterrupted flow of Casino Revenues. Within the past week, the Emergency Manager was close to a final settlement with the Counterparties. Syncora's letter, however, brought these negotiations to a standstill because unimpeded access to the Casino Revenues is a significant part of the basis for the bargain.

41. Syncora's letters are a deliberate interference with these negotiations in an effort to exert leverage over the City. In the event the Emergency Manager succeeds in negotiating such a settlement with the Counterparties, the effect of the settlement would be to terminate the swaps, thus relieving Syncora of its obligations as an insurer of the swaps payments. In other words, Syncora stands to benefit immensely from the Emergency Manager's negotiations and possible settlement with the Counterparties. Syncora's intentional interference with these negotiations reveals that Syncora's true motive is to obtain leverage concerning its greater exposure resulting from the City's default on the COPs. Syncora's actions are a deliberate attempt to put the City to the horns of a dilemma—either offer concessions to Syncora on their COPs obligations or default on the swaps payment and risk a several hundred million dollar termination payment to the Counterparties for which Syncora has only a limited responsibility.

42. Syncora took these actions in bad faith, without legal justification, for the purpose of individual aggrandizement, and to avoid its contractual liabilities as a surety for COPs payments.

**Irreparable Harm from Syncora's Actions**

43.   The City is insolvent and unable to pay its debts as they become due.   The City's ability to receive the Casino Revenues it is owed from the General Receipts Subaccount is essential to the City's financial survival.   Even net of the amount of the City's monthly swaps payments, the stream of funds from the General Receipts Subaccount is substantial, on average around $11 million each month.   To put this amount in perspective, $11 million is the equivalent of 30% of the City's available cash-on-hand as of June 30, 2013, and would allow the City to pay for nearly two months of fire fighter salaries and wages or nearly one month of police officer salaries and wages.

44.   Even with the Casino Revenues, the City is expected to run out of funds by December 31, 2013.   If the City is not able to access those funds—around $11 million per month net of the City's swaps obligations—a general default by the City will occur earlier, potentially forcing the City to file for bankruptcy under Chapter 9 of the Bankruptcy Code, 11 U.S.C. § 901 *et seq.*

45.   Moreover, because of its threatened financial collapse, the City  has a limited window of time in which to negotiate with creditors and other claimants.   At the June 14, 2013,  meeting the Emergency Manager made clear that the City could not meet all of its obligations and that it had a limited window of time in which to reach negotiated settlements with its stakeholders.   Syncora's June 17 letter to U.S. Bank, however, has essentially brought those negotiations to a standstill because the cloud over the Casino Revenues caused by Syncora has created uncertainty over how much money the City has to spend.

46.  Unless the City is able to enter into such negotiations and reach settlements quickly, its ability to resolve its financial emergency will be in jeopardy and the City will lose unique and irreplacable opportunities.  Assurance that the City will continue to have access to the Casino Revenues is critical to negotiations with these stakeholders because the Emergency Manager cannot make promises to stakeholders that he does not have the funds to satisfy.

47.  In particular, the trapping of the monies in the General Receipts Subaccount has already threatened negotiations with the Counterparties, who are among the City's largest secured creditors.  Unless the City can regain access to those funds quickly, the potentially significant benefits of these negotiations for the City will be irretrievably lost.

48.  Syncora's actions, moreover, will force the City to default on the swaps payment on July 11, 2013.  Previously, the City's $4 million monthly swaps payment was associated with the return of at least an equivalent amount in Casino Revenues the next day.  By tying up the Casino Revenues, Syncora has deprived the City of the ability to make the swaps payment, which will lead to a default when the payment is due, irreparably harming the City.

49.  The City's strained financial resources have already resulted in a collapse of essential City services, including police, fire, and emergency medical services.  The loss of $11 million in revenue per month further jeopardizes the City's ability to adequately provide essential services to its citizens and to effectuate the early stages of the Emergency Manager's restructuring plan.

50.  Meanwhile, even if Syncora had rights over the collateral, it would face no serious harm from the release of the Casino Revenues that have already accumulated in

16

the General Receipts Subaccount because a steady stream of Casino Revenues that is more than three-times as large as the City's swaps obligation is deposited in the General Receipts Subaccount each month, and will continue to be deposited in that account each month for the foreseeable future.

