# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |
| | ) | Related to Doc. No. 157 |

**OBJECTION OF THE DETROIT RETIREMENT SYSTEMS TO THE MOTION OF DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO RULE 9019, AND (III) GRANTING RELATED RELIEF**

The Police and Fire Retirement System of the City of Detroit ("PFRS") and the General Retirement System of the City of Detroit ("GRS," and together with PFRS, the "Retirement Systems") object to the Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of That Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief (the "Assumption Motion") [Doc. No. 157].

### Preliminary Statement

Through the Assumption Motion, the City of Detroit (the "City") seeks the Court's authorization to assume, and the Court's approval of, a certain Forbearance Agreement between the City and the Swap Counterparties.[1] Under the Forbearance Agreement, the City would agree to the full amount of the Swap Counterparties' asserted claims (approximately $300 million) and

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Assumption Motion.

deem them fully secured. These claims arise from a technical default asserted by the Swap Counterparties under the Swap Agreements some 16 months ago that allegedly created a potential termination event and a corresponding termination fee. Under the Forbearance Agreement, the City would continue to pay debt service to the Swap Counterparties postpetition at the approximate rate of $4 million per month and would be provided the opportunity to pay off the swap claims in the near term for a discount of between 18% and 25%, depending on the timing of payment.

The City asserts that the Forbearance Agreement is beneficial because it allegedly ensures the City's access to necessary cash, resolves its obligations under certain agreements with the Swap Counterparties at a discounted price, and avoids protracted litigation with the Swap Counterparties. However, the Assumption Motion is devoid of material information necessary to assess the benefits of the Forbearance Agreement. Without limitation and reserving all rights, the Assumption Motion fails to explain: (i) whether a valid termination event exists such that the Swap Counterparties have a valid termination right that necessitates the Forbearance Agreement in the first instance; (ii) whether the Swap Counterparties' asserted prepetition liens validly extend to Casino Revenue generated postpetition; (iii) what claims, obscurely alluded to in paragraph 47 of the Assumption Motion, may exist to challenge the validity of the Swap Contracts and liens, which claims are being waived; and (iv) by what means the City intends to obtain funds likely in excess of $200 million in the next roughly 2-6 months to effectuate an Optional Termination. Accordingly, the Assumption Motion should be denied.

## Background

In 2009, pursuant to the Collateral Agreement entered into between the City, the Service Corporations, the Swap Counterparties, and U.S. Bank, N.A., the City pledged the Casino

2

Revenue as collateral to secure the City's obligations under the Swap Agreements. The Collateral Agreement provides, among other things, that if the City fails to meet its obligations under the Swap Agreements, the Swap Counterparties are entitled to "trap" the City's Casino Revenue, which amounts to approximately $15 million per month. In addition, upon the triggering of certain default events, the Swap Counterparties are entitled to terminate the Swap Agreements and seek a termination payment from the City, which as of the end of June, 2013 was estimated at nearly $300 million dollars. *See* Assumption Motion, pp. 8-12.

According to the City, the Forbearance Agreement was entered into in July 2013 as a direct result of the Swap Counterparties threatening to declare a technical default under the Swap Agreements following the downgrading of the City's Unlimited Tax General Obligation Bonds in March of 2012. Assumption Motion, p. 12. Under the Forbearance Agreement, the Swap Counterparties agree to, among other things, forbear from terminating the Swap Agreements and from trapping the Casino Revenue. For their part, the City and the Service Corporations covenant to, among other things, "schedule any amounts due and owing to any Swap Counterparty as undisputed, fully liquidated claims." Assumption Motion, p. 16. The Forbearance Agreement also gives the City the right to direct the Swap Counterparties to terminate the Swap Agreements, at which time the City would pay the Swap Counterparties a percentage between 75% and 82% of the full termination payment, depending on when the Optional Termination Right is exercised. Assumption Motion, p. 17.

The City points to this discounted payoff as one of the primary benefits of the Forbearance Agreement. Assumption Motion, p. 27. However, given that the City estimates the full termination payment, absent any Forbearance Agreement, to be nearly $300 million, even a 25% discount of such payment would still result in a claim of hundreds of millions of dollars.

3

Furthermore, any such payment would apparently be due, in full and in cash, on or before the second business day following the Optional Termination Date. Forbearance Agreement, § 3.3.

