Detroit, Michigan, Code of Ordinances >> Part III - CITY CODE >> Chapter 18 - FINANCE AND TAXATION >> ARTICLE V. - PURCHASES AND SUPPLIES >> DIVISION 9. - DETROIT RETIREMENT SYSTEM SERVICE CORPORATION >>

## DIVISION 9. - DETROIT RETIREMENT SYSTEM SERVICE CORPORATION 

Sec. 18-5-120. - Legislative findings.
Sec. 18-5-121. - Certain definitions.
Sec. 18-5-122. - Other definitions.
Sec. 18-5-123. - Approvals and determinations.
Sec. 18-5-124. - General interpretation.
Sec. 18-5-125. - Nonprofit corporation; authorization to incorporate; purpose.
Sec. 18-5-126. - Nonprofit corporation; articles of incorporation.
Sec. 18-5-127. - Nonprofit corporation; dissolution by finance director.
Sec. 18-5-128. - Nonprofit corporation; corporate actions requiring approval by ordinance.
Sec. 18-5-129. - Nonprofit corporation; funding trusts established.
Sec. 18-5-130. - Nonprofit corporation; service contracts; Service Contract 2005; general authorization.
Sec. 18-5-131. - Nonprofit corporation; Service Contract 2005.
Sec. 18-5-132. - Nonprofit corporation; service contract 2005; changes and additions.
Sec. 18-5-133. - Nonprofit corporation; Service Contract 2005; limitations on service payments.
Sec. 18-5-134. - Nonprofit corporation; Service Contract 2005; additional service payments.
Sec. 18-5-135. - Nonprofit corporation; Service Contract 2005; hedge provisions.
Sec. 18-5-136. - Nonprofit corporation; service contract 2005; financial facilities.
Sec. 18-5-137. - Nonprofit corporation; service contract 2005; hedges; express approval.
Sec. 18-5-138. - Nonprofit corporation; Service Contract 2005; hedges, references to Act 34 and swap management plan.
Sec. 18-5-139. - Nonprofit corporation; Service Contract 2005; hedges; requirements.
Sec. 18-5-140. - Nonprofit corporation; Service Contract 2005; hedges; risk acknowledgment.
Sec. 18-5-141. - Nonprofit corporation; Service Contract 2005; public offering of certificates of participation; underwriting agreement.
Sec. 18-5-142. - Disclosure information.
Sec. 18-5-143. - Continuing disclosure.
Sec. 18-5-144. - Actions on behalf of the city.
Sec. 18-5-146—18-5-150. - Reserved.

### Sec. 18-5-120. - Legislative findings. 

The Detroit City Council expressly finds and determines that:

(a) The Home Rule City Act, 1909 PA 279, at MCL 117.4o(1), authorizes cities such as the City of Detroit (the *City*) to authorize the formation of a nonprofit corporation under the Nonprofit Corporation Act, 1982 PA 162, at MCL 450.2101, et seq., as amended for valid public purposes of the authorizing city.

(b) Article 9, Section 24 of the 1963 Michigan Constitution obligates the City to maintain the actuarial integrity of its *General Retirement System* (the *GRS*) and its *Police and Fire Retirement System* (the *PFRS*), together, the *Retirement System.*

(c) Maintaining the actuarial integrity of the Retirement System is both a constitutional obligation and an important public purpose of the City.

(d) By Ordinances No. 03-05 and No. 04-05 (the *Alternative Funding Mechanism Ordinances*), the City has *provided* an alternative funding mechanism for each, respectively, of the GRS and PFRS (each, an *Alternative Funding Mechanism*) to provide for funding unfunded actuarial accrued liability *(UAAL)* of the GRS *(GRS UAAL)* and the UAAL of the PFRS *(PFRS UAAL* and either the GRS UAAL or the PFRS UAAL, as the context may require, the *Retirement System UAAL).*

(e) The Alternative Funding Mechanism Ordinances are separate and distinct from this Ordinance, and this Ordinance provides only a means of funding particular Retirement System UAAL and thereby reducing the financial burden to the City of such Retirement System UAAL.

(f) This Ordinance shall not be deemed to affect any benefits under either the GRS or the DPFS or other subjects of collective bargaining or Act 312 Arbitration Awards, and shall be so interpreted.

