**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |

**THE MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO AND SUB-CHAPTER 98, CITY OF DETROIT RETIREES' OBJECTION TO THE CITY OF DETROIT'S ELIGIBILITY TO OBTAIN RELIEF UNDER CHAPTER 9 OF THE BANKRUPTCY CODE**

The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees (the AFSCME retiree chapter for City of Detroit retirees) (collectively, "**AFSCME**") -- the representative of the interests of between at least forty and fifty percent (40-50%) of the about 11,943 retired City of Detroit (the "**City**" or "**Debtor**") non-uniformed employees (the "**Retired AFSCME Employees**"), and about 2,523 active City employees (the "**Active AFSCME Employees**", or about seventy percent (70%) of the active non-uniformed union-represented employees, and together with the Retired AFSCME Employees, collectively, the "**AFSCME Detroit Employees**") -- through its counsel submits this objection (the "**Objection**") to the City's eligibility for relief under chapter 9 of the Bankruptcy Code and opposition to the City's (A) *Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [Docket No. 10] (the "**Statement of Eligibility**"); (B) *Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [Docket No. 14] (the "**Eligibility Brief**"); and (C) declarations of Kevyn D. Orr [Docket No. 11] (the "**Orr Declaration**", Gaurav Malhotra [Docket No. 12] and Charles M. Moore [Docket No. 13]. In

support of its Objection, AFSCME (a) submits the Declaration of Steven Kreisberg (the "**Kreisberg Declaration**") and (b) respectfully states as follows:

**PRELIMINARY STATEMENT**

> "The public can comment [on the City's proposed financial restructuring plan], but it is under the statute, it is my plan and it's within my discretion and obligation to do it.  **This isn't a plebiscite, we are not, like, negotiating the terms of the plan**.  It's what I'm obligated to do."  -- Kevyn D. Orr, May 12, 2013[1]

1.      The City's petition for relief under chapter 9 of the Bankruptcy Code should be dismissed.  First, chapter 9 of the Bankruptcy Code violates federalism under the United States Constitution through an unholy alliance permitting federal encroachment on the states' governance rights over fiscal affairs in exchange for an unlawful extension of state power which denies Michigan citizens their constitutional right to make the rules for their own bankruptcy.  Second, Michigan Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, *et seq*. ("**PA 436**") purportedly authorizing the Emergency Manager to file for chapter 9 protection runs afoul of the Michigan Constitution by not explicitly prohibiting the impairment of vested pension rights in bankruptcy, which rights are prescribed in the Michigan Constitution, and further offends the Constitutional rights of individual Detroit citizens to local self-governance.  Third, the City fails to establish that it engaged in good faith negotiations with the City's creditors or that these negotiations were impracticable under section 109(c) of the Bankruptcy Code, and indeed the entire chapter 9 petition was filed in bad faith.  Fourth, the City does not qualify for chapter 9 relief because it failed to establish that it is insolvent.  Further, the Bankruptcy Court lacks jurisdiction over matters related to the federal constitutionality of chapter 9 of the Bankruptcy Code.

---

[1] Kevyn D. Orr Interview to Detroit WWJ Newsradio 950/AP, *Detroit EM Releases Financial Plan; City Exceeding Budget By $100M Annually,* May 12, 2013,*available at* http://detroit.cbslocal.com/2013/05/12/kevin-orr-releases-financial-plan-for-city-of-detroit/.

2.      The City, led by its unelected, politically appointed Emergency Manager, Kevyn D. Orr ("**Orr**" or the "**EM**"), hastily commenced this unconstitutional, unlawfully authorized chapter 9 proceeding seeking the haven of bankruptcy to illegally attempt to slash pension and other post-employment benefit obligations and cram such reductions down the throats of current and former City employees such as the AFSCME Detroit Employees.  These proceedings were commenced without **any** good faith negotiations with the City's retirees or unions such as AFSCME, and the chapter 9 filing was a *fait accompli* long prior to the appointment of Orr as the City's EM – in fact, at a time when Orr was still a partner at the City's lead counsel's law firm.

3.      This is all against the backdrop of:

- the average non-uniformed employee pension currently at an average of slightly less than $18,000 per year (according to a June 30, 2012 General Retirement System of the City of Detroit pension valuation report); and

- The AFSCME Retirees and AFSCME Active Employees look to their government pension and City-provided medical benefits for retiree benefits. Unlike private sector employees and retirees with defined benefit pension benefits, whose pension benefits are protected even in bankruptcy by government insurance through the Pension Benefit Guaranty Corporation, or those with multiemployer pension benefits, where even if one employer withdraws or goes bankrupt the vested pension benefits to the retirees continue unchanged by that withdrawal, the AFSCME Retirees and AFSCME Active Employees' pensions are not backstopped.  **Therefore, if this Court allows the chapter 9 proceeding to go forward with the ultimate result of the pension or other retiree benefits being lost, they are lost without a safety net**.

4.      In light of recent Supreme Court precedent, chapter 9 of the Bankruptcy Code violates the United States Constitution and should be struck down by an Article III Court with authority to make this crucial Constitutional law determination.  Under *Stern v. Marshall*, 131 S. Ct. 2594 (2011), such a decision is plainly outside the realm of authority properly delegated to an Article I tribunal like this Court.

5. However, to the extent this Court disagrees and determines that it has jurisdiction to uphold the Constitutionality of chapter 9 generally, this Court should find that the City is not eligible for relief under chapter 9 pursuant to sections 109(c) and 921(c) of the Bankruptcy Code for the following reasons.

6. *First*, under section 109(c)(2) of the Bankruptcy Code, **as already determined by at least one state court ruling** issued against the Governor prior to entry of the Stay Extension Order [Docket No 166], the purported authorization by the Governor permitting the chapter 9 filing by the EM was and remains an overt act by the Governor and others in violation of the Michigan Constitution, as the filing seeks to impair or diminish the AFSCME Detroit Employees' pension benefits. Additionally, the very law purporting to allow the EM to unconditionally file for chapter 9 protection, PA 436, violates several provisions of the Michigan Constitution, including (i) Article IX, Section 24 because PA 436 does not explicitly prohibit the diminishment or impairment of vested pension rights in bankruptcy; (ii) Article VI, Section 29 because PA 436 delegates power to the EM in excess of that possessed by the legislature; and (iii) Article VII because PA 436 strips power from the electors of each city and village and runs ramshackle over the principles of local self-government firmly embedded in Michigan law.

7. *Second*, despite factual arguments to the contrary in the City's Eligibility Brief, the City has failed to establish that it has negotiated in good faith or that such negotiations were impracticable as required under section 109(c)(5) of the Bankruptcy Code. In fact, AFSCME submits that based on facts AFSCME is aware of now (discussed herein and in the Kreisberg Declaration) and further facts AFSCME expects to develop through discovery, the evidence shows (and AFSCME expects will further show) that the City conducted **no good faith**

**negotiations** with significant unions such as AFSCME prior to the filing. Rather, the City commenced this proceeding in **bad faith** and in haste in violation of section 921(c) of the Bankruptcy Code, with the sole goal of preventing a "bad" state court ruling (i) upholding the Michigan Constitution and (ii) preventing the City from taking the very inappropriate and unconstitutional journey it now seeks to embark on.

8.    If the Court ultimately were to find that the City satisfied the eligibility requirements, the EM will seek (i) to unconstitutionally and illegally abridge pension and other AFSCME Detroit Employee benefits; (ii) to proceed under section 365 of the Bankruptcy Code and illegally seek to reject vested pension and other retiree benefits; and/or ultimately (iii) to propose a chapter 9 plan of adjustment that reduces pension and other benefits but that cannot possibly be better for creditors like AFSCME Detroit Employees than the alternative of staying out of chapter 9 where pensions are guaranteed protection under the state constitution - a clear breach of the chapter 9 "best interests test." Such an outcome should not be countenanced.

9.    Finally, AFSCME reserves the right to argue, following additional discovery, that the City is solvent and does not qualify for chapter 9 relief pursuant to section 109(c)(3) of the Bankruptcy Code, particularly when certain un-monetized assets and other financial considerations which may be revealed through discovery are taken into account. The City's assertions in the Eligibility Brief that it is insolvent must be highly and independently scrutinized and challenged, including through the efforts of the Retiree Committee, once appointed, and its retained professionals.

## RELEVANT BACKGROUND

10.      Orr currently serves as the EM of the City under PA 436.

11.      The Governor appointed Orr as EM for the City on March 14, 2013, effective as of March 25, 2013.  On March 28, 2013, upon the purported effectiveness of PA 436, Orr became, and continues to act as, EM for the City under PA 436.

12.      On June 14, 2013, Orr issued a "Proposal for Creditors" which expressly stated that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons."  The same day, Orr publicly threatened, in an interview with the Detroit Free Press Editorial Board,[2] that vested pension benefits would not be protected in a chapter 9 proceeding authorized by the Governor pursuant to PA 436, and that any state laws protecting vested pension benefits would "not . . . protect" retirees in bankruptcy court.  The EM stated as follows in the interview:

> Q      You said in this report that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?
>
> A.      The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law.  Which the Ninth Circuit agrees with for now.
>
> ***
>
> A.       It is what it is - so we said that in a soft way of saying, "Don't make us go into bankruptcy."  If you think your state-vested pension rights, either as an employee or a retiree - that's not going to protect you.  If we don't reach an agreement one way or the other, we feel fairly confident that the state federal law, federalism, will trump state law or negotiate.  The irony of the situation is we might reach a deal with creditors quicker because employees and retirees think there is some benefit and that might force our hand.  That might force a bankruptcy.

---

[2] *See Q&A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, Detroit Free Press (June 16, 2013), *available at* http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-detroit-emergency-manager-creditors-fiscal-crisis.

The City has since filed with this Court its *Motion for the Entry of an Order Directing the Appointment of a Committee of Retired Employees* [Docket No. 20], the plain intent of which is to seek to negotiate a reduction or impairment of accrued pension benefits.

### A. The Webster Litigation

13.     On July 3, 2013, against the backdrop of the threatening statements made by Orr regarding Michigan state law and protected pension benefits, plaintiffs (the "**Webster Plaintiffs**") Gracie Webster (a City retiree) and Veronica Thomas (a current employee of the City) commenced a lawsuit against the State of Michigan, the Governor and the State Treasurer seeking: (a) a declaratory judgment that PA 436 violated the Constitution of the State of Michigan to the extent that it purported to authorize chapter 9 cases within which vested pension benefits might be sought to be compromised; and (b) an injunction preventing the defendants from authorizing any chapter 9 case for the City within which vested pension benefits might be sought to be reduced. *See Webster v. State of Mich.*, No. 13-734-CZ (Ingham County Cir. Ct. July 3, 2013) (the "**Webster Litigation**").[3]

14.     In briefing submitted in support of a preliminary injunction and declaratory order against the Governor, the Webster Plaintiffs explained that Article IX, Section 24 of the Michigan Constitution provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby;" that there could not be a more clear and plain constitutional mandate; and that Article IX, Section 24 means what it says: accrued pension benefits shall not be reduced.

15.     Further, as the Webster Plaintiffs noted, the Official Record of the 1963 Michigan Constitutional Convention makes clear that no governmental entity or its officials can

---

[3] Two additional lawsuits were also filed raising similar issues in addition to the Webster Litigation.

do anything to diminish or impair vested pension benefits: "This is a new section that requires that accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions be a contractual obligation which cannot diminished or impaired by the action of its officials or governing body." 2 Official Record, Constitutional Convention 1961, p. 3402.

16.     The Webster Plaintiffs also noted that PA 436 explicitly recognizes that accrued pension benefits shall not be diminished or impaired outside the bankruptcy context. For example:

- Section 11 of PA 436 requires that an emergency manager develop a written financial and operating plan for the local government and that such plan "shall provide" for "the timely deposit of required payments to the pension fund for the local government."
- Section 13 of PA 436 authorizes the emergency manager to eliminate the salary, wages or other compensation  and benefits of the chief administrative officer and members of the governing body of the local government, but expressly provides that "[t]his section does not authorize the impairment of vested pension benefits."
- Section 12(m) of PA 436 authorizes an emergency manager under certain circumstances to be appointed as the sole trustee of a local pension board and to replace the existing trustees, and requires that "the emergency manager shall fully comply with . . . Section 24 of Article IX of the state constitution . . ." when acting as the sole trustee.

17.     But, in violation of Article IX, Section 24 of the Michigan Constitution, PA 436 fails to similarly forbid the Governor explicitly from authorizing a chapter 9 bankruptcy filing if accrued pension benefits may be sought to be diminished or impaired as a consequence of that filing. Section 18 of PA 436, which purportedly empowers the Governor to authorize a municipality to file for bankruptcy under chapter 9, nowhere prohibits the Governor from authorizing such a filing if accrued pension benefits may be sought to be diminished or impaired. Clearly, the Legislature understood and honored the Michigan constitutional mandate not to diminish or impair accrued pension benefits outside of bankruptcy. Just as clearly, the Legislature omitted any constitutional protection against the impairment or

diminishment of accrued pension benefits when the Governor purports to authorize a chapter 9 bankruptcy filing under Section 18 of PA 436.

18.     In other words, if accrued pension benefits may be diminished or impaired, in violation of Article IX Section 24 of the Michigan Constitution, the section of PA 436 purporting to authorize this bankruptcy, Section 18, must be unconstitutional.

19.     On July 18, 2013, the same date this chapter 9 case was commenced, the Ingham County Circuit Court for the State of Michigan (the "**State Court**") entered a temporary restraining order (the "**TRO**", attached to the Kreisberg Declaration, Exhibit A) enjoining the Governor, the State Treasurer and the other defendants in the Webster Litigation from authorizing a chapter 9 filing and taking any further action "with respect to any filing which has already occurred" including the authorizing of an "unconditional" chapter 9 filing (*i.e.* one in which the EM would represent himself as having authority to modify and/or terminate pension obligations without limit in derogation of the Michigan Constitution).

