# EXHIBIT A-1 (Part 1)

STATE OF MICHIGAN
DEPARTMENT OF LABOR & ECONOMIC GROWTH
MICHIGAN EMPLOYMENT RELATIONS COMMISSION
ACT 312, PUBLIC ACTS OF 1969 AS AMENDED

*In the Matter of:*

CITY OF DETROIT

-and-                                                    MERC Case No. D12 D-0354

DETROIT POLICE OFFICERS
ASSOCIATION

## PANEL'S FINDINGS, OPINION AND ORDERS

**George T. Roumell, Jr., Chairman**
**Craig Schwartz, Esq., Employer (City) Designee**
**Theodore Iorio, Esq., Union (DPOA) Designee**

APPEARANCES:

FOR THE CITY OF DETROIT:          FOR DETROIT POLICE OFFICERS
                                  ASSOCIATION:

Malcolm D. Brown, Attorney        Donato Iorio, Attorney

### Prologue

This Act 312 proceeding between the Detroit Police Officers Association (DPOA), who

represents approximately 2,000 Police Officers in the City of Detroit, and the City of Detroit

(City), began with the filing of an Act 312 Petition by the DPOA on June 22, 2012. After legal

and political issues concerning P.A. 4 and the duty to bargain were resolved, the Chairman was

appointed as the Arbitrator in this matter on August 23, 2012. After numerous meetings with the

Chairman, Last Best Offers were exchanged by the parties on October 3, 2012. Opening

statements were made by the parties on November 5, 2012 and hearings were held on November

16, 19 and 29, 2012, December 12, 13, 18, 2012 and on January 8, 11 and 12, 2013.

Following the City's presentation on financial ability, the DPOA presented John Bibish, along with comments of its attorney, Donato Iorio, concerning the City's financial ability at the January 12, 2013 hearing. In order to expedite the proceedings, the Chairman, with the consent of the Panel Members, in lieu of scheduling a subsequent hearing date, stated that the City should file a written response to the DPOA's January 12, 2013 financial ability presentation, which the City did on February 1, 2013, and amplified its response in its post-hearing brief.

The Chairman, pursuant to the request of the DPOA, made an Interim Award on most aspects of the health care issues and the parties filed briefs on the remaining issues on January 25, 2013. A decision on the remaining health care issues is still pending before the Chairman. After the Chairman makes a ruling on the remaining health care issues, the parties are to submit their final health care contract language to the Chairman and a meeting or telephone conference will be held regarding the contract language.

Post-hearing briefs were filed by the parties on all non-health care issues with the last brief being filed February 15, 2013.

Between the issues presented by the City and the DPOA, there are 146 issues in dispute. The issues will be listed when discussed by the Panel rather than separately at this point.

This is the Findings, Opinion and Award pursuant to Act 312 of Public Acts of 1969, as amended, based on the Petition filed by the Detroit Police Officers Association. Subsequent to the June 30, 2012 expiration of the Master Agreement between the City of Detroit and the Detroit Police Officers Association, on July 18, 2012 the City instituted the City Employment Terms (CET) with the Detroit Police Officers Association essentially stripping the previous terms of the expired Master Agreement, which represented 40 years of negotiations.

In doing so, even though apparently the City was acting pursuant to Public Act 4 of

2

Public Acts of 2011 and the Consent Agreement with the State, no attempt was made after March 2012 to negotiate even though the City had previously negotiated a Tentative Agreement with the DPOA dated February 9, 2012 which had the goal of saving approximately $6 million annually. The CET, for example, paid attention unnecessarily to such minor details as stripping funeral leaves to two days whereas universally, throughout Southeast Michigan, police contracts provided for three days which is reasonable when a Police Officer under the stress of daily dealing with crime loses a spouse or a child. And, in the big picture, attacking funeral leave is not where the savings are. But, in the Tentative Agreement of February 2012, the DPOA was willing voluntarily to address a suspension of a wage differential worth $332,000 per year as one example and an overtime issue worth $598,000 per year.

At the same time, the CET in the view of this Chairman, ignored a very fundamental cost issue.

Even in this Act 312 arbitration the DPOA, to some extent, recognized the City's financial crisis by a Last Best Offer for essentially the first four and one-half months of a 10% wage cut and then continuing of a previous no wage increase from 2008 levels, as the DPOA members have not received a wage increase since 2008.

The CET has been devastating on crime fighting in Detroit. The CET with its 10% wage cut from a previous no wage increase since 2008 brought about by any other name a demoralized Police force. The morale of the Detroit Police Officers by any standard is at an all-time low. As Gertrude Stein wrote in *Sacred Emily*, "A rose is a rose is a rose". The record reveals that ticket writing is at an all-time low. Arrests are at an all-time low. The Department is completely demoralized. This has all occurred since the CET. And this is taking place in a major American urban area where reputedly the homicide rate per capita is among the highest in the country,

3

where Police response times are lacking.

The reduced arrest and ticket writing has had a cascading effect on crime prevention as established by the enlightened successor to O.W. Wilson, namely, Chief Bracton of New York City and Los Angeles fame who pioneered the concept that more ticket writing and mundane misdemeanor enforcement creates an atmosphere of law abiding citizens. But Police morale in Detroit is at an all-time low impacting effecting law enforcement. And as this Chairman observes, the CET missed a major economic point while emasculating contract language without at least negotiating.

In addition, 146 issues have now been presented to the Act 312 Panel as there has now been a struggle between the City and the DPOA with the DPOA attempting to regain some of the provisions of the previous Master Agreement, with the City concerned about cost savings. The existence of 146 issues presented to the Act 312 Panel was most unusual, some 43 years after the enactment of Act 312 when arguably, even in Detroit's financial crisis, the critical issues, if there had been negotiations and this would apply to both sides, could have been narrowed down.

The Chairman recognizes that the financial crisis of Detroit will require reorganization, even within the Detroit Police Department, as has been the case in other major city police departments.

It is also true that the general employees have taken some big hits with furlough days. The Chairman is aware of this. But, during the hearings, a number of which were conducted in the offices of the DPOA, on the wall there were pictures of approximately 42 Officers since 1974 who were killed in the line of duty, two of which have been killed in the last three years. This does not include those who have been injured while on duty. Thus, being a Police Officer in Detroit, a large urban area with a substantial homicide rate and citizen concern about this rate and

4

crime in general, demands personal sacrifice.

In addition to the City's financial ability, an essential issue with the Detroit Police Department is that in the marketplace the Detroit Police Officers, with the CET wages, are paid below the marketplace. The DPOA attempts to use higher paid suburban departments and of course the higher paid Michigan State Police to compare. But, even if one compares Flint and perhaps Saginaw, financially distressed cities with Flint having an Emergency Financial Manager, the Detroit Police are underpaid.

Try as hard as the DPOA has done through its counsel to shift the financial ability focus, the City is running out of cash. The City is in financial crisis. There is no question about it.

On the other hand, the City needs Police Officers to survive and grow.

An effective Detroit Police force is essential to Southeast Michigan. Southeast Michigan is critical to the growth of the great State of Michigan. A Detroit Police force consisting of demoralized Officers not paid the marketplace will have trouble, as is evident today, serving effectively. It is just that simple. But the realities of the financial situation must be faced.

Throughout the hearings, the DPOA in particular, and at some times the Chairman, asked questions about the efforts being made by the City concerning efforts in collecting taxes that were made in the past and even currently. Yet, as Jan Lazar pointed out, the past is the past. The question that might be asked is what is going to be done currently and in the future? But, again, currently, the City is in financial crisis. The Chairman and Panel majority will prepare Findings, Opinions and Orders on this basis while recognizing that a demoralized Detroit Police Department, being paid substantially under the marketplace of even financially distressed cities in the area, does not serve the interests of the public as these are Detroit Police Officers that are necessary, even at the risk of their own lives, to protect the public interest of Detroit.

5

The aim of the Chairman, joined by one member or the other of the Panel to form a majority, is to frame Orders that will withstand challenge, help the City, Department and the Officers get back on track, deal with the current financial crisis, and set the foundation for more fruitful (for both the City and the Officers) negotiations in the near future.

It should also be noted that the Chairman, joined by the DPOA Delegate, crafts the Orders based on the proposition that the Master Agreement that expired on June 30, 2012 except as otherwise modified by the Orders herein is effective the date of these Findings, Opinion and Orders; and that the CET no longer applies.

