# EXHIBIT A-1 (Part 2)

City Delegate dissents as he would include the "unless modified" language.

**Issue No. 106 - Economic -** *Article 33 - Sick Leave-Restricted Duty Assignments in Discretion of City: Restricted Limited to One Year*

Issue No. 106 is a proposal by the City to limit limited duty for Officers who are not injured on duty or have illnesses not connected to injuries on duty, as contrasted to injuries obtained while on duty to serving in a limited duty capacity for one year. This Chairman is familiar with such a provision whereby the Department would be distinguishing as to limited duty between Officers injured on duty and non-injured on duty Officers as this Chairman was called upon by the Chicago Police Department and the Fraternal Order of Police Chicago Lodge No. 7 to issue an opinion dated February 18, 2013 on the same subject against a background of numerous opinions issued by arbitrators in Chicago on the subject.

The Opinion gives the history of the matter in Chicago. Here, in Detroit, the record reveals that there are upwards to 60 non-IOD limited duty Officers serving in a Department of 2,000 Officers. In contrast, in Chicago, in a Department of 10,000 Officers, there are approximately 220 such Officers. This does make the point. Time lines do encourage Officers to get well and get back to full duty. This is particularly important in economically difficult times when the services of all Officers are needed on full duty.

There are provisions for disability retirements. This proposal only applies to non-IOD Officers. It does not apply to injury on duty Officers. The DPOA proposed the *status quo*, namely, no limitation, and the City proposed the one year limitation. As the Chairman understands the City's offer, the one year limitation would begin effective the date of the Order. Furthermore, the Panel must choose one or the other offer. Recognizing that the City needs full-time duty Officers and there are provisions for disability retirement and it seems that one year is a

46

reasonable time to recover from a disability, the Chairman, along with the City Delegate, will accept the one year limitation. The DPOA Delegate dissented, maintaining that there should be no limitation. Thus, the Order of the majority would be a one year limitation for non-IOD injuries or illnesses. There is no limitation for IOD injuries or illnesses.

**Issue No. 45 - Economic -** *Article 20 - Eliminate Educational Reimbursement*

The City has proposed that the educational stipend set forth in Article 20 under the conditions set forth therein, namely, that Officers can receive a maximum of $850 per fiscal year applied toward tuition in seeking a graduate degree from an accredited university, a maximum of $700 per fiscal year seeking an undergraduate degree, and $600 per fiscal year to be applied toward payment for participating in an employment development program be eliminated. The DPOA proposes to keep the *status quo*.

This provision has been in the parties' contract since 2000. It is similar to the provision that has been in union contracts throughout the City. The City in the current financial crisis in imposed contracts has eliminated the tuition reimbursement program throughout the City. In the Tentative Agreement the DPOA agreed to suspend the educational reimbursement until July 1, 2015.

In the overall scheme of economic benefits, this benefit has not been a major factor between the parties. In fiscal year 2011-2012, there were 43 requests of an average amount of $621 for a total of $26,716. In fiscal year 2009-2010, there were 97 requests of an average of $591 for a total of $57,365. This is an economic issue. The Panel is obliged to select one or the other Last Best Offer. It is a minuscule amount. Nevertheless, it is a saving and the DPOA at one time, in view of the current history of usage, was willing to suspend the payment for three years. The Chairman is aware of the circumstances of the Tentative Agreement which was

eventually rejected by the State. Nevertheless, this was the Tentative Agreement and gives some indication of what the parties would bargain on this issue, all other things being equal.

If this was the Last Best Offer of the DPOA, the Chairman would embrace it. But it was not.

Under the circumstances and with little usage and given the City history city-wide, the Chairman will join with the City Delegate and eliminate Article 20. The DPOA Delegate dissents.

**Issue No. 81** - **Non-Economic** - *Article 40.A - Miscellaneous-Maintenance of Conditions-Eliminate*

The City proposes to eliminate Article 40.A, the Maintenance of Conditions clause, which reads:

> Wages, hours and conditions of employment legally in effect at the execution of this Agreement shall, except as improved herein, be maintained during the term of this Agreement. No employee shall suffer a reduction in such benefits as a consequence of the execution of this Agreement.

The DPOA proposes the *status quo.*

Under normal circumstances, to the Chairman, this would be a "no brainer" and the Chairman would opt to maintain such a clause. But, because of the City's financial crisis, there will be changes in the parties' Master Agreement as a result of this Act 312. In fact, as a result of the Tentative Agreement of February 2012, there were major changes. Thus, the Maintenance of Conditions clause under such conditions is not appropriate. Hopefully, this clause can return in the future. However, under current conditions, the Chairman reluctantly must vote to at least temporarily eliminate the clause and save it for future negotiations. The City Delegate joins with the Chairman in so voting. The DPOA Delegate dissents.

48

**Issue No. 84 - Economic -** *Article 40.E - Miscellaneous-Execution of Agreement Without Prejudice to Any Grievances, etc.*

Article 40.E in the Master Agreement reads:

> The execution of this collective bargaining agreement shall be without prejudice to any pending grievances, arbitration or other litigation except where the subject matter in dispute may be resolved herein.

The City proposes to eliminate this provision. The DPOA proposes the *status quo.*

This provision has been in the parties' Master Agreement for a number of years. To the Chairman, it is an end run to avoid pending disputes which the parties have chosen to resolve other than through negotiations or Act 312. If the parties had wished to resolve the grievances in negotiations or Act 312, they should have done so.

Having chosen not to do so, then the parties, as they have in the past, should rely on other procedures. It is for these reasons that the Chairman, joined by the DPOA Delegate, votes to keep the present language. The City Delegate dissents.

**Issue No. 83 - Economic -** *Article 40 - Miscellaneous-Savings Clause*

Article 40.D of the Master Agreement reads:

> **Savings Clause.** If any article or section of this Agreement or any supplement thereto should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any article or section should be restrained by such tribunal, the remainder of this Agreement and supplements shall not be affected thereby, and the parties shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement for such article or section.

The City proposes to remove the clause "the parties shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually" and replace it with the clause "the City shall in its discretion determine". The DPOA proposes the *status quo.*

The Chairman, along with the DPOA Delegate, agrees to keep the *status quo.* This is a

49

mutual contract. If a provision of the Agreement is held invalid, then the parties should mutually agree on a replacement. It is just that simple. The City Delegate dissents.

| | |
|---|---|
| **Issue No. 140** - Economic - Union Proposal - | *Article ___ - Award of 20% of Savings from Reduction in Certain Benefits* |
| **Issue No. 114** - Economic - Union Proposal - | *Article 18-Leave Days-Pay 1 ½x for All Time on Restricted Weekends* |
| **Issue No. 136** - Economic - Union Proposal - | *New Rank of Corporal to be Established; Any Officer With 15 Years of Service Automatically Promoted to Corporal; 2% Increase* |
| **Issue No. 119** - Economic - Union Proposal - | *$500 Per Year For Cell Phone Use* |
| **Issue No. 125** - Economic - Union Proposal - | *$1,000 Bonus for All Officers* |
| **Issue No. 134** - Economic - Union Proposal - | *Field Training Officers 5% Increase in Wages* |
| **Issue No. 121** - Economic - Union Proposal | *Bank or Sell Furlough Time* |

The Chairman has grouped Issue Nos. 140 (Union Proposal), which is different than City Issue No. 140; Union Issue No. 114; Union Issue No. 136; Union Issue No. 119; Union Issue No. 125; Union Issue No. 134 and Union Issue No. 121 as a group. The reason that the Chairman has done so is that these proposals represent economic enhancement over the expired Master Agreement. The Chairman has already discussed the City's ability to pay. As this Opinion and Award is being written, a State Financial Review Team on February 19, 2013 issued a report confirming the Chairman's conclusion, along with the financial private agencies' conclusions, that the City of Detroit is in a financial crisis, to say the least. Thus, when the Chairman reviews Union Issue No. 140 and Issue Nos. 114, 136, 119, 126, 134 and 121, these are all issues that seek economic improvements of one sort or another that would be proffered in a situation where there was some semblance of an ability to pay.

The Chairman appreciates that as to Union Issue No. 140, an award of 20% of savings from reduction in certain benefits had its genesis in the Tentative Agreement of February 2012 and was no doubt the result of the give and take of bargaining. But that Agreement was rejected

50

by the State. The savings were necessary in order to arrive at an agreement in a critical financial situation. Seeking a Corporal rank is an attempt to get a pay raise where general employees are taking a pay reduction and the City is virtually, if not, insolvent. The Chairman acknowledges that this is an attempt to mirror what occurred with the Wayne County Deputies. But it is not in the cards at this time in Detroit because of the financial crisis which is the proposal represented by Issue No. 132 to provide a 2% increase for Officers with 15 years of service to be automatically promoted to Corporal.

Issue No. 119 provides for $500 per year for cell phone use. Again, this is a cost that the City cannot at this time afford.

Issue No. 125 represents a $1,000 bonus for all Officers – another cost that the City does not have the financial ability to provide.

As to a 5% increase for Field Training Officers, there are some departments that do provide a stipend for Field Training Officers such as, for example, Chicago. But, again, this Chairman with these financial difficult times in Detroit, with the amendments to Act 312 brought about by Act 116 emphasizing financial ability, if there was ever a case where financial improvements, absent compelling circumstances, can be made, this is the case. The proposals listed above, including one and one-half time pay for restricted weekends, fall in this category. This does not mean, in the Chairman's view, that there might be a situation where the marketplace might compel an economic improvement. But the cost associated with these proposals would impede the ability to maintain a competitive wage in these difficult financial times. For instance, the $500 per year cell phone payment and the $1,000 per year bonus just for the Police Officers is estimated to be $3 million. This is no small change.

