# EXHIBIT A-1 (Part 3)

This is no longer the case. Since January/February 2012, the Department has had more than 100 DPOA members retire. See Ex. 742, January 31, 2012 headcount showing 2,091 DPOA members, and Ex. 743 November 30, 2012 headcount showing 2,001 DPOPA. Since November 30, 2012 there has also been an additional 20 retirements. ...

Furthermore, during the hearing, counsel for the DPOA suggested there would be more retirements. It is problematical whether any of these retirees will be replaced in the economic environment in Detroit. Thus, there is no room to encourage any Officers to retire. For this reason, the Chairman, joined by the City Delegate, as the City opposes the early retirement plan at this point, rejects the early retirement proposal. The DPOA Delegate dissents.

**Issue No. 53** - **Economic** -   *Article 31.A - Holidays- Eliminate Holidays-Election Day and 8th and 9th Holidays*
**Issue No. 54** - **Economic** -   *Article 31.B - Holidays- Excuse Day and Holiday*
**Issue No. 55** - **Economic** -   *Article 31.C.1 - Holidays- 1 ½x on Holidays if Scheduled and Not Appear to Holiday Pay*
**Issue No. 141** - **Economic** - **Union Proposal** -   *Article 31 - Holiday Pay*
**Issue No. 56** - **Economic** -   *Article 31.C.2 - Holidays-Holiday Rosters Employer Discretion*

The above five issues all deal with holidays.

Article 31.A of the Master Agreement provides for a schedule of holidays. The City's Last Best Offer with strikeouts is as follows:

A.   **Schedule of Holidays**

Each employee shall be entitled to the following holidays in accordance with this schedule.

| | |
|---|---|
| Independence Day | July 4th |
| Labor Day | First Monday in September |
| Veteran's Day | November 11th |
| Thanksgiving Day | Fourth Thursday in November |
| Christmas Day | December 25th |
| New Year's Day | January 1st |
| Memorial Day | Last Monday in May |

~~In addition, each employee shall be entitled to a holiday on one Election Day in each year or an eighth holiday if an election is not scheduled. (Notification will be made by Special Order.) A ninth holiday shall be~~

91

~~granted to employees who have been employed ninety (90) days or more and who are entitled to regular holidays under existing ordinances. This holiday shall be taken at any time during the fiscal year which is mutually acceptable to the employee and the Department. To insure that the ninth holidays are expended proportionately throughout the year and not carried until the last months of the fiscal year, on May 1st, the commanding officer shall assign the remaining ninth holidays at his discretion. Ninth holidays which are not used prior to the end of the fiscal year will be lost.~~

Thus, the City proposes to eliminate the so-called 8th and 9th holiday. The DPOA proposes to maintain the *status quo*. In support of its position, the City Advocate in his post-hearing brief writes:

### Elimination of Election Day and Eighth and Ninth Holidays

While there are three holidays involved, in reality the City seeks to eliminate only two holidays per year. In years in which there is an election for which Officers have the day off they day off they have an eighth and ninth holiday. These holidays should be eliminated for two reasons:

- First, pursuant to the Financial Stability Agreement and Annex D it will conform the DPOA contact and the labor contracts of all other City employees whose contract has expired. As noted above, uniformity and thus ease of administration are one of the goals set forth in the Financial Stability Agreement.

- City will receive cost savings in the amount of approximately $390,000 per holiday, and with DFFA parity and approximately the City will save $500,000 per holiday and $1M for both holidays. Ex. 654. approximately $500,000 per holiday or $1M for both holidays.

The Chairman acknowledges that the City makes a point. The problem, however, is that though the City is in serious financial stress the Chairman must consider the nature of Police work and the marketplace. No one can doubt the stress of Police who are working the street and the need, when available, for holiday time off. Furthermore, even when compared with distressed cities such as Flint and Saginaw, the holiday made available by the so-called 8th and 9th

92

holiday in Detroit, which has been available for numerous years, is competitive. There is a

difference between the Police and general employees and the need to have the time off, if

available, to relieve the stress of Police work. And, as indicated, the number of holidays is

competitive even with the distressed cities such as Flint and Saginaw. It is for these reasons that

the Chairman concludes, along with the DPOA Delegate, that the deletion of the 8th and 9th

holidays, particularly in the absence of negotiations, is not the area for savings and therefore

would opt with the DPOA Delegate to maintain the *status quo*. The City Delegate dissents.

However, for the period from July 1, 2012 through June 30, 2013, there shall not be an 8th

or 9th holiday. The 8th and 9th holiday will commence the second year of the contract, July 1,

2013. On this point, the DPOA Delegate would dissent as he would opt to have an 8th and 9th

holiday begin in the first year of the contract. The City Delegate, though objecting to the 8th and

9th holiday, would nevertheless join with the Chairman in agreeing that in any event there would

not be an 8th and 9th holiday in the first year of the contract.

Issue No. 54 addresses a proposed change by the City in Article 31.B.3 as follows:

> 3. Should the holiday fall on Sunday and the Monday leave day
> begins the next 28 day work cycle, the leave day will be the
> Friday prior to the holiday or a day mutually agreed upon
> between the employee and the Department. ~~Should that Friday
> already be used in conjunction with article 32~~ [Excuse Time]
> ~~then the leave day will be Thursday or a day mutually agreed
> upon.~~

The DPOA proposes the *status quo.* The City's reason for the change is set forth in the

following statement in its counsel's post-hearing brief:

> Under the Labor Contract, if a holiday falls on a weekend and
> Friday is an excuse day for the Officer, then the Officer has Thursday
> off. This sometimes creates scheduling issues for the Department. The
> Department wants to eliminate the requirement that if Friday is an
> excuse day that the Officer has Thursday off and wants to replace it with
> a day to be mutually agreed upon. In this way, the Officer receives his

93

day off and the Department can better schedule for the holiday week.

> Therefore, the City requests that its Last Best Offer, Issue No. 54, be granted.

This statement, as the Chairman views it, is a perfect example of the failure to bargain.

If the parties had bargained rather than take this issue to Act 312, the parties would have been able to resolve the matter. The matter should have been resolved on the remand. It was not. Yet, the parties have had language on the issue in the Master Agreement for some time. This is a signal to the Chairman that the language should not be changed. If the language is to be changed, it is to be changed at the bargaining table. This is not an issue for Act 312. For this reason, the Chairman, joined by the DPOA Delegate, will vote for the *status quo* on this issue. The City Delegate dissents.

Issue No. 55 seeks to change the rate of pay for those Officers required to work from double time to time and one-half the regular rate of pay for all hours actually worked in addition to their regular day's pay of eight hours and a provision that employees who are scheduled to work on any holiday, but fail to report to work, shall not be eligible for holiday pay.

Issue No. 56 is a proposal concerning flexibility in assigning employees to various holiday rosters at the discretion of the Department by eliminating the following language in 31.C.2 under "example": "In those cases where an employee works four (4) or more hours into a holiday as a result of overtime, he is not entitled to holiday premium rate for that shift; the overtime hours shall be compensated at the regular time and one-half rate".

Issue No. 141 is a Union proposal that Officers be able to take part of their holiday pay in compensatory time. As to the DPOA's proposal, the City favors the *status quo*. Holiday pay from double time to time and one-half, though the City has suggested that there is no City

comparable to Detroit, the City did offer the comparables of St. Louis, Pittsburgh, Cleveland, Philadelphia, Baltimore and Chicago in terms of holiday pay. Only one (Pittsburgh) paid more than Detroit at 2.5 times. One (Philadelphia) paid straight time. Three (Cleveland, Baltimore and Chicago) paid time and one-half. St. Louis paid straight time plus four hours comp time. Yet, it seems with the long bargaining history of double time plus eight hours it is difficult, despite the fiscal crisis, to reduce this benefit. For this reason, the Chairman will vote with the DPOA Delegate and continue the double time for holiday work with the City Delegate dissenting as to Issue No. 55.

On Issue No. 55, there was a second Issue concerning employees who are scheduled to work on any holiday and fail to report. The Chairman believes this is a fair provision and would vote with the City Delegate and agree that such employees who fail to report will lose their holiday pay. The DPOA Delegate dissents.

As to Issue No. 56, the holiday roster issue, this seems reasonable to the Chairman and the Chairman, along with the City Delegate, will vote to accept the City's proposal. The DPOA Delegate dissents.

As to the DPOA's proposal on Issue No. 141, if the City wants to pay cash, the Chairman will go along with the City and vote with the City Delegate to reject the DPOA's proposal. The DPOA Delegate dissents.

**Issue No. 139** - **Economic - City Proposal -** *Eliminate 2% Promotional Increase*

The annual cost of the 2% increase on Officers who pass the promotional test and are on a promotional list waiting promotion is approximately $270,000 per year. During the time period July 1, 2012 to October 12, 2012, a period of three and one-half months, the 2% promotional increase cost to the city was $73,000. The 2% promotional increase has cost as much as

95

$340,000 annually to the City. *See* Exhibit 691. To the City, in financial crisis, this is no small amount.

Recognizing that the DPOA itself agreed to suspend the educational reimbursement, albeit on a sunset basis until July 1, 2015, the Chairman will agree to the elimination of the 2% promotional increase, recognizing that the parties at the end of this two year agreement can again revisit the issue. The City Delegate will join with the Chairman in adopting the City's proposal. The DPOA Delegate dissents.

