## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |
| | ) | |

## OBJECTION OF THE DETROIT RETIREMENT SYSTEMS TO THE ELIGIBILITY OF THE CITY OF DETROIT, MICHIGAN TO BE A DEBTOR UNDER CHAPTER 9 OF THE BANKRUPTCY CODE

Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Jennifer K. Green (P69019)
Evan J. Feldman (P73437)
CLARK HILL PLC
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

*Counsel to the Police and Fire Retirement System of the
City of Detroit and the General Retirement System of the City of Detroit*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ...............................................3

I.      The Retirement Systems ...................................................................3
II.     The Michigan Constitution ................................................................4
III.    The Municipal Code of the City of Detroit ...........................................6
IV.     The Governor ...............................................................................6
V.      The Emergency Manager and the Restructuring Proposal ........................7
VI.     The Pre-Petition Lawsuits ................................................................9
VII.    The Authorization and Filing of the Chapter 9 Bankruptcy Petition ..........10
VIII.   The Declaratory Judgment in *Webster* ...............................................12
IX.     The July 24, 2013 Hearings in the Bankruptcy Court ............................13

ARGUMENT ......................................................................................15

I.      The City of Detroit Cannot Satisfy the Eligibility Requirements of
        Section 109(c)(2) of the Bankruptcy Code, and Its Bankruptcy Case
        Must Be Dismissed as a Matter of Law ...............................................15

        A.      Standard of Review .............................................................15

        B.      The Supremacy Clause and Concepts of Preemption Do Not
                Apply Because Congress Gave States the Authority to Regulate
                Their Municipalities' Access to Chapter 9 Bankruptcy ..................19

                1.      The threshold issues of eligibility and access to Chapter 9
                        are the sole issues before the Court presently ..................24

        C.      The Court Must Construe Section 109(c)(2) To Require
                Compliance with State Law. .................................................26

        D.      The City is Not Specifically Authorized to be a Chapter 9
                Debtor Under State Law ......................................................27

                1.      The Governor and the Emergency Manager must uphold
                        the Michigan Constitution .........................................31

i

2. Article IX, section 24 of the Michigan Constitution prohibits the Governor and the Emergency Manager from taking any action that causes accrued public pension benefits to be diminished or impaired....................................33

3. The Governor's Authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued public pension benefits violated the Michigan Constitution and is void *ab initio*. ...................................................................................36

4. The Governor cannot abrogate provisions of the Michigan Constitution, directly or indirectly. ..........................41

5. The Emergency Manager's authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued financial benefits violated the Municipal Code of the City of Detroit and is void *ab initio*. ...........................................................................42

6. Alternatively, if PA 436 does purport to permit the impairment of accrued financial benefits, then it is unconstitutional and the Governor's Authorization and initiation of the Chapter 9 bankruptcy was *ultra vires* and void *ab initio*. ...........................................................................43

E. Collateral Estoppel Precludes the City from Relitigating the Threshold Issue of Whether the City Received Valid Authorization from the Governor to File the Petition Because That Issue Has Already Been Litigated and a Declaratory Judgment Rendered. ..........................................................................44

1. The Declaratory Judgment is entitled to full faith and credit...........................................................................45

2. The preclusive effect of the Declaratory Judgment is governed by Michigan law...........................................48

3. The elements for collateral estoppel under Michigan law are satisfied in this matter. .......................................49

   a. The Governor's authority to authorize the bankruptcy petition was actually litigated and determined by a valid final judgment.......................................49

   b. The same parties or their privies had a full and fair opportunity to litigate this issue in the state court.........51

ii

|   |   | i.  | Privity exists between *Webster* and the Retirement Systems...................................................................52 |
|   |   | ii. | Privity exists between the *Webster* Defendants and the Emergency Manager/City. .............................53 |
|   | c. | The parties had a full and fair opportunity to litigate.....56 |
|   | d. | Mutuality of estoppel exists...........................................58 |

II. The City Failed to Negotiate With Its Creditors in Good Faith and Such Negotiations Were Not Impracticable. ........................................................59

CONCLUSION ........................................................................................................61

9301723.3 14893/161046

# TABLE OF AUTHORITIES

**Cases**

*Accident Victims Home Health Care v. Allstate Ins. Co.*,
  2006 Mich. App. Lexis 1791 (Mich. Ct. App. June 6, 2006) ..............................57

*Allen v. McCurry*,
  449 U.S. 90 (1980) ...........................................................................................47

*Ashton v. Cameron County Water Improvement Dist.*,
  298 U.S. 513 (1936) .........................................................................................19

*Attorney Gen ex rel Eaves v. State Bridge Com.*
  269 N.W. 388 (Mich. 1936) ..............................................................................41

*Baker v. General Motors Corp.*,
  522 U.S. 222 (1998) .........................................................................................46

*Bay Area Factors v. Calvert (In re Calvert)*,
  105 F.3d 315 (6th Cir. 1997) ......................................................................46, 48

*Bowen v. Public Agencies opposed to Soc. Sec. Entrapment*,
  477 U.S. 41 (1986) .............................................................................................5

*City of Pontiac Retired Employees Ass'n v. Schimmel*,
  2013 U.S. App. LEXIS 16519 (6th Cir. August 9, 2013) .............................25-26

*City of Troy Bldg. Inspector v. Hershberger*,
  183 N.W. 2d 430 (Mich. App. 1970) .................................................................*50*

*Cogan v. Cogan*,
  385 N.W.2d 793 (Mich. App. 1986) ..................................................................49

*Connolly v. Pension Benefit Guar. Corp.*,
  475 U.S. 211 (1986) ...........................................................................................5

*Dearborn Heights Sch. Dist. No. 7 v. Wayne County MEA/NEA*,
  592 N.W.2d 408 (Mich. App. 1998) .......................................................52-53, 58

*Detroit Auto. Inter-Insurance Exchange v. Sanford*,
  369 N.W.2d 239, 242 (Mich. App. 1985) ..........................................................57

*Detroit v. Nortown Theatre, Inc.*,
  323 N.W.2d 411, 413-14 (Mich. App. 1982) .....................................................57

*Ditmore v. Michalik*,
  625 N.W.2d 462 (Mich. App. 2001) ...........................................................49, 57

iv

*Dullam v. Willson*,
19 N.W. 112 (Mich. 1884) ............................................................................. 38-39

*Elder v. Harrison Twp.*,
786 F. Supp. 2d 1314 (E.D. Mich. 2011) *rev'd on other grnds*,
489 Fed. Appx. 934 (6th Cir. 2012) ....................................................................53

*Eisfelder v. Michigan Dept. of Natural Resources,*
847 F. Supp. 78 (W.D. Mich. 1993)......................................................................50

*Farmers Ins. Exch. v. Young*,
2010 Mich. App. LEXIS 1499 (Mich. Ct. App. Aug. 3, 2010) ...........................57

*Hansen v. State Farm Fire and Cas. Co.*,
2006 Mich. App. LEXIS 1556 (Mich. Ct. App. May 9, 2006) ...........................57

*Hill v. Wall St. Sys.*,
2003 Mich. App. LEXIS 1261 (Mich. Ct. App. May 27, 2003).........................57

*In re City of Harrisburg,*
465 B.R. 744, 752 (Bankr. M.D. Pa. 2011).................................................. *passim*

*In re City of Stockton*,
2013 Bankr. LEXIS 2416, 21 (Bankr. E.D. Cal. June 12, 2013)........................18

*In re City of Stockton*,
475 B.R. 720, 725 (Bankr. E.D. Cal. 2012) ........................................... 17-18, 21

*In re City of Vallejo*,
403 B.R. 72 (Bankr. E.D. Cal. 2009), *aff'd IBEW, Local 2376
v. City of Vallejo (In re City of Vallejo)*, 432 B.R. 262 (E.D. Cal. 2010) ............18

*In re Miloszar*,
238 B.R. 266 (D.N.J. 1999).................................................................................46

*In re New York City Off-Track Betting Corporation*,
427 B.R. 256 (Bankr. S.D.N.Y. 2010) ......................................................... 16-17

*In re Suffolk Regional Off-Track Betting Corp.,*
462 B.R. 397 (Bankr. E.D.N.Y. 2011) ............................................. 17-18, 40, 42

*Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo
(In re City of Vallejo)*, 408 B.R. 280 (9th Cir. B.A.P. 2009) ..............................16

*Kim v. JPMorgan Chase Bank, N.A.*,
825 N.W.2d 329 (Mich. 2012) ...........................................................................40

*Kosa v. State Treasurer*,
292 N.W.2d 452 (Mich. 1980) ............................................................................33

9301723.3 14893/161046

*Laethem Equip. Co., et al. v. J & D Implement, Inc., et al.*,
    2007 Mich. App. LEXIS 1769, *17 (Mich. Ct. App. July 19, 2007)...................57

*McCartney v. Attorney General*,
    587 N.W.2d 824 (Mich. App. 1998) ...................................................39

*McKane v. City of Lansing*,
    1998 U.S. App. LEXIS 649 (6th Cir. Jan. 14, 1998) ................................... 39, 42

*Migra v. Warren City Sch. Dist. Bd. of Ed.*,
    465 U.S. 75 (1984) ..................................................................48

*Moldovan v. A&P*,
    1985 U.S. Dist. LEXIS 20659 (W.D. Pa. Apr. 17, 1985) ...................................53

*Monat v. State Farm Ins. Co.*,
    677 N.W.2d 843 (Mich. 2004) ................................................. *passim*

*Murphy v. Wayne County Employees Retirement Bd. of Trustees*,
    192 N.W.2d 568 (Mich. App. 1971) ...................................................33

*Musselman v. Governor of Mich.*,
    533 N.W.2d 237 (Mich. 1995) ................................................... 32-35

*Oshtemo Charter Twp. v. Kalamazoo County Rd. Comm'n*,
    2013 Mich. App. LEXIS 1163 (Mich. Ct. App. June 25, 2013) ............. 32, 34-35

*People ex rel Metevier v. Therrien*,
    45 N.W. 78 (Mich. 1890) ............................................................32

*People v. Neumayer*,
    275 N.W.2d 230 (Mich. 1979) .......................................................43

*Phinisee v. Rogers*,
    582 N.W.2d 852 (Mich. App. 1998) ...................................................52

*Rhodes v. Stewart*,
    705 F.2d 159 (6th Cir. 1983) ........................................................22

*Seitz v. Probate Judges Retirement System*,
    474 N.W.2d 125 (Mich. App. 1991) ...................................................33

*Sittler v. Bd. of Control*,
    53 N.W.2d 681 (Mich. 1952) ........................................................32

*Sloan v. Madison Heights*,
    389 N.W.2d 418 (Mich. 1986) .......................................................52

*Smith v. Michigan*,
    410 N.W. 2d 749 (Mich. 1987) ......................................................32

vi

*Storer v. French,*
 58 F.2d 1125 (6th Cir. 1995) ....................................................... 21-22

*Temple v. Kelel Distributing Co., Inc.*
 454 N.W. 2d 610 (Mich. App. 1990) ................................................50

*Tinsman v. City of Southfield*,
 1999 Mich. App. LEXIS 2112 (Dec. 3, 1999) ...................................33

*Tripati v. Henman,*
 857 F.2d 1366 (9th Cir. 1988) ............................................................51

*Twp. Of Dearborn v. Dearborn Twp. Clerk,*
 334 Mich. 673 (1952) .........................................................................32

*UAW v. Central Mich. Univ. Trustees*,
 815 N.W.2d 132, 138 (Mich. App. 2012) ..........................................50

*United States v. Bekins,*
 304 U.S. 27 (1938) .......................................................................... 19-20

*United States v. Security Indus. Bank*,
 459 U.S. 70 (1982) .......................................................................... 26-27

*Utica State Sav. Bank v. Oak Park,*
 273 N.W. 271 (Mich. 1937) ...............................................................39

*Warwick Corp. v. Maryland Dep't of Transp.*,
 573 F. Supp. 1011 (D. Md. 1983).......................................................51

*Wayside Transp. Co. v. Marcell's Motor Express, Inc.*,
 284 F.2d 868 (1st Cir. 1960) ..............................................................45

