# EXHIBIT 7-1

**CITY OF PONTIAC RETIRED EMPLOYEES ASSOCIATION; DELMER AN-DERSON; THOMAS HUNTER; HENRY C. SHOEMAKER; YVETTE TALLEY; DEBRA WOODS; JOHN CLAYA, Plaintiffs - Appellants, v. LOUIS SCHIMMEL, Individually and in his capacity as Emergency Manager of the City of Pontiac; CATHY SQUARE, Individually and in her official capacity as the Director of Human Resources and Labor Relations for the City of Pontiac; CITY OF PONTIAC, Defendants - Appellees.**

No. 12-2087

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

13a0215p.06; 2013 U.S. App. LEXIS 16519; 2013 FED App. 0215P (6th Cir.)

January 15, 2013, Argued
August 9, 2013, Decided
August 9, 2013, Filed

**PRIOR HISTORY:** [*1]
Appeal from the United States District Court for the Eastern District of Michigan at Detroit. No. 2:12-cv-12830--Lawrence P. Zatkoff, District Judge.
City of Pontiac Retired Emples. v. City of Pontiac, 2012 U.S. Dist. LEXIS 98858 ( E.D. Mich., July 17, 2012)

**COUNSEL:** ARGUED:Alec Scott Gibbs, LAW OF-FICE OF GREGORY T. GIBBS, Flint, Michigan, for Appellants.

Stephen J. Hitchcock, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellees.

ON BRIEF: Alec Scott Gibbs, Gregory Thomas Gibbs, LAW OFFICE OF GREGORY T. GIBBS, Flint, Michigan, for Appellants.

Stephen J. Hitchcock, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellees.

**JUDGES:** Before: COLE and GRIFFIN, Circuit Judges; GWIN, District Judge. GWIN, D. J., delivered the opinion of the court, in which COLE, J., joined. GRIFFIN, J., delivered a separate dissenting opinion.

* The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

**OPINION BY:** James S. Gwin

**OPINION**

[**2] GWIN, District Judge. Like many Michigan municipalities, the City of Pontiac has experienced significant economic difficulties, especially since the 2008 financial collapse. To address Pontiac's problems, Michigan's Governor appointed Louis Schimmel as Pontiac's emergency manager. Acting under Public Act 4, Michigan's then-existing emergency manager [*2] law, Schimmel modified the collective bargaining agreements of Pontiac's retired employees. He also modified severance benefits, including pension benefits, that Pontiac had given to other retirees not covered by collective bargaining agreements. In this case, those retired employees challenge the emergency manager's power to reduce their retirement benefits.

The retired employees say that Schimmel and Pontiac violated their federal constitutional rights, including rights given under the Contracts Clause, the Due Process Clause, and the Bankruptcy Clause. The retired employees do not specifically argue that Schimmel violated Michigan's Constitution when he changed their pension rights. But, the Michigan Legislature may have violated the Michigan Constitution when it passed Public Act 4. In addition, Michigan voters rejected Public Act 4 by referendum, and this rejection may have rendered Schimmel's actions void.

Despite the parties' inadequate briefing of these state-law issues, we decline to decide the case on federal constitutional grounds. Because state law could provide an alternative basis for deciding this case, we **VACATE** and **REMAND** to the district court to conduct additional fact-finding [*3] and consider these state-law issues.

Specifically, did two-thirds of both houses of the Michigan Legislature vote to make Public Act 4 immediately effective? And, since Michigan voters rejected Public Act 4 in a referendum, do the acts taken under the rejected law have any power? Because similar [**3] issues face many Michigan municipalities, we ask the district court to expedite consideration of the remanded case.

## I. Background

### A. Michigan's Emergency Manager Laws

Emergency Manager Louis Schimmel (the "Emergency Manager") changed contractual and pension commitments under Public Act 4. Public Act 4 is not Michigan's first law governing emergency managers, but it is the first legislation that allowed emergency managers to break collective bargaining agreements and to ignore retirement commitments. Mich. Comp. Laws §§ 141.1501-1531 (rejected by referendum 2012). In 1990, the Michigan Legislature enacted a predecessor to Public Act 4, the Local Government Fiscal Responsibility Act ("Public Act 72"). Mich. Comp. Laws § 141.1519(1)(j) (2005). Public Act 72 established a procedure for Michigan's Governor to appoint emergency managers, and gave those emergency managers the power to address local [*4] governments' financial crises. But Public Act 72 did not give emergency managers the power to modify collective bargaining agreements or pension rights. Critics of Public Act 72 complained that it did not give emergency managers the powers sometimes necessary to address municipalities' structural budget problems, especially financial problems flowing from pension commitments. Critics called for a new law, and Public Act 4 was born.

In March 2011, Michigan's Governor signed Public Act 4 into law. § 141.1503. Unlike Public Act 72, Public Act 4 gave emergency managers the power to temporarily reject, modify, or terminate existing collective bargaining agreements. Id. at §§ 141.1519(1)(k), (k)(iv). Public Act 4 also repealed Public Act 72. Id. at § 141.1503 (enacting § 1).

As we discuss, Michigan's Constitution purposely makes it difficult for laws to take immediate effect. Generally, laws do not become effective until ninety days after the end of the legislative session in which they are passed. Mich. Const. art. IV, § 27. [**4] However, this general rule does not apply if two-thirds of each house in the Legislature vote to make the law take immediate effect. Id. Public Act 4 passed by only [*5] a narrow margin. Nevertheless, the Michigan Legislature claims that two-thirds of its members voted to make Public Act 4 become immediately effective.

Michigan also has a voter rejection procedure that allows citizen-initiated rejection of Michigan legislation. In response to Public Act 4, critics collected enough signatures to have Michigan citizens vote on whether Public Act 4 should be rejected.[1] On November 6, 2012, Michigan voters rejected Public Act 4 by a fifty-two percent to forty-eight percent margin. Michigan's citizens cancelled Public Act 4.

> [1] In August 2012, after litigation over the petition, the Michigan Supreme Court ordered the Board of State Canvassers to certify the referendum for the November ballot. Stand Up for Democracy v. Sec'y of State, 492 Mich. 588, 822 N.W.2d 159, 161 (Mich. 2012). That certification suspended the operation of Public Act 4 pending the outcome of the referendum. Mich. Comp. Laws § 168.477(2) ("a law that is the subject of the referendum continues to be effective until the referendum is properly invoked").

Apparently unaffected that voters had just rejected Public Act 4, the Michigan Legislature enacted, and the Michigan Governor signed, Public Act 436. Public [*6] Act 436 largely reenacted the provisions of Public Act 4, the law that Michigan citizens had just revoked. In enacting Public Act 436, the Michigan Legislature included a minor appropriation provision, apparently to stop Michigan voters from putting Public Act 436 to a referendum.[2] Mich. Comp. Laws §§ 141.1574, 1575.

> [2] See Mich. Const. Art. II, § 9 ("The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds").

### B. City of Pontiac

In March 2009, Michigan's Governor appointed Schimmel as Pontiac's emergency manager under Public Act 72, Michigan's then-controlling emergency manager law. Although Schimmel has managed Pontiac for a number of years, Pontiac continues to struggle. Currently, Pontiac's liabilities to the benefit plans of its employees is its greatest expense, totaling $302 million.

[**5] With the passage of Public Act 4 and for the first time, Michigan gave emergency managers the power to change collective bargaining agreements and the power to stop pension benefits. In December 2011, the Emergency Manager modified Pontiac's collective bargaining agreements to shift a large portion of the city's benefits obligations [*7] onto its employees.[3] Among the changes, Pontiac cancelled disability, vision, and hearing coverage; increased annual deductibles; and cut pensions. This case resulted.

3   The Pontiac collective bargaining agreements at issue deal primarily with healthcare benefits.

### C. Procedural History

In June 2012, the City of Pontiac Retired Employees Association and a group of retired employees (collectively the "Retired Employees") filed this putative class action. They alleged several federal claims, including the unconstitutional impairment of contract, preemption under federal bankruptcy law, and deprivation of a property interest without due process of law. With the complaint, the Retired Employees filed a motion for a temporary restraining order ("TRO") and a motion for a preliminary injunction to stop certain Emergency Manager orders from taking effect. In July 2012, the district court denied the TRO motion and denied the motion for a preliminary injunction. The Retired Employees appealed.

### II. Law and Analysis

As became clear during oral argument, both parties ask this Court to reach the substantive merits of their dispute. But doing so requires us to resolve important federal constitutional issues, [*8] which are closer questions than the dissent suggests. Unlike the district court here, another Michigan federal district granted injunctive relief when faced with similar federal questions.[4] Against this backdrop, the better course of action asks the district court to see if state-law issues could avoid the need to rule on the federal claims. Because state law could provide an alternative basis for deciding this case, the [**6] more prudent approach is to allow the district court to conduct additional fact-finding and to consider the state-law issues.

> 4   See _Welch v. Brown_, No. 12-13808, 2013 U.S. Dist. LEXIS 45681, 2013 WL 1292373, at *13 (E.D. Mich. March 29, 2013).

### A. Constitutional Avoidance

Under the doctrine of constitutional avoidance, we avoid constitutional determinations when a case can be resolved on other grounds. See _Ashwander v. TVA_, 297 U.S. 288, 347, 56 S. Ct. 466, 80 L. Ed. 688 (1936) (Brandeis, J., concurring) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.") (internal citation and quotation marks omitted); _see also Muller Optical Co. v. EEOC_, 743 F.2d 380, 386 (6th Cir. 1984) ("The duty to avoid decisions of constitutional questions . . . [is] [*9] based upon the general policy of judicial restraint."). When a case can be resolved on state constitutional grounds, we should decide the state issue so as to avoid rendering a decision under the Federal Constitution. See _Siler v. Louisville & Nashville R.R. Co._, 213 U.S. 175, 191, 29 S. Ct. 451, 53 L. Ed. 753 (1909) ("This court has the same right, and can, if it deem it proper, decide the local questions only, and omit to decide the federal questions, or decide them adversely to the party claiming their benefit.") (citations omitted).

The dissent would decide the Retired Employees' contracts clause and due process claims. But these federal constitutional issues are closer questions than the dissent suggests. If the Michigan Legislature gave Public Act 4 immediate effect in violation of the Michigan Constitution, or if the voters' rejection of Public Act 4 by referendum rendered the Emergency Manager's actions void, we could avoid the federal constitutional issues. Doing otherwise forces us to decide federal constitutional questions and potentially render an advisory opinion. We should avoid this if we can.

### B. Waiver

What should a court do when the parties fail to raise an obvious issue? Here, neither the Retired [*10] Employees nor Schimmel raised the issue of whether the Michigan Legislature's giving Public Act 4 immediate effect violated the Michigan Constitution. [**7] Nor did they raise the issue of whether the voters' referendum rejection of Public Act 4 rendered the Emergency Manager's actions void. Both issues are potentially dispositive of this appeal.

Generally, we have found that a party waives an issue when they have not raised it or sufficiently addressed it. See, e.g., _Marks v. Newcourt Credit Grp., Inc._, 342 F.3d 444, 462 (6th Cir. 2003) (holding that a party "waives an issue when he fails to present it in his initial briefs") (citations omitted). But, the waiver rule is neither jurisdictional nor is it absolute. See, e.g., _In re Morris_, 260 F.3d 654, 664 (6th Cir. 2001) (holding that the waiver rule is "an accepted practice or rule of procedure rather than a jurisdictional bar to hearing issues for the first time on appeal") (citations omitted).

The dissent says that we are bound by the parties' framing of the issues. But the United States Supreme Court rejects a blanket rule. In _Independent Insurance Agents of America_, the Court held that courts of appeals have the discretion to consider [*11] issues sua sponte despite the parties' failure to raise the issue in the district court, the court of appeals, or at oral argument. _U.S. Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc._, 508 U.S. 439, 445-47, 113 S. Ct. 2173, 124 L. Ed. 2d 402 (1993) ("The contrary conclusion would permit litigants, by agreeing on the legal issue presented, to extract the opinion of a court on hypothetical Acts of Congress or dubious constitutional principles, an opinion that would be difficult to characterize as anything but advisory.").[5]

5 There, the United States Court of Appeals for the District of Columbia Circuit reversed the district court's judgement based on a theory that neither party argued to the district court or the court of appeals. *See Indep. Ins. Agents of Am., Inc. v. Clarke*, 955 F.2d 731, 293 U.S. App. D.C. 403 (D.C. Cir. 1992), *rev'd on other grounds sub nom. Indep. Ins. Agents of Am.*, 508 U.S. at 445-47. In denying rehearing *en banc*, Judge Sentelle said:

> Our colleagues question the "judicial power" of a federal court to decide an issue of law concededly dispositive of the case where parties have not raised the issue. I think it most apparent that federal courts do possess this power. The alternative is that the parties could force a federal [*12] court to render an advisory opinion. What the dissenters in effect argue is that the parties can stipulate to the state of underlying law; frame a law suit, assuming that stipulation; and obtain from the court a ruling as to what the otherwise dispositive law would be if the stipulated case were in fact the law.

*Clarke*, 965 F.2d at 1078 (Sentelle, J., concurring).

After the Supreme Court granted *certiorari*, the respondents argued that the court of appeals erred in considering the issue *sua sponte. Indep. Ins. Agents of Am.*, 508 U.S. at 445. Here, the dissent attempts to revive that argument. But, the Supreme Court dismissed the argument made by the dissent, the *Clarke* dissenters, and the respondents. *Id.* at 446-47.

[**8] Despite the importance of whether Public Act 4 should have been given immediate effect, or if the voter's referendum rejection of Public Act 4 rendered the Emergency Manager's actions void, we should not decide these issues now because the parties failed to develop these issues sufficiently for our review. In *Independent Insurance Agents of America*, the Supreme Court found that the court of appeals' *sua sponte* consideration of the unasserted issue was proper only after "giving [*13] the parties ample opportunity to address the issue." *Id.* at 448.

Thus, we return these issues to the district court to develop a factual record and consider the parties' argu-

ments. We have generally applied the waiver exception where the issue involved a question of law that required no additional factual development. *See, e.g., Morris*, 260 F.3d at 664. But here, where additional fact-finding is necessary, remand to the district court is more appropriate. *See, e.g., City of Mt. Clemens v. EPA*, 917 F.2d 908, 916 n.7 (6th Cir. 1990) (remanding to district court and declining to affirm on alternative grounds "[b]ecause these arguments were not addressed by the district court and additional fact finding would be required to resolve the issues raised").[6] The parties' failure to brief important state-law questions should not force this Court to decide important federal constitutional questions. A remand is therefore the best course of action.

> 6 *See also Burkholder v. UAW Local No. 12*, 299 F. App'x 531, 534 (6th Cir. 2008), *overruled on other grounds by Chapman v. UAW Local 1005*, 670 F.3d 677 (6th Cir. 2012); *Dandridge v. Williams*, 397 U.S. 471, 476 n.6, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970) ("When attention has been focused [*14] on other issues, or when the court from which a case comes has expressed no views on a controlling question, it may be appropriate to remand the case rather than deal with the merits of that question in this Court.").

In January 2013, after this Court heard oral argument, Michigan's Attorney General moved to intervene to brief the referendum rejection issue. While the Attorney General's supplemental briefing may aid a fact-finder considering these issues, the district court should conduct that fact-finding. *See Birth Control Ctrs., Inc. v. Reizen*, 743 F.2d 352, 366 (6th Cir. 1984) ("When an appellate court discerns that additional fact findings are necessary, the usual rule is to remand for further proceedings to permit the [**9] trial court to make the necessary findings."). The motion to intervene is therefore denied.[7] Our decision is limited to this proceeding. On remand, the Attorney General may refile its motion with the district court.

> 7 The dissent would grant the motion to intervene and direct the Michigan Attorney General to file his brief within twenty-eight days.

## C. Immediate Effect

On remand, the district court should consider whether the Michigan Legislature violated the Michigan [*15] Constitution when it gave Public Act 4 "immediate effect." There is reason to believe that it did.

