# EXHIBIT 7-2

elected officials were specifically exempt from the City's personnel rules (which contain the tie-bar provisions), with the exception that elected officials were eligible for membership in the General Employees' Retirement System. Accordingly, the tie-bar provisions provided no basis for a property interest in early retirement benefits.

### c. Common Law or Implied Contract

McKane also argues that the City, by offering the Early Retirement Plan, was extending an offer which became an implied contract upon acceptance. McKane asserts that this implied contract created a legitimate expectation of early retirement benefits, thereby creating a property right. Again, McKane's expectation was not legitimate. [*17]

Under Michigan law, a state cannot be bound by an implied contract, if that contract is illegal. *See Sittler v. Board of Control*, 333 Mich. 681, 53 N.W.2d 681, 684 (Mich. 1952). Any implied contract arising from an invalid resolution would result in an illegal contract. Accordingly, McKane cannot rely on an implied contract for a property right to early retirement benefits.

### d. Michigan Constitution

McKane asserts that the Michigan constitution created an entitlement to the Early Retirement Plan, by its provision that states that the accrued financial benefits of a pension plan and retirement system are contractual and "shall not be diminished or impaired thereby." Mich. Const., art. IX, § 24 (1963). This argument fails because the Early Retirement Plan was neither a pension nor a retirement system. *See Jurva v. Attorney General*, 419 Mich. 209, 351 N.W.2d 813, 819 (Mich. 1984) (stating that Art. IX, § 24 of the Michigan constitution not applicable to early retirement incentives).

### e. Promissory Estoppel

In some cases, promissory estoppel may be a basis for a property interest under the Due Process Clause. *See Hall v. Ford*, 272 U.S. App. D.C. 301, 856 F.2d [*18] 255, 265 (D.C. Cir. 1988) ("[plaintiff's] property interest depends upon his claim of entitlement [and] overlaps with his causes of action for breach of contract and promissory estoppel"); *National Juvenile Law Center, Inc. v. Regnery*, 238 U.S. App. D.C. 61, 738 F.2d 455, 464 (D.C. Cir. 1984) ("assuming arguendo that the standards applicable to promissory estoppel should control the use of estoppel to create a promise giving rise to an expectation interest in a case brought under the due process clause").

Under Michigan law, the elements of a promissory estoppel claim are: (1) a promise; (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the

promisee; (3) which in fact produced reliance or forbearance of that nature; and (4) in circumstances such that the promise must be enforced if injustice is to be avoided. *See Schipani v. Ford Motor Co.*, 102 Mich. App. 606, 302 N.W.2d 307, 310 (Mich. App. 1981). The promisee's reliance must be justifiable. *See Cincinnati Ins. Co. v. Citizens Ins. Co.*, 454 Mich. 263, 562 N.W.2d 648, 650 (Mich. 1997).

In the present case (assuming that the Early Retirement [*19] Plan was a promise), McKane cannot establish that his reliance was justifiable. Considering that the early retirement plan was invalid because it was not adopted in accordance with the City Charter, and McKane was mayor of the City, as a matter of law McKane's reliance could not have been justifiable. More important, McKane cannot meet the last element of Michigan's promissory estoppel test; this is not a case in which the promise must be enforced to avoid injustice. Notwithstanding the policy issues arising from a mayor taking part in structuring an early retirement plan from which he would benefit, the plan simply was invalid; justice does not require the enforcement of an invalid benefit.

### f. Past Practice

McKane argues that in the past, the City's practice had been to adopt early retirement programs by resolution and later codify the changes by ordinance. This may be McKane's best argument the City's past practice of adopting an early retirement plan -- albeit an invalid practice -- created in McKane a legitimate expectation of early retirement benefits. The district court was not convinced by this argument, stating.

> The Court is unwilling to accept plaintiff's contention [*20] that the City Council's prior practice, which was admittedly inconsistent with the City Charter, constituted an effective method of amending the ordinance. To adopt plaintiff's argument would encourage public officials to deliberately disregard municipal charters. The City Charter's requirement that amendments to existing ordinances be undertaken by passage of an ordinance protects the public by providing notice of the proposed ordinance's provisions. Although it may be possible to alter or construe collective bargaining agreements by prior practice between private parties, public entitlements cannot be created by a City Council's prior practice which fails to conform to the City Charter.

(J.A. at 51-52). Although the district court was correct in asserting that an invalid practice in the past would not serve to validate Resolution 201, the court failed to address the issue of whether this past practice created a "legitimate" expectation to early retirement benefits in McKane.

In some situations, it would seem that the existence of an understanding, fostered by municipal officials, could create a legitimate claim of entitlement. *See Perry, 408 U.S. at 602.* In the present [*21] case, however, McKane was a municipal official who helped foster the (invalid) notion that a resolution was sufficient to create an early retirement plan. It seems disingenuous, as well as unfair, for McKane to argue that he relied on past practices of the City that he himself helped to create. Moreover, the City's past practice was just as invalid as Resolution 201. Accordingly, although the past practice may have created an expectation in McKane, it did not create a legitimate expectation.

## IV.

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment in favor of the City, because McKane did not possess a property right in early retirement benefits that was subject to due process protection.

**CONCUR BY:** DAVID A. NELSON; DANNY J. BOGGS

## CONCUR

**DAVID A. NELSON**, Circuit Judge, concurring in the judgment only. Although I do not necessarily disagree with the conclusion that Michigan law gave Mr. McKane no property interest in the enhanced retirement benefits he claims, I think it is inappropriate for us to decide that question. The Michigan courts are better situated to provide a definitive declaration of Michigan law than we are, and it is at least [*22] as easy for Mr.

McKane to seek redress from the state courts as it is for him to seek redress from the federal courts. I am not persuaded that the factors identified by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976), compel the conclusion that the procedures available for the protection of whatever property interest Mr. McKane might have in receiving enhanced benefits are deficient under the United States Constitution if they do not provide for a predeprivation hearing, as long as Mr. McKane is afforded unfettered access to the full panoply of postdeprivation remedies available in the Michigan court system. See *Ramsey v. Bd. of Educ. of Whitley County, Kentucky*, 844 F.2d 1268 (6th Cir. 1988), where we held that "an interference with a property interest in a pure benefit of employment, as opposed to an interest in the tenured nature of the employment itself, is an interest that can be and should be redressed by a state breach of contract action and not by a federal action under section 1983." *Id.* at 1274-75. See also *Costello v. Town of Fairfield*, 811 F.2d 782 (2d Cir. 1987), where the Second Circuit rejected an attempt [*23] to constitutionalize a retired municipal employee's claim -- a claim which the municipality had allegedly denied without adequate notice and a meaningful opportunity to be heard -- for an increase in his retirement benefits.

I would affirm the district court's order on the strength of *Ramsey* and *Costello*, leaving to the Michigan courts such questions as the legal effect of Resolution 201.

**DANNY J. BOGGS**, Circuit Judge, concurring. I concur in Judge Cole's opinion for the court, as I believe it provides a correct resolution of the issues it addresses. I also join in Judge Nelson's concurrence, as I believe that he has set forth an equally effective means of deciding this case. In the circumstances of this particular case, I do not feel the need to determine whether one method should take precedence over the other, and I therefore concur in both opinions.

**JACK MOLDOVAN and JACK DRAPER, as Trustees for the TRI-STATE UFCW AND EMPLOYERS BENEFIT FUND, Plaintiffs vs. THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., Defendant**

Civil Action No. 82-2717

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**1985 U.S. Dist. LEXIS 20659**

**April 17, 1985, reversed and remanded May 13, 1986**

**COUNSEL:** [*1] William P. Getty, Esq., Joseph A. Vater, Jr., Esq., 1400 Frick Building, Pittsburgh, PA 15219

Leonard L. Scheinholtz, Esq., William Bevan, III, Esq., Robert F. Prorok, Esq., David J. McAlister, Esq., 747 Union Trust Building, Pittsburgh, PA 15219

**OPINION BY:** MANSMANN

**OPINION**

*OPINION*

MANSMANN, District Judge

This action is before the Court on Cross-Motions for Summary Judgment. For the reasons set forth below, the Plaintiff's Motion is denied and the Defendant's Motion is granted.

*FACTUAL AND PROCEDURAL BACKGROUND*

The Altoona Division of the Defendant, The Great Atlantic & Pacific Tea Company, Inc. ("A & P"), at one time operated 96 stores in Pennsylvania, New York, Maryland, Ohio and West Virginia. Many of the employees of these stores were covered by a collective bargaining agreement between the Defendant and Local 590 of the United Food and Commercial Workers International Union ("Local 590"). The collective bargaining agreement at issue in the instant litigation became effective on October 2, 1977 and was due to expire on September 27, 1980 ("1977-1980 agreement").

In June of 1980, the Defendant and Local 590 began negotiations for a new agreement. When the September [*2] 27, 1980 deadline passed, the collective bargaining agreement by its terms continued in force during the negotiations. On October 23, 1980, the negotiators for the Defendant and for Local 590 apparently reached an agreement. The following day a handwritten Memorandum of Agreement was drafted and executed. The Memorandum of Agreement was apparently intended to reflect modifications of the 1977-1980 agreement which would be incorporated into the new agreement at a later date.

The Defendant and Local 590 subsequently began drafting the new agreement. The resulting draft agreement was executed by Local 590 in May of 1981. When the new agreement was submitted to the Defendant, senior officials of the Defendant A&P refused to sign it, claiming that it did not accurately reflect the 1980 Memorandum of Agreement.

Despite its refusal to sign the new agreement, the Defendant nevertheless agreed to arbitrate Local 590's grievances, including a grievance concerning the reduction of certain full-time employees to part-time status and the scheduling of part-time employees. The parties selected Arbitrator Clair V. Duff to hear the dispute. The Defendant and Local 590 agreed that the arbitrator [*3] would decide initially whether or not a collective bargaining agreement existed before considering the merits of the grievances. On January 5, 1983, Arbitrator Duff rendered an opinion which concluded that no collective bargaining agreement had existed between the two parties after October 23, 1980. *See* Answer to Amended Complaint, docket No. 19, exhibit A.

Local 590 filed suit in the United States District Court for the Western District of Pennsylvania seeking to modify the arbitrator's award. On June 29, 1983 the District Court entered summary judgment affirming the arbitrator. *United Food & Commercial Workers Int'l Union, Local 590 v. Great Atlantic & Pacific Tea Co.,* Civ. No. 83-212, Slip op. (W.D. Pa. June 29, 1983)

(McCune, D.J.). Local 590 appealed to the United States Court of Appeals for the Third Circuit. The appeals court affirmed the district court. *United Food & Commercial Workers Int'l Union, Local 590, AFL-CIO-CIC v. Great Atlantic & Pacific Tea Co., 734 F.2d 455 (3d Cir. 1984).*

The instant litigation arises out of the closing of 40 of the 46 stores in the Altoona Division of the Defendant A&P on September 23, 1982. The Plaintiffs are trustees [*4] for the Tri-State UFCW and Employers Benefit Fund ("Fund"). The Plaintiffs allege that the Defendant is obligated to contribute to the Fund for three months following the time when an employee is laid-off. The Plaintiffs assert that following the closing of the 40 Altoona Division stores the Defendant failed to meet its obligation to contribute to the fund for the permanently laid-off workers. The Plaintiffs allege federal question jurisdiction pursuant to Section 502(a)(3), 502(e) and 502(f) of the Employee Retirement Income Security Act of 1974 ("ERISA"), *29 U.S.C.A. §§ 1132(a)(3),(e)&(f) (1975)*, and *Section 301* for the Labor-Management Relations Act ("LMRA"), *29 U.S.C.A. § 185 (1978)*, and diversity jurisdiction with respect to the state claims contained in Count II.

In Count I of the Amended Complaint, the Plaintiffs allege that the Defendnat failed to contribute to the Fund as required by the terms of the collective bargaining agreement between the Defendant and Local 590 in violation of Sections 502 and 515 of ERISA and *Section 301* of the LMRA. In Count II, the Plaintiffs assert that the Defendant violated the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 PA.CONS.STAT.ANN. [*5] §§ 260.1-260.45 (Purdon 1964 & 1984 Supp.), by impermissibly and unilaterally changing the terms and conditions of employment, and that the Defendant is estopped by its conduct to assert defense to its obligation to contribute to the fund.

### DISCUSSION

The parties' Cross-Motions for Summary Judgment are before the Court. The Defendant, in support of its Motion, contends that this Court has no federal question jurisdiction over the ERISA and LMRA claims because there is no contract or obligation requiring the Defendant to contribute to the Fund. The Defendant also asserts that the allegations contained in Count II of the Amended Complaint, if true, constitute an unfair labor practice cognizable only under the National Labor Relations Act ("NLRA"). The Defendant argues that all other claims contained in Count II are preempted by the NLRA. The Plaintiffs assert that the Court has federal question jurisdiction, reject the Defendant's preemption argument, and ask for summary judgment on the merits.

*Count I*

The Court first addresses the question of federal question jurisdiction over the ERISA and LMRA claims contained in Count I. The Defendant argues that *section* [*6] *301* of the LMRA speaks only to contractual obligations. *Section 301(a)* provides, in relevant part:

Suits for violation of contracts, between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organiations, may be brought in any district court of the United States having jurisdiction of the parties.

LMRA, *§ 301(a)*, *29 U.S.C.A. § 185 (1978)*. The Defendant also contends that section 515 of ERISA addresses only obligations to contribute under the terms of a collective bargaining agreement or a trust plan. Section 515 provides:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

ERISA, § 515, *29 U.S.C.A. § 1145 (1984 Supp.)*.

The Plaintiff offerrs four theories under which they claim an obligation to contribute and federal question jurisdiction. These theories involve the collective bargaining agreement, the trust plan, [*7] statutory obligations, and estoppel by conduct. The Court will address each of these theories separately.

*The Collective Bargaining Agreement*

The Defendant contends that the Plaintiffs are bound according to principles of *res judicata* and/or collateral estoppel by Arbitrator Duff's decision that there was no collective bargaining agreement between Local 590 and the Defendant after October 23, 1980. The Plaintiffs argue that they are not barred by principles of *res judicata* or collateral estoppel from asserting the existence of a collective bargaining agreement. The Plaintiffs maintain that they were not parties to the arbitration, that they are not the privies of Local 590, and that Local 590 was not their virtual representative in the arbitration. Consequently, the Plaintiffs assert that they are not bound under either a theory of *res judicata* or of collateral estoppel.

There can be no doubt that the Plaintiffs and Local 590 are not the same parties. Clearly, the trustees do not act as agents for either the union or the employer. *See NLRB v. Amax Coal Co., 453 U.S. 322, 331-32 (1981); Trustees of Local 478 Trucking & Allied Indus. Pension Fund v.* [*8] *Siemens Corp., 721 F.2d 451, 455-57 (3d Cir. 1983)* (hereinafter "Siemens Corp."). Indeed, it

cannot be said that the contractual relationship between the Plaintiffs and Local 590 places them in privity for all purposes. *O'Hare v. General Marine Transport Corp.,* 740 F.2d 160, 167 (2d Cir. 1984), *cert. denied,* 105 S.Ct. 1181 (1985). The Plaintiffs, as trustees of such a multi-employer pension fund, are obligated to protect the interests of the fund and its beneficiaries. *Siemens Corp.,* 721 F.2d at 456-57. While the trustees are appointed by either the union or the employer, their interests have been found to be antithetical to those of the appointing party. *Amax Coal Corp.,* 453 U.S. at 331-32; *Siemens Corp.,* 721 F.2d at 456.

The parties urge the Court to choose between the national policy favoring arbitration and the national policy favoring "the preservation of the independence and integrity of pension funds." *Siemens Corp.,* 721 F.2d at 455. It is not necessary for either policy to be compromised. The Court is not confronted with the question of requiring the Trustees to submit to arbitration. Instead, the Court must decide whether a prior arbitration [*9] is binding in a very limited situation.

Both Local 590 and the trustees would like to establish the existence of the collective bargaining agreement after October 23, 1980 albeit for different reasons. Local 590 needed to establish that such an agreement was in force so that it could pursue its grievances and maintain the rights of its members. The trustees need to establish the agreement's existence in order to collect funds. Because the existence of a collective bargaining agreement goes to the heart of the union's interests and to the essence of the trust's functions, it cannot be said that in the very limited arbitration before Arbitrator Duff the interests Local 590 and of the Plaintiff-trustees did not coincide.

