## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| Debtor. | ) Hon. Steven W. Rhodes |

## STATEMENT OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. IN ADVANCE OF STATUS CONFERENCE

Over the past weeks, the City of Detroit (the "City") has submitted multiple filings assailing the motivations of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora"). According to the City, Syncora's efforts to ensure the proper operation of the Collateral Agreement and its opposition to the Assumption Motion are (a) improper attempts to exert leverage over the City and (b) contrary to Syncora's own self-interest.

Syncora submits this statement to clarify the purposes behind its efforts to secure the City's compliance with the legal agreements comprising the COPs/Swaps structure and to demonstrate that Syncora's economic interests are being directly impaired by the City's efforts to terminate the Swaps and gain access to the Casino Revenues. In addition, Syncora responds to the City's suggestion that the automatic stay prohibits the normal operation of the Collateral Agreement. Last, Syncora rebuts the City's argument that the City will be crippled without immediate access to the Casino Revenues that are supposed to be trapped under the Collateral Agreement.

## I. Syncora Will Suffer Injury if the Swaps Are Terminated.

1. Lost in the City's various filings is the fact that the COPs/Swaps structure is fundamentally an economic one that is embedded with numerous terms intended to protect

Syncora's rights and interests.[1]  The City has asked the Court to approve and authorize the assumption of the Forbearance Agreement — even though this agreement is contrary to the operation of the COPs/Swaps structure and threatens Syncora's bargained-for rights and interests.  Though Syncora addresses the failings of the Forbearance Agreement in greater detail in its Objection, three points are worth noting.

2.      *First*, the existence and proper functioning of the Swaps is critical to Syncora's insurance obligations.  As the City concedes, the purpose behind the Swaps is to hedge against rising interest rates on the floating-rate COPs.  While this hedge provides a benefit to the City and the Service Corporations should interest rates rise above 6%, it also benefits Syncora, who has insured both the COPs and the Swaps since the inception of the COPs/Swaps structure.  Syncora has always viewed its obligations conjunctively precisely <u>because</u> the COPs and the Swaps are integrated legally and economically.

3.      As a result, contrary to the City's assertions that Syncora's position is "clearly a tactical ploy to obtain leverage over the City with respect to the City's other relationships with Syncora,"[2] Syncora does not want the Swaps to terminate *even if* it means the release of its Swaps obligations.  The Swaps are an important protection against rising interest rates on the COPs obligations that Syncora insures.  Thus, Syncora's position is not some calculated ploy to

---

[1] For a more detailed discussion of the COPs/Swap structure, please refer to *Objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of That Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(A) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant Rule 9019, and (III) Granting Related Relief* [Docket No. 366] (the "<u>Objection</u>").  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Objection.

[2] *Motion of Debtor City of Detroit to Schedule Status Conference, Set Briefing Schedules and Maintain Status Quo* [Adv. Pro. Docket No. 51] (the "<u>Status Quo Motion</u>") ¶ 5(a); *see also Debtor's Reply in Support of its Motion for Protective Order* [Adv. Pro. Docket No. 55] (the "<u>Protective Order Reply</u>") at 7 (describing Syncora's opposition to the Forbearance Agreement as "a pure leverage play").

exert leverage over the City vis-à-vis unrelated matters. Rather, it is a good-faith attempt to protect its economic self-interest in respect of the COPs/Swaps structure.

4. *Second*, the City, the Service Corporations, and the Swap Counterparties consistently ignore that, under Part 5(i) of the amended and restated schedules to the Swaps (the "Amended Swaps"), Syncora can refuse to consent to the termination of the Swaps as long as an Event of Default is outstanding under the Swaps. Events of Default under the Swaps include the insolvency of the Service Corporations as well as payment defaults by them in excess of $10 million. (CA § 5.4(a)(iii); Swaps §§ 5(a)(i), 5(vi).) Both types of Events of Default have occurred here. Until these Events of Default are cured, the Casino Revenues are supposed to automatically accumulate in the General Receipts Subaccount. This accumulation in turn provides the City with a powerful incentive to satisfy its obligations to the Service Corporations so that the Service Corporations can cure any outstanding Events of Default under the Swaps. In this case, that would mean drawing current on the Service Corporations' payment obligations to the COPs. This, in turn, minimizes Syncora's Swaps and COPs insurance obligations.

5. Under the Forbearance Agreement, however, the City, the Service Corporations, and the Swap Counterparties are attempting to overthrow the proper operation of the COPs/Swaps structure. Their agreement runs contrary to the very system described above, as it deprives Syncora of the ability to (a) prevent termination of the Swaps and (b) trap the Casino Revenues in the General Receipts subaccount. As a result, the City's attempt to abrogate Syncora's consent rights — with the justification that "Syncora is not prejudiced" — ignores the integrated nature of the COPs/Swaps structure and Syncora's rights as a COP-holder and COP-insurer. Put simply, Syncora's exposure will grow dramatically if the City and the Swap Counterparties are allowed to avoid the operation of the Collateral Agreement and Syncora's

3

consent rights under the Swaps — and that exposure will easily outstrip the ostensible "release" Syncora will obtain if the Swaps are allowed to terminate over its objection.

6.      *Third*, the Forbearance Agreement divests Syncora of its collateral protection without actually releasing Syncora from its Swap insurance obligations.  Assuming *arguendo* that the Forbearance Agreement is valid — even though it is not — the agreement is nothing more than an option contract pursuant to which the City can direct termination of the Swaps by a specified date.  However, whether the City will ultimately exercise this right — or if it even has the ability to do so — is unknown.

