UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                               .        Detroit, Michigan
                               .        August 21, 2013
                Debtor.        .        10:02 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. EMERGENCY MOTION FOR
CLARIFICATION OF THE JULY 25, 2013, STAY ORDER

EXPEDITED HEARING RE. NOTICE OF PENDENCY OF DEFENDANT
SYNCORA GUARANTEE, INC.'S, EMERGENCY MOTION TO DISSOLVE
THE TEMPORARY RESTRAINING ORDER AND CONDUCT
EXPEDITED DISCOVERY

STATUS HEARING RE. CORRECTED MOTION TO ASSUME LEASE OR
EXECUTORY CONTRACT

ADVERSARY PROCEEDING 13-04942 - STATUS CONFERENCE RE.
ORDER GRANTING IN PART AND DENYING IN PART DEBTOR'S
EX PARTE MOTION FOR AN ORDER SHORTENING NOTICE, STAYING
FURTHER BRIEFING AND SCHEDULING AN EXPEDITED HEARING WITH
RESPECT TO MOTION OF DEBTOR CITY OF DETROIT TO SCHEDULE
STATUS CONFERENCE, SET BRIEFING SCHEDULES AND
MAINTAIN STATUS QUO

BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  DAVID G. HEIMAN
                       North Point
                       901 Lakeside Avenue
                       Cleveland, OH  44114-1190
                       (216) 586-3939

                       Jones Day
                       By:  GREGORY M. SHUMAKER
                       51 Louisiana Avenue, N.W.
                       Washington, DC  20001-2113
                       (202) 879-3679

APPEARANCES (continued):

<pre>
                        Jones Day
                        By:  CORINNE BALL
                        222 East 41st Street
                        New York, NY  10017-6702
                        (212) 326-7844

For Robert Davis:       Paterson Law Office
                        By:  ANDREW A. PATERSON, JR.
                        46350 Grand River, Suite C
                        Novi, MI  48374
                        (248) 568-9712

For the State of        State of Michigan - Assistant Attorney
Michigan -                 General, State Operations Division
Governor, State         By:  MICHELLE M. BRYA
Treasurer, and               JOSHUA O. BOOTH
Local Emergency         525 W. Ottawa Street
Financial               P.O. Box 30754
Assistance Loan         Lansing, MI  48909
Board in State          (517) 373-1162
Case:

For Syncora Hold-       Kirkland & Ellis, LLP
ings, Ltd., Syncora     By:  STEPHEN C. HACKNEY
Guarantee, Inc.,        300 North LaSalle
and Syncora Capital     Chicago, IL  60654
Assurance, Inc.:        (312) 862-2074

For Detroit             Honigman, Miller, Schwartz & Cohn, LLP
Entertainment, LLC-     By:  JUDY B. CALTON
Motor City Casino       660 Woodward Avenue, Suite 2290
and Greektown           Detroit, MI  48226
Casino, LLC:            (313) 465-7344

For U.S. Bank:          McDermott, Will & Emery, LLP
                        By:  NATHAN F. COCO
                        227 West Monroe Street, Suite 4700
                        Chicago, IL  60606
                        (312) 372-2000

For David Sole:         Jerome D. Goldberg, PLLC
                        By:  JEROME GOLDBERG
                        2921 East Jefferson, Suite 205
                        Detroit, MI  48207
                        (313) 393-6001
</pre>

APPEARANCES (continued):

                        Vanessa G. Fluker, Esq., PLLC
                        By:  VANESSA G. FLUKER
                        2921 East Jefferson, Suite 200
                        Detroit, MI  48207
                        (313) 393-6005

For Ambac Assurance Arent Fox, LLP
Corporation:            By:  CAROLINE TURNER ENGLISH
                        1717 K Street, N.W.
                        Washington, DC  20036-5342
                        (202) 857-6178

For Financial           Weil, Gotshal & Manges, LLP
Guaranty Insurance      By:  ALFREDO R. PEREZ
Company:                700 Louisiana, Suite 1600
                        Houston, TX  77002
                        (713) 546-5040

For Detroit             Clark Hill, PLC
Retirement Systems-     By:  ROBERT GORDON
General Retirement      151 South Old Woodward, Suite 200
System of Detroit,      Birmingham, MI  48009
Police and Fire         (248) 988-5882
Retirement System
of the City of Detroit:

For Retired             Strobl & Sharp, PC
Detroit Police          By:  LYNN M. BRIMER
Members                 300 East Long Lake Road, Suite 200
Association:            Bloomfield Hills, MI  48304-2376
                        (248) 540-2300

For Erste               Ballard Spahr, LLP
Europaische             By:  VINCENT J. MARRIOTT, III
Pfandbrief-und          1735 Market Street, 51st Floor
Kommunalkreditbank      Philadelphia, PA  19103-7599
Aktiengesellschaft      (215) 864-8236
in Luxemburg, S.A.:

For International        International Union, UAW
Union, UAW:             By:  MICHAEL B. NICHOLSON
                        8000 East Jefferson Avenue
                        Detroit, MI  48214
                        (313) 926-5216

