
**detroit**
**police**
Ralph L. Godbee Jr.
Chief of Police

D.P.D. 568 (rev. 9/97)

**INTER-OFFICE MEMORANDUM**
**FORCE INVESTIGATION**

Date

**EXHIBIT 6**

November 2, 2010

To:      Commander Brian R. Stair, Internal Controls (Through Channels)

Subject:    **FINAL ADMINSTRATIVE REVIEW, FORCE INVESTIGATION CASE NUMBER 09-056, REGARDING THE FATAL SHOOTING OF OFF DUTY POLICE OFFICER PATRICIA WILLIAMS, BADGE 3140, ASSIGNED TO THE SIXTH PRECINCT, AND SUICIDE COMMITTED BY OFF DUTY POLICE OFFICER EDWARD WILLIAMS, BADGE 3294, ASSIGNED TO HOMICIDE**

From:     Sergeant Jeremy A. James, Force Investigation

### NARRATIVE

Police Officers Edward Williams, badge 3194, assigned to Homicide, and Patricia Williams, badge 3294, assigned to the Sixth Precinct, both deceased, were a married couple who resided together at 3543 Wall St., Canton, MI. The officers had been having marital problems for approximately two months; whereas, Officer P. Williams had a dating relationship with Police Officer Clifford Lee, badge 587, assigned to the Sixth Precinct.

On Sunday, September 20, 2009, at approximately 12:02 A.M., off duty Officers P. Williams and Lee went to the Canton Police Department (CPD) and requested that a scout car accompany them to her residence to assist them in removing personal items from the home. She alleged to Officer Adam Falk, badge 2897, of the CPD, that she was at her residence earlier, where Officer E. Williams pushed her to the ground, causing her to suffer a laceration to her cheek. Officer Falk informed her of their duty to submit a domestic violence report, and she then refused to give her name or Officer E. Williams's information, and left the police station with Officer Lee.

On September 20, 2009, at approximately 9:30 A.M., Officer P. Williams and her mother, identified as Ms. Deborah Ryan, W/F/54, of 41485 Greenwood, Canton, MI, went to Officer P. Williams's residence, where they were met unexpectedly by Officer E. Williams. Ms. Ryan alleged Officer E. Williams was intoxicated and waving a handgun in the air. She alleged during the confrontation, Officer E. Williams held Officer P. Williams against her will and would not allow her to leave. After several minutes, Officer P. Williams and Ms. Ryan were allowed to leave. Ms. Ryan called 911, and then she and Officer P. Williams met with CPD officers near the residence. Officer Lee responded to the area and met with Officer P. Williams and Ms. Ryan as they spoke to the officers. Officer P. Williams gave an incomplete story on what events transpired, because she did not want to jeopardize Officer E. Williams's career. After gathering the initial information, CPD officers responded to the residence; however, Officer E. Williams had left the residence. A hand-written note was confiscated by CPD officers, which stated:

> **"I, Edward G. Williams II of sound mind. (Little pissed off though), hereby leave all worldy possesion to my mother, Wanda Williams. That is to include all life insurance policies and bank accounts"**-signed September 20, 2009 @ 6:15 A.M.

> (The texts transcribed above are direct quotes with grammatical errors uncorrected)

On September 20, 2009, Lieutenant Mark Schultz, badge 1077, of CPD, had several telephone conversations with Sergeant Michael Martel, badge S-79, assigned to Homicide, regarding the incidents between the officers. Sergeant Martel advised him to send the reports to Internal Affairs (IA), via facsimile. Sergeant Martel then made notifications to Lieutenant Dwayne Blackmon, badge L-174, assigned to Homicide. During the course of the day, both CPD and homicide members attempted to contact Officer E. Williams without success. Lieutenant Schultz placed Officer E. Williams into the Law Enforcement Information Network (LEIN) as an "Endangered Missing" due to the preceding incidents. He also advised Sergeant Martell that Officer E. Williams needed to respond to either agency to be seen before being removed from LEIN.

On September 20, 2009, at approximately 6:00 P.M., Lieutenant Schultz talked to Officer E. Williams, via cellular phone, by utilizing a telephone number provided to him by Sergeant Martel. He stated that Officer E. Williams said he was fine and he had written the note in case Officer P. Williams did something to harm him.

On September 20, 2009, at approximately 6:35 P.M., Officer E. Williams responded to Homicide, and personally spoke to Sergeant Barbara Kozloff, badge S-6, assigned to Homicide, who deemed his condition to be normal, given the marital stress he was under. She further offered the help of Employee Assistance, but he refused. She contacted Lieutenant Schultz and advised him that she personally saw him in person and advised him of their conversation, and he removed the missing status from LEIN. Sergeant Kozloff advised Lieutenant Blackmon of the events that had transpired.

On Monday, September 21, 2009, at approximately 9:00 P.M., Officer E. Williams arrived at Ms. Ryan's home unannounced. Officer E. Williams apologized to her and asked several questions about Officer P. Williams. Ms. Ryan told him to leave and he left without incident. After meeting with Ms. Ryan, he and Officer P. Williams had a telephone conversation with Officer E. Williams and agreed to meet on the morning of September 22, 2009, at the Canton Library.

On Tuesday, September 22, 2009, at approximately 8:30 A.M., Police Officer Pat Sullivan, badge 1152, of the CPD, sent the police reports to DPD IA, via facsimile, and they were received by Sergeant Dietrich Lever, badge S-177, assigned to IA. The reports were headed "Civil Matter" and "Suspicious Situation." The first report titled "Civil Matter" was completed by Officer Falk, who documented the conversation that transpired when Officers P. Williams and Lee first responded to the CPD station, on September 20, 2009, at approximately 12:02 A.M. Officer Anthony Resst, badge 04082, of the CPD, who outlined the search of Officer E. Williams and Officer P. Williams's residence, completed the second report titled "Suspicious Situation". The conversation, which took place between the CPD officers and Officer P. Williams and Ms. Ryan, was not documented on the report. Officer Resst did document Officer P. Williams's reaction to the note left behind by Officer E. Williams, stating she believed he would not hurt himself and only wanted a reaction from her.

On September 22, 2009, at approximately 8:00-9:00 A.M., Officer E. Williams and P. Williams met in the parking lot of the Canton Library, 1200 South Canton Center Road, Canton, MI. The library parking lot is located approximately 100 feet south of the Canton Police Station. Officer E. Williams arrived in his privately owned, black, 2008, Dodge Charger, 09/MI/9GFA53. Officer P. Williams arrived in her privately owned, silver, 2007, BMW, 09/MI/4BQ10. The vehicles were parked next to each other. Officers E. Williams and P. Williams walked to a bench, which was adjacent to the parking lot, to discuss their marital issues.

At approximately 9:15 A.M., both returned to the passenger side of Officer E. Williams's vehicle, where he produced a blue-steel, short-barrel, .38 caliber, Smith & Wesson revolver, 5-shot, serial number 773524, and fired within contact range at Officer P. Williams, striking her in the right hand. Officer P. Williams retreated eastbound through the lot, and he fired twice more. She was struck with a round while in front of the minivan, causing her to fall to the ground. She stood up and attempted to flee, but was shot again while on the passenger side of a tan, 1999, Mercury Villager minivan, 09/MI/BHL1469, which was parked approximately fifteen feet east of Officer E. Williams's Charger. Officer P. Williams fell to the ground. Officer E. Williams approached, stood over her, and fired a fourth round which struck her in the back of the head and exited her left eye. Officer E. Williams stepped back several feet and discharged a self-inflicted gunshot to the right side of his head, causing him to fall to the ground, near the minivan. It was discovered that Officer P. Williams suffered from a gunshot wound, which entered her back and exited her neck and a grazing wound to her upper right arm. Officer E. Williams fired a total of five rounds.

Officer E. Williams was unresponsive, but breathing shallowly, and was conveyed by A034, from the Canton Fire Department, to St. Joseph's Hospital, where Dr. Robert Dunne listed him in critical condition, on chart number 036781292. Officer E. Williams was kept on life-support for organ donation and died on September 22, 2009, at approximately 1:52 P.M.

Officer P. Williams was unresponsive at the scene and did not show signs of life. She was conveyed by Medic A032, of the Canton Fire Department, who transported her to Ryanwood Annapolis Hospital, where she was pronounced dead on arrival, by Dr. Sarah Casado, and listed on chart number 0871465.

Police Officers Michael Kowalski, badge 1337, and Derek Torolski, badge 1235, both of the CPD, responded to the location and performed the duties of evidence collection and documentation.

### FORCE INVESTIGATION

On September 22, 2009, at approximately 9:30 A.M., Sergeants Michael Turner, badge S-86, and Tawaina Craig, badge S-759, assigned to Force Investigation, were notified by Lieutenant Whitney Walton, badge L-18, assigned to IA, to respond and conduct a preliminary investigation. Lieutenant Anthony Topp, badge L-10, assigned to Force Investigation also responded to the location.

Lieutenant Blackmon, Sergeants Glynn Davis, badge S-578, and Kenneth Gardner, badge S-1073, and Police Officer Scott Shea, badge 4601, all assigned to Homicide, responded to the location to assist with the preliminary investigation.

On September 24, 2009, writer was assigned this investigation.

### MEMBER(S) INVOLVED

1.   **Police Officer Edward Williams**      **Badge 3294**

| | |
|---|---|
| Pension: | 233121 |
| Duty & Uniform Status: | Off Duty |
| Assignment: | Homicide |
| Appointed: | January 4, 1994 |
| OC Spray Equipped: | No |
| Qualification Date | September 21, 2009 |
| Combat Date/Score | September 21, 2009/232 |
| Previous Shootings: | None |
| Body Armor Equipped: | No |
| Union Representative: | No |

|                        |                   |
|------------------------|-------------------|
| Attorney Involvement:  | None              |
| Duty Status:           | Full duty         |

2.  **Police Officer Patricia Williams        Badge 3140**
    Pension:                        233829
    Duty & Uniform Status:          Off Duty
    Assignment:                     Sixth Precinct
    Appointed:                      November 20, 1995
    OC Spray Equipped:              No
    Body Armor Equipped:            No
    Union Representative:           None
    Attorney Involvement:           None
    Duty Status:                    Full duty

## DESCRIPTION OF SCENE

The scene was located in the front parking lot of the Canton Public Library, located at 1200 S. Canton Center, Canton, MI. It was outdoors, during sunny daylight hours. There was a silver, BMW, parked on the east side of the lot facing west. One parking space to the north was a black, Dodge Charger, facing east. The front passenger door of the Dodge was open. There was suspected blood on the passenger side window. Approximately twenty five feet in front of the Dodge Charger was a tan, Mercury Villager minivan, parked facing west. The minivan was parked approximately one foot from a planting bed, containing trees and mulch, surrounded by a curb.

On the ground between the minivan and the curb was a trail of blood approximately three feet long which extended from the ground up onto the planting bed. On the ground under the front passenger door of the minivan was a set of keys. In front of the minivan, just northeast approximately ten feet was a large pool of blood, .38 caliber handgun, cell phone and a set of keys. Officers E. Williams and P. Williams had been transported to the hospital prior to the alert team's arrival.

## INVOLVED OFFICER STATEMENT(S)

**Police Officer Edward Williams, badge 3294, assigned to Homicide**

Deceased

**Police Officer Patricia Williams, badge 3140, assigned to the Sixth Precinct**

Deceased

### WITNESSES OFFICERS

None

### ADDITIONAL OFFICERS

#### Police Officer Adam Falk, badge 2897, of the CPD

The following is a synopsis of the Crisnet report, titled "Civil Matter," which was prepared by Officer Falk, on September 20, 2009:

Officer Falk stated on September 20, 2009, at approximately 12:30 A.M., he was assigned to the report desk when Officer P. Williams and Officer Lee entered the station regarding a domestic disturbance between her and her husband Officer E. Williams that occurred on September 19, 2009, at approximately 11:30 P.M. He stated Officer P. Williams advised him that she and Officer E. Williams have been separated for two months, but he entered the residence un-announced and heard her on the phone with her new boyfriend. Officer Falk stated that Officer P. Williams stated she attempted to leave the location, but Officer E. Williams pushed her to the ground, causing her to strike the right side of her face, causing a small laceration. He indicated that Officer P. Williams advised him that she was able to leave the scene without further problems and refused medical treatment. He added Officer P. Williams requested a scout car to accompany her to her residence so she could remove personal items.

Officer Falk stated he asked her to fill out a witness statement and she refused, stating she did not want him to be fired because he was also a Detroit Police Officer. He stated he advised her that by law, he was required to file a domestic violence report based on the information she provided. He reported that she replied she would not give her name, nor Officer E. Williams name, refused any type of service, and they both left the station. Officer Falk produced a report regarding the conversation.

