**AFFIDAVIT**

STATE OF Michigan

COUNTY OF Wayne

Mary Diane Bukowski being duly sworn according to law, deposes and attests under penalty of perjury to the following:

I, Mary Diane Bukowski, of the City of Detroit, State of Michigan, being first duly sworn on oath, state that:

1. I am over 18 years of age and competent enough to testify of my own knowledge of the facts stated herein.

2. All the facts stated by me herein are true, correct and complete to the best of my knowledge and understanding.

3. This affidavit is being provided as an addendum to my eligibility objection, Docket #440, filed August 19, 2013, in the bankruptcy case of the City of Detroit, Michigan Case No 13-53846, currently pending in front of the Honorable U.S. Bankruptcy Judge Steven W. Rhodes. I have also attached documents pertinent to my contentions.

I hereby attest to my personal and professional knowledge of matters related to what Detroit Emergency Manager Kevyn Orr, as well as the Detroit Free Press in its story of Sept. 15, 2013, "How Detroit Went Broke," have stated is a key factor in Detroit's debt crisis, namely the $1.44 billion Pension Obligation Certificates loan from UBS AG and Siebert, Brandford & Shank, to the City of Detroit, floated in 2005 and renegotiated in 2006. The Detroit Free Press article says it amounts to $2.8 billion over 20 years, and represents one-fifth of the city's debt.
http://www.freep.com/apps/pbcs.dll/article?AID=2013130801004

**I believe from my direct observation and knowledge that this entire debt is the product of "unclean hands" and must be disallowed as a factor in considering the city's eligibility for bankruptcy while it is investigated under provisions of Public Act 436.**

I retired from the City of Detroit after 25 years in 1999. Subsequently, I became an investigative reporter whose stories were published for 10 years in the weekly Michigan Citizen. I personally covered and photographed the City Council hearings during which that debt was debated and eventually approved. I have continued to research and report on that matter during my

current position as editor of the on-line newspaper, The Voice of Detroit.

Sentence #6 of my original objection cites civil matters still pending regarding the constitutionality of Public Act 436. The lawsuit filed by the Detroit pension funds has in fact since been remanded by U.S. District Judge Paul Borman to the 30th District Court of the State of Michigan and is therefore still extant, pending further events. The pension funds cite several aspects of PA 436 in their lawsuit and subsequent filings in this court which require the Emergency Manager to abide by the provisions of the State Constitution Art. 9, Sec. 24, protecting public pensions. Attorneys Jerome Goldberg (representing David Sole) and Michael Karwoski (representing himself as a retiree) have also cited these aspects in their eligibility objections.

While not acknowledging that PA 436 is constitutional, I wish to cite another portion of PA 436, since it is the act under which this Honorable Court has recognized Mr. Orr as the representative of the City of Detroit. That section is *"141.1556: Criminal conduct contributing to receivership status. Sec.16. An emergency manager shall, on his or her own or upon the advice of the local inspector if a local inspector has been retained, make a determination as to whether possible criminal conduct contributed to the financial situation resulting in the local government's receivership status. If the emergency manager determines that there is reason to believe that criminal conduct has occurred, the manager shall refer the matter to the attorney general and the local prosecuting attorney for investigation."*

EM Kevyn Orr himself stated in his June 14 Proposal to Creditors, *"The City has identified certain issues related to the validity and/or enforceability of the COPS that may warrant further investigation."* COPS (or Certificates of Participation) is another term for Pension Obligation Certificates (POC's). However, despite my direct questions to Mr. Orr during press conferences on March 14, 2013, when he was installed, and June 14, 2013, during his first meeting with Creditors, regarding whether he has launched on investigation of the validity/enforceability of the POC's, he has refused, or at the very least failed, to do so.

On Jan. 31, 2005, I was present to report on a City Council session during which Mayor Kwame Kilpatrick's Chief Financial Officer Sean Werdlow and his Deputy Mayor Anthony Adams strongly recommended that the Council pass the POC loan. It was highly controversial, and opposed at first by Council members Maryann Mahaffey, Sharon McPhail, Joann Watson, and Barbara Rose-Collins. Council President Ken Cockrel, Jr. went so far as to force recalcitrant Council members to the table by sending police to their homes to ensure a quorum, as testified to at the meeting. *(See attached print-outs of the articles from Michigan Citizen archives, Exhibits 1, 2, 3, 4.)*

Numerous representatives of the pension boards as well as union officials, retirees and city workers spoke against what they said was an extremely risky

proposition, citing the vicissitudes of Wall Street dealings.

CFO Sean Werdlow introduced Stephen Murphy of Standard and Poor's and Joe O'Keefe of Fitch Ratings to the Council, saying "It took a lot to get them here." Indeed, it appeared extremely strange that Wall Street ratings agency representatives would come to the City Council themselves to advocate for bank loans, since they allegedly "impartially" rate debt. I photographed Werdlow, Murphy, O'Keefe, and Adams at the table as they advocated for the debt and my stories on that session and others were published in the Michigan Citizen.

The POC debt was eventually passed unanimously by the City Council after threats of lay-offs by Mayor Kilpatrick and bond downgrades by the ratings agencies. It was a disaster. The stock market tanked in 2008. The City defaulted on a $400 million POC debt payment in 2009 and subsequently agreed to allow taxes rendered by the city's casinos to be given to the U.S. Bank of North America as collateral on the debt. That agreement is the subject of the Forbearance Agreement before this court which would terminate swaps related to the debt.

My contention, however, goes beyond that Forbearance Agreement to the entire POC debt itself. In November of 2005, Detroit CFO Sean Werdlow became a Managing Director at Siebert, Brandford and Shank, a position which he retains to this day. See Exhibit #4 http://www.sbsco.com/firmPage/firm1/bankingteam/seanwerdlow.aspx .

In 2006, the POC debt was re-negotiated by the same parties, UBS and Siebert, Brandford and Shank, according to documents I pulled from those released to David Sole under the Freedom of Information Act and posted as Detroit Debt Docs at https://docs.google.com/folderview?id=0BwEVDvudxHBTX1lMcXFLdzNOSEU. Siebert, Brandford and Shank continues to issue much of the city's debt according to those same documents.

This is direct evidence of "unclean hands." Mr. Werdlow's hiring by Siebert, Brandford and Shank was clearly a quid pro quo. The role of Stephen Murphy and Joe O'Keefe in advocating for that debt as representatives of Wall Street ratings agencies is similarly questionable. Additionally, former Detroit Mayor Dennis Archer was a consultant for UBS AG during the time the POC loan was finalized, raising questions about his possible involvement in the deal. See http://www.bloomberg.com/apps/news?pid=newsarchive&refer=&sid=arIsuoqg34OI and attached printout. (Exhibit #5)

I believe Mr. Orr as well has "unclean hands" in this matter since he has acknowledged both the primacy of the POC debt in the City's crisis, and "questions relating to the validity or enforceability of the debt." In addition to responses to my questions, he has acknowledged during his deposition Aug.

30, 2013, that he is aware of various indictments and civil matters brought against UBS and its swaps partner Bank of America over the past several years by U.S. regulatory agencies, during questioning by attorney Jerome Goldberg. See http://www.detroitmi.gov/Portals/0/docs/EM/Reports/ORR_KEVYN_4PP.pdf, and also the attached section from Goldberg's questioning. (Exhibit #1)

Yet he has done nothing as he is obligated to do under PA 436, the state law which this Court has acknowledged gives him authority to represent the City of Detroit, "to make a determination as to whether possible criminal conduct contributed to the financial situation resulting in the local government's receivership status."

I therefore believe the entire $2.8 billion in Pension Obligation Certificates debt, along with all related swaps, hedges and penalties, must be removed from consideration in this bankruptcy case due to the involvement of "unclean hands," and a criminal investigation must be launched involving all parties involved, before any eligibility for bankruptcy can be determined.

*(Printed Name of Affiant)* Mary Diane Bukowski

*(Signature of Affiant)*

*Mary Diane Bukowski*

*(Address of Affiant)* 9000 E. Jefferson #10-9, Detroit, Michigan 48214

**NOTARY CERTIFICATION**

SWORN to and subscribed before me, this the _16th_ day of _September_, 20_13_.

_____
NOTARY PUBLIC

My Commission Expires:

_12/11/2013_

TIMOTHY D. GREER
Notary Public, State of Michigan
County of Wayne
My Commission Expires 12-11-2013
Acting in the county of Wayne

Exhibit #1

# Police, Wall St execs called out on pension deal



**(L to r at City Council table Jan. 31, 2005: Detroit CFO Sean Werdlow, Joe O'Keefe of Fitch Ratings, Stephen Murphy of Standard & Poor's, Deputy Mayor Anthony Adams.)**

**By Diane Bukowski**
The Michigan Citizen

DETROIT — Mayor Kwame Kilpatrick marshaled financial executives to the table during a council public hearing Jan. 31 in a last-ditch attempt to get the body to approve a bond to fund pensions.

