UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN,

Debtor.

Chapter 9

Case No. 13-53846

Hon. Steven W. Rhodes

**OBJECTION OF THE OFFICIAL COMMITTEE OF RETIREES
TO THE MOTION OF DEBTOR FOR ENTRY OF AN ORDER
(1) AUTHORIZING ASSUMPTION OF THAT CERTAIN FORBEARANCE
AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO
SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH
AGREEMENT PURSUANT TO RULE 9019, AND GRANTING RELATED RELIEF**

The Official Committee of Retirees of the City of Detroit, Michigan (the "**Retiree Committee**"), through its undersigned counsel, objects to the Motion Of Debtor For Entry Of An Order (I) Authorizing Assumption Of That Certain Forbearance And Optional Termination Agreement Pursuant To Section 365(a) Of The Bankruptcy Code, (II) Approving Such Agreement Pursuant To Rule 9019, And (III) Granting Related Relief (the "**Assumption Motion**").[1] In support of this Objection, the Retiree Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. As one of its first acts in the bankruptcy case, on July 18, 2013, the City of Detroit (the "**City**") filed its Assumption Motion. [Dkt No. 17, as amended Dkt No. 157] seeking approval of the Forbearance Agreement and Optional Termination Agreement (the "**Forbearance Agreement**"), executed only three days before the bankruptcy filing, by and

---

[1] The Retiree Committee is filing this Objection to protect its rights and interests with respect to the Assumption Motion. This Objection is not an acknowledgement of or acquiescence to (i) the Court's jurisdiction to hear this case; (ii) the constitutionality of the Debtor's Chapter 9 filing; or (iii) the eligibility of the Debtor to relief under Chapter 9.

among the City, the Service Corporations (defined below) and UBS AG, SBS Financial Products Company LLC and Merrill Lynch Capital Services, (defined collectively as the "Swap Counterparties" in the Forbearance Agreement and hereinafter the "Counterparties"). The Assumption Motion drew numerous objections from both financial creditors, including parties to the 2006 and 2009 transactions that are referred to in the Forbearance Agreement and other creditors of the City, and representatives of the City's pension fund and retirees. The Retiree Committee, appointed after the objection deadline had passed, was authorized by the Court to participate in the mediation and the discovery conducted by the objecting parties.[2] After review of the underlying transaction documents as well as the arguments and information offered by the City in discovery and discussions in support of the Assumption Motion, the Retiree Committee is now compelled to join in the opposition to the Assumption Motion for the following reasons.

2. First, the Forbearance Agreement elevates the Counterparties to secured creditor status in this bankruptcy case although they are not creditors of the City and were not granted and did not possess any direct security interest in pre-petition City property. *See* Forbearance Agreement §2.1(e) Indeed, the structure adopted by the City for the 2006 and 2009 transactions, with the knowledge and participation of the Counterparties, is a fairly common mechanism used by municipalities to raise funds outside the limitations of charter or statutory mandated debt ceilings. The funds raised in this manner typically are not treated as obligations of the municipality. In this case, the City undertook contract obligations and granted security interests solely to the newly incorporated Service Corporations (defined below), which, in turn, undertook obligations to and granted security interests to the Counterparties. Thus, under the operative documents and City Ordinances, the Counterparties are creditors of creditors of the City and

---

[2] Discovery was limited primarily to the circumstances leading to the execution to the Forbearance Agreement. It was not an investigation of the historical transactions.

have, at best, a security interest in the Service Corporation's security interest--a pledge of a pledge.[3]

3. Second, the Forbearance Agreement grants the Counterparties full status as swap counterparties to the City with powers to terminate and consent to the treatment of other claims and transactions in addition to their own.[4] However, it is not clear the Counterparties actually had the right to terminate the swap contracts under the relevant agreements. For one thing, the City is not a counterparty to any of the swap contracts. In addition, the insurers insist that the Counterparties' actions required their consent. Furthermore, given the circumstances surrounding the 2009 restructuring transactions, there is no certainty that the Counterparties would be covered by the safe-harbor provision of the Bankruptcy Code for swap participants or ancillary parties.

