# Exhibit C

# In The Matter Of:

*City of Detroit*

---

*Kenneth Buckfire*
*August 29, 2013*

---



NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

*Original File BUCKFIRE_KENNETH.txt*
*Min-U-Script® with Word Index*

Page 1

```
 1              UNITED STATES BANKRUPTCY COURT
 2           FOR THE EASTERN DISTRICT OF MICHIGAN
 3                      SOUTHERN DIVISION
 4
 5  In Re:
 6
 7  CITY OF DETROIT, MICHIGAN    Chapter 9
 8                               Case No.13-53846
 9          Debtor.              Hon. Steven Rhodes
10                                         /
11
12
13      The Video Deposition of KENNETH BUCKFIRE,
14      Taken at 1114 Washington Boulevard,
15      Detroit, Michigan,
16      Commencing at 9:31 a.m.,
17      Thursday, August 29, 2013,
18      Before  Nora Morrissy, RMR, CRR, CSR-2642.
19
20
21
22
23
24
25
```

Page 2

```
 1  APPEARANCES:
 2
 3  THOMAS CULLEN, JR.
 4  BENJAMIN ROSENBLUM
 5  Jones Day
 6  51 Louisiana Avenue N.W.
 7  Washington, D.C. 20001
 8  202.879.3939
 9      Appearing on behalf of the City of Detroit.
10
11  MATTHEW G. SUMMERS
12  Ballard Spahr, LLP
13  919 North Market Street, 11th floor
14  Wilmington, Delaware 19801
15  302.252.4465
16      Appearing on behalf of EEPK.
17
18  STEPHEN HACKNEY
19  LALLY GARTEL
20  Kirkland & Ellis, LLP
21  300 North LaSalle
22  Chicago, Illinois 60654
23  312.862.2157
24      Appearing on behalf of Syncora.
25
```

Page 3

```
 1  JENNIFER GREEN
 2  FRANK GUADAGNINO
 3  Clark Hill, P.L.C.
 4  500 Woodward Avenue, Suite 3500
 5  Detroit, Michigan  48226-3435
 6  313.965.8300
 7      Appearing on behalf of Police and Fire Retirement
 8  System and Police and Fire General Retirement System.
 9
10  KELLY DIBLASI
11  Weil, Gotshal & Manges, LLP
12  767 Fifth Avenue
13  New York, New York 10153
14  212.310.8032
15      Appearing on behalf of Financial Guaranty Insurance
16  Company.
17
18  ERNEST J. ESSAD, JR.
19  Williams, Williams, Rattner & Plunkett, P.C.
20  380 North Old Woodward, Suite 300
21  Birmingham, Michigan  48009
22  248.642.0333
23      Appearing on behalf of Financial Guaranty Insurance
24  Company.
25
```

Page 4

```
 1  KAREN NEWBURY
 2  Schiff Hardin, LLP
 3  233 South Wacker Drive, Suite 6600
 4  Chicago, Illinois 60606
 5  312.258.5522
 6      Appearing on behalf of Depfa Bank, PLC, as agent for
 7  DFS WertManagement.
 8
 9  CAROLINE TURNER ENGLISH
10  Arent Fox, LLP
11  1717 K Street, NW
12  Washington, D.C. 20036
13  202.857.6000
14      Appearing on behalf of Ambac.
15
16  BIANCA FORDE
17  Winston & Strawn, LLP
18  200 Park Avenue
19  New York, New York 10166
20  212.294.4733
21      Appearing on behalf of Assured Municipal Guaranty
22  Corp.
23
24
25
```

## Page 5

1 JASON JURGENS
2 Cadwalader, Wickersham & Taft, LLP
3 One World Financial Center
4 New York, New York 10281
5 212.504.6102
6 Appearing on behalf of Merrill Lynch Capital Services.
7
8
9 GUY S. NEAL
10 Sidley Austin, LLP
11 1501 K. Street, N.W.
12 Washington, D.C. 20005
13 202.736.8041
14 Appearing on behalf of National Public Finance
15 Guarantee Corp.
16
17 STEVEN WILAMOWSKY
18 Bingham McCutchen, LLP
19 399 Park Avenue
20 New York, New York 10022
21 212.705.7960
22 Appearing on behalf of UBS.
23
24  **ALSO PRESENT:**
25 Bailey Wellman, Video Technician

