UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

| | |
|---|---|
| In re | Chapter 9 |
| | Case No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | |
| | Hon. Steven W. Rhodes |
| Debtor. | **Expedited Consideration Requested** |

## MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF ALEXANDRA SCHWARZMAN

Syncora Guarantee Inc. – as the saying goes – wants to have its cake and it eat it too.

Having designated one of its own attorneys in this case as a rebuttal witness, Syncora wants to selectively choose which questions on the designated topics the attorney will be allowed to answer, while hiding behind the attorney-client privilege on those questions Syncora doesn't wish to answer.

Alexandra Schwarzman, a first-year associate at Kirkland & Ellis LLP, participated in some (but not all) discussions between Syncora and the City regarding a proposed non-disclosure agreement. Syncora proposes to call Ms.

Schwarzman to testify about those discussions at the hearing on the Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement (the "Agreement") Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief (the "Assumption Motion").

As an initial matter, Ms. Schwarzman's testimony is utterly irrelevant to the relief sought by the City in the Assumption Motion. Even if it were relevant, the gross misapplication of the attorney-client privilege and work product doctrine by Syncora's counsel at Ms. Schwarzman's deposition would be ample grounds for excluding her testimony.

Accordingly, the City of Detroit respectfully moves *in limine* to exclude the testimony of Ms. Schwarzman from the hearing on the Assumption Motion.

## I.    MS. SCHWARZMAN'S TESTIMONY FAILS THE TEST FOR RELEVANT EVIDENCE

Under Rule 402 of the Federal Rules of Evidence, only relevant evidence is admissible in court. Rule 401 provides the test for relevant evidence: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; *and* (b) the fact is of consequence in determining the action." Fed. R. Evid. 401 (emphasis added).

Ms. Schwarzman's testimony fails this test. While her testimony would tend to make more probable the facts that Syncora and the City engaged in negotiations regarding a potential non-disclosure agreement, and that those negotiations ultimately did not come to fruition, those facts are of no consequence in determining whether the City should be permitted to assume an unrelated agreement with the Swap Counterparties.

Syncora's own objection to the Assumption Motion demonstrates the irrelevance of Ms. Schwarzman's testimony. Syncora's objection identifies three bases on which, it argues, the Court should deny the Assumption Motion: (1) the Agreement allegedly impairs third party rights; (2) the Agreement is not fair and equitable or to the economic advantage of the City; and (3) even if the Court approves assumption of the Agreement, such order should be stayed pending resolution of various disputes relating to the certificates of participation and interest rate swaps. *See* Objection, Docket No. 366, at ¶¶ 49-51. Conspicuously absent from Syncora's recitation of its objections is any argument that the Assumption Motion should be denied because the City did not enter into an unrelated non-disclosure agreement ("NDA") with Syncora. Indeed, there is no mention anywhere in Syncora's 52-page brief of an NDA.

Ms. Schwarzman testified at her deposition that the purpose of the proposed NDA was twofold: Syncora wanted to know the terms that the City was

discussing with the Swap Counterparties, and Syncora wanted to make some kind of unspecified proposal to the City.[1] *See* Schwarzman Dep. Tr., attached hereto as Exhibit 6, at 63-65. Even if we were to assume that this alleged potential proposal could have some arguable relevance to the Assumption Motion, Ms. Schwarzman's testimony does not. In the first place, Ms. Schwarzman refused to testify about the terms or purpose of the alleged proposal:

> Q. . . . Do you have any personal knowledge of what this potential proposal was to be?
>
> A. Yes.
>
> Q. . . . And your – even though this is the – the whole reason for the existence of a potential nondisclosure agreement, which is the heart of your testimony, you are refusing to answer any questions regarding this potential proposal?
>
> A. Yes.

Schwarzman Dep. Tr., Exhibit 6 at 79-80.

Second, Ms. Schwarzman testified that she did not know whether Syncora actually would have made a proposal to the City upon execution of an NDA:

> Q. Okay. So based on this language, it appears that once the agreement was finalized, Syncora wanted to make a

---

[1] Of course, to the extent that Ms. Schwarzman's knowledge of what Syncora wanted or intended is based on statements that were made to her by others, her testimony in that regard is hearsay and is inadmissible. *See* Fed. R. Evid. 802.

proposal to the City and intended to do so; is that
accurate?

A. I don't – it's true that Syncora had a desire to make a
proposal. I can't tell you what would or would not have
happened upon execution.

*Id.* at 88.

Finally, Ms. Schwarzman testified that Syncora eventually did make a

proposal to the City, notwithstanding the fact that an NDA was never executed:

Q. And now, just to circle back to something you said
before, you said that your understanding is that Syncora
has made a proposal to the City.

A. Yes.

Q. And by "proposal," you mean something in the nature
of what it wanted to make subject to the NDA, correct?

A. Correct.

Q. And it did so without the NDA, correct?

A. Correct.

*Id.* at 136-37.

Accordingly, even if Syncora's proposal to the City were somehow

germane to the Assumption Motion, Ms. Schwarzman's testimony, about an

unexecuted NDA that turned out to be unnecessary, plainly is not.

## II. MS. SCHWARZMAN'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT WILL CAUSE UNFAIR PREJUDICE AND/OR WASTE TIME

Even if the Court were to find that Ms. Schwarzman's testimony about her involvement in the failed negotiation of an unnecessary NDA is relevant to the determination of the Assumption Motion, such testimony should nonetheless be excluded. Rule 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Here, Ms. Schwarzman's testimony necessarily would either waste the time of the Court and the parties, or else cause unfair prejudice to the parties who were unable to obtain meaningful testimony at her deposition.

Ms. Schwarzman testified to little of substance at her deposition due to extraordinarily broad and improper assertions of the attorney-client privilege and work product doctrine made by her and her colleague at the deposition, William Arnault.[2] Those wrongful assertions of privilege and protection made it

---

[2] Mr. Arnault is an associate at Kirkland & Ellis. Mr. Arnault identified himself for the record as counsel only for Syncora, and Ms. Schwarzman initially testified that he did not represent her as her counsel at her deposition. Ms. Schwarzman later changed her mind and testified that Mr. Arnault was, after all, her lawyer. Schwarzman Dep. Tr., Exhibit 6 at 12-14.

extremely difficult to obtain even the most basic factual information from Ms.

Schwarzman at her deposition. For example:

- Ms. Schwarzman refused to answer, based on the work product doctrine, a yes-or-no predicate question as to whether she has an understanding of the relief sought by the City in the Assumption Motion. *Id.* at 31-32.

- Mr. Arnault instructed Ms. Schwarzman, based on the work product doctrine, to refuse to answer whether she understands that the hearing on the Assumption Motion will be an evidentiary hearing. *Id.* at 34.

- Mr. Arnault instructed Ms. Schwarzman not to reveal who she was referring to when she used the term "Swap Counterparties":

  > Q. When you say "the Swap Counterparties," who are you referring to?
  >
  > MR. ARNAULT: Objection. I'm going to object on the grounds that this is just – this is all work product information, discussions you've had with your attorney and your client. I'm going to instruct the witness not to answer.
  >
  > MS. KOVSKY-APAP: You're going to instruct her not to answer who is referred to by the term "Swap Counterparties"?
  >
  > MR. ARNAULT: Yes, I am because you're delving into information about our objection, what the strategy was in filing this objection.

  *Id.* at 41-42.

- Ms. Schwarzman refused to state whether, if she were called as a witness, her testimony would be used in support of Syncora's objection to the Assumption Motion. *Id.* at 43-44.

- Mr. Arnault instructed Ms. Schwarzman, based on the attorney-client privilege and work product doctrine, to refuse to answer whether the bases for denial of the Assumption Motion identified by Syncora in its

publicly-filed objection have anything to do with the negotiation of an NDA. *Id.* at 46-47.

- Mr. Arnault further instructed Ms. Schwarzman to refuse to state whether any words that she read aloud from Syncora's publicly-filed objection "indicated a nondisclosure agreement without using those specific words" because, Mr. Arnault asserted, "to the extent you're using 'indicated,' this could reveal work product information." *Id.* at 49.

- Mr. Arnault instructed Ms. Schwarzman not to identify the attorneys who were involved in the preparation of Syncora's proposal to the City because the identity of Kirkland & Ellis' lawyers "delves into attorney-client privilege and work product information."

- Ms. Schwarzman refused to testify, based on the attorney-client privilege, about information regarding the proposed NDA conveyed to her by another associate at Kirkland & Ellis, even though she admitted that she shared that information with counsel for the City. *Id.* at 116-119.

- Ms. Schwarzman refused to testify, based on the work product doctrine, as to her understanding of the damages provision in the draft NDA that she negotiated and about which she may be called as a witness at the hearing. *Id.* at 125-26.

Ms. Schwarzman's deposition transcript is replete with such improper objections and refusals to answer, which have no basis in the Federal Rules or applicable case law. The attorney-client privilege attaches to confidential communications relating to ***legal advice*** sought from a professional legal adviser in his capacity as such. *Reed v. Baxter*, 134, F.3d 351, 355-56 (6th Cir. 1998). Courts strictly construe the attorney-client privilege because it comes with the substantial cost of obstructing the quest for truth. *Id.* at 356 (explaining that the

attorney-client privilege is "in derogation of the search for truth"). Not all communications between a client and its attorney are privileged; rather, the privilege extends only to those communications where legal advice is sought or obtained. *Id.* at 355-56. The party asserting the protection of the privilege bears the burden of establishing its applicability. *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 450 (6th Cir. 1983).

The work-product doctrine is a qualified protection codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure. The work-product doctrine is "meant to shelter the mental processes of the attorney providing a privileged area within which he can analyze and prepare his client's case." *U.S. v. Nobels,* 422 U.S. 225, 238 (1975). Work-product protection applies to documents and tangible things "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative." Fed. R. Civ. P. 26(b)(3). "Opinion" work product consists of tangible and intangible material which reflects an attorney's efforts at investigating and preparing a case, including one's pattern of investigation, assembling of information, determination of the relevant facts, preparation of legal theories, planning of strategy, and recording of mental impressions**.** *Hickman v. Taylor,* 329 U.S. 495, 511, 67 S. Ct. 385, 393, 91 L. Ed. 451 (1947).

