# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, AND SUB-CHAPTER 98, CITY OF DETROIT RETIREES' MOTION TO COMPEL TESTIMONY OF KEVYN ORR AND ALL OTHER CITY AND STATE WITNESSES REGARDING CITY-STATE COMMUNICATIONS PRIOR TO JULY 17, 2013

The Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL-CIO, and Sub-Chapter 98, City of Detroit Retirees (the AFSCME retiree chapter for City of Detroit retirees) (collectively, "AFSCME"), pursuant to Fed. R. Civ. P. ("Rule" or "Rules"), hereby move that this Court enter an order, in the form attached hereto as **Exhibit 1**, requiring Emergency Manager Kevyn Orr (the "EM" or "Orr"), and any and all future witnesses within the control of the City of Detroit (the "City" or "Debtor") or State of Michigan (the "State"), to appear and give testimony at depositions regarding all relevant communications between City and State officials prior to July 17, 2013.

## BACKGROUND

*Relevant Pre-Petition Facts.*

1.      At least as of January 31, 2013, staff members for Michigan Governor Richard D. Snyder (the "Governor") discussed with Orr – who was at the time a bankruptcy lawyer in private practice – the potential appointment of Orr as EM for the city of Detroit and a chapter 9 filing. *See* AFSCME's Objection to Eligibility, Docket No. 438, ¶¶ 23-27.

2.	The Governor appointed Orr as EM for the City on March 14, 2013, effective as of March 25, 2013. On March 28, 2013, upon the purported effectiveness of PA 436, Orr became, and continues to act as, EM for the City under PA 436.

3.	On June 14, 2013, Orr issued a "Proposal for Creditors" which expressly stated that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." The same day, Orr publicly threatened, in an interview with the Detroit Free Press Editorial Board, that vested pension benefits would not be protected in a chapter 9 proceeding authorized by the Governor pursuant to PA 436, and that any state laws protecting vested pension benefits would "not . . . protect" retirees in bankruptcy court. *See* Docket No. 438, ¶ 12.

4.	On July 3, 2013, against the backdrop of the threatening statements made by Orr regarding Michigan state law and protected pension benefits, plaintiffs (the "Webster Plaintiffs") Gracie Webster (a City retiree) and Veronica Thomas (a current employee of the City) commenced a lawsuit against the State of Michigan, the Governor and the State Treasurer seeking: (a) a declaratory judgment that PA 436 violated the Constitution of the State of Michigan to the extent that it purported to authorize chapter 9 cases within which vested pension benefits might be sought to be compromised; and (b) an injunction preventing the defendants from authorizing any chapter 9 case for the City within which vested pension benefits might be sought to be reduced. *See Webster v. State of Mich.*, No. 13-734-CZ (Ingham County Cir. Ct. July 3, 2013) (the "Webster Litigation")

5.	Also on July 3, a lawsuit substantially similar to the Webster Litigation was filed by other active and retired City employees against the Governor and Treasurer. *Flowers v. Snyder,* No. 13-729-CZ (Ingham County Cir. Ct. July 3, 2013) (the "Flowers Litigation").

6.     Neither the Webster Litigation nor the Flowers Litigation named the City or the EM as a defendant.  *Id.  See also* Declaration of Kevyn Orr, Docket No. 11, at ¶109.

7.     On July 16, 2013, the Governor assured the public at a press conference that the EM had not yet recommended a Chapter 9 filing for Detroit.  He added: "The goal is not to be in bankruptcy, the goal is to get a resolution with creditors that allows Detroit to be successful." *See Snyder says Orr hasn't recommended a Chapter 9 filing for Detroit,* http://www.detroitnews.com/article/20130716/METRO01/307160063 (July 16, 2013).

8.     However, on July 16, 2013, the EM wrote to the Governor recommending that the City file for Chapter 9 bankruptcy.  *See* Orr Declaration, Docket No. 11 at ¶ 112 & Exh. J. This news was not made public until after the City filed for chapter 9 protection on July 18, 2013.

9.     On July 17, 2013, the Pension Systems commenced a lawsuit against the EM and the Governor similar in substance to the Webster and Flowers Litigation, but distinct in that it named the EM as a defendant.  Docket No. 11 at ¶ 109.

10.     On July 18, 2013, the Governor wrote to the EM purporting to authorize the EM to file a petition under chapter 9 for the City.  Orr Declaration, Doc. 11 at ¶ 112 & Exh. K.

11.     Also on July 18, 2013, the EM issued an order directing the City to file for chapter 9 bankruptcy, and the City filed its petition.  *Id.* at ¶ 112 & Exh. L.

***Pre-Deposition Agreements Between The Parties***

12.     On August 2, 2013, the Court entered an order (the "Scheduling Order"), establishing dates and deadlines for, among other things, concluding the depositions of fact witnesses by September 23, 2013, in connection with the adjudication of the Debtor's eligibility to file for protection under chapter 9 of the Bankruptcy Code.

13.     On August 19, 2013, AFSCME filed its initial objection to the City's eligibility to be a debtor under chapter 9. Relevant to the instant motion, AFSCME's arguments in its August 19 Objection included, but were not limited to, the following: (1) Public Act 436 violates the Michigan Constitution *as applied* insofar as it did not explicitly prohibit the Governor from authorizing a chapter 9 filing which he knew threatened to unconstitutionally reduce vested pension rights in violation of Article IX, Section 24 of the Michigan Constitution, Doc. 438 at ¶¶ 75-84; (2) the City failed to negotiate with creditors in good faith as required by section 109(c) of the Bankruptcy Code, Doc. 438 at ¶¶ 101-108; and (3) the entire chapter 9 petition was filed in bad faith insofar as the City (a) filed the petition to evade an imminent bad ruling in the Flowers and Webster Litigation, *id.* at ¶ 130; and (b) prepared, in concert with State officials, for a chapter 9 filing as a foregone conclusion before any negotiations with creditors were even contemplated. *Id.* at ¶¶ 23-27, 131.

14.     On August 23, 2013, AFSCME filed on the record its notice of deposition for witnesses of the Debtor, including but not limited to Orr. *See* Doc. No. 582.

15.     Also on August 23, 2013, AFSCME filed on the record its notice of subpoenas to ten (10) State witnesses, including but not limited to Governor Snyder.

16.     On September 1, 2013, counsel for the City represented to AFSCME by email that it would agree to offer at least seven (7) witnesses in response to AFSCME's subpoenas – Mr. Orr; Mr. Guarav Malhotra from Ernst & Young; Mr. Charles Moore from Conway McKenzie; Mr. Kennth Buckfire of Miller Buckfire; Mr. Lamont Satchel of the City; and a to-be-determined representative from Milliman. *See* **Exhibit A**, Email from Geoffrey S. Irwin to Sharon L. Levine.

17.     Counsel's September 1 email to AFSCME was clear that, as to these witnesses,

the City would "not attempt to limit [AFSCME's] questioning to the 30b6 topics" contained in AFSCME's notice of depositions "[s]ince these witnesses have been requested in their individual capacities as well." *Id.*

18. In reliance upon this representation by counsel for the City, and with the caveat that AFSCME reserved the right also to depose Detroit Mayor David Bing at a later date if such a deposition proved necessary in AFSCME's view at the close of discovery, AFSCME agreed only to depose the seven (7) witnesses listed in Paragraph 10, *supra,* and withdrew the balance of its subpoenas.

19. The State, in contrast, fought AFSCME tooth and nail over whether AFSCME should be permitted to depose any State witnesses at all. Mere moments after AFSCME, in an email sent at 4:13 PM on the Friday of Labor Day weekend, offered to limit its depositions to only five (5) of the ten (10) State witnesses whose depositions AFSCME had noticed, the State filed a motion to quash all of AFSCME's subpoenas rather than engage in any meet and confer with AFSCME. *See* Docket No. 701 at ¶¶ 7-11.

20. In its motion to quash, the State argued only that discovery of the State employees was irrelevant to the chapter 9 case and therefore unduly burdensome. The State did not argue that any of the communications sought by AFSCME were protected by the common interest doctrine.

21. On September 1, 2013, AFSCME filed its response to the State's motion to quash, making clear by its arguments that AFSCME would be seeking communications between State and City officials:

> AFSCME's challenge to the Governor's authorization and the constitutionality of the authorization under Michigan law is, in part, an "as applied" challenge (i.e. a challenge which finds the Emergency Manager law unconstitutional based on the individual

facts of the case), which turns, in part, on the fact that the Governor knew the City intended to impair pension rights when he signed his authorization. At a minimum, AFSCME needs to probe in depositions regarding the Governor's and the State's views and conclusions and factually, among other things:

- whether, how and on what basis the State and Governor concluded the City was "insolvent," as required for eligibility by 11 U.S.C. § 109(c)(3) and as defined in 11 U.S.C. § 101(32)(C);

- the nature extent and details surrounding the Governor's and State's input, influence and assumptions underpinning the purported proposed plan of adjustment, as opposed to other less drastic alternatives;

- the Governor's and the State's involvement in and influence over the City's lack of any effort to negotiate in good faith with creditors;

- the basis for the Governor's and the State's conclusion, participation in deciding or otherwise related to the City's assertion that it was "unable to negotiate with creditors because such negotiation is impracticable;"

- the City's bankruptcy petition should be dismissed because it was filed in bad faith;

- the failure of the Governor and the State to attach any contingencies to the authorization to file;

- why the Governor and the State chose in the authorization letter to rely on 11 U.S.C. § 943(b) without attaching contingencies on the authorization itself; and

- whether the Governor and the State acted in good faith in filing.

Docket No. 701 at ¶ 17.

22. The Court set a hearing date of September 10, 2013 for the State's motion to quash.

23. At 4:37 p.m. the day prior to the hearing, the State filed a brief asserting, for the first time, that the material sought by AFSCME was protected by the so-called "deliberative

-6-

process privilege." *See* Doc. No. 790. In this late-filed brief, the State again did not argue that any common interest protection applied to the communications AFSCME was seeking to discover.

24.     At the hearing on September 10, the State and AFSCME resolved their differences by agreeing, as memorialized on the record, that AFSCME would depose Governor Snyder and, if AFSCME deemed it necessary thereafter, would also have the right to depose Transformation Manager Baird and Treasurer Dillon.

25.     In sum, the State has never – in either of its filed objections to producing witnesses under its control for depositions in this case – asserted a common interest with the City.

26.     Further, to AFSCME's knowledge, the City, prior to during the EM deposition, did not assert this privilege specifically with respect to communications with the State.

### *The Orr Deposition*

27.     On September 16, 2013, the EM was deposed by AFSCME and certain other parties objecting to the City's eligibility to be a debtor under Chapter 9.

28.     Among other things, counsel attempted to depose Orr regarding his communications with Governor Snyder and the Governor's team as to what the Governor and Orr discussed about Orr's plan to reduce vested pension rights; the applicability of Article IX, Section 24 of the Michigan Constitution to that plan; and the impact of the Flowers/Webster litigation on the EM's decision to file under chapter 9 and the timing of that decision.

29.     During his deposition, the EM refused, upon recommendation of his counsel, to answer questions about communications between the EM and the Governor or his staff which took place subsequent to Orr's appointment as EM and at which counsel was present or on the

phone.

30.     For example, although Orr admitted that he had conversations about the Flowers and Webster litigation with the Governor or somebody in the Governor's office after those lawsuits were filed on July 3 but prior to July 17 when the Pension System filed its lawsuit, the EM's counsel instructed him not to reveal the content of those conversations.  *See* Rough Tr. 197:25-199:20.  A copy of the rough transcript – not yet reviewed or certified by the witness – is attached as **Exhibit B**.

31.     The EM also refused to answer questions about his conversations with the Governor between June 14 – when the City presented its intention to unconstitutionally reduce vested pension benefits – and July 3, because, according to the EM, "there's a possibility there was counsel present at each of those meetings."  Rough Tr. 204:16-205:7.

32.     When pressed, the City's counsel clarified that, indeed, he was in fact instructing Orr not to answer *any questions* which would reveal communications between the EM and State officials at which counsel for the City or State was participating and which had taken place *since Orr's appointment as Emergency Manager* -- whether related to the July 17 litigation which was filed by the Pension System against the City and State, the July 3 Flowers/Webster Litigation which was filed by active and retired employees against the State only, or "to the entire Chapter 9 filing":

```
 7  Q.  Your counsel has asserted a joint defense?
 8  A.  Yes.
 9          MR. SHUMAKER:  Common interest.
10  Q.  Common interest.  Just want to clarify to make sure I
11      understand.  We're obviously reserving our rights but
12      I want to understand whether you're claiming common
13      interest with regard to discussions relating to the
14      entire Chapter 9 filing or whether you are claiming
15      common interest just with regard to the state court
16      litigation?
```

```
17          MR. SHUMAKER:  Well, it would be to both.
18      I mean, the common interest agreement captures what
19      Mr. Orr's been doing since he became Emergency Manager
20      where there was a common interest between the state
21      and the Emergency Manager's office.  So both of those
22      would fall within to the extent that counsel was
23      involved in the communications.
```

Rough Tr. at p. 227.

33.     At an earlier point in the deposition, however, the EM and his counsel appeared

less fastidious about using privilege to guard communications which they apparently wanted to

put on the record regarding the EM's alleged good faith desire for negotiations:

```
25  Q.  Let me rephrase.  When did you decide that the timing
1       of the Chapter 9 filing should be July 18th or July
2       19th?
3   A.  Well, I didn't.  I decided to make the request and my
4       intent was to have the ability to file available and
5       possibly executed as soon as I got it.  It was without
6       talking or waiving privileges from my counselor
7       counsel and investment bankers, the concerns about us
8       losing control or being put in a situation because of
9       the ongoing litigation where I would not be able to
10      discharge my duties in an orderly fashion, in a
11      comprehensive matter to put the city on a sustainable
12      footing because of the litigation grew throughout June
13      and it was made clear to me that my desire to try to
14      continue to engage in discussions was running the risk
15      of putting my obligations under the statute in peril
16      and I think I was even counseled that I was being
17      irresponsible.
```

Rough Tr. at pp. 212-13.

## ARGUMENT

34.     The City and witnesses under its control cannot assert a "common interest"

privilege as to communications between them and witnesses under the State's control prior to

the moment the City and State became co-defendants on July 17, 2013.

35.     The so-called "common interest doctrine" is really an exception to the "general

rule" that "disclosure of an attorney's advice to a third party ordinarily results in waiver of the attorney-client privilege." *Libbey Glass, Inc. v. Oneida, Ltd.,* 197 F.R.D. 342, 347 (N.D. Ohio 1999). The State and the City are not, obviously, the same party, and therefore communications between each one's respective officers and/or attorneys ordinarily waives any attorney-client privilege which would otherwise shield those communications.

36.     "[F]or the common interest doctrine to attach, most courts . . . insist that the two parties have in common an interest in securing legal advice related to the same matter and that the communications be made to advance their shared interest in securing legal advice on that common matter. **The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial.**" *High Point SARL v. Sprint Nextel Corp.,* 2012 WL 234024, at *5 (D. Kan. Jan. 25, 2012) (collecting cases).

37.     The EM's assertion through counsel at his deposition that the Governor and the City have a common legal interest with respect to "discussions relating to the entire chapter 9 filing" fails for the simple reason that only the City has a *legal* interest in the outcome of the chapter 9 proceeding. The Governor is not the debtor. Nor is the State, and to the extent it may be a creditor – at best a minor one, not among the City's 20 largest, *see* Doc. 15 – it does not share an identical legal interest with the City in the adjustment of the latter's debts. Any interest the State or Governor may have in wanting the City to be able to adjust its debts via bankruptcy is, at best, of a political or commercial nature. Because neither the State nor the Governor's legal interests are affected by the City's chapter 9 filing, it is irrelevant whether these parties feel they would have benefited from the City's chapter 9 filing for other reasons. *See, e.g., North Am. Rescue Prods., Inc. v. Bound Tree Medical, LLC,* 2010 WL 1873291, at *4 (S.D. Ohio May 10, 2010) ("It is obvious that NARP and Ms. Norton shared a common interest

in defeating Bound Tree's action against Norton, but it is equally obvious that their joint interest was commercial—the desire for Ms. Norton not to be held liable so that, as NARP stated, 'Ms. Norton's employment by NARP [would] continue.'").

38.     Nor did the City share a common legal interest with the Governor once the Flowers and Webster complaints were filed on July 3, because the Governor's only legal interest in the Webster/Flowers litigation was in being permitted to approve the EM's recommendation that the City file under chapter 9, while the City had no legal interest in its ability to file for bankruptcy until receiving that permission.  The City effectively admitted as much in its responsive pleading to AFSCME and other parties' objections to the City's eligibility under Chapter 9, contending that it was not collaterally estopped by the state court's order in the Webster litigation because the City was never "in privity with the *Webster* defendants" where "privity" is defined as "'such an identification of interest of one person with another as to represent the same legal right.'"  Doc. No. 765 at 36-37 (quoting *Sloan v. City of Madison Heights,* 389 N.W.2d 418, 422 (Mich. 1986)).

39.     Even assuming *arguendo* that the City and State officials did share a legal interest in the outcome of the Flowers and Webster litigation, that legal interest cannot shield all communications about chapter 9 between City and State officials since the EM's appointment in March.  The Governor and the City have undoubtedly discussed numerous facts with counsel present which were not directly related to a litigation strategy in the Flowers or Webster litigation – for example, the factual matter of when the Governor became aware of, and whether he supported as a matter of policy, the EM's declared plan to make significant cuts to vested pension benefits.  Where communications between parties touch upon both business and legal strategies, communications which "address primarily business and not legal concerns" must be

produced even if other communications are protected by the common interest doctrine. *Snap-On Business Solutions, Inc. v. Hyundai Motor Am.,* 2011 WL 6957594, at *2 (N.D. Ohio 2011). "These conclusions are reinforced by the rule that the Common Interest Privilege (like all privileges) should not be given broad application." *Id.* (holding that defendant must produce, for example, what "is essentially a status report from [defendant] to a supplier describing how litigation affects their common business interests, not a communication about joint legal strategy"). *See also In re Megan-Racine Associates, Inc.,* 189 B.R. 562, 573 (Bankr. N.D.N.Y. 1995) ("The parties asserting the privilege must also demonstrate that *each communication* was made in the course of the joint-defense effort and was *designed to further that effort*." (emphasis added)).

40. Regardless, the City and State officials have waived protection of any shared attorney-client communications allegedly still privileged by virtue of their common interests. The State has committed waiver by failing to assert a common interest defense in any of its papers or oral argument before this Court, despite having vociferously pressed other far-fetched (and also arguably waived) privilege arguments as to why the Governor and his team should not be subject to depositions, and by subsequently agreeing on the record to depositions on any subject contained in AFSCME and others' objections to eligibility. The EM, in turn, waived privilege as to the "subject matter" of his considerations about the timing of the chapter 9 filing and its relation to the Flowers and Webster litigation when he "made . . . affirmative use" in his deposition of the substantive content of "counsel" he received in the presence of his attorneys, no doubt hoping to buttress his argument that he negotiated in good faith with creditors prior to ordering the chapter 9 filing, while simultaneously refusing to answer any other questions on the subject which he believed may have called for the content of conversations which took place

in the presence of his attorneys. *In re Megan-Racine Associates,* 189 B.R. at 572 n.7. At minimum, the EM's waiver should be deemed to waive the subject matter of timing of the chapter 9 filing with respect to Orr and all future City or State witnesses.

## RULE 9014-1(g) STATEMENT REGARDING CONCURRENCE

41.     Pursuant to Rule 9014-1(g), AFSCME states that at the Orr deposition, the City's counsel refused to permit Orr to answer certain questions on the basis of the common interest privilege with respect to communications with State officials, and the upon information and belief, neither the City nor State will permit any witness under their control to provide deposition testimony concerning certain relevant communications between City and State officials in the presence of legal counsel. According, AFSCME's request for the relief sought herein has already been denied by opposing counsel's instructions at the Orr deposition.

## CONCLUSION

42.     For all the foregoing reasons, AFSCME respectfully requests that this Court enter an Order (1) compelling Emergency Manager Orr to reappear for three (3) hours of deposition testimony concerning his communications with State officials in the presence of legal counsel since his appointment as Emergency Manager; and (2) confirming that no future deponent under the control of either the City or State can assert a common interest privilege as to communications between City and State officials concerning this chapter 9 case.

Dated: September 18, 2013

                      **LOWENSTEIN SANDLER LLP**
                      By: */s/  Sharon L. Levine*
                         Sharon L. Levine, Esq.
                         John K. Sherwood, Esq.
                         Philip J. Gross, Esq.
                         65 Livingston Avenue
                         Roseland, New Jersey 07068

(973) 597-2500 (Telephone)
(973) 597-6247 (Facsimile)
slevine@lowenstein.com
jsherwood@lowenstein.com
pgross@lowenstein.com

-and-

Herbert A. Sanders, Esq.
THE SANDERS LAW FIRM PC
615 Griswold St., Suite 913
Detroit, MI 48226
(313) 962-0099 (Telephone)
(313) 962-0044 (Facsimile)
hsanders@miafscme.org

-and-

Richard G. Mack, Jr., Esq.
Miller Cohen, P.L.C.
600 West Lafayette Boulevard
4th Floor
Detroit, MI 48226-3191

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub-Chapter 98, City of Detroit Retirees*

## SUMMARY OF ATTACHMENTS

The following documents are attached to this Motion, labeled in accordance with Local Rule 9014-1(b).

Exhibit 1                        Proposed Form of Order
Exhibit 2                        Intentionally Omitted (*Ex Parte* Motion to be Filed Concurrently)
Exhibit 3                        Intentionally Omitted (No Brief Required)
Exhibit 4                        Certificate of Service
Exhibit 5                        Intentionally Omitted
Exhibit 6                        Documentary Exhibits
                Exhibit A        Email from Geoffrey S. Irwin to Sharon L. Levine
                Exhibit B        Orr Deposition Rought Transcript

1

**EXHIBIT 1**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |

**ORDER ON THE MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO AND SUB-CHAPTER 98, CITY OF DETROIT RETIREES' MOTION TO COMPEL TESTIMONY OF KEVYN ORR AND ALL OTHER CITY AND STATE WITNESSES REGARDING CITY-STATE COMMUNICATIONS PRIOR TO JULY 17, 2013**

This matter coming before the Court on the motion (the "**Motion**") of the Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees (the AFSCME retiree chapter for City of Detroit retirees) (collectively, "**AFSCME**") for an order for an order to compel the deposition testimony of Kevyn Orr and all other City and State witnesses regarding City-State communications prior to July 17, 2013; and the Court having considered AFSCME's Motion, and any responses thereto; and good cause appearing;

**IT IS HEREBY ORDERED THAT:**

1. The Motion is GRANTED.

2. Emergency Manager Orr is ordered to reappear for three (3) hours of deposition testimony concerning his communications with State officials in the presence of legal counsel since his appointment as Emergency Manager.

3. No future deponent under the control of either the City or State will be permitted to assert a common interest privilege as to communications between City and State officials concerning this chapter 9 case.

4. The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Signed on _____

_____
Steven Rhodes
United States Bankruptcy Judge

**EXHIBIT 4**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 18, 2013, *The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees' Motion to Compel Testiony of Kevyn Orr and all Other City and State Witnesses Regarding City-State Communications Prior to July 17, 2013* was filed with the Clerk of the Court using the CM/ECF system, which provides electronic notification of such filing to all counsel of record.

Dated:   September 18, 2013

*/s/ Lisa Marie Bonito*
Lisa Marie Bonito
Paralegal
**LOWENSTEIN SANDLER LLP**
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
lbonito@lowenstein.com

1

**EXHIBIT 6**

# EXHIBIT  A

**From**: Geoffrey S Irwin [mailto:gsirwin@JonesDay.com]
**Sent**: Sunday, September 01, 2013 07:37 AM
**To**: Levine, Sharon L.
**Subject**: Re: Detroit -- depositions


Sharon:

Thank you, Sharon.  In light of the compressed nature of the exercise, the voluminous written and document discovery that the City is responding to by Sept 13, the Court's recent rulings and organization of the eligibility dispute, and the overlap between eligibility discovery and the evidentiary hearing on our assumption motion now set for Sept 23-24, we would ask that you withdraw a number of your deposition requests in connection with your eligibility objections.  We recognize your right to legitimate discovery, but we ask that you balance that against the aforementioned concerns before we are forced to seek relief from Judge Rhodes. Here is what we propose.

You have requested over two dozen depositions in total, 11 of which from individuals whom we represent, including a Rule 30b6 witness on 50 separate topics.  We believe this is excessive and that a smaller number of witnesses can provide you with the information you seek.  By way of example, the only other objector to request deposition discovery, the UAW and Flowers objectors, only asked for 6 total depositions.

I can represent to you now that we will put up some combination of witnesses to speak to the 30b6 topics.  That combination will almost certainly include the three witnesses who provided declarations in our opening motion: Mr. Orr, Mr. Malhotra from Ernst & Young, and Mr. Moore from Conway McKenzie.  Another set of topics will be addressed by a Miller Buckfire witness, likely Ken Buckfire.  Finally, while the Milliman firm has separate counsel, a final set of topics will be addressed by one or more witnesses from Milliman.

Since these witnesses have been requested in their individual capacities as well, we will not attempt to limit your questioning to the 30b6 topics.

We therefore ask that you withdraw your requests for additional witnesses from Miller Buckfire and Ernst & Young, whose testimony would only be duplicative of that offered by the witnesses who will be selected to best address your specific inquiries.

That would leave two remaining City witnesses, Mr. Satchel and Mayor Bing.  We are prepared to offer Mr. Satchel, but we ask that you withdraw your request for Mayor Bing.  I would be happy to speak with you about it in greater detail, but the mayor would have very little relevant information about the facts at issue here, and there would seem to be no legitimate basis for subjecting the mayor to deposition here.  If you will not withdraw the request, would you please provide us with the topics on which you propose to examine the mayor and why you cannot obtain that information from other witnesses?

We are prepared to move to quash if we cannot resolve this ourselves.  The UAW and Flowers objectors have also requested the mayor's deposition, and we will be making the same request of them.

If we can agree to this group of witnesses, I can start scheduling the depositions shortly.  Please advise at your earliest convenience.

Thanks.  Geoff

-------------------
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
-------------------

**From:** "Levine, Sharon L." [slevine@lowenstein.com]
**Sent:** 08/30/2013 10:10 PM GMT
**To:** Geoffrey Irwin
**Cc:** Heather Lennox
**Subject:** Detroit -- depositions


Geoff:

Thanks for the call. Please make a proposal by email of the witnesses you would offer to produce and the ones you would ask us then not to seek to depose so that we can share that with our client. It makes it easier for us to respond if you can share the proposal or suggestions by email. Thanks.

**Sharon L. Levine**
Partner
**Lowenstein Sandler LLP**
*T* 973 597 2374
*M* 973 768 9861
slevine@lowenstein.com
**Error! Hyperlink reference not valid.**
NEW YORK  PALO ALTO  ROSELAND

---

Circular 230 Disclaimer: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter(s) addressed herein.

This message contains confidential information, intended only for the person(s) named above, which may also be privileged. Any use, distribution, copying or disclosure by any other person is strictly prohibited. In such case, you should delete this message and kindly notify the sender via reply e-mail. Please advise immediately if you or your employer does not consent to Internet e-mail for messages of this kind.

---

Circular 230 Disclaimer: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter(s) addressed herein.

This message contains confidential information, intended only for the person(s) named above, which may also be privileged. Any use, distribution, copying or disclosure by any other person is strictly prohibited. In such case, you should delete this message and kindly notify the sender via reply e-mail. Please advise immediately if you or your employer does not consent to Internet e-mail for messages of this kind.

# EXHIBIT  B

1

uncertified rough draft

1    Uncertified Rough Draft of Kevyn Orr

2    Monday, September 16, 2013

3    Detroit, Michigan

4          THE VIDEOGRAPHER:  This is tape number one

5    to the videotaped depositions of Kevyn Orr being heard

6    before the U.S. Bankruptcy Court, Eastern District of

7    Michigan, case number 0227543.00001.  This deposition

8    is being held at 150 West Jefferson, Detroit, Michigan

9    on September 16, 2013 at 10:08 a.m.  My name is Mark

10   Meyers, I am the videographer, the court reporter is

11   Jeanette Fallon.  And will the court reporter please

12   swear in the witness.

13          (witness sworn)

14   BY MR. ULLMAN:

15   Q.   Good morning, Mr. Orr.

16   A.   Good morning.

17   Q.   My name is Anthony Ullman, I represent the retirees

18        committee.  I'm going to be asking you some questions

19        this morning as will some others.

20   A.   Okay.

21          MR. ULLMAN:  Before we begin I would just

22   like to note for the record that we received the

23   document production that the city made on Friday and

24   it was in image file, essentially TIF images, over a

25   hundred thousand pages which were essentially, as the

2

uncertified rough draft

1    city knows, very difficult to work with.  we obviously

2    have not been able to get through them all in time for

3    this morning's deposition.  We're going to continue to

4    review the documents and we're reserving our rights to

5    recall Mr. Orr for further deposition if after review

6    of the documents we feel it's appropriate to do so.

7          MR. SHUMAKER:  We'd just note for the

8    record that we're abiding by the schedule set by the

9    Court and that the documents that were produced were

10   responsive to the more than hundred document requests

11   that the city received in connection with this motion

12   and so we reserve all rights and I'm sure we'll oppose

13   any effort to continue the deposition.

14          MR. ULLMAN:  Duly noted.

15   Q.   Mr. Orr?

16   A.   Yes.

17   Q.   You've been deposed before; correct?

18   A.   Yes.

19   Q.   So you know I will ask questions and I would

20        appreciate if you wait until I finish before you

21        answer and likewise I'll wait until you finish

22        answering before starting the next question.

23   A.   Yes.

24   Q.   And if there's any question of mine you don't

25        understand, please let me know and I'll rephrase it.

3

uncertified rough draft

1    A.   Okay.

2    Q.   You were appointed Emergency Manager on March 14th,

3         2013; is that right?

4    A.   No.

5    Q.   Okay, technically you were appointed Emergency

6    Financial Manager on March 14th; is that right?

7    A.   No.

8    Q.   Okay.  When were you appointed the Emergency Financial

9         Manager?

10   A.   I think the final papers were signed on March 25th or

11        the 26th.  The announcement or roll out was on the

12        13th and 14th.

13   Q.   Okay.  So it was announced on the 13th or 14th that

14        you were going to be the Emergency Manager?

15   A.   Yes, effective March 25th.

16   Q.   And then when -- you're familiar with PA 436?

17   A.   Yes.

18   Q.   So your original appointment was the Emergency Manager

19        manager; is that right?

20   A.   Yes.

21   Q.   And then when PA 436 became effective, you became the

22        financial manager?

23   A.   No.

24   Q.   I'm sorry the Emergency Manager is that right?

25   A.   Yes.

                                                              4

                   uncertified rough draft

1    Q.   And PA 436 became effective on March 28th; is that

2         right?

3    A.   Yes, I believe so.

4    Q.   Okay.  And PA 436 followed PA 4.  Are you familiar

5         with PA 4?

6    A.   Yes.

7    Q.   And were you aware that PA 4 was struck by referendum

8         by voter referendum in Michigan in November 2012?

9    A.   Yes.

10   Q.   Now, did you have any involvement in Public Act 4 in

11        Michigan?

12   A.   No.

13   Q.   Was there any involvement by Jones Day to your

14        knowledge?

15   A.   Not to my knowledge.

16   Q.   Now, PA 436 was enacted in December of 2012; is that

17        right?

18   A.   I believe the statute speaks for itself but I do

19        believe that's right.

20   Q.   Okay.  And among other things it authorized the

21        governor to give authorization to the Emergency

22        Manager to file for bankruptcy under Chapter 9; is

23        that right?

24   A.   Yes.

25   Q.   And the text authorizes but do the not require the

                                                              5

                   uncertified rough draft

1         governor to place contingencies on the municipalities

2         proceeding under Chapter 9 is that right?

3    A.   Statute speaks for itself but I believe that's

4         correct.

5    Q.   And when did you first became aware of those

6         provisions in PA 436?

7    A.   Probably mid to late January or February.

8    Q.   Now, did you have any involvement in the drafting of

9         PA 436?

10   A.   No, none whatsoever.

11   Q.   Did Jones Day to your knowledge?

12   A.   No, none whatsoever.

13   Q.   Now, prior to the enactment of 436 did you have any

14    communications written or oral with anyone from the

15    city of Michigan -- I'm sorry, the City of Detroit or

16    the state of Michigan regarding PA 436?

17    A.    I believe that's a compound question but I'll answer

18          it.  No.

19    Q.    Now, at the time that you indicated you were

20          effectively made the -- became known that you would be

21          the Emergency Manager around the 13th or 14th of March

22          you were a practicing lawyer; is that right?

23    A.    Yes.

24    Q.    And you were at Jones Day; correct?

25    A.    Yes.

                                                    6
                        uncertified rough draft


 1    Q.    And you've been engaged in the practice of law for a

 2          number of years prior to 2013; correct?

---

 3    A.    Yes, since 1983.  I was licensed in February 1984.

 4    Q.    And your expertise was bankruptcy law is that right?

 5    A.    Started out as a trial attorney, eventually became a

 6          bankruptcy litigator, eventually into all aspects of

 7          bankruptcy law.

 8    Q.    So as of 2013 is it fair to say that you have

 9          expertise with bankruptcy law?

10    A.    Yes.

11    Q.    In fact that's what you're best known for isn't it?

12    A.    At this point I think so.

13    Q.    And you worked on the Chrysler bankruptcy in 2009; is

14          that right?

15    A.    Yes, 2008 through 2013.

16    Q.    Okay.

17    A.    Okay.

---

18    Q.    And you also spent a number of years at the office for

19          the US trustee; is that right?

20    A.    Yes.

21    Q.    And what was your role there?

22    A.    I was initially brought in as deputy director of the

23          US.  Trustee's office and upon the retirement of my

24          mentor and prior director, Jerry patch end, I became

25          director of that office.

                                                    7
                        uncertified rough draft


 1    Q.    Okay.  And was your role there in a legal capacity in

 2          terms of working with the department?

 3    A.    No, I was one of -- I was a component head of the one

 4          of the 36 components in the United States Department

 5          of Justice which was more in the nature of managerial

 6          as opposed to legal responsibility.

---

 7    Q.    Okay.  So did you ever serve as an actual trustee in a

 8          bankruptcy case?

 9    A.    At US trustee's office?

10    Q.    Yes.

11    A.    No.

12    Q.    Ands also work for the RTC; is that right?

13    A.    Yes.

14    Q.    And that was in a litigation capacity?

15    A.    Yes, litigation and supervisory.

16    Q.    Now, you've never -- prior to becoming the Emergency

17          Manager you never ran a city; did you?

18    A.    No.

19    Q.    Did you -- prior to becoming the Emergency Manager did

20          you have any position that had responsibility for the

21          operations of a municipality?

22   A.   I'm just thinking through the various career positions

23        I had.  Let me correct something.  I think your

24        question was was I ever receiver or bankruptcy

25        receiver?  Which one was it?

8

uncertified rough draft

1    Q.   I think I asked whether you were ever a trustee.

2         While you were at the --

3    A.   Not as a U.S. trustee but I had served in Florida as a

4         receiver and a trustee in a matter whose name escapes

5         me, it was some years ago.  Had I ever done anything

6         in the operations of a city inside?  No.

7    Q.   And as of 2013 did you have any experience or

8         expertise with local or state budgeting?

9    A.   Yes.

10   Q.   What was that?

Page 13

---

11   A.   At various times in my practice in Florida I was also

12        a land use attorney and from time to time would be

13        involved with various officials regarding planning and

14        zoning issues.

15   Q.   Okay, but -- and the involvement was limited to

16        planning and zoning?

17   A.   No, planning, land use and zoning, not inside the

18        government as a private practitioner.

19   Q.   Okay.  Did you have any involvement or experience in

20        actual budgeting for general, state or local

21        operations for all the various departments that are

22        involved in the running of a state or a city?

23   A.   I'm trying to be accurate without overstating my prior

24        experience.

25   Q.   Uh-huh.

Page 14

---

9

uncertified rough draft

1    A.   There were times where I was involved in various

2         campaigns, political campaigns, and as I said, land

3         use, planning and zoning, which would look at various

4         functions, but not for an entire city.

5    Q.   Okay, not for budgeting the various operations for are

6         sanitation, for police, for all the functions that go

7         into a city or a state?

8    A.   No, let me be clear if your question is was I ever

9         responsible for budgeting all the operations like in

10        Detroit which has 44 departments, the answer is no.

11   Q.   Did you ever run a corporation?

12   A.   I actually think I did.

13   Q.   What was that?

14   A.   With the RTC I was appointed as an officer for one of

Page 15

---

15        the financial institutions.

16   Q.   Okay, and when was that?

17   A.   I was at the RTC from '91 through '96 so sometime in

18        that period.

19   Q.   And what position did you hold?

20   A.   I don't recall.

21   Q.   And what were your responsibilities; do you remember

22        -- first of all do you remember what corporation it

23        was?

24   A.   I don't.  It was one of the many savings and loans

25        that we had.  I think it was in New Orleans.  The head

10

uncertified rough draft

1         of the division sent me down to take it over with a

2         team.

Page 16

---

3   Q.   Do you remember the name of the Sand L?

4   A.   I do not.

5   Q.   How long that lasted?

6   A.   I think I was commuting off and on for two to four

7        years.

8   Q.   Do you recall how many people worked for you at the

9        Sand L?

10  A.   Several hundred.

11  Q.   And that was obviously focused solely on the business

12       of that particular Sand L; correct?

13  A.   Yeah, there were a bunch of other issues, regulatory

14       issues, liability issues, insurance, but the business

15       of a savings and loan or holding -- could have been

16       the holding company for a savings and loan.

17  Q.   Outside of that have you ever worked in business?

18  A.   At a managerial level?

---

19  Q.   Yeah.

20  A.   As I said, I think I was a receiver in another case in

21       Florida and perhaps a special master in another matter

22       in Florida.

23  Q.   But just as a regular working for a condition?

24  A.   Company.

25  A.   No I've been an attorney all my professional career.

                                                            11

                        uncertified rough draft

1   Q.   Do you have any particular expertise in finance?

2   A.   Other than being a bankruptcy attorney, no, my degrees

3        are in political science and law.

4   Q.   And you indicated that you served as a trustee or

5        receiver once in Florida and what was the nature of

6        the company that you acted as receiver for?

---

7   A.   I don't recall.  I would be speculating.  It was

8        affiliated with real estate in some fashion.

9   Q.   Okay.  And do you have an accounting degree?

10  A.   No.

11  Q.   Are you an actuary?

12  A.   No.

13  Q.   Is it fair to say that as of the time of your

14       appointment as Emergency Manager your sole expertise

15       was in law and particularly in bankruptcy law?

16  A.   No.  I think that while my principal expertise was in

17       law and bankruptcy law that in that capacity we

18       obviously as bankruptcy professionals deal with

19       financial issues and requirements that require us to

20       make judgment calls.  I would not say that that

21       typically would include the level of expertise as an

22       actuary.

---

23  Q.   Okay.  And your sole -- your involvement in financial

24       issues as you indicated was gained in your capacity as

25       a bankruptcy lawyer; is that right?

                                                            12

                        uncertified rough draft

1   A.   Well, gained in my capacity as I said through the arc

2        of my career having to do with first trial attorney,

3        business law, banking and finance at the FDIT, then

4        the RTC then the Department of Justice and bankruptcy.

5   Q.   Now, you had discussions with the governor of Michigan

6        or people working with or for him prior to becoming

7        Emergency Manager; is that right?

8   A.   Yes.

9   Q.   Can you tell me about those?

10  A.   Yeah, I believe when you say people either working

11    with or for him, the initial discussion was at the end

12    of January, could have been early February, but I

13    think it was the end of January when we came in to

14    pitch for the restructuring work for the City of

15    Detroit before a restructuring team of advisors, which

16    excluded -- the governor was not involved in that

17    presentation.

18  Q.  And when was it first discussed -- when was the

19    possibility if you're acting as Emergency Manager

20    first raised?

21  A.  I believe it was raised within a few days of us coming

22    back from that presentation.

23  Q.  And how did that come about?  What was said?

24  A.  Someone called my managing partner, as I understand

25    it, I wasn't on that call, and asked if I might be

13

1    interested in serving as Emergency Manager and my then

2    managing partner relayed that conversation to me.

3  Q.  And that -- is that the first time that you became

4    aware that you were being considered for the Emergency

5    Manager position?

6  A.  Yes, I believe that was in February.

7  Q.  Now, you had attended the presentation or the pitch

8    for Jones Day that you just referred to before the

9    restructuring committee of advisors?

10  A.  Yes, Jones Day was one of I believe 21 law firms that

11    made presentations to that group about representing

12    the city.

13  Q.  And what were the qualifications of Jones Day that

14    were presented at that presentation?

15  A.  we had prepared a book of the qualifications of the

16    various attorney and the law firm and other

17    representations both in court and out of court

18    restructuring, having to do with healthcare, employee

19    benefits, labor issues, having to do with

20    environmental, bankruptcy, litigation, analyses,

21    negotiations, mediation, the full panoply of work that

22    the firm did.

23  Q.  And did you make any personal presentation at that

24    meeting, did you pitch anything?

25  A.  We all spoke.

14

uncertified rough draft

1  Q.  Okay and what did you speak about as regards what you

2    would bring to the table?

3  A.  No, there were no presentations made so much with

4    regard to what I personally might bring to the table.

5  Q.  Okay.

6  A.  Although we did discuss the experience of the team.

7    There was no presentation for why any of us for

8    instance should be Emergency Manager.  There was

9    discussion about what we perceived to be the difficult

10    status of the city and how our law firm could provide

11    representation to the city.

12  Q.  And was anything said to the committee at the meeting

13    either through the book or orally as to your

14    particular credentials and expertise?

15  A.  My credentials were included in the book as were the

16    other attorneys at the presentation.

17  Q.  Okay.  And your --

18  A.  Please.

19  Q.  Did I -- were you done?

20  A.  No, no, I was done, yeah.

21  Q.  Okay.  Were your credentials presented that presented

22      you as primarily as a bankruptcy lawyer?

23  A.  As primary as a bankruptcy and restructuring attorney,

24      yes.

25  Q.  And there there any discussion specifically of the

                                                        15
                    uncertified rough draft


1       possibility of a Chapter 9 filing at this

2       presentation?

3   A.  I don't think so.  I don't recall -- I don't -- I

4       don't -- I don't recall and the reason I say I don't

5       recall is there -- no, wait a minute.  I don't know if

6       there was a discussion about the city.  There was a

                    Page 25

---

7       discussion about other Chapter 9 cases, other cities.

8   Q.  And what specifically do you recall being said about

9       the Chapter 9 filings in the other cases?  Let me put

10      it this way.  Did Jones Day refer to experience it had

11      in doing other Chapter 9 filings?

12  A.  Yes, yes, various member of the team referred to that

13      experience, yes.

14  Q.  And is it fair to say that the Chapter 9 experience

15      was a substantial part of the pitch that Jones Day was

16      making to this committee?

17  A.  No.

18              MR. SHUMAKER:  Object to the form.

19  A.  No, it was a component of the presentation.

20  Q.  That -- you said there was a written presentation or

21      written material?

22  A.  There was a book, yes, there were written materials.

                    Page 26

---

23  Q.  And do you know whether that's been produced?

24  A.  I do not.

25              MR. ULLMAN:  I would like to call for the

                                                        16
                    uncertified rough draft


1       production of that, please.

2               MR. SHUMAKER:  We'll look into it.  I would

3       ask here that if you're going to ask for documents

4       throughout the deposition that you follow-up with a

5       letter and email.

6               MR. ULLMAN:  Sure.

7   Q.  And do you recall whether there was any discussion at

8       this presentation as to the major problems that were

9       facing Detroit at the time?

10  A.  I think there were discussions about Detroit's issues,

                    Page 27

---

11      various issues at the time, yes.

12  Q.  And do you recall any discussion about the issues that

13      Detroit was facing regarding its pension liabilities?

14  A.  I don't recall specific discussions and -- no, I don't

15      recall specific discussions but there may have been.

16  Q.  Okay.  And the same question for retirement benefits

17      in general apart from pension benefits.  Do you recall

18      any discussion of that?

19  A.  I don't recall specific discussions, but there may

20      have been.  The discussions were more at a high level

21      as opposed to detailed level.

22  Q.  And do you recall at a general level there being

23      discussion that Detroit was facing major issues

24      regarding its pension and other retirement benefit

25      liabilities?

                                                        17
                    Page 28

1  A.  I know to be candid with you the pitch book contained

2      the information regarding employee benefits and labor

3      attorneys.  One of the attorneys on the team was a

4      labor attorney but I don't recall there being specific

5      discussions in detail about those issues.

6  Q.  Do you recall in general at the committee discussion

7      being raised that Detroit was in fact facing

8      substantial issues concerning its pension and other

9      retirement benefits and needed to find a way to deal

10     with those?

11 A.  Here again I don't recall specific discussions.  There

12     may have been.  I just don't recall.

13 Q.  Okay.  Let me show you some documents, Mr. Orr.

14 A.  Thank you.

Page 29

15 Q.  You can't thank me until you've seen the documents.

16 A.  It may refresh my recollection.  I just don't recall.

17          MR. ULLMAN:  Let's mark the first one as

18     Orr 1.

19          (Marked Exhibit No. 1.)

20 Q.  Are there other copies of that?  Thanks.

21 A.  Okay.

22 Q.  Okay, what we're marked as Orr number 1 is an email

23     beers the Bates stamp ending in 113.

24 A.  Yes.

25 Q.  Now, these either -- there are a couple of emails on

                                              18

1      this chain from January of 30 -- January 30, 2013.

2  A.  Yes.

Page 30

3  Q.  And the bottom one states that it's from Richard bare

4      to core reason ball.  Who is Richard bare?

5  A.  Richard Baird is the governor's transition manager on

6      contract to the state of Michigan.

7  Q.  And he says -- the message is to core reason star,

8      sorry I missed your call.  Basically says I'm

9      inquiring about the potentiality of actually hiring a

10     member of your team for the Detroit EM spot.

11 A.  Yes.

12 Q.  And is this what you were referring to before in your

13     testimony?

14 A.  Yes, I was on the phone with Steve Brogan, he can fill

15     you in, yes, that's what I was talking about.

16 Q.  It's your testimony that prior to this you had not had

17     discussions with anyone from the state of Michigan or

18     the city of Michigan (sic) about the possibility of

Page 31

19     becoming Emergency Manager?

20 A.  Absolutely not.

21 Q.  And at the top it says if he asked if Kevyn could be

22     EM and that in fact is why he was calling?

23 A.  Yes, I see that.

24 Q.  And then that's what happened?  He did call and -- he

25     had called core reason ball to ask about you being the

                                              19

1      EM?

2          MR. SHUMAKER:  Object to the form.

3  A.  This document -- I don't know, my testimony is that I

4      believe rich had called my managing partner who was

5      Steve Brogan.  I don't know if he called Corinne Ball.

6      This seems to be an email exchange between him and

Page 32

7    Corinne Ball and then Heather Lennox and Amy Ferber.

8   Q.  Okay fair enough.  But you recall around that day

9    someone telling you that Baird had called talking

10    about the EM position and then shortly thereafter you

11    in fact got a call; is that right?

12    MR. SHUMAKER:  Object to the form.

13   A.  Yeah.  I don't know if it was -- it was soon

14    thereafter, I don't know if it was that specific day,

15    but it was soon thereafter.

16   Q.  And you then got -- did you get a call from Mr. Baird

17    directly?

18   A.  No.

19   Q.  Who did you get a call from?

20   A.  Steve BROGAN.

21   Q.  Okay that's your managing partner?

22   A.  Yes.

Page 33

---

23   Q.  And he told you that Baird wanted you to be the EM?

24   A.  He told me that they had inquired whether I was

25    interested in applying to become the EM.

20

uncertified rough draft

1   Q.  Okay and your response was?

2   A.  No.

3   Q.  Okay.  And I take it there were further conversations?

4   A.  Yes.  That conversation was no.  I did not want to

5    leave the firm and that we would tell them that.

6   Q.  And did you have a conversation with Richard BAIRD

7    concerning the possibility of your becoming the EM on

8    or about this time frame at the end of January of

9    2013?

10   A.  Yeah, I don't know if it was end of January, here

Page 34

---

11    again being in February, but I recall having a

12    conversation with rich BAIRD soon thereafter.

13   Q.  Okay, let's look at the next document.

14    (Marked Exhibit No. 2.)

15    MR. ULLMAN:  Which we'll mark as Orr 2.

16   Q.  What we've marked as Orr 2 is a document ending in

17    Bates number 303.

18   A.  Yes.

19   Q.  You've seen this email chain before, Mr. Orr?

20   A.  Yes.

21   Q.  And in fact you are on both emails; are you?

22   A.  I think I wrote the top one.

23   Q.  Okay.  Now, what is the role of Jones Day at this

24    time?  Does it have an official role with Detroit or

25    with the state of Michigan?

21

uncertified rough draft

Page 35

---

1   A.  No, at this time, as far as I recall, Jones Day was a

2    candidate to be the attorneys for the city.

3   Q.  Now, starting with the bottom email, this is from

4    Corinne Ball to you.

5   A.  Yes.

6   Q.  And she goes onto talk about food forethought for your

7    conversation with Baird.  Obviously referring to a

8    conversation expected between you and Baird.  She

9    makes reference to the Bloomberg foundation and

10    talking about whether someone should ask Baird about

11    financial support for the project and in particular

12    the EM.  Can you tell me what that's referring to?

13   A.  This is Corinne's email to me and I think she was

14    talking in some form about the Bloomberg foundation

Page 36

15    supporting Detroit efforts with the EM.  And I think

16    -- I don't know if in this email or subsequently said

17    something along the lines of I don't want anything to

18    be extraordinary but I think at that point as I said

19    on the 31st so it wasn't on the 30th, it was the 31st,

20    that I wasn't interested in the job.

21  Q.  Do you know what financial support she's referring to?

22    Did you have a conversation with her about this?

23  A.  He we did not have a -- well we may have had a

24    subsequent conversation about financial support.  We

25    -- I don't want to speculate but there may have been a

                        22

        uncertified rough draft

1    conversation about supplementing the EM salary.

2  Q.  An additional salary that would be funded privately?

3    Is that what you're saying?

---

4  A.  Yeah, I think the statute allows the EM to have

5    additional compensation and that may have been what

6    this was referring to or it may have been about the

7    Bloomberg foundation helping Detroit directly.  I'm

8    not sure, but there may have been that discussion.

9    That seems to remind me of something along those

10    lines.

11  Q.  The next statement from -- or the last sentence in

12    Ms. Ball's email says I can ask Harry for contact

13    information this kind of supports in ways nationalizes

14    the issue in the project.  Do you have an

15    understanding of what she's referring to?

16  A.  I do not.

17  Q.  You don't know what she meant when she said she used

18    the word nationalized?

---

19  A.  No I don't know if she meant raises the profile to

20    help Detroit, I don't know.

21  Q.  And you never asked her what she meant?

22  A.  I don't recall asking her what she meant.

23  Q.  In the top email in this exhibit you say that you have

24    a good conversation with Rich Baird this morning.

25    This is the 31st of January?

                        23

        uncertified rough draft

1  A.  Yes.

2  Q.  So obviously either you called him or you called him

3    as of the 31st of January?

4  A.  Yes, yes.

5  Q.  It says in this email that you told him you were

6    interested in the job but there were some things that

7    made it impractical.  Is that a fair summary of your

---

8    --

9  A.  Yes.

10  Q.  -- your conversation with Baird?

11  A.  Yes.

12  Q.  And then he suggested you give it additional

13    conversation and you said you could say that there's a

14    glimmer of hope you would take it?

15  A.  Right.

16  Q.  And then you agreed to get back in touch next week?

17  A.  Right.

18  Q.  He said -- you go on to say that he tells you he Baird

19    that he likes your presentation as pulling for us to

20    represent the city.

21  A.  Yes.

22  Q.  Is that what he told you?

23  A.  Yes.

24  Q.  Do you remember anything else about that conversation

25      with Mr. Baird?

                                                        24

                    uncertified rough draft

 1  A.  No, I remember we had a conversation, I said I was

 2      flattered but I really wasn't interested in the job, I

 3      was very comfortable at Jones Day, didn't want to

 4      leave my family, I had young children, but I would

 5      give it some consideration and I think we ended it by

 6      saying, you know, I probably don't want to take the

 7      job but I am committed to working and I did say

 8      working in lock step with the city and would be

 9      willing to take any role in this respect.

10  Q.  And was there any discussion during this conversation

11      as to what you would do if you ultimately did take the

                    Page 41

---

12      job of EM?

13  A.  No.  As I recall in this conversation based upon this,

14      the discussion was very high level and I think

15      Mr. Baird asked me to at least give it some reflection

16      and consideration and not turn it down outright.

17  Q.  And you accommodated that request; right?

18  A.  I started considering it, yes.

19  Q.  Now, when he says we're pulling for us to represent

20      the city, that's as a restructuring counsel as you

21      talked about before?

22  A.  Yes.

23  Q.  And there was a program, wasn't there, that had been

24      designed to solicit counsel to act as restructuring

25      counsel for Detroit?

                                                        25

                    uncertified rough draft
                    Page 42

---

 1  A.  I don't know if it was a program.  I know that there

 2      was a process that we and 20 other firms participated

 3      in.  I believe it was one day, maybe two, where we

 4      flew out to the airport and presented our credentials

 5      over 45 minutes.

 6  Q.  And was there particular firm that had designed or

 7      that oversaw that process?

 8  A.  I don't know.

 9  Q.  Were you aware that Buckfire, are you familiar with

10      the Buckfire?

11  A.  I know Miller Buckfire.  They were at the

12      presentation.  I don't know if they designed it.

13  Q.  Were you aware they were playing a role in the --

14  A.  Selection process?

15  Q.  -- in the selection process?
                    Page 43

---

16  A.  Yes.

17  Q.  And are you aware that they were in fact effectively

18      assigning points to the various firms that

19      participated and doing some sort of tally to help a

20      decision be made?

21  A.  Yes.

22          MR. SHUMAKER:  Objection, foundation.

23  Q.  And is it correct that Miller Buckfire was a banker

24      for Chrysler in the Chrysler bankruptcy?

25  A.  No.

                                                        26

                    uncertified rough draft

 1  Q.  They weren't?

 2  A.  No.  I'm trying to think.  Did Miller Buckfire play a

 3      role in Chrysler?  I -- let's put it this way, I had
                    Page 44

---

orrroughdraft (3).txt

4      not met anyone from Miller Buckfire in the Chrysler

5      representation.

6   Q.  Okay.  Let me show you the next document which we'll

7      mark as, what are we up to, 3?

8              (Marked Exhibit No. 3.)

9   Q.  What we've marked as Exhibit 3 is a chain of emails,

10     the first page ends in Bates number 300.  Have you

11     seen these before, Mr. Orr?

12  A.  Yes.

13  Q.  Let's first look at the first three emails in this

14     chain.

15  A.  Uh-huh.

16          MR. SHUMAKER:  The last chronologically or

17     the first ones?

18          MR. ULLMAN:  No, the 207.

19  A.  These are follow on from the prior email?
                    Page 45

orrroughdraft (3).txt

20  Q.  Uh-huh.

21  A.  Okay.

22  Q.  If we look at the one that's at the bottom of Bates

23     300 that carries over to the next one, this is an

24     email from Mr. Moss, from Daniel Moss to you?

25  A.  Yes.

                                    27
           uncertified rough draft

1   Q.  And I take it Mr. Moss is someone you worked with at

2      Jones Day; is that right?

3   A.  Yes.

4   Q.  And were you still at Jones Day at this time?

5   A.  Yes.

6   Q.  And Mr. Moss writes that nationalizing this -- making

7      this a national issue is not a bad idea.  He goes on
                    Page 46

orrroughdraft (3).txt

8      to say it gets police interceptor cover for the State

9      politicians, he goes on to say that if it succeeds

10     there will be more than enough patronage to allow

11     either Bing or snide to look for higher calls whether

12     a cabinet, Senate or corporate.  Further this would

13     give you cover and options on the back end to make up

14     for lost time there.  Can you tell me what he's

15     referring to?

16          MR. SHUMAKER:  Objection, form, foundation.

17  A.  Yeah, I would have to say that the document speaks for

18     itself.  I think it also says that indeed this gives

19     them either greater incentive to do this right.  I

20     think my response says no.

21  Q.  Let me ask you questions about this.  Mr. Moss says

22     making this a national issue is not a bad idea.  Do

23     you have an understanding as to what he's referring to
                    Page 47

orrroughdraft (3).txt

24     when he says making this a national issue?

25  A.  No.  What I think he's probably referring to is

                                    28
           uncertified rough draft

1      raising the profile of Detroit and the crisis it's in

2      so it can get some help.

3   Q.  Did you have any conversations with Mr. Moss about

4      what he meant when he wrote this email?

5   A.  No, other than that email exchange I don't recall any.

6      I think we probably did though.  We talked on a

7      regular basis.

8   Q.  Do you recall anything more specific about what he

9      meant when he wrote this is a national issue based on

10     the conversations you had with him?

11  A.  No, there were emails going back and forth and I think
                    Page 48

12    my email back to him approximately eight minutes later

13    addressed the issue.

14  Q.  Well, he goes on to say that if this gives them -- it

15    provides political cover to state politicians and it

16    gives them even greater incentive to do this right.

17    Do you have an understanding as to what the this is to

18    do what right?

19  A.  I think this is trying to fix Detroit right in a broad

20    sense.

21  Q.  And is that based on your conversations with Mr. Moss

22    or is that based on your reading of this email?

23  A.  That's based on probably my reading of this email.

24    But let me think about conversations.  It could have

25    meant to do this process right, whatever that is,

                                                    29

---

1    restructuring, out of court or in court.

2  Q.  So as you sit here now you don't have a specific

3    recollection or understanding as to exactly what

4    Mr. Moss meant; is that right?

5  A.  I have worked closely with Dan Moss for a number of

6    years.  We have conversations about a number of issues

7    but when you say do this right, I don't want to give

8    the wrong impression that there was some conversation

9    about what this right exactly meant.  I assumed it

10    meant to do the process right, whatever that is.

11  Q.  But you don't know what specifically Mr. Moss had in

12    mind because you never actually asked?

13  A.  No if you're trying to describe a specific thing or

14    process to it, no.

15  Q.  In the last sentence Mr. Moss writes, this would give

---

16    you cover and options on the back end to make up for

17    lost time there.

18  A.  Yeah.

19  Q.  Do you have an understanding as to what he was

20    referring to when he wrote that, he Mr. Moss?

21  A.  No, but I think what my -- my impression is, I think

22    what he was trying to say is if you can get -- make

23    the issue a national issue and elevate it so that you

24    get national support, that you may have greater

25    success and be able to get back to my life.

                                                    30

uncertified rough draft

1  Q.  You mean success as Emergency Manager?

2  A.  Success for the City of Detroit, yeah.

3  Q.  Well, he writes this would give you cover and options

---

4    on the back end, you Kevyn Orr?

5  A.  Yeah, but I think if you read it in conjunction -- I'm

6    sorry, I didn't mean to cut you off.

7  Q.  So my question is is he talking about you Kevyn Orr in

8    the context of being an Emergency Manager as you

9    understood it?

10  A.  No, I don't want to parse the email and try to ascribe

11    meaning to it that's not true.  You asked for my

12    understanding and my testimony is I think this is Dan

13    saying to me if you nationalize the issue that it

14    brings greater attention and perhaps the opportunity

15    for people to do this, meaning the project, right and

16    if it succeeds, then the other political members will

17    be given acknowledgment for the success.  Further, it

18    might give me the ability to come back to the firm and

19    makeup for the time that I'd lose if I did this job.

20  Q.  The job being the Emergency Manager job?

21  A.  Yes.

22  Q.  Okay.  Now, in the next email that's going up the

23      chain that is on the first page you say you wouldn't

24      do it.

25  A.  Yes.

                                                    31
                    uncertified rough draft

1   Q.  And when you say you wouldn't do it, again, do you

2       have -- what is the it that's being referred to?  So

3       far no one's ever really identified what nationalizing

4       meant?

5   A.  I'm telling you what I can think, what I meant by this

6       writing.

7   Q.  Okay.

                    Page 53

8   A.  What I meant was I wouldn't necessarily make it a

9       national issue and I think I say it would just bring

10      in the Demo Republican polarization on a national

11      scale and make Detroit a fall for the agendas of both

12      sides, meaning that people would try to use it as an

13      allegory for whatever their particular perception was.

14      I go on to say that the president would have to

15      criticize the trampling of democracy, and that's been

16      done here, not by the president I might add, and the

17      Republicans would rail against any further fed

18      bailouts and that's been said plus it deends anything

19      for Detroit a number of other municipals would have

20      their hands out in time, no one's in a blood to dole

21      out federal large guess.  I think I go on to say this

22      is a morass of problems.  So my thought was there to

23      be clear that I did not think it meaning to try to

                    Page 54

24      give the issues of Detroit national prominence was

25      particularly productive.

                                                    32
                    uncertified rough draft

1   Q.  Now, in the top email you write or I'm sorry Mr. Moss

2       writes back to you and in the second paragraph he goes

3       on to say it seems the ideal scenario would be that

4       Snyder and Bing both agree that the best option is

5       simply to go through an orderly Chapter 9 and then he

6       goes on to say that that avoids a political fight over

7       the scope of any appointed Emergency Manager, moves

8       the Ball forward and then he goes on to say a pointing

9       Emergency Manager whose ability to actually do

10      anything is questionable would only certificate to

11      have kick the can down the wrong path.

                    Page 55

12  A.  Yes.

13  Q.  And can you tell me -- obviously this is -- Mr. Moss

14      here is referring to the possibility of a Chapter 9

15      filing.

16  A.  Yes.

17  Q.  And was this something that you discussed specifically

18      with Mr. Moss?

19  A.  We probably did.

20  Q.  Okay.  And did you discuss the possibility -- so at

21      this point it was understood that one possibility, one

22      potential route of action, would be to file a Chapter

23      9 for Detroit if you took the Emergency Manager job;

24      is that right?

25  A.  Yeah, I think that since we have been reviewing

                                                    33
                    uncertified rough draft

                    Page 56

1    background information on Detroit and the possibility

2    of a Chapter 9 filing had been mentioned in 2005,

3    2006, 2009, 2011, 2012, up until this point, in fact I

4    think it was as I said I testified earlier this

5    morning the possibility of chapter 9s in other cities

6    4 been discussed that the issue after potential

7    Chapter 9 filing for the City of Detroit was not

8    particularly surprising discussion.  That had been

9    discussed on many levels in the national press, in the

10   local press, it had been recommended by a prior -- in

11   2005 I think it was recommended by a prior employee --

12   senior employee of the city, so I think that

13   discussion was the typical type of discussion that

14   you'd have with your colleagues.

15 Q.  And were you in fact at this time having those types

16   of discussions with your colleagues at Jones Day as to

17   the possibilities of a Chapter 9 filing if you took

18   the Emergency Manager job and how that would be

19   implemented?

20 A.  Yes but I don't want to give you the wrong impression

21   pause I think based upon what I've seen from some of

22   the briefing and some of the interrogatories the

23   impression is that that was predetermined and that's

24   not true.  The reality is there was much discussion

25   about what the alternatives would be and the need to

                                                    34
                uncertified rough draft

1    bring something that would bring order and efficiency

2    to the process given the number of interests that were

3    involved.

4 Q.  But it was certainly one of the possibilities that was

5    on the table as a course that might need to be

6    followed is that right?

7 A.  Oh sure it had been discussed for the better part of

8    the prior decade.

9 Q.  And in fact Mr. Moss is recommending the simplest

10   thing the best option would be to have the Snyder and

11   Bing the mayor and the governor, both agree to go

12   through an orderly Chapter 9?

13          MR. SHUMAKER:  Object to form, calls for

14   speculation.

15 Q.  That's what it says here doesn't it?

16 A.  Well, I mean the document speaks for itself.

17 Q.  My question is did you agree with that?

18 A.  No, in fact I think we had discussions back and forth

19   about, one, me not wanting to take the job and two,

20   whether or not the parties could reach concession

21   short of a Chapter 9 which would provide benefit to

22   the city in an orderly way.

23 Q.  And ultimately that didn't happen; did it?  The city

24   did file Chapter 9; didn't they?

25 A.  well, I mean, I think that we took a lot of time, I

                                                    35
                uncertified rough draft

1    took 30 days when I came into the city, I said --

2 Q.  Mr. Orr I don't mean to interrupt you but I don't want

3    to waste time.  My question was pretty simple.  I was

4    simply asking ultimately the city did file a Chapter

5    9; didn't it?

6 A.  Yes and I was giving you an explanation for why that

7    occurred.

8  Q.  I'll get to that later.

9  A.  Okay.

10  Q.  Now, in this email Mr. Moss goes on to say a pointing

11      of Emergency Manager whose ability to do anything

12      questionable would only serve to kick the can down the

13      wrong path and he's referring there to the can of the

14      Chapter 9 filing; isn't he?

15          MR. SHUMAKER:  Objection, form.  Calls for

16      speculation.

17  A.  No, no.

18  Q.  Now, in this email Mr. Moss recommends or suggests the

19      best path would be for Snyder and BING to voluntarily

20      go through a Chapter 9 and not go through the

21      Emergency Manager process; is that right?

22  A.  No, you've asked that question before but you put a

23      little color on it this time and I don't think that's

---

24      accurate.

25  Q.  Well --

1  A.  Perhaps you can rephrase it.

2  Q.  Certainly.  He says, he Moss says, it seems the ideal

3      scenario would be that Snyder and Bing both agree that

4      the best option is to simply did through an orderly

5      Chapter 9.  This avoids an unnecessary political fight

6      over the scope of authority of any appointed Emergency

7      Manager.  I'm not going to read the rest.  You see his

8      recommendation, his advice, his belief that the best

9      option is for Bing and Snyder to file Chapter 9?

10          MR. SHUMAKER:  Objection to form.

11  A.  I think you're coloring the email.  As I said before,

---

12      this is pretty typical banter between co-workers and

13      colleagues about what could happen.  You said it was

14      advice and recommendation.  To the best of my

15      knowledge we hadn't been retained then and we were

16      just going back and forth about potential options.

17  Q.  Okay.

18  A.  So I don't want to give -- my testimony to give this

19      email more import and lead to the conclusion as some

20      have already said in this litigation, that there was a

21      predetermination to file chapter 9, but ultimately it

22      was the Emergency Manager, the appointed Emergency

23      Manager, who filed the Chapter 9, not Bing and Snyder;

24      is that right.

25  A.  Yes, after he had been sued multiple times and didn't

---

1      get a comprehensive proposal from any interested party

2      or creditor.

3  Q.  Let me show you another document which we'll mark as

4      Exhibit 4.

5          (Marked Exhibit No. 4.)

6  Q.  This is a chain of emails it starts with Bates number

7      295.

8  A.  Yes.

9  Q.  Have you seen this before, Mr. Orr?

10  A.  Yes.

11  Q.  In fact, you wrote some of this; didn't you?

12  A.  Yes.

13  Q.  If we focus on the top email --

14  A.  Yes.

15  Q.  -- you're talking again -- at this point in time had

16    you decided whether to accept the Emergency Manager

17    job?  This is later in the afternoon on January 31.

18  A.   NO, I didn't.  I -- no, there was no time in the

19       initial two days that this came up that I decided to

20       accept the Emergency Manager job.

21  Q.   Okay.  And in this email you're giving some thoughts

22       on some of the issues that pertain to that; aren't

23       you?

24  A.   Yes.

25  Q.   And in particular you start talking about the

                                                        38

                      uncertified rough draft


1        legislation that pertains to the EM position.  You

2        said you went back and reviewed various laws; do you

3        see that?

4   A.   Yes.

---

5   Q.   And you talked about some laws in DC control board and

6        then you go on in the last sentence -- or I'm sorry,

7        the second to the last sentence to write, and I quote,

8        "By contrast Michigan's new EM law is a clear

9        end-around the prior initiative that was rejected by

10       the voters in November."  You wrote that?

11  A.   Yes.

12  Q.   And by the new EM law, you were referring to PA 436?

13  A.   Yes, I believe so.

14  Q.   And by the end run you're talking about the voter --

15       the fact that PA 436 was enacted in response to the

16       fact that the voters' had rejected the prior law PA 4;

17       is that right?

18  A.   Yes.

19  Q.   And PA 436 was able to avoid another referendum by

---

20       including tacking onto it a relatively minor

21       appropriation provision; is that right?

22             MR. SHUMAKER:  Objection, calls for

23       speculation.

24  A.   I don't know if that's the sum total of the difference

25       between 436 and the prior law but that was one of the

                                                        39

                      uncertified rough draft


1        components, yes.

2   Q.   And when you wrote this question, Michigan's new EM

3        law is a clear end-around the prior initiative, it was

4        rejected by the voters in November, were you writing

5        truthfully?

6   A.   I think I was writing my opinion at that time, yes.

7   Q.   And then you go on and you say, the -- and that was

8        based on the analysis that you had done as of that

---

9        date?

10  A.   Yeah, I think you would recognize that between the

11       30th when this first came up and the 31st, I think

12       this is later that afternoon, I spent sometime just

13       going through the other laws on a very cursory basis

14       to try to get a better understanding of what was being

15       asked.

16  Q.   And the conclusion you reach is what you set out in

17       the email here; correct?

18  A.   At that time.

19  Q.   You go on to say, the new EM law gives local

20       governments four choices and you go onto list them?

21  A.   Yes.

22  Q.   And that is the list of the four choices you have,

23       that comes from the statute PA 436 doesn't it?

24    A.    I believe so.  I don't have it in front of me, I have

25          it here, but I believe so without looking at it.

                                                          40
                        uncertified rough draft


1     Q.    And so at that point in time you obviously were

2           familiarizing yourself with 436 and had read it;

3           correct?

4     A.    Yes, I think what happened during this day is that I

5           initially thought of rejecting the concept of being an

6           EM, I then went back and said let me start informing

7           myself on what's required EM in looking under the law,

8           and then I was providing musings and streams of

9           consciousness of what my initial conclusions were.

10    Q.    And you mention that in your writing here that one

11          option is a Chapter 9 bankruptcy with the governor's

12          approval; correct?

13    A.    Yes.

14    Q.    And you also make note that another option is

15          Emergency Manager; is that right?  State appointed EM

16          is what you say?

17    A.    Yes.

18    Q.    And under PA 436 the Emergency Manager also had the

19          authority with the governor's approval to file for

20          Chapter 9; is that right?

21              MR. SHUMAKER:  Objection, calls for legal

22          conclusion.

23    A.    Yeah, the statute speaks for itself, but yes.

24    Q.    And you were aware of that at the time you wrote this

25          email; correct?

                                                          41
                        uncertified rough draft

1     A.    I don't know if I read through the entire statute at

2           this time.  As I said, I have trying to get some

3           familiarity.  I think it's fair to say that I at some

4           point pretty close if I wasn't aware of it at that

5           time, I pretty closely became aware of it.

6     Q.    Because you would certainly want to know what powers

7           the Emergency Manager would have if you decided to

8           take the job; correct?

9     A.    I began to inform myself about the powers that the

10          Emergency Manager would have.  But please understand

11          here again at this time I was trying to avoid taking

12          the job.

13    Q.    And you go on then in the -- and you were -- I guess

14          -- were you aware that for either the case of the

15          Chapter 9 being filed with the governor's approval

16          without the Emergency Manager being involved or the

17          Chapter 9 filing with the Emergency Manager, that in

18          either case PA 436 did not require the governor to

19          impose any contingencies on the bankruptcy filing?

20              MR. SHUMAKER:  Objection calls for legal

21          conclusion.

22    A.    I don't recall if I had done a deep dive in that

23          question at this time.  Please understand, counselor,

24          at this time I was doing a preliminary review of the

25          statute based upon I believe some published reports

                                                          42
                        uncertified rough draft


1           and a look at it online.  I may have gotten to that

2           point, I just don't recall if at this time during that

3           day I had.

4     Q.    Okay.

5    A.   But I did at some point.

6    Q.   But you certainly knew that ultimately?

7    A.   At some point I did, sure.

8    Q.   Obviously.  And then you go on in the next sentence in

9         this email to say "So although the new law provides

10        the thin veneer of a revision, it is essentially a

11        redo of the prior rejected law and appears to merely

12        adopt the conditions necessary for Chapter 9 filing."

13   A.   Yes, I said that.

14   Q.   And were you writing truthfully when you said that?

15   A.   Yeah, and I think the balance of the paragraph, the

16        news report state that opponents of the prior law are

17        already lining up to challenge this law.  So as I just

18        testified, this was my preliminary analysis based upon

19        a number of sources, some of them were the news

20        reports.

Page 73

21   Q.   And you were aware in fact that as you just indicated

22        that there were either challenges already made or that

23        were going to be made to the law?

24   A.   I was not aware that there were challenges already

25        made.  I was aware the news report states that

                                                              43
                    uncertified rough draft

1         opponents of the prior law were already lining up to

2         challenge the law.

3    Q.   And did you have any understanding at this time as to

4         what those grounds of challenge were or may be?

5    A.   No.  As I said, this was, you know, within the span of

6         a day when this was going back and forth about what it

7         may require, I was beginning to familiarize myself to

8         some degree with the statute.

Page 74

9    Q.   Your email goes on to say you're going to speak with

10        Baird in a few minutes and see what his thinking is.

11   A.   Yes.

12   Q.   Did you speak with Mr. Baird that day?

13   A.   I don't recall, but I probably did.

14   Q.   And do you recall any discussions with Mr. Baird that

15        day on the subject of the possibility of a Chapter 9

16        filing by the city?

17   A.   No.  I don't recall any discussions with Rich Baird

18        about the possibility of a Chapter 9 filing at this

19        point, no.

20   Q.   Okay.  But clearly at this point in time one of the

21        things you were focused on was the possibility of a

22        Chapter 9 filing and the legal issues that might

23        pertain to that as reflected in this email; correct?

24   A.   As I have said before, the issue of a Chapter 9 filing

Page 75

25        had been discussed many, many times with regard to

                                                              44
                    uncertified rough draft

1         Detroit for the better part of the prior decade, so in

2         doing my sort of due diligence of what the statute

3         required, part of what I was doing was reading some of

4         those very articles that I mentioned earlier today

5         where some of the prior city employees were

6         recommending that there was a filing in 2005 in

7         connection with the cops, 2006 with the cops, 2009

8         with the SWAPs, so yes, Chapter 9 had been discussed

9         many, many times in the papers I was reading.

10   Q.   And from all the discussions that you had to date with

11        various people including those at Joan day, were you

12        aware that one of the issues with PA 436, one

Page 76

13    potential ground for challenge, was that it allowed

14    the governor to authorize a bankruptcy filing without

15    imposing a condition that would prevent pension

16    obligations from being impaired?

17  A.  I don't know if I was aware of that issue at this

18    time, no.

19  Q.  well, were you aware -- you became aware of it if not

20    then at some point shortly thereafter; correct?

21  A.  Yeah, let me say this.  There was no broad based

22    concern at this point about with what the authority

23    was with regards to pensions so any sort of

24    insinuation that that was the focus at this point is

25    just inaccurate.  That wasn't true.  This as I said

                                                        45
                    uncertified rough draft

                         Page 77

---

1    before was a very cursory and initial sort of review

2    of what I was being asked to do so when I had a

3    discussion with Mr. Baird later I would have some

4    information and that's what I gleaned based upon a few

5    hours since apparently I got the call -- I was

6    informed that day, that morning or the day before to

7    the time I was going to have a call that afternoon.

8  Q.  But I take it at some point in time you became aware

9    that Article 9, Section 24 of the Michigan

10    constitution protects pension benefits from being

11    diminished or impaired?

12  A.  I believe at some point in time I became aware that

13    Article 9, Section 24 purports to protect pensions and

14    benefits in certain circumstances, yes.

15          MR. ULLMAN:  Let's mark Exhibit 5.

16          (Marked Exhibit No. 5.)
                         Page 78

---

17  Q.  Exhibit 5 is just a printout of Article 9, Section 24

18    of the Michigan constitution.  Do you recognize it as

19    such?

20  A.  I mean, the document speaks for itself but that

21    appears to be what it is, yes.

22  Q.  Okay, and I think your last answer you said that in

23    your view Section 24, Article 9 purports to protect

24    pensions and benefits in certain circumstances.

25  A.  Yes.

                                                        46
                    uncertified rough draft


1  Q.  And are you contending that the words of Article 9,

2    Section 24 means something other than what they say?

3          MR. SHUMAKER:  Objection, calls for legal

4    conclusion.
                         Page 79

---

5  A.  Yeah, I -- here again, I think the document speaks for

6    itself.  I think that my response to that issue is

7    throughout the arc of my career, whether in federal

8    government or in private practice at the Chrysler

9    case, there have been many state laws, some of them

10    quite sacrosanct, that have been abrogated by federal

11    law, not just bankruptcy law.  At the RTC we preempted

12    state, New York state, rent control litigation, law;

13    we preempted California state escheat law; we

14    preempted -- and that was the model for 50s.  In

15    Chrysler, we preempted 50 states have dealer franchise

16    laws that were preempted.  So when I said I recognize

17    this, there are federal laws that preempt state laws.

18          MR. ULLMAN:  I'm going to move to strike as

19    nonresponsive.

20  Q.  Mr. Orr, I appreciate your perhaps trying to be
                         Page 80

orrroughdraft (3).txt

21    helpful, but my question was really very limited and I

22    would appreciate it if you could just answer it.

23          MR. ULLMAN:  Could I have my question read

24    back, please?

25          (Record read back as requested.)

47

uncertified rough draft

1  A.  I think that calls for a legal conclusion and I

2    contend that they speak for themselves.

3  Q.  Now, you made mention in your -- I think when you were

4    giving your prior response you made some elusion to

5    federal law.

6  A.  Uh-huh.

7  Q.  Is there any question in your mind that apart from

8    anything that may come into play under federal law,

Page 81

---

orrroughdraft (3).txt

9    that the constitution of Michigan, Article 9, Section

10    24, prohibits pension rights from being diminished or

11    impaired?

12          MR. SHUMAKER:  Objection, calls for legal

13    conclusion.

14  A.  The document as I said speaks for itself.  Certainly I

15    think I've said before that parties can negotiate a

16    resolution of contracts.

17  Q.  That's -- that's not my question.  Could you -- can

18    you read my question back?  If there's anything about

19    it you don't understand I would be glad to rephrase.

20  A.  Uh-huh.

21          (Record read back as requested.)

22          MR. SHUMAKER:  Objection to form, calls for

23    legal conclusion.  You can answer.

24  A.  Yeah I think it does call for legal conclusion but as

Page 82

---

orrroughdraft (3).txt

25    I said contractual obligations can be negotiated at

48

uncertified rough draft

1    any time.

2  Q.  Let me rephrase it.

3          You understand what the constitution is

4    talking about is diminishing or impairing is

5    nonconsensual; correct?

6          MR. SHUMAKER:  Objection, calls for legal

7    conclusion.

8  Q.  Let me rephrase it so there can't be any ambiguity.

9    Clearly parties can if they so choose change their

10    contract rights?

11  A.  Yes.

12  Q.  Is there any question in your mind that Article 9,

Page 83

---

orrroughdraft (3).txt

13    Section 24 of the Michigan constitution protects

14    pension rights from being diminished or impaired if

15    the beneficiaries of those rights do not agree

16    consensually to such diminishment or impairment?

17          MR. SHUMAKER:  Objection, calls for legal

18    conclusion.

19  A.  I think I've answered that before.  I think there's

20    certain federal laws that allow for.

21  Q.  I'm asking about independent of any federal law.  The

22    Michigan constitution on its own, apart from any

23    overlay that you say may apply from federal law, is

24    there any question that the Michigan constitution,

25    assuming that the beneficiaries of the retirement

49

uncertified rough draft

Page 84

1    obligations don't consent, any question that in that

2    circumstance the Michigan constitution prohibits

3    pension rights from being diminished or impaired?

4              MR. SHUMAKER:  Objection, calls for legal

5    conclusion.

6  A.  Here again Mr. Ullman, you're asking me, I'm a fact

7    30(b)(6) witness, you're asking me for a legal

8    conclusion about what the statute says.  I'll say that

9    the statute speaks for itself and I certainly have

10   heard that people take that position.

11 Q.  Okay, and I'm asking you -- I'm not asking you to give

12   a legal view.  You took the position as an Emergency

13   Manager which is a nonlegal position; correct?

14 A.  Yes.

15 Q.  And I'm asking whether in your position as Emergency

16   Manager you came to an understanding as to what the

17   Michigan constitution provides in the course of

18   carrying out your duties as a Michigan -- or City of

19   Detroit Emergency Manager.

20 A.  Let me put it to you this way.  I certainly have heard

21   that parties maintain that you cannot diminish based

22   upon this constitutional provision.  For a whole host

23   of reasons whether that's accurate or not there are

24   legal arguments being made.  I understand you want me

25   to say that I understand what this statute says or

                                                          50

uncertified rough draft

1    what the constitution says and I say the language

2    speaks for itself.  I understand what it says in plain

3    language.

4  Q.  So you really just won't answer the question will you?

5            MR. SHUMAKER:  Objection to form.

6  A.  No, I've answered your question the best I can.

7  Q.  So is it your contention that apart from getting

8    advice from others, from counsel, as to what it means,

9    it the Michigan constitution, you yourself have no

10   independent view as to what the import of the Michigan

11   constitution is as regards pension rights?

12 A.  I think the Michigan constitution speaks for itself

13   and as I've said many times I have a view in other

14   matters I've been involved with where state laws have

15   been preempted and I have a view that people can

16   negotiate contractual obligations.  If your an asking

17   for a legal conclusion as to what the constitution, I

18   don't think that's appropriate for me to make.  I do

19   understand what the statute says, though.

20 Q.  Fair enough.

21            Let's go onto the next email, which is --

22   will be marked as Exhibit 6.

23            (Marked Exhibit No. 6.)

24 Q.  This is an email, you were involved in it.

25 A.  Uh-huh.

                                                          51

uncertified rough draft

1  Q.  It ends -- the first page ends in Bates number 216.

2    These are emails between Richard Baird and you; do you

3    see that?

4  A.  Yes.

5  Q.  Now, is it correct that as of this time it had been at

6    least informally decided that you would take the EM

7    position?

8  A.  I don't know if that's correct as of February 20th.

9      what I do know -- let me -- well, let me read the

10      email.

11           I don't know if I had actually informally

12      agreed to take the job at that time. What I do know

13      is that there were discussions about me taking the job

14      and that I believe the mayor had said that he wanted

15      to meet me and have a discussion about what the

16      relationship between the Emergency Manager and the

17      mayor would be.

18  Q.  Let me look -- and direct your attention to the bottom

19      email, second sentence. This is from Baird to you.

20  A.  Yeah.

21  Q.  It's talking about a conversation Baird had with the

22      mayor. He says he Baird writes told him the mayor

23      that there were certain things I would not think we

24      could agree to without your review. He's writing to

---

25      you?

52

uncertified rough draft

1  A.  Yes.

2  Q.  So this is Kevyn Orr's review?

3  A.  Yes.

4  Q.  Assessment and determination (such as keeping the

5      executive team in its entirety).

6  A.  Yes.

7  Q.  Aren't those -- the ability to have the mayor's

8      executive team kept on in its entirety, isn't that

9      something that's within the authority of the Emergency

10      Manager?

11  A.  Yes.

12  Q.  And so in saying that we can't make this determination

---

13      without Kevyn Orr's review and determination, does

14      that not indicate that by this time that you had at

15      least told them you would take the position of EM?

16  A.  No.

17  Q.  So if that's the case why as you understand it would

18      Mr. Baird be telling the mayor that there are things

19      he couldn't agree with without getting your sign-off

20      on?

21  A.  As I recall at this time, we were still discussing

22      whether or not I would take the job. I don't recall

23      how it came up, but there was some discussion about

24      what the EM's quote unquote partnership would be like

25      with the mayor. I also recall at this time I was told

53

uncertified rough draft

1      that there were other candidates that were being

---

2      reviewed, but that they wanted to, meaning Rich,

3      wanted to continue to have discussions going forward

4      and this is one of the issues that came up in those

5      discussions.

6  Q.  You agree that he Baird is writing this email that he

7      couldn't agree to changing the mayor executive team

8      without your, Kevyn Orr's review and determination;

9      correct?

10           MR. SHUMAKER: Objection, form.

11  A.  I think the document speaks for itself. That's what

12      it says, but in February, as I said, it was still

13      preliminary and in fact I think the discussion that we

14      were having at that time was that even the mayor

15      wanted to meet me, I have certainly interested in

16      meeting him, prior to me deciding to take the job.

17  Q.  And this email does not say that Baird can't make --

18      may reach an agreement without the assessment, review

19      and determination of whoever it is that ends up taking

20      the EM position; does he?

21  A.  No, the document speaks for itself but I have no way

22      of knowing if similar emails were sent to other

23      candidates.  I don't know.

24  Q.  Now, at the end of this email Mr. Baird writes we'll

25      broker a meeting via note between you and the mayor

                                                        54

                        uncertified rough draft


1       personal assistant that is not FOIAable.  Do you have

2       an understanding of what that means to be nonFOIAable?

3   A.  I think that means that whatever discussions they have

4       aren't subject to the Freedom of Information Act

5       either state or federal.

---

6   Q.  And you have an understanding as to why Mr. Baird

7       wanted meetings between you and the mayor personal

8       assistant to be not subject to FOIA?

9   A.  I don't -- I don't read this email as saying a meeting

10      meeting between me and the personal assistant.

11  Q.  He says we'll broker a meeting via note between you

12      and the mayor's personal assistant who is not

13      FOIAable?

14  A.  Yeah, as I read this email -- I never met with the

15      mayor's personal assistant so let's get that out of

16      the way.  As I read this email, we were talking about

17      a meeting between me and the mayor.

18  Q.  Right, and isn't he -- fair enough.  And isn't Baird

19      saying that he wants to set up a meeting via going

20      through the mayor's personal assistant who is not

---

21      FOIAable?

22  A.  I think that's a fair reading.

23  Q.  And do you know why he wanted to go through the route

24      of setting up this meeting through someone who is not

25      FOIAable?

                                                        55

                        uncertified rough draft


1   A.  No.

2   Q.  Did you subsequently have a meeting with the mayor?

3   A.  Yes.

4   Q.  And what was said at that meeting?

5   A.  I think the first meeting was -- my impression of the

6       first meeting was just a meet and greet.  I think the

7       mayor wanted to get an assessment of who I was as

8       potentially coming into the city as a potential

9       Emergency Manager and to sort of get to know me, start

---

10      to get to mow me.

11  Q.  How many meetings were there with the mayor before you

12      became the EM?

13  A.  At least two.

14  Q.  Do you recall when they took place?

15  A.  I do not.

16  Q.  Okay.

17  A.  Somewhere around this time frame.

18  Q.  And was the subject of Chapter 11 filing discussed at

19      either of those meetings?

20  A.  No.

21  Q.  Was the subject of a potential Chapter 11 filing

22      discussed at either of those meetings?  I'm sorry.

23      Let me rephrase my question.

24  A.  I can answer your question.  No, neither Chapter 9 nor

25   Chapter 11.

56

uncertified rough draft

1   Q.   So you didn't discuss even the potentiality of a

2        Chapter 9 filing at either of those meetings with the

3        mayor; is that your testimony?

4   A.   Yes.  I don't recall -- let me.  We may have -- I was

5        a bankruptcy attorney, we may have discussed it, but I

6        don't recall discussing specific issues regarding

7        Chapter 9 or to the extent people are suggesting that

8        that was predetermined.  I don't recall those kinds of

9        discussions.

10  Q.   Do you recall any discussion with the mayor as to the

11       issues that the city faced as a result of the pension

12       obligations?

13  A.   No.  Frankly our first meeting was more me telling him

---

14       how happy I was to meet him, I was a basketball fan,

15       particular fan of his for many years, getting his

16       understanding of the city.

17  Q.   I'm sorry, Mr. Orr, I don't mean to interrupt you, but

18       that really wasn't responsive.  My question was really

19       a yes or no question.  I didn't ask tell me everything

20       you said.  I asked a specific question.  Why don't you

21       read it back?

22  A.   What was your question again?

23            (Record read back as requested.)

24  A.   No, I don't recall that discussion.

25  Q.   And the same question for both meetings so I'm not

57

uncertified rough draft

1        sure if that question was limited to the first

---

2        meeting?

3   A.   I don't recall having those discussions in either

4        meeting.

5   Q.   Do you recall any discussion in either meeting with

6        the mayor about the issues the city was facing with

7        its obligations for healthcare benefits for retirees?

8   A.   No, I don't recall either meeting having those

9        discussions.

10  Q.   Show you the next document which we'll mark as Exhibit

11       7.

12            (Marked Exhibit No. 7.)

13  Q.   And I would like you to in particular if you would to

14       focus on the email at the top of -- let me identify

15       this first.  This is an email chain beginning at Bates

16       page 459 and what I would like to you do Mr. Orr is

17       focus on Bates page 461, the email at the top of that

---

18       page.

19  A.   461?

20  Q.   Please.

21  A.   Yes.

22  Q.   You see at the top there's an email from you to

23       Mr. Baird?

24  A.   Yes.

25  Q.   8 o'clock, 8:17 at night?

58

uncertified rough draft

1   A.   Yes.

2   Q.   And you talk among other things about what would be

3        expected on day one.  Do you see that at the bottom?

4   A.   Yes.

5   Q.   So is it fair to say that by this time you had already

6    known that you were going to take the EM job?

7  A.  No.

8  Q.  So why were you then asking about what you can expect

9    on day one?

10  A.  Because at this point I was still considering whether

11    or not I would take the job but I was doing my due

12    diligence.  As you can see from the email, there was

13    this proposed partnership agreement that the mayor

14    submitted.  I say that my intend an is not to

15    undermine the mayor role or the good faith with which

16    I suspect all parties will move forward but I wanted

17    to include qualifications not just from my role as EM

18    but also for the future so there was still no

19    determination that I would take the job but I was

20    moving forward on trying to get an idea of what was

21    expected of me if I were to take the job and also for

22    instance when I look at the documents, representative

23    samples of the CBAs and the swap and related

24    agreements.

25  Q.  You write in the last paragraph that you've been

59

uncertified rough draft

1    pouring over the law and the board's findings to

2    assure that you have some idea about what's

3    permissible and expected on day one; correct?

4  A.  Yes.

5  Q.  And by permissible and pouring over the law you meant

6    you wanted to understand and be aware of what was

7    permissible under the law; is that right?

8  A.  Yes, as I said earlier today my initial look was very

9    high level and cursory and then as this discussion

10    evolved, I started digging down more into the law.

11  Q.  And on the attachment that we have here, which begins

12    at Bates page 463, the attachment to this email chain;

13    do you see that?

14  A.  Yes.

15  Q.  And this is a list of various items that are under

16    discussion; is that right?

17  A.  Yes.

18  Q.  And you see item 7?

19  A.  Yes.

20  Q.  It says labor, retiree and benefit initiatives will be

21    pursued jointly by the mayor and the manage to the

22    extent permitted by law?

23  A.  Yes.

24  Q.  And that was part of the current thinking at the time,

25    was it, that that's one of the things the EM was going

60

uncertified rough draft

1    to do?

2  A.  Yes, I think it was envisioned in the statute and this

3    I believe came off of the mayor initial proposal, but

4    yes.

5  Q.  And the retirees and benefit initiatives, those

6    included initiatives to deal with pension and

7    healthcare costs; is that right?

8  A.  To be honest with you as you can see from my email on

9    page 461, I was still trying to get an idea of exactly

10    what they included by asking for the CBAs and the

11    background documentation so I don't want to give you

12    the wrong impression that item number 7 has the level

13    of specificity that you seem to be suggesting.  I was

14    still getting an idea of what they were.

15  Q.   I'm -- I wasn't suggesting anything.  I was asking

16       whether the retiree and benefit initiatives included

17       initiatives related to the pension and retirement

18       healthcare costs?

19            MR. SHUMAKER:  Objection, form.

20  A.   They might, but to be honest with you, at this time

21       there wasn't that level of specificity.  They

22       certainly -- the document speaks for itself.  Seven

23       says labor retiree and benefits initiative, but to the

24       extent your question is trying to suggest that there

25       were detailed levels, no, I was still doing my due

                                                              61
                        uncertified rough draft

1    diligence.
                        Page 105

---

2   Q.   There was some general understanding that there were

3        issues pertaining to pension and healthcare benefits;

4        is that right?

5   A.   I -- yes, I think there had been issues concerning

6        pension and healthcare benefits for years as I poured

7        over the consent decree and the various reports made

8        by the state from 2010 forward, yes.

9   Q.   You were aware that the pension costs and healthcare

10       costs were among the more pressing issues that the

11       City of Detroit was facing at the time?

12  A.   I'm not sure I was aware that they were among the more

13       pressing issues at that time.  I certainly knew that

14       they were significant.  Frankly, at that time I was

15       looking at debt.

16  Q.   And at this point in time did you do any analysis as

17       to what was permissible under law regarding retiree
                        Page 106

---

18       benefits?

19  A.   No, I think my prior email at Bates stamp 461 says I

20       needed to get more documentation to get an

21       understanding.

22  Q.   And your email here at the top of page 461 says I've

23       been pouring over the law?

24  A.   Yes.

25  Q.   To find out about what is permissible and my question

                                                              62
                        uncertified rough draft

1    was did that involve any consideration of what was

2    permissible under the law as regards pension and

3    healthcare benefits?

4   A.   It might have, but the permissible that I was

5        referring to was permissible writ large as far as what
                        Page 107

---

6        were the Emergency Manager's duties, which necessarily

7        could have included, but I don't want to give you the

8        wrong impression that that was the fundamental focus

9        or the primary focus of what I was saying here.  It

10       wasn't.  It was the Emergency Manager's duties writ

11       large.

12  Q.   And when you say you were pouring over the law, you

13       yourself were doing legal analysis, reading various

14       laws; is that right?

15  A.   Yes, I was trying to get background information, yes.

16  Q.   And as part of that background information did you

17       read Article 9, Section 24 of the Michigan

18       constitution?

19  A.   I may have.

20  Q.   Is there any question in your mind that you didn't?

21  A.   I -- if you have a document to refresh my recollection
                        Page 108

22    I'm happy to look at it.  Sitting here on this day on

23    February 20th, I don't recall whether or not I read

24    that article of the constitution.

25    Q.    There's no question that at some point after February

1    20th you read Article 9, Section 24 of the Michigan

2    constitution correct?

3    A.    My testimony is it may have been before or after the

4    20th.  I don't recall whether I did that sitting here

5    today.

6    Q.    Okay, but it was either one or the other but you

7    certainly have read it?

8    A.    Yes, I've read it.  I read it today.

9    Q.    And you read it before you became Emergency Manager;

---

10    didn't you?

11    A.    Yes.

12    Q.    One other question on this document actually.  As you

13    look at page 460, at the bottom there's a February 21

14    email.

15    A.    Yes.

16    Q.    And it refers to .8 of the attachment.  This again has

17    to do with the mayor existing executive team; right?

18    A.    Yes.

19    Q.    And in this time this is from Mr. Baird again; right?

20    A.    Yes.

21    Q.    And he's really explicit.  He says other than a few

22    grammatical knits, and some more language around point

23    8 so we can manage expectations if Kevyn needs to make

24    some personnel changes.  So he's clearly referring

25    here to you making personnel changes that could affect

---

1    the mayor existing executive team; isn't he?

2    A.    Yes, this wasn't written to me, but I'll read it.  I

3    mean to myself.  Yes, document speaks for itself but

4    that seems to say that.

5    Q.    Isn't it clear at this point that it was envisioned

6    and understood that Kevyn Orr, you Mr. Orr were in

7    fact going to be the Emergency Manager for the City of

8    Detroit?

9        MR. SHUMAKER:  Objection calls for

10    speculation.

11    A.    No.

12    Q.    And you agree the document speaks for itself don't

13    you?

---

14    A.    I just said that.

15        MR. ULLMAN:  Maybe this would be a good

16    time for a break.

17        THE VIDEOGRAPHER:  Going off the record at

18    11:28 a.m.

19        (A brief recess was taken.)

20        THE VIDEOGRAPHER:  We're back on the record

21    at 11:42 a.m.

22        MR. ULLMAN:

23    Q.    Mr. Orr, is it correct that prior to the official

24    announcement that you said was in March -- on March

25    13th or 14th you had had conversations with the state

1    where you said that you would take the OM job -- I'm

2      sorry the EM job?

3   A.   I think at that time in all fairness it was EFM.

4   Q.   Correct.

5   A.   Prior to the official announcement?  I think at some

6        point, I became the candidate select but I don't think

7        that I actually accepted the job -- that I was going

8        to take the job until the day I resigned, which was

9        March 15th.  I mean, I may have said yes I'm all in or

10       something like that subject to background

11       investigation and stuff like that.

12  Q.   And that would have been sometime prior to March 13th?

13  A.   I think I became the finalists sometime prior to March

14       13th, yes.

15  Q.   And that's when it became final subject to passing the

16       background, yes?

17  A.   Yes, and resigning from the firm and some other

                          Page 113

---

18       things.

19  Q.   Up to the time that it became official that you were

20       going to be the EM, did you have any conversations

21       with anyone at the state or city level about the

22       possibility of the Chapter 9 filing?

23  A.   Probably, yes.

24  Q.   And can you tell me with whom those conversations took

25       place and when?

                                                    66
                      uncertified rough draft

1   A.   No, I don't think I had them -- those types of

2        conversations with Rich Baird, those were more about

3        the job requirements and background.  If you have

4        something to refresh my recollection.

5   Q.   I'm just asking a question.

                          Page 114

---

6   A.   Yeah, I don't recall -- I may have had about filing a

7        Chapter 9 or about the possibility of a Chapter 9?

8   Q.   Either, both.

9   A.   Okay.  I don't recall.

10  Q.   Okay.  Now, at some point you -- when you became the

11       Emergency Manager or the Emergency Financial Manager

12       you became an officer of the state and subject to the

13       state laws; is that right?

14  A.   No.  I am a contractor to the state.

15  Q.   But you do -- you are subject to the state laws; are

16       you not?

17  A.   Yes, I think --

18  Q.   And in fact you're obligated to uphold the state laws;

19       are you not?

20  A.   I don't know if my contract says that I'm obligated --

21       I think my contract says I'm obligated to do my duties

                          Page 115

---

22       to the best of my abilities and I think it requires me

23       not to have any obligations due to the state, but I

24       don't know if it requires me to uphold state laws.

25  Q.   Is it your view that as Emergency Manager you are not

                                                    67
                      uncertified rough draft

1        required to comply with state laws and obey state

2        laws?

3   A.   I think it's my view as the Emergency Manager that I'm

4        required to discharge my duties as the best of my

5        ability to rectify the financial emergency of the

6        city.

7   Q.   Okay, thank you.  Can you have my question read back,

8        please?  And I would like an answer.

9             (Record read back as requested.)

                          Page 116

10  A.  The reason I said what I said is because I think the

11      statute allows me to abrogate certain state laws and

12      so when you say you comply with state laws, 436

13      clearly allows me not to comply with certain laws, so

14      --

15  Q.  And -- okay so it's your view that under PA 436 you

16      have the ability not to comply with certain state

17      laws?

18  A.  Yes.

19  Q.  And what section of 436 gives you that ability?

20  A.  There's section 12 gives me the authority to abrogate

21      contracts, to readdress financial agreements, there

22      are a number of powers in the statute, take over

23      underfunded pensions if that's what you're looking

24      for, there are a number of provisions in the statute

25      that mean I don't have to comply with state law.

1   Q.  Okay.  And PA 436 is itself part of state law; right?

2   A.  Yes.

3   Q.  So if you did something that's specifically authorized

4       under PA 436 would it be in violation of state law?

5   A.  No.

6           MR. ULLMAN:  Objection, calls for legal

7       conclusion.

8   Q.  So I'm asking you is there anything in PA 436 that

9       specifically says that you're entitled to not comply

10      with state law?

11  A.  I -- we're being somewhat circular here.

12  Q.  It's like cat and mouse.  Is there a general provision

13      in PA 436 that says the Emergency Manager need not

14      comply with the laws of Michigan State?

15  A.  My testimony is --

16  Q.  Can you just answer my question?  You could say yes,

17      no or I don't know?

18  A.  I'm trying to answer your question if you let me.

19  Q.  I would like a direct answer to my question, not a

20      speech?

21  A.  I'm trying to give you a direct answer.

22  Q.  Okay, let's hear it.

23  A.  I was going to give it to you.  The statute allows the

24      Emergency Manager to take certain actions which by

25      definition would impact certain state laws.  Your

                                                          69
uncertified rough draft

1       question was whether there's a general prohibition

2       that exempts.  That may be a legal conclusion because

3       there are many powers under 436 and someone may

4       conclude, the Court for instance, that generally the

5       intent is to allow the Emergency Manager to do certain

6       things in financial emergency.  I'm trying to respond

7       to your question as the Emergency Manager.  There are

8       certain laws that clearly under 436 I have the

9       authority to abrogate.

10  Q.  Is the constitution of the state of Michigan one of

11      those?

12  A.  I think that's a legal conclusion.

13  Q.  NO I'm asking your understanding as the Emergency

14      Manager.

15  A.  My understanding is that's a legal conclusion.

16  Q.  You -- apart from saying it's a legal conclusion, do

17      you have a view on that one way or the other?  I'm not

18    asking for your legal opinion, I'm asking for your

19    view in your capacity as Emergency Manager whether PA

20    46 allows you to disregard the strictures of the

21    Michigan constitution?

22    A.   I think that's a legal conclusion.  I'll explain it if

23    you want me to.

24    Q.   I'm just asking whether you have a view.

25    A.   Yes, I think it's a legal conclusion.

                                                    70

                        uncertified rough draft

1    Q.   And what is the legal conclusion that you believe

2    exists?

3    A.   Without going into discussions with attorneys and

4    others, the legislature of the state of Michigan is

5    presumed to have an active 436 with a full

6    understanding of other state laws including the

---

7    constitution prohibition you're focusing on.

8    Q.   I didn't focus on the constitution prohibition?

9    A.   Well you focused on it today.

10    Q.   In my question I asked a general question.  I did not

11    focus on a specific provision.

12    A.   Okay, then we'll do it generally.  My understanding is

13    that the Michigan legislature is presumed to have

14    understood the requirement of other state laws and in

15    choosing to enact 436 gave the Emergency Manager

16    certain powers which may conflict with those state

17    laws.

18    Q.   I'm asking about the constitution now.

19    A.   Including the constitution.  I said it was.

20    Q.   Does the legislature of the state of Michigan have the

21    power through an enacted law to allow people acting

---

22    for the State or for the local governments of the

23    state to disregard the Michigan constitution?

24          MR. ULLMAN:  Object to form, calls for

25    legal conclusion.

                                                    71

                        uncertified rough draft

1    A.   Here -- that's why I started this discussion by saying

2    to you that calls for a legal could be collusion.  In

3    fact, some of those issues are being briefed now.

4    Q.   And it's your position that the Michigan legislature

5    does have that authority?

6    A.   It's my position that that calls for a legal

7    conclusion.

8    Q.   Okay so you won't answer my question?

9    A.   No I think it calls for a legal conclusion.

10    Q.   That's an objection your counsel can make.  I'm asking

---

11    you what your view is.  I'm entitled to your view

12    whether it's a legal conclusion goes to the weight of

13    it.

14    A.   I just gave you my view.

15    Q.   Your only view is that it's a legal conclusion?

16    A.   No, my view is that the Michigan legislature is

17    presumed to have understood what it was doing when it

18    enacted it.

19    Q.   That's not my --

20    A.   You're not allowing me to answer.

21          MR. ULLMAN:  Why don't you read the

22    question again?

23          MR. SHUMAKER:  Why don't you read the

24    question back?

25          (Record read back as requested.)

1  Q.  That is the authority to allow people acting for the

2      State or the local governmental units to disregard the

3      constitution of the state of Michigan?

4          MR. ULLMAN:  Objection, calls for a legal

5      conclusion.

6  A.  I would suggest that since these issues are being

7      briefed, my opinion is that I am acting within my

8      authority as Emergency Manager that allows me to

9      abrogate certain provisions which may or may not

10     include the constitution.

11 Q.  And I'm simply asking for your understanding as to the

12     question I asked which is whether it is your

13     understanding your understanding and belief that the

14     legislature of Michigan has the power to allow those

---

15     acting for the State or the local governments to

16     disregard the Michigan constitution.  Your

17     understanding, Mr. Orr.

18 A.  I think the legislature might but here again that's a

19     legal conclusion.

20 Q.  Now, we have been talking more specifically about

21     Section 24 of Article 9 of the Michigan constitution;

22     is that right?

23 A.  Yes.

24 Q.  Is there anything in PA 436 that makes specific

25     reference to the Emergency Manager being able to

1      disregard the strictures of Article 9, Section 24?

2  A.  I'm going to say again, within the powers afforded the

---

3      Emergency Manager one of those powers is to abrogate

4      contracts.  The Article 9, Section 24 you're speaking

5      to says it's contractual obligation.  That's what it

6      said.  The reason I'm saying it calls for legal

7      conclusion is because 436 says the Emergency Manager

8      can break contracts and you're talking in Article 9,

9      Section 24 about a contractual obligation.  Judges

10     will ultimately have to decide this issue I suppose

11     but the way the statute is written it could be

12     interpreted that way.

13 Q.  Are you aware that there are provisions in PA 436 that

14     specifically require the Emergency Manager not to

15     violate Article 9, Section 24, do anything that would

16     diminish pension rights that are protected by that

17     article?

18 A.  If you could point me to a specific provision.

---

19 Q.  Okay.  So you're not aware is your answer?

20 A.  No, I'm -- that's why I keep telling you.  This area

21     that you're in calls for a legal conclusions that are

22     currently being briefed and quite frankly I'm

23     reluctant to give you a legal conclusion as far as my

24     understanding.  My understanding is 436 gives the

25     Emergency Manager certain powers.  My understanding is

1      that the statute that you're talking about Article 9,

2      Section 24 speaks for itself.  But amongst those

3      powers in 436 is the ability to breach contracts.

4  Q.  Let me ask you this and then we'll move on.  Are you

5      aware of any words in PA 436 that specifically

6      authorize are the Emergency Manager to disregard the

7    strictures of Article 9, Section 24?  I'm asking about

8    words in hike verbia, I'm not asking interpolations or

9    extrapolations.  I'm asking whether to your knowledge

10   if there is anything in PA 436 that explicitly says

11   that.

12   A.   I'm going to stay away from explicitly but I'll try to

13   answer your question.  If your question is is there

14   anything in 436 that says the Emergency Manager is

15   exempt from Article 9, Section 24, I've not read that

16   in the statute.  But when you say explicitly as I've

17   said several times now, those interpretations require

18   legal conclusions that are in fact being discussed and

19   briefed as we want so I'm being very careful not to

20   give an interpretation as the Emergency Manager that's

21   contrary to what the statute provides.  Ultimately I

22   suspect a jurist will have to resolve that issue.

Page 129

---

23   Q.   You took an oath of office when you became the

24   Emergency Manager; did you not?

25   A.   Yes, yes I did.

75

uncertified rough draft

1    Q.   And I think these are the words you swore.  You said I

2    do solemnly swear that I will support the constitution

3    of the United States and the constitution of this

4    state and that I will faithfully discharge the duties

5    of the office of Emergency Financial Manager City of

6    Detroit according to the best of my ability.  Do you

7    remember giving that oath?

8    A.   Yes.

9    Q.   And were you speaking truthfully when you gave that

10   oath?

Page 130

---

11   A.   Yes.

12   Q.   And did the oath you give apply equally to how you've

13   conducted yourself as Emergency Manager when PA 436

14   became effective?

15   A.   I believe so.

16   Q.   Now, after you became the Emergency Manager, you

17   certainly specifically considered the question of a

18   Chapter 9 filing; right?

19   A.   Yes.

20   Q.   Okay.  And did you consider specifically the issue of

21   whether the city had in the course of a Chapter 9

22   filing the right to seek relief that would adversely

23   affect pensions that were vested?

24   A.   Yes.

25   Q.   And isn't it correct that the retirement obligations

76

Page 131

---

1    were among the largest obligations that are facing the

2    City of Detroit?

3         MR. ULLMAN:  Objection, form.

4    A.   Retired -- retired obligations meaning both OPEB and

5    what we call unfunded pension obligations.

6    Q.   Both I'm asking collectively.

7    A.   Yes they wish's the largest cohort of unsecured

8    claims.

9    Q.   And at the time that you became the EM, how large did

10   you understand the un -- I'm sorry?

11   A.   No, I'm just saying at the time it came to me how

12   large I understand the unfunded amount to be?

13   Q.   The unfunded retirement obligations to both the

14   pension and what you call OPEB.

Page 132

15  A.   It was unclear because at the time I became Emergency

16       Financial Manager, there were reports issued by the

17       state that put the total debt of the city at 12

18       billion I believe it is, then there were subsequent

19       reports that followed on that and put it at 14

20       billion.  So at various times the figure grew.

21  Q.   And the two aspect components I've asked about, the

22       pension and the OPEB, those were very large are they

23       not?

24  A.   I think they were large.  They were in the billions of

25       dollars.

77

1  Q.   They were in the billions of dollars?

2  A.   Yes.

---

3   Q.   And this were obviously a number of issues but those

4        were among the financial issues that were impediments

5        to Detroit's fiscal health; is that right?

6   A.   I believe so.

7   Q.   And did the governor share that view with you?

8   A.   No.

9   Q.   He thought that the pension and OPEB obligations were

10       not impediments to Detroit's fiscal health?

11  A.   No, the governor -- the only discussion I had with the

12       governor was at a very high level about the dire

13       straits of the city and the need for some -- it was

14       actually the dire straits of the city and the need for

15       some reform.  There was no specific discussion about

16       pension or OPEB.

17  Q.   Now, at some point after you became the Emergency

18       Manager, did you have discussions with the governor

---

19       about a Chapter 9 filing to among other things get out

20       of the pension obligations that the city owed?

21            MR. ULLMAN:

22            MR. SHUMAKER:  Object to form.

23  A.   Yes, I believe so.

24  Q.   And when did those take place?

25  A.   Since becoming Emergency Manager on the 25th I've had

78

1        regular conversations with the governor.  Typically

2        weekly.  I don't recall the specific conversation when

3        they came up.  I will say that it wasn't within our

4        initial conversations.

5   Q.   Okay.  And we're talking -- these conversations, are

6        we talking about from the time you became the

---

7        Emergency Financial Manager or the EM?  In other

8        words, would it be -- are we talking about the early

9        or the late March time frame?

10  A.   Yeah, I don't think after the roll out and me becoming

11       effective on the 25th, I think the new statute came

12       into play within days of that.  I don't think the

13       governor and I had any discussions from the -- I'm not

14       trying to gap a between EFM and EM.

15  Q.   So this would have been within a few weeks?

16  A.   Yes.

17  Q.   After you became the EM would it be fair to say by

18       then you certainly had the discussions with the

19       governor?

20  A.   Yeah but here again they weren't specific discussions

21       about pension and OPEB they were more discussions

22       about getting to what the numbers were and the initial

23    processes of getting into the city.

24  Q.  Okay.  And in the course there were discussions that

25    you indicated about the possibility of filing a

                                                                79

1    Chapter 9?

2  A.  Yes, those discussions came on later.

3  Q.  And one of the things the Chapter 9 filing would

4    potentially allow you to do is get out of the pension

5    obligations; is that right?

6  A.  Yes.

7         MR. SHUMAKER:  Object to form.

8  Q.  Now, I take it after you became Emergency Manager you

9    explored what the issues and the options with among

10    other things the pension liabilities that the city

---

11    faced?

12  A.  Not -- no, the initial thing we started to do was to

13    try to drill down on the extent of the city's

14    financial obligations.

15  Q.  That really wasn't my question, I didn't ask what the

16    first thing you did was so why don't you just read

17    back my question.

18         (Record read back as requested.)

19  A.  At some point.

20  Q.  And do you recall when -- scratch that.

21         And did you look at various options that

22    were available to you as EM to reduce the pension

23    liabilities that existed for the city?

24  A.  Among other things.

25  Q.  And did you look at what avenues existed under state

                                                                80

---

1    law without recourse to any federal law?  In other

2    words, independent of what any federal law might

3    apply, what remedies or relief if any was available

4    under state law only?

5  A.  I'm taking my time because I'm trying to remember.

6    There were a number of different analyses and briefing

7    papers and -- that would come across the desk and I'm

8    not sure any of them focused solely on state law.

9  Q.  Okay.  And what else -- what other law did they focus

10    on if not solely state law?

11  A.  They may have focused on state law and federal law.

12  Q.  So you don't recall if there was any analysis that

13    just looked at state law?

14  A.  No, sitting here today, I don't recall.  There may

---

15    have been but I don't recall.

16  Q.  And were you aware prior to the bankruptcy filing that

17    under state law alone the pension obligations could

18    not be diminished or impaired?

19  A.  This is the discussion we had about five to ten

20    minutes ago about whether or not state law permitted

21    it and I will go back to my answer with that.  It

22    seems to suggest a legal conclusion based upon what

23    the statute 436 provides and the intent of the

24    legislature.

25  Q.  Let me ask you a different question.

                                                                81

1         Is there anything in PA 436 that allows in

2    your view the Emergency Manager to impact or adversely

3    affect pension rights in the absence of a Chapter 9

4    bankruptcy filing?

5            MR. SHUMAKER:  Objection, calls for legal

6    conclusion.

7  A.  It's the same discussion we had five to ten minutes

8    ago that I want to be very careful with and I don't

9    want to draw legal conclusion that says there's

10   nothing there.  It's a discussion we had about 436,

11   the intent of the legislature and Article 9.

12  Q.  I'm asking independent of Article 9, Mr. Orr.  Please

13   focus on the question.

14  A.  I don't -- I don't understand your question because

15   parties can negotiate anything.

16  Q.  I'm asking -- okay putting aside negotiation --

17  A.  Uh-huh.

18  Q.  -- I'm asking apart from the possibility of a Chapter

---

19   9 filing, and by the way when we talk about impair or

20   diminish, understand that if the state is impairing or

21   diminishing, it's nonconsensual?  Right that's the

22   whole point?

23  A.  NO, that's -- that's a conclusion that you're making.

24   Parties can agree to I am -- an impaired class can

25   agree to diminish their interests.  If you're reading

                                           82

                      uncertified rough draft

1    it that way that says it's nonconsensual, that's a

2    conclusion you're drawing but the language itself.

3  Q.  We don't need to get into this.

4  A.  Okay.

5  Q.  Let's put aside consensual reduction in benefits.

6  A.  Okay.

---

7  Q.  Is there anything in PA 436 as you understand it that

8    allows the Emergency Manager without going through a

9    Chapter 9 filing so I'm taking Chapter 9 off the

10   table, okay?  Anything in PA 436 without consideration

11   of Chapter 9 that allows the Emergency Manager to

12   reduce or adversely affect pension rights?

13          MR. SHUMAKER:  Objection calls for legal

14   conclusion.

15  A.  It's the discussion we had a few minutes ago that it

16   might and subject to briefing and a conclusion, the

17   Court could conclude that 436 after it was enacted --

18   duly enacted by the legislature intended to have that

19   very result.

20  Q.  Can you point to any provision in PA 436 and I can

21   show you the statute if you would like to take a look

22   that specifically says that the Emergency Manager can

---

23   abrogate or impair pension rights, again without

24   reference to either consensual diminishment or the

25   filing of a Chapter 9 bankruptcy?

                                           83

                      uncertified rough draft

1            MR. SHUMAKER:  When you say explicitly do

2    you mean expressly?

3            MR. ULLMAN:  Yes, those words.

4  A.  We discussed that ten minutes ago.

5  Q.  And I never got a straight answer so are you aware of

6    any --

7  A.  I'll give you the same answers that I gave then.

8            MR. SHUMAKER:  Object to form.  Calls for

9    legal conclusion.

10  Q.  Why don't we get out the statute.  We can take a quick

11  look.

12        MR. SHUMAKER:  Sure.

13  Q.  I've highlighted some parts but that won't affect

14  anything.  You can take a quick look and tell me if

15  there's anything that you can point to that allows the

16  Emergency Manager again this is without the regard to

17  the possibility of a Chapter 9 filing and putting

18  aside consensual diminishment of pension rights that

19  allows the Emergency Manager to abrogate or diminish

20  vested pension rights?

21        MR. SHUMAKER:  Objection, calls for legal

22  conclusion.

23  A.  We had this discussion a few minutes ago and I'll try

24  to be responsive.  I said that within certain

25  provisions of statute you had --

                                                    84
                    uncertified rough draft
                           Page 145

1   Q.  Just for the record I see that Mr. Orr has his own

2       copy --

3   A.  I do.

4   Q.  -- of PA 436 with his own annotations.

5   A.  I do.

6   Q.  Could we have that introduced as an exhibit?

7   A.  No.

8   Q.  Well, you're looking at it.

9   A.  Well, no, it's confidential.  I'll tell you what --

10        MR. ULLMAN:  It's not confidential now that

11  he's looked at it as a deposition exhibit.

12        THE WITNESS:  No.

13        MR. ULLMAN:  Mr. Shumaker, I would request

14  that you please have that marked as a deposition

                           Page 146

15  exhibit.

16        THE WITNESS:  That has interlineations and

17  comments.  It wasn't intended to --

18        MR. ULLMAN:  I would like that marked as an

19  exhibit.

20        THE WITNESS:  I would say we go to the

21  judge with that.  This is my private copy and I was

22  trying to assist you and --

23        MR. SHUMAKER:  And it will reflect

24  communications with attorney-client communications.

25  So if you want to ask questions based upon that

                                                    85
                    uncertified rough draft

1   exhibit, please do.

2         MR. ULLMAN:  Okay, we're reserving our

3   rights to have that document produced to us and so we
                           Page 147

4   don't hold up the deposition, I'll show you another

5   copy.

6         THE WITNESS:  Okay.  I was just trying to

7   help you.  Okay.  And your question is?

8   Q.  Is there anything in PA 436 and putting aside

9   consensual diminishment of pension rights or the

10  possibility of a Chapter 9 filing that allows the

11  Emergency Manager to abrogate or diminish pension

12  rights that are protected by Article 9, Section 24 of

13  the Michigan constitution?

14        MR. SHUMAKER:  Objection, calls for legal

15  conclusion.

16  A.  I would point out to you and I see you have

17  highlighted in section 12, 1, M, 2, that it says the

18  -- the language speaks for itself.  The Emergency

                           Page 148

19    Manager shall fully comply with public employee

20    retirement system investment act; okay?  And Section

21    24, Article 9 of the state constitution of 1968; okay?

22    But the provision that you were talking to, talking

23    about earlier today, okay, has that constitutional

24    provision.  But as I said, and I'll say again, there

25    may be legal reasons, for instance in section 5 where

                                                  86
                uncertified rough draft

1     the legislature specifically talked about pensions;

2     okay?  There may be legal arguments that apply here.

3     So rather than draw a legal conclusion I'll say to you

4     again; okay?  There may be an explanation for what is

5     provided in the statute subject to a determination by

6     a court.  The language of the statute speaks for

7     itself.

Page 149

---

8  Q.   And since it does speak for itself and you have read

9       it, and putting aside -- I understand your position

10      that there may be arguments that can be made, did you

11      see anything in that statute that putting aside

12      Chapter 9 and putting aside the possibility of

13      consensual diminishment states that the Emergency

14      Manager has the authority to diminish or impair

15      pension rights that are protected under Article 9,

16      Section 24?

17             MR. SHUMAKER:  Objection, this witness

18      certainly has not had time to review the entire

19      statute as he sits here.  You're talking about ever?

20 Q.   How many -- how many times have you reviewed the

21      statute, Mr. Orr?

22 A.   I don't know.  Certainly several dozen.

                Page 150

---

23 Q.   Okay.  And you have your heavily annotated copy there?

24 A.   I have a copy of the statute.

25 Q.   So I assume if there were words in the statute that

                                                  87
                uncertified rough draft

1      specifically said yeah the Emergency Manager can

2      violate Article 9, Section 24, you would know where

3      they are wouldn't you?

4             MR. SHUMAKER:  Objection to form.

5  A.   I don't know if they say violate.  But here again I

6      keep saying to you again and again these issues calls

7      for legal conclusions.  Statute speaks for itself.  I

8      think we discussed earlier today was there anything

9      that expressly said that and we said no but I don't

10     want to be in a position where we foreclose any

11     potential arguments.  I'm being very careful.

Page 151

---

12 Q.   In your consideration of the pension issue is it

13      correct that the conclusion that you reach was that

14      one way to get -- for the city to diminish and get out

15      of its pension obligations would be to go through a

16      Chapter 9 filing?

17 A.   Could you read the question back?

18             (Record read back as requested.)

19 A.   Yes, I think at some point that we reached that

20      conclusion.

21 Q.   And do you recall when that conclusion was reached?

22 A.   No.

23 Q.   Let me show you another document we'll mark this as,

24      what are we up to, 8?

25 A.   Uh-huh.

                                                  88
                uncertified rough draft
                Page 152

orrroughdraft (3).txt

1            (Marked Exhibit No. 8.)

2    Q.   You're familiar with Exhibit 8; aren't you?  It's the

3         financial and operating plan of may 12th, 2013?

4    A.   Yes.

5    Q.   And this is something that you put out; isn't it?

6    A.   Yes.

7    Q.   And this was after you were Emergency Manager; yeah?

8    A.   Yes.

9    Q.   Okay.  And do you recall giving an interview on radio

10        about the plan?

11   A.   I gave many interviews on the radio.  Is there a

12        specific one?

13   Q.   Yeah, there is.  There is one that was made on May

14        12th, 2013 on WWJ and there's one piece of it that I

15        would like to focus on in particular.  I'll read it to

16        you.  I have the article in which it's quoted but

17        maybe you remember saying this.

18   A.   Okay.

19   Q.   The quotation is -- about this plan, I believe it's

20        this plan, you said the public can comment but it is

21        under the statute, it is my plan and it's within my

22        discretion and obligation to do it.  This isn't a

23        plebiscite.  We are not like negotiating the terms of

24        the plan.  It's what I'm obligated to do.

25             Do you recall making that statement on the

                                                           89
                       uncertified rough draft

1         radio?

2    A.   Yes.

3    Q.   And you were talking about the may 12th plan when you

4         said that?

5    A.   Yes, financial and operating plan.

6    Q.   And the may 12th plan referred to the possibility of

7         reducing or eliminating retirement benefits didn't it?

8    A.   Yes.

9    Q.   And in fact just going through this briefly on pages

10        16 through 17, if I have this right, you're reporting

11        about 5 point billion in unfunded medical costs; is

12        that right?

13   A.   Yes.

14             MR. SHUMAKER:  Get to the page.  I'm sorry

15        what page was that, counsel.

16             MR. ULLMAN:  16.

17             MR. SHUMAKER:  16.  At the bottom.

18   A.   Yes.

19   Q.   Then on the next page you wrote that as part of the

20        comprehensive restructuring plan, the Emergency

21        Manager will evaluate options to reduce or eliminate

22        certain healthcare costs for both active and retired

23        employees?

24   A.   Yes.

25   Q.   And that was a true statement?

                                                           90
                       uncertified rough draft

1    A.   Yes.

2    Q.   And then if you turn back a little to page 3 of this

3         document, I think you indicate that the pension

4         liabilities are underfunded by at least 600 million

5         and possibly more, possibly significantly more?

6              MR. SHUMAKER:  Can you direct his

7         attention.

8      MR. ULLMAN:  Yeah it's in the first full

9    paragraph, the last three lines.

10  Q.  It says the city's pensions are underfunded by at

11    least 0.6 billion and perhaps significantly more once

12    appropriate actuarial assumptions and current data are

13    considered?

14  A.  Yes.

15  Q.  And that was as you view that as an accurate statement

16    also; correct?

17  A.  Yes.

18  Q.  And then if you go to page 20 to 21, beginning on page

19    20 you sort of resummarize these obligations, these

20    liabilities and then you make a couple statements on

21    page 21 at the top you say, restructuring the city's

22    liabilities in a fair and equitable manner across all

23    relevant stakeholders is necessary for the city's

Page 157

---

24    operational and financial survival.  Do you see that?

25  A.  Yes.

1  Q.  You go on to say that the restructuring of the city's

2    debt and other liabilities is essential to provide the

3    city with a strong balance sheet and it continues.  Do

4    you see that?  It's kind of in the middle of that top

5    paragraph?

6  A.  Yes.

7  Q.  And then the next paragraph that says this plan

8    recognizes that interest rates, amortization, it

9    mentions some other things, continues with security

10    interests, legacy liabilities and all other aspects of

11    short and long-term debt must be evaluated as part of

Page 158

---

12    the city's comprehensive restructuring.  It goes on

13    significant and fundamental debt relief must be

14    obtained to allow the city's revitalization to

15    continue and succeed?

16  A.  Yes.

17  Q.  In all those statements they all applied to

18    obligations that were owed as well to retirees; is

19    that right?

20  A.  I believe so.  I believe we were talking about we need

21    today do something to address those obligations.

22  Q.  And that's what you refer to here as legacy

23    liabilities, the pension and healthcare obligations?

24  A.  In part, yes.

25  Q.  They're included in legacy liabilities right?

Page 159

---

1  A.  Yes.

2  Q.  And the plan here was, as you're saying here, that the

3    plan is to reduce them; true?

4  A.  No, I think what we said here is that they must be

5    adjusted in fair and equitable manner across all

6    stakeholders that would necessarily mean an adjustment

7    yes.

8  Q.  In your view didn't that mean they had to be adjusted

9    downwards?

10  A.  What we have said and what I said at May 12th and

11    subsequently throughout is we needed -- we needed to

12    have a dialogue about what the status of an adjustment

13    would be because it was clear the city couldn't pay.

14  Q.  That's all I'm getting at Mr. Orr.  The question was

15    very simple.  That what you are saying here is that

Page 160

---

16    you needed to get these benefits reduced?

17  A.  Yes, that's what I said.

18  Q.  And is it correct that under Michigan law, again just

19    under Michigan law without reference to the bankruptcy

20    statute, you didn't have the authority or the ability

21    to reduce pension benefits?

22        MR. SHUMAKER:  Objection, calls for legal

23    conclusion.

24  A.  This is the same line of inquiry that we've gone

25    through before.  I'll state the same response if you

93

uncertified rough draft

1    would like.

2  Q.  No, I can accept that your response would be the same.

3  A.  Okay.

Page 161

---

4  Q.  Let me ask you a different question.

5  A.  Thank you.

6  Q.  Prior to the bankruptcy filing did you identify any

7    course of action under Michigan law, putting aside the

8    possibility of a consensual resolution, that would

9    allow the Emergency Manager to reduce pension benefits

10    without going through Chapter 9.

11  A.  Here again, to the did tenth it calls for legal

12    conclusion, my prior answer, but I'll try to be

13    responsive.  Yes, we did.

14  Q.  And what were those alternatives?

15  A.  Well, that's why we continued to say to the various

16    interested groups we needed to engage in a dialogue.

17  Q.  I'm saying apart from a consensual resolution.

18  A.  Okay.

19  Q.  Okay.  And what I'm asking is apart from the idea that

Page 162

---

20    people could get together and agree.

21  A.  Uh-huh.

22  Q.  Did you come up with any other course of action under

23    Michigan law that did not involve a bankruptcy filing

24    and that would allow the Emergency Manager to reduce

25    pension benefits to retirees?

94

uncertified rough draft

1  A.  I don't mean to be evasive or tour issue but there

2    were a number of different alternatives that were

3    discussed.  Some of them frankly by keeping the city

4    in a steady state would have effectively reduced those

5    pension obligations, yes.

6  Q.  So the course that was considered was simply not

7    meeting the pension obligations as they came due; is

Page 163

---

8    that right?

9  A.  No, it's just what I said.  By keeping it in a steady

10    state we weren't meeting our obligations there

11    currently.

12  Q.  And that would include also not meeting the pension

13    obligations?

14  A.  Yes, as I said, keeping in a steady state would by

15    definition reduce liabilities.  That's what the city

16    was already doing.

17  Q.  And was there any other avenue that was considered as

18    potentially viable to reduce the pension benefits

19    apart from what you just said and apart from going

20    through a Chapter 9 filing and again putting aside

21    some sort of negotiated resolution.

22  A.  Well, we didn't consider the steady state alternative

23    viable.

Page 164

24   Q.   Uh-huh.

25   A.   We thought that was quite problematic.  Putting aside

                                                          95

                              uncertified rough draft


1        the discussion we had earlier this morning about legal

2        conclusions and what we possibly could do under the

3        statute, were there any other, other than consensually

4        inviting resolutions, a potential Chapter 9 filing,

5        any other alternatives?  And a steady state, those

6        three, any other?  I don't think there were any other

7        alternatives.

8    Q.   Okay.  Let's move on to the next document, which we'll

9        mark as Exhibit 9.

10            (Marked Exhibit No. 9.)

11            (Discussion held off the record.)

---

12   Q.   Okay, let's look at Exhibit 9.  This is a proposal for

13        creditors, June 14, 2013.  You've indicated you're

14        familiar with it?

15   A.   Yes.

16   Q.   Now, this document as I understand it spells out in

17        general terms what you thought the problems were

18        facing Detroit and what you wanted to do about them?

19   A.   Well, it spells out in general terms what we think the

20        problems are and it makes a proposal to what we think

21        we should do about them.

22   Q.   Okay.  And among the significant issues facing the

23        city were retirement obligations we've discussed

24        right?

25   A.   Yes.

                                                          96

                              uncertified rough draft

---

1    Q.   And the proposal refers to cutting them; correct?

2    A.   Point me to a specific page, please.

3    Q.   Doesn't it say that they need to be reduced?  Doesn't

4        it say that?

5    A.   Yes.

6    Q.   And it says they're unsustainable doesn't it?

7    A.   Yes I think generally speaking it says that, yes.

8    Q.   And we'll go through some of the specifics?

9    A.   Okay.

10   Q.   I think in here early on around pages 23 to 24 you

11        note -- I think we discussed this a little bit -- that

12        the unfunded pension liability right now as of June

13        14th is more or less on the books as 643 million but

14        it could be as large as 3.5 billion; is that right?

15   A.   Yes.

---

16   Q.   And that figure, that 3.5 billion figure, that's work

17        that's been done for the city by the Millaman firm; is

18        that right?

19   A.   Well, among others, I think Millaman worked off an

20        initial Gabriel Rotors projections and then did their

21        own, yes.

22   Q.   And are you aware that that number, the 3.5 billion,

23        has been disputed by various parties or objectors as

24        regards the actuarial assumes shops that were used?

25   A.   Yes.

                                                          97

                              uncertified rough draft


1    Q.   And at least one firm has taken the position that the

2        number should be much less than 3.5 billion?

3    A.   I think several entities and firms have taken that

orrroughdraft (3).txt

4   position yes.

5   Q.   And you indicated you're not an actuary; correct?

6   A.   That's correct.

7   Q.   So you have no expertise in that?

8   A.   I rely on our professionals and consultants yes who

9        are actuaries.

10  Q.   So the accuracy of the 3.5 billion or some other

11       figure will be an issue that's going to be ultimately

12       decided bay court if this matter proceeds; is that

13       right?

14  A.   We think it's accurate but it may ultimately be

15       decided by a court.

16  Q.   Now, on pages 90 to 91, if I understand this, and

17       particularly on 91, this is showing the current

18       projections; right, as I understand this particular

19       schedule?

Page 169

---

orrroughdraft (3).txt

20  A.   Yes it's the ten year projections.

21  Q.   Right under what I think has been referred to as a

22       steady state?  In other words this is without the

23       restructuring?

24  A.   Yes, I think this is the ten year steady state general

25       fund only projection.

98

uncertified rough draft

1   Q.   If you look at page 91 it shows if nothing changes

2        projections for both pension, contributions and

3        healthcare benefits, right, and then the top headings?

4   A.   Yes.

5   Q.   And for pensions just using 2014 as an example we see

6        the number is 199.5 million?

7   A.   Yes.

Page 170

---

orrroughdraft (3).txt

8   Q.   And for the health benefits for 2014 it's 140.7

9        million?

10  A.   Yes.

11  Q.   And obviously if you look over the next several years

12       it goes up?

13  A.   Yes.

14  Q.   Okay.  And then so that I understand this, if you look

15       at pages 97 to 98, this is the same spreadsheet but

16       now showing what the figures would look like if this

17       proposal for restructuring were to go through; is that

18       right?

19  A.   Yes.

20  Q.   And so if we look again comparably for 2014, let's

21       see, and let's start with -- I guess we can start with

22       the pensions.  On page 97, for 2014, we now see an

23       item DC pension contribution.

Page 171

---

orrroughdraft (3).txt

24  A.   Uh-huh.

25  Q.   And that's -- that DC stands for what?

99

uncertified rough draft

1   A.   You mean the DC?

2   Q.   Yeah what do the words stand for.

3   A.   Defined contribution.

4   Q.   Defined contribution?

5   A.   Uh-huh.

6   Q.   Now, the existing -- pension plan that exists

7        under the steady state projections, is that defined

8        contribution plan?

9   A.   That would be switched over.  No, no, defined -- the

10       steady state scenario?

11  Q.   That's a defined benefit?

Page 172

12  A.  That's a defined benefit plan.

13  Q.  So what you're projecting here is a switch over to a

14     defined contribution program and for 2014 we see the

15     number for the city's contributions is now 25.4

16     million; is that right?

17  A.  Yes, that's -- yes.

18  Q.  And that compares with the -- what was the figure?

19     199.5 million that we saw under the as is?

20  A.  Yes, projections.

21  Q.  Yes.  So the diminution it looks just on the rough

22     math that the city's pension contributions under the

23     restructuring are being cut by about 80 percent is

24     that right?

25  A.  Under 75 million, 80 percent, sure, roughly.

100

uncertified rough draft

Page 173

---

1  Q.  And for health, the health benefits, which we saw that

2     were what under the current scenario something like

3     147 million?

4  A.  Retiree health, yes.

5  Q.  For retiree health?

6  A.  Uh-huh.

7  Q.  Under this proposal, the restructuring proposal, I

8     don't see any line entry for the retiree health

9     benefits.

10  A.  Yes.

11  Q.  So they're essentially being cut; correct?

12  A.  Well, the obligation is being provided with a

13     different program, but yes, the city would not have an

14     obligation going forward of that magnitude.

15  Q.  And going back to the pension contributions, you know,

Page 174

---

16     we had talked about a diminution on the order of 80

17     percent from the 199.5 figure, and I think it's the

18     city's contention that the 199.5 figure is really

19     understated right because the obligations are really a

20     lot higher?

21  A.  I think we think the liabilities -- this is the steady

22     state projection on 91, I think we think the

23     liabilities are higher because what we represented on

24     the second page of 98 is the estimated under secured

25     claims for out years as opposed to a ten year

101

uncertified rough draft

1     projection.

2  Q.  Right and if the liabilities were really greater than

3     the diminution from the steady state to the

4     restructuring scenario would be greater than 80

Page 175

---

5     percent wouldn't it?

6  A.  It might be.  I mean, we have we've said 80 percent.

7     I mean 199.5 less 25, you know, you just roughly cut

8     those in half, that's a 12 and a half percent but 788

9     percent, somewhere in that neighborhood.

10  Q.  Now, the people who are -- the retirees who are

11     getting impacted from these -- by these cuts in the

12     proposed restructuring, these are who?  These are men

13     and women who previously serve the city and are now

14     retired?

15  A.  Yeah they're two pension plans, one for general

16     services and the other for police and fire.

17  Q.  And these individuals that serve the city in both

18     public safety and nonpublic safety capacities?

19  A.  Uniform and nonuniform, yes.

Page 176

20  Q.  And were these -- I guess the issue comes because the

21      pension liabilities and the healthcare benefits that

22      may be due are not -- there's not sufficient funding

23      that was put into them; correct?

24  A.  Well, the healthcare benefit has no funding.  The 5.7

25      billion dollars.  And the pension underfunding is our

102

uncertified rough draft

1       estimate of the level of underfunding, the unfunded

2       portion of the pensions, in them.  There are assets

3       within both pension funds, it's the level of

4       underfunding that we're talking to.

5   Q.  Right and it's the underfunding that's resulting in

6       the cuts to the retirees; correct?

7   A.  Well, this is a proposal I'll say again.  We have said

8       again and again we want to have a discussion so we can

Page 177

9       figure out what the right-sizing is.

10  Q.  Can you please just answer the question Mr. Orr?

11  A.  I am but you say cuts, you say cuts and that has a

12      different connotation and I'm trying to explain it

13      fully.

14  Q.  This proposal the benefits get cut substantially don't

15      they?

16  A.  Yes, but we need to have a discussion.

17  Q.  Now, the individuals whose rights and expectations and

18      benefits are being impacted under this, they weren't

19      themselves responsible for the lack of funding that's

20      resulted in these problems are were they?

21          MR. SHUMAKER:  Objection form foundation.

22  A.  That's -- that's a loaded question about

23      responsibility and --

Page 178

24  Q.  I'm ask if the individual retirees whose pensions and

25      healthcare benefits may be impacted under this.

103

uncertified rough draft

1   A.  That's a loaded question.

2           MR. SHUMAKER:  Same objection.

3   A.  I'm going to be very careful here because while

4       recognizing that these are typically rank and file

5       employees, there's a whole bunch of issues regarding

6       responsibility and some of it has been written about

7       quite extensively.

8   Q.  And you're aware that at least the vast majority of

9       the city employees, the retirees, count on their

10      pension and healthcare benefits in order to help make

11      ends meet?

12  A.  I don't know if I'm aware of that as a fact.  I know

Page 179

13      certainly that pensions are important to retirees.

14  Q.  Now, going back to page 98 of this restructuring

15      proposal, you pointed to a box.

16  A.  Yes.

17  Q.  -- that shows a very large unsecured claim amount for

18      unsecured pension and OPEB?

19  A.  Yes.

20  Q.  And that's 9.2 billion?

21  A.  Yes.

22  Q.  And as I understand this proposal, the retirees who

23      fall into this category whose pensions and healthcare

24      benefits are being cut back by this would end up with

25      unsecured claims and get a share of the notes that the

104

uncertified rough draft

Page 180

1      city is intended to issue; is that right?

2  A.   The retirees whose pensions and healthcare benefits we

3      propose to reduce would get a share of the note, yes.

4  Q.   And is there any way to tell from this document how

5      much any individual retiree would ultimately get if

6      the notes go ahead and are issued?

7  A.   Not from this document.

8  Q.   There's no way to tell how much cash value any retiree

9      would receive under this plan that's laid out here

10     where they get notes?

11 A.   It is my understanding that there are a number of

12     different plans and benefits and factors that go into

13     that determination for any specific retiree.

14 Q.   Okay.  Now, Chapter 9 is not referred to in this

15     restructuring plan; is it?

16 A.   I don't think we did.

Page 181

---

17 Q.   And I think you indicated before that if this was not

18     agreed to by the various constituencies, then the only

19     way to implement this restructuring plan would be, if

20     at all, would be to try to go ahead and do that

21     through Chapter 9; is that right?

22 A.   I think what I said before, I think you're referring

23     to the May 12th, 45-day operating plan, but I think

24     what I said before on June 10th and June 14th is we

25     needed to engage in a dialogue because we didn't want

105

uncertified rough draft

1      to go to Chapter 9.

2  Q.   That wasn't my question.  Can you read my question

3      back?

4            (Record read back as requested.)

Page 182

---

5  A.   Yeah, I indicated that here today.

6  Q.   I'll just ask the question again.  As you understood

7      it, if the proposal here were not agreed to or some

8      other consensual resolution was not reached, was there

9      anyway for you as Emergency Manager to implement this

10     plan other than to try to get it put in place through

11     a Chapter 9 filing?

12 A.   Subject to the discussion that we've had a couple of

13     times earlier today, what I have said is that Chapter

14     9 is an option to achieve these goals.

15 Q.   And were you at this point aware of any option to

16     achieve these goals other than Chapter 9 if a

17     consensual resolution was not reached?

18 A.   There were various briefing memos and discussions, but

19     given the time frames that we were under, and I said

20     this at the June 10th meeting and I said it at the

Page 183

---

21     June 14th meeting and I want to be responsive, that if

22     we didn't, Chapter 9 was an alternative.

23 Q.   And I don't think that's fully responsive at this

24     point.  Had you identified anything else as of June 14

25     to get this plan implemented, any other course,

106

uncertified rough draft

1      putting aside consensual resolution, other than a

2      chapter 9 file?

3  A.   Nothing that would give us an orderly and

4      comprehensive resolution of these problems.

5  Q.   Now, you gave an interview that I'm sure you're

6      familiar with with the Detroit Free Press on or around

7      June 14th.  Do you remember it?  I'll just tell you

8      what -- I believe you said and I'm sure you remember

Page 184

---

```
 9      this one and you can tell me.  If not, I have the

10      quote.

11   A. Yeah, you can give me the quote.  There's so many

12      interviews, but I'll trust your quote.

13   Q. Okay.

14   A. Okay.

15   Q. This is the quotation.  Question, you said in this

16      report, referring to the June 14th proposal, that you

17      don't believe there is an obligation under our state

18      constitution to pay pensions if the city can't afford

19      it?  Answer, the reason we said it that way is to

20      quantify the bankruptcy question.  we think federal

21      supremacy trumps state law?

22   A. Yes.

23   Q. You don't deny making that statement?

24   A. No, I think I've said that several times.
```

```
25   Q. And the state law you were referring to that you
```

```
 1      referred to as being trumped was Article 9, Section 24

 2      of the state constitution; is that right?

 3   A. I believe so.

 4   Q. There's no other state law that you view as relevant

 5      to the pension issue is there?

 6   A. Subject to the discussions that we had earlier today.

 7   Q. As being trumped?  There's no other state law that you

 8      regarded as being trumped; is there?

 9   A. No, there is a no other as being trumped?

10   Q. Trumped.

11   A. Right.

12   Q. So the answer to my question, so the record is clear,
```

```
13      the answer to my question is no other?

14   A. We're not referring to another state law.

15   Q. Okay, thank you.

16   A. Okay.

17   Q. Now, ultimately -- so when the subsequent bankruptcy

18      filing was made -- which it was; right?

19   A. Yes.

20   Q. The intention -- specific intention was indeed to

21      trump Article 9, Section 24 of the state constitution;

22      correct?

23   A. That wasn't the only intention.

24   Q. But that was an intention was it not?

25   A. That was one of the objectives.
```

```
 1   Q. Now, ultimately you did request authorization for the

 2      governor to file; right?

 3   A. Yes.

 4   Q. I'm just going to put these letters into the record so

 5      we have them.

 6   A. Okay.

 7   Q. I'm not sure I'm going to ask you much about them.

 8          The first one is what we're going to mark

 9      as Exhibit 10.

10          (Marked Exhibit No. 10.)

11   Q. This is 10.  This is 10.

12   A. Thank you.

13          MR. ULLMAN:  And I might as well mark 11

14      also.  They kind of go together.

15          THE WITNESS:  Okay.

16          (Marked Exhibit No. 11.)
```

17    Q.    Okay, what we've marked as Exhibits 10 and 11

18          respectively are the July 16th, 2013 letter from you

19          to the governor and to the treasurer and then the

20          governor's response letter of July 18, 2013.

21    A.    Yes.

22    Q.    And you're obviously familiar with these documents?

23    A.    Yes.

24    Q.    And you wrote Exhibit 10, you signed it at least?

25    A.    Yes.

                                                    109
                    uncertified rough draft


1     Q.    And Exhibit 11 is the governor's response; correct?

2     A.    Yes.

3     Q.    Now, did you have discussions with the governor's

4           office or anyone on governor's team leading up to the

---

5           request letter that you sent in?

6                 MR. SHUMAKER:  Objection to form.

7     A.    Leading up to?

8     Q.    Yeah, before.

9     A.    Before that.  I think there were discussions with the

10          treasurer and even the governor that if we weren't

11          making progress on negotiations, I might have to

12          submit the letter.

13    Q.    Okay.  And in those conversations was there any

14          mention of the impact that the bankruptcy filing might

15          have or was intended to have as regards the pension

16          benefits?

17    A.    Probably, yes.

18    Q.    And do you recall anything specific about that?

19    A.    I -- um -- as I said, I had regular meetings of the

20          governor and his staff, we probably discussed this.  I

---

21          don't recall a specific discussion.

22    Q.    Do you recall telling the governor and his staff in

23          general that one of the purposes, I'm not saying the

24          only purpose, one of the purposes or intentions of the

25          Chapter 9 filing would be to allow you to cut back the

                                                    110
                    uncertified rough draft


1           pension benefits?

2     A.    Yeah, I don't want to give the misimpression that that

3           was the singular focus.  I think most of our

4           discussions were about the need for the city to deal

5           overall with its balance sheet and its obligations

6           which would include pensions.

7     Q.    Uh-huh.  Okay can you read my question back?  Listen a

8           little more closely because I was really -- it was a

---

9           little more specific of a question.

10    A.    Okay.

11                (Record read back as requested.)

12    A.    We probably had that discussion.  I don't recall

13          anything specific but we probably did.

14    Q.    And do you recall any discussion during those same

15          conversations with the governor or anyone from his

16          staff as to the impact if any of Article 9 chapter --

17          Section 24 of the Michigan constitution as regards

18          pension benefits?

19    A.    I don't recall having discussions in that regard.  No.

20    Q.    Now, if you look at the governor's response letter,

21          okay, and the last page, you see at the top there's a

22          heading called contingencies?

23    A.    Yes.

24    Q.    And it says 2012 PA 436 provides that my approval of

25    the recommendation to commence a Chapter 9 proceeding

111

uncertified rough draft

1    may place contingencies on such a filing and it gives

2    the citation, it continues, I am choosing not to

3    impose any such contingencies today.  Federal law

4    already contains the most important contingency, a

5    requirement that the plan be legally executable, 11

6    U.S.C. section 943(b)(4); do you see that?

7  A.   Yes.

8  Q.   And did you have any discussions with the governor or

9    anyone from his staff about that language before you

10    received this letter back?

11  A.   No.

12  Q.   Were you -- did you have any understanding before

13    receiving this that as to whether or not the governor

14    was going to place any contingencies on the bankruptcy

15    filing?

16  A.   No, but I was concerned about it.

17  Q.   And what were you concerned about?

18  A.   I was concerned that the governor might place some

19    contingency in any regards not just related to the

20    pensions and others but that the inner lay on limiting

21    what authority I might have would impact what

22    discretion I would have under either 436 or Chapter 9.

23    I was just concerned about contingencies.

24  Q.   And was one of the contingencies that you were

25    concerned about the contingency that could impair your

112

uncertified rough draft

1    ability or restrict your ability to cut back the

2    pensions.

3  A.   I was concerned about all contingencies.  I didn't

4    know what the governor was going to say.

5  Q.   That's really not my question.  Can you read my

6    question?

7  A.   Yes I was concerned about all of them.  That's what I

8    said.

9  Q.   And that includes specifically the one about not being

10    able to effect the pensions; correct?

11  A.   All contingencies.

12  Q.   Thank you.

13        Had you discussed within your staff the

14    possibility of the governor putting a contingency that

15    would prohibit the Emergency Manager from taking

16    actions that would impair pensions?

17  A.   My staff including my legal counsel and consultants,

18    the entirety of staff at large?

19  Q.   Yes.

20  A.   Yes.

21  Q.   And did you view the risk as substantial, that the

22    governor was going to do that?

23  A.   without disclosing any attorney-client confidences, I

24    don't know if we handicapped the risk.  It was just a

25    general discussion.  I had submitted a letter, I

113

uncertified rough draft

1    wasn't sure what I was going to get back.

2  Q.   And did you have any plan in place as to what you

3    would do if the letter came back that imposed a

4    contingency that in any Chapter 9 filing nothing could

orrroughdraft (3).txt

5  be done that would affect pension rights that were

6  protected under the Michigan constitution?

7  A.  No.

8  Q.  Now, in his letter the governor -- the portion we've

9     just looked at on the back of page 5, the governor

10    says having a legally executable planned under section

11    943(b)(4), that's the bankruptcy code; isn't it?

12 A.  I believe so.

13 Q.  So he says, he the governor says, having a legally

14    executable plan under section 943(b)(4) of the

15    bankruptcy code is a contingency for Detroit's filing

16    a bankruptcy petition; correct?

17       MR. SHUMAKER:  Objection, document speaks

18    for itself.

19 A.  That's -- I was going to say the document speaks for

20    itself.  You're sort of reading it, you know, just

orrroughdraft (3).txt

21    inversing it, but it says federal law already contains

22    the most important contingency requirement that the

23    plan is legally executable.

24 Q.  Right.  And this is in the context of him asking or

25    noting that under PA 436 he, the governor, could place

114
uncertified rough draft

1     contingencies on a Chapter 9 filing; right?

2  A.  Yes.

3  Q.  And he goes on to say that federal law also contains

4     what he calls the most important contingency on the

5     Chapter 9 filing, that it be legally executable;

6     correct?

7  A.  Yes, the letter speaks -- that's the language of the

8     letter.

orrroughdraft (3).txt

9  Q.  Did you agree with the governor's analysis here?

10 A.  I -- do I agree?  Yes, I mean, I agree that that's the

11    most important contingency that we get to, yes.

12 Q.  Now, petition was filed -- the bankruptcy petition was

13    filed on July 18th, like at 4 in the afternoon, 4:05,

14    something like that?

15 A.  That's what I was told.  I don't know the specific

16    time.

17 Q.  Now, in doing -- in making your bankruptcy filing,

18    were you intending to do something that was in

19    violation of state law?

20       MR. SHUMAKER:  Objection, calls for legal

21    conclusion.

22 A.  Here again, subject to all the discussions that we had

23    earlier today, I was intending to aleve the city of a

24    very dire situation and provide it with the maximum

orrroughdraft (3).txt

25    ability to restructure itself.

115
uncertified rough draft

1        MR. ULLMAN:  I'm going to move to strike as

2     nonresponsive.  Can you read back my question, please,

3     and can you answer it, Mr. Orr?

4        (Record read back as requested.)

5  A.  No.

6  Q.  And at this time were you aware that a bankruptcy

7     filing that would allow you to impair pension benefits

8     was at least arguably in violation of state law?

9  A.  I was aware that various parties had taken that

10    position, yes.

11 Q.  So you were aware there was an argument?  I'm not

12    saying you were agreeing with it.

orrroughdraft (3).txt

13   A.   I didn't agree with it but there was an argument.

14   Q.   Now, did you give consideration to that argument?

15   A.   Yes, I suppose I did.

16   Q.   And what did you do to give consideration to that

17        argument?

18   A.   I discussed it with counsel.

19   Q.   Okay, which counsel?

20   A.   My legal counsel.

21   Q.   Legal counsel being?

22   A.   Jones Day.

23   Q.   Jones Day.

24   A.   Uh-huh.

25   Q.   Did you make any inquiries of the State Attorney

116

uncertified rough draft

1    General?

---

orrroughdraft (3).txt

2    A.   I know at some point -- and I'm going to be careful

3         here because as a state contractor I want to be very

4         careful about whether or not the Attorney General also

5         is my counsel.  I know at some pointy met with the

6         Attorney General but I don't recall when that was.  I

7         don't recall if it was before or it was after the

8         filing.  It might have been before.

9    Q.   Okay.  Well, if it was before do you recall what

10        advice you got from the state Attorney General as to

11        whether it was legal under Michigan law for you to go

12        ahead with the bankruptcy filing but didn't protect

13        the pensions?

14             MR. SHUMAKER:  Objection.  I caution the

15        witness that to the extent it calls for

16        attorney-client communication, not to reveal those

---

orrroughdraft (3).txt

17        communications.

18   A.   I don't think I can answer the question without going

19        into attorney-client communications.

20   Q.   But you don't recall specifically whether you actually

21        consulted the State Attorney General prior to the

22        filing; do you?

23   A.   I recall meeting with the Attorney General at one -- I

24        may have had a couple -- I think I've had a couple of

25        telephone conversations with him and I recall meeting

117

uncertified rough draft

1    with him.  I don't recall whether it was prior or

2    after the filing.  I know from time to time -- I just

3    don't recall when it was.

4    Q.   Would there have been any reason for you not to

5         consult the Attorney General prior to the bankruptcy

---

orrroughdraft (3).txt

6    filing on that issue?

7    A.   No, I think the state Attorney General made his

8         position known prior to the filing.

9    Q.   Now, as of this time the petition was filed there were

10        various state court litigations that had been begun?

11   A.   Yes.

12   Q.   And those challenged among other things PA 436;

13        correct?

14   A.   Yes.

15   Q.   And its constitutionality?

16   A.   Yes.

17   Q.   And in fact the petition was filed just prior to the

18        start of a TRO.  Hearing in one of those state

19        litigations; wasn't it?

20   A.   I was told that either that night or the following

21     day.

22  Q.  And are you aware that certain objectors in this

23     proceeding have stated that the bankruptcy petition

24     was filed just before the judge in the case was about

25     to issue a TRO prohibiting the bankruptcy filing from

                                                        118
                    uncertified rough draft


1      taking place?

2   A.  I heard that after the fact, yes.

3   Q.  And are you aware that these objectors have stated

4      that in fact the state lawyers asked for a short delay

5      before the ruling was issued so they could get the

6      bankruptcy filing in before the judge came down with a

7      TRO?

8   A.  I don't know if I heard it -- I may have read that

9      later.  I don't know if I heard it.
                    Page 205

---

10  Q.  Did you have any involvement in those actions?

11  A.  No, no.

12  Q.  Do you deny that that's what occurred?

13  A.  I only know what I've heard and I have no personal

14     knowledge I just know what I've heard and what I've

15     read.

16  Q.  And isn't it correct that you wanted to get the

17     bankruptcy petition filed as soon as possible because

18     you knew there was a risk that the state might rule it

19     was illegal the state court might rule it was illegal

20     under state law for the bankruptcy proceeding to be

21     filed?

22  A.  No, that wasn't the reason.

23  Q.  Is there a particular reason that the bankruptcy

24     filing was made at 4:06 in the afternoon of the same
                    Page 206

---

25     day a TRO was being heard in the state court other

                                                        119
                    uncertified rough draft


1      than to get the jump on the state court ruling?

2          MR. SHUMAKER:  Object to the form.

3   A.  Not to the best of my knowledge.

4   Q.  Now, you're aware that the state court in that

5      litigation in fact later issued a ruling that PA 436

6      is unconstitutional to the extent that it authorizes a

7      proceeding under Chapter 9 in the way that could

8      threaten to impair or diminish accrued pension

9      benefits?

10  A.  Yes, I was informed that there I believe three

11     TROs after the bankruptcy filing.

12  Q.  And you have proceeded with the bankruptcy petition

13     notwithstanding; correct?
                    Page 207

---

14  A.  Well, the bankruptcy petition had been filed, there

15     were open questions about the application of the stay.

16     There was also a question about an appeal, which was

17     taken up I believe by the Attorney General's office.

18     So when you say you proceeded with the petition, we

19     filed the petition, there was a ruling, and there were

20     appeals.

21  Q.  Okay.  And in light of the state court ruling that PA

22     436 was unconstitutional, you did not take any steps

23     to withdraw the bankruptcy petition from filing; did

24     you?

25  A.  No.

                                                        120
                    uncertified rough draft


1   Q.  And you have not taken any steps to stop the
                    Page 208

orrroughdraft (3).txt

2      bankruptcy proceeding from going forward; have you?

3   A.   No.

4   Q.   Would this be a good time to stop for lunch, a quick

5        lunch?

6              MR. SHUMAKER:  Sure.

7              MR. ULLMAN:  I'm ready to continue but I

8        know --

9              THE WITNESS:  You got another -- how much

10       -- do you have another line of inquiry?  Whatever

11       everybody --

12             MR. ULLMAN:  I'm about to switch subject

13       matters.

14             THE VIDEOGRAPHER:  Going off the record at

15       12:52 p.m.

16             (Luncheon recess between

17             12:52 p.m. and 1:30 p.m.)

---

orrroughdraft (3).txt

18             THE VIDEOGRAPHER:  We're back on the record

19       at 1:35 p.m.

20             MR. ULLMAN:

21   Q.   Welcome back, Mr. Orr.

22   A.   Good afternoon.

23   Q.   One other question about the June 14th proposal.

24       Referring to page 98, we talked about the defined

25       contribution benefit plan?

                                                          121

                         uncertified rough draft

1   A.   Yes.

2   Q.   Okay.  Is it correct that under that plan

3        contributions are being made only for people who would

4        be current city employees?

5   A.   Will the plan be closed?

---

orrroughdraft (3).txt

6   Q.   Yes.

7   A.   Yes, I believe so.

8   Q.   So under the restructuring plan there would be no

9        pension contributions made for retirees; correct?

10  A.   I believe that's correct.

11  Q.   Now, you I believe said that the June 14th proposal

12       was presented at a meeting to representatives of

13       various creditors, I think you said that in your

14       declaration?

15  A.   On June 14th, yes.

16  Q.   Okay.  Did you speak at that meeting?

17  A.   Yes.

18  Q.   And who else spoke?

19  A.   I believe all -- several members of our team, I

20       believe it was Mr. Heiman, David Heiman, I believe it

21       was Ken Buckfire, I believe Heather Lennox was on, I

---

orrroughdraft (3).txt

22       believe Bruce Bennett was there, I believe Ken

23       Buckfire may have spoken.  I'm trying to recall if

24       there was anyone else.

25  Q.   And this meeting took about two hours total; is that

                                                          122

                         uncertified rough draft

1        right?

2   A.   Approximately that time.

3   Q.   And you indicated in your -- the declaration that you

4        filed here that at the June 14th meeting you presented

5        the proposal and you presented the executive summary

6        and people got the full proposal as they exited and I

7        think you said that you answered questions posed by

8        the attendees?

9   A.   I believe that's correct.

10    Q.    Is that an accurate and truthful description of what

11          happened at the June 14th meeting?

12    A.    Yes.

13    Q.    There were no actual negotiations at that meeting;

14          were they?

15    A.    I don't -- be careful of the word negotiations but no

16          not as it's generally understood.

17    Q.    Now, the next meeting that I believe took place was on

18          June 20; is that right?

19    A.    Are you reading through my declaration?

20    Q.    Uh-huh.

21    A.    Page 55 has a list of meetings, around that

22          approximate time.

23    Q.    Uh-huh.

24    A.    Okay yes.

25    Q.    So the next one was June 20; is that right?

1    A.    If that's what it says in my declaration, yes.

2    Q.    And there were both morning and afternoon sessions; is

3          that right?

4    A.    Yes.

5    Q.    And this was six days after the proposal had been

6          presented; correct?

7    A.    Yeah, I haven't done the counting but 14th to 20th,

8          yeah, it would be six calendar days, yes.

9    Q.    And it was a 2-hour morning session and about 90

10          minutes for the afternoon session?

11    A.    That sounds about right.

12    Q.    And in your affidavit or your declaration you

13          indicated that at this meeting, these meetings, the

14          city presented a more in-depth look at its analysis of

15          the health and pension obligations and suggested for

16          proposals -- suggested proposals for the modification

17          thereof that the city could fund within its means

18          going forward and you provided handouts of the

19          presentations.  Are those accurate descriptions of

20          what?

21    A.    Yes.

22    Q.    So there were no actual negotiations at that meeting

23          either; were there?

24    A.    I'm going to defer as to whether or not those

25          constitute negotiations.  There was a give and take is

1          my understanding but I'm not going to testify that

2          those did not constitute negotiations.

3    Q.    Well, was there any actual sit down, you know, and

4          bargaining as to what the city would agree to as an

5          alternative to what was put in the June 4th proposal

6          and what it would not?

7    A.    Here again, let me be careful here.  The obligation to

8          collectively bargain is suspended for five years so I

9          just want to state that for the record.  We are not in

10          any way by answering this question seeking to waive

11          that right.  As it is traditionally understood.  That

12          being said, I think at those meetings and all the

13          meetings I've referenced we generally asked during

14          those meetings for proposals which could be

15          characterized as negotiations.

16    Q.    Did the city make any counterproposals to the June

17          14th proposal at the June 20 meetings?

orrroughdraft (3).txt

18  A.  well we wouldn't bargain against ourselves.

19  Q.  It's a yes or no question okay?

20  A.  Sir throughout the day I'm trying to give you a

21      response.  I know you want yes or no questions for

22      purposes of your briefing, I suppose, but I'm trying

23      to give you an accurate response.

24  Q.  I would appreciate it if you could answer the question

25      without making speeches.

125

uncertified rough draft

1          MR. ULLMAN:  Can you have the question

2    read back, please?

3          THE WITNESS:  It's not speeches, it's a

4    response.

5          MR. ULLMAN:  Question read back.

Page 217

---

orrroughdraft (3).txt

6          (Record read back as requested.)

7          MR. SHUMAKER:  Object to the form.

8  A.  We didn't receive any counterproposals so there was

9      nothing to counter.

10  Q.  And did you make any further mod -- did you make any

11      modifications on June 20 to the proposal you had made

12      on June 14th?

13  A.  Here again I'm going to be careful as to whether or

14      not what we discussed at 20 referred to modifications

15      but suffice it to say we went over in detail as I said

16      in my declaration our proposal on the 14th and asked

17      for responses.

18  Q.  Okay.  The next meeting I believe took place in July;

19      is that right?  July 10th and 11th?

20  A.  Yes, here again, if you're reading my declaration,

21      that's what I state.

Page 218

---

orrroughdraft (3).txt

22  Q.  Now, in this set of meetings there were -- first of

23      all, were you present there?

24  A.  I don't -- I don't recall which of those meetings.  I

25      know I attended the 14th in person, I had my June 10th

126

uncertified rough draft

1      meeting in person, and I know I attended one or some

2      of these other meetings but I don't recall if I was

3      present at that meeting.

4  Q.  Okay.  So I take it then that you have no personal

5      recollection as you sit here now as to what happened

6      at those meetings?

7  A.  No, only as reported to me by my staff or consultants.

8  Q.  Okay.  And what is set out in your declaration that

9      you filed in the bankruptcy case regarding the July

Page 219

---

orrroughdraft (3).txt

10      10th and 11 meetings is essentially a recitation of

11      facts that were reported to you by others?

12  A.  Yeah, my information and belief, yes.

13  Q.  And so far as you were aware, the description of the

14      meetings that you put in your declaration were full

15      and complete and accurate?

16          MR. SHUMAKER:  Object to the form.

17  A.  Yes.

18  Q.  And we're talking about the meetings for July 10th and

19      11th just to be clear?

20  A.  Yes.

21  Q.  Okay.

22          MR. ULLMAN:  I'm going to show you a

23    document that we will mark as.

24          THE COURT REPORTER:  11.  Excuse me 12.

25          THE WITNESS:  12.

Page 220

1          MR. ULLMAN:  -- 12.

2          (Marked Exhibit No. 12.)

3    Q.   Exhibit 12 is a letter on the letterhead of the

4         Detroit Firefighters Association dated July 12, 2003

5         (sic) to Evan Miller and David Heiman of Jones Day?

6    A.   Yes.

7    Q.   Are you familiar with this letter?

8    A.   I've seen this letter before, yes.

9    Q.   Okay.  And in this letter the authors refer to the

10        July 10 meeting and say that in the third paragraph

11        you stated you wish to discuss pension restructuring

12        proposals, you were then asked by the DPOA president,

13        Mark Diaz, for specific city pension restructuring

14        proposals -- I'm sorry, I think I omitted benefit for

15        specific city benefit restructuring proposals.  You

16        declined to give any specific proposals.

17             As far as you're aware, is that an accurate

18        statement?

19   A.   Yes.

20   Q.   And they go on to say we are reviewing and will

21        provide the city with specific proposals.  As of this

22        time has the city received any specific proposals from

23        any of the potentially interested parties?

24   A.   Not to the best of my knowledge.

25   Q.   And the authors go on to say it would be productive if

1    the city could provide us with its specific proposals

2    on pension benefit restructuring as soon as possible.

3         We have had only two meetings -- I'm sorry, we have

4         had two meetings where the similar pension benefits

5         were addressed and still have only the general

6         observation that pension benefits must be reduced.

7         Is that a fair characterization as to the status as of

8         July 12th?

9    A.   Well, I'm assuming that it's fair to say there were

10        two meetings.  I'm not sure that they have city's

11        general observation.  My understanding was that there

12        were discussions besides the meetings and follow-up

13        regarding pension benefits but that's not best of my

14        knowledge.

15   Q.   And they go on to say sufficient we hope sufficiently

16        provide to our next meeting the city will provide us

17        with specific propose allegation on pension benefits

18        structuring so there can be genuine, good faith

19        negotiation on the city's debt?

20   A.   Yes, I see that.

21   Q.   And I think you indicated at this time the city had

22        not provided any specific proposals to these

23        gentlemen?

24   A.   No.  No no that's not what I indicated.

25   Q.   Okay.

1    A.   No, I think we did provide a proposal on June 14th and

2         I think the testimony was that we flushed those out

3         subsequently.

4    Q.   So the only proposal that had been provided so far is

5         a proposal on June 14th and nothing beyond that?

6        MR. SHUMAKER:  Object to the form.

7  A.  No, I think we said that there were other discussions

8    in fact you said based upon my declaration that there

9    were further discussions that followed up after June

10    14th.

11  Q.  Maybe I was unclear in my question.

12  A.  Okay.

13  Q.  There were no proposals that had been put out by the

14    city subsequent to the June 14th proposal; correct?

15  A.  I guess someone was on call.  Are we okay?

16      No proposals put out by -- well, you keep

17    saying proposals.  There's nothing as comprehensive

18    that was proposed as we put on June 14th.  There was

19    additional data and additional information that was

20    provided after June 14th.

21  Q.  So we're clear no additional proposals that provided

22    for the pension cuts or the health benefit cuts in a

23    way that was different from what was in substance set

24    out on June 14?

25  A.  Well, you say what was different.

130

1  Q.  You haven't change what was set out in the June 14th

2    proposal have you?

3  A.  You're not letting me respond.  Can I respond?

4  Q.  Let me withdraw the question.

5  A.  Okay.

6  Q.  Had there been any modify cage to the June 14 proposal

7    as of July 12, 2003 -- 13.

8      MR. SHUMAKER:  Object to the form.

9  A.  There could have been discussions that could qualify

10    as modifications, but generally speaking, the broad

11    outline of the proposal we submitted on June 14th was

12    still the proposal that we were talking about.

13  Q.  Okay, and what were the discussions that you were

14    referring to that you said could qualify as

15    modifications?

16  A.  Discussions we had with all members at the due

17    diligence follow-up sessions where we requested their

18    input.

19  Q.  And was there any bargaining that took place at those

20    sessions where the city said it would be willing to

21    agree to something that was different from what was in

22    June 14?

23  A.  Here again, I'm going to stay away from bargaining as

24    a legal conclusion, duty to bargain is suspended.  I

25    will say there was a back and forth and my

131

1    understanding discussions and invitations for further

2    information.

3  Q.  Thank you.  I'm going to show you the next document

4    which is a response to the one that we have as Exhibit

5    12 which we'll mark as Exhibit 13.

6      (Marked Exhibit No. 13.)

7  Q.  Exhibit 13 a letter from Jones Day in response to what

8    we have marked as Exhibit 12; do you see that?

9  A.  Yes, I believe so.

10  Q.  And you see this is -- the letter starts out by

11    thanking the authors for their letter of July 12th?

12  A.  Yes.

13  Q.  And then in the second paragraph Jones Day goes on to

14    say, consistent with the position Dave Heiman and I

15    expressed at the meeting, we still think it makes

16    sense to first try to reach common ground with key

17    unions and association leaders on actuarial

18    assumptions and methods and the amount of PFRS

19    underfunding and then tackle contributions and

20    attendant benefit changes.  Do you see that?

21  A.  Yes, it speaks for itself.

22  Q.  And was that the position of the city as of July 17,

23    2013?

24  A.  Yes, we said that before.

25  Q.  As of July 17th now, 2013, had the city presented any

                                        132
                        uncertified rough draft

1    proposals that were different from the proposals set

2    out in the June 14th document?
                        Page 229

---

3   A.  As I said previously, subject to that testimony about

4     discussions that were had at these meetings, I think

5     this letter speaks for itself.  We were requesting

6     input from the various interested parties as far as

7     our June 14th proposal.

8   Q.  And the discussions were the same ones that you

9     answered about in the very last question?

10  A.  Yes.

11  Q.  When I asked you what the discussions were?

12  A.  Yes.

13  Q.  And as of June 17th -- I'm sorry, July 17th, had the

14    city actually sat down with any union or retiree

15    association to attempt to reach an agreement on a

16    restructuring plan that had terms that were different

17    from the terms in the June 14th proposal?
                        Page 230

---

18  A.  July 17th?

19  Q.  I'm sorry, yes.

20  A.  Yes.

21  Q.  If I misspoke I'm asking as of July 17th.

22  A.  Yes, we may have.

23  Q.  You say you may have.  Did you?

24  A.  I was aware that there were ongoing confidential

25    negotiations with at least one union.

                                        133
                        uncertified rough draft

1   Q.  Okay.

2   A.  -- about a proposal.

3   Q.  Okay.  Were you present during those negotiations --

4     those discussions?

5   A.  I have -- I have not -- I have met with members'

6     representatives of those unions.  I'm not sure I was
                        Page 231

---

7     in on all negotiations.

8   Q.  Are these discussions that the city has stated are

9     subject to privilege under federal rule of evidence

10    408?

11  A.  Yes.

12  Q.  Okay.  And other -- so will you tell me what was said

13    at those sessions?

14         MR. SHUMAKER:  Objection to the extent it

15    calls you to reveal privileged communications.

16  A.  Yeah, those discussions are ongoing and so I'm -- I

17    have to be a little circumspect.  Suffice it to say

18    there were discussions along the line of this exchange

19    of letters of what could be addressed based upon our

20    June 14th proposal.

21  Q.  Okay.  And with whom were those discussions?  Which
                        Page 232

22   groups?  You said you met with one or two groups or

23   you were wear of meetings with one or two groups.

24   A.   I think those are confidential.  Because as I said,

25        those discussions are ongoing, so I don't want to

134

uncertified rough draft

1    interfere with settlement negotiations or breach

2    confidentiality so I'm reluctant to answer your

3    question.

4    Q.   Okay, well will you answer my question or will you

5         not?

6    A.   I don't think I can.  I think they're supposed to be

7         confidential.

8    Q.   Well, you know, you have to answer the question unless

9         your counsel instructs you not to.

10            MR. SHUMAKER:  If you think it's going to

---

11        reveal privileged communications, I'm going to

12        instruct you not to answer.

13   A.   I'll be -- I don't know so much -- can I consult with

14        my counsel?

15            MR. ULLMAN:  Yes.

16            THE WITNESS:  Can we go off the record?

17            MR. ULLMAN:  Yes.

18            THE WITNESS:  Let's step out.

19            THE VIDEOGRAPHER:  Going off the record at

20        1:53 p.m.

21            (A brief recess was taken.)

22            THE VIDEOGRAPHER:  We're back on the record

23        at 1:57 p.m.

24   Q.   Okay, will you answer my question, Mr. Orr?

25   A.   No, I think this is concerns commercially sensitive

---

135

uncertified rough draft

1    potentially confidential settlement negotiations and

2    implicates the attorney-client privilege so I cannot

3    answer your question.

4    Q.   Okay, so apart from the discussions that you won't

5         tell me about, would the city actually sit down with

6         any union or retiree association in an attempt to

7         reach an agreement on a structuring plan on terms that

8         are different than the terms set out in the June 14th

9         proposal as of July 17th?

10   A.   As I said before subject to the meetings we've had

11        we've exchanged information which may constitute the

12        type of sit down you're talking about.  Other than the

13        ones that have been recounted and phone calls and

14        meetings I may not be aware of, this is what I know in

---

15        my declaration.

16   Q.   And as of June 17th then I take it you had not

17        received any actual proposal -- I'm sorry keep saying

18        June.

19   A.   July.

20   Q.   As of July 17th you had not received any actual

21        proposal outside possibly with the settlement

22        discussions you were talking about from any union or

23        retiree association; is that right?

24   A.   Outside of those settlement negotiations.

25   Q.   Yes.

136

uncertified rough draft

1    A.   That is correct.

2    Q.   Now, as of July 17, have the city told any union or

orrroughdraft (3).txt

3      retiree association that it would in fact be willing

4      to proceed with the restructuring on terms that did

5      not include the elimination of ongoing pension

6      contributions for retirees?

7  A.  When you mean the city you mean all of my consultants

8      and others; correct?

9  Q.  Yes.

10 A.  There may have been discussions in that regard.  I

11     think I recall hearing that there was -- I can't

12     recall a specific meeting, a discussion about how that

13     would be arranged but I'm not sure.

14 Q.  So you personally did not make any such statement; did

15     you?

16 A.  Statement about?

17 Q.  Saying to anyone -- to any union or retiree

18     association that the city would in fact be willing to

Page 237

---

orrroughdraft (3).txt

19     agree to a restructuring that did not involve the

20     elimination of ongoing pension contributions for

21     retirees.

22 A.  No, I didn't say that.

23 Q.  And do you know in fact whether anyone working on your

24     team ever said that to any union or retiree

25     association?

137

uncertified rough draft

1  A.  No.

2  Q.  Okay.  During the time from June 14th to July 17, did

3      you or anyone else from your team tell any union or

4      retiree association that the city acknowledged that

5      under Michigan law pension rights were explicitly

6      protected from being impaired or diminished?

Page 238

---

orrroughdraft (3).txt

7  A.  I don't know.

8              MR. SHUMAKER:  Objection, form, calls for

9      speculation.

10 A.  I don't recall anyone saying that but it may have

11     happened.

12 Q.  But you personally didn't make that statement did you?

13 A.  I don't recall saying that.  I may -- you know,

14     anything is possible, I just don't recall saying it.

15 Q.  And as of July 17 had the city, you or anyone working

16     for you, told any union or retiree association that it

17     would in fact be willing to agree to a restructuring

18     plan that did not effectively eliminate the prior

19     existing health benefits for retirees?

20             MR. SHUMAKER:  Objection, foundation, calls

21     for legal speculation.

22 A.  Healthcare benefit for retirees?

Page 239

---

orrroughdraft (3).txt

23 Q.  Yeah.

24 A.  That did not eliminate it?

25 Q.  Yeah that you --

138

uncertified rough draft

1  A.  Did not adjust it in some fashion?

2  Q.  Did not essentially cut it out the way it was being

3      cutout in the June 14th proposal.

4  A.  Yeah, I want to be careful with the frame cutout

5      because I think there were subsequent discussions

6      about what would be provided instead.

7  Q.  Uh-huh.

8  A.  -- as a proposal so I don't want my testimony to seem

9      as if we were not proposing an alternative to the

10     existing healthcare plan and that had not been

Page 240

orrroughdraft (3).txt

11    discussed prior to July 17th, but subject to those

12    qualifications the answer to your question is yes.

13 Q.  Now, I've been asking you as of July 17 and then the

14    bankruptcy filing was the very next day; correct?

15 A.  Yes.

16 Q.  Now, in your declaration do you recall making

17    statements to the effect that there were expressions

18    by certain union representatives that they would not

19    and I quote countenance discussions over proposals to

20    modify either retiree healthcare or pensions?

21 A.  Yes, I think those are quite publicly stated.

22 Q.  And you refer in your declaration to newspaper reports

23    from June 20 and 21?

24 A.  Yes, and I'm trying to recall if people said that to

25    me personally as well.  Yes, but I do recall the press

                                                    139

1    reports, yes.

2 Q.  And those are in fact press reports that you referred

3    to as you said?

4 A.  Yeah, but I think -- and I'm just -- was your question

5    asked about union representatives or union members?

6 Q.  Union representatives.

7 A.  Could that include members?

8 Q.  I'm not asking about people who are just members and

9    not officials in the union.

10 A.  So you're talking about union officials?

11 Q.  Union officials.

12 A.  Okay.  That they would not countenance any change

13    to --

14 Q.  I think the language from your declaration is that

orrroughdraft (3).txt

15    they would countenance discussions or other proposals

16    to modify either retiree healthcare or pensions.

17 A.  Yeah, I don't think that was just a function of press

18    reports, I think that was relayed to me upon my

19    information and belief upon others as well.

20 Q.  Upon your information and belief sounds like you

21    didn't hear it personally?

22 A.  No, I just don't recall whether I heard it personally.

23    I have heard it personally in other meetings from

24    union representatives prior to July 17th, sure.

25 Q.  With respect to the statements that you quote in the

                                                    140

1    newspaper, those are just newspaper reports; right?

2 A.  well, if they're newspaper -- they speak for

orrroughdraft (3).txt

3    themselves if they're newspaper reports.  But have I

4    heard that from union representatives?

5 Q.  I'm --

6 A.  I'm responding to your question.  Have I heard that

7    from union representative?  Yes.

8 Q.  I'm going to get these in two phases; okay?

9 A.  Okay.

10 Q.  For the newspaper reports, you're relying on what was

11    said in the newspaper?

12 A.  Yes.

13 Q.  So you have no personal knowledge as to whether the

14    quotation in the newspaper was accurate or anything

15    like that?

16 A.  Unless I was there, I'm not the reporter, yes.

17 Q.  Now, what statements were made to you outside of what

18    you read in the newspaper?

19  A.  Quite early on I had heard from union representatives,

20      I believe at DFFA, DPLSA, DPOA, I'm not sure it

21      includes AFSCME, UAW, but I had heard statements in

22      that regard in many of the meetings that I've had with

23      them previously prior to July 17th.

24  Q.  And did they specifically -- what statements saying

25      specifically what?

                                                        141
                    uncertified rough draft

1   A.  Generally, you know, I don't know the exact quotes but

2       generally speaking what I said.  They would not

3       countenance cuts to healthcare and benefits.

4   Q.  That wasn't actually what you said in your

5       declaration.

6   A.  That's what I said generally.

                    Page 245

7   Q.  What you said in your declaration is they would not

8       countenance discussions over proposals to modify

9       either retiree healthcare or pensions.

10  A.  Yeah, healthcare, okay, yes.

11  Q.  So who said what -- I would like to know specific as

12      to who said what to you when?

13  A.  As I said, I had meetings early on with DFFA, I don't

14      recall the specific members but I recall the meeting,

15      they were quite heated.  Might have been one with

16      Mr. McNamara, Mr. Shinsky and others.  I've had many

17      meetings with DPLSA, Rodney Sizemore and Mark Young.

18      I've had meetings with DPOA, Mark Diaz, where that was

19      said prior to July 17th.

20  Q.  Okay.  And you're aware that the at least two of the

21      individuals that you mentioned are signatories to what

22      we've marked as Exhibit 12?

                    Page 246

23  A.  Yes.

24  Q.  So you're not suggesting, are you, that those people

25      were saying that their unions would not in any event

                                                        142
                    uncertified rough draft

1       negotiate with the city; were you?

2   A.  I didn't -- that's not my testimony.  That's what I

3       say in my declaration.  I think most of the

4       discussions that were had were, here again, staying

5       away from the traditional concept of negotiating

6       because I'm not waiving any rights, but the general

7       concern is we're not going to change pension and

8       healthcare benefits, there were a lot of discussions,

9       these are affecting people's lives, these are promises

10      that the city has made, all the things you've heard

                    Page 247

11      before.  Those were recounted to me many times.

12  Q.  Okay.  And as we saw from the document we've marked as

13      Exhibit 12, the DFFA was in fact interested in getting

14      specific proposals from the city and said it would be

15      making its own proposal; correct?

16          MR. SHUMAKER:  Objection, calls for

17      speculation.

18  A.  The letter speaks for itself, but it says it would be

19      productive if the city could provide us with specific

20      proposals on pension benefit restructuring as soon as

21      possible.  I think that there had been discussions in

22      some of those meetings about pension benefits but I

23      guess they're asking for more detailed information.

24  Q.  And it also says as we went through before in the

25      fourth paragraph we are reviewing and will provide the

                                                        143
                    Page 248

1    city with specific proposals; correct?

2    A.  Yeah, that's the information I got and they said they

3    were going to provide us with specific proposals.

4    Q.  Okay.  And -- okay.

5         And then we saw the response to that was in

6    Exhibit 13 again; correct?

7    A.  Yes, this is the given for the discussions I talked

8    about.

9    Q.  And then the bankruptcy filing was the very next day;

10   correct?

11   A.  Yes.

12   Q.  Did you personally have any discussions with

13   representatives of any retiree associations?

14   A.  Yes.

15   Q.  Which ones?

16   A.  Fire, Detroit -- police and fire I think, yes.  Early

17   on with --

18   Q.  The police and fire?

19   A.  Yes.

20   Q.  And what was the substance of those discussions?

21   A.  This was concerns expressed about potential impact to

22   pensions and healthcare obligations.

23   Q.  And are you aware that the police and firefighters

24   association RDPP-- I'm sorry, RDPFFA, that's who

25   you're referring to?

                                                      144

1    A.  Right, RDPFFA, yes.

2    Q.  Retired Detroit police and firefighters association.

3    They represent retired police and firefighters;

4    correct?

5    A.  Yes.  I assume, that's their name.

6    Q.  Did anyone from that organization tell you that they

7    were refusing to negotiate with the city?

8    A.  No, I don't think the discussion was of that nature

9    and character about refusing to negotiate.  I think it

10   was quite -- by some members of that meeting made

11   quite clear that they were not interested -- refusing

12   is a big word.  It was made quite clear they were not

13   interested in hearing about adjustments to pension

14   benefits.

15   Q.  But you're not saying that that organization said it

16   refused to negotiate with the city; are you?

17   A.  Like I said, refused is a big word.  There was a lot

18   of stridency in the conversations.

19   Q.  But to be clear your testimony is not that the retiree

20   association for the police and firefighters said that

21   they would refuse to enter into any negotiations with

22   the city?

23   A.  No, I keep saying it's not a question of refusing, it

24   was that you can't do this.  So they didn't say and

25   we're not going to ever talk to you again.  That did

                                                      145

1    not occur.  What was was very strident about you can't

2    do this.

3    Q.  And you could understand why they were strident about

4    what was being done to their retirement benefits can't

5    you?

6    A.  Well nothing's been done to their retirement benefits.

orrroughdraft (3).txt

7       we've held them harmless for the balance of this

8       entire year.  There was a proposal.

9   Q.  You can understand about the retirees would be upset

10      about what was proposing to be done; can't you?

11  A.  I've said that before, sure.

12  Q.  I want to show you another document.  Was that the

13      only retiree association you had discussions with?

14      Any discussions with the Detroit retired city

15      employees association?

16  A.  I'm trying to think.  None that I recall.  None that I

17      recall.

18  Q.  Okay.  Let me show you another document.

19  A.  There may -- none that I recall with specificity.

20  Q.  Okay.  And you were aware that they represented other

21      nonuniformed retirees?

22  A.  Yes.

---

orrroughdraft (3).txt

23  Q.  But you can't recall anything --

24  A.  None I recall with specificity.

25  Q.  Okay.  Let's mark the next document, which is, what,

                                                          146

                        uncertified rough draft

1       15?

2               THE COURT REPORTER:  14.

3               MR. ULLMAN:  14.

4               (Marked Exhibit No. 14.)

5   Q.  Okay, 14 is a document entitled retiree legacy cost

6       restructuring, September 11, 2013.

7   A.  Yes.

8   Q.  Are you familiar with this document?

9   A.  Yes.

10  Q.  And does this represent the city's current position as

---

orrroughdraft (3).txt

11      to what it's going to do, what it's going to provide

12      for retirees?

13  A.  This represents the slide dec that we proposed last

14      week at the initial meeting with the retiree

15      committee.

16  Q.  Okay, and does it represent the position for the city

17      currently as to what it's --

18  A.  Yes, this is the current --

19  Q.  -- planning to propose or planning to put through?

20  A.  Yes, this is the city's current thinking.

21  Q.  And as I understand this roughly, on the health side

22      what the city was saying it will do is essentially the

23      retirees who are Medicare qualified can sign up for

24      some various Medicare plans and the city will help

25      them with the payment of the premium for that?

                                                          147

---

orrroughdraft (3).txt

1   A.  Yes.

2               MR. SHUMAKER:  Objection, document speaks

3       for itself.

4   A.  But yeah on page 4 it starts that discussion, yes.

5   Q.  Okay.  And essentially for nonMedicare retirees in

6       terms of getting healthcare they're on their own and

7       the city says it will give them $125 stipend; is that

8       right?

9               MR. SHUMAKER:  Objection to form.

10  A.  Yeah, you say they're on their own but I think there's

11      a proposal here that they be able to go onto the

12      exchanges provided by the affordable care act and the

13      city would give them a stipend.

14  Q.  Right, and that's if to the extent they can do it but

15    it's up to them to do something like that; right?

16  A.   Yeah, like Harris Teeter did last week, yes.

17  Q.   And on the pension side of things has there been any

18    change from what was set out in the June 14th

19    proposal?  As I understand this, it's still a defined

20    contribution plan for current employees and no

21    contributions being made by the city for retired --

22    for retirees is that right?

23         MR. SHUMAKER:  Object to the form.

24  A.   Yeah, the general consensus is that you would close

25    the plan and there would be contributions for

148

uncertified rough draft

1    currents, yes.

2  Q.   And so again just to be clear that means for retirees

3    no ongoing contributions provided by the city?

---

4  A.   None other than their participation in the note that's

5    proposed in the June 14th proposal.

6  Q.   And with no new funding for their pensions the

7    payments will stop to the retirees would stop being

8    made when the retirement funds run out; is that right?

9  A.   That's a loaded question.  I mean, the -- and the

10    reason I say it's a loaded question, some of the

11    retirement funds have said their payments won't run

12    out so that's why we want to have a dialogue.  we

13    think they're at risk.  They've told us they're not.

14  Q.   And by the city's estimation the pension funding will

15    run out when if no new funds are put in?

16  A.   well, as you can see from our proposal, we have -- not

17    so much from the proposal but June 14th as well, we

18    made certain assumptions as to when the funds might

---

19    run out if nothing is adjusted one way or the other.

20    We've been told that we're wrong so --

21  Q.   I'm asking.  I'm asking the city's point of view.

22  A.   The city's point of view is that we've made an

23    accurate and fair assumption that the funds will run

24    out at some point within the next two decades.

25  Q.   And that's if no new money is contributed?

149

uncertified rough draft

1  A.   If -- well, and I'm being very careful.  It's not just

2    if there's no new money, it depends upon actuarial

3    rates, it depends upon rate of return.  Pensions could

4    invest in the Microsoft of their day and have more

5    than enough funds for the foreseeable future.  But

6    assuming certainly reasonable assumptions that is the

7    conclusion of the city.

---

8  Q.   And just to be clear, and that assumption as to when

9    it would run out assumes no further contributions by

10    the city; correct?

11  A.   Yes, it assumes we close the plan.  Other than the

12    note.

13  Q.   And do you have any more specific recollection as to

14    when the funds would run out other than within the

15    next two decades?

16  A.   It's in my papers.  If you want to point me to it,

17    that's fine, but I'll stand by what's in the papers.

18  Q.   Now, you recall of course putting in a declaration in

19    the bankruptcy?

20  A.   Yes.

21  Q.   I guess I can actually give you a copy in case you

22    want to refer to it.

orrroughdraft (3).txt

23  A.  Okay.

24      MR. ULLMAN:  Which we'll mark as 15.

25      (Marked Exhibit No. 15.)

150

uncertified rough draft

1  Q.  Okay, and Exhibit 15 is your declaration?

2  A.  Yes.

3  Q.  There's a lot of financial information that you put

4      out in your declaration; right?

5  A.  Yes.

6  Q.  One thing I didn't see in here is a balance sheet

7      showing the assets and liabilities of the city.

8  A.  That is correct.

9  Q.  Does one exist?

10  A.  Not in the traditional sense that you're speaking of.

11      I think in our June 14th proposal we try to provide --

Page 261

---

orrroughdraft (3).txt

12      and in other proposals we try to provide for some

13      listing of the city's potential assets of any

14      substantial form but it is their traditional corporate

15      balance sheet for instance for the city, no, not yet.

16  Q.  Do you have schedule of assets and liabilities that

17      exist though?

18  A.  Yes.

19  Q.  Have those been produced?

20  A.  I don't know if we've completed the schedules so --

21      you're talking about the schedules of assets and

22      liabilities?  I don't know.

23      MR. ULLMAN:  I'll call for their

24      production.

25      MR. SHUMAKER:  We will see.

151

uncertified rough draft
Page 262

---

orrroughdraft (3).txt

1      MR. ULLMAN:  I'm sorry?

2      MR. SHUMAKER:  We'll look into it.  I'm not

3      sure whether they've been produced or not right now as

4      I sit here.

5  A.  Well, just to be clear, as you know, under Chapter 9

6      the time frame of it.

7  Q.  That wasn't my question.

8  A.  But I'm answering your question so it won't be unclear

9      on the record.

10  Q.  But there isn't a question.

11  A.  No, I'm being responsive.  So it won't be unclear on

12      the record.  Under Chapter 9 they're actually not due

13      yet, so let's just be clear.

14  Q.  Now, at paragraphs 52 through 57 of your declaration

15      you make a number of statements about insolvency?

Page 263

---

orrroughdraft (3).txt

16      MR. SHUMAKER:  What page?

17      MR. ULLMAN:  Sure, it's 37.

18  A.  Yes.

19  Q.  And in particular you cite a lot of figures with

20      respect to cash flow and you give projections?

21  A.  Yes.

22  Q.  Now, I think you indicated you're not an accountant?

23  A.  No, I'm not.

24  Q.  And is it correct that you yourself did not prepare

25      the cash flow numbers and projections?

152

uncertified rough draft

1  A.  That is correct.

2  Q.  The underlying work was done by others?

3  A.  Yes.

Page 264

---

4   Q.   And in your declaration you cite a number of sources

5        for the figures that you give in paragraphs 54 through

6        57?

7   A.   Yes.

8   Q.   You don't cite Ernst & Young as one of the sources?

9   A.   No, that's because Ernst & Young submitted a parallel

10       affidavit at the time of this filing of Gaurav

11       Malhotra.

12  Q.   Didn't the city in fact retain Ernst & Young to

13       prepare these cash flow projections?

14  A.   The city retained Ernst & Young I believe over two

15       years ago to work on liquidity, cash flow and

16       analysis.  I don't think it was limited to just cash

17       flow projections.

18  Q.   But that's one of the things that Ernst & Young did?

19  A.   Yes.

---

20  Q.   And that's one of the things in fact that -- what's

21       his name -- Gaurav Malhotra did?

22  A.   Gaurav Malhotra.

23  Q.   I'm sorry.

24  A.   No problem.

25  Q.   And Mr. Malhotra was in fact one of the lead Ernst &

153

uncertified rough draft

1        Young players involved in working with the city;

2        wasn't he?

3   A.   Yes, he's a principal at Ernst & Young.

4   Q.   And is it correct that the figures that you're citing

5        in these paragraphs of your declaration in fact come

6        from work that come from Mr. Malhotra?

7             MR. SHUMAKER:  Which figures are we talking

---

8        about counsel?

9             MR. ULLMAN:  Basically by my recollection

10       all of -- pretty much all of the figures.  Certainly

11       in 54 these numbers about the 225 million, the

12       schedule that appears on page 39, the information

13       about the retiree legacy obligations being 8 percent

14       of revenues and this was all -- and going on I just

15       tried to chart it out briefly.  It looked to me

16       basically all this was taken or appeared also in the

17       affidavit or declaration of Mr. Malhotra.

18            MR. SHUMAKER:  I object to all this.

19       That's why I'm trying to ask you to be specific so

20       that the witness can give a responsive answer.

21  A.   Yeah, let me say --

22            MR. SHUMAKER:  Paragraphs 54 through what?

23            MR. ULLMAN:  57.

---

24            THE WITNESS:  57.

25            MR. SHUMAKER:  Through 57.

154

uncertified rough draft

1   A.   Let me say this generally.  If you look at Gaurav

2        Malhotra's declaration, he states that this

3        information is compiled by him in conversations with

4        city employees and other consultants as well.  So I

5        don't want to give the impression that he's the sole

6        source for the data that we recovered.  It is a

7        compilation of data from a number of different sources

8        and I relied on those same sources too and as this is

9        reported in the various footnotes to source the

10       material, they may have come from Mr. Malhotra but

11       they may have come from a number of different sources

12    in the process of him developing the work.

13  Q.  But either way they were not done by you personally?

14  A.  No, they were not done by me personally.

15  Q.  Did you do anything to verify the numbers the figures

16    the calculations done in paragraphs 52 through 57 of

17    your declaration were accurate?

18  A.  Yes.

19  Q.  What did you do?

20  A.  I discussed them with Mr. Malhotra and a number of

21    different consultants.  We discussed them with the

22    economists at Ernst & Young and other accountants.  I

23    discussed some of them with city employees.

24  Q.  Okay, so you essentially satisfied yourselves that the

25    people who prepared these numbers did what they were

155

---

1    supposed to do and made what you thought were

2    reasonable assumptions in coming to them; is that

3    fair?

4  A.  Yes.  I mean some of them are just factual statements

5    but yes to the extent there were assumptions and work

6    being done, there was some participation in the

7    organic work.

8  Q.  Okay and you relied on the information that was being

9    provided to you?

10  A.  Yes by the professionals.

11  Q.  By the people -- by the professionals you hired to

12    perform that task?

13  A.  Yes.

14  Q.  Now, is it correct that in the years prior to the time

15    you got there Detroit was subject to various scandals

---

16    including financial mismanagement?

17  A.  Yes.

18  Q.  And one of the former mayors in fact went to jail for

19    corruption; isn't that right?

20  A.  He's been convicted.  I don't know if he's sentenced

21    but certainly that's been widely written about.

22  Q.  Right.  And do you know whether the books and records

23    that survived that administration were complete and

24    accurate?

25  A.  I know that the, for instance, the CAFER consolidated

156

1    annual financial report, was based on certain books

2    and records.  I know that there have been questions

3    raised about the quality and competence of Detroit's

---

4    books and records.  My testimony would be that to the

5    best extent possible based upon the data that we got

6    we relied on those books and records.

7  Q.  And is it correct that the books and records -- and

8    those were the same books and records that are

9    Mr. Malhotra relied on; right?

10  A.  Yes, I think.

11        MR. SHUMAKER:  Objection, calls for

12    speculation.

13  A.  I think Mr. Malhotra's declaration states that Ernst &

14    Young did not audit the books and records of the city.

15  Q.  And did anyone else audit the books and roar of the

16    city before these numbers appear in your declaration

17    were prepared?

18  A.  There may have been.  I'm not sure because depending

19    upon at any given time where the numbers come from

20    they may have been subject to an audit or they may

21    have been subject to a review, for instance the

22    pension numbers.  Gabriel Rotor, which was GRS's

23    traditional actuary, may have done some balance so in

24    my understanding based upon both the information I

25    received and discussion from Malhotra's declaration,

157

uncertified rough draft

1    Ernst & Young did not audit them and I'm not an

2    auditor so that's my understanding.

3  Q.  But do you know whether or not anyone else audited --

4  A.  I don't know.

5  Q.  And is it correct that if the underlying data of the

6    books and records that were being used to prepare

7    these cash flow numbers and projections have material

---

8    inaccuracies that those would affect the projections

9    and the figures as well?

10        MR. SHUMAKER:  Object to the form.

11  A.  That's a hypothetical, but I think it's fair to say

12    that if they had material inaccuracies, they would

13    have an impact, but I'm unaware that they are

14    materially inaccurate.

15  Q.  But that's never been subject to an audit; has it?

16  A.  To the best of my knowledge I don't know when they

17    have or when they haven't.

18  Q.  Okay.  And I think you indicated that in coming up

19    with these figures various people were consulted in

20    various fields and a number of assumptions were made;

21    is that right?

22  A.  I believe so.

23  Q.  And I think you also indicated in your structuring

---

24    proposal from June 14th that the numbers are subject

25    to various assumptions which could or could not prove

158

uncertified rough draft

1    right; correct?

2  A.  Well, I think in June 14th we've said that it's a

3    proposal and there may be various issues that may or

4    may not be correct.

5  Q.  Yeah.  Okay, and obviously if any of the assumptions

6    that went into the underlying numbers that appear in

7    your declaration are wrong, then the numbers

8    themselves would also be subject to inaccuracy; true?

9  A.  Let me say this about that.  Both in June 14th

10    presentation and in this declaration, we've tried to

11    present an accurate picture of the city's books and

---

12    records and status to the best extent possible that we

13    have.  Where there were questions we have tried to err

14    on the side of reasonable assumptions as opposed to

15    unreasonable assumptions either way.  But your general

16    question as to whether or not if the information going

17    in was inaccurate revealed an inaccurate result I

18    think it's true just as a matter of common sense and

19    logic.

20  Q.  And the same thing as to assumptions.  If the

21    assumption made was wrong, then the output would be

22    wrong also?

23  A.  I think that's why we asked several times to have a

24    discussion about the assumptions that are necessary

25    for pension benefits.

159

uncertified rough draft

1  Q.  Now, the cash flows that are being reported in your

2      declaration, those do not include any assumptions as

3      to the monetization of various assets that the city

4      continues to hold; is that right?

5              MR. SHUMAKER:  This is paragraph 56 that

6      you're referring to, counsel?

7              MR. ULLMAN:  Yeah, I'm looking in general.

8              MR. SHUMAKER:  In cash flow?

9              MR. ULLMAN:  Yeah, cash flow.

10 A.  You're talking about generally do the cash flows

11     include any monetization of any city assets?

12 Q.  Yeah.

13 A.  No, they do not.

14 Q.  And obviously if assets currently held by the city

15     were monetized that would provide additional cash to

Page 277

---

16     pay obligations including retirement and health

17     obligations correct?

18 A.  Well, additional cash from one time asset sales may

19     not necessarily equal cash flows.  As I understand the

20     analysis, we've tried to present is cash flows based

21     upon a recurring basis as opposed to one time assets

22     but it would yield additional cash.

23 Q.  Yes.  If you sold an asset and had money you would

24     have the money available to pay something?

25 A.  Yeah, you might have a one time -- I'm not an

160

uncertified rough draft

1      accountant but you might have a one time cash charge

2      yes.

3  Q.  And if the cash, the amount you got was large, it

Page 278

---

4      could last for a long period of time; correct?

5  A.  Well, it depends upon what --

6              MR. SHUMAKER:  Objection, form.

7  A.  Depends upon what it was used for.  I mean, what are

8      you talking about?  When you say could last for a long

9      period of time, it could be a one -- you could sell

10     one asset for $5 million and that wouldn't last a

11     month.

12 Q.  Yes, and depending on the amount of assets that were

13     sold if you got a substantial amount of money that

14     could enable the City of Detroit to pay ongoing bills

15     for some period of time; true?

16             MR. SHUMAKER:  Objection to form.

17 A.  Here again, depending upon the size of the asset, but

18     anything is possible.

19 Q.  Okay.  Now, the City of Detroit owns certain pieces of

Page 279

---

20     art that are stored at the Detroit Institute of Art;

21     is that right?

22 A.  Yes.

23 Q.  And how many is that?

24 A.  I think the city owns approximately 66,000 pieces of

25     art.

161

uncertified rough draft

1  Q.  Now, those --

2  A.  No, strike that.  Let me be clear so we can move on.

3  Q.  Yeah.

4  A.  I think there are 66,000 pieces of art over at Detroit

5      Institute of Art.  I'm not sure the city owns all

6      66,000 pieces.  I've been informed that it owns 35,000

7      of those pieces in an undisputed capacity.

Page 280

8   Q.   Okay, that's what I was getting at.  And that's

9        distinct from art that is subject to a public -- or is

10       or may be subject to a public trust or something like

11       that.  This is 35,000 pieces that the city owns as you

12       said in an undisputed capacity?

13   A.   Outright, yes.

14   Q.   Outright.  Now, is it correct that the city has

15       retained Christie's to appraise this city-owned art?

16   A.   Yes.

17   Q.   And have you gotten back any information yet from

18       Christie's as to the appraised value?

19   A.   No.

20   Q.   And do you have any understanding as to the value of

21       the appraised -- of the art that's being appraised

22       independent of what -- of Christie's as a source?

23   A.   Only what I've read in various news articles and

24       blogs.

25   Q.   And I think you've seen press reports indicating that

162

uncertified rough draft

1        for some of the most important works alone the value

2        could be at least 2.5 billion or something on that

3        order?

4    A.   We talked about press reports earlier and I was

5        cautioned to be careful so I'm going to say the same.

6    Q.   I'm just asking.

7    A.   I'm trying to respond to your question.  I'm going to

8        say the same thing about press reports here.  I have

9        seen press reports reporting various values for the

10       art.

11   Q.   And have you seen press reports reporting for the most

12       important pieces alone values on the order of 2.5

13       billion?

14   A.   I don't recall if I've seen those specific press

15       reports.

16   Q.   Do you have any reason to believe that the value of

17       the city-owned art is less than something on that

18       order of magnitude?

19   A.   I'm relatively agnostic on the value of the art at

20       this point.  I'm waiting to see the appraisal.

21   Q.   Do you have any understanding as you sit here today as

22       to what the value of the city-owned art is?

23   A.   No.

24   Q.   Are you considering selling the city-owned art to

25       generate cash?

163

uncertified rough draft

1    A.   What I've said consistently is all options on the

2        table but we first have to decide what we're talking

3        about.

4    Q.   Do you have any understanding as to how long it would

5        take to sell the art if a decision were made to sell

6        it?

7    A.   No.

8    Q.   Have you considered other ways to monetize the art

9        besides an outright sale?

10   A.   All options are on the table.

11   Q.   Well, have you considered any others in particular?

12   A.   We have not made -- meaning my team and I have not

13       made any decisions with regard to the art contained at

14       DIA.

15   Q.   I'm not asking about decisions I'm just asking what

16    you considered?

17    A.    We considered allotted of things yes.

18    Q.    And have you -- well then can you answer my question

19    more specifically?  What if anyways to monetize the

20    art have you considered other than an outright sale?

21    A.    I think there's been discussions about some form of --

22    and I'm not clear because to be direct, I know that

23    some of my -- I've never been to DIA, I don't think

24    I've ever spoken with their board, I know that some of

25    my consultants have been over there and have had

                                                            164

                          uncertified rough draft


1    various discussions about the art.  I think the

2    discussions were very high level and very general.

3    That's what I know.

4    Q.    Okay, that's really very nonspecific.  Are you aware

---

5    of any specific consideration given to any form of

6    monetizing the art other than an outright sale?

7    A.    No, nothing specific.

8    Q.    Could be a lease -- nothing has been idea identified

9    as a possible route to monetize?

10    A.    Nothing specific.  There have been discussions but

11    nothing specific.

12    Q.    Have there been discussions of leasing as a possible

13    way to monetize?

14    A.    Possibly, yes.

15    Q.    Okay.  And do you have any understanding of the amount

16    of cash flow that could be generated on an annual

17    basis if the art were leased?

18    A.    Sitting here today, no.

19    Q.    Has that number been talked about?  Is there a

---

20    document that might discuss that?

21    A.    No, no, there's no document.  I -- I -- in an effort

22    to be accurate I think I had a discussion with one of

23    the representatives at Christie's that was generally

24    speaking leasing is a very difficult thing to do.

25    That's the nature of the discussion that you would

                                                            165

                          uncertified rough draft


1    have to have the right pieces at the right time at the

2    right market to generate cash.

3    Q.    So there was no discussion about the amount of money

4    it could generate?

5    A.    No, no, it -- there was some discussion about 1

6    million dollars, for instance, or something like that,

7    but it's nothing substantive.

8    Q.    Okay.  Now, the city also has a department of water

---

9    and sewers; is that right?

10    A.    Yes.

11    Q.    And as I understand it the department of water and

12    sewers operates as a separate entity for accounting

13    and operating purposes?

14    A.    As a result of Judge Cox's opinion it has separate

15    procurement, accounting and managerial

16    responsibilities but as it's stated in that opinion it

17    remains an asset in the department of the city.

18    Q.    And is it correct that the water and sewer department

19    has issued secured bonds?

20    A.    Yes, they're in my June 14th proposal.

21    Q.    Okay and I don't recall.  What was the value of the

22    bonds that were issued?

23    A.    The secured portion of the bonds all in but this also

24      includes some parking -- parking was 95 million, some

25      dedicated state revenue bonds was a couple hundred

                                                    166
                    uncertified rough draft


1       million but generally speaking about 5.7 billion.

2   Q.  And those bonds -- the 5.7 billion is secured by the

3       assets of the department?

4   A.  Yes, yes.

5   Q.  And as you understand it, does the value of the assets

6       of the department of water and sewers exceed the

7       values of the secured bonds?

8   A.  I don't know if there's been a formal appraisal but I

9       certainly would hope so.

10  Q.  Do you have an understanding of the value of the water

11      and sewer assets?

12  A.  Not sitting here today.

Page 289

---

13  Q.  Do you have a general understanding, a general

14      recollection?

15  A.  When you talk about asset values, you're talking about

16      switches, pipes, valves, things along that nature.  I

17      don't think I've ever seen an appraisal of the value

18      of the assets of the water and sewer department.

19  Q.  Do you have a general understanding of what the value

20      of the assets?

21  A.  No.

22  Q.  Is worth?

23  A.  No.

24  Q.  Have you taken any steps to monetize the value of the

25      assets owned by the water and sewer department?

                                                    167
                    uncertified rough draft

Page 290

---

1   A.  When you say monetize, I'm going to respond to the

2       question on basis that monetize is in the broad sense.

3   Q.  Uh-huh.

4   A.  Not whether it's a lease, whether it's a sale, getting

5       authority.

6   Q.  Just get money for it?

7   A.  Get money for it, get some dough, okay just want to be

8       clear.  Discussions are ongoing in that regard.

9   Q.  What are those discussions in a nutshell?

10  A.  Those are commercially sensitive so I don't want to

11      interfere.  Suffice it to say, the Judge Cox's opinion

12      spoke to the possibility of creating an authority that

13      would remove the water and sewer department's

14      operations not the assets, from the city and perhaps

15      increase additional value as a by-product of that

16      process.

Page 291

---

17  Q.  And this is what is referred to in the June 14th

18      proposal or this transaction with this new authority?

19  A.  Yes.

20  Q.  And that would involve some sort of payment by the

21      authority to the city?

22  A.  Yes, some sort of lease payment or like kind payment.

23  Q.  Do you have any understanding -- can you give me any

24      idea as to the value that would be achieved by that,

25      the amount of cash that the city would be achieving,

                                                    168
                    uncertified rough draft


1       realizing if that went through?

2   A.  Judge Cox's opinion and I'm referencing the opinion to

3       state what's already in the record references I

4       believe a 62 million dollars payment which he called

Page 292

orrroughdraft (3).txt

5    wildly speculative.  But there may be payments in that

6    regard somewhere between 40 or lower to maybe up to

7    100.  It's unclear.

8  Q.  Right now who has control over the revenues that are

9    taken in by the department of water and sewers?

10  A.  City does.

11  Q.  Now, the department of water and sewers also had

12    retirement obligations for its --

13  A.  well, they have employees that are members of the

14    general retirement fund.

15  Q.  Right.  And how were payments to the retirement fund

16    for those employees to be made?  In other words, were

17    they to be made directly by the department of water

18    and sewer to the retirement systems or were they made

19    by the department of water and sewer to the city which

20    then was to remit them to the retirement systems?

Page 293

orrroughdraft (3).txt

21  A.  You're talking about the transaction or steady state

22    now?

23  Q.  The steady state.

24  A.  Steady state now.  My understanding is that's part of

25    the city's obligation.

169

uncertified rough draft

1  Q.  So the DWS department of water and sewers is to give

2    the money for the retirement to the city, the city

3    was?

4  A.  City makes it.

5  Q.  Was then supposed to make the payment to the

6    retirement systems?

7  A.  Uh-huh.

8  Q.  And are you aware of any funds that were transmitted

Page 294

orrroughdraft (3).txt

9    by the department of water and city (sic) to the city

10    for the purpose of funding pensions that were then

11    used by the city for other purposes?

12  A.  I don't know if you can identify specific water and

13    sewer funds and transactions.  I know that the city

14    has borrowed from the general retirement system from

15    time to time.

16  Q.  So that's not really answering my question.  Can I

17    have my question read back please?

18  A.  Okay, sure.

19       (Record read back as requested.)

20  A.  Am I aware?  It would be speculative.  I've -- no.

21  Q.  So is it your testimony that all monies that were

22    transmitted by department of water and sewer to the

23    sit toy make payment for pension benefits were in fact

24    properly applied to the retirement systems as pension

Page 295

orrroughdraft (3).txt

25    contributions?

170

uncertified rough draft

1  A.  No, that's a conclusion on my statement I wasn't

2    aware.  That may have occurred but sitting here today

3    without speculating, I'm not aware of a specific

4    transaction or transactions.

5  Q.  So it may have occurred, you just don't know one way

6    or the other?

7  A.  I just don't know.

8  Q.  Now, you indicated that the city has control over the

9    money that's taken in by the department of water and

10    sewers; yes?

11  A.  City has control over the department of water and

12    sewer.  There are certain obligations due from the

Page 296

13     department of water and sewer, but yes.

14  Q.  Okay.  So if the department of water and sewer has

15     money that it wants to spend for a particular purpose,

16     is it correct that the city could decide that the

17     money should not be spent for that purpose and used

18     for something else?

19  A.  That would depend upon the nature of the bond

20     obligations that department of water and sewer because

21     although the department remains a department of the

22     city, the bond obligations that are secured have

23     certain security interests in that revenue stream.

24  Q.  Okay.  Is there anything that restricts the city from

25     taking money from the department of water and sewer

                                                        171
                       uncertified rough draft

                           Page 297

---

1     that the department of water and sewer wishes to use

2     for and has earmarked for capital improvements to the

3     water and sewer system?

4  A.  Yes, there's probably restrictions in the bond

5     instruments.

6  Q.  And other than what may be in the bond instruments is

7     there any legal prohibition on the city taking the

8     money that the DWS would otherwise use for capital

9     improvements?

10  A.  Yes, there might be under Judge Cox's opinion.

11  Q.  But without reviewing the specifics of Judge Cox's

12     opinion you don't know that?

13  A.  I don't know that.

14  Q.  Now, are you aware that in its most current proposals

15     the department of water and sewer is proposing over

16     the next several years to spend hundreds of millions

                           Page 298

---

17     of dollars on capital projects?

18  A.  Yes.

19  Q.  And have you given any consideration to not having

20     that money used for capital improvements to water and

21     sewer including new projects but in fact to have that

22     money used to satisfy other existing city obligations

23     which may include but not be limited to pension or

24     healthcare obligations?

25  A.  Have we given some consideration?  Here again, this is

                                                        172
                       uncertified rough draft

1     wrapped up in the potential transaction that is being

2     discussed and I think it's been reported with a number

3     of counties and other parties so I want to be careful

4     that I don't impact commercially sensitive
                           Page 299

---

5     information.  I know that the capital improvement plan

6     at DWSD is a component of insuring that its

7     creditworthiness remains separate and apart from the

8     city and is at a higher rate.  Your question was have

9     I given any consideration to not having them make that

10     capital improvements.

11  Q.  Or to having make a lesser capital improvement there

12     by obtaining money for the city to use for other

13     purposes?

14  A.  And my response to that would be that's all wrapped up

15     in the discussions regarding transaction and what's

16     necessary to maximize the ability of that department

17     to generate income for the benefit of the city.

18  Q.  So is that something that you're looking at and

19     considering to take money that would otherwise be used

20     for capital improvements and apply it to satisfy
                           Page 300

21    existing obligations?

22  A.  As this is a potential transaction that we talked

23    about on June 14th, that's currently under discussion

24    with some of our customer base including other

25    counties. I want to be very careful that I don't

173

uncertified rough draft

1    interfere with those negotiations by saying something

2    that would not enhance the value or maintain the value

3    of that asset. Suffice it to say, we are aware of the

4    situation and it is wrapped up in the discussions

5    we're having about a potential transaction.

6  Q.  Okay, and at this potential transaction, take that off

7    the table, assume it doesn't go through, or is

8    withdrawn, have you given any consideration to simply

---

9    looking at the capital monies that are available at

10    DWSD and using some or all of them to fund existing

11    obligations rather than new capital improvements or

12    capital improvements to existing work at the

13    department?

14  A.  Let me say it this way. We have examined a number of

15    options and alternatives related to DWSD including

16    those that might be implicated by your question.

17  Q.  So is the answer to my question yes, you have

18    considered that?

19  A.  We have considered all operations at DWSD includes

20    those that might be implicated by your question. I

21    said before I'm going to be very careful so I don't

22    interfere with the commercial aspects with what's

23    going on now.

24  Q.  And can you tell me how much you believe or understand

---

25    the city can take from the capital fund from DWSD in

174

uncertified rough draft

1    order to satisfy its ongoing obligations if it chose

2    to do that?

3  A.  I didn't say --

4        MR. SHUMAKER: Objection to form.

5  A.  I didn't say that we would take any capital, I said we

6    will we would consider it.

7  Q.  I didn't -- I'm asking can you tell me how much would

8    you understand is available to take if the city

9    decides to go down that route?

10  A.  No, I can't tell that you.

11  Q.  Have you done any analysis of that?

12  A.  Analysis is a strong word. Have we looked at the

---

13    options and related to the transaction all

14    potentialities, but I can't tell you what that number

15    would be.

16  Q.  Who within the city would be most knowledgeable about

17    the capital funds that are availability at the DWSD?

18  A.  At the city?

19  Q.  Yeah.

20  A.  Probably the operations at DSWD.

21  Q.  You also made reference in the June 14th proposal to

22    the parking systems that the city owns.

23  A.  Yes.

24  Q.  And as I understand it there are nine garages?

25  A.  Yes.

175

uncertified rough draft

orrroughdraft (3).txt

1 Q.  Two lots with over 1,200 spaces?

2 A.  Yes.

3 Q.  And over 3,400 meters?

4 A.  Yes.

5 Q.  Do you have an understanding as to the value of those

6     assets?

7 A.  No, we're currently doing our analysis as to the value

8     of those assets now.

9 Q.  And you have no preliminary view as to what they're

10    worth?  Nothing's been reported back to you on at

11    least a tentative basis?

12 A.  No, nothing has been reported back to me on -- because

13    when you talk about values, there's a range of values

14    from asset disposition and outright sale and

15    privatization to creating an operation or an authority

16    where someone has brought in, as has been done in

Page 305

---

orrroughdraft (3).txt

17    Washington, D.C., to actually operate the garages and

18    meters.  So we're looking at a range of alternatives

19    to determine what those values could be.

20 Q.  What's the range of values you're looking at so far?

21 A.  We don't have that yet.

22 Q.  How concrete have you -- let me withdraw that.

23        What specific steps have been taken so far?

24 A.  Our investment advisors and consultants are beginning

25    to discussions with various parties that undertake

uncertified rough draft

1     these types of operations within a range of

2     alternatives to try to assess values.

3 Q.  And the investment advisors would that be Buckfire?

4 A.  Yeah it would be our investment banker, Ken Buckfire,

Page 306

---

orrroughdraft (3).txt

5     Miller Buckfire.

6 Q.  Okay.  In the June 14th proposal you also make

7     reference to about 22 square miles of land that the

8     city owns?

9 A.  City-owned land, yes.

10 Q.  Do you have an understanding as to the value of that

11    land?

12 A.  I've been informed that some of the value is at best

13    nominal but no sitting here today I do not have a

14    number as to the value of the land.

15 Q.  Have any steps been taken to try to monetize that

16    value, to get dough as you put it?

17 A.  Yeah.  Well, here again, you're -- to get income

18    realization perhaps I should say more articulately,

19    but here again we're at the preliminary steps of

20    examining potential alternatives regarding land.

Page 307

---

orrroughdraft (3).txt

21 Q.  So you don't know yet?

22 A.  No.

23 Q.  The Belle Isle Park, that's also referenced in the

24    June 14th proposal?

25 A.  Yes.

uncertified rough draft

1 Q.  It's indicated that there's a prospective lease to the

2     state?

3 A.  Yes.

4 Q.  Okay.  And do you expect that to go through?

5 A.  I'm going to ask for it.  It was proposed and was not

6     accepted in time so the state withdrew it but I do

7     believe we're going to intend to ask that that lease

8     be renewed.

Page 308

9  Q.  And what's the annual rent the city would get under

10     that lease?

11  A.  The city has a $6 million maintenance obligation and

12     that would be taken up by the state so that that wouldn't

13     be cash to the city, that would relieve us of an

14     obligation.  It has several millions to tens of

15     millions of dollars in deferred maintenance at some of

16     the structures on the island and the state would

17     undertake that obligation as well.

18  Q.  So it would essentially relieve the City of Detroit --

19  A.  Take it off.

20  Q.  -- of debt burden it would otherwise bear?

21  A.  Yes.

22  Q.  You also mention the Joe Louis Arena?

23  A.  Yes.

24  Q.  Any steps taken to monetize that?

25  A.  Here again we're under initial analysis and appraisals

1     about what can be done with that.

2  Q.  Do you have any understanding so far as to what the

3     potential cash value is that could be gotten from the

4     use of that stadium?

5  A.  Well, there are existing statements regarding cash

6     flows and use of that stadium but we're reviewing

7     different ways to look at it in some fashion.

8  Q.  Do you have any understanding or belief as to the

9     value that can be realized from that?

10  A.  No.

11  Q.  Now, in your June 14th proposal you also make

12     reference to trying to increase the tax collection

13     rate.

14  A.  Yes.

15  Q.  Does the city keep a ledger, a line item, for

16     uncollected taxes?

17  A.  The city keeps many line items.  I think we -- you

18     mean uncollected taxes?

19  Q.  Yeah, listing of --

20  A.  Yes.

21  Q.  This is the amount for uncollected taxes?

22  A.  Yes.

23  Q.  Are you aware of any uncollected taxes that have in

24     the past been written off the city's books in the

25     recent tax but may in fact be collectible?

1          MR. SHUMAKER:  Objection to form.

2  A.  No.  No, in fact discussions that I've had is that

3     that -- the 50 percent compliance rate is not linear,

4     that is for every dollar put in to collect additional

5     taxes doesn't necessarily mean you're going to yield a

6     dollar plus in doing it.  It might actually be a loss

7     leader so we're examining ways of trying to increase

8     collections.  I assume you're talking about real

9     estate property taxes or income taxes?

10  Q.  Or income, any kind of taxes.

11  A.  Yeah, we're examining a number of different

12     alternatives in that regard but we're trying to

13     determine whether or not it would yield a net positive

14     benefit.

15  Q.  Are you aware in the resend past of a tax write-off,

16     an actual write-off of taxes on order of around 700

17    million?

18    A.    I have -- I didn't hear that particular figure.  I had

19          heard that there was a write-off.  Am I aware of it?

20          Yes, I'm aware of it.

21    Q.    And what's your understanding as to what write-off

22          was?  Was it 700 million, 800 million what's the

23          figure you her?

24    A.    I don't know what the figure was but I heard that it

25          was based on noncollectibles.  That the probability of

                                                            180

                        uncertified rough draft


1     collecting it was very low.

2     Q.    Are you aware of any report that indicates that there

3           was a write-off on the order of 700 million possibly

4           more, the figure I her was 700 million that may in

5           fact be collectible?

---

6     A.    I've heard that some people have maintained that is

7           collectible, but I've also heard that the general

8           consensus is it may not be.

9     Q.    Okay, and is there a specific set of taxes that that

10          pertains to, this figure we're talking about, seven or

11          800?

12    A.    I don't know.  I know that that is one of the -- in

13          the presentation we talk about various city assets,

14          airport, Belle Isle, parking, city-owned land, city

15          owned buildings, others, we also have talked about

16          account receivables and I know that that fits in that

17          bucket, potential account receivables.

18    Q.    Are you aware that the treasurer Andy Dillon has

19          acknowledged that there's a report that exists that

20          talks about the 700 or so million figure written off

---

21    that really is collectible?

22    A.    That's what I had heard, that's what I men when I said

23          I heard to that extent, yeah.

24    Q.    And do you know what this report is?

25    A.    No, I just -- I just heard about it coming in in the

                                                            181

                        uncertified rough draft


1     process of doing some due diligence, but one, I

2     haven't seen it; two, we're looking into it.

3     Q.    So you're in the process of trying to rundown that

4           report and see what it is?

5     A.    We're trying to rundown a number of reports, rumors

6           and suggestions that there are account receivables due

7           the city.

8                 MR. ULLMAN:  And I would like to request a

9           copy of that report.

---

10                MR. SHUMAKER:  We'll look into it.

11                THE WITNESS:  If we have it.

12    Q.    Now, did the city put in place tax programs -- tax

13          amnesty programs?

14    A.    Has the city put in place?

15    Q.    Yes.

16    A.    Since I've been here?

17    Q.    Yes.

18    A.    A tax amnesty program?

19    Q.    Yes, to try to get people who owe money --

20    A.    No, not yet, no.

21    Q.    Is that something you're considering?

22    A.    We have had discussions in that regard.  I know that

23          it's done for parking tickets and tax amnesty and

24          other municipalities particularly in washington, D.C.

25   but we have not done that yet.

182

uncertified rough draft

1   Q.   And I think you indicated that the city has not been

2        very efficient in collecting taxes; has it?

3   A.   I think that's a fair statement.

4   Q.   Do you have an understanding as to how much tax there

5        is that's collectible in fact could be collected if

6        the city did a more efficient job in going after tax

7        debtors?

8   A.   Yeah, as I said, the discussions we've had is that

9        collection efforts are not necessarily linear.  That

10       is for every dollar spend you're going to get more in

11       taxes.  And in fact there have been some discussions

12       that to the extent you try it could actually be

13       deleterious to the billion dollars of revenue that we

14       anticipate -- on average that we anticipate receiving

15       in the out years.  So we're examining those

16       discussions to see if you can get more recovery by

17       additional collection efforts or if you can be more

18       efficient in your ongoing collection efforts as well

19       as more user-friendly for those who want to pay their

20       taxes.  We're looking at the full range of enhancing

21       both tax collections as well as tax payments.

22   Q.   Do you have any understanding as to how much value

23        could be achieved if those goals were realized?

24   A.   Not sitting here today.

25   Q.   And are there any ongoing reports that have been

183

uncertified rough draft

1        prepared or documentation talking about what the

2        realization to the city could be if it got its tax

3        collection act more in line?

4   A.   I don't know if it's a report.  I've seen some

5        correspondence about tax rates, yes.

6            MR. ULLMAN:  Okay I would like to request

7        copies of those documents also.

8   Q.   Okay, and then Mr. Orr in your testimony this morning

9        I think you made reference to some other cases that

10       you were aware of where you said that as a result of

11       going into Chapter 9 state laws were effectively

12       trumped and you gave some examples of things, Scheat

13       law and rent control law; is that right?

14   A.   No, the -- those were Chapter 9 cases.  The cases I

15       was talking about having rent control and Scheat was

16       while I was at RTC, the state dealer law cases was a

17       Chapter 11 case for Chrysler.

18   Q.   Okay.

19   A.   So it was federal law under FIRREA.  If you remember

20       the discussion, I said Financial Institution Reform

21       Recovery Enforcement Act of 1989 as amended trumps

22       state laws.

23   Q.   So are you aware of any cases involving a Chapter 9

24       bankruptcy where as a result of going into Chapter 9 a

25       state law was held unenforceable or was held not to

184

uncertified rough draft

1        apply in a particular situation?

2   A.   I remember reading -- well, this is a communication

3        from counsel.

4            MR. SHUMAKER:  Let me caution you.

5            THE WITNESS:  Okay.

6          MR. SHUMAKER:  Don't reveal a communication

7      from counsel.

8          THE WITNESS:  Okay.

9          MR. SHUMAKER:  The question is are you

10     aware of any cases.

11  A.  Am I aware of any cases, yes.

12  Q.  And what is that case?

13  A.  I can't -- it was an attorney-client communication.

14  Q.  And are you aware of any cases where to use your

15      phraseology, as a result of a Chapter 9 filing by a

16      municipality the state constitution was trumped?

17  A.  Chapter 9 filing?

18  Q.  Yes.

19  A.  I'm not sure, because the case I'm aware of I don't

20      know if it was a state constitution.  I don't recall.

21          MR. ULLMAN:  Okay, I have no more questions

22      at this time.  But I may reserve the right, we have

23      some other people that are going to ask questions at

24      the end of that to ask some follow-ups, if that's

25      possible.

                                                    185
                    uncertified rough draft

1          THE WITNESS:  Okay.

2          MR. SHUMAKER:  You want to take a quick

3      break?

4          MR. ULLMAN:  Yeah, why don't we take a

5      break.  Someone else has to sit here.

6          THE VIDEOGRAPHER:  Going off the record at

7      2:53 p.m.

8          (A brief recess was taken.)

9          THE VIDEOGRAPHER:  We're back on record at

10     3:07 p.m.

11              EXAMINATION

12  BY MS. LEVINE:

13  Q.  Good afternoon, Mr. Orr, thank you for appearing

14      today.  Your deposition is continued, you're still

15      under oath.  To save some time I'm not going to repeat

16      some of the instructions we went through at the

17      beginning of the deposition.

18          For the record Sharon Levine, Lowenstein

19      Sandler, for the American Federation of State County

20      and Municipal Employees and with me Michael Artz,

21      in-house counsel of AFSCME.

22  A.  Okay.  Thank you and I understand.

23          (Discussion held off the record.)

24  Q.  Okay, sorry for that.

25  A.  Okay.

                                                    186
                    uncertified rough draft

1  Q.  Mr. Orr, there was some colloquy --

2          MR. SHUMAKER:  Mic.

3  Q.  There was some colloquy this morning with regard to

4      negotiations or discussions --

5  A.  Yes.

6  Q.  -- prior to the filing of the bankruptcy case.

7  A.  Yes.

8  Q.  Are you familiar with concessionary bargaining

9      historically in Detroit?

10  A.  Could you -- I have read to some degree about the

11      labor history and concessionary bargaining in Detroit

12      stemming from Walter Reuther on forward even

13      concessionary bargaining going forward from I would

14    say Mayor Kilpatrick, Mayor Cockrel and Mayor Bing and

15    in specific the 10 percent wage cuts and other

16    concessions, but if there's something else that you

17    would like to talk about, please explain it.

18 Q. So that's yes?

19 A. Yes.

20 Q. Generally?

21 A. Well, generally but if there's something specific,

22    please, yes.

23 Q. Is it your view that concessionary bargaining can

24    result in concessions with the -- with regard to

25    benefits without a Chapter 9?

                                                    187

                    uncertified rough draft

1            MR. SHUMAKER:  Objection, calls for legal

                    Page 325

---

2     conclusion.

3  A. It was my hope -- and here again, I'm going to say the

4     same statement that I said earlier today, collective

5     bargaining and concessionary bargaining, however you

6     call it, is suspended under Paris, I don't want to

7     waive any rights that the city may have under 436.  Do

8     I recognize people certainly aren't in agreement.

9     Um --

10 Q. Let me rephrase the question.  I just want to clarify.

11 A. Okay.

12 Q. I was asking for your view.  I'm not asking for a

13    legal conclusion we don't have to do the reservation

14    of rights.

15 A. Okay.

16 Q. I'm just asking Mr. Orr as he's sitting here today of

17    his understanding of whether or not it's possible

                    Page 326

---

18    without a legal conclusion to arrive at a consensual

19    agreement with or without calling it negotiations,

20    discussions or proposals, with regard to retiree --

21    with regard to benefits without a Chapter 9?

22 A. Is it possible?

23 Q. Yes.

24 A. Yes, anything a possible.  I think I've said that.

25 Q. Okay, now, historically in Detroit isn't it a fact

                                                    188

                    uncertified rough draft

1     that there were concessionary provisions made with

2     regard to benefits that impacted retirees previously

3     that did not involve Chapter 9?

4            MR. SHUMAKER:  Objection, foundation.

5  A. Over what period of time?

                    Page 327

---

6  Q. Is it your understanding that at any point in time.

7  A. As I said --

8  Q. No no it's a very -- it's a yes or no question.  At

9     any point in time prior to the bankruptcy filing have

10    there been concessionary discussions, negotiations,

11    whatever, in Detroit that have resulted in

12    concessionary changes to benefits that impacted

13    retirees?

14           MR. SHUMAKER:  Objection, foundation.

15 A. Not within the time frame that I have.

16 Q. So you're not aware of that?

17 A. No, I'm aware there have been concessionary bargaining

18    changes.  My testimony is in my view that they

19    appeared to not being able to occur within the time

20    frame I had to work with.

21 Q. I wasn't asking you what you did or didn't do.  I was

                    Page 328

22    just asking you if you're aware that there -- whether

23    or not there have been in the history of Detroit

24    concessionary changes to benefits that were

25    implemented that impacted retiree benefits without

                                    189
                        uncertified rough draft


1     there having to be a Chapter 9?

2              MR. SHUMAKER:  Same objection.

3   A.   Well, the reason I said not within my -- you're asking

4        my view.

5   Q.   I'm not asking you?

6   A.   Are you now going away from my view?

7   Q.   No I'm asking -- this is the question.

8   A.   Okay.

9   Q.   The question is -- can you read back the question?

                        Page 329

10             (Record read back as requested.)

11  A.   Yes, I am aware that in the history of Detroit there

12       have been concessionary bargains to certain benefits

13       without a Chapter 9.

14  Q.   Okay, now, prior to the filing of this Chapter 9 --

15  A.   Uh-huh.

16  Q.   --  are you aware of any concessionary bargaining

17       changes that affected retirees?

18  A.   I'm hesitating because I'm trying to recall the

19       briefing papers I went through and your specific

20       question is retirees.  I'm well aware of concessionary

21       bargaining changes for actives, now I'm thinking about

22       retirees.  I don't know.

23  Q.   Prior to the filing of this Chapter 9 petition you

24       previously discussed what I believe were four

25       meetings, June 10, June 20, July 10 and July 11; is
                        Page 330

                                    190
                        uncertified rough draft


1     that correct?

2   A.   Yes.  I think we were talking about -- there were more

3        meetings than that, but I think we were talking about

4        the four meetings that were referenced on page I

5        believe 55 I believe of my declaration.  well,

6        actually it starts on 54.  Okay.

7   Q.   What other meetings were there?

8   A.   I had had -- meetings with?

9   Q.   Meetings -- well, my understanding is that the

10       meetings on June 10, 20, July 10 and July 11 were with

11       employees or retirees.  Did you ever other meetings

12       with employees or retirees?

13  A.   You mean in a time frame?

                        Page 331

14  Q.   Yes.

15  A.   Yes.  Those were the formal structured meetings that

16       we recounted.  My understanding that there were other

17       meetings that occurred outside after formal process

18       and certainly a number of phone calls.

19  Q.   With whom -- who is the counter party to those

20       meetings?

21  A.   I'm not sure I can capture every counsel err party to

22       every meeting because my professional team and staff

23       would have various discussions but I tried to recount

24       ones that I'm aware of and who the counter parties

25       were in my declaration.

                                    191
                        uncertified rough draft


1   Q.   Was AFSCME one of the counter parties that you met

                        Page 332

orrroughdraft (3).txt

2     with outside of the four meetings we were previously

3     discussing?

4  A.  I didn't meet with them but I understand that there

5     may have been meetings or telephone calls with others.

6  Q.  Were there meetings with others?

7  A.  I don't know if there were meetings or phone calls.

8     There may have been meetings or phone calls.

9  Q.  Were there phone calls?

10  A.  I don't know.  I understand there may have been.

11  Q.  Who would have placed those phone calls on your

12     behalf?

13  A.  I don't know if they would have placed or if they

14     would have received them.  I'm not sure, but if they

15     would have been it would have been somebody probably

16     on labor benefits team, he have and Miller, Brian

17     easily or others who work with them or others on the

Page 333

---

orrroughdraft (3).txt

18     city's labor department.

19  Q.  If they were substantive meetings with anybody on

20     behalf of AFSCME would that have been reported to you?

21  A.  More than likely, yes.

22  Q.  Were there any substantive meetings with AFSCME prior

23     to the filing?

24         MR. SHUMAKER:  Objection to form.

25  A.  I'm going to -- outside of the meetings I mention in

192

uncertified rough draft

1     my declaration?

2  Q.  Outside of what we'll call the big four.

3  A.  Okay, big four.  Thank you.  Sitting here today none

4     that I recall.

5  Q.  Are you familiar with the so-called webster

Page 334

---

orrroughdraft (3).txt

6     litigation?

7  A.  Yes.

8  Q.  Okay, that litigation was filed on July 3?

9  A.  I believe so.

10  Q.  And you sent your request to governor Snyder on July

11     16th?

12  A.  Yes.

13  Q.  And Governor Snyder authorized the Chapter 9 filing on

14     July 18th?

15  A.  Yes.

16         MS. LEVINE:  Could we have it marked as Orr

17     16?

18         (Marked Exhibit No. 16.)

19         (Discussion held off the record.)

20  Q.  We've just marked a document as Orr 16.  It's really

21     it's just a Detroit News report from July 18th or July

Page 335

---

orrroughdraft (3).txt

22     17th actually at 11:00 p.m. ?

23         MR. SHUMAKER:  I'm sorry counsel, I see a

24     July 16 reference at the bottom.

25         MS. LEVINE:  Sorry July 16th at 11:00 p.m.

193

uncertified rough draft

1         MR. SHUMAKER:  Yeah.

2  Q.  Mr. Orr, do you recall reading this press coverage at

3     the time that it was -- that it came out?

4  A.  I do not recall reading this but I can read it now.

5  Q.  The -- is it your understanding that as of the date of

6     this article the governor was not thinking about --

7     actually I'm going to correct myself.  It looks like

8     according to the printout at the bottom of the page

9     it's September 13 -- no -- that's when it was printed,

Page 336

orrroughdraft (3).txt

10    never mind.

11         Was it your -- is it your understanding

12    that as of the time of this press coverage Governor

13    Snyder was not yet recommending a Chapter 9 filing for

14    Michigan?

15         MR. SHUMAKER: Objection, foundation.

16 Q. For Detroit?

17         MR. SHUMAKER: Sorry. Objection,

18    foundation, form.

19 A. I don't think -- I think I was the one recommending

20    and Governor Snyder was either going to approve or

21    disapprove of my request. This is 11:00 p.m. I

22    haven't seen this and it appears to be 11:00 p.m. it

23    says -- so give me your question again.

24 Q. What was your understanding at this point in time of

25    Governor Snyder's view with regard to whether or not

1    he would recommend -- he would accept your

2    recommendation that Detroit file a Chapter 9 petition?

3 A. It was unclear. I had gotten to the point at least on

4    the 16th of thinking it was time for me to make the

5    recommendation. It was unclear what the response was

6    going to be.

7 Q. Did you discuss the webster litigation with the

8    governor?

9 A. I don't think so.

10 Q. Did you discuss the webster litigation with anybody in

11    the governor's office?

12 A. was the webster litigation the first lawsuit filed

13    against the governor and the treasurer on the 3rd?

orrroughdraft (3).txt

14    And then the next week AFSCME joined that litigation?

15    was that by the UAW the first litigation and AFSCME

16    joined that list gauges the next week?

17 Q. One was Flowers and one was webster.

18 A. Right. So I want to make sure we're talking about the

19    right one. So you're talking about webster.

20 Q. Did you discuss either the Flowers or webster

21    litigation with the governor?

22 A. No, dint discuss it with the governor.

23 Q. Did you discuss either the webster or Flowers

24    litigation with anybody at the state?

25 A. You mean on the 16th?

1 Q. No, at any point in time.

2 A. At any time. Let me -- let me -- let me then clarify

orrroughdraft (3).txt

3    my answer. I think -- my recollection is that there

4    were lawsuits being filed that we did not discuss at

5    the beginning of July. I think there was a piece of

6    litigation that had been filed the morning of the 16th

7    -- in direct response to your question did I discuss

8    the litigation with the governor? At some point, yes.

9 Q. Do you recall whether you had that discussion with the

10    governor before July 18th?

11 A. Yes, I believe I did.

12 Q. And was it before July 18th?

13 A. Yeah, I believe it was.

14 Q. What did you discuss?

15 A. Well, was it? I think generally, and here I'm going

16    to be very careful, there were discussions I had --

17    I'm not sure I had any discussions with the governor

orrroughdraft (3).txt

18    without either my counsel being on the line or counsel

19    on behalf of the state and the governor being on the

20    line so I don't know if that implicates

21    attorney-client.

22         MR. SHUMAKER:  It certainly could.

23         THE WITNESS:  Okay.

24  A.  Without disclosing what was discussed, we had

25    discussions.

                                              196
                    uncertified rough draft


1   Q.  Okay, so it's your position -- well, let's go back.

2         So on July 3rd, for example, who was your

3     counsel?

4   A.  Well, my restructuring counsel was Jones Day, but --

5   Q.  And who was the governor's counsel?

6   A.  The governor's counsel would be I believe in the

Page 341

orrroughdraft (3).txt

7     governor's office generally heading up that group

8     would be Mike Gadola and Valerie Brader and I think

9     this correct the discussion I had earlier this

10    morning.  I may clarify a discussion I had earlier

11    this morning but I -- well direct response to your

12    question those are the people in the governor's

13    office.

14  Q.  Okay so if you and the governor were on the phone --

15  A.  Right.

16  Q.  -- then those conversations -- I'm not asking you

17    about conversations that you had just you and

18    Jones Day, I'm asking you what conversations you had

19    with representatives -- with either the governor or

20    representatives of the state prior to July 18th after

21    the Webster and Flowers litigations were filed on July

Page 342

orrroughdraft (3).txt

22    3.

23  A.  Okay.  I think we did have conversations.  I'm not

24    sure they're not protected by attorney-client

25    because --

                                              197
                    uncertified rough draft


1         MR. SHUMAKER:  If you believe lawyers were

2     on those phone calls.

3   A.  I know lawyers were on the phone, I just don't -- I'm

4     not acting as an attorney so I don't know -- I know

5     there were lawyers on the phone.  I know my lawyers

6     were on the phone so I don't --

7         MR. ULLMAN:  The fact that there were

8     lawyers on the phone doesn't make it a privileged

9     conversation.

10        MS. LEVINE:  Well, let him get the

Page 343

orrroughdraft (3).txt

11    statement out and then we'll --

12  A.  I believe there was a common interest.  Can I consult

13    my attorneys?

14        MR. SHUMAKER:  Certainly.  You want to take

15    a quick break?

16        THE VIDEOGRAPHER:  Going off the record at

17    3:24 p.m.

18        (Discussion held off the record.)

19        THE VIDEOGRAPHER:  We're back on the record

20    at 3:31 p.m.

21  Q.  Did you reach a --

22        MS. LEVINE:  Can you read back my last

23    question?

24        Actually I'll rephrase it.

25  Q.  Prior to July 17th did you have conversations with the

Page 344

13-53846-tjt    Doc 920    Filed 09/18/13    Entered 09/18/13 11:52:54    Page 112 of 155

orrroughdraft (3).txt

198

uncertified rough draft

1      governor or anybody in the governor's office?

2  A.  Prior to July 17th?

3  Q.  But since July 3.

4          MR. SHUMAKER:  About?

5  Q.  About Flowers and Webster.

6  A.  Oh.

7          MR. SHUMAKER:  Yes or no?

8  A.  Yes.

9  Q.  Prior to July 17th but after July 3, did you have any

10     discussions with the governor or anybody in the

11     governor's office about filing a -- filing for Chapter

12     9 for Detroit?

13  A.  Between the 3rd and 17th?

14  Q.  Yes.

Page 345

---

orrroughdraft (3).txt

15  A.  Yes.

16  Q.  With whom did you have the discussions about the

17     Flowers litigation, the Flowers Webster litigations?

18  A.  Attorneys in the governor's office.

19  Q.  Which ones?

20  A.  I believe Valerie Brader and Mike Gadola.

21  Q.  Anybody else?

22  A.  I'm trying to recall if in one of my discussions with

23     the governor we discussed that specific litigation or

24     just that there were cases being filed and I don't --

25     I don't recall any specific discussion about that

199

uncertified rough draft

1      particular piece of litigation, just that there were

2      lawsuits being filed.

Page 346

---

orrroughdraft (3).txt

3  Q.  So you discussed with Valerie Brader and Mike Gadola

4      the Flowers and the Webster's litigation, you

5      discussed with the governor just the fact that there

6      was the -- the litigations were pending now?  And

7      we're still within the July 3 through July 17 time

8      frame.

9  A.  I don't know if I ever discussed both cases.  I think

10     I discussed one with Brader and/or Gadola.

11  Q.  Okay and what did you discuss about the litigation

12     with braid error Gadola?

13         MR. SHUMAKER:  Objection I'm going to --

14     the question calls for the witness to reveal

15     privileged attorney-client communications as part of a

16     common interest agreement with the state and therefore

17     I'm going to instruct him not to answer.

18         MS. LEVINE:  Okay, we'll reserve our

Page 347

---

orrroughdraft (3).txt

19     rights.

20         MR. SHUMAKER:  Understood.

21  Q.  With regard to the conversations that you had with the

22     governor with regard to July 3 through July 17, with

23     regard to the potential for filing for Chapter 9, do

24     you recall specifically on what days you had those

25     conversations?

200

uncertified rough draft

1  A.  No.

2         MR. SHUMAKER:  Objection to form.

3         THE WITNESS:  Oh, okay.

4         MR. SHUMAKER:  Counsel, you're saying just

5      between him and the governor?  No one else?

6  Q.  Did you have conversations that involved the governor

Page 348

orrroughdraft (3).txt

7      between July 3 and July 17 with regard to the

8      potential for filing a Chapter 9 for Detroit?

9              MR. SHUMAKER:  Where counsel was not a part

10     of the conversation?

11             MS. LEVINE:  No, no, I'm just asking if he

12     had conversations.  I haven't asked him yet who's

13     participating and it's not privileged even with a

14     joint defense agreement, which we're reserving our

15     rights about for him to tell me that conversations

16     took place, then we will get into who participated and

17     which conversations and then we'll decide whether or

18     not he can talk to me about them.

19             MR. SHUMAKER:  Okay, I'm just making sure

20     the witness doesn't reveal anything.

21             THE WITNESS:  Okay, and waive anything.

22             MR. SHUMAKER:  And waive anything.

orrroughdraft (3).txt

23             THE WITNESS:  For the record there is no

24     effort to waive anything.  But I'm trying to be

25     accurate.

uncertified rough draft

1   Q.   Let me try to ask it more succinctly so that we can

2        parse it because I'm going to ask you questions with

3        regard to conversations where you and the governor

4        participated and there were other people present.

5   A.   Right.

6   Q.   I'm going to ask you questions with regard to you and

7        other people --

8   A.   Right.

9   Q.   -- in the governor's office?

10  A.   Right.

orrroughdraft (3).txt

11  Q.   And then we'll find out whether or not lawyers were

12       present at some or all of those conversations and then

13       we'll figure out what we do about that.

14  A.   Okay, okay.

15  Q.   Okay?

16  A.   Okay.

17             MR. SHUMAKER:  Okay.

18  Q.   So let's start with just you and the governor.  Did

19       you have conversations with just the governor between

20       July 3 and July 17th with regard to filing Chapter 9

21       for Detroit?

22  A.   There's no mystery, I just don't want to run up

23       against a privilege.  I believe at one of my -- when

24       was -- this was July 3rd?  Oh, this is -- okay.  Now

25       it -- I think that both the governor and I were on

orrroughdraft (3).txt
uncertified rough draft

1        vacation over the 4th of July weekend so we may not

2        have had and he was on vacation I believe the

3        following week so we probably did not have our weekly

4        meeting.  That's why there was a gap.  At some point

5        it is possible for us to have had a meeting after --

6        just the governor and I -- and when I say just the

7        governor and I'm including other nonlawyers, his chief

8        of staff, his deputy chief of staff, people along

9        those lines I'm not thinking any of those are

10       attorneys and if they are I'm not waiving any

11       privilege --

12  Q.   Okay.

13  A.   -- but it's possible we had meetings after that time

14       with just the governor.  Okay.

orrroughdraft (3).txt

15  Q.  What did you discuss?

16  A.  Because he's waived the deliver the process privilege.

17      I think we generally discussed the ongoing operational

18      restructuring, the status at a very high level the

19      governor, you know, we don't -- we typically do not

20      discuss how many meetings, who attended, what was

21      said, went back and forth, it was just a very high

22      level of how things were going with the restructuring

23      effort and that the lawsuits, this is just with the

24      governor, were beginning to create the risk that we

25      would lose the initiative and I might be unable to

                                                      203
                     uncertified rough draft

1       discharge my obligations under 436.

2   Q.  Did you have any conversations without counsel between
                     Page 353

orrroughdraft (3).txt

3       you and the governor between June 14 and July 3?

4   A.  June 14 and July 3?

5   Q.  The big four was June 14, June 20, July 10 and July

6       11.

7   A.  Without counsel?

8   Q.  Uh-huh.

9   A.  I may have.

10  Q.  Did you discuss the June 14 meeting with the governor?

11  A.  Yes, I believe, but that may have been -- between July

12      -- give me the dates again.

13  Q.  Well let's make it easier.  Anytime after the June 14

14      meeting.

15  A.  Yes.

16  Q.  --  did you discuss the June 14th with just the

17      governor?

18  A.  Well, with just the governor.  I typically --
                     Page 354

orrroughdraft (3).txt

19      occasionally I will meet with just the governor but

20      whenever you say just the governor my answer should

21      include those meetings where I have members of his

22      senior staff as well.

23  Q.  When you say members of his senior staff, who are you

24      referring to?

25  A.  His chief of staff.

                                                      204
                     uncertified rough draft

1   Q.  What's the name?

2   A.  Dennis Muchmore, John Roberts his deputy chief of

3       staff, sometimes my chief of staff, Shani Penn, my

4       senior advisor Sonya Mays, occasionally Treasurer

5       Dillon.  Is Andy an attorney?

6           MR. ESSAD:  Yes.
                     Page 355

orrroughdraft (3).txt

7           THE WITNESS:  Yes, he is, so I've got to be

8       careful.  So -- huh.  I think Andy was sometimes at

9       those meetings so I've got to be careful.

10  Q.  Okay so at meetings where there were no counsel

11      between June 14 and July 3, did you have any

12      discussions with regard to the June 14 or the June 20

13      meeting?

14  A.  I don't think there were any meetings where there were

15      no counsel between June 14th and July 3.

16  Q.  Okay, how many times did you meet between June 14 and

17      July 3 with the governor by in person or by telephone?

18  A.  I am not sure.

19  Q.  More than once?

20  A.  Probably.

21  Q.  More than twice?

22  A.  Likely.
                     Page 356

23   Q.   More than six times?

24   A.   I don't think -- I don't think more than that.

25   Q.   Okay, so somewhere between two and six and at every

1        single one of those meetings you believe counsel was

2        present or on telephone if it was a telephonic

3        meeting?

4    A.   Yes sometimes we would do conference calls and there

5        would be counsel present on the phone so I'm being

6        very careful here, yes, there's a possibility there

7        was counsel present at each of those meetings.

8    Q.   I'm going to ask a question but your counsel has to

9        speak first.  Are you claiming the joint defense for

10       the Flowers and the webster litigation or are you

11       claiming joint defense with regard to the thought

12       process leading up to the filing of the Chapter 9?

13            MR. SHUMAKER:  Claim --

14            MS. LEVINE:  Let me ask the question and

15       then you can assert it but I don't want to be tricky

16       I'm not trying to be tricky.

17            THE WITNESS:  Thank you, than you.

18            MS. LEVINE:  During those conversations

19       that took place prior to the filing of the webster and

20       the Flowers litigation from June 14 through July 3,

21       did you have any -- did any of the conversations that

22       you had with the governor in person or by telephone

23       conference involve discussions with regard to the

24       filing of the Chapter 9 petition.

25   A.   Between the 14th and the 3rd?

1    Q.   Uh-huh.

2    A.   I don't recall any specific discussions but they may

3        have.

4    Q.   Did you have conversations with the governor during

5        June about the -- about filing for Chapter 9 at which

6        counsel wasn't present either in person or by

7        telephone?  And when I say meetings I'm talking about

8        either in person or by telephone.

9    A.   I think I can say this.  My weekly Detroit subject

10       meetings typically include the governor, his chief of

11       staff or deputy chief of staff, treasurer Dillon and

12       one of his employees, Tom sacks on, and/or some of our

13       advisors and attorneys.  I do not recall a meeting or

14       a phone conference with the governor, it may have

15       happened, I'm just recalling it and I'm trying very

16       hard to, I do not recall a meeting or phone conference

17       where for instance treasurer Dillon was not either

18       there or on the phone.  And I'm trying to -- in the

19       few times that the governor and I have occasion just

20       one-on-one meetings, I'm trying to recall if we

21       discussed a Chapter 9 filing.  I'm now just talking

22       about the governor of one of one meetings.  It is

23       possible not in terms of timing, just generally

24       speaking because here again it was not at the grand

25       level.

1    Q.   Just to clarify, I believe that your counsel will

2        allow you to answer whether or not there's been

3      discussions with regards to a Chapter 9 filing with

4      the governor so long as counsel wasn't on the phone.

5                MR. SHUMAKER:  Correct.

6   A.  Yes, these are the meetings I'm talking about.

7   Q.  Treasurer Dillon is not counsel.

8   A.  Well, he's an attorney and I don't know if the

9      privilege attaches.

10               MR. SHUMAKER:  If you believe he was acting

11     as an attorney, then I would caution you and instruct

12     you not to answer.  If Mr. Dillon was acting as the

13     treasurer and the treasurer alone --

14               THE WITNESS:  Right.

15               MR. SHUMAKER:  -- as a businessperson, then

16     you can answer.

17               THE WITNESS:  Okay.  Okay.  That -- okay.

18  A.  Yes, then that means at some of those meetings we

---

19     probably did discuss potential Chapter 9 filing

20     without attorneys but with treasurer Dillon.

21  Q.  Prior to July 3 what was the timing that you were

22     discussing with regard to a potential Chapter 9

23     filing?

24  A.  We weren't.  Generally it was consistent with what I

25     had said at the June 10th and June 14th meetings which

                                                          208

                    uncertified rough draft

1      is after June 14th we will use the next 30 days to

2      assess where we are and what progress we're making and

3      if we're making process and I think I said at that

4      June 14th meeting in the nature of a term sheet

5      agreement in principles or concepts moving forward

6      that we might be a position to be able to extend that.

---

7      I said that at June 14th assuming a steady state.

8   Q.  After July 3 but before July 17 --

9   A.  Uh-huh.

10  Q.  -- did you have any conversations with the governor or

11     his senior staff at which counsel wasn't present?

12  A.  Excluding Treasurer Dillon or --

13  Q.  Excluding.

14  A.  Acting as -- I don't think he was acting as an

15     attorney, I think he was acting as treasurer.

16  Q.  Correct.

17  A.  Okay.  Yes, I believe so.

18  Q.  And did you -- during -- how many of those meetings

19     did you have?

20  A.  Here again, we -- the meeting of the week after the

21     4th of July holiday I think we did not have because I

22     went the week before and I think the governor was on

---

23     Mackinac the week after so I don't know if we had a

24     meeting then.  That would leave you said July 17?

25  Q.  July 3 to July 17.

                                                          209

                    uncertified rough draft

1   A.  Okay so that would leave roughly another week or two.

2      There may have been a meeting the following week and

3      I'm trying to recall if any attorneys were at that

4      meeting.  There was probably a meeting the following

5      week or the week thereafter.  There may have been

6      attorneys at one of those meetings from the governor's

7      staff.

8   Q.  How many meetings did you participate in between July

9      3 and July 17 at which -- with the governor at which

10     attorneys were present as opposed to meetings with the

orrroughdraft (3).txt

11  governor where attorneys were not present?

12  A.  I think we only had one or two meetings and attorneys

13      were present at either one or both of those meetings.

14      Excluding Treasurer Dillon.  I'm talking about

15      attorney attorneys not lawyers.

16  Q.  Who drafted your July 16th letter?  Was that you?

17  A.  No, I got a draft and I edited it.

18  Q.  Who prepared the draft for you?

19  A.  I think it was a number of folks.  It was -- I

20      forgot --

21  Q.  Was it Jones Day?

22  A.  It was more than likely Jones Day, yes, restructuring

23      guys.

24  Q.  Did you direct the draft be prepared?

25  A.  Yes, we --

                                              210
                    uncertified rough draft
                         Page 365

---

orrroughdraft (3).txt

1              MR. SHUMAKER:  You can say.  You been

2       testify to that.

3   A.  Without discussing exactly what was said, yes, I did.

4   Q.  What was the date that you gave Jones Day that

5       direction?

6   A.  I think that direction was either to start getting the

7       letter in shape that Friday, I'm not sure, either

8       preceding week or over the weekend.  Yes.

9   Q.  But after the commencement -- but that would have been

10      after July 3?

11  A.  Yes, yes, it was after July 3.

12  Q.  Did you advise the governor that you had started the

13      process of drafting that letter?

14  A.  I don't recall --

                         Page 366

---

orrroughdraft (3).txt

15             MR. SHUMAKER:  If -- if -- if the

16      communications were the governor were with counsel

17      present, then I don't want you to reveal what was

18      said.

19             THE WITNESS:  Okay.  Okay.

20             MR. SHUMAKER:  If at another meeting where

21      there was not counsel present, that's a different

22      story.

23             THE WITNESS:  Right.

24  A.  within that time frame, because I believe that was a

25      weekend, I do not recall communications with the

                                              211
                    uncertified rough draft


1       governor or communications with the governor where

2       counsel was not present.  There may have been a

3       discussion with the governor -- no, I don't recall an
                         Page 367

---

orrroughdraft (3).txt

4       independent discussion with the governor.

5   Q.  In addition to conversations in which you participated

6       in, were there conversations between your consultants

7       and the governor's office and/or his counsel between

8       July 3 and July 17?

9   A.  I believe -- well, when you say the governor's office,

10      that includes the treasurer?

11  Q.  Yes.

12  A.  Yes, I believe so.

13  Q.  The state?

14  A.  The state, yes, I believe so.

15  Q.  How many of those meetings are you aware of where you

16      did not participate?

17  A.  I --

18             MR. SHUMAKER:  Object to foundation, but --
                         Page 368

19  A.  where any meetings I didn't.  There were -- the

20      investment bankers, for instance, will talk with

21      treasury from time to time about a number of matters

22      and I'm sure that I wasn't on all of those

23      conversations.  And my legal team might talk with the

24      governor's attorney on various matters and I'm pretty

25      confident I wasn't involved in all those discussions

                                                          212
                        uncertified rough draft

1       either.  So it's not like it happened every day or it

2       was happening every half hour but I'm sure there were

3       discussions between them that I was either not

4       involved with or aware of.

5   Q.  Did any of those discussions between either the

6       investment bankers directly or your counsel and the

7       state governor's office or whomever involve
                        Page 369

8       discussions with regard to the filing of the Chapter 9

9       for Detroit and/or the timing of that filing?

10          MR. SHUMAKER:  Object to form.

11  A.  Yes, they probably did.

12  Q.  When you say they probably did, were you getting

13      reports from your investment banker and your counsel

14      with regard to the conversations they were having with

15      the governor and other representatives of the state?

16  A.  Not necessarily every -- not necessarily every

17      conversation but generally speaking so I was getting

18      reports but I cannot testify that I was privy to every

19      conversation that everyone either on legal side or the

20      investment side -- banking side or them together had.

21  Q.  When did you first start thinking that the timing for

22      the Chapter 9 filing was going to be be sooner rather
                        Page 370

23      than later?

24  A.  As opposed to?

25  Q.  Let me rephrase.  When did you decide that the timing

                                                          213
                        uncertified rough draft

1       of the Chapter 9 filing should be July 18th or July

2       19th?

3   A.  Well, I didn't.  I decided to make the request and my

4       intent was to have the ability to file available and

5       possibly executed as soon as I got it.  It was without

6       talking or waiving privileges from my counselor

7       counsel and investment bankers, the concerns about us

8       losing control or being put in a situation because of

9       the ongoing litigation where I would not be able to

10      discharge my duties in an orderly fashion, in a

11      comprehensive matter to put the city on a sustainable
                        Page 371

12      footing because of the litigation grew throughout June

13      and it was made clear to me that my desire to try to

14      continue to engage in discussions was running the risk

15      of putting my obligations under the statute in peril

16      and I think I was even counseled that I was being

17      irresponsible.

18  Q.  When did you first advisor have your consultants first

19      advise the governor or anybody affiliated with the

20      state that you were starting to draft your July 16th

21      request?

22  A.  Outside of attorney-client communications.

23          MR. SHUMAKER:  No.

24  Q.  No, I'm talking about when did you tell the governor.

25      I'm not sure it's you or --

                                                          214
                        uncertified rough draft
                        Page 372

orrroughdraft (3).txt

1   A.   But I may have --

2   Q.   -- or I'm not sure if it's your counsel who made that

3        request for you or your investment banker who made

4        that request for you --

5            MR. SHUMAKER:  Objection.

6   A.   When did I transmit the request?

7   Q.   Yes.

8            MR. SHUMAKER:  Object to the form.

9   Q.   Let me rephrase it.  When did somebody on behalf of

10       the Emergency Manager advise somebody on behalf of the

11       state that the Emergency Manager and his team was

12       starting to draft the July 16 request?

13  A.   Can I answer that if it's to an attorney at the

14       governor?

15           MR. SHUMAKER:  When.

---

orrroughdraft (3).txt

16           THE WITNESS:  Oh, when.

17           MR. SHUMAKER:  Yeah.

18  A.   Oh, that was probably Monday.  Monday, the 16th.

19  Q.   You testified previously that you were concerned you

20       wouldn't be able to carry out your obligations in an

21       orderly fashion.  What do you mean by that?

22  A.   The lawsuits that were being filed were requesting, my

23       understanding from reading them what I was informed

24       were requesting injunctions against me with any

25       options I might have available including the Chapter 9

                                                        215
                          uncertified rough draft


1        filing and were refocusing our attention on litigation

2        risk.  It they were also -- it wasn't just the -- what

3        for lack of a better word what we'll call the Flowers

---

orrroughdraft (3).txt

4        and related litigations, we were also in -- we had --

5        had defaulted on the cops' payment on June 14th and

6        had announced a settlement with Bank of American

7        Merrill Lynch commensurate with that day.  One of the

8        insurers had begun to interfere with that process from

9        June until July so we were getting hit on all sides

10       both on the creditor's side but also on for lack of a

11       better word the labor side with risk and threats and

12       lawsuits and were sued three times in June -- well,

13       sued once, one joined in the suit and sued again I

14       think on the 16th and also the Syncora of threats for

15       which we had to file litigation where I was counseled

16       that given the chaos in a sense that was erupting --

17           MR. SHUMAKER:  Hold on right there.

18           THE WITNESS:  Okay.

19           MR. SHUMAKER:  What you were counseled I

---

orrroughdraft (3).txt

20       want to make sure you're not going into an area that's

21       protected by the privilege.

22           THE WITNESS:  Okay.

23  Q.   You can give me your understanding.  You can't tell me

24       what --

25  A.   As I said before, my understanding was I was at risk

                                                        216
                          uncertified rough draft


1        of losing the ability to try to pursue a restructuring

2        in an orderly fashion.

3   Q.   Wasn't the Syncora issue settled sometime in prior to

4        the Chapter 9 filing, though?

5   A.   No.

6   Q.   The risk that you felt from the Webster/Flowers I

7        think what you referred to as three litigations --

8  A.  Uh-huh.

9  Q.  -- when did you communicate that risk to the governor

10    or the state or when did somebody communicate that

11    risk on behalf of the Emergency Manager to the

12    governor or the state?

13        MR. SHUMAKER:  Objection, foundation, form.

14  A.  Probably the preceding week of the 16th or maybe even

15    a week before that.  Let me --

16  Q.  So when you say the preceding week, just looking at a

17    calendar for a minute, what was the date there?

18  A.  Can I look at the calendar on my checkbook without it

19    being classified as an exhibit.

20  Q.  No, I won't ask you.

21  A.  I just want to make sure I'm not in trouble.  Okay I

22    don't want you to see my checkbook.  It would make you

23    cry.

---

24        MR. SHUMAKER:  July 8th was a Monday.

25        THE WITNESS:  Yeah, I'm --

217

uncertified rough draft

1  Q.  So was it --

2  A.  It was probably the week of July.

3  Q.  July 8th?  I know I can't see either.

4  A.  I -- yeah, it was probably that week, July 8th week.

5  Q.  Okay so?

6  A.  It may have been -- the reason I'm hesitating as I

7    said before I think my family and I were out that

8    preceding Friday, Saturday and Sunday and we actually

9    ran into the governor's family coming onto the island

10    I believe that Sunday so I don't think we had that

11    meeting that week so it may have actually been the

---

12    following week.

13  Q.  Meaning sometime during the week of July 15th?

14  A.  No, or the end of --

15  Q.  So it was during?

16  A.  The week of the 8th.  The 8th.  But I did not have a

17    meeting with the governor that week.

18  Q.  Well --

19  A.  Now that I look at the calendar.

20  Q.  Okay.

21  A.  Okay.

22  Q.  So just to clarify, it appears more likely than not

23    that you did not have a meeting between you and the

24    governor the week of July 8th but your understanding

25    is that during the week of July 8th probably the

218

uncertified rough draft

---

1    latter part of that week, somebody on behalf of the

2    Emergency Manager let the governor or the state know

3    that you were drafting or starting to draft the July

4    16th request and that you had concerns about the

5    flower/webster litigations?

6  A.  Yeah and here again I don't know if so much concerns

7    -- it wasn't like we were focused on Flowers Webster

8    we were saying in the universe of the world that

9    litigation, whatever name, and the Syncora struggle

10    were creating a situation that was untenable and

11    threatening what we had wanted to do.

12  Q.  Lamont Satchel.

13  A.  Yes.

14  Q.  He's your -- what's his title?

15  A.  He is the -- I believe labor negotiator for the city.

16   Q.   And what's his scope of authority?

17   A.   His scope of authority initially as labor negotiator

18        was to oversee, monitor and lead labor relationships

19        with the city and its labor partners.

20   Q.   And to whom -- and who is his direct report?

21   A.   At this point Lamont's direct report -- well, it is --

22        the org chart is being revised, but his direct report

23        would have been to the chief operating officer.

24   Q.   And who was that?

25   A.   At that time it would have been Gary Brown.

                                                         219

                    uncertified rough draft


1    Q.   And who is it today?

2    A.   It still goes through Gary Brown but I am intimately

3         involved with the process.

                    Page 381

---

4    Q.   And do you know whether or not during the month of

5         June prior and up through -- starting with June 1

6         through July 18th --

7    A.   Yes, July 18th.

8    Q.   Did Lamont Satchel have any meetings with the labor

9         organizations?

10   A.   Do I know?  I know that during this time the CBAs,

11        some of the city's collective bargaining agreements

12        were expiring and I believe that Lamont did have

13        meetings during that time not just related with that

14        but with other issues as well.

15   Q.   During your prior testimony and I apologize for

16        skipping around but I don't want to duplicate what's

17        already been done.

18   A.   That's okay.

19   Q.   You spoke about Jones Day doing a presentation or

                    Page 382

---

20        interview to the state back in January, the end of

21        February.

22   A.   Yeah, the documents I was shown this morning would

23        make it January.

24   Q.   And with whom did Jones Day meet at that time, who

25        physically was in the room?

                                                         220

                    uncertified rough draft


1    A.   Treasurer Dillon, then CFO Jack Martin, Rich Baird,

2         Chris Andrews, Ken Buckfire and one of his colleagues.

3    Q.   Any other outside consultants besides Miller Buckfire?

4    A.   Well, Rich Baird is on contract to the state, but I

5         don't -- I think -- I don't recall if Ernst & Young

6         was there.  There was a member of the financial

7         advisory board.

                    Page 383

---

8    Q.   Do you recall who that was?

9    A.   As soon as you said that it went out of my head.

10        Very, very sharp, as -- Ken -- Ken Whipple was there.

11        I'm just going through the room.  Andy, Ken Whipple,

12        Jack Martin, Chris Andrews, Rich Baird, that's all

13        that I recall off the top of my head and Miller

14        Buckfire and one of his colleagues.

15   Q.   And who was there from Jones Day?

16   A.   Aaron Agenbroad -- they were all partners.  Aaron

17        Agenbroad, Bruce Bennett, Heather Lennox, myself,

18        Corinne Ball, Steve Brogan, and I think that was -- I

19        think that was our team.

20   Q.   What was Aaron's last name again?

21   A.   Agenbroad, A-G-E-N-B-R-O-A-D.

22   Q.   what department is he in?

23   A.   Aaron Agenbroad is a partner in charge of the

                    Page 384

24    San Francisco office.  He is in the labor.

25  Q.  He's in the labor group?

                                                    221
                    uncertified rough draft


1  A.  Uh-huh.

2  Q.  Corinne, all the rest of the attorneys on the team

3      were bankruptcy?

4  A.  No.  Bruce Bennett is in the bankruptcy group.

5      Corinne Ball was in the bankruptcy group.  Heather

6      Lennox is in the structured finance and bankruptcy.

7      Steve Brogan is managing partner for the firm.

8  Q.  But he was intimately involved in Chrysler; correct?

9  A.  Steve Brogan?

10  Q.  Yes.

11  A.  Steve Brogan oversaw Chrysler representation generally

---

12      but he wasn't day-to-day counsel.  Actually I think

13      you were.  And I'm trying to think who else was there

14      if anybody.  There was a pitch book, but that's who I

15      recall.

16  Q.  Turning back to Orr 6 for a minute.

17          MR. SHUMAKER:  What is that, counsel?

18      which one?

19  A.  Is that the letter or the --

20  Q.  It's the summary of partnership governor of Michigan

21      mayor of Detroit Emergency Manager.

22          MR. SHUMAKER:  Thank you.

23          THE WITNESS:  Okay.

24  Q.  I'm on the page that ends 464.

25          MR. SHUMAKER:  4647  I'm sorry, I'm not --

                                                    222
                    uncertified rough draft

---

1          MR. ULLMAN:

2          MS. LEVINE:  The Bates stamp number 464.

3  A.  464.

4          MR. SHUMAKER:  464 or 7 are you looking at?

5          MS. LEVINE:  Oh, sorry.

6          THE WITNESS:  47?

7          MS. LEVINE:  Yes, I guess so.

8          THE WITNESS:  Yes.

9  Q.  who drafted this document?  It says draft date

10      2/21/2013?

11          MR. SHUMAKER:  Objection, foundation.

12  A.  Yeah, I don't know who drafted this document.  I think

13      the email chain shows this was a document that was

14      forwarded to me and I think there's in an email this

15      morning I asked for it to be sent to me in a word

---

16      format.  I don't know who drafted it.

17  Q.  And did you comment on this document?

18  A.  Yes I did.

19  Q.  was it ever reduce today a final form?

20  A.  I don't recall seeing a final form but there's nothing

21      signed but this may be the final form if there is such

22      a thing.

23  Q.  Paragraph 7 reads?

24  A.  Yes.

25  Q.  --  labor, retiree and benefit initiatives will be

                                                    223
                    uncertified rough draft


1      pursued jointly by the mayor and the manager to the

2      extent permitted by law.

3  A.  Yes.

orrroughdraft (3).txt

4   Q.   What's your understanding of what that means?

5   A.   That was under -- the extent permitted by law was put

6        in there I believe by me.  As you see in paragraph 6

7        there's the to the extent permitted by law is a

8        different typeset.  And my understanding there was I

9        think this was in the document of emails it talks

10       about it being an aspiration Al agreement but not

11       requirement and I just wanted to reserve the right of

12       the manager to exercise his duties as permitted by law

13       as he saw fit.

14  Q.   What were the -- what was your understanding of what

15       the labor, retiree and benefit initiatives were to be?

16  A.   Well, there were some initiatives that were ongoing

17       and at this time there were the reductions, there was

18       an act 312 award that had come up for DPOA I believe

19       and there were ongoing issues regarding the act 312s

orrroughdraft (3).txt

20       for the other police divisions but I know there were

21       -- I know there were other initiatives going on but

22       this document at this time was not intended to be a

23       detailed recitation of what those initiatives were.

24       It was generally, as I understood it, to be a -- based

25       off the consent agreement.

224

uncertified rough draft

1   Q.   Were these to be cost cutting initiatives?

2   A.   It wasn't -- here again, this was aspiration Al.  It

3        wasn't clear at this time as to what those initiatives

4        were going to be.

5   Q.   Were these initiatives going to include cost cutting

6        initiatives?

7   A.   They might have included cost cutting initiatives,

orrroughdraft (3).txt

8        yes.

9   Q.   Was it your understanding or intent in your world as

10       Emergency Manager or at the time EFM?

11  A.   At this time?

12  Q.   Yes.

13  A.   No.  This was handed to me, I had -- as I said I think

14       in the prior email chain I was doing my due diligence

15       at this time.  I had not made any decision regarding

16       cost cutting initiatives.

17  Q.   On -- we had some discussion earlier with regard to

18       some of your thinking just prior to the filing, that

19       first and second or second and third week of July.

20  A.   Right.

21  Q.   And you raised as one of the concerns, and I

22       understand that there is sagora and a lot of other

23       things going on, but you raised as one of concerns

orrroughdraft (3).txt

24       that if certain orders were entered in connection with

25       the webster/Flowers litigation that you would lose the

225

uncertified rough draft

1        ability to do some of the things that you wanted to do

2        as the Emergency Manager.

3   A.   Yes.

4   Q.   What were you afraid you were going to lose the

5        ability to do?

6            MR. SHUMAKER:  Object to the form.  I

7        object to the summary.

8   A.   Let me say this.  It wasn't just limited to labor

9        issues.  I mean we were trying to --

10  Q.   No no I understand that.  But with regard to the labor

11       issues?

orrroughdraft (3).txt
12   A.   Oh labor issues?

13   Q.   Yeah.

14   A.   We wanted to -- and they would include cost cutting

15        measures perhaps, pensions and benefits, but also

16        streamlining job efficiencies, moving into the CEt's,

17        if you're talking about just labor.

18   Q.   Narrow and specifically what were you afraid you were

19        going not be able to do if the orders that were being

20        sought were entered or enforced from the Webster and

21        Flowers litigation.

22   A.   Yeah, everything.  We were concerned that the orders

23        had the possibility of delaying the overall

24        operational financial restructuring that we were

25        pursuing because they're all interrelated and if we

orrroughdraft (3).txt

1         had the same cash spend for instance on some issues

2         that we did on others, then even the savings we were

3         trying to get in Syncora and others we might not be

4         able to service so we were concerned about everything.

5         It wasn't just one specific issue.

6              MS. LEVINE:  Can I have a short break?

7              THE WITNESS:  Sure.

8              MR. SHUMAKER:  Sure.

9              THE VIDEOGRAPHER:  Going off the record at

10        4:12 p.m.

11             (A brief recess was taken.)

12             THE VIDEOGRAPHER:  We're back on the record

13        at 4:23 p.m.

14             MS. LEVINE:

15   Q.   Mr. Orr, was one of the concerns with regard to the

orrroughdraft (3).txt
16        Flowers and Webster litigation that 436 would be found

17        unconstitutional by the state court?

18             MR. SHUMAKER:  Object to the form.

19   A.   Not -- not particularly.  Frankly, it wasn't more of a

20        concern that ultimately the statute be found

21        unconstitutional, no.  It was more of a concern of

22        just being caught up in the uncertainty of litigation

23        and appeals.

24   Q.   Then let me put a finer point on it.  Were you

25        concerned that if in fact 436 were found

1         unconstitutional at the state court level, the lower

2         level court --

3    A.   Uh-huh.

4    Q.   -- that there would be the delay in the time to run

orrroughdraft (3).txt

5         through the appeal process on that issue?

6    A.   Yes, that was one of the concerns.

7    Q.   Your counsel has asserted a joint defense?

8    A.   Yes.

9              MR. SHUMAKER:  Common interest.

10   Q.   Common interest.  Just want to clarify to make sure I

11        understand.  We're obviously reserving our rights but

12        I want to understand whether you're claiming common

13        interest with regard to discussions relating to the

14        entire Chapter 9 filing or whether you are claiming

15        common interest just with regard to the state court

16        litigation?

17             MR. SHUMAKER:  Well, it would be to both.

18        I mean, the common interest agreement captures what

19        Mr. Orr's been doing since he became Emergency Manager

orrroughdraft (3).txt

20     where there was a common interest between the state

21     and the Emergency Manager's office.  So both of those

22     would fall within to the extent that counsel was

23     involved in the communications.

24          MS. LEVINE:  Okay.

25          MR. SHUMAKER:  If that helps.

1          MS. LEVINE:  Mr. Orr was not a defendant in

2     the Flowers and Webster litigation so I just want to

3     understand what the basis is for claiming joint

4     defense or a common interest agreement between July 3

5     and I think it was July 17 or 18 when the retirement

6     system named Mr. Orr as a party.

7          MR. SHUMAKER:  Well, the common interest is

8     there's a common interest between the state and the

---

orrroughdraft (3).txt

9     Emergency Manager's office to a whole number of things

10     regarding the requests and the provision of legal

11     advice.  So if you're talking about any possible

12     communications between Mr. Orr and the governor's

13     office where counsel was present about any of the

14     subjects you name, whether it be the Flowers or the

15     webster or the Chapter 9 filing, we will assert the

16     privilege.  I -- your -- the fact that Mr. Orr was not

17     a defendant in the first two actions doesn't change

18     the assertion of the privilege that we're making.

19          MS. LEVINE:  Okay slightly different topic.

20 Q.   Are you aware of a coalition among certain of the

21     cities' unions put together in order to try and deal

22     with some of the restructuring issues with regard to

23     labor that you've been focused on?

---

orrroughdraft (3).txt

24 A.   A coalition?  Can you please explain?  Informal

25     coalition or the retiree committee or --

1 Q.   Not the retire committee.  A coalition of unions with

2     regard to trying to deal with some of the labor issues

3     that you --

4 A.   Under the AFSCME umbrella?

5 Q.   No no no?

6 A.   Or separate union.  I'm trying to -- I'm trying to

7     understand.

8 Q.   well, I think your answer indicates to me that perhaps

9     the answer is no.

10 A.   Yeah.  Okay.

11          MS. LEVINE:  I have no further questions.

12          MR. SHUMAKER:  Thank you, counsel.

---

orrroughdraft (3).txt

13          THE VIDEOGRAPHER:  Going off the record at

14     4:27 p.m.

15          (Discussion held off the record.)

16          THE VIDEOGRAPHER:  we are back on the

17     record at 4:29 p.m.

18          EXAMINATION

19 BY MR. DeCHIARA:

20 Q.   Good afternoon, Mr. Orr.

21 A.   Good afternoon.

22 Q.   My name is Peter DeChiara.  I'm an attorney with the

23     law firm of Choen Weiss & Simon, LLP.  We represent

24     the United Auto Workers in this proceeding.

25          Prior to January of 2013 were you

1    acquainted with the governor, Rick Snyder?

2  A.   Personally acquainted?  I knew he was governor of

3       Michigan but --

4  Q.   Personally acquainted.

5  A.   Remotely.  We overlapped in law school.

6  Q.   Did you maintain since law school did you maintain any

7       friendship or other social connection?

8  A.   Hadn't seen him since 1982.

9  Q.   Until --

10  A.   Until sometime earlier this year in March.

11  Q.   Did you have any professional or other dealings with

12       him between the time you were in law school until you

13       saw him in connection with -- until after January

14       2013?

15  A.   No, none that I'm aware of.

16  Q.   Before you were appointed as Emergency Manager, did

17       you have occasion to speak to the governor about what

18       could or should be done about Detroit's pension

19       liabilities?

20  A.   Before I was appointed?

21  Q.   Yes.

22  A.   No, I don't believe the governor and I talked at that

23       level of detail.

24  Q.   Okay.  Same question for any of the governor's senior

25       staff.  Did you speak to any of the governor's senior

                                                        231

                        uncertified rough draft

1       staff before you were appointed as EM regarding what

2       could or should be done about Detroit's pension

3       liabilities?

4  A.   No, I don't recall having discussions of that

5       specificity.

6  Q.   What about with Andrew Dillon?  Same question, same

7       time period.

8  A.   Right.  No, I don't think we talked at that

9       specificity.

10  Q.   Same question for Mr. Baird?

11  A.   No, no, not with Rich Baird.

12  Q.   Before you were appointed EM did you speak with anyone

13       at Jones Day about what could or should be done about

14       Detroit's pension liabilities?

15  A.   I'm trying to think back.  Before my appointment?  Did

16       I speak with anyone about pension liabilities?

17  Q.   Anyone at Jones Day, yes.

18  A.   Anyone at Jones Day?  I may but I don't recall

19       specifically.  I may have.  Um I think I probably did,

20       yes, I think I probably did.

21  Q.   Do you recall who you may have spoken to?

22  A.   No.  It could have been -- no, I don't recall who I

23       spoke to.  It could have been a number of people.

24  Q.   Did you speak to Corinne Ball?

25  A.   Corinne Ball, it may have been Corinne.

                                                        232

                        uncertified rough draft

1  Q.   Do you recall any discussions you had with her about

2       that topic?

3  A.   I don't.

4  Q.   What about the what's the name of the managing

5       partner?

6  A.   Steve Brogan?

7  Q.   Did you speak to him about that topic?

8  A.   No we didn't speak at that level of specificity, no.

9    Q.   Anyone else in the bankruptcy group that you worked

10        with at Jones Day about that topic?

11   A.   About that specific topic?

12   Q.   Right, about what could or should be done about?

13   A.   Could or should be done.

14   Q.   About Detroit's pension liabilities?

15   A.   I don't recall having that level of specificity, no.

16   Q.   You've testified earlier today about a -- what I'll

17        call a pitch meeting that Jones Day made to the city

18        in order to be considered as counsel for the city.  Do

19        you recall that testimony?

20   A.   Yes.

21   Q.   Okay.  Apart from that pitch meeting, prior to

22        Jones Day being retained by the city, do you know

23        whether there were any communications by Jones Day to

24        the city about what could or should be done about

---

25        Detroit's pension liabilities?

                                                              233
                        uncertified rough draft

1    A.   To the city?

2    Q.   Yes.

3    A.   None that I'm aware of.

4    Q.   What about to the state -- I'm sorry, go ahead.

5    A.   Well, I had two meetings with mayor Bing but I don't

6         think we discussed pensions.

7    Q.   Do you recall what you did discuss?

8    A.   Just generally the state of the city, the difficulties

9         that he had encountered, they were more getting to

10        know each other meetings.  There wasn't any plan being

11        worked out or any detailed discussions.

12   Q.   Other than the pitch book that you testified about

---

13        earlier, prior to Jones Day being retain by the city,

14        do you know whether Jones Day provided or shared with

15        the city any analysis, memos, reports or any documents

16        of that sort with the city concerning the issue of

17        Detroit's pension liabilities?

18   A.   Other than the pitch book?

19   Q.   Yes.

20   A.   None that I'm aware of.

21   Q.   Do you know -- before Jones Day was retained by the

22        city, do you know whether Jones Day spoke to anyone at

23        the state including the governor and his senior staff

24        about what could or should be done about Detroit's

25        pension liabilities?

                                                              234
                        uncertified rough draft

---

1    A.   Prior to their retention?

2    Q.   Yes.

3    A.   I think I need to explain my answer.  Between the

4         pitch which occurred I believe now on the end of

5         January until sometime in -- at some point in February

6         I recused myself from the retention, the pitch

7         process, so during the time that I was involved for

8         the few weeks I don't know of anything, I wouldn't

9         know nothing after I recused myself.

10   Q.   Okay, when was Jones Day retained by the city?  Do you

11        know what date?

12   A.   I think they were ultimately selected prior to the

13        time I got there.  I remember the -- I think it was

14        the first couple of weeks it went through city

15        council, I stepped out of that process as Emergency

16        Manager, it then went to the mayor, I think or vice

---

orrroughdraft (3).txt

17    versa, he approved and went to counsel, counsel

18    approved it, there were press reports of that time

19    frame, I believe it was approximately March -- mid

20    March.

21  Q.  Okay.

22  A.  Or was it -- no, no, no.  They had been selected in

23    March, but I don't think city council approved it

24    until later.  So I think I had been selected and

25    retained, but it had to go to the city council

235

uncertified rough draft

1    certification and approval process for some period of

2    time after that.

3  Q.  Okay.  And since I had earlier asked you whether you

4    were aware of communications by Jones Day to the state

Page 409

5    concerning what could or should be done about

6    Detroit's pension liabilities --

7  A.  Right.

8  Q.  -- is the answer to your (sic) question you're not

9    aware of any?

10  A.  Other than the pitch book?

11  Q.  Yes.

12  A.  I'm not aware of any.

13  Q.  Okay.  Are you aware of any reports or presentations

14    or memos or analysis presented by Jones Day to the

15    state concerning what could or should be done about

16    Detroit's pension liabilities that occurred before you

17    became EM?

18  A.  No, I don't recall any.

19  Q.  Are you aware of any that have occurred since you've

20    become EM?

Page 410

orrroughdraft (3).txt

21  A.  Oh, I think, yes.  I mean, I think there have been

22    presentations to the state about the city's pension

23    obligations, yes.

24  Q.  Made by Jones Day?

25  A.  Made by Jones Day and Miller Buckfire and others, yes,

236

uncertified rough draft

1    yes.

2  Q.  Okay.  And what are they?  Can you tell me what those

3    are?

4  A.  Um.

5        MR. SHUMAKER:  Objection, we're going to

6    get into the same area that's covered by the common

7    interest agreement so if you're going to -- and ask

8    him about what he knows from a general level, but if

Page 411

orrroughdraft (3).txt

9    it's what was the specific content of the

10    communication, we're going to assert the privilege and

11    I'm going to instruct him not to answer so subject to

12    that admonition you can answer.

13  Q.  Okay so without getting into the substance of any

14    documents, can you answer the question?

15  A.  Yes.  Without waiving any privilege, generally there

16    were discussions about -- and this may have included

17    attorneys and investment advisors as well as attorneys

18    and representatives of the state.  Without discussing

19    what was said, generally the pension obligation and

20    healthcare obligation and the city's lack of funding

21    to meet them as discussed, you know, I'll just

22    reference the June 14th presentation as that type of

23    discussion.

24  Q.  Were these discussions that occurred prior to the

Page 412

25    issuance of the -- prior to June 14th?

237

uncertified rough draft

1    A.    Yes, I believe they may have been, yes.

2    Q.    Did the state participate in the formulation of the

3          proposal that is the June 14th proposal?

4    A.    When you say participate, I want to be careful.  You

5          know, it generally may have been discussed at a high

6          level but the state to the best of my knowledge didn't

7          participate in any authorship.

8    Q.    Okay I'm not talking about the drafting of the

9          document?

10   A.    Yeah yeah.

11   Q.    But the formulation of the actual ideas or proposals

12         that are contain in the document.

Page 413

---

13   A.    No.

14   Q.    Did the state have input into that?

15   A.    No.  The -- well let me say it this way without

16         talking about what was said.  Generally the -- some of

17         the advisors have been in the city for years if not

18         months and have been reviewing this issue so I'm

19         talking about from the time I was there and what I'm

20         aware of.  Generally the process once I became

21         involved was we, meaning my immediate restructuring

22         team, reviewed the issues and prepared proposals and

23         then may have discussed them at a high level with the

24         state but as I said there wasn't authorship in those

25         proposals at the state level to the best of my

238

uncertified rough draft

Page 414

---

1    knowledge.

2    Q.    Okay.  Let me refer you to the June 14th proposal.

3          Which is Exhibit 9 of your deposition.

4    A.    Yes.

5    Q.    And let me refer you in particular to page 109.

6    A.    Original 109?

7    Q.    Yeah, not the stamp?

8    A.    Not the Bates stamp, yes.

9    Q.    Right.  There's the third bullet point from the bottom

10         of the page.  You can read that.  It's a two line

11         bullet point, you can read it, but what I want to

12         focus on is the language that there must be

13         significant cuts in accrued benefit pension amounts

14         for both active and currently retired persons.  Do you

15         see that language?

16   A.    Yes.

Page 415

---

17   Q.    Okay.  And did you believe that what I just read out

18         loud that statement to be true as of June 14th?  Did

19         you believe that there had to be -- the cuts that are

20         referred to there?

21   A.    Yes, based upon our analysis, yes.

22   Q.    And did you believe that at the time that the city

23         filed for bankruptcy?

24   A.    Did I believe that at the time the city filed for

25         bankruptcy?

239

uncertified rough draft

1    Q.    At the time the city filed for bankruptcy.

2    A.    Yes.

3    Q.    Let me just finish the question for the clarity of the

4          record.

Page 416

5    A.    I'm sorry.

6    Q.    At the time the city filed for bankruptcy, was it your

7          view that there had to be significant cuts in accrued

8          vested pension amounts for both active and currently

9          retired persons?

10   A.    Yes.

11   Q.    And is it still -- still your view today?

12   A.    Yes, based upon our analysis, yes.

13   Q.    This conclusion that there must be significant cuts in

14         accrued vested pension amounts for both active and

15         currently retired persons, was that assertion or that

16         idea or that notion discussed by you with the governor

17         at any time before June 14th, 2013?

18   A.    Outside of meetings with attorneys?

19              MR. SHUMAKER:  Outside of meetings or calls

20         with attorneys present.

---

21   Q.    Yeah I'm not looking to infringe your attorney client

22         privilege.

23   A.    I know.  I just don't recall all of the meetings.  It

24         may have been discussed outside those meetings.

25   Q.    Well, do you have a recollection?

                                                           240

                    uncertified rough draft

1    A.    I do not have a recollection of specific discussions.

2    Q.    Just so I understand your testimony, are you saying it

3          was -- it may have been discussed but you're not sure

4          whether or not it was discussed in meetings that were

5          outside the attorney-client privilege?  Is that your

6          testimony?

7    A.    Yes.  It -- well, to clarify, I think it -- some

8          concept probably was discussed but I'm not sure it was

---

9          discussed outside of attorney-client meetings.

10   Q.    Okay.

11   A.    Attorney-client privilege.  I want to be clear.

12   Q.    Again, without infringing attorney-client privilege,

13         did the state, and when I say the state, I mean the

14         governor, his senior staff, Mr. Dillon, his staff,

15         ever speak to you or your team asserting that there

16         had to be significant cuts in accrued vested pension

17         amounts?

18   A.    I don't recall the state ever as you say asserting

19         that there had to be.

20   Q.    At the time you filed for bankruptcy or when the city

21         filed for bankruptcy, was it your intent absent a

22         consensual deal with the relevant stakeholders that

23         accrued vested pension amounts for both active and

24         currently retired persons would be cut?

---

25   A.    Well, first it was our intent that we reach some sort

                                                           241

                    uncertified rough draft

1          of understanding with stakeholders, that's why we

2          asked for the formation of a retiree committee,

3          because we recognize we needed to have representation

4          on those issues.  Secondly what we're asking for and

5          what we proposed in this proposal was the size of the

6          unfunded pension obligation and to have discussions

7          about that amount.  We did not want to imposes it,

8          we've said that many times, so in direct response to

9          your question, I don't know what we will do absent

10         consent.

11   Q.    Okay I'm not sure you answered my question so let me

12         ask you again.

13 A. Uh-huh.

14 Q. Putting aside -- or assuming that there is no

15 consensual deal that would occur --

16 A. Right.

17 Q. -- was it your intent at the time the city filed for

18 bankruptcy that there would be a nonconsensual

19 significant cuts in accrued vested pension amounts?

20 A. No.

21 Q. That was not your intent?

22 A. No.

23 Q. Did you have -- at the time of the bankruptcy filing,

24 did you have an intention as to what you wanted to

25 happen vis-a-vis the Detroit's pension liabilities,

242

uncertified rough draft

1 were you enable to achieve a consensual deal?

2 A. Did we have an intent as to what was going to happen?

3 Q. Yeah, what did you hope would happen or what did you

4 intend to happen to the pension liabilities in

5 bankruptcy if you were unable to get a deal?

6 A. Yeah, I think you're --

7 MR. SHUMAKER: I'll object, it calls for

8 speculation, but you can --

9 A. Yeah.

10 Q. Let me -- I'm not asking to you speculate I'm asking

11 you what your actual intent was at the time you filed

12 for bankruptcy.

13 A. Our intent was to seek a consensual deal.

14 Q. Did you have -- did you think about the possibility

15 that you might not be able to achieve a consensual

16 deal? Did that cross your mind?

17 A. Yes.

18 Q. Okay. And when that thought crossed your mind that

19 you might not be able to have a consensual deal, did

20 you then have an intent as to what you wanted to have

21 happen with the pension liabilities in bankruptcy?

22 A. No. We were going to cross that bridge when we got to

23 it.

24 Q. Okay, just so I understand your testimony, you filed

25 for bankruptcy -- the city filed for bankruptcy at

243

uncertified rough draft

1 your request, you contemplated the possibility that

2 there would be no consensual deal?

3 A. Right.

4 Q. But you had no plan or intention as to what would

5 happen to the pension liabilities if there were no

6 deal?

7 MR. SHUMAKER: Object to the form. It was

8 at the governor's request but --

9 MR. DeCHIARA: Okay, I accept that

10 modification.

11 Q. But can you answer the question?

12 A. Yes. No, because we've never made a -- well, we've

13 never made a threat that what will happen if we don't

14 reach a consensual deal. We will address that issue

15 if and when it arises.

16 Q. Yeah, just to be clear, I'm not asking you about

17 threats, I'm not suggesting there were any threats.

18 I'm just asking what was your intent, what was going

19 on in your head?

20 A. We don't have an intent in that respect.

21  Q.  Mr. Orr, I would like to show you a document I'll have

22      marked as Orr Exhibit 17.  I apologize, I only have

23      one copy so let me show it to your counsel first.  Let

24      me read what it is.  It's a document that's on the

25      docket, it's a document 849, it's the City of Detroit,

                                                        244
                        uncertified rough draft

1       Michigan's objections and responses to Detroit

2       retirement system's first request for admission

3       directed to the City of Detroit, Michigan.

4               (Marked Exhibit No. 17.)

5               MR. SHUMAKER:  Thanks.

6           Okay.

7               THE WITNESS:  Okay.

8   Q.  First of all, are you familiar with that document,

9       Mr. Orr?

10              MR. SHUMAKER:  Take a look at the first

11          page.

12              THE WITNESS:  Okay.

13  Q.  And I will represent that there's a box that's circled

14      and that's my handwriting from this morning.

15  A.  Okay.  Okay.  Yes.

16  Q.  Are you familiar with this document?

17  A.  Yes.

18  Q.  Did you review it before it was filed by the city?

19  A.  Yes, I did.

20  Q.  Let me refer you to -- let me just read.  I'll read it

21      over your shoulder so we can all read it together.

22      And request for admission 12 says admit the city

23      intends to seek or diminish -- seek to diminish or

24      impair the accrued financial benefits of the

25      participants in the retirement system through this

                                                        245
                        uncertified rough draft

1       Chapter 9 case.  The response is admitted.  Were you

2       aware of that admission made by the city?

3   A.  Yes, I reviewed these before they were filed.

4   Q.  Okay.  And am I reading this correctly that the city

5       does -- or at least as of the date of this document

6       which looks like it was entered on the docket on

7       September 13th that the city intends to seek or

8       diminish to impair accrued pension benefits of Detroit

9       pensioners?

10  A.  Yes, that's admitted.

11  Q.  Okay.  And so when did -- when did the city first --

12      when did that intent by the city first come into

13      existence?  Was it in existence at the time of the

14      bankruptcy filing?

15  A.  Well, I think we said in June 14th that we need to

16      adjust pensions, I think we said it in several

17      meetings after that so when you say intent as in the

18      legal conclusion of that document, I think we've said

19      that.  I think what we've consistently said, though,

20      we want to do that consensually by a consensual plan.

21  Q.  I understand that you've said that, but I'm just

22      trying to nail down, if you will, this intent that's

23      expressed, that's admitted in response to request for

24      admission 12 in Exhibit 17.  I'm just trying to nail

25      down when that intent first came into existence.  Did

                                                        246
                        uncertified rough draft

1       it come into existence at the time of the bankruptcy,

2       sometime before the bankruptcy was filed?  If you can

3       shed whatever light you can on the timing of when that

4       intent came into existence.

5   A.  Other than what I've said, we set said at June 14th we

6       have to adjust the pensions, we asked for a consensual

7       plan so I suppose you can say without getting caught

8       in the legal conclusion of the intent, I suppose you

9       could say that from our proposal to the time of that

10      admissions the intent as you say without drawing a

11      legal conclusion occurred.

12  Q.  Okay, so that intent existed at least -- at least at

13      the time of the June 14th proposal; is that a fair

14      characterization of your testimony?

15  A.  No, I said sometime between the June 14th testimony

16      till the entry of those admissions.  The intent as you

17      say could have occurred upon the execution of that

---

18      admission.

19  Q.  Okay.  And is it -- and you don't know when that

20      intent came into existence?

21  A.  NO, I think it came frankly if you're using the word

22      intent, I think it came when that admission was

23      supplied.

24  Q.  So your testimony -- so your testimony is this intent

25      arose at the time that this answer was drafted or

                                                        247

                        uncertified rough draft


1       submitted by the city onto the docket?  That's when

2       the city developed the intent?

3   A.  I don't know if it was on the docket.  What I know is

4       the question says, a legal conclusion, the question

5       asked do you intend to benefit and we admitted it.

---

6       And I guess in response to your question when that

7       intent arose, I guess it's at the point of admission.

8   Q.  Okay.  And so you're saying prior to the city

9       preparing this document, the intent that's referred to

10      in the document did not exist?

11  A.  I'm not sure we prepared that document.

12  Q.  well, it's a filing in this case?

13  A.  It's a response.

14  Q.  By the City of Detroit?

15  A.  Right but it's a response to a request for admission.

16  Q.  Right.

17  A.  Okay.

18  Q.  But the relevant part where it says admitted.

19  A.  Since you're using intent it sounds like you're using

20      as a legal conclusion, I'm saying that using your wore

21      the formal intent occurred at the point of admission.

---

22      That's what an admission is.

23  Q.  Okay.  So -- let me describe my understanding you tell

24      me if you agree with my understanding.

25  A.  Uh-huh.

                                                        248

                        uncertified rough draft


1   Q.  So this is a request for admission that asks whether

2       -- that asks the city whether it admits that the city

3       has a certain intent and the city admitted that;

4       correct?

5   A.  Yes, yes, that's correct.

6   Q.  Okay -- so okay.  So as of the moment that the city

7       made that admission in this document, the city had

8       that intent?

9   A.  I think -- I think that's an admission, yes.

10  Q.  Right.  So we're in agreement.

11  A.  Okay.

12  Q.  My question is the intent that's referred to, did it

13      exist at any moment before the city made the

14      admission?

15  A.  In my mind, no.  I mean, the time of admission is when

16      it admits to the intent.

17  Q.  And so in the June 14th proposal when it says there

18      must be significant cuts in accrued vested pension

19      amounts, it was not your intent that there be such

20      cuts absent a consensual deal?

21  A.  what I'm saying is your letter -- your request for

22      admissions asks when does the city intend to diminish.

23      The proposal said there must be cuts, but throughout

24      that time we said we wanted a consensual resolution.

25      By using the word intent I'm saying it just as a

Page 433

1      matter of practicality the expressed intent is upon

2      that admission.

3  Q.  Let me ask you about Article 9, Section 25 (sic) of

4      the Michigan constitution.  There was a great deal of

5      colloquy earlier today about that topic.  Do you

6      recall that?

7  A.  Yes, I do.

8  Q.  Okay.  Did you have any discussions with the governor

9      or the governor's staff or Mr. Dillon or Mr. Baird at

10      any time about the meaning or import of Article 9,

11      Section 25 of the Michigan constitution?

12          MR. SHUMAKER:  Without counsel present?

13          MR. DeCHIARA:  Yeah, without invading

Page 434

14      attorney-client privilege.

15  Q.  Oh, I'm sorry, I'm misspeaking.  Section 24.

16  A.  I understood, yes, okay.

17  Q.  Yes.

18  A.  I don't recall any of those discussions without

19      counsel present.

20  Q.  Prior to your being appointed as Emergency Manager did

21      you speak to any of your colleagues at Jones Day about

22      Article 9, Section 24 of the Michigan constitution?

23  A.  Yes, I believe I did.

24  Q.  And with whom did you speak --

25  A.  With whom did I speak --

1  Q.  -- about it?

Page 435

2  A.  Let me clarify.  I don't know if I spoke, I think I

3      saw some research on that article.

4  Q.  Okay, and this was research that you saw while you

5      were a partner at Jones Day?

6  A.  Yes.

7  Q.  And it was research shown to you by your colleagues at

8      Jones -- one or more of your colleagues at Jones Day?

9  A.  Yeah, I'm -- I'm not a Michigan law constitutional

10      scholar but I think there are various research papers

11      that were circulated, I don't think anybody came in

12      and said, here, read this, I think I just saw a paper

13      that discussed it.

14  Q.  where did -- did you see it as a result of your own

15      research --

16  A.  No.

17  Q.  -- or did someone show it to you?

Page 436

orrroughdraft (3).txt

18  A.  I think somebody else was doing research on it and I

19      think it was either through a distribution or --

20      sometimes distributions come through the office, you

21      don't know who, you know, they just come through

22      interoffice mail and you read the distribution and it

23      may have been a research memo that came through my

24      office, came to my office.

25  Q.  Do you have in your mind a particular document?

1   A.  Yes, I do.

2   Q.  And was it a hard -- did it land on your desk in hard

3       copy or did it come through your email?

4   A.  No, I think it came in hard copy.

5   Q.  And do you recall what it said?

---

orrroughdraft (3).txt

6           MR. SHUMAKER:  To the extent that it's not

7   a privileged memo.

8           THE WITNESS:  No, it was marked

9   attorney-client privilege attorney work product so I

10  don't think I can speak to it.  That's what I recall

11  about it.

12          MR. SHUMAKER:  Certainly if it was a memo

13  involving attorney-client advice, you're not going to

14  -- you're not going to testify about it.  I'm going to

15  instruct you not to --

16          THE WITNESS:  Right, I think it can be

17  characterized as that, yes.

18  Q.  Without going into the substance of the document, was

19      it a document that was prepared for a client of

20      Jones Day?  Do you know?

21  A.  It may have been prepared in contemplation for a

---

orrroughdraft (3).txt

22      client.  I'm being careful because the attorney-client

23      privilege can attach prior to a formal relationship so

24      I'm just being very careful but I think it -- I think

25      it implicates attorney-client privilege.  I recall

1       seeing a memo but I also recall up in the right-hand

2       corner that it had all of the instructions about

3       privilege and work product.

4   Q.  Apart from that document did you see any other

5       documents --

6   A.  No, no.

7   Q.  Okay.  Do you recall any conversations you had with

8       any of your collateral east at Jones Day while you

9       were still at Jones Day about the Michigan

---

orrroughdraft (3).txt

10      constitution?

11  A.  No.

12  Q.  Did you attend the June 14, 2013 meeting that's

13      referenced in paragraph 80 of your declaration?

14  A.  Yes.

15  Q.  And did you speak at that meeting?

16  A.  Yes.

17  Q.  Did you say anything to the effect that -- did you say

18      anything at the meeting to the effect that this

19      meeting was not a negotiation?

20  A.  I don't recall if I said that.  I may have, but I

21      don't recall.

22  Q.  If there was testimony by others that you did say

23      that, would you be in a position to deny that you said

24      it?

25  A.  No, I don't recall that I said it or not.

1  Q.  What about the June 20th meeting?  Did you attend

2      that?

3  A.  I attended one of those meetings.  It may have been

4      the June 20th.

5  Q.  Are you saying?

6  A.  The following week, yes.

7  Q.  When you say one of those meetings, are you sure you

8      attended June 14th?

9  A.  No, no, no, no, when I say one, I mean one of the

10     subsequent.  I'm sure I attended June 14th.  June 10th

11     was Monday, June 14th was Friday, my public meeting

12     was Monday, June 14th was the all creditors meeting.

13     There was subsequent due diligence meetings the

14     following week and I recall attending at least one of

15     those that week.  That was the those I was referring

16     to.

17  Q.  I'm a little confused.  Are you sure you attended June

18     14th?

19  A.  Yes.

20  Q.  Okay.  So do you recall whether you attended June

21     20th?

22  A.  I think I did, but I don't recall.

23  Q.  Okay.  What about July 11th?

24  A.  I don't recall.

25  Q.  Okay.  So I already asked you about whether at the

1      June 14th meeting you said anything to the effect of

2      that this was not a negotiation.  Let me ask you the

3      same question for the June 20th and July 11th.  Do you

4      recall at that -- at those meetings saying anything to

5      the effect of this is not a negotiation?

6  A.  I may have.  As I've said several times today, you

7      know, bargaining negotiations is suspended for five

8      years so I may have said that but I don't recall.

9  Q.  And again if there were witnesses who testified they

10     heard you say that at one or more of these meetings,

11     would you be in a position to deny that?

12  A.  I don't know if I would deny it or if I would confirm

13     it.  I mean, their recollection of what was said could

14     be different than mine than or what they heard.

15  Q.  Did you attend a meeting on July 10th with creditors?

16  A.  I may have.

17  Q.  Same question for July 10th.  Do you recall saying

18     anything to the effect that that meeting was not a

19     negotiation?

20  A.  I think I generally when I would go to these meetings

21     say we're having discussions and exchange but I would

22     try if I said this is not a negotiation I would try to

23     make sure that I did not waive the suspension of

24     bargaining under 436 so I may have said that, yes.

25  Q.  You may have said what?

1  A.  This is not a negotiation, yeah, I may have said that.

2  Q.  Okay.  Apart from you there were others who attended

3      those meetings on behalf of the city; correct?

4  A.  Yes, I believe so.

5  Q.  Okay.  And some of those individuals spoke?

6  A.  Yes.

7  Q.  Okay.  Do you recall whether at any of those meetings

8      that you attended whether any of the other individuals

9      who were there on behalf of the city said words to the

10     effect of this is not a negotiation?

11 A.  Do I recall?  No.

12 Q.  At the June 20th meeting, is it true that the

13     attendees, and by the attendees I mean the people who

14     were not there on behalf of the city but the other

15     people, that in order to be heard they needed to fill

16     out a card and submit the card to someone who was

17     running the meeting?  Is that how things worked?

18 A.  where was the June 20th meeting?

19 Q.  I don't know.

20 A.  I -- I know at my June 10th meeting that we had

21     speakers.  I don't recall.  I don't recall June 20.

---

22 Q.  Let me clarify.  Let's talk about the June 14th

23     meeting, the one you're sure you attended.

24 A.  Right.

25 Q.  was there a system in place at that meeting wherefore

256

1      an attendee to be heard he or she had to write -- fill

2      out a card and submit it?

3  A.  Yes, I believe so.

4  Q.  Okay, and describe how -- how did that -- what was

5      that process, how did that work?

6  A.  That process was arranged by my staff.  My

7      understanding is that if people wanted to speak, he

8      they could fill out a card and a question would be

9      asked and members who were on the DS on the panel

---

257

10     would answer the question.

11 Q.  who would readout the card?

12 A.  Initially it was the -- someone I believe on my staff

13     or some of my consultant's staff but toward the end of

14     the meeting people just started asking questions

15     outright.

16 Q.  Did -- that same process of attendees having to fill

17     out a card, did that occur at any of the other

18     meetings and by the other meetings I mean either June

19     20th, July 10th or July 11th?

20 A.  I don't recall.

21 Q.  It may have.

22 A.  It may have but I don't recall.

23 Q.  Okay.  Have you ever in your career as an attorney

24     attended a negotiation session of any kind?

25 A.  Yes.

---

1  Q.  Have you ever been at a negotiation session where one

2      side or the other has to fill out a card and have it

3      read by someone else to be heard?

4  A.  You're using the phrase negotiation session and I want

5      to be clear that what we were saying is make sure that

6      we did not waive any rights under 436.  I have been at

7      meetings wherefore purposes of to engage in oral

8      discussion yes you've had to fill out cards to be

9      heard, yes.  I have been at auctions, yes I have been

10     at meetings like that.

11 Q.  At auctions?

12 A.  Yeah I have Ben at auctions been at meetings been at

13     negotiations, yes, many different types of meetings.

14  Q.  What kind of negotiations where those that

15      participants had to fill out a card to be heard?

16  A.  They could have been negotiations for finance, they

17      could have been negotiations for procedures, they

18      could have been negotiations for a number of different

19      subjects, but it's happened on more than one occasion.

20  Q.  Have you ever attended a collective bargaining

21      negotiation?

22  A.  Yeah, I think I have.

23  Q.  Okay.  Did you ever see that type of system used in a

24      collective bargaining negotiation?

25  A.  I don't think I saw it at the one I attended but

                        258
                uncertified rough draft


1       collective bargaining is suspended.

2   Q.  Did you -- before any of these meetings -- and by

---

3       these meetings, I mean the June 14th, June 20th, July

4       10th or July 11th meetings -- did you consult with the

5       governor or any other state official about how the

6       meetings would be conducted?

7   A.  No, not to the best of my knowledge.

8   Q.  Did you consult with anyone, the governor or anyone,

9       any state official, regarding what the purpose or

10      nature of the meetings would be?

11  A.  When you say consult, you know, I've testified earlier

12      today that we had regular communications with the

13      governor's office, but my understanding was that how

14      we ran meetings was substantially left up to me and my

15      team, so no we didn't consult in that regard on how

16      the meetings were run.

17  Q.  Okay, just to clarify what I mean by consult.  I mean

---

18      did you talk?

19  A.  Not at that level of detail how we're going to run, no

20      we didn't talk, no.

21  Q.  Let me mark a document which I'll mark as -- ask the

22      court reporter to mark as Exhibit 18.

23              (Marked Exhibit No. 18.)

24  Q.  Have you -- have you ever seen this document before?

25  A.  Yes.

                        259
                uncertified rough draft


1   Q.  And let me just identify it for the record.  It's a

2       letter from Jones Day to Larry Stewart dated June 27,

3       2013?

4   A.  I'm --

5               MR. SHUMAKER:  We have a different letter I

6       think.

---

7   A.  I have John Cunningham.

8               MR. SHUMAKER:  We have John Cunningham.

9               MR. DeCHIARA:  I'm sorry, let's use that

10      one.

11              THE WITNESS:  Okay.

12              MR. DeCHIARA:  Thank you.

13  Q.  Orr Exhibit 18 will be a Jones Day letter to John

14      Cunningham dated June 27, 2013.  Let me ask you, have

15      you seen this Orr Exhibit 18 before?

16  A.  Yes.

17  Q.  And the first sentence of the letter says thank you

18      for participating in the June 20th, 2013 informational

19      meetings pertaining to the City of Detroit's and then

20      it continues.

21  A.  Uh-huh.

orrroughdraft (3).txt

22    Q.    And you can read the rest.

23    A.    Yes.

24    Q.    But I won't read it aloud.

25              Do you concur with the description in the

uncertified rough draft

1     sentence that I read of the June 20th meeting as an

2     informational meeting?

3     A.    Yes.

4     Q.    Let me refer you back to your June 14th, 2013

5     proposal.

6     A.    Yes.

7     Q.    And to page -- the original page 109.  And the third

8     to the last bullet point which we read earlier and

9     again I'm going to focus on the bottom line of that

10    bullet point that says "There must be significant cuts

---

orrroughdraft (3).txt

11    in accrued vested pension amounts for both active and

12    currently retired persons."

13              At the time of the meetings that I've been

14    referring to, the June 14th, June 20th, July 10th and

15    July 11th meetings, were -- would you have been

16    willing had there been negotiations that took place to

17    compromise and accept -- accept an outcome of the

18    restructuring effort that resulted in there not being

19    cuts in accrued vested pension amounts for both active

20    and currently retired persons?

21    A.    Well, that's a hypothetical question that could depend

22    upon a number of things.  I don't know.  I would have

23    to see the proposal.  We were willing to listen to any

24    proposal or counter that came in.

25    Q.    Okay, and I'm not trying to phrase it as a

---

orrroughdraft (3).txt

uncertified rough draft

1     hypothetical, I want to focus on what was in your mind

2     at the time of these meetings.  So let me ask you.

3     Did you ever consider at the time of these meetings

4     whether you would accept in some scenario that

5     resulted from negotiations that there would be an

6     outcome to the restructuring where there would not be

7     cuts to accrued vested pension amounts?

8     A.    That depends upon the proposal and the circumstances

9     of that proposed outcome.

10    Q.    I think we're maybe misunderstanding each other.  I'm

11    not asking you what you would have done --

12    A.    Uh-huh.

13    Q.    -- had you gotten a certain proposal or what you would

14    have done under some circumstances that did not occur.

---

orrroughdraft (3).txt

15    What I'm asking you is as to what your actual state of

16    mind was at the time of these meetings.  In your

17    actual state of mind --

18    A.    Uh-huh.

19    Q.    -- did you have -- did you consider and did you think

20    about that had there been certain negotiations that

21    led down a certain path, did you in your mind consider

22    that you might accept an outcome of the restructuring

23    where there would not be cuts to accrued vested

24    pension amounts?

25    A.    I was receptive as we said to anything but that would

uncertified rough draft

1     depend upon the proposal.

2     Q.    Did you say at any of these meetings that you would be

---

orrroughdraft (3).txt

3       receptive to anything?

4   A.   No, I think we did say that, yes.

5   Q.   So you would have been receptive to an outcome where

6       there would be no cuts in accrued vested pension

7       amounts?

8   A.   That depends upon what the proposal was.  we were

9       receptive to hearing anything which we haven't heard

10      so yes.

11  Q.   And is that true today?  Are you willing to consider

12      an outcome to this restructuring effort where there

13      would be no cuts to accrued vested pension amounts?

14  A.   That depends upon the terms of the proposal.  That's

15      -- that's -- we'll listen to -- we have said before

16      and we'll say again we'll listen to anything but it

17      depends upon the terms.

18  Q.   Okay.

Page 457

---

orrroughdraft (3).txt

19  A.   Your question's a hypothetical so I -- I don't -- it

20      depends upon what the terms are.

21  Q.   Okay well we have a disagreement with whether my

22      question is a hypothetical but it is what it is.

23  A.   Okay.

24  Q.   I can only ask you to answer it to the best of your

25      ability.

263

uncertified rough draft

1   A.   That's the best of my ability.

2   Q.   Let me now ask you about what you actually said at the

3       June 14th meeting.

4   A.   Okay.

5   Q.   Do you have a recollection of any words you used to

6       communicate to those in attendance that you were open

Page 458

---

orrroughdraft (3).txt

7       to consider anything, if that's a fair

8       characterization of your prior testimony?  Did you use

9       words to that effect and if so what were those words?

10  A.   I don't remember the exact words but I think we

11      expressed the sentiment that this is a proposal and

12      we're open to discussions.

13  Q.   well, that's a little different.  I mean to be open to

14      discussion.  I'm not asking you -- I think you

15      testified a few minutes ago that you were open to

16      anything and if I'm mischaracterizing that, correct

17      me.

18  A.   well, no, anything -- and I meant anything meaning

19      anything in terms of discussions, that's why we styled

20      this, we never called this a plan, we never called

21      this a deal, we always called it a proposal because we

22      were open for discussions, any response, meaning

Page 459

---

orrroughdraft (3).txt

23      anything, so I think they're the same thing.  I'm not

24      trying to be cute in any fashion I'm just saying we

25      were open to responses, yes.

264

uncertified rough draft

1   Q.   Did you ever say to the attendees at the meetings or

2       communicate to the attendees in writing that the city

3       would consider an outcome to the restructuring effort

4       whereby there would be no cuts to accrued vested

5       pension amounts?

6   A.   Did we ever communicate?  I'm not sure that anyone on

7       my team did.  To the best of my knowledge, I don't

8       recall doing that.

9   Q.   Okay.  Did you ever -- you or your team ever

10      communicate at the meetings or in writing to the

Page 460

11    creditors that you would be open to a result of the

12    restructuring effort that would result in something

13    less than significant cuts in accrued vested pension

14    amounts?

15  A.  Let me -- this line of questioning, let me respond

16      this way.  I think it's fair to say that we

17      communicated that we were open to discussions and

18      suggestions and counsel err proposals.  Depending upon

19      what the term of those discussions, suggestions and

20      counterproposals or anything were, we were willing to

21      discuss them.

22  Q.  Let me turn your attention back to page 109 of the --

23      of Exhibit 9, which is the June 14th proposal for

24      creditors.

25  A.  Yes.

Page 461

265

1   Q.  And I believe you were questioned about this earlier

2       so I'll keep this short, but the fifth bullet point

3       from the bottom of the page makes reference to an

4       underfunding of 3.5 billion dollars.

5   A.  Yes.

6   Q.  Do you see that?

7   A.  Yes.

8   Q.  And is it that assessment of -- is it that assessment

9       that that's the level of underfunding that caused you

10      to conclude two bullet points down there that there had to

11      be significant cuts in accrued pension benefits?

12          MR. SHUMAKER:  Object to form.

13  Q.  I mean accrued pension liability?

14          MR. SHUMAKER:  Object to the form.

Page 462

15  A.  Yes, we believe there are insufficient funds, yes.

16  Q.  Okay.

17  Q.  And the pension systems themselves believed, and

18      continue to believe, that the amount of underfunding

19      is less than 3.5 billion; correct?

20  A.  Yes.

21          MR. SHUMAKER:  Objection, foundation.

22  A.  I believe they recognize they're underfunding but

23      there have been statements that it's less than 3.5

24      billion.

25  Q.  Statements by them?

266

1   A.  By them.

2   Q.  Okay.  Did you ever speak to the governor or his staff

Page 463

3       or any state officials about what was the -- or what

4       is the correct amount of underfunding?

5   A.  Yes, I believe so.

6   Q.  Who did you speak to about that?

7   A.  Putting aside any discussions with attorneys as we've

8       done.

9           MR. SHUMAKER:  Same admonition as before.

10          THE WITNESS:  Same admonition.

11  A.  I believe I may have spoke with -- me personally may

12      have spoken with the treasurer.

13  Q.  When was that?

14  A.  I don't recall.

15  Q.  Was it before or after June 14th?

16  A.  Probably before.

17  Q.  And was it a face-to-face meeting?

18  A.  It may have been.  It may have been.

Page 464

19  Q.  Where was the meeting?

20  A.  I -- I -- there were so many meetings with so many

21      different parties, not just with the treasurer, but it

22      may have been here in Detroit.  We sometimes meet in

23      Detroit.

24  Q.  Do you recall the substance of your conversation?

25  A.  I do not.

                                                    267
                    uncertified rough draft

1   Q.  Did he say to you that he believed the pension funds's

2       assessment of the amount of underfunding was

3       unrealistic or words to that effect?

4   A.  No, not that I recall.  I think -- no.

5   Q.  Did you say that to him?

6   A.  I think I said something along the lines we believe

---

7       it's 3.5, some of the pension funds have asserted it's

8       different, we need to have a dialogue to derive a

9       number.

10  Q.  So you were the one who brought up the --

11  A.  Yes.

12  Q.  -- topic?

13  A.  Yes.

14  Q.  And what caused you to believe that the pension funds

15      were underestimating the amount of liability?

16  A.  As has been discussed both in the presentation and

17      many other times, we looked at a number of factors.

18      First from Gabriel Rotor, then from Milliman's initial

19      analysis of the Gabriel Rotor report, then from

20      Milliman's independent report and the unfunded actual

21      liability, the expected rate of return on assets, the

22      proposed amortization rate, how much we have to pay

---

23      out over time --

24          THE COURT REPORTER:  I'm sorry.  Start

25      again.  The expected rate of assets.

                                                    268
                    uncertified rough draft

1   A.  The expected rate of return, the market value of

2       assets, the proposed amortization rate and other

3       factors, which led us to conclude that they were

4       underfunded at this level to meet the anticipated

5       actuarial liabilities in out years.

6   Q.  So you were advised by certain experts who were

7       consulting you --

8   A.  Yes.

9   Q.  -- about this matter?

10  A.  Yes.  As was testified to this morning, I'm not an

---

11      actuary, I relied on my team, yes.

12  Q.  But what initially caused you to look into this issue?

13      Did someone come to you and say -- suggest that the

14      pension liabilities underfunded or is this something

15      that you yourself decided to seek out an opinion from

16      experts on?

17  A.  I -- I think that this issue had been discussed prior

18      to my becoming Emergency Manager in various forms with

19      financial stability agreement, perhaps even in a

20      consent agreement.  When we're looking at all

21      obligations of the city, I seem to recall those

22      documents started out at $12 billion of total debt,

23      then a subsequent one having to do before I got here

24      in 2012 came up with $14 billion of debt, and then the

25      first 30 days that I was appointed one of the

                                                    269

uncertified rough draft

1    obligations under 436 is get a true assessment of the

2    city's financial condition, we did a deeper dive and

3    that's when we derived these numbers.  So that was

4    based upon historical calculations and my obligations

5    under the statute.

6         MR. DeCHIARA:  I would like to go off the

7    record just for a minute.  I may be done, I just want

8    to consult with co-counsel.

9         MR. SHUMAKER:  Sure.

10        THE VIDEOGRAPHER:  Going off the record at

11   5:26 p.m.

12        (A brief recess was taken.)

13        THE VIDEOGRAPHER:  We're back on the record

14   at 5:39 p.m.

Page 469

---

15        REEXAMINATION

16   BY MR. ULLMAN:

17   Q.   Mr. Orr?

18   A.   Yes.

19   Q.   Just a few more questions for you.

20   A.   Sure, Mr. Ullman.

21   Q.   You are the -- let me withdraw that.

22        The June 14th proposal that we've look at

23   was put forward by you in your capacity as Emergency

24   Manager?

25   A.   Yes.

                                             270
uncertified rough draft

1    Q.   Does anyone besides you have authority to change or

2    modify the terms of the proposal?

Page 470

---

3    A.   well, it's my proposal and under statute I have

4    substantial discretion but ultimately I report to the

5    governor, but as far as this, no one else in the city

6    does, no.

7    Q.   No one other than you?

8    A.   No one other than me.

9    Q.   Now, in connection with a Chapter 9 proceeding that's

10   ongoing, in the event that you are unable to reach a

11   consensual resolution, do you intend to withdraw the

12   bankruptcy filing?

13        MR. SHUMAKER:  Objection, calls for

14   speculation.

15   A.   Yeah, I don't know what we'll do at that point.

16   Suffice it to say, if we can't reach a consensual

17   resolution there are serious questions about the city

18   for a number of reasons.

Page 471

---

19   Q.   And if the creditors and objectors do not agree to the

20   terms that are set out in the June 14th proposal, do

21   you intend to put forward a plan in the Chapter 9

22   proceeding that treats pension contributions for

23   retirees differently than the way those contributions

24   are treated in the June 14th proposal?

25        MR. SHUMAKER:  Same objection the.

                                             271
uncertified rough draft

1    A.   Yeah, I don't know what we intend to do.  Suffice it

2    to say I think the proposal speaks for itself and

3    we'll stand by that.  We're hoping to get some

4    movement on it.

5    Q.   So as things now stand there's no plan to put forward

6    anything else if the creditors and in particular the

Page 472

7    retirees do not agree to what's set out in the June

8    14th proposal?

9  A.   As it stands right now we don't have a plan.

10         MR. ULLMAN:  I have nothing further.  Thank

11   you, Mr. Orr.

12         MR. SHUMAKER:  Thank you, counsel.

13         THE WITNESS:  Thank you.

14         THE VIDEOGRAPHER:  Going off the record at

15   5:41 p.m.

16         (Discussion held off the record.)

17         THE VIDEOGRAPHER:  We're back on the record

18   at 5:43 p.m.

19              EXAMINATION

20  BY MS. GREEN:

21  Q.   Hi, Mr. Orr.  We've met before.

22  A.   Yes.

---

23  Q.   My name is Jennifer Green, I represent the two

24   retirement systems for the City of Detroit.

25  A.   Yes, Jennifer -- Ms. Green.  Good to see you again.

uncertified rough draft

1  Q.   Thank you.  Nice to you see you too.

2         I have a question about Exhibit 11.  I

3    don't know if you have it in front of you or not.

4  A.   Okay.

5         MR. SHUMAKER:  Which one is that?

6         MS. GREEN:  It's the July 18th letter from

7    the governor.

8         MR. SHUMAKER:  Thank you.

9  A.   Okay.  It's in here.  Here it is, got it.  Okay.

10  Q.   Do you happen to know who within the governor's office

---

11   drafted this letter?

12  A.   No, I do not.

13  Q.   Do you know if Jones Day had any input in drafting the

14   July 18th letter?

15  A.   To the best of my knowledge I don't think they did.

16  Q.   Do you know if they had any input or saw a preview of

17   the letter before it was delivered on the 18th?

18  A.   To the best of my knowledge they did not.  I know I

19   did not.

20  Q.   Did you have any specific conversations with the

21   governor about this letter between July 16th and July

22   18th?

23         MR. SHUMAKER:  Without counsel present?

24         MS. GREEN:  With the caveat without counsel

25   present.

---

1  A.   Without counsel present?  No.

2  Q.   Did you have any with counsel present?

3  A.   Yes, I believe on the morning of the 18th.

4  Q.   Okay.  You testified earlier that you were exam

5    pecking a letter on the 18th and you really didn't

6    know what to expect until you actually receive the

7    letter?

8  A.   I was expecting a letter at any time after I received

9    it I and my staff, Mr. Nalling, Ms. Penn, would spend

10   the 17th and the morning of the 18th for that matter

11   wondering if the letter was going to be forthcoming.

12   I didn't know when I was going to receive the letter.

13  Q.   And did you know what the contents of the letter would

14   be with respect to any contingencies?

orrroughdraft (3).txt
15  A.  NO.

16  Q.  Were contingencies anything that were discussed during

17      the meeting with the governor between the 16th and the

18      18th?

19          MR. SHUMAKER:  Again only without counsel

20      present.  If there were any such discussions.

21  A.  No, there were none, not without counsel.

22  Q.  Without disclosing the substance of what the

23      attorney-client privilege communications would be, can

24      you at least confirm whether contingencies in general

25      were discussed with the governor prior to this letter

                                                    274
                    uncertified rough draft


1       being delivered to you on the 18th?

2   A.  No, they were not.

3   Q.  I notice that the 18th letter says that it was

---

orrroughdraft (3).txt
4       delivered via hand and electronic delivery.

5   A.  Yes.

6   Q.  What time did you get the letter on the 18th?

7   A.  I don't know, but I think it was around lunchtime.

8   Q.  Did you receive it via email or did you receive it via

9       hand-delivery?

10  A.  I don't recall depending upon which office.  I think

11      someone came in and handed it to me.  I think someone

12      on my staff gave it to me.

13  Q.  Do you recall receiving it via email?

14  A.  I think I probably did receive it, I just think

15      somebody got it before I got into my emails and

16      brought it into me.

17  Q.  Do you know if the email that this letter was attached

18      to has been produced to date?

---

orrroughdraft (3).txt
19  A.  I do not.

20  Q.  Would you be willing to produce the email that

21      attached this letter as part of this?

22          MR. SHUMAKER:  Certainly willing to look

23      into it, sure.  And it may well very.

24          MS. GREEN:  Have already been.

25          MR. SHUMAKER:  Been produced.

                                                    275
                    uncertified rough draft


1   Q.  Earlier we were discussing the common interest

2       agreement between the city and the state.  Do you have

3       an actual written common interest agreement?

4   A.  That's handled by my counsel.  I -- I believe we do.

5   Q.  Do you know if you reviewed the common interest

6       agreement?

7   A.  I don't recall if I reviewed it.

---

orrroughdraft (3).txt
8   Q.  Were you the one that would have executed it on behalf

9       of the city?

10  A.  I might have been.

11  Q.  Do you know if you've produced the common interest

12      agreement as part of this litigation?

13  A.  I don't know.

14  Q.  Would you produce the common interest agreement?

15          MR. SHUMAKER:  Look into that one too.

16          MS. GREEN:  Thank you.

17  Q.  We earlier were discussing some email correspondence

18      from January of 2013 and you had commented in an email

19      -- you characterized PA 436 as a "Clear end-around the

20      prior initiative that was rejected by the voters' in

21      November."

22  A.  Yes.

orrroughdraft (3).txt

23  Q.   What did you mean when you said that it was a "Clear

24       end-around."

25  A.   I had read that in one of the articles and as I said

276

1        during that discussion that was my cursory review of

2        the statute and I had read that somewhere, that was

3        the conclusion during that day of going back and forth

4        based upon what I had read at that time.

5   Q.   So someone else had concluded that it was a clear

6        end-around and you were agreeing with that

7        characterization?

8   A.   I was -- I was parroting in a sense what I had heard

9        and I was expressing the belief that I felt that

10       that's what was said, so yes, at that time that's what

11       I was saying.

Page 481

---

orrroughdraft (3).txt

12  Q.   Who else had said that it was a clear end-around?

13  A.   I forget which article that was in.  It could have

14       been a Free Press article or news article.  I was

15       reading or it could have been a WDIV or Fox 2

16       commentary.  I was -- I was trying to find out what

17       was going on because of -- this subject came up of me

18       possibly being a candidate for the Emergency Manager.

19  Q.   Are you now trying to say that you did not agree with

20       that characterization?

21  A.   No, at that time.

22            MR. SHUMAKER:  Object to the form.  Go

23       ahead.

24  A.   What I'm saying is at that time that was my

25       characterization.

277

Page 482

---

orrroughdraft (3).txt

1   Q.   Have you similarly expressed any reservations about PA

2        436 also being a clear end-around of Article 9,

3        Section 24 of the Michigan constitution?

4   A.   No, at that time I hadn't even -- I hadn't even

5        thought about the Michigan constitutional questions at

6        that time.

7   Q.   Have you since expressed any similar reservations?

8   A.   No, I have not.

9   Q.   Earlier you were handed Exhibit 17 I believe it was,

10       which was a copy of the city's request for admissions.

11  A.   Yes.

12  Q.   I'm sorry, the city's responses to the retirement

13       systems request for admissions.

14  A.   Yes.

15  Q.   Do you have a copy in front of you?

Page 483

---

orrroughdraft (3).txt

16            MR. SHUMAKER:  He has the only copyright

17       now.

18            MS. GREEN:  I have a few extras because

19       they were --

20            THE COURT REPORTER:  He took it back.  He

21       took the original back.

22            MR. DeCHIARA:  Oh I have it?  I have it.

23            MS. GREEN:  He's got it.  We're fine.

24            MR. SHUMAKER:  Was it marked?

25            MS. GREEN:  It was marked.

278

1            MR. SHUMAKER:  It was marked.  You need it

2        for the record.

3            THE WITNESS:  Okay.
Page 484

orrroughdraft (3).txt

4          MR. SHUMAKER:  Peter you want to take this

5     one?

6          MR. DeCHIARA:  Thanks.

7  Q.  A few moments ago you stated and I don't want to

8     mischaracterize your testimony, I believe you said if

9     you can't reach a consensual deal, there are "Serious

10    questions about the city for a number of reasons."

11 A.  Yes.

12 Q.  What did you mean when you said that?

13 A.  Oh I meant what do we do?  We have a lot of liability

14    on pension and OPEB, we simply don't have the money,

15    we can't go to the capital markets and borrow that

16    magnitude of money, we'd have to try to figure out

17    what to do next.  That's all I meant.

18 Q.  Okay.  I would like to direct your attention to

19    request for admission number five, it's on page 10 of

orrroughdraft (3).txt

20    Exhibit 17.  The request to admit asked the city to

21    admit that the restructuring proposal propose to

22    impair or diminish accrued financial benefits of the

23    participants of the retirement systems and the city

24    stated it admits that the restructuring proposal

25    contemplates a reduction in accrued financial benefits

                                                      279

                    uncertified rough draft

1     to participants of the Retirement Systems but seeks

2     agreement and acceptance by plan beneficiaries.  The

3     city's intention are to gain consensus with its

4     creditors and propose a confirm believe plan.  Did I

5     read that correctly?

6  A.  Yes.

7  Q.  And similarly with respect to number 6, the request

orrroughdraft (3).txt

8     was for the sit toy admit that the bankruptcy

9     recommendation proposes among other things to diminish

10    or impair accrued financial benefits of the

11    participants in the retirement systems.  And the

12    response is the same; correct?

13 A.  Yes.

14 Q.  Number 12 asks the city to admit that you intend to

15    seek to diminish or impair the accrued financial

16    benefits of the participants in the retirement systems

17    through the Chapter 9 case?

18 A.  Yes.

19 Q.  And you see that distinction between the three

20    questions?

21 A.  Yes.

22 Q.  Your response to number 5 and number 6 both state that

23    the city seeks a consensual agreement correct?

orrroughdraft (3).txt

24 A.  Yes.

25 Q.  Your response to number 12, which is whether you would

                                                      280

                    uncertified rough draft

1     seek to diminish or impair through the Chapter 9 case,

2     does not have the caveat regarding a consensual deal

3     being reached; correct?

4  A.  Yes.

5  Q.  Why is there that difference?  Is it because the city

6     intends to use the cram down provisions of the

7     bankruptcy code to force a nonconsensual deal?

8          MR. SHUMAKER:  Object to the form.

9  A.  Without getting into discussions with counsel, I think

10    I can -- I think I can safely say without any waiver

11    that the city intends to preserve all of its rights in

orrroughdraft (3).txt

12      answer number 12.

13  Q.   A few moments ago when asked about what the city's

14      plan was if a consensual agreement could not be

15      reached, I believe your response was the city

16      currently has no plan if a consensual agreement is not

17      reached; correct?

18  A.   That is correct, yes.

19  Q.   Sitting here today is it your testimony the city has

20      no backup plan if a consensual deal is not reached?

21          MR. SHUMAKER:  Object to the form.

22  A.   Sitting here today it's my testimony that we have no

23      plan other -- first we have no plan, but we have no

24      plan or no effort other than to try to reach a

25      consensual resolution.

                                                        281
                   uncertified rough draft
                        Page 489

---

orrroughdraft (3).txt

1  Q.   If you don't get that consensual resolution, would you

2      resort to the cram down provisions that are contained

3      within the bankruptcy code?

4  A.   I don't know.  We'll have to as I've said before we'll

5      have to cross that bridge when we get to it.

6  Q.   So the city has no present intent to resort to any

7      cram down provisions?

8  A.   We haven't formulated a plan based upon consensus or

9      not yet.

10  Q.   Maybe you haven't formulated a plan but have you

11      discussed the option?

12  A.   Oh, we've discussed a lot of options.  That's why I

13      say we want to reserve all rights.

14  Q.   Let's get into the discussions.  When was your first

15      discussion regarding using the cram down provisions if
                        Page 490

---

orrroughdraft (3).txt

16      a nonconsensual agreement was not reached?

17          MR. SHUMAKER:  Objection.  I want to

18      caution the witness about getting into any

19      attorney-client communications.  Subject to not

20      revealing anything along those lines, you can answer.

21  A.   Without getting into any communications, I'm not sure

22      there was a specific discussion about the cram down

23      provision.

24  Q.   A moment ago I thought you said, and I'm quoting from

25      right in front of me, we discussed a lot of options

                                                        282
                   uncertified rough draft

1      that's why I want to say we reserve all rights and you

2      had mentioned that there was an analysis about cram

3      down provision so there either was or there was not.
                        Page 491

---

orrroughdraft (3).txt

4  A.   I'm not -- what I'm trying to -- my testimony is I'm

5      not sure what we specifically discussed if we can't

6      get a consensual resolution we go to cram down.  There

7      were other options that were discussed.

8  Q.   Okay.

9  A.   Including that.  I don't want to give you a binary I

10      response.

11  Q.   So I have two follow-up questions then.

12  A.   Uh-huh.

13  Q.   Number one, whether was the cram down issue discussed?

14  A.   I don't recall a -- we -- without discussing what was

15      said with counsel, I don't recall --

16          MR. SHUMAKER:  The question is when.

17          THE WITNESS:  When?

18  A.   We haven't -- I don't want to be unclear.  There

19      hasn't been a specific cram down discussion, but cram
                        Page 492

20    down is one of the options has been mentioned.  we

21    have not sought to make a determination of if and when

22    we would pursue that alternative.

23  Q.  well I don't suppose you're willing to offer any sort

24    of assurance today that the city would not resort to

25    the cram down provisions if a consensual deal was not

283

uncertified rough draft

1    struck?

2  A.  I just said we want to preserve all options.  I can't

3    do that.

4  Q.  And is it also true that you cannot remember the first

5    time that that option was discussed?

6  A.  AH--

7  Q.  Let's put it this way much was it liar to the filing

8    of July 18th or was it something you discussed after

9    the filing?

10  A.  I mean, the reason I'm hesitant is I'm a bankruptcy

11    practitioner, I'm certainly aware of nonconsensual

12    creditors being subject to cram down, I'm just not

13    recalling a specific discussion.  I'm not sure we had

14    to have a discussion.

15  Q.  Okay.

16  A.  Okay, I mean.

17  Q.  What other options were discussed?  You said you

18    discussed multiple options?

19  A.  Well, without getting into negotiations, options

20    regarding which if any classes you could get, which

21    participants, other alternatives, anything short of

22    consensual, what else you might be able to offer,

23    whether you would listen to different factors that go

24    into the pay out, whether the beneficiaries would come

25    with a different proposal.  A number of things were

284

uncertified rough draft

1    discussed.

2  Q.  Who did you discuss those options with?

3  A.  Our counsel and investment bankers.

4  Q.  Have you ever discussed -- so internally you discussed

5    those options?

6  A.  Yes, yes, yes, yes.

7  Q.  Have you discussed those options with the retirement

8    systems?

9  A.  Have I personally discussed those with the retirement

10    systems?  I don't recall.  I don't think so.

11  Q.  Have you discussed those options with any of the

12    actual individuals within the Retirement Systems?

13  A.  I may have.

14  Q.  And who would that be?

15  A.  I don't remember.  There are so -- I've had over -- I

16    think at this point I've had over 200 meetings, some

17    of those including individual members of the various

18    groups and that may have come up.

19  Q.  So you've said several times throughout today and in

20    your response toss our discovery that the city's

21    intent and the city's hope I think you used the word

22    hope would be to get a consensual agreement.

23  A.  Yes.

24  Q.  And I think I recall you saying that your reading of

25    Article 9, Section 24 is that it would permit

285

uncertified rough draft

1    consensual contractual negotiations?

2  A.  I believe that's a fair characterization.

3  Q.  If that cannot be achieved, would you agree that

4     Article 9, 24, Section 24, would prohibit any other

5     impairment or diminution of the pension benefits?

6  A.  No.

7            MR. SHUMAKER:  Objection, calls for

8     speculation and for a legal conclusion.

9  Q.  And why would you disagree with that?

10 A.  For all the reasons we discussed earlier today and in

11    addition I think it calls for a legal conclusion as

12    far as what the import of 436 versus that provision

13    is.

14 Q.  Let's talk a little bit about the Chapter 9 process

15    itself.

Page 497

---

16 A.  Yes.

17 Q.  You seek authorization from the governor, step one?

18 A.  Yes.

19 Q.  Step two, the governor gives his authorization?

20 A.  Yes.

21 Q.  And then the city, you acting on behalf of the city,

22    are responsible for filing the Chapter 9 case itself;

23    correct?

24 A.  Yes.

25 Q.  And after you file the case you and your attorneys are

286

uncertified rough draft

1     responsible for the day-to-day activities in carrying

2     out that Chapter 9 case; correct?

3  A.  Yes.

Page 498

---

4  Q.  And in a Chapter 9 case only the municipality itself

5     can propose a plan of adjust many; correct?

6  A.  Correct.

7  Q.  So ultimately it will be the city that proposes a plan

8     of adjustment?

9  A.  I believe so.

10 Q.  And ultimately it will be the city that places in

11    front of the court a method to deal with its pension

12    debt?

13 A.  I believe so.

14 Q.  And it is only the Court after the city has first

15    proposed the plan, it is the court that can confirm

16    that plan?

17 A.  Yes.

18 Q.  But all the steps leading up to that confirmation are

19    acts taken by the city; correct?

Page 499

---

20 A.  I believe that's the Chapter 9 scheme.

21 Q.  You mentioned earlier that in the June time frame

22    there were certain pieces of litigation that were all

23    coming to a head; correct?  I'm referring to the

24    Syncora litigation and the Michigan State court

25    litigation.

287

uncertified rough draft

1  A.  Yeah, but I think we were talking about July when the

2     state court litigation began.

3  Q.  That's true.  The state court litigation was not until

4     July, you mentioned in your testimony that you were

5     throughout the month of June there were concerns about

6     "Losing control."

7  A.  June through I think the testimony was at various time

Page 500

orrroughdraft (3).txt

8      frames, June 14th through July 3rd and June 1 through

9      July 18th and I was saying those time frames there are

10     a number of different issues.  In the June time frame

11     I seem to remember it as in the prior deposition you

12     attended, we reached an agreement in principal, then

13     things started to go off the rails with Syncora the

14     following Monday on June 17th so that's what my

15     discussion was.

16  Q.  And so consistent with that you said you agreed there

17     were concerns that throughout June things were

18     beginning to spin out of control and I think you used

19     the words losing control?

20  A.  Yes, in June we were dealing with a number of

21     different issues but we were trying to manage them as

22     best we could and then for the better part of

23     June/July we started being hit with a number of pieces

orrroughdraft (3).txt

24     of litigation that just kept coming over the transom

25     and it appeared that we were starting to lose the

                                                    288
                        uncertified rough draft


1      initiative.

2   Q.  Okay.  You mentioned earlier when you were

3      characterizing the losing control phase of what was

4      going on --

5   A.  Uh-huh.

6   Q.  -- you said that someone counseled you that it was

7      irresponsible to be delaying the bankruptcy filing?

8          MR. SHUMAKER:  Object to the form.

9   A.  Uh-huh.

10  Q.  Who was it that accused you of being irresponsible for

11     holding off on the bankruptcy filing?

orrroughdraft (3).txt

12  A.  Well, I wouldn't characterize it as accusation.

13  Q.  Who counseled you that it was irresponsible?

14  A.  It was --

15          MR. SHUMAKER:  To the extent that it was

16     counsel, I don't want you to get into the

17     communication.

18  A.  Okay, it was a privileged communication.

19  Q.  So an attorney at Jones Day?

20  A.  No, not necessarily.  It -- various discussions with a

21     number of my team members including attorneys,

22     investment bankers and consultants.

23  Q.  So during that time frame what was the event that

24     finally pushed you to actually start preparing the

25     documents to file the bankruptcy petition?

                                                    289
                        uncertified rough draft

orrroughdraft (3).txt

1   A.  I don't know if there was an event that pushed me, but

2      I think there was a general consensus that if things

3      continued with a number of different lawsuits going on

4      simultaneously, our own litigation against Syncora,

5      that things were spiralling out of control.

6   Q.  And I'm assume that during that time frame it was you

7      that directed Jones Day to begin preparing the actual

8      documents that would eventually be filed in the

9      bankruptcy court; correct?

10  A.  Yes.

11  Q.  Do you know when you told them to go ahead and start

12     preparing the paperwork?

13          MR. SHUMAKER:  Objection, asked and

14     answered, but you can answer again.

15  A.  I'm not sure the exact date but it was probably

16    sometime in that July time frame.  Yeah.

17  Q.  And I'm sure we don't just throw documents like that

18      together.  Do you know how long they worked on the

19      documents before they were filed?

20          MR. SHUMAKER:  Object to the form.

21  A.  No, but I suspect it was at least several weeks.

22  Q.  Do you recall when the first draft of the petition or

23      the accompanying documents was provided to you for

24      your review?

25  A.  No.  But I suspect it may have been -- I don't recall.

                                                    290

                    uncertified rough draft


1   Q.  Do you recall reviewing multiple drafts, for instance?

2   A.  Oh I think I saw several drafts, yeah.

3   Q.  If the governor had included a contingency on his July

4       18th letter --

---

5   A.  Uh-huh.

6   Q.  -- would you have had to rework the petition and the

7       corresponding papers?

8           MR. SHUMAKER:  Objection, calls for

9       speculation.

10  A.  That -- that depends upon what the contingency was.

11  Q.  If there was, for example, some sort of contingency

12      regarding the pensions, did you have a separate

13      version of the documents --

14  A.  Oh.

15  Q.  -- in case there have a contingency placed by the

16      governor?

17  A.  I don't -- I don't recall if it would have required a

18      separate version or if it would have required any

19      editing if any at that point.

---

20  Q.  Well, you testified that you got his -- the governor's

21      approval letter somewhere around lunchtime.

22  A.  Right.

23  Q.  The petition was filed just a few hours later.

24  A.  Right.

25  Q.  So I'm assuming that the papers were ready to go

                                                    291

                    uncertified rough draft


1       because it was just a few hours of turnaround time;

2       correct?

3           MR. SHUMAKER:  Objection to form.

4   A.  Well, that's your assumption but the reality is you

5       can commence a bankruptcy as you know by filing a

6       petition without other documents so if the contingency

7       you're talking about depending upon what it is there

8       may have been other things we would have had to factor

---

9       too and edit, I just don't know.

10  Q.  You were asked earlier on an email from Corinne

11      Ball?

12  A.  Yes.

13  Q.  Where she mentioned the Bloomberg foundation?

14  A.  Yes.

15  Q.  Did the Bloomberg foundation ever end up providing any

16      funds with regard to either your salary or the

17      Emergency Manager -- the Emergency Manager --

18  A.  Effort.

19  Q.  -- project if you will?

20  A.  No, in fact.

21          MR. SHUMAKER:  Object to form.

22  A.  In fact I think the memo that followed on that memo

23      said no, I don't want to do that.

24   Q.   Do you know if any other private party has provided

25        funding in addition to your salary which has already

                                          292
                      uncertified rough draft

1         been made public, do you know if there were any other

2         private parties that provided funding in addition to

3         that?

4    A.   Not to me.

5    Q.   I would like to give you Exhibit Number 19.

6              (Marked Exhibit No. 19.)

7    Q.   This is city's interrogatory responses.

8    A.   Yes.

9    Q.   -- to the retirement systems' discovery requests.

10   A.   Yes.

11   Q.   After page 12 there's a verification by you.

12   A.   Yes.

                      Page 509

---

13   Q.   Is that your signature?

14   A.   Yes, should be.

15   Q.   On page 10.

16   A.   Yes.

17   Q.   On page 10 there's an interrogatory regarding private

18        funds as defined in section 93 F of PA 436.

19   A.   Right.

20             MR. SHUMAKER:  You're referring to number

21        6, counsel.

22             MS. GREEN:  Yes.

23   Q.   At this time are you aware of any private funds as

24        defined in PA 436 that have been used to supplement

25        your salary or compensation?

                                          293
                      uncertified rough draft

                      Page 510

---

1    A.   Subject to the answer, there are no private funds.

2         All I get is the compensation that's provided to me

3         pursuant to my contract and in fact I have not been

4         seeking any benefits under that contract such as

5         commuting expense, healthcare, malpractice insurance,

6         directors and officers insurance, in fact I've been

7         subsidize go my efforts out of my own pocket.

8              MS. GREEN:  If that situation changes and

9         private funds are provided, I would request a standing

10        request for supplementation to be made aware if that

11        happens.

12             MR. SHUMAKER:  I'm sure --

13             MS. GREEN:  I'm directing that to your

14        counsel.  You don't have to personally let me know.

15             MR. SHUMAKER:  We'll look into that if that

16        would happen.
                      Page 511

---

17             MS. GREEN:  I appreciate that.

18   A.   I have not asked and there is no intent or expectation

19        in that regard.

20   Q.   The -- I have one last question.  We talked about the

21        draft of the petition being prepared by Jones Day.

22        There were media reports that the city was planning to

23        file on Friday, July 19th.  Do you recall seeing

24        those?

25   A.   Yes.

                                          294
                      uncertified rough draft

1    Q.   What was it that made the city that prompt the sit toy

2         file them instead on July 18th at 4:06 p.m.?

3    A.   Counsel just because they're media reports doesn't

4         mean that that was accurate.
                      Page 512

5  Q.  Was there ever a plan to file them on the 19th?

6      Setting aid sigh what the media reported, was there a

7      plan to file them on the 19th?

8  A.  No, my plan was to have the permission, the authority,

9      to file them and make that call at some point after I

10     transmitted my letter of July 16.

11 Q.  Were any of your conversations on the 18th or the 17th

12     relating to the timing of the petition?

13 A.  Outside of communications with counsel?

14         MR. SHUMAKER:  I'm going to object to the

15     form just I'm not following your question, counselor.

16 Q.  Were any of the conversations that you had on the 17th

17     or the 18th with for instance the governor we've

18     talked about these conversations, were any of those

19     conversations relating to the timing of the filing

20     itself?

---

21         MR. SHUMAKER:  Again to the extent that

22     you're going to go into the content of the

23     conversations where counsel was present between

24     Mr. Orr and the governor, I'm going to instruct him

25     not to answer.

                                                    295

uncertified rough draft

1  Q.  Were there any conversations that you had without

2      counsel present?

3  A.  No.

4  Q.  And are you not willing to answer even what topics in

5      broad categories of topics that were discussed?

6         MR. SHUMAKER:  Again to the extent that

7      they reveal what the communications are, I'm going to

8      instruct him not to answer.

---

9  Q.  Do you know if anyone else from your team had

10     conversations outside of conversations with counsel,

11     relating to the timing of the filing?

12 A.  There may have been conversations.  I'm not aware of

13     any specific ones.

14         MS. GREEN:  I don't have any further

15     questions.  Do you have follow-up?

16         MR. SHUMAKER:  Thank you, counsel.

17         THE VIDEOGRAPHER:  This concludes the

18     deposition and we're going off the record at 6:12 p.m.

19

20

21

22

23

24

---

25