**Exhibit 6A**

**Excerpts of Deposition of Kevyn D. Orr**

Page 13

1 Jones Day.
2 **A. Absolutely.**
3 Q. You may have or did from local counsel.
4 **A. Yes.**
5 Q. And you can't recall whether you did from the City's
6 law department.
7 **A. Yes.**
8 Q. Are you waiving the attorney-client privilege in
9 connection with the motion to assume the forbearance
10 agreement?
11 **MR. SHUMAKER:** Objection, could call for
12 the revelation of attorney-client communication.
13 You can answer the question, but yes or no.
14 **A. No.**
15 **BY MR. HACKNEY:**
16 Q. If I ask you questions regarding the legal advice
17 rendered to you in connection with the forbearance
18 agreement's negotiation or execution, you will refuse
19 to answer those questions on the grounds of the
20 attorney-client privilege; is that correct?
21 **MR. SHUMAKER:** If you're asking what the
22 advice is, certainly. The communications between
23 counsel and what he was -- what he was advised on,
24 certainly.
25 **THE WITNESS:** Right.

Page 14

1 **BY MR. HACKNEY:**
2 Q. Okay. That's correct?
3 **A. Yes. That is correct.**
4 Q. So if I ask you what your view is on the likelihood
5 that the City's Swap and validity arguments will
6 prevail, you will assert the attorney-client
7 privilege; is that correct?
8 **A. Yes, more than likely.**
9 Q. If I ask you your view on the likelihood that the
10 pledge of the gaming revenues under the Michigan
11 Gaming Act is an invalid pledge, you'll assert the
12 attorney-client privilege, correct?
13 **A. Yes, more than likely.**
14 Q. If I ask you questions regarding the likelihood that
15 the City would prevail on a claim or defense against
16 the Swap counterparties, you'll assert the
17 attorney-client privilege, correct?
18 **A. Yes, more than likely.**
19 Q. And I guess I gotta clarify. When you say more than
20 likely, I mean are you asserting the privilege with
21 respect to those types of questions? I'm trying to
22 save having to --
23 **A. Sure.**
24 **MR. SHUMAKER:** Let me state for the record
25 you can ask questions as to whether those -- those

1 factors were considered by Mr. Orr, but obviously if
2 you're going to ask what he was -- what he was advised
3 by counsel, then I'm going to instruct him not to
4 answer.
5 **A. When I say more than likely, that's -- that's exactly**
6 **the distinction that I'm trying to make. Did I have**
7 **discussions with my counsel? Yes. Did those**
8 **discussions take into consideration some of those**
9 **factors? Yes. Am I going to tell you what those**
10 **discussions were and what, if any, conclusions were**
11 **made? No.**
12 **BY MR. HACKNEY:**
13 Q. Okay. Fair enough.
14 On July 15, 2013, the City entered into
15 what we're going to call the forbearance agreement
16 with the Swap counterparties and the service
17 corporations; is that correct?
18 **A. Yes.**
19 Q. When did negotiations around that agreement with the
20 Swap counterparties begin after your appointment?
21 **A. I think there were discussions about negotiations**
22 **almost immediately after my appointment. My specific**
23 **knowledge -- when you say negotiations, what do you**
24 **mean?**
25 Q. Well, let me -- let me ask it a different way, which

Page 16

1 is isn't it true that Mr. Buckfire was the lead
2 negotiator for the City on the business terms of what
3 became the forbearance agreement?
4 **A. Yes.**
5 Q. And Mr. Buckfire has testified that the negotiations
6 in earnest regarding what became the forbearance
7 agreement were conducted between June 4th and
8 June 11th of 2013?
9 **A. I don't recall those specific dates, but I think**
10 **that's the right time frame. Let me -- let me try to**
11 **be as clear as I can so we can move on. We began**
12 **talking, discussing ways with my advisors, without**
13 **discussing what we discussed, to provide the City with**
14 **liquidity almost immediately upon my appointment. The**
15 **negotiations that you're referring to I believe did**
16 **occur within that time frame.**
17 Q. Okay. So you don't have a basis as you sit here today
18 to contradict Mr. Buckfire's recollection of when the
19 key negotiations over the business terms of the
20 forbearance agreement were conducted?
21 **A. No. It might be earlier, but that's the approximate**
22 **time frame.**
23 Q. And as he was the lead negotiator, he's probably the
24 guy who would know, right?
25 **A. Sure, absolutely.**

1  various obligations both under the COPs and the Swap?
2  **A. I believe that's true.**
3  Q.  They don't have any independent sources of income?
4  **A. To the best of my knowledge, they do not.**
5  Q.  And your view today is that the City of Detroit is
6  insolvent, correct?
7  **A. Yes, yes.**
8  Q.  And fair to assume that by extension the service
9  corporations are also insolvent, too?
10     **MR. SHUMAKER:** Objection, calls for
11  speculation.
12  **A. I don't know if that's true or not.**
13     **BY MR. HACKNEY:**
14  Q.  Now, isn't it true that the composition of the service
15  corporations' boards of directors includes three City
16  officers and at least one City Council member?
17  **A. Yes. I think I said before there are City employees**
18  **and City representatives on the boards.**
19  Q.  And in fact the person who signed the forbearance
20  agreement on behalf of the service corporations was
21  the president of both service corporations, correct?
22  **A. Yes, I believe so.**
23  Q.  And her name is Cheryl Johnson, right?
24  **A. Yes.**
25  Q.  And she is also the City's finance director, correct?

1  **A. Yes.**
2  Q.  Okay.  Portia Roberson --
3  **A. Um-hm.**
4  Q.  -- is the City's corporation counsel, right?
5  **A. Yes.**
6  Q.  And she's also on the board of both service
7  corporations, correct?
8  **A. To the best of my knowledge, that's true.**
9  Q.  Do you know who made the decision at the service
10  corporations to enter into the forbearance agreement?
11  **A. I do not.**
12  Q.  Did you have any conversations with either Ms. Johnson
13  or Ms. Roberson about the service corporations
14  entering into the forbearance agreement?
15  **A. No.**
16  Q.  Isn't it true that the policy of the City is to
17  indemnify the service corporation directors for
18  actions they take in their capacity as City employees?
19  **A. I don't know that.**
20  Q.  You don't know if that's the policy of the City?
21  **A. I do not. I know the City has an indemnification**
22  **policy. I don't know if it applies to the service**
23  **corporations.**
24  Q.  Okay, but does it apply to the City employees?
25  **A. It applies to City employees acting within their**

1  **course and scope of their employment as employees of**
2  **the City.**
3  Q.  Okay.  So as you sit here today, you can't say that
4  that indemnification policy would extend to City
5  employee actions taken in their capacity as service
6  corporations --
7  **A. Correct.**
8     **MR. SHUMAKER:** Objection, calls for a legal
9  conclusion.
10     **BY MR. HACKNEY:**
11  Q.  I will -- I'm sorry.
12  **A. Okay.**
13  Q.  As emergency financial manager, you control the salary
14  of all City employees; isn't that correct?
15  **A. As emergency manager.**
16  Q.  As emergency manager, right.
17  **A. Right.**
18  Q.  Sorry.  Is that the proper --
19  **A. It changed with Public Act 436. Public Act 72 was EFM**
20  **and now I'm an EM.**
21  Q.  Okay.  Got to get my lingo.
22  **A. Yeah.**
23  Q.  And you do, as emergency manager, control the salary
24  of all City employees, correct?
25  **A. I have the authority to control the salary of all City**

1  **employees. I have not exercised that authority for**
2  **all City employees.**
3  Q.  Okay.  And you have the power to reduce those City
4  employee salaries to zero if you choose, correct?
5  **A. I think I do, yes.**
6  Q.  And you have done that on at least one prior occasion,
7  I believe, correct?
8  **A. Yes, I did do that.**
9  Q.  Okay.  Now, are you aware that the insurers, the Swap
10  insurers, like Syncora and FGIC, contend that the
11  hedges cannot be terminated without their consent
12  where there are termination events or events of
13  default?
14  **A. I have heard that. I m -- I have no independent**
15  **awareness of that.**
16  Q.  So when did you first hear that?
17  **A. I think it was all caught up in this time frame of**
18  **the -- of the discussion after the agreement in**
19  **principle, before the forbearance agreement was**
20  **reached.**
21  Q.  Your best recollection is that you heard that prior to
22  the execution of the forbearance agreement?
23  **A. I believe it may have been prior to execution.**
24  Q.  But you have taken -- you have taken no steps to
25  evaluate whether the City concurs with the insurers'

Page 85

1 construction on this point?
2 A. No. I don't think that's exactly true. I think there
3 were -- as I said before, there were a series of
4 letters and discussions that went on from the second
5 week of June throughout some point in July where I
6 believe there may have been discussions in that
7 regard, validity of that point.
8 Q. Okay. But if I ask you to express the City's view on
9 the legal merits of the insurers' contention that they
10 have the right to consent, you'll decline to answer
11 those questions because it tends to reveal the
12 attorney-client privilege.
13     MR. SHUMAKER: That's right and also calls
14 for a legal conclusion, yes.
15     MR. HACKNEY: But you'll -- I want to save
16 a big string of questions, so if I want to ask him
17 what are the pros and cons of the argument, who's
18 likely to win, how will it all come out --
19     BY MR. HACKNEY:
20 Q. You won't answer those questions on the grounds of
21 the -- because it would tend to reveal attorney-client
22 advice, correct?
23     MR. SHUMAKER: Well, I don't want to
24 prevent you from asking any questions and I don't --
25 but if he has an understanding independent of advice

Page 86

1 he's given -- but clearly to the extent it's going to
2 reveal attorney-client communication, I will tell him
3 not to answer.
4     MR. HACKNEY: Okay. I'll ask him that.
5     BY MR. HACKNEY:
6 Q. Does the City concur in the insurers' view?
7     MR. SHUMAKER: Objection, calls for a legal
8 conclusion and could ask for attorney-client
9 communications.
10     MR. HACKNEY: Are you instructing him not
11 to answer?
12     MR. SHUMAKER: To the extent that the
13 question goes to that, yes.
14 A. Maybe I can help out in this line of questioning.
15 Any -- I have not acted as an attorney on this job for
16 the aforementioned reasons, so any opinion that I
17 would express on behalf of the City in this regard
18 would be solely as a result of communications with
19 counsel and discussions.
20     BY MR. HACKNEY:
21 Q. That was my expectation. So if I ask you if the City
22 concurred, that's going to get into what your lawyer
23 thinks.
24 A. That's exactly right.
25 Q. So you -- you will assert the privilege.

