# Exhibit 6B
# Excerpts of Deposition of Kenneth Buckfire

Page 109

1 asked today. I am just here principally to follow up
2 on certain items and ask about certain other areas
3 that may be germane to Syncora.
4     So, as I understood your testimony, you
5 were the lead negotiator for the City when it came to
6 negotiating the business deal, is that correct?
7 A. Yes.
8 Q. Other people were going to paper the business deal in
9 terms of the legal terms that would embody it,
10 correct?
11 A. Yes.
12 Q. Let me ask you a question. The kickoff of the
13 negotiations that led to the forbearance agreement I
14 understood you to say began on June 4th, correct?
15 A. Yes.
16 Q. Who called that meeting?
17 A. Counsel to Jones Day called counsel for BAML and
18 invited them to the meeting.
19 Q. Fair to say that the meeting was held at the behest of
20 the City of Detroit?
21 A. Yes.
22 Q. Did you take legal advice, you personally as the lead
23 negotiator for the City, did you take legal advice
24 from Jones Day in advance of the June 4 meeting?
25 A. Yes.

Page 110

1 Q. Would you disclose to me the legal advice you obtained
2 from them?
3     MR. CULLEN: I'll instruct him not to
4 answer.
5     MR. HACKNEY: So, if I ask questions about
6 the legal advice you had been given about the COPs
7 Swap structure or various parties' rights thereunder,
8 you would instruct the witness not to answer those
9 questions?
10    MR. CULLEN: Right.
11    MR. HACKNEY: And I take it, Mr. Cullen,
12 that instruction would remain true both from -- at any
13 time?
14    MR. CULLEN: Right.
15    MR. HACKNEY: Not just with respect to the
16 June 4 meeting?
17    MR. CULLEN: Precisely.
18    BY MR. HACKNEY:
19 Q. Okay. Let me ask you, Mr. Buckfire, I'm going to
20 speculate, perhaps not wildly, that you've negotiated
21 a few deals in your lifetime.
22 A. Yes.
23 Q. Isn't it fair to say as a negotiator, you have to have
24 an understanding of the financial needs and desires of
25 your client as well as the counterparty with whom you

Page 111

1 are negotiating?
2 A. Yes.
3 Q. You also have to have at least some understanding of
4 the legal framework in order to negotiate effectively,
5 correct?
6 A. Yes.
7 Q. You don't have to go to law school, right, but you do
8 have to understand some of the ins and outs of the
9 various legal documents that you're negotiating over,
10 correct?
11 A. As well as any layman can be expected to do so.
12 Q. Now, I'd like to get a level set as to where you were
13 on June 4th, 2013 as you're going into this meeting
14 with BAML.
15 A. And UBS.
16 Q. And UBS. So, they were there too?
17 A. Yes.
18 Q. Okay. I want to make sure I have a level set under
19 the operating assumptions that you had in your mind as
20 you were going into the meeting to negotiate with the
21 Swap counterparties, okay?
22     One of your operating assumptions was that
23 there were termination events existing under the
24 Swaps, correct?
25 A. There were events of default existing under the Swaps,

Page 112

1 the collateral agreement.
2 Q. Okay. So, let's take a step back and let me be more
3 precise.
4 A. Okay.
5 Q. So, there is a Swap agreement that the Swap
6 counterparties are parties to with the service
7 corporations?
8 A. Correct.
9 Q. You are aware of that?
10 A. I am.
11 Q. You are also aware that there is a collateral
12 agreement that is between among other parties the
13 City, the service corporations and the Swap
14 counterparties, correct?
15 A. Yes.
16 Q. Now, at the time you're going into the June 4 meeting,
17 one of your operating assumptions was that there were
18 termination events under the Swap that would give the
19 Swap counterparties the right to terminate?
20     MR. CULLEN: Objection. Foundation. I
21 think he said default events.
22     MR. HACKNEY: He said default events under
23 the collateral agreement. I'm trying to be precise
24 about --
25 A. No, I was focused on the cash issue that would be at

Page 201

1 the City is precluded from taking any position
2 inconsistent with the Swap counterparties and this
3 applies through March 1st, 2014 when the Chapter 9
4 plan is filed --
5 A. Yes.
6 Q. Is there going to be another time where the City can
7 challenge the liens as invalid once the Chapter 9 plan
8 is filed?
9     MR. CULLEN: I object to the form of the
10 question but you can answer if you can --
11     BY MS. FORDE:
12 Q. Do you see that this agreement forfeits the City's
13 right to challenge any liens after the Chapter 9 plan
14 is filed?
15 A. I don't see that.
16 Q. Can you tell me why you don't see it that way?
17 A. Well, I didn't write this agreement.
18 Q. Is it your understanding that after March 1st the City
19 has another opportunity to challenge anything related
20 to this agreement?
21 A. It's not my understanding.
22 Q. Okay.
23 A. I don't know.
24 Q. Okay. Do you recognize there's a possibility then
25 that the City could be stuck with paying a very large

