# Exhibit 6A
## Excerpts of Deposition of Kenneth Buckfire

Page 69

1 A. I would recommend it.
2    BY MR. SUMMERS:
3 Q. Okay.
4    MR. SUMMERS: Let's mark that for follow-up
5 after the deposition.
6    BY MR. SUMMERS:
7 Q. You testified that as of the last analysis your
8 understanding is the estimated amount of the
9 termination payment that would be due is roughly three
10 hundred million dollars, is that correct?
11 A. Well, it clearly moves around as the interest rate
12 curve moves around. I think the most recent number is
13 somewhere reaching 275 and 300 million dollars.
14 That's before the application of the applicable
15 discount that we had provided for in the termination
16 agreement.
17 Q. And that last analysis, when was that performed?
18 A. A few days ago.
19 Q. How does the City plan to get the cash necessary to
20 make the termination payment?
21    MR. CULLEN: Objection. Foundation. Form.
22    BY MR. SUMMERS:
23 Q. Does the City have a plan at this point for how it
24 will obtain the cash necessary to pay the termination
25 payment?

Page 70

1    MR. CULLEN: Objection, foundation, form,
2 but you can address the question.
3 A. Yes, the City has a plan.
4    BY MR. SUMMERS:
5 Q. And what is that plan?
6 A. The City intends to secure a debtor in possession
7 financing of sufficient proceeds to fund the
8 termination payment as well as provide sufficient cash
9 for the City to execute on its reinvestment program
10 during the bankruptcy.
11 Q. And what is -- what actions, if any, has the City
12 taken toward obtaining debtor in possession financing?
13 A. We have contacted a large universe of potentially
14 interested investors, many of whom have signed
15 nondisclosure agreements, NDAs, pursuant to which they
16 have received the request for proposal, the RFP which
17 went out yesterday.
18 Q. And is Miller Buckfire leading the effort to obtain
19 debtor in possession financing?
20 A. Yes.
21 Q. And when you say a large universe of potential
22 investors, do you know approximately how many have
23 been talked to?
24 A. At the moment it's in excess of 30.
25 Q. And how many have -- how many have signed

Page 71

1 nondisclosure agreements?
2 A. That's the universe I'm discussing, approximately 30
3 or more.
4 Q. So, everybody you've talked to signed?
5 A. No, some people didn't want to participate. I can't
6 tell you how many we called. I can tell you how many
7 we sent NDAs to which have been returned to us, it's
8 in excess of 30.
9 Q. Are some of the people or some of the potential
10 sources of financing that Miller Buckfire have spoken
11 to said no, we're not interested?
12 A. Yes.
13 Q. And approximately how many have said no?
14 A. Hasn't been that many, maybe ten. Would your client
15 like one?
16 Q. And do you know who those ten entities are that have
17 said they are not interested?
18 A. I do, yes.
19 Q. And who are they?
20 A. I'm not going to tell you that.
21 Q. On what basis?
22 A. It's commercially sensitive information.
23    MR. CULLEN: Counsel, maybe it will help,
24 and I don't know whether you want this on the record
25 or not, but the position we are going to take with

Page 72

1 respect to this is that this is a competitive process
2 and the best result in that process is achieved by us
3 being able to negotiate with the individual parties
4 who are out there, and not to litigate the negotiating
5 strategy before we have something to bring back to the
6 court to approve.
7    So, we're not going to answer questions
8 about individual parties, we're not going to answer
9 questions about the strategy of negotiating with those
10 parties and we're not at liberty to give out the
11 information with respect to the people who responded
12 to the NDAs because they understandably don't want to
13 be shopped, don't want to take up a lot of your time.
14 We can fight this through a lot of objections and so
15 forth, and if we want to fight about that at some
16 later time, perfectly fine.
17    You can ask about his general strategy on
18 this, you can ask about the basis for his confidence
19 or nonconfidence in it. You can go through those
20 general items, but the actual strategy, the terms of
21 arrangements with individual parties I'm not going to
22 have him go into now. Hopefully by the time we get to
23 the hearing, we'll have an agreement that you will be
24 on a --
25    MR. SUMMERS: Let's go -- I think let's

