## Exhibit 6B
### Excerpts of Deposition of Kevyn D. Orr

1 Q. Your view of those legacy expenditures in the
2 bankruptcy is that they are unsecured claims, correct?
3 **A. Yes. Many of them are, yes. There are some**
4 **expenditures that are secured with regard to the water**
5 **department and parking and some miscellaneous, but the**
6 **roughly 11 and a half, 12 billion dollars that we put**
7 **out there we view as unsecured.**
8 Q. So let's go back to sourcing this termination payment.
9 **A. Yes.**
10 Q. It was my understanding of his testimony that
11 Mr. Buckfire who, by the way, is the individual tasked
12 with obtaining the City's post petition financing,
13 correct?
14 **A. Yes.**
15 Q. And is presumably the individual that's most
16 knowledgeable about that effort?
17 **A. Yes.**
18 Q. It was -- I'll represent to you that his testimony was
19 that the proceeds for the optional termination payment
20 would likely come from the post -- the proceeds of the
21 post petition financing?
22 **A. Yes.**
23    MR. JURGENS: Objection to form.
24    BY MR. HACKNEY:
25 Q. Is that also your understanding?

1 **A. Yes.**
2 Q. Okay. Now, isn't it also true that the City hopes to
3 pledge the casino revenues as part of the collateral
4 package for the post petition financing?
5    MR. SHUMAKER: I'm going to object here.
6 We're getting into an area where it is incredibly
7 commercially sensitive as to what sort of post
8 petition financing that the City is seeking.
9    MR. HACKNEY: Let me not be rude. I will
10 tell you I'm just going to ask him questions that
11 Buckfire asked yesterday -- answered. So I'm not
12 going to try and play the whole thing, but there were
13 absolutely areas where Buckfire answered. I think
14 there were a lot of other people in the room that were
15 there. I think any of your colleagues --
16    MR. SHUMAKER: Okay, that's fine.
17    MR. HACKNEY: Any of your colleagues.
18    MR. SHUMAKER: I just want to caution you.
19    MR. HACKNEY: I understand. I understand
20 the sensitivity. There were absolutely areas, though,
21 that Buckfire talked about. This was one of them. I
22 mean can I get an Amen or --
23    (Consensus Amen.)
24 **A. Okay.**
25    BY MR. HACKNEY:

1 Q. Okay. So I think there -- if I'm not mistaken, your
2 father was an amen minister.
3 **A. Great grandfather, grandfather and father.**
4 Q. So maybe --
5 **A. Yeah, took me back to -- over in the corner with the**
6 **deacons, yeah, took me back.**
7 Q. Okay. I won't compare myself to your father,
8 grandfather and great grandfather, but I can aspire.
9 **A. Yeah.**
10 Q. So I do want to talk about -- this is important.
11 Okay. This is -- isn't it true that one aspect of the
12 DIP -- I'm not going to get into the others -- is that
13 the casino revenues will be pledged or anticipated to
14 be pledged as collateral for the post petition
15 financing?
16 **A. Let me say this. That is certainly under**
17 **consideration.**
18 Q. Okay. Now, isn't it also true, though, that the
19 casino revenues have not currently been freed up on a
20 permanent basis because the City has not currently
21 exercised the option, correct?
22 **A. The certainty that we hope to get out of the**
23 **forbearance agreement has not been approved yet,**
24 **correct.**
25 Q. Well, even if it is approved by the Court, you still

1 won't have exercised the option.
2 **A. That is true with regard to the optional termination**
3 **payment.**
4 Q. Right.
5 **A. Yes.**
6 Q. And you need to exercise the option to terminate the
7 hedge, right?
8 **A. Yes.**
9 Q. You need to terminate the hedge to terminate the
10 collateral agreement.
11 **A. I think that's --**
12    MR. SHUMAKER: Object to form, to the
13 extent calls for a legal conclusion.
14 **A. Yeah, without getting into legal conclusions --**
15    COURT REPORTER: I'm sorry. This is --
16    BY MR. HACKNEY:
17 Q. You think it's a fair characterization that you need
18 to get the hedge terminated to get the collateral
19 agreement terminated?
20 **A. Yes.**
21 Q. And the good part for the City, if those things
22 happen, is that now you have unchanneled access to the
23 casino revenues going into the future?
24 **A. Yes, as we've said today, that certainty is one of the**
25 **motivations to enter into the agreement.**

Min-U-Script®
Bienenstock Court Reporting & Video
PH: 248.644.8888    Toll Free: 888.644.8080
(51) Pages 201 - 204
Page 2 of 3
13-53846-tjt    Doc 935-8    Filed 09/18/13    Entered 09/18/13 18:53:06

