**Exhibit 6B**

**Excerpts of Deposition of Kevyn D. Orr**

Page 89

1 grounds of the privilege.
2 A. Here again, there are objections in the case that make
3 some of those arguments, but I will not specifically
4 answer.
5 Q. Because of the privilege.
6 A. Because of the attorney-client privilege and it calls
7 for a legal conclusion.
8 Q. And if I ask you who had the better side of the
9 argument, you would say the same thing?
10 A. Same thing.
11    MR. SHUMAKER: Same objection, same
12 instruction.
13 A. I would say the same thing. I would say the same
14 thing.
15    BY MR. HACKNEY:
16 Q. Do you agree that the insurers can control all actions
17 of the Swap counterparties in connection with the
18 Swaps, that this would be important in terms of
19 assessing whether the City should negotiate with the
20 insurers?
21    MR. SHUMAKER: Objection, foundation, calls
22 for a legal conclusion.
23    You can answer to the extent you have an
24 understanding.
25 A. It's also a little speculative because it's a

Page 90

1 hypothetical. If then is usually a hypothetical, so I
2 would -- for the same reasons as we discussed before,
3 I would say that to the extent it calls for a legal
4 conclusion, I'll refuse to answer.
5    I would say as a rational person, if you
6 were put in a corner, then you might want to consider
7 your alternatives, including negotiations.
8    BY MR. HACKNEY:
9 Q. With the insurers?
10 A. With whoever, yes, whoever's --
11 Q. I mean it's just a simple point. We have five minutes
12 left. I'm going to milk them.
13 A. Okay.
14 Q. But it's a simple point, which is if the insurers can
15 potentially direct, like a marionette, the actions of
16 the Swap counterparties, and I understand --
17 A. Right.
18 Q. -- that you're not agreeing with that --
19 A. Right.
20 Q. -- okay, but if they can --
21 A. Um-hm.
22 Q. -- they're a potential party that you can go negotiate
23 with to play off against the Swap counterparties,
24 correct?
25    MR. SHUMAKER: Objection, calls for

Page 91

1 speculation.
2 A. Yeah, here again, I mean if that happened, possibly,
3 but that's a speculative question, so I'm going stay
4 away from it.
5    BY MR. HACKNEY:
6 Q. It is speculation, but it's logical --
7 A. As I said in my answer, a rational person would make
8 that --
9 Q. Yeah.
10 A. If you were put in a corner, you'd have to find some
11 way out, and negotiation might be one of those
12 sources, but to the extent your question is also
13 speculation, I'm going to defer from answering.
14 Q. Do you agree that the insurers are entitled to control
15 all of the actions of the Swap counterparties; it
16 raises the risk that the deal negotiated in the
17 forbearance agreement may be for naught?
18    MR. SHUMAKER: Objection, calls for
19 speculation.
20 A. Yeah, here again, maybe not.
21    BY MR. HACKNEY:
22 Q. Those are things you haven't -- you haven't considered
23 prior to today, fair statement?
24 A. That's a fair statement.
25 Q. Okay. Have you ever heard the phrase "play both ends

Page 92

1 against the middle"?
2 A. Oh, have I ever heard the phrase?
3 Q. Yes.
4 A. Yes.
5 Q. You're a bankruptcy lawyer, right?
6 A. Yes.
7 Q. You were, I should say.
8 A. I was.
9 Q. And that's one of the time-honored tricks of
10 bankruptcy negotiation, right, is to play parties off
11 against one another to try and get the best deal?
12 A. I'm not going to call it a trick.
13 Q. Tools.
14 A. Tools, tactics. You know, there -- lawyer, as a
15 negotiator, getting a yes, discussing a number of
16 different alternatives.
17 Q. And one of them is playing off both ends against the
18 middle?
19 A. Could be. People do that all -- outside of legal
20 issues, they do that in negotiation.
21 Q. Isn't it true that prior to July 17 the City never
22 engaged in substantive negotiations with Syncora?
23 A. I don't know if that's true. You said July 17th?
24 Q. Yeah. That's the date of the execution of the
25 forbearance agreement.

