# Exhibit 6C
# Excerpts of Deposition of Kenneth Buckfire

Page 133

1 A. Correct.
2 Q. So, you felt like we had some time to negotiate?
3 A. That's correct.
4 Q. Yeah. Your understanding is that the legal
5 negotiations of the forbearance agreement were
6 complicated but that they proceeded uninterrupted from
7 June 11th to July 15th, correct?
8 A. Correct.
9 Q. And if there had been a serious interruption in these
10 negotiations, you would have likely known about this
11 as an important advisor to the City, correct?
12 A. Yes.
13 Q. And you are aware of no serious interruption, correct?
14 A. No.
15 Q. That's not correct?
16 A. I'm not aware of any serious interruptions.
17 Q. In late June of 2013 you learned that Syncora wanted
18 to make a proposal to the City, isn't that correct?
19 A. Yes.
20 Q. And you had a conversation with Todd Snyder on the
21 subject of Syncora's potential proposal on Saturday,
22 June 29th, isn't that correct?
23 A. That's correct.
24 Q. Mr. Snyder you understood is a banker at Rothschild's,
25 correct?

Page 134

1 A. Correct.
2 Q. And you also understood that he was representing
3 Syncora, correct?
4 A. Yes.
5 Q. And you also understood that at the time that he was
6 calling you, that there had been previous
7 communications between counsel to Syncora and counsel
8 to the City, correct?
9 A. I had heard about it but I wasn't aware of the
10 specifics.
11 Q. Okay. So, you knew Jones Day and Kirkland and maybe
12 others had met and talked about something but you
13 didn't know what it was?
14 A. I knew they were talking about the issues raised by
15 Syncora.
16 Q. Okay. Now, tell me -- so, in terms of Syncora's
17 potential proposal, your first percipient knowledge of
18 it as a witness happens on that Saturday when you have
19 your conversation with Mr. Snyder, is that a fair
20 statement?
21 A. Correct.
22 Q. Tell me everything you can recall about that
23 conversation.
24 A. It was quite brief. Todd told me he had been retained
25 by Syncora and that they wanted to propose something

Page 135

1 that would be of benefit to the City in resolving the
2 Swap matter. I told him that we were always willing
3 to listen to anything anyone had to say and I asked
4 him to tell me what he had in mind. He never did.
5 Q. Have you told me everything you can recall about that
6 conversation?
7 A. Yes.
8 Q. During that conversation didn't Mr. Snyder describe
9 the general structure of a proposal Syncora wanted to
10 make?
11 A. No.
12 Q. So, if Mr. Snyder says he did, he's lying or mistaken?
13 A. He never made a specific proposal to me.
14 Q. I'm not saying a specific proposal, I'm saying a
15 general structure of a proposal, that's what he
16 testified to in his affidavit.
17    Did he provide to you the general structure
18 of a proposal that Syncora wanted to make?
19 A. Not that I recall.
20 Q. Possible he did, possible he didn't, you just can't
21 remember?
22 A. I can't remember.
23 Q. Did he tell you that we'd be able to put specifics
24 into the general structure of the proposal if we could
25 execute an NDA that would allow us to learn about the

Page 136

1 negotiations with the Swap counterparties?
2 A. Yes, he did.
3 Q. What did you tell him in response to that?
4 A. I said he should send us an NDA and we'll take a look
5 at it.
6 ==Q. And you understood that at least as he expressed to==
7 ==you that he wanted an NDA as a precursor in order to==
8 ==make a specific proposal, correct?==
9 ==A. Correct.==
10 ==Q. Isn't it true that after that time you understood that==
11 ==an NDA was proposed to the City, correct?==
12 ==A. Yes.==
13 ==Q. And the City refused to execute that NDA, isn't that==
14 ==correct?==
15 ==A. That's correct.==
16 Q. Do you have information about why the City refused to
17 execute it?
18 A. Well, as I recall the NDA was not with the City, it
19 was meant to be with Miller Buckfire and Jones Day and
20 we would not be able to disclose whatever they told us
21 to the City which made no sense, and that was the
22 reason we couldn't sign that NDA and that's why I
23 testified earlier he didn't really tell me a proposal,
24 he said I'd like to make a proposal. He said I'll
25 tell you the proposal if you sign the NDA. So we

