<u>**Exhibit 6A**</u>

**Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr**

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**

```
10:24   Q.   Mr. Orr, good morning.
   25   A.   Good morning.
```

**Designation:**

```
11:13   Q.   If I ask a question that isn't clear, will you ask me
   14        to rephrase it?
   15   A.   Yes.
   16   Q.   And if I ask a question and you answer it, I'm going
   17        to assume that you understood it; is that fair?
   18   A.   Yes.
   19   Q.   Mr. Orr, in the course of negotiating and executing
   20        the forbearance agreement, did you receive legal
   21        advice?
   22   A.   Yes.  The forbearance and the optional payment
   23        agreement?
   24   Q.   That's right.
   25   A.   And we'll refer to that as forbearance agreement going
12: 1        forward?
    2   Q.   I was going to call it that because it's shorter, if
    3        that's okay.
    4   A.   Sure.  That's fine.
    5   Q.   But you're right.  That's what I mean.
    6   A.   Yes.  Yes, I did receive legal advice.
    7   Q.   And did you receive legal advice from the City's law
    8        department on the subject?
    9   A.   I don't recall.  I don't think so.
   10   Q.   Did you receive legal advice from Jones Day on the
   11        subject?
   12   A.   Yes, among others.
   13   Q.   And I take it that you relied on the legal advice you
   14        received in making the decision to execute the
   15        forbearance agreement?
   16   A.   Legal advice and business advice from our consultants,
   17        yes.
   18   Q.   Who were the others that you obtained legal advice
   19        from?
   20   A.   May have obtained legal advice from our local counsel.
   21   Q.   Ah, yes.
   22   A.   And in fact I said I don't recall if I obtained any
   23        legal advice from the corporation counsel's office.  I
   24        just don't recall, so I'm not going to speculate.
   25   Q.   Three possible.  You know you got legal advice from
13: 1        Jones Day.
    2   A.   Absolutely.
    3   Q.   You may have or did from local counsel.
    4   A.   Yes.
    5   Q.   And you can't recall whether you did from the City's
    6        law department.
    7   A.   Yes.
    8   Q.   Are you waiving the attorney-client privilege in
    9        connection with the motion to assume the forbearance
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
10        agreement?
11                MR. SHUMAKER:  Objection, could call for
12        the revelation of attorney-client communication.
13                You can answer the question, but yes or no.
14    A.   No.
15    BY MR. HACKNEY:
16    Q.   If I ask you questions regarding the legal advice
17        rendered to you in connection with the forbearance
18        agreement's negotiation or execution, you will refuse
19        to answer those questions on the grounds of the
20        attorney-client privilege; is that correct?
21                MR. SHUMAKER:  If you're asking what the
22        advice is, certainly.  The communications between
23        counsel and what he was -- what he was advised on,
24        certainly.
25                THE WITNESS:  Right.
14: 1 BY MR. HACKNEY:
2     Q.   Okay.  That's correct?
3     A.   Yes.  That is correct.
4     Q.   So if I ask you what your view is on the likelihood
5        that the City's Swap and validity arguments will
6        prevail, you will assert the attorney-client
7        privilege; is that correct?
8     A.   Yes, more than likely.
9     Q.   If I ask you your view on the likelihood that the
10        pledge of the gaming revenues under the Michigan
11        Gaming Act is an invalid pledge, you'll assert the
12        attorney-client privilege, correct?
13    A.   Yes, more than likely.
14    Q.   If I ask you questions regarding the likelihood that
15        the City would prevail on a claim or defense against
16        the Swap counterparties, you'll assert the
17        attorney-client privilege, correct?
18    A.   Yes, more than likely.
19    Q.   And I guess I gotta clarify.  When you say more than
20        likely, I mean are you asserting the privilege with
21        respect to those types of questions?  I'm trying to
22        save having to --
23    A.   Sure.
24                MR. SHUMAKER:  Let me state for the record
25        you can ask questions as to whether those -- those
15: 1        factors were considered by Mr. Orr, but obviously if
2        you're going to ask what he was -- what he was advised
3        by counsel, then I'm going to instruct him not to
4        answer.
5     A.   When I say more than likely, that's -- that's exactly
6        the distinction that I'm trying to make.  Did I have
7        discussions with my counsel?  Yes.  Did those
8        discussions take into consideration some of those
9        factors?  Yes.  Am I going to tell you what those
10        discussions were and what, if any, conclusions were
11        made?  No.
12    BY MR. HACKNEY:
13    Q.   Okay.  Fair enough.
14                On July 15, 2013, the City entered into
15        what we're going to call the forbearance agreement
```

```
16          with the Swap counterparties and the service
17          corporations; is that correct?
18    A.    Yes.
```

**Designation:**
```
15:25 Q.    Well, let me -- let me ask it a different way, which
16: 1       is isn't it true that Mr. Buckfire was the lead
   2        negotiator for the City on the business terms of what
   3        became the forbearance agreement?
   4    A.  Yes.
   5    Q.  And Mr. Buckfire has testified that the negotiations
   6        in earnest regarding what became the forbearance
   7        agreement were conducted between June 4th and
   8        June 11th of 2013?
   9    A.  I don't recall those specific dates, but I think
  10        that's the right time frame.  Let me -- let me try to
  11        be as clear as I can so we can move on.  We began
  12        talking, discussing ways with my advisors, without
  13        discussing what we discussed, to provide the City with
  14        liquidity almost immediately upon my appointment.  The
  15        negotiations that you're referring to I believe did
  16        occur within that time frame.
```

**Designation:**
```
16:23 Q.    And as he was the lead negotiator, he's probably the
  24        guy who would know, right?
  25    A.  Sure, absolutely.
```

**Designation:**
```
18:14 Q.    If Mr. Buckfire testified there was an agreement in
  15        principle by June 11th of 2013, does that sound
  16        correct to you?
  17    A.  Yes, the second -- yes.  Yes, it does.
```

**Designation:**
```
20:11 Q.    Would you agree that, notwithstanding your involvement
  12        in these calls with the Swap counterparties, it's
  13        still fair to characterize Mr. Buckfire --
  14    A.  Yes.
  15    Q.  -- as the lead negotiator for the City?
  16    A.  Yes.
```

**Designation:**
```
20:17 Q.    Using Mr. Buckfire's recollection of June 4th as kind
  18        of the kickoff of these negotiations which you don't
  19        have a basis to --
  20    A.  No.
  21    Q.  -- contradict --
  22    A.  Not at all.
  23    Q.  -- I'd like to kind of level set where you were at
  24        going in to June 4th.  Okay?
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
    25                    Your assumption prior to June 4th was that
21: 1          the Swap counterparties could unilaterally --
     2          unilaterally terminate the Swap, correct?
     4    A.   Well, my understanding was the City -- there were a
     5          series of events which put the City in default.  The
     6          consent agreement prior to my appointment, the consent
     7          agreement, the declaration of a financial emergency,
     8          my appointment was an event of default.  My
     9          understanding was that due to those multiple events of
    10          default, the counterparties had the ability to
    11          exercise their rights and deprive the City of much
    12          needed casino revenue.
    14    Q.   We'll get to the casino revenue in a moment which is
    15          something that's trapped under -- potentially trapped
    16          under the collateral agreement, right?
    17    A.   Right.
    18    Q.   I want to talk about the Swap agreement which can lead
    19          to a large termination payment --
    20    A.   Yes.
    21    Q.   -- that the service corporations might owe.
    22    A.   Yes.
    23    Q.   And you understand the distinction between those two
    24          documents --
    25    A.   Yes.
22: 1    Q.   -- right?
     2    A.   Um-hm.
     3    Q.   And your assumptions prior to the June 4th meeting
     4          were that as a result of these events of default under
     5          the Swap that occurred, some of them, prior to your
     6          appointment --
     7    A.   Yes.
     8    Q.   -- that the Swap counterparties could unilaterally
     9          terminate the Swap and demand a sizable payment from
    10          the service corporations, correct?
    12    A.   Yeah, my assumption was, my understanding was that,
    13          yes, they could terminate and demand a sizable
    14          payment, whether from the service corporations or
    15          eventually from the City.  It would hit our bottom
    16          line, yes.
    18    Q.   That's right because it ripples --
    19    A.   Yes.
    20    Q.   -- through the service corporations to the City by the
    21          service agreements, right?
    22    A.   Yeah.
    24    A.   If that is in fact the process, yes.
23: 1    Q.   Now, another one of your assumptions prior to June 4
     2          was that the Swap counterparties could also
     3          unilaterally trap cash under the collateral agreement,
     4          right?
     7    A.   My understanding was that the Swap counterparties
     8          could instruct the custodian to exercise their rights
     9          to trap cash.
    11    Q.   And that was one of the rights that they had as you
    12          were going into the negotiations with them, correct?
    15    A.   My understanding -- yes.  My understanding was that
    16          they had that right.
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
18   Q.   That's why you were negotiating with them, right?
19   A.   My -- we were negotiating with them to make sure that
20        the City had access to the revenue that it needed
21        quite badly and that the City would not suffer the
22        imposition of a fairly significant termination
23        payment.
24   Q.   Now, another one of your assumptions prior to June 4
25        was that no other party could stop the Swap
24: 1     counterparties from either terminating the Swaps or
2         trapping cash, correct?
4    A.   Yeah, my assumption was -- or, rather, my
5         understanding was that the Swap counterparties had
6         certain rights and that they had the ability to
7         exercise those rights and remedies.  Whether another
8         party could, quote-unquote, stop them could depend on
9         a number of different factors.
```

**Designation:**

```
25:10  Q.   Okay.  Now, I want to also get a level set on your
11          objectives going into the negotiations, and I
12          understand that when I say you, I mean the City,
13          Mr. Buckfire, there are multiple parts --
14     A.   My -- my team --
15     Q.   That's right.
16     A.   -- consultants.
```

**Designation:**

```
26: 8  Q.   Now, I'd like to ask about your objectives as you go
9           into the negotiation.  Okay?
10     A.   Um-hm.
11     Q.   You understand that when you go into a negotiation
12          it's important to have an understanding of both the
13          financial realities that your party is -- is facing as
14          well as the legal realities that your party's facing,
15          correct?
16     A.   Yes.
17     Q.   That informs the negotiation, right?
18     A.   In making an informed decision, I would say you want
19          to have an understanding of those factors.
20     Q.   And you also want to understand what your counterparty
21          in the negotiation needs and wants are as well as
22          their potential legal rights, right?
23     A.   What your counterparty negotiations perceived needs
24          and rights are.
25     Q.   That's right.  That's right.
27: 1           Now, I'm going to ask about the City's
2           objectives in entering into the negotiations.  Okay?
3           Objective one of the City was to get the
4           counterparties to waive their cash trap at least on an
5           interim basis to allow the City access to casino
6           revenues, correct?
7      A.   I don't know if I would characterize it as objective
8           one.  It wasn't as if we were trying to prioritize one
9           objective over the other.  It was an objective to make
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
10        sure that the cash did not get trapped.
11   Q.   Okay.  So that was one of the objectives.
12   A.   Yes.
13   Q.   A second objective was that you wanted to modify the
14        Swap to get a discount on the termination amount,
15        correct?
16   A.   Yes.  That was certainly an objective, yes.
17   Q.   Okay.
21   Q.   And the third was that you wanted to obtain an option
22        about when you could direct the termination of the
23        Swap, correct?
28: 1 A.  Here again, I understand your characterization.  I'm
2         going to say that that -- that is a fair
3         characterization without trying to quantify as one
4         objective is more important than the others, and let
5         me explain my answer.
```

**Designation:**

```
28:25 Q.  And I don't mean to order them, but -- so I won't
29: 1     focus on it.  I just gave you them in an --
2    A.   Sure.
3    Q.   -- order.
4    A.   Right.
5    Q.   But those were three objectives of your negotiations,
6         correct?
7    A.   I think it's fair to say that.
8    Q.   And you achieved those three objectives in the
9         forbearance agreement, correct?
10   A.   We believe so.
```

**Designation:**

```
32: 7 Q.  So did Mr. Buckfire have authorization to make a
8         formal proposal in the first meeting?
9    A.   Yes.
10   Q.   And to your knowledge did he make one?
11   A.   I believe so.
12   Q.   What was the proposal?
13   A.   I don't remember what the exact number was, but I
14        believe the concepts were consistent throughout.
```

**Designation:**

```
33: 5 Q.  And do you remember whether they countered?
6    A.   I don't remember specifically.  I believe they may
7         have.
8    Q.   Okay.  Do you know the terms of their counter?
9    A.   Generally in the same concept I said.  If you're
10        looking for a number, for instance, we said 50 percent
11        and they came back with 98.  I don't recall those
12        specifics.
13   Q.   So you can't give me the bid and the ask --
14   A.   Yeah.
15   Q.   -- on what the Swap would be modified as far as the
16        termination?
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
17   A.   Yes, that's correct.
```

**Designation:**
```
33:21   Q.   Did the City enter into a nondisclosure agreement in
   22        connection with these negotiations?
   23   A.   Yes, I believe so.
   24   Q.   With the Swap counterparties?
   25   A.   Yes.
```

**Designation:**
```
35:18   Q.   Is it fair to say that if I ask you for the specific
   19        ebb and flow of the negotiations between the Swap
   20        counterparties in terms of the precise business
   21        deal --
   22   A.   Right.
   23   Q.   -- you would have to defer to Mr. Buckfire's
   24        recollection because he was more intimately involved?
   25   A.   That's fair.  Because Ken was -- Ken would have the
36: 1        direct meetings and then call me back.  We'd go back
    2        and forth, and I didn't keep notes and I didn't keep a
    3        calendar, so --
```

**Designation:**
```
36:20   Q.   Mr. Orr, I want to clear something up.  Maybe I've
   21        been saying it the wrong way.  I've been using the
   22        term "marching orders" with the respect to the way
   23        that you and Mr. Buckfire operated.
   24   A.   Right.
   25   Q.   And is a better way to say it that you authorized
37: 1        Mr. Buckfire to negotiate the best possible deal he
    2        could with the Swap counterparties and that's what he
    3        did?
    4   A.   That's a fair characterization, sure.
    5   Q.   And at some point did he come out of a meeting and
    6        say, Mr. Orr, this is the best deal that I'm able to
    7        get out of these Swap counterparties and it's my
    8        advice that we take it?
    9   A.   Yes.
   10   Q.   And was that on or about June 11th, 2013, which is the
   11        date he recalls the agreement in principle being
   12        reached?
   13   A.   Yes.
```

**Designation:**
```
37:16   Q.   And what was the agreement in principle that was
   17        reached as you understood it?
   18   A.   The agreement was essentially that in exchange for a
   19        reduced optional termination payment -- we'll just
   20        call it the payment under the forbearance agreement --
   21        the Swap counterparties would agree not to trap the
   22        cash, they would agree to release their liens, and
   23        also release their claims, I believe, against your
   24        client, Syncora, and we would have access to that cash
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
    25          going forward provided we made the discounted payment
38: 1          at some point in the future.  I believe at that point
     2          it was in the next 60, 90 days.
     3    Q.    Isn't the -- wasn't the agreement in principle that
     4          you'd have an option to direct the termination of the
     5          Swap?
```

**Designation:**
```
38: 8    A.    Yeah.  I believe the way it works is we would have an
     9          option to request the counterparties exercise their
    10          rights at a discounted level.
```

**Designation:**
```
38:12    Q.    And I'm not asking about the forbearance agreement.
    13          I'm asking about the agreement in principle.
    14    A.    Yeah, I think those were the general confines of the
    15          agreement in principle.
    16    Q.    Okay.  Now, you did not invite anyone else to the
    17          negotiations with the Swap counterparties; isn't that
    18          correct?
    19    A.    I did not invite anyone else.  I don't know if Ken
    20          invited anyone else or anyone else on my behalf
    21          invited anyone else.
    22    Q.    And you did not direct anyone such as Mr. Buckfire or
    23          others to invite any other parties into the
    24          negotiation, correct?
    25    A.    Correct.
39: 1    Q.    And you did not invite Syncora to participate in these
     2          negotiations, correct?
     3    A.    Correct.
     4    Q.    And you did not inform Syncora of the existence of
     5          these negotiations, correct?
     6    A.    The reason I'm hesitating is at some point clearly
     7          Syncora became aware, so I don't know how they were
     8          informed, but I did not do it, correct.
     9    Q.    You didn't do it.
    10    A.    Correct.
    11    Q.    And you did not invite FGIC to attend these
    12          negotiations, correct?
    13    A.    I believe that's correct.
    14    Q.    And you didn't direct anyone acting on your behalf to
    15          invite FGIC, correct?
    16    A.    Correct.
    17    Q.    Nor did you inform FGIC of the existence of these
    18          negotiations, correct?
    19    A.    Me personally, no.
    20    Q.    You didn't invite U.S. Bank as trustee to the funding
    21          trust or as custodian or contract administrator to
    22          attend any negotiations, correct?
    23    A.    Me personally, no.
    24    Q.    And you didn't direct anyone else acting on your
    25          behalf to do so, correct?
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**

```
40: 1   A.   Correct.
```

**Designation:**

```
40:24   Q.   At any time prior to June 11th, did the Swap
    25        counterparties send a notice of a default under the
41: 1        Swap?
     2   A.   I don't recall, but I don't think so.
     3   Q.   At any time prior to June 11th, did the Swap
     4        counterparties designate an early termination date?
     5   A.   I don't recall, but I don't think so.
     6   Q.   Did they ever threaten to?
     7   A.   They didn't threaten me.
     8   Q.   They never threatened you personally.
     9   A.   Right.
    10   Q.   Did they threaten other people who reported the
    11        threats to you?
    12   A.   Not that I know of.
    13   Q.   At any time during these negotiations, did the Swap
    14        counterparties designate an optional early
    15        termination?
    16   A.   Not that I know of.
    17   Q.   Did they ever threaten to do that?
    18   A.   Not me.
    19   Q.   And did they ever threaten anyone else who reported
    20        the threat to you?
    21   A.   Not to my knowledge, no.
    22   Q.   At any time during these negotiations, did the Swap
    23        counterparties contend that the City was in breach of
    24        the collateral agreement?
    25   A.   Which collateral agreement are you talking about?
42: 1   Q.   The collateral agreement with respect to the casino
     2        revenues.
     3   A.   The 2009 agreement?
     4   Q.   Yes.
     5   A.   Okay.  Not that I recall.
     6   Q.   In fact, the City was endeavoring to make the monthly
     7        Swap payments into the holdback account throughout
     8        this period, correct?
     9   A.   Yes.  They were being paid in the ordinary course.
    10   Q.   And to the best of your knowledge, the City has
    11        complied with all of its obligations under the
    12        collateral agreement vis-à-vis the Swap
    13        counterparties.
    14   A.   No.
    15   Q.   That's not correct?
    16   A.   No, I mean I think we were -- as I said previously
    17        today, we were in default.
    18   Q.   Of the collateral agreement?
    19   A.   Right.  You mean in terms of making the payments due
    20        under the agreement?
    21   Q.   Well, the collateral agreement I know so -- the
    22        collateral agreement and the Swap are -- they are two
    23        different agreements --
    24   A.   Yes.
```

```
     25   Q.   -- that certainly relate to one another.
43: 1    A.   Right.
      2   Q.   I'll say that.
      3   A.   Okay.
      4   Q.   I've talked about events of default under the Swap
      5        that could lead to the big termination payment.
      6   A.   Right.
      7   Q.   We talked about that earlier, right?
      8   A.   Right.
      9   Q.   I'm talking specifically now about whether there were
     10        events of default under the collateral agreement.  Had
     11        you breached any of the provisions of the collateral
     12        agreement?
     15   A.   Yeah.  That's why I'm being a little -- a little
     16        careful here.  There may be conduct under the Swaps
     17        that could be conceivably a breach under collateral
     18        agreement.  I don't know what they are, so I'm being
     19        hesitant.  But to get to your question, were we making
     20        the payments due under the Swaps?  Yes.
     22   Q.   What was -- what was the conduct under the Swap that
     23        might be --
     24   A.   I'm not sure.
     25   Q.   As you sit here today, are you aware of any breaches
44: 1        of the collateral agreement by the City?
      4   A.   None from my perspective, but there might be.  What I
      5        don't want to do is sit here today and try to draw a
      6        conclusion as to what might be a breach of the
      7        collateral agreement vis-a-vis the Swap agreement.
      8        I'm trying to answer your question that we were making
      9        the payments that were due.
     11   Q.   Yeah, I appreciate that.  I mean, I guess your answer
     12        is there may be breaches of the collateral agreement,
     13        there may not be, you don't know.
     14   A.   I don't know, that's right.
     15   Q.   Now, this June 11th agreement in principle that we
     16        were talking about earlier --
     17   A.   Right.
     18   Q.   -- was there a term sheet?
     19   A.   No.  To the best of my recollection, I did not see a
     20        term sheet at that time.
     21   Q.   And just to be clear, do you know whether there was a
     22        term sheet that you just didn't see?
     23   A.   Yeah.  There might have been a term sheet that I
     24        didn't see.  I think Ken and I and some of the other
     25        attorneys at Jones Day, Corinne, David Heiman and
45: 1        others would have a -- I'm trying to relay to you a
      2        sense that we'd have calls, but sometimes I don't
      3        recall seeing a specific term sheet at that time.


