## Exhibit 6B

**Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire**

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**

```
 9: 2   Q.   Mr. Buckfire, would you please state your name and
    3        business address for the record?
    4   A.   Kenneth Buckfire.  601 Lexington Avenue, New York, New
    5        York.
```

**Designation:**

```
11:14   Q.   Mr. Buckfire, what is your position with Miller
   15        Buckfire?
   16   A.   Co-founder and co-president of Miller
   17        Buckfire & Company.
   18   Q.   Miller Buckfire currently is employed as the financial
   19        advisor to the City of Detroit, correct?
   20   A.   As the investment banker to the City, that's correct.
```

**Designation:**

```
19:22   Q.   Now, is it fair to say that you have principal
   23        responsibility for the engagement of the City and the
   24        work that's being performed by the members of your
   25        team?
20: 1   A.   Yes.
    2   Q.   And so all the individuals we just discussed report
    3        directly to you, is that correct?
    4   A.   Yes.
```

**Designation:**

```
21:11             MR. SUMMERS:  If we could mark this as
   12        Deposition Exhibit 2, please.
```

**Designation:**

```
21:17   Q.   Mr. Buckfire, do you recognize this document?
   18   A.   I do.
   19   Q.   And it is the forbearance and optional termination
   20        agreement that was executed by Mr. Orr among others on
   21        or about July 15th, 2013, is that correct?
   22   A.   Yes.
   23   Q.   And this is the agreement that's the subject of the
   24        pending motion in the bankruptcy court which brings us
   25        here today, correct?
22: 1   A.   Yes.
    2   Q.   Okay.  And was the City's decision to enter into the
    3        forbearance agreement made by Mr. Orr?
    4   A.   Yes, it was.
```

**Designation:**

```
22:13   Q.   What role did you have in the negotiation of the
   14        forbearance agreement?
   15   A.   On behalf of the City of Detroit I had responsibility
   16        for negotiating the business terms of this agreement.
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**

```
34: 8   Q.   Is it fair -- let's draw down in detail a little bit
     9        on the June 8th meeting.  Who was -- what individuals
    10        were present at the June 8th meeting?
    11   A.   It was the same attendees as at the June 4th meeting
    12        except that Mr. Saxton and Mr. Martin did not attend.
    13   Q.   Were the service corporations present at the June 8th
    14        meeting?
    15   A.   Not to my recollection.
    16   Q.   Were the service corporations present at the June 4th
    17        meeting?
    18   A.   No.
    19   Q.   What point was information about the proposed
    20        forbearance agreement communicated to the service
    21        corporations?
    22   A.   I don't know.
    23   Q.   Do you know who was communicating with the service
    24        corporations?
    25   A.   No.
35: 1   Q.   Was anybody communicating with the service
     2        corporations?
     3   A.   I don't know.
     4   Q.   Did Mr. Orr know?
```

**Designation:**

```
35: 6   A.   I don't know.
```

**Designation:**

```
35: 8   Q.   But you never spoke with a representative of a service
     9        corporation about the forbearance agreement?
```

**Designation:**

```
35:11   A.   I already testified to that.
```

**Designation:**

```
35:25   Q.   Did the Swap counterparties ever say to the City that
36: 1        if a resolution is not reached by a certain date, they
     2        will terminate?
     3   A.   Not to my knowledge.
     4   Q.   And you said that the first defaults occurred in your
     5        view in March 2012, is that correct?
     6   A.   There was a credit rating downgrade which triggered
     7        termination event under the collateral agreement which
     8        had not been cured, and then after that the City
     9        emergency manager was appointed, that in itself was an
    10        event of default under the agreement.  So, we had
    11        several defaults.
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**

```
40: 2   Q.   Mr. Buckfire, the forbearance agreement in the City's
     3        view allows the City to direct the termination of the
     4        Swap agreements, is that correct?
     8   A.   Well, we negotiated for the right to do so if we can
     9        deliver the Swap termination payment.
    10   Q.   Is that a right that the City currently possesses
    11        under any other agreement?
    12   A.   This is the only agreement of which I'm aware.
    13   Q.   And it is the City's view that under the forbearance
    14        agreement the City is able to direct the termination
    15        of the Swap agreements without the consent of any
    16        other party, is that correct?
    21   A.   Can you repeat your question?
    22   Q.   Sure.  Under the forbearance agreement the City is
    23        able to direct the termination of the Swap agreements
    24        without the consent of any other party, is that
    25        correct?
```

**Designation:**

```
41: 3   A.   I don't know what I'm supposed to answer to.  It's our
     4        view that this is an agreement the City can perform it
     5        has rights under.
```

**Designation:**

```
44: 6   Q.   This document has been marked as Exhibit Number 3 is
     7        the proposal to creditors, executive summary of the
     8        proposal to creditors that was made on June 14th,
     9        2013, is that correct?
    10   A.   Yes.
    11   Q.   And this was prepared in connection with a meeting
    12        with creditors that was held at the Detroit Airport
    13        Westin on June 14th, 2013, is that correct?
    14   A.   That's correct.
    15   Q.   And did you participate in creating this executive
    16        summary?
    17   A.   I did.
    18   Q.   And you participated in the information that is --
    19        gathering the information that is disclosed in this
    20        executive summary, is that right?
    21   A.   Well, I reviewed drafts of it to make sure that it
    22        made sense, that it was consistent, that it was
    23        accurate, but I did not prepare the information
    24        myself.
    25   Q.   You prepared -- leave it there.  You're familiar with
45: 1        the contents of this document, correct?
     2   A.   Yes.
     3   Q.   If you turn to Page 35.  And Page 35 contains a
     4        summary of the current financial status of the City as
     5        of June 14th, 2013, is that correct?
     6   A.   No, actually this is just one way of looking at it.
     7        Page 8 and 9 are actually more relevant for the
     8        discussion we've been having today.
     9   Q.   If you stay with -- what then do you think is
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
10        contained on Page 35?
11    A.  This is a review of the City's reported historical
12        financials.
13    Q.  If you look at the column at the very far right side
14        of the page it says prelim 2013.  Do you know what
15        that column contains?
16    A.  It contains a preliminary estimate of revenues,
17        operating expenses and legacy expenses for 2013.
18    Q.  And if you look down here line labeled total revenues
19        which indicates 1.121.9 billion dollars, is that
20        correct?
21    A.  Yes.
22    Q.  And that is the total revenue that was projected as of
23        the date this executive summary was prepared for 2013?
24    A.  Yes.
25    Q.  Now, if you go down the next subsection of Page 35 is
46: 1       labeled operating expenditures, correct?
2     A.  Yes.
3     Q.  And operating expenditures preliminary 2013 column
4         indicates 692 million dollars, correct?
5     A.  Yes.
6     Q.  Now -- and the operating expenditures include --
7         included in this section include the essential
8         services that the City has to provide, is that
9         correct?
10    A.  Yes.
11    Q.  And then when you get to the legacy expenditures, is
12        it correct that the City is not currently making debt
13        payment, debt service payments to general obligation
14        bonds, is that correct?
15    A.  Yes.
16    Q.  And the City is not -- is currently deferring payments
17        for retiree health benefits, isn't that correct?
18    A.  Yes.
19    Q.  So, without making service or making payments on the
20        legacy expenditures for 2013, is it correct to say
21        that the City would have operated at a surplus for
22        fiscal year 2013?
23    A.  Well, clearly if we're not making our fixed
24        obligations, we'd have more cash than if we did.
25    Q.  And are you currently making payments on any of the
47: 1       items that are categorized under the legacy
2         expenditures part of Page 35?
3     A.  Yes.
4     Q.  What portions are you making?
5     A.  Well, we're making payments on the POC Swaps because
6         they are a secured obligation.  I'm not sure looking
7         at this whether the 141 million of debt service for
8         LTGO and UTGO incorporates payments made on the
9         secured state revenue share bonds which we have three
10        series.  I have to go back and check, but clearly the
11        City is paying its obligations on secured, that is,
12        revenue protected debt and not paying on unsecured
13        debt.
14    Q.  And the City is not at this point making its pension
15        contributions, correct?
```

```
16    A.    Correct.
17    Q.    The City at this point is not paying the health
18          benefits for retirees, correct?
19    A.    Yes, that's correct.
20    Q.    And the City is not making principal interest payments
21          to the service corporations, correct?
22    A.    That's correct.
23    Q.    Then turn to Page 38 of the executive summary.  In
24          this document among other things or this page among
25          other things contains a preliminary forecast for
48: 1       fiscal -- for the City for fiscal year 2014, is that
2           correct?
3     A.    Yes.
4     Q.    And you see the column that's labeled 2014?
5     A.    I do.
6     Q.    The column labeled for 2014 indicates the total
7           revenues for the City for 2014 are projected to be 1
8           billion 108 -- so, it's 1 billion 82 million point  8,
9           is that correct?
10    A.    Yes, a decline from 2013.
11    Q.    And expenditures, the expenditures column indicates
12          that expenditures that the City will incur for
13          essential services will total 397.2 million dollars
14          for 2014, is that correct?
15    A.    That's the projected net operating surplus, correct.
16    Q.    Yeah, I'm sorry, it's 685.7 million in expenditures
17          for fiscal year 2014, correct?
18    A.    Yes.
19    Q.    And that results in a surplus of 397.2 million
20          dollars, correct?
21    A.    Before debt service.
22    Q.    Before debt service.  But you're not making -- the
23          City is not making a significant portion of the debt
24          service, correct, in 2014?
25    A.    That's correct.
49: 1    Q.    So, for example, the City does not actually project
2           paying pension -- making pension contributions for
3           fiscal year 2014, isn't that true?
7     A.    That's correct.
8     Q.    And the City does not currently plan to pay the health
9           benefits for retirees in fiscal year 2014, correct?
13    A.    Can you repeat the question, please?
14    Q.    The City does not currently intend to pay the line
15          item for health benefits for retirees in fiscal year
16          2014?
17    A.    That's correct.
```

**Designation:**
```
53:15    Q.    So, do you believe that the City would be out of cash
16          without access to the casino revenues?
19    Q.    As of December 2013?
20    A.    If nothing else was done, yes.
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**

```
54: 5   Q.   Now, you've previously discussed the Swap
     6        counterparties entered the negotiations with the view
     7        that events of default had occurred under the Swap
     8        contracts, correct?
     9   A.   It was a fact.
    10   Q.   And so the City had the same view that there were
    11        events of default that had occurred under the Swap
    12        contracts prior to the bankruptcy?
    13   A.   It wasn't a view, it was a fact.  We had at least two
    14        defaults.
    15   Q.   And can you tell us what the two defaults were?
    16   A.   The ratings downgrade default which had occurred in
    17        2012 and the appointment of the emergency manager in I
    18        believe it was March of 2013.
    19   Q.   And were there any other defaults other than those two
    20        in the City's view?
    22   A.   There may well have been but those are the two that I
    23        recollect.
```

**Designation:**

