# <u>Exhibit 6C</u>

**Excerpts from Deposition of Kevyn Orr**

**In The Matter Of:**

*City of Detroit*

---

*Kevyn Orr*

*August 30, 2013*

---




**Bingham Farms/Southfield • Grand Rapids**

Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

*Original File ORR_KEVYN.txt*

***Min-U-Script® with Word Index***

UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

In Re:

City OF DETROIT, MICHIGAN        Chapter 9

Case No.13-53846

Debtor.        Hon. Steven Rhodes

/

The Videotaped Deposition of KEVYN ORR,
Taken at 1114 Washington Boulevard,
Detroit, Michigan,
Commencing at 8:32 a.m.,
Friday, August 30, 2013,
Before Cindy Mendenhall, RPR, CSR-5220.

BY MR. HACKNEY:

Q. Okay. That's correct?

A. Yes. That is correct.

Q. So if I ask you what your view is on the likelihood that the City's Swap and validity arguments will prevail, you will assert the attorney-client privilege; is that correct?

A. Yes, more than likely.

Q. If I ask you your view on the likelihood that the pledge of the gaming revenues under the Michigan Gaming Act is an invalid pledge, you'll assert the attorney-client privilege, correct?

A. Yes, more than likely.

Q. If I ask you questions regarding the likelihood that the City would prevail on a claim or defense against the Swap counterparties, you'll assert the attorney-client privilege, correct?

A. Yes, more than likely.

Q. And I guess I gotta clarify. When you say more than likely, I mean are you asserting the privilege with respect to those types of questions? I'm trying to save having to --

A. Sure.

MR. SHUMAKER: Let me state for the record you can ask questions as to whether those -- those

factors were considered by Mr. Orr, but obviously if you're going to ask what he was -- what he was advised by counsel, then I'm going to instruct him not to answer.

A. When I say more than likely, that's -- that's exactly the distinction that I'm trying to make. Did I have discussions with my counsel? Yes. Did those discussions take into consideration some of those factors? Yes. Am I going to tell you what those discussions were and what, if any, conclusions were made? No.

BY MR. HACKNEY:

Q. Okay. Fair enough.

On July 15, 2013, the City entered into what we're going to call the forbearance agreement with the Swap counterparties and the service corporations; is that correct?

A. Yes.

Q. When did negotiations around that agreement with the Swap counterparties begin after your appointment?

A. I think there were discussions about negotiations almost immediately after my appointment. My specific knowledge -- when you say negotiations, what do you mean?

Q. Well, let me -- let me ask it a different way, which

is isn't it true that Mr. Buckfire was the lead negotiator for the City on the business terms of what became the forbearance agreement?

A. Yes.

Q. And Mr. Buckfire has testified that the negotiations in earnest regarding what became the forbearance agreement were conducted between June 4th and June 11th of 2013?

A. I don't recall those specific dates, but I think that's the right time frame. Let me -- let me try to be as clear as I can so we can move on. We began talking, discussing ways with my advisors, without discussing what we discussed, to provide the City with liquidity almost immediately upon my appointment. The negotiations that you're referring to I believe did occur within that time frame.

Q. Okay. So you don't have a basis as you sit here today to contradict Mr. Buckfire's recollection of when the key negotiations over the business terms of the forbearance agreement were conducted?

A. No. It might be earlier, but that's the approximate time frame.

Q. And as he was the lead negotiator, he's probably the guy who would know, right?

A. Sure, absolutely.

point during the first week, but they -- they resumed. My interpretation was that they broke down, and then they recommenced a second week.

Q. Okay. So on -- if there -- to the extent Mr. Buckfire's right that there was an in-person June 8th meeting --

A. Yeah.

Q. -- do you remember what his -- what your marching orders to him were as he went into that meeting?

A. Here again, the concept of marching orders, we were trying to get to an agreement generally, and I believe the instructions were to continue to move towards that process, whatever that was. And so the specific bid/ask that were going on throughout that time, I don't -- I don't recall, but the general concept was to continue to try to move to a point to get to a discount number or a discount process.

Q. Is it fair to say that if I ask you for the specific ebb and flow of the negotiations between the Swap counterparties in terms of the precise business deal --

A. Right.

Q. -- you would have to defer to Mr. Buckfire's recollection because he was more intimately involved?

A. That's fair. Because Ken was -- Ken would have the

direct meetings and then call me back. We'd go back and forth, and I didn't keep notes and I didn't keep a calendar, so --

Q. I asked you about nondisclosure agreements, but did the City execute any other agreements of any kind with the Swap counterparties during this period that you were negotiating the forbearance agreement?

A. No, not that I know of.

(Discussion off the record at 8:59 a.m.)

(Back on the record at 8:59 a.m.)

MR. HACKNEY: No. Problem. Let's go off the record.

VIDEO TECHNICIAN: The time is 8:59 a.m. We are off the record.

(Recess taken at 8:59 a.m.)

(Back on the record at 9:08 a.m.)

VIDEO TECHNICIAN: We are back on the record at 9:08 a.m.

BY MR. HACKNEY:

Q. Mr. Orr, I want to clear something up. Maybe I've been saying it the wrong way. I've been using the term "marching orders" with the respect to the way that you and Mr. Buckfire operated.

A. Right.

Q. And is a better way to say it that you authorized

Mr. Buckfire to negotiate the best possible deal he could with the Swap counterparties and that's what he did?

A. That's a fair characterization, sure.

Q. And at some point did he come out of a meeting and say, Mr. Orr, this is the best deal that I'm able to get out of these Swap counterparties and it's my advice that we take it?

