# Exhibit 6D
**Excerpts from Deposition of Kenneth Buckfire**

# In The Matter Of:

*City of Detroit*

*Kenneth Buckfire*
*August 29, 2013*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

*Original File BUCKFIRE_KENNETH.txt*
*Min-U-Script® with Word Index*

1        UNITED STATES BANKRUPTCY COURT
2      FOR THE EASTERN DISTRICT OF MICHIGAN
3              SOUTHERN DIVISION
4
5   In Re:
6
7   CITY OF DETROIT, MICHIGAN   Chapter 9
8                               Case No.13-53846
9           Debtor.             Hon. Steven Rhodes
10                                /
11
12
13      The Video Deposition of KENNETH BUCKFIRE,
14      Taken at 1114 Washington Boulevard,
15      Detroit, Michigan,
16      Commencing at 9:31 a.m.,
17      Thursday, August 29, 2013,
18      Before  Nora Morrissy, RMR, CRR, CSR-2642.
19
20
21
22
23
24
25

```
 1            sometimes you will anticipate probably where I'm going
 2            with the question or think that you anticipate, I
 3            would ask that you to make the transcript clearer, I
 4            will ask that you wait until I complete the question
 5            before you begin your answer.
 6    A.      Thank you.
 7    Q.      Before you is what's been premarked as Deposition
 8            Exhibit 1, and I assume you have seen this document
 9            before, is that correct?
10    A.      No.
11    Q.      No.  Okay.  And it is the notice of deposition that
12            was issued that we are proceeding under today.  I'd
13            like to discuss initially with you the topics about
14            which you plan to testify at the hearing on the motion
15            to assume the forbearance and optional termination
16            agreement and prove the settlement therein.
17                    Do you have in mind the topics that you
18            intend to testify at the hearing?
19    A.      Yes.
20    Q.      And can you provide those to me?
21    A.      The reason and purpose of the negotiation with the
22            Swap counterparties and the results thereof as
23            determined in the forbearance agreement itself, the
24            financial condition of the City that led us to believe
25            that this agreement was necessary to rehabilitate the
```

```
 1              City.  Prepared to testify to the general condition of
 2              the City's financials leading up to the execution of
 3              the forbearance agreement.
 4    Q.        Are there any other topics that you intend to testify
 5              at the hearing concerning the forbearance agreement?
 6    A.        I'll testify at that point to the status of the DIP
 7              form process that will provide the financing to
 8              execute the City's option under the forbearance
 9              agreement to retire the Swaps.
10    Q.        Are there any other topics that you have not mentioned
11              in your answers that you intend to testify about?
12    A.        I'm sure there will be other things but I can't recall
13              at this time what they might be.
14    Q.        ==Mr. Buckfire, what is your position with Miller==
15              ==Buckfire?==
16    A.        ==Co-founder and co-president of Miller==
17              ==Buckfire & Company.==
18    Q.        ==Miller Buckfire currently is employed as the financial==
19              ==advisor to the City of Detroit, correct?==
20    A.        ==As the investment banker to the City, that's correct.==
21    Q.        And when was Miller Buckfire first engaged by the City
22              as investment banker?
23    A.        We were first engaged in July of 2012 for a 60-day
24              review of the City's financial condition.  We were
25              re-engaged on January 8th of this year to continue to
```

```
 1            advise the City on its financial condition and
 2            financial alternatives.  Both were -- were hired
 3            pursuant to an RFP process to which we submitted a
 4            proposal.
 5   Q.       When you were hired in July 2012, can you describe the
 6            scope of services that Miller Buckfire was engaged to
 7            provide?
 8   A.       As I mentioned earlier, we were engaged to do a
 9            general financial review of the City's financial
10            condition particularly with respect to its ability to
11            service its debt obligations.
12   Q.       Were there specific tasks that you were asked to
13            perform in connection with doing a general financial
14            review of the debt obligations?
15   A.       No, we were engaged to do a general financial review
16            and advise the mayor and the chief financial officer
17            as to what those financial conditions implied for the
18            City's ability to operate in the ordinary course.
19   Q.       That engagement began in July 2012 is what you
20            testified to, is that correct?
21   A.       Correct, and ended on August 31st.
22   Q.       Very good.  I would point out that I would ask you to
23            wait until I ask the question, though.
24                    Miller Buckfire was then re-engaged on
25            January 8th of 2013, is that correct?
```