## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

IN RE:                              ) CHAPTER 9
                                    )
CITY OF DETROIT, MICHIGAN,          ) Case No. 13-53846
                                    )
            Debtor.                 ) Hon. Steven W. Rhodes
                                    )
                                    ) Related to Doc. Nos. 157, 370

---

### SUPPLEMENTAL OBJECTION OF
### THE DETROIT RETIREMENT SYSTEMS TO THE MOTION OF
### DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
### ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL
### TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF
### THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT
### PURSUANT TO RULE 9019, AND (III) GRANTING RELATED RELIEF

The Police and Fire Retirement System of the City of Detroit ("PFRS") and

the General Retirement System of the City of Detroit ("GRS," and together with

the PFRS, the "Retirement Systems") hereby submit this Supplemental Objection

to the Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of

That Certain Forbearance and Optional Termination Agreement Pursuant to

Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant

to Rule 9019, and (III) Granting Related Relief (the "Assumption Motion") [Doc.

No. 157].

## **Preliminary Statement**

1.      On August 16, 2013, the Retirement Systems filed their objection to the Assumption Motion on the grounds that the propriety and benefits of the Forbearance Agreement[1] could not be assessed because of a lack of information or clarity regarding: (i) whether a valid termination event exists such that the Swap Counterparties have a valid termination right in support of the Forbearance Agreement; (ii) whether the Swap Counterparties' asserted pre-petition liens on the Casino Revenue extend to Casino Revenue generated post-petition; (iii) what claims, obscurely alluded to in paragraph 47 of the Assumption Motion, may exist to challenge the validity of the Swap Contracts and liens; and (iv) by what means the City of Detroit, Michigan (the "City") intends to obtain funds in the approximate amount of $200 million in the next two to six months to effectuate an Optional Termination. *See* Doc. No. 370.

2.      In their objection, the Retirement Systems joined in the objection to the Assumption Motion filed by creditor EEPK [Doc. No. 246], and reserved the right to join, subject to discovery, the objection filed by Ambac Assurance Corporation ("Ambac") [Doc. No. 348].   On August 29, August 30, and September 9, 2013, respectively, the Retirement Systems (along with the other parties objecting to the Assumption Motion, together, the "Objectors") participated

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Assumption Motion.

9450206.3 14893/165083

in the depositions of: Kenneth Buckfire, financial advisor to the City; Kevyn Orr, Emergency Manager for the City; and Gaurav Malhotra, financial restructuring advisor to the City—each of whom may testify on behalf of the City in support of the Assumption Motion at the evidentiary hearing on September 24, 2013. Discovery having now been substantially completed, the Retirement Systems hereby formally join in Ambac's objection specifically in challenging the validity of the Swap Counterparties' asserted pre-petition lien on the Casino Revenue under the Michigan Gaming Act.

3.     As mentioned above, the Retirement Systems objected to the Assumption Motion, in part, due to a lack of information regarding the method by which the City intends to pay the Optional Termination fee. [Doc. No. 370 at 12-13]. In addition, the Retirement Systems noted that the "timing of the potential Optional Terminations is troublesome, as it threatens to result in a very significant financial transaction taking place outside the context of a plan of adjustment, possibly to the irrevocable prejudice of other creditors." *Id.* at 13 n. 3. At deposition, a City witness testified that the Optional Termination fee would be funded via a DIP loan (the "DIP Loan"). *See* Exhibit A attached hereto, excerpted Buckfire Dep. at 69-70. The DIP Loan is proposed to be in an amount of approximately $350 million—larger than needed for the approximately $200 million payoff of the swap claims—with the excess approximately $150 million

proposed to be used for unspecified "reinvestment" in the City. *See id.* at 73, 79 ("We'll use proceeds to terminate the Swaps at the discount provided for in the forbearance agreement and the balance of the DIP loan will be retained by the City as working capital and to support its reinvestment program.") Based on these additional facts determined in discovery, the Retirement Systems wish to supplement their objection regarding the method of paying the Optional Termination fee.

4.     Additionally, the Retirement Systems wish to briefly supplement the argument in their original objection concerning the non-applicability of section 928(a) of the Bankruptcy Code and the resulting conclusion that the Swap Counterparties do not have a lien on postpetition Casino Revenue.

