# UNITED STATES DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

# Disparities for Women and Minorities in Retirement Savings

This report was produced by the Advisory Council on Employee Welfare and Pension Benefit Plans, usually referred to as the ERISA Advisory Council (the "Council"). This report examines Disparities for Women and Minorities in Retirement Savings. The ERISA Advisory Council was created by ERISA to provide advice to the Secretary of Labor. The contents of this report do not represent the position of the Department of Labor (DOL).

## List of Members who Worked on the Report

Mary Nell Billings, Chair
Denise M. Clark, Vice Chair
Anna Rappaport, Drafting Team
Sanford Koeppel, Drafting Team
J. M. Towarnicky, Drafting Team
Mildeen Worrell, Drafting Team
Marc LeBlanc, 2010 Council Chair
Theda Haber, 2010 Council Vice Chair
Theresa Atanasio
Sewin Chan
David Evangelista
Karin S. Feldman
Michael Sasso
Michael F. Tomasek
Kevin Wiggins

FILED 2013 SEP 19 P 2:00
CLERK
U.S. BANKRUPTCY COURT
E.D. MICHIGAN-DETROIT

## Abstract

The 2010 ERISA Advisory Council ("Council") studied disparities for women and minorities as it relates to retirement security. In 2009, the Council heard testimony as part of the topic "New Approaches to Retirement Security in the United States." This testimony indicated that women and minorities were less well positioned than white men for retirement. As a result, the Council decided to study this topic more in depth to determine if the premise is true, and if so, what is the cause of these disparities, and what the potential remedies are.

The objectives of this study are to 1) identify the causes of existing discrepancies with regard to retirement readiness for women and minorities and 2) determine what actions the Secretary of Labor could take to mitigate these discrepancies. The Council assembled empirical information from multiple sources to understand the causes of the disparities, and developed recommendations for the Secretary.

## Acknowledgements

The Council recognizes the following individuals and organizations who contributed greatly to the Council's deliberations and final report. Notwithstanding their contributions, any errors in the report rest with the Council alone.

Ariel Investments
Hewitt Associates
Prudential Financial
Heritage Foundation
US Department of Labor
Larry Good
DiWeena Streater
Ford Foundation
Women's Institute for a Secure Retirement (WISER)
La Raza
Law Offices of Elizabeth Wells
Urban Institute
National Congress of American Indians
League of United Latin American Citizens
The Hispanic Institute
McDonald's Corporation
Meizhu Lui
Economic and Employment Policy Project

 **Back to Top**

## Table of Contents

1. Executive Summary
1.1. Recommendations

2. Key Findings

3. Recommendations
3.1. Increased Education and Outreach
3.2. Guidance, Best Practices and Plan Design
3.3. Family Issues
3.4. Data Collection and Information Sharing

4. Summary of Testimony
4.1. The Types of Witnesses
4.2. Differences in the Studied Populations
4.3. Disparities Data – What are the Gaps?
4.4. Nature and Reasons for the Disparities

5. Appendix

 **Back to Top**

## Executive Summary

The 2010 ERISA Advisory Council ("Council") studied disparities for women and minorities as they relate to retirement security. The Council heard testimony in 2009 as part of the topic "New Approaches to Retirement Security in the United States" which indicated that women and minorities were less well positioned than men and whites for retirement. The Council decided to study this topic more in depth and determine if the premise itself is true, and if so, what is the causation and what are the potential remedies.

**The context for the study**

The 2009 testimony on the Ariel Hewitt study, a recent major study to examine these issues, was the catalyst for this year's topic. Fifty-seven large private sector employers anonymously contributed data on 3 million employees across several different categories - race, gender, ethnicity, salary levels and ages that were eligible to participate in 401(k) plans. This study and its results garnered great attention due to the disparities that were revealed. For comparison, a study by the Center for Retirement Research at Boston College shows that the disparities were dramatically reduced once adjusted for other factors such as education, tenure, non-pension wealth, defined benefit pension plan wealth, homeownership and income level.

While the Council referenced findings and testimony presented to formulate certain recommendations, the Council is aware that the statements referencing certain behavior patterns are general references and do not characterize any particular group with accuracy. The Council is aware of the diversity of behavioral patterns within any given group and that averages may be deceiving. Specifically, the Council agrees that there are exceptions to the general behavior pattern examined and referenced herein.

The solutions proposed are focused in part on addressing (1) the employment issues, (2) the way individuals and employers address issues relating to the retirement savings system, (3) financial literacy which will result in better decision making, and (4) addressing family issues that generally aggravate these disparities. The Council focused primarily on the factors included in (2) through (4) with the realization that financial literacy is closely linked to a successful retirement system. The Council is aware of the importance of addressing the employment and income issues but notes that these issues are beyond the scope of the Council.

**Objective and Scope**

The objectives of this study are to 1) identify the causes of the existing discrepancies with regard to retirement readiness for women and minorities and 2) determine what actions the Secretary of Labor could take to mitigate these discrepancies.

Our study focused on:

- Identifying existing disparities for women and minorities in retirement savings
- Identifying possible causes
- Identifying the stakeholders who can influence possible remedies
- The role of the Department of Labor in addressing the issues and in influencing key stakeholders
- Identifying additional educational opportunities for plan sponsors, service providers and individuals that would decrease existing disparities
- Benefit plan designs that positively impact these groups
- Guidance to plan sponsors regarding the collection and utilization of data by race and gender to help identify problem areas
- The appropriateness of costs to the plan and potential liability for the plan sponsors to facilitate such collection and utilization of plan data

**Findings and Recommendations**

The Ariel Hewitt study focused on eligible employees of large private sector employers and reflected significant disparities for women and minorities. A study of the U.S. Civil Service Retirement plan, a public plan, showed similar disparities among Federal employees. Other studies that examined samples of the entire population showed even greater disparities in retirement preparedness among minorities as they are disproportionately represented among employers who do not sponsor retirement plans.

In general, the Council found that disparities do exist and are due to a number of factors. Many minority workers are employed in industry segments that traditionally do not offer retirement plans - such as non union construction, services, and daycare. For many women, moving in and out of the work force to care for children and other family members reduces their overall earning capability and the ability to build their "human capital" in the job market, often leading to fewer promotional opportunities and lower paying jobs. Breaks in service and lower average salaries often result in much lower benefit accruals. Employment choices, including part-time work and the types of jobs women choose, are added contributors to the disparities. Less access, uneven workforce participation patterns, job choice, and lower wages combined often lead to lower account balances. The burden of lower account balances is greater for women because of their longer life spans and the need to finance more years in retirement. Minority women tend to have even lower retirement incomes than white women and many older women of all races rely solely on Social Security benefits.

Some of the differences that exist between the various groups can be attributed to education level and differences in employment patterns. The average education level of minorities is a major cause of the disparity in income which is reflected in employment, incomes, retirement benefit accruals and account balances. The lower income level results in lower contributions to savings plans, lower employer match, and lower benefit accruals.

The decline of the defined benefit system has negatively impacted many lower income individuals, regardless of race or gender. Leakage from the existing retirement system compounds the issue of low balances for those having no or inadequate emergency reserves, creating a need to draw on accumulated retirement assets. This lack of financial preparedness results in a large portion of the American population relying on Social Security as the primary or sole source of retirement income.

There are many far reaching policy issues that need attention that are well beyond the scope of this report. Our recommendations anticipate these underlying issues and root causes will not be resolved in the near term.

**The Council determined that there were four main areas for recommendations:**

- Increased Education and Outreach
  - o DOL should promote financial education in schools – both elementary and high school, helping to ensure America's future workers understand the value of securing a position that offers access to an employer-sponsored plan,
  - o DOL should continue its policy to translate all model participant notices into Spanish and translate those notices that are yet to be translated
  - o DOL should provide education to employers, spouses and the public on impact of participant divorce or death on plan benefits
  - o DOL should engage in outreach to business on the importance of sponsoring plans
  - o DOL should promote easier to understand, culturally relevant and easily accessible communications such as simpler summary plan descriptions and multi-language versions of required notices
- Guidance for plan sponsor best practices and promotion of regulatory changes for plan designs which will encourage employment-based savings plan coverage and participation
  - o DOL should provide regulatory support, with the Department of Treasury, as well as encouragement to plan sponsors to develop best practices designs to mitigate disparities, by:
    - encouraging 401(k) plan sponsors to consider the inclusion of auto-enrollment and auto-escalation features in their plans
    - encouraging employers to minimize leakage (facilitate loan portability, adopt provisions and/or technology to enable continued loan payments post separation, allow participants to suspend payments during short term periods of unemployment)

- ▪ Encouraging sponsors of 401(k) plans to allow all of their employees to participate – whether or not they would meet current permissible minimum service or age rules.
  - o DOL should encourage the development of new retirement plan structures that would facilitate the adoption of retirement plans and broaden coverage, particularly among small and very small employers.
  - o DOL should seek statutory changes to extend the period of absence permitted before the break-in-service rules would apply.
  - o DOL should issue appropriate guidance permitting targeted disclosures to women and minorities by the plan sponsor and plan administrator.

