UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                                          Chapter 9
                                                                Case No. 13-53846
City of Detroit, Michigan,

    Debtor.
_____/

**PARTY IN INTEREST DAVID SOLE'S RESPONSE TO
DEBTOR'S MOTION TO EXCLUDE TESTIMONY OF SAQIB BHATTI (DOCKET 944)**

NOW COMES Party in Interest David Sole, by and through his attorneys, Jerome D. Goldberg, PLLC, and for his Response to Debtor's Motion to Exclude Testimony of Saqib Bhatti (Docket 944), states as follows:

### INTRODUCTION/BACKGROUND

The Interest Rate Swaps between the City of Detroit and Bank of America and UBS on the 2006 Pension Obligation Certificates have already been a tremendous drain on the City's finances, taking desperately needed funds for services, wages and pensions and diverting them to the banks. The forbearance agreement, for which the City of Detroit seeks approval in its motion, would continue this pattern by diverting hundreds of millions of dollars more in City funds to two of the banks that played a role in creating the economic crisis that plagues the city.

The Interest Rate Swaps obligate the City of Detroit to pay Bank of America and UBS 6.323% interest on $800 million in bonds, when the actual rate on the bonds is a floating rate of 0.34% plus LIBOR. **See Objection of David Sole with Exhibits attached, Docket 361**. The banks presented this deal as beneficial to the City on the bases that it would allow the City to know what it owed every month, and that the difference between the fixed interest rate paid to the banks and the actual floating rate on the bonds would even out over time.

However, beginning in 2008 and continuing through the present, there was a precipitous decline in the three-month LIBOR rate that is used as the index for the floating rate bond calculation. By mid-2009, the rate declined to less than 1% and as of August 2013 was at 0.2656%. That means that as of August this year, the City of Detroit was paying UBS and Bank of America 6.323% interest on bonds where the actual interest rate was 0.6%. **Docket 361-6**.

As a result, UBS and Bank of America have been raking in a bonanza on the Interest Rate Swaps. In his deposition dated August 30, 2013, Emergency Manager Kevyn Orr acknowledged that for the years 2008-2012 the City of Detroit paid Bank of America $247.5 million for the interest rate swaps on the Pension Obligation Certificates. **Exhibit 1, Orr deposition, p 313. Exhibit 2, Financial Report to Creditors, p 34.**

Under the Forbearance Agreement between the City of Detroit and Bank of America and UBS, the City of Detroit has the option of terminating the Swaps at a slightly reduced amount, 75% of negative fair market value, by October 31, 2013, and going up to 77% and later 82% if the City terminates within the next six months. According to EM Orr's June 14, 2013, Financial Report to Creditors, the negative fair market value of the Swaps was $343.6 million as of May 31, 2013. **Exhibit 2, p 28**. Using that figure, terminating the Swaps as of that date would mean the City of Detroit would be paying an additional $264 million to Bank of America and UBS.

Orr acknowledged that the City does not have cash on hand to terminate the Swaps and would have to obtain financing to do so, and does not have access to the 0% loans floated by the Federal Reserve to the banks under Qualitative Easing. **Exhibit 1, pp 318-320**. In addition to the $200 million or greater amount paid to UBS and Bank of America, the City of Detroit will be paying hundreds of millions more in interest to cover the termination costs.

2

In his deposition, Orr acknowledged that there are issues as to the ISDA Fix, the calculations used to estimate the cost of terminating interest rate swaps. Orr acknowledged awareness of "questions raised regarding the LIBOR for certain financial institutions." **Id. p 321**.

Orr testified he was aware that UBS has been sued by the Securities and Exchange Commission for rigging municipal bonds in past years. He testified he knew that Bank of America has been investigated for potential rigging with regard to the municipal bond market. **Id. pp 322, 323.** Orr testified that his team calculated and analyzed the possibility that there may be issues surrounding potential concerns in connection with the Swap Agreements. However, he relied on the opinion of his counsel, Jones Day, to investigate potential wrongdoing in the context of the Swap Agreements. In his deposition, Orr acknowledged that Jones Day represents Bank of America as one of its clients. Jones Day also has represented UBS in bond deals. **Id. pp 324, 325**.

