# EXHIBIT 1

# In The Matter Of:

*City of Detroit*

*Kevyn Orr*
*August 30, 2013*



NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

*Original File ORR_KEVYN.txt*
**Min-U-Script® with Word Index**

## Page 309

1  entered into, correct?
2  MR. JURGENS: Objection to form.
3  MR. SHUMAKER: Objection, form.
4  A. Here again, as I've said a couple of times today, I'm
5  going to stay away from legal conclusions as to
6  whether or not a lien would or would not have existed.
7  There are equitable liens that arise ex contractu
8  outside of law. There are other issues, but suffice
9  it to say this agreement seemed to impose a lien as a
10  matter of the agreement on the casino revenue.
11  BY MS. GREEN:
12  Q. Okay. You're not claiming any equitable lien?
13  MR. JURGENS: Objection.
14  A. We're not claiming a lien. We've done an analysis,
15  and there have been several memos that have gone back
16  and forth from counsel analyzing a number of different
17  issues at law and at equity. We -- there's -- me,
18  personally, under our agreement, there's no -- been no
19  assertion of an equitable lien.
20  MS. GREEN: I have nothing further then.
21  THE WITNESS: Sure.
22  Do you need -- you need this, don't you?
23  Is this -- did you -- excuse me. Did you mark this?
24  MS. GREEN: We can mark it as an exhibit.
25  I don't know that anyone has marked it yet. We can

## Page 310

1  mark it as Exhibit 7.
2  **MARKED FOR IDENTIFICATION:**
3  DEPOSITION EXHIBIT 7
4  3:20 p.m.
5  (Discussion off the record at 3:20 p.m.)
6  (Back on the record at 3:20 p.m.)
7  MS. GREEN: I thought maybe it was earlier
8  and I just didn't know.
9  THE WITNESS: No, I don't think it was.
10  MS. GREEN: It's hard to hear down there.
11  THE WITNESS: We talked about the
12  collateral agreement.
13  MS. GREEN: We did. Okay.
14  VIDEO TECHNICIAN: Do we need to go off the
15  record for the second or are we staying on? Are you
16  asking questions?
17  MS. GREEN: Oh, were we on?
18  THE WITNESS: We can shut up.
19  MR. SHUMAKER: Why don't we go off for one
20  minute to get ourselves together.
21  VIDEO TECHNICIAN: All right. Thank you.
22  The time is 3:20 p.m. We are off the
23  record.
24  (Recess taken at 3:20 p.m.)
25  (Whereupon Lally Gartel and Stephen Hackney

## Page 311

1  left the deposition at 3:21 p.m.)
2  (Back on the record at 3:22 p.m.)
3  VIDEO TECHNICIAN: We are back on the
4  record at 3:22 p.m.
5  EXAMINATION
6  BY MR. GOLDBERG:
7  Q. How are you doing, Mr. Orr?
8  A. Hello, Mr. Goldberg. How are you?
9  Q. We met before. I'm Jerome Goldberg. I represent
10  David Sole, who's an interested party, he's a retiree,
11  along with his wife, who's also a retiree.
12  MR. GOLDBERG: First of all, I want to just
13  go on the record and thank Kirkland & Ellis and the
14  other attorneys for their patience and their working
15  with other attorneys in this case, and especially
16  someone like me who represents a very different point
17  of view and that they were objective and fair their --
18  in accommodating all the objectives here.
19  BY MR. GOLDBERG:
20  Q. Let me begin by asking just a few questions just so we
21  can put some of this into perspective. I want to call
22  your attention to Exhibit 3.
23  A. Yes. Okay.
24  Q. On page 34 of Exhibit 3, there's a chart here that
25  references expenditures from the years 2008 to 2012?

## Page 312

1  A. Yes.
2  Q. And it indicates -- first of all, I just had a
3  question. Under the POCs, it has POC Swap GF, I
4  assume that means general fund?
5  MR. SHUMAKER: Counsel, I think you may be
6  pointing to a different page than the witness has in
7  front of him.
8  BY MR. GOLDBERG:
9  Q. It's page 34 in mine. Which one did I give you? I'm
10  talking about the June 14th, 2013.
11  MR. SHUMAKER: Yeah, there's an executive
12  summary and then there's a bigger one. Are you
13  looking at the bigger one?
14  MR. GOLDBERG: I have copies of what I'm
15  looking at.
16  A. These are the executive summaries.
17  MR. GOLDBERG: Why don't I mark these and
18  that will make it easier.
19  THE WITNESS: And the larger one is this
20  one.
21  MR. SHUMAKER: The larger one is Orr
22  Number 6. Take a look at that.
23  MR. GOLDBERG: Sure. Yeah, this is the one
24  I'm looking at.
25  THE WITNESS: That's the one, the larger

**Page 313**

1 ore.
2 BY MR. GOLDBERG:
3 Q. Okay. So Exhibit Number 6.
4 A. Okay. Mr. Goldberg, which page were you at?
5 Q. Page 34.
6 A. Of the original document?
7 Q. Yes.
8 A. Okay.
9 Q. Here we go, that chart, 34. And it's a chart that
10 says study that -- lists for fiscal years ended actual
11 expenditures for 2008 to 2012; is that correct?
12 A. Yes.
13 Q. I just want to be clear. It has under POC Swaps GF.
14 That means general fund?
15 A. Yes.
16 Q. EF, is that enterprise fund?
17 A. Enterprise fund excluding department of
18 transportation.
19 Q. And I'm trying to understand, does that mean that part
20 of the POC Swaps are paid -- a small part is paid from
21 the enterprise fund?
22 A. Yes. You'll see the corresponding numbers show for
23 those categories.
24 Q. Okay. And I totaled up the years from 2008, 2012. It
25 appears that $247.5 million was paid on for the POC

