**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

**MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, MOTION FOR ENTRY OF AN ORDER MODIFYING THE AUTOMATIC STAY SOLELY TO ALLOW ADMINSTRATIVE LAW JUDGE TO EXECUTE HIS OPINION AND LIQUIDATE DAMAGE AWARD BEFORE HE RETIRES ON OCTOBER 4, 2013**

The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO ("**AFSCME**"), submits this motion (the "**Motion**") for entry of an order pursuant to sections 362(d) and 922(b) of title 11 of the United States Code (the "**Bankruptcy Code**") modifying the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code solely to permit the administrative law judge ("**ALJ**"), who is presiding over legal proceedings against the above-captioned debtor (the "**Debtor**") in a matter before the Michigan Employment Relations Commission ("**MERC**"), to execute his recommended opinion and order before his October 4, 2013 retirement. The requested relief would assist in liquidating the dollar amount of an award made pursuant to said legal proceedings, thereby facilitating this Court's treatment of that ministerial question by referring it to the statutorily empowered regulatory entity which has particular expertise in the subject matter and which is intimately familiar with the facts and law at issue as reflected in an already-issued bench decision by one of its ALJs.

## JURISDICTION, VENUE AND BASIS FOR RELIEF REQUESTED

1.      The Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 362 and 922 of the Bankruptcy Code and Bankruptcy Rule 4001.

## BACKGROUND

3.      On February 8, 2013, ALJ Doyle O'Connor of the MERC heard oral argument on and decided to recommend to the MERC for entry of a final order a resolution in AFSCME's favor of an unfair labor practice charge (the "**ULP**") filed by AFSCME against the Debtor (Case Number C12-E-092, Docket Number 12-000777).[1]  A transcript of the hearing before ALJ O'Connor is attached hereto as Exhibit A, and the ALJ's "bench opinion, which will be followed by a written opinion" in AFSCME's favor appears at pages 37-53 of that attachment.

4.      ALJ O'Connor's decision "restore[s] to the Pension Board" of the Detroit General Retirement System ("**GRS**") "the discretion previously exercised . . . regarding [distribution of annual] excess earnings" of GRS to "affected retirement plan participants" and explicitly orders that these participants "be made whole by the City to the extent that there is any practical impediment to the Pension Board making those participants whole otherwise." *Id.* at 50.

5.      Following ALJ O'Connor's February 8 bench decision, the parties submitted supplemental briefing on the appropriate remedy to be ordered by the ALJ.

---

[1] AFSCME filed the ULP under the Michigan Public Employment Relations Act ("**PERA**"), MCL 423.201 *et seq.,* which provides that an administrative law judge hold a hearing on all unfair labor practice charges and issue a recommended decision and order of the MERC, which is then reviewed by the three-member MERC itself for issuance of a final order.

6.     As of July 18, 2013, ALJ O'Connor had not issued his written decision which, among other things, would have referred this matter to the MERC to liquidate the dollar amount of the award. *Id.* at 50-51.

7.     On July 18, 2013, the Debtor filed its chapter 9 petition.

8.     Since July 18, 2013, ALJ O'Connor has not issued his written decision – which would assisting in liquidating a dollar amount of the "make whole" remedy he ordered orally – perhaps as a result of his view of the effect of the automatic stay on the ULP proceeding before the MERC.

## RELIEF REQUESTED

9.      AFSCME hereby moves this Court to modify the automatic stay to allow this matter to proceed before the MERC for the sole purpose of permitting the ALJ to execute his recommended decision, including affixing any damage award, before he retires on October 4, 2013.

## ARGUMENT

10.     A movant has the initial burden of showing a legally sufficient basis for lifting the automatic stay. *See In re M.J. & K. Co.*, 161 B.R. 586, 590 (Bankr. S.D.N.Y. 1993). Once the movant shows such cause exists, the debtor must prove that it is entitled to the protections of the stay. *See id.*; *In re Wedtech Corp.*, 87 B.R. 279, 289 (Bankr. S.D.N.Y. 1988).

11.     In determining whether cause exists under section 362(d)(1) of the Bankruptcy Code to lift the automatic stay to allow litigation to proceed in another tribunal, courts consider a number of factors (the "***Sonnax* Factors***") enumerated by the Second Circuit in *In Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280 (2d Cir. 1990). *See, e.g., In re ExpressTrak, LLC,* 2004 WL 3735126, at *8 (Bank. E.D. Mich. Jan. 20, 2004) (*Shefferly,* J.) (applying *Sonnax* Factors). Those factors are:

(1)    whether relief would result in a partial or complete resolution of the issue;

(2)    lack of any connection with or interference with the bankruptcy case;

(3)    whether the other proceeding involves the debtor as a fiduciary;

(4)    whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

(5)    whether the debtor's insurer has assumed full responsibility for defending it;

(6)    whether the action primarily involves third parties;

(7)    whether litigation in another forum would prejudice the interest of the creditors;

(8)    whether the judgment claim arising from the other action is subject to equitable subordination;

(9)    whether the movant's success in the other proceeding would result in a judicial lien avoidance action by the debtor;

(10)    the interests of judicial economy and the expeditious and economical resolution of litigation;

(11)    whether the parties are ready for trial in the other proceeding; and

(12)    impact of the stay on the parties and the balance of harms.

*Sonnax*, 907 F.2d at 1286.  Further, in determining whether cause exists to grant relief from the automatic stay under section 922, section 362(d)(1) is illustrative.

12.    "Not all of these factors will be relevant in every case," *Mazzeo v. Lenhart (In re Mazzeo)*, 167 F.3d 139, 143 (2d Cir. 1999), and a court need not give equal weight to each factor.  *In re Burger Boys, Inc.*, 183 B.R. 682, 688 (S.D.N.Y. 1994).  As set forth below, the relevant *Sonnax* Factors weigh in favor of modifying the automatic stay merely to permit Council 25 to liquidate the amount in controversy before a tribunal with special expertise in the relevant statutory cause of action and particular knowledge of the underlying facts and law at issue in the ULP.

-4-

13.     First, allowing the ALJ to issue a written opinion before his departure is appropriate.  Because the ULP was filed long before the chapter 9 case was commenced, and because "the litigation that has taken place in [the MERC] has been extensive," the relief requested herein is warranted. *See In re ExpressTrak,* 2004 WL 3735126, at *9.

14.     Second, the ULP is not connected to the bankruptcy case and would not affect proceedings before this Court other than to heighten the efficiency of those proceedings by furthering the process of placing a dollar amount on what the Debtor owes in connection with the ULP.

15.     Third, and most important, the MERC is a specialized tribunal with regulatory expertise assigned by statute specifically – and exclusively – to hear this cause of action.  The "MERC alone has jurisdiction and administrative expertise to entertain and reconcile competing allegations of unfair labor practices and misconduct under the PERA." *Kent Cnty. Deputy Sheriff's Ass'n v. Kent Cnty. Sheriff,* 463 Mich. 353, 359; 616 NW2d 677 (2000) (quoting *Rockwell v. Crestwood Sch. Dist.*, 393 Mich. 616, 630; 227 NW2d 736 (1975)).  Both for this reason and "because of the pendency of the litigation" and "extensive activity that has already taken place in" the MERC, it has special "familiarity . . . with the substantive laws governing the disputes between the parties," as well as the facts to apply to that law, and thus it will be ideal for the MERC to liquidate the dollar amount in controversy here.  *See In re ExpressTrak,* 2004 WL 3735126 at *11.

16.     Fourth and similarly, the interests of judicial economy and the expeditious and economical resolution of the ULP would best be served by permitting the ALJ to execute the opinion.  MERC and the assigned ALJ are intimately familiar with the facts and law at issue and

-5-

can most economically aid this Court, and its busy docket, with resolution of the dollar amount in controversy.

17.    Notably, the Supreme Court reached an analogous conclusion in *Nathanson v. N.L.R.B.*, 344 U.S. 25 (1952), where the Court held that a bankruptcy court must defer to the National Labor Relations Board (the "**NLRB**") for liquidation of federal unfair labor practice claims. The NLRB had found the employer guilty of unfair labor practices and ordered payment of back wages. While an action to enforce the order was pending in the court of appeals, an involuntary bankruptcy petition was filed against the employer. The court of appeals subsequently enforced the NLRB order and the NLRB filed a claim in bankruptcy. The bankruptcy court denied the claim and the Supreme Court reversed on the following rationale:

> The bankruptcy court normally supervises the liquidation of claims. But the rule is not inexorable. A sound discretion may indicate that a particular controversy should be remitted to another tribunal for litigation. And where the matter in controversy has been entrusted by Congress to an administrative agency, the bankruptcy court normally should stay its hand pending an administrative decision.... It is the Board, not the referee in bankruptcy nor the court, that has been entrusted by Congress with authority to determine what measures will remedy unfair labor practices.

*Id.* at 30 (citations omitted).

18.    Relying on *Nathanson,* the Sixth Circuit has noted that "courts which have considered this issue have generally concluded that NLRB unfair labor practice proceedings are excepted from the automatic stay by § 362(b)(4)." *N.L.R.B. v. Edward Cooper Painting, Inc.,* 804 F.2d 934, 941 (6th Cir. 1986) (collecting cases) (holding that the NLRB could enforce decision of unfair labor practice charge despite respondent employer's filing for bankruptcy under chapter 11).

19.    As in *Nathanson,* here it is the MERC which has been entrusted by statute with special authority to determine what measures will remedy unfair labor practices. *See Kent Ctny.*

*Deputy Sheriff's Ass's, supra.* Like the NLRB, the MERC thus possesses special expertise and investment which make it best suited to liquidate the dollar amount for this Court.

20.     Moreover, "the legislative history of the statute states that § 362(b)(4) excepts a governmental unit from the automatic stay where it is 'attempting to fix damages for violation' of a police or regulatory law." *Edward Cooper Painting,* 804 F.2d at 943.  In contrast, "only attempts to *enforce* money judgments are subject to the automatic stay," *id.* (emphasis in original), while the entry of such judgments by statutorily designated governmental tribunals enforcing regulatory regimes are permitted to proceed concurrent with the stay.

21.     However, to be clear, AFSCME is not asking this Court to determine at this time one way or the other whether, as a rule, state law unfair labor practice charges are subject to the automatic stay, and AFSCME reserves all its rights on this issue.

22.     Instead, AFSCME is merely asking this Court to allow the MERC proceedings to run their course, which will aid this Court's resolution of the chapter 9 case by permitting the tribunal of special expertise, which has already made a substantial investment in the matter, to finalize a preliminary conclusion on the merits, which was announced from the bench long before the Debtor filed its chapter 9 petition.

## WAIVER OF STAY

23.     Bankruptcy Rule 4001(a)(3) provides that "[a]n order granting a motion for relief from an automatic stay . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 4001(a)(3).  A waiver of the requirements of Bankruptcy Rule 4001(a)(3) is appropriate under the circumstances to permit the ALJ to execute the opinion before his October 4th departure.

## CONCLUSION

24.     For the reasons stated above, the Court should modify the automatic stay such that it does not prohibit the ALJ at the MERC from fixing a dollar amount in damages to the recommended bench decision on the merits already entered in AFSCME's favor against the Debtor by ALJ O'Connor on February 8, 2013.

25.     Such an order would not involve any further effort of the parties in that litigation, and would permit this Court to better evaluate that award, in the orderly processing of such.  The ALJ is encouraged to consider the above standards in his effort at evaluating the claim.

WHEREFORE, AFSCME respectfully requests the entry of an order clarifying and/or modifying the automatic stay as requested herein and for such other and further relief as this Court deems just.


Dated: September 23, 2013

**LOWENSTEIN SANDLER LLP**
By: /s/  *Sharon L. Levine*
    Sharon L. Levine, Esq.
    John K. Sherwood, Esq.
    Philip J. Gross, Esq.
    65 Livingston Avenue
    Roseland, New Jersey 07068
    (973) 597-2500 (Telephone)
    (973) 597-6247 (Facsimile)
    slevine@lowenstein.com
    jsherwood@lowenstein.com
    pgross@lowenstein.com

    -and-

    Herbert A. Sanders, Esq.
    THE SANDERS LAW FIRM PC
    615 Griswold St., Suite 913
    Detroit, MI 48226
    (313) 962-0099 (Telephone)
    (313) 962-0044 (Facsimile)

-8-

hsanders@miafscme.org

-and-

Richard G. Mack, Jr., Esq.
Miller Cohen, P.L.C.
600 West Lafayette Boulevard
4th Floor
Detroit, MI 48226-3191

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO*

## SUMMARY OF ATTACHMENTS

The following documents are attached to this Motion, labeled in accordance with Local Rule 9014-1(b).

| | |
|---|---|
| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Intentionally Omitted (*Ex Parte* Motion to be Filed Concurrently) |
| Exhibit 3 | Intentionally Omitted (No Brief Required) |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | Intentionally Omitted |
| Exhibit 6 | Documentary Exhibit |
| Exhibit A | Transcript of Hearing Before Administrative Law Judge Doyle O'Connor of the Michigan Employment Relations Commission Dated February 8, 2013 |

# Exhibit 1

Proposed Form of Order

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

## ORDER MODIFYING THE AUTOMATIC STAY TO ALLOW ADMINSTRATIVE LAW JUDGE TO EXECUTE HIS OPINION AND LIQUIDATE DAMAGE AWARD BEFORE HE RETIRES ON OCTOBER 4, 2013

This matter having been opened to the Court by The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO, ("**AFSCME**") in its Motion for Entry of an Order Modifying the Automatic Stay Solely to Allow Administrative Law Judge to Execute His Opinion and Liquidate Damage Award Before He Retires on October 4, 2013 (the "**Motion**"), by and through its attorneys, upon notice to the State, the City of Detroit (the "**Debtor**"), and all parties in interest in this chapter 9 case; and the Court having considered AFSCME's Motion, and any objections thereto; and good cause appearing,

IT IS ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      The automatic stay is hereby modified to permit administrative law judge Doyle O'Connor to execute his recommended decision, including affixing any damage award, before he retires on October 4, 2013, in connection with the unfair labor practice charge (the "**ULP**") filed by AFSCME against the Debtor (Case Number C12-E-092, Docket Number 12-000777).

3. This Court finds that Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure is waived for purposes of the relief granted in this Order.

# Exhibit 4

Certificate of Service

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on September 23, 2013, *The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO Motion for Entry of an Order Modifying the Automatic Stay Solely to Allow Administrative Law Judge to Execute His Opinion and Liquidate Damage Award Before He Retires on October 4, 2013* was filed with the Clerk of the Court using the CM/ECF system, which provides electronic notification of such filing to all counsel of record.

Dated:    September 23, 2013

*/s/ Keara M. Waldron*
Keara M. Waldron, Esq.
**LOWENSTEIN SANDLER LLP**
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
kwaldron@lowenstein.com

# Exhibit 6

Documentary Exhibit

**Exhibit A**

# AFSCME COUNCIL 25 v. CITY OF DETROIT

# AFSCME COUNCIL 25 MOTION HEARING

# February 8, 2013

Prepared by



Depos@NetworkReporting.com
Phone: 800-632-2720
Fax: 800-968-8653
www.networkreporting.com

*Let us assist you GLOBALLY for all of your deposition needs.*

                        STATE OF MICHIGAN

          DEPARTMENT OF ENERGY, LABOR & ECONOMIC GROWTH

               EMPLOYMENT RELATIONS COMMISSION

In the matter of:

AFSCME Council 25,

          Charging Party,

v                              Case No.:  C12-E-0092
                               Docket No.: 12-000777
City of Detroit, a Michigan
Municipal Corporation,

          Respondent.

                         /


                      MOTION HEARING

        BEFORE DOYLE O'CONNOR, ADMINISTRATIVE LAW JUDGE

        3026 West Grand Boulevard, Detroit, Michigan

            Friday, February 8, 2013, 9:00 a.m.

APPEARANCES:

For the Charging Party:    MR. RICHARD G. MACK, JR. (P58657)
                           Miller Cohen, PLC
                           600 West Lafayette Boulevard, Floor 4
                           Detroit, Michigan 48226
                           (313) 964-4454


For the Respondent:        MS. LETITIA C. JONES (P52136)
                           Assistant Corporation Counsel
                           City of Detroit Law Department
                           2 Woodward Avenue, Suite 500
                           Detroit, Michigan 48226
                           (313) 237-3002

Also Present:              Edward L. McNeil, AFSCME Council 25
                           Anita Berry



 1     **RECORDED BY:**                    **Diane H. Draugelis, CER 2530**
                                          **Certified Electronic Recorder**
 2                                         **Network Reporting Corporation**
                                          **Firm Registration Number 8151**
 3                                         **1–800–632–2720**

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 3

1                         TABLE OF CONTENTS

2                                                        PAGE

3

     Statement by Mr. Mack. . . . . . . . . . . . . . . 10,35
4    Statement by Ms. Jones . . . . . . . . . . . . . . 28,37

5

6

7

8                         EXHIBIT INDEX

                                                        PAGE
9

10                                    IDENTIFIED    RECEIVED

11

     Commission Exhibit 1. . . . . . . . .       7           9
12        (2008-2012 Collective Bargaining
          Agreement Excerpt)
13   Commission Exhibit 2. . . . . . . . .       7           9
          (11-8-2011 Letter from Crittendon
14        to City Council)
     Commission Exhibit 3. . . . . . . . .       8           9
15        (10-10-2011 Letter from Crittendon
          to City Council)
16   Commission Exhibit 4. . . . . . . . .       8           9
          (Letter from Corley to City Council)

17

18        (Exhibits retained by Judge O'Connor)

19

20

21

22

23

24

25



**NetworkReporting**
STATEWIDE COURT REPORTERS
800-632-2720

Page 4

1               Detroit, Michigan

2               Friday, February 8, 2013 - 9:11 a.m.

3               JUDGE O'CONNOR:  We're here on Michigan AFSCME

4    Council 25, Charging Party, and City of Detroit in the MERC

5    Case Number C12-E-092, Docket Number 12-000777.  Doyle

6    O'Connor, the Administrative Law Judge with the Michigan

7    Administrative Hearing System hearing this case on behalf of

8    the Michigan Administrative -- no; sorry -- on behalf of

9    Michigan Employment Relations Commission.

10              Appearance of the counsel, starting with Charging

11   Party.

12              **MR. MACK:  Richard Mack, your Honor.**

13              **MS. JONES:  Letitia Jones, on behalf of the City**

14   **of Detroit.  Seated to my right is Anita Berry, from the**

15   **Labor Relations Department, City of Detroit.**

16              **JUDGE O'CONNOR:  Good morning.**

17              **MS. BERRY:  Good morning.**

18              **JUDGE O'CONNOR:  We're here on a motion -- on**

19   **actually cross motions for summary judgment.  I have**

20   **reviewed the pleadings.  I have a couple introductory**

21   **comments, as Mr. Mack is accustomed to my doing.**

22              **The Union's motion for summary disposition in this**

23   **case relates to the adoption of a new City ordinance which**

24   **prohibited the General Retirement System Pension Board, NESA**

25   **Board, which as I understand handles pension questions for**



*NetworkReporting*
— STATEWIDE COURT REPORTERS —
*800-632-2720*

1        all City employees or virtually all City employees other

2        than police and fire.  Anyway, the ordinance prohibited the

3        Board from granting a rate of return on annuities greater

4        than the actual return, and which had the apparent impact of

5        precluding the issuance of the 13th checks to retirees.

