# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-----------------------------------------------------x
:
In re                           :          Chapter 9
:
CITY OF DETROIT, MICHIGAN,   :          Case No. 13-53846
:
              Debtor.     :          Hon. Steven W. Rhodes
:
:
-----------------------------------------------------x

## MOTION OF DEBTOR, PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER EXTENDING THE CHAPTER 9 STAY TO THE 36TH DISTRICT COURT AND CERTAIN RELATED PARTIES

The City of Detroit, Michigan ("Detroit" or the "City"), as the debtor

in the above-captioned case, hereby moves the Court, pursuant to section 105(a) of

title 11 of the United States Code (the "Bankruptcy Code"), for the entry of an

order[1] extending the automatic stay provisions of sections 362 and 922 of title 11

of the United States Code (the "Chapter 9 Stay") to the 36th District Court (as

---

[1] This Motion includes certain attachments that are labeled in accordance with Rule 9014-1(b)(1) of the Local Rules of the Bankruptcy Court for the Eastern District of Michigan (the "Local Rules"). Consistent with Local Rule 9014-1(b), a copy of the proposed form of order granting this Motion is attached hereto as Exhibit 1. A summary identifying each included attachment by exhibit number is appended to this Motion.

defined below) and certain related parties.  In support of this Motion, the City respectfully represents as follows:

## General Background

1. On July 18, 2013 (the "Petition Date"), the City filed a petition for relief in this Court, thereby commencing the largest chapter 9 case in history.

2. Incorporated in 1806, Detroit is the biggest city in Michigan. As of December 2012, the City had a population of less than 685,000 (down from a peak population of nearly 2 million in 1950).  Over the past several decades, the City has experienced significant economic challenges that have negatively impacted employment, business conditions and quality of life.

3. As of June 30, 2013 — the end of the City's 2013 fiscal year — the City's liabilities exceeded $18 billion (including, among other things, general obligation and special revenue bonds, unfunded actuarially accrued pension and other postemployment benefit liabilities, pension obligation certificate liabilities and related derivative liabilities).  As of June 30, 2013, the City's accumulated unrestricted general fund deficit was approximately $237 million.

4. In February 2013, a state review team determined that a local government financial emergency exists in the City.  Thereafter, in March 2013, Kevyn D. Orr was appointed, and now serves as, emergency manager with respect to the City (in such capacity, the "Emergency Manager") under Public Act 436 of

2012, the Local Financial Stability and Choice Act, MCL § 141.1541, <u>et</u> <u>seq.</u>

("<u>PA 436</u>").  Under Section 18(1) of PA 436, the Emergency Manager acts

exclusively on behalf of the City in this chapter 9 case.  MCL § 141.1558.

## The 36th District Court

5.      Pursuant to section 8101 of the Revised Judicature Act of 1961,

M.C.L. §§ 600.101-9948 (the "<u>Judicature Act</u>"), the State of Michigan is divided

into judicial districts under the superintending control of the Michigan Supreme

Court.  M.C.L. § 600.8101(1).

6.      The districts established by the Judicature Act are categorized

into three classes.  <u>See</u> M.C.L. § 600.8103 (classifying districts as districts of the

first, second or third class).  Third-class districts consist of one or more political

subdivisions within a county.  <u>Id.</u>  Each political subdivision within a third-class

district generally is responsible for the cost of maintaining, financing and operating

the district court within its borders, except as otherwise provided in the Judicature

Act.  <u>Id.</u>

7.      The thirty-sixth judicial district of the State of Michigan is a

district of the third class consisting solely of the City of Detroit.  M.C.L.

§ 600.8121(a).  The district court for the thirty-sixth judicial district (the "<u>36th</u>

<u>District Court</u>") is located at 421 Madison Avenue in the City of Detroit.

Accordingly, although the 36th District Court is legally distinct from the City, the

City is responsible for maintaining and financing the operations of the court, except as otherwise provided in the Judicature Act.[2]  For the fiscal year ending June 30, 2012, the City spent approximately $35,000,000 maintaining and financing the operations of the 36th District Court.   See City of Detroit, Michigan Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2012 at 81, an excerpted copy of which is attached hereto as Exhibit 6.1.[3]

### Legal Actions and Proceedings

8.      As of the Petition Date, the 36th District Court was subject to numerous claims, demands, arbitrations, causes of action, lawsuits and other legal proceedings (including administrative proceedings), whereby various third parties have alleged, or could in the future allege, among other things, that the 36th District Court is liable to such third parties or affiliates of such third parties (collectively, the "Legal Proceedings").  For example, on August 14, 2013, Patrick A. McDonald, as arbitrator, entered a Decision and Award (the "Decision and

---

[2]      One specific cost of operating the 36th District Court for which the City ultimately is not responsible, for example, is judicial salaries.  This expense initially is shared between the City and the State of Michigan, but the state ultimately is required to reimburse the City for the portion it pays, pursuant to M.C.L. § 600.8202.  The salaries of the 36th District Court's non-judicial employees, however, are funded by the City.  See id.

[3]      In addition to the funding provided by the City, the 36th District Court receives limited revenues from certain fees, costs generated from court operations and grants.

Award") in a grievance between the 36th District Court, as employer, and Michigan AFSCME Council 25 and its Local 917, acting on behalf of four former officers of the 36th District Court. A copy of the Decision and Award is attached hereto as Exhibit 6.2. By virtue of the Decision and Award, the 36th District Court was determined to be liable in the aggregate amount of $5,528,156.06 for back pay (including interest to August 15, 2013). Id. at 56-9.

9. The 36th District Court is currently involved in various other Legal Proceedings, including, without limitation, actions and other proceedings commenced by (a) Constance Grimes, (b) Arnette Rodgers, (c) Katrina Tate-Anderson, (d) Jaunice Flowers, (e) Cheryl Sharpley, (f) Anthony Cooper, (g) Wendell Finley, (h) Arecia Stevens, (i) Crystal Allen-Cruce, (j) Keith Carter, (k) Laura Hill, (l) Alvita Moss, (m) Jonathan Mapp, (n) the AFSCME Local 3308 and (o) Dornita Cleveland. In accordance with the Judicature Act, the City is obligated to provide funds to the 36th District Court to satisfy any liabilities arising from any Legal Proceedings or other obligations of, or claims against, the 36th District Court, and has historically provided the 36th District Court with such funds.

## Jurisdiction

10. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

11.     The City hereby seeks an order, pursuant to section 105(a) of the Bankruptcy Code, extending the Chapter 9 Stay to the 36th District Court and its officers, employees, agents and representatives (collectively, with the 36th District Court, the "36th District Court Parties").  The City seeks this relief to (a) aid in the administration of its bankruptcy case, (b) protect and preserve the assets of the City and prevent any disruption in the funding and operation of the 36th District Court for the benefit of the City and its residents and (c) ensure that the City is afforded the breathing spell it needs to focus on developing and negotiating a plan for adjusting its debts.

## Basis for Relief

### The Chapter 9 Stay

12.     Upon the commencement of a bankruptcy case, section 362 of the Bankruptcy Code provides for an automatic stay of actions to, among other things, collect prepetition obligations by non-debtor third parties.  The automatic stay also is supplemented in chapter 9 by section 922(a) of the Bankruptcy Code, which provides as follows:

A petition filed under this chapter operates as a stay, in addition to the stay provided by section 362 of this title, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against an officer or inhabitant of the debtor that seeks to enforce a claim against the debtor; and

(2) the enforcement of a lien on or arising out of taxes or assessments owed to the debtor.

11 U.S.C. § 922(a). In a chapter 9 case, therefore, section 922 of the Bankruptcy Code extends the self-executing protections of section 362 of the Bankruptcy Code to, among other things, actions against officers and inhabitants of the debtor to enforce claims against the debtor.

### The Court's Equitable Power to Extend the Stay in Appropriate Circumstances

13. Section 105(a) of the Bankruptcy Code authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Sixth Circuit has held that a court may utilize its equitable power under section 105(a) of the Bankruptcy Code to extend the automatic stay to non-debtor entities in "unusual circumstances." Am. Imaging Servs., Inc. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.), 963 F.2d 855, 861 (6th Cir. 1992) accord Parry v. Mohawk Motors of Michigan, Inc., 236 F.3d 299, 314 (6th Cir. 2000). Unusual circumstances exist, for example, where there is an identity between the third party and the debtor such

that a judgment against the third party would, in effect, be a judgment against the debtor.  Eagle-Picher, 963 F.2d at 861.

**Request to Extend the Chapter 9 Stay**
**to the 36th District Court Parties**

14.    The City requests that the Court exercise its equitable power under section 105(a) of the Bankruptcy Code to extend the Chapter 9 Stay to all Legal Proceedings, whether previously commenced or that could in the future be commenced, seeking to liquidate and/or enforce any claim against the 36th District Court Parties arising prior to the City's Petition Date.

15.    The City continues to provide funding to the 36th District Court, as it is obligated to do so by law, to allow the 36th District Court to maintain operations.  The City has not provided funds to the 36th District Court to satisfy obligations of the 36th District Court other than for various vendors necessary to sustain the operations of the 36th District Court, consistent with the manner in which the City has been treating its own prepetition vendor debt.  The remaining prepetition obligations of the City to the 36th District Court to fund the court's maintenance, operations and other obligations are general unsecured claims that will be treated under the City's plan of adjustment.

16.    As stated, the 36th District Court has no other source of funding for its maintenance, operations and other obligations other than funds from the City's General Fund.  If the Chapter 9 Stay is not extended to 36th District Court,

creditors of the 36th District Court whose claims arose prior to the City's bankruptcy filing could seek to enforce their state law remedies in an attempt to collect on their claims. In fact, after the entry of the Decision and Award, the grievants threatened to take such action. As set forth above, any action against the 36th District Court is, in reality, an action against the City due to the City's funding obligations.

17. The extension of the Chapter 9 Stay to the 36th District Court Parties, therefore, is necessary and appropriate and in the best interests of the City and its residents. If the Chapter 9 Stay is not extended to the 36th District Court Parties, the 36th District Court is likely to suffer a disruption in operations that would be detrimental, both monetarily and non-monetarily, to the City and its residents. The only way to avoid this result would be for the City to pay in full all of the 36th District Court's prepetition claims against the City. In reality, any claims against the 36th District Court Parties are claims against the City, and any judgments or awards entered against the 36th District Court Parties in Legal Proceedings would essentially be judgments and awards against the City. Unusual circumstances, therefore, exist to justify extending the Chapter 9 Stay to prepetition claims against the 36th District Court Parties. Eagle-Picher, 963 F.2d at 861.

## Reservation of Rights

18.     The City files this Motion without prejudice to or waiver of its rights pursuant to section 904 of the Bankruptcy Code, and nothing herein is intended to, shall constitute or shall be deemed to constitute the City's consent, pursuant to section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political or governmental powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property.

## Notice

19.     Notice of this Motion has been given to the following (or their counsel if known):  (a) all entities that have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure; (b) counsel to the 36th District Court, (c) counsel to parties actually known to the City involved in Legal Proceedings against the 36th District Court, and (d) all other known creditors of the 36th District Court.  In addition, a copy of the Motion was served on the Office of the United States Trustee.  The City submits that no other or further notice need be provided.

## Statement of Concurrence

20.     Local Rule 9014-1(g) provides that "in a bankruptcy case unless it is unduly burdensome, the motion shall affirmatively state that concurrence of

opposing counsel in the relief sought has been requested on a specified date and that the concurrence was denied." Local Rule 9014-1(g). Counsel to the 36th District Court consents to the relief requested herein. Given the number of potential creditors of the 36th District Court, it would be impracticable (and, with regard to unknown creditors, impossible) for the City to affirmatively seek the concurrence of each opposing counsel interested in the relief sought herein. Accordingly, the City submits that imposing the requirements of Local Rule 9014-1(g) in this matter would be "unduly burdensome" and requests that its requirements be waived.

### Request for Hearing

21.     In the event that objections are filed to the relief requested herein, the City requests that the Court schedule a hearing on this Motion for the omnibus hearing scheduled for October 16, 2013, at 10:00 a.m., Eastern Time, or as soon thereafter as the Court's schedule permits.

### Statement Regarding Evidentiary Nature of Hearing

22.     The City believes that this Motion raises no factual issues and anticipates that an evidentiary hearing on this Motion will not be required.

## No Prior Request

23.     No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the City respectfully requests that this Court: (a) enter an order substantially in the form attached hereto as Exhibit 1 granting the relief sought herein; and (b) grant such other and further relief to the City as the Court may deem proper.

