UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE:  CITY OF DETROIT, | . | Docket No. 13-53846 |
| MICHIGAN, | . | |
| | . | Detroit, Michigan |
| | . | September 19, 2013 |
| Debtor. | . | 3:00 p.m. |

. . . . . . . . . . . . . . . . .

HEARING RE. MOTION BY OFFICIAL COMMITTEE OF RETIREES TO
STAY DEADLINES AND THE HEARINGS CONCERNING A DETERMINATION
OF ELIGIBILITY PENDING DECISION ON MOTION TO WITHDRAW THE
REFERENCE; MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF
STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, AND
SUB-CHAPTER 98, CITY OF DETROIT RETIREES' MOTION TO COMPEL
TESTIMONY OF KEVYN ORR AND ALL OTHER CITY AND STATE WITNESSES
REGARDING CITY-STATE COMMUNICATIONS PRIOR TO JULY 17, 2013
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jones Day<br>By:  BRUCE BENNETT<br>555 South Flower Street, Fiftieth Floor<br>Los Angeles, CA  90071-2452<br>(213) 243-2382 |
| For the State of Michigan: | Dickinson Wright, PLLC<br>By:  STEVEN G. HOWELL<br>500 Woodward Avenue, Suite 4000<br>Detroit, MI  48226-3425<br>(313) 223-3033 |
| For Official Committee of Retirees: | Dentons<br>By:  CLAUDE D. MONTGOMERY<br>620 Fifth Avenue<br>New York, NY  10020<br>(212) 632-8390 |
| For AFSCME, AFL-CIO, and Sub-Chapter 98, City of Detroit Retirees: | Lowenstein Sandler, LLP<br>By:  SHARON L. LEVINE<br>65 Livingston Avenue<br>Roseland, NJ  07068<br>(973) 597-2374 |

2

APPEARANCES (continued):

For UAW:                Cohen, Weiss & Simon, LLP
                        By:  THOMAS N. CIANTRA
                        330 W. 42nd Street
                        New York, NY  10036-6979
                        (212) 356-0228

For General and         Clark Hill
Police and Fire         By:  JENNIFER K. GREEN
Retirement Systems: 500 Woodward Avenue, Suite 3500
                        Detroit, MI  48226
                        (313) 965-8300


Court Recorder:         Letrice Calloway
                        United States Bankruptcy Court
                        211 West Fort Street
                        21st Floor
                        Detroit, MI  48226-3211
                        (313) 234-0068

Transcribed By:         Lois Garrett
                        1290 West Barnes Road
                        Leslie, MI  49251
                        (517) 676-5092


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  Court is in session.  Please be seated.
2   Recalling Case Number 13-53846, City of Detroit, Michigan.
3          THE COURT:  I'd like to proceed with the motion for
4   a stay first and then the motion to compel.  Is that okay
5   with everybody?
6          MR. MONTGOMERY:  Yes, your Honor.
7          THE COURT:  All right.  Let's hear from counsel for
8   the retiree committee.  You may proceed, sir.
9          MR. MONTGOMERY:  Thank you, your Honor.
10         THE COURT:  Excuse me one second.  And now you may
11  proceed, sir.
12         MR. MONTGOMERY:  Thank you, your Honor.  Claude
13  Montgomery for the Official Committee of Retirees in the City
14  of Detroit case.  We are here before you this afternoon, your
15  Honor, and request to this Court to stay its hearings in
16  connection with the eligibility determinations being made
17  under Section 109 of the Bankruptcy Court and in that regard
18  to stay any deadlines associated with that process.  We are
19  not seeking to stay any discovery matters.  We are not
20  seeking to stay any other aspects of the case in front of the
21  Court.  We are merely seeking to stay the eligibility
22  determination itself.  And, your Honor, the reason --
23         THE COURT:  All of the objections that everyone
24  filed, not just your objections.
25         MR. MONTGOMERY:  Correct.  And we are doing so

1  because we think that this Court has a constitutional

2  infirmity with respect to our eligibility issues and many of

3  the specific eligibility issues raised by the parties and

4  that ultimately only the District Court, as an Article III

5  court, may hear the issues that go to the resolution of the

6  private rights that we think this Court must deal with in

7  order to get to the 109(c)(2) issues.

8        Now, we agree with the debtor on a number of things

9  in connection with this case surprisingly.  One is, of

10 course --

11       THE COURT:  All right.  So over the break we were

12 advised that the reason the microphones die momentarily, as

13 some of you witnessed this morning, is because they are too

14 close and we are talking too loudly into them, so maybe push

15 it a little bit further away.

16       MR. MONTGOMERY:  Farther away and less projection?

17       THE COURT:  Yeah.  Still tilt it down towards you,

18 though, yeah.  Let's try that and see if that will solve the

19 problem.  Go ahead.

20       MR. MONTGOMERY:  Thank you.  Perhaps it was the fact

21 that I suggested we might agree with the debtor on something

22 that caused the microphones --

23       MR. BENNETT:  Maybe the mikes didn't believe you.

24       MR. MONTGOMERY:  But we do, that the automatic stay

25 is in place and will stay in place to the benefit of the

1   debtor unless and until an adverse eligibility determination

2   is made under 109(c)(2) or a court dismisses for lack of good

3   faith afterwards.

4          Now, we do think that we also agree with the city

5   that we have raised state law issues.  They think they are

6   groundless.  We think they are material.  We do agree that we

7   have raised constitutional issues.  We think they are

8   dispositive constitutional issues arising under state law,

9   and we think there are strong challenges under federal law

10  if -- if -- the Court is required to reach them.  We also

11  think that the Michigan constitution -- and this we do not

12  agree -- deprives the state of the ability to assert that the

13  authorization papers, which it has presented to this Court in

14  connection with the motion to confirm eligibility, can be

15  accepted by this Court because they reflect an avowed open

16  public purpose which we say is unconstitutional under

17  Michigan law.  If that purpose is legislatively authorized,

18  then the legislation runs afoul of the Michigan constitution

19  and that neither of those questions, whether or not the

20  purpose and the factual findings that must be made by this

21  Court related to the purpose nor the determination of the

22  nature of the conflict between the Michigan constitution and

23  the statute, PA 436, can be resolved by an Article I court.

24  And, your Honor, this issue comes up because we filed our

25  objections to eligibility raising these state law issues and

1  these federal constitutional issues.  We then immediately

2  filed our motions to withdraw the reference, and a couple of

3  days later we filed our motion for a stay, so it is -- the

4  motion to withdrawn reference, that is the matter for which

5  we need to argue success or lack of success with respect to

6  our entitlement to a stay of proceedings, not the underlying

7  question of eligibility.

8       Now, the city calls our effort a groundless

9  procedural gamble.  That's their quote, not ours, your Honor.

10 And we assert, your Honor, that our challenge to eligibility

11 is not groundless nor is the challenge to jurisdiction

12 groundless, and the reason we believe so and are invoking the

13 protections of the Article III judges of this district is

14 because the challenge to the jurisdiction of the Court

15 requires this Court to make a final determination on an issue

16 of state law because it cannot get to the question of

17 authorization without passing through the objections that

18 raise the state law constitutionality issue as it applies to

19 the purpose, as it applies to the governor's authorization,

20 and as it applies to the enabling legislation under PA 436.

21      THE COURT:  Well, but you're -- what is that?  Not

22 yours?  Is your argument so broad as to say that the

23 Bankruptcy Court never has the authority to rule on an issue

24 of state law?

25      MR. MONTGOMERY:  No, but where there's consent,

 1   sometimes --

 2          THE COURT:  Absent consent.

 3          MR. MONTGOMERY:  Absent consent, we think if there's

 4   a private right at stake, Stern teaches us that you require

 5   judicial authority to reach those determinations, and if that

 6   judicial authority in this context requires a final

 7   determination as is apparently available to the Court under

 8   157, then we think there's constitutional infirmity and that

 9   Stern teaches --

10          THE COURT:  But I want to ask again --

11          MR. MONTGOMERY:  Sure.

12          THE COURT:  -- does that mean a Bankruptcy Court

13   cannot render a final judgment on any claim before it when

14   the resolution of that judgment -- or the entry of that

15   judgment depended on the Bankruptcy Court's determination of

16   a question of state law?

17          MR. MONTGOMERY:  Your Honor, I don't know where the

18   line is on that, frankly.  I do know the Supreme Court tried

19   to say this is a narrow decision.

20          THE COURT:  So you're not arguing that.

21          MR. MONTGOMERY:  I am not arguing that.

22          THE COURT:  All right.

23          MR. MONTGOMERY:  I'm arguing --

24          THE COURT:  So what's the difference between what

25   you are arguing and that?

1        MR. MONTGOMERY:  The bottom line really is, your

2   Honor, that we don't see how an Article I court can deal with

3   issues of constitutionality that deal with private rights.

4        THE COURT:  Okay.

5        MR. MONTGOMERY:  Bottom line.

6        THE COURT:  What in <u>Stern</u> versus <u>Marshall</u> says that?

7        MR. MONTGOMERY:  We think that <u>Stern</u> versus <u>Marshall</u>

8   teaches us that where a private right not coming from the

9   federal system is at issue, that that is what raises the

10  constitutional problem that requires an independent judiciary

11  to make the determination.  Here the private right that is at

12  stake in the eligibility determination is whether or not the

13  state constitution protects the pension rights under the

14  pension clause.  That is, if you will, relatively narrow.

15  Some might say it's a big question, but I think it's a

16  relatively narrow question.  We are not here --

17       THE COURT:  Are there any cases that hold that a

18  Bankruptcy Court cannot rule on a constitutional question in

19  the context of a claim for relief that it would otherwise

20  have jurisdiction over under <u>Stern</u> versus <u>Marshall</u>?

21       MR. MONTGOMERY:  Well, <u>Stern</u> itself, of course,

22  because the <u>Stern</u> court recognized that the decision that it

23  was overruling was a core decision, and --

24       THE COURT:  Well, but the issue -- the claim that

25  was involved in <u>Stern</u> was a counterclaim to a proof of claim

1   on a state law cause of action.

2           MR. MONTGOMERY:  Absolutely.

3           THE COURT:  My question was is there anything in

4   Stern that says a Bankruptcy Court can't rule on a

5   constitutional question when it would otherwise have complete

6   jurisdiction over the claim for relief that's being

7   requested?

8           MR. MONTGOMERY:  I think Judge Rakoff in the Picard

9   case basically comes to that point where he says that where

10  you are dealing with an interplay of federalism and state

11  law, the reference should be withdrawn, and that's what he

12  did in that case, so we would cite you to the Picard case

13  that's in our brief for that purpose.

14          THE COURT:  But did the Picard case deal with a

15  constitutional question?

16          MR. MONTGOMERY:  Well, it was -- it ended up being

17  whether or not you could raise in the context of a -- I

18  believe it was -- this comes out of the Madoff cases in which

19  there were challenges by the Madoff trustee against the

20  parties who had taken money or received money out of the

21  case --

22          THE COURT:  Right.

23          MR. MONTGOMERY:  -- and so basically the trustee was

24  trying to get it back, and the --

25          THE COURT:  A clawback action, yeah.

1    MR. MONTGOMERY:  Yeah, clawback action.  And the

2    participants were saying, as a matter of state law, you

3    couldn't do it, and as a matter of constitutionality, no

4    subject matter jurisdiction to make the requisite findings

5    either of liability or good faith, and so those are pretty

6    simple in our ordinary parlance, our pre-Stern parlance,

7    pretty simple determinations of state law.

8         THE COURT:  Okay.  But in that case, the claim for

9    relief was fraudulent transfer; right?

10        MR. MONTGOMERY:  Correct, or variations thereof.

11        THE COURT:  Right, which is, in the view of many

12   courts, not within the core function of the bankruptcy

13   process.

14        MR. MONTGOMERY:  Well, your Honor, in my early days

15   I thought that was central to the bankruptcy --

16        THE COURT:  Well, lots of people did, but it's a

17   long way from a fraudulent transfer action to an eligibility

18   determination, the basic question about whether a party is

19   entitled to be in bankruptcy.

