UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .        Docket No. 13-53846
        MICHIGAN,              .
                              .        Detroit, Michigan
                              .        September 19, 2013
                Debtor.       .        3:00 p.m.
. . . . . . . . . . . . . . . .

EXCERPT OF HEARING RE. MOTION BY OFFICIAL COMMITTEE OF
   RETIREES TO STAY DEADLINES AND THE HEARINGS CONCERNING A
DETERMINATION OF ELIGIBILITY PENDING DECISION ON MOTION TO
WITHDRAW THE REFERENCE; MICHIGAN COUNCIL 25 OF THE AMERICAN
FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO,
   AND SUB-CHAPTER 98, CITY OF DETROIT RETIREES' MOTION TO
COMPEL TESTIMONY OF KEVYN ORR AND ALL OTHER CITY AND STATE
   WITNESSES REGARDING CITY-STATE COMMUNICATIONS PRIOR TO
JULY 17, 2013
(MOTION TO COMPEL TESTIMONY)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:      Jones Day
                     By:  BRUCE BENNETT
                     555 South Flower Street, Fiftieth Floor
                     Los Angeles, CA  90071-2452
                     (213) 243-2382

For the State of     Dickinson Wright, PLLC
Michigan:            By:  STEVEN G. HOWELL
                     500 Woodward Avenue, Suite 4000
                     Detroit, MI  48226-3425
                     (313) 223-3033

For Official         Dentons
Committee of         By:  CLAUDE D. MONTGOMERY
Retirees:            620 Fifth Avenue
                     New York, NY  10020
                     (212) 632-8390

For AFSCME,          Lowenstein Sandler, LLP
AFL-CIO, and Sub-    By:  SHARON L. LEVINE
Chapter 98, City     65 Livingston Avenue
of Detroit           Roseland, NJ  07068
Retirees:            (973) 597-2374

APPEARANCES (continued):

```
For UAW:              Cohen, Weiss & Simon, LLP
                      By:  THOMAS N. CIANTRA
                      330 W. 42nd Street
                      New York, NY  10036-6979
                      (212) 356-0228

For General and       Clark Hill
Police and Fire       By:  JENNIFER K. GREEN
Retirement Systems:   500 Woodward Avenue, Suite 3500
                      Detroit, MI  48226
                      (313) 965-8300



Court Recorder:       Letrice Calloway
                      United States Bankruptcy Court
                      211 West Fort Street
                      21st Floor
                      Detroit, MI  48226-3211
                      (313) 234-0068

Transcribed By:       Lois Garrett
                      1290 West Barnes Road
                      Leslie, MI  49251
                      (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1                              - - -

2   uniform that it is state law that drives that determination,

3   not federal law.

4        And the fourth point I would like to make to your

5   Honor is that the huge difference between the <u>Chrysler</u> case

6   and this case is that, in fact, you could bond an appeal in

7   the <u>Chrysler</u> situation and stop the disposition of the

8   assets, and here there is no bonding of an appeal from an

9   eligibility determination.  921 says that's impossible.

10  Thank you, your Honor.

11       THE COURT:  All right.  The Court will take this

12  under advisement and issue a written opinion hopefully in the

13  next few days, so let's turn our attention then to the motion

14  to compel filed by AFSCME.  Ms. Levine, are you going to

15  argue that?

16       MS. LEVINE:  Thank you, your Honor.  Sharon Levine,

17  Lowenstein Sandler, for AFSCME.  Your Honor, I'm almost a

18  little bit sorry that we have to be here again on a discovery

19  dispute.  Our hope was and we thought we had made it clear in

20  connection with our response to the motion to quash is to

21  really just get an understanding of the events that led up to

22  the filing on July 17th and July 18th, and we're, frankly, a

23  little bit dismayed that your Honor issued a scheduling order

24  on August 2.  We filed in compliance our objection on August

25  19th.  We gave notice to the world of the discovery that we

1   wanted to take and the depositions that we wanted to take on

2   August 23.  It took awhile to reach agreement with the city

3   with regard to limiting those depositions and a schedule for

4   those depositions.  We had to confront the motion to compel

5   by the state.  Your Honor issued a decision.

6           THE COURT:  The motion to quash?

7           MS. LEVINE:  Sorry.  Issued a decision on the motion

8   to quash on the 10th.  We overcame through a meet and confer

9   on the 9th the -- on the 10th an opposition that was filed on

10  the 9th with this so-called deliberative privilege.  Now,

11  according to the response that was filed by the city to this

12  motion, we learned that they drew up a common interest

13  agreement on the 12th.  We rushed to take a deposition to

14  accommodate Mr. Orr's availability on the 16th, having gotten

15  literally thousands of documents over that weekend, only to

16  learn that there was, in essence, a new privilege that they

17  were claiming that was substantially the same in breadth as

18  the deliberative process privilege, which prevented us from

19  questioning Mr. Orr on precisely the scope of information

20  that we had clearly identified was what we were looking for,

21  so I'd ask your Honor to let us redepose him very briefly on

22  just those issues and to also ask everybody to identify for

23  us if I'm just not knowing what the privilege of the month is

24  so that we can know that on a go forward basis the privilege

25  is attorney-client privilege and/or work product privilege,

1    but if there is another privilege that I'm omitting, I'm just
2    not smart enough to think of as we're standing here today,
3    I'm asking to have it identified so that we can address it
4    and discuss it with the Court before we go forward with more
5    depositions that potentially just result in having the
6    witness directed not to answer.

