# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-----------------------------------------------------x
                                    :
In re                               : Chapter 9
                                    :
CITY OF DETROIT, MICHIGAN,          : Case No. 13-53846
                                    :
                     Debtor.        : Hon. Steven W. Rhodes
                                    :
-----------------------------------------------------x
```

## BRIEF IN OPPOSITION TO MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, MOTION FOR ENTRY OF AN ORDER MODIFYING THE AUTOMATIC STAY SOLELY TO ALLOW ADMINISTRATIVE LAW JUDGE TO EXECUTE HIS OPINION AND LIQUIDATE DAMAGE AWARD BEFORE HE RETIRES ON OCTOBER 4, 2013[1]

By the Stay Relief Motion, AFSCME seeks to advance a proceeding with the ultimate goal of reinstating a practice — the so-called "13th Check Program" — that has been a leading contributor to the spiraling unfunded actuarially accrued liabilities ("UAAL") of the City's pension funds in recent years, and that of the City's General Retirement System (the "DGRS") in particular.

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Debtor's Objection to Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL CIO, Motion for Entry of an Order Modifying the Automatic Stay Solely to Allow Administrative Law Judge to Execute His Opinion and Liquidate Damage Award Before He Retires on October 4, 2013, filed contemporaneously herewith.

ATI-2579288v7

The City, having rid itself of this millstone through legislative action almost two years ago, objects to AFSCME being granted relief from the automatic stay of sections 362 and 922 of the Bankruptcy Code (the "Automatic Stay") to pursue its effort to force the City to revive this financially debilitating and actuarially unsound practice.

## BACKGROUND

Under the 13th Check Program, the majority of excess pension earnings in years when fund performance exceeded assumed rates of return was distributed among retirees and active employees as an unearned windfall payment. According to figures relied upon by AFSCME with respect to DGRS, an average of almost 55% of earnings over and above assumed rates of return were diverted from defined benefit pension plans into the annuity savings accounts of active employees. See AFSCME Supplemental Brief (as defined below), at 6. [2] An

---

[2] Instead of being retained by the DGRS, the remaining 28% of these "excess" earnings on average was used to discount the City's forthcoming required pension contributions, thus ensuring that the net performance of the DGRS would never exceed the assumed rate of return in any given year, and UAAL would continue to increase. AFSCME Supplemental Brief (as defined below), at 6 (stating that investment earnings over and above 7.9% were distributed to retirees in the form of a 13th check, to active employees in enhanced annuity earnings and to the City in reductions in its required contributions to the DGRS); AFSCME Supplemental Brief, at Ex. 2 (table demonstrating that, in all years where distributions were made by the DGRS under the 13th Check Program, 100% of all earnings over the assumed rate of return were distributed).

ATI-2579288v7

additional 17% of any such earnings on average was distributed to retirees directly in the form of a bonus payment at the end of each year in addition to the monthly pension payments to which they were entitled — the so-called "13th check." Id. For the sake of convenience, the entire practice of distributing pension-fund earnings over assumed rates of return to retirees and active employees (whether by direct payment or through excess contributions to the City's annuity savings program) is referred to herein as the "13th Check Program."

Common sense dictates that the sanctioned skimming of pension earnings during the years when performance exceeded assumed rates of return would come home to roost in the years when those same investments underperformed assumptions; and so it was with respect to the DGRS. See Decl. of Charles M. Moore in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 13), at ¶ 19 (stating that 13th check payments "were in excess of the pensioner's earned pension and deprived the [Pension] Systems of assets that would be needed to support liabilities, especially since it is inevitable that in certain years the [Pension] Systems' investment returns would fall short of their assumed rates of return"). During periods of lower than projected investment returns, the City was forced to pay interest at the assumed rate of return even as the value of DGRS assets plummeted. See id. at ¶ 18 ("This abuse of discretion was most egregious in 2009,

when the GRS lost 24.1% of the value of its assets, but the trustees appear to have credited annuity savings plan accounts with an investment return of 7.5%.").

According to a report that was provided to City Council members by the Fiscal Analysis Division on November 21, 2011, the total cost to the City of the 13th Check Program as of June 30, 2008 was *$1.92 billion*.  See Report of Joseph Esuchanko dated March 8, 2011, at 9, attached hereto as Exhibit A; see also Steven Church, *Detroit Union Seeks to Revive '13th' Pension Check Policy*, BLOOMBERG, Sept. 26, 2013, attached hereto as Exhibit B.

