**EXHIBIT A**

# City of Detroit

## CITY COUNCIL

**IRVIN CORLEY, JR.**
DIRECTOR
(313) 224-1076

FISCAL ANALYSIS DIVISION
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 218
Detroit, Michigan 48226
FAX: (313) 224-2783
E-Mail: irvin@cncl.ci.detroit.mi.us

**ANNE MARIE LANGAN**
DEPUTY DIRECTOR
(313) 224-1078

TO:  COUNCIL MEMBERS

FROM:  Irvin Corley Jr., Director *(signature)*

DATE:  November 21, 2011

RE:  Proposed Pension Ordinance Amendment – Codifying the Distribution of Investment Earnings for the Detroit General Retirement System

In connection with the pension ordinance amendment introduced by Council Member Jenkins and under consideration by your Honorable Body I am submitting as Attachment I the preliminary report from Mr. Joseph Esuchanko, MAAA, ASA, MSPA, FCA, EA of Actuary Services Company. His services were utilized by the Pension Reform Working Group to present an independent analysis on the past practice of the Detroit General Retirement System (DGRS) concerning the distribution of earnings. I believe each member has received this preliminary report through your representative on the Pension Reform Working Group.

Adoption of the pension ordinance amendment will result in reduced pension contribution requirements from the city because contributions from the city for pensions and the accumulated interest on these contributions, or assets in the funds of the retirement system for pension payments will be protected from being used for other purposes. The reduction or savings will not be immediate, that is cannot address the current cash crisis, but will begin next fiscal year when the percentage of payroll pension contribution rate is determined by the next annual valuation report.

**Actuary Services Company information and Mr. Esuchanko's credentials include:**

"Since 1984, Actuarial Service Company, P.C. has provided actuarial consulting and full-service retirement plan administration to clients ranging from small, closely held companies to large corporations and government entities.

The company is owned and managed by Joseph Esuchanko, an Enrolled Actuary with more than 35 years of experience in the actuarial profession. Mr. Esuchanko is an associate of the Society of Actuaries and a member of the American Academy of Actuaries and the American Society of Pension Actuaries. His professional expertise has been cited in articles published by *The Houston Chronicle, New York Times, Christian Science Monitor, and Fortune.*"

**Accumulated Cost to the City:**

Mr. Esuchanko's report provides a comprehensive discussion on the information and methods he used to determine "The approximate accumulated cost to the City, due to excess earnings being distributed

to DGRS members, rather than being applied to the contractual DGRS benefits, is $1.9212 billion." This statement is found at the bottom of page 9 of the attached report.

The excess earnings include bonus interest payments to active employees' annuity accounts and "13th checks to retirees. For active employees the bonus interest represents interest above the amount declared by the trustees which has generally matched the actuarial assumed interest rate as set by the trustees.

## Intent of Proposed Ordinance Amendment

In the past the trustees of the DGRS have exercised total discretion on how investment earnings are distributed within the retirement system. The trustees have granted bonus interest to active employee annuity accounts and additional pension payments to retirees commonly known as 13th checks. The decision by the trustees on distribution of investment earnings has substantially increased the cost to the city of funding the pension system as shown by Mr. Esuchanko's analysis.

The proposed pension ordinance will codify how investment earnings will be distributed within the system. As such this ordinance amendment does not change pension benefits and does not require an actuarial study. The amendment requires that active employees' annuity accounts will be credited with the actual rate of return that the investments of the system earn for the year, with a cap of the actuarial assumed investment rate of return, currently 7.9% per the last retirement system valuation for June 30, 2010, and a floor of zero that protects the employees' annuity from losses.

In any year that the system experiences a loss, since the employees' accounts will not be reduced, the city will incur increased funding requirements. However to offset this, in years when investment earnings exceed the actuarially assumed rate of return the city will incur a reduction in funding requirements, as the employees' annuity accounts will be capped. In theory the assumed actuarial rate of return should approach the actual performance of the system over time.

## Simplified Example of Past Practice

In reality the DGRS has five funds, excluding funds required for pension obligation certificates. For this discussion I will limit the example to two funds as this reduces the complexity and highlights the way the city has lost in the past. The two funds are the pension fund and the annuity fund. The balance in the pension fund consists of the contributions from the city to fund pensions and the interest the contributions have accumulated. The annuity fund consists of voluntary employee payroll deductions, a savings account of sorts, and the interest the account has accumulated. The annuity fund is maintained by individual employee.

For this example each fund will have a beginning balance of $1.0 million. For investment purposes the funds are combined for a total investment of $2.0 million. The board of trustees establishes the assumed rate of return and sets a percentage that the annuity fund is "guaranteed" and for the following examples will be 5% in both cases.

For the first case the actual earnings on the invested pool of pension and annuity funds will be 0%, the funds will neither make or loss money on the investments. Since the annuity fund has a "guaranteed" return of 5%, the annuity fund must be increased by $50,000 ($1.0 million times 5% equals $50,000). The only place the $50,000 to increase the annuity fund can come from is the pension fund. So the pension fund is reduced by $50,000 and the annuity fund is increased by $50,000. Or the pension fund

13-53846-tjt    Doc 1066-1    Filed 10/01/13    Entered 10/01/13 16:15:54    Page 3 of 124

now has a balance of $950,000, and the annuity fund has a balance of $1,050,000. This results in the creation of an unfunded actuarial accrued liability (UAAL) in the pension fund which causes future contributions by the city for pensions to increase.

For the second case let's assume the $2.0 million earns exactly 5%, or $100,000. If the $100,000 was split evenly between the pension fund and the annuity fund there would not be a problem. Each fund would increase by $50,000, to $1,050,000 each. A UAAL would not be created and the city's contributions for pensions have increased by the exact amount of the assumption.

For the third case the assumption for earnings will be 7%, or $140,000. If the $140,000 is split equally again there would not be a problem. In fact, since the earnings exceed the assumed rate of return the pension system would be slightly over funded. The overfunding could reduce future contributions required by the city to fund pensions. However, since the split of the investment earnings has been at the sole discretion of the trustees, an equal split has not always taken place. If the split of the earnings is made so that the pension fund does not receive at least $50,000, again a UAAL would be created and future city pension contributions would have to increase.

In order to show how easily it is for the pension fund not to get credit for at least the $50,000 required to match the assumed rate of return and not create a UAAL, let's bring in the retirees 13th check. So now there are three funds/groups involved and the decision is made to split the earnings three ways, or take the $140,000 divide by 3 equals $46,666. Since the pension fund would not receive the $50,000 required to meet the assumed rate of return a UAAL is created, increasing future funding required from the city.

Unfortunately over time the third case or variations of it have taken place leading to the city having to make additional contributions to the retirement system.

**Summary**

The proposed ordinance amendment will address most of the situations where pension fund balances or assets can be diverted to the annuity fund or used to pay 13th checks to retirees increasing future contributions to pension by the city. The only situation where this will happen in the future if the amendment is adopted will be in years when the system loses money on investments. Since the ordinance contains a floor of zero for the annuity fund to prevent losses to the annuity fund, the losses of both the pension and annuity funds will have to be fully absorbed by the pension fund, similar to case one above. To offset this, in years when investment earnings exceed the actuarially assumed rate, the pension fund will gain, reducing pension contribution requirements. Hopefully over time will the two will balance out for the city.


Attachment

cc:     Council Divisions
        Auditor General Office
        Chris Brown, Chief Operating Officer
        Cheryl Johnson, Finance Director
        Pamela Scales, Budget Director
        Walter Stampor, Executive Secretary
        Denise Gardner, Mayor's Office

13-53846-tjt    Doc 1066-1    Filed 10/01/13    Entered 10/01/13 16:15:54    Page 4 of 124

**Contributions That Should Have Been Paid by the City of Detroit
To the General Retirement System
Assuming No Distribution of "Excess" Earnings**

## Objective

I have prepared an analysis of the City of Detroit (City) contributions to the City of Detroit General Retirement System (DGRS) from July 1, 1987 through June 30, 2008. My review included determination of the following values for all periods between July 1, 1985 and June 30, 2008:

A.  The contributions that were paid by the City to the DGRS retirement fund.

B.  The total contribution that would have been paid by the City to the DGRS retirement fund if the excess earnings had not been distributed.

C.  The difference between A and B, which I will refer to as the overage.

D.  The accumulation of C, including the investment returns that would have been earned on that difference.

The contributions paid by the City during this period were higher than the contributions determined using the increased assets which would have resulted if the distributed excess earnings had been applied to the funding of contractual retirement benefits. This is the result of a reduction in the unfunded actuarial accrued liability (UAAL) and a corresponding decrease in the annual amortization payments.[1]

## Information Used

This section summarizes the information I used to assist me in determining the amount that the City would have contributed. The fiscal years run from July 1 to the next June 30. Thus, I show, for example, the fiscal year from July 1, 2003 through June 30, 2004 as the 2003/2004 fiscal year.

I received a list of distributed excess contributions from July 1, 1985 through June 30, 2008. The list of the distributed excess earnings is in Table 1. The City makes contributions annually to fund the liabilities of the DGRS retirement fund. I have assumed that such contributions are made in equal monthly installments throughout the fiscal year. The actuarial valuations showed total contributions, including both City contributions and Employee contributions. The City share of contributions was accounted for separately from the Employee share. The list of City contributions is in Table 2.

---

[1] Excess earnings distribution amounts for the July 1, 2008 through June 30, 2010 fiscal year were not provided to me.

13-53846-tjt    Doc 1066-1    Filed 10/01/13    Entered 10/01/13 16:15:54    Page 5 of 124

**Table 1**
**Amount of Distributed Excess Earnings**

| Fiscal Year | Amount of Distributed Excess Earnings (In Millions) |
|---|---|
| 1985/1986 | $ 19.4 |
| 1986/1987 | $ 36.3 |
| 1987/1988 | $ 41.3 |
| 1988/1999 | $ 51.5 |
| 1989/1990 | $ 34.7 |
| 1990/1991 | $ 34.4 |
| 1991/1992 | $ 2.9 |
| 1992/1993 | $ 33.5 |
| 1993/1994 | $ 20.5 |
| 1994/1995 | $ 11.6 |
| 1995/1996 | $ 0.0 |
| 1996/1997 | $ 57.3 |
| 1997/1998 | $ 101.3 |
| 1998/1999 | $ 120.4 |
| 1999/2000 | $ 92.1 |
| 2000/2001 | $ 55.6 |
| 2001/2002 | $ 0.0 |
| 2002/2003 | $ 0.0 |
| 2003/2004 | $ 0.0 |
| 2004/2005 | $ 0.0 |
| 2005/2006 | $ 16.3 |
| 2006/2007 | $ 101.0 |
| 2007/2008 | $ 121.1 |

**Table 2**
**Amount of City Contributions**

| Fiscal Year | Amount of Contribution (In Millions) |
|---|---|
| 1987/1988 | $ 64.2 |
| 1988/1989 | $ 53.5 |
| 1989/1990 | $ 54.5 |
| 1990/1991 | $ 52.1 |
| 1991/1992 | $ 54.2 |
| 1992/1993 | $ 33.5 |
| 1993/1994 | $ 35.8 |
| 1994/1995 | $ 36.6 |
| 1995/1996 | $ 42.5 |
| 1996/1997 | $ 54.7 |

Table 2 (continued)
Amount of City Contributions

| Fiscal Year | Amount of Contribution (in Millions) |
|---|---|
| 1997/1998 | $ 52.7 |
| 1998/1999 | $ 55.7 |
| 1999/2000 | $ 66.7 |
| 2000/2001 | $ 68.1 |
| 2001/2002 | $ 67.8 |
| 2002/2003 | $ 72.9 |
| 2003/2004 | $ 95.9 |
| 2004/2005 | $ 41.7 |
| 2005/2006 | $ 58.2 |
| 2006/2007 | $ 41.4 |
| 2007/2008 | $ 43.5 |

The investment return rates which I used (listed in Table 3) were gotten from three different sources, as follows:

1. Fiscal years 1987/1988 through 1993/1994 from the actuarial assumed rates in the annual actuarial valuations[2]
2. Fiscal years 1994/1995 through 1997/1998 from the July 13, 2010 report of Edward G. Rago
3. Fiscal years 1998/1999 through 2007/2008 from the calculated rates in the annual actuarial valuations[3]

Table 3
Annual Investment Return on the DGRS
Retirement Fund

| Fiscal Year | Investment Return |
|---|---|
| 1987/1988 | 6.00% |
| 1988/1989 | 6.00% |
| 1989/1990 | 6.00% |
| 1990/1991 | 6.00% |
| 1991/1992 | 7.50% |
| 1992/1993 | 7.50% |
| 1993/1994 | 7.50% |
| 1994/1995 | 8.86% |

[2] Annual actuarial valuations did not show rates of investment return for fiscal years 1987/1988 through 1997/1998

[3] Rates in the annual actuarial valuations differed from those shown in Mr. Rago's report

| | |
|---|---|
| 1995/1996 | 5.81% |
| 1996/1997 | 11.44% |
| 1997/1998 | 12.51% |
| 1998/1999 | 9.20% |
| 1999/2000 | 9.20% |
| 2000/2001 | -4.50% |
| 2001/2002 | -6.10% |
| 2002/2003 | 3.40% |
| 2003/2004 | 14.80% |
| 2004/2005 | 9.80% |
| 2005/2006 | 11.60% |
| 2006/2007 | 18.10% |
| 2007/2008 | -5.80% |

## The Actuarially Redetermined Contributions

The contributions made by the City prior to July 1, 1987 were determined using asset amounts exclusive of the distribution of any excess earnings. Beginning with the City contribution for 1987/1988[4], the City actuarially redetermined contributions were determined using assets increased by the hypothetical inclusion of distributed excess earnings. The actual City contributions were greater than would have been required using the hypothetically increased assets.

The actuarially determined contributions, as reported by the DGRS actuary in each fiscal year, were calculated through the following procedure:

1. Calculate the normal cost, which is the cost associated with the current fiscal year of additional service covered by DGRS.

2. Calculate the actuarial accrued liability (AAL), which is the present value of costs associated with all prior fiscal years of service covered by DGRS.

3. Obtain the value of plan assets.

4. Determine the unfunded actuarial accrued liability (UAAL), which is line 2 decreased by line 3.

5. Amortize the UAAL from line 4.

---

[4] June 30, 1988 actuarial valuation.

6. The contribution is the sum of the normal cost (line 1) and the amortization of the UAAL (line 5).

The process used to determine the overage for fiscal years after June 30, 1987 is different from the process above. If the distributed excess earnings had instead been included in the actuarial value of assets, the actuarially redetermined contribution amounts, beginning with the 1987/1988 fiscal year, would have been smaller after June 30, 1987. The inclusion of the distributed excess earnings, combined with the smaller City contributions, would have increased the fund value used in the actuarial reports beginning with the June 30, 1986 report. Therefore, I had to take into account the increase in the fund value in the determination of contribution rates applied to fiscal years beginning on or after July 1, 1987.

Beginning with the June 30, 1986 actuarial valuation, the normal cost from line 1 above and the AAL from line 2 above would have been unchanged, because there was no change in actuarial assumptions. However, the actuarial value of assets would have been higher These higher amounts would first increase contributions in the 1987/1988 fiscal year, since contribution rates are determined two fiscal years in advance. Therefore, I had to take into account the increase in the contribution rate in the determination of contribution rates applied to fiscal years beginning on or after July 1, 1987.

For June 30, 1986 and later valuations, I replaced the reported assets in the above equation (item 3) with the sum of (1) the reported assets and (2) the increase in fund value which would have resulted if the distributed excess earnings had been allocated instead for contractual DGRS benefits. The increased fund is the accumulated shortfall in assets, with investment return. I assumed that the full investment return would be included in the actuarial value of assets. In fact, the assets were valued at cost in the early years of this study and after that the investment gains and losses were smoothed over a period of years and added to the prior year's actuarial value of assets. My approach generally results in a slightly lower redetermined contribution amount than would have actually occurred.

The 1986/1987 contribution was based on the June 30, 1985 actuarial valuation and, therefore, it would not have been affected by the 1985 distribution of excess earnings. The 1987/1988 contribution was based on the June 30, 1986 actuarial valuation. Since the June 30, 1986 actuarial valuation would have included the 1985 distribution of excess earnings, it, and all subsequent actuarial valuations, would have produced lower City contributions.

In redetermining the contribution rates for the June 30, 1986 and later actuarial valuations, I replaced the reported assets in the above equation (item 3) with sum of (a) the reported assets and (b) the increase in the fund value which would have resulted if the City had contributed the actuarially redetermined contribution. The increased fund is the accumulated shortfall in assets, with investment return.

The accumulated shortfall, with investment return, at the end of each fiscal year beginning with June 30, 1986 was determined using the following method:

1. Obtain the shortfall at the beginning of the fiscal year.

2. Calculate the additional shortfall in the City contribution during the fiscal year.

3. Determine the additional investment return that would have been earned by the increased fund during the fiscal year.

4. The shortfall at the end of the fiscal year is then the sum of the three amounts.

The investment return was composed of two parts. The first part was the investment return on the shortfall at the beginning of the fiscal year. This is the investment return during the fiscal year as shown in Table 3 times the fund at the beginning of the fiscal year. The second part was the investment return on the lower contributions. For this, I assumed that the lower contributions would have been made in equal monthly installments throughout the fiscal year.

Table 4 shows the overage in contributions for each fiscal year and the accumulation of the overage, using the earnings rates from Table 3, through June 30, 2008.

### Table 4
### Determination of Lower City Contributions
### If the Distributed Excess Earnings Had Been Allocated to DGRS Contractual Benefits
### (Amounts in Millions)[5]

| Fiscal Year | Actual Contributions | Contributions that Should have been made | Excess Contributions | Accumulated Excess Contributions |
|---|---|---|---|---|
| 1987/1988 | $ 64.2 | $ 62.1 | $ 2.1 | $ 2.1 |
| 1988/1989 | $ 53.5 | $ 48.5 | $ 5.0 | $ 7.2 |
| 1989/1990 | $ 54.5 | $ 45.4 | $ 9.0 | $ 16.6 |
| 1990/1991 | $ 52.1 | $ 37.7 | $ 14.5 | $ 32.1 |
| 1991/1992 | $ 54.2 | $ 36.6 | $ 17.7 | $ 52.2 |
| 1992/1993 | $ 33.5 | $ 19.9 | $ 13.6 | $ 69.7 |
| 1993/1994 | $ 35.8 | $ 21.9 | $ 13.9 | $ 88.8 |
| 1994/1995 | $ 36.6 | $ 21.3 | $ 15.2 | $ 111.9 |
| 1995/1996 | $ 42.5 | $ 21.8 | $ 20.7 | $ 139.0 |
| 1996/1997 | $ 54.7 | $ 27.3 | $ 27.4 | $ 182.3 |
| 1997/1998 | $ 52.7 | $ 27.2 | $ 25.5 | $ 230.6 |
| 1998/1999 | $ 55.7 | $ 20.1 | $ 35.6 | $ 287.5 |
| 1999/2000 | $ 66.7 | $ 20.0 | $ 46.7 | $ 360.6 |

---

[5] Numbers may not add due to rounding.

| Fiscal Year | Actual Contributions | Contributions that Should have been made | Excess Contributions | Accumulated Excess Contributions |
|---|---|---|---|---|
| 2000/2001 | $ 68.1 | $ 0.0 | $ 68.1 | $ 412.5 |
| 2001/2002 | $ 67.8 | $ 0.0 | $ 67.8 | $ 455.1 |
| 2002/2003 | $ 72.9 | $ 5.5 | $ 67.4 | $ 538.0 |
| 2003/2004 | $ 95.9 | $ 36.2 | $ 59.7 | $ 677.3 |
| 2004/2005 | $ 41.7 | $ 22.8 | $ 18.9 | $ 762.6 |
| 2005/2006 | $ 58.2 | $ 38.5 | $ 19.6 | $ 870.7 |
| 2006/2007 | $ 41.4 | $ 9.4 | $ 32.0 | $ 1,060.3 |
| 2008/2008 | $ 43.5 | $ 0.0 | $ 43.5 | $ 1,042.3 |
| Total | $ 1,146.1 | $ 522.2 | $ 623.9 | $ 1,042.3 |

Table 5 shows the increase in assets if the distributed excess earnings had been allocated to DGRS contractual benefits, using earnings rates from Table 3, through June 30, 2008. In fiscal year 1989/1990, for instance, the amount that should have been contributed was $46.8 million compared to the $56.1 million actually contributed. Thus there was a preliminary annual decrease in assets of $9.3 million. Then, $35.7 million was added to that, since distributed excess earnings were assumed to be allocated to contractual DGRS benefits. Therefore, the total annual increase in assets was $26.4 million. The accumulated increase in assets through June 30, 1989 was $156.6 million and the accumulated increase in assets as of June 30, 1990 was $192.4 million.

Table 5
Determination of Increase in Assets
If the Distributed Excess Earnings Had Been Allocated to DGRS Contractual Benefits
(Amounts in Millions)[6]

| Fiscal Year | Value of Distributed Excess Earnings at the End of the Fiscal Year | Value of Amount That Should Have Been Contributed at the End of the Fiscal Year | Value of Amount That Was Contributed at the End of the Fiscal Year | Annual Increase in Assets | Accumulated Increase In Assets |
|---|---|---|---|---|---|
| 1985/1986 | $ 20.0 | $ 66.0 | $ 66.0 | $ 20.0 | $ 20.0 |
| 1986/1987 | $ 37.4 | $ 65.7 | $ 65.7 | $ 37.4 | $ 58.6 |
| 1987/1988 | $ 42.5 | $ 64.0 | $ 66.1 | $ 40.4 | $ 102.5 |
| 1988/1989 | $ 53.0 | $ 50.0 | $ 55.1 | $ 47.9 | $ 156.6 |
| 1989/1990 | $ 35.7 | $ 46.8 | $ 56.1 | $ 26.4 | $ 192.4 |
| 1990/1991 | $ 35.4 | $ 38.8 | $ 53.7 | $ 20.5 | $ 224.5 |
| 1991/1992 | $ 3.0 | $ 37.9 | $ 56.2 | $ -15.3 | $ 226.0 |
| 1992/1993 | $ 34.8 | $ 20.6 | $ 34.8 | $ 20.6 | $ 263.6 |
| 1993/1994 | $ 21.3 | $ 22.7 | $ 37.1 | $ 6.9 | $ 290.2 |
| 1994/1995 | $ 12.1 | $ 22.3 | $ 38.2 | $ -3.8 | $ 312.1 |
| 1995/1996 | $ 0.0 | $ 22.4 | $ 43.7 | $ -21.3 | $ 309.0 |
| 1996/1997 | $ 60.6 | $ 28.9 | $ 57.8 | $ 31.6 | $ 376.0 |
| 1997/1998 | $ 107.6 | $ 28.9 | $ 56.0 | $ 80.5 | $ 503.6 |
| 1998/1999 | $ 125.9 | $ 21.0 | $ 58.2 | $ 88.7 | $ 638.6 |
| 1999/2000 | $ 96.3 | $ 20.9 | $ 69.7 | $ 47.5 | $ 744.8 |
| 2000/2001 | $ 54.3 | $ 0.0 | $ 66.6 | $ -12.3 | $ 699.1 |
| 2001/2002 | $ 0.0 | $ 0.0 | $ 65.7 | $ -65.7 | $ 590.7 |
| 2002/2003 | $ 0.0 | $ 5.6 | $ 74.1 | $ -68.5 | $ 542.2 |
| 2003/2004 | $ 0.0 | $ 38.9 | $ 103.0 | $ -64.1 | $ 558.4 |
| 2004/2005 | $ 0.0 | $ 23.9 | $ 43.7 | $ -19.8 | $ 593.3 |
| 2005/2006 | $ 17.2 | $ 40.8 | $ 61.5 | $ -3.5 | $ 658.6 |
| 2006/2007 | $ 110.1 | $ 10.3 | $ 45.2 | $ 75.2 | $ 853.0 |
| 2008/2008 | $ 117.6 | $ 0.0 | $ 42.3 | $ 75.3 | $ 878.9 |
| Total | $ 985.1 | $ 740.4 | $1,380.7 | $ 344.7 | $ 878.9 |

---

[6] Numbers may not add due to rounding.

Table 5 summarizes the sources of the contribution overage. Item (1) is the sum of the contributions that should have been made, which is objective B stated at the beginning of my report. Item (2) is the contributions which were made, which is objective A. Item (3) is the total overage which is objective C. Item (4) is the total investment return that would have been earned on the shortfall. Item (5) is the total accumulated shortfall including the investment return, which is objective D.

### Table 5
### Source of Contribution Overage as of June 30, 2008
### (Amounts in Millions)[7]

|  | Amount |
|---|---|
| (1) Contributions that should have been | $ 522.2 |
| (2) Contributions that were made | $1,146.1 |
| (3)Overage [(2) minus (1)] | $ 623.9 |
| (4) Investment return on overage | $ 418.4 |
| (5) Total accumulated overage plus investment return [(3) plus (4)] | $1,042.3 |

Table 5 summarizes the sources of the asset shortfall.

### Table 6
### Source of Asset Shortfall as of June 30, 2008
### (Amounts in Millions)[8]

|  | Amount |
|---|---|
| (1) Value of contributions that should have | $ 740.4 |
| (2) Value of contributions that were made | $1,380.7 |
| (3) Value of distributed excess earnings | $ 985.1 |
| (4)Shortfall [(1) minus (2) plus (3)] | $ 344.7 |
| (5) Investment return on shortfall | $ 534.2 |
| (6) Total accumulated shortfall plus investment return [(4) plus (5)] | $ 878.9 |

The approximate accumulated cost to the City, due to excess earnings being distributed to DGRS members, rather than being applied to contractual DGRS benefits, is $1.9212 billion[9]

The work done in developing the above conclusions was performed directly by me. I have based this statement on information available to me as of March 8, 2011. I reserve the

---

[7] Numbers may not add due to rounding.

[8] Numbers may not add due to rounding.

[9] Sum of Table 5, Line (5) plus Table 6, Line (6)

right to revise and extend my report if and when additional information becomes available that would affect my opinion.

*Joseph Esuchanko*

Joseph Esuchanko, MAAA, ASA, MSPA, FCA, EA
March 8, 2011

**EXHIBIT B**

**Bloomberg**

# Detroit Union Seeks to Revive `13th' Pension Check Policy

By Steven Church - Sep 26, 2013

Detroit's bankruptcy judge should allow a state employment panel to reinstate a pension program that gave an extra check to retirees every year using excess earnings, a city union said in court papers.

Before it ended in 2011, the policy of issuing a "13th" check and related payments cost the city $1.92 billion from 1985 to 2008, according to a report commissioned by the city. Before the Michigan Employment Relations Commission could consider restoring the checks, the city filed for bankruptcy, putting the issue on hold, according to court records filed Sept. 24 in U.S. Bankruptcy Court in Detroit.

The city allowed the pension board to give out an extra check almost every year for so long that the payment became a right that couldn't be revoked unilaterally, according to a ruling by Doyle O'Connor, an administrative law judge with the commission.

"A practice that continues for three decades is a tacit agreement," O'Connor said in an oral ruling in February. The city should have negotiated the change with the union as part of a new employment contract.

Detroit has said its biggest unsecured debt is an unfunded pension liability of $3.5 billion. The city also owes about $1.4 billion on bonds it issued to bolster city employee pension systems.

## Automatic Stay

In its motion, the American Federation of State County and Municipal Employees asked U.S. Bankruptcy Judge Steven Rhodes to lift the so-called automatic stay, which prevents lawsuits against the city while it is in bankruptcy. Because of the stay, O'Connor hasn't issued a written recommendation that the commission can use to force the city to restore the power of the pension board to issue the extra checks, the union said in its filing.

