**EXHIBIT E**

**AFSCME COUNCIL 25**,

Union,

-and-

Case No.: C12 E-092
Honorable Doyle O'Connor
*Administrative Law Judge*

**CITY OF DETROIT**,

Employer.

| | |
|---|---|
| **MILLER COHEN, P.L.C.** | **CITY OF DETROIT LAW DEPARTMENT** |
| Richard G. Mack, Jr. (P58657) | Letitia C. Jones (P52136) |
| *Attorneys for the Union* | *Attorneys for Employer* |
| 600 W. Lafayette Blvd., 4th Fl. | 2 Woodward Ave., Ste. 500 |
| Detroit, MI 48226 | Detroit, MI 48226-3535 |
| (313) 964-4454 | (313) 237-3002 |

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

## SUPPLEMENTAL BRIEF CONCERNING REMEDY

NOW COMES Charging Party AFSCME Council 25 by and through its attorneys MILLER COHEN, P.L.C. with its Supplemental Brief, and states as follows:

## I. INTRODUCTION

Charging Party supplements its Motion for Summary Disposition arguing that the backpay remedy determined by the Commission, in this unfair labor practice charge, should be based on the average disbursement for the retirees and active employees. Charging Party suggests using an average distribution percentage of the last ten (10) years. In the alternative, Charging Party seeks a remedy that the discretion – to dole out the excess earnings – be given to a Retirement Board of the same composition when the initial decision as to how to distribute the excess earnings would have been made.

In this case, Charging Party filed a partial motion for summary disposition, asking that the Commission rule in favor of it on the merits of the unfair labor practice charge. The charge involved the Respondent's discontinuation of the distribution of earnings in pension fund investments beyond an expected rate of return (7.9%). Previously, the Retirement Board had distributed investment returns above 7.9% to retirees in a "13[th] check", to active employees in an enhancement of their annuity earnings, and to the City by reducing its required contribution to the pension fund. Following the full briefing of the matter and oral argument, the ALJ announced his recommended decision and order from the bench. The transcripts of the oral argument bear out the full scope of the ALJ ruling, but essentially the ALJ held that the Respondent had indeed violated the PERA by eliminating the thirteenth check and annuity payments of the City workforce and retirees. The City so eliminated these payments by changing the City's Retirement Ordinance. The ALJ held that the City repudiated the existing bargaining agreement, and was barred under the concept of judicial estoppel from arguing that the City could make the change without bargaining. (Transcript 2/8/13, pg 37-51)

At the February 8, 2013 motion hearing, Judge O'Connor stated that the final order could entail providing the Retirement Commission with the discretion that it was stripped of by the City, including discretion to decide the amount that would have been disbursed prior to the Ordinance amendment. (Transcript 2/8/13, pg 51-52) With this supplemental brief, Charging Party suggests an alternative method of a make whole award to those harmed by the City's actions.

## II. ARGUMENT

In this case, the question of the appropriate necessarily remedy has a degree of uncertainty. The Commission is charged with going back in time and awarding the distribution

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

to the Charging Party's members which would have been awarded when first due, in 2011 and 2012 respectively. Typically, the retirement board would distribute the excess earnings in December of each year. (Nickleberry Affidavit, Paragraph 7) Under case law regarding the ULP remedy that can be awarded by either the NLRB or PERA, the goal is to find the most accurate method for calculating backpay. If there exists uncertainty, it shall be resolved against the Respondent who caused the uncertainty by taking discretion away from the Retirement Commission to begin with. The NLRB has consistently held that the remedy for an unfair labor practice is to restore the status quo ante:

> **Our objective in compliance proceedings is to restore, to the extent feasible, the status quo ante by restructuring the circumstances that would have existed had there been no unfair labor practices**. Determining what would have happened absent a respondent's unfair labor practices, however, is often problematic and inexact. Several equally valid theories may be available, each on yielding a somewhat different result. Accordingly, the General Counsel is allowed wide discretion in selecting a formula. This does not mean, however, that the Board will always approve the General Counsel's backpay formula. This does not mean, however, that the Board will always approve the General Counsel's backpay formula even if it is reasonably designed to arrive at the approximate amount of backpay due. Rather, where the Respondent, as here, urges the Board to adopt an alternate formula, the Board will determine which is the **'most accurate method' of calculating backpay, in view of all of the facts adduced by the parties. If, due to the variables involved it is impossible to reconstruct with certainty what would have happened in the absence of a respondent's unfair labor practices, we will resolve the uncertainty against the respondent whose wrongdoing created the uncertainty**.

*Alaska Pulp Corp*, 326 NLRB 522, 523 (1998) (citation and footnote omitted)(emphasis added). This private sector case law is just as applicable in the Michigan public sector. See also *Michigan State University Bd of Trustees*, 8 MPER P 26103, at \*3 (1995). The standard in Michigan is that: "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Id.*

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

Essentially, the ALJ suggested as a potential remedy that the Retirement Board be asked to indicate what discretion it would have exercised at the time of the 2011 and 2012 distributions. It should be noted that those distributions decisions were typically made in October or November of each year. It is also likely that this Commission will not rule on the ALJ Recommendations for at least the next year. Thus, the Retirement Board as constructed in 2014 (or later) will be asked to review the investment returns of 2011 and 2012, and decide what should have been distributed to active employees and retirees back then.

Charging Party posits that providing back-dated discretion to the Retirement Commission could be prejudicial to the Charging Party, and provide the Respondent a reward for having broken the law. Admittedly, any remedy afforded here is imperfect and requires a look back in time, as to how best to fashion the make whole award as called for by the statute. However, many intervening factors have taken place between the time when the Retirement Board would have made the decision to pay the distributions at issue here – October or November 2011 and 2012 respectively – and when the Board will be asked to make the decision (assuming the Commission was to grant the ALJ suggested remedy).

Most significantly, the City now has an emergency manager who is reportedly exploring the removal of at least some of the Retirement Board members. Thus, by the time the Retirement Board is asked to make the back-dated distribution, the Board may not exist; or at least be of a significantly different construction as compared to October 2011 and October 2012. Under the Retirement Ordinance, the Retirement Board is currently made up of ten (10) total persons, five (5) of them elected employees, one (1) elected retiree, one (1) resident appointed by the Mayor, and three (3) other agents of the Mayor or City Council. (Exhibit 1, Ordinance Section 47-1-4) If the Board becomes controlled by a group or an individual less sympathetic to

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

the plight of active employees and retirees than the members now seated per Ordinance, then having that individual or group decide on the "back-dated make whole" award would unjustifiably benefit the City. That individual or group would likely award less to the employees and retirees than the Ordinance-seated group, making the relief to the Charging Party and its members less than make whole.

Further, when the unfair labor practice occurred in 2011, the parties were negotiating a new agreement. The circumstances today are different, as the City has a 50/50 chance of going into municipal bankruptcy. Consequently, the Retirement Board may feel pressured to make a decision on the make whole award in light of the current financial circumstance, as opposed to the decision which would have been issued in October 2011 and 2012. If this occurs, it would again be less than a make whole award for the Charging Party.

Here, Respondent removed the discretion from the Retirement Commission, causing this uncertainty as to the amount of an appropriate back pay award. Without Respondent's repudiation, the status quo would have continued. The City should not benefit from its illegal decision to repudiate an existing contract.

The more accurate approximation of the back-pay remedy would be the average amount of money that was disbursed over a certain number of years. *Florida Steel Corp*, 273 NLRB 889 (1984); *In re Weldun Intern, Inc*, 340 NLRB No 79 (2003). In *Ironworkers Local 373*, ALJ Ricci held that when there was uncertainty in calculating a back-pay award, the more accurate calculation involved averages. 232 NLRB No 85 (1977) (citing *NLRB v Brown & Root, Inc*, 311 F2d 447 (8th Cir 1963); *United Aircraft Corp*, 204 NLRB 1068 (1973); *JH Rutter-Rex Mfg Co*, 194 NLRB 19 (1971)). Judge Ricci compared the average annual earnings of those who alleged

they were treated illegally versus the average earnings of the others in order to form the basis for the backpay calculation. *Id.*

The Charging Party here suggests, as an alternative, that the average percentage of the excess earnings be used to distribute the excess earnings in the years 2011 and 2012. As stated above, the investment earnings above 7.9% were split three ways: retirees, active employees, and the City. Each of these three groups received a percentage of the excess earnings. Going back eleven (11) years to 1997, the average percentage of the excess earnings given to the active employees is 54.92%, and the average percentage given to the retirees in the thirteenth check is 17.07%.[1] Exhibit 2 is a graph prepared by the GRS which provides the percentages each year. The numbers resemble those in the City's actuarial report from Joseph Esuchanko, presented as Exhibit E to the City's Counter Motion for Summary Disposition.

The ALJ's ruling lays the groundwork for using average percentages. In his ruling from the bench, he observed that the City's own document demonstrated the consistency in the distribution year after year, to the three groups:

> "The Esuchanko charts which the City submitted made clear that in each and every year where there were excess earnings the Pension Board allocated them amongst those three funds at the Pension Board's discretion **and in roughly comparable amounts each time**."

(Transcript 2/8/13, pg 40) (**emphasis** added) Thus, it is fair to assume that the Retirement Board would have made the distributions similar to those made since 1985, or for the last 10 years at least.

---

[1] The percentages do not change much if the average percentages for all years are used. As the graph shows, the percentage for the active employees, for all years, is 54% - the same percentage as with the last three years. The retiree percentage increases from 14% to 17% by using the last eleven years. This demonstrates that the Board usually exercised its discretion in a similar manner each year consistently, which supports the averaging formula for awarding a make whole remedy.

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

Once the percentage distributions are determined, for each of the three groups, the rest is simple calculation. For the total excess earnings in 2011 and 2012, the active employees would receive 54.92% of that and the retirees would receive 17.07% of that in the form of a thirteenth check. The remainder would be allocated to the City to reduce its required contribution to the fund.

In the alternative to averaging the percentage of payments, the Charging Party suggests that the Commission permit the retirement board – with the membership that existed at the time of the repudiation – to make the decision about the distribution. In other words, the members of the pension board who were seated in October 2011 and 2012 would be responsible for making the decision. That way, if there are changes in the composition or authority of the pension board in the future, the Respondent does not benefit from such changes with respect to its illegal act in November 2011.

WHEREFORE, AFSCME requests that the Administrative Law Judge issue an Order granting its Unfair Labor Practice charge. AFSCME further requests that the City be ordered to restore the status quo ante, prior to the November 30, 2011 Ordinance change, as described above. AFSCME requests that the City be ordered to bargain, and the City be stayed from any further change until the completion of bargaining, pursuant to law.

Respectfully submitted,

**MILLER COHEN, P.L.C.**

By: _____

Richard G. Mack, Jr. (P58657)
Keith D. Flynn (P74192)
Attorney for Charging Party
600 W. Lafayette Blvd., 4th Floor
Detroit, MI 48226
(313) 964-4454

Dated: June 24, 2013

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

7

**AFSCME COUNCIL 25,**

Union,

-and-

Case No.: C12 E-092
Honorable Doyle O'Connor
*Administrative Law Judge*

**CITY OF DETROIT,**

Employer.

| | |
|---|---|
| **MILLER COHEN, P.L.C.** | **CITY OF DETROIT LAW DEPARTMENT** |
| Richard G. Mack, Jr. (P58657) | Letitia C. Jones (P52136) |
| *Attorneys for the Union* | *Attorneys for Employer* |
| 600 W. Lafayette Blvd., 4th Fl. | 2 Woodward Ave., Ste. 500 |
| Detroit, MI 48226 | Detroit, MI 48226-3535 |
| (313) 964-4454 | (313) 237-3002 |

**MILLER COHEN, P.L.C.**
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

**PROOF OF SERVICE**

MICHELLE COIL says that on June 24, 2013 she served a copy of the *Supplemental Brief Concerning Remedy*, along with this *Proof of Service* upon:

Letitia C. Jones, Esq.
City of Detroit Law Department
2 Woodward Ave., Ste. 500
Detroit, MI 48226-3535

via *electronic* and *U.S. First-Class Mail* by placing said document in a prepaid postage envelope and depositing same in a United States Postal Receptacle in Detroit, Michigan.

MICHELLE COIL

Subscribed and sworn to before me on
June 24, 2013.

