STATE OF MICHIGAN
IN THE 3RD JUDICIAL CIRCUIT COURT
FOR THE COUNTY OF WAYNE

**CITIZENS UNITED AGAINST CORRUPT GOVERNMENT,** Case No. 13-010901-AW

A Michigan Nonprofit Corporation,                                    **Hon. Lita M. Popke**

      PETITIONER/PLAINTIFF,

-v-

**SAUNTEEL JENKINS**, in her official capacity as the duly
*"appointed"* President of the Detroit City Council,
      RESPONDENT/DEFENDANT.
_____/

ANDREW A. PATERSON (P18690)
Attorney for Petitioner/Plaintiff
46350 Grand River Ave., Suite C
Novi, MI 48374
(248) 568-9712
_____/

## *EMERGENCY*
## *EX PARTE* APPLICATION FOR LEAVE
## TO FILE COMPLAINT FOR WRIT OF QUO WARRANTO

      PETITIONER, CITIZENS UNITED AGAINST CORRUPT GOVERNMENT, by

and through its attorney, Andrew A. Paterson, and in support of its *Emergency Ex Parte*

*Application for Leave to File Complaint for Writ of Quo Warranto* ("**Application**") to

remove Respondent/Defendant, pursuant to MCR 3.306(B)(2), states the following:

## I.      GENERAL ALLEGATIONS

### The Parties

1.      Petitioner, Citizens United Against Corrupt Government ("**Petitioner**"), is a

      Michigan nonprofit corporation organized for the purpose of promoting and ensuring

      corrupt-free and law-abiding civic government through social actions and court

      actions designed to eliminate unlawful illegal actions by all governmental officials,

representatives and entities in all levels of government. Petitioner's director, Robert Davis, serves as the Director of Petitioner and is a resident and qualified registered elector in the County of Wayne, State of Michigan ("**Davis**").

2.     Davis, on behalf of Petitioner, sent the written request/application to the Attorney General requesting that he bring a *quo warranto* action against the named Respondents. Accordingly, Petitioner is the proper party that has standing to bring this *quo warranto* action to remove the named Respondents. See *Gallagher v Keefe*, 232 Mich App 363, 369; 591 NW2d 297 (1998) ("the only restriction on the face of the court rule is that the *person* who is granted leave to bring the action must be the one who gave the information to the Attorney General. MCR 3.306(B)(1); MCR 3.306(B)(3)(b)."). (**See Davis' affidavit attached hereto as Exhibit A**).

3.     As set forth in further detail, *infra*, Petitioner, as a domestic nonprofit corporation, is a "person" that has standing to bring this action in *quo warranto*.

4.     On March 25, 2013, in accordance with the authority and power granted under Public Act 436 of 2012 ("**PA 436**"), Kevyn Orr, the duly appointed emergency manager for the City of Detroit ("**Emergency Manager**"), issued written Order No. 1, in which he authorized and restored therein the pay and other benefits of the elected Mayor of the City of Detroit and all of the elected Members of the Detroit City Council ("**City Council**"). (**See Order No. 1 of the Emergency Manager attached hereto as Exhibit B**).

5.     Thereafter, on April 11, 2013, in order to settle and in response to a civil lawsuit Petitioner had filed with this Court against Respondent, the Emergency Manager, and the Detroit City Council (*Citizens United v. Kevyn Orr, et al.*, Wayne County Case

No. 13-004353-AW, Judge Lita M. Popke), the Emergency Manager issued Order No. 3, whereby he authorized therein the elected Mayor and the City Council to "continue to carry out the business, proceedings, administration, and operation of City services subject to the terms of this Order and Public Act 436." (**See Order No. 3 of the Emergency Manager attached hereto as Exhibit C**).

6. Order No.3 of the Emergency Manager further required that "[a]ny orders, ordinances, resolutions, appointments, approvals, terminations, appropriations, contracts, permits or other related actions of the Detroit Mayor and City Council from and after March 28, 2013, shall be submitted to the Emergency Manager for consideration, **but will not be valid or effective unless and until approved by the Emergency Manager or his designee in writing**." (**See Order No. 3 of the Emergency Manager attached hereto as Exhibit C**).

7. On June 27, 2013, the Emergency Manager issued Order No. 9, which was an order modifying orders nos. 1 and 3. Specifically, Order No. 9 terminated and eliminated the salary, wages, and compensation of Council President Charles Pugh ("**Elected Council President**") effective July 7, 2013, and it further ordered that "[d]uring the period that Mr. Pugh [Elected Council President] remains a member of City Council, *any authority granted in Order No. 3 for Mr. Pugh to act in the capacity as Council President is hereby revoked*." (**See Order No. 9 of the Emergency Manager attached hereto as Exhibit D**).

8. On July 9, 2013, the Detroit City Council, with the advice of counsel, voted 4-2 to unlawfully appoint Respondent Saunteel Jenkins ("**Respondent**") as the *new* President of the Detroit City Council. Council members Brenda Jones and JoAnn

Watson voted against Respondent's selection as the *new* Council President because they disagreed with the selection process. **(See July 9, 2013 Detroit Free Press article attached hereto as Exhibit E**).

