UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .         Docket No. 13-53846
        MICHIGAN,               .
                                .         Detroit, Michigan
                                .         October 2, 2013
                    Debtor.     .         10:00 a.m.
. . . . . . . . . . . . . . . . .

HEARING RE. AMENDED MOTION OF CREDITOR DEBORAH RYAN,
AN INTERESTED PARTY, FOR RELIEF FROM THIS COURT'S ORDER
STAYING PROCEEDINGS; MICHIGAN COUNCIL 25 OF THE AMERICAN
FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, MOTION FOR ENTRY OF AN ORDER MODIFYING THE
AUTOMATIC STAY SOLELY TO ALLOW ADMINISTRATIVE LAW JUDGE
TO EXECUTE HIS OPINION AND LIQUIDATE DAMAGE AWARD BEFORE
HE RETIRES ON OCTOBER 4, 2013; PETITION FOR ORDER
LIFTING STAY
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  HEATHER LENNOX
                       222 East 41st Street
                       New York, NY  10017
                       (212) 326-3837

                       Miller, Canfield, Paddock & Stone, PLC
                       By:  ERIC D. CARLSON
                            TIMOTHY FUSCO
                       150 West Jefferson, Suite 2500
                       Detroit, MI  48226
                       (313) 963-6420

For Deborah Ryan:      Goodman & Hurwitz, P.C.
                       By:  WILLIAM GOODMAN
                       1394 East Jefferson Avenue
                       Detroit, MI  48207
                       (313) 567-6170

For AFSCME,            Lowenstein Sandler, LLP
AFL-CIO, and Sub-      By:  SHARON L. LEVINE
Chapter 98, City       65 Livingston Avenue
of Detroit             Roseland, NJ  07068
Retirees:              (973) 597-2374

APPEARANCES (continued):

```
For AFSCME,          Miller Cohen, PLC
AFL-CIO:             By:  RICHARD G. MACK, JR.
                     6700 West Lafayette Blvd., 4th Floor
                     Detroit, MI  48226-3191
                     (313) 964-4454

For Detroit          Clark Hill, PLC
Retirement Systems-  By:  SHANNON L. DEEBY
General Retirement   151 South Old Woodward, Suite 200
System of Detroit,   Birmingham, MI  48009
Police and Fire      (248) 988-5889
Retirement System
of the City of Detroit:

For Detroit Branch   MELVIN BUTCH HOLLOWELL
NAACP:               8220 Second Avenue
                     Detroit, MI  48221
                     (313) 207-3890

For Arab-American    Nabih H. Ayad & Associates, P.C.
Civil Rights         By:  NABIH H. AYAD
League, Ayad Law,    2200 North Canton Center Road, Suite 220
PLLC:                Canton, MI  48187
                     (734) 983-0500

For the State of     Michigan Department of Attorney General
Michigan:            By:  NICOLE A. GRIMM
                     525 West Ottawa Street
                     P.O. Box 30736
                     Lansing, MI  48909
                     (517) 373-6434

Court Recorder:      Letrice Calloway
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1      THE CLERK:  All rise.  Court is in session.  Please
2  be seated.  Case Number 13-53846, City of Detroit, Michigan.
3      THE COURT:  One moment, please.  Okay.  So is it
4  okay with everyone if we proceed with the motion for relief
5  from the stay filed by Deborah Ann Ryan?
6      MR. GOODMAN:  William Goodman, your Honor.  We're
7  ready.
8      THE COURT:  Okay.  Step forward, please, sir, and
9  you may begin.
10      MR. GOODMAN:  May I ask if I may have my client sit
11  closer so that she can hear the proceedings?
12      THE COURT:  Sure, sure, absolutely.
13      MR. GOODMAN:  Step forward, Ms. Ryan.
14      THE COURT:  I wonder if you could make room for Ms.
15  Ryan at counsel table there.
16      MR. GOODMAN:  Good morning, your Honor.  My name is
17  William Goodman, and I represent Mrs. Ryan, who is a
18  petitioner in this matter.  And I know the Court is
19  unfamiliar with me, but I am -- I have attended a few of
20  these proceedings, and I'm well-aware of the attention that
21  the Court has paid to other pleadings that have been filed
22  and presume that the same is true for these as well.
23      THE COURT:  Yes, sir.
24      MR. GOODMAN:  So I will not impose or reiterate
25  everything that has been said; however, I thought that for

1   just a few moments, since the issue of whether or not there

2   is a likelihood of success for the creditor, Mrs. Ryan, in

3   this case, has been put in issue, I might just address it for

4   a moment.  As Jack Webb used to say, just the facts and, more

5   pertinently, just the stark facts in this matter.

6           Mrs. Ryan is the personal representative of the

7   estate of her daughter, Patricia Williams, who was murdered

8   on September the 22nd, 2009, by her then husband, who,

9   immediately after he murdered her extremely brutally, killed

10  himself.  This is a situation which had been building up for

11  at least a couple of days.  It involves two sets of

12  defendants, those -- the police officials from these --

13  Township of Canton as well as from the City of Detroit.  At

14  first the Canton Township responded and finally eventually

15  learned the identities of the domestic violence victim and

16  the perpetrator, and the perpetrator -- both, in fact, were

17  Detroit police officers.  Canton then essentially turned the

18  matter over to Detroit and in so doing failed to enforce the

19  law as we say it should have been enforced, violated the

20  equal protection clause, we are claiming, and thereby created

21  a cause of action under Section 1983 against Canton.  That is

22  not pertinent today other than the fact that those facts are

23  so intertwined with the facts involving the City of Detroit

24  because what Canton did was turn the matter over and the

25  decision as to what to do with Mr. Williams over to the City

1    of Detroit, which essentially, without any basis whatsoever,

2    asserted to Canton he's mentally fine. He had left a suicide

3    note in addition to having beaten up his wife, waved a gun

4    around and consumed a bottle of alcohol in a short period of

5    time, that he was mentally fine, that he was ready to use a

6    gun -- he was going to the range, in fact, the very next

7    day -- and not to worry and to cancel the LEIN notice that

8    Canton had posted. Canton officers have testified that had

9    that notice not been canceled, they would have tracked him

10   down -- pinged him, I think is the phrase that law

11   enforcement uses -- and thrown him into a psychiatric unit.

12          None of that happened, and, therefore, this

13   generated a 14th Amendment claim under the substantive due

14   process theory of what is called state-created danger. And

15   we've cited the Kallstrom case, which is the leading case in

16   the Sixth Circuit on this point, with the cause -- with the

17   basis for that cause of action.

18          There are cases against two individual officers,

19   actually supervisors, Sergeant Kozloff and Inspector

20   Blackmon, and, in addition, there's a case against the City

21   of Detroit, which is called a custom and policy case, a Monel

22   case, which is based upon the fact that Detroit had -- and

23   I've attached to our papers a force investigation report,

24   which acknowledges this -- the highest ratio or the highest

25   proportion of police officer suicides in the United States.

1   Nonetheless, there was no policy.  There was no training.
2   There was no guidelines whatsoever for supervisors to deal
3   with officers who were undergoing non-duty-related stress
4   that could require hospitalization or affect their duties.
5   In fact, someone who wanted help, who wanted the lifeline of
6   the -- an assistance telephone number that the police
7   department put up to its officers, if they tried to make a
8   telephone call, that number was disconnected.
9          So this then -- and, in fact, in addition, Officer
10  Williams himself was, I think, a problematic officer.  He was
11  described by deputy chief of the Detroit Police Department,
12  James Tolbert, as someone who showed a pattern of
13  disobedience throughout his history, who was disruptive, who
14  basically refused to follow rules and regulations.  That's
15  who he was, and, nonetheless, they gave him a clean bill of
16  health and told Canton, yes, drop your LEIN notice.  That
17  is -- I think, meets the tests of the Kallstrom case and
18  establishes a valid state-created danger claim.  All of this,
19  by the way, has been established, as we have pointed out,
20  through extensive discovery, which we have taken, numerous
21  depositions, almost 30, and, as I indicated in our papers,
22  this matter has been teed up, in fact, argued -- we are
23  waiting for an opinion from Judge Goldsmith as to the Canton
24  defendants, and he has told us what his decision is going to
25  be, but he hasn't rendered an opinion, so I think it would be

1   improper for me to state that now, although if asked I would.

2        And we were just about ready to file a response to

3   the city's papers to the motion for summary judgment, and I

4   think somewhat unfairly the city points to its papers to show

5   that we have a small likelihood of success in the underlying

6   matter without our ever having had a chance to file a

7   response because we were basically cut short on that by this

8   filing in this case.  Nonetheless, as I've stated, I think

9   the facts -- every one of the facts that I asserted today and

10  many more can be documented and proven, and there's certainly

11  a factual question as to each of them.

12       Now, this motion, I think, involves an unusual claim

13  in that what we are saying here is that a stay will diminish

14  my client's rights under Section 1983 of the Civil Rights Act

15  and, therefore, directly under the 14th Amendment.  She has

16  rights to full compensation, to an orderly process, to have

17  her case heard, to not have it delayed or diminished or

18  divided up in any way.  And by extending the stay to her, her

19  rights have been affected, and, therefore, her -- in effect,

20  the stay to Mrs. Ryan, both the stay as to the City of

21  Detroit and the extended stay as to the individual Detroit

22  officers, violates her Constitutional rights.

23       And I think the argument has been elaborated fairly

24  successfully in our papers.  If the Court has any questions,

25  I'd be happy to answer them, but I will say this.  The

1  purpose of Section 1983 to pursue these kinds of actions is

2  not only to compensate victims and fully and completely

3  compensate them, but it is, too, as a mechanism that Congress

4  has created to enforce the Constitution so that people's

5  rights are not violated.  Without it, there would be,

6  Congress has determined, additional violations, further

7  violations by state officials of people's constitutional

8  rights, 14th Amendment rights, and other rights as well.

9       A stark example of this -- I think this is a stark

10  example, but perhaps a simpler example would be if some

11  benighted community somewhere, having not heard about the

12  civil rights movement or the Civil Rights Act of 1964, or

13  something else still maintained public facilities that were

14  segregated, and then that municipality goes into bankruptcy,

15  and a lawsuit is brought to -- for damages perhaps and to

16  desegregate those facility -- for injunctive relief to

17  desegregate those facilities.  The municipality could easily

18  say this is going to cost us money to undertake this kind of

19  major change in our operations at this time.  Nonetheless, it

20  would be completely violative of the 13th, 14th, and 15th

21  Amendment for a stay in bankruptcy to operate in such a way.

22  In that respect, really Mrs. Ryan's rights are no different.

23  Her rights or her daughter's rights were violated fairly

24  blatantly by actions of the City of Detroit, and, as a

25  result, we have sought relief in front of Judge Goldsmith and

 1   seek to continue that relief.

 2          Now, in addition to the constitutional arguments,

 3   which I think I have -- as I said, I've alluded to today, and

 4   I think --

 5          THE COURT:  Well, but why wouldn't the law

 6   distinguish between an ongoing violation that demands remedy

 7   from this case?

 8          MR. GOODMAN:  Well, the law does distinguish between

 9   those kinds of situations.  Clearly there's different kinds

10   of relief.  There's injunctive relief.  There are damages.

11   There are distinctions obviously, and I agree with the Court

12   in that respect.  However, I do not think that the cases

13   which say that the federal courts -- Article III courts are

14   the way to proceed to enforce these rights is -- acknowledge

15   that simply because this is an action for damages, the person

16   who has been so injured can wait and that that diminution of

17   their case, the diminution of their compensation and,

18   therefore, their ability to fully enforce the Constitution is

19   acceptable.  I understand what the Court is saying, that

20   there are distinctions, of course, but the other point -- the

21   point that I made initially continues to be the case.  If law

22   enforcement officers or other public officials know that they

23   are not going to be subjected to deposition questioning,

24   judgment by judges and juries, and forced to pay

25   compensation, this is a way in which these constitutional

1 rights will be diminished and violations will increase, so in

2 that sense I think that there is a similarity between the

3 two.

4        THE COURT:  To the extent the law would recognize

5 that concern, wouldn't it -- couldn't it be addressed by

6 granting relief from the stay to allow you to liquidate your

7 claim -- that is, to fix the amount of the claim -- without

8 allowing you to actually collect on the claim against the

9 city?

10        MR. GOODMAN:  If I understand your question, what

11 you are asking is a reiteration of an argument or something

12 that I read in the debtor's papers here, which is that

13 doesn't do Mrs. Ryan any good simply to have a new form of

14 claim in the form of a liquidated claim.  That's what I

15 understand you to be asking.  Am I more or less in the right

16 area, your Honor?

17        THE COURT:  Well, sure.

18        MR. GOODMAN:  I think I --

19        THE COURT:  I mean you suggest that her rights under

20 the 14th Amendment are or would be diminished by a stay

21 because the officers involved and the city itself wouldn't be

22 called through the evidentiary process to account for what

23 may have happened here, so my question is if that's a

24 concern, why not just allow that to proceed but with the idea

25 that the collection on the judgment, just like the collection

1    on all the other debts of all the other creditors in this

2    case, needs to wait for a confirmed plan?

3         MR. GOODMAN:  My response to that is that possibly

4    that is a very partial solution to the issues I've raised,

5    but in a broader context, there's still -- Mrs. Ryan still

6    has a claim against the Canton defendants, and as I think I

7    mentioned --

8         THE COURT:  They're not stayed, are they?

9         MR. GOODMAN:  No, they are not stayed, absolutely

10   not.  However, one of the things -- I address this in my

11   reply, and I filed it late yesterday afternoon, and I

12   apologize if it did not get to the Court in time to review

13   it.

