**Docket No. 48**
**Adv. Proc. No. 13-4942**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |
| CITY OF DETROIT, MICHIGAN | ) |
| | ) Chapter 9 |
| Plaintiff, | ) |
| | ) Adversary Proceeding No. 13-[_____] |
| vs. | ) |
| | ) Hon. Steven W. Rhodes |
| SYNCORA GUARANTEE INC.; U.S. BANK, | ) |
| N.A.; MGM GRAND DETROIT, LLC; DETROIT | ) |
| ENTERTAINMENT, LLC d/b/a MOTOR CITY | ) |
| CASINO HOTEL; AND GREEKTOWN CASINO, | ) |
| LLC | ) |
| | ) |
| Defendants. | ) |

## NOTICE OF PENDENCY OF DEFENDANT SYNCORA GUARANTEE INC.'S EMERGENCY MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER AND CONDUCT EXPEDITED DISCOVERY AND *EX PARTE* MOTION FOR EXPEDITED HEARING

TO THE HONORABLE STEVEN RHODES
UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively,

"Syncora"), by and through its counsel, and for its motion states as follows:

1. This suit arises from the City of Detroit's (the "City's") complaint and motion for

temporary restraining order ("TRO") first filed on July 5, 2013 in the Circuit Court for the

County of Wayne seeking damages for tortious interference with contractual and advantageous

relations, declaratory relief, and a temporary restraining order of unlimited duration against

Syncora Guarantee Inc. ("Syncora"). Syncora removed the matter to the United States District

Court for the Eastern District of Michigan on July 11, 2013 and filed an Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedited Discovery ("Emergency Motion") on July 12, 2013 (attached herein as Exhibit 6(A)). On August 9, 2013, Judge Lawrence P. Zatkoff of the United States District Court for the Eastern District of Michigan referred the above matter to this Court pursuant to 28 U.S.C. § 157(a) and E.D. Mich. LR 83.50(a)(1).

2.     As of today, Syncora's Emergency Motion has been pending before Judge Zatkoff for almost four weeks. The Emergency Motion is fully briefed and ripe for resolution.[1] The City has represented in numerous filings that it would consent to the dissolution of the TRO and that there is no reason for the TRO to remain in place, even though the City has since refused to stipulate to the TRO's dissolution. Moreover, Syncora notes that the TRO dissolved after 14 days by operation of both state and federal law and has not been extended for good cause by any court. Mich. Comp. Laws § 3.310 (1985); Fed. R. Civ. P. 65.

3.     Syncora therefore respectfully notices this Court of the pendency of its Emergency Motion to Dissolve the TRO and requests that the Court schedule an expedited hearing for August 14, 2013 or the earliest date at the Court's convenience thereafter pursuant to the Order Establishing Motion Procedure entered by this Court on August 2, 2013 [Docket No. 283] and enter the order attached to this Notice as Exhibit 1.[2] Alternatively, in light of the City's

---

[1]     Syncora and the City's respective filings regarding this matter are attached to this Notice for the Court's convenience as Exhibits 6(A)–6(I).

[2]     The TRO relates to a collateral account of which the Court has previously been made aware. (1st Day Tr. at 67:24-25 Jul. 24, 2013.) Though the City has implied that the automatic stay bars the "trapping" of cash in the collateral account pursuant to the proper operation of the Collateral Agreement, this is not the case. The cash to be prospectively trapped in the collateral account is held by a custodian (U.S. Bank) after transmittal by non-debtor casinos and is thus not property of the estate. Additionally, sections 922(d) and 362(b)(17) of the Bankruptcy Code excepts the account at issue from the automatic stay. In any event, to the extent the City intends to seek to extend the stay to cover the "trapping" function of the collateral account, it must do so

prior representations that it would stipulate to the dissolution of the TRO, Syncora respectfully

requests that this court enter the order attached to this Notice as Exhibit 1(A).


Dated:  August 8, 2013

/s/ *Ryan Blaine Bennett*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
**MCDONALD HOPKINS PLC**
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:     (248) 646-5070
Facsimile:      (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

---

through a formal motion to extend the stay, rather than attempting to prop up an invalid TRO that binds only Syncora and US Bank.

## <u>SUMMARY OF ATTACHMENTS</u>

The following documents are attached to this Motion, labeled in accordance with Local Rule 9014-1(b).

Exhibit 1             Proposed Form of Order Granting Expedited Hearing

Exhibit 1(A)          Proposed Form of Order Dissolving the Ex Parte TRO

Exhibit 2             Notice [Not Required]

Exhibit 3             None [Brief Not Required]

Exhibit 4             None [Separate Certificate of Service to be Filed]

Exhibit 5             Affidavits [None]

Exhibit 6             [Described Below]

                      Exhibit 6(A) - Syncora's Emergency Motion to Dissolve the TRO

                      Exhibit 6(B) - City's Response to Emergency Motion to Dissolve the TRO

                      Exhibit 6(C) - Syncora's Reply to Response re Emergency Motion to Dissolve TRO

                      Exhibit 6(D) - City's Brief in Opposition to Emergency Motion to Dissolve TRO

                      Exhibit 6(E) - City's Motion for Protective Order

                      Exhibit 6(F) - Syncora's Notice of Proposed Stipulated Order

                      Exhibit 6(G) - Syncora's Proposed Stipulated Order

                      Exhibit 6(H) - City's Response to Proposed Stipulated Order

                      Exhibit 6(I) - Syncora's Response to Motion for Protective Order

**Exhibit 1**

**Proposed Form of Order Granting Expedited Hearing**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |
| CITY OF DETROIT, MICHIGAN | ) |
|  | ) Chapter 9 |
| Plaintiff, | ) |
|  | ) Adversary Proceeding No. 13-[_____] |
| vs. | ) |
|  | ) Hon. Steven W. Rhodes |
| SYNCORA GUARANTEE INC.; U.S. BANK, N.A.; MGM GRAND DETROIT, LLC; DETROIT ENTERTAINMENT, LLC d/b/a MOTOR CITY CASINO HOTEL; AND GREEKTOWN CASINO, LLC | ) ) ) ) ) |
|  | ) |
| Defendants. | ) |

## [PROPOSED] ORDER GRANTING SYNCORA GUARANTEE INC'S NOTICE OF PENDENCY OF DEFENDANT SYNCORA GUARANTEE INC.'S EMERGENCY MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER AND CONDUCT EXPEDITED DISCOVERY AND *EX PARTE* MOTION FOR EXPEDITED HEARING

**IT IS HEREBY ORDERED** that Syncora Guarantee Inc.'s *Notice of Pendency of Defendant Syncora Guarantee Inc.'s Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedited Discovery and Ex Parte Motion for Expedited Hearing* is GRANTED.

**IT IS FURTHER ORDERED** that Syncora Guarantee Inc.'s *Notice of Pendency of Defendant Syncora Guarantee Inc.'s Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedited Discovery and Ex Parte Motion for Expedited Hearing* shall be heard on August 14, 2013 at 10:00 a.m.

**IT IS SO ORDERED.**

_____
STEVEN W. RHODES
United States Bankruptcy Judge

<u>**Exhibit 1(A)**</u>

**Proposed Form of Order Dissolving the Ex Parte TRO**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |
| CITY OF DETROIT, MICHIGAN | ) |
| | ) Chapter 9 |
| Plaintiff, | ) |
| | ) Adversary Proceeding No. 13-[_____] |
| vs. | ) |
| | ) Hon. Steven W. Rhodes |
| SYNCORA GUARANTEE INC.; U.S. BANK, | ) |
| N.A.; MGM GRAND DETROIT, LLC; DETROIT | ) |
| ENTERTAINMENT, LLC d/b/a MOTOR CITY | ) |
| CASINO HOTEL; AND GREEKTOWN CASINO, | ) |
| LLC | ) |
| | ) |
| Defendants. | ) |

## [PROPOSED] ORDER DISSOLVING THE JULY 5, 2013 TEMPORARY RESTRAINING ORDER OBTAINED BY PLAINTIFF CITY OF DETROIT

**IT IS HEREBY ORDERED** that the temporary restraining order (the "TRO") obtained by Plaintiff City of Detroit (the "City") on July 5, 2013 in the Circuit Court for the County of Wayne, Case No. 13-008858-CZ is dissolved.

**IT IS FURTHER ORDERED** that this Order does not resolve, and the parties reserve their rights regarding, any of the issues in the above-entitled matter that are currently in dispute, including, but not limited to, whether the City must restore monies received during the pendency of the TRO.

**IT IS SO ORDERED.**

_____
STEVEN W. RHODES
United States Bankruptcy Judge

**<u>Exhibit 2</u>**

**Notice**

**[Not Required]**

Document1

13-58846-tjt   Doc 119-2   Filed 09/09/13   Entered 09/09/13 18:46:37   Page 1 of 1
13-58846-swr   Doc 347-4   Filed 09/09/13   Entered 09/09/13 18:45:37   Page 11 of 1

100

# Exhibit 3

**None [Brief Not Required]**

**Exhibit 4**

**None [Separate Certificate of Service to Be Filed]**

## Exhibit 5

## Affidavits [None]

Document1

13-58846-tjt  Doc 1419-2  Filed 10/09/13  Entered 10/09/13 18:46:07  Page 14 of 1
13-58846-swr  Doc 347  Filed 09/05/13  Entered 09/05/13 18:45:07  Page 1 of 1

100

# Exhibit 6(A)

## Syncora's Emergency Motion to Dissolve the TRO

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| CITY OF DETROIT,<br>a Municipal Corporation Organized<br>and Existing Under the Laws of the<br>State of Michigan,<br><br>       **Plaintiff,**<br><br>   v.<br><br>SYNCORA GUARANTEE INC.,<br>a New York Corporation,<br><br>and<br><br>U.S. BANK, N.A.,<br><br>and<br><br>MGM GRAND DETROIT, LLC,<br><br>and<br><br>DETROIT ENTERTAINMENT, LLC,<br>d/b/a MOTORCITY CASINO<br>HOTEL,<br><br>and<br><br>GREEKTOWN CASINO, LLC,<br><br>       **Defendants.** | Case No.: 2:13-cv-12987-LPZ-MKM<br><br>Hon. Lawrence P. Zatkoff |

## DEFENDANT SYNCORA GUARANTEE INC.'S EMERGENCY MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER AND CONDUCT EXPEDITED DISCOVERY

Blatantly disregarding the law, the terms of its agreements, and the facts, on

July 5, 2013, the City of Detroit (the "City") filed a Motion for an *Ex Parte*

Temporary Restraining Order and an Order to Show Cause Why a Preliminary Injunction Should Not Issue (the "Motion"). Though the Motion paints the City as a victim pushed to the brink of financial disaster by Syncora Guarantee Inc. ("Syncora"), the City's Motion tells just half the story, conveniently mischaracterizing or omitting those parts that would reflect poorly on the City and its Emergency Financial Manager, Mr. Kevyn Orr. To make matters worse, the City sought the temporary restraining order on an *ex parte* basis, despite the fact that Syncora's counsel was not only known to the City, but had been sitting across the table from the City's lawyers just days before. Without Syncora standing next to it at the podium pointing out the egregious misrepresentations and omissions contained in its papers, the City easily obtained a TRO that destroyed the status quo by releasing $15 million in collateral funds that the insolvent City presumably has dissipated, never to be recovered. Syncora now brings the instant motion pursuant to Rules 65(b)(4) and 26(d)(1) and respectfully requests that the Court grant its motion dissolving the temporary restraining order and seeking expedited discovery regarding the City's allegations and restore the *status quo ante* by ordering the City to return to the General Receipts Subaccount the funds that U.S. Bank was ordered to release.

    Counsel for Syncora hereby certifies pursuant to Local Rule 7.1(a)(2) and 37.1 that Stephen C. Hackney, counsel for Syncora, attempted to confer with

counsel for the City and U.S. Bank, N.A. ("U.S. Bank"). On July 11, 2013, Stephen Hackney, litigation counsel for Syncora, sent an email to Robert Hertzberg, Thomas F. Cullen, and Gregory Shumaker as counsel for the City, requesting their agreement that the Parties engage in expedited discovery and noting the emergency nature of the request. The same email was also sent to William Smith, counsel to U.S. Bank. U.S. Bank indicated that it was unable to concur in the motion, given its role as custodian. Counsel for Syncora and Counsel for the City held a telephone conference at 1:30 pm Eastern Time and again at 2:00 pm Eastern Time. During those calls, Mr. Hackney explained the nature of Syncora's motion and request and asked the City's attorneys if they would be willing to dissolve the temporary restraining order, restore the monies distributed from the account, and agree to an expedited discovery schedule. The City's attorneys indicated that they would probably be amenable to dissolving the temporary restraining order but would not be willing to restore the funds to the General Receipts Subaccount. Mr. Hackney explained that this condition was necessary to restore the *status quo ante*; however, the City still refused to concur in this action. At the conclusion of the call, the City's attorneys stated that Syncora could represent to the Court that the City did not agree to restore the *status quo ante* or to an expedited discovery schedule.

3

## BRIEF IN SUPPORT OF SYNCORA'S EMERGENCY MOTION

### Issues Presented

1.     Whether the Court should dissolve a temporary restraining order that was obtained under false pretenses and is legally deficient on its face.

2.     Whether good cause exists for expedited discovery given the expedited nature of the injunctive proceedings and the fact that the City's amorphous and conclusory allegations are wholly lacking in detailed factual support.

## Relevant Authority

## The Court Should Dissolve the Temporary Restraining Order

Federal Rule of Civil Procedure 65(b)(4) states that "[o]n two days' notice to the party who obtained the order without notice—or on shorter notice set by the court—the adverse party may appear and move to dissolve or modify the order."

## Good Cause Exists for Expedited Discovery in Injunctive Proceedings

Federal Rule of Civil Procedure 26(d)(1) states that "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order."

The 1993 advisory committee notes to Rule 26 state that orders authorizing expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction."

*Ellsworth Associates, Inc. v. United States*, 917 F. Supp. 841, 844 (D. D.C 1996), states that "[e]xpedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *See also U.S. Securities and Exchange Commission v. Wilson*, 2012 WL 5874456, at *4 (E.D. Mich. Nov. 20, 2012).

## I.    THE COURT SHOULD DISSOLVE THE TEMPORARY RESTRAINING ORDER THAT THE CITY OBTAINED ON AN *EX PARTE* BASIS.

### A.    The City's Sharp Tactics Lead to the Entry of a Breathtakingly Broad Temporary Restraining Order on an *Ex Parte* Basis.