51.  Without immediate and unimpeded access to its Casino Revenues in the General Receipts Subaccount, including the monies trapped by Syncora's letters, the City will be unable to deliver essential City services, successfully negotiate with and resolve disputes with claimants, and implement the initial stages of the Emergency Manager's restructuring plan, causing the City irreparable harm.

### COUNT I – INTERFERENCE WITH CONTRACTUAL RELATIONS

52.  The City repeats and realleges paragraphs 1 through 51.

53.  The City is a party to the Collateral Agreement and is entitled to the benefits of the terms, conditions, provisions and protections of that contract.

54.  Syncora is not a party to the Collateral Agreement and has no right to interfere with or defeat the purposes of that contract.

55.  The letters Syncora has sent to U.S. Bank had the purpose and effect of defeating the system the Collateral Agreement established for the orderly management of the periodic payments from the City to the Counterparties and for the orderly and reliable remission to the City of the monies in the General Receipts Subaccount and of the Casino Revenues.

56.  Neither the Collateral Agreement nor any other agreement appointed or authorized Syncora to send notices, letters, or similar documents to U.S. Bank for the purpose or effect of trapping Casino Revenues in the General Receipts Subaccount.

57. Syncora's letters have caused U.S. Bank to refuse to remit funds in the General Receipts Subaccount to the City upon payment by the City of its monthly payment as required by the Collateral Agreement.

58. Syncora sent these notices without legal right or justification and for the purpose of interfering with the Collateral Agreement's system for management of the Casino Revenues.

59. Syncora's actions were intentional, malicious, and unjustified in law.

60. The City has been injured in an amount that cannot now be determined, and will continue to be injured so long as the default notices are honored by U.S. Bank.

61. The City is entitled to compensatory and exemplary damages.

**COUNT II – INTERFERENCE WITH ADVANTAGEOUS RELATIONS**

62. The City repeats and realleges paragraphs 1 through 61.

63. The City has been engaged for many weeks in intensive negotiations with the Counterparties and others to resolve claims against the City and/or to permit the City to resolve its financial crisis.

64. The City has reached an agreement in principle with the Counterparties, but cannot conclude this agreement without ongoing access to the monies in the General Receipts Subaccount and guaranteed access in the future to the Casino Revenues.

65. Syncora was aware that the City was engaged in discussions with the Counterparties and other stakeholders, and sent these notices intentionally, without legal right or justification and for the purpose of interfering with the City's ability to pursue negotiations with these claimants and to conclude agreements with them.

66. Syncora's notices have, in fact, had the effect of interfering with these negotiations and with the City's ability to conclude agreements with the Counterparties and other stakeholders.

67. The City has been injured in an amount that cannot now be determined, and will continue to be injured so long as the default notices are honored by U.S. Bank.

68. The City is entitled to compensatory and exemplary damages.

## COUNT III – DECLARATORY JUDGMENT

69. The City repeats and realleges paragraphs 1 through 68.

70. An actual and existing controversy  has arisen between the City of Detroit and Defendants as to whether Syncora had or has the legal right to send default notices under the Collateral Agreement.  A declaratory judgment is necessary to guide the parties' future conduct and in order to preserve the City's legal rights.

71. Unless this dispute is timely resolved, the City and its residents will suffer irreparable harm.

72. The City prays for a decree pursuant to MCR 2.605 that Syncora is not entitled under the Collateral Agreement or otherwise to send notices to U.S. Bank or to take other actions with the purpose or effect of limiting the City's access to monies in the General Receipts Subaccount or Casino Revenues.

73. The City further prays for a decree pursuant to MCR 2.605 that U.S. Bank may not accept any direction from Syncora with respect to any funds in the General Receipts Subaccount or the Holdback Account.

## COUNT IV – INJUNCTIVE RELIEF

74. The City repeats and realleges paragraphs 1 through 73.

19

75. Syncora's letters will cause the City immediate and irreparable harm by depriving it of funds that are necessary for the City to successfully negotiate with and resolve disputes with its stakeholders, deliver essential City services to its citizens, and implement the initial stages of the Emergency Manager's restructuring plan.