### Argument

I.      **NEITHER ASSUMPTION UNDER 11 U.S.C. § 365 NOR APPROVAL UNDER FED. R. BANKR. P. 9019 IS APPROPRIATE BECAUSE THE CITY HAS FAILED TO PROVIDE DETAILS IN ITS MOTION SUFFICIENT TO DETERMINE THAT THE FORBEARANCE AGREEMENT IS IN THE BEST INTERESTS OF THE ESTATE.**

The Assumption Motion asks for the Court to approve the assumption of the Forbearance Agreement under 11 U.S.C. § 365, and to approve the Forbearance Agreement as a settlement under Fed. R. Bankr. P. 9019. With respect to assumption under section 365, there is a threshold issue of whether the Forbearance Agreement is "executory" in nature and thus assumable under section 365.[2] Even assuming the contract is executory, the Retirement Systems submit that it is inappropriate for the City to seek approval of its "assumption" of the Forbearance Agreement under the highly deferential "business judgment" standard applicable to contract assumptions - - in light of its complexities, the significant economic interests at stake, and its fundamental character as a settlement agreement (thus implicating Bankruptcy Rule 9019 considerations).

The City has also elected to submit the Forbearance Agreement to the Court's review under Bankruptcy Rule 9019. Therefore, the Court has all of its traditional authority to review the transactions contemplated by the Forbearance Agreement to ensure that they are fair and equitable and in the best interests of creditors. *See Reynolds v. Comm'r*, 861 F.2d 469, 473 (6th

---

[2] An executory contract is commonly defined as "a contract under which the obligations of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of another." Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973); *In re Magness*, 972 F.2d 689, 694 (6th Cir. 1992). The Retirement Systems question what obligations the Swap Counterparties are required to "perform" under the Forbearance Agreement. It appears that the obligations of the Swap Counterparties are merely to refrain from performing any actions.

4

Cir. 1988) (standard of review under Bankruptcy Rule 9019); *see also In re City of Stockton*, 486 B.R. 194, 199 (Bankr. E.D. Cal. 2013) ("When a chapter 9 debtor files a 9019 motion to have the court approve a compromise or settlement, the municipality 'consents' for purposes of § 904 to judicial interference with the property or revenues of the debtor needed to accomplish the proposed transaction."). However, the Assumption Motion fails to provide adequate information to establish that the Forbearance Agreement is indeed fair and equitable and in the best interests of creditors.

A. **The Assumption Motion Fails to Establish as a Threshold Matter That A Termination Event Occurred Prepetition that Necessitates a Forbearance Agreement.**

It is important to note that the Assumption Motion does not identify any failure of the City to make any required normal periodic payments to the Swap Counterparties under the Collateral Agreement. To the contrary, the only potential default noted is a technical default due to a downgrading of the creditworthiness of certain bonds of the City. This alleged default occurred in March 2012. The Forbearance Agreement was entered into some 16 months later. In light of the financial interests at stake in this settlement and the financial interests of the City and its other creditors, this threshold issue merits significantly closer examination.[3]

If there is no actionable default under the Swap Agreements, then the City could choose to simply continue to make its monthly payments of $4 million in accordance with the Collateral Agreement, free of the time constraints for paying off the entire claim of the Swap Counterparties under the Forbearance Agreement. This flexibility in the timing of making a termination payment is critical. Upon information and belief, the amount of the termination fee

---

[3] The import of this proposed settlement and its potential for inequitable results vis-à-vis other parties in interest in this case was poignantly expressed in a New York Times editorial today, entitled *No Banker Left Behind* (http://www.nytimes.com/2013/08/16/opinion/no-banker-left-behind.html ).

5

is a form of present-value calculation based on the difference between the fixed interest rate under the Swap Agreements and the variable interest rate under the relevant Certificates of Participation ("COPs"). If, as many expect, market interest rates rise over the next 12-24 months, the gap between the variable and fixed rates will decrease, and the termination fee payable to the Swap Counterparties will decrease, possibly quite significantly. Therefore, it is imperative that the basis for the Forbearance Agreement and its constraint on the City's ability to possibly take advantage of rising interest rates for the benefit of all of its creditors must be established in greater detail. The Assumption Motion's failure to do so warrants denial of the Motion.

    **B.**     **The Assumption Motion Fails to Establish that, Notwithstanding 11 U.S.C. § 552(a), the Prepetition Liens of the Swap Counterparties Extend to Casino Revenue Acquired by the City Postpetition.**

Though it is not entirely clear given the lack of detail provided in the Assumption Motion, there may be significant issues with respect to the treatment in the Forbearance Agreement of the claims of the Swap Counterparties as "fully secured," particularly in light of the limitations in section 552(a) of the Bankruptcy Code upon security interests in a debtor's after-acquired property.