(g) The respective Retirement System's actuaries (the *Actuaries* of the respective Retirement System) estimate that GRS UAAL is $732,958,801 and that PFRS UAAL is $516,076,553, with additional unrecognized market losses of, respectively, $213,844,162 and $327,251,711, as of their respective reports (each, an *Actuary Report*) as of June 30, 2003, with UAAL of each Retirement System expected to increase in the future.

(h) The City desires to act pursuant to Home Rule City Act and authorize the formation of a nonprofit corporation with respect to each Retirement System, to be known respectively as the *"Detroit General Retirement System Service Corporation"* and the *"Detroit Police and Fire Retirement System Service Corporation"* (each, a *Corporation*), to assist the City in maintaining the actuarial integrity of the respective Retirement System through the respective Alternative Funding Mechanism by funding the particular Retirement System UAAL and thereby achieving financial benefits for the City.

(i) Each Corporation will be acting as an instrumentality and enterprise of the City and performing an important public purpose by assisting the City to meet its constitutional obligations with respect to the particular Retirement System and thereby is an integral part of the City for federal income tax purposes and it is intended that the income of each Corporation will not be subject to federal income taxation or any taxation under the laws of the State of Michigan to the extent the same applies to the City.

(j) Each Corporation shall be separate and distinct from the City, and the City shall not be responsible for any debts or other obligations of either Corporation, and no such debt or obligation shall constitute "indebtedness" within the meaning of The Home Rule City Act.

(k) It is in the best interest of the City to obtain the services of each Corporation in connection with the Alternative Funding Mechanism for the respective GRS and PFRS by approving the form of service contracts between each of the Corporations and the City (each, a *Service Contract*) to be funded by means of a funding trust for the respective Retirement System (each, a *Funding Trust*) in connection therewith.

(l) It is further in the best interest of the City that it enter into two specific Service Contracts to fund, respectively, not more than (i) the GRS UAAL in an amount not in excess of the UAAL in the Actuary Report as of June 30, 2003, or in the Actuary Report as of June 30, 2004, whichever is greater (*Maximum GRS UAAL*) and (ii) the PFRS UAAL in an amount not in excess of the UAAL in the Actuary Report as of June

30, 2003, or in the Actuary Report as of June 30, 2004, whichever is greater (*Maximum PFRS UAAL*).

(Ord. No. 03-05, § 1, 2-4-05)

### Sec. 18-5-121. - Certain definitions. 

The following terms shall have the following respective meanings *unless* the context otherwise requires:

*Accreted Value* means, at any particular time, the denominations of the Capital Appreciation COPs as then accreted.

*Capital Appreciation COPs* means Zero Coupon COPs that have denominations that accrete in amount in a manner customary in municipal finance for the accretions in value of capital appreciation bonds.

*Certificates, Certificates of Participation* or *COPs* have the meaning given such terms in Sec. 18-5-133 [1]

*Costs of Issuance* means (i) the expense, as an initial one-time expense, of forming each Corporation; and (ii) with respect to COPs issued to fund a particular Service Contract, all items of expense related to the authorization, sale and issuance of such COPs, which may include, but are not limited to, printing costs, costs of reproducing documents, filing and recording fees, fees and charges of the Trustee, original issue discount, legal fees and charges, underwriting fee or discount, professional consultants' fees (including COPs counsel and the financial advisor to the City), costs of credit ratings, fees and charges for execution, transportation and safekeeping of such COPs, fees and charges of any Providers, and other costs, charges and fees in connection with the foregoing or in connection with the authorization, sale and issuance of such COPs then to be authenticated or delivered.

*Credit Facility* means any COPs insurance, letter of credit, line of credit, purchase agreement, surety bond or other financial arrangement intended to protect holders of COPs issued by the respective Funding Trust from loss arising from delinquent Service Payments. *Credit Facility* also means any financial arrangement intended to protect a Hedge Counterparty from a failure of the Corporation to timely pay Hedge Periodic Payables and Hedge Termination Payables.

*Deep-Discount COPs* means Zero Coupon COPs that are issued at a deep original issue discount.

*Disclosure Document* means any preliminary or final official statement or other disclosure document prepared for use by the Underwriters in connection with the initial public offering of COPs.

*Financial Facility* means, as the context may require, any Credit Facility or Liquidity Facility or any combined Credit and Liquidity Facility.

*Finance Director* means the Finance Director of the City of Detroit.

*Hedge* means any interest rate swap or other means of hedging interest rate volatility permitted under the City of Detroit Swap Management Plan.