20.     Despite the issuance of the TRO and the State Court's clear directive to the Governor regarding not authorizing any further filings by the City, the Governor did not seek to prevent the City from filing all of its "first day pleadings."  Indeed, the Governor authorized and the EM directed the chapter 9 filing just minutes before the July 18, 2013 TRO hearing was set to begin (and during a brief delay in the TRO hearing requested by the Governor's attorney) in order to potentially "cut off" any argument that the filing was not properly authorized (because the Governor knew and the EM expected that the State Court Judge was prepared to grant the TRO).

21.     On July 19, 2013, the State Court held a further hearing on the Webster Litigation and entered an Order of Declaratory Judgment (the "**Declaratory Judgment**,"

attached to the Kreisberg Declaration as Exhibit B). The Declaratory Judgment (a) finds PA 436 unconstitutional and of no force and effect to the extent it permits the Governor to authorize the EM to proceed under chapter 9 in any manner that threatens to diminish or impair pension benefits and (b) rules that the Governor must direct the EM "to immediately withdraw the chapter 9 petition … and … not authorize any further chapter 9 filing which threatens to diminish or impair accrued pension benefits." *See* Declaratory Judgment at 3.

22.     To the extent there was any authorization for the chapter 9 filing, the State Court clearly ordered that the Governor revoke it to the extent it was intended to lead to the diminishment or impairment of accrued pension benefits. However, subsequent to the issuance of the Declaratory Judgment, on July 25, 2013, this Court granted the City's motion to extend the automatic stay, which, *inter alia*, stayed pending appeals of the Declaratory Judgment (and other similar state court proceedings). *See* Docket No. 166.

**B.     The City's Pre-petition Machinations And Subsequent Meetings (But Not Negotiations) With Creditors Such As AFSCME**

**(i)     The City's Bankruptcy Was Discussed Prior To The EM Was Even Hired**

23.     In emails that surfaced following the City's chapter 9 filing going back to January 2013, long prior to any alleged good faith negotiations with creditors (more about this point below), secret discussions were being held between Detroit and officials in the Governor's office and the City's legal counsel suggesting that the best course for the City would be to send it through chapter 9 bankruptcy. These emails expose Orr's and the City's charade of pre-petition "negotiations" (in reality, one-sided meetings) in the month prior to the City's chapter 9 filing. In fact, all along the clear goal was for the City to end up in chapter 9.

24.     For example, Orr communicated as early as January 2013 regarding his proposed appointment as EM and discussed with his law firm at the time how to go about

leading the City into chapter 9. In an email (attached to the Kreisberg Declaration, Exhibit 1) dated January 31, 2013, Orr's colleague at the firm stated in an email to Orr that the "ideal scenario would be that [Michigan Governor] Snyder and [Detroit Mayor] Bing both agree that the best option is simply to go through an orderly Chapter 9. This avoids an unnecessary political fight over the scope/authority of any appointed Emergency Manager appointed and, moreover, moves the ball forward on setting Detroit on the right track." *Id*[4].

25.     Orr's colleague then stated his own reservations about whether an emergency manager would be useful outside of bankruptcy where his "ability to actually do anything is questionable given the looming political and legal fights" *Id*. In contrast, he observed in an earlier email, "[m]aking this a national issue . . . provides political cover for the state politicians" and gives them an "incentive to do this right" because "if it succeeds, there will be more than enough patronage to allow [them] to look for higher callings—whether Cabinet, Senate, or Corporate." *See* Kreisberg Declaration, Exhibit 2.[5]

26.     Others involved in the discussions prior to the chapter 9 filing included the Governor's Transformation Manager, Richard Baird ("**Baird**"). In an email also dated January 31, 2013, Orr, in anticipated of a conversation he was to have with Baird "in a few minutes" about whether to accept the EM position, observed that PA 436 "is a clear end-around the prior initiative" to repeal the previous Emergency Manager statute, Public Act 4, "that was rejected

---

[4]*See also* Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was hired, e-mails show,* http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-bankruptcy-emails (last visited on August 19, 2013).

[5] *See also* Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was hired, e-mails show,* http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-bankruptcy-emails (last visited on August 19, 2013).

by the voters in November." *See* Kreisberg Declaration, Exhibit 3.[6]  According to Orr "although the new law provides the thin veneer of a revision it is essentially a redo of the prior rejected law and appears to merely adopt the conditions necessary for a chapter 9 filing."  *Id.*

27.    In a further email dated January 31, 2013, Orr indicated that Baird wanted Orr to be hired as the EM and his firm to represent the City (regardless of whether Orr took the EM job), and that Orr indicated that he would be glad to work together with the City, even if not as EM, indicating that "I [Orr] and the firm are committed to working in lockstep with the [C]ity." *See* Kreisberg Declaration, Exhibit 4.[7]

> **(ii)    No Good Faith Negotiations Took Place Following The Appointment Of The EM With Parties Such As AFSCME Prior To The City's Chapter 9 Filing**

28.    As indicated above, the die was cast for the City's inevitable chapter 9 filing prior to the March appointment of Orr as EM.  Following Orr's appointment, the City and Orr maneuvered to establish the veneer of formal pre-petition creditor negotiations, when in reality, Orr and the Governor knew all along that the non-interactive meetings would be held on a *pro forma* basis so the City could attempt to establish alleged good faith negotiations.

29.    The facts belie the notion of any pre-filing negotiations, whether in good faith or otherwise.  Indeed, the City itself admitted both in letters and at the meetings held in the month or so prior to the filing that the City was only interested in one-way discussions, not negotiations.

---

[6] *See also* Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was hired, e-mails show,* http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-bankruptcy-emails (last visited on August 19, 2013).

[7] See also Kate Long, *Who is representing Detroit?*  http://blogs.reuters.com/muniland/2013/07/25/who-is-representing-detroit/ (last visited on August 19, 2013).

30. On June 14, 2013, the City held a meeting of representatives of the City's creditors (the "**June 14 Meeting**") to present the City's comprehensive restructuring plan/ "Proposal for Creditors" (the "**Restructuring Plan**", attached to the Kreisberg Declaration as Exhibit C). Even prior to these meetings, Orr confirmed that the City's discussions of its Restructuring Plan would not involve any negotiations, explaining that "it is under the [PA 436] statute, it is my plan and it's within my discretion and obligation to do it. **This isn't a plebiscite, we are not, like, negotiating the terms of the plan**. It's what I'm obligated to do." *See* Kevyn Orr Interview to Detroit WWJ Newsradio 950/AP, *Detroit EM Releases Financial Plan; City Exceeding Budget By $100M Annually*, May 12, 2013, *available at* http://detroit.cbslocal.com/2013/05/12/kevin-orr-releases-financial-plan-for-city-of-detroit/ (emphasis added).

31. On June 17, 2013, Steven Kreisberg, AFSCME's director of collective bargaining and health care policy, submitted a letter requesting from the EM various categories of information, assumptions, and data for AFSCME to honestly review all the information presented and begin good faith negotiations. *See* Kreisberg Declaration, Exhibit 5. AFSCME made this request prior to a scheduled June 20, 2013 meeting with unions (including AFSCME) representing the City's non-uniform employees regarding the City's pensions. At that meeting, the City represented that the meeting was "not a negotiation." *See* Kreisberg Declaration, ¶ 17. Furthermore, the letter inviting AFSCME to the June 20 meeting characterized the purpose of the meeting as being to "review" the Restructuring Plan (not negotiate it) and to have AFSCME "learn" about the Restructuring Plan. Kreisberg Declaration, Exhibit 6.

32. In a letter dated June 27, 2013 to an AFSCME local union, the City indicated that it was posting certain information to a data room and was looking forward to the unions'

"feedback" (again not negotiation) with respect to the EM's retiree benefits restructuring proposal. *See* Kreisberg Declaration, Exhibit 7.

33. In a follow up letter to the City dated July 2, 2013, Mr. Kreisberg again reiterated his request for information and data, including the backup data supporting the City retiree benefits proposal (support for which previously consisted of only a one-page financial summary). AFSCME requested relevant information and the opportunity (in conjunction with a meeting scheduled with the City's unions on July 10-11) to begin meaningfully engaging "in a good faith negotiation of these issues." *See* Kreisberg Declaration, Exhibit 8.

34. In a response letter to Mr. Kreisberg on July 3, 2013, the City advised that it would not meet separately with AFSCME, and that the July 10, 2013 scheduled meeting with the unions would be a "discussion" (again not a negotiation). *See* Kreisberg Declaration, Exhibit 9. Similarly, in an email dated June 28, 2013, the City confirmed that it wanted to meet on July 10, 2013 to "discuss" its "developing pension restructuring proposal," clearly implying that the proposal itself was not even complete yet. *See* Kreisberg Declaration, Exhibit 10.

35. At the July 10, 2013 meeting, the City announced at the inception that the meeting would be a discussion but not a negotiation. *See* Kreisberg Declaration, ¶ 18. At a similar meeting held with AFSME and certain and other unions held on July 11, 2013, again there was no negotiation.

> (iii) **The City's Bad Faith Refusal To Negotiate With Unions Such As AFSCME Has Continued Following The City's Bankruptcy Filing**

36. The City's pattern of bad faith refusal to negotiate any of its proposals regarding pensions or health insurance benefits changes has continued postpetition.

37. For example, on August 2, 2013, the City convened a meeting of local union representatives and discussed active health insurance. *See* Kreisberg Declaration, ¶ 19.

However, during that meeting, the City specifically advised those in attendance (including AFSCME representatives) that the meeting was not a negotiation. *Id* at ¶ 20. Mr. Kreisberg sent a follow up letter to the City on August 6, 2013 requesting good faith bargaining, and referenced cost savings estimates which AFSCME previously proposed in prior negotiations with the City before the development of the Emergency Manager's initial financial restructuring plan in May. *See* Kreisberg Declaration, Exhibit 11. In an August 8, 2013 response, the City advised that it would not engage in collective bargaining with AFSCME, but rather simply "discuss any feedback they may have regarding its health care restructuring plans." *See* Kreisberg Declaration, Exhibit 12.

38. On august 14,1013, the City held a follow up meeting with AFSCME on the subject of active medical benefits but did not accept any counterproposals or suggestions, but simply responded by further explaining its current intention with respect to active medical benefits.

39. Given Orr's repeated statements to the media about the City's willingness to bargain with its unions, AFSCME has been surprised by the City's unwillingness to negotiate, pre or postpetition. While AFSCME has re repeatedly stated its desire to move forward with constructive negotiations with the City on behalf of all AFSCME Detroit Employees, AFSCME cannot negotiate with an employer that is unwilling to come to the table for arms-length talks.

<u>**ARGUMENT**</u>

## I. <u>THE CITY'S PETITION VIOLATES THE UNITED STATES CONSTITUTION</u>

### A. CHAPTER 9 VIOLATES THE FEDERAL STRUCTURE OF GOVERNMENT

40. Chapter 9 of the Bankruptcy Code is an unconstitutional violation of federalism because chapter 9 allows Congress to set rules controlling State fiscal self-management – an

area of exclusive state sovereignty – as part of an unholy alliance in which the State receives in exchange powers in excess of those it would otherwise possess under the law. The losers here are citizens, such as the AFSCME Employees, who, particularly as creditors of the State, benefit from the State and Congress acting within their constitutionally defined roles so that the State remains accountable during the trying process of a municipal debt adjustment.

41.     The Supreme Court recognized this violation explicitly in 1936 when the Court declared the first federal municipal bankruptcy statute unconstitutional for the following two independent reasons: (1) the goal of a municipal bankruptcy is to enable state governments to unconstitutionally escape their debts, but states cannot accomplish the "end" of an unconstitutional act simply "by granting any permission necessary to enable Congress to do so"; and (2) municipal bankruptcy represents an incursion by Congress into the "sovereignty of the State" and its political subdivisions, which renders them "no longer free to manage their own affairs" independent of "interference" by Congress, yet the Constitution does not permit Congress to "pass laws inconsistent with the idea of sovereignty." *Ashton v. Cameron County Water Improvement Dist. No. 1,* 298 U.S. 513, 530-32 (1936).

42.     *Ashton* applies with equal force to chapter 9 as it did to the first federal bankruptcy statute. Chapter 9, like the municipal bankruptcy statute struck down in *Ashton,* is designed to empower municipalities – whose "fiscal affairs are those of the State, not subject to control or interference by the National Government," *id.* at 528 –to "change, modify or impair the obligation of their contracts" in ways not permissible outside of bankruptcy. *Id.* at 530-31. As *Ashton* recognized, that municipalities may not, unlike states, be immune from suit under the 11th Amendment is entirely unrelated to the question of whether their essential role in the federal system of government has been unconstitutionally diminished by an act of Congress.

*Ashton*, 298 U.S. at 531.  The Supreme Court recently reaffirmed this distinction in *Printz v. United States*: "[T] he distinction in our Eleventh Amendment jurisprudence between States and municipalities . . . is peculiar to the question of whether a governmental entity is entitled to Eleventh Amendment sovereign immunity, [and does not] apply [] to the question of whether a governmental entity is protected by the Constitution's guarantees of federalism, including the Tenth Amendment." 521 U.S.898, 531 n. 15 (1997) (citations omitted).

43.     To take just one extremely salient example, the City seeks to reduce its retiree health care obligations *permanently* in bankruptcy, which the Michigan Court of Appeals has held it could not do under state or federal law.  *See AFT Michigan v. State,* 297 Mich. App. 595, 825 N.W.2d 595 (2012).  This point is uncontroversial: the entire purpose of bankruptcy is to adjust debts which would otherwise be binding outside of bankruptcy.  Under chapter 9, for the privilege of skirting the laws governing its debts outside of bankruptcy, the State submits to the rules enacted by Congress for a chapter 9 filing and thereby cedes sovereign control over some of its own fiscal affairs to the federal judiciary during the bankruptcy process.