## The History

The brief submitted by the current labor counsel of the City, though the Chairman and certainly the Union Designee do not agree with some of the editorial or advocacy statements therein, essentially gives the basic facts as leading to this Act 312 proceedings and are worth quoting in total and are as follows:

| | |
|---|---|
| September 18, 2009 | The City institutes a 10% pay reduction in the form of budget required furlough days for all employees, except uniform employees. These are implemented for non-union employees immediately. For union-represented employees, the furlough days are implemented when the union labor contracts expired if a mid-term modification could not be negotiated. ATU had an 8% pay reduction effective October 1, 2010 because furlough days would not work operationally for DDOT bus drivers. The City is seeking the additional 2% and is now in Fact-Finding required by Section 13(c) of the Federal Transit Act. See Exhibit 695 at xix. |
| 2010 | City of Detroit borrows $250M through issuance of Fiscal Stabilization Bonds. City grants second lien on State revenue sharing to secure the bonds. Ex. 451 at 8. |

6

| | |
|---|---|
| March 2011 | Passage of P.A. 4 |
| December 2, 2011 | State Treasurer Andy Dillon requests that Governor Snyder undertake a preliminary review of the financial condition of the City of Detroit pursuant to P.A. 4. See Ex. 404. |
| Mid-December 2011 | City begins negotiations with its labor unions for concessions to avoid upcoming cash crisis and possible appointment of an Emergency Manager under P.A 4. |
| December 21, 2011 | State Treasurer Andy Dillon issues a preliminary review of the City's financial condition, finding probable financial stress exists in the City of Detroit and recommends the appointment of a Financial Review Team by Governor Snyder pursuant to P.A. 4. See Ex. 405. |
| December 27, 2011 | Governor Snyder appoints a Financial Review Team. Ex. 406 at 7. |
| January 2012 | Furlough days are converted to an actual 10% wage reduction for non-union employees. Ex. 695 at xix. |
| January 2012 | Financial Review Team begins reviewing City financial condition. Ex. 406 at 1, 7. |
| February 2012 | City concludes discussions with DPOA, DPCOA, DPLSA, DFFA and other unions for concessions which are placed in separate documents for each union titled "Tentative Agreement". The Tentative Agreements are subject to and require approval by State Treasurer Andy Dillon. See Tentative Agreement between DPOA and City, Ex. 771 at page 1 (introductory paragraph). The Tentative Agreements would extend the labor contracts until June 30, 2015. |
| March 2012 | City of Detroit enters into a financing transaction (referred to as the Refunding Transaction) through the Michigan Fiscal Authority under which it will borrow $137M. This transaction will take several months (Summer, 2012) to actually close. See disc |

7

containing Refunding Transaction documents provided on February 6, 2013.

As part of the transaction, the City grants to bondholders a third lien on its State revenue sharing.

Part of the transaction documents provide that no loan proceeds can be advanced to the City of Detroit without the approval of the State.

Since the City is in desperate need of cash, the City, with State approval, enters into a short term bridge loan arrangement with Bank of America under which the City borrows $80M which is placed in an escrow account to be released only upon State approval. This loan will be repaid when the Refunding Transaction closes. See disc containing Refunding Transaction documents.

| | |
|---|---|
| March 26, 2012 | Report from Detroit Financial Review Team to Governor Snyder finding that Detroit is in a condition of severe financial distress as provided under P.A. 4 and that a consent agreement pursuant to P.A. 4 needs to be entered into between the City and the State. Sec Ex. 406 at 11-12. |
| Late March 2012 | State declines to approve Tentative Agreements entered into between the City and its various unions, including DPOA, because, according Brom Stibitz, Senior Policy Advisory to State Treasurer Andy Dillon, there was insufficient concessions to meet the needs of the City of Detroit and because the City's severe financial condition requires flexibility and the State refused to be bound by labor contracts that would not expire until June 30, 2015. Vol. 9, pp. 172-173. |
| April 4, 2012 | City of Detroit and State of Michigan enter into Financial Stability Agreement. Ex, 407. |
| | The Financial Stability Agreement ("FSA") provides for the establishment of the Financial Advisory Board ("FAB") which is to plan, implement and complete financial restructuring |

8

with the City of Detroit.  Ex. 407 at 5.

The FSA provides for a Chief Financial Officer and a Project Management Director.  Ex. 407 at 16, 18.

Annex D of the FSA sets forth requirements for labor contracts which includes:

- Uniformity
- Outsourcing
- Consolidation of operations
- Changes to support financial restructuring
- Maintaining the favorable concessions from the tentative agreements (note the testimony of Brom Stibitz at Vol. 9 at 257 that the concessions in the Tentative Agreements were insufficient).

Pursuant to P.A. 4, upon execution of the Financial Stability Agreement the duty to bargain under PERA is suspended.  However, existing labor contracts continue in force until their expiration.  The FAB has no power under the FSA and P.A. 4 to terminate existing labor contracts.

| | |
|---|---|
| April 2012 | State approves the transfer of $30M of bridge loan proceeds from the Bank of America to the City so that the City can meet payroll, debt and other obligations.  Ex. 451 at 19. |
| May 25, 2012 | Jack Martin hired as Chief Financial Officer.  Vol. 9, pp. 257-258. |
| June 2012 | State approves transfer of an additional $20M from the Bank of America bridge loan proceeds so that Detroit can meet payroll, debt service and other obligations.  Ex. 451 at 19. |
| June 22, 2012 | DPOA files Petition for Act 312 arbitration.  Petition is stayed pursuant to P.A. 4 and the suspension of the duty to bargain under P.A. 4. |
| June 30, 2012 | DPOA labor contract and most other City labor contracts expire, except for DPLSA, DFFA, and |

9

the Emergency Service Operators ("ESO") in the Fire Department (expiration dates June 30, 2013). Note: DDOT and its labor contracts with the A TU and other unions are subject to Federal Transit Act Section 13(c) requirements, The Water and Sewerage Department and its labor contracts arc subject to federal court control although payroll, benefits, and other related matters are administered by the City of Detroit.

| | |
|---|---|
| June 30, 2012 | City ends FY2012 with $1.9M in cash. See CAFR and see Ex. 451 at 19. |
| | City is in violation of Act 51 by using $38.1M from the Street Fund for General Fund purposes. The City is required to repay this money to the Street Fund. Vol. 10, pp. 5-6, 15 and CAFR at 80. |
| July 9, 2012 | Kriss Andrews hired as Program Management Director. Vol. 9, p. 105. |
| July 17, 2012 | City implements City Employment Terms ("CET") for DPOA and separate CETs for each union that had a labor contract that expired on or before June 30, 2012. See CET applicable to DPOA, Ex. 401. |
| | Furlough days for non-uniform union-represented employees are converted to an actual 10% wage reduction. See Ex, 695 at xx. |
| July 27, 2012 | PFRS enters a judgment against City in Wayne County Circuit Court in the amount of $47M for past due pension plan contributions. Judgment payable with interest in 12 monthly installments. Ex. 455. |
| August 3, 2012 | Michigan Supreme Court approves placement of ballot petition seeking repeal of P.A. 4 on the ballot for the November 6, 2012 election. |
| August 9, 2012 | Board of State Canvassers enters ballot proposal on ballot. |
| | Entry of ballot proposal for November 6, 2012 election suspends P.A. 4. However, actions |

10

taken under P.A. 4 remain valid.

| | |
|---|---|
| August 2012 | City Refunding Transaction through State Fiscal Authority closes. |
| | $80M of bridge loan proceeds is repaid to Bank of America. |
| | At this time, City has actually received $50M of loan proceeds leaving $87M of loan proceeds available but subject to approval of State of Michigan before disbursement to the City of Detroit. |
| August 15, 2012 | MERC formally begins processing DPOA Act 312 Petition. |
| August 23, 2012 | George Roumell appointed as Act 312 Arbitrator. |
| October 3, 2012 | Parties exchange Last Best Offers. |
| November 6, 2012 | Voters repeal P.A. 4. |
| | PA 72 is revived. |
| | All actions taken under or pursuant to P.A. 4 prior to its suspension on or about August 9, 2012 remain valid. |
| December, 2012 | State approves transfer of an additional $10M of loan proceeds to the City of Detroit for payroll and other purposes. Ex. 451 at 20 and at fn. 1. |
| December 2012 | Governor appoints a Financial Review Team under P.A. 72n. Ex. 464, Attachment B. |
| December 2012 | City begins negotiations with non-uniform unions for additional 10% pay reduction in the form of furlough days. See Ex. 750. |
| December 21, 2012 | Interim Award on health care made by Arbitrator Roumell. A number of issues remained which were briefed on January 25, 2013. Once a ruling is made on the remaining issues, the parties will submit final healthcare contract language to the Arbitrator and oral |

11

| | presentations will be made by telephone or in person regarding the contract language. |
|---|---|
| December 27, 2012 | Passage of Act 436 (new EFM law) effective March 28, 2013. |
| February 5, 2013 | City Council passes Resolution and Mayor Bing issues Executive Order for an additional 10% pay reduction in the form of furlough days for non-union employees to be effective February 11, 2013.  Exs. 757 and 758. |
| | Bargaining continues with non-uniform union-represented employees for the furlough days. |
| February 8, 2013 | City seeks approval for an additional $20M of loan proceeds from the Refunding Transaction. |
| | If approved this will leave approximately $57M of loan proceeds.  The State has indicated it will hold in reserve at least $57M of the loan proceeds in the event the State needs funds to assist an Emergency Financial Manager or for other purposes. |
| February 11, 2013 | Furlough days equivalent to a 10% pay reduction begin for non-union employees. |

The DPOA through its attorneys filed lawsuits seeking, based upon the provisions of Act 312, to maintain the *status quo*, namely, the terms of the Master Agreement while the Act 312 was pending, but thus far the Courts have refused to maintain the *status quo* and the CET is currently in effect.