If 50% of the Officers sold one week of furlough time, this would cost the Department

51

approximately $900,000.

There would be an additional cost for the time and one-half on the restricted leave day. In addition, this provision had been rejected by three Act 312 Arbitrators, including this Chairman. this Chairman in the mid 1990's in *Case No. D92 C-0554*, noted that the issues concerning restricted days should be resolved through the grievance procedure.

Second, in his August 2003 Act 312 Award, Arbitrator William E. Long rejected an identical proposal for three reasons:

- First, Arbitrator Long stated the language in the DPOA's LBO stating that if the Department restricts leave days for any command district, precinct or part thereof, no matter how small, that this counts toward one of the six restricted days for the entire Department was unreasonable. Sec Ex. 674, second exhibit, at 84. The Panel also noted that "there is concern with the fiscal impact of the provision in the last sentence, which in the view of the Panel majority, unnecessarily restricts management in managing its personnel needs and adds unnecessary costs." *Id.* at Ex. 674, second exhibit, at 87.

- Second, Arbitrator Long credited the City's analysis of the cost of this provision should they need to exceed the number of restricted days at between $154,000 and $218,000 each day. This is obviously an astronomical cost that the City cannot afford if it is required to restrict leave days for any kind of an emergency. See Ex. 674, second exhibit, at 86.

- Third, Arbitrator Long noted that there was no record evidence to support how a six day limit on the City's ability to restrict weekend days would be enough or appropriate. Ex. 674, second exhibit, at 86·87.

Arbitrator Richard Block rejected the proposal in his March 2007 Act 312 Award. See Ex. 674, first exhibit. Arbitrator Block found that the provision would be too costly, that the City needed flexibility concerning restricted days in the event of an emergency and that there was no need shown.

Like the Long and Block Awards, this provision continues to be too costly and there has been no need shown for a change, particularly in a financially distressed city.

It is for these reasons in the economic climate in Detroit that the Chairman must vote

52

along with the City Delegate to deny the DPOA's request as to Union Issue No. 140 and to deny the DPOA's request as to Issue Nos. 114, 136, 119, 125, 134 and 121. The DPOA Delegate dissents.

**Issue No. 124 - Economic - Union Proposal -** *Economic Promotion to Sergeant Based on Seniority Only*

The DPOA as to Issue No. 124 has proposed to add a provision that promotion to and through the rank of Sergeant shall be based on length of service therein and as defined length of service. The rationale for this proposal is that promotions in the Detroit Fire Department are by seniority only rather than examination as in the Police Department. The DPOA has not pointed to any comparable police department in Southeast Michigan or anywhere in the State of Michigan where Police Officers are not promoted by examination.

Furthermore, the matter of promotion in the Detroit Police Department has been in existence since the time the parties have been negotiating. There is no basis to change.

For this reason, the Chairman, along with the City Delegate will vote to deny this request. The DPOA Delegate dissents.

**Issue No. 115 - Economic - Union Proposal -** *Article - Legal Representation-Increase Amount to $300,000 for Legal Fees*

Article 28 is entitled "Legal Representation and Identification". Paragraph 5 of Article 28 provides:

> Effective July 2004 and each fiscal year thereafter, the City shall either defend or reimburse the DPOA and/or member for all legal expenses and fees incurred by the DPOA or member if the member is criminally charged and/or prosecuted for conduct that arises out of/or involved with the good faith performance of the official duties of the employee and the member is either exonerated or the criminal charges are dismissed. The City's obligation to defend or reimburse shall be capped at an amount of one hundred thousand dollars ($100,000) each fiscal year. The DPOA shall upon request provide documentation supporting a

53

claim for reimbursement.

The DPOA proposes that the amount be increased to $300,000. The City proposes the *status quo.* This is a cost item. As in this round of contract 312, the City opposes any increase in cost and is seeking reductions. This proposal would be costly.

In his brief, the City's Advocate notes, "With no demonstration that the $100,000 allotted per year has either been exceeded was ever close to being exceeded, there is no justification for a change in this provision." Furthermore, the City can elect to defend with its own counsel and, indeed, $100,000 can buy substantial services. Without a proven need for an increased amount, this Chairman, along with the City Delegate, will deny this request. The DPOA Delegate dissents.

**Issue No. 117** - Economic -Union Proposal -  *Article 40-Miscellaneous - City shall provide DPOA members with all greater benefits provided to others*

The Union proposes a new Section L to Article 40 to read:

> The City shall propose DPOA bargaining unit members with all greater economic benefits awarded and/or provided to DPCOA, DPLSA and/or DFFA.

There is presently no such provision in the Master Agreement. This is sometimes known in labor parlance as a "favorite nation" clause.

The argument being made by the City is there should be no such provision. There has not been such a provision in the past. The City proposes that the *status quo* remain.

The Panel has put together a contract based upon the unique circumstances of Police work in Detroit and more specifically the work of the Detroit Police Officers – not the Command, not the Supervisors, not the Commanders, and not the Detroit Fire Department. Each of these units have different factors and in a reorganized and reconstituted City government may

54

be expected in each case to be reconstituted in order to respond to the economic realities of what will become a new Detroit. In the meantime, this Panel must address the needs and limitations involved with the Detroit Police Officers Association. This Panel is addressing the City's financial ability in conjunction with the public welfare of having Police protection. The marketplace for Police Officers, which is different than the marketplace, for example, of the DPLSA or the DPCOA and the art of the possible as to Detroit Police Officers when comparing with similarly situated police officers doing police work.

It is for these reasons that the Chairman, along with the City Delegate, will deny the requested addition of Section L to Article 40. The DPOA Delegate dissents.

**Issue No. 52 - Economic -** *Article 30 - Modify Shift Differential*

Article 30 of the Master Agreement provides for shift differential, namely, if the tour of duty begins between 11:00 a.m. and 6:59 p.m., the rate of shift premium is 50¢ per hour. If the tour of duty begins between 7:00 p.m. and 3:59 a.m., the rate of shift premium is 60¢ per hour.

The City proposes to reduce the shift premium for the 11:00 a.m. to 6:59 p.m. period to 25¢ per hour and from 7:00 p.m. to 3:59 a.m. to 50¢ per hour, maintaining that this is an attempt to obtain uniformity with all bargaining units throughout the City; that this has been obtained with all the non-uniform units. The DPOA seeks to maintain the *status quo.*

There is no question that this reduction would result in a savings. But it fails to recognize that Police work does not lend itself to uniformity as might be suggested by the fiscal agreement. Here is why.

In his travels among police departments over the years, particularly in large municipalities, the Chairman has been led to believe that there are two major periods in a 24-hour period of high Police activities, namely, between 4:00-8:00 p.m. and at the time that bars

55

close which the Chairman is led to believe in Michigan is 2:00 a.m. And it is also recognized that criminal activity has a tendency to occur during hours of darkness. This is not always true, of course, but there is the tendency.

In addition, as a Police force grows older and is on permanent shifts as compared to rotating shifts, older Officers tend to use seniority to obtain positions on the day shift. The value of shift premiums, which usually are not available when there are rotating shifts, is to encourage some senior Officers to take the night shifts. Thus, there is a reason for shift differentials in Police work that does not apply to general employees in both the public and the private sectors.

In other words, the work of Police Officers on the afternoon and midnight shifts, by the nature of criminal activity, can be more demanding and the Department may wish to encourage a more experienced, older Officer to seek employment on the night shift by a reasonable shift differential that is not necessary to make available to employees in other types of work. Though there may be a cost savings in halting the afternoon shift differential and in docking the night shift differential by 10¢, the nature of Police work and the need for experienced Officers in times of heavy Police activity, coupled with the fact that these shift differentials have been negotiated over a long period of time, even in a fiscal crisis, causes this Chairman to vote with the DPOA Delegate to maintain the current shift differential, namely, the *status quo*. The City Delegate dissents.

| | |
|---|---|
| **Issue No. 108** - Economic - Union Proposal - | *Article 33-Pension Benefits-2.2% Multiplier* |
| **Issue No. 109** - Economic - Union Proposal - | *Article 33.D.H-Pension-Include Banked Vacation and Sick Time in Pension Calculation* |
| **Issue No. 110** - Economic - Union Proposal - | *Article 33-Pension-Best 3 of 5 Years* |
| **Issue No. 111** - Economic - Union Proposal - | *Article 33-Pension-1.5% Escalator and Same for DROP Plan* |

The Chairman has grouped together Union Proposals represented by Issue Nos. 108, 109,

110 and 111. The DPOA and the City of Detroit entered into a Stipulated Act 312 Award in September 2011 concerning a pension multiplier and the loss of an escalator. What the DPOA proposes to introduce in Issue No. 111 is an escalator of 1.5%, to increase the multiplier from 2.1% to 2.2% (Issue No. 108), and by changing the years to be utilized in the final average compensation (Issue No. 110) from the last 60 months prior to retirement to the best three of the last five years, and to include banked vacation and sick time in average final compensation (Issue No. 109), which the City argues is contrary to the Stipulated Act 312 Award in September 2011 and is designed to alter that Award. The City introduced a report dated January 8, 2013 from actuary Joseph Esuchanko as Exhibit 741 that set forth the cost of these proposals as follows:

> Increase multiplier from 2.1% to 2.2%: $8.5M
>
> Include longevity again, plus all banked vacation and sick leave time in AFC: $103M
>
> Change the definition of Average Final Compensation from last 60 months to highest three years of the last of five years: $8.6M
>
> Reinstitution of longevity, inclusion of banked vacation and sick time and change in years of Average Final Compensation if all were granted: $19.5M
>
> Add 1.5% per annum pension escalator: $40.4M
>
> Cost to increase multiplier, change Average Final Compensation to highest three of five years, include vacation and sick banks and add 1.5% annum pension escalator: $73.2M. See Report, Ex. 741 at 11.