**Issue No. 127** - **Economic** - **Union Proposal** - *Article 11 - No Requirement to Perform*

The DPOA has proposed amending Article 11, Section B, as follows:

> Employees shall not be assigned duties normally performed by a person of higher rank, except in emergency situations, and shall receive the wages of the first year sergeant for all time/hours worked.

As the parties know, this matter is in arbitrating, awaiting an opinion. That opinion will be forthcoming when this Act 312 assignment is completed. That opinion will answer the issue raised. For this reason, the Chairman, joined by the City Delegate, will reject this proposal. The DPOA Delegate dissents.

**Issue No. 133** - **Economic** - **Union Proposal** - *Field Training Officers*

The DPOA had proposed that once an Officer is certified FTO, namely, Field Training Officer, the Officer shall receive a 5% adjusted gross wage annually. The Chairman appreciates that in other large city departments there is a precedent for such a proposal. However, the City is in a financial crisis. This is not the time, unfortunately, for such an economic improvement. The Chairman notes that, though there are arguments for such a benefit, the parties over the years, when the City was perhaps able to afford such a benefit, have not negotiated or obtained such a benefit in previous Act 312.

96

Thus, considering the financial circumstances and the previous bargaining history, the Chairman, joined by the City Delegate, will vote not to include a stipend at this time for a Field Training Officer. The DPOA Delegate dissents.

**Issue No. 133 - Union Proposal - Economic -**   *Article 40 - Miscellaneous - Include Sick Time in Lump Sum Payments*

The DPOA has proposed to amend Article 40.H as follows:

> **H.**   **Lump Sum for Banked Time.**   Whenever an employee leaves employment with the City, such employee will be paid for all banked time, ~~other than~~ including sick time, in a lump sum payment within thirty (30) calendar days of the separation, at the prevailing rate of pay in effect at the time of the separation. This includes, but is not limited to separation with a deferred vested pension or under a disability.

The City objects.

The Chairman, along with the City Delegate, agrees with the City that Article 40.H should not be amended as proposed by the DPOA. As the City points out in the transcript at Vol. 6, pg. 93, some payments involve several hundred thousand dollars and there are concerns as to sick leave that sometimes it takes anywhere from 30 days to six months to reconcile sick leave banks. This explains that the parties over the years have negotiated the language "other than sick time". It is for this reason that the Chairman was not persuaded to adopt the proposed amendment and opted with the City Delegate to continue the present Article 40.H language. The DPOA Delegate dissents.

**Issue No. 48 - Economic -**   *Article 22-Furlough Selection City Can Change*
**Issue No. 51 - Economic -**   *Article 29-Eliminate Longevity*
**Issue No. 89 A and B - Economic -**   *Article 41.A - Wages-10% Reduction*
**Issue No. 90 - Economic -**   *Article 41.A - Wages-City Right to Institute Furlough Days*

As to Issue No. 48, the City proposes to add a subparagraph I to Article 22, "Furlough

97

Selection and Cancellation", which reads: "The City reserves the right to make changes to any aspect of furloughs, including but not limited to, the number of furlough days and selection process". The Master Agreement has been negotiated between the parties, including Act 312 proceedings. This is an Act 312 proceeding where proposals have been made, testimony has been taken and arguments have been made, including arguments concerning furloughs. Once Orders have been issued and agreements have been made, this is the parties' contract. What the City is proposing is inconsistent with a binding contract to be honored by both parties. For this reason, the Chairman, joined by the DPOA Delegate, will reject the City's proposal. The City Delegate dissents.

Issue No. 89 A and B deals with wages. Issue No. 51 deals with longevity. Issue No. 90 addresses furloughs. These issues represent the core money issues with the exception of issue No. 90, which is basically a layoff issue, between the parties in this Act 312 proceedings.

As to Issue No. 89 A and B, the Last Best Offer of the City is as follows:

(CORRECTED - UPDATED)
ISSUE NO. 89 A and B - ECONOMIC

CBA Article 41.A - Wages
CET Article 38.A - Wages
CET Provision and City Last Best Offer on Issue 89 A

**WAGE DECREASE:**  All classifications and positions shall receive a 10% wage reduction effective 7-17-12.

July 17, 2012 - June 30, 2013

| CLASS CODE | TITLE | Min | Max |
| --- | --- | --- | --- |
| 33-10-11 | Police Officer | $36,274 | $47,914 |
| 33-10-12 | Police Officer (hired after 2/20/95) | $29,352 | $47,914 |
| 33-10-13 | Police Officer 2-20-95 1st Step | $29,352 | $33,065 |

98

| 33-10-14 | Police Officer - Promotion List | $47,914 | $47,914 |
|---|---|---|---|
| 33-12-11 | Communications Officer - Police Officer | $36,724 | $48,364 |
| 33-12-12 | Radio Maintenance Officer - Police Officer | $48,776 | $48,776 |
| 33-12-13 | Radio Systems & Planning Officer - Police Officer | $49,481 | $49,481 |
| 33-12-14 | Communications Officer - Police Officer - Promotion List | $48,364 | $48,364 |
| 33-12-15 | Assistant Supervisor of Motor Vehicles - Police Officer | $48,776 | $48,776 |
| 33-12-26 | Police Data Processing Programmer - Police Officer | $48,503 | $49,652 |
| 33-12-36 | Senior Police Data Processing Programmer - Governed by wage rate for a Police Lieutenant contained in the Lts. And Sgts. Labor Contract | $74,028 | $76,220 |

IF THE ARBITRATOR AWARDS THE UNION A 2-YEAR DURATION FOR THE LABOR CONTRACT, THE CITY'S LAST BEST OFFER FOR THE TIME PERIOD JULY 1, 2013 TO JUNE 30, 2014 (ISSUE 89b) IS:

July 1, 2013 - June 30, 2014

| CLASS CODE | TITLE | Min | Max |
|---|---|---|---|
| 33-10-11 | Police Officer | $36,274 | $47,914 |
| 33-10-12 | Police Officer (hired after 2/20/95) | $29,352 | $47,914 |
| 33-10-13 | Police Officer 2-20-95 1st Step | $29,352 | $33,065 |
| 33-10-14 | Police Officer - Promotion List | $47,914 | $47,914 |
| 33-12-11 | Communications Officer - Police Officer | $36,724 | $48,364 |
| 33-12-12 | Radio Maintenance Officer - Police Officer | $48,776 | $48,776 |
| 33-12-13 | Radio Systems & Planning Officer - Police Officer | $49,481 | $49,481 |
| 33-12-14 | Communications Officer - Police Officer - Promotion List | $48,364 | $48,364 |
| 33-12-15 | Assistant Supervisor of Motor Vehicles - Police Officer | $48,776 | $48,776 |

| 33-12-26 | Police Data Processing Programmer - Police Officer | $48,503 | $49,652 |
| 33-12-36 | Senior Police Data Processing Programmer - Governed by wage rate for a Police Lieutenant contained in the Lts. And Sgts. Labor Contract | $74,028 | $76,220 |

As to Issue No. 51, the City proposes to eliminate Article 29, "Longevity". As to issue

No. 90, the City proposes to add to Article 41.A the following language:

> BUDGET REQUIRED FURLOUGHS: The City reserves the right to
> reinstitute future furloughs as a means of cost containment.

The DPOA's proposal as to Issue No. 89 (wages) as well as Issue No. 51 (longevity) and

Issue No. 90 concerning budget furloughs is as follows:

DPOA
PROPOSAL NO. 89
Article 41 - Wages/Longevity

Article 41.A of the current Collective Bargaining Agreement
shall be applied/enforced as follows:

### 41. WAGES

Employees hired prior to February 20, 1995, in this title shall proceed
from minimum to maximum on the basis of five equal steps.

Employees hired on or after February 20, 1995 in this title shall receive
wage increases and step increments in accordance with Exhibit II. B.
Effective July 1, 2000, employees in this title shall proceed from
minimum to maximum on the basis of five equal steps.

Employees who have already completed the Police Academy prior to
July 1, 2000, but have not yet reached the 1st pay step shall have $1,000
of the 1st pay step applied to their annual salary, effective July 1, 2000.
Employees who complete the Police Academy on or after July 1, 2000,
will have $1,000 of the 1st pay step applied to their annual salary upon
completion of the Police Academy. This increase will be considered an
early entitlement to part of the first annual step increase.

Employees in the classification of Police Officer shall receive the
following wage adjustment effective January 1, 2013 for the duration of
this agreement.

Compensation Schedule

100

| Class Code | Title | Min. | Max. |
|---|---|---|---|
| 33-10-11 | Police Officer | $40,304 | $53,237 |
| 33-10-12 | Police Officer (hired after 2/20/95) | $32,613 | $53,237 |
| 33-12-11 | Communications Officer - Police Officer | $40,754 | $53,687 |
| 33-12-12 | Radio Maintenance Officer - Police Officer | $54,099 | $54,099 |
| 33-12-13 | Radio Systems & Planning Officer - Police Officer | $54,804 | $54,804 |
| 33-12-15 | Assistant Supervisor of Motor Vehicles – Police Officer | $54,099 | $54,099 |
| 33-12-26 | Police Data Processing Programmer - Police Officer | $53,826 | $54,975 |
| 33-12-36 | Senior Police Data Processing Programmer - Police Lieutenant | $71,870 | $74,000 |

January 1, 2013

Essentially, effective January 1, 2013, the DPOA proposed restoring the 10% wage cut in all classifications and proposing a two year agreement from July 1, 2012. The DPOA rejects the budget required furloughs and restores the longevity payments that were eliminated by the CET. The DPOA is seeking payment of longevity pay pursuant to Paragraph 29 of the Master Agreement according to the schedule thereof and according to the terms thereof.