**Statutes**

11 U.S.C. § 109(c) ...................................................................... *passim*

11 U.S.C. § 921(c) ...............................................................................16

11 U.S.C. § 943(b)(4)...........................................................................11

28 U.S.C. § 1738........................................................................... 46, 49-50

29 U.S.C. § 1321 ...................................................................................4

M.C.L. § 141.1558 ....................................................................... 36-37, 43

M.C.L. § 141.1560................................................................................55

M.C.L. § 141.1566 ....................................................................... 36-37, 43

M.C.L. § 15.151 ...............................................................................7, 31

vii

M.C.L. § 38.851 ....................................................................................5

M.C.L. §117.1. ....................................................................................4

M.C.L. §141.1201 ................................................................................7

M.C.L. §141.1541 ................................................................................7

M.C.L. §141.1549 ..............................................................................54

M.C.L. §141.1552 ........................................................................ 37, 42

M.C.L. §168.1. ....................................................................................6

M.C.L. §168.64. ................................................................................31

MICH. CONST., art. IX, § 24 ........................................................... *passim*

MICH. CONST. art. V, § 8. ..................................................................31

MICH. CONST. art. XII, § 1-3. ............................................................36

U.S. CONST. art. IV, § 1 ....................................................................45

U.S. CONST. art. VI, cl 2 ....................................................................19

U.S. CONST. amend. X ......................................................................19

**Other Authorities**

Q & A with Kevyn Orr:  Detroit's Emergency Manager Talks About
    City's Future, Detroit Free Press (June 16, 2013) ................................8

**Regulations**

20 C.F.R. § 404.1206 ..........................................................................5

20 C.F.R. § 404.1212 ..........................................................................5

**Rules**

M.C.R. 2.605 ....................................................................................50

9301723.3 14893/161046

The Police and Fire Retirement System of the City of Detroit ("PFRS") and the General Retirement System of the City of Detroit ("GRS," and together with PFRS, the "Retirement Systems") object to and contest the eligibility of the City of Detroit, Michigan (the "City") to be a debtor under Chapter 9 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"). [1]

## PRELIMINARY STATEMENT

In order to avail itself of the Bankruptcy Court, the City must first overcome the threshold issue of whether it is "eligible" to be a debtor under Chapter 9 of the Bankruptcy Code. The City cannot meet its burden. Pursuant to section 109(c)(2), a prospective municipal debtor must be "specifically authorized" under **state law** to become a debtor. The state law in this case—as embodied in the state's highest legal authority, the Michigan Constitution—forbids any act that would diminish or impair accrued public pension benefits. The Governor of the State of Michigan is duty-bound to uphold this provision, and any act in violation of the Michigan Constitution is void.

Prior to and in connection with seeking authorization to file this case, the Emergency Manager made abundantly clear his intention to impair and diminish the accrued financial benefits of each of the City's pension plans and retirement

---

[1] This Objection is filed subject to the reservations of rights in the Appearances filed by the undersigned counsel in this case, including the Retirement Systems' right to argue that this Court lacks subject-matter jurisdiction.

1

systems, in violation of the Michigan Constitution. However, since the Governor cannot unilaterally abrogate the constitutional protections of accrued pension benefits, he also has no power to authorize the Emergency Manager to do so pursuant to this Chapter 9 case. Therefore, by authorizing a contingency-free bankruptcy that makes no exception for the accrued pension benefits of the City's past and present employees, the Governor stepped outside the bounds of his authority, rendering his "authorization" an *ultra vires* act that is void *ab initio.* In fact, a Michigan state court has already held *exactly this*, and therefore, the City is collaterally estopped from attempting to assert otherwise in this Court.

Further, because section 109(c)(2) of the Bankruptcy Code explicitly directs this Court to apply state law, any argument by the City that Michigan law is preempted by federal law is simply wrong. Indeed, the Bankruptcy Court for the Middle District of Pennsylvania specifically held that in the context of an eligibility proceeding under section 109(c)(2), the Supremacy Clause and principles of preemption never come into play, because section 109(c)(2) expressly grants *states* the authority to decide this issue. *See In re City of Harrisburg*, 465 B.R. 744 (Bankr. M.D. Pa. 2011). Thus, the Michigan Constitution simply cannot be ignored. Under these circumstances, if section 109(c)(2) was applied in any manner to permit this Chapter 9 filing in derogation of state constitutional law,

9301723.3 14893/161046

then that application would violate the Tenth Amendment of the U.S. Constitution and would render section 109(c)(2) itself unconstitutional.

Similarly, because section 109(c)(2) is purely a question of state law, *all* facets of Michigan law must be complied with, or the requisite "authorization" is not valid. Thus, in this case, the City's superficial compliance with PA 436 is not sufficient for the City to meet its burden. Instead, as the Court held in *Harrisburg*, all state law must be reconciled—the authorizing statute itself as well as any other relevant laws—and if a bar exists under state law that prevents the filing, that state law must be honored and the petition must be dismissed.

Lastly, if this Court is not persuaded that the City lacks specific authorization under section 109(c)(2), the City's petition is also barred by section 109(c)(5), because it cannot demonstrate that it negotiated with its creditors in good faith prepetition or that such negotiations were impracticable. Thus, the City cannot satisfy the eligibility requirements under section 109, and its petition must be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

## I.     The Retirement Systems

The residents of the City established the Retirement Systems through amendments to the City's Charter of 1918 (effective July 1, 1938, and effective July 1, 1941, respectively) as authorized by Article VII, section 22 of the Michigan

3

Constitution and sections 4i, 4j, and 21 of the Home Rule City Act, 1909 PA 267 (as amended), M.C.L. § 117.1 *et seq*. (the "Home Rule City Act"). Among other things, the Retirement Systems: (i) administer retirement, disability, and survivor benefits to eligible uniformed and non-uniformed City employees and their beneficiaries (*i.e.,* the participants); (ii) ensure that the City actually honors its collective bargaining agreements by tendering to the Retirement Systems the City's annual and obligatory pension contributions; and (iii) protect the vested pension benefits (*i.e.,* "accrued financial benefits") of the Retirement Systems and their participants. There are more than 32,000 active and retired employees of the City, who are participants in the Retirement Systems and whose "accrued financial benefits" the Retirement Systems must protect.

## II.      The Michigan Constitution

To ensure protection of public pension benefits, the Michigan Constitution states: "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." MICH. CONST., art. IX, § 24.

Unlike private employees, public employees—such as the City's past and present employees—are not protected by the federal Employee Retirement Income Security Act ("ERISA") nor by the federal Pension Benefit Guaranty Corporation ("PBGC"). *See* 29 U.S.C. § 1321(b)(2) ("This section does not apply to any

4

plan . . . established and maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing . . . .").[2] *For the City's retirees, there is no federal "insurance program," and their only pension "guarantee" is in the Michigan Constitution.*

Furthermore, many of the retirees are not covered by Social Security. When the Social Security Act (the "SSA") was first adopted in 1935, it did not extend coverage to state and local government workers. *See, e.g., Bowen v. Public Agencies opposed to Soc. Sec. Entrapment,* 477 U.S. 41, 45 (1986). In 1950, Congress amended the SSA to allow states to elect coverage for certain state and local employees. *Id.* at 45. A year later, in 1951, Michigan elected to extend federal SSA benefits to state and local employees. *See* M.C.L. § 38.851. However, states can elect to extend SSA benefits to only specific "coverage groups" of workers, so police and firefighters are not automatically covered. *Bowen,* 477 U.S. at 45; *see also* 20 C.F.R. § 404.1206(a)(8), 20 C.F.R. § 404.1212.

---

[2] Congress enacted ERISA in 1974 to provide comprehensive regulation for *private* pension plans." *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 214 (1986) (emphasis added). ERISA was designed "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits . . . Congress wanted to guarantee that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he will actually receive it." *Id.* (citations and quotations omitted). To achieve this goal of protecting "anticipated retirement benefits," Congress created the PBGC, a wholly owned Government corporation, which functions as "an insurance program" for participants in pension plans. *Id.*

5

*As a result, a significant number of the City's retirees (in particular, the police and firefighters) have no social security benefits to fall back on,* because these City employees were never added as a "covered group" and, therefore, have not accumulated SSA benefits.

## III. The Municipal Code of the City of Detroit

Article 11, section 11-101 of the Municipal Code of the City of Detroit provides:

1. The City shall provide, by ordinance, for the establishment and maintenance of retirement plan coverage for city employees.

2. Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and that funding shall not be used for financing unfunded accrued liabilities.

3. The accrued financial benefits of active and retired city employees, being contractual obligations of the city, shall in no event be diminished or impaired.

## IV. The Governor

On November 2, 2010, the people of the State of Michigan elected Richard D. Snyder to serve as their Governor (the "Governor"). On December 30, 2010 (as mandated by Article XI, section 1 of the Michigan Constitution and section 64 of the Michigan Election Law, 1954 P.A. 116, M.C.L. §168.1 *et seq.*), the Governor swore the following oath, which was later filed with the Michigan Secretary of

6

State: "*I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Governor according to the best of my ability.*"

## V.     The Emergency Manager and the Restructuring Proposal

On March 14, 2013, Kevyn D. Orr was appointed as the emergency financial manager of the City pursuant to Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, M.C.L. §141.1201, *et seq.*  On March 28, 2013, upon the effectiveness of Public Act 436, the Local Financial Stability and Choice Act, M.C.L. §141.1541, *et seq.* ("PA 436"), Mr. Orr became, and continues to act as, the emergency manager with respect to the City (the "Emergency Manager").

On March 14, 2013, as mandated by Article XI, section 1 of the Michigan Constitution and section 1 of the Constitutional Oath of Office Act, 1951 PA 22, M.C.L. § 15.151 *et seq.*, ("PA 22"), the Emergency Manager swore the following oath, which was later filed with the Michigan Secretary of State: "*I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Emergency Financial Manager – City of Detroit according to the best of my ability.*"

In a June 13, 2013 interview with The Detroit Free Press, the Emergency Manager addressed the protection under Article IX, section 24 of the Michigan

7

Constitution against the impairment of accrued public pension benefits, expressing

his intention to evade this provision of the Michigan Constitution through a federal

Chapter 9 bankruptcy proceeding:[3]

> Q:    You said in this report that you don't believe there
>       is an obligation under our state constitution to pay
>       pensions if the city can't afford it?
>
> A:    The reason we said it that way is to quantify the
>       bankruptcy question. We think federal supremacy
>       trumps state law.
>
> Q:    Which the 9th Circuit agrees for now.
>
> A:    It is what it is—so we said that in a soft way of
>       saying, "Don't make us go into bankruptcy." **If
>       you think your state-vested pension rights,
>       either as an employee or retiree—that's not
>       going to protect you. If we don't reach an
>       agreement one way or the other, we feel fairly
>       confident that the state federal law, federalism,
>       will trump state law** or negotiate. The irony of the
>       situation is we might reach a deal with creditors
>       quicker because employees and retirees think there
>       is some benefit and that might force our hand. That
>       might force a bankruptcy.

On June 14, 2013, the Emergency Manager issued his Proposal for Creditors

(the "Restructuring Proposal") wherein he took the position that: (i) pension debts

are unsecured claims that may be, and must be, impaired in any prospective

Chapter 9 bankruptcy proceeding; and (ii) the City's alleged approximate $3.5

---

[3]  *See Q & A with Kevyn Orr: Detroit's Emergency Manager Talks About City's
Future*, Detroit Free Press (June 16, 2013), *available at*
http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-
detroit-emergency-manager-creditors-fiscal-crisis.

8

billion underfunding liability would be placed in a pool of unsecured claims comprising approximately $11.5 billion in claims, and exchanged for a *pro rata* share of an unsecured note in the face amount of $2.0 billion. The Restructuring Proposal is attached as Exhibit A to the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code. [Docket No. 11] (the "Orr Declaration").