Generally, the Michigan Constitution makes bills effective ninety days after the end of the legislative session in which they are passed. Mich. Const. art. IV, § 27. That general rule, however, is subject to the immediate

effect exception that permits the Legislature to "give *immediate effect* to acts by a *two-thirds vote* of the members elected to and serving in each house." *Id.* (emphasis added).

Discussing the framers' intent for this provision, the Michigan Supreme Court said:

> Several delegates expressed concern that granting the Legislature the power to give immediate effect to any law would endanger the referendum because it would not give the people time to gather signatures for petitions to prevent the law from going into effect. Also, there was the danger that statutes would be passed without giving people adequate time to become acquainted with the statutes and adjust to them before they went into effect. To reduce this danger, the framers decided to maintain the requirement that no act passed by the Legislature could take immediate effect *unless passed by a two-thirds vote of the* [*16] *elected members of each house.*

*Frey v. Dep't of Mgmt. & Budget*, 429 Mich. 315, 414 N.W.2d 873, 880-81 (Mich. 1987) (emphasis added) (footnotes omitted).

[**10] The Michigan Legislature seems to have ignored the two-thirds vote requirement when it gave Public Act 4 immediate effect. The Michigan Legislature has a Senate with thirty-eight members and a House with 110 members. Thus, the two-thirds vote requirement is twenty-six votes in the Senate and seventy-four votes in the House. But, Public Act 4 passed in the House with sixty-two votes--twelve short of the two-thirds requirement for an immediate effect motion. Yet, despite the clear absence of the necessary two-thirds vote, the House proceeded to give Public Act 4 immediate effect over the objections of the minority party.[8]

> 8 Rep. Kandrevas made the statement: "I vote NO . . . and protest the events that transpired on the floor today. . . . [including] an utter disregard for demands by the requisite number of voting members for a record roll call vote on the question of Immediate Effect."

To achieve this result, the House used a rule that allows it to conduct a "rising vote," where the presiding officer examines the chamber to see whether the requisite two-thirds [*17] support exists. *See Hammel v. Speaker of House of Representatives*, 297 Mich. App. 641, 825 N.W.2d 616, 619 (Mich. Ct. App. 2012), *ap-*

*peal denied*, 493 Mich. 973, 829 N.W.2d 862 (Mich. 2013). Apparently, a two-thirds vote occurs whenever the presiding officer says it occurs--irrespective of the actual vote. This authority is unchecked and often results in passing motions for immediate effect that could not receive the constitutionally required two-thirds vote. Apparently, the Michigan Legislature believes the Michigan Constitution can be ignored.

Public Act 4 exemplifies the farce. The Michigan House presiding officer refused a request for a roll call vote and made Public Act 4 immediately effective through the obvious fiction that twelve House members immediately changed their positions. This process has been the subject of considerable contention and scrutiny.[9] [**11] In effect, the Michigan Legislature has made their "rising vote" rule trump the Michigan Constitution.

> 9 *See, e.g.*, Mark Brush, *Michigan Court of Appeals Rejects House Dems Bid to Stop 'Immediate Effect'*, Michigan Radio (Aug. 16, 2012, 5:28 PM), http://www.michiganradio.org/term/immediate-effect; Paul Egan, *Michigan Court of Appeals Debates Republican Legislature's* [*18] *Immediate Effect*, Detroit Free Press (Aug. 8, 2012, 12:40 PM), http://www.freep.com/apps/pbcs.dll/article?AID= /201208081240/NEWS15/120808051; Libby Spencer, *Michigan House Republicans Repeatedly Violated State Constitution*, The Detroit News (Apr. 6, 2012, 4:13 PM), http://blogs.detroitnews.com/politics/2012/04/06/ michi-gan-house-republicans-repeatedly-violated-state-constitution/; Jennifer White, *Immediate Effect Sheds National Light on Michigan, So What?*, Michigan Radio (Apr. 12, 2012, 9:39 PM), http://www.michiganradio.org/post/immediate-effect-sheds-national-light-michigan-so-what; Paul Egan, *Michigan House Democrats Lose Challenge to GOP's Voice Votes that Give Laws Immediate Effect* (Aug. 17, 2012), http://www.freep.com/article/20120817/NEWS15 /308170058/Michigan-House-Democrats-losecha llenge-to-GOP-s-voice-votes-that-give-laws-imm ediate-effect.

Despite the Michigan Constitution's express limitation, the Legislature has perverted the immediate effect exception to swallow the constitutional rule. Under Republican control of the House, in 2011, the Legislature passed 319 out of 323 bills with immediate effect. In 2010, it passed 345 out of 363 bills with immediate effect. Democrats [*19] have also abused the exception. Under Democratic control of the House, in 2006, the

Legislature passed 664 out of 682 bills with immediate effect. Plainly, the Legislature will not self-correct its abuse of the immediate effect exception because the majority party controls and benefits from the process.

The issue has been examined by Michigan's lower courts. See Hammel, 825 N.W.2d at 618. In Hammel, the plaintiffs said that under the Michigan Constitution, "article 4, § 27, motions for immediate effect are required to be resolved by a roll call vote, and that article 4, § 18 prohibits a requirement that motions for immediate effect and for a roll call vote be made orally." Id. at 619. The trial court agreed and entered an order for a preliminary injunction. Id.

But the Michigan Court of Appeals reversed. Id. at 623. It found that the plaintiffs had failed to demonstrate a likelihood of success on the merits because "[t]he constitutional provisions at issue permit the manner in which they are applied to be determined by adoption of the rules of the House." Id. at 622. This reasoning make little sense. The Michigan Constitution expressly limits the Legislature's power to give laws immediate [*20] effect. Yet, the Michigan Court of Appeals says that the Michigan Legislature has the power to decide whether that constitutional limitation applies? Alternatively, the court of appeals also made the illogic finding that the plaintiffs failed [**12] to show irreparable harm because the "plaintiffs' ability to vote and the effectiveness of their vote have not been impaired." Id.

On May 1, 2013, the Michigan Supreme Court denied the plaintiffs' application for leave to appeal the Hammel case. Hammel v. Speaker of House of Representatives, 493 Mich. 973, 829 N.W.2d 862 (Mich. 2013). The dissent here characterizes the Michigan Supreme Court's review as somewhat affirming the Hammel opinion. But the Michigan Supreme Court simply has not spoken on the immediate effect issue and no conclusion can be taken from its declining to review the case.

Where "a state's highest court has spoken to an issue, we are bound by that decision unless we are convinced that the high court would overrule it if confronted with facts similar to those before us." Kirk v. Hanes Corp. of N.C., 16 F.3d 705, 707 (6th Cir. 1994) (citation omitted). Where a state appellate court has resolved an issue to which the high court has not spoken, [*21] the Supreme Court has said that the appellate court decision "is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." West v. American Tel. & Tel. Co., 311 U.S. 223, 237, 61 S. Ct. 179, 85 L. Ed. 139 (1940). "We may refuse to follow intermediate appellate court decisions where we are persuaded that they fail to reflect state law correctly, but we 'should not reject a

state rule just because it was not announced by the highest court of the state,' even if we believe that the rule is 'unsound.'" Ziebart Int'l Corp. v. CNA Ins. Cos., 78 F.3d 245, 250-51 (6th Cir. 1996) (quoting FL Aerospace v. Aetna Cas. & Sur. Co., 897 F.2d 214, 218-19 (6th Cir. 1990)).

On remand, the district court should consider whether the Michigan Supreme Court would overrule Hammel. There is reason to believe it would. The Michigan constitutional provision seems obviously directed at restricting its Legislature's ability to give bills immediate effect unless a real two-thirds of the elected members in each house agree. And the court of appeals' belief that house members do not need to vote on immediate effect if they have [*22] had a chance to vote on the underlying legislation turns Michigan's Constitution article IV, § 27 on its head.

[**13] Michigan courts do not refrain from scrutinizing the Legislature's determination that a bill is passed with immediate effect. First, before 1963, the Michigan Constitution imposed additional requirements on the Legislature before it could give a bill immediate effect: it said that the bill must be "immediately necessary for the preservation of the public peace, health or safety." Indus. Bank of Wyandotte v. Reichert, 251 Mich. 396, 232 N.W. 235, 236 (Mich. 1930). At that time, when the Legislature said a bill should take immediate effect, courts reviewed the Legislature's determination to ensure that the bill was immediately necessary for those reasons. See, e.g., Attorney Gen. v. Lindsay, 178 Mich. 524, 145 N.W. 98, 103 (Mich. 1914) ("The determination of the Legislature by giving [the act] immediate effect is not conclusive upon the courts, and they must decide, as a matter of law, whether the act so declared is . . . within this constitutional provision. This is clearly a judicial question.").[10] Likewise, courts should review the Legislature's compliance with the Michigan Constitution's two-thirds vote [*23] requirement to give a bill immediate effect.

> 10    See also People v. Asta, 343 Mich. 507, 72 N.W.2d 282, 287 (Mich. 1955) ("It may fairly be said that the imposition of the specific tax in question and amendment to the act in question have to do with the public peace, health and safety."); Newberry v. Starr, 247 Mich. 404, 225 N.W. 885, 887 (Mich. 1929) ("The act relates to important state agencies having to do with preservation of public health, peace, and safety."); Mich. Taxpayers United, Inc. v. Governor, 236 Mich. App. 372, 600 N.W.2d 401, 403 (Mich. Ct. App. 1999) ("Whether the Legislature properly gave immediate effect to the bill is a

question of law that we review de novo.") (citation omitted).

Second, in the federal system, the Supreme Court has said that courts should review congressional procedural rules to determine if they violate the Constitution. *See, e.g., United States v. Ballin,* 144 U.S. 1, 5, 12 S. Ct. 507, 36 L. Ed. 321 (1892) ("The constitution empowers each house to determine its rules of proceedings. *It may not by its rules ignore constitutional restraints* or violate fundamental rights.") (emphasis added). A contrary rule--that the Legislature's creation of procedural rules is not limited by constitutional restraints--could lead to absurd results. [*24] The Michigan Legislature cannot end the Michigan Constitution's two-thirds requirement by passing a rule saying it will ignore the requirement. To conclude otherwise would effectively allow the Michigan Legislature to unilaterally amend the Michigan Constitution.

[**14] Because the Legislature gave Public Act 4 immediate effect, the bill purportedly became effective on March 16, 2011, after the governor signed it into law. In December 2011, the Emergency Manager gave the orders we review in this case. Those orders modified the retirement plans of over 1000 municipal retirees. But, if the Legislature's attempt to give Public Act 4 immediate effect violated the Michigan Constitution, then Public Act 4 would not have become effective until March 2012, ninety days after the legislative session ended. Consequently, the Emergency Manager would not have possessed the power to modify the employees' retirement plans when he did.

The district court, after conducting additional fact-finding, could conclude that the immediate effect issue resolves the case because the Emergency Manager did not have the power to modify the employees' retirement plans at the time he acted. Because the immediate effect issue [*25] is potentially dispositive and is a state-law ground, we remand to the district court.

### D. Rejection by Referendum

Even if the Michigan Legislature's passage of Public Act 4 with immediate effect did not violate the Michigan Constitution, remand is also warranted to allow the district court to consider whether the voters' November 2012 referendum of Public Act 4 voided the Emergency Manager's actions. After Michigan voters rejected Public Act 4, do actions taken under Public Act 4 continue to have effect?

In an August 6, 2012, opinion (the "Referendum Opinion"), the Michigan Attorney General said that:

> If 2011 PA 4 [Public Act 4] is disapproved by voters pursuant to the power of

referendum under Const 1963, art 2, § 9, *that law will no longer have any effect* and the formerly repealed law, 1990 PA 72 [Public Act 72], is permanently revived upon certification of the November 2012 general election results.

> Once the effect of 2011 PA 4 [Public Act 4], the Local Government and School District Fiscal Accountability Act, MCL 141.1501 et seq., was suspended under Const 1963, art 2, § 9 and MCL 168.477(2), the prior repealed law, 1990 PA 72 [Public Act 72], is revived until certification [**15] of the [*26] November 2012 general election results. Depending on the vote of the electorate, the temporary revival of 1990 PA 72 [Public Act 72] will either cease with the approval of Public Act 4, or become permanent with the Act's disapproval.

2012 Mich. Op. Att'y Gen. No. 7267 (Aug. 6, 2012) (emphasis added). On November 6, 2012, Michigan voters rejected Public Act 4 by a 52-percent to 48-percent margin.

Nevertheless, the effect of the referendum on actions that the Emergency Manager took before the rejection is uncertain. First, Proposal 12-1, the referendum on Public Act 4, does not expressly say what effect referendum rejection would have on past Emergency Manager actions. The referendum text did not specifically say whether a rejection would invalidate past Emergency Manager actions. Moreover, the text accompanying the referendum was merely the full text of Public Act 4. Neither the ballot text nor its accompanying explanatory text stated the effect of rejection on past Emergency Manager actions.

Second, the Michigan Constitution does not say what effect a referendum rejection of Public Act 4 would have. The Michigan Constitution gives voters the power to approve or reject laws enacted by [*27] the Legislature. It provides, in relevant part:

> The people reserve to themselves . . . the power to approve or reject laws enacted by the legislature, called the referendum . . . . The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at

which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

Mich. Const. art. II, § 9.[11]

11 The record of the 1963 constitutional convention is also unhelpful. *See* Secretary of the Convention, State of Michigan Constitutional Convention Official Record 2955-56 (Austin C. Knapp ed., 1962).

[**16] The Michigan Constitution thus merely outlines the referendum process. It does not say what effect a referendum rejection has on action taken under the rejected statute, but before the referendum. [*28] While Michigan Compiled Laws § 168.477(2) says that "a law that is the subject of the referendum continues to be effective until the referendum is properly invoked," § 168.477(2) controls only to suspend operation of the challenged statute until the voters' decide the referendum. Put simply, "properly invoked" more likely describes certification of the referendum for the ballot, and § 168.477(2) does not control after rejection of the statute by the voters. The Michigan Constitution outlines only the procedures for, and not the effect of, referendum.

Third, in Public Act 436, the successor to Public Act 4, the Michigan Legislature arguably expressed doubt about the lawfulness of Emergency Manager action taken before the November 2012 referendum. Specifically, Public Act 436 provides:

All proceedings and actions taken . . . under former 2011 PA 4 [Public Act 4], former 1988 PA 101, or former 1990 PA 72 [Public Act 72] before the effective date of this act are ratified and are enforceable as if the proceedings and actions were taken under this act.

Mich. Comp. Laws § 141.1544. Thus, by making prior Emergency Manager actions taken under Public Act 4 or Public Act 72 enforceable as if they [*29] were taken under Public Act 436, the Legislature seems to have anticipated that courts would find past Emergency Manager actions unlawful.[12] Consequently, it is arguable that even

the Legislature expressed doubt about the lawfulness of past Emergency Manager actions in light of the voters' rejection of Public Act 4.

12 On remand, the district court should also consider whether the Michigan Legislature possesses the power to retroactively immunize its own acts that the voters rejected by referendum. Because of the voters' rejection of Public Act 4 by referendum, and because Public Act 4 is substantially similar to Public Act 436, such a power could infringe on the voters' referendum power under the Michigan Constitution article II, § 9.

Fourth, in state court filings, the Michigan Attorney General has failed to cite to any authority supporting his position that the Emergency Manager's actions under Public Act 4 are valid after the referendum. To the contrary, in his brief to the Michigan [**17] Supreme Court in *Davis v. Emergency Manager for the Detroit Pub. Sch.*, 491 Mich. 899, 810 N.W.2d 555 (Mich. 2012), the Michigan Attorney General says that "the rejection of a law by referendum is *more powerful* than the repeal of a law because *the rejection* [*30] *erases the Legislature's and Governor's original enactment.*" Opposition Brief for Appellee at 16 *Davis v. Emergency Manager for the Detroit Pub. Sch.*, 491 Mich. 899, 810 N.W.2d 555 (Mich. 2012) (No. 146187) (emphasis added).