In such a situation as this, where the interests of the party pressing its claims have been fully and fairly represented in an adjudication by another whose interests are closely aligned, *res judicata* or collateral estoppel may bar relitigation of those same issues. The principles of the preclusion doctrines may be extended to those in privity with the parties to the initial action or to those whose interests were fully and fairly represented by the parties. [*10] *Society Hill Civic Assoc. v. Harris,* 632 F.2d 1045, 1050 n.4 (3d Cir. 1980). The opinion of the United States Court of Appeals for the Fifth Circuit in *Aerojet-General Corp. v. Askew,* 511 F.2d 710 (5th Cir.), *cert. denied,* 423 U.S. 908 (1975), is instructive. The *Aerojet-General* Court held:

Under federal law of res judicata, a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative.

*Id.* at 719 (citations omitted).

The Court finds that the interests of the Plaintiffs, in establishing that a collective bargaining agreement was in effect after October 23, 1983, were fully and fairly represented by Local 590 in the arbitration before Arbitrator Duff. Although the two adjudications cannot be said to involve the same parties or privies, the interests of Local 590 and of Plaintiff are closely aligned with respect to this particular issue. The Court finds that Local 590 acted as the virtual representative of the Plaintiffs in the prior arbitration.

The Plaintiffs argue that they are not bound by the agreement between Local 590 and the Defendant [*11] to arbitrate the existence of the collective bargaining agreement. The fact that the union and the employer agreed to submit the question to the arbitrator is not relevant to the application of the doctrines of *res judicata* and collateral estoppel. Parties may agree voluntarily to submit an issue to an arbitrator. *Kane Gas Light & Heating Co. v. International Brotherhood of Firemen & Oilers, Local 112,* 687 F.2d 673, 676, 683 (3d Cir. 1982), *cert. denied,* 460 U.S. 1011 (1983). The arbitration in question was upheld by the United States District Court as well as by the United States Court of Appeals. Arbitrators may have preclusive effect in future litigation under the doctrines of *res judicata* and collateral estoppel. *See Moran v. Paine, Webber, Jackson & Curtis,* 389 F.2d 242, 246 (3d Cir. 1968).

Consequently, the Plaintiffs are collectively estopped from relitigating the issue of the collective bargaining agreement's existence. The Plaintiffs are bound by Arbitrator Duff's ruling that no collective bargaining agreement was in effect between Local 590 and the instant Defendant after October 23, 1980.

*The Trust Agreement.*

The Plaintiffs argue that [*12] the Defendant had an obligation to contribute to the Fund by virtue of the continuation or extension of the obligation contaned in 1977-1980 agreement. The Court accepts, for purposes of this Motion, the Plaintiffs' assertion that the Defendant is an employer as defined in section 2.1 of the Trust Agreement and is, therefore, bound by "all of the obligations imposed by this Trust." Trust Agreement, § 2.1, docket no. 69, at 4. Likewise, the Court agrees "that if an employer's obligation arises under an extension of a collective bargaining agreement, the Trustees have a power and duty to collect those contributions." Brief in Support of Plaintiffs' Motion for Summary Judgment and In Opposition to Defendant's Brief"). The Court accepts, for purposes of this Motion, the Plaintiffs' argument that the Defendant's characterization of section 5.3 of the Trust Agreement as a limit on the obligation of an employer to the specific term of a collective bargaining agreement is incorrect.

The essence of the Plaintiffs' argument lies in the interpretation of section 8.5 of the agreement. Section 8.5, which is entitled "Term of Trust", provides, in relevant part:

This Trust shall continue [*13] so long as any collective bargaining agreement exists which provides for contributions to be made to the Trust Fund hereunder, and in the event any collective bargaining agreement has been terminated prior to the signing of a new collective bargaining agreement, the Trust shall likewise continue on so long as the Union involved and the Employer are negotiating for a new collective bargaining agreement . . . Notwithstanding any provisions herein concerning the duration and termination of this Trust, the Trust shall continue in existence for so long a period as may be necessary to conclude its affairs.

Trust Agreement, § 8.5, docket no. 69, at 27. The Court finds that this provision applies only to the duration and termination of the trust as an entity. While statutory law may require the employer to maintain the status quo and continue contributions during the negotiation of a new collective bargaining agreement, nothing in the Section 8.5 of the Trust Agreement, quoted here, provides an independent obligation to continue contributions.

Consequently, the Court rejects the Plaintiffs' contention that there is ERISA and LMRA jurisdiction over this case based on an obligation [*14] to contribute contained in the Trust Agreement itself.

*Statutory Obligations.*

The Plaintiffs contend that Section 515 of ERISA, 29 U.S.C. § 1145, "creates a federal statutory right to prompt and efficient collection of delinquent contributions, which should not be subject to final resolution in arbitration." Plaintiffs' Brief, at 25. The Plaintiffs ask the Court to examine the legislative history and the opinion of the United States Court of Appeals for the Ninth Circuit in *Amaro v. The Continental Can Company, 724 F.2d 747 (9th Cir. 1984)*. The Plaintiffs urge the Court to accord the same status to ERISA as the Supreme Court has to Title VII in *Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974)* and to the Fair Labor Standards Act in *Barrentine v. Arkansas-Best Freight System, 450 U.S. 728 (1981)*. The essential question is whether ERISA confers statutory rights on the Plaintiffs, including the right to file suit in federal court, which cannot be impaired by a prior arbitration on the existence of the underlying document.

The legislative history of ERISA invoked by Plaintiffs informs that ERISA was enacted to "simplify delinquency collections" so that they [*15] might be recovered "efficaciously, and without regard to issues which

might arise under labor-management relations law." *Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 87 (1982) and Robbins v. Prosser's Moving & Storage Co., 700 F.2d 433, 440 n.4 (8th Cir. 1983), aff'd, 104 S.Ct. 1844 (1984)*. Those principles are not infringed by applying the principle of collateral estoppel, a principle which is not part of labor-management relations law. This is especially true where, as here, the issue to which estoppel is applied is the very existence of the collective bargaining agreement. Certainly, the legislative history can be read to indicate that ERISA actions for delinquent contributions should be efficaciously conducted. Where there is no underlying promise or contractual obligation, however, no ERISA claim shoud lie.

The *Amaro* case relied on by the Plaintiffs is likewise not on point. Although the *Amaro* Court held that the claimants had a statutory ERISA right to proceed despite prior arbitration, the ERISA claim invoked in *Amaro* was a Section 510 claim which alleged that the company had laid off employees in order to interfere with the attainment of their [*16] benefit rights. The Court found:

This statutory claim is not for benefits under a collective bargaining agreement. . . . The ERISA action is to enforce statutory rights designed to protect the employees from actions which interfere with their attainment of eligibility for those benefits. We are persuaded that in enacting section 510, Congress created a statutory right independent of any collectively bargained right.

*Amaro,* 724 F.2d t 749 (citation omitted). The instant case is brought on a different basis. The Plaintiffs seek to enforce an obligation to contribute to the fund under Section 515 of ERISA.

The Court finds the reasoning of the United States Court of Appeals for the Eighth Circuit in *Delaney v. Union Carbide Corp., 749 F.2d 17 (8th Cir. 1984)*, to be more closely aligned to the issue in the instant case. In *Delaney,* the Plaintiff argued that the arbitration clause contained in the collective bargaining agreement was unenforceable and that he was entitled to pension benefits notwithstanding a prior arbitration. The *Delaney* Court was confronted with the same argument based on Title VII and the Fair Labor Standards Act as the Court is here. The [*17] *Delaney* Court noted that "[t]he key distinction between the present case and cases like *Barrentine* and *Alexander,* we think, is that here the rights that plaintiff seeks to enforce are wholly created by contract, the very contract that also contains the arbitration clause plaintiff seeks to avoid." *Delaney,* 749 F.2d at 19.

The rights asserted here are likewise contractual in nature. The Court refuses to imply statutory rights under section 515 of ERISA where the Plaintiffs can demonstrate no independent contractual right.

*Estoppel by Conduct.*

The Plaintiffs contend that because the Defendant continued to make contributions for up to three months on behalf of laid off employees before and after the closing of the Altoona Division, the Defendant is estopped to deny the existence of an agreement to make the contributions to the Fund in the event of a layoff.

The Plaintiffs' argument is not persuasive. The Defendnat is required by section 8(a)(5) of the NLRA, 29 U.S.C.A. § 158(a) (1973) to maintain the status quo by continuing contributions until bargaining to an impasse with the union. Given that statutory obligation, the Court cannot say that the Defendant [*18] should be estopped by its conduct to deny its non-NLRA obligation to contribute.

The cases on which the Plaintiffs rely do not support their argument. In *Central States Southeast & Southwest Areas Pension Fund v. Hitchings Trucking*, 472 F. Supp. 1243, 1246 (E.D. Mich. 1979), the Court found that the employer had not effectively terminated the year to year continuation of the contract. While the Court noted that the actions of the employer in checking off union dues and contributing certain funds in compliance with the contract "wold have the tendency to estop the employer from denying the existence of an agreement," *id.* at 1247, the estoppel issue was not squarely before the Court.

In *Producers Dairy Delivery Co. v. Western Conf. of Teamsters Pension Trust Fund*, 654 F.2d 625 (9th Cir. 1981), the Court was confronted witwh a situation in which the employer had continued to contribute funds even after bargaining to an impasse. The Court ruled that the employer could not get a refund for the contributions made after reaching an impasse in the negotiations. The employees had continued to work, said the Court, on the premise that those contributions had been made to [*19] the Fund on a non-refundable basis. Consequently, to allow the company to get the money back would be to allow the employees to be misled.

Neither case cited by the Plaintiffs provides persuasive authority. The Court finds no other basis for a claim of estoppel by conduct where the conduct is statutorily mandated. Consequently, the Court rejects the Plaintiffs' position that their estoppel theory provides a basis for ERISA and/or LMRA jurisdiction in this case.

*COUNT II*

The Defendant argues that the ERISA, the LMRA and the state law claims contained in Count II are preempted by the NLRA. The Defendant contends that the gravaman of the Count II allegations is that the Defendant committed an unfair labor practice in violation of Section 8(a)(5) of the NLRA and that, as such, the claims belong to the exclusive jurisdiction of the National Labor Relations Board ("NLRB"). The Defendant concludes that the Court has no jurisdiction over the state and federal claims contained in Count II.

The Plaintiffs deny that Count II alleges an unfair labor practice pursuant to Section 8(a)(5) of the N.L.R.A. The Plaintiffs contend that Count II makes out a claim based on the Defendant's [*20] improper interpretation of the terms and conditions of employment and is not based on a unilateral change of those terms and conditions. The Plaintiffs argue: "The Fund is before this Court seeking damages from A&P as a result of the breach of a term and condition which A&P continued after the expiration of the 1977 Agreement, but which A&P did not properly interpret." Plaintiffs' Brief, at 56-57.

Suits which allege unfair labor practices belong to the exclusive jurisdiction of the NLRB. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245 (1959). Suits to enforce provisions of collective bargaining agreements are, on the other hand, subject to the jurisdiction of the federal district courts. 29 U.S.C. § 185(a); *Cement Mason Health & Welfare Trust Fund for Northern California v. Kirkwood-Bly, Inc.*, 520 F. Supp. 942, 944 (N.D. Cal. 1981) (hereinafter *"Cement Masons"*), *aff'd without opinion*, 692 F.2d 641 (9th Cir. 1982). Indeed, the NLRA does not preempt a district court's jurisdiction over a section 301 LMRA action for breach of contract which is also an unfair labor practice. *Smith v. Evening News Assoc.*, 371 U.S. 195, 201 (1962).

In the present [*21] case, the Defendant was obligated by the terms of the 1977-1980 collective bargaining agreement to make certain payments to the Fund. Upon expiration of that agreement, the Defendant continued to make payments to the Fund. Indeed, the Defendant is compelled by the NLRA to continue to contribute to such a pension fund as required by the expired agreement until it has bargained to an impasse. *See* NLRA, § 8(a)(5), 29 U.S.C.A. § 158(a)(5) (1973); *Capitol City Lumber Co. v. NLRB*, 721 F.2d 546, 548-49 (6th Cir. 1983) *(per curiam), cert. denied*, 104 S.Ct 1291 (1984); *American Distributing Co., v. NLRB*, 715 F.2d 446, 449-50 (9th Cir. 1983), *cert. denied*, 104 S. Ct. 2170 (1984). In the instant case, as the Defendant expressly asserts, the Defendant and Local 590 had not bargained to an impasse and the statutory obligation to contribute remained. *See* Defendant's Reply Brief, at 42 n.48.

The Plaintiffs argue that Count II involves a misinterpretation by the Defendant of the terms and conditions of employment which existed by virtue of section 8(a)(5) of the NLRA and which had been recognized by the Defendant.

Thus, the Plaintiffs claim that they assert a Section [*22] 301 claim for breach of contradct, not an unfair labor practice claim.

The Defendant relies primarily on the opinion of the district court in _Cement Masons, 520 F. Supp. 942_. _Cement Masons_ involved a similar factual situation in which the Plaintiffs claimed that the contract itself survived the expiration date. _Id._ at 944. The _Cement Masons_ Court held:

As the court in _Hinson_ [v. _NLRB,_ 428 F.2d 133 (8th Cir. 1970)] indicated, these agreements do not "survive" in the sense that they continue as legally operative documents; rather, the _terms_ "survive" in order to define the parameters of the employer's obligation under section 8(a)(5) to maintain the status quo during negotiations.

_Id._ at 945. The Court agrees with this reasoning. To the extent Section 8(a)(5) of the NLRA extends the duty of the employer to contribute, it does so only for purposes of the NLRA.

Thus, to the extent the Plaintiffs wish to make out either an ERISA or an LMRA cause of action, they are required to establish some independent obligation of Defendant. In light of this Court's ruling with respect to Count I theories, there is no basis upon which the Plaintiff can [*23] assert a violation of either ERISA or the LMRA. Consequently, the federal claims contained in Count II are preempted by the NLRA.

With respect to the state law claims contained in Count II, the same analysis applies. As the Court stated above, the Plaintiffs' claims are preempted by the NLRA to the extent that they rely on an obligation to contribute arising under section 8(a)(5) of the NLRA. The United States Supreme Court noted in _San Diego Building Trades Council v. Garmon,_ 359 U.S. 236, 244 (1959):

When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield.

The _Garmon_ Court continued:

When an activity is arguable subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.

_Id._ at 245.

The State Law Claims contained in Count II are, in fact, allegations of an [*24] unfair labor practice within the purview of Section 8(a)(5). Although the Plaintiffs assert that a misinterpretation of an 8(a)(5) obligation does not constitute a brech of that section, the Court finds this to be merely a semantic, not a substantive difference. Indeed, the wording of the Amended Complaint itself belies the Plaintiffs' reasoning. In the Amended Complaint, the Plaintiffs alleged that the "Defendant unilaterally changed the terms of and conditions of employment without notifying the employees of the change." Amended Complaint, docket no. 16, P24, at 7. The Court finds no basis for distinguishing the Count II state law claims from a Section 8(a)(5) unfair labor practice allegation.

Consequently, the Court grants the Defendant's Motion with respect to Count II.

For the reasons stated above, the Defendant's Motion is granted and the Plaintiff's Motion is denied.

An appropriate Order shall issue.

_ORDER_

And now, this 17th day of April, 1985, in conformity with the foregoing Opinion, it is hereby ORDERED that the Plaintiffs' Motion for Summary Judgment is DENIED and the Defendant's Motion for Summary Judgment is GRANTED.

It is further ORDERED that [*25] Judgment is ENTERED in favor of the Defendant and against the Plaintiff.

**LAETHEM EQUIPMENT COMPANY, LAETHEM FARM SERVICE COMPA-
NY, and CANUSA EQUIPMENT COMPANY, Plain-
tiffs/Counter-Defendants-Appellants/Cross-Appellees, v J & D IMPLEMENT, INC.,
Defendant/Counter-Plaintiff/Third-Party Plaintiff-Appellee/Cross-Appellant, and
FRANCIS M. LAETHEM LIVING TRUST, KATHRYN M. LAETHEM, TRUS-
TEE, and LAETHEM LAND COMPANY, LLC, Third-Party Defendants.**

No. 266648

**COURT OF APPEALS OF MICHIGAN**

**2007 Mich. App. LEXIS 1769**

**July 19, 2007, Decided**

**NOTICE:**     THIS IS AN UNPUBLISHED OPINION.
IN ACCORDANCE WITH MICHIGAN COURT OF
APPEALS RULES, UNPUBLISHED OPINIONS ARE
NOT PRECEDENTIALLY BINDING UNDER THE
RULES OF STARE DECISIS.

**SUBSEQUENT HISTORY:** Appeal denied by Laethem
v. J & D Implement, Inc., 2008 Mich. LEXIS 315
(Mich., Feb. 19, 2008)

**PRIOR HISTORY:**  [*1]
   Tuscola Circuit Court. LC No. 05-022863-CK.
Laethem Equip. Co. v. Deere & Co., 2007 U.S. Dist.
LEXIS 21063 ( E.D. Mich., Mar. 26, 2007)

**DISPOSITION:**     Reversed and remanded. We do not
retain jurisdiction.

**JUDGES:** Before: Davis, P.J., and Hoekstra and
Donofrio, JJ.

**OPINION**

   PER CURIAM.