7.      In the interim though, while the City seeks financing and debates whether to cleave the COPs/Swaps structure, Syncora remains obligated on its Swap insurance.  Syncora is justifiably unwilling to see the collateral that secures its insurance obligations released to the City for any amount of time while it remains liable for the Swaps.  Thus, even viewed solely from the vantage point of its role as Swap insurer, Syncora needs to enforce its rights regarding retention of the Casino Revenues in the General Receipts Subaccount.

8.      In short, the City's repeated efforts to portray Syncora as a bad actor ignore the principled economic and legal motivations it has for seeing the legal agreements comprising the COPs/Swaps structure enforced according to their terms.

## II.      The Automatic Stay Does not Apply to the Casino Revenues.

9.      Despite its current representations to the contrary, the City is aware that the automatic stay does not apply to the Casino Revenues.  That is, after all, why the City has been touting the Forbearance Agreement as an agreement that will give the City much-needed liquidity via access to the Casino Revenues.[3]  If the automatic stay applied, the City would have

---

[3] *See, e.g.*, Forbearance Agreement Motion ¶ 41.

gained access to the Casino Revenues upon commencement of these chapter 9 proceedings and would not now need to press the Court for expedited approval of the Forbearance Agreement.[4]

10.     The City now, however, takes the position that the automatic stay *does* apply to the Casino Revenues.  This is demonstrably incorrect for four reasons.  *First*, the Casino Revenues in the General Receipts Subaccount are not subject to the automatic stay because they are not property of the City.  *Second*, the accumulation of the Casino Revenues in the General Receipts Subaccount is not an act to "obtain possession" or "exercise control" under section 362(a)(3) of the Bankruptcy Code.  *Third,* the accumulation of the Casino Revenues in the General Receipts Subaccount is exempt from the stay as an application of pledged special revenues under section 922(d) of the Bankruptcy Code.  *Fourth*, the Casino Revenues are swap collateral and any actions by swap participants to enforce their contractual right to such collateral is exempted from the automatic stay under section 362(b)(17) of the Bankruptcy Code.

**A.     The Casino Revenues are not Subject to the Automatic Stay because they are not Property of the City.**

11.     The Casino Revenues held in the General Receipts Subaccount are not property of the City and therefore the automatic stay does not protect them.  *See In re RCS Engineered Prod. Co., Inc.*, 102 F.3d 223, 227 (6th Cir. 1996) (holding that the automatic stay did not apply because the property interest at issue was not property of the estate).  Contrary to the City's conclusory assertion that "there can be no question" that the funds held in the General Receipts Subaccount are the City's property,[5] such Casino Revenues, like funds held in escrow, are not

---

[4]  *See also Debtor's Ex Parte Motion for an Order Shortening Notice, Staying Further Briefing and Scheduling an Expedited Hearing with respect to Motion of Debtor City of Detroit to Schedule Status Conference, Set Briefing Schedules and Maintain Status Quo* [Adv. Pro. Docket No. 52] (the "Status Quo Procedural Motion") ¶ 9 ("The City believes that full consideration of whether to dissolve the TRO can only be made after determining whether the automatic stay prevents Syncora from attempting to interfere with the City's casino revenues.").

[5]  Status Quo Motion ¶ 11.

property of the City unless and until the City satisfies all applicable conditions precedent that entitle it to possession of the Casino Revenues pursuant to the Collateral Agreement.

12.     Under New York law, a valid escrow requires (a) a written agreement where (b) the grantor deposits property with, and relinquishes control to, an escrowee and (c) subsequent delivery of the property by an escrowee to the grantee is conditioned upon the happening of an event or the performance of an act.  *See*, *e.g.*, *In re AppOnline.com, Inc.*, 315 B.R. 259 (Bankr. E.D.N.Y. 2004); *In re Royal Bus. Sch., Inc.*, 157 B.R. 932, 938 (Bankr. E.D.N.Y. 1993).  And, it is well-established that funds held in escrow are not property of the debtor subject to the automatic stay.  *See Creative Data Forms, Inc. v. Penn. Minority Bus. Dev. Auth.*, 72 B.R. 619, 624 (E.D. Pa. 1985) aff'd, 800 F.2d 1132 (3d Cir. 1986) (escrow account was not property of the estate even when the debtor was both the grantor and grantee of the account); *see also In re Atlantic Gulf Cmty. Corp.*, 369 B.R. 156, 163 (Bankr. D. Del. 2007) (escrow account was not estate property where debtor was a contingent grantee, entitled to the funds only upon the satisfaction of certain conditions); *In re Cannon*, 277 F.3d 838, 856 (6th Cir. 2002) (escrow account held by an attorney was not property of the attorney-debtor's estate).

13.     The Collateral Agreement established an escrow for the Casino Revenues.  Casino licensees pay the Casino Revenues directly into the General Receipts Subaccount, which is a custodial account maintained by U.S. Bank, a third-party custodian.  Meanwhile, the City makes monthly payments on account of the Swaps into a holdback account, which is a separate custodial account U.S. Bank maintains that also contains funds that have been pledged under the Collateral Agreement.

14.     Significantly, the City does not own or control either of these custodial accounts. In fact, the City only gains a right to possess the Casino Revenues once U.S. Bank certifies that

the City has made the requisite monthly payments on account of the Swaps and otherwise has satisfied all of the conditions precedent set forth in the Collateral Agreement (such as curing any Events of Default under § 5.4(a)(iii)). At that time, U.S. Bank typically pays the Casino Revenues from the General Receipts Subaccount to the City. If, however, the City has not satisfied its obligations (*e.g.*, payment into the holdback account) or there is a continuing Event of Default under the Collateral Agreement, the Casino Revenues must remain in the General Receipts Subaccount as cash collateral securing the City's performance in accordance with, and by automatic operation of, the Collateral Agreement. (CA §§ 5.2, 5.4.) Any modification, amendment, or waiver of these terms requires Syncora's consent, which has not been given.