For National Public Sidley Austin, LLP
Finance Guarantee       By:  GUY S. NEAL
Corporation:            1501 K Street, N.W.
                        Washington, DC  20005
                        (202) 736-8041

```
Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

1        THE CLERK:  All rise.  Court is in session.  Please

2 be seated.  Case Number 13-53846, City of Detroit, Michigan,

3 and Case Number 13-04942, City of Detroit versus Syncora

4 Guarantee, et al.

5        THE COURT:  One second, please.  Chris.  All right.

6 Did someone want to be sworn in?

7        ATTORNEY:  Yes.

8        THE COURT:  Someone would like to be admitted to the

9 bar of the Court.  Step forward, please.

10       MR. COCO:  Good morning, your Honor.

11       THE COURT:  Good morning.  What are your names,

12 please?

13       MR. COCO:  Nathan Coco from McDermott, Will & Emery.

14       THE COURT:  Mr. Coco.

15       MR. PRICE:  Good morning, your Honor.  William Price

16 from Clark Hill.

17       THE COURT:  Mr. Price.

18       MR. GUADAGNINO:  Frank Guadagnino, Clark Hill.

19       THE COURT:  What's your last name, sir?

20       MR. GUADAGNINO:  Guadagnino.

21       THE COURT:  Welcome.  Okay.  Are the three of you

22 prepared to take the oath of admission to the Bar of the

23 Court?  Please raise your right hands.  Do you affirm that

24 you will conduct yourself as an attorney and counselor of

25 this Court with integrity and respect for the law, that you

1  have read and will abide by the civility principles approved
2  by the Court, and that you will support and defend the
3  Constitution and laws of the United States?

4          ATTORNEYS:  I will (collectively).

5          THE COURT:  All right.  Welcome.  We'll take care of
6  your paperwork for you.  You are all set.

7          ATTORNEY:  Thank you, your Honor.

8          THE COURT:  You're welcome.  One second, please.  My
9  password is not working here, Chris.  All right.  Well, let's
10 start.  I want to start with the Davis matter, please.

11         MR. PATERSON:  Thank you, your Honor.  Andrew
12 Paterson on behalf of Robert Davis.

13         THE COURT:  And you may proceed, sir.

14         MR. PATERSON:  Sir, this is our motion for
15 clarification of your stay order that was entered in July and
16 addressed, as we saw it, three state lawsuits that were
17 included in the stay, although the debtor was not a party to
18 those suits, but they did involve the first or second biggest
19 liability of the debtor, the pension plans.  And the
20 definition or the identification of those cases was set forth
21 in the motion, and your order did adopt that.

22         THE COURT:  Excuse me one second, sir.  Chris, it's
23 working.  Go ahead, sir.

24         MR. PATERSON:  Since that time, your order has been
25 interposed in our state case up in Ingham County on an open

1   meetings case.  It's also been interposed in other matters

2   that I've been involved in, and I'd like to have some

3   clarification as to the extent of that order.  I feel that

4   the state proceeding in Ingham County is an open meetings

5   case that has no impact whatsoever directly or practically on

6   the debtor's Chapter 9 protections.

7           THE COURT:  Well, let's talk about that.  What does

8   your client seek to accomplish by that lawsuit?

9           MR. PATERSON:  A declaration from the Court that the

10  Loan Board violated the Open Meetings Act in connection with

11  the appointment of Mr. Orr under Public Act 72 as the

12  emergency financial manager for the City of Detroit.

13          THE COURT:  And what does he intend to do with that

14  declaration if he obtains it?

15          MR. PATERSON:  The declaration is used in the state

16  court to guide conduct of public bodies, and I will also seek

17  an injunction that they not violate the OMA again, although

18  it's somewhat moot at this point since Public Act 72 has now

19  been repealed by the enactment of Public Act 436 of 2012

20  under which Mr. Orr currently serves and is appointed.

21          THE COURT:  Is it your representation to the Court

22  that it is not the intent of your client to use such a

23  declaration to remove Mr. Orr from office?

24          MR. PATERSON:  It is, and he did in our reply brief

25  so stipulate that we would not be appealing any such

1    decision.  I also indicated to the Court and have brought

2    with me a copy of the transcript from our July 24 hearing

3    before Judge Collette wherein he indicated that he was not

4    going to invalidate any actions taken by the Loan Board in

5    connection with the appointment.

6                THE COURT:  Well, I appreciate that, but I want to

7    be sure you understand the very specific question I'm asking

8    you.  I get that it is not the intent of your client or of

9    the state court to invalidate any of the actions of the Loan

10   Board or any of the actions that Mr. Orr has taken from the

11   time of his appointment until whenever that judgment might be

12   entered.  I've got that.

13               MR. PATERSON:  Nor could I seek that relief, nor

14   could the Court grant that under Michigan law.

15               THE COURT:  But that's not the question I'm asking.

16   I'm asking is -- the question I'm asking is is it your

17   representation to the Court that your client will not seek to

18   use that judgment to remove Mr. Orr from office in the

19   future?

20               MR. PATERSON:  That is, in fact, our stipulation.

21               THE COURT:  So if I heard you correctly, what you

22   plan to do with this judgment is to use it to enjoin the Loan

23   Board or others from violating the Open Meetings Act in the

24   future?

25               MR. PATERSON:  That is correct.

1          THE COURT:  And anything else?

2          MR. PATERSON:  No.  I mean the relief that I seek is

3     the declaration.  I am compelled to ask for an injunction

4     against further violations.  It's within the discretion of

5     the state court to issue or not issue that, and then I will,

6     of course, be seeking reimbursement of the attorneys' fees

7     and costs.

8          THE COURT:  All right.  So the question remaining to

9     be addressed is why shouldn't the order that the Court

10    previously entered be read to stay your suit or the suit

11    where you represent Mr. Davis?

12         MR. PATERSON:  Because none of the debtor's assets

13    or property is affected whatsoever by my suit.  My suit is

14    against state actors, not against the city.  The city is not

15    a party.  None of its departments are parties.  None of its

16    assets or property is subject to any action by the Circuit

17    Court in my OMA suit.  My OMA suit is exclusively against the

18    governor, the state treasurer, and the state Emergency

19    Financial Loan Board.

20         THE COURT:  All right.  Anything further, sir?

21         MR. PATERSON:  No.  I would just emphasize that the

22    de facto doctrine does validate all of the acts that have

23    occurred to date, in any event, and there's been no response

24    to that.  I mean that is clearly the state law.

25         THE COURT:  Thank you, sir.

1    MR. PATERSON:  Thank you.

2    THE COURT:  Who will be addressing this?  Oh, I'm

3  sorry.

4    MS. BRYA:  Good morning, your Honor.  Michelle Brya

5  and Joshua Booth.  We represent the governor, the state

6  treasurer, and the Local Emergency Financial Assistance Loan

7  Board in the state case.

8    It is our position that the scope of your order

9  extending the bankruptcy stay should include the Davis case.

10  In the debtor's motion they specifically requested that it

11  apply to actions against the governor, the treasurer, and the

12  Loan Board that directly or indirectly seek to enforce claims

13  against the city or interfere with the city's actions or

14  activities in the Chapter 9 case.  Although the order that

15  was signed by this Court specifically acknowledged the three

16  pre-petition cases, we believe that by the language of that

17  order it said that that language was included for the

18  avoidance of doubt, and it didn't in any way limit the scope

19  of your order to those three cases.

20    The defendants in the state case, the Davis versus

21  Loan Board case, are the exact same defendants that this

22  Court acknowledged in its order, the state treasurer, the

23  governor, and the Local Financial Emergency Loan Board, and

24  Davis seeks to invalidate the emergency manager, and that

25  would clearly interfere with the state's activities in the

1  Chapter 9 bankruptcy case.  Until Mr. Paterson filed his
2  reply brief, we weren't aware of his position with respect to
3  the invalidation, but clearly in his prayer for relief in the
4  state case in his second amended complaint he requests a
5  declaration that all decisions of the defendants, including
6  its votes taken at the March 14th Loan Board meeting, are
7  invalidated, and one of the decisions that they made that day
8  was the appointment of Mr. Orr, so we believe that by seeking
9  such relief, Mr. Paterson and Mr. Davis have not withdrawn
10 those claims for the invalidation of the emergency manager,
11 and, therefore, Judge Collette in the state case could still
12 order that invalidation occur and that Mr. Orr's appointment
13 be invalidated.  And we believe that that could have a
14 significant impact on the Chapter 9 proceedings, and we're
15 asking that you extend the scope of stay.
16         THE COURT:  Suppose the motion were granted with the
17 condition that prohibited that?
18         MS. BRYA:  That prohibited the ability for the state
19 court to invalidate the emergency manager?
20         THE COURT:  Precisely.
21         MS. BRYA:  That would be something that we would be
22 probably comfortable with, your Honor.  I mean certainly
23 that's the concern that we have is that if his position is
24 invalidated, then it could significantly impact the City of
25 Detroit and the state in general.

1    THE COURT:  It sounds like all Mr. Davis and his

2  counsel want here is a declaration that the Open Meetings Act

3  was violated and attorney fees.

4    MS. BRYA:  To some extent I think that that's

5  correct, your Honor, although they still have those claims in

6  their complaint, and so that relief, again, can still be

7  granted.

8    THE COURT:  But if my order of clarification limited

9  Mr. Davis to those two forms of relief, you would be

10  comfortable with that?

11    MS. BRYA:  Yes, your Honor, I believe we would.

12    THE COURT:  All right.  Thank you.

13    MS. BRYA:  Thank you, your Honor.

14    MR. HEIMAN:  Good morning, your Honor.  David

15  Heiman, Jones Day, on behalf of the city.  As a technical

16  matter, this seems more like a request for relief from stay

17  than clarification, but I'll leave that to your Honor, and I

18  don't -- it matters not to me whether we try to go through a

19  proper process or not in that respect, but I would like to

20  say that we're obviously very concerned about anything that

21  would in any way question the role or authority of the

22  executive decision-maker of the city, and I cannot imagine

23  anything that would be more disruptive to a Chapter 9 case

24  than that.  So to just respond to your proposal, if I can

25  call it that, I also have no problem with the suggestion as

1    it relates to Mr. Davis and his counsel, Mr. Paterson.  I am

2    concerned, however, about the impact of a ruling that

3    potentially invalidates the -- for the record, invalidates

4    the appointment of Mr. Orr not so much for the party that is

5    making the commitment to your Honor but for the rest of the

6    world and what they do with that, so I think we have to

7    address that.  I have no problem with your Honor getting

8    comfortable with whatever works here, but I just want to make

9    sure that we have covered the waterfront in terms of not

10   being exposed to some third party coming in and saying, "Look

11   at that order," so with that --

12          THE COURT:  Is it possible -- one second, sir.  Is

13   it legally possible to give Mr. Orr and the city that kind of

14   protection?

15          MR. HEIMAN:  I would assume -- I'm not a

16   constitutional scholar, your Honor, but I would assume if

17   your Honor issues an order that makes it clear -- and what I

18   think I heard you say is your order would say that, without,

19   again, being technical, the stay will not apply to the Davis

20   lawsuit -- the pending Davis lawsuit so long as the

21   Bankruptcy Court does not move to invalidate the appointment

22   of Mr. Orr.

23          THE COURT:  Well, you said "Bankruptcy Court," but,

24   of course, you mean the Circuit Court.

25          MR. HEIMAN:  Yes.  I'm sorry.  Excuse me.  I'm

1  sorry.  And so --

2       THE COURT:  Well, actually my question was a little

3  more specific than that.  It was the stay would be clarified

4  to permit Mr. Davis to seek a judgment -- a declaratory

5  judgment under the Open -- that the Open Meetings Act was

6  violated, obviously not finding that.  That's not our role

7  here, but a declaratory judgment that the -- seeking a

8  declaratory judgment that the Open Meetings Act was violated

9  and attorney fees, period.

10      MR. HEIMAN:  Okay.  And if I may suggest that we add

11 to that and that no other party may use any such ruling

12 should it come to pass in any way regarding -- with respect

13 to Mr. Orr's appointment without coming back to the

14 Bankruptcy Court, I think we would be satisfied, so it's --

15 it would, in fact, be a clarification of the stay as relates

16 to Mr. Davis' lawsuit, so I would think we could do that,

17 your Honor.

18      THE COURT:  Sir.

19      MR. PATERSON:  Yes.  I think the Court should be

20 aware that the Open Meetings Act itself I think addresses Mr.

21 Heiman's concern.  Section MCL 15.273 reads, "The circuit

22 court shall not have jurisdiction to invalidate a decision of

23 a public body for a violation of this act unless an action is

24 commenced pursuant to this section within the following

25 specified period of time," and then "(a) Within 60 days after

1  the approved minutes are made available to the public by the

2  public body."  His appointment was on March 14th.  Sixty days

3  have come and gone.  No one else can seek to invalidate the

4  appointment of Mr. Orr under Public Act 72 because the

5  Circuit Court would not have jurisdiction.

6         THE COURT:  So I take it by that that you wouldn't

7  object to the additional suggestion that Mr. Heiman made

8  here.

9         MR. PATERSON:  I would not.  It simply restates the

10  law, I think, of the state.

11         THE COURT:  Sir.

12         MR. HEIMAN:  No.  I was good.

13         THE COURT:  Okay.

14         MR. HEIMAN:  Thank you.

15         THE COURT:  Well, in the circumstances, it appears

16  to the Court that we have an agreement as to how this motion

17  should be resolved, so, Mr. Peterson, I'm going to ask you to

18  prepare an order with the three agreed upon conditions here

19  and have it approved as to form by the Attorney General's

20  Office and counsel for the city and then submit it to the

21  Court.

22         MR. PATERSON:  Will do.  Thank you, your Honor.

23         THE COURT:  You're all set, sir.  All right.  Let's

24  turn our attention to the Syncora matters.  I'd like actually

25  first to address the adversary proceeding if that's okay with

1 everyone. Who will be addressing the adversary proceeding

2 for the city?

3       MR. SHUMAKER: I will, your Honor. Gregory Shumaker

4 of Jones Day.

5       THE COURT: Mr. Shumaker.

6       MR. SHUMAKER: Yes.

7       THE COURT: All right. So let's review where we are

8 in the adversary proceeding and where we think we might be

9 going. Okay?

10       MR. SHUMAKER: Certainly.

11       THE COURT: As best I can figure it, Syncora has a

12 motion to dismiss that's pending and fully briefed and needs

13 a hearing date. Yes?

14       MR. SHUMAKER: It's almost fully briefed, your

15 Honor. There's a reply brief from --

16       THE COURT: Reply brief, yes.

17       MR. SHUMAKER: -- the city due I think on the 26th.

18       THE COURT: Okay. There is the city's motion for a

19 protective order. What's the briefing status on that?

20       MR. SHUMAKER: The reply brief was filed by the city

21 recently, and that was in response, if you recall, your

22 Honor, to their emergency motion to dissolve the TRO and for

23 discovery, so we responded by responding to the motion to

24 dissolve and then with a motion for protective order with

25 respect to the discovery they sought.

1    THE COURT:  Right.  And so then the other motion is

2    the motion to dissolve the TRO.

3    MR. SHUMAKER:  That's right, your Honor.

4    THE COURT:  All right.  Well, my questions for you

5    are what is the city's position on dissolving the TRO, and I

6    ask that with the vague notion that perhaps the TRO has

7    already expired by its own terms, if not by operation of law

8    or rule, and what further relief does the city seek in this

9    adversary proceeding, in any event?

10    MR. SHUMAKER:  Well, your Honor, excellent

11    questions.  The TRO, of course, by Michigan law typically

12    expires as of 14 days.  Judge Berry indicated that the TRO

13    should remain in full force and effect until the Court

14    specifies otherwise.  After that happened, the case then got

15    removed, and then it got transferred to your Honor, referred

16    to your Honor, so the TRO has been out there.  If you will,

17    we believe that one option for the Court would be under

18    Section 108(b) of the Bankruptcy Code, which allows -- when

19    an order is enforced in a nonbankruptcy proceeding and fixes

20    a period which is -- say it's 14 days -- the city filed on

21    the 13th day.  The TRO was entered on July 5th, and the city

22    filed on July 18th.  Section 108(b) provides a 60-day, if you

23    will, extension, but I can't tell you, your Honor, that I've

24    got a case on that one, but it is something.  But in the end,

25    the TRO has been out there.  We know that it is still needed,

1  which has kind of hung up the communications between the
2  parties because we know that Syncora is going to try to
3  capture or try to trap the $15 million that goes into the
4  lockbox arrangement every month, and so we have been
5  unwilling, without them agreeing to not go after the cash, to
6  agree to a dissolution.
7          THE COURT:  But it's your position that the
8  automatic stay --
9          MR. SHUMAKER:  Correct, your Honor.
10         THE COURT:  -- would prohibit that regardless.
11         MR. SHUMAKER:  I don't mean to say what I just said
12  was not relevant because I think it is, but in the end we
13  think since the city has filed that the casino revenues, if
14  you will, your Honor, the tax -- the wagering taxes, are
15  subject to the automatic stay, so the TRO may have run its
16  useful life, but we do believe that the automatic stay would
17  prohibit Syncora from taking the actions that it intends to
18  take.
19         THE COURT:  Well, is it -- just procedurally is it
20  your and your client's intent to try to keep this temporary
21  restraining order in effect, if it is in effect, pending this
22  Court's ruling on whether the stay is in effect as to this
23  property?
24         MR. SHUMAKER:  Well, your Honor, what we have asked
25  for is that the Court maintain the status quo through the

1  hearing on the assumption motion because the purported

2  consent rights that Syncora is asserting are also -- are

3  going to be ruled upon, if you will, in that proceeding, and,

4  therefore, we see them as very closely connected.  And what

5  we would prefer, your Honor, is either an extension of the

6  TRO or -- you know, that's why I raised the 108(b) vehicle --

7  or simply -- I don't think we're asking for the stay.  We

8  just noted the stay applies to this property or we believe

9  the stay applies to this property, and Syncora has not moved

10 to -- moved for relief from the stay.  And as a result, we

11 would --

12          THE COURT:  It contends the stay doesn't apply.

13          MR. SHUMAKER:  I'm sorry.

14          THE COURT:  It contends the stay does not apply.

15          MR. SHUMAKER:  That's correct, your Honor.  That's

16 correct, which we disagree with, and I'm more than happy to

17 address those points, your Honor, if you'd like me to, but

18 we -- and they filed a statement yesterday that went into the

19 different reasons why they believe the automatic stay does

20 not apply.

21          THE COURT:  Right.  I saw that.

22          MR. SHUMAKER:  Yeah.  Oh, your Honor, one other

23 thing I should raise is not only is the 362 stay out there,

24 but we also believe that there's a stay under Chapter 9 that

25 applies which is 922(a)(2), which would also prevent Syncora

1    from taking post-petition action against the casino revenues

2    which are taxes, and so that would be another vehicle for

3    maintaining the status quo as we believe is necessary.

4            THE COURT:  Well, if you got a court order

5    clarifying that the stay does prohibit Syncora notifying U.S.

6    Bank to trap these funds, would that obviate the need for

7    this adversary proceeding altogether?

8            MR. SHUMAKER:  I don't -- the remaining aspects of

9    the adversary proceeding would be the tort claims that the

10   city advanced in that initial complaint on July 5th, which

11   were the intentional interference with a contract,

12   intentional interference with an advantageous relationship,

13   so those torts presumably would move forward, but in terms

14   of, you know, the declaration that we sought, at least --

15           THE COURT:  Well, but has the city really suffered

16   any damages, assuming those wrongs were committed?

17           MR. SHUMAKER:  Well, I think that's something that

18   we would need to flesh out in discovery, but I think that the

19   declaratory --

20           THE COURT:  Excuse me, but really?

21           MR. SHUMAKER:  Well, your Honor, it's -- those

22   claims are still out there.

23           THE COURT:  How long -- how long --

24           MR. SHUMAKER:  We would -- we would --

25           THE COURT:  How long was the city without the funds

1    because of the trap?

2          MR. SHUMAKER:  At least a couple of weeks, your

3    Honor, since June.  It's complicated because the --

4          THE COURT:  So there may be a bit of damages from

5    that maybe.

6          MR. SHUMAKER:  There might be some damages from

7    that, correct, your Honor.

8          THE COURT:  Maybe.  All right.  So what you seek by

9    your request to maintain the status quo pending the

10   resolution of the assumption motion is the explicit or

11   implicit -- I'm not sure which -- order that the TRO

12   previously granted is still in effect.

13         MR. SHUMAKER:  That would be fine with us, your

14   Honor.

15         THE COURT:  Well, I'm asking what you're requesting.