#### Police Officer Anthony Resst, badge 04082, CPD

The following is a synopsis of a Crisnet report, titled "Suspicious Situation," which was prepared by Officer Resst, on September 20, 2009.

Officer Resst stated on September 20, 2009, at 5:03 PM, he responded to 3543 Wall St., the residence of Detroit Police Officers P. Williams and E. Williams. Officer Resst said a third party, identified as Ms. Ryan, called 911. Officer Resst stated Ms. Ryan alleged that Officer E. Williams had a weapon and was possibly assaulting Officer P. Williams. While en route to the location, he

stated Sergeant Smedley, no further information, performed a traffic stop of a silver BMW and identified the occupants as Officer P. Williams and Officer Lee.

Officer Resst reported that Officer P. Williams relayed her garage code through Sergeant Smedley and gave him consent to enter her home. He stated he heard noises emanating from within the residence and believed it was someone whimpering. He indicated he searched the residence and found a dog, caged inside of the kitchen that was whimpering. He added no one else was within the residence. Officer Resst stated while searching upstairs, he observed a note dated, September 20, 2009, with a timestamp of 6:15 P.M. He indicated he confiscated the note and asked Officer P. Williams about it. He noted she responded by saying he wouldn't hurt himself and that Officer E. Williams was attempting to agitate her.

Officer Resst stated he spoke to Ms. Ryan who stated she was with Officer P. Williams earlier and entered her residence. He stated that she said Officer E. Williams was within the residence, holding a handgun; however, he did not point the handgun at anyone, nor used it in a threatening or intimidating manner. He said she continued to state he didn't do anything wrong.

Officer Resst placed the letter on evidence tag PT091998.

### Lieutenant Mark Schultz, badge 1077, of CPD

The following is of a synopsis of a Crisnet report prepared by Lieutenant Schulz on September 20, 2009:

Lieutenant Schultz reported that on September 20, 2009, at approximately 9:30 A.M., he and Officer Brian Deyoung, badge 1340, of the CPD, responded to 3543 Wall Street, in Canton, Michigan, to search for Officer E. Williams. He indicated that they did not locate Officer E. Williams, but Officer Deyoung discovered the note produced by Officer E. Williams, which stated "I, Edward G. Williams II of sound mind. (Little pissed off though), hereby leave all my worldly possessions to my mother, Wanda Williams. That is to include all life insurance policies and bank accounts."

Lieutenant Schultz stated that on September 20, 2009, at approximately 10:00 A.M., he contacted Sergeant Michael Martel, badge S-79, assigned to Homicide, and advised him that Officer P. Williams had entered the CPD station to initially file a domestic violence report on September 20, 2009, in regards to the incident that occurred at 3543 Wall a few hours earlier. He also advised him of the handwritten note. He advised him that due to the nature of the incident, Officer E. Williams was being placed into LEIN as a "Missing, Critical." He reported he was advised by Sergeant Martel to fax any pertinent paperwork to

**DefResp1stDocs-0009**

DPD IA and added Sergeant Martel advised him that another detective from Homicide was talking to Officer E. Williams, and he sounded "fine."

Lieutenant Schultz stated Sergeant Martel contacted him on that same date, at approximately 6:00 P.M., and gave him Officer E. Williams' cellular phone number. He stated he made contact with Officer E. Williams who advised that him that he was "o.k." and explained that he wrote the note in case Officer P. Williams did something to hurt him. He indicated he advised Officer E. Williams that he needed to report to his supervisors at DPD in order to be removed from LEIN. He noted Officer E. Williams responded that he would report immediately.

Lieutenant Schultz stated on that same date, at approximately 6:35 P.M., he was contacted by Sergeant Kozloff who stated Officer E. Williams had reported to Homicide, and they had a personal discussion. He stated she informed him that in her opinion that he was "mentally fine." He indicated that based on this information, he removed Officer E. Williams' missing status from LEIN.

On September 23, 2009, Lieutenant Schultz submitted a supplemental report which mirrored the report he submitted on September 20, 2009. He indicated Officer E. Williams was entered into LEIN as a "missing person." In addition, he stated Sergeant Kozloff stated she offered Officer E. Williams DPD's version of an Employee Assistance Program.

**Police Officer Kamin Bode, badge 41, of the Highland Park Police Department**

The following is a synopsis of an audio-recorded interview conducted on September 22, 2009, at approximately 11:55 A.M., with writer, at Homicide:

Officer Bode stated she and Officer P. Williams have been friends for approximately ten years and use to routinely work together while formerly assigned to the Tenth Precinct. She said Officers E. Williams and P. Williams had an intimate relationship for several years prior to their marriage. She indicated Officer P. Williams has complained of being assaulted by Officer E. Williams before, but Officer P. Williams didn't want to report it and jeopardize his employment. She indicated that she has overheard arguments between the both of them and described them as loud with lots of profanity. She added that Officers P. Williams and E. Williams had dealt with a prior matter of infidelity involving Officer E. Williams in 2008.

Officer Bode stated on September 19, 2009, at approximately 12:30 P.M., Officer P. Williams called her and informed her Officer E. Williams had discovered she was having an affair with a subject described as "Officer Cliff"

(Officer Lee). She said Officer P. Williams advised her that she and Officer E. Williams got into a fight and he choked her. She indicated Officer P. Williams left the house with her son and met at her house, adding she observed a scratch on her face. She indicated Officer P. Williams spent the night at Officer Lee's house.

Officer Bode stated on September 20, 2009, at approximately 12:30 P.M., she spoke to Officer P. Williams who stated CPD officers responded her house. She said she drove to Officer P. Williams' house and spoke to her. She said she was told by Officer P. Williams that she and her mother, Mrs. Ryan, entered the house to gather some belongings and Officer E. Williams was sitting on the kitchen countertop. She stated Officer P. Williams said he had a gun in his lap, lifted his pant leg and stated, "Yeah, I got another mother-fucking gun, too." She stated Officer P. Williams said she and Mrs. Ryan exited through the garage and called the CPD. Officer Bode stated after Officer P. Williams told her what had happened, she arrived at the home and they both entered the location and gathered some belongings. She reported while at the location, CPD found a handwritten letter produced by Officer E. Williams, which stated he left all property to his mother, which the officers confiscated. She added after they gathered some items, they left the location.

Officer Bode stated she called Officer P. Williams the evening of September 20, 2009, and was told she was staying at Officer Lee's residence.

Officer Bode stated she called Officer P. Williams the morning of September 21, 2009, and was told that she and Officer E. Williams discussed selling the house. She said they also talked at approximately 4:00 P.M. and discussed sharing an apartment together in the future.

Officer Bode stated she called Officer P. Williams at approximately 4:30 P.M., on September 21, 2009, but the connection was poor and was then disconnected. She stated she attempted to call and text message Officer P. Williams the evening of September 21, 2009, but she did not get a response.

Officer Bode stated she attempted to call Officer P. Williams the morning of September 22, 2009, but she did not get a response.

Officer Bode stated she did not know of any financial, chemical or alcohol abuse, gambling abuse, or any other stressors that may have been an issue with Officer E. Williams. She added Officer E. Williams had a best friend named "Paul" described as a black male, who drove a black, newer model sport utility vehicle. She provided writer with his last known cellular number.

### Police Officer Shawn Davidson, badge 3854, assigned to the Eighth Precinct

The following is a synopsis of an audio-recorded interview conducted on September 22, 2009, at approximately 12:45 P.M., with writer, while at Homicide:

Officer Davidson stated he received a telephone call on September 22, 2009, at approximately 3:00 A.M., from Officer E. Williams who asked if he knew someone by the name of "Cliff", who also worked at the Northwestern District. Officer Davidson stated he responded that he did, but he didn't know him personally. He indicated Officer E. Williams said he cheated on Officer P. Williams and now she cheated on him, so they were even, and then added he needed to get a divorce. He approximated his telephone conversation to last approximately 5-10 minutes. He denied Officer E. Williams making threats of harm toward Officer P. Williams.

Officer Davidson stated he called Officer P. Williams, who he has been friends with for approximately fourteen years and advised her of the telephone conversation he had with Officer E. Williams. He stated she said it was bound to happen and thanked him for the phone call. He added she did not seem concerned.

Officer Davidson stated he does not know of any prior domestic violence issues and added he did not believe Officer E. Williams had a violent demeanor.

### Police Officer Clifford Lee, badge 587, formerly assigned to the NWD, currently assigned to Eighth Precinct

The following is a synopsis of a written statement produced by Officer Lee, on September 22, 2009, at approximately 1:30 P.M., which was completed for CPD, and the audio-recorded Garrity statements made by Officer Lee, to writer, on March 12, 2009, at 660 Woodward. Detroit Police Officers Association Attorney John Goldpaugh was present:

Officer Lee stated he and Officer P. Williams started dating approximately one and a half months ago (July, 2009), when she was separated from Officer E. Williams. He stated Officer E. Williams attempted to reconcile with her over an infidelity issue which had occurred earlier in their relationship.

Office Lee stated on September 19, 2009, he spoke to Officer P. Williams, via cellular phone, who told him her and her son, Kevin Swoope, W/M/10, was going to bed. He stated at approximately 11:00 P.M., she called him, via home telephone, and told him Officer E. Williams had come to her house, taken her cellular phone and threw her keys to her vehicle into the bushes. He indicated

her and her son left the residence and met him somewhere on Geddes Road. Officer Lee stated they dropped her son off at Ms. Ryan's house and drove back to her residence to see if Officer E. Williams was still there. When they arrived they observed a black Cadillac, which she believed, was owned by Mr. Armstrong, parked in the driveway. He added they did not stop and continued onward. He reported he asked her repeatedly if Officer E. Williams hit her and she replied, "No, he didn't hit me." He advised her that something didn't feel right and then convinced her to file a report at CPD. He stated they drove to the CPD and talked to the officer on the desk; however, she began to give CPD initial information, but stopped. Officer Lee stated Officer P. Williams did not want Officer E. Williams to get fired and just wanted him to leave her alone. He added she was also concerned that Officer E. Williams was well connected and was concerned about her future with the department, as well. He indicated they left CPD station and spent the night at his house in Westland.

Officer Lee stated on September 20, 2009, in the morning, Officer P. Williams needed to return to her residence to retrieve hockey equipment for her son and insisted that Officer Lee not to go to the residence with her. He stated they agreed Ms. Ryan would accompany her and if they observed Officer E. Williams vehicle in the garage, they would leave. He said although he didn't go to the house, he drove around the area in case something happened at the residence. He indicated approximately ten minutes passed and Ms. Ryan called his cellular phone, and frantically said Officer E. Williams had Officer P. Williams upstairs. He reported he drove towards her house and called 911. Officer Lee stated he relayed the available information to the dispatcher and a description of Officer E. Williams. He added that while he was talking to the dispatcher, Officer P. Williams had left the residence and called him. He stated he met with Officer P. Williams and Ms. Ryan on the side of Geddes Road, along with two CPD officers. He reported he overheard her state that Officer E. Williams had a gun in his hand and on his ankle, that he had been drinking and that he wanted to talk. He added during this conversation, Officer E. Williams had given Officer P. Williams back her cellular telephone. Officer Lee stated she lied to Officer E. Williams and stated she would retrieve something out of her car, and then fled the location. He denied overhearing either Officer P. Williams or Ms. Ryan state they were assaulted while talking to the CPD officers. He said they, along with the CPD officers responded to her residence, along with several other officers. He indicated the officers searched the house and discovered a note left by Officer E. Williams.

Officer Lee stated after the CPD officers left the location, they both went to Officer P. Williams' son's hockey game and that Officer E. Williams was texting her cellular phone repeatedly. He said Officer P. Williams spent the night at Ms. Ryan's house and told her son about the impending divorce. He indicated she told him she attempted to file for divorce after the cruise Officers E. Williams and

P. Williams had taken during the summer, however, they were married in Mexico and her divorce attorney could not find the appropriate paperwork.