"It took a lot to get them here," said the city's chief financial officer, Sean Werdlow.

Werdlow objected loudly when Councilwoman Sharon McPhail got a representative of Fitch Ratings, a bond rating agency, to admit his company had "frequently been apprised" of the city's plan to use layoffs and service cutbacks to deal with a $300 million budget deficit.

The representative, Joe O'Keefe, said his agency currently rates the city's credit as "A, with a negative outlook," unless the city enacts those cuts. In 1992, Wall Street bond rating agencies drastically downgraded the city's credit after city unions voted down a ten-percent pay cut.

Werdlow said 2,000 to 3,000 city employees would be laid off unless the bond deal is approved. He said it would save the city $160 million in this year's budget, and compared the deal to refinancing a home mortgage, from a current rate of 7.8 percent to a lower rate of 5.6 percent.

Werdlow added that the city could not borrow only the money owed to the pension funds this year, but the entire $1.2 billion in liabilities owed over the next 14 years.

He was directly contradicted at various times by the bond executives, who said the city's pension debt is a "soft liability," not a "hard liability" like a home mortgage, and could be borrowed in annual allotments.

Stephen Murphy of Standard and Poor's, however, said it would be "financially prudent" to make the debt a hard liability.

Councilwoman Sharon McPhail and George Orzech, who both sit on the city's Police and Fire Retirement System Board, pointed out that a "soft liability" can vary to the city's advantage. In previous years, Orzech said, that system was over-funded due to successful investments, eliminating the city's liability.

Addressing Murphy, Councilwoman JoAnn Watson said, "If the transaction is approved but the stock market goes south in the following years, what would that do to the city's bond rating?"

Watson cited negative factors influencing the nation's economy, including competition from automakers in China and elsewhere, and the war in Iraq.

Murphy responded, "That would be a significant problem." He stressed that for the deal to succeed, pension boards would have to resist demands for better retiree benefits and distribution of excess profits, as with the "13th check" city retirees used to receive.

Werdlow said the elected retiree boards would still control the distribution of proceeds from the bonds.

The city council is deliberating not only on the bond issue, but also on an ordinance to form two non-profit corporations that would oversee the funds, doling them out to the boards on an annual basis.

Henry Sciortino, head of the state oversight board now running the City of Pittsburgh, tried to assuage the impact of remarks he made at Kilpatrick's economic forum Jan. 5.

At the time, he had cited a pension bond deal as partially responsible for the city's default. During the council session, he said that the deal was "non-callable," meaning interest rates could not be renegotiated even after they went down on the national market. That goes against Werdlow's claim that only 10 to 15 percent of Detroit's proposed bond deal is "non-callable."

Councilwoman Barbara Rose-Collins said the city council should not rush to pass the bonds without exhausting other possible options.

Union presidents Emily Kunze and John Riehl, representing workers in the city's Water, Public Lighting, Finance and Human Resources departments, laid out some of those alternatives during the hearing.

Kunze said it was the responsibility of big business to deal with the city's deficit.

"They got all the tax abatements," she said. "What are they giving back to the community? We demand some of that money they're spending on the Superbowl for our services!"

She said part of the problem behind the deficit is that the Kilpatrick administration failed to pay payroll taxes on time to the federal government, which has left the city with about $4 million in fines.

As for the bond deal, Kunze added: "We can't enter into a scheme like this with no guarantees. We can't gamble with Detroit's future."

The deal was scheduled for a council vote on Feb. 2, when Council President Maryann Mahaffey is expected to return from an absence due to shoulder surgery.

Bankole Thompson contributed to this report.

*E-mail: dbukowski@michigancitizen.com*

Exhibit #2

# Council caves: Votes for risky pension bonds

## Many city workers relieved

**By Diane Bukowski**
The Michigan Citizen

DETROIT — After months of opposing it, the Detroit City Council's "Fabulous Four" voted for a $1.2 billion pension bond deal Feb. 4, 2005 stunning many supporters while comforting city workers worried about keeping their jobs.

"The state took over the schools to control a $1.5 billion construction bond proposal," Agnes Hitchcock of the Call 'Em Out Coalition said. "Now it looks like we're telling them that the city is a good thing to take over as well."

Helen Moore, head of the Keep the Vote No Takeover Coalition, agreed: "Call 'em out, call 'em out, what's it all about — elected politicians selling us out."

But many city employees reacted with relief, saying they feared being laid off if the council didn't go along with the deal.

Prior to the vote Mayor Kwame Kilpatrick told the council that if the bond deal didn't pass, "I'll have to lay off 2,000 workers. We've already told Wall Street we would use the pension obligation certificates to close the gap in our budget."

For a while during the lengthy discussion, the council president, Maryann Mahaffey, along with Councilwomen Barbara Rose Collins, Sharon McPhail and Joann Watson, went toe to toe with the mayor.

McPhail, a candidate for Kilpatrick's job, told the incumbent mayor: "This is a very risky transaction. Your own people at your economic forum called this one of the seven deadly sins of municipal finance. If the deal doesn't do what is expected, we could face receivership under the local government Fiscal Responsibility Act. If the stock market does well, that $1.2 billion in unfunded pension liability could go away, but we'd still owe it in bonds."

"So what?" Kilpatrick responded.

McPhail and the vice president of the Detroit Police Officers Association, Paul Stewart, who both sit on the Police and Fire Retirement Board, said their colleagues would likely support a different scenario to address the budget crisis: deferring the city's payments to the system for this year and spreading out future payments.

Kilpatrick turned the proposal down flat, saying that borrowing the bonds at a lower interest rate would still be preferable.

In a seven-point alternative plan, Watson proposed rescinding non-essential private contracts, including one between the water department and the Infrastructure Management Group.

"I want you to commit to no layoffs and restoration of bus services until there are deep cuts in management," she added.

Mahaffey pointed to a list of $300 million in no-bid contracts, asking that those be slashed.

Others who would not endorse the bond package included Ed McNeil and Jimmy Hearns, representing Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME).

Their boss, Council 25 President Al Garrett, later said he was misquoted as being in support of the deal, but added, "Frankly I didn't see any better alternative. We're in favor of bringing private contracts back in, but my concern was the timetable. How long would it take, and what litigation would be involved?"

In the end, with Watson and the mayor several times leaving the room together, and Collins abruptly saying the matter could be resolved, the four council members jointly capitulated.

They voted yes on the strength of verbal promises from Kilpatrick to retain all workers — other than the 700 fired last month — until July 1; to freeze new non-essential purchases and real estate leases; and to meet with the council on a regular basis.

In statements, McPhail and Mahaffey said they gave their vote with "unreadiness" and "reluctance."

Watson, who has lobbied for a "team approach" to deal with the budget crisis, said she felt the mayor would use upcoming meetings to address the council's concerns about private contracts.

Asked whether she felt Kilpatrick would agree to eliminate the contract with IMG, whose executives have contributed large amounts to his campaign fund, Watson said campaign finances were not the issue.

The mayor must now meet with city unions to see if they will agree to ten-percent pay cuts like those he asked the council to endorse for non-union members.

Ron Gracia, president of the Senior Accountants, Analysts and Appraisers Association, said afterwards, "The mayor held city employees hostage to get this vote, but he's not laying off police and fire employees, and he's not asking them for a ten-percent cut. The deficit is in the general fund, and 60 percent of my members are not paid out of that fund. He's creating an economic underclass."

Garrett, the Council 25 president, said Kilpatrick had already told his union that at least 600 AFSCME workers would be added to the unemployment rolls if they voted down the pay cuts.

E-mail: dbukowski@michigancitizen.com

Exhibit #3

# Archer on bond dealer's payroll



Dennis Archer

## Bond dealer to reap millions in fees

**By Bankole Thompson**
The Michigan Citizen

DETROIT — As the city prepares to hand UBS Financial Services the pension bond deal, it will in a way reward former Detroit Mayor Dennis Archer, a lobbyist on the payroll of the giant investment bank.

Faced with a growing deficit of over $300 million for 2005-2006, Detroit turned to its retirement systems last week to borrow $1.2 billion in pension bonds in the name of saving jobs.

Several Detroit City Council members had expressed fear that borrowing money to pay for the city's financial woes without proper structural changes in city government was bad business. Nevertheless, the Detroit City Council voted 8-0 to approve Mayor Kwame Kilpatrick's plan to do just that.

In March 2004, The Associated Press carried an article by Justin Pope showing how large investment banks like UBS thrive off bond deals with the help of lobbyists such as Archer.