4. Third, the Forbearance Agreement insulates all of the transactions surrounding the issuance of the 2009 swap contracts and Collateral Agreement in addition to the City or the Service Corporation's performance thereunder from third party challenges. Under the Forbearance Agreement, the City, the Emergency Manager, and the Services Corporations waive all objections to the Counterparties purported secured claims. *See* Forbearance Agreement § 2.1(b). In addition, under Section 1.3(h) of the Forbearance Agreement, a successful challenge to the swap contracts, the Collateral Agreement, the Forbearance Agreement or any "Transaction Documents" (broadly defined in Section 2.1(a) of the Forbearance Agreement) by the City, Emergency Manager, the Service Corporations or *by any party* constitutes an event of default.

---

[3] The Committee joins in the objection of the General Retirement System and the Police and Fire Retirement System (the "**Retirement System**") [Dkt #370] to the secured creditor status of the Counterparties' claim pursuant to section 552 of the Bankruptcy Code in the event that the Counterparties can establish a direct claim against the Debtor.

[4] Section 1.3(h) taken literally would seem to preclude any recovery in a plan to the COPs (defined as "2006 Pension Funding Securities" in the Forbearance Agreement) prior to their maturity date.

Thus, approval of the Forbearance Agreement effectively cuts off the right of any party to challenge the validity of the 2009 transactions.

5. In addition, the Committee is concerned that the steps the City must take to actually consummate the Forbearance Agreement will tie up the City's assets in a manner that leaves the City without any resources to provide the promised retirement compensation (both pension and healthcare benefits) to its retirees.[5] As a practical matter, implementation of the Forbearance Agreement is entirely dependant on the City's finding debtor-in-possession financing ("**DIP Financing**"). The City is intending to use DIP Financing (a) to pay the Counterparties a significant percentage of their newly recognized secured claim against the City and, (b) for City redevelopment programs as part of the City's transition plan. The City will most likely pledge all its free assets, including the casino revenue, to the DIP financers. The bifurcation of the Assumption Motion from approval of the financing necessary to implement the Forbearance Agreement deprives the Court and the objecting parties of adequate information to assess the benefits and burdens of the Forbearance Agreement and settlement.

6. The Forbearance Agreement should not be approved, as explained below, because it is economically irrational in that it will free up assets that must be repledged to pay the price of the release of the assets. The Forbearance Agreement and related "settlement" are inequitable or unfair in that they force the City to finance operations with draconian cuts to the retirees' benefits and pensions while the City borrows to prefer entities that have no legitimate claim as creditors over the retirees who hold a constitutionally protected, higher priority claim. Finally, the Assumption Motion fails to provide adequate information for approval without disclosure of both the legal issues being settled and the terms of the DIP Financing.

---

[5] Such a "tie up" may come in the form of restrictive covenants as to the use of cash or assets not currently subject to security interests.

7. Based on the above and the extensive objections that have been filed, the City cannot meet the legal test for its approval under section 365 of the Bankruptcy Code as legitimate exercise of its business judgment or under the Federal Rules of Bankruptcy Procedure 9019 as a fair and equitable settlement. For these reasons, as more fully discussed below, the Committee respectfully requests that the Court withhold approval of the Assumption Motion.

**FACTUAL BACKGROUND**

8. The transactions referenced in and underlying the Forbearance Agreement and settlement arise from the City's constitutional and statutory obligations to establish, maintain and fund pension compensation promises to the City's employees.[6] In 2005, pursuant to a series of Ordinances,[7] the City authorized an alternative funding mechanism in an attempt to address the

---

[6] The City's obligations under Article 9 §24 of the 1963 Michigan Constitution are two fold: (a) to maintain the pensions for its employees as a contractual obligation without diminution or impairment, and (b) to actually fund the financial benefits on an annual basis. Section 24 states in its entirety:

> The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.
>
> Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

The specifics for meeting these constitutional imperatives are left to state and municipal law. Michigan's Public Employees Retirement System Investment Act ( MCL §38.1140m) provides that a Michigan municipality's required annual contribution to its employee retirement system must be an actuarially determined contribution amount, consisting of (1) a current service cost payment, (2) a payment of at least the annual accrued amortized interest on any unfunded accrued actuarial liability and (3) a payment of the annual accrued amortized portion of the unfunded principal liability.