## Page 6

1  TABLE OF CONTENTS
2
3 Witness                          Page
4 KENNETH BUCKFIRE
5
6 **EXAMINATION**
7   BY MR. SUMMERS: 8
8 **EXAMINATION**
9   BY MR. HACKNEY: 108
10 **EXAMINATION**
11   BY MS. DIBLASI: 165
12 **EXAMINATION**
13   BY MS. ENGLISH: 171
14 **EXAMINATION**
15   BY MS. FORDE: 189
16 **EXAMINATION**
17   BY MS. GREEN: 202
18 **EXAMINATION**
19   BY MS. NEWBURY: 204
20
21  EXHIBITS
22
23 Exhibit                          Page
24 (Exhibits retained by counsel.)
25

## Page 7

1 DEPOSITION EXHIBIT 1           8
2 DEPOSITION EXHIBIT 2          21
3 DEPOSITION EXHIBIT 3          43
4 DEPOSITION EXHIBIT 4          80
5 DEPOSITION EXHIBIT 5         170

## Page 8

1 Detroit, Michigan
2 Thursday, August 29, 2013
3   9:31 a.m.
4
5   **MARKED FOR IDENTIFICATION:**
6   DEPOSITION EXHIBIT 1
7   9:21 a.m.
8   **VIDEO TECHNICIAN:** We are now on the
9 record. This is the videotaped deposition of Kenneth
10 Buckfire being taken on Thursday, August 29th, 2013.
11 The time is now 9:31 a.m. We are located at 1114
12 Washington Boulevard, Detroit, Michigan.
13   We are here in the matter of In Re: City of
14 Detroit, Michigan case number 13-53846 in the United
15 States Bankruptcy Court, Eastern District of Michigan.
16   My name is Bailey Wellman, video
17 technician. Will the court reporter please swear in
18 the witness.
19   KENNETH BUCKFIRE,
20 was thereupon called as a witness herein, and after
21 having first been duly sworn to testify to the truth,
22 the whole truth and nothing but the truth, was
23 examined and testified as follows:
24   **MR. SUMMERS:** Good morning.
25   **EXAMINATION**

BY MR. SUMMERS:
Q. Mr. Buckfire, would you please state your name and business address for the record?
A. Kenneth Buckfire. 601 Lexington Avenue, New York, New York.
Q. For the record my name is Matthew Summers. I'm an attorney at Ballard Spahr in Wilmington, Delaware and we represent the entity that's caused people a little trouble with the name but we've been referring to it as EEPK.
  Mr. Buckfire, you understand the way a deposition process works, correct?
A. I believe so.
Q. And you've been deposed on numerous occasions previously, correct?
A. Yes.
Q. Because of that experience I just provide a few basic ground rules that I will ask you to abide by today. First if the question that I ask is not clear, please let me know and I will attempt to rephrase it and if I ask a question and you don't understand it but answer it anyway, I would ask you not to do that but to ask me to clarify and if you give me an answer, I will assume you understood the question.
  Second, because we are on the record and

sometimes you will anticipate probably where I'm going with the question or think that you anticipate, I would ask that you to make the transcript clearer, I will ask that you wait until I complete the question before you begin your answer.
A. Thank you.
Q. Before you is what's been premarked as Deposition Exhibit 1, and I assume you have seen this document before, is that correct?
A. No.
Q. No. Okay. And it is the notice of deposition that was issued that we are proceeding under today. I'd like to discuss initially with you the topics about which you plan to testify at the hearing on the motion to assume the forbearance and optional termination agreement and prove the settlement therein.
  Do you have in mind the topics that you intend to testify at the hearing?
A. Yes.
Q. And can you provide those to me?
A. The reason and purpose of the negotiation with the Swap counterparties and the results thereof as determined in the forbearance agreement itself, the financial condition of the City that led us to believe that this agreement was necessary to rehabilitate the

City. Prepared to testify to the general condition of the City's financials leading up to the execution of the forbearance agreement.
Q. Are there any other topics that you intend to testify at the hearing concerning the forbearance agreement?
A. I'll testify at that point to the status of the DIP form process that will provide the financing to execute the City's option under the forbearance agreement to retire the Swaps.
Q. Are there any other topics that you have not mentioned in your answers that you intend to testify about?
A. I'm sure there will be other things but I can't recall at this time what they might be.
Q. Mr. Buckfire, what is your position with Miller Buckfire?
A. Co-founder and co-president of Miller Buckfire & Company.
Q. Miller Buckfire currently is employed as the financial advisor to the City of Detroit, correct?
A. As the investment banker to the City, that's correct.
Q. And when was Miller Buckfire first engaged by the City as investment banker?
A. We were first engaged in July of 2012 for a 60-day review of the City's financial condition. We were re-engaged on January 8th of this year to continue to