The City is mystified how, for example, a yes-or-no answer as to whether Ms. Schwarzman, as a fact witness, has an understanding of what the Forbearance and Optional Termination Agreement is, could possibly reflect Ms. Schwarzman's "efforts at investigating and preparing a case, including one's pattern of investigation, assembling of information, determination of the relevant facts, preparation of legal theories, planning of strategy, and recording of mental impressions." Similarly, the City cannot fathom how the bases of Syncora's objection that are spelled out in a *publicly filed document* constitute, in the minds of Syncora's counsel, "confidential communications relating to legal advice sought from a professional legal adviser in his capacity as such."

The novel positions taken by Ms. Schwarzman and Mr. Arnault on the attorney-client privilege and work product doctrine would be untenable in any event, but all the more so here, where Syncora chose to file a declaration by its attorney and to designate her as a witness, thus waiving privilege as to the topics of her testimony. *See, e.g., Witmer v. Acument Global Techs., Inc.*, 2010 U.S. Dist. LEXIS 100663, *7-8, *11 ( E.D. Mich. Sept. 23, 2010) (agreeing that "defendants waived the attorney-client privilege by 'submitting an affidavit of their General Counsel testifying about matters which they now claim are privileged'").

Nonetheless, it is clear that if Ms. Schwarzman is permitted to testify, one of two things will happen. First, Syncora's counsel may hold fast to the

position they have staked out, and will waste the very limited time of the Court and the parties at the hearing by improperly instructing the witness not to answer questions and arguing that the identity of the "Swap Counterparties" is somehow privileged information.

Alternatively, Syncora may decide to waive privilege and permit Ms. Schwarzman to testify fully – thereby unfairly prejudicing the parties who were unable to obtain such testimony at Ms. Schwarzman's deposition. Courts have found that this kind of sword-and-shield approach to privilege is impermissible. *See, e.g. Galindo v. Vanity Fair Cleaners*, 2012 U.S. Dist. LEXIS 91005 (S.D.N.Y. June 29, 2012) ("It is certainly the case that if there are areas into which plaintiffs prevented inquiry at a deposition on the basis that they were protected from disclosure by the attorney-client privilege, plaintiffs may not at trial attempt to present evidence on those precise areas.").

Either potential scenario warrants exclusion of Ms. Schwarzman's testimony under Rule 403.

## III.     CONCURRENCE

Counsel for the City sought the concurrence of counsel for Syncora in the relief sought in this motion, but such concurrence was not obtained.

## IV.  CONCLUSION

For the foregoing reasons, the City respectfully requests that the Court enter an order, in the form attached hereto as Exhibit 1, excluding Ms. Schwarzman from testifying at the hearing on the Assumption Motion.


Dated:  September 16, 2013          Respectfully submitted,

/s/ Deborah Kovsky-Apap
Robert S. Hertzberg
Deborah Kovsky-Apap
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
Telephone:  (248) 359-7300
Fax:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

- and -

Thomas F. Cullen, Jr.
Gregory M. Shumaker
Geoffrey S. Stewart
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001.2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com


**ATTORNEYS FOR THE CITY OF DETROIT**

# EXHIBIT 1

## Proposed Order

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

| | |
|---|---|
| In re | Chapter 9 |
| | Case No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | |
| | Hon. Steven W. Rhodes |
| Debtor. | |

## ORDER EXCLUDING TESTIMONY OF ALEXANDRA SCHWARZMAN

This matter having come before the Court on the motion (the
"Motion") of the Debtor, City of Detroit, for entry of an order excluding the
testimony of Alexandra Schwarzman at the hearing (the "Hearing") on the Motion
of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain
Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of
the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and
(III) Granting Related Relief, and the Court being otherwise advised in the
premises;

IT IS HEREBY ORDERED that the Motion is granted.

IT IS FURTHER ORDERED that the testimony of Alexandra Schwarzman is excluded from being presented at the Hearing.

# EXHIBIT 2

## Notice of Motion and Opportunity to Object

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

| | |
|---|---|
| In re | Chapter 9 |
| | Case No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | |
| | Hon. Steven W. Rhodes |
| Debtor. | **Expedited Consideration Requested** |

## NOTICE OF DEBTOR CITY OF DETROIT'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF ALEXANDRA SCHWARZMAN

    **PLEASE TAKE NOTICE** that on Sept 16, 2013, the Debtor, City of Detroit, filed its *Motion in Limine to Exclude Testimony of Alexandra Schwarzman* (the "**Motion *in Limine***") in the United States Bankruptcy Court for the Eastern District of Michigan (the "**Bankruptcy Court**") seeking entry of an order excluding the testimony of Alexandra Schwarzman at the hearing on the Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement (the "Agreement") Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief, set to take place in the Bankruptcy Court on September 23, 2013.

    **PLEASE TAKE FURTHER NOTICE** that **your rights may be affected by the relief sought in the Motion *in Limine*. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

    **PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant the Debtor's Motion *in Limine*, or you want the

Bankruptcy Court to consider your views on the Motion *in Limine*, by **October 3, 2013 at 4:00 p.m. (EDT)**[1] you or your attorney must:

1.     File a written objection or response to the Motion *in Limine* explaining your position with the Bankruptcy Court electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:[2]

**United States Bankruptcy Court**
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

**Jones Day**
51 Louisiana Ave. NW
Washington, D.C. 20001-2113
Attention: Christopher DiPompeo

-and-

**Pepper Hamilton LLP**
Suite 1800, 4000 Town Center
Southfield, Michigan 48075
Attn: Robert Hertzberg and Deborah Kovsky-Apap

2.     If an objection or response is timely filed and served, the clerk will schedule a hearing on the Motion *in Limine* and you will be served with a notice of the date, time and location of the hearing.

**PLEASE TAKE FURTHER NOTICE that if you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the Motion *in Limine* and may enter an order granting such relief.**

---

[1] Concurrently herewith, the Debtor is seeking expedited consideration and shortened notice of the Motion *in Limine*. If the Court grants such expedited consideration and shortened notice, the Debtor will file and serve notice of the new response deadline.

[2] A response must comply with F. R. Civ. P. 8(b), (c) and (e).

Dated:  September 16, 2013                    Respectfully submitted,




                                              /s/ Deborah Kovsky-Apap
                                              Robert S. Hertzberg
                                              Deborah Kovsky-Apap
                                              PEPPER HAMILTON LLP
                                              4000 Town Center, Suite 1800
                                              Southfield, MI  48075
                                              Telephone:  (248) 359-7300
                                              Fax:  (248) 359-7700
                                              hertzbergr@pepperlaw.com
                                              kovskyd@pepperlaw.com

                                                 - and -

                                              Thomas F. Cullen, Jr.
                                              Gregory M. Shumaker
                                              Geoffrey S. Stewart
                                              JONES DAY
                                              51 Louisiana Avenue, N.W.
                                              Washington, D.C.  20001.2113
                                              Telephone:  (202) 879-3939
                                              Facsimile:  (202) 626-1700
                                              tfcullen@jonesday.com
                                              gshumaker@jonesday.com
                                              gstewart@jonesday.com


                                              **ATTORNEYS FOR THE CITY OF
                                              DETROIT**

# EXHIBIT 3

**Brief**
**(Not Applicable)**

# EXHIBIT 4

## Certificate of Service

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

| | |
|---|---|
| In re | Chapter 9 |
| | Case No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | |
| | Hon. Steven W. Rhodes |
| Debtor. | |

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2013, I electronically filed the

Debtor's Motion *in Limine* to Exclude the Testimony of Alexandra Schwarzman

with the Clerk of the Court which sends notice by operation of the Court's

electronic filing service to all ECF participants registered to receive notice in this

case.

Dated: September 16, 2013        /s/ Deborah Kovsky-Apap
                                            Deborah Kovsky-Apap (68258)

# EXHIBIT 5

**Affidavits**
**(Not Applicable)**

# EXHIBIT 6

## Excerpts from Transcript of Deposition
## of Alexandra Schwarzman

```
 1              UNITED STATES BANKRUPTCY COURT

 2              EASTERN DISTRICT OF MICHIGAN

 3                  SOUTHERN DIVISION

 4  _____

 5  In re                        )  Chapter 9

 6                               )

 7  CITY OF DETROIT, MICHIGAN,   )  Case No. 13-53846

 8                               )

 9                 Debtor.       )  Hon. Steven W. Rhodes

10  _____ )

11

12                                    `

13      The videotaped deposition of ALEXANDRA SCHWARZMAN,

14  called by the City of Detroit for examination, taken

15  pursuant to notice, agreement and by the provisions of

16  the Federal Rules of Civil Procedure 26 and 30 and

17  Federal Rules of Bankruptcy Procedure 7026 and 7030

18  pertaining to the taking of depositions, taken before

19  DEBORAH HABIAN, Registered Merit Reporter, Certified

20  LiveNote Reporter, a Notary Public within and for the

21  County of Cook, State of Illinois, and a Certified

22  Shorthand Reporter of said State, at the offices of

23  Jones Day, 77 West Washington Street, Chicago,

24  Illinois, on Thursday, the 12th day of September,

25  2013, at 12:00 p.m. CST.
```