Page 87

1 A. I will assert the privilege.
2 Q. And if I ask you what are the arguments for and
3 against this point, you'll assert the privilege.
4 A. I will assert the privilege, but I am aware there are
5 a number of objections that have been filed in the
6 case that have addressed those issues and none of them
7 have caused me any surprise.
8 Q. If I said that the City -- if I asked you what the
9 City's view is on -- well, let me take a step back.
10     Do you agree that the insurers can block an
11 early termination of the Swap, that this would be
12 important to assessing whether the City was in danger
13 of owing a termination payment?
14     MR. SHUMAKER: Objection, calls for a legal
15 conclusion.
16 A. Yes, same thing. I'd only have a response to that
17 based upon discussions I've had with counsel.
18     BY MR. HACKNEY:
19 Q. Do you agree that the insurers can block a
20 termination, that it would make sense to negotiate
21 with the insurers to determine whether you can secure
22 their agreement not to consent to any termination?
23     MR. JURGENS: Objection, form.
24     MR. SHUMAKER: Same objection.
25 A. Same response. It would only be based upon

Page 88

1 discussions I've had with counsel.
2     BY MR. HACKNEY:
3 Q. Are you aware that the insurers contend that they have
4 the right to control all actions that may be taken by
5 the Swap counterparties in connection with the -- with
6 the Swaps?
7 A. I am aware of that, yes.
8 Q. When did you first develop that awareness?
9 A. During some course of the correspondence that occurred
10 during this time frame that we previously discussed
11 today.
12 Q. And have you taken steps to evaluate whether the City
13 concurs with the insurers' construction of the
14 operative documents on this point?
15 A. Have we taken steps? Yes.
16 Q. Yeah. And what is the City's position?
17     MR. SHUMAKER: Objection, calls for the
18 provision of attorney-client communications, and I
19 will instruct him not to answer.
20     BY MR. HACKNEY:
21 Q. Yeah, I'm just going -- I'm making a record here.
22 Okay? I don't want to have -- I tried to --
23 A. I'm with you. I'm with you.
24 Q. And if I ask you what the arguments are on both sides
25 of this point, you'll also refuse to answer on the

1 Q.   And what advisors did you rely upon in making this
2 decision?
3 A.   My attorneys, Mill -- my investment banker, Miller
4 Buckfire; our accountants, Ernst & Young; virtually --
5 virtually -- Conway McKenzie, our operational advisor,
6 virtually all of them.
7 Q.   All of your third party advisors?
8 A.   Yes, yes.
9 Q.   And anyone else that you relied upon in making the
10 decision?
11 A.   Oh, probably members of my immediate staff such as my
12 senior advisor, chief of staff, but less so.  More of
13 my outside third party advisors.
14 Q.   What documents did you rely upon in making the
15 decision, if any?
16 A.   We looked at a number of -- the term sheet, the actual
17 draft of the forbearance agreement.  There may have
18 been some e-mails.  I just recall a lot of telephone
19 calls.  There may have been some forecast, cash
20 forecast, and actuals, and some of the public reports
21 I had issued regarding our cash position.
22 Q.   Any other documents you can remember considering as
23 part of this decision to enter into the forbearance
24 agreement?
25 A.   There may have been correspondence.  As I said, there

1 were letters that were exchanged between Mr. LeBlanc
2 and myself, and others, the letter you showed me
3 today.  I'm just trying to capture the universe of
4 what would have been included, but any -- any and all
5 documents related to this that I would have seen would
6 probably fall under that characterization.
7 Q.   Any legal memoranda from Jones Day that you considered
8 in making this decision?
9 A.   Yes, probably.
10 Q.   Okay.  Written legal memoranda that you reviewed?
11 A.   Yeah, including e-mails.  Yeah.
12 Q.   Now, did you take time to familiarize -- to
13 familiarize yourself with any of the legal documents
14 relating to the COPs Swap structure in connection with
15 your decision to execute the forbearance agreement?
16 A.   I relied -- I may have seen them, but I relied upon
17 consultation with my counsel and investment bankers.
18 Q.   The documents I'm referring to are -- can we agree
19 they're relatively complicated legal documents?
20 A.   Yeah, I'd say they're not simple documents.  It's not
21 a -- you know, an auto purchase contract, yeah.
22 Q.   Right.  So can I fairly characterize that -- that you
23 may have looked at the documents, but you didn't
24 attempt to master -- master them in terms of their
25 legal ins and outs?

1 A.   Yeah.  That's a --
2      MR. SHUMAKER: Object to form.
3 A.   That's a fair characterization.  As I said, I'm trying
4 to stay away from acting as an attorney in this job.
5      BY MR. HACKNEY:
6 Q.   Okay.
7 A.   For a number of reasons.
8 Q.   So you relied on your advisors to explain to you how
9 the COP Swap agreements worked?
10 A.   Yes.
11 Q.   And you also relied on them to explain to you how the
12 COP Swap agreements worked in conjunction with the
13 forbearance agreement that you were about to execute?
14      MR. JURGENS: Object to form.
15 A.   Yes.
16      BY MR. HACKNEY:
17 Q.   So what is the relationship between the forbearance
18 agreement and the COPs Swap structure?
19 A.   Well, my understanding is that the forbearance
20 agreement is related to the Swaps structure, but that
21 the COPs structure is unrelated.
22 Q.   Okay.  So the forbearance agreement is part of the
23 same subject matter as the collateral agreement and
24 the Swaps agreement, but not the COPs part of the
25 structure?

1 A.   That's my understanding.
2 Q.   Okay.  In your legal career, have you come across the
3 concept of the idea that two different contracts can
4 be part of one integrated transaction?
5 A.   Sure.  Yes.
6 Q.   You're familiar with that as an idea?
7 A.   Oh, yeah, sure.
8 Q.   Okay.  What do you understand that to mean?
9      MR. SHUMAKER: Objection, form.
10 A.   There are a number of ways that two different
11 documents were -- may refer to the other, as simple as
12 attachments, exhibits, the master -- the master
13 service agreement on a loan, for instance.  There are
14 a number of ways that one document can relate to
15 another as explicitly expressed and intended.
16      BY MR. HACKNEY:
17 Q.   Yeah, and I know this is a -- you know, we're not
18 talking about was the stoplight red or green here, but
19 you are also a lawyer with a relatively --
20 A.   I was.
21 Q.   -- sophisticated clientele and experience?
22 A.   Well --
23 Q.   You understand the idea that two different contracts
24 can form part of one larger agreement?
25 A.   Oh, sure.  Yeah.

1  Q.   Is the forbearance agreement part of an integrated
2  transaction with the amended Swap agreements?
3      MR. SHUMAKER: Objection, calls for a legal
4  conclusion.
5  A.   Yeah, I'm going to stay away from characterizing it as
6  an integrated transaction.  That may have legal
7  consequence.  I know they are related.
8      BY MR. HACKNEY:
9  Q.   Okay.  They are related, but you can't answer today
10  whether they're part of an integrated transaction as
11  the person who executed it on behalf of the City?
12  A.   Yeah.
13      MR. SHUMAKER: Same objection.
14  A.   Yeah, because -- because of legal implications of
15  using that nomenclature.
16      BY MR. HACKNEY:
17  Q.   Okay.  So it may be, it may not be, you just don't
18  know?
19  A.   Precisely.  I'll rely on the attorneys to characterize
20  that.
21  Q.   Is the forbearance agreement part of an integrated
22  transaction with the collateral agreement?
23      MR. SHUMAKER: Same objection.
24  A.   Same answer.  I'll rely on the attorneys to
25  characterize it as integrated.  I know I signed the

1  forbearance agreement.
2      BY MR. HACKNEY:
3  Q.   You did?
4  A.   Yes.
5  Q.   So it may be, it may not be, you don't know?
6  A.   Correct.
7  Q.   And did you consider any of those questions when you
8  entered into the forbearance agreement?
9  A.   We may have had some discussions.  The question such
10  as whether they're integrated or supersede or are
11  related may have been discussed.
12  Q.   But as you sit here today, you can't answer my
13  question about whether it is integrated into other
14  agreements or not?
15  A.   True.  I'm going to re -- because of the possible
16  legal implications of anything I say, I'm going to
17  rely on our counsel.
18  Q.   Okay.  Well, I guess there are legal implications of
19  all of the testimony that you give today --
20  A.   Yeah.
21  Q.   -- both good and bad.
22  A.   Right.
23  Q.   So I guess are you saying that you can't reveal
24  attorney-client communications or are you saying that
25  you just don't know the answer to this particular

1  legal question?
2  A.   I'm saying I can't reveal attorney-client
3  communications, and based upon the characterization, I
4  have formed no independent decision outside of
5  discussions with my attorney as to whether or not
6  they're integrated.
7  Q.   Okay.  Let me ask you the reverse question, which is,
8  is the forbearance agreement a separate agreement from
9  the collateral agreement?
10  A.   Is it a separate agreement?
11  Q.   Yeah.
12  A.   I believe it's related to it, but yeah, it was a
13  separate agreement, sure.  It wasn't entered into
14  contemporaneously.
15  Q.   Meaning one that does not form part of a common
16  agreement with the collateral agreement?
17  A.   Here again, you're using a characterization as common
18  agreement or integrated.  I'm going to stay away
19  because those may have legal connotations.  What I
20  know is the forbearance agreement was entered into in
21  2009, and the collateral agreement attempts to resolve
22  issues of default that are raised by the forbearance
23  agreement and also including obligations of the City.
24  Q.   Isn't it -- I'd like to shift and ask you a question
25  about the service agreements between the City and the

1  service corporations.
2  A.   Okay.
3  Q.   Isn't it true that the City is in default of its
4  obligations under the service agreements because it
5  missed the --
6  A.   June 14th payment?
7  Q.   That's right.
8  A.   We're in default.
9  Q.   Okay.  And isn't it also true that the City is not
10  proposing to cure those defaults in connection with
11  the assumption of the forbearance agreement?
12  A.   I believe that's true.
13  Q.   And you would agree that the City is not going to
14  provide assurances that it will perform with the
15  service agreements in the future, correct, as part of
16  the assumption motion?
17  A.   I'm going to be careful here because we're -- we're
18  trying to have discussions about what we're going to
19  do with regard to the proposal, so I don't want to say
20  now something that may or may not occur in the future,
21  but there is no present intent -- in response to your
22  question, no present intent to do that.
23  Q.   You certainly haven't represented that you will as
24  part of the assumption motion?
25  A.   Yes.

1 that cash in terms of going forward.
2 Q. Now, if the collateral agreement operates the trapped
3 cash automatically upon an event of default under the
4 Swap --
5 A. Um-hm.
6 Q. -- is there anything in the forbearance agreement that
7 alters that mechanism?
8 MR. SHUMAKER: Objection, calls for legal
9 conclusion.
10 A. Yeah, here again, your conclusion if it acts to trap
11 automatically, I don't know if I would characterize it
12 that way. I know that the agreements work that money
13 comes in on a daily basis. That money is put into I
14 think one account. At the end of each month, some
15 portion of that money is sent out to another account,
16 and every quarter that money is disbursed. I'm not
17 going to characterize as to whether or not it would --
18 it would change that mechanism automatically.
19 BY MR. HACKNEY:
20 Q. Okay. You can't say if it does or it doesn't?
21 A. Correct.
22 Q. And can you say here today whether the collateral
23 agreement operates automatically or does not?
24 A. The collateral agreement, it's my understanding, using
25 your words automatically, operates to trap cash, but

1 automatically.
2 Q. Okay. And is that based on conversations you've had
3 with counsel?
4 A. Yes.
5 Q. And if I ask you for the pros and cons of that
6 argument as to who's likely to win and how the City
7 came to its view, you would refuse to answer those
8 questions on the basis of the attorney-client
9 privilege, correct?
10 A. Yes, sir.
11 Q. Now, you also mentioned that the forbearance
12 agreement -- or we talked about the idea that the
13 forbearance agreement provides for a workable unwind
14 of the Swap, correct?
15 A. Right.
16 MR. JURGENS: Objection to form.
17 BY MR. HACKNEY:
18 Q. How does it do that?
19 A. Well, my understanding, as I said before, in the
20 forbearance agreement, the parties agree to certain --
21 certain events that we will pay -- meaning the City --
22 will pay a discount, an optional termination payment
23 or cause that payment to be made; that in
24 consideration for that payment, the parties to the
25 agreement will release any claims they have to