Page 202

1 figure after the Chapter 9 plan and have no ability to
2 challenge it if -- at some certain stage regardless of
3 the validity of those liens?
4 A. That's a possibility.
5 Q. Okay.
6     MS. FORDE: Thank you. No further
7 questions.
8     MS. GREEN: Good afternoon, my name is
9 Jennifer Green. I just have a few questions.
10     THE WITNESS: May I ask who you represent,
11 Counsel?
12     MS. GREEN: Police and Fire Retirement
13 System and the General Retirement System.
14     THE WITNESS: And you are with what law
15 firm?
16     MS. GREEN: Clark Hill.
17     EXAMINATION
18     BY MS. GREEN:
19 Q. I had a hard time hearing down there. I may have
20 written this down wrong. I thought I heard you say
21 that you had received a letter from or the City had
22 received a letter from the Michigan Gaming Control
23 Board saying that it was okay to pledge the casino
24 funds.
25 A. Well, if you look at the original collateral

Page 203

1 agreement, I believe it was dated June 18th of 2009,
2 there is attached as an exhibit to that a letter from
3 the Michigan Gaming Control Board saying that they
4 were okay with the arrangements embodied in the
5 collateral agreement.
6 Q. Do you know the date of the letter?
7 A. I believe it was the same date as the agreement.
8 Q. My next question I believe someone may have alluded to
9 but I don't know that we got this far. You said that
10 you assumed that the liens were valid in your
11 negotiations, correct?
12 A. Yes.
13 Q. Did you also understand that the lien arose solely
14 from the collateral agreement itself?
15 A. That's my understanding.
16 Q. Okay. And as far as the lien -- look at my last page
17 of notes here -- did you discuss with anyone whether
18 pledging the casino revenue was permissible under the
19 Michigan Gaming Act or was the letter the only thing
20 that was relied upon?
21     MR. CULLEN: Objection to the extent that
22 it calls for privileged conversations, where we have
23 directed no inquiry between himself and Jones Day.
24     MS. GREEN: And that is my question so is
25 he not going to answer that?

Page 204

1     MR. CULLEN: If he can find in his memory a
2 nonprivileged conversation that affects --
3     THE WITNESS: With Jones Day, impossible.
4     MR. CULLEN: Not with Jones Day but with
5 somebody else, a nonprivileged conversation, you can
6 answer with respect to that.
7     BY MS. GREEN:
8 Q. Do you have a nonprivileged conversation that you can
9 recall regarding whether or not you discussed with
10 anyone whether pledging the casino revenue was
11 permissible under the Michigan Gaming Act?
12 A. No.
13     MS. GREEN: Thanks. That's my only
14 question. Thank you.
15     MS. NEWBURY: Good afternoon, Mr. Buckfire.
16 My name is Karen Newbury. I'm with Schiff Hardin, and
17 I represent DepfaBank as agent for DFS WertManagement.
18     THE WITNESS: Can you say that really fast
19 twice?
20     MS. NEWBURY: I said it really fast once.
21 So, that will be enough.
22     THE WITNESS: Thank you.
23     EXAMINATION
24     BY MS. NEWBURY:
25 Q. You've testified earlier today that you were the

Page 205

1  individual largely responsible for the negotiation of
2  the business terms of the forbearance agreement,
3  correct?
4  **A. Yes.**
5  Q. So, you are familiar with and perhaps even designed
6  the optional termination provisions?
7  **A. Yes.**
8  Q. So, if I ask you to explain to me the way that the
9  termination amount will be calculated with all the
10 accompanying definitions such as optional termination
11 notice on Page 11 of the agreement, then mid-market
12 amount and optional termination amount on Page 14, you
13 could walk me through this in plain English without
14 any trouble, right?
15 **A. That's a bold statement. I'll do my best.**
16 Q. Would you please try?
17 **A. Okay. Well, the calculation of the termination amount**
18 **is not an easy quantitative exercise because pursuant**
19 **to the underlying agreement which is not in front of**
20 **me today so I can't refer you to it, you're supposed**
21 **to go and seek bids in the market from dealers to find**
22 **out what the value of the Swap is, and then you figure**
23 **out from that what the termination amount is.**
24     So, it's not a simple calculation that you
25 can just do mathematically on Bloomberg. You could

Page 206

1  get to a pretty good answer because everyone looks at
2  the same LIBOR curves but it is a matter of market
3  checking.
4  Q. So, it's your understanding that the optional
5  termination amount is to be determined on the optional
6  termination date which is the date that the City gives
7  notice, is that correct?
8  **A. That's my understanding.**
9     **MS. NEWBURY:** Thank you, that's all.
10    (Discussion held off the record at
11    3:24 p.m.)
12    (Back on the record at 3:24 p.m.)
13    **MR. HACKNEY:** I think we are done.
14    **VIDEO TECHNICIAN:** This concludes today's
15 deposition. The time is 3:24 p.m. We are off the
16 record.
17    (The deposition was concluded at 3:24 p.m.
18    Signature of the witness was not requested by
19    counsel for the respective parties hereto.)
20
21
22
23
24
25

Page 207

1              CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN )
3                    ) SS
4  COUNTY OF WAYNE)
5
6       I, NORA MORRISSY, certify that this
7  deposition was taken before me on the date
8  hereinbefore set forth; that the foregoing questions
9  and answers were recorded by me stenographically and
10 reduced to computer transcription; that this is a
11 true, full and correct transcript of my stenographic
12 notes so taken; and that I am not related to, nor of
13 counsel to, either party nor interested in the event
14 of this cause.
15
16
17
18
19
20
21
22       NORA MORRISSY, CSR-2642
23       Notary Public,
24       Wayne, County, Michigan.
25 My Commission expires: 9-13-13