Page 73

1  go -- move through the questions and see how we do.
2      MR. CULLEN: Okay.
3      MR. SUMMERS: I understand the City's
4  position on it.
5      MR. CULLEN: Okay.
6      BY MR. SUMMERS:
7  Q. You said an RFP went out yesterday?
8  A. Correct.
9  Q. Approximately how many people was the RPF sent to
10 yesterday?
11 A. The 30 plus people who signed the NDA.
12 Q. How much debtor-in-possession financing does the City
13 hope to obtain?
14 A. Three hundred fifty million dollars, up to three
15 hundred fifty million dollars.
16 Q. And does the City have a goal on the interest rate?
17 A. The lowest possible interest rate.
18 Q. Does the RFP attempt to define what that lowest
19 possible interest rate is?
20 A. No.
21 Q. Does it define whether the interest rate needs to be
22 fixed or variable?
23 A. No.
24 Q. What covenants, if any, are included in the RFP as
25 being acceptable or not acceptable?

Page 74

1  A. I'm not going to discuss that. It's commercially
2  sensitive.
3  Q. How long of maturity on the DIP financing is the City
4  looking to obtain?
5  A. Through the pendency of the end of the case.
6  Q. And is the City offering a lien on casino revenues in
7  connection with the DIP financing?
8  A. In part.
9  Q. I assume the City does not expect to obtain unsecured
10 financing?
11 A. I would take it if it was offered.
12 Q. No doubt. What other collateral is the City offering
13 to secure the DIP financing loan?
14 A. I'm not going to answer that question.
15 Q. Does the RFP define what collateral would be
16 available?
17 A. Yes, it does.
18 Q. And that's been sent out to potential investors?
19 A. Who have signed nondisclosure agreements.
20 Q. If somebody new came and said I would be interested in
21 providing DIP financing, you would have them sign an
22 NDA and then provide them the RFP?
23 A. If they wanted to make an unsolicited proposal without
24 the benefit of the RPF, we would be happy to accept
25 it. Are you suggesting your client is interested in

Page 75

1  is submitting a proposal?
2  Q. Is the City offering art work as collateral?
3  A. I'm not going to discuss the terms of the term sheet,
4  sorry.
5  Q. Well, we kind of picked and choose what terms in the
6  RFP we are discussing and not discussing.
7      MR. CULLEN: We have in the attempt to
8  accommodate your desire for information and to
9  maintain control of the integrity of this process
10 which we believe is best negotiated as a negotiation
11 and not a litigation.
12     MR. SUMMERS: I guess I struggle with
13 understanding why the collateral that's offered in the
14 RPF that's been sent out when we know the interest
15 rate, the amount of the financing the debtor seeks,
16 why that puts the City at a competitive disadvantage.
17     MR. CULLEN: We didn't say the interest
18 rate.
19     MR. SUMMERS: The lowest possible.
20     MR. CULLEN: This is the beginning of a
21 negotiation. It's the beginning of a negotiation that
22 isn't at an end yet, that hasn't had any response to
23 the RFPs yet, it's an initial offer, and that's what
24 it is, and he's discussing it as such and willing to
25 testify about it as such, but I'm not going to read

Page 76

1  the terms of the RFP in the newspaper and our bidders
2  are not going to read the terms of the RFP in the
3  newspaper because that would hamper the process and
4  hamper our ability to get best value.
5      MR. SUMMERS: But we already have in the
6  record that the casino revenues are part of the
7  collateral that's being offered, so, what's wrong with
8  finding out what the rest of the collateral that's
9  being offered?
10     MR. CULLEN: Not going to argue with you,
11 Counsel. I'm telling you what the position is. I've
12 tried to be accommodating. It's as far as I am going
13 to go.
14 BY MR. SUMMERS
15 Q. Has the City had discussions with the State of
16 Michigan about providing financing?
17 A. I'm not going to discuss that.
18 Q. What is the City's view about what has to happen in
19 order to be able to obtain debtor-in-possession
20 financing -- let me put a finer point.
21     Are there certain events that the City
22 believes has to happen in the case for it to be able
23 to realistically obtain debtor-in-possession
24 financing?
25 A. Yes, there are events in the case.