1  Q.  But do you also understand that you can't currently
2  pledge the casino revenues to a post petition lender
3  in a -- prior to having exercised the option under the
4  forbearance agreement?
5  **A.  Well, let's be careful without drawing legal**
6  **conclusions.  You can always enter into agreements**
7  **that have contingencies attached to them and the**
8  **parties will wait for those contingencies to occur.**
9  **That certainly has happened with a number of different**
10  **negotiations, not just in this case, but happens all**
11  **the time.**
12  Q.  That's fair that you absolutely -- you make a pledge
13  that's contingent on something else.  But isn't it
14  true that, as a general matter, post petition lenders
15  typically like to make sure that they have clean
16  collateral before they make a loan that's secured by
17  that collateral?
18  MR. SHUMAKER: Objection, calls for
19  speculation.
20  **A.  I think that's generally a fair characterization;**
21  **however, there have been cases that I've been involved**
22  **with outside of this one where post petition lenders**
23  **have been willing to make pledges or commitments**
24  **subject to certain contingencies.**
25  BY MR. HACKNEY:

1  Q.  Isn't it your expectation today, though -- is it -- is
2  it your expectation today that any post petition
3  lender will want clear -- a clear lien on the casino
4  revenues before it's willing to lend?  Is that your
5  current expectation?
6  **A.  Well, my current expectation is it might well want**
7  **clear lien before it's willing to fund.  I would think**
8  **in many of the bankruptcy cases that I've been**
9  **involved in, post petition lenders, for instance, are**
10  **willing to make commitments subject to the Court**
11  **approving their super priority liens, and then once**
12  **that approval is granted, they fund the loan, so**
13  **that's fairly common.**
14  Q.  I'm going to confirm for the record that conversations
15  with the State of Michigan about providing DIP
16  financing or with the federal government about
17  providing DIP financing are still questions that you
18  will refuse to answer on the grounds of commercial
19  sensitivity?
20  MR. SHUMAKER: I think you can ask Mr. Orr
21  those questions.  I don't want to -- I don't want to
22  categorically exclude you from doing that.
23  BY MR. HACKNEY:
24  Q.  Are they commercially sensitive?
25  **A.  They are commercially sensitive, but I don't want to**

1  **mislead you.  It is my assumption that, while they're**
2  **commercially sensitive, that's not going to be**
3  **forthcoming.**
4  Q.  Oh, really?
5  **A.  Yes.**
6  Q.  So just to tie it up, you tried to get a -- whether
7  it's credit enhancement or liquidity from the State
8  and the Feds, and your expectation is that you won't
9  be able to?
10  **A.  My understanding at the State level is that there's**
11  **certain prohibitions of the State law on the ability**
12  **of the State to lend to the City, and at the Federal**
13  **level my understanding is that it's not going to be**
14  **forthcoming, direct aid.**
15  Q.  Interesting.  And what about credit enhancement by the
16  State?
17  **A.  Here again, it's highly commercially insensitive --**
18  **sensitive.  I don't want to say anything that**
19  **forecloses it, but we -- let me answer it this way.**
20  **We are operating on the assumption that that will not**
21  **come -- be forthcoming.**
22  Q.  The casino revenues are about 170 million dollars a
23  year; isn't that correct?
24  **A.  Yeah, 170, 180 somewhere in there.**
25  Q.  Yeah.  In fact, that -- it's interesting because the

1  DIP proceeds you're seeking are up to 350; is that
2  correct?
3  **A.  Here again, those are commercially sensitive, but I**
4  **think that's fair.  Yes, I think that's fair.**
5  Q.  Okay.  And that's the equivalent of two years' worth
6  of casino revenues, correct?
7  **A.  Yes.**
8  Q.  Okay.  And that's something that you think you may be
9  able to get without having to pledge a clear lien on
10  the casino revenues, right?
11  **A.  No.  What I'm trying to say is you can certainly enter**
12  **into commitments.  I'm drawing commitments different**
13  **from funding.  You can certainly have a lender which**
14  **is quite common in bankruptcy cases to make a**
15  **commitment subject to approval of its security**
16  **interest or priorities to actually fund.**
17  Q.  Okay.
18  **A.  So that can occur.**
19  Q.  So the fact that that can occur means that there can
20  be uncertainty in connection with the casino revenues
21  and it won't hamstring your DIP process, correct?
22  **A.  Yeah, it's not so much -- well, to a degree what**
23  **you're saying is correct.  It's not so much**
24  **uncertainty with casino revenues because that's math.**
25  **It may be some uncertainty with regard to the ability**