Page 93

1 A. Right. I don't know if that's true. I believe there
2 were discussions that may have been, but you
3 characterize it as substantive negotiations, so I
4 don't know if that's true.
5 Q. You certainly didn't participate in any substantive
6 negotiations with Syncora, correct?
7 A. Well, I -- you know, you say negotiations. I know
8 there were a series of letters going back and forth
9 and I know that there was a letter -- I just don't
10 recall when I sent it -- to Mr. LeBlanc that said if
11 you want to have serious negotiations, then let's have
12 a discussion, but let's stop sending these letters
13 back and forth.
14 Q. But isn't it your position that there were no serious
15 negotiations with Syncora because Syncora would not
16 make a proposal?
17 A. I believe in one of those letters I expressed that
18 concern, yes.
19 Q. And to your knowledge Syncora never made a proposal to
20 the City of Detroit prior to July 17th, correct?
21 A. Yeah, I believe there was a discussion -- well, there
22 was discussion about an exchange of NDAs, and Syncora
23 said they wanted to make a proposal, but they first
24 wanted to see the proposal from the Swap
25 counterparties, and I believe in one of my letters to

Page 94

1 Mr. LeBlanc, I said well, the parties need to sign a
2 NDA, and my understanding was Syncora declined to do
3 that.
4    MR. HACKNEY: Let's actually take a break
5 right now in light of the videotape and maybe we can
6 use it as a chance to stretch our legs and use the
7 restroom.
8    VIDEO TECHNICIAN: The time is 10:04 a.m.
9 This marks the end of tape number 1. We are off the
10 record.
11    (Recess taken at 10:04 a.m.)
12    (Back on the record at 10:14 a.m.)
13    VIDEO TECHNICIAN: We are back on the
14 record at 10:14 a.m. This marks the beginning of tape
15 number 2.
16    BY MR. HACKNEY:
17 Q. Mr. Orr, I kind of want to cut through this with
18 Syncora. I understand that there were letters back
19 and forth between you and Syncora.
20 A. Yes.
21 Q. But I just want to make clear for the record that
22 there were not substantive negotiations of the type
23 that you engaged in with the Swap counterparties with
24 Syncora about an alternative proposal to the
25 forbearance agreement prior to its execution on

Page 95

1 July 17th, correct?
2 A. I believe -- July 17th?
3 Q. (Nods head).
4 A. I believe that's true. As I said, I think there was
5 some discussion about a potential offer from Syncora,
6 but I believe that got caught up in the NDA issue and
7 that went away, so yes, I believe that's true.
8 Q. And your recollection in the NDA issue is that the
9 City wanted an NDA, but Syncora wouldn't sign it?
10 A. My recollection -- no. My recollection was the City
11 needed an NDA because we were asking all parties --
12 nondisclosure agreement, we were asking all parties to
13 sign them. There was some discussion -- I put in a
14 letter, I seem to recall, that Syncora sign one, but I
15 don't want to speculate or mischaracterize. There
16 were some discussion about a NDA before Syncora would
17 show us their proposal and something about they wanted
18 to see the Swap counterparties' proposal before
19 signing an NDA first or something along those lines.
20 Q. You're not aware of any situation where the City
21 refused to sign an NDA with Syncora, correct?
22 A. No, not that I'm aware of.
23 Q. In fact, it was the City that wanted an NDA with
24 Syncora?
25 A. Yes. I believe that's true.

Page 96

1 Q. And it's also true that you did not engage in
2 substantive negotiations with FGIC about an
3 alternative to the forbearance agreement prior to
4 July 17th, correct?
5 A. Yeah, with regard to the issue of substantive, I'll --
6 I'll, you know, caution that I'm not -- I'm not
7 necessarily characterizing, but to the best of my
8 knowledge, that's a fair characterization.
9 Q. You didn't make a proposal about an alternative to
10 FIGC and FIGC didn't make one to you.
11 A. Yes, to the best of my knowledge, that's true.
12 Q. And that's also true with respect to Syncora, correct?
13 A. Yes, that's true.
14 Q. Now, I think you've testified previously that no
15 proposal was forthcoming from Syncora in connection
16 with the TRO proceedings.
17 A. Okay.
18 Q. I'll just represent that to you --
19 A. Okay.
20 Q. -- as a way of --
21 A. Yeah. In one of my affidavits --
22 Q. That's right.
23 A. -- or something, yeah.
24 Q. Were you aware that Mr. Buckfire had had a
25 conversation with Todd Snyder of Syncora?