Page 137

1  never got a proposal.
2  Q. I want to make that clear that's subject to you saying
3  you don't remember whether he provided the general
4  outlines of the structure or not, correct?
5  A. No.
6  MR. CULLEN: Objection. Foundation. I
7  don't know what general --
8  MR. HACKNEY: Foundation?
9  MR. CULLEN: Yeah, general outline is my
10 problem.
11 A. I can't recall him telling me anything about what he
12 was going to propose and certainly wasn't specific.
13 If he had been specific, I probably would remember it.
14    BY MR. HACKNEY:
15 Q. And that's because -- but you do remember him telling
16 you the specifics would come after we sign an NDA?
17 A. I do.
18 Q. Yeah. And then your understanding is that there was a
19 problem with the NDA that you couldn't discuss the
20 proposal with the EFM?
21 A. That's correct.
22 Q. And that was something that the parties couldn't get
23 over?
24 A. I asked Jones Day to go back to Kirkland Ellis and try
25 to fix the problems we had in the NDA and then I moved

Page 138

1  on to other issues.
2  Q. And your understanding was that to the extent those
3  problems didn't get fixed it was because Kirkland
4  Ellis was being obstinate with respect to the terms of
5  NDA?
6  A. I don't know why we never resolved it.
7  Q. So, to this day you don't know whether or not an NDA
8  could have been struck that would have allowed Syncora
9  to make a rival proposal, correct?
10 A. All I can tell you is that no NDA was entered into
11 because the terms were unacceptable.
12 Q. And you don't know why one wasn't entered into
13 ultimately after that?
14 A. I don't think we could ever resolve the issues.
15 Q. And this was in advance of your having executed the
16 forbearance agreement, correct?
17 A. Yes.
18 Q. As a negotiator, don't you agree that it's nice
19 whenever you can play two parties off against each
20 other?
21 A. I didn't have two parties, I had one party. I had the
22 Swap counterparties.
23 Q. And I'm not asking about in this case, I'm asking
24 about as a general principle, isn't it nice when you
25 can play two parties off against each other?

Page 139

1  A. Sometimes.
2  Q. Isn't that something that you'll do in the DIP
3  financing which is you'll get all these offers in and
4  then you'll make these guys compete with each other in
5  order to drive best possible deal for the City,
6  correct?
7  A. Only if you assume a level playing field which this
8  negotiation was not.
9  Q. I'm just asking generally about the idea of trying to
10 drive the best deal possible through competition
11 amongst different negotiating parties. Can be
12 valuable, right?
13 A. Can be under the right circumstances. This was not
14 one of them.
15 Q. And what was wrong about the circumstances?
16 A. Because we had only two parties to the table, the Swap
17 counterparties who had signed the collateral
18 agreement. There was nobody else to negotiate with.
19 Q. That's right, that's right, because your understanding
20 was that Syncora had no rights whatsoever under the
21 collateral agreement, correct?
22 A. Correct.
23 Q. And your understanding was they had no ability to
24 direct the actions of the Swap counterparties,
25 correct?

Page 140

1  A. I testified earlier that my understanding, I was
2  advised, the only parties of interest here are the
3  Swap counterparties.
4  Q. And it was also your understanding that Syncora didn't
5  have any rights under the Swaps that would be
6  terminated, correct?
7  A. Only talking about the collateral agreement.
8  Q. We talked about the fact that there might be a
9  termination event for four hundred million dollars.
10 That's not under the collateral agreement, right?
11 A. True.
12 Q. So, we are talking about the Swaps, right?
13 A. Yes.
14 Q. Now, let's put aside what you've been told about who
15 the relevant parties were. You did know that Syncora
16 was a Swap insurer, right?
17 A. Yes.
18 Q. And you understood as a layperson but a sophisticated
19 one that if an insurer makes a payment to the insured
20 it becomes subrogated to the rights of the insured
21 with respect to that payment, correct?
22 A. Yes.
23 Q. And isn't it true that if the Swap counterparties had
24 terminated, they wouldn't have waited around for two
25 years to collect the casino revenues, right, they