Designation:
45:18  Q.   Do you remember whether there was a term sheet?
     19   A.   There eventually was a term sheet.  I just don't
     20        remember whether or not it was on June 11th.
     21   Q.   That's fine.  So do you think it went agreement in
     22        principle, non-binding term sheet, and then
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
 23        negotiation of definitive documents?
 24    A.  Yes.
```

**Designation:**
```
46: 6    Q.  And so at some point you did see a non-binding term
  7          sheet that embodied the agreement in principle
  8          Mr. Buckfire had negotiated, correct?
  9    A.  Yes.  Oh, yes.
```

**Designation:**
```
46:18    Q.  And the term sheet was consistent with the agreement
  19         in principle that we discussed earlier that
  20         Mr. Buckfire negotiated?
  21    A.  Yes.  It had obviously, as terms do, have more
  22         information, but it was consistent.
  23    Q.  So between July 11 -- I'm sorry.
  24             Between June 11th --
  25    A.  Okay.
47: 1    Q.  -- and July 15th, which is the execution date of the
  2          forbearance agreement --
  3    A.  Yes.
  4    Q.  -- you pivot from negotiating this agreement in
  5          principle that Mr. Buckfire has struck to now
  6          documenting it, correct?
  7    A.  Yes.
  8    Q.  Now, Mr. Buckfire has testified that those -- that
  9          those negotiations proceeded without interruption from
  10         June 11th to Ju -- July 15th.  Is that consistent with
  11         your recollection?
  12    A.  The negotiations continued.  I think there were other
  13         events related to the agreement, some of them by your
  14         client in that time frame, but yes, we continued
  15         negotiating.
  16    Q.  Okay.  And there were no serious interruptions in
  17         those negotiations, correct?
  19    A.  There was an agreement reached.  I'm going to take
  20         your time frame, June 11th.  Ken and I had a
  21         discussion about the amount.  It was somewhere south
  22         of 25 percent.  I believe in the same second week I
  23         said we can't do this deal for less than a 25 percent
  24         discount.  I believe the negotiations broke down, then
  25         the next day they came back without changing the
48: 1        framework of the agreement, just the number changed,
  2          the discount went up, and then I believe that -- yes,
  3          I believe negotiations continued continually
  4          throughout that time.
```

**Designation:**
```
48:17    Q.  Were there any serious interruptions in the
  18         negotiations between June 11 and July 15?
  19             MR. SHUMAKER:  Same objection.
  20    A.  You keep saying serious, and to the best of my
  21         knowledge there were no material or significant
  22         interruptions.  I don't want to try to characterize
```

```
23        what serious means.  I think negotiations continued
24        unabated.
```

**Designation:**
```
65:11  Q.  During the course of your negotiations back to the
  12        agreement in principle of what became the forbearance
  13        agreement, did you ever solicit the views of any of
  14        the other monoline insurers, such as Ambac or Assured
  15        or National about what they thought the City should
  16        do?
  17  A.  Not that I recall.
  18  Q.  Did you ever solicit the views of any COP holders
  19        about what they thought the City should do with
  20        respect to the --
  21  A.  I didn't solicit their views, no.
  22  Q.  Did you direct anyone acting on your behalf to solicit
  23        the views of any of those parties?
  24  A.  Not that I recall.
  25  Q.  Isn't it true that getting the forbearance agreement
66: 1        was a life or death issue for the City of Detroit?
   2  A.  Yes, getting the forbearance agreement was very
   3        important to the City of Detroit.
   4  Q.  Is it a life or death issue?
   6  A.  When you say life or death, you know, here again I'm
   7        trying to be responsive, but I want (sic) to
   8        characterize it.  The City needs the casino revenue
   9        badly.  It was cash poor at that time.  It would have
  10        facilitated without access, and it continues to be
  11        relatively cash poor without access.  It could have
  12        facilitated a cash crisis.  Life or death suggests to
  13        me it was critical and it might have been life or
  14        death, but what it does mean is that we could not have
  15        made the investment and cannot make the investment
  16        that is so crucial for the City.
  18  Q.  In fact, isn't it your position that without access to
  19        the casino revenues that people in the City of Detroit
  20        may die?
  21  A.  Yes.
```

**Designation:**
```
71: 3  Q.  Given the importance of this issue, I assume that you
   4        had made requests from the State of Michigan to
   5        provide the City with liquidity prior to June 4th;
   6        isn't that correct?
   7  A.  Sir, you can assume whatever you want.  The reality is
   8        under my contract I have an obligation to report and
   9        coordinate with the State.  We had had discussions, I
  10        believe, with the State about potential liquidity, and
  11        we were told that that would be unavailable.
  12  Q.  And you conveyed to the State the seriousness of the
  13        City's situation, correct?
  14  A.  I don't think I had to convey to the State the
  15        seriousness of the City's situation.  I think the
  16        State's well aware.
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
17   Q.   So the State understood that getting liquidity was a
18        life or death issue for the City of Detroit, correct?
21   A.   Whatever the State understood, what I'm trying to tell
22        you is I conveyed to them what our needs are.
24   Q.   You conveyed the extreme seriousness of the situation
25        to the State, correct?
72: 1 A.   As I said, I don't think I had to convey it to the
2         State.  The State had just been through almost two
3         years of determining a financial emergency existed.
4    Q.   And the State did not provide the City with any
5         liquidity prior to June 4th, correct?
6    A.   No.
7    Q.   I am correct that they didn't?
10   A.   You are correct, they did not.
```

**Designation:**

```
72:25 Q.   And the City owns a fine art collection; isn't that
73: 1     correct?
2    A.   The City owns the Detroit Institute of Arts in its
3         collection.
4    Q.   And did you attempt to value the art collection with
5         an eye towards selling pieces of the art collection to
6         relieve the City's life or death liquidity crisis?
8    A.   Prior to June 14th?
10   Q.   Prior to June 11th, which is the date of the agreement
11        in principle.
12   A.   No.  We've entered into an agreement with Sotheby's to
13        begin that process now, not related to relieving the
14        liquidity crisis, just as a matter of prudence to
15        determine the value of assets.
16   Q.   Your expectation is that the -- that the City's art
17        collection is very valuable; isn't that correct?
18   A.   I've been told that, yes.
19   Q.   Isn't it possible it may be worth billions of dollars?
20   A.   That would be speculation.  I've been told it is
21        valuable.
22   Q.   Could it be worth hundreds of millions of dollars?
23   A.   That would be speculation.  I've been told that it's
24        valuable.
25   Q.   Okay.  So as of June 4th, you didn't know whether or
74: 1     not the City might have billions of dollars of art
2         sitting in its art institute; is that your testimony?
3    A.   No.  My testimony is that I understand it as valuable.
4         The exact value of it is to be determined.
5    Q.   And you made no effort to sell any of that art prior
6         to engaging in the negotiations with the Swap
7         counterparties, correct?
8    A.   No.  That's true.
9    Q.   What about federal aid?  Did you attempt -- did you
10        attempt to obtain federal aid prior to the June 4
11        commencement of negotiations with the Swap
12        counterparties?
13   A.   I don't know if it was prior to or around that time.
14        It may have been.  We may have sought federal aid
15        prior to that.
```

```
16   Q.   And you conveyed the seriousness of the situation to
17        whomever you spoke to at the federal government?
18   A.   Yes, I believe the federal government was aware of the
19        seriousness of the situation.
20   Q.   And the federal government was also unwilling to
21        provide aid to the City of Detroit; is that your
22        testimony?
23   A.   Yes, direct aid.
24   Q.   Let me ask you some questions about the service
25        corporations.  The service corporations are two
75: 1     entities that have long names that I'll only say to
 2        you if you want -- really want me to.
 3   A.   We'll stipulate I know what you mean by the service
 4        corporations.
 5   Q.   And there are two of them?
 6   A.   There are two.
 7   Q.   Okay.
 8   A.   Police and Fire General Services.
 9   Q.   There you go.  So you already know them and you said
10        the names.  So the two service corporations are
11        parties to the forbearance agreement, correct?
12   A.   Yes.
13   Q.   And Mr. Buckfire testified yesterday, I'll represent
14        to you, that his understanding is that you directed
15        the service corporations to execute the forbearance
16        agreement and they did so; is that correct?
17   A.   No.
18   Q.   Okay.  Were there arms' length negotiations with the
19        service corporations?
20   A.   To the best of my knowledge, there was.
21   Q.   And who led those?
22   A.   I'm not quite sure.  I know that -- in response to
23        your question, I did not direct a service corporation.
24        They were organized by the City.  And they are managed
25        by City employees, but I had no direct -- I gave no
76: 1     direct instruction to either of the service
 2        corporations.
 3   Q.   Okay.  So my question was about negotiations with the
 4        service corporations.
 5   A.   Right.
 6   Q.   Who conducted the arms' length negotiations with the
 7        service corporations on behalf of the City?
 8   A.   I'm not sure.
 9   Q.   Well, you know it wasn't you?
10   A.   Yes, it wasn't me.
11   Q.   And did you ever direct Mr. Buckfire to engage in
12        direct negotiations with the service corporations?
13   A.   No.  I directed Mr. Buckfire to do whatever needed to
14        get done to get the agreement in principle resolved
15        and signed.  That's what I did, but I did -- said
16        nothing specific.  Just to be responsive to your
17        question, said oh, go talk to the service
18        corporations, there was nothing that specific.
19   Q.   So to the extent there was a negotiation that needed
20        to be had, it was his job to go have it?
21   A.   It was his or someone else on my -- on my
```

```
22        reorganization team's job, yeah, sure.
23    Q.  Well, did you direct anyone else on your team to go
24        negotiate with the service corporations?
25    A.  No.  Once we reached an agreement in principle, I
77: 1        directed my team to more or less go forth and get it
 2        documented and get it done.
 3    Q.  And the service corporations are legally separate from
 4        the City, correct?
 5    A.  Yes, they are.
 6    Q.  Your powers as emergency financial manager do not
 7        extend to the service corporations, correct?
 8    A.  I haven't examined that question, so I can't answer
 9        you yes or no.
10    Q.  Can you direct their actions under PA 436?
11    A.  I'm not sure.
12    Q.  Do you have any firsthand knowledge that the service
13        corporations engaged in arms' length negotiations with
14        the Swap counterparties?
15    A.  No.
16    Q.  If they had, do you think that's something you would
17        have likely heard about?
20    A.  I may have.  As emergency manager, there are a number
21        of things that occur, as you might imagine, on a daily
22        basis that I may or may not hear of.  I might have.
24    Q.  As you sit here today, though, can you recall hearing
25        that there were ongoing negotiations between the
78: 1        service corporations and the Swap counterparties?
 2    A.  No.
```

**Designation:**

```
78:13    Q.  I was just asking whether -- you understand that the
14        service corporations have service contracts with the
15        City?
16    A.  Yes.
17    Q.  And you understand that the City has hedge-related
18        payments that it has to make to the service
19        corporations --
20    A.  Yes.
21    Q.  -- that they then can use to make to the Swap
22        counterparties under the Swap?
23    A.  Yes.
```

**Designation:**

```
79: 2    Q.  Do you understand that the collateral agreement
 3        secures the City's obligation to the service
 4        corporations and the service corporations' obligation
 5        to the Swap counterparties?
 6    A.  That's the legal conclusion.  It might.  That's -- I'm
 7        going to stay away from relaying my understanding
 8        because, frankly, I haven't -- I'm going to be
 9        careful, frankly.  It might.
10    Q.  Okay.  You don't know as you sit here today?
11    A.  I have an impression of something along those lines,
12        yes.
```

```
13   Q.   And what is it?
14   A.   That it does -- it may well secure it.  It's just that
15        it's a legal conclusion that I don't want to make.
```

**Designation:**
```
80: 1   Q.   Now, if the City's able to perform under the
 2           forbearance agreement and exercises the option, the
 3           effect of this is that the hedge will be terminated,
 4           correct?
```

**Designation:**
```
80: 7   A.   I believe there will no longer be a need for the
 8           hedge, yes.
```

**Designation:**
```
80:10   Q.   And the collateral agreement will also be terminated
11           in that event, correct?
12   A.   If we -- if the City performs?
13   Q.   Right.
14   A.   Yes.
15   Q.   And that will free up the casino revenues to be used
16           by the City, correct?
17   A.   Yes.
18   Q.   Okay.  How does that benefit the service corporations?
19   A.   I don't know if it does or doesn't.  I know it
20           benefits the City.
21   Q.   Can you think of a way that it benefits the service
22           corporations as you sit here today?
23   A.   No.  That would be speculation.
24   Q.   And you understand that the service corporations
25           depend on the City to make the payments of their
```

**Designation:**
```
81: 1        various obligations both under the COPs and the Swap?
 2   A.   I believe that's true.
 3   Q.   They don't have any independent sources of income?
 4   A.   To the best of my knowledge, they do not.
 5   Q.   And your view today is that the City of Detroit is
 6           insolvent, correct?
 7   A.   Yes, yes.
 8   Q.   And fair to assume that by extension the service
 9           corporations are also insolvent, too?
```

**Designation:**
```
81:12   A.   I don't know if that's true or not.
```

**Designation:**
```
81:14   Q.   Now, isn't it true that the composition of the service
15           corporations' boards of directors includes three City
16           officers and at least one City Council member?
```

```
17   A.   Yes.  I think I said before there are City employees
18        and City representatives on the boards.
19   Q.   And in fact the person who signed the forbearance
20        agreement on behalf of the service corporations was
21        the president of both service corporations, correct?
22   A.   Yes, I believe so.
23   Q.   And her name is Cheryl Johnson, right?
24   A.   Yes.
25   Q.   And she is also the City's finance director, correct?
82: 1   A.   Yes.
2   Q.   Okay.  Portia Roberson --
3   A.   Um-hm.
4   Q.   -- is the City's corporation counsel, right?
5   A.   Yes.
6   Q.   And she's also on the board of both service
7        corporations, correct?
8   A.   To the best of my knowledge, that's true.
9   Q.   Do you know who made the decision at the service
10        corporations to enter into the forbearance agreement?
11   A.   I do not.
12   Q.   Did you have any conversations with either Ms. Johnson
13        or Ms. Roberson about the service corporations
14        entering into the forbearance agreement?
15   A.   No.
16   Q.   Isn't it true that the policy of the City is to
17        indemnify the service corporation directors for
18        actions they take in their capacity as City employees?
19   A.   I don't know that.
20   Q.   You don't know if that's the policy of the City?
21   A.   I do not.  I know the City has an indemnification
22        policy.  I don't know if it applies to the service
23        corporations.
24   Q.   Okay, but does it apply to the City employees?
25   A.   It applies to City employees acting within their
83: 1        course and scope of their employment as employees of
2        the City.
3   Q.   Okay.  So as you sit here today, you can't say that
4        that indemnification policy would extend to City
5        employee actions taken in their capacity as service
6        corporations --
7   A.   Correct.
```

**Designation:**

```
83:13   Q.   As emergency financial manager, you control the salary
14        of all City employees; isn't that correct?
15   A.   As emergency manager.
16   Q.   As emergency manager, right.
17   A.   Right.
```

**Designation:**

```
84: 3   Q.   Okay.  And you have the power to reduce those City
4        employee salaries to zero if you choose, correct?
5   A.   I think I do, yes.
6   Q.   And you have done that on at least one prior occasion,
7        I believe, correct?
```

```
 8   A.    Yes, I did do that.
```

**Designation:**
```
85: 8   Q.    Okay.  But if I ask you to express the City's view on
    9         the legal merits of the insurers' contention that they
   10         have the right to consent, you'll decline to answer
   11         those questions because it tends to reveal the
   12         attorney-client privilege.
   13               MR. SHUMAKER:  That's right and also calls
   14         for a legal conclusion, yes.
   15               MR. HACKNEY:  But you'll -- I want to save
   16         a big string of questions, so if I want to ask him
   17         what are the pros and cons of the argument, who's
   18         likely to win, how will it all come out --
   19   BY MR. HACKNEY:
   20   Q.    You won't answer those questions on the grounds of
   21         the -- because it would tend to reveal attorney-client
   22         advice, correct?
   23               MR. SHUMAKER:  Well, I don't want to
   24         prevent you from asking any questions and I don't --
             but if he has an understanding independent of advice
86: 1         he's given -- but clearly to the extent it's going to
    2         reveal attorney-client communication, I will tell him
    3         not to answer.
    4               MR. HACKNEY:  Okay.  I'll ask him that.
    5   BY MR. HACKNEY:
    6   Q.    Does the City concur in the insurers' view?
    7               MR. SHUMAKER:  Objection, calls for a legal
    8         conclusion and could ask for attorney-client
    9         communications.
   10               MR. HACKNEY:  Are you instructing him not
   11         to answer?
   12               MR. SHUMAKER:  To the extent that the
   13         question goes to that, yes.
   14   A.    Maybe I can help out in this line of questioning.
   15         Any -- I have not acted as an attorney on this job for
   16         the aforementioned reasons, so any opinion that I
   17         would express on behalf of the City in this regard
   18         would be solely as a result of communications with
   19         counsel and discussions.
   20   BY MR. HACKNEY:
   21   Q.    That was my expectation.  So if I ask you if the City
   22         concurred, that's going to get into what your lawyer
   23         thinks.
   24   A.    That's exactly right.
   25   Q.    So you -- you will assert the privilege.
87: 1   A.    I will assert the privilege.
    2   Q.    And if I ask you what are the arguments for and
    3         against this point, you'll assert the privilege.
    4   A.    I will assert the privilege, but I am aware there are
    5         a number of objections that have been filed in the
    6         case that have addressed those issues and none of them
    7         have caused me any surprise.
    8   Q.    If I said that the City -- if I asked you what the
    9         City's view is on -- well, let me take a step back.
```