```
55:15   Q.   To your knowledge had the Swap counterparties ever
    16        threatened to bring litigation claims against the
    17        City?
    18   A.   No.
    19   Q.   Has the City considered whether the Swap
    20        counterparties have claims against the City other than
    21        those arising out of the defaults under the Swap
    22        agreements?
    24   A.   I don't know.
56: 1   Q.   Has the City evaluated whether it is in breach of the
     2        collateral agreement?
    10   Q.   In your view have you engaged in any analysis of
    11        whether the City has breached the collateral
    12        agreement?
    13   A.   No.
    14   Q.   To your knowledge has anyone else associated with the
    15        City analyzed whether the City is in breach of the
    16        collateral agreement?
    17   A.   I don't know.
    22   Q.   Have the service corporations ever threatened to your
    23        knowledge claims against the City?
57: 1   A.   I don't know.
     3   Q.   Have you ever analyzed whether these service
     4        corporations may have claims against the City?
     5   A.   No.
     6   Q.   Have you analyzed whether or evaluated -- strike that.
     7        Let me start again.
     8            Have you evaluated whether the City has
     9        claims against the Swap counterparties?
    12   Q.   Has Miller Buckfire evaluated whether the City has
    13        claims against the Swap counterparties?
    14   A.   No.
    15   Q.   Has anyone else working for the City analyzed whether
    16        the City has claims against the Swap counterparties?
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
    18   A.   No.
    20   Q.   No, you don't know --
    21   A.   I don't know.
    22   Q.   So, Miller Buckfire performed no investigation into
    23        whether the City has claims against the Swap
    24        counterparties in connection with this forbearance
    25        agreement, correct?
58: 2   A.   No.
```

**Designation:**
```
58:10   Q.   Do you have a view as to what claims the forbearance
    11        agreement releases?
    12   A.   No.  The answer was no at end of the table.  I'll
    13        speak up.  I apologize.
    14   Q.   Does the forbearance agreement operate to release any
    15        claims that might be held against the City?
    17   A.   I don't know.
```

**Designation:**
```
58:19   Q.   Do you have an understanding of how interest rate
    20        movements may affect the termination payment that
    21        would become due under the Swap agreements?
    22   A.   Yes.
```

**Designation:**
```
58:25   Q.   And what is that understanding?
59: 1   A.   Well, as interest rates come down, the Swap
     2        termination liability goes up.
     3   Q.   And if interest rates go up, what happens to the Swap
     4        termination liability?
     5   A.   Comes down.
     6   Q.   And there would come a point if interest rates
     7        increased enough where the City could actually become
     8        in the money on the Swaps, is that correct?
     9   A.   It would except that the Swap counterparties in 2009
    10        negotiated for the right to terminate the Swaps so
    11        they would never actually be in a net liability
    12        position against the City if that were to occur.
    13   Q.   What is your basis for stating that the Swap
    14        counterparties negotiated the right to terminate the
    15        Swaps in 2009?
    16   A.   Well, I've already testified that I reviewed the
    17        collateral amendment entered into in 2009 and
    18        discussed it with counsel to the City.  In their
    19        review of the contract, and I can't remember exactly
    20        the provision now but that was their interpretation of
    21        the contract right.
    22   Q.   Have you reviewed any of the other 2009 documents
    23        related to the Swaps?
    24   A.   No.
    25   Q.   Has the City undertaken any analysis to evaluate
60: 1        future interest rate moves?
     2   A.   We have reviewed the forward LIBOR curve.
```

```
 3   Q.   And who performed that review?
 4   A.   That review was performed by Mr. Sanjay Marken, one of
 5        our associates.  M A R K E N, first name S A N J A Y.
 6   Q.   And when did he perform that review?
 7   A.   The most recent one was performed a few days ago.
 8   Q.   What did that review show?
 9   A.   It showed that the current forward LIBOR curve does
10        not show that the interest rate that's relevant to
11        this Swap would ever rise above six-and-three-quarters
12        percent which is the fixed rate on the Swap, and,
13        therefore, the market is telling us that the
14        probability of the Swap ever going in the money for
15        the benefit of the City is very low.
16   Q.   Does the analysis address whether interest rates are
17        generally rising or decreasing?
18   A.   The LIBOR curve is an observable market fact.  I'm not
19        going to speculate on when rates are going up or down.
20        They will fluctuate.
21   Q.   Have interest rates increased since the forbearance
22        agreement was executed?
23   A.   Yes.
24   Q.   And what effect has that increase on -- in interest
25        rates had on the estimated termination payment under
61: 1        the forbearance agreement?
 3   A.   Well, the assumption in June of this year when we
 4        began to negotiate with the Swap counterparties was
 5        the termination payment was around four hundred
 6        million dollars.  The rise in rates since that time
 7        and it's now almost August probably has reduced that
 8        termination payment to around three hundred million
 9        dollars or even lower.
10             So, yes, the rise in rates has resulted in
11        a reduction of the termination payment.
12   Q.   And is that analysis of the reduction to the
13        termination payment something that Miller Buckfire has
14        prepared?
16   A.   Well, there is a procedure embodied in the collateral
17        agreement that lets you determine the termination
18        payment if one is to occur.  We've simply analyzed the
19        net value of the assumed LIBOR payments and Swap
20        payments and come up with our own estimate.
22   Q.   And that analysis was performed by Mr. Marken?
23   A.   That's right.
```

**Designation:**

```
63: 3   Q.   Mr. Buckfire, did Mr. Marken perform any analysis
 4        related to the interest rates' effect on the Swaps
 5        prior to the analysis he performed a few days ago?
 6   A.   No.
```

**Designation:**

```
63:19   Q.   Did you describe what claims you would litigate
20        aggressively to the Swap counterparties?
21   A.   No.
```

```
22   Q.   Did you make any assertions to the Swap counterparties
23        concerning the validity of their liens at the June 4th
24        meeting?
25   A.   No.
64: 1   Q.   Was the potential of the City challenging the liens
 2        held by the Swap counterparties ever a matter
 3        discussed during the negotiation of the forbearance
 4        agreement?
```

**Designation:**

```
64: 7   Q.   Discussed with the Swap counterparties.
 8   A.   Yes.
 9   Q.   When was that discussed?
10   A.   It was a very hectic period.  I did really almost
11        nothing between June 4th and the 11th but try to
12        negotiate this deal.  I know at several points in my
13        conversations with the business people I let them know
14        that if there were issues with the collateral, we
15        would raise them if necessary to protect the City.
16   Q.   Did you articulate what those issues might be?
17   A.   No.
```

**Designation:**

```
65: 8   Q.   So, you never performed an analysis of the merits of
 9        those claims?
10   A.   No.
```

**Designation:**

```
65:19   Q.   Did you assert any arguments or potential litigation
20        claims other than the issues surrounding the granting
21        of the liens in your negotiations with the Swap
22        counterparties?
23   A.   No.
24   Q.   Did you articulate to the Swap counterparties why in
25        the City's view the liens may or may not be valid?
66: 1   A.   Not directly, no.
```

**Designation:**

```
69: 7   Q.   You testified that as of the last analysis your
 8        understanding is the estimated amount of the
 9        termination payment that would be due is roughly three
10        hundred million dollars, is that correct?
11   A.   Well, it clearly moves around as the interest rate
12        curve moves around.  I think the most recent number is
13        somewhere reaching 275 and 300 million dollars.
14        That's before the application of the applicable
15        discount that we had provided for in the termination
16        agreement.
17   Q.   And that last analysis, when was that performed?
18   A.   A few days ago.
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**
```
69:23  Q.   Does the City have a plan at this point for how it
   24        will obtain the cash necessary to pay the termination
   25        payment?
```

**Designation:**
```
70: 3  A.   Yes, the City has a plan.
```

**Designation:**
```
70: 5  Q.   And what is that plan?
    6  A.   The City intends to secure a debtor in possession
    7        financing of sufficient proceeds to fund the
    8        termination payment as well as provide sufficient cash
    9        for the City to execute on its reinvestment program
   10        during the bankruptcy.
```

**Designation:**
```
70:18  Q.   And is Miller Buckfire leading the effort to obtain
   19        debtor in possession financing?
   20  A.   Yes.
```

**Designation:**
```
71:16  Q.   And do you know who those ten entities are that have
   17        said they are not interested?
   18  A.   I do, yes.
   19  Q.   And who are they?
   20  A.   I'm not going to tell you that.
   21  Q.   On what basis?
   22  A.   It's commercially sensitive information.
```

**Designation:**
```
73:24  Q.   What covenants, if any, are included in the RFP as
   25        being acceptable or not acceptable?
74: 1  A.   I'm not going to discuss that.  It's commercially
    2        sensitive.
```

**Designation:**
```
74: 6  Q.   And is the City offering a lien on casino revenues in
    7        connection with the DIP financing?
    8  A.   In part.
```

**Designation:**
```
74:12  Q.   No doubt.  What other collateral is the City offering
   13        to secure the DIP financing loan?
   14  A.   I'm not going to answer that question.
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**

```
75: 2   Q.   Is the City offering art work as collateral?
    3   A.   I'm not going to discuss the terms of the term sheet,
    4        sorry.
```

**Designation:**

```
76:15   Q.   Has the City had discussions with the State of
   16        Michigan about providing financing?
   17   A.   I'm not going to discuss that.
```

**Designation:**

```
76:21                 Are there certain events that the City
   22        believes has to happen in the case for it to be able
   23        to realistically obtain debtor-in-possession
   24        financing?
   25   A.   Yes, there are events in the case.
77: 1   Q.   And what is that deal?
```

**Designation:**

```
77: 4   A.   Well, we have to find a willing lender, that's number
    5        one.  Number two, we have to have a court order
    6        approving the form of the DIP financing, and, number
    7        three, we believe we need to have approval of the
    8        forbearance and termination agreements we get the
    9        benefit of the elimination of the collateral pledge
   10        and the benefit of the discount.
```

**Designation:**

```
77:12   Q.   Do you need a determination on eligibility as well?
   13   A.   Probably as a condition to closing but not as a
   14        condition to getting a loan commitment.
```

**Designation:**

```
79:10   Q.   And if the City obtains a debtor-in-possession
   11        financing, what's the intended use of the financing?
```

**Designation:**