A. Yes.

Q. And was that on or about June 11th, 2013, which is the date he recalls the agreement in principle being reached?

A. Yes.

MR. SHUMAKER: Objection to form.

BY MR. HACKNEY:

Q. And what was the agreement in principle that was reached as you understood it?

A. The agreement was essentially that in exchange for a reduced optional termination payment -- we'll just call it the payment under the forbearance agreement -- the Swap counterparties would agree not to trap the cash, they would agree to release their liens, and also release their claims, I believe, against your client, Syncora, and we would have access to that cash going forward provided we made the discounted payment

entities that have long names that I'll only say to you if you want -- really want me to.
A. We'll stipulate I know what you mean by the service corporations.
Q. And there are two of them?
A. There are two.
Q. Okay.
A. Police and Fire General Services.
Q. There you go. So you already know them and you said the names. So the two service corporations are parties to the forbearance agreement, correct?
A. Yes.
Q. And Mr. Buckfire testified yesterday, I'll represent to you, that his understanding is that you directed the service corporations to execute the forbearance agreement and they did so; is that correct?
A. No.
Q. Okay. Were there arms' length negotiations with the service corporations?
A. To the best of my knowledge, there was.
Q. And who led those?
A. I'm not quite sure. I know that -- in response to your question, I did not direct a service corporation. They were organized by the City. And they are managed by City employees, but I had no direct -- I gave no

direct instruction to either of the service corporations.

Q. Okay. So my question was about negotiations with the service corporations.

A. Right.

Q. Who conducted the arms' length negotiations with the service corporations on behalf of the City?

A. I'm not sure.

Q. Well, you know it wasn't you?

A. Yes, it wasn't me.

Q. And did you ever direct Mr. Buckfire to engage in direct negotiations with the service corporations?

A. No. I directed Mr. Buckfire to do whatever needed to get done to get the agreement in principle resolved and signed. That's what I did, but I did -- said nothing specific. Just to be responsive to your question, said oh, go talk to the service corporations, there was nothing that specific.

Q. So to the extent there was a negotiation that needed to be had, it was his job to go have it?

A. It was his or someone else on my -- on my reorganization team's job, yeah, sure.

Q. Well, did you direct anyone else on your team to go negotiate with the service corporations?

A. No. Once we reached an agreement in principle, I

directed my team to more or less go forth and get it documented and get it done.

Q. And the service corporations are legally separate from the City, correct?

A. Yes, they are.

Q. Your powers as emergency financial manager do not extend to the service corporations, correct?

A. I haven't examined that question, so I can't answer you yes or no.

Q. Can you direct their actions under PA 436?

A. I'm not sure.

Q. Do you have any firsthand knowledge that the service corporations engaged in arms' length negotiations with the Swap counterparties?

A. No.

Q. If they had, do you think that's something you would have likely heard about?

MR. SHUMAKER: Objection, calls for speculation.

A. I may have. As emergency manager, there are a number of things that occur, as you might imagine, on a daily basis that I may or may not hear of. I might have.

BY MR. HACKNEY:

Q. As you sit here today, though, can you recall hearing that there were ongoing negotiations between the

A. Yes.
Q. Okay. Portia Roberson --
A. Um-hm.
Q. -- is the City's corporation counsel, right?
A. Yes.
Q. And she's also on the board of both service corporations, correct?
A. To the best of my knowledge, that's true.
Q. Do you know who made the decision at the service corporations to enter into the forbearance agreement?
A. I do not.
Q. Did you have any conversations with either Ms. Johnson or Ms. Roberson about the service corporations entering into the forbearance agreement?
A. No.
Q. Isn't it true that the policy of the City is to indemnify the service corporation directors for actions they take in their capacity as City employees?
A. I don't know that.
Q. You don't know if that's the policy of the City?
A. I do not. I know the City has an indemnification policy. I don't know if it applies to the service corporations.
Q. Okay, but does it apply to the City employees?
A. It applies to City employees acting within their

course and scope of their employment as employees of the City.

Q. Okay. So as you sit here today, you can't say that that indemnification policy would extend to City employee actions taken in their capacity as service corporations --

A. Correct.

MR. SHUMAKER: Objection, calls for a legal conclusion.

BY MR. HACKNEY:

Q. I will -- I'm sorry.

A. Okay.

Q. As emergency financial manager, you control the salary of all City employees; isn't that correct?

A. As emergency manager.

Q. As emergency manager, right.

A. Right.

Q. Sorry. Is that the proper --

A. It changed with Public Act 436. Public Act 72 was EFM and now I'm an EM.

Q. Okay. Got to get my lingo.

A. Yeah.

Q. And you do, as emergency manager, control the salary of all City employees, correct?

A. I have the authority to control the salary of all City

employees. I have not exercised that authority for all City employees.

Q. Okay. And you have the power to reduce those City employee salaries to zero if you choose, correct?

A. I think I do, yes.

Q. And you have done that on at least one prior occasion, I believe, correct?

A. Yes, I did do that.

Q. Okay. Now, are you aware that the insurers, the Swap insurers, like Syncora and FGIC, contend that the hedges cannot be terminated without their consent where there are termination events or events of default?

A. I have heard that. I m -- I have no independent awareness of that.

Q. So when did you first hear that?

A. I think it was all caught up in this time frame of the -- of the discussion after the agreement in principle, before the forbearance agreement was reached.

Q. Your best recollection is that you heard that prior to the execution of the forbearance agreement?

A. I believe it may have been prior to execution.

Q. But you have taken -- you have taken no steps to evaluate whether the City concurs with the insurers'