## Supplement

I.     **Section 928(a) of the Bankruptcy Code Does Not Apply to the Swap Counterparties' Purported Liens Because the Casino Revenue is Not a "Special" Excise Tax and Thus Does Not Constitute "Special Revenue."**

5.     In their objection to the Assumption Motion, the Retirement Systems argued that "[r]egardless of whether Casino Revenue may constitute 'special revenue' as defined under Bankruptcy Code section 902(2), the protection under section 928(a) of liens in special revenues should not apply to the Swap Counterparties' security interest in the Casino Revenue." *See* Doc. No. 370 at 9. The Retirement Systems demonstrated that section 928(a) is intended only to apply

to those liens on special revenues that secure revenue bonds that financed the project from which the revenues derive. The Retirement Systems therefore argued that section 928(a) is inapplicable here because the Casino Revenue does not secure revenue bonds at all (the Swap Contracts are not revenue bonds), let alone revenue bonds that financed a project or program which created the Casino Revenue. *Id.* at 10 (citing Collier on Bankruptcy, ¶ 928.02 (16th Ed. 2013)).

6. While the foregoing analysis essentially focuses on whether the Casino Revenue can serve as special revenues for the Swap Counterparties in light of the intent of section 928(a), the Retirement Systems wish to hereby supplement that analysis by focusing specifically on the issue of whether the Casino Revenue even constitutes "special revenue" in the first instance under section 902(2).

7. Section 902(2) defines "special revenues" as, *inter alia*, "special excise taxes imposed on particular activities or transactions." 11 U.S.C. § 902(2)(B).

8. The term "excise tax" is undefined in the Bankruptcy Code, but it has been defined with respect to section 507(a) as "an indirect tax, one not directly imposed upon persons or property. . . and is one that is 'imposed on the performance of an act, the engaging in any occupation, or the enjoyment o[f] a privilege.'" *New Neighborhoods, Inc. v. West Va. Workers' Compensation Fund*, 886 F.2d 714, 719 (4th Cir. 1989) (quoting *In re Tri-Manufacturing & Sales Co.*, 82

9450206.3 14893/165083

B.R. 58, 60 (Bankr. S.D. Ohio 1988)).  An excise tax is a "pecuniary obligation imposed by a government to defray taxes of an authorized undertaking." *Id.*

9.     While the City and/or the Swap Counterparties may argue that the Casino Revenue is an "excise tax" because it is imposed on a particular activity (gaming), not all excise taxes are meant to be considered "special revenues" under section 902(2)(B).  The statute is clear that only ***special*** excise taxes constitute special revenue.  11 U.S.C. § 902(2)(B).

10.     The placement of the word "special" before "excise tax" in section 902(2)(B) was done to illustrate Congress' intention that section 928(a) only apply to special revenues that secure the payment of special revenue bonds.  *See* H.R. Rep. 100-1011, 100th Cong., 2d Sess., at 4 (1988); Collier on Bankruptcy § 928.02 (16th Ed. 2013).  As not all excise taxes are necessarily imposed to finance a particular project from which that excise tax revenue derives, Congress added the qualifier "special" to section 902(2)(B) to limit the kinds of excise taxes that should be considered "special revenues" under section 928(a) in order to narrowly tailor the application of section 928(a) to its intended purpose—encouraging bond-financing investment in municipal programs or projects by protecting the holders of those bonds.

11.     It is clear from the legislative history to section 902 that special excise taxes, and therefore special revenues, are not intended to include taxes which do not fund a specific project or program (and the Casino Revenue does not fund a specific project or program). S. Rep. 100-506, 100th Cong., 2d Sess., at 13 (1988). A report submitted in connection with the legislative process illustrates the situation in which special excise taxes should be considered special revenues:

> Hotel-motel taxes, meal taxes, and license fees are included in special excise taxes. They are often imposed for particular purposes. For example, a hotel-motel excise or a meal tax might be imposed in a particular area of a municipality or throughout a city to finance the construction and operation of a convention center. Bonds secured by the special excise tax are issued to finance the construction. . . . However, where the revenue may be used for other purposes, it should not constitute "special revenues."