- ▨ Address family related issues including clarification of rules related to qualified domestic orders to reduce confusion and legal fees as it relates to providing plan information to participants and spouses and the actions necessary to qualify an order.
  - o DOL should clarify or address
    - ▪ whether a spouse is a beneficiary (by regulation)
    - ▪ the circumstances under which a spouse is entitled to receive participant information (e.g., before receiving distributions)
- ▨ Data Collection and the Sharing of Information
  - o DOL should facilitate the voluntary collection of data on women/minorities disparities (including national origin)
  - o DOL should facilitate a clearinghouse on collecting disparity studies
  - o DOL should provide guidance to confirm the appropriateness of using plan assets to gather and supply this information/data.

**Back to Top**

# Summary of Key Findings

### Basic findings/findings vary by group

- ▨ Significant disparities exist for women and racial minorities.
- ▨ After age 65, older women alone are much more likely to be poor than married women and women of color are much more likely to be poor than white women. Divorced women and widows have special issues.
- ▨ For about four out of ten women alone, Social Security is their only source of retirement income. Generally, working women receive a lower benefit from Social Security based on their work records due to lower wages or uneven work patterns.
- ▨ The Council heard different results about whether there are disparities related to ethnicity once you control for income. Ariel/Hewitt and the Urban Institute studies confirmed that even after controlling for income, disparities remained. The Center for Retirement Research study suggests disparities based on race are no longer a determinant factor once you control for many other variables. Regardless, there are significant disparities in retirement preparedness.
- ▨ More Blacks are out of the labor force at ages 55-64 than the other groups in part due to higher rates of disability.
- ▨ Most of the studies referenced in the testimony did not address Asian Americans. However, the issues this segment of the population face were documented in the testimony and a corresponding study by Prudential. This group of workers tend to be employed in small family-owned businesses where the responsibility to save for retirement falls directly to the worker. Many individuals in this group were aware of the need to save and had very high goals in retirement. Yet, worker savings behaviors were generally insufficient to attain the high goals they set for themselves regarding retirement preparedness.

- Native Americans have both high rates of unemployment, much higher than other groups, and higher rates of poverty. They are least likely to be employed where there is an employer-sponsored plan except for governmental employment. The structure of their tribal government has presented special legal issues that are beyond the scope of the Council.

### Benefit level/plan issues

- Differences in benefits are consistent with differences in employment histories, incomes and types of employment.
- Many have not accumulated sufficient funds for emergencies. Many Americans live paycheck- to-paycheck. For many, the 401(k) plan also serves as an emergency fund. Changing loan repayment options or allowing repayment of hardship distributions could prove to be helpful.
- Modifications can be made to plan designs to produce very good results for women and minorities. Testimony from McDonald's Corporation demonstrated this. While McDonald's did eliminate automatic enrollment for a broader cross section of its workforce, it did redesign the 401(k) plan and re-implement automatic features for managers. McDonald's found that these plan changes have made a positive difference in the turnover rate and retirement security for their workers among all ethnic groups.

### Insights

- Trusted sources of information/advice and peer groups can be important. Trusted sources vary community by community and group by group. Particularly for minorities, trusted sources may not be what we would expect, according to WISER.
- Culturally appropriate communication is important. Information should come from a trusted source. For people with longer term employment in organizations they trust, the employer is an excellent trusted source. However, for many Blacks, Hispanics and women, the employer may not be the trusted source. In those cases, the community may be a resource in locating trusted sources which can vary by group. If there is a union or professional association (e.g., nurses), it can be a trusted source.
- There is an inadequate understanding of the financial products that can be helpful to people. This is particularly true about product solutions and retirement income.
- While the law offers protection to individuals who are seeking their share of pension benefits on divorce, it is not always easy to get a good result through the use of a QDRO. Some plans do not have the protection offered by ERISA and different requirements apply. Many family attorneys are not knowledgeable, and some employers or plan sponsors make it difficult to secure the benefits due a spouse.

### Related issues: Unbanked

- Many people are unbanked and for some, the lack of trust, or lack of access to suitable arrangements could be factors.
- Being unbanked presents additional challenges for some individuals to adequately participate in the retirement savings system.
  - Jacqueline Johnson Pata, National Congress of American Indians notes: A recent FDIC study revealed that 44.5% of American Indian and Alaska Native households are under banked, and 15.6% are completely unbanked.[1] These findings demonstrate the limited exposure minorities have to financial services, perhaps even if they work for an employer that offers access to retirement accounts.
  - Arnoldo Mata, Hispanic Institute, Americans for Secure Retirement, notes that slightly more than 9% of all American families and approximately 25% of Hispanics are among the "unbanked."

### Data and issues surrounding data

- To be able to document the disparities and monitor any progress, the availability of data is very important. Employers are more likely to provide data to some sort of a pooled study like the Ariel study where individual company results are available only to that plan sponsor and cannot otherwise be identified.
- Data sets that include a sample of the total population are helpful but not enough to measure progress within plans or the success of specific features in those plans in terms of improving retirement preparedness of women and minorities. They include information about the unemployed and those without access to plans and offer a different and important perspective.

Back to Top

## Recommendations

## 3.1 Increased Education and Outreach

The Council heard testimony from multiple sources supporting the fact that saving behavior, much like many other forms of behavior, is learned. Because women and minorities are often not exposed at an early stage to investment management and strategies, optimal saving techniques, or in some cases basic saving patterns, the Council placed emphasis on early intervention for these groups.

Exposing children to investment strategies and decision making, the stock exchange and how it works, stocks and bonds, mutual funds, money market accounts, individual retirement accounts, as well as the need to save adequately to finance their years in retirement could be an important step in equalizing the current disparities that exist between children of the wealthy families and children of families that do not have access to investment products or discuss them as part of family life. These efforts also can result in some success for families that are currently under banked or unbanked as the attitudes and knowledge of the older generation become informed by the knowledge of the younger.

## 3.1.1 The Council recommends that the Department of Labor pursue opportunities to promote financial education in secondary schools

The Council received testimony that provided overwhelming support for financial education efforts, beginning as early as elementary school, as a significant tool to change cultural attitudes about savings and to ultimately improve habits regarding retirement savings.

Testimony from the Heritage Foundation pointed out that some of the differences in retirement resources for Blacks are attributable to racial differences in savings decisions. Differences in savings decisions that do not maximize retirement savings opportunities are not limited to this group. While Blacks appear less likely than white workers to invest in and hold high-yielding assets such as stocks, testimony showed that women are less likely to accept certain levels of risks even in exchange for higher rates of return; due to a lack of knowledge and understanding of investment products (see testimony of WISER and Prudential).

It was noted in testimony that according to research attitudes about savings, risks preferences and investment choices may be learned or mimicked from parents. It is believed that wealth-enhancing behaviors are more likely to be transferred to children by wealthy parents, who have greater understanding, access to, and knowledge about financial markets than low-wealth parents. In recommending increased education and outreach efforts in this area, beginning as early as elementary school, it was acknowledged that this could help equate the learning opportunities for savings by children from lower-income families to the opportunities available to children of higher income families.

## 3.1.2 The Council recommends that the Department of Labor continue its policy of translating all model participant notices and other

**participant-required disclosures to be culturally relevant and easily understood, including notices that are yet to be issued**

The Council heard from Sharon Watson, Director of the Office of Participant Assistance (OPA)[1]. This office administers EBSA's Participant and Compliance Outreach, Education, and Assistance program, and coordinates three major education campaigns, including retirement savings. OPA received the 2008 USA Service Citizen Service Award for its excellence in providing participant and compliance assistance directly to the public. The Council commends OPA and its staff for its excellent work.

Many of the witnesses testified about the importance of being able to produce employee-required disclosures, such as the Summary Plan Description, in a more culturally relevant and/or understandable format. Testimony from McDonalds Corporation highlighted the success that can be achieved when an employer invests in communicating the importance of saving for retirement to their employees. Unfortunately, the level of detail and care required to produce this success revealed other challenges the employers face. As highlighted by Ms. Watson, in OPA's efforts to trans-create some of the publications to make them more culturally relevant the office found that literal translation of the underlying legal requirement does not always work. For example, the term "portable benefits" could not be literally translated to Spanish because such a translation would be interpreted as "transportation of benefits." The Council heard additional testimony that a term such as "grandfathered plans or benefits" could not be literally translated to Spanish. Employers have expressed concern that in an effort to make required employee notices and disclosures more culturally relevant that they could be challenged as not being in compliance or that communications directed to a specified group could be interpreted as isolating a particular group, or that the information could be later used negatively against the employer.

When translating the required employee notices and other required disclosures to a more culturally relevant format it is very important to use focus groups to produce the best results. Ms. Watson indicated more success when OPA can conduct focus groups for publications and other culturally relevant disclosure. However, Ms. Watson indicated that with limited financial resources, the department cannot always receive the benefit of focus group testing. Given the increased benefit that comes from this effort, the Council encourages the Department of Labor to work more closely with OPA to address these financial and time constraints for the greater benefit of America's diverse workforce.