Orr further testified that he was aware there have been prosecutions of UBS executives who were involved in their municipal bond divisions. **Id. p 326**. In response to a question as to why he has not conducted a criminal investigation to look into potential misconduct with regard to the Swap Agreements tied to Detroit's Pension Obligation Certificates, Orr testified that in fact there were matters under investigation that may or may not implicate criminal wrongdoing by UBS. **Id. at 328**.

## I. PROPOSED WITNESS TESTIMONY OF SAQIB BHATTI

Saqib Bhatti is a Fellow at the Nathan Cummings Foundation where his job is to research the role that municipal finance deals play in public budget crises. Prior to that fellowship, Mr. Bhatti worked as a Senior Financial Analyst with the Service Employees International Union

3

13-53846-tjt    Doc 992    Filed 09/20/13    Entered 09/20/13 17:13:15    Page 3 of 8

(SEIU) where his work focused on municipal finance and the housing crisis.  **Exhibit 3, Bhatti affidavit dated September 17, 2013.**

In his deposition testimony, Mr. Bhatti testified that he examined 1,100 swap transactions, in which he calculated the dollar amount of the spread that was paid by public entities based on the difference between the variable interest rate paid on the bonds and the fixed interest rate paid to the banks.  He examined numerous court cases and newspaper reports to develop a narrative tied to the calculations.  Based on this data, Mr. Bhatti determined that the swaps became most costly in the aftermath of the financial crisis of 2007-2008. At that time, the Federal Reserve slashed interest rates in response to the collapse of Lehman Brothers and the financial crisis caused by banks' predatory lending practices and increasingly risky investments.  **Ex. 4, Bhatti deposition, pp 38-40, 46-48**.

Mr. Bhatti further testified that in his position as a Nathan Cummings Fellow, on a daily basis he monitors the financial industry with regard to interest rate swaps, including news reports, federal regulatory filings and enforcement actions relative to Swap Agreements.  **Exhibit 5, Bhatti Affidavit dated Sept. 20, 2013.**

With regard to LIBOR manipulation, Mr. Bhatti testified that there is a well-established study dated April 2012 entitled "Does LIBOR reflect banks' borrowing costs?".  The study estimates the degree to which the LIBOR index was manipulated during different time periods.  The study has been utilized to establish the existence of LIBOR manipulation and the amount of manipulation in over a dozen lawsuits across the United States.  Mr. Bhatti's research has applied the methodology in that study to calculate the LIBOR manipulation in over a dozen locations in the U.S.  He has applied the study to quantify the losses suffered by the City of

Detroit as a result of its being placed in Swap Agreements based on the LIBOR index by UBS and Bank of America/SBS. **See Exhibit 5. Exhibit 6, attached.**

## II. MR. BHATTI'S TESTIMONY IS ADMISSIBLE

Mr. Bhatti is not being qualified as an expert in this case. He is not being asked to give opinion testimony as to whether or not there was any wrongdoing or fraud in connection with the Swap Agreements in the present case. He is not being asked to give an opinion as to whether the Forbearance Agreement should be allowed or disallowed.

The issue at this stage of the proceedings is whether this honorable Court should approve a Forbearance Agreement that removes the Swap Agreements from the bankruptcy proceedings based on a cost to the City of Detroit of hundreds of millions of dollars, and a profit to UBS and Bank of America of $200 million to $260 million, on top of the $247 million these banks have already netted on this deal.

Interested Party David Sole is arguing that because of documented wrongdoing in the municipal bond markets, a fact conceded by Emergency Manager Orr, it would at least behoove the City to conduct a proper investigation into whether or not there was wrongdoing in the securing of the Swap Agreements in the present case. Pursuant to the Bankruptcy Code, if such wrongdoing was uncovered, the City of Detroit could potentially save desperately-needed funds by having UBS and Bank of America's swap claims equitably subordinated or disallowed.

Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. FRE 401.

Mr. Bhatti's testimony, based on his review and personal knowledge of more than 1,100 swap agreements nationwide, will aid the Court in gaining a proper perspective on swaps as they

relate to the present case. Based on Mr. Bhatti's daily monitoring of the financial industry relative to swap agreements, he can present to the Court testimony on the extent of regulatory filings nationwide as well as reports documenting wrongdoing in the financial industry relative to swap agreements. This will assist the Court in making a determination of whether further investigation of the Swap Agreements in the present case is warranted before approving a forbearance agreement that removes the Swaps from the review of the Bankruptcy Court. Mr. Bhatti's testimony, based on his personal knowledge concerning LIBOR manipulation, may assist the Court in deciding whether the Swap Agreements in the instant case merit a closer examination of this issue before the Forbearance Agreement is approved or not.

Moreover, Interested Party Sole contends that another factor that must be examined in making this determination is the role that UBS and Bank of America, well-known and well-established subprime mortgage lenders, played in the mortgage foreclosure crisis which has devastated Detroit. Emergency Manager Orr cynically testified that he did not know whether the subprime lending crisis was a major contributor to Detroit's financial crisis. **Exhibit 1, p 332.**

Orr's statement flies in the face of a City of Detroit study in 2009 which documented that from 2004-2006, 73% of new mortgages in Detroit were high-cost loans, defined as loans with interest rates at least 3% above the standard interest rate. The study states: "The exorbitant numbers of high cost loans in Detroit is disturbing. From 2005 to 2007 [the period in which the Swap Agreements were taken out], Detroit experienced an astounding 67,000 foreclosures, more than 20% of all household mortgages. There were 4,600 tax foreclosures in the first six months of 2008 with over $25 million in taxes due on these properties. Early estimates indicate that at least two-thirds of tax or mortgage foreclosed properties stand vacant causing tremendous problems for Detroit on many levels." The study reflects that foreclosed properties lose cities

6

$20,000 per home in lost property taxes, unpaid utility bills, property upkeep, sewage and maintenance. "High foreclosure rates also cause disinvestment by nearby residents, which contributes to neighborhood decline, affects surrounding property values, and leads to population loss and increased crime." **Exhibit 7, attached.**

Mr. Bhatti's testimony is relevant to rebut EM Orr's statements that it is unclear that the subprime mortgage crisis was a cause of Detroit's financial problems. As Mr. Bhatti stated in his deposition, based on his study of 1,100 swap agreements, he can testify that the swap agreements became very costly to cities and other public bodies in the aftermath of the financial crisis that occurred in 2007 (when Lehman Brothers collapsed), and when interest rates became reduced to almost 0%. This was the consequence of the housing bubble resulting from the subprime mortgage crisis bursting. As stated above, Detroit was one of the cities most impacted by the subprime crisis.

It would be a travesty for this honorable Court to okay a forbearance agreement which benefits two of the very same banks, UBS and Bank of America, whose predatory mortgage practices helped create the financial crisis in Detroit that has precipitated this bankruptcy. To the extent Mr. Bhatti's testimony is helpful on this issue, it should be allowed.

WHEREFORE: Interested Party David Sole respectfully requests that this honorable Court deny Debtor's Motion to Exclude the Testimony of Saqib Bhatti. Interested Party Sole concurs in Debtor's Motion for an Expedited Hearing on this Motion (Docket 947).

Respectfully submitted,

JEROME D. GOLDBERG, PLLC

By: */s/ Jerome D. Goldberg*
Jerome D. Goldberg (P61678)
Attorney for David Sole, Party in Interest
2921 East Jefferson, Suite 205
Detroit, MI 48207
Phone: 313-393-6001
Fax: 313-393-6007
Email: apclawyer@sbcglobal.net

DATED: September 20, 2013