**Page 314**

1 Swaps during those years.
2 A. I don't have that total in front of me, but I'm going
3 to take it that that's the accurate number.
4 Q. It appears that it's usually about between 45 to 50
5 million a year.
6 A. Right, if you average 5, 10, 15, 20.
7 Q. Just so we're clear, I mean, that 247 million, none of
8 that went to turn on any lights in the City of
9 Detroit, did it?
10 MR. SHUMAKER: Object to the form.
11 A. It was legacy expenditures, debt service.
12 BY MR. GOLDBERG:
13 Q. It basically went to UBS and to Bank of America. It
14 was their reward for betting correctly on a hedge bet,
15 right?
16 MR. JURGENS: Objection to form.
17 MR. SHUMAKER: Objection to form.
18 A. Yeah, I'm going to stay away from characterizing it as
19 a reward. There were payments made pursuant to
20 existing certificates of participation at that time.
21 BY MR. GOLDBERG:
22 Q. And it was based on, as we talked about before, that
23 the difference between the interest rate on the
24 floating rate Swaps -- on the floating rate COPs and
25 the fixed rate that the -- that the City was obligated

**Page 315**

1 to pay the Swap counterparties, correct?
2 A. Yes --
3 MR. SHUMAKER: Objection to form.
4 A. -- as we discussed earlier today.
5 BY MR. GOLDBERG:
6 Q. Just so I'm clear, the -- what we're talking about
7 with the optional termination event. The exhibit --
8 the same exhibit you're referencing -- let's just get
9 this -- I want to call your attention to page 28.
10 A. Of the same exhibit?
11 Q. Same exhibit.
12 A. Okay.
13 Q. Am I correct in the -- that that reflects that as of
14 May 31, 2013, according to your proposal for
15 creditors, the negative fair value of the Swaps was
16 $343.6 million?
17 A. That's what it says. Recent valuations established
18 the negative fair value --
19 COURT REPORTER: I'm sorry. You're reading
20 way too fast.
21 THE WITNESS: I'm sorry.
22 A. Recent valuations established. The negative fair
23 value of the Swaps at approximately 343.6 million as
24 of May 31st.
25 BY MR. GOLDBERG:

**Page 316**

1 Q. So in the optional termination policy that's part of
2 the forbearance agreement, if the City was to pay the
3 initial payment, the City would still owe 264 -- we'd
4 be paying 264 million approximately on the Swaps?
5 MR. SHUMAKER: Objection to form.
6 BY MR. GOLDBERG:
7 Q. We'd be paying 75 percent of whatever the termination
8 amount is at that point?
9 A. Well, it's 75 percent of termination amount at that
10 point, which I believe has since declined from
11 May 31st.
12 Q. Why do you say it's declined?
13 A. Because interest rates have shifted, and so at any
14 given time we'd have to value the interest rate
15 formula at the time you choose to exercise the
16 optional termination provision of the forbearance
17 agreement.
18 Q. The interest rate that we're talking about on the Swap
19 is linked to the LIBOR; isn't that correct?
20 A. Yes.
21 Q. The three-month LIBOR?
22 A. Yes. I believe so.
23 Q. I pulled the three-month LIBOR historical index. It
24 indicated that as of -- might as well as mark this as
25 an exhibit.

**Page 317**

1     MR. GOLDBERG: Can you mark this as an
2   exhibit?
3     MARKED FOR IDENTIFICATION:
4     DEPOSITION EXHIBIT 8
5     3:29 p.m.
6     BY MR. GOLDBERG:
7 Q. It appears that as of August of 2013, the three-month
8    LIBOR rate was .2655 percent?
9     MR. SHUMAKER: Objection, foundation.
10 A. Is there -- if you're talking about --
11     BY MR. GOLDBERG:
12 Q. Under 2013.
13 A. 2013, a specific category in August which reads
14    0.26550.
15 Q. Right. So it's actually gone down since July of 2013
16    according to this chart.
17 A. Yes. Did I say up before?
18 Q. You had indicated that the interest rates -- right,
19    that the -- I mean, if it goes down, the City owes
20    more; isn't that correct?
21 A. Right.
22 Q. Just so we're clear again, that 200 -- whatever --
23    whether the figure is 247 million or 200 million, the
24    optional termination payment is not going to be -- the
25    City gets no direct benefit from that payment?

**Page 318**

1     MR. JURGENS: Objection.
2     MR. SHUMAKER: Objection to form.
3 A. Well --
4     BY MR. HACKNEY:
5 Q. Let me be -- strike that question.
6    No lights get turned on from that money.
7    That's money that comes out of the City budget.
8     MR. SHUMAKER: Same objection.
9 A. Well, it's money -- yeah, I would say that it's money
10   that the City is obligated to pay in some fashion, but
11   to the extent we get a discount, the City benefits.
12     BY MR. GOLDBERG:
13 Q. I heard before the testimony, and I think it's pretty
14   obvious, that the City does not have the money on hand
15   to pay that termination amount, correct?
16     MR. JURGENS: Objection to form.
17 A. Yes, I'm told that is correct.
18     BY MR. GOLDBERG:
19 Q. And to do so it's going to have to float another bond
20   or some kind of loan?
21 A. Well, it would have to in some fashion derive some
22   funding from the capital markets, yes.
23 Q. Okay. I read something, and I heard the same figures
24   floated here. I read an article in the Detroit News
25   and I heard the same -- I wasn't able to come

**Page 319**

1    yesterday due to an illness of my wife, but --
2 A. Oh, I'm sorry.
3 Q. -- they were talking about a $350 million bond of some
4    kind that is being looked into being floated, correct?
5 A. Here again, I want to be careful. It's unclear
6    whether or not it is a bond.
7 Q. Okay.
8 A. What is clear is there's some post petition financing
9    proposal which are quite sensitive, but that number is
10   not an unreasonable number and it has been mentioned
11   about in the press.
12 Q. And is it reasonable to say that that 2 -- 350 million
13   is not going to come free to the City?
14 A. No. The City will have to finance it in some fashion.
15 Q. I mean, I did a little research myself and looked up a
16   bond in Ann Arbor that was recently financed for
17   340 million at 4 percent which is, I would think we
18   both agree, was a good interest rate --
19 A. Um-hm.
20 Q. -- and the -- Ann Arbor would be paying 230 million in
21   interest on that bond over a 25-year period.
22 A. Here again, Mr. Goldberg, I want to be very careful.
23   Without representing or agreeing that the post
24   petition financing that's being discussed will take
25   the characteristic of a bond.