6                The Employer has responded and asserted its own

7        cross motion for summary disposition.  There's no dispute

8        over the fact that a changed ordinance was adopted in

9        November of 2011 and that a timely charge was filed.

10       There's likewise no dispute over the fact that the terms of

11       the pension plan are mandatory subjects of bargaining, which

12       the City concedes in its brief.

13               It's alleged, and seemingly undisputed, that in

14       November 2011 the City adopted a pension ordinance to be

15       effective December 20, 2011 which altered certain prior

16       practices of the Pension Board.  That change occurred

17       without bargaining and during the term of an existing

18       collective bargaining agreement.  That existing collective

19       bargaining agreement incorporated by reference the prior

20       version of the pension ordinance and City charter

21       provisions.

22               I want to note, because it's a procedural question

23       of some importance, City raised the concern with the

24       identity of the Charging Party.  The motion was brought as

25       captioned solely on behalf of AFSCME Council 25 and its



1    several locals and not on behalf of the so-called coalition

2    of Detroit Unions, to which a passing reference is made in

3    the original charge, even though the coalition was not

4    listed as a charging party.  Unless I'm told otherwise

5    immediately, my consideration of arguments is limited to

6    AFSCME Council 25 and its various subordinate locals.

7                    MR. MACK:  That is correct, your Honor.

8                    JUDGE O'CONNOR:  Okay.  I thought so, and I

9    thought it was good the City raised it because the worst

10   thing possible is to end up not knowing who is fighting over

11   what.

12                    All right.  Based on the pleadings I have relied

13   on the terms of several documents which both sides relied

14   on, and I'm going to list them, and I guess I will

15   denominate them as exhibits, even though I don't have copies

16   prepared.  You both have them.

17                    So Commission Exhibit 1 is the 2008 to 2012

18   Collective Bargaining Agreement, which I think is attached

19   in part to one of the pleadings.

20                    MS. JONES:  Respondent Pleading Number -- Letter

21   A.  I'm sorry.

22                    JUDGE O'CONNOR:  All right.  And that's an

23   excerpt.

24                    MR. MACK:  Yes.

25                    JUDGE O'CONNOR:  Is it acceptable to both parties



1        that I just treat the excerpt as the exhibit or does

2        somebody want to submit the whole contract?

3                    MR. MACK:  I think the excerpt is fine.

4                    JUDGE O'CONNOR:  Okay.  We'll mark the excerpt,

5        and I will clean up the file on this later.  We'll mark the

6        excerpt as Commission Exhibit 1 as attached to the

7        Employer's brief at Tab A.  I'll just copy that, mark it as

8        Commission Exhibit 1 and put it in the file.

9                    (Commission Exhibit 1 marked)

10                   JUDGE O'CONNOR:  Commission Exhibit 2 will be the

11       November 8, 2011 letter by Corporation Counsel Crittendon --

12       I guess I should say former Corporation Counsel

13       Crittendon -- to the City Council attaching the then

14       proposed ordinance, and that's attached to somebody's -- I

15       think the City's brief again.

16                   MS. JONES:  Exhibit C?

17                   JUDGE O'CONNOR:  Yes; Exhibit C to the City's

18       brief will be Commission Exhibit 2.

19                   (Commission Exhibit 2 marked)

20                   JUDGE O'CONNOR:  There's then a Commission Exhibit

21       3 will be an October 10, 2011 letter to the City Council by

22       Crittendon, which is at City Tab D.

23                   MS. JONES:  As well as AFSCME D.

24                   JUDGE O'CONNOR:  Right.  And both sides relied on

25       all these things in whole or in part.



 1              (Commission Exhibit 3 marked)

 2              JUDGE O'CONNOR:  4, Commission Exhibit 4, will be

 3    a letter from City Council Financial Analysis Division

 4    Director Corley -- that's C-o-r-l-e-y -- to the City

 5    Council, which incorporated Corley's description of the

 6    pension plan's prior practice, and attached to that was an

 7    analysis and related charts prepared by the City Council for

 8    actuary -- by Actuary Joseph Esuchanko -- that's

 9    E-s-u-c-h-a-n-k-o.  The Union attached one of Esuchanko's

10    charts to its brief as I recall.

11              MR. MACK:  That was --

12              JUDGE O'CONNOR:  It looked the same.

13              MR. MACK:  Yeah, it was similar data.  It was not

14    actually an Esuchanko chart, it was just a chart provided to

15    the Union by the City at some point.

16              JUDGE O'CONNOR:  Anyway, I'm marking -- and that's

17    the Corley/Esuchanko document is at Tab E of the City's

18    brief.

19              (Commission Exhibit 4 marked)

20              JUDGE O'CONNOR:  All right.  Has anybody got any

21    objection to any of those?

22              MR. MACK:  No.

23              MS. JONES:  That's fine.

24              JUDGE O'CONNOR:  They lay the ground work for how

25    we got where we are today.  As I understand it, the Union's



1    assertion is that the change was an unlawful unilateral

2    change in an existing condition of employment, and a

3    repudiation of the then in place collective bargaining

4    agreement.

5              The Union's motion is additionally supported by

6    facially competent affidavit.  Oh, I should note -- I don't

7    think I expressed this.  I am admitting Commission Exhibits

8    1 through 4.

9              (Commission Exhibits 1 through 4 received)

10             MR. MACK:  Okay.

11             JUDGE O'CONNOR:  The City earlier asserted the

12   defense that the question of the Pension Board's exercise of

13   discretion in the distribution of excess earnings was not an

14   established condition of employment, and rather was in

15   essence an ultra vires act by the Board.  The Union

16   addressed that assertion at least in part by its reliance on

17   the decision in AFSCME v Detroit, 218 Mi App 263, 1996, in

18   which the City prevailed.  In that case the City had sought

19   a similar change regarding distribution of excess earnings,

20   in that case via charter amendment, and according to the

21   Court, the City acknowledged at the time that no such change

22   can actually be implemented without first bargaining because

23   the then current system of distribution of earnings was an

24   established condition of employment.

25             As both parties are presumably aware, the wisdom



1    of the prior practice and the wisdom of the ordinance change

2    are not issues before me for review.  The only question

3    before MERC is whether a change in mandatory conditions of

4    employment was implemented in an unlawful manner.

5    Similarly, the wisdom of the Court of Appeals decision in

6    1996 was not before me.  It's a published decision involving

7    these same two parties.

8              All right.  Unless there's any procedural

9    questions, issues, the Union filed the first motion, so

10    you're going first.

11              MR. MACK:  Thank you, Judge.  Judge, you've laid

12    out clearly the background concerning the nature of this

13    dispute.  This is a dispute concerning the practice that has

14    been going on as the City even acknowledges, since the early

15    '80's concerning the distribution of earnings from

16    investments of the City of Detroit Retirement System.  The

17    outline of exactly what has been happening since the early

18    '80's is as follows.

19              The Retirement Board, which is appointed in large

20    part by individuals who are either elected from

21    employment -- positions of employment with the City of

22    Detroit retirees, and there are some appointees from the

23    mayor and the City Council, but the majority of the Board

24    represents either employees or retirees.  This Board will

25    have an actuary establish an actuarial rate of return,



Page 11

1    essentially an expected rate of return as to how the

2    investments of the Retirement System should perform in the

3    market.  In the event that those investments perform above

4    that level -- 7.9 percent has been the level for the last I

5    think almost 10 years -- what the Board will then do is

6    treat the earnings above that level of performance in what

7    are called excess earnings.  The Board then decides to

8    distribute those excess earnings in three different ways.

9    They will allocate a portion of the excess earnings to

10   retirees into what is known as the 13th check.  Usually came

11   around December.  This is just additional check going to

12   retirees.  They will allocate a portion of those earnings to

13   active employees as an enhancement into their annuity

14   accounts.

15            Describing that a bit, active employees have

16   options to contribute either three, five or seven percent of

17   their salary into an account, and the City contributes some

18   as well.  For years when the Retirement System performed

19   above that actuarial estimated percentage, 7.9 percent for

20   instance, a portion of those excess earnings are given to

21   those active employees into their annuity accounts so that

22   the interest rate of investment for purposes of that year in

23   the annuity account is enhanced.

24            So, for instance, if normally the market performed

25   at "X" percent for that year, the City will treat the



1    earning in the annuity account as a little bit more so that

2    basically they get more money into the annuity account, and

3    it's cash in their pocket essentially.

4              And then the third way that they allocate these

5    excess earnings is by having the City's contribution to the

6    Retirement System reduced by a certain amount by whatever is

7    remaining.  Every year the City makes -- actually, every

8    month -- the City makes a contribution into the Retirement

9    System.  The City general fund makes a contribution into the

10   Retirement System representing its liability toward that

11   system for employees on the rolls who are expected to be

12   retiring.  And it makes that -- the Retirement System Board

13   would take the third portion of the excess earnings and

14   reduce what the City is responsible for contributing of

15   that.  And this was a practice that as the City indicated in

16   an affidavit that was attached to its motion, and even

17   earlier, had been going on for decades.  I note specifically

18   in Tab B, the affidavit of Marilyn Roc Berdijo, and she

19   indicated that she worked for the General Retirement System

20   for approximately 24 years and three months, and she has

21   been the assistant executive director of the General

22   Retirement System since January of last year, and she says:

23              "I can testify that in each year when there were

24          excess earnings, the Board would make decisions on

25          crediting those accounts within the retirement system



1            with the earnings.  This is the understanding that the

2            term excess earnings -- excess is defined as funds

3            above the actuarially assumed rate."

4                 So there's an acknowledgment that this happened.

5        There's an acknowledgment that the Board made these

6        distributions.  Such an acknowledgment, Judge, that in the

7        case that you just referenced, which I have is Senior

8        Accountants Analyst and Appraiser's Association versus City

9        of Detroit, 218 Mi App 263, in that case I think it's

10       important for two reasons that I highlight now for you.

11                The first is that the leaders of the City of

12       Detroit at that time felt it important to end this practice.

13       They felt that the only way they could end the practice of

14       making the distributions into these funds, the three-way

15       distribution of excess earnings that I've just described, is

16       by placing a charter amendment before the city voters to end

17       the practice.  So, in other words, it was their opinion that

18       this practice was not only an established practice as we

19       know in labor law, but it was something that was so

20       established that you couldn't change it without a charter

21       amendment.

22                The second part, of course, is that in that

23       case -- I'll get to it a little bit later -- but they

24       acknowledged that they did in fact have to bargain the

25       change with the Union in the event that the charter



1    amendment was successful, which of course, gets into our

2    theory of judicial estoppel.

3              So that's the practice.  The facts, as you

4    indicated, are really beyond dispute.  We have the affidavit

5    of June Nickleberry.  Her real name is Armella Nickleberry.

6    I don't think I remembered that.  But she's the president of

7    Local 214, as well as the president of the City of Detroit

8    Presidents.  So there's an organization City of Detroit

9    Presidents; all of the AFSCME presidents who represent City

10   of Detroit employees have an organization where all 18 of

11   them together, and she's the head of that group as well.

12   And she actually pulled her annuity statements for several

13   years that she could locate them and demonstrated the

14   existence of this practice where, in fact, when the returns

15   were above 7.9 percent, her annuity reflected an investment

16   beyond that amount.  And in one year, as an example,

17   paragraph three of her affidavit, the investment was 15.9

18   percent.

19             So the other part to this practice, Judge, it's

20   important to note is that when there was a return in the

21   market that was below the expected return, assumed rate of

22   return, 7.9 percent as the example, the annuity account and

23   the retirees still received some -- I'm sorry.  The annuity

24   account still received some contribution.  So, in other

25   words, the 7.9 percent, the expected rate of return was seen



1    as a floor, so any investment rate of return below that

2    amount, it was still treated as if 7.9 percent had in fact

3    been realized in the market investments irrespective of what

4    was actually realized.

5              This ordinance change changed things in two

6    respects with respect to this practice.  The easiest way to

7    describe it with respect to the annuity is that it took the

8    7.9 percent from being a floor to being a ceiling.  And as

9    far as the 13th check, it eliminated the 13th check practice

10   altogether.  So this was done, as you've indicated, and it's

11   not been disputed without bargaining really, without notice

12   as Ms. Nickleberry indicates, the president of Detroit

13   Presidents, she would have been one of the individuals

14   contacted if the City wanted to alert the unions of the

15   potential change in practice for the purpose of bargaining.

16   Of course, at that time they were in the middle of a

17   contract, so under law, there really was no obligation of

18   the Union to have bargained.  But nonetheless, the City did

19   not attempt to make efforts at bargaining, but merely went

20   forward with the change, introduced it, and as of November

21   the 30th, the new ordinance came into effect which

22   eliminated the floor of the expected rate of return for the

23   annuity accounts, and as a matter of fact, it created it as

24   a ceiling, so now for annuity accounts, in the event that

25   there is a rate of return that's above 7.9 percent, the



1    investment -- let me phrase it right.  The annuity accounts

2    only seeks 7.9 percent.  So if there is a, for instance, as

3    she testified in the event of -- I think it was just this

4    past year in 2012 -- there was a -- her paragraph five of

5    her affidavit indicates that her understanding is that the

6    GRS rate of return for its investments would have been 20.9

7    percent.  However, the annuity investment rate was now

8    capped based on the ordinance at 7.9 percent.  And the

9    ordinance language lays that out clearly that it is now

10   capped.  So the expected rate of return that's determined by

11   the actuary went from being a ceiling -- went from being a

12   floor to a ceiling.  And that actually, Judge, amounts to a

13   taking of sorts.  If I'm a City employee and I put my money

14   into an annuity and that annuity performs beyond 7.9

15   percent, the City is still capping me at 7.9 percent

16   regardless of what my money actually did in the market.  But

17   you're not dealing with Constitutional issues, you're

18   dealing with parity issues, not unless it's a cap and it's a

19   significant change which results in a significant loss.

20          If you look at the charts that have been provided

21   by both sides in what you've deemed Exhibit B, I believe it

22   is.

23          JUDGE O'CONNOR:  4.

24          MR. MACK:  4.  I'm sorry.

25          JUDGE O'CONNOR:  That's Corley/Esuchanko.



1                    MR. MACK:  Yes.

2                    JUDGE O'CONNOR:  Is that Tab E on the City's

3      brief?

4                    MR. MACK:  Yes.  Thank you.  You can see the value

5      of what this actuary lays out was actually contributed and

6      should have been contributed.  And he lays out that there is

7      this is -- page nine of his report, the bottom indicates,

8      "The approximated accumulated cost to the City due to excess

9      earnings being distributed to DGRS, Detroit General

10     Retirement Service members, rather than being applied to the

11     contractual DGRS benefits is 1.9 to 1.2 billion dollars."

12                   JUDGE O'CONNOR:  That's a lot of money.

13                   MR. MARK:  So over the course of time, it's a lot

14     of money.  And again, this was a practice that was set up

15     decades ago by City leadership, consultation with the Union

16     membership.  At the time they had actuaries, and at the time

17     they I'm sure were told the financial consequence of the

18     practice.  Nonetheless, they put the practice in place and

19     we in the state of Michigan still have labor laws which

20     provide that if you're going to change a practice which is a

21     mandatory subject of bargaining, the way to do that is to

22     approach the Union.

23                    As a side note, I think that had the City

24     approached the Union in a reasonable fashion with the

25     proposed changes, a way to save some money, they would have



1    found the same ear that they found last year when the City

2    unions gave well over $100 million in concessions to the

3    City.  But again, it's unfortunate that the City opted not

4    to go that route, but instead decided to make a unilateral

5    change in the middle of an existing bargaining agreement.

6            The Tab E that we attach to ours is a different

7    formulation; Exhibit E to our motion for partial summary

8    disposition.  What this chart shows, and this is again a

9    chart created by the General Retirement System, what this

10   chart shows is the amount of real dollars placed into each

11   of those three pots year after year as a result of the

12   excess earnings.  And you can see the retirees earn anywhere

13   from -- one year, 1995, they didn't earn anything because

14   they don't get -- they did not get a 13th check when the

15   excess earnings did not exceed or did not at least reach

16   that 7.9 percent.  They didn't lose any other, their normal

17   pension checks, but they did not receive the 13th check.