Dated: September 25, 2013          Respectfully submitted,


/s/ Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# SUMMARY OF ATTACHMENTS

The following documents are attached to this Motion, labeled in accordance with Local Rule 9014-1(b).

| | |
|---|---|
| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Notice of Motion |
| Exhibit 3 | None  [Brief Not Required] |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | None  [No Affidavits Filed Specific to This Motion] |
| Exhibit 6.1 | Excerpt of 2012 Annual Report |
| Exhibit 6.2 | Decision and Award |

# EXHIBIT 1

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
--------------------------------------------------x
                                   :
In re                              : Chapter 9
                                   :
CITY OF DETROIT, MICHIGAN,         : Case No. 13-53846
                                   :
                    Debtor.        : Hon. Steven W. Rhodes
                                   :
                                   :
--------------------------------------------------x
```

## ORDER, PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE, EXTENDING THE CHAPTER 9 STAY TO THE 36TH DISTRICT COURT AND CERTAIN RELATED PARTIES

This matter coming before the Court on the Motion of Debtor,

Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order

Extending the Chapter 9 Stay to the 36th District Court and Certain Related Parties

(the "Motion"),[1] filed by the City of Detroit, Michigan (the "City"); the Court

having reviewed the Motion and having considered the statements of counsel and

the evidence adduced with respect to the Motion at a hearing before the Court

(the "Hearing"); and the Court finding that: (a) the Court has jurisdiction over this

matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding

pursuant to 28 U.S.C. § 157(b), (c) notice of the Motion and the Hearing was

---

[1]     Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

sufficient under the circumstances, (d) the unusual circumstances present in this chapter 9 case warrant extending the Chapter 9 Stay to the 36th District Court Parties; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.     The Motion is GRANTED.

2.     Pursuant to section 105(a) of the Bankruptcy Code, the Chapter 9 Stay is extended to apply in all respects to all claims against the 36th District Court Parties arising prior to July 18, 2013.

3.     For the avoidance of doubt, all Legal Proceedings, and any efforts or actions by any holders of claims against the 36th District Court Parties arising prior to July 18, 2013, are stayed pursuant to section 105(a) of the Bankruptcy Code, pending further order of this Court.

4.     This Order is entered without prejudice to the right of any creditor of the 36th District Court to file a motion for relief from the stay imposed by this Order using the procedures, and under the standards, of sections 362(d) through (g) of the Bankruptcy Code.

# EXHIBIT 2

Form B20A(Official Form 20A)
12/1/10

**UNITED STATES BANKRUPTCY COURT**
**Eastern District of Michigan**

In re:

                                                      Chapter: 9

**CITY OF DETROIT, MICHIGAN,**

                                                      Case No.: 13-53846

                            **Debtor.**

                                                     Judge:  Hon. Steven W. Rhodes

Address:  2 Woodward Avenue, Suite 1126
                Detroit, Michigan  48226

Last four digits of Social Security or
Employer's Tax Identification (EIN) No(s).(if any):  38-6004606

**NOTICE OF MOTION OF DEBTOR, PURSUANT TO**
**SECTION 105(a) OF THE BANKRUPTCY CODE, FOR**
**ENTRY OF AN ORDER EXTENDING THE CHAPTER 9 STAY**
**TO THE 36TH DISTRICT COURT AND CERTAIN RELATED PARTIES**

      The City of Detroit, Michigan (the "City") has filed papers with the Court seeking entry of an order, pursuant to sections 105(a) of the Bankruptcy Code extending the automatic stay of sections 362 and 922 of the Bankruptcy Code to the district  court for the thirty-sixth district court of the State of Michigan and certain related parties.

      <u>**Your rights may be affected.**</u>  **You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case.  (If you do not have an attorney, you may wish to consult one.)**

      If you do not want the court to grant the relief sought in the motion, or if you want the court to consider your views on the motion, **on or by October 9, 2013**, you or your attorney must:

1.             File with the court a written response or an answer, explaining your position at:[1]

**United States Bankruptcy Court**
United States Bankruptcy Court
211 W. Fort Street, Suite 2100
Detroit, Michigan  48226

             If you mail your response to the court for filing, you must mail it early enough
             so the court will **receive** it on or before the date stated above.  All attorneys are
             required to file pleadings electronically.
             You must also mail a copy to:

---

[1]         Any response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

2.        If a response or answer is timely filed and served, the Court will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing. The City has requested that the Court schedule a hearing date of October 16, 2013 at 10:00 a.m., Eastern Time with respect to the motion.

**If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

Dated:    September 25, 2013          Respectfully submitted,

/s/  Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# **EXHIBIT 4**

## CERTIFICATE OF SERVICE

    I, Heather Lennox, hereby certify that the foregoing Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Extending the Chapter 9 Stay to the 36th District Court and Certain Related Parties was filed and served via the Court's electronic case filing and noticing system on this 25th day of September, 2013.

               /s/ Heather Lennox_____

# **EXHIBIT 6.1**



# Comprehensive Annual Financial Report

## City of Detroit, Michigan
### For the Fiscal Year Ended June 30, 2012

Dave Bing, Mayor
Jack Martin, Chief Financial Officer



*"We hope for better things."* | *"It shall rise again from the ashes.""*

FOUNDED **1701**
INCORPORATED **1806**
AREA (Square Miles) **137.9**
POPULATION **713,777**

# City of Detroit

# Comprehensive Annual Financial Report

## for the Fiscal Year Ended June 30, 2012

Dave Bing, Mayor

**(c) Deficit Fund Equity**

The General Fund had a deficit fund balance of $269,486,657 at June 30, 2012. Local Development Finance Authority (a Component Unit) (LDFA) had a fund deficit of $26,861,662. Eastern Market Corporation had an unrestricted fund deficit of $123,209. The City's Financial Stability Agreement serves as the General Fund's deficit elimination plan. See Note XIII – Subsequent Events for details of the Financial Stability Agreement. LDFA's plan for elimination of its deficit involves the continued collection of incremental tax revenues and payment of its debt service requirements in the upcoming years. Eastern Market Corporation's plan for elimination of its deficit involves ongoing cost containment.

**(d) Excess of Expenditures Over General Fund Appropriations**

The legal level of budget control is maintained at the appropriation level, which is more detailed than the budget in the Required Supplementary Information. Listed below are expenditures that exceeded its corresponding appropriation for the year ended June 30, 2012:

| Agency Description | Appropriation Description | YTD Budget Final | YTD Actual | Variance |
|---|---|---|---|---|
| Building and Safety | Business License Center | $ 609,484 | $ 764,627 | $ (155,143) |
| Finance | Treasury Division | 11,355,446 | 11,543,053 | (187,607) |
| Fire | Fire Fighting Operations | 134,081,250 | 144,819,435 | (10,738,185) |
| Health and Wellness Promotions | Community Health Services | 1,167,010 | 1,297,439 | (130,429) |
|  | Lead Abatement | 315,814 | 382,431 | (66,617) |
| Human Resources | Personnel Selection | 581,825 | 596,054 | (14,229) |
| Human Services | Senior Advocacy | 9,025 | 117,649 | (108,624) |
| Non-Departmental | Tax Support-DOT | 52,445,928 | 90,565,317 | (38,119,389) |
|  | Parking Systems Operating Advance | 6,307,770 | 6,854,492 | (546,722) |
|  | Claims Fund (Insurance Premium) | 66,751,937 | 75,686,421 | (8,934,484) |
|  | Centralized Utility Payments | 11,000 | 38,060 | (27,060) |
| Planning and Development | Real Estate & GIS | 1,058,826 | 1,169,752 | (110,926) |
| Police | Eastern Operations Bureau | 9,119 | 226,515 | (217,396) |
|  | Western Operations Bureau | 4,424 | 3,415,969 | (3,411,545) |
|  | Management Services Bureau | 16,312,654 | 21,904,107 | (5,591,453) |
|  | Rape Couseling Unit | 405,743 | 778,547 | (372,804) |
|  | Police Athletic League | 575,241 | 694,159 | (118,918) |
|  | Operations | 217,200,829 | 224,675,163 | (7,474,334) |
| General Services Department | Administration | 1,483,170 | 1,628,186 | (145,016) |
|  | General Services - Street Fund | 3,527,493 | 3,674,546 | (147,053) |
|  | 36th District Madison Center | 4,146,373 | 4,191,927 | (45,554) |
|  | Inventory Management | 4,147,512 | 4,878,155 | (730,643) |
| Auditor General | Audit - CAFR | 1,439,118 | 1,843,136 | (404,018) |
| 36th District Court | State Transferred Functions | 28,562,599 | 30,802,665 | (2,240,066) |
| **Total All Agencies** |  | $ 552,509,590 | $ 632,547,805 | $ (80,038,215) |

# EXHIBIT 6.2

# ARBITRATION

36th **District Court**
        **Employer**

*Grievance: Court Officers*

**and**

*Implementation of Award*

**Michigan AFSCME Council 25 and
its Local 917**
        **Union**

_____/


# DECISION AND AWARD


## I.    APPEARANCES

**For the Employer:**

Matthew S. Derby, Esq.
Kotz Sangster Wysocki PC
400 Renaissance Center, Suite 3400
Detroit, MI   48243-1618

**For the Union:**

Robert Fetter, Esq.
Miller Cohen, PLC
600 W. Lafayette Blvd, 4th Floor
Detroit, MI   48226


**PATRICK A. McDONALD**
**Arbitrator**

# TABLE OF CONTENTS

I.     APPEARANCES.................................................................**Cover**

II.    INTRODUCTION........................................................... 3

III.   FACTS........................................................................ 5

IV.   RELEVANT CONTRACTUAL AND STATUTORY LANGUAGE.......... 20

V.    CONTENTIONS OF THE PARTIES............................... 26

VI.   ISSUE .................................................................. 36

VII.  DISCUSSION AND DECISION..................................... 36

VIII. AWARD................................................................... 56

## II.  INTRODUCTION

This particular case began several years ago when, on September 22, 2004, 36th District Court Officers Bobby Jones (Jones) and Carlton Carter (Carter) were notified in writing of their non-reappointment to their court officer positions. On January 5, 2007, 36th Court Officers Richard Weatherly (Weatherly) and Roderick Holley (Holley) were notified in writing of their non-reappointment to their court officer positions. AFSCME represents the officers and on their behalf filed grievances and demanded arbitration of the four grievances.

Because both parties, as well as the courts of Michigan, are thoroughly familiar with the facts in this case, I will not spend a great deal of time enumerating the procedural steps that occurred. Suffice it to say that this Arbitrator issued a January 2009 Decision and Award deeming all four grievances arbitrable. Thereafter, a hearing was conducted on the merits. A Decision and Award was issued in June 2009, ordering the reinstatement with back pay for all of the Grievants. The Employer did not carry out the Award. Instead, in July of 2009, the Employer filed a Complaint in Wayne County Circuit Court seeking to vacate the arbitration Decisions. The action to vacate was  assigned to Wayne Circuit Judge Jeanne Stempien. Judge Stempien issued an Opinion and Award on May 4, 2010, fully affirming both arbitration Decisions (Joint Exhibit 3).

In that same month, the Employer filed an appeal with the Court of Appeals. On February 28, 2012, the Court of Appeals issued its Decision, affirming in part and vacating

3

in part Judge Stempien's Decision (Exhibit 4). This Decision was appealed to the Michigan Supreme Court, which, in October of 2012, overturned the Decision of the Court of Appeals that had reversed the Arbitrator's Award of reinstatement for the Grievants (Joint Exhibit 5). The Supreme Court of Michigan found that "the arbitrator and the Wayne Circuit Court correctly found that MCR 3.106(C) does not preclude relief where the collective bargaining agreement imposes a just cause standard for termination" (Joint Exhibit 5).

Following the Michigan Supreme Court Decision, the Employer finally reinstated Messrs. Carter and Jones in January of 2013, and Mr. Holley in March of 2013. Mr. Weatherly is still waiting for his reinstatement.[1]

Because the parties were not able to agree on the back pay previously ordered, arbitration hearings were held on June 18, 2013 and June 20, 2013 to determine the appropriate back pay remedy for each of the four Grievants. During those hearings, each party was well represented by counsel and had the full opportunity of presenting exhibits and testimony. Six witnesses testified and 35 exhibits were introduced. A transcript was made of the proceedings. The parties, through counsel, supplemented this opportunity with extensive post-hearing briefs. This matter is now ready for Decision and Award.

---

[1]As discussed at the June 18 and June 20, 2013 hearings, Mr. Weatherly has not been reinstated. The parties have agreed to a separate arbitration hearing regarding the basis for the non-reinstatement, if necessary. For the purpose of the instant back pay hearing, the Arbitrator set a back pay accrual cut-off date for Mr. Weatherly of January 7, 2013 (Trial Record, pp 156-159; 166-176).

4

## III.    FACTS

The four Grievants in this particular case were court officers serving with the 36th District Court.  Court officers serve in one of two divisions – either civil or real estate.  In this case, all four of the Grievants served in the real estate division (Trial Record, p 34).  A court officer's job duties include serving summons on landlord/tenant issues; orders of eviction; orders for the seizure or attachment of property; orders requiring arrest authority pursuant to MCR 2.103(D); and other services as the Court may require (see Trial Record, p 34, Employer Exhibits 30, 31, 32, and Union Exhibit 35).  Court officers carry badges and firearms and forcibly enter private residences to carry out evictions and remove furniture and personal possessions.

The 36th District Court has issued a statement concerning filing fees and service fees for services (Employer Exhibit 30).  Fees for service of process or papers are also set forth in Michigan Compiled Laws 600.2559 (Employer Exhibit 31), as well as the Michigan Court Rules (MCR 3.105, 106) (Employer Exhibit 32).  In addition, in reinstating the Grievants, the following duties were mentioned:

- Orders of Eviction
- Orders for the Seizure or Attachment of Property
- Orders requiring arrest authority pursuant to MCR 2.103(D)
- Other services the court may require