20        MR. MONTGOMERY:  Yes.  As the Bridgeport case

21   teaches us, your Honor, if it can be relied upon for the

22   proposition that mere -- the existence of authorization

23   papers filed by the party is not enough -- you have to go

24   behind those to see whether or not, as a matter of state law,

25   there, in fact, was an entitlement for the city officials to

1  file the pleadings they did, and in the <u>Bridgeport</u> case they

2  said the answer was no.  Those are pure state law issues.  In

3  fact, I believe the case law generally supports the

4  proposition that the 109(c)(2) issue to be decided is a state

5  law issue.

6        THE COURT:  Fair enough, but you're not arguing that

7  in the <u>Bridgeport</u> case anyone found that it was inappropriate

8  for that bankruptcy judge --

9        MR. MONTGOMERY:  No one raised it.

10       THE COURT:  -- to come to that conclusion.  Right.

11 No one raised the issue.

12       MR. MONTGOMERY:  No one raised it.  Similarly, no

13 one raised it in --

14       THE COURT:  All right.  Besides Judge Rakoff's view

15 in <u>Picard</u>, are there any other cases that hold that when a

16 constitutional issue is raised, a Bankruptcy Court can't hear

17 it?

18       MR. MONTGOMERY:  I would also point your Honor to

19 the <u>Sutton</u> case, which was a default case, again, sort of in

20 the context of a recovery action by a trustee, and in the

21 Western District of Michigan, the judge in the <u>Sutton</u> --

22       THE COURT:  Right, but --

23       MR. MONTGOMERY:  -- case finds that it's a

24 fundamental right to have an independent oversight of an

25 Article III court.

1    THE COURT:  Fair enough, but what was the

2  constitutional issue that a Bankruptcy Court would have to

3  decide in resolving the merits of the claim?

4    MR. MONTGOMERY:  I don't think there was one.

5    THE COURT:  That's what I'm asking you.

6    MR. MONTGOMERY:  But, again, so I guess my

7  suggestion to the Court is that if an ordinary private right

8  cause of action is something that the Supreme Court has said

9  the Article III judges should be looking at, how much more so

10  must it be if a constitutional issue of state law is raised,

11  not a contract enforcement action, not a legislative is there

12  a right of recovery.

13    THE COURT:  Right, so how do you deal with the

14  city's argument that the answer to that question is the

15  question before the Bankruptcy Court is the eligibility of

16  the debtor to be in Bankruptcy Court?  That's the question.

17    MR. MONTGOMERY:  Absolutely, your Honor.

18    THE COURT:  And there's nothing in Stern versus

19  Marshall or any other case, for that matter, which says that

20  the Bankruptcy Court can't rule on all issues, legal,

21  factual, constitutional, in deciding that ultimate question.

22    MR. MONTGOMERY:  If your Honor were to say that

23  eligibility was solely a function of federal law, I would

24  have to agree with your Honor, but the cases teach us that

25  eligibility is not a function of federal law.  It's a

1 | function of state law.

2 |        THE COURT: Well, but, see, I thought we moved past

3 | that with my first question, which was are you arguing that

4 | merely because the Court has to decide a state law question,

5 | Stern versus Marshall applied, and you said you didn't know

6 | that, "A," and you weren't sure where the line was.

7 |        MR. MONTGOMERY: I did say that, but what I am also

8 | suggesting to your Honor, that when the state law question is

9 | one of constitutionality and the right of the people of the

10 | State of Michigan to control their executives through their

11 | constitution, I think that is a relatively unique and narrow

12 | set of circumstances, a narrow set of circumstances for a

13 | court to deal with.

14 |        THE COURT: Okay. One more question on this, and

15 | then we can move on to the other considerations.

16 |        MR. MONTGOMERY: Yes, please.

17 |        THE COURT: There's lots of case law which says that

18 | the Court whose jurisdiction is challenged determines first

19 | the challenge. At least according to the city's papers

20 | there's that case law. How do you deal with that?

21 |        MR. MONTGOMERY: I say to you again that where the

22 | question is the constitutional limits of a Court's own

23 | jurisdiction, that that requires the party with the authority

24 | to resolve constitutional issues under our system to do it.

25 | And really the only place where there are any general

1 jurisdiction for constitutional issues is either in the

2 federal courts or in the state courts with respect to their

3 own systems.

4          THE COURT:  Um-hmm.

5          MR. MONTGOMERY:  And here a federal court, which is,

6 unfortunately, not an Article III judge -- an Article III

7 court, is being asked to resolve that question.

8          THE COURT:  So you would say that the Tax Court and

9 the Federal Court of Claims, both of which are Article I

10 courts, don't have jurisdiction to hear constitutional

11 issues?

12          MR. MONTGOMERY:  Certainly not under state law.

13          THE COURT:  How about under federal law?

14          MR. MONTGOMERY:  I don't know the answer to that,

15 and I'm not going to --

16          THE COURT:  You're arguing that this Article I court

17 doesn't have jurisdiction to consider your challenge to

18 Chapter 9 of the Bankruptcy Code, aren't you?

19          MR. MONTGOMERY:  Correct.  No question that I'm

20 asserting that.

21          THE COURT:  All right.  So why would the Tax Court

22 or the Federal Court of Claims be any different?

23          MR. MONTGOMERY:  Because we have a Supreme Court

24 which has identified at least this Article I court as having

25 limitations.

1       THE COURT:  Well, but there's nothing in <u>Stern</u>

2   versus <u>Marshall</u> that would suggest that the Supreme Court was

3   picking on Bankruptcy Courts, is there?

4       MR. MONTGOMERY:  Well, there actually is one thing

5   that suggests it, which --

6       THE COURT:  What?

7       MR. MONTGOMERY:  And that is that the -- the notion

8   coming out of the Supreme Court that Congress can't give to a

9   legislated body the right to decide questions of state law,

10  and the Court picked on the Bankruptcy Court because of the

11  private rights theory.

12      THE COURT:  Fair enough, but I'm asking you about an

13  Article I court's authority to rule on a federal

14  constitutional issue --

15      MR. MONTGOMERY:  Well, if --

16      THE COURT:  -- because you make that challenge, too,

17  whatever its merits are.

18      MR. MONTGOMERY:  Whether or not a public entitlement

19  can be challenged on a constitutional basis in the Article I

20  court charged with resolving that public entitlement is not a

21  question that we should have to deal with today, and I don't

22  think it is necessary, with all due respect, your Honor, to

23  find out what the limits of <u>Stern</u> are.  The only question we

24  are suggesting to your Honor, that this relatively narrow

25  exception where this Court under all authority is told that

1   the eligibility determination is a function of state law and
2   that this Court does make a final ruling from which no stay
3   can be had under 921, that's pretty clearly a final
4   resolution of a private right question if the authorization
5   issue has to go through another state's constitution as it
6   has to do in this case.  And the constitutional impairment
7   issue for the pension clause is whether or not an unelected
8   official can seek recourse to this Court to deprive people of
9   their pension rights, and that is a very different, I would
10  say, kettle of fish than your ordinary question, and it is
11  the specialness, if you will -- I know that's not really a
12  word, but the special nature of the circumstances --
13          THE COURT:  Um-hmm.
14          MR. MONTGOMERY:  -- that we are asking this Court to
15  take into consideration in deciding whether to offer a stay.
16          THE COURT:  Um-hmm.
17          MR. MONTGOMERY:  Now, if I may turn to some of the
18  other --
19          THE COURT:  Yeah.
20          MR. MONTGOMERY:  -- issues that you must deal with,
21  which is what is the standard for granting a stay, well,
22  again, it is not mere possibility of success.  The
23  debtor's -- the city's papers misquote the -- our assertion.
24  We say that it has to be more than a mere possibility of
25  success.  Specifically, the probability of success that must

1  be demonstrated is inversely proportional to the amount of

2  irreparable injury absent the stay.  Simply stated, one or

3  more excuses of the other, less of the other, and a stay may

4  issue so long as more than the mere possibility of success on

5  the merits is shown and for which we cite the Michigan

6  Coalition of Radioactive Users coming out of the Sixth

7  Circuit.

8          Now, the -- we, again, assert, your Honor, that

9  the -- we've already talked about the likelihood of success.

10  Your Honor has a feeling one way or another, maybe even a

11  decision one way or another on that point, but we think it's

12  more than a mere possibility, so then we turn to the question

13  of how do we balance the injury --

14          THE COURT:  Um-hmm.

15          MR. MONTGOMERY:  -- that we say exists here, and we

16  say the injury in the motion to withdraw the reference, not

17  in the eligibility question, but in the motion to withdraw

18  the reference is are we being deprived of having access to

19  the proper court to deal with our issues, which under Sutton

20  is looked at as a due process question, but we say it's a

21  very simple issue.  If we believe that your Honor has to

22  decide a constitutional issue and we are right that an

23  Article III court should decide the constitutional issue, is

24  the possible deprivation of that right an irreparable injury?

25  And I believe the Sixth Circuit in the Obama versus Ohio case

1   says that the mere possibility or threat of an injury to a

2   constitutional right should be looked at as irreparable

3   injury.  And, again, in that particular case, the voting

4   rights case, it was a First Amendment assertion.  Nothing had

5   actually happened yet somewhat like the city is arguing, we

6   haven't done anything yet, we don't know that anybody is not

7   going to vote, we don't know that anybody -- despite our

8   statements to the contrary, we don't know that anybody is

9   going to lose their pension rights, but the threat is

10  unequivocally present.  The emergency manager has made

11  repeated statements.  He's filed declarations, all of which

12  inform publicly --

13          THE COURT:  I'm missing the link between denial of

14  the stay and a deprivation of your right.

15          MR. MONTGOMERY:  Oh, it's the constitutional right.

16  The constitutional right is do the retirees of the City of

17  Detroit have the constitutional right to have the correct

18  court make the first determination.

19          THE COURT:  Right, but how does denial of a stay

20  result in that deprivation?

21          MR. MONTGOMERY:  Your Honor, if you hold the

22  hearings and you make the determination, that is why the

23  injury could occur because we say the wrong court is dealing

24  with the question.  If your Honor doesn't issue a stay but,

25  in fact --

1　　　　THE COURT:  You don't have access to the District

2　Court after that?

3　　　　MR. MONTGOMERY:  But an appeal of a determination is

4　not the same thing as having the determination made in the

5　first instance.

6　　　　THE COURT:  Why not?

7　　　　MR. MONTGOMERY:  First, factual findings --

8　　　　THE COURT:  The District Court's review would be de

9　novo in either instance.

10　　　　MR. MONTGOMERY:  Well, if this was a core matter and

11　if this Court had the jurisdiction to deal with it, neither

12　of which --

13　　　　THE COURT:  Are you asserting that the Court's

14　determination about the eligibility to be in bankruptcy is

15　not a core matter?

16　　　　MR. MONTGOMERY:  No.  In fact, that's the problem.

17　This is just like Stern in that regard.  It is unquestionably

18　a core matter, and so you unquestionably have the right to

19　make formal findings.

20　　　　THE COURT:  Right, but the issue of whether -- the

21　issue of whether either Chapter 9 or PA 436 is constitutional

22　is a legal issue that the District Court would review de

23　novo.  Yes?

24　　　　MR. MONTGOMERY:  Yes, but I think --

25　　　　THE COURT:  Yes?

1          MR. MONTGOMERY:  Yes.

2          THE COURT:  So how does denying a stay deprive you

3     of access to the District Court?

4          MR. MONTGOMERY:  Your Honor, I think it's the -- if

5     review were a sufficient salve on the injury of having the

6     wrong court make the decision, I don't think <u>Stern</u> would have

7     reversed because, "A," --

8          THE COURT:  Oh, well --

9          MR. MONTGOMERY:  -- we're in an appeal process, and,

10    "B," the --

11         THE COURT:  <u>Stern</u> versus <u>Marshall</u> involved a case

12    with very substantial disputes as to fact which the

13    Bankruptcy Court had resolved and which the Court held that

14    the District Court should have resolved, and we all know that

15    there's a difference between the District Court trying an

16    issue of fact in the first instance, on the one hand, and on

17    the other hand a District Court reviewing a Bankruptcy

18    Court's findings of fact.

19         MR. MONTGOMERY:  And, your Honor, we have suggested

20    in our papers both on the eligibility question and in our

21    motion to withdraw the reference that your Honor or whoever

22    is the decider will have to make factual determinations as

23    part of the question of the determination of

24    constitutionality.  Specifically, if there is an unlawful

25    purpose, in order to reach the conclusion that it is an

1    unlawful purpose, you have to make findings of fact as to

2    what the purpose was.  You can't get to the question of

3    lawfulness without going through the fact of purpose, and

4    here there may be some argument as to what the purpose is.