7         Your Honor has read everything, as far as I can
8    tell, every time we've been here, so unless you need me to
9    run through the case law, we would look to the Court for some
10   direction.

11        THE COURT:  Well, I think it would be helpful to
12   hear your -- how you deal with the privilege claim that was
13   made, this --

14        MS. LEVINE:  Your Honor --

15        THE COURT:  -- common interest claim.

16        MS. LEVINE:  -- we understand that when there's a
17   common legal theory and you're really truly doing a joint
18   defense to a litigation that the defendants often confer in
19   terms of what is tantamount to work product and litigation
20   strategy, but when you're dealing with an issue like
21   eligibility and the core inquiry in connection with the
22   eligibility is the good faith and/or to the extent we -- you
23   know, we haven't yet grappled with that, but to the extent
24   there are factual issues with regard to the as applied issue
25   of authority, these are -- this is the very nature of

1   proving -- their proving good faith and authorization and our

2   ability to challenge that good faith and authorization, so

3   when we're dealing with this commercial kind of issue, this

4   factual kind of issue, we respectfully submit that it's

5   different than simply launching a defense on a common legal

6   theory to a litigation claim.

7           THE COURT:  Um-hmm.  Okay.

8           MS. LEVINE:  Unless your Honor has any questions,

9   thank you.

10          MR. BENNETT:  Bruce Bennett, Jones Day, on behalf of

11  the city.  I think -- I don't understand the preamble because

12  I think we're overstating matters just a little bit.  There's

13  been a lot of cooperation in discovery.  Everybody has been

14  able to get the depositions they need taken.  There was a

15  waiver of one privilege, which was the deliberative process

16  privilege, and then Mr. Orr was deposed.  This is the

17  transcript, and I don't know if your Honor looked at it, but

18  this is really bad for old people like me because the type is

19  unbelievably tiny.  This is a huge transcript.  There are

20  disputes over 12 questions or 11 questions.  I can't remember

21  exactly how many there are, but that's it in this whole -- I

22  don't remember -- 135-page times four transcript, so that's

23  first of all.  We have, in fact, the demonstration of a very

24  cooperative discovery process with no material obstruction

25  and a disagreement over 12 questions or 11 questions or

1  however many it is.

2       It wasn't a secret to them that the attorney-client

3  privilege was going to be claimed by everybody.  No one

4  waived any aspect of the attorney-client privilege, and that

5  is the privilege that was invoked.  Their assertion is you've

6  waived the attorney-client privilege by reason of the fact

7  that there was a discussion between Mr. Orr and the governor

8  and a lawyer.

9       THE COURT:  Don't jump there.  Start me in baby

10  steps here.

11       MR. BENNETT:  Okay.

12       THE COURT:  What questions did Mr. Orr refuse to

13  answer, and what was the basis for claiming a privilege in

14  support of that refusal?

15       MR. BENNETT:  Okay.  First one is -- here's the

16  exact question.  You're going to want me to read a little bit

17  before that.  "Okay."  Question:  "Okay.  What did you

18  discuss about the litigation with braid" -- and there's the

19  word "error" there, which I don't think is right, but I think

20  that's somebody else's name -- "and Gadola?"  That was

21  objected.  The person was a lawyer, and so I think we're

22  talking --

23       THE COURT:  Which person was a lawyer?

24       MR. BENNETT:  Gadola is a lawyer; correct?  Gadola

25  is lawyer.  So there was a -- apparently a meeting

1  involving -- okay.  You got to go further.  Oh, Brader is the

2  other person.  Valerie Brader and Mike Gadola were the two

3  persons.

4        THE COURT:  So those two are lawyers.

5        MR. BENNETT:  For --

6        THE COURT:  Whose lawyer?

7        MR. BENNETT:  For the state.

8        THE COURT:  They're the state's lawyers, so Orr is

9  being asked about a conversation with lawyers for the state?

10        MR. BENNETT:  I think the governor was also in the

11  room.  Is that the --

12        MS. LEVINE:  Your Honor, we're not asking for

13  conversations between Mr. Orr and his counsel and Jones Day.

14        THE COURT:  That was going to be my next question.

15        MS. LEVINE:  Okay.  What we're --

16        THE COURT:  But who else was there?

17        MR. BENNETT:  I have to read back.

18        THE COURT:  Let's assume for a minute the governor

19  was not there.  Why is Mr. Orr's conversations with someone

20  else's lawyers protected by the attorney-client privilege?