On June 20, 2013, Kevyn D. Orr, as emergency manager with respect to the City (the "Emergency Manager") under Michigan Public Act 436 of 2012 ("PA 436"),[3] issued Emergency Manager Order No. 8 ordering the City's Auditor General and Inspector General to conduct a joint investigation into possible waste, abuse, fraud and corruption associated with the City's employee benefit programs. A copy of the preliminary report issued jointly by the Auditor General and Inspector General (the "AG/IG Report") is attached hereto as Exhibit C.[4]  Among numerous other irregularities, the AG/IG Report uncovered the payment of retiree

---

[3]     This statute is also known as the Local Financial Stability and Choice Act, MCL § 141.1541, *et seq.*, and is referred to herein as "PA 436."

[4]     An additional report is due 60 days after this initial report, pursuant to the terms of Emergency Manager Order No. 8.

-4-

annuity interest and credits in excess of market rates equivalent to an effective annual rate of return of 20% for select years.  AG/IG Report, at 8.  In addition, the AG/IG Report notes that beginning balances as of the beginning of fiscal year 2006 exceeded 2005 ending balances by 13% in all cases.  Id. at 9.  Upon information and belief, the City believes that these fiscal irregularities are the result of the 13th Check Program.

In November 2011, the City Council passed an ordinance amending sections 47-1-18 and 47-1-21 of the Detroit City Code to prohibit members of the Board of Trustees of the DGRS (the "Board of Trustees") from granting a rate of return on annuities greater than the actual return, thereby effectively eliminating the 13th Check Program.  Tr. of Feb. 8, 2013 Hr'g (the "Transcript"), at 4:22 to 5:5, attached hereto as Exhibit D.[5]  In response, AFSCME commenced an unfair labor practice proceeding (Case No. C12-E-092) (the "State Labor Proceeding") before the Michigan Employment Relations Commission (the "MERC") alleging that the 13th Check Program had become a condition of employment under the collective bargaining agreement then in effect between AFSCME and the City (the "CBA") with respect to which the City was required to bargain with AFSCME.  Id. at 5:13-21.

---

[5]     The Transcript is from the Hearing in the State Labor Proceeding (as those terms are defined below).

ATI-2579288v7

On February 8, 2013, a hearing (the "Hearing") was held on cross motions for summary judgment in the State Labor Proceeding before Administrative Law Judge Doyle O'Connor ("ALJ O'Connor"). Id. at 1. At the Hearing, ALJ O'Connor ruled that a duty to bargain existed with respect to the 13th Check Program, and that the City failed to satisfy this duty by unilaterally eliminating the 13th Check Program through legislation. Id. at 49:12-50:11. ALJ O'Connor further stated that he intended to enter his recommended decision and order (the "Recommended Decision and Order") recommending to the MERC that the discretion to conduct in the 13th Check Program be restored to the Board of Trustees. Id. at 50:12-51:10.

Following the Hearing, both parties submitted supplemental briefs (together, the "Supplemental Briefs") to ALJ O'Connor addressing the nature of relief that ALJ O'Connor proposed to recommend to the MERC. Copies of the Supplemental Briefs of AFSCME and the City are attached hereto, respectively, as Exhibit E (the "AFSCME Supplemental Brief") and Exhibit F (the "City Supplemental Brief").

AFSCME argues in its Supplemental Brief that, if ALJ O'Connor recommends that the discretion of the Board of Trustees to conduct the 13th Check Program be reinstated with an award of backpay (and if the MERC adopts ALJ O'Connor's Recommended Decision and Order), then AFSCME's members may be

-6-

prejudiced if the composition of the Board of Trustees is not as favorable to AFSCME's interests as it was during the period following the elimination of the 13th Check Program in 2011. AFSCME Supplemental Brief, at 2-5. AFSCME thus requests that ALJ O'Connor and the MERC implement one of two methods to quantify AFSCME's backpay claim — either (a) taking an average of payments made under the 13th Check Program for the past ten years or (b) reconstituting a Board of Trustees consisting of the same members that existed at the time of the elimination of the 13th Check Program to exercise its discretion with respect to an award of backpay. AFSCME Supplemental Brief at 5-6. Neither of the extraordinary forms of relief requested by AFSCME was raised before ALJ O'Connor or discussed by the parties at the Hearing, nor is there any precedent for such relief.