Resuming the 13th-check policy "would bring back a practice that would really damage the funds," Bill Nowling, a spokesman for Detroit Emergency Manager Kevyn Orr, said in a telephone interview today.

Sharon Levine, an attorney for the union, didn't immediately return e-mails requesting comment on the filing.

The case is City of Detroit, 13-bk-53846, U.S. Bankruptcy Court, Eastern District of Michigan (Detroit).

To contact the reporters on this story: Steven Church in U.S. Bankruptcy Court in Detroit at schurch3@bloomberg.net

To contact the editor responsible for this story: Andrew Dunn at adunn8@bloomberg.net

®2013 BLOOMBERG L.P. ALL RIGHTS RESERVED.

**EXHIBIT C**

# City of Detroit

## OFFICE OF THE AUDITOR GENERAL
## OFFICE OF THE INSPECTOR GENERAL



## Emergency Manager Order No. 8
## Initial 60 Day Report

## July 2011 – March 2013



# CITY OF DETROIT



Mark W. Lockridge, CPA
Auditor General

James W. Heath, Esq.
Inspector General

## MEMORANDUM

**DATE:**    August 20, 2013

**TO:**    Kevyn D. Orr, Emergency Manager

**FROM:**    Mark Lockridge, Auditor General, CPA, CIA, CGAP
James Heath, Esq., Inspector General

**RE:**    Emergency Manager Order No. 8 Initial 60 Day Report

**CC:**    Mayor Dave Bing
Honorable City Council

Attached for your review is the Initial 60 Day Report in accordance with the Emergency Manager Order No. 8 issued on June 20, 2013, to conduct a joint investigation into possible waste, abuse, fraud, and corruption associated with the City's employee benefit programs.

The initial scope of this investigation includes:

- The Detroit General Retirement System
- The Detroit Police & Fire Retirement System
- Health Care Benefits
- Unemployment Benefits

Pursuant to Section 141.1550, Section 10 (1):

> An emergency manager shall issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary to accomplish the purposes of this act...to enable the orderly accomplishment of the financial and operating plan. Local elected and appointed officials and employees, agents, and contractors of the local government shall take and direct those actions that are necessary and advisable to maintain compliance with the financial and operating plan.

Copies of the Office of the Auditor General reports can be found on our website at http://www.detroitmi.gov/CityCouncil/LegislativeAgencies/AuditorGeneral/tabid/2517/Default.aspx and Copies of the Office of the Inspector General reports can be found on our website at http://www.detroitmi.gov/DepartmentsandAgencies/OfficeofInspectorGeneral.aspx.

Mark W. Lockridge, CPA
Auditor General

James W. Heath, Esq.
Inspector General

Office of the Auditor General
2 Woodward Avenue, Suite 208
Detroit, MI 48226
(313) 224-3101

Office of the Inspector General
65 Cadillac Square, Suite 3210
Detroit, MI 48226
(313) 628-2517

**Emergency Manager Order No. 8**
**Initial 60 Day Report**
**July 2011 – March 2013**

**Table of Contents**

|  | Page |
|---|---|
| EXECUTIVE SUMMARY | 1 |
| BACKGROUND | 3 |
| PENSIONS | 5 |
| HEALTH CARE | 13 |
| UNEMPLOYMENT COMPENSATION | 28 |
| SUPPLEMENTAL INFORMATION | |
| Emergency Manager Order No. 8 | 32 |
| Health Care Process Flowchart | 35 |

# EXECUTIVE SUMMARY

Pursuant to Emergency Manager Order No. 8 (EMO8), the Auditor General (AG) and the Inspector General (IG) conducted a joint investigation into the City's pension and health care benefits offered to employees and retirees. The scope of this investigation was an independent review of the City's administration of employee benefits during the period of July 1, 2011 through March 31, 2013.

The initial phase of investigation involved reading relevant prior audit and consultants reports; reviewing the City Charter, Municipal Manual, DRMS reports, organization charts, policies, procedures, ordinances, and Finance Directives; gathering policies and procedures of core operations and other similar data; interviewing department personnel regarding the department's transactions, controls, functions, records, and personnel; and documenting and testing processes.

The following overall objectives were set for the initial investigation:

- Review the effectiveness and efficiency of the administration of the Pension and Benefit programs' operations and their compliance with policies, plans, procedures, laws and regulations regarding financial transactions;

- Assess control procedures for the administration of the benefit programs and to determine if any control weaknesses exist;

- Determine if unemployment benefits were only paid to eligible individuals and to assess if control procedures are in place to detect ineligible or fraudulent claims;

- Review program performance in delivery of services to meet the programs' stated goals and objectives.

**Pensions Investments**
Pension investments occur in five major categories - real estate, mortgages, bond, stocks, or other special investment accounts of a life insurance company. Our initial investigation focused on real estate investments since this is an area where individuals allegedly involved in fraudulent activity are currently being investigated by external authorities. Our investigation revealed that in the periods prior to the scope of this investigation, both the General Retirement and Police and Fire Retirement pension systems were heavily invested in real estate. However, the officers of both pension systems have taken measures to align the investment portfolios with asset allocations recommended by consultants and approved by the Board of Trustees' in January 2013. The recommendations will guide the pensions systems into compliance with Public Act 314 of 1965, which governs the allowable composition of government investment portfolios. During the next 60 days, we intend to look at the total composition of the individual pension systems investment portfolios.

**Pensions Disbursements**
During this initial investigation, we uncovered several inconsistencies in the General Retirement System (GRS), such as questionable interest rates applied to annuities, the probability of bonuses being included in annuity account holders balances and ultimately included in their refund/disbursement, and overtime pay included in their

average final compensation calculation. While City's Charter does not prohibit these items, we question the wisdom of these policies along with the fiduciary responsibility of the Pension Board of Trustees. We feel that further scrutiny of the annuity disbursements calculations and the inputs used to calculate the average final compensation of monthly pensions is warranted. Also, in the next phase of this investigation, we intend to perform similar analysis on the Police and Fire Pension System.

**Health Care Benefit Administration**
Our review of the City's administration of employee benefits for health care underscores published reports, in that the process is poorly documented, highly transactional and extremely labor intensive. Albeit, and even with these process inefficiencies, our limited testing did not find any errors in employee deductions for health care contributions. We did find several areas of concern and internal control weaknesses with respect to the review and reconciliation of the billings from our major medical service provider. During the next phase of our investigation we intend to conduct tests of billings and payments to all health care providers, and continue documenting the processes.

**Transition of Payroll and Benefit Administration to a Managed Care Provider**
In November 2012, the City entered into a five year contract with a third-party to assume the payroll and benefit administration functions. We have several concerns with the proposed transition because the final product does not address or eliminate the underlying structural inefficiencies built into our current human resource operations. We found an absence of a total cost/benefit analysis, a lack of adequate process flows, no documentation which focused on internal controls, and a high probability that the project as currently planned may not provide the financial cost-savings as projected. We recommend a new assessment of the project, including a complete cost/benefit analysis.

**Unemployment Compensation**
Our initial investigation into the City's unemployment compensation claims revealed that of the 1,484 claims processed during our review period, 13% (or 192) of the claims are likely fraudulent, and another 36% (or 536) of the claims are highly questionable and need additional investigation to determine if the recipients were eligible for compensation. We intend to conduct a forensic investigation into these claims, and document internal and external controls for unemployment claims processing that are both preventative and detective in nature.

Additionally, there are personal service contractors who are receiving unemployment compensation. There is potential additional exposure to the City if contractors are subsequently deemed as employees by the Internal Revenue Service. The general rule is you are not an independent contractor if you perform services that can be controlled by an employer (what will be done and how it will be done) and this applies even if you are given freedom of action.

# BACKGROUND

On June 20, 2013, and pursuant to Michigan's Public Act 436 of 2012, Kevyn D. Orr, the Emergency Manger (EM) of the City of Detroit, issued Emergency Manager Order No. 8. The order reads in part:

> In accordance with powers granted to the Inspector General (IG) and the Auditor General (AG) by the City Charter, the IG and the AG shall jointly conduct an investigation into any possible waste, abuse, fraud, or corruption, including, but not limited to, administrative misfeasance or other impropriety with respect to the administration, operation, or implementation of Benefit Programs.

> The IG and the AG shall prepare and deliver a preliminary written report to the EM within 60 days of the date of this Order (the "60 Day Report") regarding the preliminary findings of the investigation and making recommendations regarding next steps, and any corrective, prospective, legal, additional investigatory or other action designed to address any waste, abuse, fraud, or corruption uncovered.

> The IG and AG shall update and revise the 60 Day Report by providing additional written reports to the EM as necessary but no later than every 60 days after the issuance of the initial 60 Day Report, and such other reports as may be necessary from time to time.

> *See pages 32 through 34 of this report for the full Emergency Manager Order No. 8.*

## Employment Benefits

The City of Detroit offers a competitive and comprehensive employee benefit package including medical, dental, vision, life insurance, long-term disability insurance, vacation, sick leave, other leave policies, and retirement benefits. The City's benefits are administered by the:

- **Finance Department Retirement (Pension) Division**
  The Retirement Division administers the Pension Systems for the City of Detroit. The Retirement Systems of the City of Detroit are comprised of two separate systems each governed by a Board of Trustees. The General Retirement System is for active and retired general City employees, and the Police and Fire Retirement System is for active and retired police officers and firefighters.

- **Human Resources**
  The Mission of the Human Resources Department is to provide services and implement programs that attract, hire, retain, and support a qualified and talented workforce committed to providing timely, high quality services to City of Detroit employees and its citizens, in an environment that contributes to the City's objectives.

The following tables provide an overview of employees receiving retirement and health care benefits:

## Number of Retirement Fund Participants

| Retirement System | No. of Members* |
|---|---|
| General Retirement System | 20,542 |
| Police and Fire Retirement System | 12,699 |

*Source: *General Retirement System and Police and Fire Retirement System Financial Statements, June 30, 2012*

## Number of Persons Receiving Health Care Benefits

| Employment Status | No. of Employee Health Care Contracts* |
|---|---|
| Active | 9,203 |
| Retired | 24,612 |

*Source: *City of Detroit Finance Department's roster of billings and payments to health care carriers at December 2012.*

# PENSIONS

**Background**

A General Retirement System (GRS) for the employees of the City of Detroit was established under the authority of the 1918 Detroit City Charter and is continued under City Ordinance Section 47-1-2 for the purpose of providing retirement and survivor benefits for eligible City employees and their beneficiaries. The effective date for the system was July 1, 1938. Section 47-1-3 created a Board of Trustees of the General Retirement System who is responsible for the general administration, management and responsibility for the proper operation of the System, and for making effective the provisions of Chapter 47 of the City Code.

The 1973 Defined Benefit/Defined Contribution Plan consists of a Defined Benefit Plan and a Defined Contribution (Annuity) Plan; participation with employee contributions to the annuity plan is optional.

The composition of the active employees to retired employees is depicted in the table below:

| Breakdown of Retirement Fund Participants | | |
|---|---|---|
| Description | General Retirement System | Police & Fire Retirement System |
| Active members | 6,519 | 3,181 |
| Members receiving benefits | 11,790 | 9,323 |
| Terminated plan members entitled to, but not yet receiving benefits | 2,233 | 195 |
| Total Members | 20,542 | 12,699 |

**Pension Payroll General Retirement System**

We selected ten retirees to test the accuracy of the calculations used for the Annual Pension Allowance (APA). The APA consists of the Average Final Compensation (AFC), the Unused Sick Leave (USL) allowance, and an additional multiplier based on years of service. The AFC is the average of the highest wages earned in any consecutive 36 month period within the last 120 months of active employment. Employees have the option of including 25% of the balance of their USL to their AFC. The USL amount is derived by multiplying the hourly rate at the time of retirement by 25% of the total sick bank balance. The total sick bank balance includes the total hours of both the "current" and "reserve" sick time bank at the time of retirement. The sick leave policy for active employees prior to the implementation of the City Employment Terms (CET) effective July 1, 2012, stipulates that twelve days (96 hours) are added to your "current" sick bank each year on July 1st, and an additional five days (40 hours) are added to your reserve sick bank on July 1st if the employee works a minimum of 1600 hours in the previous fiscal year.

The retirement allowance calculation consists of the following three (3) inputs:

- A basic pension of $12 per month for each full year of service, but not to exceed $120;

- A pension allowance equal to the sum of 1.6% times your first 10 years of service, plus 1.8% times each year of service greater than 10 years up to 20 years, plus 2.0% times each year of service greater than 20 years up to 25 years, plus 2.2% times each year of service over 25 years; multiplied by the AFC:

| Years of Service | Multiplier |
|---|---|
| 0 - 10 | 1.6% |
| 11 - 20 | 1.8% |
| 21 - 25 | 2.0% |
| 25 + | 2.2% |

- The annuity portion of the disbursement is calculated on the balance in the employee's account and the age of the employee upon retirement.

| Typical Straight Life Monthly Calculation Table | | | | | | | |
|---|---|---|---|---|---|---|---|
| Average Final Comp. | Years of Service | | | | | | |
| | 10 | 15 | 20 | 25 | 30 | 35 | 40 |
| $24,000.00 | $330.00 | $ 510.00 | $ 690.00 | $ 890.00 | $1,110.00 | $1,330.00 | $1,550.00 |
| 26,000.00 | 356.67 | 551.67 | 746.67 | 963.33 | 1,201.67 | 1,440.00 | 1,678.33 |
| 28,000.00 | 383.33 | 593.33 | 803.33 | 1,036.67 | 1,293.33 | 1,550.00 | 1,806.67 |
| 30,000.00 | 410.00 | 635.00 | 860.00 | 1,110.00 | 1,385.00 | 1,660.00 | 1,935.00 |
| 32,000.00 | 436.67 | 676.67 | 916.67 | 1,183.33 | 1,476.67 | 1,770.00 | 2,063.33 |
| 34,000.00 | 463.33 | 718.33 | 973.33 | 1,256.67 | 1,568.33 | 1,880.00 | 2,191.67 |
| 36,000.00 | 490.00 | 760.00 | 1,030.00 | 1,330.00 | 1,660.00 | 1,990.00 | 2,320.00 |
| 38,000.00 | 516.67 | 801.67 | 1,086.67 | 1,403.33 | 1,751.67 | 2,100.00 | 2,448.33 |
| 40,000.00 | 543.33 | 843.33 | 1,143.33 | 1,476.67 | 1,843.33 | 2,210.00 | 2,576.67 |
| 42,000.00 | 570.00 | 885.00 | 1,200.00 | 1,550.00 | 1,935.00 | 2,320.00 | 2,705.00 |
| 44,000.00 | 596.67 | 926.67 | 1,256.67 | 1,623.33 | 2,026.67 | 2,430.00 | 2,833.33 |
| 46,000.00 | 623.33 | 968.33 | 1,313.33 | 1,696.67 | 2,118.33 | 2,540.00 | 2,961.67 |
| 48,000.00 | 650.00 | 1,010.00 | 1,370.00 | 1,770.00 | 2,210.00 | 2,650.00 | 3,090.00 |
| 50,000.00 | 676.67 | 1,051.67 | 1,426.67 | 1,843.33 | 2,301.67 | 2,760.00 | 3,218.33 |
| 52,000.00 | 703.33 | 1,093.33 | 1,483.33 | 1,916.67 | 2,393.33 | 2,870.00 | 3,346.67 |
| 54,000.00 | 730.00 | 1,135.00 | 1,540.00 | 1,990.00 | 2,485.00 | 2,980.00 | 3,475.00 |
| 56,000.00 | 756.67 | 1,176.67 | 1,596.67 | 2,063.33 | 2,576.67 | 3,090.00 | 3,603.33 |
| 58,000.00 | 783.33 | 1,218.33 | 1,653.33 | 2,136.67 | 2,668.33 | 3,200.00 | 3,731.67 |
| 60,000.00 | 810.00 | 1,260.00 | 1,710.00 | 2,210.00 | 2,760.00 | 3,310.00 | $3,860.00 |

*Example: An employee who retirees at ten years of service and whose average final compensation amount is $24,000, will receive an annuity of $330.00 per month. The calculation of select monthly annuities is presented in the following table:*

| Example of Monthly Annuity Calculations: | | |
|---|---|---|
| AFC, Yrs of Service $000's | Monthly Allowance Amount | Calculations/Formula Break-out |
| $24k, 10yrs | $ 330.00 | = ((0.016*10*24000)+120)/12 |
| $50k, 15yrs | 1,051.67 | = (((0.016*10)+(0.018*5))*(50000)+120)/12 |
| $30k, 20yrs | 860.00 | = (((0.016*10)+(0.018*10))*(30000)+120)/12 |
| $60k, 25yrs | 2,210.00 | = ((((0.016*10)+(0.018*10)+(0.02*5))*(60000))+120)/12 |
| $48k, 30yrs | 2,210.00 | = ((((0.016*10)+(0.018*10)+(0.02*5)+(0.022*5))*(48000))+120)/12 |
| $36k, 35yrs | 1,990.00 | = ((((0.016*10)+(0.018*10)+(0.02*5)+(0.022*10))*(36000))+120)/12 |
| $58k, 40yrs | 3,731.67 | = ((((0.016*10)+(0.018*10)+(0.02*5)+(0.022*15))*(58000))+120)/12 |

We collected supporting documentation independent of the General Retirement System (GRS) to verify the accuracy of the information used by GRS to compute the AFC.

Through our testing we determined the following:

- The 36 consecutive month wage calculations for retirees tested were consistent with the records kept by the HR Payroll Division;

- The 25% Unused Sick Bank allowance allocation included in the AFC computation had some inconsistencies when conducting the comparative analysis:

  o There were variations in the sick bank hours included in the AFC calculation recorded by HR Payroll when compared to the data recorded by GRS;

  o When comparing the sick bank hours:

    ▪ GRS calculations were unclear;

    ▪ Source documentation lacked continuity;

    ▪ There was no direct interface between HR Payroll and the GRS system.

- The 36 consecutive month selection were all within the last 120 months of the retirees' active employment per policy guidelines;

- Additional documentation will be required from HR to determine if the years of service recorded by HR is consistent with the years of service included in the GRS AFC calculation. Since years of service input could not be validated, calculating the entire annual pension allowance for the sample set could not be done (Recommend performing this task in the next 60-days).

<u>Other Concerns – Pension Payroll</u>
- Human Resources have three (3) different systems used for payroll record keeping purposes: Payroll Personnel System (PPS), Oracle, and Workbrain. As a result, it was very difficult to obtain consistent bank time data from HR because employee data has been partially transitioned to different systems, or is maintained in multiple systems. We recommend further review to ascertain the accuracy of the unused sick bank data used to compute AFC in the test sample;

- For GRS, the AFC calculations included at least two calendar years of wages in the selected 36 consecutive months. When comparing the employee's W-2 earnings to the employee's actual annual salary, the W-2 data grossly exceeded the salary amount. This could be attributed to excessive overtime, perhaps a quantitative assessment will determine if savings could be realized if an employee's actual salary were used in the AFC calculations as opposed to the wages earned. We will expound on this theory in the next 60 days;

- There is a breakdown in communication between HR and the Pension Division which is evident by the lag time when completing the transition from active payroll to retirement payroll. This was acknowledged by Pension and Human Resource employees. We recommend that the retirement process be reevaluated to improve continuity for City employees.

**Annuity Refunds**
Based on our review of the GRS (only) annuity refunds, we plan to further investigate the policies that govern the annuity interest percentage and other credits. Analytics and sample testing are currently in progress. Based on our preliminary observations of the sample data we have found the following:

- Retirees received interest and credits which are in excess of the market rate earned by the retirement system in the following periods1984-1986, 1995-2000, and 2005-2007, which is equivalent to an effective rate of return of over 20% for each fiscal year:
  - GRS has yet to deliver a policy that outlines how Trustees determined interest rate and dividend credits each year;

- Irregularities have been seen amongst annuity participants where interest dividend credits were given disproportionately to annuitant's;

- Annuity participants who contributed similar amounts over the course of their employment have received excessively disproportionate annuity refund amounts.

We developed a formula that gives an effective interest rate for each year of employees in the sample set by dividing the interest earned by the beginning balance to test for continuity amongst the sample set. The test revealed the following discrepancies:

- There was no consistent or direct relationship with the change in the balance of the net assets or the investment income earned by the fund in the respective fiscal year;

- The effective interest earned method revealed some discrepancies, however further analysis will need to be conducted to determine if there is actual partiality being given when allocating interest and dividend credits to annuitants.

In addition, upon review of the ledger detail of the sample set, we found that the beginning balance in fiscal year 2006 exceeded the ending balance of fiscal year 2005 by 13% in all cases.

Other Concerns and Recommendations
During the initial phase of this investigation, we had limited time to assess the root cause of the anomalies found thus far in our sample data set for GRS annuity disbursements. Therefore, in the next 60 days, we plan a focused review of the multiple dynamics used to offer interest and dividend credits to annuity account holders. We also will perform similar analysis of the PFRS annuity disbursements.

In addition to our concerns for GRS Pension Payroll and Annuity Refunds we also recommend reviewing the following areas for the GRS:

- Cash Receipts;
- Revenue generated from investments;
- Other expenses;
- Related policies and procedures.

**Asset Allocation**
Public Act 314 of 1965 states the pension boards "may invest in annuity investment contracts or participations in separate real estate, mortgage, bond, stock or other special investment accounts of a life insurance company authorized to do business in the states." Furthermore, it outlines limitations related to the percentages of assets that can be invested in each of the categories. The Boards establish asset allocations to distribute the property between the categories in compliance with these limitations. The Board has not made any investments in separate real estate (i.e., direct investment outside of a pooled investment) over the last five years. The Investment Officer for the Pension Systems indicated that he has suggested to both Boards that no further investments in separate real estate occur in part because both systems have exceeded their asset allocation in this category.

**Real Estate Investments**
Public Act 314 of 1965 states that the systems can invest, "10% of a system's assets in publicly or privately issued real estate investment trusts or in real or personal property otherwise qualified." The act further states that "an investment fiduciary of a system having assets of more than $100,000,000.00 may" enter into other forms of investment related to real estate that should also not exceed 10% of the systems' assets. The Detroit General Retirement System (GRS) and Detroit Police and Fire Retirement System (PFRS) boards have established asset allocation polices in compliance with the state limitations in the public act. However, based on our review of 2010-11 and 2011-12 real estate asset allocations for each system, neither of the systems was in

compliance with the their self-imposed asset allocation limitations as follows:

**Real Estate (Public or Private) Investment Percentages**

| Retirement System | Policy Target | 2010-11 Allocation | 2010-11 Difference | 2011-12 Allocation | 2011-12 Difference |
|---|---|---|---|---|---|
| GRS | 10.00% | 12.22% | 2.22% | 13.99% | 3.99% |
| PFRS | 7.00% (2011) 8.00% (2012) | 14.33% | 7.33% | 12.60% | 4.60% |

*Source: Summary of Asset Allocation Reports GRS & PFRS August 31, 2011 & June 30, 2012*

As indicated above, the GRS and PFRS system policy target percentages were in compliance with State of Michigan limitations. However, the actual percentages of assets allocated to real estate by the systems exceed the targets set by the retirement systems. The financial statements of each system include the statement that, the boards "has established asset allocation policies which are expected to deliver more than enough investment income over a very long period of time to satisfy the obligations to pay the benefits promised to the members of the Plan." As of June 30, 2010 the GRS Annual Report documented a $73,388,448 Net Realized/Unrealized Loss related to equity – real/personal. The PFRS Annual report for the same period documented a $52,172,675 Net Realized Loss related to Equity Real Estate and a $19,223,213 loss related to Equity – Real Estate Investment Trusts (REITs) & Pooled.

REITs are organizations that invest funds of multiple systems for shares of interest in real estate investments. Act 314 indicates real estate investments can be invested through REITs and therefore categorized outside of the 10% limitation. Furthermore, the act includes a section that would include "other" investments not specifically mentioned in the act. This category can include real estate investments as well. The Investment Officer for both systems stated direct real estate investments of the systems have been transferred and are now managed by REITs. Accordingly, the systems have taken advantage of the opportunity to reclassify investments in real estate in compliance with the statute to ensure asset allocations do not exceed state limitations.
The Investment Officer also stated that, due to market fluctuations in recent years, the valuations of other investment categories decreased. This reduced the percentage of investment in other asset categories and increasing the investment in real estate (i.e., equity- real/personal).

## Changes in General Retirement System Asset Value Percentages



As indicated in the graph above, the valuation of equity in real and personal property increased sharply in 2008, as did the valuations of debt obligations and mortgages. Meanwhile, the valuation of common and preferred stock and foreign securities sharply decreased. However, in addition to the percentage of change based on the makeup of the fund, the system entered into additional real estate investment during the 2008 fiscal year, after which no additional investments have been made. As of 2008, the percentage of investment in real estate has exceeded the systems' asset allocation provision. Other retirement systems, with similar participant levels, have the following real estate target levels and allocations for the 2012 fiscal year.

### Asset Allocations of Retirement Systems with Similar Participant Levels

| Retirement System | Participants | Real Estate Allocation | Long Term Target Allocation |
|---|---|---|---|
| Policemen's Annuity and Benefit Fund, Chicago, IL | 25,523 | 4% | 5% |
| Houston Municipal Employee Pension System | 27,675 | 9.1% | 12% |
| Los Angeles City Employee's Retirement System | 42,646 | 6.1% | 5% |
| Employee Retirement System of the City of Milwaukee | 26,854 | 8.5 | 7.0% |

Based on our research regarding other systems with similar participant levels, most other systems, have lower target levels ranging from 3% to 5% below that of the GRS and 1% to 3% below that of the PFRS. Furthermore, all have lower actual real estate allocation percentage levels ranging from 4.89% to 9.99% lower than the GRS and3.5% to 8.6% lower than the PFRS. In regards to other pension systems within the State of Michigan, the largest systems had the following allocation rates for the 2011 fiscal year:

**Asset Allocations of Other Michigan Retirement Systems**

| System | Participants | Real Estate Allocation | Long Term Target Allocation |
|---|---|---|---|
| Michigan Employee Retirement System | 90,670 | 6.2% | 7% |
| State Employee Retirement System | 81,392 | 10.8% | 9% |

In addition, even though other retirement systems within the state of Michigan have larger participation levels than GRS and PFRS, their real estate allocation targets are 1% to 3% lower. The actual real estate allocations for the other Michigan systems are also 3.53% to 6.0% lower than those of GRS and PFRS. This suggests an industry standard of a conservative investment level in real estate.

The current Investment Advisor for the systems has indicated that he has suggested to the boards that the asset investments, related to real estate, be reduced to meet the systems' established target amounts and the related allocations should be adjusted (i.e., lowered) to better diversify the investments of the funds. He also indicated the systems have recently initiated steps to liquidate real estate investments. The Boards of each system should continue to take whatever steps necessary and prudent to bring the real estate investments within their self-imposed targeted amounts. Additionally, the systems should ensure that; their investment policies outline the criteria for determining the categories in which real estate investment are presented in the financial statements, future transactions related to direct investments in real estate and all other asset categories are in compliance with Public Act 314 and the asset allocation targets.

## HEALTH CARE

The City of Detroit offers a competitive and comprehensive employee benefit package which includes medical, dental, and vision health care benefits.