**Kathryn L. Golba**, Notary Public
Wayne County, MI
My Commission expires: **2/20/19**

# EXHIBIT 1

## Sec. 47-1-4. - Board of Trustees; Membership; Appointment; Election.[5]

The Board of the General Retirement System shall consist of ten Trustees, as follows:

(1) The Mayor, *ex officio,* or the Mayor's alternate;

(2) One City Council Member, *ex officio,* who is selected by that body[6]

(3) The City Treasurer, *ex officio;*

(4) Five members of the Retirement System to be elected by the members of the Retirement System in accordance with such rules and regulations as may be adopted by the Board. No more than one Trustee shall be elected from any one City Department;

(5) One Detroit resident, appointed by the Mayor subject to the approval of the Board, who is neither an employee of the City nor is eligible to receive benefits under the Retirement System; and

(6) One retiree who is receiving benefits under the Retirement System and who is elected by retired City employees in accordance with procedures established by Section 47-1-5

*(Ord. No. 29-01, § 1. 11-30-01; Ord. No. 28-06, § 1, 9-13-06)*

# EXHIBIT 2

## AFFIDAVIT OF JOHN RIEHL

**County of**  _____Wayne_____  )
                                ) SS
**State of**  _____Michigan_____  )


I, John Riehl, first being duly sworn, state the following facts:

1.      I have personal knowledge of the following facts and if called as a witness I would be competent to testify as to such facts.

2.      I currently serve as a trustee on the General Retirement System board of trustees. I have served in this capacity since July 2010.

3.      The attached document is a document reflecting the distribution of excess earnings from the year 1985 through 2007. This document was provides to the Board trustees at a retirement board meeting. I believe the document was provided at a meeting in 2011 (It could have been in 2012).

Further affiant sayeth not.


_____
John Riehl

Subscribed and sworn to before me

On this _____ day of June, 2013


_____
, Notary Public
Wayne County, Michigan
My Commission Expires: _____

| CITY OF DETROIT | | | |
|---|---|---|---|
| GENERAL RETIREMENT SYSTEM | | | |
| DISTRIBUTION OF EXCESS EARNINGS HISTORY | | | |
| | MILLION OF DOLLARS | | |
| | EMPLOYEES | RETIREES | CITY | TOTAL |
| 1985 Amount | $16.8 | $2.6 | $24.8 | $44.2 |
| % of Total | 38.0% | 5.8% | 56.2% | 100% |
| 1986 Amount | $32.6 | $3.7 | $32.3 | $68.6 |
| % of Total | 47.5% | 5.5% | 47.0% | 100% |
| 1987 Amount | $34.5 | $6.8 | $46.0 | $87.3 |
| % of Total | 39.5% | 7.8% | 52.7% | 100% |
| 1988 Amount | $42.0 | $9.5 | $15.4 | $66.9 |
| % of Total | 62.8% | 14.2% | 23.0% | 100% |
| 1989 Amount | $28.6 | $6.1 | $12.0 | $46.7 |
| % of Total | 61.3% | 13.1% | 25.6% | 100% |
| 1990 Amount | $28.1 | $6.3 | $6.6 | $41.0 |
| % of Total | 68.4% | 15.4% | 16.2% | 100% |
| 1991 Amount | $2.3 | $0.6 | $1.2 | $4.1 |
| % of Total | 56.6% | 14.2% | 29.2% | 100% |
| 1992 Amount | $26.5 | $7.0 | $10.6 | $44.1 |
| % of Total | 60.1% | 16.0% | 23.9% | 100% |
| 1993 Amount | $16.4 | $4.1 | $3.9 | $24.4 |
| % of Total | 67.3% | 16.9% | 15.8% | 100% |
| 1994 Amount | $9.0 | $2.6 | $3.1 | $14.7 |
| % of Total | 61.2% | 17.7% | 21.1% | 100% |
| 1995 Amount | $0 | $0 | $0 | $0 |
| % of Total | 0% | 0% | 0% | 0% |
| 1996 Amount | $45.2 | $12.1 | $62.6 | $119.9 |
| % of Total | 37.7% | 10.1% | 52.2% | 100% |
| 1997 Amount | $77.3 | $24.0 | $23.4 | $124.7 |
| % of Total | 62.0% | 19.2% | 18.8% | 100% |
| 1998 Amount | $92.8 | $27.6 | $80.0 | $200.4 |
| % of Total | 46.3% | 13.8% | 39.9% | 100% |

| CITY OF DETROIT | | | |
|---|---|---|---|
| GENERAL RETIREMENT SYSTEM | | | |
| DISTRIBUTION OF EXCESS EARNINGS HISTORY | | | |
| | | | |
| | | MILLION OF DOLLARS | |
| | EMPLOYEES | RETIREES | CITY | TOTAL |
| | | | | |
| 1999 Amount | $75.2 | $16.9 | $20.2 | $112.3 |
| % of Total | 67.0% | 15.0% | 18.0% | 100% |
| | | | | |
| 2000 Amount | $43.4 | $12.2 | $29.3 | $84.9 |
| % of Total | 51.2% | 14.4% | 34.4% | 100% |
| | | | | |
| 2001 Amount | $0 | $0 | $0 | $0 |
| % of Total | 0% | 0% | 0% | 0% |
| | | | | |
| 2002 Amount | $0 | $0 | $0 | $0 |
| % of Total | 0% | 0% | 0% | 0% |
| | | | | |
| 2003 Amount | $0 | $0 | $0 | $0 |
| % of Total | 0% | 0% | 0% | 0% |
| | | | | |
| 2004 Amount | $0 | $0 | $0 | $0 |
| % of Total | 0% | 0% | 0% | 0% |
| | | | | |
| 2005 Amount#1 | $9.4 | $6.9 | $12.1 | $28.4 |
| % of Total | 33.2% | 24.4% | 42.4% | 100% |
| | | | | |
| 2006 Amount#2 | $79.9 | $21.1 | $21.1 | $122.1 |
| % of Total | 65.4% | 17.3% | 17.3% | 100% |
| | | | | |
| 2007 Amount#3 | $96.2 | $24.9 | $40.7 | $161.8 |
| % of Total | 59.4% | 15.4% | 25.2% | 100% |
| | | | | |
| | | | | |
| Total | $756.2 | $195.0 | $445.3 | $1,396.5 |
| | 54.1% | 14.0% | 31.9% | 100% |
| | | | | |
| | | | | |
| #1  CITY includes $5.1M of POC interest | | | | |
| and RETIREES $1.4M set aside for future retiree distribution | | | | |
| | | | | |
| #2 RETIREES $3.9M set aside for future retiree distribution | | | | |
| | | | | |
| #3 RETIREES $6.7M set aside for future retiree distribution | | | | |

# EXHIBIT F

| | | |
|---|---|---|
| IN THE MATTER OF: | Docket No. | 12-000777-MERC |
| AFSCME Council 25 | Case No. | C12 E-092 |
| Charging Party | Agency: | Michigan Employment Relations Commission |
| V | | |
| City of Detroit, a Michigan Municipal Corporation | Case Type: | Unfair Labor Practice |
| Respondent | | |

Richard G. Mack, Jr. (P58657)
Attorney- Charging Party
Miller Cohen PC
600 W. Lafayette Blvd, 4th flr.
Detroit, MI 48226
(13) 9614-4454
richardmack@millercohen.com

Letitia C. Jones (P52136)
Attorney – Respondent
City of Detroit Law Department
660 Woodward, Suite 1800
Detroit, MI 48226
(313) 237-3002
jonelc@detroitmi.gov

## RESPONDENT CITY OF DETROIT'S RESPONSE
## TO CHARGING PARTY'S SUPPLEMENTAL BRIEF

### PROCEDURAL BACKGROUND

This action was filed by Charging Party, AFSCME Council 25 alleging that Respondent City of

Detroit has committed an unfair labor practice in violation of PERA, MCL 423.201 et seq. Specifically, the

City of Detroit is alleged to have violated §§10(1)(a),(c), and (e) and Section 15 when it enacted an

ordinance changing the terms of paying annuity interest to its members and retires in violation of various

AFSCME agreements. The requested relief extends to members and non-members (non-AFSCME union

members, retirees, non-union employees), and in a manner that never existed prior to any alleged change..

The City of Detroit previously filed a response, in the form of a motion to dismiss, averring that it

has not repudiated the collective bargaining agreement between the parties, denying that the subject is a

mandatory subject of bargaining, and that the appropriate forum is through the grievance process.[1] The ALJ treated the City's motion as if a position statement. AFSCME filed an amendment to its initial charge, to which the City responded. A preliminary meeting took place, at which time the ALJ requested that the Charging Party file a motion to dismiss, which occurred. Respondent filed a cross motion in response.

After oral arguments on the motions, the ALJ rendered an opinion from the bench, essentially finding that the City, on the basis of contract repudiation, had committed a ULP. However, at the time of this writing, there has been no written decision produced by the ALJ confirming his statements made at the hearing.

On June 10, 2013, AFSCME's attorney contacted the ALJ and the City via email, requesting to be allowed to file a supplemental brief specific to remedies.[2] Because the City's earlier request to file a supplemental brief, to re-visit its arguments stated in its initial motion to dismiss, was denied, the City initially responded to the email requests, "I am assuming that if this is granted, the City will be given ample opportunity to respond. Please advise." Upon consideration, the City attorney believed that, as a bench decision had been issued, a motion was the appropriate action to open the record and file a supplemental brief. The ALJ denied that a motion was necessary and allowed supplemental brief and response to be filed – but only as to remedy.

Section 16 of the Act provides for the following remedies: cease and desist from the unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, *as will effectuate the policies of this act.*[3]

---

[1] Attachment A: City's initial motion filed by Andrew Jarvis.

[2] Interestingly, the City requested to supplement the record, but was denied.

[3] MCL 423.216(b)

## ARGUMENT

<u>1.     Dismissal of the ULP is the proper remedy.</u>

There has been a significant change in the law that would require the tribunal to issue a decision to comport with this change. The legal reasoning of the Macomb decision requires this ALJ to revisit his oral decision to conform to that of the Supreme Court's ruling.[4] Therefore, as a matter of law, the ALJ must dismiss this charge.

In the City's initial response, [5] it argued that this matter is not proper before MERC, as the issue relating to pension benefits is covered by the collective bargaining agreement. Therefore, it should be before an arbitrator. During the course of the various proceedings, the ALJ directed the parties to review four cases that he found to be applicable.[6]

One of those cases - Macomb County v AFSCME Council 25 - was appealed to the Michigan Supreme Court. The Charging Party and Firm in the Macomb case is the same as in the instant matter and as such has knowledge of this ruling. In the Supreme Court's ruling, it adopts a bright line rule that MERC's review of a CBA in the context of a refusal to bargain claim is limited to determining whether the agreement covers the subject of the claim.[7] If so, the contract controls and there is no PERA issue presented. The opinion emphasizes that, in an instance in which a matter is "covered by" a CBA, any claim of past practice

---

[4] Attachment B: Macomb County v AFSCME 494 Mich 65 (2013).

[5] Attachment A

[6] SAAA et al v City of Detroit et al, 218 Mich App 263 (1996); Detroit Police Officers Assoc v City of Detroit, 391 Mich 44 (1974); IAFF v City of Warren, 411 Mich 642 (1981); Macomb County et al v AFSCME et al, 294 Mich App 149 (2011).

[7] In Port Huron Educ Assn v Port Huron Area School Dist, 452 Mich 309 (1996), the court holds "Where there is a contract covering the subject matter of a dispute, which has provisions reasonably relied on for the action in question, and the contract also has a grievance procedure with final and binding arbitration, the Commission finds that the contract controls and no PERA issue is presented.[FN16]

FN16. A subject need not be explicitly mentioned in an agreement in order for the subject to be "covered by" the agreement. Dept of Navy, supra at 252, 962 F2d at 61. However, if the subject is "covered by" the agreement, the "clear and unmistakable standard," the standard that the initial MERC panel relied on, is not applicable. The NLRB has held in similar situations, a matter does not have to be explicitly mention in the agreement in order to be "covered by" the agreement.

---

must establish a meeting of the minds and mutual acceptance. [8] Just because authority was not exercised for several years is insufficient as a matter of law to establish a past practice in a matter covered by the CBA. A review of this ruling, as it relates to the Charge, would suggest that based on the Supreme Court decision, this matter should be dismissed.