9.    In addition to unlawfully appointing Respondent as the ***new*** Council President, at the July 9, 2013 City Council meeting, the Detroit City Council also voted to appoint Councilmember Andre Spivey as the Council President Pro-Tem as a result of the resignation of the former Council President Pro-Tem Gary Brown, who resigned effective July 1, 2013 to take a job in the Emergency Manager's administration. **(See July 9, 2013 Detroit Free Press article attached hereto as Exhibit E**).

10.   Since the Detroit City Council's vote to appoint Respondent as the ***new*** Council President, and vote to appoint Councilmember Andre Spivey as the new Council President Pro-Tem, the Emergency Manager has not issued a written order approving the unlawful appointment of Respondent as the Council President nor has the Emergency Manager issued a written order approving the appointment of Councilmember Andre Spivey as the Council President Pro-Tem.

11.   Nonetheless, since being unlawfully appointed as the ***new*** Council President on July 9, 2013, Respondent has been unlawfully exercising the duties of the office of Council President.

12.   It is important to state for the record, that the Elected Council President, to date, has not resigned nor has he been removed from office in accordance with law.

## A.  The Nature of the Quo Warranto Action

13.   Petitioner's action is in *quo warranto* and seeks thereby Respondents removal for holding office illegally. "[**Q]uo warranto is the proper and *exclusive remedy* to

**try title to office finally and conclusively**." *Layle v Adjutant Gen. of Mich.*, 384 Mich 638, 641; 186 NW2d 559 (1971). (Emphasis supplied). And see, numerous Court of Appeals and Michigan Supreme Court decisions that have held that "[Q]uo warranto is the proper remedy to try title to office finally and conclusively." *Wayne Rep Comm v Bd of Commers*, 70 Mich App 620, 627; 247 NW2d 571 (1976), citing *Layle, supra*, and see, *Attorney General, ex rel Cook v Burhans*, 304 Mich 108; 7 NW2d 370 (1942); *Stokes v Clerk of the Monroe County Canvassers*, 29 Mich App 80; 184 NW2d 746 (1970).

14. This Court has jurisdiction to decide the merits of a *quo warranto* action. This Court can invoke the *quo warranto* "exclusive remedy" of removal of Respondent from the office of President of the Detroit City Council.

15. For the purposes of this action in *quo warranto*, and for which this Application seeking "leave" to file Petitioner's Complaint is sought, it is alleged that the City of Detroit is a "public corporation." (See, *Dartland v. Hancock Public Schools*, 25 Mich App 14; 181 NW2d 41 (1970)[1].)

16. For the purposes of this action in quo warranto, and for which this Application seeking "leave" to file Petitioner's Complaint is sought, it is alleged that the Respondent "unlawfully holds or exercises a state office" in a "public corporation" that was created by "this state's authority." See, *Dartland v. Hancock Public Schools*, *supra fn 1*.

---

[1] The Court determined that school districts are public corporations for purposes of *quo warranto* actions - "It is patent to us that … the School District of the City of Hancock is a 'public corporation'…" citing numerous other decisions so finding school districts public corporations in other contexts.

17.    Petitioner alleges that its Application herein is made by a Petitioner that is "a person" who has the necessary standing to bring this action against Respondent. Petitioner is a "person" with standing pursuant to MCR 3.306(B)(3)(a) and (b), because it did apply to the Michigan Attorney General and request that the Attorney General bring this *quo warranto* action against the Respondent. (**See Petitioner's July 30, 2013 Quo Warranto Request to the Attorney General attached hereto as Exhibit F**).

18.    MCR 3.306(B)(3)(b) states: "If, … the Attorney General refuses to bring the action, the person may apply to the appropriate court for leave to bring the action himself or herself." Petitioner is a "person" who has acquired standing to bring this action. See, *City of Grand Rapids v. Harper*, 32 Mich App 324, 328; 188 NW2d 668 (1971) ("the word 'person' is commonly held to *embrace bodies politic and corporate* as well as individuals.") (Emphasis supplied).

19.    Petitioner has standing to file this Application pursuant to MCR 3.306(B)(3)(b), because the Attorney General has declined to file the action himself. (**See Letter from Attorney General, Bill Schuette, to Petitioner dated August 7, 2013 a copy being attached hereto as Exhibit G**).

20.    The *quo warranto* statute, MCL 600.4501, as well as MCR 3.306, authorizes Petitioner, as a "person", to bring this action, for which this Application seeks leave to file its Complaint.

21.    MCL 600.4501 states in relevant part: "The attorney general shall bring an action for quo warranto when the facts clearly warrant the bringing of that action. If the attorney general receives information from a private party and refuses to act, that *private party*

*may bring the action upon leave of court*." And see *Davis v Chatman*, 292 Mich App

603, 613-614; 808 NW 2d 555 (2011).