14        THE COURT:  Oh, no.  We got it.  We read it.

15        MR. GOODMAN:  Well, what I said there in response to

16   that is that there is an additional interest here, which is

17   the interest of -- there are conflicts between these

18   defendants.  There are who's telling -- you know, who's

19   telling the --

20        THE COURT:  Right.

21        MR. GOODMAN:  -- truth, things like that, that can

22   best be resolved by having it heard in one forum, format, and

23   so on.

24        THE COURT:  Um-hmm.

25        MR. GOODMAN:  And -- well, I've already -- the Court

1   is not --

2          THE COURT:  This solution would address that concern

3   as well, wouldn't it?

4          MR. GOODMAN:  I suppose that it would.  I suppose

5   that it would address that concern.  Whether -- let me put it

6   this way.  I would accede to the Court's suggestion in this

7   regard, if it is a suggestion, but not give up the

8   opportunity to subsequently argue in the -- in light of a

9   verdict at some point that we are entitled to immediately --

10          THE COURT:  Well, let me ask you about that.  Is

11  there any case law that holds that the imposition of an

12  automatic stay violates the 14th Amendment when it delays

13  collection on a valid constitutional claim such as you assert

14  you have here?

15          MR. GOODMAN:  As the Court may know, I've practiced

16  law for almost 50 years.  I have very little familiarity with

17  this particular area of the law.  However, I have not been

18  able to find any such case.

19          THE COURT:  Okay.  Anything further, sir?

20          MR. GOODMAN:  I don't have anything further at this

21  time, your Honor.  Thank you.

22          THE COURT:  All right.  Let me hear from the city

23  then.

24          MR. CARLSON:  Your Honor, Eric Carlson from Miller

25  Canfield on behalf of the City of Detroit.

13

1           THE COURT:  Sir.

2           MR. CARLSON:  I, likewise, will be brief because I

3   know the Court has read the papers, but I would like to take

4   the opportunity to do three things.  I'd like to highlight a

5   few things in our objection, respond to the reply that was

6   filed late yesterday on a couple items, and then spend a

7   brief moment replying to some of the oral arguments that were

8   made.

9           As we highlighted in our objection, the automatic

10  stay is one of the fundamental principles and protections

11  afforded by bankruptcy.  It's key to give the city a

12  breathing spell, to give them the opportunity to try and put

13  together a plan of adjustment.  The city right now is engaged

14  in a significant number of activities, including eligibility

15  and discovery process that's on a very tight timeline, as the

16  Court knows.

17          THE COURT:  Well, let's pause there --

18          MR. CARLSON:  Sure.

19          THE COURT:  -- and ask whether it's the same

20  attorneys who are dealing with that tight time frame as would

21  be dealing with Ms. Ryan's claims --

22          MR. CARLSON:  You know, I don't know the --

23          THE COURT:  -- under the impression -- and correct

24  me if I'm wrong -- that it was corporate counsel's -- or

25  corporation counsel's office who would be dealing with a

1  personal injury claim or a constitutional claim like this

2  one.

3      MR. CARLSON:  That could be to some degree true;

4  however, your Honor, as you well know probably in discovery

5  proceedings, it's the city and its in-house counsel that has

6  the vast knowledge and resources to be able to gather

7  discovery information and provide it to corporate counsel

8  upon, you know, the need, so even if there is limited

9  overlap, there is clearly overlap, and there is

10  responsibility being had by in-house counsel with respect to

11  these issues.  And the distraction --

12      THE COURT:  Is it your representation to the Court

13  that the individual or individuals who would be assigned to

14  shepherd the city's defense of this injury claim, this

15  constitutional claim, through trial would have

16  responsibilities in this Chapter 9 proceeding?

17      MR. CARLSON:  I can't answer that directly, your

18  Honor.  I haven't asked my -- I haven't asked my client that

19  question, but I would assume for logical reasons that there

20  are individuals that would be involved in this case who also

21  are being asked questions on a daily basis.  For instance,

22  okay, this is Number 12, I think, of the relief from stay

23  motions.  I know I relied on this individual to defend this

24  action.  No doubt there are other actions in this bankruptcy

25  that are coming that this individual would be asked to opine

1 on and help assist with.

2          THE COURT:  Okay.

3          MR. CARLSON:  Tragic set of facts, your Honor, very

4 sad, but with all due respect to opposing counsel, that's not

5 the issue.  The issue for this Court to consider is cause.

6 Cause is defined in this jurisdiction or at least outlined by

7 five factors that the Court is to consider, and the facts and

8 the merits of the case are but one factor.  There are other

9 factors to consider, and as the Plastech Court stated, the

10 overall decision that this Court has to make is a weight of

11 the hardships between the two parties with the eye on the

12 overall goal of the Bankruptcy Code.  And I would submit that

13 at this premature or very early stage in this proceeding, the

14 hardship on the city outweighs the hardship on the plaintiff.

15 That said, the stay doesn't deny her her claims.  The stay

16 doesn't prohibit the claims.  The stay doesn't terminate the

17 claims.  It just stays the claims.  And at a future date

18 maybe there's a -- maybe there's justification to liquidate

19 it in the state court.  That's not the point.

20          THE COURT:  When is that?

21          MR. CARLSON:  I would submit, your Honor, that, at a

22 minimum, it would be after eligibility is determined, and

23 more likely and more logical, it would be after some sort of

24 claims resolution process has been put forth and agreed upon

25 because this is one of --

1          THE COURT:  All right.  Let's talk about that.

2          MR. CARLSON:  Okay.

3          THE COURT:  I asked in our initial status conference

4     way back when what the city's plan was to deal with tort

5     claims, and I'm going to just sort of generically include

6     this kind of a claim within that category.  Didn't really get

7     an answer, and I want to ask it again.  This case is only one

8     of --

9          MR. CARLSON:  700.

10         THE COURT:  -- hundreds.

11         MR. CARLSON:  Um-hmm.

12         THE COURT:  What's the plan?

13         MR. CARLSON:  My understanding is it's being worked

14    along with everything else in this case right now and will be

15    set forth in a short period of time.  I can't speak directly

16    to exactly what the plan is right now because I'm personally

17    not involved in that process; however --

18         THE COURT:  Go ahead and take your time and consult

19    because I want an answer to this question.

20         MR. CARLSON:  My colleague's comment, your Honor, is

21    that there will be a process proposed after a claims bar date

22    is set, and part of the process would be to suggest engaging

23    in mediation prior to moving these claims further in

24    litigation, which obviously would save potential time and

25    costs.

1          THE COURT:  Ms. Lennox, any idea what the city's

2     intentions are in regard to a claims bar date?

3          MS. LENNOX:  Your Honor, as your Honor might know --

4     oh, I'm sorry.  For the record, Heather Lennox of Jones Day.

5     Earlier this week, we just filed the amended list of the

6     claims with the amounts, which was very crucial, and it took

7     a lot of time getting through the city's system with that, so

8     now that that is filed, we are working on a bar date motion.

9     We would expect to have it filed promptly, hopefully for

10    hearing in October or late November, and then normally we

11    would ask for like a 60-day --

12         THE COURT:  October or early November?

13         MS. LENNOX:  That would be fine, your Honor,

14    certainly.  We can do that.  And normally we'd like to give

15    folks like 60 days, at a minimum, or whatever the Court might

16    think, certainly 30 at a -- 30 days at a minimum to 60 days

17    to get their claims on file, and then the debtor would have

18    to kind of go through them a little bit and then start the

19    process, so that's kind of our general timing that we've been

20    thinking about, your Honor.

21         THE COURT:  Thank you.  So, Mr. Carlson, apart from

22    what you've already said on the record about counsel's

23    potential involvement in both this case and other cases and

24    the Chapter 9, what other prejudice would there be to the

25    city if the Court granted relief from the stay for purposes

1    of liquidating this claim but not collecting on it?

2           MR. CARLSON:  A significant amount of time and

3    effort, your Honor.  Although this case may be ready for

4    trial, by opposing counsel's own admission, it involves a

5    highly complex area of the law.  There have been numerous

6    depositions.  I think he said less -- you know, just shy of

7    30 -- significant discovery, motions for sanctions in the

8    underlying case, I mean a significant contested -- highly

9    contested case.  And the time and energy on the city combined

10   with the costs associated with both representing the city and

11   indemnifying the individual defendants, which is another

12   issue in this motion -- the city is obligated to indemnify

13   and defend those individual defendants -- it is a -- I would

14   submit a major distraction, and as the Court has already

15   mentioned, it's one of 700, so, you know, the question, I

16   guess, I would ask at this point without having a claims

17   procedure process in place is why this one, why now.  It's

18   not -- it's just not the right time, your Honor.

19          Then briefly I'd like to just respond if I could to

20   a couple of things in the reply real quickly, and then I'll

21   address the oral argument.  With respect, real briefly, to

22   the due process argument, your Honor, we did cite to the St.

23   Vincent case in which the Court has ruled on --

24          THE COURT:  Before we move on, I have to ask on this

25   issue of prejudice that you have identified -- and I respect

1  the fact that this is only one of several hundred,

2          MR. CARLSON:  Sure.

3          THE COURT:  Apart from your statements on the record

4  here, is there any affidavit that I've missed from the city

5  that details or specifies this prejudice that you assert?

6          MR. CARLSON:  The hardships that would be imposed

7  upon the city?

8          THE COURT:  Yes.

9          MR. CARLSON:  Not attached to the papers, no, your

10  Honor.

11          THE COURT:  Or filed at all?

12          MR. CARLSON:  There have been numerous motions and

13  numerous objections, so whether there have been in other

14  objections I can't confirm or deny.

15          THE COURT:  All right.  Go ahead.

16          MR. CARLSON:  With respect to the reply, your Honor,

17  real briefly, again, I highlighted earlier and I just wanted

18  to highlight again because it is an issue that was raised by

19  the motions, the city isn't -- the city is obligated to

20  indemnify and defend the individual defendants.  We believe

21  that the extension stay order, Docket Number 166, clearly

22  addresses and covers nonofficer employees, so the combination

23  of the indemnification as well as the extension stay order

24  clearly means that those proceedings against those

25  individuals should not go forward as well.

1        And with that, your Honor, you know, I think our

2  position would be that, again, the motion should be denied,

3  and at this point it's just too early in the proceeding.

4        THE COURT:  Any reply, sir?

5        MR. GOODMAN:  Just briefly.  While it's true that

6  there are -- I have no reason to disagree with 700

7  outstanding cases, and many of them, I'm sure, are just,

8  worthy, and in need of compensation and redress -- there is a

9  difference analytically in our argument between cases which

10  raise issues under the United States Constitution and the

11  Civil Rights Act of 1871 and common law tort cases, and --

12        THE COURT:  Well, but isn't it true that many of the

13  1983 actions are among those that are filed in this District

14  Court?

15        MR. GOODMAN:  I'm sure that's true and in state

16  court as well, and I'm sure that there are many, although I

17  don't know the number because I don't have access to that,

18  and all we've gotten is a gross numerical accounting, and I

19  do think there's a difference.  That's the only point I would

20  like to make.

21        THE COURT:  Right.

22        MR. GOODMAN:  With regard to the Court's inquiry

23  regarding -- or information that was provided to the Court

24  regarding mediation, I understand that a mediation process in

25  this Court might be somewhat different.  However, this case

1  has already been mediated through -- by a magistrate in this

2  district, and the city's position was that notwithstanding --

3          THE COURT:  Well, all you need say is that the

4  mediation was not successful.

5          MR. GOODMAN:  Well, I'm not going to talk about a

6  number here.  I'm simply going to say that their position was

7  there would be no offers made until their motion for summary

8  judgment was decided, and that, of course, goes to the heart

9  of what we've tried to assert here today in court, so that

10  was all I was trying to bring to the Court's attention.

11  Thank you very much.

12          THE COURT:  All right.  Thank you.  All right.  I'm

13  going to take this under advisement and issue a written

14  opinion shortly.

15          The next motion I'd like to hear, if it's okay with

16  everyone, is the motion for relief from stay filed by AFSCME,

17  please.  Is that okay with everybody?

18          MS. LEVINE:  Good morning, your Honor.  Sharon

19  Levine, Lowenstein Sandler, for AFSCME, the American

20  Federation of State, County and Municipal Employees, and Sub-

21  Chapter 98.  Your Honor, I want to clarify what may be a

22  little bit ambiguous in paragraph 22 of our motion.  All we

23  seek here today -- all we seek here today is to let the

24  administrative law judge sign his opinion, if he determines

25  to sign his opinion, before he retires on Friday, so we're

1   not asking the city to do anything further.  We're not asking

2   this Court to do anything further.  We're not doing anything

3   further.  We understand that there's a claims reconciliation

4   process that is going to be teed up and heard by the Court in

5   due course.  We understand that with regard to the

6   eligibility issues and what's going on there, a lot of people

7   are drinking from a fire hose right now, but we don't want to

8   lose this window of opportunity to have the administrative

9   law judge, who has spent a year and a half with this matter,

10   to at least ink his opinion, and then whatever your Honor

11   determines is appropriate from that, including if your Honor

12   determines nothing is appropriate from that, we would be back

13   before this Court on that issue.