As the City tells it, it had no choice but to file the Motion after Syncora allegedly "instructed" U.S. Bank to trap the funds in the General Receipts Subaccount.  (Mot. at 7-9.)  According to the City, after the cash trapping began, settlement negotiations were held that were not "productive" because Syncora declined to make a "proposal."  (*Id*. at 8.)  Claiming that it faced financial ruin if the funds in the General Receipts Subaccount were not released, the City filed a Motion asking a court to do just that.  (*Id*. at 10-13.)

Significantly, the City never provided Syncora with notice of this Motion. (Ex. A, Snyder Dec., ¶ 12; Ex. B, Schwarzman Dec., ¶ 7.)  The failure to give notice in this instance is particularly offensive because Syncora's counsel were not only known to the City, they had *met* with the City to discuss the issues between the parties just days earlier.  (Ex. A, Snyder Dec., ¶ 11; Ex. B, Schwarzman Dec., ¶¶ 4-5.)  And Mr. Orr's affidavit nowhere explains what emergency faced the City that was so compelling that it could not wait even an hour or two to see if any of the half-dozen Syncora lawyers known to the City could be raised by email or telephone.  It is now clear why — the City knew that Syncora would be able to expose the City and reveal to the court the falsehoods and half-truths littered

6

throughout the Motion.[1]  Because of the City's less than forthright tactics, Syncora was not present at the hearing and thus unable to contradict the City's innacurate version of events.

Central to the City's case is Syncora's June 17th letter to U.S. Bank. According to the City, Syncora's letter "instructed" U.S. Bank to trap the funds in the General Receipts Subaccount and, by doing so, Syncora tortiously interfered with the City's contractual and business relations.  (Mot. at 7 (claiming that Syncora "demanded" that U.S. Bank trap in the General Receipts Subaccount all monies that would otherwise flow to the City).)  And yet even a cursory review of the letter reveals that Syncora never instructed or demanded that U.S. Bank take any action.  (*See* Ex. D to Orr. Aff., 6/17/13 letter from C. LeBlanc to S. Brown.) In fact, the letter merely memorializes a prior conversation between Syncora and U.S. Bank in which U.S. Bank expressed its independent view that the Service Corporation's default in not making a $40 million payment to the Certificate of Participation holders triggered a cross-default under the Swap Agreement which led to *automatic* cash trapping under the Collateral Agreement.  (*Id*.)  U.S. Bank has never disputed that that conversation took place.  (*See, e.g.,* Ex. E to Orr Aff., 6/24/13 email from W. Smith (U.S. Bank).)

---

[1] An additional reason the City likely did not notify Syncora is that it feared Syncora would immediately see through the City's transparently fraudulent joinder of the non-diverse Casino Defendants and remove the case.  (*See* Syncora's Notice of Removal to United States District Court, filed on July 11, 2013.)

7

The City's misrepresentations regarding the impact of the letter do not end there.  Ignoring the unambiguous language of the Collateral Agreement, the City claims that the cash trap occurs only when a party to the Collateral Agreement demands it.  (Mot. at 16.)  The Collateral Agreement clearly states, however, that the cash trap occurs *automatically* upon an Event of Default under a Hedge.  The language is unambiguous:

**Section 5.4**        **When Payments from General Receipts Subaccount Prohibited**

     (a)      **No payment shall be made to the City from the General Receipts Subaccount**

         (i)      on and after the Term Period End Date or

         (ii)      on or after the occurrence of a Termination Event under a Hedge where the related [Swap] Counterparty is not the sole Affected Party *except* as otherwise permitted by subsection (b), below or

         (iii)      while an Event of Default is continuing under a Hedge where the related [Swap] Counterparty is not the sole Defaulting Party.

(Ex. B to Orr. Aff, Collateral Agreement § 5.4(a)(i)-(iii) (emphasis added).)  No provision in the Collateral Agreement requires that section 5.4's provisions be invoked by notice — to the contrary, the provision operates automatically by design.  Thus, there was nothing sinister or improper about Syncora's letter to the U.S. Bank.  Syncora simply confirmed that U.S. Bank acted in accordance with the

Collateral Agreement and enacted a procedure meant to protect Syncora and the Swap Counterparties from the City's inability to meet its financial obligations.

In addition to the contents of the letter and the operation of the Collateral Agreement, the City also misrepresents the parties' discussions surrounding it. In its Motion, the City claims that discussions with Syncora had stalled and that, if the Court did not immediately grant the City's Motion, the City would suffer irreparable harm. (Mot. at 8, 10-13.) This claim is false on a number of different levels.

To begin, Syncora was not unwilling to negotiate with the City. In fact, it was Syncora who suggested that the parties work together to resolve the dispute consensually. (*See* Ex. H to Orr. Aff., 6/26/13 letter from C. LeBlanc to K. Orr ("As we have already communicated to your representatives, we are open to exploring the possibility of a mutually satisfactory resolution of the issues surrounding the revenues in the General Receipts Subaccount.").)

In addition, the negotiations between the City and Syncora had not stalled. To the contrary, they had barely begun when the City filed its Motion. (Ex. A, Snyder Dec., ¶¶ 7-12; Ex. B, Schwarzman Dec., ¶¶ 3-7.) Indeed, the parties were in the process of executing a non-disclosure agreement ("NDA") that would have allowed them to commence the negotiations in earnest. (Ex. A, Snyder Dec., ¶¶ 10-12; Ex. B, Schwarzmann Dec., ¶¶ 3-7.) Contrary to the City's suggestion that

9

"no proposal was forthcoming" from Syncora, the facts will show that Syncora was never able to make its proposal because the City curiously refused to agree to a standard NDA that would have required the City to hold the proposal in confidence.  (Ex. B, Schwarzman Dec., ¶ 5.)

The City's inexplicable refusal to agree to an industry-standard term of a vanilla NDA, viewed in hindsight, reveals that the City and Mr. Orr never intended to engage in good-faith negotiations in the first place.  Instead, the City used the carrot of further negotiations to string Syncora along and lull it into a false sense of security — all while the City was surreptitiously preparing its Motion.

Indeed, the City revealed its true intentions on July 5th — the Friday of the July 4th holiday weekend.  That afternoon, the City filed the Motion and requested an immediate *ex parte* hearing for its temporary restraining order.  At the hearing, the City claimed that it did not have time to notify Syncora of the Motion and the hearing.  (*See Ex Parte* Restraining Order and Order to Show Cause Why A Preliminary Injunction Should Not Issue ("*Ex Parte* Restraining Order"), ¶ 6.) Like many of the City's statements, this too was false.

In fact, the City had been communicating with Syncora's counsel on an almost daily basis as the parties negotiated an NDA aimed at furthering discussions.  (Ex. A, Snyder Dec., ¶ 11; Ex. B, Schwarzman Dec., ¶ 4.) Nevertheless, before filing a Motion that it had obviously prepared many days in

10

advance, the City made no effort to contact Syncora. (Ex. A, Snyder Dec., ¶ 12; Ex. B, Schwarzman Dec., ¶ 7.)  It did not pick up the phone.  (Ex. A, Snyder Dec., ¶ 12; Ex. B, Schwarzman Dec., ¶ 7.)  Nor did it send an email.  (Ex. A, Snyder Dec., ¶ 12; Ex. B, Schwarzman Dec., ¶ 7.)  Not surprisingly, the City never explains why it could not have done so.  The Motion papers are long and detailed and were clearly in the works days before July 5th.  And yet no one gave Syncora's counsel a courtesy call advising them that the Motion was coming.  (Ex. A, Snyder Dec., ¶ 12; Ex. B, Schwarzman Dec., ¶ 7.)  Conveniently though, the City had no difficulties emailing Syncora the temporary restraining order just minutes after it had been entered.  (Ex. A, Snyder Dec., ¶ 12; Ex. B, Schwarzman Dec., ¶ 7)

Despite the wholly improper nature of the City's tactics, its strategy succeeded.  With no party present to contest the City's half-truths, the court entered an order granting the City's requested relief.  (*See Ex Parte* Restraining Order.)  In doing so, however, the court issued a temporary restraining order that is breathtaking in a number of respects.

*First*, the impetus for the court's temporary restraining order is Syncora's letter to U.S. Bank.  (*Id* ¶ 1.)  Significantly though, the court's order contains no findings that Syncora's letter was improper, untruthful, or in violation of any of the numerous agreements to which Syncora is a party.  Nor does the City allege that anything Syncora said in its letter was untrue.  In other words, the court has

penalized Syncora — a direct and third-party beneficiary to the agreements making up the COPs/Swap structure with hundreds of millions of dollars at risk — for sending an entirely truthful letter to U.S. Bank on the subject of a Collateral Agreement that is fundamental to the entire structure.

*Second*, the court's temporary restraining order did not *preserve* the status quo, it *destroyed* it. Where, as here, an event of default has occurred, the Collateral Agreement *automatically* acts to bar distributions from the General Receipts Subaccount. (*See* Ex. B to Orr. Aff, Collateral Agreement § 5.4(a)(i)-(iii).) Thus, the *status quo ante* just prior to the filing of the Motion was that U.S. Bank was properly trapping cash under section 5.4 of the Collateral Agreement. The court's temporary restraining order violates the provisions of this agreement and allows the funds in the General Receipts Subaccount to flow out and be dissipated by the allegedly insolvent City of Detroit which, in turn, causes irreparable harm to Syncora. The state court thus destroyed the status quo and allowed $15 million to be distributed to the City without even giving Syncora a chance to be heard. Worse, the Court found the City need not provide a bond to protect Syncora in the interim.

*Third*, the temporary restraining order states that it "shall remain in full force and effect until this Court specifically orders otherwise." (*Ex Parte* Restraining Order at 3.) Yet, under Michigan law, a temporary restraining order may not

exceed 14 days except for good cause shown. MICH. COMP. LAWS § 3.310(B)(3). In its order, however, the court never stated that it had good cause to extend the time that the temporary restraining order remained in effect. (*See Ex Parte* Restraining Order.)

*Fourth*, the temporary restraining order is written so broadly that it actually restricts Syncora's rights under the relevant contracts and the First Amendment. Read literally, the terms of the temporary restraining order do not allow Syncora to publicly express its view regarding how the Collateral Agreement should operate. (*Id.* at 3.) For example, in even suggesting (without basis) that the court fashion a remedy allowing the City to evade its Irrevocable Instructions, the City has violated section 5.1(b) of the Collateral Agreement, which prohibits it from taking "*any action* to redirect the revenues contrary to the Irrevocable Instructions." This in turn constitutes a new default under section 5(a)(iii)(3) of the Swap, which should automatically trap cash under section 5.4(a)(iii) of the Collateral Agreement. Under the temporary restraining order, Syncora is forbidden from making observations to U.S. Bank regarding these developments. As such, the temporary restraining order is a stunning display of prior restraint.

**B.    The City's Legal Theory Wholly Ignores Critical Amendments to the Swap Agreement that Establish Syncora's Right to Consent to any Waivers to the Collateral Agreement's Automatic Cash Trapping Provisions.**

The City's claims are based on its apparent belief that the Collateral Agreement does not provide Syncora with "the right to direct the custodian's conduct with respect to the collateral." (*See*, *e.g.*, Mot. at 15.)  According to the City, because Syncora has no such rights, its alleged interference with the City's contractual and business relations was unjustified and improper.  (*Id.* at 16-18.) The City ignores, however, that Syncora has consent rights regarding the waiver and amendment of provisions under the Collateral Agreement via the Swap Agreements.  Moreover, these rights arose *specifically in connection with* the 2009 transaction that led to the creation of the Collateral Agreement in the first instance. Syncora's consent rights arose in the following manner.

Part 3(d) of the Amended and Restated Schedule to the 1992 ISDA Master Agreement (the "Amended Swap") provides that the Collateral Agreement is one of two "Credit Support Documents."  (Ex. C, Amended Swap.)  Part 5(d) of the Amended Swap then modifies Section 8(b) of the ISDA Master Agreement (the "Swap").  (Ex. D, the Swap.)  Part 5(d) amended Section 8(b) so that it now reads as follows:

> **No amendment, modification or waiver in respect of this Agreement or any Credit Support Document** [*e.g.,* the Collateral Agreement] will be effective unless in writing (including a writing

14

evidenced by a facsimile transmission) and executed by each of the parties **and the Swap Insurer** [*e.g.,* Syncora] or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

Part 5(k) of the Amended Swap further states:

> Party A [Swap Counterparty] and Party B [Service Corporation] hereby each acknowledge and agree that the Swap Insurer shall be an express third-party beneficiary (and not merely an incidental third party beneficiary) of this Agreement and of the obligations of each such party under any Insured Rate Swap Transaction, and as such, entitled to enforce the Agreement and the terms of any such Insured Rate Swap Transaction against such party on its own behalf and otherwise shall be afforded all remedies available hereunder or otherwise afforded by law against the parties hereto to redress any damage or loss incurred by the Swap Insurer.

(Ex. C, Amended Swap, Part 5(k).)

Read together, these provisions make clear that the provisions of the Collateral Agreement cannot be amended, waived, or modified unless (1) done in writing and (2) that writing is executed by the parties *and* Syncora. Syncora is further able to enforce this term of the Swap via the express enforcement rights it is provided under the Amended Swap. (*Id.*)

As a result, the City is incorrect to claim that Syncora has no right to direct U.S. Bank's conduct, even if Syncora had done so, which it did not. In fact, U.S. Bank could not take any action that was in conflict with the express terms of the Collateral Agreement — *i.e.*, releasing funds from the General Receipts Subaccount after an Event of Default under a Hedge — without first obtaining the consent of Syncora, even where, as here, the Swap Counterparties have apparently

been secretly waiving the cash trapping requirements of section 5.4 of the Collateral Agreement. (Ex. A, Snyder Dec., ¶ 7.)

In yet another display of a surprising lack of candor with the state court, the City *never mentioned* these provisions in its papers and worse, never attached the amended Swap Agreement to its pleadings. The City thus purposely left the state court in the dark regarding the central legal provision that defeats the City's claims. It is obvious that the City did not want Syncora's counsel in attendance on July 5, 2013, because it knew Syncora's counsel would give the lie to the entire premise of the City's Verified Complaint.

### C.    The City Failed to Demonstrate that It was Entitled to Injunctive Relief.

Courts consider injunctive relief to be an extraordinary remedy that is necessary only where justice requires, an adequate remedy at law does not exist, and there is real and imminent danger of irreparable injury. *Kernen v. Homestead Dev. Co.*, 232 Mich. App. 503, 509 (1998). To determine whether injunctive relief is necessary, courts weigh "(1) the likelihood that the party seeking the injunction will prevail on the merits; (2) the danger that the party seeking the injunction will suffer irreparable harm if the injunction is not issued; (3) the risk that the party seeking the injunction would be harmed more by the absence of the injunction than the opposing party would be by the granting of the relief; and (4) the harm to the public interest if the injunction is issued." *Michigan AFSCME Council 25 v.*

16

*Woodhaven-Brownstown Sch. Distr.*, 293 Mich. App. 143, 148 (2011).   As demonstrated above, all four of these factors weigh in favor of Syncora.