76. Syncora will suffer no hardship from a release of the funds in the General Receipts Subaccount because it has no rights under the Collateral Agreement to the Casino Revenues, no current payment obligations under the swaps insurance agreements to the Counterparties, and no potential injury that cannot be remedied at law by money damages from the continually accumulating Casino Revenues.

77. The City is likely to succeed on the merits of its claims, because Syncora is not a party to the Collateral Agreement and has no right under that or any other document to direct U.S. Bank's handling of the collateral in the General Receipts Subaccount.

78. The public interest favors the City because the inability to withdraw $11 million in net revenue each month from the City's balance sheet will significantly hinder the City's ability to provide essential police, fire, and other city services to its residents, and will impede its ability to resolve successfully the financial emergency.

79. Plaintiff seeks preliminary, temporary and permanent injunctive relief, pursuant to MCR 3.310, restraining Defendants from taking any action contrary to the declaration of rights sought by the plaintiff.

**JURY DEMAND**

80. Plaintiff demands trial by jury on all issues to which it is entitled to a trial by jury.

**WHEREFORE**, Plaintiff prays for judgment:

(a)  Awarding money damages against Syncora, in an amount to be determined at trial, for compensation for the injury caused by defendant;

(b)  Awarding exemplary damages against Syncora, in an amount to be determined at trial, for defendant's tortious, intentional and unjustified conduct;

(c)  Declaring that Syncora has and had no right to take any action under the Collateral Agreement or any other document or authority purporting to limit the City's access to Casino Revenues or the funds in the General Receipts Subaccount;

(d)  Declaring that the Collateral Agreement permits U.S. Bank to rely on notices provided only by the Counterparties which are signatories to the Collateral Agreement;

(e)  Entering preliminary, temporary and permanent injunctive relief enjoining Syncora from taking any action to limit the City's access to Casino Revenues or the funds in the General Receipts Subaccount;

(f)  Entering preliminary, temporary, and permanent injunctive relief enjoining U.S. Bank to make payments to the City from the General Receipts Subaccount, unless instructed to do otherwise by the Counterparties pursuant to the terms of the Collateral Agreement, without regard to any assertion of rights by Syncora;

(g)  Entering preliminary, temporary, and permanent injunctive relief against the Casino Defendants, in the event this Court is unable to fashion appropriate relief against Syncora and U.S. Bank, enjoining the Casino

21

Defendants to make payment of Casino Revenues directly to the City rather than to the General Receipts Subaccount, or establishing another mechanism for payment mutually acceptable to the City and the Counterparties;

(h)  Entering preliminary, temporary, and permanent injunctive relief against all Defendants, enjoining Defendants from instituting or maintaining litigation in any other court or otherwise taking any steps to defeat the jurisdiction of this Court; and

(i)  Awarding such other relief as the Court deems just and proper.


Dated:  July 5, 2013

**CITY OF DETROIT**

 /s/ Robert S. Hertzberg                   
ROBERT S. HERTZBERG (P30261)
DEBORAH KOVSKY-APAP (P68258)
Pepper Hamilton LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
(248) 359-7300  -  Telephone
(248) 359-7700  -  Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

THOMAS F. CULLEN, JR. (*pro hac vice* pending)
GREGORY M. SHUMAKER (*pro hac vice* pending)
GEOFFREY S. STEWART (*pro hac vice* pending)
Jones Day
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

*Attorneys for Plaintiff*

22

## VERIFICATION

I, _KEVIN D ORR_, hereby certify that I am the

_EMERGENCY MANAGER_ of the City of Detroit (the "City"). I am authorized to verify

the foregoing Complaint for injunctive relief, declaratory judgment and other relief on

behalf of the City and do so based upon my personal knowledge, the records of the

City, and matters made known to me by other employees, representatives or agents of

the City. Therefore, I verify that the facts stated in the foregoing Complaint are true

and correct to the best of my personal knowledge, information and belief.

STATE OF MICHIGAN          )
                           ) ss.
COUNTY OF WAYNE            )

The foregoing was acknowledged under oath before me this _4th_ day of July,

2013, by _Kevyn D. Orr_ on behalf of the City of Detroit.

_____

Notary Public

MARYELLEN LEOPOLD
Notary Public, State of Michigan
County of Oakland
My Commission Expires Apr. 03, 2019
Acting in the County of _____