Section 552 of the Bankruptcy Code provides, in part as follows:

> (a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

11 U.S.C. § 552. While the above provision generally cuts off the ability of a prepetition lien resulting from a prepetition security agreement from attaching to property acquired by the debtor postpetition, section 552(b) provides an exception, permitting such a prepetition lien to attach to postpetition proceeds, products, offspring, or profits of prepetition collateral. 11 U.S.C. § 552.

6

1.  **The Assumption Motion Fails to Establish that the Liens Held by the Swap Counterparties Are Statutory Liens.**

As set forth above, section 552(a) provides that property acquired by the debtor or the debtor's estate after the commencement of the case is not subject to a lien "resulting from any security agreement" entered into by the debtor prior to the petition date. 11 U.S.C. § 552(a). The result is that section 552(a) applies only to liens arising out of security agreements, and not to other liens such as statutory liens. *See Alliance Capital Mgmt. L.P. v. County of Orange (In re County of Orange)*, 189 B.R. 499, 502 (C.D. Cal. 1995) (citing *United States v. Fuller (In re Fuller)*, 134 B.R. 945, 948 (9th. Cir. B.A.P. 1992)).

The City and/or the Swap Counterparties may argue that the prepetition liens granted to the Swap Counterparties in the Collateral Agreement are statutory liens and are therefore not subject to section 552(a)'s cutting off of such lien rights in postpetition property. In actuality, the liens in question arose out of a security agreement between the City, the Service Corporations, the Swap Counterparties, and U.S. Bank, N.A. Thus, section 552(a) remains fully applicable.

A "statutory lien" is defined in the Bankruptcy Code as a "lien arising solely by force of a statute on specified circumstances or conditions, . . . but does not include security interest or judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute." 11 U.S.C. § 101(53). The *Alliance Capital* court clarified that the distinguishing feature of a statutory lien is that it arises *solely* by force of statute. *Alliance Capital*, 189 B.R. at 502.

In *Alliance Capital*, certain sections of the California Government Code ("CGC") authorized counties to issue tax and revenue anticipation notes as a form of short-term municipal financing. *Id.* at 500. The CGC also authorized that revenues could be pledged to secure

7

payment on those notes, and that in such case the notes shall be a first lien and charge against the pledged funds. *Id.* at 500-01. Pursuant to these provisions, Orange County adopted a resolution authorizing the issuance of $200 million of anticipation notes and granting a first lien against certain pledged revenues. After Orange County filed its petition under chapter 9 of the Bankruptcy Code, there was an issue as to whether these liens were statutory, and survived the bankruptcy filing, or whether they arose out of a security agreement, in which case the liens would not survive the bankruptcy filing under 11 U.S.C. § 552(a). *Id.* at 501.

The court held that the liens were statutory on grounds that the CGC statutes in place (1) authorized the county to borrow through issuing notes, (2) authorized pledging specific revenue to secure those notes, (3) required the resolution authorizing the issuance of notes to specify what revenues were being pledged, and (4) provided that the notes would be a first lien against the pledged revenues. *Id.* at 503. The court cited the legislative history to 11 U.S.C. § 101(53), which states that a statutory lien is one that arises automatically, and is not based on an agreement to give a lien. *Id.* at 502 (citing S. Rep. No. 95-989, 95th Cong., 2nd Sess. 1978). The court also cited *Collier on Bankruptcy*, which distinguished statutory liens and security interests by stating that if "the lien arises by force of statute, without any prior consent between the parties, it will be deemed a statutory lien . . . If the creation of the lien is dependent upon an agreement, it is a security interest even though there is a statute which may govern many aspects of the lien." *Id.* (quoting 2 *Collier*, para. 101.53, at 101-150.51). The court held that though Orange County had a choice of *whether* to pledge, or *what* to pledge, once they made that choice the "lien is fixed by law as a first lien," and therefore the liens arose solely by statute and were properly statutory liens. *Id.* at 503.

In this case, unlike in *Alliance Capital*, there were no statutes or ordinances authorizing the Collateral Agreement or the liens granted therein until the parties to the Collateral Agreement agreed on each and every essential term to that agreement, including the liens contemplated to be granted, and presented a non-binding term sheet to City Council. *See* Ordinance No. 05-09 (the "Authorizing Ordinance"), Sec. 18-16-4. City Council then adopted the Authorizing Ordinance with the express purpose of authorizing the agreement that had already been reached between the parties. *See id.* at 18-16-4(n) ("This Ordinance is adopted for the purpose of implementing the transactions contemplated by the term sheet. . . ."). Thus, it cannot be said that the liens arising out of the Collateral Agreement arose *solely* by force of statute; rather, it is more accurate to say that the Authorizing Ordinance arose out of the agreement to grant the liens. Because the parties to the Collateral Agreement consented to the liens *prior* to the Authorizing Ordinance's existence, the liens are security interests, whether or not the liens are provided for or dependent on the Authorizing Ordinance, and whether or not the liens are made fully effective by the Authorizing Ordinance. *See* 11 U.S.C. § 101(53).