*Liquidity Facility* means any letter of credit, line of credit, purchase agreement, or other financial arrangement intended to provide funds for the purchase of any COP in the event of a failure of the remarketing thereof.

*Mayor* means the Chief Executive Officer of the City of Detroit pursuant to Section 5-101 of the 1997 Detroit City Charter.

*Ordinance* when used as "this Ordinance" means this ordinance with the number in the caption thereof as originally adopted by the City and thereafter as it may be amended by ordinance of the City; *provided* that, the term "this Ordinance" does not include any amendment of this Ordinance as originally adopted affecting either Service Contract 2005 *unless* such amendment expressly so provides and then only if such amendment does not materially impair any obligations to any holders of any Certificates issued in respect of either Service Contract 2005 or the Trustee of the Funding Trust under which such Certificates were issued.

*Person* means any natural person, firm, association, corporation, trust, partnership, joint venture, joint-stock company, municipal corporation, public body or other entity, however organized.

*Provider* means a Person obligated under a Financial Facility to make payments in respect of COPs or Authorized Hedges.

*Provider Scheduled Payments* means Scheduled Payments representing unpaid disbursements owing to a Provider in respect of a Financial Facility, and may include Service Charges to the extent required by the Provider.

*Representative* means the Person selected by the Financial Director as the representative of the Underwriters.

*Service Contract 2005* means either the GRS Service Contract 2005 or the PFRS Service Contract 2005, as the context may require. The designation "2005" is descriptive and not prescriptive and means the calendar year in which the City enters into the first Service Contract for the respective Retirement System.

*Trustee* means the Person acting as trustee of a Funding Trust.

*Underwriting Agreement* means the agreement between the Corporation, the City and the Underwriters for the purchase of the Certificates of Participation.

*Underwriters* means the Representative and other Persons identified in the Underwriting Agreement as "Under-writers."

*Zero Coupon COPs* means COPs that do not provide for periodic payments in respect of "interest." Zero Coupon COPs are either Capital Appreciation COPs or Deep Discount COPs.

(Ord. No. 03-05, § 1, 2-4-05)

### Sec. 18-5-122. - Other definitions. 

The following terms are defined elsewhere in this Ordinance:

*Term     Defined In*
Act 34 .....Sec. 18-5-138
Authorized Hedge .....Sec. 18-5-137

Additional Service Payment .....Sec. 18-5-134
City Information .....Sec. 18-5-142
Funding Costs .....Sec. 18-5-132
Funding Rate .....Sec. 18-5-132
Funding Rate Methodology .....Sec. 18-5-133
GRS Service Contract 2005 .....Sec. 18-5-130
Hedge Counterparty .....Sec. 18-5-135
Hedge Periodic Payable .....Sec. 18-5-132
Hedge Periodic Receipt .....Sec. 18-5-135
Hedge Termination Payable .....Sec. 18-5-132
Hedge Termination Receipt .....Sec. 18-5-135
Maximum Funding Rate .....Sec. 18-5-133
PFRS Service Contract 2005 .....Sec. 18-5-130
Provider Prepayments .....Sec. 18-5-133
Provider Rate .....Sec. 18-5-133
Rule .....Sec. 18-5-142
Scheduled Payments .....Sec. 18-5-132
Service Charges .....Sec. 18-5-132
Service Contract General Terms .....Sec. 18-5-131
Service Payments .....Sec. 18-5-132
Sinking Fund Installments .....Sec. 18-5-133
Subject UAAL .....Sec. 18-5-132
Swap Management Plan .....Sec. 18-5-138
Underwriters' Discount .....Sec. 18-5-141

*(Ord. No. 03-05, § 1, 2-4-05)*

### Sec. 18-5-123. - Approvals and determinations. 

Any approval or determination authorized to be given or made by any individual pursuant to this Ordinance shall be conclusively evidenced if an instrument or document executed by such individual provides for the subject matter of such determination, and it shall not be necessary that such determination or the basis therefor be specifically recited in such instrument or document.