44.     Neither of the justifications provided by the Supreme Court less than two years after *Ashton* when it upheld Congress's next, substantially similar, municipal bankruptcy statute in *United States v. Bekins*, 304 U.S. 27 (1938) – (1) that the contracts clause of the federal constitution makes the passage of a state law adjusting municipal debts impossible and thus the need for a federal law providing for municipal bankruptcy pressing, and (2) that a State has a right to consent to federal intrusion into its own fiscal affairs – remains valid.  This is because intervening Supreme Court precedent holds that states can fashion their own municipal reorganization statutes but cannot consent to any derogation of their sovereign powers.

45.     As a threshold matter, the Supreme Court has held since *Bekins* that states *can* pass legislation to adjust municipal debts in a financial emergency.  *See Faitoute Iron & Steel Co. v. City of Asbury Park,* 316 U.S. 502 (1942).  In doing so, the Supreme Court scoffed at the presumption that the federal government could "completely absorb" from a State a power "so peculiarly local as the fiscal management of its own household."  *Asbury Park,* 316 U.S. at 508-09.  *See also United States Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1 (1977) (recognizing that state legislation adjusting a state's contractual obligations may not violate the contracts clause under certain circumstances).  For this reason alone, *Bekins,* which relied heavily on the Supreme Court's perception that some mechanism was needed to permit states to adjust their debts during the "[e]conomic disaster" of the Great Depression, 316 U.S. at 53-54, is no longer binding.

**(ii)   The Supreme Court's Development Of Constitutional Federalism Doctrine Has Effectively Overruled *Bekins***

46.     Over the past two decades the Supreme Court issued a series of opinions clarifying both the importance of the federal system of government to *individual* liberty and, concomitantly, the inability of a state to consent to an affront by Congress to that federal system.  The fountainhead of these cases is *New York v. United States,* 505 U.S. 144 (1992).  There, Justice O'Connor, writing for the majority, explained at length that any statute exercising federal control over a power which "is an attribute of state sovereignty" – as is the case here with respect to a state's management of the fiscal affairs of its political subdivisions, *see Ashton, supra* – is "necessarily" an exercise of "a power the Constitution has not conferred on Congress" and therefore unconstitutional.  505 U.S. at 156.  "The States 'form distinct and

independent portions of the supremacy, no more subject, within their respective spheres, to the general authority than the general authority is subject to them, within its own sphere.'" *Alden v. Maine,* 527 U.S. 706, 714 (1999) (quoting The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison)). Thus the Supreme Court's duty, Justice O'Connor has explained, is to "invalidate[] measures deviating from" the federalist "form of government" set forth in the Constitution, however "formalistic" the result may appear in light of "the era's perceived necessity." *New York,* 505 U.S. at 187.

> (a) **Chapter 9 Impinges On The AFSCME Employees' Individual Rights To Federalism By Eviscerating The Accountability Of Michigan To Its Citizens And Creditors**

47.     *New York* and its progeny represent a direct rebuff to *Bekins* and other Depression-era cases, which softened the requirements of federalism in moments of perceived peril, by setting forth since then a robust vision of federalism which "divides authority between federal and state governments for the protection of individuals." *New York,* 505 U.S. at 181. That vision begins with the "incontestable" truth "that the Constitution established a system of 'dual sovereignty,'" under which the sovereignty reserved to a State and its citizens is "'inviolable.'" *Printz,* 521 U.S. at 918-20 (quoting The Federalist No. 39, at 245 (J. Madison)) (other citations omitted). "Residual state sovereignty was also implicit, of course, in the Constitution's conferral upon Congress of not all governmental powers, but only discrete, enumerated ones, Art. I, § 8, which implication was rendered express by the Tenth Amendment's assertion that '[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.'" *Printz,* 521 U.S. at 920.

48.     The premise of the federal constitutional structure is that "Congress would exercise its legislative authority directly over individuals rather than over States." *New York*, 505 U.S. at 166 (citing 1 Records of the Federal Convention of 1787, p. 313 (M. Farrand ed. 1911) (explaining the "rejection of the New Jersey Plan in favor of the Virginia Plan")).  As a corollary, individual citizens possess a vested right in the guarantee of a strongly demarcated separation of power between the state and federal government to ensure that each remains responsible to the citizens for the tasks with which it was charged:

> The great innovation of this design was that "our citizens would have two political capacities, one state and one federal, each protected from incursion by the other"—"a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it."  [*Printz,* 521 U.S. at 920 (quoting *U. S. Term Limits, Inc. v. Thornton*, 514 U. S. 779, 838 (1995) (Kennedy, J., concurring)).]

49.     This structural separation of powers protects individual liberty in myriad ways by creating a "'double security as to the rights of the people.'"  *Printz,* 521 U.S. at 922 (quoting The Federalist No. 51, at 323 (J. Madison)).  It ensures that neither branch will accumulate "excessive power," thereby reducing "the risk of tyranny and abuse from either front." *Printz,* 521 U.S. at 921 (quotation omitted).  The separation of powers principle further "contemplates that a State's government will represent and remain accountable to its own citizens." *Printz,* 521 U.S. at 920 (citations omitted).  For "[i]f, as Madison expected, the Federal and State Governments are to control each other, see The Federalist No. 51, and hold each other in check by competing for the affections of the people, see The Federalist No. 46, those citizens must have some means of knowing which of the two governments to hold accountable for the failure to perform a given function." *United States v. Lopez,* 514 U.S. 549, 576-77 (1995) (Kennedy,

J., concurring).  *See also United States v. Morrison,* 529 U.S. 598, 615-16 (2000) (citing the bulk of Justice Kennedy's concurrence in *Lopez* and holding that Congress may not "use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority").  Accordingly, "[t]he Framers thus ensured that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy."  *Nat. Fed'n of Indep. Business v. Sibelius,* 132 S. Ct. 2566, 2578 (2012) (Roberts, C.J.) (quoting The Federalist No. 45, at 293 (J. Madison)).

50.      Chapter 9 does unconstitutional violence to the federal structure by obfuscating the system of direct accountability protected by federalism.  By outsourcing to the federal judiciary the problem of a state reorganizing its obligations, chapter 9 provides states with unconstitutional – as well as unnecessary, given *Asbury Park* – cover from its citizens by confusing them as to whom to accord "blame" and "credit" for the results.  *Printz,* 521 U.S. at 931; *New York,* 505 U.S. at 169.  *See also Gregory v. Ashcroft,* 501 U.S. 452, 459 ("These twin powers will act as mutual restraints only if both are credible.").  "The resultant inability to hold either branch of the government answerable to the citizens is more dangerous even than devolving too much authority to the remote central power."  *Lopez,* 514 U.S. at 576-77 (Kennedy, J., concurring) (citations omitted).

51.      In point of fact, on January 31, 2013, Orr's colleague himself touted the deflection of accountability for state and city politicians as a benefit.  "Making this a national idea is not a bad thing," he wrote, because "[i]t provides political cover for the state politicians. Indeed, this gives them an even greater incentive to do this right because, if it succeeds, there will be more than enough patronage to allow either [Mayor] Bing or [Governor] Snyder to look

for higher callings—whether Cabinet, Senate or Corporate." Kreisberg Declaration, Exhibit 2. In a subsequent reply to Orr later that day, Orr's colleague provided a clear indication of his idea of the "right" way to do "this," stating: "the ideal scenario would be that Snyder and Bing both agree that the best option is simply to go through an orderly chapter 9." Kreisberg Declaration, Exhibit 1.

52.     This veil over accountability is woven into the very structure of chapter 9. While the City must consent to a chapter 9 filing and retains some control over the chapter 9 process, even before the City proposes a plan the Bankruptcy Judge is able to commandeer the City's operation in exchange for the protection of the Bankruptcy Code by using its equitable powers, as it already has in this case, to order the City to, *inter alia,* turn over documents and engage in mediation and negotiations which the State would not need to submit to outside of Bankruptcy.  *See Mediation Order* [Docket No. 322] ("the Court concludes that it is necessary and appropriate to **order** the parties to engage in the facilitative mediation of any matters that the Court refers in this case," moreover, the mediator is "authorized to enter any order necessary for the facilitation of mediation proceedings", including regarding discovery issues).

53.     Moreover, Bankruptcy Code section 926 provides that "[i]f the debtor refuses to pursue a cause of action under section 544, 545, 547, 548, 549(a) or 550 of this title, then on request of a creditor, the court may appoint a trustee to pursue such cause of action." 11 U.S.C. § 926(b).  In at least one reported case, *In re Alabama State Fair Authority*, 232 B.R. 252 (N.D. Ala. 1999), the bankruptcy court appointed a trustee to pursue preference actions.  Thus, the bankruptcy court has discretion, despite a municipal debtor having made the policy choice to settle a pre-petition debt, to appoint a third-party trustee to ignore the municipality's decision

and pursue avoidance of such a settlement. With regard to preference avoidance, this is a power an individual creditor could not independently assert under state law.

54. If the City wishes to obtain the true spoils of bankruptcy – a plan of adjustment – it must submit to a much greater degree of federal interference, thus further blurring the line between Congress and the State as to who is to blame for the contents of that plan. This is because, in order for a debtor's plan to receive approval under chapter 9, it must incorporate priorities of distribution according to the Bankruptcy Code. The tension between chapter 9 and state law rights was highlighted in *In re County of Orange,* 191 B.R. 1005 (Bankr. C.D. Cal. 1996), where the court, on preemption grounds, invalidated California's law providing for the establishment of a trust with respect to certain securities. Relying on the doctrine of preemption alone, the County of Orange court held that "The California legislature cannot rewrite the bankruptcy priorities." *Id.* at 1017.

55. If the people of Michigan were to enact their own laws for adjusting municipal debts, those laws might have very different priorities than chapter 9. Chapter 9, for instance, allows administrative expenses under Bankruptcy Code section 503 and gives them priority under Bankruptcy Code section 507(a)(2), and adopts the definition of secured claims from Bankruptcy Code section 506, to name a few. 11 U.S.C. § 901(a). Importantly, in contrast, the people of Michigan might very well decide to treat issues such as claim priority quite differently. For instance, they might choose to place unsecured retiree health claims before administrative expenses, thus benefitting the AFSCME retirees. This is, after all, a state whose constitution explicitly protects pension rights. But once the state accesses chapter 9, the AFSCME employees are denied the right to petition their government to enact a municipal debt

adjustment law of this nature, and the state can shirk its responsibility to the voice of its citizens by blaming injustice on the claim priorities, rules, and procedures of the Bankruptcy Code.

56.     That the City retains some autonomy over its affairs under chapter 9 is irrelevant, for the mere incursion into territory reserved to the states is sufficient to violate the Constitution. "[W]here, as here, it is the whole object of the law to direct the functioning of the state [government], and hence to compromise the structural framework of dual sovereignty . . . a 'balancing' analysis is inappropriate. It is the very principle of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect." *Printz*, 521 U.S. at 932.

57.     Ultimately, the allocation of state resources as between competing creditors of the City should be determined "by the political process established by the citizens of the State, not by judicial decree mandated by the Federal Government." *Alden,* 527 U.S. at 751. "When the Federal Government asserts authority over a State's most fundamental political processes, it strikes at the heart of the political accountability so essential to our liberty and republican form of government." *Id.* While the road to adjusting the City's debts may be longer if it must first involve "greater citizen involvement in democratic processes . . . in shaping the destiny of" the City's reorganization process rather than that set forth in chapter 9 as a result of "the political processes that control a remote central power," *Bond v. United States,* 131 S. Ct. 2355, 2364 (2011), "the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day." *New York,* 505 U.S. at 187.

58. The unconstitutionality of chapter 9 is further confirmed by its unsuccessful attempt to preserve some independence for state sovereigns within the constraint of the grant of power to Congress by Article I, Section 8 Clause 4 (the "Bankruptcy Clause") to establish "uniform" bankruptcy laws. Although the bankruptcy code for private debtors may treat debtors differently in different states due to variations in state law and still pass muster as "uniform," within a state there must be "geographical" uniformity for debtors. *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 188 (1902). But by ceding to each state the ability to define its own qualifications for a municipality to declare bankruptcy, chapter 9 permits the promulgation of non-uniform bankruptcies within states – as in Michigan, where Act 436 has wildly divergent effects on different cities, whose authority to declare bankruptcy purports to rest on the discretion of a Governor who can attach whichever contingencies he wishes. *See* MCL 141.1558. It is no surprise that this attempt to elude the demands of federalism thereby fails for this additional reason, for municipal bankruptcy would have been an entirely foreign concept to the framers who modeled much of our federal Constitution on British law which did not then, and still does not today, even contemplate municipal bankruptcy. *See, e.g.,* Janie Anderson Castle, *The People's Mayor for London?*, 5 J. Loc. Gov't L. 29, 32 (2002); Annerose Tashiro, *Sovereign Insolvency*, 99 Eur. Law. 5 (2010) ("There is no such thing today anywhere in Europe as a sovereign insolvency regime.") (advocating implementation of a bankruptcy regime mirroring that of chapter 9 in the EU).

59. It cannot be adequately emphasized that under *Asbury Park* the State has the authority to amend its own laws to allow for its municipalities to adjust their debts without resorting to a coercive federal statute which unconstitutionality obscures accountability and is not a uniform bankruptcy law. It can even, furthermore, seek federal financial assistance to

help meet those debts.  *See, e.g., South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (Rehnquist,

C.J.) ("[O]bjectives not thought to be within Article I's enumerated legislative fields may

nevertheless be attained through the use of the spending power and the conditional grant of

federal funds." (internal quotation omitted)).  What the State cannot do – but what chapter 9

demands – is to submit to federal rules which would not merely incentivize the State's use of

lawful power, but engorge that power at the expense of its citizens' inviolable right to control

the operation of their sovereign by setting the rules by which it adjusts its own debts.