<u>**The Criteria**</u>

Act 312 of Public Acts of 1969, as amended, in Section 9 thereof sets forth the criteria to be followed by an arbitration panel.  Act 116 of Public Acts of 2011 amended Section 9, which Section 9 as amended by Act 116 providing as follows:

> Sec. 9. (1) If the parties have no collective bargaining agreement or the parties have an agreement and have begun negotiations or

12

discussions looking to a new agreement or amendment of the existing agreement and wage rates or other conditions of employment under the proposed new or amended agreement are in dispute, the arbitration panel shall base its findings, opinions, and order upon the following factors:

(a) The financial ability of the unit of government to pay. All of the following shall apply to the arbitration panel's determination of the ability of the unit of government to pay:

(i) The financial impact on the community of any award made by the arbitration panel.

(ii) The interests and welfare of the public.

(iii) All liabilities, whether or not they appear on the balance sheet of the unit of government.

(iv) Any law of this state or any directive issued under the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531, that places limitations on a unit of government's expenditures or revenue collection.

(b) The lawful authority of the employer.

(c) Stipulations of the parties.

(d) Comparison of the wages, hours, and conditions of employment of the employees involved in the arbitration proceeding with the wages, hours, and conditions of employment of other employees performing similar services and with other employees generally in both of the following:

(i) Public employment in comparable communities.

(ii) Private employment in comparable communities.

(e) Comparison of the wages, hours, and conditions of employment of other employees of the unit of government outside of the bargaining unit in question.

(f) The average consumer prices for goods and services, commonly known as the cost of living.

(g) The overall compensation presently received by the employees, including direct wage compensation, vacations, holidays, and other excused time, insurance and pensions, medical and

13

hospitalization benefits, the continuity and stability of employment, and all other benefits received.

(h) Changes in any of the foregoing circumstances while the arbitration proceedings are pending.

(i) Other factors that are normally or traditionally taken into consideration in the determination of wages, hours, and conditions of employment through voluntary collective bargaining, mediation, fact-finding, arbitration, or otherwise between the parties, in the public service, or in private employment.

(2) The arbitration panel shall give the financial ability of the unit of government to pay the most significance, if the determination is supported by competent, material, and substantial evidence.

Though the Act 116 amendment does require the Panel to give financial ability the most significance, the Legislature recognized that the Panel could consider other factors. The amendment also included the 9(1)(e) comparison with other employees of the unit of government outside of the bargaining unit in question. Obviously, the City wishes the Panel to consider the fact that other employees of the City, including union employees, have taken wage cuts in the 10-20% category.

There is the a(ii) interest and welfare of the public. In this case, this is an important consideration, namely, the fact that public safety is involved; that Detroit Police Officers are not writing tickets and arrests are not being made, which affects safety issues and therefore the interest and welfare of the public. Then there is 9(1)(h)(i), other factors. There is the so-called demoralized criteria and what this Chairman has many times referred to as the art of the possible criteria, namely, what is needed to avoid a demoralized Police force in a high crime area and what is the art of the possible? In this case, as pointed out, the approach of the CET and the failure to attempt to negotiate after March 2012 demoralized the Department, affecting the delivery of Police service. Then there is the art of the possible. What is possible to resolve this

14

dispute short of further disruption in the Department? These factors, when combined with the ability to pay, which is dominant in this situation, must be considered by the Panel in considering the proposals.

It must be recognized that the internal comparisons cannot be overlooked. The unionized general employees as well as union employees have taken a pay reduction by way of furlough days due to the financial emergency in Detroit. Another 24/7 operation in the City, the ATU, namely, the bus drivers, have taken an 8% reduction and are in fact finding for a remaining 2% reduction. These facts cannot be overlooked by the Panel in balancing the economic proposals. On the other hand, as already pointed out by the Chairman, Police work is inherently dangerous, suggesting that some recognition must be placed on this factor and the comparison of the marketplace for well trained Police Officers capable of dealing with crime prevention and intervention by reviewing the marketplace for Police Officers in Southeast Michigan by making comparisons with Police employment in comparable financially distressed communities while considering the financial emergency in Detroit and the financial sacrifices of other Detroit employees.

As already alluded to, the DPOA counsel attempts as a good advocate to have the Panel look to such communities as Birmingham, Livonia, Grosse Pointe, Sterling Heights, all communities with substantial fund balances, rather high pay, as well as the Michigan State Police whose top pay is in the $67,000 range. The City of Detroit, under financial stress, cannot afford those ranges because of financial problems. But, as the Chairman addresses wages, it is very difficult to suggest that the job of a Detroit Police Officer is not as difficult as a State Trooper or Police in the surrounding communities if not more so because of the nature of criminal activity in Detroit, only emphasizing that Detroit Officers are underpaid. Yet, there are two distressed

15

communities nearby whose wages, as will be pointed out, are above what the CET is suggesting that Detroit Officers should be paid, namely, Flint and Saginaw, which make the point.

Then the issue becomes one of priorities and the question of the interest and welfare of the public in Detroit that has one of the highest homicide rates per capita in the country. The Chairman, when turning to the issues, recognizing that the financial ability is "the most significant", also considered other criteria including the marketplace and the welfare of the public and the nature of Police employment including, as compared to other Detroit City employees as representative in the Southeast, the significant number of Detroit Police Officers who have been killed on duty as compared to Michigan State Troopers and other municipal police departments in Michigan.

Yet, the Panel must recognize that the civilian employees of the City of Detroit during Detroit's financial emergency have taken up to a 20% pay cut which, in evaluating the situation with the Police, the Panel cannot overlook.

Section 8 of Act 312 provides:

**423.238 Identification of economic issues in dispute; submission and adoption of settlement offers; findings, opinion, and order.**

Sec. 8. The arbitration panel shall identify the economic issues in dispute and direct each of the parties to submit to the arbitration panel and to each other its last offer of settlement on each economic issue before the beginning of the hearing. The determination of the arbitration panel as to the issues in dispute and as to which of these issues are economic is conclusive. The arbitration panel, within 30 days after the conclusion of the hearing, or within up to 60 additional days at the discretion of the chair, shall make written findings of fact and promulgate a written opinion and order. As to each economic issue, the arbitration panel shall adopt the last offer of settlement which, in the opinion of the arbitration panel, more nearly complies with the applicable factors prescribed in section 9. The findings, opinions and order as to all other issues shall be based upon the applicable factors prescribed in section 9.

16

Pursuant to this provision, certain of the issues presented by the parties have been determined to be economic issues requiring the Panel to adopt the Last Best Offer of one party or the other. Other issues have been determined not to be economic and as to those the Panel may formulate an order based upon the applicable factors prescribed in Section 9. As to each issue that follows, there will be a majority vote.

## City's Financial Ability

Detroit's poor financial health can be attributed to a number of factors. With hindsight, a careful observer could point to a number of things that the City's leadership should have been done differently. Today, however, the fact remains that the City is dangerously low on cash. Unfortunately, this situation is unlikely to change in the near term. While many drastic reform measures have been implemented, true reform does not happen overnight.

Over the past several decades, Detroit suffered from declining population and high unemployment. For these reasons, tax revenue has substantially declined. Since 1990, the City's population has declined by approximately 30%. In addition, unemployment has increased by roughly 200%. When the associated loss of income tax revenue is combined with recent decreases in state revenue sharing, it is not surprising that the City has experienced debilitating cash flow problems. Between property taxes, municipal income taxes, and wagering taxes, only wagering taxes have remained somewhat steady over the past six years. Since 2008, property tax revenue has decreased approximately 12% due to declining taxable property valuations and increasing charge-backs due to delinquency rates. Income tax revenues have declined due to lower taxable income of both residents and non-residents. While wagering tax revenues have remained steady, they are projected to decrease beginning in 2013 due to a loss of market share caused by a new casino in Toledo.

17

Declining population has also affected state revenue sharing. Since 2008, revenue sharing has decreased by approximately 30%. Between 2011 and 2012, revenue sharing declined from $239 million to $173 million. This startling decrease is primarily due to the population decline illustrated by the 2010 census. If Detroit continues to lose population, this amount will decline even further.

While Mayor Bing and his team can be applauded for effectuating large cost cutting measures, revenue has continued to decline faster than expenses. Because the City has issued debt to cover the significant shortfalls between revenue and expenditures, debt service costs have increased substantially. For example, debt service and POC expenditures are expected to increase from $126 million in 2008 to $151 million in 2013. Additionally, due to the growing number of retiree and legacy costs, the benefit and pension costs per active employee have jumped from $18,000 in 2000 to $28,000 in 2012. While reductions to the active workforce have occurred, the number of retirees and their associated costs are rising. These costs do not decline when headcount of active employees is reduced.