After setting forth this cost analysis, the City's Advocate at page 70 of his brief concludes:

> In view of the stipulated Act 312 Award in September 2011 and the City's current financial condition, awarding the DPOA any of its proposed pension proposals is totally and completely unwarranted. Furthermore, considering that the City has already borrowed $1.5B (the POCs) to fund the pension, any more liability is simply unwarranted.

The Chairman agrees that with the City's financial situation and the fact that only a year

previously the DPOA stipulated to the changes referenced in the Stipulated Act 312 Award of September 2011, this is not the time to make the changes sought . For this reason, the Chairman, concurred in by the City Delegate, will vote to reject the DPOA's proposals as to Issue Nos. 108, 109, 110 and 111. The DPOA Delegate dissents.

**Issue Nos. 95 and 96 - Economic -** *Article 46-Pension Board to Provide Information to City;*
*City Right to Change Board*
**Issue No. 120 - Economic - Union Proposal -** *Article 46-Pension Board-Add Two DPOA*
*Representatives*

The parties have two competing issues as to the Pension Board. The DPOA proposes to have the right to add two Trustees elected to the Police and Fire Pension Board. Presently, the Pension Board's composition has a 50/50 representation as a result of an Act 312 decision by Arbitrator William Long and then confirmed by Arbitrator Ken Frankland as a result of the September 2011 Stipulated Award. Although there was testimony by DPOA President Diaz suggesting that the Commander representative favored management, with the Long and Frankland Awards favoring the current composition and the method in the contract for breaking ties, there is no persuasive reason to overrule previous arbitrators on this issue.

For this reason, the Chairman, along with the City Delegate, will vote for the *status quo*. The DPOA Delegate dissents.

As to Issue No. 95, this issue is the opposite of Issue No. 121 and is an attempt to change the composition of the Board proposed by the City by eliminating the deadlock mechanism implemented by Arbitrator Long in *Case No. D01 D-0568* and to provide in Paragraph L language "The City reserves the right to change the composition structure and decision making procedures of the Pension Board". The Chairman, joined by the DPOA Delegate, will vote for the *status quo*. The City Delegate dissents.

58

As to Issue No. 96, except with the elimination of the reference to the CET and replacing it with the word "order", which is housekeeping language, the Chairman, joined by the City Delegate, will adopt Issue No. 96 which provides as follows:

> M.    Within fifteen (15) days of the effective date of this CET, the Pension Board shall provide to the Mayor and City Council all pension plan documents, including but not limited to: Plan Documents, Plan Amendments, Favorable Determination Letters (Pension Only), Summary Plan Descriptions, All Summaries of Material Modification, Model Enrollment Forms, Insurance Contracts, All Funding/Actuarial Reports, All Explanations provided to Participants/Employees such as "Benefits at a Glance" and/or other summaries. The Pension Board shall provide to the Mayor and City Council all future amendments to any such documents within five (5) days of the amendment.

This seems to be a reasonable provision as, since the City is supplying funds for financing the pension obligations, the City is entitled to the pension documents as set forth in the above provision and Paragraph M should be incorporated into Article 96 of the Master Agreement.

**Issue No. 123** - **Economic - Union Proposal** -    *Article 40-Miscellaneous-Canine*

Article 40.K of the Master Agreement provides:

> K.    **Canine**. With respect to any assignment made to Canine (K-9) on or after July 1, 2007, the City may, at its discretion, direct the member on said assignment to return all departmental dogs under the age of five and all departmental equipment to the department at such time as that member is no longer assigned to Canine.

The DPOA proposes to replace Section K as follows:

> Paragraph K - Deleted to reflect the fact that DPOA bargaining unit members retiring from and/or leaving the canine unit will be permitted to keep their canine.

There is no evidence that there was bargaining over this provision. The City proposes to keep the *status quo*, making the return of equipment optional at the discretion of the Department

for dogs under the age of five. This provision was in the Master Agreement as a result of negotiations. There is a cost, although minor, in the scheme of things. But, with the lack of negotiations, even on the remand, the Chairman will not vote to modify the Master Agreement. This is a matter that should be negotiated between the parties. For this reason, the Chairman will vote with the City Delegate to maintain the *status quo*. The DPOA Delegate dissents.

**Issue No. 28 - Economic -** *Article 13.A and B - Off-Duty Court Appearance-2x Straight Time*
**Issue No. 29 - Economic -** *Article 13.D - Off-Duty Court Appearance First 60 Hours as Comp Time*
**Issue No. 30 - Economic -** *Article 13.G - Off-Duty Court Appearance - Holiday Court Appearance 1 ½x*

The City proposes to modify four Sections of Article 13 addressing off-duty court appearances. The City as to Article 13.A proposes to change the minimum time for off-duty court appearances from three hours at time and one-half to two hours at straight time (Issue No. 28) and to delete the sentence, "Off-duty court appearances for a period of less than 45 minutes which abut a prescheduled shift may be treated as either overtime or court time at the option of the Department".

As part of Issue No. 28, the City proposes to amend Article 13.B so that the second paragraph shall read, "If the actual amount of time spent in court is less than two hours, the member shall be credited with two hours worked at straight time" and to amend the third paragraph of Article 13.B to read, "If the court appearance is for two hours or more, the member shall be carried working for the actual amount of time worked".

Issue No. 29 addresses Article 13.D and provides, as proposed by the City, "Each fiscal year, the first sixty (60) hours of off-duty court time for any member shall be compensated through credited compensatory leave time placed in the member's leave bank and not cash payment. After the sixty hours of off-duty court time are worked in the fiscal year, the member

60

shall have the option of being paid in cash or being credited with compensatory time. Furthermore, such off-duty court time shall be paid in cash rather than granting compensatory time when necessary to comply with F.L.S.A. requirements". In the Master Agreement, the member has the option to be credited with compensatory time or being paid in cash, subject to FLSA requirements.

Issue No. 30 is a proposal that "a member who is required to appear in court on a holiday will receive credit either for an off-duty court appearance at the two hours straight time minimum or holiday premium pay (1x) for the actual time spent on the court appearance whichever is greater". The Master Agreement had provided in Section 13.G, "...at three hour minimum or holiday premium pay (2x) for the actual time spent on the court appearance, whichever is greater".

The DPOA proposes the *status quo*, namely, the language in the Master Agreement.

The City notes, as in Exhibit 646, overtime costs for the Department for 2011-2012 were $24 million; that changing court time for two hours straight time from three hours at time and one-half would save the Department $1.5 million annually; that requiring the first 60 hours of court time as banked as compensatory time would save the Department $700,000 per year.

The fact is that in the Tentative Agreement of February 2012, the DPOA, as an attempt to assist the City to save money, did agree to these proposals as to off-duty court appearances, namely, "Article 13 'Off-Duty Court Appearances' of the collective bargaining agreement shall be modified through August 13, 2015 to provide as follows ...". As the Chairman interprets the Agreement, the DPOA was willing to agree to these modifications for a period of three years on the condition that the savings represented by the modifications, along with other savings, would first sunset and, in the Tentative Agreement, would provide that the DPOA members would

61

receive 20% of the savings represented by the Tentative Agreement. Then, too, there was to be no reduction in salary and longevity. Nevertheless, the State rejected the Tentative Agreement because allegedly there was not sufficient economic savings.

The matter has come before an Act 312 Panel. This Panel will recommend a two year contract under certain conditions. The Panel will provide for certain additional savings that were not in the Tentative Agreement, including certain provisions for structural changes that will aid in reorganizing the Department to be economically more efficient and yet provide the Officers with a pathway for a more competitive wage.

As the Chairman sees the proposal of the City, it is in three parts, namely, the court appearance being two times straight time, the first 60 hours as comp time, and holiday court appearance as time and one-half. The City noted at page 59 of its advocate's brief that "The City requests these changes for the following reasons". The fourth reason that the City gives is:

> The DPOA agreed to this provision as part of the Tentative Agreement. See Ex. 771, p. 1. Although the Tentative Agreement was rejected by the State of Michigan because it did not provide sufficient overall savings and because the Labor Contract would be extended to June 30, 2015, there is support for this concept from the DPOA.

As to Issue No. 29, the bank of compensatory time would save the Department $700,000 per year and for this reason this Chairman, along with the City Delegate, will opt for this proposal with the DPOA Delegate dissenting. However, as to changing Article 13.A and B as proposed and Article 13.G as to holiday court appearances as proposed, the Chairman, along with the DPOA Delegate, will opt for the *status quo*. Though the changes would represent a savings in overtime, depriving the Officers of a long time benefit is not the way to obtain the savings. What needs to be done is to encourage the Officers to write tickets. If the Department wishes to control overtime as to court appearances and holiday court appearances, then the Department

62

should consider adopting the technique that is prevalent in other Michigan municipal police departments, namely, to have a supervisor negotiate with the citizens who are ticketed and only have the court Officers come to court in the event there are contested tickets. This works well, particularly in suburban departments and controls overtime. There was no showing that the Department has utilized this technique to control overtime justifying eliminating a long-standing contractual benefit.