According to Exhibit 2 of the Master Agreement Schedule, Officers who are employed after February 20, 1995 are hired in under the City's proposal at $29,352. There are five steps beginning after one year until reaching top pay which under the City's proposal would be $47,914 on an annual base wage. Under the DPOA proposal, the top pay after five years would be the rate that existed on July 1, 2008, namely, $53,237 annualized as there had been no pay raise at the base rate since July 1, 2008.

101

Succinctly put, in advocating for a one year contract, the City was proposing to maintain a 10% pay cut. In advocating for a two year contract, if the Panel was so disposed, the City was advocating for a 10% pay cut for two years. Initially, the DPOA was advocating a three year contract and advocating that it maintain the same level of pay, no pay cut, for three years. The Chairman urged the DPOA to back off to a two year contract, recognizing the situation that the parties were facing which the DPOA accepted in making an offer of a two year contract. Then the Chairman urged, based upon his belief that he would not find the financial situation in Detroit as critical as it turned out to be, that the DPOA offer to accept the 10% pay cut for the first six months and then a restoration of the 10% for the last 18 months. The DPOA accepted this suggestion from the Chairman and made this its offer, namely, to accept the 10% pay cut that had prevailed until January 1, 2013 and then a restoration of the 10% beginning January 1, 2013.

In an attempt to convince the Chairman of their respective positions, the parties offered competing comparables with the City suggesting internal comparables and suggesting that there were no external comparables. The DPOA ignored the internal comparables, suggested certain national Police comparables, and referenced 15 Southeastern Michigan Police comparables as well as Saginaw and Flint. The City suggested that there were no external Police comparables comparable to Detroit. Though the City's internal comparables do reference general employees who have taken pay cuts that were imposed, none of the internal comparables have the same working conditions as Detroit Police Officers who, as pointed out in the prologue, are faced with the same hazards of employment that have unfortunately in some cases resulted in the death of some Officers. In other words, the Police marketplace is what is being paid by other nearby communities for police services.

Nevertheless, the general employees in Detroit in recent years have taken pay cuts so that

102

in 2013 their pay cuts have averaged a 20% pay cut for both unionized and non-union employees – both supervisors/executives and general employees whereas, up to July 2012, the uniform employees have not taken a pay cut. The financial situation in Detroit is at an emergency stage. Regardless of the Police marketplace, this fact cannot be overlooked by the Chairman, regardless of the equities and the Police marketplace. Yet, the marketplace for Police work is there to behold.

The Midwest national comparables ranging from $55,000 to $80,000 annually are not particularly helpful because the taxing authority of the other national Midwest cities varies and are not comparable with Detroit. Nor are the economic conditions in the other national Midwest cities comparable with Detroit.

Likewise, the 15 suburban cities in Southeast Michigan used by the DPOA are not comparable with Detroit. Detroit is not, for example, Livonia, Birmingham, Troy, the Grosse Pointes (Public Safety Departments) or Royal Oak – cities that are financially well off and are not in financial distress. Nor can the Michigan State Police be considered a comparable because Michigan is not in financial distress as Detroit finds itself. Nevertheless, the comparables were used to point out that, for instance, Michigan in base wages on an annual basis at a five year level, exclusive of longevity, pays a State Trooper $59,988. The top pay for a Michigan State Trooper at 10 years is $64,143.36 and after 20 years, $65,730.24. The suburban districts are paying anywhere between $55,000 and $60,000 annually.

One of the criteria under Section 9 of Act 312, besides financial ability, is external comparables. A proper comparable in this situation would be, as pointed out at the beginning of this Opinion in the open letter to Emergency Manager Orr, Flint, Michigan, 60 miles away from Detroit, which is under an Emergency Financial Manager, and Saginaw, Michigan,

103

approximately 85 miles away from Detroit, which is also a financially distressed city, having a deficit in excess of $3 million. Yet, in each of those cities, the police officers are paid more than Detroit's current $47,914 based on an annual base wage at 2,080 straight time hours for a five year Officer, the top pay in Detroit.

Below is a chart comparing the base wage and total compensation between Detroit at the current $47,916 top rate, Flint and Saginaw, noting that Flint is also under an Emergency Financial Manager under Act 72:

| Five (5) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $51,336 | $60,888 |
| Saginaw | $53,700 | $63,396 |

| Ten (10) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $51,336 | $62,028 |
| Saginaw | $53,700 | $66,048 |

| Fifteen (15) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $52,176 | $64,272 |
| Saginaw | $53,700 | $67,344 |

| Twenty (20) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $53,148 | $66,000 |
| Saginaw | $53,700 | $68,628 |

As the above chart indicates, in terms of base salary Flint, under an Emergency Financial Manager, is approximately at the five year level $4,000 more than Detroit Officers. As the Officer has more years on the job, the spread, even with Flint, is more. When total compensation is compared, even at five years, the spread between Detroit and Flint is dramatic, namely, $9,000, and almost $12,000 between Saginaw and Detroit.

104

These facts are devastating. These are not comparisons with the high paid State Police nor with Livonia, Birmingham, the Grosse Pointes (Public Safety Departments). The Chairman has chosen to compare primarily with another nearby community that is under an Emergency Financial Manager, namely, Flint. And look what the facts reveal. Compared with the marketplace, Detroit Police Officers, faced with the Police working conditions of a large urban area, are by any definition underpaid even in a distressed community faced with a financial emergency.

To put it another way, there can be no doubt that the job of a Detroit Police Officer is certainly as difficult as any in Southeast Michigan or, for that matter, the State Police because of the nature of Police work in a large urban American city. Furthermore, the Chairman is informed that the Flint figure was imposed by the Emergency Financial Manager, further emphasizing that the Detroit Police Officers, in comparison with a nearby distressed Michigan city, namely, Flint, Michigan's third largest city, are vastly underpaid.

As to Issue No. 51, longevity, the City proposes to eliminate longevity, arguing that the City has eliminated longevity with its other unions by virtue of the City Employment Terms as well as its non-union personnel. Yet, in order to reach some semblance in the marketplace, the DPOA argues that it needs longevity and proposes that longevity pay be restored.

The external comparable of Flint and Saginaw clearly establishes that the Detroit Police Officers at $47,416 at the five year rate are grossly underpaid, even in a city that is under an Emergency Financial Manager where there is a serious question of the ability to pay.

Even though the Chairman made the suggestion of what he believes should be the Union's Last Best Offer because it was evident that Detroit Police Officers were clearly underpaid in the comparable workplace in comparable police work, the Chairman, applying the

105

312 criteria and the emphasis required to be put on financial ability, hit a roadblock of Detroit's financial crisis, causing the Chairman to reconsider his initial reaction because of his obligation to follow the statute and the criteria set forth therein as there is a question of ability to pay, though the Chairman will point out that a careful analysis suggests that the Orders that will follow will indicate that if Detroit wishes to have a viable Police force in the interest of the citizens' public welfare, there is a way to have some semblance of the ability to pay. In this regard, what a majority of the Panel has done is for the first year continue no pay raises, even though Flint during the same year is making a base wage of $4,000 more. There was recognized that those Officers who are 12 hour shifts, and that is not all of the Detroit Police Officers, are being paid if they work a full year on 12 hour shifts an extra 104 hours at 84 hours every two weeks. But this does not apply to all Detroit Police Officers. The Panel majority, the Chairman and the DPOA Delegate, although the DPOA Delegate is reluctant, believing that the Panel should have awarded a pay restoration in the first year of the contract or at least by July 1, 2013, would award a 5% restoration effective January 1, 2014. This gives the Emergency Manager and Mayor nine months to reorganize the Department, if he so chooses, in conjunction with the City and the Department. This will bring the five year Officer up to $50,311.80, based upon a 2,080 hour year, still below Flint. However, if the Department continues 12 hour shifts 84 hours in a two week cycle and makes the 84 hour cycle available, Officers will be able to earn additional monies, at least those on patrol, as they have in the past year.

The reason for not restoring the longevity is there is the claimed ability to pay proposition and the fact that longevity was eliminated with the Lieutenants and Sergeants in an Act 312 proceeding, has been eliminated throughout the City, although imposed, and is not available in Flint. What the majority of the Panel has done is illustrated by the following chart:

106

| Five (5) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| **Detroit** | **$50,311.80** | $54,225 app. |
| Flint | $51,336 | $60,888 |
| Saginaw | $53,700 | $63,396 |

| Ten (10) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| **Detroit** | **$50,311.80** | $54,225 app. |
| Flint | $51,336 | $62,028 |
| Saginaw | $53,700 | $66,048 |

| Fifteen (15) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| **Detroit** | **$50,311.80** | $54,225 app. |
| Flint | $52,176 | $64,272 |
| Saginaw | $53,700 | $67,344 |

| Twenty (20) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| **Detroit** | **$50,311.80** | $54,225 app. |
| Flint | $53,148 | $66,000 |
| Saginaw | $53,700 | $68,628 |

The Emergency Manager, the Mayor and the Treasurer of the State of Michigan should consider, with the blessings of the Governor, moving the date of the 5% restoration to July 1, 2013 when considering the above comparisons.