## VI. The Pre-Petition Lawsuits

On July 3, 2013, four participants of GRS filed two separate lawsuits against the Governor, the State Treasurer, and the State of Michigan in the Ingham County Circuit Court, both seeking: (i) a declaration that PA 436 violates Article IX, section 24 of the Michigan Constitution by purporting to permit the impairment of accrued financial benefits in a Chapter 9 bankruptcy proceeding; and (ii) a temporary restraining order or preliminary injunction precluding the Governor and Treasurer from authorizing a Chapter 9 bankruptcy proceeding. *Flowers, et al. v. Snyder*, *et al.*, Case No. 13-729-CZ (Hon. Rosemarie Aquilina) (the "Flowers Case"); *Gracie Webster, et al. v. The State of Michigan, et al.*, Case No. 13-734-CZ (Hon. Rosemarie Aquilina) (the "Webster Case," and together with the Flowers Case, the "Companion Cases").[4] On July 3, 2013, the Webster plaintiffs filed a motion for declaratory judgment and sought expedited relief. On July 15, 2013,

---

[4] The Governor, the State Treasurer, and the State of Michigan are collectively referred to herein as the "Webster Defendants."

the Webster Defendants filed a motion for summary disposition seeking, on an expedited basis, adjudication of their request for dismissal. *See* Webster Defendants' Motion for Summary Disposition attached as Exhibit 1.

On July 17, 2013, the Retirement Systems filed a Complaint for Declaratory Relief against the Governor and the Emergency Manager in the Ingham County Circuit Court, Case No. 13-768-CZ (the "Retirement Systems Lawsuit" and, together with the Companion Cases, the "Pre-petition Lawsuits").

## VII.    The Authorization and Filing of the Chapter 9 Bankruptcy Petition

On July 16, 2013, upon information and belief, the Emergency Manager delivered a letter to the Governor and the State Treasurer recommending, pursuant to section 18(l) of PA 436, that the City be authorized to file a case under Chapter 9 of the Bankruptcy Code (the "Bankruptcy Recommendation"). The Bankruptcy Recommendation is attached as Exhibit J to the Orr Declaration. In the Bankruptcy Recommendation, the Emergency Manager states that "[t]he City's debt and legacy liabilities must be significantly reduced" and that, in recommending a Chapter 9 bankruptcy, "the negotiation of changes to pension and retiree benefits with the City's retiree constituency is impracticable without court intervention." Bankruptcy Recommendation at pp. 2, 8. Based on the foregoing and many other excerpts from the Bankruptcy Recommendation, it is clear that the Emergency Manager contemplated use of the Chapter 9 process to implement his

10

Restructuring Proposal, including the impairment and diminishment of "legacy" accrued pension benefits.

On July 18, 2013, the Governor sent a letter to the Emergency Manager and the State Treasurer purporting to grant to the Emergency Manager authorization to place the City into Chapter 9 bankruptcy (the "Governor's Authorization"). The Governor's Authorization is attached as Exhibit K to the Orr Declaration. The Governor expressly recognized that section 18(1) of PA 436 authorized him to place "contingencies" on a bankruptcy filing, but he nevertheless declined to do so. *Id.* at p. 4. Citing section 943(b)(4) of the Bankruptcy Code, the Governor concluded: "Federal law already contains the most important contingency—a requirement that the plan be legally executable." *Id.*

On July 18, 2013 (the "Petition Date"), the City filed its Voluntary Petition under Chapter 9 of the Bankruptcy Code (the "Bankruptcy Petition") and also filed the City Eligibility Submissions.[5]

_____

[5] The Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code [DN 10] (the "Statement of Qualifications"), the Orr Declaration, the Declaration of Gaurav Malhortra in Support of Statement of Qualifications [DN 12] (the "Malhortra Declaration"), the Declaration of Charles M. Moore in Support of Statement of Qualifications [DN 13] (the "Moore Declaration"), and the Memorandum in Support of Statement of Qualifications [DN 14] (the "Eligibility Memorandum") are collectively referred to herein as the "City Eligibility Submissions."

9301723.3 14893/161046

## VIII. The Declaratory Judgment in *Webster*

On July 19, 2013, the Circuit Court for Ingham County held a hearing on the Webster Plaintiffs' Motion for Declaratory Judgment and on the Webster Defendants' Motion for Summary Disposition. Following the hearing, the court entered its Order of Declaratory Judgment (the "Declaratory Judgment") in the Webster Case, a copy of which is attached as Exhibit 2. The Declaratory Judgment was entered against the Webster Defendants—all non-Debtor entities relative to the City's bankruptcy case. In the Declaratory Judgment, the Ingham County Circuit Court ruled:

> On July 16, 2013, City of Detroit Emergency Manager Kevyn Orr submitted a recommendation to Defendant Governor Snyder and Defendant Treasurer Dillon pursuant to Section 18(1) of PA 436 to proceed under Chapter 9, which together with the facts presented in Plaintiffs' filings, reflect that Emergency Manager Orr intended to diminish or impair accrued pension benefits if he were authorized to proceed under Chapter 9. On July 18, 2013, Defendant Governor Snyder approved the Emergency Manager's recommendation without placing any contingencies on a Chapter 9 filing by the Emergency Manager; and the Emergency Manager filed a Chapter 9 petition shortly thereafter. ***By authorizing the Emergency Manager to proceed under Chapter 9 to diminish or impair accrued pension benefits, Defendant Snyder acted without authority under Michigan law and in violation of Article IX Section 24 of the Michigan Constitution***.

*Id.* (emphasis added).

12

The Ingham County Circuit Court further ruled that "PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; and PA 436 is to that extent of no force or effect." *Id.*[6]

## IX. The July 24, 2013 Hearings in the Bankruptcy Court

On July 19, 2013, in response to the Pre-Petition Lawsuits, the City filed the Stay Motions.[7] The Retirement Systems filed an objection [Docket No. 141] to the Stay Motions, arguing (i) that in light of the absence of valid state authorization for the filing of the Bankruptcy Petition (per the Declaratory Judgment), the filing was void, and there could not be any discussion of the application of a non-existent automatic stay, and (ii) other substantive objections.

---

[6] The Retirement Systems Lawsuit was subsequently removed and transferred to the United States District Court for the Eastern District of Michigan, Case No. 13-13255, and was assigned to the Honorable Paul D. Borman. On August 7, 2013, Judge Borman issued an Opinion and Order Remanding This Case to State Court for Lack of Jurisdiction/No Case or Controversy [Dist. Ct. Docket No. 7].

[7] The Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code [Docket No. 53] (the "Stay Confirmation Motion"), and the Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor [Docket No. 56] (the "Stay Extension Motion," and together with the Stay Confirmation Motion, the "Stay Motions").

On July 24, 2013, the Court held a hearing on the Stay Motions.  Although

the Court granted the Stay Motions, it also made clear that:

> The Court is making no ruling whatsoever on whether the City of Detroit is eligible to be a debtor in Chapter 9. The Court is making no ruling on whether the state constitution prohibited the emergency manager's appointment or prohibited the emergency—excuse me—prohibited the [G]overnor from authorizing this Chapter 9 filing without excepting from it the constitutionally protected pension rights of its citizens. The Court is not ruling on whether the state court orders that were entered either pre- or post-bankruptcy should be given preclusive effect under principles of res judicata, collateral estoppel, Rooker-Feldman, or any other preclusive doctrine. The Court is not ruling on whether any orders entered by the state court after this bankruptcy case was filed violated the automatic stay. The Court is not ruling on whether the City of Detroit can propose a feasible or confirmable plan in light of the state constitution or any other consideration, for that matter.
>
> All of these issues on which the Court is not ruling today are fully preserved. Of course, when and if these issues are raised in an appropriate way, the Court will rule on them in due course with adequate notice and opportunity to be heard. [8]

---

[8] As discussed in more detail at Argument section I.B.1, *infra*, this Objection focuses on eligibility issues and not on the issue described by the Court as "whether the City of Detroit can propose a feasible or confirmable plan in light of the state constitution or any other consideration." As indicated by the Court, this issue, among other issues, is "fully preserved" and shall be raised "in due course."

14

Exhibit 3, 7/24/2013 Hrg. Tr. at p. 84, lines 1-24.  On July 25, 2013, the Court

entered orders granting the Stay Motions.[9]

**Argument**

I.  **The City of Detroit Cannot Satisfy the Eligibility Requirements of Section 109(c)(2) of the Bankruptcy Code, and Its Bankruptcy Case Must Be Dismissed as a Matter of Law.**

    A.  **Standard of Review**

The City may be a debtor under Chapter 9 of the Bankruptcy Code if and

only if it:

> (1)    is a municipality;
>
> (2)    is *specifically authorized*, in its capacity as a municipality or by name, to be a debtor under such chapter *by State law*, or by a governmental officer or organization *empowered by State Law* to authorize such entity to be a debtor under such chapter;
>
> (3)    is insolvent;
>
> (4)    desires to effect a plan to adjust such debts; and
>
> (5)    (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

---

[9] *See* Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non Officer Employees and (C) Agents and Representatives of the Debtor [Docket No. 166] and Order Pursuant to Section 105(a) of the Bankruptcy Code Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code [Docket No. 167].

15

(B) has negotiated in good faith with creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c)(1-5) (emphasis added).

Section 921(c) of the Bankruptcy Code provides that "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of [the Bankruptcy Code]." 11 U.S.C. § 921(c).[10]

Courts have ruled that after an objection to the petition, the bankruptcy court must dismiss the case if the petition does not meet the requirements of the Bankruptcy Code, notwithstanding the seemingly permissive language of section 921(c). *See, e.g., In re New York City Off-Track Betting Corporation*, 427 B.R. 256, 264 (Bankr. S.D.N.Y. 2010) ("Courts must dismiss the petitions of debtors filing under chapter 9 who fail to satisfy [the] requirements [of section 109(c)]."), citing *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of*

---

[10] While the arguments in this Objection focus on the City's inability to satisfy the eligibility requirements under sections 109(c)(2) and (5) of the Bankruptcy Code, the same arguments support a dismissal of the City's petition for lack of good faith under section 921(c).

16

*Vallejo)*, 408 B.R. 280, 289 (9th Cir. B.A.P. 2009); *In re Suffolk Regional Off-Track Betting Corp.,* 462 B.R. 397, 421 (Bankr. E.D.N.Y. 2011) (citation omitted) ("Despite the permissive statutory language, courts have construed § 921(c) to require the mandatory dismissal of a petition filed by a debtor who fails to meet the eligibility requirements under §109(c).").

The burden rests with the debtor to establish by a preponderance of the evidence that the requirements of Bankruptcy Code section 109(c) have been met. *In re City of Stockton*, 475 B.R. 720, 725 (Bankr. E.D. Cal. 2012) (internal citations omitted) ("The burden of proof, at least as to the five § 109(c) elements, is on the municipality as the proponent of voluntary relief. . . . The quantum of proof . . . is the familiar preponderance-of-evidence standard of basic civil litigation."); *In re City of Harrisburg,* 465 B.R. 744, 752 (Bankr. M.D. Pa. 2011) (citations omitted) ("The burden of establishing eligibility is on the debtor."); *Suffolk Regional Off-Track Betting Corp.*, 462 B.R. at 414 (citations omitted) ("The debtor bears the burden to establish that the requirements of § 109(c) are satisfied."). In order to satisfy § 109(c)(2), that "explicit authorization must be written, 'exact, plain, and direct with well-defined limits so that nothing is left to inference or implication.'" *New York City Off-Track Betting Corporation*, 427 B.R.at 267 (citations omitted).

9301723.3 14893/161046

The eligibility requirements, with the exception of the section 109(c)(2) requirement, are "federal questions based on, and created by, the federal Bankruptcy Code and subject to a federal rule of decision." *Stockton*, 475 B.R. at 729. The eligibility determination under section 109(c)(2), however, presents a *question purely of state law. Id.*; *In re City of Stockton*, 2013 Bankr. LEXIS 2416, 21 (Bankr. E.D. Cal. June 12, 2013) ("California law governs the question whether the City [of Stockton] is authorized to be a chapter 9 debtor."). As one bankruptcy court has observed, states "act as gatekeepers to their municipalities' access to relief under the Bankruptcy Code." *In re City of Vallejo*, 403 B.R. 72, 76 (Bankr. E.D. Cal. 2009), *aff'd IBEW, Local 2376 v. City of Vallejo (In re City of Vallejo)*, 432 B.R. 262 (E.D. Cal. 2010). Bankruptcy courts exercise jurisdiction carefully when the authority to file bankruptcy under state law is questioned "in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment." *Harrisburg*, 465 B.R. at 754 (internal citation omitted); *see also Suffolk Regional Off-Track Betting Corp.*, 462 B.R. at 420 (internal citations omitted) (emphasis added) ("Although §109(c) should be construed broadly to give effect to Congress'[s] intent 'to expand the applicability of chapter IX as much as possible' . . . the Court may not accomplish this by turning a blind eye to New York law governing the scope of a county's authority.").