The Attorney General suggests that the referendum rendered prior Emergency Manager actions void. Yet, in the same brief, the Attorney General also says "[t]he voters' rejection does not render [Public Act 4] void *ab initio* since it was lawfully enacted by the Legislature in the first instance. Thus the disapproval has no effect on lawful actions taken by the emergency managers during the time [Public Act 4] was effective." *Id.* at 21. Despite recognizing that a "referendum is more powerful than a repeal," and despite saying that the referendum "erase[d]" Public Act 4, the Michigan Attorney General seems to argue the inconsistent position that the Emergency Manager's action under Public Act 4 are valid after the referendum. The district court should consider this issue after more specific briefing. Consequently, we remand to the district court so that it can decide if the voters' referendum rendered the Emergency Manager's actions void.

## III. Conclusion

We refuse to rush to decide federal constitutional issues. Because [*31] the immediate effect issue and the referendum issue are state-law grounds on which the Court could decide this case, we vacate and remand to the district court to conduct additional fact-finding and consider these issues.

## DISSENT BY: GRIFFIN

## DISSENT

[**18] GRIFFIN, Circuit Judge, dissenting. The majority remands the case to the district court on the grounds that issues of state law never raised by the parties "could" provide an alternative basis for deciding this case. In doing so, the majority misapplies the constitutional avoidance doctrine, directs the district court to address issues more appropriately left to the Michigan courts, and unjustifiably departs from our well-established principles of appellate review that generally bar this court from deciding issues that are not argued, preserved, or ruled upon by the lower court or tribunal. In my view, only the federal constitutional issues raised by the parties are properly before us. Addressing those issues, I would affirm the district court's judgment because it did not abuse its discretion when it denied the Retired Employees' request for injunctive relief. In addition, I would grant the Michigan Attorney General's motion to intervene. Accordingly, I respectfully [*32] dissent.

I.

In enacting 2011 PA 4, the Michigan Legislature recognized that "the health, safety, and welfare of the citizens of this state would be materially and adversely affected by the insolvency of local governments" and "the fiscal accountability of local governments is vitally necessary . . . to assure the provision of necessary governmental services essential to public health, safety, and welfare." Mich. Comp. Laws § 141.1503. The law permitted the "state to take action and to assist a local government in a condition of financial stress or financial emergency . . . by requiring prudent fiscal management and efficient provision of services, permitting the restructuring of contractual obligations, and prescribing the powers and duties of state and local government officials and emergency managers." Id. It authorized emergency managers ("EMs") to temporarily reject, modify, or terminate existing collective bargaining [**19] agreements ("CBAs") if certain conditions were met. Id. at § 141.1519(1)(k), (k)(iv). It also allowed them to adopt or amend ordinances. Id. at § 141.1519(1)(dd).

The City of Pontiac has experienced difficult economic times and has been operating under an emergency [*33] manager for many years. For the fiscal year ending June 30, 2008, the city budget deficit was $7,007,957; for the fiscal year ending June 30, 2009, the deficit was $5,607,638; and for the fiscal year ending June 30, 2010, the deficit was $4,089,199. For the fiscal year ending June 30, 2011, the budget indicates that there was a surplus of $554,732, but apparently only because the City of Pontiac failed to make certain contributions in excess of $11 million. For the fiscal year ending June 30, 2012, the budget projects a deficit of $8,376,527. For the fiscal year ending June 30, 2013, the budget projects that expenses will exceed revenue by $5,903,485.

For the fiscal year ending June 30, 2013, although a budget surplus is expected from the sale of a wastewater treatment facility, which is to be transferred to Oakland County, the EM believes that declining property taxes and unfunded liabilities continue to create a structural deficit in the city budget. The City of Pontiac's unfunded liability to the General Employees Healthcare System is over $221 million, and its unfunded liability to the Police and Fire System is over $81 million. At present, retiree healthcare is the City of Pontiac's [*34] largest expense. For the fiscal year ending June 30, 2013, it will spend $13.5 million on medical and dental insurance coverage, of which only $1.2 million is for current employees.

Over the years, the City of Pontiac has negotiated numerous CBAs under which it has contracted to provide health insurance coverage for certain municipal retirees. In addition, with regard to non-union retirees, Chapter 92 established a plan and trust "to provide health care and life insurance benefits . . . for the welfare of certain retirees of the city who are eligible to receive a retirement benefit . . . and the spouses and eligible dependents of such retirees through a prefunded group health and insurance benefits plan." The City of Pontiac has also promised certain health insurance benefits by virtue of separation agreements and past practice.

[**20] At issue in this case are the EM's actions, made pursuant to PA 4, to address the City of Pontiac's financial troubles. In a series of orders issued in December 2011, the EM modified CBAs and other agreements in such a way that shifted the cost of prescriptions and insurance co-payments onto retirees. The EM also repealed Chapter 92.

The Retired Employees filed [*35] a class action in federal court, asserting the following federal claims: (1) impairment of contract under the federal constitution; (2) federal preemption in the area of municipal debt reduction; and (3) deprivation of a property interest without due process of law. On these grounds, among others, the Retired Employees asked the district court to enjoin the City of Pontiac from implementing proposed changes to their healthcare benefits and to reinstate their coverage to previous levels.

The district court denied the Retired Employees' request for injunctive relief, and this appeal followed. The issues presented in this case and controversy are limited to whether the Retired Employees are entitled to injunctive relief based on an unconstitutional impairment of contract, preemption under federal bankruptcy law, or

deprivation of a property interest without due process of law.

II.

Rather than address the issues ruled on below and raised by the parties on appeal, the majority contrives "potentially dispositive" state-law grounds for resolving this case, under the guise of "constitutional avoidance." Specifically, the majority questions whether PA 4 was properly given immediate effect and [*36] whether the EM's past actions remain valid in light of the voters' rejection by referendum. Having raised these issues *sua sponte*, the majority directs the district court to address them on remand.

In doing so, the majority misunderstands and misapplies the constitutional avoidance doctrine. As explained in *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346, 56 S. Ct. 466, 80 L. Ed. 688 (1936) (Brandeis, J., concurring), "[t]he Court developed . . . a series of rules under [**21] which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." Among them is the rule against "anticipat[ing] a question of constitutional law in advance of the necessity of deciding it." *Id.* (internal quotation marks omitted). "It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Id.* (internal quotation marks omitted). This avoidance principle does not apply here, first, because the federal constitutional questions raised in this case are not "anticipated." Rather, the issues were ruled on below and are properly presented on appeal. We unquestionably have jurisdiction to "adjudge the legal rights of litigants [*37] in actual controversies." *Liverpool, N.Y. & P. S.S. Co. v. Comm'rs of Emigration*, 113 U.S. 33, 39, 5 S. Ct. 352, 28 L. Ed. 899 (1885).

Second, the constitutional avoidance doctrine presumes that a nonconstitutional ground for resolving the case is properly before the court. *Ashwander*, 297 U.S. at 347 (Brandeis, J., concurring). "The Court will not pass upon a constitutional question although properly presented by the record, if there is also *present* some other ground upon which the case may be disposed of." *Id.* (emphasis added). The majority asserts that we should not allow the litigants to force us into deciding constitutional questions, apparently believing that courts are responsible for framing the issues. This is not so. "[W]e rely on the parties to frame the issues for decision," as "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Greenlaw v. United States*, 554 U.S. 237, 243, 244, 128 S. Ct. 2559, 171 L. Ed. 2d 399 (2008) (internal quotations marks omitted); *accord Carducci v. Regan*, 714 F.2d 171, 177, 230 U.S. App. D.C. 80 (D.C. Cir. 1983) (Scalia, J.) ("The premise of our adversarial system is that appellate courts do not sit as [*38] self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.").

In addition, we should not avoid a constitutional question when its resolution is necessary to dispose of the case. *Ashwander*, 297 U.S. at 347 (Brandeis, J., concurring). Here, the majority concedes that the state issues are merely "potentially dispositive." Although offering an opinion on their resolution, the majority admits that the case cannot [**22] be decided on the basis of state law "because the parties have failed to develop these issues sufficiently for our review." Indeed, the parties have failed to argue or develop them at all.

Just as the majority is incapable of deciding the case on state-law grounds, there is no reason to believe that the district court will be able to do so on remand. The Michigan Constitution provides that "the legislature may give immediate effect to acts by a two-thirds vote of the members elected to and serving in each house." Const. 1963, art. 4, § 27. Significantly, whether the House passes an act and whether it gives it immediate effect are two separate votes. For example, the House passed HB 4246 and [**39] HB 4929 by less than a two-thirds vote, yet two-thirds of the House voted orally in favor of their immediate effect. *Hammel v. Speaker of House of Representatives (Hammel I)*, 297 Mich. App. 641, 825 N.W.2d 616, 619 (Mich. Ct. App. 2012). Thus, the mere fact that the House passed PA 4 short of a two-thirds vote is not reason to doubt the validity of its immediate effect.

In *Hammel I*, the plaintiffs sought to enjoin the immediate effect of HB 4246 and HB 4929, arguing that the Michigan Constitution required a role call vote on the record, but the Michigan Court of Appeals rejected the argument. The court explained that "[a] general challenge to the governing procedures in the House of Representatives is not appropriate for judicial review." *Id.* The court also observed that the House rule allowing motions for immediate effect to be resolved by a rising vote did not conflict with the plain language of § 27, and, in any case, the plaintiffs did not challenge the House rule. *Id.* at 621. According to the court, an injunction was improper because "[t]he constitutional provisions at issue permit the manner in which they are applied to be determined by adoption of the rules of the House, which [the] plaintiffs [*40] concede they do not challenge, and which we do not oversee." *Id.* at 622. The Michigan Supreme [**23] Court denied the plaintiffs' application for leave to appeal. *Hammel v. Speaker of the House of Representatives (Hammel II)*, 493 Mich. 973, 829 N.W.2d 862 (Mich. 2013). Thus, *Hammel I* is the law of Michigan. Contrary to the majority's assertion, I do not

characterize *Hammel II* "as somehow affirming" *Hammel I*. Rather, I characterize *Hammel II* as a denial of leave to appeal, the effect of which leaves *Hammel I* intact. Michigan Court Rule 7.215(J)(1) provides that published decisions of the Michigan Court of Appeals issued on or after November 1, 1990, are precedentially binding on subsequent panels of the Michigan Court of Appeals. Accordingly, *Hammel I* is precedent on this issue until or unless it is overruled by the Michigan Supreme Court.

> 1    The majority is correct that, before 1963, the Michigan courts would scrutinize whether the legislature properly passed a bill with immediate effect. At the time, the state constitution limited the availability of immediate effect to "acts immediately necessary for the preservation of the public peace, health or safety," Mich. Const. 1908, art. 5, § 21, and courts would [*41] review the legislative determination of public necessity, see *Attorney General ex rel. Barbour v. Lindsay*, 178 Mich. 524, 145 N.W. 98, 103 (Mich. 1914). The Michigan Constitution no longer imposes a public necessity requirement. *See* Mich. Const. 1963, art. 4, § 27.

The majority apparently disagrees with the *Hammel I* decision. According to the majority, the reasoning in *Hammel I* on this issue of state law "make[s] little sense." But because "lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments," it is unclear what the majority hopes to be accomplished on remand. *Marks v. Tennessee*, 554 F.3d 619, 622 (6th Cir. 2009) (internal quotation marks omitted). A federal court is bound by a state appellate court's judgment on a question of state law "absent a *strong showing* that the state's highest court would decide the issue differently." *Kirk v. Hanes Corp. of N.C.*, 16 F.3d 705, 707 (6th Cir. 1994) (internal quotation marks omitted); *accord West v. AT&T*, 311 U.S. 223, 237, 61 S. Ct. 179, 85 L. Ed. 139 (1940) (explaining that a federal court lacks authority to disregard a state appellate court's judgment on a question of state law "unless it is convinced . . . that the highest court [*42] of the state would decide otherwise"). Where, as here, "the highest court has refused to review the lower court's decision," the possibility that it will reach a conclusion contrary to that decision at a later date "remains a matter of conjecture." *West*, 311 U.S. at 237-38. Thus, because there does not exist a "strong showing" that the Michigan Supreme Court would reach a contrary conclusion, *Hammel I* is binding on federal courts and, consequently, the federal district court has no basis to question the validity of PA 4's immediate effect on remand.

It is also inappropriate to direct the district court to review whether the rejection by referendum of PA 4

rendered the EM's past actions void. The Michigan courts have [**24] not squarely addressed this issue. The Michigan courts are in a better position to rule on novel questions of Michigan law. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 560 (6th Cir. 2008). It is especially inappropriate for a federal court to rule on an unanswered question of state law *sua sponte*. In *United States National Bank of Oregon v. Independent Insurance Agents of America*, 508 U.S. 439, 446-47, 113 S. Ct. 2173, 124 L. Ed. 2d 402, cited by the majority, the United States Supreme Court approved the [*43] D.C. Circuit's *sua sponte* consideration of an issue of *federal* law, relying on the Article III federal judicial power, which "extend[s] to all Cases . . . arising under . . . the Laws of the United States." Art. III, § 2, cl. 1. However, the decision does not support a federal court's *sua sponte* consideration of novel questions of *state* law, as ordered here. To my knowledge, the majority's chosen action is unprecedented.

The issues created by the majority have not been raised, decided, or preserved. The Retired Employees have never (neither below nor on appeal) argued that PA 4 was improperly given immediate effect or its rejection by referendum rendered the EM's past actions void, thereby forfeiting those issues. Moreover, the Retired Employees expressly waived the latter issue at oral argument.[2] Imprudently, my colleagues have departed from our proper judicial role by becoming advocates in their zeal to create controversies that do not exist.

> 2    Courts frequently confuse the concepts of "waiver" and "forfeiture." Waiver is the intentional relinquishment or abandonment of a known right, whereas forfeiture is the failure to make the timely assertion of a right. *United States v. Olano*, 507 U.S. 725, 733, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993). [*44] Here, there was an express waiver regarding one of the issues and a forfeiture of the other.

"As a general rule, appellate courts do not consider any issue not passed upon below." *In re Morris*, 260 F.3d 654, 663 (6th Cir. 2001). Our cases have developed three circumstances that justify departure from the general rule. *Id.* at 664. Under the exception relied on by the majority, although not passed upon below, this court may address issues presented with sufficient clarity and requiring no factual development where their resolution would promote the finality of litigation in the case. *Id.* Issues are presented with sufficient clarity when "extensively briefed" by both parties. *United States v. Pickett*, 941 F.2d 411, 415 (6th Cir. 1991). Here, the parties never raised the [**25] issues (much less extensively briefed them), and the majority concedes that the issues lack the factual development necessary for their resolu-

tion. More importantly, the resolution of the issues on remand will not serve the interest of finality, because the district court's decision will not be precedentially binding regarding Michigan law. *Doe v. Young Marines of the Marine Corps League*, 277 Mich. App. 391, 745 N.W.2d 168, 172 (Mich. Ct. App. 2007) [*45] ("We are not bound to follow a federal court's interpretation of state law[.]").

The cases relied on by the majority do not involve forfeited or waived issues. *See Dandridge v. Williams*, 397 U.S. 471, 476 n.6, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970); *Burkholder v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Local No. 12*, 299 F. App'x 531, 534 (6th Cir. 2008), *overruled on other grounds by Chapman v. UAW Local 1005*, 670 F.3d 677 (6th Cir. 2012); *City of Mt. Clemens v. EPA*, 917 F.2d 908, 916 n.7 (6th Cir. 1990). Rather, in those cases, the preserved issues raised and argued below were simply not addressed by the lower court. In such situation, "[w]hen attention has been focused on other issues, or when the court from which a case comes has expressed no views on a controlling question," the appellate court may find it appropriate to remand the case for additional factual development and resolution by the lower court. *Dandridge*, 397 U.S. at 476 n.6. But "forfeiture" or "waiver" is not the appropriate term for this occurrence. The majority's reliance on *Dandridge, Burkholder,* and *Mt. Clemens* is therefore misplaced.