   Plaintiffs appeal as of right an order granting sum-
mary disposition to defendant. Defendant purports to
cross-appeal, but in fact only asserts an alternative
ground for affirmance. [1] We find that the grant of sum-
mary disposition was erroneous, and the asserted alter-
native basis is without merit. We therefore reverse and re-
mand.

   1  The ground asserted by defendant was not
   addressed by the trial court. However, even if it
   had actually been rejected by the trial court, "[a]

cross appeal [i]s not necessary to urge an 'alterna-
tive ground for affirmance.'" *Middlebrooks v
Wayne Co*, 446 Mich 151, 166 n 41; 521 NW2d
774 (1994).

   The instant litigation arises out of considerable his-
tory and a prior lawsuit. On January 4, 1993, Francis M.
Laethem, then the sole owner of plaintiffs Laethem
Equipment Company (LEC), Laethem Farm Service
Company (LFSC), Canusa Equipment Company
(Canusa) (collectively, the "Laethem businesses"), died
testate. Pursuant to his estate plan, the Laethem busi-
nesses were placed into the Francis M. Laethem Living
Trust.  [*2] The Trust named three of Francis's children,
Mark, Michael, and Kathryn Laethem, as trustees. The
Trust provided for "disinterested" and "interested" trus-
tees. Although the Trust did not explicitly name Kathryn
as the disinterested trustee, it clearly indicates that she
was, and it is also clear from the record that all relevant
parties also regarded her as the "disinterested trustee."
The Trust likewise indicates that Mark and Michael were
"interested trustees." The Trust provided that the "Set-
tlor's spouse," Anne Laethem, could remove a disinter-
ested trustee after naming a replacement.

   At the time of Francis's death, Mark and Michael
had been operating the Laethem businesses, and they
continued to do so. The family members apparently had
some discussions regarding Mark and Michael intending
to purchase the Laethem businesses from the Trust.
"Stock Purchase Agreements" were executed for the sale
of Canusa and LEC; they were made between Mark and
Michael in their roles as trustees and Mark and Michael
in their roles as individuals, and they were witnessed by
Anne. [2] Kathryn, acting as the Laethem businesses' certi-
fied private accountant, submitted yearly tax returns

starting in 1994, [*3] indicating that Mark and Michael were sole co-owners of the Laethem businesses. Between 1994 and 2001, Mark and Michael apparently secured several dealership franchises for the Laethem businesses, among other activities.

> 2 Plaintiffs concede that these transactions were poorly documented, and an alleged purchase of LFSC was not documented at all.

In 2001, Kathryn began raising objections to the business arrangements, and Mark and Michael attempted to negotiate a resolution. On October 15, 2001, Anne executed a document formally stating that she was removing Mark and Michael as trustees. Kathryn proceeded to act as sole trustee thereafter. On October 21, 2001, Kathryn removed Mark and Michael from their positions as officers and directors of the Laethem businesses. Mark and Michael apparently continued to be employed by the Laethem businesses and continued to conduct some of those businesses' operations. In the complaint in the underlying suit, Mark and Michael alleged that Kathryn did not actually tell them that they were no longer officers or directors, but that between late 2001 and late 2002, Kathryn informed a number of other creditors, financers, and franchisers that the Laethem [*4] businesses were insolvent or that Mark and Michael were no longer officers or directors or permitted to endorse corporate checks. On January 15, 2003, during a business meeting at the Laethem businesses' offices and involving Mark, Michael, and representatives from John Deere, Kathryn arrived with police and armed guards, terminated Mark and Michael's employment, and had them removed from the premises. Mark and Michael submitted a final offer to purchase the businesses; they then filed the complaint in the underlying suit on February 18, 2003.

The parties have only provided us with a few scattered excerpts from the underlying action. Mark and Michael alleged that Kathryn terminated most of the employees of the Laethem businesses and shut down most of their operations. Of particular significance to this case, on February 27, 2003, the trial court entered a temporary restraining order concluding "that unless the Court restrains Defendants [3] from selling or liquidating assets, Plaintiffs may suffer irreparable harm;" therefore "Defendants are restrained from selling, encumbering, liquidation [sic] or otherwise disposing of assets outside of the ordinary course of business." The next day, [*5] on February 28, 2003, Kathryn executed an "Asset Purchase Agreement" between J&D Implement, Inc. (defendant in the instant action) as the buyer, LEC as the seller, and the Trust. The only Laethem business that was a party to the agreement was LEC; none of the other Laethem businesses were mentioned anywhere in the agreement. Kathryn signed the agreement both in her capacity as

President of LEC and as the Trustee of the Trust, notwithstanding the prior purchase of LEC by Mark and Michael. The agreement explicitly referred to the pending lower court Case No. 03-21644-CZ and the fact that Michael and Mark were plaintiffs therein. On the same day, Kathryn individually, as Trustee of the Trust, entered into a "Commercial Lease Agreement" with J&D; J&D was the "tenant," the Trust was the "landlord," and the term of the lease was to be three years, beginning on February 3, 2003. None of the Laethem businesses were mentioned at all except in a reference to the pending litigation.

> 3 "Defendants" at this point referred to the defendants in the prior litigation, Kathryn and the Trust.

On November 1, 2004, the trial court entered a default judgment in favor of Mark and Michael, finding that they "are [*6] now and have been since January 4, 1993," the 50/50 co-owners of the Laethem companies, with the rights to profit from and control the companies themselves; the court also found that Mark and Michael had been the 50/50 equitable co-owners of all of the Laethem companies' commercial real estate located in Caro, Michigan. The same day, the parties apparently placed a settlement agreement on the record. The parties to the underlying lawsuit signed the Settlement Agreement on December 14, 2004. Specifically, the settlement agreement provides that it is made "between Mark Laethem and Michael Laethem (Mark and Mike) on the one hand, and Kathryn Laethem, the Francis M. Laethem Trust (the Trust), and Anne Laethem, Nancy Laethem Stern, Joseph Laethem, Carol Starling and Mary Vinckier (collectively, the Mother and Remaining Siblings), on the other."

The instant action was commenced approximately one month later, on February 15, 2005, by the Laethem businesses themselves. According to the second amended complaint, J&D acquired "certain of LEC's assets" pursuant to the February 28, 2003, Asset Purchase Agreement for the sum of $ 50,000, when in fact the assets were worth more than a million dollars. [*7] J&D did not acquire any "non-John Deere parts" in the transaction, but J&D allegedly sold non-John Deere parts anyway and kept the proceeds. J&D also did not acquire any assets of LFSC or Canusa, but allegedly took or sold property belonging to both. Finally, J&D allegedly took confidential or proprietary information belonging to all three of the Laethem businesses, even though information was not part of the asset purchase transaction. Plaintiffs further alleged that defendant knew or had reason to know that the assets it had acquired from LEC were worth far more than what defendant paid for them, and furthermore defendant knew or had reason to know

that Kathryn did not have the authority to execute the agreement on behalf of LEC.

The trial court granted summary disposition to defendant, holding that all of plaintiffs' claims derived from the February 28, 2003 agreements between J&D and LEC and executed by Kathryn at a time when Kathryn was fully authorized to do so. The trial court concluded that because Kathryn was properly authorized as sole trustee of the Trust to execute the agreements, the action was barred, so summary disposition was required under MCR 2.116(C)(7). The trial [*8] court further observed that when Mark and Michael received retroactive ownership of the businesses, they received the businesses' assets as they existed in December 2004. The trial court concluded that "LEC, LFSC, and Canusa cannot now rewrite history to undo this contract entered into by LEC and the Trust." The trial court deemed the rest of plaintiffs' claims derivative of issues arising out of the Asset Purchase Agreement or were or were premised on acts by Kathryn while she was acting in her capacity as president of LEC and trustee of the Trust.

J&D had filed a counter-complaint against plaintiffs and a third-party complaint against Kathryn and the Trust, essentially seeking indemnification; as a result of the trial court's grant of summary disposition in J & D's favor on plaintiffs' complaint, J & D sought to dismiss its counter-complaint and third-party complaint without prejudice. The parties stipulated to those dismissals, and the trial court granted the motion to dismiss without prejudice on November 1, 2005. This appeal followed.

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment [*9] as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all evidence submitted by the parties in the light most favorable to the nonmoving party and grants summary disposition only where the evidence fails to establish a genuine issue regarding any material fact. *Id.,* 120. Under MCR 2.116(C)(7), where the claim is allegedly barred, this Court considers any admissible documentary evidence supplied by the parties but otherwise treats the contents of the complaint as true. *Id.,* 119. This Court also reviews de novo as a question of law the proper interpretation of a contract. *Klapp v United Ins Group Agency, Inc,* 468 Mich 459, 463; 663 NW2d 447 (2003). The question whether res judicata bars a subsequent suit is a question of law that is reviewed de novo. *Pierson Sand and Gravel, Inc v Keeler Brass Co,* 460 Mich 372, 379; 596 NW2d 153 (1999). Although the trial court did not address all the issues argued on appeal, they were all raised below, and an issue raised in the trial court and pursued on appeal is preserved for review. *Peterman v Dep't of Natural Resources,* 446 Mich 177, 183; 521 NW2d 499 (1994).

Defendant [*10] argued below, and argues on appeal, that the settlement agreement that terminated the prior litigation contained a comprehensive release that now precludes plaintiffs from bringing any claims against defendant. It is not clear to what extent the trial court relied on the release provisions of the settlement agreement, but the trial court did hold that Mark and Michael received whatever assets of the Laethem businesses happened to exist as of the date of the settlement agreement. We have analyzed the applicability of the settlement agreement, and we agree with plaintiffs. To the extent the trial court concluded that the Settlement Agreement that ended the underlying action constituted a release by any party against defendant J&D, or that the a transfer in ownership of a corporation cuts off the corporation's ability to bring a claim on its own behalf for a harm sustained prior to the transfer in ownership, the trial court clearly erred.

The plain language of the settlement agreement unambiguously states in its first paragraph that the parties thereto *release each other* from claims. The same paragraph then goes on to explain that *this release* is to be complete, and *this completeness* includes [*11] "claims by or against any artificial entities." The only rational interpretation of the "by or against" language is that it was intended to preclude the parties to the agreement from bringing any claims against each other by any means. [4] The "by or against" language explains "this mutual release," which in turn references only Mark, Michael, Kathryn, the Trust, Anne, and the other Laethem siblings. Therefore, the agreement precludes a suit by any of the Laethem businesses - or even an entirely new entity under the control of Mark or Michael - against any of the parties to the underlying action based on anything that occurred prior to November 1, 2004. It does not preclude a suit by any natural or artificial entity against any other natural or artificial entity not a party to the agreement. It therefore does not preclude a claim by the instant plaintiffs against the instant defendant.

> 4    Defendant's interpretation would preclude any of the parties to the underlying action from suing *anyone* for any wrong they might have suffered prior to the date of the release. Defendant asserts that its construction would be rational because it would prevent the Laethem businesses from exposure to a countersuit [*12] by J&D. However, the agreement expressly contemplates at least the possibility of some kind of suit by J&D against the Laethem businesses. It also explicitly states that "[t]he parties acknowledge and

agree that any claims or causes of action held by [the Laethem businesses] are the sole and exclusive property of those entities."

The trial court also erred in finding that the settlement agreement itself transferred any assets or conveyed ownership of the Laethem businesses. The settlement agreement only "acknowledges" that Mark and Michael are the owners of the Laethem businesses. An order was entered before the settlement agreement was entered into, setting forth the *finding* that Mark and Michael "are now and have been since January 4, 1993," the 50/50 co-owners of the Laethem companies. Furthermore, the Laethem businesses' assets would have always belonged to the Laethem businesses. Absent circumstances such as fraud or illegality, corporations are legally distinct entities from their shareholders, even if there is only a single owner. *Dep't of Consumer & Industry Services v Shah, 236 Mich App 381, 393; 600 NW2d 406 (1999).* So a transfer in ownership of the corporations would have [*13] no bearing on whether the corporations *themselves* had a cause of action for a harm the *corporation itself* suffered. See *OD Silverstein, MD, PC v Services, Inc, 165 Mich App 355, 358-359; 418 NW2d 461 (1987)* (holding that a corporation's obligations survive changes in the corporation's ownership). The trial court ignored this distinction when it reasoned that new owners of a corporation cannot bring an action, in their role as owners of the corporation and on behalf of the corporation, for a harm sustained by the corporation prior to the new owners' assumption of ownership.

The more important consideration is the significance of the Asset Purchase Agreement. Defendant argues that plaintiffs' own assertions establish that Kathryn was authorized to execute it: plaintiffs' complaint averred that "On February 28, 2003, JD [sic] entered into an agreement with LEC, which at the time was controlled by Kathryn Laethem, and with the Francis M. Laethem Trust, also controlled by Kathryn Laethem." Defendant asserts that Kathryn was the sole trustee of the Trust, and notwithstanding any later retroactive changes in ownership, she had full authority in her capacity as sole trustee to bind the Laethem [*14] businesses at the time of the Asset Purchase Agreement. However, a proper parsing of plaintiffs' complaint does not establish agreement that Kathryn was *authorized* to do anything, merely that she was "in control" of the Trust and of LEC. A primary issue in the prior litigation was whether Kathryn was authorized to act as she did. The settlement agreement provides that Kathryn was always *a* trustee, not that she was *the* trustee. The trust provisions authorized Anne to remove the *disinterested* trustee only, meaning she could only have removed Kathryn, not Mark or Michael. Even assuming, arguendo, that all three trustees were "disinterested," they could only be removed after naming a successor, so her removal of Mark and Michael would still have been procedurally impermissible. Therefore, the Trust should not have permitted Kathryn to act as sole trustee, so her authority to bind the Trust or any trust-owned businesses to an agreement in that capacity was nonexistent.

Moreover, the trial court entered a temporary restraining order restraining Kathryn "from selling, encumbering, liquidation [sic] or otherwise disposing of assets outside of the ordinary course of business" the *day before* [*15] the Asset Purchase Agreement was entered into. Although this Court has not been provided with enough of the record from the prior proceedings to determine when or if the TRO was removed, it is highly unlikely that it would have been removed by the next day. The Asset Purchase Agreement apparently disposes of a significant portion of the Laethem businesses' assets and was an extraordinary transaction for the Laethem businesses. Therefore, the Asset Purchase Agreement must have been directly contrary to the order of the court. Also significantly, the Asset Purchase Agreement itself referenced the pending litigation by Mark and Michael against Kathryn. Therefore, J&D must have been aware of the existence of the pending litigation, and it should have been aware of the nature thereof, part of which was Kathryn's authority to act as sole trustee. Consequently, defendant's reliance on Kathryn's apparent authority to bind the Trust and to bind the Laethem businesses was misplaced.

Kathryn actually lacked authority to act as sole trustee of the Trust and to enter into the Asset Purchase Agreement in that role, she was under a court order not to engage in the kind of transaction represented by [*16] the Asset Purchase Agreement, and her apparent authority should have been clearly dubious. It is therefore unnecessary to further address whether J&D exceeded the scope of the Asset Purchase Agreement. The Asset Purchase Agreement was outside of Kathryn's authority.

Defendant finally argues that summary disposition should be affirmed on the alternative ground of res judicata. We disagree.

Res judicata is a judicially created doctrine intended to guard parties against multiple lawsuits, to conserve judicial resources, and to promote certainty. *Pierson Sand and Gravel, Inc., supra* at 380. It applies broadly in Michigan to bar subsequent actions between the same parties concerning issues that actually were, or reasonably should have been, addressed and decided in a prior action. *Id.* "The doctrine bars a second, subsequent action when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have

been, resolved in the first." _Adair v State_, 470 Mich 105, 121; 680 NW2d 386 (2004). Furthermore, the doctrine of res judicata "bars not only claims already litigated, but also every claim arising [*17] from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." _Id._

Regarding the first element, this Court has held that res judicata applies to settlements and consent judgments. _Ditmore v Michalik_, 244 Mich App 569, 576; 625 NW2d 462 (2001). See also, _Rayl v Hammond's Estate_, 100 Mich 140, 146-148; 58 NW 654 (1894). Therefore, defendant is correct in asserting that res judicata is potentially applicable here, notwithstanding the fact that the original litigation was ended by mutual agreement among the parties rather than by a trial and judgment. The distinction is between an action that is resolved for substantive reasons, as opposed to purely procedural reasons. _Verbrugghe v Select Specialty Hosp_, 270 Mich App 383, 394-396; 715 NW2d 72 (2006). For the purposes of res judicata, a settlement by agreement of the parties is substantive, so the prior litigation was "decided on its merits."