15. Accordingly, this structure satisfies all of the requirements of an escrow. Therefore, the Casino Revenues held in the General Receipts Subaccount are not property of the City and the automatic stay does not apply.

**B.** **Even if the Casino Revenues are the City's Property, the Mere Accumulation thereof in the General Receipts Subaccount Pursuant to the Self-Executing Terms of the Collateral Agreement is not an Act to "Obtain Possession" or "Exercise Control" under Section 362(a)(3) of the Bankruptcy Code.**

16. Assuming *arguendo* that the Casino Revenues are property of the City, the mere accumulation of cash in the General Receipts Subaccount is not an action "to obtain possession" or "to exercise control" over that property under section 362(a)(3) of the Bankruptcy Code. The Supreme Court has recognized that freezing a debtor's bank account is not an exercise of control over the debtor's property. *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 21 (1995) (finding that placing an administrative hold on debtor's bank account was "neither a taking of possession of [the debtor's] property nor an exercising of control over it"). Under section 5.4 of the Collateral Agreement, the Custodian is obligated to place a hold on the General Receipts

7

Subaccount if, as here, an Event of Default has occurred. Such a self-effectuating hold is outside the scope of section 362(a)(3) of the Bankruptcy Code.

### C. The Casino Revenues and the Operation of the Collateral Agreement are Exempt from the Automatic Stay Pursuant to Section 922(d) of the Bankruptcy Code.

17. Section 922(d) of the Bankruptcy Code provides that "a petition filed under this chapter does not operate as a stay of application of pledged special revenues in a manner consistent with section [928] of this title to payment of indebtedness secured by such revenues." Section 902(2)(B) of the Bankruptcy Code defines special revenues to include "special excise taxes imposed on particular activities or transactions."

18. Although not defined under section 902(2)(B), "excise tax" has been defined in other bankruptcy contexts as "an indirect tax that is not directly imposed upon persons or property, but one that is imposed on the performance of an act, engaging in an occupation, or the enjoyment of a privilege." *New Neighborhoods, Inc. v. West Va. Comp. Ins. Fund*, 886 F.2d 714, 719 (4th Cir. 1989) (holding that premiums owed to a workers' compensation fund were excise taxes entitled to priority under section 507 of the Bankruptcy Code). Michigan law provides that an excise tax is "any tax which does not fall within the classical definition of a poll tax or property tax, and embraces every form of burden not laid directly upon persons or property . . . [including] a tax imposed upon the performance of an act, the engaging in an occupation, or the enjoyment of a privilege." *Dooley v. City of Detroit*, 370 Mich. 194, 206-07 (1963).

19. Here, each component of the Casino Revenues is a specific tax on the act of gaming.[6] The City Ordinance clearly states that Wagering Taxes are an excise tax. Detroit City

---

[6] The Casino Revenues comprise (a) Developer Payments imposed under the casino licensee's development agreements with the City (the "<u>Developer Payments</u>"); (b) Wagering Taxes imposed by City ordinance (the "<u>City Ordinance</u>"); (c) Additional Wagering Taxes imposed by state law (the "<u>Wagering Tax Revenue Statute</u>"); and (d)

8

Code § 18-14-3 (imposing "an excise tax upon the adjusted gross receipts of a casino licensee."). Additionally, though neither the Wagering Tax Revenue Statute nor the Developer Agreements specifically call for an "excise tax," both impose a tax on the adjusted gross receipts of casino licensees, which, like the Wagering Taxes, is a tax on a specific activity — gaming. Accordingly, the Casino Revenues are excise taxes and, thus, "special revenues" under section 902(2)(B) of the Bankruptcy Code that were pledged (as discussed below) under the Collateral Agreement. The Casino Revenues are therefore property of the type exempted from the stay under section 922(d) of the Bankruptcy Code.

20. As further evidence of the nature of the Casino Revenues, both Orrick Herrington & Sutcliffe LLP ("Orrick"), special counsel to the City for the execution of the Collateral Agreement, and the City have acknowledged that the Wagering Taxes are special revenues. In conjunction with the execution of the Collateral Agreement, Orrick issued an opinion stating that "if the matter were properly briefed and presented to a court, the court would hold that the Wagering Taxes constitute 'special revenues' under [s]ection 902(2) of the Bankruptcy Code." (Ex. 1, Orrick Opinion, p 7.) The City recently adopted a similar position, stating in its June 2013 initial proposal to creditors that the City was "treating the swap obligations as special revenue debt secured by the wagering tax revenues." (City Proposal, June 14, 2013 p. 28.)

21. Not only are all of the Casino Revenues special revenues, they are all pledged special revenues as well. The Collateral Agreement granted the Service Corporations a lien on all the Casino Revenues. (CA § 4.1(b) ("The City pledges to the Service Corporations and creates a first priority lien upon all of the City's right, title and interest in, to and under the

---

in the event the City repeals the City Ordinance, an Alternative Tax also imposed by the Wagering Tax Revenue Statute.

Pledged Property,[7] whether received or to be received, in order to secure the payment of all City Hedge Payables Related Obligations).)   The Service Corporations then pledged all of their secured interests in the Casino Revenues to the Swap Counterparties.  (CA § 4.2(a).)