16         MR. SHUMAKER:  Well, I --

17         THE COURT:  I'm not offering anything.  I just want

18   to know what you want here.

19         MR. SHUMAKER:  Well, what I think is -- the fact

20   that the automatic stay applies I believe would prevent

21   Syncora from doing what we believe they want to do.

22         THE COURT:  Well, if that's your position, it seems

23   to me you ought to think seriously about consenting to the

24   dismissal of the case.  Let me hear from Syncora's counsel.

25         MR. HACKNEY:  Good morning, your Honor.  Stephen

1   Hackney.  It's nice to see you again.

2          THE COURT:  Mr. Hackney.

3          MR. HACKNEY:  So I think you've gone to the nub of

4   some of the issues, your Honor, because I think what is

5   really trying to happen -- what the city is really trying to

6   have happen here is I think they're uncertain as to whether

7   the stay applies, and they're hoping that they can prop up

8   the TRO as an interim measure where they sort out whether --

9          THE COURT:  I sort of asked that, and the answer was

10  no.

11         MR. HACKNEY:  And I think that to the point that if

12  they believe the stay applies, then there is certainly no

13  need for the TRO.  There will be no irreparable harm going

14  forward because the stay will prevent against that.  We have

15  been cards on the table with the Court in terms of expressing

16  our views about the stay because we didn't want to come in

17  here and get the TRO dissolved and then pop up later, so that

18  was part of the reason for the lengthy filings.

19         THE COURT:  I read what you wrote about that.

20         MR. HACKNEY:  I know you've had a lot of filings,

21  but -- we're not trying to weigh you down unnecessarily, but

22  we wanted to be transparent with you.  But I guess from my

23  standpoint, your Honor --

24         THE COURT:  Well, let's just ask the question --

25         MR. HACKNEY:  Yeah.

1          THE COURT:  -- since you are willing to be so

2    transparent.

3          MR. HACKNEY:  Yes.

4          THE COURT:  If, with the city's consent or without

5    it, the Court dissolves the TRO --

6          MR. HACKNEY:  Yeah.

7          THE COURT:  -- do you intend to notify U.S. Bank to

8    trap casino funds?

9          MR. HACKNEY:  So I think that there are two answers

10   to that question, your Honor.

11         THE COURT:  Are they both either yes or no?

12         MR. HACKNEY:  Ironically, the first one is that it's

13   important to understand about our position on the legal

14   documents that -- and this is actually very important to the

15   way the collateral agreement works is that it doesn't matter

16   whether we notice U.S. Bank to trap or not.  This is very

17   important.  So under Section 5.4(a)(3) of the collateral

18   agreement, when there is an event of default of which the

19   custodian is aware -- that's U.S. Bank -- it shall not remit

20   money to the city.  And the custodian is aware that there are

21   events of default separate and apart from Syncora's letters,

22   which were merely describing its view of the state of the

23   world, because Mr. Orr himself in his proposal to creditors

24   in his presentation on June 14th said there was, so he

25   created that state of mind in U.S. Bank.  That is what led to

1  the conversation that we believe happened, which led to our

2  confirmatory letter that under the normal automatic operation

3  of the collateral agreement cash trapping would occur, so

4  that's why I'm prefacing my question of what will Syncora do

5  because our view continues to be that it doesn't matter

6  whether we take action or not.  It's something that happens

7  automatically.  So I think the -- as to what will we do, you

8  know, I think the answer is that we've expressed our view to

9  you that we do not believe that the stay applies.  We've also

10  attempted to describe to you this machinery embodied in the

11  COP's and the swap and the different types of rights we have,

12  so we believe that we have not only enforcement rights

13  directly under the collateral agreement and the swap

14  agreement but also direction rights to the swap

15  counterparties themselves vis-a-vis their rights under the

16  collateral agreement.  And while I can't say definitively

17  today what we will do, I do want to represent to the Court

18  that we believe that we would continue to have those rights

19  notwithstanding the stay, so, in an effort to be responsive

20  to your question, I think it's something we could do, but,

21  more importantly, I think it's something that we do not have

22  to do.

23        THE COURT:  So that's a definite maybe.

24        MR. HACKNEY:  Yeah.  But, your Honor, if I could add

25  something, I mean I'm trying not to argue the merits of the

1    dissolution motion, but I think, as you saw, we have very

2    strong feelings about that TRO.  I mean that TRO was granted

3    ex parte, and I won't argue the merits, but I think it's

4    already been in place for -- since July 5th, so I think

5    that's something on the order of 45 days.  And now the city

6    is saying we think it should be extended another 60 days, and

7    we don't see the merits of it under the classic test, and we

8    also don't believe that it --

9            THE COURT:  Well, 60 days from filing, not from now.

10           MR. HACKNEY:  Fair point.  Fair point, but -- so I

11   really think that what -- I think that we have to just be

12   candid about what's happening here, and I think this is

13   really about the auto stay.  I think it's does the automatic

14   stay apply, and you know what, Syncora, if it does, act at

15   your peril because you could be subject to sanctions if you

16   violate the automatic stay, and, city, you know, if there's a

17   question that the automatic stay doesn't apply -- for

18   example, when the city touted the assumption motion, they

19   were talking about the access to the liquidity they would

20   get.  I took that by negative implication to suggest if we

21   didn't do the forbearance agreement, there would be cash

22   trapping.  So, city, if there's questions about whether you

23   think the automatic stay applies, it's incumbent upon you to

24   file a motion to extend it, but I wanted to add one last

25   thing, your Honor.  I'll try not to go on at length, but when

1    I did the conversation with Mr. Shumaker about our motion to

2    dissolve and asked them whether they would consent, this is

3    what I understood them to say.  I understood them to say we

4    will stipulate to dissolution.  We're not putting the money

5    back, so we had a disagreement there.  But what will happen

6    then is U.S. Bank will go back to trapping cash in the

7    interim, and then I take from their papers that they

8    anticipated that they would have then filed, and so if that

9    had happened, as we believe it should have, given the

10   stipulation, then it would have been clearly on the points of

11   the automatic stay.  It would have been does the automatic

12   stay apply or does it not.  I don't think that there's

13   anything about the passage of time and the fact that the TRO

14   actually didn't get formally dissolved by Judge Zatkoff that

15   should change the essential nature of that legal question.  I

16   think that's the appropriate place to leave the parties

17   rather than having this TRO involved, which then leads to a

18   preliminary injunction hearing which requires discovery and,

19   to my mind, is not the real debate between the parties.

20           One last note, your Honor.  The motion to dismiss is

21   not fully briefed because not only do we have to get their

22   response, but I think we also are able to reply.

23           THE COURT:  Right.  Thank you.

24           MR. HACKNEY:  Thank you.

25           THE COURT:  Well, before you sit down, let me just

1    ask you procedurally whether you are willing to take on in a
2    formal context in this Court and on an expedited basis the
3    extent to which the stay applies to any of the rights you
4    think your client has in the circumstances.
5              MR. HACKNEY:  Yeah.  So if the TRO were dissolved
6    and we shifted the focus to where we think it was -- where it
7    should be, I would absolutely work with counsel and with the
8    Court to move through an expedited process of resolving the
9    status of the stay, and so if I'm right and cash is trapped
10   in the interim, it would only be the amount of cash that's
11   trapped while that issue is resolved, and we would absolutely
12   work with the Court to meet any schedule you set.  You can
13   see we've done work on it already, so --
14             THE COURT:  Yes.  You've briefed it extensively
15   already.
16             MR. HACKNEY:  Yeah.
17             THE COURT:  Ms. Calton, did you want to be heard?
18             MS. CALTON:  We're representing Defendants Detroit
19   Entertainment, LLC, which is the Motor City Casino, and
20   Greektown Casino, LLC, and I think with respect to what
21   you're discussing today, our desire is pretty easy.  We want
22   whatever order is entered to be very clear where we're
23   supposed to pay the money so that we're at no risk of ever
24   having to pay it a second time.
25             THE COURT:  Right.

1          MS. CALTON:  Okay.

2          THE COURT:  I don't think anyone could object to

3   that.  One more, sir.

4          MR. COCO:  Yes, your Honor.  Good morning again.

5   Nathan Coco on behalf of -- on behalf of U.S. Bank in its

6   capacity as custodian under the collateral agreement.  Your

7   Honor, as we noted in our response brief that was filed some

8   time ago, U.S. Bank in this capacity is simply a custodian.

9   It is not U.S. Bank's role or discretion under the agreement

10  to decide whether or not there's an event of default, and,

11  you know, there's obviously a live dispute about whether or

12  not the stay applies, whether or not the cash should be

13  trapped or must be trapped.  U.S. Bank in this dispute is

14  simply seeking clarification one way or the other.  We are

15  trying to avoid a situation much like the casinos where we're

16  subject to conflicting instructions from the city and from

17  Syncora and, you know, are forced to separately seek the

18  Court's decision-making authority on those issues, so --

19         THE COURT:  That's a bit inconsistent from what I

20  heard Mr. Hackney say.  He said you have obligations once you

21  are aware of a default.

22         MR. COCO:  And there is a dispute about whether or

23  not there is an event of default --

24         THE COURT:  All right.

25         MR. COCO:  -- as I understand it because --

1     THE COURT:  That's a different question.

2     MR. COCO:  -- because the swap counterparties

3 haven't officially declared a default, but I just want to

4 make sure the record is clear.  U.S. Bank is not taking a

5 position that there is or is not.  It's an issue that's been

6 presented to the Court by the parties who have an economic

7 interest in this dispute.  We just seek clarification to make

8 sure that we're not put in an untenable situation where we're

9 forced to reconcile two conflicting directions.

10    THE COURT:  Fair enough, sir.  Thank you.

11    MR. COCO:  Thank you.

12    MR. SHUMAKER:  Your Honor, if I may, briefly.  Mr.

13 Hackney was talking about how the collateral agreement works.

14 Of course, your Honor realizes that Syncora, the swap

15 insurer, is not a party to the collateral agreement and not a

16 third-party beneficiary.  There's no clause in that agreement

17 nor has there been any default on the swaps payments by the

18 city.  And we fundamentally disagree on this position as to

19 whether there is automatic cash trapping of the casino

20 revenues.  Mr. Hackney referred to a conversation between Mr.

21 Orr and U.S. Bank.  U.S. Bank has filed a paper disavowing

22 Syncora's version of those events, and we strongly believe

23 that the only parties that can -- the only entities that can

24 declare an event of default are the actual parties to the

25 collateral agreement.  That would be the swap counterparties

1    and not Syncora.

2         THE COURT:  Well, let me ask you the same question

3    that I asked of Mr. Hackney.  Are you and your client

4    prepared to address the issue of whether the automatic stay

5    in this case acts to prohibit Syncora from enforcing any of

6    the rights that it thinks it has under whatever the

7    agreements are here?

8         MR. SHUMAKER:  Your Honor, I think we would be more

9    than happy to do that.  We believe that it would be -- the

10   burden of proof would be incumbent upon Syncora to show that

11   they were entitled to that relief, but the only other thing I

12   would share, your Honor, is that we would still ask that the

13   Court prohibit the -- Syncora from taking steps to get at the

14   city's property, the casino revenues, which are so vital to

15   the city.  I mean we're talking if they take actions vis-a-

16   vis U.S. Bank --

17        THE COURT:  Well, all right.  Fair enough.  Let me

18   just put the schedule question to the two of you.  I'm

19   available today or we have a hearing -- a regularly scheduled

20   hearing for next Wednesday.  We could do it then or some

21   other time.  What suits you?  Do you want a moment to consult

22   with your --

23        MR. SHUMAKER:  If I might.

24        THE COURT:  -- staff there?  Sir.

25        MR. SHUMAKER:  Your Honor, we would be willing to do

1  it on an expedited basis over the next week for the August

2  28th hearing if we were able to have the status quo

3  maintained in some fashion.

4          THE COURT:  Sir.

5          MR. HACKNEY:  Your Honor, I think that in late June

6  when we thought that we were negotiating an NDA with the city

7  in order to make a proposal if the --

8          THE COURT:  Negotiating what?

9          MR. HACKNEY:  Negotiating an NDA with the city.

10  That's what we thought we were doing on July 3rd.

11          THE COURT:  I'm sorry.  Negotiating what?

12          MR. HACKNEY:  A nondisclosure agreement.  I'm sorry,

13  your Honor.  Don't mean to be overly familiar.  If they had

14  asked us back then, "Hey, will you stand still while we

15  negotiate this nondisclosure agreement, see if we can work it

16  out, make a proposal?" there might have been a different

17  willingness on behalf of my client to voluntarily stand

18  still, but I think -- I'm not authorized to say that we will

19  voluntarily stand still, your Honor.  I certainly will say

20  that we're happy to show up and argue this on August 27th,

21  August 28th if that works with the Court's schedule.  My

22  personal view is this TRO, there's not a lawful basis to

23  maintain it for a variety of reasons, and I just don't think

24  that we can just use it as this interim measure.  I don't

25  think a week's worth of cash trapping is going to cripple the

1    city, and so -- and by the way, if the TRO stays in place,

2    then you have the preliminary injunction, and we have to

3    schedule the discovery.  It's just -- I don't think it's an

4    efficient way to proceed, but we certainly will show up and

5    argue this next week if you'd like us to.  I'm not even

6    sure -- I will have to say I'm not even sure when the city

7    gets the next payment discharged from the general receipt

8    subaccount, so I don't know if they're going to --

9            THE COURT:  Anybody have an answer to that question?

10           MR. SHUMAKER:  I'm sorry, your Honor.  I'm sorry.  I

11   missed the question.

12           MR. HACKNEY:  He wants to know when the next release

13   is to the city.

14           THE COURT:  When is the next release from the

15   subaccount?

16           MR. SHUMAKER:  It should be on or about the 26th,

17   your Honor.

18           THE COURT:  26th of this month?

19           MR. SHUMAKER:  Yes, your Honor.

20           MR. HACKNEY:  I was hoping it was.

21           THE COURT:  So it's before next Wednesday.

22           MR. HACKNEY:  I didn't know if U.S. Bank might know

23   the precise answer to that because it builds up, and then it

24   discharges to them, and so if it wasn't even going to

25   discharge, there is more time, so --

1    THE COURT:  Right.  Well, I wonder, Mr. Shumaker, if
2    it isn't in the best interest of all concerned to reconvene
3    later this afternoon and have argument on this question.
4    It's certainly been briefed in various filings that the two
5    of you have made.  I'm prepared.
6        MR. SHUMAKER:  Your Honor, we got their papers
7    setting forth their arguments yesterday, and --
8        THE COURT:  Of course you did, but none of it was
9    any surprise to you.
10        MR. SHUMAKER:  Well, in terms of their positions on
11    the automatic stay, I believe there were some things in there
12    that were brand new, and we've --
13        THE COURT:  Okay.
14        MR. SHUMAKER:  You know, I believe that if your
15    Honor believes that's the only way to do it, that's what
16    we'll -- that's what we'll do.  We would hope that there
17    would be -- because the automatic stay is in place, we
18    believe, presumptively, that we could do this on --
19        THE COURT:  My concern with your relying on the TRO
20    is twofold.  I'm not confident, as a matter of law, that it
21    is still in place.  I don't know.  Second, I'm not
22    comfortable imposing one without all of the process that
23    Rule -- I think it's 65 of the Federal Rules of Civil
24    Procedure requires, which we have not -- or you have not
25    invoked, so I think it's in the city's best interest to get

1    this matter resolved very promptly, and I think it's also in

2    Syncora's best interest, too, because, you know, there's

3    money coming in, and there's money going out.

4            MR. SHUMAKER:  And we will do it today then, your

5    Honor.

6            THE COURT:  I suppose we could reconvene tomorrow if

7    you think 24 hours will be necessary to help you prepare for

8    it, but, in the meantime, there are risks, right --

9            MR. SHUMAKER:  Your Honor --

10           THE COURT:  -- and to consult with your people and

11   let me know what you want to do.

12           MR. SHUMAKER:  This afternoon is fine, your Honor.

13           THE COURT:  This afternoon is fine.  Okay.  Is that

14   all right with you, sir?

15           MR. HACKNEY:  Absolutely.

16           THE COURT:  What time would either of you suggest?

17   May I suggest three?

18           MR. SHUMAKER:  Three o'clock?

19           MR. HACKNEY:  You bet.

20           MR. SHUMAKER:  That's great.

21           THE COURT:  All right.  At three o'clock we will

22   have an oral argument on the issue of whether the automatic

23   stay of either 922 or 362 stays Syncora's enforcement of any

24   of its rights under any of the applicable agreements.

25           MR. HACKNEY:  And, your Honor, did you have a view

1  on the dissolution motion and whether we should argue its
2  merits, or is the TRO going to be dissolved?
3          THE COURT:  Well, my thought there was to wait and
4  see what the outcome of the stay motion was.
5          MR. HACKNEY:  Okay.
6          THE COURT:  If the answer to that is there is no
7  stay or it's a limited stay or whatever, then the city may or
8  may not decide to pursue a TRO, and we'll have to figure out
9  how to do that.  If the answer is, yes, the stay applies,
10 then I think the city would agree to dissolve the TRO and
11 maybe even dismiss the lawsuit.  So is that okay to hold off
12 on that?
13         MR. HACKNEY:  Absolutely.  The only reason I'm
14 asking is we do technically have a status conference today on
15 the adversary that would normally involve scheduling of
16 things like the preliminary --
17         THE COURT:  Right.  So let's hold off on that.
18         MR. HACKNEY:  Understood.  Your Honor, I just want
19 to make one more technical note on the adversary -- on the
20 adversary proceeding just before we leave the podium, which
21 is it's not precisely before you, but I think one thing that
22 we'll have to do is clarify the precise nature of the Court's
23 jurisdiction.  There were competing theories of jurisdiction
24 offered to Judge Zatkoff, and Judge Zatkoff merely held that
25 he did have jurisdiction.  And I wanted to flag this with you

1  as a potentially important issue to things like mandatory

2  abstention and so forth under Section 1334.  It's not before

3  you.  I'm merely raising it with you in the means of a status

4  to let you know that we think that may be an issue that has

5  to be resolved.

6          THE COURT:  Can you be a little more specific for

7  me?

8          MR. HACKNEY:  I sure can.  When we removed the case,

9  we asserted that the casino defendants had been fraudulently

10  joined, and in doing so we represented that diversity

11  jurisdiction existed that supported removal.  By the time

12  Judge Zatkoff asked for clarification of this, the bankruptcy

13  had intervened, and they filed a motion that said it doesn't

14  matter anymore whether there was removal, and maybe there was

15  diversity jurisdiction.  They hedged a bit, but they said now

16  there's related-to jurisdiction.

17          THE COURT:  Okay.

18          MR. HACKNEY:  So that's good enough for him, but I

19  think for you it will be important for you to decide whether

20  you have either or both and so on and so forth.  I'm just

21  making that point now.

22          THE COURT:  All right.

23          MR. HACKNEY:  Thank you, your Honor.

24          THE COURT:  Sir.

25          MR. GOLDBERG:  Very briefly --

1          THE COURT:  Sir.

2          MR. GOLDBERG:  What I'm hearing is that the

3    hearing -- the expedited hearing you're talking about is a

4    hearing on whether the automatic stay applies to post-

5    petition release of the casino tax dollars.  Is that correct?

6          THE COURT:  Yes, among other things.

7          MR. GOLDBERG:  I mean I just want to call attention

8    that in -- I represent party of interest David Sole.  We

9    filed an objection to the approval of the forbearance

10    agreement.  One of the central arguments in our objection,

11    which we did brief, was --

12          THE COURT:  Excuse me, sir.  Could you just state

13    your appearance on the record?

14          MR. GOLDBERG:  I apologize.  Jerome Goldberg, and

15    I'm appearing on behalf of interested party David Sole.  We

16    did file an objection to the city's motion for approval of

17    the forbearance --

18          THE COURT:  Right.

19          MR. GOLDBERG:  -- agreement, and one of the things

20    that we did brief in the objection -- and it goes to the core

21    of our objection -- is whether or not the automatic stay does

22    apply to the -- based on Section 922 and Section 928.  And we

23    would appreciate at least consideration going to the

24    arguments we raised in the brief, which we took some time to

25    raise, and --