Officer Lee stated on September 21, 2009, Officer P. Williams had talked with members of the CPD, who advised her they had contacted his employer, who relayed the order to him not to make contact with Officer P. Williams. He stated Officer E. Williams called and texted her cellular phone the entire day, attempting to apologize to Officer P. Williams. He added Officer E. Williams also inquired as to whom she was with and what location they were at. Officer Lee stated they at one point in the day, he, Officer P. Williams and her son went to Lucky's, in Novi, and he believed Officer E. Williams was attempting to find them together. He indicated Officer E. Williams would go from angry, to sad, to calm, to angry, and continued in circles. He approximated that Officer E. Williams attempted to contact Officer P. Williams by texting and calling hundreds of times. Officer Lee stated they left Lucky's and dropped her son off with his biological father, in a parking lot on Ann Arbor Trail. Officer Lee stated Officer P. Williams eventually talked to Officer E. Williams on the phone for a while and stated Officer E. Williams told her he wanted closure. He said she didn't know what to do and he convinced her not to meet him in person. He indicated Officer E. Williams called his personal cellular phone, he answered it and they got into a verbal argument. He added Officer E. Williams did not know who he was at the time and that he believed he was an ex-boyfriend

Officer Lee stated on September 22, 2009, she told him she needed to go to her mother's house to shower and change clothes. He stated he didn't believe her and foresaw her meeting Officer E. Williams in person. He indicated she told him that she was tired of the drama and believed if she talked to him once more, he'd leave her alone. He reported that they agreed that she would first respond to the CPD and tell them where they were meeting. Officer Lee stated he talked to her, via cellular phone and she stated she was walking into the CPD to let them know where they were meeting. He stated once off the phone with Officer P. Williams, he called the CPD and inquired if they saw anyone matching either officer's description, which they replied that they hadn't. He indicated he called her again and she told him that she and Officer E. Williams were talking and everything appeared to be fine, adding she was leaving in approximately ten minutes. He reported after approximately 20 minutes, he sent her several text messages; however, he did not receive a response. He stated he called CPD again and was advised of the shooting.

### Sergeant David Schreiner, badge 1337, of the CPD

The following is a synopsis of the Crisnet report, which was prepared by Sergeant Schreiner, on October 20, 2009:

Sergeant Schreiner stated he responded to the incident location and observed a female on the ground that had suffered from multiple gunshot wounds to the body and head, and observed a male who was lying in the parking lot with a gunshot wound to his head. He indicated he ordered a perimeter around the location and assigned the responding detectives their duties.

### Police Officer Patrick Sullivan, badge 1152, of the CPD

The following is a synopsis of the Crisnet report prepared by Officer Sullivan, on September 22, 2009:

Officer Sullivan documented two separate incidents on one report. Officer Sullivan first noted that on September 22, 2009, at approximately 8:30 A.M., he faxed reports to Sergeant Dietrich Lever, badge S-177, assigned to Internal Affairs, which documented what events had occurred the past couple of days between Officer E. Williams and Officer P. Williams.

Officer Sullivan then documented on September 22, 2009, at approximately 9:16 A.M., approximately 45 minutes later, he responded to a "Shooting at the Library." He stated he arrived approximately one minute after the run was dispatched and upon arrival, observed Officer E. Williams lying on the ground, with his head pointed to the north and his feet pointed to the south. He said he observed a .38 caliber revolver with wood handgrips lying near Officer E. Williams. He indicated he was unable to feel a pulse, but did observe Officer E. Williams breathing. He reported Officer P. Williams was lying mostly on her back, with her head pointed to the west and her feet pointed to the east. Officer Sullivan stated he observed a bullet hole in her face and didn't observe any signs of life. He stated Officer E. Williams was immediately transported to the hospital and Officer P. Williams was connected to a heart monitor.

Officer Sullivan stated as the investigation was underway, he heard screeching tires, and was met by Officer Lee, who was visibly upset and stated he was Officer P. Williams' current boyfriend.

### Police Officer Michael Kowalski, badge 1337, of the CPD

The following is a synopsis of the Crisnet report, which was prepared by Officer Kowalski, on September 22, 2009:

Officer Kowalski stated he responded to the incident location and obtained photographs. He stated Westland Tow towed both vehicles from the scene. He noted several items were left within the vehicles, specifically a bottle of Kettle One vodka, which was found within Officer E. Williams's vehicle.

### Police Officer Derek Torolski, badge 1235, of the CPD

The following is a synopsis of the Crisnet report, which was prepared by Officer Torolski, on September 22, 2009:

Officer Torolski stated he responded to the location and observed a black male lying on the ground, with a gun, cellular phone and a set of keys next to him. He said he observed a white female next to the minivan, with a set of keys underneath the vehicle. He added both had large pools of blood around them. He indicated he marked evidence with tags and assisted Officer Kowalski with recording and recovering evidence.

### Police Officer Michael Tulip, badge 873, of the CPD

The following is a synopsis of the Crisnet report, which was prepared by Officer Tulip, on September 20, 2009:

Officer Tulip stated when he arrived at the library parking lot he observed a male lying on the ground with blood coming from his head and observed a female lying on the ground next to a vehicle, who was also "bloody." He indicated he was ordered to follow the EMS truck which transported Officer P. Williams to the hospital, where he remained until her body was transported to the morgue.

The following is a synopsis of the Crisnet report, which was prepared by Officer Tulip, on September 22, 2009:

Officer Tulip stated he obtained search warrants for both officers' vehicles, as well as, the minivan. He stated he placed several items on evidence, which was listed on his partner's report, that being Officer Brandon Hayford, badge 3394, of the CPD.

Officer Tulip stated he obtained a search warrant for 3543 Wall, which was executed on September 22, 2009. He stated in the master bedroom he recovered three books regarding the topics of infidelity and sex addiction. He indicated two handguns were recovered, as well. He reported observing a broken picture frame within a garbage can in the garage, along with several torn wedding photographs.

### Police Officer Brandon Hayford, badge 3394, of the CPD

The following is a synopsis of the Crisnet report, which was prepared by Officer Hayford, on September 22, 2009:

Officer Hayford's report mirrored the report that was submitted by Officer Tulip, as it related to serving the search warrant at 3543 Wall and obtaining evidence (See Evidence and Firearms).

### Police Officer Justin Amaimo, badge 3275, of the CPD

The following is a synopsis of the Crisnet report, which was prepared by Officer Amaimo, on September 22, 2009:

Officer Amaimo stated he was ordered to follow the EMS truck which transported Officer E. Williams to the hospital, where he remained until he expired at approximately 1:52 P.M.

### Detective Justin Arminiak, badge 3437, of the CPD

The following is a synopsis of the Crisnet report, which was prepared by Detective Arminiak, on September 29, 2009:

Detective Arminiak stated he attended the autopsy of Officer E. Williams, performed by Dr. Bader Cassin. He noted there was a gunshot wound to the right side of his skull and added there was an exit wound on the left side of the skull. He stated Dr. Cassin stated it was a contact-range gunshot wound.

### Detective Tim Wright, badge 840, of the CPD

The following is a synopsis of the Crisnet report, which was prepared by Detective Wright, on September 23, 2009:

Detective Wright stated he responded to the library and observed Officer P. Williams lying on the ground and noted that Officer E. Williams had already been transported. He stated he assisted with locating witnesses in the

immediate area. He stated he responded to Annapolis Hospital and placed Officer P. Williams' clothing and cellular phone on evidence. He said he responded to St. Joseph Hospital and placed Officer E. Williams clothing and cellular phone on evidence.

Detective Wright stated on September 24, 2009, he attended the autopsy of Officer P. Williams, performed by Dr. Bashiniski. She noted there was a contact, gunshot wound to her left hand, a gunshot wound which entered her back and exited her upper chest, and a gunshot wound to the rear, right side of her skull which exited her through the left eye.

### Police Officer Mike Wells, badge 1093, of the CPD

The following is a synopsis of the Crisnet report, which was prepared by Officer Wells, on October 19, 2009:

Officer Wells stated he photographed several text messages from both officers' cellular phones (See Electronic Transmissions). He noted he attempted to determine who she was talking to, as witnesses reported, while talking to Officer E. Williams the morning of the incident. Officer P. Williams's cellular phone showed she had received several missed phone calls from Officer Lee.

Officer Wells stated he observed on Officer E. Williams's cellular phone that both officers had exchanged several text messages on September 22, 2009, around midnight. He stated they discussed meeting on that same date and added Officer P. Williams had text that she was concerned about her safety and also text "no guns!" He indicated the last telephone call was between the officers, on September 22, 2009, at approximately 8:55 A.M., prior to the incident.

### Police Officer John Wallace, badge 3151, of the CPD

The following is a synopsis of the Crisnet report, which was prepared by Officer Wallace, on September 22, 2009:

Officer Kowalski stated he responded to the incident location and observed a male and female on the ground who had suffered from multiple gunshot wounds.

### Police Officer Matthew Jenkinson, badge 1121, of the CPD

The following is a synopsis of the Crisnet report, which was prepared by Officer Jenkinson, on September 22, 2009:

Officer Kowalski stated he responded to the incident location and observed a male and female on the ground who had suffered from multiple gunshot wounds. He indicated he assisted in securing the scene.

### Police Officer Jacob Krogmeier, badge 3443, of the CPD

The following is a synopsis of the Crisnet report, which was prepared by Officer Krogmeier, on September 22, 2009:

Officer Krogmeier stated he responded to the incident location and observed a male and female on the ground who had suffered from multiple gunshot wounds. He indicated he responded to the library and assisted in identifying witnesses.

### Police Officer Andrew Kelley, badge 3678, of the CPD

The following is a synopsis of the Crisnet report, which was prepared by Officer Kelley, on September 22, 2009:

Officer Kelley stated he responded to the incident location and was assigned scene security and assisted in clearing the immediate perimeter.

### Sergeant Michael Martel, badge S-79, assigned to Homicide

The following is a synopsis of the audio-recorded Garrity statements made by Sergeant Martel to writer, on January 28, 2009, while in the presence of Investigator Myron Love, badge I-204, assigned to Homicide and Attorney Fred Walker, retained by the Lieutenant's and Sergeant's Association:

Sergeant Martel stated on September 20, 2009, he received a telephone call from a lieutenant from CPD (Lieutenant Schultz) who informed him on September 19, 2009, Officer P. Williams responded to the CPD station and began to give information regarding a domestic issue however they left without giving her name. He said he was informed by Lieutenant Schultz that on September 20, 2009, CPD officers responded to the officers' residence and discovered it was the same female that had responded to the CPD station the night earlier. He indicated he was informed that there was an incident at the residence however it did not rise to criminality. Sergeant Martel stated he was

informed of the handwritten note and noted Lieutenant Schultz was concerned about his wellbeing.

On that same date, Sergeant Martel stated he contacted Lieutenant Dwayne Blackmon, badge L-174, assigned to Homicide, Sergeant Whitney Walton, badge L-18, assigned to IA, and Notification and Control. He stated he contacted Officer Anthony Wright, badge 4308, assigned to Homicide, and asked him to contact Officer E. Williams, due to a good working relationship they had. He added that he had disciplined Officer E. Williams in the past and believed he may open up to someone who wasn't a supervisor. Sergeant Martel stated Officer Wright talked to him, via, telephone, and reported back to him that he sounded "O.K." Sergeant Martel stated Lieutenant Schultz called him again and stated he was still concerned regarding Officer E. Williams' welfare. He stated he relayed Officer E. Williams' cellular phone number to Lieutenant Schultz, who then contacted him. He stated Lieutenant Schultz called him back and stated Officer E. Williams refused to go to the CPD, but agreed to respond to Homicide and talk to a supervisor. He indicated Officer E. Williams responded to Homicide and talked to Sergeant Kozloff, but he was not present during the conversation. He added he didn't recall when he last saw Officer E. Williams, but stated it was before the notification by Lieutenant Schultz.

Sergeant Martel stated prior to his notification by CPD, he never made any observations from Officer E. Williams that would rise to the level of appearing mentally unstable.

On June 9, 2010, writer made a follow-up telephone call to Sergeant Martel who stated Lieutenant Walton advised him to have CPD fax relative paperwork to IA and not Homicide.

### Sergeant Barbara Kozloff, badge S-6, assigned to Homicide

The following is a synopsis of the audio-recorded Garrity statements made by Sergeant Kozloff to writer, on January 28, 2009, while in the presence of Attorney Walker:

Sergeant Kozloff stated on September 20, 2009, she was notified by Sergeant Martel, via telephone, who stated he was informed by CPD that they had concerns regarding Officer E. Williams's wellbeing and wanted to contact him. She stated she received a phone call from Lieutenant Schultz who informed her CPD officers responded to the officers' residence and the confiscation of a handwritten note left by Officer E. Williams. She indicated she asked if he was wanted for criminal charges and he replied that no criminal charges were pending and that they were listing him in LEIN as a "Serious Missing." She

**DefResp1stDocs-0020**

reported Lieutenant Schultz stated he would be in LEIN until someone made personal contact with Officer E. Williams.

Sergeant Kozloff stated she contacted Lieutenant Blackmon, who stated he was aware of the information, which had already been relayed to him by Sergeant Martel. She stated as she was on the phone with Lieutenant Blackmon, Officer E. Williams called her on her department issued cellular phone. She stated he said he was surprised CPD wanted to list him in LEIN and asked if she could report that she saw him personally, although she hadn't. Sergeant Kozloff stated she replied "No," and ordered him to Homicide Base. She stated he asked why they would do that and she replied it was due to the note that he had wrote. She added he replied he would arrive at Homicide Base in ten minutes.