"Like many big investment banks, UBS Financial Services relies on a stable of well-connected local lobbyists to steer lucrative municipal bond underwriting business back its way," Pope wrote.

He reported the firm has about 28 political consultants under contract, including Archer.

In 2003, UBS paid its consultants $1.8 million, up 66 percent from 2002, Pope reported.

"UBS isn't the only firm spending big money lobbying to win business underwriting, or selling a government body's bonds to the public, usually at a markup," he wrote. "Merrill Lynch spent nearly $3 million last year, and J.P. Morgan Chase spent $3.3 million. Payments to consultants by the top 15 securities underwriters hit $7.3 million in the first half of last year, up 70 percent since 1998, according to data compiled by The Bond Buyer, an industry publication."

He said the media hardly covers the $1.9 trillion municipal bond market, which is a critical part of the economy.

"The sector has thrived in recent years; budget cuts have sent state and local governments scrambling for funds, while low interest rates have made it appealing for them to seek those funds in the bond market," Pope wrote.

Archer could not be reached for comment on whether he's playing a role in securing the bond deal between UBS and the city.

"There is too much cronyism in this administration," said City Council President Maryann Mahaffey, referring to Kilpatrick's mayoralty.

UBS was among several rating agencies and bond insurers, including Fitch Ratings and Standard & Poor's, that went before council at the behest of the Kilpatrick administration to answer questions

about the deal as a possible solution to the city's fiscal crisis.

"It is standard business practice in the modern world but I find it very bothersome," Mahaffey said. "I don't even know if there was an open bidding to deal with UBS. That is part of the secrecy. I just don't like it."

Either way, Mahaffey voted for the deal. Ironically, it was Archer who added nearly 3,000 employees to the city's payroll during his administration, contributing to the budget deficit that in turn created the need for the bond sale.

But the bond deal is fraught with questions, a major one being whether such a deal could work for a city like Detroit.

"Pension bonds should not be used to fund plans that require substantial liquidity to meet net cash outflows," said James B. Burnham, an expert on pension bonds.

Burnham, the Murrin Professor of Global Competitiveness at Duquesne University in Pittsburgh, said it is challenging to manage pension bond obligations.

"Like any financial debt instrument, pension bonds are two-edged swords. In the hands of the right borrower, a well-designed pension bond issue may play a useful if limited role in managing pension obligation certificates," he said.

But a poorly-designed issue, he went on, reflects "a desperate effort to avoid coming to terms with fiscal reality, with unpleasant ultimate consequences for all concerned."

The City of Pittsburgh, now under receivership, makes a strong case against pension bonds, Burnham said.

"Pittsburgh is a poster child for the case against pension bonds," Burnham said. "In the case of Pittsburgh's plan, in 2001 the gap between payments and contributions plus interest and dividends was a negative $8 million."

That meant the plan managers had to liquidate an equivalent amount of investments in a down market, he said.

He added: "Such an action violates the basis behind the apparent long-run returns on investment in equities. No serious effort was made to address the problem of the underlying structural deficit. Instead the city resorted to one-shot financial transactions, such as the sale of the water and sewer operations to an off-balance sheet entity and the sale of tax liens."

Burnham said the Government Finance Officers Association recommends state and local governments to use caution in issuing pension obligation bonds.

"GFOA says governments should be sure they are legally authorized to issue these bonds and that other legal or statutory requirements governing the pension fund are not violated," he said.

Burnham said the GFOA states that the issuance of pension obligation bonds should not become a substitute for prudent funding of pension plans.

Visit www.gfoa.org for the full text of GFAO's recommendations.

With the passing of the pension bonds, Kilpatrick now has to work out details with UBS Financial Services and hire bond attorneys, according to one city analyst. The analyst said the deal will cost the city about $12 million in legal fees.

*E-mail bthompson@micigancitizen.com*

Exhibit #4

# Wall Street junks Detroit

**But fight may be brewing**

**ANALYSIS**
**By Diane Bukowski**
The Michigan Citizen—Dec. 2005

DETROIT — After meeting for several hours with Mayor Kwame Kilpatrick and his top aides shortly after city elections, Standard & Poor's once again downgraded the city's bond ratings, this time to BBB- one step above junk level.

Despite Kilpatrick's lay-offs of 1,396 city workers since June and recently disclosed plans to close most of the city's recreation centers, S&P said, "The administration's hesitancy to cut positions, as well as the inability to adjust union contracts to gain savings, has deepened the budget gap for fiscal 2006."

The agency went on to demand that city workers and retirees pay even more for their health care, although they have already shouldered increasing health care co-pays. S&P also endorsed Kilpatrick's other contract proposals, which include a 10 percent pay cut in the form of a shortened work week.

S&P found a note of hope, however.

"Union negotiations appear hopeful because the contracts are currently expired, and should no agreement be made between the two sides a last-best offer (determined by the arbitrator) could be imposed," said S&P.

"Since new contracts will be in place by March 1, 2006, the city has assumed some savings in contracts costs during the last four months of the fiscal year."

Whether city workers will agree to Wall Street's demands remains to be seen, however. A demonstration by the city's largest union local, representing water department workers, was planned for Dec. 1 to honor the 50th anniversary of the day Rosa Parks refused to relinquish her seat on a city bus in Montgomery, Alabama.

"If Detroit stands up for decent public services and fair treatment for public workers it will set the wheel in motion across the nation," reads a flyer for the demonstration, scheduled for 4:15 p.m. outside the Coleman A. Young Municipal Center. "People everywhere are waiting for someone to stand up and fight. If not Detroit, then who will do it?"

Standard and Poor's recently slashed credit ratings for General Motors and Ford even lower than the city's, dumping them into the junk bond basement.

But threats by unions representing Delphi workers that they would strike in response to the

company's demands to slash wages from an average of $27 an hour to $12.50, have forced GM, Delphi's largest customer, to intercede in the Delphi negotiations. Delphi has now postponed its deadline for filing a motion in bankruptcy court to cancel union contracts from Dec. 16 to Jan. 20 next year.

Even Republican legislators have recently come out to challenge Wall Street, in the wake of the collapses of Enron and WorldCom after exposures of massive fraud.

In July, U.S. Congressman Michael G. Fitzpatrick (R-Pennsylvania) introduced a bill in the House of Representatives to regulate ratings agencies, H.R. 2990, the "Credit Rating Agency Duopoly Relief Act of 2005." The bill's introduction spurred the Securities and Exchange Commission's staff to outline "Key Issues for A Legislative Framework for the Oversight and Regulation of Credit Rating Agencies."

Fitzpatrick said, "As a Bucks County Commissioner, I remember the financial hardships that the people in the 8th District of Pennsylvania faced when Enron and WorldCom went bankrupt. It is extremely disturbing that the two largest Nationally Recognized Statistical Rating Organizations (NRSROs) – Moody's and S&P – rated Enron and WorldCom at invest grade just prior to their bankruptcy filings."

Fitzpatrick went on, "Credit rating agencies claim that they are not in the business of detecting fraud, but they are most certainly in the business of impacting the bottom line of companies, municipalities and school districts. The better the credit rating, the lower the interest rate the borrower must pay to expand its operations, construct a road or build a school."

S&P has responded in alarm, conducting a concerted campaign to defeat the legislative efforts. In a letter to Pennsylvania Congressman Paul Kanjorski, S&P executive Kathleen Corbet even claimed that government regulation of credit ratings agencies would violate their First Amendment Rights.

She alleged that the agencies "perform journalistic functions by gathering information, analyzing that information, and disseminating their resulting opinions—in the form of credit ratings and commentary—to the general public."

In 2004, S&P and Moody's downgraded Puerto Rico's credit ratings, causing the government to carry out massive lay-offs of public employees and increase utility rates, bus fares, highway tolls, car registration fees and public university tuition by huge amounts. The government has also refused to negotiate wage increases with public workers.

In its release on Detroit's bond rating downgrade, S&P cited the city's "high debt burden" including the recent addition of $1.2 billion in pension obligation bonds that S&P analyst Steven J. Murphy came to Detroit to campaign for, as another negative factor in the city's economic outlook.

But S&P did not ask the banks, to which the city paid $366 million in 2005 alone for that

debt, or the city's wealthy contractors, who refused en masse to take a 10 percent cut in their payments from the city, to sacrifice along with the city's workers and youth. It did not ask President George Bush to end the war in Iraq and give the $400 million a year which Detroit provides in tax dollars for the military budget, back to the people of Detroit.

The coming period will show whether Detroit's residents, workers and youth will mount a fight against Wall Street's escalating demands.