[7] *See* Chapter 54, Article I through X, Ordinance No. 03-05, To Provide For an Alternative Funding Mechanism With Respect to the City's Obligations To Make Annual Contributions to Fund the Benefits Available Under General Retirement System, etc. dated February 4, 2005; Chapter 54, Article I through X, Ordinance No. 04-05, To Provide For an Alternative Funding Mechanism With Respect to the City's Obligations To Make Annual Contributions to Fund the Benefits Available Under Police and Fireman Retirement System, etc. dated February 4, 2005; Ordinance No. 05-05 Chapter 18, To Approve the Form of a standard Service Contract To Provide Pension Funding Services to the City By Reducing Unfunded Accrued Actuarial Liabilities (UAAL) and To Authorize The City To enter Into Service Contracts for 2005 and to Authorizes the Hedges in connection with the Funding of the UAAL of the Retirement Systems.

outstanding unfunded accrued actuarial liabilities ("**UAAL**") of the Retirement Systems and the City's constitutionally protected pension benefit promises. Specifically, the Ordinances authorized the incorporation of the Detroit General Retirement System Service Corporation ("**DRGS Service Corp**"), and the Detroit Police and Fire Retirement system Service Corporation ("**PFRS Service Corp**") (collectively the "**Service Corporations**"), the execution of service contracts (the "**Service Contracts**") between the City and each of the Service Corporations, and the formation of a trust agreement (the "**Funding Trust**") to issue taxable certificates of participation ("**COPs**") and accept the complete assignment of Service Contract payments necessary to service the COPs.[8] The COPs were sold to investors and the proceeds from the sale of the COPs were used to satisfy, among other things, the City's obligation to reduce the UAAL and cover financing costs.

9. The 2005 COPs paid interest at different interest rates depending on the series issued. Certain of the 2005 COPs originally bore interest at a floating rate tied to LIBOR. The Service Corporations entered into interest rate exchange agreements "(**Swap Contracts**"), as authorized by City Ordinance, to hedge the variable rate exposure created by the issuance of the floating rate COPs. The Swap Contracts were designed to effectively convert the City's floating interest rate exposure into a fixed rate. In the event interest rates rose passed a certain negotiated point, the Counterparties would owe the Service Corporations. The inverse was also true - if interest rates dropped, then the Service Corporations would owe the Counterparties. As all parties involved in this proceeding are painfully aware, interest rates have been at historic lows

---

[8] The Service Contracts, Funding Trust documents and the Ordinances are exhibits to multiple objections to the Assumption Motion. To conserve resources and limit repetition, the Committee has only attached three exhibits in support of its objection. The Ordinance 18-16-1, attached as Exhibit A summarizes the history of the 2005, 2006 and 2009 transactions discussed herein. The Collateral Agreement, attached as Exhibit B, is the key document of the 2009 restructuring. The deposition transcript of Kenneth Buckfire ("**Buckfire Deposition**"), attached as Exhibit C in relevant part, gives the high level view of the amount and purpose of the DIP Financing.

- 6 -
13-53846-tjt    Doc 874    Filed 09/16/13    Entered 09/16/13 15:35:46    Page 6 of 16

for nearly five years. Thus, the Service Corporations paid substantial periodic payments ("**Hedge Periodic Payables**") to the Counterparties funded by City through payments on the Service Contracts to the Service Corporations.[9]

10. The revenue stream from the Service Contracts was divided into two streams: the service payments to pay principal and interest on the COPs ("**Funding Trust Receivables**") that was transferred, assigned and otherwise conveyed to the Funding Trust and Hedge Payable consisting of Hedge Periodic Payable and a hedge termination payable (the "**Hedge Termination Payable**") pledged as a security interest to the Service Corporations, which in turn, pledged their interests to the Counterparties.

**The 2006 Transaction**

11. The same process took place in 2006 to create a structure substantially identical to the 2005 transaction, described above, except the 2006 COPs had a longer term payout for the purpose of increasing the effective amortization period of the UAAL and to reduce the annual costs of the funding through the City's Service Contracts. The 2005 hedges were terminated with termination values in favor of the Service Corporations and the proceeds of the 2006 COPs were used to refund the variable rate 2005 COPs.