advise the City on its financial condition and financial alternatives. Both were -- were hired pursuant to an RFP process to which we submitted a proposal.
Q. When you were hired in July 2012, can you describe the scope of services that Miller Buckfire was engaged to provide?
A. As I mentioned earlier, we were engaged to do a general financial review of the City's financial condition particularly with respect to its ability to service its debt obligations.
Q. Were there specific tasks that you were asked to perform in connection with doing a general financial review of the debt obligations?
A. No, we were engaged to do a general financial review and advise the mayor and the chief financial officer as to what those financial conditions implied for the City's ability to operate in the ordinary course.
Q. That engagement began in July 2012 is what you testified to, is that correct?
A. Correct, and ended on August 31st.
Q. Very good. I would point out that I would ask you to wait until I ask the question, though.
  Miller Buckfire was then re-engaged on January 8th of 2013, is that correct?

**Page 49**

1 Q. So, for example, the City does not actually project
2 paying pension -- making pension contributions for
3 fiscal year 2014, isn't that true?
4    MR. CULLEN: Objection. Foundation. Form.
5    BY MR. SUMMERS:
6 Q. You may answer.
7 A. That's correct.
8 Q. And the City does not currently plan to pay the health
9 benefits for retirees in fiscal year 2014, correct?
10    MR. CULLEN: Objection. Foundation. Form.
11    BY MR. SUMMERS:
12 Q. You may answer.
13 A. Can you repeat the question, please?
14 Q. The City does not currently intend to pay the line
15 item for health benefits for retirees in fiscal year
16 2014?
17 A. That's correct.
18 Q. And the City does I guess intend to continue paying
19 the monthly payment to the Swaps, is that correct,
20 which is represented by the 50.6 million?
21 A. Yes, but again you have to look at the caption of this
22 page. This is not the City's plan.
23 Q. This is the City's projection, however?
24 A. This is the City's projection in the absence of the
25 reinvestment plan that the City manager has already

**Page 50**

1 said he is going to put in place and is putting in
2 place.
3    So, this is interesting but not relevant to
4 this discussion because it does not include as the
5 caption indicates clearly at the top the increased in
6 expenditures necessary to restore services to adequate
7 levels for the residents.
8 Q. But if you look at this -- and the revenues for fiscal
9 year 2014 include 170 million in wage earning
10 revenues, is that correct?
11 A. Yes.
12 Q. So, if the City is operating, understanding your
13 qualification, but if the City is under this
14 projection showing a 397.2 million dollar surplus, if
15 it did not have access to the casino revenues during
16 fiscal year 2014, there still would be a surplus, is
17 that correct?
18 A. But it's not the City's plan. This is academic.
19 Q. Whether it's academic or not, that's what this
20 indicates, is that correct?
21    MR. CULLEN: Objection. Foundation. Form.
22 A. Yes.
23    MR. CULLEN: And asked and answered.
24    BY MR. SUMMERS:
25 Q. And in fact if the City pays the termination fee, it's

**Page 51**

1 no longer going to be paying the Swaps' monthly
2 payment, correct?
3 A. Yes, but this is not the City's plan.
4 Q. If the City did not have access to casino revenues
5 from now until December 2013, does the City believe
6 there will be any point where it would run out of
7 cash?
8 A. You have to look at Page 8. It answers that question.
9 On Page 8 which is clearly presented to the creditors
10 on June the 8th -- June 14th rather, and also on Page
11 9 which forecasts out to June of '14 we clearly show
12 on a monthly basis what we believe the City's cash
13 position to be in the absence of any transaction and
14 you can see that business as usual results in the City
15 having 14 million of cash by the end of June of '13 in
16 the absence of any intermediary action and that that
17 number would not incorporate any cash being spent on
18 the reinvestment program because it hasn't started
19 yet. This indicates quite clearly the dire position
20 the City would be in if we lost access to the 170
21 million of gaming revenue because that would
22 immediately translate into a net cash loss of 160
23 million on this page alone.
24 Q. This cash flow page on Page 8 indicates or assumes the
25 City will be making certain legacy payments that it is