1  the limited categories of information that
2  Miss Schwarzan -- Schwarzman may testify about, any
3  questions should be limited to these narrow
4  categories.
5          Third and last, Miss Schwarzman is an
6  attorney at Kirkland & Ellis who has been providing
7  legal advice to Syncora. So I want to be very clear
8  up front that by putting her up for this deposition we
9  are not waiving any protections afforded by the
10 attorney-client privilege or the work product doctrine
11 and she will not be providing answer -- or providing
12 answers to any questions that require her to divulge
13 any privileged or otherwise-protected information.
14         Thanks, Deb.
15         MS. KOVSKY-APAP: Okay. Well, we'll
16 respond to those objections in due course, I'm sure.
17         MR. ARNAULT: Sure.
18         ALEXANDRA SCHWARZMAN,
19 called as a witness herein by the City of Detroit,
20 having been first duly sworn, was examined and
21         testified as follows:
22         EXAMINATION
23 BY MS. KOVSKY-APAP:
24         Q.    Okay. Ms. Schwarzman, as I mentioned
25 before my name is Deb Kovsky and my firm is special

1  litigation counsel to the City of Detroit and I'll be
2  asking you some questions under oath today.
3          My first question for you is, have
4  you ever been deposed before?
5          A.    No.
6          Q.    Have you ever attended a deposition?
7          A.    No.
8          Q.    So I just want to give you some real
9  basic what I call rules of road, just so that we're on
10 the same page and so that the court reporter is able
11 to get down your answers clearly.
12         First, I -- I'd ask that you give
13 verbal answers to questions since the court reporter,
14 even though we're videotaping, this the court reporter
15 still needs to be able to record your verbal answers.
16         If you need a break at any point or
17 if you need to consult with your colleague for any
18 reason, that's fine, just let us know. But what I'd
19 ask is if there was a pending question to first answer
20 the question then we can take a break. Okay?
21         A.    Okay.
22         Q.    If I ask a question and you don't
23 understand what I mean, will you ask me to rephrase
24 if?
25         A.    Yes.

1          Q.    Okay. And if you don't ask me to
2  rephrase the question, I'm going to assume you
3  understand it.
4          A.    Okay.
5          Q.    And if you answer the question, I
6  will assume that you've understood what the question
7  is asking. Okay?
8          A.    Okay.
9          Q.    Is there any reason that you're
10 unable to testify fully and accurately today?
11         A.    No.
12         Q.    Are you taking any medications?
13         A.    No.
14         Q.    Are you under the influence of
15 alcohol or any drugs?
16         A.    No.
17         Q.    Are you represented here by counsel
18 today?
19         A.    Yes. Well, my firm.
20         Q.    Well, when Mr. Arnault introduced
21 himself for the record, he indicated that he
22 represents Syncora.
23         A.    That's correct.
24         Q.    And he does not represent you
25 personally; is that correct?

1          A.    Correct.
2          Q.    Okay. So you are not actually
3  represented by counsel today?
4          A.    Correct.
5          Q.    Okay. Did you have any discussions
6  with anyone in preparation for this deposition?
7          A.    Yes.
8          Q.    Who did you have discussions with?
9          A.    Mr. Arnault and Steve --
10         MR. ARNAULT: Well, sorry. I'll just
11 interject for the record. We do -- I do represent
12 Miss Schwarzman in her -- into the capacity that she's
13 testifying today.
14         MS. KOVSKY-APAP: Well, she's
15 testified that she believes she's not represented by
16 you, so...
17         MR. ARNAULT: Well, I mean, we can
18 take this off the record or -- do you believe --
19 sorry. Go ahead.
20         We can take this off the record
21 quickly.
22         THE VIDEOGRAPHER: Now going off the
23 record at 12:07 p.m.
24         (Recess taken from 12:07 p.m. to 12:09 p.m.)
25         THE VIDEOGRAPHER: Now going back on

4 (Pages 10 to 13)

**Page 14**

1  the record at 12:09 p.m.
2  BY MS. KOVSKY-APAP:
3      Q.   Miss Schwarzman, is there any
4  testimony that you've already given that you would
5  like to correct?
6      A.   Yes.
7      Q.   And what is that testimony?
8      A.   I am being represented by
9  Mr. Arnault.
10     Q.   Do you have an engagement letter with
11 Mr. Arnault?
12     A.   No.
13     Q.   But it's your testimony that an
14 attorney-client relationship exists between you and
15 Mr. Arnault.
16         MR. ARNAULT:  You can answer "yes" or
17 "no."
18         THE WITNESS:  Yes.
19 BY MS. KOVSKY-APAP:
20     Q.   Did you have any discussions with
21 anyone in preparation for your deposition?
22     A.   Yes.
23     Q.   And who did you have those
24 discussions with?
25     A.   Mr. Arnault.

**Page 15**

1      Q.   Did you have discussions with anyone
2  else?
3      A.   Yes.
4      Q.   Who else did you have discussions
5  with?
6      A.   Steve Hackney.
7      Q.   And do you have an attorney-client
8  relationship with Mr. Hackney as well?
9          MR. ARNAULT:  You can answer "yes" or
10 "no."
11         THE WITNESS:  Yes.
12 BY MS. KOVSKY-APAP:
13     Q.   Do you have -- have you entered into
14 an engagement letter with Mr. Hackney?
15     A.   No.
16     Q.   Did you review any documents in
17 preparation for your deposition?
18     A.   Yes.
19     Q.   What documents did you review in
20 preparing for this deposition?
21     A.   My affidavit.
22     Q.   Did you review any other documents?
23     A.   No.
24     Q.   Okay.  Backtracking a little bit just
25 to get some background, could you actually state your

**Page 16**

1  full name for the record.
2      A.   Alexandra Schwarzman.
3      Q.   I apologize if I've been
4  mispronouncing your last name.
5          What's your current address?
6      A.   747 North Wabash, Apartment 1903,
7  Chicago, Illinois, 60611.
8      Q.   I want to talk to you a little bit
9  about your educational and your work background.  You
10 went to college?
11     A.   Yes.
12     Q.   Where did you go?
13     A.   Vanderbilt University.
14     Q.   And when did you graduate from
15 Vanderbilt?
16     A.   2007.
17     Q.   Did you have a major there?
18     A.   Political science.
19     Q.   And what kind of degree did you
20 graduate with?
21     A.   A B.A.
22     Q.   Did you receive any honors while were
23 you in college?
24     A.   Yes.
25     Q.   Can you describe them?

**Page 17**

1      A.   Magna cum laude.
2      Q.   And after you graduated from
3  Vanderbilt College, did you take a job?
4      A.   Yes.
5      Q.   How long after you graduated from
6  college did you start your first job?
7      A.   Three months.
8      Q.   And what was that job?
9      A.   I was a sales assistant at Real
10 Simple Magazine.
11     Q.   Okay.  And can you describe to us
12 what is Real Simple Magazine?
13     A.   Real Simple Magazine was under a Time
14 Inc. brands, I think they've been sold since, it's a
15 women's lifestyle magazine.
16     Q.   And what were your job
17 responsibilities as a -- you said you were a sales
18 assistant?
19     A.   Um-hum.
20     Q.   What were your job responsibilities?
21     A.   Correspondence with clients,
22 preparations for meetings, selling ad pages.
23     Q.   And where did you work when you were
24 working at Real Simple?  Where is that located?
25     A.   New York.

Alderson Reporting Company
1-800-FOR-DEPO

13-53846-swr    Doc 893    Filed 09/16/13    Entered 09/16/13 16:26:18    Page 27 of 40

---

Page 30

1  question again?
2  BY MS. KOVSKY-APAP:
3      Q.    My question is, were you aware,
4  before this was filed, that you might be called as a
5  witness?
6          MR. ARNAULT:  You can answer "yes" or
7  "no."
8          THE WITNESS:  Yes.
9  BY MS. KOVSKY-APAP:
10      Q.   And how did you come by that
11  awareness?                    * * * *
12      A.   I don't want to reveal any
13  communications.
14          MR. ARNAULT:  Yes.  Objection.  This
15  is -- objections, this would be internal Kirkland
16  communications and work product.
17          Instruct the witness not to answer.
18  BY MS. KOVSKY-APAP:
19      Q.   Now, the first paragraph of this
20  document makes reference to "the motion of Debtor for
21  entry of an order:  (I) authorizing the assumption
22  about certain forbearance and optional termination
23  agreement pursuant to Section 365(a) of the Bankruptcy
24  Code (II) approving such agreement pursuant to
25  Rule 9019 and (III) granting related relief."

---

Page 31

1          Do you see that?
2      A.   Yes.
3      Q.   Now do you understand in that
4  reference, the Debtor that's being referred to is the
5  City of Detroit?
6      A.   Yes.
7      Q.   Are you familiar with the motion that
8  is referenced in the first paragraph of what I'll call
9  this disclosure?
10      A.  Yes.
11      Q.   Have -- and just because it's a real
12  mouth-full of a motion, if I refer to that as "the
13  Assumption Motion," would that be okay?
14      A.  Yes.
15      Q.   Okay.  Have you reviewed the
16  Assumption Motion?
17      A.  Yes.
18      Q.   Do you have an understanding of what
19  relief the Debtor is seeking by the Assumption Motion?
20                           * * * *
21          MR. ARNAULT:  Objection.  This calls
22  for work product information.
23          I'll instruct the witness not to
24  answer.
25          MS. KOVSKY-APAP:  Mr. Arnault, she's

---

Page 32

1  testifying as to -- as a rebuttal witness with respect
2  to the motion.
3          MR. ARNAULT:  No.  She's actually
4  testifying as a rebuttal witness with respect to the
5  negotiations that she had surrounding the TRO, and
6  with respect to her declaration.  She doesn't mention
7  the forbearance agreement or the order.
8          MS. KOVSKY-APAP:  Well, this -- this
9  is -- this is the Amended Disclosure of Rebuttal
10  Witnesses and Documents In Advance of the September 23
11  Hearing and it makes specific reference to the
12  Assumption Motion.  There is no hearing pending
13  regarding a nondisclosure agreement.
14          MR. ARNAULT:  But if you look at what
15  she is -- what we specifically --
16          MS. KOVSKY-APAP:  We're going to move
17  on.
18          MR. ARNAULT:  Okay.
19  BY MS. KOVSKY-APAP:
20      Q.    So you decline to -- to state whether
21  you have an understanding of what relief the Debtor is
22  seeking?                   * * * *
23      A.    Correct.
24      Q.    Are you aware that your firm's
25  clients, Syncora Guarantee Inc. and Syncora Capital

---

Page 33

1  Assurance Inc. have objected to the Assumption Motion?
2          MR. ARNAULT:  You can answer "yes" or
3  "no."
4          THE WITNESS:  Yes.
5          MS. KOVSKY-APAP:  Unless you have an
6  objection to state for the record, I'd appreciate it
7  if you don't instruct the witness how to answer.
8          MR. ARNAULT:  Okay.  But I'm
9  telling -- because you're wading into potentially --
10          MS. KOVSKY-APAP:  If you -- if you
11  want to state an objection for the record, you can
12  state an objection for the record.  But I have to ask
13  you to stop instructing the witness how to answer my
14  questions.
15          MR. ARNAULT:  Understood.
16  BY MS. KOVSKY-APAP:
17      Q.    So just to ask the question again:
18  You're aware that these two entities which I'll
19  refer -- convenience refer to as "Syncora," unless I'm
20  specifically referring to one or other of them.
21  Is that okay if I refer to them collectively as
22  "Syncora"?
23      A.    Yes.
24      Q.    You are aware that they have objected
25  to the Assumption Motion, correct?