1 maybe not in the way that is detrimental to the City.
2 It has two accounts, a subrecipient holding account --
3 COURT REPORTER: Subrecipient?
4 THE WITNESS: Subrecipient.
5 A. -- two accounts, an initial general account and then a
6 subrecipient account. We'll just call them that.
7 Those monies come in -- so when you use
8 automatic, those monies come in daily, but they're
9 disbursed according to the terms, and have been
10 disbursed according to their terms.
11 Q. I'm not talking about interim trapping that --
12 A. Right.
13 Q. -- happens in the first part of the month until the
14 whole bank account builds up.
15 A. Right.
16 Q. I'm talking about what I'll call big time cash
17 trapping upon an event of default --
18 A. Right.
19 Q. -- or termination event.
20 A. Right.
21 Q. So let me go back. I guess my question is, like, do
22 you have a view on whether that big time cash trapping
23 is supposed to happen automatically under the
24 collateral agreement?
25 A. My understanding is that it does not happen

1 trapping the casino revenue; and, here again, the
2 parties will release their liens and any potential
3 claims they have against the insured.
4 Q. The discount that you obtained through the
5 negotiations that Mr. Buckfire led --
6 A. Right.
7 Q. -- is a discount to the so-called early termination of
8 the Swap.
9 A. Yes.
10 Q. Correct?
11 A. Yes.
12 Q. So if you just read the Swap agreement, it would -- it
13 implies a termination value, correct?
14 MR. JURGENS: Objection, form.
15 MR. SHUMAKER: Objection, Calls for --
16 BY MR. HACKNEY:
17 Q. It implies an early termination value?
18 MR. JURGENS: Objection to form.
19 A. We'll use a nomenclature. It implies a value for
20 termination fee that I understand represents the loss
21 expectation of the counterparties.
22 BY MR. HACKNEY:
23 Q. That's exactly right.
24 And the discount you negotiated in the
25 forbearance agreement is a discount to that amount in

1 Q. I want to go back to the forbearance agreement. We
2 were talking about the things that it does in terms of
3 providing access to casino revenues, allowing for an
4 unwind of the Swap. These were my descriptions of
5 it --
6 **A. Right.**
7 Q. -- candidly, from your motion --
8 **A. Right.**
9 Q. -- but we were talking generally about these things.
10 The valuable consideration that the City gets under
11 the forbearance agreement are all things that it can
12 exercise without any consent from any other party,
13 correct?
14 MR. SHUMAKER: Objection, calls for a legal
15 conclusion.
16 You can answer.
17 **A. That's my understanding of the way it works, yeah.**
18 BY MR. HACKNEY:
19 Q. Do you agree that the effect of the forbearance
20 agreement, if the option is exercised, is to modify
21 the amount of the termination payment owed under the
22 Swaps down to whatever percentage is applicable as of
23 that date?
24 MR. JURGENS: Objection to form.
25 MR. SHUMAKER: Objection, form, calls for a

1 legal conclusion.
2 **A. If you're talking about the forbearance agreement and**
3 **the formula that's involved for the percentage change**
4 **depending upon -- as linked to time, as well as the**
5 **requirement that we get approval of the agreement at a**
6 **certain time period, yes, that's true.**
7 BY MR. HACKNEY:
8 Q. Okay. I mean the effect of the forbearance agreement
9 is that instead of owing what the City would owe under
10 the Swap, which is the hundred percent of the
11 termination value, it now owes -- only owes the
12 discounted amount?
13 **A. Yes.**
14 Q. So the effect is that it modifies that provision in
15 the Swap in a way that's favorable for the City?
16 MR. JURGENS: Objection to form.
17 **A. That's a fair characterization.**
18 THE WITNESS: Sorry.
19 BY MR. HACKNEY:
20 Q. Now, the forbearance agreement, another part of it,
21 that it allows the City to direct the Swap
22 counterparties to terminate the Swap, correct?
23 MR. SHUMAKER: Objection, calls for a legal
24 conclusion.
25 MR. JURGENS: Objection.

1 MR. HACKNEY: I understand you want to
2 preserve objections. This is the individual who
3 signed the agreement --
4 **A. Yeah, the --**
5 MR. HACKNEY: -- so I'm asking him for his
6 understanding.
7 MR. SHUMAKER: Okay. That's fine.
8 **A. Yeah, the mechanism is such that it's not our**
9 **termination, that it's the parties -- it's the**
10 **counterparties' termination.**
11 BY MR. HACKNEY:
12 Q. That's right. It's their termination right, but the
13 City gets to direct them to exercise it.
14 **A. Correct.**
15 Q. Okay. Is that a right that the City currently
16 possesses under any of the other agreements to the
17 best of your knowledge?
18 **A. To the best of my knowledge, no.**
19 Q. That's a right it obtained as a result of the
20 forbearance agreement, correct?
21 **A. Correct.**
22 Q. And the City's able to exercise that right to direct
23 the actions of the Swap counterparties without the
24 consent of any third party, correct?
25 **A. To the best of my knowledge, that's true.**

1 Q. Now, if Syncora has the right to control all actions
2 of the Swap counterparties under the contract
3 administration agreement, your position is that the
4 forbearance agreement overrides that provision in the
5 contract administration agreement; is that correct?
6 MR. SHUMAKER: Objection, calls for
7 speculation.
8 **A. I think it calls for speculation and it also**
9 **essentially implies a legal analysis. I will defer to**
10 **my counsel as to what our position would be. What I**
11 **do know is that forbearance agreement gives us certain**
12 **rights.**
13 BY MR. HACKNEY:
14 Q. Okay. What if I said that when it comes to the
15 interaction between Syncora's alleged control rights
16 under the contract administration agreement and the
17 City's alleged control right under the forbearance and
18 optional termination agreement, you would refuse to
19 answer those questions on the grounds that it would
20 get into attorney-client advice that you've received
21 from your counsel, correct?
22 **A. That is correct.**
23 MR. SHUMAKER: It most likely would,
24 depending upon how you phrased the question.
25 MR. HACKNEY: I'm asking.

## Page 133

1 any termination events where the Swap counterparty was
2 the sole affected party?
3    MR. SHUMAKER: Objection, calls for a legal
4 conclusion.
5 A. Yeah.
6    BY MR. HACKNEY:
7 Q. I'm not asking for the advice. I'm asking had you
8 evaluated that.
9 A. We had evaluated a number of issues and suffice it to
10 say that was probably one of them.
11 Q. You can't remember whether it was or it wasn't?
12 A. I can't remember if --
13 Q. Pretty technical question?
14 A. Yeah. As I said before, I'm not trying to be evasive.
15 It's just that the conversations I have with my
16 counsel, investment banker, you know, on a daily
17 basis, are -- there are days when there are dozens.
18 Q. Now, if I asked you whether you had evaluated whether
19 there were any events of default under the Swap where
20 the Swap counterparties were the defaulting party --
21 A. Sure.
22 Q. -- can you answer that question?
23 A. Whether I personally or whether it had been done on
24 the payoff of the team?
25 Q. Either.

## Page 134

1 A. I personally don't recall doing that. I do recall
2 that members of the team and I may have had those
3 discussions, yes.
4 Q. Is it fair to say that if I ask you to describe to me
5 what potential events of default or termination events
6 where the Swap counterparties were the sole affected
7 party or the defaulting party --
8 A. Right.
9 Q. -- you would decline to answer those questions on the
10 basis of the attorney-client privilege?
11    MR. SHUMAKER: To the extent they would
12 reveal those communications, of course.
13    MR. HACKNEY: Well, I mean --
14 A. Yes, I would.
15    BY MR. HACKNEY:
16 Q. Okay. Even if I ask you about your understanding of
17 the position, your position is that you don't have one
18 independent of your legal advisors.
19 A. I -- on this question, I don't have one independent of
20 my legal advisors.
21 Q. So I can't ask you what your understanding is --
22 A. Right.
23 Q. -- because it will necessarily reveal the legal advice
24 you got.
25 A. I'm trying to see if there's a way I can answer your

## Page 135

1 question without implicating discussions. No. It
2 might -- it might implicate some discussions I had
3 with counsel.
4 Q. Okay. Mr. Orr, is the forbearance agreement a
5 settlement?
6    MR. SHUMAKER: Objection, calls for a legal
7 conclusion.
8 A. Let me say this. I'm aware that the motion pending in
9 front of the Court is both for -- we call in
10 bankruptcy, what I used to call in bankruptcy, both an
11 assumption of an agreement and a ^ 9019 settlement.
12    BY MR. HACKNEY:
13 Q. So it's been held out by the City as a settlement,
14 correct?
15 A. Yeah. I think there's a debate as to whether or not
16 you need to seek settlement approval in a Chapter 9
17 case, but we are.
18 Q. Okay. Does the forbearance agreement settle any
19 claims on a final basis?
20 A. I think it does.
21 Q. Isn't it true, though, that if the City doesn't
22 exercise the option, everyone goes back to the status
23 quo ante?
24 A. Yes. That's the contingency, yes.
25 Q. Okay. So if that were to happen, everyone's claims

## Page 136

1 would still be in play.
2 A. I'm going to be careful with the word claims, but
3 everyone would revert back to the status quo ante.
4 Q. Okay. So whatever claims they had at the status quo
5 ante they'd have again?
6 A. Yeah, whatever claims -- technically, whatever claims,
7 colloquially, whatever they had would, revert back to
8 the status quo ante.
9 Q. Can we agree that in that eventuality no claims of any
10 of the parties of the forbearance agreement would have
11 been finally resolved by the forbearance agreement?
12 A. To the best of my knowledge, yes.
13 Q. Now, put aside the threat of declaring an early
14 termination under the Swap --
15 A. Right.
16 Q. -- which we've discussed extensively today as a right
17 the Swap counterparties have under the Swap --
18 A. Okay.
19 Q. -- put that aside. Have you evaluated, separate and
20 apart from that, whether there are other tort or
21 contract claims that the Swap counterparties may have
22 against the City?
23 A. I think there were discussions, but, here again, those
24 would be wrapped up in attorney-client communications.
25 Q. So if I asked you to reveal the assessment of whether

Min-U-Script®
Bienenstock Court Reporting & Video
Ph: 248.644.8888    Toll Free: 888.644.8080
(34) Pages 133 - 136
Page 9 of 23

13-53846-tjt    Doc 933-7    Filed 09/18/13    Entered 09/18/13 18:13:27

1 there were other claims that the Swap counterparties
2 have against the City, you would decline to answer
3 those questions on the grounds of attorney-client
4 privilege?
5 **A. I think I would have to. I do recall discussions, but**
6 **I think I'd have to decline on the basis of**
7 **attorney-client privilege.**
8 Q. Have the Swap counterparties threatened to bring any
9 claims against the City?
10 **A. Well, here again, being careful with the word claims,**
11 **you mean unrelated to the defaults such as tort**
12 **claims?**
13 Q. I guess I would say the Swap agreement is one you
14 understand that's between the Swap counterparties and
15 the service corporations.
16 **A. Right.**
17 Q. Okay. So I'm trying to put that in a box for now.
18 **A. Right.**
19 Q. And we've talked about that extensively.
20 **A. Right.**
21 Q. So other than any claims they may have against the
22 service corporations --
23 **A. Right.**
24 Q. -- that could absolutely have implications for the
25 City, but other than that, have the Swap

1 counterparties threatened to bring any other claims
2 directly against the City?
3 **A. None that I'm aware of.**
4 Q. I may have asked you this earlier, but I just -- I
5 want to make sure that I didn't miss it and so if it's
6 asked and answered I apologize, but did the City
7 evaluate whether it is in breach of the collateral
8 agreement?
9 **A. Did we evaluate it?**
10 Q. Yeah.
11 **A. Yes, I and my consultants evaluated it.**
12 Q. Is this one where if I asked you the results of those
13 evaluations you'd decline to answer?
14 **A. Yes.**
15 Q. It is true that prior to the forbearance agreement,
16 the only direct contractual agreement under which both
17 the City and the Swap counterparties had signed was
18 the collateral agreement, correct?
19 **A. To the best of my knowledge, that's correct.**
20 Q. Now, have the service corporations threatened to bring
21 any claims against the City?
22 **A. None that I'm aware of.**
23 Q. And have you undertaken an assessment of the
24 likelihood of the service corporations to the extent
25 they were to assert claims against the City?