Page 105

1    all of the gaming revenues until that claim has been
2    fully satisfied.
3        Now, simple math will tell you if we have
4    170 million of gaming revenues and we have a three
5    hundred million dollar termination payment and we have
6    an implied interest rate on that termination payment
7    it will probably take somewhere between two and three
8    years to pay it off in full.
9  Q.  That presumes that the lien held by the Swap
10   counterparties against the casino revenues is a valid
11   and enforceable lien, correct?
12 A.  That's what the agreement specifies.
13 Q.  Well --
14 A.  The 2009 agreement specifies.
15 Q.  Right, but --
16 A.  That's the agreement the City is bound by if the
17   forbearance agreement is not approved.
18 Q.  Unless there's a litigation claim that exists that
19   might invalidate the liens?
20 A.  In which case who knows what the Swap counterparties
21   might do and what we might have access to in terms of
22   gaming revenue.
23 Q.  So, the legal analysis is important to informing --
24 A.  Any risk the City is being asked to take that doesn't
25   have access to gaming revenues is an unacceptable risk

Page 106

1    from the point of view of the City's ability to
2    rehabilitate itself.
3  Q.  Have you evaluated noncore assets as a source of funds
4    for the City?
5        MR. CULLEN:  Objection.  Foundation.  Form.
6  A.  Yes.
7        BY MR. SUMMERS:
8  Q.  And what evaluation have you performed?
9  A.  As we've identified in the June 14th plan we did
10   identify for the benefit of the public and the
11   creditors all potential noncore assets that might have
12   value that could be used pursuant to the plan of
13   adjustment.
14 Q.  And on August 5th you announced the City had hired
15   Christie's to appraise the collection at the Detroit
16   Institute of Art, correct?
17 A.  I didn't announce that.
18 Q.  The City announced it.
19 A.  The City announced it.
20 Q.  That they hired Christie's, correct?  Do you have an
21   understanding of the approximate value of the City's
22   art collection?
23 A.  No.
24 Q.  Do you have an understanding as to when the City
25   expects to receive the appraisal from Christie's?

Page 107

1  A.  Yes, by the end of October 2013.
2  Q.  What is the City's intention with respect to analyzing
3    the appraisal and making a determination as to the art
4    work once it receives the appraisal?
5        MR. CULLEN:  Objection.  Foundation.  Form.
6  A.  I can't even speculate as to what we'll do until we
7    have some facts as to what value we're dealing with.
8    That's why they were retained.
9        BY MR. SUMMERS:
10 Q.  Has the City considered selling or leasing Belle Isle?
11 A.  Not to my knowledge.
12 Q.  Has the City looked into possible sources of funding
13   from the State of Michigan?
14 A.  I'm not going to discuss that.
15 Q.  Has the City looked into possible sources of funding
16   from the federal government?
17 A.  I'm not going to discuss that either.
18 Q.  On what basis?
19 A.  Commercially sensitive information.
20       MR. SUMMERS:  I'm going to propose we take
21   maybe -- why don't we stop the tape for a minute.
22       VIDEO TECHNICIAN:  The time is 12:18 p.m.
23   we are off the record.
24       (Recess taken at 12:18 p.m.)
25       (Back on the record at 1:21 p.m.)

Page 108

1        VIDEO TECHNICIAN:  We are back on the
2    record at 1:21 p.m.  This marks the beginning of tape
3    number three.
4        EXAMINATION
5        BY MR. HACKNEY:
6  Q.  Mr. Buckfire, good afternoon.  My name is Steve
7    Hackney.  I'm an attorney at Kirkland & Ellis, and I
8    represent Syncora Capital Assurance and Syncora
9    Guaranty.  Nice to meet you.
10 A.  Likewise.
11 Q.  I think we had a brief conversation which you
12   suggested there might have been something you'd like
13   to correct with respect to a name from the morning's
14   testimony.
15 A.  Yes, thank you, Mr. Hackney.  I incorrectly identified
16   the attorney from Cadwalader who was present at the
17   June 4th meeting.  His correct name is Larry
18   Stromfeld, S T R O M F E L D.  That's his correct name
19   and that's who attended the meeting.
20 Q.  If you think of any other corrections, don't hesitate
21   to stop me and let me know and we'll give you an
22   opportunity to make them.
23 A.  Thank you.
24 Q.  So, I've been listening to your testimony.  It's not
25   my intention to re-ask you all the questions that were