Page 97

1  A. As I said, there were -- you know, during this --
2  there were many conversations that were going back and
3  forth and I wasn't necessarily aware of all of them.
4  I knew they were -- they were going back and forth,
5  but it is -- if that's true, it wouldn't surprise me.
6  Q. So you don't remember it as you sit here today?
7  A. No, I do not.
8  Q. Okay. Because this was in the -- this was in the
9  period of where the cash was being trapped.
10 A. Right. But, sir, here again, there were so many -- so
11 many discussions going back and forth about so many
12 things. I mean in this period we were dealing with
13 the June 10th meeting, the June 14th creditor's
14 presentation, trying to do the Swap settlement, the
15 run up to my quarterly report. There were just --
16 there were a lot of conversations about a lot of
17 things. I simply don't remember.
18 Q. Okay. And I take it you don't recall that Mr. --
19 whether Mr. Buckfire told you that Syncora had
20 described to him the general structure of a proposal
21 it wanted to make?
22 A. He may have. I just don't recall it.
23 Q. Okay. It's true, isn't it, that as of the date of the
24 execution of the forbearance agreement, your office
25 had received multiple calls from Claude LeBlanc at

Page 98

1  Syncora, correct?
2  A. I'm not aware of that. There may have been multiple
3  calls, but I'm not aware -- I received no calls.
4  Q. Okay. So you don't -- I take it your secretary --
5  A. My office may have. Yeah, my secretary may have, but
6  I didn't.
7  Q. So you don't know whether he called you or not?
8  A. If you're representing to me that he did, I have no
9  reason to believe that that's untrue.
10 Q. Okay. And I take it you have never called personally
11 Mr. LeBlanc --
12 A. No.
13 Q. -- isn't that correct?
14 A. No, I don't think so.
15 Q. So you didn't return those calls if they were made?
16 A. No.
17 Q. I just want -- I guess I -- the City has entered into
18 numerous nondisclosure agreements --
19 A. Right.
20 Q. -- in these cases, correct?
21 A. Yes.
22 Q. I mean has it entered into hundreds?
23 A. I don't know. I don't -- I don't operate the data
24 room or any others, but I suspect there's certainly
25 many.

Page 99

1  Q. We can say that there are lots.
2  A. There are lots.
3  Q. Okay.
4  A. Okay.
5  Q. And there's no reason you can think of today that the
6  City wouldn't enter into one with Syncora.
7  A. No.
8  Q. Were you aware that Syncora wanted a nondisclosure
9  agreement so that it could make a proposal that would
10 be an alternative to the Swap counterparties?
11 A. As I said, I believe I have a letter that discusses
12 the NDA issue, but it was caught up in something
13 related to Syncora -- as I understood it, Syncora
14 wanting to see the Swap counterparty proposal first
15 prior to entering an NDA.
16 Q. Did you ever hear that Syncora had gotten over that
17 issue and was now willing to just make a proposal to
18 the City?
19 A. No.
20 Q. So no one ever told you that?
21 A. No, I don't recall ever hearing that.
22 Q. Okay. Would that have been significant to you if you
23 heard that?
24     MR. SHUMAKER: Objection, calls for
25 speculation.

Page 100

1  A. Yeah. Here again, it depends upon what point in time,
2  if we were already bound by the definitive term sheet
3  and then -- or the agreement, I believe the
4  forbearance agreement has an obligation we cooperate
5  with Swap counterparties, so it wouldn't have mat --
6  no, it would not have mattered at that time, so it
7  depends on when that would have occurred.
8      BY MR. HACKNEY:
9  Q. But if it was prior to July 17th, if there were any
10 parties that were out there that thought they had a
11 good deal for the City, that would have been something
12 you wanted to know?
13 A. We are always willing to listen to parties that think
14 they have a good deal for the City.
15 Q. Isn't it true that the City's decision to enter into
16 the forbearance agreement was made by you, in your
17 role as emergency manager?
18 A. Yes, after consultation with my -- with my employees,
19 staff and consultants, yes.
20 Q. And when did you make that decision?
21 A. To enter into the actual agreement?
22 Q. Yes.
23 A. The day I signed it.
24 Q. July 15th, 2013?
25 A. I believe so, yes.