```
10                  Do you agree that the insurers can block an
11          early termination of the Swap, that this would be
12          important to assessing whether the City was in danger
13          of owing a termination payment?
14                  MR. SHUMAKER:  Objection, calls for a legal
15          conclusion.
16      A.  Yes, same thing.  I'd only have a response to that
17          based upon discussions I've had with counsel.
18      BY MR. HACKNEY:
19      Q.  Do you agree that the insurers can block a
20          termination, that it would make sense to negotiate
21          with the insurers to determine whether you can secure
22          their agreement not to consent to any termination?
24                  MR. SHUMAKER:  Same objection.
25      A.  Same response.  It would only be based upon
88: 1       discussions I've had with counsel.
 2      BY MR. HACKNEY:
 3      Q.  Are you aware that the insurers contend that they have
 4          the right to control all actions that may be taken by
 5          the Swap counterparties in connection with the -- with
 6          the Swaps?
 7      A.  I am aware of that, yes.
 8      Q.  When did you first develop that awareness?
 9      A.  During some course of the correspondence that occurred
10          during this time frame that we previously discussed
11          today.
12      Q.  And have you taken steps to evaluate whether the City
13          concurs with the insurers' construction of the
14          operative documents on this point?
15      A.  Have we taken steps?  Yes.
16      Q.  Yeah.  And what is the City's position?
17                  MR. SHUMAKER:  Objection, calls for the
18          provision of attorney-client communications, and I
19          will instruct him not to answer.
20      BY MR. HACKNEY:
21      Q.  Yeah, I'm just going -- I'm making a record here.
22          Okay?  I don't want to have -- I tried to --
23      A.  I'm with you.  I'm with you.
24      Q.  And if I ask you what the arguments are on both sides
25          of this point, you'll also refuse to answer on the
89: 1       grounds of the privilege.
 2      A.  Here again, there are objections in the case that make
 3          some of those arguments, but I will not specifically
 4          answer.
 5      Q.  Because of the privilege.
 6      A.  Because of the attorney-client privilege and it calls
 7          for a legal conclusion.
 8      Q.  And if I ask you who had the better side of the
 9          argument, you would say the same thing?
10      A.  Same thing.
11                  MR. SHUMAKER:  Same objection, same
12          instruction.
13      A.  I would say the same thing.  I would say the same
14          thing.
15      BY MR. HACKNEY:
16      Q.  Do you agree that the insurers can control all actions
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
17        of the Swap counterparties in connection with the
18        Swaps, that this would be important in terms of
19        assessing whether the City should negotiate with the
20        insurers?
23               You can answer to the extent you have an
24        understanding.
25   A.   It's also a little speculative because it's a
90: 1     hypothetical.  If then is usually a hypothetical, so I
 2        would -- for the same reasons as we discussed before,
 3        I would say that to the extent it calls for a legal
 4        conclusion, I'll refuse to answer.
 5               I would say as a rational person, if you
 6        were put in a corner, then you might want to consider
 7        your alternatives, including negotiations.
 9   Q.   With the insurers?
10   A.   With whoever, yes, whoever's --
11   Q.   I mean it's just a simple point.  We have five minutes
12        left.  I'm going to milk them.
13   A.   Okay.
14   Q.   But it's a simple point, which is if the insurers can
15        potentially direct, like a marionette, the actions of
16        the Swap counterparties, and I understand --
17   A.   Right.
18   Q.   -- that you're not agreeing with that --
19   A.   Right.
20   Q.   -- okay, but if they can --
21   A.   Um-hm.
22   Q.   -- they're a potential party that you can go negotiate
23        with to play off against the Swap counterparties,
24        correct?
91: 2  A. Yeah, here again, I mean if that happened, possibly,
 3        but that's a speculative question, so I'm going stay
 4        away from it.
 6   Q.   It is speculation, but it's logical --
 7   A.   As I said in my answer, a rational person would make
 8        that --
 9   Q.   Yeah.
10   A.   If you were put in a corner, you'd have to find some
11        way out, and negotiation might be one of those
12        sources, but to the extent your question is also
13        speculation, I'm going to defer from answering.
14   Q.   Do you agree that the insurers are entitled to control
15        all of the actions of the Swap counterparties; it
16        raises the risk that the deal negotiated in the
17        forbearance agreement may be for naught?
20   A.   Yeah, here again, maybe not.
22   Q.   Those are things you haven't -- you haven't considered
23        prior to today, fair statement?
24   A.   That's a fair statement.
25   Q.   Okay.  Have you ever heard the phrase "play both ends
92: 1     against the middle"?
 2   A.   Oh, have I ever heard the phrase?
 3   Q.   Yes.
 4   A.   Yes.
 5   Q.   You're a bankruptcy lawyer, right?
 6   A.   Yes.
```

```
 7   Q.   You were, I should say.
 8   A.   I was.
 9   Q.   And that's one of the time-honored tricks of
10        bankruptcy negotiation, right, is to play parties off
11        against one another to try and get the best deal?
12   A.   I'm not going to call it a trick.
13   Q.   Tools.
14   A.   Tools, tactics.  You know, there -- lawyer, as a
15        negotiator, getting a yes, discussing a number of
16        different alternatives.
17   Q.   And one of them is playing off both ends against the
18        middle?
19   A.   Could be.  People do that all -- outside of legal
20        issues, they do that in negotiation.
21   Q.   Isn't it true that prior to July 17 the City never
22        engaged in substantive negotiations with Syncora?
23   A.   I don't know if that's true.  You said July 17th?
24   Q.   Yeah.  That's the date of the execution of the
25        forbearance agreement.
93: 1   A.   Right.  I don't know if that's true.  I believe there
 2        were discussions that may have been, but you
 3        characterize it as substantive negotiations, so I
 4        don't know if that's true.
 5   Q.   You certainly didn't participate in any substantive
 6        negotiations with Syncora, correct?
 7   A.   Well, I -- you know, you say negotiations.  I know
 8        there were a series of letters going back and forth
 9        and I know that there was a letter -- I just don't
10        recall when I sent it -- to Mr. LeBlanc that said if
11        you want to have serious negotiations, then let's have
12        a discussion, but let's stop sending these letters
13        back and forth.
14   Q.   But isn't it your position that there were no serious
15        negotiations with Syncora because Syncora would not
16        make a proposal?
17   A.   I believe in one of those letters I expressed that
18        concern, yes.
19   Q.   And to your knowledge Syncora never made a proposal to
20        the City of Detroit prior to July 17th, correct?
21   A.   Yeah, I believe there was a discussion -- well, there
22        was discussion about an exchange of NDAs, and Syncora
23        said they wanted to make a proposal, but they first
24        wanted to see the proposal from the Swap
25        counterparties, and I believe in one of my letters to
94: 1   Mr. LeBlanc, I said well, the parties need to sign a
 2        NDA, and my understanding was Syncora declined to do
 3        that.
```

**Designation:**

```
94:17   Q.   Mr. Orr, I kind of want to cut through this with
18        Syncora.  I understand that there were letters back
19        and forth between you and Syncora.
20   A.   Yes.
21   Q.   But I just want to make clear for the record that
22        there were not substantive negotiations of the type
```

```
   23          that you engaged in with the Swap counterparties with
   24          Syncora about an alternative proposal to the
   25          forbearance agreement prior to its execution on
95: 1          July 17th, correct?
    2     A.   I believe -- July 17th?
    3     Q.   (Nods head).
    4     A.   I believe that's true.  As I said, I think there was
    5          some discussion about a potential offer from Syncora,
    6          but I believe that got caught up in the NDA issue and
    7          that went away, so yes, I believe that's true.
    8     Q.   And your recollection in the NDA issue is that the
    9          City wanted an NDA, but Syncora wouldn't sign it?
   10     A.   My recollection -- no.  My recollection was the City
   11          needed an NDA because we were asking all parties --
   12          nondisclosure agreement, we were asking all parties to
   13          sign them.  There was some discussion -- I put in a
   14          letter, I seem to recall, that Syncora sign one, but I
   15          don't want to speculate or mischaracterize.  There
   16          were some discussion about a NDA before Syncora would
   17          show us their proposal and something about they wanted
   18          to see the Swap counterparties' proposal before
   19          signing an NDA first or something along those lines.
   20     Q.   You're not aware of any situation where the City
   21          refused to sign an NDA with Syncora, correct?
   22     A.   No, not that I'm aware of.
   23     Q.   In fact, it was the City that wanted an NDA with
   24          Syncora?
   25     A.   Yes.  I believe that's true.
96: 1     Q.   And it's also true that you did not engage in
    2          substantive negotiations with FGIC about an
    3          alternative to the forbearance agreement prior to
    4          July 17th, correct?
    5     A.   Yeah, with regard to the issue of substantive, I'll --
    6          I'll, you know, caution that I'm not -- I'm not
    7          necessarily characterizing, but to the best of my
    8          knowledge, that's a fair characterization.
    9     Q.   You didn't make a proposal about an alternative to
   10          FIGC and FIGC didn't make one to you.
   11     A.   Yes, to the best of my knowledge, that's true.
   12     Q.   And that's also true with respect to Syncora, correct?
   13     A.   Yes, that's true.

Designation:
97:23     Q.   Okay.  It's true, isn't it, that as of the date of the
   24          execution of the forbearance agreement, your office
   25          had received multiple calls from Claude LeBlanc at
98: 1          Syncora, correct?
    2     A.   I'm not aware of that.  There may have been multiple
    3          calls, but I'm not aware -- I received no calls.
    4     Q.   Okay.  So you don't -- I take it your secretary --
    5     A.   My office may have.  Yeah, my secretary may have, but
    6          I didn't.
    7     Q.   So you don't know whether he called you or not?
    8     A.   If you're representing to me that he did, I have no
    9          reason to believe that that's untrue.
   10     Q.   Okay.  And I take it you have never called personally
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
11        Mr. LeBlanc --
12   A.   No.
13   Q.   -- isn't that correct?
14   A.   No, I don't think so.
15   Q.   So you didn't return those calls if they were made?
16   A.   No.
17   Q.   I just want -- I guess I -- the City has entered into
18        numerous nondisclosure agreements --
19   A.   Right.
20   Q.   -- in these cases, correct?
21   A.   Yes.
22   Q.   I mean has it entered into hundreds?
23   A.   I don't know.  I don't -- I don't operate the data
24        room or any others, but I suspect there's certainly
25        many.
99: 1 Q.  We can say that there are lots.
2    A.   There are lots.
3    Q.   Okay.
4    A.   Okay.
5    Q.   And there's no reason you can think of today that the
6         City wouldn't enter into one with Syncora.
7    A.   No.
8    Q.   Were you aware that Syncora wanted a nondisclosure
9         agreement so that it could make a proposal that would
10        be an alternative to the Swap counterparties?
11   A.   As I said, I believe I have a letter that discusses
12        the NDA issue, but it was caught up in something
13        related to Syncora -- as I understood it, Syncora
14        wanting to see the Swap counterparty proposal first
15        prior to entering an NDA.
16   Q.   Did you ever hear that Syncora had gotten over that
17        issue and was now willing to just make a proposal to
18        the City?
19   A.   No.
20   Q.   So no one ever told you that?
21   A.   No, I don't recall ever hearing that.
22   Q.   Okay.  Would that have been significant to you if you
23        heard that?
```

**Designation:**

```
100: 1 A. Yeah.  Here again, it depends upon what point in time,
2         if we were already bound by the definitive term sheet
3         and then -- or the agreement, I believe the
4         forbearance agreement has an obligation we cooperate
5         with Swap counterparties, so it wouldn't have mat --
6         no, it would not have mattered at that time, so it
7         depends on when that would have occurred.
```

**Designation:**

```
100:15 Q. Isn't it true that the City's decision to enter into
16        the forbearance agreement was made by you, in your
17        role as emergency manager?
18   A.   Yes, after consultation with my -- with my employees,
19        staff and consultants, yes.
```

```
20   Q.   And when did you make that decision?
21   A.   To enter into the actual agreement?
22   Q.   Yes.
23   A.   The day I signed it.
24   Q.   July 15th, 2013?
25   A.   I believe so, yes.
```

**Designation:**
```
102: 7   Q.   Any legal memoranda from Jones Day that you considered
     8        in making this decision?
     9   A.   Yes, probably.
    10   Q.   Okay.  Written legal memoranda that you reviewed?
    11   A.   Yeah, including e-mails.  Yeah.
    12   Q.   Now, did you take time to familiarize -- to
    13        familiarize yourself with any of the legal documents
    14        relating to the COPs Swap structure in connection with
    15        your decision to execute the forbearance agreement?
    16   A.   I relied -- I may have seen them, but I relied upon
    17        consultation with my counsel and investment bankers.
    18   Q.   The documents I'm referring to are -- can we agree
    19        they're relatively complicated legal documents?
    20   A.   Yeah, I'd say they're not simple documents.  It's not
    21        a -- you know, an auto purchase contract, yeah.
    22   Q.   Right.  So can I fairly characterize that -- that you
    23        may have looked at the documents, but you didn't
    24        attempt to master -- master them in terms of their
    25        legal ins and outs?
103: 1   A.   Yeah.  That's a --
```

**Designation:**
```
103: 3   A.   That's a fair characterization.  As I said, I'm trying
     4        to stay away from acting as an attorney in this job.
```

**Designation:**
```
103: 8   Q.   So you relied on your advisors to explain to you how
     9        the COP Swap agreements worked?
    10   A.   Yes.
    11   Q.   And you also relied on them to explain to you how the
    12        COP Swap agreements worked in conjunction with the
    13        forbearance agreement that you were about to execute?
```

**Designation:**
```
103:15   A.   Yes.
```

**Designation:**
```
103:17   Q.   So what is the relationship between the forbearance
    18        agreement and the COPs Swap structure?
    19   A.   Well, my understanding is that the forbearance
    20        agreement is related to the Swaps structure, but that
    21        the COPs structure is unrelated.
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
 22   Q.   Okay.  So the forbearance agreement is part of the
 23        same subject matter as the collateral agreement and
 24        the Swaps agreement, but not the COPs part of the
 25        structure?
104: 1   A.   That's my understanding.
  2   Q.   Okay.  In your legal career, have you come across the
  3        concept of the idea that two different contracts can
  4        be part of one integrated transaction?
  5   A.   Sure.  Yes.
  6   Q.   You're familiar with that as an idea?
  7   A.   Oh, yeah, sure.
  8   Q.   Okay.  What do you understand that to mean?
```

**Designation:**
```
104:10   A.   There are a number of ways that two different
 11        documents were -- may refer to the other, as simple as
 12        attachments, exhibits, the master -- the master
 13        service agreement on a loan, for instance.  There are
 14        a number of ways that one document can relate to
 15        another as explicitly expressed and intended.
```

**Designation:**
```
104:23   Q.   You understand the idea that two different contracts
 24        can form part of one larger agreement?
 25   A.   Oh, sure.  Yeah.
105: 1   Q.   Is the forbearance agreement part of an integrated
  2        transaction with the amended Swap agreements?
```

**Designation:**
```
105: 5   A.   Yeah, I'm going to stay away from characterizing it as
  6        an integrated transaction.  That may have legal
  7        consequence.  I know they are related.
```

**Designation:**
```
106:23   Q.   So I guess are you saying that you can't reveal
 24        attorney-client communications or are you saying that
 25        you just don't know the answer to this particular
107: 1        legal question?
  2   A.   I'm saying I can't reveal attorney-client
  3        communications, and based upon the characterization, I
  4        have formed no independent decision outside of
  5        discussions with my attorney as to whether or not
  6        they're integrated.
```

**Designation:**
```
107:24   Q.   Isn't it -- I'd like to shift and ask you a question
 25        about the service agreements between the City and the
108: 1        service corporations.
  2   A.   Okay.
  3   Q.   Isn't it true that the City is in default of its
  4        obligations under the service agreements because it
```

```
     5          missed the --
     6     A.   June 14th payment?
     7     Q.   That's right.
     8     A.   We're in default.
     9     Q.   Okay.  And isn't it also true that the City is not
    10          proposing to cure those defaults in connection with
    11          the assumption of the forbearance agreement?
    12     A.   I believe that's true.
    13     Q.   And you would agree that the City is not going to
    14          provide assurances that it will perform with the
    15          service agreements in the future, correct, as part of
    16          the assumption motion?
    17     A.   I'm going to be careful here because we're -- we're
    18          trying to have discussions about what we're going to
    19          do with regard to the proposal, so I don't want to say
    20          now something that may or may not occur in the future,
    21          but there is no present intent -- in response to your
    22          question, no present intent to do that.
    23     Q.   You certainly haven't represented that you will as
    24          part of the assumption motion?
    25     A.   Yes.
109: 1     Q.   We talked about this earlier.  I don't want to reask
     2          the question, but I want to tie it up in connection
     3          with the assumption motion, which is, there are also
     4          events of default existing under the Swaps.
     5     A.   Yes.
     6     Q.   Those are the cause of all the problems, right?
     7     A.   Yes.
     8     Q.   The City is not proposing to cure those defaults in
     9          connection with the assumption agreement, correct?
    10     A.   I'm going to be careful with the characterization of a
    11          cure because, as you know, and -- I have formed no
    12          independent decision as to whether or not that
    13          nomenclature's true.  What I will say is that pursuant
    14          to the forbearance agreement we are attempting to
    15          resolve any and all defaults that may have occurred
    16          under the collateral agreement.
    17     Q.   Under -- and I was asking about the Swaps.
    18     A.   And the Swaps.
    19     Q.   And the Swaps.
    20               So the forbearance agreement is an effort
    21          to resolve any defaults that exist under the
    22          collateral agreement and amended Swaps?
    23     A.   Yes.
    24     Q.   Okay.  And in your view it does that?
    25     A.   Yes.
110: 1     Q.   Okay.
     2     A.   Yes.
     3     Q.   So I'll say it this way.  In your assumption motion,
     4          isn't it true the City doesn't promise to cure any
     5          defaults under the collateral agreement or the Swap
     6          agreement; isn't it that correct?
     7     A.   Here again, and I'm not trying to be evasive.  I
     8          just -- you know, there are concepts of cure in the
     9          bankruptcy code, for instance, with regard to the
    10          assumptions of contracts so on and so forth, and I
```