```
79:14   A.   I've already answered it.
```

**Designation:**

```
79:16   Q.   Why don't you go ahead, say it again.
   17   A.   We'll use proceeds to terminate the Swaps at the
   18        discount provided for in the forbearance agreement and
   19        the balance of the DIP loan will be retained by the
   20        City as working capital and to support its
   21        reinvestment program.
   22   Q.   Are there any other intended uses to the DIP financing
   23        other than the two you just said?
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
   24   A.    Not that I'm aware of.
```

**Designation:**
```
   85: 6   Q.    Go back to the negotiations that occurred in 2013.
       7         Did you invite Syncora to participate in those
       8         negotiations?
       9   A.    No.
      10   Q.    Why not?
      11   A.    They weren't a party to the collateral agreement.
      12   Q.    Did you consult with Mr. Orr as to whether Syncora
      13         should be invited to the negotiations?
      14   A.    No.
      15   Q.    Did you invite Financial Guaranty Insurance Company to
      16         participate in the negotiations concerning the
      17         forbearance agreement?
      18   A.    No.
      19   Q.    Did you consult with Mr. Orr with respect to the
      20         decision whether Financial Guaranty Insurance Company
      21         should be invited to those negotiations?
      22   A.    No.
      23   Q.    So, you made that decision -- how did you come to the
      24         decision not to invite -- we'll call it FGIC?
      25   A.    It never came up.  They weren't a party to the
   86: 1         agreement.
       2   Q.    Did you invite US Bank to participate in the
       3         negotiations concerning the forbearance agreement?
       4   A.    No.
       5   Q.    Why not?
       6   A.    Not a party to the agreement.
       7   Q.    To the collateral agreement?
       8   A.    Correct.
       9   Q.    And to your knowledge no one else invited Syncora,
      10         FGIC or US Bank to participate in the negotiations on
      11         the forbearance agreement?
      12   A.    Correct.
```

**Designation:**
```
   87:11   Q.    Did you ever advise Mr. Orr that you thought Syncora
      12         should be a party to the negotiations?
      13   A.    No.
```

**Designation:**
```
   88:11   Q.    At any time during the negotiations in 2013 did the
      12         Swap counterparties send a notice of an event of
      13         default?
      14   A.    I don't recall if we ever received an official notice
      15         but we certainly were aware of the fact they could
      16         send one at any time.
      17   Q.    And at any time during the negotiations in 2013 did
      18         the Swap counterparties formally designate an early
      19         termination date?
      20   A.    No.
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**

| | | |
|---|---|---|
| 89: 3 | Q. | Now, you've indicated there was I guess an agreement |
| 4 | | -- is it fair to say there was an agreement at least |
| 5 | | in principle on the terms of the forbearance agreement |
| 6 | | on or before June 11th, is that correct? |
| 8 | A. | There was an economic understanding, yes. |

**Designation:**

| | | |
|---|---|---|
| 89:10 | Q. | What happened after June 11th with respect to the |
| 11 | | negotiations? |
| 12 | A. | Well, the attorneys for the City and for the Swap |
| 13 | | counterparties began to negotiate the forbearance |
| 14 | | agreement. I was not directly involved in that |
| 15 | | because it was primarily in fact solely with respect |
| 16 | | to the nonfinancial terms of it. |
| 17 | | That took several weeks of very intensive |
| 18 | | work amongst the lawyers for all the parties to arrive |
| 19 | | at an agreement that could be executed which it turned |
| 20 | | out not before July 15th. |
| 21 | | So, it took about a month to complete the |
| 22 | | negotiations for the agreement, so -- |
| 23 | Q. | Other than attorneys working to document I guess the |
| 24 | | legal terms -- well, document the whole thing, was |
| 25 | | there anything else that caused a month, approximately |
| 90: 1 | | a month to elapse between agreement on the financial |
| 2 | | terms and execution of the forbearance agreement? |
| 3 | A. | No, it was a very, very active negotiation amongst the |
| 4 | | parties to the arrive at the final document. |

**Designation:**

| | | |
|---|---|---|
| 93: 8 | Q. | To your knowledge at no point in 2012 did the Swap |
| 9 | | counterparties send a notice of an event of default to |
| 10 | | the City? |
| 13 | A. | Not to my knowledge. |

**Designation:**

| | | |
|---|---|---|
| 94:17 | Q. | You're familiar with the Detroit General Retirement |
| 18 | | System Service Corporation and the Detroit Police and |
| 19 | | Fire Retirement System Service Corporation? |
| 20 | A. | I know they exist. |
| 21 | Q. | Do you have an understanding -- just for the record |
| 22 | | I'll refer to them as the service corporations, do you |
| 23 | | have an understanding what the service corporations |
| 24 | | are? |
| 25 | A. | Yes. |
| 95: 1 | Q. | And what is that understanding? |
| 2 | A. | They were created for the purpose of the City |
| 3 | | borrowing 1.4 billion dollars in 2005 and 2006 and |
| 4 | | making a contributions of the like amount to the |
| 5 | | pension funds. |
| 6 | Q. | Do you understand the service corporations to be |

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
  7        controlled by the City?
  8   A.   Yes.
  9   Q.   And do you understand the service corporations to be
 10        controlled by the emergency manager?
 11   A.   I assume that's the case but I don't know for a fact.
 12   Q.   And the service corporations are in fact parties to
 13        the forbearance agreement, correct?
 14   A.   Yes, they are.
 15   Q.   Who acted on behalf of the service corporations in
 16        connection with the forbearance agreement?
 17   A.   The City did.
 18   Q.   And by the City can you identify the individuals that
 19        you are referring to when you say the City?
 20   A.   Mr. Orr.
 21   Q.   To your knowledge did any members of the Board of
 22        Directors of the service corporations consult with
 23        Mr. Orr about the forbearance agreement?
 24   A.   I don't know.
 25   Q.   Did Mr. Orr -- let's ask it the other way.  Did
96: 1        Mr. Orr consult with any members of the Board of
  2        Directors of the service corporations in connection
  3        with the forbearance agreement?
  4   A.   I don't know.
  5   Q.   Did anyone at Miller Buckfire have any contact with
  6        anyone, any -- any member of the Board of Directors of
  7        the service corporations in connection with the
  8        negotiations?
  9   A.   I don't think so.
 10   Q.   And do you know who presented the forbearance
 11        agreement to the service corporations for execution?
 12   A.   No.
 13   Q.   Would Mr. Orr know that?
 14   A.   I don't know.
 15   Q.   Do you know who would know that?
 16   A.   I don't know.
 17   Q.   The person who signed the forbearance agreement on
 18        behalf of the service corporations, a woman named
 19        Cheryl Johnson, is that correct?
 20   A.   Yes.
 21   Q.   Do you know Miss Johnson?
 22   A.   No.
 23   Q.   Do you know what position Miss Johnson holds, if any,
 24        on the service corporations?
 25   A.   Well, the signature page indicates that she's the
97: 1        president.
  2   Q.   You've never spoken to Miss Johnson about the
  3        forbearance agreement?
  4   A.   No.
  5   Q.   Have you ever spoken with Portia Roberson about the
  6        forbearance agreement?
  7   A.   No.
  8   Q.   Do you know Miss Roberson?
  9   A.   No.
 10   Q.   Has anyone from Miller Buckfire ever spoken with
 11        Miss Roberson?
 12   A.   I don't know.
```

```
13   Q.   Are you aware that the insurers contend that the Swap
14        agreements cannot be terminated without their consent?
15   A.   Yes.
16   Q.   And when did you first become aware of that
17        contention?
18   A.   Well, last week in court I heard Mr. Hackney describe
19        those arguments to the judge.
20   Q.   Have you taken any steps to evaluate whether the City
21        agrees with the insurer's construction of the
22        operative documents on this point?
23   A.   No.
```

**Designation:**
```
98:25  Q.   Are you aware that the insurers contend they have the
99: 1       right to control essentially all actions to be taken
2           by the Swap counterparties in connection with the Swap
3           agreements?
```

**Designation:**
```
99: 5  A.   Yes, I am.
```

**Designation:**
```
99: 7  Q.   And when did you develop that awareness?
8      A.   When I was in court last week listening to
9           Mr. Hackney's description of those issues to the
10          judge.
11     Q.   And have you taken any steps to evaluate whether the
12          City concurs with the insurer's construction of the
13          documents on this point?
14     A.   No.
```

**Designation:**
```
101: 8 Q.   In determining whether to enter into the settlement
9           agreement, did the City consider whether the casino
10          revenues constituted special revenues under the
11          bankruptcy code?
16     A.   No.
18     Q.   So, you didn't consider it or you don't know?
19     A.   I said we didn't consider it.
```

**Designation:**
```
107:10 Q.   Has the City considered selling or leasing Belle Isle?
11     A.   Not to my knowledge.
```

**Designation:**
```
107:12 Q.   Has the City looked into possible sources of funding
13          from the State of Michigan?
14     A.   I'm not going to discuss that.
15     Q.   Has the City looked into possible sources of funding
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
16          from the federal government?
17    A.    I'm not going to discuss that either.
18    Q.    On what basis?
19    A.    Commercially sensitive information.
```

**Designation:**
```
108: 6  Q.  Mr. Buckfire, good afternoon.  My name is Steve
     7      Hackney.  I'm an attorney at Kirkland & Ellis, and I
     8      represent Syncora Capital Assurance and Syncora
     9      Guaranty.  Nice to meet you.
    10  A.  Likewise.
```

**Designation:**
```
109: 4              So, as I understood your testimony, you
     5      were the lead negotiator for the City when it came to
     6      negotiating the business deal, is that correct?
     7  A.  Yes.
     8  Q.  Other people were going to paper the business deal in
     9      terms of the legal terms that would embody it,
    10      correct?
    11  A.  Yes.
    12  Q.  Let me ask you a question.  The kickoff of the
    13      negotiations that led to the forbearance agreement I
    14      understood you to say began on June 4th, correct?
    15  A.  Yes.
    16  Q.  Who called that meeting?
    17  A.  Counsel to Jones Day called counsel for BAML and
    18      invited them to the meeting.
    19  Q.  Fair to say that the meeting was held at the behest of
    20      the City of Detroit?
    21  A.  Yes.
    22  Q.  Did you take legal advice, you personally as the lead
    23      negotiator for the City, did you take legal advice
    24      from Jones Day in advance of the June 4 meeting?
    25  A.  Yes.
110: 1  Q.  Would you disclose to me the legal advice you obtained
     2      from them?
     3              MR. CULLEN:  I'll instruct him not to
     4      answer.
     5              MR.  HACKNEY:  So, if I ask questions about
     6      the legal advice you had been given about the COPs
     7      Swap structure or various parties' rights thereunder,
     8      you would instruct the witness not to answer those
     9      questions?
    10              MR. CULLEN:  Right.
    11              MR. HACKNEY:  And I take it, Mr. Cullen,
    12      that instruction would remain true both from -- at any
    13      time?
    14              MR. CULLEN:  Right.
    15              MR. HACKNEY:  Not just with respect to the
    16      June 4 meeting?
    17              MR. CULLEN:  Precisely.
    18  BY MR. HACKNEY:
    19  Q.  Okay.  Let me ask you, Mr. Buckfire, I'm going to
```