Richard B. Levin and Lawrence P. King, "Report of the National Bankruptcy Conference on Proposed Municipal Bankruptcy Amendments," included in the Hearings Before the Subcommittee on Courts and Administrative Practice of the Committee on the Judiciary, 100th Cong., 2d Sess. at 553 (S. Hrg. 100-1067, June 10, 1988).

12.     Here, the Casino Revenue does not secure bonds issued to finance the program or project from which the Casino Revenue derives. Rather, the Casino Revenue is available for the general purposes enumerated in section 12(3)(a) of the Michigan Gaming Control and Revenue Act. Mich. Comp. Laws § 432.212(3)(a). "Taxes available for general municipal purposes do not constitute 'special revenues.'" *In re Heffernan Mem. Hosp. Dist.*, 202 B.R. 147, 149 (Bankr. S.D. Cal. 1996). Accordingly, even if the Casino Revenue could be considered an "excise tax" in the technical sense, it is not a "***special*** excise tax" under section 902(2)(B) and thus cannot be considered "special revenue" for purposes of section 928(a). Absent application of section 928(a), the Swap Counterparties' purported liens in the Casino Revenue do not extend to any post-petition Casino Revenue pursuant to section 552(a), rendering the Swap Counterparties unsecured creditors of the City. As the Forbearance Agreement contemplates treating any amounts owed to the Swap Counterparties as fully secured claims in bankruptcy, the Forbearance Agreement improperly elevates any claims of the Swap Counterparties above similarly situated general unsecured creditors. Accordingly, the Assumption Motion must be denied.

9450206.3 14893/165083

## II. Facts Obtained In Discovery Regarding The Method Of Paying The Optional Termination Fee Further Support The Argument That The Assumption Motion Cannot Be Approved Under Rule 9019 Until The Details Of The DIP Loan Are Known

13. In their objection to the Assumption Motion, the Retirement Systems argued that even if the Swap Counterparties' claims were to be treated as secured, the complete lack of detail regarding how the City intends to pay the Optional Termination fee is problematic and bars the Court from being able to determine whether the Forbearance Agreement is fair and equitable and in the best interests of creditors. In discovery, a City witness stated that the City has disseminated a request for proposal to various lending sources, seeking terms for a postpetition loan and that, based on responses thus far, the City expects to obtain the DIP Loan, in the approximate amount of $350 million. *See* Exhibit A, Buckfire Dep. at 69-70. While the proceeds will first be used to pay the Optional Termination fee, the remaining approximately $150 million will be used for unidentified, miscellaneous "reinvestment" in the City. *Id.* at 73, 79.

14. The Retirement Systems have not received a definitive term sheet for the DIP Loan, but, presumably, it will provide for the encumbering of previously unencumbered assets.[2] The liquidation proceeds of such unencumbered assets

---

[2] To date, the City has confirmed that it will be offering a lien on the Casino Revenue as part of any DIP Loan, but the City refused to answer any further questions on this topic under the guise of "commercial sensitivity." (Ex. A, Buckfire Dep. at 74).

9450206.3 14893/165083

conceivably could be used to pay claims of the Retirement Systems in order to support pension benefits of active and retired employees of the City. Instead, those assets are apparently proposed to be encumbered by the DIP Loan, with the proceeds being used for other undefined, amorphous purposes. Clearly, this arrangement threatens to prejudice the Retirement Systems and their beneficiaries: the City has stated that it intends to impair and diminish the accrued pension benefits of the Retirement Systems' beneficiaries due to allegedly limited resources, and now it is apparently intending to place some of those limited resources beyond the reach of the Retirement Systems for unspecified purposes.

15. The Court's consideration of whether the Forbearance Agreement should be approved under Bankruptcy Rule 9019 as being fair and equitable and in the best interests of creditors (assuming the Court has determined as a threshold matter that the secured claims of the Swap Counterparties are indeed valid) should await, at a minimum, the City's production of a proposed finalized agreement for the DIP Loan, in order to permit evaluation of its terms and its impact upon the City's creditors.[3] In fact, the City's witness has conceded that "we have to have a court order approving the form of the DIP financing." *See* Exhibit A, Buckfire

---

[3] Indeed, in the absence of a demonstrated default and triggering event and a need for approval of the Forbearance Agreement in the near term, the Retirement Systems submit that consideration of such a settlement with potentially far-reaching effects should occur, if at all, in conjunction with the plan-confirmation process.