### 3.1.3 The Council recommends that the Department of Labor develop ways to promote education for employers, spouses and the public regarding the impact of a participant's divorce or death on access or availability of benefits under a pension plan

From testimony heard it was established that single and widowed women have fewer retirement assets, rely more heavily on Social Security benefits as their main financial source in retirement, and are most likely to live in poverty. (See testimony from the Ford Foundation, WISER, and the Heritage Foundation). Therefore, it is very important that women are fully educated on their rights to a share of retirement assets held in a pension plan by their spouse during the dissolution of the marriage and resulting division of marital assets, or in the event of death of a spouse.

Elizabeth Wells testified that "in a large percentage of marital separation and dissolution matters where retirement benefits are included in the parties' assets, either the retirement benefits have been accrued only by the husband, or the value of the husband's retirement benefits are significantly greater than the value of the wife's retirement benefits." She also testified that very often women have little or no knowledge of their spouse's (or former spouse's) retirement benefits prior to the involvement of an attorney in the case that has knowledge of these issues.

The Council believes that the Department of Labor can improve its education and outreach efforts in this area to make sure women know they have a legal right to a share of any retirement benefits their spouse

accrues in an employer-sponsored pension plan during the course of the marriage. Women can be educated on steps they can take to protect their share of these assets in the case of separation, divorce or death. The DOL can form a partnership with employers who sponsor pension plans and adopt some best practices recommendations including (but not limited to) notification to a non-participating spouse on the existence of the plan, and the employee's participation status in the plan. Verification of receipt of such notification could be required from the non-participating spouse. Additional educational materials, prepared by or in partnership with DOL, could be provided to the non-participating spouse in conjunction with initial notification or some reasonable time later. Employee workshops could be conducted throughout the country in collaboration with women's advocacy groups and other invested players.

### 3.1.4 The Council encourages the Department of Labor to expand and elevate its efforts to educate employers on the importance of sponsoring pension plans with incentives for employees to participate in a plan

Saving for retirement has been more successful in the employer-sponsored area than other personal savings options. The Council believes that the DOL can capitalize on this advantage by promoting the importance of employers to sponsor retirement savings plans for their employees.

The Council received testimony that illustrated opportunities where existing disparities could be reduced if some unique aspects of the saving decision patterns of some women and minority groups are linked to employer-plan sponsorship. For example, the Council learned that Asian Americans generally respond more positively to forced savings than any other minority group (see Heritage Foundation). Therefore, an employer-sponsored 401(k) plan with automatic enrollment would benefit this group of workers. Another example is women who generally have lower retirement savings than males due, in part, to their lack of knowledge of investment options and how they work. An employer plan that allocates investment decisions to the plan trustee who manages pooled assets of a plan would benefit this group. In addition, increased education on financial literacy would benefit women and Black workers.

The DOL is well positioned to work with successful employers and develop some best practices that can be shared with employers who do not offer plans, or would like to improve participation and contribution levels in their plans. Consequently, the Council encourages DOL to explore and initiate some increased outreach to employers with the intended goal of expanding the number of employers who offer pension plans to their employees, and to encourage adequate contribution rates to the plans.

## 3.2 Family Issues

The difference in economic status between married women and those who were formerly married is partly due to the decisions and actions of the individuals involved – lack of planning, savings decisions, payout elections, the need to provide for survivors, and actions taken related to divorce and division of benefits. Married women are much better off than single women in retirement. In 2008, fewer than six percent of married elderly women were poor compared to more than 15 percent of elderly widows and more than 20 percent of divorced and separated women. (Kijakazi, page 9) The education and outreach section of this report includes a recommendation with regard to education and outreach to various groups related to pension resources and financial security of the survivor after the death of one spouse and of both parties after divorce. That recommendation should be considered together with the other recommendations on family and spouse issues.

The Council also found that the process related to division of pension benefits on divorce is often not smooth. The Council recognizes that the DOL has guidance on QDROs and that some of the process matters are related to stakeholder knowledge, and not the need for more guidance. The following recommendations are made to support the process where more guidance or clarification would be helpful.

## 3.2.1 Recommendations on Family Issues

DOL should clarify or address:

- whether a spouse is a beneficiary (by regulation)
- the circumstances under which a spouse is entitled to receive participant information (e.g., before receiving distributions)

## 3.2.2 Rationale and Discussion of Family and Spouse Issues

The reason for clarifying whether a spouse is a beneficiary is to make it clearer when a spouse is able to obtain documents from a plan and to smooth some of the difficulties that spouses may encounter in learning about the pension benefits earned by the other spouse. This would open the way to better defining the circumstances when the spouse is entitled to information, and make it easier to get information that may be necessary to protect the spouse's interest.

The Council also discussed clarifying what materials would be sent to a spouse. While there was no consensus on a recommendation, several members of the Council felt that more information on this point would be very helpful.

The Council heard input on divorce process issues primarily from Elizabeth Wells, an attorney concentrating on pension benefits in divorce and representing individuals. In addition, Cindy Hounsell and Kilolo Kijakazi pointed out the adverse consequences of family issues on older women.

**Matters related to widows**

The Council did not make recommendations with regard to improving the situation for widows other than the education and outreach recommendation. While this is an important planning issue for individuals, the Council did not seek specific DOL actions to address this issue. (It should also be noted that the matter of security for widows is related to the distribution of plan benefits, and the Council noted that the DOL is already addressing issues related to the payment of plan benefits after retirement.)

**Background re divorce and pension benefits**[2]

The Council made recommendations to improve the processes related to the division of pension benefits on divorce. Generally ERISA protected pension benefits cannot be assigned to others, and are not subject to attachment through a court order. Benefits of a spouse after divorce are an exception to this general rule. Provisions relating to the division of pension benefits are rooted in the Retirement Equity Act (REA), which was passed in 1984. One of the goals of REA was to offer a solution to the problems of getting retirement benefits to former spouses and former dependents on dissolution of the marriage and division of marital assets. The order that permits the transfer of the share of assets is called a Qualified Domestic Relations Order (QDRO).

The division of benefits on divorce is important to women because of the disparities in income and wealth which was the subject of the testimony. As a result of lifetime employment and earning patterns, women have significantly lower average income than men in old age. The goal of REA and QDROs is to provide safeguards to spouses after a divorce, and particularly to spouses who do not work outside of the home, or who have lower earnings because they work primarily in the home. Underlying these goals is the implicit assumption that the agreement in the marriage was for one partner to be the sole or primary breadwinner, and the other partner to care for the home and support the work of the primary breadwinner. The pension benefits earned during the marriage are needed to support both spouses during retirement. These policy reasons underlie the REA mechanisms by which the benefits earned during the marriage can be split as

part of the divorce agreement. In some cases, the pension benefits may be the greatest financial asset, or the only retirement asset held by the couple.

The Council also heard that one of the biggest issues related to divorce and pensions is that some types of plans are not covered by ERISA's QRDO requirements or equivalent requirements. Some plans have no QDRO requirements and practices can vary among these plans. The Council noted that some of these plans, such as state and local plans, are not regulated by the DOL. Executive benefit plans and church plans are also not subject to QDRO requirements.

The Council heard that many women are not aware of what pension plans their husbands participate in, even in situations where women are participate in household decision making. In some cases when they are aware of their husband's pension plan, they may not know its details.

Under the current DOL guidelines for QDROs, plan administrators may not mandate the use of specified QDRO forms. Some plans, however, do not comply with this and make it more difficult for individuals in divorce proceedings by trying to impose the use of the plan's QDRO forms. It is unclear from the testimony how commonplace this practice is. Nevertheless, the problem with these standardized QDRO forms is that the format and computation used can adversely affect benefits that may be payable to the non-participating individual's interests. The Council heard testimony on one extreme case where two alternative methods were used to calculate benefit values and the value under one method was 13% of the value determined under the alternative method.

Some Council members note that model QDRO forms can often benefit alternate payees, particularly participants in defined benefit plans. The forms reduce costs entailed in drafting an order and ensure that an order is not entered that cannot be administered by the plan. In fact, model forms are often sought by domestic relations practitioners.

In addition to the issues surrounding model forms, the Council learned that there are some operational challenges to the fair division of pension benefits on divorce. Some of the problems/challenges identified to the Council are as follows:

- Obtaining plan information can be time consuming for the non-employee spouse and can involve a lot of hassle and expense. One of the instances where obtaining information is particularly difficult is when a company has been through a merger, consolidation or name change. When companies/plans chose not to cooperate in providing the necessary information, it is difficult and time consuming to get the information through other means. To compel the production could require initiating a Federal court action. Elizabeth Wells told us that in her experience, the minimum cost (legal fees) to the plaintiff to bring such an action is $5,000 dollars and that in some cases the legal costs of such actions are $10,000 are more. A reason for these costs is that divorce is a state court action and a separate Federal court action is needed to obtain the information.

- Obtaining approval of QDROs can be difficult for the alternate payee spouse and his or her attorney. Some plans urge parties to submit a proposed order before it is presented to the Court, which is a practice the Council endorses for all plans. This will reduce disputes and expense, and speed up the process to QDRO finalization. When companies do not review QDROs before presentation to the court, it often leads to more involvement by the courts, lengthens the process, and increases the legal costs of the QDRO.

- It is very important to get QDROs entered at the time of divorce. Failure to do this creates risk of possible forfeiture of the assets for the non-employee.