**Page 320**

1 Q. No problem. But either way, we are in agreement that
2    that financing -- we don't have -- the City does not
3    have a source for -- it doesn't have a relationship
4    with the Fed that the banks have where it gets a zero
5    qualitative easing and zero percent loans, does it?
6 A. The City does not -- is not a qualified financial
7    institution to go to the Fed discount window nor does
8    it have an extra several hundred million dollars in
9    its funds.
10 Q. Let me ask another question. I want to call your
11   attention to the forbearance agreement.
12 A. Yes.
13 Q. Which exhibit is that?
14 A. That's Exhibit 2.
15 Q. Let me call your attention to page 14.
16 A. Yes.
17 Q. And it indicates under mid-market amount --
18 A. Yes.
19 Q. -- am I reading it correctly to say that the -- when
20   the optional termination goes into effect, assuming it
21   goes into effect, that the calculation on what's owed
22   on the Swap that's the basis for the termination is
23   based on the ISDA fix 3?
24     MR. SHUMAKER: Objection to form. The
25   document speaks for itself.

Min-U-Script®     Bienenstock Court Reporting & Video     (80) Pages 317 - 320
Ph: 248.644.8888    Toll Free: 888.644.8080
13-53846-tjt    Doc 992-2    Filed 09/20/13    Entered 09/20/13 17:13:15    Page 5 of 18

**Page 321**

BY MR. GOLDBERG:

Q. Okay.

A. Yeah, here again, the document speaks to itself and it says methodology that is agreed to by the City and based upon the present value as it speaks to the rest of the document, yes.

Q. Have you looked into the fact that there's a lot of literature out now that's exposing a pretty large scandal with reg -- regard to the ISDA fix that involves and implicates both Bank of America and UBS?

MR. JURGENS: Object to form.

A. Without characterizing the nature of the literature, I think it's safe to say that I am aware of some issues that have been discussed regarding ISDA, fixed.

BY MR. GOLDBERG:

Q. Are you aware also of issues that have come out with regard to the LIBOR, specifically with regard to UBS and Bank of America in the setting of using the LIBOR as a standard?

MR. JURGENS: Objection to form.

A. I am aware that in the past years there have been some questions raised regarding the LIBOR for certain financial institutions, yes.

BY MR. GOLDBERG:

Q. Has that affected your analysis of how to deal with

**Page 322**

the Swap counterparties in terms of the -- the forbearance agreement?

A. No.

Q. The fact that it's potential fraud was involved in the setting of these --

MR. JURGENS: Objection to form.

MR. SHUMAKER: Objection to form.

A. Mr. Goldberg, I'm going to defer from accepting the characterization of potential fraud. It is -- it is as reported.

BY MR. GOLDBERG:

Q. Okay. That's fine.

Are you also aware that the -- that UBS was -- let me find that.

Are you aware that UBS has been sued by the Securities and Exchange Commission for rigging in regard to municipal bonds?

A. In past years?

Q. That there was a final judgment -- yes, in past years.

A. Yes.

Q. Are you aware of the final judgment that was -- there was a final judgment on a case that was filed on -- it's 112539 -- that -- and that one of the bonds that actually was involved in that case was the Detroit water and sewage bond case?

**Page 323**

A. I had heard that. I have not read the final judgment.

Q. Well, I'd be glad to pass you down a copy.

MR. GOLDBERG: Why don't we mark this.

MARKED FOR IDENTIFICATION:

DEPOSITION EXHIBIT 9

3:36 p.m.

BY MR. GOLDBERG:

Q. Are you also aware that Bank of America has been investigated for potential rigging with regard to the municipal bond market?

MR. JURGENS: Objection to form.

A. I am aware that Bank of America has been investigated. The exact specifics of the investigation I am not aware of.

BY MR. GOLDBERG:

Q. In light of these investigations that deal with rigging of the municipal bond market, was that taken into consideration by the City in how to approach the question of this forbearance agreement and potential action on these Swaps?

A. Perhaps you could be more specific in what way you're asking whether that was taken into consideration.

Q. I mean, if there, in fact, was fraud -- based on the fact there's at least an indication of fraudulent activity by both Bank of America and UBS within the

**Page 324**

municipal bond market, has there been any investigation as to whether or not that was the case with -- with regard to the Swaps associated with the POCs?

MR. JURGENS: Objection to form.

MR. SHUMAKER: Objection to form, foundation.

A. Yeah, first, it's not clear that there was fraud with respect to POCs. I think your prior question concerning Bank of America concerned bonds at DWSD that as my understanding are not implicated by this process, meaning the forbearance agreement, but have we calculated and analyzed the possibility that there may be issues surrounding potential concerns in connection with the Swap agreement, the answer is yes.

BY MR. GOLDBERG:

Q. And who was -- who were those discussions with in terms of whether or not to pursue that?

A. I would have had discussions with my counsel.

Q. When you say your counsel, who do you mean?

A. My attorneys.

Q. Jones Day, is that --

A. Well, Jones Day. We also have local counsel that's involved that's sitting here, Pepper Hamilton, and others.

Page 321

BY MR. GOLDBERG:

Q. Okay.

A. Yeah, here again, the document speaks to itself and it says methodology that is agreed to by the City and based upon the present value as it speaks to the rest of the document, yes.