18   But in every year where the savings were as such, they

19   received it.  And then as I indicated for the annuity

20   accounts, they are -- it's not excess in that the

21   investments weren't seen as beyond 7.9 percent, but again

22   the floor was at 7.9 percent, so the columns marked in here

23   zero indicate a -- that there was no dollars above the 7.9

24   percent rate.  And again, all of this is laid out in their

25   quarterly report and the Krystal Crittendon letter, so there



1    really isn't any dispute as to how this money was allocated.

2             So the change came into effect as indicated on

3    November the 30th without bargaining.  Those are the facts.

4             The City makes --

5             JUDGE O'CONNOR:  Let me ask just for a second.

6             MR. MACK:  Sure.

7             JUDGE O'CONNOR:  Any objection to marking the

8    Union's Exhibit E as --

9             MS. JONES:  We don't know where he got "E" from.

10   He is claiming that it's from the General Retirement System,

11   but there is no verification of that.

12            JUDGE O'CONNOR:  That's the objection; fine.  Go

13   on.

14            MR. MACK:  I wonder if Ms. -- okay.  There are a

15   couple of legal defenses raised by the City to the general

16   argument, first off, that this was a unilateral change in

17   the mandatory term and condition of employment.

18            There's no dispute that the benefits that we're

19   addressing here were, in fact, mandatory subject to

20   bargaining.  The Macomb County case which is cited in our

21   brief at 294 Mi App 149, and specifically on page 160, makes

22   clear that "Retirement or pension benefits and methods of

23   calculating them are mandatory subjects of bargaining."

24            Here there is no dispute that these benefits are

25   benefits that are realized by active members.  First off,



1    active members are those who hold the annuity accounts.

2    When monies are distributed into the annuity accounts, it's

3    active members who realize that benefit.  The retirement

4    benefits are benefits realized by active members upon

5    retirement.  Again, case law is clear.  Not only the Macomb

6    County case, but many other cases within MERC precedent

7    make very clear that benefits afforded to active members

8    upon retirement are, in fact, mandatory subject to

9    bargaining that they enjoy as active members.  It's part of

10   their retirement package as it were.  So the loss of this

11   13th check has an impact on active employees.

12           The other argument that the City raises as to why

13   this is not a unilateral change is because it was an

14   issue -- it was a change made by the -- it was a practice

15   done by the Retirement System and not the City of Detroit,

16   and they felt the Retirement System for all of these decades

17   was acting ultra vires.  It was acting beyond the scope of

18   its authority.  And again, the best case to point to with

19   respect to that is the City's response, if, in fact, that

20   were the case, was in 1996, or actually earlier, to try to

21   change the charter with respect to this practice.  So the

22   City obviously took the position back then that the practice

23   was within the charter because it felt it needed a change to

24   the charter in order to adjust the practice.  The City's

25   response was not to say, "Board, we're suing you to enjoin



1    you from continuing to violate the charter and the

2    ordinances," it was to, "Let's change the charter to make

3    illegal your practice," which obviously was, at the time,

4    legal and currently today legal.

5              In addition to that, the Macomb County case again,

6    pages 159 to 160, cite to what established the precedent

7    stating, quoting, "Employer was responsible for its

8    bargaining obligations regardless of whatever actions are

9    taken by an independent Pension Board," and it cites the

10   Detroit Police Officers Association case versus City of

11   Detroit, 212 Mi App 383, on page 390, and then it even says,

12   quote, "It is even improper for an employer to remove a

13   subject of mandatory bargaining from the scope of PERA by

14   assigning its management to a body insulated from PERA,"

15   close quote.

16             And for the City to argue that you've been

17   breaking the law all this time, but we tried to change the

18   law back in the early '90's, and we then actually changed

19   law again in November 2011 is a conflict of an argument

20   which is not resolvable.

21             The City of Detroit case, what I call the SAAA

22   case, I think makes out best our argument as to why this

23   Commission should judicially estop the City from claiming

24   that this mandatory subject of bargaining is not, in fact, a

25   mandatory subject of bargaining that requires bargaining to



**NetworkReporting**
STATEWIDE COURT REPORTERS

800-632-2720

1    change.

2           In that case as indicated the City sought -- City

3    administration sought a change in the charger language in

4    order to prohibit the excess earnings practice, and when the

5    City of Detroit was sued by the Unions as AAA AFSCME to

6    prohibit them from going forward with the change in the

7    charter, arguing that this change would infringe upon a

8    mandatory subject of bargaining with respect to us and it

9    has to be bargained first, the City's response was, "Wait a

10   minute.  Wait a minute.  We'll bargain.  We can't change

11   this until we bargain it with the Unions."  So the City laid

12   out to the court in response to the Union's request for

13   injunctive relief, emergency injunctive relief, the City's

14   defense was, "We have a two-step process in order to have

15   this change applied to unionized City workers.  The first of

16   the two step process is we have to get it passed on the

17   ballot.  We have to change the charter because currently

18   it's legal and we have to make it illegal."

19          The second of the two-step process is we have to

20   bargain the change with respect to unionized workers.  And

21   we realize that we have to bargain that change.  The Court

22   denied the injunction, Court of Appeal in its opinion

23   approved the denial of the injunction by saying in part,

24   City acknowledges it has to bargain, so there is no

25   irreparable harm that the City would suffer because the



**NETWORK**Reporting
— STATEWIDE COURT REPORTERS —
800-632-2720

1      City -- I'm sorry -- that the Unions would suffer because

2      the City realizes that if the change comes into effect, it

3      will have to bargain it with the Unions.  It won the case on

4      that basis.  It was successful in defeating the City's --

5      the Union's attempt at seeking an injunction.

6           For the City now to come and claim that this

7      unilateral change is not a violation of PERA and it does not

8      have to bargain with the Unions first is in violation of the

9      Doctrine of Judicial Estoppel, and we lay that out in our

10     brief.  The brief indicates the rising of the judicial

11     estoppel is, quote:

12           "A rising from equitable estoppel.  It's a

13           doctrine that one may not take inconsistent positions

14           during legal proceedings.  The Doctrine of Judicial

15           Estoppel concludes a party as a matter of law from

16           adopting a legal position in conflict with one earlier

17           taken in the same or related proceeding."

18     And we analyzed the Spohn v Van Dyke Public Schools case

19     which lays out how one party in that case took a position in

20     one venue and then took a -- one based on that position, and

21     then took an opposite position in a different venue and it

22     was judicially estoped from advancing that legal theory.

23     And that's exactly what the City is doing here, so we think

24     that this ought to be declared a unilateral change and a

25     mandatory subject of bargaining.



1        We also argue that this constitutes repudiation,

2    and repudiation of not only express language of the contract

3    and the incorporated language of the charter and ordinances,

4    but also a past practice which is now engrafted into the

5    contract as a result of 30-some years of practice at least.

6        A repudiation exists when there's a substantial

7    contract breach, there's a significant impact on the

8    bargaining unit and there's no bonafide dispute over the

9    interpretation of the contract.

10        Here the contract breach you have is substantial.

11    It impacts every single AFSCME member who has an annuity,

12    and every single AFSCME member who is subject to retirement

13    from the City of Detroit; that's all of them.

14        The significant impact is that what the one

15    actuary indicated over the years $1.9 billion, so we're

16    talking about a lot of money.  And the chart lays out

17    dollars year by year, so it's a significant amount of money

18    for the individuals involved.

19        And then, finally, no bonafide dispute over the

20    interpretation of the contract.  Well, the best evidence of

21    that is Corley report, the Krystal Crittendon report, the

22    other documents from the City which lay out the practice as

23    to how it went, the affidavit of the City's affiant, Ms.

24    Nickleberry, the Charging Party's affiant.  There's no

25    dispute over the fact that this practice did, in fact,



1    exist.  It is, in fact, a past practice, and we lay out the

2    law with respect to that.  This is the Amalgamated Transit

3    Union form of past practice as opposed to Port Huron form of

4    past practice.

5              Of course, Amalgamated lays out that:

6              "If a collective bargaining agreement is ambiguous

7         or silent on the subject for which a past practice is

8         developed, there need only be a tacit agreement that

9         the practice would continue."

10             Port Huron is applicable when there is conflicting

11   language within the contract and the parties are seeking to

12   treat the practice as part of the contract which conflicts

13   with already existing language, and that is a higher

14   standard of proof involved in clear and express.  But we

15   don't have that here.  We have an agreement on the practice.

16   So we think that this falls squarely within the realm of a

17   repudiation as well.

18             And, finally, the City did raise a claim about how

19   the retirees are not proper parties to this matter.  I've

20   laid out earlier how these retirees -- well, when the charge

21   brought on behalf of active employees who have lost the

22   annuity enhancement and have lost the opportunity for the

23   13th check upon retirement, but in addition to that we

24   believe that this court could look at the West Ottawa

25   Education Association case, 126 Mi App 306, or the City of



1    Trenton opinion, no exceptions, 24 MPER, paragraph 26 out of

2    2011, for the doctrine that if a change can constitute a

3    mandatory subject of bargaining if, quote, "the concerns

4    bodily effect the terms and conditions of employment of

5    active employees," close quote.

6           And what you have here is a change in an

7    ordinance, a retirement ordinance which impacted everybody.

8    The City did not parse out how it would treat actives versus

9    retirees, but it lumped them all together, and when you have

10   a provision to -- when you have a change which impacts

11   retirees and actives and is intertwined in that fashion, the

12   change will constitute a mandatory subject of bargaining, so

13   even if there is some claim that this charge is not brought

14   on behalf of active employees, that argument ought to

15   encompass the change that was made to the ordinance as well.

16          So with that, if there are no questions, we ask

17   that this Commission order that the status quo be returned,

18   that there be back pay, back benefits made, all individuals

19   impacted made whole, with respect to the 13th checks, with

20   respect to the annuity enhancement losses, and that there be

21   an order to bargain, and that the order to bargain will be

22   that the City has an obligation to maintain that status quo

23   throughout bargaining until there is a legitimate good faith

24   impact.

25          JUDGE O'CONNOR:  The collective bargaining



1        agreement, the 2008-2012, has it expired?

2                      MR. MACK:  Yes.

3                      JUDGE O'CONNOR:  It hasn't been extended?

4                      MR. MACK:  Okay.  I'm going to hear from the City

5        next, but why don't we take five.

6                      (Off the record)

7                      JUDGE O'CONNOR:  Back on the record.  All right.

8        From the City?

9                      MS. JONES:  Okay.  Brother Counsel and I had some

10       discussion.  We note in your introductory comments that you

11       were admitting four of the exhibits, and we were wondering

12       why all of the exhibits were not being considered by the

13       Commission.  I shouldn't say "all," because I am objecting

14       to the one, but --

15                      JUDGE O'CONNOR:  The reason I selected the ones I

16       selected was you both relied on them.

17                      MS. JONES:  Okay.

18                      JUDGE O'CONNOR:  And they seemed undisputed of

19       origin.  If there's something else that either side wants to

20       propose, the other side doesn't object to, I'll admit it,

21       too, but I picked the ones that seemed public records and

22       undisputed.

23                      MS. JONES:  Did you want your affidavit in?

24                      MR. MACK:  The discussion was about the affidavits

25       in particular, whether they have to be exhibits or are they



Page 28

1       just more like testimony.

2                   JUDGE O'CONNOR:  Well, I don't think the

3       affidavits have to be admitted as exhibits.

4                   MS. JONES:  Okay.

5                   JUDGE O'CONNOR:  I'm fine with admitting them as

6       exhibits.  It keeps the record a little bit cleaner.  You

7       both have affidavits.  If you both want them admitted,

8       that's fine.  I don't care.  They're attached to the

9       motions.

10                  MR. MACK:  Yeah, that's correct.

11                  MS. JONES:  Okay.  That's fine.

12                  JUDGE O'CONNOR:  Good enough?

13                  MS. JONES:  Good enough.

14                  MR. MACK:  That's fine.

15                  JUDGE O'CONNOR:  Okay.

16                  MS. JONES:  Okay.  Specifically Brother Counsel

17      gave you quite a bit of background, so I won't belabor the

18      record with a lot of background.

19                  The issue before you is whether a change in

20      mandatory conditions of employment was implemented in an

21      unlawful manner, and specifically the City of Detroit states

22      it has not been implemented in an unlawful manner.  The City

23      did concede after reviewing the cases that the judge

24      referred us to, we did concede in our response and counter

25      motion that on page 10 of our motion that it is conclusive



1    that the issue of retirement plans is a mandatory subject of

2    bargaining.

3              So let me get to some of the points that Brother

4    Counsel brought up before I get into my main argument.  He

5    suggests that there is a past practice, and in order to have

6    a past practice as he indicated by the cases he cited,

7    Amalgamated or Port Huron, there has to be either contract

8    language or a tacit agreement, and it is our position that

9    there has not been a tacit agreement; that, yes, it has been

10   over a period of time, but there have been challenges along

11   the way, so it was not necessarily agreed upon, and just to

12   focus on that.

13             Then he suggests that there was a taking because

14   if you remove the floor, the 7.9 as the floor, that

15   constitutes a taking, but yet still when the plan doesn't

16   make the 7.9, wouldn't it also constitute a taking when they

17   get to 7.9 and they -- and it wasn't earned?

18             Finally, as it relates to retirees not being

19   proper parties, and he suggests that based on West Ottawa

20   and City of Trenton that he is bringing it forth because his

21   active members will eventually retire and this is a benefit

22   they'll lose, I refer your Honor to the case on page nine

23   that we reference, Butler versus Wayne County, citing to

24   Allied Chemical.  Butler versus Wayne County is 289 Mi App

25   664.  It's a 2010 case and it cites to Allied Chemical,



1    which is 404 US 157, a 1971 case which holds that the

2    retirees are not members of the Union, they are not

3    employees of the Employer, and therefore, they would not be

4    considered under the Union's realm unless specifically

5    stated in the contract language, and it does not state so in

6    the contract language.

7              Now, that being said, that was just to address

8    some of the points that Brother Counsel brought out.  As it

9    relates to the actual question in this matter, we have what

10   is a mandatory subject of bargaining, which is the

11   retirement plans.  When the ordinance was implemented, it

12   was implemented under the time period when Public Act 4 was

13   still legally in effect.  Thus, it was legally enacted.  It

14   was not implemented in an unlawful manner.  And when I cite

15   the PA 4, let me give you the cite to that.  Michigan

16   Compiled Laws, Section 141.1501 et seq.  Specifically under

17   Public Act 4 there was a provision under specifically

18   Section 10.  It stated that Section 15, the right of

19   collective bargaining was suspended, and that cite is

20   Michigan Compiled Laws, Section 141.1514(a), Section 10,

21   and specifically the ordinance was enacted November 2011

22   with an effective date of December 15th, 2011.  Public Act 4

23   was enacted and in full effect on March 16, 2011.  It was

24   not repealed until November 2012, so the action that was

25   taken by the City to change the ordinance, as well as other



1    terms and conditions of employment to other Unions and

2    members of AFSCME, was legally enacted.  We had no duty to

3    bargain, and even Brother Counsel states in his argument

4    earlier today, he stated something to that effect that the

5    Union, because they were in the middle of a contract, had no

6    obligation to bargain.  The City didn't even attempt to

7    bargain.  But at that point when it was enacted, the City

8    did not have a duty to bargain.

9            So because of that, and there have been numerous

10   cases involving this and involving AFSCME, in fact, and then

11   the most recent case, which is not cited in our motion,

12   counter motion, but was just issued last week, Judge Stern

13   in a MERC decision regarding POAM also agreed with the

14   following -- the holdings of the following cases -- excuse

15   me.  Feel like I'm going to sneeze here.  DPOA versus City

16   of Detroit, which was a case in the Court of Claims;

17   Roberts versus Detroit Board of Education, which was a Wayne

18   County Circuit Court; DPOA versus City of Detroit, Wayne

19   County Circuit Court; City of Detroit versus AFSCME, which

20   was a MERC decision by Judge Peltz, all of these -- and now

21   the Judge Stern decision that came down last week -- all of

22   these acknowledged that when the City imposed or implemented

23   certain terms under PA 4 they had a right to do so and it

24   was not an unlawful implementation of that, of PERA.  And

25   the reason for that is because of that specific language



1    under Michigan 141.1514(a), Section 10, that the duty to

2    bargain was suspended.  And because of that we are asking

3    that you grant in favor of the City that there was no --

4    that the change of mandatory conditions was not implemented

5    in an unlawful manner.

6              And as it relates to the relief requested by

7    Brother Counsel, status quo being restored, back pay remedy

8    and an order to bargain, those remedies, they are bargaining

9    right now I guess as it relates to various terms and

10   conditions before the Right to Work Act comes into play,

11   but -- and before the new emergency management law comes

12   into play, but as it relates to this particular ordinance,

13   we were legally correct in implementing it and we would ask

14   that you rule in our favor.

15             JUDGE O'CONNOR:  Is that it?

16             MS. JONES:  Uh-huh (affirmative)

17             JUDGE O'CONNOR:  Let me ask you, in your brief you

18   refer to PA 4.  You assert that the City was subject to a

19   consent agreement under PA 4.  Today you seem to argue that

20   the duty to bargain generally was suspended by PA 4.  Can

21   you clarify that for me?

22             MS. JONES:  Without having -- I probably should

23   have brought the Act with me.  Without having the Act with

24   me, there is specific language in the Act that states the

25   duty to bargain under PERA has been suspended.