(Union Exhibit 35, Bobby Jones, see letter effective January 7, 2013

Court officers perform their duties under the court rules.  As court officers, the Grievants can perform one of their duties of removing personal property.  Sheriffs may also

5

do so if they are appointed out of that particular district.[2]

There is a set fee structure for court officers and bailiffs who are also members of Local 917 of the Union. They are governed by the same Collective Bargaining Agreement. The Grievants testified that there is a set fee structure that they received in writing from the City of Detroit Housing Department. That fee structure included even non-city owned housing (Trial Record, pp 125-126). The fee is based upon the size of the property and the type of property, and whether it's commercial, residential, apartments, etc. The normal fee is $70.00 per room plus $5.00 for each additional room (Trial Record, p 56, 95, 124). Court officers working with the 36th District Court make sure they have guidelines regarding commercial property (Trial Record, p 128). This fee is paid directly to the court officers and is reported on a 1099 form. On their taxes, the court officers deduct the cost of this service, supplies, equipment, vehicle use and pay for the crews that they organize to perform such work (Trial Record, p 39-41). Further, under Michigan Court Rule 3.106, court officers are required to retain copies of all bills and receipts regarding Orders of Eviction (Employer Exhibit 32).

The first witness for the Union was Mr. Carlton Carter, who stated he began work as a clerk with the Court in 1989 and became a court officer in 1998. He was suspended from his duties on August 11, 2004 (Joint Exhibit 10) and was terminated on September 22, 2004

---

[2] Bailiffs perform the exact same duties as court officers. However, bailiffs are paid a $20,000.00 salary on top of those duties (Trial Record, p 36, 43).

(Joint Exhibit 11).  He ultimately was reinstated on January 7, 2013.

The first witness, the Grievant Carlton Carter, explained the procedure he uses in performing evictions:

> A.    If there's a landlord involved in it we meet them at the property, we go to the door, knock on the door, if nobody answers we gain entry to the property.  The landlord is responsible for having a container there that we're to put personal property in.
>
> I have some guys that work for me and we remove all of the personal property out of the house and put it in the container and the landlord locks his property.
>
> Q.    And are those your duties pursuant to court rule?
>
> A.    Yes.
>
> Q.    Who else can perform that duty of removing the personal property?
>
> A.    Court officers.
>
> Q.    How about sheriffs?
>
> A.    They can if they're appointed out of that district.
>
> Q.    So can anybody perform that work?
>
> A.    No.
>
> Q.    Only court officers?
>
> A.    Correct.

Mr. Carter was also asked how court officers are paid for eviction work.  He explained as follows:

> A.    The landlord pays us upon completion or if it's a law firm involved in it we invoice the law firm and the law firm pays us within ten days.

7

Q. What is the fee?

A. Normal fee is $70 per room for a normal room, the first floor, it goes up $5 additional per floor per room, basement starts off at $150.00.

Q. And who sets that fee?

A. It was set by the city some years ago.

Q. So you don't have any control to negotiate that rate?

A. No.

Q. And what about apartments? What's the rate for apartments?

A. Normal apartment, first floor, four room apartment usually runs about 425. It pays a difference when you have the distance that it takes you to get to the dumpster, if there's not an elevator working at that time and your guys have to go up and down the steps, all that plays a part in it so like your normal four room apartment it runs about 425.00.

Q. What about commercial buildings?

A. Commercial buildings vary depends on what's in the commercial building, how much has to be removed from the commercial building.

Mr. Carter further testified that being a court officer is a very dangerous job. Court officers carry weapons during the course of their duties.

Mr. Carter identified his federal tax records for the years 2004 through 2012 (Joint Exhibit 6). He also identified what was marked as a "Carter Back Pay Summary," listing base income, unemployment benefits, interim wages and income received, among other columns (Union Exhibit 16).

Mr. Carter testified that he only worked seven and a half months in 2004 due to his

8

suspension. His annualized income is based on what he earned in the first seven and a half months of 2004 as annualized. Carter explained that court officers' income fluctuated depending on the number of jobs and papers they serve (Trial Record, p 42). His annualized income for 2004 was $88,857.60 on his W-2 form, and $167,142.40 on his 1099 form. His total annualized income for 2004 was $256,000.00.

In 2005, Mr. Carter explained that he had no W-2 income, but he did have $10,767.00 in business income as reported on a 1099 form (Exhibit 6). That amount represents income from clerical work he did for a bailiff. In 2005, Carter earned $9,412.00 in unemployment compensation, which is also listed.

Mr. Carter explained that some of the income reported on his tax returns is income earned by his wife, Yolanda Carter (Trial Record, pp 45-51). This income is not reflected in the summary.

In February of 2006, Mr. Carter indicated that he got a position with the District Court in Highland Park. At the Highland Park District Court, he made $108,390.00. In 2007, he made $146,135.00. In 2008, he made $138,810.00 (Joint Exhibit 6).

According to Carter, in 2009, he incorporated as an independent business contractor, Carlton Carter & Associates (Trial Record, p 47). This business paid Carter $15,000.00 in salary and he earned $49,282.00 in profits (Trial Record, p 47). In 2010, Mr. Carter made $21,174.00 from the City of Highland Park. He also received $41,065.00 from his duties as a Highland Park court officer (Trial Record, p 49 and Exhibit 16).

9

For 2011, Mr. Carter's income from Carlton Carter & Associates and the City of Highland Park amounted to $37,278.00.

In 2012, Mr. Carter's business made a profit of $26,314.00 and he received interim income of $35,076.00.

Mr. Carter explained that he helped a judge get elected in Highland Park and that is how he got the position of court officer in that court. It is a patronage position.

On cross-examination, Mr. Carter indicated that he was first appointed by Chief Judge Joseph Baltimore in 1998. The rates set by the City of Detroit Housing Commission were in documents given to Carter and other court officers as they started their job. He indicated that he applied the same standards for private evictions.

Concerning interim employment, Mr. Carter explained that he was fortunate to get interim employment, even though it did not meet the standards of the 36th District Court. He also applied at a number of other courts, including Inkster, Southfield, and Hamtramck. He also applied for and took some security jobs. He also applied for many jobs, including court officer positions in Southfield, Highland Park, and several other district courts. He applied for work in Southfield, Warren, Redford, Garden City and Inkster (Trial Record, p 67). He accepted a court officer appointment from the 30th District Court around February 8, 2006 and remained employed there until his reinstatement at the 36th District Court. Mr. Carter explained that he applied for several security jobs including Sentra Security and several factory jobs, including Spring Technologies in Livonia. Carter explained that he incorporated Carlton Carter & Associates because of a suggestion from his accountant to be

10

able to get more writeoffs for expenses that he incurred in doing evictions (Trial Record, p 81).

The next witness for the Union was Mr. Bobby Jones. Mr. Jones testified that he began work at the 36th District Court as a court officer in 1998. His employment was terminated on September 30, 2004. He ultimately was reinstated on January 7, 2013 (Trial Record, p 83-84).

Mr. Jones identified all of his tax records between 2004 and 2012 (Joint Exhibit 7). He also identified a Back Pay Summary Sheet (Union Exhibit 15). It was similar in form to the one that Mr. Carter identified. It has columns showing base income, unemployment amounts received, and interim income for all the years in question. Mr. Jones, being terminated on September 30, 2004, worked nine months for that year. His income from W-2 sources for serving summons and orders of eviction showed that he earned $77,138.00. His 1099 income, which came from actually performing the evictions, after expenses, was $27,222.00. His total income for that nine-month period was $104,360.00 (Joint Exhibits 7 and 15). Other income he received was from cashing in on his retirement account because he was old enough at the time (Trial Record, p 85).

Jones explained that in 2004, he made a relatively low amount of income for a court officer. Usually, court officers average between $225,000 and $250,000 a year. According to Jones, he typically made about $250,000 per year (Trial Record, p 87). However, for 2004, his annualized income amounted to $139,146.67. That is his base income in calculating the years that he was off as a result of his discharge. The summary sheet admitted

11

into evidence reflects the unemployment compensation he received as well as his interim earnings (Union Exhibit 15).

Mr. Jones explained that for 2005 through 2011, he had subsequent employment from which he earned income. This amount is to be subtracted from the base amount and a sub-total occurs for each year. For example, in 2005, Jones said he drove an armored car for All Security (Trial Record, pp 87-88). In 2006, Jones earned $30,730 in income from All Security. In 2007, that amounted to $29,454.00 from All Security. He also received a payment of $12,000 from the 36th District Court as wages for being laid off for 30 days.

Jones explained that a grievance was filed that ultimately went to arbitration. He, along with other court officers, received $12,000.00 each. The $12,000.00 is not included in his summary (Union Exhibit 15). In 2008, Jones testified that he earned $25,245.00 (Trial Record, p 92). That was from All Security. In 2009, that amounted to $27,850.00 from All Security. In 2010, he earned $29,712.00 from All Security. In 2011, Jones made $15,359.00 from All Security and $7,020.00 in unemployment. Jones explained that he lost his job with All Security when the armored car was held up at was held up at gunpoint (Trial Record, p 93, 100). He then began to collect Social Security benefits in the amount of $5,732.00.

In 2012, Mr. Jones filed a joint tax return because he got married. The W-2 income of $33,212.72 was his wife's income. As a result, it would not be reported on his summary sheet. He received $2,106.00 in unemployment and $7,903.00 in Social Security benefits (Trial Record, p 94).

12

Jones testified that on April 17, 2013, he filed for bankruptcy (Employer Exhibit 22). His bankruptcy documents mention an average monthly income of $4,443.88. He had not included the 1099 income because he had not yet received his 1099 form at the time (Trial Record, p 105).

Since returning to work, Jones testified that the present volume of work is below what it used to be. Apparently, according to Jones, this is occurring because the 36th District Court added six persons to the bailiff/court officer contingent (Trial Record, p 202).

Jones said he sought employment through a number of sources, including newspapers, friends, family, and Michigan Works. He applied for many court officer positions both in Michigan as well as out of state. He specifically recalled a position in Kansas. He also sent a resume to the City of Southfield, and filled out applications at various security companies including, but not limited to, Total Security, Brink's, Gaurdia. He applied and was hired for a position with All Security Services, Inc. and was employed there from September 2005 through August 2011 (Exhibit 20). During his second period of unemployment, Jones said he was required to apply for approximately three jobs every two weeks. He was never denied benefits for not seeking work (Trial Record, p 95).

The third witness for the Union was Mr. Roderick Holley, Grievant, who started his work for the 36th District Court in 1981 as a clerk. He worked in that classification until 1997 when he then transferred to the Michigan Supreme Court where he worked for two years. He then came back to the 36th District Court in 1998 and became a court officer. He

13

was terminated in January of 2007 and was reinstated on March 4, 2013 (Trial Record, p 115).

Mr. Holley identified all of his tax records from 2007 through 2013 (Joint Exhibit 8). He also identified a Back Pay Summary Sheet prepared for the years 2006 through 2013 (Union Exhibit 18). His baseline pay is $226,174.00. Mr. Holley was not reinstated until March 2013, so there is a portion of back pay for that two month period, which must be calculated.

For the year 2006, Mr. Holley reported $81,200.00 in W-2 income and $144,974.00 from 1099 income performing evictions on behalf of the Court. That income was earned as a result of his regular duties as a court officer (Trial Record, p 116). That totaled $226,174.00. According to Holley, that was fairly typical as he averaged between $200,000 and $300,000 per year (Trial Record, p 118).

For 2007, Mr. Holley explained he reported $47,400.00 in W-2 income. The summary only shows $35,400.00 as the $12,000.00 was the money received from the 36th District Court regarding a grievance that was settled in 2007 but was for an earlier period of time. Holley also received $9,412.00 in unemployment compensation. He also received $84,536.00 in pensions and annuities for which he paid a penalty of $5,347.00 for early withdrawal (Trial Record, pp 117-118).

In 2008, Mr. Holley made $6,154.00 in unemployment compensation. In 2009, that amounted to $16,029.00 in unemployment compensation. For 2010, he earned $5,418.00

14

in unemployment compensation. In 2011 and 2012, Mr. Holley did not file tax returns because he was unemployed and did not earn any income (Trial record, p 119).

During his testimony, Holley explained that the job of a court officer is a patronage position. One mainly gets the job through knowing the judge or having an affiliation with the chief judge or working on a judge's election campaign. One cannot expect to apply for one of these jobs and get hired without having that type of affiliation or relationship. Holley said that he investigated other court officer jobs and found that, while they were similar regarding the nature of the work, they were not the same regarding pay. He had conversations with other court officers in Michigan that learned that they were independent contractors. None of them received benefits like the 36th District Court officers did. According to Holley, his job was first arranged by the Chief Judge of the Michigan Supreme Court, Mr. Conrad Mallett. That is how he first got hired by the 36th District Court. After his termination, he did not have a relationship with other chief judges or other persons in the position of power to obtain a court officer position with any other district courts.