5    The city in its response paper says nothing has happened as

6    if what are we complaining about, as if there wasn't some

7    reality to the emergency manager's statements of his

8    intention both before and after he filed the case, so I

9    expect your Honor to have a real live fight with lawyers, you

10   know, making their challenges and, you know, complicating

11   your life in making the decision-making that you're going to

12   do, but it's going to be final when it's over for you because

13   if you're -- if the city is right, it'll be a core matter.

14   There will be factual findings that have to be reviewed not

15   on a de novo basis.

16           THE COURT:  Um-hmm.

17           MR. MONTGOMERY:  And so we think that's why your

18   Honor needs to be especially sensitive to the question of

19   what court is doing it.  You know, basically we're asking the

20   Court to see the danger in having the citizens of Michigan,

21   who are the retirees of the city, have the wrong court make

22   the factual determination as to whether or not the purpose

23   for which this filing occurred was or was not one that

24   Article IX, Section 24, of the Michigan constitution --

25           THE COURT:  Of course, if the Court -- if this Court

1  does issue a judgment that involves findings of fact that

2  result from a trial and disputed issues of fact, the District

3  Court could just treat them as proposed findings of fact and

4  conclusions of law if it agrees with you on Stern versus

5  Marshall.  Yes?

6        MR. MONTGOMERY:  It could do that or vacate and

7  start over.  It could do a number of things.

8        THE COURT:  Right.  So if all that is true, where's

9  the injury to your client?

10        MR. MONTGOMERY:  The injury, your Honor, is at the

11  beginning of the process, and the beginning of the process

12  is, in effect, once this Court or the District Court makes

13  that determination, the gavel comes down, eligibility, right,

14  there's no more possibility of a stay or a slowing down of

15  the process.  Specifically, if your Honor -- at least as I

16  read the statute, if your Honor has the jurisdiction to make

17  the determination and you make the determination of

18  eligibility, the District Court to whom the appeal is made

19  can't stay it because 921 says so.  So it's got to go back in

20  order to do anything of that nature decide that there was no

21  subject matter jurisdiction to begin with here, and if

22  there's no subject matter jurisdiction, why are we doing

23  this?  And so we say to you the injury under the Obama case,

24  the threat to constitutional rights, the threat to due

25  process problems --

1      THE COURT: Were you in court this morning when
2  the --
3      MR. MONTGOMERY: Was not.
4      THE COURT: -- retirees addressed the Court?
5      MR. MONTGOMERY: I was not, your Honor.
6      THE COURT: Perhaps you heard that several of them
7  expressed the most profound concern about the uncertainty
8  resulting from these proceedings about whether they will
9  receive their pensions or not suggesting, doesn't it, that
10  it's in their best interest to get to the answer to that
11  question as promptly as possible?
12      MR. MONTGOMERY: I suspect your Honor also heard,
13  although I don't know this because I wasn't here, that some
14  of the retirees said we want to also make sure that the right
15  court hear -- that there is a history almost --
16      THE COURT: You're absolutely right. Some of them
17  said that, but I want to hear what you say about my question.
18      MR. MONTGOMERY: Well, your Honor, the pace at which
19  the proceeding moves is an important one for both sides, but
20  we, the retiree committee, believe that the more important
21  question than pace is who and whether or not that party --
22  that is, the correct who to decide -- sets a pace that is
23  accelerated or slow. And whoever the -- your Honor has made
24  a determination as to what the right pace is. We know that
25  October 23 and October 24 we are going to have a hearing in

1   front of you on eligibility.  You have made that

2   determination, and everybody is running like crazy to get

3   there.  Whether or not an Article III judge would have

4   exactly the same process, something slightly different, I

5   don't know, but I do think it's important to the process of

6   shaping the findings of fact that the trier of fact have a

7   role if it's judicial in how that occurs, and that is why

8   we're asking for the stay.  And if I may --

9         THE COURT:  And how do you deal with the city's

10  argument that it would suffer irreparable harm if the stay is

11  granted?

12        MR. MONTGOMERY:  First, I would point out that the

13  automatic stay is in place and that your granting of a stay,

14  your Honor, were you to do it, does not affect their right to

15  be in this court pursuant to the automatic stay and that they

16  still have the protections from creditor seizure no matter

17  what happens.

18        Second, I would point out to your Honor that there's

19  a range of time lines that have occurred in cases where

20  eligibility is found.  There have been two months, three

21  months, and the Stockton case took a full year in which the

22  process worked itself out.  Now, we are certainly not

23  suggesting that it take a year.  In fact, we're hoping it

24  does because we'd just as soon that the pension issue was

25  resolved long before that on behalf of the retiree committee,

1  in effect working myself out of a job, and -- but --

2      THE COURT:  Well, Stockton only took a year to get

3  to eligibility because the parties asked the judge to hold

4  the decision in pocket pending their discussions and

5  negotiations.

6      MR. MONTGOMERY:  And which the city has not asked

7  here, as far as we know has not asked for that to happen.

8  Otherwise they would probably be joining us in some fashion

9  or another, so we assume that the city believes --

10     THE COURT:  Right.  But the city's argument about

11 its prejudice from a stay here is more fundamental than that,

12 isn't it?  They argue they need to get to plan

13 confirmation -- plan negotiation and then plan confirmation

14 as promptly as possible because, at a minimum, city services

15 are impaired.  We heard those stories here this morning as

16 well, some of which were very tragic and compelling, and they

17 need to get on to the business of rebuilding the city.

18     MR. MONTGOMERY:  And thanks to your Honor, they're

19 actually doing that because you set forth a mediation order.

20     THE COURT:  Well, but if we put off the eligibility

21 hearing --

22     MR. MONTGOMERY:  But, your Honor --

23     THE COURT:  -- we're putting off the whole process

24 accordingly.

25     MR. MONTGOMERY:  I would say not because right now

1    there's no --

2              THE COURT:  You've asked for a delay of all the

3    dates.

4              MR. MONTGOMERY:  I was going to make a slightly

5    different point if I may, your Honor --

6              THE COURT:  Okay.

7              MR. MONTGOMERY:  -- which is that the city is

8    actively engaged in negotiations with multiple parties over

9    what a plan might look like in this case through the

10   mediation process, which your Honor set forth.  Your Honor

11   has already dealt with, in effect, the possibility of delay

12   by asking Judge Rosen to crack heads and move people, which

13   is what he is doing.

14             THE COURT:  Well, that's not exactly the language I

15   used with him.  Okay.  I'll accept it.

16             MR. MONTGOMERY:  If I misunderstood, please tell me.

17             THE COURT:  No.  I did tell him that his -- I'll

18   share this with you.  I did tell him that his deliverable is

19   a confirmable plan.

20             MR. MONTGOMERY:  And so we say that to the extent

21   that the inability to engage with creditor constituencies

22   might arise from a delay in eligibility, we say that's

23   demonstrably not true.

24             THE COURT:  Okay.

25             MR. MONTGOMERY:  All right.  And the last issue, I

```
 1   think, just goes back to the first, which is where does
 2   public interest sit --
 3              THE COURT:  Right.
 4              MR. MONTGOMERY:  -- and here we think having the
 5   right court make the right decision on the constitutionality
 6   question is it.
 7              THE COURT:  All right.
 8              MR. MONTGOMERY:  Thank you.
 9              THE COURT:  Thank you, sir.  All right.  Before I
10   hear the city's argument, I'm going to take a ten-minute
11   recess.
12              THE CLERK:  All rise.  Court is in recess.
13         (Recess at 3:34 p.m., until 3:42 p.m.)
14              THE CLERK:  Court is in session.  Please be seated.
15              THE COURT:  Sir.
16              MR. BENNETT:  See if I can get this right.
17              THE COURT:  But not too close.
18              MR. BENNETT:  Not too close.  Good afternoon, your
19   Honor.  Bruce Bennett, Jones Day, on behalf of the city.  I
20   want to go to a couple of small points and then get to the
21   center of some of the disputes or discussions that you had a
22   few minutes ago.
23              First of all, the Bridgeport case was, of course,
24   decided by a bankruptcy judge, not by a district judge, and,
25   second, on the Court's jurisdiction to consider
```

1  constitutional issues, it is, of course, the case that in

2  <u>Stern</u> it started at a bankruptcy judge even though there was

3  a constitutional issue.  It wasn't withdrawn to the District

4  Court because there was a constitutional issue raised below.

5  And in <u>Waldman</u> and the long series of post-<u>Stern</u> cases have

6  similarly started in a bankruptcy judge and worked their way

7  up through the system -- through the appellate system, and

8  they were not removed to the district judge.  If they were

9  removed to the district judge, there would have been nothing

10  for <u>Waldman</u> to decide, so we have, I think, ample evidence of

11  the fact that the rules that we cited in our papers and the

12  cases that we cited in our papers about courts having

13  jurisdiction to determine their own jurisdiction are alive

14  and well.

15       Now, I think there are a lot of very easy ways to

16  determine that there are no serious issues on the merits here

17  and that there is really no prospect that the District Court

18  is going to be inclined to withdraw the reference.  Number

19  one -- and I think you got to it in a slightly different

20  way -- there's a very big difference when you read the cases

21  between those cases that involve the possible assertion of a

22  jury trial right and those that don't because where a jury

23  trial right is involved and there is a problem with the

24  Bankruptcy Court's jurisdiction, the reference has to be

25  revoked because the Bankruptcy Court doesn't have the power

1   to conduct a jury trial.  The consequence if a bankruptcy
2   judge does not have the power to hear a case on other than a
3   jury trial ground, the consequence is that the bankruptcy
4   judge enters recommended findings and conclusions.  And, your
5   Honor, the way that works is your Honor decides that.  I
6   think, frankly, the Rakoff decision in <u>Madoff</u> is a very
7   significant outlier, and when you really read it, the
8   footnote that the retiree committee pointed to, what Judge
9   Rakoff is saying there is that he wants to make the decision
10  as to whether to withdraw the reference, not that he thinks
11  that there is a constitutional issue embedded in the
12  fraudulent transfer cases that were before him, and so when
13  he talks about the constitution being a reason for him
14  hearing something, he's talking about the issue of the
15  withdrawal of the reference even though he admits that one of
16  the things he could do even if he orders revocation of the
17  reference is refer it back to the Bankruptcy Court for
18  recommended findings and recommended conclusions.  He says
19  that, too, in the same opinion, actually in the same footnote
20  or near it.  I can't remember exactly.
21          So the first reason why it seems inconceivable to us
22  that the District Court is going to revoke the reference is
23  that even if the District Court decides -- and for many
24  reasons that I'm going to discuss in a second we don't think
25  that the District Court will decide -- that there's any

1  infirmity in this Court's jurisdiction to determine

2  eligibility, the District Court's response is going to be the

3  bankruptcy judge should enter recommended findings and

4  conclusions, and, your Honor, if the District Court were not

5  involved at this stage with that particular instruction, your

6  observation that you could enter an order -- you could enter

7  findings of fact and conclusions of law and a district judge

8  on appeal who thought that there was a problem with this

9  Court's jurisdiction could treat them as recommended orders,

10  recommended findings, recommended conclusions, and deal with

11  them on a de novo level as to facts and law, whereas in a

12  straight appeal it would be de novo as to law, clearly

13  erroneous as to fact, so that's the first reason, that

14  withdrawal is not going to be the end result anyway.

15      The second reason, the courts -- you know, the --

16  when we discussed the -- when we're discussing the whole

17  issue of whether or not the Bankruptcy Court should enter a

18  dispositive order or a recommendation to the District Court,

19  the vocabulary of deciding an issue was always the way it was

20  discussed when you were discussing the issue with Mr.