21        MR. BENNETT:  Well, because, as we set forth in our

22  papers, it's not just anyone else.  The governor, of course,

23  appointed Mr. Orr but also can remove Mr. Orr.  There is

24  the -- the state government has a series of continuing ties

25  to the things Mr. Orr can do, including approving

1  expenditures of over $50,000, and there's a whole bunch of

2  other different things.  They're all -- the list is in our

3  papers.  He is paid by the state, by the way, and his

4  protective detail is provided by the state.  I think the sum

5  total of that under the state law is they're supposed to be

6  coordinating, and, quite frankly, I think this Court wants to

7  encourage them to be coordinating.  And if they're going to

8  be coordinating and they're going to be talking about legal

9  issues, those discussions should be privileged.  They clearly

10  have a common interest.  None of the cases define it as a

11  common legal theory.  The cases talk about interests relating

12  to legal things, and, quite frankly, we believe that the

13  entire fiscal emergency and all of the solutions to it -- in

14  this period we're talking about out-of-court solutions

15  potentially -- there's no Chapter 9 had been filed yet --

16  those conversations have to be privileged, that the governor

17  has to be able to talk to Mr. Orr's lawyers, and Mr. Orr has

18  to be able to talk to the governor's lawyers.  And, frankly,

19  Mr. Orr's lawyers and the governor's lawyers have to be able

20  to talk to each other, too, in an environment where what they

21  say can't be invaded by others so that they can talk about

22  with candor all of the things not only that they're thrilled

23  about but things that they're bothered by.

24          THE COURT:  What other questions, or does that

25  discussion cover all of those?

1      MR. BENNETT: That discussion I think covers all of

2   the questions, but I'm happy to go through them. They're

3   hard -- they're going to be tough for me to read, but I can

4   find them all. They're highlighted.

5      THE COURT: But what we're looking for are questions

6   that were asked of Mr. Orr other than of discussions he had

7   with these two attorneys who were attorneys for the governor.

8      MR. BENNETT: I think that's all the ones that were

9   objected to. Were there others?

10     MS. LEVINE: Your Honor, basically the problem is,

11  though, that the line of questioning was shut down because

12  what we were trying to understand was the -- you know, the

13  conversations that took place between the emergency manager

14  and the state, the governor and his inner circle, leading up

15  to the filing of the Chapter 9 petition.

16     THE COURT: Unfortunately, I've just been advised

17  that in order for your statements to be on the record, I need

18  to have you near a microphone and preferably the podium.

19  Preferably the podium, please. So let me just try to pin it

20  down as efficiently as we can here. You want to ask

21  questions of Mr. Orr about his conversations with individuals

22  who were attorneys for the governor.

23     MS. LEVINE: Your Honor, what we're looking -- we're

24  not looking to -- there's the state and its attorneys --

25     THE COURT: Right.

1          MS. LEVINE:  -- and there's the city and its

2     attorneys.

3          THE COURT:  Right.

4          MS. LEVINE:  But any combination of those, our view

5     is that's not an attorney-client privilege.  In other words,

6     if I talk to --

7          THE COURT:  Right.  So that was my -- that was my

8     question.  You want to --

9          MS. LEVINE:  That's really what we --

10         THE COURT:  You want to ask him questions about his

11    conversations with the governor's attorneys and with the

12    governor --

13         MS. LEVINE:  Yes.

14         THE COURT:  -- but not necessarily about his

15    conversations with his own counsel.

16         MS. LEVINE:  Correct.  No, no.  I'm not looking to

17    ask the governor what he said to his lawyer --

18         THE COURT:  Or Mr. Orr --

19         MS. LEVINE:  -- or what he might have heard --

20         THE COURT:  Yeah.

21         MS. LEVINE:  -- the governor say to his lawyer.

22         THE COURT:  Okay.

23         MS. LEVINE:  I'm not looking for two-party attorney-

24    client privilege conversations.  We disagree with the concept

25    that there's a four-party attorney-client privilege.

1          THE COURT:  Okay.  Okay.  So, Mr. Bennett, you

2     addressed why you think there's attorney-client privilege

3     that protects Mr. Orr from testifying about his conversations

4     with the governor's lawyers.  How about his conversations

5     with the governor himself?

6          MR. BENNETT:  Mr. Shumaker did not object to any

7     questions that were asked about the -- the conversations

8     between the governor and Mr. Orr where lawyers were not

9     present were never objected to.  All of these questions deal

10    with questions about meetings that were attended by a lawyer

11    for the governor.

12         THE COURT:  All right.  So why would every question

13    that Mr. Orr might be asked about his conversation with the

14    governor even when a lawyer was present be privileged?

15         MR. BENNETT:  Well, it might not be, but the first

16    question I started with -- and, frankly, I think it's up to

17    my opponent to point out a question that wasn't like this --

18    "Okay.  What did you discuss about the litigation with" --

19    and it must have been Brader now that I see this -- "and

20    Gadola?" And I have to tell you I can't think of a more

21    privileged question in the world.

22         THE COURT:  Well, but that wasn't my question.

23         MR. BENNETT:  I know that.  I don't know what the

24    other one -- I don't know which other questions, whether -- I

25    don't know whether any question was asked.

1    THE COURT:  Well, but Ms. Levine says that the line

2   was shut down.

3    MR. BENNETT:  Actually, your Honor, that's just not

4   true.  If your Honor wants to read ----

5    THE COURT:  All right.  I don't want --

6    MR. BENNETT:  -- the deposition transcript, you will

7   find that all --

8    THE COURT:  I don't even want to go there.

9    MR. BENNETT:  Okay.

10    THE COURT:  I want an answer to my question, which

11   is do you concede that there are questions that Mr. Orr -- do

12   you concede that there are questions that Mr. Orr should

13   answer about his conversations with the governor even with

14   counsel present?