The City, in its Supplemental Brief, argued in part that the intervening June 12, 2013 decision by the Supreme Court of Michigan in <u>Macomb County v. AFSCME Council 25 Locals 411 and 893</u>, 833 N.W.2d 225 (Mich. 2013), clarified that the State Labor Proceeding was not properly before the MERC in the first place and should be dismissed. City Supplemental Brief, at 3-4.

The <u>Macomb</u> case addressed a MERC ruling that a public employer committed an unfair labor practice by refusing to bargain over a change in use of actuarial tables from the prior practice established over a period of 23 years.

Macomb, 833 N.W.2d at 240-41.  After the MERC ruling was affirmed on appeal

to the Michigan Court of Appeals (in a decision relied upon by ALJ O'Connor (see

Transcript at 42:20-43:11)), the Michigan Supreme Court reversed this ruling.

Macomb, 833 N.W.2d at 240-41.  The Michigan Supreme Court held that, because

the subject of the unfair labor practice proceeding was covered by a collective

bargaining agreement, the employer satisfied its duty to bargain when it entered

into the original collective bargaining agreement.  Id. at 241.  "Moreover, absent a

mutual agreement, the mere lengthy use of the [applicable] actuarial table did not

create a term or condition of employment independent of the collective bargaining

agreements."  Id.  The Michigan Supreme Court thus reversed and remanded the

matter to the MERC for dismissal of the unfair labor practice claims.  Id.

        The City argues that the Macomb decision, issued after ALJ O'Connor

conducted the Hearing on February 8, 2013, is controlling of the outcome of the

State Labor Proceeding because AFSCME took the position that the 13th Check

Program had become a term of the CBA, and ALJ O'Connor made the same

determination at the Hearing.  City Supplemental Brief, at 3-4; see also Transcript

at 45:19-21 ("The City had and has no colorable claim that it did not face a clear

and binding contractual obligation to keep in place the [13th Check Program]"); id.

at 45:22-25 ("the City's conduct further constituted an unfair labor practice as it

was an unlawful repudiation of the binding 2008-2012 collective bargaining

agreement").  Just as in <u>Macomb</u>, therefore, AFSCME's relief with respect to the elimination of the State Labor Proceeding, to the extent it is entitled to any, is through arbitration — <u>i.e.</u>, the grievance procedure established under the now-expired CBA.  <u>Id.</u>

No hearing has been conducted on the extraordinary relief requested by AFSCME in its Supplemental Brief or the intervening legal authority raised by the City in its Supplemental Brief, and ALJ O'Connor has not issued his Recommended Decision and Order.

Pursuant to the rules of procedure applicable to proceedings before the MERC, once an administrative law judge has issued his or her recommended decision and order, parties have 20 days to file exceptions and a further ten days to file cross-exceptions to the recommendations.  <u>See</u> Michigan Public Employment and Labor Relations Law Manual, at pp. 281-82 (excerpt attached hereto as <u>Exhibit G</u>).  Thereafter, the MERC is authorized to enter its order in the proceeding, and the parties may appeal as of right within 20 days after the MERC enters its decision.  <u>See</u> <u>id.</u>

## **ARGUMENT**

Section 362(a) of the Bankruptcy Code provides in relevant part that:

> a petition filed under . . . this title . . . operates as a stay, applicable to all entities, of . . . the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could

have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case . . . .

11 U.S.C. § 362(a). The automatic stay "is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions." Javens v. City of Hazel Park (In re Javens), 107 F.3d 359, 363 (6th Cir. 1997) (quoting H.R. REP. NO. 95-595, at 340 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6296). In a chapter 9 case, the automatic stay is supplemented by section 922 of the Bankruptcy Code, which provides in relevant part that:

A petition filed under this chapter operates as a stay, in addition to the stay provided by section 362 of this title, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against an officer or inhabitant of the debtor that seeks to enforce a claim against the debtor

11 U.S.C. § 922(a).

***No Cause Exists Justifying***
***Relief from the Automatic Stay***

Section 362(d) of the Bankruptcy Code authorizes a bankruptcy court to grant relief from the Automatic Stay in limited circumstances. See 11 U.S.C. § 362(d); see also 11 U.S.C. § 922(b) (making section 362(d) of the Bankruptcy Code applicable to proceedings stayed under section 922(a) of the Bankruptcy

-10-

Code).  In particular, section 362(d)(1) of the Bankruptcy Code provides that a

party in interest may obtain relief from the Automatic Stay "for cause, including

the lack of adequate protection of an interest in property of such party in interest."