The Human Resources Department (HR) is responsible overall for the administration of employee health benefits. Its mission is to provide services and implement programs that attract, hire, retain, and support a qualified and talented workforce committed to providing timely, high quality services to City of Detroit employees and its citizens, in an environment that contributes to the City's objectives. The following divisions of HR administer health and other employee related benefits which are the:

- Central Services is responsible for centralized functions including Unemployment, Test Development and Administration, and Classification and Compensation;

- Employee Services (which includes Payroll) supports the management staff and employees of all City departments by providing consulting services which include employee relations, recruitment and selection, and employee certification. It is also responsible for processing employee payroll and facilitating human resources employee transactions;

- Labor Relations is primarily responsible for negotiating collective bargaining agreements and additional supplemental agreements in accordance with the City Charter and State Law. In addition, it conducts Special Conferences, Umpire hearings, Panel hearings, Arbitration hearings, and Pre-Arbitration grievance appeals. Labor Relations communicates and records all economic activities related to City of Detroit employees such as salaries, uniform allowances, rate changes, benefit changes, etc.:

  - The Benefits Administration Office (BAO) is a subdivision of Labor Relations and is responsible for administering, medical, dental, and optical, as well as supplemental life insurance benefits. According to benchmark studies, the office is grossly understaffed, and currently there are eight full time equivalents (FTE's) to handle the benefits of all the active and retired employees.



48 Bargaining Units    11 Carriers    58 Program Options    15 Systems

Over 10,000 Medical Payroll Deduction Codes
40,000 Total Employee Payroll Deduction Codes
Average of 56,000 Transactions Per Month

Two divisions of the Finance Department are involved with employee health care related benefits:

- Accounts Division - Accounting Section handles cash management, coordinates the preparation of the Comprehensive Annual Financial Report, and manages accounting information and grant programs;

- Retirement (Pension) Division administers the pension systems for the City of Detroit.

Also, within the Detroit Police Department, there are fifty or more police officers performing a timekeeping role and another twenty employees performing time capture and payroll processing roles.

The Retirement Systems for the City of Detroit (RSCD) is a separate organization and it performs the major activity of administering the General Retirement System (GRS) and the Police and Fire Retirement System (PFRS). The department is governed by two separate Boards of Trustees who oversee its operations and has its own accounting, payroll, and other benefit related activities.

**Health Care Benefit Administration Major Processes**
The City's Health Care Benefit Administration process is largely undocumented, extremely labor intensive, run on antiquated systems, and largely populated by manual processes. Based on interviews with representatives from HR, BAO, Pensions, and Finance, we compiled a flowchart depicting the process from the employee's initial selection of health care benefits to qualifying events such as layoff, termination, retirement or death (*See the Health Care Process Flowcharts on pages 35 and 36 of this report.*) Our review of the process underscores previous operational assessments performed by various consultants, and highlights areas of concern and internal control weaknesses. Listed below are the major processes with highlighted areas of concern. In addition, we have noted where additional testing or review should occur in the next phase of this investigation:

# Health Care Administrative Processes

| Department/Division | Process | Comments and Concerns |
|---|---|---|
| | | 🟨 Area of Concern |
| | | 🟦 Recommendation |
| Human Resources | Create city-wide employee and benefit deduction codes based on job codes, class codes, and bargaining units | • This process is driven by the number of benefit plans, options, and bargaining units resulting in a total of 40,000 deduction codes and over 10,000 medical codes |
| | | • 87.2% of medical plan participants are serviced by three carriers<br>• There are an additional five carriers who administer medical plans to only 12.8% of plan participants |
| | | • We recommend testing of the creation of deduction codes |
| Human Resources | Add employee to the employee database (PPS or Oracle/HRMS): job code, class code, and bargaining unit | • We recommend testing updates to the employee database |
| Benefits Administration Office | Add employee to carrier systems: medical, dental, vision, and "carved-out" pharmacy | • Requires at minimum, three updates per person for medical, dental, vision |
| | | • We recommend independent verification of plan participation on the carrier systems |
| Benefits Administration Office | Assign deduction codes in employee database (PPS or Oracle/HRMS) | • Requires at minimum, three updates per person for medical, dental, vision, and "carved-out" pharmacy |

| Department/Division | Process | Comments and Concerns<br>🟨 Area of Concern<br>🟦 Recommendation |
|---|---|---|
| Benefits Administration Office | Qualifying event necessitates updates to deduction codes in employee database (PPS or Oracle/HRMS) | • Requires two to six updates per person for medical, dental, vision, and "carved-out" pharmacy; Have to delete current codes then re-add new codes<br>• The laborious manual process is intensified due to the antiquated technology<br>• Changes are tracked on a manual excel spreadsheet and reconciled against PPS and HRMS reports<br>• The same clerk that updates the database also prepares the list of changes and the reconciliation |
| Benefits Administration Office | Supervisor Review Spreadsheet of Changes And Reconcile to PPS or HRMS | • The supervisor relies on internal knowledge of all health related deduction codes<br>• Handwritten reconciliation adjustments were not properly supported<br>• We recommend independent verification of changes to plan participation |
| Benefits Administration Office | Calculation of Monthly Payments for Premium Based Carriers | • Due to a lack of resources, payments to premium based carriers average 90 to 120 days in arrears<br>• We recommend verification of billings and payments |
| Benefits Administration Office | Reconciliation of Self-Insured Based Medical Plans Billings | • The BAO performs a limited review of the monthly billing from BC/BSM who service 64.7% of active and retired employees<br>• A separate detailed claims audits is performed by third party vendors every three years; the last audit was 2010 |

| Department/Division | Process | Comments and Concerns |
|---|---|---|
| | | 🟨 Area of Concern<br>🟦 Recommendation |
| | | • We recommend verification of billings and payments, and testing the accuracy of the BC/BSM billing (average billing is $17 to $18 million per month)<br>• We recommend the third party detailed claims audit as soon as possible |
| Benefits Administration Office | Other Policies Relating to Health Care Costs (Medicare Eligibility, Spin-off of Divisions) | • Policy requiring employees who turn age 65 and must enroll in Medicare Parts A and B, and Medicare becomes the primary insurer<br>• Limited policy on the process for tracking, determining, and paying or not paying legacy costs for units that we have spun off (DIA, Zoo, Historical Museum, Cobo Authority, Housing Authority, Fort Wayne, and the new PLA), specifically healthcare benefits, and pensions. |
| | | • A retiree must notify BAO when they reach age 65; also BAO receives notifications from other external sources when this qualifying event occurs<br>• The City may be incurring improper legacy health care costs for spin-off divisions/activities |
| | | • We recommend verification that any retiree eligible for Medicare is enrolled in the system and the City becomes their secondary insurer<br>• Investigate policies surrounding spin-off divisions as it relates to legacy health care costs |
| Finance | Wire transfer Payments to Carriers | • One FTE is primarily responsible processing all health care related costs |

| Department/Division | Process | Comments and Concerns<br>☐ Area of Concern<br>☐ Recommendation |
|---|---|---|
| | | • There are twenty wire transfers per month for payments |
| | | • We recommend verification of billings and payments |
| Pension | Process Retirement Application; Conduct Retirement Exit Interview; Calculate Pension | • Notification to BAO of retirements is a manual process; Retirement benefit selection forms are put into a tray for BAO to retrieve and process |
| | | • There is a 2-3 month delay in processing plan changes relating to retirement |
| | | • We recommend independent evaluation of the time lag between the change in status from active to retired; assess the impact to health care costs |

## Benefit Plan Carriers, Billings, and Payments

Medical service providers (carriers) can be classified into two types based on the City's method of calculating and paying for services:

- Self-Insured – Costs are "as incurred" and payments are based on actual costs less the employee contribution; the billing is calculated by the carrier;

- Premium Based – The payment is calculated by the City (BAO) based on the number of enrollees in the plan times a flat rate premium; it is paid regardless of employee usage or non-usage. In some cases, advance payments are made to a carrier to cover their up-front costs. The advance payment is reconciled to the actual amount after the BAO calculates the correct premium based costs, resulting in adjustments to next month's payment.

## Health Care Plan Options for Active Employees and Retirees 2012-2013

The City of Detroit's employee and retiree benefits plans are very complicated and stratified. The variety of plans offered, along with the numerous options available to each of the several bargaining units makes a comparable analysis difficult. Below you will find a summarization of the different types of plans, the different health care carriers (providers), and the range of costs for both active employees, retirees, and the City. Contribution rates listed in the tables below are the rate ranges for the period of December 2012; open enrollments that took place in the winter of 2013 may have changed both the employee and City rates.

Generally, there are three types of medical plans in the health care industry: **Health**

**Maintenance Organizations**, **Preferred Provider Options**, and **Traditional Medical Plans**.

Health Maintenance Organizations (HMO)
HMO plans manage and coordinate medical care. Plan participants select a primary care physician who provides the majority of medical services and coordinates other services, such as specialty care, hospital services, and diagnostic testing. The use of network providers is required. Because of this restriction, out-of-pocket expenses for covered benefits are usually lower than with other types of plans. It is important to note that employees and retirees who select an HMO plan must reside in the network services area of the HMO plan. If the employee or retiree moves outside of the service area, they are no longer eligible for the HMO plan and must switch to another plan. The following tables show the ranges of employee and employer contributions for various health care plans:

| Health Care Plan | Employee Contribution (Bi-weekly Range) | City Contribution (Bi-weekly Range) |
|---|---|---|
| Blue Care Network HMO | $40 - $125 | $199 - $501 |
| Health Alliance Plan HMO | $41 - $157 | $196 - $494 |
| Total Health Care HMO | $32 - $91 | $160 - $464 |

Preferred Provider Options (PPO)
PPO plans consist of a network of independent physicians, hospital and other health care providers who have agreed to accept a pre-approved amount as full payment for services provided to employees and members. Under this arrangement, out-of-pocket expenses are usually lower for covered benefits when network health care providers (rather than out of network providers) are used for services. Annual deductibles and co-pays are required for certain services.

| Health Care Plan | Employee Contribution (Bi-weekly Range) | City Contribution (Bi-weekly Range) |
|---|---|---|
| Community Blue PPO | $22 - $102 | $174 - $409 |
| U.S. Health – C.O.P. S. Trust PPO | $66 - $165 | $215 - $546 |

Traditional Medical Plans
Traditional plans allow members to receive services from virtually any health care provider nationwide. Because there are virtually no limitations placed on where and when services are received, and the providers are less restricted in the fees they

charge, out-of-pocket expenses and employee payroll contributions for medical coverage are higher under traditional plans.

| Health Care Plan | Employee Contribution (Bi-weekly Range) | City Contribution (Bi-weekly Range) |
| --- | --- | --- |
| Blue Cross Traditional | $76 - $396 | $210 - $500 |
| Blue Cross Comprehensive Major Medical | $62 - $145 | $225 - $546 |

The information provided in the preceding tables and paragraphs is a simplified overview of the City's very complicated employee health care benefits. Some plans are only available to one or a few bargaining units and different bargaining units have varying benefits options available to them, as well as different employee contribution amounts. The following table details active employee and retirees plan participation by medical, dental, and vision carrier:

## Overview of the Health Care Service Providers

The following tables document the variety of carriers and payment process and plan participation:

### Health Care Carriers

| Carrier | Type | Self-Insured | Premium Based | Advance Payment | Reconciled by Labor Relations |
|---------|------|--------------|---------------|-----------------|-------------------------------|
| Blue Cross Blue Shield (BC/BS) | Medical Pharmacy | X | | | N, pay as billed |
| HAP | Medical Pharmacy | | X | | Y |
| COPS Trust United Healthcare (Police only) | Medical Dental Vision | | X | X | Y |
| Total Health Care | Medical | | X | | Y |
| CVS Caremark | Pharmacy (only) | X | | | N pay as billed |
| Dentcap | Dental | | X | | Y |
| Golden Dental | Dental | | X | | Y |
| Co-op Optical (No longer offered) | Vision | | X | | Y |
| Heritage Optical | Vision | | X | | Y |
| US Alliance (Spectra) Available (Police only) | Vision | | X | X | Y |

## Active and Retired Employees Receiving Health Care Benefits
## As of December 2012

| Medical Carrier | BC/BSM Hospital | | US Health | BCN | HAP | THC | BC/BS Option E | BC/BS Community Blue Option F | BC/BS CMM Option G Comprehensive Major | TOTAL Excl Census Count | % of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| @ December 2012 | 12/2012 Schedule | Census 2011-12 | Per Medical Monthly Report | | | | | | | | |
| Active Police | 1,952 | 2,116 | 410 | 53 | 104 | 15 | - | - | - | 2,534 | 7.5% |
| Active Fire (Incl EMS) | 923 | 946 | 34 | 71 | 154 | 9 | - | - | - | 1,191 | 3.5% |
| Active Gen City (Incl DOT) | 3,191 | 2,844 | - | 599 | 1,306 | 382 | - | - | - | 5,478 | 16.2% |
| Subtotal Active | 6,066 | 5,906 | 444 | 723 | 1,564 | 406 | - | - | - | 9,203 | 27.2% |
| Retired Police | 7,167 | 5,057 | 99 | 49 | 118 | - | 295 | 2,064 | 724 | 10,516 | 31.1% |
| Retired Fire (Incl EMS) | 1,985 | 1,729 | - | 17 | 59 | - | 414 | 415 | 188 | 3,078 | 9.1% |
| Retired Gen City (Incl DOT) | 6,674 | 7,053 | - | 714 | 2,210 | - | 253 | 1,151 | - | 11,002 | 32.5% |
| COBRA | - | - | 1 | 1 | 5 | - | - | - | - | 7 | 0.0% |
| Early Retirees | - | - | - | 1 | 8 | - | - | - | - | 9 | 0.0% |
| Sub Total Retirees | 15,826 | 13,839 | 100 | 782 | 2,400 | - | 962 | 3,630 | 912 | 24,612 | 72.8% |
| **Total No. of Employees Receiving Medical Benefits** | 21,892 | 19,745 | 544 | 1,505 | 3,964 | 406 | 962 | 3,630 | 912 | 33,815 | 100.0% |
| **Percentage of Total By Carrier** | 64.7% | 58.4% | 1.6% | 4.5% | 11.7% | 1.2% | 2.8% | 10.7% | 2.7% | 100.0% | |

| Medical Carrier | BC/BSM Hospital | US Health | BCN | HAP | THC | BC/BS Option E | BC/BS Community Blue Option F | BC/BS CMM Option G Comprehensive Major | TOTAL Excl Census Count | % of Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Total No. of Employees Receiving Dental Benefits @ 12/2012 | Participants in these plans use the dental carriers offered by the City (Dencap and Golden Dental | US Health Dental | Participants in these plans use the dental carriers offered by the City (Dencap and Golden Dental) | | | | | | 13,641 | 40.3% |
| Total No. of Employees Receiving Co-op Optical Benefits @ 12/2012 | Participants in these plans use the dental carriers offered by the City (Dencap and Golden Dental | US Health Optical | Participants in these plans use the optical carriers offered by the City (Heritage Optical, Co-op no longer offered) | | | | | | 58 | 0.2% |
| Pharmacy Benefits | BC/BS Pharmacy; CVS Caremark | Note: All of these plans include Pharmacy Benefits | | | | | | | | |

Note:  The Census Count is based on the actual count as of June 30, 2012 and it is developed annually to support billings to the departments and the Comprehensive Annual Financial Report.

To summarize the plan participation by carrier:

- 85.5% of active and retired employees are serviced by a Blue Cross Blue Shield or Blue Care Network health plan product;

- 87.2% of employees are serviced by three medical plans, while the remaining 12.8% are serviced by five different carriers.

Listed below are additional areas of concern not covered in the preceding table:

- Currently, there are seven employees in the BAO to handle the benefits of over 30,000 active and retired employees; one of the two senior retiree specialists is on loan to the project development team for transitioning benefit administration to a third-party service provider;

- Written policies and procedures are very limited and do not adequately document the City's process for the administration of employee benefits.  Instead, required tasks and processes are carried out by staff based solely on individual, internally retained employee knowledge.  This puts the City at greater risk of properly administering benefits if these employees were to leave or miss work for an extended period of time.

Coalition of Public Safety Employees Health Trust

The "Coalition of Public Safety Employees Health Trust", also known as the "COPS Health Trust Fund", list themselves as a non-profit, statewide health and welfare fund established in 1994 by the Michigan Association of Police Officers (M.A.P.O.) The insurance plan is only available to police and fire employees. The COPS Trust Fund is the plan administrators for US Health/US Health Alliance Insurance.

As of December 2012, there were 410 active police personnel participating in the COPS plan. However, after the BAO completed the 2012 open enrollment, the number of plan participants increased by approximately 1,000 employees, to an approximate total of 1,410, which represents 55.6% of active police.

Regarding the validity of the trust fund, a manager with the State of Michigan's Department of Insurance and Financial Services (DIFS), Insurance Rate & Forms Division, provided the following information:

- "Coalition of Public Safety Employees Health Trust" or "C.O.P.S. Health Trust Fund" (hereinafter referred to as COPS) is not a licensee of DIFS, nor is it required to be a licensee of DIFS;

- It appears from their website that COPS allows its members/participants to join and enroll in coverage available through the Trust. The coverage is provided by US Health and Life Insurance Company with In-Network benefits provided by Cofinity PPO, which is a provider network;

- DIFS can confirm that US Health and Life Insurance Company are licensed to do business in Michigan as a life and health insurer;

- Cofinity is a PPO. A PPO is a group of doctors and/or other providers that band together to form a network. A PPO that does not pay claims or assumes any risk associated with the services it provides is not regulated by DIFS. These types of PPOs merely contract with licensed organizations at discounted fee-for-service rates.

DIFS suggested that the Corporations, Securities and Commercial Licensing would have a record of this Trust. However, the State of Michigan Department of Licensing and Regulatory Affairs, Corporations, Securities & Commercial Licensing Bureau confirmed that there is no record of an entity named either Coalition of Public Safety Employees Health Trust or C.O.P.S. Health Trust Fund on file with the Corporation Division.

Because we cannot confirm the existence of the COPS Health Trust Fund as a valid corporation or trust in the State of Michigan, coupled with their plan requiring the highest cost of contributions from the City, we recommend a cost/benefit analysis to justify continued use of offering this plan to a select and limited population of employees.

**Testing of the Administration of Employee Health Care Benefits**

We conducted a limited test of employee benefits contributions by selecting a small sample of ten active and ten retirees to determine if the payroll deductions were proper and properly recorded. We compared the employees' benefit selections with their payroll records for the last pay period in December 2012.

Through our testing we determined all of the payroll deductions for the employee contributions were correct. However, we did not test Dental and Vision deductions because the withholdings for these benefits are done monthly and not per pay period. The pay period selected for testing did not have dental and vision deductions.

While no errors were found in the employee deductions for health care contributions, it was found to be an extremely labor intensive process that lacks good documentation, uniformity of processes, and it is prone to errors for the following reasons:

- Due to the combination of job codes, class codes, and bargaining units, there are over 10,000 deduction codes for health benefit selections;

- In some cases, employees enrolled in the same health care plan had different deduction codes due to different bargaining units and departments; per BAO, this is required to segregate data for statistical reporting purposes;

- Changes in benefits selection requires between two to six updates to an employee's payroll deduction codes for any one change in healthcare plans or deductions;

- The codes in the system did not necessarily match the codes on the employee benefits enrollment forms because changes were made without using the standard form. In some cases, updates were made to employee deduction codes by the BAO in reaction to changes in health care plans on a bargaining unit or city wide basis;

- Active employees in six departments use the HRMS/Oracle system and their changes are processed through the online employee portal, and not through the standard paper forms;

- In an effort to confirm the appropriateness of the withholdings eleven different rate sheets were required. Rates vary greatly based on single, two-person, or family and bargaining unit, job code and time of employment;

- There is a lack of communication between Payroll, Pension, and Benefits Administration, which leads to a time lag of employees and retirees who become eligible for Medicare, transitioning from the City being their primary insurer to Medicare. This is a missed opportunity for the City to save on health care costs.

**Transition of Payroll and Benefit Administration to a Managed Care Provider**

On November 13, 2012, the Director of Human Resources presented to the Administration and City Council, the proposed transition of payroll and benefits administration to a managed service provider. The presentation focused primarily on the "highly manual, labor-intensive, and three to four times more costly payroll

processes." It was noted that the City had selected Automatic Data Processing Incorporated (ADP) as the external service provider for payroll processing and benefit administration, with promises of improved service and reduced costs:

| Projected Cost Savings | Millions |
|---|---|
| Labor Processing Costs Savings | $4.7 |
| Information Technology Costs Savings | 4.5 |
| Total Savings | $9.2 |

The presentation listed other benefits such as:

- Re-deployment of fifty uniformed police officers from payroll to public safety;
- Significant improvements and improved controls over payroll and benefit administration processing;
- Dedicated Payroll and Benefits Call Center;
- Annual costs charged by ADP of $5.5 million;
- One-time implementation costs of $7.5 million.

Payroll cost savings were based on the results of a study conducted by Sourcing Analytics to quantify the total cost of ownership (TCO) of the payroll and benefit administration operations (April 2012). However, the cost of outsourcing Human Resources (HR) and Benefit Administration Operations (BAO) were not calculated or included in the summary of the City's TCO:

**City of Detroit Total Cost of Ownership per Employee**

| Activity | City Cost | Cost of Outsourcing | Average Cost | Comments |
|---|---|---|---|---|
| Payroll [A] | $ 62 | $18 | $ 15 | This was the only comparison referenced in the HR presentation |
| HR [B] | $101 | Not stated | $ 76 | HR and BAO will continue to provide oversight for the project and ongoing operations. However, the residual cost of these activities was not included in the total outsourced cost of this function |
| BAO [B] | $ 60 | Not Stated | $156 | |
| **Total** | **$223** | **Not Stated** | **$247** | |

Sources   [A] *City of Detroit Payroll & Benefits Administration, presented by Patrick Aquart, Human Resources Director, November 13, 2012.*

[B] *Financial Analysis Tool Total Cost of Ownership Results, City of Detroit, April 2012, Sourcing Analytics.*

A representative of BAO stated that even with the shortage of staff and outdated computer systems, their current cost of operations is less than the average. It was also stated that a rate for outsourcing of BAO and HR was unavailable because ADP's "benefits administration module is new" so they could not quote or calculate the cost savings.

<u>Contract Pricing Summary</u>
The five year ADP contract was signed and approved by City Council in December 2012, for a total contract amount of $32.3 million. In addition to one-time implementation fees of $4.3 million, the contract includes monthly service fees of $43 per employee per month, based on a minimum of 8,500 employees per month. The minimum service fee is payable regardless of whether the City's actual usage decreases below the minimum number of employees. Given, that the active employees with health care contracts was 9,203 (at December 2012) which is just 8% more than the minimum threshold, we could easily slip below the threshold if the City moves forward with plans to outsource or transfer operations of the Public Lighting Department, the Department of Public Works, Municipal Parking, the Detroit Department of Transportation, and the Detroit Water and Sewerage Department. An upper threshold on pricing is set based on 10,579 employees; services for those employees will be billed at higher rates.

The contract price structure includes incremental fees such as screening and selection services, pass through expenses such as payment of travel and related expenses, maintenance and development fees, change control fees, and other time and material services. With a new system, this pricing structure could result in a significant amount of additional costs.

Employee Benefit Operations
A main underlying cause of the complexity of the City's benefit administration is the vast number of employee deductions codes. As previously stated, there are over 40,000 employee deduction codes in one of our legacy systems. Approximately 10,000 of the deduction codes are needed for health care elections. The codes identify the deduction amount but do not accurately reflect the benefit plan associated with the employee, nor capture any dependent information.

Internal Controls and Process Documentation
The Transition Team Project Manager provided us with ADP's system workflows for Payroll and HR operations, but did not provide a flow for BAO. However, the workflows do not include work processes or points of internal controls. The Project Manager stated that the focus at this time is setting up the system and "once this is done and we determine what the system can and cannot do, and then we will set up processes to handle the gaps and design the internal controls. We may need to set up new manual processes to cover the gap areas."

Scheduled Target Completion
The project is scheduled for an April 2014 implementation. However this date may be at risk because the team is still waiting on the 2013-2014 health plans so they can be put into the system.

In conclusion, we recommend an independent, comprehensive cost analysis of the entire Payroll and Benefit Administration Project and the reviewer should provide an opinion as to whether the City should continue the project as a currently contracted or amend the project scope. The analysis should include accurately costing operations and processes that will remain with the City such as reconciliations and oversight, costs of implementing adequate internal controls, and the ongoing project management costs.

# UNEMPLOYMENT COMPENSATION

**Background**

Unemployment Insurance is a form of social insurance administered in Michigan by the Unemployment Insurance Agency (UIA). It is designed to help individuals replace some of their income when they have become unemployed through no fault of their own. To qualify for benefits, a worker must be unemployed, have sufficient qualifying wages, and must be otherwise eligible for benefits. There are several reasons a worker would be ineligible for benefits, including discharge for misconduct and voluntarily leaving the position, which would require the worker to meet certain UIA standards to qualify for benefits. The employer handbook, provided by the UIA and available on their website, details the information above as well as any additional information necessary to determine unemployment requirements and eligibility.

In addition to services or benefits for unemployed workers, the UIA also offers benefits to workers who are underemployed, which means the individual is working part-time with earnings. These workers are paid a reduced weekly benefit amount based on UIA calculations. If a worker earns more than 1.6 times their benefit amount, they would not be eligible for benefits during that week. Under no circumstances is a full-time employee eligible for unemployment benefits.

The following steps usually occur when a worker files a claim for unemployment:

Unemployed Worker:

- Files an unemployment claim with UIA and supplies the required information.

Unemployment Insurance Agency:

- Obtains information from the employer to determine eligibility for benefits, including verification of employment history, reason for separation and wages;
- Makes a determination based on the information obtained and notifies the worker.

City of Detroit Human Resources Department (HR):

- HR Analyst at Central Services validates, contests, and maintains unemployment claims filed against the City of Detroit and ensures that the City is represented at related hearings;
- HR Analyst at Employee Services provides detailed information on employee separations and appears at unemployment hearings with appropriate witnesses and supporting documentation;
- A Principal Clerk prepares and maintains unemployment claim files and a claims database;
- The HR Manager compiles data and prepares quarterly/yearly unemployment reports.

The City is a reimbursing employer, and is liable for every dollar the UIA pays in

benefits to unemployed or underemployed City workers. It is imperative that HR conduct a timely review of the eligibility of claims as soon as they are notified by UIA that a claim has been filed. This communication is a crucial step in the process. It is in this phase where HR notifies UIA of events that would disqualify the worker for benefits, including leaving the position voluntarily, being discharged for misconduct, or if the worker is still employed and was never discharged from employment. If and when HR fails to provide this information timely, or fails to respond to UIA's requests for information, a determination is made based on the information provided by the worker. Unemployment compensation paid by UIA against ineligible claims, ultimately results in the City losing money due to fraud or waste.

According to the UIA, when questions regarding the City's unemployment claims were first raised by an anonymous tip (December 2011), HR was approximately 1.5 years behind in processing unemployment claims. In January 2012, a representative from HR also expressed concerns about some of the human resources staff collecting unemployment while being employed full time. It was stated that the 50% staff reductions in HR between fiscal years 2009 and 2013 negatively impacted the unemployment claims processing. This resulted in numerous workers being paid unemployment benefits that they were not eligible to receive.