The Charge as amended suggests that there is a repudiation of the contract. In Port Huron, an employer "can fulfill its statutory duty by bargaining about a subject and memorializing resolution of that subject in the collective bargaining agreement. When the parties "negotiate for a provision in the collective bargaining agreement that fixes the parties' rights," they "foreclose further mandatory bargaining" because "the matter is 'covered by' the agreement." In the instant case, there are provisions in the collective bargaining agreement specific to retirement plans. The Macomb ruling further states that "the MERC itself has recognized this limitation on its scope of authority,... when the parties have agreed to a separate grievance or arbitration process, the MERC's review of a collective bargaining in the context of a refusal-to-bargain claim is limited to determining whether the agreement covers the subject of the claim.

The Supreme Court decision reiterates the City's initial argument that the matter should be grieved through arbitration and not through the MERC if it is "covered by" the contract. There is no dispute that the issue is "covered by" the contract, as Charging Party puts forth in its amended charge:

3.    The City's actions, described below, **constitute repudiation of the AFSCME-City agreement,** a violation of the status quo, and constitute a unilateral modification of a mandatory subject of bargaining without bargaining to impasse. It also constitutes a mid-term modification of the AFSCME bargaining agreement. {emphasis added}

The Charging Party further posits in paragraph 15 of their amended complaint that,

15.    The AFSCME bargaining agreement, in Article 47.T., indicates that "[a]ll Retirement and Pension Plan Provisions provided for by the City Charter and Municipal Code are incorporated herein by referral unless otherwise specifically modified by this Agreement and Ordinance 2-93, JCC, Page 133. " Thus, the previous ordinance, which established the past practice of the GRS Board making

---

[8] Butler v Wayne County, 289 Mich App 664 (2010); Allied Chemical v Pittsburgh Plate Glass, 404 US 157 (1971)

excess earnings distribution, was incorporated into the AFSCME bargaining agreement.

---

If this is the case, then the issue is 'covered by' the collective bargaining agreement; therefore, this matter is not proper before MERC. As such, the proper action would be for this matter to be dismissed.

2.    Why Charging Party's argument for remedies should fail.

However, in the first instance, AFSCME's allegations should fail because there is no liability. It was at the discretion of the Board to allow enhanced interest rate, but there was no guarantee of any distribution or on what amount the distribution would be.

Even on its own terms, the problems with the remedies sought by the Charging Party are *numerous.* The remedies are contrary to the ALJ's ruling because it disregards the ALJ's finding that the collective bargaining agreement allowed the Board to decide and that the City violated that agreement. Charging Party wants a decision based on discretion, but wants a remedy that is not!  They disregard the entire basis for which the ALJ predicated its ruling. It seeks relief beyond the authority of the ALJ because such relief includes persons not in its bargaining unit (non-union, non-AFSCME members, retirees). As a matter of law, AFSCME cannot represent the retirees without consent. [9]

The retirement system is a legislatively created retirement system for "all" of the City's employees, not just members of AFSCME. The Board is to administer the plan consistent with the ordinance and state statute.[10]  As part of administering the plan, the Board makes investments and where the investment

---

[9] Labor jurisprudence is clear that retirees cannot be part of this group or "bargaining unit." Refer to Allied Chemical case 404 US 157 (1971), which held that retirees are not "employees" within the meaning of the collective bargaining obligations of the NLRA and cannot be "employees" included in a bargaining unit. Supra at 172.  This is so even in a case where an employer modifies benefits that were originally established through collective bargaining. See Rosetto v Pabst Brewing Co. 128 F3d 538 (citing to Allied Chemical, 404 US at 183-188. Several other cases support the argument that AFSCME cannot argue for the 13th check – see Cleveland Electric 440 F3d 809(2006) which allows for consent by opting-in; Teamster v Genessee Commnity Mental Health, 2012 WL 3024138; AFSCME v Wayne County, 810 NW2d 53 (2010).

[10] Chapter 47 of the Detroit City Code; §24 of Michigan Constitution.

exceeded expected earnings, the Board used its discretion to apply an enhanced interest rate to be applied to annuities. The Retirement System funding level has fallen dramatically over the past few years and once again, the Board used its discretion and elected not to allow the enhanced interest rate to be applied to annuities.

It is because the funding has fallen, the City is obligated by state law to protect the pension. Therefore, it enacted an ordinance setting limitations on the Board's "discretion" to modify the plan. While the ordinance was enacted in November 2011, any distribution is speculative at best. There was no guarantee from year to year that a distribution would be made. This is highlighted in Charging Party's Supplemental Brief Exhibit 2, which shows payments were not made in 2008, 2009, 2010, and thereafter in 2011 when the ordinance was enacted[11]

Charging Party's charge would suggest that the status quo, prior to the enactment of the ordinance, was the board **having the discretion** to allow for an enhanced interest rate (or excess earnings) to be applied to the annuity of active members, with any change to be "bargained for." However, there is nothing in the record that indicates that Charging Party sought to bargain on this amendment. Further, there is nothing in the record that Charging Party negotiated the amount of the enhanced interest rate, yet Charging Party seeks the use of an average distribution percentage of the last ten (10) years for both retirees and active employees. Instead of Charging Party seeking that the status quo be restored, he attempts to fashion a remedy that would not have been available to him before the alleged ULP. Additionally, the choice of an average of ten years is arbitrary and capricious. *Therefore, a calculation based on a ten-year average would result in a windfall and be an extreme sanction for the City.*

Charging Party states an alternative remedy: that the discretion to dole out the excess earnings be given back to a Retirement Board of the same composition when the initial decision as to how to distribute

---

[11] The affidavit of John Riehl in CPs exhibit 2 should be disregarded as it was submitted without signature. If Respondent were to have submitted an unsigned affidavit, not only would it be disregarded, but also the attorney would be properly scolded for it.

the excess earnings would have been made. First, let us review the folly of this request. The board is elected by "ALL" of the city's employees, not just "AFSCME" members, so to request that the ALJ unseat those who were properly elected into the position would be unreasonable and result in further unnecessary litigation. Additionally, it seems to suggest that the previously seated board was not neutral, but somehow biased toward fulfilling the union's requirement of getting enhanced earnings. Yet still, in 2008-2010, the Board did not fulfill the union's requirement of getting enhanced earnings.

Charging Party then appears to suggest that a monetary award, which he references as back pay, should be given for 2011 and 2012.[12] Even if the alleged ULP had not taken place, there was no guarantee that there would have been enhanced interest given to its members' annuity in 2011 and 2012. Such a remedy would fall outside of the legislative intent, as found in MCL 423.216(b).

Charging Party further finds fault with the ALJ's suggestion that the retirement Board be asked to indicate what discretion it would have exercised at the time of the 2011 and 2012 distributions. Charging Party suggests that 'providing back-dated discretion to the current retirement commission could be prejudicial to the Charging Party and provide the Respondent a reward for having broken the law.' Once again, it appears he is stating that if they don't rule in the union's favor, then they are siding with the Respondent. In other words, they should be biased in favor of the union.

The Board has a fiduciary duty to "ALL" active employees paying into the plan and to those retirees under the plan. Distribution of "Excess Earnings" by the Pension Board was a breach of fiduciary duty by the Pension Board, and the City did not have a bargaining duty before ceasing what was essentially an unlawful practice. It further was a violation of Section IX, Sec. 24 of the Michigan

---

[12] Charging Party cites to cases that can be distinguished from the instant case, in that they involve the reinstatement of workers and therefore involve back pay. The back pay is for monies they actually would have received 'but for" the ULP. In the instant case, it is speculative whether they would have received any distribution, as it was based on the Board's discretion. Therefore, it was speculative -- not absolute as in the cases cited.

Constitution, and the City did not have a bargaining duty before ceasing what was a violation of law. This position was outlined in the opinion letter to City Council, dated October 10, 2011.

Charging Party suggests that the uncertainty was caused by the removal of discretion. However, as stated before, there were no guarantees for enhanced interest, nor was there any enhanced interest for the three years prior. Charging Party acknowledged in his brief that he has a concern that the City may be going into bankruptcy, yet does not account for the fact that the plan is not just for his members – it's for all City employees. Directing a monetary penalty of any kind would not be a remedy *as will effectuate the policies of the act*.[13] If indeed it is determined that a ULP took place, the proper remedy would be to cease and desist the ULP, restore to the status quo, and if any changes are to be made, they are to be bargained for.

Finally, the Charging Party requests that "the City be ordered to bargain and the City be stayed from any further change until the completion of bargaining, pursuant to law." The City is currently under a consent decree and an Emergency Manager, who has broad powers under PA 436. PERA doesn't apply. Because of which, "pursuant to law" would not require the City of Detroit to bargain.

As to the retirees, Respondent City stands by its position that the retirees are not represented here. They are not employees and not part of the collective bargaining agreement. The retiree claims occurred post-employment and not while in the bargaining unit. There is no remedy at this point that can be fashioned until their consent has been given for AFSCME to represent them in this matter.

Further, they are not similarly situated. While there was no guarantee that any distribution would have been made or what the amount would have been, the retirees continued to receive 13th checks under the discretion of the board prior to the enactment of the ordinance.

---

[13] MCL 423.216(b)

As to the enactment of the ordinance, any midterm modifications to retiree benefits would be permissive and not subject to PERA.[14] Therefore, the issue of the 13th check is not proper here.

## CONCLUSION

Respondent states that the appropriate remedy is dismissal of the ULP charge, and the matter should go to arbitration.

However, if the ALJ/Commission does not feel that the issue is "covered by" the collective bargaining agreement, then the appropriate remedy would be to cease and desist in the actions causing the unfair labor practice and restore to the status quo – that being give the GRS Board the discretion it previously had prior to the enactment of the ordinance.

Charging Party wants a decision based on discretion, but wants a remedy that is not! Any other remedy would fall outside of the authority of the Commission, as the requested remedy affects members outside of the bargaining unit. Further, it would be granting benefits not entitled to prior to the alleged ULP would be punitive in nature and not in accordance with the remedies provision under PERA.

WHEREFORE, Respondent requests that this matter be dismissed as a matter of law.

Respectfully submitted

/s/ Letitia C. Jones
Letitia C. Jones
CITY OF DETROIT LAW DEPT
2 Woodward, Suite 500
Detroit, MI 48226
p. (313) 237-3002
f. (313) 224-5505
e. jonelc@detroitmi.gov
(P52136)

Date: July 11, 2013

---

[14] See footnote 9.

## Certificate of Service

**Letitia Jones** certifies that on12th day of July 2013, she caused Respondent's Response to Charging Party's Supplemental Brief on Remedies to be electronically served upon MERC and the attorney of record for the Charging Party. The appropriate hard copies are being placed in the mail to be delivered by the US Postal Service.

> */s/ Letitia C. Jones*
> LETITIA C. JONES
> CITY OF DETROIT LAW DEPT
> 2 Woodward, #500
> Detroit, MI 48226
> (313) 237-3002
> (P52136)

# Exhibit A

STATE OF MICHIGAN
EMPLOYMENT RELATIONS COMMISSION
LABOR RELATIONS DIVISION

In the Matter of:

CITY OF DETROIT,
        Respondent-Public Employer                    Unfair Labor Practice Charge

And

AMERICAN FEDERATION OF STATE
COUNTY AND MUNICIPAL EMPLOYEES,
MICHIGAN COUNCIL 25
        Charging Party-Labor Organization

| Richard G. Mack (P*****) | Andrew R. Jarvis (P*****) |
|---|---|
| Attorney for Charging Party | Representative for Respondent |
| Michigan AFSCME Council 25, AFL-CIO | City of Detroit Law Department |
| 600 W. Lafayette Blvd. | 1650 First National Building |
| 4th Floor | 660 Woodward Ave. |
| Detroit, MI 48226 | Detroit, MI 48226 |
| (313) 964-4454 | (313) 237-5038 |

### RESPONDENT CITY OF DETROIT'S MOTION TO DISMISS CHARGING PARTY'S UNFAIR LABOR PRACTICE CHARGE

NOW COMES RESPONDENT, CITY OF DETROIT, by and through its representative, Andrew R. Jarvis, and states as follows as its Motion to Dismiss the Unfair Labor Practice (ULP) charge brought by Charging Party:

1.  That Respondent denies the Charging Party's allegations that it violated the Public Employment Relations Act ("PERA"), Sections 10(1)(a,c,e) and Section 15.

2.  That the Detroit City Council voted on and approved an Ordinance to amend Chapter 47 of the 1984 Detroit City Code, Retirement Systems, Article I, by limiting payments by the General Retirement System so that neither the General Retirement System nor the trustees charged with management of the System may provide any savings plan, annuity plan, or other participant investment or savings vehicle that provides an annual return to investing participants which in any year is greater than the actual investment return net of expenses of the Retirement System invested reserves for the year in which the return is earned and accrued, provided, that such return shall neither be greater than the assumed annual return as expressed in the plan's valuation for the year nor less than zero.