### B. This Court Has The Authority To Grant Petitioner's *Ex Parte* Application Without Petitioner Providing Any Notice To Respondents Of Its Application

22.    The Court has the right to grant *ex parte*, Petitioner's Application to file its

Complaint.  Respondent is required to receive notice of this Application.  As the

Court of Appeals held in *Davis v Chatman*, 292 Mich App 603, at 612-613; 784

NW2d 823 (2010):

> Initially, we reject defendant's argument that plaintiff was required to provide notice before seeking leave to file for quo warranto.  Neither the relevant court rule (MCR 3.306) nor the statute (600.4501) contains a notice requirement, and our Supreme Court has found that fact dispositive of this issue:
>
>> 'It will be observed that the statute does not require notice.  There appears to be no necessity for notice.  It is the initial step in the proceeding.  Its object is to obtain permission to take out a summons in *quo warranto*.  Leave of the court is required by the statute to prevent an extravagant use of the writ unless there is some real basis for it. <u>Failure to give notice to the defendant does not deprive him of any substantial right.  He has his full day in court after leave is granted and summons is served on him.  *To require notice results in giving the defendant two flings at his defense.*</u>  If defendant be given notice, of the application he will make the same showing that he afterward does on the merits.  If the matter is of such character that the circuit judge would like to hear from defendant before granting leave, he may always make an order requiring him to show cause why leave should not be granted.  This leaves the matter open so that no harm can result. [*Ferzacca v. Freeman*, 240 Mich 682, 684-685; 216 NW 469 (1927**).]**

*Davis v Chatman*, 292 Mich App 603, at 612-613. (Emphasis supplied.)

23.    Accordingly, Petitioner is not obligated to provide Respondent with notice of this *Ex*

*Parte* Application.  This Court has the power and authority to grant the requested

relief and permit Petitioner to file its Complaint, without receiving a response or

argument by the Respondent.  *Davis v Chatman, supra*, at 612-613.

## II.   Jurisdiction of the 3rd Judicial Circuit Court

24.   MCR 3.306 governs actions in *quo warranto,* and section A(1) thereof, provides this

Court with original jurisdiction.  It states:

**3.306 Quo Warranto**

**(A) Jurisdiction.**
**(1) An action for quo warranto against a person who usurps, intrudes into, or unlawfully holds or exercises a state office, or against a *state officer* who does or suffers an act that by law works a forfeiture of the office, must be brought in the Court of Appeals.**
**(2)** All other actions for quo warranto must be brought in the circuit court.
**(B) Parties.**
**(1) Actions by Attorney General.  An action for quo warranto is to be brought by the Attorney General when the action is against:**
**(a) a person specified in subrule (A)(1);**
**(b) a person who usurps, intrudes into, or wrongfully holds or exercises an office in a public corporation created by this state's authority;**

***********

**(2) Actions by Prosecutor or Citizen.**  Other actions for quo warranto may be brought by the prosecuting attorney of the proper county, without leave of court, **or by a citizen of the county by special leave of the court.**
**(3) Application to Attorney General.**
**(a)  A person may apply to the Attorney General to have the Attorney General bring an action specified in subrule (B)(1).**  The Attorney General may require the person to give security to indemnify the state against all costs and expenses of the action.  The person making the application, and any other person having the proper interest, may be joined as parties plaintiff.
**(b) If, on proper application and offer of security, the Attorney General refuses to bring the action, the person may apply to the appropriate court for leave to bring the action himself or herself.**

***************

> **(C)** **Venue.  The general venue statutes and rules apply to actions for quo warranto, unless a specific statute or rule contains a special venue provision applicable to an action for quo warranto.**
>
> **(D)** Hearing.  The court may hear the matter or may allow the issues to be tried by a jury.(Emphasis added.)

25.   The 3rd Judicial Circuit Court for the County of Wayne, has jurisdiction over Petitioner's Application and Complaint for the reason that Respondent, in her official capacity as the "appointed" *new* President of the Detroit City Council is **not** a "state officer" and Respondent's office is **not** a "state office."  Pursuant to MCR 3.306(A)(2), a *quo warranto* action against her, must be brought in this court.

26.   MCR 3.306(A) states:

> (1) An action for quo warranto against a person who usurps, intrudes into, or unlawfully holds or exercises a state office, or against a state officer who does or suffers an act that by law works a forfeiture of the office, must be brought in the Court of Appeals.
>
> **(2) All other actions for quo warranto must be brought in the circuit court.** (Emphasis supplied).

27.   "[A] proceeding in the nature of quo warranto pertaining to a state officer must be brought in the Court of Appeals, **but any other quo warranto proceeding must originate in the circuit court**."  *Williams v Lansing Bd. of Ed.*, 69 Mich App 654, 660-661; 245 NW2d 365 (1976).  (Emphasis supplied).

28.   In accordance with the 2012 Detroit City Charter, as amended, Respondent is a local elected official of the City of Detroit.

29.   Accordingly, pursuant to MCR 3.306(A), this Circuit Court is the proper venue for this *quo warranto* action.

### III. Factual and Legal Allegations Demonstrate Leave Must Be Granted

30.    In November 2009, Respondent, under the former 1997 Detroit City Charter, was elected to one of the nine (9) at large seats on the Detroit City Council.

31.    In accordance with the § 4-103 of the former 1997 Detroit City Charter, the President and President Pro-Tem were determined by which Council members received the highest and second highest number of popular votes, respectively.  Therefore, in accordance with the former 1997 Detroit City Charter, based upon the popular vote from the November 2009 General Election, Charles Pugh was elected as the Council President ("**Elected Council President**") and Gary Brown was elected as the Council President Pro-Tem because they received the highest and second highest number of popular votes, respectively.  (**See § 4-103 of the former 1997 Detroit City Charter attached hereto as Exhibit I**).

32.    However, in November 2011, the voters of the City of Detroit voted overwhelmingly to amend and revise the former 1997 Detroit City Charter.  The revisions and amendments made to the former 1997 Detroit City Charter went into effect on January 1, 2012 ("**2012 Detroit City Charter**").