14           THE COURT:  Okay.  So, again, just to clarify here,

15   if your motion is granted, what impact would that have on the

16   timing and the deadlines associated with what would normally

17   happen in that context if the bankruptcy weren't filed?

18           MS. LEVINE:  Your Honor, our understanding is that

19   because the automatic stay -- and perhaps your Honor's order

20   could then address this directly, but our understanding is

21   that the automatic stay would toll those deadlines for that

22   period of time that the stay was imposed under 108, but if

23   we're wrong about that, your Honor could address that in the

24   order as well.

25           THE COURT:  You think I have the authority to do

1 that?

2         MS. LEVINE:  Your Honor, I think that -- your Honor,

3 I do believe that under the Bankruptcy Code there is a

4 tolling once the automatic stay is in place under Bankruptcy

5 Code Section 108, and I think that your Honor would have the

6 authority to do that, but the -- but more importantly, I'm

7 not sure that anybody is even suggesting that we go back at

8 this point in time to the MERC or to any other administrative

9 proceeding.  Really our understanding is is that the

10 administrative law judge, as part of this decision, could, if

11 he decides, issue a damage award or at least designate a

12 suggested damage award, and given all that's gone on in front

13 of him, that at some point in time in this case might prove

14 of value to the parties here.

15         THE COURT:  How much in damages -- excuse me -- is

16 your client seeking?

17         MS. LEVINE:  Your Honor, I don't recall the numbers,

18 but it's a substantial -- it's a substantial amount.  I don't

19 have all of the -- I'm not sure that we want --

20         THE COURT:  Approximately.

21         MS. LEVINE:  I'm not sure actually that we want to

22 put a number on the record here.  You know, that's part of

23 that proceeding, and we're not ready to pre-try that issue,

24 but to the extent that he inks a number, it would be a number

25 that would then come back and get treated here or to the --

1        THE COURT:  I thought you had filed a paper with a

2   number in it, and I just couldn't remember what the number

3   was.

4        MS. LEVINE:  Your Honor, I don't mean to be hedging,

5   but my understanding is -- and I'm new to this whole

6   process -- is that it's based upon the percentage of

7   investments, and we gave a range, and that's part of the

8   reason actually why we're looking for the administrative law

9   judge's guidance to the extent he wants to give it.

10        THE COURT:  And what was the range?

11        MS. LEVINE:  Our range was different, your Honor,

12   than the debtor's.  What was the debtor's -- your Honor, if I

13   can introduce to the Court my co-counsel.

14        THE COURT:  Sure.  Sir.

15        MR. MACK:  Richard Mack, your Honor.

16        THE COURT:  Richard --

17        MR. MACK:  Richard Mack, M-a-c-k.

18        THE COURT:  Yes.  Okay.

19        MR. MACK:  I'm the attorney who tried that

20   litigation.

21        THE COURT:  Yes.

22        MR. MACK:  The complication in just identifying a

23   number for your Honor is that it was based upon what were

24   determined to be excess earnings beyond the pension fund's

25   performance in the market, so if the pension fund performed

1  beyond 7.9 --

2          THE COURT:  Right.

3          MR. MACK:  -- percent in the market, then that money

4  was to be distributed three ways, as laid out --

5          THE COURT:  Right.

6          MR. MACK:  -- in our supplemental pleadings, so

7  obviously it would depend on this precise investment in the

8  market in the two years at issue here, 2011, 2012, and then

9  one of the ways that we've suggested as a means of obtaining

10  a damage award to the ALJ is assigning an average to that,

11  so --

12          THE COURT:  Yeah.  You were going to go back ten

13  years, do an average.

14          MR. MACK:  Yes.  We cited case law.

15          THE COURT:  So what was your range?

16          MR. MACK:  Well, the percentage is -- I believe it

17  was 54 percent of the excess earnings went to -- again, it

18  depends on the performance in the market in 2011, 2012.  I

19  simply don't have the number.  I think the 2011 year was 18-

20  percent performance in the market.  2012 was -- I think was

21  20-percent performance in the market.  So you would take the

22  percentages above 7.9 for those two years and then divvy up

23  that excess earnings those three ways, so --

24          THE COURT:  Forgive me for not remembering, but did

25  your paper that you filed with the ALJ not calculate all of

1  that and come to a bottom line request?  I thought it did.

2        MR. MACK:  We came to a bottom line request on the

3  percentages.

4        THE COURT:  Right.  What was it?

5        MR. MACK:  On the percentages.

6        THE COURT:  Oh, on the percentage.

7        MR. MACK:  Yes.

8        THE COURT:  Not on the amount.

9        MR. MACK:  No.

10        THE COURT:  All right.

11        MR. MACK:  Not on the amount.

12        THE COURT:  Well, then I won't pin you down any

13  further.  Thank you, sir.

14        MS. LEVINE:  Sorry, your Honor, that we don't have a

15  definitive number.  I was hoping maybe it was just outside

16  what I --

17        THE COURT:  In any event, you're not seeking

18  collection of that now.  That's what you're telling the Court

19  and the city.

20        MS. LEVINE:  Your Honor, we're actually seeking less

21  than not even seeking collection of that now.  In other

22  words, my understanding is that once the AL -- once the

23  administrative law judge inks his decision, there's potential

24  for supplemental proceedings outside of this Court's

25  jurisdiction that might further impact that number.  We're

1 | not even asking for that and haven't made any decision, and
2 | we're assuming that the state hasn't made any -- and the city
3 | hasn't made any decision about any further proceedings
4 | either.  Literally we just became aware that the
5 | administrative law judge was retiring on Friday, and we're
6 | just seeking stay relief till Saturday so that if, in fact,
7 | he's inclined to issue this opinion, for whatever we all
8 | determine it's worth at a later date, we don't lose the
9 | benefit of giving him that opportunity.

10 | THE COURT:  Though you're not even sure it's going
11 | to happen.

12 | MS. LEVINE:  No.  I wouldn't presume to know exactly
13 | what the judge will or will not want to do, but I -- but we
14 | do understand that this Court -- this case was filed right as
15 | he was at the point in that process where we ordinarily would
16 | have expected that the opinion would have been issued.

17 | THE COURT:  Assuming the opinion is issued and it's
18 | consistent with his oral opinion a few months back, what
19 | impact would that have or could that have on any ongoing
20 | obligation of the city?

21 | MS. LEVINE:  Your Honor, our -- your Honor, we
22 | suspect it depends what happens after the Chapter 9 and what
23 | happens in the plan of adjustment.  In other words, once we
24 | all have that knowledge in front of us, we'll be able to
25 | react to it, but most importantly, what we --

1          THE COURT:  Well, let me be more specific.  Will it

2    be your client's position that following the close of this

3    2013 calendar year, the city will have an obligation

4    consistent with what the ALJ has proposed in his oral

5    decision and presumably will memorialize in his written

6    decision?

7          MS. LEVINE:  The answer is, your Honor, that was the

8    position that we took in connection with that litigation.

9    Obviously this is just a recommendation, and then it would go

10   back through a process, and all that is predicated on the

11   fact that obviously it's our view that the pensions can't be

12   adjusted during this proceeding, but, you know, we have yet

13   to see what will come out of the plan of adjustment process,

14   but we're not here waiving any rights with regard to

15   prospective rights, especially prospective rights that we

16   would have had had the stay not been lifted and the

17   administrative law judge not retired.  In other words, our --

18   you know, our expectation is that all we're really looking to

19   do here is take a snapshot of a particular piece of

20   information that may become useful at a future point in time

21   simply because we're not going to have it available to us at

22   that future point in time.

23          THE COURT:  Well, if there's no reason to believe

24   that the written opinion will vary in any significant respect

25   either in terms of result or rationale from what the judge

1  said on the record, why do you need the written opinion?

2        MS. LEVINE:  Two reasons, your Honor.  Number one,

3  we don't know that for a fact.  He has the ability to

4  reconsider whatever it is he would like to reconsider as part

5  of issuing that written opinion, so that could be useful to

6  know.  And, number two, with the supplemental filings, it's

7  my understanding -- and I'm admitting I'm an onlooker as

8  well, but with the supplemental filings, it's possible that

9  we get more clarity with regard to the dollar amount of

10  awards that could be useful or probative should we determine

11  to use them in connection with claims reconciliation and

12  other issues in this case.

13        THE COURT:  The union's underlying claim here was

14  that the city was required to but failed to negotiate this

15  issue.  Yes?

16        MS. LEVINE:  Yes, in part, your Honor, and that --

17  but that there was also damages that flowed from that.

18        THE COURT:  Are you, by which, of course, I mean the

19  union -- is the union and the city still obligated by law to

20  negotiate this issue?

21        MS. LEVINE:  Your Honor, we would hope so, but part

22  of what we're working through in the mediation --

23        THE COURT:  What is your position on whether the law

24  requires negotiation of this issue?

25        MS. LEVINE:  We believe that the law does require

1 negotiation of this issue, your Honor, but that is,

2 frankly --

3    THE COURT:  And so you fully intend to still do

4 that?

5    MS. LEVINE:  On a go-forward basis?  Depends upon

6 what kind of stay relief we would get, and we're not asking

7 your Honor to address that issue now.

8    THE COURT:  Well, for example, as part of the claims

9 resolution process.

10    MS. LEVINE:  Well, that's beyond the scope of what

11 we're looking for today.  In other words, it's --

12    THE COURT:  I want your assurance that if the law

13 requires you to negotiate this, you'll do that.

14    MS. LEVINE:  We would be happy to do that, your

15 Honor.

16    THE COURT:  Excellent.

17    MS. LEVINE:  I thought that you were -- I didn't

18 want to go beyond what your -- what we were asking for in

19 terms of the relief.

20    THE COURT:  I get that.  I feel compelled to ask one

21 more question here, and if you want to defer to Mr. Mack,

22 feel free.  Was there anything in writing anywhere, in a

23 contract, in the pension documents, in a city ordinance, in

24 the city charter, that explicitly authorized the pension

25 trustees to make these so-called 13th payments?

1    MR. MACK:  Mr. Mack again, your Honor.  Yes.  Our

2    position was that both in the city charter as well as in the

3    contract itself as well as the --

4        THE COURT:  What was the language in them that

5    authorized this?

6        MR. MACK:  It's part of the pleadings, your Honor.

7    If you want, I can take a moment and --

8        THE COURT:  Just summarize.

9        MR. MACK:  It essentially gave the board discretion

10   to establish payments as it saw fit beyond a certain level of

11   estimated earnings in the pension investment system, so what

12   would happen is each year an actuary --

13       THE COURT:  I know what happened.  That wasn't my

14   question.  My question was what authorized what happened.

15       MR. MACK:  Yes.  The charter and the contract.

16       THE COURT:  All right.  Thank you, sir.  Are you all

17   set?

18       MS. LEVINE:  Thank you, your Honor.

19       THE COURT:  Okay.

20       MS. LENNOX:  Good morning, your Honor.  Again,

21   Heather Lennox of Jones Day for the city, for the record.  At

22   first blush, your Honor, this request -- the request that's

23   posed in AFSCME's motion does seem pretty innocuous, but upon

24   further reflection and upon further analysis of the city, we

25   think it has very far-reaching implications for this case and

1    its creditors and the city going forward.  And why is that?

2    First, the practice of the 13th check program and we think

3    the deleterious effects that it's had on the city and on the

4    pension plans themselves has been pretty well-documented, and

5    I don't need to go into it now.  The practice, which in the

6    past was wholly discretionary and we think financially and

7    actuarially unsound, has caused the pension plans to lose as

8    much as 1.9 billion in asset value over the years.  That was

9    in a report presented from an actuary to City Council in

10   2008.  As an investigation of this practice -- an

11   investigation of the practice and the past practices of this

12   has been ordered by the emergency manager, and that

13   investigation is ongoing, but the preliminary report was

14   issued, and it's pretty grim.  We did attach that report,

15   which is a public document, as Exhibit C to our objection.

16   So the City Council finally abolished this discretionary

17   practice in 2011.  As your Honor --

18            THE COURT:  Is that $1.9 billion figure in that

19   report?

20            MS. LENNOX:  It is in the report of Exhibit A to our

21   motion, yes, sir, the report presented to City Council in

22   2008, at page 9, I believe.  As your Honor knows, the pension

23   underfunding issue is one of the most critical issues in this

24   case.  Any claims that may be asserted with respect to the

25   underfunding or claims related to pension benefits are claims

1  in this case that we think ultimately should be resolved by

2  this Court.

3          Now, one could take the counter-argument and say,

4  well, look, the administrative law judge heard argument on

5  this issue seven and a half months ago, why not just let him

6  commit it to paper, and maybe it could help the Court decide

7  this issue.  Here's why not.  The hearing on this issue

8  before the administrative law judge was in February of 2013.