*First*, the City is not likely to prevail on the merits of its claims.   The complaint upon which the TRO was issued descends entirely from the premise that Syncora has no rights with respect to the Collateral Agreement at issue.   That premise is clearly and unambiguously refuted by Section 8(b) of the Amended Swap Agreement, which clearly gives Syncora the right to consent to any waivers, modifications, or amendments of the Collateral Agreement.

*Second*, the City's irreparable harm allegations are amorphous and unsubstantiated.   The City's generalized liquidity crisis is years in the making and does not constitute "irreparable" harm attributable to Syncora.   Nor does the City explain how Syncora's truthful letter has "constrained" its ongoing negotiations.   Furthermore, Syncora was not, as the City claims, even responsible for the cash trap — that procedure was meant to operate automatically under the Collateral Agreement.

*Third*, while the City has failed to specify what harm, if any, it suffered as a result of the cash trap, Syncora's irreparable harm is obvious and quantifiable — collateral that should be trapped is being dissipated by an insolvent City, never to be recovered.

*Fourth*, the City failed to demonstrate any harm to the public interest that was not already occurring due to the fact that the City currently is insolvent and unable to pay its debts when they become due.   The greater public harm is permitting a public official — who has no check on his power — to act outside the bounds of the law and attempt to violate Syncora's First Amendment and contractual rights.   No matter how dire the circumstances, the rule of law must apply.

## II.   THE CITY'S AMORPHOUS FACTUAL ALLEGATIONS REQUIRE EXPEDITED DISCOVERY.

### A.   The City's Motion and Complaint Lack the Factual Information Necessary to Assess the City's Claim for Injunctive Relief.

At the heart of this case is the letter that Syncora delivered to U.S. Bank on June 17, 2013.   Though this letter simply informed U.S. Bank that the Service Corporation's failure to make scheduled payments constituted an event of default that *automatically* operated to bar distributions from the General Receipts Subaccount (Ex. D to Orr. Aff.), the City claims that the alleged impact of this letter — the trapping of the cash in the General Receipts Subaccount — would cause it irreparable harm unless the court issued injunctive relief.  (Mot. at 10-13.) In support of this argument, the City's Motion and Verified Complaint attempt to explain (a) the harm that it will suffer; (b) whether that harm is irreparable; (c) the City's likelihood of success on the merits; and (d) the harm to the public interest.

18

(*Id*. at 10-19.)  Notably though, for each of these factors, the City fails to provide the information necessary to determine whether a preliminary injunction should issue.

> ### i.  The City Fails to Provide All of the Information That Is Necessary to Determine the Harm that the City Will Suffer and Whether that Harm is Irreparable.

In its Motion and Complaint, the City argues that it will suffer irreparable harm unless the Court issues a temporary restraining order and preliminary injunction.  (*Id*. at 10-13.)  Except for a few conclusory statements, however, the City never explains how and why it would suffer irreparable harm.

For example, the City claims that the cash trap has "greatly constrained" the Emergency Manager's ability to engage in discussions with City stakeholders and will cause the City to lose unique and irreplaceable opportunities to settle with the stakeholders.  (*Id*. at 10-11.)  Apparently, Syncora and the Court are expected to take Mr. Orr at his word, because his affidavit does not detail the negotiations nor explain how the City has been "greatly constrained," making it difficult to assess whether and how Syncora's two-paragraph confirmatory letter has caused irreparable harm.  Nor does the City explain which stakeholder demands, if any, the City will not be able to meet as a result of the cash trap.

In addition, the City claims that its negotiations with the Swap Counterparties "are particularly at risk without intervention by the Court."  (*Id*. at

11.)  According to the City, the Emergency Manager had reached an agreement in principle with the Swap Counterparties that the cash trap threatened to destroy. (*Id.*)  This is news to Syncora, which has been wholly and unjustifiably excluded from the City's negotiations with the Swap Counterparties — negotiations with which it is now alleged to have tortiously interfered.  (Ex. A, Snyder Dec., ¶ 7.) Consistent with the theme, the City does not provide any information about the negotiations between the parties or the terms of the tentative agreement.  Without this information, it is impossible to assess the City's claim that the cash trap actually threatens the City's negotiations with the Swap Counterparties and, if so, how much harm it would cause.

Finally, the City claims that its "inability to access the Casino Revenues has immediate consequences for its ability to provide even basic city services such as police, fire, and emergency medical services."  (Mot. at 12.)  Despite this dire prediction, the City does not identify exactly what those "immediate consequences" are, what services it would not be able to provide, and when it would need to cut them.

       **ii.**     **The City Fails to Provide All of the Information That Is Necessary to Determine Whether the City is Likely to Succeed on the Merits of its Claims.**

In its Motion and Complaint, the City argues that it is likely to succeed on the merits of its declaratory judgment and tortious interference claims.  For both of

these claims, however, the City fails to provide essential information that is necessary to assess the City's likelihood of success.

*First*, the City claims that it is likely to succeed on the merits of its declaratory judgment claim regarding rights under the Collateral Agreement. (*Id.* at 15-16.)   According to the City, notwithstanding the unambiguous language requiring cash-trapping, Syncora was wrong to request after-the-fact confirmation of U.S. Bank's independent determination that it had a duty, under Section 5.4(a)(iii) of the Collateral Agreement, to withhold funds in the event of a cross-default under the Swap Agreement. (*Id.* at 16.)   And yet, in support of this argument, the City does not provide any evidence demonstrating the duties of U.S. Bank or how it would have handled the Event of Default without Syncora's letter.   Nor does the City rebut Syncora's claim that U.S. Bank expressed its intention to trap cash *prior to* Syncora's letter. (*See* Ex. D to Orr Aff., 6/17/13 letter from C. LeBlanc to S. Brown.)

*Second*, the City claims that it is likely to succeed on the merits of its tortious interference claims. (Mot. at 17.)   In particular, the City claims that it will be able to establish that Syncora's letter led to the collapse of the negotiations between the City and the Swap Counterparties. (*Id.*)   The City never explains, however, how this letter led to the collapse of the negotiations.   Nor does the City point to any communications from the Swap Counterparties establishing that the

collapse is attributable to Syncora's letter.  And, most significantly, the City never identifies any breach of the Collateral Agreement that was caused by Syncora or its letter.

> ### iii.   The City Fails to Provide All of the Information That Is Necessary to Determine the Harm to the Public Interest.

In its Motion and Complaint, the City argues that granting the temporary restraining order and preliminary injunction will help avoid serious harm to the public interest.  (*Id.* at 18.)  In particular, the City claims that losing access to the Casino Revenues will (a) frustrate its ability to successfully negotiate with its stakeholders and (b) lead to the collapse of vital City services.  (*Id.* at 18-19.)

As noted above, however, the City fails to provide the information necessary to assess its claim.  For example, it does not identify which stakeholders it will lose the ability to negotiate with.  Similarly, it does not identify which vital City services will collapse as a result of the cash trap.  Instead, the City relies on general statements — *i.e.*, "Without immediate access to the Casino Revenues, the City will be unable to move forward with the Emergency Manager's plan for resolving the crisis" — that lack any supporting evidence.

> ### B.   Good Cause Exists for Expedited Discovery.

As a general rule, "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)[.]"  FED. R. CIV. P. 26(d)(1).  However, courts have wide discretion with respect to discovery and may order

expedited discovery prior to a Rule 26(f) upon a showing of good cause.  *Id.*;

*Arista Records, LLC v. Does 1-4*, 2007 WL 4178641, at *1 (W.D. Mich. Nov. 20,

2007); *see also Ellsworth Associates, Inc. v. United States*, 917 F. Supp. 841, 844

(D.D.C. 1996).

The advisory committee notes further explain that orders authorizing

expedited discovery "will be appropriate in some cases, such as those involving

requests for a preliminary injunction."  FED. R. CIV. P. 26 advisory committee

notes (1993).  Much of the case law echoes these advisory notes, as courts have

routinely found that "[e]xpedited discovery is particularly appropriate when a

plaintiff seeks injunctive relief because of the expedited nature of injunctive

proceedings."  *Ellsworth Associates, Inc.*, 917 F. Supp. at 844; *see also Arista

Records, LLC*, 2007 WL 4178641, at *1; *U.S. Securities and Exchange

Commission v. Wilson*, 2012 WL 5874456, at *4 (E.D. Mich. Nov. 20, 2012);

*Edudata Corp. v. Scientific Computers, Inc.*, 599 F. Supp. 1084, 1088 (D. Minn.

1984), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 429 (8th Cir. 1984)

(ordering expedited discovery on the grounds that "[f]urther development of the

record before the preliminary injunction hearing will better enable to court to judge

the parties' interests and respective chances for success on the merits").  For this

reason, parties to a preliminary injunction are often able to establish good cause for

expedited discovery.  *See*, *e.g.*, *Ellsworth Associates, Inc.*, 917 F. Supp. at 844.

In this case, good cause exists for expedited discovery. *First,* as discussed above, the City has failed to include in its Motion and Complaint much of the information necessary to assess its claim for a preliminary injunction. Expedited discovery is therefore necessary for the parties to develop the evidentiary record in advance of the preliminary injunction hearing. Without this discovery, both the parties and the Court will not be able to assess the parties' interests and respective chances for success on the merits. *Edudata Corp.*, 599 F. Supp. at 1088. *Second,* because this dispute has arisen in the context of a preliminary injunction, the parties will not be able to complete all of the necessary discovery unless it is performed on an expedited schedule. *See Ellsworth Associates, Inc.*, 917 F. Supp. at 844. *Third,* Syncora's contemplated discovery requests — attached as Exhibits E-S — are tailored to the specific issues in this case and seek only that information which is necessary to determine whether injunctive relief is necessary. Thus, they will not impose an undue burden on the City or any third-parties.

WHEREFORE, for the foregoing reasons, Syncora respectfully requests that the Court grant its Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedited Discovery and restore the *status quo ante* by ordering the City to return to the General Receipts Subaccount the funds that U.S.

Bank was ordered to release.  A copy of the discovery requests Syncora intends to

serve is attached as Exhibits E-S.


Dated:  July 12, 2013                    Respectfully submitted,

                                    By:  /s/ Gerard V. Mantese
                                         Gerard V. Mantese (P34424)
Stephen C. Hackney                       Ian M. Williamson (P65056)
Ryan Blaine Bennett                      Brendan H. Frey (P70893)
William E. Arnault                       Mantese Honigman Rossman and
Lally A. Gartel                          Williamson, P.C.
KIRKLAND & ELLIS LLP                     1361 East Big Beaver Road
300 North LaSalle                        Troy, Michigan 48083
Chicago, Illinois 60654                  Phone: 248-457-9200
Telephone: (312) 862-2000                Fax: 248-457-9201
Facsimile: (312) 862-2200

*ATTORNEYS FOR DEFENDANT*                 *ATTORNEYS FOR DEFENDANT*
*SYNCORA GUARANTEE, INC.*                 *SYNCORA GUARANTEE, INC.*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CITY OF DETROIT, a Municipal
Corporation Organized and Existing
Under the Laws of the State of Michigan,

        Plaintiff,

    v.

SYNCORA GUARANTEE INC.,

and

U.S. BANK, N.A.,

and

MGM GRAND DETROIT, LLC,

and

DETROIT ENTERTAINMENT, LLC
d/b/a MOTORCITY CASINO HOTEL,

and

GREEKTOWN CASINO, LLC,

        Defendants.

Case No.:  2:13-cv-12987

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 12, 2013, I caused the foregoing papers to be filed with the

Clerk of the Court using the ECF system and served the following parties via U.S. Mail and

Electronic Mail at the following addresses:

| | |
|---|---|
| **MGM Grand Detroit, LLC** | **U.S. Bank, N.A.** |
| Resident Agent: CSC-Lawyers | William Smith, Esq. |
| Incorporating Service Co. | wsmith@mwe.com |
| 601 Abbot Road | |
| East Lansing, MI 48823 | |

**Greektown Casino, LLC**
Resident Agent: Olisaeloka Dallah
555 E. Lafayette Street
Detroit, MI 48226

**Detroit Entertainment, LLC d/b/a Motorcity Casino Hotel**
Resident Agent: Cheryl Scott-Dube
2901 Grand River Ave.
Detroit, MI 48201

**City of Detroit**
Robert S. Hertzberg
hertzbergr@pepperlaw.com
Deborah Kovsky-Apap
kovskyd@pepperlaw.com
Thomas F. Cullen, Jr.
tfcullen@jonesday.com
Gregory M. Shumaker
gshumaker@jonesday.com
Geoffrey S. Stewart
gstewart@jonesday.com

I declare under the penalty of perjury that the foregoing statements are true to the best of my knowledge, information, and belief.

_/s/Gerard V. Mantese_____
Gerard V. Mantese

## INDEX OF EXHIBITS

**Ex. A** - Declaration of Todd Snyder

**Ex. B** - Declaration of Alexandra Schwarzman

**Ex. C** - Amended Swap

**Ex. D** - Swap

**Ex. E** - Defendant Syncora Guarantee Inc.'s First Set of Document Requests to the City of Detroit

**Ex. F** - Schedule A to Third-Party Subpoena to the Detroit General Retirement System Service Corporation

**Ex. G -** Schedule A to Third-Party Subpoena to Detroit Police and Fire Retirement System Service Corporation

**Ex. H** - Schedule A to Third-Party Subpoena to UBS AG

**Ex. I** - Schedule A to Third-Party Subpoena to Ernst & Young LLP

**Ex. J** - Schedule A to Third-Party Subpoena to Jones Day LLP

**Ex. K** - Schedule A to Third-Party Subpoena to SBS Financial Products Company, LLC

**Ex. L** - Defendant Syncora Guarantee Inc.'s First Set of Document Requests to U.S. Bank

**Ex. M** - Schedule A to 30(b)(6) Deposition of Detroit General Retirement System Service Corporation

**Ex. N** - Schedule A to 30(b)(6) Deposition of the Detroit Police and Fire Retirement System Service Corporation

**Ex. O** - Defendant Syncora Guarantee Inc.'s Notice of Deposition of Kevyn D. Orr

**Ex. P** - Schedule A to 30(b)(6) Deposition of SBS Financial Products Company, LLC

**Ex. Q** - Notice of Deposition of U.S. Bank National Association Pursuant to Rule 30(b)(6)

**Ex. R** - Schedule A to 30(b)(6) Deposition of UBS AG

**Ex. S** - Notice of Deposition of Plaintiff City of Detroit Pursuant to Rule 30(b)(6)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan,** | |
| Plaintiff, | |
| v. | Case No.: 2:13-cv-12987-LPZ-MKM |
| **SYNCORA GUARANTEE INC., a New York Corporation** | Hon. Lawrence P. Zatkoff |
| and | |
| **U.S. BANK, N.A.,** | |
| and | |
| **MGM GRAND DETROIT, LLC,** | |
| and | |
| **DETROIT ENTERTAINMENT, LLC, d/b/a MOTORCITY CASINO HOTEL,** | |
| and | |
| **GREEKTOWN CASINO, LLC,** | |
| Defendants. | |

## DECLARATION OF TODD R. SNYDER

I, Todd R. Snyder, hereby declare that I am an adult and have personal knowledge of the following:

1.    I am the Executive Vice Chairman of Rothschild Inc. and Co-Chair of its North American Debt Advisory and Restructuring Group.