### 2. Significant Questions Exist as to Whether Bankruptcy Code Section 928 Applies to the Liens of the Swap Counterparties.

Regardless of whether Casino Revenue may constitute "special revenue" as defined under Bankruptcy Code section 902(2), the protection under section 928(a) of liens in special revenues should not apply to the Swap Counterparties' security interest in the Casino Revenue. Section 928(a) of the Bankruptcy Code states that "[n]otwithstanding section 552(a) . . . special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 928(a). A leading treatise indicates that section 928(a) should only

9

apply to liens on special revenues that secure revenue bonds that financed the project from which

the revenues derive. *See* 6-928 *Collier on Bankruptcy*, ¶ 928.02.

Section 928 was enacted in 1988. The impetus for adoption of this provision was the

recognition of the fundamental difference between industrial or revenue bonds, on the one hand,

and general municipal bond financing, on the other hand. *In re Las Vegas Monorail Co.*, 429

B.R. 770, 782 (Bankr. D. Nev. 2010). As Congress noted:

> At the same time the municipality approves financing through a revenue
> bond project or program, however, it has made the assumption that the
> project or program will generate adequate revenues to repay the
> bondholders and operate the project or program without any general
> financial obligation on the part of the municipality. Thus, unlike [general
> obligation] bonds, the general taxpayers are usually not committed to
> repaying the bonds . . . through general tax revenues.

*In re Las Vegas Monorail Co.*, 429 B.R. at 782 (quoting S. Rep. No. 100-506, at 4 (1988). The

goal was to remove the risk that revenue bondholders would be stripped of their liens on revenue

acquired by the debtor after the commencement of a municipality's chapter 9 case pursuant to 11

U.S.C. § 552(a). *County of Orange v. County of Orange*, 179 B.R. 185, 191-92 (Bankr. C.D.

Cal. 1995). The "effect is to prevent special revenues that secure an issue of revenue bonds from

being diverted to be available for the municipality's general expenses or obligations." 6-928

*Collier on Bankruptcy*, ¶ 928.01.

Here, the Swap Agreements and any amounts thereunder simply bear no relation to the

development of the casinos that generate the Casino Revenue and, therefore, bear no relation to

the policy and intended class of protected claimholders underlying Bankruptcy Code section

928(a). The rationale for section 928(a)—to encourage bond-financing investment in municipal

programs or projects by protecting the holders of those bonds—is not implicated with respect to

the Swap Counterparties and their lien claims. To accord section 928(a) treatment to the Swap

10

Counterparties' prepetition liens would therefore be arbitrary and would result in a windfall to two bank institutions whose claims have no ostensible basis to stand in a better position than many other unsecured financial creditors. Therefore, section 552(a) should be found to remain applicable to prohibit the prepetition liens of the Swap Counterparties from reaching Casino Revenue acquired by the City postpetition.

<blockquote>

3.     **The Assumption Motion Fails to Establish that Swap Counterparties Have a Lien in Casino Revenue Acquired by the City Postpetition as "Proceeds" of the Swap Counterparties' Prepetition Collateral.**

</blockquote>

The "proceeds" exception provided by 11 U.S.C. § 552(b) does not apply to the Casino Revenue acquired by the City postpetition because such postpetition revenue is wholly separate from the Swap Counterparties' prepetition collateral—the Casino Revenue acquired by the City pre-petition. Under 11 U.S.C. § 552(b), if a security agreement entered into pre-petition creates a security interest in property of the debtor acquired prepetition, and to "proceeds, products, offspring, or profits of such property," then such security interest extends to such proceeds, products, offspring, or profits acquired by the debtor's estate postpetition to the extent provided for in the security agreement and by applicable nonbankruptcy law. 11 U.S.C. § 552(b).

"Proceeds" is defined in the Michigan Uniform Commercial Code as "(A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; (B) whatever is collected on, or distributed on account of, collateral; (C) rights arising out of collateral . . . ." Michigan U.C.C. § 9-102(a)(64). The Casino Revenue that accrues postpetition does not fall into any of these categories of "proceeds" as it does not stem from or arise out of the disposition of the Swap Counterparties' prepetition collateral - - *i.e.*, Casino Revenue accrued prepetition.