*(Ord. No. 03-05, § 1, 2-4-05)*

### Sec. 18-5-124. - General interpretation.

(a) Words of the masculine gender include correlative word of the feminine and neuter gender.
(b) Unless the context clearly otherwise requires, words importing the singular include the plural and vice versa.
(c) References to sections and by number refer to the corresponding sections of this Ordinance unless otherwise stated.
(d) The terms *hereby, hereto, herein, hereunder* and any similar terms refer to this Ordinance as a whole and not to any particular provision hereof.
(e) The term *or* is not exclusive unless the context otherwise requires.
(f)

(g) The enumeration of things after the term *including* is to be interpreted as illustrative and not restrictive.

(g) References to sections of a Public Act, or to a Public Act as a whole, also include any amendments thereto unless otherwise indicated and analogous sections or Public Acts enacted as substitutes therefor.

*(Ord. No. 03-05, § 1, 2-4-05)*

### Sec. 18-5-125. - Nonprofit corporation; authorization to incorporate; purpose. 

(a) The mayor, or the finance director acting at the direction of the mayor, is hereby authorized to incorporate or provide for the incorporation of two nonprofit corporations, respectively to be known as the *"Detroit General Retirement System Service Corporation"* and the *"Detroit Police and Fire Retirement System Service Corporation,"* under the *Michigan Nonprofit Corporation Act.*

(b) Each Corporation shall be incorporated solely for the charitable purpose of assisting the City in maintaining the actuarial integrity of the Retirement System by providing for funding of Retirement System UAAL.

*(Ord. No. 03-05, § 1, 2-4-05)*

### Sec. 18-5-126. - Nonprofit corporation; articles of incorporation. 

(a) The original articles of incorporation for each Corporation as filed by the incorporator shall contain provisions to the effect set forth in this Section.

  (1) The Corporation is an instrumentality and enterprise of the City, constituting an integral part of the City in assisting it in meeting its obligations with respect to the Pension System; provided, however, the Corporation shall be a legal entity separate and distinct from the City, and the City shall not be responsible for any debts or other obligations of the Corporation.

  (2) The Corporation shall be subject to all local, state and federal laws that apply to the City as provided in The Home Rule City Act, and shall be a "public body" for purposes of the Michigan Campaign Finance Act, 1976 PA 388, as amended, as further provided in The Home Rule City Act.

  (3) No part of the net earnings of the Corporation shall inure to the benefit of any director or individual.

  (4) The Corporation shall be organized in a directorship basis.

  (5) The Corporation shall have five (5) directors to be appointed as follows:

    (i) Two directors shall be members of the Detroit City Council (the *"Council"*), as selected by the Council from time to time, who shall serve as directors at the pleasure of the Council.

    (ii) The following three City officers shall serve as directors of the Corporation: Finance Director, Budget Director, and Corporation Counsel, or persons serving in such positions in an interim or acting capacity.

  (6) The Finance Director shall serve as president of the Corporation.

  (7) Each director shall serve ex officio and, upon leaving the position by virtue of which such person is a director or, in the case of Council members, resigning as director or being removed or replaced as a director by Council, shall submit a written resignation or shall be deemed to have been removed. Upon such resignation or removal, such director shall not longer serve as a director of the Corporation; provided, however, that

  such director may continue as a director until a successor is selected as provided herein, if specifically authorized in writing to remain as a director by the party entitled to fill such director's position notwithstanding such resignation or removal.

(8) Upon dissolution of the Corporation, all assets of the Corporation remaining after the payment of its obligations and liabilities shall be distributed to and shall become the property of the City.

(9) No amendment of any provision required by this Ordinance to be contained in the articles of incorporation shall become effective unless approved by ordinance or resolution of the City.

(b) The original articles of incorporation as filed by the incorporator may otherwise contain such provisions as the incorporator deems necessary or desirable.

(Ord. No. 03-05, § 1, 2-4-05)

### Sec. 18-5-127. - Nonprofit corporation; dissolution by finance director. 

When a Corporation has existed for fifteen (15) years, the Finance Director shall take appropriate action to dissolve the Corporation when it has no obligations outstanding and no COPS are outstanding if dissolution is then permitted under the Nonprofit Corporation Act.

### Sec. 18-5-128. - Nonprofit corporation; corporate actions requiring approval by ordinance.

(a) *Additional provisions required in the articles of incorporation.* In addition to the other provisions required by this Ordinance to appear in the original articles of incorporation of each Corporation, the original articles of incorporation as filed by the incorporator shall contain provisions to the effect set forth in this section.

(b) *Corporate existence; disposition of assets.* None of the following actions by the Corporation shall be effective *unless* approved by ordinance or resolution of the City:

(1) Any dissolution of the Corporation other than as provided in its articles of incorporation.