**(b)    Chapter 9's Requirement Of State Consent Cannot Cure The Violation Of Individual Rights**

60.    The Supreme Court squarely held in *New York* that "[t]he constitutional

authority of Congress cannot be expanded by the 'consent' of the governmental unit whose

domain is thereby narrowed, whether that unit is the Executive Branch or the States."  505 U.S.

at 182.  Even when such consent is accomplished by statute.  *See, e.g., Buckley v. Valeo,* 424

U.S. 1 (1976) (Congress infringed the President's appointment power via a law signed by the

President); *INS v. Chadha,* 462 U.S. 919 (1983) (legislative veto violated the constitutional

requirement of presentment even where President signed law with legislative veto provision).

61.    The decision in *Bekins* therefore erred in concluding that the then-operative

municipal bankruptcy statute was not unconstitutional simply because the statute required the

municipality's petition and plan of composition to be authorized by state law.  304 U.S. at 52.

To the contrary, the conclusion in *Bekins* that the only "obstacle" to the exercise of federal

bankruptcy over state political subdivisions "lies in the right of the State to *oppose* federal

interference," 304 U.S. at 52-54, is squarely foreclosed by the Court's subsequent decision in

*New York*.  Thus the prior rule from *Ashton* – "Neither consent nor submission by the States

can enlarge the powers of Congress," and therefore states cannot "accomplish" an unavailable

"end by granting any permission necessary to enable Congress to do so," 298 U.S. at 531 – is the correct one.

62.     The Court concluded in *New York* that State consent cannot cure an otherwise unconstitutional infringement of state sovereignty for the same reason that municipal bankruptcy violates constitutional federalism in the first place: the design of federalism is meant "for the protection of individuals," not States.  *New York,* 505 U.S. at 181 ("The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States.").  State government officers may even have "powerful incentives" to consent to a diminishment of state sovereignty to evade one of the core benefits federalism promises to individual citizens: direct accountability of political officials for actions taken in their clearly demarcated domains of authority.  *Id.* at 182-83 ("[I]t is likely to be in the political interest of each individual official to avoid being held accountable to the voters.").  Therefore state consent cannot not be allowed to dismantle the delicate balance of powers protecting the accountability of each dual sovereign to its citizens.

**B.     AFSCME'S ACTIVE AND RETIRED MEMBERS HAVE INDIVIDUAL STANDING TO ASSERT THAT CHAPTER 9 VIOLATES THEIR INDIVIDUAL RIGHTS TO A FEDERAL SYSTEM OF GOVERNMENT**

63.     The Supreme Court has squarely held that individuals – and not just states – have standing to challenge that Congress has "exceeded its powers under the Constitution, thus intruding upon the sovereignty and authority of the States."  *Bond v. United States,* 131 S. Ct. 2355 (2011).  As also analyzed *supra,* individuals have their "own constitutional interests" to "assert injury from governmental action taken in excess of the authority that federalism defines," and their "rights in this regard do not belong to the State."  *Id.* at 2363-64.

64.     Two aspects of the Court's conclusion in *Bond* are of special relevance to the instant case. First, the Court emphasized that federalism protects not just "the integrity of the [state and federal] governments themselves," but also, distinctly, "the people, from whom all governmental powers are derived." *Id.* at 2464. Individual citizens' interests in pressing federalism complaints include the "liberties that derive from the diffusion of sovereign power," such as (1) "greater citizen involvement in democratic processes" and citizens' consequent ability to use their voices "in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power"; and (2) the promise that "laws enacted in excess of delegated governmental power cannot direct or control their actions" and the consequent protection of citizens from the "arbitrary power" caused by giving any one government too much sway over "the concerns of public life." The City's chapter 9 petition threatens AFSCME's members with both of these harms insofar as it (1) shields the City from a democratic process of resolving its fiscal crisis by rejecting the accountability of local politicians responsive to Detroit's citizenry in favor of an unelected federal judiciary, and (2) allows the federal government to concoct rules for the resolution of disputes in an "area of traditional state concern." *Lopez,* 514 U.S. at 580 (Kennedy, J., concurring).

65.     Second, the *Bond* Court rejected the argument, pressed by the respondent, that a state's waiver of any interference with its sovereignty should trump objections by individual citizens on Tenth Amendment grounds. *See* Brief for the Amicus Curiae Appointed to Defend the Judgment Below at 25, *Bond v. United States*, 131 S. Ct. 2355 (2011) (No. 09-1227) ("Particularly when the private party's interests are not aligned with those of the State, as may well be true in this very case . . . private party suits have the potential to frustrate and undermine state policies and decisions."). To the contrary, the Court held, a claim that "a law

was enacted in contravention of constitutional principles of federalism . . . need not depend on the vicarious assertion of a State's constitutional interests, even if a State's constitutional interests are also implicated." *Bond,* 131 S. Ct. at 2365. Whether the State has invited the federal incursion upon State authority is irrelevant. Only whether the individual claimant's injury so much as "*might* not have come about if the matter were left for the [State] to decide" on its own matters to the analysis. *Id.* at 2366.

66.     No doubt exists that if the State of Michigan were left to devise its own scheme for adjusting municipal debts – as is squarely within its authority under *Asbury Park* – the State *might* devise a system different from the United States Bankruptcy Code. Under the microscope of "greater citizen involvement" at the local level, the City, fulfilling the promise of federalism to its citizens, would be more directly constrained to create a process responsive to their needs – including, perhaps, the same needs which prompted the passage of the state constitutional amendment protecting the very diminishment or impairment of vested pension rights which the City now seeks to accomplish under the cover of chapter 9. Regardless, because chapter 9 allows the City a process for adjusting its debts which is not identical to the process for doing so under state law – either as it currently exists or as it would exist if the state were to pass its own municipal composition law – AFSCME's members, as debtors of the City, have standing to object to the City's use of chapter 9 on federalism grounds.

### C.    THIS COURT LACKS JURISDICTION TO DECIDE WHETHER CHAPTER 9 VIOLATES THE UNITED STATES CONSTITUTION

67.     This Court lacks jurisdiction to decide whether chapter 9 violates the Constitution. As the Supreme Court recently explained in *Stern v. Marshall,* Article III of the Constitution assigns the job of resolving questions of constitutional law to the "judicial power of the United States." 131 S. Ct. at 2609. Because bankruptcy judges are appointed under

Article I–unlike judges appointed under Article III, who have life tenure and protection from removal or diminishment of salary – Congress may not grant to bankruptcy judges the right to exercise that power. *Id.*

68.     No doubt exists either that the resolution of federal constitutional questions comes under the "judicial power" and is not subject to any exception thereto. *Stern,* building on the Court's decisions in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50 (1982), and *Granfinanciera, S.A. v. Nordberg,* 492 (U.S. 33) (1989), held that any narrow "public rights" exception permitting bankruptcy judges to issue certain final orders does not apply to any legal claim "independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy." 131 S. Ct. at 2611. The federal constitutional claims of AFSCME's members stem from the Constitution, not the Bankruptcy Code, and cannot be resolved by the very claims process whose legality is the subject of the constitutional challenge.

69.     Moreover, the instant constitutional challenge to chapter 9 has nothing to do with a federal regulatory scheme. *Stern* is quite clear that the "public rights" exception is limited to claims asserting rights "integrally related to particular federal government action," *i.e.*, claims challenging action undertaken pursuant to "a federal regulatory scheme" or whose resolution "by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority." *Id.* at 2613. Where, as is the case with this purely constitutional argument, the determination of a legal question has nothing to do with the contours of federal regulations or expert agency fact-finding, the argument must be resolved by an Article III judge.

70.     At its core, the "public rights" exception is designed to address situations where – unlike here – a party seeks to enforce rights which Congress has created by statute.  *See Granfinanciera,* 492 U.S. at 51 (citations omitted).  This constitutional challenge to chapter 9 invokes no such public right; "Congress has nothing to do with it."  *Stern,* 131 S. Ct. at 2613.  Nor do bankruptcy judges possess any special expertise at resolving constitutional challenges to their own authority.  "The experts in the federal system at resolving" constitutional questions such as this one "are the Article III courts, and it is with those courts that [this] claim must stay."  *Id.* at 2615.  The words of the Supreme Court in *Stern* apply with equal force here:

> What is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment by a court with broad substantive jurisdiction, on a [constitutional] cause of action, when the action neither derives from nor depends upon any agency regulatory regime.  If such an exercise of judicial power may nonetheless be taken from the Article III Judiciary simply by deeming it part of some amorphous "public right," then Article III would be transformed from the guardian of individual liberty and separation of powers we have long recognized into mere wishful thinking.  [*Id.*]

71.     Accordingly, and with respect, this Court should immediately refer this constitutional challenge to chapter 9 to the District Court for the Eastern District of Michigan.

## II.     THE CITY IS NOT ELIGIBLE TO FILE FOR CHAPTER 9 PROTECTION UNDER SECTION 109(C) OF THE BANKRUPTCY CODE

72.     The City, as a purported municipal debtor, bears the burden of establishing it is eligible for relief under chapter 9.  *See, e.g.*, *In re City of Stockton*, 475 B.R. 720, 725-26 (Bankr. E.D. Cal. 2012) (citing cases); *In re Valley Health Sys.*, 383 B.R. 156, 161 (Bankr. C.D. Cal. 2008); *In re County of Orange*, 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995); *In re Sullivan County Regional Refuse Disposal Dist.*, 165 B.R. 60, 72 (Bankr. D.N.H. 1994).  "[A]ccess to Chapter 9 relief has been designed to be an intentionally difficult task."  *Sullivan County*, 165 B.R. at  82; *see also In re Cottonwood Water and Sanitation Dist.*, 138 B.R. 973,

979 (Bankr. D. Colo. 1992) (explaining that, although the Bankruptcy Code, as remedial legislation, is generally broadly construed, "municipal bankruptcies involve significant problems . . . not encountered in the private sector" and raise important constitutional issues, so that "Congress consciously sought to 'limit accessibility to the bankruptcy court' by municipalities." (internal citation omitted)).  As a result, "[t]he bankruptcy court's jurisdiction should not be exercised lightly in chapter 9 cases." *Sullivan County*, 165 B.R. at 82.

73.     As demonstrated below, the City necessarily fails to carry its burden with respect to the following eligibility requirements: (i) valid authorization under Michigan state law (section 109(c)(2) of the Bankruptcy Code); and (ii) good faith negotiations or impracticability of such negotiations (section 109(c)(5) of the Bankruptcy Code ).  AFSCME also reserves the right to argue (following completion of discovery) that the City does not satisfy the insolvency requirement under section 109(c)(3) of the Bankruptcy Code.

74.     Furthermore, the evidence reveals that the City's bankruptcy petition was filed in bad faith and not motivated by a proper purpose under chapter 9 and should be dismissed pursuant to section 921(c) of the Bankruptcy Code. *See e.g.*, *In re McCurtain Municipal Authority*, 2007 WL 4287604 at *3 (Bankr. E.D. Okla. Dec. 4, 2007) (holding that "the inability to pay debts as they become due depend[s] upon the inescapable quality of the obligation and the certainty that it cannot be met. Mere possibility or even speculative probability is not enough.") (citations omitted).

### A.     The City Is Not Authorized By Michigan State Law To Be A Debtor Under Chapter 9

75.     The City contends that it is authorized to be a debtor under state law because Section 18 of PA 436, M.C.L. 141.1558, provides that "[u]pon receipt of the written approval [of the Governor], the emergency manager is authorized to proceed under chapter 9," and

further "empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9." *See* Eligibility Brief, p. 10. However, the Governor's blanket grant of permission to file for bankruptcy under Section 18 of PA 436 violated the Michigan Constitution because it failed to explicitly prohibit the impairment or diminishment of vested pension rights. Moreover, the appointment of the Emergency Manager under PA 436 violates the "strong home rule" provisions of the Michigan Constitution. Where, as here, a state constitution bars the purported state law authorization, a chapter 9 petition must be dismissed. *See In re City of Harrisburg, PA*, 465 B.R. 744 (Bankr. M.D. Pa. 2011) (analyzing Pennsylvania Constitution to determine whether city was authorized to file under chapter 9).

> **(i)** **Governor Snyder's Authorization Of The City's Petition Under Section 18 Of PA 436 Violated Article IX, Section 24 Of The Michigan State Constitution**

76. As a Michigan Circuit Court Judge has already held, Michigan State law forbids authorization of the City's bankruptcy petition insofar as it seeks to reduce accrued pension benefits in violation of the State Constitution. Yet the Emergency Manager has been very clear that he intends to use this chapter 9 proceeding to do just that. Indeed, the Emergency Manager had made that intent known well prior to requesting the Governor's permission to file under chapter 9. For instance, on June 14, 2013 he both (a) issued a "Proposal for Creditors" expressly stating that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons," and (b) publicly threatened, in an interview with the Detroit Free Press Editorial Board, that vested pension benefits will not be protected in a chapter 9 proceeding authorized by the Governor pursuant to PA 436, and that any state laws protecting vested pension benefits will "not . . . protect" retirees in bankruptcy court.

77. Article IX, Section 24 of the Michigan Constitution provides: "The accrued financial benefits of each pension plan and retirement system of the state and its political

subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." It means what it says: "[U]nder Art. 9, § 24, a retirement benefit *cannot be reduced.*" *Seitz v. Probate Judges Retirement System,* 189 Mich. App. 445, 474 N.W. 2d 125, 128 (1991) (emphasis added); see *also id.* at 127 ("Article IX, § 24 protects those persons covered by a state or local pension or retirement plan from having their benefits reduced." (citing *Detroit Police Officers Ass'n v. Detroit,* 391 Mich. 44, 69, 214 N.W.2d 803 (1974))).