The City's cumulative unrestricted deficit indicates that the City is insolvent. Over the past five years, the City has run an average annual operating deficit of nearly $100 million. These large financial shortfalls have been addressed with long term debt issuances and drastic cost-cutting actions. Despite the receipt of loan proceeds from the issuance of new debt, cash balances have declined since 2008 due to large operating deficits. Even with the current cost saving measures, the city will have an estimated $110 million shortfall at the end of FY2013. Remaining proceeds from the August 2012 issuance of the "Refunding Bonds," together with remaining short term borrowings, are currently held in escrow and can only be used with State approval. The state has mandated that the city reduce cash outflow by between $30 million and

18

$45 million. In addition, the State may release some of the escrow funds; however, it is unlikely that the State will release more than $20 million by the end of FY2013. Even if the City fully reduces cash outflow by the stipulated amount and the State releases a portion of the escrow account, the city is still left with a $50 million to $60 million cash shortfall at the end of FY2013. Quite simply, the city could be out of cash.

In the past, the city has issued debt to cover such shortfalls, but due to recent debt downgrades, this is no longer possible. The City's credit ratings have been deteriorating rapidly and are at all-time lows. Currently, Detroit's credit ratings are below investment grade (junk status) and are lower than any other major US city. Since the beginning of 2012, Moody's has downgraded the City's credit rating from B2 to Caa1. Similarly, Fitch has downgraded the City's rating from B to CCC. According to Moody's November 2012 report, "[t]hese downgrades reflect the City's ongoing precariously narrow cash position and a weakened State oversight framework following the repeal of Public Act 4. ... The negative outlook ... is based on the rising possibility that the city could file for bankruptcy or default on an obligation over the next 12 to 24 months, the general uncertainty of the State oversight as challenges to Public Act 72 persist following the repeal of Public Act 4, and the City's ongoing inability to implement reforms necessary to regain financial stability." Furthermore, the City has nearly reached its legal debt limit. It is currently leveraged to 93% of its general obligation borrowing capacity. This illustrates that the City is no longer able to cover cash shortfalls with debt.

According to the McKenzie Group, there exists a $183 million income tax opportunity for the City. According to another, more conservative estimate created by DPOA witness John Bibish, approximately $54 million of income taxes are left on the table every year. Thus, the DPOA questions the City's performance of collecting income taxes over the years. In fact, the

19

income tax staff positions were reduced from 49 in 2009 to 32 currently. Of all the departments from which employees can be cut, the DPOA asks why make cuts from the group that collects the revenue?

Then, too, as the McKenzie Group and Bibish estimates are just that, a realistic income tax figure is not known.

According to Cheryl Johnson, the current computer system used in the Department of Finance has not been updated since 1998. However, the city has worked with Compuware to build an application that will allow the City to identify non-filer residents (those city residents who file with the IRS but failed to file with the City). The DPOA has indicated that uncollected income taxes could bolster the city's cash. To this effect, letters are currently being sent to resident non-filers. While the City has started the process to collect income taxes from resident non-filers, the success of such an initiative is uncertain.

According to Janet Lazar, an expert in city income taxes, collecting from non-filers will probably not be overly successful. This prediction is based on her observations of other Michigan cities, such as Highland Park. According to Lazar, the City's population is aging. Many of the City's residents receive pension benefits, Social Security, and other governmental assistance that are not taxable by the city. In addition, due to the low income status of many of the city's residents, the cost of collection could often exceed the amount owed. Furthermore, the collection of unpaid income taxes takes time, often in excess of one year. Unfortunately, the City is running out of cash and does not have the luxury of time.

According to Mr. Bibish, it does not need to take over a year to improve tax collections. To improve collections, the City should create work groups that are responsible for collection. For example, light duty police officers could be assigned to work with collection investigators.

20

However, this suggestion is unlikely to work. The employees in the Income Tax Division belong to one of three unions in the treasury Department, the AFSCME, the Association of Professional and Technical Employees, or the Detroit Income Tax Investigators Association. Each union has a labor contract. The use of non-unit personal to perform bargaining unit work could be problematic.

The City should also devise a way to more effectively collect income tax from non-residents. According to Cheryl Johnson, letters are not being sent to non-resident non-filers because the city does not have data on non-resident non-filers. However, even if the City increased its efforts in this regard, there was testimony questioning the results because the tax rate of a non-resident is lower than that of a resident.

In order to increase income tax collections, Lazar has suggested that local income taxes be collected along with State income tax. This has worked in other states. It has worked in Michigan, too. When a pilot program was attempted in Albion, compliance increased significantly. In Albion, revenue increased 18% in the first year. An 18% income tax revenue increase in Detroit could be substantial. Despite its success in Albion, other cities refused to participate due to territorial disputes. The local tax divisions incorrectly claimed that the state would keep the revenue. They improperly compared the initiative to state revenue sharing. Just as state revenue sharing was cut, they claimed that the state would also keep the local tax revenue. However, this is a weak argument. By law, the local revenue must be given to the locality. Unfortunately, the argument was enough to scare many mayors.

While the City's financial information may appear to indicate that cash is available to pay police officers, certain restrictions often disallow such funds to be used for such purposes. For example, Mr. Bibish claims that there is approximately $68.1 million available in the Capital

21

Improvement Project Fund. This amount represents the Revised Free Balance from outstanding project balances. However, all the monies listed under Capital Projects Funds are special project funds raised from voter approved bond issues. The money can only be used for the specific purpose set forth in the bond issue. The City cannot transfer capital project funding to pay debt service for anything other than the project for which the debt was incurred. Therefore, the suggestion that the old capital projects should be closed out and the unused bond funds transferred to pay debt service for other projects is not possible.

Mr. Bibish has also suggested that too much has been budgeted for the 2013 Claims Fund. The official red-book budget for 2013 included a $100 million provision for the Claims Fund. In 2010 and 2011 respectively, only $70 million and $68 million were needed for claims. This indicates that there is approximately $31 million budgeted in excess over the amount needed in 2010 and 2011. If the administration originally thought $80 million was enough (the 2013 Executive Legal Budget only listed $80 million), why was the amount increased to $100 million? It may appear that $100 million may be excessive.

Nevertheless, had the State not released $10 million from escrow in December 2012, the city would have run out of cash. In addition, the only reason the City did not run out of cash in mid-2012 was because the City borrowed more money. Now, the City has borrowed all it can. Its credit rating has decreased to such a low level that additional borrowing is no longer possible.

In his brief, counsel for the DPOA questioned the priorities in the 2012-2013 budget. The Chairman will not go there, so to speak, for those are financial decisions. The City is obligated to provide fire fighting services, emergency medical services, street and sidewalk maintenance, recreation services, garbage pickup, waste disposal, legal defense and the list goes on. Hopefully, those who make the City's financial decisions will recognize the obvious – that

22

public safety is a major concern to the citizens of Detroit; that the issue is whether the Detroit
Police Officers are being compensated comparable with other distressed cities, given the hazards
of serving in a municipality such as Detroit and the responsibilities in controlling mounting crime
concerns in the community.

A State Financial Review Team consisting of financial experts following a review of the
City's finances concluded that the City's finances were in a crisis situation and so reported to the
Governor in the following letter dated February 19, 2013:

DATE:       February 19, 2013[1]

TO:         Governor Snyder

FROM:       Detroit Financial Review Team:
            Andy Dillon
            Darrell Burks
            Ronald E. Goldsberry
            Frederick Headen
            Thomas H. McTavish
            Kenneth Whipple

SUBJECT:    Report of the Detroit Financial Review Team

The Detroit Financial Review Team met on December 19th and 20th
2012, and January 3rd, 7th, 9th, 16th, 25th, and February 1st, 14th, and
15th 2013, to review information relevant to the financial condition of
the City of Detroit. Based upon those reviews, the Review Team
concludes, in accordance with Section 14(3)(c) of Public Act 72 of
1990, the Local Government Fiscal Responsibility Act, that a local
government financial emergency exists within the City of Detroit
because no satisfactory plan exists to resolve a serious financial
problem. Accompanying this report is supplemental documentation in
support of our conclusion.

Our conclusion is based primarily upon the following considerations:

1.  Cash Crisis. The City continues to experience a significant
    depletion of its cash. Projections have estimated a cumulative
    cash deficit in excess of $100.0 million by June 30, 2013,
    absent implementation of financial countermeasures. While the
    Mayor and City Council deserve credit for considering and, in
    some instances, adopting difficult financial reforms, those

23

reforms are too heavily weighted toward one-time savings and apply only to non-union employees who represent only a small portion of the City's overall wage and benefit burden.

2. _General Fund Deficits_. The City's General Fund has not experienced a positive year-end fund balance since fiscal year 2004. Since that time, the General Fund has had cumulative deficits ranging from $155.4 million in fiscal year 2005, to $331.9 million in fiscal year 2009. The General Fund deficit was $326.6 million in fiscal year 2012: The primary methods by which City officials have sought to address these deficits has been by issuing long-term debt. While such an approach reduces the deficit in the year in which the debt is issued, it also reduces fund balance over time as debt service payments increase. Had City officials not issued debt, the City's accumulated General Fund deficit would have been $936.8 million in fiscal year 2012.

3. _Long-Term Liabilities_. As of June 30, 2012, the City's long-term liabilities, including unfunded actuarial accrued pension liabilities and other post-employment benefits, exceeded $14 billion. City officials have projected that over the next five years, the expenditures needed to fund certain long-term liabilities will total approximately $1.9 billion. However, City officials have not yet devised a satisfactory plan to address the long-term liability issue.