Based upon this analysis, a majority of the Panel will continue the *status quo* as to Article 38.A and B and Article 13.G with the City Delegate dissenting. As to Issue No. 29, the Chairman, concurred in by the City Delegate, will agree to adopt the City's proposal as to off-duty court appearances for 60 hours at comp time. The DPOA Delegate dissents.

| | |
|---|---|
| **Issue Nos. 71 and 72 - Economic -** | *Article 35.A.2 - Sick Leave-Freeze Sick Leave Banks; Limit Future Accrual of Sick Leave; Elimination of Seniority Sick Leave* |
| **Issue No. 73 - Economic -** | *Article 35.B - Sick Leave-Use of Sick Time for Family and Relatives Discretionary* |
| **Issue No. 74 - Non-Economic -** | *Article 35.F - Sick Leave-Call in Sick Daily Until Doctor Note* |
| **Issue No. 75 - Economic -** | *Eliminate Pay-Out of Sick Leave Accrued After July 17, 2012* |
| **Issue No. 76 -** | *Interest Payments* |
| **Issue No. 77 -** | *Drop Plan Participants-Receipt of Payouts* |
| **Issue No. 78 -** | *Reservation of Right to Cap Accumulation of Sick Leave and Compensatory Time* |

The City has proposed the above four listed Issues. Issue Nos. 71, 72, 73, 76, 77 and 78 are proposed amendments to Article 35 addressing sick leave. Issue No. 75 addresses an overall elimination of payout of sick leave accrued after July 17, 2012. All of the Issues are deemed economic except Issue No. 74, which is deemed non-economic.

There are two types of sick leave in the Master Agreement. The current sick leave provides that an Officer earns one sick day per month which is placed in a sick leave bank,

63

namely, the current sick leave bank. In addition, after one year, an Officer is credited with five seniority sick days in his or her sick bank. Both banks, current and seniority sick time bank, can accumulate without limitation.

Issue No. 71 is a City proposal that the current sick leave bank be frozen as of July 17, 2012 and that further accumulation of current sick leave banks will be capped at 300 hours.

Issue No. 72 eliminates seniority sick days and freezes existing seniority sick banks.

Though the City maintains, based on Exhibit 659, that the value of seniority sick banks in the Police Department is approximately $2 million every year and that this is an ongoing liability, the fact is that seniority sick banks have been part of the parties' Master Agreement for a number of years. This provision is in the parties' contract as a guarantee against catastrophic injury or illnesses. With no evidence of negotiations to limit the effect of this provision, the Chairman, joined by the DPOA Delegate, will vote to maintain the *status quo*, namely, the present provision in the Master Agreement as to seniority sick bank and the unlimited accumulation of seniority sick leave with the City Delegate dissenting.

As to Issue No. 71, the Chairman recognized that the payout of sick time at retirement is a cost. The DPOA proposes as to Issue No. 71 that the *status quo* be maintained, noting that the unlimited accumulation of current sick time has been in the parties' Master Agreement for some time. The Chairman appreciates that this creates a substantial economic obligation on the part of the City. Yet, the Department is concerned about absenteeism and its effect on the Department's 24/7 operation and the need to have Police on the streets; that absenteeism interferes with the Department's operation. If Officers in effect have no incentive not to use sick days despite the possibility of discipline, the incentive to accumulate sick days as insurance against catastrophic illnesses or the award in accumulation could very well impact on the efforts of the Department to

64

avoid absenteeism and the overtime caused by absences.

There are creative ways that the Chairman has seen in other departments to address the so-called legacy costs created by the payouts at retirement or leaving the Department of accumulated sick time. But the proposal of capping, particularly at the low number of 300 hours, would not fit in to the concept of the art of the possible and would not, in the opinion of the Chairman, shared by the DPOA Delegate, have been reached at the bargaining table.

For this reason, as to Issue No. 71, the Chairman, joined by the DPOA Delegate, will opt to remain the *status quo* and reject the City's proposal. The City Delegate dissents.

As to Issue No. 75, the City proposes that a member shall receive full pay for 100% of the unused accumulated sick bank accumulated as of the date of July 17, 2012. Payment shall be made after permanent retirement/separation within 90 days if the amount is less than $10,000 and if in excess of $10,000 the amount shall be paid in semi-annual installments for a period of three years on September 1st and August 1st with no interest due.

The DPOA proposes the *status quo* as to Article 35.M which gives the Officer the option to take a payment of the accumulated sick time or choose to receive the three year average of 25% of the unused accrued sick leave bank in one (1) ... and have the sum included in the final average compensation used to compute the member's service pension of the retirement allowance. ... The lump sum payment the member will receive will be the remaining value of the unused accrued sick leave as provided ... above.

The Panel must choose one or the other option. Issue No. 75 assumes a cap on sick leave and, as explained on Issue No. 73, a majority of the Panel has rejected the cap on sick leave because such a cap could well encourage absenteeism which the Department wishes to avoid. For this reason, the Chairman, along with the DPOA Delegate, votes to maintain the *status quo*

65

as to issue No. 75 and maintain Article 35.M. The City Delegate dissents.

As to Issue No. 76, the City in the event, which was the case, that a majority of the Panel rejected the City's Issue No. 75, nevertheless proposed that payments made on sick leave accumulations, if the amount is less than $10,000, be paid within 90 days after permanent retirement/separation and if in excess of $10,000 the amount shall be paid in semi-annual installments for a period of three years on February 1st and August 1st with no interest due. The Chairman interprets this to mean that if the payments are not made when due, then interest would be paid. On this basis, the Chairman will vote with the City Delegate to accept this proposal as to issue No. 76. The DPOA Delegate dissents. This ruling is subject to the ruling on Issue No. 77.

As to Issue No. 77, the City proposes that DROP Plan participants may only receive payout of sick time when they permanently retire, not when they enter the DROP Plan. Under the expired Master Agreement, DROP Plan participants receive sick leave payout when they enter the DROP Plan and continue to work as Police Officers. This proposal could save money to the City. However, it has an unintentional consequence. For this reason, the City would ask to amend the proposal to permit Drop Plan participants at the time they enter the Drop Plan to exercise the option, if desired, set forth in Article 35.M.2 and defer after collecting the three year average of 25% of the unused accrued sick leave bank available at the time of entering the Drop Plan would be received at the time the participant permanently retires. The City agrees to amend the proposal accordingly with the concurrence of the DPOA. Though the DPOA objects to the proposal, the Chairman and the City Delegate concur in the proposal with this amendment, namely, that the Drop Plan participant may exercise the 35.M.2 option at the time of entering the Drop Plan with the understanding that the remaining value of the unused accrued sick leave bank

66

shall not be paid to the Drop Plan participant until the Drop Plan participant permanently retires.

As to Issue No. 78, the City proposes, "The City reserves the right for purposes of retirement payout to cap the number of hours a member may accumulate in their sick leave and compensatory time banks or to the extent allowed by law, cap the amount of payouts from such banks upon retirement." The DPOA objects to such language.

The Chairman has been asked in these proceedings to rule on provisions, including proposals as to caps on payouts. The Chairman, with one or the other Delegate, has made rulings. Once making these rulings, this becomes part of the contract. If the rulings do not modify the Master Agreement, the language or the practices developed under the Master Agreement remain. What Issue No. 78 does is to ignore negotiations, ignore the provisions of the contract that have been crafted between the parties over the years, and these Act 312 proceedings which were carefully developed by the parties through testimony and extensive briefs. There is no place in these proceedings or in the Master Agreement for such language. It fails to recognize that there are two parties to the Agreement. For this reason, the Chairman, joined by the DPOA Delegate, will reject the City's proposal on Issue No. 78. The City Delegate dissents.

In Issue No. 73, the City seeks to amend Article 35.B by amending the last sentence of the first paragraph entitled "Sick Time Credit" as follows:

> The granting of sick time for attendance upon these relatives is <u>at the discretion of the City</u> ~~and not limited to any given number of days per fiscal year~~. However, no more than three (3) days will be granted in one instance.

The City is adding the language "at the discretion of the City" and striking out "and not limited to any given number of days per fiscal year".

67

The City's Advocate correctly recognizes in his brief the possible impact of the Family and Medical Leave Act on this language, as does the Chairman. Furthermore, the current language has been in Master Agreement for some time. The DPOA objects to this language change.

For these reasons, the Chairman, joined by the DPOA Delegate, will opt for the *status quo* as proposed by the DPOA. The City Delegate dissents.

Issue No. 74 is non-economic. The issue deals with Article 35.E which is entitled "Reporting Illness or Disability". The City proposes one change, namely, notification on a daily basis. The City tells the story of an Officer who when asked to notify the Officer's Command, actually sought a protective order. The Chairman finds this incredible. Though the Chairman appreciates that the DPOA objects, the Chairman finds that this proposal is reasonable to a point. The language should be further refined to clarify that if an Officer is hospitalized that the Officer does not have to call in daily or if the Officer is recuperating from a hospital stay at home that the Officer, if producing a medical statement that indicates when the Officer may return, that this would not require the Officer to call in daily.

In other words, the language should be refined so that it is clear when the daily requirement is to be met.