In regard to the longevity, again recognize what the longevity payments were in the Master Agreement that expired on June 30, 2012 that had been in the Master Agreement for some time. After five years, an Officer received 1% of base wage; after 11 years, 2% of base wage; after 16 years, 3% of base wage; and after 21 years, 4% of base wage. Using these figures, if the Emergency Manager and the Mayor should consider, recognizing that longevity is being eliminated in Detroit, to bake in as part of the base wage the previous longevity into the Police Officer's base wage. If this is done, look at the figures in comparison with Flint and Saginaw:

| Five (5) Year Officer | Annual Base |
|---|---|
| **Detroit** | **$50,814.92** |
| Flint | $51,336 |
| Saginaw | $53,700 |

107

| Eleven (11) Year Officer | Annual Base |
|---|---|
| **Detroit** | **$51,318.04** |
| Flint | $51,336 |
| Saginaw | $53,700 |

| Sixteen (16) Year Officer | Annual Base |
|---|---|
| **Detroit** | **$51,821.15** |
| Flint | $52,176 |
| Saginaw | $53,700 |

| Twenty-One (21) Year Officer | Annual Base |
|---|---|
| **Detroit** | **$52,324.27** |
| Flint | $53,148 |
| Saginaw | $53,700 |

If the longevity is baked in, it should be done by the Emergency Manager and Mayor. The Panel has not done this although the DPOA Delegate would do it as he believes longevity should have been included in the Order. It should be noted that the City Delegate dissents on any pay increases or any consideration of longevity. The City Delegate agrees with the Chairman that the Chairman has no authority to include longevity. The DPOA Delegate would have included longevity in any event.

Now, where is this money coming from, given the City's ability to pay? First, the Emergency Manager has nine months to reorganize the Department to bring efficiencies to the Department, including controlling overtime. And, in this regard:

(1) there are provisions to work out, including 12 hour shifts and perhaps an arrangement of a dual eight hour/12 hour program which can eliminate, according to the Department, substantial overtime;

(2) in regard to going to court on tickets and ordinance violations, the Detroit Police Department, in conjunction with the 36th District Court, can adopt the techniques used in the suburban courts and departments where a supervisor can conduct pre-trials and arrange for pleas

108

from citizens to avoid having Officers appear in court, thereby saving overtime. This is a well-known technique in suburban departments and apparently has not been used in Detroit and can save overtime;

(3) working with the Chief Judge of the 36th District Court, address the question of Judges who do not appear timely in court which contributes to the overtime that Officers spend in court;

(4) move a number of Officers who are not doing police work out of their positions and into field work. The importance of this is that when these proceedings began there were over 2,000 Police Officers. The latest count is there are under 2,000 Officers either as a result of resignations or retirements. It is anticipated that there will be more retirements before the proposed raises take effect. In the opinion of the Chairman, it is unnecessary to replace the retiring Officers as probably the same or even more police service can be performed for the citizens of Detroit with less Officers if Police Officers are put out on the street.

One example suffices. In Central District, when one walks into that District, there is an Officer assigned to the screening device. Right behind that Officer there are two or three civilian employees at a security desk. If one turns right and walks down the hall, there are three counters where fully uniformed Officers are serving the public for some type of licenses. Every time the Chairman has gone by there, there have been rarely one or two citizens being served. Exactly why there are three full service Officers behind those counters when that work could be done by civilians or whether one Officer rather than three Officers could be doing the work. In other words, a careful survey throughout the Department might reveal a substantial number of Police Officers who could be doing police work rather than civilian work or their jobs could be combined. The significance of this is, rather than replacing Officers who are resigning or

109

retiring, Officers could be performing work out in the field with no increased cost. It is estimated that assuming the overhead cost of a $51,000 or $53,000 Officer is one-third, these Officers not replaced represents an $80,000 reduction in the budget. If 100 Officers are not replaced, but instead 100 Officers are moved out of counters or out of Precincts where they are not doing police work, this provides the financing to give these Police Officers a wage comparable with Flint and Saginaw. The Emergency Manager and the City government has nine months to accomplish this consistent with the City's ability to pay.

Detroit is in a serious financial crisis. There is a need to have more Police Officers on the street. But the Orders here limit the number of non-IOD limited duty Officers. The Orders provide for civilianization. The Chairman has illustrated the one example where there are Officers who seemingly are wearing full uniforms and are not doing police work, answering calls of citizens and who could replace retiring Officers without adding to the force and still serve the citizens and not strain the City's finances. It may be that, with retirements and resignations and utilizing available person power that could be put out on the street without hiring any other personnel, the Department could operate with between 1,800 to 1,900 Officers and provide the same current service and even increased service to the citizens of Detroit and pay the comparable wages ordered by the majority of the Panel and be cost neutral, in other words without adding costs to the Department. This comment goes hand in hand with the recognition in the Orders of attempts at the need to save overtime costs. The Panel has clearly recognized the City's dire financial crisis.

There is the Section 9(h) criteria that fact finding and arbitrators consider, namely, the art of the possible. The Chairman appreciates that the civilian employees have taken pay cuts. This is unfortunate. But, police work is different. It is dangerous. It has resulted in Police Officers

110

losing their lives. And, as one can see, all the majority of this Panel has done is made a comparison with another city, Flint, that has an Emergency Financial Manager, and the comparison has been with wages that were imposed by that Emergency Financial Manager. Any court that might be called upon to review this Opinion should recognize that the art of the possible means that a strike should be avoided. That is the purpose of Act 312. And it would seem that it is possible by applying careful management techniques to get Police Officers out on the street; that it means a smaller Department in terms of numbers, a more effective Department that can do it with less money with Officers who are paid at least a reasonable rate with a comparable community, then this should be done.

Incidentally, this is what is happening in other communities, even to the effect, based upon this Chairman's experience in Chicago, that even Command Officers are now out on the street as a matter of course. Thus, the Chairman realizes there are a number of things that could be done in the Department based on his own observations that can be tightened up consistent with protecting the integrity of the contract and the integrity of the Department, consistent with the City's limited ability to pay.

If the observations of the Chairman are followed, the Order may even be cost neutral. If the Emergency Manager with the Mayor bake in the longevity payments, it is suggested that it still could be in the $5 million to $6 million range as the longevity payments would not have been due until December 2013. And, then, as pointed, it still would be cost neutral. In other words, the ruling of the majority of the Panel, although the DPOA Delegate reluctantly signed the Order only to get a majority ruling, gives the Emergency Manager the opportunity to accelerate the restoration of 5% as early as July 2013. And, even then, the Chairman is of the view that it could be cost neutral if the resignations and retirements are not replaced. But, certainly, the

111

baking in of the longevity payments at a minimum should be voluntarily done by the Emergency Manager and the Mayor because these are, in the view of the Chairman, cost neutral.

The DPOA Delegate very reluctantly concurs with the Chairman, but if the DPOA Delegate had his druthers would have restored the complete amount of the cut on January 1, 2013. The City Delegate dissents. The City Delegate agrees with the Chairman that longevity should not be restored. The DPOA Delegate voted to restore longevity.

Concerning Issue No. 90, the City proposes to add to Article 41.A the following provision: "Budget Required Furloughs. The City reserves the right to reinstitute future furloughs as a means of cost containment." The DPOA objects to such a provision. Hopefully, such a provision will not during the life of this Agreement be instituted. But the financial crisis in Detroit is such that this is a possibility. Furthermore, this is consistent with management rights. For this reason, the Chairman, joined by the City Delegate, will vote to include such a provision. The DPOA Delegate dissents.

**Issue No. 103 - Economic - City Proposal -** *12-Hour Shifts*
**Issue No. 122 - Non-Economic - Union Proposal -** *10-Hour Shifts*

Issue No. 103 is a City issue which the City has dubbed as an economic proposal dealing with 12 hour shifts. The DPOA has proposed Issue No. 122 dealing with work schedules which the DPOA has dubbed as non-economic. Both offers deal with work schedules. The dilemma that the parties have presented is that if an economic issue, then the Panel must select one or the other Offer. If a non-economic issue, the Panel can fashion an award. The two Issues involve work schedules. Work schedules represent a condition of employment which is not necessarily an economic issue. Therefore, the Chairman concludes that since the two Issues are schedules that both Issue No. 103 (12 Hour Shifts) and the proposed 4/10 work schedule is also a work

112

schedule; that the two issues are non-economic. The DPOA Delegate agrees with the Chairman. The City Delegate dissents. This means that the Panel can fashion its own Orders as to scheduling.

As to the 4/10 work schedule, this was a proposal in the Tentative Agreement if 10 hours shifts are utilized as a development of a pilot program. Commander Benson testified that he did a study on a 10 hour shift model and concluded that it would increase the cost to the Department in instituting such a schedule. Commander Benson explained that two 10-hour shifts would cover 20 hours per day which he believed would mean the need to have more equipment and Officers to cover the additional four hours per day which the Department does not have the equipment or the personnel available to accommodate the additional needed squad cars. The Chairman was persuaded by this testimony and for this reason will join with the City Delegate in rejecting Issue No. 122, as mandating a 10 hour shift. On this point, the City Delegate joins with the Chairman in agreeing that this is a management right. The DPOA Delegate believes, again, that the Panel should have issued an Order mandating a 10 hour shift. However, the Department retains the management right to determine whether the Department wishes to initiate a 10 hour shift. The DPOA Delegate dissents.