9301723.3 14893/161046

**B.  The Supremacy Clause and Concepts of Preemption Do Not Apply Because Congress Gave States the Authority to Regulate Their Municipalities' Access to Chapter 9 Bankruptcy.**

Under the Supremacy Clause, "the Laws of the United States . . . shall be the supreme Law of the Land."  U.S. CONST. art. VI, cl 2.  The Tenth Amendment, however, provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."  U.S. CONST. amend. X.

Under section 109(c)(2), the relevant federal law *directs* that eligibility turns on proper state authorization under state law.  This, in turn, reflects a further federal constitutional norm of critical importance:  political subdivisions of a state can only seek bankruptcy relief to the extent authorized by state law.  *See Ashton v. Cameron County Water Improvement Dist.,* 298 U.S. 513 (1936); *United States v. Bekins,* 304 U.S. 27 (1938).

In *Ashton*, the Supreme Court struck down as unconstitutional the provisions of Chapter IX of the former Bankruptcy Act, because they authorized political subdivisions of a state to file for federal bankruptcy relief without state authorization.  *Ashton,* 298 U.S. at 531-32.  Following *Ashton*, Congress amended the Bankruptcy Act to include a mechanism in Chapter X that permitted state entities to file for federal bankruptcy relief if the state authorized them to do so and, critically, required dismissal if the relevant plan was not "authorized by law,"

19

meaning "state law." *Bekins*, 304 U.S. at 49.[11]  In upholding the new statutory provision under Chapter X, the Court in *Bekins* concluded that the debtor in that case—a California irrigation district—was eligible to file for relief because California statutory law authorized it to do so.  Moreover, in remarking on the statute, the Court observed that it was otherwise carefully drawn to preserve the State's sovereignty and Tenth Amendment concerns because "[t]he bankruptcy power is exercised . . . only in a case where the action of the [debtor] in carrying out a plan of composition approved by the bankruptcy court is authorized by state law." *Id.* at 51.[12]

Accordingly, the current Bankruptcy Code *expressly* reserves the question of eligibility to state law.  *See* 11 U.S.C. § 109(c)(2) (requiring a municipal debtor to be "specifically authorized . . . to be a debtor . . . *by State law*, or by a governmental officer or organization empowered *by State law* to authorize such entity to be a debtor") (emphasis added).  While the majority of Bankruptcy Code provisions are governed by federal law, this particular Code provision explicitly

---

[11] Following *Ashton*, Congress amended the Bankruptcy Act to include Chapter X, which was later redesignated as Chapter IX pursuant to the Chandler Act in 1938.

[12] To address Tenth Amendment concerns, Congress has amended the municipal bankruptcy statute several times, gradually requiring more rigorous state-law authorization.  *See, e.g.,* H. Rep. 95-595, 95th Cong., 1st Sess. 319 (1977) (recognizing that *Ashton* and *Bekins* require state authorization of municipal bankruptcy to protect state sovereignty); *see also Harrisburg*, 465 B.R. at 753-55.

20

demands that state law—not federal law—be applied. Indeed, as one court has observed:

> Section 109(c)(2) presents a question of pure state law . . . . All other eligibility questions under § 109(c)— § 109(c)(1) municipality; § 109(c)(3) insolvent; § 109(c)(4) desire to effect plan of adjustment; and § 109(c)(5) creditor negotiation—and the good faith question under § 921(c) *are federal questions based on, and created by, the federal Bankruptcy Code and subject to a federal rule of decision.*

*Stockton*, 475 B.R. at 729 (emphasis added).

Where the Code expressly reserves authority to the states (such as it does with exemptions, for example),[13] the Sixth Circuit Court of Appeals has held that the Supremacy Clause and preemption principles do not apply:

> It is fundamental that the state and federal legislatures share concurrent authority to promulgate bankruptcy laws, . . . and that the Supremacy Clause and the doctrine of preemption will serve to invalidate state promulgations to the extent that they are inconsistent with or contrary to federal law. *It is equally axiomatic, however, that Congress has not preempted an area wherein it has legislated when it expressly and concurrently authorizes the state legislatures to disregard or opt-out of such federal legislative area. In such instance, rather than preempting the area, Congress expressly authorizes the*

---

[13] With respect to exemptions, "Bankruptcy Code § 522(b)(1) gives the debtor a choice between exempting the property specified in Bankruptcy Code § 522(d) or exempting the property protected by federal non-bankruptcy law or state or local law 'unless the State law that is applicable to the debtor . . . specifically does not so authorize.' . . . Thus, Congress vested states with the authority to deny their citizens the ability to use the federal exemption scheme[.]" *Storer v. French (In re Storer)*, 58 F.2d 1125, 1127 (6th Cir. 1995) (citation omitted).

21

> **states to "preempt" the federal legislation.** Congress did
> not intend to preempt bankruptcy exemptions through the
> promulgation of 11 U.S.C. § 522(d) since it vested in the
> states the ultimate authority to determine their own
> bankruptcy exemptions.

*Rhodes v. Stewart*, 705 F.2d 159, 163 (6th Cir. 1983), *cert. denied*, 464 U.S. 983

(1983) (internal citations omitted) (emphasis added); *see also Storer*, 58 F.3d at

1127. By the same reasoning, the Supremacy Clause and preemption principles do

not apply to consideration of whether a Chapter 9 debtor has met the state law

eligibility requirement under Bankruptcy Code section 109(c)(2).

The debtor in *Harrisburg* unsuccessfully relied on the Supremacy Clause to

argue that any infirmity in its authorization to file a Chapter 9 petition should be

ignored. In *Harrisburg*, the Harrisburg City Council contended that Act 26 (a

statute that precluded third-class cities, including Harrisburg, from filing a

bankruptcy petition), could not prevent Harrisburg's bankruptcy filing because it

violated the Supremacy Clause of the U.S. Constitution. *Harrisburg*, 465 B.R. at

755. The *Harrisburg* court rejected that argument:

> [The *Supremacy Clause* does not invalidate] the actions
> taken by the [state of Pennsylvania] to regulate the use of
> the bankruptcy process by distressed third class cities.
> **The citation to the Supremacy Clause does not support
> City Council's argument because, as noted above, in
> regard to <u>admission</u> into the bankruptcy process, §
> 109(c)(2) recognizes that a <u>state</u> serves as a
> municipality's gatekeeper into Chapter 9. It is only
> <u>after</u> a state specifically authorizes a municipality to file
> a bankruptcy petition <u>and an order for relief is entered</u>**

22

> ***under 11 U.S.C. § 921(d)** that the Supremacy Clause
> would become relevant to matters before this Court*.

*Id.* (emphasis added).[14]   The rationale for this was succinctly explained by the
court in *Harrisburg*:

> The allegation that the [city of Harrisburg] has sought
> bankruptcy relief in defiance of this [state] statutory bar
> ***raises important concerns of federalism and respect for
> the power of states to manage their internal affairs***.
> Primary among these concerns is the Tenth Amendment
> to the U.S. Constitution, which provides that "powers not
> delegated to the United States by the Constitution, nor
> prohibited by it to the States, are reserved to the States
> respectively, or to the People."  U.S. Const. amend. X.
> ***Although Congress has the sole power to establish
> "uniform Laws on the subject of Bankruptcies
> throughout the United States" (U.S. Const. art. I, § 8),
> where federal bankruptcy law intersects with the rights
> of states to regulate the activities of political
> subdivisions created by the state, principles of dual
> sovereignty as defined by the Tenth Amendment must
> be considered.   Congress has made bankruptcy
> available to municipalities, but states retain their
> concomitant rights to limit access by their political
> subdivisions to bankruptcy relief.***

*Harrisburg*, 465 B.R. at 753.   Accordingly, any notion that the Michigan

Constitution is preempted in this matter is incorrect.

---

[14]   The court also noted that: "Even after an order for relief is granted, states
maintain significant control over their political subdivisions.  This position is set
forth bluntly in § 903 of the Bankruptcy Code, which states that Chapter 9 does not
'limit or impair the power of a State to control, by legislation or otherwise, a
municipality . . . in the exercise of the political or governmental powers of such
municipality . . . .'" *Harrisburg*, 465 B.R. at 755 (citing 11 U.S.C. § 903).

9301723.3 14893/161046

1.    **The threshold issues of eligibility and access to Chapter 9 are the sole issues before the Court presently.**

The Retirement Systems submit that it is important to clarify what is and is not before the Court at this juncture in the case. As discussed above, what is before the Court is the threshold or gating issue of whether the City is authorized to commence this case under Bankruptcy Code section 109(c)(2). This issue turns on state law. As discussed *infra*, the Court should construe section 109(c)(2) as requiring compliance with state law in order to avoid rendering Chapter 9 unconstitutional. Other elements of eligibility or lack of good faith are or may be before the Court at this time as well.

What is not before the Court at this juncture (without limitation and reserving all rights) is the issue of whether otherwise-applicable state constitutional law can be abrogated in a Chapter 9 proceeding (specifically, whether accrued public pension benefits protected under state constitutional law can be diminished or impaired by a debtor in a Chapter 9 proceeding, pursuant to a plan of adjustment or otherwise)—even assuming that the debtor has satisfied the eligibility requirements of the Bankruptcy Code. This issue includes but is not limited to the question of whether, under Bankruptcy Code sections 943(b)(4) and/or 903, a debtor may confirm a plan that violates state law by impairing accrued pension benefits.

9301723.3 14893/161046

This separation of issues follows not only as a matter of logic but also in light of: (a) the Court's indication that only issues of "eligibility" would be addressed at this time in connection with the scheduled October 23, 2013 hearing; and (b) the doctrine of constitutional avoidance, as recently relied upon by the United States Court of Appeals for the Sixth Circuit in *City of Pontiac Retired Employees Ass'n v. Schimmel*, 2013 U.S. App. LEXIS 16519 (6th Cir. August 9, 2013) (recommended for full-text publication).[15] The Sixth Circuit Court of Appeals stated in that case:

> Under the doctrine of constitutional avoidance, we avoid constitutional determinations when a case can be resolved on other grounds. *See Ashwander v. TVA*, 297 U.S. 288, 347, 56 S. Ct. 466, 80 L. Ed. 688 (1936) (Brandeis, J., concurring) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.") (internal citation and quotation marks omitted); *see also Muller Optical Co. v. EEOC,* 743 F.2d 380, 386 (6th Cir. 1984) ("The duty to avoid decisions of constitutional questions . . . [is] based upon the general policy of judicial restraint."). When a case can be resolved on state constitutional grounds, we should decide the state issue so as to avoid rendering a decision under the Federal Constitution. *See Siler v. Louisville & Nashville R.R. Co.,* 213 U.S. 175, 191, 29 S. Ct. 451, 53 L. Ed. 753 (1909) ("This court has the same right, and can, if it deem it proper, decide the local questions only, and omit to decide the federal questions, or decide them adversely to the party claiming their benefit.") (citations omitted).

---

[15] All unpublished cases cited herein are attached collectively as Exhibit 7.

25

*City of Pontiac Retired Employees Ass'n,* 2013 U.S. App. LEXIS at 8-9.  By the same reasoning, if the Court determines that the City is not eligible for bankruptcy relief as a matter of state law, it need not consider the federal constitutional questions involved with respect to sections 943(b)(4) and/or 903.  Under the canon of constitutional avoidance, the Court should first address, in the context of construing and applying section 109(c)(2), the state law issue of the validity and state constitutionality of the Governor's Authorization, to possibly avoid having to address potential federal constitutional issues regarding (without limitation and reserving all rights) the Supremacy Clause, the Bankruptcy Clause, and the Tenth Amendment to the U.S. Constitution that may be implicated in determining the ability of a Chapter 9 debtor to abrogate state constitutional law via a plan of adjustment or otherwise.