In addition to dissenting from the consideration of waived and forfeited issues, [*46] I also respectfully dissent from the majority's order denying the Michigan Attorney General's motion to intervene. In the rare case when *sua sponte* consideration on appeal is proper, interested parties should be provided "ample opportunity to address the issue." *Indep. Ins. Agents of Am.*, 508 U.S. at 448. My colleagues disregard this principle. Having characterized the state-law issues as important and potentially dispositive of the case, the majority paradoxically denies the Attorney General's request to defend the state's position with respect to those issues. They do this despite the Attorney General's statutorily protected right to intervene in any matter in which the people of Michigan [**26] may be interested. *See* Mich. Comp. Laws § 14.28. In my view, allowing intervention on remand provides inadequate recourse to the damage the majority has done already.

III.

Only the federal constitutional issues ruled on below and raised by the parties on appeal are properly before us and therefore should be decided. We review the district court's denial of injunctive relief for an abuse of discretion. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). We review [*47] a district court's underlying legal conclusions de novo and its factual findings for clear error. *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012). Our review is "highly deferential," and we will disturb the district court's determination "only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012) (internal quotation marks omitted).

A district court evaluating a plaintiff's request for injunctive relief considers four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. *Id.* at 615. "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)). [*48] The burdens of production and persuasion fall on the plaintiff. *McNeilly*, 684 F.3d at 615. "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion"; an injunction is an "extraordinary remedy" available only when the circumstances "clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (internal quotation marks omitted).

[**27] A. Likelihood of Success on the Merits

1. Contracts Clause

The district court determined that the Retired Employees failed to show a likelihood of success on the merits of their Contracts Clause claim. It reached this conclusion because they challenged the EM's actions, which it determined did not constitute an exercise of a legislative power, making the Contracts Clause inapplicable. *See New Orleans Waterworks Co. v. La. Sugar Refining Co.*, 125 U.S. 18, 30, 8 S. Ct. 741, 31 L. Ed. 607 (1888) ("The prohibition [against the impairment of contracts] is aimed at the legislative power of the State, and not at the decisions of its courts, or the acts of administrative or executive boards or officers, or the doings of corporations or individuals."); *Ross v. Oregon*, 227 U.S. 150, 162, 33 S. Ct. 220, 57 L. Ed. 458 (1913). [*49] Second, the district court stated that the Retired Employees failed to allege that the state denied them an opportunity to seek recourse through the courts or that the state foreclosed the imposition of an adequate state remedy for an established impairment. *See Crosby v.*

*City of Gastonia*, 635 F.3d 634, 640 (4th Cir. 2011) ("[R]ecourse to § 1983 for the deprivation of rights secured by the Contracts Clause is limited to the discrete instances where a state has denied a citizen the opportunity to seek adjudication through the courts . . . or has foreclosed the imposition of an adequate remedy for an established impairment. Section 1983 provides no basis to complain of an alleged impairment in the first instance.").

The court also indicated that some impairments of contract are constitutional, but this does not appear to be a basis for its conclusion that the Retired Employees' claim was unlikely to succeed. Nonetheless, this court may affirm based on any reason advanced by the City of Pontiac against the issuance of a preliminary injunction that was presented before the district court. *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 349 (6th Cir. 1998). [*50] Therefore, it is appropriate to consider the City of Pontiac's claim that the alleged impairment survives constitutional scrutiny.

[**28] The Contracts Clause provides that "No state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I § 10, cl. 1. The prohibition against impairments of contracts, however, is not absolute. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428, 54 S. Ct. 231, 78 L. Ed. 413 (1934). A claim under the Contracts Clause requires a showing that: "(1) a contract exists, (2) a change in law impairs that contract, and (3) the impairment is substantial." *Mascio v. Pub. Emps. Ret. Sys. of Ohio*, 160 F.3d 310, 313 (6th Cir. 1998) (internal quotation marks omitted). Absent such a showing, there is no constitutional violation.

In this case, it is apparent that the EM impaired the contractual rights of at least some retirees who had been guaranteed various healthcare benefits in CBAs. Indeed, if such contractual rights did not exist or had expired, then seemingly, it would have been unnecessary for the EM to utilize his power under PA 4 to modify the CBAs.

Assuming a contractual impairment, the question becomes whether the impairment is substantial. A court assessing [*51] whether an impairment is substantial considers "the extent to which reasonable expectations under the contract have been disrupted." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006) (internal quotation marks omitted). In *Buffalo Teachers Fed'n*, the Second Circuit determined that a wage freeze worked such a disruption to employees' reasonable expectations to contractually negotiated wage increases that the impairment was substantial. *Id.* Because this case involves a reduction of benefits, as opposed to a freeze of benefits, the impairment here very well may be more

substantial than in *Buffalo Teachers Fed'n*. For this reason, and because defendants do not argue otherwise, a substantial impairment can be presumed.

If the impairment is substantial, to survive constitutional scrutiny, the government must have a legitimate public purpose behind the impairment, and the impairment must be reasonable and necessary to serve that purpose. *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-12, 103 S. Ct. 697, 74 L. Ed. 2d 569 (1983); *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 25, 97 S. Ct. 1505, 52 L. Ed. 2d 92 (1977). "A legitimate public purpose is one aimed [**29] at remedying an important general social or economic problem [*52] rather than providing a benefit to special interests." *Buffalo Teachers Fed'n*, 464 F.3d at 368 (internal quotation marks omitted). An impairment may be considered reasonable and necessary if: (1) impairing the contract was considered on par with other policy alternatives; (2) a more moderate course would not have served the legitimate public purpose equally well; and (3) the impairment was reasonable in light of the surrounding circumstances. *Id.* at 371.

The City of Pontiac argues that impairing the Retired Employees' contractual rights was reasonable and necessary to serve a legitimate public purpose. The City of Pontiac relies on *Buffalo Teachers Fed'n*, where several teachers unions sought to enjoin a wage freeze implemented by the city board pursuant to the Buffalo Fiscal Responsibility Act. *Id.* at 365-66. Pursuant to the Act, the city board froze the wages of union members, despite contractually negotiated wage increases that had been memorialized in CBAs. *Id.* at 366. The district court granted the defendants' motion for summary judgment, concluding as a matter of law that the wage freeze did not violate the Contracts Clause, and the Second Circuit affirmed. *Id.* at 367, 376.

The [*53] Second Circuit determined that the wage freeze was a reasonable and necessary means of addressing the city's fiscal crisis. *Id.* at 368-71. First, the wage freeze was implemented "only after other alternatives had been considered and tried," including a hiring freeze and school closings and layoffs. *Id.* at 371. Second, a temporary wage freeze was moderate relative to the more drastic measure of eliminating more municipal jobs and closing more schools. *Id.* As a further indication of reasonableness, the court considered the temporary and prospective nature of the wage freeze. *Id.* at 372. Finally, although the unions argued that the existence of alternatives made the wage freeze unnecessary, the court declined "to second-guess the wisdom of picking the wage freeze over other policy alternatives, especially those that appear more Draconian, such as further layoffs or elimination of essential services." *Id.* Accordingly, the impairment survived constitutional scrutiny. *Id.*

[**30] Likewise, the EM's efforts to address the City of Pontiac's impending insolvency serve a legitimate public purpose. See *Buffalo Teachers Fed'n, 464 F.3d at 368* (stating that addressing a city's financial problems is a legitimate [*54] public purpose); *see also Sanitation & Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 993 (2d Cir. 1997)* (explaining that a legitimate public purpose is one aimed at remedying an important and general social or economic problem). Further, the modifications to the CBAs were implemented only after the City of Pontiac took other drastic steps to reduce its budgetary problems, including elimination of the police department, emergency dispatch services, animal control services, the vital records department, the fire department, and the near elimination of the department of public works. Because retiree healthcare is the City of Pontiac's largest expense, reducing (but not eliminating) healthcare benefits for retirees appears to be the most effective means to improve its financial troubles. It is improper to second-guess the wisdom of the EM's choice to modify retirees' healthcare benefits over other alternatives such as the elimination of further public services. The modifications thus appear reasonable and necessary. Most significantly, the Retired Employees, who have the burden of showing entitlement to injunctive relief, have made absolutely no argument to the contrary.

The [*55] Retired Employees filed two letters and notices of supplemental authority, but they still fail to explain how the EM's orders were either unreasonable or unnecessary. In *Yurk v. City of Flint*, No. 01-71149-NZ (Genesee Cnty. Cir. Ct. Dec. 11, 2012), the plaintiffs sought to enjoin the implementation of Order No. 13, which modified the terms of a settlement agreement issued by Flint's emergency manager pursuant to PA 4.[3] Critically, the court reasoned that Order No. 13 was not "necessary" to save the local government from bankruptcy because a more moderate course would have served its public purpose just as well--rather than require the plaintiffs to advance a $100 co-payment for name-brand drugs and seek a refund after the fact by jumping through certain hoops, a more moderate course would have been to require the plaintiffs [**31] to pay the $100 co-payment only after they failed to jump through those same hoops. *Id.* at 8. Unlike the plaintiffs in Yurk, the Retired Employees have not advanced a more moderate course.

> 3  Incidentally, Flint's emergency manager issued Order No. 13 during PA 4's operative life. Therefore, the court reasoned, "the referendum defeat of 2011 PA 4 has not rendered Order [*56] No. 13 invalid or moot." *Id.* at 3.

The Retired Employees also point to *Providence Retired Police & Firefighter's Ass'n v. City of Providence*, 2012 R.I. Super. LEXIS 23 (R.I. Super. Ct. Jan. 30, 2012), a case involving the constitutionality of an ordinance requiring retirees to enroll in Medicare as a condition of receiving healthcare benefits, contrary to the terms of their CBAs. Granting the retirees' motion for a preliminary injunction, the court found two indications that the ordinance was unreasonable: (1) Providence was aware of its chronic financial problems when it continuously entered into CBAs guaranteeing healthcare benefits; and (2) the transfer to Medicare was intended to be permanent. 2013 U.S. Dist. LEXIS 45681, [WL] at *52, 56. Many of the CBAs at issue here, however, were entered into long before the City of Pontiac could have anticipated the economic crisis that has set in over the last several years, and it is unclear whether shifting healthcare costs onto retirees is intended to be permanent.

Lastly, the Retired Employees call our attention to *Welch v. Brown*, No. 12-13808, 2013 U.S. Dist. LEXIS 45681, 2013 WL 1292373 (E.D. Mich. Mar. 29, 2013), where the plaintiffs argued that the reduction of their healthcare benefits was [*57] unreasonable and unnecessary, and they suggested more moderate alternatives that would achieve the defendants' stated legitimate public purpose. In this case, however, the Retired Employees have not argued that the reduction of their benefits was unreasonable and unnecessary, and they have not suggested a more moderate course that would address the City of Pontiac's fiscal crisis.

Moreover, in all of the above cases (*Yurk, Providence Retired Police & Firefighter's Ass'n*, and *Welch*), the court ruled on a request for injunctive relief in the first instance. Our judgment as an appellate court is confined by the standard of review. We can reverse only when we are convinced that the district court abused its discretion. That a court *could* reasonably grant a preliminary injunction in the first instance does not make the district court's decision in this case an abuse of discretion. Albeit for different [**32] reasons than relied on below, I would conclude that the district court acted within its discretion when it concluded that the Retired Employees failed to show a likelihood of success on the merits of their Contracts Clause claim. This factor weighs in favor of the City of Pontiac.

## 2. Federal [*58] Preemption

The Retired Employees next allege that the EM's orders are preempted by the Bankruptcy Code, 11 U.S.C. § 903(1), which provides that "a State law prescribing a method of composition [i.e., reduction] of indebtedness of [a] municipality may not bind any creditor that does not consent to such composition." Although the Retired Employees certainly did not consent to the reduction of their healthcare benefits, they fail to offer authority sup-

porting their contention that PA 4 prescribes a "method of composition," and the only authority on point that has been brought to this court's attention suggests the contrary. *See Subway-Surface Supervisors Ass'n v. New York City Transit Auth.*, 44 N.Y.2d 101, 375 N.E.2d 384, 391, 404 N.Y.S.2d 323 (N.Y. 1978) (holding that a wage freeze in violation of a CBA made pursuant to the Financial Emergency Act for the City of New York did not constitute "composition" and, thus, was not preempted by federal bankruptcy law).

This is not a bankruptcy proceeding, and the EM's orders do not purport to discharge any incurred debt. Rather, the EM's orders modify the terms of CBAs, a measure that appears to be an effort to eliminate the incurrence of additional debt. Further, the Supreme [*59] Court "has sustained provisions arguably affecting the bankruptcy power where the state laws were not directly in conflict with the Bankruptcy Act" and has "stress[ed] that the federal municipal Bankruptcy Act is not in any way intended to infringe on the sovereign power of a state to control its political subdivisions." *Ropico, Inc. v. City of New York*, 425 F. Supp. 970, 983 (S.D. N.Y. 1976). Because the Retired Employees' preemption arguments are not well supported, a likelihood of success on the merits at this stage has not been established, and this factor weighs in favor of the City of Pontiac.

[**33] 3. Due Process

Third, the district court determined that the Retired Employees were unlikely to succeed on the merits of their due process claims. To establish a procedural due process claim, a plaintiff must demonstrate that he or she has been deprived of a protected property interest without adequate process. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). "A contract, such as a collective bargaining agreement, may create a property interest." *Leary*, 228 F.3d at 741. Yet it is unclear whether there can be a property interest in lifetime, unchanging healthcare benefits. [*60] *See Bell v. Westmoreland Cent. Sch. Dist.*, No. 87-CV-1592, 1991 U.S. Dist. LEXIS 3063, 1991 WL 33161, *3 (N.D. N.Y. Mar. 11, 1991) (stating that "a constitutionally protected property interest in the continuation of post-retirement health insurance benefits does not exist"); *cf. Lawrence v. Town of Irondequoit*, 246 F. Supp. 2d 150, 158 (W.D. N.Y. 2002) (finding no constitutionally protected property interest where the plaintiffs continued to receive retirement benefits but at a different level).

Further, having reviewed the excerpts of CBAs provided by the Retired Employees, as the district court observed, there is no provision forever entitling retirees to the exact same healthcare benefits. Indeed, such a guarantee would be impractical; as the City of Pontiac asserts, "the insurance provided ten years ago is not even

commercially available." Additionally, in the context of an ERISA claim, this court has stated that "[i]f a welfare benefit has not vested, after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA." *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 578 (6th Cir. 2006) (internal quotation marks omitted). [*61] Because we have not been provided with the CBAs in their entirety, it is difficult to discern the intent of the contracting parties and whether healthcare benefits were guaranteed indefinitely or were instead subject to change. Accordingly, the Retired Employees have failed to carry their burden to demonstrate a likelihood of success on the merits of their due process claim, which tends to weigh in favor of the City of Pontiac.

[**34] B. Irreparable Harm

Turning to the next factor in the preliminary injunction analysis, the district court determined that the Retired Employees failed to show that they would suffer irreparable harm if an injunction were not granted. One way to show irreparable harm is by demonstrating a constitutional violation. *See Overstreet*, 305 F.3d at 578. As explained in detail above, however, the Retired Employees have not shown a reasonable likelihood that their constitutional rights have been violated, a conclusion which tends to weigh against a finding of irreparable harm.