Regarding the second element, it is undisputed that the actual parties to the instant litigation are not the same parties who were involved in the prior litigation. However, "a perfect identity of the parties is not required;" rather, "privity is to be so [*18] identified in interest with another party that the first litigant represents the same legal right that the later litigant is trying to assert." _Adair, supra_ at 122. In the prior litigation, Mark and Michael sued, in their individual capacities, for control of the Laethem businesses. In the instant litigation, the Laethem businesses are suing, in their own capacities, to recover assets that were allegedly wrongfully taken or to recoup damages allegedly sustained due to interference with their affairs. The sole shareholder of a corporation cannot sue in his own name on behalf of the corporation. _Randall v Dudley_, 111 Mich 437, 439-440; 69 NW 729 (1897). The interests involved in the prior action were limited to the individuals involved, and the interests involved here are limited to the corporations. Therefore, the parties are not identical and they are not in privity. The second element of res judicata is not met.

Related to the second element, the third element of res judicata, "whether the matter in the second case was or could have been resolved in the first," is to be determined by pragmatically. _Adair, supra_ at 123-125. This entails assessing "whether the claims in the instant case [*19] arose as part of the same transaction as did the claims in" the prior action, "by considering whether the facts are related in time, space, origin or motivation, [and] whether they form a convenient trial unit." _Id., 125,_ quoting 46 Am Jur 2d, Judgments § 533, p 801 (emphasis added by the _Adair_ Court omitted). The prior litigation was a dispute between siblings and co-trustees over ownership of the plaintiffs in the present litigation. It was therefore largely a "family affair" between individuals. Defendant argues that in the prior litigation, Mark and Michael were asserting rights on behalf of the Laethem businesses, but this is simply incorrect. The prior litigation was personal. More importantly, the prior litigation was over control of the Laethem businesses, which in turn governs _who can_ assert rights on behalf of the corporations. As a pragmatic matter, the instant litigation, which is purely corporate, _could not_ have been asserted until it was determined who owned the Laethem businesses. The third element of res judicata is also not met.

We therefore hold that the settlement agreement between the parties to the prior litigation did not bar any claims the parties thereto might [*20] have had against any individual or entity not a party thereto, and it did not itself convey ownership of the Laethem businesses or any assets thereof. We also hold that the Asset Purchase Agreement between Kathryn as sole trustee of the Trust and as President of LEC was contrary to both her actual and apparent authority, and it was forbidden by the previous day's court order. Finally, we hold that although the prior action was decided on its merits, it is not res judicata as to the instant litigation.

Reversed and remanded. We do not retain jurisdiction.

/s/ Alton T. Davis

/s/ Joel P. Hoekstra

/s/ Pat M. Donofrio

LEXSEE

**ACCIDENT VICTIMS HOME HEALTH CARE, Plaintiff-Appellant, v ALLSTATE INSURANCE COMPANY, Defendant-Appellee.**

No. 257786

COURT OF APPEALS OF MICHIGAN

2006 Mich. App. LEXIS 1791

June 6, 2006, Decided

**NOTICE:** [*1] THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**PRIOR HISTORY:** Wayne Circuit Court. LC No. 04-400191-NF.

**DISPOSITION:** Affirmed.

**JUDGES:** Before: Neff, P.J., and Saad and Bandstra, JJ.

**OPINION**

PER CURIAM.

Plaintiff, Accident Victims Home Health Care, appeals the trial court's order that granted summary disposition to defendant, Allstate Insurance Company. We affirm.

I. Facts and Procedural History

On April 28, 2001, Bridget Gaither sustained various injuries when she was struck by an automobile while she was riding a bicycle in the City of Detroit. Among other providers, Accident Victims Home Health Care provided Gaither healthcare services that totaled approximately $ 40,000. Gaither sought personal protection insurance (PIP) benefits from Allstate Insurance Company, the insurer of the automobile. The parties agree that Allstate paid some of Gaither's medical expenses, but rejected others because, according to Allstate, the expenses were not related to the accident. Accordingly, Gaither's guardian filed a lawsuit on Gaither's behalf to recover no-fault benefits from Allstate.

It [*2] is undisputed that some of the benefits Gaither sought were for services she received from Accident Victims. During the litigation, the trial court ordered Accident Victims' owner, George Paige, to appear for deposition. His deposition never took place, however, and Gaither settled with Allstate for $ 6,000 in October 2003. As part of the settlement process, Gaither's legal guardian signed a release that stated that Allstate did not have to pay any further benefits to her and she also expressly released Allstate from all claims for benefits by Accident Victims and her other healthcare providers. On December 10, 2003, pursuant to a stipulation by the parties, the trial court entered an order that dismissed the case with prejudice.

On January 5, 2004, Accident Victims filed this action against Allstate and asserted that it is entitled to PIP benefits for Gaither's healthcare services. Allstate filed a motion for summary disposition and argued that Gaither's release barred Accident Victims' action. The trial court granted summary disposition to Allstate on August 11, 2004, and Accident Victims now appeals. [1]

> 1 "A trial court's order granting summary disposition pursuant to MCR 2.116(C)(7) is reviewed de novo 'to determine whether the moving party was entitled to judgment as a matter of law.'" Hall v Small, 267 Mich. App. 330, 333; 705 N.W.2d 741 (2005), quoting Stoudemire v Stoudemire, 248 Mich. App. 325, 332; 639 N.W.2d 274 (2001).

[*3] II. Analysis

Our courts have routinely permitted medical care providers to file or intervene in actions to recover no-fault benefits from insurers to pay for medical services provided to automobile accident victims. Regents of the Univ of Michigan v State Farm Mutual Ins Co, 250 Mich. App. 719; 650 N.W.2d 129 (2002); Lakeland Neurocare Centers v State Farm Auto Ins Co, 250 Mich. App 35; 645 N.W.2d 59 (2002); Munson Medical Ctr v Auto Club Ins Ass'n, 218 Mich. App. 375; 554

N.W.2d 49 (1996); *Johnson v Michigan Mutual Ins Co*, 180 Mich. App. 314; 446 N.W.2d 899 (1989). This is true regardless whether the injured person is also involved in the litigation. *Regents, supra, Lakeland, supra, Munson, supra.* Further, our Court has recognized the validity of an insured's assignment of rights to past due and presently due no-fault benefits to a healthcare provider. *Professional Rehabilitation Assoc v State Farm Mut Auto Ins Co*, 228 Mich. App. 167, 172; 577 N.W.2d 909 (1998).

As a practical matter, [*4] we also recognize that "it is common practice for insurers to directly reimburse healthcare providers for services rendered to their insureds." *Lakeland, supra at 39*. And, when a dispute arises with regard to the reasonable amounts owing for healthcare, it is far more likely for the provider to seek reimbursement from the insurer, rather than the injured party. As this Court observed in *LaMothe v Auto Club Ins Ass'n*, 214 Mich. App. 577; 543 N.W.2d 42 (1996):

> [I]n the circumstance where the health care services provider felt that the reasonability determination of the insurer was flawed, it is also unlikely that the provider would be so impolitic as to sue the insured rather than the insurer for the difference. Again, the reason is the very practical one of the provider placing itself on the wrong side of a David and Goliath match-up. Thus, we can anticipate that health care services providers, as practical litigants, would bypass the insured and directly sue, pursuant to third-party beneficiary theories, the entity with prospects identical to their own for engendering jury sympathy -- the insurer. [*Id.* at 585-586.]

When [*5] confronted with the question whether a healthcare provider's claim for no-fault benefits is entirely dependant on the rights of the injured party, our Court has also opined that "[a]lthough plaintiffs may have derivative claims, they also have direct claims for personal protection insurance benefits." *Regents, supra at 733*.

In light of these precedents, we question the proposition advanced by Allstate that an insured may enter a release that purports to discharge any claim by a healthcare provider for reasonable medical expenses owed by an insurer in exchange for a settlement check made payable only to the insured. However, regardless of the question of the validity of the release, Accident Victims' claim is barred by collateral estoppel. Accord-

ingly, we need not address Allstate's position regarding the release.

"Collateral estoppel, or issue preclusion, precludes relitigation of an issue in a subsequent, different cause of action between the same parties or their privies when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in the prior proceeding." *Ditmore v Michalik*, 244 Mich. App. 569, 577; [*6] 625 N.W.2d 462 (2001). In the underlying *Gaither* case, the parties, Gaither and Allstate, voluntarily dismissed the lawsuit with prejudice after they negotiated and settled the claims. See *Limbach v Oakland Co Rd Comm*, 226 Mich. App. 389, 395; 573 N.W.2d 336 (1997). Those claims, among others, indisputably included past medical expenses that Gaither incurred when she received healthcare services from Accident Victims. Indeed, the parties agree that Gaither's claim for no-fault benefits from Allstate was based, in part, on Allstate's refusal to pay bills submitted by Accident Victims for its services to Gaither.

Moreover, the precise issue Accident Victims now seeks to litigate was fully litigated in the prior proceeding. In the underlying case, Gaither sought PIP benefits for reasonable and necessary expenses related to her medical care from Accident Victims and other healthcare providers as a result of the motor vehicle accident. Allstate challenged the amounts claimed by Gaither because, it argued, that they were not reasonably necessary or related to the accident. Here, Accident Victims seeks payment for the identical benefits Gaither [*7] claimed in the prior proceeding and, again, challenges Allstate's failure to pay the PIP benefits and argues that the expenses resulted from the motor vehicle accident and were the result of reasonably necessary services to Gaither. In the prior case, Gaither and Allstate reached a settlement with regard to the amount of PIP benefits Allstate would pay for reasonably necessary services necessitated by the automobile accident, and they voluntarily dismissed the action with prejudice. This constitutes a final adjudication of the identical issue Accident Victims raises in this case. *Limbach, supra.*

We further hold that, here, the interests of Gaither and Accident Victims are sufficiently similar so that the prior litigation afforded Accident Victims a forum to protect its rights under the no-fault act. Thus, for purposes of collateral estoppel, Gaither and Accident Victims were in privity. This Court set forth in *Phinisee v Rogers*, 229 Mich. App. 547, 553-554; 582 N.W.2d 852 (1998) the definitions of privity applicable in this state:

> In *Sloan v Madison Heights*, 425 Mich. 288, 295-296; 389 N.W.2d 418

(1986), [*8] our Supreme Court defined "privity" as follows: "In its broadest sense, privity has been defined as 'mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right.' " (Citation omitted). Black's Law Dictionary (6th ed.), p 1199, defines privity as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right . . . . [It] signifies that [the] relationship between two or more persons is such that a judgment involving one of them may justly be conclusive upon [the] other, although [the] other was not a party to lawsuit.

"Privity between a party and a non-party requires both a 'substantial identity of interests' and a 'working or functional relationship . . . in which the interests of the non-party are presented and protected by the party in the litigation.' " *SOV* [v *Colorado*, 914 P.2d 355, 360 (Colo, 1996)], quoting *Public Service Co v Osmose Wood Preserving, Inc*, 813 P.2d 785, 787 (Colo App, 1991).

Here, Gaither and Accident [*9] Victims had substantially identical interests in the PIP benefits because, while Accident Victims billed the amounts for services, Gaither was entitled to reimbursement for them. Indeed, as noted, our case law holds that Accident Victims has standing to pursue no-fault benefits just as the insurer has that right.

Under these facts, Allstate should not be subject to multiple litigation over the identical expenses that were fully litigated, settled, and dismissed with prejudice in *Gaither*. Our decision is also premised on the undisputed fact that Accident Victims was fully aware of the *Gaither* litigation. Even prior to Gaither's decision to file suit, Accident Victims knew, when it sent bills to Allstate for payment that Allstate rejected them as unnecessary or unrelated to the accident. Further, Accident Victims

concedes that it knew that Gaither filed the action and was seeking the same no-fault benefits to which Accident Victims now claims it is entitled. Accident Victims clearly could have sought to intervene in Gaither's case in order to fully protect its own interests in the disputed benefits, but failed to do so. MCR 2.209; *Johnson, supra.* [*10] [2] Accident Victims will not be heard to argue that the insurer must now pay the same benefits it litigated in the prior action when Accident Victims sat on its rights during the prior litigation. [3] Accordingly, we affirm the trial court's grant of summary disposition to Allstate, but for reasons different than those relied upon by the trial court.

[2] Moreover, Accident Victims could have negotiated with Gaither for an assignment of her rights to the past-due benefits and, even now, may seek payment for its services directly from Gaither. While we acknowledge that, in many instances, an accident victim may be unable to pay the substantial medical bills incurred following a motor vehicle accident, this further underscores the healthcare provider's interest in intervening in an action to recover those benefits before its rights to payment are decided or settled, and dismissed.

[3] To the extent Accident Victims may claim rights to benefits, penalty interest or fees that Gaither failed to raise or litigate in the prior action, those claims would be barred by res judicata because, under Michigan's broad application of the rule, claims arising out of the same transaction that were *or could have been raised* in the prior litigation are also barred. *Bergeron v Busch*, 228 Mich. App. 618, 621; 579 N.W.2d 124 (1998).

[*11] Affirmed.

/s/ Henry William Saad

/s/ Richard A. Bandstra

I concur in result only.

/s/ Janet T. Neff

**FARMERS INSURANCE EXCHANGE, Plaintiff-Appellee, v RUFUS YOUNG, Defendant-Appellant, and NICOLE WILLIAMS and LINDA LEE, Defendants. HENRY FORD HEALTH SYSTEM, Plaintiff-Appellee, v FARMERS INSURANCE EXCHANGE, Defendant-Appellant.**

No. 275584, No. 283865

**COURT OF APPEALS OF MICHIGAN**

**2010 Mich. App. LEXIS 1499**

**August 3, 2010, Decided**

**NOTICE:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**SUBSEQUENT HISTORY:** Review pending at Farmers Ins. Exch. v. Young, 488 Mich. 980, 791 N.W.2d 116, 2010 Mich. LEXIS 2453 (2010)
Leave to appeal denied by Farmers Ins. Exch. v. Young, 489 Mich. 909, 796 N.W.2d 470, 2011 Mich. LEXIS 777 (2011)

**PRIOR HISTORY:** [*1]
Wayne Circuit Court. LC No. 06-601127-NF. Wayne Circuit Court. LC No. 06-611910-NF.

**JUDGES:** Before: ZAHRA, P.J., and O'CONNELL and K.F. KELLY, JJ.

**OPINION**

PER CURIAM.

In Docket No. 275584, defendant, Rufus Young, appeals as of right a declaratory judgment in favor of plaintiff, Farmers Insurance Exchange, which denied Young personal protection insurance benefits. In Docket No. 283865, defendant, Farmers Insurance Exchange, appeals as of right a subsequent judgment in favor of plaintiff, Henry Ford Health System ("Henry Ford"). It challenges the trial court's earlier order refusing to apply collateral estoppel to Henry Ford's claim and denying Farmers Insurance Exchange's motion for summary disposition. [1] We affirm in Docket No. 275584 and reverse in Docket No. 283865.

1 This Court consolidated the appeals in docket numbers 275584 and 283865. *Farmers Ins Exchange v Young*, unpublished order of the Court of Appeals, entered September 10, 2008 (Docket Nos. 275584 and 283865).

I. BASIC FACTS AND PROCEEDINGS

This case arises out of an automobile accident that occurred on June 6, 2005. Nicole Williams owned a 2001 Kia, one of the vehicles involved in the accident. Before the accident, she received a prepaid vacation [*2] to the Bahamas. She planned to stay in the Bahamas from Sunday, June 5, 2005, until Thursday, June 9, 2005, and needed a caretaker for seven-year-old Jalen. Williams learned that her cousin, Lee, was losing her home. Williams invited Lee to stay at her home and take care of Jalen. Lee accepted the offer and moved in on Saturday, June 4, 2005.

Williams testified that she spoke to Lee about the Kia before she left for her trip. Because Williams had been on disability and could not drive, the vehicle was parked in Williams' fenced backyard. Williams had not insured it or used it for several months. Williams testified that she told Lee that "I didn't have any insurance," and Lee replied, "I'm not going anywhere." Williams believed that if she told Lee that the vehicle was uninsured, Lee would not drive it. Williams testified that Lee did not need to drive anywhere in order to care of Jalen. Williams provided Lee with food and money, and told Lee to walk Jalen around the corner to school. Lee had driven the Kia once previously, years earlier, in an "emergency." Cynthia Hughes, Williams' sister, told Lee that she would be available if Jalen or Lee needed transportation.