22.     Finally, accumulation of the Casino Revenues in the General Receipts Subaccount constitutes "application of the pledged special revenues in a manner consistent with section [928]."  Section 928 of the Bankruptcy Code provides that "special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."  11 U.S.C. § 928(a).   Accumulation of the Casino Revenues in the General Receipts Subaccount is in accordance with the terms of the Collateral Agreement pursuant to which the lien was granted and in support of such lien.  Accordingly, the automatic stay does not apply.

23.     Further, if the Casino Revenues could not be held in the General Receipts Subaccount postpetition in accordance with the terms of the Collateral Agreement, the underlying purpose of section 922(d)'s exemption from the automatic stay for pledged special revenues would be undermined.   Before the addition of sections 902, 922, and 928 to the Bankruptcy Code, as the City has admitted, section 552 of the Bankruptcy Code operated to extinguish prepetition liens of municipal creditors.   Municipalities, unlike companies, generally cannot grant liens on specific assets.   Rather, municipalities can generally only grant liens on the proceeds of assets.   *See In re Jefferson Cnty., Ala.*, 474 B.R. 228, 267-71 (Bankr. N.D. Ala. 2012) (explaining the legislative history of sections 902, 922, and 928 of the Bankruptcy Code). Section 552(a) of the Bankruptcy Code, which states that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any

---

[7] Pledged Property includes the Casino Revenues.  (CA §§ 1.2, 1.4, 1.6).

security agreement entered into by the debtor before the commencement of the case," effectively nullifies prepetition liens on proceeds of assets of a municipality. Furthermore, such liens are not protected by section 522(b) of the Bankruptcy Code which creates an exception to section 552(a) for prepetition liens on proceeds of an asset that extent to the underlying asset. In recognition of this problem, Congress enacted sections 902, 922, and 928 of the Bankruptcy Code to ensure that municipal financial creditors would realize the benefit of their bargains in the event of a chapter 9 filing. *See* S. Rep. No. 100-506, at 12 (1988) ("[T]he [section 902, 922, and 928] amendments insure that revenue bondholders receive the benefit of their bargain with the municipal issuer, namely they will have unimpaired rights to the project revenue pledged to them.").

24.    If, notwithstanding the basic operation of the Collateral Agreement, the Casino Revenues cannot remain in the General Receipts Subaccount and are instead paid to the City, then the Swap Counterparties, and, by extension, the Swap Insurers, will lose their security interest in the Casino Revenues. Once paid to the City and placed in the City's general fund, the Casino Revenues will not be traceable. As a result, in the event the Swap Counterparties or Swap Insurers needed to draw on their cash collateral, they would not be able to trace the funds to which they are entitled. Moreover, even if the Casino Revenues were traceable, the Swap Counterparties and Swap Insurers may not be able to compel the City to turn them over because the Court may not have the authority to make the City do so. *See* 11 U.S.C. § 904. As a result, without the ability to trap the Casino Revenues in the General Receipts Subaccount in accordance with the terms of the Collateral Agreement, the Swap Counterparties' prepetition lien on the Casino Revenues effectively would be nullified in contravention of Congress's objectives in enacting sections 902, 922, and 928 of the Bankruptcy Code. Accordingly, retention of the

11

Casino Revenues in the General Receipts Subaccount is an application of pledged special revenues in accordance with section 928 of the Bankruptcy Code and therefore exempt from the automatic stay pursuant to section 922(d) of the Bankruptcy Code. To be sure, Syncora seeks nothing more than the continued enforcement of the terms of the Collateral Agreement with respect to the Casino Revenues. Specifically, Syncora seeks continued enforcement of section 5.4 of the Collateral Agreement, which operates automatically to trap cash upon the occurrence of certain Termination Events and Events of Default. (CA § 5.4.) And several Termination Events and Events of Default have occurred.

> **D.** **The Casino Revenues and the Operation of the Collateral Agreement are Exempt from the Automatic Stay Pursuant to Section 362(b)(17) of the Bankruptcy Code.**

25.    Section 362(b)(17) was enacted to "ensure that the swap and forward contract financial markets are not destabilized by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code." H.R. Rep. No. 484, H.R. REP. 101-484. It provides an exception to the automatic stay for "the exercise by a swap participant . . . of any contractual right . . . under any security agreement or arrangement . . . forming a part of or related to any swap agreement." 11 U.S.C. § 362(b)(17); *see also In re Mirant Corp.*, 314 B.R. 347, 353 (Bankr. N.D. Tex. 2004) (holding that counterparty's postpetition exercise of its contract rights under swap agreement was exempted from the automatic stay).

26.    A "swap participant" is "an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor." 11 U.S.C. § 101(53C). The term "swap agreement" includes, among other things, "any security agreement or arrangement or other credit enhancement related to any agreements or transactions [in connection with interest rate swaps]." *Id.* at § 101(53B)(A)(vi). A "security agreement" is any "agreement that creates or provides for a security interest." 11 U.S.C. § 101(50).

27.     The Swap Counterparties are swap participants because they and the City are parties to the Collateral Agreement.  The Collateral Agreement is a security agreement because it provides for a security interest.  *See id.*  And it is a swap agreement because it relates to interest rate swaps.  *See id.* at § 101(53B)(A)(vi).  Accordingly, the Swap Counterparties may exercise any contractual rights under the Collateral Agreement under section 362(b)(17) of the Bankruptcy Code.  *See id.* at §§ 101(53C), 362(b)(17).