```
 1          THE COURT:  Okay.  We will look at that, and if
 2   you'd like to be heard this afternoon at three o'clock,
 3   that's fine with me as well.
 4          MR. GOLDBERG:  My problem this afternoon is my wife
 5   has cancer surgery next Wednesday, and she does have an
 6   important appointment with the doctor.  I'm available
 7   tomorrow morning to be heard, but I could not be available
 8   today.
 9          THE COURT:  Right.
10          MR. GOLDBERG:  But I would appreciate this because
11   we feel it is a very -- we feel this whole issue is a major
12   issue because it deals with interest rate swaps, which we
13   briefed, and that's a -- we're talking about tons of money
14   going to these banks and for what we believe is very little
15   socially useful, but I'm not going to argue our argument
16   there, but obviously the question of whether or not the city
17   is going to have to pay the money goes to whether it's a
18   secured loan.  It goes to the status within bankruptcy, and
19   it goes to whether -- it goes to the efficacy and the
20   necessity for this forbearance agreement and any benefit to
21   the city and to the -- against the interest of other
22   creditors like my clients, who are pensioners, who will see
23   less funds available for their pensions because the money is
24   going to the banks when the money does not even have to go to
25   the banks, so I would like to be heard on this question, but
```

1    I know I'm not available at three o'clock.  If there's no
2    other way to reschedule, I appreciate the -- I would at least
3    appreciate that my brief be considered, be looked at.  We
4    took time doing it.  We feel there are very valid arguments
5    on why the automatic stay does not apply -- I mean does
6    apply -- my apology -- does apply, and, you know, if there's
7    going to be post-briefing on it, we'd like to be involved in
8    that as well.
9            THE COURT:  All right, sir.  You have my commitment
10   to review that part of your briefs for this afternoon's
11   hearing.  Thank you.
12           MR. GOLDBERG:  I appreciate it.  And it's Docket
13   361.
14           THE COURT:  Oh, okay.  Thank you.  All right.  The
15   other item that's on the agenda is a status hearing on the
16   motion to assume the executory contract, the forbearance
17   agreement.  Is there anything that anyone would like to bring
18   up in that regard?
19           MR. SHUMAKER:  Yes, your Honor.  Gregory Shumaker
20   again for the record.  Your Honor, last time we met on August
21   2nd, you'll recall that Syncora had asked for a significant
22   amount of discovery relating to the assumption motion.  At
23   the end of the hearing, I had informed the Court that the
24   city planned on putting on one or two witnesses for -- at the
25   hearing, and your Honor then ordered that there be -- that

1  depositions of the debtor's witnesses and any exhibits that

2  it proposed to proffer take place.  The city did do that on

3  Friday, I believe, and designated three witnesses and put

4  forth its exhibit list and has, in fact, given copies of all

5  of those exhibits pursuant to your order.

6          Syncora has put forth a witness list of ten

7  witnesses, one of whom overlaps, and that's the emergency

8  manager.  We've got -- your Honor has set the end of next

9  week for the end of those depositions.  We were wondering,

10  your Honor, if that was what you had envisioned for the

11  hearing, that there would be multiple other witnesses.  As

12  your Honor knows, it's not supposed to be a mini trial.  We

13  want your Honor to be -- you know, have everything it needs

14  to be informed -- fully informed, but that puts into some

15  sort of question the length of the hearing perhaps.  I don't

16  know if, you know, September 9th -- if 13 witnesses can be

17  put on that day, but, in any event, we wanted to raise that

18  as a status conference and get your guidance on that and then

19  also sort of the length of the depositions.  We have 13

20  objectors on the assumption motion.  We'd ask for

21  clarification from your Honor that whatever depositions go

22  forward be limited in length and perhaps that the objectors

23  be asked to coordinate in terms of their timing so there's no

24  duplication of effort for the parties.

25          THE COURT:  What limit would you suggest?

1          MR. SHUMAKER:  Well, your Honor, you know, a lot

2     of -- I don't know exactly with regard to the Syncora

3     witnesses how long those would take.  I was hoping with

4     regard to the three witnesses that the city had put forth,

5     including the emergency manager, given all that's going on,

6     that those be depositions of a half day in length.

7          THE COURT:  Thank you, sir.

8          MR. HACKNEY:  Stephen Hackney on behalf of Syncora,

9     your Honor.  So the first thing I want to say is that the

10    order didn't require us to identify witnesses or disclose

11    documents, but we thought it would be safer to identify any

12    potential rebuttal witnesses now.

13         THE COURT:  Well, the reason for that was because

14    you didn't tell me at the last hearing that you intended to

15    call any witnesses.

16         MR. HACKNEY:  And I don't have a present intention.

17    It's not a will call list.  I mean I don't know what the

18    city's witnesses are going to say in their depositions.  I

19    have their affidavits.  I have a sense of what they're going

20    to say, but there is water under the bridge yet.  We just did

21    it earlier rather than later rather than doing a rebuttal

22    witness list after we take the depositions.  That's all we

23    did.  I don't have a present intention to call witnesses.  I

24    will say I don't fully know enough about the city's case-in-

25    chief on the assumption motion to make that decision.  That's

1   a nuance decision.  I don't anticipate putting on hours of

2   testimony from Syncora or its financial advisors.  I will

3   tell you that four of the names on the list are the service

4   corporation directors who are -- is a party to the

5   forbearance agreement, so those were names that we put on the

6   list as well as potential percipient witnesses.  And then we

7   identified a bunch of documents as well, so I'm not -- it's

8   not my intention to hijack your assumption hearing.  I agree

9   with the statement that a Court can't resolve third-party

10  rights in the context of assumption or 9019, so it's within

11  the context of that guidance that the Court gave that we

12  were -- that we submitted this list.

13          THE COURT:  Are the depositions of the three city

14  witnesses scheduled?

15          MR. HACKNEY:  They aren't scheduled, your Honor.

16  Well, that's in part because I didn't want to just fire out a

17  notice and then claim all the seven hours to myself.  I've

18  been trying to coordinate and have already had communications

19  with the other objectors, some of them.  Our intention is to

20  coordinate a call tomorrow so that the depositions can be as

21  orderly as possible in terms of not having a merry-go-round

22  of attorneys asking questions.  And if we can do that, we

23  will, but the one thing I'll say, your Honor, is we won't be

24  able to get the depositions done, I doubt, with all of the

25  objectors in a half day.  I think all of the objectors means

1　that we'll need the full seven hours for sure.

2　　　　　One last point on the matter of status, your Honor.

3　　　　　THE COURT:  I don't quite get that given the

4　relatively narrow scope of the issues and the hearing.

5　　　　　MR. HACKNEY:  I guess, you know, I won't reargue our

6　last interaction with each other on this subject.  I guess I

7　will just say that this is a very complicated structure, and

8　the implications of the forbearance --

9　　　　　THE COURT:  Of course that's true, but nobody argues

10　about the structure.  The structure is what it is.  It's in

11　the documents.

12　　　　　MR. HACKNEY:  Agreed; agreed.  But I also think the

13　implications, the analysis of the structure, of the city's

14　need for cash, of the validity of various things, is a

15　factual question that I know different objectors are going to

16　want to inquire --

17　　　　　THE COURT:  All right.  But that's a different

18　question than the question of the structure.

19　　　　　MR. HACKNEY:  That's a fair point.  It's just that

20　the complexity of the structure bleeds over somewhat into the

21　factual inquiry we do need to make in terms of have they run

22　their traps properly in order to try and get this deal

23　approved because they are contending that this will lead to

24　performance, so -- and, your Honor --

25　　　　　THE COURT:  You're talking about 21 hours of

1  depositions just on the city's side in a hearing that I was

2  thinking of allocating each side three hours to try.

3          MR. HACKNEY:  With the objectors grouped as a class?

4  Well, remember, your Honor, I think that I will say part of

5  the value of the depositions happening outside of the

6  courtroom is that it streamlines the presentation before the

7  Court.  I mean cross-examination gets a lot crisper when you

8  have the time to clarify and there's not as much fumbling

9  around in the courtroom, so I'm not sure that the deposition

10  will run contrary to your desire to run a tight hearing.  I

11  think it may accentuate it.

12          THE COURT:  Thank you, sir.  Does anyone else want

13  to be heard on these issues?

14          MR. HACKNEY:  Your Honor, if I could raise --

15          THE COURT:  Oh, is there more?

16          MR. HACKNEY:  I'm sorry.

17          THE COURT:  I'm sorry.  I'm sorry.

18          MR. HACKNEY:  No.  That's okay.  I try not to go on

19  at length.  I wanted to clarify one thing.  There's been

20  these repeated references to the data room as being something

21  that they've provided to us, and I just want to confirm that

22  it is being deemed discoverable and responsive to our

23  requests.  The reason for this is important.  Everyone had to

24  sign an NDA to go into the data room meaning --

25          THE COURT:  Nondisclosure agreement.  Got it.

1    MR. HACKNEY:  Nondisclosure agreement.  I'm going to

2 write that on my forehead this evening so --

3    THE COURT:  No, no, no.

4    MR. HACKNEY:  -- I see it every time I look in --

5    THE COURT:  You can use the letters from now on.

6    MR. HACKNEY:  Yeah.  No.

7    THE COURT:  I got it now.

8    MR. HACKNEY:  I will try to be less euphemistic.

9 I'm sorry.  Under the nondisclosure agreement, you can't

10 disclose the information from the data room in court, to

11 witnesses, et cetera, unless the city agrees with you that it

12 is discoverable by other means, in which case now it can be

13 used in court proceedings.  I think that that's happened, and

14 I just want to clarify that that's happened because that's

15 going to facilitate depositions, filing of briefs before the

16 Court, and the execution of this hearing and a bunch of other

17 ones before you.  I don't think they put any privileged

18 information in that room, so there's -- it's financial

19 information of the city, so I think it should be

20 discoverable.

21    THE COURT:  All right.  I will get around to putting

22 that question to the city.

23    MR. HACKNEY:  Thank you.

24    MS. ENGLISH:  Good morning, your Honor.  Caroline

25 English from Arent Fox.  We represent Ambac, and we filed an

 1    objection.  We, like Syncora, also at this point do not
 2    anticipate the need to put forth rebuttal witnesses and
 3    exhibits at the September 9th hearing, but based on what we
 4    hear from the city's witnesses during depositions, it's
 5    possible, and so we would like to request that a schedule be
 6    entered allowing us after the conclusion of those depositions
 7    to disclose any rebuttal witnesses and exhibits we might like
 8    to offer during the evidentiary hearing and then allow the
 9    city, if necessary, to depose our witnesses as well.  I'll
10    also --
11           THE COURT:  That would require that the depositions
12    take place like tomorrow, all three at the same time.
13           MS. ENGLISH:  Well, I think we have an extra week
14    built in.  The depositions of the city witnesses are supposed
15    to conclude by August 30th, I believe, and I think the
16    trial -- or the hearing is the 9th, so we do have the week of
17    Labor Day.  We could squeeze in some extra depositions if
18    necessary.  Again, we don't anticipate that it'll be
19    necessary, but we couldn't say for sure, and we need to
20    reserve the right to call any witnesses as we see fit after
21    we depose the city's witnesses.
22           THE COURT:  All right.  Thank you.
23           MS. ENGLISH:  Thank you.
24           THE COURT:  Sir.
25           MR. PEREZ:  Good morning, your Honor.  Alfredo

1   Perez. I represent FGIC. Your Honor, in connection with our

2   limited objection, we did file two declarations. One was my

3   declaration just attaching the documents that we relied on,

4   so I don't think that's an issue, but we did file a very

5   short declaration for Stephen Spencer on kind of two issues,

6   and that would be our direct testimony of him to the extent

7   the hearing goes forward. So I don't know if anybody wants

8   to question him about that, but that -- you know, those two-

9   or three-page declaration would be our direct testimony of

10   him.

11         THE COURT: If you haven't already, perhaps you

12   could work with the city on seeing if they would be willing

13   to have that declaration be admitted in lieu of testimony.

14         MR. PEREZ: Okay. I will do that, your Honor.

15         THE COURT: Would anyone else like to be heard?

16         MR. GORDON: Good morning, your Honor. Robert

17   Gordon of Clark Hill on behalf of the Detroit Retirement

18   Systems. I just thought this might be the right time to echo

19   the sentiment of Mr. Goldberg. I don't know what's going to

20   get argued in oral argument regarding the stay this

21   afternoon, but we did in our papers raise the issue of

22   whether the lien asserted by the swap participants actually

23   extends to the post-petition casino revenue, so there could

24   be an issue there relative to whether there would be a basis

25   for even arguing whether the stay applies or doesn't apply,

1    so we just want to make sure that the Court is aware of that.

2            THE COURT:  Thank you.

3            MR. GORDON:  Thank you very much, your Honor.  And

4    other than that, I echo Mr. Hackney's suggestion that all

5    objectors would somehow in a very efficient way hopefully be

6    able to participate in the same discovery so no one is

7    duplicating each other.  Thank you.

8            MS. BRIMER:  Good morning, your Honor.  Lynn M.

9    Brimer appearing on behalf of the Retired Detroit Police

10   Members Association.  Your Honor, we filed a limited

11   objection chiefly concerned that, as the Court is aware,

12   there was a retiree committee formation meeting yesterday.

13   The committee was -- will be appointed at the request of the

14   city, and to just request that the Court ensure whatever

15   scheduling order the Court puts in place takes into

16   consideration the opportunity for committee and committee

17   counsel to address these what are going to be ultimately very

18   significant issues to the ability of the city to honor its

19   pension obligations.

20           THE COURT:  Thank you for reminding me of that.

21           MR. MARRIOTT:  Good morning, your Honor.  Vince

22   Marriott, Ballard Spahr, on behalf of EEPK.  If you remember,

23   they're the unpronounceable --

24           THE COURT:  I do.

25           MR. MARRIOTT:  I rise only to address the notion

1   that it would be half-day depositions as opposed to full-day.

2   Not all of the objections raise the same issues.  I mean

3   there is some overlap, but there's also some independent,

4   depending upon who's objecting --

5            THE COURT:  Right.

6            MR. MARRIOTT:  -- so that it is not as though a

7   single lawyer could be designated to handle all of the

8   questioning, so I think that given the lack of overlap among

9   the objections, I think a full day would be appropriate, not

10  half.  Thank you.

11           THE COURT:  Thank you, sir.

12           MR. GOLDBERG:  Your Honor, Jerome Goldberg appearing

13  again on behalf of Mr. Sole.  We also did file a declaration

14  with our objections of the declaration of David Sole based on

15  a thorough review of the swap documents based on a previous

16  FOIA we had done, and if -- we are very amenable to that

17  declaration being entered in lieu of any testimony and will

18  check with -- as you instructed the other attorneys, we could

19  check with the others.  If they want to talk to -- depose Mr.

20  Sole, we would clearly make him available.

21           THE COURT:  All right.

22           MR. GOLDBERG:  If I could maybe visit one issue, and

23  I apologize for -- I sat thinking about this.  I am available

24  tomorrow morning to be part of this argument on the automatic

25  stay, which I think is a very important argument, and if

 1  there was any way to reschedule -- I just am absolutely not

 2  available this afternoon.  I'm pledged to -- family comes

 3  first obviously, but I could make myself available tomorrow

 4  morning or Friday for the argument on the stay if that's

 5  possible.  Thank you.

 6          THE COURT:  Well, I certainly appreciate your

 7  interest in this issue and your client's, of course, and your

 8  personal circumstances, but I think it is in the best

 9  interest of all concerned to proceed this afternoon, so

10  that's what we're going to do.

11          MR. GOLDBERG:  If I could have a representative who

12  works with me appear, that would be okay.

13          THE COURT:  Absolutely.

14          MR. GOLDBERG:  Okay.  I appreciate it.  Thank you.

15          THE COURT:  Absolutely.  Anyone else?

16          MS. CALTON:  For clarification, your Honor, will the

17  status conference in the adversary proceeding be resumed this

18  afternoon or set for some other day?

19          THE COURT:  What more did you think we needed to

20  accomplish?

21          MS. CALTON:  Well, I don't know that we need to

22  accomplish, but if there's going to discuss discovery and

23  scheduling and briefing or is it really just going to be the

24  stay argument?

25          THE COURT:  Well, you raise a good point.  It is

1  possible that if the Court holds that the stay does not apply

2  and the city wants to go ahead with the adversary and

3  including the TRO, there may be some scheduling issues

4  discussed at that time.

5          MS. CALTON:  Okay.

6          THE COURT:  Okay?  Okay.  Mr. Shumaker.

7          MR. SHUMAKER:  Yes, your Honor.

8          THE COURT:  What's your answer to Mr. Hackney's

9  question?

10         MR. SHUMAKER:  His question is -- there were

11 several, your Honor.  I'm sorry.

12         THE COURT:  Well, his question about the data room

13 being discoverable and, therefore, not subject to your NDA.

14         MR. SHUMAKER:  Right.  The reason that the NDA's

15 were necessary, your Honor, is because there's a number of

16 sensitive financial documents, projections that are in the

17 data room that the city strongly believes should not be

18 disseminated unless there's an NDA in place.  We have

19 provided the parties with all of the documents that we've --

20         THE COURT:  I have to ask you to pause there with

21 this very general question, which is in bankruptcy why isn't

22 every piece of paper not privileged discoverable by any

23 creditor?

24         MR. SHUMAKER:  Well, your Honor, I think the answer

25 is if it's -- it might be discoverable, but it would -- it's

1    possible it would be provided to the Court under seal if

2    there was competitively sensitive information in there

3    that --