Sergeant Kozloff stated she notified Lieutenant Blackmon of the conversation, who advised her to see if he was "O.K." and offer him the assistance of Personal Affairs. She stated Officer E. Williams responded to the base and they walked outside together to talk. She indicated he stated he left his wife and knew the CPD officers had responded to his residence. She reported he stated he wrote the note because everyone forgets that his wife is a police officer too, and if she ever did anything to him, he'd want his mother to have his belongings. She stated she asked him if it was a suicide note, where he responded "Barb, you know I would never do anything like that." She said he stated he wasn't going back to his residence and was staying at a friend's house that lived on the east side. He added his weapons were at his residence as well, and she advised him not to go there to retrieve them. She added he agreed and would give his friend the garage code to retrieve his belongings.

Sergeant Kozloff stated she offered him the assistance of Personal Affairs, where he again stated he wouldn't commit suicide. She stated she did not observe any signs of distraught or sorrow, just agitation. She described his typical demeanor as arrogant and kept his social life personal. She added he did not make any statements or show signs of needing to be committed. She indicated she debriefed Lieutenant's Blackmon and Schultz of the conversation, whereas, CPD removed his missing status from LEIN.

### Lieutenant Dwayne Blackmon, badge L-174, assigned to Homicide

The following is a synopsis of the audio-recorded Garrity statements made by Lieutenant Blackmon, on June 9, 2010, at approximately 10:25 A.M., while at 660 Woodward. Lieutenant Blackmon waived his right to legal representation:

Lieutenant Blackmon stated he was notified by Sergeant Martel that he had received a notification from CPD that Officer E. Williams was involved in a domestic dispute where a handgun was drawn and a "strange" note, which stated he was leaving some things to his mother. He did not recall exactly what the note said, because he did not recall the specific information given to him by Sergeant Martel and never saw a copy of the note. Lieutenant Blackmon stated he advised Sergeant Martel to contact IA for guidance. He stated he wanted Sergeant Martel to have the note faxed to Homicide base. He was advised by Sergeant Martel that a member of IA advised him not to have the paperwork from CPD faxed to Homicide, but to IA, instead, and advised him that CPD had a "Serious Missing" alert in LEIN, since he had not been seen since the incident at Officer E. Williams's residence. He added CPD required that someone from DPD physically see Officer E. Williams since he was missing.

Lieutenant Blackmon stated he advised Sergeant Kozloff to make physical contact with Officer E. Williams in order to cancel the missing status with CPD and did not tell her to assess his mental stability. He indicated she did not make any statements which would have required his committal. He stated after Sergeant Kozloff met with Officer E. Williams, she advised him that he appeared normal, and ensured her that he was fine and would never hurt himself. Lieutenant Blackmon stated he did not know him personally, but knew that he displayed a confident, sometimes arrogant personality and did not believe him to lack confidence. He added he has not had any prior notifications regarding Officer E. Williams being mentally unstable.

Lieutenant Blackmon stated he advised Commander Paul Wells of the situation, who did not order anything further. He stated Homicide did not receive any paperwork from CPD.

### Lieutenant Whitney Walton, badge L-18, assigned to Homicide

The following is a synopsis of an audio-recorded interview with Lieutenant Walton, on June 9, 2010, at approximately 11:15 A.M., while at 660 Woodward.

Lieutenant Walton stated she was notified by Sergeant Martel about a police report Officer E. Williams's wife (Officer P. Williams) lodged with CPD, regarding an argument they had. She stated she was unaware until after the homicide/suicide incident that his wife was an officer. She stated she told

Sergeant Martel that IA would need a copy of the police reports and that CPD would handle the criminal investigation. She stated Sergeant Martel advised her that CPD also found a note which was written by Officer E. Williams regarding his personal safety. Lieutenant Walton stated she advised Sergeant Martel that since he works at Homicide, to make contact with him. She stated Sergeant Martel advised her that CPD was faxing Homicide a copy of the letter to him and she advised him of the confidential nature of the note and to ensure the note doesn't spread around the department. She stated IA received the faxed paperwork from CPD approximately one hour before the actual homicide/suicide incident.

## CIVILIAN WITNESSES

### Ms. Deborah Ryan, W/F/54, of 41485 Greenwood, Canton, MI

The following is a synopsis of the audio-recorded statement given by Ms. Ryan, on March 15, 2010, at approximately 5:30 P.M., while at 660 Woodward, while in the presence of Attorney William Goodman.

Ms. Ryan stated she was unaware of any past domestic violence issues regarding Officer E. Williams or of any marital problems Officer P. Williams and Officer E. Williams were having.

Ms. Ryan stated in February of 2009, she stated Officer P. Williams told her she had a miscarriage, which required a "D & C" (dilation and curettage). She stated on the date Officer P. Williams went through the procedure, she had not received a telephone call from neither Officer P. Williams or Officer E. Williams regarding her wellbeing. Ms. Ryan indicated she drove to their residence and knocked on the door, however, no one answered. She stated the front door was partially opened and she heard both of them arguing. She indicated she overheard Officer P. Williams allege to Officer E. Williams that a "girlfriend" of Officer E. Williams came to their residence that morning after her procedure and she and the girlfriend "had words." She stated she did not interject and felt it was a private matter, hoping Officer P. Williams would talk to her about it, but she never did. She added Officer P. Williams handled everything on her own as she, herself did (Ms. Ryan).

Ms. Ryan stated between February and July of 2009, when Officer P. Williams and Officer E. Williams went on a cruise, communication broke down between the two of them. She stated Officer E. Williams was a possessive person and eluded that he was the cause of the tension.

Ms. Ryan stated on Saturday, September 19, 2009, at approximately 8:00 P.M., Officer P. Williams came to her residence along with her son, Mr. Swoope,

who were both visibly upset. She said Officer P. Williams began to cry and asked for her help and knew something had happened because she had a red mark on her face. She indicated Officer P. Williams stated she and E. Williams agreed that she could not live there anymore and Officer E. Williams was supposed to leave the home, but then reneged. Ms. Ryan stated she was surprised to hear what she was told. She stated Officer P. Williams alleged he took her cellular phone and car keys and threw them. Her son had to find the car keys in the neighbor's yard. She added Officer P. Williams alleged he also struck her. Ms. Ryan stated Officers Lee and Bode came to her residence, whereas, she tried to calm them all down. She stated she had only met Officer Lee a couple of times prior to him arriving at her house and added she believed Officer P. Williams and Officer E. Williams's relationship had diminished since her daughter had introduced her and Officer Lee before. She stated after a discussion between the group, Officer P. Williams agreed to file a report with CPD and that Officer Lee demanded it. She stated they both left her residence and she was unsure what transpired afterward, adding her grandson left with Ms. Ryan's other daughter.

Ms. Ryan stated on Sunday, September 20, 2009, Officer P. Williams called her and asked if she would meet her at her residence. She stated they met at approximately 8:30 A.M., and drove to Officer P. Williams's residence to retrieve personal items. She stated she expressed her concern if Officer E. Williams was at the residence and Officer P. Williams stated he should not be there. She stated they drove together in Officer P. Williams's vehicle and during the drive over, she inquired about what happened the night before. Ms. Ryan stated Officer P. Williams replied that she is handling the situation and did not elaborate further. She stated they opened the garage door utilizing the garage door opener and did not see Officer E. Williams's vehicle, thereby, believing he was not home.

Ms. Ryan stated she walked into the residence first, entering through the interior garage door, into the kitchen. She stated Officer P. Williams followed behind her and entered the family room. She indicated she heard Officer E. Williams's voice and visibly saw Officer E. Williams first. He was sitting next to the sink. Ms. Ryan stated she was surprised and asked why he was there. She then began to argue while he was holding a semi-automatic handgun in his right hand, adding he appeared intoxicated and that she could smell intoxicants on his breath. She also observed bottles of unknown spirits on the kitchen counter. She stated at some point, he lifted his pant-leg up, pointed to another handgun on his ankle, and said, "See, I have one here, too." She attempted to shield Officer P. Williams from Officer E. Williams, who ran upstairs to retrieve some personal items. She said she blocked the stairway that lead upstairs from Officer E. Williams, who stated "What are you doing in my fucking home, I hate you, bitch, you were never welcome, leave Katie here and I'll take care of it." She

DefResp1stDocs-0024

stated Officer E. Williams was waving the gun in the air, but was not sure if he ever pointed the handgun at her. Ms. Ryan stated she heard Officer P. Williams proceeding back downstairs, at which time Officer E. Williams pushed her into the wall and proceeded upstairs. She stated she grabbed him which caused him to spin around. Officer P. Williams ran past him and they both attempted to run out of the front door. She said she ran out first; however, Officer P. Williams was pulled back inside of the residence by Officer E. Williams, who then locked the door. She indicated she called 911 while outside, at which time, the front door opened and Officer P. Williams exited the house, with Mr. E. Williams in the doorway, still holding the handgun. Ms. Ryan stated they met at the car and pleaded with Officer P. Williams not to return to the house. She stated she told Officer E. Williams that she called 911 because she did not want him to hurt himself or anyone else. Ms. Ryan stated he told them both to just leave, so they entered Officer P. Williams's vehicle and left.

Ms. Ryan stated she met the CPD and Officer Lee on Geddes Road. She stated the officers did not ask her any questions, told her to stay back and only spoke to Officer P. Williams and Officer Lee. She stated when she was finally asked questions, she informed the officers that she was the person who called 911 and that Officer E. Williams's personal car was not at the residence. She stated she told the CPD officers that he was armed with two guns. She stated did not speak to the officers long and did not overhear the conversation Officer P. Williams provided. She indicated after the discussion with the CPD officers, they were advised to drive back to the residence and they will follow. She added she asked Officer P. Williams what was going on, whereas Officer P. Williams told her to be quiet and that they were returning to her residence.

Ms. Ryan stated she and Officer P. Williams returned to the house with approximately seven police cars. She stated the officers went into the residence and Officer E. Williams as gone. She stated two officers escorted Officer P. Williams back into the house. She indicated Officer Bode talked to a CPD officer and she received a text from Officer E. Williams who wrote, "I know you're looking for me, but I'm not there." Ms. Ryan stated she alerted the officers and told Officer Bode that a report needs to be made. She stated Officer Bode responded, "You shouldn't make a report, because you don't know what it's going to do to his position." She added a CPD officer, described as a W/M, 6'0", mid-30's, in uniform, who was near agreed and stated, "There's a lot more involved, Ms. Ryan." Ms. Ryan stated her and Officer Bode began to argue about making the report, then she walked away and stood by the car, by herself. She stated they re-entered Officer P. Williams's vehicle and Officer P. Williams said, "Mom, you can't make a report." She stated she responded that she was scared and that it was not a good situation. She indicated Officer P. Williams replied, "You can't make a report, I don't want to ruin his life, mom." Ms. Ryan stated a CPD officer asked her if Officer E. Williams threatened you and she

responded that she did not believe he pointed it directly at her, but was waving it around. She stated the CPD officer stated he had to file a report and she asked Officer P. Williams why she would not file a report. She stated she kept quiet, thereafter at the scene. She added Officer P. Williams was adamant about Officer E. Williams losing his position and not causing more problems than he was already in. Ms. Ryan stated out of respect for Officer E. Williams, P. Williams and with the advice of the CPD officer, she did not file her version of the story. She approximated her being at the house 1-2 hours.

Ms. Ryan stated later on that same date she called Officer P. Williams, who told her she was going to make a police report and for her not to tell anyone about what Officer E. Williams did. She said complied and did not tell anyone. She indicated in the evening, Officer P. Williams came to her house and stayed the night, with her son. Ms. Ryan stated she and Officer P. Williams got into a bad argument and she told Officer P. Williams that she was concerned for her and her son. Ms. Ryan stated she replied that she could handle the situation and did not want to cause Officer E. Williams trouble.

Ms. Ryan stated on September 21, 2009, at approximately 3:00 P.M., she stated she met Officer P. Williams and Officer Lee at her home to talk. She stated she was upset that Officer P. Williams was not alone and wanted to talk to her alone. Ms. Ryan said she replied that she could handle it. She indicated she told Officer P. Williams to be careful and believed Officer E. Williams was possessive. Ms. Ryan stated she, herself, is a private person and left her alone; believing Officer P. Williams would return and talk to her.

Ms. Ryan stated later that evening, she received a telephone call at approximately 7:48, from Officer P. Williams, who stated she was sleeping at Officer Lee's residence that night. She stated she told her she did not think it was a good idea.

Ms. Ryan stated at approximately 9:00 P.M., Officer E. Williams arrived at her residence and walked into the house. She stated he apologized to her and asked questions about Officer P. Williams, regarding Officer Lee, whether or not he was a police officer and inquiring about the type of vehicle that he drove. Ms. Ryan stated she told him to leave and he left without incident. She stated at approximately 10:30 P.M., she called Officer P. Williams and advised her what had happened. She indicated they got into an argument.