Exhibit #5





# SEAN WERDLOW

## Managing Director

OUR PEOPLE

PARTNERS

BANKING TEAM



Mr. Werdlow joined Siebert Brandford Shank in November 2005 following 4 years of senior financial management experience as the City of Detroit Chief Financial Officer. While at the City, Mr. Werdlow was responsible for identifying and implementing numerous initiatives that resulted in $200 million of expenditure reductions and $300 million of revenue generation. Prior to joining the City of Detroit, Mr. Werdlow served as Vice President of Finance and Treasurer of the Detroit Medical Center. His primary responsibilities included debt issuance, management of system wide cash and the management of key stakeholder (rating agencies, bond investors, credit enhancers) relationships and strategies.

Mr. Werdlow has extensive experience in debt issuance, having directly managed over $7 billion of taxable and tax exempt debt over his 17 years of experience in both the private and public sectors. Mr. Werdlow's experience includes structuring and managing transactions in the areas of leasing, water and sewer, pension, hospital finance, tax increment finance, economic development and general obligations.

Mr. Werdlow holds a B.S. in Corporate Finance from Wayne State University.

© 2010, Siebert Brandford Shank & Co., LLC - Member FINRA and SIP
© 2011 Siebert Brandford Shank & Co., L.L.C. - Member FINRA and SIPC
| Home | Request Information | Disclosures | Privacy Policy | SiteMap

Exhibit #6

# UBS Citigroup Paid Ex Politicians to Win Bond Work (Update2)

*By Martin Z. Braun and Eddie Baeb - February 10, 2005 12:38 EST*

http://www.bloomberg.com/apps/news?pid=newsarchive&refer=&sid=arlsuoqg34OI

Feb. 10 (Bloomberg) -- UBS AG, the top underwriter of U.S. municipal bonds last year, also led in another category -- paying former government officials to win contracts to underwrite the debt that public agencies use to build schools, hospitals and roads.

The Zurich-based bank paid $2.4 million last year to 28 consultants, including Dennis Archer, former Detroit mayor, and Ray Sullivan, a spokesman for President George W. Bush when he was governor of Texas. Sullivan's wife, Leslie, is Texas Governor Rick Perry's chief fund-raiser.

The use of consultants has come under scrutiny from the Municipal Securities Rulemaking Board, the municipal bond regulator in the U.S., as a pending federal investigation in Philadelphia is examining political corruption in public finance. On a national level, more than 80 percent of municipal bonds are privately arranged, without competitive bidding.

``The fundamental question that's being avoided or evaded is whether or not undue influence is being brought to bear,'' said William Kittredge, 55, founder of the Center for the Study of Capital Markets and Democracy in Arlington, Virginia. ``Is the public suffering as a result by paying more?''

The 10 largest underwriters paid $11.2 million to bond consultants last year, according to filings with the Alexandria, Virginia-based MSRB. Citigroup Inc., based in New York, ranked second in payments to consultants with $1.83 million, followed by New York-based JPMorgan Chase & Co. with $1.41 million, filings show.

Banks pay consultants to help win bond work because consultants know about the financial needs of state and local bond issuers, said Rob Barber, co-head of public finance at Merrill Lynch & Co. in New York.

`Good Understanding'

Municipal bond consultants develop marketing strategies, talk to public officials and advise banks on ways to win underwritings.

``They are on the ground often with the clients and they have a good understanding of what the clients' needs are,'' Barber said last April. Merrill spokeswoman Terez Hanhan said on Feb. 8 that Barber had nothing to add to that interview.

Merrill, the biggest securities firm by capital according to the New York-based Securities Industry Association, ranked eighth in payments to bond consultants in 2004, spending $675,592, filings show.

Merrill is a passive, minority investor in Bloomberg LP, the parent of Bloomberg News.

UBS, Europe's largest bank by assets, increased its payments to consultants by 18 percent in 2004 from 2003. It also led banks, with $107,700 in payments to political action committees, its filings show.

Former Democratic Leader

UBS reported that its highest-paid consultant in 2004 was National Strategies Inc., a Washington-based firm that solicited bond work for UBS in California, Georgia, Kansas, Oklahoma, and West Virginia, the bank's filings said.

The bank reported that it paid National Strategies $767,542 for ``assisting and advising UBS Financial Services Inc. on financings.''

National Strategies, headed by Al Gordon, a former chairman of the New York State Democratic Party and aide to former Governor Mario Cuomo, helped UBS win $7.9 billion in underwriting work in California, the MSRB filings show.

UBS spokeswoman Susan Austin said in an e-mailed statement: ``The firm's use of consultants is fully transparent and complies with applicable MSRB rules. All contributions made by UBS Financial Services Inc. as a firm -- and contributions made by UBSFSI employees -- are also made in compliance with MSRB rules and applicable laws, rules, and regulations.''

Gordon didn't return calls seeking comment.

One member of National Strategies, Colleen Quinn, has worked on two presidential campaigns and three statewide political campaigns in California, according to the company's Web site.

Quinn didn't return a call seeking comment.

Citigroup Consultants

Citigroup reported that it paid Smith & Ballard Inc. of Tallahassee, Florida, $120,409 in 2004 for consulting help in winning public finance work. Smith & Ballard helped Citigroup win $375 million in state insurance bonds.

Brian Ballard, a principal in the consulting company, is a registered state lobbyist and was chief of staff to Florida Governor Bob Martinez when he served from 1987 to 1991.

Ballard didn't return a phone call seeking comment. Citigroup spokesman Joseph Christinat declined to discuss the bank's dealings with consultants.

Citigroup also paid L. Garry Smith & Associates in Tampa, Florida, $243,170 as a municipal bond consultant in 2004. The company is headed by Smith, who was a chief of staff to Florida Governor Bob Graham, who served from 1978 to 1986.

Tampa Sports Authority

Citigroup reported that it paid the company last year to consult with the Tampa Sports Authority about possible financing. Smith was a board member of that authority from 1999 to 2003.

Smith declined to comment.

Last year, the MSRB sought to ban underwriters from hiring consultants. In a notice filed April 5, 2004, on the proposal, the MSRB wrote: ``Some consultant practices challenge the integrity of the municipal securities market.''

In the notice, the rulemaking board said political contributions by consultants may conflict with its 1994 pay-to-play rule, called G-37, which bars underwriters from contributing more than $250 to local officials who award bond work.

``The MSRB has noted in recent years significant increases in the number of consultants being used, the amount these consultants are being paid and the level of reported political giving by consultants,'' the board wrote in the notice. ``The MSRB is concerned that some of these political contributions may be indirect violations of Rule G-37.''

New Proposals

The MSRB now wants to subject consultants to the same campaign contribution restrictions as public finance bankers face under Rule G-37.

Christopher Taylor, executive director of the MSRB, said the board may announce its planned new proposal as soon as next week. The board is holding a three-day meeting this week, and Taylor said underwriters' use of consultants will be a primary topic.

``Everyone hopes we can reach a decision at this meeting,'' Taylor said. ``This is not an easy topic.''

The Bond Market Association, which last June wrote a letter to the MSRB saying that consultants help spur competition, supports limiting political contributions while it opposes treating consultants as bank employees.

The New York-based trade group represents bond dealers.

``Consultants serve a legitimate and important role in the industry by permitting broker-dealers that do not have the resources to maintain an office or an adequate presence in a particular jurisdiction to compete for municipal securities business,'' wrote Lynnette Hotchkiss, associated general counsel of the Bond Market Association in the June 4, 2004, letter.

`Expect a Return'

The fact that the largest banks paid the most to consultants shows the benefits of hiring politically connected people to win bond work, said Kittredge, who started the center in Arlington last year to study public finance.

``These are for-profit organizations,'' said Kittredge, a former public finance professor at the University of Georgia in Athens, Georgia. ``They don't spend money without a reason. They expect a return on their investment.''

UBS also reported the largest single political contribution among underwriters, a $30,000 donation to the Republican Party of Texas's administrative account in the third quarter.

MSRB rules permit municipal bond underwriters to contribute to political action committees as long as the committees don't serve as conduits to contribute to officials in charge of underwriting selections.

In September, UBS was named as a senior manager on the first-ever sale of highway bonds for the Texas Mobility Fund in April, a $1 billion deal. A year before, UBS donated $20,000 to a successful referendum campaign to authorize the sale of $3 billion of highway bonds. Such contributions are legal in Texas.

`No Influence'

James Bass, director of finance for the Texas Department of Transportation, said UBS was selected through a competitive process. Firms were scored based on their knowledge of state legislation, expertise in transportation finance and ideas ``to maximize leverage,'' Bass said.

``I can honestly tell you we had no influence from any elected official,'' Bass said.

Nevis Securities LLC, an Atlanta-based minority-owned firm, ranked second in consulting fees, collecting $500,000 from JPMorgan, the second-largest U.S. bank, behind Citigroup.