**The 2009 Transaction**

12. In January 2009, the Counterparties notified the Service Corporations that an "additional termination event" within the meaning of the Swap Contract had occurred.[10] Ultimately, negotiations between the parties yielded the 2009 Collateral Agreement among the City, the Service Corporations, the Counterparties, and U.S. Bank as custodian (the "**Collateral**

---

[9] Now interest rates are rising. Accordingly, the Hedge Periodic Payables to the Counterparties should be decreasing.

[10] The objecting parties questioned whether an event of default triggering the Counterparty's the right to terminate the Swap Contracts actually occurred and whether the Counterparties had the authority to terminate the Swap Contracts on their own.

**Agreement**"). *See* the Collateral Agreement attached as Exhibit B. In exchange for the Counterparties' agreement to rescind the declaration of a termination event, pursuant to an Ordinance of the City, the City directed wagering tax revenue and other payments (the "**Casino Revenue**") to certain accounts held by U.S. Bank and pledged to the Service Corporations its interests in the Casino Revenue and those accounts (the "**City Pledge**"). *See* Collateral Agreement § 4.1. The Service Corporations, in turn, granted to the Counterparties a security interest in the City Pledge. *See* Collateral Agreement § 4.2. The Collateral Agreement preserves the treatment of the obligations to the Counterparties as obligations of the Service Corporations, not the City. Moreover, the Collateral Agreement expressly states:

> The obligations of the City under this Agreement shall not constitute or create any indebtedness of the City within the meaning of The Home Rule City Act, being Act 279 of the Public Acts of Michigan of 1909, as amended, or any Michigan constitutional or other non-tax statute or City Charter limitation. Collateral Agreement § 3.2.
>
> The City Hedge Payable Related Obligations and all obligations of the City under this Agreement [to the Service Corporations] are contractual obligations, enforceable in the same manner as any other contract of the City and are not general obligations of the City to which the City has pledged its full faith and credit or ad valorem taxing power. Collateral Agreement § 3.3(a).

Collateral Agreement, Exh. B at 14

13. As part of the 2009 transaction, the Swap Contract interest rate was raised to approximately 6.75% at a time that the actual interest rate was near zero and the terms of the Swap Contracts were revised, according to Kenneth Buckfire, to permit the Counterparties to terminate at the point when they might have been required to pay the City. *See* Buckfire Deposition, Exh. C. at 59. As the City now concedes, the Swap Contract was a one-sided deal. The transactions that would be subject to an investigation in any other bankruptcy case are protected from the investigation and challenge by the Committee and any other party by terms of

the Forbearance Agreement. The Forbearance Agreement, in that regard, prevents the Retiree Committee from fulfilling its statutory investigative duties under 11 U.S.C. §1103(c)(2).

**DIP Financing**

14. The City does not have financing to make the optional, but fully expected termination payment promised to the Counterparties under the Forbearance Agreement. The City has disclosed that it is seeking to borrow $350,000,000, the better part of which would be used to pay the Counterparties' termination payment under the Forbearance Agreement. *See* Buckfire Deposition, Exh C. at 70 and.73. The remainder of the borrowed funds are to be used to execute a reinvestment program. As part of the collateral package, the City is offering a lien on the Casino Revenue in part. *See* Buckfire Deposition, Exh C. at. 74.

15. The Assumption Motion is the predicate to the DIP Financing. Yet the Court and the objecting parties are being asked to approve the Assumption Motion without an ability to assess the terms of the financing. Because of the essential link between Forbearance Agreement and the missing financing, it is impossible for the parties to assess the benefits and burdens of the Forbearance Agreement and settlement.

## ARGUMENT

16. The Forbearance Agreement is championed by the City because it purports to create unrestricted liquidity by freeing Casino Revenue and allows the City to avoid time-consuming litigation. The value of the Forbearance Agreement in furthering either of the goals is minimal. Pursuant to the terms of the Forbearance Agreement the Counterparties agree to forbear from (1) issuing any notice designating an Early Termination Date with respect to any Swap Contracts; and (2) instructing U.S. Bank to hold the City's Casino Revenue. Forbearance Agreement §1.1. In exchange, the Counterparties receive a release of claims and a very rich

termination package that is financed largely by reduced payments to the City's retiree health coverage and thus exceeds any notions of fairness and equity to the City's retirees.