**Page 52**

1 in fact not currently making, is that correct?
2 A. Yes, it does.
3 Q. For example, it assumes that the City will make
4 pension contributions, correct?
5 A. No, I think we are assuming here we continue to defer
6 those pension contributions and that's why if you look
7 at the bottom and you see accumulated deferrals, you
8 see the number grows every month, that's the pension
9 contribution we weren't making.
10 Q. If you look at -- this assumes that the City will
11 continue to payments on general obligation bonds?
12 A. That's right. This is the status quo. In the absence
13 of any restructuring or preservation of cash plan or
14 reinvestment of the City, this will be the financial
15 condition of the City in the absence of any action.
16 Q. Right. But as a result in part of filing the Chapter
17 9 bankruptcy proceeding, there are significant legacy
18 obligations that are not being paid?
19 A. This clearly shows if you look at the far right column
20 June of '13 that trying to operate a City of this
21 scale with 14 million of cash bearing in mind that
22 that could be zero or negative on any given day
23 depending on collections made it almost impossible to
24 prudently operate the City and that was the proximate
25 reason why it became necessary to defer the payment on

Page 69

1 A. I would recommend it.
2   BY MR. SUMMERS:
3 Q. Okay.
4   MR. SUMMERS: Let's mark that for follow-up
5 after the deposition.
6   BY MR. SUMMERS:
7 Q. You testified that as of the last analysis your
8 understanding is the estimated amount of the
9 termination payment that would be due is roughly three
10 hundred million dollars, is that correct?
11 A. Well, it clearly moves around as the interest rate
12 curve moves around. I think the most recent number is
13 somewhere reaching 275 and 300 million dollars.
14 That's before the application of the applicable
15 discount that we had provided for in the termination
16 agreement.
17 Q. And that last analysis, when was that performed?
18 A. A few days ago.
19 Q. How does the City plan to get the cash necessary to
20 make the termination payment?
21   MR. CULLEN: Objection. Foundation. Form.
22   BY MR. SUMMERS:
23 Q. Does the City have a plan at this point for how it
24 will obtain the cash necessary to pay the termination
25 payment?

Page 70

1   MR. CULLEN: Objection, foundation, form,
2 but you can address the question.
3 A. Yes, the City has a plan.
4   BY MR. SUMMERS:
5 Q. And what is that plan?
6 A. The City intends to secure a debtor in possession
7 financing of sufficient proceeds to fund the
8 termination payment as well as provide sufficient cash
9 for the City to execute on its reinvestment program
10 during the bankruptcy.
11 Q. And what is -- what actions, if any, has the City
12 taken toward obtaining debtor in possession financing?
13 A. We have contacted a large universe of potentially
14 interested investors, many of whom have signed
15 nondisclosure agreements, NDAs, pursuant to which they
16 have received the request for proposal, the RFP which
17 went out yesterday.
18 Q. And is Miller Buckfire leading the effort to obtain
19 debtor in possession financing?
20 A. Yes.
21 Q. And when you say a large universe of potential
22 investors, do you know approximately how many have
23 been talked to?
24 A. At the moment it's in excess of 30.
25 Q. And how many have -- how many have signed

Page 71

1 nondisclosure agreements?
2 A. That's the universe I'm discussing, approximately 30
3 or more.
4 Q. So, everybody you've talked to signed?
5 A. No, some people didn't want to participate. I can't
6 tell you how many we called. I can tell you how many
7 we sent NDAs to which have been returned to us, it's
8 in excess of 30.
9 Q. Are some of the people or some of the potential
10 sources of financing that Miller Buckfire have spoken
11 to said no, we're not interested?
12 A. Yes.
13 Q. And approximately how many have said no?
14 A. Hasn't been that many, maybe ten. Would your client
15 like one?
16 Q. And do you know who those ten entities are that have
17 said they are not interested?
18 A. I do, yes.
19 Q. And who are they?
20 A. I'm not going to tell you that.
21 Q. On what basis?
22 A. It's commercially sensitive information.
23   MR. CULLEN: Counsel, maybe it will help,
24 and I don't know whether you want this on the record
25 or not, but the position we are going to take with

Page 72

1 respect to this is that this is a competitive process
2 and the best result in that process is achieved by us
3 being able to negotiate with the individual parties
4 who are out there, and not to litigate the negotiating
5 strategy before we have something to bring back to the
6 court to approve.
7   So, we're not going to answer questions
8 about individual parties, we're not going to answer
9 questions about the strategy of negotiating with those
10 parties and we're not at liberty to give out the
11 information with respect to the people who responded
12 to the NDAs because they understandably don't want to
13 be shopped, don't want to take up a lot of your time.
14 We can fight this through a lot of objections and so
15 forth, and if we want to fight about that at some
16 later time, perfectly fine.
17   You can ask about his general strategy on
18 this, you can ask about the basis for his confidence
19 or nonconfidence in it. You can go through those
20 general items, but the actual strategy, the terms of
21 arrangements with individual parties I'm not going to
22 have him go into now. Hopefully by the time we get to
23 the hearing, we'll have an agreement that you will be
24 on a --
25   MR. SUMMERS: Let's go -- I think let's