---

9 (Pages 30 to 33)

| Page 34 |
| --- |

```
 1        A.   Yes.
 2        Q.   And you understand that a hearing is
 3   going to be held in the bankruptcy court on
 4   September 23rd to address, among other things,
 5   Syncora's objection to the Assumption Motion, correct?
 6        A.   Yes.
 7        Q.   You understand that the
 8   September 23rd, hearing in the bankruptcy court on the
 9   Assumption Motion will be an evidentiary hearing,
10   correct?
11             MR. ARNAULT:  Objection.  Again,
12   you're delving into what her understanding is and is
13   work product information.  So I'm going to instruct
14   her not to answer this question.
15             MS. KOVSKY-APAP:  I'm asking her if
16   she's aware of a public hearing.
17             MR. ARNAULT:  You're asking her
18   understanding of what is going to occur at that
19   hearing.  You just -- you asked her if her
20   understanding is that it will be an evidentiary
21   hearing.
22             MS. KOVSKY-APAP:  That's public
23   information.  I'm just asking if she's aware of the
24   public information that the Court has permitted
25   parties to call witnesses at the hearing.
```

| Page 35 |
| --- |

```
 1             MR. ARNAULT:  Okay.
 2   BY MS. KOVSKY-APAP:
 3        Q.   Are you aware of the public
 4   information, that has been disclosed to the public,
 5   which is public and nonprivileged, which is that the
 6   hearing on September 23rd will be what is commonly
 7   known as an evidentiary hearing?
 8        A.   Yes.
 9        Q.   Do you know what an evidentiary
10   hearing is?
11        A.   One in which evidence is presented.
12        Q.   And do you have an understanding of
13   what that means when evidence is presented?
14        A.   No.
15        Q.   Have you ever been to something that
16   would commonly be called an "evidentiary hearing"?
17        A.   Potentially.
18        Q.   You've potentially been to one?
19        A.   Correct.
20        Q.   Can you explain what that means?
21        A.   I've attended several hearings as a
22   law student and as a summer associate.  And I could
23   not tell you with certainty whether they were
24   evidentiary or nonevidentiary hearings.
25        Q.   Okay.  I'll represent to you that
```

| Page 36 |
| --- |

```
 1   when I say "evidentiary hearing," what I mean is a
 2   hearing where witnesses are called to present
 3   testimony and where documents are admitted into the
 4   record.  Okay?
 5        A.   Okay.
 6        Q.   And do you understand that, at the
 7   evidentiary hearing, the City will have the
 8   opportunity to put on evidence to try to persuade the
 9   court to grant the Assumption Motion?
10        A.   Yes.
11        Q.   And that would be called, commonly,
12   the City's case in chief, right?
13        A.   Sure.
14        Q.   Okay.  So just going back to the
15   disclosure statement, you see on -- at the bottom of
16   Page 1, it says "Syncora may call the following
17   witnesses in rebuttal to the City's case in chief."
18             Do you see that?
19        A.   Yes.
20        Q.   And on Page 2 you're listed as a
21   rebuttal witness, right?
22        A.   Yes.  For limited purpose.
23        Q.   Right.  Do you have an understanding,
24   generally, of what the role of a rebuttal witness is?
25        A.   Yes.
```

| Page 37 |
| --- |

```
 1        Q.   Can you tell me what your general
 2   understanding is?
 3        A.   To rebut the evidence that's put --
 4   been put forward by the other side.
 5        Q.   And do you agree that it's not
 6   uncommon in litigation to designate potential rebuttal
 7   witnesses, even before the other side puts on any
 8   evidence at all, before the hearing even begins?
 9             MR. ARNAULT:  Objection, form.
10   BY MS. KOVSKY-APAP:
11        Q.   Do you understand the question?
12        A.   Yes, I -- I think that's probably
13   normal.
14        Q.   And in fact, that's what Syncora has
15   done in this case, correct?
16        A.   Yes.
17        Q.   And when rebuttal witnesses are
18   designated ahead of time, it's because the designating
19   party expects that the other side will try to
20   demonstrate certain facts that they want to rebut,
21   correct?
22             MR. ARNAULT:  Objection, form,
23   foundation, and to the extent that you're asking for
24   what Syncora's planning to do at the hearing.
25             MS. KOVSKY-APAP:  No.  I'm asking her
```

10 (Pages 34 to 37)

Page 38

1 generally what her understanding is of how rebuttal
2 witnesses work.
3          MR. ARNAULT: Okay.
4          Objection, form and foundation.
5          THE WITNESS: Can you repeat the
6 question.
7 BY MS. KOVSKY-APAP:
8      Q.    Is it your understanding that when
9 rebuttal witnesses are designated ahead of time, it's
10 because the party designating those witnesses
11 anticipates that certain testimony or evidence will be
12 put in and the designating party wants to rebut it?
13     A.    That seems like a reasonable reason.
14     Q.    So the designating party then figures
15 out who they would want to call to rebut that
16 anticipated testimony.
17          MR. ARNAULT: Objection, foundation.
18          THE WITNESS: I suppose. I have
19 never been part of the process so I can't say with any
20 certainty.
21 BY MS. KOVSKY-APAP:
22     Q.    Well, if you are called as a rebuttal
23 witness in this case, what facts do you expect to
24 rebut?
25          MR. ARNAULT: Objection. I'm going

Page 39

1 to object on the grounds here that this calls for a
2 work product information, attorney-client information
3 to be protected.
4          And I'll instruct the witness not to
5 answer to the extent that the information has not
6 already been provided in the filing.
7 BY MS. KOVSKY-APAP:
8      Q.    Well, to the extent that the
9 information has already been provided, why don't you
10 tell me.
11     A.    Well, looking at Paragraph 2 on
12 Page 2, I would imagine that I am going to rebut facts
13 regarding the negotiations of that NDA.
14     Q.    Well, what facts about the
15 negotiations of the NDA do you anticipate would be put
16 into evidence?
17          MR. ARNAULT: Objection.
18          THE WITNESS: I have no way to know.
19          MS. KOVSKY-APAP: I'm going to have
20 this Objection marked. And I, hopefully, have a copy
21 for myself here somewhere.
22          For those on the phone we're marking
23 as Exhibit 2 a document entitled "Objection of Syncora
24 Guarantee Inc. and Syncora Capital Assurance Inc. to
25 motion of debtor for entry of an order (I) authorizing

Page 40

1 the assumption of that certain forbearance and
2 optional termination agreement pursuant to Section
3 365(a) of the bankruptcy code, (II) approving such
4 agreement pursuant to Rule 9019 and (III) granting
5 related relief."
6          (Schwarzman Exhibit 2 was marked for ID.)
7 BY MS. KOVSKY-APAP:
8      Q.    Miss Schwarzman, please take a moment
9 to look at the document and let me know when you're
10 ready to talk about it.
11     A.    I'm ready.
12     Q.    Are you familiar with this document?
13     A.    Yes.
14     Q.    And what is it?
15     A.    It is my client's objection to the
16 Debtor's motion to assume the forbearance agreement.
17     Q.    Do you have an understanding of what
18 that forbearance agreement is?
19          MR. ARNAULT: Objection. This is
20 work product information, attorney-client.
21          I would instruct the witness not to
22 answer.
23          MS. KOVSKY-APAP: It's a factual
24 question. I want to know if she's familiar with the
25 document.  .