1 **A. No. I don't recall doing that.**
2 Q. So you haven't assessed that?
3 **A. Not me independently, no.**
4 Q. Okay. And it's not something you took into account as
5 part of this agreement?
6 **A. No. We -- there was a discussion about the interest**
7 **of all the parties. I, independently, did not**
8 **handicap whether the service corporations might bring**
9 **a claim against the City. I think there were**
10 **discussions about it. Many of those discussions would**
11 **have been caught up in the general discussions that I**
12 **was having with counsel and my other advisors.**
13 Q. And you wouldn't be able to discuss them?
14 **A. No.**
15 Q. But the service corporations' claims against the City,
16 those are not resolved by the forbearance agreement,
17 correct?
18 **A. If they have any. I don't think they are.**
19 Q. Let me cut to it. Is it fair to say you haven't given
20 this any real consideration?
21 **A. Yeah. We -- it is fair to say that it was -- there**
22 **was no real deep consideration of it. We did consider**
23 **it.**
24 Q. Now, as the City evaluated whether it has claims
25 against the Swap counterparties --

1 **A. Um-hm.**
2 Q. -- okay?
3 **A. Um-hm.**
4 Q. And if I ask you to tell me what claims you have, will
5 you tell me them or will you assert the privilege?
6 **MR. SHUMAKER: I would instruct the witness**
7 that may implicate attorney-client communications.
8 **A. I would have no independent knowledge of what claims**
9 **may have other than discussions I've had with counsel**
10 **so I wouldn't answer.**
11 **BY MR. HACKNEY:**
12 Q. Okay. If I ask you what's the likelihood that you'll
13 win on the claims?
14 **A. Same answer.**
15 Q. You would follow the advice --
16 **A. Yeah.**
17 Q. -- and assert the privilege?
18 **A. Yeah.**
19 Q. Okay.
20 **A. In my prior life, as an attorney, likely would be a**
21 **hundred percent.**
22 Q. Okay.
23 **A. But I can't say that.**
24 Q. Well, let me ask you -- let me ask you just a -- sort
25 of this is your understanding of the forbearance

Page 141

1 agreement.
2 **A. Right.**
3 Q. What claims are you asking the Court to approve the
4 settlement of?
5 **A. In claims that might be had by the parties vis-à-vis**
6 **each other.**
7 Q. So any and all claims that they have under the Swaps
8 or the collateral agreement or the service contracts
9 or any other contracts --
10 **A. Yes.**
11 Q. -- those claims are being resolved by the forbearance
12 agreement?
13 **A. To the best of my knowledge, that is true.**
14 Q. Okay. And the result of the forbearance agreement is
15 that the City will be able to perform under the
16 forbearance agreement without being subject to any
17 liability to any third party?
18 **A. That is my understanding.**
19 Q. And so will the Swap counterparties, correct?
20 **A. That is my understanding.**
21 Q. It will give you what I'll call a clean closing?
22 **A. As I said earlier this week, it will bring us to**
23 **closure and certainty, yes. Earlier today.**
24 Q. That is also one of the values of this agreement to
25 both and you the Swap counterparties, you the City?

Page 142

1 **A. Right.**
2 Q. Which is that it absolves you for any liability in
3 connection with the relevant agreements?
4 **MR. SHUMAKER:** Objection to form.
5 BY MR. HACKNEY:
6 Q. As a result of performance under the forbearance
7 agreement, correct?
8 **MR. SHUMAKER:** Objection calls for
9 speculation.
10 **A. My understanding is that it provides us with closure**
11 **and finality regarding any claims and relationships**
12 **that the parties have.**
13 BY MR. HACKNEY:
14 Q. Okay. And there's no trailing liability?
15 **A. That is correct.**
16 Q. And just for the record, if I asked to you assess the
17 likelihood of success of all of the different claims
18 that are being resolved by the forbearance agreement,
19 you would assert the attorney-client privilege and
20 refuse to answer?
21 **A. That is correct. I have made no independent**
22 **assessment outside of any conversation I would have**
23 **had with counsel and my advisors.**
24 Q. Now, Mr. Orr, I'm going to speculate you may have
25 negotiated a settlement or two in your life as a

Page 143

1 lawyer.
2 **A. That's a fair statement.**
3 Q. And isn't it also fair -- I will tell you I have as
4 well, but --
5 **A. Right.**
6 Q. Isn't it common that settlement agreements typically
7 involve releases of liability by the parties against
8 one another?
9 **A. It is not uncommon for there to be releases in**
10 **settlement agreements.**
11 Q. And I will tell you I actually was racking my brain to
12 see whether I ever entered into a settlement agreement
13 that didn't have a release. I couldn't think of one.
14 Have you ever entered into a settlement agreement that
15 didn't have a release?
16 **A. Yes.**
17 Q. Okay. You have?
18 **A. Yes, I have.**
19 Q. Okay. Do you know whether the forbearance agreement
20 contains a release of claims by the parties against
21 one another?
22 **MR. SHUMAKER:** Objection, calls for legal
23 conclusion.
24 You can answer.
25 **A. Okay. I'd have to read through it and consult with my**

Page 144

1 counsel to make sure. I know the agreement speaks for
2 itself.
3 BY MR. HACKNEY:
4 Q. It does, but as you sit here today, I take it you
5 reviewed the forbearance agreement in connection with
6 the preparation for your deposition?
7 **A. Maybe not as in depth as you might think.**
8 Q. Okay. I know you have a lot on your plate.
9 **A. I have a lot on my plate.**
10 Q. But I guess I'm saying are you seriously unaware as to
11 whether there's a release in the forbearance
12 agreement?
13 **A. Seriously or not, I think the forbearance agreement**
14 **resolved all claims between the parties. Sitting here**
15 **today without examining it, I'm not aware as to**
16 **whether or not it specifically has a release.**
17 Q. Okay. So the -- whether it's in the forbearance
18 agreement or in the effect of its approval, it
19 operates as a release for everyone involved?
20 **A. Yeah. The reality is -- when you asked me the**
21 **question before as to whether or not it has a release,**
22 **the reality is that to the extent you asked -- I**
23 **believe in the motion you asked for assumptions and**
24 **9019 settlement that the order might well contain a**
25 **release so -- I wasn't trying to be truculent with**

1  you.  I'm just saying that, yes, the effect of the
2  approval of the agreement should have that impact.
3  Q.  I'm not going to try to go claim by claim because your
4  understanding is it releases all claims of the Swap
5  counterparties, the service corporations, and the City
6  against one another?
7  A.  Yes.
8  Q.  Now, the Swap insurers, as part of the forbearance
9  agreement, they get a release of their insurance
10  obligations under the Swap in the event the City
11  directs an optional termination, correct?
12  A.  Yes, I believe that's true.
13  Q.  And this was one of the things that the City has
14  touted, which is to say, hey, Swap insurers, pipe down
15  this is good for you, right?
16      MR. SHUMAKER: Objection to form.
17  A.  Yeah, without characterizing, you know, the colloquial
18  characterization, yes, we think that's a benefit.
19      BY MR. HACKNEY:
20  Q.  That's a concept that you've argued in your papers --
21  A.  Yes.
22  Q.  -- as to why the Swap insurers should be happy?
23  A.  Yes.
24  Q.  Now, do you understand you -- you have argued that
25  this is a benefit to the Swap insurers under the

1  forbearance agreement, correct?
2  A.  Yes, I believe so.
3  Q.  Are the swap insurers third party beneficiaries as you
4  understand it as the signatories to the agreement --
5  of the agreement?
6      MR. SHUMAKER: Objection, calls for a legal
7  conclusion.
8  A.  Here, I'm not acting as a lawyer as I understand it.
9  I'll have to decline from answering whether or not
10  they're third party beneficiaries.  As you know,
11  they're intended beneficiaries, incidental
12  beneficiaries.  A lot of these questions are questions
13  of fact, so that would draw me into a legal analysis
14  and I'll stay away from that.
15      BY MR. HACKNEY:
16  Q.  Let me -- let me -- let me -- what I'll do then is
17  I'll ask you your understanding as a layperson --
18  A.  Okay.
19  Q.  -- because you are -- you can say that you're acting
20  as a layperson --
21  A.  I am.
22  Q.  -- so to speak.
23  A.  Yes.
24  Q.  Okay.  As a layperson person, do you have a view one
25  way as to whether Syncora is a third party beneficiary

1  under the agreement?
2  A.  As a layperson, I really haven't examined it.
3  Q.  So don't know one way or the other?
4  A.  Don't know one way or the other.
5  Q.  Do you have a view as to whether Syncora or FGIC, for
6  that matter, can sue to enforce the agreement?
7  A.  I don't know one way or the other.
8  Q.  They may have, they may not have?
9  A.  Yeah.  I'd probably weigh on the side of they don't,
10  but I -- I don't have a view one way or the other.
11  Q.  And have you considered the possibility that if they
12  don't have the right to sue to enforce the agreement,
13  that they also would not have the right to sue to
14  enforce the release that's in the agreement?
15      MR. SHUMAKER: Objection --
16  A.  They might or they might --
17      MR. SHUMAKER: -- calls for a legal
18  conclusion.
19  A.  They might or they might not.
20      BY MR. HACKNEY:
21  Q.  And let's be frank.  That's not your concern, right?
22  A.  Well, to be honest with you, you know, without getting
23  into whether or not there may be equitable rights,
24  estoppel, third party intended, unintended beneficiary
25  rights, things along those lines, what I do know --

1  incidental benefits -- what I do know is the
2  agreement, and what we've said is it provides a
3  benefit to the insured.
4  Q.  That's right, but you obviously don't represent the
5  insured, you represent the City?
6  A.  I am employed by the governor on behalf of the City,
7  that is correct.
8  Q.  And so if the insurer can't enforce the agreement to
9  take advantage of the release, that's the insurer's
10  problem, correct?
11  A.  Well, without characterizing whether or not it's their
12  problem or so, my fiduciary duty runs to the City in
13  its interest; it does not necessarily run to Syncora.
14  Q.  Yeah.  Can we agree that you certainly didn't
15  negotiate into the agreement any specific provision
16  granting the insurers the right to sue to enforce that
17  provision?
18  A.  I made no instruction to my team to negotiate such a
19  provision.
20  Q.  In entering into the forbearance agreement, did you
21  consider whether or not the automatic stay would apply
22  to cash trapping if the City filed for bankruptcy?
23      MR. SHUMAKER: Objection, calls for a legal
24  conclusion.
25  A.  Without getting -- here again, there were discussions