Page 141

1  would have demanded Syncora made good on its Swap
2  insurance and let Syncora try and stick around and
3  collect the casino revenues, correct?
4      MR. CULLEN: Objection. Foundation. Form.
5  Calls for speculation.
6  A.  It wasn't an issue for the City.
7      BY MR. HACKNEY:
8  Q.  I'm asking whether you thought that was a possibility
9  back at the time you were negotiating the forbearance
10 agreement?
11 A.  It wasn't an issue for the City. Had no impact on the
12 City's access to cash.
13 Q.  But if Syncora was a party that might come in in lieu
14 of the Swap counterparties, didn't you want to find
15 out whether you might be able to cut a better deal
16 with Syncora?
17     MR. CULLEN: Objection. Foundation. Form.
18 Calls for speculation.
19 A.  I can't speculate to that.
20     BY MR. HACKNEY:
21 Q.  All you can say is that you never did, correct?
22 A.  Correct.
23 Q.  And in fact between June 29th when you spoke to
24 Mr. Snyder and today, there have never been
25 substantive negotiations between the City and Syncora

Page 142

1  to your knowledge, isn't that correct?
2  A.  Not on this, no.
3  Q.  I wanted to clarify something that you said about the
4  DIP earlier and it was mainly that -- you used the
5  phrase I didn't understand with respect to the casino
6  revenues, you said -- you either said that the casino
7  revenues would be a part of the collateral package or
8  that part of the casino revenues would be in the
9  collateral package, and I wanted to clarify that.
10     MR. CULLEN: Objection. Foundation. Form.
11 I don't think he said either.
12 A.  I didn't.
13     BY MR. HACKNEY:
14 Q.  Oh, okay. Well, I thought for sure you had said one
15 of those two, but let me understand what you
16 anticipate -- this is subject to counsel's concern,
17 but I think there has been testimony about the casino
18 revenues as part of the collateral package.
19 ==As the banker who is leading the DIP,==
20 ==what's your understanding of the role the casino==
21 ==revenues will play in the collateral package offered==
22 ==in connection with the DIP?==
23 ==A.  They will be part of the collateral package.==
24 ==Q.  So, they will be part, and when you say they, do you==
25 ==mean a specific period of time of the casino revenues==

Page 143

1  ==or do you mean casino revenues projecting into the==
2  ==future?==
3  ==A.  It's commercially sensitive so I'm going to decline to==
4  ==answer it.==
5      MR. HACKNEY: Okay. I'll just reserve on
6  that. I obviously don't think there's a bunch of
7  value we have going back and forth. I understand your
8  position about this. On some of the other ones, we
9  may come to those briefly and talk about it, but I get
10 the DIP one.
11     BY MR. HACKNEY:
12 Q.  You agree that the goal of the forbearance agreement
13 is to get the collateral agreement to terminate so
14 that the City can get access to the casino revenues,
15 correct?
16     MR. CULLEN: Objection. Foundation. Form.
17 A.  That is one of the goals.
18     BY MR. HACKNEY:
19 Q.  That is one of the goals. And isn't it true that your
20 current expectation is that you need the postpetition
21 financing, the DIP loan to close in order to be able
22 to exercise the option under the forbearance
23 agreement, correct?
24 A.  Correct.
25 Q.  And there was testimony on that today because you

Page 144

1  don't have the money otherwise, right, Mr. Buckfire?
2  A.  That is part of the collateral package, yes.
3  Q.  I'm talking about the use of proceeds of the DIP just
4  so we're clear. Part of the use of proceeds of the
5  DIP will be to exercise the option under the
6  forbearance agreement, correct?
7  A.  Correct.
8  Q.  You understand that you won't have unfettered access
9  to the casino revenues until you exercise the option
10 that leads to the termination of a Swap in the
11 collateral agreement, correct?
12 A.  Yes.
13 Q.  Isn't this a bit circular?
14 A.  Regrettably.
15 Q.  How did you factor that consideration into the
16 determination as to whether to engage in the
17 forbearance agreement?
18 A.  Well, this is why the Swap collateral agreement is
19 such a problem for the City. Unless we can eliminate
20 the collateral and regain control over gaming revenues
21 without risk of loss because of defaults that would
22 trap it, we need to rationalize and clean this up in
23 order to put the City on a sound financial basis.
24 Q.  So, there are two parts -- there are -- there may be
25 many parts but two of the important parts of the