Page 101

1  Q. And what advisors did you rely upon in making this
2  decision?
3  A. My attorneys, Mill -- my investment banker, Miller
4  Buckfire; our accountants, Ernst & Young; virtually --
5  virtually -- Conway McKenzie, our operational advisor,
6  virtually all of them.
7  Q. All of your third party advisors?
8  A. Yes, yes.
9  Q. And anyone else that you relied upon in making the
10 decision?
11 A. Oh, probably members of my immediate staff such as my
12 senior advisor, chief of staff, but less so. More of
13 my outside third party advisors.
14 Q. What documents did you rely upon in making the
15 decision, if any?
16 A. We looked at a number of -- the term sheet, the actual
17 draft of the forbearance agreement. There may have
18 been some e-mails. I just recall a lot of telephone
19 calls. There may have been some forecast, cash
20 forecast, and actuals, and some of the public reports
21 I had issued regarding our cash position.
22 Q. Any other documents you can remember considering as
23 part of this decision to enter into the forbearance
24 agreement?
25 A. There may have been correspondence. As I said, there

Page 102

1  were letters that were exchanged between Mr. LeBlanc
2  and myself, and others, the letter you showed me
3  today. I'm just trying to capture the universe of
4  what would have been included, but any -- any and all
5  documents related to this that I would have seen would
6  probably fall under that characterization.
7  Q. Any legal memoranda from Jones Day that you considered
8  in making this decision?
9  A. Yes, probably.
10 Q. Okay. Written legal memoranda that you reviewed?
11 A. Yeah, including e-mails. Yeah.
12 Q. Now, did you take time to familiarize -- to
13 familiarize yourself with any of the legal documents
14 relating to the COPs Swap structure in connection with
15 your decision to execute the forbearance agreement?
16 A. I relied -- I may have seen them, but I relied upon
17 consultation with my counsel and investment bankers.
18 Q. The documents I'm referring to are -- can we agree
19 they're relatively complicated legal documents?
20 A. Yeah, I'd say they're not simple documents. It's not
21 a -- you know, an auto purchase contract, yeah.
22 Q. Right. So can I fairly characterize that -- that you
23 may have looked at the documents, but you didn't
24 attempt to master -- master them in terms of their
25 legal ins and outs?

Page 103

1  A. Yeah. That's a --
2     MR. SHUMAKER: Object to form.
3  A. That's a fair characterization. As I said, I'm trying
4  to stay away from acting as an attorney in this job.
5     BY MR. HACKNEY:
6  Q. Okay.
7  A. For a number of reasons.
8  Q. So you relied on your advisors to explain to you how
9  the COP Swap agreements worked?
10 A. Yes.
11 Q. And you also relied on them to explain to you how the
12 COP Swap agreements worked in conjunction with the
13 forbearance agreement that you were about to execute?
14    MR. JURGENS: Object to form.
15 A. Yes.
16    BY MR. HACKNEY:
17 Q. So what is the relationship between the forbearance
18 agreement and the COPs Swap structure?
19 A. Well, my understanding is that the forbearance
20 agreement is related to the Swaps structure, but that
21 the COPs structure is unrelated.
22 Q. Okay. So the forbearance agreement is part of the
23 same subject matter as the collateral agreement and
24 the Swaps agreement, but not the COPs part of the
25 structure?

Page 104

1  A. That's my understanding.
2  Q. Okay. In your legal career, have you come across the
3  concept of the idea that two different contracts can
4  be part of one integrated transaction?
5  A. Sure. Yes.
6  Q. You're familiar with that as an idea?
7  A. Oh, yeah, sure.
8  Q. Okay. What do you understand that to mean?
9     MR. SHUMAKER: Objection, form.
10 A. There are a number of ways that two different
11 documents were -- may refer to the other, as simple as
12 attachments, exhibits, the master -- the master
13 service agreement on a loan, for instance. There are
14 a number of ways that one document can relate to
15 another as explicitly expressed and intended.
16    BY MR. HACKNEY:
17 Q. Yeah, and I know this is a -- you know, we're not
18 talking about was the stoplight red or green here, but
19 you are also a lawyer with a relatively --
20 A. I was.
21 Q. -- sophisticated clientele and experience?
22 A. Well --
23 Q. You understand the idea that two different contracts
24 can form part of one larger agreement?
25 A. Oh, sure. Yeah.