```
11        want to make sure that I don't testify as to a legal
12        conclusion.  So what I will say is we are trying -- by
13        the assumption agreement and forbearance agreement, we
14        are trying to resolve all defaults under those
15        documents, both the collateral agreement and the
16        Swaps.
17    Q.  Okay.  And how does it achieve that resolution?
18    A.  Well, the documents speaks for itself, but generally
19        speaking, it imposes obligations upon us to perform a
20        certain ways within certain time frames with regard to
21        the potential termination payment.  It therefore gives
22        us a discount for that payment.  It releases the
23        casino revenue and imposes obligations, and this is my
24        language, upon the Swap counterparties not to trap
25        that revenue upon performance of certain obligations,
111: 1    in addition, obligates those parties to release liens
     2    and potential claims as a result of the transaction.
```

**Designation:**

```
114:21    Q.  So let me go back.  I guess my question is, like, do
     22        you have a view on whether that big time cash trapping
     23        is supposed to happen automatically under the
     24        collateral agreement?
     25    A.  My understanding is that it does not happen
115: 1        automatically.
     2    Q.  Okay.  And is that based on conversations you've had
     3        with counsel?
     4    A.  Yes.
     5    Q.  And if I ask you for the pros and cons of that
     6        argument as to who's likely to win and how the City
     7        came to its view, you would refuse to answer those
     8        questions on the basis of the attorney-client
     9        privilege, correct?
     10    A.  Yes, sir.
```

**Designation:**

```
116: 4    Q.  The discount that you obtained through the
     5        negotiations that Mr. Buckfire led --
     6    A.  Right.
     7    Q.  -- is a discount to the so-called early termination of
     8        the Swap.
     9    A.  Yes.
     10    Q.  Correct?
     11    A.  Yes.
     12    Q.  So if you just read the Swap agreement, it would -- it
     13        implies a termination value, correct?
```

**Designation:**

```
116:17    Q.  It implies an early termination value?
     19    A.  We'll use a nomenclature.  It implies a value for
     20        termination fee that I understand represents the loss
     21        expectation of the counterparties.
```

**Designation:**

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
116:23   Q.   That's exactly right.
    24             And the discount you negotiated in the
    25        forbearance agreement is a discount to that amount in
117: 1        the Swap?
```

**Designation:**

```
117: 4   A.   It is a discount to that, yes.  It is a discount to
     5        that expected amount.
```

**Designation:**

```
117: 7   Q.   Yeah.  It is a discount to what would otherwise be
     8        owing under the Swap in the absence of the forbearance
     9        agreement if the Swap counterparties designated an
    10        early termination.
    11   A.   I believe that's correct.
```

**Designation:**

```
117:14   Q.   Okay.  Now, you know that there's a different concept
    15        which is an optional early termination under the Swap,
    16        correct?
    17   A.   Um-hm.
```

**Designation:**

```
118: 2   Q.   Under the Swap --
     3   A.   Right.
     4   Q.   -- there is a different type of termination that's
     5        called an optional early termination.  Are you aware
     6        of that?
     7   A.   I am aware of that.
     8   Q.   Okay.  That's one where the insured -- the Swap
     9        counterparties contend that they can terminate the
    10        Swap and walk away with no payment.
    11   A.   Any understanding I would have about what the Swap
    12        counterparties can do would be based upon
    13        consultations with counsel, but suffice it to say I
    14        have heard of that concept.
    15   Q.   Okay.  So if I ask you about the pros and cons of that
    16        argument and who would likely to win, you would assert
    17        the attorney-client privilege; is that correct?
    18             MR. SHUMAKER:  We would.
    19   A.   Yes.
```

**Designation:**

```
118:21   Q.   Okay.  But I do want to say that you understand that
    22        the Swap counterparties are substantially in the money
    23        under prevailing interest rates, correct?
    24   A.   There is a lot of money that the City's going to owe,
    25        yes.
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**

```
119: 9   Q.   Yeah.  So what I mean is if the Swap was terminated
     10        today --
     11   A.   Right.
     12   Q.   -- it's the service corporations that would owe money
     13        to the Swap counterparties, not the Swap
     14        counterparties that would owe money to the service
     15        corporations.
```

**Designation:**

```
119:19   A.   Yeah.
```

**Designation:**

```
119:21   Q.   That's what I mean by in the money.
     22   A.   Yeah, I -- I think that's true.
     23   Q.   Okay.  I mean that's -- I'm not trying to be flip, but
     24        that is the reason that you negotiated the discount?
     25   A.   That's the mechanism, yes.  Yeah.
120: 1   Q.   Okay.  I want to make an obvious point, which is the
      2        Swap counterparties have never come to the City and
      3        said hey, we're going to exercise that optional early
      4        termination rights that has us walking away and being
      5        paid nothing, correct?
```

**Designation:**

```
120: 8   A.   To the best of my knowledge, I've never heard that.
```

**Designation:**

```
120:13   Q.   Let me -- if you had heard them threaten that, it
     14        would have made Mr. Buckfire's negotiation a lot
     15        easier.
     16   A.   I think it would have made the entire situation a lot
     17        easier, but I've never heard that.
     18   Q.   They've never offered to walk away without any
     19        payment.
     20   A.   I've never heard them offer to walk away without a
     21        payment.
     22   Q.   Okay.  Too bad.
     23   A.   I'm more than willing to accept that offer.
     24   Q.   I was going to say we're all open, right?
     25   A.   Right.
121: 1   Q.   I want to go back to the forbearance agreement.  We
      2        were talking about the things that it does in terms of
      3        providing access to casino revenues, allowing for an
      4        unwind of the Swap.  These were my descriptions of
      5        it --
      6   A.   Right.
      7   Q.   -- candidly, from your motion --
      8   A.   Right.
      9   Q.   -- but we were talking generally about these things.
     10        The valuable consideration that the City gets under
```

```
11          the forbearance agreement are all things that it can
12          exercise without any consent from any other party,
13          correct?
17    A.    That's my understanding of the way it works, yeah.
19    Q.    Do you agree that the effect of the forbearance
20          agreement, if the option is exercised, is to modify
21          the amount of the termination payment owed under the
22          Swaps down to whatever percentage is applicable as of
23          that date?
122: 2 A.   If you're talking about the forbearance agreement and
3           the formula that's involved for the percentage change
4           depending upon -- as linked to time, as well as the
5           requirement that we get approval of the agreement at a
6           certain time period, yes, that's true.
8     Q.    Okay.  I mean the effect of the forbearance agreement
9           is that instead of owing what the City would owe under
10          the Swap, which is the hundred percent of the
11          termination value, it now owes -- only owes the
12          discounted amount?
13    A.    Yes.
14    Q.    So the effect is that it modifies that provision in
15          the Swap in a way that's favorable for the City?
17    A.    That's a fair characterization.
20    Q.    Now, the forbearance agreement, another part of it,
21          that it allows the City to direct the Swap
22          counterparties to terminate the Swap, correct?
123: 4 A.   Yeah, the --
8     A.    Yeah, the mechanism is such that it's not our
9           termination, that it's the parties -- it's the
10          counterparties' termination.
12    Q.    That's right.  It's their termination right, but the
13          City gets to direct them to exercise it.
14    A.    Correct.
15    Q.    Okay.  Is that a right that the City currently
16          possesses under any of the other agreements to the
17          best of your knowledge?
18    A.    To the best of my knowledge, no.
19    Q.    That's a right it obtained as a result of the
20          forbearance agreement, correct?
21    A.    Correct.
22    Q.    And the City's able to exercise that right to direct
23          the actions of the Swap counterparties without the
24          consent of any third party, correct?
25    A.    To the best of my knowledge, that's true.
```

**Designation:**

```
125:14 Q.   Okay.  So -- but you -- you can't give me your
15          understanding of how Syncora's alleged rights under
16          the contract administration agreement interact with
17          the City's alleged rights under the forbearance
18          agreement.
19    A.    I can't do that without implicating conversations I've
20          had with my counsel.
21    Q.    And just for the record, you won't?
22    A.    And I won't.
```

```
23   Q.   That's right.
24   A.   And I won't, yes.
```

**Designation:**
```
126:18  Q.   I want to go back to the subject of cash trapping
   19        really quick because we had just moments ago talked
   20        about whether it worked automatically --
   21   A.   Right.
   22   Q.   -- or whether it worked upon notice.
   23   A.   Right.
   24   Q.   But prior to the forbearance agreement, it was your
   25        view that the Swap counterparties had the right to
127: 1        direct U.S. Bank to trap the casino revenues; isn't
    2        that correct?
    3   A.   I think if there were events of default, and here they
    4        are, yes.
    5   Q.   Yeah.  That was a driver of the negotiation --
    6   A.   Yes.
    7   Q.   -- correct?
    8   A.   Certainly is, yes.
    9   Q.   And your understanding is that as part of the
   10        forbearance agreement during the -- during the --
   11        during the forbearance period, the Swap counterparties
   12        have temporarily relinquished that right to direct
   13        cash trapping so long as the optional termination
   14        period is pending.
   15   A.   Yes, they are forebearing from exercising their right.
   16   Q.   Okay.  Now, you understand that cash passes through
   17        the general receipts subaccount on a monthly basis.
   18        We talked about that earlier.
   19   A.   Right.
   20   Q.   It's trapped until a certain point and then the City
   21        makes the holdback account, and when they get --
   22        become equal, there's a discharge of payment to the
   23        City from the general receipts subaccount, and then
   24        for the remainder of the month, the City gets access
   25        to the casino revenues, correct?
128: 1   A.   Yes.  My understanding is about $500,000 a day are
    2        paid into those accounts and the mechanism is very
    3        similar to what you said --
    4   Q.   Okay.
    5   A.   -- how it operates.
    6   Q.   Can we agree that the way the forbearance agreement
    7        works is that certainly between July 17th and now and
    8        from now to whenever the forbearance, the option is
    9        either exercised or expires, there's going to be cash
   10        that passes through this account, already passed
   11        through the account, that goes to the City?
   12   A.   Yes.  There should be.
   13   Q.   If the option expires without the City's exercise of
   14        the option, isn't it true that under the forbearance
   15        agreement, the City has no obligation to put that cash
   16        back into the -- into the general receipts subaccount?
   19   A.   I --
   21   Q.   Just asking for your understanding of how the
```

```
22          agreement works.
23    A.    Sure.  And my understanding of how the agreement
24          works, without having it in front of me and consulting
25          counsel, is the parties revert back to the status quo
129: 1      ante as where they were, and I do not recall that
2           there's an obligation for remittor (sic) --
3     Q.    Yeah.
4     A.    -- of monies that were paid during the forbearance
5           period.
6     Q.    And the agreement does speak for itself.  I'm just
7           asking for your understanding of the agreement.
8     A.    That's my understanding.
9     Q.    I have read the agreement, and my reading of
10          Section 1.2(c) of the agreement is that when the
11          option expires without being exercised, that it's just
12          as you said, everyone is restored to the status quo
13          ante, but the City doesn't have to put the money it
14          received back in the -- in the interim back into the
15          account.
16    A.    Right, which is status quo because we would have
17          received that money in any event.
18    Q.    Okay.  But what I just said is also your
19          understanding?
20    A.    Yes.
```

**Designation:**

```
130: 8      Q.    Let me hand you this forbearance agreement.
9     A.    Okay.
10    Q.    I've marked it as Orr Exhibit 2.
11    A.    Okay.
12                        MARKED FOR IDENTIFICATION:
13                        DEPOSITION EXHIBIT 2
14                        10:48 a.m.
15    A.    Okay.
16    BY MR. HACKNEY:
17    Q.    Do you have it in front of you?
18    A.    Yes.
19    Q.    And is that, to the best of your knowledge, a true and
20          accurate copy of the forbearance agreement?
21    A.    Yes, it appears to be.
22    Q.    Now, if you look at the -- on page 2 of the second
23          full recital?
24    A.    Uh-hm.
25    Q.    You'll see that it says, "Whereas, pursuant to the
131: 1      terms of each Swap agreement, it is the view of the
2           Swap counterparties that one or more events of default
3           and/or additional termination events has occurred,
4           with the service corporations" -- "with the service
5           corporation as the defaulting party or sole affected
6           party, and therefore each of SBS and UBS has the right
7           to designate an early termination date for the related
8           Swap agreements."
9                   Do you see that?
10    A.    Yes, I do.
11    Q.    I have a long set of questions here that I would like
```

```
12        to collapse if I could, which is, this just says it's
13        the view of the Swap counterparties.  The fact of the
14        matter is it's also the City's view that there are
15        termination events and events of default existing
16        under the Swap.
17   A.   Yes, I think that's fair.
18   Q.   And that as a result of those termination and events
19        of default in the absence of this agreement, the Swap
20        counterparties would have the right to designate an
21        early termination date.
22   A.   Yes.
23   Q.   If I asked you to catalog all of the termination
24        events and events of default under the Swap, would you
25        be able to do that?
132: 1  A. No, I wouldn't, not without a consulting client and a
 2        long compendium of events that occurred before I was
 3        appointed.
 4   Q.   You do know some of them offhand.
 5   A.   Sure, like the consent agreement, the declaration of
 6        financial emergency, the appointment of the financial
 7        advisory board, the failure to make some of the --
 8        there are a bunch of them, but I couldn't catalog them
 9        all.
10   Q.   Yeah.  Your appointment?
11   A.   My appointment.  I'm an event of default.
12   Q.   You are -- you are an embodiment of default.
13   A.   I'm an embodiment of default.
14   Q.   So at some point we will have to cure you.
15   A.   You will have to talk to my wife about that.
16   Q.   Okay.  The -- okay.  So that is helpful.  I was going
17        to go through some of these things, but it doesn't
18        sound like there's an actual dispute between the City
19        and the Swap counterparties on this point, correct?
20   A.   No.
```

**Designation:**
```
134: 4  Q. Is it fair to say that if I ask you to describe to me
 5        what potential events of default or termination events
 6        where the Swap counterparties were the sole affected
 7        party or the defaulting party --
 8   A.   Right.
 9   Q.   -- you would decline to answer those questions on the
10        basis of the attorney-client privilege?
11            MR. SHUMAKER:  To the extent they would
12        reveal those communications, of course.
13            MR. HACKNEY:  Well, I mean --
14   A.   Yes, I would.
15   BY MR. HACKNEY:
16   Q.   Okay.  Even if I ask you about your understanding of
17        the position, your position is that you don't have one
18        independent of your legal advisors.
19   A.   I -- on this question, I don't have one independent of
20        my legal advisors.
21   Q.   So I can't ask you what your understanding is --
22   A.   Right.
23   Q.   -- because it will necessarily reveal the legal advice
```

```
        24        you got.
        25    A.  I'm trying to see if there's a way I can answer your
    135: 1        question without implicating discussions.  No.  It
         2        might -- it might implicate some discussions I had
         3        with counsel.
         4    Q.  Okay.  Mr. Orr, is the forbearance agreement a
         5        settlement?
         8    A.  Let me say this.  I'm aware that the motion pending in
         9        front of the Court is both for -- we call in
        10        bankruptcy, what I used to call in bankruptcy, both an
        11        assumption of an agreement and a ^  9019 settlement.
        13    Q.  So it's been held out by the City as a settlement,
        14        correct?
        15    A.  Yeah.  I think there's a debate as to whether or not
        16        you need to seek settlement approval in a Chapter 9
        17        case, but we are.
        18    Q.  Okay.  Does the forbearance agreement settle any
        19        claims on a final basis?
        20    A.  I think it does.
        21    Q.  Isn't it true, though, that if the City doesn't
        22        exercise the option, everyone goes back to the status
        23        quo ante?
        24    A.  Yes.  That's the contingency, yes.
        25    Q.  Okay.  So if that were to happen, everyone's claims
    136: 1        would still be in play.
         2    A.  I'm going to be careful with the word claims, but
         3        everyone would revert back to the status quo ante.
         4    Q.  Okay.  So whatever claims they had at the status quo
         5        ante they'd have again?
         6    A.  Yeah, whatever claims -- technically, whatever claims,
         7        colloquially, whatever they had would, revert back to
         8        the status quo ante.
         9    Q.  Can we agree that in that eventuality no claims of any
        10        of the parties of the forbearance agreement would have
        11        been finally resolved by the forbearance agreement?
        12    A.  To the best of my knowledge, yes.
        13    Q.  Now, put aside the threat of declaring an early
        14        termination under the Swap --
        15    A.  Right.
        16    Q.  -- which we've discussed extensively today as a right
        17        the Swap counterparties have under the Swap --
        18    A.  Okay.
        19    Q.  -- put that aside.  Have you evaluated, separate and
        20        apart from that, whether there are other tort or
        21        contract claims that the Swap counterparties may have
        22        against the City?
        23    A.  I think there were discussions, but, here again, those
        24        would be wrapped up in attorney-client communications.
        25    Q.  So if I asked you to reveal the assessment of whether
    137: 1        there were other claims that the Swap counterparties
         2        have against the City, you would decline to answer
         3        those questions on the grounds of attorney-client
         4        privilege?
         5    A.  I think I would have to.  I do recall discussions, but
         6        I think I'd have to decline on the basis of
         7        attorney-client privilege.
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
 8   Q.   Have the Swap counterparties threatened to bring any
 9        claims against the City?
10   A.   Well, here again, being careful with the word claims,
11        you mean unrelated to the defaults such as tort
12        claims?
13   Q.   I guess I would say the Swap agreement is one you
14        understand that's between the Swap counterparties and
15        the service corporations.
16   A.   Right.
17   Q.   Okay.  So I'm trying to put that in a box for now.
18   A.   Right.
19   Q.   And we've talked about that extensively.
20   A.   Right.
21   Q.   So other than any claims they may have against the
22        service corporations --
23   A.   Right.
24   Q.   -- that could absolutely have implications for the
25        City, but other than that, have the Swap
138: 1        counterparties threatened to bring any other claims
 2        directly against the City?
 3   A.   None that I'm aware of.
 4   Q.   I may have asked you this earlier, but I just -- I
 5        want to make sure that I didn't miss it and so if it's
 6        asked and answered I apologize, but did the City
 7        evaluate whether it is in breach of the collateral
 8        agreement?
 9   A.   Did we evaluate it?
10   Q.   Yeah.
11   A.   Yes, I and my consultants evaluated it.
12   Q.   Is this one where if I asked you the results of those
13        evaluations you'd decline to answer?
14   A.   Yes.
```

**Designation:**
```
138:20   Q.   Now, have the service corporations threatened to bring
21        any claims against the City?
22   A.   None that I'm aware of.
23   Q.   And have you undertaken an assessment of the
24        likelihood of the service corporations to the extent
25        they were to assert claims against the City?
139: 1   A.   No.  I don't recall doing that.
 2   Q.   So you haven't assessed that?
 3   A.   Not me independently, no.
 4   Q.   Okay.  And it's not something you took into account as
 5        part of this agreement?
 6   A.   No.  We -- there was a discussion about the interest
 7        of all the parties.  I, independently, did not
 8        handicap whether the service corporations might bring
 9        a claim against the City.  I think there were
10        discussions about it.  Many of those discussions would
11        have been caught up in the general discussions that I
12        was having with counsel and my other advisors.
13   Q.   And you wouldn't be able to discuss them?
14   A.   No.
15   Q.   But the service corporations' claims against the City,
16        those are not resolved by the forbearance agreement,
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
17          correct?
18   A.     If they have any.  I don't think they are.
19   Q.     Let me cut to it.  Is it fair to say you haven't given
20          this any real consideration?
21   A.     Yeah.  We -- it is fair to say that it was -- there
22          was no real deep consideration of it.  We did consider
23          it.
24   Q.     Now, as the City evaluated whether it has claims
25          against the Swap counterparties --
140: 1   A. Um-hm.
2    Q.     -- okay?
3    A.     Um-hm.
4    Q.     And if I ask you to tell me what claims you have, will
5           you tell me them or will you assert the privilege?
6                  MR. SHUMAKER:  I would instruct the witness
7           that may implicate attorney-client communications.
8    A.     I would have no independent knowledge of what claims
9           may have other than discussions I've had with counsel
10          so I wouldn't answer.
11   BY MR. HACKNEY:
12   Q.     Okay.  If I ask you what's the likelihood that you'll
13          win on the claims?
14   A.     Same answer.
15   Q.     You would follow the advice --
16   A.     Yeah.
17   Q.     -- and assert the privilege?
18   A.     Yeah.
```

## Designation:

```
140:24   Q. Well, let me ask you -- let me ask you just a -- sort
25          of this is your understanding of the forbearance
141: 1      agreement.
2    A.     Right.
3    Q.     What claims are you asking the Court to approve the
4           settlement of?
5    A.     In claims that might be had by the parties vis-à-vis
6           each other.
7    Q.     So any and all claims that they have under the Swaps
8           or the collateral agreement or the service contracts
9           or any other contracts --
10   A.     Yes.
11   Q.     -- those claims are being resolved by the forbearance
12          agreement?
13   A.     To the best of my knowledge, that is true.
14   Q.     Okay.  And the result of the forbearance agreement is
15          that the City will be able to perform under the
16          forbearance agreement without being subject to any
17          liability to any third party?
18   A.     That is my understanding.
19   Q.     And so will the Swap counterparties, correct?
20   A.     That is my understanding.
21   Q.     It will give you what I'll call a clean closing?
22   A.     As I said earlier this week, it will bring us to
23          closure and certainty, yes.  Earlier today.
24   Q.     That is also one of the values of this agreement to
```

```
        25        both and you the Swap counterparties, you the City?
142: 1   A.   Right.
      2  Q.   Which is that it absolves you for any liability in
      3        connection with the relevant agreements?
      6  Q.   As a result of performance under the forbearance
      7        agreement, correct?
     10  A.   My understanding is that it provides us with closure
     11        and finality regarding any claims and relationships
     12        that the parties have.
     14  Q.   Okay.  And there's no trailing liability?
     15  A.   That is correct.
     16  Q.   And just for the record, if I asked to you assess the
     17        likelihood of success of all of the different claims
     18        that are being resolved by the forbearance agreement,
     19        you would assert the attorney-client privilege and
     20        refuse to answer?
     21  A.   That is correct.  I have made no independent
     22        assessment outside of any conversation I would have
     23        had with counsel and my advisors.
```

**Designation:**

```
144:10   Q.   But I guess I'm saying are you seriously unaware as to
     11        whether there's a release in the forbearance
     12        agreement?
     13  A.   Seriously or not, I think the forbearance agreement
     14        resolved all claims between the parties.  Sitting here
     15        today without examining it, I'm not aware as to
     16        whether or not it specifically has a release.
     17  Q.   Okay.  So the -- whether it's in the forbearance
     18        agreement or in the effect of its approval, it
     19        operates as a release for everyone involved?
     20  A.   Yeah.  The reality is -- when you asked me the
     21        question before as to whether or not it has a release,
     22        the reality is that to the extent you asked -- I
     23        believe in the motion you asked for assumptions and
     24        9019 settlement that the order might well contain a
     25        release so -- I wasn't trying to be truculent with
145: 1        you.  I'm just saying that, yes, the effect of the
      2        approval of the agreement should have that impact.
      3  Q.   I'm not going to try to go claim by claim because your
      4        understanding is it releases all claims of the Swap
      5        counterparties, the service corporations, and the City
      6        against one another?
      7  A.   Yes.
      8  Q.   Now, the Swap insurers, as part of the forbearance
      9        agreement, they get a release of their insurance
     10        obligations under the Swap in the event the City
     11        directs an optional termination, correct?
     12  A.   Yes, I believe that's true.
     13  Q.   And this was one of the things that the City has
     14        touted, which is to say, hey, Swap insurers, pipe down
     15        this is good for you, right?
```

**Designation:**

```
145:17   A.   Yeah, without characterizing, you know, the colloquial
```

```
    18          characterization, yes, we think that's a benefit.
```

**Designation:**
```
145:20   Q.   That's a concept that you've argued in your papers --
    21   A.   Yes.
    22   Q.   -- as to why the Swap insurers should be happy?
    23   A.   Yes.
    24   Q.   Now, do you understand you -- you have argued that
    25        this is a benefit to the Swap insurers under the
146: 1        forbearance agreement, correct?
     2   A.   Yes, I believe so.
```

**Designation:**
```
146:24   Q.   Okay.  As a layperson person, do you have a view one
    25        way as to whether Syncora is a third party beneficiary
147: 1        under the agreement?
     2   A.   As a layperson, I really haven't examined it.
     3   Q.   So don't know one way or the other?
     4   A.   Don't know one way or the other.
     5   Q.   Do you have a view as to whether Syncora or FGIC, for
     6        that matter, can sue to enforce the agreement?
     7   A.   I don't have one way or the other.
     8   Q.   They may have, they may not have?
     9   A.   Yeah.  I'd probably weigh on the side of they don't,
    10        but I -- I don't have a view one way or the other.
    11   Q.   And have you considered the possibility that if they
    12        don't have the right to sue to enforce the agreement,
    13        that they also would not have the right to sue to
    14        enforce the release that's in the agreement?
```

**Designation:**
```
147:16   A.   They might or they might --
```

**Designation:**
```
147:19   A.   They might or they might not.
```

**Designation:**
```
148: 8   Q.   And so if the insurer can't enforce the agreement to
     9        take advantage of the release, that's the insurer's
    10        problem, correct?
    11   A.   Well, without characterizing whether or not it's their
    12        problem or so, my fiduciary duty runs to the City in
    13        its interest; it does not necessarily run to Syncora.
    14   Q.   Yeah.  Can we agree that you certainly didn't
    15        negotiate into the agreement any specific provision
    16        granting the insurers the right to sue to enforce that
    17        provision?
    18   A.   I made no instruction to my team to negotiate such a
    19        provision.
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**
```
151: 6    Q.    If I ask you about the specifics of the conversations
      7          you had about whether the automatic stay applied and
      8          the likelihood that it would or wouldn't, you'll
      9          decline to answer those questions on the basis of the
     10          attorney-client privilege, correct?
     11    A.    Yes, again, today I would have to do that.
```

**Designation:**
```
153:14    Q.    Your counsel rendered advice to you about the
     15          likelihood, the pros and cons of the arguments, and
     16          you're not at liberty to provide that advice to us
     17          because it would invade the attorney-client privilege?
     18    A.    Yes, I believe that's correct.
```

**Designation:**
```
154:18    Q.    If the automatic stay applied, it might get access to
     19          the casino revenue during the whole bankruptcy,
     20          correct?
     21    A.    It might.
     22    Q.    Yeah.  We're talking about different things that you
     23          consider as you're analyzing your options, right?
     24    A.    Yeah, correct.
     25    Q.    And this is -- this is a potentially important one
155: 1          because you might be able to get longer access to cash
      2          from the automatic stay than you were getting from the
      3          forbearance agreement, correct?
      4    A.    Here again, that's a contingent it might, but that has
      5          to be drawn up also in discussion of potential risk
      6          that Safe Harbor provision would allow the
      7          counterparties to exercise their rights and therefore
      8          obviate any benefits the City could receive from the
      9          automatic stay.
```

**Designation:**
```
155:12    Q.    So just to be clear, if I ask you about the specific
     13          ins and outs of all those potential arguments,
     14          likelihoods of success and so forth, you will not
     15          answer those questions on the basis of the
     16          attorney-client privilege, correct?
     17    A.    That is correct.
     18    Q.    Oh, I know.  The City recently argued in court against
     19          yours truly that the automatic stay bars the cash
     20          trapping provisions of the collateral agreement.  Are
     21          you aware of that?
     22    A.    I believe I am, yes.
```

**Designation:**
```
156: 3    Q.    Did the Swap counterparties give their consent to the
      4          City to make those arguments in court?
      5    A.    I don't know.
```

```
 6   Q.   And -- so you don't know whether they did or they
 7        didn't?
 8   A.   That is correct.
 9   Q.   You understand that as originally designed the Swaps
10        were designed to hedge against interest rate risk on
11        the floating COPs?
```

**Designation:**
```
156:15  A.   That is my understanding.
```

**Designation:**
```
156:17  Q.   And I can unpack it if you want.  I know we get into
18           the --
19      A.   That's my understanding.
20      Q.   Yeah, okay.  Let's just do basics of interest rate
21           risk, which is if the interest rates go above the
22           hedge rate, then now the Swap counterparties have to
23           pay the difference to the service corporations so that
24           they can pay the difference to the floating rate COPs,
25           correct?
```

**Designation:**
```
157: 2  A.   That is my understanding.
```

**Designation:**
```
157: 4  Q.   That's how the hedge works.
 5               Now, interest rates do not favor the City
 6           in the Swaps -- we asked that earlier.
 7      A.   Right.
```

**Designation:**
```
157: 9  Q.               But more basics of interest rate hedging,
10           so as the interest rates go up and start to approach
11           the hedge, the amount the City owes under the Swap via
12           service corporations goes down?
13      A.   That -- that is my understanding.
14      Q.   And as it crosses over the hedge line, the service
15           corporation could actually be in the money?
```

**Designation:**
```
157:17  A.   Yeah, here again, we had the discussion about in the
18           money or not, but to the extent your point is saying
19           that they would benefit more from the hedge than the
20           counterparties would, that is my understanding.
```

**Designation:**
```
157:22  Q.   When the interest rates get above the hedge line?
23      A.   (Nods head).
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**

```
158: 5   Q.   When you entered into the forbearance agreement on
      6        July 15th --
      7   A.   Right.
      8   Q.   -- what steps did you take prior to that time to
      9        evaluate future interest rate moves?
     10   A.   Any discussions in those -- that regard would have
     11        been with our investment bankers and generally with
     12        our attorneys.  What I'm trying to think of is were
     13        there any discussions that I had with Miller Buckfire
     14        which would not have been confidential in that regard.
     15        I don't think that there were.  What I can say is that
     16        we evaluated the potentiality of the -- of the
     17        interest rate fluctuation as indexed to LIBOR going up
     18        or down, but I think most of those, if not all of
     19        them, were in communications with one or more of my
     20        attorneys.
     21   Q.   And when you say we evaluated the interest rate
     22        fluctuations, that would have been tasked to Miller
     23        Buckfire to do?
     24   A.   Yes, Miller Buckfire in conjunction with folks from
     25        Jones Day.  Yeah, sure.
159: 1   Q.   Okay.  No disrespect to the fine lawyers at Jones Day.
      2        I don't know if I can calculate future interest rates
      3        as a lawyer.
      4             It was in Miller Buckfire's province to do
      5        it.  They may have done it in conjunction with Jones
      6        Day?
      7   A.   Yes, yes.
      8   Q.   Okay.  And any review of forward curves or different
      9        interest rate implications currently existing in the
     10        market would have been done by Miller Buckfire?
     11   A.   Yes.
     12   Q.   And your recollection is that it was done and it was
     13        something that you considered as part of the decision
     14        entering into this agreement?
     15   A.   I believe so.
     16   Q.   You're aware, for example, that the Federal Reserve
     17        has indicated intent to scale back its monthly bond
     18        purchases?
     19   A.   I heard that.
     20   Q.   And --
     21   A.   Quantitative reasoning --
     22   Q.   Yeah.
     23   A.   Yeah.
     24   Q.   And you're aware that many people believe that that
     25        may lead interest rates to rise; isn't that right?
160: 1   A.   Yes.
      2   Q.   Okay.  Did you analyze the likelihood that the
      3        interest rates would rise or was that also tasked to
      4        Miller Buckfire?
      5   A.   I didn't do it independently.  That would have been
      6        tasked to Miller Buckfire.
      7   Q.   And if I asked what that analysis showed, I would have
      8        to ask Mr. Buckfire that?
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
 9    A.    Yes, you would.
10    Q.    Okay.
11    A.    Yes, you would.
12    Q.    Let me ask you about -- in the motion to assume the
13          forbearance agreement, the City states that it has
14          examined whether there are viable actions to challenge
15          the Swap contracts.  Do you recall that?
16    A.    Yes.
17    Q.    Under what theory could the City challenge the
18          validity of the Swap contracts?
19    A.    Any theories that we discussed -- I'll give you two
20          answers.  One, many of the theories, my understanding
21          is and somebody -- I haven't read all of the
22          objections, but I've read some of them.  Some of the
23          objections in this case have discussed some of those
24          theories.
25                  Two, any theories which we would have
161: 1          examined, either independently or in the context of
 2          reviewing and handicapping the probability of success
 3          of some of the objections, would have been done with
 4          counsel.
 5    Q.    And so you'll refuse to describe both the theories and
 6          their likelihood of success because it would invade
 7          the attorney-client privilege; is that correct?
 8    A.    Yes.  Unfortunately, yes.
 9    Q.    If I asked you what likelihood of success the City
10          attributes to an action seeking to declare the Swaps
11          invalid, you'll decline to answer that on the
12          attorney-client privilege?
13    A.    Yes.
```

**Designation:**
```
161:22    Q.    In your proposal for creditors on June 14, 2013, you
23          said that the City has identified certain issues
24          related to the validity and/or enforceability of the
25          COPs --
162: 1    A.    Yes.
 2    Q.    -- that may warrant further investigation.
 3    A.    Yes.
 4    Q.    Do you remember that?
 5    A.    Yes.
 6    Q.    I'm saving us from having to go through that --
 7    A.    Yeah, yeah.  No.  I remember.
 8    Q.    What issues has the City identified?
 9                  MR. SHUMAKER:  Again, I'm going to caution
10          the witness --
11    A.    Yeah.
12                  MR. SHUMAKER:  -- if this is going to
13          reveal attorney-client communications to not answer.
14                  Subject to that, you can answer.
15    A.    Here again, there would be no issues that -- and I
16          hate to keep saying this.  There'd be no issues that I
17          independently would have identified because I'm trying
18          very hard not to act as a lawyer.  I would have only
19          identified those issues and had discussions of them in
```

```
20        consultations with my attorneys.  So whether there are
21        issues such as void ab initio, fraud, any of the other
22        issues that typically go to contracts, I would only
23        have had those discussions with counsel, so
24        consequently I can't speak to this.
25   BY MR. HACKNEY:
163: 1   Q.   Okay.  And you'll assert the attorney-client privilege
2             as a protection against describing the invalidity of
3             the COPs analysis?
4        A.   Yes, because I did no independent analysis.
5        Q.   Has the City completed its investigation into this
6             issue?
7        A.   No.  The City's investigation into a number of things
8             are ongoing.
9        Q.   Okay.  And this is one of them?
10       A.   This is one of them, yeah.
11       Q.   Okay.  So the City hasn't reached a conclusion on this
12            subject because it hasn't concluded its investigation
13            into the subject, correct?
14       A.   It -- I think that's fair, yes.
15       Q.   And has the City considered whether the service
16            agreements between the service corporations and the
17            City are lawful?
18       A.   I don't recall if we looked into that.
19       Q.   So that's one that you --
20       A.   I just don't recall if that was one.
21       Q.   You may have investigated, you may have not?
22       A.   Correct.  I don't recall that one.
23       Q.   If you have investigated, do you know if the
24            investigation has concluded or do you not know?
25       A.   No.  If we had investigated or are investigating it,
164: 1        my understanding it would not have been concluded.
2        Q.   Okay.  So much like with the COPs, generally the
3             validity of the service contracts with the City is a
4             subject of ongoing investigation that has not yet
5             concluded.
6        A.   It may be the subject of ongoing investigation which
7             has not yet concluded.
8        Q.   Okay.  If I asked you how either of those two
9             investigations, the one into the COPs validity or the
10            one into the service contracts validity, impacted your
11            decision to enter into the forbearance agreement, you
12            will decline to answer because it would tend to reveal
13            attorney-client communications?
14       A.   For all the reasons we discussed today, the -- yes, I
15            would have to.
16       Q.   Mr. Orr, let me ask you about under section 803 of the
17            service contracts --
18       A.   Yeah.
19       Q.   -- I'm going to save us both from having to go through
20            them --
21       A.   Yeah.
22       Q.   -- so I'll represent to you what it relates to and see
23            if you've heard of it.
24       A.   Okay.
25       Q.   Okay?
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
165: 1                    Under section 803 of the service contracts
     2         payments by the City to the service corporations are
     3         classified according to a waterfall.
     4    A.   Um-hm.
     5    Q.   Have you heard of this waterfall?
     6    A.   Yes.
     7    Q.   Okay.  Did you evaluate whether there were any claims
     8         that any parties to the structure might have against
     9         one another if the forbearance agreement leads to the
    10         payment of monies outside of the waterfall?
    11    A.   I assume you're alluding to prioritization or
    12         subordination in claims along those regards, and the
    13         answer:  I think there probably was, but, here again,
    14         I would -- I did not do it independently.  It would
    15         have been done by my counsel.
    16    Q.   Okay.  So you can't tell me the fruits of the analysis
    17         or the City's position on the likelihood of success on
    18         the issue because it's protected by the
    19         attorney-client --
    20    A.   That is --
    21    Q.   -- privilege?
    22    A.   -- correct.
    23    Q.   If I ask you how it impacted your decision to enter
    24         into the forbearance agreement, you'd also not be able
    25         to answer that on the basis of the attorney-client
166: 1         privilege?
     2    A.   That is correct.  In addition, that's part of the
     3         deliberative process.
     4    Q.   Have you analyzed whether or not COP holders might
     5         have claims against the Swap counterparties if the
     6         City exercises the optional termination right?
     7    A.   There -- have we analyzed it?  The answer is yes, I
     8         believe so.
     9    Q.   Okay.  What's the result of that analysis?
    10    A.   Here again, any discussion would have been caught up
    11         in discussions I would have had with my counsel in
    12         that regard, so I decline to answer the question.
```

**Designation:**
```
166:22   Q.   We've just been talking now about the COPs.  We've
    23         talked about the Swaps a lot.  I'm going to for a
    24         moment reference the 2006 COPs Swap transaction
    25         documents.
167: 1   A.   Okay.
     2   Q.   Do you know generally what I mean when I say that?
     3   A.   Yes.  The original documents by which the City
     4         borrowed money, 1.4 billion, for the unfunded
     5         actuarial liability --
```

**Designation:**
```
167: 7   A.   For the unfunded actuarial liability involve -- the
     8         organic documents.
```

**Designation:**

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
167:10   Q.   That is exactly correct.  And, to name a few, there
    11        are the service contracts, the contract administration
    12        agreement, the trust agreement, and the master and --
    13        and amended Swap agreements, correct?
    14   A.   Yes.
    15   Q.   You've heard of all of those?
    16   A.   Yes.
    17   Q.   And there are multiple versions of them?
    18   A.   There are multiple versions of them.
    19   Q.   For example, there are two service contracts --
    20   A.   That's right.
    21   Q.   -- because there are two service corporations.
    22   A.   That's right.
    23   Q.   Now, your understanding is that some of these
    24        documents were amended in 2009 in connection with the
    25        addition of the collateral agreement to the package,
168: 1        correct?
     2   A.   Yes.  I'm going to take your meaning -- the amendment
     3        to mean that's the -- yes, the net effect of what
     4        happened in 2009.
     5   Q.   Okay.  Did you know, for example, that the service
     6        contracts were also literally amended --
     7   A.   Yes.
     8   Q.   -- as part of that?
     9   A.   Yes.  We're talking generally about all the documents
    10        without specifically going into each one.
    11   Q.   Although I did -- I did in that last one.
    12   A.   Yeah, you did, and so I'm following your lead on what
    13        we're talking about.
    14   Q.   Okay.
    15   A.   Okay.
    16   Q.   The Swaps were also themselves amended in addition to
    17        the collateral agreement being created?
    18   A.   I believe so.
```