```
20            speculate, perhaps not wildly, that you've negotiated
21            a few deals in your lifetime.
22    A.      Yes.
23    Q.      Isn't it fair to say as a negotiator, you have to have
24            an understanding of the financial needs and desires of
25            your client as well as the counterparty with whom you
111: 1        are negotiating?
2     A.      Yes.
3     Q.      You also have to have at least some understanding of
4             the legal framework in order to negotiate effectively,
5             correct?
6     A.      Yes.
7     Q.      You don't have to go to law school, right, but you do
8             have to understand some of the ins and outs of the
9             various legal documents that you're negotiating over,
10            correct?
11    A.      As well as any layman can be expected to do so.
12    Q.      Now, I'd like to get a level set as to where you were
13            on June 4th, 2013 as you're going into this meeting
14            with BAML.
15    A.      And UBS.
16    Q.      And UBS.  So, they were there too?
17    A.      Yes.
18    Q.      Okay.  I want to make sure I have a level set under
19            the operating assumptions that you had in your mind as
20            you were going into the meeting to negotiate with the
21            Swap counterparties, okay?
22                    One of your operating assumptions was that
23            there were termination events existing under the
24            Swaps, correct?
25    A.      There were events of default existing under the Swaps,
112: 1        the collateral agreement.
2     Q.      Okay.  So, let's take a step back and let me be more
3             precise.
4     A.      Okay.
5     Q.      So, there is a Swap agreement that the Swap
6             counterparties are parties to with the service
7             corporations?
8     A.      Correct.
9     Q.      You are aware of that?
10    A.      I am.
11    Q.      You are also aware that there is a collateral
12            agreement that is between among other parties the
13            City, the service corporations and the Swap
14            counterparties, correct?
15    A.      Yes.
16    Q.      Now, at the time you're going into the June 4 meeting,
17            one of your operating assumptions was that there were
18            termination events under the Swap that would give the
19            Swap counterparties the right to terminate?
25    A.      No, I was focused on the cash issue that would be at
113: 1        risk under the collateral agreement.
3     Q.      And let me tie it up a little bit to see if this jogs
4             your memory.  The collateral agreement certainly
5             relates to the Swaps that was entered into in 2009,
6             correct?
```

```
 7   A.   Correct.
 8   Q.   The collateral agreement cash trap arguably slams shut
 9        upon the occurrence of termination events or events of
10        default under the Swap, is that your understanding?
15   Q.   Okay.
16   A.   Want to try again.
17   Q.   Did you understand that the collateral agreement and
18        the cash trapping were securitizing the City's
19        obligations to the service corporations and the
20        service corporations' obligations to the Swap
21        counterparties under the Swap?
22   A.   No.
23   Q.   Did you understand that the collateral agreement what
24        it was ultimately securing was the termination payment
25        that might be made under the Swaps?
114: 2   A.   No.
 4   Q.   Did you believe that the collateral agreement had
 5        created like a new obligation by the City to pay the
 6        Swap counterparties?
 7   A.   It created a collateralized obligation to pay the Swap
 8        counterparties.
 9   Q.   Okay.  So, going back to the June 4 meeting, let me
10        put it in vernacular that I hope is more correct about
11        what you were assuming.  Okay?
12             You were assuming that there had been
13        events of default under the collateral agreement that
14        would allow the Swap counterparties to trap cash,
15        correct?
16   A.   I wasn't assuming anything.  I knew there were two
17        events of default.
18   Q.   Let me --
19   A.   But they had not been asserted by the Swap
20        counterparties but they existed.
21   Q.   Let me restate it.  As of June 4 you knew that there
22        were events of default under the collateral agreement
23        that would allow the Swap counterparties to trap cash,
24        fair statement?
25   A.   If they chose to do so, yes.
115: 1   Q.   If they chose to do so.
 2   A.   Correct.
 3   Q.   And you also -- let me make sure I get this right.
 4        You also believed that they would be able to declare
 5        termination event and potentially be paid four hundred
 6        million dollars, correct?
 7   A.   Yes.
 8   Q.   And that was also one of your operating assumptions as
 9        you're going into the negotiation, correct?
10   A.   Yes.
11   Q.   And your understanding that they could do so was that
12        they could do so unilaterally, correct?
13   A.   Correct.
14   Q.   And your understanding with both with respect to
15        declaring termination of the Swaps and getting a
16        termination payment and trapping cash was that there
17        was no other party that could direct their actions,
18        correct?
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
19   A.   That's correct.
20   Q.   And your understanding of these operating assumptions
21        remain consistent between June 4 and June 11 when you
22        struck the agreement in principle, correct?
23   A.   Correct.
24   Q.   And in fact it remained consistent for you all the way
25        through the execution on July 15th of the forbearance
116: 1       agreement, correct?
 2   A.   Correct.
 3   Q.   And the forbearance agreement itself did not
 4        materially change the business terms of the deal that
 5        you had struck on June 11th, correct?
 6   A.   No, except for the small negotiation we had around the
 7        date of the first option.  It was the only material
 8        business term that changed.
 9   Q.   Okay.  So, there was some changes of timing in terms
10        of when the percentages stepped up?
11   A.   Yes, because the agreement took a long time to
12        negotiate.  We had originally assumed we would
13        complete a forbearance in June.  It took until July so
14        we asked for and were granted an additional month on
15        the first option payment.
16   Q.   Fair point.  Thank you for that correction.  Other
17        than that change to what I'll describe as the business
18        terms that you negotiated on June 11th, there were no
19        other material changes to the deal that you struck,
20        correct?
21   A.   No.
22   Q.   It was just legal beagles doing what they do, correct?
23   A.   I would never call them legal beagles, but yes, the
24        lawyers were doing what they were supposed to do.
25   Q.   Okay.  All right.  Now, I want to clarify at the June
117: 1       4 meeting other than saying that the City would
 2        vigorously litigate attempts to trap cash, you did not
 3        express the City's views on the merits of that
 4        litigation, correct?
 5   A.   Correct.
 6   Q.   You just said we're going to fight like hell to stop
 7        you from trapping cash or words to that effect?
 8   A.   That's correct.
 9   Q.   And you didn't say by the way here's why we are going
10        to win because we have this great argument and you're
11        going to lose, right?
12   A.   I never said that.
13   Q.   Never said words to that effect, correct?
14   A.   No.
15   Q.   Never attempted to argue the merits of why the Swap
16        counterparties wouldn't be able to trap cash, fair
17        statement?
18   A.   Correct.
19   Q.   And no one else on the City side did either, correct?
21   A.   Not to my recollection.
23   Q.   And you never attempted to argue the merits of the
24        City's case to the Swap counterparties at any time
25        between June 4 and June 11 when you reached the
118: 1       agreement in principle, correct?
```

```
 2    A.    Correct.
 3    Q.    And you never witnessed anyone else do so on behalf of
 4          the City either, correct?
 5    A.    Not that I recall.
```

**Designation:**
```
120:13 Q.    Now, at the time of the June 4 meeting you were aware
  14          that a bankruptcy filing for the City of Detroit was
  15          at least a possibility, correct?
  16    A.    Yes.
  17    Q.    Had you reached the view at that time that it was a
  18          likelihood?
  19    A.    It was a possibility.
```

**Designation:**
```
121: 4 Q.    And if I ask you at the time -- well, let me ask a
   5          general question.  I'm not asking you to disclose the
   6          subject of communication -- the communications
   7          themselves, but I want to ask whether you had taken
   8          legal advice on the subject of the automatic stay.
   9          Don't tell me what the legal advice was.
  10                 Had you taken legal advice on the subject
  11          of the automatic stay at any time between June 4 and
  12          June 11?
  14    A.    Yes, I did.
  16    Q.    So, you had taken legal advice from Jones Day, is that
  17          correct?
  18    A.    Correct.
  19    Q.    But if I ask you what the advice was, you'll follow
  20          your counsel's instruction and not answer, correct?
  21    A.    Correct.
```

**Designation:**
```
122: 4 Q.    I have a broader question which is at any time prior
   5          to June 11th did you or anyone else at Miller Buckfire
   6          to your knowledge perform an analysis of what interest
   7          rates were likely to do in the future?
   8    A.    No.
   9    Q.    Did anyone study any LIBOR curves prior to June 11?
  10    A.    I don't recall.
  11    Q.    You certainly didn't?
  12    A.    I did not.
  13    Q.    Okay.  When you testified about Mr. Marken, you
  14          testified about something I think he had done a couple
  15          days ago and we're in August.  So, I'm going to ask
  16          the same question now about July 15th which is the
  17          execution date.
  18                 As of the execution date of the forbearance
  19          agreement, had you or anyone else at Miller Buckfire
  20          undertaken an assessment of what interest rates were
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
21      likely to do?
22   A.  No.
```

**Designation:**

```
123: 6   Q.  You were asked a lot of questions about the service
     7       corporations.  I think we established that you don't
     8       know their directors and haven't met them, but I want
     9       to make a point clear about the negotiations which is
    10       you never engaged in arm's length negotiations with
    11       the service corporations, correct?
    12   A.  Correct.
    13   Q.  And you never witnessed anyone else do so either,
    14       correct?
    15   A.  Correct.
    16   Q.  And it's your understanding that Mr. Orr directed the
    17       service corporations to execute the agreement and they
    18       did, correct?
    19   A.  Correct.
    20   Q.  Now, you referenced a standstill agreement that was
    21       something that had been proposed by the Swap
    22       counterparties prior to June 4, 2013.
    23               Do you recall that testimony?
    24   A.  I do.
    25   Q.  Your understanding of the standstill agreement, I
124: 1       understand we are going to get it but we don't have it
     2       today so I have to tell you what I understand from
     3       your testimony.
     4               Your understanding of it was that it
     5       allowed the cash to flow out of the -- it allowed the
     6       casino revenues to flow in exchange for the City
     7       agreeing to waive arguments about the invalidity of
     8       the Swaps but was terminable at any time?
     9   A.  By the Swap counterparties.
    10   Q.  By the Swap counterparties, correct?
    11   A.  Correct.
    12   Q.  And that was unacceptable because that meant at any
    13       time they could change their mind and trap the cash,
    14       correct?
    15   A.  By those terms, yes.
    16   Q.  Now, under the forbearance agreement I understand that
    17       you're not an attorney but you are a sophisticated
    18       businessman who deals with legal documents on a
    19       regular basis, true statement?
    20   A.  Regrettably.
    21   Q.  More than he wants to?  But under the forbearance
    22       agreement isn't it true that your understanding is
    23       that the City has agreed during the forbearance period
    24       that it won't seek to declare the Swaps invalid,
    25       correct?
125: 1   A.  Correct.
     2   Q.  And during the forbearance period the Swap
     3       counterparties are allowing the cash to flow through
     4       the collateral account, right?
     5   A.  Yes.
     6   Q.  So, they waive their argument to trap the cash in
```