Dep. at 77.    The Retirement Systems submit that bifurcating the Court's

consideration of the merits of the Forbearance Agreement and the terms of the DIP

Loan is illogical and inappropriate.

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Jennifer K. Green (P69019)
151 S. Old Woodward Ave., Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

Counsel to the Police and Fire Retirement
System of the City of Detroit and the
General Retirement System of the City of
Detroit

Dated:  September 20, 2013

9450206.3 14893/165083

# EXHIBIT A

# IN RE: CITY OF DETROIT

# KENNETH BUCKFIRE

## August 29, 2013

*Prepared for you by*



**BIENENSTOCK**

NATIONWIDE COURT REPORTING & VIDEO

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

 1    A.    I would recommend it.

 2    BY MR. SUMMERS:

 3    Q.    Okay.

 4                 MR. SUMMERS:  Let's mark that for follow-up

 5          after the deposition.

 6    BY MR. SUMMERS:

 7    Q.    You testified that as of the last analysis your

 8          understanding is the estimated amount of the

 9          termination payment that would be due is roughly three

10          hundred million dollars, is that correct?

11    A.    Well, it clearly moves around as the interest rate

12          curve moves around.  I think the most recent number is

13          somewhere reaching 275 and 300 million dollars.

14          That's before the application of the applicable

15          discount that we had provided for in the termination

16          agreement.

17    Q.    And that last analysis, when was that performed?

18    A.    A few days ago.

19    Q.    How does the City plan to get the cash necessary to

20          make the termination payment?

21                 MR. CULLEN:  Objection.  Foundation.  Form.

22    BY MR. SUMMERS:

23    Q.    Does the City have a plan at this point for how it

24          will obtain the cash necessary to pay the termination

25          payment?

1              MR. CULLEN:  Objection, foundation, form,

2         but you can address the question.

3    A.   Yes, the City has a plan.

4    BY MR. SUMMERS:

5    Q.   And what is that plan?

6    A.   The City intends to secure a debtor in possession

7         financing of sufficient proceeds to fund the

8         termination payment as well as provide sufficient cash

9         for the City to execute on its reinvestment program

10        during the bankruptcy.

11   Q.   And what is -- what actions, if any, has the City

12        taken toward obtaining debtor in possession financing?

13   A.   We have contacted a large universe of potentially

14        interested investors, many of whom have signed

15        nondisclosure agreements, NDAs, pursuant to which they

16        have received the request for proposal, the RFP which

17        went out yesterday.

18   Q.   And is Miller Buckfire leading the effort to obtain

19        debtor in possession financing?

20   A.   Yes.

21   Q.   And when you say a large universe of potential

22        investors, do you know approximately how many have

23        been talked to?

24   A.   At the moment it's in excess of 30.

25   Q.   And how many have -- how many have signed

1       nondisclosure agreements?

2   A.  That's the universe I'm discussing, approximately 30

3       or more.

4   Q.  So, everybody you've talked to signed?

5   A.  No, some people didn't want to participate.  I can't

6       tell you how many we called.  I can tell you how many

7       we sent NDAs to which have been returned to us, it's

8       in excess of 30.

9   Q.  Are some of the people or some of the potential

10      sources of financing that Miller Buckfire have spoken

11      to said no, we're not interested?

12  A.  Yes.

13  Q.  And approximately how many have said no?

14  A.  Hasn't been that many, maybe ten.  Would your client

15      like one?

16  Q.  And do you know who those ten entities are that have

17      said they are not interested?

18  A.  I do, yes.

19  Q.  And who are they?

20  A.  I'm not going to tell you that.

21  Q.  On what basis?

22  A.  It's commercially sensitive information.

23          MR. CULLEN:  Counsel, maybe it will help,

24      and I don't know whether you want this on the record

25      or not, but the position we are going to take with

1       respect to this is that this is a competitive process

2       and the best result in that process is achieved by us

3       being able to negotiate with the individual parties

4       who are out there, and not to litigate the negotiating

5       strategy before we have something to bring back to the

6       court to approve.