- In some cases, there are problems with securing the payment of benefits when a participant changes status in the plan and the QDRO has not yet been filed in the Court. For example, if the participant is deceased before the QDRO is filed, that can create difficulty for the prior spouse. In the case of plans that are not required to accept QDROs it is very difficult to obtain benefits for the non-employee.

- Several types of plans are not mandated to accept QDROs on the same basis as ERISA plans. This group of plans includes, but is not limited to, non-qualified deferred compensation plans, church plans and state

and local plans. The Council was told that in isolated situations, non-qualified executive plans include provisions that enable the plan to avoid paying benefits if they are alienated

- State and local plans vary in their legal requirements and acceptance of QDROs, creating confusion and mistakes even when the non-employee spouse has rights to a share of the benefits held in the plan.
- When 401(k) balances are rolled over into an IRA, there is less protection for spouses after the rollover is completed.

The Council heard multiple recommendations representing concerns from participants with regard to smoothing the process of treating benefits on divorce. The Council did not hear from other stakeholders on these specific issues. The testimony of Elizabeth Wells provides details for additional recommendations for future study and consideration.

## 3.3 Guidance, Best Practices and Plan Design

Our investigation of disparities in retirement plan participation, contribution rates, investment allocation and asset accumulation between genders and among races/ethnicities (hereinafter disparities) did not include testimony or data that suggested in any way that the disparities were the result of gaps in laws and regulations, or a lack of enforcement. Rather, the testimony The Council received revealed that:

1. Women and minorities are more likely to work part time or seasonally
2. Women and minorities may be over-represented in sectors of the economy or occupations with less retirement plan access
3. Data may reflect underlying disparities in incomes, length of service, and care giving responsibilities, suggesting that proposals targeting increased coverage will not be sufficient to reduce the disparities
4. Some plan designs and processes may be effective at reducing disparities

Past Advisory Council reports have focused on expanding coverage by encouraging employers to adopt plans. Our focus also includes changes to reduce disparities that remain after plans are adopted. Many of our recommendations focus on actions the Department of Labor can take to encourage plan sponsors and service providers to voluntarily adopt provisions which have been demonstrated as effective at encouraging participation by women and minorities.

### 3.3.1 DOL should provide regulatory support, with the Department of Treasury, and support plan sponsors to develop best practices designs to mitigate disparities by:

- Encouraging 401(k) plan sponsors to consider the inclusion of auto-enrollment and auto-escalation features in their plans
- Encouraging employers to minimize leakage (facilitate loan portability, adopt provisions and/or technology to enable continued loan payments post separation, allow participants to suspend payments during short term periods of unemployment)
- Encouraging sponsors of 401(k) plans to allow all of their employees to participate – whether or not they would meet current permissible minimum service or age rules.

### 3.3.2 DOL should encourage the development of new retirement plan structures that would facilitate the adoption of retirement plans and broaden coverage, particularly among small and very small employers.

### 3.3.3 DOL should seek statutory changes to extend the period of absence permitted before the break-in-service rules would apply.

### 3.3.4 DOL should issue appropriate guidance permitting targeted disclosures to women and minorities by the plan sponsor and plan administrator.

### 3.3.5 Rationale/Discussion

**Automatic Enrollment**

The Council has heard testimony about behavioral economics that suggests that many workers do not make benefit decisions following extensive analysis, careful consideration of all available alternatives, or with a focus on short, intermediate and long term results. Instead, many decisions are heavily influenced by past experiences, the current market environment, time constraints, and how choices are presented or framed. Minor, sometimes overlooked details, particularly in how choices are presented, may drive outcomes. In addition to issues with how the initial decisions are made, data show many workers tend not to revisit prior choices they have made about benefit participation or investment decisions. Few want to admit a mistake, even fewer budget time to review prior decisions.

The Council recommends the Department of Labor publicly support, as well as separately initiate outreach that will complement and enhance various initiatives already underway supporting the adoption of automatic features (enrollment, escalation, investment, etc.) for all workers, whether recently hired or of longer tenure.

Any Department outreach to plan sponsors should include collecting information on the results obtained by those who have already implemented automatic features, those who considered but did not adopt such features, and those who never considered such features – with a specific focus on cost as an impediment (see data collection, below).

**Plan Leakage & Encouraging Portability**

The Council heard testimony that women and minorities have higher utilization of plan loans. One reason for this is that loan use is generally higher among lower income workers and those with less access to credit from commercial sources.

The Council's heard testimony loans do not result in "leakage" unless they are not repaid. Studies show that access to assets via loans may favorably impact participation and contribution rates. Loans are obviously preferable to withdrawals. However, debt burdens (whether from a plan loan or a loan from a commercial source) may lead some workers to reduce regular contributions during the repayment period – impacting retirement benefit accumulations.

The Council recommends the Department encourage plan sponsors and service providers to improve the likelihood of loan repayment by:

1. Adopting processes that will facilitate loan repayment after termination of employment
2. Utilizing clear disclosures highlighting the options for loan repayment after termination of employment
3. Encouraging plan sponsors to make loans available in lieu of hardship withdrawals
4. Implementing low cost electronic repayment capability

Note that each of the above actions may impact plan administrative costs. The Council encourages the Department to work with the Treasury Department to modify existing loan regulations in the event of financial hardship.

**Part Time Employee Participation**

Because women and minorities represent a large percentage of part time positions, the Council recommends that the Department, working with the Treasury Department, identify options that will encourage plan sponsors to offer voluntary participation to part time and seasonal workers who consistently work fewer than 1,000 hours. Often plan sponsors adopt eligibility limits to minimize administrative expense and to improve the likelihood of passing discrimination tests. The Department should take action to ensure that employers who expand coverage to otherwise ineligible workers are not negatively impacted as a result of such expansion (i.e. failing discrimination testing).

**Background – What We Heard - Plan Design**

Many witnesses confirmed that access to an employer-sponsored plan was a differentiator – that employer support through the offer of a voluntary plan was effective at increasing retirement savings. The Center for Retirement Studies report cited above "401k Plans and Race," which discounted disparities premised on race, did find that "Blacks and Hispanics are less likely than Whites to be eligible for an employer-sponsored plan."

Multiple witnesses confirmed that women and minorities tended to have lower earnings, less job tenure and more frequently work in industries that do not offer access to an employer sponsored retirement plan. Where such access exists, a smaller percentage of women and minorities participate and tended to contribute less than white males.

Barbara Butrica and Richard Johnson of the Urban Institute reviewed research on racial and gender disparities, noting that in 2009, 65% of white wage and salary workers were offered employer sponsored retirement plans compared to only 56% of Black workers and 38% of Hispanic workers. Dr. Butrica and Dr. Johnson found that differences in employer size and industry, earnings, pension availability and participation rates, contribution rates, investment behavior and plan leakage all contributed to large racial, ethnic and gender differences in pension wealth.

**Race/Ethnicity**

Arnoldo Mata, The Hispanic Institute, Americans for Secure Retirement, notes that on average Hispanics have lower levels of educational attainment, less earning power, and a lower level of savings than non-Hispanics – and that they are less likely to have access to an employer sponsored retirement plan. He also notes that many Hispanics lack the financial literacy necessary for sound retirement planning.

The Employee Benefits Research Institute, based on estimates from the U. S. Census Bureau's Current Population Survey, cited wage and salary workers ages 21 – 64 with employer sponsored plan access of :[3]

| White | Black | Latino | Native-Born Latino | Foreign-Born Latino |
|-------|-------|--------|--------------------|---------------------|
| 60.6% | 52.9% | 34.6% | 49.1% | 25.7% |

Approximately 53% of the adult Hispanic workforce (approximately 12 million people) is foreign born. Of these 3.2 million are naturalized citizens, while 8.5 million are not U. S. Citizens. 49.1% of native-born Hispanic workers have access to an employer sponsored retirement plan, compared to 25.7% foreign-born Latino workers;[4] average personal income in 2008 was $44,297 for native-born Hispanics, $33,703 for foreign-born Hispanics ($57,877 for whites);[5] 84% of native-born Hispanics completed high school, compared to 53% of foreign-born Hispanics.[6]

It was noted that as many as two-thirds of Hispanics are employed in the service sector – where employer sponsored plans are less prevalent. Thomas Bartell, Chairman of Americans for Secure Retirement, cites a recent study conducted by the Hispanic Institute and Americans for Secure Retirement which reported that only 25.6% of Hispanics are covered by pension plans, compared to 42.5% of whites and 40% of African-Americans.[7] Another significant distinction is the size of the employer. For example, 90% of companies with more than 100 employees offer a retirement plan, compared to only 49% of employers with fewer than 100 employees.[8] Latinos are much more likely to work for small private businesses; in 2007, 52% of the Latino workforce was employed in small businesses with fewer than 100 employees, compared to 42% of the White workforce and 32% of the Black workforce.[9] Finally, data from the Survey of Income and Program Participation shows Latinos as more than twice as likely to be excluded from plan participation at their employer because they did not work sufficient hours or because of job type.[10]

### Gender

Cindy Hounsell, President of the Women's Institute for a Secure Retirement (WISER) confirmed the nature of the retirement gap – women work fewer years, earn less, work part-time, lack access to pension and retirement savings opportunities and they must plan for a longer retirement.