Q. Have you looked into the fact that there's a lot of literature out now that's exposing a pretty large scandal with reg -- regard to the ISDA fix that involves and implicates both Bank of America and UBS?

MR. JURGENS: Object to form.

A. Without characterizing the nature of the literature, I think it's safe to say that I am aware of some issues that have been discussed regarding ISDA, fixed.

BY MR. GOLDBERG:

Q. Are you aware also of issues that have come out with regard to the LIBOR, specifically with regard to UBS and Bank of America in the setting of using the LIBOR as a standard?

MR. JURGENS: Objection to form.

A. I am aware that in the past years there have been some questions raised regarding the LIBOR for certain financial institutions, yes.

BY MR. GOLDBERG:

Q. Has that affected your analysis of how to deal with

Page 322

the Swap counterparties in terms of the -- the forbearance agreement?

A. No.

Q. The fact that it's potential fraud was involved in the setting of these --

MR. JURGENS: Objection to form.

MR. SHUMAKER: Objection to form.

A. Mr. Goldberg, I'm going to defer from accepting the characterization of potential fraud. It is -- it is as reported.

BY MR. GOLDBERG:

Q. Okay. That's fine.

Are you also aware that the -- that UBS was -- let me find that.

Are you aware that UBS has been sued by the Securities and Exchange Commission for rigging in regard to municipal bonds?

A. In past years?

Q. That there was a final judgment -- yes, in past years.

A. Yes.

Q. Are you aware of the final judgment that was -- there was a final judgment on a case that was filed on -- it's 112539 -- that -- and that one of the bonds that actually was involved in that case was the Detroit water and sewage bond case?

Page 323

A. I had heard that. I have not read the final judgment.

Q. Well, I'd be glad to pass you down a copy.

MR. GOLDBERG: Why don't we mark this.

MARKED FOR IDENTIFICATION:

DEPOSITION EXHIBIT 9

3:36 p.m.

BY MR. GOLDBERG:

Q. Are you also aware that Bank of America has been investigated for potential rigging with regard to the municipal bond market?

MR. JURGENS: Objection to form.

A. I am aware that Bank of America has been investigated. The exact specifics of the investigation I am not aware of.

BY MR. GOLDBERG:

Q. In light of these investigations that deal with rigging of the municipal bond market, was that taken into consideration by the City in how to approach the question of this forbearance agreement and potential action on these Swaps?

A. Perhaps you could be more specific in what way you're asking whether that was taken into consideration.

Q. I mean, if there, in fact, was fraud -- based on the fact there's at least an indication of fraudulent activity by both Bank of America and UBS within the

Page 324

municipal bond market, has there been any investigation as to whether or not that was the case with -- with regard to the Swaps associated with the POCs?

MR. JURGENS: Objection to form.

MR. SHUMAKER: Objection to form, foundation.

A. Yeah, first, it's not clear that there was fraud with respect to POCs. I think your prior question concerning Bank of America concerned bonds at DWSD that as my understanding are not implicated by this process, meaning the forbearance agreement, but have we calculated and analyzed the possibility that there may be issues surrounding potential concerns in connection with the Swap agreement, the answer is yes.

BY MR. GOLDBERG:

Q. And who was -- who were those discussions with in terms of whether or not to pursue that?

A. I would have had discussions with my counsel.

Q. When you say your counsel, who do you mean?

A. My attorneys.

Q. Jones Day, is that --

A. Well, Jones Day. We also have local counsel that's involved that's sitting here, Pepper Hamilton, and others.

Page 325

1 Q. I mean, isn't Jones Day -- doesn't Jones Day represent
2 this Bank of America as one of its clients on its Web
3 site?
4 A. Yes, Jones Day does represent Bank of America.
5 Q. How could Jones Day investigate one of its own clients
6 for potential fraud?
7    MR. SHUMAKER: Objection, form.
8    MR. JURGENS: Objection, form.
9 A. I am today, Mr. Goldberg, a client of Jones Day. The
10 specific practices of Jones Day regarding its
11 investigations, I would suggest that you refer to
12 them.
13    BY MR. GOLDBERG:
14 Q. Okay. I'm just saying you utilize them --
15 A. Yes, I do.
16 Q. -- for their -- for their advice on whether or not to
17 conduct such an investigation. I'm trying to ask you
18 as your -- in your independent position as emergency
19 manager, wouldn't you think that a law firm that
20 represents the precise person you're asking to
21 investigate for fraud could not give you an
22 objective appraisal?
23 A. No.
24    MR. JURGENS: Objection to form.
25    MR. SHUMAKER: Objection to form.

Page 326

1 A. No. In my experience, having worked now at three
2 different law firms, I have seen situations where law
3 firms are fully capable of investigating clients, yes.
4    BY MR. GOLDBERG:
5 Q. Are you aware that three executives of UBS were in --
6 recently jailed that -- who were involved in municipal
7 bond division were recently jailed?
8 A. I'm aware that there were prosecutions related to UBS.
9 I wasn't aware of the exact number or who they are.
10 Q. Okay. I do have -- now, I'm not privy to much on that
11 either, but I do have articles that do cite that.
12 A. Okay.
13 Q. And they cited three people who were just convicted in
14 July of this year.
15 A. Okay.
16 Q. Are you aware that Bank of -- an executive of Bank of
17 America in its municipal bond division was indicted in
18 2012?
19 A. I don't recall if I was aware of that.
20 Q. Okay. Let me just ask under -- pursuant to the Public
21 Act 436 section 13 -- section 16, aren't you mandated
22 to conduct a criminal investigation, or at least to
23 refer potential suspicion of criminal investigation to
24 the Attorney General in connection with -- if there's
25 any kind of criminal activity associated with the