1            MR. MACK:  I can read the Act.

2            JUDGE O'CONNOR:  I'm familiar with the Act.

3    Referring to the Employer's brief at page seven, it asserts

4    that "In March 2011, Public Act 4 was enacted.  With the

5    City being under a consent agreement, the terms requiring

6    collective bargaining under PERA were suspended."

7            MS. JONES:  That is correct.

8            JUDGE O'CONNOR:  When was the City under a consent

9    agreement?

10            MS. JONES:  I don't have the date that the City --

11    April 2012, I'm being told by Ms. Berry, of Labor Relations.

12            JUDGE O'CONNOR:  April 2012?

13            MS. BERRY:  Yes.

14            JUDGE O'CONNOR:  And when was the unilateral

15    change made to the pension plan?

16            MS. JONES:  The plan was made -- the change to the

17    pension plan was in November of 2011, effective date

18    December 2011.

19            JUDGE O'CONNOR:  So the consent agreement doesn't

20    come into play until six months later?

21            MS. JONES:  That is correct.  However, Public Act

22    4 specifically states that PERA was suspended.

23            JUDGE O'CONNOR:  Do you really want to argue that

24    to me?

25            MS. JONES:  That is our argument, that the duty to



1          collectively bargain was suspended during the time period

2          that Public Act 4, when it was in existence.

3                    JUDGE O'CONNOR:  Under what provision of PA 4?

4          The part that says that bargaining is suspended during a

5          consent agreement perhaps?

6                    MS. JONES:  Without -- as I indicated earlier,

7          without the actual Act in front of me, I cannot state that

8          you had to be under an agreement to be -- for Public Act 4

9          to -- the provisions of Public Act 4 to be in existence or

10         be effective.

11                   JUDGE O'CONNOR:  That is what you assert in your

12         brief with the City being under a consent agreement.  I

13         thought it notable that your brief didn't assert when the

14         City was under a consent agreement notwithstanding providing

15         in that same paragraph, and the preceding one, all the

16         effective dates of everything else, you didn't provide the

17         effective date of the consent agreement.

18                   MS. JONES:  And that was my error.  I did not know

19         what the date of the consent agreement, when it started.

20                   JUDGE O'CONNOR:  But you sought to have this

21         Tribunal rely on that in dismissing a claim?

22                   MS. JONES:  I'm relying on the Act, the Public Act

23         4 which states that Section 15 of PERA was suspended.

24                   JUDGE O'CONNOR:  Okay.  Anything else from the

25         City?



1                    MS. JONES:  Nothing else from the City.

2                    JUDGE O'CONNOR:  Mr. Mack, anything further from

3          you?

4                    MR. MACK:  Just on that point, Judge, the Act,

5          Public Act 4 that Counsel for the City is referencing is

6          specifically 141.1514(a), paragraph 10, and it reads as

7          follows:

8                    "Unless the State Treasurer determines otherwise,

9               beginning 30 days after the date a local government

10              enters into a consent agreement under this Act, that

11              local government is not subject to Section 15.1 of

12              1947, PA 336,  MCL 423.215 for the remaining term of

13              the consent agreement."

14                    The consent agreement, I asked the Court to take

15          judicial notice of the fact that the consent agreement was

16          signed on April the 4th, 2012, which meant that that

17          provision, paragraph 10, did not come into effect until 30

18          days thereafter, being May the 4th, 2012.  I think it's

19          apparent that any change made to a unilateral term and

20          condition of employment prior to that date without question

21          certainly is governed by PERA.

22                    As a matter of fact, the coalition, and yours

23          truly, actually, made an argument in a different case before

24          this Tribunal that even that paragraph does not in fact

25          constitute a removal of the duty to bargain in its entirety



1      because there are several other provisions of PERA, namely

2      Sections 9, 10 and 11 which also call for an Employer to

3      have a duty to bargain.  That particular paragraph only

4      removed paragraph 15 of PERA.  But nonetheless, that

5      paragraph was not in effect because the ordinance change was

6      not made.  And all of the cases that Counsel cited to,

7      whether it be the Robert Davis case, whether it be the Judge

8      Manderfield ruling, the Judge MacDonald ruling, even Judge

9      Stern's recent ruling, the POAM case, all of those cases

10     addressed changes that were made to terms and conditions of

11     employment post the May 4, 2012 execution or effective date

12     of the paragraph 10 of PERA -- of PA 4 rather.  They did not

13     involve anything that which took place prior to.  So none of

14     those cases are relevant here.

15            And finally I note that on the Krystal Crittendon

16     letter of October 10, 2011, page six of that letter, she

17     does go into --

18            JUDGE O'CONNOR:  Let me get to that in a second.

19     Page six?  Okay.  Got it.

20            MR. MACK:  Nothing but that was where she

21     addressed the labor law considerations, and, of course, she

22     does not raise any argument that there is no duty bargain,

23     Public Act 4, it's in existence and therefore, we had the

24     right to make this unilateral change.

25            That's all, Judge.



1           JUDGE O'CONNOR:  Does the City want to do any

2      response?

3           MS. JONES:  I'm trying to get to the letter.

4           JUDGE O'CONNOR:  Sure.  In particular I want you

5      to focus on whether you want to withdraw your argument as to

6      PA 4.

7           MS. JONES:  As it relates to PA 4, no, I do not

8      want to withdraw that argument, but I do wish to speak to

9      what Brother Counsel just brought up about labor law

10      considerations.

11           Her labor law considerations is speaking to the

12      fact that we can't give unbargained for benefits on Union

13      members.  I guess his argument is in the same vein, you

14      can't take them away without negotiations.  But we are

15      acknowledging in her letter that there is collective

16      bargaining process as it relates to these benefits.

17           JUDGE O'CONNOR:  Anything further from the City?

18           MS. JONES:  No.

19           JUDGE O'CONNOR:  All right.  I am prepared to

20      issue a bench opinion, which will be followed by a written

21      decision.  The time for filing exceptions to the written

22      decision, to the decision, begins to run on the date the

23      written decision is issued, not today.  So today really is a

24      preview of what will be inserted into a written decision.

25           I should note for the record that Judge Tyra



1    Wright has joined us and is sitting in the back of the

2    courtroom.   She sometimes observes the trials.

3              I find that this case is controlled by the

4    indistinguishable decision in the 1996 published Court of

5    Appeals decision involving these same parties, AFSCME and

6    Detroit.   It's further controlled by judicial estoppel where

7    the City prevailed in that case by asserting the very thing

8    they deny today, and that is the City, in the '96 case as

9    recounted by the Court of Appeals conceded, as it must have

10   done under the then existing law, that regardless of charter

11   provision or any change to it, regardless of ordinance or

12   any change to it, the City could not unilaterally change

13   aspects of the pension plan without bargaining first with

14   the Union.

15             The City today acknowledges in its brief duty to

16   bargain, but asserts to the contrary, there was no duty to

17   bargain under PA 4, which I'll address in a minute.

18             The City never addresses, either in oral argument

19   or its brief, the impact of the clearly controlling

20   published decision between these same two parties.  I find

21   that shocking and troubling that it wasn't even addressed,

22   because it is so clearly controlled.

23             The City, in the 1996 decision, sought to change

24   by charter amendment the very issue, or at least part of the

25   very underlying issue at stake here today, and that is the



1    Pension Board's allocation of excess earnings.  In 1996 the

2    City sought to change it by charter amendment.  In 2011 they

3    sought to change it by pension ordinance change.  That is

4    not a distinction where the question is was there a duty to

5    bargain.

6              Then and now there was no factual dispute; there

7    is no factual dispute.  The excess earnings have always been

8    allocated at the discretion of the Pension Board.  The Union

9    has argued that that's a binding past practice.  The City

10   asserts that it wasn't mutual.  I find the assertion of a

11   lack of mutuality frivolous given the prior litigation,

12   given the City's concession in the prior litigation that it

13   was an established prior practice.  It's also -- I also find

14   it frivolous based on the exhibits produced by the City in

15   this case.  The Corley letter, which was an advice letter to

16   City Council by its own staff which recounts in very

17   specific terms that there was an existing prior practice

18   that was well recognized, but the City did not like that

19   prior practice and wanted to change it, but acknowledging

20   with incredible specificity that the prior practice that

21   existed for over 20 years, spelling out year by year the

22   amount of money allocated by the Pension Board over the

23   City's concern about how it was being allocated, but with

24   the City's acquiescence in collective bargaining agreement

25   after collective bargaining agreement, and the City



1   repeatedly re-adopted collective bargaining agreements,

2   including the 2008-2012 agreement which was initially

3   unilaterally imposed on the Union and then expressly

4   acquiesced by the Union which incorporates by reference the

5   very pension ordinance that the City sought to unilaterally

6   change.  It was more than a tacit agreement.  It was an

7   express agreement with full understanding by both parties.

8            Then -- in 1996 that is -- and now, in --

9   actually, before the change in 2011.  The excess earnings

10  have always been allocated at the discretion of the Pension

11  Board.  The Board as set forth in the City's exhibits

12  allocated the so-called excess earnings, that is earnings

13  above a projected target rate of return, to essentially

14  three different things or three funds; the retiree 13th

15  check, and secondly to supplement the holdings in individual

16  employee annuity funds and to reduce the City pension

17  contribution.  The Esuchanko charts which the City submitted

18  made clear that in each and every year where there were

19  excess earnings the Pension Board allocated them amongst

20  those three funds at the Pension Board's discretion and in

21  roughly comparable amounts each time.

22            There was no dispute even in 1996 the practice had

23  been longstanding.  It's obvious that the City's preference,

24  for understandable reasons, was to change that practice.  It

25  attempted to do so unilaterally in 1996 and again in 2011.



1       As I said, I see no distinction between the City's

2   unilateral effort to change it by pension ordinance or by

3   charter amendment.  In each case, as the City rightly

4   conceded in 1996, regardless of a change to those ordinances

5   or charter provisions, the duty to bargain remained.

6           In the 1996 decision, which is a published

7   decision binding on the parties and binding on me, the Court

8   recounts that the City in response to AFSCME's challenge,

9   quote, "Agrees that the challenged provision cannot be

10   legally implemented even if enacted by the voters without

11   first bargaining," close quote.

12           The City's concession in 1996 that there was a

13   duty to maintain these precise conditions of employment

14   absent bargaining was correct under the law then, and

15   remains correct under current case law interpreting PERA.

16   Regardless, I would otherwise find the City bound by res

17   judicata and by collateral estoppel by that 1996 decision

18   involving these two parties before me today on that same

19   mixed question of fact and law.

20           I think it's particularly notable -- why don't we

21   add who just came in at counsel table?

22           MR. MACK:  Yes.

23           MR. MCNEIL:  Good morning.  Ed McNeil, Special

24   Assistant to President Alvin Garrett, Michigan AFSCME

25   Council 25.



1           JUDGE O'CONNOR:  Wanted to make sure it was in the

2      transcript.

3           It's particularly notable that one of the earliest

4      cases interpreting and enforcing PERA involved the City of

5      Detroit and the DPOA, and an assertion by the City, and this

6      was in the early '70's.

7           MR. MACK:  '74.

8           JUDGE O'CONNOR:  Counsel for the Union indicates

9      it was '74.  I was just going by vague recollection.

10     Because it is such black letter law, I don't have to

11     remember the cite to the case.  I'll insert it in the

12     decision.  But in the Detroit DPOA case the City asserted,

13     "We don't have to bargain about pensions because they're

14     controlled by our charter, and our pension ordinance," and

15     the Michigan Supreme Court said, "You're wrong.  You've been

16     wrong since 1974."  You were wrong in -- you were right in

17     1996 in acknowledging that they had to bargain before they

18     could make a change, and it's not just wrong, but frivolous

19     today to argue otherwise.

20          The Union Counsel cited to the Macomb County Court

21     of Appeals decision, another more recent decision which

22     again involved a change in what the Court found to be a

23     tacitly agreed-upon, very arcane question under the pension

24     plan of the use of a particular actuarial table, whether it

25     was mixed gender or single gender use of the actuarial



1      table.  In that case the Court of Appeals upheld MERC's

2      finding that a unilateral change by an Employer to something

3      as arcane and minute an impact as which actuarial table to

4      use, a mixed, or a blended or a single table, was a

5      violation of the duty to bargain.  MERC's case law has long

6      held that an attempt -- the NLRB makes the same findings --

7      but an attempt by an Employer to unilaterally change a

8      process that involves a particular decision maker or

9      discretionary decision making process to a unilateral

10     Employer decision is an unlawful change in existing

11     conditions of employment.

12              The City adopted the change and dispute in this

13     case by amending a pension -- not just amending a pension

14     ordinance.  It's undisputed that after the pension ordinance

15     was adopted, the City unilaterally implemented that change,

16     unlike the position the City took in 1996 which was that

17     they needed to change the charter, and that even if the

18     charter were changed, which has a higher status than a

19     pension ordinance, the City acknowledged they would still

20     not be able to implement the change until they bargained

21     with the Unions over it.  Here the City threw out that

22     concession and actually implemented the change without

23     bargaining.

24              It's undisputed and supported by affidavit

25     submitted by the Union and not contradicted by the City,



1    that in each year in which there were excess earnings, the

2    Pension Board allocated those earnings, then divided the

3    monies as I've described into three separate pots,

4    essentially; part to reduce the City's contribution under

5    the defined benefit plan, part to the 13th check and part to

6    the annuity accounts.  The Corley and Esuchanko documents

7    submitted by and relied on by the City unequivocally

8    establish that the practice was consistent and of

9    longstanding.

10                   Again, the 1996 Court of Appeals decision alone

11   would have regardless established this process was an

12   established condition of employment.  If it existed in 1996

13   and still existed in 2011, it's an established condition of

14   employment.

15                   The change directly affected an existing and

16   fundamental condition of employment.  Again, Detroit versus

17   DPOA held that pension plans and promises made under them

18   were a fundamental condition of employment such that the

19   City of Detroit had to bargain over them in the DPOA case

20   notwithstanding a preexisting charter provision which set

21   terms different than the DPOA was seeking.  City's conduct

22   was unlawful and constitutes a refusal to bargain in good

23   faith by unilaterally changing an existing condition of

24   employment as to active employees.

25                   Additionally, the City's conduct occurred at a



1       point in time when the parties had in place a negotiated

2       collective bargaining agreement.  This is really the second

3       half of the charge, and it's subject to a separate analysis.

4              That binding collective bargaining agreement

5       expressly incorporated by reference the prior version of the

6       pension ordinance and charter provisions, and taking

7       judicial notice, was negotiated in the context of both

8       parties understanding and being aware of the 1996 Court of

9       Appeals decision on this very topic as they were both

10      parties to that case.  They can't deny knowledge of it

11      having previously litigated the very dispute that we're here

12      on today.

13             The law, the case law, and PERA did not change in

14      any relevant aspect between the 1996 decision by the Court

15      of Appeals and the 2011 action by the Employer.  I was,

16      frankly, I think I indicated, stunned by the failure of the

17      City in its brief on the merits of the case to even address

18      the obviously relevant 1996 decision.

19             The City had and has no colorable claim that it

20      did not face a clear and binding contractual obligation to

21      keep in place the preexisting and previously litigated

22      method of allocating excess earnings.  As such, the City's

23      conduct further constituted an unfair labor practice as it

24      was an unlawful repudiation of the binding 2008-2012

25      collective bargaining agreement, which obviously was still



1    in effect at the point of the November 2011 pension

2    ordinance change.

3              Union Counsel appropriately cited to the ATU past

4    practice case and the line of cases following ATU.  This

5    was, I think, beyond a tacit agreement, but it was at

6    minimum a tacit agreement.  A practice that continues for

7    three decades is a tacit agreement.  A practice where the

8    City has previously sought a charter amendment

9    unsuccessfully to end the practice is, at minimum, a tacit

10   agreement.  I think, frankly, it rises to the level of an

11   express agreement where the parties having previously fought

12   over the terms of the charter and the pension ordinance,

13   then incorporate them by reference in the collective

14   bargaining agreement.  What is incorporated by reference is

15   the then existing pension ordinance and charter, and that's

16   in keeping with the Macomb County decision.

17             The City's sole proffered defense really was, in

18   its brief, was that the financial stability agreement

19   entered into under 2011 PA 4 suspended the duty to bargain.

20   The City disingenuously failed to disclose in its brief that

21   the financial stability agreement, also referred to as a

22   consent agreement, was not entered into until more than five

23   months after the complained of conduct.  The argument was

24   frivolous.  The assertion that PA 4 suspended the duty to

25   bargain generally was a frivolous argument.  It demeans the



1    City and the Tribunal for an argument that specious to be

2    made.  It was shocking.  PA 4 was very clear by its terms,

3    as the City is well aware.  And I have no doubt, but that

4    the City is well aware.

5            PA 4 while it was in place provided for several

6    options, the appointment of a financial manager or entering

7    into a consent agreement.  It provided very expressly and

8    clearly and the section of the statute cited by City Counsel

9    is absolutely clear and unambiguous.  It provided that the

10   duty to bargain was suspended 30 days following entering

11   into consent agreement, which clearly had not occurred in

12   November of 2011.

13           The April 2012, and it is conceded belatedly by

14   the City that the financial stability agreement was not

15   entered into until April of 2012, cannot and did not

16   possibly excuse the City's November 2011 unlawful acts.

17           The failure to disclose to the Tribunal the

18   financial stability agreement on which the City's argument

19   relied was entered into long after this dispute arose, while

20   asking the Tribunal to rely on the financial stability

21   agreement as the City's principal defense exhibited a

22   troubling lack of candor contrary to the expectations of

23   MRPC 3.3.

24           The City has further raised the question of

25   AFSCME's standing to represent already retired former



1     employees.  The City is incorrect in its assertions that the

2     case law cited provide that AFSCME former employees who are

3     retirees are not members of AFSCME.  They may well be, they

4     may not be.  It's individually -- some retirees continue to

5     belong to unions, some don't.  They are, however, no longer

6     part of the bargaining unit.  The City was correct to that

7     extent.