Holley did testify that he sought positions with a number of employers. They included being a security officer at the Odawa Casino Resort; a security position at the Westin Book Cadillac in Detroit; Director of Environmental Services as Compass Group Michigan; a manager's position at Kroger's in Redford, Michigan; various positions at Henry Ford Hospital; various positions at Metropolitan Detroit Airport in Romulus, Michigan; plant supervision at EPI services in Livonia; a maintenance technician at Hayman

15

Company in Detroit; a security officer at G-45 Secure Solutions in Southfield; as a chef at Applebee's in Dearborn; and a first shift operator in Rochester Hills.

Holley testified that he also applied for a court officer position in Las Vegas, Nevada; a mobile patrol officer for Securities USA in Milwaukee, Wisconsin; a dispatcher in Detroit, a manual machinist at Monarch Tech Services, North Suburbs, Wisconsin; a technical service manager at SMS Milcraft; Nationwide-dispatcher for Republic Services, Chicago, Illinois; a court officer in Highland Park, Michigan; a court officer in Warren, Michigan; a securities supervisor, protective services in Troy; a field technician for Comcast Cable in Detroit; plus numerous other positions set forth in Union Exhibit 20.

He also mentioned that he was considered for a position at Harper Hospital in Detroit in hospital security in 2008 but was unable to fulfill the position because he did not have a CCW permit at the time. Holley said he did not have the money to renew his permit. It would have taken two months to get the permit and DMC was not willing to hold the job for him (Trial Record, pp 131-132). Holley testified that he sought over a hundred other employers as well. While he received unemployment compensation, he was obligated to apply for at least four jobs a week. He said he was never denied benefits for not seeking work (Trial Record, p 120). Holley said he was out of work for six years. He relief on family, general assistance, Church and friends. In 2008 he said his car was repossessed. In 2009 he lost his home. He is being sued by the IRS and has a judgment against him. His creditors call him every day (Trial Record, p 121).

16

The final witness for the Union was Mr. Richard Weatherly. Mr. Weatherly testified that he began his employment with the 36th District Court as a court officer in 1998. He was terminated in 2007 (Trial Record, p 134). Mr. Weatherly identified his tax record for 2006 through 2013 (Joint Exhibit 9). He also identified a Back Pay Summary Sheet for the years 2006 through 2013 (Union Exhibit 17). The baseline used for Mr. Weatherly's income was his statement for 2006, that his tax returns indicate $94,680.00 in W-2 earnings, and $143,563.00 in 1099 earnings for eviction services, among other things. That gives him a total of $238,243.00. Mr. Weatherly explained that his typical income varied between $220,000 and $250,000 (Trial Record, p 138). Weatherly said his wife's income was not included in the summary sheet (Union Exhibit 17).

In 2007, Mr. Weatherly said he did earn some income from the 36th District Court. That included interim W-2 earnings of $16,128.00 and $16,646.00 in 1099 earnings. He also received unemployment in the amount of $7,602.00.

In 2008, Weatherly collected $7,964.00 in unemployment compensation; W-2 income was that of his wife. In 2009, unemployment compensation amounted to $16,029.00. He had no other income for the year. In 2010, Weatherly received $5,418.00 in unemployment compensation. He had no other income. In 2011, he had no income at all. His wife only had $642.00 in income. In 2012, again Mr. Weatherly had no income. His wife had $8,378.00l (Trial Record, p 141).

Mr. Weatherly testified that he sought employment from a great number of employers. He repeatedly filed applications with the Greektown Casino and MGM Detroit Casino, the

17

Motor City Casino, and the Detroit Board of Education. He dealt with Ms. Washington at the Detroit Board of Education. He also sought employment with the Wayne County Road Commission and the Oakland County Road Commission. He applied for employment with the City of Ecorse Treasury Department along with General Motors, Ford Motor Company and Chrysler. He received an interview at Zee's Income Tax, where he dealt with a Ms. Miller. He applied at Ruben's landscape, Unified Transportation, and Art Van Furniture. He also sought court officer positions in Ecorse and Ypsilanti. In addition, he indicated that he sought work at numerous other employers but was unable to obtain the records showing his applications (Union Exhibit 20).

Weatherly explained that he cashed out on his 401(K) and paid a penalty to receive it early. He went six years without employment and as a result he lost his house, cars, and all credit cards. With this testimony, the Union rested on its direct case.

The witness for the 36th District Court was Ms. Constance Allen, an employee of 21 years. Ms. Allen explained that she had been a Judicial Assistant since her appointment and also, in 2011, acted as interim Human Resources Director. In March of 2013, she again took over the interim HR Director position and continues to be both a Judicial Assistant and interim Director of Human Resources (Trial Record, p 168). She has also been involved in matters pertaining to negotiations with the Union in this case.

Ms. Allen prepared a spreadsheet showing bailiffs and court officers with the 36th District Court from 2005 through 2012 (Employer Exhibit 23). Ms. Allen indicated that in 2013, there are now 25 Bailiff/Court Officers. Ms. Allen also identified a document titled

"Complaint to Compel Arbitration" filed by AFSCME Union on July 3, 2007 (Employer Exhibit 28). Ms. Allen also identified an arbitration Decision by Arbitrator Paul Glendon dated November 29, 2004 in a discipline case (Union Exhibit 19).

Ms. Allen referred to court rule 3.106, pertaining to record keeping for court officers. Court officers are required to keep copies of all bills and receipts for services for at least a year (Trial Record, p 193; see also Employer Exhibit 32). Ms. Allen also identified a Life Insurance Benefit Agreement (Employer Exhibit 33).

The final witness in the case was Mr. Thornton Jackson, a witness in rebuttal for the Union. Mr. Jackson identified himself as a bailiff in the 36th District Court and has been in that position for approximately 32 years. Mr. Jackson indicated that the bailiff's job duties are essentially the same as the court officer's (Trial Record, p 215). Mr. Jackson testified that the 36th District Court initially refused to arbitrate the grievances filed by Mr. Jones and Mr. Carter after their termination in 2004. Mr. Jackson testified that he was in constant talks with a Mr. Meadows, who served as the Employer's interim HR Director. According to Jackson, he mentioned at least 20 different times that the parties talked about possibly resolving these grievances. This was between 2005 and 2007 (Trial Record, p 219). That completed the case by the parties.

# IV. RELEVANT CONTRACTUAL AND STATUTORY LANGUAGE

## RULE 3.106 PROCEDURES REGARDING ORDERS FOR THE SEIZURE OF PROPERTY AND ORDERS OF EVICTION

**(A)** **Scope of Rule.** This rule applies to orders for the seizure of property and orders of eviction.

**(B)** **Persons Who May Seize Property or Conduct Evictions**. The persons who may seize property or conduct evictions are those persons named in MCR 2.103(B), and they are subject to the provisions of this rule unless a provision or a statute specifies otherwise.

    (1) A court may provide that property shall be seized and evictions conducted only by:

        A. court officers and bailiffs serving that court;

    (2) Each court must post, in a public place at the court, a list of those persons who are serving as court officers or bailiffs. The court must provide the State Court Administrative Office with a copy of the list, and must notify the State Court Administrative Office of any changes.

**(C)** **Appointment of Court Officers**. Court officers may be appointed by a court for a term not to exceed two (2) years.

    (1) The appointment shall be made by the chief judge. Two or more chief judges may jointly appoint court officers for their respective courts.

    (2) The appointing court must specify the nature of the court officer's employment relationship at the time of appointment.

    (3) The appointing court must maintain a copy of each court officer's application, as required by the State Court Administrative Office.

    (4) The State Court Administrative Office shall develop a procedure for the appointment and supervision of court officers, including a model application form. Considerations shall include, but are not limited to, an applicant's character, experience, and references.

20

# M.C.L.A. 600.2559
## 600.2559. Fees for service of process of papers

Sec. 2559. (1) Except as provided in subsections (2) and (8), the following is the schedule of fees allowed for process or papers served out of a court in this state by a person authorized under this act or supreme court rule to serve process:

(a) For personal service of a summons and complaint in a civil action, along with supporting documents, for each defendant, $23.00 plus mileage.

(b) For personal service of an affidavit and account, for each defendant, $23.00 plus mileage.

(c) For a request for and writ of garnishment, for each garnishee and defendant, $20.00 plus mileage.

(d) For personal service of an order to seize goods that are the subject of a claim and delivery action, $37.00 plus mileage, plus the actual and reasonable expense of seizing, keeping, and delivering the goods.

(e) For receiving and filing a bond from or on behalf of a defendant in a claim and delivery action, $17.00.

(f) For an order to show cause, for each person served, $23.00 plus mileage.

(g) For a subpoena on discovery, for each person served, $23.00 plus mileage.

(h) For levying under or serving an order for the seizure of property and any accompanying paper, $37.00 plus mileage, plus the actual and reasonable expense of seizing and keeping the property under the order.

(I) If the person has seized property under an order for the seizure of property issued in an action in which a judgment is entered against the owner of the property, regardless of whether the judgment is entered before or after the order is issued, and if the judgment is satisfied prior to sale of the seized property by full payment of the judgment or settlement between the parties, 7% of the first $8,000.00 of the payment or settlement amount and 3% of the payment or settlement amount exceeding the first $8,000.00.

(j) For sale of property seized under an order for the seizure of property, 7% of the first $8,000.00 in receipts and 3% of any receipts exceeding the first $8,000.00.

(k) For each notice of sale under an order for the seizure of property or construction lien posted in a public place in the city or township, $23.00 plus mileage.

(l) For an order of eviction or a writ for the restitution of premises, for each defendant, $37.00 plus mileage, plus the actual and reasonable expense for the physical removal of property from the premises.

(m) For a subpoena directed to a witness, including a judgment debtor, $23.00 plus mileage.

(n) For a civil bench warrant or body execution, $37.00 plus mileage, plus a reasonable fee per hour for the amount of time involved in executing the warrant.

(o) For service by mail, $10.00 plus the actual cost of postage.

(p) For each verification by a process server, $10.00 plus mileage.

\* \* \*

(8) A person authorized under this act or supreme court rule to serve process may charge a fee for service of process that exceeds the fee prescribed under this section or other law if the fee is agreed to in advance in writing by the person serving process and the person requesting the service.

\* \* \*

(10) As used in this section, "order for the seizure of property" includes a writ of attachment and a writ of execution, including, but not limited to, execution in a claim and delivery action on property other than the property that is the subject of the claim and delivery action.

## COLLECTIVE BARGAINING AGREEMENT

\* \* \*

## ARTICLE 8 - GRIEVANCE PROCEDURE

Section 1.

In the event differences should arise between the Employer and the Union during the

22

term of this Agreement as to the interpretation and application of any of its provisions, the parties shall act in good faith to promptly resolve such differences in accordance with the following procedure.

Section 2.

Employees shall have the right to present grievances through a designated Union representative at the appropriate step of the Grievance procedure.

\*　　\*　　\*

Section 9.

D. . . . The Arbitrator shall limit the decision strictly to the interpretation, application or enforcement of this Agreement and shall be without power and authority to make any decision:

      A.     Contrary to, or inconsistent with, or modifying or varying, in any way, the terms of this Agreement.

      B.     Granting any wage increases or decreases.

\*　　\*　　\*

E. Arbitrators shall be without authority to require the Employer to delegate, alienate, or relinquish any powers, duties, responsibilities, obligations, or discretions which by State Law or State Constitution the Employer cannot delegate, alienate, or relinquish or pay any funds other than back wages.

\*　　\*　　\*

H. There shall be no appeal from the Arbitrator's decision if made in accordance with the Arbitrator's jurisdiction and authority under this Agreement. The Arbitrator's decision shall be final and binding on the Employer, on the employee or employees, and the Union.

I. In the event a case is appealed to an Arbitrator and it is found the Arbitrator has no power to rule on such case, the matter shall be referred back to the parties without decision or recommendation on the merits of the case.

\*　　\*　　\*

23

## ARTICLE 10 - MANAGEMENT'S RIGHTS

It is understood and agreed by the parties that the Employer possesses the sole and exclusive duty and right to operate and manage the Court, its Division/Departments, and programs and carry out constitutional, statutory and administrative policy mandates and goals. The powers, authority and discretion of the Employer to exercise its rights and carry out its responsibilities shall be limited only by the specific and express terms of this Agreement and applicable statues [sic] and court rules. Listing or failure to list specific managements rights in this Agreement shall not be construed as a waiver of any management rights not specifically designated.

\*  \*  \*

## ARTICLE 12 - DISCIPLINARY PROCEDURE

Section 1.