21  Montgomery and when I was discussing the issue here, and

22  there is, of course -- if you think about it carefully and

23  listen to it, there's actually something wrong with even

24  talking about it that way because Stern at the end of the day

25  is about the entry of a final order.  Stern isn't about

1   interim orders or interlocutory orders at all, and it turns
2   out that a determination of eligibility is an interlocutory
3   order.  There's about four cases that say so, and so that's
4   another reason why it is not clear to us how it is that a
5   district judge is ever going to decide that the reference
6   would be revoked.  You have even in jury trial cases cases
7   where revocation of the reference is ultimately going to
8   happen for some reason later.  Those cases remain in the
9   Bankruptcy Court for as long as possible almost through all
10  discovery disputes, through all pretrial motions, and only
11  the trial itself gets moved.  So where you're dealing with an
12  interlocutory order and when Stern is all about the final
13  order -- and, in fact, in Stern itself the Supreme Court says
14  we're not trying to change the way things work in Bankruptcy
15  Courts, and you heard why.
16          THE COURT:  Well, but I heard -- Mr. Montgomery
17  argued or at least I heard him argue that what's key to the
18  understanding of Stern is not the Court's authority to enter
19  an order, be it final or interlocutory, but the nature of the
20  issue that the Court has to consider in getting there.  And
21  if the nature of the issue involves federal constitution or
22  the state constitution or the resolution of facts to
23  determine -- that are necessary to determine
24  constitutionality, Mr. Montgomery argues Stern says no to
25  that.

1          MR. BENNETT:  Well, I'll take it either way because

2    there's -- there is other ways to approach the question even

3    if one thought that it's discuss -- that it really is

4    focusing on an issue.  The fact of the matter is it isn't.

5    It talks about a final determination of a state law claim.

6    It does not talk about at all the components and questions

7    that might come up in the course of it.

8          And I'm going to jump ahead to another part of my

9    argument that I think is unbelievably important.  It could

10   not be that way because if what -- if you read Stern to say

11   all you need to do to upset Bankruptcy Court jurisdiction,

12   defendant who's unhappy being in the Bankruptcy Court, is

13   raise an issue of state law that is ordinarily decided, if

14   that was the only question, in a state court maybe with a

15   jury, just raise it, then you've escaped the Bankruptcy

16   Court, and, of course, that can't possibly be what Stern

17   means.  And, of course, we run into courts dealing with this

18   precise problem in the mandatory withdrawal context where a

19   defendant wants to get out of a Bankruptcy Court and all of a

20   sudden fills its papers with supposed issues where there are

21   collisions between bankruptcy -- the Bankruptcy Code and laws

22   regulating interstate commerce.  And the courts that have

23   confronted those cases have been wiser or savvier than the

24   defendants who tried this and say not so fast, that we are

25   not going to look at all the things that you've introduced as

1  additional issues to try to determine whether or not

2  interstate commerce is implicated.  We're going to look at

3  the claim, the claim that's pled and the kind of action that

4  we're dealing with, and we're going to decide what's the real

5  essence of the claim.  And I think, frankly, Stern -- whether

6  or not there's ambiguity -- and I, frankly, didn't find it

7  myself -- I think it has to be focused on what is the claim,

8  not is what does the defendants throw up to resist it, and

9  what is the essence of the claim and the basis for relief,

10 not the issues that might come up along the way.  And so,

11 again, my second reason --

12          THE COURT:  Let me ask you to pause there with these

13 two questions.  First is are there any cases that actually

14 say that, and by that I mean Stern focuses on the Court's

15 authority to enter judgments and claims, not on the Court's

16 authority to resolve the issues that need to be resolved to

17 get to judgment?

18          MR. BENNETT:  I don't know.  I didn't have -- I did

19 not have time to look for them, and I did not --

20          THE COURT:  All right.

21          MR. BENNETT:  I did not go look for them, but we did

22 cite cases that have essentially the same epistemology as

23 applied to the analysis of the mandatory abstention

24 provisions, and they are in our brief.

25          THE COURT:  Second question.  The issue for today is

1  not should the reference be withdrawn.

2          MR. BENNETT:  Exactly.

3          THE COURT:  It's not will the District Court

4  withdraw the reference.

5          MR. BENNETT:  Right.

6          THE COURT:  It's something much less than that.

7          MR. BENNETT:  That is exactly --

8          THE COURT:  We can debate the exact language, but

9  it's something like reasonable likelihood of success or more

10  than a mere possibility, so the question is even if you

11  disagree with Mr. Montgomery's ultimate argument on the Stern

12  question, the question is does his argument have enough merit

13  to pass this test given that what we're talking about here is

14  a stay?

15          MR. BENNETT:  Well, I don't think -- I don't think

16  so.  I think the first point was enough in and of itself.

17  We're not dealing with a jury trial right.  We're not dealing

18  with something that -- where this Court could not enter

19  recommended findings and decisions, and so when you look at

20  it from that perspective, even if the District Court were to

21  decide that Mr. Montgomery is right there's a jurisdictional

22  defect, we think that the chances that the District Court is

23  going to say ship it up to me are zero; that what he will say

24  at most is I'll take recommendations, and we'll move on from

25  there.  And for that reason alone, there is no reason to stay

1   this because that would effectively mean the reference isn't

2   withdrawn even if there is a jurisdictional defect, so

3   there's no reason to stay anything.  That's number one.

4       The next argument on the list, which, frankly, I

5   think is one that you mentioned earlier as well is we are

6   very clearly dealing with a federal right here.  We are not

7   dealing with a private right.  This is not an action to take

8   away someone's pension.  This is an action to determine

9   whether Chapter 9 is applicable and to this particular

10  available --

11      THE COURT:  You mean whether the city is eligible.

12      MR. BENNETT:  Is available to this particular -- to

13  this particular city, and that -- I don't think we need to

14  have a debate as to whether the Bankruptcy Code creates

15  public rights or private rights.  If you don't have the

16  Bankruptcy Code -- and, of course, states don't -- there is

17  no such thing as a debt adjustment scheme, so the Bankruptcy

18  Code is not the echo or successor of some preexisting common

19  law right.  It was created as a matter of federal law because

20  the constitution authorized the United States federal

21  government to create the Bankruptcy Code, and they have the

22  Bankruptcy Code.  It is as federal right as they come.  And

23  eligibility is whether or not this particular municipality

24  can invoke the federally created right.  This is unbelievably

25  analogous to all of the constitutional cases that have dealt

1   with whether or not you're entitled to an Article III court,

2   for example, to get Social Security benefits or to challenge

3   certain things with respect to Social Security or Medicare.

4   All those cases come out the same way, that when you're

5   dealing with the -- a federally created scheme and no

6   preexisting state law right, the procedures you get are

7   embedded in that scheme, and they're administrative law

8   judges.  That's why we have them.  And that, frankly, is a

9   judge that -- is a court that's got less judicial attributes

10  than this court, so we are not -- and I'm pretty sure that

11  when other administrative procedures come about,

12  administrative law judges are told what you're doing, Judge,

13  is unconstitutional usually with respect to the Fifth

14  Amendment, but that doesn't mean the administrative law judge

15  does not get to do his or her job in the context of

16  administering a federal scheme.  And there is no reason,

17  quite frankly, why any arguments that have been made to

18  undermine the authorization of this debt adjustment case do

19  anything to change the character of the determination, which

20  is whether the federal scheme is going to be applied in this

21  case.  And in that circumstance, your Honor, we think there

22  is literally no, not even a possible amount -- there is

23  literally no chance of success in this case.

24          And I want to make one more unrelated point.  Your

25  Honor may not have read ahead to our papers responding to the

1  eligibility objections.

2         THE COURT:  I did.

3         MR. BENNETT:  So then you already know -- and I

4  think it belongs on the table in this context for the purpose

5  that you are suggesting, which is whether this case is really

6  at the edge and whether there is a possibility that there can

7  be relief here.  This all starts from the premise that

8  there's something particular and exceptional about the

9  treatment of pensions under the Michigan constitution.  And

10  as you know from our papers, there certainly is a section --

11  a separate clause that addresses it, but it's no different

12  than the protection for contracts generally under the

13  Michigan contract laws or, for that matter, for the

14  protections that all contracts with states have under the

15  contract laws of the United States Constitution.  They are

16  the -- the language of all these different protections are

17  almost indistinguishable, and if the pension --

18         THE COURT:  Okay.  I can't permit you to argue the

19  merits of the underlying constitutional claim.  That's not

20  what we're here for today.

21         MR. BENNETT:  I was not arguing the underlying

22  merits.  I was pointing out the same -- I guess this is a --

23  this is a -- kind of the same point that the Bankruptcy

24  Courts and the District Courts are pointing to when they talk

25  about mandatory abstention, which is the argument here is

1  based upon this idea that there's a -- that this case is

2  special; that the constitutional provision here is what's

3  going to take it out of this court.  Well, every single

4  bondholder has one that has almost the same words that they

5  can point to.  You don't have a single bondholder here saying

6  anything -- any reference has to be withdrawn.  This is

7  the -- I raise this only to point out that the argument of

8  exceptionalism --

9        THE COURT:  Million possible reasons for that.

10        MR. BENNETT:  Pardon?

11        THE COURT:  There are a million possible reasons for

12  that --

13        MR. BENNETT:  Or in any other --

14        THE COURT:  -- none of which carry any particular

15  legal weight.

16        MR. BENNETT:  Or in any other case where bondholders

17  have been on the other side of the eligibility question, for

18  that matter.

19        THE COURT:  You are certainly correct to the extent

20  you are pointing out that Bankruptcy Courts since Stern have

21  dealt with constitutional issues without objection from the

22  parties or at least objection under Stern versus Marshall.

23        MR. BENNETT:  I will go further.

24        THE COURT:  What inference to draw from that is less

25  clear, isn't it?

1    MR. BENNETT:  I'm not sure, your Honor.  I think

2  that the books would be full of withdrawal cases, and they're

3  not and which, by the way, there's a broader point here that

4  wasn't --

5    THE COURT:  Well, with all due respect to everyone

6  involved, there are lots of reasons why parties might prefer

7  where they are.

8    MR. BENNETT:  Okay.  True enough.  I'm certainly not

9  going to argue about that.  Now, but while we're talking

10  about, you know, what the cases say and don't say, let's now

11  get back to the fact that we're dealing with a stay motion,

12  and there is not a single case where a -- that was

13  reported -- that was brought to you by the retiree committee

14  or that we could find when we looked that enters a stay while

15  a withdrawal for reference proceeding is going on in the

16  District Court.  There are, in fact, a whole bunch of

17  cases -- I don't know how many.  I didn't count them

18  particularly --

19    THE COURT:  Something tells me --

20    MR. BENNETT:  -- but they were cited.

21    THE COURT:  Something tells me that the lawyer in

22  Stern versus Marshall who was in your shoes made the same

23  argument.

24    MR. BENNETT:  That -- okay.  Well, at any rate,

25  there -- oh, I see.  Well, here actually -- but these are --

1  that's different.  Stern made this argument for the first

2  time, and it hadn't been squarely rejected.  I'm saying that

3  the cases in the books that deal with the stay, they squarely

4  reject requests for stay pending motions to -- pending the

5  hearing in the District Court of motions to withdraw the

6  reference precisely on the grounds -- one of them

7  precisely -- and I can't remember the name off the top of my

8  head -- one of them precisely on the grounds that, wait a

9  second, even if I was -- even if I were to find that there is

10 a jurisdictional defect, the bankruptcy judge is just -- is

11 going to give me recommended conclusions anyway, and the

12 bankruptcy judge will figure out which is right, so there are

13 actually cases --

14        THE COURT:  You mean the District Court will figure

15 out which is right.

16        MR. BENNETT:  The District Court.  Well, no.  They

17 say the Bankruptcy Court judge in the first instance will

18 decide which he -- he or she decides to enter, and then the

19 District Court will decide if he or she was right.

20        THE COURT:  Oh, that.  Okay.

21        MR. BENNETT:  Let me move on to burden --

22        THE COURT:  Okay.

23        MR. BENNETT:  -- because if we're -- if your Honor

24 believes there may be a case, albeit weak, with respect to

25 withdrawal of the reference, which we respectfully disagree,

1    we then have to take a look at the comparative burdens, and

2    here there is no -- once you focus on the correct question,

3    which is how does the stay inflict a burden on the retirees,

4    you find the answer that as a legal matter it doesn't at all.