15    MR. BENNETT:  Yeah.  It is possible that there

16   was -- it is possible that you could pose a question that

17   does not involve any legal advice and that would not be

18   privileged.  I don't know that they did, and I don't think

19   they did.  And I want to be very clear about this.  No one

20   shut anybody down, but the questions that were asked, at

21   least the ones I remember -- and I'm happy to have --

22    THE COURT:  Let me ask Ms. Levine.  Would you return

23   to the podium?  You can both stand there; right.  Can you

24   point to a question that Mr. Orr was asked about a

25   conversation with the governor directly which Mr. Orr was

1  instructed not to answer?

2        MS. LEVINE:  Your Honor, maybe it was our mistake

3  during the course of the deposition, but we didn't go through

4  the whole line of questioning having them direct each time

5  for him not to answer.  Our understanding was basically that

6  for that period of time, virtually all of the -- we were led

7  to believe that virtually all of the conversations that took

8  place between anybody on behalf of the city and anybody on

9  behalf of the state also included somebody from counsel and

10 that, therefore, there really weren't going to be any

11 conversations that they could discuss with us in the, for

12 example, two weeks leading up to the filing of the Chapter 9

13 petition.

14       THE COURT:  Um-hmm, um-hmm.

15       MS. LEVINE:  So, you know, we had a limited

16 deposition.

17       THE COURT:  All right.  So let's just assume that

18 for purposes of resoling this motion the Court needs to

19 resolve the issue of attorney-client privilege and this

20 common interest doctrine.

21       MS. LEVINE:  Thank you.

22       THE COURT:  All right.  So is there anything further

23 you wanted to say on that legal question in the circumstances

24 here?

25       MS. LEVINE:  Your Honor --

1      THE COURT:  I was asking Mr. Bennett, and then I'll

2  get back to you.

3      MR. BENNETT:  I think I may have gotten there

4  already, and I think our papers are clear, but the -- first

5  of all, number one, there is absolutely clearly a common

6  interest concerning what the state wants to achieve with

7  respect to Detroit and what the emergency manager wants to

8  achieve with respect to the City of Detroit, and the entire

9  statutory scheme is one that contemplates that they're

10  working together on some level.  And if they're working

11  together on some level, they have to communicate.  And if

12  they have to communicate, they clearly have to communicate

13  about legal matters, and those discussions absolutely have to

14  be privileged.  Otherwise they're not going to happen, and

15  that would be the worst of all possibilities.

16      THE COURT:  I'm not sure why it matters, but are the

17  attorneys that were mentioned here, Mr. Gadola and -- what's

18  the other one --

19      MR. BENNETT:  Valerie Brader.

20      THE COURT:  Brader?

21      MR. BENNETT:  Yes.

22      THE COURT:  -- from the attorney general's office or

23  the governor's own like legal counsel, which I don't even

24  know if he has?

25      MR. BENNETT:  You got me on that one.  I don't know.

1          THE COURT:  Anybody know?  Mr. Howell.

2          MR. HOWELL:  Thank you, your Honor.  They are the

3   governor's counsel.  They are the chief legal advisor and

4   deputy chief legal advisor to the governor in the governor's

5   office.

6          THE COURT:  Thank you.  Thank you for that, sir.

7          MR. HOWELL:  And it's Michael Gadola and Valerie

8   Brader.

9          THE COURT:  Thank you.

10          MR. BENNETT:  Okay.  The second part is that there

11   was apparently a complaint of when the document actually got

12   done.  The truth of the matter is the common interest

13   exception to the waivers of attorney-client privilege may be

14   founded on a verbal agreement, an oral agreement.  The cases

15   are crystal clear about that.  And that was actually reached

16   way back in March, and I think if we need to demonstrate that

17   further, I believe that we can.  I think that the papers are

18   adequate and describe clearly that we meet all of the

19   relevant tests to be able to assert the attorney-client

20   privilege in these circumstances and for the state to be able

21   to assert the attorney-client privilege in these

22   circumstances.

23          THE COURT:  Any reply?

24          MS. LEVINE:  Your Honor, we'd respectfully submit

25   that there are at least two issues out here where this can't

1   be the right result if, in fact, we're going to have a

2   meaningful inquiry into the facts surrounding a good faith

3   filing.  We need to -- we need to be able to question, and we

4   can't have all of the decision-makers shielded by the

5   attorney-client privilege for the two-week period leading up

6   to the bankruptcy filing.  In addition --

7           THE COURT:  Well, let me ask you about that.  Even

8   if I were to agree with you that this is necessary for your

9   inquiry, that there are no other sources of available

10  evidence on these points, is there such an exception to this

11  privilege in law?