11 U.S.C. §362(d)(1).

"The Bankruptcy Code does not define 'cause' as used in

[section] 362(d)(1).  Therefore, under [section] 362(d), 'courts must determine

whether discretionary relief is appropriate on a case by case basis.'" Chrysler LLC

v. Plastech Engineered Prods., Inc. (In re Plastech Engineered Prods., Inc.),

382 B.R. 90, 106 (Bankr. E.D. Mich. 2008) (quoting Laguna Assocs. L.P. v. Aetna

Casualty & Surety Co. (In re Laguna Assocs. L.P.), 30 F.3d 734, 737 (6th Cir.

1994)).

The determination of whether to grant relief from the Automatic Stay

"resides within the sound discretion of the Bankruptcy Court." Sandweiss Law

Center, P.C. v. Kozlowski (In re Bunting), No. 12-10472, 2013 WL 153309, at *17

(E.D. Mich. Jan. 15, 2013) (quoting In re Garzoni, 35 F. App'x 179, 181 (6th Cir.

2002)).  In determining whether cause exists, however, "the bankruptcy court

should base its decision on the hardships imposed on the parties with an eye

towards the overall goals of the Bankruptcy Code." Plastech, 382 B.R. at 106

(quoting In re C & S Grain Co., 47 F.3d 233, 238 (7th Cir. 1995)).

AFSCME cites to the factors enumerated by the United States Court of Appeals for the Second Circuit in In re Sonnax Indus., Inc. v. Tri Components Prods. Corp. (In re Sonnax Indus., Inc.), 907 F.2d 1280 (2d Cir. 1990), in support of its argument that cause exists justifying relief from the Automatic Stay.[6] Stay

---

[6]    The factors set identified by the Second Circuit in Sonnax are as follows:

(1) whether relief would result in a partial or complete resolution of the issue;

(2) lack of any connection with or interference with the bankruptcy case;

(3) whether the other proceeding involves the debtor as a fiduciary;

(4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

(5) whether the debtor's insurer has assumed full responsibility for defending it;

(6) whether the action primarily involves third parties;

(7) whether litigation in another forum would prejudice the interest of the creditors;

(8) whether the judgment claim arising from the other action is subject to equitable subordination;

(9) whether the movant's success in the other proceeding would result in a judicial lien avoidance action by the debtor;

(10) the interests of judicial economy and the expeditious and economical resolution of litigation;

(11) whether the parties are ready for trial in the other proceeding; and

(12) impact of the stay on the parties and the balance of harms.

Sonnax, 907 F.2d at 1286.

ATI-2579288v7

Relief Motion at ¶ 11. The relevant <u>Sonnax</u> factors, however, confirm that no cause (much less sufficient cause) exists to justify relief from the Automatic Stay to allow ALJ O'Connor to enter his Recommended Decision and Order.

With respect to the first factor, relief from the Automatic Stay will not result in the resolution of any issues in the State Labor Proceeding. The relief that AFSCME maintains it seeks will result solely in the entry of the Recommended Decision and Order by ALJ O'Connor, but this matter will not be resolved short of a decision by the MERC. Pursuant to the MERC's rules of procedure, following the entry of any Recommended Decision and Order, the parties will be entitled to file exceptions and cross-exceptions prior to the matter coming before the MERC and any potential appeals, all of which would entail the expenditure of significant time and resources on the part of the City. Even to have the Recommended Decision and Order entered, the City believes there should a hearing to consider the post-hearing Supplemental Briefs, the material facts that have changed since the initial hearing (including, among other things, the appointment of the Emergency Manager, the effectiveness of PA 436 and changes in governing precedent) and the material new remedial relief now sought by AFSCME. Absent completion of all of those steps, no issues will be resolved.