**Areas of Concern and Deficiencies**
Our review of the Unemployment Claims Process found the following areas of concern and deficiencies:

- Processing of unemployment claims was inadequate and did not adhere to the established policy:
    - No one was processing unemployment claims in the Human Resources department creating a backlog;
    - There was no evidence of a database of unemployment claims being maintained;
    - There was no evidence of quarterly/yearly reports being prepared by HR Management;
    - The policy does not outline the steps taken in departments who do not utilize the centralized human resources function.
- A number of employees may have received unemployment benefits they were not eligible to receive. Quarterly billing reports from the UIA detailed the amount the City of Detroit owed to UIA for the reimbursement of benefits paid to individuals by quarter. We reviewed quarterly billing reports from the UIA as well as quarterly separation reports from the City of Detroit and found the following:
    - The City of Detroit paid unemployment claims for 1,484 individuals from July 1, 2011-March 31, 2013;
    - Of the 1,484 claims, only 756 appear to be claims related to lay-offs;
    - 536 of the claims need additional investigation to determine eligibility;

- 192 of the claims filed appear to be ineligible because the individuals were either full time employees or had no employment history with the City of Detroit.

The issue with these claims is a direct result of not following policy. If the City followed established policy, a number of the questionable claims would have been resolved prior to benefits being paid to the workers. The following provides detailed information about the unemployment claims filed against the City:

**Unemployment Claims from July 1, 2011-March 31, 2013**

| Description | No. of Employees |
|---|---|
| Laid off due to a reduction in force | 359 |
| Laid off for seasonal reasons | 95 |
| Laid off voluntarily/other reasons | 12 |
| Laid off then rehired | 302 |
| Terminated/Discharged for various reasons | 253 |
| Resigned for various reason | 64 |
| Personal Services Contractors | 65 |
| Retired | 49 |
| Full-time, active employees who were not laid off | 134* |
| Seasonal, active employees who were not laid off | 60 |
| No employment history with the City of Detroit | 58* |
| Miscellaneous | 33 |
| **Total** | 1,484 |

*Note: These two categories comprise the individual claims that make up the 192 persons that could be ineligible for unemployment compensation.*

- Lack of uniformity and timeliness in the responses provided to UIA. Both the UIA and the HR have known for over a year that some of the unemployment claims filed against the City were not valid. However, finding an appropriate resolution to this problem has been delayed due to the following:

  - Departments were setting their own policies for what is considered full time employment, causing confusion and delays with claims processing from UIA;

  - The terminology varied across departments, for example a furlough day in the Finance Department is an unpaid day, whereas a furlough day in the Police Department is treated as vacation leave;

  - Policies vary by department on paying for overtime; in some departments an employee could have worked 38 hours and received overtime and

another employee could have worked 44 hours with no overtime;

- ○ Several departments, such as the Police and Fire Departments, maintain their employee time records separately from the remainder of the City, causing delays for HR to respond to UIA's requests for information.

## Recommendations

In summary, based on our review of the unemployment claims, we recommend the following:

- Determine which of the 192 ineligible claims fall under intentional fraud and pursue prosecution;

- Initiate administrative action for the claims found to be ineligible but not fraudulent;

- Work with UIA to make a final determination on the eligibility of the 536 claims in question;

- Ensure employees who were laid off only collected unemployment during their eligible period;

- Quantify the total dollar amount lost due to the City paying for ineligible claims.

Emergency Manager Order No. 8



### EMERGENCY MANAGER
### CITY OF DETROIT

### ORDER No. 8

### JOINT INVESTIGATION BY THE INSPECTOR GENERAL AND AUDITOR GENERAL INTO POSSIBLE WASTE, ABUSE, FRAUD, AND CORRUPTION ASSOCIATED WITH THE CITY'S EMPLOYEE BENEFIT PROGRAMS

BY THE AUTHORITY VESTED IN THE EMERGENCY MANAGER
FOR THE CITY OF DETROIT
PURSUANT TO MICHIGAN'S PUBLIC ACT 436 OF 2012,
KEVYN D. ORR, THE EMERGENCY MANAGER,
ISSUES THE FOLLOWING ORDER:

*Whereas*, on March 28, 2013, Michigan Public Act 436 of 2012 ("PA 436") became effective and Kevyn D. Orr became the Emergency Manager ("EM") for the City of Detroit (the "City") with all the powers and duties provided under PA 436; and

Pursuant to section 10(1) of PA 436, the EM may "issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary to accomplish the purposes of this act;" and

Section 10(1) of PA 436 makes any such order "binding on the local elected and appointed officials and employees, agents, and contractors of the local government to whom it is issued;" and

Section 7.5-301 of the 2012 Charter for the City of Detroit ("City Charter") creates an independent Office of Inspector General and vests the City's Inspector General (the "IG") with the responsibility to "ensure honesty and integrity in City government by rooting out waste, abuse, fraud, and corruption;" and

1

Under Section 7.5-306(1) of the City Charter, the IG is charged with investigating "any Public Servant, city agency, program or official act . . . either in response to a complaint or on the Inspector General's own initiative in order to detect and prevent waste, abuse, fraud and corruption;" and

Under Section 7.5-306 of the City Charter, the IG shall have "access to the financial and other records of all City agencies at any time;" and

Under Section 7.5-105(3) of the City Charter, the City's Auditor General (the "AG") is required to "[i]nvestigate the administration and operation of any city agency and report findings and recommendations to the City Council and the Mayor;" and

Section 7.5-105(1) of the City Charter grants the AG "access to all financial records, human resource records, and other records of city agencies necessary to perform his/her functions;" and

The IG and AG have authority under Sections 7.5-307 and 7.5-105(3) of the City Charter, respectively, to "subpoena witnesses, administer oaths, take testimony, require the production of evidence relevant to a matter under investigation, enter and inspect premises within the control of any city agency during regular business hours;" and

Section 7.5-310 of the City Charter provides that "[a]ny Public Servant who willfully and without justification or excuse obstructs an investigation of the Inspector General by withholding documents or testimony is subject to forfeiture of office, discipline, debarment or any other applicable penalty;" and

Section 7.5-308 of the City Charter provides that where the IG "has probable cause to believe that any Public Servant [as defined in the City Charter] or any person doing or seeking to do business with the City has committed or is committing an illegal act, then [the IG] shall promptly refer the matter to the appropriate prosecuting authorities;" and

The City provides various benefits to active City employees and their dependents, and retirees and their dependents, including, but not limited to, unemployment, disability, and health insurance and defined benefit and defined contribution pension plans (collectively, "Benefit Programs"); and

In furtherance of the City's financial and operational restructuring, the EM has determined that it is necessary and appropriate for the IG and the AG to jointly investigate the administration, operation or implementation of Benefit Programs to identify any waste, abuse, fraud, or corruption, including, but not limited to, administrative misfeasance or other impropriety; and

The EM believes that any such waste, abuse, fraud, or corruption in the administration, operation or implementation of Benefit Programs harms the City and its residents, and that identifying and correcting such waste, abuse, fraud, or corruption is necessary and appropriate to carry out the purposes of PA 436.

2

**It is hereby ordered that:**

1. In accordance with the powers granted to the IG and the AG by the City Charter, the IG and the AG shall jointly conduct an investigation into any possible waste, abuse, fraud, or corruption, including, but not limited to, administrative misfeasance or other impropriety with respect to the administration, operation or implementation of Benefit Programs.

2. The IG and the AG shall prepare and deliver a preliminary written report to the EM within 60 days of the date of this Order (the "60 Day Report") regarding the preliminary findings of the investigation and making recommendations regarding next steps, and any corrective, prospective, legal, additional investigatory or other action designed to address any waste, abuse, fraud, or corruption uncovered.

3. The IG and AG shall update and revise the 60 Day Report by providing additional written reports to the EM as necessary, but no later than every 60 days after the issuance of the initial 60 Day Report, and such other reports as may be necessary from time to time.

4. All local elected and appointed officials, employees, agents, trustees, and contractors of the local government shall comply with this Order and any requests made by the IG or AG, either jointly or independently.

5. If any component of this Order is declared illegal, unenforceable, or ineffective by a court of competent jurisdiction, such component shall be deemed severable so that all other components contained in this Order shall remain valid and effective.

6. This Order is effective immediately upon the date of execution below.

7. This Order shall be distributed to the Mayor, City Council members, the IG, the AG, and all other City department directors.

8. The Emergency Manager may modify, rescind, or replace this Order at any time.

Dated: June 20th, 2013

By: _____
Kevyn D. Orr
Emergency Manager
City of Detroit

cc:    State of Michigan Department of Treasury
        Mayor David Bing
        Members of Detroit City Council

3



EMPLOYEE BENEFIT ADMINISTRATION: PROCESS FLOW HEALTH CARE BENEFITS
Employee
Human Resources
Benefits Administration
Finance
Health Care Carriers
Start Employee Hired
Employee
Employee Receive Wages Payroll Deduction
A
Start
Qualifying Event (Marriage, Birth)
Update Benefit Selections (Health Plan, Dependents, Beneficiaries)
C
HR Staff
Start Hiring Process
Complete Initial Benefit Enrollment; Make Selections
Create Job and Class Codes
Assign to Bargaining Unit
Copy
HR Update Employee Database Assign Job and Class Code Based on Bargaining Unit
D
HR
Update Employee Database
95% PPS
5% Oracle/HRMS
Medical
Dental
Optical
= 2 - 6 Updates Per Person; 1st Terminate M/D/V then 2nd Add M/D/V Can only process One Employee at a Time and Cannot complete transaction on the Same Day
Qualifying Event
Over 10,000 Codes
Original
= 3 Updates Per Person
Benefits Clerks
Verify Employee Status; Create "Coding Form" Match Elections on Hardcopy Benefit Enrollment Form to the Employee Database
Update Carrier Systems
= 3 Updates Per Person
Medical
Dental
Optical
Update Carrier Systems
Assign Deduction Codes in PPS/Oracle (~10 Thousand Codes to Choose from)
Change Deduction Codes in PPS/Oracle (~10 Thousand Codes to Choose from)
(9) Medical Carriers
(3) Dental Providers
(4) Optical Providers
+(1) "Carved-Out" Pharmacy Provider
The process lacks a check and balance to ensure that all changes were input into PPS and the Supervisor's Review is a manual process that relies on internal knowledge of all 10,000+ Deduction Codes.
Benefit Supervisor Review and Reconcile to PPS Report of Changes
Lack of Segregation of Duties as the same clerk that updates PPS/ Oracle also prepares the Changes Spreadsheet.
Generate Changes Excel Spreadsheet and Prepare Premium Based Carriers Monthly Billings
Make Corrections
Any Discrepancies
Yes
No
A
A
Payroll Deductions
Generate Actual Costs Benefit Reports; Make Accrual JV's in DRMS; Generate CAFR
Finance Wire Transfers
~ 20 Wire Transfers per Month
Benefits Analyst
Prepare Wire Transfer Summaries; Generate DRMS JV's;
Start
Receive Monthly Billing from BC/BSM
Receive Weekly Billing from CVS Caremark
Send Monthly Medical Roster and Billings Support by Carrier to Finance (Premium Based Carriers Only)
Send Monthly Hospitalization (Billings Reports) to Carriers (Excl BC/BSM)
BAO performs a limited review of the monthly billing from BC/BSM
Stop
Receive Payment
No
Any Discrepancies
Premium- Based Carriers Reconcile Activity
Yes



EMPLOYEE BENEFIT ADMINISTRATION: PROCESS FLOW FOR QUALIFYING EVENTS
Employee
Payroll
Human Resources
Pensions
Benefits Administration
Employee
Start
Qualifying Event: FMLA
Start
Qualifying Event: Reach Age 65 Eligible for Medicare
Start
Qualifying Event: Layoff Termination
Start
Qualifying Event: Retirement
Initial Event?
No
Yes
Update Benefit Selections (Health Plan, Dependents, Beneficiaries)
B
A
Employee Receive Wages Payroll Deduction
Start
Qualifying Event: Death
Was the person an active employee?
Yes
No Retired
Payroll
Determine Effective Date; Create Pre-Retirement Notice; Prepare Retirement Letter and Initial Notice to Department
HR Staff
Receive, Review and Approve FMLA
D
Update Benefit Selections (Health Plan, Dependents, Beneficiaries)
Retire Employee from Active Employee Database
Stop
Process Employee Death
HR
Pensions
Conduct Retirement (Exit) Interview
Calculate Pension Amount and complete Face Sheet
Employee
Update Benefit Selections (Health Plan, Dependents, Beneficiaries)
Process Employee Death
Email
Complete Retirement Application and Initial Post-Retirement Benefit Selections (COD Retiree Health Benefits Form)
Pension Board
Pension Board Review and Approve Retirement
Notification of Approval
Employee's Department
Pension
Most Retirees Elect to Keep Same Benefits Unless the Plan is Not Available to them.
Update Pension Payroll Database
Benefits Clerks
Notification from Multiple Sources
Start
Retrieve New Retiree Selections From Mail Tray
Review for Dependents, Surviving Spouse, COBRA Medical Benefits
Review for Dependents, Surviving Spouse, COBRA Medical Benefits
Process List subject to "off-Boarding" Process
C
Premiums Preserved for 12 Months; Prepare Cash Letter
B
B
Process Retiree Health Benefits Assign Codes
~2-3 Month Delay in Processing. Retirees Deductions are different than Active Payroll Codes.
May Create a Separate Contract for the Surviving Spouse (Health Benefits Only)
Medicare Becomes the Primary Insurer

# EXHIBIT D

# AFSCME COUNCIL 25 v. CITY OF DETROIT

# AFSCME COUNCIL 25 MOTION HEARING

## February 8, 2013

Prepared by



Depos@NetworkReporting.com
Phone: 800-632-2720
Fax: 800-968-8653
www.networkreporting.com

*Let us assist you GLOBALLY for all of your deposition needs.*

STATE OF MICHIGAN

DEPARTMENT OF ENERGY, LABOR & ECONOMIC GROWTH

EMPLOYMENT RELATIONS COMMISSION

In the matter of:

AFSCME Council 25,

          Charging Party,

v                                    Case No.:  C12-E-0092
                                     Docket No.: 12-000777
City of Detroit, a Michigan
Municipal Corporation,

          Respondent.

                              /


                         MOTION HEARING

       BEFORE DOYLE O'CONNOR, ADMINISTRATIVE LAW JUDGE

       3026 West Grand Boulevard, Detroit, Michigan

           Friday, February 8, 2013, 9:00 a.m.

APPEARANCES:

For the Charging Party:      MR. RICHARD G. MACK, JR. (P58657)
                             Miller Cohen, PLC
                             600 West Lafayette Boulevard, Floor 4
                             Detroit, Michigan 48226
                             (313) 964-4454


For the Respondent:          MS. LETITIA C. JONES (P52136)
                             Assistant Corporation Counsel
                             City of Detroit Law Department
                             2 Woodward Avenue, Suite 500
                             Detroit, Michigan 48226
                             (313) 237-3002

Also Present:                Edward L. McNeil, AFSCME Council 25
                             Anita Berry



NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

Page 2

1    **RECORDED BY:**                    **Diane H. Draugelis, CER 2530**
                                    **Certified Electronic Recorder**
2                                    **Network Reporting Corporation**
                                    **Firm Registration Number 8151**
3                                    **1-800-632-2720**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



800-632-2720

Page 3

1                          TABLE OF CONTENTS

2                                                              PAGE

3

    Statement by Mr. Mack. . . . . . . . . . . . . . . 10,35
4   Statement by Ms. Jones . . . . . . . . . . . . . . 28,37

5

6

7

8                          EXHIBIT INDEX

                                                             PAGE
9

10                                         IDENTIFIED    RECEIVED

11

    Commission Exhibit 1. . . . . . . . .         7           9
12       (2008-2012 Collective Bargaining
         Agreement Excerpt)
13  Commission Exhibit 2. . . . . . . . .         7           9
         (11-8-2011 Letter from Crittendon
14       to City Council)
    Commission Exhibit 3. . . . . . . . .         8           9
15       (10-10-2011 Letter from Crittendon
         to City Council)
16  Commission Exhibit 4. . . . . . . . .         8           9
         (Letter from Corley to City Council)

17

18       (Exhibits retained by Judge O'Connor)

19

20

21

22

23

24

25



1          Detroit, Michigan

2          Friday, February 8, 2013 - 9:11 a.m.

3          JUDGE O'CONNOR:  We're here on Michigan AFSCME

4    Council 25, Charging Party, and City of Detroit in the MERC

5    Case Number C12-E-092, Docket Number 12-000777.  Doyle

6    O'Connor, the Administrative Law Judge with the Michigan

7    Administrative Hearing System hearing this case on behalf of

8    the Michigan Administrative -- no; sorry -- on behalf of

9    Michigan Employment Relations Commission.

10          Appearance of the counsel, starting with Charging

11   Party.

12          **MR. MACK:  Richard Mack, your Honor.**

13          **MS. JONES:  Letitia Jones, on behalf of the City**

14   **of Detroit.  Seated to my right is Anita Berry, from the**

15   **Labor Relations Department, City of Detroit.**

16          **JUDGE O'CONNOR:  Good morning.**

17          **MS. BERRY:  Good morning.**

18          **JUDGE O'CONNOR:  We're here on a motion -- on**

19   **actually cross motions for summary judgment.  I have**

20   **reviewed the pleadings.  I have a couple introductory**

21   **comments, as Mr. Mack is accustomed to my doing.**

22          **The Union's motion for summary disposition in this**

23   **case relates to the adoption of a new City ordinance which**

24   **prohibited the General Retirement System Pension Board, NESA**

25   **Board, which as I understand handles pension questions for**



1      all City employees or virtually all City employees other

2      than police and fire.  Anyway, the ordinance prohibited the

3      Board from granting a rate of return on annuities greater

4      than the actual return, and which had the apparent impact of

5      precluding the issuance of the 13th checks to retirees.

6              The Employer has responded and asserted its own

7      cross motion for summary disposition.  There's no dispute

8      over the fact that a changed ordinance was adopted in

9      November of 2011 and that a timely charge was filed.

10     There's likewise no dispute over the fact that the terms of

11     the pension plan are mandatory subjects of bargaining, which

12     the City concedes in its brief.

13             It's alleged, and seemingly undisputed, that in

14     November 2011 the City adopted a pension ordinance to be

15     effective December 20, 2011 which altered certain prior

16     practices of the Pension Board.  That change occurred

17     without bargaining and during the term of an existing

18     collective bargaining agreement.  That existing collective

19     bargaining agreement incorporated by reference the prior

20     version of the pension ordinance and City charter

21     provisions.

22             I want to note, because it's a procedural question

23     of some importance, City raised the concern with the

24     identity of the Charging Party.  The motion was brought as

25     captioned solely on behalf of AFSCME Council 25 and its



1    several locals and not on behalf of the so-called coalition

2    of Detroit Unions, to which a passing reference is made in

3    the original charge, even though the coalition was not

4    listed as a charging party.  Unless I'm told otherwise

5    immediately, my consideration of arguments is limited to

6    AFSCME Council 25 and its various subordinate locals.

7                MR. MACK:  That is correct, your Honor.

8                JUDGE O'CONNOR:  Okay.  I thought so, and I

9    thought it was good the City raised it because the worst

10   thing possible is to end up not knowing who is fighting over

11   what.

12               All right.  Based on the pleadings I have relied

13   on the terms of several documents which both sides relied

14   on, and I'm going to list them, and I guess I will

15   denominate them as exhibits, even though I don't have copies

16   prepared.  You both have them.

17               So Commission Exhibit 1 is the 2008 to 2012

18   Collective Bargaining Agreement, which I think is attached

19   in part to one of the pleadings.

20               MS. JONES:  Respondent Pleading Number -- Letter

21   A.  I'm sorry.

22               JUDGE O'CONNOR:  All right.  And that's an

23   excerpt.

24               MR. MACK:  Yes.

25               JUDGE O'CONNOR:  Is it acceptable to both parties



1          that I just treat the excerpt as the exhibit or does

2          somebody want to submit the whole contract?

3                    MR. MACK:  I think the excerpt is fine.

4                    JUDGE O'CONNOR:  Okay.  We'll mark the excerpt,

5          and I will clean up the file on this later.  We'll mark the

6          excerpt as Commission Exhibit 1 as attached to the

7          Employer's brief at Tab A.  I'll just copy that, mark it as

8          Commission Exhibit 1 and put it in the file.

9                    (Commission Exhibit 1 marked)

10                    JUDGE O'CONNOR:  Commission Exhibit 2 will be the

11         November 8, 2011 letter by Corporation Counsel Crittendon --

12         I guess I should say former Corporation Counsel

13         Crittendon -- to the City Council attaching the then

14         proposed ordinance, and that's attached to somebody's -- I

15         think the City's brief again.

16                    MS. JONES:  Exhibit C?

17                    JUDGE O'CONNOR:  Yes; Exhibit C to the City's

18         brief will be Commission Exhibit 2.

19                    (Commission Exhibit 2 marked)

20                    JUDGE O'CONNOR:  There's then a Commission Exhibit

21         3 will be an October 10, 2011 letter to the City Council by

22         Crittendon, which is at City Tab D.

23                    MS. JONES:  As well as AFSCME D.

24                    JUDGE O'CONNOR:  Right.  And both sides relied on

25         all these things in whole or in part.



1              (Commission Exhibit 3 marked)

2              JUDGE O'CONNOR:  4, Commission Exhibit 4, will be

3      a letter from City Council Financial Analysis Division

4      Director Corley -- that's C-o-r-l-e-y -- to the City

5      Council, which incorporated Corley's description of the

6      pension plan's prior practice, and attached to that was an

7      analysis and related charts prepared by the City Council for

8      actuary -- by Actuary Joseph Esuchanko -- that's

9      E-s-u-c-h-a-n-k-o.  The Union attached one of Esuchanko's

10     charts to its brief as I recall.

11             MR. MACK:  That was --

12             JUDGE O'CONNOR:  It looked the same.

13             MR. MACK:  Yeah, it was similar data.  It was not

14     actually an Esuchanko chart, it was just a chart provided to

15     the Union by the City at some point.

16             JUDGE O'CONNOR:  Anyway, I'm marking -- and that's

17     the Corley/Esuchanko document is at Tab E of the City's

18     brief.

19             (Commission Exhibit 4 marked)

20             JUDGE O'CONNOR:  All right.  Has anybody got any

21     objection to any of those?

22             MR. MACK:  No.

23             MS. JONES:  That's fine.

24             JUDGE O'CONNOR:  They lay the ground work for how

25     we got where we are today.  As I understand it, the Union's



1    assertion is that the change was an unlawful unilateral

2    change in an existing condition of employment, and a

3    repudiation of the then in place collective bargaining

4    agreement.

5              The Union's motion is additionally supported by

6    facially competent affidavit.  Oh, I should note -- I don't

7    think I expressed this.  I am admitting Commission Exhibits

8    1 through 4.

9              (Commission Exhibits 1 through 4 received)

10             MR. MACK:  Okay.

11             JUDGE O'CONNOR:  The City earlier asserted the

12   defense that the question of the Pension Board's exercise of

13   discretion in the distribution of excess earnings was not an

14   established condition of employment, and rather was in

15   essence an ultra vires act by the Board.  The Union

16   addressed that assertion at least in part by its reliance on

17   the decision in AFSCME v Detroit, 218 Mi App 263, 1996, in

18   which the City prevailed.  In that case the City had sought

19   a similar change regarding distribution of excess earnings,

20   in that case via charter amendment, and according to the

21   Court, the City acknowledged at the time that no such change

22   can actually be implemented without first bargaining because

23   the then current system of distribution of earnings was an

24   established condition of employment.

25             As both parties are presumably aware, the wisdom



NetworkReporting
— STATEWIDE COURT REPORTERS —
800-632-2720

1      of the prior practice and the wisdom of the ordinance change

2      are not issues before me for review.  The only question

3      before MERC is whether a change in mandatory conditions of

4      employment was implemented in an unlawful manner.

5      Similarly, the wisdom of the Court of Appeals decision in

6      1996 was not before me.  It's a published decision involving

7      these same two parties.

8              All right.  Unless there's any procedural

9      questions, issues, the Union filed the first motion, so

10     you're going first.

11             MR. MACK:  Thank you, Judge.  Judge, you've laid

12     out clearly the background concerning the nature of this

13     dispute.  This is a dispute concerning the practice that has

14     been going on as the City even acknowledges, since the early

15     '80's concerning the distribution of earnings from

16     investments of the City of Detroit Retirement System.  The

17     outline of exactly what has been happening since the early

18     '80's is as follows.

19             The Retirement Board, which is appointed in large

20     part by individuals who are either elected from

21     employment -- positions of employment with the City of

22     Detroit retirees, and there are some appointees from the

23     mayor and the City Council, but the majority of the Board

24     represents either employees or retirees.  This Board will

25     have an actuary establish an actuarial rate of return,



1    essentially an expected rate of return as to how the

2    investments of the Retirement System should perform in the

3    market.  In the event that those investments perform above

4    that level -- 7.9 percent has been the level for the last I

5    think almost 10 years -- what the Board will then do is

6    treat the earnings above that level of performance in what

7    are called excess earnings.  The Board then decides to

8    distribute those excess earnings in three different ways.

9    They will allocate a portion of the excess earnings to

10   retirees into what is known as the 13th check.  Usually came

11   around December.  This is just additional check going to

12   retirees.  They will allocate a portion of those earnings to

13   active employees as an enhancement into their annuity

14   accounts.

15           Describing that a bit, active employees have

16   options to contribute either three, five or seven percent of

17   their salary into an account, and the City contributes some

18   as well.  For years when the Retirement System performed

19   above that actuarial estimated percentage, 7.9 percent for

20   instance, a portion of those excess earnings are given to

21   those active employees into their annuity accounts so that

22   the interest rate of investment for purposes of that year in

23   the annuity account is enhanced.

24           So, for instance, if normally the market performed

25   at "X" percent for that year, the City will treat the



NetworkReporting
— STATEWIDE COURT REPORTERS —
800-632-2720

1    earning in the annuity account as a little bit more so that

2    basically they get more money into the annuity account, and

3    it's cash in their pocket essentially.

4              And then the third way that they allocate these

5    excess earnings is by having the City's contribution to the

6    Retirement System reduced by a certain amount by whatever is

7    remaining.  Every year the City makes -- actually, every

8    month -- the City makes a contribution into the Retirement

9    System.  The City general fund makes a contribution into the

10   Retirement System representing its liability toward that

11   system for employees on the rolls who are expected to be

12   retiring.  And it makes that -- the Retirement System Board

13   would take the third portion of the excess earnings and

14   reduce what the City is responsible for contributing of

15   that.  And this was a practice that as the City indicated in

16   an affidavit that was attached to its motion, and even

17   earlier, had been going on for decades.  I note specifically

18   in Tab B, the affidavit of Marilyn Roc Berdijo, and she

19   indicated that she worked for the General Retirement System

20   for approximately 24 years and three months, and she has

21   been the assistant executive director of the General

22   Retirement System since January of last year, and she says:

23             "I can testify that in each year when there were

24        excess earnings, the Board would make decisions on

25        crediting those accounts within the retirement system



1          with the earnings.  This is the understanding that the

2          term excess earnings -- excess is defined as funds

3          above the actuarially assumed rate."

4               So there's an acknowledgment that this happened.

5     There's an acknowledgment that the Board made these

6     distributions.  Such an acknowledgment, Judge, that in the

7     case that you just referenced, which I have is Senior

8     Accountants Analyst and Appraiser's Association versus City

9     of Detroit, 218 Mi App 263, in that case I think it's

10    important for two reasons that I highlight now for you.

11              The first is that the leaders of the City of

12    Detroit at that time felt it important to end this practice.

13    They felt that the only way they could end the practice of

14    making the distributions into these funds, the three-way

15    distribution of excess earnings that I've just described, is

16    by placing a charter amendment before the city voters to end

17    the practice.  So, in other words, it was their opinion that

18    this practice was not only an established practice as we

19    know in labor law, but it was something that was so

20    established that you couldn't change it without a charter

21    amendment.