3. That the amendment definition of 'regular interest' to be commensurate with the limitation to be contained in Section 47-1-18 of the Detroit City Code, and to make provision concerning the income fund commensurate with the limitation to be contained in Section 47-1-18 of the Detroit City Code

4. That the Respondent denies the Charging Party's allegations that it repudiated the AFSCME –City Agreement, a violation of the status quo, and constituent a unilateral modification of a mandatory subject of bargaining without bargaining to impasse.

5. That the subject of the Annuity Interest of the City of Detroit General Retirement Systems is not, nor has it ever been a bargained issue.

6. That the appropriate venue for disputes alleging a violation of the Collective Bargaining Agreement (CBA) is the grievance procedure as contained in the CBA, not the Employment Relations Commission.

7. That the Charging Party has failed to state an unfair labor practice under PERA.

WHEREFORE, RESPONDENT, CITY OF DETROIT, respectfully requests:

1. That the ULP charge be dismissed in its entirety, with prejudice;

2. That Charging Party reimburses the City of Detroit its costs in having to answer such a frivolous ULP charge.

3. Any other relief which is proper.

Dated: July 17, 2012          Respectfully Submitted:


_____
Andrew R. Jarvis (P*****)
Attorney for Respondent – Public Employer
City of Detroit, Law Department
1650 First National Building
660 Woodward Ave.
Detroit, MI 48226
(313) 237-5038

# Exhibit B



MACOMB COUNTY, MACOMB COUNTY ROAD COMMISSION, and 16TH JUDICIAL CIRCUIT COURT, Respondents-Appellants, v AFSCME COUNCIL 25 LOCALS 411 and 893, INTERNATIONAL UNION UAW LOCALS 412 and 889, and MICHIGAN NURSES ASSOCIATION, Charging Parties-Appellees.

No. 144303

SUPREME COURT OF MICHIGAN

*494 Mich. 65; 2013 Mich. LEXIS 905*

March 5, 2013, Argued
June 12, 2013, Decided
June 12, 2013, Filed

**PRIOR HISTORY:** *Macomb County v. AFSCME Council 25 Locals 411 & 893, 294 Mich. App. 149, 818 N.W.2d 384, 2011 Mich. App. LEXIS 1587 (2011)*

**JUDGES:** [**1] Chief Justice: Robert P. Young, Jr. Justices: Michael F. Cavanagh, Stephen J. Markman, Mary Beth Kelly, Brian K. Zahra, Bridget M. McCormack, David F. Viviano. MCCORMACK, J. (dissenting). VIVIANO, J., took no part in the decision.

**OPINION BY:** Robert P. Young

**OPINION**

[*70] BEFORE THE ENTIRE BENCH (except VIVIANO, J.)

YOUNG, C.J.

The public employment relations act (PERA)[1] requires public employers to bargain with their employees' designated representatives concerning the "terms and conditions of employment," including the calculation of retirement benefits. Failure to do so constitutes an unfair labor practice. The unfair labor practice complaints at issue in this case arise out of the Macomb County Retirement Commission's decision to change the actuarial table used to calculate joint and survivor retirement benefits for employees retiring after July 1, 2007. We hold that the respondents did not commit an unfair labor practice when they refused to bargain with the charging parties over this decision and that the remedy for this dispute lies in the grievance and arbitration system these parties have created.

1  *MCL 423.201 et seq.*

If a collective bargaining agreement covers the term or condition of employment in dispute, [**2] "the details and enforceability of the provision are left to arbitration."[2] The unfair labor practice complaints in this case concern subject matters covered by the collective bargaining agreements. Thus, the grievance process contemplated in the collective bargaining agreements is the appropriate avenue to challenge respondents' actions. The collective bargaining agreements grant the retirement commission discretion to establish actuarial [*71] tables to calculate joint and survivor benefits. The retirement commission's 24-year practice of using the same actuarial table to calculate those benefits does not, on its own, constitute the clear and unmistakable evidence necessary to overcome the collective bargaining agreements' coverage of the matter and create a new term or condition of employment. As a result, none of the unfair labor practice charges can be sustained. We reverse the decision of the Court of Appeals and remand this case to the Michigan Employment Relations Commission for dismissal of the unfair labor practice complaints.

2  *Port Huron Ed Ass'n v Port Huron Area Sch Dist, 452 Mich 309, 321; 550 NW2d 228 (1996).*

I. FACTS AND PROCEDURAL HISTORY

The Macomb County Board of Commissioners [**3] enacted the retirement ordinance and established the Macomb County Employees Retirement System to "provid[e] pension and retirement benefits for the em-

ployees of the County of Macomb . . . ."[3] The ordinance vests the seven-member Macomb County Retirement Commission with "the general administration, management and responsibility for the proper operation of the Retirement System, and for construing and making effective the provisions of [the] Ordinance."[4]

> 3  Macomb County retirement ordinance, § 1.
> 4  *Id.* at § 3.

The retirement ordinance grants a retiring county employee the option of receiving a monthly retirement allowance payable only until the employee's death, or receiving a reduced allowance during the retiree's life, the payment of which continues after this death and through the life of a named beneficiary.[5] If the retiree [*72] chooses to allow a surviving beneficiary to receive payments in addition to his or her own "straight life benefit," the monthly "joint and survivor" payment is reduced to ensure that it is "the actuarial equivalent . . . of [the employee's] straight life retirement allowance . . . ."[6] The retirement ordinance does not define the term "actuarial equivalent."

> 5  Section 22(b) [**4] of the Macomb County retirement ordinance conditions a union represented employee's benefits on those "provided in the applicable collective bargaining agreement . . . ."
> 6  Macomb County retirement ordinance, § 26(a). The ordinance lists five separate options, with varying benefits that the surviving beneficiary would receive.

This case focuses on the method that the retirement system uses to calculate the joint and survivor benefit as compared to the straight life benefit. Until 1982, the county used gender-based actuarial tables to calculate the joint and survivor benefit. However that year, in response to a United States Supreme Court decision[7] and a Michigan Attorney General opinion,[8] the commission concluded that it could not continue to use gender-based actuarial tables. It sought the advice of its actuary, Gabriel, Roder, Smith & Company (GRS), in selecting a single, gender-neutral actuarial table to calculate the joint and survivor payment without regard to either the employee's or the beneficiary's gender. GRS outlined several alternative approaches and noted that the only approach "designed to make sure that no participant will receive a lesser benefit than under [existing] [**5] procedures," would be to adopt the female actuarial table for all retirees. Ultimately, the retirement commission chose to adopt the female actuarial table for all retirees.

> 7  *City of Los Angeles Dept of Water & Power v Manhart*, 435 U.S. 702; 98 S. Ct. 1370; 55 L. Ed. 2d 657 (1978).
> 8  *OAG, 1981-1982, No 5846, 1981 Mich. AG LEXIS 175, p 29* (January 22, 1981).

For 24 years, the retirement system applied the female actuarial table when calculating its retirees' [*73] monthly joint and survivor payments. However, GRS studied the retirement system over a five-year period (2001-2005) and concluded that the joint and survivor benefit was "more valuable than the single life annuity form of payment." To ensure that the optional joint and survivor payment would "have the same present value, on average, as the straight life normal form of payment," GRS proposed a different actuarial table for the commission to adopt. GRS determined that a blended table that assumed 60% male retirees and 40% female retirees would best approximate benefits that are equal in value among all the options. At its November 17, 2006 meeting, the commission voted 4-3 to adopt this 60% male actuarial table, to take effect for all employees who retire on or after [**6] July 1, 2007.[9]

> 9  Any employees who retired before July 1, 2007, were unaffected by the decision and continued to receive benefits as calculated from the female actuarial table.

The charging parties demanded collective bargaining over the change.[10] Respondents rejected this demand and claimed that the existing collective bargaining agreements gave the commission discretion to adopt new actuarial tables.[11] The charging parties then filed unfair labor practice complaints with the Michigan Employment Relations Commission (MERC).

> 10  The charging parties are: AFSCME Council 25, Locals 411 and 893; International Union UAW Locals 412 and 889; and Michigan Nurses Association.
> 11  The respondents are: Macomb County, Macomb County Road Commission, and 16th Judicial Circuit Court. This case involves nine separate collective bargaining agreements between the charging parties and the respondents, each admitted as exhibits in the hearing before the hearing referee. Article 26(A) of the collective bargaining agreement between UAW Local 412, Unit 75 and Macomb County states that
>
> > [t]he Employer shall continue the benefits as provided by the presently constituted Macomb County Employees' Retirement Ordinance, [**7] and the Em-

ployer and the employee shall abide by the terms and conditions thereof, provided, that the provisions thereof may be amended by the Employer as provided by the statutes of the State of Michigan . .
. .

An identical provision appears in seven of the other collective bargaining agreements: between UAW Local 889 and Macomb County, between AFSCME Local 411 and Macomb County, between the Michigan Nurses Association and Macomb County, and between four additional bargaining units of UAW Local 412 and Macomb County. The collective bargaining agreement between AFSCME Local 893 and the Macomb County Road Commission referred to the ordinance in outlining health and life insurance benefits and to "retirement benefit option[s]" in outlining a surviving spouse's health insurance benefits.

[*74] After conducting a three-day hearing, the hearing referee recommended that the MERC dismiss the unfair labor practice charges. She determined that a retirement plan's actuarial assumptions are mandatory subjects of bargaining under the PERA. However, because the underlying collective bargaining agreements "contain extensive provisions 'covering' pension benefits," and because "the parties were satisfied, [**8] and agreed, to have these benefits calculated as provided in the ordinance," she concluded that the respondents had already fulfilled their statutory duty to bargain over the retirement system's actuarial assumptions. While "the meaning of the term 'actuarial equivalent' in the ordinance involved bona fide questions of contract interpretation," those questions "are properly subject to resolution through the grievance arbitration procedures set out in the parties' contracts," not in litigation over unfair labor practices.

The charging parties filed exceptions to the hearing referee's proposed decision.[12] The MERC agreed with [*75] the charging parties and rejected the referee's decision and recommended order. It concluded that "[t]he actuarial assumptions at issue here were never memorialized in the Retirement Ordinance or any of the collective bargaining agreements referencing the Retirement Ordinance." Although the ordinance did not define the actuarially equivalent benefits promised to retirees and their beneficiaries, the term's meaning "has been subordinated to the question of whether the parties have amended their agreements by the longstanding practice of calculating optional pension [**9] benefits that are not the actuarial equivalent of straight life benefits . . . ." On this question,

the MERC determined that the parties "tacitly agreed that joint and survivor benefits would continue to be calculated as they had [been] in the past." As a result, the MERC concluded that respondents' unilateral change violated the duty to bargain and that respondents must revert to the female actuarial table.[13]

12   A hearing referee's proposed decision "shall be considered by the commission only if raised in exceptions or cross exceptions to the proposed decision and recommended order filed under R 423.176." Mich Admin Code, R 423.161(6). Mich Admin Code, R 423.176 provides that "[a]ny party may file written exceptions to the decision and recommended order of the administrative law judge, or to any other part of the record or proceedings, including rulings upon motions or objections, and a brief in support thereof." Although Teamsters Local 214 was initially a charging party against respondent 16th Judicial Circuit Court, it did not file exceptions to the hearing referee's decision pursuant to Rule 423.176. Accordingly, the MERC adopted the hearing referee's decision and recommended order [**10] as to Teamsters Local 214. MERC Case No. C07 E-111 (January 25, 2010).
13   The MERC held that respondents could only change the actuarial table if the parties agreed to a different actuarial table or if, upon expiration of the existing collective bargaining agreements, the parties' good faith bargaining over the actuarial table reached an impasse. The MERC also ordered respondents to recalculate the joint and survivor benefits of any retiree whose benefits were reduced under the new actuarial table; to compensate them, with interest, for the reduction in benefits it had already paid; and to post a notice indicating their intent to comply with the ruling.