33.    Amongst the many sweeping changes made to the former 1997 Detroit City Charter, § 3-108 of the 2012 Detroit City Charter now requires that seven (7) council members are to be elected by districts, with two (2) council members to be elected at-large, and § 4-103 of the 2012 Detroit City Charter now requires that *beginning in January 2014*, the Council President and Council President Pro-Tem are to be elected by the members of the City Council.  As noted above, under § 4-103 of the former 1997 Detroit City Charter, the President and President Pro-Tem were determined by which

Council members received the highest and second highest number of popular votes, respectively.

34.    On March 25, 2013, in accordance with the authority and power granted under Public Act 436 of 2012 ("**PA 436**"), Kevyn Orr, the duly appointed emergency manager for the City of Detroit ("**Emergency Manager**"), issued written Order No. 1, in which he authorized and restored therein the pay and other benefits of the elected Mayor of the City of Detroit and all of the elected Members of the Detroit City Council ("**City Council**").  **(See Order No. 1 of the Emergency Manager attached hereto as Exhibit B).**

35.    Thereafter, on April 11, 2013, in response to a civil lawsuit Petitioner had filed with this Court against Respondent, the Emergency Manager, and the Detroit City Council (*Citizens United v. Kevyn Orr, et al*., Wayne County Case No. 13-  -AW, Judge Lita M. Popke), the Emergency Manager issued Order No. 3, whereby he authorized therein the elected Mayor and the City Council to "continue to carry out the business, proceedings, administration, and operation of  City services subject to the terms of this Order and Public Act 436."  **(See Order No. 3 of the Emergency Manager attached hereto as Exhibit C)**.

36.    Order No.3 of the Emergency Manager further required that "[a]ny orders, ordinances, resolutions, appointments, approvals, terminations, appropriations, contracts, permits or other related actions of the Detroit Mayor and City Council from and after March 28, 2013, shall be submitted to the Emergency Manager for consideration, but will not be valid or effective unless and until approved by the

Emergency Manager or his designee in writing." (**See Order No. 3 of the Emergency Manager attached hereto as Exhibit C**).

37.     On June 27, 2013, the Emergency Manager issued Order No. 9, which was an order modifying orders nos. 1 and 3. Specifically, Order No. 9 terminated and eliminated the salary, wages, and compensation of Council President Charles Pugh ("**Elected Council President**") effective July 7, 2013, and it further ordered that "[d]uring the period that Mr. Pugh [Elected Council President] remains a member of City Council, *any authority granted in Order No. 3 for Mr. Pugh to act in the capacity as Council President is hereby revoked*." (**See Order No. 9 of the Emergency Manager attached hereto as Exhibit D**).

38.     On July 9, 2013, the Detroit City Council, with the advice of counsel, voted 4-2 to unlawfully appoint Respondent Saunteel Jenkins ("**Respondent**") as the *new* President of the Detroit City Council. Council members Brenda Jones and JoAnn Watson voted against Respondent's selection as the *new* Council President because they disagreed with the selection process. (**See July 9, 2013 Detroit Free Press article attached hereto as Exhibit E**).

39.     In addition to unlawfully appointing Respondent as the *new* Council President, at the July 9, 2013 City Council meeting, the Detroit City Council also voted to appoint Councilmember Andre Spivey as the *new* Council President Pro-Tem as a result of the resignation of the former Council President Pro-Tem Gary Brown, who resigned effective July 1, 2013 to take a job in the Emergency Manager's administration. (**See July 9, 2013 Detroit Free Press article attached hereto as Exhibit E**).

40. Since the Detroit City Council's vote to appoint Respondent as the *new* Council President, and vote to appoint Councilmember Andre Spivey as the new Council President Pro-Tem, the Emergency Manager has *not* issued a written order approving the unlawful appointment of Respondent as the Council President nor has the Emergency Manager issued a written order approving the appointment of Councilmember Andre Spivey as the Council President Pro-Tem.

41. Nonetheless, since being unlawfully appointed as the *new* Council President on July 9, 2013, Respondent has been unlawfully exercising the duties of the office of Council President.

42. It is important to state for the record, that the Elected Council President, to date, has not resigned nor has he been removed from office in accordance with law.

43. It is Petitioner's position that as a result of the Elected Council President not being removed from office in accordance with law and as a result of the Elected Council President failing to submit his letter of resignation, the City Council did not have any legal authority to appoint Respondent to the office of Council President irrespective of the Emergency Manager's unlawful Order No. 9. Additionally, as a result of the Emergency Manager failing to issue a written order approving Respondent's appointment, Respondent had no legal authority to assume the office of Council President and thus her appointment shall be declared void as a matter of law.

A. **The Emergency Manager Does Not Have the Authority to Remove an Individual Member of the Detroit City Council from their Elected Office**

44. It is undisputed that the Elected Council President is currently "temporarily absent". However, the Elected Council President's unexplained "temporary absence" does not

give the Emergency Manager the authority to revoke him of his authority and title as the duly elected President of the Detroit City Council.

45. Respondent's unlawful appointment to the office of Council President by her colleagues seems to stem from Corporation Counsel's misunderstanding of the Emergency Manager's powers and authority as set forth in PA 436.