9  That was a full month before the emergency manager was

10 appointed for the city.  Since that time, several other

11 relevant things have happened.  The collective bargaining

12 agreement has expired.  The Michigan Supreme Court has

13 reversed a decision relied on by the administrative law

14 judge.  The parties have been permitted several months after

15 that hearing to file additional briefs on which no hearing

16 has been held, and this is important because both parties in

17 their briefs -- and those briefs were attached as exhibits to

18 our objection, your Honor -- both parties recognized the

19 changes in circumstances and the changes in the law since

20 that hearing.  In its paper, AFSCME argues for brand new

21 remedies that are inconsistent with past practices because it

22 feared -- and it states this openly -- it feared what an

23 emergency manager might do to affect its claim.  The city

24 pointed out that the Michigan Supreme Court reversed the key

25 case that was relied on by the administrative law judge, so

1   it is clear from the papers themselves, your Honor, that

2   neither party would view what the administrative law judge

3   must do here or what is being requested by this relief as

4   simply memorializing what happened and what he said on --

5   February 2013.  AFSCME is arguing for new claim relief, and

6   the city has new legal arguments.  This would have to be a

7   new ruling on new facts with new law without the benefit of a

8   hearing plus, your Honor, I would say that the Michigan

9   Supreme Court's decision in Macomb County versus AFSCME calls

10  into doubt whether the administrative law judge even has

11  jurisdiction or is the proper forum for hearing and resolving

12  this matter.

13       If AFSCME wants to assert and liquidate its claim

14  against the city, we believe it should do so in this forum

15  and in this Court because perhaps the most important thing

16  that has changed since February 2013 is that the city has now

17  filed a Chapter 9 case, but we don't even need to decide this

18  issue today.  The request in the motion, as Ms. Levine

19  pointed out, is narrow.  It is for relief from the stay for

20  the administrative law judge to issue a recommendation.

21       I just enumerated a host of reasons why that

22  shouldn't happen, and I can add another.  That

23  recommendation, if issued, doesn't fully or finally resolve

24  anything, which is one of the factors that the Court should

25  consider when seeking to lift the stay.  Exemptions and

1　cross-exemptions could be filed to the MERC.  It may even be

2　dismissed because that may be an improper forum for hearing

3　the matter, so there is no full resolution that can happen.

4　If AFSCME has a claim, it will still be out there, and they

5　can still assert it in this Court or if your Honor should

6　decide at some point some other forum, but we believe it

7　should be this Court.  They will not be harmed one whit by

8　the maintenance of the stay, but this relief, if there's --

9　if there's something that is definitive and if something

10　becomes binding, it's exceedingly far-reaching for the city,

11　and it goes beyond relief for AFSCME, it would apply -- the

12　reasoning of it certainly would apply to all of the unions

13　and all of the pension plans, so we think, your Honor, while

14　the relief does appear innocuous, it is ill-advised, and we

15　think the Court should deny the motion.

16　　　　THE COURT:  Well, if this limited stay relief is

17　granted and the deadlines for subsequent action, whatever

18　that might be, are tolled, how would the city be prejudiced?

19　　　　MS. LENNOX:  I think it would be prejudiced -- well,

20　again, our position is is that he can't rule.  He's got new

21　facts, new laws, no hearing.

22　　　　THE COURT:  Is that for me to decide, or is that for

23　him to decide?

24　　　　MS. LENNOX:  I think -- as a matter of due process,

25　I think it would be important for the city to have a new

1  hearing, and, frankly, his retirement is of no moment.  There

2  can be another administrative law judge to pick this up and

3  have that hearing.

4      THE COURT:  But, again, I ask you is that for him to

5  decide, or is that for me to decide?

6      MS. LENNOX:  Well, I think in the first -- I don't

7  think you have to decide that question, per se, your Honor,

8  but what you're being asked to do is to lift the stay to

9  allow something to happen, something that we don't know as we

10  all sit here in the courtroom here, if the stay is lifted,

11  what will happen.  Will that decision that was issued on the

12  record in February simply be committed to paper, and, if so,

13  what happens with the subsequent facts and briefing?  Will

14  those be taken into account?  Will they not?  Will we have to

15  have another proceeding in front of another administrative

16  law judge to untangle that later?  We don't know as we stand

17  here today because you're right, that is not for anybody in

18  this courtroom to figure out, but lifting the stay could set

19  those activities in motion.

20      THE COURT:  Well, but that wouldn't happen if the

21  relief from the stay were as limited as Ms. Levine asks for

22  here.

23      MS. LENNOX:  If the relief -- what we don't know as

24  we stand here today is what would happen if the relief, as

25  limited as Ms. Levine asks for, happens.  We don't know

1   whether Administrative Law Judge O'Connor would simply write

2   down on a piece of paper that which is already contained in

3   the transcript.  If he would consider further the papers that

4   have been filed and the subsequent facts, in which case he

5   would have done so without a hearing, we just don't know

6   that.

7           THE COURT:  All right.  Thank you.

8           MS. LEVINE:  Your Honor, just briefly.

9           THE COURT:  Yes.

10          MS. LEVINE:  Your Honor, we'd respectfully submit

11   actually for the whole litany of issues that were just raised

12   by the debtor that the limited stay relief is more

13   compelling, not less compelling, especially if the tolling

14   applies, and we would confirm right now that we would consent

15   to tolling to the extent that's an issue, and the debtor can

16   consent on the other side.

17         This administrative law judge has had this in front

18   of him for a year and a half.  He's had the hearings.  He's

19   had the briefing.  And we're assuming that in his mind he has

20   something that he wants to do, which may, in fact, be nothing

21   because that, in effect, is something for these purposes.

22   What we don't want to do is lose that, and if we -- and if we

23   have this limited relief, come Monday we'll all know what

24   that is.  And some appropriate time in the future, we can

25   decide if or when or how that something should be utilized by

1  this Court, if at all, but if we don't let this judge, you

2  know, do what it is he feels appropriate here with the

3  deliberation and the time and the effort and the judicial

4  resources that he has already expended on this matter, it's

5  potentially disadvantageous to all of us in this process.

6           THE COURT:  Do I understand correctly that the

7  process is that this administrative law judge simply proposes

8  a recommended order or judgment, whatever it's called --

9           MS. LEVINE:  I'm shaking my head, for the record.

10          THE COURT:  -- to the Michigan --

11          MS. LEVINE:  Yes.

12          THE COURT:  I'm sorry.

13          MS. LEVINE:  I was shaking my head.  The answer is

14  yes.  He issues a recommendation.  It's not a --

15          THE COURT:  To the Michigan Employment --

16          MS. LEVINE:  Yes.

17          THE COURT:  -- Commission.

18          MS. LEVINE:  Yes.  And we're not asking for

19  proceedings before the MERC, the Michigan Employment

20  Commission.  We're just asking that this judge be able to do

21  whatever it is he would feel appropriate between now and his

22  retirement on Friday.

23          THE COURT:  So as a recommendation, does it have --

24  if that's all that came out of this relief from stay, would

25  that have any binding effect on anyone?

1    MS. LEVINE:  Your Honor, our understanding -- and my

2  co-counsel can correct me if I'm wrong, but my understanding

3  is that it's an issue that could be considered de novo by the

4  MERC but that it is something that is useful for the MERC to

5  have when it makes those deliberations.  We respectfully

6  submit that if it comes here, as the potentially now

7  appropriate Court, that it could be useful here as well.

8    THE COURT:  Again, a process question about MERC

9  that you could feel free to defer to Mr. Mack, but how do you

10  deal with the city's argument -- or at this point it's just a

11  concern -- that because of this Michigan Supreme Court

12  decision from Macomb County in the meantime, there may not

13  even be jurisdiction?

14    MS. LEVINE:  Your Honor, we're dealing with

15  jurisdictional issues here as well.  That doesn't mean that

16  at the appropriate time by the appropriate tribunal having

17  this piece of paper signed between now and Friday wouldn't

18  help.  If it turns out that he lacked jurisdiction or that

19  the decision should not be considered, that's fine, but if

20  we're wrong about that, then we've lost this window of

21  opportunity.

22    THE COURT:  Did you want to add something to that,

23  sir?

24    MR. MACK:  If you wish.

25    THE COURT:  No.  It's up to you.

1          MR. MACK:  The Macomb County case that was

2     referenced was not appropriately interpreted in the city's

3     pleading, so just for purposes of -- there is no

4     jurisdictional issue raised by the Macomb County court case.

5          MS. LEVINE:  Your Honor, obviously we have views on

6     the Macomb County case, but we're not even asking this Court

7     to consider those.  Win, lose, or draw, we're seeking just

8     very narrow relief that may, in fact, be useful.  And if it's

9     not, so be it, but if it would have been, then we've lost it,

10    and that's really all we're asking for today.  Thank you.

11         THE COURT:  Okay.  Oh, did you want to be heard,

12    too?

13         MS. DEEBY:  Yes, please.  For the record, your

14    Honor, Shannon Deeby of Clark Hill.  I represent both the

15    General Retirement System of the City of Detroit and the

16    Police and Fire Retirement System of the City of Detroit.

17    For today's purposes, we're just addressing the issues

18    related to the GRS.  What we would say, your Honor, is that

19    to the extent that AFSCME's motion is seeking very limited

20    relief enabling it to liquidate a damage claim or a damage

21    amount, we would not oppose the motion.  However, if, as the

22    city suggests in their responsive pleadings and as were

23    raised apparently in the supplemental briefing filed by

24    AFSCME that they were requesting a recommendation that the

25    board be reconstituted as of 2011, 2012, we would oppose any

1  kind of impact on board composition, board governance, or the
2  governance of the systems.  We think it would be wholly
3  inappropriate.

4        THE COURT:  What's your client's position, since you
5  have stood up here, on whether the Retirement Systems
6  distribution of this 13th check for all these decades was
7  legal?

8        MS. DEEBY:  As I understand it, your Honor, the
9  board acted completely within their discretion pursuant to
10  the governing laws and their contracts.

11        THE COURT:  All right.  Thank you.  Because of the
12  urgency of this, I want to give you a decision today, so I'll
13  commit to do that, say, 30 minutes after the conclusion of
14  the next hearing --

15        MS. LEVINE:  Thank you.

16        THE COURT:  -- on the record here.

17        MS. LEVINE:  Thank you very much.

18        MR. MACK:  Thank you, your Honor.

19        MS. LEVINE:  Your Honor, with the Court's
20  permission, there's court-ordered mediation that I'm supposed
21  to be in downstairs.  May I be excused pending coming back to
22  hear the decision?

23        THE COURT:  Of course.

24        MS. LENNOX:  Your Honor, I might make that same
25  request.  I'm supposed to --

1          THE COURT:  Of course.  Go.

2          MS. LENNOX:  Is there a particular time your Honor

3    would like us back in the courtroom?

4          THE COURT:  That would be easier for you, wouldn't

5    it?  All right.  Let's just pin a time on it, and let's say

6    one o'clock.

7          MS. LENNOX:  One.  Thank you, your Honor.

8          MS. LEVINE:  Thank you.

9          THE COURT:  The final matter on the Court's docket

10   today is the motion for relief from stay filed by the NAACP.

11         MR. HOLLOWELL:  Good morning, your Honor.

12         THE COURT:  And you may proceed.

13         MR. HOLLOWELL:  Thank you, Judge.  Melvin Hollowell,

14   general counsel on behalf of the NAACP, and my co-counsel

15   here, Nabih Ayad, as well, and we'll address a couple issues

16   for you this morning.  Good morning, Judge.

17         THE COURT:  Yes, sir.  Go ahead.

18         MR. HOLLOWELL:  Again, this is our request of relief

19   from extension of the stay entered by the Court, and first I

20   wanted to deal with just the substance, if I could, just very

21   briefly, of our case that, you know, the case is -- it's not

22   about debtor-creditor issues.  It's about voting rights.  And

23   Public Act 436, the emergency manager law, creates, in our

24   view, two classes of voters.  I guess it's best put in a

25   nutshell.  It creates a superior class of voters where votes

1    for elected officials and those elected have full powers and
2    duties and an inferior class of voters where you can vote,
3    but your vote doesn't have the full authority that it should.
4    And these separate and unequal classes of voters violates the
5    14th Amendment, and we've cited in our brief Bush versus Gore
6    and the doctrine of equal dignity of each vote in Headnote 4.

7        It constitutes a fundamental and irreparable harm,
8    as we demonstrated in our pleadings, that now since the law
9    has gone into effect, over 50 percent, 50.4 percent to be
10   exact, of all African Americans now in the State of Michigan
11   are under emergency managers versus 1.3 percent of the
12   state's white population.

13       We further would say that we have long been at this
14   issue.  I think, as this Court knows, Judge, we have fully
15   litigated the question of whether this should have been on
16   the ballot.  We won that case in front of the Michigan
17   Supreme Court.  As this Court knows, that the voters of this
18   state voted by 53 percent to reject the emergency manager
19   law, and yet just five weeks after that it was overturned by
20   a lame duck session of the Michigan legislature and a new
21   emergency manager law was put into place.

22       So our view on this is, Judge, that, as the NAACP
23   has done throughout a hundred years, you know, we look at
24   questions of equal access to quality education and criminal
25   justice reform and certainly the rights of voters.  Those

 1  have been the wheelhouse issues for the NAACP for the better
 2  part of a century, and this case goes directly to that.  And,
 3  you know, the language, again, in Public Act 436 is pretty
 4  striking in respect to the evisceration of the powers and
 5  duties of elected officials, so it decapitates them.  And so
 6  what you have in the nine jurisdictions that are under
 7  emergency managers, Detroit but one of them, their powers are
 8  advisory, and so they have the authority to meet, but that's
 9  pretty much it.  And in our view, that triggers, particularly
10  with the disparate impact on African American voters, a
11  fundamental constitutional right to vote, which is preeminent
12  over all other rights to vote, and I would just draw the
13  Court's attention to the U.S. Supreme Court's decision in
14  Reynolds versus Sims where the Court indicated that the right
15  to exercise the franchise in a free and unimpaired manner is
16  preservative of all other basic rights.