2.    I was involved in the discussions between Syncora Guarantee Inc. ("Syncora") and the City of Detroit (the "City") regarding U.S. Bank's decision to trap the funds in the

General Receipts Subaccount.   My declaration describes these discussions and the events surrounding them.

3.      On June 17, 2013, Syncora sent U.S. Bank a letter memorializing a prior conversation between Syncora and U.S. Bank in which U.S. Bank expressed the view that it would not make any payment to the City from the General Receipts Subaccount while an Event of Default is continuing under a Hedge. (*See* Ex. D to Orr. Aff., 6/17/13 letter from C. LeBlanc to S. Brown.)  I was personally a party to the referenced conversation, which took place in Detroit on June 14, 2013, and involved myself, William Smith (counsel to U.S. Bank N.A.), and Ryan Bennett (counsel to Syncora).  During that conversation, which was witnessed by a number of individuals, including representatives of U.S. Bank, Mr. Bennett expressed his understanding that the City's failure to make the $40 million payment to the Service Corporations, would cause the Service Corporation's to default on their interest payment to the Certificates of Participation and would also constitute a cross-default under the Swap Agreement, triggering automatic cash trapping under the Collateral Agreement.  Neither Mr. Smith nor his client disagreed with Mr. Bennett, and Mr. Smith added words to the effect of "The cash ain't going anywhere until there is resolution."

4.      After several communications between Syncora, the City, and U.S. Bank regarding the propriety of trapping the cash under the Collateral Agreement, representatives from Syncora and the City held an in-person meeting on June 27, 2013.  We understood that the primary purpose of this meeting was to discuss the statements made by the City's Emergency Manager during his June 14, 2013 creditors' meeting.  It soon became clear, however, that the City's representatives were most interested in discussing U.S. Bank's recent decision to trap the funds in the General Receipts Subaccount.

5.      Initially, the City maintained that Syncora was solely responsible for the U.S. Bank's decision.  While Syncora explained that the City was mistaken in its view, given the automatic aspects of the cash trapping provisions in the Collateral Agreement, Syncora stated that it was willing to work with the City to craft a mutually satisfactory resolution to the issues surrounding the funds in the General Receipts Subaccount.  As the parties continued to discuss this issue, we reiterated our desire to engage in constructive discussions surrounding a potential settlement — a point that I personally communicated to City representatives during a break in the meeting.

6.      During the meeting, the City representatives seemed amenable to such discussions and asked Syncora to provide the City with a proposal.  The City further explained that this issue presented immediate concerns and asked us to put together our proposal as quickly as possible.

7.      The next morning I contacted one of the City's representatives and informed him that we had started to create a settlement proposal.  I explained, however, that we could not provide the City with anything more than a rough outline of our proposal unless we better understood what the City and the Swap Counterparties had been discussing about a discounted payoff of the termination liability for the Collateral Agreement.  As we had only recently discovered, the City had been negotiating with the Swap Counterparties, who, it appears, were secretly purporting to waive the cash trapping requirements of section 5.4 of the Collateral Agreement.  However, the City had never notified us of these negotiations or explained what the parties had been discussing.  The City representative stated that he understood why we needed that information but would need to speak with Ken Buckfire, the individual conducting the negotiations with the Swap Counterparties on behalf of the City.

3

8.      At that time, we tried calling Mr. Buckfire but were unable to reach him. He was unavailable for the rest of the business day. As a result, we set up a conference call for the following day.

9.      During my June 29, 2013 conference call with Mr. Buckfire, I explained that we needed one or two data inputs from the City in order to complete our proposal. Mr. Buckfire stated that he was not willing to share the data I requested and instead requested details of our proposal. I described, at a high level, the structure of our proposal. In response, he asked for greater financial detail regarding our proposal. I explained, though, that it was impossible to provide greater financial detail unless we first received some limited data from the City — which is exactly why we had made such a request.

10.     Despite this explanation, Mr. Buckfire remained unwilling to provide the requested information. He stated, however, that he would consider providing the requested data after the parties executed a non-disclosure agreement ("NDA").

11.     Accordingly, that day, attorneys for Syncora and the City began negotiating the terms of this NDA. My understanding is that over the next few days Syncora and the City exchanged a draft of a proposed NDA and held numerous discussions regarding its terms.

12.     While these discussions were still ongoing, on July 5, 2013, the City filed its Motion for an *Ex Parte* Temporary Restraining Order and an Order to Show Cause Why a Preliminary Injunction Should Not Issue (the "Motion"). Though representatives for the City and Syncora had been talking almost daily, the City never notified Syncora that it intended to file a Motion. Instead, Syncora first learned of the Motion when the City emailed Syncora the temporary restraining order minutes after it was entered.

4

_____
                    Todd R. Snyder

Executed this 12 day of July, 2013.

5

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| **CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan,** | |
| **Plaintiff,** | |
| **v.** | **Case No.: 2:13-cv-12987-LPZ-MKM** |
| **SYNCORA GUARANTEE INC., a New York Corporation,** | **Honorable Lawrence P. Zatkoff** |
| **and** | |
| **U.S. BANK, N.A.,** | |
| **and** | |
| **MGM GRAND DETROIT, LLC,** | |
| **and** | |
| **DETROIT ENTERTAINMENT, LLC, d/b/a MOTORCITY CASINO HOTEL,** | |
| **and** | |
| **GREEKTOWN CASINO, LLC,** | |
| **Defendants.** | |

## DECLARATION OF ALEXANDRA SCHWARZMAN

I, Alexandra Schwarzman, hereby declare that I am an adult and have personal knowledge of the following:

1.      I am an associate with Kirkland & Ellis LLP.

2.      I was involved in the discussions between Syncora Guarantee Inc. and its affiliates ("Syncora") and the City of Detroit (the "City") regarding the terms of a non-disclosure

agreement ("NDA"). My declaration describes these negotiations and the events surrounding them.

3.    It is my understanding that representatives from the City were unwilling to provide Syncora with additional data about the City's discussions with the Swap Counterparties unless the City and Syncora first entered into an NDA. As a result, on June 29, 2013, the City and its attorneys began drafting an NDA that it planned to circulate to Syncora and its representatives.

4.    On June 30, 2013, the City provided a draft of its proposed NDA. The day after receiving that proposal, attorneys for both parties participated in a conference call regarding the terms of the NDA. Then, on July 2, 2013, the parties participated in two more calls regarding the terms of the proposed NDA.

5.    At that stage, the parties still had not been able to reach an agreement on a few issues. In particular, the attorney for the City (a) did not know whether an NDA was executed with the Swap (and, if so, whether Syncora could see it) and (b) was not willing to agree to maintain the confidentiality of Syncora's proposal without further discussion with the City.

6.    After the parties' July 2, 2013 discussions, the Jones Day attorney for the City stated that he needed to further consider the few outstanding issues but would get back to us shortly.

7.    While we were waiting for the City's attorney to contact us and resume the discussions regarding the NDA, the City filed its Motion for an *Ex Parte* Temporary Restraining Order and an Order to Show Cause Why a Preliminary Injunction Should Not Issue (the "Motion"). Before filing the Motion, the City and its attorneys did not inform Syncora or its attorneys that the City would be a filing a motion and requesting an *ex parte* hearing. Instead,

2

Syncora and its attorneys learned of the Motion when the City emailed Syncora the temporary restraining order minutes after it was entered.

_____
Alexandra Schwarzman

Executed this _12_ day of _July_, 2013.

3

# AMENDED AND RESTATED SCHEDULE
## DATED AS OF JUNE 26, 2009
## TO THE
## 1992 ISDA MASTER AGREEMENT
## LOCAL CURRENCY SINGLE JURISDICTION
## DATED AS OF
## JUNE 7, 2006

(General Retirement System/Syncora)

## BETWEEN

**SBS FINANCIAL PRODUCTS COMPANY, LLC,** a Delaware limited liability company

("Party A")

and

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION,** a not-for-profit corporation organized under the laws of the State of Michigan

("Party B")


## Part 1.

## Termination Provisions

In this Agreement:

(a)     **"*Specified Entity*"** means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | NONE |
| Section 5(a)(vi), | NONE |
| Section 5(a)(vii), | NONE |
| Section 5(b)(ii), | NONE |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | NONE |
| Section 5(a)(vi), | NONE |
| Section 5(a)(vii), | NONE |
| Section 5(b)(ii), | NONE |

(b)     **"*Specified Transaction*"** will have the meaning specified in Section 12 of this Agreement.

(c)     The **"*Cross Default*"** provisions of Section 5(a)(vi) of this Agreement, as modified below, will apply to Party A and to Party B.  Section 5(a)(vi) of this Agreement is hereby amended by the addition of the following at the end thereof:

"*provided, however,* that notwithstanding the foregoing, an Event of Default shall not occur under either (1) or (2) above if, as demonstrated to the reasonable satisfaction of the other party, (a) the event or condition referred to in (1) or the failure to pay referred to in (2) is a failure to pay caused by an error or omission of an administrative or operational nature; and (b) funds were available to such party to enable it to make the relevant payment when due; and (c) such relevant payment is made within three Business Days following receipt of written notice from an interested party of such failure to pay."

If such provisions apply:

**"*Specified Indebtedness*"** means any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) for the payment or repayment of any money.

**"*Threshold Amount*"** means:

(i)     with respect to Party A, an amount equal to 2% of shareholders' equity (howsoever described) of Party A as shown on the most recent annual audited financial statements of Party A and

(ii)     with respect to Party B, $10,000,000.

(d)     **The "*Credit Event Upon Merger*"** provisions of Section 5(b)(ii) will apply to Party A and Party B, amended as follows:

"Credit Event Upon Merger" shall mean that a Designated Event (as defined below) occurs with respect to a party, any Credit Support Provider of the party or any applicable Specified Entity (any such party or entity, "X"), and such Designated Event does not constitute an event described in Section 5(a)(viii) but the creditworthiness of X, or, if applicable, the successor, surviving or transferee entity of X, is materially weaker than that of X immediately prior to such event. In any such case where the Affected Party shall be the party with respect to which, or with respect to the Credit Support of which, the Designated Event occurred, or, if applicable, the successor, surviving or transferee entity of such party. For purposes hereof, a Designated Event means that, after the date hereof:

(i)     X consolidates, amalgamates with or merges with or into, or transfers all or substantially all its assets to, or receives all or substantially all the assets or obligations of, another entity; or

(ii)     any person or entity acquires directly or indirectly the beneficial ownership of equity securities having the power to elect a majority of the board of directors of X or otherwise acquires directly or indirectly the power to control the policy-making decisions of X."

(e)     **The "*Automatic Early Termination*"** provision of Section 6(a) will not apply to Party B and will apply to Party A; *provided, however,* that with respect to a party, where the Event of Default specified in Section 5(a)(vii)(1), (3), (4), (5), (6) or to the extent analogous thereto, (8) is governed by a system of law which does not permit termination to take place after the occurrence

of the relevant Event of Default, then the Automatic Early Termination provisions of Section 6(a) will apply to such party or Party B.

(f)    ***"Payments on Early Termination"***.  For the purpose of Section 6(e) of this Agreement:

    (i)    Market Quotation will apply.

    (ii)    The Second Method will apply, except as modified as provided in Parts 6 and 7 hereof.

(g)    "Termination Currency" means U.S. Dollars.

(h)    There shall be added to Section 5(a) of the Agreement the following Events of Default:

    "(ix)    Authority; Repudiation.  Party B shall cease to have authority to make payments under this Agreement or any Transaction subject to this Agreement, or any government entity having jurisdiction over Party B shall enact any legislation which would have the effect of repudiating this Agreement or any Transaction subject to this Agreement."

    "(x)    Amounts payable by Party B to Party A hereunder shall cease to be payable and secured in accordance with the terms specified in Part 4(b)(ii)(g) of this Schedule."

(i)    ***"Additional Termination Event"*** will apply to Party A and to Party B.  In addition to the Additional Termination Events set forth in Part 5 of this Schedule, the following shall constitute Additional Termination Events.

    (i)    ***Party A Additional Termination Events.***  Party A or its Credit Support Provider's long-term senior unsecured debt rating from (a) S&P is withdrawn, suspended or falls below "BBB-", or (b) Moody's is withdrawn, suspended or falls below "Baa3".

    For purposes of the foregoing Termination Event in this Part 1(i)(i), the sole Affected Party shall be Party A and all Transactions shall be Affected Transactions.

    (ii)    ***Party B Additional Termination Events***.