The purpose of 11 U.S.C. § 552(a) is to "allow a debtor to gather into the estate as much money as possible to satisfy the claims of all creditors." *In re Bering Trader, Inc.*, 944 F.2d 500,

11

502 (9th. Cir. 1991). "Section 552(b) balances the Code's interest in freeing the debtor of pre-petition obligations with a secured creditor's rights to maintain a bargained-for interest in certain items of collateral. It provides a *narrow* exception to the general rule of 552(a)." *Id.* (emphasis in original).

The City and/or the Swap Counterparties may argue that the Swap Counterparties' prepetition collateral is the *right to receive* Casino Revenue, rather than simply the Casino Revenue itself, and thus any Casino Revenue that comes into existence post-petition constitutes "proceeds" of the pre-petition right to receive Casino Revenue. However, section 552(b) is not meant to apply to a broad right to payment. *Id.* Were that the case, section 552(b) would have included "accounts" among the other enumerated types of property listed therein. *Id.* The *Bering Trader* court explained that proceeds, products, offspring, and profits are all *derivative* types of property. *Id.* "Accounts," on the other hand, "encompasses any right to payment," and the "inclusion of such a broad term within the purview of section 552(b) would result in the exception swallowing the rule." *Id.* This is because the purpose of section 552(a) is to limit security interests in after-acquired property. Since any creditor with a security interest in after-acquired property must necessarily have some right to receive property that is not yet in existence or not yet in possession of the debtor, treating such after-acquired property as "proceeds" of the *right to receive* such property would render section 552(a) inoperable to practically any security agreement with an after-acquired property provision.

### C. The Assumption Motion Fails to Identify How It Will Finance Any Optional Termination under the Forbearance Agreement.

As stated, the Assumption Motion makes no mention of how the City intends to pay the Optional Termination Amount to the Swap Counterparties in the event that it elects to direct the Swap Counterparties to terminate the Swap Agreements. The Assumption Motion indicates that

12

such payment would be in the range of hundreds of millions of dollars. *See* Assumption Motion, ¶ 23. This highlights the impropriety of applying a one-time approval of a contract assumption under section 365. There are events that will likely play out regarding the *implementation* of the Forbearance Agreement subsequent to the scheduled hearing on the matter that may have a significant impact on whether the Forbearance Agreement is indeed fair and equitable and in the best interests of creditors. Accordingly, subject to the other objections above, the Retirement Systems submit that the Assumption Motion cannot be approved under Bankruptcy Rule 9019 until the implementation of the Optional Termination is made known to the Court, and, at a minimum, the Court should reserve and retain review of this matter pending the City's proposal of a specific Optional Termination transaction.[4]

> **D. The Assumption Motion Fails to Identify What Challenges to the Validity of the Swap Agreements and Liens May Exist, as Well as Other Important Information.**

At paragraph 47 of the Assumption Motion, the City makes an obscure reference to the possibility of challenges that may be made to the validity of the Swap Agreements and/or the pledges of the Casino Revenue pursuant thereto. However, the City proceeds to state in seemingly pro forma fashion that the documents are complex and that such claims would only have led to protracted, expensive, and uncertain litigation and therefore were deemed not worth pursuing. Such lack of detail cannot permit the Court and others to discern whether the

---

[4] The Retirement Systems also submit that the timing of the potential Optional Terminations is troublesome, as it threatens to result in a <u>very</u> significant financial transaction taking place outside the context of a plan of adjustment, possibly to the irrevocable prejudice of other creditors. As the court in *City of Stockton* stated, if there is not effective Rule 9019 review of a municipality's settlement of a matter, it may need "to account for prior compromises during the plan confirmation proceedings." 486 B.R. 194, 195 (Bankr. E.D. Cal. 2013). However, the Retirement Systems question whether effective review or "accounting" can take place at the plan-confirmation stage if the Optional Termination is not required to occur as a part of or in conjunction with the plan and the plan-confirmation process.

13

Forbearance should be approved under Bankruptcy Rule 9019. Therefore, the Assumption Motion should be denied.

Similar and additional objections are expressed by creditor EEPK in its objection to the Assumption Motion [Docket No. 246]. Accordingly, the Retirement Systems join in EEPK's objection as well.

## Conclusion

For the reasons stated above, the City should not be permitted to assume the Forbearance Agreement, and the Forbearance Agreement should not be approved under Bankruptcy Rule 9019. Accordingly, the Retirement Systems respectfully request that the Assumption Motion be denied. Subject to discovery, the Retirement Systems reserve the right to also join in the objection to the Assumption Motion filed by Ambac Assurance Corporation [Docket No. 348].

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

Dated: August 16, 2013

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

14