(2) The liquidation of the Corporation.

(3) The merger or consolidation of the Corporation with or into any other entity, unless:

 (i) the resulting or surviving entity (if other than the Corporation) is organized as an instrumentality and enterprise of the City under the Nonprofit Corporation Act expressly assumes all outstanding obligations of the Corporation; and is subject to limitations to the same effect as the Corporation is subject under this Ordinance; and

 (ii) Immediately after giving effect to the transaction, no default or event of default has occurred and is continuing under any agreement of the Corporation or to which its property is subject.

(4) The Corporation shall not sell all, or substantially all, of its assets in a single transaction or series of transactions; *provided* that, this limitation shall not apply to sales, transfers or grants of security interests in assets to obtain funding for any Retirement System UAAL.

(c) *Bankruptcy.*

(1) The Corporation shall not:

 (i) Commence any case, proceeding or other action or file a petition under any existing or future bankruptcy, insolvency or similar law seeking (a) to adjudicate

the Corporation a bankrupt or insolvent, (b) to have an order for relief entered with respect to the Corporation, or (c) reorganization, arrangement, adjustment, wind-up, liquidation, dissolution, composition or other relief with respect to the Corporation or its obligations.

(ii) Consent to the institution of bankruptcy or insolvency proceedings against the Corporation;

(iii) Seek or consent to the appointment of a receiver, custodian, liquidator, assignee, trustee, sequestrator (or other similar official) of the Corporation or a substantial part of its assets;

(iv) Except as required by law, admit its inability to pay its obligations as they become due;

(v) Fail generally to pay its obligations as the same become due within the meaning of the United States Bankruptcy Code, as determined by a bankruptcy court of competent jurisdiction;

(vi) Make a general assignment for the benefit of creditors;

(vii) Authorize, take any action in furtherance of, consent to or acquiesce in any of the foregoing or any similar action or other proceedings under any United States or state bankruptcy, insolvency or similar law.

(2) If a court of competent jurisdiction determines that the Corporation may, notwithstanding the prohibition set forth in paragraph (1), above, take an action otherwise prohibited, the Corporation shall not take any such action without it being approved by ordinance of the City.

*(Ord. No. 03-05, § 1, 2-4-05)*

### Sec. 18-5-129. - Nonprofit corporation; funding trusts established.

(a) No Funding Trust itself shall create any debt, indebtedness or other obligation of the City, whether "indebtedness" within the meaning of The Home Rule City Act or otherwise under Michigan law.

(b) Each Funding Trust and all Certificates of Participation issued thereunder shall contain a statement to that effect set forth in subsection (A) above, but it shall not be a violation thereof if a Funding Trust grants participation in the subject Service Contract or Service Payments to be made thereunder, or grants a security interest in any such Service Contract or such Service Payments.

*(Ord. No. 03-05, § 1, 2-4-05)*

### Sec. 18-5-130. - Nonprofit corporation; service contracts; Service Contract 2005; general authorization. 

The Finance Director is authorized to enter into Service Contracts, in the name of and on behalf of the City, with the respective Corporation to fund all or a portion of GRS UAAL (the *GRS Service Contract 2005*) and to fund all or a portion of PFRS UAAL (the *PFRS Service Contract 2005*).

*(Ord. No. 03-05, § 1, 2-4-05)*

### Sec. 18-5-131. - Nonprofit corporation; Service Contract 2005. 

(a)

        The General Terms and Conditions for Retirement System Service Contracts of the City of Detroit (the *Service Contract General Terms*) shall be in substantially the form submitted with this Ordinance with such changes as may be approved by the Finance Director.

(b)    Service Contract 2005 shall incorporate the Service Contract General Terms by reference, and the particular terms of Service Contract 2005 shall be in substantially the form submitted with this Ordinance with such changes or additions as may be approved by the Finance Director.

*(Ord. No. 03-05, § 1, 2-4-05)*

### Sec. 18-5-132. - Nonprofit corporation; service contract 2005; changes and additions.

The authority of the Finance Director to make changes or additions to the form of Service Contract 2005 is subject to the limitations contained in this Section and other Sections of this Ordinance.

(1)    The UAAL that may be funded pursuant to the respective Service Contract 2005 (*Subject UAAL*) shall not exceed.