78. Article IX, Section 24 completely protects the "receipt of pension benefits related to work already performed by" any City employees, whether active or retired – i.e., any pension benefits which have "accrued" and thus become "vested pension benefits" – from being diminished *at all.* *APTE v. Detroit,* 154 Mich. App. 440, 398 N.W.2d 436, 439-40 (1986); *Advisory Opinion re Constitutionality of 1972 PA 258,* 389 Mich. 659, 663 (1973) (holding that "the intention of the people in adopting" Article 9, Section 24 was that "the benefits of pension plans are in a sense deferred compensation for work performed . . . which should not be diminished by the employing unit after the service has been performed." (quoting 1 Official Record, Constitutional Convention 1961, 770-71)). Vested pensions rights covered by Article IX, Section 24 differ in this important respect from contractual benefits protected solely by Article I, Section 10 of the Michigan Constitution (the State's "Contracts Clause"), which in a narrow set of cases may not prohibit the State from effecting "a modest, temporary impairment" of those other types of "governmental contracts . . . as a matter of last resort to address a fiscal emergency." *AFT Michigan v. State,* 297 Mich. App. 597, 602, 825 N.W.2d 595 (2012) (noting that "[a]ll parties agree that . . . accrued financial benefits under Const. 1963, art. 9, § 24 . . . may not be impaired," but concluding that the retiree health benefits in question were not "accrued financial benefits" within the wholesale protection of Article IX,

Section 24 and thus proceeding to consider whether they could be impaired under the Contracts Clause); *BCBSM v. Governor,* 422 Mich. 1, 22-23, 367 N.W.2d 1 (1985) ("The federal balancing approach has been adopted by our Court for purposes of adjudicating state Contract Clause claims as well as federal Contract Clause claims.").

79.    Governor Snyder violated Article IX, Section 24 – and with it the requirement, set forth at 11 U.S.C. § 109(c)(2), that he be "empowered by State law to authorize" the City to become a debtor – when he failed to condition the City's chapter 9 petition on the complete preservation of vested pension rights despite the clearly available public information that the Emergency Manager intended to use the Governor's authorization to diminish constitutionally sacrosanct pension benefits.[8]  Section 18 allows the Governor to "place contingencies on a local government in order to proceed under Chapter 9," but does not explicitly require that compliance with Article IX, Section 24 be one of those contingencies.  In this case, the Governor explicitly chose "not to impose such contingencies."  *See* Docket No. 1 at p. 16.

80.    Section 18 is unconstitutional as applied where, as here, the Governor has abused his discretion by purporting to authorize a bankruptcy which "would violate the constitution."  *Taxpayers of Michigan Against Casinos v. State,* 478 Mich. 99, 107-08 & n.3 (2007) (even "broad discretion" granted to Governor by statute to act unilaterally must be exercised "within the limits of the constitution").  Moreover, Governor Snyder's authorization has itself unconstitutionally caused an "immediate, concrete injury" to Council 25's members by creating a "contingent liability" that their inviolable rights will be disregarded, causing them to reorder their financial affairs.  *See Clinton v. New York,* 524 U.S. 417 (1998) (plaintiffs had standing to challenge constitutionality of executive action which, if left unchecked, would leave

---

[8]  To the extent the unconstitutionality of the Governor's authorization turns on the question of whether he was on notice of the Emergency Manager's intent to unconstitutionally diminish vested pension rights, AFSCME will seek discovery regarding information possessed by the Governor, including any other applicable discovery.

undisturbed potential future harm posing, by virtue of its magnitude, immediate and direct financial consequences to plaintiffs).

81.    The strings left unattached to the Governor's sign-off speak volumes because PA 436 is not ignorant of Article IX, Section 24.  To the contrary, other sections of the Act explicitly reiterate that accrued pension benefits shall not be diminished or impaired outside the bankruptcy context.  *See, e.g.,* MCL 141.1551(1)(d) (requiring that the Emergency Manager's financial and operating plan provide for "[t]he timely deposit of required payments to the pension fund for the local government"); MCL 141.1552(i)(m)(ii) (allowing the Emergency Manager in certain circumstances to serve as the sole trustee of a municipality's pension fund, but requiring that he "fully comply with . . . section 24 of article IX of the state constitution"); MCL 141.1553 (eliminating the "the accrual of postemployment benefits" of local government officers but prohibiting "the impairment of vested pension benefits").  Thus the Governor's contingency-free permission reads like an open invitation to the Emergency Manager to violate the State Constitution in bankruptcy, and therefore is unconstitutional.

82.    In the alternative, this Court should hold that any authorization the Governor sought to provide under Section 18 carried with it the implicit contingency that all actions taken pursuant to it by the Emergency Manager, including the proposal of any plan of adjustment under 11 U.S.C. § 943, must comply with the State Constitution, including Article IX, Section 24.  In his letter to the Emergency Manager giving unconditional permission to file under chapter 9, Governor Snyder observed that the Bankruptcy Code "contains the most important contingency – a requirement that the plan be legally executable" under 11 U.S.C. § 943(b)(4). Docket No. 1 at p. 16.  Because a plan of adjustment which would reduce vested benefits would not be legally executable under the Michigan Constitution – and because, as Governor, Snyder

is forbidden from authorizing any violation of the state constitution – his letter to the EM should, in the alternative, be construed as requiring compliance with Article IX, Section 24.

83.     AFSCME and its members must not be made to wait to raise a § 943(b)(4) argument until the moment a plan is proposed – though of course they reserve the right to do so – because of the harm being suffered by the AFSCME Detroit Employees *now* as a result of their credible fear that the Emergency Manager will force them to accept the unconstitutional impairment or diminishment of their vested pension rights - the threat of which he is attempting to use as leverage against then *now*. Thus, if this Court plans to find the City eligible to file for bankruptcy under chapter 9, it should hold on the record *now* that any plan proposed by the City will have to comply with Article IX, Section 24 because the Governor could not have given permission to file under chapter 9 without including the implicit contingency that the City's plan of adjustment not reduce vested pension benefits.  Otherwise creditors with vested pension rights will continue to suffer an unconstitutional injury throughout the course of this bankruptcy as a result of the threats of the Emergency Manager , and the Court will be virtually powerless to prevent that harm unless and until the City proposes its plan of adjustment.  To prevent that harm *now*, the Court at the very least should clarify, as a preliminary condition of eligibility, that these bankruptcy proceedings cannot reduce vested pension benefits. *Cf. Seitz,* 189 Mich. App. at 456 (declining to "throw out" a pension-reform statute in its entirety where none of the plaintiff state court judges could show that they would receive reduced pension benefits under said statute, but clarifying that the state was required "to honor its obligations" not to enforce the statute wherever doing so would in fact result in a reduction to a retired judge's vested pension rights). *See also Lansing School Educ. Ass'n v Lansing Bd. of Educ.,*

487 Mich. 349, 372 n.20; 792 N.W.2d. 686 (2010) (declaratory judgment appropriate under Michigan law to accomplish a "sharpening of the issues raised" (quotation omitted)).

84.     Whatever its route – either by holding that the Governor violated Article IX, Section 24 by granting the City blanket permission to file under chapter 9 despite knowing full well that the Emergency Manager plans to use chapter 9 to cram down unconstitutional pension reductions, or that the Governor's permission carried with it the implicit condition that Article IX, Section 24 not be violated in bankruptcy– this Court must, when applying state law, hold the Governor to the truism that he cannot take actions "that would violate the constitution" even where he is acting with "broad discretion" delegated to him by statute. *See Taxpayers of Michigan Against Casinos, supra.*

### (ii)     PA 436 Violates The Strong Home Rule Provisions Of The Michigan Constitution

85.     "Michigan is strongly committed to the concept of home rule," a structural state-local federalism under which "[t]he charter of a city stands as its 'constitution,'" and "once adopted by a vote of the electors, a city's charter may be amended only by a vote of the electors." *Bivens v. Grand Rapids*, 443 Mich. 391, 400-01 (1993) (quotations omitted) (striking down local ordinance which conflicted with local charter because local government could not "effectively amend the charter without subjecting the amendment to the scrutiny and approval of the local electorate").  This "strong home rule" regime reflects a bedrock principle of state law, which has been true for each of Michigan's three Constitutions beginning with the Constitution of 1850 and continuing through the current Constitution of 1963: all officers of cities are to "'be elected by the electors *thereof*, or appointed by such authorities *thereof*,'" not by the central State Government.  *See Brouwer v. Bronkema*, 377 Mich. 616, 652, 141 N.W.2d 98 (1966) (quoting *People ex re. Le Roy v. Hurlbut*, 24 Mich. 44, 65 (1871) (Cooley Court)).

86. In blatant disregard of this constitutional mandate, PA 436 – pursuant to which the Emergency Manager contends he has authority to file under chapter 9 on behalf of the City – strips the local electorate of its constitutional right to select its own officials, as well as to "frame, adopt and amend its charter" under Article VII, Section 22; to approve, by a two-thirds majority, any local act of the state legislature under Article IV, Section 9; and to be subject to administrative authority only where that authority is guided by standards created by the legislature and subject to due process of law, see *BCBSM v. Governor*, 367 N.W. 2d 1, 51 (Mich. 1985). For each of these reasons, PA 436 offends the "strong home rule" of Detroit, and the Emergency Manager is not lawfully authorized to file for bankruptcy on behalf of the City or to act as its representative during chapter 9 proceedings

> (a) **PA 436 Violates The Right Of The People Of Detroit To Select Their Own Local Officers And To Structure Their Own Government Via Charter**

87. In one of its first cases interpreting the meaning of Michigan's current Constitution, the Michigan Supreme Court reaffirmed the hallmark holding of the legendary Cooley Court: city residents have the state constitutional right to select their own local representatives. *Brouwer,* 377 Mich. at 651-61. As Justice Cooley held in his seminal *Hurlbut* opinion – the wellspring of the so-called "Cooley Doctrine" of local government, *see* David J. Barron, *The Promise of Cooley's City: Traces of Local Constitutionalism,* 147 Univ. Penn. L. Rev. 487 (1999) – the right "to choose in some form the persons who are to administer the local regulations" is a right of local electors so basic to the "traditions, practice and expectations" of Michigan that it undergirds the State's Constitution even in the absence of express constitutional language to that effect. *Hurlbut,* 24 Mich. at 29-33.

88. Having lived under the Cooley doctrine for 90 years at the time of Michigan's most recent constitutional convention, the framers of the 1963 Constitution would have

understood *Hurlbut* as an even more foundational constitutional norm than Cooley himself. Indeed, the framers sought, in adopting the strong home rule regime which as now set forth in Article VII, to continue the "trend . . . toward strengthening inherent local government powers" which Justice Cooley "led" when he set forth the "rule" of local self-government in *Hurlbut.* 1 Official Record, Constitutional Convention 1961, 1052-53. As a result, Article VII provides that "[t]he legislature *shall* provide by general laws for the incorporation of cities and villages," Art. VII, § 21; that under those general laws, "the electors of each city and village *shall* have the power and authority to frame, adopt and amend its charter," Art. VII, § 22; and that "[t]he provisions of this constitution and law concerning counties, townships, *cities* and villages *shall* be liberally construed *in their favor*," Art. VII, § 34. (Emphases added.)

89. PA 436 offends Article VII in myriad ways. First, it effectively adopts a new charter for Detroit which substitutes the *unelected* Emergency Manager for the Mayor *and* City Council collectively – including by granting the EM the power to, *inter alia,* issue orders directing the mayor and city council; set the local government budget unilaterally; enter into, and break, contractual agreements for the City, including CBAs, loans, and property transfers; seize control of the pension fund from its trustees; and, most relevant here, act "exclusively on the local government's behalf in . . . . chapter 9." *See* MCL 141.1549(2) ("Upon appointment, an emergency manager shall act for and in the place and stead of the governing body and the office of chief administrative officer of the local government."); MCL 141.1550(1) ("An emergency manager shall issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary[.]"); MCL 141.1552 (EM may amend local government budget; make

contracts; terminate CBAs; enter loan agreements; transfer property); MCL 141.1558 (EM directs bankruptcy).

90.     It is a direct violation of *Hurlbut* and *Brouwer* that the EM serves in the role of mayor and city council without being selected by Detroit.

91.     Moreover, despite the existence of detailed procedures in the Detroit Charter concerning the method of passing local laws and the interplay of authority between the local legislative and executive officers, the EM may even exercise, according to PA 436, all authority of the mayor and city council *simultaneously* "concerning the adoption, amendment, and enforcement of ordinances or resolutions of the local government" and "[t]ake any other action or exercise any power or authority of any officer, employee, department, board, commission, or other similar entity of the local government, whether elected or appointed, relating to the operation of the local government."  MCL 141.1552(1)(dd-ee).

92.     To the drafters of the current Michigan Constitution, PA 436 would appear to parody Article VII.  The provisions of Article VII directing the legislature to provide for the incorporation of cities to be governed by charters written by the cities' voters is "mandatory," and even before the 1963 Constitution – which *increased* the home rule powers of cities – it was well-established that, in executing that mandate, ""under the Constitution the legislature [does] not have the power to change the law as embodied in the charter [of a local government] without a ratifying vote of the village electors."  *Utica State Sav. Bank v. Village of Oak Park*, 279 Mich. 568, 273 N.W. 271, 274 (1937) (state statute retroactively ratifying all contracts for purchase of lands by local governments could not ratify land contract which was unlawful under local charter).  This is because "the power vested in the [local] electors by the Constitution" to amend their own charter necessarily requires that "the Legislature does not

have the power to alter or amend a [local] charter without the approval of the [local] electors." *Id.* at 577. Nor does the Legislature have the power to enter into contracts on behalf of the local government. *Id.* at 578. Yet PA 436 purports to empower Emergency Manager to assume all the powers of the local charter – including the ability to bind a city by contract for generations to come – without the core structural accountability for those powers baked into the charter in the form of local elections and separation of powers.