4. _Bureaucratic Structure_. The City Charter contains numerous restrictions and structural details which make it extremely difficult for City officials to restructure the City's operations in any meaningful and timely manner. These restrictions include numerous steps and time periods which must be observed before certain proposed changes may be implemented and provisions which make it all but impossible to restructure municipal services.

Based upon the foregoing, the Review Team concludes, in accordance with Section 14(3)(c) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem. Section 14(3) of the Act also requires that a copy of this report be transmitted to Mayor Dave Bing, Detroit City Councilmembers, the Speaker of the House of Representatives, and the Senate Majority Leader.

cc: Dave Bing, Mayor
Detroit City Councilmembers
James Bolger, Speaker of the House of Representatives

Randy Richardville, Senate Majority Leader

[1] Pursuant to Section 14(3) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, a Review Team is required to report its findings to the Governor within 60 days of its appointment, unless the Governor specifies an earlier date or grants a one-time 30-day extension. This Review Team was appointed on December 18, 2012, and in accordance with statutory convention, 60 days thereafter was February 16, 2013, a Saturday.

However, Section 6 of the Revised Statutes of 1846, which applies to statutes and administrative rules, provides that "[i]n computing a period of days, the first day is excluded and the last day is included. If the last day of any period or a fixed or final day is a Saturday, Sunday or legal holiday, the period or day is extended to include the next day which is not a Saturday, Sunday or legal holiday." Therefore, this Review Team report is due on February 19, 2013.

Though counsel for the DPOA questioned the conclusions of the report, the Chairman and the City Delegate, based upon the record made before the Panel, including comments of the rating agencies and the financial information furnished, is in agreement with the Review Team's conclusions in that Detroit is in a financial crisis, having limited ability to pay.

There are ways to raise revenue from both residents who can afford to pay as well as non-residents. Here are the ideas because, without interfering with the political process, this Chairman believes that a Chairman in this situation must take some responsibilities and make some revenue raising suggestions:

1.      Instead of laying off or furloughing people in the Finance Section, the City should add to the Finance Section to aid in collecting taxes and in particular income taxes so that it can have agents that can go into the field and monitor the non-residents and particularly the following types of individuals:

     A.      All the lawyers advertising on the billboards on the freeways of Detroit because many of them, if not all, are earning income in Detroit, even though having offices out of Detroit. Whether they are trial lawyers or probate lawyers in the Circuit and Federal Courts, 36th District Courts or Probate Courts, they earn portions of their fees in Detroit;

     B.      There are lawyers that advertise that they are Social Security specialists who have offices outside of Detroit but earn their income in Detroit at the Social Security Administrative Tribunals;

     C.      There are labor lawyers who appear before the National Labor Relations Board in the McNamara Building and before MERC at Cadillac Place;

25

D.   There are lawyers that appear before State agencies in the Cadillac Place Building;

E.   There are doctors who have offices in Macomb County and in Grosse Pointe who are operating at St. John's Hospital whose operating rooms, on information and belief, are in Detroit, thereby earning substantial income in Detroit. There are doctors who operate at Sinai, Ford and the DMC.

F.   There are lawyers from New York, Philadelphia and Washington, D.C. that try cases in the Federal Court in Detroit. There are bankruptcy lawyers that come to Detroit. There are visiting athletic teams in three major sports who come to Detroit and earn income in Detroit. There are entertainers that come to Detroit and earn income in Detroit. One does not collect by just writing letters. One needs agents "out there".

2.   The City should contact Louisville, Kentucky and ask how Louisville collects income tax from non-residents who come to Louisville. It so happens that at a regional meeting of the National Academy of Arbitrators, two arbitrators, including Richard Block, told this Chairman of their experience of going to Louisville, Kentucky and arbitrating for a non-municipality and being contacted by the city and asked to pay city income tax for their efforts in the city of Louisville. One of them was arbitrating for General Electric. One told that he was "hit" for $33.00. The question is, how does Louisville get the information? This Chairman was hit by Big Rapids, Michigan for a day he spent in Big Rapids arbitrating.

Detroit, with the cooperation of the State, can prevail on the State legislature to enact two statutes requiring all businesses outside of the city limits, as well as within the city limits, to withhold City of Detroit income tax and also a non-discrimination act so that the employer will not discriminate against hiring City of Detroit residents because some employers might avoid hiring a Detroit resident to avoid the withholding requirement.

Another idea is to pass at least for a limited time (three or four years, if not longer) a sports ticket tax for hockey, baseball and football of $1.00 to $2.00. This would bring in upwards to $10 million annually. The events do receive Police protection at their athletic events. Detroit is in a financial crisis. People go to the Lions, Tigers and the Red Wings games. Particularly at the Tigers and Lions games, there is substantial Police presence. This modest

26

amount will not keep people away. And Detroit is in a crisis. This will help pay for needed Police services. Any resistance should be overcome. These are dire financial times. The Officers must be brought up to the marketplace.

Furthermore, the general employees cannot be expected to continue to sacrifice as they have been.

Jan Lazar is correct. The State should be collecting the City of Detroit income tax at least as to residents and to non-residents who are already identified as consistent filers. And when other non-residents are identified in a comprehensive investigation, the State should add them to the State collecting efforts. The Chairman recognizes that this may not be done until 2014, but it should be part of the long range effort.

Many of the above suggestions may not be able to be implemented immediately to address the current cash crisis. In this regard, the Chairman, concerned with restoring the Detroit Police Officers to a reasonable competitive pay rate and some long established benefits necessary to keep the Detroit Police Officers competitive and benefits used to control absences, the orders will provide for civilianization permitting the Department to employ Police Officers in jobs that require MCOLES certification and that other jobs now performed by Police Officers can be performed by civilians. This will permit the Department to serve citizens with fewer sworn Officers at the same level of Police services as now with Officers being paid at the market rate. Furthermore, if necessary, as was the case in Flint, some Officers may be laid off or the force can be reduced as a result of attrition due to retirements. With civilianization, this could impact the number of Officers available for street duty. Yet, there would be, if need be, less current costs to the City while restoring some benefits and paying Officers at least a competitive wage with the distressed cities.

In addition, in addressing the Issues, the Chairman has voted with the City Delegate to control some overtime costs. This approach gives significance to the financial ability in Detroit's situation while recognizing other Section 9 criteria, both in the short run and in the long run.

## The Issues

### Preliminary Comment

To repeat a refrain, the parties have submitted 146 issues for the Panel to decide. The number of issues are as a result of the fact the City imposing in July 2012 without further negotiation the City Employment Terms which in many details had little rhyme or reason in addressing the City's financial crisis as applied to public safety and by any definition was an attempt to "gut" the Master Agreement between the City of Detroit and the Detroit Police Officers Association, a product of 40 years of negotiations and Act 312 proceedings. Such an approach brought forth approximately 37 issues proffered by the DPOA attempting to seek economic improvements in a financially distressed city, creating an unrealistic labor relations atmosphere, and had the effect of overlooking the welfare of the public, *i.e.*, the need for an efficient, effective Detroit Police Department. This goal can best be established by the comparables, namely, the marketplace for Police Officers even among the more distressed communities and a recognition even by the Legislature that the Legislature has given special recognition to police unions of the duty to bargain in the current labor climate in Michigan. It is for this reason that the Chairman, concurred in by the Union Delegate, will address the issues based upon the expired Master Agreement and will reject in total the City Employment Terms as those terms were not negotiated terms and were terms implemented under Public Act 4, which act was rejected by the people of the State of Michigan.

28

Furthermore, if there had been negotiations as in the case of the Tentative Agreement, presumably even if on an around-the-clock basis, a number of the issues would have been reduced. Even so, both the counsel for the City and the DPOA are to be complimented for the fact that they were able to complete the hearings in record time despite the number of issues and to present their briefs in an extraordinarily accelerated time. Those who read this Opinion, if there ever is a Hall of Fame for Lawyers, should make these two counsel the first candidates because both have put in extraordinary efforts as had the two Panel Members. Nevertheless, in a 2013 Act 312, the Chairman will repeat there should not have been 146 issues nor should there have been a CET without an opportunity to bargain for, as the Chairman, as pointed out, it has bred a demoralized Police force.

Counsel mutually numbered the Issues. The Panel will follow the parties' numbering of the Issues, but the Issues will not be discussed in numerical order. In some cases, the Issues will be discussed in interest groups for convenience.

**The reference on each Issue to "*status quo*" is a reference to the language in the Master Agreement that expired on June 30, 2012. In addition, the references to the current contract are to the Master Agreement that expired on June 30, 2012.**

**Issue No. 97 -**        *Article 48 - Contract Duration*

It is appropriate to begin the discussion of the Issues with the length of the contract. Issue No. 97 addresses duration. The City maintains that this is an economic issue. The DPOA maintains that this is a non-economic issue. As a non-economic issue, the Panel can formulate a provision without accepting the Last Best Offer of either party. The Chairman, joined by the DPOA Delegate, accepts the DPOA's position that duration is a non-economic issue.