The Chairman, along with the City Delegate, will approve of the concept once the City clarifies exactly when the daily requirement is to be met. In other words, if an Officer is out, presumably the daily requirement will be met until the Officer produces a doctor's statement indicating the times of illness and return date or when the Command knows that the Officer is recuperating under a direction of a doctor and has documentation to that effect or is in the hospital. The language should be refined. If there is a dispute between the parties as to the

68

refinement, then it should be returned to the Panel for refinement. Otherwise, the concept is sound.

Therefore, the Chairman will join with the City Delegate, recognizing that the DPOA objects to this change but, in the interest of completing this contract immediately, will adopt this language subject to the comments of the Chairman here. If there is a dispute in any given case as to any discipline over the failure to call in because it fell into one of the categories discussed by this Chairman, that dispute should be attached either to an expedited arbitration at the next expedited arbitration date if the discipline is meted out or to a regular arbitration with these comments so that the umpire will understand the intent behind the change approved by a majority of this Panel. The DPOA Delegate dissents.

### Issue No. 80 - Economic - *Jury Duty*

The City proposes to replace Article 35, "Jury Duty" with entirely new language. The new language proposes that "An employee shall be allowed to attend jury duty without pay. An employee may elect to use paid leave for any day he/she serves on jury duty. Jury duty time shall not be counted as time worked for the purposes of computing overtime." This is Section A of the new Article 35. There is also Sections B and C. In Section B there is a provision that provides, "that the Department shall have the discretion in seeking to have the employee excused when his services are essential".

The DPOA proposes to maintain the *status quo* which provides that jury time is paid time and that the jury fees are to be returned to the City.

The City's rationale for the change as set forth in its counsel's brief is, "One of the goals of the Annex D of the Financial Stability Agreement was that there be uniformity in contract provisions." The brief goes on to point out that, except with unexpired labor contracts, the City's

69

expired contracts now have the proposed language.

The Chairman appreciates the desire for uniformity. But there are two reasons why the Chairman will vote with the DPOA Delegate to maintain the *status quo*. First, there is only so much that can be accomplished in an Act 312 and one negotiations. The provisions for jury duty would not be the main focus of negotiations between the parties because there is no showing that it represents a financial savings. Second, the provision as to seeking to have the employee excused is always the Department prerogative. The Department could issue a Special Order without any contract provision asking that all Officers notify the Department as to pending jury duty notification and then exercise the right to seek to have the Officer excused.

Finally, in many cases, an Officer will no doubt be excused as compared to the general employee population. It is doubtful that a Police Officer would be permitted to sit on a jury involving a criminal matter. It is doubtful that a Police Officer would be permitted to sit on a jury involving litigation against another Police Officer or the City. Thus, there was no persuasive reason in the grand scheme of things, particularly when there were no negotiations, to change this provision. For these reasons, the Chairman will vote with the DPOA Delegate and reject the City's proposal and maintain the *status quo*. The City Delegate dissents.

| | |
|---|---|
| **Issue No. 26** - Economic - | *Article 10.C. - Seniority-Assign to Avoid OT* |
| **Issue No. 31** - Economic - | *Article 14.A - Overtime-Dept. Has Right To Limit OT by Reassigning, etc.* |
| **Issue No. 36** - Economic - | *Article 14.D - Overtime-Assign OT Without Regard to Preschedule OT* |
| **Issue No. 43** - Economic - | *Article 14.E.9.F - Overtime-Assign From Straight time From Any Entity* |
| | |
| **Issue No. 32** - Economic - | *Article 14.B.1 - Overtime-Eliminate Daily Overtime* |
| **Issue No. 34** - Economic - | *Article 14.C - Overtime-Work 80 Hours for OT* |
| **Issue No. 33** - Economic - | *Article 14.B.4 - Overtime-Not Include Sick Time For OT* |
| **Issue No. 35** - Economic - | *Article 14.C - Overtime-Calculation* |

**Issue Nos. 37 and 38 - Economic -** *Article 14.D.2 - Overtime-Notice of OT*
**Issue No. 39 - Economic -** *Article 14.D.3 - Overtime-Union Verify OT Lists*
**Issue No. 42 - Economic -** *Article 14.D.9 - Overtime-Not Call More than 10 For OT*
**Issue No. 129 - Economic - Union Proposal -** *Article 14 - Overtime-Eligible to Work Overtime on a Furlough Day*

Overtime is an important issue to both the DPOA and the City. For a financially strapped City in fiscal year 2011-2012, the overtime cost for the Police Department was $24.9 million. In fiscal year 2010-2011, it was $24.3 million. Not all of this was attributable to the Police Officers. Some was attributable to the Lieutenants and Sergeants as well as the Command. Yet, this is a substantial cost. On the other hand, Police Officers do rely on overtime.

Issue No. 33 is a proposal to amend Article 14.B.4 as follows: "Time off due to furlough, liquidation of compensatory time, and other paid absences (not including sick leave) shall be considered as time worked when applying overtime rules."

The Chairman begins with the discussion that in the Tentative Agreement of February 2011 the DPOA did agree to a modification besides court time as to overtime costs for, in Paragraph 6 of the Tentative Agreement, the following was provided:

> Overtime. Article 14, "Overtime," shall be modified to provide that unless otherwise compelled by the Fair Labor Standards Act, members shall not be eligible for any overtime compensation in any pay period in which the member fails to work at least eighty (80) hours. Sick time shall not be considered as time worked in meeting the 80 hour work requirement, but time off due to furlough, liquidation of compensatory time, and other paid absences shall continue to be considered as time worked.

The DPOA rejected the City's proposal despite the Tentative Agreement. There is a logical reason for accepting the City's proposal. It discourages the casual taking of sick time on a daily basis for an Officer can still be called in to work overtime without any penalty for taking off sick. The taking of casual sick time will be discouraged, thereby aiding in the control of sick

71

time.

Based upon this analysis and the fact that the DPOA was agreeable to this provision at one time, the Chairman, along with the City Delegate, will agree with the City's proposal as to Issue No. 33. The DPOA Delegate dissents.

As to Issue No. 34, the City proposes that overtime shall be calculated on the following basis: "... unless otherwise compelled by the Fair Labor Standards Act, members shall not be eligible for any overtime compensation in any pay period in which the member fails to work at least eighty (80) hours". In the City's brief, it is stated that the purpose of this provision is "elimination of sick leave as time worked for purposes of calculating the 80 work hour requirement before overtime begins. Time off for furlough, compensatory time and other leave time (except sick time) will be considered time worked". The provision provides elimination of daily overtime (i.e., overtime after eight hours in a day) and payment of overtime only after 80 hours worked in a pay period.

The Chairman, along with the City Delegate, will vote to include this clause with the DPOA Delegate dissenting, with the clear understanding that the clause should have language consistent with the post-hearing brief that "time off for furlough, compensatory time and other leave time (except sick time) will still be considered time worked". This is the intent of the language and it should be in the contract. This is not an amendment. This is the intent and it is consistent with Issue No. 33. The whole idea of the language is to eliminate time and one-half for time after eight hours.

As to Issue No. 26, the City proposes to add to Article 10.C.4, "The Department may transfer, assign members to different entities on a day to day or week to week basis to limit, avoid or eliminate overtime or for other staffing or manpower purposes." The DPOA objects.

72

This came from the CET.

As to Issue No. 31, the City proposes to add in Article 14.A, "The Department retains the right to limit overtime in determining the deployment, assignment of personnel and resources, including transferring/reassigning employees to different entities on a day to day or week to week basis to limit, avoid or eliminate overtime."

There are difficulties with these two proposals, causing the DPOA to object to these additions. Until very recently, the Department had a Tactical Unit – one on the east side and one on the west side – where the Officers in that Unit were familiar with the entire City and could fill in where there was a need in any District or Precinct. The Chairman appreciates that that Unit has been disbanded. Based upon the proposed Issue Nos. 26 and 31, the proposals ignore seniority and could be causing seniority Officers being transferred while junior Officers are not being transferred. In the case of Issue No. 26, there appears to be an end run around seniority provisions as the last phrase, "or for any other staffing or manpower purposes", does not seem to have anything to do with overtime provisions. Then there is the safety problem in that an Officer could be transferred to an area where the Officer is unfamiliar. An Officer could be transferred to a so-called delta zone and be unaware that the Officer is in a delta zone. The Chairman understands a delta zone is a zone known as being an area where there is a tendency of hostility toward Police Officers. Officers who work such an area are familiar with such dangerous parts, whereas Officers unfamiliar with the area, coming from other areas in the City, would not be.

It is all these factors that cause this Chairman to join with the DPOA Delegate in rejecting the proposals of the City in adding in the contract proposals represented by Issue Nos. 26 and 31. The City Delegate dissents.

As to Issue No. 39, the City proposes to add to Article 14.E.3.a.c which reads, "The

73

Union shall verify and notify the City of any discrepancies in the overtime roster and indemnify the City if its failure to notify the City results in a grievance for overtime". The DPOA objects to this provision. In the absence of negotiations over this provision, the Chairman will opt not to honor this request. This is a matter for the bargaining table, not Act 312, particularly when there were so many other issues presented. The DPOA Delegate agrees with the Chairman. The City Delegate dissents.

Issue Nos. 36, 37 and 38 address changes as to the procedures in addressing prescheduled overtime. Presently, the Department is operating in patrol on a 12 hour schedule.