As to the 12-hour shifts, the Department maintains that the 12-hour shifts project a savings annually in overtime of approximately $3 million per year; that in the Second Precinct, comparing January 2012 before 12-hour shifts with November 2012, there was an increase of Officers on the street from 52% to 76%; that in the Eighth Precinct there was an increase from 75% to 86%. Inspector Rivers testified that there were examples of Officers working on the eight hour shift basis on double shifts. She gave an example in Exhibit 710 in the period between June 27, 2011 through August 7, 2011 in the Southwestern District there were 63 double

113

shifts, meaning Officers worked 63 double shifts or 16 straight hours. The proposed schedule in one scenario provides for a five day week, followed by a two day week, with one three day weekend.

The Chairman appreciates that there are consistent runs in Detroit; that the schedule does provide all Officers with every other weekend off. It does provide a savings in overtime and allegedly provides for more cars on the street.

On the other hand, there has been a ground squall from Officers indicating that there is a fatigue factor that Officers, because of the consistent runs in a large urban area, are having difficulty adjusting to 12 hour days. Yet, other Officers welcome the 12 hour shift. Under such circumstances, this is a matter that should have been developed with more care on the part of the Department with input from Union representatives, recognizing that the Department does have the management right to institute a 12 hour shift. The Chairman, joined by the City Delegate with the Union Delegate dissenting, recognizes the Department's management right to institute a 12 hour shift. However, the Order will also provide, with the City Delegate dissenting, with the Chairman and the DPOA Delegate concurring, that there be established a committee consisting of one member of the Department and one Officer of the DPOA to meet within one week of this Order to explore the possibility of providing an opportunity to operate 12 hour shifts with volunteers and allowing other Officers to work eight hour shifts and to report their findings to the Chief within two weeks of this Order. If the Chief accepts the recommendations of the committee and in doing so implements a volunteer 12 hour program, this ends the matter. If the Chief does not accept a voluntary program by May 1, 2013, then within one month of May 1, 2013 the matter may be submitted to the Chairman of this Panel as the senior Umpire under the Umpire System, to determine whether the Chief has been arbitrary in exercising his management

114

discretion in determining not to accept a voluntary program, with the standard being to curtail overtime and to have more patrol cars on the street.

The City Delegate agrees with the Chairman that the decision to have 12 hour shifts is a management right, but disagrees with the committee approach as spelled out in the Order. The DPOA Delegate dissents on the issue of 12 hour shifts, maintaining that it is a condition of employment to be negotiated, but would concur with the Chairman as to the committee approach and the opportunity to grieve in the event that the Chief does not accept the committee recommendation or implements, in any event, a volunteer program in establishing 12 hour shifts.

One final point which is a point made by the Chairman. The Chairman, in writing this portion of the Opinion as to 12 hour shifts, does so on the proposition that the schedule that will be adopted will be an 84 hour schedule on a two week cycle as this has been the schedule that the Department has used since implementing the 12 hour schedule. The Department's testimony on this point has been that a 10 hour day is not as effective as a 12 hour day in having cars on the road and in eliminating overtime.

**Issue No. 102 - Non-Economic - City Proposal -** *Emergency Manager*

The City proposes the following language as to an Emergency Manager:

> An Emergency Manager appointed under the Local Financial Statutory and Choice Act may reject, modify or terminate this collective bargaining agreement as provided within the Local Financial Stability and Choice Act 436 P.A. 2012.
>
> Inclusion of the foregoing language does not constitute an agreement by the DPOA to the substantive or procedural content of the language. In addition, inclusion of the language does not constitute a waiver of the DPOA's right to raise Constitutional and/or other legal challenges (including contractual or administrative challenges) to: (1) the validity of the Local Financial Stability and Choice 436 P.A. 2012; (2) appointment of an Emergency Manager; or (3) any action of an Emergency Manager which acts to reject, modify or terminate the collective bargaining agreement.

115

The difficulty with this proposal is the failure to recognize that it is not a mandatory subject of bargaining. Act 312 is designed to resolve disputes between public employers and police and fire unions when the parties have reached impasse over mandatory subjects of bargaining. An Act 312 Panel's jurisdiction is limited to resolving mandatory subjects of bargaining.

Section 15(7) of the Public Employment Relations Act provides:

> (7) Each collective bargaining agreement entered into between a public employer and public employees under this act after March 16, 2011 shall include a provision that allows an emergency manager appointed under the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531, to reject, modify, or terminate the collective bargaining agreement as provided in the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531. Provisions required by this subsection are prohibited subjects of bargaining under this act.

Subsequent to the rejection of Public Act 4, the Legislature enacted Act 436 of Public Acts of 2012. Pursuant to Section 30 of Act 436 and Act 212 30(1) as well as 30(2), it seems that the references to Act 4 of Public Acts of 2011 contained in 15(7) of PERA would also apply to Act 436 of 2012. The point is "provisions required by this subjection are prohibited subjects of bargaining under this Act". This means, in the view of this Chairman, that placing the proposed provision is not a mandatory subject of bargaining, but is required by PERA; that the refusal by the DPOA to agree to such a provision in their contract may well be an unfair labor practice. But that would be a matter before the Michigan Employment Relations Commission and is not a matter to be resolved by this Act 312 Panel, whose jurisdiction is to address mandatory subjects of bargaining. For this reason, the Chairman declines to join either party in issuing an Order including the City's offer on this subject for lack of jurisdiction. Having received no majority, the proposal fails for lack of a majority vote, with the City Delegate

116

dissenting as the City Delegate would vote to include the City's Last Best Offer. The DPOA Delegate takes the position that it would not be an unfair labor practice to resist including such language in the contract.

**Issue No. 60 - Economic -**  *Article 33.J - Pension Provisions-Longevity Delete from AFC*

In Issue No. 60, the City proposes to delete longevity from the average final compensation of the pension plan. Though a majority of the Panel has not included longevity in this contract, longevity has been in previous contracts and it is hoped that the City and the Emergency Manager may in their wisdom reinstate longevity and for this reason the Chairman, joined by the DPOA Delegate, will reject the City's Issue No. 60 which the DPOA obviously objects to. The City Delegate dissents.

**Issue No. 66 - Economic -**  *Article 33 - Pension Provisions-Right to Create/Amend/Eliminate DC Plan*
**Issue No. 67 - Economic -**  *Article 31.U.10 - Pension Provisions-City May Create Loan Program from DC Plan*

The City proposes in issue No. 67 to modify Article 31.U as follows:

    U.    **Defined Contribution Plan.**

* * *

    10.    Participant Loan Program. ~~There shall be a~~ The City may create a participant loan program which will conform with the requirements of Section 72(p) of the Internal Revenue Code and shall be limited to "hardship" circumstances, as defined by the Plan Administrator and will only be available if no other loans from the Plan are outstanding. A participant who satisfies applicable rules and procedures as established by the Administrator may borrow from the participant's accounts an amount which does not exceed the lesser of fifty (50%) percent of the participant's vested accumulated balance or Fifty Thousand and 00/100 ($50,000.00) Dollars. Loans must be for a minimum of One Thousand and 00/100 ($1,000.00) Dollars. Repayment shall be done through payroll deduction. However, any outstanding balance shall be due upon termination of employment.

117

* * *

Thus, the City proposes to amend Section U.10 by making the Participant Loan Program permissive rather than mandatory, and not only to new hires but to all Officers without negotiating with the DPOA.

Article 31 - Pension Provisions

U. **Defined Contribution Plan for Current and New Hires** - The City reserves the right to design, establish, manage, amend, and implement a Defined Contribution Plan and related duty disability retirement provisions for current employees and new hires, which may include a Defined Contribution Retirement Health Care Plan.

This Plan shall be effective for all bargaining unit members hired into the Department on or after June 30, 2012 and when employee contributions may be made on a pre-tax basis.

Bargaining unit members hired into the Department at or after that time, other than as provided herein in regard to duty-disability beneficiaries, will not accrue benefits under the old plan. Rather, those bargaining unit members hired into the Department on or after the effective date shall accrue benefits exclusively under this Section.

* * *

10.     See Issue 67.

* * *

The issue of the type of pension plan is usually an issue of negotiation between the parties. Likewise, the parties did agree that the loan program would be mandatory. There has been no showing after the parties previously agreed that it would be mandatory; that there is any persuasive reason that now the program should be permissive. For both of these reasons, the Chairman, joined by the DPOA Delegate, will vote to deny the request of the City to adopt the proposal represented by Issue No. 66 and 67 which the DPOA objects. The City Delegate dissents.

118

**Issue No. 68 - Economic -** *Article 33.V.1 - Pension Provisions-City Right to Amend Disability Retirement*

In Article 33.V.1, the City proposed the following amendment represented by the underscoring:

      V.    Duty Disability Retirement Provisions

          1.    Subject <u>to the City's reserved authority to amend and modify the following and</u> subject to c, below, applicable to all bargaining unit members who file application for disability retirement benefits, the definition of "total disability" and "total incapacity" for the duty disability retirement provisions is as follows:

* * *

There was no showing of a need for this provision. The duty disability retirement provisions have been in the contract for some. They are a result of negotiations or an Act 312 between the parties. Subsections a, b and c under Section V.1 were carefully drafted. If there are changes, the changes should be mutually negotiated between the parties or mutually contested in an Act 312. For these reasons, the Chairman, concurred in by the DPOA Delegate, will vote to deny the issue No. 68 proposal by the City. The City Delegate dissents.