## C. The Court Must Construe Section 109(c)(2) To Require Compliance with State Law.

Congress included section 109(c)(2) as part of Chapter 9 for a particular and important purpose—to preserve the role of state law in determining the eligibility of a state municipality to file for bankruptcy relief.  Moreover, Congress did so for compelling constitutional reasons in the wake of *Ashton* and *Bekins*.  As the Supreme Court has directed, in construing a federal statutory provision such as section 109(c)(2), federal courts should do so not only to effectuate its object and purpose but also to avoid questions about its constitutionality.  *See United States v.*

26

*Security Indus. Bank*, 459 U.S. 70, 78 (1982) (reciting the "cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided") (citations and internal marks omitted).

In this case, construing section 109(c)(2) to permit the City to commence a Chapter 9 case notwithstanding that the relevant state official's authorization violated state law would do more than simply cast doubt on the constitutionality of section 109(c)(2); it would render it unconstitutional. The deference owed under the Tenth Amendment and the Supreme Court's decisions in *Ashton* and *Bekins* is not to state officials, but to state law. In this case, it is clear that Michigan law does not permit the Governor to authorize the City's bankruptcy filing under the circumstances present here—as already determined by an appropriate state court. In order to fully respect state law as Congress has directed, and likewise avoid any constitutional question regarding section 109(c)(2), this Court should conclude that the City is not eligible for bankruptcy relief.

### D. The City is Not Specifically Authorized to be a Chapter 9 Debtor Under State Law.

The Bankruptcy Code is explicit as to who may be a debtor under Chapter 9. Pursuant to Bankruptcy Code section 109(c)(2), the only entity that may be a Chapter 9 debtor is one that is *specifically authorized by State law* or by a governmental officer or organization *empowered by State law* to authorize such

27

entity to be a debtor under Chapter 9. 11 U.S.C. § 109(c)(2). In its Eligibility Memorandum, the City argues that it satisfied section 109(c)(2) because (a) PA 436 authorized the Emergency Manager to recommend that the City commence a Chapter 9 bankruptcy proceeding, provided certain statutory requirements were satisfied; (b) the statutory requirements of PA 436 have been satisfied; (c) the Governor provided written authorization for the City to commence a Chapter 9 bankruptcy proceeding; and (d) upon receipt of the Governor's Authorization, PA 436 authorized the Emergency Manager to commence this case. *See* Eligibility Memorandum at pp. 9-11. This kind of technical argument, however, is insufficient to meet the City's burden. What matters is the substance of the City's authority, not its superficial form. The United States Bankruptcy Court for the Middle District of Pennsylvania rejected a similar argument in the *Harrisburg* case, and it properly fails as a matter of law.

In *Harrisburg, supra*, the city council adopted a resolution authorizing the city to file a Chapter 9 bankruptcy case. The authorizing statute at issue, Pennsylvania's Municipal Financial Recovery Act ("Act 47"), provided authority for a city to file bankruptcy if any one of five statutory conditions were satisfied. *Harrisburg*, 465 B.R. at 751. A second act, Act 26, restricted the ability of a financially distressed city of the third class to file Chapter 9 bankruptcy and prohibited government agencies from authorizing a distressed third-class city from

becoming a debtor under Chapter 9 of the Bankruptcy Code. *Id.* A third act, the Optional Third Class City Charter Law (the "Charter Law"), authorized the mayor to appoint a solicitor with the advice and consent of the city council. *Id.* at 764-65. Against this legislative backdrop, the *Harrisburg* court held that the city council did not have the authority to commence a bankruptcy case on behalf of the city of Harrisburg and it was not authorized under state law to be a debtor under the Bankruptcy Code. *Id.* at 765. The court thus dismissed the debtor's bankruptcy case. *Id.*

The *Harrisburg* court first concluded that, on its face, the city had complied with Act 47 and "would have been specifically authorized to file a petition under Chapter 9," absent the filing bar imposed by Act 26. *Harrisburg*, 465 B.R. at 754-55. Turning to the question of whether Act 26 eliminated the city's ability to file for bankruptcy, the court considered and disregarded challenges to the constitutionality of Act 26 based upon federal and state law. *Id.* at 755-63. The Court concluded that Act 26 eliminated the city of Harrisburg's ability to file bankruptcy, reasoning:

> Act 47 is intended to address the needs of financially distressed cities. It's [sic] provisions, however, ***are not intended to replace the entire scheme of governance set forth in the Charter Law and the Third Class City Code. Statutory provisions should be construed with reference to similar enactments and not simply read in a vacuum.*** ... When § 261(b) of Act 47 is read in *pari materia* with the Third Class City Code and the Charter Law, ***§ 261(b)***

29

> *provides a limitation on the otherwise unfettered right of the Mayor to commence legal action on behalf of the City. Section 261(b) does not supplant other law allocating power between the executive and legislative branches of municipal government*, it simply clarifies that a mayor in a city operating under Plan A may not cause a petition to be filed unless a majority of the council also agrees that this is an appropriate course of action. ***Accordingly, City Council's usurpation of the executive power of the Mayor by commencing litigation of behalf of the City of Harrisburg violated the Charter Law and the Third Class City Code.***

*Harrisburg*, 465 B.R. at 764-65 (internal citation omitted) (emphasis added).

Based upon state law and its analysis of the relationship between Act 47, Act 26, and the Charter Law, the *Harrisburg* court determined that the city council: (i) usurped the executive power of the mayor by commencing the bankruptcy; (ii) violated the Charter Law and the Third Class City Code; and (iii) did not have the authority to commence a bankruptcy case on behalf of the city. *Id.* As a result, the court concluded that the city was not specifically authorized to be a debtor as required by section 109(c)(2) and dismissed the bankruptcy case. *Id.*

Consistent with *Harrisburg*, Michigan's authorizing statute (PA 436) and the Governor's Authorization granted thereunder, must be construed with reference to the other laws of the state—specifically, Article IX, section 24 of the Michigan Constitution. The City is not eligible to be a Chapter 9 debtor simply because it "technically" received authorization from the Governor under PA 436 to file this case. *Harrisburg* requires a more rigorous review of the relevant state laws and

30

directs that even if the City technically complied with PA 436, the Governor is not empowered to authorize a bankruptcy if the filing simultaneously offends some other state law. Instead, the City must demonstrate that it received authorization from the Governor to be a Chapter 9 debtor, and that this authorization itself was valid under all of the laws of the State of Michigan (*i.e.,* both PA 436 and the Michigan Constitution). When PA 436 is read in conjunction with Article IX, section 24 of the Michigan Constitution, it becomes readily apparent that, although the City obtained a *superficial* authorization to commence this case from the Governor, that authorization is **invalid**. The City cannot satisfy section 109(c)(2), and the City is ineligible to be a debtor under Chapter 9 of the Bankruptcy Code.

## 1. The Governor and the Emergency Manager must uphold the Michigan Constitution.

The Michigan Constitution demands that "the governor shall take care that the laws be faithfully executed." MICH. CONST. art. V, § 8.[16] The single most important law for the Governor to uphold is the Michigan Constitution. "[T]he

---

[16] The Michigan Constitution requires that all officers—legislative, executive and judicial—in the state of Michigan must take an oath to support the Constitution of the United States and the Constitution of the state of Michigan. MICH. CONST. 1963, art. XI, § 1. Michigan law also requires that "[e]very person elected to the office of governor . . . before entering upon the duties of his office, shall take and subscribe to the oath as provided in section 1 of article 11 of the state constitution and deposit same with the secretary of state." M.C.L. § 168.64. In addition: "All persons now employed, or who may be employed by the state of Michigan . . . shall . . . take and subscribe to the oath or affirmation required of members of the legislature and other public officers by [MICH. CONST., art. XI, § 1]." M.C.L. § 15.151.

plain provisions of the Constitution are paramount." *Twp. of Dearborn v. Dearborn Twp. Clerk*, 55 N.W.2d 201, 207 (1952). The proposition that the "Michigan Constitution is a limitation on the plenary power of government" is one "so basic as to require no citation." *Smith v. Michigan*, 410 N.W.2d 749 (Mich. 1987) (J. Boyle, concurring in part and dissenting in part). It "is the fundamental law to which all other laws must conform." *Id.*

"Public officers have and can exercise only such powers as are conferred on them by law." *Sittler v. Bd. of Control*, 53 N.W.2d 681, 684 (Mich. 1952) (citations omitted). It is thus clear that the Michigan Constitution provides clear limitations on actions that may be taken by each branch of government, and no branch has the authority to eradicate constitutional guarantees. *See Musselman v. Governor of Mich.*, 533 N.W.2d 237, 244-45 (Mich. 1995); *Oshtemo Charter Twp. v. Kalamazoo County Rd. Comm'n*, 2013 Mich. App. LEXIS 1163, *19 (Mich. Ct. App. June 25, 2013) ("The Legislature's authority does not extend to eradicating constitutional guarantees."); *People ex rel Metevier v. Therrien*, 45 N.W. 78, 80 (Mich. 1890) ("The Governor cannot, by any act of his own, enlarge the power granted him by the Legislature . . . [and] cannot foreclose the right of the courts to preserve . . . constitutional rights."). Accordingly, the Governor can only exercise the power granted to him by law, and he is unable to act in violation of the State Constitution.

### 2. Article IX, section 24 of the Michigan Constitution prohibits the Governor and the Emergency Manager from taking any action that causes accrued public pension benefits to be diminished or impaired.

The Michigan Constitution prohibits the State of Michigan and its political subdivisions from diminishing or impairing the "accrued financial benefits" of their pension plans and retirement systems. MICH. CONST. art. IX, § 24. The Michigan Supreme Court has defined the term "accrued financial benefit" as "the right to receive certain pension payments upon retirement, based on service performed." *Kosa v. State Treasurer*, 292 N.W.2d 452, 459-60 (Mich. 1980) (citation omitted).[17] Action that diminishes or impairs "accrued financial benefits" is in violation of a "solemn" obligation "between public employees and the Legislature guaranteeing that pension benefit payments cannot be constitutionally impaired." *Id.* at 465.

---

[17] *See also Tinsman v. City of Southfield*, 1999 Mich. App. LEXIS 2112, at *10 (Mich. Ct. App. Dec. 3, 1999) (unpublished) ("By changing the formula and applying it to all current employees, the net effect was to diminish or impair plaintiffs' accrued financial benefits in the pension plan, contrary to Mich. Const. 1963, art. 9, § 24."); *Seitz v. Probate Judges Retirement System*, 474 N.W.2d 125, 130 (Mich. App. 1991) ("[T]he state may not reduce the pension benefit of any state employee or official, or local employee or official, once a pension right has been granted"); *Murphy v. Wayne County Employees Retirement Bd. of Trustees*, 192 N.W.2d 568 (Mich. App. 1971) (affirming grant of summary judgment in favor of plaintiff on his request for specific relief in the form of reinstatement of his retirement benefits which were unconstitutionally impaired and diminished by legislative act).

33

As established above, the Governor is required to uphold the Michigan Constitution and, therefore, is duty-bound to prevent the City from diminishing or impairing the "accrued financial benefits" of its pension plan and retirement systems. Moreover, financial distress is not grounds for the Legislature or the Executive branch to abrogate the Michigan Constitution. Indeed, the Michigan Supreme Court has specifically ruled that the Governor cannot violate Article IX, section 24—even if only done so "temporarily" or in response to a financial crisis. In *Musselman, supra,* a former Michigan governor attempted to reduce expenditures by decreasing appropriations to the schools' retirement system by $54 million. The plaintiffs, a group of current and retired public school employees, argued that the governor's actions violated the second sentence of Article IX, section 24, which requires "financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities." The governor argued that his power under Michigan Constitution article 5, section 20 (which permits the governor to "reduce expenditures") authorized him to do so. *Musselman*, 533 N.W.2d at 239-40.