The other source of irreparable harm asserted in this case is the reduction of retiree healthcare benefits. The district court's analysis of this argument is very limited. Although acknowledging that [*62] the EM's orders reduce the Retired Employees' healthcare benefits and force them to pay more out-of-pocket expenses (or forego medical treatment), the court did not consider the harm to be irreparable given that their benefits were not being eliminated entirely. The district court's reasoning is not compelling and overlooks the threat to the Retired Employees' health and safety caused by even a reduction in coverage. A reduction in healthcare benefits is a recognized source of irreparable harm for purposes of a preliminary injunction. *See Golden v. Kelsey-Hayes Co.*, 845 F. Supp. 410, 415 (E.D. Mich. 1994) (stating that "reductions in retiree insurance coverage constitute irreparable harm"); *Hinckley v. Kelsey-Hayes Co.*, 866 F. Supp. 1034, 1044 (E.D. Mich. 1994) (same). With this in mind, but taking into account that a constitutional violation is unlikely, this factor weighs slightly in favor of the Retired Employees.

C. Balance of Equities and Public Interest

Nonetheless, the harm to the Retired Employees must be balanced against the threatened harm to others, and consideration must also be given to the public inter-

est. The district court concluded that issuing an injunction would likely [*63] cause the City of Pontiac's financial troubles to continue, which would likely result in a complete elimination of healthcare benefits for the Retired Employees, further layoffs, and fewer [**35] public services being provided for the benefit of all residents. Given the drastic measures that the City of Pontiac has already taken to address its fiscal crisis, I cannot disagree with the district court's forecast. These factors thus weigh against the Retired Employees. Balancing the four factors together, and given the highly deferential standard of review, I would hold that the district court

did not abuse its discretion when it denied the extraordinary remedy of injunctive relief.

IV.

In my view, the majority improperly remands the case to the district court to address uncontested issues of state law. Instead, I would address the federal constitutional issues raised on appeal and affirm the district court's judgment denying the Retired Employees' request for injunctive relief. In addition, I would grant the Attorney General's motion to intervene. For these reasons, I respectfully dissent.





Analysis
As of: Aug 19, 2013

OSHTEMO CHARTER TOWNSHIP, Plaintiff/Counter-Defendant-Appellant, v
KALAMAZOO COUNTY ROAD COMMISSION,
Defendant/Counter-Plaintiff-Appellee, and ALAMO TOWNSHIP and
KALAMAZOO CHARTER TOWNSHIP, Defendants-Appellees.

No. 304986

COURT OF APPEALS OF MICHIGAN

*2013 Mich. App. LEXIS 1163*

June 25, 2013, Decided

**NOTICE:**

THIS OPINION IS UNCORRECTED AND
SUBJECT TO REVISION BEFORE PUBLICATION IN
THE MICHIGAN COURT OF APPEALS REPORTS.

**PRIOR HISTORY:** [*1]
Kalamazoo Circuit Court. LC No. 2009-000307-CZ.
*Oshtemo Charter Twp. v. Kalamazoo County Rd.
Comm'n, 288 Mich. App. 296, 792 N.W.2d 401, 2010
Mich. App. LEXIS 786 (2010)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff township
appealed an order from the Kalamazoo Circuit Court
(Michigan), which granted summary disposition in favor
of defendants, a county road commission and two
townships, upholding the road commission's decision to
void a truck route ordinance.

**OVERVIEW:** After a township adopted a truck route

ordinance as authorized by *MCL 257.726(1)*, two other
townships challenged the ordinance under *MCL
257.726(3)*. The county road commission determined that
the prohibited routes were primary roads and voided the
ordinance without making any finding that the ordinance
was unreasonable. The court determined that *Const.
1963, art 6, § 28* authorized an appeal because reasonable
control of roads was a specifically reserved constitutional
right of local governments. Both townships and county
road commissions had reasonable control of highways, as
provided in *Const 1963, art 7, §§ 16, 29*. The truck route
ordinance did not conflict with state law under *Const
1963, art 7, § 22* because the ordinance did not directly
conflict with *MCL 257.726* and did not conflict with a
validly promulgated rule of an administrative agency.
Local road commissions had no authority to promulgate
rules. The court concluded that *MCL 257.726(3)*, as
applied to a reasonable township traffic control
ordinance, was unconstitutional because it contravened
the grant of authority in *Const 1963, art 7, § 29* allowing
municipalities to adopt local traffic regulations.

**OUTCOME:** The court reversed and remanded for entry of summary disposition in favor of the township that had enacted the truck route ordinance.

**CORE TERMS:** township's, ordinance, state law, traffic control, route, void, truck, county road, street, traffic, highway, delegation, promulgate, reasonable control, adjoining, approve, abuse of discretion, conflicted, voided, agency's decision, judicial review, de novo, private rights, enact, local governments, administrative agency, preliminary injunction, written objection, legislative authority, municipalities

**LexisNexis(R) Headnotes**

*Governments > Local Governments > Duties & Powers*
*Transportation Law > Commercial Vehicles > Traffic Regulation*
[HN1] *Const 1963, art 7, § 29* reserves to counties, townships, and other local governments the right to reasonable control of the traffic within their boundaries.

*Governments > Local Governments > Duties & Powers*
*Governments > Local Governments > Ordinances & Regulations*
*Transportation Law > Commercial Vehicles > Traffic Regulation*
[HN2] In *MCL 257.726(1)*, the Michigan Legislature has provided that townships may adopt truck route ordinances.

*Civil Procedure > Declaratory Judgment Actions > State Judgments > Appellate Review*
*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Summary Judgment > Partial Summary Judgments*
[HN3] An appellate court reviews de novo a trial court's decision to grant or deny a motion for summary disposition in an action for a declaratory judgment.

*Civil Procedure > Summary Judgment > Partial Summary Judgments*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN4] A party is entitled to summary disposition under

*MCR 2.116(C)(10)* if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN5] An appellate court reviews de novo issues of constitutional law.

*Administrative Law > Judicial Review > Reviewability > General Overview*
[HN6] See *Const. 1963, art 6, § 28.*

*Governments > Local Governments > Claims By & Against*
[HN7] A private right is a personal right, as opposed to the right of the public or the state. Local governments may protect their specifically reserved constitutional rights on behalf of the public they represent.

*Administrative Law > Judicial Review > Standards of Review > General Overview*
[HN8] When an agency makes a decision without a contested case hearing, the trial court must review the agency's or officer's decision to determine whether the decision was authorized by law. *Const. 1963, art 6, § 28.* An agency's decision is not authorized by law if it violates a statute or constitution, exceeds the statutory authority or jurisdiction of the agency, is made after unlawful procedures that result in material prejudice, or is arbitrary and capricious. Courts--including trial courts reviewing an agency's decision--review de novo issues of constitutional law and statutory construction.

*Administrative Law > Separation of Powers > Legislative Controls > General Overview*
*Governments > Local Governments > Administrative Boards*
*Governments > Local Governments > Duties & Powers*
[HN9] Agencies--such as county road commissions--do not have any inherent authority. An agency is limited in power and authority by its statutory enactment. Agencies are only allowed the powers that the Legislature chooses to delegate to them through statute. Somewhat similarly, townships possess only those powers that are expressly granted by or fairly implied from the Michigan Constitution or actions of the Legislature.

*Governments > Local Governments > Duties & Powers*
*Transportation Law > Commercial Vehicles > Traffic*
*Regulation*
[HN10] See *Const 1963, art 7, § 29.*

*Governments > Local Governments > Administrative*
*Boards*
*Governments > Local Governments > Duties & Powers*
*Transportation Law > Commercial Vehicles > Traffic*
*Regulation*
[HN11] Both townships and county road commissions have constitutional authority for reasonable control of highways. *Const 1963, art 7, §§ 16, 29.* Thus, neither has exclusive control. For some purposes, jurisdiction over its streets and roads remains with the township. For instance, a township does not need to obtain consent from a county road commission to enact an ordinance regulating truck traffic in the township. However, if several townships each designate noncontiguous routes a chaotic patchwork will ensue that may render certain township ordinances unreasonable.

*Governments > Local Governments > Administrative*
*Boards*
*Transportation Law > Commercial Vehicles > Traffic*
*Regulation*
[HN12] See *MCL 257.726(3).*

*Governments > Local Governments > Home Rule*
*Governments > Local Governments > Ordinances &*
*Regulations*
*Governments > State & Territorial Governments >*
*Relations With Governments*
[HN13] Michigan is strongly committed to the concept of home rule, and constitutional and statutory provisions which grant power to municipalities are to be liberally construed. But *Const 1963, art 7, § 29*--which reserves certain authority to local governments--is explicitly subject to other constitutional provisions, including *Const 1963, art 7, § 22. Const 1963, art 7, § 22* empowers cities and villages to adopt resolutions and ordinances relating to its municipal concerns, property and government, subject to the constitution and law. The Michigan Supreme Court has interpreted this constitutional grant of authority to mean that a township retains control of its highways and may pass ordinances related to them, as long as those ordinances do not contravene the state laws. Thus, a local government may exercise reasonable

control to regulate matters of local concern, but only in a manner and to the degree that the regulation does not conflict with state law. *Const 1963, art 7, § 29* only empowers a township to enact an ordinance that does not conflict with state law.

*Governments > Local Governments > Ordinances &*
*Regulations*
*Governments > State & Territorial Governments >*
*Relations With Governments*
[HN14] An ordinance may conflict with state law in several fashions--by conflicting with a provision directly, or by conflicting with an agency's interpretation of state law. Obviously, an ordinance conflicts with state law when it directly conflicts with a statute. An ordinance also conflicts with state law if it conflicts with a validly promulgated rule of an administrative agency.

*Administrative Law > Agency Rulemaking > State*
*Proceedings*
*Governments > Local Governments > Administrative*
*Boards*
*Transportation Law > Commercial Vehicles > Traffic*
*Regulation*
[HN15] The Legislature has not conferred the authority to promulgate rules on local road commissions. And *MCL 257.726* does not itself grant county road commissions the authority to promulgate rules to enforce its provisions.

*Governments > Local Governments > Administrative*
*Boards*
*Governments > Local Governments > Duties & Powers*
*Transportation Law > Commercial Vehicles > Traffic*
*Regulation*
[HN16] *MCL 257.726(3)* is unconstitutional as applied to a reasonable township traffic control ordinance because the authority that it purports to grant to county road commissions conflicts with *Const 1963, art 7, § 29.*

*Constitutional Law > The Judiciary > Case or*
*Controversy > Constitutionality of Legislation >*
*General Overview*
*Constitutional Law > State Constitutional Operation*
[HN17] When a statute contravenes the provisions of the Michigan Constitution it is unconstitutional and void. The Legislature's authority does not extend to eradicating

constitutional guarantees.

*Governments > Local Governments > Home Rule
Governments > State & Territorial Governments >
Relations With Governments
Transportation Law > Commercial Vehicles > Traffic
Regulation*
[HN18] The Legislature exceeds its authority when it
attempts to prevent municipalities from adopting traffic
regulations, as explicitly authorized by the Michigan
Constitution, when such an attempt does not conflict with
state law.

*Administrative Law > Separation of Powers >
Legislative Controls > General Overview*
[HN19] The Legislature may delegate to an
administrative body the power to make rules and decide
particular cases. Delegations of legislative authority
include delegations of rulemaking authority and referral
statutes, which allow an agency to determine whether a
fact has occurred that triggers the statute's operation. But
in such delegations, a complete lack of standards is
constitutionally impermissible.

**JUDGES:** Before: SERVITTO, P.J., and WHITBECK
and SHAPIRO, JJ.

**OPINION**

PER CURIAM.

Plaintiff Oshtemo Charter Township (Oshtemo
Township) appeals as of right the circuit court's order
granting summary disposition under *MCR 2.116(C)(10)*
in favor of defendants Kalamazoo County Road
Commission (the Road Commission), Alamo Township
(Alamo Township), and Kalamazoo Charter Township
(Kalamazoo Township) on Oshtemo Township's claim
that the Road Commission's decision to void an Oshtemo
Township truck route ordinance under the authority of
*MCL 257.726(3)* was invalid. We reverse and remand.

I. OVERVIEW

[HN1] *Article 7, § 29 of the Michigan Constitution*
reserves to counties, townships, and other local
governments the right to reasonable control of the traffic
within their boundaries. [HN2] In *MCL 257.726(1)*, the
Michigan Legislature has provided that townships may
adopt truck route ordinances, and in *MCL 257.726(3)*, the

Legislature has purported to grant local road
commissions the authority to "void or approve" such
ordinances.

We conclude that a township does not have the
authority to adopt any ordinance that conflicts with state
law. An ordinance can conflict with state law by
conflicting [*2] with the rules of an administrative
agency. But county road commissions, despite being
administrative agencies, do not have the authority to
promulgate rules. A truck route ordinance does not
conflict with state law either directly or through the
operation of an administrative agency under *MCL
257.726(3)*. Because a reasonable truck route ordinance
does not conflict with state law, a township has the
authority to adopt one.

We also conclude that the Legislature may not
override a power provided in the Constitution. Therefore,
to the extent *MCL 257.726(3)* allows a county road
commission to void a traffic control ordinance without
demonstrating that the ordinance is unreasonable, it
conflicts with the Michigan Constitution's grant of the
power to townships to adopt reasonable traffic control
ordinances, and is unconstitutional as applied.

The Road Commission only has the authority to void
an unreasonable traffic control ordinance. Because the
Road Commission did not determine that the ordinance
was unreasonable, the Road Commission's decision was
contrary to the Michigan Constitution, and thus it was not
authorized by law. Because the trial court improperly
determined that the decision [*3] was authorized by law,
we must reverse and remand.

II. FACTS

A. OSHTEMO TOWNSHIP'S TRUCK ROUTE
ORDINANCE

*MCL 257.726(1)* allows local authorities to pass an
ordinance that prohibits trucks on specified routes. In
March 2007, Oshtemo Township passed its Truck Route
Ordinance, which prohibited heavy trucks from traveling
on (1) 10th Street between both G and H Avenues, (2)
10th Street between West Main Street and G Avenue, (3)
9th Street between West Main Street and H Avenue, and
(4) H Avenue between 9th Street and Drake Road
(collectively, the prohibited routes).[1] The prohibited
routes are all county primary roads.

1 Oshtemo Township Ordinance, §§ 153.005 and 153.006.

## B. OBJECTIONS TO THE TRUCK ROUTE ORDINANCE

The Legislature amended *MCL 257.726*, adding *subdivision (3)*, which became effective on January 13, 2009.[2] *MCL 257.726(3)* allows a township to make an objection to an adjoining township's truck route ordinance, and provides that the county road commission will resolve the objection if the townships fail to resolve it.[3] In February 2009, Kalamazoo Township and Alamo Township challenged Oshtemo Township's truck route ordinance.

2  539 PA 2008.
3  *MCL 257.726(3).*

On May 21, 2009, after the parties [*4] failed to resolve the dispute, the Road Commission determined that the prohibited routes were primary roads and voided the ordinance. On June 4, 2009, Oshtemo Township filed in circuit court a claim of appeal and complaint for a preliminary injunction and declaratory relief against the Road Commission, Alamo Township, and Kalamazoo Township. Oshtemo Township asserted in pertinent part that (1) *MCL 257.726(3)* did not apply to the ordinance, (2) *MCL 257.726(3)* conflicts with *Const 1963, art 7, § 22* and, because Oshtemo Township's ordinance was reasonable, the Road Commission improperly voided it, (3) *MCL 257.726(3)* unlawfully delegates authority to the Road Commission, and (4) *MCL 257.726(3)* does not contain adequate governing standards.

In June 2009, the trial court granted Oshtemo Township's request for a preliminary injunction on the basis that *MCL 257.726(3)* did not apply to the prohibited routes because there were no truck routes designated under the statute to which *MCL 257.726(3)* referred. In April 2010, this Court determined that the mistaken reference was a scrivener's error, and remanded the case to the circuit court for further consideration.[4]

4  *Oshtemo Charter Twp v Kalamazoo Co Rd Comm, 288 Mich App 296; 792 NW2d 401 (2010).*

## C. [*5] OSHTEMO TOWNSHIP'S TRAFFIC CONTROL ORDER

On March 9, 2010, while this Court's decision concerning the preliminary injunction was pending, Oshtemo Township appointed James J. Valenta as its Traffic Engineer pursuant to the Michigan State Police's Uniform Traffic Code, which Oshtemo Township had adopted in September 2003. Valenta issued a traffic control order on April 13, 2010 under Rule 28.1151 of the Uniform Traffic Code. The traffic control order contained a truck route map, designated specific roadways as truck routes, and prohibited commercial truck traffic from "all other roadways in the township." On April 13, 2010, Oshtemo Township confirmed the traffic control order.