Hughes drove Williams [*3] to the airport. Williams testified that Hughes did not use the Kia for this

trip. However, Lee testified that Hughes drove Williams to the airport in the Kia and that meanwhile she and Jalen stayed at Hughes' home. Lee claimed that Hughes did not own a vehicle. Lee testified that when Hughes returned, she gave Lee the keychain and instructed her to take Jalen and the vehicle back to Williams' home. Lee claimed that, in addition to caring for Jalen, she needed the Kia in order to move her belongings into Williams' home.

On the night of the accident, Lee was intoxicated. She drove Jalen, in the Kia, from Williams' home to a party store to buy beer. Then, she took Jalen to Young's workplace. Young worked in a two-family unit, repairing drywall, plumbing and electrical problems. He also lived on the premises. When Lee reached the unit, she drank beer on the porch while Jalen rode his bike. Lee stayed approximately 45 minutes. When Lee stood up to leave, between 7:00 and 8:00 p.m., both she and Young believed that she was no longer fit to drive.

Lee testified that she was "ready to go home," but leaving was not an emergency. She hoped that Young would help her move into Williams' home. In [*4] contrast, Young testified that Lee was annoying him at work. He testified that even though Lee was intoxicated, he could not allow her and Jalen to stay there. Because he did not want Lee to drive in her condition, Young agreed to drive them to Williams' home. Young's driving privileges had been terminated since 1983. Young testified that Williams did not give him permission to drive the Kia before she left. He opined that, in light of his driving record, Williams would not have allowed him to use it. He did not know if Lee had permission to drive the Kia.

While Young was driving to Williams' home with Lee and Jalen, another driver hit the Kia. Lee and Young were injured. Jalen was killed. The other driver was criminally charged for the accident. Young did not receive a traffic citation.

Because none of the parties or vehicles were insured, Young subsequently applied for personal protection benefits for his injuries and medical expenses through the Assigned Claims Facility, MCL 500.3172. Farmers Insurance Exchange was Young's Assigned Claims Carrier. Farmers Insurance Exchange filed a complaint for declaratory relief on January 11, 2006. Farmers Insurance Exchange claimed that it could [*5] deny benefits to Young under MCL 500.3113 because he used Williams' vehicle without consent or a reasonable belief that he was entitled to use it.

Following the presentation of evidence at trial on December 6, 2006, the trial court stated that Young was not lawfully entitled to drive Lee and Jalen to Williams' home because he was unlicensed. The court also stated that no exigency existed because Lee had money to seek

alternative transportation. Finally, the court stated that the Good Samaritan doctrine did not apply because it excuses a defendant from contributory negligence, not unlawful conduct. The trial court concluded that Farmers Insurance Exchange was entitled to relief. The trial court also dismissed Young's case against Farmers Insurance Exchange for first-party benefits, lower court no. 06-603757-NF, based on res judicata. Young filed a motion for reconsideration with the trial court on December 19, 2006. Consistent with its holding on December 6, 2006, on January 10, 2007, the trial court entered an order stating that Young unlawfully operated the Kia and had no reasonable belief that he was entitled to do so. The trial court also ordered that Young was not entitled to no-fault [*6] benefits arising out of the accident, which resulted from his use of the Kia. Young filed an appeal as of right.

In a separate case, Henry Ford filed a complaint against Farmers Insurance Exchange on April 25, 2006. It maintained that it provided services to Young for injuries arising from the June 6, 2005, accident. It claimed that Farmers Insurance Exchange was liable for the cost of these services pursuant to MCL 500.3112. In its answer, Farmers Insurance Exchange denied liability.

On February 23, 2007, Farmers Insurance Exchange filed a motion for summary disposition. It claimed that the trial court's earlier declaratory judgment finding that Young was not entitled to personal protection insurance benefits arising out of the June 6, 2005, accident, barred Henry Ford's recovery for Young's medical expenses from that accident. In response, Henry Ford argued that the parties in the two cases differed, it was not provided notice of the declaratory judgment action, and it had not yet had an opportunity to litigate the issue. It also argued that the declaratory judgment was not final because all appeals had not been exhausted. Relying on *Borgess Medical Ctr v Resto*, 273 Mich App 558; 730 NW2d 738 (2007), [*7] [2] vacated and aff'd *Borgess Medical Ctr v Resto*, 482 Mich 946; 754 NW2d 321 (2008), and stating that summary disposition would be inequitable, the court denied Farmer's Insurance Exchange's motion on April 17, 2007.

> 2 The Supreme Court vacated this Court's majority opinion in *Borgess*, but affirmed its judgment for the reasons stated in the concurring opinion. *Borgess Medical Ctr, supra*, 482 Mich 946.

The trial court excluded from evidence the outcome of the declaratory judgment and the case proceeded to trial. Young testified for Henry Ford. He clarified or changed his testimony from that in the declaratory judgment action in several respects. First, he testified that he wanted Lee to leave his workplace because he expected

his supervisor and did not want him to see Lee. Second, in contrast to his earlier testimony that he did not know if Lee had permission to drive the Kia, Young testified that he believed she had permission. Third, in contrast to his earlier testimony that Williams would not have permitted him to drive the Kia, Young testified that Williams may have allowed it if he had asked her. Because Williams and Lee were not available, Williams' earlier deposition and Lee's testimony [*8] from Young's trial were read into the record for the jury. The jury found in Henry Ford's favor, concluding that Henry Ford incurred $ 157,523.86 for services provided to Young and that Young did not take the vehicle unlawfully, without a reasonable belief that he was entitled to do so. [3] A judgment for Henry Ford was entered on January 30, 2008. Farmers Insurance Exchange filed its claim of appeal from this judgment on February 20, 2008.

> [3] We note that the trial court did not instruct the jury regarding the definition of "taken unlawfully" in MCL 500.3113(a).

Docket No. 275584 was submitted on case call on February 13, 2008. On February 22, 2008, Young filed a motion in Docket No. 275584, requesting that this Court consider the jury verdict for Henry Ford and the corresponding January 30, 2008, judgment. This Court granted Young's motion on March 20, 2008. *Farmers Ins Exchange v Young*, unpublished order of the Court of Appeals, entered March 20, 2008 (Docket No. 275584). On August 26, 2008, Farmers Insurance Exchange moved to consolidate docket numbers 275584 and 283865. This Court granted the motion on September 10, 2008. [4]

> [4] *Farmers Ins Exchange v Young*, unpublished order of the Court [*9] of Appeals, entered September 10, 2008 (Docket Nos. 275584 and 283865).

## II. DOCKET NO. 275584

On appeal, Young contends that the trial court erred when it concluded that, pursuant to an exclusion in MCL 500.3113, he was not entitled to personal protection insurance benefits.

### A. STANDARD OF REVIEW

This Court reviews de novo a trial court's ruling in a declaratory judgment action. *Toll Northville, Ltd v Northville Twp*, 480 Mich 6, 10; 743 NW2d 902 (2008). The trial court's findings of fact are reviewed for clear error. *Christiansen v Gerrish Twp*, 239 Mich App 380, 387; 608 NW2d 83 (2000); MCR 2.613(C). A trial court's finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake was made. *Christiansen*, 239 Mich App at 387.

### B. ANALYSIS

MCL 500.3113(a) provides, in pertinent part, that:

> A person is not entitled to be paid personal protection insurance benefits for accidental bodily injury if at the time of the accident any of the following circumstances existed:
>
> (a) The person was using a motor vehicle or motorcycle which he or she had taken unlawfully, unless the person reasonably believed that he or she was entitled to take and use the vehicle.

This [*10] Court recently addressed the above provisions in *Amerisure Ins Co v Plumb*, 282 Mich App 417, 766 NW2d 878 (2009), lv denied, 485 Mich 909; 773 NW2d 18 (2009), under very similar circumstances.

In *Plumb*, the plaintiff was at a bar consuming alcohol. Another patron later arrived at the bar having driven himself there in an uninsured Jeep Cherokee. He left the keys in the vehicle and left the doors open. He did not know the plaintiff and did not give her permission to drive the vehicle. The plaintiff left the bar with two other men. One of the men allegedly handed her the keys to the Jeep and asked her to drive because he was on probation. The plaintiff was intoxicated, did not maintain automobile insurance, and did not reside with a relative who carried automobile insurance. Further, her driver's license had been suspended. Later that morning, the plaintiff was found lying in a field near the bar, having sustained severe injuries. Police concluded that the plaintiff had been driving the Jeep and was its sole occupant. *Plumb*, 282 Mich App at 420-421.

The plaintiff sought PIP benefits and an insurer was assigned the claim. The insurer, however, filed a declaratory action alleging that the [*11] plaintiff was not entitled to PIP benefits pursuant to MCL 500.3113(a) when the Jeep was taken unlawfully and when the plaintiff did not have a reasonable belief that "she was entitled to take and use the vehicle." In a split decision, this Court held that the plaintiff "unlawfully took" the Jeep and that the plaintiff did not reasonably believe that she was entitled to use a vehicle.

Here, the trial court made sufficient findings to conclude Young took the Kia unlawfully for the purposes of MCL 500.3113(a). The trial court found that Lee did not have Williams' permission to drive the Kia. Williams testified that she told Lee that the Kia was uninsured and she believed Lee would not drive it because Lee said,

"I'm not going anywhere." The trial court also found that "[t]hough [Young] allegedly was, according to one person, given the direction by a Linda Lee to operate the [Kia], [Young] had no reason to believe that she had the authority or permission to give him permission to operate the [Kia]." The lower court record supports this finding. The record reflects that Young knew Lee, the mother of two of his daughters, and Williams, Lee's cousin, very well. Also, the record establishes [*12] that Young knew the Kia belonged to Williams and did not belong to Lee. Young even testified that Williams would not have consented to him driving the Kia. Further, a reasonable inference can be made that Lee would not have had Williams' permission to use Kia when she arrived at Young's place of employment intoxicated with Williams' son in tow. The argument that Young believed that Lee had Williams' permission to use the Kia under these circumstances is disingenuous and contrary to the record evidence. There is no evidence that Young had Williams' consent or implied consent to take the Jeep. Thus, consent could not be implied through a chain of entrustment from Lee to Young. *Bronson Methodist Hosp v Forshee*, 198 Mich App 617, 626; 499 NW2d 423 (1993). [5] Accordingly, under *Plumb*, Young took the Kia unlawfully for the purposes of MCL 500.3113(a).

> 5    Our dissenting colleague claims to be following his dissent in *Plumb*, 282 Mich App 417, in which he expressly, "concur[red] with the majority's holdings that no genuine issue of material fact exists regarding whether defendant Rae Louise Plumb *unlawfully* took the Jeep." *Id.* at 433 (O'CONNELL, J., dissenting) (emphasis added). However, under [*13] the same legally operative facts, the dissent now concludes that Young lawfully took the Kia. In doing so, the dissent claims to "follow the Court's statement in *Bronson, supra*, which specifically interpreted MCL 500.3113(a) so as *not* to exclude from coverage those individuals who operate a motor vehicle without a valid operator's permit." (Emphasis in original). The dissenting opinion in *Plumb* did not even mention *Bronson*. In any event, *Bronson* is distinguishable. In *Bronson*, the alleged insured presented evidence of an "unbroken chain of permissive use" to establish consent. *Id.*, at 625. In the instant case, there is no evidence that Williams consented to Young driving the Kia. Indeed, the trial court's findings support a conclusion that Young engaged in joyriding. *Mester v State Farm Mut Ins Co*, 235 Mich App 84, 88; 596 NW2d 205 (1999). Because Young and Williams are not family members, the exception to joyriding is not available. *Id.*; *Allen v State Farm Mut Automobile Ins Co*, 268 Mich App

342, 346; 708 NW2d 131 (2005) (BANDSTRA, J.). Moreover, the majority of the Supreme Court does not appear to have been persuaded by the arguments now advanced by the dissent. *Plumb*, 485 Mich at 909-911.

In [*14] addition, *Plumb* also held that the plaintiff could not have reasonably believed that he was entitled to legally use the Jeep at the time of the accident. This Court noted that the plaintiff was intoxicated and her driver's license had been suspended. As noted, Lee and Young did not have consent to drive the Kia. In addition, Young was not issued a valid operator's license and he knew it was unlawful for him to operate the Kia without a license. Further, Lee testified that an emergency did not exist to require Young to drive. Although Lee was intoxicated and unable to drive, she had money for a cab or bus. She also could have contacted Hughes for assistance. Alternatively, Lee could have remained where she was until she was sober. In light of these facts, Young could not have reasonably believed that he was entitled to use the Kia. The trial court properly determined that, pursuant to MCL 500.3113(a), Young was excluded from personal protection insurance benefits. *Id.* [6]

> 6    Rather than respond to the many contrivances within the dissent, i.e., nn 5, 12, we merely recognize the dissenting opinion would essentially sanction extending no-fault benefits to those operating automobiles who are [*15] unlicensed, uninsured and lack the owner's permission, so long as they were allegedly doing good deeds.

DOCKET NO. 283865

On appeal, Farmers Insurance Exchange maintains that Henry Ford's action should have been barred by collateral estoppel as a result of the ruling in the declaratory judgment action. [7]

> 7    The dissenting opinion argues that the trial court in Docket No. 275584 did not conclude that "Young unlawfully took this vehicle." The dissent is forced to take this position because otherwise Henry Ford's action would be barred by collateral estoppel. There is no legal merit to the dissent's argument. The trial court entered an order finding that Young was not entitled to no-fault benefits. In this order, the trial court expressly concluded that Young did not have a reasonable belief that he was entitled to use the Kia. Implicit in the trial court's finding is the conclusion that Young unlawfully took the Kia.
>
> The dissent further erroneously relies on evidence that in Docket No. 275865 that "a jury determined that the Kia was not unlawfully taken."

(Emphasis removed). As discussed below, the trial court in Docket No. 275865 erred in not granting Farmers Insurance Exchange *summary [\*16] disposition* based on collateral estoppel. Before the second case was presented to the jury, there existed an order in Docket No. 275584 concluding that Young was not entitled to no-fault benefits. Accordingly, the jury verdict in Docket No. 275865 is legally irrelevant and should not even be considered for any purpose.

## A. STANDARD OF REVIEW

The application of legal doctrines, such as collateral estoppel, is reviewed de novo. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).

## B. ANALYSIS

Farmers Insurance Exchange specifically argues that the trial court erred by denying its motion for summary disposition. It maintains that Henry Ford's claim for the repayment of Young's medical expenses should have been collaterally estopped by the trial court's declaratory judgment. We agree.

The application of collateral estoppel generally requires the satisfaction of three elements:

> (1) "a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment;" (2) "the same parties must have had a full [and fair] opportunity to litigate the issue;" 2 and (3) "there must be mutuality of estoppel." [*Monat v State Farm Ins Co*, 469 Mich 679, 682-684; 677 NW2d 843 (2004), [\*17] quoting *Storey v Meijer, Inc*, 431 Mich 368, 373 n 3; 429 NW2d 169 (1988).]

Here, the issue actually litigated was whether MCL 500.3113(a) precluded Farmers Insurance Exchange's payment of personal protection insurance benefits to Young. Therefore, when Farmers Insurance Exchange argued MCL 500.3113(a) as a defense to Henry Ford's subsequent action, this issue had already been litigated. *Monat, supra*, 469 Mich 682.

Further, for collateral estoppel to preclude relitigation of issues, the parties in the second action must be the same as or privy to the parties in the first action. *Van-Vorous v Burmeister*, 262 Mich App 467, 480; 687 NW2d 132 (2004). "A party is one who is directly interested in the subject matter and has a right to defend or to control the proceedings and to appeal from the judg-

ment." *Husted v Auto-Owners Ins Co*, 213 Mich App 547, 556; 540 NW2d 743 (1995), aff'd 459 Mich 500 (1999). Even though *Henry Ford* was not a named party in the declaratory action, it was privy to Young. "A person is in privy to a party if, after the judgment, the person has an interest in the matter affected by the judgment through one of the parties, such as by inheritance, succession, or purchase." [*18] *Husted, supra*, 213 Mich App 556. In addition to a substantial identity of interests, Michigan courts require "'a working or functional relationship . . . in which the interests of the non-party are presented and protected by the party in the litigation.'" *Peterson Novelties, Inc v City of Berkley*, 259 Mich App 1, 13; 672 NW2d 351 (2003), quoting *Phinisee v Rogers*, 229 Mich App 547, 553-554, 582 NW2d 852 (1998), lv den 459 Mich 956 (1999).

Here, Young and Henry Ford shared an interest in the declaratory judgment, namely, Young's right to recover personal insurance protection benefits, including medical costs arising from the accident. *Husted, supra*, 213 Mich App 556. Although Henry Ford claimed that it was not provided notice of the declaratory judgment action, it acknowledged that it learned of the action from responses to interrogatories filed in its own action. With this knowledge, Henry Ford could have intervened in the declaratory judgment action to protect its rights. We conclude that Henry Ford was privy to Young in the declaratory action.