28.     The Swap Counterparties therefore have the contractual right, exempted from the automatic stay, to enforce section 5.4(a)(iii) under the Collateral Agreement, which provides that "[n]o payment shall be made to the City from the General Receipts Subaccount . . . while an Event of Default is continuing under a Hedge where the related Counterparty is not the sole Defaulting Party."

29.     Furthermore, under the Contract Administration Agreement, Syncora has the right to direct the actions of the Swap Counterparties under the Collateral Agreement.  (CAA § 6.9.2(2) ("[A]ny Insurer not then in default under its Credit Insurance [*i.e.*, Syncora] shall . . . control all actions that may be taken by any Specified Hedge Counterparty that is the beneficiary of such Credit Insurance, including for purposes of actions permitted to be taken by such Specified Hedge Counterparty under this Agreement for the purposes of giving all other directions, consents and waivers that such Specified Hedge Counterparty may give.").)  As a result, any direction from Syncora to the Swap Counterparties to ensure that the Casino Revenues are trapped in the General Receipts Subaccount would not be subject to the automatic stay.

30.     Finally, as set forth in Syncora's Objection, though it is not a signatory to the Collateral Agreement, Syncora has various rights under the Swaps and the Collateral Agreement

by virtue of its status as an insurer and third-party beneficiary. First, Syncora insures the Swaps, and, as such, provides a "credit enhancement." *See In re Macklin*, No. 10-446010, 2012 WL 8250012, at *11 (Bankr. E.D. Cal. Feb. 16, 2012) (noting that insurance is a form of credit enhancement). As noted, a credit enhancement in connection with an interest rate swap is itself a swap agreement. *See* 11 U.S.C. § 101(53B)(A)(iv). Second, Syncora is a third-party beneficiary under the Collateral Agreement, and is therefore a swap participant. Because Syncora is a swap participant, it can enforce the terms of the Collateral Agreement and may, for example, send U.S. Bank, as custodian, a notice of an event triggering retention of the Casino Revenues in the General Receipts Subaccount, unhindered by the automatic stay. *See id.* at § 362(b)(17).

31.     Accordingly, for the above reasons, the Casino Revenues and the operation of the Collateral Agreement are exempt from the automatic stay pursuant to section 362(b)(17) of the Bankruptcy Code.

**III.    The City Overstates Its Immediate Need to Access the Casino Revenues.**

32.     Given the unambiguous language of the operative documents, whether the City needs the Casino Revenues or not, they must be automatically trapped. Nonetheless, in numerous filings, the City claims that, without immediate access to the funds in the General Receipts Subaccount, it will suffer immediate and irreparable harm.[8] This claim, however, is belied by the proposal that Mr. Orr provided to the City's creditors as part of his June 14, 2013 presentation, which reveals that the City's immediate access to the Casino Revenues is *not* essential to the day-to-day operations of the City. (Ex. A to Orr Aff.)

33.     As part of this proposal, Mr. Orr detailed the current financial status of the City. According to this presentation, the City forecasts 2014 revenues of approximately $1.083 billion,

---

[8] Status Quo Motion ¶ 10; *see also id.* at ¶ 4 (describing the cash trap as an "untenable loss"); Status Quo Procedural Motion ¶ 8 (describing the effect of the cash trap as "immediate and irreparable harm to the City and its creditors").

with approximately $170 million derived from Casino Revenues. (*Id.* at 38.) The City forecasts approximately $685.7 million in operating expenditures for 2014. (*Id.*) Thus, even if the City did not receive any of the Casino Revenues for all of 2014 — approximately $170 million — the City still projects a net operating surplus of approximately $227.2 million.[9]

34.    In light of the above calculations, the City is projected to be cash-flow positive for 2014. This is relevant because the City has argued that its dire need for liquidity necessitates that the funds in the General Receipts Subaccount not be trapped. As demonstrated herein, however, the City's contention is contradicted by its own projections.

35.    The City may not be satisfied with the current level of services it is providing to its citizens. But its claim that the current level of services will be materially threatened by the normal operation of the Collateral Agreement is not supported by the record. In any event, the City's desire for cash is not a basis to disregard the plain language of the Collateral Agreement, which was designed to operate automatically.

[*Remainder of this page intentionally left blank*]

---

[9] The City's summary of its current financial status also details its funded debt and legacy liability related expenditures. However, Mr. Orr has stated that he will (a) not be making debt service payments to the general obligation bonds; (b) not be contributing to the pensions; (c) treat the retirees as unsecured creditors; and (d) not be making the COP-related service payments to the COP-holders. In addition, if the Casino Revenues are trapped, then there is no need for the City to make the Swap-related payments to the Service Corporations. Finally, none of the expenditures referenced above are necessary to the City's day-to-day operations. Accordingly, they were not considered in the calculations described in paragraph 33.

Dated:  August 20, 2013

/s/ *Ryan Blaine Bennett*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:     (248) 646-5070
Facsimile:     (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

16

**Exhibit 1**

**Orrick Opinion**



ORRICK, HERRINGTON & SUTCLIFFE LLP
666 FIFTH AVENUE
NEW YORK, NY 10103-0001
*tel 212-506-5000*
*fax 212-506-5151*
WWW.ORRICK.COM

JUNE 26, 2009

THE PARTIES LISTED ON SCHEDULE A HERETO

> Re:  Collateral Agreement, dated as of June 15, 2009, among the City of
> Detroit, certain Service Corporations, acting severally and not jointly,
> <u>U.S. Bank National Association, as Custodian, and certain Counterparties</u>

Ladies and Gentlemen:

We have acted as special counsel to the City of Detroit, Michigan (the "City"), the Detroit General Retirement System Service Corporation ("GRS") and the Detroit Police and Fire Retirement System Service Corporation ("PFRS" and, together with GRS, the "Service Corporations") in connection with the settlement and release of certain claims that could have been asserted against the City and the Service Corporations under certain interest rate exchange agreements that were entered into by the Service Corporations in connection with the $948,540,000 Taxable Certificates of Participation, Series 2006, issued by the Detroit Retirement Systems Funding Trust 2006 (the "Certificates"). The Certificates are payable solely from certain Service Payments to be made by the City pursuant to certain Service Contracts between the City and the Service Corporations. In connection with the issuance of the Certificates, the Service Corporations entered into several interest rate exchange agreements (collectively, the "Swap Agreements") with UBS AG, SBS Financial Products Company, LLC (SBS), and Merrill Lynch Capital Services, Inc., as credit support provider to SBS, (collectively, the Counterparties). Additionally, certain payments under the Swap Agreements were guaranteed under insurance policies issued either by Financial Guaranty Insurance Company ("FGIC") or XL Capital Assurance Inc., now Syncora ("XL") (collectively, the "Insurers"). As the result of a series of rating downgrades of the Certificates and Insurers in 2008 and 2009, the Service Corporations were notified by the Counterparties that they believed that an Additional Termination Event had occurred under each respective Swap Agreement, providing the Counterparties the right to seek termination of their respective Swap Agreement.



**ORRICK**

Pursuant to an ordinance adopted by the City Council of the City on May 19, 2009, Ordinance 05-09 (the "Ordinance") and a resolution adopted by the City Council on June 23, 2009 (the "Resolution"), the City and the Service Corporations were authorized to execute and deliver that certain Collateral Agreement, dated as of June 15, 2009, among the City, the Service Corporations, acting severally and not jointly, U.S. Bank National Association, as Custodian, and the Counterparties (the "Collateral Agreement"). Unless otherwise defined herein, capitalized terms used herein that are defined in the Collateral Agreement shall have the meanings herein as given to such terms in the Collateral Agreement. Pursuant to the Ordinance, the City has pledged to the Service Corporations the City's rights to, among other property, certain wagering taxes levied or imposed by Detroit City Code Section 18-4-3 pursuant to Section 12(4)(b) of the Wagering Tax Revenue Statute (the "Wagering Taxes"), now or hereafter receivable by the City to secure payment of the obligations under the Swap Agreements as and when the same become due and payable. Pursuant to the Ordinance and the Collateral Agreement, each Service Corporation, in turn, pledged to the Counterparties, severally and not jointly, as security for such Service Corporation's obligations under the respective Swap Agreements, its rights to the City Pledge. Pursuant to certain Irrevocable Instructions, dated June [25], 2009, the City has instructed each Casino Licensee to make payment of the Wagering Taxes and other amounts owed to the City to the Custodian for credit to a specially designated account as set forth in such Irrevocable Instructions.

You have requested our opinion as to whether, if the City or a Service Corporation were to become a debtor in a case under Chapter 9 of the United States Bankruptcy Code (Title 11, U.S.C.) (the "Bankruptcy Code"), the Wagering Taxes would constitute "special revenues" under section 902(2) of the Bankruptcy Codes.

In connection with our role as special counsel to the City and the Service Corporations, we have reviewed (i) the Collateral Agreement; (ii) the Irrevocable Instructions; (iii) the Hedge; and (iv) the Service Contracts (collectively, the "Documents"). We have also reviewed the Ordinance and the Resolution. In addition, we have examined and relied on such agreements, documents, instruments and other certificates of officials, officers and representatives of the City and the Service Corporations and we have made such investigations of law as we have deemed appropriate as a basis for the opinions and conclusions expressed herein. For purposes of this opinion, we have not reviewed any documents other than the Documents. In particular, we have not reviewed any document (other than the Documents) that is referred to in or incorporated by reference into any Document. We have assumed without investigation that there exists no provision in any document that we have not reviewed that is inconsistent with the


**ORRICK**

opinions stated herein. We have conducted no independent factual investigation of our own, but rather have relied solely upon the Documents, the statements and information set forth therein, and the additional matters recited or assumed therein, all of which we have assumed to be true, complete, and accurate in all material respects. We have also assumed without investigation the accuracy of all representations and warranties as to matters of fact contained in the Documents. Because the opinions set forth herein are based solely upon our review of the Documents, we express no opinion herein as to the effect of any transaction other than, or any act or omission of any person or entity other than the parties to, the transactions contemplated by the Documents.

For purposes of this opinion, we have assumed, without investigation, that the following statements are correct:

1. Each of the Documents has been duly authorized, executed, and delivered by each of the·parties thereto, constitutes the valid and binding obligation of each of the parties thereto, the executed Documents as to which we have reviewed forms will conform in all respects with the form reviewed, and will be enforceable against each such party in accordance with the terms thereof. Each of the Documents, and the transactions contemplated thereby, is performed by each of the parties thereto and complies with all applicable laws, and each of the parties to the transactions contemplated by the Documents complies in all material respects with applicable laws.

2. As of the date hereof, the City and each of the Service Corporation has sufficient working capital to satisfy its uncontested liabilities as such liabilities become due.

3. The City and each Service Corporation is eligible to be a debtor only under Chapter 9 of the Bankruptcy Code. Less than 80 percent of the value of the assets of the City or a Service Corporation consist of assets relating to farming operations. Neither the City nor either Service Corporation is a bank. Neither the City nor a Service Corporation owns trackage facilities that are leased by a common carrier by railroad engaged in the transportation of individuals or property. Neither the City nor a Service Corporation is a common carrier by railroad engaged in the transportation of individuals or property. Neither the City nor a Service Corporation is a corporation organized under Section 25A of the Federal Reserve Ordinance that operates, or that operates as, a multilateral clearing organization pursuant to Section 409 of the Federal Deposit Insurance Corporation Improvement Ordinance of 1991.



ORRICK

The Parties Listed on Schedule A
Hereto
June 26, 2009
Page Four


      4.  The obligation of the City and each Service Corporation under the Ordinance constitute valid and binding obligations of the City and each Service Corporation enforceable in accordance with their terms under the Ordinance.

      5.  The City Pledge, as set forth in the Ordinance, is valid, binding and enforceable.

      6.  Article XIV of Chapter 18 of the Detroit City Code is in full force and effect in accordance with all applicable City Charter, constitutional and statutory requirements, and is within the City's powers, require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of applicable law or regulation or of the City Charter or of any agreement, judgment, injunction, order, decree or other instrument binding upon the City. The City has not rescinded, reduced or ceased to impose the Wagering Taxes.

      Chapter 9 of the Bankruptcy Code affords special protection to certain creditors having a lien on "special revenues" from the effect of Section 552(a). Under Bankruptcy Code Section 552(a), property acquired by a debtor after filing bankruptcy is not subject to any lien created prior to bankruptcy. See, e.g., United Sav. Ass'n v. Timbers of Inwood Forest, 484 U.S. 365, 374 (1988). Section 552(a) is incorporated into Chapter 9 of the Bankruptcy Code through Bankruptcy Code § 901. In 1988, Congress enacted a limited exception to the application of Section 552(a) by making Bankruptcy Code § 552(a) inapplicable to "special revenues". Thus, under Bankruptcy Code § 928, bondholders secured by a lien on special revenues retain their lien on the special revenues that arise post-petition. See, In re County of Orange, 179 B.R. 185, 191-192 (Bankr. C.D. Cal. 1995) ("Code § 928 was enacted [to] mak[e] § 552(a) inapplicable to revenue bonds."

      Section 902(2) defines "special revenues, in relevant part, as:

". . . special excise taxes imposed on particular activities or transactions."

      While there is no specific definition of excise taxes under the Bankruptcy Code, particularly under Section 902(2), excise taxes have been defined in other sections under the Bankruptcy Code as "an indirect tax that is not directly imposed upon persons or property, but one that is imposed on the performance of an act, the engaging in any occupation, or the enjoyment of a privilege." New Neighborhoods, Inc. v. West. Va. Workers Comp. Ins. Fund,



ORRICK

886 F.2d 714 (4th Cir. 1989) (premiums owed to a workers' compensation fund were excise taxes entitled to priority under Bankruptcy Code § 507(a)(7)).

In In re Lorber Industries of California, Inc., 675 F.2d 1062, 1066 (9th Cir. 1982), the Ninth Circuit set forth the following four-prong test to determine whether an exaction should be characterized as a tax:

(a) an involuntary pecuniary burden, regardless of name, laid upon individuals or property;

(b) imposed by, or under authority of the legislature;

(c) for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it;

(d) under the police or taxing power of the state.

Here, the Wagering Tax Revenue Statute authorized the City to impose both a wagering tax and a municipal services fee upon a person who is licensed by the Michigan Gaming Control Board to operate a casino within the City of Detroit. The Wagering Taxes were imposed by the City on each of the Casino Licensees, the proceeds of which are required to be used by the City for the purposes authorized and set forth in the Wagering Tax Revenue Statute. Pursuant to Detroit City Code Section 18-4-3, adopted pursuant to Section 12(4)(b) of the Wagering Tax Revenue Statute, the City imposed the Wagering Taxes. Detroit City Code Section 18-4-3 specifically provides that:

"(a) a wagering tax is hereby imposed **as an excise tax** upon the adjusted gross receipts of a casino licensee.

(b) The wagering tax that is imposed pursuant to this section shall be equal to nine and nine-tenths percent (9.9%) of the **adjusted gross receipts** which are received by a casino licensee and subject to tax under subsection (a) of this section.

(c) The wagering tax that is imposed pursuant to this section shall be applied against all **adjusted gross** receipts received in 1999 and each year thereafter in which a casino licensee is licensed by the



ORRICK

board to conduct a gambling operation within the city." (emphasis added)

Thus, a court should conclude that the Wagering Taxes are excise taxes within the meaning of Bankruptcy Code § 902(2). As described in the legislative history, the term "special revenues" was intended "to cover special excise taxes imposed on particular activities or transactions---such as an excise tax on hotel or motel rooms imposed by some municipalities or an excise tax on the sale of alcoholic beverages." H.R. Rep. 100-1011, 100th Cong., 2d Sess. 6-7 (1988); S. Rep. 100-506, 100th Cong., 2d Sess. 21 (1988); and see Collier on Bankruptcy 4-507 ¶ 507.10[6] (15th ed. Rev.) (The legislative history to the Bankruptcy Code suggests that excise taxes includes sales taxes, estate and gift taxes, gasoline and special fuel taxes, and wagering and truck taxes). See United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 323, 326 n.1 (1st Cir. 2003) (quoting Black's Law Dictionary at 585 (7th ed. 1999)) ("[a]n excise tax is '[a] tax imposed on the manufacture, sale, or use of goods ... or an occupation or activity....' " ); In re Albion Health Servs., 339 B.R. 171, 178-79 (Bankr. W.D. Mich. 2006) (contributions to the Michigan Unemployment Compensation Fund was not a "tax" entitled to priority; court stated that "An excise tax is: [a] tax imposed on the performance of an act, the engaging in an occupation, or the enjoyment of a privilege. [citation omitted] A tax on the manufacture, sale, or use of goods or on the carrying on of an occupation or activity, or a tax on the transfer or property. In current usage the term has been extended to include various license fees and practically every internal revenue tax except the income tax (e.g., federal alcohol and tobacco excise taxes, IRC § 5001 et seq.")) (citing Black's Law Dictionary (6th Edition)).

In In re Juvenile Shoe Corporation of America, 99 F.3d 898 (8th Cir. 1996), the Eighth Circuit held that a 15% flat tax levied on funds reverted to an employer from an over-funded employer pension fund constitutes an excise tax because it was designed to capture the tax benefit the employer received at the expense of the government while the funds were held in the tax-exempt pension trust. Thus, it had the same effect as assessing the tax prior to the employer's placement of the funds in the pension plan and accordingly the primary objective was to support the government rather than to penalize an unlawful act. But see United States v. Reorganized CF&I Fabricators of Utah, Inc., 518 U.S. 213 (1996) (an IRS provision imposing a ten percent "tax" on any accumulated funding deficiency of certain pension plans was not an excise tax but instead was, for bankruptcy purposes, a penalty to be dealt with as an ordinary unsecured claim); and In re Jenny Lynn Min. Co., 780 F.2d 585, 588 (6th Cir. 1986) (a tax is an exaction for public purposes; fee for obtaining a strip mining permit is not an excise tax).



ORRICK

The Parties Listed on Schedule A
Hereto
June 26, 2009
Page Seven

Based on and subject to the foregoing, as well as the limitations set forth below and the further qualification that there is no case directly on point, we are of the opinion that if the matter were properly briefed and presented to a court, the court would hold that the Wagering Taxes constitute "special revenues" under Section 902(2) of the Bankruptcy Code.

We express no opinion whether Bankruptcy Code § 928 applies with respect to the City Pledge. We note that some courts have held that Bankruptcy Code § 928 is not unlimited. See In re County of Orange, 179 B.R. at 191-192 ("Section 928 was narrowly crafted to apply only to special revenue bonds)." One noted treatise has indicated that the purpose of Section 928 "was to protect liens granted to secure financings which related to the purpose for the financing" and "should not be construed as authorizing the special treatment . . . on special revenues unrelated to the project, system or works for which the bonds were issued." Collier on Bankruptcy ¶ 507.10[6]. Collier goes on to say "For example, a lien on receipts from an existing hotel/motel tax to secure bonds issued to build a new city college facility, or a lien on sewer tax revenues to secure bonds for an electric generating station, should not qualify for the special treatment afforded revenue bonds by the 1988 Amendments." Id.

We express no opinion concerning the laws of any jurisdiction other than the Bankruptcy Code and, of the Bankruptcy Code, Chapter 9 of the Bankruptcy Code. We do not express any opinion herein as to any bankruptcy case affecting any entity other than the City or a Service Corporation, or as to any case involving the City or either Service Corporation under any other chapter of the Bankruptcy Code. We also do not express any opinion as to any wagering taxes other than the Wagering Taxes or whether the municipal services fee imposed by Detroit City Code Section 18-14-4 pursuant to Section 12(4)(b) of the Wagering Tax Revenue Statute constitutes "special revenues". We express no opinion as to whether a Service Corporation is eligible to be a debtor under Chapter 9 of the Bankruptcy Code.

The opinions set forth above are given as of the date hereof and we disavow any undertaking or obligation to advise you of any changes in law or any facts or circumstances that may hereafter occur or come to our attention that could affect such opinions. Furthermore, it is our and your understanding that the foregoing opinions are not intended to be a guaranty as to what a particular court would actually hold, but an opinion as to the decision a court should reach if the issue were properly presented to it and the court followed what we believe to be the applicable legal principles. In that regard, you should be aware that all of the foregoing opinions are subject to inherent limitations because of the pervasive equity powers of bankruptcy courts,



ORRICK

The Parties Listed on Schedule A
Hereto
June 26, 2009
Page Eight

the overriding goal of reorganization to which other legal rights and policies may be subordinated, the potential relevance to the exercise of judicial discretion of future-arising facts and circumstances and the nature of the bankruptcy process. This opinion is solely for your benefit in connection with the transactions described in the first paragraph hereof and may not be relied upon or used by, circulated, quoted or referred to, nor may copies hereof be delivered to, any other person without our prior written approval.

Very truly yours,

*Orrick, Herrington & Sutcliffe LLP*

ORRICK, HERRINGTON & SUTCLIFFE LLP



ORRICK

SCHEDULE A

| The City of Detroit<br>City of Detroit Law Department<br>First National Building, Suite 1650<br>660 Woodward Avenue<br>Detroit, Michigan 48226 | U.S. Bank, National Association<br>535 Griswold, Suite 550<br>Detroit, Michigan 48226 |
|---|---|
| UBS Securities LLC<br>677 Washington Boulevard<br>Stamford, CT 06901 | SBS Financial Products Company, LLC<br>100 Wall Street, 22nd Floor<br>New York, New York 10005 |
| Merrill Lynch Capital Services, Inc.<br>Merrill Lynch World Headquarters<br>4 World Trade Center, 18th Floor<br>New York, New York 10080 | Financial Guaranty Insurance Company<br>125 Park Avenue<br>New York, New York 10017 |
| Syncora Guaranty Inc.<br>1221 Avenue of the Americas<br>New York, New York 10020 | |
| | |