4              THE COURT:  Competitively sensitive?

5              MR. SHUMAKER:  Well, I mean sensitive financial

6    information.

7              THE COURT:  These days.

8              MR. SHUMAKER:  I'm sorry, your Honor.

9              THE COURT:  What do you mean?  What do you mean?

10   Give me an example.

11             MR. SHUMAKER:  Well, there are --

12             THE COURT:  Give me an example of a document that

13   parties can see but you don't want disseminated, whatever

14   that means.

15             MR. SHUMAKER:  Your Honor, there are cash

16   projections relating to the city's financial future.  There

17   are expert reports.

18             THE COURT:  Okay.  Stop there.  Financial

19   projections.  Why are they sensitive?

20             MR. SHUMAKER:  They have --

21             THE COURT:  Doesn't the city want every one of its

22   citizens to see what the city's financial future is projected

23   to look like?

24             MR. SHUMAKER:  Yes, your Honor, but --

25             THE COURT:  What's the problem?

1          MR. SHUMAKER:  There are a lot of different

2     scenarios that are played out in those projections which,

3     again, the city has believed is it would not be in its best

4     interest to be disseminated in public.

5          THE COURT:  Okay, but why not?

6          MR. SHUMAKER:  Because we believe that the --

7          THE COURT:  What would be the harm to the city's

8     interest if that happened?

9          MR. SHUMAKER:  Yes, your Honor.

10         THE COURT:  What would the harm be?

11         MR. SHUMAKER:  Your Honor, you know, it's hard to

12    imagine the different scenarios that might develop with some

13    of the information that would suggest certain things.  That's

14    why we proceeded in this fashion.

15         THE COURT:  Well, generally speaking, speculation

16    and conjecture are not the basis for confidentiality, are

17    they?

18         MR. SHUMAKER:  That's true, your Honor.

19         THE COURT:  Now, you moved on to expert reports.

20    Those are discoverable, in any event, aren't they?

21         MR. SHUMAKER:  Your Honor, I mean I guess there's

22    also a relevancy concern.  I mean a lot of this

23    information --

24         THE COURT:  This is bankruptcy.  What's not

25    relevant?  All right.  I'm going to -- I'm going to just

1  pause this inquiry now because I sense the need for it.

2  We're going to reconvene this question also at three o'clock

3  because I want you to seriously consider with your colleagues

4  and your client the extent to which confidentiality is

5  necessary and appropriate for what's in your data room, and

6  at that point you can give me a more specific answer.

7        MR. SHUMAKER:  Thank you, your Honor.

8        THE COURT:  And that'll work for you, too, Mr.

9  Hackney.

10       MR. HACKNEY:  It will.

11       THE COURT:  All right.  All right.  So what else?

12  Okay.  So I guess I need to make a decision about the length

13  of depositions.  I am persuaded that the depositions of the

14  three city witnesses should be permitted for six hours, and

15  the Court will allow that.  It is the Court's hope and

16  expectation that these depositions can be scheduled as

17  promptly as possible so that parties opposing the motion can

18  determine the extent to which they will put on rebuttal

19  testimony.  In the circumstances, the Court will order the

20  disclosure of rebuttal witnesses 24 hours after the

21  conclusion of the last of the three depositions, and then the

22  city will have an opportunity to depose them if it sees fit.

23  Having said that, it is still the Court's strong intent to

24  proceed with the hearing on the date it set.  Anything else

25  we can do between now and three o'clock?  Sir.

1        MR. NICHOLSON:  Michael Nicholson appearing for

2   International Union, UAW.  I won't be able to be here at

3   three o'clock, your Honor, because of a prior commitment, but

4   I did want to report to the Court that with respect to the

5   NDA, the nondisclosure agreement, in meetings leading up to

6   the filing, we raised the very same questions the Court

7   raised and really didn't get a satisfactory answer.  We said

8   why shouldn't retirees, our members, citizens, be allowed to

9   know what's going on, and we were told we wouldn't get

10  certain information unless we signed the NDA.  We refused to

11  do that.  We still have not signed the NDA.  I think the

12  Court's concern is very appropriate.  Thank you.

13       THE COURT:  All right.  I do have one more thing to

14  put on the agenda for three o'clock, which is the issue that

15  I raised about how much time each side should be allowed to

16  present evidence at the hearing.  I'd like for you to suggest

17  some answer to that question to me at that time.  Anything

18  else anyone have at this time?  All right.  We'll be in

19  recess until three o'clock.

20       THE CLERK:  All rise.  Court is in recess.

21     (Recess at 11:16 a.m., until 3:01 p.m.)

22       THE CLERK:  All rise.  Court is in session.  Please

23  be seated.  Recalling Case Number 13-53846, City of Detroit,

24  Michigan, and Case Number 13-04942, City of Detroit versus

25  Syncora Guarantee, Incorporated, et al.

1    THE COURT:  Okay.  Let's address the automatic stay

2  issue.

3    MR. SHUMAKER:  Your Honor, could I interrupt with

4  two preliminary matters if it's okay?

5    THE COURT:  Sure.

6    MR. SHUMAKER:  My colleague, Ms. Ball, is going to

7  argue the stay motion, but two things I wanted to get back to

8  your Honor on.  One of them was, in light of your Honor's

9  willingness to have this hearing so quickly this afternoon, I

10  wanted to indicate that the city is willing to dissolve the

11  TRO, so prior to the automatic stay motion being heard we

12  thought we should tell you that.

13    The second thing is with regard to the data room.  I

14  wanted to be very clear that the city very much agrees with

15  your Honor that this is -- we should be as transparent as we

16  possibly can be with regard to documents affecting the city

17  and its citizens, and what we would propose, though, as much

18  as we agree with that, there are some documents -- we talked

19  about the 70,000 or so pages that are in that data room over

20  the break, and there are certain documents that we have

21  concerns about.  There's really kind of two categories.  One

22  is documents that involve individual privacy issues.  There

23  are some documents relating to different employee salaries,

24  compensation, benefits, Social Security numbers and whatnot

25  that we would be very reluctant to have disseminated publicly

1   for obvious reasons.

2           And then, secondly, in connection with sort of some

3   of the pension assessments, the city agreed to an agreement

4   with Milliman, which is a pension actuary, and as part of the

5   city's agreement we agreed to an NDA with Milliman, so anyone

6   who has come into the data room since then can get access to

7   the Milliman documents but also has been required to sign an

8   NDA.  We're happy to talk to Milliman about that, but that

9   was the other category that we were concerned about that

10  was -- obviously had some sensitivity as well.  What we would

11  propose is that if -- if it was all right with your Honor,

12  that we go through, cull out any of those documents that we

13  have those concerns about, and approach your Honor with a

14  motion for a protective order very, very quickly.  We don't

15  think any of this stuff has any relevance to the ongoing

16  assumption motion, but if we determine that the protective

17  order motion has to be filed, to get it filed in the next day

18  or two and then come back perhaps next Wednesday, if your

19  Honor was amenable to that, to argue that if there were

20  certain documents that we thought really should remain under

21  seal and require further protection.

22          MR. HACKNEY:  That makes sense to me, your Honor.  I

23  think it switches the burden a bit.  Instead of saying it's

24  all confidential until it's not, it says it's all not

25  confidential unless it should be.

1       THE COURT:  All right.  So this will solve the issue

2   you raised initially about discoverable material.  Yes?

3       MS. CALTON:  Judy Calton for Detroit Entertainment

4   and Greektown Casino.  We've been told that my clients aren't

5   eligible for the data room; that they won't tell the criteria

6   for who is eligible for the data room, which this may be

7   great for these two parties, but it doesn't help for the rest

8   of us.  I don't know what the criteria is for who can have

9   access.

10      MR. NEAL:  If I could -- good afternoon, your Honor.

11  Guy Neal, Sidley Austin, for National Public Finance

12  Guarantee Corp.  I rise to address the Milliman issue.  The

13  city has taken the position that in order for parties in

14  interest and creditors to have access to these actuarial

15  reports and valuations of their post-employment benefits,

16  OPEB's, that you need to release Milliman.  You have to

17  execute a third-party release.  We have not executed that

18  release.  We don't believe it's appropriate that we need to

19  enter into a release in order to obtain these materials.  If

20  Mr. Shumaker's opinion --

21      THE COURT:  Of what?

22      MR. NEAL:  Excuse me.  Release of any and all claims

23  that one may have against Milliman.  I'm not saying we have

24  claims, but I'm not sure why one needs to release a party in

25  order to get access to information that may become public.

1    If it's the city's position that they're going to arrive at
2    a -- they're going to evaluate what needs to be public and
3    what needs not to be public by the next hearing, we're happy
4    to work with the city on that.  If they have a stated
5    position that they're going to hold firm to this third-party
6    release and the parties need to sign it, I'd like to have
7    that addressed today.
8            MR. GORDON:  Good afternoon, your Honor.  Robert
9    Gordon on behalf of the Detroit Retirement Systems.  I would
10   echo the comments of Mr. Neal on that point.  There already
11   have been also, just for the Court's edification, releases or
12   information provided by the city about some of those
13   Milliman, quote, unquote, reports, and I use that term
14   loosely because I don't believe they are reports.  They are
15   letters, they are analyses, but they're not actuarial
16   reports.  But, for example, there was a June 4 letter from
17   Milliman that was in that data room that was subject to these
18   confidentiality agreements, but then there's been information
19   released by the city about those reports, so there's
20   additional issues about whether things that are in that data
21   room and that might have been arguably at one time subject to
22   confidentiality are still subject to it, so I welcome having
23   that discussion at next week's hearing.  I don't think anyone
24   will be prejudiced in the interim.  Thank you.
25           MR. SHUMAKER:  And, your Honor, that is what I was

1   talking about is that the city was required to enter into

2   this contract with Milliman, and that's who we would like to

3   talk to about addressing the concerns that were just raised

4   about those documents.  As to the initial --

5              THE COURT:  Well, before we move on from that,

6   please ask the people with this firm that if they're not

7   willing to excuse what is apparently your contractual

8   requirement to get a release from the people who see their

9   work product, they need to come to court next week and talk

10  with me about it.

11             MR. SHUMAKER:  Be happy to do that, your Honor.  And

12  then as to access to the -- to I think it was Detroit

13  Entertainment, again, considering that this is the approach

14  that we think should be taken, they would get access like any

15  other objector or party.

16             THE COURT:  All right.  So we'll look forward to

17  your motion in the next day or so.  Ms. Ball.

18             MS. BALL:  Thank you, your Honor.  Good afternoon.

19  Corinne Ball on behalf of the City of Detroit.  Your Honor, I

20  rise to do a number of things, but I thought it might be

21  helpful, with the Court's indulgence, if I provided the

22  context in terms of the nature of the asset that we're

23  talking about this afternoon.  The casino tax revenues are

24  probably the highest quality revenue stream the city has.  It

25  certainly is one of the largest and we believe the most

1    stable tax stream that the city has generating in excess of
2    175 million a year and forecast to generate roughly that much
3    in at least each of the next ten years.  Being able to use
4    this valuable revenue stream is pivotal to the overall
5    resolution of this case and the rehabilitation of the city.

6            Another point that's been bouncing -- perhaps we
7    could assist the Court -- are the numbers that have been
8    discussed in connection with the swap, and your Honor may
9    wonder why.  With these particular swaps, which are between
10   the counterparties and the service corporations, the
11   termination value, your Honor, floats inversely with interest
12   rates, so as interest rates rise, the termination value is
13   reduced so that as of now I am told the discounted price to
14   free up this revenue stream is less than 200 million and, in
15   fact, estimated at 190 million.  To date I think there has
16   been no debate in any of the three litigations involving the
17   casino revenues that if the swap obligation is discharged,
18   the lien on these revenues is released.  I also think there
19   is no debate that Syncora has not paid anything on the swaps
20   and that there are no amounts due.

21           Moreover, your Honor, absent the forbearance
22   agreement, were the swap counterparties to exercise their
23   alleged rights under Section 560 to terminate the swap, by
24   our calculation, as is reflected in Mr. Orr's affidavit,
25   Syncora's exposure is capped at $27 million.

1     Your Honor, as is obvious to me but sometimes not as
2  obvious to others given the pendency still of litigation and
3  the fact that the city has no assurance that the settlement
4  with the counterparties will be approved, it may, in fact,
5  flounder or fail.  As is obvious from the 13 objections filed
6  to date, there are key issues as to which the city is not
7  prepared to concede any of these points today, since it
8  doesn't know where the settlement will end up, but certain
9  issues, your Honor, we think may be raised this afternoon,
10  and I wanted to share with you our view that we'd like to
11  make certain assumptions during our argument this afternoon.
12     Key among those issues which are being settled,
13  should the settlement and assumption motion be approved and
14  succeed, is are the casino wagering tax revenues special
15  revenues within the meaning of 9022.  There is dicta in the
16  Jefferson case cited by Syncora, and, your Honor, I know
17  there are three JeffCo decisions that have been cited
18  frequently with you.  I'm referring to the decision on the
19  receivership, which is reported at 474 B.R. 28, suggesting
20  that a revenue picture like ours it may or may not be special
21  revenues, so we are reserving that issue.
22     Obviously, your Honor, we're also not prepared to
23  concede that the swap is valid or that the pledge of the
24  revenues are valid, but having from the outset reserved on
25  those issues, we think we can still address the stay's

1  applicability to the wagering tax revenues.

2       I was impressed by Syncora's statement of yesterday

3  where for the first time they asserted that the casino tax

4  revenues, the wagering tax revenues payable by casino owners

5  to the city, are not property of the city, and for that

6  proposition -- and your Honor will have to excuse me because

7  we'll be referring to New York cases a lot this afternoon as

8  many of these documents are governed by New York law -- they

9  point to cases which there's only one common theme among the

10 escrow cases cited by Syncora in support of that proposition,

11 and the common theme is you have to go to the underlying

12 agreement, and you have to look at it and see what it says.

13 So if we go to the key agreement, which is the collateral

14 agreement, which, as your Honor knows, Syncora is not a party

15 to, the agreement has a definition of pledged property in

16 Section 1.2, which keys into the definition of revenues that

17 are pledged and ultimately to the city's tax -- wagering tax

18 revenues.  So I think that the agreement is fairly clear that

19 these revenues are property of the city, and the remedy

20 section -- and, in particular, Section 11(c) of that

21 collateral agreement -- confirms that the revenues remain

22 property of the city in these accounts and cannot be accessed

23 except with an appropriation by the city of its revenues to

24 that purpose.  So I think this agreement, were one to read

25 it, is fairly clear that these revenues are remaining

1    property of the city.  But I think we would then turn, your
2    Honor, beyond the agreement to the decision again by Judge
3    Bennett in ruling on the receivership motion.  You may recall
4    that the monolines and other warrant holders in that case
5    sought to restore the receivership in the context of
6    Jefferson County's Chapter 9.  Judge Bennett spent a very
7    thoughtful opinion, and in that he concluded that the pledged
8    revenues, even though in possession of a receiver appointed
9    by a state court, remained property of the Chapter 9 debtor
10   and, as your Honor knows, ultimately did not restore the
11   receivership and did say that these properties are protected
12   by the stays of 362(a) and 922.  So I think we have the
13   general proposition look to the agreement as well as a very
14   specific one in Chapter 9, and that was an exceptionally
15   well-reasoned opinion.
16           I also think, your Honor, that there should be no
17   doubt that the casino tax revenues, technically wagering tax
18   revenues, are taxes within the meaning of Section 922(a)(2),
19   which has a very specific reference to taxes being protected.
20   While we're not prepared to concede, as I indicated already,
21   your Honor, that casino revenues are special revenues,
22   assuming arguendo for this afternoon that they are special
23   revenues within the meaning of Section 9022, there's still
24   two problems.  It's not clear to us that Syncora has
25   standing -- since it's not a secured party and it cannot

65

apply these revenues, that it has standing to raise or to be
within the protection of 922 at all.  It's not a party.
These properties were not pledged to them.  But more
importantly, if one actually looks to the words of 922,
literally it says that the stay does not apply to the
application of special revenues to the payment of
indebtedness.  As I think I've already shared with your
Honor, there are no amounts owing under the swap, and there
is no indebtedness remaining to be paid currently due on the
swaps, so we think reliance on 922(d) is misplaced for two
reasons.

        And, your Honor, if I -- I thought it might be most
helpful if I went to 922(a)(2) first -- it's a very narrow
argument -- and then if your Honor would still like us to
argue the applicability of 362(b)(17), we're prepared to do
that.  I don't think there's any debate that wagering taxes
are taxes.

        I also think, your Honor, that the 11th Circuit in a
case called In re. Patterson -- and perhaps at this point,
your Honor -- I have assembled a listing of the authorities
that I'd be using.  Would it be helpful to the Court so that
I don't have to keep reporting them -- I also have some for
Syncora.  May I approach, your Honor?

        THE COURT:  Yes.

        MS. BALL:  Your Honor, the 11th Circuit case named