Ms. Ryan stated on September 22, 2010, she received a telephone call from her son, Kelly, advising her to come to his home in Garden City. She stated once at the house, she was notified by family members of the shooting. She stated she did not believe there were financial issues between Officer E. Williams and Officer P. Williams.

### Mr. Gregory Paul Armstrong, B/M/36, of 43662 Amber Court, Canton

#### INITIAL DUE DILIGENCE

During the preliminary investigation, writer learned from Officer Bode that Officer E. Williams's closest acquaintance was a male named "Paul," described only as a black male. Officer Bode provided writer with his last known cellular number.

During this investigation, writer left several messages with Mr. Armstrong and had not received any follow up contacts from Mr. Armstrong. Due to the lack of additional information, writer was unable to proceed further.

On February 17, 2010, while inventorying personal items of both officers to be released to their perspective families, writer discovered a form titled "Translation of a Marriage Certificate," within a black bag owned by Officer P. Williams. Documented on the form was "Mr. Gregory Paul A(r)mstrong," with a listed age of 33, in 2006. Writer queried LEIN and obtained resident information for Mr. Armstrong.

On February 19, 2010, writer and Sergeant Valerie Clardy, badge S-1104, assigned to Force Investigation, responded to 43662 Amber Court, Canton, Mr. Armstrong's last known address. No one answered the door; therefore, writer left a business card.

On February 25, 2010, writer received a voicemail message by a male who identified himself as Mr. Armstrong. He stated he would agree to an interview, on either March 1-2, 2010. Writer called Mr. Armstrong utilizing the number provided and left a voicemail message with contact information.

On February 26, 2010, writer sent a certified letter to his address and was subsequently contacted by Mr. Armstrong. He was interviewed on March 5, 2010.

#### RECORDED STATEMENT

The following is a synopsis of an audio-recorded interview of the statements made by Mr. Armstrong, obtained by writer, on March 5, 2010, while at 660 Woodward. Mr. Armstrong accompanied by Attorney Stephanie Carson.

Mr. Armstrong stated Officers E. Williams and P. Williams had marital problems in 2008, but had reconciled. He stated the couple went on a cruise in the summer of 2009, but their relationship deteriorated afterward because she

**DefResp1stDocs-0027**

was dating Officer Lee. He added that neither officer was attending family functions together, but did remain living together.

Mr. Armstrong stated on September 19, 2009, during the day, Officer E. Williams came to his house and gave an account of an incident that had occurred between him and Officer P. Williams. He stated to Mr. Armstrong that both of them were at the residence, when he found Officer P. Williams in the garage and overheard her having an intimate telephone conversation with another person. He told him that he grabbed her phone and a struggle ensued. He then gave an account of him running upstairs, locking the door and reading text messages. Officer E. Williams told Mr. Armstrong that he attempted to drive away, but Officer P. Williams jumped into his car. He said she finally got out of his car and he drove to Mr. Armstrong's house. Mr. Armstrong stated Officer E. Williams left his residence to make changes to his bank accounts.

Mr. Armstrong stated Officer E. Williams contacted him on the evening of Saturday, September 19, 2009, between 9:00 P.M. and 10:00 P.M., and asked if he could pick him up at his residence. He said he drove to his residence and spoke with him, noting he appeared calm. He indicated he assisted Officer E. Williams in collecting some clothes because he was going to spend the night at Mr. Armstrong's residence. He reported Officer P. Williams had arrived at the residence while he was there, but was unable to gain entry because Officer E. Williams had disabled the automatic garage door opener. He added Officer E. Williams left shortly afterward and added he did not have any conversations with her. He added he and Officer P. Williams went to the bar and had some drinks.

Mr. Armstrong stated on that same day, at approximately 12:00 A.M., he and Officer E. Williams returned to his residence where Officer E. Williams was going to spend the night. He stated Officer E. Williams left for a brief period and then returned to his residence, then got onto his computer to investigate some things.

On Sunday, September 20, 2009, Mr. Armstrong stated when he awoke, Officer E. Williams had already left. He said he contacted him on his cellular phone and Officer E. Williams told him he and Officer P. Williams had gotten into an altercation and that he was leaving the house. He indicated he told him that it wasn't worth it anymore and to meet him for breakfast. He reported that while on the phone, Officer E. Williams stated he had written a letter and left it for his mother, in case something happened. Mr. Armstrong stated he asked him why he'd write a letter, when Officer E. Williams replied, "I don't know, she's gotta gun, I've gotta gun...who knows what could happen."

On that same day, they met for breakfast, where he observed that Officer P. Williams called and texted Officer E. Williams repeatedly. He said he

suggested to take some time off of work and stay away from Officer P. Williams. He indicated Officer E. Williams slept at his house during the day and awoke sometime later, adding unsure when exactly he awoke. He reported Officer E. Williams stated he needed to return to his residence to retrieve some range equipment since he was qualifying on September 21, 2009. Mr. Armstrong stated he advised him not to return to his residence, but he proceeded to anyway. He stated he did not have any contact with him.

On Monday, September 21, 2009, he stated he received a telephone call from Officer E. Williams who stated he was at the range. He stated he was going to his office and then go home and rest because he had to work on September 22, 2009. He indicated this was the last conversation he had with Officer E. Williams.

- Statement taken from Attorney Carson

During the interview with Mr. Armstrong, writer learned that Attorney Carson, who was representing Mr. Armstrong, also had information pertinent to the investigation. Ms. Carson stated on September 21, 2009, after Officer E. Williams qualified at the gun range, he went to her office and insisted she begin divorce proceedings. She stated she attempted to convince him to wait and see if things improve, however, he threatened to hire another attorney. She stated she began to fill out the initial paperwork to process a divorce.

Ms. Carson stated she called him that evening to advise him of heavy traffic, but he advised her that he was driving to Canton. She stated she advised him not to go to his residence.

Ms. Carson stated on September 22, 2009, at approximately 6:30-7:00 A.M., she and Officer E. Williams exchanged text messages. She stated she asked him if he was alright and replied, "No, but it will be," which was the last communication she had with him. She added she's known Officer E. Williams for approximately ten years.

Both Mr. Armstrong and Attorney Carson stated that they did not see any signs of homicidal or suicidal tendencies and added it appeared that he wanted a divorce and was ready to move on. Both stated they were unaware of any domestic violence issues between the officers and appeared to have a good relationship, prior to their marital problems. Ms. Carson stated she'd received telephone calls in the past where he was upset regarding various issues and she stated that she could "talk him down" and make him relax. Mr. Armstrong added that he knew Officer E. Williams routinely stored the revolver used in the incident in the glove box of his personal vehicle.

**DefResp1stDocs-0029**

### Ms. Phyllis Taylor, U/F, no further information

The following is a synopsis of the verbal interview, obtained by Detective Justin Arminiak, badge 3437, of the CPD. Officer Arminiak stated in his report that he obtained this statement at the scene, but did not document when it was obtained. During this investigation, writer did not receive a written statement obtained from Ms. Taylor.

Ms. Taylor stated she was driving through the library parking lot at approximately 9:10 A.M., when she observed a white female talking on a cellular phone, while crossing Civic Center Drive on foot. She noted that she appeared to have left the area of the administration building. She said she parked her vehicle, exited, and then heard popping sounds. She indicated she observed the female fall to the ground just south of the minivan. She reported the female stood back up and ran north, while a black male continued to shoot her. Ms. Taylor stated the female fell to the ground again and the male walked up to her, placed the gun to her head and fired. She stated the male placed the gun next to his own head and fired, which caused him to fall to the ground and not move. She indicated she was yelling for the man to stop and yelled for help.

### Ms. Bryant, U/F, no further information

The following is a synopsis of the verbal interview, obtained by Detective Arminiak. Detective Arminiak stated in his report that he obtained this statement at the scene, but did not document when it was obtained. During this investigation, writer did not receive a written statement obtained from Ms. Bryant.

Ms. Bryant stated she observed a white female on her cellular phone, who appeared to be upset. She stated she heard gunshots and looked into the direction of the noise. She said she observed a black male point a gun to his head, fire, and then fall to the ground. She added she could see someone else lying on the ground near the male, but was unable to see whom from her vantage point.

### Ms. Barbara Gudenburr, U/F, of 8237 Mannington, Canton

The following is a synopsis of a written statement by Ms. Gudenburr, on September 22, 2009, at approximately 10:55 A.M., and submitted to the CPD:

Ms. Gudenburr stated at approximately 8:00 A.M., she drove behind the CPD station, and observed a male and female sitting on a bench, talking. She stated she observed two cars parked in the parking lot and made a distinction because the library didn't open for another hour. She did not add any additional information.

### Ms. Teresa Tan, U/F, of 1939 Echo Woods Dr., Canton

The following is a synopsis of a written statement by Ms. Tan, on September 22, 2009, and submitted to the CPD.

Ms. Tan utilized the same timestamp of 9:15 A.M. for both the time of the incident and the time she completed the written statement. Writer determined this to be an error. The exact time the statement was taken is unknown.

Ms. Tan stated at approximately 9:15 A.M., she drove to the Canton Library. Upon arrival, she observed a woman with dark clothing and high heels, walking across the parking lot from City Hall. She stated she heard two gunshots, looked around, and no longer saw the woman. She indicated she heard a third gunshot and observed a man lying on the ground. She reported she didn't believe it was real and stayed in her car for approximately one minute. After the male didn't move, she exited her vehicle and called 911.

### Ms. Zainab Siddiqui, U/F, of 1777 Brookdale Drive, Canton

The following is a synopsis of a written statement by Ms. Siddiqui, on September 22, 2009, and submitted to the CPD. She did not fill out the time she completed the written statement.

Ms. Siddiqui stated as she was in the lobby of the library, she heard approximately 5-6 gunshots. She stated there was a pause, then heard a woman scream. She added she ran into the library and didn't look back.

### Mr. Steven McConnell, U/M, of 47250 Victorian Square, Canton

The following is a synopsis of a written statement by Mr. McConnell, on September 22, 2009, and submitted to the CPD. He did not fill out the time he completed the written statement.

Ms. McConnell stated at approximately 8:00 A.M., he observed a man and woman walking in the park. He stated he then observed them walking toward their cars, while still talking. He indicated he believed the man was upset due to his body language. He added he entered the library and didn't see or hear anything further.

### Ms. Barbara Kallil, U/F, of 48825 Central Park Drive, Canton

The following is a synopsis of a written statement by Ms. Kallil, on September 22, 2009, and submitted to the CPD. She did not fill out the time she completed the written statement.

Ms. Kallil stated while pulling into the library parking lot, she observed a nicely dressed female walking across the street from the city offices, with a broken heel. She stated the female appeared upset, so she didn't ask if she needed help. She said she parked her vehicle and began to walk toward the library entrance when she heard two gunshots. She indicated an unidentified witness yelled, "He's shooting her!" Call the police!" Ms. Kallil stated she heard another two gunshots, whereas, she ran into the library. She stated she then heard another gunshot, and the unidentified witness ran toward the black car.

### Ms. Judy Cox, U/F, of 6711 Devonshire, Canton

The following is a synopsis of a written statement by Ms. Cox, on September 22, 2009, at approximately 10:53 A.M., and submitted to the CPD.

Ms. Cox stated she arrived at the library at approximately 8:30 A.M. and observed a black male and white female standing near the Memorial Clock. She stated the male appeared to be intently listening to the female, who had her back facing her direction. She said their conversation seemed tense, but did not observe any weapons or aggressive behavior. No further information was provided.

### Mr. William Rice, U/M, of 1199 West Lemont, Canton

The following is a synopsis of a written statement by Mr. Rice, on September 22, 2009, at approximately 10:55 A.M., and submitted to the CPD.

Mr. Rice stated as he drove along side of the library, he observed a black male fall to the ground in front of a brown minivan. He stated he exited his vehicle and observed a white female lying next to the minivan. He said the black male was still breathing and observed a pistol lying next to his head. He indicated he told witnesses to stay back.

### Ms. Deborah Sobczak, U/F, of 33422 Orangelawn, Livonia

The following is a synopsis of a written statement by Ms. Sobczak, on September 22, 2009, at approximately 10:55 A.M., and submitted to the CPD.

Ms. Sobczak stated she pulled into the library and observed a black male who was wearing casual clothing and a white female dressed in business attire walking across the street. She stated she stopped to allow them to cross in front of her vehicle. She added the female appeared "all business" like a break-up had just occurred, and the male looked more relaxed. No further information was provided.

### Ms. Laurie Birchler, U/F, of 1260 Linden Street, Plymouth

The following is a synopsis of a written statement by Ms. Birchler, on September 22, 2009, at approximately 10:55 A.M., and submitted to the CPD.