Nevis, whose principals include Julius Hollis, once an aide to former Atlanta Congressman and Mayor Andrew Young, helped JPMorgan win underwriting of $1.3 billion in utility bonds for Memphis, Tennessee, said Nevis Managing Director and Chief Financial Officer Marrion Heflin.

Nevis also helped JPMorgan become co-manager of $293 million of bonds for the Atlanta airport.

`It's All About Relationships'

``This business is all about ideas and it's all about relationships,'' said Heflin. JPMorgan holds an equity interest in Nevis, he said.

Negotiated sales are more expensive for taxpayers, six academic studies have shown. A 2002 study of 148 New Jersey sales by University of Connecticut professor Mark Robbins found that governments using competition saved $1.26 million.

Following are the 10 largest underwriters ranked by the amount they paid consultants to help win municipal bond work in 2004:

| Underwriter | Amount Spent on Consultants |
| --- | --- |
| UBS | $2.36 million |
| Citigroup | $1.85 million |
| JPMorgan | $1.41 million |
| Bear Stearns | $1.26 million |
| Morgan Stanley | $1.17 million |
| Lehman | $910,677 |
| RBC Dain Rauscher | $769,101 |
| Merrill Lynch | $675,592 |
| Goldman Sachs | $629,430 |
| Bank of America | $187,900 |

To contact the reporter on this story: Martin Z. Braun in New York at mbraun6@bloomberg.net.

To contact the editor responsible for this story: Beth Williams in New York at bewilliams@bloomberg.net

Exhibit #7

City of Detroit

Kevyn Orr
August 30, 2013

Page 309

1  entered into, correct?
2      MR. JURGENS: Objection to form.
3      MR. SHUMAKER: Objection, form.
4  A.  Here again, as I've said a couple of times today, I'm
5      going to stay away from legal conclusions as to
6      whether or not a lien would or would not have existed.
7      There are equitable liens that arise ex contractu
8      outside of law.  There are other issues, but suffice
9      it to say this agreement seemed to impose a lien as a
10     matter of the agreement on the casino revenue.
11     BY MS. GREEN:
12 Q.  Okay.  You're not claiming any equitable lien?
13     MR. JURGENS: Objection.
14 A.  We're not claiming a lien.  We've done an analysis,
15     and there have been several memos that have gone back
16     and forth from counsel analyzing a number of different
17     issues at law and at equity.  We -- there's -- me,
18     personally, under our agreement, there's no -- been no
19     assertion of an equitable lien.
20     MS. GREEN: I have nothing further then.
21     THE WITNESS: Sure.
22     Do you need -- you need this, don't you?
23 Is this -- did you -- excuse me.  Did you mark this?
24     MS. GREEN: We can mark it as an exhibit.
25 I don't know that anyone has marked it yet.  We can

Page 310

1  mark it as Exhibit 7.
2      MARKED FOR IDENTIFICATION:
3      DEPOSITION EXHIBIT 7
4      3:20 p.m.
5      (Discussion off the record at 3:20 p.m.)
6      (Back on the record at 3:20 p.m.)
7      MS. GREEN: I thought maybe it was earlier
8  and I just didn't know.
9      THE WITNESS: No, I don't think it was.
10     MS. GREEN: It's hard to hear down there.
11     THE WITNESS: We talked about the
12 collateral agreement.
13     MS. GREEN: We did.  Okay.
14     VIDEO TECHNICIAN: Do we need to go off the
15 record for the second or are we staying on?  Are you
16 asking questions?
17     MS. GREEN: Oh, were we on?
18     THE WITNESS: We can shut up.
19     MR. SHUMAKER: Why don't we go off for one
20 minute to get ourselves together.
21     VIDEO TECHNICIAN: All right.  Thank you.
22     The time is 3:20 p.m.  We are off the
23 record.
24     (Recess taken at 3:20 p.m.)
25     (Whereupon Lally Gartel and Stephen Hackney

Page 311

1  left the deposition at 3:21 p.m.)
2      (Back on the record at 3:22 p.m.)
3      VIDEO TECHNICIAN: We are back on the
4  record at 3:22 p.m.
5      EXAMINATION
6      BY MR. GOLDBERG:
7  Q.  How are you doing, Mr. Orr?
8  A.  Hello, Mr. Goldberg.  How are you?
9  Q.  We met before.  I'm Jerome Goldberg.  I represent
10     David Sole, who's an interested party, he's a retiree,
11     along with his wife, who's also a retiree.
12     MR. GOLDBERG: First of all, I want to just
13 go on the record and thank Kirkland & Ellis and the
14 other attorneys for their patience and their working
15 with other attorneys in this case, and especially
16 someone like me who represents a very different point
17 of view and that they were objective and fair their --
18 in accommodating all the objectives here.
19     BY MR. GOLDBERG:
20 Q.  Let me begin by asking just a few questions just so we
21     can put some of this into perspective.  I want to call
22     your attention to Exhibit 3.
23 A.  Yes.  Okay.
24 Q.  On page 34 of Exhibit 3, there's a chart here that
25     references expenditures from the years 2008 to 2012?

Page 312

1  A.  Yes.
2  Q.  And it indicates -- first of all, I just had a
3      question.  Under the POCs, it has POC Swap GF, I
4      assume that means general fund?
5      MR. SHUMAKER: Counsel, I think you may be
6  pointing to a different page than the witness has in
7  front of him.
8      BY MR. GOLDBERG:
9  Q.  It's page 34 in mine.  Which one did I give you?  I'm
10     talking about the June 14th, 2013.
11     MR. SHUMAKER: Yeah, there's an executive
12 summary and then there's a bigger one.  Are you
13 looking at the bigger one?
14     MR. GOLDBERG: I have copies of what I'm
15 looking at.
16 A.  These are the executive summaries.
17     MR. GOLDBERG: Why don't I mark these and
18 that will make it easier.
19     THE WITNESS: And the larger one is this
20 one.
21     MR. SHUMAKER: The larger one is Orr
22 Number 6.  Take a look at that.
23     MR. GOLDBERG: Sure.  Yeah, this is the one
24 I'm looking at.
25     THE WITNESS: That's the one, the larger

Page 313

1  one.
2      BY MR. GOLDBERG:
3  Q.  Okay.  So Exhibit Number 6.
4  A.  Okay.  Mr. Goldberg, which page were you at?
5  Q.  Page 34.
6  A.  Of the original document?
7  Q.  Yes.
8  A.  Okay.
9  Q.  Here we go, that chart, 34.  And it's a chart that
10  says study that -- lists for fiscal years ended actual
11  expenditures for 2008 to 2012; is that correct?
12  A.  Yes.
13  Q.  I just want to be clear.  It has under POC Swaps GF.
14  That means general fund?
15  A.  Yes.
16  Q.  EF, is that enterprise fund?
17  A.  Enterprise fund excluding department of
18  transportation.
19  Q.  And I'm trying to understand, does that mean that part
20  of the POC Swaps are paid -- a small part is paid from
21  the enterprise fund?
22  A.  Yes.  You'll see the corresponding numbers show for
23  those categories.
24  Q.  Okay.  And I totaled up the years from 2008, 2012.  It
25  appears that $247.5 million was paid on for the POC

Page 314

1  Swaps during those years.
2  A.  I don't have that total in front of me, but I'm going
3  to take it that that's the accurate number.
4  Q.  It appears that it's usually about between 45 to 50
5  million a year.
6  A.  Right, if you average 5, 10, 15, 20.
7  Q.  Just so we're clear, I mean, that 247 million, none of
8  that went to turn on any lights in the City of
9  Detroit, did it?
10      MR. SHUMAKER: Object to the form.
11  A.  It was legacy expenditures, debt service.
12      BY MR. GOLDBERG:
13  Q.  It basically went to UBS and to Bank of America.  It
14  was their reward for betting correctly on a hedge bet,
15  right?
16      MR. JURGENS: Objection to form.
17      MR. SHUMAKER: Objection to form.
18  A.  Yeah, I'm going to stay away from characterizing it as
19  a reward.  There were payments made pursuant to
20  existing certificates of participation at that time.
21      BY MR. GOLDBERG:
22  Q.  And it was based on, as we talked about before, that
23  the difference between the interest rate on the
24  floating rate Swaps -- on the floating rate COPs and
25  the fixed rate that the -- that the City was obligated

Page 315

1  to pay the Swap counterparties, correct?
2  A.  Yes --
3      MR. SHUMAKER: Objection to form.
4  A.  -- as we discussed earlier today.
5      BY MR. GOLDBERG:
6  Q.  Just so I'm clear, the -- what we're talking about
7  with the optional termination event.  The exhibit --
8  the same exhibit you're referencing -- let's just get
9  this -- I want to call your attention to page 28.
10  A.  Of the same exhibit?
11  Q.  Same exhibit.
12  A.  Okay.
13  Q.  Am I correct in the -- that that reflects that as of
14  May 31, 2013, according to your proposal for
15  creditors, the negative fair value of the Swaps was
16  $343.6 million?
17  A.  That's what it says.  Recent valuations established
18  the negative fair value --
19      COURT REPORTER: I'm sorry.  You're reading
20  way too fast.
21      THE WITNESS: I'm sorry.
22  A.  Recent valuations established.  The negative fair
23  value of the Swaps at approximately 343.6 million as
24  of May 31st.
25      BY MR. GOLDBERG:

Page 316

1  Q.  So in the optional termination policy that's part of
2  the forbearance agreement, if the City was to pay the
3  initial payment, the City would still owe 264 -- we'd
4  be paying 264 million approximately on the Swaps?
5      MR. SHUMAKER: Objection to form.
6      BY MR. GOLDBERG:
7  Q.  We'd be paying 75 percent of whatever the termination
8  amount is at that point?
9  A.  Well, it's 75 percent of termination amount at that
10  point, which I believe has since declined from
11  May 31st.
12  Q.  Why do you say it's declined?
13  A.  Because interest rates have shifted, and so at any
14  given time we'd have to value the interest rate
15  formula at the time you choose to exercise the
16  optional termination provision of the forbearance
17  agreement.
18  Q.  The interest rate that we're talking about on the Swap
19  is linked to the LIBOR; isn't that correct?
20  A.  Yes.
21  Q.  The three-month LIBOR?
22  A.  Yes.  I believe so.
23  Q.  I pulled the three-month LIBOR historical index.  It
24  indicated that as of -- might as well as mark this as
25  an exhibit.

Page 317

1    MR. GOLDBERG: Can you mark this as an
2  exhibit?
3    MARKED FOR IDENTIFICATION:
4    DEPOSITION EXHIBIT 8
5    3:29 p.m.
6    BY MR. GOLDBERG:
7  Q.  It appears that as of August of 2013, the three-month
8  LIBOR rate was .2655 percent?
9    MR. SHUMAKER: Objection, foundation.
10 A.  Is there -- if you're talking about --
11   BY MR. GOLDBERG:
12 Q.  Under 2013.
13 A.  2013, a specific category in August which reads
14  0.26550.
15 Q.  Right.  So it's actually gone down since July of 2013
16  according to this chart.
17 A.  Yes.  Did I say up before?
18 Q.  You had indicated that the interest rates -- right,
19  that the -- I mean, if it goes down, the City owes
20  more; isn't that correct?
21 A.  Right.
22 Q.  Just so we're clear again, that 200 -- whatever --
23  whether the figure is 247 million or 200 million, the
24  optional termination payment is not going to be -- the
25  City gets no direct benefit from that payment?

Page 318

1    MR. JURGENS: Objection.
2    MR. SHUMAKER: Objection to form.
3  A.  Well --
4    BY MR. HACKNEY:
5  Q.  Let me be -- strike that question.
6    No lights get turned on from that money.
7  That's money that comes out of the City budget.
8    MR. SHUMAKER: Same objection.
9  A.  Well, it's money -- yeah, I would say that it's money
10  that the City is obligated to pay in some fashion, but
11  to the extent we get a discount, the City benefits.
12   BY MR. GOLDBERG:
13 Q.  I heard before the testimony, and I think it's pretty
14  obvious, that the City does not have the money on hand
15  to pay that termination amount, correct?
16   MR. JURGENS: Objection to form.
17 A.  Yes, I'm told that is correct.
18   BY MR. GOLDBERG:
19 Q.  And to do so it's going to have to float another bond
20  or some kind of loan?
21 A.  Well, it would have to in some fashion derive some
22  funding from the capital markets, yes.
23 Q.  Okay.  I read something, and I heard the same figures
24  floated here.  I read an article in the Detroit News
25  and I heard the same -- I wasn't able to come

Page 319

1  yesterday due to an illness of my wife, but --
2  A.  Oh, I'm sorry.
3  Q.  -- they were talking about a $350 million bond of some
4  kind that is being looked into being floated, correct?
5  A.  Here again, I want to be careful.  It's unclear
6  whether or not it is a bond.
7  Q.  Okay.
8  A.  What is clear is there's some post petition financing
9  proposal which are quite sensitive, but that number is
10  not an unreasonable number and it has been mentioned
11  about in the press.
12 Q.  And is it reasonable to say that that 2 -- 350 million
13  is not going to come free to the City?
14 A.  No.  The City will have to finance it in some fashion.
15 Q.  I mean, I did a little research myself and looked up a
16  bond in Ann Arbor that was recently financed for
17  340 million at 4 percent which is, I would think we
18  both agree, was a good interest rate --
19 A.  Um-hm.
20 Q.  -- and the -- Ann Arbor would be paying 230 million in
21  interest on that bond over a 25-year period.
22 A.  Here again, Mr. Goldberg, I want to be very careful.
23  Without representing or agreeing that the post
24  petition financing that's being discussed will take
25  the characteristic of a bond.

Page 320

1  Q.  No problem.  But either way, we are in agreement that
2  that financing -- we don't have -- the City does not
3  have a source for -- it doesn't have a relationship
4  with the Fed that the banks have where it gets a zero
5  qualitative easing and zero percent loans, does it?
6  A.  The City does not -- is not a qualified financial
7  institution to go to the Fed discount window nor does
8  it have an extra several hundred million dollars in
9  its funds.
10 Q.  Let me ask another question.  I want to call your
11  attention to the forbearance agreement.
12 A.  Yes.
13 Q.  Which exhibit is that?
14 A.  That's Exhibit 2.
15 Q.  Let me call your attention to page 14.
16 A.  Yes.
17 Q.  And it indicates under mid-market amount --
18 A.  Yes.
19 Q.  -- am I reading it correctly to say that the -- when
20  the optional termination goes into effect, assuming it
21  goes into effect, that the calculation on what's owed
22  on the Swap that's the basis for the termination is
23  based on the ISDA fix 3?
24   MR. SHUMAKER: Objection to form.  The
25  document speaks for itself.

Page 321

1    BY MR. GOLDBERG:
2 Q.  Okay.
3 A.  Yeah, here again, the document speaks to itself and it
4    says methodology that is agreed to by the City and
5    based upon the present value as it speaks to the rest
6    of the document, yes.
7 Q.  Have you looked into the fact that there's a lot of
8    literature out now that's exposing a pretty large
9    scandal with reg -- regard to the ISDA fix that
10   involves and implicates both Bank of America and UBS?
11    MR. JURGENS: Object to form.
12 A.  Without characterizing the nature of the literature, I
13    think it's safe to say that I am aware of some issues
14    that have been discussed regarding ISDA, fixed.
15    BY MR. GOLDBERG:
16 Q.  Are you aware also of issues that have come out with
17    regard to the LIBOR, specifically with regard to UBS
18    and Bank of America in the setting of using the LIBOR
19    as a standard?
20    MR. JURGENS: Objection to form.
21 A.  I am aware that in the past years there have been some
22    questions raised regarding the LIBOR for certain
23    financial institutions, yes.
24    BY MR. GOLDBERG:
25 Q.  Has that affected your analysis of how to deal with

Page 322

1    the Swap counterparties in terms of the -- the
2    forbearance agreement?
3 A.  No.
4 Q.  The fact that it's potential fraud was involved in the
5    setting of these --
6    MR. JURGENS: Objection to form.
7    MR. SHUMAKER: Objection to form.
8 A.  Mr. Goldberg, I'm going to defer from accepting the
9    characterization of potential fraud.  It is -- it is
10    as reported.
11    BY MR. GOLDBERG:
12 Q.  Okay.  That's fine.
13    Are you also aware that the -- that UBS
14    was -- let me find that.
15    Are you aware that UBS has been sued by the
16    Securities and Exchange Commission for rigging in
17    regard to municipal bonds?
18 A.  In past years?
19 Q.  That there was a final judgment -- yes, in past years.
20 A.  Yes.
21 Q.  Are you aware of the final judgment that was -- there
22    was a final judgment on a case that was filed on --
23    it's 112539 -- that -- and that one of the bonds that
24    actually was involved in that case was the Detroit
25    water and sewage bond case?

Page 323

1 A.  I had heard that.  I have not read the final judgment.
2 Q.  Well, I'd be glad to pass you down a copy.
3    MR. GOLDBERG: Why don't we mark this.
4    MARKED FOR IDENTIFICATION:
5    DEPOSITION EXHIBIT 9
6    3:36 p.m.
7    BY MR. GOLDBERG:
8 Q.  Are you also aware that Bank of America has been
9    investigated for potential rigging with regard to the
10    municipal bond market?
11    MR. JURGENS: Objection to form.
12 A.  I am aware that Bank of America has been investigated.
13    The exact specifics of the investigation I am not
14    aware of.
15    BY MR. GOLDBERG:
16 Q.  In light of these investigations that deal with
17    rigging of the municipal bond market, was that taken
18    into consideration by the City in how to approach the
19    question of this forbearance agreement and potential
20    action on these Swaps?
21 A.  Perhaps you could be more specific in what way you're
22    asking whether that was taken into consideration.
23 Q.  I mean, if there, in fact, was fraud -- based on the
24    fact there's at least an indication of fraudulent
25    activity by both Bank of America and UBS within the

Page 324

1    municipal bond market, has there been any
2    investigation as to whether or not that was the case
3    with -- with regard to the Swaps associated with the
4    POCs?
5    MR. JURGENS: Objection to form.
6    MR. SHUMAKER: Objection to form,
7    foundation.
8 A.  Yeah, first, it's not clear that there was fraud with
9    respect to POCs.  I think your prior question
10    concerning Bank of America concerned bonds at DWSD
11    that as my understanding are not implicated by this
12    process, meaning the forbearance agreement, but have
13    we calculated and analyzed the possibility that there
14    may be issues surrounding potential concerns in
15    connection with the Swap agreement, the answer is yes.
16    BY MR. GOLDBERG:
17 Q.  And who was -- who were those discussions with in
18    terms of whether or not to pursue that?
19 A.  I would have had discussions with my counsel.
20 Q.  When you say your counsel, who do you mean?
21 A.  My attorneys.
22 Q.  Jones Day, is that --
23 A.  Well, Jones Day.  We also have local counsel that's
24    involved that's sitting here, Pepper Hamilton, and
25    others.

13-53846-tjt   Doc 872   Filed 09/16/13   Entered 09/16/13 14:22:34   Page 25 of 30

1  Q.  I mean, isn't Jones Day -- doesn't Jones Day represent
2  this Bank of America as one of its clients on its Web
3  site?
4  **A.  Yes, Jones Day does represent Bank of America.**
5  Q.  How could Jones Day investigate one of its own clients
6  for potential fraud?
7      MR. SHUMAKER: Objection, form.
8      MR. JURGENS: Objection, form.
9  **A.  I am today, Mr. Goldberg, a client of Jones Day.  The**
10  **specific practices of Jones Day regarding its**
11  **investigations, I would suggest that you refer to**
12  **them.**
13      BY MR. GOLDBERG:
14  Q.  Okay.  I'm just saying you utilize them --
15  **A.  Yes, I do.**
16  Q.  -- for their -- for their advice on whether or not to
17  conduct such an investigation.  I'm trying to ask you
18  as your -- in your independent position as emergency
19  manager, wouldn't you think that a law firm that
20  represents the precise person you're asking to
21  investigate for fraud could not give you an
22  objective appraisal?
23  **A.  No.**
24      MR. JURGENS: Objection to form.
25      MR. SHUMAKER: Objection to form.

1  **A.  No.  In my experience, having worked now at three**
2  **different law firms, I have seen situations where law**
3  **firms are fully capable of investigating clients, yes.**
4      BY MR. GOLDBERG:
5  Q.  Are you aware that three executives of UBS were in --
6  recently jailed that -- who were involved in municipal
7  bond division were recently jailed?
8  **A.  I'm aware that there were prosecutions related to UBS.**
9  **I wasn't aware of the exact number or who they are.**
10  Q.  Okay.  I do have -- now, I'm not privy to much on that
11  either, but I do have articles that do cite that.
12  **A.  Okay.**
13  Q.  And they cited three people who were just convicted in
14  July of this year.
15  **A.  Okay.**
16  Q.  Are you aware that Bank of -- an executive of Bank of
17  America in its municipal bond division was indicted in
18  2012?
19  **A.  I don't recall if I was aware of that.**
20  Q.  Okay.  Let me just ask under -- pursuant to the Public
21  Act 436 section 13 -- section 16, aren't you mandated
22  to conduct a criminal investigation, or at least to
23  refer potential suspicion of criminal investigation to
24  the Attorney General in connection with -- if there's
25  any kind of criminal activity associated with the

1  financial crisis in Detroit?
2  **A.  Yes.  To be clear, under 436 I have no independent**
3  **prosecutorial authority, but I do have the authority**
4  **to make criminal referrals to appropriate**
5  **prosecutorial authorities.**
6  Q.  In light of the cost to the City of the Swaps and the
7  continuing costs, which we all acknowledge will be
8  substantial even in light of the forbearance
9  agreement, have you made any referral to at least do
10  a -- conduct an investigation based on the evidence
11  that, that -- I'm not accusing them of criminal
12  activity in these activities.  I have no basis for
13  doing that, but on the other hand that fact that
14  their -- some of their top executives in this area
15  have been convicted would at least lead me to want to
16  take a look at that in light of Detroit's situation.
17      MR. JURGENS: Objection to form.
18      MR. SHUMAKER: Objection, form.
19  **A.  Yeah, it is a run-on question, Mr. Goldberg, but let**
20  **me say this.  We are -- we have an -- analyzed to the**
21  **degree and looked at everything significantly related**
22  **to this transaction.  Any --**
23      BY MR. GOLDBERG:
24  Q.  Have or have not?  I'm sorry.
25  **A.  We have.  We have.**

1  Q.  Okay.
2  **A.  If there appears to be a basis for making a criminal**
3  **referral of any kind related to anything that falls**
4  **under my purview of 436, I will do that.**
5  Q.  But at this point nothing -- there hasn't even been a
6  request for such an investigation?
7  **A.  I would be careful about -- I -- I have asked -- there**
8  **are matters that are under investigation that may or**
9  **may not implicate the subject matters you're talking**
10  **about.  I'm going to defer to speak about them**
11  **further.**
12  Q.  Okay.  Are you familiar with the circumstances that
13  led to the 2005 Swap?
14  **A.  I'm familiar with what I've read.  I wasn't here in**
15  **the City at the time.**
16  Q.  Do you know why Moody's -- not Moody's -- Fitch and
17  Standard & Poor's would have been at the table along
18  with UBS when this -- when this was discussed?
19  **A.  First, I don't know that they were at the table and,**
20  **secondly, if they were, I do not know why they would**
21  **have been.**
22  Q.  Well, I do have a photograph of them at the table
23  which I'd be glad to share with you --
24  **A.  Okay.**
25  Q.  -- from the Michigan Citizen.  It was taken at that

Page 329

1  time. Let me see if I can find that.
2      MR. GOLDBERG: Here, I can mark this.
3      MARKED FOR IDENTIFICATION:
4      DEPOSITION EXHIBIT 10
5      3:43 p.m.
6      BY MR. GOLDBERG:
7  Q.  This is a photograph taken by the -- it was in the
8  Michigan Citizen July 31st, 2005, it reflects a
9  picture of Sha -- Sean Werdlow, Stephen Murphy of
10 Standard & Poor -- Poor's, Joe Keefe -- Joe O'Keefe of
11 Fitch, the Deputy Mayor, Anthony Adams, and the -- and
12 the -- and -- and the representative of SBS at the
13 table.
14     MR. SHUMAKER: Is there a question?
15     BY MR. GOLDBERG:
16 Q.  Sure. I was asking why would Moody -- why would
17 Standard & Poor and Fitch be at the table?
18     MR. SHUMAKER: Objection, foundation, form,
19 document speaks for itself.
20 A.  Yeah, Mr. Goldberg, this purports to be a document
21 showing some of these members at counsel table. I
22 have no idea -- I wasn't here, and I have no idea what
23 the discussions were and whether or not it's
24 accurately represented to be something related to
25 this. This document speaks for itself.

Page 330

1      BY MR. GOLDBERG:
2  Q.  So you haven't done really any substantive
3  investigation on what the circumstances were that --
4  that why -- that put the City into the pension
5  obligations with certificates and Swap --
6      MR. SHUMAKER: Objection to form.
7      BY MR. GOLDBERG:
8  Q.  -- when they first were initiated in 2005?
9  A.  Yeah, all I can say is this -- this picture appears to
10 be what it purports to be and speaks for itself. I
11 don't know if it's accurate or not.
12 Q.  Let me just ask one quick -- that I was kind of
13 curious about, personally. It appears that there
14 was -- the first COP and Swap was in 2005. Then they
15 were terminated and a new one -- new COPs and Swaps
16 were placed in 2006. Is that your understanding?
17 A.  I don't know if that's my understanding. I know there
18 were -- there were two series that went on. I'm going
19 to be careful with the question of replacing them, but
20 let's go with your question.
21 Q.  Okay. I guess my curiosity is why the banks would pay
22 a termination fee of 2.7 million, according to those
23 documents, to the City to then have them
24 renegotiate -- replaced?
25 A.  Mr. Goldberg --

Page 331

1      MR. SHUMAKER: Object to form, foundation.
2  A.  I wasn't here in the City at the time. I have no
3  idea.
4      BY MR. GOLDBERG:
5  Q.  Okay. That's fine.
6      Have you approached the Securities and
7  Exchange Commission to conduct any kind of
8  investigation of the Swaps in light of their extensive
9  investigations of UBS and Bank of America?
10     MR. JURGENS: Objection to form.
11 A.  Yeah, here again, any -- your question is have I? I
12 think I can answer your question. I think the answer
13 is no.
14     BY MR. GOLDBERG:
15 Q.  Okay. And you haven't approached them to intervene in
16 the bankruptcy which they have a right to do as we
17 both know under the bankruptcy code?
18 A.  I would hazard a guess that the Security and Exchange
19 Commission is aware of Detroit's bankruptcy.
20 Q.  But you have not approached them to aid you in doing a
21 proper investigation of the Swaps?
22 A.  No. I -- I think they're fully capable of determining
23 what they should do within their mission.
24 Q.  Have you looked into the mortgage practices of Bank of
25 America that -- in light of the financial crisis of

Page 332

1  Detroit?
2      MR. JURGENS: Objection to form.
3      MR. SHUMAKER: Objection to form.
4      MR. ESSAD: Objection to relevance.
5  A.  I don't think my duties under 436 would specify to
6  look into the mortgage crisis, so the answer is no.
7      BY MR. GOLDBERG:
8  Q.  But you would agree with me that the mortgage crisis
9  and the subprime lending crisis is a major contributor
10 to Detroit's financial crisis, would you not?
11     MR. SHUMAKER: Objection to form,
12 foundation.
13 A.  Mr. Goldberg, I don't know if it was or it wasn't.
14     BY MR. GOLDBERG:
15 Q.  You don't know if it was or it wasn't?
16 A.  No. I've -- I've heard reports that there was
17 disproportionate mortgage foreclosures and so on and
18 so forth, but I've made no conclusion as to whether or
19 not that was a major contributor to Detroit's
20 financial crisis.
21 Q.  I've got you. Well, let me -- let me run this --
22     (Whereupon Vincent Marriott and Matthew
23     Summers left the Deposition at 3:47 p.m.)
24     MS. ENGLISH: Can we go off the record for
25 one second, please?

1    VIDEO TECHNICIAN: We are off the record.
2   The time is 3:47.
3      (Recess taken at 3:47 p.m.)
4      (Back on the record at 3:48 p.m.)
5    VIDEO TECHNICIAN: Back on the record at
6   3:48 p.m.
7   BY MR. GOLDBERG:
8  Q.  I'm sorry, I didn't bring that report with me.
9      So your public -- your statement to me is
10  you're not clear whether the subprime mortgage crisis
11  in Detroit was a factor in Detroit's financial crisis?
12  A.  No. My statement --
13    MR. SHUMAKER: Objection to form.
14  A.  My statement to you -- I believe your question was,
15    was it a major factor, and I said I understand there
16    have been reports, allegations, and stories that there
17    was disproportionate mortgage foreclosure in the City
18    of Detroit. I don't know if that was a major factor
19    in its financial crisis.
20    BY MR. GOLDBERG:
21  Q.  And you haven't looked into that issue independently?
22  A.  No, I've not looked into it independently.
23  Q.  Even though the banks -- the same banks that are
24    claiming all these Swaps were directly involved in the
25    subprime mortgage crisis?

1    MR. JURGENS: Objection to form.
2  A.  Here again, your characterization was directly
3    involved. My mission in this forbearance agreement is
4    look at whether or not this is in the best interest of
5    the City at the time.
6    BY MR. GOLDBERG:
7  Q.  Sure.
8  A.  It seems to be as you and I have discussed before,
9    several times now, that you have expressed concerns
10    about a broader issue regarding banks involvement with
11    the mortgage foreclosure crisis in the City of
12    Detroit. In my opinion, that's not directly related
13    to the issue that we have at hand in the forbearance
14    agreement.
15  Q.  Let me just ask you one other question. We've been
16    talking about alternative sources of financing.
17    You're familiar with the last CAFR?
18  A.  Yes.
19  Q.  Are you familiar with the -- what the 82 million in
20    chargebacks means in this CAFR that the City is
21    paying?
22  A.  Yes, I think I have some understanding.
23  Q.  What is your understanding of it, sir?
24  A.  That there's a certain obligation on the City to pay
25    some money out based upon an analysis of either

1    overcharges or obligations that it has to other --
2    other organizations and entities.
3  Q.  Are you aware that chargebacks specifically deal with
4    chargebacks to the County that the County buys -- pays
5    the City for foreclosed tax -- foreclosed properties,
6    then sells them, and the City is responsible for the
7    difference between what they're sold for and what
8    the -- what originally was paid to the City?
9  A.  Yes, as I said --
10    MR. SHUMAKER: Objection, form, foundation.
11  A.  As I said, it's a process by which the City has
12    obligations to other organizations and entities.
13    BY MR. GOLDBERG:
14  Q.  Are you aware that the state has hundreds of -- at
15    least 200 million dollars available in the Hardest --
16    Helping Hardest Hit funds that could be used to pay
17    off delinquent property taxes?
18  A.  I've heard that representation before in terms of the
19    Hardest Hit funds. What I am aware of is that the
20    City is entitled to get 52 million dollars of the
21    late -- latest one hundred million dollar transfer of
22    the Hardest Hit funds for blight remediation.
23  Q.  That's true. Which affects -- affects your general
24    proposal in terms of the cost of blight, correct?
25  A.  Well, it helps us in terms of getting at the cost of

1    blight as quickly as possible.
2  Q.  But my question was a little different on that.
3  A.  Um-hm.
4  Q.  Have you intervened with Governor Snyder who you --
5    who you're -- your appointor --
6  A.  Right.
7  Q.  -- to secure the release of these Hardest Hit funds to
8    pay off property taxes which would both stabilize
9    communities to keep people in their homes and
10    stabilize the City budget by avoiding the need to pay
11    80 million in chargebacks?
12    MR. SHUMAKER: Objection, foundation.
13  A.  It is not -- it is not -- it has been made clear to me
14    that it is not clear to me that, one, we'd have access
15    to those funds and that those funds can be
16    appropriately used for that purpose.
17    BY MR. GOLDBERG:
18  Q.  It's not?
19  A.  It's -- it's not clear. That's --
20  Q.  Well, I'll send you some literature on that so you can
21    clarify that.
22  A.  Okay.
23    MR. GOLDBERG: Okay. Okay. Thank you very
24  much.
25    THE WITNESS: Thank you very much.

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re
CITY OF DETROIT, MICHIGAN,
                Debtor

Chapter 9
Case No. 13-53846
Hon. Steven W. Rhodes

### OBJECTIONS TO THE PETITION FILED BY ONE KEVYN D. ORR SEEKING TO COMMENCE A CASE UNDER CHAPTER 9 OF TITLE 11 OF THE UNITED STATES CODE ON BEHALF OF THE CITY OF DETROIT, MICHIGAN

*ADDENDUM to Docket #440*

### PROOF OF SERVICE

    I hereby assert that on *Sept. 16, 2013* I filed the above *Addendum to* Objections to the Petition Filed by One Kevyn D. Orr Seeking to Commence a Case Under Chapter 9 of Title 11 of the United States Bankruptcy Code on Behalf of the City of Detroit and served said Objections upon the following parties of record via United States Mail *and email.*

*Mary Deane Bakowski*
_____
Name

Counsel to the Debtor
David G. Heiman, Esq.
Heather Lennox, Esq.
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
T: (216) 586-3939
F: (216) 579-0212
http://www.jonesday.com

Counsel to the Debtor
Jeffrey B. Ellman, Esq.
Jones Day
1420 Peachtree Street, NE
Suite 800
Atlanta, GA 30309-3053
T: (404) 521-3939
F: (404) 581-8330
http://www.jonesday.com

FILED
2013 SEP 16 P 12: 55
U.S. BANKRUPTCY COURT
E.D. MICHIGAN-DETROIT

Counsel to the Debtor
Bruce Bennett, Esq.
Jones Day
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
T: (213) 489-3939
F: (213) 243-2539
http://www.jonesday.com

Local Counsel to the Debtor
Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
Miller, Canfield, Paddock & Stone, P.L.C.
150 West Jefferson
Suite 2500
Detroit, MI 48226
T: (313) 963-6420
F: (313) 496-7500
http://www.millercanfield.com

Office of the United States Trustee
U.S. Department of Justice
211 West Fort Street
Suite 700
Detroit, MI 48226
T: (313) 226-7999
F: (313) 226-7952
http://www.justice.gov/ust/r09

DATED: Sept. 16, 2013