17. The financing for that package remains largely a mystery. All the City is willing to reveal is that it is intending to borrow $350,000,000 (a) to pay the Counterparties a significant percentage of their alleged secured claim and, (b) for redevelopment programs as part of the City's transition plan. The City has offered the Casino Revenue as part of the collateral package for the DIP Financing. The Forbearance Agreement is a stage setting step for the DIP Financing. As a result, the City cannot make the case for the value of the Forbearance Agreement without disclosing the burdens imposed by the DIP Financing.

18. Similarly, the City cannot prove the value of the proposed settlement with the counterparties without the analysis of the claims that are being settled and a response to legal impediments to the counterparties' claims and rights raised by the objecting parties.

19. The Assumption Motion is opposed by both the capital market creditors and the retirees. The view of the major constituents of the case is that the agreement between Counterparties and the City is unreasonable and not in the best interests of the estate. Accordingly, the Assumption Motion should not be approved under the applicable standard.

**I. The City Has The Burden To Demonstrate that The Forbearance Agreement And Settlement Meet the Fair and Equitable Standard**

20. The Sixth Circuit holds that in evaluating a proposed settlement "[t]he bankruptcy court ... is obligated to weigh all conflicting interests in deciding whether [a] compromise is 'fair and equitable,' considering such factors as (i) the probability of success on the merits, (ii) the complexity and expense of litigation, and (iii) the reasonable views of creditors." *Bauer v. Commerce Union Bank,* 859 F.2d 438, 441 (6th Cir. 1988); *accord, e.g., Lyndon Prop. Ins. Co. v. Katz*, 196 Fed. Appx. 383, 387 (6th Cir. 2006); *Bard v. Sicherman (In re Bard),* 49 Fed. Appx.

528, 530 (6th Cir. 2002); *see also, Cook v. Terlecky (In re Cook)*, 336 B.R. 600, 2006 WL 13114, at *3 (B.A.P. 6th Cir. Jan. 4, 2006) (unpublished table decision).

21.  When performing its evaluation, the court must "apprise itself of the underlying facts and [ ] make an independent judgment as to whether the compromise is fair and equitable. The court is not permitted to act as a mere rubber stamp or to rely on the . . . [debtor's] word that the compromise is reasonable." *Reynolds v. Comm'r*, 861 F.2d 469, 473 (6th Cir. 1988) (citations omitted); *see also, Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 437 (1968) (holding that bankruptcy court must have the facts in order to make an informed and independent decision). Ultimately, the Debtor has the burden of persuading the court that the compromise is in the best interest of the estate. *McGraw v. Yelverton (In re Bell & Beckwith)*, 87 B.R. 476,478 (N.D. Ohio 1988). Based on the Assumption Motion and the evidence it has produced, the City cannot meet the burden.

**II. The City Has Failed To Adduce Evidence Regarding The Risk of Litigation**

22.  Courts have approved settlements where there were complex legal issues after a full presentation by the debtor of the issues to be resolved. *See Buchwald Capital Advisors LLC v. Papas (In re Greektown Holdings, LLC)*, No. 12-12340, 2012 U.S. Dist. LEXIS 139814 (E.D. Mich. Sept. 27, 2012), (*rev'd on other grounds*) *Papas v. Buchwald Capital Advisors*, Case No. 12-2434 2013 U.S. App. Lexis 17718 (6th Cir. Aug. 26, 2013). But here, the Debtor has not given the Court any evidence on the three factors it is required to evaluate to approve the settlement. Nor has such evidence been produced to the objectors during discovery. Further, the Debtor has not proffered any evidence concerning the probability of success on the merits with respect to any of the potential legal challenges to the underlying obligations or security interests of the Counterparties The Assumption Motion merely asserts that "while the City has examined whether there are viable actions to challenge the Swap Contracts or the City's pledge

of the Casino Revenue to secure its obligations to the Swap Counterparties, litigation would be protracted, expensive and, in terms of success, uncertain." Assumption Motion at p. 27, ¶ 47. This is insufficient to support a finding with respect to the probability of success on the merits. Indeed, in other cases where movants have failed to provide proof of an investigation into actual claims that the estate can assert or that are being asserted against the estate, the proposed settlements have been deemed improper.