**Page 73**

1  go -- move through the questions and see how we do.
2  MR. CULLEN: Okay.
3  MR. SUMMERS: I understand the City's
4  position on it.
5  MR. CULLEN: Okay.
6  BY MR. SUMMERS:
7  Q. You said an RFP went out yesterday?
8  A. Correct.
9  Q. Approximately how many people was the RPF sent to
10   yesterday?
11  A. The 30 plus people who signed the NDA.
12  Q. How much debtor-in-possession financing does the City
13   hope to obtain?
14  A. Three hundred fifty million dollars, up to three
15   hundred fifty million dollars.
16  Q. And does the City have a goal on the interest rate?
17  A. The lowest possible interest rate.
18  Q. Does the RFP attempt to define what that lowest
19   possible interest rate is?
20  A. No.
21  Q. Does it define whether the interest rate needs to be
22   fixed or variable?
23  A. No.
24  Q. What covenants, if any, are included in the RFP as
25   being acceptable or not acceptable?

**Page 74**

1  A. I'm not going to discuss that. It's commercially
2   sensitive.
3  Q. How long of maturity on the DIP financing is the City
4   looking to obtain?
5  A. Through the pendency of the end of the case.
6  Q. And is the City offering a lien on casino revenues in
7   connection with the DIP financing?
8  A. In part.
9  Q. I assume the City does not expect to obtain unsecured
10   financing?
11  A. I would take it if it was offered.
12  Q. No doubt. What other collateral is the City offering
13   to secure the DIP financing loan?
14  A. I'm not going to answer that question.
15  Q. Does the RFP define what collateral would be
16   available?
17  A. Yes, it does.
18  Q. And that's been sent out to potential investors?
19  A. Who have signed nondisclosure agreements.
20  Q. If somebody new came and said I would be interested in
21   providing DIP financing, you would have them sign an
22   NDA and then provide them the RFP?
23  A. If they wanted to make an unsolicited proposal without
24   the benefit of the RPF, we would be happy to accept
25   it. Are you suggesting your client is interested in

**Page 75**

1   is submitting a proposal?
2  Q. Is the City offering art work as collateral?
3  A. I'm not going to discuss the terms of the term sheet,
4   sorry.
5  Q. Well, we kind of picked and choose what terms in the
6   RFP we are discussing and not discussing.
7  MR. CULLEN: We have in the attempt to
8  accommodate your desire for information and to
9  maintain control of the integrity of this process
10  which we believe is best negotiated as a negotiation
11  and not a litigation.
12  MR. SUMMERS: I guess I struggle with
13  understanding why the collateral that's offered in the
14  RPF that's been sent out when we know the interest
15  rate, the amount of the financing the debtor seeks,
16  why that puts the City at a competitive disadvantage.
17  MR. CULLEN: We didn't say the interest
18  rate.
19  MR. SUMMERS: The lowest possible.
20  MR. CULLEN: This is the beginning of a
21  negotiation. It's the beginning of a negotiation that
22  isn't at an end yet, that hasn't had any response to
23  the RFPs yet, it's an initial offer, and that's what
24  it is, and he's discussing it as such and willing to
25  testify about it as such, but I'm not going to read

**Page 76**

1  the terms of the RFP in the newspaper and our bidders
2  are not going to read the terms of the RFP in the
3  newspaper because that would hamper the process and
4  hamper our ability to get best value.
5  MR. SUMMERS: But we already have in the
6  record that the casino revenues are part of the
7  collateral that's being offered, so, what's wrong with
8  finding out what the rest of the collateral that's
9  being offered?
10  MR. CULLEN: Not going to argue with you,
11  Counsel. I'm telling you what the position is. I've
12  tried to be accommodating. It's as far as I am going
13  to go.
14  BY MR. SUMMERS
15  Q. Has the City had discussions with the State of
16   Michigan about providing financing?
17  A. I'm not going to discuss that.
18  Q. What is the City's view about what has to happen in
19   order to be able to obtain debtor-in-possession
20   financing -- let me put a finer point.
21     Are there certain events that the City
22   believes has to happen in the case for it to be able
23   to realistically obtain debtor-in-possession
24   financing?
25  A. Yes, there are events in the case.