Page 41

1          MR. ARNAULT: Well, okay. Then ask
2 her if she's familiar with the document.
3          MS. KOVSKY-APAP: I just did.
4          MR. ARNAULT: You asked her what her
5 understanding was.
6          MS. KOVSKY-APAP: No, I did not.
7 BY MS. KOVSKY-APAP:
8      Q.    Are you aware of what the forbearance
9 agreement is?
10     A.    Yes.
11     Q.    Can you tell me, when your client
12 objects to the forbearance agreement, what exactly is
13 that agreement that they're objecting to?
14     A.    The agreement is a agreement between
15 the City and the Swap Counterparties to -- for early
16 termination of the swaps.
17     Q.    When you say "the Swap
18 Counterparties," who are you referring to?
19          MR. ARNAULT: Objection. I'm going
20 to object on the grounds that this is just -- this all
21 work product information, discussions you've had with
22 your attorney and your client.
23          I'm going to instruct the witness not
24 to answer.
25          MS. KOVSKY-APAP: You're going to

11 (Pages 38 to 41)

---

**Page 42**

1  instruct her not to answer who is referred by the term
2  "Swap Counterparties"?
3          MR. ARNAULT:  Yes, I am because
4  you're delving into information about our objection,
5  what the strategy was in filing this objection.
6          MS. KOVSKY-APAP:  There's no –
7  Mr. Arnault, there's no strategy question here.  I'm
8  asking her to factually identify which entities are
9  intended by the words "Swap Counterparties," which she
10 just used.
11         MR. ARNAULT:  Okay.  You can answer
12 that.  You can answer who are the Swap Counterparties.
13         MS. KOVSKY-APAP:  That was my
14 question.
15         THE WITNESS:  UBS and Merrill Lynch.
16 BY MS. KOVSKY-APAP:
17     Q.    Are there any other parties that are
18 referred to by the term "Swap Counterparties"?
19     A.    Yeah, there used to be.
20     Q.    And who are they?
21     A.    SBS.
22     Q.    Okay.  Did you assist in preparing
23 this objection?
24     A.    Yes.
25     Q.    Did you perform any of the legal

---

**Page 43**

1  research that went into drafting it?
2      A.    Yes.
3      Q.    And did you actually take part in
4  drafting it?
5      A.    Yes.
6      Q.    Have you reviewed the objection in
7  its entirety before today?
8      A.    Yes.
9      Q.    Are you aware that the objection
10 purports to set out specific bases on which Syncora
11 argues that the Assumption Motion should be denied?
12     A.    That's what the document says.
13     Q.    And if you are called as a rebuttal
14 witness, your rebuttal testimony would be used in
15 support of this objection, correct?    * * * *
16         MR. ARNAULT:  Objection.  This calls
17 for work product information and attorney-client.
18         Instruct the witness not to answer.
19     (Telephonic announcement:  Joining the meeting.)
20         MS. KOVSKY-APAP:  Who just joined?
21         MS. KAUFMAN:  This is Dana Kaufman
22 from Weil.  Sorry.  I got disconnected before.
23         MS. KOVSKY-APAP:  Okay.  Not a
24 problem.
25 BY MS. KOVSKY-APAP:

---

**Page 44**

1      Q.    Ms. Schwarzman, your client has
2  objected to the Assumption Motion, correct?
3      A.    Yes.
4      Q.    And your client has designated you as
5  a potential rebuttal witness for the hearing on that
6  Assumption Motion, correct?
7      A.    Yes.
8      Q.    Is it not a fair statement to say
9  that your rebuttal testimony, whatever it may be, will
10 be in support of your client's objection, as opposed
11 to, for example, in support of assumption?  * * * *
12     A.    I --
13         MR. ARNAULT:  Object -- Objection,
14 form.  And objection, you know, to the extent that
15 this is what would require you to disclose any work
16 product or attorney-client --
17 BY MS. KOVSKY-APAP:
18     Q.    Well, to the --
19         MR. ARNAULT:  -- instruct you not to
20 answer.
21 BY MS. KOVSKY-APAP:
22     Q.    -- to the extent that you can answer
23 it without disclosing work product or attorney-client
24 information?
25     A.    I'm not going to answer that.

---

**Page 45**

1      Q.    Can you take a look at Paragraph 48
2  of the objection.
3      A.    (Reviewing document.)
4      Q.    And please read the last sentence of
5  Paragraph 48 aloud.
6      A.    "The court should deny the Assumption
7  Motion for three principal reasons."
8      Q.    Okay.  And it appears that the next
9  three paragraphs, 49, 50 and 51, which begin with the
10 words "First," "Second," and "Third," respectively,
11 those appear to summarize the three reasons that
12 Syncora argues justify denial of the Assumption
13 Motion.  Do you agree?
14         MR. ARNAULT:  Objection, the document
15 speaks for itself.
16         And to the extent that you would need
17 to divulge any attorney-client information or work
18 product, I instruct you not to answer.
19 BY MS. KOVSKY-APAP:
20     Q.    To the extent that you can look at
21 this document and tell me whether those three
22 paragraphs appear to summarize the three reasons
23 referenced in Paragraph 48, I would appreciate an
24 answer.
25         MR. ARNAULT:  Objection, the document

---

1  speaks for itself.
2              MS. KOVSKY-APAP:  Your objection is
3  noted counsel.  Thank you.
4              MR. ARNAULT:  Um-hum.
5              THE WITNESS:  I believe that that's
6  an accurate reading one can make.
7  BY MS. KOVSKY-APAP:
8      Q.    Okay.  And take a moment, please, to
9  review paragraphs 49, 50 and 51, if you would.
10     A.    (Reviewing document.)
11           Okay.
12     Q.    None of those reasons that are
13  identified in those three paragraphs, those paragraphs
14  that summarize the reasons for denial of the
15  Assumption Motion, none of those has anything to do
16  with the negotiation of an NDA; is that correct?
17                      * * * *
18           MR. ARNAULT:  Objection, the document
19  speaks for itself.  And this would require the witness
20  to make a legal conclusion which would invade the work
21  product doctrine and attorney-client privilege.
22           I instruct the witness not to answer.
23           MS. KOVSKY-APAP:  As far as the
24  document speaking for itself, your objection is noted.
25  BY MS. KOVSKY-APAP-APAP:

1      Q.    However, to the extent that all I am
2  asking is, looking at the words on the page, do you
3  agree that there's nothing in those three paragraphs
4  that references a nondisclosure agreement?  * * * *
5           MR. ARNAULT:  Objection.  This would
6  require analysis of those three paragraphs which is
7  work product and attorney-client.  And I instruct the
8  witness not to answer.
9           MS. KOVSKY-APAP:  Mr. Arnault, I
10  would hate to have to get the judge on the phone on
11  such a simple matter, although he did invite us to do
12  so.
13           I am not asking her to analyze.  If
14  she -- fine.  Let's do this -- we'll do it the hard
15  way.
16  BY MS. KOVSKY-APAP:
17     Q.    Miss Schwarzman, please read
18  Paragraph 49 out loud.
19     A.    "First, the Forbearance Agreement
20  purports to impair significant third-party rights and
21  seeks to mute state law contractual disputes of third
22  parties.  Neither Section 365 nor Bankruptcy Rule 9019
23  allow the Court to adjudicate complicated state law
24  issues that bear on third parties who are not parties
25  to the settlement or contract.  Instead, the

1  impairment of third-party rights is a clear basis to
2  deny the Assumption Motion."
3      Q.    Now, none of those words that you
4  just read included the words "nondisclosure
5  agreement," correct?
6      A.    Correct.
7      Q.    And using your basic understanding of
8  English and not any legal analysis, do any of those
9  sentences refer to the negotiation of a nondisclosure
10  agreement?
11           MR. ARNAULT:  Objection, form.  And
12  objection to the extent that you can separate out your
13  basic understanding of English and legal analysis
14  but --
15           MS. KOVSKY-APAP:  Mr. Arnault, I have
16  to ask you to stop with the speaking objections.
17           MR. ARNAULT:  Well, you're trying to
18  delve into what is clearly work product information.
19  You're going after strategy information and her
20  analysis of what the reasons are that Syncora's
21  objecting to -- to the Assumption Motion.  It's
22  clearly work product information and I'm going to
23  continue objecting and instructing the witness not
24  to -- not to answer.
25  BY MS. KOVSKY-APAP:

1      Q.    To the extent that you are able to
2  answer based on your understanding of the English
3  language -- which as a graduate of Vanderbilt and NYU,
4  I assume is pretty good -- are you able to tell me
5  whether any of these sentences that you just read in
6  Paragraph 49 refer to the negotiation of a
7  nondisclosure agreement?
8           MR. ARNAULT:  Objection, the document
9  speaks for itself.
10           THE WITNESS:  I did not read the
11  words "nondisclosure agreement."
12  BY MS. KOVSKY-APAP:
13     Q.    Did you read any words that indicated
14  a nondisclosure agreement without using those specific
15  words?                 * * * *
16           MR. ARNAULT:  Objection, form and,
17  again, this would, to the extent you're using
18  "indicated," this could reveal work product
19  information.
20           I'll instruct the witness not to
21  answer.
22  BY MS. KOVSKY-APAP:
23     Q.    Without revealing work product
24  information, do you see any reference to a negotiation
25  of a nondisclosure agreement?        * * * *

13-53846-swr    Doc 893    Filed 09/16/13    Entered 09/16/13 16:26:18    Page 32 of 40

1   provide Syncora with additional data about the City's
2   discussions with the Swap Counterparties."
3           What was the basis of your
4   understanding that that was the issue?
5       A.   There was a meeting on June 27th
6   between the City's advisors and advisors for Syncora
7   along with the client. At the end of that meeting,
8   statements were made to the extent that a proposal
9   would be forthcoming from Syncora to the City. And I
10  believe statements were made at that meeting that the
11  City was unwilling to provide us information about an
12  agreement in principal the City had with the Swap
13  Counterparties.
14      Q.   Okay. And that was a meeting you
15  attended?
16      A.   Yes.
17      Q.   Okay. And where was that meeting?
18      A.   At Jones Day's New York offices.
19      Q.   Okay. You then say that "As a
20  result, the City and its attorneys began drafting an
21  NDA."
22          And what's the basis of your
23  knowledge that happened --
24      A.   I received a copy of the NDA.
25      Q.   Okay. But you didn't talk to -- you

1   didn't sit with anyone during the drafting process?
2   This wasn't a joint effort?
3       A.   Correct.
4       Q.   Okay. So you surmised, based on the
5   fact that you received it, that that was when they
6   started drafting it?
7       A.   Yes.
8       Q.   And when you say the "Swap
9   Counterparties," again, you're referring here to the
10  same Swap Counterparties that you previously
11  identified?
12      A.   Yes.
13      Q.   And that was UBS and Merrill Lynch?
14      A.   Yes. And formerly, SBS.
15      Q.   Okay. So based on your understanding
16  from this meeting that you attended between the City
17  and Syncora, Syncora wanted information from the city
18  about the City's negotiations with the Swap
19  Counterparties?
20      A.   My impression was that Syncora was
21  willing to make a proposal which was really the basis
22  of, you know, our moving forward with the City.
23  Additionally, Syncora had requested from the City,
24  information.
25      Q.   Well, what information was Syncora