1 because, quite frankly, at the time we were in
2 negotiating this agreement in June, we were hoping
3 that this agreement and its announcement was for other
4 creditors to -- and other stakeholders, including the
5 labor side, to come in and negotiate additional
6 agreements.  So we may have had discussion about what
7 the impact, if we filed bankruptcy, would have been,
8 but, frankly, at this time we were hoping we were
9 going to get a round of agreements in place.
10 BY MR. HACKNEY:
11 Q.  You knew that as of July 15th, when you executed the
12 forbearance agreement, that bankruptcy was possible?
13 A.  Oh, sure.  We knew it was possible, yeah.
14 Q.  Fair to say that by July 15th, given all the work that
15 was going on, you were of the view that it was likely?
16 A.  No, not really.  We had been sued -- the governor and
17 the treasurer had been sued a few weeks before that.
18 The following week I believe one union had joined in
19 that suit and the Monday of the week after that, the
20 governor and I were sued, and I believe July -- I
21 don't have a calendar.  I believe July 15th was that
22 Monday.
23 Q.  It was.
24 A.  Yes.  So we signed this agreement and, frankly, even
25 at that time, because there was a whole lot of things

1 going on, there was litigation, there were stays in
2 place, there were appeals to the state court, it
3 certainly was possible and we were with doing
4 contingency planning given the paper, but we have not
5 made any determination at that point as to whether or
6 not, excuse me, we were going to file.
7 Q.  It was certainly possible enough that it behooved you
8 to analyze whether the automatic stay might be a way
9 to get access to the casino revenues, correct?
10 A.  Yeah, I don't recall whether or not we did it then or
11 before or just during that week, but -- but we --
12 there was some discussion about the impact of the
13 automatic stay, yes.
14 Q.  So is it possible that you did not evaluate the
15 applicability of the automatic stay in the event of a
16 bankruptcy prior to executing the forbearance
17 agreement?
18 MR. SHUMAKER: Objection --
19 A.  No.
20 MR. SHUMAKER: -- asked and answered.
21 A.  No.  What I said is at some point during that time or
22 even prior we had to have those discussions.
23 BY MR. HACKNEY:
24 Q.  You may have had them in advance of July 15th, you may
25 not have, you just can't remember?

1 A.  No.  I -- let's be clear.  I think we had them before.
2 I think we had them around that time because in that
3 week, when I was sued that Monday, there were
4 discussions about what they may be and we were signing
5 this agreement at the time.
6 Q.  If I ask you about the specifics of the conversations
7 you had about whether the automatic stay applied and
8 the likelihood that it would or wouldn't, you'll
9 decline to answer those questions on the basis of the
10 attorney-client privilege, correct?
11 A.  Yes, again, today I would have to do that.
12 Q.  The one thing I will say that we can agree on, though,
13 is that if the automatic stay did bar cash trapping,
14 that would be valuable to the City because at least
15 during the pendency of the bankruptcy it would then
16 have access to the casino revenues, correct?
17 A.  Well, it's -- here again, it's a hypothetical and
18 contingent question, but I take your meaning, and what
19 I would say is I think certainly one of the benefits
20 of the automatic stay is that you maintain the status
21 quo and access to cash.  There are also provisions
22 however in the bankruptcy code -- I'm not acting as an
23 attorney, but I am aware -- of Safe Harbor provisions
24 related to certain financial instruments and you have
25 to factor that in as well.

1 Q.  And those are?
2 COURT REPORTER: Can you please slow down?
3 THE WITNESS: I'm sorry.
4 BY MR. HACKNEY:
5 Q.  Those are risk factors that might make the automatic
6 stay not applicable?
7 A.  That's correct.
8 MR. SHUMAKER: Objection, calls for a legal
9 conclusion.
10 A.  I was informed without telling specific --
11 BY MR. HACKNEY:
12 Q.  Right.
13 A.  -- conversations that those are issues you have to
14 take into consideration.
15 Q.  And so let me try and collapse this if I can.  If I
16 ask you about whether the casino revenues are special
17 revenues being applied to indebtedness, you will
18 refuse to answer?
19 MR. SHUMAKER: You can ask him whether he
20 considered them, but in terms of likelihood of success
21 or communication between --
22 BY MR. HACKNEY:
23 Q.  I'll do it that way.
24 Did you consider whether there were special
25 revenues that were accepted from the automatic stay

1 under 922(d)?
2 A. We considered all of these issues including the
3 interaction 922(d) with 362 and I considered them in
4 the context with my counsel.
5 Q. Okay. You considered whether 362(b)(17) exception for
6 Swap collateral applied?
7 A. Yes.
8 Q. Did you consider whether the collateral account --
9 rather, the gaming revenues were even property of the
10 estate at all?
11 A. Yes.
12 Q. So you considered all those questions.
13 A. Um-hm.
14 Q. Your counsel rendered advice to you about the
15 likelihood, the pros and cons of the arguments, and
16 you're not at liberty to provide that advice to us
17 because it would invade the attorney-client privilege?
18 A. Yes, I believe that's correct.
19 Q. But I do want to get -- I do want to just get your
20 agreement that the question is important to at least
21 one of the benefits of the forbearance agreement which
22 was the interim access to cash during the optional
23 termination period.
24 A. I think the question is relevant.
25 Q. Yeah.

1 A. Yes.
2 Q. In fact the optional termination period, it could end
3 as soon as on September 16th; at the latest it goes to
4 June 30, 2014, right?
5 A. Correct.
6 MR. SHUMAKER: Objection, document speaks
7 for itself.
8 A. Yeah, the document --
9 BY MR. HACKNEY:
10 Q. Whatever it says --
11 A. Yeah.
12 Q. -- that's your understanding?
13 A. Yes.
14 Q. So that -- the forbearance agreement -- let's put it
15 this way, Mr. Orr. The forbearance agreement gets you
16 access to cash during the optional termination period.
17 A. Yes, I believe that's true.
18 Q. If the automatic stay applied, it might get access to
19 the casino revenue during the whole bankruptcy,
20 correct?
21 A. It might.
22 Q. Yeah. We're talking about different things that you
23 consider as you're analyzing your options, right?
24 A. Yeah, correct.
25 Q. And this is -- this is a potentially important one

1 because you might be able to get longer access to cash
2 from the automatic stay than you were getting from the
3 forbearance agreement, correct?
4 A. Here again, that's a contingent it might, but that has
5 to be drawn up also in discussion of potential risk
6 that Safe Harbor provision would allow the
7 counterparties to exercise their rights and therefore
8 obviate any benefits the City could receive from the
9 automatic stay.
10 Q. That's right.
11 A. So we considered all of those.
12 Q. So just to be clear, if I ask you about the specific
13 ins and outs of all those potential arguments,
14 likelihoods of success and so forth, you will not
15 answer those questions on the basis of the
16 attorney-client privilege, correct?
17 A. That is correct.
18 Q. Oh, I know. The City recently argued in court against
19 yours truly that the automatic stay bars the cash
20 trapping provisions of the collateral agreement. Are
21 you aware of that?
22 A. I believe I am, yes.
23 Q. Yeah. In fact, I think that your spokesman,
24 Mr. Nowling, may have made statements in the press
25 about the impact of the judge's rulings. Are you

1 familiar with those statements?
2 A. I am.
3 Q. Did the Swap counterparties give their consent to the
4 City to make those arguments in court?
5 A. I don't know.
6 Q. And -- so you don't know whether they did or they
7 didn't?
8 A. That is correct.
9 Q. You understand that as originally designed the Swaps
10 were designed to hedge against interest rate risk on
11 the floating COPs?
12 MR. SHUMAKER: Objection, calls for a legal
13 conclusion.
14 MR. JURGENS: Objection to form as well.
15 A. That is my understanding.
16 BY MR. HACKNEY:
17 Q. And I can unpack it if you want. I know we get into
18 the --
19 A. That's my understanding.
20 Q. Yeah, okay. Let's just do basics of interest rate
21 risk, which is if the interest rates go above the
22 hedge rate, then now the Swap counterparties have to
23 pay the difference to the service corporations so that
24 they can pay the difference to the floating rate COPs,
25 correct?

1   MR. SHUMAKER: Objection, form.
2 A. That is my understanding.
3   BY MR. HACKNEY:
4 Q. That's how the hedge works.
5   Now, interest rates do not favor the City
6 in the Swaps -- we asked that earlier.
7 A. Right.
8 Q. I will strike that.
9   But more basics of interest rate hedging,
10 so as the interest rates go up and start to approach
11 the hedge, the amount the City owes under the Swap via
12 service corporations goes down?
13 A. That -- that is my understanding.
14 Q. And as it crosses over the hedge line, the service
15 corporation could actually be in the money?
16   MR. JURGENS: Objection to form.
17 A. Yeah, here again, we had the discussion about in the
18 money or not, but to the extent your point is saying
19 that they would benefit more from the hedge than the
20 counterparties would, that is my understanding.
21   BY MR. HACKNEY:
22 Q. When the interest rates get above the hedge line?
23 A. (Nods head).
24 Q. That's right.
25   Okay. Now, when you were entering into the

1 forbearance agreement on July 17th, what steps did you
2 take personally to evaluate future -- I'm sorry. I
3 misspoke, didn't I?
4 A. Yeah.
5 Q. When you entered into the forbearance agreement on
6 July 15th --
7 A. Right.
8 Q. -- what steps did you take prior to that time to
9 evaluate future interest rate moves?
10 A. Any discussions in those -- that regard would have
11 been with our investment bankers and generally with
12 our attorneys. What I'm trying to think of is were
13 there any discussions that I had with Miller Buckfire
14 which would not have been confidential in that regard.
15 I don't think that there were. What I can say is that
16 we evaluated the potentiality of the -- of the
17 interest rate fluctuation as indexed to LIBOR going up
18 or down, but I think most of those, if not all of
19 them, were in communications with one or more of my
20 attorneys.
21 Q. And when you say we evaluated the interest rate
22 fluctuations, that would have been tasked to Miller
23 Buckfire to do?
24 A. Yes, Miller Buckfire in conjunction with folks from
25 Jones Day. Yeah, sure.

1 Q. Okay. No disrespect to the fine lawyers at Jones Day.
2 I don't know if I can calculate future interest rates
3 as a lawyer.
4   It was in Miller Buckfire's province to do
5 it. They may have done it in conjunction with Jones
6 Day?
7 A. Yes, yes.
8 Q. Okay. And any review of forward curves or different
9 interest rate implications currently existing in the
10 market would have been done by Miller Buckfire?
11 A. Yes.
12 Q. And your recollection is that it was done and it was
13 something that you considered as part of the decision
14 entering into this agreement?
15 A. I believe so.
16 Q. You're aware, for example, that the Federal Reserve
17 has indicated intent to scale back its monthly bond
18 purchases?
19 A. I heard that.
20 Q. And --
21 A. Quantitative reasoning --
22 Q. Yeah.
23 A. Yeah.
24 Q. And you're aware that many people believe that that
25 may lead interest rates to rise; isn't that right?