**Page 161**

1    City's plan is are the investments that Mr. Orr wants
2    to make, right?
3  A. Right.
4  Q. And the cost reductions he wants to make, right?
5  A. And the increase in staffing levels across services to
6    provide higher level services to the City.
7  Q. But that's in the reinvestment, right?
8  A. No, it's actually hard to break out that way because a
9    lot of it is actually in the salaries line and the HR
10   lines.
11       So, you have to go back to the numbers and
12   ask me a lot of those questions.
13 Q. The proposed investments that he wants to make, that
14   he proposes to make that I'm so ruthlessly omitting,
15   they are in this document, right?
16 A. Not in this projection.
17 Q. They're not in this projection, but they are in this
18   proposal?
19 A. That's right.
20 Q. He laid them all out in gory detail?
21 A. Yes, he did.
22 Q. He also lays out a number of cost cutting initiatives,
23   isn't that correct?
24 A. Yes, he does.
25 Q. And one of his goals is also to make the City more

**Page 162**

1    efficient, correct?
2  A. Yes.
3  Q. At the same time he also wants to make it operate
4    better, correct?
5  A. Correct.
6  Q. Those two things from a net operating standpoint work
7    in tension with one another, right?
8  A. They do over time, but you have to consider the
9    timetable and when these things are done.
10 Q. I want to ask you a question about state and federal
11   aid but I don't want to mix it up into the DIP which I
12   understand -- which I took to mean earlier was one of
13   the sensitivities there. I want to go back to June 4,
14   2011.
15       Prior to June 4, 2011 had you undertaken
16   any effort to evaluate whether there was either state
17   aid or federal aid that you could use in lieu of
18   having to negotiate this deal with the Swap
19   counterparties?
20 A. We are assuming there is no aid available to the City.
21 Q. You were assuming that there was none, but had you
22   undertaken an effort to determine whether there could
23   be some?
24 A. I've already testified that I'm not going to discuss
25   that.

**Page 163**

1  Q. And why aren't you going to tell me about that?
2  A. It's commercially sensitive information.
3  Q. Why?
4  A. That's my answer.
5  Q. Well, I can understand why if you are seeking estate
6    guarantee of a DIP or other things today, I get that,
7    and I'm not going to ask you about that, but I am
8    going to say that I think I deserve an answer on what
9    happened prior to June 4 in terms of finding
10   alternative ways to address the City's liquidity
11   crisis because after all what's been presented to us
12   was if we didn't do this deal, the City would die, and
13   I do think we are entitled to ask well, what had you
14   tried to do with other actors, so, can we get over it
15   or --
16       MR. CULLEN: You could certainly ask if he
17   had received any assurance of the availability of any
18   other funding from any other source during that time
19   period.
20       MR. HACKNEY: Well, I do appreciate that
21   but I often tend to ask my own questions. Let me
22   try and ask it in a way that hopefully serves your
23   concerns.
24       BY MR. HACKNEY:
25 Q. And let me first ask you, Mr. Buckfire, had your firm,

**Page 164**

1    you or your firm undertaken any analysis of this
2    question? You don't have to tell me what it was.
3    Let's go in stages.
4        Had you analyzed the problem?
5  A. Yes, we did.
6  Q. You had analyzed the problem. And is it your
7    testimony that divulging the results of that analysis
8    would be commercially sensitive?
9  A. Yes.
10 Q. Is part of the reason for that because of the way any
11   potential aid from the City or from the state or the
12   feds might interplay with the DIP process, is it the
13   way they knit up, is that the problem?
14 A. Yes.
15 Q. All right.
16       MR. HACKNEY: Let me suggest a short break.
17   I think that it may be time for me to pass the baton.
18       MR. CULLEN: Okay.
19       VIDEO TECHNICIAN: The time is 2:19 p.m.
20   This marks the end of tape number three. We are off
21   the record.
22       (Recess taken at 2:19 p.m.)
23       (Back on the record at 2:30 p.m.)
24       VIDEO TECHNICIAN: We are back on the
25   record at 2:30 p.m. This marks the beginning of tape