**Designation:**
```
169: 2   Q.   I believe the City ordinance describes this as all one
     3        transaction.
     4   A.   Right.
     5   Q.   Do you have a basis to dispute it?
```

**Designation:**
```
169: 8   A.   Yeah.
```

**Designation:**
```
169:10   A.   Yeah, I have no basis to dispute it.  Yeah.
```

**Designation:**
```
169:17   Q.   You took a look at them.  You know that they all refer
    18        to one other and relate to one another.
```

# Objectors' Designations From August 30, 2013 Deposition of
# Kevyn Orr

**Designation:**
```
169:22  A.   Yeah, if -- without drawing any legal meaning to the
    23       concept that they all refer to one another, I believe
    24       that they do.
```

**Designation:**
```
170: 1  Q.   Now, the forbearance agreement that you just signed on
     2       July 15th, that also references the 2006 transaction
     3       documents, correct?
     4  A.   I believe so.
     5  Q.   Okay.  In fact, doesn't it borrow certain terms from
     6       some of those documents?
     7  A.   Without -- yeah, without reviewing the 2005 and 2006
     8       documents or spending time here today reading through
     9       this agreement, I believe that's accurate.
```

**Designation:**
```
170:15  Q.   The -- do you know that one of the things that the
    16       City agreed to do under the forbearance agreement is
    17       that during the optional termination period --
    18  A.   Right.
    19  Q.   -- the City won't try to seek to invalidate any of the
    20       2006 transaction documents?
    21  A.   I believe that's true.
    22  Q.   Okay.  That's one piece that's big enough that you're
    23       familiar with?
    24  A.   Yeah, I believe that's true.
    25  Q.   So is it fair to say that the 2006 transaction
171: 1       documents, the collateral agreement from 2009, and the
     2       forbearance agreement are all documents that relate to
     3       the same subject matter?
     4  A.   Without drawing a legal conclusion, I believe in a
     5       broad sense it's fair to say that they relate to the
     6       same subject matter, meaning the Swaps.
     7  Q.   Does the forbearance agreement amend any of the
     8       provisions in the 2006 COPs or Swap transaction
     9       documents?
```

**Designation:**
```
171:12  A.   Yeah.  I want to be very careful here.  In addition to
    13       the document speaks for itself, I don't want to draw a
    14       relationship between the COPs document, which is
    15       separate, to the Swaps document.
    16            When I said they relate broadly to the
    17       subject, to the extent COPs were money borrowed to try
    18       to fund a pension obligation, and the Swaps were in
    19       place as a hedge against the interest rate
    20       fluctuations in those documents, and the collateral
    21       agreement 2009 was a document that was meant to
    22       address defaults that had occurred in relation to the
    23       Swaps document, and this document was meant to address
```

```
        24         the Swaps, they relate to that same subject area, but
        25         I don't want to have my testimony suggest that there's
  172: 1            a legal relationship between the COPs and the Swaps
         2         document as relates to this agreement, forbearance and
         3         optional termination agreement.
```

**Designation:**

```
  172: 5   Q.    So as you sit here today, is your answer that you
         6         don't know if the forbearance agreement amends any of
         7         the 2006 COPs Swap transaction documents?  It may, it
         8         may not, you don't know?
         9   A.    That is -- that is correct.  I'm not going to draw a
        10         legal conclusion.
```

**Designation:**

```
  173: 8   Q.    Okay.  Is it your understanding that the 2006 COPs
         9         Swap transaction documents retain their vitality as
        10         legal agreements to the -- of the parties thereto?
        11   A.    It's my understanding that they have whatever vitality
        12         they have according to their terms.
        13   Q.    Okay.  So all the rights that all the parties to the
        14         COPs Swap transaction documents had before the
        15         forbearance agreement, they still have today?
        16   A.    No.  Here again, you're -- I just want to be careful.
        17         It seems that you're trying to conflate COPs with
        18         Swaps, and I want to be careful.
        19   Q.    Well, I want to say all of them, but if you say no,
        20         it's different on these, some rights have changed, but
        21         on these everyone's rights are preserved, that's okay.
        22   A.    Yeah, I want to be careful as far as saying what their
        23         rights are because I do believe those are legal
        24         questions, and in fact some of them are being
        25         litigated in the various piece of litigation that are
  174: 1            going on.
         2   Q.    Hence this deposition?
         3   A.    Hence this deposition.  So I want to be very careful
         4         that I not give any testimony that would implicate a
         5         legal conclusion with regard to those documents.
         6   Q.    And I'm not asking for a legal conclusion.  I'm just
         7         asking for your understanding as the signatory --
         8   A.    Right.
         9   Q.    -- as to whether the COPs Swap transaction documents,
        10         whether all the parties preserved their rights under
        11         those documents, not withstanding the forbearance
        12         agreement, or whether the forbearance agreement
        13         changes the parties' rights under those documents.
        14   A.    And that's why I'm being careful because my
        15         understanding of the forbearance agreement is that it
        16         imposed upon the City, service corporations and the
        17         counterparties certain obligations to forebear.  I'm
        18         not going to draw a legal conclusion as to whether or
        19         not that amended any rights or changed any rights
        20         under the original documents.
        21   Q.    It may have, it may not have?
```

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
| 22    | A. | It may.  It may have not.  I'll leave that to the           |
| 23    |    | attorneys.                                                  |
| 24    | Q. | It may constitute a waiver, it may not constitute a         |
| 25    |    | waiver, you'll leave that to the attorneys?                 |
| 175: 1| A. | I'll leave that to the attorneys.                           |
| 2     | Q. | At the time that you entered into the forbearance           |
| 3     |    | agreement, were you aware that the Swap insurers had        |
| 4     |    | the right to consent to waivers, modifications or           |
| 5     |    | amendments of the Swap agreement and the collateral         |
| 6     |    | agreement?                                                  |
| 8     | A. | I was aware that some of the Swap insurers had              |
| 9     |    | asserted they had those rights.  I had drawn no             |
| 10    |    | independent legal conclusion as to whether or not they      |
| 11    |    | did.                                                        |
| 13    | Q. | Okay.  So you didn't know whether they were right or        |
| 14    |    | they were wrong --                                          |
| 15    | A. | Correct.                                                    |
| 16    | Q. | -- at the time you executed the agreement?                  |
| 17    | A. | I had had discussions with my attorneys about whether       |
| 18    |    | they were right or they were wrong, but I had no            |
| 19    |    | independent conclusions.                                    |
| 20    | Q. | And you won't disclose the subject of your counsel's        |
| 21    |    | communications?                                             |
| 22    | A. | I cannot disclose that subject because that's an            |
| 23    |    | attorney-client communication.                              |
| 24    | Q. | Did you evaluate when you entered into the forbearance      |
| 25    |    | agreement, whether the act of entering into it would        |
| 176: 1|    | multiply the amount of litigation that the City might       |
| 2     |    | face?                                                       |
| 3     | A. | I think it's fair to say that we considered whether it      |
| 4     |    | might.  Any time you're in a transaction I think you        |
| 5     |    | consider whether it might suborn litigation, yes.           |
| 6     | Q. | And what were your conclusions on this subject?             |
| 7     | A. | Here again, any conclusions we would have had would         |
| 8     |    | have been in this whole air of discussions with my          |
| 9     |    | counsel.  What I can say, without saying what my            |
| 10    |    | conclusions specifically were of the probability that       |
| 11    |    | it might create additional litigation, is I thought         |
| 12    |    | that overall it was in the best interest of the City        |
| 13    |    | to enter into agreement.                                    |
| 14    | Q. | But you won't disclose to me your communications with       |
| 15    |    | your counsel about whether this might multiply the          |
| 16    |    | amount of litigation?                                       |
| 17    | A. | That is correct.  Multiply, increase, whatever.             |
| 18    | Q. | And have you -- did you evaluate whether performing         |
| 19    |    | under the forbearance agreement, performing -- and by       |
| 20    |    | that I mean exercising the option.                          |
| 21    | A. | Right.                                                      |
| 22    | Q. | Whether -- let me say it again.                             |
| 23    |    | Have you evaluated whether exercising the                   |
| 24    |    | option under the forbearance agreement might subject        |
| 25    |    | the City to additional liability?                           |
| 177: 1| A. | Here again, all of these issues regarding potential of      |
| 2     |    | contingent claims, additional litigation, the              |
| 3     |    | advisability of entering into the agreement,                |
| 4     |    | considering that we were in litigation, and as I said       |

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
       5            before there may have been litigation threats made
       6            additionally, were taken into consideration in
       7            consultation with my counsel.
       8    Q.      But you can't disclose those communications?
       9    A.      They are attorney-client communications.
```

**Designation:**
```
178: 5    Q.      Let me hand you what I've marked as Orr Exhibit 4.
```

**Designation:**
```
178:10    Q.      Do you have Orr Exhibit 4 in front of you, sir?
      11    A.      Yes, I do.
      12    Q.      So, Mr. Orr, I'll represent to you that this is the
      13            proposed order that your counsel submitted along with
      14            the motion.
```

**Designation:**
```
178:17    Q.      Do you understand that?
      18    A.      Yes.  Yes, I do.
```

**Designation:**
```
179:20    Q.               Do you understand the Swap counterparties
      21            and the City and the service corporations -- there's a
      22            provision in the forbearance agreement that talks
      23            about the fact that you need to get an order
      24            entered --
      25    A.      Sixty days.
180: 1    Q.      -- that's mutually agreeable.
       2    A.      Yes.
       3    Q.      And that was the 60-day time period.
       4    A.      Yes.
       5    Q.      And we can find the specific provision, but --
       6    A.      Yes.
       7    Q.      -- you know what I'm talking about.
       8    A.      Yes, I do.
       9    Q.      Okay.  So the form of the order is important.
      10    A.      Um-hm.
      11    Q.      Is that a yes?
      12    A.      Yes.
      13    Q.      And it's important because if the order changes
      14            materially, it might arguably give the Swap
      15            counterparties the right to declare an end to the
      16            termination period.
```

**Designation:**
```
180:19    A.      Here again, without making a legal assessment, I
      20            understand your meaning that we -- we have an
      21            obligation in the City to make sure the order is in a
      22            form that is mutually agreeable to the parties.
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**
```
180:24  Q.   And this is it, right?
    25  A.   That is the proposed order.
181: 1  Q.   And this one, you know, is mutually agreeable to the
     2       parties.
     3  A.   I believe that it is, yes.
     4  Q.   I mean, you may not have negotiated it --
     5  A.   Correct.
     6  Q.   -- personally, but it's your expectation that people
     7       acting on your behalf then went to make sure that the
     8       proposed order was mutually agreeable to the Swap
     9       counterparties?
    10  A.   That is correct.
```

**Designation:**
```
182:19  Q.   Okay.  But if the Court enters an order that is not
    20       mutually agreeable to the City and the Swap
    21       counterparties, that could give the Swap
    22       counterparties the right to terminate the optional
    23       forbearance period?
```

**Designation:**
```
183: 1  A.   Yes.  Here again, it's speculative, in my -- but I
     2       don't anticipate that experience.  In my experience
     3       most judges are -- my experience is that many judges
     4       are very careful not to undermine the underlying
     5       agreement by the order that's entered.
```

**Designation:**
```
183: 7  Q.   So we can agree, though, that this order is an
     8       important part of the forbearance agreement, correct?
     9  A.   Yes.  I think the order is relevant to the forbearance
    10       agreement.
    13  Q.   And it's important to it?
    15  A.   I think it's a -- yes.
```

**Designation:**
```
184:11  Q.   Do you know who -- do you know whether anyone
    12       approached the service corporations to get their views
    13       on the order?
    14  A.   I do not.
    15  Q.   You certainly didn't?
    16  A.   No.
```

**Designation:**
```
187:24  Q.   Let me ask you about some of them then.  Look on the
    25       page 3 at E which is entitled Consent to Use of Casino
188: 1       Revenues.
     2  A.   Um-hm.  Um-hm.
     3  Q.   And it contains a finding that says, "Pursuant to
     4       section 1.2 of the forbearance agreement, UBS AG and
```

```
 5          MLCS consent to the City's use of the casino revenue
 6          as set forth in the forbearance agreement."
 7                  Do you see that?
 8    A.    Yes, I do.
 9    Q.    And then it says, "The consent of the UBS AG and MLCS
10          will allow the City immediate access to its casino
11          revenue as set forth in forbearance agreement and no
12          other or further consents are required."
13                  Do you see that?
14    A.    Yes, I do.
15    Q.    Okay.  Is this an important part of the proposed
16          order?
```

**Designation:**
```
188:18 A.   Well, first, the document speaks for itself.  Two --
```

**Designation:**
```
188:20 Q.   It doesn't speak for itself in terms of whether it's
21          important.
22    A.    Well, let me respond.  Two, to the extent this is an
23          order into a motion, it -- as we had discussed earlier
24          today, it's important that we have unfettered access
25          to the casino revenue; and, three, I do think this is
189: 1      a central aspect of the forbearance agreement.
```

**Designation:**
```
189:12 Q.   Take a look at paragraph G, arms' length agreement.
13          The forbearance agreement was negotiated at arms'
14          length and in good faith by all parties, and it goes
15          on to say, "UBS AG and MLCS are not insiders of the
16          City as that term is defined in bankruptcy code
17          section 10131?
18    A.    Um-hm.
19    Q.    And this is the important part I want to you focus on,
20          "The parties entry into and performance under the
21          forbearance agreement does not violate any law,
22          including the bankruptcy code, and does not give rise
23          to any claim or remedy against the parties thereto
24          except as may be expressly set forth in this order or
25          in such agreement."
190: 1              Do you see that?
 2    A.    Yes.
 3    Q.    Do you remember earlier we talked about whether if the
 4          City performed under the forbearance agreement it
 5          would be able to do so without the fear of liability
 6          to other parties?
 7    A.    Yes.
 8    Q.    And your understanding was it could do so, correct?
 9    A.    Yes.
10    Q.    And that so could the Swap counterparties, correct?
11    A.    Yes.
12    Q.    And isn't this provision one part of the basis for
13          your -- for that view?
14    A.    Well, you know, as I said, this provision draws a
```

```
15        legal conclusion and I have not independently or as an
16        attorney done an analysis of what this provision will
17        provide, but that's my understanding, yes.
18   Q.   Are you just reading this provision for the first
19        time?
20   A.   No.  I think I -- as I said, I think I saw the order
21        attached to the motion.  I just didn't recall it
22        immediately or as terms by itself.  I was more
23        familiar with the motion because I read that in
24        conjunction with my affidavit that was attached to the
25        motion, but I think that's the effect of what this
191: 1    provision does.
2    Q.   Is this an important part of the order --
5    Q.   -- from the City's perspective?
7    A.   Yes, without giving rise to the nomenclature
8         important.  As I said before, it's important that we
9         have certainty and -- regarding the use of the casino
10        revenue, and this term certainly looks like it would
11        provide that.
13   Q.   Okay.  And not only does it provide you the certainty
14        about the casino revenue, it provides you with the
15        certainty that you will not be -- the City will not be
16        subject to any liability as a result of performing
17        under the forbearance agreement, correct?
18   A.   Yes, I believe so.
19   Q.   And it does the same thing for the Swap
20        counterparties, correct?
21   A.   Yes, I believe so.
22   Q.   Take a look at paragraph 4 on the bottom of page 4.
23   A.   Um-hm.
24   Q.   It says, "The forbearance agreement is approved in its
25        entirety.  The City is authorized to perform its
192: 1    obligations that arise from the forbearance agreement
2         pursuant to Bankruptcy Rule 9019, and any actions
3         taken heretofore in furtherance of these obligations
4         are hereby ratified."
5              Do you see that?
6    A.   Yes, I do.
7    Q.   You understand that to be a provision by which the
8         Court provides a judicial authorization to the City
9         and the Swap counterparties to perform under the
10        forbearance agreement, correct?
15   A.   My understanding --
17   A.   My understanding is that is the practical effect of
18        this provision.
20   Q.   Okay.  Is this an important part of this order?
21             MR. SHUMAKER:  Objection to form.
22   A.   I think approval of the forbearance agreement is an
23        important part of this order, yes.
25   Q.   But also the judicial authorization to perform.
193: 1   A.   Yes, I believe so.
2    Q.   Let me -- let me cut through some of these provisions,
3         which is, what the parties really want the Court to do
4         here, both the City and Swap counterparties, is to
5         tell them you are allowed to perform this forbearance
6         agreement without fear of reprisal from any third
```

```
 7          party, correct?
10    A.    Yeah, and I also think it calls for a legal
11          conclusion, but let me see if I can answer the
12          question.  The motion sets forth what I believe are
13          the conditions necessary for approval of the
14          forbearance agreement.  This order seeks to approve
15          that motion, so to the extent it does that, yes, I
16          believe it authorizes the parties to perform and gives
17          them the authority to go forward to a motion according
18          to its terms which incorporates by definition the
19          forbearance agreement, so yeah.
21    Q.    And they can do so without fear of liability to third
22          parties.
23    A.    You know, that -- that impacts upon -- I believe that
24          may impact upon the question is not atypical in some
25          orders as far as -- as we discussed earlier today,
194: 1      releases, third party liability, exculpation, those
 2          are legal conclusions.  My understanding is that the
 3          way the order is -- is worded that, yes, it allows the
 4          parties to go forward.
 5                  COURT REPORTER:  To --
 6                  THE WITNESS:  To go forward.
 7                  MR. HACKNEY:  Without liability to third
 8          parties.
 9    BY MR. HACKNEY:
10    Q.    I think we're going over ground we've gone over
11          before.
12    A.    Yeah.  I believe that's the intent of the order, yes.
13    Q.    Okay.  So one of the benefits of the order to the City
14          and the Swap counterparties is that to the extent
15          there are third party claims -- and I know you're not
16          conceding that there are any --
17    A.    Right.
18    Q.    -- it clears them away.
19    A.    I believe that's accurate, which is one of the -- yes.
20          I believe that's accurate.
```

**Designation:**

```
197:13    Q.    The -- I want to talk about the source of proceeds for
14              any potential termination payment down the road.  This
15              is a subject I discussed with Mr. Buckfire yesterday.
16        A.    Um-hm.
```

**Designation:**

```
198:15    Q.    And I'm going to give you some notional amounts that
16              are based on comments your counsel has made in court,
17              just to try and get general agreement.
18        A.    Sure.
```

**Designation:**

```
198:19    Q.    But it's very possible that the amount of the
20              termination payment could be between 180 and 220
21              million dollars?
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**

| | | |
|---|---|---|
| 198:23 | A. | I think that's fair.  We certainly hope it's on the |
| 24 | | lower end or lower of that scale, but that depends |
| 25 | | what the rates are at any given day. |

**Designation:**

| | | |
|---|---|---|
| 199: 2 | Q. | Okay.  Now, let's link up the potential sizeable |
| 3 | | termination payment that the City may have to marshall |
| 4 | | if it wants to exercise the option with the City's |
| 5 | | current financial capabilities. |
| 6 | A. | Yes. |
| 7 | Q. | Okay.  Isn't it true that the City does not currently |
| 8 | | have enough cash on hand to be able to fund a |
| 9 | | termination payment that was in the range of 200 |
| 10 | | million dollars? |
| 11 | A. | That is true. |

**Designation:**

| | | |
|---|---|---|
| 199:15 | Q. | Do you know how much cash the City has today? |
| 16 | A. | On any given day, we fluctuate approximately in the |
| 17 | | neighborhood of I want to say 30 to 40 million |
| 18 | | dollars.  Right now that number may be a little bit |
| 19 | | higher because we just went through one of our tax |
| 20 | | collection periods in August. |

**Designation:**

| | | |
|---|---|---|
| 200: 3 | Q. | Do you still project that you're going to run out of |
| 4 | | cash by the end of the year? |
| 5 | A. | If we don't have this agreement, there's a very real |
| 6 | | chance, yes, in a steady state, we will run out of |
| 7 | | cash. |
| 8 | Q. | And by -- what do you mean by a steady state? |
| 9 | A. | If we don't do anything such as secure this casino |
| 10 | | revenue, if we don't go to the capital markets and |
| 11 | | borrow additional funds, which appears unlikely which |
| 12 | | the City has done every other year since 2008 to make |
| 13 | | up the difference, yes, the projections show that by |
| 14 | | December of this year, we will run out of cash. |
| 15 | Q. | Are those the pre-bankruptcy projections? |
| 16 | A. | Yes.  I believe so. |
| 17 | Q. | Those are the projections that we'll get into in a |
| 18 | | moment that -- but that assumes that the City's paying |
| 19 | | its legacy expenditures on a current basis, right? |
| 20 | A. | Yes.  As we have -- as we have represented, we intend |
| 21 | | to continue doing that throughout the year. |

**Designation:**

| | | |
|---|---|---|
| 201: 8 | Q. | So let's go back to sourcing this termination payment. |
| 9 | A. | Yes. |
| 10 | Q. | It was my understanding of his testimony that |

```
11        Mr. Buckfire who, by the way, is the individual tasked
12        with obtaining the City's post petition financing,
13        correct?
14   A.   Yes.
15   Q.   And is presumably the individual that's most
16        knowledgeable about that effort?
17   A.   Yes.
18   Q.   It was -- I'll represent to you that his testimony was
19        that the proceeds for the optional termination payment
20        would likely come from the post -- the proceeds of the
21        post petition financing?
22   A.   Yes.
```

**Designation:**
```
201:25  Q.   Is that also your understanding?
202: 1  A.   Yes.
```

**Designation:**
```
203:10  Q.   So I do want to talk about -- this is important.
11           Okay.  This is -- isn't it true that one aspect of the
12           DIP -- I'm not going to get into the others -- is that
13           the casino revenues will be pledged or anticipated to
14           be pledged as collateral for the post petition
15           financing?
16      A.   Let me say this.  That is certainly under
17           consideration.
18      Q.   Okay.  Now, isn't it also true, though, that the
19           casino revenues have not currently been freed up on a
20           permanent basis because the City has not currently
21           exercised the option, correct?
22      A.   The certainty that we hope to get out of the
23           forbearance agreement has not been approved yet,
24           correct.
25      Q.   Well, even if it is approved by the Court, you still
204: 1       won't have exercised the option.
2       A.   That is true with regard to the optional termination
3            payment.
```

**Designation:**
```
204: 6  Q.   And you need to exercise the option to terminate the
7            hedge, right?
8       A.   Yes.
```

**Designation:**
```
204:17  Q.   You think it's a fair characterization that you need
18           to get the hedge terminated to get the collateral
19           agreement terminated?
20      A.   Yes.
21      Q.   And the good part for the City, if those things
22           happen, is that now you have unchanneled access to the
23           casino revenues going into the future?
24      A.   Yes, as we've said today, that certainty is one of the
25           motivations to enter into the agreement.
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
205: 1   Q.   But do you also understand that you can't currently
     2        pledge the casino revenues to a post petition lender
     3        in a -- prior to having exercised the option under the
     4        forbearance agreement?
     5   A.   Well, let's be careful without drawing legal
     6        conclusions.  You can always enter into agreements
     7        that have contingencies attached to them and the
     8        parties will wait for those contingencies to occur.
     9        That certainly has happened with a number of different
    10        negotiations, not just in this case, but happens all
    11        the time.
    12   Q.   That's fair that you absolutely -- you make a pledge
    13        that's contingent on something else.  But isn't it
    14        true that, as a general matter, post petition lenders
    15        typically like to make sure that they have clean
    16        collateral before they make a loan that's secured by
    17        that collateral?
```

**Designation:**

```
205:20   A.   I think that's generally a fair characterization;
    21        however, there have been cases that I've been involved
    22        with outside of this one where post petition lenders
    23        have been willing to make pledges or commitments
    24        subject to certain contingencies.
```

**Designation:**

```
206: 1   Q.   Isn't it your expectation today, though -- is it -- is
     2        it your expectation today that any post petition
     3        lender will want clear -- a clear lien on the casino
     4        revenues before it's willing to lend?  Is that your
     5        current expectation?
     6   A.   Well, my current expectation is it might well want
     7        clear lien before it's willing to fund.  I would think
     8        in many of the bankruptcy cases that I've been
     9        involved in, post petition lenders, for instance, are
    10        willing to make commitments subject to the Court
    11        approving their super priority liens, and then once
    12        that approval is granted, they fund the loan, so
    13        that's fairly common.
    14   Q.   I'm going to confirm for the record that conversations
    15        with the State of Michigan about providing DIP
    16        financing or with the federal government about
    17        providing DIP financing are still questions that you
    18        will refuse to answer on the grounds of commercial
    19        sensitivity?
```

**Designation:**

```
206:24   Q.   Are they commercially sensitive?
    25   A.   They are commercially sensitive, but I don't want to
207: 1        mislead you.  It is my assumption that, while they're
     2        commercially sensitive, that's not going to be
     3        forthcoming.
     4   Q.   Oh, really?
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
 5    A.   Yes.
 6    Q.   So just to tie it up, you tried to get a -- whether
 7         it's credit enhancement or liquidity from the State
 8         and the Feds, and your expectation is that you won't
 9         be able to?
10    A.   My understanding at the State level is that there's
11         certain prohibitions of the State law on the ability
12         of the State to lend to the City, and at the Federal
13         level my understanding is that it's not going to be
14         forthcoming, direct aid.
15    Q.   Interesting.  And what about credit enhancement by the
16         State?
17    A.   Here again, it's highly commercially insensitive --
18         sensitive.  I don't want to say anything that
19         forecloses it, but we -- let me answer it this way.
20         We are operating on the assumption that that will not
21         come -- be forthcoming.
22    Q.   The casino revenues are about 170 million dollars a
23         year; isn't that correct?
24    A.   Yeah, 170, 180 somewhere in there.
25    Q.   Yeah.  In fact, that -- it's interesting because the
208: 1         DIP proceeds you're seeking are up to 350; is that
 2         correct?
 3    A.   Here again, those are commercially sensitive, but I
 4         think that's fair.  Yes, I think that's fair.
 5    Q.   Okay.  And that's the equivalent of two years' worth
 6         of casino revenues, correct?
 7    A.   Yes.
```

**Designation:**
```
209: 5    Q.   The fact of the matter is the DIP process is just
 6         getting off the ground, correct?
 7    A.   I think that's fair to say.
 8    Q.   I think it's literally in the last couple days, right?
 9    A.   I think that's fair.
10    Q.   So you don't know as you sit here today, and you
11         probably wouldn't tell me if you did --
12    A.   Right.
13    Q.   -- what the current appetite of the lenders is for
14         uncertainty around the casino revenues, correct?
15    A.   That -- that I think is part of the process.  Yeah.
16    Q.   Now, have you attempted to borrow money -- has the
17         City attempted to borrow money and secure those
18         borrowings with a lien on something other than the
19         casino revenues?
20    A.   No.
21    Q.   Is the -- is the City considering pledging art as
22         collateral?
```

**Designation:**
```
211: 2              MR. SHUMAKER:  I'm going to say that's --
 3         we're drawing a line.  We're getting into specifics,
 4         and I'm going to instruct him not to answer.
 5              MR. HACKNEY:  I -- okay.  That's just all I
 6         need to know for the record.
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**

```
211:11   Q.   The City does have other revenue streams; isn't that
    12        correct?
    13   A.   Yes.
    14   Q.   In fact, on an annual basis, the City's revenues are
    15        in the neighborhood of a billion to a billion 1,
    16        correct?
    17   A.   Yes, I think that's fair.
    18   Q.   And on an annual basis, the casino revenues are in the
    19        range of 170 to 180 million?
    20   A.   Yes.
    21   Q.   Roughly a little less than 20 percent of the City's
    22        annual revenues.
    23   A.   17 and a half, 18 percent.
```

**Designation:**

```
211:25             So have you engaged the possibility of
212: 1        pledging other revenue streams as security for the
    2         DIP?
    3    A.   This is a commercially sensitive area.  In addition,
    4         there are potentially legal issues that must be
    5         resolved.  Suffice it to say we have examined a number
    6         of different possibilities, looking at what options we
    7         might have given the City's various ordinary revenue
    8         streams.
    9    Q.   And are there other revenue streams that could be
    10        pledged?  I'm not going to ask you whether you are
    11        going to pledge them, whether you will, whether you
    12        plan to, but are there other revenue streams that
    13        could be pledged?
    14   A.   There might be.  There might be, but there's -- here
    15        again, there's certain legal issues regarding any
    16        revenue streams that have to be resolved.
```

**Designation:**

```
212:20   Q.   So just in terms of level setting --
    21   A.   Right.
    22   Q.   -- the casino revenues are approximately 15 million a
    23        month.
    24   A.   Yes, I think that's fair.
    25   Q.   Net of the Swap payment which is still made on a
213: 1        monthly basis under the forbearance agreement --
    2    A.   Yes.
    3    Q.   -- you net about 11 million?
    4    A.   I think that's correct.
    5    Q.   Okay.  Your claim is that these revenues are necessary
    6         to the operation of the City.  I think we discussed
    7         that earlier.
    8    A.   Yes.
    9    Q.   And in fact it's your expectation that you will use
    10        these revenues to fund the reinvestment program that
    11        you have planned with respect to the 1.25 billion
```

```
12        dollars of reinvestment in the City over the next ten
13        years?
14    A.  Yes, that's correct.  An average of 125 million a year
15        which a big component of it is this revenue.
16    Q.  Okay.  So fair statement, you're going to take the
17        casino revenues and you're going to plow them into the
18        City, correct?
19    A.  More -- I mean, money goes into a bathtub, but yes.
20        The casino -- we don't have the casino revenue.  We
21        have no other source to make reinvestment in the City.
22    Q.  And that's what you want to do?
23    A.  Yes.
24    Q.  And so as a creditor, I'm going to make the obvious
25        point that you don't plan to take the casino revenues
214: 1        and give them to the unsecured creditors, correct?
2    A.  I think that's generally a fair characterization.
3    Q.  So isn't it fair that other than perhaps certainly
4        benefitting the people of Detroit if you reinvested in
5        the City, the creditors themselves will not see their
6        recoveries enhanced by the fact that the City has
7        gained access to these casino revenues, correct?
10    A.  Yeah, I'm going to be careful here because one of the
11        things we've offered in our proposal, June 14th
12        proposal, is a 2 billion dollar note that has some
13        capacity to fluctuate.  Generally speaking, your
14        statement is true, but there's another concept that
15        without this reinvestment there's a very real chance
16        that the City will have no chance to stabilize and
17        grow and the creditors will see no opportunity for any
18        benefit because the City would have an inability of --
19        continue to decline, quality of life will continue to
20        decline, revenue from other streams will continue to
21        decline, and the City's ability to satisfy its
22        obligations to the creditors will continue to decline.
23    Q.  Now, I understand that distinction, and we're talking
24        now about the proposal you've made to creditors that
25        you would give all of the unsecureds --
215: 1    A.  Yes.
2    Q.  -- effectively a pot of 2 billion dollars of bonds.
3    A.  Correct.
4    Q.  And I want to distinguish between two concepts and
5        make sure that we're on the same page because I think
6        that we are.
7    A.  Right.
8    Q.  The first point is that you do agree that you're not
9        going to take the casino revenues and put it on top of
10        the 2 billion pot to make a larger recovery for
11        creditors.
12    A.  Yes, that's fair.
13    Q.  But you are saying that there could be some value to
14        the creditors of a revitalized Detroit because that
15        Detroit will be more able to perform under the
16        2 billion dollars in bonds that you're going to give
17        them as part of your proposal?
18    A.  That's correct.
19    Q.  Okay.  Did I summarize accurately the distinction you
```

```
    20          were trying to draw there?
    21    A.    Yes.  Yes.  There's a broader concept about the need
    22          to revitalize the City and grow beyond just the
    23          interest of the creditors.  It's also for the citizens
    24          and residents and future of the City.
    25    Q.    Oh, absolutely.  I understand that.
216: 1    A.    But, yes, that's generally -- no direct benefit from
     2          the casino revenue.
```

**Designation:**
```
216:15    Q.    I understand that as a general concept, but I meant
     16          have you undertaken actually any actual analysis of
     17          the potential Delta 2 creditor recovery?
     18    A.    Oh, from the 120 -- from the casino revenue?
     19    Q.    Right.
     20    A.    Yes, I believe we have.
     21    Q.    And what does it show?
     22    A.    Here again, that's -- it's sensitive and, in addition,
     23          I believe those discussions were caught up in
     24          discussions I had with counsel, so I'm going to have
     25          to decline.
217: 1    Q.    Those are privileged communications?
     2    A.    I believe so.
     3    Q.    So the analysis of how my client Syncora, as an
     4          unsecured creditor, would do if the assumption motion
     5          is denied versus how it will do if its granted, that's
     6          something that you cannot speak to?
     7    A.    Right, because it goes into the analysis, as we said
     8          earlier today, what would happen if it were denied,
     9          what the options would be to the City, what litigation
    10          risk would happen, what would be caught up in the
    11          existing litigation, all those issues.
    12    Q.    Let me hand you Orr Exhibit Number 3.
```

**Designation:**
```
218:24    Q.    Now, you prepared this proposal for creditors that
     25          I've marked as Orr Exhibit 3 in anticipation of your
219: 1          June 14, 2013 meeting with creditors, correct?
     2    A.    Yes, I and my team put this together.
```

**Designation:**
```
221: 2    Q.    So let me draw your attention, if I could, to page 38
     3          of this report.
     4    A.    Yes.
     5    Q.    Now, this is -- this is titled A Look At the Future in
     6          the Absence of Restructuring Initiatives.  Do you see
     7          that?
     8    A.    Yes.
     9    Q.    Okay.  So what this table is doing is it's saying here
    10          is where the City of Detroit is headed without any
    11          increases in expenditures necessary to restore City
    12          services to adequate levels; without additional
    13          investments by the City and services assets or
    14          infrastructure; and, last, without any changes to
```

```
15        legacy liabilities, correct?
16   A.   Yes, that's correct.
17   Q.   Now, we're going to talk about each of these three
18        things in a moment, but the fact of the matter is each
19        of those three things have changed during the
20        bankruptcy process in terms of what legacy liabilities
21        are getting paid or what reinvestments are being made,
22        correct?
23   A.   To some degree they have and to some degree they
24        haven't.  We are still in a steady state with, for
25        instance, salary, overtime, fringe, health benefits,
222: 1    operating expenses, with regard to secure debt
2         service, pension contributions which remain
3         underfunded, health benefits are still in a steady
4         state.  We are hopefully in a steady state on a
5         revenue side as well.
6    Q.   I was just making --
7    A.   But, yes.
8    Q.   I was making a simpler point, which is, for example --
9         we'll go into this, but like you're not paying the
10        service payments related to the COPs during the
11        bankruptcy?
12   A.   I believe that's correct.
13   Q.   Okay.  And I think you're deferring pension
14        contributions.
15   A.   A portion of the pension contributions.  For instance,
16        this year I think we had an obligation of
17        approximately 131 million dollars.  I think we paid 31
18        million of it.
19   Q.   Okay.  So a portion.
20   A.   But that is the steady state.  The City regularly
21        defers pension contributions.
22   Q.   True, true.  We'll get into this in a moment here,
23        but --
24   A.   Right.
25   Q.   -- now, the fiscal year of the City runs from June 30
223: 1    to June 30, right?
2    A.   Yeah, July 1 to June 30.
3    Q.   Right.  Yeah.  Okay.
4              And the years that are listed here, it's
5         your understanding these are the fiscal years,
6         correct?
7    A.   2008 to 2012 are fiscal year actuals.  2013 were
8         preliminary forecasts, at this time forward.
9    Q.   That's right.  This was back in June, so you had a
10        little -- there was a stub period on June 2013?
11   A.   Yes.
12   Q.   When I talked to Mr. Buckfire yesterday, he indicated
13        that it was his understanding that these years are
14        July 1, 2013 through June 30, 2014 --
15   A.   That's correct.
16   Q.   -- 2014 here?
17   A.   That is correct.
18   Q.   Now, the forecast that the City indicates when it
19        comes to total revenues for the fiscal year that we're
20        currently in is about 1,082,800,000 in total revenue,
```

```
  21        correct?
  22   A.   That is correct.  That's down about 30-some-odd
  23        million dollars from the prior year.
  24   Q.   Right.  And if you look at the operating expenditures,
  25        that shows that you anticipate 685.7 million in
224: 1        operating expenditures during that -- this fiscal year
   2        that we're currently in, correct?
   3   A.   That is correct.
   4   Q.   Now, if you just viewed these things in isolation, you
   5        are representing here a net operating surplus of just
   6        under $400,000,000, correct?
   7   A.   That's roughly, correct, yes.
   8   Q.   Now, the -- and the operating expenditures are the
   9        amount of money that you forecast needing to operate
  10        the City as you found it with its current level of
  11        services when you were appointed, correct?
  12   A.   That is correct.
  13   Q.   Okay.  So that's the point of the caveat at the top,
  14        which is you have the aim of improving services in the
  15        City, but when you compiled this expenditures
  16        analysis, this was based on here is how we currently
  17        do things in the City of Detroit, providing the level
  18        of services we currently provide, and here is how much
  19        it costs?
  20   A.   That is correct.
  21   Q.   Now, isn't it true that -- we've talked about the fact
  22        that while the casino revenues fluctuate between 170
  23        and 180 million, even if you took them out of this
  24        forecast, you would still have a net operating surplus
  25        of $227,000,000, correct?
225: 1   A.   Well --
   2   Q.   Put aside --
   3   A.   Yeah, put aside --
   4   Q.   I understand.
   5   A.   -- debt service and pension contributions, healthcare,
   6        but just looking at operating expenses, that would be
   7        correct.
   8   Q.   And -- that's right.  I'm emphatically doing that.
   9        I'm referring to --
  10   A.   Right.
  11   Q.   -- this line.  Okay?
  12   A.   Right.
  16   A.   It's in bold.  It's the 1, 2, 3, 4th line down.
  18   Q.   And, I mean, can we agree it wasn't an accident that
  19        whoever compiled this broke the legacy expenditures
  20        down below the operating expenditures, correct?
  21   A.   Yes.  I'm sure that was intentional.
  22   Q.   Right.  And that's because, for example, while
  23        payments to the COPs are likely very important to the
  24        COP holders --
  25   A.   Right.
226: 1   Q.   -- they're not something that you actually use to run
   2        the City.
   3   A.   Well, yes, it's not an operating expense.
   4   Q.   Right.
   5   A.   It's a debt service.
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
 6   Q.   Right.
 7                   A payment to a police officer for their
 8        time or for their benefits, that is an operating
 9        expense?
10   A.   Absolutely.
11   Q.   And that's all covered in the operating expenditures.
12   A.   Yeah.  Salary over time and fringe benefits, yes.
13   Q.   Okay.  So if you follow along in my hypothetical and
14        we took out what we'll call a hundred -- we'll split
15        the difference.  We'll say it's 175,000,000.
16   A.   Sure.
17   Q.   I'll tell you in here it's projected to be 170 -- why
18        don't we use the number here.  If we took the 170 out,
19        you'll still have 227.2 million dollars to work with
20        from the standpoint of a net operating surplus,
21        correct?
22   A.   Yes, roughly $230,000,000.
```

**Designation:**

```
236: 7   Q.   I've asked you earlier about selling the art and I
 8        asked you about it as considering it as a potential
 9        backup plan to the negotiations with the Swap
10        counterparties.
11   A.   Right.
12   Q.   Do you remember that testimony?
13   A.   Yes, I do.
14   Q.   We went back and forth.
15   A.   Yes.
16   Q.   I'd like to bring it forward to the future, to the
17        present.
18   A.   Yes.
19   Q.   Which is, are you under active consideration now of
20        using the art to alleviate the liquidity crisis and to
21        do all of the things that you say you want to do in
22        this proposal?
23   A.   No.  There are no plans to use the art or any other
24        asset in particular to liquidate it to
25        relieve liquidity issues in the City.  What I have
237: 1        said when I first took this job, and continue to say,
 2        all options are on the table.  We are currently
 3        beginning the process of appraising approximately
 4        3,500 pieces of art in the City of the 66,000 that are
 5        there at the DIA, and once we go through that process,
 6        we will have to decide what, if anything, we need to
 7        do, but I have no plans to use art to relieve the
 8        liquidity crisis that the City is in now.
 9   Q.   So let me offer an observation for you to react to,
10        which is, earlier on when I was asking you questions,
11        you were telling me about the terrible things
12        happening in the City, people dying, being shot, the
13        seriousness of the problems with which you're
14        grappling.
15   A.   Yes.
16   Q.   You've also identified the assumption motion as
17        something that needs to be moved along quickly because
```

```
18          of its importance to the issues that we discussed,
19          right?
20   A.     Right.
21   Q.     Why isn't the art equally important to allowing you to
22          fix Detroit?
23   A.     I haven't said that it's not important.  What I've
24          said is there are no plans to liquidate it to address
25          those concerns.  I think it is fair to say that there
238: 1      has been much debate as to the value of art versus
2           alleviating a number of other concerns, and I've heard
3           that debate and I've listened to it, but our first
4           order of business is to assess what we're talking
5           about and then we'll decide what, if anything, we need
6           to do.
7    Q.     Isn't it fair to say that you certainly haven't put
8           the art time line, in terms of your decision-making
9           process, you haven't given it the same sort of speed
10          you've given to the forbearance agreement time line?
```

**Designation:**

```
238:12  A.  Yeah.  I think it's fair to say that in our proposal I
13          think we included roughly 15 buckets of assets, and
14          none of them have been given the same priority that we
15          deem the forbearance agreement principally because
16          we're not in default with regard to art.  We're in
17          default with regard to the Swap agreement.
18      Q.  Well, that was actually going to be my point, which
19          is, you own the art.
20      A.  Yes.
21      Q.  So you don't have to negotiate with anybody in order
22          to sell it, right?
23      A.  No, but a prudent thing to do, and we've said this
24          before, is to find out what we're talking about first,
25          and that's why we're going through an appraisal
239: 1      process.
2       Q.  Just a few more questions and I'll pass the baton.
3       A.  Sure.
4       Q.  I take it that when you were appointed as emergency
5           fin -- emergency manager, you familiarized yourself
6           with some of the prior negotiations that had gone on
7           around efforts to resolve the Swap that I believe were
8           referenced in the 2012 CAFR of the City of Detroit.
9       A.  Consolidated report, yes.
10      Q.  You at least made inquiry as to what happened last
11          year when you tried to work this out.
12      A.  Yes.
13      Q.  And it's also your understanding that the potential
14          right of the Swap counterparties to terminate the Swap
15          and demand a large termination payment goes back all
16          the way to March of 2012; isn't that correct?
17      A.  At least, yes.
18      Q.  Thinking that's consistent with your report here --
19      A.  Yes.
20      Q.  -- you say that.
21      A.  Yes.
```

```
22  Q.  So isn't it true that from March 2012 all the way to
23      June 4, when Mr. Buckfire went into the negotiating
24      room for the first time with the Swap counterparties,
25      during that entire time, the Swap counterparties had
240: 1  never trapped cash?
2   A.  To the best of my knowledge, that's true.
3   Q.  And they had never declared a termination event?
4   A.  To the best of my knowledge -- to the best of my
5       knowledge, that's true.
```

**Designation:**

```
248:12  Q.  Let's turn now, Mr. Orr, to the topic of the consent
13          rights or -- of FGIC and Syncora topic that you were
14          discussing with Mr. Hackney earlier.
15      A.  Yes.
16      Q.  And actually, let's focus specifically on the
17          negotiations that the City engaged in with the Swap
18          counterparties leading up to the execution of the
19          forbearance agreement.
20      A.  Okay.
21      Q.  And when you were speaking with Mr. Hackney, you
22          testified that you yourself did not invite either FGIC
23          or Syncora to those negotiations, correct?
24      A.  Yes.  To the best of my knowledge, that's true.
25      Q.  And I believe you said you also didn't suggest to
249: 1      anyone else that they should invite FGIC or Syncora to
2           those negotiations, correct?
3       A.  Yes.  I believe I testified I did not instruct anybody
4           to invite them.
5       Q.  To your knowledge, did anyone else suggest inviting
6           either FGIC or Syncora to the negotiations?
7       A.  As I testified earlier today, there were a series of
8           letters that were exchanged, and at some point there
9           was some discussion about Syncora submitting a
10          proposal.  That discussion was wrapped up into whether
11          or not it would sign a reciprocal nondisclosure
12          agreement.  To the best of my knowledge, that never
13          happened.
14      Q.  But I think we established that the letter exchanged
15          with Syncora occurred at some point after June 11th,
16          when there had been an agreement in principle on the
17          economic terms of the forbearance agreement; is that
18          correct?
19      A.  Yes.  I believe we -- we testified that June 11th we
20          reached agreement and principally documented,
21          June 14th we had the presentation for creditors, and
22          the letter I saw earlier today I think was dated
23          June 17th.
24      Q.  That's right.  So prior to June 11th, did anyone else
25          to your knowledge suggest inviting either FGIC or
250: 1      Syncora to the negotiations?
2       A.  Not to my knowledge, no.
3       Q.  And you mentioned just a minute ago that there had
4           been some discussion with Syncora or representatives
5           of Syncora about an alternative proposal to the
```

```
 6        forbearance agreement, and I think you said to
 7        Mr. Hackney that there had been no negotiations with
 8        FGIC about an alternative proposal; is that correct?
 9              MR. SHUMAKER:  Objection to form.
10   A.   Yeah, it's a compound question, but I think the way I
11        would answer it, yes, we would talk about whether or
12        not someone had been invited.  And I think what I said
13        is to the best of my knowledge I did not invite FGIC
14        and I did not know if anybody else did.
```

**Designation:**
```
253:21   Q.   One of the things you -- one of the things Mr. Hackney
   22        asked you about was if in the course of the
   23        negotiation of the forbearance agreement, you had what
   24        he referred to as a plan B.  Do --
   25   A.   Right.
254: 1   Q.   -- you recall him asking that question?
    2   A.   Yes, I recall that discussion.  Yes.
    3   Q.   And you responded by saying, without specifically
    4        having a plan B, you had considered alternative to the
    5        forbearance agreement structure, correct?
    6   A.   Correct.
```

**Designation:**
```
255: 9   Q.   Did you consider capital market alternatives to the
   10        forbearance agreement?
   11   A.   We did, but to be perfectly honest with you, the City
   12        had borrowed so much money from the capital markets
   13        without the probability of being able to pay it back
   14        on any reasonable or rational time frame that that
   15        wasn't a serious consideration was taking on more
   16        debt.
   17   Q.   Okay.  So you didn't really believe that had you a
   18        what we -- what I just described as a capital market
   19        alternative to the forbearance agreement?
   20   A.   The City has no -- what I've said at the June 10th --
   21        public meeting on June 14th we were addicted to debt
   22        and we had no ability to take on additional debt.
```

**Designation:**
```
264: 7   Q.   Mr. Hackney also asked you some questions about the
    8        service corporations and about whether there were any
    9        negotiations on behalf of the City with the service.
   10        Corporations?
   11   A.   Yes.
   12   Q.   Okay.  I believe you answered that negotiating with
   13        service corporations would not have been your job.  It
   14        would have been Ken Buckfire's or someone else's job
   15        to do that.
   16   A.   Yes.  I believe that's right.
   17   Q.   Okay.  If it wasn't Ken Buckfire's job, who else's job
   18        would it have been?
   19   A.   It might have been someone else on his team or at
   20        Miller Buckfire or someone else on behalf of the other
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
    21        counsel for the emergency manager or the City.
    22   Q.   Someone else in your office you mean?
    23   A.   No.  No.  Other consultants and attorneys on behalf of
    24        the City.
    25   Q.   Okay.  But am I correct that no one has reported to
265: 1        you that they had negotiations with the service
     2        corporations; is that correct?
     3   A.   Yeah, reported.  I'm going to be careful.  My
     4        understanding was we had an agreement, I signed it,
     5        and it was sent to the service corporations.  I
     6        personally had no negotiations with them, but my
     7        understanding, based upon the fact it was executed,
     8        that whoever needed to procure and secure those
     9        signatures did so.
    10   Q.   You don't know who got those signatures from the
    11        service corporations?
    12   A.   No.  Sitting here today I do not.
```

**Designation:**
```
265:15            Do you -- are you assuming then that there
    16        were some negotiations between the City and the
    17        service corporations?
    18   A.   Yeah.  Here again, I'm going to say whenever you -- as
    19        I said to Mr. Hackney, whenever you talk about
    20        negotiations, you know, so we don't get bogged down in
    21        nomenclature, I'm assuming that something happened
    22        that had the service corporations aware of the
    23        agreement, that they agreed to and they signed off on
    24        it.  So if those constitute negotiations, that's what
    25        I'm assuming, but I'm saying to you that I had no
266: 1        independent negotiations and I don't know who did
     2        that.
     3   Q.   And you don't have any idea sitting here today about
     4        what those negotiations would have involved, how they
     5        happened, when they happened, how long they took,
     6        anything like that; is that right?
     7   A.   That's right.
```

**Designation:**
```
271:15   Q.   And how much do you estimate that more federal
    16        assistance to be?
    17   A.   I have no idea.  Whatever -- whatever we can get.  If
    18        it's several millions more, if it's several hundreds
    19        millions more, we're going to apply for it.
    20   Q.   Do you think it's a possibility it could be hundreds
    21        of millions more?
    22   A.   Possibility it could be.
```

**Designation:**
```
271:23   Q.   Earlier in your testimony you were asked a lot of
    24        questions about legal analyses or legal claims that
    25        might have been made, and on those questions you
272: 1        claimed attorney-client privilege --
     2   A.   Yes.
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
 3   Q.   -- and said that you didn't have an independent view
 4        that didn't come from attorney-client communications.
 5   A.   Yes.
```

**Designation:**
```
278:23  Q.   Did you make an independent assessment apart from
 24          advice of counsel as to the strengths -- strengths or
 25          weaknesses of the City's claims against the Swap
279: 1       counterparties?
 2   A.      Not without the advice of counsel, no.
```

**Designation:**
```
284: 3  Q.   Did you have any analysis done as to the cost of a
 4           litigation with the Swap counterparties?
 5   A.      No.  I don't recall if any of the documents included
 6           costs.  We -- there were discussions about the
 7           potential costs and the timing, but I don't recall if
 8           any of the documents did.
 9   Q.      Okay.  What was your best estimate as to how much a
 10          litigation with Swap counterparties would cost the
 11          City?
 12  A.      I don't -- I don't remember what the best estimates
 13          were.  They -- they ranged from --
 14              MR. SHUMAKER:  Object.  I just want to make
 15          sure you're not going to be revealing any
 16          attorney-client communications with your answer.
 17              THE WITNESS:  Okay.
 18              MR. SHUMAKER:  I'll interject that.  I'll
 19          let you answer the question as to whether that was
 20          addressed.  I don't want you to go --
 21              THE WITNESS:  Okay.
 22              MR. SHUMAKER:  -- into anything --
 23              THE WITNESS:  Okay.
 24              MR. SHUMAKER: -- beyond that.
 25  A.      It was addressed, and suffice it to say I think it's
285: 1       fair to assume that in litigation in the nature you're
 2           discussing that it could go into millions of dollars.
```

**Designation:**
```
285: 4  Q.   How about the time it would take to litigate the Swap
 5           counterparties?  Did you estimate how long it would
 6           take?
```

**Designation:**
```
285: 8  A.   Let's -- let's do it this way.  I think it's fair to
 9           say that there were discussions regarding the time for
 10          litigation and/or appeals and the costs that were
 11          involved if that tack was taken.
```

**Designation:**
```
285:13  Q.   How long did you estimate it would take to litigate
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
14        with Swap counterparties?
15   A.   I'm not sure the predicate is there that I estimated
16        the length of time.
17   Q.   Okay.  If you didn't estimate the length of time,
18        that's an okay answer to give.
19   A.   Yeah.  I'm trying to be as clear as I can for you and
20        say that there were discussions, but there's nothing
21        as specific as the lodestar method of analysis which
22        you understand is time times hours billed, so on and
23        so forth.  There were discussions and there were
24        analyses about what it could be.
25   Q.   Now, I have to unpack that a little bit because you
286: 1        mentioned the lodestar analysis, one of my favorite
2             friends.  Did you have a lodestar analysis done for
3             litigation with the Swap counterparties?
4                 MR. SHUMAKER:  Objection, this is getting
5             into the -- the specific communications between
6             Mr. Orr and his counsel when you start to go through
7             what -- what are the particulars of the advice that
8             was being given.  I allowed you to go forward with
9             whether he considered the length of litigation in his
10            answer, but I don't want him to go into the specifics
11            of any sort of analysis that was done by counsel.
12                With that admonition, you can answer.
13   A.   Again, without going to the specifics of discussion
14        I've had with counsel, there were discussions about
15        potential length of litigation and appeals and the
16        potential cost.  Those discussions included time that
17        may have impaired my ability to complete my obligation
18        within the time frame provided by Public Act 436, as
19        well as significant costs, litigation cost being
20        incurred by the City.
```

**Designation:**

```
286:22   Q.   Okay.  Here is my question again, because in your
23            answer you mentioned lodestar analysis, so I'm just
24            asking -- it's a yes or no question.
25       A.   Um-hm.
287: 1   Q.   Did you have a lodestar analysis performed with
2             respect to a litigation with the Swap counterparties?
3                 MR. SHUMAKER:  Again, I'm going to object.
4             I believe that that question asks the -- asks Mr. Orr
5             to reveal privileged attorney-client communications
6             when you get into specific lodestar analysis.
```

**Designation:**

```
289:11   Q.   Do you recall whether you ever discussed with any of
12            the Swap counterparties the City's potential legal
13            arguments as against the Swap counterparties?
14       A.   Did I?
15       Q.   Yeah.
```

**Designation:**

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
289:18   A.   No, I don't think I had though those discussions.  No.
    20   Q.   Did you ever debate the validity of the Swap
    21        counterparties secured position with anyone from the
    22        Swap counterparties?
    23   A.   Did I personally?
    24   Q.   Yes.
    25   A.   No.
```

**Designation:**

```
296: 6   Q.   Well, let me ask you this.  Has -- based on this
     7        document, the City's plan is to allocate a 2 billion
     8        dollar note to the unsecureds, and this plan is -- it
     9        has a line item for continuing to pay the Swaps?
    10   A.   Yes.
    11   Q.   Does the 2 billion dollar number change if the Swap
    12        payments change?
    13   A.   To the best of my knowledge, no.  I don't assume that.
```