```
 7          exchange for other things that they got, correct?
 8    A.    Correct.
```

**Designation:**
```
126:15  Q.  You never proposed what I'll call a smaller deal that
    16      would have attempted to maintain the status quo for
    17      some period of time without trying to achieve a
    18      potential termination of a Swap at a discount so on
    19      and so forth, true statement?
    20  A.  True.
```

**Designation:**
```
127: 6  Q.  Isn't it true that between March 12th of -- between
     7      March of 2012 and June 4th, 2013, the Swap
     8      counterparties had never terminated the Swaps,
     9      correct?
    10  A.  That's true.
    11  Q.  Despite the fact that in your view they had the right
    12      to do so, right?
    13  A.  That's correct.
    14  Q.  And during that entire time period which is 14 months
    15      they had never demanded that cash be trapped, correct?
    16  A.  No, they hadn't.
```

**Designation:**
```
129:13  Q.  Understood.  That's very helpful.  So, let me try and
    14      summarize it which is when you re-engaged in January
    15      of 2013, you were made aware of a -- of the general
    16      desire of the Swap counterparties to for lack of a
    17      better term figure out what the City and the Swap
    18      counterparties were going to do about the Swap,
    19      correct?
    20  A.  Yes.
    21  Q.  And you then held them off between that time and June
    22      4 as you tried to buy time for Ernst & Young to get
    23      its arms around the financial position of the City,
    24      correct?
    25  A.  Yes, and our other advisors.
130: 1  Q.  And your other advisors, absolutely.  And it was only
     2      after you had gotten that analysis done that you felt
     3      you were now ready to initiate a meeting with the Swap
     4      counterparties to speak meaningfully about what should
     5      be done with the Swap?
     6  A.  In the context of an overall recommendation to Mr. Orr
     7      about how to protect the City and its liquidity.
     8  Q.  And so during that time period which was from January
     9      of 2013 to June of 2013, despite these growing signs
    10      of impatience by the Swap counterparties, they still
    11      didn't trap cash, did they?
    12  A.  They were being paid in the ordinary course.  There
    13      was no economic consequence that they had to worry
    14      about.  They didn't know the financial condition of
    15      the City.  There was no economic reason for them to do
```

```
16        anything, but clearly as the condition of the City
17        became more desperate and everyone became more aware
18        of it, the risk they would do something became
19        greater.
20   Q.   I see.  So, it was the disclosure of information by
21        Mr. Orr on June 14th, was that a factor that drove you
22        to negotiate in advance of that?
23   A.   No.  Recall that his earlier disclosure was I believe
24        in April.
25   Q.   Oh, that's right.
131: 1   A.   And that was the first time that the public and the
2        capital markets really became aware of the true
3        financial condition of Detroit.
4    Q.   So, in April Mr. Orr made a disclosure that basically
5        said if I could summarize that things are not well in
6        Detroit, correct?
7    A.   That's accurate.
8    Q.   But despite that disclosure and subsequent to the
9        report in April and May, Swap counterparties didn't
10       demand cash be trapped, correct?
11   A.   Correct.
12   Q.   They didn't terminate the Swap, correct?
13   A.   Correct.
14   Q.   After June 11, after you've cut the business deal and
15       here come the lawyers to write it down, fair to say
16       that you're on the sidelines now as the lawyers work
17       out the legal language, but you're still monitoring
18       the course of the legal negotiations given the
19       importance of what's at stake?
22   A.   I was generally aware of what was going on.
24   Q.   I'm trying to get on the idea that you're not on the
25       phone with all these lawyers like directly
132: 1       participating and listening to the negotiations of the
2        forbearance agreement itself but you're keeping tabs
3        on how it's progressing and when it's hoped to be
4        executed, correct?
5    A.   Correct.
6    Q.   Put another way, you are aware of the legal
7        negotiation process as it goes along even though
8        you're not personally involved in it, correct?
9    A.   Correct.
10   Q.   And that's because this was such an important
11       agreement that you as an important advisor to the City
12       needed to be up to speed on what was going on with the
13       forbearance agreement?
14   A.   Correct, but recall that on June 11th the Swap
15       counterparties did issue a letter to US Bank
16       authorizing them to release the tranche of cash due to
17       us on June 15th and therefore we knew we had until
18       July 15th to get to the next tranche.
19            So, from a financial perspective I was
20       comfortable with where we were with the Swap
21       counterparties.
22   Q.   Because after that discharge of cash, then it goes
23       back to just slowly building up, you get it for the
24       rest of the month and then it slowly builds up in the
```

```
    25        first part of July?
133: 1   A.   Correct.
     2   Q.   So, you felt like we had some time to negotiate?
     3   A.   That's correct.
     4   Q.   Yeah.  Your understanding is that the legal
     5        negotiations of the forbearance agreement were
     6        complicated but that they proceeded uninterrupted from
     7        June 11th to July 15th, correct?
     8   A.   Correct.
     9   Q.   And if there had been a serious interruption in these
    10        negotiations, you would have likely known about this
    11        as an important advisor to the City, correct?
    12   A.   Yes.
    13   Q.   And you are aware of no serious interruption, correct?
    14   A.   No.
    15   Q.   That's not correct?
    16   A.   I'm not aware of any serious interruptions.
    17   Q.   In late June of 2013 you learned that Syncora wanted
    18        to make a proposal to the City, isn't that correct?
    19   A.   Yes.
    20   Q.   And you had a conversation with Todd Snyder on the
    21        subject of Syncora's potential proposal on Saturday,
    22        June 29th, isn't that correct?
    23   A.   That's correct.
    24   Q.   Mr. Snyder you understood is a banker at Rothschild's,
    25        correct?
134: 1   A.   Correct.
     2   Q.   And you also understood that he was representing
     3        Syncora, correct?
     4   A.   Yes.
     5   Q.   And you also understood that at the time that he was
     6        calling you, that there had been previous
     7        communications between counsel to Syncora and counsel
     8        to the City, correct?
     9   A.   I had heard about it but I wasn't aware of the
    10        specifics.
    11   Q.   Okay.  So, you knew Jones Day and Kirkland and maybe
    12        others had met and talked about something but you
    13        didn't know what it was?
    14   A.   I knew they were talking about the issues raised by
    15        Syncora.
    16   Q.   Okay.  Now, tell me -- so, in terms of Syncora's
    17        potential proposal, your first percipient knowledge of
    18        it as a witness happens on that Saturday when you have
    19        your conversation with Mr. Snyder, is that a fair
    20        statement?
    21   A.   Correct.
    22   Q.   Tell me everything you can recall about that
    23        conversation.
    24   A.   It was quite brief.  Todd told me he had been retained
    25        by Syncora and that they wanted to propose something
135: 1        that would be of benefit to the City in resolving the
     2        Swap matter.  I told him that we were always willing
     3        to listen to anything anyone had to say and I asked
     4        him to tell me what he had in mind.  He never did.
     5   Q.   Have you told me everything you can recall about that
```

```
     6          conversation?
     7     A.   Yes.
     8     Q.   During that conversation didn't Mr. Snyder describe
     9          the general structure of a proposal Syncora wanted to
    10          make?
    11     A.   No.
    12     Q.   So, if Mr. Snyder says he did, he's lying or mistaken?
    13     A.   He never made a specific proposal to me.
    14     Q.   I'm not saying a specific proposal, I'm saying a
    15          general structure of a proposal, that's what he
    16          testified to in his affidavit.
    17               Did he provide to you the general structure
    18          of a proposal that Syncora wanted to make?
    19     A.   Not that I recall.
    20     Q.   Possible he did, possible he didn't, you just can't
    21          remember?
    22     A.   I can't remember.
    23     Q.   Did he tell you that we'd be able to put specifics
    24          into the general structure of the proposal if we could
    25          execute an NDA that would allow us to learn about the
136: 1          negotiations with the Swap counterparties?
     2     A.   Yes, he did.
     3     Q.   What did you tell him in response to that?
     4     A.   I said he should send us an NDA and we'll take a look
     5          at it.
     6     Q.   And you understood that at least as he expressed to
     7          you that he wanted an NDA as a precursor in order to
     8          make a specific proposal, correct?
     9     A.   Correct.
    10     Q.   Isn't it true that after that time you understood that
    11          an NDA was proposed to the City, correct?
    12     A.   Yes.
    13     Q.   And the City refused to execute that NDA, isn't that
    14          correct?
    15     A.   That's correct.
```

**Designation:**

```
137:15    Q.   And that's because -- but you do remember him telling
    16          you the specifics would come after we sign an NDA?
    17     A.   I do.
    18     Q.   Yeah.  And then your understanding is that there was a
    19          problem with the NDA that you couldn't discuss the
    20          proposal with the EFM.
    21     A.   That's correct.
    22     Q.   And that was something that the parties couldn't get
    23          over?
    24     A.   I asked Jones Day to go back to Kirkland Ellis and try
    25          to fix the problems we had in the NDA and then I moved
138: 1          on to other issues.
     2     Q.   And your understanding was that to the extent those
     3          problems didn't get fixed it was because Kirkland
     4          Ellis was being obstinate with respect to the terms of
     5          NDA?
     6     A.   I don't know why we never resolved it.
     7     Q.   So, to this day you don't know whether or not an NDA
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
    8          could have been struck that would have allowed Syncora
    9          to make a rival proposal, correct?
   10    A.    All I can tell you is that no NDA was entered into
   11          because the terms were unacceptable.
   12    Q.    And you don't know why one wasn't entered into
   13          ultimately after that?
   14    A.    I don't think we could ever resolve the issues.
   15    Q.    And this was in advance of your having executed the
   16          forbearance agreement, correct?
   17    A.    Yes.
   18    Q.    As a negotiator, don't you agree that it's nice
   19          whenever you can play two parties off against each
   20          other?
   21    A.    I didn't have two parties, I had one party.  I had the
   22          Swap counterparties.
   23    Q.    And I'm not asking about in this case, I'm asking
   24          about as a general principle, isn't it nice when you
   25          can play two parties off against each other?
139: 1   A.    Sometimes.
    2    Q.    Isn't that something that you'll do in the DIP
    3          financing which is you'll get all these offers in and
    4          then you'll make these guys compete with each other in
    5          order to drive best possible deal for the City,
    6          correct?
    7    A.    Only if you assume a level playing field which this
    8          negotiation was not.
    9    Q.    I'm just asking generally about the idea of trying to
   10          drive the best deal possible through competition
   11          amongst different negotiating parties.  Can be
   12          valuable, right?
   13    A.    Can be under the right circumstances.  This was not
   14          one of them.
   15    Q.    And what was wrong about the circumstances?
   16    A.    Because we had only two parties to the table, the Swap
   17          counterparties who had signed the collateral
   18          agreement.  There was nobody else to negotiate with.
   19    Q.    That's right, that's right, because your understanding
   20          was that Syncora had no rights whatsoever under the
   21          collateral agreement, correct?
   22    A.    Correct.
   23    Q.    And your understanding was they had no ability to
   24          direct the actions of the Swap counterparties,
   25          correct?
140: 1   A.    I testified earlier that my understanding, I was
    2          advised, the only parties of interest here are the
    3          Swap counterparties.
    4    Q.    And it was also your understanding that Syncora didn't
    5          have any rights under the Swaps that would be
    6          terminated, correct?
    7    A.    Only talking about the collateral agreement.
    8    Q.    We talked about the fact that there might be a
    9          termination event for four hundred million dollars.
   10          That's not under the collateral agreement, right?
   11    A.    True.
   12    Q.    So, we are talking about the Swaps, right?
   13    A.    Yes.
```