7               So, we're not going to answer questions

8       about individual parties, we're not going to answer

9       questions about the strategy of negotiating with those

10      parties and we're not at liberty to give out the

11      information with respect to the people who responded

12      to the NDAs because they understandably don't want to

13      be shopped, don't want to take up a lot of your time.

14      We can fight this through a lot of objections and so

15      forth, and if we want to fight about that at some

16      later time, perfectly fine.

17              You can ask about his general strategy on

18      this, you can ask about the basis for his confidence

19      or nonconfidence in it.  You can go through those

20      general items, but the actual strategy, the terms of

21      arrangements with individual parties I'm not going to

22      have him go into now.  Hopefully by the time we get to

23      the hearing, we'll have an agreement that you will be

24      on a --

25              MR. SUMMERS:  Let's go -- I think let's

```
 1          go -- move through the questions and see how we do.
 2                    MR. CULLEN:  Okay.
 3                    MR. SUMMERS:  I understand the City's
 4          position on it.
 5                    MR. CULLEN:  Okay.
 6     BY MR. SUMMERS:
 7     Q.   You said an RFP went out yesterday?
 8     A.   Correct.
 9     Q.   Approximately how many people was the RPF sent to
10          yesterday?
11     A.   The 30 plus people who signed the NDA.
12     Q.   How much debtor-in-possession financing does the City
13          hope to obtain?
14     A.   Three hundred fifty million dollars, up to three
15          hundred fifty million dollars.
16     Q.   And does the City have a goal on the interest rate?
17     A.   The lowest possible interest rate.
18     Q.   Does the RFP attempt to define what that lowest
19          possible interest rate is?
20     A.   No.
21     Q.   Does it define whether the interest rate needs to be
22          fixed or variable?
23     A.   No.
24     Q.   What covenants, if any, are included in the RFP as
25          being acceptable or not acceptable?
```

1    A.    I'm not going to discuss that.  It's commercially

2          sensitive.

3    Q.    How long of maturity on the DIP financing is the City

4          looking to obtain?

5    A.    Through the pendency of the end of the case.

6    Q.    And is the City offering a lien on casino revenues in

7          connection with the DIP financing?

8    A.    In part.

9    Q.    I assume the City does not expect to obtain unsecured

10         financing?

11   A.    I would take it if it was offered.

12   Q.    No doubt.  What other collateral is the City offering

13         to secure the DIP financing loan?

14   A.    I'm not going to answer that question.

15   Q.    Does the RFP define what collateral would be

16         available?

17   A.    Yes, it does.

18   Q.    And that's been sent out to potential investors?

19   A.    Who have signed nondisclosure agreements.

20   Q.    If somebody new came and said I would be interested in

21         providing DIP financing, you would have them sign an

22         NDA and then provide them the RFP?

23   A.    If they wanted to make an unsolicited proposal without

24         the benefit of the RPF, we would be happy to accept

25         it.  Are you suggesting your client is interested in

```
1         is submitting a proposal?

2    Q.   Is the City offering art work as collateral?

3    A.   I'm not going to discuss the terms of the term sheet,

4         sorry.

5    Q.   Well, we kind of picked and choose what terms in the

6         RFP we are discussing and not discussing.

7              MR. CULLEN:  We have in the attempt to

8         accommodate your desire for information and to

9         maintain control of the integrity of this process

10        which we believe is best negotiated as a negotiation

11        and not a litigation.

12             MR. SUMMERS:  I guess I struggle with

13        understanding why the collateral that's offered in the

14        RPF that's been sent out when we know the interest

15        rate, the amount of the financing the debtor seeks,

16        why that puts the City at a competitive disadvantage.

17             MR. CULLEN:  We didn't say the interest

18        rate.

19             MR. SUMMERS:  The lowest possible.

20             MR. CULLEN:  This is the beginning of a

21        negotiation.  It's the beginning of a negotiation that

22        isn't at an end yet, that hasn't had any response to

23        the RFPs yet, it's an initial offer, and that's what

24        it is, and he's discussing it as such and willing to

25        testify about it as such, but I'm not going to read
```

1    the terms of the RFP in the newspaper and our bidders

2    are not going to read the terms of the RFP in the

3    newspaper because that would hamper the process and

4    hamper our ability to get best value.