Women and men do not face the same economic challenges in retirement preparation. Women:

- Who work full time earn about 78 cents for every dollar men earn – while Black women earn 64 cents and Hispanic women 52 cents.[11]
- Women have fewer years in the workforce and are more than twice as likely to work in part-time jobs.
- Women average 12 years out of the workforce to provide care to their families – losing pay increase opportunities, and retirement savings opportunities.[12]

Thomas Bartell, Chairman of Americans for Secure Retirement, noted that a typical 65 year old woman has a 31 percent chance of living to age 90 or older, as compared to only 18 percent for a typical 65 year-old male.

### Witness Recommendations

Much testimony focused on the need to offer lifetime income options – many specifically endorsed adjustments that would increase the number of plans that would support annuitization or otherwise confirm safe harbor protections for default lifetime income distribution options (Brent A. Wilkes, LULAC; Cindy Hounsell, WISER; Thomas Bartell, Americans for Secure Retirement; Joan H. Cleveland, Prudential; and Arnoldo Mata, The Hispanic Institute, Americans for Secure Retirement.

Cindy Hounsell, WISER, noted the disconnect between workers perceptions of retirement readiness when accrued benefits are expressed as a single sum, versus when the account balance is expressed as a monthly income stream.

While no one suggested automatic features were a "silver bullet" solution, many witnesses recommended expanded use of automatic features as a means to reduce some of the disparities in retirement preparation (Barbara Hogg, Hewitt Associates; Amar Parikh, Ariel Investments).

Several witnesses recommended adjustments to loan provisions – such as making loans portable, extending the "cure period" for loans upon involuntary termination, and encouraging plan sponsors to allow loan repayments after termination. Several recommended new restrictions on hardship withdrawals or new provisions designed to allow participants to repay the withdrawal within a specified time period after the hardship was resolved.

## 3.4 Data Collection and Information Sharing

It is very important to have data to measure the disparities to understand:

- The nature and size of the disparities,
- The underlying causes for the disparities and
- Whether progress is being made.

It has often been said that "what gets measured gets managed, and what does not get measured gets forgotten." In business, "if you can't measure it, you can't manage it." In the case of disparities involving legally protected groups, society has an interest in understanding what the problems are and whether progress is being made. Societal data sets are very valuable in identifying the issues and problems and can be particularly important because broad solutions might not work at all. Conditions may vary greatly by sub-groups. For example, the testimony provided to the Council by the Urban Institute helped identify disparities, and also reflected that some disparities were due to the nature of employment of different groups and the types of jobs they held.

## 3.4.1 Data Collection and the Sharing of Information Recommendations

- DOL should facilitate the voluntary collection of data on women/minorities disparities (including national origin)
- DOL should facilitate a clearinghouse on collecting disparity studies
- DOL should provide guidance to confirm the appropriateness of using plan assets to gather and supply this information/data.

Employers who are working to deal with disparities also have an interest in collecting their own data and updating it periodically. However, individual employers are vulnerable to discrimination suits and data on their workforces and different characteristics are likely to be discoverable in the event of litigation. These concerns make many employers reluctant to collect and share data. The Council commends McDonald's for the excellent information presented on its plans, and how they affect different racial groups. However, individual members of the Council believe that many employers would be unwilling to provide such data due to the level of perceived risk, and that other means need to be found if information is to be successfully collected.

One option would be to have ongoing studies similar to the one conducted by Ariel and Hewitt. Business organizations may be much more willing to participate in a study conducted by a third party where the results are pooled and they remain anonymous. However, this would not help individual employers measure the success of their own implemented programs.

The Council has heard testimony that urges the Department to serve as a clearinghouse of initiatives undertaken by employers or studies conducted by credible third parties that demonstrated effective options for reducing disparities.

This could be implemented by helping coordinate with academic institutions the creation of a standard file requirement/data set, with de-identified data, to accumulate information on plan participation where gender and race/ethnicity/national origin information are also captured. The data collected should also allow individual employers to confirm the success (or lack thereof) of changes in plan design – such as automatic features, expanded eligibility, etc. There is considerable diversity in plan design – eligibility, vesting, automatic features, etc. As a result, the data collected should be sufficiently specific and robust to assist plan sponsors in identifying the success of any one particular feature.

The data base should also facilitate the collection of professional studies that highlight disparities in retirement asset and wealth accumulation; and with the ultimate goal that the database will include studies which document how recommendations made here were implemented and helped reduce the disparity in retirement preparation among races/ethnicities and between genders.

**Background – What We Heard - Data**

Multiple witnesses recommended government support to capture data with breakdowns by race, ethnicity and gender, as well as national origin. However, Cindy Hounsell, WISER, noted that "We don't need to fund more studies. ... The time for studies is behind us. The time for action is now."

Some recommended mandatory collection of data to be used for benchmarking purposes and to identify those designs and processes that appear to be most effective at reducing disparities. Amar Parikh of Ariel Investments specifically noted that employers might find value in identifying not only the disparities in their own data, but to compare disparities against a larger database. Witnesses generally agreed that certain designs are likely to be beneficial – automatic features (enrollment, escalation, investment, etc.)

Back to Top

# Summary of Testimony

## 4.1 The Types of Witnesses

The Council heard testimony from a range of witnesses representing various stakeholders and different minority groups. The witnesses included:

- Representatives of Hispanic, Native American, and Black communities, as well as Women's Institute for a Secured Retirement (WISER), an organization that has worked with women on retirement security issues
- McDonald's Corporation that provided insight from the perspective of an employer who has taken steps to address some of these issues
- Representatives from organizations that have conducted extensive research focused on disparities, including Ariel Capital and its partner, Hewitt Associates, the Urban Institute, and Prudential
- A representative of the Ford Foundation who presented Research and insight on how the Foundation has addressed the challenges of reducing disparities for women and minorities in the area of retirement security

## 4.2 Differences in the Studied Populations

It should be noted that the Council heard research from a number of sources, and the nature of the data sets used in the research is quite different. The Ariel report is a study of large private employer 401(k) plans and illustrates difference in results by groups within such plans. The studies cited by the Urban Institute and Ford Foundation use data based on a sample of the entire population and show larger disparities since they include people who are not covered by plans as well as those who are. In addition, these two studies, unlike the Ariel study, reflect the impact of people who are unemployed, out of the workforce for a period of time, or who have jobs without plans. The Civil Service Retirement research covered a large governmental plan and allows for comparison with private sector plans. It is important to note that the results may differ depending on the sample set that was used.

## 4.3 Disparities Data – What are the Gaps?

The major disparities can be documented in the following areas:

- Amount saved – both in the percentage of compensation saved as well as the account balances (Ariel, Urban and others)
- Earnings level of women and minorities
- Level of participation in plans – linked to the types of employment generally held

- The impact of leakage on these groups
- The impact of divorce or death of one's spouse on the ability to save for retirement

Data from Ariel testimony (pg 5) on 401(k) Saving & Investing Behaviors by Race and Ethnicity

| Group | Part Rate | Cont Rate | % with Equity Investments | % with Loans | % Using Hardship Withdrawals | 401(k) Balance for Employees Earning $30,000–$59,999 |
|---|---|---|---|---|---|---|
| African-American | 66% | 6.0% | 66% | 39% | 7.8% | $21,224 |
| Asian | 76% | 9.4% | 73% | 16% | 2.0% | $32,590 |
| Hispanic | 65% | 6.3% | 70% | 29% | 3.4% | $22,017 |
| White | 77% | 7.9% | 72% | 21% | 2.1% | $35,551 |

The Ariel study is based on 57 large 401(k) plans with 3 million participants. The Ariel testimony points out that: "Even when factors such as salary, job tenure, and age were held constant, African-Americans were still 7% less likely to participate than whites, and Hispanics were 6% less likely. Asians on the other hand were 3% more likely to participate. When you hold those other factors constant, African-American savers contributed 11% less pay than whites and Hispanics contributed 6% less. In contrast, Asians contributed 21% more."

It is important to note that the Ariel study did not attempt to study the impact of plan design on participation, contribution rates and investment allocation. The Ariel data was compiled using balances as of December 31, 2007; so, there wasn't sufficient time following the passage of the Pension Protection Act of 2006 to gauge the impact of that law's embrace of automatic features in 401(k) plans.

The Ariel testimony also cites a study by the Office of Personnel Management (OPM) that was conducted with the Federal Thrift Savings Plan (TSP) that indicated minorities were less likely to participate in the TSP (participation rate of 82.5% for minorities vs. 87.8% for whites) and that the minorities who participated contributed about 25% less than their white counterparts.

The table below from Ford Foundation Testimony (page 3) sets forth differences in access to plans by ethnic groups, gender, and marital status. This table is based on population data and includes the effect of differences in employment including not working, and differences by type of employer. The marital status data is for both sexes. Married individuals have significantly better access to retirement plans, and this is true for all workers and for full time workers.