Page 327

1 financial crisis in Detroit?
2 A. Yes. To be clear, under 436 I have no independent
3 prosecutorial authority, but I do have the authority
4 to make criminal referrals to appropriate
5 prosecutorial authorities.
6 Q. In light of the cost to the City of the Swaps and the
7 continuing costs, which we all acknowledge will be
8 substantial even in light of the forbearance
9 agreement, have you made any referral to at least do
10 a -- conduct an investigation based on the evidence
11 that, that -- I'm not accusing them of criminal
12 activity in these activities. I have no basis for
13 doing that, but on the other hand that fact that
14 their -- some of their top executives in this area
15 have been convicted would at least lead me to want to
16 take a look at that in light of Detroit's situation.
17    MR. JURGENS: Objection to form.
18    MR. SHUMAKER: Objection, form.
19 A. Yeah, it is a run-on question, Mr. Goldberg, but let
20 me say this. We are -- we have an -- analyzed to the
21 degree and looked at everything significantly related
22 to this transaction. Any --
23    BY MR. GOLDBERG:
24 Q. Have or have not? I'm sorry.
25 A. We have. We have.

Page 328

1 Q. Okay.
2 A. If there appears to be a basis for making a criminal
3 referral of any kind related to anything that falls
4 under my purview of 436, I will do that.
5 Q. But at this point nothing -- there hasn't even been a
6 request for such an investigation?
7 A. I would be careful about -- I -- I have asked -- there
8 are matters that are under investigation that may or
9 may not implicate the subject matters you're talking
10 about. I'm going to defer to speak about them
11 further.
12 Q. Okay. Are you familiar with the circumstances that
13 led to the 2005 Swap?
14 A. I'm familiar with what I've read. I wasn't here in
15 the City at the time.
16 Q. Do you know why Moody's -- not Moody's -- Fitch and
17 Standard & Poor's would have been at the table along
18 with UBS when this -- when this was discussed?
19 A. First, I don't know that they were at the table and,
20 secondly, if they were, I do not know why they would
21 have been.
22 Q. Well, I do have a photograph of them at the table
23 which I'd be glad to share with you --
24 A. Okay.
25 Q. -- from the Michigan Citizen. It was taken at that

Page 329

1  time. Let me see if I can find that.
2      MR. GOLDBERG: Here, I can mark this.
3      **MARKED FOR IDENTIFICATION:**
4      **DEPOSITION EXHIBIT 10**
5      3:43 p.m.
6      BY MR. GOLDBERG:
7  Q. This is a photograph taken by the -- it was in the
8  Michigan Citizen July 31st, 2005, it reflects a
9  picture of Sha -- Sean Werdlow, Stephen Murphy of
10 Standard & Poor -- Poor's, Joe Keefe -- Joe O'Keefe of
11 Fitch, the Deputy Mayor, Anthony Adams, and the -- and
12 the -- and -- and the representative of SBS at the
13 table.
14     MR. SHUMAKER: Is there a question?
15     BY MR. GOLDBERG:
16 Q. Sure. I was asking why would Moody -- why would
17 Standard & Poor and Fitch be at the table?
18     MR. SHUMAKER: Objection, foundation, form,
19 document speaks for itself.
20 A. Yeah, Mr. Goldberg, this purports to be a document
21 showing some of these members at counsel table. I
22 have no idea -- I wasn't here, and I have no idea what
23 the discussions were and whether or not it's
24 accurately represented to be something related to
25 this. This document speaks for itself.

Page 330

1      BY MR. GOLDBERG:
2  Q. So you haven't done really any substantive
3  investigation on what the circumstances were that --
4  that why -- that put the City into the pension
5  obligations with certificates and Swap --
6      MR. SHUMAKER: Objection to form.
7      BY MR. GOLDBERG:
8  Q. -- when they first were initiated in 2005?
9  A. Yeah, all I can say is this -- this picture appears to
10 be what it purports to be and speaks for itself. I
11 don't know if it's accurate or not.
12 Q. Let me just ask one quick -- that I was kind of
13 curious about, personally. It appears that there
14 was -- the first COP and Swap was in 2005. Then they
15 were terminated and a new one -- new COPs and Swaps
16 were placed in 2006. Is that your understanding?
17 A. I don't know if that's my understanding. I know there
18 were -- there were two series that went on. I'm going
19 to be careful with the question of replacing them, but
20 let's go with your question.
21 Q. Okay. I guess my curiosity is why the banks would pay
22 a termination fee of 2.7 million, according to those
23 documents, to the City to then have them
24 renegotiate -- replaced?
25 A. Mr. Goldberg --

Page 331

1      MR. SHUMAKER: Object to form, foundation.
2  A. I wasn't here in the City at the time. I have no
3  idea.
4      BY MR. GOLDBERG:
5  Q. Okay. That's fine.
6  Have you approached the Securities and
7  Exchange Commission to conduct any kind of
8  investigation of the Swaps in light of their extensive
9  investigations of UBS and Bank of America?
10     MR. JURGENS: Objection to form.
11 A. Yeah, here again, any -- your question is have I? I
12 think I can answer your question. I think the answer
13 is no.
14     BY MR. GOLDBERG:
15 Q. Okay. And you haven't approached them to intervene in
16 the bankruptcy which they have a right to do as we
17 both know under the bankruptcy code?
18 A. I would hazard a guess that the Security and Exchange
19 Commission is aware of Detroit's bankruptcy.
20 Q. But you have not approached them to aid you in doing a
21 proper investigation of the Swaps?
22 A. No. I -- I think they're fully capable of determining
23 what they should do within their mission.
24 Q. Have you looked into the mortgage practices of Bank of
25 America that -- in light of the financial crisis of