8           It is axiomatic that neither the Employer nor the

9     Union can demand to bargain over changes in conditions

10    affecting already retired former employees.  It doesn't

11    alter the Union's claim as to the impact on active employees

12    who were promised that the Pension Board would have the

13    discretion to allocate ceratin funds, excess earnings, to

14    their annuity accounts and were promised that upon

15    retirement they would and eligible for 13th checks to the

16    extent that there were unearned excess earnings or excess

17    earnings above their rate, expected one.  I stumbled over

18    that phrase.  I'm not an actuary.

19          As I said, there's no duty to bargain over changes

20    and conditions affecting already retired former employees.

21    However, that doesn't fully answer the question in this

22    case.  The parties may, of course, voluntarily enter into

23    negotiations over permissive subjects of bargaining.  The

24    question of possibly raising a pension benefit for people

25    who already are retired is a permissive subject of



1    bargaining.  It's not prohibited.  The parties can, if they

2    choose to, negotiate over it.

3              Here the Union has not sought as relief any demand

4    over any right to bargain as to former employees.  Rather

5    the Union is seeking to enforce the Employer's obligation to

6    not make unilateral changes in promises that had already

7    been made and were still in effect, both the current

8    employees regarding their entitlements once they retire,

9    which is a perfectly ordinary mandatory subject to

10   bargaining, and as to individuals who were part of the

11   bargaining unit and since retired.

12             The Union is asserting, and I have found the

13   Employer in implementing unilaterally the changes to the

14   pension ordinance and cutting off the 13th check, has

15   repudiated the terms of an existing collective bargaining

16   agreement.  Under PERA, the repudiation of the clear,

17   undisputed terms of an existing contract is more than a mere

18   contract breach which would otherwise be left to the

19   grievance procedure or circuit court suit over damages or

20   whatnot, breach of contract.  Rather it's treated as a

21   refusal of bargaining in good faith and is therefore an

22   unlawful unfair labor practice even if related to a

23   permissive subject of bargaining over which there was

24   necessarily no duty to bargain as in the Commission

25   decisions in the Kalamazoo County Sheriff case where the



Page 50

1      Commission held that where you have a mixed question, a

2      collective bargaining agreement that covers both mandatory

3      subjects and permissive subjects, the package is the

4      package.  It's a single package.  Neither side can

5      unilaterally carve it up into pieces and say, "We'll comply

6      with one piece.  We won't comply with this other piece,"

7      unilaterally and without violating the duty to bargain.

8      Once a contract has been reached, it must be treated as

9      binding on both parties, as the Commission held in Kalamazoo

10     County Sheriff, or the possibility of productive future

11     bargaining is destroyed.

12              I will be recommending the restoration of the

13     status quo by restoring to the Pension Board the discretion

14     previously exercised by the City being ordered to not

15     interfere in the exercise of that discretion by the Pension

16     Board regarding excess earnings, that the Retirement Board

17     be notified by the City of the restoration of their

18     preexisting discretion, that affected retirement plan

19     participants, both active employees and retirees, be made

20     whole by the City to the extent that there is any practical

21     impediment to the Pension Board making those participants

22     whole otherwise.

23              Because it may be -- the most practical resolution

24     may be for the Pension Board to reallocate those assets.

25     Either way, it is ultimately the obligation of the City to



1       correct the problem it caused by its unilateral action

2       which, again, was taken in direct rejection of the

3       obligations it conceded that it had in the 1996 litigation.

4               I will recommend a posting of a notice to reaffirm

5       for active employees, posting of the notice at the work

6       places to reaffirm for active employees that the contractual

7       promises made to them must be kept.

8               That's it.  I will issue a written decision

9       following this up once I receive the transcript.  Any

10      questions?

11              MR. MACK:  Yes, Judge.  On the make whole, just as

12      a clarification to the extent practical, would that involve

13      I imagine in the compliance phase I presume some

14      determination as to what would have been allocated but for

15      the change?  I mean part of it is discretionary, so I

16      realize that there may be some additional steps to take to

17      determine the allocation which would have been made but for

18      the change, but I believe that could be addressed for

19      instance in just having the Pension Board in a meeting make

20      that decision, had this been our investment earnings, with

21      this being the actuarial rate of return, I mean this amount

22      was the excess earnings, here's what we would have done

23      putting it into three pots, something to that effect, and

24      then determining who was made whole, who was harmed and who

25      needs to be made whole following that determination.  Is



1            that something along the lines of what you indicated?

2                    JUDGE O'CONNOR:  Well, what I've indicated I

3            intend to order is that -- if I can have everyone's

4            attention.

5                    MS. JONES:  Go ahead, sir.

6                    JUDGE O'CONNOR:  That the status quo be restored,

7            the steps that I'll be recommending be ordered are that the

8            City restore to the Pension Board the discretion previously

9            exercised, specifically that the City notify the Pension

10           Board that the discretion has been restored.  The Pension

11           Board will have to act based on that discretion and

12           determine what they think is necessary to put back together

13           what would have otherwise happened.  And the Pension Board

14           has a prior history as laid out by Corley and Esuchanko of

15           how they typically did that, but it is within the discretion

16           of the Pension Board how precisely they do that.

17                   The part that you asked your question about which

18           was to the extent practical, that's not what I said.

19                   MR. MACK:  Okay.

20                   JUDGE O'CONNOR:  What I said was that my

21           expectation is that the first level response will be by the

22           Pension Board just using their discretion to decide what

23           they think should happen.

24                   MR. MACK:  Okay.

25                   JUDGE O'CONNOR:  What I propose to order is that



1          to the extent that there's any practical impediment to the

2          Pension Board making the participants whole, it will be upon

3          the City to make the participants whole.

4                    Any questions from the City as to the nature or

5          extent of the order?

6                    MS. JONES:  No.  I'll wait for the written

7          decision.

8                    JUDGE O'CONNOR:  Okay.  Thank you, all.

9                    MR. MACK:  Thank you, Judge.

10                   (Proceedings concluded at 10:55 a.m.)

11

12                              -0-0-0-

13

14

15

16

17

18

19

20

21

22

23

24

25



800-632-2720

## A

**AAA** 22:5
**able** 43:20
**absent** 41:14
**absolutely** 47:9
**acceptable** 6:25
**account** 11:17,23
  12:1,2 14:22,24
**Accountants** 13:8
**accounts** 11:14,21
  12:25 15:23,24
  16:1 18:20 20:1,2
  44:6 48:14
**accumulated** 17:8
**accustomed** 4:21
**acknowledged** 9:21
  13:24 31:22 43:19
**acknowledges**
  10:14 22:24 38:15
**acknowledging**
  37:15 39:19 42:17
**acknowledgment**
  13:4,5,6
**acquiesced** 40:4
**acquiescence** 39:24
**act** 9:15 30:12,17
  30:22 32:10,23,23
  32:24 33:1,2,4,21
  34:2,7,8,9,22,22
  35:4,5,10 36:23
  52:11
**acting** 20:17,17
**action** 30:24 45:15
  51:1
**actions** 21:8
**active** 11:13,15,21
  19:25 20:1,3,4,7,9
  20:11 25:21 26:5
  26:14 29:21 44:24
  48:11 50:19 51:5
  51:6
**actives** 26:8,11
**acts** 47:16

**actual** 5:4 30:9
  34:7
**actuarial** 10:25
  11:19 42:24,25
  43:3 51:21
**actuarially** 13:3
**actuaries** 17:16
**actuary** 8:8,8 10:25
  16:11 17:5 24:15
  48:18
**add** 41:21
**addition** 21:5 25:23
**additional** 11:11
  51:16
**additionally** 9:5
  44:25
**address** 30:7 38:17
  45:17
**addressed** 9:16
  36:10,21 38:21
  51:18
**addresses** 38:18
**addressing** 19:19
**adjust** 20:24
**administration**
  22:3
**Administrative**
  1:13 4:6,7,8
**admit** 27:20
**admitted** 28:3,7
**admitting** 9:7
  27:11 28:5
**adopted** 5:8,14
  43:12,15
**adopting** 23:16
**adoption** 4:23
**advancing** 23:22
**advice** 39:15
**affiant** 24:23,24
**affidavit** 9:6 12:16
  12:18 14:4,17
  16:5 24:23 27:23
  43:24

**affidavits** 27:24
  28:3,7
**affirmative** 32:16
**afforded** 20:7
**AFSCME** 1:5,24
  4:3 5:25 6:6 7:23
  9:17 14:9 22:5
  24:11,12 31:2,10
  31:19 38:5 41:24
  48:2,3
**AFSCME's** 41:8
  47:25
**ago** 17:15
**agreed** 29:11 31:13
**agreed-upon** 42:23
**agreement** 3:12
  5:18,19 6:18 9:4
  18:5 25:6,8,15
  27:1 29:8,9 32:19
  33:5,9,19 34:5,8
  34:12,14,17,19
  35:10,13,14,15
  39:24,25 40:2,6,7
  45:2,4,25 46:5,6,7
  46:10,11,14,18,21
  46:22 47:7,11,14
  47:18,21 49:16
  50:2
**agreements** 40:1
**Agrees** 41:9
**ahead** 52:5
**alert** 15:14
**alleged** 5:13
**Allied** 29:24,25
**allocate** 11:9,12
  12:4 48:13
**allocated** 19:1 39:8
  39:22,23 40:10,12
  40:19 44:2 51:14
**allocating** 45:22
**allocation** 39:1
  51:17
**alter** 48:11

**altered** 5:15
**altogether** 15:10
**Alvin** 41:24
**Amalgamated** 25:2
  25:5 29:7
**ambiguous** 25:6
**amending** 43:13,13
**amendment** 9:20
  13:16,21 14:1
  38:24 39:2 41:3
  46:8
**amount** 12:6 14:16
  15:2 18:10 24:17
  39:22 51:21
**amounts** 16:12
  40:21
**analysis** 8:3,7 45:3
**Analyst** 13:8
**analyzed** 23:18
**Anita** 1:24 4:14
**annuities** 5:3
**annuity** 11:13,21
  11:23 12:1,2
  14:12,15,22,23
  15:7,23,24 16:1,7
  16:14,14 18:19
  20:1,2 24:11
  25:22 26:20 40:16
  44:6 48:14
**answer** 48:21
**anybody** 8:20
**Anyway** 5:2 8:16
**App** 9:17 13:9
  19:21 21:11 25:25
  29:24
**apparent** 5:4 35:19
**Appeal** 22:22
**Appeals** 10:5 38:5
  38:9 42:21 43:1
  44:10 45:9,15
**Appearance** 4:10
**APPEARANCES**
  1:16

**applicable** 25:10
**applied** 17:10
  22:15
**appointed** 10:19
**appointees** 10:22
**appointment** 47:6
**Appraiser's** 13:8
**approach** 17:22
**approached** 17:24
**appropriately** 46:3
**approved** 22:23
**approximated** 17:8
**approximately**
  12:20
**April** 33:11,12
  35:16 47:13,15
**arcane** 42:23 43:3
**argue** 21:16 24:1
  32:19 33:23 42:19
**argued** 39:9
**arguing** 22:7
**argument** 19:16
  20:12 21:19,22
  26:14 29:4 31:3
  33:25 35:23 36:22
  37:5,8,13 38:18
  46:23,25 47:1,18
**arguments** 6:5
**Armella** 14:5
**arose** 47:19
**asked** 35:14 52:17
**asking** 32:2 47:20
**aspect** 45:14
**aspects** 38:13
**assert** 32:18 34:11
  34:13
**asserted** 5:6 9:11
  42:12
**asserting** 38:7
  49:12
**assertion** 9:1,16
  39:10 42:5 46:24
**assertions** 48:1



**asserts** 33:3 38:16
  39:10
**assets** 50:24
**assigning** 21:14
**assistant** 1:21
  12:21 41:24
**Association** 13:8
  21:10 25:25
**assumed** 13:3
  14:21
**attach** 18:6
**attached** 6:18 7:6
  7:14 8:6,9 12:16
  28:8
**attaching** 7:13
**attempt** 15:19 23:5
  31:6 43:6,7
**attempted** 40:25
**attention** 52:4
**ATU** 46:3,4
**authority** 20:18
**Avenue** 1:22
**aware** 9:25 45:8
  47:3,4
**axiomatic** 48:8
**a.m** 1:15 4:2 53:10

___

**B**

**B** 12:18 16:21
**back** 20:22 21:18
  26:18,18 27:7
  32:7 38:1 52:12
**background** 10:12
  28:17,18
**ballot** 22:17
**bargain** 13:24
  22:10,11,20,21,24
  23:3,8 26:21,21
  31:3,6,7,8 32:2,8
  32:20,25 34:1
  35:25 36:3,22
  38:16,17 39:5
  41:5 42:13,17
  43:5 44:19,22

46:19,25 47:10
  48:9,19 49:4,24
  50:7
**bargained** 15:18
  22:9 43:20
**bargaining** 3:12
  5:11,17,18,19
  6:18 9:3,22 15:11
  15:15,19 17:21
  18:5 19:3,20,23
  20:9 21:8,13,24
  21:25,25 22:8
  23:25 24:8 25:6
  26:3,12,23,25
  29:2 30:10,19
  32:8 33:6 34:4
  37:16 38:13 39:24
  39:25 40:1 41:11
  41:14 43:23 45:2
  45:4,25 46:14
  48:6,23 49:1,10
  49:11,15,21,23
  50:2,11
**based** 6:12 16:8
  23:20 29:19 39:14
  52:11
**basically** 12:2
**basis** 23:4
**beginning** 35:9
**begins** 37:22
**behalf** 4:7,8,13
  5:25 6:1 25:21
  26:14
**belabor** 28:17
**belatedly** 47:13
**believe** 16:21 25:24
  51:18
**belong** 48:5
**bench** 37:20
**benefit** 20:3 29:21
  44:5 48:24
**benefits** 17:11
  19:18,22,24,25

20:4,4,7 26:18
  37:12,16
**Berdijo** 12:18
**Berry** 1:24 4:14,17
  33:11,13
**best** 20:18 21:22
  24:20
**beyond** 14:4,16
  16:14 18:21 20:17
  46:5
**billion** 17:11 24:15
**binding** 39:9 41:7,7
  45:4,20,24 50:9
**bit** 11:15 12:1
  13:23 28:6,17
**black** 42:10
**blended** 43:4
**Board** 4:24,25 5:3
  5:16 9:15 10:19
  10:23,24 11:5,7
  12:12,24 13:5
  20:25 21:9 31:17
  39:8,22 40:11,11
  40:19 44:2 48:12
  50:13,16,16,21,24
  51:19 52:8,10,11
  52:13,16,22 53:2
**Board's** 9:12 39:1
  40:20
**bodily** 26:4
**body** 21:14
**bonafide** 24:8,19
**bottom** 17:7
**Boulevard** 1:14,18
**bound** 41:16
**breach** 24:7,10
  49:18,20
**breaking** 21:17
**brief** 5:12 7:7,15,18
  8:10,18 17:3
  19:21 23:10,10
  32:17 33:3 34:12
  34:13 38:15,19

45:17 46:18,20
**bringing** 29:20
**Brother** 27:9 28:16
  29:3 30:8 31:3
  32:7 37:9
**brought** 5:24 25:21
  26:13 29:4 30:8
  32:23 37:9
**Butler** 29:23,24

___

**C**

**C** 1:20 7:16,17
**calculating** 19:23
**call** 21:21 36:2
**called** 11:7
**candor** 47:22
**cap** 16:18
**capped** 16:8,10
**capping** 16:15
**captioned** 5:25
**care** 28:8
**carve** 50:5
**case** 1:7 4:5,7,23
  9:18,20 13:7,9,23
  19:20 20:5,6,18
  20:20 21:5,10,21
  21:22 22:2 23:3
  23:18,19 25:25
  29:22,25 30:1
  31:11,16 35:23
  36:7,9 38:3,7,8
  39:15 41:3,15
  42:11,12 43:1,5
  43:13 44:19 45:10
  45:13,17 46:4
  48:2,22 49:25
**cases** 20:6 28:23
  29:6 31:10,14
  36:6,9,14 42:4
  46:4
**cash** 12:3
**caused** 51:1
**ceiling** 15:8,24
  16:11,12

**CER** 2:1
**ceratin** 48:13
**certain** 5:15 12:6
  31:23
**certainly** 35:21
**Certified** 2:1
**challenge** 41:8
**challenged** 41:9
**challenges** 29:10
**change** 5:16 9:1,2
  9:19,21 10:1,3
  13:20,25 15:5,15
  15:20 16:19 17:20
  18:5 19:2,16
  20:13,14,21,23
  21:2,17 22:1,3,6,7
  22:10,15,17,20,21
  23:2,7,24 26:2,6
  26:10,12,15 28:19
  30:25 32:4 33:15
  33:16 35:19 36:5
  36:24 38:11,12,12
  38:23 39:2,3,3,19
  40:6,9,24 41:2,4
  42:18,22 43:2,7
  43:10,12,15,17,20
  43:22 44:15 45:13
  46:2 51:15,18
**changed** 5:8 15:5
  21:18 43:18
**changes** 17:25
  36:10 48:9,19
  49:6,13
**changing** 44:23
**charge** 5:9 6:3
  25:20 26:13 45:3
**charger** 22:3
**charging** 1:6,17 4:4
  4:10 5:24 6:4
  24:24
**chart** 8:14,14 18:8
  18:9,10 24:16
**charter** 5:20 9:20