A. The Court supports the concept of progressive discipline. The intent and purpose of this article is to provide for progressive disciplinary action. Disciplinary action shall be imposed upon an employee for failure to fulfill the employee's job responsibilities or for improper conduct while on the job or any conduct that deprives litigants of due process or results in the Court being found liable following a judicial hearing. Nothing in this Article shall prevent the Employer from taking immediate and appropriate disciplinary action including discharge without prior notice should it be required by the circumstances, with prompt written notice thereof to the Union. Disciplinary action including discharge shall be imposed only for just cause, which includes, but is not limited to misfeasance or malfeasance. Misfeasance is defined as the improper performance of a job function. Malfeasance is defined as the doing of an act which is wrong and/or unlawful.

\*  \*  \*

Section 2.

A. In any case, where disciplinary action is necessary, the normal order of procedure shall be as follows, except in those instances referred to in Section 1-A of this Article.

B. Procedural Steps:

   1. Oral Reprimand.
   2. Written Reprimand.

24

3. Suspension.
4. Discharge.

\*  \*  \*

ARTICLE 18 - ENTIRE AGREEMENT

This Agreement contains the entire understanding and agreement of the parties. It is further agreed that there are no verbal agreements or understandings that affect or qualify any of the terms of the Agreement, and all conflicting practices and policies shall not be binding upon either party unless executed in writing.

\*  \*  \*

## MCR 3.106 PROCEDURES REGARDING ORDERS FOR THE SEIZURE OF PROPERTY AND ORDERS OF EVICTION

(G)  Procedures Regarding Orders for Seizure of Property.

\*  \*  \*

(6)  Costs allowed by statute shall be paid according to law.

(a)  Copies of all bills and receipts for service shall be retained for one year by the person serving the order.

(b)  Statutory collection fees shall be paid in proportion to the amount received.

(c)  There shall be no payment except as provided by law.

\*  \*  \*

(H)  Procedures Regarding Orders of Eviction.
Copies of all bills and receipts for services shall be retained by the person serving the order for one year.

25

## V.  CONTENTIONS OF THE PARTIES

### A.  For AFSCME

The Union begins by indicating that the purpose of an arbitration award is to make whole the party damaged by the violation of the Collective Bargaining Agreement. In the absence of limiting language within the agreement itself, arbitrators generally have been considered to possess broad discretion to fashion an appropriate remedy. In this particular case, according to the Union, the four court officers (Grievants) are entitled to be made whole for the 36th District Court's unlawful actions.

The Union contends that the back pay award covers wages and other benefits from employment, such as commissions, tips, gratuities, etc. It indicates that the traditional remedy for improper discharges in the labor relations field is reinstatement and back pay. Both aspects of the remedy are designed to restore the aggrieved employee to the status quo ante. In this case, there is no merit, according to the Union, to the Employer's argument that all of the court officers' compensation is not wages. Absent any other definition in the contract, it's proper to look at the dictionary definition. *Black's Law Dictionary* has the following definition:

> Wages include every form of remuneration payable for a given period to an individual for personal services, including salaries, commissions, vacation pay, bonuses, and the reasonable value of board, lodging, payments in kind, tips, and any similar advantage received from the employer.
> (*Black's Law Dictionary*, 9th Edition, 2009)

An award of lost wages may also include commissions (see *Wheeler* v *Snyder Buick,*

*Inc.*, 794 F2d 1228 (7ᵗʰ Circuit, 1986). In that case, the court calculated the amount of monthly commissions income to be added to the former employee's basic salary to yield the amount of back pay due. See also *California Sportservice dba Petco Park*, 123 LA 1228 (Calhoun, 2007). Courts have also included tip and gratuity income in a back pay award even where employees did not correctly report their tip income to Internal Revenue Service See *NLRB* v *Louton, Inc.*, 822 F2d 412 (3ʳᵈ Circuit, 1987); see also *Atlantic Limousine, Inc.* v *NLRB*, 243 F3d 711 (3ʳᵈ Circuit, 2001). Tips may be a large part of an employee's income and tips generally come not from the employer, but from other sources. Yet, as the cases show, tips and gratuities are included in back pay awards (*NLRB* v *Lee Hotel Corp*, 13 F3d 1351 (9ᵗʰ Circuit, 1994).

In this case, according to the Union, the argument is even much stronger for the Grievants as court officers that their 1099 income should be included in the back pay award. Ms. Allen, the acting HR Director, acknowledged that performing evictions is part of the duties of a court officer. She stated, "That's what they are appointed to do" (Trial Record, p 208). Moreover, MCR 3.106 provides that court officer duties include evictions. The statute provides that officers are compensated for doing these duties (see MCL 600, paragraph 2559.

According to the Union, the Employer is arguing that because the court officers had two sources of income, they were working two separate jobs. The Union submits that this argument should be rejected as having absolutely no merit. The argument assumes that the court officers were "moonlighting" when they performed evictions. The fact is that court

officers can only perform evictions as court officers. When court officers perform evictions, they are not moonlighting or performing a second job unrelated to their primary employment. Indeed, once the Grievants were terminated, in terms of employment, their authority to perform evictions ended summarily along with their other duties. Moreover, there is no question that absent an award that includes all of their wages, they will not be made whole and they will suffer from receiving much less than the status quo ante.

Certainly, employers are responsible for "consequential damages." These are routinely recoverable for breaches of contract, and even individual contracts of employment. In this case, the Employer was the entity that employed the court officers and assigned evictions to them to facilitate. They acted on the court's behalf as part of the court's enforcement of its orders.

The back pay is calculated based upon an employee's prior average earnings. That's one of the two legally acceptable ways to estimate the gross amount of wages an unjustly fired employee would have earned. Many arbitrators use the average earnings of five employees to calculate the back pay of an improperly discharged guard. In *S.D. Warren Company*, 113 LA 272 (1999), Arbitrator Daniel found that the comparison with the five officers would accurately take into consideration variables of scheduling assignments and acceptance of overtime.

In this case, the Back Pay Summaries for each of the Grievants as court officers properly deducted the officers' interim earnings and unemployment compensation from the proposed back pay award.

28

The Union points out that the mitigation of damages doctrine is not a universally accepted principle by arbitrators. If the Collective Bargaining Agreement is silent regarding any such duty, the contract does not obligate a duty to mitigate. The Union emphasizes that even if this Arbitrator recognizes such a duty, the burden of proof rests with the Employer. In other words, the failure to mitigate damages is an affirmative defense and the burden of proof is upon the Employer. In this case, the Court has the burden to prove that the Grievants failed to mitigate their damages by showing the availability of substantially equivalent positions.

In this case, according to the Union, all of the Grievants made significant efforts to look for work. Their ongoing efforts satisfied the necessary "effort" and "diligence" required under the doctrine of mitigation. Despite these efforts, they suffered severe economic distress from the loss of the jobs during one of the worst employment environments of modern world history.

Finally, the Union argues that it did not unreasonably delay arbitration. When a union is not responsible for any delay in the arbitration process, there is no reason to reduce an employer's liability for back pay. In this case, the first two Grievants, as court officers, were fired in 2004. Grievances were filed by the Union. Between the filing of grievances and 2007, the Union president and the Director of Human Resources had numerous meetings. Despite continuing to meet, the parties were not able to resolve the grievances. As of 2007, after court officers Holley and Weatherly were also terminated and grievances filed, it became evident that there was going to be no resolution of the matters, so the Union sought

29

Circuit Court assistance to compel arbitration (Trial Record, pp 218-219; and see Exhibit 28).

The Union contends that interest on the back pay award is appropriate under the circumstances in this case. Messrs. Carter and Jones were terminated in 2004; while Messrs. Holley and Weatherly were terminated in 2007. Any compensation they receive will be affected by the time value of money to a much greater degree than a more typical labor arbitration. In Carter's and Jones' situation, nine years have passed. While with Messrs. Holly and Weatherly, you still have a six year period. Certainly, arbitrators have granted interest when an employer's dilatory conduct has caused the delay.

In summary, the Union concludes that back pay awards should be based on the four court officers' total wages as reported on both their W-2 and 1099 forms. The Union submits that the officers are entitled to interest in order to have a make whole remedy.


**B.    For the 36th District Court**

The Employer contends that it is clear that the court officers, or Grievants, derived their earnings from two independent sources. There are earnings paid to the court officers from the law firms, creditors, or landlords for whom the court officers performed seizures of property or real estate, and leased premises evictions. Rates are set between those parties and the court officers and procedures and requirements are governed by Michigan statute and court rules. The second source of income for court officers would be the W-2 wages paid by the Employer to the court officers. According to the Employer, only W-2 salary/wages

30

are permitted under the Bargaining Agreement to be considered for a back pay award.

The Employer submits that the burden of proof falls squarely on the Grievants and Union to establish entitlement to remedy claims and claims for damages. In this case, the Collective Bargaining Agreement clearly does not govern or even address earnings from statutory fees paid to the court officers from third parties, such as law firms or landlords. It was not contemplated by the parties in bargaining for the Agreement. Instead, the CBA speaks of court officer compensation in terms of "salary" or "wages."

The Employer points out that frequently, arbitrators resort to dictionary definitions of words to determine the ordinary meanings of words as used within collective bargaining agreements. In this case, the Collective Bargaining Agreement uses the term "salary" as well as the term "wages." According to *Black's Law Dictionary*, "salary" is defined as:

> **Salary** . . . An agreed compensation for services – esp. professional or semiprofessional services – usu. Paid at regular intervals on a yearly basis, as distinguished from an hourly basis. • Salaried positions re usually exempt from the requirements of the Fair Labor Standards Act (on overtime and the like) but are subject to state regulation . . . .

"Wage" is defined as:

> **Wage** . . . Payment for labor or services, usu. Based on time worked or quantity produced; specif., compensation of an employee based on time worked or output of production. • Wages include every form of remuneration payable for a given period to an individual for personal services, including salaries, commission, vacation pay, bonuses, and the reasonable value of board, lodging, payments in kind, tips, and any similar advantage received from the employer. An employer usually must withhold income taxes from wages.

All the parties to this dispute admit that the court officers received W-2 wages paid

31

through the Court and reported on annual W-2 Wage and Tax Statements. In contrast, according to the Employer, each of the Grievants received tax reporting of their statutory fees on 1099 forms issued directly by the payee law firms or landlords.

The Employer emphasizes that Article 24 and Appendix A of the CBA provide for biweekly employer and employee contributions to a Defined Contribution Retirement Plan (Joint Exhibit 1). Such retirement plan contributions occur through payroll withholding and these are evidenced by the W-2's produced by the Grievants. In contrast, retirement contributions were not reported in any of the 1099's (Joint Exhibit 8). Further, the statutory fees paid by third parties paid directly from the landlord or attorney for commercial or residential evictions vary in amount from job to job. The amounts are subject to statute and not subject to the Collective Bargaining Agreement.

Further, according to the Employer, the Grievants treated their work and fee compensation procedures and evictions in a manner entirely inconsistent with wages received under the Bargaining Agreement. In their income tax filings, the Grievants reported the statutory fees earnings as business income, either under a sole proprietorship or as a corporation, and reported business expenses for tax purposes regarding the expenses incurred in seizure and eviction activities. The Grievants testified that they set the fees charged for evictions based upon the document published by the Detroit Housing Commission. This Detroit Housing Commission document was not negotiated or ratified between the Union and the Court.

The Employer refers to Article 23 of the Collective Bargaining Agreement that requires the Court to provide court officers with life insurance coverage at two times annual salary. This article became the subject of a grievance in which the Union and Court agreed to set the life insurance benefit at $200,000 (Employer Exhibit 33).

The Employer contends that the Arbitrator's jurisdictional authority is limited to the Collective Bargaining Agreement. The Employer cites Article 8, Section 10, (D), (E) and (F), claiming restrictions in the Arbitrator's authority.

The Employer further claims that any loss of ability to perform evictions and seizures by the court officers and the concomitant collection of statutory fees to these activities, amounts to a consequential loss. Such consequential or incidental damages are not commonly recognized in labor arbitration, according to the Employer *(Mid-America Dairymen, Inc.*, 1993 WL 788011, p 9 (Pratte, 1993). In this case, according to the Employer, there is no indication that consequential or incidental contract damages were ever contemplated as a form of damages for a make whole remedy under the grievance or arbitration procedures of the CBA. It submits that the term "wages" and "salary" only encompass remuneration paid by the Employer to an employee for services performed for the Employer. Hence, the Employer concludes that the term "back pay" does not include consequential damages.