5    And I think the first place you need to go to see this is

6    really the Chrysler case, and what the Chrysler case tells us

7    is is that -- in Chrysler the opponents to the -- the people

8    who were asking for a stay said we really need a stay while

9    the District Court determines jurisdiction because if we

10   don't get the stay, the sale process -- a sale process is

11   going to continue, a 363 sale is going to continue, and the

12   assets might be sold.  And the Bankruptcy Court said, well,

13   yeah, but you have rights if the sale isn't -- if the sale is

14   implemented and the District Court decides I've made a

15   mistake, you have a remedy, and the creditor said, well, no,

16   we don't.  This 363(m) that require -- that says that it's

17   not stayed in the bankruptcy yet, you have to post a bond,

18   and even if your ability to -- even if the ability of the

19   courts to correct the situation is burdened by the

20   requirement that a party has to post a bond, that isn't

21   irreparable injury because the system has its own correction.

22   And even though it has burdens along the way, you are stuck

23   with them.  And as your Honor pointed out, in this particular

24   case no one has to post a bond, and there is a perfect

25   mechanism for self-correction, which is if it is the case

1  that your Honor enters an order for relief and if it is the

2  case that any of the -- that the retiree committee decides

3  they want to appeal that decision on the basis that your

4  Honor had no jurisdiction to grant it, then the District

5  Court that receives it has your order, your findings, your

6  conclusions. And if the District Court decides, no, there

7  was a jurisdictional defect, he can then treat them as a

8  recommended order, a recommended set of findings, a

9  recommended set of conclusions of law and decide then on a de

10 novo basis as to fact issues as well as for law whether or

11 not to adopt them. There is no harm at all. The system has

12 a self-correction mechanism built in. No constitutional

13 rights are being lost in between. No constitutional rights

14 are being trampled in between. And, again, it's a

15 comparison.

16         Let's take a look at the city. As your Honor

17 pointed out, this case is not about the automatic stay. This

18 case is about getting a plan confirmed. There are cases I'm

19 sure that your Honor sees in the business side where it's all

20 about the automatic stay because no one has the faintest idea

21 what their plan is going to look like. That's not this case.

22 We need to get a plan done. We would like to get a plan done

23 consensually. If we can't get it done -- plan consensually,

24 we need to get a plan done another way, and we need to get it

25 done quickly. The legion -- the reasons why we need to get

1  it done quickly are many.  The most prominent are the short

2  tenure of the emergency manager as a matter of law, but also

3  and even more fundamentally, while we can do some things

4  during this case to ameliorate the situation on the ground in

5  Detroit, we can't do as much as we would like to do.  Your

6  Honor, I think, understands that.  And, secondly, we are

7  always focused on the decisions that people who live here and

8  have businesses here have to make about whether they're going

9  to stay and the decisions people a little bit outside the

10 city or away from the city might be making about whether to

11 come here or to have a business here.  And, frankly, we don't

12 think those decisions are going to get made until the outcome

13 of this case looks a lot clearer.

14        On a more grubby detailed level, your Honor knows

15 that financing is one of the things that we're looking for in

16 connection with the hearing on assumption of the swap

17 settlement, and if your Honor has taken the time to look at

18 this aspect of Chapter 9 yet -- and I wouldn't blame you if

19 you didn't -- you would find that while 921(e) has very

20 effective protections for lenders who lend after an order for

21 relief is entered, even if that order is reversed on appeal,

22 there is kind of a vacuum in Chapter 9 for the protection

23 that lenders would get in the event that they loaned before

24 an order of relief was entered and the order of relief was

25 not entered.  We have good reasons why we think those orders

1  would be safe, too, but they require taking very, very, very

2  close and careful looks at other sections of the Bankruptcy

3  Code, and we think lenders are less comfortable in that

4  environment, so, in fact, we have case-specific things that

5  we need to do where having an order of relief or not having

6  an order of relief soon makes a great deal of difference, so

7  I would submit that there is no legally cognizable harm.  I

8  wouldn't just stand on the Chrysler case.  There are several

9  more I can discuss if you want to on that question.

10      THE COURT:  Have you submitted an affidavit

11  regarding this potential harm if the stay that is requested

12  is granted?

13      MR. BENNETT:  We did not submit an affidavit.  We

14  think it appears from --

15      THE COURT:  How do you deal with Mr. Montgomery's

16  argument that there's nothing about the relief he requests

17  here today that would have any impact on the negotiations for

18  a plan and Judge Rosen is going to crack heads at my request?

19      MR. BENNETT:  Okay.  Your Honor, the reality is that

20  the entry or nonentry of an order of relief is going to have

21  an enormous impact on the negotiations as I assume you would

22  have suspected.  It is not the case that that -- at least I

23  hope it's not the case that the kind of negotiations we can

24  have after the eligibility issue is behind us will be the

25  same as the kind of negotiations we have today.  So even on

1    the plan front, I think time is of the essence.  This is not

2    a -- this is not a perfect environment to be working in right

3    now, which is why we originally proposed --

4            THE COURT:  I hate to go there.  Maybe I shouldn't.

5    Feel free to decline to answer this question.  Why is that?

6    What is it about this case or more generally why do you argue

7    that?  What's the basis for that argument?

8            MR. BENNETT:  Well --

9            THE COURT:  And like I say, feel free to decline to

10   answer that question --

11           MR. BENNETT:  Well, I --

12           THE COURT:  -- because I really don't want to know

13   anything about your mediation discussions.

14           MR. BENNETT:  And I'm going to go into the other --

15   precisely for that purpose, I'm going to talk about other

16   cases.  The idea of these prolonged eligibility contests

17   starts in Vallejo, a case that could easily, by the way,

18   become a Chapter 18 case because everybody got --

19           THE COURT:  A new chapter.

20           MR. BENNETT:  -- so tired in -- because of how long

21   and how drawn out the procedures turned out to be that they

22   actually had to stop repairing the finances of the city

23   before they were done.  And I think that what happened in

24   Stockton similarly is going to -- when people look back on

25   it -- whether it was a great idea at the time or not, when

1   people look back on it, they are going to decide that the

2   nine months or so of the delay that was added to the Stockton

3   eligibility contest as a result of the mediation in the

4   middle, that that was just wasted time tacked onto the case.

5   And for whatever reason I don't think in the case of Vallejo

6   and I don't think in the case of Stockton they are dealing

7   with the same level of deterioration in population and

8   deterioration in business base that we are dealing with here.

9   The macro problems are different.  We need to convince the

10  outside world that we're -- that, number one, we're making

11  progress.  That would help a great deal.  More importantly,

12  we're close to the end.  I think that will be a really big

13  deal and actually emerge from a proceeding.  And so many

14  other things that are going on in this community depend on it

15  that it's really different than some of the other cases where

16  the municipalities are smaller and in a lot of ways, as bad

17  as their situations are, less severe than the situation is

18  here.  Speed is of the essence.  Putting disputed questions

19  behind us where we can will help resolve remaining issues

20  that may be harder to resolve.  And, again, we -- it is a

21  prediction, not a certainty, but I -- the prediction is not

22  grounded on a declaration, but it's grounded in the law which

23  we just discussed, that getting a financing done before an

24  order for relief is a very different story than getting a

25  financing done after an order for relief.

1          THE COURT:  And the fourth consideration?

2          MR. BENNETT:  Fourth consideration is the public

3    interest.  We mentioned a few in your brief.  Your Honor

4    mentioned another one.  You had another version of certainty.

5    Some of the things that I've just described in terms of the

6    importance of moving through this case quickly are about

7    certainty.  You raised another one.  Retirees want to know.

8    All the creditors want to know, but so do all the residents.

9    So does anyone thinking of moving here or investing here.

10   There is an enormous public interest in finding out how this

11   case ends and, frankly, how -- and to a degree how much

12   progress we're making, that we're kind of a track, that we're

13   going in the right direction.  It matters enormously on the

14   ground here in Detroit.

15         THE COURT:  Well, when I asked Mr. Montgomery about

16   that, his response was, yes, of course, certainty regarding

17   pensions is important, but the committee has decided a higher

18   priority is having the right court decide the constitutional

19   issues as far as at least the retiree committee was

20   concerned.

21         MR. BENNETT:  Well, okay.  The only constitutional

22   issue that your Honor is being asked to decide is the

23   authorization question which has made Detroit be a debtor.

24   That's the only question that you -- that is so far on the

25   table.  And we've pointed out that ultimately if they are

1   entitled to have a different court to decide that, which we

2   do not agree, they're going to get that opportunity. That's

3   going to happen soon enough. As soon as your Honor enters an

4   order, if you deny -- if you dismiss the case and don't enter

5   an order for relief, we all go home. They've won. If you

6   enter an order for relief, findings of fact and conclusions

7   of law, the next thing they do is go to the District Court.

8   And there will be time for that decision. That's not going

9   to get mooted out so quickly.

10   THE COURT: I hope you don't all go home because the

11   problems will still be there.

12   MR. BENNETT: Well, but then you'll have to find

13   that that solution, which is -- again, I said this, a federal

14   scheme -- it's the only one -- that happens to be true.

15   There is no other scheme, and I don't know what happens. And

16   I think that's an important question everyone needs to ask,

17   including the representatives of the pension committee, is,

18   okay, if there is no -- if there is no proceeding, the city's

19   financial condition is the same, and bondholders have all

20   kinds of rights. Pensions have all kinds of rights, too.

21   Everyone is owed a lot of money. The outcome of that will

22   not be pretty.

23   THE COURT: All right. Anything further?

24   MR. BENNETT: Not unless you have any questions.

25   THE COURT: Thank you.

1        MR. HOWELL:  Good afternoon, your Honor.  Steven G.

2   Howell, Dickinson Wright, special assistant attorney general

3   appearing on behalf of the State of Michigan.  Just wanted to

4   state for the record that the State of Michigan concurs in

5   the response filed by the City of Detroit, and we believe

6   this Court should deny the relief requested and we should

7   continue on the course that has been charted before us.

8   Thank you, your Honor.

9        THE COURT:  Thank you, sir.  Anyone else before we

10  get back to Mr. Montgomery?  Sir.

11       MR. MONTGOMERY:  Thank you, your Honor.  I'd like

12  four extremely brief points.  One is that, of course, going

13  straight to the District Court eliminates a layer, and under

14  some circumstances that might actually yield a faster result.

15       Second point that I'd like to make is that the

16  city's concession in the context -- the undisputed context

17  that eligibility is a core issue, that there is a possibility

18  that your Honor has to make recommended findings means there

19  is at least -- at least a possibility that the Court lacks

20  the jurisdiction to hear the matter, so I think from the

21  city's vantagepoint, as argued to you, the issue is not zero

22  to mere.  It's really whether or not mere has gone to

23  material in terms of possibility.

24       Third point.  Eligibility is a federal right, but

25  Bekins teaches us that it depends on state consent, and the

1  case law, including the Stockton case and the others, are
2  uniform that it is state law that drives that determination,
3  not federal law.
4         And the fourth point I would like to make to your
5  Honor is that the huge difference between the Chrysler case
6  and this case is that, in fact, you could bond an appeal in
7  the Chrysler situation and stop the disposition of the
8  assets, and here there is no bonding of an appeal from an
9  eligibility determination.  921 says that's impossible.
10 Thank you, your Honor.
11        THE COURT:  All right.  The Court will take this
12 under advisement and issue a written opinion hopefully in the
13 next few days, so let's turn our attention then to the motion
14 to compel filed by AFSCME.  Ms. Levine, are you going to
15 argue that?
16        MS. LEVINE:  Thank you, your Honor.  Sharon Levine,
17 Lowenstein Sandler, for AFSCME.  Your Honor, I'm almost a
18 little bit sorry that we have to be here again on a discovery
19 dispute.  Our hope was and we thought we had made it clear in
20 connection with our response to the motion to quash is to
21 really just get an understanding of the events that led up to
22 the filing on July 17th and July 18th, and we're, frankly, a
23 little bit dismayed that your Honor issued a scheduling order
24 on August 2.  We filed in compliance our objection on August
25 19th.  We gave notice to the world of the discovery that we

1   wanted to take and the depositions that we wanted to take on

2   August 23.  It took awhile to reach agreement with the city

3   with regard to limiting those depositions and a schedule for

4   those depositions.  We had to confront the motion to compel

5   by the state.  Your Honor issued a decision.