12          MS. LEVINE:  Well, the answer, your Honor, is

13  twofold.  I'm not sure that -- I think that what that does is

14  that takes the privilege out of context.  I don't think the

15  privilege needs an exception.  I think the problem is this

16  takes the privilege out of context --

17          THE COURT:  Um-hmm.

18          MS. LEVINE:  -- number one.  Number two --

19          THE COURT:  Why or how do --

20          MS. LEVINE:  -- itself --

21          THE COURT:  Okay.

22          MS. LEVINE:  -- has shown up in the court in two

23  capacities.  Okay.  They're here supporting the appointment

24  of the emergency manager and moving forward here, but they're

25  also separately looking into and potentially defending issues

1  related to 436, so --

2         THE COURT:  Well, you say the state, but the state

3  is --

4         MS. LEVINE:  In and of itself there's an inherent --

5         THE COURT:  -- like a lot of different people.  I

6  know the attorney general's position might be characterized

7  as you have said.  I'm not sure the governor's is.

8         MS. LEVINE:  Us either, Judge, and that's the --

9  that's part of the problem.  In other words, if what's

10 happened here is all of the decision-making and all of the

11 conversations that would shed light on good faith happen

12 because there's an attorney in the room, we'd respectfully

13 submit that that's an improper use of the privilege.  You

14 can't take factual decision-making and make it all -- and

15 make it attorney-client privilege.  There has to have been an

16 independent deliberative process by the governor and by the

17 emergency manager with regard to coming to the conclusion and

18 reaching an understanding with regard to why they made

19 those -- the decisions that they made coming up to this

20 process.  And for us not to be able to inquire with regard to

21 the nature of the good faith of that decision-making process

22 prevents us from doing the analysis we need to do to

23 determine whether or not the Chapter 9 petition was actually

24 filed in good faith and whether or not the authority as

25 applied was an appropriate application of the authority.

1      THE COURT:  Um-hmm.  Mr. Bennett, isn't it the case

2  that two individuals, even assuming their legal interests are

3  aligned in any given context -- isn't it the case that they

4  can't shield the conversations between them that would

5  otherwise be discoverable just by having an attorney in the

6  room?

7      MR. BENNETT:  That's certainly right.

8      THE COURT:  So when is it that the conversations

9  between the two individuals is protected because there is an

10  attorney in the room?

11      MR. BENNETT:  When legal issues are being discussed

12  and they're talking about legal -- when they're talking about

13  legal advice or when they're sharing facts for the benefit of

14  the lawyer so that they can get legal advice.  The

15  communications that are privileged, as I remember it, are the

16  legal advice itself and the --

17      THE COURT:  So if the governor and Mr. Orr are

18  having conversations about the financial necessity to file

19  bankruptcy, is that discoverable even if there's an attorney

20  listening in?

21      MR. BENNETT:  If they're talking about the numbers,

22  what are the numbers, that's an easy case for me.  You could

23  get discovery as to their conversation as to what the numbers

24  are.  If the issue became they're talking about the numbers

25  and they're saying, "Are these numbers numbers that would

 1  meet the definition of insolvency as that term has been

 2  embellished by the cases -- in the Code and embellished by

 3  the cases?" then I think you're talking about conversations

 4  that are, in fact, protected and, frankly, questions that no

 5  one has got a legitimate interest of inquiring about.  The

 6  premise, which I think is leading to your questions, that --

 7  and which is where Ms. Levine starts, which is inquiry has

 8  been foreclosed, is belied by this.  We're talking about 12

 9  questions in a 150-page -- well, a 400-, 500-page transcript.

10       THE COURT:  No, but I have to accept the implication

11  in the fact that Ms. Levine took the time and trouble to file

12  this motion that this is an important inquiry for her, so I'm

13  just going to accept that at face value, but I guess part of

14  what I'm struggling with here -- and I think maybe Ms.

15  Levine, too, is -- if the governor was willing to waive the

16  deliberative process privilege, to the extent there was one

17  and it applied, in order to move this bankruptcy forward on

18  the issue of eligibility, why are there any different

19  considerations here?

20       MR. BENNETT:  This is different in kind.  The reason

21  we have an attorney-client privilege is because we want the

22  governor to be able to unburden himself and share his

23  innermost doubts, concerns, and legal problems with lawyers

24  to get effective legal advice.  And if he does that in front

25  of Mr. --

1          THE COURT:  But that's the same premise as the
2   deliberative process --
3          MR. BENNETT:  Actually --
4          THE COURT:  -- except that it's not with attorneys.
5   It's with others.
6          MR. BENNETT:  Well, except when you're -- but the
7   deliberative process is likely more about facts as opposed to
8   exposures which may be the subject of future litigation, and
9   the last thing in the world that I think anyone would have
10  contemplated is if they show up and say, "Well, you know, the
11  governor's private attorneys expressed some substantial
12  doubts about this as part of a presentation of a case before
13  you."  I can't imagine that the way our adversary system is
14  supposed to work is supposed to generate those kinds of
15  results in courtrooms.
16         THE COURT:  All right.  In answer to my -- I'll get
17  to you.  In answer to my question of why the governor would
18  waive the deliberative process but not -- the deliberative
19  process privilege --
20         MR. BENNETT:  Right.
21         THE COURT:  -- but not this privilege, your answer
22  was there is an attorney-client privilege.
23         MR. BENNETT:  No.  I think -- I didn't say that.  I
24  think that --
25         THE COURT:  Accepting that --

1          MR. BENNETT:  Yeah.

2          THE COURT:  -- why would he waive one and not the

3     other if his interest in the waiver of the one was to get to

4     eligibility as efficiently and fairly as possible, which I

5     commend it?