With respect to the second factor, the outcome of the State Labor Proceeding may have a profound effect on this chapter 9 case. AFSCME argues

-13-

that the State Labor Proceeding will merely heighten the efficiency of the City's

chapter 9 case and assist in liquidating the dollar amount of an award against the

City. Stay Relief Motion at 1, 5. Far from assisting in the liquidation of claims,

however, the relief contemplated by ALJ O'Connor at the Hearing would allow

discretion to revive the deleterious 13th Check Program under the direction of the

Board of Trustees, contrary to the restructuring initiative and goals of the City in

this case. Alternatively, AFSCME for the first time in its supplemental brief

argues that a new and unprecedented calculation of distributions under the 13th

Check Program be put in place that removes the discretion of the Board of Trustees

and requires a calculation of retiree and active employee distributions based on the

deleterious past practices. Failing that, AFSCME argues to restore the power of

prior members of the Board of Trustees to make these determinations. Through

these extraordinary means potentially substantial liabilities could be imposed on

the City by increasing the UAAL of the DGRS. Although these liabilities would

be subject to treatment as general unsecured claims in this case, there is no basis to

seek to impose these liabilities in the midst of the City's restructuring and outside

of the normal claims process and restructuring discussions. Such an approach

would undermine the efforts of the City and the authority of this Court to address

fundamental restructuring issues central to this chapter 9 case.

With respect to the fourth factor, AFSCME argues at length that the MERC "is a specialized tribunal with regulatory expertise assigned by statute specifically — and exclusively — to hear [the State Labor Proceeding]." Stay Relief Motion at ¶ 15. This argument is irrelevant, however, because AFSCME states that it does not seek relief from the Automatic Stay to allow the State Labor Proceeding to move forward before the MERC. Moreover, as the City argued in its Supplemental Brief, based on the Michigan Supreme Court's recent decision in the <u>Macomb</u> case, it is at best unclear that this matter is properly before the MERC in the first place. Sweeping relief from the Automatic Stay to allow this dispute to proceed before the MERC, or in a new arbitration proceeding consistent with the <u>Macomb</u> ruling, would require the City to engage in significant additional litigation or arbitration activities (including potential appeals), further draining the City's resources and distracting it from its restructuring efforts.

With respect to the tenth factor, the interests of judicial economy are not advanced by authorizing ALJ O'Connor to prepare and enter a Recommended Decision and Order immediately before he retires on October 4, 2013. There are few similarities between the City's situation today and when ALJ O'Connor presided over the Hearing almost eight months ago on February 3, 2013. Since that date, for example: (a) the Emergency Manager was appointed under PA 436, a law that was not in effect on the date of the Hearing; (b) AFSCME and the City

-15-

both filed Supplemental Briefs raising further issues for consideration before a Recommended Decision and Order should be entered; (c) the Michigan Supreme Court issued the <u>Macomb</u> decision (reversing one of the decisions relied upon by ALJ O'Connor); (d) the CBA has expired; and (e) the City commenced this chapter 9 case.

If this dispute is determined to be properly before the MERC at all, these factors counsel in favor of transitioning the State Labor Proceeding, at the appropriate time, to an new administrative law judge pursuant to the MERC's usual procedures. There is no justification for deviating from these normal procedures with the hope that ALJ O'Connor is able to enter a Recommended Decision and Order considering all of the relevant factors on an emergency basis within a 48-hour window prior to his retirement.

Overall, with respect to the twelfth <u>Sonnax</u> factor (and the consideration that carries the greatest weight in this Court), the balance of the harms between the parties establishes that no cause exists justifying relief from the Automatic Stay. If this Court denies the relief that AFSCME requests in the Stay Relief Motion, then, presumably, the responsibility of entering the Recommended Decision and Order will pass to another administrative law judge pursuant to established procedures, who will enter the Recommended Decision and Order at the appropriate time in light of the arguments raised by the parties at the Hearing

-16-

and in the Supplemental Briefs, and AFSCME will suffer no legally cognizable harm.

If the Court were to grant relief from the Automatic Stay, however, and ALJ O'Connor were immediately to rule in favor of AFSCME based upon his prior ruling on the record at the Hearing, then AFSCME's efforts to revive the fiscally irresponsible practices of the 13th Check Program potentially would be advanced, subject to the inevitable additional litigation about the treatment and effect of any such Recommended Decision and Order. As such, the City anticipates that the Court will be forced to entertain, and the City to defend against, further efforts by AFSCME or other interested parties to bring the 13th Check Program back to life. At a running cost of $1.92 billion as of 2008 (and the potential that the City would be held liable for back pay at the discretion of the Board of Trustees in addition to 13th Check Program payments going forward), the potential impact on the City's efforts to restructure and the interests of other creditors and parties in interest in this chapter 9 case is difficult to overstate.