22              The second part, of course, is that in that

23    case -- I'll get to it a little bit later -- but they

24    acknowledged that they did in fact have to bargain the

25    change with the Union in the event that the charter



1    amendment was successful, which of course, gets into our

2    theory of judicial estoppel.

3            So that's the practice.  The facts, as you

4    indicated, are really beyond dispute.  We have the affidavit

5    of June Nickleberry.  Her real name is Armella Nickleberry.

6    I don't think I remembered that.  But she's the president of

7    Local 214, as well as the president of the City of Detroit

8    Presidents.  So there's an organization City of Detroit

9    Presidents; all of the AFSCME presidents who represent City

10   of Detroit employees have an organization where all 18 of

11   them together, and she's the head of that group as well.

12   And she actually pulled her annuity statements for several

13   years that she could locate them and demonstrated the

14   existence of this practice where, in fact, when the returns

15   were above 7.9 percent, her annuity reflected an investment

16   beyond that amount.  And in one year, as an example,

17   paragraph three of her affidavit, the investment was 15.9

18   percent.

19           So the other part to this practice, Judge, it's

20   important to note is that when there was a return in the

21   market that was below the expected return, assumed rate of

22   return, 7.9 percent as the example, the annuity account and

23   the retirees still received some -- I'm sorry.  The annuity

24   account still received some contribution.  So, in other

25   words, the 7.9 percent, the expected rate of return was seen



1    as a floor, so any investment rate of return below that

2    amount, it was still treated as if 7.9 percent had in fact

3    been realized in the market investments irrespective of what

4    was actually realized.

5              This ordinance change changed things in two

6    respects with respect to this practice.  The easiest way to

7    describe it with respect to the annuity is that it took the

8    7.9 percent from being a floor to being a ceiling.  And as

9    far as the 13th check, it eliminated the 13th check practice

10   altogether.  So this was done, as you've indicated, and it's

11   not been disputed without bargaining really, without notice

12   as Ms. Nickleberry indicates, the president of Detroit

13   Presidents, she would have been one of the individuals

14   contacted if the City wanted to alert the unions of the

15   potential change in practice for the purpose of bargaining.

16   Of course, at that time they were in the middle of a

17   contract, so under law, there really was no obligation of

18   the Union to have bargained.  But nonetheless, the City did

19   not attempt to make efforts at bargaining, but merely went

20   forward with the change, introduced it, and as of November

21   the 30th, the new ordinance came into effect which

22   eliminated the floor of the expected rate of return for the

23   annuity accounts, and as a matter of fact, it created it as

24   a ceiling, so now for annuity accounts, in the event that

25   there is a rate of return that's above 7.9 percent, the



1    investment -- let me phrase it right.  The annuity accounts

2    only seeks 7.9 percent.  So if there is a, for instance, as

3    she testified in the event of -- I think it was just this

4    past year in 2012 -- there was a -- her paragraph five of

5    her affidavit indicates that her understanding is that the

6    GRS rate of return for its investments would have been 20.9

7    percent.  However, the annuity investment rate was now

8    capped based on the ordinance at 7.9 percent.  And the

9    ordinance language lays that out clearly that it is now

10   capped.  So the expected rate of return that's determined by

11   the actuary went from being a ceiling -- went from being a

12   floor to a ceiling.  And that actually, Judge, amounts to a

13   taking of sorts.  If I'm a City employee and I put my money

14   into an annuity and that annuity performs beyond 7.9

15   percent, the City is still capping me at 7.9 percent

16   regardless of what my money actually did in the market.  But

17   you're not dealing with Constitutional issues, you're

18   dealing with parity issues, not unless it's a cap and it's a

19   significant change which results in a significant loss.

20            If you look at the charts that have been provided

21   by both sides in what you've deemed Exhibit B, I believe it

22   is.

23            JUDGE O'CONNOR:  4.

24            MR. MACK:  4.  I'm sorry.

25            JUDGE O'CONNOR:  That's Corley/Esuchanko.



1             MR. MACK:  Yes.

2             JUDGE O'CONNOR:  Is that Tab E on the City's

3    brief?

4             MR. MACK:  Yes.  Thank you.  You can see the value

5    of what this actuary lays out was actually contributed and

6    should have been contributed.  And he lays out that there is

7    this is -- page nine of his report, the bottom indicates,

8    "The approximated accumulated cost to the City due to excess

9    earnings being distributed to DGRS, Detroit General

10   Retirement Service members, rather than being applied to the

11   contractual DGRS benefits is 1.9 to 1.2 billion dollars."

12            JUDGE O'CONNOR:  That's a lot of money.

13            MR. MARK:  So over the course of time, it's a lot

14   of money.  And again, this was a practice that was set up

15   decades ago by City leadership, consultation with the Union

16   membership.  At the time they had actuaries, and at the time

17   they I'm sure were told the financial consequence of the

18   practice.  Nonetheless, they put the practice in place and

19   we in the state of Michigan still have labor laws which

20   provide that if you're going to change a practice which is a

21   mandatory subject of bargaining, the way to do that is to

22   approach the Union.

23           As a side note, I think that had the City

24   approached the Union in a reasonable fashion with the

25   proposed changes, a way to save some money, they would have



1    found the same ear that they found last year when the City

2    unions gave well over $100 million in concessions to the

3    City.  But again, it's unfortunate that the City opted not

4    to go that route, but instead decided to make a unilateral

5    change in the middle of an existing bargaining agreement.

6            The Tab E that we attach to ours is a different

7    formulation; Exhibit E to our motion for partial summary

8    disposition.  What this chart shows, and this is again a

9    chart created by the General Retirement System, what this

10   chart shows is the amount of real dollars placed into each

11   of those three pots year after year as a result of the

12   excess earnings.  And you can see the retirees earn anywhere

13   from -- one year, 1995, they didn't earn anything because

14   they don't get -- they did not get a 13th check when the

15   excess earnings did not exceed or did not at least reach

16   that 7.9 percent.  They didn't lose any other, their normal

17   pension checks, but they did not receive the 13th check.

18   But in every year where the savings were as such, they

19   received it.  And then as I indicated for the annuity

20   accounts, they are -- it's not excess in that the

21   investments weren't seen as beyond 7.9 percent, but again

22   the floor was at 7.9 percent, so the columns marked in here

23   zero indicate a -- that there was no dollars above the 7.9

24   percent rate.  And again, all of this is laid out in their

25   quarterly report and the Krystal Crittendon letter, so there



1    really isn't any dispute as to how this money was allocated.

2              So the change came into effect as indicated on

3    November the 30th without bargaining.  Those are the facts.

4              The City makes --

5              JUDGE O'CONNOR:  Let me ask just for a second.

6              MR. MACK:  Sure.

7              JUDGE O'CONNOR:  Any objection to marking the

8    Union's Exhibit E as --

9              MS. JONES:  We don't know where he got "E" from.

10   He is claiming that it's from the General Retirement System,

11   but there is no verification of that.

12             JUDGE O'CONNOR:  That's the objection; fine.  Go

13   on.

14             MR. MACK:  I wonder if Ms. -- okay.  There are a

15   couple of legal defenses raised by the City to the general

16   argument, first off, that this was a unilateral change in

17   the mandatory term and condition of employment.

18             There's no dispute that the benefits that we're

19   addressing here were, in fact, mandatory subject to

20   bargaining.  The Macomb County case which is cited in our

21   brief at 294 Mi App 149, and specifically on page 160, makes

22   clear that "Retirement or pension benefits and methods of

23   calculating them are mandatory subjects of bargaining."

24             Here there is no dispute that these benefits are

25   benefits that are realized by active members.  First off,



1    active members are those who hold the annuity accounts.

2    When monies are distributed into the annuity accounts, it's

3    active members who realize that benefit.  The retirement

4    benefits are benefits realized by active members upon

5    retirement.  Again, case law is clear.  Not only the Macomb

6    County case, but many other cases within MERC precedent

7    make very clear that benefits afforded to active members

8    upon retirement are, in fact, mandatory subject to

9    bargaining that they enjoy as active members.  It's part of

10   their retirement package as it were.  So the loss of this

11   13th check has an impact on active employees.

12            The other argument that the City raises as to why

13   this is not a unilateral change is because it was an

14   issue -- it was a change made by the -- it was a practice

15   done by the Retirement System and not the City of Detroit,

16   and they felt the Retirement System for all of these decades

17   was acting ultra vires.  It was acting beyond the scope of

18   its authority.  And again, the best case to point to with

19   respect to that is the City's response, if, in fact, that

20   were the case, was in 1996, or actually earlier, to try to

21   change the charter with respect to this practice.  So the

22   City obviously took the position back then that the practice

23   was within the charter because it felt it needed a change to

24   the charter in order to adjust the practice.  The City's

25   response was not to say, "Board, we're suing you to enjoin



1    you from continuing to violate the charter and the

2    ordinances," it was to, "Let's change the charter to make

3    illegal your practice," which obviously was, at the time,

4    legal and currently today legal.

5              In addition to that, the Macomb County case again,

6    pages 159 to 160, cite to what established the precedent

7    stating, quoting, "Employer was responsible for its

8    bargaining obligations regardless of whatever actions are

9    taken by an independent Pension Board," and it cites the

10   Detroit Police Officers Association case versus City of

11   Detroit, 212 Mi App 383, on page 390, and then it even says,

12   quote, "It is even improper for an employer to remove a

13   subject of mandatory bargaining from the scope of PERA by

14   assigning its management to a body insulated from PERA,"

15   close quote.

16             And for the City to argue that you've been

17   breaking the law all this time, but we tried to change the

18   law back in the early '90's, and we then actually changed

19   law again in November 2011 is a conflict of an argument

20   which is not resolvable.

21             The City of Detroit case, what I call the SAAA

22   case, I think makes out best our argument as to why this

23   Commission should judicially estop the City from claiming

24   that this mandatory subject of bargaining is not, in fact, a

25   mandatory subject of bargaining that requires bargaining to



1    change.

2              In that case as indicated the City sought -- City

3    administration sought a change in the charger language in

4    order to prohibit the excess earnings practice, and when the

5    City of Detroit was sued by the Unions as AAA AFSCME to

6    prohibit them from going forward with the change in the

7    charter, arguing that this change would infringe upon a

8    mandatory subject of bargaining with respect to us and it

9    has to be bargained first, the City's response was, "Wait a

10   minute.  Wait a minute.  We'll bargain.  We can't change

11   this until we bargain it with the Unions."  So the City laid

12   out to the court in response to the Union's request for

13   injunctive relief, emergency injunctive relief, the City's

14   defense was, "We have a two-step process in order to have

15   this change applied to unionized City workers.  The first of

16   the two step process is we have to get it passed on the

17   ballot.  We have to change the charter because currently

18   it's legal and we have to make it illegal."

19             The second of the two-step process is we have to

20   bargain the change with respect to unionized workers.  And

21   we realize that we have to bargain that change.  The Court

22   denied the injunction, Court of Appeal in its opinion

23   approved the denial of the injunction by saying in part,

24   City acknowledges it has to bargain, so there is no

25   irreparable harm that the City would suffer because the



1       City -- I'm sorry -- that the Unions would suffer because
2       the City realizes that if the change comes into effect, it
3       will have to bargain it with the Unions.  It won the case on
4       that basis.  It was successful in defeating the City's --
5       the Union's attempt at seeking an injunction.
6              For the City now to come and claim that this
7       unilateral change is not a violation of PERA and it does not
8       have to bargain with the Unions first is in violation of the
9       Doctrine of Judicial Estoppel, and we lay that out in our
10      brief.  The brief indicates the rising of the judicial
11      estoppel is, quote:
12             "A rising from equitable estoppel.  It's a
13             doctrine that one may not take inconsistent positions
14             during legal proceedings.  The Doctrine of Judicial
15             Estoppel concludes a party as a matter of law from
16             adopting a legal position in conflict with one earlier
17             taken in the same or related proceeding."
18      And we analyzed the Spohn v Van Dyke Public Schools case
19      which lays out how one party in that case took a position in
20      one venue and then took a -- one based on that position, and
21      then took an opposite position in a different venue and it
22      was judicially estoped from advancing that legal theory.
23      And that's exactly what the City is doing here, so we think
24      that this ought to be declared a unilateral change and a
25      mandatory subject of bargaining.



1           We also argue that this constitutes repudiation,

2      and repudiation of not only express language of the contract

3      and the incorporated language of the charter and ordinances,

4      but also a past practice which is now engrafted into the

5      contract as a result of 30-some years of practice at least.

6           A repudiation exists when there's a substantial

7      contract breach, there's a significant impact on the

8      bargaining unit and there's no bonafide dispute over the

9      interpretation of the contract.

10          Here the contract breach you have is substantial.

11     It impacts every single AFSCME member who has an annuity,

12     and every single AFSCME member who is subject to retirement

13     from the City of Detroit; that's all of them.

14          The significant impact is that what the one

15     actuary indicated over the years $1.9 billion, so we're

16     talking about a lot of money.  And the chart lays out

17     dollars year by year, so it's a significant amount of money

18     for the individuals involved.

19          And then, finally, no bonafide dispute over the

20     interpretation of the contract.  Well, the best evidence of

21     that is Corley report, the Krystal Crittendon report, the

22     other documents from the City which lay out the practice as

23     to how it went, the affidavit of the City's affiant, Ms.

24     Nickleberry, the Charging Party's affiant.  There's no

25     dispute over the fact that this practice did, in fact,



1    exist.  It is, in fact, a past practice, and we lay out the

2    law with respect to that.  This is the Amalgamated Transit

3    Union form of past practice as opposed to Port Huron form of

4    past practice.

5              Of course, Amalgamated lays out that:

6              "If a collective bargaining agreement is ambiguous

7         or silent on the subject for which a past practice is

8         developed, there need only be a tacit agreement that

9         the practice would continue."

10             Port Huron is applicable when there is conflicting

11   language within the contract and the parties are seeking to

12   treat the practice as part of the contract which conflicts

13   with already existing language, and that is a higher

14   standard of proof involved in clear and express.  But we

15   don't have that here.  We have an agreement on the practice.

16   So we think that this falls squarely within the realm of a

17   repudiation as well.

18             And, finally, the City did raise a claim about how

19   the retirees are not proper parties to this matter.  I've

20   laid out earlier how these retirees -- well, when the charge

21   brought on behalf of active employees who have lost the

22   annuity enhancement and have lost the opportunity for the

23   13th check upon retirement, but in addition to that we

24   believe that this court could look at the West Ottawa

25   Education Association case, 126 Mi App 306, or the City of



STATEWIDE COURT REPORTERS

800-632-2720

1    Trenton opinion, no exceptions, 24 MPER, paragraph 26 out of

2    2011, for the doctrine that if a change can constitute a

3    mandatory subject of bargaining if, quote, "the concerns

4    bodily effect the terms and conditions of employment of

5    active employees," close quote.

6            And what you have here is a change in an

7    ordinance, a retirement ordinance which impacted everybody.

8    The City did not parse out how it would treat actives versus

9    retirees, but it lumped them all together, and when you have

10   a provision to -- when you have a change which impacts

11   retirees and actives and is intertwined in that fashion, the

12   change will constitute a mandatory subject of bargaining, so

13   even if there is some claim that this charge is not brought

14   on behalf of active employees, that argument ought to

15   encompass the change that was made to the ordinance as well.

16           So with that, if there are no questions, we ask

17   that this Commission order that the status quo be returned,

18   that there be back pay, back benefits made, all individuals

19   impacted made whole, with respect to the 13th checks, with

20   respect to the annuity enhancement losses, and that there be

21   an order to bargain, and that the order to bargain will be

22   that the City has an obligation to maintain that status quo

23   throughout bargaining until there is a legitimate good faith

24   impact.

25           JUDGE O'CONNOR:  The collective bargaining



NetworkReporting
— STATEWIDE COURT REPORTERS —
800-632-2720

1      agreement, the 2008-2012, has it expired?

2                  MR. MACK:  Yes.

3                  JUDGE O'CONNOR:  It hasn't been extended?

4                  MR. MACK:  Okay.  I'm going to hear from the City

5      next, but why don't we take five.

6                  (Off the record)

7                  JUDGE O'CONNOR:  Back on the record.  All right.

8      From the City?

9                  MS. JONES:  Okay.  Brother Counsel and I had some

10     discussion.  We note in your introductory comments that you

11     were admitting four of the exhibits, and we were wondering

12     why all of the exhibits were not being considered by the

13     Commission.  I shouldn't say "all," because I am objecting

14     to the one, but --

15                 JUDGE O'CONNOR:  The reason I selected the ones I

16     selected was you both relied on them.

17                 MS. JONES:  Okay.

18                 JUDGE O'CONNOR:  And they seemed undisputed of

19     origin.  If there's something else that either side wants to

20     propose, the other side doesn't object to, I'll admit it,

21     too, but I picked the ones that seemed public records and

22     undisputed.

23                 MS. JONES:  Did you want your affidavit in?

24                 MR. MACK:  The discussion was about the affidavits

25     in particular, whether they have to be exhibits or are they



1          just more like testimony.

2                    JUDGE O'CONNOR:  Well, I don't think the

3          affidavits have to be admitted as exhibits.

4                    MS. JONES:  Okay.

5                    JUDGE O'CONNOR:  I'm fine with admitting them as

6          exhibits.  It keeps the record a little bit cleaner.  You

7          both have affidavits.  If you both want them admitted,

8          that's fine.  I don't care.  They're attached to the

9          motions.

10                   MR. MACK:  Yeah, that's correct.

11                   MS. JONES:  Okay.  That's fine.

12                   JUDGE O'CONNOR:  Good enough?

13                   MS. JONES:  Good enough.

14                   MR. MACK:  That's fine.

15                   JUDGE O'CONNOR:  Okay.

16                   MS. JONES:  Okay.  Specifically Brother Counsel

17         gave you quite a bit of background, so I won't belabor the

18         record with a lot of background.

19                   The issue before you is whether a change in

20         mandatory conditions of employment was implemented in an

21         unlawful manner, and specifically the City of Detroit states

22         it has not been implemented in an unlawful manner.  The City

23         did concede after reviewing the cases that the judge

24         referred us to, we did concede in our response and counter

25         motion that on page 10 of our motion that it is conclusive



1   that the issue of retirement plans is a mandatory subject of

2   bargaining.

3           So let me get to some of the points that Brother

4   Counsel brought up before I get into my main argument.  He

5   suggests that there is a past practice, and in order to have

6   a past practice as he indicated by the cases he cited,

7   Amalgamated or Port Huron, there has to be either contract

8   language or a tacit agreement, and it is our position that

9   there has not been a tacit agreement; that, yes, it has been

10  over a period of time, but there have been challenges along

11  the way, so it was not necessarily agreed upon, and just to

12  focus on that.

13          Then he suggests that there was a taking because

14  if you remove the floor, the 7.9 as the floor, that

15  constitutes a taking, but yet still when the plan doesn't

16  make the 7.9, wouldn't it also constitute a taking when they

17  get to 7.9 and they —— and it wasn't earned?

18          Finally, as it relates to retirees not being

19  proper parties, and he suggests that based on West Ottawa

20  and City of Trenton that he is bringing it forth because his

21  active members will eventually retire and this is a benefit

22  they'll lose, I refer your Honor to the case on page nine

23  that we reference, Butler versus Wayne County, citing to

24  Allied Chemical.  Butler versus Wayne County is 289 Mi App

25  664.  It's a 2010 case and it cites to Allied Chemical,



1    which is 404 US 157, a 1971 case which holds that the

2    retirees are not members of the Union, they are not

3    employees of the Employer, and therefore, they would not be

4    considered under the Union's realm unless specifically

5    stated in the contract language, and it does not state so in

6    the contract language.

7              Now, that being said, that was just to address

8    some of the points that Brother Counsel brought out.  As it

9    relates to the actual question in this matter, we have what

10   is a mandatory subject of bargaining, which is the

11   retirement plans.  When the ordinance was implemented, it

12   was implemented under the time period when Public Act 4 was

13   still legally in effect.  Thus, it was legally enacted.  It

14   was not implemented in an unlawful manner.  And when I cite

15   the PA 4, let me give you the cite to that.  Michigan

16   Compiled Laws, Section 141.1501 et seq.  Specifically under

17   Public Act 4 there was a provision under specifically

18   Section 10.  It stated that Section 15, the right of

19   collective bargaining was suspended, and that cite is

20   Michigan Compiled Laws, Section 141.1514(a), Section 10,

21   and specifically the ordinance was enacted November 2011

22   with an effective date of December 15th, 2011.  Public Act 4

23   was enacted and in full effect on March 16, 2011.  It was

24   not repealed until November 2012, so the action that was

25   taken by the City to change the ordinance, as well as other



1    terms and conditions of employment to other Unions and

2    members of AFSCME, was legally enacted.  We had no duty to

3    bargain, and even Brother Counsel states in his argument

4    earlier today, he stated something to that effect that the

5    Union, because they were in the middle of a contract, had no

6    obligation to bargain.  The City didn't even attempt to

7    bargain.  But at that point when it was enacted, the City

8    did not have a duty to bargain.

9              So because of that, and there have been numerous

10   cases involving this and involving AFSCME, in fact, and then

11   the most recent case, which is not cited in our motion,

12   counter motion, but was just issued last week, Judge Stern

13   in a MERC decision regarding POAM also agreed with the

14   following -- the holdings of the following cases -- excuse

15   me.  Feel like I'm going to sneeze here.  DPOA versus City

16   of Detroit, which was a case in the Court of Claims;

17   Roberts versus Detroit Board of Education, which was a Wayne

18   County Circuit Court; DPOA versus City of Detroit, Wayne

19   County Circuit Court; City of Detroit versus AFSCME, which

20   was a MERC decision by Judge Peltz, all of these -- and now

21   the Judge Stern decision that came down last week -- all of

22   these acknowledged that when the City imposed or implemented

23   certain terms under PA 4 they had a right to do so and it

24   was not an unlawful implementation of that, of PERA.  And

25   the reason for that is because of that specific language



NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

1      under Michigan 141.1514(a), Section 10, that the duty to

2      bargain was suspended.  And because of that we are asking

3      that you grant in favor of the City that there was no --

4      that the change of mandatory conditions was not implemented

5      in an unlawful manner.

6                And as it relates to the relief requested by

7      Brother Counsel, status quo being restored, back pay remedy

8      and an order to bargain, those remedies, they are bargaining

9      right now I guess as it relates to various terms and

10     conditions before the Right to Work Act comes into play,

11     but -- and before the new emergency management law comes

12     into play, but as it relates to this particular ordinance,

13     we were legally correct in implementing it and we would ask

14     that you rule in our favor.

15                JUDGE O'CONNOR:  Is that it?

16                MS. JONES:  Uh-huh (affirmative)

17                JUDGE O'CONNOR:  Let me ask you, in your brief you

18     refer to PA 4.  You assert that the City was subject to a

19     consent agreement under PA 4.  Today you seem to argue that

20     the duty to bargain generally was suspended by PA 4.  Can

21     you clarify that for me?

22                MS. JONES:  Without having -- I probably should

23     have brought the Act with me.  Without having the Act with

24     me, there is specific language in the Act that states the

25     duty to bargain under PERA has been suspended.



1              MR. MACK:  I can read the Act.

2              JUDGE O'CONNOR:  I'm familiar with the Act.

3      Referring to the Employer's brief at page seven, it asserts

4      that "In March 2011, Public Act 4 was enacted.  With the

5      City being under a consent agreement, the terms requiring

6      collective bargaining under PERA were suspended."

7              MS. JONES:  That is correct.

8              JUDGE O'CONNOR:  When was the City under a consent

9      agreement?

10             MS. JONES:  I don't have the date that the City --

11     April 2012, I'm being told by Ms. Berry, of Labor Relations.

12             JUDGE O'CONNOR:  April 2012?

13             MS. BERRY:  Yes.

14             JUDGE O'CONNOR:  And when was the unilateral

15     change made to the pension plan?

16             MS. JONES:  The plan was made -- the change to the

17     pension plan was in November of 2011, effective date

18     December 2011.

19             JUDGE O'CONNOR:  So the consent agreement doesn't

20     come into play until six months later?

21             MS. JONES:  That is correct.  However, Public Act

22     4 specifically states that PERA was suspended.

23             JUDGE O'CONNOR:  Do you really want to argue that

24     to me?

25             MS. JONES:  That is our argument, that the duty to



NetworkReporting
— STATEWIDE COURT REPORTERS —
800-632-2720

1    collectively bargain was suspended during the time period

2    that Public Act 4, when it was in existence.

3              JUDGE O'CONNOR:  Under what provision of PA 4?

4    The part that says that bargaining is suspended during a

5    consent agreement perhaps?

6              MS. JONES:  Without -- as I indicated earlier,

7    without the actual Act in front of me, I cannot state that

8    you had to be under an agreement to be -- for Public Act 4

9    to -- the provisions of Public Act 4 to be in existence or

10   be effective.

11             JUDGE O'CONNOR:  That is what you assert in your

12   brief with the City being under a consent agreement.  I

13   thought it notable that your brief didn't assert when the

14   City was under a consent agreement notwithstanding providing

15   in that same paragraph, and the preceding one, all the

16   effective dates of everything else, you didn't provide the

17   effective date of the consent agreement.

18             MS. JONES:  And that was my error.  I did not know

19   what the date of the consent agreement, when it started.

20             JUDGE O'CONNOR:  But you sought to have this

21   Tribunal rely on that in dismissing a claim?

22             MS. JONES:  I'm relying on the Act, the Public Act

23   4 which states that Section 15 of PERA was suspended.

24             JUDGE O'CONNOR:  Okay.  Anything else from the

25   City?



1            MS. JONES:  Nothing else from the City.

2            JUDGE O'CONNOR:  Mr. Mack, anything further from

3     you?

4            MR. MACK:  Just on that point, Judge, the Act,

5     Public Act 4 that Counsel for the City is referencing is

6     specifically 141.1514(a), paragraph 10, and it reads as

7     follows:

8            "Unless the State Treasurer determines otherwise,

9            beginning 30 days after the date a local government

10           enters into a consent agreement under this Act, that

11           local government is not subject to Section 15.1 of

12           1947, PA 336,  MCL 423.215 for the remaining term of

13           the consent agreement."

14           The consent agreement, I asked the Court to take

15    judicial notice of the fact that the consent agreement was

16    signed on April the 4th, 2012, which meant that that

17    provision, paragraph 10, did not come into effect until 30

18    days thereafter, being May the 4th, 2012.  I think it's

19    apparent that any change made to a unilateral term and

20    condition of employment prior to that date without question

21    certainly is governed by PERA.

22           As a matter of fact, the coalition, and yours

23    truly, actually, made an argument in a different case before

24    this Tribunal that even that paragraph does not in fact

25    constitute a removal of the duty to bargain in its entirety



1    because there are several other provisions of PERA, namely

2    Sections 9, 10 and 11 which also call for an Employer to

3    have a duty to bargain.  That particular paragraph only

4    removed paragraph 15 of PERA.  But nonetheless, that

5    paragraph was not in effect because the ordinance change was

6    not made.  And all of the cases that Counsel cited to,

7    whether it be the Robert Davis case, whether it be the Judge

8    Manderfield ruling, the Judge MacDonald ruling, even Judge

9    Stern's recent ruling, the POAM case, all of those cases

10   addressed changes that were made to terms and conditions of

11   employment post the May 4, 2012 execution or effective date

12   of the paragraph 10 of PERA -- of PA 4 rather.  They did not

13   involve anything that which took place prior to.  So none of

14   those cases are relevant here.

15              And finally I note that on the Krystal Crittendon

16   letter of October 10, 2011, page six of that letter, she

17   does go into --

18              JUDGE O'CONNOR:  Let me get to that in a second.

19   Page six?  Okay.  Got it.

20              MR. MACK:  Nothing but that was where she

21   addressed the labor law considerations, and, of course, she

22   does not raise any argument that there is no duty bargain,

23   Public Act 4, it's in existence and therefore, we had the

24   right to make this unilateral change.

25              That's all, Judge.



NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

1          JUDGE O'CONNOR:  Does the City want to do any

2     response?

3          MS. JONES:  I'm trying to get to the letter.

4          JUDGE O'CONNOR:  Sure.  In particular I want you

5     to focus on whether you want to withdraw your argument as to

6     PA 4.

7          MS. JONES:  As it relates to PA 4, no, I do not

8     want to withdraw that argument, but I do wish to speak to

9     what Brother Counsel just brought up about labor law

10    considerations.

11         Her labor law considerations is speaking to the

12    fact that we can't give unbargained for benefits on Union

13    members.  I guess his argument is in the same vein, you

14    can't take them away without negotiations.  But we are

15    acknowledging in her letter that there is collective

16    bargaining process as it relates to these benefits.

17         JUDGE O'CONNOR:  Anything further from the City?

18         MS. JONES:  No.

19         JUDGE O'CONNOR:  All right.  I am prepared to

20    issue a bench opinion, which will be followed by a written

21    decision.  The time for filing exceptions to the written

22    decision, to the decision, begins to run on the date the

23    written decision is issued, not today.  So today really is a

24    preview of what will be inserted into a written decision.

25         I should note for the record that Judge Tyra



**NetworkReporting**
— STATEWIDE COURT REPORTERS —
800-632-2720

1    Wright has joined us and is sitting in the back of the

2    courtroom.  She sometimes observes the trials.

3         I find that this case is controlled by the

4    indistinguishable decision in the 1996 published Court of

5    Appeals decision involving these same parties, AFSCME and

6    Detroit.  It's further controlled by judicial estoppel where

7    the City prevailed in that case by asserting the very thing

8    they deny today, and that is the City, in the '96 case as

9    recounted by the Court of Appeals conceded, as it must have

10   done under the then existing law, that regardless of charter

11   provision or any change to it, regardless of ordinance or

12   any change to it, the City could not unilaterally change

13   aspects of the pension plan without bargaining first with

14   the Union.

15        The City today acknowledges in its brief duty to

16   bargain, but asserts to the contrary, there was no duty to

17   bargain under PA 4, which I'll address in a minute.

18        The City never addresses, either in oral argument

19   or its brief, the impact of the clearly controlling

20   published decision between these same two parties.  I find

21   that shocking and troubling that it wasn't even addressed,

22   because it is so clearly controlled.

23        The City, in the 1996 decision, sought to change

24   by charter amendment the very issue, or at least part of the

25   very underlying issue at stake here today, and that is the



NetworkReporting
— STATEWIDE COURT REPORTERS —
800-632-2720

1    Pension Board's allocation of excess earnings.  In 1996 the

2    City sought to change it by charter amendment.  In 2011 they

3    sought to change it by pension ordinance change.  That is

4    not a distinction where the question is was there a duty to

5    bargain.

6              Then and now there was no factual dispute; there

7    is no factual dispute.  The excess earnings have always been

8    allocated at the discretion of the Pension Board.  The Union

9    has argued that that's a binding past practice.  The City

10   asserts that it wasn't mutual.  I find the assertion of a

11   lack of mutuality frivolous given the prior litigation,

12   given the City's concession in the prior litigation that it

13   was an established prior practice.  It's also -- I also find

14   it frivolous based on the exhibits produced by the City in

15   this case.  The Corley letter, which was an advice letter to

16   City Council by its own staff which recounts in very

17   specific terms that there was an existing prior practice

18   that was well recognized, but the City did not like that

19   prior practice and wanted to change it, but acknowledging

20   with incredible specificity that the prior practice that

21   existed for over 20 years, spelling out year by year the

22   amount of money allocated by the Pension Board over the

23   City's concern about how it was being allocated, but with

24   the City's acquiescence in collective bargaining agreement

25   after collective bargaining agreement, and the City



1      repeatedly re-adopted collective bargaining agreements,

2      including the 2008-2012 agreement which was initially

3      unilaterally imposed on the Union and then expressly

4      acquiesced by the Union which incorporates by reference the

5      very pension ordinance that the City sought to unilaterally

6      change.  It was more than a tacit agreement.  It was an

7      express agreement with full understanding by both parties.

8              Then -- in 1996 that is -- and now, in --

9      actually, before the change in 2011.  The excess earnings

10     have always been allocated at the discretion of the Pension

11     Board.  The Board as set forth in the City's exhibits

12     allocated the so-called excess earnings, that is earnings

13     above a projected target rate of return, to essentially

14     three different things or three funds; the retiree 13th

15     check, and secondly to supplement the holdings in individual

16     employee annuity funds and to reduce the City pension

17     contribution.  The Esuchanko charts which the City submitted

18     made clear that in each and every year where there were

19     excess earnings the Pension Board allocated them amongst

20     those three funds at the Pension Board's discretion and in

21     roughly comparable amounts each time.

22             There was no dispute even in 1996 the practice had

23     been longstanding.  It's obvious that the City's preference,

24     for understandable reasons, was to change that practice.  It

25     attempted to do so unilaterally in 1996 and again in 2011.



NetworkReporting
— STATEWIDE COURT REPORTERS —
800-632-2720

1    As I said, I see no distinction between the City's
2    unilateral effort to change it by pension ordinance or by
3    charter amendment.  In each case, as the City rightly
4    conceded in 1996, regardless of a change to those ordinances
5    or charter provisions, the duty to bargain remained.

6          In the 1996 decision, which is a published
7    decision binding on the parties and binding on me, the Court
8    recounts that the City in response to AFSCME's challenge,
9    quote, "Agrees that the challenged provision cannot be
10   legally implemented even if enacted by the voters without
11   first bargaining," close quote.

12         The City's concession in 1996 that there was a
13   duty to maintain these precise conditions of employment
14   absent bargaining was correct under the law then, and
15   remains correct under current case law interpreting PERA.
16   Regardless, I would otherwise find the City bound by res
17   judicata and by collateral estoppel by that 1996 decision
18   involving these two parties before me today on that same
19   mixed question of fact and law.

20         I think it's particularly notable -- why don't we
21   add who just came in at counsel table?

22         MR. MACK:  Yes.

23         MR. MCNEIL:  Good morning.  Ed McNeil, Special
24   Assistant to President Alvin Garrett, Michigan AFSCME
25   Council 25.



1          JUDGE O'CONNOR:  Wanted to make sure it was in the

2    transcript.

3          It's particularly notable that one of the earliest

4    cases interpreting and enforcing PERA involved the City of

5    Detroit and the DPOA, and an assertion by the City, and this

6    was in the early '70's.

7          MR. MACK:  '74.

8          JUDGE O'CONNOR:  Counsel for the Union indicates

9    it was '74.  I was just going by vague recollection.

10   Because it is such black letter law, I don't have to

11   remember the cite to the case.  I'll insert it in the

12   decision.  But in the Detroit DPOA case the City asserted,

13   "We don't have to bargain about pensions because they're

14   controlled by our charter, and our pension ordinance," and

15   the Michigan Supreme Court said, "You're wrong.  You've been

16   wrong since 1974."  You were wrong in -- you were right in

17   1996 in acknowledging that they had to bargain before they

18   could make a change, and it's not just wrong, but frivolous

19   today to argue otherwise.

20         The Union Counsel cited to the Macomb County Court

21   of Appeals decision, another more recent decision which

22   again involved a change in what the Court found to be a

23   tacitly agreed-upon, very arcane question under the pension

24   plan of the use of a particular actuarial table, whether it

25   was mixed gender or single gender use of the actuarial



NetworkReporting
— STATEWIDE COURT REPORTERS —
800-632-2720

1       table.  In that case the Court of Appeals upheld MERC's

2       finding that a unilateral change by an Employer to something

3       as arcane and minute an impact as which actuarial table to

4       use, a mixed, or a blended or a single table, was a

5       violation of the duty to bargain.  MERC's case law has long

6       held that an attempt -- the NLRB makes the same findings --

7       but an attempt by an Employer to unilaterally change a

8       process that involves a particular decision maker or

9       discretionary decision making process to a unilateral

10      Employer decision is an unlawful change in existing

11      conditions of employment.

12              The City adopted the change and dispute in this

13      case by amending a pension -- not just amending a pension

14      ordinance.  It's undisputed that after the pension ordinance

15      was adopted, the City unilaterally implemented that change,

16      unlike the position the City took in 1996 which was that

17      they needed to change the charter, and that even if the

18      charter were changed, which has a higher status than a

19      pension ordinance, the City acknowledged they would still

20      not be able to implement the change until they bargained

21      with the Unions over it.  Here the City threw out that

22      concession and actually implemented the change without

23      bargaining.

24              It's undisputed and supported by affidavit

25      submitted by the Union and not contradicted by the City,



NetworkReporting
— STATEWIDE COURT REPORTERS —
800-632-2720

1     that in each year in which there were excess earnings, the

2     Pension Board allocated those earnings, then divided the

3     monies as I've described into three separate pots,

4     essentially; part to reduce the City's contribution under

5     the defined benefit plan, part to the 13th check and part to

6     the annuity accounts.  The Corley and Esuchanko documents

7     submitted by and relied on by the City unequivocally

8     establish that the practice was consistent and of

9     longstanding.

10               Again, the 1996 Court of Appeals decision alone

11    would have regardless established this process was an

12    established condition of employment.  If it existed in 1996

13    and still existed in 2011, it's an established condition of

14    employment.

15               The change directly affected an existing and

16    fundamental condition of employment.  Again, Detroit versus

17    DPOA held that pension plans and promises made under them

18    were a fundamental condition of employment such that the

19    City of Detroit had to bargain over them in the DPOA case

20    notwithstanding a preexisting charter provision which set

21    terms different than the DPOA was seeking.  City's conduct

22    was unlawful and constitutes a refusal to bargain in good

23    faith by unilaterally changing an existing condition of

24    employment as to active employees.

25               Additionally, the City's conduct occurred at a



NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

1    point in time when the parties had in place a negotiated

2    collective bargaining agreement.  This is really the second

3    half of the charge, and it's subject to a separate analysis.

4              That binding collective bargaining agreement

5    expressly incorporated by reference the prior version of the

6    pension ordinance and charter provisions, and taking

7    judicial notice, was negotiated in the context of both

8    parties understanding and being aware of the 1996 Court of

9    Appeals decision on this very topic as they were both

10   parties to that case.  They can't deny knowledge of it

11   having previously litigated the very dispute that we're here

12   on today.

13             The law, the case law, and PERA did not change in

14   any relevant aspect between the 1996 decision by the Court

15   of Appeals and the 2011 action by the Employer.  I was,

16   frankly, I think I indicated, stunned by the failure of the

17   City in its brief on the merits of the case to even address

18   the obviously relevant 1996 decision.

19             The City had and has no colorable claim that it

20   did not face a clear and binding contractual obligation to

21   keep in place the preexisting and previously litigated

22   method of allocating excess earnings.  As such, the City's

23   conduct further constituted an unfair labor practice as it

24   was an unlawful repudiation of the binding 2008-2012

25   collective bargaining agreement, which obviously was still



1    in effect at the point of the November 2011 pension

2    ordinance change.

3            Union Counsel appropriately cited to the ATU past

4    practice case and the line of cases following ATU.  This

5    was, I think, beyond a tacit agreement, but it was at

6    minimum a tacit agreement.  A practice that continues for

7    three decades is a tacit agreement.  A practice where the

8    City has previously sought a charter amendment

9    unsuccessfully to end the practice is, at minimum, a tacit

10   agreement.  I think, frankly, it rises to the level of an

11   express agreement where the parties having previously fought

12   over the terms of the charter and the pension ordinance,

13   then incorporate them by reference in the collective

14   bargaining agreement.  What is incorporated by reference is

15   the then existing pension ordinance and charter, and that's

16   in keeping with the Macomb County decision.

17           The City's sole proffered defense really was, in

18   its brief, was that the financial stability agreement

19   entered into under 2011 PA 4 suspended the duty to bargain.

20   The City disingenuously failed to disclose in its brief that

21   the financial stability agreement, also referred to as a

22   consent agreement, was not entered into until more than five

23   months after the complained of conduct.  The argument was

24   frivolous.  The assertion that PA 4 suspended the duty to

25   bargain generally was a frivolous argument.  It demeans the



NetworkReporting
— STATEWIDE COURT REPORTERS —
800-632-2720

1      City and the Tribunal for an argument that specious to be

2      made.  It was shocking.  PA 4 was very clear by its terms,

3      as the City is well aware.  And I have no doubt, but that

4      the City is well aware.

5           PA 4 while it was in place provided for several

6      options, the appointment of a financial manager or entering

7      into a consent agreement.  It provided very expressly and

8      clearly and the section of the statute cited by City Counsel

9      is absolutely clear and unambiguous.  It provided that the

10     duty to bargain was suspended 30 days following entering

11     into consent agreement, which clearly had not occurred in

12     November of 2011.

13          The April 2012, and it is conceded belatedly by

14     the City that the financial stability agreement was not

15     entered into until April of 2012, cannot and did not

16     possibly excuse the City's November 2011 unlawful acts.

17          The failure to disclose to the Tribunal the

18     financial stability agreement on which the City's argument

19     relied was entered into long after this dispute arose, while

20     asking the Tribunal to rely on the financial stability

21     agreement as the City's principal defense exhibited a

22     troubling lack of candor contrary to the expectations of

23     MRPC 3.3.

24          The City has further raised the question of

25     AFSCME's standing to represent already retired former



NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

1    employees.  The City is incorrect in its assertions that the

2    case law cited provide that AFSCME former employees who are

3    retirees are not members of AFSCME.  They may well be, they

4    may not be.  It's individually -- some retirees continue to

5    belong to unions, some don't.  They are, however, no longer

6    part of the bargaining unit.  The City was correct to that

7    extent.

8            It is axiomatic that neither the Employer nor the

9    Union can demand to bargain over changes in conditions

10   affecting already retired former employees.  It doesn't

11   alter the Union's claim as to the impact on active employees

12   who were promised that the Pension Board would have the

13   discretion to allocate ceratin funds, excess earnings, to

14   their annuity accounts and were promised that upon

15   retirement they would and eligible for 13th checks to the

16   extent that there were unearned excess earnings or excess

17   earnings above their rate, expected one.  I stumbled over

18   that phrase.  I'm not an actuary.

19           As I said, there's no duty to bargain over changes

20   and conditions affecting already retired former employees.

21   However, that doesn't fully answer the question in this

22   case.  The parties may, of course, voluntarily enter into

23   negotiations over permissive subjects of bargaining.  The

24   question of possibly raising a pension benefit for people

25   who already are retired is a permissive subject of



STATEWIDE COURT REPORTERS

800-632-2720

1       bargaining.  It's not prohibited.  The parties can, if they

2       choose to, negotiate over it.

3               Here the Union has not sought as relief any demand

4       over any right to bargain as to former employees.  Rather

5       the Union is seeking to enforce the Employer's obligation to

6       not make unilateral changes in promises that had already

7       been made and were still in effect, both the current

8       employees regarding their entitlements once they retire,

9       which is a perfectly ordinary mandatory subject to

10      bargaining, and as to individuals who were part of the

11      bargaining unit and since retired.

12              The Union is asserting, and I have found the

13      Employer in implementing unilaterally the changes to the

14      pension ordinance and cutting off the 13th check, has

15      repudiated the terms of an existing collective bargaining

16      agreement.  Under PERA, the repudiation of the clear,

17      undisputed terms of an existing contract is more than a mere

18      contract breach which would otherwise be left to the

19      grievance procedure or circuit court suit over damages or

20      whatnot, breach of contract.  Rather it's treated as a

21      refusal of bargaining in good faith and is therefore an

22      unlawful unfair labor practice even if related to a

23      permissive subject of bargaining over which there was

24      necessarily no duty to bargain as in the Commission

25      decisions in the Kalamazoo County Sheriff case where the



NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

1    Commission held that where you have a mixed question, a

2    collective bargaining agreement that covers both mandatory

3    subjects and permissive subjects, the package is the

4    package.  It's a single package.  Neither side can

5    unilaterally carve it up into pieces and say, "We'll comply

6    with one piece.  We won't comply with this other piece,"

7    unilaterally and without violating the duty to bargain.

8    Once a contract has been reached, it must be treated as

9    binding on both parties, as the Commission held in Kalamazoo

10   County Sheriff, or the possibility of productive future

11   bargaining is destroyed.

12          I will be recommending the restoration of the

13   status quo by restoring to the Pension Board the discretion

14   previously exercised by the City being ordered to not

15   interfere in the exercise of that discretion by the Pension

16   Board regarding excess earnings, that the Retirement Board

17   be notified by the City of the restoration of their

18   preexisting discretion, that affected retirement plan

19   participants, both active employees and retirees, be made

20   whole by the City to the extent that there is any practical

21   impediment to the Pension Board making those participants

22   whole otherwise.

23          Because it may be -- the most practical resolution

24   may be for the Pension Board to reallocate those assets.

25   Either way, it is ultimately the obligation of the City to



NetworkReporting
— STATEWIDE COURT REPORTERS —
800-632-2720

1    correct the problem it caused by its unilateral action

2    which, again, was taken in direct rejection of the

3    obligations it conceded that it had in the 1996 litigation.

4             I will recommend a posting of a notice to reaffirm

5    for active employees, posting of the notice at the work

6    places to reaffirm for active employees that the contractual

7    promises made to them must be kept.

8             That's it.  I will issue a written decision

9    following this up once I receive the transcript.  Any

10   questions?

11            MR. MACK:  Yes, Judge.  On the make whole, just as

12   a clarification to the extent practical, would that involve

13   I imagine in the compliance phase I presume some

14   determination as to what would have been allocated but for

15   the change?  I mean part of it is discretionary, so I

16   realize that there may be some additional steps to take to

17   determine the allocation which would have been made but for

18   the change, but I believe that could be addressed for

19   instance in just having the Pension Board in a meeting make

20   that decision, had this been our investment earnings, with

21   this being the actuarial rate of return, I mean this amount

22   was the excess earnings, here's what we would have done

23   putting it into three pots, something to that effect, and

24   then determining who was made whole, who was harmed and who

25   needs to be made whole following that determination.  Is



1        that something along the lines of what you indicated?

2                    JUDGE O'CONNOR:  Well, what I've indicated I

3        intend to order is that -- if I can have everyone's

4        attention.

5                    MS. JONES:  Go ahead, sir.

6                    JUDGE O'CONNOR:  That the status quo be restored,

7        the steps that I'll be recommending be ordered are that the

8        City restore to the Pension Board the discretion previously

9        exercised, specifically that the City notify the Pension

10       Board that the discretion has been restored.  The Pension

11       Board will have to act based on that discretion and

12       determine what they think is necessary to put back together

13       what would have otherwise happened.  And the Pension Board

14       has a prior history as laid out by Corley and Esuchanko of

15       how they typically did that, but it is within the discretion

16       of the Pension Board how precisely they do that.

17                   The part that you asked your question about which

18       was to the extent practical, that's not what I said.

19                   MR. MACK:  Okay.

20                   JUDGE O'CONNOR:  What I said was that my

21       expectation is that the first level response will be by the

22       Pension Board just using their discretion to decide what

23       they think should happen.

24                   MR. MACK:  Okay.

25                   JUDGE O'CONNOR:  What I propose to order is that



Page 53

1       to the extent that there's any practical impediment to the

2       Pension Board making the participants whole, it will be upon

3       the City to make the participants whole.

4               Any questions from the City as to the nature or

5       extent of the order?

6               MS. JONES:  No.  I'll wait for the written

7       decision.

8               JUDGE O'CONNOR:  Okay.  Thank you, all.

9               MR. MACK:  Thank you, Judge.

10              (Proceedings concluded at 10:55 a.m.)

11

12                              -0-0-0-

13

14

15

16

17

18

19

20

21

22

23

24

25



**A**

**AAA** 22:5
**able** 43:20
**absent** 41:14
**absolutely** 47:9
**acceptable** 6:25
**account** 11:17,23
12:1,2 14:22,24
**Accountants** 13:8
**accounts** 11:14,21
12:25 15:23,24
16:1 18:20 20:1,2
44:6 48:14
**accumulated** 17:8
**accustomed** 4:21
**acknowledged** 9:21
13:24 31:22 43:19
**acknowledges**
10:14 22:24 38:15
**acknowledging**
37:15 39:19 42:17
**acknowledgment**
13:4,5,6
**acquiesced** 40:4
**acquiescence** 39:24
**act** 9:15 30:12,17
30:22 32:10,23,23
32:24 33:1,2,4,21
34:2,7,8,9,22,22
35:4,5,10 36:23
52:11
**acting** 20:17,17
**action** 30:24 45:15
51:1
**actions** 21:8
**active** 11:13,15,21
19:25 20:1,3,4,7,9
20:11 25:21 26:5
26:14 29:21 44:24
48:11 50:19 51:5
51:6
**actives** 26:8,11
**acts** 47:16

**actual** 5:4 30:9
34:7
**actuarial** 10:25
11:19 42:24,25
43:3 51:21
**actuarially** 13:3
**actuaries** 17:16
**actuary** 8:8,8 10:25
16:11 17:5 24:15
48:18
**add** 41:21
**addition** 21:5 25:23
**additional** 11:11
51:16
**additionally** 9:5
44:25
**address** 30:7 38:17
45:17
**addressed** 9:16
36:10,21 38:21
51:18
**addresses** 38:18
**addressing** 19:19
**adjust** 20:24
**administration**
22:3
**Administrative**
1:13 4:6,7,8
**admit** 27:20
**admitted** 28:3,7
**admitting** 9:7
27:11 28:5
**adopted** 5:8,14
43:12,15
**adopting** 23:16
**adoption** 4:23
**advancing** 23:22
**advice** 39:15
**affiant** 24:23,24
**affidavit** 9:6 12:16
12:18 14:4,17
16:5 24:23 27:23
43:24

**affidavits** 27:24
28:3,7
**affirmative** 32:16
**afforded** 20:7
**AFSCME** 1:5,24
4:3 5:25 6:6 7:23
9:17 14:9 22:5
24:11,12 31:2,10
31:19 38:5 41:24
48:2,3
**AFSCME's** 41:8
47:25
**ago** 17:15
**agreed** 29:11 31:13
**agreed-upon** 42:23
**agreement** 3:12
5:18,19 6:18 9:4
18:5 25:6,8,15
27:1 29:8,9 32:19
33:5,9,19 34:5,8
34:12,14,17,19
35:10,13,14,15
39:24,25 40:2,6,7
45:2,4,25 46:5,6,7
46:10,11,14,18,21
46:22 47:7,11,14
47:18,21 49:16
50:2
**agreements** 40:1
**Agrees** 41:9
**ahead** 52:5
**alert** 15:14
**alleged** 5:13
**Allied** 29:24,25
**allocate** 11:9,12
12:4 48:13
**allocated** 19:1 39:8
39:22,23 40:10,12
40:19 44:2 51:14
**allocating** 45:22
**allocation** 39:1
51:17
**alter** 48:11

**altered** 5:15
**altogether** 15:10
**Alvin** 41:24
**Amalgamated** 25:2
25:5 29:7
**ambiguous** 25:6
**amending** 43:13,13
**amendment** 9:20
13:16,21 14:1
38:24 39:2 41:3
46:8
**amount** 12:6 14:16
15:2 18:10 24:17
39:22 51:21
**amounts** 16:12
40:21
**analysis** 8:3,7 45:3
**Analyst** 13:8
**analyzed** 23:18
**Anita** 1:24 4:14
**annuities** 5:3
**annuity** 11:13,21
11:23 12:1,2
14:12,15,22,23
15:7,23,24 16:1,7
16:14,14 18:19
20:1,2 24:11
25:22 26:20 40:16
44:6 48:14
**answer** 48:21
**anybody** 8:20
**Anyway** 5:2 8:16
**App** 9:17 13:9
19:21 21:11 25:25
29:24
**apparent** 5:4 35:19
**Appeal** 22:22
**Appeals** 10:5 38:5
38:9 42:21 43:1
44:10 45:9,15
**Appearance** 4:10
**APPEARANCES**
1:16

**applicable** 25:10
**applied** 17:10
22:15
**appointed** 10:19
**appointees** 10:22
**appointment** 47:6
**Appraiser's** 13:8
**approach** 17:22
**approached** 17:24
**appropriately** 46:3
**approved** 22:23
**approximated** 17:8
**approximately**
12:20
**April** 33:11,12
35:16 47:13,15
**arcane** 42:23 43:3
**argue** 21:16 24:1
32:19 33:23 42:19
**argued** 39:9
**arguing** 22:7
**argument** 19:16
20:12 21:19,22
26:14 29:4 31:3
33:25 35:23 36:22
37:5,8,13 38:18
46:23,25 47:1,18
**arguments** 6:5
**Armella** 14:5
**arose** 47:19
**asked** 35:14 52:17
**asking** 32:2 47:20
**aspect** 45:14
**aspects** 38:13
**assert** 32:18 34:11
34:13
**asserted** 5:6 9:11
42:12
**asserting** 38:7
49:12
**assertion** 9:1,16
39:10 42:5 46:24
**assertions** 48:1



NetworkReporting

STATEWIDE COURT REPORTERS

800-632-2720

**asserts** 33:3 38:16
39:10
**assets** 50:24
**assigning** 21:14
**assistant** 1:21
12:21 41:24
**Association** 13:8
21:10 25:25
**assumed** 13:3
14:21
**attach** 18:6
**attached** 6:18 7:6
7:14 8:6,9 12:16
28:8
**attaching** 7:13
**attempt** 15:19 23:5
31:6 43:6,7
**attempted** 40:25
**attention** 52:4
**ATU** 46:3,4
**authority** 20:18
**Avenue** 1:22
**aware** 9:25 45:8
47:3,4
**axiomatic** 48:8
**a.m** 1:15 4:2 53:10

———————
**B**
———————
**B** 12:18 16:21
**back** 20:22 21:18
26:18,18 27:7
32:7 38:1 52:12
**background** 10:12
28:17,18
**ballot** 22:17
**bargain** 13:24
22:10,11,20,21,24
23:3,8 26:21,21
31:3,6,7,8 32:2,8
32:20,25 34:1
35:25 36:3,22
38:16,17 39:5
41:5 42:13,17
43:5 44:19,22

46:19,25 47:10
48:9,19 49:4,24
50:7
**bargained** 15:18
22:9 43:20
**bargaining** 3:12
5:11,17,18,19
6:18 9:3,22 15:11
15:15,19 17:21
18:5 19:3,20,23
20:9 21:8,13,24
21:25,25 22:8
23:25 24:8 25:6
26:3,12,23,25
29:2 30:10,19
32:8 33:6 34:4
37:16 38:13 39:24
39:25 40:1 41:11
41:14 43:23 45:2
45:4,25 46:14
48:6,23 49:1,10
49:11,15,21,23
50:2,11
**based** 6:12 16:8
23:20 29:19 39:14
52:11
**basically** 12:2
**basis** 23:4
**beginning** 35:9
**begins** 37:22
**behalf** 4:7,8,13
5:25 6:1 25:21
26:14
**belabor** 28:17
**belatedly** 47:13
**believe** 16:21 25:24
51:18
**belong** 48:5
**bench** 37:20
**benefit** 20:3 29:21
44:5 48:24
**benefits** 17:11
19:18,22,24,25

20:4,4,7 26:18
37:12,16
**Berdijo** 12:18
**Berry** 1:24 4:14,17
33:11,13
**best** 20:18 21:22
24:20
**beyond** 14:4,16
16:14 18:21 20:17
46:5
**billion** 17:11 24:15
**binding** 39:9 41:7,7
45:4,20,24 50:9
**bit** 11:15 12:1
13:23 28:6,17
**black** 42:10
**blended** 43:4
**Board** 4:24,25 5:3
5:16 9:15 10:19
10:23,24 11:5,7
12:12,24 13:5
20:25 21:9 31:17
39:8,22 40:11,11
40:19 44:2 48:12
50:13,16,16,21,24
51:19 52:8,10,11
52:13,16,22 53:2
**Board's** 9:12 39:1
40:20
**bodily** 26:4
**body** 21:14
**bonafide** 24:8,19
**bottom** 17:7
**Boulevard** 1:14,18
**bound** 41:16
**breach** 24:7,10
49:18,20
**breaking** 21:17
**brief** 5:12 7:7,15,18
8:10,18 17:3
19:21 23:10,10
32:17 33:3 34:12
34:13 38:15,19

45:17 46:18,20
**bringing** 29:20
**Brother** 27:9 28:16
29:3 30:8 31:3
32:7 37:9
**brought** 5:24 25:21
26:13 29:4 30:8
32:23 37:9
**Butler** 29:23,24

———————
**C**
———————
**C** 1:20 7:16,17
**calculating** 19:23
**call** 21:21 36:2
**called** 11:7
**candor** 47:22
**cap** 16:18
**capped** 16:8,10
**capping** 16:15
**captioned** 5:25
**care** 28:8
**carve** 50:5
**case** 1:7 4:5,7,23
9:18,20 13:7,9,23
19:20 20:5,6,18
20:20 21:5,10,21
21:22 22:2 23:3
23:18,19 25:25
29:22,25 30:1
31:11,16 35:23
36:7,9 38:3,7,8
39:15 41:3,15
42:11,12 43:1,5
43:13 44:19 45:10
45:13,17 46:4
48:2,22 49:25
**cases** 20:6 28:23
29:6 31:10,14
36:6,9,14 42:4
46:4
**cash** 12:3
**caused** 51:1
**ceiling** 15:8,24
16:11,12

**CER** 2:1
**ceratin** 48:13
**certain** 5:15 12:6
31:23
**certainly** 35:21
**Certified** 2:1
**challenge** 41:8
**challenged** 41:9
**challenges** 29:10
**change** 5:16 9:1,2
9:19,21 10:1,3
13:20,25 15:5,15
15:20 16:19 17:20
18:5 19:2,16
20:13,14,21,23
21:2,17 22:1,3,6,7
22:10,15,17,20,21
23:2,7,24 26:2,6
26:10,12,15 28:19
30:25 32:4 33:15
33:16 35:19 36:5
36:24 38:11,12,12
38:23 39:2,3,3,19
40:6,9,24 41:2,4
42:18,22 43:2,7
43:10,12,15,17,20
43:22 44:15 45:13
46:2 51:15,18
**changed** 5:8 15:5
21:18 43:18
**changes** 17:25
36:10 48:9,19
49:6,13
**changing** 44:23
**charge** 5:9 6:3
25:20 26:13 45:3
**charger** 22:3
**charging** 1:6,17 4:4
4:10 5:24 6:4
24:24
**chart** 8:14,14 18:8
18:9,10 24:16
**charter** 5:20 9:20



**NetworkReporting**
STATEWIDE COURT REPORTERS
800-632-2720

13:16,20,25 20:21
20:23,24 21:1,2
22:7,17 24:3
38:10,24 39:2
41:3,5 42:14
43:17,18 44:20
45:6 46:8,12,15
**charts** 8:7,10 16:20
40:17
**check** 11:10,11
15:9,9 18:14,17
20:11 25:23 40:15
44:5 49:14
**checks** 5:5 18:17
26:19 48:15
**Chemical** 29:24,25
**choose** 49:2
**circuit** 31:18,19
49:19
**cite** 21:6 30:14,15
30:19 42:11
**cited** 19:20 29:6
31:11 36:6 42:20
46:3 47:8 48:2
**cites** 21:9 29:25
**citing** 29:23
**city** 1:8,21 3:14,15
3:16 4:4,13,15,23
5:1,1,12,14,20,23
6:9 7:13,21,22 8:3
8:4,7,15 9:11,18
9:18,21 10:14,16
10:21,23 11:17,25
12:7,8,9,14,15
13:8,11,16 14:7,8
14:9 15:14,18
16:13,15 17:8,15
17:23 18:1,3,3
19:4,15 20:12,15
20:22 21:10,16,21
21:23 22:2,2,5,11
22:15,24,25 23:1
23:2,6,23 24:13

24:22 25:18,25
26:8,22 27:4,8
28:21,22 29:20
30:25 31:6,7,15
31:18,19,22 32:3
32:18 33:5,8,10
34:12,14,25 35:1
35:5 37:1,17 38:7
38:8,12,15,18,23
39:2,9,14,16,18
39:25 40:5,16,17
41:3,8,16 42:4,5
42:12 43:12,15,16
43:19,21,25 44:7
44:19 45:17,19
46:8,20 47:1,3,4,8
47:14,24 48:1,6
50:14,17,20,25
52:8,9 53:3,4
**City's** 7:15,17 8:17
12:5 17:2 20:19
20:24 22:9,13
23:4 24:23 39:12
39:23,24 40:11,23
41:1,12 44:4,21
44:25 45:22 46:17
47:16,18,21
**claim** 23:6 25:18
26:13 34:21 45:19
48:11
**claiming** 19:10
21:23
**Claims** 31:16
**clarification** 51:12
**clarify** 32:21
**clean** 7:5
**cleaner** 28:6
**clear** 19:22 20:5,7
25:14 40:18 45:20
47:2,9 49:16
**clearly** 10:12 16:9
38:19,22 47:8,11
**close** 21:15 26:5

41:11
**coalition** 6:1,3
35:22
**Cohen** 1:17
**collateral** 41:17
**collective** 3:12 5:18
5:18 6:18 9:3
25:6 26:25 30:19
33:6 37:15 39:24
39:25 40:1 45:2,4
45:25 46:13 49:15
50:2
**collectively** 34:1
**colorable** 45:19
**columns** 18:22
**come** 23:6 33:20
35:17
**comes** 23:2 32:10
32:11
**comments** 4:21
27:10
**Commission** 1:3
3:11,13,14,16 4:9
6:17 7:6,8,9,10,18
7:19,20 8:1,2,19
9:7,9 21:23 26:17
27:13 49:24 50:1
50:9
**comparable** 40:21
**competent** 9:6
**Compiled** 30:16,20
**complained** 46:23
**compliance** 51:13
**comply** 50:5,6
**concede** 28:23,24
**conceded** 38:9 41:4
47:13 51:3
**concedes** 5:12
**concern** 5:23 39:23
**concerning** 10:12
10:13,15
**concerns** 26:3
**concession** 39:12

41:12 43:22
**concessions** 18:2
**concluded** 53:10
**concludes** 23:15
**conclusive** 28:25
**condition** 9:2,14,24
19:17 35:20 44:12
44:13,16,18,23
**conditions** 10:3
26:4 28:20 31:1
32:4,10 36:10
41:13 43:11 48:9
48:20
**conduct** 44:21,25
45:23 46:23
**conflict** 21:19
23:16
**conflicting** 25:10
**conflicts** 25:12
**consent** 32:19 33:5
33:8,19 34:5,12
34:14,17,19 35:10
35:13,14,15 46:22
47:7,11
**consequence** 17:17
**consideration** 6:5
**considerations**
36:21 37:10,11
**considered** 27:12
30:4
**consistent** 44:8
**constitute** 26:2,12
29:16 35:25
**constituted** 45:23
**constitutes** 24:1
29:15 44:22
**Constitutional**
16:17
**consultation** 17:15
**contacted** 15:14
**CONTENTS** 3:1
**context** 45:7
**continue** 25:9 48:4

**continues** 46:6
**continuing** 21:1
**contract** 7:2 15:17
24:2,5,7,9,10,20
25:11,12 29:7
30:5,6 31:5 49:17
49:18,20 50:8
**contractual** 17:11
45:20 51:6
**contradicted** 43:25
**contrary** 38:16
47:22
**contribute** 11:16
**contributed** 17:5,6
**contributes** 11:17
**contributing** 12:14
**contribution** 12:5,8
12:9 14:24 40:17
44:4
**controlled** 38:3,6
38:22 42:14
**controlling** 38:19
**copies** 6:15
**copy** 7:7
**Corley** 3:16 8:4
24:21 39:15 44:6
52:14
**Corley's** 8:5
**Corley/Esuchanko**
8:17 16:25
**Corporation** 1:8,21
2:2 7:11,12
**correct** 6:7 28:10
32:13 33:7,21
41:14,15 48:6
51:1
**cost** 17:8
**Council** 1:5,24 3:14
3:15,16 4:4 5:25
6:6 7:13,21 8:3,5
8:7 10:23 39:16
41:25
**counsel** 1:21 4:10



**NetworkReporting**

STATEWIDE COURT REPORTERS

800-632-2720

7:11,12 27:9
28:16 29:4 30:8
31:3 32:7 35:5
36:6 37:9 41:21
42:8,20 46:3 47:8
**counter** 28:24
31:12
**County** 19:20 20:6
21:5 29:23,24
31:18,19 42:20
46:16 49:25 50:10
**couple** 4:20 19:15
**course** 13:22 14:1
15:16 17:13 25:5
36:21 48:22
**court** 9:21 10:5
22:12,21,22 25:24
31:16,18,19 35:14
38:4,9 41:7 42:15
42:20,22 43:1
44:10 45:8,14
49:19
**courtroom** 38:2
**covers** 50:2
**created** 15:23 18:9
**crediting** 12:25
**Crittendon** 3:13,15
7:11,13,22 18:25
24:21 36:15
**cross** 4:19 5:7
**current** 9:23 41:15
49:7
**currently** 21:4
22:17
**cutting** 49:14
**C-o-r-l-e-y** 8:4
**C12-E-0092** 1:7
**C12-E-092** 4:5

**D**

**D** 7:22,23
**damages** 49:19
**data** 8:13
**date** 30:22 33:10,17

34:17,19 35:9,20
36:11 37:22
**dates** 34:16
**Davis** 36:7
**days** 35:9,18 47:10
**dealing** 16:17,18
**decades** 12:17
17:15 20:16 46:7
**December** 5:15
11:11 30:22 33:18
**decide** 52:22
**decided** 18:4
**decides** 11:7
**decision** 9:17 10:5
10:6 31:13,20,21
37:21,22,22,23,24
38:4,5,20,23 41:6
41:7,17 42:12,21
42:21 43:8,9,10
44:10 45:9,14,18
46:16 51:8,20
53:7
**decisions** 12:24
49:25
**declared** 23:24
**deemed** 16:21
**defeating** 23:4
**defense** 9:12 22:14
46:17 47:21
**defenses** 19:15
**defined** 13:2 44:5
**demand** 48:9 49:3
**demeans** 46:25
**demonstrated**
14:13
**denial** 22:23
**denied** 22:22
**denominate** 6:15
**deny** 38:8 45:10
**Department** 1:2,21
4:15
**describe** 15:7
**described** 13:15

44:3
**Describing** 11:15
**description** 8:5
**destroyed** 50:11
**determination**
51:14,25
**determine** 51:17
52:12
**determined** 16:10
**determines** 35:8
**determining** 51:24
**Detroit** 1:8,14,18
1:21,22 4:1,4,14
4:15 6:2 9:17
10:16,22 13:9,12
14:7,8,10 15:12
17:9 20:15 21:10
21:11,21 22:5
24:13 28:21 31:16
31:17,18,19 38:6
42:5,12 44:16,19
**developed** 25:8
**DGRS** 17:9,11
**Diane** 2:1
**different** 11:8 18:6
23:21 35:23 40:14
44:21
**direct** 51:2
**directly** 44:15
**director** 8:4 12:21
**disclose** 46:20
47:17
**discretion** 9:13
39:8 40:10,20
48:13 50:13,15,18
52:8,10,11,15,22
**discretionary** 43:9
51:15
**discussion** 27:10,24
**disingenuously**
46:20
**dismissing** 34:21
**disposition** 4:22

5:7 18:8
**dispute** 5:7,10
10:13,13 14:4
19:1,18,24 24:8
24:19,25 39:6,7
40:22 43:12 45:11
47:19
**disputed** 15:11
**distinction** 39:4
41:1
**distribute** 11:8
**distributed** 17:9
20:2
**distribution** 9:13
9:19,23 10:15
13:15
**distributions** 13:6
13:14
**divided** 44:2
**Division** 8:3
**Docket** 1:7 4:5
**doctrine** 23:9,13,14
26:2
**document** 8:17
**documents** 6:13
24:22 44:6
**doing** 4:21 23:23
**dollars** 17:11 18:10
18:23 24:17
**doubt** 47:3
**Doyle** 1:13 4:5
**DPOA** 31:15,18
42:5,12 44:17,19
44:21
**Draugelis** 2:1
**due** 17:8
**duty** 31:2,8 32:1,20
32:25 33:25 35:25
36:3,22 38:15,16
39:4 41:5,13 43:5
46:19,24 47:10
48:19 49:24 50:7
**Dyke** 23:18

**E**

**E** 8:17 17:2 18:6,7
19:8,9
**ear** 18:1
**earlier** 9:11 12:17
20:20 23:16 25:20
31:4 34:6
**earliest** 42:3
**early** 10:14,17
21:18 42:6
**earn** 18:12,13
**earned** 29:17
**earning** 12:1
**earnings** 9:13,19
9:23 10:15 11:6,7
11:8,9,12,20 12:5
12:13,24 13:1,2
13:15 17:9 18:12
18:15 22:4 39:1,7
40:9,12,12,19
44:1,2 45:22
48:13,16,17 50:16
51:20,22
**easiest** 15:6
**ECONOMIC** 1:2
**Ed** 41:23
**Education** 25:25
31:17
**Edward** 1:24
**effect** 15:21 19:2
23:2 26:4 30:13
30:23 31:4 35:17
36:5 46:1 49:7
51:23
**effective** 5:15 30:22
33:17 34:10,16,17
36:11
**effort** 41:2
**efforts** 15:19
**either** 10:20,24
11:16 27:19 29:7
38:18 50:25
**elected** 10:20



NetworkReporting

STATEWIDE COURT REPORTERS

800-632-2720

**Electronic** 2:1
**eligible** 48:15
**eliminated** 15:9,22
**emergency** 22:13
  32:11
**employee** 16:13
  40:16
**employees** 5:1,1
  10:24 11:13,15,21
  12:11 14:10 20:11
  25:21 26:5,14
  30:3 44:24 48:1,2
  48:10,11,20 49:4
  49:8 50:19 51:5,6
**employer** 5:6 21:7
  21:12 30:3 36:2
  43:2,7,10 45:15
  48:8 49:13
**Employer's** 7:7
  33:3 49:5
**employment** 1:3
  4:9 9:2,14,24 10:4
  10:21,21 19:17
  26:4 28:20 31:1
  35:20 36:11 41:13
  43:11 44:12,14,16
  44:18,24
**enacted** 30:13,21
  30:23 31:2,7 33:4
  41:10
**encompass** 26:15
**ENERGY** 1:2
**enforce** 49:5
**enforcing** 42:4
**engrafted** 24:4
**enhanced** 11:23
**enhancement** 11:13
  25:22 26:20
**enjoin** 20:25
**enjoy** 20:9
**enter** 48:22
**entered** 46:19,22
  47:15,19

**entering** 47:6,10
**enters** 35:10
**entirety** 35:25
**entitlements** 49:8
**equitable** 23:12
**error** 34:18
**essence** 9:15
**essentially** 11:1
  12:3 40:13 44:4
**establish** 10:25
  44:8
**established** 9:14,24
  13:18,20 21:6
  39:13 44:11,12,13
**estimated** 11:19
**estop** 21:23
**estopped** 23:22
**estoppel** 14:2 23:9
  23:11,12,15 38:6
  41:17
**Esuchanko** 8:8,14
  40:17 44:6 52:14
**Esuchanko's** 8:9
**et** 30:16
**event** 11:3 13:25
  15:24 16:3
**eventually** 29:21
**everybody** 26:7
**everyone's** 52:3
**evidence** 24:20
**exactly** 10:17 23:23
**example** 14:16,22
**exceed** 18:15
**exceptions** 26:1
  37:21
**excerpt** 3:12 6:23
  7:1,3,4,6
**excess** 9:13,19 11:7
  11:8,9,20 12:5,13
  12:24 13:2,2,15
  17:8 18:12,15,20
  22:4 39:1,7 40:9
  40:12,19 44:1

45:22 48:13,16,16
  50:16 51:22
**excuse** 31:14 47:16
**execution** 36:11
**executive** 12:21
**exercise** 9:12 50:15
**exercised** 50:14
  52:9
**exhibit** 3:8,11,13
  3:14,16 6:17 7:1,6
  7:8,9,10,16,17,18
  7:19,20 8:1,2,19
  16:21 18:7 19:8
**exhibited** 47:21
**exhibits** 3:18 6:15
  9:7,9 27:11,12,25
  28:3,6 39:14
  40:11
**exist** 25:1
**existed** 39:21 44:12
  44:13
**existence** 14:14
  34:2,9 36:23
**existing** 5:17,18 9:2
  18:5 25:13 38:10
  39:17 43:10 44:15
  44:23 46:15 49:15
  49:17
**exists** 24:6
**expectation** 52:21
**expectations** 47:22
**expected** 11:1
  12:11 14:21,25
  15:22 16:10 48:17
**expired** 27:1
**express** 24:2 25:14
  40:7 46:11
**expressed** 9:7
**expressly** 40:3 45:5
  47:7
**extended** 27:3
**extent** 48:7,16
  50:20 51:12 52:18

53:1,5
**E-s-u-c-h-a-n-k-o**
  8:9

---

## F

**face** 45:20
**facially** 9:6
**fact** 5:8,10 13:24
  14:14 15:2,23
  19:19 20:8,19
  21:24 24:25,25
  25:1 31:10 35:15
  35:22,24 37:12
  41:19
**facts** 14:3 19:3
**factual** 39:6,7
**failed** 46:20
**failure** 45:16 47:17
**faith** 26:23 44:23
  49:21
**falls** 25:16
**familiar** 33:2
**far** 15:9
**fashion** 17:24
  26:11
**favor** 32:3,14
**February** 1:15 4:2
**Feel** 31:15
**felt** 13:12,13 20:16
  20:23
**fighting** 6:10
**file** 7:5,8
**filed** 5:9 10:9
**filing** 37:21
**finally** 24:19 25:18
  29:18 36:15
**financial** 8:3 17:17
  46:18,21 47:6,14
  47:18,20
**find** 38:3,20 39:10
  39:13 41:16
**finding** 43:2
**findings** 43:6
**fine** 7:3 8:23 19:12

28:5,8,11,14
**fire** 5:2
**Firm** 2:2
**first** 9:22 10:9,10
  13:11 19:16,25
  22:9,15 23:8
  38:13 41:11 52:21
**five** 11:16 16:4 27:5
  46:22
**floor** 1:18 15:1,8,22
  16:12 18:22 29:14
  29:14
**focus** 29:12 37:5
**followed** 37:20
**following** 31:14,14
  46:4 47:10 51:9
  51:25
**follows** 10:18 35:7
**form** 25:3,3
**former** 7:12 47:25
  48:2,10,20 49:4
**formulation** 18:7
**forth** 29:20 40:11
**forward** 15:20 22:6
**fought** 46:11
**found** 18:1,1 42:22
  49:12
**four** 27:11
**frankly** 45:16
  46:10
**Friday** 1:15 4:2
**frivolous** 39:11,14
  42:18 46:24,25
**front** 34:7
**full** 30:23 40:7
**fully** 48:21
**fund** 12:9
**fundamental** 44:16
  44:18
**funds** 13:2,14
  40:14,16,20 48:13
**further** 35:2 37:17
  38:6 45:23 47:24



NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

**future** 50:10

### G

**G** 1:17
**Garrett** 41:24
**gender** 42:25,25
**general** 4:24 12:9
  12:19,21 17:9
  18:9 19:10,15
**generally** 32:20
  46:25
**give** 30:15 37:12
**given** 11:20 39:11
  39:12
**go** 18:4 19:12 36:17
  52:5
**going** 6:14 10:10,14
  11:11 12:17 17:20
  22:6 27:4 31:15
  42:9
**good** 4:16,17 6:9
  26:23 28:12,13
  41:23 44:22 49:21
**governed** 35:21
**government** 35:9
  35:11
**Grand** 1:14
**grant** 32:3
**granting** 5:3
**greater** 5:3
**grievance** 49:19
**ground** 8:24
**group** 14:11
**GROWTH** 1:2
**GRS** 16:6
**guess** 6:14 7:12
  32:9 37:13

### H

**H** 2:1
**half** 45:3
**handles** 4:25
**happen** 52:23
**happened** 13:4
**happening** 10:17
**harm** 22:25
**harmed** 51:24
**head** 14:11
**hear** 27:4
**hearing** 1:12 4:7,7
**held** 43:6 44:17
  50:1,9
**higher** 25:13 43:18
**highlight** 13:10
**history** 52:14
**hold** 20:1
**holdings** 31:14
  40:15
**holds** 30:1
**Honor** 4:12 6:7
  29:22
**Huron** 25:3,10 29:7

### I

**IDENTIFIED** 3:10
**identity** 5:24
**illegal** 21:3 22:18
**imagine** 51:13
**immediately** 6:5
**impact** 5:4 20:11
  24:7,14 26:24
  38:19 43:3 48:11
**impacted** 26:7,19
**impacts** 24:11
  26:10
**impediment** 50:21
  53:1
**implement** 43:20
**implementation**
  31:24
**implemented** 9:22
  10:4 28:20,22
  30:11,12,14 31:22
  32:4 41:10 43:15
  43:22
**implementing**
  32:13 49:13
**importance** 5:23
**important** 13:10,12
  14:20
**imposed** 31:22 40:3
**improper** 21:12
**including** 40:2
**inconsistent** 23:13
**incorporate** 46:13
**incorporated** 5:19
  8:5 24:3 45:5
  46:14
**incorporates** 40:4
**incorrect** 48:1
**incredible** 39:20
**independent** 21:9
**INDEX** 3:8
**indicate** 18:23
**indicated** 12:15,19
  14:4 15:10 18:19
  19:2 22:2 24:15
  29:6 34:6 45:16
  52:1,2
**indicates** 15:12
  16:5 17:7 23:10
  42:8
**indistinguishable**
  38:4
**individual** 40:15
**individually** 48:4
**individuals** 10:20
  15:13 24:18 26:18
  49:10
**infringe** 22:7
**initially** 40:2
**injunction** 22:22,23
  23:5
**injunctive** 22:13,13
**insert** 42:11
**inserted** 37:24
**instance** 11:20,24
  16:2 51:19
**insulated** 21:14
**intend** 52:3
**interest** 11:22
**interfere** 50:15
**interpretation** 24:9
  24:20
**interpreting** 41:15
  42:4
**intertwined** 26:11
**introduced** 15:20
**introductory** 4:20
  27:10
**investment** 11:22
  14:15,17 15:1
  16:1,7 51:20
**investments** 10:16
  11:2,3 15:3 16:6
  18:21
**involve** 36:13 51:12
**involved** 24:18
  25:14 42:4,22
**involves** 43:8
**involving** 10:6
  31:10,10 38:5
  41:18
**irreparable** 22:25
**irrespective** 15:3
**issuance** 5:5
**issue** 20:14 28:19
  29:1 37:20 38:24
  38:25 51:8
**issued** 31:12 37:23
**issues** 10:2,9 16:17
  16:18

### J

**January** 12:22
**joined** 38:1
**Jones** 1:20 3:4 4:13
  4:13 6:20 7:16,23
  8:23 19:9 27:9,17
  27:23 28:4,11,13
  28:16 32:16,22
  33:7,10,16,21,25
  34:6,18,22 35:1
  37:3,7,18 52:5
  53:6
**Joseph** 8:8
**JR** 1:17
**judge** 1:13 3:18 4:3
  4:6,16,18 6:8,22
  6:25 7:4,10,17,20
  7:24 8:2,12,16,20
  8:24 9:11 10:11
  10:11 13:6 14:19
  16:12,23,25 17:2
  17:12 19:5,7,12
  26:25 27:3,7,15
  27:18 28:2,5,12
  28:15,23 31:12,20
  31:21 32:15,17
  33:2,8,12,14,19
  33:23 34:3,11,20
  34:24 35:2,4 36:7
  36:8,8,18,25 37:1
  37:4,17,19,25
  42:1,8 51:11 52:2
  52:6,20,25 53:8,9
**judgment** 4:19
**judicata** 41:17
**judicial** 14:2 23:9
  23:10,14 35:15
  38:6 45:7
**judicially** 21:23
  23:22
**June** 14:5

### K

**Kalamazoo** 49:25
  50:9
**keep** 45:21
**keeping** 46:16
**keeps** 28:6
**kept** 51:7
**know** 13:19 19:9
  34:18
**knowing** 6:10
**knowledge** 45:10
**known** 11:10
**Krystal** 18:25



24:21 36:15

**L**

L 1:24
labor 1:2 4:15
  13:19 17:19 33:11
  36:21 37:9,11
  45:23 49:22
lack 39:11 47:22
Lafayette 1:18
laid 10:11 18:24
  22:11 25:20 52:14
language 16:9 22:3
  24:2,3 25:11,13
  29:8 30:5,6 31:25
  32:24
large 10:19
law 1:13,21 4:6
  13:19 15:17 20:5
  21:17,18,19 23:15
  25:2 32:11 36:21
  37:9,11 38:10
  41:14,15,19 42:10
  43:5 45:13,13
  48:2
laws 17:19 30:16
  30:20
lay 8:24 23:9 24:22
  25:1
lays 16:9 17:5,6
  23:19 24:16 25:5
leaders 13:11
leadership 17:15
left 49:18
legal 19:15 21:4,4
  22:18 23:14,16,22
legally 30:13,13
  31:2 32:13 41:10
legitimate 26:23
Letitia 1:20 4:13
letter 3:13,15,16
  6:20 7:11,21 8:3
  18:25 36:16,16
  37:3,15 39:15,15

42:10
Let's 21:2
level 11:4,4,6 46:10
  52:21
liability 12:10
likewise 5:10
limited 6:5
line 46:4
lines 52:1
list 6:14
listed 6:4
litigated 45:11,21
litigation 39:11,12
  51:3
little 12:1 13:23
  28:6
local 14:7 35:9,11
locals 6:1,6
locate 14:13
long 43:5 47:19
longer 48:5
longstanding 40:23
  44:9
look 16:20 25:24
looked 8:12
lose 18:16 29:22
loss 16:19 20:10
losses 26:20
lost 25:21,22
lot 17:12,13 24:16
  28:18
lumped 26:9

**M**

MacDonald 36:8
Mack 1:17 3:3 4:12
  4:12,21 6:7,24 7:3
  8:11,13,22 9:10
  10:11 16:24 17:1
  17:4 19:6,14 27:2
  27:4,24 28:10,14
  33:1 35:2,4 36:20
  41:22 42:7 51:11
  52:19,24 53:9

**Macomb** 19:20
  20:5 21:5 42:20
  46:16
main 29:4
maintain 26:22
  41:13
majority 10:23
maker 43:8
making 13:14 43:9
  50:21 53:2
management 21:14
  32:11
manager 47:6
mandatory 5:11
  10:3 17:21 19:17
  19:19,23 20:8
  21:13,24,25 22:8
  23:25 26:3,12
  28:20 29:1 30:10
  32:4 49:9 50:2
**Manderfield** 36:8
manner 10:4 28:21
  28:22 30:14 32:5
**March** 30:23 33:4
**Marilyn** 12:18
mark 7:4,5,7 17:13
marked 7:9,19 8:1
  8:19 18:22
market 11:3,24
  14:21 15:3 16:16
marking 8:16 19:7
matter 1:4 15:23
  23:15 25:19 30:9
  35:22
mayor 10:23
**MCL** 35:12
**McNeil** 1:24 41:23
  41:23
mean 51:15,21
meant 35:16
meeting 51:19
member 24:11,12
members 17:10

19:25 20:1,3,4,7,9
  29:21 30:2 31:2
  37:13 48:3
membership 17:16
**MERC** 4:4 10:3
  20:6 31:13,20
**MERC's** 43:1,5
mere 49:17
merely 15:19
merits 45:17
method 45:22
methods 19:22
**Mi** 9:17 13:9 19:21
  21:11 25:25 29:24
**Michigan** 1:1,8,14
  1:18,22 4:1,3,6,8
  4:9 17:19 30:15
  30:20 32:1 41:24
  42:15
middle 15:16 18:5
  31:5
**Miller** 1:17
million 18:2
minimum 46:6,9
minute 22:10,10
  38:17 43:3
mixed 41:19 42:25
  43:4 50:1
money 12:2 16:13
  16:16 17:12,14,25
  19:1 24:16,17
  39:22
monies 20:2 44:3
month 12:8
months 12:20
  33:20 46:23
morning 4:16,17
  41:23
motion 1:12 4:18
  4:22 5:7,24 9:5
  10:9 12:16 18:7
  28:25,25 31:11,12
motions 4:19 28:9

**MPER** 26:1
**MRPC** 47:23
**Municipal** 1:8
mutual 39:10
mutuality 39:11

**N**

name 14:5
nature 10:12 53:4
necessarily 29:11
  49:24
necessary 52:12
need 25:8
needed 20:23 43:17
needs 51:25
negotiate 49:2
negotiated 45:1,7
negotiations 37:14
  48:23
neither 48:8 50:4
**NESA** 4:24
**Network** 2:2
never 38:18
new 4:23 15:21
  32:11
**Nickleberry** 14:5,5
  15:12 24:24
nine 17:7 29:22
**NLRB** 43:6
normal 18:16
normally 11:24
notable 34:13
  41:20 42:3
note 5:22 9:6 12:17
  14:20 17:23 27:10
  36:15 37:25
notice 15:11 35:15
  45:7 51:4,5
notified 50:17
notify 52:9
notwithstanding
  34:14 44:20
**November** 5:9,14
  7:11 15:20 19:3



21:19 30:21,24
33:17 46:1 47:12
47:16
**Number** 2:2 4:5,5
6:20
**numerous** 31:9

**O**

**object** 27:20
**objecting** 27:13
**objection** 8:21 19:7
19:12
**obligation** 15:17
26:22 31:6 45:20
49:5 50:25
**obligations** 21:8
51:3
**observes** 38:2
**obvious** 40:23
**obviously** 20:22
21:3 45:18,25
**occurred** 5:16
44:25 47:11
**October** 7:21 36:16
**Officers** 21:10
**Oh** 9:6
**okay** 6:8 7:4 9:10
19:14 27:4,9,17
28:4,11,15,16
34:24 36:19 52:19
52:24 53:8
**once** 49:8 50:8 51:9
**ones** 27:15,21
**opinion** 13:17
22:22 26:1 37:20
**opportunity** 25:22
**opposed** 25:3
**opposite** 23:21
**opted** 18:3
**options** 11:16 47:6
**oral** 38:18
**order** 20:24 22:4
22:14 26:17,21,21
29:5 32:8 52:3,25

53:5
**ordered** 50:14 52:7
**ordinance** 4:23 5:2
5:8,14,20 7:14
10:1 15:5,21 16:8
16:9 26:7,7,15
30:11,21,25 32:12
36:5 38:11 39:3
40:5 41:2 42:14
43:14,14,19 45:6
46:2,12,15 49:14
**ordinances** 21:2
24:3 41:4
**ordinary** 49:9
**organization** 14:8
14:10
**origin** 27:19
**original** 6:3
**Ottawa** 25:24
29:19
**ought** 23:24 26:14
**outline** 10:17
**O'Connor** 1:13
3:18 4:3,6,16,18
6:8,22,25 7:4,10
7:17,20,24 8:2,12
8:16,20,24 9:11
16:23,25 17:2,12
19:5,7,12 26:25
27:3,7,15,18 28:2
28:5,12,15 32:15
32:17 33:2,8,12
33:14,19,23 34:3
34:11,20,24 35:2
36:18 37:1,4,17
37:19 42:1,8 52:2
52:6,20,25 53:8

**P**

**PA** 30:15 31:23
32:18,19,20 34:3
35:12 36:12 37:6
37:7 38:17 46:19
46:24 47:2,5

**package** 20:10 50:3
50:4,4
**page** 3:2,8 17:7
19:21 21:11 28:25
29:22 33:3 36:16
36:19
**pages** 21:6
**paragraph** 14:17
16:4 26:1 34:15
35:6,17,24 36:3,4
36:5,12
**parity** 16:18
**parse** 26:8
**part** 6:19 7:25 9:16
10:20 13:22 14:19
20:9 22:23 25:12
34:4 38:24 44:4,5
44:5 48:6 49:10
51:15 52:17
**partial** 18:7
**participants** 50:19
50:21 53:2,3
**particular** 27:25
32:12 36:3 37:4
42:24 43:8
**particularly** 41:20
42:3
**parties** 6:25 9:25
10:7 25:11,19
29:19 38:5,20
40:7 41:7,18 45:1
45:8,10 46:11
48:22 49:1 50:9
**party** 1:6,17 4:4,11
5:24 6:4 23:15,19
**Party's** 24:24
**passed** 22:16
**passing** 6:2
**pay** 26:18 32:7
**Peltz** 31:20
**pension** 4:24,25
5:11,14,16,20 8:6
9:12 18:17 19:22

21:9 33:15,17
38:13 39:1,3,8,22
40:5,10,16,19,20
41:2 42:14,23
43:13,13,14,19
44:2,17 45:6 46:1
46:12,15 48:12,24
49:14 50:13,15,21
50:24 51:19 52:8
52:9,10,13,16,22
53:2
**pensions** 42:13
**people** 48:24
**PERA** 21:13,14
23:7 31:24 32:25
33:6,22 34:23
35:21 36:1,4,12
41:15 42:4 45:13
49:16
**percent** 11:4,16,19
11:25 14:15,18,22
14:25 15:2,8,25
16:2,7,8,15,15
18:16,21,22,24
**percentage** 11:19
**perfectly** 49:9
**perform** 11:2,3
**performance** 11:6
**performed** 11:18
11:24
**performs** 16:14
**period** 29:10 30:12
34:1
**permissive** 48:23
48:25 49:23 50:3
**phase** 51:13
**phrase** 16:1 48:18
**picked** 27:21
**piece** 50:6,6
**pieces** 50:5
**place** 9:3 17:18
36:13 45:1,21
47:5

**placed** 18:10
**places** 51:6
**placing** 13:16
**plan** 5:11 29:15
33:15,16,17 38:13
42:24 44:5 50:18
**plans** 29:1 30:11
44:17
**plan's** 8:6
**play** 32:10,12 33:20
**PLC** 1:17
**Pleading** 6:20
**pleadings** 4:20 6:12
6:19
**POAM** 31:13 36:9
**pocket** 12:3
**point** 8:15 20:18
31:7 35:4 45:1
46:1
**points** 29:3 30:8
**police** 5:2 21:10
**Port** 25:3,10 29:7
**portion** 11:9,12,20
12:13
**position** 20:22
23:16,19,20,21
29:8 43:16
**positions** 10:21
23:13
**possibility** 50:10
**possible** 6:10
**possibly** 47:16
48:24
**post** 36:11
**posting** 51:4,5
**potential** 15:15
**pots** 18:11 44:3
51:23
**practical** 50:20,23
51:12 52:18 53:1
**practice** 8:6 10:1
10:13 12:15 13:12
13:13,17,18,18



13-53846-swr Doc 1066 Filed 09/24/13 Entered 09/24/13 00:41:54 Page 120 of 93
124

14:3,14,19 15:6,9
15:15 17:14,18,18
17:20 20:14,21,22
20:24 21:3 22:4
24:4,5,22,25 25:1
25:3,4,7,9,12,15
29:5,6 39:9,13,17
39:19,20 40:22,24
44:8 45:23 46:4,6
46:7,9 49:22
**practices** 5:16
**precedent** 20:6
21:6
**preceding** 34:15
**precise** 41:13
**precisely** 52:16
**precluding** 5:5
**preexisting** 44:20
45:21 50:18
**preference** 40:23
**prepared** 6:16 8:7
37:19
**Present** 1:24
**president** 14:6,7
15:12 41:24
**presidents** 14:8,9,9
15:13
**presumably** 9:25
**presume** 51:13
**prevailed** 9:18 38:7
**preview** 37:24
**previously** 45:11
45:21 46:8,11
50:14 52:8
**principal** 47:21
**prior** 5:15,19 8:6
10:1 35:20 36:13
39:11,12,13,17,19
39:20 45:5 52:14
**probably** 32:22
**problem** 51:1
**procedural** 5:22
10:8

**procedure** 49:19
**proceeding** 23:17
**proceedings** 23:14
53:10
**process** 22:14,16
22:19 37:16 43:8
43:9 44:11
**produced** 39:14
**productive** 50:10
**proffered** 46:17
**prohibit** 22:4,6
**prohibited** 4:24 5:2
49:1
**projected** 40:13
**promised** 48:12,14
**promises** 44:17
49:6 51:7
**proof** 25:14
**proper** 25:19 29:19
**propose** 27:20
52:25
**proposed** 7:14
17:25
**provide** 17:20
34:16 48:2
**provided** 8:14
16:20 47:5,7,9
**providing** 26:10
**provision** 26:10
30:17 34:3 35:17
38:11 41:9 44:20
**provisions** 5:21
34:9 36:1 41:5
45:6
**public** 23:18 27:21
30:12,17,22 33:4
33:21 34:2,8,9,22
35:5 36:23
**published** 10:6
38:4,20 41:6
**pulled** 14:12
**purpose** 15:15
**purposes** 11:22

**put** 7:8 16:13 17:18
52:12
**putting** 51:23
**P52136** 1:20
**P58657** 1:17

**Q**

**quarterly** 18:25
**question** 5:22 9:12
10:2 30:9 35:20
39:4 41:19 42:23
47:24 48:21,24
50:1 52:17
**questions** 4:25 10:9
26:16 51:10 53:4
**quite** 28:17
**quo** 26:17,22 32:7
50:13 52:6
**quote** 21:12,15
23:11 26:3,5 41:9
41:11
**quoting** 21:7

**R**

**raise** 25:18 36:22
**raised** 5:23 6:9
19:15 47:24
**raises** 20:12
**raising** 48:24
**rate** 5:3 10:25 11:1
11:22 13:3 14:21
14:25 15:1,22,25
16:6,7,10 18:24
40:13 48:17 51:21
**reach** 18:15
**reached** 50:8
**read** 33:1
**reads** 35:6
**reaffirm** 51:4,6
**real** 14:5 18:10
**realize** 20:3 22:21
51:16
**realized** 15:3,4
19:25 20:4

**realizes** 23:2
**reallocate** 50:24
**really** 14:4 15:11
15:17 19:1 33:23
37:23 45:2 46:17
**realm** 25:16 30:4
**reason** 27:15 31:25
**reasonable** 17:24
**reasons** 13:10
40:24
**recall** 8:10
**receive** 18:17 51:9
**received** 3:10 9:9
14:23,24 18:19
**recognized** 39:18
**recollection** 42:9
**recommend** 51:4
**recommending**
50:12 52:7
**record** 27:6,7 28:6
28:18 37:25
**RECORDED** 2:1
**Recorder** 2:1
**records** 27:21
**recounted** 38:9
**recounts** 39:16
41:8
**reduce** 12:14 40:16
44:4
**reduced** 12:6
**refer** 29:22 32:18
**reference** 5:19 6:2
29:23 40:4 45:5
46:13,14
**referenced** 13:7
**referencing** 35:5
**referred** 28:24
46:21
**Referring** 33:3
**reflected** 14:15
**refusal** 44:22 49:21
**regarding** 9:19
31:13 49:8 50:16

**regardless** 16:16
21:8 38:10,11
41:4,16 44:11
**Registration** 2:2
**rejection** 51:2
**related** 8:7 23:17
49:22
**relates** 4:23 29:18
30:9 32:6,9,12
37:7,16
**Relations** 1:3 4:9
4:15 33:11
**relevant** 36:14
45:14,18
**reliance** 9:16
**relied** 6:12,13 7:24
27:16 44:7 47:19
**relief** 22:13,13 32:6
49:3
**rely** 34:21 47:20
**relying** 34:22
**remained** 41:5
**remaining** 12:7
35:12
**remains** 41:15
**remedies** 32:8
**remedy** 32:7
**remember** 42:11
**remembered** 14:6
**removal** 35:25
**remove** 21:12
29:14
**removed** 36:4
**repealed** 30:24
**repeatedly** 40:1
**report** 17:7 18:25
24:21,21
**Reporting** 2:2
**represent** 14:9
47:25
**representing** 12:10
**represents** 10:24
**repudiated** 49:15



NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

**repudiation** 9:3
24:1,2,6 25:17
45:24 49:16
**request** 22:12
**requested** 32:6
**requires** 21:25
**requiring** 33:5
**res** 41:16
**resolution** 50:23
**resolvable** 21:20
**respect** 15:6,7
20:19,21 22:8,20
25:2 26:19,20
**respects** 15:6
**responded** 5:6
**Respondent** 1:9,20
6:20
**response** 20:19,25
22:9,12 28:24
37:2 41:8 52:21
**responsible** 12:14
21:7
**restoration** 50:12
50:17
**restore** 52:8
**restored** 32:7 52:6
52:10
**restoring** 50:13
**result** 18:11 24:5
**results** 16:19
**retained** 3:18
**retire** 29:21 49:8
**retired** 47:25 48:10
48:20,25 49:11
**retiree** 40:14
**retirees** 5:5 10:22
10:24 11:10,12
14:23 18:12 25:19
25:20 26:9,11
29:18 30:2 48:3,4
50:19
**retirement** 4:24
10:16,19 11:2,18

12:6,8,10,12,19
12:22,25 17:10
18:9 19:10,22
20:3,5,8,10,15,16
24:12 25:23 26:7
29:1 30:11 48:15
50:16,18
**retiring** 12:12
**return** 5:3,4 10:25
11:1 14:20,21,22
14:25 15:1,22,25
16:6,10 40:13
51:21
**returned** 26:17
**returns** 14:14
**review** 10:2
**reviewed** 4:20
**reviewing** 28:23
**re-adopted** 40:1
**Richard** 1:17 4:12
**right** 4:14 6:12,22
7:24 8:20 10:8
16:1 27:7 30:18
31:23 32:9,10
36:24 37:19 42:16
49:4
**rightly** 41:3
**rises** 46:10
**rising** 23:10,12
**Robert** 36:7
**Roberts** 31:17
**Roc** 12:18
**rolls** 12:11
**roughly** 40:21
**route** 18:4
**rule** 32:14
**ruling** 36:8,8,9
**run** 37:22

_____

**S**

**SAAA** 21:21
**salary** 11:17
**save** 17:25
**savings** 18:18

**saying** 22:23
**says** 12:22 21:11
34:4
**Schools** 23:18
**scope** 20:17 21:13
**Seated** 4:14
**second** 13:22 19:5
22:19 36:18 45:2
**secondly** 40:15
**section** 30:16,18,18
30:20,20 32:1
34:23 35:11 47:8
**Sections** 36:2
**see** 17:4 18:12 41:1
**seeking** 23:5 25:11
44:21 49:5
**seeks** 16:2
**seemingly** 5:13
**seen** 14:25 18:21
**selected** 27:15,16
**Senior** 13:7
**separate** 44:3 45:3
**seq** 30:16
**Service** 17:10
**set** 17:14 40:11
44:20
**seven** 11:16 33:3
**Sheriff** 49:25 50:10
**shocking** 38:21
47:2
**shows** 18:8,10
**side** 17:23 27:19,20
50:4
**sides** 6:13 7:24
16:21
**signed** 35:16
**significant** 16:19
16:19 24:7,14,17
**silent** 25:7
**similar** 8:13 9:19
**Similarly** 10:5
**single** 24:11,12
42:25 43:4 50:4

**sir** 52:5
**sitting** 38:1
**six** 33:20 36:16,19
**sneeze** 31:15
**sole** 46:17
**solely** 5:25
**somebody** 7:2
**somebody's** 7:14
**sorry** 4:8 6:21
14:23 16:24 23:1
**sorts** 16:13
**sought** 9:18 22:2,3
34:20 38:23 39:2
39:3 40:5 46:8
49:3
**so-called** 6:1 40:12
**speak** 37:8
**speaking** 37:11
**Special** 41:23
**specific** 31:25
32:24 39:17
**specifically** 12:17
19:21 28:16,21
30:4,16,17,21
33:22 35:6 52:9
**specificity** 39:20
**specious** 47:1
**spelling** 39:21
**Spohn** 23:18
**squarely** 25:16
**stability** 46:18,21
47:14,18,20
**staff** 39:16
**stake** 38:25
**standard** 25:14
**standing** 47:25
**started** 34:19
**starting** 4:10
**state** 1:1 17:19 30:5
34:7 35:8
**stated** 30:5,18 31:4
**Statement** 3:3,4
**statements** 14:12

**states** 28:21 31:3
32:24 33:22 34:23
**stating** 21:7
**status** 26:17,22
32:7 43:18 50:13
52:6
**statute** 47:8
**step** 22:16
**steps** 51:16 52:7
**Stern** 31:12,21
**Stern's** 36:9
**stumbled** 48:17
**stunned** 45:16
**subject** 17:21 19:19
20:8 21:13,24,25
22:8 23:25 24:12
25:7 26:3,12 29:11
30:10 32:18 35:11
45:3 48:25 49:9
49:23
**subjects** 5:11 19:23
48:23 50:3,3
**submit** 7:2
**submitted** 40:17
43:25 44:7
**subordinate** 6:6
**substantial** 24:6,10
**successful** 14:1
23:4
**sued** 22:5
**suffer** 22:25 23:1
**suggests** 29:5,13,19
**suing** 20:25
**suit** 49:19
**Suite** 1:22
**summary** 4:19,22
5:7 18:7
**supplement** 40:15
**supported** 9:5
43:24
**Supreme** 42:15
**sure** 17:17 19:6
37:4 42:1



suspended 30:19
32:2,20,25 33:6
33:22 34:1,4,23
46:19,24 47:10
system 4:7,24 9:23
10:16 11:2,18
12:6,9,10,11,12
12:19,22,25 18:9
19:10 20:15,16

**T**

Tab 7:7,22 8:17
12:18 17:2 18:6
table 3:1 41:21
42:24 43:1,3,4
tacit 25:8 29:8,9
40:6 46:5,6,7,9
tacitly 42:23
take 12:13 23:13
27:5 35:14 37:14
51:16
taken 21:9 23:17
30:25 51:2
talking 24:16
target 40:13
term 5:17 13:2
19:17 35:12,19
terms 5:10 6:13
26:4 31:1,23 32:9
33:5 36:10 39:17
44:21 46:12 47:2
49:15,17
testified 16:3
testify 12:23
testimony 28:1
Thank 10:11 17:4
53:8,9
theory 14:2 23:22
thing 6:10 38:7
things 7:25 15:5
40:14
think 6:18 7:3,15
9:7 11:5 13:9
14:6 16:3 17:23

21:22 23:23 25:16
28:2 35:18 41:20
45:16 46:5,10
52:12,23
third 12:4,13
thought 6:8,9 34:13
three 11:8,16 12:20
14:17 18:11 40:14
40:14,20 44:3
46:7 51:23
three-way 13:14
threw 43:21
time 9:21 13:12
15:16 17:13,16,16
21:3,17 29:10
30:12 34:1 37:21
40:21 45:1
timely 5:9
today 8:25 21:4
31:4 32:19 37:23
37:23 38:8,15,25
41:18 42:19 45:12
told 6:4 17:17
33:11
topic 45:9
transcript 42:2
51:9
Transit 25:2
Treasurer 35:8
treat 7:1 11:6,25
25:12 26:8
treated 15:2 49:20
50:8
Trenton 26:1 29:20
trials 38:2
Tribunal 34:21
35:24 47:1,17,20
tried 21:17
troubling 38:21
47:22
truly 35:23
try 20:20
trying 37:3

two 10:7 13:10 15:5
22:16 38:20 41:18
two-step 22:14,19
typically 52:15
Tyra 37:25

**U**

Uh-huh 32:16
ultimately 50:25
ultra 9:15 20:17
unambiguous 47:9
unbargained 37:12
underlying 38:25
understand 4:25
8:25
understandable
40:24
understanding
13:1 16:5 40:7
45:8
undisputed 5:13
27:18,22 43:14,24
49:17
unearned 48:16
unequivocally 44:7
unfair 45:23 49:22
unfortunate 18:3
unilateral 9:1 18:4
19:16 20:13 23:7
23:24 33:14 35:19
36:24 41:2 43:2,9
49:6 51:1
unilaterally 38:12
40:3,5,25 43:7,15
44:23 49:13 50:5
50:7
Union 8:9,15 9:15
10:9 13:25 15:18
17:15,22,24 25:3
30:2 31:5 37:12
38:14 39:8 40:3,4
42:8,20 43:25
46:3 48:9 49:3,5
49:12

unionized 22:15,20
unions 6:2 15:14
18:2 22:5,11 23:1
23:3,8 31:1 43:21
48:5
Union's 4:22 8:25
9:5 19:8 22:12
23:5 30:4 48:11
unit 24:8 48:6
49:11
unlawful 9:1 10:4
28:21,22 30:14
31:24 32:5 43:10
44:22 45:24 47:16
49:22
unsuccessfully 46:9
upheld 43:1
use 42:24,25 43:4
Usually 11:10

**V**

v 1:7 9:17 23:18
vague 42:9
value 17:4
Van 23:18
various 6:6 32:9
vein 37:13
venue 23:20,21
verification 19:11
version 5:20 45:5
versus 13:8 21:10
26:8 29:23,24
31:15,17,18,19
44:16
violate 21:1
violating 50:7
violation 23:7,8
43:5
vires 9:15 20:17
virtually 5:1
voluntarily 48:22
voters 13:16 41:10

**W**

wait 22:9,10 53:6
want 5:22 7:2
27:23 28:7 33:23
37:1,4,5,8
wanted 15:14 39:19
42:1
wants 27:19
wasn't 29:17 38:21
39:10
way 12:4 13:13
15:6 17:21,25
29:11 50:25
Wayne 29:23,24
31:17,18
ways 11:8
week 31:12,21
went 15:19 16:11
16:11 24:23
weren't 18:21
West 1:14,18 25:24
29:19
We'll 7:4,5 22:10
50:5
we're 4:3,18 19:18
20:25 24:15 45:11
whatnot 49:20
wisdom 9:25 10:1,5
wish 37:8
withdraw 37:5,8
won 23:3
wonder 19:14
wondering 27:11
Woodward 1:22
words 13:17 14:25
work 8:24 32:10
51:5
worked 12:19
workers 22:15,20
worst 6:9
wouldn't 29:16
Wright 38:1
written 37:20,21,23
37:24 51:8 53:6



NetworkReporting

STATEWIDE COURT REPORTERS

800-632-2720

**wrong** 42:15,16,16 42:18

**X**

**X** 11:25

**Y**

**Yeah** 8:13 28:10
**year** 11:22,25 12:7 12:22,23 14:16 16:4 18:1,11,11 18:13,18 24:17,17 39:21,21 40:18 44:1
**years** 11:5,18 12:20 14:13 24:5,15 39:21

**Z**

**zero** 18:23

**$**

**$1.9** 24:15
**$100** 18:2

**0**

**0-0-0** 53:12

**1**

**1** 3:11 6:17 7:6,8,9 9:8,9
**1-800-632-2720** 2:3
**1.2** 17:11
**1.9** 17:11
**10** 7:21 11:5 28:25 30:18,20 32:1 35:6,17 36:2,12 36:16
**10,35** 3:3
**10-10-2011** 3:15
**10:55** 53:10
**11** 36:2
**11-8-2011** 3:13
**12-000777** 1:7 4:5

**126** 25:25
**13th** 5:5 11:10 15:9 15:9 18:14,17 20:11 25:23 26:19 40:14 44:5 48:15 49:14
**141.1501** 30:16
**141.1514(a)** 30:20 32:1 35:6
**149** 19:21
**15** 30:18 34:23 36:4
**15th** 30:22
**15.1** 35:11
**15.9** 14:17
**157** 30:1
**159** 21:6
**16** 30:23
**160** 19:21 21:6
**18** 14:10
**1947** 35:12
**1971** 30:1
**1974** 42:16
**1995** 18:13
**1996** 9:17 10:6 20:20 38:4,23 39:1 40:8,22,25 41:4,6,12,17 42:17 43:16 44:10 44:12 45:8,14,18 51:3

**2**

**2** 1:22 3:13 7:10,18 7:19
**20** 5:15 39:21
**20.9** 16:6
**2008** 6:17
**2008-2012** 3:12 27:1 40:2 45:24
**2010** 29:25
**2011** 5:9,14,15 7:11 7:21 21:19 26:2 30:21,22,23 33:4 33:17,18 36:16

**39:2** 40:9,25 44:13 45:15 46:1 46:19 47:12,16
**2012** 6:17 16:4 30:24 33:11,12 35:16,18 36:11 47:13,15
**2013** 1:15 4:2
**212** 21:11
**214** 14:7
**218** 9:17 13:9
**237-3002** 1:23
**24** 12:20 26:1
**25** 1:5,24 4:4 5:25 6:6 41:25
**2530** 2:1
**26** 26:1
**263** 9:17 13:9
**28,37** 3:4
**289** 29:24
**294** 19:21

**3**

**3** 3:14 7:21 8:1
**3.3** 47:23
**30** 35:9,17 47:10
**30th** 15:21 19:3
**30-some** 24:5
**3026** 1:14
**306** 25:25
**313** 1:19,23
**336** 35:12
**383** 21:11
**390** 21:11

**4**

**4** 1:18 3:16 8:2,2,19 9:8,9 16:23,24 30:12,15,17,22 31:23 32:18,19,20 33:4,22 34:2,3,8,9 34:23 35:5 36:11 36:12,23 37:6,7 38:17 46:19,24

47:2,5
**4th** 35:16,18
**404** 30:1
**423.215** 35:12
**48226** 1:18,22

**5**

**500** 1:22

**6**

**600** 1:18
**664** 29:25

**7**

**7** 3:11,13
**7.9** 11:4,19 14:15 14:22,25 15:2,8 15:25 16:2,8,14 16:15 18:16,21,22 18:23 29:14,16,17
**70's** 42:6
**74** 42:7,9

**8**

**8** 1:15 3:14,16 4:2 7:11
**80's** 10:15,18
**8151** 2:2

**9**

**9** 3:11,13,14,16 36:2
**9:00** 1:15
**9:11** 4:2
**90's** 21:18
**96** 38:8
**964-4454** 1:19



NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720