The Court of Appeals affirmed the MERC's decision in a split opinion.[14] The majority agreed with the MERC that actuarial assumptions are mandatory subjects of [*76] bargaining, that "the term 'actuarial equivalence' as used in this case did not unambiguously mean 'equal in value,'"[15] and that the parties' past practice of using the female actuarial table "constituted a 'tacit agreement'" to continue using it absent collective bargaining.[16] The majority further concluded that the continuous use of the female actuarial table "was 'so widely acknowledged [**11] and mutually accepted that it created an amendment to the contract,'" even if the County's definition of "actuarial equivalence" unambiguously intended to establish options that were equal in value.[17]

14   *Macomb Co v AFSCME Council 25 Locals 411 & 893, 294 Mich App 149; 818 NW2d 384 (2011).*

15   *Id. at 165.*

16   *Id. at 166.*

17   *Id. at 170*, quoting *Port Huron Ed Ass'n v Port Huron Area Sch Dist, 452 Mich 309, 329; 550 NW2d 228 (1996)* (brackets omitted).

The dissenting judge would have reversed the MERC's decision and would have adopted the hearing referee's recommended order. The dissenting judge believed that the term "actuarial equivalent" is unambiguous and required "optional retirement benefits [to] be equivalent or equal in value on the basis of actuarial assumptions."[18] Because it "results in the optional benefits being more valuable than the straight-life benefit,"[19] the dissent opined that using the female actuarial table for all employees was inconsistent with the ordinance. The dissent further reasoned that by agreeing to incorporate the ordinance into their collective bargaining agreements, the employees' "retirement benefits and the methods used to calculate them--including mortality tables [**12] and actuarial assumptions--are 'covered by' the parties' CBAs," and do not require further bargaining.[20]

18   *294 Mich App at 178* (MARKEY, P.J., dissenting).

19   *Id.*

20   *Id. at 184* (MARKEY, P.J., dissenting). Judge MARKEY alternatively concluded that actuarial assumptions are not subject to mandatory bargaining in the first instance because the commission "is vested with the authority to determine mortality tables and actuarial assumptions necessary to ensure 'actuarial equivalence' of optional requirement benefits . . . ." *Id. at 172* (MARKEY, P.J., dissenting). However, respondents do not raise this threshold issue on appeal. Moreover, this Court has held that the calculation of retirement benefits is a matter of mandatory collective bargaining. *Detroit Police Officers Ass'n v Detroit, 391 Mich 44, 63; 214 NW2d 803 (1974).*

[*77] We granted respondents' application for leave to appeal and ordered the parties to brief "whether the Court of Appeals properly applied the holding of *Port Huron Ed Ass'n v Port Huron Area Sch Dist, 452 Mich 309; 550 N.W.2d 228 (1996)*, when it concluded that the parties intended to modify the collective bargaining agreement by use of the 100% female/ 0% male mortality tables."[21]

21   *491 Mich. 915 (2012).*

## II. [**13] STANDARD OF REVIEW

In a case on appeal from the MERC, the MERC's factual findings are conclusive if supported by "competent, material, and substantial evidence on the whole record."[22] Legal questions, which include questions of statutory interpretation[23] and questions of contract interpretation,[24] are reviewed de novo.[25] As a result, an administrative agency's legal rulings "are set aside if they are in violation of the constitution or a statute, or affected by a substantial and material error of law."[26]

22   *Const 1963, art 6, § 28. Amalgamated Transit Union, Local 1564, AFL-CIO v Southeastern Mich Transp Auth, 437 Mich 441, 450; 473 NW2d 249 (1991).*

23   *In re Complaint of Rovas Against SBC Mich, 482 Mich 90, 102; 754 NW2d 259 (2008).*

24   *In re Egbert R Smith Trust, 480 Mich 19, 24; 745 NW2d 754 (2008).*

25   *Little v Hirschman, 469 Mich 553, 557; 677 NW2d 319 (2004).*

26   *Amalgamated Transit Union, 437 Mich at 450.*

## III. ANALYSIS

The PERA governs the relationship between public [*78] employees and governmental agencies.[27] When it was enacted in 1976,[28] the PERA "drastically altered public employee labor relations in Michigan." It represents the Legislature's intent to "assure[] public employees of protection [**14] against unfair labor practices, and of remedial access to a state-level administrative agency with special expertise in statutory unfair labor practice matters."[30]

27   The PERA applies to any "any person holding a position by appointment or employment in the government of this state, in the government of 1 or more of the political subdivisions of this state, in the public school service, in a public or special district, in the service of an authority, commission, or board, or in any other branch of the public service," subject to exceptions not applicable in this case. *MCL 423.201(1)(e).*

28   *1976 PA 18; MCL 423.201 et seq.*

29   *The Lamphere Sch v Lamphere Federation of Teachers, 400 Mich 104, 116; 252 NW2d 818 (1977).* The PERA amended the Hutchinson Act, 1947 PA 336, which "had prohibited public employees from engaging in collective bargaining. The PERA not only permitted collective bargaining by employees, see [MCL 432.09], but it [also] required public employers to negotiate with public employees' bargaining units, see [MCL 432.10]." *Id.*

page 5

30  *Detroit Fire Fighters Ass'n v Detroit, 408 Mich 663, 684; 293 NW2d 278 (1980).*

*Section 15(1) of the PERA* requires a public employer to engage in collective [**15] bargaining with its employees' designated representatives "with respect to wages, hours, and other terms and conditions of employment . . . ."[31] This Court has held that the calculation of retirement benefits is a mandatory subject of collective bargaining.[32] *Section 10(1)* specifies that "[i]t shall be unlawful for a public employer . . . to refuse to bargain collectively with the representatives of its public employees."[33] [*79] This duty "persists during the life of the collective bargaining agreement."[34] A violation of *§ 10(1)* "shall be deemed to be [an] unfair labor practice[] remediable by the [MERC]."[35]

31  *MCL 423.215(1). Section 15(1) of the PERA* covers similar subjects of mandatory collective bargaining as § 8(d) of the National Labor Relations Act. *29 USC 158(d)* (requiring covered employers to bargain "with respect to wages, hours, and other terms and conditions of employment"). See *Detroit Police Officers Ass'n, 391 Mich at 53* ("The decision by the Michigan Legislature to adopt the language of § 8(d) of the NLRA is significant.").
32  *Detroit Police Officers Ass'n, 391 Mich at 63.*
33  *MCL 423.210(1)(e).*
34  *Amalgamated Transit Union, 437 Mich at 449-450.*
35  *MCL 423.216.*

This Court's caselaw  [**16] explains the PERA's requirement to engage in collective bargaining: "The primary obligation placed upon the parties in a collective bargaining setting is to meet and confer in good faith."[36] Good faith requires a party to be "actively engaged in the bargaining process with an open mind and a sincere desire to reach an agreement."[37] While the parties do not need to reach an agreement on a subject of mandatory collective bargaining, "neither party may take unilateral action on the subject absent an impasse in the negotiations."[38]

36  *Detroit Police Officers Ass'n, 391 Mich at 53.*
37  *Id. at 53-54.*
38  *Id. at 55.*

In *Port Huron Education Association v Port Huron School District,* we examined the statutory duty to bargain in the context of an existing, controlling collective bargaining agreement. An employer "can fulfill its statutory duty by bargaining about a subject and memorializing resolution of that subject in the collective bargaining agreement."[39] When the parties "'negotiat[e] for a provision in the collective bargaining agreement that fixes the parties' rights,'" they "'foreclose[] further mandatory bargaining'" because "the matter is 'covered by' the agreement."[40]

39  *Port Huron Ed Ass'n, 452 Mich at 317-318.*
40  *Id. at 318,* [**17] quoting *Local Union No 47, Int'l Brotherhood of Electrical Workers v NLRB, 288 U.S. App DC 363, 368; 927 F2d 635 (1991).*

[*80] The foundational principle of our contract jurisprudence is that parties must be able to rely on their agreements.[41] This principle applies no less strongly to collective bargaining agreements: when parties to a collective bargaining agreement "'bargain about a subject and memorialize the results of their negotiation in a collective bargaining agreement, they create a set of enforceable rules--a new code of conduct for themselves-- on that subject.'"[42] A party to the collective bargaining agreement "has a right to rely on the agreement as the statement of its obligations on any topic 'covered by' the agreement."[43]

41  See, e.g., *Wilkie v Auto-Owners Ins Co, 469 Mich 41, 52; 664 NW2d 776 (2003)* ("The notion, that free men and women may reach agreements regarding their affairs without government interference and that courts will enforce those agreements, is ancient and irrefutable.").
42  *Port Huron Ed Ass'n, 452 Mich at 319,* quoting *Dep't of Navy v Fed Labor Relations Auth, 295 U.S. App DC 239, 248; 962 F2d 48 (1992).*
43  *Port Huron Ed Ass'n, 452 Mich at 327.*

The MERC ordinarily  [**18] "does not involve itself with contract interpretation when the agreement provides a grievance process that culminates in arbitration."[44] However, when a charging party claims that a respondent has failed to bargain over a mandatory subject of bargaining, the MERC must "determine whether the agreement 'covers' the dispute."[45] As a result, "it is often necessary for the MERC . . . to review the terms of an agreement to ascertain whether a party has breached its statutory duty to bargain."[46] If the agreement covers "the term or condition in dispute," then "the details and enforceability of the provision are left to arbitration."[47] The MERC itself has recognized this [*81] limitation on its scope of authority,[48] which we reaffirm today: when the parties have agreed to a separate grievance or arbitration process, the MERC's review of a collective bargaining agreement in the context of a refusal-to-bargain claim is limited to determining whether the agreement covers the subject of the claim.

44 *Id. at 321.*

45 *Id.*

46 *Id.*

47 *Id.* "[A]rbitration has come to be the favored procedure for resolving grievances in federal and Michigan labor relations . . . ." *Grand Rapids v Grand Rapids Lodge No 97, Fraternal Order of Police, 415 Mich 628, 634; 330 NW2d 52 (1982).* [**19] However, "[t]he preference for arbitration . . . is triggered only if the parties agree to arbitrate." *Id.*

48 See *St Clair Co Rd Comm v Local 516M Serv Employees Int'l Union,* 1992 MERC Labor Op 533, 538 ("Where there is a contract covering the subject matter of a dispute, which has provisions reasonably relied on for the action in question, and the contract also has a grievance procedure with final and binding arbitration, the Commission finds that the contract controls and no PERA issue is presented.").

In *Port Huron,* the charging party also claimed that, notwithstanding a collective bargaining agreement that covered the matter in dispute, the parties' course of conduct created a *new* term or condition of employment that existed independently from the collective bargaining agreement. While this Court reviewed the parties' course-of-conduct claim separately from the collective bargaining agreement, we underscore that it is incumbent on courts and the MERC not to conflate an unfair labor practice complaint with an arbitrable disagreement over the terms of the collective bargaining agreement. Unambiguous language in a collective bargaining agreement dictates the parties' rights and obligations [**20] even in the face of a conflicting past practice, "unless the past practice is so widely acknowledged and mutually accepted that it creates an amendment to the contract."[49] The party that seeks to overcome unambiguous contract language "must show the parties had [*82] a meeting of the minds with respect to the new terms or conditions so that there was an agreement to modify the contract."[50]

49 *Port Huron Ed Ass'n, 452 Mich at 329.* When the collective bargaining agreement is ambiguous or silent on the subject, "there need only be 'tacit agreement that the practice would continue.'" *Id.* at 325, quoting *Amalgamated Transit Union,* 437 Mich at 454-455.

50 *Port Huron Ed Ass'n, 452 Mich App at 312.*

We clarify the *Port Huron* analysis to explain that this is an exceedingly high burden to meet. Any lesser standard would defeat the finality in collective bargaining agreements and would blur the line between statutory unfair labor practice claims and arbitrable disagreements over the interpretation of collective bargaining agreements. As a result, the party that seeks to overcome an unambiguous collective bargaining agreement must present evidence establishing the parties' affirmative intent to revise the [**21] collective bargaining agreement and establish new terms or conditions of employment. Moreover, because "arbitration has come to be the favored procedure for resolving grievances in federal and Michigan labor relations,"[51] doubt about whether a subject matter is covered should be resolved in favor of having the parties arbitrate the dispute. The arbitrator, not the MERC, is ordinarily best equipped to decide whether a past practice has matured into a new term or condition of employment.

51 *Grand Rapids, 415 Mich at 634.*

## IV. APPLICATION

At issue in this case is whether respondents were required to bargain with the charging parties before the retirement commission changed the actuarial tables used to calculate joint and survivor monthly payments. The parties do not dispute that the calculation of retirement benefits is a matter of mandatory collective bargaining.[52] However, respondents claim that the retirement [*83] ordinance unambiguously gave the commission the discretion to change the actuarial tables used to calculate joint and survivor benefits and, moreover, that they satisfied the duty to bargain because the collective bargaining agreements, in turn, incorporate the ordinance's provisions [**22] authorizing this discretion. The charging parties dispute that characterization of the collective bargaining agreement and instead claim that the respondents' use of the female actuarial table for 24 years created a separate and enforceable term of employment that could not be changed absent additional collective bargaining.

52 *Detroit Police Officers Ass'n, 391 Mich at 63.*

### A. THE RETIREMENT ORDINANCE

The Macomb County Retirement Ordinance explicitly provides the retirement commission with discretion to adopt actuarial calculations that apply to the retirement system: "The Retirement Commission shall from time to time adopt such mortality and other tables of experience, and a rate or rates of regular interest, as are necessary in the Retirement System on an actuarial basis."[53] When an employee selects the joint and survivor option to allow a beneficiary to receive monthly retirement allowance payments after the employee's death, the ordinance requires the monthly payments to be reduced so that the joint and survivor option is "the actuarial equivalent" of the straight life benefit.[54]

53    Macomb County Retirement Ordinance, § 15.

54    Section 26(a) of [**23] the Macomb County Retirement Ordinance provides:

> Prior to the receipt of his/her first monthly retirement payment but not thereafter, a member may elect to receive his/her retirement allowance as a straight life retirement allowance payable throughout his/her life or he/she may elect to receive the actuarial equivalent, at that time, of his/her straight life retirement allowance in a reduced retirement allowance payable throughout his/her life and nominate a beneficiary. . . .

The beneficiary then would receive payments on his or her survival of the employee on the basis of the particular provisions of the five options listed. Moreover, § 22(b) allows a union represented member to "elect to receive his/her retirement allowance under an option provided in Section 26 in lieu of a straight life retirement allowance."

[*84] The ordinance does not define the term "actuarial equivalent." Because "actuarial equivalent" is a term of art, we must assume that the Macomb County Retirement Commission intended the term to have its technical meaning.[55] Black's Law Dictionary defines "actuarial equivalence" as "[t]he amount of accrued pension benefits to be paid monthly or at some other interval so that the [**24] total amount of benefits will be paid over the expected remaining lifetime of the recipient."[56] This definition makes clear that an actuarially equivalent monthly benefit must be calculated to allocate benefits over a projected period of time, that is, the life expectancy of the recipient(s). The Attorney General reached a similar conclusion in the opinion that prompted the commission's original action to adopt a female-only actuarial table. When defining the phrase "actuarially equivalent" in the statutory election of early retirement benefits, the Attorney General stated that the term meant a "'benefit of equal value'" to its comparison plan "'when computed upon the basis of such mortality and other tables as may be adopted by the retirement board.'"[57] We believe that the Attorney General's [*85] construction accurately describes this technical term and thus we adopt it as our own.

55    See MCL 8.3a ("[T]echnical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning."); Gora v City of Ferndale, 456 Mich 704, 711; 576 NW2d 141 (1998) ("The rules governing the construction [**25] of statutes apply with equal force to the interpretation of municipal ordinances.").

56    Black's Law Dictionary (8th ed), p 39.

57    OAG, 1981-1982, No 5846, 1981 Mich. AG LEXIS 175, p 31, quoting King Co Employees' Ass'n v State Employees Retirement Bd, 54 Wn.2d 1; 336 P.2d 387, 391 (1959) (emphasis omitted).

Furthermore, we hold that this definition of "actuarial equivalent" is unambiguous in the context of the ordinance. The ordinance itself makes clear that the county must present the joint and survivor options to a retiring employee in a way that estimates that the employee and his or her beneficiary are projected to receive an equal amount of total benefits from a joint and survivor option as the employee would receive from the straight life option.

Moreover, it is also clear from the evidence in this case that the parties had this same understanding of the term's meaning. GRS's report states that the proposed actuarial table is "designed to have the same present value, on average, as the straight life normal form of payment" and states that the 100% female blend is not actuarially equivalent to the straight life payment. Indeed, the charging parties' own expert witness testified that "[a]ctuarially equivalent [**26] to me means equal" and "[i]dentical in value."[58] For these reasons, we conclude that the dissenting judge of the [*86] panel correctly determined that actuarial equivalence requires "optional benefits that include payments to a survivor be equal in value to the straight-life benefit on the basis of statistical data regarding mortality and other factors such as the rate of interest."[59]

58    In concluding that the term "actuarial equivalent" is ambiguous, the Court of Appeals majority erroneously focused on a different statement by the charging parties' expert witness that distinguished actuarial equivalence from the valuation of benefits: "'[A]ctuarially equivalent is usually a term used in a plan document to set the optional forms to another optional form. The valuation of those optional forms is a different matter, whole different assumption set.'" Macomb Co, 294 Mich App at 164 (emphasis omitted). However, the extratextual evidence that the Court of Appeals majority used to define the ordinance's term did not refute the plain meaning of the term.

The expert noted that actuaries use gender-based actuarial tables when valuing future ex-

pected outlays for the purposes of valuing its pension obligations [**27] on the open market. He testified that "to value these benefits, they would value them as an open market valuation," which takes a recipient's sex into account, unlike the method used to define the recipient's benefits.

Thus, it is unremarkable for an expert to say that the county's own valuation of its pension obligations uses a different set of assumptions than its calculation of the pension benefits that are due its employees. This internal calculation is a more precise projection of its future pension funding obligations because, unlike the calculation of benefits due an employee, the county's internal calculation of its obligations can factor the differences in life expectancy between men and women.

59    *Macomb Co, 294 Mich App at 177* (MARKEY, P.J., dissent). Judge MARKEY interpreted the term "actuarial equivalent" by looking to the separate definitions of the terms "actuary" and "equivalent." However, as stated, the phrase "actuarial equivalence" is a term of art and as such has independent significance, as evidenced by its use in many similar retirement plans. See, e.g., *Dunn v Bd of Trustees of Wayne Co Retirement Sys, 160 Mich App 384, 394; 407 NW2d 657 (1987)* ("An employee pension [**28] . . . shall be the actuarial equivalent of his accumulated contributions standing to his credit . . . .") (quotation marks and citation omitted).

## B.    THE    COLLECTIVE    BARGAINING AGREEMENTS

While the ordinance clearly gives the commission discretion to maintain actuarially equivalent joint and survivor benefits, the ordinance is only effective as to unionized employees "as provided in the applicable collective bargaining agreement . . . ."[60] As a result, we must examine the individual collective bargaining agreements to determine whether they incorporate the ordinance's terms. Eight of the nine collective bargaining agreements at issue in this case expressly incorporate the terms of the retirement ordinance in the determination of retirement benefits.[61] They state identically that "[t]he Employer shall [*87] continue the benefits as provided by the presently constituted Macomb County Employees' Retirement Ordinance, and the Employer and the employee shall abide by the terms and conditions thereof, provided, that the provisions thereof may be amended by the Employer as provided by the statutes of the State of Michigan . . . ." Because the collective bargaining agreements cover the calculation of [**29] retirement benefits, we conclude that the grievance procedure is the appropriate

avenue for the charging parties' claims arising out of the parties' rights under their respective collective bargaining agreement.[62]

60    Macomb County Retirement Ordinance, § 22(b).
61    The eight collective bargaining agreements containing identical language are those bargained by: UAW Local 412, Units 39, 46, 49, 55, and 75; UAW Local 889; AFSCME Local 411; and the Michigan Nurses Association.
62    Each of these collective bargaining agreements specifies a grievance procedure. Six of the collective bargaining agreements provide a grievance procedure for "all disputes that may arise between [the parties] concerning the interpretation or operation of this Agreement." The collective bargaining agreement between UAW Local 889 and Macomb County states that the grievance procedure applies to "all disputes, including but not limited to dismissals, suspensions, demotions and other disciplinary actions of any type that may arise between [the parties] concerning the interpretation or operation of this Agreement." Finally, the collective bargaining agreement between UAW Local 412, Unit 46 and Macomb County states that a grievance [**30] is "a claim, reasonably, and sensibly founded, of a violation of this Agreement."

The ninth collective bargaining agreement--between the Macomb County Road Commission and AFSCME Local 893--implicitly incorporates the retirement ordinance. A subject "need not be explicitly mentioned in an agreement in order for the subject to be 'covered by' the agreement."[63] In the context of retiree health care benefits, the Local 893 collective bargaining agreement states that "[h]ospital-medical coverage will be extended to a retiring Employee and spouse who qualifies and received [sic] benefits under the Macomb County Retirement ordinance" and that this coverage "shall be [*88] discontinued upon the death of the retiree, unless the spouse continues to be entitled to and receive payment under a retirement benefit option." Additionally, it states that "[e]mployees retiring from the Road Commission of Macomb County and eligible for benefits under the Macomb County Retirement Ordinance" shall receive a $10,000 life insurance benefit. The collective bargaining agreement specifies the formula to calculate a retiree's pension benefits but, more important for the purposes of this case, it expressly refers to a "retirement [**31] benefit option" that allows a surviving beneficiary to receive benefits. As a result, we hold that this collective bargaining agreement incorporates the retirement ordinance to the extent that the ordinance governs optional joint and survivor benefits and that the grievance proce-

dure is the appropriate forum for the remaining charging party to raise its claim regarding disputes arising out of the collective bargaining agreement.[64]

> 63  *Port Huron Ed Ass'n, 452 Mich at 322 n 16*, citing *Dep't of Navy, 295 U.S. App DC at 252*.
> 64  The collective bargaining agreement also supplies a grievance process "limited to a complaint or request of the grievant which involves the interpretation [or] application of, or compliance with, the provisions of this Agreement."

## C. PAST PRACTICE

The parties have unambiguously expressed in the collective bargaining agreements their intent that the retirement ordinance governs the commission's discretion to amend the actuarial tables used to calculate joint and survivor benefits and to ensure that retirees enjoy actuarially equivalent benefits regardless of the option that they select. Nevertheless, the charging parties claim that the past practice of using the female [**32] actuarial table to calculate those benefits created a new term or condition of employment that exists independently from the collective bargaining agreement.

[*89]  As stated, this Court's caselaw allows a charging party to raise an unfair labor practice complaint for changing a term or condition of employment even when a collective bargaining agreement controls, but only when the new term or condition amounts to an amendment of the collective bargaining agreement. However, overcoming an unambiguous provision in the collective bargaining agreement requires the charging parties to "show the parties had *a meeting of the minds* with respect to the new terms or conditions so that there was an agreement to modify the contract."[65] The past practice must be "so widely acknowledged and *mutually accepted* that it creates an amendment to the contract."[66]

> 65  *Port Huron Ed Ass'n, 452 Mich at 312* (emphasis added).
> 66  *Id. at 329* (emphasis added).

The evidence here does not establish more than the charging parties' unilateral expectation that the female actuarial table would continue to be used even if it were determined by the retirement commission that a different table would better effectuate the provisions [**33] of the retirement plan. The charging parties rely only on the fact that the female actuarial table has been used for more than two decades as dispositive of this issue. In *Gogebic Community College Michigan Educational Support Personnel Ass'n v Gogebic Community College*, the Court of Appeals ruled that the parties intended that the employer would have discretion to choose a dental insurance carrier because the collective bargaining

agreement only articulated the benefits due employees.[67] There, testimony that the union's chief negotiator expected the employer to continue using a particular dental insurance carrier "does not amount to a 'meeting [*90] of the minds' that the employer would only use the [existing dental carrier] and falls far short of demonstrating conduct showing an unequivocal modification with 'definite, certain, and intentional' terms."[68]

> 67  *Gogebic Community College Mich Ed Support Personnel Ass'n v Gogebic Community College, 246 Mich App 342; 632 NW2d 517 (2001)*.
> 68  *Id. at 354*, quoting *Port Huron, 452 Mich at 329*.

*Gogebic* is instructive in this case. Indeed, our conclusion here is stronger than that in *Gogebic* because the ordinance expressly stated that the retirement commission [**34] has discretion to amend the actuarial table. Moreover, the parties negotiated the instant collective bargaining agreements before they took effect in 2005--after the retirement commission had been using the female actuarial table for 23 years. If the parties had intended to remove the discretion from the retirement commission's authority, they had ample opportunity to do so. The fact that the retirement commission chose not to exercise its discretion until 2006 does not overcome the parties' reaffirmation in their collective bargaining agreements of the discretion provided to the retirement commission in the ordinance.

The dissent argues that § 15 of the retirement ordinance establishes the parties' intent to enshrine the 100% female actuarial table as a term of employment, or at least creates an ambiguity regarding whether the retirement commission retained the discretion to adopt a different actuarial table. The dissent is wrong on both counts.

First, § 15 of the ordinance initially *reinforces* that the retirement commission has discretion to formulate an appropriate actuarial table.[69] Only then does this provision note that the retirement commission "is *currently* [*91] using . . . a blending [**35] of male and female rates."[70] This description of the current actuarial table does not in any way indicate the intent to limit the retirement commission's discretion to adopt a different actuarial table in the future, nor does it create an ambiguity in the retirement commission's discretion.[71] Thus, § 15 does not negate--in fact, it reinforces--the retirement commission's discretion to establish actuarial tables.

> 69  "The Retirement Commission shall from time to time adopt such mortality and other tables of experience, and a rate or rates of regular interest, as are necessary in the Retirement System on

an actuarial basis." Macomb County Retirement Ordinance, § 15.

70 *Id.* (emphasis added).

71 In contrast to this case, the charging party in *Detroit Police Officers Ass'n v Detroit* provided evidence indicating that the employer admitted that the past practice was binding. *Detroit Police Officers Ass'n v Detroit, 452 Mich 339, 347; 551 NW2d 349 (1996).*

Second, while the charging parties and dissent urge that the 100% female actuarial table was a bargained-for benefit that respondents could not unilaterally change, § 15 actually undercuts this argument. Rather than specifying with particularity that [**36] the retirement system was "currently using" the 100% female actuarial table, § 15 simply describes the then "current" actuarial table as a "blending of male and female rates." Accordingly, the dissent's reliance on § 15 is unfounded.

Finally, the UAW asserts that the retirement commission acknowledged that the actuarial table is a term or condition of employment and points to a statement in the minutes that the county's human resources director should "meet and confer (not meet and approve) with the unions regarding this change." However, assuming that the retirement commission's belief about the nature of these collective bargaining agreements was relevant, this statement actually belies the UAW's claim that the retirement commission acted with the understanding that the actuarial table was a term or condition of employment. The statement indicates that the commission was *not* looking for the unions' approval [*92] of the 60% male actuarial table but expected that the unions would be consulted about the change. The charging parties can point to no *mutual commitment* that the retirement commission would continue using the female actuarial table. As a result, the commission's past practice of [**37] using the female actuarial table did not create a term or condition of employment independent from the collective bargaining agreements.

## V. CONCLUSION

Because the collective bargaining agreements at issue in this case cover the subject of the unfair labor practice claims, the respondents satisfied their statutory obligation to bargain over the calculation of retirement benefits and the appropriate forum for challenging implementation of the collective bargaining agreements is the grievance process that the agreements contemplate. Moreover, absent a mutual agreement, the mere lengthy use of the female actuarial table did not create a term or condition of employment independent of the collective bargaining agreements. Therefore, we reverse the Court of Appeals and remand this case to the MERC for dismissal of the charging parties' unfair labor practice claims.

Robert P. Young, Jr.

Stephen J. Markman

Mary Beth Kelly

Brian K. Zahra

**DISSENT BY:** Bridget M. McCormack

## DISSENT

MCCORMACK, J. (*dissenting*).

This case concerns the statutory duty to bargain about the calculation of retirement benefits under the public employment relations act (PERA), *MCL 423.201 et seq.* I agree with the majority that the calculation of retirement [**38] benefits is a mandatory subject of collective bargaining, that the calculation of retirement benefits is covered by the [*93] parties' collective bargaining agreements (CBAs), and that the term "actuarial equivalent" is unambiguous. Without evidence of a mutually agreed upon intentional practice that modified this unambiguous contract term, I would also agree with the majority about the outcome here. But I conclude that the parties' 24-year intentional practice of using a very specific formula for achieving "actuarial equivalence" amended the contract and requires bargaining anew before a unilateral change may be made to that practice. Therefore I respectfully dissent and would affirm the Court of Appeals' judgment on this basis.

When there is a statutory duty to bargain under the PERA, the analysis from *Port Huron Ed Assoc v Port Huron Sch Dist*[1] applies when an unfair labor practice (ULP) is alleged. A public employer may defend against an ULP charge by fulfilling the statutory duty to bargain and memorializing the terms of that bargain in a CBA.[2] When an issue is covered by the CBA, the parties' past practice may amend the CBA, such that a public employer is nevertheless bound to bargain [**39] under PERA before making a unilateral change to that practice. When contract language is ambiguous or silent "there need only be tacit agreement that the practice would continue."[3] When the agreement is unambiguous with respect to the term affected by a conflicting practice, more is required. The contract language will control:

> [U]nless the past practice is so widely acknowledged and mutually accepted that it creates an amendment to the contract.
>
> [*94] While, to be sure, parties to a contract may modify it by a later agreement, . . . the conduct relied upon to show

such modification must be unequivocal and the terms of modification must be definite, certain, and intentional.[4]

As this Court explained in *Detroit Police Officers Ass'n v Detroit*, when applying the *Port Huron* analysis:

The [*Port Huron*] majority approvingly cited a case that stated that the parties' agreement to modify the contract can be deduced from their course of conduct if it is unequivocal and the terms of modification are definite, certain, and intentional. Further, the majority indicated that the party seeking to supplant the contract language must prove that the other party intentionally chose to reject the negotiated contract [**40] and knowingly acted in accordance with the past practice.[5]

Thus, if the parties' *course of conduct* shows that they intentionally chose to modify a provision in the CBA because past practice contradicted the plain meaning of that provision, a party to the CBA cannot later rely on the plain meaning of that provision and ignore the past practice.

1 *Port Huron Ed Assoc v Port Huron Sch Dist*, 452 Mich 309; 550 NW2d 228 (1996).

2 *Id. at 317-318.*

3 *Id. at 325* (quotation marks and citation omitted).

4 *Id. at 329* (quotation marks and citation omitted).

5 *Detroit Police Officers Ass'n v Detroit*, 452 Mich 339, 345; 551 NW2d 349 (1996) (citation omitted).

Because I agree with the majority that the term "actuarial equivalent" is unambiguous, the charging parties in this case must meet a higher standard of proof to show that the parties' practice amended that contract term. They have done so. As the evidence of the parties' mutual agreement regarding the specific actuarial formula to be used to calculate retirement benefits is longstanding and substantial, I would hold that the charging parties have "submit[ted] proofs illustrating that the parties had a meeting of the minds with respect to the new terms [**41] or conditions-- [*95] intentionally choosing to reject the negotiated contract and knowingly act in accordance with the past practice."[6] We have guidance on whether the evidence relating to the past practice meets the higher standard given our past decisions. This case lies somewhere between the facts of *Port Huron* and *Detroit Police*. In those cases we addressed whether past practice modified unambiguous contract language, and we came to opposite conclusions.

6 *Id.*

In *Detroit Police*, this Court held that the past practice modified the unambiguous language of the contract.[7] The contract at issue there provided that the board of trustees would determine whether an incapacitation resulted from the performance of duty. However, the parties' longstanding practice was inconsistent with this language, such that the medical director would make the determination and the medical board's decision on the issue was subsequently binding on the board of trustees.[8] In 1991, the board of trustees attempted to recapture its authority to make the duty determination by unilaterally passing a resolution, resulting in the ULP charge.

7 *Id. at 341.*

8 *Id. at 341-342.*

In finding that the past practice modified the unambiguous [**42] contract language, this Court found the following facts to be important: (1) the board of trustees meeting minutes from prior years accepting decisions by the medical board as final and binding; (2) the city attorney's admission to the past practice; (3) the disapproval by the board's attorney of the resolution and reference to the 'current and well established practice' of the medical director making the decisions; (4) board member testimony that from 1983 to 1990 medical [*96] board decisions were regarded as final and binding; and (5) evidence that the board developed forms for use by the medical board, which expressly indicated that the medical board was to make a "duty-connectedness finding."[9]

9 *Id. at 346-348.*

In contrast, in *Port Huron* this Court held that the past practice did not modify the unambiguous language of the contract. *Port Huron* concerned the proration of health insurance benefits for teachers hired midyear. A 1978 CBA had provided in unambiguous terms that such benefits would be prorated for midyear hires.[10] In the 1987-88 school year, the district hired 8 teachers midyear, prompting the school district to inform the new hires that their benefits would be prorated per the [**43] contract language.[11] This Court affirmed the Michigan Employment Relations Commission's determination that the school district's payments of full insurance benefits for midyear hires prior to 1987 was inadvertent, and that the teacher's association had not presented sufficient proof that "the district knowingly paid employees hired midyear insurance benefits for the entire summer in disregard of contract language to the contrary, with the intent that such payment would supplant the agreement."[12] Notably, the hearing officer found that "the district's fail-

ure to prorate benefits before 1988 was simply a mistake or oversight . . . . There was no evidence the district was aware it had not followed the express language of the agreement."[13]

> 10  *Port Huron, 452 Mich at 312.*
>
> 11  *Id. at 313.*
>
> 12  *Id. at 331.*
>
> 13  *Id. at 314-315.* Notably, "[t]he record is unclear whether there were any teachers hired for less than a full year before the 1983-84 school year. From 1983 to 1987, however, eleven teachers were hired midyear." *Id. at 313.* In other words, the practice the charging parties cited may have only been in place a few years.

[*97]  The facts regarding the practice at issue in this case are far closer to *Detroit* [**44] *Police* than to *Port Huron.* The past practice of calculating optional pension benefits using a 100% female/0% male mortality table was certainly not a mistake and it was used for over two decades.[14] At least one of the trustees of the retirement commission opposed the unilateral adoption of the new mortality table because of this longstanding practice. Additionally, an actuarial study was conducted in 1993 and no action was taken to change the practice of using 100% female/0% male mortality tables as a result, even though the purpose of the study was to review the system's actuarial assumptions for calculating employer contributions and employee optional benefits. This continued use of the 100% female/0% male tables after the previous study, given that formula's uneasy relationship with the term "actuarial equivalence," underscored the intentional commitment to that formula by the parties.

> 14  The relevant time span in *Port Huron* was at most 10 years, whereas the time span in *Detroit Police* was potentially as long as 49 years. Although the length of time is not a dispositive factor, it certainly bears on our analysis of whether a past practice is something that an employer merely "knew [**45] or should have known," as opposed to something that is more "definite, certain, and intentional."

The 100% female/0% male mortality table has never achieved actuarial equivalence; in fact, the parties selected it to accomplish other goals. Thus, while actuarial equivalence may have an unambiguous meaning, the application of that table was contrary to the plain meaning of that term, and the employers cannot now rely on the term's plain meaning when it is convenient or beneficial. Specifically, the 1982 actuarial study indicated that only a 100% female/0% male blend would be [*98] able to provide female employees with the same benefits they had received in the past, under gender-based tables

which the parties agreed they could no longer use, because any other blend would reduce benefits to female employees.[15] The retirement commission did not want that result. These same issues were on the table in 1993 when the parties studied the actuarial tables again. That no change was adopted following the results of this 1993 study, even though the mortality table was still derived from the 1971 data and assumptions designed not to achieve actuarial equivalence but rather to give female employees the [**46] same benefits they had received under gender-based mortality tables, is further evidence that the practice of using the 100% female/0% male mortality table was deliberate and agreed on.

> 15  The 1982 actuarial study states: "Instead of being designed to remove all cost of option election from the plan, the factors could be designed to make sure that no participant will receive a lesser benefit than under present procedures. To accomplish this, the present female factors would be used for all future retirants."

There is additional evidence that the practice of using the specific actuarial 100% female/0% male tables was intentional and not inadvertent. For example, the 1982 actuarial report that originally led the retirement commission to adopt the 100% female/0% male table contained the following statement:

> COMMENT C: The Retirement System Ordinance provides that an optional benefit will be "the actuarial equivalent" of the standard benefit. The Retirement Commission could adopt a rule stating that for purposes of determining amounts of optional benefits, the actuarial equivalent will be based upon a *stipulated interest rate and unisex mortality table.* This could eliminate the need for an [**47] ordinance change.

The report proposed a solution to the problem presented by the ordinance's stated goal of "actuarial [*99] equivalence" and the adopted practice's departure from that goal. The retirement commission took the study's recommendation and amended the retirement ordinance in 1982 to reflect the newly adopted 100% female/0% male actuarial assumptions:

> For purposes of determining actuarial [sic] equivalent Retirement Allowances, the Retirement Commission is currently using a 7 1/2% interest rate and a blending of male and female rates based on the

1971 group annuity mortality table pro-
jected to 1984 with ages set back 2
years.[16]

This extremely specific language amended the retirement
ordinance because the actuaries and the retirement com-
mission trustees realized that the 100% female/0% male
table they were committed to using posed a problem with
respect to the trade definition of the term 'actuarial
equivalent.' In other words, when the 1982 retirement
commission decided to adopt a practice that would not
achieve actuarial equivalence, it voluntarily amended the
retirement ordinance to reflect this understanding. Like-
wise, the employers' decision to apply the 100% fe-
male/0% male [**48] table was a "'definite, certain, and
intentional'" action.[17] Deliberate action is evidence that
the practice of using a 100% female/0% male table was
"widely acknowledged and mutually accepted."

16    Section 15 of the Macomb County Retire-
ment Ordinance.
17    *Port Huron, 452 Mich at 329* (citation omit-
ted).

Although the 1982 actuarial study indicated that a
100% female/0% male mortality table was the only way
for female retirees to continue to receive benefits at the
rate they had been receiving them, the retirement com-
mission could have chosen to adopt a mortality table that
featured a different blend at less cost to the system, and
which was more likely to achieve "actuarial [*100]
equivalence," as the actuarial report made clear. Instead,
the retirement commission decided to use a system that
benefited female employees at a cost to actuarial equiva-
lence.[18] If the retirement commission had wanted to re-
tain *full* discretion to change the actuarial assumptions
unilaterally, it would not have amended the ordinance
with this language. This action is an even stronger indi-
cator of intent than any cited in *Detroit Police:* Here, the
parties' course of conduct was unequivocal and the terms
of modification were [**49] definite, certain, and inten-
tional.

18    The actuarial report specifically acknowl-
edged that adopting a 100% female/0% male
blend would probably impose a higher cost to the
system. See n 16.

The majority states that the retirement commission
has always retained the *discretion* to elect how to deter-
mine actuarial equivalence, and I agree with the majority
that § 15 of the Ordinance says as much.[19] But [*101]
this is the same provision of the retirement ordinance that
specifically provides that the actuarial equivalence is to
be determined "using a 7 1/2% interest rate and a blend-

ing of male and female rates based on the 1971 group
annuity mortality table projected to 1984 with ages set
back 2 years," which reflects the 1982 amendment to the
ordinance and the adoption of the 100% female/0% male
mortality table.[20] It cannot be disputed that the amended
§ 15 language refers specifically to "the 1971 Group An-
nuity Mortality Table projected to 1984, for females, set
back two years."[21] This 1971 data set formed the basis for
the 100% female/0% male blend the parties began using
after this amendment, underscoring that the amended
language refers to the 100% female mortality table, as it
is the only mortality [**50] table that is derived from the
1971 data set.

19    Once a court has determined that an issue is
covered by a CBA, the *Port Huron* analysis di-
rects the court to determine whether that language
is ambiguous. In this case, the majority finds that
"actuarial equivalent" is the relevant term for am-
biguity analysis and that it is unambiguous. Un-
ambiguous language will control unless the past
practice is widely acknowledged and mutually
accepted such that it amends the CBA itself.
However, the majority opinion also finds that the
retirement ordinance gives the retirement com-
mission the unilateral discretion to change the ac-
tuarial assumptions: thus, *no* past practice can
overcome the language of § 15. The majority
conflates the issues: If the majority believes that
the discretionary language of § 15 affects the past
practice analysis, this language should also be
scrutinized for ambiguity. Because the retirement
ordinance specifically sets the actuarial assump-
tions at a definite interest rate and mortality table
in § 15, I would find that the § 15 is ambiguous
as to whether the retirement commission retains
unilateral discretion in selecting actuarial as-
sumptions. When there is ambiguous contract
[**51] language, the parties' practice is evaluated
under a "knew or should have known" standard.
Under that standard, I would find that the respon-
dents-appellants knew or should have known that
the language of § 15 sacrificed the retirement
commission's unilateral discretion in favor of set-
ting "actuarial equivalent" to a benchmark that
would not conflict with its trade definition. Con-
trary to the majority's position, when read *in full*
instead of piecemeal, § 15 of the retirement ordi-
nance is ambiguous as to whether the retirement
commission has retained unilateral discretion to
modify actuarial assumptions. Indeed, when read
in full, § 15 is instead evidence that the retire-
ment commission intentionally abandoned actuar-
ial equivalence.

20   Section 15 of the retirement ordinance. The majority's view that the adverb "currently" modifying the verb "using" indicates that the retirement commission retained unilateral discretion ignores a full reading of § 15. As previously explained, the entire second sentence of § 15 ("currently" included) is unnecessary if the majority is correct. Because the retirement ordinance sets actuarial equivalence to a set benchmark, I still find that the § 15 does not [**52] *unambiguously* grant the retirement commission unilateral discretion.

21   The majority also fails to note that § 15 refers explicitly to "the 1971 group annuity mortality table projected to 1984 with ages set back 2 years." The newly proposed 60% female/40% male table would be based on "the 2000 RP Mortality Table projected for 15 years, with no set back on ages." The newly proposed table represents a change to the plain language of § 15.

The retirement commission's practice of using an agreed upon formula sacrificed both actuarial equivalence and its *full* discretion. If the commission had [*102] intended to retain the discretion to unilaterally change the actuarial assumptions for the sake of implementing the plain meaning of the actuarial equivalency requirement, it could have done so without explicitly memorializing this roundabout way "actuarial equivalence" was to be achieved. Moreover, even if the retirement commission retained some degree of discretion under the amended portion of the ordinance's reference to a "blended" table, the *employer's* unequivocal application of the 100% female/0% male table for 24 years meant that the employers sacrificed adherence to the plain meaning of "actuarial [**53] equivalence," and that all parties to the CBAs were bound to the specific 100% female/0% male blend.

The retirement commission's amendment to the retirement ordinance makes the comparison to *Gogebic College Mich Ed Support Personnel Ass'n v Gogebic Community College*[22] unhelpful. In *Gogebic*, the Court of Appeals held that the employer had discretion to select the dental insurance carrier, because the contract only indicated what benefits were due employees, not what carrier would provide the benefits. The retirement ordinance in this case did not merely state that employees would be able to elect optional pension benefits, but actually set the means by which those benefits would be calculated and explicitly incorporated the actuarial assumptions to be used in calculating optional pension benefits.

22   *Gogebic College Mich Ed Support Personnel Ass'n v Gogebic Community College, 246 Mich App 342; 632 NW2d 517 (2001).*

The amendment to § 15 of the retirement ordinance reflects the retirement commission's adoption of the 100% female/0% male mortality table, and the parties' application of that table represents a "definite, certain, and intentional" action. Because the parties' commitment [*103] to this [**54] intentional formula lasted 24 years and survived a previous actuarial study without change, I would find that the charging parties have shown that the past practice was so widely acknowledged and mutually accepted as to create an amendment to the contract, and that the PERA mandates the parties return to the bargaining table.

Bridget M. McCormack

Michael F. Cavanagh

VIVIANO, J., took no part in the decision of this case because he was the Chief Judge of the 16th Judicial Circuit Court before his appointment to this Court.

# **EXHIBIT G**

Each party has the opportunity to call and examine witnesses. In cases where credibility is an issue, sequestration is generally granted upon request. Rule 22 of the Commission rules and regulation prohibits mediators from testifying in Commission proceedings. Other than this specific prohibition, there are few limitations on who can appear as a witness. Either party may call the opposing party for cross examination. In cases filed by individual charging parties, the individual may appear as a witness and make a sworn statement.

Witnesses who are subpoenaed are entitled to the same fees and mileage paid witnesses in the circuit court of the county where the hearing take place. Payment must be made by the party at whose request the witness appears prior to the time the witness testifies. (R 423.461) Whether or not employees will receive payment for work time when they appear at Commission proceedings depends on the policy of the particular employer. *Oakland County*, 1986 MERC Lab Op 866; *University of Michigan*, 1989 MERC Lab Op 720.

## HEARINGS

Hearings on unfair labor practice charges are held at the Commission offices in Detroit or Lansing. They are held pursuant to sections 10 and 16 of PERA and are conducted in accordance with the provisions of the Michigan Administrative Procedures Act (MAPA), MCLA 24.201 *et seq*; MSA 3.560(101) and of the Commission's rules and regulations (R 423.461-465).

Prior to the formal hearing, the ALJ will ordinarily conduct a pre-hearing conference, exploring the possibility of settlement, factual stipulations, or other means of clarifying the issues. If the matter cannot be resolved informally, the ALJ will convene the hearing for the purpose of taking evidence upon the complaint. Each party may call witnesses, introduce documentary or other evidence, and cross-examine witnesses of the other party. A court reporter provided by the Commission records the proceedings and prepares an official transcript. The rules of evidence are followed as far as practicable, but with the latitude permitted by Section 75 of the MAPA.

The Commission will not entertain interlocutory appeals of ALJ rulings made during the hearing. The proponent of rejected evidence will generally be permitted to make an offer of proof to preserve an objection for Commission consideration.

Upon close of proofs, each party has the opportunity to make a closing statement or file a written brief. The general practice is to file a brief in lieu of closing statement. A brief due date is set by the ALJ after consultation with the parties. Since a decision and recommended order is not issued until the transcript is prepared, and since the parties' briefs should refer to specific portions or pages of the transcript, the availability of the transcript is also a factor in setting a due date. The due date may range from 2 weeks to 30 days or more depending on the nature of the case and length of hearing. Briefs are filed simultaneously by the parties. Reply briefs are only allowed under special circumstances, and permission to file must be granted by the ALJ.

Upon receipt of transcript and briefs of the parties, the ALJ prepares a decision and recommended order setting forth findings of fact, conclusions of law and the reasons for his/her determinations on all

material issues (R 423.465). Within 20 days after service of the ALJ's decision and recommended order, a party may appeal this recommended order by filing exceptions in writing with the Commission. An original and four copies are required. In compliance with Rule 66, exceptions must set forth specifically the question of procedure, fact, law, or policy to which exceptions are taken; identify that part of the ALJ's decision and recommended order to which objection is made; and designate by precise citation or page the portions of the record relied on. Exceptions which do not comply with Rule 66 may be disregarded. *City of Lansing*, 1991 MERC Lab Op 354. Within 10 days after service of the exceptions a party may file cross exceptions and brief in support thereof or a brief in support of the ALJ decision and recommended order. A request for an extension of time in which to file exceptions must be in writing, filed prior to the due date, and served on the other parties. If no exceptions are filed within the 20 day period and no extensions granted, the recommended order of the ALJ becomes the order of the Commission.

After consideration of the exceptions, the Commission may adopt, modify, or reverse the ALJ's recommended order, or remand for further hearing. Under Section 16(c), until the record in the case has been filed in a court, the Commission may modify or set aside, in whole or in part, any finding or order made or issued by it. The Commission will entertain motions for reconsideration, rehearing, or to reopen the record within this time period.

The remedial action ordered by the Commission may result in a dispute between the parties on matters such as back-pay, reinstatement rights or related issues. Under these circumstances, either party may request a compliance hearing. The matter will then be assigned to an ALJ who will hold a hearing and issue a decision subject to exceptions.

## APPEALS FROM COMMISSION ORDERS

Any party aggrieved by a final order of the Commission may, within twenty days of such order, obtain review as a matter of right in the court of appeals. The appealing party must file a timely petition with the court of appeals and request that the Commission file a certified copy of the record in the proceeding with the court. The findings of the Commission with respect to questions of fact are conclusive, if supported by competent, material, and substantial evidence on the record considered as a whole. If no petition for review is timely filed, the statute provides that it shall be conclusively presumed that the Commission's order is supported by competent, material, and substantial evidence. The court may refuse to apply this presumption and deny enforcement of a Commission order, if there is no evidence on a point crucial to the Commission's decision. *Jeanette v Stadium Co*, 117 Mich App 240 (1982). An enforcement petition, unlike a petition for review, may be filed at any time.

## PUBLICATIONS

The Commission decisions, as well as the recommended decisions and orders of the ALJ's, are compiled in MERC Labor Opinions, published by Opinions Press in Big Rapids, Michigan. Cases are cited by year and page number: 1990 MERC Lab Op 1. The cases are indexed annually and at five-year intervals.