46. As noted above, On June 27, 2013, the Emergency Manager issued Order No. 9, which was an order modifying orders nos. 1 and 3. Specifically, Order No. 9 terminated and eliminated the salary, wages, and compensation of the Elected Council President effective July 7, 2013, and it further ordered that "[d]uring the period that Mr. Pugh [Elected Council President] remains a member of City Council, *any authority granted in Order No. 3 for Mr. Pugh to act in the capacity as Council President is hereby revoked*." (**See Order No. 9 of the Emergency Manager attached hereto as Exhibit D**).

47. Thereafter, on July 9, 2013, the Detroit City Council, with the advice of counsel, voted 4-2 to unlawfully appoint Respondent Saunteel Jenkins ("**Respondent**") as the *new* President of the Detroit City Council. Council members Brenda Jones and JoAnn Watson voted against Respondent's selection as the *new* Council President because they disagreed with the selection process. (**See July 9, 2013 Detroit Free Press article attached hereto as Exhibit E**).

48. PA 436 proscribes the power and authority of the Emergency Manager as it relates to exercising the powers of the local elected "governing body." Specifically, MCL 141.1549(2) of PA 436 states in relevant part:

"**Upon appointment, an emergency manager *shall act for and in the place and stead of the governing body* and the office of chief administrative officer of the**

**local government.** The emergency manager shall have broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare. Following appointment of an emergency manager and during the pendency of receivership, *the governing body* and the chief administrative officer of the local government **shall not exercise any of the powers of those offices** *except as may be specifically authorized in writing by the emergency manager* **or as otherwise provided by this act and are subject to any conditions required by the emergency manager.**" (Emphasis supplied).

49.     MCL 141.1549(2) of PA 436 does not authorize the Emergency Manager to revoke the power and the authority away from an ***individual member*** of the "governing body." The language of MCL 141.1549(2) of PA 436 clearly states that the Emergency Manager is to "***act for and in the place of***" the "***governing body***" and the "***chief administrative officer.***" This section further provides that the "***governing body***" and "***chief administrative officer***" "***shall not* exercise any of the powers of those offices** *except as may be specifically authorized in writing by the emergency manager.*"

50.     The Detroit City Council is the "governing body" of the City of Detroit and Mayor Dave Bing is the "chief administrative officer" of the City of Detroit. Thus, by its plain meaning, under MCL 141.1549(2) of PA 436, the Emergency Manager only has the authority to limit and/or revoke the power of **the** *entire* **"governing body" as a whole** and not a single member thereof. The only ***individual elected official*** the Emergency Manager has the authority to revoke the power and authority away from is the "chief administrative officer", who in this case is Mayor Dave Bing.

51.     As noted above, the Emergency Manager, in response to a civil lawsuit filed by the Petitioner, issued Order No. 3, which gave the Detroit City Council and the members

thereof to exercise all of their authority as granted them under the 2012 Detroit City Charter with certain limitations.

52. The Emergency Manager can only exercise the powers and authority as granted him under statute. As our Court of Appeals recently explained in *State of Michigan v Blackwell*, 299 Mich App 727; ____ NW2d____ (2013) (Docket No.306975), slip op at p 3:

> "**Public officers have and can exercise only such powers as are conferred on them by law**, and a State is not bound by contracts made in its behalf by its officers or agents without previous authority conferred by statute or the Constitution." *Roxborough v Mich Unemployment Compensation Comm*, 309 Mich 505, 510; 15 NW2d 724 (1944) (quotation marks and citation omitted)." (Emphasis supplied).

53. As the duly appointed Emergency Manager for the City of Detroit, the Emergency Manager is a "public officer" and "state officer". See *Davis v Emergency Manager for the Detroit Pub School*, 491 Mich 899 (2012).

54. Accordingly, the Emergency Manager "have and can exercise only such powers as are conferred on [him] by law." *State of Michigan v Blackwell, supra.* And as noted above, PA 436 does not give the Emergency Manager the authority to revoke the power of an ***individual member*** of a "governing body". PA 436 only allows the Emergency Manager to limit the powers of the ***entire*** "governing body" and not those of an ***individual member***.

55. Therefore, paragraph No. 3 of Order No. 9 is not enforceable for it violates PA 436 and it shall be declared illegal and unenforceable and deemed severable so that all other components contained in Order No. 9 shall remain valid and effective.

**B. Respondent's Appointment as the President of The Detroit City Council Violates the 2012 Detroit City Charter and Thus, Her Appointment Shall be Declared Void as A Matter of Law.**

56.     It is undisputed that since June 2013, the Elected Council President has been "temporarily absent" from his duties as the President of the Detroit City Council.

57.     As noted above, on July 9, 2013, the Detroit City Council, with the advice of counsel, voted 4-2 to unlawfully appoint Respondent Saunteel Jenkins ("**Respondent**") as the *new* President of the Detroit City Council. Council members Brenda Jones and JoAnn Watson voted against Respondent's selection as the *new* Council President because they disagreed with the selection process.  (**See July 9, 2013 Detroit Free Press article attached hereto as Exhibit E**).

58.     However, the appointment of Respondent as the President of the Detroit City Council violated the 2012 Detroit City Charter, as amended.

59.     § 4-103 of the 2012 Detroit City Charter provides the method and order of succession in case of a "temporary absence" of the Elected Council President.  § 4-103 of the 2012 Detroit City Charter states in pertinent part:

> "**City Council shall select its President and President Pro-Tempore from among its members by *majority vote of the members serving at its first regular session in 2014***.  The term for City Council President and President Pro-Tempore shall be four (4) years.  Selection of the President and President Pro-Tempore shall be every four years.
>
> "Members serving in the offices of President or President Pro-Tempore may be removed from their office by a unanimous vote of all members serving, exclusive of the officer being removed.  If an officer is removed, the basis and vote for removal shall be publicly recorded in the minutes of the city council at a public meeting.

"*In the event of a vacancy in the office of President*, including by removal *or temporary absence*, *the President Pro-Tempore shall serve as President* for the unexpired term in the case of vacancy or removal, *or until the return of the President in the case of absence* due to succession under section 5-109 or otherwise.  Any vacancy in the office of President Pro-Tempore shall be filled by majority vote of members serving on the City Council for the unexpired term.  However, if the office of President Pro-Tempore because available because of succession under 5-109, City Council shall select a President Pro-Tempore to serve until the return of the President and resulting resumption of the office by the President Pro-Tempore."  (Emphasis supplied)  (**See §4-103 of the 2012 Detroit City Charter attached hereto as Exhibit H**).

60.    It is undisputed that the Elected Council President is currently "temporarily absent".  However, the Elected Council President's unexplained "temporary absence" did not give the Emergency Manager the authority to revoke the Elected Council President of his authority and title as the duly elected President of the Detroit City Council.  Additionally, the unexplained "temporary absence" of the Elected Council President did not give the Detroit City Council the authority to appoint a new Council President.

61.    § 4-103 of the 2012 Detroit City Charter clearly and unambiguous states that "[i]*n the event of a vacancy in the office of President*, including by removal *or temporary absence*, *the President Pro-Tempore shall serve as President* for the unexpired term in the case of vacancy or removal, *or until the return of the President in the case of absence…*" (Emphasis supplied)

62.    Therefore, as a result of the unexplained "temporary absence" of the Elected Council President, the President Pro-Tem was to serve as Council President until the Elected Council President returned.

63.    In this case, since the former Council President Pro-Tem Gary Brown had resigned, pursuant to § 4-103 of the 2012 Detroit City Charter, the Detroit City Council had the authority to vote for a new President Pro-Tem. However, they did not have the authority to appoint a new Council President.

64.    Seemingly, members of the Detroit City Council were given bad legal advice pertaining to the interpretation and meaning of the very first sentence of § 4-103 of the 2012 Detroit City Charter.

65.    The first sentence of § 4-103 of the 2012 Detroit City Charter states:

    "City Council shall select its President and President Pro Tempore from among its members by majority vote of the members serving *at its first regular session in 2014.*" (Emphasis supplied) (**See § 4-103 of the 2012 Detroit City Charter attached hereto as Exhibit H).**

66.    Certain members of the Detroit City Council erroneously interpreted this sentence to mean that they could vote to select a new Council President in spite of the fact that the Elected Council President had not resigned nor had been removed from office.

67.    More importantly, as further evidence that certain members of the Detroit City Council's interpretation was incorrect, the clear and unambiguous wording of the first sentence of § 4-102 of the 2012 Detroit City Charter clearly states that the City Council could only vote for a new Council President and President Pro-Tem "**at its fist regular session in 2014**."

68.     The July 9, 2013 meeting was not the "**first regular session in 2014**."  Therefore, the

Detroit City Council did not possess the legal authority to vote amongst its members

to select a ***new*** Council President at the July 9, 2013 meeting.  This sentence,

authorizing the Detroit City Council to appoint its Council President does not become

effective until "2014" not 2013.

69.     As further evidence that the Detroit City Council did not have the authority to appoint

the  Respondent to the office of Council President, the 2012 Detroit City Charter,

provides that the terms of offices of the members of the Detroit City Council that

were elected under the former 1997 Detroit City Charter would  continue until their

respective terms expire.   § 13-103 of the 2012 Detroit City Charter states in relevant

part:

> "**No provision of this Charter shall affect or impair the rights or
> privileges of city officers** or employees **existing when this Charter takes
> effect with respect to appointment, ranks, grades, tenure of office,
> promotion, removal, pension and retirement rights, or the civil rights or
> privileges of city officers or employees**."  (Emphasis supplied).

70.     § 13-109 of the 2012 Detroit City Charter further provides:

> "**The term of a member serving a fixed term of office on any multi-
> member body when this Charter takes effect shall expire at the end of the
> fixed term**, unless otherwise indicated in this Charter. Appointments to
> vacancies arising on the multi-member bodies shall then be made in
> accordance with the provisions in this Charter."   (Emphasis supplied).

71.     As noted above, under § 4-103 of the former 1997 Detroit City Charter, the Council

President was chosen based upon the individual who received the highest number of

votes in the November general election.  (**See § 4-103 of the former 1997 Detroit**

**City Charter attached hereto as Exhibit I).**

72.     It is undisputed that the Elected Council President received the highest number of votes in the November 2009 general election and under the former 1997 Detroit City Charter, his term of office was for four (4) years.  Thus, until such time as the Elected Council President resigns, and/or is removed from office in accordance with law, the Elected Council President has the right to serve in that capacity and the Detroit City Council cannot vote to appoint a *new* Council President without first voting to remove him from said seat.

73.     The language of the 2012 Detroit City Charter is clear and unambiguous.

74.     The rules governing the construction of statutes apply with equal force to the interpretation of municipal ordinances and city charters.  *Gora v City of Ferndale*, 456 Mich 704, 711; 576 NW2d 141 (1998); *Detroit v Walker*, 445 Mich 682, 691; 520 NW2d 135 (1994). "The Legislature is presumed to have intended the meaning it has plainly express[,]" and clear statutory language must be enforced as written." *Davis v City of Detroit Financial Review Team*, ____ Mich App ____; ____ NW2d ____ (2012) (Opinion issued May 21, 2012 (Docket Nos.309218; 309250), slip op at p 8.

75.     Thus, the clear and unambiguous provisions of § 4-103 of the 2012 Detroit City Charter must be applied and enforced as written.  *Id*.  See also *In re Storm*, 204 Mich App 323, 327; 514 NW2d 538 (1994), overruled in part on other grounds *Detroit Police Officers Ass' v City of Detroit*, 452 Mich 339; 551 NW2d 349 (1996) (Where language of a charter is clear, there is no need for interpretation.  The charter must be applied as written.)

76. Although this Court and the Respondent may believe that the removal of Respondent from the office of Council President in light of the current circumstances is trivial, the People of the City of Detroit chose to have this provision it its city charter and the will of the People cannot be ignored or overruled by this Court. "Fundamental principles of democratic self-government preclude the judiciary from substituting its judgment for that of the people." *In re Proposals D & H*, 417 Mich 409, 423; 339 NW2d 848 (1983).

### C. Respondent's Appointment is Void as A matter of Law Because the Emergency Manager Did Not Issue A Written Order Approving Respondent's Appointment as Council President

77. Even assuming the Detroit City Council had the authority to appoint Respondent to the position of Council President, which Petitioner correctly asserts they did not, Respondent's appointment is void as a matter of law because the Emergency Manager did not issue a written order in accordance with PA 436 and his Order No. 3 approving Respondent's appointment as Council President.

78. As noted above, a majority of the Detroit City Council voted on July 9, 2013 to appoint Respondent as the new President of the Detroit City Council and also voted to appoint Councilmember Andre Spivey as the new Council President Pro-Tem.

79. Upon the vote of the Detroit City Council on July 9, 2013, Respondent assumed the office of Council President and began exercising the duties of Council President.

80. As of the date of the filing of this *Ex Parte* Application/Complaint, the Emergency Manager has not issued a written order approving and/or confirming the appointments of Respondent as Council President and Andre Spivey as Council President Pro-Tem.

81. MCL 141.1552(1)(ff) of PA 436 states:

Sec. 12. (1) An emergency manager may take 1 or more of the following additional actions with respect to a local government that is in receivership, notwithstanding any charter provision to the contrary:

(ff) Remove, replace, appoint, or confirm the appointments to any office, board, commission, authority, or other entity which is within or is a component unit of the local government.

82.     In accordance with the powers granted him under MCL 141.1552(1), the Emergency Manager ordered in Order No. 3 the following:

> "*Any* orders, ordinances, resolutions, ***appointments***, approvals, terminations, appropriations, contracts, permits, **or other related actions of the** Detroit Mayor and ***City Council* from and after March 28, 2013**, ***shall be*** submitted to the Emergency Manager for consideration, ***but will not be valid or effective unless and until approved by the Emergency Manager or his designee in writing.***" (Emphasis supplied) **(See Order No. 3 attached hereto as Exhibit C)**.

83.     Thus, in accordance with the clear and unambiguous language of the Emergency Manager's Order No. 3, Respondent's appointment is not valid because the Emergency Manager or his designee has not approved Respondent's appointment in writing.

84.     Accordingly, Respondent did not have the legal authority to assume and exercise the duties of the office of Council President because her unlawful appointment has not received approval/confirmation from the Emergency Manager.

### D. Petitioner Has Met All Of The Legal Requirements Necessary For This Court To Grant Leave

85.     On July 30, 2013, Petitioner:

i)      Submitted an application to the Attorney General, pursuant to MCR 3.306(B)(3), requesting the Attorney General to institute *quo warranto* proceedings against Respondent in this Court pursuant to MCR 3.306(B)(1)(a)&(b);

ii)     Such application was properly made pursuant to MCR 3.306(B)(3)and offered to provide any security deemed necessary to indemnify the state against all costs and expenses of the action;

iii)    Such application outlined the factual basis for, and necessity of, instituting a *quo warranto* action against Respondent. (See, Petitioner's Quo Warranto Application to Attorney General Bill Schuette, dated July 30, 2013, attached hereto as **Exhibit F).**

86.     After a review of Petitioner's application (**Exhibit F**), on August 7, 2013, the Attorney General delivered to Petitioner his response, declining to file a *quo warranto* action against Respondent. **(See, Attorney General's letter responding to Petitioner's application for *quo warranto* attached hereto as Exhibit G**).

87.     Petitioner has followed the requirements of the Michigan Court Rules, and the statute, providing for a *quo warranto* action and writ, and Petitioner, pursuant to MCR 3.306(B)(3)(b), submits to this Court this Application for leave to file a *quo warranto* complaint against Respondents.

88.     Petitioner submits to the Court that it is well-settled that the Court is obligated, in the interest of justice, and as required by law, to grant Petitioner's Application for Leave to File a Complaint for a Writ of *Quo Warranto* against Respondents. The legal test or standard to grant a private person, such as Petitioner, leave to file a *quo warranto* action, has been set forth by the Court of Appeals in *City of Grand Rapids v. Harper, supra*. The standard or test is twofold:

> "… especially in light of the trend to provide more liberal requirements in the area of who may petition for a writ of *quo warranto*. The personal interest of the relator, or lack of it, is no longer relevant. The most important considerations in granting leave to file *quo warranto*:
>
> * * *

13-53846-swr   Doc 1049-5   Filed 10/03/13   Entered 10/03/13 16:33:35   Page 25 of 28

'would be whether an appropriate application was made to the Attorney General, in cases where required, and whether the application discloses sufficient apparent merit to justify further inquiry by quo warranto proceedings.' 4 Honigman & Hawkins, Michigan Court Rules Annotated (2d Ed), Rule 715, p 231."[*Id.*at 328-329] (Emphasis added.)

89.     The Michigan Court of Appeals, again, recently applied and upheld, the twofold *City of Grand Rapids* standard or test that must be met in the granting of leave to file an action for *quo warranto*. They did so in *Davis v Chatman*, 292 Mich App 603, at 613-614. The Court in *Davis v Chatman, supra*, citing *City of Grand Rapids, supra*, held:

> [T]his Court has previously stated that the most important considerations in granting leave to file quo warranto are (1) whether an appropriate application was made to the Attorney General and (2) whether the application disclosed sufficient apparent merit to justify further inquiry by quo warranto proceedings. [*Davis v Chatman*, 292 Mich App 603, at 613.]

90.     Both requirements set forth in *City of Grand Rapids*, and reiterated in *Davis v Chatman,* have been met by Petitioner's Application herein**:** (1). The Petitioner first made application to the Attorney General as required by MCR 3.306(B)(3), and the Attorney General declined to file such action, but gave thereby, Petitioner any necessary authority to proceed with this Application in this Court to seek leave file such an action himself; (2). This Application adequately and thoroughly discloses sufficient and apparent merit to justify further inquiry by means of Petitioner's *quo warranto* action against Respondent, to wit:

> The Detroit City Council did not have the legal authority to appoint Respondent to the office of Council President.

13-53846-swr   Doc 1049-5   Filed 10/03/13   Entered 10/03/13 16:03:45   Page 26 of 28

91.     It must also be noted that Respondents' potential status, serving illegally, nonetheless are acting as a *defacto* officers. Whether acts taken by Respondents while serving as *defacto* officers are valid or not, is of no legal consequence to the question of whether Petitioner's Application must be granted. The Court of Appeals previously made such error in *Davis v Emergency Manager for Detroit Public Schools*, 491 Mich 899 (2012), and the Michigan Supreme Court correctly VACATED that part of the Appeals Court's order that provided such as its legal reasoning for its denial of the application. See *Davis v Emergency Manager for Detroit Public Schools*, 491 Mich 899 (2012).

92.     It is manifest that Petitioner's complaint herein, for which leave is hereby sought, is meritorious, and the successful remedy resulting therefrom, will be the Court's removal of the Respondent from the office of Council President.

## <u>Conclusion</u>

The Petitioner has complied with the requirements of the Michigan Court Rules and the *quo warranto* statute, by first imposing upon the Attorney General to bring the action in *quo warranto*. The Attorney General having declined to commence such action, the Petitioner may now proceed. Petitioner's application has disclosed sufficient facts concerning Respondent's unlawfully assuming the office of President of the Detroit City Council, thus justifying further inquiry into Respondent's unlawful appointment. See *Davis v Chatman*, 292 Mich App 603, at 613-614.

The Court should therefore assume its jurisdiction, grant leave to the Petitioner, permit the filing of his complaint in *quo warranto* against Respondent, hear the matter and grant Petitioner the relief sought in such action. The Court should thus grant Petitioner the

initial relief sought of leave to file herein the complaint and action for quo warranto against

Respondent.

## <u>REQUEST FOR RELIEF</u>

**WHEREFORE,** for the foregoing reasons, Petitioner, Citizens United Against

Corrupt Government, prays and requests that the Court grant and issue the following relief:

1. *Ex parte,* an **ORDER** Granting Petitioner's *Application for Leave to File a Complaint for a Writ of Quo Warranto*, against Respondent pursuant to MCR 3.306(B)(3)(b), *Ferzacca v. Freeman*, *supra*, and *Davis v Chatman*, *supra*;

2. Alternatively, *ex parte,* **ORDER** Respondent to **Show Cause**, why leave should not be granted to Petitioner to file his *Complaint for a Writ of Quo Warranto* against Respondents, and **ORDER** a hearing thereon on an expedited basis and advance such hearing on an emergency basis on the Court's docket in accordance with MCR 3.301(D);

3. **ORDER** any and all such other relief, as justice may so require.

Respectfully submitted,

/s/ ANDREW A. PATERSON_____
ANDREW A. PATERSON (P18690)
Attorney for Petitioner Citizens United
46350 Grand River Ave., Suite C
Novi, MI 48374
(248) 568-9712

DATED: August 19, 2013