17          Further, in the Elrod versus Burns case -- and
18  that's the 427 U.S. at 373 case -- that goes to ongoing
19  constitutional deprivations, and it says that particularly as
20  it relates to the right to vote, the loss of constitutionally
21  protected freedoms for even minimally periods of time
22  constitutes irreparable injury, quote, unquote.  And so our
23  argument is that not just in the City of Detroit but in all
24  of the other eight jurisdictions across the State of
25  Michigan, these constitutional deprivations are ongoing and

1  deserve to be litigated fully and fairly in front of Judge

2  Steeh where the case has been filed.

3       Second, if I could just briefly issue -- or address

4  the issue of collateral attack, and notwithstanding the

5  allegation that this is a collateral attack, this is not a

6  collateral attack on the Detroit bankruptcy.  It's really

7  a -- it's a direct attack on the constitutionality of Public

8  Act 436.  And, you know, the timeline is very important in

9  connection with this.  I think I talked just a moment ago

10  about 2011 and how we, you know, certainly gathered petitions

11  to get this matter in front of the voters in 2011, 2012

12  litigation, as this Court knows, and about the results of

13  that, but then as we get into 2013, the March 28 effective

14  date of the statute and then the emergency manager was

15  appointed, the NAACP brought its suit on May 13th, and so --

16  and we amended the complaint on June 27th.  And there was

17  some allegation in the pleadings as to, well, you know, you

18  amended it, you know, later.  The reason we amended the

19  complaint was because in the interim between May 13th and

20  June 27th, as this Court I know is aware, the U.S. Supreme

21  Court decided the Shelby County versus Holder case.  We

22  had -- our case is predicated upon the 14th Amendment.  We

23  have one provision which deals with the Voting Rights Act,

24  and so we supplemented Section 5 and 4, which was ruled

25  unconstitutional by the U.S. Supreme Court in the Shelby

1    County case, and substituted Section 3 of the Voting Rights

2    Act, but the claims, other than that, and the relief sought

3    was the same.  This was the NAACP's filing, therefore, on May

4    13th was well in advance of the July 18th bankruptcy hearing,

5    and, furthermore, well before the July 25th Bankruptcy Court

6    order regarding stay.

7         We did not learn of the extension of the stay until

8    into August.  We were not on the certificate of notice.

9    Defendants, State of Michigan, certainly should have noticed

10   us.  That was Docket Entry Number 140.  We were not on that

11   certificate.  There was no reason for us to know.  The first

12   notice we received was in the U.S. District Court in front of

13   Judge Steeh.  Upon notice we moved expeditiously to ask for

14   relief from that stay, so it is not, in our view, our burden

15   here.  It, rather, is on the state and the city as it relates

16   to that as to why we were not noticed.  And we certainly

17   would have liked to have been in front of this Court when

18   there was the initial argument as it relates to this, but,

19   again, we were not noticed and not brought in for those

20   proceedings.

21        And let me just, lastly, address the stay issue

22   itself, Judge, and I would direct the Court's attention to

23   Section Roman Numeral III of the city's brief where it talks

24   about automatic stay and then says in dealing with the -- I

25   think it's a Javens versus Hazel Park case, the Sixth Circuit

1    case, that the automatic stay, quote, "gives the debtor a

2    breathing spell from its creditors," gives the debtor a

3    breathing spell from its creditors.  Well, we are not a

4    creditor.  That is not us.  We are -- we seek no money

5    damages.  We did not name the city.  We did not name --

6              THE COURT:  You could have filed an objection to

7    eligibility.

8              MR. HOLLOWELL:  We don't take a position on the

9    eligibility.  Our position is that we should be allowed to

10   prosecute our case on the constitutional issues, and the city

11   is free to move forward on its --

12             THE COURT:  So your position is there was nothing

13   about the filing of this case that violated the United States

14   Constitution.  Is that your position?

15             MR. HOLLOWELL:  There's nothing about the filing of

16   this case that violated the --

17             THE COURT:  Is that your position, sir?

18             MR. HOLLOWELL:  I'm not sure I understand the

19   question.  Our case says that --

20             THE COURT:  I need an answer to my question.

21             MR. HOLLOWELL:  I'm not sure I understand the

22   question, Judge.

23             THE COURT:  Detroit filed Chapter 9.

24             MR. HOLLOWELL:  Yes.

25             THE COURT:  Your clients did not file eligibility

 1    objections.  They could have.  They didn't.  Is it your

 2    position that there is nothing about this filing, this

 3    Chapter 9 filing, that violated the Constitution?

 4          MR. HOLLOWELL:  Our position is that we don't take a

 5    position on the Chapter 9 filing.  We do not take a position

 6    on the Chapter 9 filing, so our position is --

 7          THE COURT:  Okay.  So whatever argument you could

 8    have made about the constitutionality of this filing you

 9    waived by not filing a timely objection?

10          MR. HOLLOWELL:  No.  Judge, we would respectfully

11    say that we were not a party to that case nor were we noticed

12    in the docket entry as it relates to parties in that case

13    that the parties in that case, in our view, would have had an

14    obligation to have given us notice for the opportunity to

15    present at that hearing.  Our belief is that --

16          THE COURT:  When you say "that hearing," what

17    hearing are you referring to because we have not had a

18    hearing on eligibility yet?

19          MR. HOLLOWELL:  The matters in front of the judge,

20    the previous matters in front of the judge as it relates to

21    the city's initial filing, and --

22          THE COURT:  You're not seriously contending you

23    weren't aware that the City of Detroit filed bankruptcy?

24          MR. HOLLOWELL:  Certainly was.  We certainly were,

25    but we filed before the city filed, Judge.  That's the point,

1    and the point is that our case is separate and distinct from
2    the city's case and that the city --
3            THE COURT:  Well, but the question that the city
4    raises is can it be separate.
5            MR. HOLLOWELL:  Yes.  That is the question that the
6    city raises, and we said we see no reason why it cannot be
7    separate and follow a separate track.  Again, it does not --
8            THE COURT:  Isn't it the case, though, that the
9    relief you seek, if granted, would terminate the emergency
10   manager, yes?
11           MR. HOLLOWELL:  Yes.
12           THE COURT:  And what impact would that have on this
13   case?
14           MR. HOLLOWELL:  Well, it would be speculative as to
15   where it would go from there, but certainly the elected mayor
16   of the City of Detroit certainly would have the powers and
17   authority to move forward with the bankruptcy if he so chose.
18   That's the point.  Our point is that not just the City of
19   Detroit but all those other cities have had irreparable harm.
20   We are in front of Judge Steeh, and we should have the
21   authority to proceed in front of Judge --
22           THE COURT:  Of course, none of your individual
23   plaintiffs are from any of those other cities, are they?
24           MR. HOLLOWELL:  No.  The individual plaintiffs
25   are --

1          THE COURT:  This case is about Detroit, isn't it?

2          MR. HOLLOWELL:  No.  Well, we also have the Michigan

3     branch of the NAACP, which represents individuals all

4     throughout the State of Michigan.

5          THE COURT:  Right, but none of the members of the

6     state branch who live in those other cities are named as

7     plaintiffs; right?

8          MR. HOLLOWELL:  The state branch of the NAACP --

9          THE COURT:  Am I right about that, sir?

10         MR. HOLLOWELL:  Well, if I could say the state

11    branch represents all NAACP residents throughout the State of

12    Michigan.

13         THE COURT:  Am I right about my question?

14         MR. HOLLOWELL:  Well, the individual plaintiffs,

15    yes.  However, if the judge would take a look at the actual

16    complaint, the complaint is very specific in terms of

17    alleging the harms in each one of those other cities, so it's

18    not like it was just about the City of Detroit.  It was about

19    a lot of different cities, not -- eight other cities, to be

20    specific, and we looked at the individual conduct in each one

21    of those cities, and we pled that, and we put that in the

22    complaint.  And that has been a part of our pleading from the

23    very beginning.

24         As I would also say is that -- Judge, that on the

25    automatic stay issue where it casts uncertainty over the

1    bankruptcy case, we would also argue the reverse, that the

2    bankruptcy casts uncertainty over the fundamental

3    constitutional protections which were filed before the

4    Bankruptcy Court and before bankruptcy and which can and

5    should be addressed by Judge Steeh, so we would finally say

6    that we are not litigating or contesting eligibility, which

7    is what, again, the Garzoni case deals with.  And even if it

8    did apply, again, we were saying that we -- when you look at

9    particularly the hardship upon other --

10        THE COURT:  Okay.  So when you say you're not

11   objecting to eligibility, isn't that same thing as saying you

12   have waived any objections to eligibility that you might

13   have?

14        MR. HOLLOWELL:  We have not taken any position on

15   eligibility.  As Mr. Goodman said earlier, this is -- our

16   case is in federal District Court, and we are pursuing our

17   rights and remedies under the federal District Court, not

18   under the Bankruptcy Court, and we believe that we should be

19   allowed to proceed in the Article III court.

20        THE COURT:  I'm sorry.  I had another question for

21   you, sir.

22        MR. HOLLOWELL:  Oh, yes.

23        THE COURT:  Is there any way your lawsuit can be

24   tailored or permitted to proceed that would not have an

25   impact on this bankruptcy case?

1    MR. HOLLOWELL:  Yes.  We don't object to

2  eligibility.  We are not alleging any pecuniary interest.

3  We're not seeking money damages.  There's no claim against

4  the city.  There's no --

5    THE COURT:  So if I gave you a period of time to

6  file an eligibility objection that was based on the claims

7  you make in your complaint or any other grounds, for that

8  matter, you wouldn't file that objection?

9    MR. HOLLOWELL:  We would not file an objection.

10    THE COURT:  All right.  Thank you, sir.

11    MR. HOLLOWELL:  Thank you, Judge.

12    MR. AYAD:  Good morning, Judge.  For the record,

13  Attorney Nabih Ayad on behalf of the NAACP, Stallworth, State

14  Representative Rashida Tlaib, and the rest of the

15  complainants in this particular matter.  Judge, just to echo

16  brother counsel, Butch Hollowell's, position that we are not

17  objecting to eligibility.  We are not objecting.  And to

18  answer your -- answer this Court's question, Judge, yes, we

19  could move forward.  We could move forward.  You know, what

20  we were asking in our initial complaint before Judge Steeh,

21  Judge, was the issue of an injunctive relief, and we're

22  asking that we could move forward.  Everything that's

23  happened in the past, that's still okay with us, Judge.

24  We're not contesting eligibility.  We're not saying that the

25  emergency manager did not have the power and authority under

 1   PA 436 to file for bankruptcy.  We're not contesting that,

 2   Judge.  And the powers of this Court and the powers of the

 3   Judge Steeh's court in the District Court has the ability to

 4   say, you know, we're not going to, you know, repurchase Belle

 5   Isle back.  We're not going to repurchase certain items back.

 6   We're not going to cut those contracts that we're in and

 7   replace them and everything else.  We're saying, Judge,

 8   moving forward, moving forward on this particular -- the

 9   judge could limit it.  Your Honor could limit it.  So does

10   the Judge Steeh in the District Court can limit the powers,

11   let's say, that moving forward on a prospective injunctive

12   order that PA 436 may be unconstitutional, but what has

13   already happened we're not going to touch.  You know what?

14   Quite frankly, Judge, we're okay with that.  We're more

15   concerned about the abilities of -- more than half of the

16   African Americans in this state lack the ability to vote, a

17   vote fundamental of all fundamental rights across this

18   country.  It is fundamental and basic in our society of fair

19   play and in a democratic society that we have the right for

20   individuals to vote, and the Supreme Court of this land, so

21   has the Sixth Circuit, Judge, spoken about the ability -- the

22   dilution of the vote even on a much, much lower standard, was

23   found to be unconstitutional.  Here we don't have one

24   plaintiff, two plaintiffs, a hundred plaintiffs.  We have

25   hundreds of thousands.  The majority of African Americans in

1  this state can no longer basically represent -- can no longer

2  vote for their state -- for their local elections, Judge.

3         THE COURT:  Let me just interrupt you there, sir,

4  and ask you how you deal with the state's argument that

5  everyone who wanted to vote did vote and their votes counted?

6         MR. AYAD:  Judge, I think that would insult the

7  intelligence of the Court.  It would insult my intelligence

8  as a civil rights attorney, Judge.

9         THE COURT:  I need to hear you articulate your

10 response.

11        MR. AYAD:  I'll tell you exactly why, Judge.  I can

12 vote for a bird.  Doesn't mean that bird is going to be able

13 to do anything, Judge.  If I vote for my city councilman, has

14 no powers -- inherent in each vote in the state is the power,

15 Judge.

16        THE COURT:  One second.  For technical reasons, I've

17 been asked to ask you to move like six inches back from the

18 microphone because --

19        MR. AYAD:  I'm sorry.

20        THE COURT:  -- what happens is our system gets

21 overloaded if it's too loud, and then it cuts out, and then

22 the people in the other rooms can't hear you.

23        MR. AYAD:  Well, I definitely want to be heard,

24 Judge, so --

25        THE COURT:  Okay.

1        MR. AYAD:  -- I'll back up a little bit.  Thank you.

2   Your Honor, you know, inherent in every vote, it's a

3   fundamental constitutional -- it defies all sense of logic

4   that when I vote someone, there is inherent in that vote the

5   right that I'm saying I want you to represent me.  I want you

6   to take -- there's inherent the power of that vote to give to

7   this individual to represent me as a constituent of this

8   region, of the state, and of this country.  When you take

9   away that, if I give you that power and your power is no

10  good, it's a misnomer, Judge.  There is no real power.  There

11  is no real vote.  You're striking the vote.  How about if

12  legislation comes out from the national -- from the Congress

13  and the Senate says -- in the Senate, Judge, and across this

14  nation says each and every one of us have a right to vote.

15  You can vote.  Go ahead and vote whoever you want, but guess

16  what?  We're still going to control everything that we want

17  to do, and we're going to place whoever we want to place in

18  that thing.  It's a misnomer, Judge.  It insults the

19  intelligence of the ordered society.  It insults the

20  intelligence of any democratic society.  That's not the right

21  to vote.  That's not what vote was inherent, and --

22        THE COURT:  How do you --

23        MR. AYAD:  -- that's not what our framers of our

24  Constitution envisioned, Judge.

25        THE COURT:  How do you deal with the state's

1  argument that the people who made the decision to substitute

2  the emergency manager for the mayor and the City Council, to

3  the extent he did, were elected by the vote of the people?

4      MR. AYAD:  Well, Judge, I would have to say -- let's

5  talk about that a little bit.

6      THE COURT:  Please.

7      MR. AYAD:  In fact, that when you guys tried to

8  shove this down our throat and not even put on the ballot, we

9  have to actually fight you and go up to the Supreme Court on

10  it, and the Supreme Court ruled in favor of the individuals

11  to basically put it on that ballot, and it was put on the

12  ballot.  And guess what, Judge?  The majority, the majority

13  who, again, Judge, are not majority African American in the

14  state, voted that they don't want the PA 436, but instead,

15  Judge, what this basically state representatives did is

16  shoved it down the people's throat, Judge,

17  unconstitutionally.  I would still have -- and I'll still

18  have an argument in front of Judge Steeh, Judge --

19      THE COURT:  Is there a constitutional right that

20  people have to have their legislators only enact laws that

21  the people agree with?

22      MR. AYAD:  That's a very good question, Judge.  It's

23  going right to the heart of the argument.  Not necessarily,

24  Judge, but the people do have some kind of right, and that's

25  called the constitution and the bill of rights and the First

1 Amendment rights and the fundamental rights, the right to

2 vote, Judge, across this country, and that trumps all the

3 legislations.  If we look throughout history, Judge, the

4 legislations have been overruled under certain bills and

5 statutes and state statutes, and this is one of those types

6 of situations where they will be overruled on this particular

7 matter.

8          THE COURT:  Right, but they've never been

9 overruled --

10          MR. AYAD:  That's what we think the likelihood of

11 success is strong.

12          THE COURT:  -- because there's evidence that the law

13 was not supported by a majority of the people.

14          MR. AYAD:  No.  It was supported by the majority of

15 the people, Judge.  That's the thing.  It was actually just

16 voted by the --

17          THE COURT:  No, no, no.  My question is broader than

18 that.  No law has ever been held unconstitutional based on

19 evidence that that law was not supported by a majority of

20 people; right?

21          MR. AYAD:  Maybe so, Judge, but the fact of the

22 matter is I know, Judge, and I think we all could understand

23 the importance of a fundamental -- of the most fundamental of

24 rights.  We're not talking about any kind of right, Judge.

25 We're not talking about your ability to have a 30-day hearing

1  before a certain thing or relief.  We're talking about the

2  right to vote, Judge.  What is this society -- what is the

3  American society, the democratic society, without the ability

4  to vote?  You strip that away, Judge, I don't know what is

5  more fundamental.  I really don't know what's more

6  fundamental.

7         THE COURT:  Right, but to the extent that argument

8  works as against PA 436 --

9         MR. AYAD:  Correct.

10        THE COURT:  -- the fact that the people supported or

11 didn't support PA 436 is irrelevant, isn't it?

12        MR. AYAD:  I think it is relevant, Judge, to a

13 certain extent because the will of the people was not

14 followed.  That's one.  But, second, Judge, will of the

15 people are not -- it is a overall will of the Constitution of

16 the United States.  It was a strong component in all the will

17 of the people, and that is the U.S. Constitution.  The U.S.

18 Constitution and the -- all the affirmants thereafter just

19 says the individual should have the right.  One vote, one

20 person, Judge, under the Constitution, and that is so

21 fundamental.  People's lives -- wars were battled over these

22 particular rights, and we shouldn't allow it to be stripped

23 away by the simple PA 436.  I would still be here arguing or

24 I'd be arguing before Judge Steeh had the people not voted

25 for a majority as to pass that particular legislation because

1    it draws on -- blocks off the minority.

2         THE COURT:  Let's bring this back to the bankruptcy

3    case.

4         MR. AYAD:  Yes, I will do that, Judge.  If I may,

5    Judge, you know --

6         THE COURT:  Well, let me focus you on this specific

7    question, which you started to touch on, and so did Mr.

8    Hollowell.  Assume you win tomorrow in the District Court and

9    you get the prospective relief that you seek.

10        MR. AYAD:  Correct.

11        THE COURT:  The emergency manager is out of office.

12   The mayor and the City Council are back in.  What's the

13   impact of that on this bankruptcy?

14        MR. AYAD:  And here it comes, and that's a very

15   important question, Judge, and I agree with you.  And we

16   considered this, Judge, and we considered -- again, we were

17   very careful, Judge.  Our arguments are strictly the Voting

18   Rights Act, the Constitutional fundamental right of the

19   voting rights.  What we're saying is, Judge, there is too

20   many contingencies.  There are two many ifs out there.  Let

21   me give you an example.  First of all, if you lift the stay,

22   we go back before Judge Steeh.  Judge Steeh could rule that

23   PA 436 is constitutional.  That issue for a moment.  Either

24   way, party -- either party is going to appeal to the Sixth

25   Circuit.  We appeal to the Sixth Circuit.  Whether we say

1 it's unconstitutional or constitutional, the Sixth Circuit

2 can rule, another if that it's constitutional or

3 unconstitutional.  Then there may be a certiorari before the

4 Supreme Court.  Brother counsel is going to be arguing before

5 the Supreme Court in a month -- less than a month from now,

6 Judge, on the affirmative action situation, but we may go up

7 to the Supreme -- then that argument, then it comes back

8 down -- say the City Council or the mayor -- the mayor may

9 say, you know, this is in the best interest -- again, another

10 if and contingency, Judge, that the mayor may say I want this

11 bankruptcy, not -- maybe the new City Council or the new

12 mayor may say I want this bankruptcy.

13         Lastly, Judge, and this is very important and

14 fundamental, Judge.  We should not, Judge, base our rulings

15 and our positions on such an important fundamental right.  No

16 right -- no bankruptcy rule should ever trump the right of an

17 independent constituent of this nation to be able to vote for

18 their local elections.  That's a very dangerous, dangerous

19 route.  There is no more right more fundamental of all

20 fundamental rights, Judge, as the right to vote, and the

21 bankruptcy rules should not establish that.

22         Then lastly, Judge, I want to add, too, again, like

23 we argued earlier, the judge -- again, we're asking for

24 injunctive order, Judge.  We're not saying, you know, apply

25 it retroactively.  We're not saying apply it a month ago or

 1   two months ago.  We're saying just rule that PA 436 is
 2   unconstitutional.  That state judge, Judge Steeh -- that
 3   federal judge, Judge Steeh, can still rule proactively going
 4   forward that it's unconstitutional, but yet you are not to
 5   basically take away from what's already happened because
 6   we're too down in the line for it.  And I heard yesterday
 7   they were leasing -- they've already leased the Belle Isle to
 8   the state, Judge.  Again, we're not going backward, Judge.
 9   We're moving forward.  We're not contesting the eligibility
10   of the particular bankruptcy.  We're saying if PA 436 is
11   constitutional, absolutely, Judge.  You know, the emergency
12   manager is within his right basically to file for bankruptcy
13   because the state statute gives him that powers and duties.
14   We're not contesting that.  Our argument, just like so many
15   different of these arguments, you're not going to see one
16   particular case in this Court, Judge, that has our particular
17   arguments, and our arguments are very, very simple.  We're
18   not creditors.  We're not debtors.  We're not contractual.
19   We're not asking for service or money damages.  We're simply
20   saying this is a fundamental constitutional civil rights
21   issue as to the voting rights of these individuals in this
22   state.  That's it.  We don't want nothing further, Judge, on
23   that particular matter.  And with all due respect to this
24   Court, Judge, we feel that this is not the proper forum for
25   this, not -- and I agree with your Honor on your previous

1  rulings.  You've indicated that you could decide civil rights

2  issues, and I agree with that.  I'm not contesting that.  But

3  I challenge brother and sister counsels on this particular

4  matter to show me a case where strictly -- only strictly

5  constitutional issues were presented to a Bankruptcy Court as

6  opposed to dual issues where there's a creditor or the City

7  of Detroit is a defendant or debtor and there may be

8  collateral constitutional issues.  This is not the case.

9  This is not the forum.  This is not the situation here,

10  Judge.  We understand that sometimes judges, for instance, in

11  a criminal case, may be called upon to rule on civil rights

12  issues, you know, seizures and what have you, but this is not

13  the case, Judge.  This is strictly, strictly a constitutional

14  civil rights issue to vote.  We don't want nothing from the

15  city.  We haven't named the city.  We haven't named the

16  emergency manager.  We don't want nothing from them, Judge,

17  as to that.

18          THE COURT:  All right.  Let me ask you to wrap up,

19  sir.

20          MR. AYAD:  I'm sorry.

21          THE COURT:  Let me ask you to wrap up, please.

22          MR. AYAD:  All right, Judge.  I will wrap up.  And

23  lastly, Judge, I would say where does an individual that has

24  ongoing constitutional violations incurred such as the

25  majority of African Americans in this state, Judge, where do

1  they go for relief?  If we were to adopt their position, then

2  they're saying basically we should come to the Bankruptcy

3  Court to address our civil rights issues, Judge.  Where do we

4  go for -- where do we go for relief?  Is there a petition?

5  Is there a door that we can go knock on and say, "Give me my

6  relief.  I'm being violated"?  If we were to adopt the

7  opposing's position, Judge, what we would be saying is that

8  if I was arrested as a resident of the City of Detroit and be

9  put in jail the next day, I technically cannot even grieve

10  the City of Detroit, what have you, because the City of

11  Detroit has filed for bankruptcy.  It's too broad.  It's too

12  overwhelming, Judge.  It defies all notions of the --

13  inherent in any democratic society and civil society, Judge,

14  that we have an ability, an ability to ask for relief from

15  when we are grieved, Judge.  And here I don't see unless your

16  Honor allows us to move forward before Judge Steeh and

17  address those simple constitutional issues -- again, Judge,

18  emergency manager, PA 436, that's only one of the powers he

19  has is to file bankruptcy.  He has many powers.  He can sell,

20  fire, discharge.  He can -- you know, he can order supplies,

21  toilet paper, whatever the case may be.  These are just but

22  one of the inherent powers that he has.  We're not

23  challenging those, Judge.  What we're challenging is PA 436

24  as being unconstitutional.

25          THE COURT:  Let me hear from the city.  Thank you.

1          MR. AYAD:  Thank you, Judge.

2          THE COURT:  Or the state.

3          MR. FUSCO:  Good morning, your Honor.  Timothy

4    Fusco, Miller Canfield, on behalf of the City of Detroit.

5    Your Honor, I'll be brief and try to focus on the bankruptcy

6    issues that are presented by this motion.

7          First of all, as your Honor referenced in his

8    questions to counsel, the NAACP was fully aware of the filing

9    and on August 5th filed an appearance in the case.  There's

10   no question that the NAACP could have raised a constitutional

11   objection, which, as your Honor determined in his opinion

12   denying the motion for stay by the Retirees' Committee, is

13   something justiciable before this Court if it relates to the

14   question of eligibility.

15         The plaintiff devotes much of its brief and its

16   reply to two issues that it seems to have abandoned today,

17   first that this case was not contemplated by the extension

18   order and that the extension order entered by your Honor did

19   not deal with this case because it was not one of the

20   enumerated cases.  That issue was, as the plaintiffs note,

21   brought before Judge Steeh, and he made a decision that the

22   plain language of the stay order would apply to this lawsuit.

23   I don't think that's --

24         THE COURT:  I have to ask why the city didn't

25   include this litigation in its motion to extend the stay.

1     MR. FUSCO:  I asked the question myself, and I think

2  the question at that point was just one of visibility at that

3  point.  It may have -- it just slipped under the radar.  It

4  certainly wasn't an intent to exclude this case from the

5  ambit of the extension order.  Second, the --

6     THE COURT:  NAACP litigation in federal court didn't

7  have visibility?

8     MR. FUSCO:  Well, not as much visibility as a judge

9  in Ingham County enjoining people and sending orders to the

10  President, no, it didn't quite have that much visibility.

11     The second issue is this Court didn't have authority

12  to enter the stay order.  Again, that's nothing more than an

13  attempt to relitigate the motion brought before this Court to

14  obtain the extension.  I think it's been decided, and for the

15  same reasons that your Honor referenced in granting the

16  relief initially, it's applicable here, but the real issue is

17  the one --

18     THE COURT:  Are there any other lawsuits out there

19  that lack visibility?

20     MR. FUSCO:  If they're not visible, then they

21  probably don't, no.

22     THE COURT:  That was a serious question.

23     MR. FUSCO:  We're not aware --

24     THE COURT:  Are there any other lawsuits out there

25  that we should know about that are similar to this one?

1         MR. FUSCO:  Well, there's a motion that's been filed

2  in the Phillips matter.  I don't know if that was referenced

3  in the order or not.  And we'll be dealing with that shortly.

4  I'm not aware at this point of any other constitutional

5  challenges, if that's what you're asking.

6         THE COURT:  Well, let me just pin the question down.

7  Are there any other lawsuits out there that are pending,

8  federal court or state court, in which the city is going to

9  contend that issues raised in them should be raised here in

10  the context of eligibility?

11         MR. FUSCO:  We're not aware of any right now.  The

12  state may be, your Honor, and that's a question you might

13  want to pose to the state since the defendants in these cases

14  have been --

15         THE COURT:  Fair enough.

16         MR. FUSCO:  -- state officers rather than the city.

17  When you get to -- and the issue that you did ask counsel,

18  which is isn't this really an eligibility objection, and the

19  question was continually, I think, not answered, in Michigan

20  we have one procedure for the filing of a Chapter 9 case,

21  and, of course, as your Honor obviously knows, the

22  municipality has to be authorized by the state in order to

23  file.  The only way you can file a Chapter 9 is through the

24  appointment of an emergency manager, the emergency manager

25  seeking authority from the governor, then the emergency

1    manager exercising his discretion or her discretion to file

2    the case.  The notion that if the plaintiffs prevail in

3    having the EM law declared unconstitutional -- and what the

4    plaintiff asked for in the complaint is not simply that but a

5    preliminary and permanent injunction prohibiting any EM from

6    exercising any authority and a preliminary and permanent

7    order that actions exercised by the emergency manager under

8    PA 436 are unenforceable.  So at that point, your Honor, I

9    think it's pretty clear we don't have the basis for a filing.

10   We have no EM.  We have no one else that can authorize a

11   filing or continue with the case, so the notion that the

12   mayor and council just suddenly slip into the place of the

13   emergency manager is just not consistent with the statute.

14   This is just as much an objection to eligibility as all the

15   other constitutional objections that were filed and that are

16   being heard by this Court.

17        THE COURT:  Let's pin this down because I want to

18   make sure I understand what you're saying.  You're saying

19   that if prospectively the emergency manager appointment is

20   held unconstitutional and enjoined, that would have the

21   impact or the result of, what, voiding this bankruptcy

22   because under law only the emergency manager can pursue the

23   bankruptcy?

24        MR. FUSCO:  Yes.  And I think if you asked him --

25        THE COURT:  Is that what the emergency manager law

1  says --

2          MR. FUSCO:  No.

3          THE COURT:  -- or does it say that only an emergency

4  manager can file a bankruptcy case?

5          MR. FUSCO:  It says only an emergency manager can

6  file the case, but we have --

7          THE COURT:  Well, that's been done, and if the NAACP

8  is not seeking to avoid that act, what's the problem?

9          MR. FUSCO:  Well, the problem is the NAACP also asks

10  that all the actions taken by the emergency manager are

11  unenforceable.

12          THE COURT:  Well, all right.  Assume for a minute

13  there's been a retraction of that and all they seek is

14  prospective relief.

15          MR. FUSCO:  Well, then I think we have the

16  interference with the bankruptcy case that your Honor is so

17  concerned about and why you've tried to consolidate --

18  arduously tried to consolidate all of the possible issues

19  affecting the bankruptcy case before this Court.  You have at

20  that point a great deal of uncertainty.  Who decides that

21  issue?  If it stays with Judge Steeh, is it he?  Does the

22  issue come back here?  We're trying right now.  In fact, Ms.

23  Lennox is down right now in mediation trying to reach

24  agreements with creditors, and if this case and others like

25  it are allowed to proceed in different forums, we have the

1  risk of inconsistent results.  We have the result of

2  uncertainty.  It's going to have a significantly deleterious

3  effect to this case and how it -- and how it proceeds.  And,

4  your Honor, we're not depriving -- we're not depriving the

5  plaintiff of the right to assert these claims.  As your Honor

6  noted, you said, "Well, what if I allow you to file a late

7  objection to eligibility?"  And the NAACP wasn't interested

8  in that, but why not?  File that and have it heard here.

9  Your Honor has already determined you have jurisdiction to

10 hear that.

11      THE COURT:  Right.  The answer to that that I heard

12 was their case isn't only about Detroit.

13      MR. FUSCO:  Um-hmm.

14      THE COURT:  There are, what, eight other entities --

15      MR. FUSCO:  There are.

16      THE COURT:  -- that have these emergency managers.

17 Where does the NAACP go to bring its claim as to them?

18      MR. FUSCO:  Why wouldn't the result here have the

19 same effect on those as it does on Detroit?  If your Honor

20 determines --

21      THE COURT:  Didn't understand that answer.

22      MR. FUSCO:  If your Honor determines that PA 436 is,

23 indeed, unconstitutional, why wouldn't that have -- be

24 dispositive of the emergency managers in those other

25 jurisdictions as well?  Same statute; same issues.  It's no

 1   different than if Judge Steeh sitting in Detroit says, "Well,

 2   yes, I'm going to declare it invalid."  Presumably that would

 3   affect all of them.  You're hearing the same issue.

 4            THE COURT:  Well, but isn't it the difference that

 5   in this case I can only hear from people who have an interest

 6   in the outcome of this case, which would not include the

 7   residents of Pontiac, Flint, Benton Harbor, the other

 8   jurisdictions that have emergency managers?  There's a

 9   process question here.

10            MR. FUSCO:  Well, except none of those people are

11   involved in this lawsuit now.  They have not claimed --

12            THE COURT:  Well, all right.  I asked that question,

13   didn't I, and the answer I got was that the state NAACP

14   represents --

15            MR. FUSCO:  And that party is here.

16            THE COURT:  -- across the state.

17            MR. FUSCO:  And that party is here, and that party

18   can well participate in this case raising the eligibility

19   objection and make the same exact arguments.  It's a question

20   right now of forum and whether you're going to be able to do

21   what you've tried so hard to do, which is centralize all of

22   these issues before this Court.  I mean I'd, indeed, argue

23   that you're going to get a faster result here than you

24   would -- than you would in front of -- in front of Judge

25   Steeh, so I see -- and when you balance it, if you leave the

 1   stay in place right now and the NAACP elects not to file an
 2   eligibility objection, once the stay is terminated either
 3   because you could, "A," say the city is not eligible -- and
 4   we all agree in that case that the matter may go forward --
 5   or plan of adjustment is confirmed, and the stay goes away.
 6   You can still proceed with the case.  This is no different
 7   than any other matter in which we're simply delaying.  Now,
 8   it's even better than the tort case.
 9           THE COURT:  You wouldn't have any objection if the
10   NAACP filed a second lawsuit seeking relief on the emergency
11   manager law in all of the other municipal entities other than
12   Detroit?
13           MR. FUSCO:  I think what you're asking is what
14   happens if the NAACP files a brand new lawsuit.  It may have
15   to procedurally dismiss this one before it does that, but it
16   files an action in Flint or even better in the Western
17   District for Benton Harbor.
18           THE COURT:  Doesn't matter where it files.
19           MR. FUSCO:  And it files a suit alleging the same
20   claims and saying the emergency manager in Benton Harbor is
21   unconstitutional.  If your first question is do we think the
22   stay would apply to that, the answer is yes.
23           THE COURT:  You do?
24           MR. FUSCO:  We do, um-hmm.  Now, but what would
25   happen --

1          THE COURT:  What are the grounds for that?

2          MR. FUSCO:  Well, why is it any different than any

3     of the other actions?  The outcome in that case would have a

4     direct result and effect on this bankruptcy.

5          THE COURT:  Why is that?

6          MR. FUSCO:  Because that's the decision that your

7     Honor made when you extended the stay.  It's going to be a

8     suit against state officers involving a matter that could

9     adversely affect the bankruptcy case.

10          THE COURT:  And that's the question I'm asking.

11     What's the adverse effect if another judge somewhere holds

12     that the appointment of an emergency manager in Benton

13     Harbor -- and, of course, we don't mean to pick on Benton

14     Harbor -- is unconstitutional?  What's the effect on this

15     case?

16          MR. FUSCO:  Well, it's the same effect as if the

17     plaintiffs prevail in this case.

18          THE COURT:  What is the effect?

19          MR. FUSCO:  The effect is if the Court rules it's --

20     PA 436 is unconstitutional and we don't have an emergency

21     manager statute, then it's our position there's no procedure

22     for the filing of a bankruptcy case.

23          THE COURT:  Well, but that ruling is binding only on

24     the parties in that case.

25          MR. FUSCO:  Well, if it's in the Eastern District,

1    it presumably would be binding on your Honor, but I know the

2    District Court, Bankruptcy Court issue, but we can still have

3    the --

4                THE COURT:  For the record --

5                MR. FUSCO:  Yes.

6                THE COURT:  -- the Bankruptcy Court is not bound by

7    decisions of the --

8                MR. FUSCO:  I know.

9                THE COURT:  -- District Court except as they are on

10   appeal in the case.

11               MR. FUSCO:  Or the law of the case.  That's correct.

12   That's correct.  But think about the effect on the bankruptcy

13   itself, and we're talking right now -- let's look at where we

14   are in the status in this case.  We're very early in both

15   cases.  We're early in the case before Judge Steeh, and we're

16   early in the case here.  There's been no determination of

17   eligibility, and there's been nothing in the District Court

18   case other than cross -- motion to dismiss and a response

19   filed to a motion to dismiss.  Now, you're moving this case

20   forward at an accelerated pace, one that is faster than any

21   other Chapter 9 that I've seen.  We have not even had a

22   determination of eligibility.  You're trying to create an

23   atmosphere where parties are negotiating and endeavoring to

24   reach a consensual plan of adjustment, which obviously is

25   what's in the best interest of everybody in this case.

1    Putting this case on hold -- and, indeed, the NAACP --

2              THE COURT:  I don't think that's so obvious to the

3    NAACP.

4              MR. FUSCO:  Well, it alluded to that in its reply

5    where --

6              THE COURT:  I think what it thinks is in the best

7    interest of the case is to have the elected mayor and City

8    Council be the one who do that negotiation.

9              MR. FUSCO:  Um-hmm.  And there's absolutely no

10   certainty that's what's going to happen.  In fact, I would

11   argue that I think it's highly likely that's not what's going

12   to happen.  And the next -- the first thing you're going to

13   see after that ruling is a motion to dismiss this case.

14             THE COURT:  I was only challenging your assertion

15   that it's obvious that the mediation is in the best interest

16   of everyone.  I'm not sure everyone would share that view.

17             MR. FUSCO:  Well, consensual resolution --

18             THE COURT:  I agree with you.  That's why I ordered

19   mediation, but --

20             MR. FUSCO:  Yes.

21             THE COURT:  -- not everyone agrees with that.

22             MR. FUSCO:  And one result that might be appropriate

23   here is to continue the stay at this point, and if you

24   determine the city is eligible, we can revisit it.

25             THE COURT:  Revisit what?

1          MR. FUSCO:  The stay motion and file another motion,

2     or we can revisit that.  My point is at this point in both

3     cases, it's early.

4          THE COURT:  Why would your position be any different

5     after eligibility than it is now?

6          MR. FUSCO:  I don't know what the --

7          THE COURT:  Argue the same deleterious effect if the

8     mayor came in with the City Council in this case in place of

9     the emergency manager.

10         MR. FUSCO:  We'd have a much better idea where the

11    case is going, I think, at that point.

12         THE COURT:  Well, the same is true after plan

13    confirmation, too, assuming there's --

14         MR. FUSCO:  Yes.

15         THE COURT:  -- confirmation.  All right.  Anything

16    further?

17         MR. FUSCO:  No.

18         MR. HOLLOWELL:  Briefly, Judge --

19         THE COURT:  One second.  You represent the state;

20    right?

21         MS. GRIMM:  I do, your Honor.  Good morning.

22         THE COURT:  All right.  So we're going to hear from

23    the state, and then we'll get back to you.

24         MR. HOLLOWELL:  Thank you.

25         MS. GRIMM:  For the record, Assistant Attorney

General Nicole Grimm appearing on behalf of the State of

Michigan. I would simply reiterate most of what the city

said. Our position, I think, is laid out in the briefing

before this Court. I would want to emphasize that it was

stated in the beginning repeatedly that this is about voting

rights and not debtor creditor, but, again, the relief sought

in the second amended complaint -- or I'm sorry -- the first

amended complaint would absolutely eviscerate Detroit's

bankruptcy filing, and as counsel for the city made clear,

that -- having an emergency manager file for bankruptcy is

the only way for that filing to happen, so it's difficult to

discern how either this Court did not have discretion in the

first instance, which I think petitioners imply, at least in

their first pleading before this Court, or how now the stay

cannot be extended to include this case when it is, I think,

axiomatically related to the bankruptcy proceeding.

          THE COURT:  Well, is it the attorney general's

reading of PA 436 that only an emergency manager can

prosecute the Chapter 9 case once having filed it?

          MS. GRIMM:  I would agree with the Court that as far

as I know --

          THE COURT:  It's only a question.  There's

nothing --

          MS. GRIMM:  Right.

          THE COURT:  -- to agree with or disagree with.

1          MS. GRIMM:  Okay.  Well --

2          THE COURT:  Just a question.  What's the attorney

3    general's reading?

4          MS. GRIMM:  As far as I know, the emergency manager

5    law states only that the emergency manager is the one that

6    has to file it.

7          THE COURT:  Um-hmm.

8          MS. GRIMM:  In terms of prosecution, though, I think

9    that if a law is ruled unconstitutional, then all of the

10   actions taken under that law are null and void, and that's

11   certainly the relief sought in the petitioner's lawsuit.

12         THE COURT:  It's a complex question, but if I heard

13   counsel for the NAACP correctly, they're only seeking

14   prospective relief.

15         MS. GRIMM:  Right.  And that's something new.

16   That's new today and not appearing in any papers that have

17   been filed, but, again, I would --

18         THE COURT:  That solve the problem?

19         MS. GRIMM:  Well, I would question whether that is

20   actually something that's possible because they are not

21   backing off from seeking a declaration that PA 436 is

22   unconstitutional.  If it's unconstitutional now, then I

23   believe, as a matter of law, necessarily, actions taken under

24   it would also have been unconstitutional and void, and that

25   would include the filing for bankruptcy.

1          THE COURT:  Well --

2          MS. GRIMM:  That's my understanding.

3          THE COURT:  Do you remember the case of the attorney

4     who came before the Court seeking relief from the stay so he

5     could get his attorney fees because the state judge had found

6     the Open Meetings Act violation?

7          MS. GRIMM:  Yes.

8          THE COURT:  Davis.

9          MS. GRIMM:  Yes.  I'm familiar with that case.

10         THE COURT:  Thank you, staff.

11         MS. GRIMM:  Yes.

12         THE COURT:  Okay.  So he had all this law, right,

13    which said that, you know, even if it's -- even if the

14    appointment is found to be illegal, the actions taken in the

15    meantime are still valid.  He had all that law.

16         MS. GRIMM:  Okay.

17         THE COURT:  Doesn't all that law save whatever Mr.

18    Orr has done in the meantime and especially given the

19    representation made on the record here today?

20         MS. GRIMM:  Can I just ask just which representation

21    the Court is referring to?  The representation that only --

22         THE COURT:  The representation that the relief they

23    seek is only prospective, yes, that.

24         MS. GRIMM:  I don't know if I can speak definitively

25    to that.

 1          THE COURT:  Okay.

 2          MS. GRIMM:  My reading would be I'm not very sure

 3   that you could --

 4          THE COURT:  You're concerned.  Okay.

 5          MS. GRIMM:  Yeah.  I am concerned about that.  Other

 6   than that, I think at least what petitioners have stated in

 7   their papers is that they're seeking to invalidate Kevyn

 8   Orr's appointment and everything he's done pursuant to it,

 9   and we would adopt the city's position as well.

10          THE COURT:  Okay.

11          MS. GRIMM:  Thank you.

12          THE COURT:  Thank you.  All right.  For rebuttal,

13   I'm going to ask one or the other of you to speak.

14          MR. HOLLOWELL:  That's fine, Judge.

15          THE COURT:  Take your choice.

16          MR. HOLLOWELL:  Thank you.  Wrap it up, Judge.

17   Again, Melvin Hollowell on behalf of the NAACP.  So as it

18   relates to the Court's inquiry, the federalism republican

19   form of democracy question about the legislature also being

20   elected and how does that work as it relates to a vote of the

21   people, well, that was actually addressed by the Sixth

22   Circuit in the League of Women Voters versus Brunner case,

23   which we cited in our brief today, 458 F.3d 16.

24          THE COURT:  What did they say?

25          MR. HOLLOWELL:  And they said it's part of the

1  inquiry to determine whether or not the statute is

2  unconstitutional.  That is part of a several-prong test.

3          THE COURT:  Um-hmm.

4          MR. HOLLOWELL:  Was there a vote of the people?  And

5  they look at were there ordinances in place, you know, were

6  those ordinances voted on by the people, were there state

7  referenda, were there -- so that is actually part of what the

8  Sixth Circuit says you have to look at.

9          THE COURT:  Um-hmm.

10          MR. HOLLOWELL:  So it's part of the case.  The

11  second thing is I would refer the Court to our complaint and

12  Section 61 through 66 very specifically where we outline the

13  jurisdictions outside of the City of Detroit.

14          THE COURT:  Right.

15          MR. HOLLOWELL:  And, third, as it relates to

16  counsel's I think condescending comment that the NAACP's case

17  lacked visibility, it was a nationally -- I think it was

18  pretty condescending.  We're a hundred-year-old organization.

19  It was authorized by the national NAACP.  U.S. Labor

20  Secretary Robert Reich weighed in.

21          THE COURT:  You heard me --

22          MR. HOLLOWELL:  I did.

23          THE COURT:  -- express similar skepticism --

24          MR. HOLLOWELL:  I did.

25          THE COURT:  -- about that response --

1          MR. HOLLOWELL:  Incredibly condescending.

2          THE COURT:  -- so I think we can just let it go at

3     that.

4          MR. HOLLOWELL:  Yeah.  We'll let it go at that.  And

5     then as it relates to prospective -- certainly not obvious to

6     us that mediation is the best.  The best for us is democratic

7     rule, and the Court focused in like a laser beam on what we

8     saw as well, is that Public Act 436 is silent with respect to

9     moving forward.  It only talks about filing, but it doesn't

10    say, okay, after filing, and so we're saying we'll sign an

11    order.  We will sign an order saying that we are going to

12    contest anything prior to today or whenever the Court rules

13    relative to --

14         THE COURT:  No.  If you win your lawsuit before

15    Judge Steeh, if that goes ahead, your next step won't be to

16    come into this Court and file a motion to dismiss on the

17    grounds that the filing was unconstitutional.

18         MR. HOLLOWELL:  That's exactly right, and we would

19    sign an order to that effect, Judge.  And, you know, by the

20    same token, you know, in Pontiac they sold the Silverdome to

21    some folks in Canada.  We're not saying go find those folks

22    in Toronto and return the Silverdome back.  The relief is

23    prospective, and so, again, as we've said before, not name

24    the city, there's no debtor creditor issues.  This is purely

25    a voting rights issue.  And for the reasons stated on the

1  record, we would ask that the stay -- that we have an

2  exception to the extension of the stay.

3          Is it okay if he just says what he was going to say

4  to me in my ear?

5          THE COURT:  Okay.

6          MR. AYAD:  Just to give credence that this is not

7  new information, Judge, we indicated on Docket Number 29 and

8  35 in our response to the motion to dismiss before Judge

9  Steeh one of the options is bankruptcy.  We've never ruled

10  that out.  In fact, after we said that, two weeks later they

11  filed for bankruptcy, Judge, so that was something that was

12  contemplated.

13          MR. HOLLOWELL:  Thank you, Judge.

14          THE COURT:  All right.  Everybody all set?

15          MS. GRIMM:  Your Honor, if I may briefly point out

16  something about the Emergency Manager Act?  It does actually

17  say -- in MCL 141.1558, Section 18, it says that the

18  emergency manager is the only one empowered to act

19  exclusively on the local government's behalf in any such case

20  under Chapter 9, so it is not only the filing of the

21  bankruptcy but also the prosecution of it.

22          THE COURT:  All right.  All right.  The Court will

23  take this under advisement and issue a written decision.  I

24  think that's it for our docket today, so we will be in

25  recess --

1            THE CLERK:  All rise.

2            THE COURT:  -- until one o'clock.

3            THE CLERK:  Court is in recess.

4        (Recess at 11:54 a.m., until 1:10 p.m.)

5            THE CLERK:  Court is in session.  Please be seated.

6    Recalling Case Number 13-53846, City of Detroit, Michigan.

7            THE COURT:  The record should reflect counsel are

8    here.  My apologies to you, counsel, for being a few minutes

9    late here, and I need another minute to get organized here.

10   Okay.

11           On September 24, 2013, AFSCME filed a motion for

12   entry of an order modifying the automatic stay solely to

13   allow administrative law judge to execute his opinion and

14   liquidate damage award before he retires on October 4, 2013.

15   It also requested an expedited hearing on this matter, which

16   the Court granted and set for hearing today.  In the

17   meantime, the City of Detroit did file an objection to the

18   motion and a brief.

19           AFSCME asserts that the matter before the Michigan

20   Employment Relations Commission, MERC, has been fully

21   briefed, and, in fact, the administrative law judge, ALJ,

22   is -- has already given an oral opinion in the matter.  The

23   record also reflects that prior to the bankruptcy petition,

24   the parties submitted supplemental briefs to the ALJ

25   regarding the appropriate remedy and other matters.

1    Therefore, AFSCME asserts that all that remains for the ALJ

2    to do is to issue a written opinion.  It asserts that

3    allowing the ALJ to issue a written opinion will simply

4    create a snapshot of the ALJ's recommendation.  It further

5    asserts that this modification of the automatic stay will not

6    prejudice the city or drain city resources or distract the

7    city from the pending Chapter 9 proceedings before the

8    Bankruptcy Court because there is nothing for it left to do

9    in the litigation before the ALJ.

10           A decision whether or not to lift the automatic stay

11   resides within the sound discretion of the Bankruptcy Court.

12   In re. Garzoni, 35 Federal Appendix 179, 181, Sixth Circuit,

13   2002, citing Laguna Associates Partnership v. Aetna Casualty

14   & Insurance Company, In re. Laguna Associates Limited

15   Partnership, 30 F.3d 734, 737, Sixth Circuit, 1994.  The

16   Garzoni court stated on the same page, quote, "Bankruptcy

17   Code Section 362(d)(1) provides that the bankruptcy court may

18   grant relief from the automatic stay for cause.  See 11

19   U.S.C., Section 362(d)(1).  The bankruptcy court considers

20   the following factors in deciding whether to lift a stay:

21   (1) judicial economy; (2) trial readiness; (3) resolution of

22   preliminary bankruptcy issues; (4) the creditor's chance of

23   success on the merits; and (5) the cost of defense or other

24   potential burden to the bankruptcy estate and the impact of

25   the litigation on other creditors."  Bankruptcy courts have

held that it may be appropriate to lift the automatic stay
when another court, quote, "already had all of the
documentation and evidence in its hands in order to rule in
the matter and a decision could be made almost immediately,"
close quote, In re. Bunting, 2013 Westlaw 153309, Eastern
District of Michigan, January 15th, 2013.

After reviewing all of these factors, the Court
concludes that they weigh in favor of modifying the automatic
stay to allow entry of the ALJ's written opinion.  In the
Court's view, the most important matter -- or factor is that
it does not appear that there will be any prejudice to the
city if the relief sought by the moving party, AFSCME, is
granted and if all we allow is for the ALJ to issue a written
decision.

In particular, AFSCME's proposed order only seeks to
allow the ALJ to execute his recommended decision before he
retires on October 4th, 2013.  In this regard, the Court must
state for the record that the fact that the ALJ -- the ALJ's
retirement is imminent is, in the Court's view, largely
irrelevant.  The Court should decide whether it's appropriate
to grant this limited relief from the stay regardless of
whether the ALJ happens to be retiring imminently or not.
The Court notes that the proposed order also waives the stay
of the order as provided for in Bankruptcy Rule 4001(a)(3),
and that's appropriate here as well.

1          The Court does acknowledge and recognize that the

2    city takes the position that there is much more process that

3    is required before the ALJ and also before MERC before this

4    matter is finalized.  The Court concludes, however, that it

5    is not for this Court to decide whether the ALJ has completed

6    all of the process necessary for him to issue a decision.

7    It's for the ALJ to decide.  And, of course, in that regard,

8    if the city determines that its procedural or substantive

9    rights have been prejudiced by any action of the ALJ that

10   flows from or results from this order or otherwise, those

11   objections are, of course, fully preserved to be presented as

12   appropriate in future proceedings.

13          Accordingly, the Court does grant relief from the

14   automatic stay but only until 11:59 p.m. on October 4th,

15   2013, for the sole purpose of allowing the administrative law

16   judge to -- the opportunity to issue a written recommendation

17   should he decide that it is appropriate to do so.  This

18   relief that the Bankruptcy Court is granting is neither a

19   request for the ALJ to issue a recommendation or an order to

20   do so.  And just to be crystal clear about this, if the ALJ

21   feels that more process is required for any reason, whether

22   it's the arguments made in the post-hearing briefs or the

23   events that have occurred post-hearing, relief from stay is

24   not granted to allow for any other or further process or

25   procedures.

1          The parties have agreed on the record and the Court

2    does order that all dates and deadlines that would otherwise

3    flow under state law from any opinion or recommendation that

4    the ALJ issues are tolled and will be tolled indefinitely

5    pending a further order of this Court.

6          Finally, the Court feels compelled to state on the

7    record that it has taken the time to articulate on the record

8    here this very narrow ruling so that it is clear that this

9    case should not be considered precedent for other parties'

10   motions for relief from the stay because the facts and

11   circumstances here are unusual or unique, to say the least.

12   The Court will prepare an appropriate order.  Anything

13   further?

14          MS. LEVINE:  Thank you.

15          MS. LENNOX:  No, your Honor.  Thank you.

16          THE COURT:  All right.  We'll be in recess then.

17          THE CLERK:  All rise.  Court is adjourned.

18       (Proceedings concluded at 1:20 p.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett          October 8, 2013
_____      _____
Lois Garrett