        (1)    The City Payments made in any Month, in aggregate, are less than the Holdback Requirement for such Month; or

        (2)    The City fails to make an appropriation in the City's final annual budget adopted pursuant to and in compliance with the City Charter prior to the commencement of any Fiscal Year and to maintain such appropriation without limitation, transfer or reduction throughout such Fiscal Year, on a line item basis authorizing exclusively payment of the City Payments and as a "first budget" obligation, of an amount at least equal to the Regular Custodian Payments scheduled to become due during the Fiscal Year plus an amount equal to *the greater* of (X) the amount of the Hedge Periodic Payables under the Hedges scheduled to become due during the Fiscal Year without giving effect to any netting and (Y) for the first Fiscal Year

commencing July 1, 2009, $49,936,975 and, for each subsequent Fiscal Year thereafter, $50,736,975; or

(3)    The Quarterly Coverage as of the end of any Month is less than 1.75; or

(4)    Either (1) the unenhanced rating on the 2006 Pension Funding Securities assigned by S&P falls below "BB" or the unenhanced rating on the 2006 Pension Funding Securities assigned by Moody's falls below "Ba2" and as of the immediately preceding Month's end the Quarterly Coverage is 2.15 or less, or (2) the unenhanced rating on the 2006 Pension Funding Securities assigned by S&P is withdrawn, suspended or reduced below "BB-" or the unenhanced rating on the 2006 Pension Funding Securities assigned by Moody's is withdrawn, suspended or reduced below "Ba3"; or

(5)    At any time following a Ratings Upgrade, the unenhanced rating on the 2006 Pension Funding Securities is withdrawn, suspended or reduced below "BBB-" by S&P or withdrawn, suspended or reduced below "Baa3" by Moody's; or

(6)    The City, a Service Corporation, or a third party shall commence litigation or take any other judicial action, or any legislative action is taken, to set aside or avoid or limit the 2006 Transaction, the City Pledge, the Service Corporation Security Interest, or the Service Corporation Pledge or any other part of the Definitive Documents or the Settlement Transaction (other than with respect to a Developer Agreement), or if the Authorizing Ordinance or any part thereof shall be amended (without the consent of Party A), revoked, rescinded, nullified or suspended for any reason; or

(7)    The City shall rescind, reduce or cease to impose the tax currently imposed as of the Amendment Effective Date by Section 18-14-3 of the Detroit City Code or the City, within two Business Days following the earlier to occur of notice from the Collateral Agreement Custodian that a taxpayer has inadvertently or erroneously paid the Wagering Tax Property directly to the City or the Finance Director learning of such payment, shall fail to transfer by wire transfer in same day funds to the Collateral Agent Custodian for deposit into the General Receipts Subaccount such payment. However, the rescinding of such tax shall not result in a Termination Event hereunder if such tax is then collected by the State of Michigan pursuant to Section 12(1) of the Wagering Tax Revenue Statute and an amount of such collections equal to or greater than the tax imposed as of the Amendment Effective Date is paid to the Collateral Agreement Custodian under arrangements satisfactory to Party A; or

(8)    The City fails to pay any Service Charges, Accrued Service Charges, Regular Scheduled Payments or Sinking Fund Installments as and when due and payable under either Service Contract; or

(9)     The City fails to pay when due any principal of, or interest on, any indebtedness for borrowed money, other than Excluded Indebtedness, aggregating $1,000,000 or more or any other event shall occur the effect of which is to cause, or to permit the holder or holders of such indebtedness (or a trustee or agent on behalf of such holder or holders) to cause such indebtedness to become due, or to be prepaid in full (whether by redemption, purchase, offer to purchase or otherwise), prior to its stated maturity, in each case after giving effect to any applicable grace period requiring notice or the lapse of time or both; or

(10)    The City fails to pay any judgment or judgments aggregating $1,000,000 or more, excluding judgments (1) on appeal and being contested in good faith, (2) for which the City has reached an agreement with the judgment creditor as to the timing and manner of payment that does not involve the imposition of any additional ad valorem property taxes above the Property Tax Threshold and with which agreement the City is in compliance or (3) for which the City is diligently making arrangements for payment and the delay in payment will not result in the City being held in contempt of court for nonpayment or in the imposition of a lien on the City's general funds or the imposition of any additional ad valorem property taxes in excess of the Property Tax Threshold; or

(11)    The City commences a case or files a petition seeking relief under the Bankruptcy Code or any other insolvency law or procedure, consents to an order of relief in any such proceeding or to the filing of any such petition, seeks or is subject to the appointment of a receiver or an emergency financial manager for all or any substantial part of its assets or makes an assignment for the benefit of its creditors, or if the Governor of the State of Michigan determines that a financial emergency exists in the City.

For purposes of the foregoing Termination Events in this Part 1(i)(ii), the sole Affected Party shall be Party B and all Transactions shall be Affected Transactions.

(j)     **Default Rate.**  Notwithstanding anything to the contrary in the Agreement, the Default Rate applicable to any amount owed by Party B to Party A during the Term Payment Period shall be LIBOR plus 9% (the "Specified Default Rate"), where "LIBOR" is determined (i) with respect to the remainder of the first Fiscal Year following a Specified Additional Termination Event, as the arithmetic average of USD-LIBOR-BBA (as defined in the 2006 ISDA Definitions, with a Designated Maturity of three months) as of the close of business on the fifteenth (15th) day of the three calendar months immediately preceding such Specified Additional Termination Event and, (ii) with respect to each subsequent Fiscal Year, as the arithmetic average of USD-LIBOR-BBA (as defined in the 2006 ISDA Definitions, with a Designated Maturity of three months) as of the close of business on the fifteenth (15th) day of March, April and May of the immediately preceding Fiscal Year.

(k)     **Remedies.**  In addition to all other remedies available hereunder and which remain unaffected hereby, following the designation of an Early Termination Date hereunder resulting from an Event of Default or Termination Event with respect to which Party B is the Defaulting Party or sole Affected Party, as the case may be, Party A shall have the remedies available to it as a secured party to enforce the Service Corporation Pledge, the Service Corporation Security Interest and the City Pledge.  Such remedies of Party A as a secured party under the Service Corporation Pledge and Service Corporation Security Interest shall include the exercise of all rights and remedies otherwise available to the Service Corporations as secured parties under the City Pledge, including the right to cause the Pledged Property to be applied to the obligations owing to Party A hereunder up to the amounts then appropriated.  Furthermore, such remedies include the right to cause the Pledged Property to be applied to the obligations owing to the Swap Counterparties under the Hedges up to the amounts then appropriated and, to the extent that not all amounts for all obligations owing to the Swap Counterparties have been appropriated, the right to use judicial process to obtain appropriations and to exercise any other equitable remedies available to the Swap Counterparties against the Service Corporations and the City, as a Michigan home rule city, in respect of such unappropriated amounts; provided, however, that if an Early Termination Date is designated by Party A hereunder as a result of a Specified Additional Termination Event, Party A shall forbear from exercising any remedies as a secured party against the Pledged Property during the Term Payment Period.

(l)     **Waiver and Rescission.**  As of the Amendment Effective Date, Party A waives its right to declare an Early Termination Date, and hereby rescinds any previously delivered notice of Termination Event and/or designation of an Early Termination Date, in connection with the Additional Termination Event set forth, prior to the Amendment Effective Date, in Part 5(b)(ii)(3) of the Schedule to this Agreement.

(m)     **Amendment Effective Date Representations of Party B.**  Party B hereby further represents that, as of the Amendment Effective Date:

(i)     The City has given an Irrevocable Instruction to each Casino Licensee and Developer.

(ii)     No action, proceeding or investigation has been instituted, nor has any order, judgment or decree been issued or proposed to be issued by any court, agency or authority to set aside, restrain, enjoin or prevent the consummation of any transaction contemplated hereby or seeking material damages against the City, a Service Corporation or either Swap Counterparty in connection with the amendment and restatement of the Schedule to this Agreement or the Settlement Transaction.

(n)     **Indemnification.**

(i)     To the extent permitted by law, Party B shall defend and hold harmless Party A from and against any and all losses, damages, liabilities, and expenses incurred and paid (each, a "liability") by Party A arising out of or resulting from the commencement or continuation of any litigation, judicial action, or legislative action of the kind described in Part 1(i)(ii)(6) hereof.

(ii)     If, for so long as this Agreement is in effect, Party A has actual notice or knowledge of any claim or loss for which indemnification by Party B is asserted, Party A shall give to Party B written notice within such time as is reasonable under the circumstances, describing such claim or loss in reasonable detail. However, any delay or failure of Party A to give the notice shall not affect Party B's indemnification obligations except to the extent that Party B was prejudiced by the delay or failure.

(iii)    If a demand or claim for indemnification is made hereunder with respect to losses the amount or extent of which is not yet known or certain, then the notice of demand for indemnification shall so state, and, where practicable, shall include an estimate of the amount of the losses.

(iv)     In the case of actual notice of indemnification hereunder involving any litigation, arbitration or legal proceeding, Party B shall have responsibility to, and shall employ counsel, and shall assume all expense with respect to, the defense or settlement of such claim.

(v)      Notwithstanding Party B's assumption of the defense, Party A shall have the right to employ separate counsel and to participate in the defense of such action, and Party B shall bear the reasonable out of pocket fees, costs and expenses of such separate counsel if:

    (1)      other than under Part 1(i)(ii)(6) hereof, a Termination Event or Event of Default has occurred hereunder, other than a Specified Additional Termination Event;

    (2)      other than under Part 1(i)(ii)(6) hereof, the Term Period End Date has occurred;

    (3)      the result of the use of counsel chosen by Party B to represent Party A would present such counsel with a conflict of interest;

    (4)      the actual or potential defendants in, or targets of, any such action include Party A and Party A shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to Party B;

    (5)      Party B shall not have employed counsel reasonably satisfactory to Party A to represent Party B within a reasonable time after notice of the institution of such action; or

    (6)      Party B, in its discretion, shall authorize Party A to employ separate counsel at Party B's expense.

Party B shall not be liable under this Agreement for any amount paid by Party A to settle any claims or actions if the settlement is entered into without Party B's consent which

may not be unreasonably withheld or delayed.  Each of Party A and Party B hereby agrees and acknowledges that any amount in respect of indemnification payable by Party B to Party A in accordance with this Part 1(n) is an expense that may not be claimed and is not payable under the Swap Insurance Policy.

## Part 2.

### Agreement to Deliver Documents

For the purpose of Sections 3(d) and 4(a) of this Agreement, each party agrees to deliver the following documents:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Evidence of the authority and true signatures of each official or representative signing this Agreement or, as the case may be, a Confirmation, on its behalf. | On or before execution of this Agreement and each Confirmation forming a part of this Agreement. | Yes |
| Party A | Opinion of Counsel to Party A in a form reasonably satisfactory to Party B. | On or before execution of this Agreement. | No |
| Party B | Covered Indenture as hereinafter defined. | On or before execution of this Agreement. | Yes |
| Party B | Certified copy of the resolution of Party B's Board of Directors (or equivalent authorizing documentation) authorizing the execution and delivery of this Agreement and each Confirmation and performance of its obligation hereunder. | On or before execution of this Agreement. | Yes |
| Party B | A copy of Party B's audited annual financial statements prepared in accordance with generally accepted accounting principles within the United | On or before the 365th day after the end of Party B's fiscal year. | Yes |

Detroit/Amended and Restated Schedule GRS-SBS (Syncora)
OHS East:160553167.11                                    8

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | States. | | |
| Party B | A copy of the City's audited annual financial statements prepared in accordance with generally accepted accounting principles within the United States. | Within 15 days of public availability, but in any case no later than 365 days after the end of the City's fiscal year. | Yes |
| Party B | A copy of the City's quarterly financial statements. | If and when the City prepares such quarterly reports, when such quarterly reports become publicly available. | Yes |
| Party B | Opinion of legal counsel to Party B in form and substance satisfactory to Party A. | On or before execution of this Agreement. | No |
| Party B | Commitment to issue each Swap Insurance Policy (as such term is defined in Part 4 hereof). | On or before the execution of this Agreement with respect to the initial Insured Rate Swap Transaction hereunder, and thereafter on or before the Trade Date of each subsequent Insured Rate Swap Transaction. | No |
| Party B | Swap Insurance Policy and the Opinion of counsel to the Swap Insurer with respect to such Swap Insurance Policy in form and substance satisfactory to Party A. | On or before the delivery of the related 2006 Pension Funding Securities to the underwriters with respect to the initial Insured Rate Swap Transaction hereunder, and | No |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | | thereafter on or before execution of the Confirmation evidencing each subsequent Insured Rate Swap Transaction. | |
| Party B | Confirmations, updates and additional documentation concerning the opinion of counsel, board resolutions and certificates delivered pursuant to each of the foregoing documents to be delivered as Party A may reasonably request. | Prior to the Effective Date of each Transaction after the initial Transaction hereunder. | Yes |
| Party B | Certified copy of the Service Contract together with an opinion of Certificate Counsel in form and substance satisfactory to Party A which addresses each of the Sources of Payment set forth in Section 3(g) of this Agreement. | On or before execution of the Service Contract. | No |
| Party B | Authorizing Ordinance | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of Lewis & Munday, a Professional Corporation, special counsel to the City and Party B, in form and substance satisfactory to Party A, including customary opinions given in connection with municipal financing transactions and addressing the items identified on Exhibit | On or prior to the Amendment Effective Date | No |

Detroit/Amended and Restated Schedule GRS-SBS (Syncora)
OHS East 160553167 11                    10

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | A hereto next to such counsel's name | | |
| Party B | An opinion of the City Corporation Counsel, in form and substance satisfactory to Party A, addressing the items identified on Exhibit A hereto next to such counsel's name. | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of Orrick, Herrington & Sutcliffe LLP, special counsel to the City, in form and substance satisfactory to Party A, addressing the items identified on Exhibit A hereto next to such counsel's name. | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of special tax counsel to the City, in form and substance satisfactory to Party A, addressing the items identified on Exhibit A hereto next to such counsel's name. | On or prior to the Amendment Effective Date | No |
| Party B | To the extent not duplicative with any other document to be delivered in this Part 2, each document required to be delivered under Section 2.4 of the Collateral Agreement. | On or prior to the Amendment Effective Date | Yes |

## Part 3.

### Miscellaneous

(a)     ***Addresses for Notices.*** For the purposes of Section 10(a) of this Agreement:

(i)     All notices or communications to Party A shall, with respect to a particular Transaction, be sent to the address, telex number, or facsimile number reflected in the Confirmation of that Transaction, and any notice for purposes of Sections 5 or 6 shall be sent to:

SBS Financial Products Company, LLC
Wall Street, 22nd Floor
New York, NY 10005
Attention: John Carter
Telephone: (646) 775-4880
Facsimile: (646) 576 - 9684

(ii)    All notices or communications to Party B shall be sent in care of the Contract Administrator to the address as set forth in Section 10.1 of the Contract Administration Agreement.

(iii)    A copy of all notices or communications to either Party A or Party B shall be sent to the address, or facsimile number reflected below:

Syncora Guarantee Inc.
(formerly known as XL Capital Assurance Inc.)
1221 Avenue of the Americas
New York, New York  10020
Attention:  Surveillance
Telephone: (212) 478-3400
Facsimile:  (212) 478-3597

(b)    **Offices**.  Party A, if it enters into a Transaction through an Office other than its head or home office represents to Party B that, notwithstanding the place of booking office or jurisdiction of incorporation or organization, the obligations of Party A are the same as if it had entered into the Transaction through its head or home office.  This representation will be deemed to be repeated by Party A on each date on which a Transaction is entered into.

(c)    **Calculation Agent.**  The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(d)    **Credit Support Document.**  With respect to Party A: (i) the Credit Support Annex dated the date hereof between Party B and Merrill Lynch Capital Services, Inc. ("MLCS"); (ii) the Transaction Transfer Agreement (the "Transfer Agreement") dated the date hereof between Party A, Party B and MLCS; and (iii) the Guarantee of Merrill Lynch & Co., Inc. ("ML&Co.") with respect to the Transfer Agreement.  With respect to Party B: (i) the Service Contracts and the Contract Administration Agreement (collectively, the "Covered Indenture") and (ii) the Collateral Agreement.

(e)    **Credit Support Provider.**  Credit Support Provider means:  With respect to Party A, MLCS and ML&Co. and with respect to Party B, none.

(f)    **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of New York; *provided, however*, that the corporate powers and legal capacity of Party B shall be governed by and construed in accordance with the laws of the State of Michigan.

(g)  **Jurisdiction.** Section 11(b)(i) of this Agreement is deleted in its entirety and replaced by the following:

(i)  submits to the extent permitted by law to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

(h)  **Waiver of Immunities.**  Section 11(c) of this Agreement is deleted in its entirety and replaced by the following:

"**Waiver of Immunities.**  Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues, all immunity on the grounds of sovereignty or other similar grounds from (i) suit in a breach of contract action, (ii) relief by way of injunction, order for specific performance or for recovery of property and (iii) execution or enforcement of any judgment to which it or its revenues might otherwise be entitled in any Proceedings, and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any such Proceedings."

(i)  **Netting of Payments.**  Subparagraph (ii) of Section 2(c) of this Agreement will apply.

(j)  **"Affiliate"** will have the meaning specified in Section 12 of this Agreement.

### Part 4.

### Other Provisions

(a)  **Intentionally Omitted.**

(b)  **Additional Representations.**

(i)  The first sentence of Section 3 is amended to read in its entirety as follows:

"Each party represents to each other party (which representations will be deemed to be repeated on each date on which a Transaction is entered into and, in the case of the representations in Section 3(a), (e) and (f) of this Agreement, at all times until the termination of this Agreement) the following:"

(ii)  Section 3 is amended by adding the following subsections (e), (f) and (g) thereto:

(e)  <u>Non-Speculation</u>. Party B represents and warrants to Party A that this Agreement has been, and each Transaction hereunder will be, entered into for purposes of managing of its borrowings or investments or in connection with a line of

Detroit/Amended and Restated Schedule GRS-SBS (Syncora)
OHS East 160553167 11                    13

business and not for the purpose of speculation;

(f)     Eligible Contract Participant.   Each party is an "eligible contract participant" under, and as defined in, Section 1a(12) of the Commodity Exchange Act, as amended (7 U.S.C. § 1a(12)); and

(g)     Sources of Payment.   As provided in the Contract Administration Agreement, all payments due under this Agreement from Party B to Party A are payable from and secured by amounts owing by the City to Party B pursuant to the Service Contract in respect of Hedge Payables.  Such amounts are payable by the City from all available revenues of the City's General Fund (as delineated in the City's audited financial statements).  If the City were to fail to pay any amount owing in respect of a Hedge Payable when due, Party A (or the Contract Administrator, if authorized by Party A to so act on Party A's behalf) could pursue remedies against the City to enforce that contractual obligation and the City would be required to pay any resulting judgment against it.  If the City were to fail to provide for payment of any such judgment, a court can compel the City to raise the payment through the levy of taxes, as provided in the Revised Judicature Act of 1961, Act No. 236 of the Michigan Public Acts of 1961, as amended (Michigan Compiled Laws Section 600.6093), without limit as to rate or amount.  In addition, all amounts due from Party B hereunder are secured by and payable from the Pledged Property (including, but not limited to, amounts held in the Holdback Account) in accordance with the terms of the Collateral Agreement.

(c)     *Additional Agreements.*

Compliance with Covered Indenture.  Party B will observe, perform and fulfill each provision in the Covered Indenture applicable to Party B. Party B hereby agrees not to amend, supplement, modify or waive any provision of the Covered Indenture without the consent of Party A if such amendment, supplement, modification or waiver would: (i) change any of the payment times, amounts, obligations, terms or any other payment-related provision in any Service Contract applicable to the City; (ii) impair any right Party B may have under the Service Contract to enforce payments from the City, or impair any right Party A may have under the Covered Indenture to enforce its security interest granted therein or any other right thereunder; or (iii) permit the creation of any new lien ranking prior to or on a parity with, or terminate, or deprive Party A of the security afforded to it by Sections 8.02 and 8.03 of the Service Contracts or Section

Detroit/Amended and Restated Schedule GRS-SBS (Syncora)
OHS East 160553167 11                                      14

2.4 of the Contract Administration Agreement (collectively, the "Incorporated Provisions"). The Incorporated Provisions are hereby incorporated by reference and made a part of this Agreement to the same extent as if such provisions were set forth herein. Any amendment, supplement, modification or waiver of any of the Incorporated Provisions without the prior written consent of the other party hereto shall have no force and effect with respect to this Agreement. Any amendment supplement or modification for which such consent is obtained shall be part of the Incorporated Provisions for purposes of this Agreement. Party B shall not assign or transfer its right or obligations under the Covered Indenture without the prior written consent of the other party hereto and the Swap Insurer.

(d)     **Relationship Between Parties.**  Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i)     Non-Reliance.  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii)     Assessment and Understanding.  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii)     Status of Parties.  The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(e)     **Waiver of Jury Trial. EACH PARTY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS RELATING TO THIS AGREEMENT OR ANY CREDIT SUPPORT DOCUMENT.**

(f)     **Consent to Recording.**  Each party (i) consents to the recording of all telephone conversations between trading, operations and marketing personnel of the parties and their Affiliates in connection with this Agreement or any potential Transaction; (ii) agrees to give notice to such personnel of it and its Affiliates that their calls will be recorded; and (iii) agrees that in any Proceedings, it will not object to the introduction of such recordings in evidence on grounds that consent was not properly given.

Detroit/Amended and Restated Schedule GRS-SBS (Syncora)
OHS East:160553167.11                          15

(g)     *Scope of Agreement.* The Transactions entered into between the parties June 6, 2006 and June 2, 2005 and any other specific Specified Transactions designated in writing by the parties hereto after the date hereof, shall be subject to the terms hereof.

(h)     *Indemnification Limited to Extent of Applicable Law.* The parties acknowledge that Party B's authority to indemnify Party A, as required by Section 9 of the Agreement, for expenses, fees and taxes may be limited by Michigan law and Party B's obligation to indemnify Party A could be limited to the extent of applicable law.

(i)     *Additional Definitions.* Section 12 is hereby amended by adding the following definitions:

"2006 Funding Trust" shall have the meaning specified in the Collateral Agreement.

"2006 Pension Funding Securities" shall have the meaning specified in the Collateral Agreement.

"2006 Transactions" shall have the meaning specified in the Collateral Agreement.

"Accounts" shall have the meaning specified in the Collateral Agreement.

"Accrued Service Charges" shall have the meaning specified in the Service Contracts.

"Amendment Effective Date" means June 26, 2009.

"Authorizing Ordinance" shall have the meaning specified in the Collateral Agreement.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

"Casino Licensee" shall have the meaning specified in the Collateral Agreement.

"City" means the City of Detroit, Michigan.

"City Charter" means the Charter of the City of Detroit, Michigan.

"City Clerk" means the Clerk of the City of Detroit, Michigan.

"City Council" means the Council of the City of Detroit, Michigan.

"City Payment" shall have the meaning specified in the Collateral Agreement.

"City Pledge" shall have the meaning specified in the Collateral Agreement.

"Closing Date" shall have the meaning specified in the Collateral Agreement.

"Collateral Agreement" means that certain Collateral Agreement dated as of June 15, 2009, among Party A, Party B, PFRS, UBS, the City, U.S. Bank National Association and Merrill Lynch Capital Services, Inc.

"Collateral Agreement Custodian" means the person identified as the "custodian" under the Collateral Agreement and any successor thereto.

"Contract Administration Agreement" means the Contract Administration Agreement 2006 dated June 12, 2006 among Detroit Retirement Systems Funding Trust 2006, Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation, severally and not jointly, U.S. Bank National Association, separately and not as Trustee of the Detroit Retirement Systems Funding Trust 2006 and the Hedge Counterparties Named Therein.

"Counterparty(ies)" shall have the meaning specified in the Collateral Agreement.

"Covered Indenture" means the Service Contracts together with the Contract Administration Agreement.

"Definitive Documents" shall have the meaning specified in the Collateral Agreement.

"Detroit General Retirement System Service Contract" means the Detroit General Retirement System Service Contract dated June 7, 2006 between Party B and the City.

"Detroit Police and Fire Retirement System Service Contract" means the PFRS Service Contract dated June 7, 2006 between the Detroit Police and Fire Retirement System Service Corporation and the City.

"Developer" shall have the meaning specified in the Collateral Agreement.

"Developer Agreement" shall have the meaning specified in the Collateral Agreement.

"Excluded Indebtedness" shall have the meaning specified in the Collateral Agreement.

"Finance Director" shall have the meaning specified in the Collateral Agreement.

"Fiscal Year" shall have the meaning specified in the Collateral Agreement.

"General Receipts Subaccount" shall have the meaning specified in the Collateral Agreement.

"Hedge" shall have the meaning specified in the Collateral Agreement.

"Hedge Payable" shall have the meaning specified in the Service Contracts.

"Hedge Periodic Payables" shall have the meaning specified in the Service Contracts.

"Holdback Account" shall have the meaning specified in the Collateral Agreement.

"Holdback Requirement" shall have the meaning specified in the Collateral Agreement.

"Irrevocable Instructions" shall have the meaning specified in the Collateral Agreement.

"MCL" means the Michigan Compiled Laws.

"Month" shall have the meaning specified in the Collateral Agreement.

"Moody's" means Moody's Investors Service, Inc.

"Office" means a branch or office of a party, which may be such party's head or home office.

"PFRS" means the Detroit Police and Fire Retirement System Service Corporation.

"Pledged Property" shall have the meaning specified in the Collateral Agreement.

"Property Tax Threshold" shall have the meaning specified for the "Threshold" in the Collateral Agreement.

"Quarterly Coverage" shall have the meaning specified in the Collateral Agreement.

"Ratings Upgrade" shall have the meaning specified in the Collateral Agreement.

"Regular Custodian Payment" shall have the meaning specified in the Collateral Agreement.

"Regular Scheduled Payments" shall have the meaning specified in the Service Contracts.

"Revenues" shall have the meaning specified in the Collateral Agreement.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Service Charges" shall have the meaning specified in the Service Contracts.

"Service Contracts" means the Detroit General Retirement System Service Contract and the Detroit Police and Fire Retirement System Service Contract.

"Service Corporations" means Party B and PFRS.

"Service Corporation Pledge" shall have the meaning specified in the Collateral Agreement.

"Service Corporation Security Interest" shall have the meaning specified in the Collateral Agreement.

"Settlement Transaction" shall have the meaning specified in the Collateral Agreement.

"Sinking Fund Installments" shall have the meaning specified in the Service Contracts.

"Specified Additional Termination Event" means each of the Additional Termination Events specified in Parts 1(i)(ii)(3), 1(i)(ii)(4), 1(i)(ii)(5), 1(i)(ii)(9) and 1(i)(ii)(10) of this Amended and Restated Schedule.

"Specified Event" shall have the meaning specified in the Collateral Agreement.

"Swap Counterparties" means, collectively, Party A and UBS and their respective successors and assigns.

"Swap Insurance Policy" means the Syncora Guarantee Inc. Insurance Policy issued by the Swap Insurer with respect to the Transaction(s) between Party A and Party B entered into pursuant to this Agreement.

"Swap Insurer" means Syncora Guarantee Inc. (formerly known as XL Capital Assurance Inc).

"Term Payment Period" shall have the meaning specified in the Collateral Agreement.

"Term Period End Date" shall have the meaning specified in the Collateral Agreement.

"UBS" means UBS AG.

"Wagering Taxes" shall have the meaning specified in the Collateral Agreement.

"Wagering Tax Property" shall have the meaning specified in the Collateral Agreement.

"Wagering Tax Revenue Statute" means the Michigan Gaming Control and Revenue Act, being MCL 432.201 et seq., MSA 18.969(201), et seq., as amended.

## Part 5.

### Insurer Provisions

The following provisions shall apply to any Transactions for which the Swap Insurance Policy has been issued by the Swap Insurer, for the account of Party B, as principal, and Party A, as beneficiary (the "Insured Rate Swap Transactions"):

(a)   *Designation of Early Termination Date.* Notwithstanding anything to the contrary in Section 6 of this Agreement, if any:

(i)   Event of Default in respect of any Insured Rate Swap Transaction under this Agreement occurs; or

(ii)   Termination Event (other than the Additional Termination Events set forth in Part 5(b) below) in respect of any Insured Rate Swap Transaction under this Agreement occurs;

then, in either such case, neither Party A nor Party B shall designate an Early Termination Date pursuant to Section 6 of this Agreement in respect of any such Insured Rate Swap Transaction without the prior written consent of the Swap Insurer.

(b)   *Party B Additional Termination Events.* The following shall each constitute an Additional Termination Event:

Detroit/Amended and Restated Schedule GRS-SBS (Syncora)
OHS East:160553167.11                                19

(i)      the Swap Insurer fails to meet its payment obligations under the Swap Insurance Policy and such failure is continuing with respect to the Swap Insurer under the Swap Insurance Policy; or

(ii)     the Swap Insurer fails to have a claims-paying ability rating of at least "A-" from S&P or a financial strength rating of at least "A3" from Moody's; *provided*, *however*, that additionally:

> (1)      an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party; or

> (2)      a Termination Event has occurred or is continuing with respect to Party B as the Affected Party; or

(iii)    An Insurer Event has occurred and is continuing; *provided*, *however*, that additionally:

> (1)      an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party; or

> (2)      a Termination Event has occurred or is continuing with respect to Party B as the Affected Party.

Any of the following shall be considered an "Insurer Event":

> (1)      the Swap Insurer is in conservation, liquidation or receivership under the New York Insurance Laws; or

> (2)      the Swap Insurer (a) fails to have (1) a claims-paying ability rating of at least "AAA" from S&P, or (2) a financial strength rating of at least "Aaa" from Moody's; and (b) fails to pay obligations for indebtedness for money borrowed or to meet then-current policy obligations for which claims have been properly presented in a aggregate amount in excess of $100,000,000, which failure to make payment (in whole or in part) is not due to: (u) administrative error; (v) Swap Insurer action to contest a claim; (w) an order from, or action by, a regulator of the Swap Insurer which forbids, delays or impedes such payment, except in connection with a Swap Insurer insolvency, conservation or receivership; (x) the occurrence of an act of God which prevents such payment; (y) the usual mechanisms or channels employed to make such payment being unavailable to the Swap Insurer through no fault of the Swap Insurer; (z) a statute, rule or order (including, but not limited to exchange controls) which forbids, delays or impedes either (i) such payment, other than in connection with a Swap Insurer insolvency, conservation or receivership, or (ii) the acquisition of, or payment in, a currency required in order to make such payment.

For purposes of any Additional Termination Event described under this Part 5(b), the sole "Affected Party" shall be Party B.

(c)      *Insurer Directed Termination.*  Notwithstanding anything in this Agreement, if an Event of Default under this Agreement occurs with respect to Party B as the Defaulting Party or any Termination Event under this Agreement occurs with respect to Party B as the Affected Party, then the Swap Insurer (so long as it has not failed to make any payment under the terms and conditions of the Swap Insurance Policy) shall have the right (but not the obligation) upon notice to Party A to designate an Early Termination Date with respect to Party B with the same effect as if such designation were made by Party A.  For purposes of the foregoing sentence, an Event of Default with respect to Party B shall be considered to be continuing, notwithstanding any payment by the Swap Insurer under the Swap Insurance Policy. Party A and Party B acknowledge that, except as the Swap Insurance Policy may be otherwise endorsed, unless (x) the Swap Insurer designates an Early Termination Date (as opposed to merely consenting to such designation by one of the parties) or (y) an Additional Termination Event specified in Part 5(b)(i) or (ii) has occurred, payments due from Party B because an Early Termination Date has been designated will not be insured.  In any event, the parties acknowledge that pursuant to the Swap Insurance Policy that (i) the amount payable by the Swap Insurer in respect of payments due from Party B because an Early Termination Date has been designated by the Swap Insurer shall not be limited in amount, and (ii) the amount payable by the Swap Insurer in respect of payments due from Party B because an Early Termination Date has been designated by Party A shall not exceed the amount specified in the Swap Insurance Policy.

(d)      *Amendments.* Section 8(b) of the Agreement is hereby amended by (A) adding the words "or any Credit Support Document" after the word "Agreement" in the first line thereof and (B) adding the phrase "and the Swap Insurer" following the words "parties" in the third line thereof.

(e)      *Transfers/Assignments.* Notwithstanding Section 7 of the Agreement, except as provided in Part 6(c) hereof, neither party may transfer, assign or delegate its rights or duties with respect to an Insured Rate Swap Transaction under the Agreement, unless it receives the prior written consent of the Swap Insurer; *provided, however*, that Party A may assign or delegates its rights and duties without the Swap Insurer's prior written consent to a party (a) that meets the definition of "Reference Market Maker" (other than the ratings requirement set forth therein) and that has long-term senior unsecured debt ratings at least in the single –A category from Moody's and S&P or the Credit Support Provider of such party has claims paying ability ratings or financial strength ratings at least in the single –A category from Moody's and S&P and (b) that assumes the rights and duties of Party A pursuant to a master agreement that is substantially similar to this Agreement and in form and substance satisfactory to the Swap Insurer; and *provided, further*, that Party A may make such an assignment or delegation to an affiliate of Party A if Party A or its Credit Support Provider, provides a guarantee of the  Insured Rate Swap Transaction that is reasonably acceptable in form and substance to the Swap Insurer.

(f)      *No Suspension of Payments.*  Notwithstanding Section 2(a)(iii) of this Agreement, Party A shall not suspend any payments due under an Insured Rate Swap Transaction under Section 2(a)(iii) of the Agreement unless Party A has designated an Early Termination Date pursuant to the terms hereof.

(g)     *No Netting.* Notwithstanding Section 2(c) of this Agreement, in no event shall either Party A or Party B be entitled to net its payment obligations in respect of the Insured Rate Swap Transactions against the payment obligations of the other party in respect of other Transactions under this Agreement if such Transactions are not Insured Rate Swap Transactions, nor may either Party A or Party B net the payment obligations of the other party under Transactions that are not Insured Rate Swap Transactions against the payment obligations of such party under Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under Insured Rate Swap Transactions be treated separate and apart from all other Transactions. Section 6(e) of this Agreement shall apply to all Insured Rate Swap Transactions with the same effect as if the Insured Rate Swap Transactions constituted a single master agreement. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Rate Swap Transactions shall be determined without regard to any Transactions other than the Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under the Insured Rate Swap Transactions be treated separate and apart from all other Transactions unless otherwise agreed to in writing by the Swap Insurer.

(h)     *No Set-off for Counterclaim.* In no event shall either Party A or Party B be entitled to set-off its payment obligations in respect of an Insured Rate Swap Transaction against the payment obligations of the other party (whether by counterclaim or otherwise) under any other agreement(s) between Party A and Party B or instrument(s) or undertaking(s) issued or executed by one party to, or in favor of, the other party, if such obligations are not Insured Rate Swap Transactions, or net the payment obligations of the other party that are not with respect to Insured Rate Swap Transactions against the payment obligations of such party under Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under Insured Rate Swap Transactions be treated separate and apart from all other obligations. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Rate Swap Transaction shall be determined without regard to any obligation other than those under the Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under the Insured Rate Swap Transactions be treated separate and apart from all other obligations unless otherwise specified in such other obligation and agreed to in writing by the Swap Insurer.

(i)     *Party A – Notice of Rating Downgrade, Suspension or Withdrawal.* Party A shall provide written notice to Party B and to the Swap Insurer of any downgrade, withdrawal or suspension of Party A's Credit Support Provider's long-term senior unsecured debt rating, within 15 Business Days of the occurrence of such event. Failure of Party A to provide such notice shall not constitute an Event of Default under this Agreement.

(j)     *Representations and Agreements.* Each party agrees that each of its representations and agreements in this Agreement is expressly made to and for the benefit of the Swap Insurer.

(k)     *Third-party Beneficiary.* Party A and Party B hereby each acknowledge and agree that the Swap Insurer shall be an express third-party beneficiary (and not merely an incidental third-party beneficiary) of this Agreement and of the obligations of each such party under any Insured Rate Swap Transaction, and as such, entitled to enforce the Agreement and the terms of any such

Insured Rate Swap Transaction against such party on its own behalf and otherwise shall be afforded all remedies available hereunder or otherwise afforded by law against the parties hereto to redress any damage or loss incurred by the Swap Insurer including, but not limited to, fees (including professional fees), costs and expenses incurred by the Swap Insurer which are related to, or resulting from any breach by such party of its obligations hereunder.

(l)     **Policy Coverage.** Party A and Party B hereby acknowledge and agree that the Swap Insurer's obligation with respect to Insured Rate Swap Transactions shall be limited to the terms of the Swap Insurance Policy. Notwithstanding Section 2(d) or any other provision of this Agreement, the Swap Insurer shall not have any obligation to pay interest on any amount payable by Party B under this Agreement.

(m)     **Subrogation.** Party A and Party B hereby acknowledge that to the extent of payments made by the Swap Insurer to Party A under the Swap Insurance Policy, the Swap Insurer shall be fully subrogated to the rights of Party A against Party B under the Insured Rate Swap Transaction to which such payments relate, including, but not limited to, the right to receive payment from Party B and the enforcement of any remedies. Party A hereby agrees to assign to the Swap Insurer its right to receive payment from Party B under any Insured Rate Swap Transaction to the extent of any payment thereunder by the Swap Insurer to Party A. Party B hereby acknowledges and consents to the assignment by Party A to the Swap Insurer of any rights and remedies that Party A has under any Insured Rate Swap Transaction or any other document executed in connection herewith.

(n)     **Isolation of Insured Rate Swap Transactions in Designating an Early Termination Date.**

(i)     Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of non-Swap Insurer Insured Rate Swap Transactions by Party A or Party B shall not apply to any Insured Rate Swap Transactions under this Agreement, unless expressly provided in such designation and agreed to in writing by the Swap Insurer.

(ii)     Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of the Insured Rate Swap Transactions by the Swap Insurer or by Party A or Party B shall apply only to the Insured Rate Swap Transactions and not to any other Transaction under this Agreement, unless expressly provided in such designation and agreed to in writing by the Swap Insurer. Nothing contained in this Part 5(n) shall affect the rights of Party A under this Agreement to designate an Early Termination Date in respect of any Transaction that is not an Insured Rate Swap Transaction, which designation shall not apply to the Insured Rate Swap Transactions.

(o)     **Expenses.** Party B agrees to reimburse the Swap Insurer immediately and unconditionally upon demand for all reasonable expenses incurred by the Swap Insurer in connection with the issuance of the Swap Insurance Policy and the enforcement by the Swap Insurer of Party B's obligations under this Agreement and any other documents executed in connection with the execution and delivery of this Agreement, including, but not limited to, fees (including

professional fees), costs and expenses incurred by the Swap Insurer which are related to, or resulting from, any breach by Party B of its obligations hereunder.

(p)     *Notices.* A copy of each notice or other communication between the parties with respect to this Agreement must be forwarded to the Swap Insurer by the party distributing such notice or other communication and any such notice or other communication shall not be effective as to the parties hereto until it has been received by the Swap Insurer.

(q)     *Reference Market-makers.* The definition of "Reference Market-makers" set forth in Section 12 of the Agreement shall be amended in its entirety to read as follows:

> "Reference Market-makers" means four (4) leading dealers in the relevant swap market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time of deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among dealers having an office in the same metropolitan area. The rating classification assigned to any outstanding long-term senior debt securities of such dealers shall be at least (1) "A1" or higher as determined by Moody's, (2) "A+" or higher as determined by S&P or if not rated by one of S&P or Moody's, (3) an equivalent investment grade rating determined by a nationally-recognized rating service acceptable to both parties; *provided, however,* that in any case, if Market Quotations cannot be determined by four (4) such dealers, the party making the determination of the Market Quotation may designate, with the consent of the other party and the Swap Insurer, one (1) or more leading dealers whose long-term senior debt bears a lower investment grade rating or the parties may agree, with the consent of the Swap Insurer, to use fewer than four (4) leading dealers.

(r)     *Party A Delivery of Legal Opinion.* Party A will be required to deliver a legal opinion with respect to its power and authority to enter into the Agreement and to the enforceability of the Agreement, satisfactory in form and substance to the Swap Insurer, with the Swap Insurer as an addressee.

(s)     *Additional Representations of Party B.* Party B hereby further represents to Party A (which representations will be deemed to be repeated by Party B at all times until the termination of this Agreement) that:

> (i)     This Agreement has been, and each Transaction hereunder will be (and, if applicable, has been), entered into for the purposes of managing its borrowings and not for purposes of speculation.

> (ii)     Party B has taken all steps necessary or advisable to create the security and source of payment for Party B's obligations hereunder described in Section 4(f) of the Agreement.

> (iii)     Any Transaction entered into pursuant to this Agreement together with any transactions that Party B has or may enter into with Party A and/or with any or all other parties does not and will not violate or exceed any limits or restrictions contained in any

Detroit/Amended and Restated Schedule GRS-SBS (Syncora)
OHS East 160553167 11                                            24

authorizations, approvals or resolutions of the board of directors, shareholders or other authorized body of Party B.

(iv)     The execution and delivery by Party B of this Agreement, each Confirmation and any other documentation relating hereto, and the performance of Party B of its obligations hereunder and thereunder, are in furtherance, and not in violation, of the municipal purposes for which Party B is organized pursuant to the laws of the State of Michigan.

(v)     This Agreement and each Transaction hereunder do not constitute any kind of investment by Party B that is proscribed by any constitution, charter, law, rule, regulation, government code, constituent or governing instrument, resolution, guideline, ordinance, order, writ, judgment, decree, charge, or ruling to which Party B (or any of its officials in their respective capacities as such) or its property is subject.

(t)     ***Optional Early Termination.***   Party A shall have the right to terminate one or more Transactions hereunder, either in whole or in part, on any Business Day; *provided* that no Event of Default or Termination Event is then occurring with respect to which Party A is the Defaulting Party or sole Affected Party, by providing at least five (5) Business Days' prior written notice to Party B of its election to terminate and its designation of the effective date of termination (the "Party A Optional Early Termination Date").   On the Party A Optional Early Termination Date, Party A shall determine the amount payable in connection with such termination as the greater of (i) zero and (ii) the amount calculated in accordance with Section 6(e) of the Agreement, as if (A) the Party A Optional Early Termination Date were the Early Termination Date with respect to the terminated Transaction(s) or portion thereof, (B) the terminated Transaction(s) were the sole Affected Transaction(s), (C) Party B were the sole Affected Party and (D) Second Method and Loss applied.   For the avoidance of doubt, in no event will Party B owe any amount to Party A in connection with an election by Party A to exercise its option under this Part 5(t), other than any Unpaid Amounts.

## Part 6.

## Transaction Transfer Provisions.

(a)     ***Bankruptcy Code.***   It is the express intention of Party A, Party B and each Credit Support Provider of any party that (i) this Agreement and all Transactions hereunder, the Transaction Transfer Agreement (including, without limitation, the option granted therein), and any Credit Support Annex that may be entered into between Party B and the Credit Support Provider  shall collectively constitute a single agreement; (ii) the foregoing, together with the Transfer Swap Agreement and Transfer Transactions thereunder (as such terms are defined in the Transaction Transfer Agreement) shall each constitute a "swap agreement" as defined in section 101(53B) of Title 11 of the United States Code, Sections 101-1330 (the "Bankruptcy Code"); and (iii) each of the parties constitutes a "swap participant" under section 101(53C) of the Bankruptcy Code, in each case subject to and entitled to the exemptions and protections afforded by, among other things, sections 362(b)(17), 546(g), 548(d) and 560 of the Bankruptcy Code.

(b)     ***Transaction Transfer Agreement.***   Notwithstanding anything contained herein to the contrary, neither Credit Support Provider shall have any obligations under this Agreement (other

than as a result of the operation of Part 6(c) below, if applicable) and shall only have such obligations as are expressly provided for in the Transaction Transfer Agreement. The parties hereto agree that the Credit Support Providers shall be express third party beneficiaries of this Agreement, including but not limited to all of the representations, covenants, agreements and other obligations of the parties to this Agreement. Additionally, notwithstanding anything contained herein to the contrary, the parties hereby agree that in the event Credit Support Providers are replaced as the "Credit Support Provider" by a Substitute Credit Support Provider (as defined in the Transaction Transfer Agreement) under the Transaction Transfer Agreement in accordance with the terms thereof, then the Substitute Credit Support Provider shall be deemed to be the Credit Support Provider hereunder and all references herein to either Credit Support Provider or both shall be deemed to be references to such Substitute Credit Support Provider.

(c)  ***Assignment.***

    (i)    Notwithstanding Part 5 of this Agreement, Party B, Party A and the Swap Insurer (by its delivery of the Swap Insurance Policy is deemed to have agreed) each hereby acknowledges and agrees that (A) provided that Party A is not a Defaulting Party or the sole Affected Party, Party A shall have at any time, other than following the occurrence of an Event of Default under this Agreement where Party B is the Defaulting Party or a Termination Event under this Agreement where Party B is the Affected Party or any event which with the giving of notice and/or the passage of time would constitute an Event of Default under this Agreement where Party B is the Defaulting Party or a Termination Event under this Agreement where Party B is the Affected Party, the right to transfer and assign all of Party A's rights, interests and obligations in, to and under this Agreement and all Transactions hereunder to MLCS by written notice to Party B and the Credit Support Providers specifying the effective date (such effective date, the "<u>Assignment Date</u>") of such transfer and assignment (and such transfer and assignment shall automatically occur as of the Assignment Date without the need for further action by any party), and (B) MLCS shall have the right, at any time and for any reason in its sole discretion, to request that Party A transfer and assign all of Party A's rights, interests and obligations in, to and under this Agreement and all Transactions hereunder to MLCS by written notice to Party B and Party A specifying the Assignment Date of such transfer and assignment (and such transfer and assignment shall automatically occur as of the Assignment Date without the need for further action by any party).

    (ii)    Upon the Assignment Date of any transfer and assignment specified in accordance with Part 6(c)(i) above, (A) the Provider shall be deemed to have transferred and assigned all of its rights, interests and obligations in, to and under this Agreement and all Transactions hereunder to MLCS, (B) MLCS shall have all the rights that the Provider would have under this Agreement and all Transactions hereunder, (C) MLCS shall be obligated to perform all existing and unperformed obligations of the Provider under this Agreement and all Transactions hereunder, including those obligations arising before the Assignment Date but not yet performed, (D) Party B shall remain obligated to perform all of its existing and unperformed

obligations under this Agreement and all Transactions hereunder, including those obligations arising before the Assignment Date but not yet performed, (E) the Provider and Party B shall be released and discharged from all obligations to each other with respect to this Agreement and all Transactions hereunder, and their respective rights and obligations hereunder and thereunder shall be cancelled with no payments owed by either party to the other, (F) on and after the Assignment Date, the provisions set forth in Exhibit B to the Transaction Transfer Agreement shall be applicable to this Agreement and all Transactions hereunder, (G) the Transaction Transfer Agreement shall simultaneously automatically terminate without the need for further action by any party thereto, and (H) the guarantee of ML & Co. (as set forth in the Transaction Transfer Agreement) shall apply to the Agreement as assigned (and shall no longer apply to the terminated Transaction Transfer Agreement).

(iii)    Party B, Party A and Credit Support Provider shall execute such instruments of assignment, assumption and release or discharge, of a ministerial nature, as any of them may reasonably request to evidence or effectuate the provisions in this Part 6(c).

## Part 7.

## Credit Support Provisions.

(a)    In the event that a Settlement Amount would be payable by Party A to Party B, Party B agrees that (i) the termination of this Agreement concurrently with the entry by MLCS into a Transfer Swap Agreement (as defined in Paragraph 2 of the Transaction Transfer Agreement) with Party B in accordance with Paragraph 2 of the Transaction Transfer Agreement, (ii) the agreement by Party A to pay such Settlement Amount to MLCS in consideration of MLCS entering into such Transfer Swap Agreement (and Party A hereby agrees to pay such Settlement Amount); *provided,* that the Transaction Transfer Agreement shall be effective irrespective of the nonpayment of such Settlement Amount by Party A to MLCS, and (iii) the payment by MLCS to Party B of any net Unpaid Amounts owing to Party B (which MLCS agrees to pay pursuant to the Transaction Transfer Agreement), shall constitute full satisfaction of any payment otherwise owing from Party A to Party B pursuant to Section 6(e) of this Agreement, and that Party A shall be fully discharged from any and all obligations under Section 6(e) of this Agreement. In the event that any net Unpaid Amounts would be owing by Party B to Party A (such that clause (iii) of the preceding sentence would not be applicable), Party A hereby assigns to MLCS, absolutely and not for purposes of security, all of Party A's right to receive any such net Unpaid Amounts from Party B, and Party A agrees that only MLCS shall be entitled to receive any such net Unpaid Amounts from Party B, and that Party A shall have no recourse to Party B with respect thereto.

(b)    In the event that a Settlement Amount would be payable by Party B to Party A, Party A agrees that (i) the termination of this Agreement concurrently with the entry by MLCS into a Transfer Swap Agreement with Party B in accordance with Paragraph 2 of the Transaction Transfer Agreement, (ii) the agreement by MLCS to pay such Settlement Amount to Party B in

consideration of Party B entering into such Transfer Swap Agreement (which MLCS agrees to pay pursuant to the Transaction Transfer Agreement), (iii) the absolute assignment by Party B to Party A of Party B 's right to receive such Settlement Amount from Credit Support Provider, and (iv) the payment by MLCS to Party B of any net Unpaid Amounts owing to Party B (which MLCS agrees to pay pursuant to the Transaction Transfer Agreement) shall constitute full satisfaction of any payment otherwise owing from Party B to Party A pursuant to Section 6(e) of this Agreement, and that Party B shall be fully discharged from any and all obligations under Section 6(e) of this Agreement. In accordance with clause (iii) of the preceding sentence, Party B hereby assigns to Party A, absolutely and not for purposes of security, all of Party B's right to receive any such Settlement Amount from MLCS pursuant to clause (ii) of the preceding sentence, and Party A agrees that only MLCS shall be obligated to pay such Settlement Amount to Party A, and that Party A shall have no recourse to Party B with respect thereto. In the event that any net Unpaid Amounts would be owing by Party B to Party A (such that clause (iv) of the first sentence of this Part 7(b) would not be applicable), Party A hereby assigns to MLCS, absolutely and not for purposes of security, all of Party A's right to receive any such net Unpaid Amounts from Party B, and Party A agrees that only MLCS shall be entitled to receive any such net Unpaid Amounts from Party B, and that Party A shall have no recourse to Party B with respect thereto.

(c)      In the event that a Settlement Amount is to be determined, the parties agree that such Settlement Amount shall be determined by MLCS on behalf of, and for the benefit of, the Non-defaulting Party or the party which is not the Affected Party (as applicable), and that such Settlement Amount shall be conclusive. For purposes of determining such Settlement Amount, MLCS shall not be obligated to obtain quotations from more than one Reference Market-maker, which Reference Market-maker may be MLCS. Notwithstanding the foregoing, if an Event of Default or Termination Event shall have occurred with respect to which Party A is the Defaulting Party or an Affected Party, and such Event of Default or Termination Event (x) is triggered by the occurrence of an event which, by definition of such Event of Default or Termination Event, occurs with respect to MLCS or the Credit Support Document, and (y) arises solely by reason of an event or condition that is directly attributable to MLCS under this Agreement or the Transaction Transfer Agreement, then Party B, and not Credit Support Provider, shall determine such Settlement Amount.

Please confirm your agreement to the terms of the foregoing Schedule by signing below.

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

By:_____

    Name:  Norman L. White
    Title:   President


**SBS FINANCIAL PRODUCTS COMPANY, LLC**, a Delaware limited liability company


By:_____

    Name:
    Title:

Please confirm your agreement to the terms of the foregoing Schedule by signing below.

**DETROIT GENERAL RETIREMENT
SYSTEM SERVICE CORPORATION**

By:_____
    Name:  Norman L. White
    Title:   President

**SBS FINANCIAL PRODUCTS COMPANY,
LLC**, a Delaware limited liability company

By:_____
    Name:  John Carter
    Title:   President

SCHEDULE OF OPINIONS

| Lewis & Munday,<br>a Professional Corporation | • The Settlement Transaction will not cause the City to violate or exceed any applicable debt limit or constitute or create any "indebtedness" of the City within the meaning of any limitation of the Home Rule City Act (Act 279 of the Public Acts of Michigan of 1909, as amended) or any Michigan constitutional or other non-tax statutory or City Charter limitation,<br><br>• the Authorizing Ordinance was duly adopted in accordance with state law and City Charter requirements, is in effect as of the Closing Date, has not been amended, and is valid, binding, and enforceable (subject, in each case, to bankruptcy and other customary exceptions),<br><br>• the City Pledge, including the lien of the City Pledge established pursuant to the Authorizing Ordinance, is valid, binding and enforceable and the Service Corporation Pledge is valid, binding, enforceable and perfected (subject, in each case, to bankruptcy and other customary exceptions),<br><br>• the definitive agreements entered into in connection with the Settlement Transaction are valid, binding and enforceable (subject, in each case, to bankruptcy and other customary exceptions),<br><br>• the pledge and use of Pledged Property as contemplated in the Settlement Transaction will constitute authorized purposes under the Wagering Tax Revenue Statute (including, if applicable at the time, any regulation or ordinance, other than the Authorizing Ordinance, relating thereto), the Authorizing Ordinance and Section 18-14-1 et seq. of the Detroit City Code,<br><br>• the pledge and use of the Pledged Property as contemplated by the Settlement Transaction does not and shall not "supplant existing…local expenditures" as prohibited by Section 12(14) of the Wagering Tax Revenue Statute,<br><br>• the Settlement Transaction and any other transactions to be consummated in connection therewith are not subject to approval by vote of the electors of the City and are not subject to any right of referendum by City electors; and |
| --- | --- |

| | |
|---|---|
| | • any actions taken by the City Council, in connection with the Settlement Transaction, by resolution, in lieu of ordinance, are fully valid, binding and enforceable against the City, notwithstanding that such actions were taken by resolution instead of by ordinance (subject, in each case, to bankruptcy and other customary exceptions). |
| Orrick, Herrington & Sutcliffe LLP | The Wagering Tax Property constitute "special revenues" as defined in Bankruptcy Code §902(2) with respect to any case under Chapter 9 of the Bankruptcy Code in which the City or a Service Corporation is the debtor (subject to assumptions, qualifications, and limitations as are customary for bankruptcy opinions). |
| Special tax counsel to the City | Consummation of the Settlement Transaction (including any amendments of the Service Contracts in connection therewith) will not result in (i) the 2006 Funding Trust being treated as other than a grantor trust under Subpart E, Part I of Subchapter J of the Internal Revenue Code of 1986, as amended, (ii) the Service Charges and Regular Scheduled Payments failing to constitute payments in respect of indebtedness for U.S. federal income tax purposes, or (iii) otherwise any modifications, adverse to the City, the Service Corporations, the holders of the 2006 Pension Funding Securities or the Counterparties, to the conclusions reached in the tax opinions given in connection with the outstanding transactions. |
| City Corporation Counsel | Relying upon certifications of the City Clerk, the City Charter and any amendments thereto were duly approved by a majority of the City electors voting thereon and the City Charter and any such amendments have not been rescinded in whole or in part as of the Closing Date (subject to bankruptcy and other customary exceptions). |

Capitalized terms used but not otherwise defined in this Exhibit A shall have the meanings ascribed to them in them in the Collateral Agreement.

139083v1
(**Local Currency-Single Jurisdiction**)



# ISDA®

**International Swaps and Derivatives Association, Inc.**

# MASTER AGREEMENT

dated June 7, 2006

SBS Financial Products Company, LLC and Detroit General Retirement System Service Corporation have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement (the "Master Agreement"), which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

## 1. Interpretation

(a) *Definitions*. The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b) *Inconsistency*. In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c) *Single Agreement*. All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

## 2. Obligations

(a) General Conditions.

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in · respect of the relevant Transaction has occurred or been effectively designated and (3) each other

(b) *Change of Account*.  Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c) *Netting*.  If on any date amounts would otherwise be payable:—

      (i)      in the same currency; and

      (ii)     in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction.  The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease, to apply to such Transactions from such date).  This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d) *Default Interest; Other Amounts*.  Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate.  Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.  If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.     Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that:—

(a) *Basic Representations*.

      (i)     *Status*.  It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

      (ii)    *Powers*.  It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support

Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance;

(iii)    *No Violation or Conflict*.  Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents*.  All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding*.  Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b) *Absence of Certain Events*.  No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c) *Absence of Litigation*.  There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d) *Accuracy of Specified Information*.  All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a) *Furnish Specified Information*.  It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b) *Maintain Authorizations*.  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c) *Comply with Laws*.  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

## 5.    Events of Default and Termination Events

(a) *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default*.

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation*. A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to

Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)   **Bankruptcy**.  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)   is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)   **Merger Without Assumption**.  The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1)   the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)   the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)  **Termination Events**.  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below

constitutes an Illegality if the event is specified in (i) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below:—

> (i)      *Illegality*.  Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—
>
> > (1)      to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or
> >
> > (2)      to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;
>
> (ii)      *Credit Event Upon Merger*.  If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or
>
> (iii)      *Additional Termination Event*.  If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality*.  If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

## 6.      Early Termination

(a) *Right to Terminate Following Event of Default*.  If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions.  If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b) *Right to Terminate Following Termination Event*.

    (i)    *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

    (ii)    *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

    (iii)    *Right to Terminate*. If:—

        (1)    an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

        (2)    an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) *Effect of Designation*.

    (i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

    (ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) *Calculations*.

    (i)    *Statement*. On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

    (ii)    *Payment Date*. An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the

amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) **Payments on Early Termination.** If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss," and a payment method, either the "First Method" or the "Second Method." If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method," as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)   **Events of Default.** If the Early Termination Date results from an Event of Default:—

(1)   *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

(2)   *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)   *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)   *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)   **Termination Events.** If the Early Termination Date results from a Termination Event:—

(1)   *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)   *Two Affected Parties.* If there are two Affected Parties:—

(A)    if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

(B)    if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    *Adjustment for Bankruptcy.*  In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate.*  The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty.  Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.    Transfer

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a) a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b) a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.    Miscellaneous

(a) *Entire Agreement*.  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b) *Amendments*.  No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c) *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d) *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e) *Counterparts and Confirmations.*

    (i)     This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

    (ii)     The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f) *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g) *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 9.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 10.    Notices

(a) *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)     if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)     if sent by telex, on the date the recipient's answerback is received;

    (iii)     if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)     if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)     if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery ) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b) *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 11.    Governing Law and Jurisdiction

(a) *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b) *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)     submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)     waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c) *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 12.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

      (a)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

      (b)     in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

      (c)     in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

      (d)     in all other cases, the Termination Rate.

*"consent"* includes a consent, approval, action, authorization, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iii).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"law"* includes any treaty, law, rule or regulation and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is

to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)     the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)     such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Event"* means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early

Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate.   Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed.  The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

SBS FINANCIAL PRODUCTS COMPANY, LLC, a
Delaware limited liability company

By: _____

    Name: John Carter

    Title:  President

DETROIT GENERAL RETIREMENT
SYSTEM SERVICE CORPORATION

By: _____

    Name:

    Title:

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

SBS FINANCIAL PRODUCTS COMPANY, LLC, a Delaware limited liability company

By: _____
    Name: John Carter
    Title: President

DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION

By: _____
    Name: Roger Short
    Title: President