    (i)    In the case of the GRS Service Contract 2005, the amount of GRS UAAL as determined by the Finance Director not in excess of the Maximum GRS UAAL; and

    (ii)    In the case of the PFRS Service Contract 2005, the amount of PFRS UAAL as determined by the Finance Director not in excess of the Maximum PFRS UAAL.

(2)    Each Service Contract 2005 shall provide for payments to be made by the City for the services of the respective Corporation in reducing the present and future costs of the respective Subject UAAL. These payments (Contract Payments) consist of (i) Service Payments (described in paragraph 3 below) and (ii) Additional Service Payments (described in Sec. 18-5-134).

(3)    Service Payments (*Service Payments*) consist of the following:

    (i)    Amounts to be paid in installments (*Scheduled Payments*) representing in the aggregate the amount of the Subject UAAL and any additional amounts permitted by Sec. 18-5-133(a)(1) subject to the limitations contained in Sec. 18-5-133(a)(2) through (5);

    (ii)    Amounts payable periodically (*Service Charges*) sufficient to pay periodic expenses (*Funding Costs*), incurred by the respective Funding Trust in funding the Subject UAAL and the additional amounts referred to in clause (i) above and calculated in the same manner as interest (a *Funding Rate*) on the outstanding Scheduled Payments, *subject* to the limitations contained in Sec. 18-5-133(b); and

    (iii)    Such periodic amounts (*Hedge Periodic Payables*) and termination payments (*Hedge Termination Payables*) as may become payable by the Corporation in accordance with any Authorized Hedge.

(4)    Each Service Contract 2005 shall permit the sale of participation interests under the respective Funding Trust in such Service Contract 2005 and in the Service Payments of the City to be made thereunder in the form of Certificates of Participation.

*(Ord. No. 03-05, § 1, 2-4-05)*

**Sec. 18-5-133. - Nonprofit corporation; Service Contract 2005; limitations on service payments.** 🔗

(a) *Scheduled Payments.*

(1) In addition to the amount of the Subject UAAL, the aggregate amount of Scheduled Payments may include amounts, not in excess of seven percent (7%) of Subject UAAL acceptable to the Finance Director, in connection with the Corporation funding its obligations under the Service Contract through the issuance of COPs, including: Costs of Issuance, prefunded Service Charges, a reserve against delinquent Service Payments, Underwriters' Discount *plus* accretions in connection with any Capital Appreciation COPs *so long* as the Accreted Value of Capital Appreciation COPs does not result in such COPs having a yield-to-maturity (computed in accordance with customary municipal finance practice) that exceeds the Maximum Funding Rate.

(2) Scheduled Payments shall be paid over a period of not more than fifteen (15) years, as determined by the Finance Director, provided that, such period may be extended to not in excess of any extension authorized by the Board of the particular Retirement System amortizing period.

(3) Scheduled Payments may be prepaid in accordance with a schedule of mandatory prepayment installments (*Sinking Fund Installments*) as determined by the Finance Director.

(4) Provider Scheduled Payments may be subject to such mandatory prepayment as may be required by the respective Provider (*Provider Prepayments*).

(5) Except for Sinking Fund Installments and Provider Prepayments, no Scheduled Payment shall be subject to mandatory prepayment or acceleration; *provided* that, nothing in this prohibition shall prohibit the payment of amounts necessary to purchase COPs with a mandatory or optional tender option feature.

(b) *Service charges.*

(1) No Service Charge shall be based on a Funding Rate (expressed as an annual percentage) rate in excess of the maximum rate permitted by law (the Maximum Funding Rate).

(2) Funding Rates may be fixed or variable (or any combination of fixed or variable) and if variable may be determined by Dutch auction, index (such as the London Interbank Offered Rate or "LIBOR") or by remarketing or any other means customarily used to determine variable rates in municipal finance (Funding Rate Methodology).

(3) It is not required that Service Charges for all installments of Scheduled Payments under a Service Contract 2005 be computed on the basis of one Funding Rate or under one Funding Rate Methodology. Service Charges with respect to different installments of Scheduled Payments under a Service Contract 2005 may be computed under a different Funding Rate or Funding Rate Methodology *subject* in all cases to paragraph b(1) above.

(4) Service Charges may provide for a rate or rate methodology required by a Provider (a *Provider Rate*) to compensate it for any unrepaid disbursements in respect of its Financial Facility. A Provider Rate shall not exceed the maximum rate permitted by law.

(5) Each Service Contract 2005 may provide that Funding Costs of the Corporation shall be the Provider Rate with respect to Service Payments representing unrepaid amounts in respect of the Financial Facility and that the relevant Service Charges shall be adjusted accordingly.

*(Ord. No. 03-05, § 1, 2-4-05)*

## Sec. 18-5-134. - Nonprofit corporation; Service Contract 2005; additional service payments. 

Each Service Contract 2005 may provide for the following in addition to the Service Payments (*Additional Service Payments*):

(1) Periodic amounts equal to customary trustee fees and expenses to compensate each Trustee of a Funding Trust;

(2) Periodic amounts equal to customary fees of remarketing agents, auction agents and broker-dealers if the Finance Director determines that it is in the best interest of the City that some or all of the COPs are of the variable rate type.

(3) Periodic amounts equal to customary fees and expenses of a Provider or Providers if the Finance Director determines that it is in the best interest of the City that some or all of the COPs have the benefit of a Financial Facility provided by any such Provider;

(4) Periodic amounts for the general administration of the Corporation.

## Sec. 18-5-135. - Nonprofit corporation; Service Contract 2005; hedge provisions.

(a) No Service Contract shall provide for Service Payments based on payments in respect of a Hedge other than an Authorized Hedge.

(b) A Service Contract 2005 shall contain provisions to the following effect if such Service Contract 2005 provides for Service Payments in respect of an Authorized Hedge:

(1) Any amount due the respective Corporation as a periodic payment of Service Charges shall be offset by any amount (a *Hedge Periodic Receipt*) received by the Trustee on behalf of such Corporation as a correlative periodic payment from the counterparty to the Hedge (the *Hedge Counterparty*) to the extent the City is otherwise current in making Service Payments.

(2) Payments of Hedge Periodic Payables and Hedge Termination Payables shall be made by the City to the Trustee on behalf of the respective Corporation in the amounts and on the due dates thereof.

(3) Any amount received by the Trustee on behalf of the Corporation as a Termination Payment from the Hedge Counterparty (a *Hedge Termination Receipt*) shall be paid to the City to the extent the City is current in making Service Payments.

*(Ord. No. 03-05, § 1, 2-4-05)*

## Sec. 18-5-136. - Nonprofit corporation; service contract 2005; financial facilities. 

If the Finance Director determines that one or more Financial Facilities will result in more favorable terms to the City, the Finance Director is authorized to sign a Service Contract on behalf of the City containing provisions with respect to any such Financial Facility.

*(Ord. No. 03-05, § 1, 2-4-05)*

### Sec. 18-5-137. - Nonprofit corporation; service contract 2005; hedges; express approval.

Such instruments as are acceptable to the Finance Director as being in accordance with Sec. 18-5-139 shall constitute a Hedge (an *Authorized Hedge*) for which the City may make Service Payments under a Service Contract 2005. One or more Authorized Hedges are permitted for each Service Contract 2005 with Hedge Counterparties selected by the Finance Director.

(Ord. No. 03-05, § 1, 2-4-05)

### Sec. 18-5-138. - Nonprofit corporation; Service Contract 2005; hedges, references to Act 34 and swap management plan.

(a) The City Council recognized that neither the Revised Municipal Finance Act, being 2001 PA 34, as amended (Act 34), nor the *City of Detroit, Michigan, Swap Management Plan* as adopted on November 26, 2002, as the same may be thereafter amended (the Swap Management Plan), is applicable to the Corporation; however, since a Service Contract 2005 will obligate the City to make payments correlative to payments made by the Corporation under an Authorized Hedge, the City has determined to generally apply criteria of Act 34 and the Swap Management Plan as a prudential matter as they relate to Authorized Hedges.

(b) The use of Act 34 and the Swap Management Plan as prudential criteria shall not make or be interpreted to make Act 34 or the Swap Management Plan applicable to the Corporation or its transactions as a matter of law.

(Ord. No. 03-05, § 1, 2-4-05)

### Sec. 18-5-139. - Nonprofit corporation; Service Contract 2005; hedges; requirements.

(a) *Counterparty.* The counterparty shall meet the applicable requirements of Act 34.

(b) *Term.* The term of the Hedge shall not extend beyond the due date of the last Scheduled Payment installment.

(c) *Notional Amount.* The notional amount shall not exceed the aggregate amount of the Scheduled Payments.

(d) *Corporation Rate.* The rate payable by the Corporation shall not exceed the Maximum Funding Rate.

(e) *Counterparty Rate.* The rate payable by the counterparty shall not unduly expose the Corporation to material basis risk in the opinion of the Finance Director.

(f) *Termination.* The termination events shall be customary for interest rate swaps of the nature of the Hedge and shall comply with the Swap Management Plan.

(g) *Compliance.* The Hedge shall conform to the requirements of Act 34 and comply with the Swap Management Plan in all material respects.

(Ord. No. 03-05, § 1, 2-4-05)

### Sec. 18-5-140. - Nonprofit corporation; Service Contract 2005; hedges; risk acknowledgment.

(a) Hedges have inherent risks. Inherent risks that are generally recognized and reasonably foreseen are set forth in the Swap Management Plan as previously approved by the City

- Council. Any evaluation of risks necessarily involves expectations and assumptions about future events, which by their nature are uncertain and may not occur as anticipated. Furthermore, unforeseen events may occur which may have material adverse effects on present expectations and assumptions. Hence, there can be no assurance that all risks, regardless of remoteness or other unforeseeability, have been evaluated.
- (b) Subject to the limitations in any risk evaluation, the City Council expressly acknowledges the risks associated with each Authorized Hedge.
- (c) The City Council understands that in order to prudently manage Service Charges and reduce Funding Cost volatility, a Service Contract 2005 may obligate the City to make Service Payments in respect of Hedge Periodic Payables and Hedge Termination Payables even though, due to events beyond the control of the City or the Corporation, the Subject UAAL is not funded.

(Ord. No. 03-05, § 1, 2-4-05)

**Sec. 18-5-141. - Nonprofit corporation; Service Contract 2005; public offering of certificates of participation; underwriting agreement.**

- (a) Since the public offering of the COPs is for the benefit of the City, the Finance Director shall make the City a party to the Underwriting Agreement by executing it in the name and on behalf of the City.
- (b) The City shall not be a party to the Underwriting Agreement if it provides for compensation to underwriters in excess of one percent (1%) of the aggregate amount of Scheduled Payments (*Underwriters' Discount*) or if the original issue discount in connection with the initial public offering of any COP is greater than ten percent (10%) *except* in the case of Deep Discount COPs.
- (c) The original issue discount for any Deep Discount COPs shall not result in such Deep Discount COPs having a yield-to-maturity (computed in accordance with customary municipal finance practice) that exceeds the Maximum Funding Rate.
- (d) An Underwriting Agreement may provide for liquidated damages payable by the City in the event the closing conditions required to be satisfied by either the City or the Corporation are not satisfied. If a good faith check in the amount of the liquidated damages payable by the Underwriters is required to be provided by the Representative, then such good faith check shall be payable to the order of the City.

(Ord. No. 03-05, § 1, 2-4-05)

**Sec. 18-5-142. - Disclosure information.** 

- (a) The Finance Director is authorized to prepare or cause the preparation of information relating to the City (the *City Information*) for inclusion in the Disclosure Document; to deem the City Information "final" for purposes of Rule 15c2-12 promulgated by the Securities and Exchange Commission under the Securities and Exchange Act of 1934, as amended (the *Rule*); and to sign the City Information in the name of and on behalf of the City.
- (b) The Finance Director may authorize the distribution of the City Information by the Underwriters in connection with the initial public offering of the COPs.

(Ord. No. 03-05, § 1, 2-4-05)

**Sec. 18-5-143. - Continuing disclosure.** 

The Finance Director may enter into a Continuing Disclosure Agreement in the name of and on behalf of the City and respect to the City Information in customary form in order to permit the Underwriters and other Persons subject to the Rule to comply therewith in connection with the purchase and sale of COPs.

*(Ord. No. 03-05, § 1, 2-4-05)*

## Sec. 18-5-144. - Actions on behalf of the city. 

In addition to the authority herein expressly granted to the Finance Director, the Finance Director is hereby authorized and directed to do all things and take all actions necessary or desirable to consummate the other transactions contemplated by this Ordinance.

*(Ord. No. 03-05, § 1, 2-4-05)*

## Sec. 18-5-146—18-5-150. - Reserved. 

FOOTNOTE(S):

--- () ---

*1918 Detroit City Charter, T.9, C.7, A. 1. (Back)*