93.     While it cannot be denied that the state possesses a robust role in demarcating the limits within which a municipality may structure the form of its government via charter, PA 436 swallows whole the rights reserved to local electors in Article VII to execute, within limits, their own vision of local government. For instance, typically "municipal officers can bind a municipality only if they are empowered to do so by the city charter." *Manning v. City of Hazel Park*, 202 Mich. App 685, 691; 509 N.W. 2d 874 (1993). The Emergency Manager, however, possesses no such constraint under the terms of PA 436, which grants him his extreme powers "notwithstanding any charter provision to the contrary." MCL 141.1552(1). Under PA 436, therefore, the Emergency Manager not only violates the charter by purporting to act with all of the power of the entire municipal government simultaneously as a matter of procedure, but also by doing so in direct violation of any substantive limitation that charter places on the local government. In effect, each time the Emergency Manager takes an act which contravenes the City Charter – a charter which, to be clear, has not formally been repealed – he decrees an amendment to that charter. But, as discussed *supra*, Detroit's citizens have a constitutional right to be the ones to amend their own charters. Here too PA 436 egregiously violates Article VII.

94.     Article VII does not permit such a scorched earth approach to local democracy. The Emergency Manager's purported statutory authority to act for the City is antithetical to Article VII, and therefore the Emergency Manager was never authorized by state law to file the City's chapter 9 petition. As fundamentally, the "City" has therefore not *voluntarily* filed a petition under Section 301 as incorporated by Section 901(a) of the Bankruptcy Code.

**(b)     PA 436 Purports To Delegate Authority To The Emergency Manager In Excess Of That Possessed By The Legislature**

95.     Section VII is not the exclusive mechanism protecting the "home rule" rights of local electors in the Michigan Constitution. Municipalities are further protected by Article IV, Section 29, which forbids the legislature from passing a local act both (a) "in any case where a general act can be made applicable, and (b) "until approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected." "The requirement of a 2/3 vote of both houses and a majority vote in the area affected protects localities against arbitrary action." *Advisory Opinion on Constitutionality of 1975 PA 301,* 400 Mich. 270, 287, 254 N.W. 2d 528 (1977) (quoting 2 Official Record, Constitutional Convention 1961, p 2415).

96.     PA 436 allows the Emergency Manager to adopt local ordinances and take purely local legal acts which would otherwise be assigned to the local government. *See* MCL 141.1552. Before the EM takes a local act of this nature, however, neither he nor the legislature makes any determination whether a general act could accomplish the same purpose; seeks the approval of two-thirds of the legislature; or submits the proposed act to the local electors for ratification. PA 436 therefore delegates to the EM power that the legislature simply does not possess. For even assuming *arguendo* that PA 436 is a general as opposed to local law, it contemplates the future passage of limitless local ordinances without the prophylactic

mechanisms built into Artice IV, Section 29 to preserve "the settled purpose of the framers of the [Constitution] and of the people who adopted it to forever insure to the people the right to control their affairs purely local." *Attorney General v. Lacy,* 180 Mich. 329, 337, 146 N.W. 871 (1914) (striking down local law passed by legislature).

97.     The legislature cannot delegate power beyond that which it possesses.  "That the Michigan Legislature may legislate absent constitutional limitations does not mean that it may wield legislative power in a manner other than that carefully prescribed by the Michigan Constitution."  *Blank v. Dep't of Corrections,* 462 Mich. 103, 119, 611 N.W.2d 530 (2000). Yet PA 436 does just that, subjecting Detroit's citizens to purely local acts – including the instant chapter 9 petition – taken by a central authority without the protection of Article IV, Section 29.  In this case that local legislation includes not only this illegal bankruptcy, but all of the legislative acts undertaken by the Emergency Manager leading up to and in support of the chapter 9 petition, the extent and content of which will be further developed in discovery and at trial.

> **(c)      PA 436 Unconstitutionally Delegates Legislative Authority To The Emergency Manager Because It Lacks Adequate Standards To Guide The Emergency Manager's Actions In Bankruptcy, Which Are Not Subject To Judicial Review**

98.     Even assuming *arguendo* that the legislature had the authority to delegate its illegally asserted control over local self-governance, that delegation must still have included (1) "sufficient standards and safeguards" to "direct[] and check[] the exercise of delegated power," as well as (2) "due process requirements" ensuring judicial review of the delegated action. *BCBSM v. Governor,* 367 NW 2d 1, 51-52 (Mich. 1985).  PA 436 lacks both with respect to the Emergency Manager's control of the City during bankruptcy.

99.     First, PA 436 provides no standards whatsoever to the Emergency Manager –

other than any "contingencies" which the Governor, and not the legislature, may have, but did

not in this case, designated – for how to exercise the City's affairs under chapter 9.  MCL

141.1558.  Thus the Emergency Manager is unfettered, for example, to enter into settlements

resolving claims by creditors – settlements which, under Section 7-5-203 of the Detroit City

Charter, are legislative acts of the City which must be approved by the City Council – without

following any guidelines provided by the State.  While the Bankruptcy Court may apply its

own *federal law* constraints in the course of approving, or not, such settlements – though the

authority of a bankruptcy judge to do so is questionable in light of federalism principles, *see*

*infra* – there is simply no *state law* standard to refer to evaluate whether the Emergency

Manager, in entering the settlements, is effectively legislating in bankruptcy within the intent of

the legislature.  "This complete lack of standards is constitutionally impermissible." *BCBS,* 367

N.W. 2d at 55, and therefore the Emergency Manager is not authorized under state law to carry

out the Legislature's attempted delegation of authority under chapter 9.

100.     Second, and relatedly, even assuming *arguendo* that PA 436 does contain

standards constraining the absolute power of the Emergency Manager to act for the City under

chapter 9, those standards are not subject to the requisite judicial review.  As a result of the

automatic stay, the Emergency Manager's actions during chapter 9 can only be litigated to the

bankruptcy court, which itself lacks authority to decide freestanding state-law claims.  *See* 11

U.S.C. §§ 902(a), 362 (automatic stay); *Stern v. Marshall, supra* (Article I judge prohibited

from deciding independent state law claims unhinged from bankruptcy).  But the City can

arguably enter into settlements with creditors under chapter 9 *without* receiving approval from

the Bankruptcy Judge, even if a competing creditor requests judicial review.  *See In re City of*

*Stockton, California,* Case No. 12-32118-C-9 (Bankr. E.D. Cal. Feb. 5, 2012) ("11 U.S.C. §

904 gives a chapter 9 debtor freedom to decide whether to ignore or to follow Rule 9019

compromise-approval procedure[.]").  The Emergency Manager thus acts in a legal vacuum,

accountable neither in state court nor federal court for exercising the legislative power

delegated to him by the State.  The Michigan Constitution does not permit such insulation.

**B.      The City Failed To Participate In Any Good Faith Negotiations With
          Creditors Prior To Filing For Bankruptcy As Required For Eligibility
          Under Chapter 9**

101.     The City cannot meet its burden under section 109(c)(5) of the Bankruptcy Code

of proving that it conducted good faith negotiations with its creditors or that such negotiations

were impracticable.

102.     Congress enacted the "negotiation" requirement of section 109(c) to prevent

capricious filings of chapter 9 petitions, and Courts do not "view lightly the negotiation

requirements of 11 U.S.C. § 109(c)(5)."  *See In re Villages at Castle Rock Metro. Dist. No. 4,*

145 B.R. 76, 85 (Bankr. D. Colo. 1990); *In re Town of Westlake, Tex.,* 211 B.R. 860, 867-68

(Bankr. N.D. Tex. 1997) (suggesting that section 109(c)(5) requires that a municipality have an

intent to negotiate with creditors it intends to impair).  "The 'creditor protection' provided by

section 109(c)(5). . .  insures that the creditors have an opportunity to negotiate concerning a

plan on a level playing filed with the debtor before their rights are further impaired by the

provisions of section 362 of the Code."  *Sullivan County,* 165 B.R. at 78-79).

103.     In *Cottonwood Water,* the Court explained the good faith negotiation

requirement under section 109(c)(5) of the Bankruptcy Code as follows:

>      Congress consciously sought to limit accessibility to the bankruptcy court by
> municipalities [by requiring] . . . the municipal entity, before rushing to . . .
> Court, to first seek to negotiate in good faith concerning the treatment the
> creditors may be expected to receive under a plan to be filed under section

941 of the [Bankruptcy] Code. . . . The 'creditor protection' provided by section 109(c)(5) . . . insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired by the provisions of section 362 of the [Bankruptcy] Code.

138 B.R. at 979.

104.    Accordingly, the burden is on the City to demonstrate (i) that it engaged in good faith negotiations with its creditors concerning the possible terms of a plan or (ii) why it was unable to engage in such negotiations.  ASFSCME respectfully submits that the City cannot demonstrate any negotiations with creditors such as AFSCME, let alone "good faith" negotiations, and further given that the City conducted no pre-petition negotiations with significant creditors such as AFSCME, the City should not be heard to argue that negotiations were impracticable.

(i)    **The City Failed To Negotiate With Creditors Such As AFSCME**

105.    The City claims it satisfies the section 109(c)(5)(B) requirement for negotiating with its creditors prior to the bankruptcy filing by negotiating with creditors, including unions such as AFSCME, via several meetings held with its unions where the City discussed its restructuring proposals and took certain questions.  *See* Eligiblity Brief, pp. 53-61(citing, *inter alia*, Orr Declaration, ¶¶ 90-96).   What the City fails to mention is that, as discussed extensively above and as indicated by Orr himself prior to the scheduling of these meetings, it was made clear throughout these series of 3 or 4 relatively short meetings that the meetings were "discussions" and the City was not willing to conduct **any** negotiations.  The City has argued that the EM "openly invited the City's creditors to contact the City and its advisors to begin negotiations."  Eligiblity Brief, p. 55.  In fact, the City rebuffed negotiations, which require concessions from both sides and collaboration between the debtor and its significant

creditors. The City (acting through Orr) simply was not interested in negotiations (and as Orr indicated regarding the Restructuring Plan, "[t]his isn't a plebiscite, we are not, like, negotiating the terms of the plan").

106.    *In re Ellicott School Building Authority* is directly on point. There, the debtor held three public meetings with large creditors regarding its proposed restructuring, although creditors were advised that the economic provisions of the proposed plan were not negotiable. 150 B.R. 261, 266 (Bankr. D. Colo. 1992). The court held that even though the debtor conducted three public meetings explaining its proposed plan of restructuring to bondholders, it did not negotiate in good faith because it indicated that the economic terms of its proposed plan were non-negotiable. *Id.* (debtor must be open to negotiating the substantive terms of a proposed plan); *cf. Int'l Ass'n of Firefightes, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 289 (9th Cir. B.A.P. 2009) (finding that the city did not satisfy section 109(c)(5)(B) because it "never negotiated with Unions or any of its creditors over the possible terms of a plan of adjustment."); *Sullivan County*, 165 B.R. at 78-79 ("The 'creditor protection' provided by section 109(c)(5) . . . insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired . . . ." (citation omitted)).

107.    The City's a "take it or leave it" Restructuring Plan proposal that was not really open to any negotiations (good faith or otherwise) should be rejected as the court did in *Ellicott School*. The City failed to engage in **any** negotiations with its significant creditors such as AFSCME regarding the Restructuring Plan. Flatly refusing to conduct any negotiations (despite repeated requests by AFSCME both prior to and subsequent to the City's bankruptcy filing) falls far short of the standard required under section 109(c)(5) of the Bankruptcy Code.

108.   The City has publicly proclaimed its willingness to negotiate, yet it and its representatives' (i) statements that the meetings held to discuss the Restructuring Proposal were not negotiations and (ii) continued bad faith refusal postpetition to hold negotiations (despite requests from AFSCME to jump start negotiations) makes it more than clear that the City has conducted no good faith negotiations with AFSCME and similarly situated creditors.

(a)   **Even Assuming That The City Engaged In Negotiations, Such Negotiations Did Not Relate To A Plan That Is In The Best Interests Of Creditors As Required By Section 109(c)(5)(B)**

109.   While AFSCME submits that the City did not engage in any good faith negotiations with creditors such as AFSCME prior to the City's chapter 9 filing, even assuming this Court were to find otherwise, the City also has not satisfied section 109(c)(5)(B) of the Bankruptcy Code because the plan or terms of a plan being negotiated must be a plan that can be effectuated in chapter 9. *See Sullivan County*, 165 B.R. at 78 (debtor failed to meet burden of showing that it negotiated in good faith because the plan that was proposed was not a plan that could be effectuated in chapter 9); *Cottonwood Water*., 138 B.R. at 979 (finding that "in order for this Debtor to be entitled to the entry of an order for relief, it must be prepared to show that it engaged in good faith negotiations with its creditors concerning the possible terms of a plan to be effected pursuant to section 941 of the Bankruptcy Code.").

110.   Here, the proposed Restructuring Plan is patently unconfirmable because the plan seeks to unconstitutionally wipe out guaranteed vested pension benefits pursuant to a plan that would presumably be crammed down on creditors, including those City retirees and employees that participate in the various pension and other retirement benefit plans.  Given that creditors owed pension obligations have absolute rights to such obligations under Michigan law as set forth extensively above, and one of the main goals of this proceeding is to modify vested

pension and other retiree benefits, the City has no ability to confirm any plan of adjustment modifying such rights.  *See* 11 U.S.C. §943(b)(4) (stating that the Court shall confirm a chapter 9 plan only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan.").

111.    Additionally, the Restructuring Plan is not in the "best interests of creditors" and thus could not be confirmed pursuant to section 943(b)(7) of the Bankruptcy Code.  The "best interests of creditors" test in the context of a chapter 9 case does not compare treatment under a plan of liquidation, but rather to other alternatives to creditors to the plan.  *See, e.g., In re Sanitary & Improvement Dist., #7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989); ("Section 943(b)(7) [with respect to the best interest of creditor's provision] ... simply requires the court to make a determination of whether or not the plan as proposed is better than the alternatives."); *In re Mount Carbon Metropolitan Dist.*, 242 B.R. 18, 34 n.50 (Bankr. D. Colo. 1999) ("The 'best interest' requirement of § 943(b)(7) is generally regarded as requiring that a proposed plan provide a better alternative for creditors than what they already have.") (citing 4 Collier on Bankruptcy, 943.03[7] (Lawrence P. King, ed., 15th ed.1999)).

112.    Had there been no chapter 9 filing by the City, pension creditors could not be impaired under the Michigan Constitution, and thus any impairment of such rights under a plan would violate Michigan law and be patently non-confirmable.  Accordingly, because the Restructuring Proposal proposes to unconstitutionally wipe out guaranteed vested pension benefits, the proposal cannot satisfy the requirements of good faith negotiations over a plan that could be effectuated in chapter 9.

113.    Orr failed to consider before filing for bankruptcy protection or since the filing, an equitable argument for the pension fund beneficiaries that creditors extending debt after

funding concerns surfaced should be subject to equitable subordination/fraudulent conveyance under Bankruptcy Code sections 510(c) and 544(b)/548(a).

114.    Further, under Bankruptcy Code section 928(b), Orr should be exploring whether certain other creditors should bear the burden of some of the City's operating expenses during bankruptcy process, before benefit cuts are implemented.

>   **(ii)    Negotiations With Certain Categories Of Creditors Such As AFSCME Were Not Impracticable**

115.    The City alleges that it alternatively qualifies for eligibility under section 109(c)(5)(C) of the Bankruptcy Code because negotiations were impracticable.

116.    As with the other eligibility requirements, the burden of proving impracticability rests with the City.  *See In re Pierce County Housing Authority,* 414 B.R. 702, 713 (Bankr. W.D. Wash. 2009); *Vallejo*, 408 B.R. at 289 (citing *Valley Health*, 383 B.R. at 161).  Courts considering section 109(c)(5)(C) define the ordinary meaning of "impracticable" as "'not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible.'"  *See, e.g.*, *Vallejo*, 408 B.R. at 298 (citing Valley *Health*, 383 B.R. at 163).  Whether negotiations were impracticable is fact specific and depends upon the circumstances of the case.  *See Vallejo*, 408 B.R. at 298.

117.    The City alleges that negotiations were impracticable because, in part, the City had (i) numerous series of bonds and indebtedness held by multiple holders and (ii) approximately 20,000 retirees not represented by any formal agent or committee and other potential involuntary creditors.  Furthermore, the City claims that the refusal of certain creditor constituencies to engage in good faith negotiations rendered negotiations impracticable.

118.    In fact, AFSCME believes that the exact opposite is true here.  The City predetermined that its pre-bankruptcy negotiations (which, as discussed above, were not

negotiations) would fail.  As discussed extensively above, the Governor and his staff plotted for several months prior to the hiring of Orr as EM to bring in Orr, as an experienced bankruptcy counsel, to lead the City on a clear path towards a chapter 9 filing, and any negotiations were a façade – the City went through the motions of pre-petition meetings but, as is evident from its pre-petition conduct *vis a vis* AFSCME, never had any intention of negotiating outside of bankruptcy.

119.    While the City alleges that it has over 100,000 creditors, it is clear that the main creditors the City had to negotiate with were the unions, its retirees, and the bond trustees.

120.    The City itself has in the past negotiated for retiree health benefits and pension benefits outside of a chapter 9 proceeding.  It is a red herring to say that negotiating medical benefits or pensions is impractical *per se*.

121.    While courts have made clear that impracticability can be demonstrated by the volume of creditors to negotiate with, in no case AFSCME is aware of did a court find that negotiations were impracticable where the Debtor did not even attempt to negotiate pre-petition with its largest creditors such as AFSCME (and after repeated requests to do so).  In *Ellicott School*, the court determined that the debtor holding "public meetings to which all bondholders were invited" showed that negotiations were practicable.

122.    AFSCME is not suggesting that pre-petition negotiations could have bound everyone or must have involved all of the City's thousands of creditors.  Rather, some level of negotiation with principal creditors could have led the City to a non-bankruptcy solution.  By

way of analogy, section 109(c)(5)(B) of the Bankruptcy Code contemplates pre-bankruptcy negotiations with creditors that municipality intends to impair, not all creditors.[9]

123.    Given the City's lack of negotiations with creditors such as AFSCME and similar union representatives that could have negotiated regarding the largest portion of the City's unsecured debt, the City's arguments that negotiations were impracticable should be rejected.

**C.    The City's Petition Should Be Dismissed Under Section 921(c) As Filed In Bad Faith**

124.    The City's bankruptcy petition is subject to dismissal pursuant to section 921(c) of the Bankruptcy Code because the filing was in bad faith.  Section 921(c) of the Bankruptcy Code provides that "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title."

125.    "Good faith is not defined in the Bankruptcy Code."  *In re McCurtain Mun. Auth.*, No. 07-80363, 2007 WL 4287604, at *4 (Bankr. E.D. Okla. Dec. 4, 2007).  Courts have determined, however, that the primary function of the good faith requirement in chapter 9 is to "ensure the integrity of the reorganization process by limiting access to its protection to those situations for which it was intended."  *Sullivan County*, 165 B.R. at 80 (citation omitted); *see also In re City of Stockton, California*, 493 B.R. 772, 794 (Bankr. E.D. Cal. 2013) ("Section 921(c) "good faith" serves a policy objective of assuring that the chapter 9 process is being used in a manner consistent with the reorganization purposes of the Bankruptcy Code"); *Villages at Castle Rock*, 145 B.R. at 81 (describing good faith as requirement that "prevents

---

[9] Importantly, the City describes in the Orr Declaration that of the City has nearly $12 billion in unsecured debt, but 75% of that (approximately $9.2 billion) relates to underlined accounting liabilities for post-employment benefit or underfunded pension liabilities.

abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes") (internal quotation marks and citation omitted).

126.    While good faith in the chapter 9 context is not defined in the Bankruptcy Code, courts have looked to discussions of good faith in the chapter 11 context to determine whether a chapter 9 petition has been filed in good faith. *McCurtain Mun. Auth.*, 2007 WL 4287604, at *4 (referencing chapter 11 good faith standards to determine whether chapter 9 petition was filed in good faith) (quoting *Villages at Castle Rock*, 145 B.R. at 81); *County of Orange*, 183 B.R. at 608 (observing that "courts have ... applied to chapter 9 cases the judicial reasoning that developed in chapter 11 cases" regarding good faith); *Sullivan County*, 165 B.R. at 82 (examining and applying chapter 11 good faith requirements to chapter 9 petition)).

127.    In the chapter 11 context, courts have explained that the requirement of good faith

> prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes.  Moreover, a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons . . .  available only to those debtors and creditors with 'clean hands.'

*In re Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986).

128.    Relevant considerations regarding good faith under chapter 9 include "whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing are consistent with chapter 9, the extent of the City's pre-petition efforts to address the issues, the extent that alternatives to chapter 9 were considered, and whether the City's residents would be prejudiced by denying chapter 9 relief." *Stockton*, 493 B.R. at 794.

129. Here, a review of the various relevant factors considered by courts when analyzing good faith under section 921(c) lead to the inescapable conclusion that the City's chapter 9 case was filed in bad faith and with unclean hands.

130. First, the City's filing came several minutes prior to a Michigan State Court issuing a TRO enjoining the Governor from authorizing the filing. The State lawyers at the hearing on the TRO asked for a short delay when they realized that an adverse ruling was forthcoming with respect to the City's ability to authorize any chapter 9 authorization which did not proscribe the reduction of pension benefits violated the Michigan constitution. During that recess, the City filed for chapter 9 protection. Thus, the City commenced this proceeding "in the dark of night" to avoid a ruling it viewed as not in its favor. Such a filing is the antithesis of the careful, deliberative decision to file required under chapter 9, as "[t]he legislative history indicates that the strict hurdles to filing Chapter 9 were implemented to ensure that it was considered by a municipality only as a last resort." *Pierce County*, 414 B.R. at 714 (citation omitted) (noting debtor decided to file a chapter 9 petition only after several years of failed negotiations and attempts at mediation); *cf. Valleo*, 408 B.R. at 295 ("The evidence needs to show that the 'purpose of the filing of the chapter 9 petition not simply be to buy time or evade creditors.'"). The City simply filed to evade what it viewed as an imminent negative state court ruling. The City simply does not have "clean hands".

131. Additionally, as discussed extensively above, the City did not reasonably consider any alternatives to chapter 9, was preparing for a chapter 9 filing months before any creditor meetings to discuss restructuring options even started, and refused to negotiate with major creditors such as AFSCME as required. Simply put, the predetermined filing was done in bad faith and should be dismissed.

**D.** **AFSCME Reserves The Right To Argue, Following Discovery, That The City Is Solvent**

132. The Bankruptcy Code does not offer relief to a city simply because it is suffering economic difficulties. *See, e.g.*, *In re City of Bridgeport*, 129 B.R. 332, 339 (Bankr. D. Conn. 1991) (although City projected $16 million budget deficit, it was not insolvent, and "financial difficulties short of insolvency are not a basis for chapter 9 relief"); *In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1386 (10th Cir. 1998) (debtor not eligible for relief simply because it was severely economically distressed).

133. In order to carry its burden on insolvency, the City must prove either that it is "(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C). The test under the first prong requires current non-payment of obligations, but the test under the second prong is prospective, looking to the debtor's future inability to pay. *Bridgeport*, 129 B.R. at 336-37. Solvency is measured as of the petition date. *See, e.g., In re Town of Westlake, Texas*, 211 B.R. 860, 866 (Bankr. N.D. Tex. 1997) (citing cases).

134. The purposeful refusal to make a few payments comprising a relatively small part of the City's budget does not satisfy the definition of "insolvent" under 11 U.S.C. § 101(32)(C)(i). *See, e.g., Uecker & Assocs. v. Tenet Healthsystem Hosps., Inc. (In re West Contra Costa Healthcare Dist.)*, No. 06-41774 T, 2010 Bankr. LEXIS 994, at *8 (Bankr. N.D. Cal. Mar. 26, 2010) (failure to pay $1.3 million out of $10-$11 million total operating expenses did not mean the debtor was "generally not paying its debts")

135. While the City alleges that it was forced to suspend certain payments to "conserve its dwindling cash", such allegations are highly factual and need to be further probed through proper discovery.

136.    Furthermore, the City has not demonstrated it was unable to pay its debts as they came due as of the petition date under 11 U.S.C. § 101(32)(C)(ii) for several reasons.

137.    First, the City "deliberately budget[ed and] spen[t] itself into insolvency (so as to qualify under § 101(32)(C)(ii)), when other realistic avenues and scenarios [were] possible." *Town of Westlake*, 211 B.R. at 867.  Second, "[t]he mere fact that a municipality has adopted a budget that reflects a cash flow shortfall is not independently sufficient to meet the requirement of the 'unable to pay' test."  COLLIER ON BANKRUPTCY ¶ 900.02[2][c][i] (16th ed. 2011). Such a budget "must be evaluated in light of past and current practices, the practices of similar municipalities, and the extant facts and circumstances." Id.

138.    Here, the City's past and current practices, as well as current facts and circumstances, not only show that the City has many available (but unexplored) options to enable it to pay its debts as they become due, but also that the City simply may have less than a reliable handle on its finances.  Thus, the information provided in the City's current budget may (upon completing of proper discovery) be "insufficient credible proof" of insolvency. *Town of Westlake*, 211 B.R. at 867; *see also Bridgeport*, 129 B.R. at 338  (requiring concrete proof "that [the city] will be unable to pay its debts as they become due in its current fiscal year or, based on an adopted budget, in its next fiscal year" and noting that "[o]bviously, it is necessary for cities to make informed financial projections").

139.    The City's current financial difficulties currently are actually less severe than in some prior years, and AFSCME preliminarily believes (subject to discovery) that there may be numerous other available means to solve the City's current financial difficulties and generate sufficient funds to pay its debts coming due in the coming fiscal year.  These include enhancing revenues by aggressively collecting obligations owed, aggressively pursuing repayment of

millions of dollars in loans owed to the general fund (including through the hiring of more employees in the City's collections area), and taking further steps to reduce costs. AFSCME recognizes that all parties (including current and former employees) will be required to sacrifice, but reasonable concessions from all significant creditors would easily bring the City closer to stability.

140. Given the highly fact intensive inquiry related to insolvency and the lack of any discovery available on these issues to AFSCME, AFSCME reserves the right to make additional arguments about the City's insolvency (or lack thereof) pending the completion of discovery.

## CONCLUSION

For the reasons set forth herein, AFSCME respectfully requests that this Court issue an order dismissing the City's chapter 9 petition and granting such other and further relief as is just and proper under the circumstances.

Dated: August 19, 2013

LOWENSTEIN SANDLER LLP
By: /s/ *Sharon L. Levine*
Sharon L. Levine, Esq.
Wojciech F. Jung, Esq.
Philip J. Gross, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-6247 (Facsimile)
slevine@lowenstein.com
wjung@lowenstein.com
pgross@lowenstein.com

-and-

Herbert A. Sanders, Esq.
THE SANDERS LAW FIRM PC
615 Griswold St., Suite 913
Detroit, MI 48226
(313) 962-0099 (Telephone)
(313) 962-0044 (Facsimile)
hsanders@miafscme.org

-and-

Richard G. Mack, Jr., Esq.
Miller Cohen, P.L.C.
600 West Lafayette Boulevard
4th Floor
Detroit, MI 48226-3191

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub-Chapter 98, City of Detroit Retirees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ii

PRELIMINARY STATEMENT ................................................................................. 2

RELEVANT BACKGROUND ................................................................................. 6

    A.    The Webster Litigation ............................................................. 7

    B.    The City's Pre-petition Machinations And Subsequent Meetings (But Not Negotiations) With Creditors Such As AFSCME ................................................................. 10

        (i)    The City's Bankruptcy Was Discussed Prior To The EM Was Even Hired ........................................... 10

        (ii)    No Good Faith Negotiations Took Place Following The Appointment Of The EM With Parties Such As AFSCME Prior To The City's Chapter 9 Filing ............................................. 12

        (iii)    The City's Bad Faith Refusal To Negotiate With Unions Such As AFSCME Has Continued Following The City's Bankruptcy Filing ..................................... 14

ARGUMENT ................................................................................................ 15

I.    THE CITY'S PETITION VIOLATES THE UNITED STATES CONSTITUTION ................................................................. 15

    A.    CHAPTER 9 VIOLATES THE FEDERAL STRUCTURE OF GOVERNMENT ........................................... 15

        (i)    A Federal Municipal Bankruptcy Statute Is No Longer Necessary To Accomplish An Adjustment Of Municipal Debts ....................................... 18

        (ii)    The Supreme Court's Development Of Constitutional Federalism Doctrine Has Effectively Overruled Bekins ....................................... 18

B.  AFSCME'S ACTIVE AND RETIRED MEMBERS HAVE INDIVIDUAL STANDING TO ASSERT THAT CHAPTER 9 VIOLATES THEIR INDIVIDUAL RIGHTS TO A FEDERAL SYSTEM OF GOVERNMENT ......................................................................... 27

C.  THIS COURT LACKS JURISDICTION TO DECIDE WHETHER CHAPTER 9 VIOLATES THE UNITED STATES CONSTITUTION ..................................... 29

II.  THE CITY IS NOT ELIGIBLE TO FILE FOR CHAPTER 9 PROTECTION UNDER SECTION 109(C) OF THE BANKRUPTCY CODE .......................................................................................................... 31

A.  The City Is Not Authorized By Michigan State Law To Be A Debtor Under Chapter 9 ................................... 32

(i)  Governor Snyder's Authorization Of The City's Petition Under Section 18 Of PA 436 Violated Article IX, Section 24 Of The Michigan State Constitution ................................................. 33

(ii)  PA 436 Violates The Strong Home Rule Provisions Of The Michigan Constitution .................................... 38

B.  The City Failed To Participate In Any Good Faith Negotiations With Creditors Prior To Filing For Bankruptcy As Required For Eligibility Under Chapter 9 ....................... 46

(i)  The City Failed To Negotiate With Creditors Such As AFSCME ................................................. 47

(ii)  Negotiations With Certain Categories Of Creditors Such As AFSCME Were Not Impracticable ................................. 51

C.  The City's Petition Should Be Dismissed Under Section 921(c) As Filed In Bad Faith ..................................... 53

D.  AFSCME Reserves The Right To Argue, Following Discovery, That The City Is Solvent ........................................ 56

CONCLUSION ........................................................................................................ 59

TABLE

# TABLE OF AUTHORITIES

**Pages**

<small>CASES</small>

*Advisory Opinion re Constitutionality of*
    *1972 PA 258,* 389 Mich. 659 (1973) ........................................................................34

*AFT Michigan v. State,*
    297 Mich. App. 595, 825 N.W.2d 595 (2012) ................................................17, 35

*In re Alabama State Fair Authority,*
    232 B.R. 252 (N.D. Ala. 1999) .................................................................................23

*Alden v. Maine,*
    527 U.S. 706 (1999) ...........................................................................19, 24, 25

*APTE v. Detroit,*
    154 Mich. App. 440, 398 N.W.2d 436 (1986) ........................................................34

*Ashton v. Cameron County Water Improvement Dist. No. 1,*
    298 U.S. 513 (1936) ...........................................................................17, 18, 19, 27

*Attorney General v. Lacy,*
    180 Mich. 329, 146 N.W. 871 (1914) ......................................................................44

*BCBSM v. Governor,*
    367 NW 2d 1 (Mich. 1985) .......................................................................................45

*BCBSM v. Governor,*
    422 Mich. 1, 367 N.W.2d 1 (1985) .............................................................35, 39, 45

*Bivens v. Grand Rapids,*
    443 Mich. 391 (1993) ...............................................................................................39

*Blank v. Dep't of Corrections,*
    462 Mich. 103, 611 N.W.2d 530 (2000) ..................................................................44

*Bond v. United States,*
    131 S. Ct. 2355 (2011) ......................................................................................passim

*Brouwer v. Bronkema,*
    377 Mich. 616, 141 N.W.2d 98 (1966) ......................................................39, 40, 41

*Buckley v. Valeo,*
    424 U.S. 1 (1976) .....................................................................................................26

*In re City of Bridgeport,*
  129 B.R. 332 (Bankr. D. Conn. 1991) ................................................................56, 57

*In re City of Harrisburg, PA,*
  465 B.R. 744 (Bankr. M.D. Pa. 2011) ......................................................................33

*In re City of Stockton*,
  475 B.R. 720 (Bankr. E.D. Cal. 2012) ....................................................................32

*In re City of Stockton, California,*
  493 B.R. 772 (Bankr. E.D. Cal. 2013) ..............................................................53, 55

*In re City of Stockton, California,*
  Case No. 12-32118-C-9 (Bankr. E.D. Cal. Feb. 5, 2012) ......................................46

*Clinton v. New York,*
  524 U.S. 417 (1998) ................................................................................................36

*In re Cottonwood Water and Sanitation Dist.,*
  138 B.R. 973 (Bankr. D. Colo. 1992) ........................................................32, 47, 50

*In re County of Orange*,
  183 B.R. 594 (Bankr. C.D. Cal. 1995) ..............................................................32, 54

*In re County of Orange,*
  191 B.R. 1005 (Bankr. C.D. Cal. 1996) ..................................................................23

*Detroit Police Officers Ass'n v. Detroit,*
  391 Mich. 44, 214 N.W.2d 803 (1974) ...................................................................34

*In re Ellicott School Building Authority,*
  150 B.R. 261, 266 (Bankr. D. Colo. 1992) ..............................................................48

*Faitoute Iron & Steel Co. v. City of Asbury Park,*
  316 U.S. 502 (1942) ..........................................................................18, 21, 26, 29

*Granfinanciera, S.A. v. Nordberg,*
  492 (U.S. 33) (1989) ........................................................................................30, 31

*Gregory v. Ashcroft,*
  501 U.S. 452 ............................................................................................................22

*In re Hamilton Creek Metro. Dist.,*
  143 F.3d 1381 (10th Cir. 1998) ...............................................................................56

*Hanover Nat'l Bank v. Moyses,*
  186 U.S. 181 (1902) ................................................................................................25

-iv-

*INS v. Chadha,*
  462 U.S. 919 (1983) ...................................................................................27

*Int'l Ass'n of Firefightes, Local 1186 v. City of Vallejo (In re City of Vallejo),*
  408 B.R. 280 (9th Cir. B.A.P. 2009) ..........................................48, 51, 55

*Lansing School Educ. Ass'n v Lansing Bd. of Educ.,*
  487 Mich. 349...............................................................................................38

*re. Le Roy v. Hurlbut,*
  24 Mich. 44 (1871) ...........................................................................39, 40, 41

*In re Little Creek Dev. Co.,*
  779 F.2d 1068 (5th Cir. 1986) ....................................................................54

*Manning v. City of Hazel Park,*
  202 Mich. App 685 ......................................................................................43

*In re McCurtain Municipal Authority,*
  2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4, 2007).................33, 53, 54

*In re Mount Carbon Metropolitan Dist.,*
  242 B.R. 18 (Bankr. D. Colo. 1999)...........................................................51

*Nat. Fed'n of Indep. Business v. Sibelius,*
  132 S. Ct. 2566 (2012) (Roberts, C.J.) ......................................................21

*New York v. United States,*
  505 U.S. 144 (1992) ............................................................................passim

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,*
  458 U.S. 50 (1982) ......................................................................................30

*In re Pierce County Housing Authority,*
  414 B.R. 702 (Bankr. W.D. Wash. 2009)............................................51, 55

*Printz v. United States,*
  521 U.S.898, 531 n. 15 (1997) ...................................................................17

*In re Sanitary & Improvement Dist., #7,*
  98 B.R. 970 (Bankr. D. Neb. 1989)............................................................50

*Seitz v. Probate Judges Retirement System,*
  189 Mich. App. 445, 474 N.W. 2d 125 (1991) .....................................34, 38

*South Dakota v. Dole,*
  483 U.S. 203 (1987) (Rehnquist, C.J.) ......................................................26

*Stern v. Marshall,*
  131 S. Ct. 2594, 2609 (2011) .......................................................................... 3, 30

*In re Sullivan County Regional Refuse Disposal Dist.,*
  165 B.R. 60 (Bankr. D.N.H. 1994)....................................................................passim

*Taxpayers of Michigan Against Casinos v. State,*
  478 Mich. 99 (2007) ..................................................................................... 36, 38

*In re Town of Westlake, Tex.,*
  211 B.R. 860 (Bankr. N.D. Tex. 1997) .......................................................47, 56, 57

*U. S. Term Limits, Inc. v. Thornton,*
  514 U. S. 779 (1995) ............................................................................................ 20

*Uecker & Assocs. v. Tenet Healthsystem Hosps., Inc. (In re West Contra Costa*
  *Healthcare Dist.),*
  No. 06-41774 T, 2010 Bankr. LEXIS 994, at *8 (Bankr. N.D. Cal. Mar. 26, 2010) .............56

*United States Trust Co. of N.Y. v. New Jersey,*
  431 U.S. 1 (1977) ................................................................................................ 18

*United States v. Bekins,*
  304 U.S. 27 (1938) .................................................................................... 18, 19, 27

*United States v. Lopez,*
  514 U.S. 549 (1995) .................................................................................. 21, 22, 29

*United States v. Morrison,*
  529 U.S. 598 (2000) ............................................................................................ 21

*Utica State Sav. Bank v. Village of Oak Park,*
  279 Mich. 568, 273 N.W. 271 (1937) ................................................................... 42

*In re Valley Health Sys.,*
  383 B.R. 156 (Bankr. C.D. Cal. 2008) .............................................................. 32, 51

*In re Villages at Castle Rock Metro. Dist. No. 4,*
  145 B.R. 76 (Bankr. D. Colo. 1990).............................................................. 47, 54

*Webster v. State of Mich.,*
  No. 13-734-CZ (Ingham County Cir. Ct. July 3, 2013) .......................................... 7

**STATUTES**

11 U.S.C. § 101(32)(C) .......................................................................................... 56

11 U.S.C. § 101(32)(C)(i)........................................................................................ 56

11 U.S.C. § 101(32)(C)(ii) ...........................................................................................57

11 U.S.C. § 901(a) ...............................................................................................24, 43

11 U.S.C. §§ 902(a), 362 ...........................................................................................46

11 U.S.C. § 904 ...........................................................................................................46

11 U.S.C. § 926(b) ......................................................................................................23

11 U.S.C. § 943 ...........................................................................................................37

11 U.S.C. § 943(b)(4) ...........................................................................................37, 50

*section 109(c) of the Bankruptcy Code* ..........................................................1, 2, 32, 46

section 109(c)(2) of the Bankruptcy Code ..........................................................4, 32, 35

section 109(c)(3) of the Bankruptcy Code ................................................................5, 32

section 109(c)(5) of the Bankruptcy Code ............................................................passim

section 109(c)(5)(B) of the Bankruptcy Code ..................................................48, 49, 53

section 109(c)(5)(C) of the Bankruptcy Code ...........................................................51

sections 109(c) and 921(c) of the Bankruptcy Code ...................................................4

section 365 of the Bankruptcy Code .........................................................................5

section 503 of the Bankrutcy Code ..........................................................................24

section 507(a)(2) of the Bankrucy Code ...................................................................24

section 921(c) of the Bankruptcy Code ................................................5, 33, 53, 55

section 929 of the Bankruptcy Code .........................................................................23

section 941 of the Bankruptcy Code ..................................................................50, 47

section 943(b)(7) of the Bankruptcy Code .........................................................50, 51

section 362 of the Code ............................................................................................47

Loc. Gov't L. 29, 32 (2002) .......................................................................................26

MCL 141.1549(2) .......................................................................................................41

MCL 141.1550(1) .......................................................................................................41

MCL 141.1551(1)(d) ..................................................................................................36

MCL 141.1552 ....................................................................................................41, 44

MCL 141.1552(1)...............................................................................................43

MCL 141.1552(1)(dd-ee) ..................................................................................42

MCL 141.1552(i)(m)(ii) .....................................................................................36

MCL 141.1553 ..................................................................................................37

MCL 141.1558 .....................................................................................25, 33, 41, 45

Second, Michigan Public Act 436 of 2012, the Local Financial Stability and Choice
  Act, MCL § 141.1541, *et seq.* .........................................................................2

## REGULATIONS

*Advisory Opinion on Constitutionality of 1975 PA 301,* 400 Mich. 270, 287, 254 N.W.
  2d 528 (1977) ..................................................................................................44

## OTHER AUTHORITIES

Annerose Tashiro, *Sovereign Insolvency,*99 Eur. Law. 5 (2010) ................................26

David J. Barron, *The Promise of Cooley's City: Traces of Local Constitutionalism*, 147
  Univ. Penn L. Rev. 487 (1999)...........................................................................40

Section 7-5-203 of the Detroit City Charter ..................................................................45

Detroit Free Press (June 16, 2013), *available at*
  http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-detroit-
  emergency-manager-creditors-fiscal-crisis. ..........................................................6

Janie Anderson Castle, *The People's Mayor for London?,* 5 J. Loc. Gov't L. 29, 32
  (2002) ...............................................................................................................26

Kate Long, *Who is representing Detroit?*
  http://blogs.reuters.com/muniland/2013/07/25/who-is-representing-detroit/.........................12

Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was
  hired, e-mails show,*
  http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-
  bankruptcy-emails ...............................................................................................11, 12

May 12, 2013,*available at* http://detroit.cbslocal.com/2013/05/12/kevin-orr-releases-
  financial-plan-for-city-of-detroit/.........................................................................2, 13