The City proposes that the Agreement run from July 1, 2012 to June 30, 2013. The

29

DPOA proposes that the Agreement run from July 1, 2012 to June 30, 2014. The Chairman appreciates that the parties have spent a great deal of time, effort and money in presenting this case.

Yet, by any standard, the City is in a dire financial crisis. The City is in need of a serious reorganization. This is a given. The Department is in the need of reorganization as part of the City's reorganization. On the other hand, by any definition, the CET as applied to the Police brought about a demoralized Police Department that affected the productivity of the Police and the public welfare, causing this Panel to have to deal unnecessarily with 146 issues, starting with resurrecting a Collective Bargaining Agreement that was a product of 40 years or more of negotiations and interest arbitration. It would seem, therefore, to the Chairman that to bring stability to the situation that there be a two year contract beginning on July 1, 2012 with an automatic re-opener on health care insurance and pension issues, with the automatic re-opener taking place on June 30, 2013 which is not too far away. This way, all of the other issues are established, including wages, longevity, transfer rights, seniority rights and the other issues that came before the Panel, including sick leave accumulation.

Health care and pensions are major issues that the parties will be obliged without the pressure of so many issues to review beginning June 30, 2013. The re-opener is automatic as to these two issues, though it is recognized that the health care insurance, because of the enrollment, continues until January 2014. Nevertheless, health care will be re-opened for discussion beyond the open enrollment ending January 2014. To repeat, the re-opener on June 30, 2013 for all pension issues and health issues will be re-opened automatically on June 30, 2013.

The Chairman has been joined by the DPOA Delegate in voting for a two year contract except that the DPOA Delegate dissents from a re-opener. The City Delegate dissents from a

30

two year contract but would agree that if there is a two year contract he will vote for a re-opener as to pensions and health care.

| | |
|---|---|
| **Issue No. 1** - **Economic** - | *Union Security - 2% Dues Collection Charge* |
| **Issue No. 5** - **Economic** - | *Article 4 - Basis of Representation, Pay for Full-Time Union Officers* |
| **Issue No. 8** - **Non-Economic** - | *Article 4.O - Basis of Representation, Pay for Grievance Committee* |

The Chairman, for discussion purposes, has grouped Issue Nos. 1, 5 and 8 together as the underlying principle applies. The City proposes to add a Section L to Article 3 whereby the DPOA would reimburse the City "an amount equal to 2% for all Union dues and service fees amounts remitted to the Union" which the DPOA opposes, as there is no such provision in the Master Agreement nor has there ever been such a provision in the parties' numerous past agreements.

As to Issue No. 5, presently the City pays the wages for the full-time release of the President, Vice President, Sergeant at Arms and Financial Secretary of the DPOA. Similarly, as to Issue No. 8, the City has been paying the salary and benefits for three Grievance Committee Members to be off two working days per week. The City proposes that the DPOA reimburse the City for the salary and benefits of the full-time DPOA Officers and the two working days off that the three Grievance Committee Members are off. The DPOA proposes the *status quo*.

The rationale of the City is that the 2% dues collection fee has been imposed on all City unions and that granting this provision would achieve uniformity consistent with the requirements of the Financial Stability Agreement.

In regard to reimbursement for Union Officers and the Grievance Committee Members, the City notes that it has ceased paying the wages and benefits of union officers for every union in the City that has expired labor contracts; that the cost per year for three Grievance Committee

31

Members is $296,000 per year; that the cost for four full-time Union Officers and three Grievance Committee Members is $691,096; that the cost to the City for all full-time Union representatives City-wide is $2,797,747; and that when the cost for part-time as well as full-time Union representatives City-wide is added, the grand total is $3,125,806.

The Chairman recognizes that this is a considerable amount of savings that cannot be overlooked in a financially distressed City of Detroit and the DPOA's $691,096 cannot be overlooked. However, there is a failure to recognize the unique circumstances of Police representation. Because of the nature of Police work, including physical contact with certain members of the public, Police Officers are sometimes charged with abuse of force requiring Police representation, including representation of Union Officers as well as legal counsel. This involves *Garrity* hearings where Officers are represented by both counsel and Union Officers as well as discipline hearings. There are other discipline proceedings in a quasi-military organization, putting an undue burden on the DPOA which is not as common in a civilian union.

Furthermore, though the ranks of the DPOA have been reduced, the representation needs continue. In addition, there is no showing that the 2% charge would save any appreciable sum of money for the City. There is no showing that the City has charged for deducting for charitable contributions. There is no showing that the City's payroll system is not already keyed to providing such deductions without additional appreciable costs. This has been a method of dealing between the parties for many years. Though the DPOA has approximately 2,000 individuals either paying dues or a service fee, with the cost of representation because of the nature of Police work and discipline issues in a quasi-military organization, its dues structure will have difficulty supporting the representation that the DPOA must provide.

Having said the above, however, in applying the art of the possible and recognizing the

32

City's financial situation, the Chairman will agree with the City on Issue No. 8 and provide that if the DPOA wishes to have Grievance Committee Members receive two working days off per week, on any days off those days shall be at the expense of the DPOA, namely, their salaries and benefits for those days off shall be paid by the DPOA. This will amount to a savings of $296,000 per annum by the City and can be afforded by the DPOA. This represents a compromise, recognizes the City's financial situation, and it is up to the DPOA to adjust, if it so desires, its method of delivering services to its members. The DPOA must recognize that it is somewhat being treated differently than other unions in the City. But this is because of the nature of the members it represents and the cost associated with doing so, as explained by the Chairman.

As to Issue No. 5, the Chairman believes that the Order is unique to the Detroit Police Officers Association for the reason discussed in this portion of the Opinion. For this reason, the Chairman cautions that the Order as to Issue No. 5 or the Opinion that has been written by the Chairman as to Issue No. 5 should not be taken as a precedent as to the other uniform groups as their numbers and their situations are different and may or may not support the claim for full-time Union Officers as was made by the DPOA based on the numbers of Officers represented by the DPOA that were made to this Panel and the type of representation that was required to be made on a day to day basis.

The Union Delegate concurs with the Chairman as to Issue Nos. 1 and 5, but dissents as to Issue No. 8. The City Delegate dissents as to issue Nos. 1 and 5, but concurs with the Chairman as to Issue No. 8.

**Issue No. 27** - **Economic** - *Article 12.A - Modify Funeral Leave*

Issue 27 pertains to the funeral leave provisions of Article 12. This is an economic issue. The City proposes that the number of leave days for funeral of immediate family members be

33

reduced from three (3) to two (2). Additionally, the City proposes that leave days for funerals of immediate family members exceeding two (2) days only be extended to "a total of five (5) days to be charged against current sick leave…" Conversely, the DPOA proposes that the *status quo* be maintained, which would provide three (3) days of leave for the funerals of immediate family members. The language affording three (3) days of funeral leave has been in the contract between the City and the DPOA for a number of years. The City has put forth no convincing justification for a reduction in leave days for the funerals of immediate family members. Although legitimate, the cost savings associated with the City's proposal do not justify a reduction in leave days for funerals of immediate family members in light of added stress to officers. Indeed, reducing the historical funeral leave that the officers have had would add to the stress of an already highly stressful job at times of personal crisis. Furthermore, comparables to other cities indicate that the City's proposal, frankly, is below any of the listed police jurisdictions. Accordingly, considering the lack of significant, consistent cost savings and the comparables presented, the Chairman denies the City's requested changes to Article 12. The DPOA Delegate joins the Chairman in adopting the *status quo*. The City Delegate dissents.

| | |
|---|---|
| **Issue No. 79 - Economic -** | *Article 37 - Bonus Vacation Days - Eliminate* |
| **Issue No. 40 - Economic -** | *Article 14.D.4 - Overtime-Bonus Vacation Days - Did Not Work Roster* |
| **Issue No. 47 - Economic -** | *Article 22.A - Furlough Selection-Delete-Attach Bonus Vacation Days to Furlough Days* |
| **Issue No. 49 - Economic -** | *Article 25 - Emergency/Excused Leave Days-Relation to Sick and Bonus Vacation Days* |
| **Issue No. 58 - Economic -** | *Article 31.E.6 - Holidays-Bonus Vacation Days* |
| **Issue No. 59 - Economic -** | *Article 31.F.2 - Holidays-Bonus Vacation Days* |
| **Issue No. 135 - Economic - Union Proposal -** | *Article 22-Furlough Selection and Cancellation-Sell Furlough Time-Continue to Attach Leave Days and Bonus Vacation Days to Furlough* |
| **Issue No. 142 - Economic - Union Proposal -** | *Article 37-Bank and Pay Bonus Vacation Days* |

34

**Issue No. 116** - **Economic - Union Proposal -**     *Article 37-Bonus Vacation-Bonus Vacation Days Not Used to Excused Time or Comp Bank*

The above issues deal with bonus vacation days which are set forth in Article 37 of the

Master Agreement which in its entirety reads:

### 37.  BONUS VACATION DAYS

Bonus vacation days are granted for unused current sick time.  Officers who have accumulated a minimum of fifty (50) sick days including both current and seniority days and have a minimum of six (6) years of service on July 1st of each year will be credited with one-half (1/2) of the unused current sick time from the previous fiscal year up to six (6) days.  An officer may request to take his bonus vacation days in any sequence (except when attached to a furlough as stated below) by submitting a request in writing to his commanding officer.  This request will be reviewed for the availability of personnel by his commanding officer.  Seniority will be a prime consideration when several officers request the same period of time off.

An officer shall be allowed to use up to three (3) bonus vacation days in conjunction with a furlough.  The request to utilize bonus vacation days in this manner must be included in the leave day request.  Bonus vacation days, when connected to a furlough, shall not be canceled unless the accompanying furlough is canceled.  This article does not affect or limit the right of the Department to determine the number of employees assigned to work.  Consequently, there will be no increase in the total number of employees who are absent and the effect of granting an employee's request could be that the seniority leave day request of another employee (even if more senior) will be denied.

The Department must insure that bonus vacation days are expended proportionately throughout the year and arc not carried until the last months of the fiscal year; therefore, on April 1st, the commanding officer shall assign the remaining bon us vacation days at his discretion. Any request to utilize unused bonus vacation days in conjunction with a furlough scheduled during the months of April, May or June must be submitted to the commanding officer by April 1st or those bonus vacation days will be assigned.

Bonus vacation time shall be deducted from the member's bonus vacation bank before compensatory time shall be taken.

As the first sentence of Article 37 clearly indicates, bonus vacation days are linked to

"unused current sick time".  In other words, bonus vacation days are granted as an incentive to

35

encourage an Officer's attendance.

The Department continues to be concerned with Officers who have absentee issues. This is the reason that the parties have negotiated an attendance program set forth in Article 36, namely, the D.P.D. 350 program. Absenteeism causes the Department overtime costs in that the Department on occasion finds it necessary to backfill for absent Officers on an overtime basis. Thus, when the City proposes in Issue No. 79 to eliminate bonus vacation days and suggests that it would save $1.2 million per year in the Police Department alone, the proposal ignores the cost of absenteeism.

The DPOA objects to eliminating Article 37, the bonus vacation days, and proposes that the *status quo* be maintained. This is an economic issue requiring the Panel to elect one of the parties' proposals. In the view of the Chairman, for the reasons already suggested, namely, absences add to the cost of the Department's operations, any savings resulting from the elimination of the Bonus Vacation Days program would be outweighed by the cost of backfilling because of absenteeism. Furthermore, the Bonus Vacation Day program has been a part of the Collective Bargaining Agreement between the DPOA and the City for a number of years. Considering the City has show no convincing reason justifying the elimination of the Bonus Vacation Days program, the Chairman decides to maintain the *status quo*. The DPOA Delegate joins the Chairman. The City Delegate dissents.

As to Issue No. 40, since a majority of the Panel is not eliminating bonus vacation days, bonus vacation days will be part of the Did Not Work Roster. Therefore, the City's Issue No. 40 will no longer be necessary and will be rejected with the DPOA Delegate voting with the Chairman on this rejection as the proposal would remove bonus vacation days from the Did Not Work Roster. The City Delegate dissents.

36

As to Issue 47, the City's Last Best Offer proposes the elimination of language contained in Article 22.A regarding Bonus Vacation Days granted in connection with furlough days. The DPOA objects to the elimination of this language and supports maintaining the *status quo*. This is an economic issue with the Panel obliged to select one or the other Last Best Offer. Since a majority of the Panel, in addressing Issue No. 79, opted not to eliminate bonus days, it follows that as to Issue No. 47 that the Chairman, joined by the DPOA Delegate, will opt to maintain the *status quo* as to Article 22.A since bonus vacation days shall remain in the Master Agreement. The City Delegate dissents.

Issue 49 makes reference to Article 25, "Emergency/Excused Leave Days". The last sentence of that Article in the first paragraph reads: "All excused days will be deducted from the member's accumulated sick bank and will consequently affect the accumulation of bonus vacation days." The City proposes to remove the phrase "and will consequently affect the accumulation of bonus vacation days". The DPOA proposes the *status quo*. The City's proposal was on the assumption that bonus vacation days will be eliminated. Since a majority of the Panel rejected the proposal to eliminate bonus vacation days, a majority of the Panel, namely, the Chairman and the DPOA Delegate, will vote to reject the elimination of the bonus vacation language from Article 25. The City Delegate dissents.

Issue No. 58 addresses Article 31.E.6 and the preparation and maintenance of holiday rosters and the elimination of the phrase "and up to three (3) bonus vacation days" as proposed by the City. The DPOA proposes the *status quo*. Since a majority, namely the Chairman and the DPOA Delegate, have voted to maintain the bonus vacation days, the same majority rejects the elimination of the preparation and maintenance of holiday rosters, the language "and up to three (3) bonus vacation days", and will vote to maintain the *status quo* and keep the reference to

37

the three bonus vacation days in Article 31.E.6.d.  The City Delegate dissents.

Issue No. 59 is similar to issue No. 58 in that Article 31.F.2 addresses Special Rules Affecting Rotation.  The City proposes to delete from Article 31.F.2 the following language:

> F.    Special Rules Affecting Rotation.
>
> \* \* \*
>
> 2.    **Employees on Furlough.**  For purposes of this Article, a furlough period includes the customary five (5) attached leave days ~~and up to three (3) bonus vacation days~~.  The furlough includes the holiday even if it should fall on the first day of the regularly scheduled furlough.
>
> \* \* \*

The language that the City proposed to delete is the strikeout language.  The DPOA proposes the *status quo* and to keep the deleted language.  Since the deletion assumes the elimination of the bonus vacation days and a majority of the Panel has opted to maintain the bonus vacation days, a majority of the Panel, namely, the Chairman and the DPOA Delegate, will vote to deny the request to delete the above language with the City Delegate dissenting.

As to Issue Nos. 135, 142 and 116, which are DPOA proposals, the DPOA has made the following proposals:

**DPOA**
**PROPOSAL NO. 116**
**Article 37 - Bonus Vacation Days**

**ARTICLE 37 (NON-ECONOMIC)**

Paragraph 3 of the current collective bargaining agreement shall be amended by addition the following proposed new language:

**"Effective July 1, 2012 any bonus vacation days not used by June 30 of each year, shall be automatically credited with an equivalent amount of "excused time" which will be placed in the officers compensatory bank."**

38

## ARTICLE 22 (NON-ECONOMIC)

Paragraph G – Shall be amended as follows: "Effective with the first furlough draw after August 28, 2011, members may elect to sell up to one (1) week of furlough time (5 consecutive days) per furlough period. This shall not diminish the election to attach five leave days and up to three (3) Bonus Vacation Days in connection with the furlough. An election to sell furlough time shall be at the time of the furlough draw. Payment shall be made within thirty (30) days after the furlough draw.

DPOA
PROPOSAL NO. 142
Article 37 - Bonus Vacation Days

## ARTICLE 37 - BONUS VACATION DAYS

Article 37, "Bonus Vacation Days," shall be modified upon issuance of this Award to provide that bonus vacation days that are not utilized during the fiscal year will be banked and paid at the rate of pay and rank at time of banking.

In regard to these proposals, the City's Advocate at pages 87 and 88 of his post-hearing brief writes:

3.    **Union Issue No. 135 - Right To Attach Bonus Vacation Days To Furlough Days Even If Furlough Days Are Sold**

The City agreed to allow Officers to sell one week of furlough time. With this agreement Officers gave up their right to schedule time off using furlough time and agreed to be at work. It is inconsistent to allow that an Officer to then schedule leave days and bonus vacation days for the same time period.

Further, to allow the Officer to schedule up to eight consecutive days off even though he has sold his furlough time is unfair to others who want furlough time and maybe prevented from taking it because the employee continues to schedule leave time and bonus vacation time during that period. It is hard enough to schedule furlough time when an Officer has sold furlough days to take available vacation time for Bonus Vacation Days and leave days.

39

4. **The DPOA Wants The Right To Bank And Sell Any Bonus Vacation Days Not Utilized Within The Fiscal Year**

This request should be denied for the following reasons:

- Bonus Vacation Days were agreed upon because they had to be used and could not be paid out costing the City much needed cash. This is the premise upon which Bonus Vacation Days were agreed upon and placed in the Labor Contract. To now allow them to be paid out would violate the principle underlying this contract provision.

- If police officers are allowed to bank and sell unused Bonus Vacation Days it will be costly to the City. It will cost the City $985,000 to payoff Bonus Vacation Days if all eligible officers bank and sell them. See Ex. 663.

- In the Ability To Pay portion of this Brief the City made it clear it has no cash. To allow Police Officers to convert Bonus Vacation Days into paid days negatively affects the City's cash, cash which the City does not have.

5. **Conversion of Bonus Vacation Time To Excuse Days To Be Placed In Officer's Compensatory Time Bank**

The DPOA wants to convert any unused bonus vacation days to excuse time to placed in Officers' compensatory time bank. The City opposes this request for the following reasons.

- At the present time bonus vacation days must be used or lost. It was negotiated as time off to be utilized during the fiscal year so that the problems of carryover would not exist. Further, they were negotiated such that they would be used and not cash out as compensatory time at retirement.

- Allowing the conversion of bonus vacation days to compensatory time would allow the officer to have these days paid out as compensatory time bank at retirement. The City is trying to decrease the retirement leave bank payments it must make not increase them.

- See cost implications set forth in the prior section. Ex. 663.

These proposals will add approximately $1 million annually in cost. Based upon the

City's fiscal condition, this is not the contract to add costs. The only reason the Chairman opted

with the DPOA Delegate to maintain the bonus vacation days is because the bonus vacation days

40

was an incentive to encourage good attendance and, for this reason, had the potential of not only being cost neutral but cost effective, *i.e.*, discouraging absences and, therefore, controlling overtime. Thus, the Chairman, with the concurrence of the City Delegate, will vote to reject Union Issue Nos. 135, 142 and 116. The DPOA Delegate dissents.

**Issue 50 - Economic -**      *Article 27 - Police Reserves*

Issue 50 addresses Article 27 of the Collective Bargaining Agreement dealing with police reserves. The DPOA proposes to maintain the current language of Article 27 and keep the status quo. Conversely, the City, in its Last Best Offer, proposes the following modified language:

> The City may deploy Police Reserve Officers to assist on-duty police officers or to assist the Department by performing tasks that do not require MCOLES certification. These tasks shall be limited to traffic duty, crowd control, riding with a Police Officer if the Police Officer consents, school patrol, handling and assisting in handling abandoned vehicle, helping with special events and central events, issuing parking tickets, and taking police reports.

Since at least 1998, the current Article 27 language has been in the contract. The question of police reserves is always a difficult one for the Police unions and municipalities to negotiate to their mutual satisfaction. In Detroit, under the current contract language, which either was negotiated or awarded in a 312 arbitration, the parties have developed certain practices as to the use of police reserves. In the absence of any current negotiations on the issue, the City wishes to impose an employment term that the City may hire and deploy police reserve officers in a manner deemed appropriate by the Chief of Police. There is no evidence that the parties were negotiating to an impasse on this subject. Nor were they making any concrete proposals prior to this 312 arbitration proceeding to modify the existing practices. Based upon the lack of bargaining history, which suggests no need to change the current practice, the Chairman, joined by the DPOA Delegate, decides to adopt the *status quo*. Article 27 will continue to read:

41

ARTICLE 27

In continuing its policy on police reserves, the City will in no event use police reserves to perform the essential core duties of bargaining unit members or to circumvent the holiday overtime and/or any other provisions of this agreement. Should a dispute over the deployment of reserves arise, the burden of proceeding and the burden of proof in any grievance/arbitration matter shall be on the Employer to establish by probative, objective evidence, that its use of reserves did not circumvent any provision of the collective bargaining agreement, and, but for the deployment of reserves, bargaining unit members would not have been used to participate in the particular event, duty, function, activity, etc.

Reserves cannot be assigned to ride with employees unless the employee consents. Reserves shall not ride with employees assigned to one person cars except in such situations that arise under Article 6.E.4.f. of this Agreement.

The City Delegate dissents.

**Issue No. 70 - Economic -** *Article 33 - Pension Provisions - City Right to Modify DB Plans*

In Issue 70, the City proposes the addition of new language to Article 33. The language of the City's proposed Article 33.X reads as follows:

The City reserves the right to modify, amend, and/or eliminate any and all aspects of its pension/retirement plan(s), unless prohibited by law.

The DPOA objects to the insertion of the City's proposed Article 33.X. This is an economic issue. The City's proposed Article 33.X is too open ended. When parties enter into a contract, they agree to be bound by the agreed upon terms. The proposed Article 33.X could serve to deny the DPOA of the agreed upon terms contained in the contract. Once orders are issued, they should be final and binding. Accordingly, the Chairman, joined by the DPOA Delegate, declines to adopt Article 33.X. The City Delegate dissents.

**Issue No. 85 - Non-Economic -** *Article 40.F - Miscellaneous-Service Weapon*

The City wishes to amend Article 40, Miscellaneous, Section F, as follows, represented by the strikeouts, suggesting that a weapon costs in excess of $600 and can be recycled:

42

F.C.   Service Weapon.  All employees shall be provided at no charge
with their department-issued service weapon upon full service
retirement, provided, however, that no employee who retires
before July 1, 1995 shall be entitled to receive their Department
issued Glock semi automatic weapon unless the employee has
been qualified with the Glock semi automatic weapon for one
year as of the date of retirement.

~~~~~~~~~Effective July 1, 1989, this provision shall apply to employees
who take a 40 & 8 vested pension.

The Department may refuse to give employees their weapon for
good cause shown.

This has been designated as a non-economic issue by the parties.

The City is correct that the proviso should be eliminated because there are no Officers
now employed who would be subject to the proviso.  Except for eliminating the proviso, there is
no reason to change the language.  It has been in the parties' Master Agreement for some time,
including the provision for employees who can retire at 40 and 8.  For this reason, the Chairman,
joined by the DPOA Delegate, will vote to maintain the current language minus the proviso.  The
City Delegate dissents.  The language will now read:

F.   Service Weapon.  All employees shall be provided at no charge
with their department-issued service weapon upon full service
retirement.

Effective July 1, 1989, this provision shall apply to employees
who take a 40 & 8 vested pension.

The Department may refuse to give employees their weapon for
good cause shown.

**Issue No. 88** - **Economic** -   *Article 40.I - Miscellaneous-Correction of Overpayments and*
*Underpayments*

Issue No. 88 addresses Article 40.I of the Master Agreement which is entitled "Correction
of Overpayments and Underpayments."  The City wishes to delete the current language and
replace it with the following language:

43

When by payroll error an employee is underpaid or overpaid, the City is expressly authorized to correct the underpayment or overpayment by payroll adjustment pursuant to applicable law. The City reserves the right to seek immediate recovery through appropriate legal proceedings.

Here, again, the Chairman is faced with no current history of bargaining. But the Chairman is faced with a contract provision that has survived at least two 312 arbitration proceedings, if not before. The whole idea of PERA is to bargain. When this Chairman remanded these proceedings back to bargaining, as permitted by Act 312, he was hoping that he would not be faced with provisions such as this to be decided as this is a provision that should have been resolved by the parties. As it is, this provision has obviously been resolved by the parties long ago, since it has been, there is no reason, in the view of this Chairman, to modify the contract language. Therefore, the Chairman, with the DPOA Delegate concurring, will reject the City's position and continue the language of Article 40.I in the Master Agreement. The City Delegate dissents.

**Issue No. 91** - **Economic** - *Article 41.A - Wages-Additional Classification Payments*

As to Issue No. 91, which references Article 41.B of the Master Agreement, the City proposes the following language with the addition of "unless modified" and the strikeout "Beginning July 1, 200~~4~~8 through June 30, 2009":

Unless modified, salaries for the following classifications will be maintained at the dollar differentials indicated for the term of this Agreement ~~beginning July 1, 20048 through June 30, 2009~~.

1. **Communications Officer - Police Officer (Class Code 33-12-11)**

| | |
|---|---|
| Start | $450 over starting salary of Police Officer |
| After one year | $450 over starting salary of one-year Police Officer |
| After two years | $450 over starting salary of two-year Police Officer |
| After three years | $450 over starting salary of three- year Police |

44

| | | Officer |
|---|---|---|
| | After four years | $450 over starting salary of four-year Police Officer |
| | After five years | $450 over starting salary of five-year Police Officer |

2. **Band Director - Police Officer (Class Code 33-12-14)**
   $821 over maximum of salary of Police Officer

3. **Assistant Supervisor of Motor Vehicles - Police Officer (Class Code 33-12-15)**
   $862 over maximum salary of Police Officer

4. **Police Data Processing Programmer - Police Officer (Class Code 33-12-26)**
   Minimum: $589 over maximum salary of Police Officer
   Maximum: $1,738 over maximum salary of a Police Officer

5. **Radio Maintenance Officer - Police Officer (Class Code 33-12-12)**
   $862 over maximum salary of a Police Officer

6. **Radio Systems and Planning Officer - Police Officer (Class Code 33-12-13)**
   $1,567 over maximum salary of a Police Officer

7. **Senior Police Data Processing Programmer - Police Officer (Class Code 33- 12-36)**
   Police Lieutenant salary

The DPOA agrees with this language which is in the Master Agreement except the DPOA does not agree with the addition of "unless modified" and the DPOA referenced *status quo* without mentioning striking the "beginning July 1, 2008" language. The Chairman, along with the DPOA Delegate would agree with striking the "unless modified" language because once an agreement is consummated it is the parties' agreement. If the parties want to modify it, that is up to the parties. As a housekeeping matter, the "beginning" language should be struck and the DPOA Delegate agrees that the language "beginning July 1, 2008 through June 30, 2009" should be struck because it is redundant and obsolete. On this assumption, in striking the words "unless modified", the Chairman and the DPOA Delegate adopts the DPOA's *status quo* language. The

45