Issue No. 42 addresses a limitation on the number of calls that are to be made before on-duty personnel are offered the opportunity to accept overtime and does provide by mandatory overtime by inverse seniority when the daily on-duty roster in the event a sufficient number do not accept the overtime assignment. With 12 hour shifts there is a problem with such a provision if the junior Officer or any Officer on duty has already worked 12 hours, namely, a problem with fatigue.

A majority of the Panel will address the 12 hour schedule on patrol elsewhere. It seems that even if, based upon the majority opinion, the Department and Patrol goes back to eight hours, there is no showing of a need for the changes proposed by the City as to Issue Nos. 36, 37, 38 and 42; that without negotiation there is no indication that the parties would have reached some accommodation. Thus, the Panel has not been given any guidance of what would have occurred at the bargaining table. Since the present language on these subjects has been in the contract for some time, the Chairman, along with the DPOA Delegate, will opt to make no changes to the Master Agreement as to Issue Nos. 36, 37, 38 and 42. The City Delegate dissents as to Issue Nos. 36, 37, 38 and 42.

74

As to Issue No. 43, the City proposes to add an Article 14.E.9.f which would read, "The Department reserves the right to assign Officers on straight time from any entity in the City to avoid utilization of any overtime." The DPOA objects. The Chairman appreciates the sentiment behind the City's Last Best Offer as to Issue No. 43. There is, however, a limit to the quest to control overtime. There are the seniority provisions in the contract. There are the bid rights to certain entities which are to be followed. There is the limitation on assigning out rights. This language, to the Chairman, seems too broad and ignores other provisions of the contract that the parties over the years have negotiated. There are provisions sustained by this Chairman, with the concurrence of the City Delegate, in this Opinion that will assist the City in controlling overtime costs and yet protect basic contract rights that have been negotiated over the years between the City and the DPOA. This language as written would not pass muster at the bargaining table. This is another situation where the Chairman is limited to the parties' Last Best Offers. Without protective language giving recognition to other provisions in the contract, this Chairman cannot adopt this language.

It is based upon this analysis that the Chairman is joined by the DPOA Delegate in rejecting the City's proposal as to Issue No. 43. The City Delegate dissents.

Issue No. 129 seeks to amend Article 14.D.5, Overtime, by adding furloughs to the times that employees "are entitled to participate in pre-scheduled overtime opportunities". Reviewing Article 14.5, the symmetry of the provision and its meaning would suggest that furloughs should be included if in fact there is pre-scheduled overtime. Therefore, the Chairman, along with the DPOA Delegate, will vote to add furlough to Article 14.5 as proposed by the DPOA. The City Delegate dissents.

Finally, as to Issue No. 35, Overtime Calculation, because longevity will be restored the

75

second year of the contract by a majority vote, the calculation in Article 14.C shall remain as in the Master Agreement with the Chairman voting with the DPOA Delegate to maintain the Article 14.C overtime calculation without changes. The City Delegate dissents.

**Arbitration:**

| | |
|---|---|
| **Issue No. 14 - Non-Economic -** | *Article 8.A - Arbitration-2 Umpires, Not 4* |
| **Issue No. 128 - Economic - Union Proposal -** | *Article 4 - Basis of Rep - Special Conferences Held Within 5 Days)* |
| **Issue No. 130 - Non-Economic - Union Proposal -** | *Article 14-Overtime-Prescheduled O.T. Grievance Heard by Arbitrator Within 30 Days* |
| **Issue No. 131 - Non-Economic - Union Proposal -** | *Article 17-Arbitration on Performance Review Within 30 Days* |
| **Issue No. 132 - Non-Economic - Union Proposal -** | *Article 36 - Regularity in Sick Leave Benefits - Arbitration on Attendance Issues Within 30 Days* |
| **Union Proposal No. 146 - Economic -** | *Article 7 - Non-Economic: Payment of Umpire for cancellation days by party cancelling hearing)* |
| **Issue No. 16 - Non-Economic -** | *Article 8.F - Arbitration-Back Wages* |

There are seven issues dealing with arbitration or related to dispute resolution in the parties' Master Agreement. The Chairman has grouped these issues together for the purposes of convenience.

The Master Agreement provides for four Umpires. Currently, the parties are operating with three Umpires with one vacancy. This is Issue No. 14. The City proposes to reduce the number of four Umpires to two. The City's rationale is threefold. First, the number of Officers assigned to the Labor Relations Law Unit has decreased since 2008 from a high of six Officers in the unit plus an Inspector to three Officers in the unit plus an Inspector, although recently a fourth Officer has been added to the unit.

In addition, the Law Department in most cases has not been furnishing counsel as it has in the past, adding further strain to the Labor Relations Law Unit. Though this Chairman, who also

76

serves as an Umpire for the parties, is aware of the situation, and also the argument that the parties have been able, nevertheless, to dispose of a number of cases under these circumstances as the parties have embarked on an ambitious mediation process, the Chairman is not persuaded that at this juncture there is a need to reduce the number of Umpires. This may be an issue in the future or by negotiations between the parties. But, this is not a matter that at this time should be addressed in Act 312. For this reason, the Chairman, joined by the DPOA Delegate, will opt to vote to decline the City's proposal to reduce the number of Umpires. The City Delegate dissents.

Issue No. 128 addresses Article 4, Section 2, the provision for Special Conferences, which provides that "arrangements for such special conferences shall be made five (5) calendar days in advance whenever possible." The DPOA proposes to amend Section 2 to read, "Arrangements for such special conferences shall be made and take place within five (5) calendar days of the request". The argument was made that there have been delays in scheduling Special Conferences. The response of the Department was that it takes time to gather information needed to be presented for Special Conferences and whether the Chief or other high ranking Officers are needed to be present. Particularly in this time of reorganization in the City and within the Department itself, there will be substantial time demands on the Chief and other high ranking Department Officers that could very well make it not possible to meet the five day deadline and the fact that the present "wherever possible" language has been in the contract for some time, causing the Chairman, along with the City Delegate, to vote to decline to adopt the DPOA proposal and adopt the City's proposal to keep the *status quo*.

Issue No. 130 is a proposal by the DPOA to add a sentence to Section D.10 concerning overtime grievances to reflect "the grievance shall be heard by an arbitrator within thirty (30) days from the date of the submission of the grievance as an extra day on an expedited basis."

77

Issue No. 131 is a proposal by the DPOA amending Article 17.D to read, "The Personnel Bureau shall convene the Performance Evaluation Board to hear the matter within forty-five (45) days of the date of the written request to appeal. If the appeal is not heard within forty-five (45) days, the Performance Evaluation shall be increased to its prior rating." T he City points out that there may be reasons that the Evaluation Board may not be able to be convened within 45 days and that the result could well be that an underperforming Officer could, by a technicality, not have his or her true rating recorded.

Issue No. 132 is a proposal to add an extra arbitration date under Article 36.H addressing disputes concerning the Attendance Control procedures. The City objects to these proposals. The DPOA argues that such disputes need expedited resolution. The City argues that with its limited staff which also have other duties it will not be able to keep such deadlines.

The Chairman, in reviewing these proposals, would vote to deny same. The current expediting process has been resolving a number of the attendance issues promptly. In fact, there is time on the regular one-day process per month to resolve additional cases. The parties need more time to develop the current procedures. If they are not working, then the parties can sit down and refine the process. Until this is done, within the parties' respective current resources, there is no reason to memorialize any changes. This may be necessary in the future, but not until there has been further experience both in the Performance Evaluation Board and in the expedited process. It is for this reason that the Chairman, along with the City Delegate, votes to reject the DPOA's proposals as to Issue Nos. 130, 131 and 132. The DPOA Delegate dissents.

In this arbitration section, the Chairman appreciates that he has voted in most cases to reject the DPOA's proposals along with one City proposal. But these proposals, including the City proposal, should have been addressed at the bargaining table. They are proposals that in a

78

true impasse situation would have not reached impasse. The Chairman's approach was to address the larger issues that these circumstances have brought to the Panel and to recognize that the issues brought forth that the Chairman has dubbed the "arbitration issues" need time to be worked out between the parties based upon further experience. This explains the Chairman's approach.

As to Issue No. 16, the City proposes an overhaul of Article 8. F regarding arbitration of back wages claims of DPOA members. Specifically, the City Proposes that Article 8.F read:

### ARTICLE 8.F

All claims for back wages shall be limited to the amount of wages that the employee would have earned, less any compensation for *temporary employment obtained subsequent to his/her removal from the City payroll, and payments from Unemployment Insurance, Social Security Disability, Welfare, Family Independence Agency, City-Funded Long-Term Disability Insurance, Sickness and Accident Insurance or Automobile Accident Income Replacement Insurance. Where appropriate, the City shall reimburse those agencies and insurance funds so as to not affect the employee's equity therein; and* when an employee is suspended pending disposition of charges against him, there shall be no offset of interim earnings provided he is exonerated and restored to duty. In consideration for the above, the Union agrees to process cases of officers under suspension in a prompt manner.

The City's proposed changes to Article 8.F would significantly alter a contractual provision that has been included in the agreement between the City and DPOA for many years. Conversely, the DPOA argues for maintaining the *status quo*. Under the current circumstances, there is no reason for a change to the current language of Article 8.F. As an economic issue, the Chairman adopts the proposal of the DPOA. The DPOA Delegate joins the Chairman. The City Delegate dissents. Therefore, Article 8.F will continue to read:

### ARTICLE 8.F

All claims for back wages shall be limited to the amount of wages that the employee otherwise would have earned less any compensation for

79

personal services he may have received from any source during the period in question excluding documented overtime and Department authorized income earned outside his regularly scheduled work period.

When an employee is suspended pending disposition of charges against him, there shall be no offset of interim earnings provided he is exonerated and restored to duty. In consideration for the above, the Union agrees to process cases of officers under suspension in a prompt manner.

**Issue No. 146 -**       *Article 7 - Non-Economic: Payment of Umpire for cancellation days by party cancelling hearing*

The DPOA proposes to place in the contract a provision that the party who cancels an arbitration hearing shall be responsible for paying the Umpire's cancellation fee.

This is one of the items that should never be in an Act 312. This is an item that should have been negotiated if the parties had been negotiating. Furthermore, this Chairman, who has had the privilege of serving as an Umpire with the parties for some time, never realized that the Umpires were charging cancellation fees because this Chairman was under the impression that under the contract with the parties the Umpires were not to charge cancellation fees. This came as a revelation to this Chairman. Because this Chairman believes this matter should be at the bargaining table and not at Act 312, and because this is a matter that should be resolved by the parties at the time the issue arises, noting that at the last cancellation with this Umpire, due to unexpected illness of one of the attorneys, this Umpire never thought of charging a cancellation fee and this Umpire did not. For these reasons, joined by the City Delegate, this Chairman rejects this proposal. The DPOA Delegate dissents.

**Union Representation:**

| | |
|---|---|
| **Issue No. 2 - Non-Economic -** | *Article 4.A - Basis of Representation-One Steward/One Alternate* |
| **Issue No. 4 - Non-Economic -** | *Article 4.D - Basis of Representation-Seniority of Chief Steward and Steward* |

80

Article 4.A of the Master Agreement provides that "Employees shall be represented by one (1) steward for each shift" in each represented district. Maintaining that this provision has not been followed in all cases, the City has proposed to add the following sentence to Article 4.A, "Any current practice inconsistent with this representation provision shall be discontinued". The DPOA opposes the addition of this sentence and seeks the *status quo*. This is a matter for the parties to negotiate in the view of this Chairman and not a matter that should be brought to Act 312 with so many other issues. For this reason, the Chairman will vote with the DPOA Delegate and maintain the *status quo*. The City Delegate dissents.

As to Issue No. 4, the City proposes the following changes as underlined, namely, to amend Article 4.D as follows:

> D.   Except as otherwise provided, only one (1) chief steward and one (1) steward from each shift shall enjoy top seniority ·insofar as remaining with their district, precinct, section, unit, or platoon during their term of office, and they shall not be transferred out of or reassigned from their district, section, unit or platoon, except for justifiable cause or reduction in force, or when a district. precinct, section. unit or platoon is discontinued or otherwise inactivated or consolidated.

The City has agreed to remove the phrase "except as otherwise provided". Thus, the Panel is considering this proposal with the "except as" phrase removed. The DPOA apparently objects to the proposal. But there is, in the view of the Chairman, no reason to object because, frankly, the language is cleanup language. This is a simply adjustment and one that the DPOA should have agreed to long ago. For this reason, the Chairman, joined by the City Delegate, will accept the proposed language as amended with the "except as otherwise provided" removed as proposed by the City. The DPOA Delegate dissents.

**Transfer and Assignments:**

81

| | |
|---|---|
| **Issue No. 21 - Non-Economic -** | *Article 10.C.1.a - Seniority-Assignments and Transfers-No Transfer if Discipline or Attendance Issues* |
| **Issue No. 24 - Non-Economic -** | *Article 10.C.2.a-Seniority-Assignments and Transfers-No Transfer if Discipline or Attendance Issues* |
| **Issue No. 22 - Economic -** | *Article 10.C.1.A - Seniority -Assignments and Transfers-Additional Entities Exempt* |
| **Issue No. 23 - Non-Economic -** | *Article 10.C.1.c-Seniority-Assignments and Transfers Additional Entities Exempt* |
| **Issue No. 104 - Economic - City Proposal -** | *Article 10C.1.d -Seniority-Transfer From Assigned Duty After 5 years* |
| **Issue No. 126 - Economic - Union Proposal -** | *Article 10 - Seniority - 50 Day Duration on Temporary Assignments* |
| **Issue No. 21 - Non-Economic -** | *Art. 10.C.1.a, Seniority-Assignments and Transfers-No Transfer if Discipline or Attendance Issues* |

In Issue 21, the City's Last Best Offer proposes an overhaul to Article 10.C.1.a, which deals with assignments and transfers based upon seniority. Under the current agreement, "[a]ll assignments and transfers except those excluded herein, shall be based upon seniority provided the employee is qualified." Essentially, the City proposes that assignments and transfers be based upon a number of factors, including seniority, attendance, and the employee's disciplinary record. With respect to attendance, the City proposes that "the employee cannot have been on initial counseling regarding attendance or on the attendance control program – D.P.D. 350 program – within six (6) months." Regarding the employee's disciplinary record, the City proposes that the employee's record, the preceding six (6) months, shall be considered. The DPOA asserts that the *status quo* should be maintained. This is a non-economic issue.

Accordingly, the Chairman, joined by the DPOA Delegate, declines to adopt the City's Last Best Offer with the City Delegate dissenting. The current language of Article 10.C.1 has been a part of the agreement between the City and the DPOA for some time and the City has put forth no cogent reason, in the view of the Chairman, for changing the current provision. Indeed, the City has D.P.D. 350 for controlling attendance and Bonus Vacation Days for incentivizing

attendance. In addition, attendance misconduct can be addressed through disciplinary procedures. It would seem that the parties would not have chosen to modify the current techniques for absence control and disciplinary procedures contained in the Collective Bargaining Agreement if faced with a strike. Therefore, Article 10.C.1 a will continue to read:

ARTICLE 10.C.1.a

All assignments and transfers except those excluded herein, shall be based on seniority provided the employee is qualified.

1. Transfers;

   a. The present practice of individual officers filing requests (Police Manuel Vol. IV, Chapter 1, Sec. 4) for transfers between various districts, and entities shall be continued. The requests shall be valid for a period until October 1st each year. Continuation requests may be submitted on or after August 15th. Whenever openings occur in districts, or entities, the most senior employee on the list shall be transferred provided the employee is qualified. Any time there are common seniority dates on the transfer list, the transfer shall be given to the member who was first recorded as approved by the Personnel Section. In the event members with common seniority dates also have a common recording date, the selection shall be by blind draw. An association representative shall be present at the tie-breaking procedure. The following entities shall be excluded from this procedure…

**Issue No. 24** - **Non-Economic** - *Article 10.C.2.a - Seniority-Assignments and Transfers-Additional Entities Exempt*

Regarding Issue 24, the City proposes the addition of substantive language to Article 10.C.2.a. Specifically, the City's Last Best Offer proposes the following addition:

An assignment list shall be maintained. Placement on the assignment list shall be based on the following factors: seniority, attendance, (the employee cannot have been on initial counseling regarding attendance or on the attendance control program – D.P.D. 350 program – within six (6) months) and the employee's disciplinary record, excluding written reprimands, over the preceding six (6) months (such discipline shall be utilized only after all administrative remedies have been exhausted).

83

> Employees who have been placed on the assignment list shall be
> removed from the assignment list if the member receives an initial
> counseling regarding attendance, is placed on the attendance control
> program, or receives written disciplinary action, excluding written
> reprimands (such discipline shall be utilized only after all administrative
> remedies have been exhausted).

This is a non-economic issue, with the DPOA asserting that the *status quo* of Article 24.C.2.a should remain. The provisions of Article 24.C.2.a have been included in the contractual arrangement between the City and the DPOA for some time and there has been no showing of problem with the current provisions. Furthermore, the City has other effective methods of controlling and rewarding attendance, including Bonus Vacation Days. Additionally, the City may exact discipline upon those who maintain poor attendance records. Accordingly, with respect to Article 10.C.2.a, the Chairman decides that the *status quo* should be maintained. The Chairman, joined by the DPOA Delegate, adopts the *status quo*. The City Delegate dissents. Article 10.C.2.a will continue to read:

> A request for assignments within a district, or entity once an employee is
> assigned there, can be made by submitting DPD Form #31 (referred to as
> a Blue Slip) to the Commanding Officer. The request shall be valid for a
> period until October 1st each year. An employee may have only one
> assignment request on file at any time; the most recent request will
> replace earlier requests. Whenever openings occur within districts, or
> entities, the most senior employee on the list shall be assigned provided
> the employee is qualified. Any time there are common seniority dates
> on a job assignment list the job assignment shall be given to the member
> whose request was first received by supervision…

As to Issue No. 104, the City proposes to add the following provision to Article 10.C.1.d, Transfers: "Notwithstanding anything set forth in this Article, the Department may transfer any member from any non-patrol entity to a patrol entity after the completion of five (5) years in the non-patrol entity." The DPOA objects and proposes the *status quo*, namely, objects to any such provision in the contract. The Chairman understands the Department's desirability to have such

84

a provision. But, presumably, with the reorganization of the Department, a number of entities will be eliminated. First, there is no need for such a provision and second, if there are some non-patrol entities, Officers who have seniority will have the opportunity to bid into those positions and their seniority rights should be honored. It is for these reasons that the Chairman, along with the DPOA Delegate, will vote not to include such language in this contract round. The City Delegate dissents.

Issue No. 126 is the Union proposal to amend Article 10.C.2.c to modify the parties' longstanding provision that temporary assignments will not exceed 84 days to 60 days. The City opposes such a change. The Chairman, along with the City Delegate, will vote to maintain the *status quo* which is the City's Last Best Offer, with the DPOA Delegate dissenting. The reason for this is that the 84 day provision has been in the contract for some time. There is no persuasive reason to change. This is the way the parties have operated for some time. In this era of reorganization in the Department, this is not the time for such a change.

In regard to Issue No. 22, Article 10.C.1.a addresses transfers and particularly exempts from seniority transfers 29 entities in the Department. The City proposes to add to this exemption list the following additional entities: Bomb Squad, City Council, Fatal Squad, Field Training, Gang Enforcement, Firearms Training, Homicide, Technical Support, Tactical Operations and Task Force Administration. The DPOA objects to adding these additional entities. This is a one-third increase. The DPOA argues that there is "no demonstrated need" for the change.

As the Chairman views the situation, in reviewing the arguments and Exhibit 639, there is an argument as to the Bomb Squad because of the expense of six weeks of military bomb disposal training in Alabama and one year of probation training with the Unit plus the six written

85

examinations and six practical examination application testing. There is a need to choose an applicant with the aptitude for this type of work. It is also understandable that in terms of Technical Support that there may be special aptitudes in this day and age of computers and advanced technology that may not necessarily involve the most senior Officers.

But, beyond these two entities, when compared to the type of entities that the parties over the years have excluded, the Chairman believes that the Department has not made its case for the other eight proposed entities. The City Delegate would concur as to the Bomb Squad and the Technical Support, but would dissent as to the exclusion of the City Council, Fatal Squad, Field Training, Gang Enforcement, Firearms Training, Homicide, Tactical Operations and Task Force Administration. The DPOA Delegate would dissent as to the Bomb Squad and the Technical Support inclusion, but would concur with the Chairman as to the exclusion of City Council, Fatal Squad, Field Training, Gang Enforcement, Firearms Training, Homicide, Tactical Operations and Task Force Administration.

**Issue No. 86 - Economic -**    *Article 40.G - Miscellaneous-Deferred comp Selected by City and Direct Deposit*

The City has proposed to amend Article 40.G "Miscellaneous" as follows, represented by the strikeouts, with the DPOA objecting, proposing the *status quo*, namely, objecting to the strikeouts:

> ~~G~~D. **Deferred Compensation and Direct Deposit**. Members of the bargaining unit may participate in the deferred compensation and direct deposit programs offered by the City. ~~The Association shall be entitled to arrange for the establishment of a deferred compensation program by a company of its choosing, which shall be included in the deferred compensation programs offered by the City.~~

The City notes that it pays for the administrative costs of the deferred compensation

86

program. Therefore, its counsel writes, "Accordingly, the City wants this provision changed such that the City will select the deferred compensation company and program. The City operates a number a number of benefit plans and there are cost savings to the City in combining the various benefit plans available to employees. ... If the City is going to pare the cost, it should choose the carrier to limit that cost".

The difficulty with this argument is there has been no negotiation between the parties; that the present language has been in the contract for some time. It is possible that the DPOA selected carrier could match the City's cost or even below the City's cost. In other words, the blanket statement, without a history of negotiations and the possibility that the DPOA could meet or even with its chosen carrier be able to save the City money in this area, suggests that this provision has not been well thought out by the City. For this reason, the Chairman will vote with the DPOA Delegate and reject the City's proposal and maintain the *status quo*. The City Delegate dissents. There just was not a history of negotiations addressing the potential cost savings either way.

**Issue No. 87 - Economic -** *Article 40.H - Miscellaneous-Payment of Banked Time*

The City proposes to amend Article 40.H as follows:

> **Lump Sum for Banked Time.** Whenever an employee leaves employment with the City, such employee will be paid for all banked time, other than sick time, at the prevailing rate of pay in effect at the time of the separation. This includes, but is not limited to separation with a deferred vested pension or under a disability. <u>DROP plan participants shall only receive payout for banked time when they permanently retire, not when they enter the DROP plan.</u>
>
> ~~Payment shall be made pursuant to the City's schedule for that specific payment~~. <u>Payment shall be paid within 90 days if the amount is less than Ten Thousand ($10,000.00) Dollars, and if in excess of Ten Thousand ($10,000.00) Dollars, the amount shall be made in semi-annual installments over a three-year period with the installments due on February 1 and August 1 with no interest due.</u>

87

The underscoring represents the City's proposed additional language. The strikeouts represent the deletions. The DPOA proposes the *status quo*.

The Chairman reviewed the language as proposed as two proposals – one addressing DROP Plan participants; the second dealing with the payout. The proposed amendment of the City, objected to by the DPOA, proposes that the DROP Plan participants receive the payout for bank time other than sick time when they permanently retire. To the Chairman, this is a reasonable proposition for it prevents the participant from being in a higher tax bracket and it preserves cash funds for the City during a time when the City is in financial crisis. For this reason, the Chairman, joined by the City Delegate, will vote to adopt this amendment. The DPOA Delegate dissents.

As to the provision for a payout, the Chairman interprets the no interest language which in Issue No. 144 the DPOA in effect proposed, except the Chairman interprets the City's proposal to include that if the installments are not made when due then interest would be paid. On this basis, the Chairman would accept the City's payout proposal with the City Delegate agreeing and the DPOA Delegate dissenting.

**Issue No. 144 - Economic - Union Proposal -**     *Article 33 - Separation Payments*

The DPOA has proposed the following new language to Article 33:

> X.     All provisions of the collective bargaining agreement relating to separation payments shall be modified to provide that effective January 1, 2013, for future separation payments to members who were already eligible to retire as of the effective date of the Award, a member will have the option of receiving (a) lump sum payment ninety (90) days after separation, or (b) semiannual installments for a period of three (3) years after separation, with no interest unless payment is not made on the date it is due. This option shall not be available to members in the ERIP established as part of the Award.

With the exception of the last sentence, this option shall not be available to members in

88

the ERIP established as part of this Award which, as will be explained elsewhere, there will be no ERIP. The Chairman does not believe this language is appropriate, as this is contrary to other issues that the Panel has ruled upon and, therefore, the Chairman, joined by the City Delegate, will opt to deny the proposal. The DPOA Delegate dissents.

**Issue No. 145** - **Non-Economic** - **Union Proposal** - *Article 33 - Payment of Accumulated*

This is another proposal by the DPOA which reads:

### ARTICLE 33 - PAYMENT OF ACCUMULATED BANKED TIME UPON ELECTION TO PARTICIPATE IN THE D.R.O.P.

Upon issuance of this Award, the provisions of Article 133, "Pension Provisions," pertaining to 'DROP' payments shall be modified in accordance with the Memorandum of Understanding attached hereto as Exhibit B.

The City objects. There is a Memorandum signed by the parties dated February 9, 2011. It is reasonable and it dovetails with the other Orders in regard to payouts and the limits of when payouts are made for those participating under the DROP Plan as issues under the Orders herein. By agreeing to this proposal, the Chairman would be acting in contradiction to other proposals that the Chairman has agreed to and for this reason rejects the DPOA proposal as to Issue No. 145, joined by the City Delegate. The DPOA Delegate dissents.

**Issue No. 143** - **Economic** - **Union Proposal** - *Article 33 - Early Retirement*

The DPOA has proposed in Article 33, "Early Retirement", which reads:

### ARTICLE 33 - EARLY RETIREMENT

**New language: ¶W**

W.     An Early Retirement Incentive Program ("ERIP") will be offered to a limited number of officers in the Department and the participation will be based on seniority upon the issuance of this Award. The total maximum number of early retirements will be 150, to be allocated to members of the DPOA (76%), the DPLSA (23%) and the DPCOA (1%).

89

Employees will be eligible to participate in ERIP if they (a) are three (3) years or less away from completing either 20 or 25 years of service, and (b) have sufficient banked time to purchase the remaining service time. Officers participating in the program will retire immediately using their years of service and banked time to get to 20 years of service and their pension will be calculated based on 20 years of service. All banked time will be relinquished in exchange for retirement service credit.

The City will offer members with between 17 and 20 years of service the ability to early retire as follows, as well as between 22 and 25 years: The City will offer such members the ability to retire three (3) years earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have more than [1,000] hours of banked time (i.e. sick time, furlough, vacation or compensatory), and who relinquish all of their banked time. The City will offer members to retire two (2) years earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have at least [500] or more hours of banked time, and who relinquish all of their banked time. The City will offer members to retire one (1) year earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have less than [500] hours of banked time, and who relinquish all of their banked time. The utilization of banked time, for purposes of the calculation, begins with sick time.

DROP participants with 22 years of service who have not received their lump sum payout from their banks may use such banked time to participate in the ERIP in accordance with the above.

Any language not expressly modified remains current language (i.e. CBA *status quo)*.

The City opposes adding this provision.

This language was in the Tentative Agreement signed on February 9, 2012 which at that time the City had agreed to it. In his post-hearing brief at page 71, the City's counsel writes in part:

The Tentative Agreement contained an early retirement plan under which 100 DPOA members would be able to retire three years early by forfeiting certain accrued banks or by purchasing time. This proposal was agreed to because the City believed it was in a position to allow 100 DPOA Officers to retire early and leave the force. The underlying concept was that these Officers would not need to be replaced and there would be substantial savings.

90