**Issue No. 69 -**    *Article 33 - New Pension provision. Eliminate vision and dental care*

The City proposes to add to Article 33 a new section on pensions reading:

      Upon the effective date of this Agreement, all vision and dental pensions shall no longer be provided for any future retirees after January 1, 2013.

The DPOA opposes.

The rationale that the City presents is that this is a cost item to the City as the City is required to fund this benefit; that its consultants suggest that this benefit is not prevalent in other pension plans. The DPOA questions this fact. Though the Chairman appreciates that the City is

119

in financial difficulty, there are disputes between the parties as to the financial condition of the pension plan plus the need to make reforms. The problem that the Chairman sees is that with no history of bargaining and an attempt to resolve such issues as this, given the City's financial plight, more needs to be done at the bargaining table before submitting the issue to the Panel. It is for this reason that the Chairman, joined by the DPOA Delegate, will at this time reject this proposal. Though the DPOA Delegate did not agree with the Chairman's position on a re-opener as to pensions, and therefore expressed concern as to the re-opener, in order to obtain a majority vote at this time, agrees to vote to reject the City's proposal on Issue No. 69. The City Delegate dissents, believing that the issue should be addressed at this time.

**Issue No. 62 - Economic -** *Article 33.R.1 - Pension Provisions-Full Time to Stay in DROP*
**Issue No. 63 - Economic -** *Article 33.R.2 - Pension Provisions-DROP Limited to 5 Years*

Issue Nos. 62 and 63 are proposals by the City as to the DROP Plan. These are proposals to amend the DROP Plan which the DPOA opposes. Issue No. 62 is a proposal by the City to amend Article 33.R.1 to add the following language:

> Members entering the DROP Plan after the effective date of this
> Agreement must remain in a full duty status for the duration of their
> participation in the DROP Plan. If a member is not able to return to full
> duty status within six months, their participation in the DROP Plan shall
> terminate and he/she shall revert to a regular pension.

The proposal also proposes to delete the reference to the 2.25 escalator in Section R.5 and in R.9. Likewise, in R.2, the proposal proposes to incorporate the City's proposal as to Issue No. 63, the five year limitation on participation in the DROP Plan.

The Chairman would agree with the elimination of the reference to the 2.25% escalator because this is a housekeeping matter related to the stipulation in the 2011 Act 312 arbitration before Chairman Frankland. Thus, this would take care of subsections 5 and 9. As to subsection

120

2, this will be discussed in the discussion on Issue No. 63.

The Chairman appreciates the proposal put forth by the City. But the difficulty is that the language is drafted as an internal inconsistency and it does not distinguish between IOD and non-IOD injuries or address the overall issue of limited duty. For this reason, the Chairman, concurred with by the DPOA Delegate, will deny the City's proposal except as to Sections R.5 and 9. The City Delegate dissents as to Section s R.1 and 2, but will concur with the Chairman as to Sections R.5 and 9, and as to Sections R.5 and 9, the DPOA Delegate dissents.

As to issue No. 63, the City seeks to limit the participation in the DROP Plan to five years. When the DROP Plan was adopted by the parties, there was no limitation. There would have to be a further record developed to establish a cost factor that would strain the already fragile financial condition of the City to convince this Chairman that this provision is needed. At this point, the Chairman is not convinced. For this reason, the Chairman will join with the DPOA Delegate and deny this proposal but, as the Chairman did with Issue No. 63, he again repeats that as to Sections R.5 and 9, he will agree with the City Delegate that the reference to the 2.25 multiplier will be deleted. On this point, the DPOA Delegate dissents. On the point of denying the limitation, the City Delegate dissents, but does agree with the Chairman as to Sections R.5 and 9 in deleting the 2.25 references to the multiplier.

**Issue No. 61 - Economic -** *Article 35.K - Pension Provisions-Delete Reference to 2.25% Escalator-No Escalator for Future*
**Issue No. 64 - Economic -** *Article 33.R.5- Pension Provisions-Delete Reference to 2.25% Escalator*
**Issue No. 65 - Economic -** *Article 31.R.8 - Pension Provisions-Delete Reference to 2.25% Escalator*

Issue Nos. 61, 64 and 65 are what the City proposes are cleanup provisions representing the stipulated award of 2011 concerning eliminating the 2.25% escalator for service credits

121

earned after September 1, 2011. As to Article 33.K, the City proposes as follows:

K.   On or after July 1,1992, and the first of July each year thereafter, the pension portion of any retirement allowance or death benefit of a member or beneficiary of a member as defined in Article IV, Section 1 (d) of the plan provisions, and Article 31, K of this Agreement (to include those members who opt to retire under the new plan provisions) shall be increased at the rate of 2.25% per annum computed on the basis of the amount of the pension received at the time of retirement by all new plan members who are currently retired or who retire on or after July 1, 1992.

~~For persons retiring on or after July 1, 2001, under the new plan provisions, the 2.25% per annum escalation amount shall be re computed each fiscal year on the basis of the amount of pension received in the previous fiscal year (i.e., the 2.25% per annum escalation amount shall be compounded).~~

The pension portion of any retirement allowance or death benefit of a member, or beneficiary of a member as defined in Article IV, Section 1 (d) of the plan provisions, and Article 31 (K) of this Agreement (to include those members who opt to retire under the new plan provisions) earned on or after September 1, 2011, shall not be increased whatsoever, per annum or otherwise. The pension portion of any retirement allowance or death benefit of a member, or beneficiary of a member as defined herein, accrued prior to September 1, 2011, shall still be increased as provided herein. Hence pension benefits earned based on service rendered on or after September 1, 2011 will no longer receive the 2.25% per annum escalation amount. The 2.25% per annum escalation amount shall continue to apply to pension benefits earned based on service rendered before September 1, 2011.

<u>Pension benefits based on service rendered after the effective date of this Agreement shall continue to not be subject to any escalation amounts.</u>

The City proposes to delete one full paragraph as struck out and add a sentence as underscored, plus a reference to Article 31.K of this Agreement.

As to Issue No. 64, the City proposed to amend Article 33.R.5 as represented by the following underscoring and strikeout:

122

R.     DROP Plan:

    1.       See Issue No. 62.
    2.       See Issue No. 63.

* * *

    5.       The amount paid into the DROP accumulation account shall be 75% of the member's regular retirement allowance plus the annual escalator <u>applicable to the credited service years</u> ~~of 2.25% times that portion of any retirement allowance earned prior to September 1, 2011~~.

* * *

    8.       See Issue 65.

* * *

Likewise, as to Issue No. 65, the City proposes to amend Article 31.R.8 with the following strikeouts and underscoring:

R.     DROP Plan:

    1.       See Issue 62.

    2.       See Issue 63.

* * *

    5.       See Issue 64.

* * *

    8.       When the member permanently retires, the member will receive a regular retirement allowance calculated as if the member retired on the day the DROP account started. <u>The member's retirement allowance shall include all annual escalator amounts</u> ~~2.25%~~ <u>subject to Article 31(K)</u> that would have been added while the member was participating in the DROP plan.

* * *

The history behind this language goes back to correspondence between the then counsel of the City, Kenneth Wilson, and the current counsel of the DPOA, Donato Iorio, when in a letter dated July 14, 2011 Mr. Wilson wrote Mr. Iorio as follows:

    I am writing to confirm that the City of Detroit and the Detroit

123

Police Officers Association (DPOA) have negotiated the agreement summarized below subject to ratification. This agreement would resolve changes to the collective bargaining agreement that would otherwise have been determined by a majority of a panel pursuant to Public Act 312 of 1969, as amended. Subject to ratification, this agreement is as follows:

\* \* \*

iv.     **Elimination of Escalator.** Pension benefits earned based on service rendered **after September 1, 2011** would no longer receive a 2.25% per annum escalation. Pension benefits earned pursuant to service rendered prior to that date would still be subject to the escalator. (Identical to LSA award other than the effective date.)

This language then became part of a Stipulated 312 Award before Chairman Kenneth P. Frankland signed on September 22, 2011 in MERC Case No. D09 F-0731 wherein the Stipulated Award provided:

iv.     **Elimination of Escalator.** Pension benefits earned based on service rendered **after September 1, 2011** would no longer receive a 2.25% per annum escalation. Pension benefits earned pursuant to service rendered prior to that date would still be subject to the escalator.

Based upon this history, the Chairman concludes that the language proposed by the City in Issue Nos. 61, 64 and 65 reflects this stipulation. It is clarifying language. And, by placing this history in this Opinion, confirming the history, all will understand the meaning of the language. For this reason, the Chairman, voting with the City Delegate, accepts the City's proposal as to Issue Nos. 61, 64 and 65. The DPOA objected, arguing for the *status quo*. Based on the history, the Chairman cast his vote as indicated with the City Delegate. The DPOA Delegate dissents.

<u>Issue No. 9</u> - Non-Economic -     *Article 6.A - Management Rights-Add Law and FSA*
<u>Issue No. 10</u> - Non-Economic -     *Article 6.D, E and F - New Management Rights Provision*
<u>Issue No. 11</u> - Economic -     *Article 6.G - Management Rights-Delete Confusing Section*
     *G about CBA Supplementing Charter*
<u>Issue No. 12</u> - Economic -     *Article 6 - Management Rights-Reserve all Rights*

124

These Issues proposed by the City address management rights and are amendments to Article 6 of the Master Agreement. All of the amendments proposed are opposed by the DPOA, who propose that the *status quo* remain.

The amendments essentially mirror the City Employment Terms. The fact of the matter is the management rights and responsibilities provisions in the Master Agreement have been negotiated over a long period of time and, in the opinion of the Chairman, gives the Department broad rights only subject to any negotiated "provisions of this Agreement".

The management rights in the Master Agreement are two pages long. They have been tested in the umpire system and the Department has fared quite well among the umpires. All the proposals do is represent a stylistic change. There is no need to reinvent the wheel. The present management rights language gives the Department broad rights which the Department has in the past and will continue to exercise. For these reasons, the Chairman, joined by the DPOA Delegate, declines to adopt the City's proposals as to Issue Nos. 9, 10, 11 and 12 and votes to continue the *status quo*. The City Delegate dissents.

**Issue No. 17** - **Non-Economic** - *Article 9 - Discipline-Department Can Implement Disciplinary Policies, etc.*

The City has proposed to amend the introduction to Article 9, "Discipline", as follows:

> All alleged charges and specifications against employees will indicate the specific violation of Departmental rules and regulations including the date, time and location of such alleged violations and a statement in simple concise language of the facts constituting the allegations. The Department reserves the right to implement and/or modify disciplinary policies, rules and penalties, including but not limited to policies relating to use of alcohol and marijuana and other controlled substances with at least thirty (30) days prior notice to the Union.

This, again, is a non-economic issue. Under its management rights, it would seem that the Department has the right to amend policies. But this is asking to confirm this right in the

contract. Likewise, the DPOA has the right to challenge the reasonableness of the rule. Therefore, the Chairman would add the language to the Union's right to challenge the reasonableness of the rule in the grievance procedure. With this added provision, the Chairman would adopt the City's Last Best Offer. The City Delegate reluctantly would agree. The DPOA Delegate dissents with amending the provision.

## Uniforms

The parties had proposals on uniforms but, during these proceedings, there was a representation that the parties were reaching an agreement on the issue of uniforms. Based upon this representation, the Panel will not issue an award on uniforms. If the Chairman is mistaken, then the Chairman shall be so advised within five days of the issuance of this Opinion and Award and the Panel will meet to address the issue of uniforms.

### Issue No. 94 - City Issue - *Eliminate Adoption by Reference*

Issue No. 94 is a proposal by the City to delete Article 45 of the Master Agreement which is entitled "Adoption by Reference or Relevant Charter Provisions, Ordinances and Resolutions" and reads:

> Except as otherwise provided in this Agreement, the parties further agree that all provisions of the City Charter, Ordinances and Resolutions of the City Council relating to the working conditions and compensation of employees are incorporated herein by reference and made a part hereof to the same extent as if they were specifically set forth. These charter provisions, ordinances and resolutions include, but are not necessarily limited to, the following subject matter:
>
> A.      Hours of work and method of compensation
> B.      Overtime payments
> C.      Premium payments
> D.      Uniforms and equipment
> E.      Vacations (furlough and leave days)
> F.      Holidays
> G.      Non duty connected illness or disability (sick leave)
> H.      Duty connected illness or disability

126

~~I.     Retirement System (pension)~~
~~J.     Longevity pay~~

The Chairman agrees that there is no reason to reference the Charter Provisions,

Ordinances and Resolutions; that the contract involved here should stand by itself. For this

reason, the Chairman, joined by the City Delegate, will agree to the elimination with the DPOA

Delegate dissenting as the DPOA objects to the elimination of Article 45.

**Issue No. 93** - Economic - *Article 43 - Civilianization*

The City proposes to amend Article 43, "Civilianization", as follows:

> The Department shall have the right to use civilians <u>in any
> function/classification not requiring MCOLES certification, including in
> any of the functions/classifications listed below. Any police officer in a
> function/classification that is civilianized shall be reassigned.</u> ~~as it
> deems appropriate so long as it does not reduce the force or erode the
> membership of the bargaining unit as a result of the use of civilians in
> the following commands and district assignments~~ ~~including of the
> following s/classifications~~:

> Commands
> <u>1.</u>  Fleet Management
> <u>2.</u>  Equipment Property Control Section
> <u>3.</u>  Communication Systems Section
> 4.  Communications Operations
> 5.  Uniform Store
> 6.  Auto Pound
> 7.  Records/Identification Section
> 8.  Print Shop
> 9.  Graphic Arts
> 10. Crime Analysis
> 11. Technology Liaison Office
> <u>12. Technical Support</u>
> <u>13. Any administrative function or classification</u>

> District Assignments
> <u>1.</u>  Vehicle Maintenance Officer
> <u>2.</u>  Property Officer
> <u>3. Any administrative function or classification</u>

~~To the extent civilians are employed to replace sworn officers it shall be
done on the basis of either adding civilian staff, or by attrition when an
officer voluntarily leaves the positions he/she currently holds.~~

127

~~Should the Department decide to utilize officers in any of the above~~
~~mentioned positions, those positions shall be made available for officers~~
~~to submit DPD 568 Inter Office Memorandums for the transfer requests~~
~~for the commands. Unless a position is abolished, the Department must~~
~~fill all vacancies as soon as practicable if not with civilian than with~~
~~sworn officers.~~

Effective September 1, 2011, the Department may, at its discretion, reassign bargaining unit members from the 36th District Court in order that they may be replaced with civilian staff or civilian security personnel.

<u>The provisions of Article 10 shall not apply to this provision.</u>

The strikeouts in the text represent deletions. There is also an added addition, namely, "The provisions of Article 10 shall not apply to this provision". There is also some additional language in the text concerning MCOLES certification. The City has also added under "Commands" three additional entities, namely, Communications Operations, Technical Support and "Any administrative function or classification". Under "District Assignments", the City has added "Any administrative function or classification".

The DPOA proposes the *status quo*.

Although the City maintains there are 90 Officers affected, some of the City's count includes present entities that can be civilianized, including Fleet Management, which the City claims involves 14 Officers. The present Article 43 already provides for civilianization of Fleet Management. The largest group in the City's proposal is Communications Operations involving approximately 42 Officers.

The City does make a point. In their presentations, the parties did refer to the contract between the City of Chicago and the Fraternal Order of Police Chicago Lodge No. 7 which represents the Chicago Police Officers. Section 23.12 of that contract recognizes civilianization of the functions that the city is seeking to civilianize and the amendment proposed to Article 43.

128

The City is seeking with less certified Officers in the Department to put more Officers on the street performing Police work. The City is seeking what other major departments are doing as evidenced by the Chicago contract. This civilianization process will take some time. Based upon the record, the City, even with its present language, has not always been able to civilianize. Yet, the City should have the opportunity to do so as part of the reorganization of the Department and the well being of the citizens served by the Department.

For these reasons, the Chairman, with the concurrence of the City Delegate, will vote to accept the proposal of the City to amend Article 43. The DPOA Delegate dissents.

**Issue No. 99** - **City Proposal** - **Economic** -    *Article 33 - Pension-Lump Sum-Actuarial Reduction*

**Issue No. 100** - **City Proposal** - **Economic** -    *Article 33 - Pension-Gaines and Losses on Annuity Accounts*

These are two issues dealing with pensions. As to Issue No. 99, the City proposes an amendment to Article 33 that reads: "Bargaining unit members may not receive a lump sum cashout of all or part of their accrued financial benefits from the Police and Fire Retirement System without actuarial reduction of benefits fully equivalent to and otherwise of equal value to such payment." As to Issue No. 100, the City proposes to add the following language:

> Bargaining unit members having participant accounts with the Police and Fire Retirement System which may be distributed to participant's beneficiaries in one or more installments rather than as an annuity, sometimes referred to as annuity accounts, shall have such accounts ratably adjusted, not less frequently than once per year, based on actual returns, positive or negative, experienced by the Trust during the fiscal year preceding the crediting date. Final distribution of the account balance due a participant or beneficiary shall be delayed until the final adjustment has been made.

The DPOA objects to these proposals.

The provisions for employee pension contributions and annuity funds have been in the

129

parties' Master Agreement since January 1, 1987. There was no evidence that there was any

negotiation on these proposals by the City. Given the length of time that the concept at issue has

been in the contract and the lack of negotiation between the parties, the Chairman will vote to

maintain the *status quo*. This is the type of proposal, given its longevity, whereby there should

be a history of negotiation. Therefore, the Chairman, along with the DPOA Delegate, will vote

to maintain the *status quo* as to Issue Nos. 99 and 100. The City Delegate dissents.

**Issue No. 107** - **Economic** - **Union Proposal** - *Article 34 - Regularity in Use of Sick Leave-Discipline*

Issue No. 107 addresses regularity in the use of sick leave benefits and proposes to amend

Article 34.A as follows:

> **A.** **General:**
>
> The Detroit Police Department is responsible for providing efficient law enforcement services. Maximum attendance is required from all members if this responsibility is to be fulfilled.
>
> The Department shall provide a guideline (copy attached) for determining excessive/improper use of sick usage. It is, therefore, necessary to identify and correct members who have developed a pattern or regularity in the use of their sick leave benefits.
>
> **CITY LAST BEST OFFER**
>
> **A.** **General:**
>
> The Detroit Police Department is responsible for providing efficient law enforcement services. Maximum attendance is required from all members if this responsibility is to be fulfilled.
>
> The Department shall provide a guideline (copy attached) for determining excessive/improper use of sick usage. It is, therefore, necessary to identify and correct members who have developed a pattern or regularity in the use of their sick leave benefits.

Attached to the Offer is an extensive Guideline. The actual proposal refers to Article 34.

However, the proposal would best fit into Article 36 which is the Article in the Master

130

Agreement referring to regularity in the use of sick leave benefits.

The DPOA opposes the addition of this language and, therefore, opts for the *status quo*. The Chairman, concurred in by the DPOA Delegate, believes that this is a non-economic issue and that the Panel, therefore, is not bound by one Offer or the other of the parties.

There was little bargaining on this issue, even though the Chairman is aware that the question of the use of sick leave benefits has generated grievances between the parties. Therefore, the Chairman believes that the matter requires more discussion and negotiations between the parties than was discussed in these proceedings. For this reason, the Chairman, joined by the DPOA Delegate, will opt for a Letter of Understanding to be attached to the contract whereby the parties are to form a regularity in the use of sick leave benefits committee with two members from the Police administration and two members from the DPOA selected by the President. The committee shall meet within one month of the issuance of these Orders. The committee shall attempt to reach agreement on the guidelines for determining excessive and improper sick leave usage. If the committee is not able to reach agreement by October 1st, the matter shall be referred to the Panel of existing Umpires who shall render a final and binding opinion by January 15, 2014. The referenced referral should be done no later than October 15, 2013. A majority opinion of the Panel shall be binding on the parties. This shall be in reference to the amendment to Article 36.A. Otherwise, all the provisions of Article 36.A as well as the remaining provisions of Article 36.A shall remain in place.

The DPOA Delegate will join with the Chairman in accepting the Chairman's proposal. The City Delegate would have agreed with the City's proposal as to the amendment to Section A, but would agree with the Chairman and the DPOA Delegate that all the other provisions of Article 36.B through H and the portions of Article 36.A that were not proposed to be amendment

131

would stay.

**Issue No. 82** - *Article 40.C - Miscellaneous- Extent of Agreement*

The City proposes to eliminate Article 40.C, "Miscellaneous", which both parties agree is non-economic, and reads:

> **Extent of Agreement.** The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the City and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and agrees that the other shall not be obliged to bargain collectively with respect to any subject or matter referred to or covered in this Agreement or with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subject matter may not have been within the knowledge or contemplation of either or both parties at the time that they negotiated or signed this Agreement, unless otherwise provided for herein.

The DPOA objects, noting that this language has been in the parties' contract for a number of years. The Chairman sees no reason why this language should not be in the parties' contract. With the number of issues involved in this Act 312, certainly the parties have the opportunity to present the issues they wish put forward. Therefore, it would seem that Article 40.C is an appropriate provision. For this reason, the Chairman, joined with the DPOA Delegate, will vote to retain Article 40.C as it was in the expired Master Agreement expiring on June 30, 2012, with the City Delegate objecting.

## Retroactivity

The provisions of the Orders are prospective if involving economic matters from the date of the Opinion and Orders, with the City Delegate agreeing with the Chairman on this point and the DPOA Delegate dissenting.

The City has proposed to amend Article 31.E.5, "Holidays", as follows:

E.      **Preparation and Maintenance of Holiday Rosters.**

\* \* \*

5.      **District Rosters.** <u>At the discretion of the Employer,</u> all district personnel shall be included on one of the following rosters with the exception as noted in 31.E.5.e.:

    a.    **Platoon One.** All employees who start work between 12:00 a.m. and 3:59 a.m.

    b.    **Platoon Two.** All employees who start work between 4:00 a.m. and 10:59 a.m. (including staff personnel).

    c.    **Platoon Three.** All employees who start work between 11:00 a.m. and 4:00 p.m.

    d.    **Platoon Four.** An employees who start work between 4:01 p.m. and 11:59 p.m.

    e.    The exception to the above is personnel assigned to <u>Central Events</u> ~~Special Operations (formerly Special Events Section) of the First Precinct. Only First Precinct Special Operations shall maintain their own rosters.~~

**NOTE:** These start times shall not include roll call time, nor desk personnel who start earlier than normal hours.

In other words, the City proposes to add the words "At the discretion of the Employer" and add to E.5.e "Central Events" and to delete the remaining language as indicated. The DPOA objects to the changes.

The Chairman believes that this language, namely, the change to "Central Events" represents the current organization in the Department. The Chairman also believes that the reference to the addition of "At the discretion of the Employer" is a reasonable addition, consistent with management rights. For this reason, the Chairman, along with the City Delegate, will vote to accept the City's proposal. The DPOA Delegate dissents.

**Issue No. 112** - **Economic** -  *Article 33 - Pension Provisions*

The Union has proposed to add the following Paragraph P to Article 33:

> Paragraph P – New 13   "Effective July 1, 2009, all members that elect DROP, with the immediate payout option shall be paid for all bank time, including sick time, within thirty (30) days.  Should any member not receive their lump sum payments within thirty (30) days, they shall receive Michigan judgment interest."

The City opposed this proposal and has made Last Best Offers set forth in Issue Nos. 75, 87 and 145.

The Chairman, joined by the City Delegate, rejects the Union's proposal for the reasons discussed under Issue Nos. 75, 87 and 145.  The DPOA Delegate dissents.

**Issue No. 102** - **Economic - City Issue**    *Health Care Coverage For All Spouses of Employees Hired on or after January 1, 2003*

The City is proposing that there be no health care coverage for all spouses of employees hired on or after January 1, 2003.  The DPOA opposes such a provision.  This would affect Officers who have been on the force for 10 years.  It would obviously affect the City's ability to recruit qualified candidates because retiree health care for one's spouse is a plus for recruitment.  It is doubtful that in negotiations the City would prevail in this request without a major concession on the part of the City.  For this reason, the Chairman, joined by the DPOA Delegate, will vote to deny this request.  The City Delegate dissents.

**Issue No. 113** - **Economic**    *DPOA Shall Have The Authority to Name an Alternate Health Care Provider*

The DPOA proposes to add to Article 21 a new Section H, namely, "The DPOA shall have the authority to name an alternate health care provider consistent with the terms enumerated in Article 21."  The DPOA has not been able to prevail in such a provision in the past.  Furthermore, in the view of the Chairman, it is the responsibility of the City to present insurance

134

plans and proposals. If the DPOA has an insurance carrier that it wishes to propose to the City, it may at the bargaining table. Furthermore, as the City points out, it is the City that administers various health plans in many bargaining units. For this reason, the Chairman, joined by the City Delegate, chooses not to adopt the DPOA's proposal as to a new Section H as proposed. The DPOA Delegate dissents.

**Issue No. 137** - Non-Economic - DPOA Proposal

The DPOA has proposed to add a new Section R to Article 21 requesting that the City provide the DPOA certain information from Blue Cross Blue Shield each May 1st. This provision has not been in the parties' contract for some time, if ever. In the view of the Chairman, there is no reason to have such a provision in the contract. This is a matter for discussion between the parties during their day-to-day relationship. Therefore, the Chairman, joined by the City Delegate, will vote to deny this request. The DPOA Delegate dissents.

**Issue No. 92 A and B** - Economic - City Issue *Permanent Shift Program*

Article 42 of the Master Agreement provides for the permanent shift program. In 42.A, the City proposes to add the following sentences: "The City reserves the right to modify, amend, terminate or suspend the permanent shift program in its sole discretion. In the event that the City exercises this right, the City may give prior notice to the Union." As the parties well know, this Chairman in a previous Act 312 at the request of the parties initiated the permanent shift program. The program has been successful and there is no reason to abandon the program. It was a joint initiated program and if it is abandoned, in the view of the Chairman, its elimination should be jointly negotiated as was its creation. For this reason, the Chairman, along with the DPOA Delegate, will vote to deny the addition of the proposed language. The City Delegate dissents.

135

As to Issue 92B, which is a proposal to eliminate the Joint Labor Management Permanent Shift Committee set forth in Sections D and E, this language is now obsolete as it was necessary when the permanent shift program was in its infancy and as a result the City has proposed to eliminate this language, which apparently the DPOA objects to the elimination. There is no reason after permanent shifts have been in place in excess of 10 years to have such language. Therefore, voting with the City, the Chairman agrees to eliminate Sections D and E of the current language. The DPOA Delegate dissents.

## O R D E R S

The Orders and the votes of the Delegates are as set forth in the body of the Opinion. The views expressed in the Opinion are the views of the Chairman and those voting with the Chairman do not necessarily represent the views of the Delegate voting with the Chairman. But the vote of the Delegate with the Chairman was necessary to obtain a majority vote on the Issue involved. For convenience, these Orders have been signed by the Delegates on separate pages, but have the same effect as if signed on the same pages with the Chairman.

March 25, 2013

GEORGE T. ROUMELL, JR., Chairman

136

March 25, 2013

_____

CRAIG S. SCHWARTZ, City Delegate, concurring
and dissenting where indicated

137

March 25, 2013

Theodore M. Iorio

THEODORE M. IORIO, DPOA Delegate,
concurring and dissenting where indicated

138