The court disagreed with the governor and started by acknowledging the unique status of pension benefits: "pension obligations differ from nearly every other type of government spending insofar as they simply cannot be reduced or cut

34

. . . Michigan governmental units do not have the option . . . of not paying retirement benefits." *Musselman*, 533 N.W.2d at 243. The Court ruled that although the Michigan Constitution expressly allowed the Governor to reduce expenditures and that "education has not been immunized from emergency reductions," the governor still could not reduce expenditures if it ran afoul of another constitutional provision (namely, Article IX, section 24). *Id.* at 244. Further, "[Article 5, section 20] certainly would not authorize the government to refuse to satisfy its contractual obligations, such as pension payments to retirees," even "in an emergency." *Id.* The court also rejected the governor's argument that the violation was merely "temporary," holding that Governor lacks "authority to violate other constitutional provisions even temporarily." *Id.* at 245. Lastly, the court ruled that the Legislature was likewise barred from adopting the governor's unconstitutional strategy: "Insofar as it authorizes the Governor to select and implement spending cuts in an emergency, it simply affords him legislative power. But the Legislature does not have authority to fail to prefund a pension fund, even temporarily."[18] *Id.*

---

[18] On rehearing, the majority wrote that they would "affirm all portions of this Court's April 25, 1995, majority opinion [in *Musselman I*]." *Musselman v. Governor*, 545 N.W.2d 346, 346 (1996). Justice Brickley, who had previously been in the majority, dissented on the grounds that it was not "necessary to interpret the meaning of 'financial benefits' as the term applies to Const 1963, art 9, § 24," so he would no longer hold that health care benefits constitute "financial benefits" within the meaning of Article IX, section 24. *Id.* at 349. This does not change the validity of *Musselman I* as it relates to the Retirement Systems' analysis, however, because it is not being cited for the proposition that "accrued financial benefits" includes health care benefits.

35

Thus, the Governor, the Legislature, and the Emergency Manager must all abide by the Michigan Constitution and cannot take any act that would impair or diminish accrued financial benefits—even temporarily—regardless of any financial circumstances they believe to be exigent.

3. **The Governor's Authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued public pension benefits violated the Michigan Constitution and is void *ab initio*.**

Sections 18 and 26 of PA 436 permit the Governor to authorize the Emergency Manager to initiate a Chapter 9 bankruptcy proceeding. M.C.L. § 141.1558(1); M.C.L. § 141.1566(1). If the Governor does grant such an authorization, those same provisions of PA 436 permit the Emergency Manager to file a petition under Chapter 9. *Id.*

However, PA 436 does not enable the Governor to authorize a Chapter 9 filing if such filing would violate the Michigan Constitution—indeed, the statute could not permit this, as the Governor and the Legislature do not have the authority to simply legislate amendments to the Michigan Constitution.[19]  In addition, nothing in PA 436 expressly authorizes the Governor or Emergency Manager to seek to have municipal pension debts or the accrued financial benefits of municipal

---

[19] The Michigan Constitution can be amended three ways, none of which have occurred here—(i) by legislative proposal and a vote of electors, (ii) by petition and a vote of electors, or (iii) by a general revision at a constitutional convention. See MICH. CONST. art. XII, § 1-3.

9301723.3 14893/161046

pension plans impaired under Chapter 9. To the contrary, section 12(1)(m)(ii) of PA 436 states that if appointed sole trustee of either of the Retirement Systems, **"[t]he emergency manager shall fully comply with . . . section 24 of article IX of the state constitution of 1963.**" M.C.L. § 141.1552(1)(m)(ii) (emphasis added).[20]

Further, sections 18(1) and 26(2) of PA 436 state that "[t]he governor may place *contingencies* on a local government in order to proceed under chapter 9." M.C.L. § 141.1558(1); M.C.L. § 141.1566(2) (emphasis added). By authorizing the Governor to place conditions on a Chapter 9 authorization, it can be presumed that the Legislature intended for Chapter 9 authorizations, in applicable situations, to be contingent upon, among other things, the Emergency Manager not being permitted to seek or accede to the impairment of accrued pension benefits, in order to uphold the State Constitution.

The Governor's Authorization acknowledges that section 18(1) of PA 436 permitted him to place "contingencies" on a bankruptcy filing, but the Governor nevertheless declined to do so. Exhibit K to Orr Declaration, p. 4. In so declining, the Governor violated the Michigan Constitution. Citing section 943(b)(4) of the Bankruptcy Code, the Governor concluded: "Federal law already contains the

---

[20] Section 11(1)(d) of PA 436 also requires that any financial and operating plan developed by the Emergency Manager shall provide for "[t]he timely deposit of required payments to the pension fund for the local government or in which the local government participates." M.C.L. § 141.1551(1)(d).

37

most important contingency - - a requirement that the plan be legally executable." *Id.* This reasoning, however, is faulty. It confuses and conflates two different issues. The first issue arises under section 109(c)(2) regarding whether the Governor even has the authority under applicable state law to authorize the Chapter 9 filing. As discussed *supra*, this is a separate and threshold issue that must be addressed before one considers the interplay of federal and state constitutional issues implicated by an analysis of section 943(b)(4). An analysis of that first, threshold issue leads to the conclusion that a contingency for preserving the state constitutional protection of accrued pension benefits is a mandatory contingency upon the authorization of the City's filing of its Chapter 9 Bankruptcy Petition.

Michigan courts have long held that a Governor's actions outside the confines of the Michigan Constitution are "null and void." In the early Michigan Supreme Court case of *Dullam v. Willson*, the court found unconstitutional the Governor's action in attempting to remove a state school trustee from his post without a hearing. *Dullam v. Willson*, 19 N.W. 112 (Mich. 1884). In *Dullam*, Justice Cooley noted:

> Courts, in determining whether rights exist, or whether vested rights have ceased to exist, do not act necessarily or usually as appellate tribunals, whose judgments operate on the tribunals or persons whose invasions of right are complained of. They may or may not do so. **But in a constitutional government the action of all**

38

> *persons, official or private, which is in violation of*
> *constitutional rights, is simply null and void, and*
> *usually needs no reversal. And the action of any*
> *department of government, whether legislative,*
> *executive or judicial, beyond its jurisdiction, or against*
> *the constitutional limitations of its authority, is in law*
> *the same as if there had been no action, and cannot be*
> *recognized as having legal effect. . . . No executive*
> *authority exists outside of its legal boundaries.*

*Id.* at 120-21 (Cooley, J., concurring) (emphasis added).

Given this legal framework, it is clear that actions taken by the Governor that are outside of his constitutional power are *ultra vires*. "The term 'ultra vires' means outside the scope of authority." *McCartney v. Attorney General*, 587 N.W.2d 824, 826 (Mich. App. 1998) (citation omitted). "Thus, if the Governor acts outside the scope of his authority, his actions are considered ultra vires." *Id.*

*Ultra vires* acts are void *ab initio*. *See, e.g., McKane v. City of Lansing*, 1998 U.S. App. LEXIS 649, *12-15 (6th Cir. Jan. 14, 1998) (affirming district court determination that city council's adoption of an early retirement plan was void *ab initio* when adopted via resolution, not ordinance); *Utica State Sav. Bank v. Oak Park*, 273 N.W. 271, 274 (Mich. 1937) ("Surely no one, in view of the constitutional, statutory and charter provisions noted herein, could successfully assert that the legislature had the power to make a contract of this character in behalf of the defendant village. It follows that notwithstanding the remedial act of

9301723.3 14893/161046

the legislature, the contract under which plaintiffs assert their rights was void in its inception and still remains so.").

If an act is void *ab initio*, it is as though the act never occurred in the first place. *See Kim v. JPMorgan Chase Bank, N.A.*, 825 N.W.2d 329, 330 (Mich. 2012) (citing Black's Law Dictionary (9th ed.) and defining void *ab initio* as "[n]ull from the beginning, as from the first moment. . .").

In the municipal bankruptcy context, if the government official or entity authorizing the bankruptcy is acting *ultra vires*, then the bankruptcy filing is *not* "specifically authorized" and the petition must be dismissed. *See Suffolk Off-Track Betting Corp.*, 462 B.R. at 420-21 ("The County Resolution exceeded Suffolk County's authority and is therefore unconstitutional and void . . . Accordingly, Suffolk OTB has not complied with § 109(c)(2), and is therefore ineligible to be a debtor under chapter 9.") (internal citations omitted).

In this case, the Governor exceeded his authority under the Michigan Constitution by authorizing the Emergency Manager to file a Chapter 9 petition without conditioning that authorization upon the preservation of the State constitutional protection of accrued pension benefits, and his action was therefore *ultra vires* and void *ab initio*. Because the Governor's action was void *ab initio*, the Emergency Manager had no authority to file a Chapter 9 petition under PA 436, and his actions in doing so were similarly void *ab initio*.

40

**4.  The Governor cannot abrogate provisions of the Michigan Constitution, directly or indirectly.**

The Governor is bound to uphold the State Constitution, including the provisions of Article IX, section 24.  He does not have the authority to unilaterally abrogate provisions of the State Constitution.   Similarly, he cannot delegate authority that he does not have to a third party (*i.e.*, the Emergency Manager) to take actions that would result in an abrogation of constitutional provisions.   In essence, the Governor cannot do indirectly what he cannot do directly. *See Attorney Gen ex rel Eaves v. State Bridge Com.,* 269 N.W. 388, 392 (Mich. 1936) ("It is a fundamental and familiar proposition of law that the State may not do indirectly that which it is forbidden to do directly.").[21]

It therefore follows that neither the Legislature nor the Governor may delegate to the Emergency Manager the authority to impair or diminish the accrued financial benefits of the Retirement Systems and their participants because Article

---

[21]  See also *Blank v. Dep't. of Corrections*, 564 N.W.2d 130, 136 (Mich. App. 1997) ("The Legislature may not do indirectly what it cannot do directly."); *Socialist Workers Party v. Secretary of State*, 317 N.W. 1, 11 (Mich. 1982) (holding that the Legislature could not "do indirectly what art 2, § 4, forbids it from doing directly."); *Regents of University of Mich. v. State*, 235 N.W.2d 1, 17 (Mich. 1975) ("The condition may not be designed to permit the Legislature to indirectly accomplish that which it may not do directly."); *Toebe v. Munising*, 275 N.W. 744, 748 (Mich. 1937) ("This manner of doing indirectly that which may be done directly, is not proscribed by the language of the Constitution.").

41

IX, section 24 of the Michigan Constitution expressly denies the Legislative and

Executive branches that power.  *See Musselman,* 533 N.W.2d at 245.

> **5.**  **The Emergency Manager's authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued financial benefits violated the Municipal Code of the City of Detroit and is void *ab initio*.**

Article 11, section 11-101(3) of the Municipal Code of the City of Detroit

also prohibits the diminishment or impairment of accrued financial benefits of

active and retired city employees.  When the Emergency Manager recommended

that the City be authorized to file bankruptcy and when the Emergency Manager

commenced this case without conditioning such filing upon the protection of

accrued pension benefits of active and retired city employees, the Emergency

Manager violated the Detroit Municipal Code.[22]  Thus, for this additional reason,

his actions were *ultra vires* and void *ab initio.  See McKane and Suffolk, supra.*

Accordingly, the City was not validly authorized to be a debtor under Chapter 9, it

---

[22] Reserving all rights, the Retirement Systems note that PA 436, on its face, appears to authorize the Emergency Manager to suspend, amend, or repeal ordinances of a municipality.  M.C.L. § 141.1552(2) ("Except as otherwise provided in this act, during the pendency of the receivership, the authority of the chief administrative officer and governing body to exercise power for and on behalf of the local government under law, charter, and ordinance shall be suspended and vested in the emergency manager.").  However, the Emergency Manager did not suspend Article 11, section 11-101(3) of the Detroit Municipal Code as of the date of his recommendation or the Petition Date.  *See* Emergency Manager Order No. 13, July 18, 2013, attached to the City's Bankruptcy Petition (Docket No. 1) at 9-11 (no suspension of Article 11, section 11-101(3) mentioned).

42

cannot satisfy the requirements of section 109(c)(2), and the case must be dismissed.

> **6. Alternatively, if PA 436 does purport to permit the impairment of accrued financial benefits, then it is unconstitutional and the Governor's Authorization and initiation of the Chapter 9 bankruptcy was *ultra vires* and void *ab initio*.**

If this Court determines that PA 436 does indeed provide that the Governor and the Emergency Manager can take actions that may impair the City's obligations for accrued pension benefits, then, for the reasons discussed above, PA 436 contravenes Article IX, section 24 of the Michigan Constitution and is of no force and effect.

It is a well-established rule that courts "will presume that all legislation is constitutional and will attempt to construe legislation so as to preserve its constitutionality." *People v. Neumayer*, 275 N.W.2d 230, 237 (Mich. 1979). Here, sections 18(1) and 26(2) of PA 436 provide this Court with an opportunity to save PA 436 from being unconstitutional by finding that PA 436 does **not** authorize the Governor or Emergency Manager to cause the impairment of constitutionally-protected accrued public pension benefits through authorization of a Chapter 9 bankruptcy. Both provisions state that "[t]he governor may place contingencies on a local government in order to proceed under chapter 9." M.C.L. § 141.1558(1); M.C.L. § 141.1566(2). By authorizing the Governor to place conditions on a

Chapter 9 authorization, it may thus be presumed that the Legislature intended for Chapter 9 authorizations, in applicable situations, to be contingent on the Emergency Manager not being permitted to seek or accede to the impairment of accrued financial benefits.

**E.      Collateral Estoppel Precludes the City from Relitigating the Threshold Issue of Whether the City Received Valid Authorization from the Governor to File the Petition Because That Issue Has Already Been Litigated and a Declaratory Judgment Rendered.**

On July 19, 2013, the Ingham County Circuit Court—a court of competent jurisdiction—entered the Declaratory Judgment stating: "PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; and **PA 436 is to that extent of no force or effect**." (Exhibit 2, Declaratory Judgment, pg. 2) (emphasis added). The Declaratory Judgment further states: "The Governor is prohibited by Article IX Section 24 . . . from authorizing an emergency manager . . . to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and **any such action by the Governor is without authority**. . .[.]" *Id.* (emphasis added). The City ignores that the very statute it relies upon to demonstrate that it was "specifically authorized" under Section 109(c)(2) has been

44

deemed "unconstitutional" and "of no force and effect" by a Michigan state court to the extent that statute is being relied upon to support the Governor's Authorization of the filing of the Bankruptcy Petition. It also ignores that the Governor was specifically found to *lack* the authority to grant such authorization. Collateral estoppel, however, prevents the City (and this Court) from ignoring the Declaratory Judgment, and the City is barred from re-litigating this issue in this forum.

### 1. The Declaratory Judgment is entitled to full faith and credit.

The Full Faith and Credit Clause in the United States' Constitution commands that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." U.S. CONST. art. IV, § 1. While this clause is binding only upon the States, "Congress imposed on the federal courts the duty to give full faith and credit to judgments of the state courts" by implementing the Full Faith and Credit Statute, codified at 28 U.S.C. § 1738. *Wayside Transp. Co. v. Marcell's Motor Express, Inc.*, 284 F.2d 868, 870-71 (1st Cir. 1960). The Full Faith and Credit Statute states:

> The . . . judicial proceedings of any court of any . . . State
> . . . shall have the same full faith and credit in every court

45

within the United States . . . as they have by law or usage
in the courts of such State . . . from which they are taken.

28 U.S.C. § 1738.

Under the Full Faith and Credit Statute, state court judgments must be honored by federal bankruptcy courts. "When a federal court re-examines an issue that has already been determined in the State Courts, tension may develop. To avoid this imminent conflict, Congress passed the 'Full Faith and Credit Act.'" *In re Miloszar*, 238 B.R. 266, 269 (D.N.J. 1999) (internal citations and quotations omitted). The Full Faith and Credit Statute "requires the federal courts to give a prior State Court judgment the same preclusive effect that it would be given in subsequent proceedings in the same state." *Id.* As a result, for example"[t]he Bankruptcy Court does not have the power to vacate a State Court default judgment." *Id.*; *see also Bay Area Factors v. Calvert (In re Calvert)*, 105 F.3d 315, 317 (6th Cir. 1997) ("Our determination of the collateral estoppel effect of a state court default judgment in bankruptcy dischargeability proceedings begins with the Full Faith and Credit Statute, 28 U.S.C. § 1738, which requires the federal courts to give full faith and credit to the judicial proceedings of state courts.")

Notably, a state court's *judgment* is entitled to stricter compliance than a state's general *laws*. *See Baker v. General Motors Corp.*, 522 U.S. 222, 233 (1998). In *Baker*, the United States Supreme Court distinguished between the credit a court must give to another state's *laws* versus the credit owed to another

46

court's *judgments* and concluded that a court cannot refuse to give effect to another court's judgment:

> The Full Faith and Credit Clause does not compel a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate. ***Regarding judgments, however, the full faith and credit obligation is <u>exacting</u>.*** A final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, ***qualifies for recognition throughout the land.*** For claim and issue preclusion (*res judicata*) purposes, in other words, the judgment of the rendering State gains nationwide force.

*Id.* (internal quotations and citations omitted, emphasis added). The Supreme Court has acknowledged the importance of judgment recognition between the state and federal courts:

> [I]nvocation of *res judicata* and collateral estoppel [relieves] parties of the cost and vexation of multiple lawsuits, [conserves] judicial resources, and, by preventing inconsistent decisions, [encourages] reliance on adjudication . . . [T]hese doctrines also serve to promote the comity between state and federal courts that has been recognized as a bulwark of the federal system.[23]

*Allen v. McCurry*, 449 U.S. 90, 94-96 (1980) (internal quotes omitted).

---

[23] Coincidentally, the Court acknowledged these concerns when ordering the stay be extended to the Governor and the Treasurer; the Court noted dual proceedings are "costly, expensive, and inefficient" and there is "of course, a danger of potentially inconsistent results." (Exhibit 3, 7/24/2013 Hrg. Tr., pg. 81). This is precisely why the declaratory judgment must be given effect—a second crack at this argument in the bankruptcy court is "costly, expensive, and inefficient," and could lead to "inconsistent results."

9301723.3 14893/161046

Under the Full Faith and Credit Act, this Court is bound by the Declaratory Judgment.

**2.    The preclusive effect of the Declaratory Judgment is governed by Michigan law.**

The Full Faith and Credit Clause directs a federal court to apply the law of the state in which the judgment was rendered for purposes of determining its preclusive effect:

> <u>**This statute directs a federal court to refer to the preclusion law of the State in which judgment was rendered**</u>. "It has long been established that § 1738 does not allow federal courts to employ their own rules . . . in determining the effect of state judgments.  Rather, it goes beyond the common law and commands a federal court to accept the rules chosen by the State from which the judgment is taken.

*Bay Area Factors*, 105 F.3d at 317 (citing *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) (quoting *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481-82 (1982)) (emphasis added); *Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 81 (1984) ("It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.").  In this case, the applicable preclusion law is that of the State of Michigan.

48

### 3. The elements for collateral estoppel under Michigan law are satisfied in this matter.

Under Michigan law, "[c]ollateral estoppel, or issue preclusion, precludes relitigation of an issue in a subsequent, different cause of action between the same parties or their privies when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in the prior proceeding." *Ditmore v. Michalik*, 625 N.W.2d 462, 467 (Mich. Ct. App. 2001). The elements that must be satisfied before collateral estoppel may be applied are: (1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties or their privies must have had a full and fair opportunity to litigate the issue; and (3) there must be mutuality of estoppel, if collateral estoppel is being applied offensively. *Monat v. State Farm Ins. Co.*, 677 N.W.2d 843, 845-46 (Mich. 2004).

### a. The Governor's authority to authorize the bankruptcy petition was actually litigated and determined by a valid final judgment.

To be considered "actually litigated," the issue must be "put into issue by the pleadings, submitted to the trier of fact for a determination, and thereafter determined." *Cogan v. Cogan*, 385 N.W.2d 793, 795 (Mich. App. 1986).

In this case, the Governor's "authority" and the validity of PA 436 was fully briefed by all of the parties, and a hearing was held where both parties argued their relative positions (and notably, the Attorney General's office argued the Webster

49

Defendants' position and represented the Emergency Manager and the City's interests). (*See* Exhibit 4, Webster Verified Complaint; Exhibit 5, 7/19/2013 Hrg. Tr.; Exhibit 1, Webster Defendants' Motion for Summary Disposition). The Declaratory Judgment squarely adjudicated the authority issue and found the Governor lacked authority "to authorize an emergency manager to proceed under Chapter 9" and that the Governor is "prohibited . . . from authorizing an emergency manager under PA 436 to proceed under Chapter 9. . .[.]"

Further, the Declaratory Judgment is a valid final judgment. M.C.R. 2.605(E) ("Declaratory judgments have the force and effect of, and are reviewable as, final judgments").[24] It is irrelevant for collateral estoppel purposes that the Declaratory Judgment was appealed by the Webster Defendants, because an appeal does not affect the "finality" of a judgment for claim and issue preclusion purposes.[25]

---

[24] Michigan courts are empowered to "declare the rights and other legal relations of an interested party seeking a declaratory judgment." M.C.R. 2.605(A)(1). The purpose of a declaratory judgment is to "guide" the parties' "future conduct." *UAW v. Central Mich. Univ. Trustees*, 815 N.W.2d 132, 138 (Mich. App. 2012).

[25] "The rule in Michigan is that a judgment pending on appeal is deemed *res judicata*." *City of Troy Bldg. Inspector v. Hershberger*, 183 N.W. 2d 430, 433 (Mich. App. 1970); *see also Temple v. Kelel Distributing Co., Inc.*, 454 N.W. 2d 610, 611 (Mich. App. 1990) (defendant appealed an adverse ruling, but the decision still had *res judicata* effect); *Eisfelder v. Michigan Dept. of Natural Resources*, 847 F. Supp. 78, 83 (W.D. Mich. 1993) ("It is also . . . clear under Michigan law that the fact an appeal is pending does not affect an order's finality.").

50

It is anticipated that the City will argue that the Declaratory Judgment is not a "valid" judgment, because the bankruptcy petition was filed at 4:06 p.m. on July 18, 2013 (thereby triggering the automatic stay), and the Declaratory Judgment was not issued until the following day. The automatic stay, however, did not apply to the Webster Defendants when the Declaratory Judgment was entered: the Declaratory Judgment was issued on July 19, and the Court did not extend the automatic stay to the Webster Defendants until July 25. *See* Docket No. 166, pg. 2. Thus, the Retirement Systems have satisfied the first prong of the collateral estoppel analysis.

> **b.** ***The same parties or their privies litigated this issue in the state court.***

For collateral estoppel to be applied, the same parties or their privies must have had a full and fair opportunity to litigate the issue. *Monat*, 577 N.W.2d at 685. "A party is one who was directly interested in the subject matter, and who had a right to defend in, or control, the proceedings, and who had a right to appeal

---

As one judge has aptly observed, to deny preclusion because a judgment was pending appeal "would be laughable. If a judgment was denied its *res judicata* effect merely because an appeal was pending, litigants would be able to refile an identical case in another trial court while the appeal is pending, which would hogtie the trial courts with duplicative litigation." *Warwick Corp. v. Maryland Dep't of Transp.*, 573 F. Supp. 1011, 1014 (D. Md. 1983); *see also Tripati v. Henman*, 857 F.2d 1366, 1367 (9th. Cir. 1988) ("To deny preclusion in these circumstances would lead to an absurd result: Litigants would be able to refile identical cases while appeals are pending, enmeshing their opponents and the court system in tangles of duplicative litigation.").

51

from the judgment." *Dearborn Heights Sch. Dist. No. 7 v. Wayne County MEA/NEA*, 592 N.W.2d 408, 412 (Mich. App. 1998).

Privity is defined as "mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right." *Sloan v. Madison Heights,* 389 N.W.2d 418, 422 (Mich. 1986). For collateral estoppel purposes, privity between a party and non-party can exist where there is a "substantial identity of interests" and a "working or functional relationship. . . in which the interests of the non-party are presented and protected by the party in the litigation." *Phinisee v. Rogers*, 582 N.W.2d 852, 854 (Mich. App. 1998). Accordingly, a nonparty to the prior proceeding may be bound if "that party controlled the earlier proceeding or if the party's interests were adequately represented in the original matter." *Dearborn Heights*, 592 N.W.2d at 412.

### i. *Privity exists between Webster and the Retirement Systems.*

Privity exists between an individual pension member, such as Webster, and the Retirement System itself. There is both a "substantial identity of interests" and a "working or functional relationship . . . in which the interests of the non-party are presented and protected by the party in the litigation." *Phinisee*, 582 N.W.2d at 854. In similar contexts, courts have found privity. For example, in *Dearborn Heights*, the court found that "individual employees are 'substantially identical to

52

the labor organizations which represented them as charging parties before MERC [Michigan Employee Relations Commission].'" *Dearborn Heights*, 592 N.W.2d at 412 (citation omitted). Similarly, in *O'Keefe v Merrill Lynch & Co.*, 32 Kan. App. 2d 474, 488-489 (2004), the court found that an administrator of an estate is sufficiently in privity with heirs or beneficiaries of an estate to be subjected to principles of claim preclusion, and in *Moldovan v. A&P*, 1985 U.S. Dist. LEXIS 20659 (W.D. Pa. Apr. 17, 1985), the court found privity between a local union chapter and the trustees for a multiemployer benefit plan.

### ii. *Privity exists between the Webster Defendants and the Emergency Manager/City.*

As noted above, the defendants in the Webster Case were (i) the State of Michigan, (ii) the Governor, and (iii) the Treasurer. The Emergency Manager and the City were not named defendants. However, privity exists between the Webster Defendants and the Emergency Manager (and by extension, the City) such that collateral estoppel applies.

In the context of public officials, "[p]rivity may exist between individual government officials and the entities that they work for even if the officers were not named defendants in the previous action." *Elder v. Harrison Twp.*, 786 F. Supp. 2d 1314, 1324-25 (E.D. Mich. 2011) *rev'd on other grnds*, 489 Fed. Appx. 934 (6th Cir. 2012) (internal citation omitted) ("When officers are sued in their official capacity, privity is often found.") In this case, the City has already

53

admitted that: "[t]he State of Michigan. . . acts through its officials. . . . So to the extent that the named parties in there are the governor and the treasurer, the state acts through those officials." (Exhibit 3, 7/24/13 Hrg. Tr., pg. 68). Similarly, the City has admitted that "the emergency manager assumed all of the powers and acts for and in the place of and in the stead of the mayor and the city council. . . [.]" (*Id.* at pp. 7-8).

Furthermore, the terms of PA 436 itself establishes privity between the Governor, the Emergency Manager, and the City. The general powers of the Emergency Manager are set forth in Section 9 of PA 436, which provides, in relevant part, that "an emergency manager shall act for and in the place and stead of the office of chief administrative officer of the local government" and serves "at the pleasure of the governor." M.C.L. § 141.1549(2) and M.C.L. §141.1549(3)(d).

Moreover, any recommendation that the City of Detroit proceed under Chapter 9 is explicitly controlled by the Governor, and the Emergency Manager can only act at the behest of the Governor.

Indeed, the City has conceded that such an "identity of interests" exists here—the City based its entire Stay Extension Motion on the premise that there was an "identity of interests" between the Governor, the Treasurer, the Emergency Manager and the City. *See, e.g.*, Docket No. 56, ¶ 19-21. The City admitted in its motion that the Governor and the Treasurer are "***closely connected to the City and***

54

*the Emergency Manager*." *Id.* (emphasis added). At the hearing on July 24, 2013, the City again admitted the reason it needed the stay extended was because it was concerned that lawsuits involving the Webster Defendants could potentially bind the City. (Exhibit 3, 7/24/2013, pg. 12) (emphasis added).

In granting the Stay Extension Motion, this Court acknowledged the close connection: "In this case, the Court readily finds that the debtor—the interests of the debtor and the interests of those potential defendants to whom the debtor seeks to extend the automatic stay [*i.e.*, the Governor and the Treasurer] *are so intertwined* that the unusual circumstances test is met." (Exhibit 3, 7/24/2013 Hrg. Tr. at pg. 78) (emphasis added).

Lastly, the same attorney (the Attorney General of Michigan) represents the Governor, the State, and the Emergency Manager. While this alone is not dispositive, it is significant because it illustrates the close connection between the relevant governmental officials—state officers such as the Attorney General represent state agents and interests, not those of strangers to state government. In this case, the Attorney General's Office has a duty to defend the Emergency Manager from all civil claims challenging the validity of PA 436 or the authority of the Emergency Manager. M.C.L. § 141.1560(2)-(3). Thus, the City's interests were adequately represented by the Attorney General. Accordingly, based on the

55

entire scheme and structure of PA 436, the City is certainly a "privy" to the Webster Defendants and is thus bound by the Declaratory Judgment.

### c. The parties had a full and fair opportunity to litigate.

In determining whether a party has had a "full and fair" opportunity to litigate the issue, Michigan courts may look to the factors outlined in the Restatement of Judgments. *Monat*, 469 Mich. at 685, n. 2 (citing Rest. 2d Judgments § 28-29). However, failure to exhaust all appeals does not mean a party lacked a full and fair opportunity to litigate, nor does it delay application of collateral estoppel. *See footnote 25, supra.*

In this case, the Declaratory Judgment was entered after a Motion for Summary Disposition was filed by the Webster Defendants. The Webster Defendants chose to file this dispositive motion just twelve days after the complaint was filed by Webster, thereby foregoing discovery or other litigation processes. (Exhibit 6, Register of Actions). The Webster Defendants even requested an expedited ruling from the state court, urging: "a speedy resolution of this action is required to avoid adversely impacting the City of Detroit's Emergency Manager's current efforts to reach a consensus that could achieve some financial stability for the City [and] . . . [d]elaying a resolution of this case would certainly have a negative impact on those efforts. . .[.]" (Exhibit 1, Webster Defendants' Motion for Summary Disposition, pg. 4). The City can hardly

56

complain that its position was not fully and fairly litigated when the Governor, the State, and the Treasurer filed a motion *affirmatively seeking summary adjudication of this very issue on an expedited basis.*

Further, a full jury trial on the merits is not necessary in order for a matter to be deemed fully and fairly litigated; declaratory judgments are entitled to preclusive effect.[26] *See Farmers Ins. Exch. v. Young*, 2010 Mich. App. LEXIS 1499, at *22 (Mich. Ct. App. Aug. 3, 2010) (concluding that a declaratory judgment was a final judgment for purposes of collateral estoppel or *res judicata*); *Hansen v. State Farm Fire and Cas. Co.*, 2006 Mich. App. LEXIS 1556, at *8 (Mich. Ct. App. May 9, 2006) (affirming the trial court's summary disposition ruling in favor of defendant by applying collateral estoppel based on a declaratory judgment); *Hill v. Wall St. Sys.*, 2003 Mich. App. LEXIS 1261, *11-14 (Mich. Ct. App. May 27, 2003) (applying collateral estoppel to an earlier declaratory judgment).

Thus, sufficient privity exists between the various parties to permit the

---

[26] Similarly, arbitration awards, consent judgments, settlement agreements, and cases resolved by dispositive motion are also entitled to preclusive effect. *Laethem Equip. Co., et al. v. J & D Implement, Inc., et al.*, 2007 Mich. App. LEXIS 1769, *17 (Mich. Ct. App. July 19, 2007) (settlement agreement); *Accident Victims Home Health Care v. Allstate Ins. Co.*, 2006 Mich. App. Lexis 1791, *6-7 (Mich. Ct. App. June 6, 2006) (settlement agreement); *Ditmore*, 625 N.W.2d at 466 (consent judgment); *Detroit Auto. Inter-Insurance Exchange v. Sanford*, 369 N.W.2d 239, 242 (Mich. App. 1985) (arbitration award); *Detroit v. Nortown Theatre, Inc.*, 323 N.W.2d 411, 413-14 (Mich. App. 1982) (summary or default judgment).

57

application of collateral estoppel, and those privies had a full and fair opportunity to litigate the issue.

### d. *Mutuality of estoppel exists.*

"Mutuality of estoppel requires that in order for a party to estop an adversary from relitigating an issue that party must have been a party, or in privy to a party, in the previous action." *Monat,* 677 N.W.2d at 846. Estoppel is considered "mutual" if the party taking advantage of the earlier adjudication "would have been bound by it, had it gone against him." *Id.* at 846-47.

Here, mutuality is present on both sides. The facts, circumstances and entire structure of PA 436 demonstrate that mutuality exists to justify the Retirement Systems' use of collateral estoppel offensively against the City. The plaintiffs in Webster are participants in the GRS and thus share identical interests with the Retirement Systems – protecting their accrued financial benefits from being impaired. *See Dearborn Heights*, 592 N.W.2d. at 412. There is also little doubt that a judgment against the Webster plaintiffs would bind the Retirement Systems. More important, had the Webster court found in favor of the Webster Defendants and ruled that the Governor *did* have authority to authorize the City's Chapter 9 case, the City would undoubtedly be relying on the Declaratory Judgment to support its position in the eligibility proceedings. Thus, mutuality of estoppel exists because both sides are bound by the judgment.

## II.    The City Failed to Negotiate With Its Creditors in Good Faith and Such Negotiations Were Not Impracticable.

In his Declaration, the Emergency Manager describes a series of informational and presentational meetings that he and his advisors conducted with various creditor constituents and their representatives, including the Retirement Systems, over the course of several weeks prior to the Petition Date. *See* Orr Declaration at ¶¶ 80-81, ¶¶85-103. The Emergency Manager also attests that negotiations with the City's creditors were impracticable due to the sheer volume of creditors, certain creditors' alleged refusal to compromise their positions, and as a result of the Pre-Petition Lawsuits, and that despite this impracticability, the City attempted to negotiate with its creditors in good faith. *Id.* at ¶¶ 108-111**.** The City alleges that these allegations support a finding that it meets the negotiation requirements set forth in section 109(c)(5)(B) and (C), and that it is eligible to be a debtor under chapter 9 of the Bankruptcy Code. Eligibility Memorandum at pp. 39-61.

In the weeks prior to the commencement of this bankruptcy case, the Retirement Systems, its counsel and advisors, devoted significant resources to researching and reviewing both the City's and the Retirement Systems' financial situations, including attending the informational presentations on June 14, June 20, June 25, July 10 and July 11, 2013 that were referenced in the Orr Declaration. As stated, these sessions were primarily presentational, with multiple parties in

59

attendance; there was no opportunity at these meetings for meaningful bilateral discussions. In fact, both the City and the Retirement Systems were in no position to discuss matters substantively because material prerequisite financial information required for such discussions was, and is, not yet complete.

Admittedly, the Retirement Systems filed the Retirement Systems Lawsuit, seeking *declaratory relief* that neither the Governor nor the Emergency Manager has authority to file a Chapter 9 or take other actions that will result in the impairment or diminishment of the accrued pension benefits of the Retirement Systems and their participants. The Retirement Systems Lawsuit, however, does not evidence a refusal to engage in discussions with the City, but instead evidences an effort to obtain a judicial declaration of state law and its impact upon City of Detroit pension benefits. Subject to their position that accrued pension benefits are constitutionally protected, the Retirement Systems have never indicated that the Retirement Systems Lawsuit and bilateral discussions are mutually exclusive initiatives. To the contrary, the Retirement Systems have always indicated a willingness to pursue these initiatives in parallel (assuming adequate financial information is made available to facilitate such discussions). Discussions between the City and the Retirement Systems were thus not impracticable merely because of the Retirement Systems Lawsuit. Accordingly, the City cannot meet its burden of proof to establish its eligibility to be a Chapter 9 debtor under Bankruptcy Code

60

section 109(c)(5).[27]

<u>CONCLUSION</u>

The City cannot meet its burden of proof to establish that it has satisfied the eligibility requirements of Bankruptcy Code section 109(c)(2) and 109(c)(5). Therefore, this case should be dismissed as a matter of law, pursuant to Bankruptcy Code section 921(c).

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Jennifer K. Green (P69019)
Evan J. Feldman (P73437)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

Dated: August 19, 2013

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

---

[27] The Retirement Systems anticipate that other creditors will object to the City's eligibility on the grounds of section 109(c)(5) and will conduct discovery on the issue. The Retirement Systems expressly reserve the right to participate in the discovery process and request access to all discovery, documents exchanged, and depositions.

61