Kalamazoo Township and Alamo Township challenged the traffic control order on the same grounds that they had challenged the ordinance, and argued that the resolution voiding the ordinance also voided the traffic control order.

## D. THE TRIAL COURT'S RULINGS

After this Court's remand, the Road Commission renewed its motion for summary disposition. In April 2011, the trial court heard arguments concerning the validity of the traffic control order. The trial court determined that the traffic control order fell within the [*6] purview of *MCL 257.726*, and determined that *MCL 257.726(3)* gave the Road Commission the authority to resolve any conflict of "respective rights and responsibilities of the various townships in relation to one another as to the appropriateness of particular traffic patterns." The trial court determined that the Road Commission's previous determination to void the ordinance also voided the traffic control order. The trial court ultimately concluded that *MCL 257.726(3)* was constitutional, and granted summary disposition in the Road Commission's favor concerning the traffic control order.

The trial court heard arguments on April 18, 2011, concerning the Road Commission's decision to void the ordinance. The Road Commission contended that the "shall be final" language of *MCL 257.726(3)* precluded judicial review of its decision or, in the alternative, that the trial court could only review the decision for an abuse of discretion. Oshtemo Township argued that the trial court must at the least determine whether the Road Commission's decision was reasonable and whether it was authorized by law. Oshtemo Township argued that under these standards, the decision by the Road

Commission conflicted [*7] with the Michigan Constitution's protection of a township's reasonable control over its roads, and that the burden was on the Road Commission to show that Oshtemo Township's decision was unreasonable.

The trial court found that *MCL 257.726(3)* was constitutional, and that the Road Commission was authorized to review and void the truck route ordinance. It determined that the statute "in essence[] provide[s] the County Road Commission with the authority to arbitrate the dispute." It opined that it must review the Road Commission's decision to void Oshtemo Township's ordinance for an abuse of discretion, and found that the Road Commission did not abuse its discretion when it voided Oshtemo Township's ordinance. Accordingly, the trial court granted summary disposition on the majority of Oshtemo Township's claims. On June 22, 2010, the parties dismissed Oshtemo Township's remaining claim by stipulation. Oshtemo Township now appeals.

## III. STANDARDS OF REVIEW

[HN3] This Court reviews de novo the trial court's decision to grant or deny a motion for summary disposition in an action for a declaratory judgment.[5] [HN4] A party is entitled to summary disposition under *MCR 2.116(C)(10)* if "there is no genuine issue [*8] as to any material fact, and the moving party is entitled to judgment . . . as a matter of law."[6] [HN5] This Court reviews de novo issues of constitutional law.[7]

> 5   *Lansing Sch Ed Ass'n v Lansing Bd of Educ (On Remand), 293 Mich App 506, 512-513; 810 NW2d 95 (2011).*
> 6   *MCR 2.116(C)(10); Maiden v Rozwood, 461 Mich 109, 120; 597 NW2d 817 (1999).*
> 7   *Harvey v Michigan, 469 Mich 1, 6; 664 N.W.2d 767 (2003).*

## IV. THE TRIAL COURT'S REVIEW

### A. OSHTEMO TOWNSHIP'S RIGHT TO JUDICIAL REVIEW

*Article 6, Section 28 of the Michigan Constitution* provides that

> [HN6] [a]ll final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law . . .

Alamo Township contends that Oshtemo Township has no right to claim an appeal under this constitutional provision because Oshtemo Township, as a public entity, has no "private rights or licenses." [HN7] A private right is "a personal right, as opposed to the [*9] right of the public or the state."[8] Local governments may protect their specifically reserved constitutional rights on behalf of the public they represent.[9] As we will discuss, the Michigan Constitution has reserved to local governments the specific right at issue in this appeal--reasonable control of roads. We reject Alamo Township's argument that Oshtemo Township had no private right for the Road Commission's decision to affect solely by virtue of its status as a public entity.

> 8   *Midland Cogeneration Venture LP v Naftaly, 489 Mich 83, 93; 803 NW2d 674 (2011),* quoting Black's Law Dictionary (8th ed).
> 9   See, e.g., *Oakland Co v State, 456 Mich. 144, 167; 566 N.W.2d 616 (1997)* (concerning standing).

### B. LEGAL STANDARDS OF THE TRIAL COURT'S REVIEW

[HN8] When an agency makes a decision without a contested case hearing, the trial court must review the agency's or officer's decision to determine whether the decision was authorized by law.[10] An agency's decision is not authorized by law if it violates a statute or constitution, exceeds the statutory authority or jurisdiction of the agency, is made after unlawful procedures that result in material prejudice, or is arbitrary and capricious.[11] Courts--including [*10] trial courts reviewing an agency's decision--review de novo issues of constitutional law and statutory construction.[12]

> 10   *Const 1963, art 6, § 28; Ross v Blue Care Network of Mich, 480 Mich 153, 164; 747 NW2d 828 (2008).*
> 11   *Northwestern Nat'l Cas Co v Comm'r of Ins,*

*231 Mich App 483, 488; 586 NW2d 563 (1998).*
12   *City of Taylor v Detroit Edison Co, 475 Mich 109, 115; 715 NW2d 28 (2006); In re Complaint of Rovas Against SBC Mich, 482 Mich 90, 102; 754 NW2d 259 (2008).*

## C. APPLYING THE STANDARDS

To the extent that the trial court determined that it could review the Road Commission's decision to void the statute for an abuse of discretion, it may have erred. The Road Commission did not hold a contested case hearing, and *MCL 257.726* does not require one. Thus, the trial court should only have determined whether its decision was authorized by law. However, the trial court's misapplication of an incorrect standard, when the case hinges on whether the agency's decision was authorized by law, may be a harmless error.

Here, Oshtemo Township filed both a claim of appeal and an action for a declaratory judgment. The trial court found that the Road Commission was not barred from making its determination by [*11] *Article 7, § 29 of the Michigan Constitution of 1963*, and that its action was authorized by *MCL 257.726(3)*, that its decision was not arbitrary and capricious, and that it did not act with bias. The trial court indicated that it was taking its guidance from other cases, which clearly indicate that the trial court reviews these issues under a de novo standard. We are not convinced that the trial court applied an improperly deferential standard--much less an abuse of discretion standard--to its determination that the agency's decision was authorized by law. In any event, we conclude that any error in the trial court's misapplication of an "abuse of discretion" standard to the Road Commission's decision to void Oshtemo Township's statute was harmless.

## V. *MCL 257.726(3)* CONFLICTS WITH *CONST 1963, ART 7, § 22*

### A. LEGAL BACKGROUND

[HN9]    Agencies--such as county road commissions--do not have any inherent authority. An agency is limited in power and authority by its statutory enactment.[13] Agencies "are only allowed the powers that the Legislature chooses to delegate to them through statute."[14]

13   *People v Idziak, 484 Mich 549, 584; 773*

*NW2d 616 (2009).*
14   *Herrick Dist Library v Library of Mich, 293 Mich App 571, 582; 810 NW2d 110 (2011).*

Somewhat [*12] similarly, townships possess only those powers that are expressly granted by or fairly implied from the Michigan Constitution or actions of the Legislature.[15] Local control over roads is one of the powers that the Michigan Constitution specifically grants to townships,[16] as *Const 1963, art 7, § 29* provides:

> [HN10] Except as otherwise provided in this constitution the right of all counties, townships, cities and villages to the reasonable control of their highways, streets, alleys and public places is hereby reserved to such local units of government.

[HN11] Both townships and county road commissions have constitutional authority to reasonable control of highways.[17] Thus, neither has exclusive control.[18] "[F]or some purposes, jurisdiction over its streets and roads remain[s] with the township."[19] For instance, a township does not need to obtain consent from a county road commission to enact an ordinance regulating truck traffic in the township.[20]

15   *Hanselman v. Killeen, 419 Mich. 168, 187; 351 N.W.2d 544 (1984); City of Taylor, 475 Mich at 115.*
16   *City of Taylor, 475 Mich at 116.*
17   *Const 1963, art 7, § 29; Const 1963, art 7, § 16;* see *Turner v Washtenaw Co Rd Comm, 437 Mich. 35, 36; 467 N.W.2d 4 (1991).*
18   See [*13] *Robinson Twp v Ottawa Co Bd of Co Rd Comm'rs, 114 Mich. App. 405, 411-412; 319 N.W.2d 589 (1982).*
19   *Id. at 412.*
20   *Id. at 414.*

However, this Court has recognized that "if several townships each designate noncontiguous routes a 'chaotic patchwork' will ensue" that may render certain township ordinances unreasonable.[21] The Legislature has granted Road Commissions the following authority in *MCL 257.726(3)*:

> [HN12] If a township has established any prohibition or limitation under [*MCL*

257.726(1)] on any county primary road that an adjoining township determines diverts traffic onto a border highway or street shared by the township and the adjoining township, the adjoining township may submit a written objection to the county road commission having jurisdiction over the county primary road, along with a copy to the township that established the prohibition or limitation, on or before the later of March 1, 2009, or 60 days after the township approves the prohibition or limitation. The written objection shall explain how the prohibition or limitation diverts traffic onto the border highway or street shared by the township and the adjoining township. The county road commission shall then investigate the objection. [*14] The township and adjoining township shall cooperate with that investigation and negotiate in good faith to resolve the objection. If the objection is not resolved within 60 days after the township receives the copy of the written objection, the county road commission has the authority to, and shall, either approve or void the prohibition or limitation that is the subject of the objection within 60 days thereafter, which decision shall be final. For purposes of this subsection, "county primary road" means a highway or street designated as a county primary road pursuant to 1951 PA 51, *MCL 247.6[5]1 to 247.6[5]5*.[22]

21  *Id. at 414-415.*
22  See *Oshtemo Charter Twp, 288 Mich App at 304.*

B. APPLICATION

1. THE PARTIES' CONTENTIONS

Alamo Township contends that the Legislature appears to have designed this statute to address a concern over the potential "chaotic patchwork" problem that this Court recognized in *Robinson*. Oshtemo Township contends that the Legislature's attempt to address the problem, as written, conflicts with *Const 1963, art 7, §*

29, and because the Michigan Legislature cannot override the Michigan Constitution, the Road Commission's decision to void Oshtemo Township's ordinance under [*15] that statutory provision was not authorized by law.

Kalamazoo Township contends in its brief on appeal that the Road Commission's decision properly overrides Oshtemo Township's ordinance because the ordinance--after the Road Commission's decision--is contrary to state law. However, Kalamazoo Township conceded at oral argument that the ordinance is not contrary to state law. Because of the importance of this issue to Oshtemo Township's authority to enact its ordinance, we will briefly explain why Oshtemo Township's ordinance does not conflict with state law.

2. ORDINANCES MUST COMPLY WITH STATE LAW

[HN13] "Michigan is strongly committed to the concept of home rule, and constitutional and statutory provisions which grant power to municipalities are to be liberally construed."[23] But *Const 1963, art 7, § 29*--which reserves certain authority to local governments-is explicitly subject to other constitutional provisions, including *Const 1963, art 7, § 22*.[24] *Const 1963, art 7, § 22* "empowers cities and villages 'to adopt resolutions and ordinances relating to its municipal concerns, property and government, *subject to the constitution and law*.'"[25] The Michigan Supreme Court has interpreted this constitutional [*16] grant of authority to mean that a township retains control of its highways and may pass ordinances related to them, as long as those ordinances "do not contravene the State laws."[26] Thus, a local government may "exercise 'reasonable control' to regulate matters of local concern, but only in a manner and to the degree that the regulation does not conflict with state law."[27]

23  *Bivens v Grand Rapids, 443 Mich 391, 400; 505 NW2d 239 (1993).*
24  *City of Taylor, 475 Mich at 116.*
25  *Id.,* quoting *Const 1963, art 7, § 22* (emphasis in original).
26  *Fenton Gravel Co v Fenton, 371 Mich 358, 362; 123 NW2d 763 (1963),* quoting *People v McGraw, 184 Mich 233, 238; 150 NW 836 (1915).*
27  *City of Taylor, 475 Mich at 117-118.*

*Const 1963, art 7, § 29* only empowers a township to

enact an ordinance that does not conflict with state law. Therefore, if Oshtemo Township's ordinance conflicts state law, then Oshtemo Township simply does not have authority to enact its ordinance.

### 3. OSHTEMO TOWNSHIP'S ORDINANCE DOES NOT CONFLICT WITH STATE LAW

[HN14] An ordinance may conflict with state law in several fashions. Pertinent to this case, Oshtemo Township's ordinance could conflict with state law by conflicting with *MCL 257.726(3)* directly, [*17] or by conflicting with an agency's interpretation of state law. We conclude that Oshtemo Township's ordinance does not conflict with state law in either of these two fashions.

Obviously, an ordinance conflicts with state law when it directly conflicts with a statute.[28] Here, Oshtemo Township's ordinance does not directly conflict with *MCL 257.726*, as *subdivision (1)* directly allows Oshtemo Township to pass an ordinance regulating truck routes. Nor does it conflict with *subdivision (3)* simply by existing, as *subdivision (3)* provides that an ordinance may be valid or may be void.

> 28  *Fenton Gravel Co, 371 Mich at 363.*

An ordinance also conflicts with state law if it conflicts with a validly promulgated rule of an administrative agency.[29] In *City of Taylor v Detroit Edison Co*, for example, the Legislature granted the Michigan Public Service Commission authority to promulgate rules to enforce, among other things, the placement of utility wires.[30] The Public Service Commission promulgated rules that possibly conflicted with the City of Taylor's preexisting ordinance.[31] The Public Service Commission argued that the City of Taylor's ordinance was required to yield to the Public Service Commission's [*18] rules if they indeed conflicted.[32]

> 29  See *City of Taylor, 475 Mich at 123-124.*
> 30  *Id. at 118.*
> 31  31 *Id.*
> 32  *Id. at 119.*

The Michigan Supreme Court held that, to the extent that the Taylor ordinance conflicted with the Public Service Commission's rules, the ordinance might not be valid because it conflicted with state law.[33] In reaching its decision, the Court stated that the cases supporting the

City of Taylor's position "were decided before the MPSC's promulgation of rules regarding the underground relocation of wires. Thus, there was no state law for the municipal action to conflict with."[34] The Michigan Supreme Court's decision in *City of Taylor* clearly hinged on the Public Service Commission's authority, delegated to it by the Legislature, to promulgate rules that then became state law.

> 33  *Id. at 123-124.*
> 34  *Id. at 119.*

Here, [HN15] the Legislature has *not* conferred the authority to promulgate rules on local road commissions. In arguing that Oshtemo Township has no right to judicial review, Alamo Township asserts in its brief on appeal that the Road Commission "is not a 'state board, commission or agency' authorized under the laws of this State to promulgate rules from which an appeal or other judicial [*19] review has not otherwise been provided by law . . . . [The Road Commission] is certainly not . . . authorized to promulgate rules . . . ." And *MCL 257.726* does not itself grant county road commissions the authority to promulgate rules to enforce its provisions.

We conclude that Oshtemo Township's ordinance does not conflict with state law, either directly or by conflicting with an agency's interpretation of state law.

### 4. *MCL 257.726(3)* IS UNCONSTITUTIONAL AS APPLIED

We conclude that [HN16] *MCL 257.726(3)* is unconstitutional as applied to a reasonable township traffic control ordinance because the authority that it purports to grant to county road commissions conflicts with *Article 7, § 29 of the Michigan Constitution.* As this Court has recently recognized, [HN17] "when a statute contravenes the provisions of the state constitution it is unconstitutional and void."[35] The Legislature's authority does not extend to eradicating constitutional guarantees.[36]

> 35  *AFSCME Council 25 v State Employees Retirement Sys, 294 Mich App 1, 15; 818 NW2d 337 (2011).*
> 36  See *Midland Cogeneration Venture LP, 489 Mich at 94.*

The Michigan Supreme Court has held that [HN18] the Legislature exceeds its authority when it attempts to

prevent [*20] municipalities from adopting traffic regulations, as explicitly authorized by the Michigan Constitution, when such an attempt does not conflict with state law.[37] In *City of Dearborn v Sugden & Sivier, Inc,* the Legislature passed a statute, 1949 PA 300, which provided that local authorities could establish limitations on highways "except State trunk-line highways."[38] After the plaintiff was ticketed for an excessive axle load, it challenged the ordinance, arguing that Dearborn inappropriately placed a weight limit on a trunk-line highway.[39] Noting that the reasonableness of the ordinance was not at issue and that "[i]t does not assume to authorize conduct by those using its streets and highways of a character forbidden by general State law," the Court held that "the Legislature exceeded its authority in undertaking to prevent municipalities from adopting such an ordinance."[40]

> 37  See *City of Dearborn v Sugden & Sivier, Inc,* 343 Mich 257; 72 NW2d 185 (1955).
> 38  *Id.* at 259, quoting 1949 PA 300.
> 39  *Id.* at 259-260.
> 40  *Id.* at 265-267.

We conclude that the Legislature has exceeded its authority to the extent that it has purported to grant a county road commission the authority to void a township's [*21] reasonable traffic control ordinance. At the very least, the road commission must determine that the township's ordinance is unreasonable. Here, despite that the Townships offered evidence concerning the reasonableness of the ordinance before the Road Commission, it did not determine that the ordinance was unreasonable when it resolved to void it. And when before the trial court, the Road Commission, Kalamazoo Township, and Alamo Township did not even attempt to demonstrate that Oshtemo Township's traffic control ordinance is unreasonable. Thus, we conclude that *MCL 257.726(3)* is unconstitutional as applied to a reasonable township traffic control ordinance.

## VI. DELEGATION OF LEGISLATIVE AUTHORITY

Finally, we need not reach the merits of Oshtemo Township's argument concerning the validity of the Legislature's delegation of authority because of our previous conclusion. But we do note that if the road commission's decision to "void or approve" an ordinance was not limited to voiding those ordinances that are unreasonable, the complete lack of standards contained in the statute would very likely render it a constitutionally

deficient delegation of authority. [HN19] The Legislature "may delegate [*22] to an administrative body the power to make rules and decide particular cases . . . ."[41] Delegations of legislative authority include delegations of rulemaking authority and "referral statute[s]," which allow an agency to determine whether a fact has occurred that triggers the statute's operation.[42] But in such delegations, "[a] complete lack of standards is constitutionally impermissible."[43]

> 41  *Herrick Dist Library,* 293 Mich App at 580, quoting *West Virginia ex rel Dyer v Sims,* 341 U.S. 22, 30; 71 S. Ct. 557; 95 L. Ed. 713, 62 Ohio Law Abs. 584 (1951).
> 42  *Taylor v Gate Pharmaceuticals,* 468 Mich. 1, 10; 658 N.W.2d 127 (2002); *In re Complaint of Rovas Against SBC Mich,* 482 Mich at 101.
> 43  *Blue Cross & Blue Shield of Mich v Governor,* 422 Mich 1, 55; 367 NW2d 1 (1985).

In terms of a delegation of legislative authority, *MCL 257.726(3)* rests on very unsteady ground. In *Blue Cross & Blue Shield of Mich v Governor,* the Michigan Supreme Court held that the Legislature's instruction to the Insurance Commission to "either approve or disapprove" risk factors proposed by health care corporations, without any guiding standards, was not a constitutionally permissible delegation of Legislative authority.

This case is extremely similar [*23] to *Blue Cross & Blue Shield of Mich.* Here, *MCL 257.726* contains neither factors for the road commission to consider when determining whether to "approve or void" an ordinance nor guiding standards, even in the form of a generalized statement of public policy. Thus, even if *MCL 257.726(3)* did not conflict with *Const 1963, art 7, § 22* as applied to a reasonable traffic control ordinance, we are extremely skeptical that it would pass constitutional muster as, on its face, it would appear to confer unlimited discretion, without guiding standards, on county road commissions.

## VII. CONCLUSION

We conclude that *MCL 257.726(3)* conflicts with *Const 1962, art 7, § 22* to the extent that it purports to grant county road commissions the authority to void a township's reasonable traffic control ordinance when that ordinance does not conflict with state law. Here, the Road Commission did not determine that Oshtemo Township's ordinance is unreasonable. Thus, the Road Commission's

decision violated the Michigan Constitution, and the trial court erred when it determined that the Road Commission's decision to void Oshtemo Township's traffic control ordinance under *MCL 257.726(3)* was authorized by law. Given [*24] our conclusions, we need not reach Oshtemo Township's remaining issues.

We reverse and remand for entry of summary disposition in favor of Oshtemo Township. We do not retain jurisdiction. Oshtemo Township, having prevailed in full, may tax costs under *MCR 7.219(A)*.

/s/ Deborah A. Servitto

/s/ William C. Whitbeck

/s/ Douglas B. Shapiro

**DONALD E. TINSMAN, JOHN E. VARNHAGEN, WILLIAM P. KEMPER and STANLEY R. STEINKE, Plaintiffs-Appellants, v CITY OF SOUTHFIELD, Defendant, and CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM and CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM BOARD, Defendants-Appellees. DONALD E. TINSMAN, JOHN E. VARNHAGEN, WILLIAM P. KEMPER and STANLEY R. STEINKE, Plaintiffs-Appellees, v CITY OF SOUTHFIELD, Defendant, and CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM and CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM BOARD, Defendants-Appellants.**

No. 207035, No. 207056

COURT OF APPEALS OF MICHIGAN

1999 Mich. App. LEXIS 2112

December 3, 1999, Decided

**NOTICE:** [*1] IN ACCORDANCE WITH THE MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**PRIOR HISTORY:** No. 207035. Oakland Circuit Court. LC No. 95-491548 CK.

No. 207056. Oakland Circuit Court. LC No. 95-491548 CK.

**DISPOSITION:** Affirmed.

**JUDGES:** Before: Gribbs, P.J., and Smolenski and Gage, JJ.

**OPINION**

PER CURIAM.

Plaintiffs are retired members of the City of Southfield's police department. They filed a two-count complaint alleging that they were deprived of retirement benefits previously earned contrary to the state constitution, Const 1963, art 9, § 24, and the Civil Rights Act, MCL 37.2202; MSA 3.548(202). Plaintiffs' claims arise from a change in their retirement benefits as set forth in the collective bargaining agreements. Plaintiffs alleged that under the collective bargaining agreement entered before 1988, each of them were entitled to receive a regular retirement pension payable throughout his life of two and one-half percent of his average final compensation (AFC) multiplied by the first twenty-five years of service credited to him, plus one percent of his AFC multiplied by the number of years, and fraction of [*2] a year, of service rendered by him in excess of twenty-five years. Under a new collective bargaining agreement dated July 1, 1988, the computation of plaintiffs' benefits was limited to credit for only twenty-five years of service, with the compensation multiplier increased from two and one-half percent to 2.8 percent of their AFC.

The parties agreed that the trial court could decide the matter pursuant to cross-motions for summary disposition, based on stipulated facts. The trial court ruled in favor of plaintiffs with respect to count I, holding that the new formula adopted in the 1988 collective bargaining agreement to compute retirement benefits violated Const 1963, art 9, § 24, because application of the new formula to plaintiffs deprived them of financial benefits they had already accrued for work performed. However, the trial court ruled in favor of defendants with respect to count II of plaintiffs' complaint, holding that plaintiffs failed to establish age discrimination under the Civil Rights Act. Plaintiffs appeal as of right the trial court's decision in Docket No. 207035. Defendants appeal as of right the court's decision in Docket No. 207056. The appeals have been consolidated [*3] for this Court's consideration. We affirm.

This Court reviews a trial court's decision on summary disposition de novo. _Baker v Arbor Drugs, Inc,_ 215 Mich App 198, 202; 544 NW2d 727 (1996). A motion under MCR 2.116(C)(10) tests the factual support for a claim. _Id._ A court reviewing such a motion must

consider the pleadings, affidavits, depositions, admissions, and other documentary evidence. _Baker, supra_ at 202. Summary disposition may be granted if, except as to the amount of damages, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. _Babula v Robertson_, 212 Mich App 45, 48; 536 NW2d 834 (1995).

_Docket No. 207035_

In Docket No. 207035, plaintiffs contend that the trial court erred in dismissing count II of their complaint, in which they alleged that defendants' retirement system discriminated against older employees with regard to the amount of benefits paid. We disagree.

Defendants' retirement system was primarily funded by the City of Southfield, but employees were required to contribute five percent of their income to the system. Upon [*4] retirement, employees had the option of withdrawing their mandatory contributions. The parties agree that, when retiring officers elected to withdraw their contributions at the time of retirement, defendants reduced the benefits paid to those retirees based in part on the retiree's life expectancy and the life expectancy of a spouse. Defendants made this adjustment because, after withdrawals were made from the retirement system, there was less time for defendants to recoup the funding of benefits related to those employees that retire at a more advanced age. To offset this difference, the benefits of older retirees were reduced more, although not a substantial amount.

Plaintiffs rely upon a disparate treatment theory. In order to establish a prima facie case involving disparate treatment, plaintiffs were required to show that they were members of a protected class and that they were treated differently than persons of a different class for the same or similar conduct. _Barnell v Taubman Co, Inc_, 203 Mich App 110, 120-121; 512 NW2d 13 (1993). Age need not be the sole factor in an employment decision in order to constitute discrimination, but it must be [*5] a determining factor. _Matras v Amoco Oil Co_, 424 Mich 675, 682; 385 NW2d 586 (1986). Furthermore, for a disparate treatment theory, the plaintiff must show that the defendant had a discriminatory motive in order to establish a prima facie case. _Farmington Education Ass'n v Farmington School District_, 133 Mich App 566, 572; 351 NW2d 242 (1984). However, MCL 37.2202(2); MSA 3.548(202)(2) provides that the prohibition against discrimination in the Civil Rights Act shall not apply to the implementation or establishment of a bona fide retirement policy or system if it is not a subterfuge to evade the purposes of the act. A retirement policy is considered bona fide where it "exists and pays benefits." _Zoppi v Chrysler Corp_, 206 Mich App 172, 177; 520 NW2d 378 (1994).

Plaintiffs' contention involves a dispute over how defendants' actuaries reduced payments made to older retirees using mortality tables to estimate life expectancies. However, plaintiffs have not shown that the method to compute the annuity withdrawals is a subterfuge to evade the Civil Rights Act. See _McNabb v Mich Consolidated Gas Co_, 656 F. Supp. 866, 869 [*6] (ED Mich, 1987) (the Civil Rights Act does not require employers to alter actuarial reality).

Plaintiffs also contend that defendants violated the Civil Rights Act by requiring plaintiffs to continue to contribute five percent of their income towards retirement when they were not credited for service beyond twenty-five years after the new formula went into effect. The trial court did not address the merits of this argument, apparently because it concluded that the twenty-five-year cap for accruing benefits did not apply to plaintiffs, given that application of the new pension formula to plaintiffs was unconstitutional. As hereinafter discussed, we agree that the state constitution was violated. Thus, the new pension formula does not apply to plaintiffs to the extent that they would receive greater benefits under the old formula. Moreover, to the extent that plaintiffs would fare better under the new formula, it follows that they have not been harmed by the change in formulas, and the requirement that they must continue to contribute to their pension plans, because their benefits would not decrease overall as a result of the switch in formulas.

Accordingly, the trial court correctly [*7] granted defendants' motion for summary disposition as to count II of plaintiffs' complaint.

_Docket No. 207056_

In Docket No. 207056, defendants contend that the trial court erred in holding that the new formula adopted in 1988 for computing retirement benefits is unconstitutional as applied to plaintiffs. Defendants further contend that Const 1963, art 9, § 24 was not violated because plaintiffs had no vested right in the formula for computing benefits. We disagree and hold that the trial court correctly granted summary disposition for plaintiffs on this count.

Const 1963, art 9, § 24 provides in pertinent part that, "the accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." We agree with plaintiffs and the trial court that, under the facts of this case, by changing the formula for calculation of pension benefits, defendants diminished plaintiffs' accrued financial benefits. In _Advisory Opinion re Constitutionality of 1972 PA 258_, 389 Mich 659, 662-663; 209

NW2d 200 (1973), our Supreme Court [*8] construed the term "accrued financial benefits" as the right to receive pension payments upon retirement for services performed based upon the framers' intent expressed at the 1961 Constitutional Convention. [1] We agree with the trial court's findings that, under the facts in this case, the framers intended to include plaintiffs' "second tier" pension benefits (i.e., benefits earned for service beyond twenty-five years under the old formula) as "accrued financial benefits" under Const 1963, art 9, § 24:

> The Court finds that all four Plaintiffs had accrued financial benefits under the second tier or phase of the "old formula" pension plan. Plaintiffs Kemper and Steinke both had over 30 years of service accumulated at the time the "new formula" was ratified by the tentative agreement in November 1989. Plaintiffs Varnhagen and Tinsman both had over 25 years of service. All four Plaintiffs had reached the second phase or tier of the plan and effectively vested in the formula in existence at the time. All four had already performed services under a benefit formula which provided a 1% multiplier of their AFC for that service and contained no limits on the total pension earned.

> This [*9] Court finds that once Plaintiffs entered the post 25 year phase under the "old formula," the Constitution guaranteed them the right to rely upon those benefits. Indeed, a delegate to the 1961 Constitutional Convention, where the constitutional provision was added, aptly explained:

>> "Once the employee, by working pursuant to an understanding that this is the benefit structure presently provided, has worked in reliance thereon, he has the contractual right to those benefits which may not be diminished or impaired." 1 Official Record, Constitutional Convention 1961, p 774.

> This case illustrates the reliance of a member of a benefit plan who has already performed services under a certain benefit

scheme. Prior to the modification of the "old formula," all four Plaintiffs chose not to retire at 25 years. The existence of service credit beyond 25 years is obviously an important consideration to a member who is determining whether to retire or to continue to work beyond 25 years. These Plaintiffs, who all entered the second tier of the system prior to its modification, had a right to rely on its continued validity.

1  Advisory opinions of the Supreme Court are not considered binding authority, but the Court's advisory opinions may be followed as persuasive authority. *Advisory Opinion re Constitutionality of 1972 PA 294*, 389 Mich 441, 460 n 1; 208 NW2d 469 (1973).

[*10]  By changing the formula and applying it to all current employees, the net effect was to diminish or impair plaintiffs' accrued financial benefits in the pension plan, contrary to Const 1963, art 9, § 24. While a legislative body may increase pension benefits, it may not reduce the benefits with respect to those individuals who have accrued rights under the pension plan at the time of the legislative enactment. *Seitz v Probate Judges Retirement System*, 189 Mich App 445, 455-456; 474 NW2d 125 (1991). See also *Campbell v Judges' Retirement Bd*, 378 Mich 169, 181-182; 143 NW2d 755 (1966) ("The legislature may add to but not diminish benefits without running afoul of [the] constitutional prohibition against impairment of the obligation of a contract.") Under the facts of this case, and in light of the principle expressed in *Campbell* and *Seitz*, we agree with the trial court that the individual plaintiffs may follow the formula that provides them with the greatest benefits.

Defendants also contend that plaintiffs were subject to the terms of the new collective-bargaining agreement negotiated by their union and, therefore, [*11] they are bound by the new agreement. We disagree. While plaintiffs are subject to the new agreement, their union could not diminish or impair their individual rights to benefits already accrued. OAG, 1983-1984, No 6244, p 1688 (August 31, 1984); OAG, 1981-1982, No. 5941, p 2349 (August 5, 1981). [2] "While a union may bargain away collective rights, individual rights of employees may not be bargained away." *Grand Rapids v Grand Rapids Lodge No 97, Fraternal Order of Police*, 415 Mich 628, 637-638, n 6; 330 NW2d 52 (1982). Accordingly, we conclude that the new collective bargaining agreement does not apply to plaintiffs to the extent that its provi-

sions violate plaintiffs' accrued financial benefits under Const 1963, art 9, § 24.

> 2    Attorney General opinions, while not precedentially binding, can be persuasive authority. *Macomb Co Prosecutor v Murphy*, 233 Mich App 372, 382; 592 NW2d 745 (1999).

We also find no merit in defendants' contention that plaintiffs [*12] waived their rights to retire under the old formula when they failed to retire earlier. This contention lacks merit because a waiver requires a voluntary and intentional relinquishment of a known right or advantage. *Van Antwerp v Detroit*, 47 Mich App 707, 717; 210 NW2d 3 (1973). Under the facts of this case, we cannot say that plaintiffs intentionally waived their rights to retire under the old formula.

Finally, we reject defendants' contention that plaintiffs' claims are barred for failure to exhaust their contractual remedies. Plaintiffs do not contend that defendants violated the collective bargaining agreement. Rather, plaintiffs contend that defendants' violated their constitutional rights. Although a union speaks for its members, it has no duty to pursue for its members rights possessed independent of the collective bargaining agreement. *Florence v Dep't of Social Services*, 215 Mich App 211, 214; 544 NW2d 723 (1996).

Affirmed.

/s/ Roman S. Gribbs

/s/ Michael R. Smolenski

/s/ Hilda R. Gage

LEXSEE

**TERRY J. McKANE, Plaintiff-Appellant, v. CITY OF LANSING, et al., Defendants-Appellees.**

No. 96-2228

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

1998 U.S. App. LEXIS 649

January 14, 1998, Filed

**NOTICE:** [*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 1998 U.S. App. LEXIS 4534.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN.

**DISPOSITION:** AFFIRMED.

**COUNSEL:** For TERRY J. McKANE, Plaintiff - Appellant: Jeffrey C. Murphy, White, Przybylowicz, Schneider & Baird, Thomas A. Baird, Okemos, MI.

For THE CITY OF LANSING, Defendant - Appellee: Brian W. Bevez, James D. Smiertka, City Attorney's Office for the City of Lansing, Lansing, MI.

**JUDGES:** BEFORE: NELSON, BOGGS and COLE, Circuit Judges. DAVID A. NELSON, Circuit Judge, concurring in the judgment only. DANNY J. BOGGS, Circuit Judge, concurring.

**OPINION BY:** R. GUY COLE, JR.

**OPINION**

**R. GUY COLE, JR., Circuit Judge.** Appellant, a former mayor of Lansing, Michigan, brought this § 1983 action against the City of Lansing and its retirement board alleging denial of due process in the termination of enhanced benefits under an early retirement plan. Appellant now challenges the district [*2] court's grant of summary judgment in favor of the City, which was based upon its determination that Appellant's enhanced retirement benefits did not constitute a property interest subject to due process protection. For the following reasons, we **AFFIRM** the judgment of the district court.

**I.**

Plaintiff-Appellant Terry McKane was first elected to the City Council of Lansing, Michigan in 1971 and served until November 1981, when he was elected mayor for a four-year term commencing January 1982. Thereafter, McKane was re-elected to two additional terms as mayor. As an elected employee, McKane was exempt from the personnel rules of the City. [1] Elected officials such as McKane, however, were eligible for membership in the City's General Employees' Retirement System, which is set out in Chapter 292 of the Codified Ordinances of the City of Lansing. The "covered positions" under Chapter 292 include: the City's elected officials; exempt and appointed employees; executive management plan employees; and the City's teamster employees. [2] City of Lansing Administration Code § 292.01(t).

[1] The personnel rules do, however, "tie-bar" certain benefits of union-affiliated City employees to specific classifications of non-union City employees. McKane claims that elected officials were included in the tie-bar provisions; however, the tie-bar provisions in the personnel rules apply to: (1) executive employees and (2) non-bargaining unit employees. Elected officials were covered by a separate rule.

[*3]

[2] The "teamster" employees were those affiliated with Teamsters Local 580.

In 1991, concern arose regarding the fiscal health of the City, causing McKane to appoint a Blue Ribbon Committee of community members to provide financial advice. The Committee concluded that "based on its projected revenue growth, the City will find wage and benefit costs associated with human capital increasingly difficult to afford. Consequently a comprehensive strategy must be formulated to control these costs." (J.A. at 45, 825). In response to the report, McKane considered various strategies, ultimately recommending to City Council that Finance Director Stephen Duarte develop an Early Retirement Plan for municipal employees to effectuate a voluntary reduction in force. [3]

> 3   The City had previously adopted an Early Retirement Plan available to employees between May 1, 1988 and June 30, 1988. This plan was adopted by Resolution 196 on April 17, 1988, and was never adopted by ordinance.

[*4] Duarte developed such a plan and presented it to the City Council Committee of the Whole on March 28, 1992; the Executive Committee of the City Council then discussed the presentation in a closed session. The minutes of the Executive Committee session stated that the plan would affect "Teamsters, Exempt and Executive Pay Plan Personnel, and Elected Officials." (J.A. at 285; 867) (emphasis in original). The proposed plan would be available to covered members between the time frame of July 1, 1992 and January 4, 1993, would grant an additional five years of credited service to be used in calculating the monthly pension benefits and would increase the monthly benefit multiplier from 2.5% to 2.75%. Negotiation of the proposed plan took place with Teamsters Local 580, which accepted the plan in a written memorandum of understanding. At a subsequent, closed session of the Executive Committee, a list of employees eligible for the Early Retirement Plan -- which included McKane's name -- was distributed.

At the next regular City Council meeting on April 13, 1992, the Council decided to implement the Early Retirement Plan and approved "Resolution 201," which ratified the adoption [*5] of the plan with respect to union employees and extended the same early retirement benefits to "Executive and all other non-unionized (excluding district court) civilian personnel." (J.A. at 316). At this time, the Early Retirement Plan adopted by Resolution 201 was not adopted by ordinance. [4]

> 4   On April 17, 1995, the City finally passed Ordinance 913 which adopted the Early Retirement Plan and specifically excluded elected officials from the Plan.

On November 23, 1992, McKane applied, and subsequently was approved, for early retirement. On December 29, 1992, McKane began to receive benefits pursuant to the Early Retirement Plan, and Council president James Crawford completed McKane's term of office. McKane's retirement prompted a citizens' group and a local union to file lawsuits against the City contesting the lawfulness of the Early Retirement Plan, based in part on the fact that the plan was adopted by resolution rather than ordinance. The City took the position that the plan was lawful; the lawsuits were [*6] ultimately dismissed for lack of standing and laches.

In November 1993, David Hollister was elected mayor. Hollister opposed the Early Retirement Plan, in particular the payment of enhanced benefits to McKane and another elected official, City Clerk Jim Blair, and directed the new City Attorney to investigate the program. In Attorney Opinion No. 94-01 issued January 28, 1994, City Attorney James Smiertka concluded:

> It is our conclusion that the Early Retirement Plan was improperly adopted and is a nullity and void and the two elected officials are not entitled to its benefits. It is our further opinion and conclusion that the City is not liable for the increased benefits to the two elected officials either under Resolution 201 or by virtue of contract.
>
> However, the City is liable for the increased benefits to the Union and Non-Union Personnel mentioned in this opinion who elected to take the Early Retirement Plan. Nevertheless, an Ordinance should be presented and adopted to ratify Resolution 201 as to those individuals because of Charter requirements.

(J.A. at 1028).

On the day that Attorney Opinion 94-01 was issued, Mayor Hollister sent McKane a letter informing [*7] him that his retirement benefits would immediately be adjusted to exclude benefits attributable to the Early Retirement Plan. Also on January 31, 1994, the Retirement Board posted notice of a special meeting to be held on February 1, 1994, for the purpose of discussing "correction of benefits." At the meeting, the Retirement Board voted unanimously to ratify the decision reducing McKane's retirement benefits. McKane's annual benefits were reduced from $ 48,865.96 to $ 36,120.13, or a reduction of $ 1062.15 per month.

On February 9, 1994, the City's interim finance director informed McKane by letter that the Retirement Board had resolved to correct his monthly retirement

13-53846-tjt   Doc 519-8   Filed 08/19/13   Entered 08/19/13 23:55:20   Page 34 of 36

benefits based on the City Attorney's Opinion. McKane's attorney responded by letter, expressing McKane's disagreement with the decision of the Retirement Board. Thereafter, on March 17, 1994, the City Attorney sent McKane's attorney a letter offering McKane a hearing on the reduction of benefits. McKane did not request a hearing, but rather filed suit against the City, its Retirement Board and the individual members of the Board in their individual and official capacities, alleging that he had been deprived of property [*8] without due process of law under the Fourteenth Amendment, in violation of 42 U.S.C. § 1983, and further alleging state law claims of denial of due process pursuant to the state constitution, breach of contract, diminishment of retirement benefits and promissory estoppel. In response, the defendants filed twenty-six affirmative defenses and a seven-count counterclaim.

Following discovery, the parties filed cross-motions to dismiss and for summary judgment. On August 19, 1996, the district court granted summary judgment in favor of defendants with respect to McKane's § 1983 claim, dismissed the state law claims without prejudice [5] and dismissed the case in its entirety. The district court determined that McKane never possessed a property right in the enhanced retirement benefits because the legislation which purportedly created the Early Retirement Plan was invalid, as it was enacted by resolution rather than ordinance. This timely appeal followed.

     5   McKane has refiled his state law claims in Ingham County, Michigan Circuit Court.

[*9] II.

We review a grant of summary judgment de novo, using the same test as that used by the district court. See Brooks v. American Broadcasting Co., 932 F.2d 495, 500 (6th Cir. 1991). In reviewing summary judgment motions, courts must view the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970).

III.

A. Procedural Due Process

The Due Process Clause of the Fourteenth Amendment prohibits states from depriving individuals of life, liberty or property without due process of law. To establish a due process violation, a plaintiff first must establish a deprivation of life, liberty or property, and then, that the afforded process was less than that due See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985). The amount of

process due varies with the circumstances of each case. See Morrissey v. Brewer, 408 U.S. 471, 481, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972). In determining whether the afforded process in a particular case comported with due process, three [*10] factors must be balanced: "First, the private interest that will be affected by the official action, second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." Mathews v. Eldridge, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976).

In the present case, we must first determine whether McKane was deprived of a liberty or property interest. McKane asserts that his entitlement to enhanced retirement benefits constituted a property right subject to procedural due process protections.

1. Property Rights

As stated by the United States Supreme Court:

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . . Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or [*11] understandings that secure certain benefits and that support claims of entitlement to those benefits.

Board of Regents v. Roth, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972). In Board of Regents, the Court held that a non-tenured assistant professor at a university who was not rehired did not have a property interest in re-employment when the terms of his employment did not provide for re-employment, nor was there a state statute or university rule or policy that created a legitimate expectation of re-employment. 408 U.S. at 578.

On the same day the Court decided Board of Regents, the Court held in a similar case concerning a professor who was not rehired, that a question of fact was created regarding whether a state junior college had a de facto tenure program which could create such a legitimate expectation of a property interest in re-employment. See Perry v. Sindermann, 408 U.S. 593, 601-02, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972). The

*Perry* Court stated that "[a] person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement [*12] to the benefit." 408 U.S. at 601.

Thus, the question presented in this case is whether McKane had a legitimate expectation of entitlement to enhanced retirement benefits. McKane contends that six separate grounds create such a legitimate expectation: (1) Resolution 201; (2) the personnel tie-bar provisions; (3) common law or implied contract; (4) the Michigan constitution; (5) promissory estoppel; and (6) past custom and practice.

### a. Resolution 201

Resolution 201 purportedly adopted the Early Retirement Plan, including "Executive and all other non-unionized . . . civilian personnel" among the employees eligible for the plan. (J.A. at 316). The resolution did not specifically include elected officials in the group of eligible employees; however, elected officials were included in the group named at the Executive Committee session. Regardless of who was included, the district court determined that Resolution 201 was void ab initio because it was not adopted by ordinance as required. We agree with the district court's conclusion.

In Michigan, resolutions serve to implement short-term ministerial functions, while ordinances establish more permanent influences on the community [*13] itself. *See Parr v. Fulton*, 9 Mich. App. 719, 158 N.W.2d 35, 37 (Mich. App. 1968) (citing *Kalamazoo Municipal Utilities Ass'n v. City of Kalamazoo*, 345 Mich. 318, 76 N.W.2d 1 (Mich. 1956)). A resolution is not a law, but the special or temporary form in which a legislative body expresses a determination or directs a particular action; this is in contrast to an ordinance, which sets forth a permanent rule. *See Kalamazoo Municipal Utilities, 76 N.W.2d at 5-6*. Unlike the enactment of a resolution, the enactment of an ordinance is a legislative act that requires introduction in writing, notice, public hearing and publication. Lansing City Charter §§ 3-302, 3-304, 3-305. The Michigan Supreme Court has stated that when the substance of a city action requires an ordinance, a resolution cannot operate as a de facto ordinance; any attempt to legislate by resolution is "simply a nullity." *Rollingwood Homeowners Corp. v. City of Flint*, 386 Mich. 258, 191 N.W.2d 325, 330 (Mich. 1971).

Section 3-301 of the Lansing City Charter provides in part that "those acts of the City shall be by ordinance which . . . amend or repeal any ordinance previously adopted." The City's retirement [*14] system was adopted by Ordinance 132 on May 19, 1941 and the requirements for retirement age and service are set out in §

292.20 of Lansing's Administration Code. Relying on the foregoing, the district court concluded that the Early Retirement Plan could not be adopted by resolution because it amended a previously adopted ordinance; therefore, Resolution 201 was a nullity.

McKane argues that the Early Retirement Plan was ministerial and temporary in nature, because it had a limited window of opportunity, that is, it only applied to covered employees within the time frame between July 1, 1992 and January 4, 1993. McKane's argument is unavailing. Despite the limited window of opportunity for exercising an option to take advantage of the Early Retirement Plan, the plan had long-term effects on the City and its finances, and clearly amended the previously enacted retirement ordinance, albeit for a limited group of employees. Such long-term, lasting effects cannot be deemed ministerial in nature *See Parr*, 9 Mich. App. 719 at 723, 158 N.W.2d 35 at 37 ("By no stretch of logic can we find that a large-scale rezoning of property . . . is only a ministerial function of government."). Accordingly, the Early Retirement [*15] Plan should have been enacted by ordinance; Resolution 201 was therefore ineffective and did not create a property interest in early retirement benefits. [6]

> 6   Despite the ineffectiveness of Resolution 201, the collective bargaining agreement with Teamsters Local 580 set out in a memorandum of understanding would seem to have made the Early Retirement Plan binding as to union employees. This is now a moot point, as the Early Retirement Plan finally was adopted by ordinance on April 17, 1995 and specifically included union employees.

### b. Personnel "Tie-bar" Provisions

McKane also argues that because the benefits of elected officials were "tie-barred" to the benefits of the union employees, he had a legitimate expectation to early retirement benefits. McKane's contention appears to be that because the tie-bar provisions provided him with membership in the General Employees' Retirement System, he is entitled to the "associated" benefits of the Early Retirement Plan. Again, McKane's contention lacks merit.

[*16]   There is no argument that McKane was entitled to membership in the General Employees' Retirement System; however, that membership did not arise from the tie-bar provisions and further, did not provide to McKane a legitimate expectation of entitlement to early retirement benefits. As previously discussed, the Early Retirement Plan failed to amend the existing retirement provisions because it was adopted by resolution rather than ordinance. Moreover, as stated by the district court,