Contrary to this conclusion, Henry Ford relies on Borgess *Medical Ctr, supra*, 273 Mich App 569, and maintains that it was not privy to Young [*19] because it had a cause of action for unpaid medical bills, which was independent from Young's application for personal protection benefits. We agree that Henry Ford had an independent cause of action. See *Borgess Medical Ctr, supra*, 273 Mich App 558 (the subsequently vacated opinion held that a medical provider has an independent cause of action against a no-fault carrier liable for benefits to the injured person); *Lakeland Neurocare Ctrs v State Farm Mut Automobile Ins Co*, 250 Mich App 35, 42-44; 645 NW2d 59 (2002) (a party providing benefits to an injured person entitled to no-fault benefits may make a direct claim against a no-fault insurer). However, Henry Ford's standing to pursue such a cause of action merely highlights its ability and failure to intervene in the declaratory judgment action. Thus, standing does not obviate the relationship between Henry Ford and Young.

Mutuality is an additional requirement for collateral estoppel. *Monat, supra*, 469 Mich 683-684.

> "'Mutuality of estoppel requires that in order for a party to estop an adversary from relitigating an issue that party must have been a party, or in privy to a party,

in the previous action. In other words, the estoppel [*20] is mutual if the one taking advantage of the earlier adjudication would have been bound by it, had it gone against him.'" [*Id.*, pp 684-685*, quoting *Lichon v American Universal Ins Co, 435 Mich 408, 427; 459 NW2d 288 (1990).*]

Here, the party asserting collateral estoppel, Farmers Insurance Exchange, was a party to the declaratory judgment action and it would have been bound by the judgment, had it gone against it. Therefore, we conclude mutuality existed.

Last, the parties dispute whether the judgment was final. Henry Ford stresses that this Court has stated that a judgment is final "when all appeals have been exhausted or when the time available for an appeal has passed." *Leahy v Orion Twp, 269 Mich App 527, 530; 711 NW2d 438 (2006)*; see also *Cantwell v Southfield, 105 Mich App 425, 429-430; 306 NW2d 538 (1981)*. We agree there is no question that, as in Leahy, a party cannot collaterally attack a judgment that has been finalized on appeal. However, we conclude that the above proposition does not necessarily permit a party to collaterally attack a judgment that has yet to be finalized on appeal. Indeed, this Court has previously held that "[t]he rule in Michigan is that a judgment pending [*21] on appeal is deemed *res judicata.*" *City of Troy Building Inspector v Hershberger, 27 Mich App 123, 127; 183 NW2d 430 ) (1970)* (emphasis in original), citing 14 Michigan Law & Practice Judgment, § 176, p 620. Further, that "[o]nly in a case where the second appeal itself prevents the prior judgment from being operative is the *res judicata* effect of the prior judgment inoperative." *Id.* (emphasis in original), citing *McHugh v Trinity Bldg Co, 254 Mich 202, 206; 236 NW 232 (1931)*. Several cases have since recognized the above principles. See *Temple v Kelel Distributing Co, Inc, 183 Mich App 326, 328; 454 NW2d 610 (1990)* ("Although defendant has appealed an adverse ruling that plaintiff's decedent was not an employee at the time of the accident, the decision nevertheless has res judicata effect."); *Roskam Baking Co v Lanham Machinery Co, 105 F Supp 2d 751, 755 (WD Mich 2000.* ("Michigan and federal courts hold that appeal of a judgment does not alter the judgment's preclusive effect"); *Robinson v Fiedler, 91 F 3d 144 (CA 6, 1996)* (decision of lower court is res judicata, regardless of pending appeal); *Fognini v Verellen,* unpublished per curiam opinion of the Court of Appeals, issued March [*22] 25, 2003 (Docket No. 235453); *47 Am Jur 2d, Judgments, § 528,* p 314; Restatement Judgments, 2d, § 528, comment f (one policy supporting the refusal to apply collateral estoppel with a judgment pending on appeal is to prevent inconsistent judgments that could

arise when a judgment pending on appeal serves as the basis for a subsequent judgment, but is later reversed). Thus, we conclude for purposes of collateral estoppel or res judicata that the January 10, 2007 declaratory judgment was a "final judgment." Accordingly, the court erred in denying Farmers Insurance Exchange's motion for summary disposition on Henry Ford's claim.

We affirm in Docket No. 275584 and reverse in Docket No. 283865. We remand for entry of judgment consistent with this opinion. We do not retain jurisdiction.

/s/ Brian K. Zahra

/s/ Kirsten Frank Kelly

**DISSENT BY: O'CONNELL**

**DISSENT**

O'CONNELL, J. (*dissenting*).

I respectfully dissent. In *Henry Ford Health Sys v Farmers Ins Exch*, Docket No. 283865, a jury determined that the Kia was not taken unlawfully. Further, in *Farmers Ins Exch v Young*, Docket No. 275584, the trial court never determined that the Kia was taken unlawfully. Since no determination was ever made that the vehicle was taken [*23] unlawfully, the exception set forth in MCL 500.3113(a) precluding receipt of PIP benefits by an individual using a vehicle "which he or she had taken unlawfully" does not apply to this case. Accordingly, defendant-appellant Rufus Young is entitled to no-fault personal protection insurance (PIP) benefits, [1] and Henry Ford Health System is entitled to reimbursement for services provided to Young. I would reverse the trial court in Docket No. 275584 and affirm the trial court in Docket No. 283865. I note that the majority opinion reaches the opposite result in each of these cases.

> 1    The statutory phrase is "personal protection insurance benefits," but they are also known as "first party" or "PIP" benefits. *McKelvie v Auto Owners Ins Ass'n, 459 Mich 42, 44 n 1; 586 NW2d 395 (1998)*.

I. FACTS

Although there is conflicting testimony in these cases, it appears that the essential facts are as follows. Nicole Williams owned a 2001 Kia. Linda Lee, Williams's cousin, lived with Williams. Young is Lee's boyfriend. Williams was on vacation in the Bahamas when the accident in question occurred. According to Lee, Cynthia Hughes, Williams's sister, had driven Williams to the airport in the Kia. When Hughes [*24] returned from the airport after dropping off Williams, she handed the

car keys to Lee and told Lee to drive Williams' son, Jalen, in the Kia back to Williams' house. If a jury accepts these facts as true, Lee had lawful possession of the Kia.

The facts also suggest that on the day of the accident, an intoxicated Lee permitted Young to drive her and Jalen home. Unfortunately, as Young was driving Lee and Jalen home, they were involved in the accident at issue in this case. Under this set of facts, which the jury in Docket No. 283865 apparently accepted as true, neither Lee nor Young unlawfully took the Kia.

II. ISSUES

A. NO UNLAWFUL TAKING HAS BEEN ESTABLISHED

These cases involve the interpretation of MCL 500.3113(a). The fundamental issue in this case is whether Young unlawfully took the motor vehicle in question. I conclude that there was no unlawful taking of this vehicle and, therefore, both Young and Henry Ford Health System are entitled to reimbursement for services provided to Young.

The majority in Amerisure Ins Co v Plumb, 282 Mich App 417; 766 NW2d 878 (2009), lv den 485 Mich 909 (2009), set forth the circumstances under which MCL 500.3113 applies, stating:

> MCL 500.3113 precludes [*25] PIP benefits under certain circumstances, and it provides, in pertinent part:
>
>> A person is not entitled to be paid personal protection insurance benefits for accidental bodily injury if at the time of the accident any of the following circumstances existed:
>>
>>> (a) The person was using a motor vehicle or motorcycle which he or she had *taken unlawfully, unless the person reasonably believed that he or she was entitled to take and use the vehicle.* [Emphasis added in Amerisure Ins.]

Thus, PIP benefits will be denied if the taking of the vehicle was unlawful and the person who took the vehicle lacked "a

reasonable basis for believing that he [or she] could take and use the vehicle." *Bronson Methodist Hosp v Forshee, 198 Mich App 617, 626; 499 NW2d 423 (1993).* When applying § 3113(a), the first level of inquiry will always be whether the taking of the vehicle was unlawful. If the taking was lawful, the inquiry ends because § 3113(a) does not apply. [*Amerisure Ins, 282 Mich App at 424-425.*]

Accordingly, *Amerisure Ins* makes clear that when determining whether MCL 500.3113(a) precludes PIP coverage, "the first level of inquiry" is "whether the taking of the vehicle was unlawful." *Id.* at 425. If the [*26] taking was lawful, MCL 500.3113(a) does not apply. *Id.*

The lower court record in Docket No. 283865 indicates that the jury determined that Young had not unlawfully taken the vehicle. The jury verdict form states:

**Question No. 4:**

Did Rufus Young use a motor vehicle at the time of the accident which he had taken unlawfully and without reasonable belief that he was entitled to take and use the vehicle?

Answer: N (yes or no)

Accordingly, because the jury in Docket No. 283865 determined that Young did *not* "use a motor vehicle at the time of the accident which he had taken unlawfully," the inquiry ends at this point with respect to this case. MCL 500.3113(a) does not apply, and Young is entitled to PIP benefits. The judgment in the case properly reflected this outcome, as Farmers Insurance Exchange (Farmers), the assigned claims provider, was required to reimburse Henry Ford Health System $ 157,523.86 to cover the cost of Young's treatment for injuries arising from the accident.

In Docket No. 275584, the trial court never made sufficient findings of fact to conclude that Young took the Kia unlawfully for purposes of MCL 500.3113(a). In the final order entered in this case, the trial court stated [*27] in its entirety:

The Trial of this matter having been heard before the Honorable John O'Hara on December 6, 2006 and the Court returning a verdict in favor of Farmers Insurance Exchange,

IT IS HEREBY ORDERED that Rufus Young was operating a vehicle in violation of MCLA 500.3113(a) as he was unlawfully operating said vehicle and had no reasonable belief that he was entitled to use same.

IT IS FURTHER ORDERED that Rufus Young is therefore not entitled to the receipt of No-Fault Benefits arising out of the June 6, 2005 motor vehicle accident.

IT IS SO ORDERED.

This order indicates that the trial court based its decision to deny Young PIP benefits on its conclusion that Young was "unlawfully operating" this vehicle at the time of the accident. However, I maintain that the unlawful operation of a vehicle is not a legal basis for denying PIP benefits. *Amerisure Ins, 282 Mich App at 433* (O'CONNELL, J., dissenting). Further, although the order indicates that the trial court determined that Young "had no reasonable belief that he was entitled to use" the vehicle, the trial court never determined whether Young unlawfully *took* the vehicle. [2] In my opinion, the trial court's failure to even determine [*28] whether an unlawful taking occurred constitutes error. In the absence of a finding by the trial court in Docket No. 275584 that an "unlawful taking" occurred, Young is entitled to PIP benefits.

2   "A court speaks through its orders, and the jurisdiction of this Court is confined to judgments and orders." *Lown v JJ Eaton Place, 235 Mich App 721, 726; 598 NW2d 633 (1999)*, quoting *Law Offices of Lawrence J Stockler, PC v Rose, 174 Mich App 14, 54; 436 NW2d 70 (1989)*; see also MCR 7.203(A). Accordingly, we need not look beyond this order to conclude that the trial court failed to address whether an unlawful taking occurred. Nevertheless, the trial court's statements at the conclusion of the bench trial indicate that the trial court never explicitly determined that an unlawful taking occurred.

The majority opinion compounds the error by assuming that the trial court concluded that Young unlawfully took this vehicle. Armed with this faulty conclusion, the majority then concludes that the doctrine of collateral estoppel applies in Docket No. 283865. I would note that neither the doctrine of collateral estoppel nor MCL 500.3113(a) applies if the trial court does not first determine that Young [*29] unlawfully took the vehicle. [3]

3   Interestingly, the question whether Young had unlawfully taken the vehicle was decided for the first time in Docket No. 283865, the action that the majority concludes is barred by collateral estoppel.

B. LAWFUL OPERATION IS NOT REQUIRED TO RECEIVE PIP BENEFITS

For the reasons stated in my dissent in *Amerisure Ins, 282 Mich App 417*, I respectfully dissent from the majority's conclusion that in order to obtain PIP benefits, defendant must reasonably believe that he was entitled to take and lawfully use the motor vehicle at the time of the accident. First, I note that this case is distinguishable from *Amerisure Ins*. In *Amerisure Ins*, the majority determined, and I concurred, that "there is no genuine issue of material fact that Plumb unlawfully took the Jeep, and § 3113(a) applies." *Id. at 427*. Conversely, the facts of this case suggest that no lawful taking occurred in this case. [4] However, I also maintain, as I did in *Amerisure Ins*, that MCL 500.3113(a) does not require "lawful" operation of a motor vehicle in order to obtain PIP benefits.

4   In particular, the facts indicate that Williams, the owner of the Kia, gave the car keys to Hughes, who in turn gave [*30] them to Lee. Under these facts, Lee continued to have lawful possession of the Kia when she drove, intoxicated, to Young's workplace and let him drive her back to Williams' house.

Our Court has stated on numerous occasions, "[I]t is the unlawful nature of the taking, not the unlawful nature of the use, that is the basis of the exclusion under [MCL 500.3113(a)]." *Butterworth Hosp v Farm Bureau Ins Co, 225 Mich App 244, 250; 570 NW2d 304 (1997)*. The majority simply assumes that the vehicle was "unlawfully taken," and claims that defendant must have a reasonable belief that he could "legally use" and "lawfully operate" the motor vehicle in order to receive PIP benefits. [5] I disagree. The statute does not, nor was it intended to, address whether the use of the motor vehicle was legal or the *operation* of a motor vehicle was lawful. [6] This statute is only concerned with whether the vehicle was *taken* in a lawful manner. [7]

5   It is axiomatic that a vast number of accidents are caused by the unlawful operation of a motor vehicle; a requirement that one must "legally use" or "lawfully operate" a motor vehicle before one can collect no-fault benefits would defeat the purpose of purchasing insurance. [*31] I suspect that many motorists would be surprised to learn that they would not be entitled

to PIP benefits if they caused an accident by, for example, running a red light or speeding, or if they had a suspended or expired license at the time of an accident.

6    As in *Amerisure Ins*, the majority in this case adds the word "legally" before the word "use" in the savings clause. My response to this grafting of additional words onto the statute is the same as it was in that case:

> Although I note that it is not the role of this Court to add or subtract words from the statute, the ordinary reader of <u>MCL 500.3113</u> may wonder how one can unlawfully take a motor vehicle and still have a reasonable belief that he or she is entitled to use the vehicle. As a reader of this statute, I share this concern. However, this Court's job is merely to interpret the statute as it is written. The Legislature may wish to revise the statute to provide for a "reasonable belief" that one is entitled "to take the vehicle and legally use the vehicle." [*Amerisure Ins*, 282 Mich App at 434 n 2 (O'CONNELL, J., dissenting).]

7    The term "unlawfully taken" indicates that the vehicle must have been taken in violation of a Michigan [*32] statute. The majority points to no Michigan statute that Young violated when he took this vehicle. Although Young unlawfully operated the vehicle, the statute does not disqualify an individual from receiving PIP benefits if he operated the vehicle unlawfully.

In *Bronson Methodist Hosp*, 198 Mich App 617, Stanley Pefley permitted his son, Thomas, to use his vehicle, while prohibiting Thomas's friends, especially Mark Forshee, from using the vehicle. *Id.* at 626. Thomas was driving Forshee and another friend, William Morrow, in the vehicle when he was pulled over and arrested for having beer and a billy club in the vehicle, in violation of his probation. *Id.* at 620. Thomas entrusted the vehicle to Morrow to drive home, but at Morrow's request, Forshee later drove the vehicle, although he did not have a valid operator's license. *Id.* at 620-621. Forshee began speeding in the vehicle and entered a high-speed chase with police, which ended when he crashed the car and was injured. *Id.* at 621.

The *Bronson* Court noted that the question whether an individual has a reasonable basis for believing that he can take and use the vehicle does not lend itself to a hard and fast rule, but depends largely [*33] on the circumstances of a particular case. The Court explained:

> [U]nder [<u>MCL 500.3113(a)</u>], it is necessary not only that the taking of the vehicle be unlawful, but also that the person who took the automobile not have a reasonable basis for believing that he could take and use the vehicle. In the case at bar, the trial court focused on the restrictions imposed by Stanley Pefley on his son not to allow others to use the vehicle and specifically the restriction barring Mark Forshee's use of the vehicle. While these facts are certainly relevant and would perhaps even be dispositive had Forshee borrowed the vehicle without anyone's knowledge or consent, it is nevertheless necessary to look at the specific, unique facts that led up to Forshee's driving of the vehicle on the night in question.
>
> Forshee's use of the automobile did not arise in a context where he had merely "borrowed" his friend's automobile for his personal use without the friend's knowledge or permission or even in a context where he took possession of the vehicle contrary to the friend's wishes while on an outing with his friend. Rather, Thomas Pefley had entrusted the vehicle to Morrow to drive home, with Pefley's only other [*34] option presumably being to have the car impounded and towed and his friends stranded in need of transportation. Thereafter, Morrow turned the vehicle over to Forshee to drive, apparently because he was uncomfortable driving a vehicle with a manual transmission.
>
> We cannot say that it is unreasonable for a person to believe that he cannot take and use a vehicle where he was a passenger in the vehicle and the driver/owner (or owner's son) is in police custody and wishes the vehicle taken home and the only other available driver is unwilling to drive because he is uncomfortable with the manual transmission. A person in such a position, while understanding that there is a general preclusion to his use of the vehicle, might nonetheless reasonably believe it permissible under those unique

circumstances to take and use the vehicle. The fact that the subsequent use of the vehicle was beyond the scope of the entrustment is irrelevant, because the focus is on the taking of the vehicle, not the use. See *State Farm [Mut Auto Ins Co v Hawkeye-Security Ins Co*, 115 Mich App 675; 321 NW2d 769 (1982)]. [*Bronson Methodist Hosp*, 198 Mich App at 626-627.]

The *Bronson* Court also clarified that MCL 500.3113 [*35] does *not* exclude individuals who operate a motor vehicle without a valid operator's license from receiving PIP benefits:

> Similarly, the fact that Forshee did not possess a driver's license also does not control resolution of the insurance issue because it is the unlawful nature of the taking, not the unlawful nature of the use, that forms the basis of the exclusion under the statute. In MCL 500.3113; MSA 24.13113, the Legislature excluded from personal protection insurance benefits individuals who unlawfully take motor vehicles and those who have not procured the automobile insurance required under the no-fault act. If the Legislature had desired to also exclude from coverage those individuals who operate a motor vehicle without a valid operator's permit, it could have included that class of individuals within the purview of the statute. It did not. [*Id.* at 627-628.]

In *Butterworth Hosp*, 225 Mich App at 246, the injured party, Floyd Wright, was driving his mother's vehicle without her permission when he was involved in an accident. In his majority opinion in the case, Judge Bandstra stated:

> Farm Bureau asserts that Wright took the vehicle unlawfully because he took it knowing that he [*36] was physically incapable of operating the vehicle safely and was not entitled to be a licensed driver. Farm Bureau argues that Wright was therefore driving recklessly in violation of MCL 257.626; MSA 9.2326 or driving feloniously under MCL 752.191; MSA 28.661. Further, Farm Bureau argues that Wright's taking of his mother's vehicle was unlawful because he knew that it was uninsured. Farm Bureau argues that

Wright violated MCL 500.3102(2); MSA 24.13102(2), which makes it a misdemeanor to operate a motor vehicle on a public highway knowing that it is uninsured. Each of these arguments raises questions regarding the use of the vehicle by Wright, not the taking. However, it is the unlawful nature of the taking, not the unlawful nature of the use, that is the basis of the exclusion under [MCL 500.3113(a)]. *Bronson Methodist Hosp* [, 198 Mich App at 627]; *State Farm Mut Automobile Ins Co* [, 115 Mich App at 682]. [*Id.* at 250.]

In fact, to insert a "lawful use" requirement into MCL 500.3113(a) partially defeats the purpose of the no-fault act, which is to provide benefits to those who are involved in automobile accidents regardless of fault. [8] Furthermore, it creates two classes of drivers under [*37] MCL 500.3113(a): those who have a reasonable belief that they are entitled to take and use a vehicle, and those who have a reasonable belief they can take and *lawfully* use a motor vehicle. Under the majority's interpretation of MCL 500.3113(a), the first class would be denied benefits under the no-fault act, while the second class would be entitled to collect PIP benefits. [9]

[8]   I note that instead of treating the word "use" as a legal term of art, as the majority advocates, this Court should presume that since the word is not defined by the no-fault act, it is subject to ordinary comprehension. See *People v Martin*, 271 Mich App 280, 352; 721 NW2d 815 (2006), affirmed 482 Mich 851 (2008). *Random House Webster's College Dictionary* (1997) has 22 separate definitions for the word "use," including "to employ for some purpose; put into service," "to avail oneself of; apply to one's own purposes," and "to take unfair advantage of; exploit." Nowhere in these 22 definitions does the dictionary define "use" as the equivalent of "lawful operation."

[9]   I note that under the majority's interpretation of this statute, both *Bronson* and *Butterworth Hosp* would have been wrongly decided. In both cases, the [*38] drivers of the motor vehicles lacked express permission to operate the vehicles, and the driver in Bronson did not have a valid driver's license. *Bronson Methodist Hosp*, 198 Mich App at 625, 627; *Butterworth Hosp*, 225 Mich App at 246. Further, Young's belief that he could take and use this vehicle is clearly more reasonable than that of the drivers in the afore-

mentioned cases. In this case, Young had permission to take and use the vehicle from the person who had possession of both the motor vehicle and the motor vehicle's keys. In the real world, one does not ask an intoxicated person if "she has permission to driver her cousin's vehicle," nor does one ask, "do you think your cousin would allow me to drive you home," when deciding that she is not fit to drive. It is important to remember: "Friends don't let friends drive drunk." In his deposition, Young testified that in his opinion, Williams would allow him to operate her vehicle if she knew that Lee was intoxicated.

I concur with the implication in the majority opinion that defendant could not lawfully operate this vehicle because his license was suspended. However, I disagree with the majority's conclusion that MCL 500.3113(a) imposes [*39] a requirement on defendant that he reasonably believe he or she was entitled to take and *legally* use the motor vehicle. The savings clause does not contain the words "legally use" or "lawfully operate." Instead, I would follow the Court's statement in *Bronson*, which specifically interpreted MCL 500.3113(a) so as *not* to exclude from coverage those individuals who operate a motor vehicle without a valid operator's permit. [10]

> 10 Because *Bronson* was published after November 1, 1990, it is binding on this Court. MCR 7.215(J)(1). Under the principle of stare decisis, this Court is obligated to follow *Bronson*, not *Amerisure Ins*, to the extent that these rulings conflict. MCR 7.215(C)(2).

In my opinion, the exclusion of PIP benefits should apply only if the injured party had the intent to steal the vehicle or, under some circumstances, the intent to joyride in the vehicle. [11] As Judge Hoekstra stated in his concurrence in *Butterworth Hosp*, "[MCL 500.3113(a)] precludes coverage only where the person taking the vehicle unlawfully does so with the intent to steal and [] the provision was not intended to exclude coverage for a person injured while joyriding in an automobile." *Butterworth Hosp*, 225 Mich App at 253 [*40] (Hoekstra, J., concurring).

> 11 Although in *Butterworth Hosp*, 225 Mich App at 249-250, this Court touched on the circumstances in which joyriding would not necessarily preclude the recovery of PIP benefits, the question of joyriding is not at issue in this case and, in my opinion, is best left for another day.

Under MCL 500.3113(a) and its savings clause, an individual who steals a motor vehicle is not entitled to coverage from the insurance company insuring the stolen vehicle. Again, MCL 500.3113(a) provides, in pertinent part:

> A person is not entitled to be paid personal protection insurance benefits for accidental bodily injury if at the time of the accident any of the following circumstances existed:
>
> (a) The person was using a motor vehicle or motorcycle which he or she had taken unlawfully, unless the person reasonably believed that he or she was entitled to take and use the vehicle.

The purpose of MCL 500.3113(a) is to preclude PIP coverage on the stolen vehicle if, at the time of the accident, "[t]he person was using a motor vehicle . . . which he or she had taken unlawfully." That means that if an individual takes a vehicle with the intent to steal that vehicle, the company insuring [*41] the vehicle does not have to provide PIP benefits to the thief. Nothing in this part of the statute addresses the unlawful operation of a motor vehicle. From a public policy standpoint, this makes sense. An insurance company does not assume the risk of paying PIP benefits to an individual who unlawfully takes (i.e., steals) and uses a motor vehicle insured by the company. Whether the vehicle was being lawfully or unlawfully operated at the time of the accident is of little consequence; because the *taking* was unlawful, the insurance company is not required to provide PIP benefits.

The savings clause attached to MCL 500.3113(a), which reads "unless the person reasonably believed that he or she was entitled to take and use the vehicle," only applies to the "intent to steal" element. If a person reasonably believes he is *entitled* to take and use the motor vehicle, the savings clause negates the "intent to steal" clause in the first part of the sentence. The savings clause was not intended to add a "lawful operation" clause to the equation. As the *Bronson* Court aptly noted, if that were the case, the Legislature would have added the words "lawfully operate" to the savings clause. See *Bronson Methodist Hosp*, 198 Mich App at 627-628.

Stated [*42] another way, the savings clause was not intended to void insurance coverage based on the unlawful *operation* of a motor vehicle. Individuals purchase insurance to protect themselves from the financial consequences of involvement in an automobile accident, so that if such an accident does occur (often, arising from some type of unlawful operation), coverage is available for damages. The task of punishing those individuals who unlawfully operate a motor vehicle is best left to the police and prosecutor; the Legislature did not intend to

preclude these individuals from receiving PIP benefits as an additional punishment. Under MCL 500.3113(a), the unlawful nature of the taking of the vehicle, not the unlawful use of the vehicle, determines if an individual is entitled to PIP benefits.

I also note that MCL 500.3113(a) requires that the defendant "had taken unlawfully" the motor vehicle in order to forgo his entitlement to PIP benefits. I agree with the majority opinion that if defendant had unlawfully taken (i.e., stolen) this vehicle, then he would *not* be entitled to no-fault benefits. However, the facts of this case are clear: defendant is *not* the person who unlawfully took this vehicle. [*43] Defendant simply drove an intoxicated acquaintance back to her cousin's home where she was staying at the time, taking her there in the car in which she arrived. In so doing, defendant was not using a motor vehicle that he had taken unlawfully; at most, he was using a motor vehicle that *another person* might have taken unlawfully. [12] This is a far different act than stealing or even joyriding in a motor vehicle. De-

fendant neither had the intent to steal this vehicle nor to joyride. Since the intent element is not present, I would find that defendant is entitled to PIP benefits.

12    I note that anyone who takes the keys of the vehicle that an intoxicated person had been driving from that person by subterfuge or force and drives the intoxicated person home in that vehicle may fall under the umbrella of the majority opinion. The majority's decision could make a sober individual less inclined to drive an intoxicated person home, especially if he must use some type of subterfuge to obtain the intoxicated person's car keys.

I would reverse the decision of the trial court in Docket No. 275584 and affirm the decision of the trial court in Docket No. 283386.

/s/ Peter D. O'Connell

**JANET HANSEN, Personal Representative of the ESTATE OF JACK HANSEN, Plaintiff-Appellant, v STATE FARM FIRE & CASUALTY COMPANY, Defendant-Appellee.**

No. 258054

COURT OF APPEALS OF MICHIGAN

2006 Mich. App. LEXIS 1556

May 9, 2006, Decided

**NOTICE:** [*1] THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**PRIOR HISTORY:** Kent Circuit Court. LC No. 04-005745-CP.

**DISPOSITION:** Affirmed.

**JUDGES:** Before: Smolenski, P.J., and Owens and Donofrio, JJ.

**OPINION**

PER CURIAM.

Plaintiff, as personal representative of the Estate of Jack Hansen, appeals as of right from the trial court's order denying her motion for summary disposition and granting summary disposition in favor of defendant. We affirm. This appeal is being decided without oral argument pursuant to MCR 7.214(E).

The facts giving rise to this case are as follows. In 1996, plaintiff and Jack Hansen, then husband and wife, purchased an umbrella insurance policy from one of defendant's agents, Dennis Leach. The policy, which provided coverage in addition to that provided by the Hansen's existing homeowner's and automobile policies, contained an intra-family exclusion not present in the underlying automobile insurance policy. On March 7, 2000, plaintiff's daughter, Holly Williams, crashed a car owned by Jack Hansen and insured by defendant. The car's passenger, Holly's sister [*2] Laura Beth Williams, died as a result of the accident. Laura Beth's estate filed suit and obtained a $ 300,000 judgment against Jack Hansen and Holly Williams. Defendant then filed a suit against the Hansens in the Montcalm Circuit Court and obtained a declaratory judgment holding that, due to the intra-family exclusion, the umbrella policy did not cover the judgment obtained by Laura Beth's estate. In response, plaintiff filed the instant suit in the Kent Circuit Court, alleging that Leach misrepresented the extent of the coverage under the umbrella policy by failing to disclose the intra-family exclusion and seeking damages under the Michigan Consumer Protection Act (MCPA). [1] Plaintiff moved for summary disposition based on collateral estoppel, asserting that, at the bench trial in the earlier litigation, the presiding judge, David A. Hoort, held that Leach had in fact misrepresented the terms of the policy. The trial court took a different view of Judge Hoort's ruling and granted summary disposition in favor of defendant.

1 MCL 445.901 et seq.

[*3] The decision to grant or deny summary disposition presents a question of law that this Court reviews de novo. _Veenstra v Washtenaw Country Club_, 466 Mich. 155, 159; 645 N.W.2d 643 (2002). Similarly, whether collateral estoppel bars a claim constitutes a question of law subject to de novo review. _VanVorous v Burmeister_, 262 Mich. App. 467, 476; 687 N.W.2d 132 (2004).

The trial court initially considered plaintiff's motion under MCR 2.116(C)(10) and ultimately granted summary disposition in favor of defendant pursuant to MCR 2.116(I). Summary disposition is appropriate under MCR 2.116(C)(10) where "there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." _West v General Motors Corp_, 469 Mich. 177, 183; 665 N.W.2d 468 (2003). When ruling on motions brought under MCR 2.116(C)(10), courts must consider "the affidavits, pleadings, depositions, admissions, and other documentary evidence in the light most favorable to the nonmov-

ing party." *Ritchie-Gamester v City of Berkley*, 461 Mich. 73, 76; [*4] 597 N.W.2d 517 (1999). Further, "[if] it appears to the court that the opposing party, rather than the moving party, is entitled to judgment, the court may render judgment in favor of the opposing party." MCR 2.116(I)(2); *Auto-Owners Ins Co v Allied Adjusters & Appraisers, Inc*, 238 Mich. App. 394, 397; 605 N.W.2d 685 (1999).

However, MCR 2.116(C)(7), rather than (C)(10), provides the proper basis for granting summary disposition pursuant to the doctrine of collateral estoppel. *Alcona Co v Wolverine Environmental Production*, Inc, 233 Mich. App. 238, 246; 590 N.W.2d 586 (1998). Despite the fact that it considered the motion under the wrong subrule, the trial court's error was harmless. When deciding on a motion under MCR 2.116(C)(7), as with motions brought pursuant to subsection (C)(10), courts consider all affidavits, pleadings, and other documentary evidence, construing them in the light most favorable to the nonmoving party. *Id.* Further, where a trial court grants summary disposition based on the wrong subrule, Michigan appellate courts will [*5] review the order under the correct rule. *Speik v Dep't of Transportation*, 456 Mich. 331, 338, n 9; 572 N.W.2d 201 (1998). Consequently, we review the trial court's decision under MCR 2.116(C)(7).

Collateral estoppel precludes relitigation of issues between the same parties. *VanVorous, supra*, 479-480, citing *Jones v Chambers*, 353 Mich. 674, 680-681; 91 N.W.2d 889 (1958). In *Monat v State Farm Ins Co*, 469 Mich. 679, 682-685; 677 N.W.2d 843 (2004), our Supreme Court stated that a party seeking application of this doctrine must establish that: (1) a question of fact was actually litigated and determined by a valid and final judgment, (2) the same parties had a full and fair opportunity to litigate the issue, and (3) there is mutuality of estoppel, i.e., the party seeking to take advantage of the prior adjudication would have been bound by it if it had resulted in an adverse disposition.

In the earlier litigation, Judge Hoort noted that the parties did not dispute that the umbrella policy in question contained an intra-family exclusion that, if applied, [*6] would exclude coverage. But among the issues being litigated was the Hansens' claim that defendant's agents misrepresented the terms of the policy. After finding that the Hansens were told that the umbrella policy extended the coverage available under their other insurance policies, Judge Hoort stated:

> As such, the statement made by them was not due or because of any type of fiduciary relationship between the insurer and the insured. Again, unfortunately it was a statement that was made, that was

made without knowledge of what the policy was and was unfortunately wrong. That statement, whether one call it a misrepresentation or an innocent misrepresentation or puffing or anything else is not something such as that would allow for liability under the umbrella policy here. Maybe it would be something as such that would allow the parties to break the contract or get some type of refund, but it is not something that would require enforcement or coverage of the umbrella policy in this case.

Plaintiff asserts that this statement establishes that Judge Hoort found that Leach misrepresented the terms of the umbrella policy. Plaintiff also contends that, although he found the [*7] intra-family exclusion enforceable, the judge's statement invited the Hansens to seek other relief and prompted plaintiff to file suit under the MCPA.

However, following the above statement, Judge Hoort went on to state:

> It is close but because there was never even any thought so far as any family exclusion, I'm not willing to say that the representations by Mr. Leach were something as such that indicated that the coverage would be identical. I don't think that would be a reasonable interpretation of his representation. There are with that many minute differences in every policy, especially when you are a cross-coverage policy between auto owners, home owners or otherwise.. . .[T Tr, 13-14.]

Judge Hoort explicitly found that defendant's agent did not tell the Hansens that the extent of their coverage under the umbrella policy would be identical to that under their underlying policies. Rather than enforcing the exclusion despite a misrepresentation, Judge Hoort held that Leach did not make the alleged misrepresentation.

Based on Judge Hoort's findings, the trial court in the instant case correctly applied the doctrine of collateral estoppel and granted summary [*8] disposition in favor of defendant. A question of fact regarding whether Leach misrepresented the extent of the coverage under the umbrella policy was actually litigated and determined in the earlier action for declaratory judgment. Because both parties assert that collateral estoppel requires judgment in their favor, they must necessarily agree that they

had a full and fair opportunity to argue the issue before Judge Hoort. Finally, if Judge Hoort had found that a misrepresentation had occurred, defendant would be bound by that judgment. Because each of the requirements set forth in *Monat, supra*, 682-685, have been satisfied, we find that plaintiff is estopped from asserting that defendant's agent misrepresented the terms of the umbrella policy. And because plaintiff premised her claims on the existence of such misrepresentations, her action for damages under the MPCA must fail. Consequently, we affirm the trial court's order denying plain-

tiff's motion for summary disposition and granting summary disposition in favor of defendant.

Affirmed.

/s/ Michael R. Smolenski

/s/ Donald S. Owens

/s/ Pat M. Donofrio

LEXSEE

**JOYCE RUTH HILL, Personal Representative of the Estate of Michael Keene Hill, Deceased, Plaintiff-Appellee, v WALL STREET SYSTEMS, INC, ZBIGNIEW SZWAJNOS, JAN KOMAR, L.F. TRANSPORTATION, INC., and ANDRZEJ LASSAK, jointly and severally, Defendants, and AUTO-OWNERS INSURANCE COMPANY, Defendant-Appellant.**

No. 234455

COURT OF APPEALS OF MICHIGAN

2003 Mich. App. LEXIS 1261

May 27, 2003, Decided

**NOTICE:**    [*1]  THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**SUBSEQUENT HISTORY:** Appeal denied by Hill v. Van Wall St. Sys., 469 Mich. 1021, 678 N.W.2d 441, 2004 Mich. LEXIS 473 (2004)

**PRIOR HISTORY:**    Van Buren Circuit Court. LC No. 95-040448-NI.
CANAL INS. CO. v. JOYCE RUTH HILL, Personal Representative of the ESTATE OF MICHAEL KEENE HILL, 1999 Mich. App. LEXIS 1538 (Mich. Ct. App., Sept. 3, 1999)

**DISPOSITION:**    Reversed.

**JUDGES:** Before: Whitbeck, C.J., and Cavanagh and Bandstra, JJ.

**OPINION BY:** William C. Whitbeck

**OPINION**

PER CURIAM.

Defendant Auto-Owners Insurance Company appeals by leave granted the trial court's judgment entering an arbitration award in favor of plaintiff, Joyce Hill. Auto-Owners also appeals the trial court's denials of its motions for relief from judgment, to vacate the arbitration award, and to amend the judgment, as well as the trial court's grant of sanctions. We reverse.

I. Basic Facts And Procedural History

This case arises out of an automobile accident that occurred in August of 1994. This Court described the underlying events when it reviewed a related declaratory judgment action in 1999:

Decedent Michael Keene Hill died when his truck hit a tractor-trailer driven by defendant Jan Komar. While driving a 1992 Kenworth tractor, Komar had hauled a truckload of cleaning compound and corrosive liquid from Chicago to California for defendant [L.F. Transportation]. [*2]  [Canal Insurance Company] provided [L.F. Transportation] liability coverage for the Kenworth tractor. The Kenworth was owned by defendant Andrzej Lassak, Komar's employer, and leased to [L.F. Transportation]. After Komar delivered the materials, he drove the Kenworth back, carrying a shipment of produce bound for Toronto that Lassak had arranged for Komar to pick up. When Komar arrived in Chicago en route to Toronto, the Kenworth developed mechanical problems. To ensure that Komar could complete the trip to Toronto, Lassak arranged to lease or borrow a 1985 Mack tractor owned by defendant Zbigniew Szwajnos. Szwajnos had previously leased the 1985 Mack to defendant Wall Street Systems, Incorporated . . . . Komar eventually delivered the produce to Toronto driving the Mack and headed back toward Chicago with an empty trailer. The accident occurred in Van Buren County during Komar's return to Chicago.[1]

1   *Canal Ins Co v Joyce Ruth Hill*, unpublished opinion per curiam of the Court of Appeals, issued September 3, 1999 (Docket No. 208953).

[*3]  On June 6, 1995, plaintiff Joyce Hill, the decedent's widow, filed a wrongful death action against Komar, Lassak, Szwajnos, Wall Street Systems, and L.F. Transportation. [2] In June of 1996, Canal Insurance Company, the insurer who issued a policy on the Kenworth tractor to defendant L.F. Transportation, filed a separate declaratory judgment action in the Van Buren Circuit Court in which it asserted that it was not obligated under the policy to provide coverage of the accident involving the Mack tractor. In August of 1997 the trial court entered an order in the declaratory judgment action finding that the policy issued to Canal did, in fact, cover the accident. After the trial court denied a motion by Canal for reconsideration, Canal appealed the trial court's decision to this Court.

2   Wall Street and L.F. Transportation later obtained summary disposition in their favor, and they are not a part of this appeal.

As a result of Canal's appeal, in February of 1998 Hill made a demand on defendant Auto-Owners, the [*4] insurer who had issued a no-fault insurance policy on the vehicle decedent was driving, that an uninsured motorist claim be arbitrated pursuant to the terms of that policy. The Auto-Owners policy contained an uninsured motorists provision and a provision for arbitration of such claims.

Canal denied that there was coverage and continued to deny it in its appeal, even after the court ruled that there was coverage. Canal claimed that Hill should be deemed "uninsured" and thus be able to maintain an uninsured motorist claim. When Auto-Owners failed to respond to this demand, Hill filed an amended complaint in the wrongful death action in March of 1998 adding a claim for arbitration under the terms of the Auto-Owners policy.

In response, in May of 1998 Auto-Owners filed a motion for summary disposition as to count II of Hill's first amended complaint, arguing that the trial court, in its August 1997 ruling in the declaratory judgment action, had already ruled that there was coverage under the Canal policy and that, therefore, Hill had no basis for seeking uninsured motorist benefits under the Auto-Owners policy. Hill responded with a cross-motion for summary disposition, pointing out [*5] that Canal was continuing to deny coverage and requesting the trial

court, notwithstanding its holding in the declaratory judgment action, to find that under these circumstances Komar's vehicle was uninsured, thus permitting the case to proceed to arbitration.

After hearing arguments from both parties in June of 1998, the trial court denied AutoOwners' motion, granted Hill's motion, and ordered the case to arbitration. After the trial court denied its motion for reconsideration or rehearing, Auto-Owners filed an interlocutory appeal to this Court and, in connection with the appeal, filed a motion for a stay of proceedings in the trial court. In response, Hill filed a motion to compel Auto-Owners to designate an arbitrator. After a hearing, the trial court denied the stay and granted Hill's motion. In December of 1998, this Court entered an order denying Auto-Owners' interlocutory appeal because Auto-Owners had failed to persuade the Court of the need for immediate appellate review. Hill then filed a demand for arbitration.

In September of 1999, this Court issued its unpublished opinion in Case No. 208953 affirming the trial court's ruling in the declaratory judgment action and finding [*6] that the Canal policy covered the accident. Canal immediately filed an application for leave to appeal with the Supreme Court, but that Court denied the motion. In the meantime, however, the uninsured motorist action moved forward, and in December of 1999, more than three months after this Court affirmed the trial court's declaratory judgment, and two weeks before the Supreme Court denied Canal's application, the arbitrators rendered an award of $ 875,000 in favor of Hill. Subsequently the arbitrators clarified that this award included interest at twelve percent per annum from March 13, 1998, the date on which Hill filed her first amended complaint

In January of 2000, Auto-Owners filed a motion for relief from the trial court's 1998 order compelling arbitration. Auto-Owners asserted that, now that this Court had affirmed that Canal's policy covered the accident and the Supreme Court had denied Canal's application for leave to appeal, the circumstances were changed so completely that it would be inequitable for the order to be prospectively applied. In response, Hill filed a motion for entry of judgment on the arbitration award. After a hearing, the trial court denied Auto-Owners' [*7] motion and granted Hill's motion.

Auto-Owners then filed a motion for rehearing on the question of the arbitrator's award of interest only, as well as a motion to vacate the arbitration award on the basis that the contract provided for arbitration only for uninsured motorists, whereas the trial court had already determined that Hill was insured pursuant to the Canal policy. After a hearing, the trial court denied both mo-

tions in an order dated June 22, 2000, and also awarded sanctions on the ground that Auto-Owners had repeatedly presented the same arguments. Hill then filed a motion for voluntary dismissal of count 1 of her first amended complaint and the trial court granted this motion. Auto-Owners filed a motion to alter or amend the interest judgment. The trial court denied this motion and again awarded sanctions against Auto-Owners.

Accordingly, in December of 2000, Auto-Owners filed a claim of appeal with this Court. This Court dismissed on the grounds that the judgment from which Auto-Owners had appealed was not final. Auto-Owners then filed a delayed application for leave to appeal on May 24, 2001, which this Court granted.

II. Jurisdiction

A. Standard Of Review

Whether [*8] this Court has jurisdiction to consider the appeal is a question of law that we review de novo. [3]

> [3] _Jeffrey v Rapid American Corp_, 448 Mich. 178, 184; 529 N.W.2d 644 (1995).

B. MCR 7.205(F)(3)

In this case, Auto-Owners initially attempted to appeal the December 5, 2000 order denying its motion to amend the judgment and granting Hill's motion for sanctions as of right. However, this Court dismissed the appeal on the ground that this order was not a final order, and therefore could not be appealed as of right. Auto-Owners then filed a delayed application for leave to appeal each of five separate orders: the April 14, 2000 judgment for plaintiff; the April 26, 2000 denial of relief from judgment; the June 22, 2000 denial of the motion to vacate the judgment; the June 22, 2000 motion granting sanctions; and the December 5, 2000 order denying the motion to amend the judgment and granting further sanctions. This Court granted leave to appeal all five orders.

As a general matter, this [*9] Court has jurisdiction to grant applications for leave to appeal various orders that a party may not appeal as of right. [4] Because Auto-Owners' application for leave was filed more than twelve months after the date of the July 9, 1998 order denying AutoOwners' motion for summary disposition, however, Hill argues that this Court lacks jurisdiction to hear the appeal under MCR 7.205(F)(3), which provides that "if an application for leave to appeal is filed more than 12 months after entry of the order or judgment on the merits, leave to appeal may not be granted." [5]

> [4] See MCR 7.203(B)(1)-(5).

> [5] This rule has since been amended to begin the twelve-month period from the entry of a final judgment or other order appealable as of right, or entry of the order or judgment being appealed, whichever is later. See MCR 7.205(F)(3)(a), (b).

First, we note that the "order or judgment on the merits" of the case was not the July 9, 1998 order denying Auto-Owners' motion for summary disposition, but rather the April 14, 2000 judgment [*10] entering the arbitration award. We recognize that Auto-Owners' May 24, 2001 application for leave to appeal this judgment was also untimely under 7.205(F)(3); however, we hold that the twelve-month time limit was tolled between December 20, 2000 and January 29, 2001 while Auto-Owners attempted to pursue an appeal of right. [6] Accordingly, this Court has jurisdiction to consider Auto-Owners' appeals.

> [6] See _Riza v Niagara Mach & Tool Works_, 411 Mich. 915 (1981); _People v Kincade_, 206 Mich. App. 477; 522 N.W.2d 880 (1994).

Hill argues that the tolling principle established in _Riza_ and followed in _Kincade_ should not apply in this case because this Court did not have jurisdiction to consider Auto-Owners' appeal as of right. However, contrary to Hill's argument, the same circumstance existed in _Kincade_. Although Hill correctly points out that Kincade's appeal of right was originally dismissed for failure to comply with certain filing requirements rather than [*11] for lack of jurisdiction, [7] this Court later determined on remand that Kincade could only have appealed the decision in question by leave granted in any event. [8] Therefore, we reject Hill's argument that a party's attempt to appeal as of right a decision that may only be appealed by leave granted cannot serve to toll the time limit in 7.205(F)(3).

> [7] _Kincade, supra_ at 480.
> [8] Id. at 482.

III. Collateral Estoppel

A. Standard Of Review

Auto-Owners argues that the trial court erred in denying its motions for summary disposition of count II of Hill's first amended complaint, because this claim was barred by the doctrine of collateral estoppel. Accordingly, Auto-Owners asserts that, because the trial court erred in allowing this case to go forward, it is entitled to a reversal of the judgment entered against it. This Court reviews de novo the trial court's decision on a motion for summary disposition. [9] The applicability of collateral estoppel is a question of law, which this Court also reviews de novo. [10]

9  *Maiden v. Rozwood,* 461 Mich. 109, 118; 597 N.W.2d 817 (1999).
10  *Minicuci v. Scientific Data Mgt, Inc.,* 243 Mich. App. 28, 34; 620 N.W.2d 657 (2000).

[*12]  B. Collateral Estoppel

The doctrine of collateral estoppel precludes relitigation of an issue in a subsequent, different cause of action between the same parties when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in that prior proceeding. [11] In this case the question is whether the issue determined in the declaratory action was the same as the issue raised in this case. In order for collateral estoppel to apply, the ultimate issue to be concluded in the subsequent action must be the same as that involved in the first action. [12] This Court has defined this requirement to mean that the issues must be identical, and not merely similar. [13] We conclude that this requirement was met in the present case and that, therefore, Auto-Owners was entitled to summary disposition.

11  *Ditmore v Michalik,* 244 Mich. App. 569, 577; 625 N.W.2d 462 (2001).
12  *Detroit v Qualls,* 434 Mich. 340, 357; 454 N.W.2d 374 (1991).
13  *Eaton Co Rd Comm'rs v Schultz,* 205 Mich. App. 371, 376; 521 N.W.2d 847 (1994).

C. The Issues In The Declaratory [*13] Judgment Action And In This Action The question litigated in the declaratory judgment action was whether the tortfeasors named in Hill's original complaint were covered by liability insurance under the Canal policy. The question raised in count II of Hill's amended complaint in this case was whether she was entitled to uninsured motorist benefits under the Auto-Owners policy. While at first blush these two questions may appear to be similar but distinct, in fact, the issue raised in each action was identical. The question of whether the tortfeasors were insured and the question of whether Hill was entitled to uninsured motorist benefits are simply opposite sides of the same coin. Simply put, if the tortfeasors were insured, Hill was not entitled to uninsured motorist benefits; if the tortfeasors were not insured, Hill was entitled to uninsured motorist benefits. In each case, thus, the true question was whether the tortfeasors were insured. The trial court's final judgment answered this question in the affirmative, and this Court subsequently affirmed.

Accordingly, because the declaratory judgment was between the same parties, because this prior proceeding culminated in a valid final [*14] judgment, because the issue resolved in the declaratory judgment action was identical to that raised in count II of Hill's first amended complaint, and because this issue was actually and necessarily determined in the declaratory judgment action, Hill was barred by the doctrine of collateral estoppel from bringing count II of her first amended complaint. [14] Therefore, we conclude, Auto-Owners was entitled initially to summary judgment and is now entitled to a reversal of the judgment entered against it in April of 2000. Because the trial court erred in rejecting Auto-Owners' repeated attempts to bring this meritorious argument to the trial court's attention, we also reverse the trial court's June 22, 2000 and December 5, 2000 orders granting sanctions.

14  *Ditmore, supra* at 577.

With this issue resolved, it is unnecessary for this Court to consider the remaining questions raised on appeal.

Reversed.

/s/ William C. Whitbeck

/s/ Mark J. Cavanagh

/s/ Richard A. Bandstra

[*15]