1   <u>In re. Patterson</u>, the 11th Circuit has told us that a credit

2   union's action to freeze revenues constitutes a violation of

3   the stay as an act to enforce a lien.  That particular

4   passage appears at 967 Fed. 2d at 512.  We also have one of

5   your colleagues from the Southern District of Ohio in a case

6   called <u>In re. Figgers</u>.  In that case, the Court was

7   confronted with a refusal to release funds, which the Court

8   similarly found a violation of the stay as a prohibited

9   enforcement and collection action.  So, your Honor, I think

10  we now have freezing or refusing to release is enforcing a

11  lien, and we have taxes, so plain meaning for this

12  afternoon's purposes, the casino wagering tax revenues --

13  there should be a stay protecting them from enforcement of a

14  lien.

15          Now, what else do we know about a stay under Chapter

16  9?  Again, thanks to Judge Klein in <u>Stockton</u> --

17          THE COURT:  Well, the question that Syncora raises

18  is how is U.S. Bank's act in allowing the funds in the sub

19  account to accumulate rather than to turn it over to the city

20  a violation of the stay, an exercise of control --

21          MS. BALL:  Your Honor, I think --

22          THE COURT:  -- assuming it is property of the

23  debtor?

24          MS. BALL:  I think, your Honor, that's the Southern

25  District of Ohio.  That's enforcement of lien, refusing to

1    release revenues.  Similarly, your Honor, I think that
2    Syncora has somewhat overstated the Supreme Court's ruling in
3    Strumpf.  Your Honor may recall that the Supreme Court did
4    find in Strumpf that freezing revenues for a short duration
5    was not a violation of the stay, but it was really a stopgap
6    measure, if one looks at that case at 516 U.S. 19 and 20, to
7    get to the Bankruptcy Court to seek relief from the stay.

8            Your Honor, U.S. Bank has been releasing revenues
9    without a hitch until June 17th when communication started
10   from Syncora.  There were -- all of the events that were
11   alleged in Syncora's papers had all -- many had occurred
12   before then, but a custodian has a view.  I wouldn't be
13   surprised at all.  The documents only protect them if they
14   rely on the directions of the swap counterparties as the
15   secured party.  As part of the forbearance agreement, your
16   Honor may recall those swap counterparties consented to the
17   continuing release of those funds to the city.  Query, would
18   U.S. Bank ever had changed releasing revenues which it had
19   been doing since the emergency financial manager was
20   appointed in March, it had been doing for over a year when
21   there was an intervening credit rating downgrade?  It was
22   doing what the secured parties wanted it to do until a
23   communication from Syncora, and the nature of those
24   communications, your Honor, are probably beyond this
25   afternoon, but they were peppered with words like "demand

1   that you hold." It was not "look to your agreement." And
2   if, in fact, 922(a)(2) applies, if this matter of law does,
3   and we would submit to your Honor on these facts it does,
4   then there are no exception -- the 362(b) exceptions that are
5   being argued by Syncora, they don't apply in Chapter 9.
6   There has to be another basis to come to your Honor and seek
7   relief from the stay. 362(c), (d), and (e) apply, but (b)
8   doesn't. So if we're in Chapter 9 stay world, I think U.S.
9   Bank has to think about it. I think Judge Klein and Judge
10  Bennett, both in Stockton and all three JeffCo cases, have
11  underscored that the exceptions to the automatic stay that
12  one would classically rely on, police power, 362(b), do not
13  apply, so in construing that agreement, I think -- which no
14  one has done and the custodian has zero obligation to do, a
15  fact -- that's the position it has espoused in filings in the
16  adversary proceeding now pending before your Honor, so we
17  know, your Honor, that if a Chapter 9 stay applies,
18  362(b)(17) doesn't.
19          Now, if I were to take a detour with your Honor's
20  indulgence -- bear with me because there is a critical
21  difference between 362(b) and Section 560. The way the
22  exceptions work in the safe harbor world it appears to us --
23  it appears to me first from Judge Shannon's decision in
24  SemCrude where he actually took the lead -- he took the
25  general proposition that the automatic stay is very broad

1  relying on Timbers and Midatlantic and said that exceptions

2  really have to be construed extremely narrowly.  I think we

3  know that from him, but he looked at the safe harbors, and I

4  want to get back to 560.  It is relevant to the Chapter 9

5  stay.  He looked at the safe harbors as saying it kind of

6  works as a package, but fundamentally it's about offset

7  netting and the termination of qualifying financial

8  contracts.  In Judge Shannon's SemCrude case, your Honor may

9  not be aware of the facts, but it involved what the Wall

10 Street types call a triangular setoff, which means that if

11 one of the nondebtor parties' affiliates owes an obligation,

12 they can set off -- I mean one of the debtor's affiliates

13 owes the counterparty an obligation, they can set off the

14 debtor's property.  The contract said that was totally

15 permissible.  They look to 362(b)(17), contract right, we're

16 exercising this.  Judge Shannon, who was affirmed in his

17 decision, said, no, very narrow exception.  You still have to

18 fundamentally be entitled to set off or exercise the rights

19 that you're seeking to exercise.

20        So why do I want to get back to 560?  560, 561, 559

21 are the part of the safe harbors.  If your Honor looks to the

22 language of 560, unlike the language of anything in 362,

23 including 362(o), 560, were the swap counterparties to

24 actually be terminating the swap, says right in it -- and I

25 quote, your Honor -- that they have a right to do so

1   notwithstanding any provision in this title, meaning

2   including, I would argue, 922(a)(2) if it were the swap

3   counterparties who were, in fact, terminating the swap.  They

4   have something they can point to.  362(b) has no such

5   reference to notwithstanding anything else in this title.

6   362, including 362(o), operate subject to Chapter 9.  So I

7   think that when we think of the decisions, your Honor, that

8   have really looked at this issue and they are, when one

9   thinks about the qualifying financial contract decisions,

10  outside of Chapter 9, you have to start, as I said, with

11  Judge Shannon's decision in <u>SemCrude</u> on the triangular

12  merger.

13          Shortly after that, Judge Peck would follow again.

14  He, too, encountered very creative arguments that banks and

15  financial parties raised to say that they were arguing --

16  they were asserting a contractual right that enabled them to

17  squirt through this very narrow exception of 362(b)(17).  So

18  even if we were only operating under the automatic stay, I

19  think we have to look to Judge Peck's ruling against

20  Swedbank, and, your Honor, that's reported on the list that I

21  have given you at 433 B.R. 101, and that was affirmed.  And

22  Judge Buchwald in affirming that decision went at length

23  through the legislative history of the safe harbors, and, in

24  fact, relied on <u>Dewsnup</u>, the Supreme Court decision, to say

25  we have to pay attention to the fundamental principles.  If

1  this was designed for a setoff and a termination, that's the
2  only time it can be used.  So Swedbank that got the bright
3  idea that it could have had a contractual right to do more
4  than that was found to have violated the stay and directed to
5  release to Lehman the monies it was holding.

6          Shortly after that a name familiar to this Court,
7  Bank of America, would try something very similar against
8  Lehman.  They said, "Gee, we also have a contract right to
9  take your monies wherever we're holding it and apply it to
10 your debt.  And since we're involved in a swap, we should be
11 able to do that."  And, your Honor, that case was cited in
12 our statement to you of earlier this week.  And Judge Peck
13 said, "Wait a minute.  No.  You are not within the safe
14 harbor, and you shouldn't have done that.  You should have
15 come to me first and demonstrated your entitlement to relief
16 from the stay."  Failing that, he found that they had, in
17 fact, violated the stay.

18         You would then have the opportunity -- and Lehman
19 gave Judge Peck many opportunities to deal with the safe
20 harbors, your Honor.  Forgive me for reverting to New York
21 decisions so often, but he would then have to deal with
22 another triangular setoff case with UBS.  In the list of
23 authorities I've given you, your Honor, that's the Lehman
24 case that is followed with the initials UBS.  Again,
25 following Judge Shannon's lead, no, your contract may say --

1  or you can argue till you're blue in the face your contract

2  says you can do that, but that is not permitted.  That is not

3  a right that should be recognized.  It's beyond the

4  termination of a swap and going against collateral.

5         The case that probably gets the most press -- and it

6  was not reported, your Honor, so I don't know your rules

7  regarding an unreported decision.  It was a decision in the

8  transcript of Judge Peck.  In that case, a financial party

9  known as Metavante had relied on a provision in the ISDA

10  master swap.  It's very interesting.  Metavante was, in swap

11  vernacular, out of the money, which meant that Metavante

12  should have been paying monies periodically into the debtor.

13  Metavante said, "Wait a minute.  Safe harbor.  I have the

14  right -- I have the right to terminate the swap, and I

15  haven't decided whether I want to or not, but I also have a

16  contract provision which I'm exercising under 362(b)(17) that

17  says I don't have to perform if the debtor is not

18  performing."  Judge Peck had little patience -- had little

19  patience with that provision and said, "You waived your right

20  to terminate on account of the bankruptcy.  You haven't done

21  it, and you can't exercise other remedies."  That's not the

22  scope of this exception known as 362(b)(17).  It's far

23  narrower.

24         Another bank would come along shortly thereafter,

25  the Bank of New York.  And your Honor may be familiar -- and

1    I know that it did come up, I think, in <u>Collins & Aikman</u>

2    where there are special provision entities where there are

3    management rights, and if one were to become bankrupt, the

4    management rights would flip to the nondebtor.  Someone

5    sought to enforce such provision against Lehman.  They had a

6    swap and a financial contract, and they also had this flip

7    right.  And they literally read 362(b)(17), any contract

8    right.  Judge Peck said absolutely not.

9         It's not confined to Wall Street cases, your Honor.

10   In <u>Calpine</u> there was a forward contract in the energy field

11   between <u>Calpine</u> and Reliant Energy, and Judge Lifland was

12   confronted with Reliant Energy as a nondebtor trying to

13   exercise a right, a remedy, under its contract under 362(b).

14   Judge said, "Wait a minute.  You're not terminating this

15   forward.  That's all that's protected in the safe harbor.

16   It's not a roving commission to do what you want to a debtor

17   and withhold."

18        Your Honor, Judge Gonzales had a similar experience

19   in <u>Enron</u> when someone commenced a DEC action in state court

20   in reliance on a remedy in their contract, and he found that

21   that, too, was a violation of the stay.

22        But what I'm kind of concerned about -- and I

23   certainly did not mean to concede -- we're not sure since

24   we've heard conflicting statements and we certainly are not

25   conceding that Syncora has any contract rights with respect

1    to the casino revenues and the collateral agreement.  In

2    fact, we've heard them say they're not doing anything.  To

3    your Honor's point earlier, they're passive.  So, your Honor,

4    we think they can't be on all sides of this issue.  We think

5    that the automatic stay of 362(a) has to rise to protect

6    property of the city of this magnitude.  Your Honor, this

7    property has substantial value.  It can support substantial

8    leverage to resolve this case.  It should be protected by the

9    automatic stay as a critical resource of the city, but its

10   characteristic as a tax can't be ignored either, which would

11   bring in the separate protection of Section 922(a)(2).  And,

12   your Honor, there's only one exception for that, and that's

13   in the safe harbors themselves, not the exceptions from the

14   stay, and I don't think that anyone, in light of the

15   forbearance agreement, certainly the swap counterparties, are

16   not terminating the swap.

17        Your Honor, I'd like to reserve the right to respond

18   as this was somewhat unscheduled, and we've tried to

19   anticipate the arguments that Syncora might raise.

20        THE COURT:  Thank you.

21        MR. HACKNEY:  Good afternoon, your Honor.  Stephen

22   Hackney on behalf of Syncora.  So there were a lot of cases

23   that were referenced there.  I would propose to start with

24   each of the three arguments I think that were made as to why

25   the stay should not apply, and I'd propose to start with the

fact that we contend that the property of the casino revenues
is not property of the estate.  And I thought it would be
helpful if I could walk the Court through where exactly this
property goes and how it gets to where it goes under the
collateral agreement, so there -- I don't think -- I heard
Ms. Ball say that I guess maybe they're reserving on the
question of whether it's a special revenue, but these are
excise taxes that we believe constitute special revenues that
are imposed on the activity of gaming and gaming related
activities.  They come into the hands of the casino, and then
instead of being paid to the city, as they normally would be,
the city gave irrevocable instructions to the casinos
directing them to pay the money to U.S. Bank.  And the
irrevocable instructions are interesting because they also
come with a release that says if you pay the money to U.S.
Bank, you have no further obligation.  You are released.
U.S. Bank then under the collateral agreement sets up a
number of accounts.  There's an account called the holdback
account, there's an account called the developer account, and
there's an account called the general receipt subaccount.
Put the holdback account over to this side for a moment
conceptually.  The developer account and the general receipt
subaccount are accounts that U.S. Bank itself sets up under
the collateral agreement.  They are housed at -- in New York
City, so the accounts themselves are physically outside the

1  State of Michigan.  The funds then go into the developer

2  account, and U.S. Bank at certain times then itself transfers

3  the funds from the developer account to the general receipt

4  subaccount.  They are only paid -- and the collateral account

5  uses the word "the custodian shall make payment of the funds

6  to the city upon the" -- either the city fulfilling certain

7  specific events or the nonoccurrence of other events as we

8  contend under Section 5.4, a termination event, an event of

9  default.  If those things are happening, then the custodian

10  shall not pay to the city the funds in the general receipt

11  subaccount.

12        The reason I'm going through this in such detail is

13  because the question is whether or not the casino revenues

14  are property of the estate.  I don't think it's a question as

15  to whether the debtor has an interest in them.  It certainly

16  has an interest in them, but that is not tantamount to saying

17  that it is property of the estate.  Here the --

18        THE COURT:  What's the nature of that interest that

19  you concede?

20        MR. HACKNEY:  I would -- what we have analogized it

21  to, your Honor, is a residual interest like one in an escrow

22  account.  And, in fact, I think we have made an argument in

23  our papers that the collateral agreement does create an

24  escrow account under New York law.  It has the hallmarks of

25  an escrow --

 1          THE COURT:  Would you agree it's a contingent

 2   interest?

 3          MR. HACKNEY:  Yeah.  I think -- I would think of it

 4   as residual, but I think contingent maybe is also accurate in

 5   the sense that it is contingent upon a number of things

 6   either coming to pass or not coming to pass before the city

 7   has a right to receive the property, but we have cited the

 8   cases to you that we cited --

 9          THE COURT:  Well, let me ask you to pause one more

10   time --

11          MR. HACKNEY:  Oh, you bet.

12          THE COURT:  -- for what, you know, will seem like a

13   silly question, but I'm going to put it to you anyway.  If

14   it's not the debtor's property, whose is it?

15          MR. HACKNEY:  I think that the answer to that is

16   that it is property of the custodian.  The custodian has

17   title to the property.  It has control and possession over

18   the property.  There are other people that have interests in

19   the property.  The service corporations have an interest in

20   the property by operation of the city pledged to them.

21          THE COURT:  The custodian has no beneficial interest

22   in the property.

23          MR. HACKNEY:  I would have to think about that some

24   more.  The custodian is entitled to --

25          THE COURT:  There are no circumstances under which

1   the money would ever go to the custodian for the custodian's

2   own use and benefit; right?

3           MR. HACKNEY:  I will have to duck that one, your

4   Honor, and say I'm not sure just because there are

5   circumstances where in its role as contract administrator the

6   contract administrator is allowed to pay itself some of its

7   fees.  I don't know if the custodian has similar provisions

8   that say, "Oh, by the way, before I kick the money out, I get

9   to hold back the X, Y, and Z."  I'm not saying it does.  I'm

10  just saying I'm not certain.  I can't concede it from the

11  podium, but -- so does the service corporation have an

12  interest in this property that is the property of the

13  custodian?  Yes.  Does the swap counterparty --

14          THE COURT:  All right.  Let's stop there.

15          MR. HACKNEY:  Yeah.

16          THE COURT:  Assuming for the moment that the city

17  has even a contingent interest in the money on deposit in

18  this account, isn't any attempt to exercise control over that

19  contingent interest stayed by Section 362(a)(3)?

20          MR. HACKNEY:  Yeah.  I guess I would say we don't

21  believe so, your Honor, because of the cases that we have

22  cited that say where in the context of an escrow all the

23  debtor has is a contingent interest that isn't sufficient to

24  establish that the property is property of the estate, and so

25  the stay does not apply in the first instance.  And I would

1    note that we have also cited cases to this effect.

2           THE COURT:  But what's the logic behind that?  I ask

3    that because in every other circumstance I can think of where

4    a debtor has a contingent interest in property, that

5    contingent interest is considered to be property of the

6    estate protected by the automatic stay.  Why would an escrow

7    agreement be any different?

8           MR. HACKNEY:  Well, I can only say that I guess

9    reason number one would be certainly we've cited cases

10   suggesting that it is, but in terms of the policies behind

11   those cases --

12          THE COURT:  Okay.

13          MR. HACKNEY:  -- I think the policies are that there

14   is value to having certainty with respect to security that's

15   been granted by a debtor that is no longer under its

16   possession or control, and so you can see a situation where

17   if the debtor -- I can see where the debtor has -- is driving

18   its car around, but, yes, it's pledged the title to a bank

19   there.  The debtor still retains the primary possession and

20   ownership of the property.  The creditor there's interest is

21   a security interest that they're not allowed to foreclose

22   upon without violating the automatic stay.  I understand that

23   as an example where there are contingencies to the debtor's

24   interest, but it's got the hallmarks of possession and

25   control, and it's actually using the car.  Where I think

1  things change from the standpoint of the Bankruptcy Code,
2  they certainly change from the standpoint of the cases that
3  we've cited is where the debtor now gives the car as well to
4  the bank that's also holding the title and saying, "Now this
5  is property that can be held pursuant to this agreement.  I
6  can only get it back in these certain circumstances."
7          THE COURT:  So if under state law a creditor has a
8  possessory security interest in property, your position would
9  be that that creditor is not required to seek relief from the
10  stay because the stay doesn't apply?  That's an extraordinary
11  position to take.
12          MR. HACKNEY:  Where the creditor has a possessory
13  interest in --
14          THE COURT:  Possessory, yeah.  It holds possession
15  of the property as a secured creditor under state law like a
16  pawn shop or a bank that holds a CD, for example, as a
17  security interest.
18          MR. HACKNEY:  What I would say is that the escrow
19  cases we have cited I think read onto that circumstance that
20  you've identified, which is that, yes, where the maintenance
21  of the escrow, the continued operation of the escrow
22  subsequent to the bankruptcy filing does not constitute a
23  violation of the automatic stay.
24          THE COURT:  Well, but that would only be because the
25  stay doesn't apply; right?

1          MR. HACKNEY:  That is correct.  I mean I'm not

2    trying to assume the conclusion, but I'm saying the cases

3    that we have cited were considering the question of whether

4    or not the maintenance of the escrow violated the automatic

5    stay because of the fact that the debtor had -- did have

6    potentially a residual interest in the property that was in

7    the escrow account, and what those cases said is the debtor's

8    residual interest does not rise to the level of making the

9    property property of the estate.  Part of the reason we're

10   analogizing to them is we do think at some point the rubber

11   has to meet the road in terms of looking at --

12         THE COURT:  Well, but there are a gazillion cases

13   that say a secured creditor who's in possession of collateral

14   must turn that over to the debtor and -- to the debtor, and

15   the creditors' relief is to ask for adequate protection,

16   right --

17         MR. HACKNEY:  Your Honor, I have to --

18         THE COURT:  -- outside of Chapter 9?

19         MR. HACKNEY:  I have to say I -- I will say, your

20   Honor, I'm not familiar with those cases as I stand here

21   today.  I prepared on the cases that were cited in the city's

22   papers.  It does seem to me, though, that to the extent those

23   cases hold that way, that the creditor has to pay the money

24   over to the debtor, they may be distinguishable from the

25   escrow context wherein the escrow is specifically designed to

1  capture the money while different parties' potential rights

2  are assessed, so I can only say that the cases we have cited

3  are ones in which there's -- it's agreed that the debtor has

4  a contingent and residual interest to the property

5  potentially someday, but it doesn't have either possession or

6  control of the property.  We have cited cases saying that the

7  operation of the escrow is not outside the automatic stay.

8         Your Honor, I would like to speak briefly, if I

9  could, to the question of the pledged special revenues.  So I

10  don't think that there's a real debate that -- as to whether

11  these are pledged special revenues.  I understand counsel's,

12  I guess, reserved on that, but they are excise taxes.

13  There's an opinion from Orrick Herrington that was issued in

14  connection with the 2009 collateral agreements formation

15  identifying the wagering taxes as excise taxes, and Mr. Orr

16  himself in his proposal identified them as such, so I think

17  what I'd like to turn to, though, is the city's argument that

18  there's not going to be any application to indebtedness

19  because -- the fact that they're staying current on the swap.

20  And I want to address this because I think this misapprehends

21  the precise nature of the structure because the obligations

22  to make the periodic swap payments are the obligations of the

23  service corporation.  The city's obligations that are secured

24  by the city's pledge of these revenues are obligations under

25  the service contracts.  All of the city's obligations under

1  the service contracts have accelerated as a result of the

2  city's bankruptcy filing, so we disagree with the fact that

3  the city is current with respect to its obligations under the

4  service contract that the city pledged secures.  So I think

5  that argument by the city misses the mark.

6          THE COURT:  Is that acceleration legal?

7          MR. HACKNEY:  To the best of my knowledge, it is,

8  your Honor.  It's provided for in the service contracts that

9  the city signed that contain numerous opinions that were

10 rendered with them regarding the legality of those contracts.

11         THE COURT:  Is there any other indebtedness you rely

12 on?

13         MR. HACKNEY:  Well, I guess what I would say is that

14 the ultimate application of the wagering revenues to the

15 obligations of the service corporations under the swap in the

16 future would also be potential indebtedness that would

17 require the trapping now.  For example, if Mr. Orr decides

18 I'm going to stop paying the swap in light of the fact that

19 the trap is valid, then the payments will be made out of the

20 trapped funds via the -- from the city -- from the custodian

21 to the --

22         THE COURT:  Let's assume your argument is accurate

23 as far as it goes.  That is to say, the party holding the

24 lien can proceed.  How does that help you?  Why does that

25 suggest that there's no stay against Syncora because Syncora

1    does not have a lien?

2         MR. HACKNEY:  Well, first of all, the language of

3    Section 922(d) is not versed in the language of who possesses

4    the right in question, which distinguishes it from something

5    like 362(b)(17), which we'll get to in a moment, which talks

6    about swap participants, but let me answer your question

7    head-on, your Honor, and say that remember that this is an

8    integrated transaction, and so the collateral agreement not

9    only takes pains to integrate itself into the swaps

10   agreement, the services agreement, and the contract

11   administration agreement, the swaps agreement also makes

12   clear that the services contract, the collateral agreement,

13   and the contract administration agreement are all credit

14   support documents underneath the swap agreement.

15        Now, the significance of this, your Honor, is that

16   the way this structure works is that because Syncora

17   possesses the -- along with FGIC, but because the insurers

18   possess the ultimate economic exposure here to the structure,

19   the system -- the structure gives them the power to enforce

20   the various agreements and the right to direct the actions of

21   other people.  So if you look at the swaps agreement, for

22   example, Syncora is an explicit third-party beneficiary with

23   the rights to enforce the obligations underneath the swap

24   agreement, which, as I've noted, is integrated with these

25   other agreements.  Under the services contract, it's also an

explicit third-party beneficiary with the rights of
enforcement, and what is also unique is that under the
contract administration agreement, it has the rights to
direct the actions of the service corporation, the custodian,
and the swap counterparties.  The reason for that, your
Honor, is in order to remain in control of a structure that
it's ultimately going to be paying people on, if you default
on your insurance, you lose these control and direction
rights, so you have to be staying current, which Syncora has
done, but the -- I'm trying to be responsive to your point,
which is to say they keep saying -- you know, it's like a
drum they're beating to say that -- what they're really
saying, your Honor, is Syncora is not a signatory to the
collateral agreement.  And you know what?  They're right.
Syncora is not a signatory to the collateral agreement, but
you should know that its consent was required to enter into
the collateral agreement.  It is a noticed party under the
collateral agreement.  There are provisions in the collateral
agreement that say that in order to exercise its rights under
the collateral agreement, it must not be in default of its
credit insurance that hearken back to the other provisions in
the services agreement and the swap and the contract
administration agreement that talk about not being in default
of your credit insurance, and so Syncora is absolutely a
party in interest and a third-party beneficiary with rights

1  of enforcement, and that would entail the right to direct the

2  conduct of the swap counterparties, so even if the Court

3  decided under 922(d) it is important to me, the Court, that

4  the party asserting 922(d)'s exemption of special revenues

5  being applied to indebtedness have some connection to that,

6  what I'm telling you, your Honor, is we absolutely do because

7  that's the way these agreements are designed to work in terms

8  of the control, the consent, and the direction rights.

9         Your Honor, I was going to speak briefly to the

10  question of Section 362(b)(17) of the Bankruptcy Code, if I

11  may.

12         THE COURT:  Yes.

13         MR. HACKNEY:  So the key argument here, there is not

14  a suggestion, I don't believe, that the swap is not a swap,

15  that the collateral agreement isn't a security agreement

16  within the meaning of a swap agreement, which, by the way,

17  extends to agreements beyond just the swap agreement.  I

18  think the sole argument that the city is making here is that

19  Syncora is not a swap participant, and so I think I would not

20  belabor or repeat the arguments that I all just made about

21  the way Syncora is intimately connected to and has the powers

22  of different aspects of the agreements to both enforce them

23  directly and to direct other parties to do things including

24  the swap counterparties.  So from my standpoint at a

25  functional level, if you look at the language as to whether

1   Syncora is a participant in the swap, it fits within the
2   plain language not only because it has potential economic
3   exposure to it, but also because it has rights of
4   enforcement, and it has rights to direct the swap
5   counterparties underneath the swap.  To me that makes it a
6   swap participant under the plain language.

7           There is admittedly -- there is a dearth of
8   authority on this question.  We've researched it to say can
9   we find a case one way or the other, and while I'll start as
10  an advocate by telling you that we found no case saying that
11  a swap insurer is not a swap participant, I'll also be candid
12  and tell you that we haven't found a case that says that a
13  swap insurer is a swap participant, so we're somewhat in a
14  case of first impression, but I wanted to offer you two
15  notes.  The first is that that Lehman case that they did cite
16  in their briefs, which is a -- I would describe as a highly
17  distinguishable case -- there was a -- Lehman involved, I
18  believe, Bank of America as attempting to use its role as a
19  custodian in one context, to grab the money and use it to set
20  off against an unrelated agreement that it believed it had
21  with Lehman, and not only was it held not to have the setoff
22  rights, which were the premise for what it was doing, it was
23  also -- certainly shouldn't be using the amounts it was
24  holding as custodian in order to try and set off its other
25  obligations, so Lehman is inapposite.  Obviously we take the

1  admonitions to be cautious with respect to the stay

2  seriously, and I'm not diminishing them, but here is what is

3  interesting about Lehman, I think, which is when Bank of

4  America invoked Section 362(b)(17) in Lehman, it was just a

5  custodian, you know.  I mean, yeah, they're a signatory to a

6  swap, but are they really a participant in the swap?  They're

7  not somebody that's going to benefit from the swap one way or

8  the other.  And the Court in that case never said, "You're

9  not a swap participant."  It said, "I will address your

10  argument on the merits as to whether Section 362(b)(17)

11  applies," and then concluded that it did not.  And I think

12  that's significant because Syncora is absolutely a market

13  participant in connection with the swaps.  Swap insurance is

14  a common aspect of the market, and so to ignore the practical

15  realities I think would ignore some of the purposes of the

16  safe harbor.

17         I would also note that we were able to find language

18  from Collier's, and this is 5 Collier on Bankruptcy 560.031,

19  and what it said was the special protections for swap

20  agreements provided by Section 560 and other provisions of

21  the Bankruptcy Code are available to all parties to swap

22  agreements with the debtor because the swap -- the term "swap

23  participant" is broadly defined in Section 101(53C) to mean a

24  entity that, at any time before the filing of the petition,

25  has an outstanding swap agreement with the debtor, thus the

1  swap protections are generally available to all parties who

2  could benefit therefrom.  That's obviously --

3  　　　　　　THE COURT:  _Collier_ cite any cases in support of

4  that?

5  　　　　　　MR. HACKNEY:  It does not in the provision I'm

6  reading, so take it for what it's worth, your Honor.  I

7  understand it's not the same as a Supreme Court opinion, I

8  know, but in short I think that if you take a functional look

9  at the purposes of the Safe Harbor Act, it was designed to

10 provide certainty with respect to swap participants with

11 respect to things like collateral agreements.

12 　　　　　　THE COURT:  How do you deal with Ms. Ball's argument

13 that under 922(b), Section 362(b) does not apply?

14 　　　　　　MR. HACKNEY:  Yeah.  So under 922 -- and I'm

15 sorry -- was that --

16 　　　　　　THE COURT:  (B).

17 　　　　　　MR. HACKNEY:  I want to make sure.  There was an

18 argument made under 922(a)(2) that these are the collection

19 of taxes.  Am I mis --

20 　　　　　　THE COURT:  Well, 922(a)(2), yes.

21 　　　　　　MR. HACKNEY:  And then --

22 　　　　　　THE COURT:  It's a stay applicable to all entities

23 of the enforcement of a lien on or arising out of taxes or

24 assessments owed to the debtor.  There's that stay.

25 　　　　　　MR. HACKNEY:  Yeah.

1         THE COURT:  But there's nothing that suggests that

2    (b) -- the exceptions in (b) -- 362(b) apply to that stay.

3         MR. HACKNEY:  Okay.  So at the first level, our

4    argument, your Honor, is that under Section 922(d) what

5    922(d) says, "Notwithstanding section 362 of this title and

6    subsection (a) of this section," so even if Ms. Ball were

7    correct -- and I will tell you why we don't concede that she

8    is -- they still have to run the rapids of 922(d) because it

9    specifically excepts 922(a).

10        The second thing I will tell you, your Honor, is

11   that I would say we have conducted research on this, and we

12   were, if I'm not mistaken, only able to find one case that

13   related to this provision, and it's in my iPhone, so I don't

14   have it for you because you have to turn your iPhone off in

15   the courtroom, so -- which is a good -- which is a good rule

16   because we're all too connected, but, anyway, I was reading

17   the case over lunchtime, and what my associate told me was he

18   was only able to find one case where this was invoked, and

19   the case there involved confusion or attempts to collect

20   taxes by an entity that was distinct from the debtor.  I

21   don't believe that this is currently the enforcement of a

22   lien against -- arising out of the taxes or assessments owed

23   to the debtor.  This is the natural operation of the

24   collateral agreement, the irrevocable instructions that were

25   entered into long ago, so there is no action that's being

1    taken by someone.  That's what's frustrating to the city is

2    the inaction, the refusal to transmit the monies that the

3    city has set by this -- by the dead hand of the collateral

4    agreement and the irrevocable instructions to flow directly

5    to the custodian.

6          THE COURT:  You keep tripping over that.  There's

7    lots of case law that says that Section 362 doesn't

8    distinguish much between action and inaction, and I assume

9    that case law would apply to 922 because it's the same

10   language, if not the same policy.  How do I deal with that

11   here?

12         MR. HACKNEY:  Well, I guess the -- I think the --

13   you would deal with it first by saying that it only applies

14   to property of the debtor ab initio, so you do have to get to

15   that stage.  And then second, even if the -- even if we are

16   on the subject of action versus inaction being irrelevant,

17   you also do have to find that 92 --

18         THE COURT:  What the cases say is that there are

19   many circumstances in which the inaction of a creditor

20   constitutes the exercise of control over the debtor's

21   property.

22         MR. HACKNEY:  But in those cases I'm going to

23   surmise there is a finding that it is property of the debtor,

24   and there's also --

25         THE COURT:  Right.

1          MR. HACKNEY:  So --

2          THE COURT:  Right.  It is.

3          MR. HACKNEY:  I also don't want to assume the

4  conclusion the other way against me, which is we have a

5  threshold question that says it's not property of the debtor.

6          THE COURT:  Okay.  So there's two different issues.

7  The first is is what is at stake property of the debtor.  The

8  second issue is is what the debtor is doing in relation to

9  that property an exercise of control over it.

10         MR. HACKNEY:  That's right, and that the 9 --

11         THE COURT:  What the cases say is that on the second

12  issue, the issue of exercise of control, inaction can be an

13  exercise of control.

14         MR. HACKNEY:  And I think the -- so and not to

15  forget that 922(d) is also an exception to 922 --

16         THE COURT:  Right.

17         MR. HACKNEY:  -- (a)(2), but I think -- Mr. Bennett

18  has handed me a helpful note, and hopefully I'm doing him

19  justice, but what he points out is we are not seeking to

20  interfere with the contingent interest that the city does

21  have.  It is merely that the property which is not the city's

22  property is the cash itself continue to be trapped, so that

23  is the distinction there which, again, folds back into our

24  argument that it's not property of the estate.

25         Your Honor, I have said my piece.  I think we --

1          THE COURT:  All right.

2          MR. HACKNEY:  -- may have exhausted my knowledge

3    of --

4          THE COURT:  Thank you.

5          MR. HACKNEY:  -- bankruptcy law as well, so thank

6    you very much, your Honor.

7          THE COURT:  Anyone else briefly without duplicating

8    what's already been said?

9          MR. NEAL:  Yes, your Honor.  Good afternoon again.

10   Guy Neal, Sidley Austin, counsel for National Public Finance

11   Guarantee Corp.  I rise to echo or to -- to echo and to

12   underscore what Ms. Ball said about her reservations as it

13   relates to the special revenue determination, and without

14   treating this as a complete reservation of rights, which I

15   know is not something I need to do, I would encourage your

16   Honor to expressly reserve or avoid ruling on the issue of

17   whether or not these are special revenues such that they are

18   excepted from the automatic stay.

19         NPFG, among others -- I think about 12 or 13

20   others -- have filed an objection to the swap forbearance

21   motion, will be an active participant in discovery, will

22   litigate this issue on the 9th, and those threshold issues

23   that are raised -- and there are just three of them, so I

24   will be brief -- that were raised in NPFG's objection or

25   technically NPFG's joinder to Ambac's objection is that the

1   swap obligations are unauthorized under state law and,

2   therefore, void. State law does not authorize the city to

3   pledge casino revenue to secure swap obligations, and, third,

4   the casino revenue does not constitute special revenue, and,

5   accordingly, the swap counterparties do not have a lien on

6   post-petition casino revenue. I think these were the same

7   three issues that Ms. Ball appropriately reserved on. Those

8   are issues to be -- that have been extensively briefed and

9   will be extensively argued and litigated on the 9th, so I

10   would ask your Honor in your ruling today not to foreclose

11   any argument -- or foreclose us -- excuse me -- and others

12   who, frankly, are not here in the courtroom today, including

13   Assured and Ambac this afternoon, to make these arguments on

14   the 9th.

15         THE COURT: Thank you, sir.

16         MR. NEAL: Thank you very much.

17         THE COURT: Mr. Gordon, you rose.

18         MR. GORDON: I did, your Honor, and the vagaries of

19   going second -- Mr. Neal said everything I wanted to say.

20         THE COURT: Thank you.

21         MR. GORDON: But just for the record, we support the

22   same position. It was our understanding that the arguments

23   today were simply as to whether the stay had any effect on

24   Syncora as a third party not standing in the shoes of a swap

25   participant. Those issues are really to be dealt with on the

1    9th.  Thank you, your Honor.

2         THE COURT:  Anybody else before we get back to Ms.

3    Ball?  One more, yes.

4         MS. FLUKER:  Good afternoon, your Honor.  May it

5    please the Court, Vanessa Fluker standing in for the attorney

6    of record, Jerome Goldberg, on behalf of interested party

7    David Sole.  I do concur with Ms. Ball's arguments.  I would

8    just like to highlight a couple points that I think add

9    something to that, and that is, number one, that the gravamen

10   of this whole issue is whether we have a special revenue

11   here, and I think that is significant.  Counsel for Syncora

12   made an argument about the escrow and was very eloquent, but

13   the bottom line is the escrow was created based on the

14   alleged lien that was on the revenue that came into the city

15   via the wagering taxes.  Therefore, it's incumbent to be able

16   to ascertain whether, in fact, this is a special revenue

17   which, pursuant to statute, it obviously is.  If you look not

18   only at the definition under 902, but also if you look at the

19   Michigan statute that allocates the revenue, it specifically

20   articulates purposes that the revenue could be used for,

21   including hiring, training of street patrol officers,

22   neighborhood, downtown economic developments.  It's just a

23   laundry list of things that it could be used for, so to say

24   that it was specifically earmarked for the payment of Syncora

25   as a custodian, I think that is a far stretch, particularly

1    when you have statutes incorporating this.

2            THE COURT:  Not on the list?

3            MS. FLUKER:  That is correct.  They're not on the

4    list, exactly.  Therefore, we believe that obviously the stay

5    is applicable and just based on pure statutory construction

6    in addition to the collateral agreement itself that does not

7    specifically isolate all of these funds that would make it

8    constitute a special revenue as defined by Section 902.  I do

9    concur, as I indicated, with Attorney Ball.

10           THE COURT:  Thank you very much, ma'am.  Ms. Ball.

11           MS. BALL:  Thank you, your Honor.  If I may, I rise

12   for, I think, a very short list of points, but two of them

13   are critical.  I have a picture which I think lays out what

14   Mr. Hackney tried to describe to you.  I have one for Mr.

15   Hackney as well.  May I approach, your Honor?

16           THE COURT:  Yes.

17           MS. BALL:  I think your Honor has appropriately

18   cautioned Syncora regarding the fact that secured creditors

19   remain subject to the automatic stay even if they're the IRS.

20   Your Honor may recall Whiting Pools where the IRS had seized

21   property and similarly claimed it's no longer property of the

22   debtor.  The Supreme Court has told us that's clearly not

23   true, and, in fact, as I mentioned to you earlier, Judge

24   Bennett in his assessment in Jefferson County as to whether

25   or not possession by the receiver removed revenues from the

1  estate of Jefferson County similarly concluded no.

2          But I want to get back to three things that Mr.

3  Hackney said.  On this -- this picture, your Honor, has

4  nothing to do with any agreement other than the collateral

5  agreement, and all the payments that are required to be made

6  are not made under the service contract as alleged by Mr.

7  Hackney.  As a matter of fact, there are payments that

8  casinos every day are directed to pay revenues into that

9  general receipt subaccount.  Monthly under the collateral

10  agreement the payments are made by the city under the

11  collateral agreement into the holdback account.  Once there

12  is a -- once the city makes that payment into the holdback

13  account, every day, not remote in the future, not at the end

14  of the year, every day casino revenues are released in that

15  monthly cycle, so payments -- monthly payments are made by

16  the city under the collateral agreement, never goes near the

17  service corp., the service contract.  It's a contractual

18  obligation under the collateral agreement.  Similarly, under

19  the collateral agreement, the city has the right to obtain a

20  release of its funds from the holdback from the general

21  receipts account every day until the next monthly cycle

22  begins, so the city has a contract right under the collateral

23  agreement to have monies released to it from -- its monies

24  released to it from the general receipts subaccount on a

25  daily basis every day in the month after it has made the

1   payment.

2          THE COURT:  What paragraph of the agreement are you

3   referring to?

4          MS. BALL:  Pardon?

5          THE COURT:  I'm sorry.  What paragraph of the

6   agreement are you --

7          MS. BALL:  Paragraph 5.2 of the collateral

8   agreement, your Honor.  And then the payments to the city

9   from the holdback account are in Section 5.5, so everything

10  works here in a closed circle under this agreement that

11  Syncora is not a party to.

12         The other point which I think goes to the

13  application of special revenues to indebtedness, again,

14  assuming arguendo that the special -- that the casino

15  revenues are special revenues, the only obligation for which

16  the casino revenues stand as collateral is the hedge payable,

17  payments under the swap, very clear in the grant of the

18  security interest under the collateral agreement that that is

19  the scope of the city pledge, and that is in Section 4.1.

20  While I know it has been -- well, I don't know.  It just

21  seems that it's been fundamental to the approach that my

22  colleagues representing Syncora have taken that this really

23  is a complex, interrelated, multiple, multi-party, everybody

24  is in the game situation, your Honor, that world changed, and

25  it changed radically in 2009.  And what changed in 2009?  And

1    I want to get to the Syncora consent.

2           What happened in 2009 was, your Honor may be aware

3    from all the papers, there was a downgrade of the city, but

4    the city wasn't the only one on its heels.  The insurers had

5    been downgraded, and there had been an insurer event under

6    the swap as well, so here everyone was facing the prospect in

7    2009 of a massive default by the city and a massive amount of

8    money due.  The city did the responsible thing.  The banks

9    kind of had everybody.  We were all on our heels, the city,

10   Syncora, FGIC.  Nobody was in tremendous shape in 2009.  I'm

11   sure it's a time that your Honor recalls well, particularly

12   in this part of the country.

13          So what happened in 2009?  We've heard a lot about

14   the banks got collateral.  Well, that's true, and I want to

15   come back to that.  Two major things happened in 2009.  We

16   focused on one.  One was the city gave the swap

17   counterparties collateral in this closed circuit agreement

18   under a document which was not only -- the insurers weren't a

19   party to it, but, your Honor, also the city was very careful.

20   Kudos to them.  In the section that my colleagues are so wont

21   to quote to your Honor, which the rest of us might refer to

22   as a merger clause, you know, Section 14, 14(a), that all

23   these other documents constitute the entire agreement of the

24   parties, it's very interesting because only three places --

25   and I would dare our colleagues to find more -- where the

1    word "insurer" is even mentioned in the collateral agreement,

2    and it's mentioned in the merger section. You know what it

3    says? This section does not apply to any rights and

4    obligations of the insurers. The insurers had nothing to do

5    with the collateral agreement. Why? Because a second change

6    happened in 2009. And, your Honor, it was very obvious

7    because the ordinance of the city in that summer of 2009 had

8    a term sheet, and the term sheet kind of highlighted it very

9    nicely. It laid out in gory detail the fact that the city

10    was now going to pay a higher rate of interest to the banks.

11    It was going to put up collateral. But it also provided for

12    the end of the hedge. It severed the tie between the COP's,

13    which are the certificates of participation, insure the other

14    insurance obligation by Syncora that has nothing to do with

15    the swaps, and Syncora disagrees with that construction, but

16    it, in essence, said to the banks you get a free -- get out

17    of jail free card. You can walk away from these swaps

18    anytime you want, and, you know, your Honor, when do you

19    think a rational financial player is going to walk away from

20    those swaps? When they're going to be out of the money for

21    the banks. So rather than ever have to pay a nickel, the

22    banks got the right to just wash their hands and say, "We

23    walk." Well, that's a radical change, your Honor. That

24    meant that the hedge could never really be a value to the

25    city. It was never going -- to the service corps. Excuse

1    me.  It was never going to be in the money.  That was kind of
2    a radical change, but it was consistent with the city's view
3    that we are pledging this incredible revenue stream, the last
4    big one we have, to the banks, and we want to be able to get
5    it back.  So if those swaps are terminated, we only have to
6    deal with you, and we'll get our -- we'll get our revenue
7    stream back.  But that is an immense change, your Honor, and
8    what's very interesting -- and I have copies with me should
9    your Honor want to walk through this with me.  Mr. Hertzberg,
10   perhaps you can help me.  Mr. Hackney is a hundred percent
11   correct that Syncora was asked to consent to everything that
12   happened in 2009, and I have with me, your Honor, a copy of
13   their waiver and consent.  May I approach?
14             THE COURT:  Yes.
15             MS. BALL:  Your Honor, in the third paragraph on the
16   first page of that waiver and consent --
17             THE COURT:  All right.  I'll let you describe this
18   to me briefly, but I'm going to --
19             MS. BALL:  Your Honor, suffice it to say all the
20   agreements that they consented to were appended to their
21   consent, and, in fact, Syncora did consent not once but four
22   different times because they had four different policies on
23   four different swaps to this amendment that broke the hedge,
24   that broke the --
25             THE COURT:  Okay.  So what does this have to do with

1   whether the stay is applicable --

2           MS. BALL:  Your Honor, it goes to the --

3           THE COURT:  -- in the circumstances that we're

4   talking about here?

5           MS. BALL:  Sorry.  It goes to any debt unpaid on the

6   COP's or the service are so far afield from this pledge and

7   should not be countenance in the context of suggesting that

8   922(d) is applicable here.  It is only payments under the

9   swap, and they have all been timely made.  And all the

10  payments in our contract rights to get the release of

11  revenues are under the collateral agreement, and that's a

12  right that we believe the automatic stay and the stay of

13  Chapter 9 protect.  It is not a very complicated series of

14  many other things.  The city pays every month.  Thereafter

15  every day they get their revenues, their tax revenues.  Your

16  Honor, I think there should be no doubt that it remains

17  property of the city throughout, and I think, as I said

18  earlier, the remedy section of the collateral agreement,

19  which is the only way to get remedies should they trap, also

20  provides that you have to go through all the hoops to get to

21  that property because it's city property, and you only get

22  there by appropriation.  So to suggest that it ever ceases

23  being property of the city is totally contrary to this

24  agreement, which is the agreement by which these revenues are

25  delivered to the custodian.  I can see I've worn out my

1  welcome.  I'm sorry.  Thank you.

2          THE COURT:  Thank you.

3          MS. BALL:  Do you have any questions?

4          MR. HACKNEY:  Just a brief rebuttal.

5          THE COURT:  Yes, sir.

6          MR. HACKNEY:  I will resist the temptation.  I'm not

7  always good at resisting temptations, but I'm not going to

8  argue the way the structure works and our interpretation

9  because it's super technical, and I don't believe it's

10 germane here, so I'm going to just respectfully disagree with

11 Ms. Ball.

12         But I want to address the diagram because you'll

13 remember that in my argument I said that the payments under

14 the service contract which the city pledged definitely

15 secures had all accelerated so that there is a disagreement

16 with us with their contention that the city is current.

17 They're holding this diagram up to say, no, look, the amounts

18 go directly to the counterparties from the holdback account.

19 I only want to tell you that this is a very technical point,

20 but under Section 5.7(a)(1) of the collateral agreement, it

21 says "payments to the counterparties and the custodian from

22 the holdback account," and it says, "The custodian shall pay

23 to the counterparties from the holdback account at the end of

24 each quarterly period" -- so these are the three months that

25 have now stacked up -- an amount equal to all hedge periodic

1   payables, capital HPP.  Hedge periodic payables are defined

2   in the service contract as a periodic amount owing by the

3   corporation under a stated hedge, so the only reason I'm

4   making this hypertechnical point is to say that to the extent

5   these payments are made to the counterparties, they are made

6   for the ultimate benefit of the service corporation, which

7   is, of course, the party to the swap.

8           The only other limited point I wanted to make, your

9   Honor, is that in Section 14.14 where Ms. Ball said there's

10  this sort of curious reference to Syncora, it says words to

11  the effect of Syncora's rights and obligations shall be

12  unaffected by -- this section does not apply to any rights or

13  obligations of the capital line insurers.  This is the

14  integration provision of the collateral agreement.

15  Obviously, a quick reminder that the swap itself references

16  the collateral agreement, the services contracts, and the

17  contract administration agreements as credit support

18  documents, so there's integration on that end as well, but

19  more importantly, I think all this is doing is noting that

20  Syncora's insurance obligation contracts are not referenced

21  in the various documents that are part of the integration,

22  and we are not claiming that we're coming through one of our

23  insurance documents and exercising direct rights.  We are

24  claiming that we have enforcement and consent and direction

25  rights as third-party beneficiaries explicitly in the

1  agreements.  That's all I think that provision is designed to
2  do.  Thank you for your patience today, your Honor.
3          THE COURT:  All right.  The Court will take this
4  under advisement and either written -- either issue a written
5  opinion before next Wednesday or give it to you on the record
6  at that time when we reconvene on the discovery and
7  disclosure issue.
8          MR. HACKNEY:  Your Honor, if I could say --
9          THE COURT:  One thing -- sir.
10         MR. HACKNEY:  I'm sorry.  Just to the extent there
11 was any failing in my presentation today to respond to some
12 of your questions, I wanted you to know that we would be
13 happy to submit additional pleadings.  I know that you get a
14 lot of pleadings every day, but --
15         THE COURT:  Okay.
16         MR. HACKNEY:  -- there were some questions you posed
17 that if you'd like more, we'd be happy to prepare --
18         THE COURT:  In the meantime, the Court will maintain
19 the status quo, whatever that is.  At some point, in light of
20 the city's agreement to dissolve the TRO perhaps after the
21 court rules on the stay motion, the two of you can prepare an
22 order and submit it to the Court that accomplishes that.
23         There is one more matter that I want to discuss with
24 certain parties, and I'm looking at the -- what?
25         MS. CALTON:  I'm sorry.  On the order dissolving the

1  injunction, could they circulate it to the casino so we can

2  make sure the language protects us for making payments in the

3  interim and not be at risk to have to pay them a second time?

4          THE COURT:  Any objection to that?

5          MR. SHUMAKER:  No, your Honor.

6          MR. HACKNEY:  No.

7          MS. CALTON:  Thank you.

8          THE COURT:  You're welcome.  Okay.  So I want to

9  have a conversation with certain attorneys but not with

10  everyone, so I need a show of hands.  Who here represents

11  parties who are signatories to any of the agreements that

12  have been discussed here today?  Okay.  If your hand is not

13  raised, I'm going to ask you to leave the courtroom at this

14  time.  That includes members of the press and the public.

15  I'm going to ask you to leave the courtroom at this time if

16  you do not represent a party to one of these agreements.

17  Turn it off.  Turn it off.  We're going to turn off CourtCall

18  and the overflow courtroom communication as well.

19          (Proceedings concluded at 4:25 p.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


        I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett            August 29, 2013
_____        _____
Lois Garrett