Ms. Birchler stated she had parked her vehicle on the west side of the parking lot and while exiting, heard 2-3 gunshots, coming from a northern direction. She stated she observed a male with dark hair, white shirt and shorts looking at something on the ground. She said she observed him back away, make a motion, heard additional gunshots, and then observed him fall to the ground. She indicated she ran to an employee entrance of an unidentified business and locked the door.

### Mr. Leo Papa, U/F, of 1920 Preserve Circle, Canton

The following is a synopsis of a written statement by Mr. Papa, on September 22, 2009, at approximately 10:32 A.M., and submitted to the CPD.

Mr. Papa stated at approximately 8:10 A.M., he observed a black male and white female seated on a bench, near the Memorial Clock at the entrance of Veteran's Park. He stated they appeared to be talking peacefully and added he'd never seen them before. He did not add additional information.

### Mr. William Stacey, W/M/57, of 1200 South Canton Center, Canton

The following is a synopsis of a verbal statement given by Mr. Stacey to Officer Wells, on September 22, 2009. Officer Wells did not state at what time the statement was taken.

Mr. Stacey stated he is employed by the library as a security officer. He stated as he pulled into the library parking lot, he observed a black male fall to the ground. He said he did not observe anything prior to that. He added there

are no external cameras attached to the library which would have captured the incident.

### Mr. Bruce Woods, W/M/58, of 42150 Addison, Canton

The following is a synopsis of a verbal statement given by Mr. Woods to Officer Wells, on September 22, 2009. Officer Wells did not state at what time the statement was taken.

Mr. Woods stated he heard three shots which he believed to be firecrackers. He said he observed a black male back up from the minivan, and then heard one additional gunshot. He indicated after the final shot, he observed the male fall to the ground.

### Ms. Geraldine Gorecki, W/F/74, of 195 Queensway, Canton

The following is a synopsis of a verbal statement given by Ms. Gorecki to Officer Wells, on September 22, 2009. Officer Wells did not state at what time the statement was taken.

Ms. Gorecki stated while standing next to her vehicle, she heard a loud "pop, pop, pop." She stated she heard a separate gunshot and observed a black male backing away from the minivan. She indicated she observed the male shoot himself and fall to the ground.

### CANVASS

A canvass was conducted by the CPD, and the above documented statements were obtained. A canvass sheet was not completed by the CPD. It should be noted that the incident location occurred in an office building district, between the Canton Library and CPD station.

### EVIDENCE

The following evidence was recovered by the CPD. Department issued items were released to Force Investigation; and all department issued equipment was returned the respective unit(s). Personal items of the officers were returned to the respective families. Non-department, evidentiary items remained with the CPD.

**PT091998:** Hand written letter by Officer E. Williams, recovered from 3543 Wall, Canton, MI

**PT092043:** Blue steel, .38 caliber, Smith and Wesson revolver, serial number 773524, recovered from the shooting scene.

Registered to his mother, Ms. Yukima Pamela Williams, B/F/56, of 18967 Archdale; registered on September 5, 1979.

**PT092039:** Two blood swabs, recovered from the front of the minivan

**PT092038:** Two, blood swabs, recovered from Officer E. Williams' vehicle

**PT092037:** DNA swap recovered from .38 caliber handgun used in homicide/suicide

**PT092036:** Two Blood swaps, recovered from .38 caliber handgun used in homicide/suicide

**PT092034:** One set of BMW car keys, recovered from Officer P. Williams

**PT092035:** Five, spent .38 caliber rounds, recovered from the .38 caliber handgun used in the homicide/suicide

**PT092032:** One, LG cellular telephone, recovered from Officer E. Williams

**PT092087:** Black, gun belt with and empty holster and empty magazines, with handcuffs, recovered from Officer P. Williams's vehicle

**PT092082:** Black, Coach purse, Kenneth Cole watch, Silver colored necklace, wallet with DPD identification and badge, recovered from Officer P. Williams's vehicle

**PT092086:** Black, .40 caliber, Smith and Wesson semi-automatic handgun, serial number DSX7767, along with an empty magazine and 121 loose rounds, recovered from Officer P. Williams's vehicle

**PT092083:** Currency, $11.13, recovered from Officer P. Williams's vehicle

**PT092081:** Hewlett-Packard Laptop, serial number CND6135N3, recovered from Officer P. Williams's vehicle

**PT092040:** Blackberry cellular phone, recovered from Officer E. Williams

**PT092041:** One, live, .40 caliber round, recovered from Officer E. Williams, location unknown

**PT092090:** One, black backpack, containing miscellaneous police equipment, including a prep radio, handcuffs, holster, baton, gun belt and belt keepers, recovered from Officer E. Williams's vehicle

**PT092089:** Two, .40 caliber magazines, w/ 16 rounds of live, .40 caliber ammunition, recovered from Officer E. Williams's vehicle

**PT092093:** One, brown file jacket with miscellaneous papers, recovered from Officer E. Williams's vehicle

**PT092091:** One, bullet resistant vest, recovered from Officer E. Williams's vehicle

**PT092092:** One, empty gun case, recovered from Officer E. Williams's vehicle

**PT092044:** One set of keys, recovered from the scene

**PT092047:** CD containing photographs from the scene

**PT092094:** Black, bi-fold wallet containing a police badge, miscellaneous cards and identification, recovered from Officer E. Williams

**PT092095:** Black, tri-fold wallet containing miscellaneous cards, recovered from Officer E. Williams

**PT092132:** Clothing, recovered from Officer E. Williams

**PT092133:** Clothing, recovered from Officer P. Williams

**PT092045:** Black, .40 caliber, Glock semi-automatic handgun, model 27, serial number DEF207, recovered from recovered from 3543 Wall St., Canton, MI

**PT092048:** Ten, live, .40 caliber rounds, recovered from 3543 Wall St., Canton, MI (taken from above .40 caliber Glock, model 27)

**PT092050:** Black, .40 caliber, Smith and Wesson semi-automatic handgun, serial number DSX7771, recovered from 3543 Wall St., Canton, MI

**PT092049:** Fifteen, live, .40 caliber rounds, recovered from 3543 Wall St., Canton, MI (taken from above .40 caliber S & W)

**PT092051:** Answering machine, recovered from 3543 Wall St., Canton, MI

**PT092052:** Loose rounds-197 total, recovered from 3543 Wall St., Canton, MI

**PT092053:** Loose rounds-14 total, recovered from 3543 Wall St., Canton, MI

**PT092055:** Purple, Palm Pilot, serial number 00V3VBX4H039, recovered from 3543 Wall St., Canton, MI

**PT092056:** Loose rounds-49 total, recovered from 3543 Wall St., Canton, MI

**PT092057:** Two, wedding photos torn into small pieces, lying on kitchen counter, recovered from 3543 Wall St., Canton, MI

**PT092058:** Wedding photos torn into small pieces, found within a garbage can, recovered from 3543 Wall St., Canton, MI

**PT092059:** Black bag, containing miscellaneous police equipment, including a hat, paperwork and flashlight, recovered from 3543 Wall St., Canton, MI

**PT092060:** Black bag, containing miscellaneous police equipment, including a radio, box of ammunition, belt, hat, bullet resistant vest and shirts, recovered from 3543 Wall St., Canton, MI

**PT092061:** Samsung cellular phone, unknown color, serial number SGH-R225M, recovered from 3543 Wall St., Canton, MI

**PT092062:** CD containing photographs of residence

A ballistics report was not contained in the paperwork provided by CPD, therefore, it was not determined if the firearms evidence was tested for ballistic properties.

## VEHICLES INVOLVED

1. Black, 2008, Dodge Charger, 09/MI/9GFA53, VIN: 2B3KA53H68H236990.

2. Silver, 2007, BMW, 09/MI/4BQ10, VIN: WBANF73567CU28598

3. Tan, 1999, Mercury minivan, 09/MI/BHL1469, VIN: 4M2XV11T2XDJ45844

## ELECTRONIC TRANSMISSIONS

Writer talked to Officer Wells on October 20, 2009, who stated this incident was not recorded by neighboring businesses or scout car video.

### CPD FRONT DESK VIDEO/AUDIO RECORDINGS

On April 8, 2010, writer was provided one video/audio recording by Attorney Goodwin, which was saved digitally to a compact disk. Writer was able to hear most of the conversation during the conversation, however, the audio was low and some conversation was indiscernible.

The recordings showed that on September 20, 2009, at approximately 12:02 A.M., Officers P. Williams and Lee responded to the CPD front desk and asked Officer Falk for a police escort to her home. The total conversation lasted approximately ten minutes. During the entire conversation, Officer P. Williams did not give her name or gave her address. She told Officer Falk that she and Officer E. Williams had been separated for approximately two months and he was upset that she was dating another person. She indicated that all three of them were Detroit Police Officers and that she just wanted to retrieve her belongings. She stated Officer E. Williams took her keys and cellular phone, thus placing the phone in his pocket and throwing her keys in the bushes in front of her house. She described how she ran toward the keys and Officer E. Williams pushed her and she suffered from a scratch on her face from either the bushes or the ground. Officer Falk stated he also observed the laceration on her face and offered her medical attention, of.which she refused.

Officer P. Williams stated she could not report it because it would affect his employment. Officer Falk informed her that everything was being recorded and that if he didn't file a report based on her statement that if something happened, "they'd hang me out to dry." He explained that Officer E. Williams wouldn't be the first officer charged with domestic violence. Officer P. Williams stated, "I don't want to do that," twice to Officer Falk. Officer Falk asked Officer Lee what he thought of the situation and he replied that Officer P. Williams is worried about the long-term.

Officer Falk again stated to both officers that he needed to file a report in case something serious happened. He asked Officer P. Williams to fill out a witness report and that paperwork would be faxed to the prosecutor's office, for a determination. Officer P. Williams told Officer Falk that she could not because he would lose his job.

Officer Falk stated he would consult with his sergeant and left the front desk for several minutes. Officers P. Williams and Lee walked away from the desk and their conversation could not be heard by writer. Upon return, Officer Falk confirmed that he needed to make a report to send to the prosecutor's office. Officer Falk asked her name again and she refused to give it to him. Officer Lee asked Officer Falk if CPD could just do an escort. Officer Falk stated no that he needed her name for the report. Officer Falk discussed the criminal process to Officer P. Williams and attempted to convince her to give him her personal information. Officer P. Williams stated to him that she was going to go figure out what she wants to do. Officer Falk asked if they still wanted CPD to escort them to the house and they declined as they walked out of the lobby.

## TELEPHONE CONVERSATION BETWEEN THE DPD AND CPD

On March 29, 2010, writer was provided four telephone conversations by Attorney Goodwin, which was saved digitally to a compact disk. The times and dates of the following conversations was not "time stamped" on the audio recording.

*RECORDING #1 (1 minute/14 seconds):*

This recording appears to be the first notification from CPD to DPD regarding Officer E. Williams, on Sunday, September 20, 2009.

Officer Michael Steckel, badge 1365, of the CPD, called Detroit Police Homicide and talked to Sergeant Martel. He stated there was an incident involving Officer E. Williams, which involved alcohol, a gun and a note. Officer Steckel referenced the note as a suicide note, and then added that it wasn't really a suicide note. Officer Steckel stated Officer E. Williams was currently talking to his Lieutenant and that his Lieutenant would contact Sergeant Martel once the conversation was over. Officer Steckel did not identify who the Lieutenant was.

Officer Steckel told Sergeant Martel that Officer E. Williams was going to be placed in LEIN as an "Endangered Missing." He suggested to Sergeant Martel to do a Fitness for Duty evaluation on Officer E. Williams. Officer Steckel suggested that DPD see if Officer E. Williams is "good" and if not, to send him to a psychiatric unit.

*RECORDING #2 (7 minutes/33 seconds):*

This recording appears to be a follow-up phone call from Lieutenant Schultz to Sergeant Martel regarding Officer E. Williams, on Sunday, September 20, 2009.

Lieutenant Schultz called Central District and was transferred to Homicide, and ultimately talked to Sergeant Martel. He informed Sergeant Martel that Officer E. Williams and Officer P. Williams had a domestic issue and that Officer P. Williams had went to the CPD to ask for assistance. He stated that once she found out that a report would be generated, she left. Lieutenant Schultz stated earlier that same morning (September 20, 2009), CPD was dispatched to their home because of an argument. He stated CPD officers arrived after Officer P. Williams and Ms. Ryan had already left the location and affected a traffic stop near the house of both Officer P. Williams and Ms. Ryan to gather information from both. He indicated the officers were given information by Ms. Ryan that she observed through the window, Officer E. Williams holding onto a handgun. Lieutenant Schultz stated Officer P. Williams and Ms. Ryan stated he did not point the handgun at either person, nor threaten them. He added that he didn't know what he was doing with it.

Lieutenant Schultz stated CPD officers returned to the home and searched the house; however, Officer E. Williams was not there. He informed Sergeant Martel that a note was found and read it to him over the phone, verbatim. Lieutenant Schultz stated Officer P. Williams told the officers at the scene that the note was just a ploy to make her worry and that he would not do anything to harm himself. Lieutenant Schultz stated to Sergeant Martel that he was giving DPD the "heads up" and that a "Suspicious Report" would be produced at CPD.

Sergeant Martel requested that the note and information be faxed to Homicide and provided the facsimile number. He added he notified Lieutenant Blackmon of the events. Lieutenant Schultz stated the note didn't say anything about suicide, but believed considering the circumstances that it may elude to suicide. Sergeant Martel stated to him that he agreed. Lieutenant Schultz and Sergeant Martel exchanged contact information and a description of Officer E. Williams. Sergeant Martel stated his partner was on the phone with Officer E. Williams, during their telephone conversation, but did not state whom.

*RECORDING #3 (4 minutes/08 seconds):*

This recording appears to be a follow-up phone call from Sergeant Martel to Lieutenant Schultz regarding Officer E. Williams, on Sunday, September 20, 2009.

Sergeant Martel stated his partner talked to Officer E. Williams on the phone and was told he "sounded fine." He informed Lieutenant Schultz not to fax over the paperwork to Homicide and that IA will be handling the incident, adding IA wanted Homicide "completely out of it."

Lieutenant Schultz informed Sergeant Martel that last night a "Civil Report" was generated because Officer P. Williams and Officer Lee responded to the CPD; however, they did not give their names and did not give the address, during that time. He added he didn't believe Officer E. Williams knew about Officer Lee and stated there may be a workplace issue. Lieutenant Schultz stated he was not working tomorrow (Monday, September 21, 2009), but would ensure that the paperwork was faxed the next morning.

*RECORDING #4 (1minutes/02 seconds):*

This recording appears to be a follow-up phone call from Sergeant Kozloff to Lieutenant Schultz regarding Officer E. Williams, on Sunday, September 20, 2009.

Sergeant Kozloff stated she spoke with Officer E. Williams in person and that all was fine. She stated she asked him about the note, and Officer E. Williams replied that he wrote it because Officer P. Williams has a gun. Lieutenant Schultz asked if "All is well?" and she responded, "Yes, it is." Sergeant Kozloff stated she offered employee services of Personal Affairs, however, he declined. She stated he was scheduled to attend the range and Lieutenant Schultz stated Officer E. Williams would be removed from LEIN. Sergeant Kozloff told Lieutenant Schultz to call her on her cellular phone if anything additional happened.

TEXT MESSAGES:

Writer was provided an incomplete list of text messages which were sent between Officers E. Williams and P. Williams, and those sent from Officer Lee to Officer P. Williams, which were recovered by Officer Wells, of the CPD. Officer Wells stated in his Crisnet Report that he photographed those text messages that were pertinent to the investigation and that other text messages were not of an evidentiary value. The texts transcribed below are direct quotes with grammatical errors uncorrected.

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer E. Williams | Officer P. Williams | Unknown |

**"I was never never until u treated us like second class citizens. im not use to it and never will be. as far as me cheating & u finding out katie had every opportunity to leave and chose to stay. I am a whore and and always will be be, but apparently so is your daighter"**

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer P. Williams | Officer E. Williams | 9/21/09   8:27 P.M. |

**"U have kev and I scared.  I want to talk and figure things out but you are so calm it makes me thing u will hurt me"**

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer P. Williams | Officer E. Williams | 9/21/09   8:56 P.M. |

**"Can we talkand u listen to what I have to say withoug cutting me off or scaring me."**

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer E. Williams | Officer P. Williams | 9/21/09   11:02 P.M. |

**"u r a coward. U just hung up"**

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer E. Williams | Officer P. Williams | 9/22/09   12:11 A.M. |

**"so he and I can talk since u wont come home"**

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer E. Williams | Officer P. Williams | 9/22/09   12:19 A.M. |

**"im  not  some  guy  u  r  fuckin  around  with...im  your husband.....come home"**

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer E. Williams | Officer P. Williams | 9/22/09   12:19 A.M. |

**"answer your fuckin phone"**

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer E. Williams | Officer P. Williams | 9/22/09   12:19 A.M. |

**"im meeting your man right now at joy and newburgh"**

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer P. Williams | Officer E. Williams | 9/22/09   12:26 A.M. |

DefResp1stDocs-0042

"I'm not with Cliff. We will talk tomorrow in public no guns!"

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer E. Williams | Officer P. Williams | 9/22/09  12:27 A.M. |

"im beyond mad or hurt. stay with that trash"

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer P. Williams | Officer E. Williams | 9/22/09  12:31 A.M. |

"I'm not layed up with anyone! You are not my fool. Tomorrow no guns in the day. I won't go to work."

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer E. Williams | Officer P. Williams | 9/22/09  12:32 A.M. |

"now or NEVER and i mean it!"

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer E. Williams | Officer P. Williams | 9/22/09  3:45 A.M. |

"answer the phone"

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer Lee | Officer P. Williams | 9/22/09  9:10 A.M. |

"Im done listening to u lie to me. I called the canton police back they said they still don't c u"

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer Lee | Officer P. Williams | 9/22/09  9:26 A.M. |

"well?"

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer Lee | Officer P. Williams | 9/22/09  9:37 A.M. |

"This is the last time i will ask you to leave, im not goint to beg u, u dont want to answer then lets just end this relationship"

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer Lee | Officer P. Williams | 9/22/09  9:37 A.M. |

**DefResp1stDocs-0043**

**"i wont call u anymore. please dont call me ever again."**

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| "Barnes" | Officer P. Williams | 9/22/09    9:40 A.M. |

**"What up u ok"**

| Sent by: | Received by: | Date/Time: |
|---|---|---|
| Officer Lee | Officer P. Williams | 9/22/09    9:37 A.M. |

**"i wont call u anymore. please dont call me ever again."**

## MEDICAL INFORMATION

Officer P. Williams was conveyed to Ryanwood Annapolis Hospital by Medic A032 of the Canton Fire Department. She was pronounced dead upon arrival, on chart number 0871465, by Doctor Casado.

On September 23, 2009, Dr. Sloan Bashiniski performed Officer P. Williams's autopsy. She noted there was a contact, gunshot wound to her left hand, a gunshot wound which entered her back and exited her upper chest, a grazing wound to her upper right arm, and a gunshot wound to the rear, right side of her skull which exited her through the left eye.

Officer E. Williams was conveyed to St. Joseph's Hospital by Medic A034, of the Canton Fire Department. He was did not have brain function and he was kept alive artificially for organ donor transplant. He was treated by Dr. Dunne, on chart number 036781292, and listed in critical condition until he died on September 22, 2009, at approximately 1:52 P.M.

On September 23, 2009, Dr. Cassin performed Officer E. Williams' autopsy. He reported there was a gunshot wound to the right side of his skull and an exit wound on the left side of the skull. Dr. Cassin noted that the wound appeared to be a contact-range gunshot wound.

## CONSULTATION WITH THE WAYNE COUNTY PROSECUTOR'S OFFICE

N/A

## EXTENSION REQUEST(S)

Writer submitted an extension request on December 11, 2009, to Lieutenant Topp, due to the fact that writer was instructed to interview Officer E.

Williams then supervisors, in an effort to determine if protocol was followed regarding subordinates and mental stress. Due to homicide trials that both members were required to prepare and testify in, Sergeants Martel and Kozloff were scheduled for Garrity on January 28, 2010.

Writer submitted an extension request on February 25, 2010, to Lieutenant Topp. Witness Mr. Armstrong contacted writer on that same date and stated he agreed to provide a statement. Writer made several follow-up phone calls to Mr. Armstrong, however, he did not contact writer. Writer performed due diligence, which included sending a certified letter to his residence.

Writer submitted an extension request on March 5, 2010, to Lieutenant Topp. Witness Mr. Armstrong called writer on March 3, 2010, who stated he still wished to be interviewed. Writer scheduled the interview and was subsequently completed on March 5, 2010.

Writer submitted an extension request on March 29, 2010, to Lieutenant Topp. Writer received additional evidence which needed to be reviewed and assessed (telephone recordings) which writer had not received from CPD.

Writer submitted an extension request on April 8, 2010, to Lieutenant Topp. Writer received additional evidence which needed to be reviewed and assessed (telephone recordings) which writer had not received from CPD.

Writer submitted an extension request on June 7, 2010, to Lieutenant Topp. After reviewing the aforementioned evidence, writer scheduled a Garrity interview with Lieutenant Blackmon and interview with Lieutenant Walton.

## ISSUES AND DISCREPANCIES

### DOMESTIC VIOLENCE ALLEGATIONS

According to the Detroit Police Manual, Series 100, Chapter 102.3-6.1, Code of Conduct, which states in part"

**"Officers who withhold information, fail to cooperate with departmental investigations, or who fail to report the misconduct of officers to a supervisor, whether on or off duty, shall be subject to disciplinary action;"**

According to Officer Falk, on September 19, 2009, at approximately 11:30 P.M., an unidentified female and male (Officers P. Williams and Lee) entered the CPD, whereas, Officer P. Williams requested a scout car to accompany her to her residence to collect personal items. She told Officer Falk of an earlier

altercation where she was pushed down by her estranged husband (Officer E. Williams), which caused a small laceration to her cheek. Officer Falk stated she alleged it occurred when her face hit the ground and the video/audio recordings showed that she stated either a bush that she fell into caused it or the ground. Once asked to provide a written statement, Officer P. Williams refused and both exited the station.

Writer reviewed the autopsy photographs of Officer P. Williams and did not observe a laceration on her face, which was alleged to have happened two days prior. Writer concludes that if there was a laceration on her face on September 19, 2009, it was minor.

Officer Lee stated on the evening of September 21, 2009, Officer P. Williams confided in him allegations of past incidents of domestic violence by Officer E. Williams. Officer Lee stated once apprised of this information, he was going to report the misconduct. In addition, he did not witness any of the alleged incidents of domestic violence.

During this investigation, it was learned that Officer P. Williams had several opportunities to report the domestic violence incidents which had occurred by Officer E. Williams, however, based on witness interviews, she stated she did not want to jeopardize his career and failed to report the incidents.

The homicide/suicide occurred on the morning of September 22, 2009. Based on this information, writer concludes that Officer P. Williams made the decision to withhold important information regarding allegations of domestic violence and that Officer Lee learned of these allegations just before the homicide/suicide incident occurred. Therefore, writer finds that Officer Lee was not in violation of the aforementioned directive.

## EVALUATION OF OFFICER E. WILLIAMS' MENTAL HEALTH, DEPARTMENTAL PROTOCOL, AND SUICIDE RISK

During this investigation, it was learned that Officer P. Williams was in fear for her safety, as it related to her husband, Officer E. Williams. On September 19, 2009, Officer Bode reported that she confided to her that he had choked her earlier that morning. On September 20, 2009, at approximately 12:20 A.M., Officer P. Williams responded to the CPD and requested a marked unit to assist her with removing her items from the home, however, she failed to disclose the assault on September 19, 2009, or her personal identification information. She subsequently left the station, leaving the CPD with an anonymous complainant. On that same date, at approximately 9:30 A.M., Officer P. Williams and her mother, Ms. Ryan, responded to her residence to retrieve personal items as documented on Officer Resst's Crisnet report, both P. Williams and Ms. Ryan,

stated Officer E. Williams had an unholstered handgun in his possession. Both failed to report their concerns regarding his behavior, left pertinent details out regarding Officer E. Williams holding Officer P. Williams against her will, and insisted he did not hold the weapon in a threatening manner. While at the residence, Officers of the CPD recovered the handwritten note which is quoted below. The texts transcribed below are direct quotes with grammatical errors uncorrected.

> **"I, Edward G. Williams II of sound mind. (Little pissed off though), hereby leave all worldy possesion to my mother, Wanda Williams. That is to include all life insurance policies and bank accounts"**-signed September 20, 2009 @ 6:15 A.M.

An objective evaluation of this letter finds that Officer E. Williams stated he was displeased and left his possessions to his mother. The statement is suggestive; however, it is brief and there were no threats of harm to himself or Officer P. Williams on the note. Furthermore, there was no actual attempt and Ms. Ryan stated she believed he was intoxicated. It was noted by CPD officers that while at the scene, Ms. Ryan told the officers he did not threaten or point the weapon at them. Ms. Ryan stated Officer P. Williams pleaded with her to withhold assault allegations in order to protect his employment. The CPD report from Officer Resst stated Officer P. Williams said Officer E. Williams would never hurt himself and that he wrote the note to get a reaction out of her.

Based on the information that was provided to CPD at the time by Officer P. Williams and Ms. Ryan and the note that was recovered, Lieutenant Schultz contacted Sergeant Martel and advised them of the situation and that an "Endangered Missing" status was place into LEIN. Lieutenant Schultz stated Officer E. Williams needed to respond to either CPD or DPD and be seen in person before the status was removed.

Sergeants Martel notified his supervisor, Lieutenant Blackmon, of the above information and updated him as the incident progressed. Lieutenant Blackmon stated he tasked Sergeant Kozloff to make physical contact with Officer E. Williams, based on the LEIN status by CPD. Although he stated it was not within her capacity to make a determination on his mental status, writer concludes that as a supervisor, had she observed conduct that she believed to be suicidal and that it was going to occur in the near future, as described below, she would have had to act on those observations

Officer E. Williams voluntarily responded to Homicide and had a conversation with Sergeant Kozloff. She determined, based on her personal observations and experience as a law enforcement officer that he was suffering from a reasonable amount of stress given the marital problems they were having

**DefResp1stDocs-0047**

and determined he did not display behavior that appeared homicidal/suicidal. Due to the fact that she personally observed Officer E. Williams, she notified Lieutenant Schultz who then ensured that he was removed from LEIN as a missing person.

- *STATE OF MICHIGAN PROBATE COURT PETITION FOR HOSPITALIZATION*

According to the State of Michigan Probate Court Petition/Application for Hospitalization (Form PCM 201), an individual must personally have observed and swear "under the penalties of perjury" that the behavior displayed by an individual justify hospitalization until a formal hearing. This form is routinely completed by sworn police officers within the State of Michigan who encounter individuals who display behavior consistent with suicidal tendencies.

As it related to suicidal tendencies, two factors must be met in order to legally hospitalize an individual, which is quoted below:

> **"as a result of this mental illness, the individual can be reasonably expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of this expectation."**

Based on these legal parameters, writer concludes that Sergeant Kozloff did not personally observe behavior that would have led her to believe Officer E. Williams was going to harm Officer P. Williams or himself, nor did she personally observe him make significant threats to support said behavior. Furthermore, she was not provided pertinent information, because Officer P. Williams and Ms. Ryan withheld information.

- *CURRENT DPD MENTAL HEALTH PROTOCOL*

During this investigation, writer, along with the assistance of Police Officer Felisa Russell, badge 4933, assigned to Planning and Accreditation, queried the Detroit Police Manual in an effort to ascertain the protocol regarding supervisory duties and procedures as it related to officers with mental stress, absent alcohol or narcotic inclusions, which may be deemed to affect their duties and/or require hospitalization. Two manual citings where discovered which may be related to non-duty-related stress. Both are listed below

"Sickness, Injury or Death", Series 400, Chapter 401.8-4.3, "Psychological/Stress related illness," which stated:

"If a member is unable to finish the shift because of a psychological/stress related illness 'and' indicates the illness is 'duty related', the supervisor shall notify the Medical Section by telephone during regular business hours or through the Notification and Crime Reporting Section, at all other times, and shall be guided by the advice of the commanding officer of the Medical Section.  'Member(s) shall not be sent to an authorized clinic for psychological or stress related problems'"

"Sickness, Injury, or Death", Series 400, Chapter 401.8-4.3, "Reporting for duty with a non-duty related injury or illness," which stated:

"Though supervisors do not ordinarily have the professional qualifications to permit judgment as to whether or not a member is sick, in some instances, even medically untrained persons can make a determination that someone is sick. Therefore, when it is apparent that a member has reported for duty with a non-duty related injury or illness which obviously impairs the member's ability to perform his/her duties or whose condition may pose a direct threat to their own health and safety or to the health and safety of other department personnel or the public, that member shall not be permitted to work. 'The member shall not be authorized to use any authorized clinic at department expense.' The member and/or supervisors may contact the Medical Section during normal business hours or through the Notification and Crime Reporting Section if they have concerns regarding the member's ability to work."

On March 11, 2010, writer talked to Lieutenant Jevestine Coleman, badge L-40, Commanding Officer of Medical Section, who stated she was unaware of a policy that outlined the proper procedure regarding supervisors who reasonably believe that a subordinate may be under non-duty-related stress that may be deemed to affect their duties and/or require hospitalization. She stated if an officer were directed to Medical Section by a supervisor to be evaluated, they would not be turned away, but the member would be only **assisted** with seeking psychological services that would be ultimately **paid for by the member.** Therefore, it is the member's option to receive such an evaluation and treatment, not mandatory.

- *EMPLOYEE ASSISTANCE*

On February 19, 2010, writer talked to Sergeant Steven Myles, badge S-241, assigned to Medical Section, Employee Assistance, and asked if there is policy which outlines a supervisor's duty as it related to officers with duty-related or non-duty-related mental stress, which may be deemed to affect their duties and/or require hospitalization. Sergeant Myles stated he was unaware of one and would research the issue.

On February 24, 2010, writer talked to Sergeant Myles who stated he found no such policy regarding an officer's ability to perform their duty, due to stress, absent alcohol or narcotic inclusions. In addition, he stated the only paperwork Employee Assistance had was from January 5, 2000, which was addressed to "All Supervisors," which was titled "Guidelines for Contacting the Psychological Service Office of the Medical Section." This memorandum, which was created by then Inspector Linda M. White, of the Medical Section, outlined protocol regarding officers who call in sick due to duty-related and non-duty-related stress or psychological difficulties and outlined how to address duty-related and non-duty-related suicidal/homicidal ideation.

In addition, writer found that the telephone number for Employee Assistance, which was listed on the department website, was disconnected (313-852-4655). Writer notified Medical Section of this information. As of the writing of this report, the telephone number has not been corrected.

- *SUICIDE RISK*

According to the National Association of the Police Chiefs, there are approximately 300 officer suicides a year, nearly double the amount killed annually to duty related incidents. Dr. Bengt B. Arnetz, MD, PhD, MPH, MScEpi, Director of the Division of Occupational and Environmental Health at Wayne State University, recently concluded in study in 2009, that revealed the Detroit Police Department (DPD) has the highest suicide rate in the nation amongst its officers, as compared to similar sized departments. Since 2006, the DPD has lost one officer to a duty-related death; however, the Department has lost seven members to suicide during the same timeframe:

1. Police Officer Ryan Parshall (2006)
2. Police Officer Brian Moffett (2006)
3. Police Officer Brian Vieau (2007)
4. Police Officer Tabitha Stokes-McCree (2007)
5. Sergeant David Cobb (2008)
6. Police Officer Edward Williams (2009)
7. Police Officer Patricia Williams (2009-homicide victim during suicide)

- *CONCLUSION*

Based on this information, writer concludes that Sergeant Kozloff made her best, objective decision and did not have departmental guidance while evaluating Officer E. Williams's mental status.

- *ADDITIONAL INFORMATION*

Writer found that during the conversations between CPD and DPD, no member attempted to contact Officer P. Williams regarding her wellbeing. Albeit, Officer P. Williams had several opportunities to fully disclose the events that had transpired to CPD and there is no established DPD policy in regards to contacting a spouse involving said incidents; however, writer concludes that there was a missed opportunity to assess a member of our department regarding her personal wellbeing during the last days that lead up to her death.

## DID SERGEANT MARTEL OBSTRUCT THE PRELIMINARY INVESTIGATION?

Lieutenant Schultz documented in his report that he spoke to Sergeant Martel, who advised him not to fax the pertinent paperwork to Homicide, but to IA, although a Homicide supervisor eventually evaluated his mental wellbeing. Based on the nature of this particular incident, the assertion of obstruction should be addressed.

The telephone recordings on September 20, 2009, showed that Sergeant Martel initially told Lieutenant Schultz to fax pertinent paperwork to Homicide. Sergeant Martel advised Lieutenant Walton of the scenario and she informed him that CPD would handle the criminal investigation and that IA would handle the administrative investigation. She advised him that the paperwork should be faxed to IA and that if paperwork was inadvertently faxed to Homicide, to ensure its confidentiality. During a follow-up phone call, he advised Lieutenant Schultz to fax said paperwork to IA, who responded that he was not working on September 21, 2009, but would ensure that it was faxed over. It was determined that IA did not receive the paperwork from CPD until Tuesday, September 22, 2009. IA normal operating hours are Monday-Friday, 7:00 A.M.-5:00 P.M.

Writer concludes that although Sergeant Martel initially told Lieutenant Schultz to fax pertinent paperwork to Homicide, he had a conversation with Lieutenant Walton and then later that same day informed Lieutenant Schultz otherwise. Sometime during that conversation, Sergeant Martel concluded that all of the paperwork should be forwarded to IA and not Homicide, due to the confidential nature.

Writer concludes that paperwork of this kind would be of a strict confidential nature and only IA would have been privy to the contents. Sergeant Kozloff made a determination on his mental capacity based on the initial information she had at the time and her personal observations and experience as a law enforcement officer. Writer concluded that physically observing a faxed copy of the note and reports generated by CPD would not have added additional information. The note was suggestive and the reports were generated based on the statements made by Officer P. Williams and Ms. Ryan, which unfortunately downplayed the seriousness of recent events.

To conclude, writer finds that there is no obstruction regarding this investigation as it relates to Sergeant Martell advising Lieutenant Schultz to fax the paperwork to IA rather than Homicide.

## SUMMARY AND CONCLUSIONS

At the conclusion of this investigation, writer has found that on September 22, 2009, at approximately 9:00 A.M., Officers E. Williams and P. Williams agreed to meet at the Canton Public Library, which was adjacent to the CPD, to discuss marital issues. There were prior marital issues regarding infidelity between the two and they had separated approximately two months prior. Officer P. Williams was a victim of domestic violence; however, she failed to report the incident due to the fact that she did not want to hinder Officer E. Williams' employment with the department. Based on her actions and recovered text messages, she was fearful of him becoming violent.

Prior to September 22, 2009, CPD responded to their residence and discovered a handwritten note left by Officer E. Williams, which stated he wished for his possessions and life insurance policies to go to his mother. Although the note was suggestive, it lacked specific intent and wasn't prima facie evidence that he had homicidal/suicidal tendencies. Furthermore, Officer P. Williams and Ms. Ryan did not report any acts of assault or criminal activity to CPD. This information was relayed to Sergeants Martel and Kozloff, and ultimately, Sergeant Kozloff found that it was reasonable that Officer E. Williams was under stress due to a marital conflict and did not find that his actions warranted hospitalization. Based on the fact that there is no established policy regarding members who are experiencing psychological difficulties, absent alcohol and narcotic dependency, she based her determination by utilizing a reasonable, objective point of view and was not responsible for pursuing the situation any further.

On September 22, 2009, while at the library parking lot, Officers E. Williams and P. Williams ended up next to his Charger, where he produced a loaded revolver and fired four rounds at Officer P. Williams, ultimately taking her

life. Officer E. Williams then turned the handgun on himself and fired the last round, ultimately taking his life.

The manual citings when the use of Deadly Force is justified, in Section 300, Directive 304.2-4.2, "Use of Force," which states in part:

"a). **Murder or attempted murder;**
b). **Assault with intent to commit murder;**
c). **Criminal sexual conduct, first and third degree;**
d). **Armed robbery or attempted armed robbery, or**
e). **Assaults that result in life-threatening bodily injury.**"

Based on the facts and circumstances in this investigation, writer concludes that Officer E. Williams was not presented with any of the aforementioned prerequisites and did not comply with departmental guidelines, as it related to utilizing Deadly Force. Officer E. Williams's actions were criminal in nature and not within the scope of his sworn duty.

## PSYCHOLOGICAL STRESS WITHIN THE DETROIT POLICE DEPARTMENT

At the conclusion of this investigation, it was concluded that the Detroit Police Department suffers from the highest national rate of suicide amongst police officers and has endured an appalling number of suicides in the past four years, as researched by Dr. Arnetz.

## POLICY VIOLATIONS

Officer E. Williams was found to be in violation of the department's Deadly Force requirements, as stated above.

## TACTICAL ANALYSIS

N/A

## FINAL RECOMMENDATIONS

Based on the aforementioned circumstances relative to this incident, writer recommends that Force Investigation case 09-056 be closed with a finding of a finding of **"SUSTAINED MISCONDUCT,"** as it relates to Officer E. Williams's use of Deadly Force against Officer P. Williams. Although Officer E. Williams is deceased, writer recommends that this investigation be closed in its entirety for archive purposes, hence this investigation should be forwarded to Disciplinary for closure.

Writer further recommends an additional finding of **"EXONERATED,"** as it related to Sergeants Martel and Kozloff's actions during this incident.

Writer further recommends that due to the nature of the circumstances surrounding this incident and the data gathered regarding the recent history of member suicides, writer recommends this report be forwarded to Medical Section and Risk Management for policy assessment and evaluation.

Writer further recommends that the contact number for Employee Assistance be updated on the department website.

JEREMY A. JAMES
Sergeant, S-823
Force Investigation

**DefResp1stDocs-0054**