23. For example, in *In re Engman*, 331 B.R. 277 (Bankr. W.D. Mich. 2005), the trustee sought approval of a settlement pursuant to which a creditor, a condominium association, would receive 100% payment on its claim. The debtor objected, raising several concerns about the validity of the creditor's claim, and asserted that the trustee failed to investigate and offer proof that he had investigated the claims and the likelihood of success if he challenged the claims. The court held that the "Trustee's oversight of critical issues relating to the validity and amount of the condominium association's lien claim, coupled with his decision to forego any serious efforts to negotiate a reduction of that claim, places the settlement [ ] outside the bounds of what an informed business person would have accepted." *Id.* at 305. Likewise, a district court reversed a bankruptcy court's order approving a compromise where the trustee "had not placed on the record any of the facts of his…investigation and never provided any explanation of why he completely reversed field." *In re Trailer Course, Inc.*, 2007 U.S. Dist. LEXIS 23816, at *17 (D. M.D. Tenn. March 30, 2007).

24. The substance of the Debtor's investigation into the Swap Contracts, and the 2009 transactions specifically, is important. Prior to the 2009 Collateral Agreement, the Debtor's Casino Revenues had not been pledged to support the service payments and the Counterparties did not have any contractual right to the funds. However, something transpired, that every major creditor in this case has asserted is improper on various grounds, and the Debtor is completely

- 12 -
13-53846-tjt    Doc 874    Filed 09/16/13    Entered 09/16/13 15:35:46    Page 12 of 16

silent on that issue. Although the Debtor knows the terms of the 2009 transactions, including its one-sided payment obligation, it has chosen to treat the Counterparties as its creditors, elevate their claims, and pay them an inordinate amount of money without challenging the Counterparties' position. Moreover, the Debtor has agreed to terms that not only eliminate its rights to challenge the Counterparties' claims, but also the ability of an official, section 1102 committee to challenge them as well. Such expansive treatment for the Counterparties in the face of the serious issues raised by creditors regarding the validity of the pledge supporting the 2009 transaction, questioning the existence of a default giving rise to the 2009 renegotiation, and the propriety of the 2009 transactions absent the consent of the insurers cannot be justified based solely on an unsupported statement that "litigation would be protracted, expensive and, in terms of success, uncertain." Assumption Motion at p. 27, ¶ 47.

### III. The Court Should Defer To The Reasonable View of the City's Creditors

25. The Courts in this Circuit defer to the reasonable view of creditors in assessing the fairness of a proposed settlement under Rule 9019. *Bard v. Sicherman (In re Bard),* 49 Fed. Appx. ,at 530; *Bauer v. Commerce Union Bank*, 859 F.2d at 441. Here, every major creditor constituency in this case, has objected to the proposed settlement, which weighs against approval of the Forbearance Agreement. Courts have cautioned that "looking only to the fairness of the settlement as between the debtor and the settling claimant [and ignoring third-party rights] contravenes a basic notion of fairness. *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1994); *see also, Cullen v. Riley (In re Masters Mates & Pilots Pension Plan)*, 957 F.2d 1020, 1031 (2d Cir. 1992) (holding that "where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval," and requiring determination that "no one has been set apart for unfair treatment."). Indeed, the Sixth Circuit Bankruptcy Appeal Panel reversed an order approving a compromise

that "totally disregarded" the interests of a creditor that "had the most to lose". *See In re Haven, Inc.*, 326 B.R. 901, 2005 WL 927666, at *3 (B.A.P. 6th Cir. April 7, 2005) (unpublished table decision).

26. In *Haven* the debtor sought to settle the claims of a secured creditor whose recorded mortgage was defective by stipulating that mortgage was properly executed and recorded and distributing sale proceeds to the secured creditor ahead of other secured parties with properly recorded mortgages and liens. In approving the settlement, the bankruptcy court did not make any findings of fact in support of its ruling that the settlement was fair and equitable. Upon reviewing the record, the B.A.P. court found that the record did not support the bankruptcy court's decision. Specifically, the B.A.P. court found that a distribution scheme that provided for sale proceeds to be remitted first to the debtor and then the challenged secured creditor to the balance of its defective mortgage is not "fair and equitable", particularly where "not all parties to the proceeding have joined in the agreement and the interests of the creditor with the most to lose [ ] have been totally disregarded." *Haven*, 2005 WL 927666, at *7-8. The Retiree Committee submits that the City is attempting to do the same here -- elevate payment of the Counterparties' claim over the rights of other creditors with priority, constitutional claims in the face of issues regarding the propriety of the Counterparties' claims, without allowing creditors to investigate, and without advising this Court of the City's investigation, if any.

27. Admittedly, when an asset of the estate involves protracted investigation or potentially costly litigation, with no guarantee as to the outcome, the trustee must act cautiously and courts accord wide latitude to a trustee's business judgment. *See, In re C.R. Stone Concrete Contractors, Inc.,* 2006 WL 2079139 at *10 (Bankr. D. Mass. July 27, 2006)(quoting *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.),* 212 F.3d 632, 635 (1st Cir. 2000)). A trustee is not entitled to the full breadth of such latitude, however, where he has failed to reach an

informed judgment after diligent investigation. *Id.* at \*11 (providing "little weight to the Trustee's determination that the Stipulations are in the best interest of the estate" due to lack of diligent investigation).

28.     In *C.R. Stone,* the court found that the trustee had "pursued only a cursory investigation of the Debtor's claims" where he had (i) reviewed the pleadings and their accompanying exhibits, (ii) conducted an interview with the Debtor's accountant, (iii) interviewed only four individuals, and (iv) made no apparent attempt to interview the many third parties or many employees of the Debtor and defendants who must have been witnesses. The court found this inquiry to be insufficient and was a basis for the court's refusal to accept the proposed settlement. *See also, Engman*, 331 B.R. at 299 (stating that "There must be at least a rational business purpose to support the [ ] decision. In addition, the decision process itself must evidence at least rudimentary due diligence.") (citations omitted).

29.     The Debtor argues stridently that its business judgment is entitled to deference, however, it has failed to offer sufficient information regarding the financing that it will need to consummate the Forbearance Agreement. Absent such information, the City has failed to provide evidence that it has indeed exercised reasonable business judgment or that the compromise is fair and equitable under Rule 9019. *Bard*, 49 F. Appx. at 530; *Fishell v. Soltow (In re Fishell)*, 47 F.3d 1168 at \*3 (6th Cir. 1995) (unpublished opinion).

WHEREFORE, the Committee respectfully requests that the Court withhold approval of the Assumption Motion and grant such other and further relief as the Court deems just and proper.

- 15 -
13-53846-tjt    Doc 874    Filed 09/16/13    Entered 09/16/13 15:35:46    Page 15 of 16

Respectfully submitted;

| By: /s/ Carole Neville | Sam J. Alberts | Claude D. Montgomery (P29212) |
|---|---|---|
| Carole Neville | DENTONS US LLP | SALANS FMC SNR DENTON |
| DENTONS US LLP | 1301 K Street, NW | EUROPE LLP |
| 1221 Avenue of the Americas | Suite 600, East Tower | Rockefeller Center |
| New York, New York 10020 | Washington, DC 20005-3364 | 620 Fifth Avenue |
| Tel: (212) 768-6700 | Tel: (202) 408-6400 | New York, New York 10020 |
| Fax: (212) 768-6800 | Fax: (202) 408-6399 | Direct: (212) 632-8390 |
| carole.neville@dentons.com | sam.alberts@dentons.com | claude.montgomery@dentons.com |

By: /s/ Matthew E. Wilkins
Matthew E. Wilkins (P56697)
Paula A. Hall (P61101)
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Direct: (248) 971-1711
Cell: (248) 882-8496
Fax: (248) 971-1801
wilkins@bwst-law.com
hall@bwst-law.com                                  Dated: September 16, 2013
*Counsel for the Official Committee of Retirees*