1   requesting from the City?
2       A.   Terms of the City's agreement with
3   the Swap Counterparties.
4       Q.   And how do you know that that's the
5   information that they wanted?
6       A.   That's what they said.
7       Q.   Okay. What did they want that
8   information for?                    * * * *
9           MR. ARNAULT: Objection to the extent
10  that it would reveal attorney-client privilege or work
11  product.
12          Instruct you not to answer.
13          MS. KOVSKY-APAP: This goes to the
14  heart of the NDA negotiations. What they're
15  negotiating for.
16          MR. ARNAULT: Well, you're asking why
17  Syncora wanted that information and that would reveal
18  attorney-client privilege and --
19          MS. KOVSKY-APAP: You've -- you have
20  opened the door to that. Your client has opened the
21  door to that. Your client put it issue. You can't
22  call an attorney to provide fact testimony and then
23  hide behind the attorney-client privilege.
24          MR. ARNAULT: Well, if you're -- you
25  can ask questions about facts that were revealed in

1   her declaration, but to the extent that you're asking
2   for why Syncora wanted to do certain things, that goes
3   to the heart of the attorney-client privilege and work
4   product.
5           MS. KOVSKY-APAP: Her declaration
6   reveals that Syncora was demanding data from the City
7   about its discussion with the Swap Counterparties.
8   That makes that entire topic fair game.
9           MR. ARNAULT: I disagree.
10          MS. KOVSKY-APAP: Well, we'll have to
11  let the court decide.
12          MR. ARNAULT: That's fine.
13  BY MS. KOVSKY-APAP:
14      Q.   Okay. You said it was your
15  impression that Syncora wanted to make a proposal to
16  the City?
17      A.   I said Syncora stated to the City
18  that they were willing to make a proposal.
19      Q.   So it wasn't just your impression,
20  you heard words to that effect; is that correct?
21      A.   I heard words to that effect.
22      Q.   And that was at that meeting on, you
23  said it was June 29th?
24      A.   27th.
25      Q.   I'm sorry. June 27th.

Alderson Reporting Company
1-800-FOR-DEPO

| Page 78 |
|---|

1  BY MS. KOVSKY-APAP:
2      Q.   Yes, you do have an understanding?
3      A.   Yes.
4      Q.   So there was presumably some benefit
5  that Syncora would achieve by offering a proposal to
6  the City?        * * * *
7      MR. ARNAULT:  I'm going to object on
8  the grounds that, again, you're delving into her
9  mental impressions and her communications with our
10 client.
11     So I'm going to instruct the witness
12 not to answer.
13 BY MS. KOVSKY-APAP:
14     Q.   Is Syncora in the business of
15 altruism?
16     A.   You would have to ask them.
17     MR. ARNAULT:  Objection, form.
18 BY MS. KOVSKY-APAP:
19     Q.   In your experience, does a business
20 party typically make a proposal that does not benefit
21 itself?
22     MR. ARNAULT:  Objection, form,
23 foundation.
24 BY MS. KOVSKY-APAP:
25     Q.   You can answer.

| Page 79 |
|---|

1      A.   I suppose it depends on the business.
2      Q.   In your discussions with counsel for
3  the City regarding a nondisclosure agreement, was this
4  proposal -- this potential proposal was discussed?
5      A.   Not the terms.
6      Q.   But, yes, this pro -- was this
7  potential proposal discussed in any form?
8      A.   The existence of a proposal was
9  discussed.
10     Q.   Well, tell me what you said about the
11 potential proposal.
12     A.   We wanted the City to keep the terms
13 of the proposal confidential from the Swap
14 Counterparties.
15     Q.   Did you give the City any indication
16 of what the proposal might be about?
17     A.   I did not discuss what the proposal
18 would be about, no.
19     Q.   Did Mr. Bennett discuss, in your
20 hearing, anything about the proposal?
21     A.   No.
22     Q.   So you have no personal knowledge --
23 well, let me ask you:  Do you have any personal
24 knowledge of what this potential proposal was to be?
25     A.   Yes.

| Page 80 |
|---|

1      Q.   You do have personal knowledge of
2  that.  And your -- even though this is the -- the
3  whole reason for the existence of a potential
4  nondisclosure agreement, which is the heart of your
5  testimony, you are refusing to answer any questions
6  regarding this potential proposal?
7      A.   Yes.
8      MR. ARNAULT:  And I'll note for the
9  record that this -- during the depositions of Mr. Orr
10 and Mr. Buckfire, they refused to answer questions
11 about the DIP or the DIP proposal on the grounds that
12 it was commercially sensitive information and --
13     MS. KOVSKY-APAP:  Counsel, you really
14 need to make stop making talk speaking objections.
15 We're not arguing the motion in front of the court
16 right now.  I'm asking questions of the witness.
17     MR. ARNAULT:  I'm simply telling you
18 that we will be objecting on the same grounds.
19     MS. KOVSKY-APAP:  Counsel, if you
20 have an objection to state for the record, by all
21 means, do so.
22     MR. ARNAULT:  Okay.  Objection.  That
23 question would call for commercially sensitive
24 information that we will not be disclosing, much as
25 the City did not disclose in its --

| Page 81 |
|---|

1      MS. KOVSKY-APAP:  Counsel, you can
2  state your objection for the record.  You do not need
3  to make arguments.  We're not deposing Mr. Orr today,
4  nor are we arguing before the court.
5  BY MS. KOVSKY-APAP:
6      Q.   Without going into what that
7  potential proposal might actually contain, are you
8  aware -- are -- are you aware if a written proposal
9  was actually prepared?
10     A.   Yes.
11     Q.   Were you involved in the preparation
12 of such a proposal?
13     A.   No.
14     Q.   Do you know who was involved?
15     A.   Yes.
16     Q.   Were there attorneys from Kirkland
17 who were involved?
18     A.   Yes.
19     Q.   Do you know which attorneys were
20 involved in the preparation of that proposal?
21     A.   Yes.
22     Q.   Who were they?    * * * *
23     MR. ARNAULT:  Objection.  This delves
24 into attorney-client privilege and work product
25 information.

Page 86

1 subject to the execution and delivery of this
2 agreement."
3        Do you agree that those "Whereas"
4 clauses indicate the reason for the parties entering
5 into negotiation of this NDA?
6        MR. ARNAULT: Objection, the document
7 speaks for itself. Asking the witness to draw a legal
8 conclusion and -- which would divulge attorney-client
9 information and work product in her impression of this
10 document, I'm going to instruct the witness not to
11 answer.
12        MS. KOVSKY-APAP: You're going to
13 instruct the witness not to tell me what these words
14 say, and -- and based on our --
15 BY MS. KOVSKY-APAP:
16        Q.   All right. Not based on -- on any
17 advice that you have provided to your client and not
18 based on any communications with your client, based
19 solely on your knowledge of the English language, does
20 it appear that these two paragraphs set forth the
21 reason that the parties entered into negotiation of an
22 NDA?
23        MR. ARNAULT: Objection, the document
24 speaks for itself.
25        MS. KOVSKY-APAP: Your objection is

Page 87

1 noted.
2 BY MS. KOVSKY-APAP:
3        Q.   You can answer.
4        A.   It would appear that they also set
5 two points when the state of the world.
6        Q.   I'm sorry. Say that again?
7        A.   If these are all the of the state of
8 the world, it would appear that these are both also
9 the state of the world at the time.
10        Q.   And by "state of the world at the
11 time," what do you mean?
12        A.   Well, you and I just agreed that
13 "Whereas" clauses give you the background on the state
14 of the world when this agreement is being negotiated.
15 So assuming that's true, these things would also be
16 part of that state of the world.
17        Q.   And when you say "state of the
18 world," part of the state of the world is reasons for
19 doing something, correct?
20        A.   It would appear.
21        MR. ARNAULT: Objection, form.
22 BY MS. KOVSKY-APAP:
23        Q.   You can answer.
24        A.   Yeah. It would -- it would appear
25 those are both reasons.

Page 88

1        Q.   Okay. So these are the reasons
2 why -- these are reasons, maybe not all of the
3 reasons, but these are at least part of the reason why
4 the parties decided to enter into negotiations.
5        So based on this, which obviously
6 went back and forth between you and Jones Day since
7 this appears to have come from Jones Day to you --
8 well, actually let me ask: Was this sent directly to
9 you?
10        A.   No.
11        Q.   How did you receive a copy of it?
12        A.   It was forwarded to me.
13        Q.   By whom?
14        A.   Ryan Bennett.
15        Q.   Okay. So based on this language, it
16 appears that once the agreement was finalized, Syncora
17 wanted to make a proposal to the City and intended to
18 do so; is that accurate?
19        A.   I don't -- it's true that Syncora had
20 a desire to make a proposal. I can't tell you what
21 would or would not have happened upon execution.
22        Q.   Okay. Do you recall, on the second
23 July 2 phone call, Ryan Bennett suggesting that
24 Syncora might be willing to share noneconomic terms of
25 its proposal without signing an NDA?

Page 89

1        A.   Yes.
2        Q.   But Syncora didn't do that, right?
3        A.   I'm not sure.
4        Q.   Well, do you know whether, to this
5 day, Syncora has made its quote/unquote "proposal" to
6 the City?
7        A.   Yes.
8        Q.   You do know?
9        A.   I do.
10        Q.   And has a proposal to the City been
11 made?
12        A.   Yes.
13        Q.   Can you tell me the terms of that
14 proposal?
15        A.   No.
16        MR. ARNAULT: Same objection.
17        THE WITNESS: It's commercially
18 sensitive.
19 BY MS. KOVSKY-APAP:
20        Q.   Has Syncora entered into a
21 nondisclosure agreement with the City?
22        A.   Yes.
23        Q.   With respect to the proposal?
24        A.   No.
25        Q.   So any nondisclosure agreement that

23 (Pages 86 to 89)

Page 114

1  too.
2  BY MS. KOVSKY-APAP:
3      Q.    There's nothing in here giving
4  assurance that any NDA -- that this NDA is no less
5  favorable than any NDA that the City may have signed
6  with the Swap Counterparties, correct?
7      A.    Correct.
8      Q.    And so that was another provision
9  that Syncora had originally asked for that it then
10 dropped that request, correct?
11     A.    Correct.
12     Q.    Do you know why Syncora was willing
13 to drop that request?
14     A.    No.
15     Q.    Now, you notice that this agreement
16 is not between Syncora and the City, correct?
17     A.    (Reviewing document.)
18     Q.    Looking at -- at exhibit --
19     A.    Yes.
20     Q.    Shoot.  What number is this?
21           THE REPORTER:  Six.
22 BY MS. KOVSKY-APAP:
23     Q.    Sorry.  Looking at Exhibit -- I'm
24 referring to Exhibit 6.
25           Who are the proposed parties to this

Page 115

1  agreement?
2      A.    The advisors to the City of Detroit
3  and Syncora Guarantee Inc. and Syncora Capital
4  Assurance.
5      Q.    And by "advisors to the City of
6  Detroit," who you referring to?
7      A.    I believe Jones Day and Miller
8  Buckfire.
9      Q.    And Jones Day is the City's legal
10 counsel, correct?
11     A.    Yes.
12     Q.    Do you know who Miller Buckfire is?
13     A.    Yes.
14     Q.    And who is Miller Buckfire?
15     A.    They are, like, financial advisors.
16     Q.    To the City?
17     A.    To the City.
18     Q.    Okay.  Do you have an understanding
19 for the reason why the advisors were substituted in as
20 the counterparty under this confidentiality agreement?
21     A.    No.  Jones Day made that change.
22     Q.    Did you discuss with Syncora whether
23 that change was acceptable?
24     A.    I did not discuss directly with the
25 client.

Page 116

1      Q.    Are you aware of discussions with the
2  client whether this change was acceptable?
3      A.    Again, they signed the agreement, so
4  I have to assume they were okay with it.
5      Q.    But are you aware of whether
6  discussions took place with Syncora as to whether it
7  would be acceptable to have the City's advisors as the
8  counterparties?
9      A.    No.  No firsthand knowledge.
10     Q.    Did you ask any questions of Jones
11 Day when you received a draft showing that the
12 counterparty had been changed from the City of Detroit
13 to the advisors?
14     A.    I don't recall.
15     Q.    Did you have an understanding of the
16 impact or what the impact would be of changing the NDA
17 party from the City to the City's professionals?
18     A.    No.  I don't think I did.
19     Q.    Did you have a discussion with anyone
20 about that issue?
21     A.    Not that I recall.
22     Q.    Do you recall that, on or around
23 July 10th, 2013, you conveyed to counsel for the City
24 that Syncora Capital Assurance Inc. would be the
25 signatory to the NDA?

1      A.    Yes.
2      Q.    Was that change your idea?
3      A.    No.
4      Q.    Whose idea was it?
5      A.    Someone else at Kirkland.
6      Q.    Do you recall who?
7      A.    Yes.
8      Q.    Well, who at Kirkland?
9      A.    Noah Ornstein.
10     Q.    Who is Noah Ornstein?
11     A.    He's an associate at Kirkland &
12 Ellis.
13     Q.    And what practice group is he in?
14     A.    Restructuring.
15     Q.    Do you understand -- do you have an
16 understanding why suggested that that change be made?
17     A.    Yes.
18     Q.    What was your understanding?
19           MR. ARNAULT:  Objection.
20           To the extent that this would reveal
21 attorney-client privilege or work product information,
22 instruct the witness not to answer.
23           THE WITNESS:  It's part of internal
24 con -- conversations.
25 BY MS. KOVSKY-APAP:

Page 118

1    Q.   Well, did you make a proposal to the
2    City's attorneys that the signature block be changed?
3    A.   Yes.
4    Q.   Did you explain to them why?
5    A.   Yes.
6    Q.   What was your explanation?
7    A.   Because Syncora Capital Assurance
8    Inc. was the entity that has engaged its advisors.
9    Q.   I – I'm sorry. I don't understand.
10   A.   Syncora Capital Assurance Inc. is the
11   named party on the engagement letter between Syncora
12   and Syncora's advisors.
13   Q.   Between Syncora and?
14   A.   Syncora's advisors.
15   Q.   Being Kirkland?
16   A.   Among others.
17   Q.   Okay. And is that the same
18   information that was conveyed to you by Noah Ornstein?
19   A.   Yes.
20   Q.   So when you're asserting the
21   attorney-client privilege as to that information, this
22   was actually information you'd already conveyed to the
23   City, correct?
24   A.   Now -- yes, it went from Noah to me
25   and then to the City.

Page 119

1    Q.   Okay. Miss Schwarzman, do you
2    understand when you convey information to a third
3    party, it loses its status as attorney-client
4    privileged?
5    A.   Yes, thank you.
6    Q.   Okay. What is the -- what is the
7    relationship in terms of corporate structure between
8    Syncora Guarantee Inc. and Syncora Capital Assurance
9    Inc.?
10   A.   They're affiliates of one another.
11   Q.   Are they -- do you know, are they
12   under common ownership? Is one a subsidiary of the
13   other?
14   A.   I do not know the exact corporate
15   structure of Syncora.
16   Q.   Did you have an understanding of the
17   effect of having the NDA signed by Syncora Capital
18   Assurance Inc. and not by Syncora Guarantee Inc.?
19   A.   Jones Day, in response to our
20   proposal to change the signature block, indicated to
21   us that they were unwilling to not have -- or they
22   needed Syncora Guarantee Inc. to be a signatory as
23   Syncora Guarantee Inc. held positions related to --
24   financial positions related to the City.
25   Q.   All right. Prior to having that

Page 120

1    conversation with Jones Day, did you give any
2    consideration to what effect it might have on the
3    proposed NDA to have only one of the Syncora entities
4    sign it?
5    A.   Well, the first draft only had one
6    Syncora entity on there. We switched the entity and
7    then we put both of them on there.
8    Q.   Okay. So did you give any
9    consideration to what practical effect it would
10   have -- it would have on the NDA to have one Syncora
11   entity versus the other?
12   A.   Yes. I told Jones Day that we wanted
13   Syncora Capital Assurance Inc. to sign because they
14   were the entity with whom the advisors were engaged.
15   Q.   Why would that matter?
16   A.   We wanted it to be consistent.
17   Q.   But this NDA isn't an engagement
18   letter for a professional advisor, correct?
19   A.   Correct.
20   Q.   So how is it consistent to have the
21   party that happens to be the one that employs the
22   lawyers be the one to sign the NDA?
23   MR. ARNAULT:  I'm just going to
24   caution the witness here. To the extent it would
25   require her to reveal any work product information or

Page 121

1    attorney-client, instruct you not to answer.
2    THE WITNESS:  I can't tell you any
3    more than that we wanted it to line up.
4    BY MS. KOVSKY-APAP:
5    Q.   So you don't actually have a personal
6    understanding of what difference it would make?
7    MR. ARNAULT:  Objection, form.
8    THE WITNESS:  To the extent I have a
9    personal understanding, it's conversations between
10   myself and other Kirkland attorneys and it was not
11   ever communicated to Jones Day.
12   BY MS. KOVSKY-APAP:
13   Q.   Okay. So you're unable to explain
14   why -- the fact that Syncora Capital Assurance
15   employed the professionals made them the appropriate
16   party to sign the NDA?
17   A.   I believe I told you the reason we
18   gave Jones Day was that that was the entity that had
19   engaged us and that was the entity that we wanted to
20   sign this NDA. Anything beyond that, I cannot --
21   either don't know or can't tell you.
22   Q.   Well, which is it?
23   A.   I don't know what you're looking for,
24   so I don't know what -- if I know whatever it is that
25   you're looking for.

Alderson Reporting Company
1-800-FOR-DEPO

1      Q.    I'm just trying to see the connection
2  between the fact that Syncora Capital Assurance Inc.
3  signed the engagement letter with the attorneys,
4  that's one fact over here, and here's an unrelated
5  nondisclosure agreement. Why would Syncora Capital
6  Assurance, in your mind, be the appropriate entity?
7  What's -- what's the connection there?
8            MR. ARNAULT: Objection, asked and
9  answered.
10           THE WITNESS: I told you the reason
11  that we gave. That was the reason I was told, change
12  the signature block. Syncora Capital Assurance Inc.
13  was a signatory to these other ones, it's going to
14  stay consistent, send it across.
15  BY MS. KOVSKY-APAP:
16     Q.    When you say "these other ones," you
17  mean the other nondisclosures agreements?
18     A.    No. The engagement letters.
19     Q.    In your mind is an engagement letter
20  equivalent to a nondisclosure agreement?
21     A.    No.
22     Q.    Okay. And you mentioned before that
23  you were not involved in all of the negotiations
24  regarding the nondisclosure agreement, correct?
25     A.    Correct.

1      Q.    For example, there were some e-mails
2  that you were not copied on, correct?
3      A.    Correct.
4      Q.    And there were phone conversations
5  between the two sides that you didn't participate in,
6  correct?
7      A.    Correct.
8      Q.    For example, a July 8th phone call
9  between Ben Rosenblum and Ryan Bennett, you were not
10  involved in that phone conversation, correct?
11     A.    Correct.
12     Q.    And to the extent that there were
13  voicemails and e-mails on July 14th between Jamie
14  Sprayregen and David Heiman, you were not involved in
15  those, correct?
16     A.    Correct.
17     Q.    Who is Jamie Sprayregen?
18     A.    Jamie Sprayregen is the head of the
19  restructuring practice at Kirkland & Ellis.
20     Q.    So, basically, your ultimate boss?
21     A.    Sure.
22     Q.    And do you know who David Heiman is?
23     A.    Yes.
24     Q.    And who is he?
25     A.    He's a partner at Jones Day.

1      Q.    A very senior partner?
2      A.    Well, he seems very old, so I would
3  assume very senior.
4      Q.    You realize we're going to tell him
5  that, right?
6      A.    That's okay.
7      Q.    So to the extent that there were
8  direct negotiations going on between Mr. Sprayregen
9  and Mr. Heiman, it would be fair to say that there
10  were negotiations going on at the highest levels of
11  the two firms, correct?
12     A.    Correct.
13     Q.    And to put it colloquially, that was
14  above your pay grade?
15     A.    Yes. Above my pay grade and after
16  they'd taken out a TRO against us.
17     Q.    And you don't have any personal
18  knowledge of the communications where you weren't a
19  participant, correct?
20     A.    I wasn't a participant, no.
21     Q.    I'm sorry. Could you speak up?
22     A.    I wasn't a participant, no.
23     Q.    Okay. Thank you.
24           Taking a look at Exhibit 6, could you
25  turn to page -- let me find it -- Page 4, Section B,

1  "Damages"?
2      A.    Yep.
3      Q.    Could you read that out loud.
4      A.    "Damages. The Receiving Party
5  understands and agrees that money damages will not be
6  a sufficient remedy for its breach of any provision of
7  this Agreement and that the Providing Party shall be
8  entitled to seek specific performance and injunctive
9  or other equitable relief as a remedy for any breach
10  of this Agreement (regardless of whether damages may
11  or may not be readily quantifiable and without posting
12  a bond or other security). Such remedy shall be in
13  addition to all other remedies available at law or
14  equity to the Providing Party."
15     Q.    When you were negotiating this
16  agreement, did you review that provision?
17     A.    I read the whole agreement.
18     Q.    Did you form an understanding what
19  that provision meant?
20     A.    Yes.
21     Q.    Can you tell me what your
22  understanding of that provision is?      * * * *
23           MR. ARNAULT: Objection, calls for
24  work product information.
25           I instruct the witness not to answer.

Page 126

1    THE WITNESS: No.
2    BY MS. KOVSKY-APAP:
3        Q.    Do you agree that this provision
4    would impose certain remedies on a party that breached
5    a fully-executed nondisclosure agreement? * * * *
6            MR. ARNAULT: Objection, the document
7    speaks for itself and it also calls for work product
8    information to the extent that you're asking for her
9    understanding of what this provision requires.
10           I instruct the witness not to answer.
11           THE WITNESS: I'm not going to
12   answer.
13   BY MS. KOVSKY-APAP:
14       Q.    Miss Schwarzman, based on your
15   knowledge of the English language --
16       A.    Um-hum.
17       Q.    -- and the words that you just read,
18   do you agree that this provision provides for remedies
19   for breach of this agreement?
20           MR. ARNAULT: Objection, the document
21   speaks for itself.
22           MS. KOVSKY-APAP: Noted.
23   BY MS. KOVSKY-APAP:
24       Q.    You can answer.
25       A.    Yes. It talks about remedies for

Page 127

1    breach of the agreement.
2        Q.    And those remedies could be imposed
3    on any party that breached this agreement, correct?
4            MR. ARNAULT: Objection, document
5    speaks for itself and --
6            MS. KOVSKY-APAP: Noted.
7            THE WITNESS: And no, I don't think
8    that's how it reads.
9    BY MS. KOVSKY-APAP:
10       Q.    Okay. Tell me how you think it
11   reads.            * * * *
12           MR. ARNAULT: Objection, calls for
13   work product.
14           MS. KOVSKY-APAP: She just told me
15   she doesn't think that's how it reads. She's already
16   telling me what she thinks of the documents.
17           MR. ARNAULT: So she is definitely
18   just answering "yes" or "no." She's not telling you
19   what exactly it means.
20           I instruct the witness not to answer.
21           THE WITNESS: I'm not going to
22   answer.
23           MS. KOVSKY-APAP: All right. We'll
24   do this the really long way. Good thing I have a late
25   flight.

Page 128

1    BY MS. KOVSKY-APAP:
2        Q.    Okay. Let's go back to the first
3    page and we're going to go over some definitions here
4    because I want to make sure we understand who the
5    receiving party is. Okay? Or actually we can first
6    do the providing party.
7            Looking under Section A,
8    "Confidentiality," the first paragraph, do you see
9    "The Advisors (on behalf of the City) and Syncora (as
10   applicable, the 'Providing Party')"?
11       A.    Yes.
12       Q.    Okay. So that means that either the
13   Advisors or Syncora, as applicable, could be the
14   "Providing Party," correct?
15       A.    Yes.
16       Q.    Then it says -- oh, "...and
17   Representatives (as such term is defined below)."
18           So it even broadens that term to a
19   bunch of other people. And we can go over that
20   definition if you'd like, if you feel that it's
21   necessary to give you an understanding of what's meant
22   by "Representative".
23       A.    No, I'm okay.
24       Q.    Okay. So skipping over that part, so
25   the Providing Party "are furnishing the other Party

Page 129

1    (as applicable, the 'Receiving Party')."
2            So that means to the extent that the
3    advisors are receiving information from Syncora,
4    they're the receiving party, correct?
5            MR. ARNAULT: Objection. You're --
6    the document says what it says and you're still asking
7    for her interpretation of this provision which
8    requires her to divulge work product, her mental
9    impressions of this agreement.
10           MS. KOVSKY-APAP: She is a fact
11   witness who is called upon to testify about her
12   negotiation of this agreement and her understanding of
13   what the plain language of this provision is, is fair
14   game.
15           MR. ARNAULT: She was called as a
16   fact witness, now you're asking her for her
17   impressions and her interpretation.
18           MS. KOVSKY-APAP: No. I don't need
19   any impressions or any legal interpretation
20   whatsoever.
21   BY MS. KOVSKY-APAP:
22       Q.    Based on your simple, straightforward
23   knowledge of the English language and the terms of
24   these words, this provision here, you already agreed
25   that "Providing Party" could mean Advisors or Syncora,

Alderson Reporting Company
1-800-FOR-DEPO

13-53846-swr    Doc 893    Filed 09/16/13    Entered 09/16/13 16:26:18    Page 39 of 40

1    A.    Okay.
2    Q.    -- just to back up a second --
3    A.    Can you ask me the question again.
4    Q.    And just to make sure that it's
5 clear: Unless your counsel instructs you not to
6 answer on the basis of privilege, and that is
7 assuming, of course, that Mr. Arnault is your counsel,
8 unless you're instructed not to answer on the basis of
9 privilege, you do need to answer. And he's making his
10 objections for the record.
11        MR. ARNAULT: Oh, and so my objection
12 is, to the extent that you can answer her question
13 without revealing attorney-client information or work
14 product or legally interpreting it, then you can. But
15 if your interpretation is based upon a legal
16 interpretation, then I instruct you not to answer.
17        THE WITNESS: Can you reask the
18 question.
19 BY MS. KOVSKY-APAP:
20    Q.    Do you agree that had Jones Day and
21 Miller Buckfire signed this agreement, that damages
22 provision that we just discussed a few moments ago
23 could have subjected them, as receiving parties, to
24 remedies for breach of this agreement?
25        MR. ARNAULT: Same objection and

1 instruction.
2        THE WITNESS: (Reviewing document.)
3 Maybe.
4 BY MS. KOVSKY-APAP:
5    Q.    Well, you agreed that the damages
6 provision would subject a receiving party to remedies
7 if they breached the agreement, correct?
8    A.    Correct.
9    Q.    And those parties would be Miller
10 Buckfire and Jones Day, right?
11    A.    Right.
12    Q.    Because they're the ones on the
13 signature block, aren't they?
14    A.    Yep.
15    Q.    And they're the professionals for the
16 City, who's the plaintiff in a lawsuit against
17 Syncora, right?
18    A.    Um-hum.
19    Q.    And I'm asking you, in your
20 experience, would it be common for a plaintiff in the
21 City's position to go and tell its advisors, its legal
22 professionals, to enter into an agreement with the
23 defendant that the City is suing, an agreement that
24 could subject those advisors to remedies for breach?
25        MR. ARNAULT: Objection.

1 BY MS. KOVSKY-APAP:
2    Q.    Do you think that's a common
3 situation in your experience?
4        MR. ARNAULT: Objection, form,
5 foundation.
6        THE WITNESS: In my limited
7 experience, no.
8 BY MS. KOVSKY-APAP:
9    Q.    As a professional advisor yourself,
10 would you deem it prudent to enter into an agreement
11 with your client's adversary in litigation that could
12 subject your firm to remedies for breach?
13        MR. ARNAULT: Objection, form,
14 foundation.
15        THE WITNESS: No.
16 BY MS. KOVSKY-APAP:
17    Q.    Have you ever, as a professional
18 advisor, signed an agreement with your client's
19 adversary in litigation that could subject your firm
20 to remedies for breach?
21    A.    No.
22    Q.    Are you aware of any instance in
23 which Kirkland & Ellis has done so?
24    A.    I'm not aware.
25    Q.    And now, just to circle back to

1 something you said before, you said that your
2 understanding is that Syncora has made a proposal to
3 the City.
4    A.    Yes.
5    Q.    And by "proposal," you mean something
6 in the nature of what it wanted to make subject to the
7 NDA, correct?
8    A.    Correct.
9    Q.    And it did so without the NDA,
10 correct?
11    A.    Correct.
12    Q.    So whether or not there was an NDA in
13 place ultimately was irrelevant, correct?
14        MR. ARNAULT: Objection, form.
15        And to the extent that it requires
16 you to reveal attorney-client information or work
17 product information, instruct you not to answer.
18        MS. KOVSKY-APAP: I'm not asking for
19 anything that Syncora said.
20        MR. ARNAULT: But you are asking for
21 her mental impressions.
22        MS. KOVSKY-APAP: No, I'm not.
23        MR. ARNAULT: Yes -- okay. I
24 disagree.
25        THE WITNESS: What was the question?