1 A. Yes.
2 Q. Okay. Did you analyze the likelihood that the
3 interest rates would rise or was that also tasked to
4 Miller Buckfire?
5 A. I didn't do it independently. That would have been
6 tasked to Miller Buckfire.
7 Q. And if I asked what that analysis showed, I would have
8 to ask Mr. Buckfire that?
9 A. Yes, you would.
10 Q. Okay.
11 A. Yes, you would.
12 Q. Let me ask you about -- in the motion to assume the
13 forbearance agreement, the City states that it has
14 examined whether there are viable actions to challenge
15 the Swap contracts. Do you recall that?
16 A. Yes.
17 Q. Under what theory could the City challenge the
18 validity of the Swap contracts?
19 A. Any theories that we discussed -- I'll give you two
20 answers. One, many of the theories, my understanding
21 is and somebody -- I haven't read all of the
22 objections, but I've read some of them. Some of the
23 objections in this case have discussed some of those
24 theories.
25   Two, any theories which we would have

1 examined, either independently or in the context of
2 reviewing and handicapping the probability of success
3 of some of the objections, would have been done with
4 counsel.
5 Q. And so you'll refuse to describe both the theories and
6 their likelihood of success because it would invade
7 the attorney-client privilege; is that correct?
8 A. Yes. Unfortunately, yes.
9 Q. If I asked you what likelihood of success the City
10 attributes to an action seeking to declare the Swaps
11 invalid, you'll decline to answer that on the
12 attorney-client privilege?
13 A. Yes.
14 Q. Can we agree that if the Swaps are not valid, it
15 wouldn't make sense for you to enter into the
16 forbearance agreement?
17 A. No, not necessarily. There may be other prudential
18 reasons that the City might want to be bring closure
19 and certainty is access to its cash flow irrespective
20 of the probability that the Swaps are valid or not
21 valid.
22 Q. In your proposal for creditors on June 14, 2013, you
23 said that the City has identified certain issues
24 related to the validity and/or enforceability of the
25 COPs --

1 Q. Okay. And you'll assert the attorney-client privilege
2 as a protection against describing the invalidity of
3 the COPs analysis?
4 A. Yes, because I did no independent analysis.
5 Q. Has the City completed its investigation into this
6 issue?
7 A. No. The City's investigation into a number of things
8 are ongoing.
9 Q. Okay. And this is one of them?
10 A. This is one of them, yeah.
11 Q. Okay. So the City hasn't reached a conclusion on this
12 subject because it hasn't concluded its investigation
13 into the subject, correct?
14 A. It -- I think that's fair, yes.
15 Q. And has the City considered whether the service
16 agreements between the service corporations and the
17 City are lawful?
18 A. I don't recall if we looked into that.
19 Q. So that's one that you --
20 A. I just don't recall if that was one.
21 Q. You may have investigated, you may have not?
22 A. Correct. I don't recall that one.
23 Q. If you have investigated, do you know if the
24 investigation has concluded or do you not know?
25 A. No. If we had investigated or are investigating it,

1 A. Yes.
2 Q. -- that may warrant further investigation.
3 A. Yes.
4 Q. Do you remember that?
5 A. Yes.
6 Q. I'm saving us from having to go through that --
7 A. Yeah, yeah. No. I remember.
8 Q. What issues has the City identified?
9     MR. SHUMAKER: Again, I'm going to caution
10 the witness --
11 A. Yeah.
12     MR. SHUMAKER: -- if this is going to
13 reveal attorney-client communications to not answer.
14     Subject to that, you can answer.
15 A. Here again, there would be no issues that -- and I
16 hate to keep saying this. There'd be no issues that I
17 independently would have identified because I'm trying
18 very hard not to act as a lawyer. I would have only
19 identified those issues and had discussions of them in
20 consultations with my attorneys. So whether there are
21 issues such as void ab initio, fraud, any of the other
22 issues that typically go to contracts, I would only
23 have had those discussions with counsel, so
24 consequently I can't speak to this.
25     BY MR. HACKNEY:

1 my understanding it would not have been concluded.
2 Q. Okay. So much like with the COPs, generally the
3 validity of the service contracts with the City is a
4 subject of ongoing investigation that has not yet
5 concluded.
6 A. It may be the subject of ongoing investigation which
7 has not yet concluded.
8 Q. Okay. If I asked you how either of those two
9 investigations, the one into the COPs validity or the
10 one into the service contracts validity, impacted your
11 decision to enter into the forbearance agreement, you
12 will decline to answer because it would tend to reveal
13 attorney-client communications?
14 A. For all the reasons we discussed today, the -- yes, I
15 would have to.
16 Q. Mr. Orr, let me ask you about under section 803 of the
17 service contracts --
18 A. Yeah.
19 Q. -- I'm going to save us both from having to go through
20 them --
21 A. Yeah.
22 Q. -- so I'll represent to you what it relates to and see
23 if you've heard of it.
24 A. Okay.
25 Q. Okay?

1    Under section 803 of the service contracts
2  payments by the City to the service corporations are
3  classified according to a waterfall.
4  **A.  Um-hm.**
5  Q.  Have you heard of this waterfall?
6  **A.  Yes.**
7  Q.  Okay.  Did you evaluate whether there were any claims
8  that any parties to the structure might have against
9  one another if the forbearance agreement leads to the
10  payment of monies outside of the waterfall?
11  **A.  I assume you're alluding to prioritization or**
12  **subordination in claims along those regards, and the**
13  **answer:  I think there probably was, but, here again,**
14  **I would -- I did not do it independently.  It would**
15  **have been done by my counsel.**
16  Q.  Okay.  So you can't tell me the fruits of the analysis
17  or the City's position on the likelihood of success on
18  the issue because it's protected by the
19  attorney-client --
20  **A.  That is --**
21  Q.  -- privilege?
22  **A.  -- correct.**
23  Q.  If I ask you how it impacted your decision to enter
24  into the forbearance agreement, you'd also not be able
25  to answer that on the basis of the attorney-client

1  privilege?
2  **A.  That is correct.  In addition, that's part of the**
3  **deliberative process.**
4  Q.  Have you analyzed whether or not COP holders might
5  have claims against the Swap counterparties if the
6  City exercises the optional termination right?
7  **A.  There -- have we analyzed it?  The answer is yes, I**
8  **believe so.**
9  Q.  Okay.  What's the result of that analysis?
10  **A.  Here again, any discussion would have been caught up**
11  **in discussions I would have had with my counsel in**
12  **that regard, so I decline to answer the question.**
13  Q.  Okay.  Have you analyzed whether those potential
14  claims may have an impact on whether the Swap
15  counterparties go forward with the optional
16  termination amount -- optional termination?
17  **A.  I don't recall if we did that specific analysis.  I --**
18  **think that was probably caught up in the whole**
19  **universe of analyses of potential claims, pros and**
20  **cons analyses, but I don't recall that one**
21  **specifically.**
22  Q.  We've just been talking now about the COPs.  We've
23  talked about the Swaps a lot.  I'm going to for a
24  moment reference the 2006 COPs Swap transaction
25  documents.

1  **A.  Okay.**
2  Q.  Do you know generally what I mean when I say that?
3  **A.  Yes.  The original documents by which the City**
4  **borrowed money, 1.4 billion, for the unfunded**
5  **actuarial liability --**
6  **COURT REPORTER:** For the --
7  **A.  For the unfunded actuarial liability involve -- the**
8  **organic documents.**
9  **BY MR. HACKNEY:**
10  Q.  That is exactly correct.  And, to name a few, there
11  are the service contracts, the contract administration
12  agreement, the trust agreement, and the master and --
13  and amended Swap agreements, correct?
14  **A.  Yes.**
15  Q.  You've heard of all of those?
16  **A.  Yes.**
17  Q.  And there are multiple versions of them?
18  **A.  There are multiple versions of them.**
19  Q.  For example, there are two service contracts --
20  **A.  That's right.**
21  Q.  -- because there are two service corporations.
22  **A.  That's right.**
23  Q.  Now, your understanding is that some of these
24  documents were amended in 2009 in connection with the
25  addition of the collateral agreement to the package,

1  correct?
2  **A.  Yes.  I'm going to take your meaning -- the amendment**
3  **to mean that's the -- yes, the net effect of what**
4  **happened in 2009.**
5  Q.  Okay.  Did you know, for example, that the service
6  contracts were also literally amended --
7  **A.  Yes.**
8  Q.  -- as part of that?
9  **A.  Yes.  We're talking generally about all the documents**
10  **without specifically going into each one.**
11  Q.  Although I did -- I did in that last one.
12  **A.  Yeah, you did, and so I'm following your lead on what**
13  **we're talking about.**
14  Q.  Okay.
15  **A.  Okay.**
16  Q.  The Swaps were also themselves amended in addition to
17  the collateral agreement being created?
18  **A.  I believe so.**
19  Q.  Now, you're aware that these contracts that form the
20  2006 COPs Swap transaction documents were contracts
21  that were entered into the same day back in 2006?  I
22  know you weren't there.
23  **A.  Yeah, I wasn't there, and I have seen them.  I just**
24  **don't recall sitting here today if they're the same**
25  **day.  If you're representing to me that is a fact, I**

Page 213

1  monthly basis under the forbearance agreement --
2  **A.  Yes.**
3  Q.  -- you net about 11 million?
4  **A.  I think that's correct.**
5  Q.  Okay.  Your claim is that these revenues are necessary
6  to the operation of the City.  I think we discussed
7  that earlier.
8  **A.  Yes.**
9  Q.  And in fact it's your expectation that you will use
10  these revenues to fund the reinvestment program that
11  you have planned with respect to the 1.25 billion
12  dollars of reinvestment in the City over the next ten
13  years?
14  **A.  Yes, that's correct.  An average of 125 million a year**
15  **which a big component of it is this revenue.**
16  Q.  Okay.  So fair statement, you're going to take the
17  casino revenues and you're going to plow them into the
18  City, correct?
19  **A.  More -- I mean, money goes into a bathtub, but yes.**
20  **The casino -- we don't have the casino revenue.  We**
21  **have no other source to make reinvestment in the City.**
22  Q.  And that's what you want to do?
23  **A.  Yes.**
24  Q.  And so as a creditor, I'm going to make the obvious
25  point that you don't plan to take the casino revenues

Page 215

1  **A.  Yes.**
2  Q.  -- effectively a pot of 2 billion dollars of bonds.
3  **A.  Correct.**
4  Q.  And I want to distinguish between two concepts and
5  make sure that we're on the same page because I think
6  that we are.
7  **A.  Right.**
8  Q.  The first point is that you do agree that you're not
9  going to take the casino revenues and put it on top of
10  the 2 billion pot to make a larger recovery for
11  creditors.
12  **A.  Yes, that's fair.**
13  Q.  But you are saying that there could be some value to
14  the creditors of a revitalized Detroit because that
15  Detroit will be more able to perform under the
16  2 billion dollars in bonds that you're going to give
17  them as part of your proposal?
18  **A.  That's correct.**
19  Q.  Okay.  Did I summarize accurately the distinction you
20  were trying to draw there?
21  **A.  Yes.  Yes.  There's a broader concept about the need**
22  **to revitalize the City and grow beyond just the**
23  **interest of the creditors.  It's also for the citizens**
24  **and residents and future of the City.**
25  Q.  Oh, absolutely.  I understand that.

Page 214

1  and give them to the unsecured creditors, correct?
2  **A.  I think that's generally a fair characterization.**
3  Q.  So isn't it fair that other than perhaps certainly
4  benefitting the people of Detroit if you reinvested in
5  the City, the creditors themselves will not see their
6  recoveries enhanced by the fact that the City has
7  gained access to these casino revenues, correct?
8  MR. SHUMAKER: Objection, calls for
9  speculation.
10  **A.  Yeah, I'm going to be careful here because one of the**
11  **things we've offered in our proposal, June 14th**
12  **proposal, is a 2 billion dollar note that has some**
13  **capacity to fluctuate.  Generally speaking, your**
14  **statement is true, but there's another concept that**
15  **without this reinvestment there's a very real chance**
16  **that the City will have no chance to stabilize and**
17  **grow and the creditors will see no opportunity for any**
18  **benefit because the City would have an inability of --**
19  **continue to decline, quality of life will continue to**
20  **decline, revenue from other streams will continue to**
21  **decline, and the City's ability to satisfy its**
22  **obligations to the creditors will continue to decline.**
23  Q.  Now, I understand that distinction, and we're talking
24  now about the proposal you've made to creditors that
25  you would give all of the unsecureds --

Page 216

1  **A.  But, yes, that's generally -- no direct benefit from**
2  **the casino revenue.**
3  Q.  Consistent with what we've just discussed then, you
4  haven't undertaken an analysis to show how much
5  creditor -- unsecured creditor recoveries would be
6  enhanced if the forbearance agreement is approved,
7  because you intend to use the money to reinvest in the
8  City.
9  **A.  No.  I'm not sure that's true.  I mean, that's why I**
10  **was saying before, part of it is enhancing the**
11  **stability of the City and its ability to meet or**
12  **actually to provide for that 2 billion dollar note.**
13  **It depends on large part on the ability to stabilize**
14  **the City.**
15  Q.  I understand that as a general concept, but I meant
16  have you undertaken actually any actual analysis of
17  the potential Delta 2 creditor recovery?
18  **A.  Oh, from the 120 -- from the casino revenue?**
19  Q.  Right.
20  **A.  Yes, I believe we have.**
21  Q.  And what does it show?
22  **A.  Here again, that's -- it's sensitive and, in addition,**
23  **I believe those discussions were caught up in**
24  **discussions I had with counsel, so I'm going to have**
25  **to decline.**

1 as has been reported. We're currently doing an
2 analysis of our grants administration and application
3 process to make it better, and I think we're also
4 reviewing it for making specific grant requests, I
5 think some specifically related to public safety.
6 So I don't know if -- sitting here today if
7 actual documents have been submitted, but I know we
8 are mining the federal programs with an eye toward
9 making applications and some have been made or some
10 are near to being made.
11 Q. Are there specific grants you're targeting in this
12 application process?
13 A. That's handled by the folks in the City bureaucracy
14 and consultants, so I -- as I said, health, safety and
15 welfare, meaning police, fire, EMT, City grants
16 meaning blight, HUD grants and others, yes, but
17 sitting here today, I don't know which specific ones
18 have been submitted.
19 Q. And who was handling that process?
20 A. Ultimately, in my office, it would be a combination of
21 the existing -- hopefully in the City as well --
22 existing grant procurers, you know, whether they're at
23 different departments in planning and development,
24 police and fire. It would be at that level, at a line
25 level, would be applying for grants.

1 Q. Is that going to happen under your supervision?
2 A. I certainly hope so, yes.
3 Q. Do you have any idea of how much money in grant
4 programs might be available to the City?
5 A. Well, the City has already applied of somewhere in the
6 neighborhood of 300 million in 71 programs. We have
7 been told that none of those 71 programs are in
8 compliance. Some of those programs we're receiving
9 technical assistance from HUD --
10 COURT REPORTER: I need you to slow down.
11 THE WITNESS: I'm sorry.
12 A. Some of those programs we're receiving technical
13 assistance, for instance, from HUD, and our intent is
14 to get our grants administration and application
15 process more up to date and streamlined so we can
16 apply for as many grants as we can possibly get our
17 hands on.
18 BY MS. ENGLISH:
19 Q. Okay. You confused me there for a minute because
20 you've said you've got a bunch of grant applications
21 already in with respect to programs that are
22 noncompliant, but I thought you said earlier you don't
23 have any grant applications in.
24 A. No, no, no.
25 Q. Okay.

1 A. You asked me if there were any new ones going in.
2 Q. Okay.
3 A. We -- the City has received, in past years and
4 currently, almost 300 million dollars in federal
5 grants.
6 Q. Okay.
7 A. Okay. We hoped -- and they're being administered
8 through 71 different programs in the City. I think
9 that's been publicly discussed before. We hope to
10 apply for even more grants. So I can be clear, what
11 we are trying to do is to get some assistance so that
12 we can get better at this process, this administration
13 application process, so we would be eligible for more
14 federal assistance that's already existing.
15 Q. And how much do you estimate that more federal
16 assistance to be?
17 A. I have no idea. Whatever -- whatever we can get. If
18 it's several millions more, if it's several hundreds
19 millions more, we're going to apply for it.
20 Q. Do you think it's a possibility it could be hundreds
21 of millions more?
22 A. Possibility it could be.
23 Q. Earlier in your testimony you were asked a lot of
24 questions about legal analyses or legal claims that
25 might have been made, and on those questions you

1 claimed attorney-client privilege --
2 A. Yes.
3 Q. -- and said that you didn't have an independent view
4 that didn't come from attorney-client communications.
5 A. Yes.
6 Q. Okay. I want to ask, without divulging what the
7 advice was of your counsel, can you just list for me
8 what the topics were on which you got advice, or would
9 you claim the privilege as to just the topics as well?
10 A. Maybe I can do it this way. I think I've said before
11 that in this case, for instance, your client has filed
12 an objection.
13 Q. Yes, it has.
14 A. And in this case many objections have been filed and
15 many of the topics listed in those objections, and I
16 think I said with Mr. Hackney, whether it was
17 subordination, prioritization, equitable estoppel,
18 tort, invalidation of liens ab initio, whatever they
19 were, none of those analyses or claims came as a
20 surprise to me and that in some fashion -- without
21 divulging what I had spoken with to my counsel, in
22 some fashion issues such as those had been discussed
23 and analyzed with my counsel, attorneys and advisors.
24 Q. So, for example, if -- as you know, Ambac filed an
25 objection, and --

Page 273

1 A. Yes.
2 Q. -- one of the arguments raised was whether the Swap
3 obligations themselves were void ab initio because
4 they did not comply with Act 34.
5 A. Yes.
6 Q. You're familiar with that argument that we raised?
7 A. Yeah.
8 Q. Can you -- and again without asking -- I'm not asking
9 you to divulge what the advice was or what the
10 analysis was you got from your counsel, but can you
11 tell me what issues, just by naming the topics, you
12 sought advice on with respect to that argument?
13 MR. SHUMAKER: Well, the seeking of advice
14 somewhat implicates communications. If you were to
15 look at topics perhaps as to whether he regarding your
16 objection whether he -- they were raised, without
17 going into the communications, I think he could
18 respond to that.
19 BY MS. ENGLISH:
20 Q. That's exactly what I'm asking.
21 A. Okay. Well, for instance, whether or not arguments
22 such as that would erase the obligation in toto or
23 subordinate it to a lower level, whether or not an
24 obligation like that would raise defenses on behalf of
25 the obligor of equitable estoppel to the City, whether

Page 274

1 or not there are facts surrounding those documents and
2 liens that would equitably raise issues as far as
3 their validity beyond void ab initio, whether or not
4 the law in the district and the circuit supported a
5 clean remedy that could be easily obtained, and
6 whether or not it would be expensive and extensive
7 litigation and appeals over a period of time, things
8 such as those were discussed and examined.
9 Q. When you say whether there were equitable issues, what
10 do you mean by that?
11 A. Here again, without going into discussion, any of the
12 concern -- equity is -- implicates action such as
13 clean hands. Whether there were issues surrounding
14 the City's conduct and issues along those lines, that
15 would be factually intensive and lead to, for
16 instance, increased litigation costs which I think is
17 mentioned in our motion or some of the papers we
18 filed, things along those lines, general equitable
19 concerns.
20 Q. When you just listed for me the types of concerns and
21 topics you were exploring with counsel, you didn't
22 mention Act 34.
23 A. Well, as I said, I said for instance. I didn't mean
24 for it to be an exhaustive list, and that's why
25 without sitting here today, counsel, memos that were

Page 275

1 prepared, analyses, I can't give you a compendium or
2 an exhaustive list of things that were considered, so
3 I don't want to leave you with the misimpression that
4 somehow the analysis wasn't complete or we didn't
5 consider more issues than the one I did. We did.
6 Those are just the ones that came, sitting here
7 today -- you asked me a question -- off the top of my
8 head that I remembered for instance --
9 Q. Did you have legal analysis done on whether the Swaps
10 transactions complied with Act 34?
11 A. As I said, without getting into discussions with my
12 counsel, a whole panoply of issues, some of which are
13 contained in the objections filed, including those
14 filed by your client, were examined.
15 Q. Okay. Now can you answer my question? Did you have
16 legal analysis done on whether the Swap transactions
17 complied with Act 34?
18 A. As I said --
19 MR. SHUMAKER: Objection, asked and
20 answered.
21 A. As I said --
22 MR. SHUMAKER: If you want to share with
23 him the argument, that might help.
24 A. There a whole panoply of issues, some of them
25 contained in the objections such as the one filed by

Page 276

1 your client which were examined and reviewed.
2 BY MS. ENGLISH:
3 Q. Was Act 34 one of them?
4 A. More than likely, yes.
5 Q. More than likely? You don't know?
6 A. No. Sitting here today, I just said to you, for
7 instance, that many of the issues, without being a
8 compendium or being exhaustive, were examined. Act 34
9 was probably one of them. I did not mean for my
10 testimony to be exhaustive because I don't have the
11 analyses or the benefit of discussing them with my
12 client prior to your question today.
13 Q. I do understand the answers that you're giving me.
14 They're just not quite answers to the questions I'm
15 asking.
16 A. Okay.
17 Q. So let me -- in your answer right now when I was
18 trying to hone in on was Act 34 --
19 A. Um-hm.
20 Q. -- examined, right?
21 A. Yes.
22 Q. You said probably.
23 A. Yes.
24 Q. So you're not sure?
25 A. No. I said --

Page 277

1    MR. SHUMAKER: Objection, asked and
2  answered.
3  A.  I'll say it again.  Probably means that it was, but I
4  don't want my answer to represent to you that it was a
5  compendium.  If you want to keep asking me about Act
6  34, that's fine, but I said more likely than not it
7  was examined.  I -- just sitting here right now, I
8  don't have an independent recollection of all the
9  things we examined.  Act 34 was more than likely one
10  of them.
11    BY MS. ENGLISH:
12  Q.  Okay.  But sitting here today you don't have an
13  independent recollection for sure that Act 34 was
14  looked at; is that correct?
15  A.  I just said --
16    MR. SHUMAKER: Objection, asked and
17  answered.
18  A.  I just said it's more likely than not.
19    BY MS. ENGLISH:
20  Q.  Sitting here today do you have a recollection as to
21  whether there was legal analysis done as to the
22  validity of the pledge of casino revenues under the
23  gaming act?
24  A.  I thought you just asked -- well, suffice it to say I
25  believe so.

Page 278

1  Q.  You believe so?
2  A.  Yes.
3  Q.  Are you sure?
4  A.  I believe so.
5  Q.  Are you sure?
6  A.  I believe so.
7    MR. SHUMAKER: Objection, asked and
8  answered.
9    BY MS. ENGLISH:
10  Q.  Do you recall seeing a legal analysis or memo that was
11  prepared with respect to the validity of the pledge of
12  casino revenues under the gaming act?
13  A.  Ms. English, I see -- I see a lot of memos.  As I said
14  before this line of questioning, it's more likely than
15  not that I did, but sitting here today, in an effort
16  to be accurate, I don't specifically recall all of the
17  issues we examined.  More likely than not, it included
18  Act 34, it included validity of liens.
19    COURT REPORTER: It included validity --
20    THE WITNESS: Validity of liens.
21    COURT REPORTER: Thank you.
22    BY MS. ENGLISH:
23  Q.  Did you make an independent assessment apart from
24  advice of counsel as to the strengths -- strengths or
25  weaknesses of the City's claims against the Swap

Page 279

1  counterparties?
2  A.  Not without the advice of counsel, no.
3  Q.  Why didn't the City just sue the Swap counterparties
4  and then negotiate from there?
5  A.  You know, one of the things that we have, both in
6  bankruptcy and in Public Act 436, is that in the
7  deliberative process the emergency manager has
8  discretion to make decisions, business judgment
9  decisions, within that discretion, irrespective of
10  third parties, the decisions as to how that should
11  have occurred.
12    We made a decision in consultation with
13  counsel that this was the best way to proceed.
14  Commencing litigation might well have created a
15  cascade of other events such as the very event we are
16  trying to avoid which is trapping the casino revenue
17  for time and a number of months and/or years which
18  would have made the probability of me completing my
19  mission within the time frame of the statute
20  difficult.
21  Q.  If the City couldn't get a deal such as the
22  forbearance agreement, was the City prepared to sue
23  the Swap counterparties then?
24    MR. SHUMAKER: Objection to the extent that
25  question is asking for attorney-client privileged

Page 280

1  communication.  I'll object.
2    If you have some independent understanding,
3  you can answer.
4  A.  Mrs. English, I'll say this.  Without getting into
5  communications with my counsel, we examined all
6  alternatives, and as I said earlier with Mr. Hackney,
7  including potential litigation.
8    BY MS. ENGLISH:
9  Q.  If you hadn't gotten a deal, were you prepared to sue
10  them then?
11    MR. SHUMAKER: Objection, calls for
12  speculation.
13  A.  Yeah, I was going to say.  I don't know.  We'd have to
14  examine the situation on the ground at that time.
15    BY MS. ENGLISH:
16  Q.  Okay.  Let me ask you this.  If the forbearance
17  agreement is not approved by the bankruptcy court,
18  will the City then sue the Swap counterparties?
19    MR. SHUMAKER: Objection, calls for
20  speculation.
21  A.  Here again, it's a different version of the prior
22  question which it calls me to speculate as to what we
23  would do if the Court does not approve the agreement.
24    BY MS. ENGLISH:
25  Q.  If there were to be litigation with the Swap

Page 281

1  counterparties, do you have some sense as to what
2  claims might be asserted against the Swap
3  counterparties?
4     MR. SHUMAKER: Objection, asked and
5  answered.
6  A.  Yeah, as we said before, those are discussions that
7  I've had with my counsel.  I would consult with them
8  as to our possible -- I can't tell you in direct
9  response to your question and this line of questioning
10  what we would do.  What I can tell you is that we
11  would engage in a process of examining what our
12  alternatives were and try to make an informed and
13  reasonable decision based upon the information we had
14  at that time.
15     BY MS. ENGLISH:
16  Q.  Okay.  So sitting here today you are not able to tell
17  me even a single claim that the City might assert
18  against the Swap counterparties?
19  A.  There are a number of claims that the City might
20  assert.  As I said earlier today, some of them might
21  be framed in some of the objections.  Whether or not
22  we would ultimately assert those, depends upon a
23  number of different factors that we would have to
24  examine at that point.
25  Q.  Well, in the forbearance agreement, the City is giving

Page 282

1  up the right to assert claims against the Swap
2  counterparties, correct?
3  A.  If the forbearance agreement is approved and we
4  ultimately execute on the agreement, then yes, the
5  parties would forebear and would not sue each other.
6  Q.  Right.  So all I'm asking is give me one example of
7  one claim you're giving up in the forbearance
8  agreement.
9  A.  I suppose any of the claims that have been implicated
10  in some of the objections that have been filed and, as
11  I said earlier today, some of those claims which is
12  the ones we discussed a few minutes ago, such as
13  estoppel, ab initio and those others.
14  Q.  Did any of your legal counsel ever prepare a memo or a
15  written analysis for the City that outlined a
16  litigation strategy against the Swap counterparties?
17  I'm not asking what would have been in it, if there
18  was one.  I just want to know if there was any written
19  analysis ever prepared that outlined a litigation
20  strategy.
21  A.  Well, without, here again, drawing into the
22  nomenclature of a litigation strategy, because that
23  can mean a number of different things, including up --
24  up to and through attaching a proposed complaint, for
25  instance, without getting into the nomenclature, I

Page 283

1  would say that, as I said before this afternoon, there
2  was analysis of the potential claims, strengths and
3  weaknesses and options available to the City.
4  Those -- some of those were prepared in writing, yes.
5  Q.  You just mentioned a draft complaint.  Was there ever
6  a draft complaint prepared?
7     MR. SHUMAKER: I think you mischaracterized
8  what he said.  That's my objection.
9  A.  Yeah, as I said, some of those types of things could
10  include a draft complaint.  I don't recall seeing a
11  draft complaint.
12     BY MS. ENGLISH:
13  Q.  Do you recall seeing a memo that outlined strengths
14  and weaknesses of claims that could be asserted in a
15  complaint?
16  A.  As I said before, I think there were memorandum and
17  advice that was given regarding the various claims,
18  defenses and alternatives available to the City which
19  could have included a memorandum of the nature you're
20  talking about.
21  Q.  It could have included it --
22  A.  It could.
23  Q.  -- but you're not sure whether it did or not?
24  A.  Sitting here today I don't specifically remember all
25  the memos that would fit the description that you're

Page 284

1  making.  There were memos discussing the various
2  strengths and weaknesses of the positions.
3  Q.  Did you have any analysis done as to the cost of a
4  litigation with the Swap counterparties?
5  A.  No.  I don't recall if any of the documents included
6  costs.  We -- there were discussions about the
7  potential costs and the timing, but I don't recall if
8  any of the documents did.
9  Q.  Okay.  What was your best estimate as to how much a
10  litigation with Swap counterparties would cost the
11  City?
12  A.  I don't -- I don't remember what the best estimates
13  were.  They -- they ranged from --
14     MR. SHUMAKER: Object.  I just want to make
15  sure you're not going to be revealing any
16  attorney-client communications with your answer.
17     THE WITNESS: Okay.
18     MR. SHUMAKER: I'll interject that.  I'll
19  let you answer the question as to whether that was
20  addressed.  I don't want you to go --
21     THE WITNESS: Okay.
22     MR. SHUMAKER: -- into anything --
23     THE WITNESS: Okay.
24     MR. SHUMAKER: -- beyond that.
25  A.  It was addressed, and suffice it to say I think it's

1  fair to assume that in litigation in the nature you're
2  discussing that it could go into millions of dollars.
3      BY MS. ENGLISH:
4  Q.  How about the time it would take to litigate the Swap
5  counterparties?  Did you estimate how long it would
6  take?
7      MR. SHUMAKER:  Same admonition.
8  A.  Let's -- let's do it this way.  I think it's fair to
9  say that there were discussions regarding the time for
10  litigation and/or appeals and the costs that were
11  involved if that tack was taken.
12      BY MS. ENGLISH:
13  Q.  How long did you estimate it would take to litigate
14  with Swap counterparties?
15  A.  I'm not sure the predicate is there that I estimated
16  the length of time.
17  Q.  Okay.  If you didn't estimate the length of time,
18  that's an okay answer to give.
19  A.  Yeah.  I'm trying to be as clear as I can for you and
20  say that there were discussions, but there's nothing
21  as specific as the lodestar method of analysis which
22  you understand is time times hours billed, so on and
23  so forth.  There were discussions and there were
24  analyses about what it could be.
25  Q.  Now, I have to unpack that a little bit because you

1  mentioned the lodestar analysis, one of my favorite
2  friends.  Did you have a lodestar analysis done for
3  litigation with the Swap counterparties?
4      MR. SHUMAKER:  Objection, this is getting
5  into the -- the specific communications between
6  Mr. Orr and his counsel when you start to go through
7  what -- what are the particulars of the advice that
8  was being given.  I allowed you to go forward with
9  whether he considered the length of litigation in his
10  answer, but I don't want him to go into the specifics
11  of any sort of analysis that was done by counsel.
12      With that admonition, you can answer.
13  A.  Again, without going to the specifics of discussion
14  I've had with counsel, there were discussions about
15  potential length of litigation and appeals and the
16  potential cost.  Those discussions included time that
17  may have impaired my ability to complete my obligation
18  within the time frame provided by Public Act 436, as
19  well as significant costs, litigation cost being
20  incurred by the City.
21      BY MS. ENGLISH:
22  Q.  Okay.  Here is my question again, because in your
23  answer you mentioned lodestar analysis, so I'm just
24  asking -- it's a yes or no question.
25  A.  Um-hm.

1  Q.  Did you have a lodestar analysis performed with
2  respect to a litigation with the Swap counterparties?
3      MR. SHUMAKER:  Again, I'm going to object.
4  I believe that that question asks the -- asks Mr. Orr
5  to reveal privileged attorney-client communications
6  when you get into specific lodestar analysis.
7      BY MS. ENGLISH:
8  Q.  I don't want the analysis.  I just want to know
9  whether had you one done because you mentioned it.
10  A.  I did mention it, but, here again, I think my response
11  was that there was an analysis that was done.  I'm not
12  sure.  I don't recall if it was as specific as the
13  type of lodestar analysis to give you an example, and
14  without going into conversation between me and my
15  counsel, I say again, we did an analysis and had
16  discussions regarding potential claims and defenses
17  that could be asserted, the potential length of time
18  it would take and the significant cost that might be
19  incurred by the City.
20  Q.  I'm going to move on.
21  A.  Okay.  Sure.
22  Q.  Did the City obtain approval from the Michigan
23  Department of Treasury for the COPs or the Swap
24  obligations, do you know?
25  A.  You mean initially?

1  Q.  Yeah.
2  A.  I don't know.  Well, wait a minute.  Wait a minute.
3      I recall seeing a letter some time ago on
4  official Michigan State letterhead -- well, I recall
5  seeing a letter.  It may have been some form related
6  to the COPs.  I just don't remember specifically, but
7  I do recall seeing a letter on Michigan letterhead
8  related to the transaction.
9  Q.  Okay.  So I'm going to put in a request to your
10  counsel.
11      MS. ENGLISH:  If there is an approval or a
12  letter from the Michigan Department of Treasury with
13  respect to the COPs or the Swaps, we'd like to request
14  a copy of that.
15      MR. SHUMAKER:  We'll look into it.
16      MS. ENGLISH:  Thanks.
17      BY MS. ENGLISH:
18  Q.  Here's another one I don't know if you know the answer
19  to this.
20  A.  Right.
21  Q.  Do you know if the City approved the offering circular
22  that went out with respect to the COPs?
23  A.  I do not.
24  Q.  You mentioned earlier that you were on conference
25  calls with Ken Buckfire and the principals of the Swap