```
14   Q.   Now, let's put aside what you've been told about who
15        the relevant parties were.  You did know that Syncora
16        was a Swap insurer, right?
17   A.   Yes.
18   Q.   And you understood as a layperson but a sophisticated
19        one that if an insurer makes a payment to the insured
20        it becomes subrogated to the rights of the insured
21        with respect to that payment, correct?
22   A.   Yes.
23   Q.   And isn't it true that if the Swap counterparties had
24        terminated, they wouldn't have waited around for two
25        years to collect the casino revenues, right, they
141: 1    would have demanded Syncora made good on its Swap
2         insurance and let Syncora try and stick around and
3         collect the casino revenues, correct?
6    A.   It wasn't an issue for the City.
8    Q.   I'm asking whether you thought that was a possibility
9         back at the time you were negotiating the forbearance
10        agreement?
11   A.   It wasn't an issue for the City.  Had no impact on the
12        City's access to cash.
13   Q.   But if Syncora was a party that might come in in lieu
14        of the Swap counterparties, didn't you want to find
15        out whether you might be able to cut a better deal
16        with Syncora?
19   A.   I can't speculate to that.
21   Q.   All you can say is that you never did, correct?
22   A.   Correct.
23   Q.   And in fact between June 29th when you spoke to
24        Mr. Snyder and today, there have never been
25        substantive negotiations between the City and Syncora
142: 1    to your knowledge, isn't that correct?
2    A.   Not on this, no.
```

**Designation:**
```
142:19              As the banker who is leading the DIP,
20        what's your understanding of the role the casino
21        revenues will play in the collateral package offered
22        in connection with the DIP?
23   A.   They will be part of the collateral package.
24   Q.   So, they will be part, and when you say they, do you
25        mean a specific period of time of the casino revenues
143: 1    or do you mean casino revenues projecting into the
2         future?
3    A.   It's commercially sensitive so I'm going to decline to
4         answer it.
```

**Designation:**
```
143:12   Q.   You agree that the goal of the forbearance agreement
13        is to get the collateral agreement to terminate so
14        that the City can get access to the casino revenues,
15        correct?
17   A.   That is one of the goals.
19   Q.   That is one of the goals.  And isn't it true that your
```

```
20        current expectation is that you need the postpetition
21        financing, the DIP loan to close in order to be able
22        to exercise the option under the forbearance
23        agreement, correct?
24   A.   Correct.
25   Q.   And there was testimony on that today because you
144: 1        don't have the money otherwise, right, Mr. Buckfire?
 2   A.   That is part of the collateral package, yes.
 3   Q.   I'm talking about the use of proceeds of the DIP just
 4        so we're clear.  Part of the use of proceeds of the
 5        DIP will be to exercise the option under the
 6        forbearance agreement, correct?
 7   A.   Correct.
 8   Q.   You understand that you won't have unfettered access
 9        to the casino revenues until you exercise the option
10        that leads to the termination of a Swap in the
11        collateral agreement, correct?
12   A.   Yes.
13   Q.   Isn't this a bit circular?
14   A.   Regrettably.
15   Q.   How did you factor that consideration into the
16        determination as to whether to engage in the
17        forbearance agreement?
18   A.   Well, this is why the Swap collateral agreement is
19        such a problem for the City.  Unless we can eliminate
20        the collateral and regain control over gaming revenues
21        without risk of loss because of defaults that would
22        trap it, we need to rationalize and clean this up in
23        order to put the City on a sound financial basis.
24   Q.   So, there are two parts -- there are -- there may be
25        many parts but two of the important parts of the
145: 1        forbearance agreement are getting the Swap
 2        counterparties to waive their right to trap cash and
 3        then taking out the Swap at a discounted value,
 4        correct?
 5   A.   Well, if we take out the Swap at a discounted value
 6        and we pay off the Swap, then there is no need for the
 7        collateral agreement.
 8   Q.   That's true but that may be something that happens
 9        down the road.  So, in the interim between then it's
10        the waiver of the cash trapping rights and the
11        discounted potential value of the termination,
12        correct?
13   A.   Which is a short-term agreement.  It only goes to next
14        June.  There are termination events along the way and
15        in any case as I am aware as a sophisticated layman,
16        there is risk under the bankruptcy code that the Swap
17        counterparties could avail themselves of relief under
18        the provisions for Swaps and irrespective of the
19        automatic state, still take the money.
20   Q.   Okay.  But they've waived those rights under the
21        forbearance agreement?
22   A.   So long as the forbearance agreement exists.
23   Q.   And they waive their rights under the collateral
24        agreement to trap crash, correct?
25   A.   For now.
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**
```
147:12   Q.   So, I'd like to ask you about the concept of what I
      13        call a clean closing, okay, and a clean closing is one
      14        where you engage in a transaction with someone and
      15        both parties walk away from the transaction with an
      16        expectation that neither of them will have liability
      17        arising from the closing.  That's what I mean when I
      18        say a clean closing.
      19               Isn't it true that it's your understanding
      20        that it is important to the Swap counterparties that
      21        they get a clean closing with the City if the City
      22        exercises its option?
      23   A.   Yes.
```

**Designation:**
```
149:16   Q.   All right.  Do you remember we talked about -- do you
      17        remember that you talked about the concept that the
      18        Swap counterparties could walk away from the Swaps if
      19        interest rates ever look like they were going into
      20        territory that was positive for the service
      21        corporations?
      22   A.   Yes.
      23   Q.   And that was a right that you understood they had
      24        received as part of the 2009 restructuring that led to
      25        the collateral agreement, correct?
150: 1   A.   Yes.
       2   Q.   Do you understand that that's called an optional early
       3        termination?
       4   A.   Yes.
       5   Q.   And you understand that under -- when they exercise an
       6        optional early termination, the Swap counterparties
       7        take nothing from the service corporations, correct?
       8   A.   That's correct.
       9   Q.   That's the point of the walkaway which is they get to
      10        walk away but they don't get paid anything?
      11   A.   That's because the Swaps not in the money anymore.
      12   Q.   Well, even if it is or is it isn't, right?
      13   A.   Right.
      14   Q.   In fact  today the Swaps are very much in the money,
      15        correct?
      16   A.   Correct.
      17   Q.   And obviously the Swap counterparties have never
      18        threatened to exercise an optional early termination,
      19        correct?
      23   Q.   To you?
      24   A.   No.
      25   Q.   That wouldn't make sense, would it?
151: 1   A.   Not as long as you're being paid on time.
       2   Q.   And also why would you terminate a Swap on an optional
       3        early basis and be paid nothing when it is worth by
       4        your testimony approximately three hundred million
       5        dollars, correct?
       7   A.   It wouldn't be economically rational.
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
 9   Q.   That would not be economically rational.  And your
10        understanding under the forbearance agreement is
11        what's happening is that in exchange for all the
12        consideration, the Swap counterparties' termination
13        rights are being discounted to somewhere between 75
14        and 82 percent, correct?
15   A.   Correct.
16   Q.   We talked a lot about cash flow forecasts earlier.
17        The cash flow forecasts that are contained in the
18        proposal that you discussed with Mr. Summers, do you
19        remember those?
20   A.   Yes, uh-huh.
21   Q.   E & Y prepared those, correct?
22   A.   Yes.
23   Q.   And you have certainly reviewed them and familiarized
24        yourself with them, correct?
25   A.   Yes.
152: 1   Q.   But you are not someone who can answer specific
 2        questions about how they were created, correct?
 3   A.   No, that's correct.
 4   Q.   If I wanted to ask about any particular line item how
 5        did they get this number, the person to ask that would
 6        be Ernst & Young?
 7   A.   Correct.
 8   Q.   I'd like to go back and talk briefly about the art and
 9        I don't want to talk about the art as part of the DIP
10        or anything like that or what you're going to do with
11        it.
12             I want to go back to June 4 and ask as of
13        June 4, had you made an assessment of the value of the
14        City's art collection?
15   A.   No.
16   Q.   Have you made even a rough approximation of its worth?
17   A.   No.
18   Q.   And why hadn't you done that?
19   A.   We're not qualified to do so.
20   Q.   Why hadn't you retained someone, gosh, back in
21        January, February that was qualified to do so to come
22        in and see whether these assets were valuable?
23   A.   We identified early on as an issue.  We got to it as
24        we could, but it was not a significant crisis for the
25        City because we were focused on cash and preserving
153: 1        cash.
 2   Q.   Well, sometimes art can be turned into cash I think,
 3        isn't that right?
 4   A.   Some people would think so.
 5   Q.   In fact there are art sales of significant amount
 6        every year in this country, isn't that right?
 7   A.   So I'm told.
 8   Q.   And you've read about them in the paper from time to
 9        time when you read the Wall Street Journal, correct?
10   A.   Yes.
11   Q.   And this is art that the City owns, right?
14   Q.   Correct?
15   A.   That's correct.
16   Q.   But you understood took no effort to see whether the
```

```
17        City could obtain cash out of assets that were hanging
18        in the Detroit Art Institute as a substitute for going
19        in and engaging in this negotiation with the Swap
20        counterparties, correct?
21    A.  Correct.
22    Q.  We talked earlier about creditor recoveries and I want
23        to make sure that I understood your testimony on that
24        point.
25            You understand that Mr. Orr made a proposal
154: 1        to creditors that's called proposal for creditors back
 2        in June of 2013, correct?
 3    A.  Correct.
 4    Q.  You helped him formulate that proposal, isn't that
 5        right?
 6    A.  Yes.
 7    Q.  The proposal -- I'm going to summarize it but you
 8        should feel free to correct me as somebody who knows
 9        it better and can say it better than I, but basically
10        put the proposal suggests that unsecured creditors
11        will share in two billion dollars of bonds that are
12        issued by the City upon emergence, correct?
13    A.  Correct.
14    Q.  And the proposal assumes that the City will have
15        unfettered access to casino revenues because that's
16        what its projections show, correct?
17    A.  Yes.
18    Q.  So, even if the City has unfettered access to the
19        casino revenues, its current proposal is still that
20        the unsecured creditors will just share in this two
21        billion dollar pot, correct?
22    A.  That's correct.
23    Q.  So, is it fair to say that getting access to this
24        money will not by itself increase creditor recoveries?
25    A.  No, it's part of the base case plan that we presented
155: 1        which is the base case recovery we presented on June
 2        14th.
 3    Q.  Right.  So, if the court grants the motion and you get
 4        access to it, that will be consistent with the base
 5        case which is consistent with the two billion dollar
 6        offer, right?
 7    A.  Correct.
 8    Q.  So, it won't go up if the court grants you the access
 9        that you're assuming you'll get?
10    A.  But it will go down if the court does not.
11    Q.  That's a different question.  I'll get to that in a
12        moment.
13            It  won't go up if the court grants the
14        motion, correct?
15    A.  Correct.
16    Q.  Your argument if I understood it was that the
17        casino revenues will be used to invest in the City,
18        correct?
19    A.  Revenues of the City are fungible.  All I'm saying if
20        you don't have access to those revenues, then you
21        don't have the billion dollar plus of revenues that
22        you thought you had which is supporting not only
```

```
 23        current operations but the reinvestment plan.
 24   Q.   And I will say that I had understood you earlier to
 25        say if you didn't have access to casino revenues, that
156: 1      City services would suffer?
  2   A.   In the short-term, yes.
  3   Q.   Yeah.  But it's fair to say that you're not proposing
  4        to obtain the casino revenues, access to them and
  5        throw them on to the pot of the two billion dollars
  6        that's already being proposed to unsecured creditors,
  7        correct?
 11   A.   I've already testified that the access to gaming
 12        revenues is part of the plan which supports the two
 13        billion dollar anticipated issuance of notes.
 15   Q.   And you mean that from a feasibility standpoint,
 16        right?
 17   A.   Yes.
 18   Q.   You mean it will strengthen the City and that will
 19        make the City more able to perform under the notes and
 20        that will make the notes more valuable to the
 21        creditors, right?
 22   A.   That would be one result.
 23   Q.   Let me ask you by how much will creditor recoveries go
 24        down if the court declines to approve the forbearance
 25        agreement?
157: 1   A.   We haven't calculated that plan yet.  It would
  2        certainly be a significant reduction and it would be
  3        borne primarily by the unsecured creditors as a
  4        group.
  5   Q.   Prior to July 15th you had not attempted a detailed
  6        calculation to understand the impact to unsecured
  7        creditor recoveries if the casino revenues were not
  8        unfreed, correct?
  9   A.   That's correct.
 10   Q.   So, you don't know whether it's pennies on the dollar
 11        or dimes on the dollar, correct?
 12   A.   We are already at dimes on the dollar in this --
 13   Q.   There's only pennies left.
 14   A.   We hope there's pennies left.
 15   Q.   There was some -- there was a lot of questioning
 16        about the financial forecasts, and I'm not going to
 17        try and reinvent the wheel, but I would ask you to go
 18        back to that Page 35 that you were discussing
 19        earlier.
 20              Do you remember, Mr. Buckfire, being asked
 21        questions about this page?
 22   A.   I do.
 23   Q.   And I guess I want to be clear that -- I know we're
 24        coming to the end of 2013, so, we'll move to this
 25        other page in a second, but at least with respect to
158: 1      2013 if you put legacy expenditures aside,
  2        Ernst & Young forecast is of a substantial net
  3        operating surplus in excess of four hundred million
  4        dollars, correct?
  5   A.   But how can you put legacy expenditures aside in 2013
  6        because we were doing all this through the end of
  7        June.
```

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 8     | Q. | Fair enough.                                                 |
| 9     | A. | So, these are the numbers.                                   |
| 10    | Q. | Well, these are -- 2013 includes probably a full year        |
| 11    |    | projection, so --                                            |
| 12    | A. | Fiscal year ends June 30th.                                  |
| 13    | Q. | Oh, so, fiscal year 2013 ends on June?                       |
| 14    | A. | That's correct.                                              |
| 15    | Q. | Let's go to 38 then.                                         |
| 16    | A. | Okay.                                                        |
| 17    | Q. | Good correction there.  We'll see if it's a big              |
| 18    |    | difference in 2014.  So, this is the next fiscal year,       |
| 19    |    | right?                                                       |
| 20    | A. | Correct.                                                     |
| 21    | Q. | And this is again a financial forecast prepared by           |
| 22    |    | Ernst & Young, correct?                                      |
| 23    | A. | Yes.                                                         |
| 24    | Q. | Now, I understand your point about the fact that this        |
| 25    |    | doesn't reflect the different initiatives that Mr. Orr       |
| 159: 1|    | wants to implement, okay, so let me bracket that, I          |
| 2     |    | heard you say that earlier, but if you hold those to         |
| 3     |    | one side and if you also hold legacy expenditures to         |
| 4     |    | one side, what the City's numbers reveals is that it         |
| 5     |    | has a nearly four hundred million dollar net operating       |
| 6     |    | surplus, correct?                                            |
| 7     | A. | One could look at it that way.                               |
| 8     | Q. | And all of the cops and the fire department and the          |
| 9     |    | ambulance drivers, their payroll, that's all included        |
| 10    |    | in these numbers, correct?                                   |
| 12    | A. | Yes.                                                         |
| 14    | Q. | And so are their health benefits, correct?                   |
| 15    | A. | Yes.                                                         |
| 16    | Q. | Okay.  So, if I understood it correctly, Mr. Orr wants       |
| 17    |    | to do a billion and a quarter of reinvestment in the         |
| 18    |    | City over the next ten years, correct?                       |
| 19    | A. | That's right.                                                |
| 20    | Q. | And that's about 125 million a year, correct?                |
| 21    | A. | That's correct.                                              |
| 22    | Q. | And, so, even if we took the 397 down by his                 |
| 23    |    | initiatives by 125 million, you'd still have                 |
| 24    |    | approximately 272 million dollars left, correct, in          |
| 25    |    | net operating surplus?                                       |
| 160: 1| A. | Yes.                                                         |
| 2     | Q. | And that's even with him being able to do all the            |
| 3     |    | wonderful things that he wants to do for the City,           |
| 4     |    | right?                                                       |
| 5     | A. | That's correct.                                              |
| 6     | Q. | So, we're now going to go to the area where I begin to       |
| 7     |    | do complex math which means adding things twice in a         |
| 8     |    | row where I often fall down.  But I said it was about        |
| 9     |    | 272 and the casino revenues are only about 170 in this       |
| 10    |    | forecast, right?                                             |
| 11    | A. | That's correct.                                              |
| 12    | Q. | So, even if you didn't have those and even if Mr. Orr        |
| 13    |    | did all his improvements, you'd still have a hundred         |
| 14    |    | million dollar net operating surplus, correct?              |
| 15    | A. | No, that's actually not the case, and this is not            |

```
16          meant to be the City's plan, it's not the City's plan.
17          If you are proposing a different plan where the City
18          plans to liquidates itself, then yes, I guess you
19          could look at it this way.
20    Q.    I'm just referring to the preliminary forecast that
21          you all put together in this proposal and gave to us.
22    A.    This is not the City's plan and it's not the City's
23          forecast.  This is an illustration of what happens if
24          you don't do anything.
25    Q.    And the key differences between this and what the
161: 1      City's plan is are the investments that Mr. Orr wants
2           to make, right?
3     A.    Right.
4     Q.    And the cost reductions he wants to make, right?
5     A.    And the increase in staffing levels across services to
6           provide higher level services to the City.
7     Q.    But that's in the reinvestment, right?
8     A.    No, it's actually hard to break out that way because a
9           lot of it is actually in the salaries line and the HR
10          lines.
11               So, you have to go back to the numbers and
12          ask me a lot of those questions.
13    Q.    The proposed investments that he wants to make, that
14          he proposes to make that I'm so ruthlessly omitting,
15          they are in this document, right?
16    A.    Not in this projection.
17    Q.    They're not in this projection, but they are in this
18          proposal?
19    A.    That's right.
20    Q.    He laid them all out in gory detail?
21    A.    Yes, he did.
22    Q.    He also lays out a number of cost cutting initiatives,
23          isn't that correct?
24    A.    Yes, he does.
25    Q.    And one of his goals is also to make the City more
162: 1      efficient, correct?
2     A.    Yes.
3     Q.    At the same time he also wants to make it operate
4           better, correct?
5     A.    Correct.
6     Q.    Those two things from a net operating standpoint work
7           in tension with one another, right?
8     A.    They do over time, but you have to consider the
9           timetable and when these things are done.
10    Q.    I want to ask you a question about state and federal
11          aid but I don't want to mix it up into the DIP which I
12          understand -- which I took to mean earlier was one of
13          the sensitivities there.  I want to go back to June 4,
14          2011.
15               Prior to June 4, 2011 had you undertaken
16          any effort to evaluate whether there was either state
17          aid or federal aid that you could use in lieu of
18          having to negotiate this deal with the Swap
19          counterparties?
20    A.    We are assuming there is no aid available to the City.
21    Q.    You were assuming that there was none, but had you
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
    22              undertaken an effort to determine whether there could
    23              be some?
    24      A.      I've already testified that I'm not going to discuss
    25              that.
163: 1      Q.      And why aren't you going to tell me about that?
     2      A.      It's commercially sensitive information.
     3      Q.      Why?
     4      A.      That's my answer.
```

**Designation:**
```
163:25      Q.      And let me first ask you, Mr. Buckfire, had your firm,
164: 1              you or your firm undertaken any analysis of this
     2              question?  You don't have to tell me what it was.
     3              Let's go in stages.
     4                      Had you analyzed the problem?
     5      A.      Yes, we did.
     6      Q.      You had analyzed the problem.  And is it your
     7              testimony that divulging the results of that analysis
     8              would be commercially sensitive?
     9      A.      Yes.
    10      Q.      Is part of the reason for that because of the way any
    11              potential aid from the City or from the state or the
    12              feds might interplay with the DIP process, is it the
    13              way they knit up, is that the problem?
    14      A.      Yes.
```

**Designation:**
```
165:18      Q.      Is it your understanding that the Series 2006-B COPs
    19              were issued with a floating interest rate?
    20      A.      Yes.
    21      Q.      And is it your understanding that the Swap contracts
    22              were entered into to hedge against the interest rate
    23              risk associated with the Series 2006-B COPs?
    24      A.      Yes.
    25      Q.      And the Swap contracts accomplish this hedge by
166: 1              effectively limiting the City's payment obligations
     2              under the service contracts with respect to the Series
     3              2006-B COPs to the fixed rate that's set forth in the
     4              Swap contracts, is that correct?
     5      A.      Correct, which was amended in 2009.
     6      Q.      What was amended?
     7      A.      The original fixed rate was lower in 2006 and it was
     8              increased slightly in 2009 as part of the amendment.
     9      Q.      The Swap contracts were amended in 2009 --
    10      A.      The rate, the rate was.
    11      Q.      The rate on the Series 2006-B --
    12      A.      That's my understanding.
    13      Q.      Okay.  And with the amendment in 2009 the Swap
    14              contracts still remained in place, correct?
    15      A.      That's my understanding.
    16      Q.      And those Swap contracts are still in place today and,
    17              therefore, still hedging the interest rate risk today?
    19      A.      Except as modified by the 2009 amendment.
    21      Q.      So, do you agree that from the perspective of the City
```

```
    22          with the Swap contracts in place it's as if the
    23          Series 2006-B COPs have a fixed interest rate?
    24    A.    Yes.
    25    Q.    Have you heard of structures like this being referred
167: 1          to as a synthetic fixed rate of interest?
     2    A.    Yes.
```

**Designation:**
```
167:22    Q.    Is there any benefit to the City from having this
    23          structure with the 2006-B COPs having a floating rate
    24          hedged by the Swap contracts as opposed to merely
    25          issuing those COPs with a traditional fixed rate?
168: 2    A.    All their debt is now fixed.  I mean they are not
     3          taking any interest rate risk as a result of the Swap
     4          that was put on top of the floating rate COPs.  That
     5          is the benefit to the City.
     7    Q.    The benefit to the City from the structure is that
     8          it's a comparable interest rate risk exposure for the
     9          City?
    10    A.    They have eliminated the floating rate exposure and
    11          now they have a fixed rate on this debt similar to the
    12          rate exposure they have on the 2005 COPs which are
    13          fixed rate.  So, it's all fixed now.
```

**Designation:**
```
172:17    Q.    Did you discuss any legal arguments that the City
    18          might have had against the Swap counterparties with
    19          Mr. Orr?
    20    A.    No.
```

**Designation:**
```
174:24    Q.    You want to give a minute here for your counsel maybe
    25          to object, maybe not, what legal arguments did you
175: 1          discuss that the City might be able to raise against
     2          the Swap counterparties?
     3                 MR. CULLEN:  I'm going to object and direct
     4          him not to answer.
     5    A.    I wouldn't have answered anyway, but thank you.
```

**Designation:**
```
175:17    Q.    All right.  May I assume that any questions I ask you
    18          about what legal arguments or issues you might have
    19          discussed that the City would have had to assert
    20          against the Swap counterparties, conversations you
    21          would have had with Jones Day people your counsel is
    22          going to object and instruct you not to answer?
    23                 MR. CULLEN:  You can assume that.
```

**Designation:**
```
175:25    Q.    Slightly different question.  Did you have any
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
176: 1         discussions with Mr. Orr regarding the probability of
     2         success on legal arguments the City could raise
     3         against the Swap counterparties?
     4    A.   Yes.
     5    Q.   When did those discussions take place?
     6    A.   During May.
     7    Q.   Can you tell me about those discussions with Mr. Orr?
     8              MR. CULLEN:  Direct him not to answer.
```

**Designation:**
```
177: 5              MS. ENGLISH:  And if I ask him to tell me
     6         about those conversations, will you direct him not to
     7         answer?
     8              MR. CULLEN:  I will indeed.
```

**Designation:**
```
177:10   Q.   Did you discuss with anyone else the probability of
     11        success that the City might have had on legal
     12        arguments against the Swap counterparties?
     13   A.   No.
     14   Q.   Were there any written documents or memos that
     15        evaluated the City's legal arguments against the Swap
     16        counterparties?
     20   A.   No.
     21   Q.   Are you aware of any written analyses that were done
     22        about the legal arguments the City might assert?
     23   A.   No.
```

**Designation:**
```
178: 6   Q.   Going into the start of the negotiations with the Swap
     7         counterparties on June 4th, did you assume that the
     8         Swap counterparties' liens were valid?
     9    A.   I did.
```

**Designation:**
```
179:12   Q.   Can you tell me what the other alternatives were that
     13        you considered?
     14   A.   Well, we considered finding another lender to fund the
     15        termination of the Swaps.  This is back in May when we
     16        knew the financial condition of the City was dire.  We
     17        did not think we could attract a lender to come in to
     18        take out the Swap termination payment at a hundred
     19        cents or even at a discount under the tight time frame
     20        that we had to work with nor did we think we could do
     21        that at a rate of interest that could ever be
     22        acceptable to the City.
     23   Q.   Let me stop you right there and ask did you try?
     24   A.   No.
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**
```
180:13   Q.   Prior to June 4th, did you submit a request to the
    14        state for aid on behalf of the City?
    15   A.   I'm not going to answer that question.
    16   Q.   You will not answer even whether the City made a
    17        request for state aid prior to June 4th?
    18   A.   It's commercially sensitive information.  I
    19        respectfully cannot answer that question.
    20   Q.   Was there a request for state aid that was rejected
    21        prior to June 4th?
    22   A.   I'm not going to answer that question.
    23   Q.   On what basis won't you answer whether there was one
    24        that was rejected?
    25   A.   Commercially sensitive information.
181: 1   Q.   How is it commercially sensitive?  If there was a
     2        state aid request that was rejected, how is that
     3        sensitive now?
     4   A.   You're asking me to speculate.
     5   Q.   I'm asking you why you're not answering.
     6   A.   It's commercially sensitive information.
     7   Q.   Tell me why it's commercially sensitive in your view.
     8   A.   It would have an impact on our ability to prosecute a
     9        successful DIP financing process for the City at this
    10        point.
    11   Q.   It would jeopardize your DIP financing if the public
    12        knew that a state aid request had been rejected prior
    13        to June 4th?
    14   A.   You're saying that.  I didn't say that.
    15   Q.   I'm trying to understand why you won't give us the
    16        information.
    17   A.   It's commercially sensitive.
    18   Q.   How is it commercially sensitive?
```

**Designation:**
```
181:20   A.   I'm not going to answer it.
```

**Designation:**
```
181:22   Q.   Just for kicks let's do the same line of questioning
    23        for federal aid, okay?  Was there a request made by
    24        the City for federal aid prior to June 4th?
    25   A.   I decline to answer that question.
182: 1   Q.   On what grounds do you decline to answer?
     2   A.   It's commercially sensitive information.
     3   Q.   And why do you feel it's commercially sensitive?
     4   A.   Because it would have an impact on our DIP financing
     5        process.
     6   Q.   Was there a request for federal aid that was rejected
     7        prior to June 4th?
     8   A.   I decline to answer that question.
     9   Q.   And do you decline on the exact same grounds you've
    10        just given me?
    11   A.   Yes.
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**

```
183:25    Q.   Did you have any substantive conversations with the
184: 1         Swap counterparties about whether or not their liens
     2         were valid other than, you know, we threaten to
     3         litigate, we threaten to defend, did you actually get
     4         into a discussion about the validity of their liens
     5         with them?
     6    A.   No, I had no other cards to play so I just kept
     7         reminding them we would be aggressive.
```

**Designation:**

```
184:12    Q.   What other unencumbered revenue streams or assets does
     13        the City have?
     14   A.   Well, we have income tax revenues, we have property
     15        tax revenues.  I'm speaking now in the Chapter 9
     16        context.  The state revenues are pledged to three
     17        series of bonds that were issued historically by the
     18        City.  So, there really is no other source of revenue
     19        that's available to the City that could be pledged or
     20        used aside from these.
     21             There are, of course, a list of noncore
     22        assets we identified on June 14th that we are
     23        evaluating for potential value but we have reached no
     24        conclusion yet as to how much is available there.
     25   Q.   I just want to make sure.  You were talking about
185: 1         state shared revenues are pledged, right, did I get
     2         that correct?
     3    A.   They are securing three different series of bonds that
     4         have a pledge of those revenues and that's already
     5         been used.
     6    Q.   So, the remaining unencumbered City assets or revenues
     7         are the noncore assets that were listed?
     8    A.   Right.
     9    Q.   Income tax and property tax?
     10   A.   Correct.
     11   Q.   Is that all?
     12   A.   Well, the gaming revenues if we can eliminate the
     13        collateral agreement.
     14   Q.   Is there any reason that the noncore assets, income
     15        tax or property tax could not be pledged as collateral
     16        to secure DIP financing?
     17   A.   They could be.
```

**Designation:**

```
185:18    Q.   You testified earlier that if the forbearance
     19        agreement was not approved, it would have dire
     20        consequences for the City, is that correct?
     21   A.   Yes.
     22   Q.   Does the City have a backup plan if the forbearance
     23        agreement is not approved?
     24   A.   Well, we're developing one now.  We are proceeding on
     25        the assumption the court will grant relief on this
186: 1         transaction and let us proceed with it and if they
     2         tell us they won't, we'll have a backup plan.
```

```
 3   Q.   What is the backup plan you're currently considering?
 4   A.   It's being developed right now.  It would be not the
 5        plan currently proposed.
```

**Designation:**

```
190:17  Q.   Okay.  Do you understand that under certain
   18        circumstances the agreement prohibits the City from
   19        taking action that's inconsistent with the position of
   20        the counterparties in litigation, for instance?
   21   A.   That's my understanding.
```

**Designation:**

```
201:18  Q.   Is it your understanding that after March 1st the City
   19        has another opportunity to challenge anything related
   20        to this agreement?
   21   A.   It's not my understanding.
   22   Q.   Okay.
   23   A.   I don't know.
   24   Q.   Okay.  Do you recognize there's a possibility then
   25        that the City could be stuck with paying a very large
202: 1        figure after the Chapter 9 plan and have no ability to
    2        challenge it if -- at some certain stage regardless of
    3        the validity of those liens?
    4   A.   That's a possibility.
    5   Q.   Okay.
```