5              MR. SUMMERS:  But we already have in the

6    record that the casino revenues are part of the

7    collateral that's being offered, so, what's wrong with

8    finding out what the rest of the collateral that's

9    being offered?

10             MR. CULLEN:  Not going to argue with you,

11   Counsel.  I'm telling you what the position is.  I've

12   tried to be accommodating.  It's as far as I am going

13   to go.

14  BY MR. SUMMERS

15  Q.   Has the City had discussions with the State of

16       Michigan about providing financing?

17  A.   I'm not going to discuss that.

18  Q.   What is the City's view about what has to happen in

19       order to be able to obtain debtor-in-possession

20       financing -- let me put a finer point.

21             Are there certain events that the City

22       believes has to happen in the case for it to be able

23       to realistically obtain debtor-in-possession

24       financing?

25  A.   Yes, there are events in the case.

```
 1   Q.   And what is that deal?
 2              MR. CULLEN:  Objection to the extent it
 3         calls for a legal conclusion.
 4   A.   Well, we have to find a willing lender, that's number
 5         one.  Number two, we have to have a court order
 6         approving the form of the DIP financing, and, number
 7         three, we believe we need to have approval of the
 8         forbearance and termination agreements we get the
 9         benefit of the elimination of the collateral pledge
10         and the benefit of the discount.
11   BY MR. SUMMERS:
12   Q.   Do you need a determination on eligibility as well?
13   A.   Probably as a condition to closing but not as a
14         condition to getting a loan commitment.
15   Q.   And what time line does the City hope to secure
16         debtor-in-possession financing?
17   A.   Well, it's a large group of potential lenders, and,
18         therefore, we have requested preliminary indications
19         of interest by September the 6th, next Friday.  We
20         want to determine who really has a serious interest
21         and therefore encourage their ability to do due
22         diligence in a rational way because they will all have
23         due diligence requirements.
24              We simply can't handle all 30.  If they all
25         decide they want to put in proposals, we'll do the
```

```
 1            best we can, but I'm assuming a smaller number when
 2            they see the RFP will want to proceed to the second
 3            stage which is to propose actual terms in response to
 4            our RFP.  The date for that I believe is September the
 5            16th.
 6    Q.      Has a time line for the DIP financing because the view
 7            of what the time line should be for the DIP financing
 8            beyond the September 16th deadline?
 9    A.      Well, we will receive I hope on the 16th multiple
10            serious indications of interest back by term sheets.
11            At that point we will look at how many we have and
12            we'll determine whether there's one that is so
13            superior to the others that we'll negotiate with that
14            party exclusively.
15                    If we have a lot that are very competitive,
16            we may decide to negotiate with several of them at the
17            same time.
18                    So, I don't have a clear view at this time
19            what date we'll actually select our lender, but it
20            will clearly be something we'll focus on after the
21            16th of September.  The goal will be to do it as soon
22            as possible.
23    Q.      Based on your experience in other cases do you have a
24            view as to what -- how long the selection of the
25            lender is likely to take?
```

1   A.   Depends on how many proposals I get back.

2   Q.   If you get 15 back, do you have a view of how long

3        it's likely to take?

4   A.   We should be so lucky.  I think that will take several

5        weeks, probably two weeks to come up with a winning

6        bid as it were.

7   Q.   And then the intent would be to as quickly as possible

8        present that to the bankruptcy court, is that correct?

9   A.   Yes.

10  Q.   And if the City obtains a debtor-in-possession

11       financing, what's the intended use of the financing?

12            MR. CULLEN:  Asked and answered but you can

13       address it again.

14  A.   I've already answered it.

15  BY MR. SUMMERS:

16  Q.   Why don't you go ahead, say it again.

17  A.   We'll use proceeds to terminate the Swaps at the

18       discount provided for in the forbearance agreement and

19       the balance of the DIP loan will be retained by the

20       City as working capital and to support its

21       reinvestment program.

22  Q.   Are there any other intended uses to the DIP financing

23       other than the two you just said?

24  A.   Not that I'm aware of.

25  Q.   And the amount of the casino revenues that are