% of Work Force Who Worked for an Employer that Sponsored a Retirement Plan and the % Who Participated in a Plan by Race, Ethnicity, Gender, and Marital Status, 2008```(13)

| | All Workers | All Workers | Full-time, Full-year, Wage and Salary Workers Ages 21-64 | Full-time, Full-year, Wage and Salary Workers Ages 21-64 |
|---|---|---|---|---|
| | Employer Sponsorship Rate | Worker Participation Rate | Employer Sponsorship Rate | Worker Participation Rate |
| All | 50.6 | 40.4 | 62.5 | 54.8 |

| By Ethnicity | | | | |
|---|---|---|---|---|
| White | 54.3 | 44.1 | 67.3 | 60.0 |
| Black | 50.0 | 37.8 | 60.3 | 50.5 |
| Latino | 33.7 | 25.2 | 42.4 | 34.5 |
| Other | 49.0 | 38.4 | 59.3 | 51.4 |
| **By Gender** | | | | |
| Male | 49.6 | 40.5 | 60.8 | 53.7 |
| Female | 51.7 | 40.2 | 64.6 | 56.2 |
| **By Marital Status** | | | | |
| Married | 55.8 | 48.0 | 65.8 | 59.7 |
| Widowed | 44.8 | 34.8 | 60.8 | 54.1 |
| Divorced | 53.6 | 42.9 | 63.5 | 54.2 |
| Separated | 42.0 | 31.0 | 52.1 | 41.1 |
| Never Married | 40.7 | 26.2 | 54.4 | 43.7 |

## 4.4 Nature and Reasons for the Disparities

Testimony from the Ford Foundation and the Urban Institute research provide further analysis of the disparities between groups and the reasons for these disparities. Both witnesses cite multiple research sources and they generally cite research using population based data bases that include both the employed and others. Some of these reasons are outlined below:

**Access to Pension Benefits:** According to the 2009 Current Population Survey (CPS), nearly three in five workers ages 25 to 59 had access to an employer-sponsored retirement plan - 64.6 percent of white workers, compared to 55.7 percent of Black workers and 38.4 percent of Hispanic workers. The share of workers with access to an employer-sponsored retirement plan also increased significantly with age for most racial and ethnic groups. However, the overall numbers mask age differences in offer rates between male and female workers. At the youngest ages, women were more likely than men to be employed in jobs with retirement plans. At older ages, this pattern was reversed. (The Urban Institute)

Among employed individuals who do not have access to employer-sponsored pension plans, Hispanics are heavily represented because they are generally employed in small firms and/or the service industry. For this group of workers, the solutions are directly linked to encouraging employers in these categories to establish retirement plans, and to encourage individuals to seek employment with employers who offer pension plans. In the alternative, more education on the utilization of IRAs could be undertaken.

**Patterns in retirement benefits coverage:** Blacks were found to be relatively more likely to have Defined Benefit (DB) coverage because of the high rates of government employment. Hispanics were found to have lowest coverage, to most likely work for small employers, and to work in industries with very low pension coverage. Women were less likely to work full-time, thereby reducing their chances for pension coverage where they did not meet the hours of service eligibility requirements. That research concluded that occupation is a major factor in the availability of retirement plans. The testimony for the Ford Foundation indicates that Blacks and Latinos are more likely than whites to be employed in service, farming, and construction industries - industries where employers are least likely to offer retirement benefits.

**Shift from DB to Defined Contribution (DC) plans:** Another reason for the disparity in retirement readiness is the shift from defined benefit to defined contribution plans, where most private-sector defined benefit plans are funded solely through employer contributions while most private-sector defined

contribution plans require affirmative elections and worker contributions to receive company financial support.

**Projected retirement income:** The representative from the Ford Foundation also testified that "A paper by the Economic Policy Institute (Eisenbrey and Spriggs, 2005) showed a growing retirement income gap between households of color and white households from 1989 to 2001. In 1989, white households had an expected retirement income of $59,100, on average, compared to $22,200 for Blacks and Latinos. By 2001, the expected retirement income for white households climbed to $80,800 as opposed to $28,100 for households of color. This growing gap was attributed to the shift from defined benefits to defined contributions." (Ford Foundation)

**Unemployment, time out of the labor force, and involuntary part-time work:** These factors also contribute to the disparities. "People of color and women are more likely to face unemployment, have longer periods of unemployment, work involuntary part-time jobs, and have lower wages than white workers. In addition, women are more likely than men to spend time out of the labor market caring for family members". (Ford Foundation)

**Poverty at older ages:** The difference in poverty rates among the elderly was cited as another aspect of existing disparities. According to data from the Census Bureau's Current Population Survey (CPS), one in ten adults ages 65 and older were poor in 2008, but poverty rates varied widely with race and marital status. Poverty rates ranged from 7.6 percent for non-Hispanic whites, to 19.3 percent for Hispanics, to 19.9 percent for non-Hispanic Blacks.[14] Only 5.6 percent of married women were poor, compared with 15.4 percent of widowed women, 18.1 percent of never married women, and 20.6 percent of divorced or separated women. (The Urban Institute analysis). The Ford Foundation paper cited poverty rates from a different analysis with very similar results. It was noted that the Native American population also has very high poverty rates. (Pata testimony.)

**Women's Issues Linked to Marital Status:** Unmarried women's high poverty rates in retirement may partly reflect differences in pension coverage at younger ages. Overall, 61.7 percent of married women were employed in jobs with retirement plans in 2009. By comparison, only 57.5 percent of divorced or separated women, 55.4 percent of never married women, and 53.3 percent of widowed women worked in jobs that offered retirement plans. Patterns of offer rates by marital status were generally similar for white, Black, and other minority women.

**Differences in earnings:** Median earnings in 2009 among male workers ages 25 to 59 ranged from $48,000 for whites to $32,000 for Blacks and only $28,000 for Hispanics. Males have higher earnings than females, with greater differences for whites. (The Urban Institute analysis) Not only are workers in low paying jobs less likely to have access to an employer-sponsored plan, but low earnings will often result in lower pensions. This was the case even for those workers who have employer-sponsored retirement plans and who contribute to these plans. The Ford Foundation report cited an EBRI report that: "showed only about 30 percent of workers earning $10,000 to $15,000 per year had jobs with retirement plans. By comparison, over 70 percent of workers earning $50,000 or more worked for employers sponsoring a retirement plan."

**Differences in account balances:** Research conducted by the Urban Institute found large differences in 401(k) balances among individuals age 25 to 58 in 2004 that can be linked to racial and ethnic factors. Average 401(k) account balances per person were $32,291 for whites, but only $17,784 for Blacks, and $17,049 for Hispanics. Even when IRA balances were included, average retirement account balances per person were $38,571 for whites, but only $20,506 for Blacks, and $17,517 for Hispanics. (The Urban Institute) This analysis shows a greater disparity than the Ariel study cited above, but it should be remembered that the Urban Institute analysis data base includes people without access to employer-sponsored plans.

Situations to be addressed vary not only by race and gender, but also by plan status. Here are some examples with possible directions for reduction of disparities:

- Employed individuals who are eligible to participate in an employer sponsored 401(k) plan but either do not participate or fail to save an adequate amount.

For this group, the challenge is how to increase the level of participation and/or savings rates. Some approaches to be considered include auto-enrollment with corresponding auto-increases in contribution levels. In addition, improved education efforts can be used to address some of these issues.

Individuals who are employed in firms that offer 401(k) plans but are not eligible because of part-time employment or classification in an ineligible position.

For this group of workers, possible solutions could include (1) actions that would encourage plan sponsors to modify eligibility to a lower number of hours worked, (2) encouraging these workers to establish an IRA for retirement savings, or (3) encouraging employers to increase the number of hours worked or change to an eligible classification to increase coverage.

Some proponents of Auto IRAs see this type of savings vehicle as a possible solution for this group, but others have reservations on whether such an approach will accomplish the desired goal. Legislative proposals have already been advanced in this area.

Individuals who are not regularly employed. Solutions for this group are beyond the scope of the Council because they are outside of the employer-sponsored plans area.

Some of the solutions for this group of workers include more flexible repayment of loans, including after the individual terminates employment with the sponsoring employer, and leveraging EGTRRA's endorsement of rollovers by removing any residual barriers that inhibit account aggregation. Hewitt Associates' and other studies show leakage is significantly higher where account balances are smaller. For example, with the assistance of the Department of Treasury, regulatory changes could encourage account consolidation by permitting participants to rollover any Roth IRA monies into their Roth 401(k) accounts.

 Back to Top

## Appendix — Summaries of Testimony

## 5.1 Amar Parikh, Director of Corporate Affairs, Ariel Investments, LLC

Barbara J. Hogg, FSA, Principal and Senior Retirement Consultant, Hewitt Associates LLC.

Mr. Parikh reviewed in detail the 2009 study entitled: *401(k) Plans in Living Color: A Study of 401(k) Savings Disparities Across Racial and Ethnic Groups*. This was a study of 3 million 401(k) participants among over 50 large employers. Even after controlling for differences due to age, earnings and tenure, the Ariel/Hewitt study found pronounced disparities in participation, contribution rates, investments and loans/withdrawals.

Mr. Parikh suggested reasons for the differences – a lack of financial literacy, lack of exposure to equities and a lack of trust in the markets, along with misinformation and conservatism. He recommended:

Tracking participation and other related data measures by race and ethnicity
Modifications in loan requirements to foster repayment, specifically, Ariel does not believe loans should be eliminated, but recommends changes to fundamental aspects of loans, including:

1. Providing a longer period for repayment after separation
2. Allow loan repayments after separation
3. Make loans portable

Financial education as a mandated part of public school education

Widespread adoption of automatic features in 401(k) plans

Increased direct employer involvement in financial education surrounding retirement

Ms. Hogg reviewed results of a recent study entitled: *Retirement Income Adequacy at Large Companies: The Real Deal 2010*. Key findings of that study were reviewed:

Employees contributing to their plan over a full working career are on track to have retirement resources of 13.3 times pay at retirement age, 15% short of their retirement needs of 15.7 times pay

The shortfall grows to 32% when including all employees (both those who are contributing and those who are not contributing).

Ms. Hogg noted that only about 18% of workers included in this study, again, primarily representing workers of large employers, were on track to achieve the goal of meeting their retirement needs. The 2.4 times pay shortfall varied by gender – 3.1 times pay for women, 1.8 times pay for men. Adding to the disparity, Ms. Hogg noted that women are more likely to earn less, live longer, save less, invest less aggressively, as well as have an increased likelihood of leakage due to breaks in service for care giving purposes.

Ms. Hogg also recommended changes in loans, including:

Making loans portable

Extending the "cure period" for loans upon involuntary termination

Encouraging plan sponsors to allow loan repayment after termination

Ms. Hogg also recommended changes to withdrawals, specifically:

Allowing participants to re-contribute hardship withdrawals to their accounts

Modifications in hardship withdrawal availability

Restrictions on the availability of other in-service withdrawals

Finally, Ms. Hogg endorsed Mr. Parikh's recommendation on data collection:

Employers should be encouraged to voluntarily collect and report data based on gender, race and ethnicity

The federal government should offer specific guidelines for the data collection

## 5.2 Jackie Chan, Prudential Financial

Jackie Chan, Vice President, Global Markets Research Department reviewed the 2009 study of Asian Americans and retirement readiness done by Prudential. While noting their aggressive retirement goals—a comfortable or upscale retirement beginning before age 65—Ms. Chan indicated that 37 percent of Asian Americans had less than $50,000 in combined retirement savings and only 19 percent were very confident of having enough money to achieve the desired goal. She also noted the potential knowledge gap regarding financial products that could supplement workplace pension and savings plans and Social Security benefits. Asian Americans were interested in learning more about financial products to plan for retirement, but nearly 75 percent did not use a financial professional.

Ms. Chan noted that employers could be helpful in providing information and encourage discussions with financial professionals. She noted Prudential's support for lifetime income disclosure on defined contribution plan statements as well as the automatic IRA bill and the Multiple Small Employer Plan concept.

## 5.3 Joan Cleveland, Prudential Financial

Joan Cleveland, Senior Vice President, Business Development, Individual Life Insurance reviewed the 10th anniversary edition of Prudential's *Financial Experience & Behaviors Among Women* survey.

Ms. Cleveland reported that over the years women have become more involved in financial decision-making in their households and more knowledgeable about financial matters. At the same time, women are not becoming more confident about making financial decisions, with 82 percent saying they need some or a lot of help. While women want financial advice, they cannot find financial professionals they trust, relying instead on family and friends with other sources being employers and the Internet.

To address the situation and assist women in achieving retirement goals, Ms. Cleveland made the following recommendations:

Encourage full participation in workplace retirement plans

Convert involvement in financial decision-making into action plans for retirement, including protection against longevity risk

DOL should clarify safe harbor protections for lifetime income distribution options

Financial firms and advisors must work to build trust as well as evaluate guaranteed lifetime income options

Financial firms, advisors and employers should provide educational materials that meet women's needs

## 5.4 Kilolo Kijakazi, M.S.W., Ph.D., Ford Foundation

The current initiative that Dr. Kijakazi is working on is Building Economic Security Over a Lifetime. The goal of the initiative is to achieve intergenerational economic security through public policies that address inequities in current laws.

### Status of Retirement Readiness by Race, Ethnicity, Gender, and Marital Status

All Workers

A study by the Employee Benefit Research Institute or EBRI (November 2009) reflects that in 2008 about 51 percent of all workers held jobs with employers that sponsored a retirement plan. Just over 40 percent of all workers participate in a plan. These levels represent a decline from 2000 when almost 57 percent of workers were employed in a job where a retirement plan was sponsored and about 44 percent of all workers participated in a plan. The author attributed these declines to falling stock market returns, the economic crisis, and the declining and freezing of defined benefit plans as employers shift from these plans to defined contribution plans.

The EBRI report focuses on full-time, full-year workers ages 21-64 since they are the workers most likely to be offered a plan at work. Among this group, 63 percent worked for an employer sponsoring a retirement plan and about 55 percent of workers participate in a plan.

A study by the Center on Retirement Research estimated that in 2009, 51 percent of all households ages 65 were at risk at not having sufficient income to maintain their standard of living after retirement. This estimate varied by income level. Forty two percent for households in the highest third of the income

distribution were at risk, compared to 47 percent of the middle third, and 60 percent of the bottom third. This increasing level of risk has implications for people of color and women since they are disproportionately represented among low-income households.

Workers of Color

The EBRI report shows that 67 percent of white full-time full-year wage and salary workers ages 21-64 are employed in jobs that sponsor a retirement plan compared to 60 percent of Blacks, 42 percent of Latinos and 59 percent of other workers of color. Sixty percent of white workers participated in an employer sponsored plan while 51 percent of Blacks, 35 percent of Latinos, and 51 percent of other workers of color participated.

A paper by the Economic Policy Institute (Eisenbrey and Spriggs, 2005) showed a growing retirement income gap between households of color and white households from 1989 to 2001. In 1989 white households had an expected retirement income of $59,100, on average, compared to $22,200 for Blacks and Latinos. By 2001, the expected retirement income for white households had climbed to $80,800 as opposed to $28,100 for households of color. This growing gap was attributed to the shift from defined benefits to defined contributions (which will be discussed more extensively in the section on "Causes in Disparities in Retirement Readiness").

The ability of low-wage earners to save for retirement, however, is constrained by their relatively low earnings. Given that people of color are disproportionately represented among low-wage workers, saving more may be a challenge.

Female Workers

Women also had a higher rate of participation in retirement plans (about 56 percent) than men (less than 54 percent).

When all workers are considered, however, the participation rate for women is lower than the rate for men. This is because women are more likely to be part-time workers, to work in occupations that have a lower likelihood of employers sponsoring a retirement plan, to spend time out of the labor market, and to have lower earnings.

The shift from defined benefit to defined contribution plans has been a mixed blessing for women. Women have a longer life expectancy than men, which makes an annuity more valuable to women, on average.

## Causes of Disparities in Retirement Readiness

A study by the Center on Retirement Research found that, "for comparably situated individuals, Blacks, whites, and Hispanics respond in a similar fashion in terms of joining a 401(k) plan and deciding how much to contribute. However, Blacks and Latinos are less likely to have the jobs where employers sponsor 401(k) plan. They are also less likely to have earnings and job tenure that would enable them to participate in a retirement plan. When asked if in her opinion forcing certain employers to do something could that potentially reduce their workforce, her response was, "why should employers in certain industries be treated differently?" For example -farming and service industries.

The EBRI report shows that only about 30 percent of workers earning $10,000 to $15,000 per year had jobs with retirement plans. By comparison, over 70 percent of workers earning $50,000 or more worked for employers sponsoring a retirement plan.

Occupations also are a factor in the availability of retirement plans. Blacks and Latinos are more likely than white workers to be employed in service, farming, and construction occupations.

Another reason for the disparity in retirement readiness is the shift from defined benefit to defined contribution plans and the differential impact the shift had on workers' decisions to participate in a plan. Low earners were more than three times more likely than the highest earners to indicate that money was the reason for not participating in a defined contribution plan. Given that Black and Latino workers are disproportionately represented among low-wage earners, they are more likely to have lower participation rates.

The percentage of workers ages 47 to 55 with any defined benefit coverage dropped from 68 percent to 40 percent and workers with only a defined benefit plan fell from 55 percent to 10 percent. The study indicated that lower wages made it harder for these workers to contribute to defined contribution accounts. So many households of color did not lose just defined benefit coverage; they lost pension coverage of any kind.

The author of the EPI paper indicates that defined contribution policies exacerbate the racial gap in retirement income in two ways. First, due to labor market discrimination, young Blacks ages 20-29 are much less likely to have a job (60 percent) than white people the same age (75 percent).

The second way in which IRA and 401(k) structures contribute to racial disparities in retirement accumulation has to do with the timing of contributions that are invested in the stock market.

Risk of Economic Insecurity

As a result of the disparities in retirement readiness, people of color, women, and single people are more vulnerable to poverty in their old age.

## Reliance on Social Security

In addition to pensions, assets, and earnings, workers and their families rely on Social Security as an important source of income. Two thirds of elderly beneficiaries age 65 and older receive at least half of their income from Social Security.

Social Security Coverage

In 2006, 90 percent of elderly white people received Social Security benefits (Social Security Administration, 2008). By comparison, 82 percent of Black seniors, 75 percent of Latino seniors and 68 percent of Asian-American seniors received Social Security. This lack of coverage for workers of color is the result of several factors. Blacks and Latinos make up a disproportionate share of household and farm workers. These occupations were not covered by Social Security until the 1950s. While these occupations are now covered, they have a higher rate of non-reported wages by employers to the Social Security Administration (Kijakazi, 2004). Consequently, workers in these occupations are less likely to accumulate the number of credits needed to qualify for Social Security benefits. A final factor contributing to the lack of coverage for some workers is their undocumented status. When asked if it made sense to carve out a piece of Social Security and privatize it, Dr. Kijakazi responded that she would be wary and it would depend on the design and it should provide a tax break for lower income families.

## Data Collection

It would be beneficial to have data collected from both public and private section employers on an ongoing and more frequent basis that includes information about the employers, the plan, and workers, such as:

Characteristics of the firm (e.g., public, private, industry, number of employees)
Whether the employer sponsors a retirement plan

Whether the plan is a defined benefit or defined contribution, or whether both are offered

Whether there is an employer match and the matching rate

Whether there is an annuity option and survivors benefit

Eligibility of workers to participate in a plan

Type of plan for which workers are eligible to participate

Participation rates by workers

Number and demographic characteristics of workers including race, ethnicity, national origin, American Indian tribe, gender, age, wage, level of education, other retirement assets

The Ford Foundation has just funded Duke University's Research Network on Racial and Ethnic Inequality to undertake a study to design and implement a national asset scorecard that would provide an assessment/rating of the wealth position of members of various racial and ethnic groups that comprise the U.S. populations.

The Department of Labor can play an important role in addressing the disparities in retirement readiness. One important step would be to work collaboratively with the Social Security Administration to enforce the requirement for employers to report wages of their employees so that these workers will receive Social Security credits.

The Center for Retirement Research concluded that the best way to increase retirement savings for people of color is by focusing on plan design. Things like auto enrollment, employer matches, refundable tax credit and auto IRA's. When asked which recommendation she liked the best (see below recommendations), she is in favor of the traditional pension plan.

The Pension Rights Center conducted a six-year project called Conversations on Coverage during which it assembled a wide range of stakeholders – including representatives of business, labor, the financial industry and academia – to discuss ways to expand pension coverage for low- and moderate-wage workers. They developed several proposals to improve coverage:

*The Guaranteed Account Plan (GAP)* would be a hybrid plan with individual accounts funded by the employer based on a percentage of the employee's pay

*The Plain Old Pension Plan* would be a new and simplified version of the basic traditional defined benefit pension plan

*The Retirement Investment Account* would establish a government-sponsored clearinghouse to administer portable lifetime individual accounts

*The Model T Plan* is a simplified multiple employer payroll deduction plan offered by financial institutions to small businesses

## 5.5 Elizabeth Wells

**Background:** Ms. Wells is an Attorney in Chicago concentrating on pension benefits in divorce and representing individuals. She started with a brief history re QDROs. The Retirement Equity Act (REA) was passed in 1984, in order to offer a solution to the problems of getting retirement benefits to former spouses and former dependents. Under ERISA, benefits could not be assigned, so REA allowed assignment of plan assets in divorce and also an exception to pre-emption. Note that pension law is Federal law and generally state courts make DROs. As a result of lifetime employment patterns, women have a lot lower income than men in old age – goal of REA and QDROs to provide safeguards to spouses, and particularly women who do not work outside of the home, and to provide greater equity to spouses; REA takes into account work patterns, status of marriage. The statistics show some improvement since 1984, but disparities still exist.

**Big issue for the Advisory Council** --- DOL could take some modest steps that would make a real difference in how much cost and complexity there is reaching solution.

**Problems:** Ms. Wells has identified some of the problems she has encountered, and others have brought to her by lawyers working on pensions in the domestic relations area. Elizabeth has identified several problems –

Obtaining information about the plans can be time consuming and involve a lot of hassle

Obtaining approval of QDROs

Payment of benefits when participant changes status in the plan

Obtaining benefits for divorced spouses in plans not mandated to accept QDROs – never sees this issue discussed

Fifth issue – 401(k) moving into IRA which has less protection for spouses

Experience and financial knowledge of women –Even where women are participating in making decisions about the household, they may not be aware of what husbands have done to put money away and where money is that they do not know about. Many women do not know about their husband's pension plans.

Problems occur when companies have changed names or when they have voice-mail systems that send one in circles. There should be better DOL regulations on provision of information. DOL should have standardized requirements on what must be provided, with a separate list for DB and DC plans.

Another issue --- when a plan does not comply --- it would be very helpful if there was a standard process to get help from the DOL on compliance with information request. Note that the attorney can go into Federal court to get documents, but cost to get information is generally $5,000 plus. This is a big issue for lower income people. Even a form letter from DOL would be a big help.

There are a lot of issues of getting approval on QDROs. Very helpful when administrators will agree to review draft letters. Much better to do this prior to going to court, then can negotiate with other attorney before going to court. It would be very good if guidelines would be promulgated, strongly encouraging plans to review.

DOL has guidelines that plan administrators may not require their forms, but some plans do not comply and make it very difficult. Problem with standardized QDRO forms is that they can really affect benefits, and be very adverse to individual interests. In one case the standardized QDRO gave the participant 1/8 of the benefit that a custom QDRO gave the participant.

It is very important to get QDRO entered at the time of divorce, but many attorneys do not do that. A problem can occur when the participant died before the order was entered. The DOL new reg does not deal with some of the important situations that are still open.

Elizabeth has made a series of recommendations to address these issues, listed in her written testimony.

**Plans that are not mandated to accept QDROs** include non-qualified plans, some state and local plans, 457 and 403(b) plans, Church plans. These plans can accept QDROs but are not required to accept them.

## 5.6 David John, The Heritage Foundation

Women have experienced substantial gains in the labor market over the last several decades. The share of women in the labor force has grown from under 38 percent in 1960 to almost 60 percent in 2000. Women have also made concomitant gains in educational attainment levels and wage rates. Today, a higher

proportion of women than men graduate from college and women's earnings are approaching the level of men's.

Despite the improvements in women's employment outcomes, gender differences in employment persist in several key aspects. First, women are more likely to choose jobs that are part-time, have shorter careers in the paid job market, and experience shorter job tenure at any given point in time than men. Second, despite the fact that many women have entered highly-skilled and highly-paid occupations, the majority of women still work in occupations or industries with lower earnings.

These gender differences in employment patterns partly explain women's lower earnings relative to men and lower wages lead to lower overall retirement saving for women compared to men. Comparing retirement accounts of women and men, women near retirement are 5 percentage points less likely than men to have a pension or a retirement plan. Not only do women have comparable participation and contribution rates to men, at each earnings level, female wage and salary workers are slightly more likely to participate in a pension or retirement plan than male workers. Differences in retirement balance may also be due to differences between men and women in investment patterns.

The major disadvantage for women of the shift away from defined benefit plans and toward 401(k) plans is the loss of the automatic life annuity through an employer-based retirement plan. Because women tend to live longer than men, a life annuity, which insures against outliving one's resources, is more valuable to women than to men.

The decline in marriage rates creates concerns for women's retirement security because of the close link between marital status and economic status for women. Unmarried women, on average, have fewer economic resources than married women.

## Retirement Savings Experience among African-Americans[15]

Many studies have documented that the average Black family has lower savings than the average U.S. family. The value of non-housing assets for the median Black family is one-twelfth that of the typical American family, compared to one-fifth when housing equity is counted. To a large extent, these differences are attributable to racial differences in labor market experience, such as a higher unemployment rate and more part-time work. These differences lead to lower average earnings than white persons and differential access to employer-sponsored retirement plans.

### A. Differences in labor market experience

Unemployment rates are 50 percent higher among Blacks than white persons. In fact, higher unemployment rates among Blacks are apparent across all education groups, including among college graduates who, as a group, tend to have the lowest unemployment rate among all workers. As a result of these labor market differences, Black families tend to have lower earnings than white families.

Racial differences in labor market experience also lead to differential access to employer sponsored retirement coverage. In the private sector, Black workers are less likely to be offered retirement coverage than other workers because they are more likely to work in part-time and lower-wage jobs. Compared to white workers, the gap is even greater; 50 percent of white workers in the private sector are covered by an employer-sponsored retirement plan compared to only 42 percent of Black workers.

### B. Differences in saving decisions

There also is some evidence that 401(k) contribution rates among Blacks with DC plans are smaller than those of other households. Additionally, Blacks appear to be less likely than white workers to invest in and hold high-yielding assets, such as stocks, than the average U.S. family.

Another possible consequence of Blacks' greater likelihood of having poor relatives throughout the family tree is that Blacks are subsequently less likely than those with wealthier kin networks to acquire knowledge, skills and opportunities related to saving and perhaps more basic understanding of financial matters.

There is also increasing evidence that financial illiteracy is widespread among the U.S. population, but it is particularly acute among specific demographic groups, such as those with low education, women, African-Americans, and Hispanics.