Page 332

1  Detroit?
2      MR. JURGENS: Objection to form.
3      MR. SHUMAKER: Objection to form.
4      MR. ESSAD: Objection to relevance.
5  A. I don't think my duties under 436 would specify to
6  look into the mortgage crisis, so the answer is no.
7      BY MR. GOLDBERG:
8  Q. But you would agree with me that the mortgage crisis
9  and the subprime lending crisis is a major contributor
10 to Detroit's financial crisis, would you not?
11     MR. SHUMAKER: Objection to form,
12 foundation.
13 A. Mr. Goldberg, I don't know if it was or wasn't.
14     BY MR. GOLDBERG:
15 Q. You don't know if it was or it wasn't?
16 A. No. I've -- I've heard reports that there was
17 disproportionate mortgage foreclosures and so on and
18 so forth, but I've made no conclusion as to whether or
19 not that was a major contributor to Detroit's
20 financial crisis.
21 Q. I've got you. Well, let me -- let me run this --
22     (Whereupon Vincent Marriott and Matthew
23     Summers left the Deposition at 3:47 p.m.)
24     MS. ENGLISH: Can we go off the record for
25 one second, please?

Page 333

1 VIDEO TECHNICIAN: We are off the record.
2 The time is 3:47.
3 (Recess taken at 3:47 p.m.)
4 (Back on the record at 3:48 p.m.)
5 VIDEO TECHNICIAN: Back on the record at
6 3:48 p.m.
7 BY MR. GOLDBERG:
8 Q. I'm sorry, I didn't bring that report with me.
9 So your public -- your statement to me is
10 you're not clear whether the subprime mortgage crisis
11 in Detroit was a factor in Detroit's financial crisis?
12 A. No. My statement --
13 MR. SHUMAKER: Objection to form.
14 A. My statement to you -- I believe your question was,
15 was it a major factor, and I said I understand there
16 have been reports, allegations, and stories that there
17 was disproportionate mortgage foreclosure in the City
18 of Detroit. I don't know if that was a major factor
19 in its financial crisis.
20 BY MR. GOLDBERG:
21 Q. And you haven't looked into that issue independently?
22 A. No, I've not looked into it independently.
23 Q. Even though the banks -- the same banks that are
24 claiming all these Swaps were directly involved in the
25 subprime mortgage crisis?

Page 334

1 MR. JURGENS: Objection to form.
2 A. Here again, your characterization was directly
3 involved. My mission in this forbearance agreement is
4 look at whether or not this is in the best interest of
5 the City at the time.
6 BY MR. GOLDBERG:
7 Q. Sure.
8 A. It seems to be as you and I have discussed before,
9 several times now, that you have expressed concerns
10 about a broader issue regarding banks involvement with
11 the mortgage foreclosure crisis in the City of
12 Detroit. In my opinion, that's not directly related
13 to the issue that we have at hand in the forbearance
14 agreement.
15 Q. Let me just ask you one other question. We've been
16 talking about alternative sources of financing.
17 You're familiar with the last CAFR?
18 A. Yes.
19 Q. Are you familiar with the -- what the 82 million in
20 chargebacks means in this CAFR that the City is
21 paying?
22 A. Yes, I think I have some understanding.
23 Q. What is your understanding of it, sir?
24 A. That there's a certain obligation on the City to pay
25 some money out based upon an analysis of either

Page 335

1 overcharges or obligations that it has to other --
2 other organizations and entities.
3 Q. Are you aware that chargebacks specifically deal with
4 chargebacks to the County that the County buys -- pays
5 the City for foreclosed tax -- foreclosed properties,
6 then sells them, and the City is responsible for the
7 difference between what they're sold for and what
8 the -- what originally was paid to the City?
9 A. Yes, as I said --
10 MR. SHUMAKER: Objection, form, foundation.
11 A. As I said, it's a process by which the City has
12 obligations to other organizations and entities.
13 BY MR. GOLDBERG:
14 Q. Are you aware that the state has hundreds of -- at
15 least 200 million dollars available in the Hardest --
16 Helping Hardest Hit funds that could be used to pay
17 off delinquent property taxes?
18 A. I've heard that representation before in terms of the
19 Hardest Hit funds. What I am aware of is that the
20 City is entitled to get 52 million dollars of the
21 late -- latest one hundred million dollar transfer of
22 the Hardest Hit funds for blight remediation.
23 Q. That's true. Which affects -- affects your general
24 proposal in terms of the cost of blight, correct?
25 A. Well, it helps us in terms of getting at the cost of

Page 336

1 blight as quickly as possible.
2 Q. But my question was a little different on that.
3 A. Um-hm.
4 Q. Have you intervened with Governor Snyder who you --
5 who you're -- your appointor --
6 A. Right.
7 Q. -- to secure the release of these Hardest Hit funds to
8 pay off property taxes which would both stabilize
9 communities to keep people in their homes and
10 stabilize the City budget by avoiding the need to pay
11 80 million in chargebacks?
12 MR. SHUMAKER: Objection, foundation.
13 A. It is not -- it is not -- it has been made clear to me
14 that it is not clear to me that, one, we'd have access
15 to those funds and that those funds can be
16 appropriately used for that purpose.
17 BY MR. GOLDBERG:
18 Q. It's not?
19 A. It's -- it's not clear. That's --
20 Q. Well, I'll send you some literature on that so you can
21 clarify that.
22 A. Okay.
23 MR. GOLDBERG: Okay. Okay. Thank you very
24 much.
25 THE WITNESS: Thank you very much.

Min-U-Script®    Bienenstock Court Reporting & Video    (84) Pages 333 - 336
Ph: 248.644.8888    Toll Free: 888.644.8080
13-53846-tjt   Doc 992-2   Filed 09/20/13   Entered 09/20/13 17:13:15   Page 10 of 18

# EXHIBIT 2

# CITY OF DETROIT
# PROPOSAL FOR CREDITORS

JUNE 14, 2013

This proposal is based on numerous projections and assumptions concerning future uncertain events including estimates of tax revenues and forecasts of future business and economic conditions in the city, all of which are beyond the control of the city. Actual results may differ from the assumptions and projections presented herein, and such differences could be material.

Additional data are being gathered or developed, and various critical financial and operational analyses remain in process. Thus, this proposal remains subject to material change.

# DETROIT FACES STRONG ECONOMIC HEADWINDS

**DETERIORATING MACROECONOMIC CONDITIONS.**

During the past several decades, the City of Detroit (the "City") has experienced changes that have adversely affected the economic circumstances of the City and its residents.

**Declining Population.** The City's population has declined 63% since its postwar peak, including a 26% decline since 2000:

- June 1950: 1,849,600
- June 1990: 1,028,000
- June 2000: 951,270
- June 2010: 713,777
- December 2012: 684,799

**High Unemployment.** Despite some recent improvement, the City's unemployment rate has nearly tripled since 2000:

- June 2000: 6.3%
- June 2010: 23.4%
- June 2012: 18.3%

**Number of Detroit Residents Employed.**

|                    | 2000    | 2010    | 2012    |
|--------------------|---------|---------|---------|
| Labor force        | 381,498 | 361,538 | 343,856 |
| Employment         | 353,813 | 278,063 | 279,960 |
| Unemployment       | 27,685  | 83,475  | 63,896  |
| Unemployment rate  | 7.3%    | 23.1%   | 18.6%   |

1

**The City is Not Paying Its Debts as They Come Due.**

- The City is not making its pension contributions as they come due. The City has deferred payment of its year-end Police and Fire Retirement System contributions (and finances such deferrals at a rate of 8%). As of May 2013, the City had deferred approximately $54 million in pension contributions related to current and prior periods and will defer approximately $50 million on June 30, 2013 for current year PFRS pension contributions. Therefore, by fiscal year end the City will have deferred over $100 million of pension contributions.

- The City will not make the scheduled $39.7 million payments due on its pension-related certificates of participation on June 14, 2013.

**Plummeting Credit Ratings.**

The City's credit ratings have continuously declined during the past decade and are well below investment grade. No major U.S. city has lower credit ratings.

Ratings on the City's Uninsured General Obligation Bonds

| | Moody's | Standard & Poor's | Fitch |
|---|---|---|---|
| June 30, 2003 | Baa1 | A- | A |
| June 30, 2004 | Baa1 | A- | A |
| June 30, 2005 | Baa1 | BBB+ | BBB+ |
| June 30, 2006 | Baa2 | BBB | BBB |
| June 30, 2007 | Baa2 | BBB | BBB |
| June 30, 2008 | Baa2 | BBB | BBB |
| June 30, 2009 | Baa2 | BB | BB |
| June 30, 2010 | Ba3 | BB | BB |
| June 30, 2011 | Ba3 | BB | BB- |
| June 30, 2012 | B3 | B | CCC |

8

- The City estimates that, as of June 30, 2013, the City will have $121.5 million in other outstanding installment notes and loans payable related to various public improvement projects.

- $87.8 million in notes payable, which notes were issued in connection with the "Section 108" HUD Loan Guarantee Program and are secured by future "Block Grant" revenues.

- $33.7 million in loans payable ($33.6 million of which is a non-interest bearing unsecured loan payable to the Downtown Development Authority as general operating funds become available).

- On August 23, 2012, the City issued $129.5 million of LTGO bonds at a $9.1 million premium (generating $137 million in proceeds after issuance costs) in part to defease short term bonds issued March 2012. The remaining proceeds of this issuance were set aside with a trustee bank in an escrow account to provide funds for reforms and liquidity in FY 2013. The current amount of the escrow is approximately $80 million.

- A schedule of the secured general obligation bonds and secured notes and loans payable as of June 30, 2012 is attached hereto as Appendix D. A schedule of the unsecured general obligation bonds and unsecured loans payable as of June 30, 2012 is attached hereto as Appendix E. A chart setting forth the annual debt service on the foregoing general fund obligations (and other liabilities) is attached hereto as Appendix G.

**Certificates of Participation (Pension).**

- In 2005, service corporations established by the GRS and PFRS created a trust that issued the COPs. The proceeds of the COPs were contributed to the City's pension trusts.

- Principal and interest on the COPs is payable solely from payments made by the City to the service corporations pursuant to service contracts.

- The City estimates that, as of the close of FY 2013 (i.e., June 30, 2013), the following amounts were outstanding under the COPs:

  - $480.3 million in outstanding principal amount of $640,000,000 Certificates of Participation Series 2005 A maturing June 15, 2013 through 2025; and

  - $948.54 million in outstanding principal amount of $948,540,000 Certificates of Participation Series 2006 A and B maturing June 15, 2019 through 2035.

27

- The City has allocated portions of the COP liabilities among the transportation, sewage disposal, water and library funds based on each fund's share of the aggregate UAAL determined at the time of issuance of the COPs.

- The City has identified certain issues related to the validity and/or enforceability of the COPs that may warrant further investigation.

- A schedule of the COPs and related swap liabilities as of June 30, 2012 is attached hereto as Appendix C.

**Swap Liabilities Related to Certificates of Participation.**

- In connection with the COPs, the City entered into eight pay-fixed, receive-variable interest rate swap contracts, effective as of June 12, 2006, with a total notional amount of $800 million.

- Recent valuations establish the negative fair value of the swaps at approximately $343.6 million (as of May 31, 2013).

- January 2009 — The City received notice from the swap contract counterparties that downgrading of the COPs and certain swap insurers would constitute an "Additional Termination Event" under the swap contracts if not cured.

- June 2009 — The City and the swap contract counterparties agreed on an amendment to the swap agreements, eliminating the Additional Termination Event and the potential for an immediate demand for a termination payment. Pursuant to the amendment:

  - The swap counterparties waived their right to termination payments; and

  - The City agreed to:

    - direct certain wagering tax revenues to a trust as collateral for the quarterly payments owing to the swap counterparties;

    - increase the interest rate of the swap agreements by 10 basis points effective July 1, 2010; and

    - include new termination events, including if COP ratings were withdrawn, suspended or downgraded.

- March 2012 — COPs were further downgraded which triggered another Termination Event; City and the swap counterparties are in negotiations regarding the Termination Event.

- March 2013 — Appointment of Emergency Manager constitutes an event of default triggering another Termination Event.

28

- Although this proposal reflects treating the swap obligations as special revenue debt secured by the wagering tax revenues, that treatment is still being reviewed by the Emergency Manager.

- A chart setting forth the annual debt service on the COPs and related swap liabilities is attached hereto as Appendix H.

## UNSUSTAINABLE RETIREE BENEFITS.

### OPEB Liabilities Are Large and Unfunded.

- The OPEB plans consist of the Health and Life Insurance Benefit Plan and the Supplemental Death Benefit Plan.

- As of June 30, 2011 (the most recently published actuarial valuation), there were 19,389 retirees eligible to receive benefits under the City's OPEB plans. The number of retirees receiving benefits from the City is expected to increase over time.

- 99.6% of the City's OPEB liabilities are unfunded.

- **Health and Life Insurance Plan**

  - Defined benefit plan providing hospitalization, dental care, vision care and life insurance to current employees and substantially all retirees.

  - City generally pays for 80% to 100% of health care coverage for eligible retirees.

  - $5,718,286,228 in actuarial liabilities as of June 30, 2011. An updated actuarial valuation based on more recent census data is currently being developed by third party professionals.

  - The Health and Life Insurance Plan is 0% funded; financed entirely on a "pay-as-you-go" basis.

  - $177,460,627 cost to the City on account of retiree benefits during FY 2012 provided under the Health and Life Insurance Plan.

  - City's contribution is in addition to $23,516,879 in FY 2012 contributions by retirees.

## Steady State Projection of Legacy Expenditures (assuming no restructuring)

($ in millions)

| | FISCAL YEAR ENDED ACTUAL | | | | | PRELIMINARY FORECAST | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| **Legacy expenditures** | | | | | | | | | | |
| Debt service (LTGO) | $(66.6) | $(106.2) | $(63.5) | $(64.5) | $(62.6) | $(70.8) | $(70.9) | $(61.8) | $(61.8) | $(38.5) |
| Debt service (UTGO) | (67.2) | (71.5) | (72.4) | (72.8) | (73.0) | (70.6) | (64.9) | (62.5) | (57.6) | (57.6) |
| POC - principal and interest (GF) | (24.6) | (20.9) | (23.6) | (33.5) | (33.0) | (46.8) | (51.4) | (53.3) | (55.0) | (56.9) |
| POC - principal and interest (EF, excl. DDOT) | (1.8) | (1.4) | (1.5) | (1.8) | (2.0) | (5.3) | (5.9) | (6.1) | (6.4) | (6.6) |
| POC - principal and interest (DDOT) | (3.5) | (2.8) | (3.0) | (3.6) | (4.0) | (3.3) | (3.7) | (3.8) | (3.9) | (4.1) |
| POC - swaps (GF) | (38.6) | (43.9) | (44.7) | (44.7) | (44.8) | (42.9) | (42.8) | (42.8) | (42.7) | (42.7) |
| POC - swaps (EF, excl. DDOT) | (2.3) | (2.0) | (2.0) | (2.0) | (2.0) | (4.8) | (4.8) | (4.8) | (4.9) | (4.9) |
| POC - swaps (DDOT) | (4.5) | (4.0) | (4.0) | (4.0) | (4.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) |
| Pension contributions - Public Safety | (58.9) | (31.4) | (32.8) | (81.6) | (49.8) | (46.1) | (139.0) | (163.0) | (180.0) | (198.0) |
| Pension contributions - Non-Public Safety | (10.6) | (27.0) | (11.1) | (28.3) | (25.4) | (19.9) | (36.9) | (42.5) | (47.7) | (53.1) |
| Pension contributions - DDOT | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (12.3) | (23.6) | (27.7) | (31.2) | (34.8) |
| Health benefits - retiree - Public Safety | (73.7) | (80.2) | (70.4) | (79.6) | (90.6) | (91.5) | (88.6) | (95.2) | (101.7) | (108.0) |
| Health benefits - retiree - Non-Public Safety | (47.4) | (51.6) | (50.6) | (49.0) | (49.2) | (49.7) | (38.8) | (41.5) | (44.6) | (47.7) |
| Health benefits - retiree - DDOT | (8.2) | (11.8) | (11.2) | (11.1) | (10.3) | (10.4) | (13.3) | (14.3) | (15.3) | (16.3) |
| **Total legacy expenditures** | $(414.6) | $(462.0) | $(397.9) | $(486.1) | $(461.6) | $(477.3) | $(587.6) | $(622.4) | $(655.9) | $(672.3) |
| **Total revenues (excl. financing proceeds)** | $1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 |
| **Total legacy expenditures as a % of total revenues** | 29.7% | 33.9% | 30.8% | 36.9% | 38.6% | 42.5% | 54.3% | 59.5% | 63.0% | 64.6% |

13-53846-tjt    Doc 992-2    Filed 09/20/13    Entered 09/20/13 17:13:15    Page 18 of 18