13:16,20,25 20:21
20:23,24 21:1,2
22:7,17 24:3
38:10,24 39:2
41:3,5 42:14
43:17,18 44:20
45:6 46:8,12,15
**charts** 8:7,10 16:20
40:17
**check** 11:10,11
15:9,9 18:14,17
20:11 25:23 40:15
44:5 49:14
**checks** 5:5 18:17
26:19 48:15
**Chemical** 29:24,25
**choose** 49:2
**circuit** 31:18,19
49:19
**cite** 21:6 30:14,15
30:19 42:11
**cited** 19:20 29:6
31:11 36:6 42:20
46:3 47:8 48:2
**cites** 21:9 29:25
**citing** 29:23
**city** 1:8,21 3:14,15
3:16 4:4,13,15,23
5:1,1,12,14,20,23
6:9 7:13,21,22 8:3
8:4,7,15 9:11,18
9:18,21 10:14,16
10:21,23 11:17,25
12:7,8,9,14,15
13:8,11,16 14:7,8
14:9 15:14,18
16:13,15 17:8,15
17:23 18:1,3,3
19:4,15 20:12,15
20:22 21:10,16,21
21:23 22:2,2,5,11
22:15,24,25 23:1
23:2,6,23 24:13

24:22 25:18,25
26:8,22 27:4,8
28:21,22 29:20
30:25 31:6,7,15
31:18,19,22 32:3
32:18 33:5,8,10
34:12,14,25 35:1
35:5 37:1,17 38:7
38:8,12,15,18,23
39:2,9,14,16,18
39:25 40:5,16,17
41:3,8,16 42:4,5
42:12 43:12,15,16
43:19,21,25 44:7
44:19 45:17,19
46:8,20 47:1,3,4,8
47:14,24 48:1,6
50:14,17,20,25
52:8,9 53:3,4
**City's** 7:15,17 8:17
12:5 17:2 20:19
20:24 22:9,13
23:4 24:23 39:12
39:23,24 40:11,23
41:1,12 44:4,21
44:25 45:22 46:17
47:16,18,21
**claim** 23:6 25:18
26:13 34:21 45:19
48:11
**claiming** 19:10
21:23
**Claims** 31:16
**clarification** 51:12
**clarify** 32:21
**clean** 7:5
**cleaner** 28:6
**clear** 19:22 20:5,7
25:14 40:18 45:20
47:2,9 49:16
**clearly** 10:12 16:9
38:19,22 47:8,11
**close** 21:15 26:5

41:11
**coalition** 6:1,3
35:22
**Cohen** 1:17
**collateral** 41:17
**collective** 3:12 5:18
5:18 6:18 9:3
25:6 26:25 30:19
33:6 37:15 39:24
39:25 40:1 45:2,4
45:25 46:13 49:15
50:2
**collectively** 34:1
**colorable** 45:19
**columns** 18:22
**come** 23:6 33:20
35:17
**comes** 23:2 32:10
32:11
**comments** 4:21
27:10
**Commission** 1:3
3:11,13,14,16 4:9
6:17 7:6,8,9,10,18
7:19,20 8:1,2,19
9:7,9 21:23 26:17
27:13 49:24 50:1
50:9
**comparable** 40:21
**competent** 9:6
**Compiled** 30:16,20
**complained** 46:23
**compliance** 51:13
**comply** 50:5,6
**concede** 28:23,24
**conceded** 38:9 41:4
47:13 51:3
**concedes** 5:12
**concern** 5:23 39:23
**concerning** 10:12
10:13,15
**concerns** 26:3
**concession** 39:12

41:12 43:22
**concessions** 18:2
**concluded** 53:10
**concludes** 23:15
**conclusive** 28:25
**condition** 9:2,14,24
19:17 35:20 44:12
44:13,16,18,23
**conditions** 10:3
26:4 28:20 31:1
32:4,10 36:10
41:13 43:11 48:9
48:20
**conduct** 44:21,25
45:23 46:23
**conflict** 21:19
23:16
**conflicting** 25:10
**conflicts** 25:12
**consent** 32:19 33:5
33:8,19 34:5,12
34:14,17,19 35:10
35:13,14,15 46:22
47:7,11
**consequence** 17:17
**consideration** 6:5
**considerations**
36:21 37:10,11
**considered** 27:12
30:4
**consistent** 44:8
**constitute** 26:2,12
29:16 35:25
**constituted** 45:23
**constitutes** 24:1
29:15 44:22
**Constitutional**
16:17
**consultation** 17:15
**contacted** 15:14
**CONTENTS** 3:1
**context** 45:7
**continue** 25:9 48:4

**continues** 46:6
**continuing** 21:1
**contract** 7:2 15:17
24:2,5,7,9,10,20
25:11,12 29:7
30:5,6 31:5 49:17
49:18,20 50:8
**contractual** 17:11
45:20 51:6
**contradicted** 43:25
**contrary** 38:16
47:22
**contribute** 11:16
**contributed** 17:5,6
**contributes** 11:17
**contributing** 12:14
**contribution** 12:5,8
12:9 14:24 40:17
44:4
**controlled** 38:3,6
38:22 42:14
**controlling** 38:19
**copies** 6:15
**copy** 7:7
**Corley** 3:16 8:4
24:21 39:15 44:6
52:14
**Corley's** 8:5
**Corley/Esuchanko**
8:17 16:25
**Corporation** 1:8,21
2:2 7:11,12
**correct** 6:7 28:10
32:13 33:7,21
41:14,15 48:6
51:1
**cost** 17:8
**Council** 1:5,24 3:14
3:15,16 4:4 5:25
6:6 7:13,21 8:3,5
8:7 10:23 39:16
41:25
**counsel** 1:21 4:10



7:11,12 27:9
28:16 29:4 30:8
31:3 32:7 35:5
36:6 37:9 41:21
42:8,20 46:3 47:8
**counter** 28:24
31:12
**County** 19:20 20:6
21:5 29:23,24
31:18,19 42:20
46:16 49:25 50:10
**couple** 4:20 19:15
**course** 13:22 14:1
15:16 17:13 25:5
36:21 48:22
**court** 9:21 10:5
22:12,21,22 25:24
31:16,18,19 35:14
38:4,9 41:7 42:15
42:20,22 43:1
44:10 45:8,14
49:19
**courtroom** 38:2
**covers** 50:2
**created** 15:23 18:9
**crediting** 12:25
**Crittendon** 3:13,15
7:11,13,22 18:25
24:21 36:15
**cross** 4:19 5:7
**current** 9:23 41:15
49:7
**currently** 21:4
22:17
**cutting** 49:14
**C-o-r-l-e-y** 8:4
**C12-E-0092** 1:7
**C12-E-092** 4:5

## D

**D** 7:22,23
**damages** 49:19
**data** 8:13
**date** 30:22 33:10,17

34:17,19 35:9,20
36:11 37:22
**dates** 34:16
**Davis** 36:7
**days** 35:9,18 47:10
**dealing** 16:17,18
**decades** 12:17
17:15 20:16 46:7
**December** 5:15
11:11 30:22 33:18
**decide** 52:22
**decided** 18:4
**decides** 11:7
**decision** 9:17 10:5
10:6 31:13,20,21
37:21,22,22,23,24
38:4,5,20,23 41:6
41:7,17 42:12,21
42:21 43:8,9,10
44:10 45:9,14,18
46:16 51:8,20
53:7
**decisions** 12:24
49:25
**declared** 23:24
**deemed** 16:21
**defeating** 23:4
**defense** 9:12 22:14
46:17 47:21
**defenses** 19:15
**defined** 13:2 44:5
**demand** 48:9 49:3
**demeans** 46:25
**demonstrated**
14:13
**denial** 22:23
**denied** 22:22
**denominate** 6:15
**deny** 38:8 45:10
**Department** 1:2,21
4:15
**describe** 15:7
**described** 13:15

44:3
**Describing** 11:15
**description** 8:5
**destroyed** 50:11
**determination**
51:14,25
**determine** 51:17
52:12
**determined** 16:10
**determines** 35:8
**determining** 51:24
**Detroit** 1:8,14,18
1:21,22 4:1,4,14
4:15 6:2 9:17
10:16,22 13:9,12
14:7,8,10 15:12
17:9 20:15 21:10
21:11,21 22:5
24:13 28:21 31:16
31:17,18,19 38:6
42:5,12 44:16,19
**developed** 25:8
**DGRS** 17:9,11
**Diane** 2:1
**different** 11:8 18:6
23:21 35:23 40:14
44:21
**direct** 51:2
**directly** 44:15
**director** 8:4 12:21
**disclose** 46:20
47:17
**discretion** 9:13
39:8 40:10,20
48:13 50:13,15,18
52:8,10,11,15,22
**discretionary** 43:9
51:15
**discussion** 27:10,24
**disingenuously**
46:20
**dismissing** 34:21
**disposition** 4:22

5:7 18:8
**dispute** 5:7,10
10:13,13 14:4
19:1,18,24 24:8
24:19,25 39:6,7
40:22 43:12 45:11
47:19
**disputed** 15:11
**distinction** 39:4
41:1
**distribute** 11:8
**distributed** 17:9
20:2
**distribution** 9:13
9:19,23 10:15
13:15
**distributions** 13:6
13:14
**divided** 44:2
**Division** 8:3
**Docket** 1:7 4:5
**doctrine** 23:9,13,14
26:2
**document** 8:17
**documents** 6:13
24:22 44:6
**doing** 4:21 23:23
**dollars** 17:11 18:10
18:23 24:17
**doubt** 47:3
**Doyle** 1:13 4:5
**DPOA** 31:15,18
42:5,12 44:17,19
44:21
**Draugelis** 2:1
**due** 17:8
**duty** 31:2,8 32:1,20
32:25 33:25 35:25
36:3,22 38:15,16
39:4 41:5,13 43:5
46:19,24 47:10
48:19 49:24 50:7
**Dyke** 23:18

## E

**E** 8:17 17:2 18:6,7
19:8,9
**ear** 18:1
**earlier** 9:11 12:17
20:20 23:16 25:20
31:4 34:6
**earliest** 42:3
**early** 10:14,17
21:18 42:6
**earn** 18:12,13
**earned** 29:17
**earning** 12:1
**earnings** 9:13,19
9:23 10:15 11:6,7
11:8,9,12,20 12:5
12:13,24 13:1,2
13:15 17:9 18:12
18:15 22:4 39:1,7
40:9,12,12,19
44:1,2 45:22
48:13,16,17 50:16
51:20,22
**easiest** 15:6
**ECONOMIC** 1:2
**Ed** 41:23
**Education** 25:25
31:17
**Edward** 1:24
**effect** 15:21 19:2
23:2 26:4 30:13
30:23 31:4 35:17
36:5 46:1 49:7
51:23
**effective** 5:15 30:22
33:17 34:10,16,17
36:11
**effort** 41:2
**efforts** 15:19
**either** 10:20,24
11:16 27:19 29:7
38:18 50:25
**elected** 10:20



**Electronic** 2:1
**eligible** 48:15
**eliminated** 15:9,22
**emergency** 22:13
  32:11
**employee** 16:13
  40:16
**employees** 5:1,1
  10:24 11:13,15,21
  12:11 14:10 20:11
  25:21 26:5,14
  30:3 44:24 48:1,2
  48:10,11,20 49:4
  49:8 50:19 51:5,6
**employer** 5:6 21:7
  21:12 30:3 36:2
  43:2,7,10 45:15
  48:8 49:13
**Employer's** 7:7
  33:3 49:5
**employment** 1:3
  4:9 9:2,14,24 10:4
  10:21,21 19:17
  26:4 28:20 31:1
  35:20 36:11 41:13
  43:11 44:12,14,16
  44:18,24
**enacted** 30:13,21
  30:23 31:2,7 33:4
  41:10
**encompass** 26:15
**ENERGY** 1:2
**enforce** 49:5
**enforcing** 42:4
**engrafted** 24:4
**enhanced** 11:23
**enhancement** 11:13
  25:22 26:20
**enjoin** 20:25
**enjoy** 20:9
**enter** 48:22
**entered** 46:19,22
  47:15,19

**entering** 47:6,10
**enters** 35:10
**entirety** 35:25
**entitlements** 49:8
**equitable** 23:12
**error** 34:18
**essence** 9:15
**essentially** 11:1
  12:3 40:13 44:4
**establish** 10:25
  44:8
**established** 9:14,24
  13:18,20 21:6
  39:13 44:11,12,13
**estimated** 11:19
**estop** 21:23
**estopped** 23:22
**estoppel** 14:2 23:9
  23:11,12,15 38:6
  41:17
**Esuchanko** 8:8,14
  40:17 44:6 52:14
**Esuchanko's** 8:9
**et** 30:16
**event** 11:3 13:25
  15:24 16:3
**eventually** 29:21
**everybody** 26:7
**everyone's** 52:3
**evidence** 24:20
**exactly** 10:17 23:23
**example** 14:16,22
**exceed** 18:15
**exceptions** 26:1
  37:21
**excerpt** 3:12 6:23
  7:1,3,4,6
**excess** 9:13,19 11:7
  11:8,9,20 12:5,13
  12:24 13:2,2,15
  17:8 18:12,15,20
  22:4 39:1,7 40:9
  40:12,19 44:1

  45:22 48:13,16,16
  50:16 51:22
**excuse** 31:14 47:16
**execution** 36:11
**executive** 12:21
**exercise** 9:12 50:15
**exercised** 50:14
  52:9
**exhibit** 3:8,11,13
  3:14,16 6:17 7:1,6
  7:8,9,10,16,17,18
  7:19,20 8:1,2,19
  16:21 18:7 19:8
**exhibited** 47:21
**exhibits** 3:18 6:15
  9:7,9 27:11,12,25
  28:3,6 39:14
  40:11
**exist** 25:1
**existed** 39:21 44:12
  44:13
**existence** 14:14
  34:2,9 36:23
**existing** 5:17,18 9:2
  18:5 25:13 38:10
  39:17 43:10 44:15
  44:23 46:15 49:15
  49:17
**exists** 24:6
**expectation** 52:21
**expectations** 47:22
**expected** 11:1
  12:11 14:21,25
  15:22 16:10 48:17
**expired** 27:1
**express** 24:2 25:14
  40:7 46:11
**expressed** 9:7
**expressly** 40:3 45:5
  47:7
**extended** 27:3
**extent** 48:7,16
  50:20 51:12 52:18

  53:1,5
**E-s-u-c-h-a-n-k-o**
  8:9

---

**F**

**face** 45:20
**facially** 9:6
**fact** 5:8,10 13:24
  14:14 15:2,23
  19:19 20:8,19
  21:24 24:25,25
  25:1 31:10 35:15
  35:22,24 37:12
  41:19
**facts** 14:3 19:3
**factual** 39:6,7
**failed** 46:20
**failure** 45:16 47:11
**faith** 26:23 44:23
  49:21
**falls** 25:16
**familiar** 33:2
**far** 15:9
**fashion** 17:24
  26:11
**favor** 32:3,14
**February** 1:15 4:2
**Feel** 31:15
**felt** 13:12,13 20:16
  20:23
**fighting** 6:10
**file** 7:5,8
**filed** 5:9 10:9
**filing** 37:21
**finally** 24:19 25:18
  29:18 36:15
**financial** 8:3 17:17
  46:18,21 47:6,14
  47:18,20
**find** 38:3,20 39:10
  39:13 41:16
**finding** 43:2
**findings** 43:6
**fine** 7:3 8:23 19:12

  28:5,8,11,14
**fire** 5:2
**Firm** 2:2
**first** 9:22 10:9,10
  13:11 19:16,25
  22:9,15 23:8
  38:13 41:11 52:21
**five** 11:16 16:4 27:5
  46:22
**floor** 1:18 15:1,8,22
  16:12 18:22 29:14
  29:14
**focus** 29:12 37:5
**followed** 37:20
**following** 31:14,14
  46:4 47:10 51:9
  51:25
**follows** 10:18 35:7
**form** 25:3,3
**former** 7:12 47:25
  48:2,10,20 49:4
**formulation** 18:7
**forth** 29:20 40:11
**forward** 15:20 22:6
**fought** 46:11
**found** 18:1,1 42:22
  49:12
**four** 27:11
**frankly** 45:16
  46:10
**Friday** 1:15 4:2
**frivolous** 39:11,14
  42:18 46:24,25
**front** 34:7
**full** 30:23 40:7
**fully** 48:21
**fund** 12:9
**fundamental** 44:16
  44:18
**funds** 13:2,14
  40:14,16,20 48:13
**further** 35:2 37:17
  38:6 45:23 47:24



**future** 50:10

**G**

**G** 1:17
**Garrett** 41:24
**gender** 42:25,25
**general** 4:24 12:9
  12:19,21 17:9
  18:9 19:10,15
**generally** 32:20
  46:25
**give** 30:15 37:12
**given** 11:20 39:11
  39:12
**go** 18:4 19:12 36:17
  52:5
**going** 6:14 10:10,14
  11:11 12:17 17:20
  22:6 27:4 31:15
  42:9
**good** 4:16,17 6:9
  26:23 28:12,13
  41:23 44:22 49:21
**governed** 35:21
**government** 35:9
  35:11
**Grand** 1:14
**grant** 32:3
**granting** 5:3
**greater** 5:3
**grievance** 49:19
**ground** 8:24
**group** 14:11
**GROWTH** 1:2
**GRS** 16:6
**guess** 6:14 7:12
  32:9 37:13

**H**

**H** 2:1
**half** 45:3
**handles** 4:25
**happen** 52:23
**happened** 13:4

52:13
**happening** 10:17
**harm** 22:25
**harmed** 51:24
**head** 14:11
**hear** 27:4
**hearing** 1:12 4:7,7
**held** 43:6 44:17
  50:1,9
**higher** 25:13 43:18
**highlight** 13:10
**history** 52:14
**hold** 20:1
**holdings** 31:14
  40:15
**holds** 30:1
**Honor** 4:12 6:7
  29:22
**Huron** 25:3,10 29:7

**I**

**IDENTIFIED** 3:10
**identity** 5:24
**illegal** 21:3 22:18
**imagine** 51:13
**immediately** 6:5
**impact** 5:4 20:10
  24:7,14 26:24
  38:19 43:3 48:11
**impacted** 26:7,19
**impacts** 24:11
  26:10
**impediment** 50:21
  53:1
**implement** 43:20
**implementation**
  31:24
**implemented** 9:22
  10:4 28:20,22
  30:11,12,14 31:22
  32:4 41:10 43:15
  43:22
**implementing**
  32:13 49:13

**importance** 5:23
**important** 13:10,12
  14:20
**imposed** 31:22 40:3
**improper** 21:12
**including** 40:2
**inconsistent** 23:13
**incorporate** 46:13
**incorporated** 5:19
  8:5 24:3 45:5
  46:14
**incorporates** 40:4
**incorrect** 48:1
**incredible** 39:20
**independent** 21:9
**INDEX** 3:8
**indicate** 18:23
**indicated** 12:15,19
  14:4 15:10 18:19
  19:2 22:2 24:15
  29:6 34:6 45:16
  52:1,2
**indicates** 15:12
  16:5 17:7 23:10
  42:8
**indistinguishable**
  38:4
**individual** 40:15
**individually** 48:4
**individuals** 10:20
  15:13 24:18 26:18
  49:10
**infringe** 22:7
**initially** 40:2
**injunction** 22:22,23
  23:5
**injunctive** 22:13,13
**insert** 42:11
**inserted** 37:24
**instance** 11:20,24
  16:2 51:19
**insulated** 21:14
**intend** 52:3

**interest** 11:22
**interfere** 50:15
**interpretation** 24:9
  24:20
**interpreting** 41:15
  42:4
**intertwined** 26:11
**introduced** 15:20
**introductory** 4:20
  27:10
**investment** 11:22
  14:15,17 15:1
  16:1,7 51:20
**investments** 10:16
  11:2,3 15:3 16:6
  18:21
**involve** 36:13 51:12
**involved** 24:18
  25:14 42:4,22
**involves** 43:8
**involving** 10:6
  31:10,10 38:5
  41:18
**irreparable** 22:25
**irrespective** 15:3
**issuance** 5:5
**issue** 20:14 28:19
  29:1 37:20 38:24
  38:25 51:8
**issued** 31:12 37:23
**issues** 10:2,9 16:17
  16:18

**J**

**January** 12:22
**joined** 38:1
**Jones** 1:20 3:4 4:13
  4:13 6:20 7:16,23
  8:23 19:9 27:9,17
  27:23 28:4,11,13
  28:16 32:16,22
  33:7,10,16,21,25
  34:6,18,22 35:1
  37:3,7,18 52:5

53:6
**Joseph** 8:8
**JR** 1:17
**judge** 1:13 3:18 4:3
  4:6,16,18 6:8,22
  6:25 7:4,10,17,20
  7:24 8:2,12,16,20
  8:24 9:11 10:11
  10:11 13:6 14:19
  16:12,23,25 17:2
  17:12 19:5,7,12
  26:25 27:3,7,15
  27:18 28:2,5,12
  28:15,23 31:12,20
  31:21 32:15,17
  33:2,8,12,14,19
  33:23 34:3,11,20
  34:24 35:2,4 36:7
  36:8,8,18,25 37:1
  37:4,17,19,25
  42:1,8 51:11 52:2
  52:6,20,25 53:8,9
**judgment** 4:19
**judicata** 41:17
**judicial** 14:2 23:9
  23:10,14 35:15
  38:6 45:7
**judicially** 21:23
  23:22
**June** 14:5

**K**

**Kalamazoo** 49:25
  50:9
**keep** 45:21
**keeping** 46:16
**keeps** 28:6
**kept** 51:7
**know** 13:19 19:9
  34:18
**knowing** 6:10
**knowledge** 45:10
**known** 11:10
**Krystal** 18:25



24:21 36:15

**L**

**L** 1:24
**labor** 1:2 4:15
  13:19 17:19 33:11
  36:21 37:9,11
  45:23 49:22
**lack** 39:11 47:22
**Lafayette** 1:18
**laid** 10:11 18:24
  22:11 25:20 52:14
**language** 16:9 22:3
  24:2,3 25:11,13
  29:8 30:5,6 31:25
  32:24
**large** 10:19
**law** 1:13,21 4:6
  13:19 15:17 20:5
  21:17,18,19 23:15
  25:2 32:11 36:21
  37:9,11 38:10
  41:14,15,19 42:10
  43:5 45:13,13
  48:2
**laws** 17:19 30:16
  30:20
**lay** 8:24 23:9 24:22
  25:1
**lays** 16:9 17:5,6
  23:19 24:16 25:5
**leaders** 13:11
**leadership** 17:15
**left** 49:18
**legal** 19:15 21:4,4
  22:18 23:14,16,22
**legally** 30:13,13
  31:2 32:13 41:10
**legitimate** 26:23
**Letitia** 1:20 4:13
**letter** 3:13,15,16
  6:20 7:11,21 8:3
  18:25 36:16,16
  37:3,15 39:15,15

42:10
**Let's** 21:2
**level** 11:4,4,6 46:10
  52:21
**liability** 12:10
**likewise** 5:10
**limited** 6:5
**line** 46:4
**lines** 52:1
**list** 6:14
**listed** 6:4
**litigated** 45:11,21
**litigation** 39:11,12
  51:3
**little** 12:1 13:23
  28:6
**local** 14:7 35:9,11
**locals** 6:1,6
**locate** 14:13
**long** 43:5 47:19
**longer** 48:5
**longstanding** 40:23
  44:9
**look** 16:20 25:24
**looked** 8:12
**lose** 18:16 29:22
**loss** 16:19 20:10
**losses** 26:20
**lost** 25:21,22
**lot** 17:12,13 24:16
  28:18
**lumped** 26:9

**M**

**MacDonald** 36:8
**Mack** 1:17 3:3 4:12
  4:12,21 6:7,24 7:3
  8:11,13,22 9:10
  10:11 16:24 17:1
  17:4 19:6,14 27:2
  27:4,24 28:10,14
  33:1 35:2,4 36:20
  41:22 42:7 51:11
  52:19,24 53:9

**Macomb** 19:20
  20:5 21:5 42:20
  46:16
**main** 29:4
**maintain** 26:22
  41:13
**majority** 10:23
**maker** 43:8
**making** 13:14 43:9
  50:21 53:2
**management** 21:14
  32:11
**manager** 47:6
**mandatory** 5:11
  10:3 17:21 19:17
  19:19,23 20:8
  21:13,24,25 22:8
  23:25 26:3,12
  28:20 29:1 30:10
  32:4 49:9 50:2
**Manderfield** 36:8
**manner** 10:4 28:21
  28:22 30:14 32:5
**March** 30:23 33:4
**Marilyn** 12:18
**mark** 7:4,5,7 17:13
**marked** 7:9,19 8:1
  8:19 18:22
**market** 11:3,24
  14:21 15:3 16:16
**marking** 8:16 19:7
**matter** 1:4 15:23
  23:15 25:19 30:9
  35:22
**mayor** 10:23
**MCL** 35:12
**McNeil** 1:24 41:23
  41:23
**mean** 51:15,21
**meant** 35:16
**meeting** 51:19
**member** 24:11,12
**members** 17:10

19:25 20:1,3,4,7,9
  29:21 30:2 31:2
  37:13 48:3
**membership** 17:16
**MERC** 4:4 10:3
  20:6 31:13,20
**MERC's** 43:1,5
**mere** 49:17
**merely** 15:19
**merits** 45:17
**method** 45:22
**methods** 19:22
**Mi** 9:17 13:9 19:21
  21:11 25:25 29:24
**Michigan** 1:1,8,14
  1:18,22 4:1,3,6,8
  4:9 17:19 30:15
  30:20 32:1 41:24
  42:15
**middle** 15:16 18:5
  31:5
**Miller** 1:17
**million** 18:2
**minimum** 46:6,9
**minute** 22:10,10
  38:17 43:3
**mixed** 41:19 42:25
  43:4 50:1
**money** 12:2 16:13
  16:16 17:12,14,25
  19:1 24:16,17
  39:22
**monies** 20:2 44:3
**month** 12:8
**months** 12:20
  33:20 46:23
**morning** 4:16,17
  41:23
**motion** 1:12 4:18
  4:22 5:7,24 9:5
  10:9 12:16 18:7
  28:25,25 31:11,12
**motions** 4:19 28:9

**MPER** 26:1
**MRPC** 47:23
**Municipal** 1:8
**mutual** 39:10
**mutuality** 39:11

**N**

**name** 14:5
**nature** 10:12 53:4
**necessarily** 29:11
  49:24
**necessary** 52:12
**need** 25:8
**needed** 20:23 43:17
**needs** 51:25
**negotiate** 49:2
**negotiated** 45:1,7
**negotiations** 37:14
  48:23
**neither** 48:8 50:4
**NESA** 4:24
**Network** 2:2
**never** 38:18
**new** 4:23 15:21
  32:11
**Nickleberry** 14:5,5
  15:12 24:24
**nine** 17:7 29:22
**NLRB** 43:6
**normal** 18:16
**normally** 11:24
**notable** 34:13
  41:20 42:3
**note** 5:22 9:6 12:17
  14:20 17:23 27:10
  36:15 37:25
**notice** 15:11 35:15
  45:7 51:4,5
**notified** 50:17
**notify** 52:9
**notwithstanding**
  34:14 44:20
**November** 5:9,14
  7:11 15:20 19:3



21:19 30:21,24
33:17 46:1 47:12
47:16
**Number** 2:2 4:5,5
6:20
**numerous** 31:9

**O**

**object** 27:20
**objecting** 27:13
**objection** 8:21 19:7
19:12
**obligation** 15:17
26:22 31:6 45:20
49:5 50:25
**obligations** 21:8
51:3
**observes** 38:2
**obvious** 40:23
**obviously** 20:22
21:3 45:18,25
**occurred** 5:16
44:25 47:11
**October** 7:21 36:16
**Officers** 21:10
**Oh** 9:6
**okay** 6:8 7:4 9:10
19:14 27:4,9,17
28:4,11,15,16
34:24 36:19 52:19
52:24 53:8
**once** 49:8 50:8 51:9
**ones** 27:15,21
**opinion** 13:17
22:22 26:1 37:20
**opportunity** 25:22
**opposed** 25:3
**opposite** 23:21
**opted** 18:3
**options** 11:16 47:6
**oral** 38:18
**order** 20:24 22:4
22:14 26:17,21,21
29:5 32:8 52:3,25

53:5
**ordered** 50:14 52:7
**ordinance** 4:23 5:2
5:8,14,20 7:14
10:1 15:5,21 16:8
16:9 26:7,7,15
30:11,21,25 32:12
36:5 38:11 39:3
40:5 41:2 42:14
43:14,14,19 45:6
46:2,12,15 49:14
**ordinances** 21:2
24:3 41:4
**ordinary** 49:9
**organization** 14:8
14:10
**origin** 27:19
**original** 6:3
**Ottawa** 25:24
29:19
**ought** 23:24 26:14
**outline** 10:17
**O'Connor** 1:13
3:18 4:3,6,16,18
6:8,22,25 7:4,10
7:17,20,24 8:2,12
8:16,20,24 9:11
16:23,25 17:2,12
19:5,7,12 26:25
27:3,7,15,18 28:2
28:5,12,15 32:15
32:17 33:2,8,12
33:14,19,23 34:3
34:11,20,24 35:2
36:18 37:1,4,17
37:19 42:1,8 52:2
52:6,20,25 53:8

**P**

**PA** 30:15 31:23
32:18,19,20 34:3
35:12 36:12 37:6
37:7 38:17 46:19
46:24 47:2,5

**package** 20:10 50:3
50:4,4
**page** 3:2,8 17:7
19:21 21:11 28:25
29:22 33:3 36:16
36:19
**pages** 21:6
**paragraph** 14:17
16:4 26:1 34:15
35:6,17,24 36:3,4
36:5,12
**parity** 16:18
**parse** 26:8
**part** 6:19 7:25 9:16
10:20 13:22 14:19
20:9 22:23 25:12
34:4 38:24 44:4,5
44:5 48:6 49:10
51:15 52:17
**partial** 18:7
**participants** 50:19
50:21 53:2,3
**particular** 27:25
32:12 36:3 37:4
42:24 43:8
**particularly** 41:20
42:3
**parties** 6:25 9:25
10:7 25:11,19
29:19 38:5,20
40:7 41:7,18 45:1
45:8,10 46:11
48:22 49:1 50:9
**party** 1:6,17 4:4,11
5:24 6:4 23:15,19
**Party's** 24:24
**passed** 22:16
**passing** 6:2
**pay** 26:18 32:7
**Peltz** 31:20
**pension** 4:24,25
5:11,14,16,20 8:6
9:12 18:17 19:22

21:9 33:15,17
38:13 39:1,3,8,22
40:5,10,16,19,20
41:2 42:14,23
43:13,13,14,19
44:2,17 45:6 46:1
46:12,15 48:12,24
49:14 50:13,15,21
50:24 51:19 52:8
52:9,10,13,16,22
53:2
**pensions** 42:13
**people** 48:24
**PERA** 21:13,14
23:7 31:24 32:25
33:6,22 34:23
35:21 36:1,4,12
41:15 42:4 45:13
49:16
**percent** 11:4,16,19
11:25 14:15,18,22
14:25 15:2,8,25
16:2,7,8,15,15
18:16,21,22,24
**percentage** 11:19
**perfectly** 49:9
**perform** 11:2,3
**performance** 11:6
**performed** 11:18
11:24
**performs** 16:14
**period** 29:10 30:12
34:1
**permissive** 48:23
48:25 49:23 50:3
**phase** 51:13
**phrase** 16:1 48:18
**picked** 27:21
**piece** 50:6,6
**pieces** 50:5
**place** 9:3 17:18
36:13 45:1,21
47:5

**placed** 18:10
**places** 51:6
**placing** 13:16
**plan** 5:11 29:15
33:15,16,17 38:13
42:24 44:5 50:18
**plans** 29:1 30:11
44:17
**plan's** 8:6
**play** 32:10,12 33:20
**PLC** 1:17
**Pleading** 6:20
**pleadings** 4:20 6:12
6:19
**POAM** 31:13 36:9
**pocket** 12:3
**point** 8:15 20:18
31:7 35:4 45:1
46:1
**points** 29:3 30:8
**police** 5:2 21:10
**Port** 25:3,10 29:7
**portion** 11:9,12,20
12:13
**position** 20:22
23:16,19,20,21
29:8 43:16
**positions** 10:21
23:13
**possibility** 50:10
**possible** 6:10
**possibly** 47:16
48:24
**post** 36:11
**posting** 51:4,5
**potential** 15:15
**pots** 18:11 44:3
51:23
**practical** 50:20,23
51:12 52:18 53:1
**practice** 8:6 10:1
10:13 12:15 13:12
13:13,17,18,18



14:3,14,19 15:6,9
15:15 17:14,18,18
17:20 20:14,21,22
20:24 21:3 22:4
24:4,5,22,25 25:1
25:3,4,7,9,12,15
29:5,6 39:9,13,17
39:19,20 40:22,24
44:8 45:23 46:4,6
46:7,9 49:22
**practices** 5:16
**precedent** 20:6
21:6
**preceding** 34:15
**precise** 41:13
**precisely** 52:16
**precluding** 5:5
**preexisting** 44:20
45:21 50:18
**preference** 40:23
**prepared** 6:16 8:7
37:19
**Present** 1:24
**president** 14:6,7
15:12 41:24
**presidents** 14:8,9,9
15:13
**presumably** 9:25
**presume** 51:13
**prevailed** 9:18 38:7
**preview** 37:24
**previously** 45:11
45:21 46:8,11
50:14 52:8
**principal** 47:21
**prior** 5:15,19 8:6
10:1 35:20 36:13
39:11,12,13,17,19
39:20 45:5 52:14
**probably** 32:22
**problem** 51:1
**procedural** 5:22
10:8

**procedure** 49:19
**proceeding** 23:17
**proceedings** 23:14
53:10
**process** 22:14,16
22:19 37:16 43:8
43:9 44:11
**produced** 39:14
**productive** 50:10
**proffered** 46:17
**prohibit** 22:4,6
**prohibited** 4:24 5:2
49:1
**projected** 40:13
**promised** 48:12,14
**promises** 44:17
49:6 51:7
**proof** 25:14
**proper** 25:19 29:19
**propose** 27:20
52:25
**proposed** 7:14
17:25
**provide** 17:20
34:16 48:2
**provided** 8:14
16:20 47:5,7,9
**providing** 26:10
30:17 34:3 35:17
38:11 41:9 44:20
**provisions** 5:21
34:9 36:1 41:5
45:6
**public** 23:18 27:21
30:12,17,22 33:4
33:21 34:2,8,9,22
35:5 36:23
**published** 10:6
38:4,20 41:6
**pulled** 14:12
**purpose** 15:15
**purposes** 11:22

**put** 7:8 16:13 17:18
52:12
**putting** 51:23
**P52136** 1:20
**P58657** 1:17

---

**Q**

**quarterly** 18:25
**question** 5:22 9:12
10:2 30:9 35:20
39:4 41:19 42:23
47:24 48:21,24
50:1 52:17
**questions** 4:25 10:9
26:16 51:10 53:4
**quite** 28:17
**quo** 26:17,22 32:7
50:13 52:6
**quote** 21:12,15
23:11 26:3,5 41:9
41:11
**quoting** 21:7

---

**R**

**raise** 25:18 36:22
**raised** 5:23 6:9
19:15 47:24
**raises** 20:12
**raising** 48:24
**rate** 5:3 10:25 11:1
11:22 13:3 14:21
14:25 15:1,22,25
16:6,7,10 18:24
40:13 48:17 51:21
**reach** 18:15
**reached** 50:8
**read** 33:1
**reads** 35:6
**reaffirm** 51:4,6
**real** 14:5 18:10
**realize** 20:3 22:21
51:16
**realized** 15:3,4
19:25 20:4

**realizes** 23:2
**reallocate** 50:24
**really** 14:4 15:11
15:17 19:1 33:23
37:23 45:2 46:17
**realm** 25:16 30:4
**reason** 27:15 31:25
**reasonable** 17:24
**reasons** 13:10
40:24
**recall** 8:10
**receive** 18:17 51:9
**received** 3:10 9:9
14:23,24 18:19
**recognized** 39:18
**recollection** 42:9
**recommend** 51:4
**recommending**
50:12 52:7
**record** 27:6,7 28:6
28:18 37:25
**RECORDED** 2:1
**Recorder** 2:1
**records** 27:21
**recounted** 38:9
**recounts** 39:16
41:8
**reduce** 12:14 40:16
44:4
**reduced** 12:6
**refer** 29:22 32:18
**reference** 5:19 6:2
29:23 40:4 45:5
46:13,14
**referenced** 13:7
**referencing** 35:5
**referred** 28:24
46:21
**Referring** 33:3
**reflected** 14:15
**refusal** 44:22 49:21
**regarding** 9:19
31:13 49:8 50:16

**regardless** 16:16
21:8 38:10,11
41:4,16 44:11
**Registration** 2:2
**rejection** 51:2
**related** 8:7 23:17
49:22
**relates** 4:23 29:18
30:9 32:6,9,12
37:7,16
**Relations** 1:3 4:9
4:15 33:11
**relevant** 36:14
45:14,18
**reliance** 9:16
**relied** 6:12,13 7:24
27:16 44:7 47:19
**relief** 22:13,13 32:6
49:3
**rely** 34:21 47:20
**relying** 34:22
**remained** 41:5
**remaining** 12:7
35:12
**remains** 41:15
**remedies** 32:8
**remedy** 32:7
**remember** 42:11
**remembered** 14:6
**removal** 35:25
**remove** 21:12
29:14
**removed** 36:4
**repealed** 30:24
**repeatedly** 40:1
**report** 17:7 18:25
24:21,21
**Reporting** 2:2
**represent** 14:9
47:25
**representing** 12:10
**represents** 10:24
**repudiated** 49:15



**repudiation** 9:3
  24:1,2,6 25:17
  45:24 49:16
**request** 22:12
**requested** 32:6
**requires** 21:25
**requiring** 33:5
**res** 41:16
**resolution** 50:23
**resolvable** 21:20
**respect** 15:6,7
  20:19,21 22:8,20
  25:2 26:19,20
**respects** 15:6
**responded** 5:6
**Respondent** 1:9,20
  6:20
**response** 20:19,25
  22:9,12 28:24
  37:2 41:8 52:21
**responsible** 12:14
  21:7
**restoration** 50:12
  50:17
**restore** 52:8
**restored** 32:7 52:6
  52:10
**restoring** 50:13
**result** 18:11 24:5
**results** 16:19
**retained** 3:18
**retire** 29:21 49:8
**retired** 47:25 48:10
  48:20,25 49:11
**retiree** 40:14
**retirees** 5:5 10:22
  10:24 11:10,12
  14:23 18:12 25:19
  25:20 26:9,11
  29:18 30:2 48:3,4
  50:19
**retirement** 4:24
  10:16,19 11:2,18

  12:6,8,10,12,19
  12:22,25 17:10
  18:9 19:10,22
  20:3,5,8,10,15,16
  24:12 25:23 26:7
  29:1 30:11 48:15
  50:16,18
**retiring** 12:12
**return** 5:3,4 10:25
  11:1 14:20,21,22
  14:25 15:1,22,25
  16:6,10 40:13
  51:21
**returned** 26:17
**returns** 14:14
**review** 10:2
**reviewed** 4:20
**reviewing** 28:23
**re-adopted** 40:1
**Richard** 1:17 4:12
**right** 4:14 6:12,22
  7:24 8:20 10:8
  16:1 27:7 30:18
  31:23 32:9,10
  36:24 37:19 42:16
  49:4
**rightly** 41:3
**rises** 46:10
**rising** 23:10,12
**Robert** 36:7
**Roberts** 31:17
**Roc** 12:18
**rolls** 12:11
**roughly** 40:21
**route** 18:4
**rule** 32:14
**ruling** 36:8,8,9
**run** 37:22

_____

**S**
**SAAA** 21:21
**salary** 11:17
**save** 17:25
**savings** 18:18

**saying** 22:23
**says** 12:22 21:11
  34:4
**Schools** 23:18
**scope** 20:17 21:13
**Seated** 4:14
**second** 13:22 19:5
  22:19 36:18 45:2
**secondly** 40:15
**section** 30:16,18,18
  30:20,20 32:1
  34:23 35:11 47:8
**Sections** 36:2
**see** 17:4 18:12 41:1
**seeking** 23:5 25:11
  44:21 49:5
**seeks** 16:2
**seemingly** 5:13
**seen** 14:25 18:21
**selected** 27:15,16
**Senior** 13:7
**separate** 44:3 45:3
**seq** 30:16
**Service** 17:10
**set** 17:14 40:11
  44:20
**seven** 11:16 33:3
**Sheriff** 49:25 50:10
**shocking** 38:21
  47:2
**shows** 18:8,10
**side** 17:23 27:19,20
  50:4
**sides** 6:13 7:24
  16:21
**signed** 35:16
**significant** 16:19
  16:19 24:7,14,17
**silent** 25:7
**similar** 8:13 9:19
**Similarly** 10:5
**single** 24:11,12
  42:25 43:4 50:4

**sir** 52:5
**sitting** 38:1
**six** 33:20 36:16,19
**sneeze** 31:15
**sole** 46:17
**solely** 5:25
**somebody** 7:2
**somebody's** 7:14
**sorry** 4:8 6:21
  14:23 16:24 23:1
**sorts** 16:13
**sought** 9:18 22:2,3
  34:20 38:23 39:2
  39:3 40:5 46:8
  49:3
**so-called** 6:1 40:12
**speak** 37:8
**speaking** 37:11
**Special** 41:23
**specific** 31:25
  32:24 39:17
**specifically** 12:17
  19:21 28:16,21
  30:4,16,17,21
  33:22 35:6 52:9
**specificity** 39:20
**specious** 47:1
**spelling** 39:21
**Spohn** 23:18
**squarely** 25:16
**stability** 46:18,21
  47:14,18,20
**staff** 39:16
**stake** 38:25
**standard** 25:14
**standing** 47:25
**started** 34:19
**starting** 4:10
**state** 1:1 17:19 30:5
  34:7 35:8
**stated** 30:5,18 31:4
**Statement** 3:3,4
**statements** 14:12

**states** 28:21 31:3
  32:24 33:22 34:23
**stating** 21:7
**status** 26:17,22
  32:7 43:18 50:13
  52:6
**statute** 47:8
**step** 22:16
**steps** 51:16 52:7
**Stern** 31:12,21
**Stern's** 36:9
**stumbled** 48:17
**stunned** 45:16
**subject** 17:21 19:19
  20:8 21:13,24,25
  22:8 23:25 24:12
  25:7 26:3,12 29:1
  30:10 32:18 35:11
  45:3 48:25 49:9
  49:23
**subjects** 5:11 19:23
  48:23 50:3,3
**submit** 7:2
**submitted** 40:17
  43:25 44:7
**subordinate** 6:6
**substantial** 24:6,10
**successful** 14:1
  23:4
**sued** 22:5
**suffer** 22:25 23:1
**suggests** 29:5,13,19
**suing** 20:25
**suit** 49:19
**Suite** 1:22
**summary** 4:19,22
  5:7 18:7
**supplement** 40:15
**supported** 9:5
  43:24
**Supreme** 42:15
**sure** 17:17 19:6
  37:4 42:1



**suspended** 30:19
32:2,20,25 33:6
33:22 34:1,4,23
46:19,24 47:10
**system** 4:7,24 9:23
10:16 11:2,18
12:6,9,10,11,12
12:19,22,25 18:9
19:10 20:15,16

**T**

**Tab** 7:7,22 8:17
12:18 17:2 18:6
**table** 3:1 41:21
42:24 43:1,3,4
**tacit** 25:8 29:8,9
40:6 46:5,6,7,9
**tacitly** 42:23
**take** 12:13 23:13
27:5 35:14 37:14
51:16
**taken** 21:9 23:17
30:25 51:2
**talking** 24:16
**target** 40:13
**term** 5:17 13:2
19:17 35:12,19
**terms** 5:10 6:13
26:4 31:1,23 32:9
33:5 36:10 39:17
44:21 46:12 47:2
49:15,17
**testified** 16:3
**testify** 12:23
**testimony** 28:1
**Thank** 10:11 17:4
53:8,9
**theory** 14:2 23:22
**thing** 6:10 38:7
**things** 7:25 15:5
40:14
**think** 6:18 7:3,15
9:7 11:5 13:9
14:6 16:3 17:23

21:22 23:23 25:16
28:2 35:18 41:20
45:16 46:5,10
52:12,23
**third** 12:4,13
**thought** 6:8,9 34:13
**three** 11:8,16 12:20
14:17 18:11 40:14
40:14,20 44:3
46:7 51:23
**three-way** 13:14
**threw** 43:21
**time** 9:21 13:12
15:16 17:13,16,16
21:3,17 29:10
30:12 34:1 37:21
40:21 45:1
**timely** 5:9
**today** 8:25 21:4
31:4 32:19 37:23
37:23 38:8,15,25
41:18 42:19 45:12
**told** 6:4 17:17
33:11
**topic** 45:9
**transcript** 42:2
51:9
**Transit** 25:2
**Treasurer** 35:8
**treat** 7:1 11:6,25
25:12 26:8
**treated** 15:2 49:20
50:8
**Trenton** 26:1 29:20
**trials** 38:2
**Tribunal** 34:21
35:24 47:1,17,20
**tried** 21:17
**troubling** 38:21
47:22
**truly** 35:23
**try** 20:20
**trying** 37:3

**two** 10:7 13:10 15:5
22:16 38:20 41:18
**two-step** 22:14,19
**typically** 52:15
**Tyra** 37:25

**U**

**Uh-huh** 32:16
**ultimately** 50:25
**ultra** 9:15 20:17
**unambiguous** 47:9
**unbargained** 37:12
**underlying** 38:25
**understand** 4:25
8:25
**understandable**
40:24
**understanding**
13:1 16:5 40:7
45:8
**undisputed** 5:13
27:18,22 43:14,24
49:17
**unearned** 48:16
**unequivocally** 44:7
**unfair** 45:23 49:22
**unfortunate** 18:3
**unilateral** 9:1 18:4
19:16 20:13 23:7
23:24 33:14 35:19
36:24 41:2 43:2,9
49:6 51:1
**unilaterally** 38:12
40:3,5,25 43:7,15
44:23 49:13 50:5
50:7
**Union** 8:9,15 9:15
10:9 13:25 15:18
17:15,22,24 25:3
30:2 31:5 37:12
38:14 39:8 40:3,4
42:8,20 43:25
46:3 48:9 49:3,5
49:12

**unionized** 22:15,20
**unions** 6:2 15:14
18:2 22:5,11 23:1
23:3,8 31:1 43:21
48:5
**Union's** 4:22 8:25
9:5 19:8 22:12
23:5 30:4 48:11
**unit** 24:8 48:6
49:11
**unlawful** 9:1 10:4
28:21,22 30:14
31:24 32:5 43:10
44:22 45:24 47:16
49:22
**unsuccessfully** 46:9
**upheld** 43:1
**use** 42:24,25 43:4
**Usually** 11:10

**V**

**v** 1:7 9:17 23:18
**vague** 42:9
**value** 17:4
**Van** 23:18
**various** 6:6 32:9
**vein** 37:13
**venue** 23:20,21
**verification** 19:11
**version** 5:20 45:5
**versus** 13:8 21:10
26:8 29:23,24
31:15,17,18,19
44:16
**violate** 21:1
**violating** 50:7
**violation** 23:7,8
43:5
**vires** 9:15 20:17
**virtually** 5:1
**voluntarily** 48:22
**voters** 13:16 41:10

**W**

**wait** 22:9,10 53:6
**want** 5:22 7:2
27:23 28:7 33:23
37:1,4,5,8
**wanted** 15:14 39:19
42:1
**wants** 27:19
**wasn't** 29:17 38:21
39:10
**way** 12:4 13:13
15:6 17:21,25
29:11 50:25
**Wayne** 29:23,24
31:17,18
**ways** 11:8
**week** 31:12,21
**went** 15:19 16:11
16:11 24:23
**weren't** 18:21
**West** 1:14,18 25:24
29:19
**We'll** 7:4,5 22:10
50:5
**we're** 4:3,18 19:18
20:25 24:15 45:11
**whatnot** 49:20
**wisdom** 9:25 10:1,5
**wish** 37:8
**withdraw** 37:5,8
**won** 23:3
**wonder** 19:14
**wondering** 27:11
**Woodward** 1:22
**words** 13:17 14:25
**work** 8:24 32:10
51:5
**worked** 12:19
**workers** 22:15,20
**worst** 6:9
**wouldn't** 29:16
**Wright** 38:1
**written** 37:20,21,23
37:24 51:8 53:6



**NetworkReporting**

STATEWIDE COURT REPORTERS

800-632-2720

**wrong** 42:15,16,16 42:18

---

**X**

**X** 11:25

---

**Y**

**Yeah** 8:13 28:10
**year** 11:22,25 12:7 12:22,23 14:16 16:4 18:1,11,11 18:13,18 24:17,17 39:21,21 40:18 44:1
**years** 11:5,18 12:20 14:13 24:5,15 39:21

---

**Z**

**zero** 18:23

---

**$**

**$1.9** 24:15
**$100** 18:2

---

**0**

**0-0-0** 53:12

---

**1**

**1** 3:11 6:17 7:6,8,9 9:8,9
**1-800-632-2720** 2:3
**1.2** 17:11
**1.9** 17:11
**10** 7:21 11:5 28:25 30:18,20 32:1 35:6,17 36:2,12 36:16
**10,35** 3:3
**10-10-2011** 3:15
**10:55** 53:10
**11** 36:2
**11-8-2011** 3:13
**12-000777** 1:7 4:5

**126** 25:25
**13th** 5:5 11:10 15:9 15:9 18:14,17 20:11 25:23 26:19 40:14 44:5 48:15 49:14
**141.1501** 30:16
**141.1514(a)** 30:20 32:1 35:6
**149** 19:21
**15** 30:18 34:23 36:4
**15th** 30:22
**15.1** 35:11
**15.9** 14:17
**157** 30:1
**159** 21:6
**16** 30:23
**160** 19:21 21:6
**18** 14:10
**1947** 35:12
**1971** 30:1
**1974** 42:16
**1995** 18:13
**1996** 9:17 10:6 20:20 38:4,23 39:1 40:8,22,25 41:4,6,12,17 42:17 43:16 44:10 44:12 45:8,14,18 51:3

---

**2**

**2** 1:22 3:13 7:10,18 7:19
**20** 5:15 39:21
**20.9** 16:6
**2008** 6:17
**2008-2012** 3:12 27:1 40:2 45:24
**2010** 29:25
**2011** 5:9,14,15 7:11 7:21 21:19 26:2 30:21,22,23 33:4 33:17,18 36:16

**39:2** 40:9,25
**44:13** 45:15 46:1 46:19 47:12,16
**2012** 6:17 16:4 30:24 33:11,12 35:16,18 36:11 47:13,15
**2013** 1:15 4:2
**212** 21:11
**214** 14:7
**218** 9:17 13:9
**237-3002** 1:23
**24** 12:20 26:1
**25** 1:5,24 4:4 5:25 6:6 41:25
**2530** 2:1
**26** 26:1
**263** 9:17 13:9
**28,37** 3:4
**289** 29:24
**294** 19:21

---

**3**

**3** 3:14 7:21 8:1
**3.3** 47:23
**30** 35:9,17 47:10
**30th** 15:21 19:3
**30-some** 24:5
**3026** 1:14
**306** 25:25
**313** 1:19,23
**336** 35:12
**383** 21:11
**390** 21:11

---

**4**

**4** 1:18 3:16 8:2,2,19 9:8,9 16:23,24 30:12,15,17,22 31:23 32:18,19,20 33:4,22 34:2,3,8,9 34:23 35:5 36:11 36:12,23 37:6,7 38:17 46:19,24

47:2,5
**4th** 35:16,18
**404** 30:1
**423.215** 35:12
**48226** 1:18,22

---

**5**

**500** 1:22

---

**6**

**600** 1:18
**664** 29:25

---

**7**

**7** 3:11,13
**7.9** 11:4,19 14:15 14:22,25 15:2,8 15:25 16:2,8,14 16:15 18:16,21,22 18:23 29:14,16,17
**70's** 42:6
**74** 42:7,9

---

**8**

**8** 1:15 3:14,16 4:2 7:11
**80's** 10:15,18
**8151** 2:2

---

**9**

**9** 3:11,13,14,16 36:2
**9:00** 1:15
**9:11** 4:2
**90's** 21:18
**96** 38:8
**964-4454** 1:19