The Employer further argues that interest awards on back pay are traditionally rejected by labor arbitrators. The Employer cites the weight of arbitrable authority rejecting awards

33

of interest on top of damages. The exception would be when one party has acted arbitrarily or capriciously or in bad faith. The Employer cites a number of cases to that effect.

The Court cites the fact that it proceeded to arbitration in 2008 following the Circuit Court decision by Judge Warfield Moore to submit the case to arbitrability to the Arbitrator. The Employer cites the fact that the Michigan Court of Appeals validated one of the Employer's arguments in the appeal of Judge Stempien's Circuit Court Decision. In short, the Employer submits that there is no basis for the Arbitrator to award interest in this back pay case.

Further, the Employer argues that the Glendon arbitration award and the non-precedent setting settlement agreement had no bearing in the instant arbitration. That particular award arose in 2004 and was heard by Arbitrator Paul Glendon (Union Exhibit 19). The grievance arose over a 30-day suspension. As a result, the Employer submits that the Glendon award has no relevance to the instant case.

One of the main contentions of the Employer is that there should be a reduction in any back pay order due to the failure of the Grievants to mitigate damages. It submits that at least three of the four Grievants failed to mitigate their damages. According to the Employer, an employee has a duty to use reasonable efforts to mitigate damages by applying for employment wherever possible. It cites several cases to that effect.

Further, according to the Employer, a reduction of back pay damages is warranted due to the Union's delay from 2004 until 2007 in an attempt to enforce arbitration rights under

34

the Bargaining Agreement. Despite being told by the Court/Employer that it would not arbitrate such grievances, the Union did not file the Complaint to Compel Arbitration until July of 2007. Thus, there was a two year and four month lapse, according to the Employer. The Court resolution of the Judge Stempien Decision required time from May 4, 2010 until October 31, 2012 (see Joint Exhibits 3 and 5). This was a two year six month time span. According to the Employer, this is the time span that should be eliminated from any back pay periods for Carter and Jones.

The Employer also raises the question that there should not be any wage back pay amounts, indicating "back pay at any level may be questionable in this case." In essence, giving the Grievant court officers an Award of "back pay" is de facto fee sharing, since other court officers received pay for the services they performed and cases processed across the counter in the Court's civil division.

The Employer asks the Arbitrator not to give any weight to the testimony of the Grievants about there being no comparable court officer jobs in Michigan.

As it pertains to each of the Grievants, the Employer submits the following amounts:

- Grievant Bobby Jones – total gross back pay of $590,619.36 (before reductions for mitigation failure, interim W-2 earnings, and Union delay)

- Grievant Carlton Carter – total gross back of $626,242.24 (before reductions for interim W-2 earnings and Union delay)

- Grievant Richard Weatherly – total gross back pay of $514,937.00 (before reduction for mitigation failure)

- Grievant Roderick Holley – total gross back pay of $441,787.00 (before

35

reduction for mitigation failure.

In summary, the Employer 36th District Court submits that a back pay remedy, if awardable, must be limited to lost W-2 earnings only and these earnings must be reduced to reflect failures to mitigate damages, Union delay, and interim W-2 earnings.

VI.     ISSUE

**Considering the arbitration Decision and Award dated June 26, 2009, addressed to the 36th District Court and AFSCME Council 25 and its Local 917, that the four court officer Grievants were to be reinstated to their former position of court officer, and that the Employer was ordered to reimburse each of the Grievants for wages dating back to their date of termination or non-reappointment, at the rates in effect during those years of termination, what is the appropriate back pay remedy?**

VII.    DISCUSSION AND DECISION

As the parties are aware, on Tuesday, November 18, 2008, a full and fair hearing was held at the office of the American Arbitration Association concerning the sole issue of arbitrability of the grievances. I rendered a Decision and Award dated January 26, 2009 concluding that the four grievances were arbitrable.

Approximately three months later, on April 24, 2009, a hearing again was held at the

36

office of the American Arbitration Association on the merits of the case concerning just cause. At all times both parties had been ably represented by legal counsel. A Decision and Award was issued on June 26, 2009 by the undersigned Arbitrator. As a result of that Decision and Award, each of the Grievants was to be reinstated to their former position as a court officer. Further, the Employer was ordered to reimburse each of the Grievants for wages dating back to their date of termination or non-reappointment at the rates in effect during those years of termination. The Grievants' seniority was also to be reinstated and the Grievants' employment records were to be modified in accordance with the Decision and Award.

In the Award, I allowed that the Employer may deduct any unemployment benefits received by the Grievants during the same period of time as well as any interim earnings received by the Grievants from the date that back pay was due.

The purpose of that Decision and Award was to be as fair as possible to both parties and based upon the evidence presented, resolve this dispute with appropriate remedy for both parties. Following two full days of hearing, on June 18, 2013 and June 20, 2013, on the issue of the appropriate back pay remedy for each of the four Grievants, legal counsel presented extensive post-hearing briefs. Once again, both parties were ably represented by legal counsel and a transcript was made of the proceedings. In those post-hearing briefs, the parties discussed a number of issues all relevant to the main issue of the appropriateness of the back pay remedy for each of the four Grievants.

Formulating an appropriate back pay award under the "make whole" principle mandates a determination by the Arbitrator of the wages that the Grievants would have earned but for their discharge without just cause. A very common method used by both the National Labor Relations Board and arbitrators is the "projection of average earnings" formula.[3] Back pay is based on an estimate of the employee's "average earnings" for some specified period prior to discharge.[4]

The Employer, however, contends that the earnings of the court officers are derived from two independent sources. First are the earnings paid to the court officers directly by the Court to the court officers in W-2 wages. The second source of earnings for the court officers comes from seizures of property or real estate and leased premise evictions. According to the Union, however, the Employer argument that simply because the court officers have two sources of income doesn't mean that they are working two separate jobs. According to the Union, the Employer argument assumes that the court officers were "moon lighting" when they performed evictions.

Both parties cite the Arbitrator to *Black's Law Dictionary* in terms of definitions. The Employer refers to the term "salary" as defined by *Black's Law Dictionary* as " . . . an agreed compensation for services, especially professional or semi-professional services, paid at regular intervals on a yearly basis as distinguished from an hourly basis."

---

[3] *Ohio Hoist Manufacturing Company*, 496 F2d 14 (6th Circuit, 1974).

[4] Hill & Sinicropi, *Remedies in Arbitration*, BNA Books (1981), at p 65.

38

The Employer also cites the definition for the word "wage" as a payment for labor or services based on time worked or quantity produced. Wages include every form of remuneration payable for a given period to an individual for personal services, including salaries, commission, vacation pay, bonuses, and the reasonable value of board, lodging, payments-in-kind, tips, and any similar advantage received from the Employer *(Black's Law Dictionary*, 9th Edition (2009).

In reviewing such definitions, the definition for "salary" does not offer a great amount of assistance in settling this particular dispute. The definition for "wages," however, indicates that it "includes every form of remuneration payable for a given period to an individual for personal services." The definition specifically includes salaries, commissions . . . and . . . tips . . . ." This definition raises several important points. In several cases, both by courts and arbitrators, an award of lost wages includes commissions. In the case of *Wheeler* v. *Snyder Buick, Inc.*, 794 F2d 1228 (7th Circuit, 1986), the court calculated the amount of monthly commissions income to be added to the former employee's basic salary to yield an amount of back pay due.[5]

Courts have also included tips and gratuity income in a back pay award.[6] As most of us are aware, tips, depending upon the job and service rendered, may be a large part of an employee's income. In most cases, tips generally come not from the Employer, but from

---

[5]Also see *California Sportservice dba Petco Park*, 123 LA 1228 (Calhoun, 2007).

[6]See *NLRB* v *Louton, Inc.*, 822 F2d 412 (3rd Circuit, 1987), and *Atlantic Limousine, Inc.* v. *NLRB*, 243 F3d 711 (3rd Circuit, 2001).

39

other sources. Yet, tips and gratuities many times are included in back pay awards.[7]

I find this argument to be convincing in this particular case because the work performed by these court officers in evictions is a definite part of the duties of a court officer. For example, in reinstating Grievant Bobby Jones, by letter dated December 21, 2012, Chief Judge Kenneth King specifically mentioned that Jones would be expected to perform the following duties on an "as needed basis" if requested:

- Orders of Eviction
- Orders for the Seizure or Attachment of Property
- Orders requiring Arrest authority pursuant to MCR 2.103(D)
- Other services the Court may require

(Union Exhibit 35)

Equally important, even HR Director Constance Allen acknowledged that performing evictions is part of the duties of a court officer when she stated, "that's what they're appointed to do" (Trial Record, p 208).

Just as important, Michigan Court Rule 3.106 provides that court officer duties include evictions. The Michigan statute likewise provides that court officers are compensated for doing these duties (MCL 600, paragraph 2559; Employer Exhibit 31). In other words, when court officers perform evictions, they are performing duties inherent in their appointment and are not moonlighting on a second job. It is important to remember that court officers can only perform evictions when they are court officers. Once the Grievants were terminated, in terms of employment, their authority to perform evictions ended

---

[7]NLRB v. *Lee Hotel Corp.*, 13 F3d 1351 (9th Circuit, 1994).

40

summarily along with their other duties. Thus, absent an award that includes all of their wages for performing their duties, it is clear that they would not be made whole and would suffer from receiving much less than the status quo ante.

Reasonably foreseeable consequential damages are recoverable for breaches of contract, including individual contracts of employment. (*Pan American Aircorp*, 116 LA 757 (Nolan, 2001). In this case, it was certainly foreseeable that terminating these court officers would cause them the direct loss of income received from evictions.[8]

With this discussion, then, of the projection of average earnings formula, let us discuss the base income for each of the Grievants.

### Carlton Carter

Mr. Carter began work as a clerk for the Court in 1989 and became a court officer in 1998. He was suspended on August 11, 2004 and terminated in September of 2004 (Exhibit 10). Looking at his tax records for tax year 2004, his W-2 income for the period he worked through his August 11th suspension totaled $55,536.00. His 1099 earnings for that period was $104,464.00, for a total of $160,000.00. On an annualized basis, for both the W-2 and 1099 earnings, the total amounted to $256,000.00 as the base line for this Grievant (see more details in Union Exhibit 16).

---

[8]In an arbitration case in 2004 involving these same two parties, Arbitrator Paul Glendon awarded back pay covering the grievants' W-2 and 1099 income concerning a 30-day suspension to grievants in that case (see Union Exhibit 19).

41

The federal 1040 tax returns for Mr. Carter, along with the Michigan 1040 tax returns, were introduced into evidence (Joint Exhibit 6). Those cover the years 2003 through 2012. Based upon those records and the discussion previously mentioned, and using the $256,000.00 as the base line for average earnings, the following figures and columns are submitted:

| Year | Base Income | Unemployment | Interim W-2 | Interim 1099 | Sub-Total |
|------|-------------|--------------|-------------|--------------|-----------|
| 2004 | $ 256,000.00 | $ | $ 55,536.00 | $ 104,464.00 | $ 96,000.00 |
| 2005 | $ 256,000.00 | $ 9,412.00 | $ | $ 10,767.00 | $ 235,821.00 |
| 2006 | $ 256,000.00 | $ | $ | $ 108,390.00 | $ 147,610.00 |
| 2007 | $ 256,000.00 | $ | $ | $ 146,135.00 | $ 109,865.00 |
| 2008 | $ 256,000.00 | $ | $ | $ 138,810.00 | $ 117,190.00 |
| 2009 | $ 256,000.00 | $ | $ 15,000.00 | $ 49,282.00 | $ 191,718.00 |
| 2010 | $ 256,000.00 | $ | $ 21,174.00 | $ 41,065.00 | $ 193,761.00 |
| 2011 | $ 256,000.00 | $ | $ 37,278.00 | $ (556.00) | $ 219,278.00 |
| 2012 | $ 256,000.00 | $ | $ 35,076.00 | $ 26,314.00 | $ 194,610.00 |

**Bobby Jones**

Mr. Jones began work at the 36th District Court as a court officer in 1998. His employment was terminated on September 30, 2004. He was reinstated on January 7, 2013 (Trial Record, pp 83-84). In 2004, when he was terminated, he basically worked nine months that year for the 36th District Court. His income from W-2 earnings for serving summonses, orders of evictions, etc. showed that he earned $77,138.00. His 1099 income from performing evictions, after expenses, was $27,222.00. The total for that nine month period was $104,360.00. When that amount is annualized to take into account the months of

42

October, November and December of 2004, his total is $139,146.67. That would be his base income or average income. That 2004 amount is a relatively low amount of income for a court officer since court officers generally earn an average of between $220,000.00 and $250,000.00 a year. Mr. Jones, during his testimony, indicated that he typically averaged approximately $250,000.00 a year (Trial Record, p 87). Nevertheless, for back pay purposes, based upon his 2004 annualized income, that base line, or base amount, would be $139,146.67 (see Joint Exhibit 7 and Union Exhibit 15).

| Year | Base Income | Unemployment | Interim W-2 | Interim 1099 | Sub-Total |
|------|-------------|--------------|-------------|--------------|-----------|
| 2004 | $ 139,146.67 | $ | $ 77,138.00 | $ 27,222.00 | $ 34,786.67 |
| 2005 | $ 139,146.67 | $ 9,412.00 | $ 7,585.00 | $ | $ 122,149.67 |
| 2006 | $ 139,146.67 | $ | $ 30,758.00 | $ | $ 108,388.67 |
| 2007 | $ 139,146.67 | $ | $ 29,455.00 | $ | $ 109,691.67 |
| 2008 | $ 139,146.67 | $ | $ 25,245.00 | $ | $ 113,901.67 |
| 2009 | $ 139,146.67 | $ | $ 27,850.00 | $ | $ 111,296.67 |
| 2010 | $ 139,146.67 | $ | $ 29,712.00 | $ | $ 109,434.67 |
| 2011 | $ 139,146.67 | $ 7,020.00 | $ 15,359.00 | $ | $ 116,767.67 |
| 2012 | $ 139,146.67 | $ 2,106.00 | $ | $ | $ 137,040.67 |

**Richard Weatherly**

Mr. Weatherly commenced his employment with the 36th District Court as a court officer in 1998. He was terminated on January 8, 2007 (see Joint Exhibit 14 and Trial Record, p 134).[9] Mr. Weatherly's tax records were submitted into evidence (Joint Exhibit

_____

[9]As discussed with counsel for the parties and the Arbitrator at the June 18 and June 20, 2013 arbitration hearings, Mr. Weatherly has not yet been reinstated to his former position as court officer by the 36th District Court. The parties have agreed to a separate arbitration hearing

43

9). For 2006, Mr. Weatherly had W-2 wages of $94,680.00 and 1099 wages of $143,563.00, for a total of $238,243.00. That would be his base income, or base line, for back pay purposes. Using that base income figure, the following amounts are submitted for back pay purposes:

| Year | Base Income | Unemployment | Interim W-2 | Interim 1099 | Sub-Total |
|------|-------------|--------------|-------------|--------------|-----------|
| 2007 | $ 238,423.00 | $ 7,602.00 | $ 16,128.00 | $ 16,646.00 | $ 197,867.00 |
| 2008 | $ 238,423.00 | $ 7,964.00 | $ | $ | $ 230,279.00 |
| 2009 | $ 238,423.00 | $ 16,029.00 | $ | $ | $ 222,214.00 |
| 2010 | $ 238,423.00 | $ 5,418.00 | $ | $ | $ 232,825.00 |
| 2011 | $ 238,423.00 | $ | $ | $ | $ 238,243.00 |
| 2012 | $ 238,423.00 | $ | $ | $ | $ 238,243.00 |
| 2013 | $ 119,121.50 | $ | $ | $ | $ 119,121.50 |

**Roderick Holley**

Mr. Holley began his employment with the 36th District Court in 1981 as a clerk. He worked in that capacity until 1997, when he worked for the Michigan Supreme Court for two years. He returned to employment with the 36th District Court in 1998 as a court officer. He was terminated on January 8, 2007 and reinstated on March 4, 2013. Mr. Holley's tax record, both from federal and state sources, was admitted into evidence as Union Exhibit 18. After reviewing those records, it appears that in 2006, Mr. Holley had W-2 wages totaling $81,200.00 and 1099 wages for performing evictions and other duties connected with his court officer position of $144,974.00. This totaled $226,174.00, which would be his base

regarding the basis for the non-reinstatement, if necessary. For the purpose of the back pay hearing, your Arbitrator did set a back pay accrual cutoff date for Mr. Weatherly of January 7, 2013 (Trial Record, pp 156-159, 166-176).

wages, or base line, for back pay purposes.

| Year | Base Income | Unemployment | Interim W-2 | Interim 1099 | Sub-Total |
|------|-------------|--------------|-------------|--------------|-----------|
| 2007 | $ 226,174.00 | $ 9,412.00 | $ 35,400.00 | $ | $ 181,362.00 |
| 2008 | $ 226,174.00 | $ 6,154.00 | $ | $ | $ 220,020.00 |
| 2009 | $ 226,174.00 | $ 16,029.00 | $ | $ | $ 210,145.00 |
| 2010 | $ 226,174.00 | $ 5,418.00 | $ | $ | $ 220,756.00 |
| 2011 | $ 226,174.00 | $ | $ | $ | $ 226,174.00 |
| 2012 | $ 226,174.00 | $ | $ | $ | $ 226,174.00 |
| 2013 | $ 37,695.67 | $ | $ | $ | $ 37,695.67 |

As the parties can see in each case, in keeping with my Award dated June 26, 2009, deductions have been made in the case of each Grievant for any unemployment benefits received, as well as interim earnings received by the Grievants.

Several sub-issues still remain to be resolved. The Employer argues that there should be reductions made in any back pay order due to a failure on a Grievant's part to mitigate damages. It submits that this is required in the case of at least three of the Grievants.

In considering the arguments of the parties, I do agree with the Employer that an aggrieved employee has the duty to make reasonable efforts to obtain gainful employment to mitigate any loss that he is suffering as a result of the Employer's breach of contract. Usually, however, the failure to mitigate damages is an affirmative defense and the burden of proof is upon the Employer who raises that defense.[10] As an authoritative treatise on remedies in arbitration states:

---

[10]*Edgecomb* v. *Traverse City School District*, 341 Mich 106 (1954); *Ogden* v. *George F. Alger Company*, 353 Mich 402 (1958); and *Reinardy* v. *Bruzzese*, 368 Mich 688 (1962). See also *American Bakeries Company*, 77 LA 530 (Modjeska, 1981).

> A discharged employee should be required to make a reasonable effort to mitigate damages by seeking substantially equivalent employment. The reasonableness of his efforts should be evaluated in light of the individual's qualifications and the relevant job market. His burden is not onerous and does not require that he be successful in mitigating his damages. Further, the burden of proving lack of diligence or an honest good faith effort on the employee's part is on management.
> (Hill & Sinicropi, *Remedies in Arbitration*, 216 BNA Books, 2nd Edition, 1991) See also Ford vs. Nicks, 866 F2d 865 (6th Circuit, 1989); *EEOC* vs. *EMC Corp*, 2000 US App LEXIS 1941, at 36.

In deciding what is a reasonable effort to find a job, most courts agree that an employee is not obliged to explore every possibility or devote every day to a search for work.[11]

The U. S. Sixth Circuit Court of Appeals, which governs Michigan, has stressed the "reasonable" element of the duty to mitigate and stresses that "an employee is not required to go to heroic lengths in attempting to mitigate his damages, but only to take reasonable steps to do so (*Suggs* v. *ServiceMaster Education Food Service*, 72 F3d 1228 (6th Circuit, 1996), quoting *Ford* v. *Nicks*, 866 F2d 865 (6th Circuit, 1989).

Moreover, the 6th Circuit has also indicated that an employee's duties to seek "substantially equivalent employment," not merely any employment (*U.S.* v. *City of Warren*, 138 F3d 1083 (6th Circuit, 1998). This means that the claimant need not go into another line of work or accept a demotion.[12] The NLRB has ruled that an employee need not seek

---

[11]*Nieman D. Industries, Inc. & United Paperworkers International Union*, 94 LA 669 (Nolan, 1998); see also *NLRB* v. *Arduini Manufacturing Company*, 394 F2d 420 (1st Circuit, 1968); see also The Power of the Arbitrator to Make Monetary Awards, Wolff, *Seventeen Proceedings of the National Academy of Arbitrators*, 176 (1964).

[12]*NLRB* v. *Madison Courier, Inc.*, 153 US App DC 232, 472 F2d 1307 (1972).

employment which is not consonant with his particular skills, background, and experience, or which involves conditions that are substantially more onerous than his previous position (*Wonder Markets, Inc.*, 236 NLRB 787 (1978)).

I have reviewed the transcript and record of the testimony of each of the Grievants in this particular case. I conclude that each of them did make reasonable efforts to find employment and mitigate their damages. For example, in the case of Grievant Bobby Jones, who was terminated on September 30, 2004, after receiving unemployment compensation in the early part of 2005, he was able to find interim employment with All Security Company driving an armored car. He continued with that employment in 2006, 2007, 2008, 2009, 2010, and 2011. He testified that he lost his job in 2011after a robbery took place when he was held up at gunpoint (Trial Record, pp 93-100). I find these efforts to be reasonable and diligent. Mr. Jones further testified that he filed for bankruptcy in April of 2013 (Exhibit 22; Trial Record p 103).

In the case of Grievant Carlton Carter, who was terminated in 2004, the records indicate that Mr. Carter received unemployment compensation in the amount of $9,412.00 in 2005, and interim earnings of $10,767.00 for that year (Union Exhibit 16 and Joint Exhibit 6). From 2006 through 2012, Mr. Carter had a position with the District Court in Highland Park. He had interim earnings that year of $108,390.00. In 2007, 2008, 2009, 2010 through 2012, Mr. Carter continued interim employment and did not collect unemployment compensation for the period from 2006 through 2012.

In the case of Mr. Richard Weatherly, who was terminated in 2007, during that year

Mr. Weatherly received unemployment compensation in the amount of $7,602.00 and had interim W-2 and interim 1099 earnings of over $32,000.00. Mr. Weatherly testified as to the fact that he sought employment from a number of employers and repeatedly filed applications, naming such employers as Greek Town Casino, MGM Detroit Casino, Motor City Casino, the Detroit Board of Education, and the Wayne County Road Commission, as well as others (Exhibit 20). During the years from 2007 through 2010, when he received unemployment compensation, he had an obligation to seek employment by seeking at least four jobs a week (Trial Record, p 142). At no time was he ever denied unemployment benefits for not fulfilling that obligation.

Despite these efforts, Mr. Weatherly was out of work for over six years. While he received assistance from other members of his family and friends to pay his bills, he testified that he lost his home, his car was repossessed, and his credit cards shut down (Trial Record, p 143).

In the case of Grievant Roderick Holley, Mr. Holley received unemployment compensation in 2007 and had interim W-2 earnings of $35,400.00. For the ensuing years of 2008 through 2012, Mr. Holley testified extensively concerning a large number of employers at which he sought employment. These included the Odawa Casino Resort; security positions at the Westin Book Cadillac, Detroit; Environmental Services at the Compass Group; manager at a Kroger's in Redford; Henry Ford Hospital, where he applied for various positions; and the Metro Airport, where he applied for various positions. (See also numerous other employers mentioned in Exhibit 20.)

As was the case with Mr. Weatherly, Mr. Holley had a duty and obligation to seek work while he collected unemployment. He made a diligent effort to obtain the record of those positions, according to his testimony. At no time was Mr. Holley denied benefits for not seeking work (Trial Record, p 120). Mr. Holley has been out of work for six years. He relied on family and General Assistance, as well as his Church and Friends for assistance. Despite these efforts, in December of 2009, his home was repossessed. In 2008, his car was repossessed. Holley testified that he has some outstanding liens with the IRS and has a judgment against him (Trial Record, p 121). Presently, he still has outstanding IRS liens as a result of his unemployment. He disclosed to the IRS that he is seeking back pay in his grievance litigation (Trial Record pp 132-133).

Unfortunately for the Grievants, particularly during the period from 2008 through 2012, the Detroit area has been suffering from what would probably be defined as a economic depression, in terms of finding work. Even giant corporations like General Motors and Chrysler Corporation, which employ large numbers of employees in the Michigan area, went through bankruptcy proceedings. Hence, it is understandable that two of the four Grievants were not able to find employment during this period of time.

Also to be considered is the fact that the positions that the four Grievants held as court officers were patronage-type positions. This means that these court officer positions are not the types of jobs for which one can put in an application and be hired. Courts do not hire applicants simply because of their looks. These are patronage positions and applicants must prove vital and serviceable to the courts that employ them. There was testimony concerning

49

the fact that each of the Grievant's received his initial appointment with the 36th District Court through the patronage of either a Chief Judge of the 36th District Court or another court. Unfortunately, during the interim periods of employment, these positions were no longer available to the Grievants.

I do note that the Employer in this case has not provided any evidence that substantially equivalent positions were available to any of the Grievants. Importantly, a review of the trial record in this case does not demonstrate that the Employer placed into evidence any proof that the Grievants failed to exercise reasonable diligence in locating such positions. Hence, based upon the evidence submitted, I do conclude that the Grievants demonstrated reasonable diligence in attempting to locate interim employment and mitigate their damages.

The Employer further submits that a reduction of back pay damages is warranted due to the Union's delay from September 2004 until July 2007 to attempt enforcement of arbitration rights under the Collective Bargaining Agreement. The Employer points out that Grievants Jones and Carter were separated from employment by notices dated September 22, 2004 (see Employer Exhibits 24 and 25). On January 5, 2007, court officers Richard Weatherly and Roderick Holley were terminated from their positions as court officers (see Employer Exhibits 26 and 27). Grievances were filed on behalf of these four court officers. By letter dated March 6, 2007, James A. Meadows, Director of the Human Resources division for the Employer, notified AFSCME Union that the four step grievance was denied adding "this matter is not subject to the grievance procedure" (Employer Exhibits 26 and 27).

50

In July of 2007, the Union filed its Complaint to Compel Arbitration (Employer Exhibit 28). The Wayne County Circuit Court entered an Order Compelling Arbitration and the Employer 36th District Court appealed that Decision.

As the parties are aware, the issue as to arbitrability and the issue on the merits was bifurcated at the request of the Employer. To that end, an evidentiary hearing was held on November 18, 2008 at the American Arbitration Association. This Arbitrator rendered a Decision and Award dated January 26, 2009, concluding that the grievances in this case concerning the four Grievants were arbitrable.

Subsequently, an arbitration hearing on the merits was held on April 24, 2009 at the American Arbitration Association offices in Southfield, Michigan. Once again, both parties had experienced legal counsel representing them. A transcript of the proceedings was made. In a Decision and Award dated June 26, 2009, this Arbitrator concluded that the grievances shall be and are sustained and that the Employer had not fulfilled its burden of demonstrating just cause for non-reappointment of the four Grievants. The remedy included reinstatement and back pay.

This Arbitrator was not party to the proceedings in the Wayne County Circuit Court concerning the arbitrability issue heard by Judge Warfield Moore and the two parties. As a result, I am not aware of whether the Employer raised the argument concerning the Union's delay from 2004 until 2007, in terms of enforcement of arbitration rights. If it did, obviously the Circuit Court for the County of Wayne did not find merit to such an argument. If the Employer did not raise that issue, it's ironic that it would now raise the issue six years later,

51

at this late date, on the issue of appropriate back pay.

In its post-hearing briefs, the Employer emphasized that the

> court resolution of the Judge Stempien decision required the time from May 4, 2010 (Joint Exhibit 3) until October 31, 2012 (Joint Exhibit 5), a two year and six month time span. This is the time span that should be eliminated from any back pay award periods for Carter and Jones. (Employer brief, p 21)

In reviewing the Employer's request, it is unclear exactly what time period it is complaining about. Is it the time period between 2004 and 2007, or is it the time span between May 4, 2010 and October 31, 2012? If it is the time period between 2004 and July of 2007, I do not find that argument to have merit. If anything, that argument should have been raised at the Circuit Court level when the Union's Complaint to Compel Arbitration was heard.

If it is the time span between the court resolution by Judge Stempien from May 4, 2010 until October 31, 2012, this occurred as a result of the Employer's appeal of Judge Moore's Decision to Compel Arbitration and this Arbitrator's Decisions. That two year six month time span mentioned in the Employer's brief was a consequence of its appeal of the arbitration Award and would not justify eliminating this time span.

One final issue separating the parties is the difference of opinion by the Employer and the Union concerning whether interest should be applied to any back pay award (See Union Exhibits 15 through 18). The Employer contends that in the absence of an express contract provision to the contrary, Arbitrators **traditionally** do not award interest on back pay or other monetary awards. There are exceptions, however, to that rule.

52

On the other hand, the Union is requesting interest on the back pay and argues that it is appropriate under the circumstances since Grievants Carter and Jones were terminated in 2004 while Grievants Holley and Weatherly were terminated in 2007. Hence, they have been without employment for over eight and six years, respectively. It argues that any compensation they receive will be affected adversely by the time value of money to a much greater degree than a more typical labor arbitration. Further, the Union submits that to grant interest is within the Arbitrator's inherent power.[13]

As Hill & Sinicropi point out in their series on *Remedies in Arbitration*, "It has not been the practice of arbitrators to award interest as a part of the traditional make whole package, primarily because (1) the parties rarely request it in the submission, and (2) it's not considered customary in the industrial relations forum."[14] However, the authors point out that the absence of awarding interest was first attributed to a

> . . . one time, and now abandoned, practice of the NLRB of not awarding interest on back pay awards. Since the Board and court actions frequently spill over into the arbitration area, attention is called to the reasoning of the Board when, in 1962, the NLRB changed its practice of not awarding interest.

In the case of *Isis Plumbing Company*, 138 NLRB 97 (1962), the Board stated, "back pay" granted to an employee under the Act is considered as wages lost by the employee as a result of a respondent's wrong. It is not a fine or penalty imposed on the respondent by the Board.

---

[13]*Fallstaff Brewing Corporation* v. *Teamsters*, 479 F Supp 850 (DNJ, 1978); see also *Contempo Design*, 120 LA 1317 (Bogue, 2004).

[14]BNA Books, at pp 197-200 (1981).

It is an indebtedness arising out of an obligation imposed by statute – – an incident fixed by law to the employer/employee relationship, a liability based on quasi-contracts . . . . Accordingly, under accepted legal and equitable principles, interest should be added to back pay awards made to employees who have been discriminatorily separated from their employment.

In reviewing the merits of these arguments, until a Decision and Award was issued on June 26, 2009 by this Arbitrator, the parties had not had the full opportunity to present witness testimony and exhibits at the trial or arbitration level. As a result, I do conclude that no interest should be added to any back pay award until after June 26, 2009, when both a Decision as to arbitrability and a Decision on the merits had been issued by this Arbitrator. At that time, the 36th District Court, the Employer in this case, was well aware that the grievances had been sustained and that it had not sustained its burden of demonstrating just cause for non-reappointment of the four court officer Grievants. The Award expressly respectfully directed the Employer to reinstate each of the Grievants to their former position of court officer "as soon as reasonably possible." The Employer was ordered:

> . . . to reimburse each of the Grievants for wages dating back to their date of termination or non-reappointment, at the rates in effect during those years of termination. The Grievants' seniority is also to be reinstated and the Grievants' employment records are to be modified in accord with this Decision and Award. The Employer may deduct any unemployment benefits received by the Grievants during the same period of time, as well as any interim earnings received by the Grievants from back pay due.

As a result, the interest rates allowed by Michigan statute would commence as of July,

2009.[15] For the six month period July 2009 through December 2009 at the rate of 3.101%. The following interest rates would be applicable for the six-month increments thereafter:

| | |
|---|---|
| January 1, 2010 | 3.480% |
| July 1, 2010 | 3.339% |
| January 1, 2011 | 2.553% |
| July 1, 2011 | 3.007% |
| January 1, 2012 | 2.083% |
| July 1, 2012 | 1.871% |
| January 1, 2013 | 1.687% |
| July 1, 2013 | 1.944% |

I do thank both legal counsel for their cooperation and courtesies throughout these proceedings. I do commend them upon the excellence of their post-hearing briefs, which are quite helpful.

---

[15]See MCL Sections 600.6013 and 600.6455 and Subsection 6 of Section 6613 and Subsection 2 of Section 6455 of Public Act 236 of 1961 as amended. See Appendix A attached.

55

## VIII. AWARD

The Employer 36th District Court is ordered to implement paragraph 3 of the Award dated June 26, 2009 in this case by paying the four Grievants the following back pay amounts:

### Carlton Carter

| | |
|---|---:|
| Amount due as of 7/1/2009 | $ 706,486.00 |
| Interest (3.101% - 7/1/09 - 12/30/09) = $21,908.13 ÷ 2 = | 10,954.06 |
| 1/1/2010 - Wages for period 1/1/2009-12/30/2009 | $ 191,718.00 |
| | |
| Balance due and owing as of January 1, 2010: | $ 909,158.06 |
| Interest (3.480% - 1/1/10 - 6/30/10) = $31,638.70 ÷ 2 = | 15,819.35 |
| Interest (3.339% - 7/1/10 - 12/30/10) = $30,356.79 ÷ 2 = | 15,178.39 |
| 1/1/2011 - Wages for period 1/1/2010-12/30/2010 | $ 193,761.00 |
| | |
| Balance due and owing as of 1/1/2011: | $ 1,133,916.80 |
| Interest (2.553% - 1/1/11 - 6/30/11) = $28,948.89 ÷ 2 = | 14,474.45 |
| Interest (3.007% - 7/1/11 - 12/30/11) = $34,096.88 ÷ 2 = | 17,048.44 |
| 1/1/2012 - Wages for period 1/1/2011-12/30/2011 | $ 219,278.00 |
| | |
| Balance due and owing as of 1/1/2012: | $ 1,384,717.69 |
| Interest (2.083% - 1/1/12 - 6/30/12) = $28,843.67 ÷ 2 = | 14,421.83 |
| Interest (1.871% - 7/1/12 - 12/30/12) = $25,908.07 ÷ 2 = | 12,954.03 |
| 1/1/2013 - Wages for period 1/1/2012-12/30/2012 | $ 194,610.00 |
| | |
| Balance due and owing as of 1/1/2013: | $ 1,606,703.55 |
| Interest (1.687% - 1/1/13 - 6/30/13) = $27,105.09 ÷ 2 = | 13,552.54 |
| Interest (1.944% - 7/1/2013 - 8/15/13) = $3,936.38 | 3,936.38 |
| | |
| **Balance due as of 8/15/2013*** | **$ 1,624,192.47*** |

*Interest continues to accumulate - currently $85.57/day*

**Bobby Jones**

| | |
|---|---|
| Amount due as of 7/1/2009 | $ 488,918.35 |
| Interest (3.101% - 7/1/09 - 12/30/09) = $15,161.36 ÷ 2 = | 7,580.68 |
| 1/1/2010 - Wages for period 1/1/2009-12/30/2009 | <u>$ 111,296.67</u> |
| | |
| Balance due and owing as of January 1, 2010: | $ 607,795.70 |
| Interest (3.480% - 1/1/10 - 6/30/10) = $21,151.29 ÷ 2 = | 10,575.64 |
| Interest (3.339% - 7/1/10 - 12/30/10) = $20,294.30 ÷ 2 = | 10,147.15 |
| 1/1/2011 - Wages for period 1/1/2010-12/30/2010 | <u>$ 109,434.67</u> |
| | |
| Balance due and owing as of 1/1/2011: | $ 737,953.16 |
| Interest (2.553% - 1/1/11 - 6/30/11) = $18,839.94 ÷ 2 = | 9,419.97 |
| Interest (3.007% - 7/1/11 - 12/30/11) = $22,190.25 ÷ 2 = | 11,095.12 |
| 1/1/2012 - Wages for period 1/1/2011-12/30/2011 | <u>116,767.67</u> |
| | |
| Balance due and owing as of 1/1/2012: | $ 875,235.92 |
| Interest (2.083% - 1/1/12 - 6/30/12) = $18,231.16 ÷ 2 = | 9,115.58 |
| Interest (1.871% - 7/1/12 - 12/30/12) = $16,375.66 ÷ 2 = | 8,187.83 |
| 1/1/2013 - Wages for period 1/1/2012-12/30/2012 | <u>137,040.67</u> |
| | |
| Balance due and owing as of 1/1/2013: | $ 1,029,571.00 |
| Interest (1.687% - 1/1/13 - 6/30/13) = $17,368.86 ÷ 2 = | 8,684.43 |
| Interest (1.944% - 7/1/2013 - 8/15/13) = | <u>2,522.42</u> |

**Balance due as of 8/15/2013\***      **<u>$ 1,040,777.85 \*</u>**

*\*Interest continues to accumulate - currently $54.83/day*

**Richard Weatherly**

| | |
|---|---:|
| Amount due as of 7/1/2009 | $ 428,146.00 |
| Interest (3.101% - 7/1/09 - 12/30/09) = $ 13,276.81 ÷ 2 = | 6,638.40 |
| 1/1/2010 - Wages for period 1/1/2009-12/30/2009 | <u>$ 222,214.00</u> |
| | |
| Balance due and owing as of January 1, 2010: | $ 656,998.40 |
| Interest (3.480% - 1/1/10 - 6/30/10) = $22,863.54 ÷ 2 = | 11,431.77 |
| Interest (3.339% - 7/1/10 - 12/30/10) = $21,937.18 ÷ 2 = | 10,968.59 |
| 1/1/2011 - Wages for period 1/1/2010-12/30/2010 | <u>$ 232,825.00</u> |
| | |
| Balance due and owing as of 1/1/2011: | $ 912,223.76 |
| Interest (2.553% - 1/1/11 - 6/30/11) = $23,289.07 ÷ 2 = | 11,644.54 |
| Interest (3.007% - 7/1/11 - 12/30/11) = $27,430.57 ÷ 2 = | 13,715.28 |
| 1/1/2012 - Wages for period 1/1/2011-12/30/2011 | <u>$ 238,243.00</u> |
| | |
| Balance due and owing as of 1/1/2012: | $ 1,175,826.58 |
| Interest (2.083% - 1/1/12 - 6/30/12) = $24,492.47 ÷ 2 = | 12,246.23 |
| Interest (1.871% - 7/1/12 - 12/30/12) = $21,999.71 ÷ 2 = | 10,999.86 |
| 1/1/2013 - Wages for period 1/1/2012-12/30/2012 | <u>$ 238,243.00</u> |
| | |
| Balance due and owing as of 1/1/2013: | $ 1,437,315.67 |
| Interest (1.687% - 1/1/13 - 6/30/13) = $24,247.51 ÷ 2 = | 12,123.76 |
| Interest (1.944% - 7/1/2013 - 8/15/13) = $3,521.38 | <u>3,521.38</u> |

**Balance due as of 8/15/2013\***　　　　　　　　　**<u>$ 1,452,960.81\*</u>**

*\*Interest continues to accumulate - currently $76.55/day*

**Roderick Holley**

| | |
|---|---:|
| Amount due as of 7/1/2009 | $ 401,382.00 |
| Interest (3.101% - 7/1/09 - 12/30/09) = $12,446.85 ÷ 2 = | 6,223.43 |
| 1/1/2010 - Wages for period 1/1/2009-12/30/2009 | $ 210,145.00 |
| | |
| Balance due and owing as of January 1, 2010: | $ 617,750.43 |
| Interest (3.480% - 1/1/10 - 6/30/10) = $21,497.71 ÷ 2 = | 10,748.86 |
| Interest (3.339% - 7/1/10 - 12/30/10) = $20,626.69 ÷ 2 = | 10,313.34 |
| 1/1/2011 - Wages for period 1/1/2010-12/30/2010 | $ 220,756.00 |
| | |
| Balance due and owing as of 1/1/2011: | $ 859,568.63 |
| Interest (2.553% - 1/1/11 - 6/30/11) = $21,944.79 ÷ 2 = | 10,972.39 |
| Interest (3.007% - 7/1/11 - 12/30/11) = $25,847.23 ÷ 2 = | 12,923.61 |
| 1/1/2012 - Wages for period 1/1/2011-12/30/2011 | $ 226,174.00 |
| | |
| Balance due and owing as of 1/1/2012: | $ 1,109,638.63 |
| Interest (2.083% - 1/1/12 - 6/30/12) = $23,113.77 ÷ 2 = | 11,556.89 |
| Interest (1.871% - 7/1/12 - 12/30/12) = $20,761.34 ÷ 2 = | 10,380.67 |
| 1/1/2013 - Wages for period 1/1/2012-12/30/2012 | $ 226,174.00 |
| | |
| Balance due and owing as of 1/1/2013: | $ 1,357,750.19 |
| Interest (1.687% - 1/1/13 - 6/30/13) = $22,905.24 ÷ 2 = | 11,452.62 |
| Interest (1.944% - 7/1/2013 - 8/15/13) = $ 3,326.45 | 3,326.45 |
| Reinstated to work 3/4/2013 - 2013 Wages due - 1/1 to 3/3 | $ 37,695.67 |

**Balance due as of 8/15/2013***           **$ 1,410,224.93***

*Interest continues to accumulate - currently $72.31/day*

Respectfully Submitted,

*[signature]*

Patrick A. McDonald

PAM/mab

Dated:  August 14, 2013

# APPENDIX A

 **Department of Treasury**



MICHIGAN.GOV
Michigan's
Official
Website

close print view

## Interest Rates for Money Judgments

**January 1, 2013**

Subsection 6 of Section 6013, and Subsection 2 of Section 6455 of Public Act No. 236 of 1961, as amended, (M.C.L. Sections 600.6013 and 600.6455) state the following.

Sec. 6013(6) Except as otherwise provided by subsection (5) and subject to subsection (11), for complaints filed on or after January 1, 1987, interest on a money judgment recovered in a civil action shall be calculated at 6-month intervals from the date of filing the complaint at a rate of interest which is equal to 1% plus the average interest rate paid at auctions of 5-year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually, pursuant to this section.

Sec. 6455 (2) Except as otherwise provided in this subsection, for complaints filed on or after January 1, 1987, interest on a money judgment recovered in a civil action shall be calculated from the date of filing the complaint at a rate of interest which is equal to 1% plus the average interest rate paid at auctions of 5-year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually, pursuant to this section.

Pursuant to the above requirements, the State Treasurer of the State of Michigan, hereby certify that 0.687% was the average interest rate paid at auctions of 5-year United States treasury notes during the six months immediately preceding January 1, 2013.

### HISTORICAL INTEREST RATES

| TIME PERIOD | INTEREST RATE |
|---|---|
| January 1, 1987 | 6.66% |
| July 1, 1987 | 7.50% |
| January 1, 1988 | 8.39% |
| July 1, 1988 | 8.21% |
| January 1, 1989 | 9.005% |
| July 1, 1989 | 9.105% |
| January 1, 1990 | 8.015% |
| July 1, 1990 | 8.535% |
| January 1, 1991 | 8.26% |
| July 1, 1991 | 7.715% |
| January 1, 1992 | 7.002% |
| July 1, 1992 | 6.68% |
| January 1, 1993 | 5.797% |
| July 1, 1993 | 5.313% |
| January 1, 1994 | 5.025% |
| July 1, 1994 | 6.128% |
| January 1, 1995 | 7.38% |
| July 1, 1995 | 6.813% |
| January 1, 1996 | 5.953% |
| July 1, 1996 | 6.162% |
| January 1, 1997 | 6.340% |
| July 1, 1997 | 6.497% |
| January 1, 1998 | 5.920% |
| July 1, 1998 | 5.601% |
| January 1, 1999 | 4.8335% |
| July 1, 1999 | 5.067% |
| January 1, 2000 | 5.7563% |
| July 1, 2000 | 6.473% |
| January 1, 2001 | 5.965% |
| July 1, 2001 | 4.782% |
| January 1, 2002 | 4.14% |
| July 1, 2002 | 4.36% |
| January 1, 2003 | 3.189% |
| July 1, 2003 | 2.603% |
| January 1, 2004 | 3.295% |
| July 1, 2004 | 3.357% |
| January 1, 2005 | 3.529% |

| Date | Rate |
| --- | --- |
| July 1, 2005 | 3.845% |
| January 1, 2006 | 4.221% |
| July 1, 2006 | 4.815% |
| January 1, 2007 | 4.701% |
| July 1, 2007 | 4.741% |
| January 1, 2008 | 4.033% |
| July 1, 2008 | 3.063% |
| January 1, 2009 | 2.695% |
| July 1, 2009 | 2.101% |
| January 1, 2010 | 2.480% |
| July 1, 2010 | 2.339% |
| January 1, 2011 | 1.553% |
| July 1, 2011 | 2.007% |
| January 1, 2012 | 1.083% |
| July 1, 2012 | 0.871% |
| January 1, 2013 | 0.687% |
| July 1, 2013 | 0.944% |