6           THE COURT:  The motion to quash?

7           MS. LEVINE:  Sorry.  Issued a decision on the motion

8   to quash on the 10th.  We overcame through a meet and confer

9   on the 9th the -- on the 10th an opposition that was filed on

10  the 9th with this so-called deliberative privilege.  Now,

11  according to the response that was filed by the city to this

12  motion, we learned that they drew up a common interest

13  agreement on the 12th.  We rushed to take a deposition to

14  accommodate Mr. Orr's availability on the 16th, having gotten

15  literally thousands of documents over that weekend, only to

16  learn that there was, in essence, a new privilege that they

17  were claiming that was substantially the same in breadth as

18  the deliberative process privilege, which prevented us from

19  questioning Mr. Orr on precisely the scope of information

20  that we had clearly identified was what we were looking for,

21  so I'd ask your Honor to let us redepose him very briefly on

22  just those issues and to also ask everybody to identify for

23  us if I'm just not knowing what the privilege of the month is

24  so that we can know that on a go forward basis the privilege

25  is attorney-client privilege and/or work product privilege,

 1  but if there is another privilege that I'm omitting, I'm just

 2  not smart enough to think of as we're standing here today,

 3  I'm asking to have it identified so that we can address it

 4  and discuss it with the Court before we go forward with more

 5  depositions that potentially just result in having the

 6  witness directed not to answer.

 7          Your Honor has read everything, as far as I can

 8  tell, every time we've been here, so unless you need me to

 9  run through the case law, we would look to the Court for some

10  direction.

11          THE COURT:  Well, I think it would be helpful to

12  hear your -- how you deal with the privilege claim that was

13  made, this --

14          MS. LEVINE:  Your Honor --

15          THE COURT:  -- common interest claim.

16          MS. LEVINE:  -- we understand that when there's a

17  common legal theory and you're really truly doing a joint

18  defense to a litigation that the defendants often confer in

19  terms of what is tantamount to work product and litigation

20  strategy, but when you're dealing with an issue like

21  eligibility and the core inquiry in connection with the

22  eligibility is the good faith and/or to the extent we -- you

23  know, we haven't yet grappled with that, but to the extent

24  there are factual issues with regard to the as applied issue

25  of authority, these are -- this is the very nature of

1  proving -- their proving good faith and authorization and our

2  ability to challenge that good faith and authorization, so

3  when we're dealing with this commercial kind of issue, this

4  factual kind of issue, we respectfully submit that it's

5  different than simply launching a defense on a common legal

6  theory to a litigation claim.

7          THE COURT:  Um-hmm.  Okay.

8          MS. LEVINE:  Unless your Honor has any questions,

9  thank you.

10         MR. BENNETT:  Bruce Bennett, Jones Day, on behalf of

11 the city.  I think -- I don't understand the preamble because

12 I think we're overstating matters just a little bit.  There's

13 been a lot of cooperation in discovery.  Everybody has been

14 able to get the depositions they need taken.  There was a

15 waiver of one privilege, which was the deliberative process

16 privilege, and then Mr. Orr was deposed.  This is the

17 transcript, and I don't know if your Honor looked at it, but

18 this is really bad for old people like me because the type is

19 unbelievably tiny.  This is a huge transcript.  There are

20 disputes over 12 questions or 11 questions.  I can't remember

21 exactly how many there are, but that's it in this whole -- I

22 don't remember -- 135-page times four transcript, so that's

23 first of all.  We have, in fact, the demonstration of a very

24 cooperative discovery process with no material obstruction

25 and a disagreement over 12 questions or 11 questions or

1   however many it is.

2          It wasn't a secret to them that the attorney-client

3   privilege was going to be claimed by everybody.  No one

4   waived any aspect of the attorney-client privilege, and that

5   is the privilege that was invoked.  Their assertion is you've

6   waived the attorney-client privilege by reason of the fact

7   that there was a discussion between Mr. Orr and the governor

8   and a lawyer.

9          THE COURT:  Don't jump there.  Start me in baby

10  steps here.

11         MR. BENNETT:  Okay.

12         THE COURT:  What questions did Mr. Orr refuse to

13  answer, and what was the basis for claiming a privilege in

14  support of that refusal?

15         MR. BENNETT:  Okay.  First one is -- here's the

16  exact question.  You're going to want me to read a little bit

17  before that.  "Okay."  Question:  "Okay.  What did you

18  discuss about the litigation with braid" -- and there's the

19  word "error" there, which I don't think is right, but I think

20  that's somebody else's name -- "and Gadola?"  That was

21  objected.  The person was a lawyer, and so I think we're

22  talking --

23         THE COURT:  Which person was a lawyer?

24         MR. BENNETT:  Gadola is a lawyer; correct?  Gadola

25  is lawyer.  So there was a -- apparently a meeting

1    involving -- okay.  You got to go further.  Oh, Brader is the

2    other person.  Valerie Brader and Mike Gadola were the two

3    persons.

4              THE COURT:  So those two are lawyers.

5              MR. BENNETT:  For --

6              THE COURT:  Whose lawyer?

7              MR. BENNETT:  For the state.

8              THE COURT:  They're the state's lawyers, so Orr is

9    being asked about a conversation with lawyers for the state?

10             MR. BENNETT:  I think the governor was also in the

11   room.  Is that the --

12             MS. LEVINE:  Your Honor, we're not asking for

13   conversations between Mr. Orr and his counsel and Jones Day.

14             THE COURT:  That was going to be my next question.

15             MS. LEVINE:  Okay.  What we're --

16             THE COURT:  But who else was there?

17             MR. BENNETT:  I have to read back.

18             THE COURT:  Let's assume for a minute the governor

19   was not there.  Why is Mr. Orr's conversations with someone

20   else's lawyers protected by the attorney-client privilege?

21             MR. BENNETT:  Well, because, as we set forth in our

22   papers, it's not just anyone else.  The governor, of course,

23   appointed Mr. Orr but also can remove Mr. Orr.  There is

24   the -- the state government has a series of continuing ties

25   to the things Mr. Orr can do, including approving

1    expenditures of over $50,000, and there's a whole bunch of

2    other different things.  They're all -- the list is in our

3    papers.  He is paid by the state, by the way, and his

4    protective detail is provided by the state.  I think the sum

5    total of that under the state law is they're supposed to be

6    coordinating, and, quite frankly, I think this Court wants to

7    encourage them to be coordinating.  And if they're going to

8    be coordinating and they're going to be talking about legal

9    issues, those discussions should be privileged.  They clearly

10    have a common interest.  None of the cases define it as a

11    common legal theory.  The cases talk about interests relating

12    to legal things, and, quite frankly, we believe that the

13    entire fiscal emergency and all of the solutions to it -- in

14    this period we're talking about out-of-court solutions

15    potentially -- there's no Chapter 9 had been filed yet --

16    those conversations have to be privileged, that the governor

17    has to be able to talk to Mr. Orr's lawyers, and Mr. Orr has

18    to be able to talk to the governor's lawyers.  And, frankly,

19    Mr. Orr's lawyers and the governor's lawyers have to be able

20    to talk to each other, too, in an environment where what they

21    say can't be invaded by others so that they can talk about

22    with candor all of the things not only that they're thrilled

23    about but things that they're bothered by.

24            THE COURT:  What other questions, or does that

25    discussion cover all of those?

1    MR. BENNETT: That discussion I think covers all of

2    the questions, but I'm happy to go through them. They're

3    hard -- they're going to be tough for me to read, but I can

4    find them all. They're highlighted.

5    THE COURT: But what we're looking for are questions

6    that were asked of Mr. Orr other than of discussions he had

7    with these two attorneys who were attorneys for the governor.

8    MR. BENNETT: I think that's all the ones that were

9    objected to. Were there others?

10    MS. LEVINE: Your Honor, basically the problem is,

11    though, that the line of questioning was shut down because

12    what we were trying to understand was the -- you know, the

13    conversations that took place between the emergency manager

14    and the state, the governor and his inner circle, leading up

15    to the filing of the Chapter 9 petition.

16    THE COURT: Unfortunately, I've just been advised

17    that in order for your statements to be on the record, I need

18    to have you near a microphone and preferably the podium.

19    Preferably the podium, please. So let me just try to pin it

20    down as efficiently as we can here. You want to ask

21    questions of Mr. Orr about his conversations with individuals

22    who were attorneys for the governor.

23    MS. LEVINE: Your Honor, what we're looking -- we're

24    not looking to -- there's the state and its attorneys --

25    THE COURT: Right.

1      MS. LEVINE:  -- and there's the city and its

2   attorneys.

3         THE COURT:  Right.

4         MS. LEVINE:  But any combination of those, our view

5   is that's not an attorney-client privilege.  In other words,

6   if I talk to --

7         THE COURT:  Right.  So that was my -- that was my

8   question.  You want to --

9         MS. LEVINE:  That's really what we --

10        THE COURT:  You want to ask him questions about his

11  conversations with the governor's attorneys and with the

12  governor --

13        MS. LEVINE:  Yes.

14        THE COURT:  -- but not necessarily about his

15  conversations with his own counsel.

16        MS. LEVINE:  Correct.  No, no.  I'm not looking to

17  ask the governor what he said to his lawyer --

18        THE COURT:  Or Mr. Orr --

19        MS. LEVINE:  -- or what he might have heard --

20        THE COURT:  Yeah.

21        MS. LEVINE:  -- the governor say to his lawyer.

22        THE COURT:  Okay.

23        MS. LEVINE:  I'm not looking for two-party attorney-

24  client privilege conversations.  We disagree with the concept

25  that there's a four-party attorney-client privilege.

1      THE COURT: Okay. Okay. So, Mr. Bennett, you
2  addressed why you think there's attorney-client privilege
3  that protects Mr. Orr from testifying about his conversations
4  with the governor's lawyers. How about his conversations
5  with the governor himself?

6      MR. BENNETT: Mr. Shumaker did not object to any
7  questions that were asked about the -- the conversations
8  between the governor and Mr. Orr where lawyers were not
9  present were never objected to. All of these questions deal
10 with questions about meetings that were attended by a lawyer
11 for the governor.

12     THE COURT: All right. So why would every question
13 that Mr. Orr might be asked about his conversation with the
14 governor even when a lawyer was present be privileged?

15     MR. BENNETT: Well, it might not be, but the first
16 question I started with -- and, frankly, I think it's up to
17 my opponent to point out a question that wasn't like this --
18 "Okay. What did you discuss about the litigation with" --
19 and it must have been Brader now that I see this -- "and
20 Gadola?" And I have to tell you I can't think of a more
21 privileged question in the world.

22     THE COURT: Well, but that wasn't my question.

23     MR. BENNETT: I know that. I don't know what the
24 other one -- I don't know which other questions, whether -- I
25 don't know whether any question was asked.

1    THE COURT: Well, but Ms. Levine says that the line

2  was shut down.

3    MR. BENNETT: Actually, your Honor, that's just not

4  true. If your Honor wants to read ----

5    THE COURT: All right. I don't want --

6    MR. BENNETT: -- the deposition transcript, you will

7  find that all --

8    THE COURT: I don't even want to go there.

9    MR. BENNETT: Okay.

10    THE COURT: I want an answer to my question, which

11  is do you concede that there are questions that Mr. Orr -- do

12  you concede that there are questions that Mr. Orr should

13  answer about his conversations with the governor even with

14  counsel present?

15    MR. BENNETT: Yeah. It is possible that there

16  was -- it is possible that you could pose a question that

17  does not involve any legal advice and that would not be

18  privileged. I don't know that they did, and I don't think

19  they did. And I want to be very clear about this. No one

20  shut anybody down, but the questions that were asked, at

21  least the ones I remember -- and I'm happy to have --

22    THE COURT: Let me ask Ms. Levine. Would you return

23  to the podium? You can both stand there; right. Can you

24  point to a question that Mr. Orr was asked about a

25  conversation with the governor directly which Mr. Orr was

1    instructed not to answer?

2        MS. LEVINE:  Your Honor, maybe it was our mistake

3    during the course of the deposition, but we didn't go through

4    the whole line of questioning having them direct each time

5    for him not to answer.  Our understanding was basically that

6    for that period of time, virtually all of the -- we were led

7    to believe that virtually all of the conversations that took

8    place between anybody on behalf of the city and anybody on

9    behalf of the state also included somebody from counsel and

10   that, therefore, there really weren't going to be any

11   conversations that they could discuss with us in the, for

12   example, two weeks leading up to the filing of the Chapter 9

13   petition.

14       THE COURT:  Um-hmm, um-hmm.

15       MS. LEVINE:  So, you know, we had a limited

16   deposition.

17       THE COURT:  All right.  So let's just assume that

18   for purposes of resoling this motion the Court needs to

19   resolve the issue of attorney-client privilege and this

20   common interest doctrine.

21       MS. LEVINE:  Thank you.

22       THE COURT:  All right.  So is there anything further

23   you wanted to say on that legal question in the circumstances

24   here?

25       MS. LEVINE:  Your Honor --

1    THE COURT:  I was asking Mr. Bennett, and then I'll

2  get back to you.

3    MR. BENNETT:  I think I may have gotten there

4  already, and I think our papers are clear, but the -- first

5  of all, number one, there is absolutely clearly a common

6  interest concerning what the state wants to achieve with

7  respect to Detroit and what the emergency manager wants to

8  achieve with respect to the City of Detroit, and the entire

9  statutory scheme is one that contemplates that they're

10  working together on some level.  And if they're working

11  together on some level, they have to communicate.  And if

12  they have to communicate, they clearly have to communicate

13  about legal matters, and those discussions absolutely have to

14  be privileged.  Otherwise they're not going to happen, and

15  that would be the worst of all possibilities.

16    THE COURT:  I'm not sure why it matters, but are the

17  attorneys that were mentioned here, Mr. Gadola and -- what's

18  the other one --

19    MR. BENNETT:  Valerie Brader.

20    THE COURT:  Brader?

21    MR. BENNETT:  Yes.

22    THE COURT:  -- from the attorney general's office or

23  the governor's own like legal counsel, which I don't even

24  know if he has?

25    MR. BENNETT:  You got me on that one.  I don't know.

1          THE COURT:  Anybody know?  Mr. Howell.

2          MR. HOWELL:  Thank you, your Honor.  They are the

3    governor's counsel.  They are the chief legal advisor and

4    deputy chief legal advisor to the governor in the governor's

5    office.

6          THE COURT:  Thank you.  Thank you for that, sir.

7          MR. HOWELL:  And it's Michael Gadola and Valerie

8    Brader.

9          THE COURT:  Thank you.

10         MR. BENNETT:  Okay.  The second part is that there

11   was apparently a complaint of when the document actually got

12   done.  The truth of the matter is the common interest

13   exception to the waivers of attorney-client privilege may be

14   founded on a verbal agreement, an oral agreement.  The cases

15   are crystal clear about that.  And that was actually reached

16   way back in March, and I think if we need to demonstrate that

17   further, I believe that we can.  I think that the papers are

18   adequate and describe clearly that we meet all of the

19   relevant tests to be able to assert the attorney-client

20   privilege in these circumstances and for the state to be able

21   to assert the attorney-client privilege in these

22   circumstances.

23         THE COURT:  Any reply?

24         MS. LEVINE:  Your Honor, we'd respectfully submit

25   that there are at least two issues out here where this can't

1  be the right result if, in fact, we're going to have a

2  meaningful inquiry into the facts surrounding a good faith

3  filing.  We need to -- we need to be able to question, and we

4  can't have all of the decision-makers shielded by the

5  attorney-client privilege for the two-week period leading up

6  to the bankruptcy filing.  In addition --

7          THE COURT:  Well, let me ask you about that.  Even

8  if I were to agree with you that this is necessary for your

9  inquiry, that there are no other sources of available

10  evidence on these points, is there such an exception to this

11  privilege in law?

12          MS. LEVINE:  Well, the answer, your Honor, is

13  twofold.  I'm not sure that -- I think that what that does is

14  that takes the privilege out of context.  I don't think the

15  privilege needs an exception.  I think the problem is this

16  takes the privilege out of context --

17          THE COURT:  Um-hmm.

18          MS. LEVINE:  -- number one.  Number two --

19          THE COURT:  Why or how do --

20          MS. LEVINE:  -- itself --

21          THE COURT:  Okay.

22          MS. LEVINE:  -- has shown up in the court in two

23  capacities.  Okay.  They're here supporting the appointment

24  of the emergency manager and moving forward here, but they're

25  also separately looking into and potentially defending issues

1  related to 436, so --

2          THE COURT:  Well, you say the state, but the state

3  is --

4          MS. LEVINE:  In and of itself there's an inherent --

5          THE COURT:  -- like a lot of different people.  I

6  know the attorney general's position might be characterized

7  as you have said.  I'm not sure the governor's is.

8          MS. LEVINE:  Us either, Judge, and that's the --

9  that's part of the problem.  In other words, if what's

10  happened here is all of the decision-making and all of the

11  conversations that would shed light on good faith happen

12  because there's an attorney in the room, we'd respectfully

13  submit that that's an improper use of the privilege.  You

14  can't take factual decision-making and make it all -- and

15  make it attorney-client privilege.  There has to have been an

16  independent deliberative process by the governor and by the

17  emergency manager with regard to coming to the conclusion and

18  reaching an understanding with regard to why they made

19  those -- the decisions that they made coming up to this

20  process.  And for us not to be able to inquire with regard to

21  the nature of the good faith of that decision-making process

22  prevents us from doing the analysis we need to do to

23  determine whether or not the Chapter 9 petition was actually

24  filed in good faith and whether or not the authority as

25  applied was an appropriate application of the authority.

1          THE COURT:  Um-hmm.  Mr. Bennett, isn't it the case

2     that two individuals, even assuming their legal interests are

3     aligned in any given context -- isn't it the case that they

4     can't shield the conversations between them that would

5     otherwise be discoverable just by having an attorney in the

6     room?

7          MR. BENNETT:  That's certainly right.

8          THE COURT:  So when is it that the conversations

9     between the two individuals is protected because there is an

10    attorney in the room?

11         MR. BENNETT:  When legal issues are being discussed

12    and they're talking about legal -- when they're talking about

13    legal advice or when they're sharing facts for the benefit of

14    the lawyer so that they can get legal advice.  The

15    communications that are privileged, as I remember it, are the

16    legal advice itself and the --

17         THE COURT:  So if the governor and Mr. Orr are

18    having conversations about the financial necessity to file

19    bankruptcy, is that discoverable even if there's an attorney

20    listening in?

21         MR. BENNETT:  If they're talking about the numbers,

22    what are the numbers, that's an easy case for me.  You could

23    get discovery as to their conversation as to what the numbers

24    are.  If the issue became they're talking about the numbers

25    and they're saying, "Are these numbers numbers that would

1   meet the definition of insolvency as that term has been

2   embellished by the cases -- in the Code and embellished by

3   the cases?" then I think you're talking about conversations

4   that are, in fact, protected and, frankly, questions that no

5   one has got a legitimate interest of inquiring about.  The

6   premise, which I think is leading to your questions, that --

7   and which is where Ms. Levine starts, which is inquiry has

8   been foreclosed, is belied by this.  We're talking about 12

9   questions in a 150-page -- well, a 400-, 500-page transcript.

10          THE COURT:  No, but I have to accept the implication

11  in the fact that Ms. Levine took the time and trouble to file

12  this motion that this is an important inquiry for her, so I'm

13  just going to accept that at face value, but I guess part of

14  what I'm struggling with here -- and I think maybe Ms.

15  Levine, too, is -- if the governor was willing to waive the

16  deliberative process privilege, to the extent there was one

17  and it applied, in order to move this bankruptcy forward on

18  the issue of eligibility, why are there any different

19  considerations here?

20          MR. BENNETT:  This is different in kind.  The reason

21  we have an attorney-client privilege is because we want the

22  governor to be able to unburden himself and share his

23  innermost doubts, concerns, and legal problems with lawyers

24  to get effective legal advice.  And if he does that in front

25  of Mr. --

1          THE COURT:  But that's the same premise as the

2     deliberative process --

3          MR. BENNETT:  Actually --

4          THE COURT:  -- except that it's not with attorneys.

5     It's with others.

6          MR. BENNETT:  Well, except when you're -- but the

7     deliberative process is likely more about facts as opposed to

8     exposures which may be the subject of future litigation, and

9     the last thing in the world that I think anyone would have

10    contemplated is if they show up and say, "Well, you know, the

11    governor's private attorneys expressed some substantial

12    doubts about this as part of a presentation of a case before

13    you."  I can't imagine that the way our adversary system is

14    supposed to work is supposed to generate those kinds of

15    results in courtrooms.

16         THE COURT:  All right.  In answer to my -- I'll get

17    to you.  In answer to my question of why the governor would

18    waive the deliberative process but not -- the deliberative

19    process privilege --

20         MR. BENNETT:  Right.

21         THE COURT:  -- but not this privilege, your answer

22    was there is an attorney-client privilege.

23         MR. BENNETT:  No.  I think -- I didn't say that.  I

24    think that --

25         THE COURT:  Accepting that --

```
1            MR. BENNETT:  Yeah.
2            THE COURT:  -- why would he waive one and not the
3    other if his interest in the waiver of the one was to get to
4    eligibility as efficiently and fairly as possible, which I
5    commend it?
6            MR. BENNETT:  He didn't ask me, so this is
7    speculative, but you could say that the deliberative process,
8    to the extent there was debate about numbers, he might say,
9    "Okay.  I'm prepared to make that public for the world," or
10   if it's about -- if it's discussions about how I viewed and
11   how other people viewed the city's economic circumstances,
12   how I viewed and how others viewed the state of services that
13   were being -- yeah, there are many, many, many other things
14   that are captured by the deliberative process exception that
15   I can see why a client would decide, okay, I'm prepared for
16   the world to take a look at that, but discussions with
17   counsel about exposures to just put the narrowest possible
18   point on it -- and I don't think it is that narrow, but do I
19   believe for a second that the decision to waive the
20   deliberative process privilege that might open up and
21   illuminate facts and debates about facts, political facts,
22   policy driving facts versus am I going to open up discussions
23   that we had about potential litigation exposures, I think,
24   frankly, those are different in kind, and I see a line.
25   Don't know how I would draw it in every particular instance.
```

1          THE COURT:  Um-hmm.  Ms. Levine, anything further?

2          MS. LEVINE:  Your Honor, I would just note that one

3    of the things that we've been talking about that makes a

4    difference in the bankruptcy process is that it's a difficult

5    scary fast process, and transparency --

6          THE COURT:  It's a what?

7          MS. LEVINE:  It's a difficult scary and very fast

8    process, and transparency helps.  It just does.  It's an

9    understanding how we got here, even if we're wrong in terms

10   of the allegations and the arguments that we've made with

11   regard to our objections to eligibility, learning that

12   through the discovery process or having all the facts

13   presented to your Honor and having your Honor consider that

14   when you're considering eligibility is a better place for a

15   credible bankruptcy process than to say we have the code of

16   silence.  We're not going to tell you how or why we made

17   these decisions to file.  We're not going to tell you how or

18   why we discussed these decisions between the city and the

19   state, and we're going to hide behind a privilege and then

20   determine that because you can't show any issues with regard

21   to eligibility, the only thing that stands is our analysis

22   with regard to why we are eligible.

23         THE COURT:  Well, privilege always suppresses the

24   truth, doesn't it?

25         MS. LEVINE:  Your Honor, it's -- but the discussions

1  that we're talking about are the discussions between the
2  state and the city.  We're not talking about Mr. Orr having a
3  one-on-one conversation with Jones Day or the governor having
4  a one-on-one consultation with his counsel.  We're talking
5  about the process that took place leading up to the timing
6  and the understanding of why the eligibility -- why the
7  bankruptcy was filed when it was filed and how it was filed
8  and what the rationale was for filing at that point in time.
9  It's the who, what, where, when.  Those are the basic types
10 of facts that you look to in making a decision with regard to
11 good faith and bad faith.
12          THE COURT:  All right.  Thank you.  Who else wanted
13 to be heard?  Mr. Howell again, and then I'll get to you,
14 sir.  Seriously, I promise you.
15          MR. HOWELL:  Thank you, your Honor.  Again, Steven
16 G. Howell appearing on behalf of the state.  Just a couple
17 things in response to your questions.  In the deliberative
18 process privilege and the decision to waive that, one of the
19 factors in coming to that conclusion was that was to ask the
20 governor why he made the decision he made, what factors
21 influenced him, what he based his decision on outside of
22 attorney-client privilege are questions that can be asked, it
23 seems to me, and his deliberations in coming to the
24 conclusion, and it seems to me that's what they want to know
25 is how -- you know, what was the governor's conclusion and

1    what -- you know, what made him come to that conclusion.  And
2    outside of the attorney-client privilege, those questions can
3    be asked and answered it would seem to me.  But when you get
4    to the attorney-client privilege, the whole core to that is
5    that you have to be able to have open and candid discussions.
6    You have to weigh the alternatives.  You have to look at the
7    risks, and you have to know that that discussion with your
8    counsel is protected.  Now, when you carry that over to the
9    common interest --

10          THE COURT:  But that's a -- that strikes me as a
11   gross overstatement of the privilege.

12          MR. HOWELL:  Well --

13          THE COURT:  I mean all of that only works if the
14   questions are legal questions.

15          MR. HOWELL:  Are legal.  I was going to make that
16   point, your Honor.

17          THE COURT:   Okay.

18          MR. HOWELL:  I'm not trying to argue that this is
19   outside of that, but what I'm saying is that the workings
20   between the governor's office and the emergency manager under
21   the statute, under the bankruptcy are very close.  They have
22   to work together.  There are instances, in fact, where the
23   state is obligated to defend the emergency manager in certain
24   actions that he takes.  He's appointed by the state.  I mean
25   the relationship and the common interest is clear and

 1   unquestioned.  The only thing we're trying to protect is the
 2   obtaining of legal advice and the belief that the common
 3   interest is an extension of the attorney-client privilege and
 4   that when those interests are common and you're working
 5   together in dealing with those issues -- and they are legal
 6   issues -- that that is protected, your Honor.
 7           The only other point I'd like to make is there was
 8   an argument relative to waiver as to the state, and that, you
 9   know, was raised in the motion filed yesterday.  And I would
10   just say the motion that was filed to quash was to
11   significantly limit, if not stop some of the discovery on
12   arguments that were made.  It did not then go into a whole
13   lot of other privileges that are driven by questions or
14   particular documents, and, in fact, the motion to quash
15   specifically referenced that and said this -- you know, we
16   reserve on -- in paragraph 7 of the motion to quash, we
17   reserve on privileges for a later date, and those privileges
18   were reserved in that motion originally.  And when the
19   discussions took place and there was, in fact, an agreement
20   reached, dates were set, and we're working on that trying to
21   finalize the order, and productions will occur, and at that
22   point logs will be turned over and documents will produce and
23   issues will be raised at that point but not the deliberative
24   process.  And in that discussion we said the deliberative
25   process, but all others were reserved.  And the primary one

1   that we're concerned about here today is the attorney-client

2   privilege, and we believe that that is very important.  It is

3   legal issues, and it is legal issues discussed with counsel

4   among the two teams that are trying to take this case forward

5   and trying to bring this to a successful conclusion, your

6   Honor.  Thank you.

7          THE COURT:  Sir.

8          MR. CIANTRA:  Thank you, your Honor.  Very briefly,

9   Thomas Ciantra, Cohen, Weiss & Simon, here for the UAW.  We

10  join in the motion that AFSCME has made, and I just wanted to

11  draw attention to a couple of particular points.  One, I

12  believe that the city and now the state have grossly

13  overstated the scope of the common interest doctrine.  All

14  right.  The case law, we think, which is set out in the

15  Libbey Glass case that's cited in AFSCME's papers makes it

16  very clear that the common interest that has to be involved

17  is a common interest, a common legal interest.  It is not

18  sufficient to rely upon the common interest that the state

19  and the emergency manager are looking to achieve with respect

20  to the overall restructuring of the City of Detroit's

21  finances.  It's a much more limited doctrine.  And the

22  limited scope of that doctrine we submit is particularly

23  important here because of the public interest in the

24  transparency of government decision-making that is involved

25  here and that had been placed in issue by the objections to

1  eligibility that the UAW has filed and that other parties
2  have filed in this case, so the scope of that exception is
3  very critical because what -- it seems from our perspective
4  that what is the common interest here is in shielding those
5  discussions, in shielding those directions, in shielding the
6  course of action that was decided upon.
7       Second point that I just wanted to briefly make is
8  that this issue is not only with respect to a dozen questions
9  that were raised at Mr. Orr's deposition.  Reference was made
10  earlier to document production in this case.  Last Friday we
11  received literally tens of thousands of pages of documents
12  that were produced by the city on an expedited basis.
13  Obviously we have not received a privilege log.  One could
14  not expect that.  However, I would expect, based on the
15  position that the city has taken, that that log is going to
16  be very long and detailed indeed because we are certain that
17  there are multiple documents, e-mail communications, memos,
18  other things that would have passed between these parties
19  that would be comprised by this, so it's not just a question
20  of a discrete number of questions asked in a deposition.  It
21  really goes to the heart and soul of the eligibility
22  objections that have been raised.  Thank you.
23       THE COURT:  Thank you.
24       MS. GREEN:  I will also be brief.  Jennifer Green on
25  behalf of the General and Police and Fire Retirement Systems.

1  Speaking of the privilege log, there was a privilege log

2  produced on Friday, September 13th.  There were just under

3  11,000 documents that are claimed to be privileged.  Out of

4  those 11,000 documents, we have so far determined that there

5  are roughly 400 to 600 documents that they are claiming are

6  protected by the common interest privilege.

7       On Monday, during Mr. Orr's deposition, the city

8  appeared to limit this common interest privilege to -- and

9  I'm going to quote from the deposition -- "what Mr. Orr has

10 been doing since he became emergency manager where there was

11 a common interest between the state and the emergency

12 manager's office," and I believe today counsel limited it to

13 that as well.  And we all know the emergency manager was not

14 appointed until March of 2013.  The Chapter 9 proceeding

15 obviously began in July of 2013.  The privilege log, however,

16 asserts the common interest privilege as far back as December

17 15th of 2011, well before the emergency manager was ever

18 appointed, and so that raises a concern about whether or not

19 this privilege is being abused and whether it's being

20 asserted too broadly.

21       Today in the papers filed by the city they have

22 characterized the common interest between the city and the

23 state as, quote, "they share a common interest in rectifying

24 the financial emergency of the city," which may be a

25 political or may be a commercial interest, but I don't think

1  that that's necessarily a legal interest that they share in

2  common.

3          The other thing that's of concern is in the

4  privilege log these communications are -- there are some that

5  are without any counsel between -- it'll be, for instance,

6  Andy Dillon, the state treasurer, or Richard Baird, who is

7  not even a state employee.  My understanding is he is a

8  consultant who is -- has some sort of contract with either

9  the State of Michigan or with the governor, and he's all of a

10  sudden part of this common interest privilege, so that is our

11  concern.  And while we concur with AFSCME's motion and

12  support the relief requested today, there may be another

13  issue relating to these documents that may need to be raised

14  with the Court at an appropriate time, and we would like to

15  ask that today's ruling perhaps be without prejudice in case

16  we need to file a motion to compel on the documents

17  themselves.  We would obviously like to raise the issue with

18  the city.  Perhaps we can work something out without having

19  to involve the Court --

20          THE COURT:  Okay.

21          MS. GREEN:  -- before that.  One last thing

22  dovetailing with what the UAW mentioned.  There is a Sixth

23  Circuit case called Reed versus Baxter -- it's 134 F.3d 351,

24  1998 case -- that talks about the need to prevent the abuse

25  of the attorney-client privilege where it is a governmental

1  entity or a governmental actor that is asserting it.  And in
2  that case they say that courts and commentators have
3  cautioned against broadly applying the privilege to
4  governmental entities.  The recognition of a governmental
5  attorney-client privilege imposes the same costs as are
6  imposed in the application of the corporate privilege but
7  with an added disadvantage.  The governmental privilege
8  stands squarely in conflict with a strong public interest in
9  open and honest government.  And that's sort of what we face
10  here is, you know, we have questions about decisions that
11  were made the day of the filing, and we asked questions about
12  were contingencies discussed, did you and the governor have a
13  meeting on July 18th, and they said, "Well, counsel was
14  there.  We're not answering."
15      THE COURT:  No, but pause there.  Does that Sixth
16  Circuit case impose any identifiable functional restriction
17  on the attorney-client privilege in the context of a
18  governmental officer claiming it?
19      MS. GREEN:  In that case it was -- I believe there
20  was a city council member and another officer of the city,
21  and the Court said your legal interests were not identical.
22  They were not aligned.  And in this case, even if their
23  political or maybe commercial interests were aligned, it's
24  not necessarily clear that their legal interests were
25  aligned, and that would be our objection.

1          THE COURT:  All right.

2          MS. GREEN:  Thank you, your Honor.

3          THE COURT:  All right.  I'm going to take this under

4     advisement and come back into court at 5:15 with a decision.

5          THE CLERK:  All rise.  Court is in recess.

6     (Recess at 4:54 p.m., until 5:31 p.m.)

7          THE CLERK:  Court is in session.  Please be seated.

8          THE COURT:  The record should reflect that counsel

9     are present.  The Court concludes that the common interest

10    doctrine does apply in these circumstances.  The Court so

11    concludes based on this analogous hypothetical.  As we all

12    know, when a corporation files bankruptcy, its board of

13    directors must give its consent, must authorize the filing.

14    Ordinarily, of course, the corporation itself would have its

15    own counsel giving it advice on whether to file bankruptcy,

16    what the ramifications would be, what possible reasons there

17    might be not to file bankruptcy, et cetera, et cetera.

18    Ordinarily the board of directors would not have its own

19    separate counsel in that process.  It would rely on corporate

20    counsel, but it could.  A board of directors could hire

21    special counsel to advise it on whether to authorize the

22    filing or not.  Assume for a moment it did, and then the

23    board or members of the board, its lawyer, the corporation's

24    lawyer and corporate management all met together.  It seems

25    clear enough to this Court that the common interest doctrine

1  would shield those conversations even though technically the

2  corporate attorney does not represent the board and the

3  board's attorney does not represent the corporation.  The

4  Court cannot identify any way to distinguish that case from

5  our case.

6  Now, having come to that conclusion, that does not

7  mean that every question that Ms. Levine or others want to

8  ask of Mr. Orr in this case is protected by the attorney-

9  client privilege, and here it becomes hard for -- really

10  impossible for the Court to rule specifically.  I can give

11  you some general guidance, and I'm willing to do that, but

12  the application of the attorney-client privilege can only be

13  adjudged on a question-by-question basis.

14  Here's the general guidance I'm willing to give to

15  you, for what it's worth, and then an offer.  If the

16  conversations among the governor, the governor's lawyers,

17  Mr. Orr, and/or Mr. Orr's lawyers were for the purpose of

18  seeking legal advice from the lawyers about the bankruptcy,

19  then it's protected.  If the conversations were, for example,

20  between Mr. Orr and Mr. Snyder for other purposes, for

21  example, to discuss the political ramifications of the

22  bankruptcy or for other purposes I'm too naive to fathom,

23  then it would, it seems to the Court, not be protected by the

24  attorney-client privilege.  And I don't know what more to

25  tell you at this point except to make to you the offer I

1   think I made to you before, which is when you're sitting in a

2   deposition and you come to a disagreement about whether the

3   privilege applies to a specific question, you can get me on

4   the phone, and I will resolve it on the spot if I at all can,

5   but I make that offer with the caveat that the guidance that

6   I just gave you is probably the guidance I'm going to follow,

7   and you can figure it out as well as I can, so I don't know

8   what more to say except that sort of technically the motion

9   to compel that's before the Court is granted in part and

10  denied in part.  I will allow a further opportunity with the

11  guidance that I've given you for Mr. Orr's deposition.  I'm

12  sure you'll be able to find a mutually convenient time for

13  that.

14          Is there anything else I can help you with here

15  today?

16          MS. LEVINE:  Thank you, your Honor.

17          THE COURT:  All right.  We'll be in recess then.

18          THE CLERK:  All rise.  Court is adjourned.

19      (Proceedings concluded at 5:36 p.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett             September 26, 2013
_____      _____
Lois Garrett