6          MR. BENNETT:  He didn't ask me, so this is

7     speculative, but you could say that the deliberative process,

8     to the extent there was debate about numbers, he might say,

9     "Okay.  I'm prepared to make that public for the world," or

10    if it's about -- if it's discussions about how I viewed and

11    how other people viewed the city's economic circumstances,

12    how I viewed and how others viewed the state of services that

13    were being -- yeah, there are many, many, many other things

14    that are captured by the deliberative process exception that

15    I can see why a client would decide, okay, I'm prepared for

16    the world to take a look at that, but discussions with

17    counsel about exposures to just put the narrowest possible

18    point on it -- and I don't think it is that narrow, but do I

19    believe for a second that the decision to waive the

20    deliberative process privilege that might open up and

21    illuminate facts and debates about facts, political facts,

22    policy driving facts versus am I going to open up discussions

23    that we had about potential litigation exposures, I think,

24    frankly, those are different in kind, and I see a line.

25    Don't know how I would draw it in every particular instance.

1          THE COURT:  Um-hmm.  Ms. Levine, anything further?

2          MS. LEVINE:  Your Honor, I would just note that one

3    of the things that we've been talking about that makes a

4    difference in the bankruptcy process is that it's a difficult

5    scary fast process, and transparency --

6          THE COURT:  It's a what?

7          MS. LEVINE:  It's a difficult scary and very fast

8    process, and transparency helps.  It just does.  It's an

9    understanding how we got here, even if we're wrong in terms

10   of the allegations and the arguments that we've made with

11   regard to our objections to eligibility, learning that

12   through the discovery process or having all the facts

13   presented to your Honor and having your Honor consider that

14   when you're considering eligibility is a better place for a

15   credible bankruptcy process than to say we have the code of

16   silence.  We're not going to tell you how or why we made

17   these decisions to file.  We're not going to tell you how or

18   why we discussed these decisions between the city and the

19   state, and we're going to hide behind a privilege and then

20   determine that because you can't show any issues with regard

21   to eligibility, the only thing that stands is our analysis

22   with regard to why we are eligible.

23         THE COURT:  Well, privilege always suppresses the

24   truth, doesn't it?

25         MS. LEVINE:  Your Honor, it's -- but the discussions

1   that we're talking about are the discussions between the
2   state and the city.  We're not talking about Mr. Orr having a
3   one-on-one conversation with Jones Day or the governor having
4   a one-on-one consultation with his counsel.  We're talking
5   about the process that took place leading up to the timing
6   and the understanding of why the eligibility -- why the
7   bankruptcy was filed when it was filed and how it was filed
8   and what the rationale was for filing at that point in time.
9   It's the who, what, where, when.  Those are the basic types
10  of facts that you look to in making a decision with regard to
11  good faith and bad faith.
12          THE COURT:  All right.  Thank you.  Who else wanted
13  to be heard?  Mr. Howell again, and then I'll get to you,
14  sir.  Seriously, I promise you.
15          MR. HOWELL:  Thank you, your Honor.  Again, Steven
16  G. Howell appearing on behalf of the state.  Just a couple
17  things in response to your questions.  In the deliberative
18  process privilege and the decision to waive that, one of the
19  factors in coming to that conclusion was that was to ask the
20  governor why he made the decision he made, what factors
21  influenced him, what he based his decision on outside of
22  attorney-client privilege are questions that can be asked, it
23  seems to me, and his deliberations in coming to the
24  conclusion, and it seems to me that's what they want to know
25  is how -- you know, what was the governor's conclusion and

 1  what -- you know, what made him come to that conclusion.  And

 2  outside of the attorney-client privilege, those questions can

 3  be asked and answered it would seem to me.  But when you get

 4  to the attorney-client privilege, the whole core to that is

 5  that you have to be able to have open and candid discussions.

 6  You have to weigh the alternatives.  You have to look at the

 7  risks, and you have to know that that discussion with your

 8  counsel is protected.  Now, when you carry that over to the

 9  common interest --

10          THE COURT:  But that's a -- that strikes me as a

11  gross overstatement of the privilege.

12          MR. HOWELL:  Well --

13          THE COURT:  I mean all of that only works if the

14  questions are legal questions.

15          MR. HOWELL:  Are legal.  I was going to make that

16  point, your Honor.

17          THE COURT:   Okay.

18          MR. HOWELL:  I'm not trying to argue that this is

19  outside of that, but what I'm saying is that the workings

20  between the governor's office and the emergency manager under

21  the statute, under the bankruptcy are very close.  They have

22  to work together.  There are instances, in fact, where the

23  state is obligated to defend the emergency manager in certain

24  actions that he takes.  He's appointed by the state.  I mean

25  the relationship and the common interest is clear and

1  unquestioned.  The only thing we're trying to protect is the

2  obtaining of legal advice and the belief that the common

3  interest is an extension of the attorney-client privilege and

4  that when those interests are common and you're working

5  together in dealing with those issues -- and they are legal

6  issues -- that that is protected, your Honor.

7          The only other point I'd like to make is there was

8  an argument relative to waiver as to the state, and that, you

9  know, was raised in the motion filed yesterday.  And I would

10 just say the motion that was filed to quash was to

11 significantly limit, if not stop some of the discovery on

12 arguments that were made.  It did not then go into a whole

13 lot of other privileges that are driven by questions or

14 particular documents, and, in fact, the motion to quash

15 specifically referenced that and said this -- you know, we

16 reserve on -- in paragraph 7 of the motion to quash, we

17 reserve on privileges for a later date, and those privileges

18 were reserved in that motion originally.  And when the

19 discussions took place and there was, in fact, an agreement

20 reached, dates were set, and we're working on that trying to

21 finalize the order, and productions will occur, and at that

22 point logs will be turned over and documents will produce and

23 issues will be raised at that point but not the deliberative

24 process.  And in that discussion we said the deliberative

25 process, but all others were reserved.  And the primary one

1   that we're concerned about here today is the attorney-client

2   privilege, and we believe that that is very important.  It is

3   legal issues, and it is legal issues discussed with counsel

4   among the two teams that are trying to take this case forward

5   and trying to bring this to a successful conclusion, your

6   Honor.  Thank you.

7           THE COURT:  Sir.

8           MR. CIANTRA:  Thank you, your Honor.  Very briefly,

9   Thomas Ciantra, Cohen, Weiss & Simon, here for the UAW.  We

10  join in the motion that AFSCME has made, and I just wanted to

11  draw attention to a couple of particular points.  One, I

12  believe that the city and now the state have grossly

13  overstated the scope of the common interest doctrine.  All

14  right.  The case law, we think, which is set out in the

15  Libbey Glass case that's cited in AFSCME's papers makes it

16  very clear that the common interest that has to be involved

17  is a common interest, a common legal interest.  It is not

18  sufficient to rely upon the common interest that the state

19  and the emergency manager are looking to achieve with respect

20  to the overall restructuring of the City of Detroit's

21  finances.  It's a much more limited doctrine.  And the

22  limited scope of that doctrine we submit is particularly

23  important here because of the public interest in the

24  transparency of government decision-making that is involved

25  here and that had been placed in issue by the objections to

1  eligibility that the UAW has filed and that other parties

2  have filed in this case, so the scope of that exception is

3  very critical because what -- it seems from our perspective

4  that what is the common interest here is in shielding those

5  discussions, in shielding those directions, in shielding the

6  course of action that was decided upon.

7          Second point that I just wanted to briefly make is

8  that this issue is not only with respect to a dozen questions

9  that were raised at Mr. Orr's deposition.  Reference was made

10 earlier to document production in this case.  Last Friday we

11 received literally tens of thousands of pages of documents

12 that were produced by the city on an expedited basis.

13 Obviously we have not received a privilege log.  One could

14 not expect that.  However, I would expect, based on the

15 position that the city has taken, that that log is going to

16 be very long and detailed indeed because we are certain that

17 there are multiple documents, e-mail communications, memos,

18 other things that would have passed between these parties

19 that would be comprised by this, so it's not just a question

20 of a discrete number of questions asked in a deposition.  It

21 really goes to the heart and soul of the eligibility

22 objections that have been raised.  Thank you.

23          THE COURT:  Thank you.

24          MS. GREEN:  I will also be brief.  Jennifer Green on

25 behalf of the General and Police and Fire Retirement Systems.

1  Speaking of the privilege log, there was a privilege log

2  produced on Friday, September 13th.  There were just under

3  11,000 documents that are claimed to be privileged.  Out of

4  those 11,000 documents, we have so far determined that there

5  are roughly 400 to 600 documents that they are claiming are

6  protected by the common interest privilege.

7       On Monday, during Mr. Orr's deposition, the city

8  appeared to limit this common interest privilege to -- and

9  I'm going to quote from the deposition -- "what Mr. Orr has

10  been doing since he became emergency manager where there was

11  a common interest between the state and the emergency

12  manager's office," and I believe today counsel limited it to

13  that as well.  And we all know the emergency manager was not

14  appointed until March of 2013.  The Chapter 9 proceeding

15  obviously began in July of 2013.  The privilege log, however,

16  asserts the common interest privilege as far back as December

17  15th of 2011, well before the emergency manager was ever

18  appointed, and so that raises a concern about whether or not

19  this privilege is being abused and whether it's being

20  asserted too broadly.

21       Today in the papers filed by the city they have

22  characterized the common interest between the city and the

23  state as, quote, "they share a common interest in rectifying

24  the financial emergency of the city," which may be a

25  political or may be a commercial interest, but I don't think

1   that that's necessarily a legal interest that they share in

2   common.

3         The other thing that's of concern is in the

4   privilege log these communications are -- there are some that

5   are without any counsel between -- it'll be, for instance,

6   Andy Dillon, the state treasurer, or Richard Baird, who is

7   not even a state employee. My understanding is he is a

8   consultant who is -- has some sort of contract with either

9   the State of Michigan or with the governor, and he's all of a

10   sudden part of this common interest privilege, so that is our

11   concern. And while we concur with AFSCME's motion and

12   support the relief requested today, there may be another

13   issue relating to these documents that may need to be raised

14   with the Court at an appropriate time, and we would like to

15   ask that today's ruling perhaps be without prejudice in case

16   we need to file a motion to compel on the documents

17   themselves. We would obviously like to raise the issue with

18   the city. Perhaps we can work something out without having

19   to involve the Court --

20         THE COURT: Okay.

21         MS. GREEN: -- before that. One last thing

22   dovetailing with what the UAW mentioned. There is a Sixth

23   Circuit case called Reed versus Baxter -- it's 134 F.3d 351,

24   1998 case -- that talks about the need to prevent the abuse

25   of the attorney-client privilege where it is a governmental

1  entity or a governmental actor that is asserting it.  And in

2  that case they say that courts and commentators have

3  cautioned against broadly applying the privilege to

4  governmental entities.  The recognition of a governmental

5  attorney-client privilege imposes the same costs as are

6  imposed in the application of the corporate privilege but

7  with an added disadvantage.  The governmental privilege

8  stands squarely in conflict with a strong public interest in

9  open and honest government.  And that's sort of what we face

10  here is, you know, we have questions about decisions that

11  were made the day of the filing, and we asked questions about

12  were contingencies discussed, did you and the governor have a

13  meeting on July 18th, and they said, "Well, counsel was

14  there.  We're not answering."

15         THE COURT:  No, but pause there.  Does that Sixth

16  Circuit case impose any identifiable functional restriction

17  on the attorney-client privilege in the context of a

18  governmental officer claiming it?

19         MS. GREEN:  In that case it was -- I believe there

20  was a city council member and another officer of the city,

21  and the Court said your legal interests were not identical.

22  They were not aligned.  And in this case, even if their

23  political or maybe commercial interests were aligned, it's

24  not necessarily clear that their legal interests were

25  aligned, and that would be our objection.

1          THE COURT:  All right.

2          MS. GREEN:  Thank you, your Honor.

3          THE COURT:  All right.  I'm going to take this under

4     advisement and come back into court at 5:15 with a decision.

5          THE CLERK:  All rise.  Court is in recess.

6        (Recess at 4:54 p.m., until 5:31 p.m.)

7          THE CLERK:  Court is in session.  Please be seated.

8          THE COURT:  The record should reflect that counsel

9     are present.  The Court concludes that the common interest

10    doctrine does apply in these circumstances.  The Court so

11    concludes based on this analogous hypothetical.  As we all

12    know, when a corporation files bankruptcy, its board of

13    directors must give its consent, must authorize the filing.

14    Ordinarily, of course, the corporation itself would have its

15    own counsel giving it advice on whether to file bankruptcy,

16    what the ramifications would be, what possible reasons there

17    might be not to file bankruptcy, et cetera, et cetera.

18    Ordinarily the board of directors would not have its own

19    separate counsel in that process.  It would rely on corporate

20    counsel, but it could.  A board of directors could hire

21    special counsel to advise it on whether to authorize the

22    filing or not.  Assume for a moment it did, and then the

23    board or members of the board, its lawyer, the corporation's

24    lawyer and corporate management all met together.  It seems

25    clear enough to this Court that the common interest doctrine

 1  would shield those conversations even though technically the

 2  corporate attorney does not represent the board and the

 3  board's attorney does not represent the corporation.  The

 4  Court cannot identify any way to distinguish that case from

 5  our case.

 6          Now, having come to that conclusion, that does not

 7  mean that every question that Ms. Levine or others want to

 8  ask of Mr. Orr in this case is protected by the attorney-

 9  client privilege, and here it becomes hard for -- really

10  impossible for the Court to rule specifically.  I can give

11  you some general guidance, and I'm willing to do that, but

12  the application of the attorney-client privilege can only be

13  adjudged on a question-by-question basis.

14          Here's the general guidance I'm willing to give to

15  you, for what it's worth, and then an offer.  If the

16  conversations among the governor, the governor's lawyers,

17  Mr. Orr, and/or Mr. Orr's lawyers were for the purpose of

18  seeking legal advice from the lawyers about the bankruptcy,

19  then it's protected.  If the conversations were, for example,

20  between Mr. Orr and Mr. Snyder for other purposes, for

21  example, to discuss the political ramifications of the

22  bankruptcy or for other purposes I'm too naive to fathom,

23  then it would, it seems to the Court, not be protected by the

24  attorney-client privilege.  And I don't know what more to

25  tell you at this point except to make to you the offer I

1  think I made to you before, which is when you're sitting in a

2  deposition and you come to a disagreement about whether the

3  privilege applies to a specific question, you can get me on

4  the phone, and I will resolve it on the spot if I at all can,

5  but I make that offer with the caveat that the guidance that

6  I just gave you is probably the guidance I'm going to follow,

7  and you can figure it out as well as I can, so I don't know

8  what more to say except that sort of technically the motion

9  to compel that's before the Court is granted in part and

10  denied in part.  I will allow a further opportunity with the

11  guidance that I've given you for Mr. Orr's deposition.  I'm

12  sure you'll be able to find a mutually convenient time for

13  that.

14          Is there anything else I can help you with here

15  today?

16          MS. LEVINE:  Thank you, your Honor.

17          THE COURT:  All right.  We'll be in recess then.

18          THE CLERK:  All rise.  Court is adjourned.

19      (Proceedings concluded at 5:36 p.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett            September 26, 2013
_____     _____
Lois Garrett