All of the remaining <u>Sonnax</u> factors either are not relevant to the State Labor Proceeding or further demonstrate that no cause exists justifying relief from the Automatic Stay. For example, (a) the State Labor Proceeding does not involve the City as a fiduciary, (b) no insurer has assumed responsibility for defending the City, (c) the State Labor Proceeding involves no third parties other than AFSCME,

(d) continuation of the State Labor Proceeding certainly would prejudice the interests of creditors for the reasons set forth above and (e) the parties are not ready for trial (or, in this case, a final adjudication) of the State Labor Proceeding because AFSCME has not requested that relief and substantial questions of law and factual developments remain for consideration before any Recommended Decision and Order should be issued to the MERC.  Thus, under the <u>Sonnax</u> factors cited by AFSCME, no cause exists justifying relief from the Automatic Stay.

**_The State Labor Proceeding_**
**_Is Subject to the Automatic Stay_**

AFSCME further suggests that the State Labor Proceeding may not be subject to the Automatic Stay.  In this regard, section 362(b) of the Bankruptcy Code provides, in relevant part:

> The filing of a petition . . . does not operate as a stay —
>
> . . . of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's . . . police or regulatory power . . . .

11 U.S.C. § 362(b)(4).  This so-called "Police Power Exception" is applicable when a governmental unit acts to enforce public policy against a debtor rather than pursue a pecuniary purpose.  <u>See Chao v. Hospital Staffing Servs., Inc.</u>, 270 F.3d

ATI-2579288v7

374, 385-86 (6th Cir. 2001) (citing, among others, <u>Word v. Commerce Oil Co.</u>

<u>(In re Commerce Oil Co.)</u>, 847 F.2d 291, 295 (6th Cir. 1988) and <u>NLRB v. Edward</u>

<u>Cooper Painting, Inc.</u>, 804 F.2d 934, 942 (6th Cir. 1986)).

AFSCME devotes a significant share of its brief to an argument that

the State Labor Proceeding is excepted from the Automatic Stay by operation of

the Police Power Exception. <u>See</u> Stay Relief Motion at ¶¶ 17-20. AFSCME

subsequently retreats from this argument and clarifies that it is not seeking an

adjudication of whether the State Labor Proceeding is or is not, in fact, subject to

the Automatic Stay. <u>Id.</u> at ¶¶ 21-22. The Court presumably is expected to infer

from the mere allegation that the Police Power Exception may apply to the State

Labor Proceeding that "cause" exists justifying relief from the stay under

section 362(d)(1) of the Bankruptcy Code.

The State Labor Proceeding is not excepted from the Automatic Stay

by the Police Power Exception, and the authority cited by AFSCME on this point

is irrelevant, for the simple reason that AFSCME (<u>i.e.</u>, the plaintiff in the State

Labor Proceedings) is not a governmental unit.[7] <u>See U.S. ex rel. Kolbeck v. Point</u>

---

[7]     The term "governmental unit" means:

> United States; State; Commonwealth; District; Territory;
> municipality; foreign state; department, agency, or
> instrumentality of the United States (but not a United
> States trustee while serving as a trustee in a case under
> this title), a State, a Commonwealth, a District, a

<u>Blank Solutions, Inc.</u>, 444 B.R. 336, 338-40 (E.D. Va. 2011) (<u>Qui</u> <u>tam</u> action brought by private person under the False Claims Act to enforce the government's police or regulatory power was not excepted from the Automatic Stay by the Police Power Exception because the exception applies exclusively to actions brought by governmental units, not merely actions in furtherance of the police or regulatory powers of governmental units); <u>In re Saint Vincent's Catholic Medical Centers of New York</u>, 429 B.R. 139, 148-49 (Bankr. S.D.N.Y. 2010) (holding that an action to prevent the closure of a hospital brought by private parties is not excepted from the Automatic Stay even though the same action in the hands of the New York State Department of Health may fall within the "narrowly construed" Police Power Exception). Thus, the Police Power Exception does not except the State Labor Proceeding from the Automatic Stay, and this argument does not support AFSCME's claim that "cause" exists justifying relief from the Automatic Stay.

WHEREFORE, for the foregoing reasons, the City respectfully requests that this Court: (a) deny the Stay Relief Motion; and (b) grant such other and further relief to the City as the Court may deem proper.

---

Territory, a municipality, or a foreign state; or other foreign or domestic government.

11 U.S.C. § 101(27). Thus, AFSCME patently is not a governmental unit and is not entitled to the benefit of the Police Power Exception.

Dated: October 1, 2013         Respectfully submitted,


/s/ Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
   STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY