**Schedule 1A**
**Schedule of 2005 Hedges to be Terminated**
**to**
**GRS Service Contract 2006**

| Hedge Counterparty | Notional Amount | Amount to be Terminated | Hedge Termination Receivable |
|---|---|---|---|
| UBS AG | $161,400,000 | $161,400,000 | $12,130,515 |
| Citibank, N.A. | $53,800,000 | $53,800,000 | $3,825,110 |
| SBS Financial Products Company, LLC | $53,800,000 | $53,800,000 | $4,043,505 |

## Schedule 1B-NTS
## Non-Tender Schedule
## to
## GRS Service Contract 2006

**2005 Prepayment Date:  July, 13, 2006**
**Funding Rate Portion:  Fixed**

| Subject 2005 Scheduled Payment | 2005 Scheduled Payment Dates (June 15 of each Year) For Reference Purposes Only | 2005 Prepayment Premium[1] | Service Charge Rate | Service Charges due 06/15/06 | Service Charges Accrued to 2005 Prepayment Date |
|---|---|---|---|---|---|
| $5,055,000 | 2007 | $24,290.04 | 4.004% | $101,201.10 | $15,742.39 |
| 7,435,000 | 2008 | 35,726.30 | 4.154% | 154,424.95 | 24,021.66 |
| 10,095,000 | 2009 | 48,508.00 | 4.234% | 213,711.15 | 33,243.96 |
| 8,180,000 | 2010 | 39,306.14 | 4.314% | 176,442.60 | 27,446.63 |
| 7,340,000 | 2011 | 35,269.81 | 4.404% | 161,626.80 | 25,141.95 |
| 7,720,000 | 2012 | 37,095.77 | 4.453% | 171,885.80 | 26,737.79 |
| 8,115,000 | 2013 | 38,993.80 | 4.503% | 182,709.23 | 28,421.44 |
| 8,535,000 | 2014 | 41,011.97 | 4.563% | 194,726.03 | 30,290.72 |
| $62,475,000 | | $300,201.82 | | $1,356,727.65 | $211,046.52 |

**Summary**

Subject 2005 Scheduled Payments ................ $62,475,000.00
Service Charges due 06/15/06 ................ 1,356,727.65
Accrued Service Charges to
   2005 Prepayment Date ................ 211,046.52
2005 Prepayment Premiums ................ 300,201.82[1]
Non-Tender Amount ................ $64,342,975.99

**For the purposes of 2005 Section 5.03(c):**

- The Optional Prepayment Amount is the sum of the Subject 2005 Scheduled Payments and the 2005 Prepayment Premiums.
- The Accrued Service Charges are the sum of the Service Charges due 06/15/06 and the Accrued Service Charges to the 2005 Prepayment Date.
- The Hedge Amount is $0, there being Hedge Termination Receivables due the Corporation.
- The Total Prepayment Amount is the Non-Tender Amount.

[1] Includes $300,201.82 contingency since actual Prepayment Premiums cannot be determined until 3 business days prior to 2005 Prepayment Date.

1974114 0069/401675

Tender Payment Date: June 12, 2006
Funding Rate Portion: Variable Rate

## Schedule 1B-TS
## Tender Schedule
## to
## GRS Service Contract 2006

| Subject 2005 Scheduled Payment | 2005 Scheduled Payment Dates (June 15 of each Year) For Reference Purposes Only | Tender Scheduled Payments | Tender Premiums | Service Charge Rate | Service Charges Accrued to Tender Payment Date |
|---|---|---|---|---|---|
| $269,000,000 | 2025 | $269,000,000 | $1,076,000 | 3M LIBOR + 0.28% | $3,451,494.17 |

Tender Scheduled Payments .................... $269,000,000.00
Tender Premiums .................... 1,076,000.00
Accrued Service Charges to
    Tender Payment Date .................... 3,451,494.17
Tender Fees and Expenses .................... 836,354.63
Tender Amount .................... $274,363,848.80

**Schedule 2**
**Scheduled Payments Attachment**
**to**
**GRS Service Contract 2006**

Scheduled Payments are due on the following Scheduled Payment Dates in the respective amounts set forth opposite such dates

| Scheduled Payment Dates (June 15 of each year) | Service Charge Class | | | |
|---|---|---|---|---|
| | Fixed Rate Scheduled Payments | Fixed Rate Service Charge Rates | Index Rate Scheduled Payments | Index Rate Service Charge Rates |
| 2029 | - | - | $90,504,000 | 3M LIBOR + 0.30%* |
| 2030 | - | - | - | - |
| 2031 | - | - | - | - |
| 2032 | - | - | - | - |
| 2033 | - | - | - | - |
| 2034 | - | - | $193,242,000 | 3M LIBOR + 0.34%* |
| 2035 | $68,950,000 | 5.989% | - | - |
| **Totals** | **$68,950,000** | | **$283,746,000** | |

* Index Rate Service Charge Rates are determined in accordance with the **Index Rate Funding Cost Supplement**

1974114.0069/401675

13-53846-swr   Doc 1368-3   Filed 08/26/13   Entered 08/26/13 21:53:50   Page 25 of 100
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 4 of 100   204

**Schedule 3**
**Sinking Fund Installments Attachment**
**To GRS Service Contract 2006**

Scheduled Payments due on the following Scheduled Payment Dates are subject to mandatory prepayment on the following Scheduled Payment Dates in the respective amounts set forth opposite such dates, each of which constitutes the Sinking Fund Installment due on the respective Sinking Fund Installment Date.

**Sinking Fund Installments of Scheduled Payments Due 2029**

| Scheduled Payment Dates (June 15 of each year) | Service Charge Class Index Rate |
|---|---|
| 2026 | $26,459,000 |
| 2027 | 28,107,000 |
| 2028 | 29,857,000 |
| 2029* | 6,081,000 |
| Total | $90,504,000 |

*Final maturity, not a Sinking Fund Installment Date

**Sinking Fund Installments of Scheduled Payments Due 2034**

| Scheduled Payment Dates (June 15 of each year) | Service Charge Class Index Rate |
|---|---|
| 2029 | $25,634,000 |
| 2030 | 33,699,000 |
| 2031 | 35,810,000 |
| 2032 | 38,052,000 |
| 2033 | 40,435,000 |
| 2034* | 19,612,000 |
| Total | $193,242,000 |

*Final maturity, not a Sinking Fund Installment Date

**Sinking Fund Installments of Scheduled Payments Due 2035**

| Scheduled Payment Dates (June 15 of each year) | Service Charge Class Fixed Rate |
|---|---|
| 2034 | $23,355,000 |
| 2035* | 45,595,000 |
| Total | $68,950,000 |

*Final maturity, not a Sinking Fund Installment Date

1974114.0069/401675

13-53846-swr    Doc 1360-33    Filed 09/26/13    Entered 09/26/13 17:30:58    Page 26 of 102    205
13-53846-tjt    Doc 1140-6    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 5 of 100

**Schedule 4**
**Schedule of Credit Insurance**
**to**
**GRS Service Contract 2006**

| Service Charge Class/ Scheduled Payment Date | Financial Agreement | Provider |
|---|---|---|
| Index Rate/2029 | Bond Insurance Policy | XL Capital |
| Index Rate/2034 | Bond Insurance Policy | FGIC |
| Fixed Rate/2035 | Bond Insurance Policy | FGIC |

1974114.0069/401675

13-53846-swr    Doc 13663-3    Filed 08/24/13    Entered 08/24/13 17:50:50    Page 27 of 102
13-53846-tjt    Doc 1140-6    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 6 of 100    206

## Schedule 5
## Schedule of Stated Hedges
### to
### GRS Service Contract 2006

| Service Charge Class | Type of Hedge | Hedge Counterparty | Notional Amount | Termination Date |
|---|---|---|---|---|
| Index Rate | Variable to Fixed: Corporation pays fixed: Counterparty pays 3 month LIBOR + 0.30% | UBS AG | $45,252,000 | 2029 |
| Index Rate | Variable to Fixed: Corporation pays fixed: Counterparty pays 3 month LIBOR + 0.30% | SBS Financial Products Company. LLC[1] | $45,252,000 | 2029 |
| Index Rate | Variable to Fixed: Corporation pays fixed: Counterparty pays 3 month LIBOR + 0.34% | UBS AG | $96,621,000 | 2034 |
| Index Rate | Variable to Fixed: Corporation pays fixed: Counterparty pays 3 month LIBOR + 0.34% | SBS Financial Products Company. LLC[2] | $96,621,000 | 2034 |

[1] Merrill Lynch Capital Services, Inc. (*"MLCS"*), the credit support provider of SBS, shall obtain the rights and be subject to the obligations of a Stated Hedge Counterparty hereunder upon the occurrence of a Transfer Party Accession Event (as defined in the Contract Administration Agreement), as a Stated Hedge Counterparty pursuant to the Transaction Transfer Agreement dated as of June 7, 2006 among the Corporation, SBS and MLCS. In no event shall SBS and MLCS simultaneously have the same rights hereunder.

[2] Merrill Lynch Capital Services, Inc. (*"MLCS"*), the credit support provider of SBS, shall obtain the rights and be subject to the obligations of a Stated Hedge Counterparty hereunder upon the occurrence of a Transfer Party Accession Event (as defined in the Contract Administration Agreement), as a Stated Hedge Counterparty pursuant to the Transaction Transfer Agreement dated as of May 25, 2005 among the Corporation, SBS and MLCS. In no event shall SBS and MLCS simultaneously have the same rights hereunder.

1974114.0069/401675

# General Terms and Conditions

of the

## GRS Service Contract 2006

between the

## Detroit General Retirement System Service Corporation

and the

## City of Detroit

---

**Dated as of June 1, 2006**

---

## Table of Contents

Article I — Definitions and Related Matters ............................................................. 1
    Section 1.01. Certain Definitions .................................................................. 1
    Section 1.02. Other Definitions .................................................................... 5
    Section 1.03. Service Payment Components .................................................. 6
    Section 1.04. Business Days .......................................................................... 6
    Section 1.05. Certificates Held in Book-Entry Form ..................................... 6
    Section 1.06. Interpretation .......................................................................... 6

Article II — Terms of Service Contract .................................................................... 7
    Section 2.01. Particulars of Specific Terms ................................................... 7
    Section 2.02. Variation of General Terms; Conflict with General Terms ......... 8

Article III — Representations and Warranties.......................................................... 8
    Section 3.01. Representations of the Corporation ........................................ 8
    Section 3.02. Representations of the City .................................................... 9
    Section 3.03. Labor Related Representations of City and Corporation ......... 10

Article IV — Service and Funding Arrangements .................................................. 10
    Section 4.01. Provision of Services.............................................................. 10
    Section 4.02. Payment Obligation ............................................................... 11
    Section 4.03. Funding Obligation ............................................................... 11
    Section 4.04. Disposition of Certificate Proceeds ....................................... 11

Article V — Scheduled Payments........................................................................... 11
    Section 5.01. Scheduled Payments .............................................................. 11
    Section 5.02. Mandatory Prepayment by Sinking Fund Installments............ 11
    Section 5.03. Optional Prepayment of Scheduled Payments ...................... 12
    Section 5.04. Satisfaction of Scheduled Payments by Delivery of Certificates...... 14

Article VI — Service Charges................................................................................. 14
    Section 6.01. Agreement to Pay Service Charges; Funding Costs ............... 14
    Section 6.02. Prepaid Service Charges; Hedge Receivables......................... 15
    Section 6.03. Fixed Rate Funding Methodology .......................................... 15
    Section 6.04. Variable Rate Funding Methodology ...................................... 15
    Section 6.05. Accreted Value Funding Methodology ................................... 16

Article VII — General Provisions Governing Service Payments and Contract
              Administrator Payments ................................................................. 17
    Section 7.01. Time of Service Payments...................................................... 17
    Section 7.02. Hedge Payables ..................................................................... 17
    Section 7.03. Subrogation ........................................................................... 17
    Section 7.04. Investment ............................................................................. 18
    Section 7.05. Satisfying Service Contract Deficiencies ................................ 18
    Section 7.06. No Set-Off.............................................................................. 19

1974114 0069\401794

i

13-53846-swr Doc 1366-3 Filed 08/16/13 Entered 08/16/13 20:53:50 Page 30 of 100 209
13-53846-tjt Doc 1140-6 Filed 10/10/13 Entered 10/10/13 14:54:54 Page 9 of 100

**Article VIII — Satisfaction of Service Payments and Contract Administrator Payments**.......................................................................................... 19
    **Section 8.01.** Certain Defined Terms ............................................................... 19
    **Section 8.02.** Preservation of Parity among Service Contracts ........................ 19
    **Section 8.03.** Satisfaction of Service Payments ............................................. 20
**Article IX — Miscellaneous** ...................................................................... 20
    **Section 9.01.** Acceleration on Bankruptcy .................................................... 20
    **Section 9.02.** Termination or Assignment of Stated Hedges ......................... 20
    **Section 9.03.** Required Ratings of Hedge Counterparties .............................. 21
    **Section 9.04.** Addresses for Notices ............................................................. 21
    **Section 9.05.** Amendment ............................................................................ 21
    **Section 9.06.** No Waiver; Remedies. ............................................................. 22
    **Section 9.07.** Binding Obligation. ................................................................. 22
    **Section 9.08.** General Corporate Expenses .................................................. 22
    **Section 9.09.** Fees and Expenses. ................................................................. 22
    **Section 9.10.** Permitted Assignment. ........................................................... 23
    **Section 9.11.** Direct Payment of Service Payments; "Successor" Defined ........... 24
    **Section 9.12.** Third Party Beneficiaries ...................................................... 24
    **Section 9.13.** Reliance on Representations and Warranties ......................... 25
    **Section 9.14.** Contract Administration ........................................................ 25
    **Section 9.15.** Governing Law ...................................................................... 25
    **Section 9.16.** Headings ................................................................................ 25
    **Section 9.17.** Integration ............................................................................ 25
    **Section 9.18.** Counterparts ......................................................................... 26

1974114 0069\401794

ii

13-53846-swr   Doc 3613-3   Filed 08/06/14   Entered 08/06/14 20:59:36   Page 11 of 62   210
13-53846-tjt   Doc 1140-6   Filed 10/10/13 Entered 10/10/13 14:54:54   Page 10 of 100

GENERAL TERMS AND CONDITIONS
OF THE
GRS SERVICE CONTRACT 2006
OF THE
DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION
Dated as of June 1, 2006
(the *General Terms*)

The General Terms govern the 2006 GRS Service Contract between the Detroit General Retirement System Service Corporation (the **Corporation**) and the City of Detroit (the **City**).

## Article I — Definitions and Related Matters

### Section 1.01.  Certain Definitions

In addition to terms elsewhere defined in this Service Contract, the following terms shall have the following respective meanings *unless* the context otherwise clearly indicates:

*Accreted Value Funding Portion* means the portion, if any, of the amount to be funded pursuant to the particular Specific Terms equal to the total of the Accreted Value Scheduled Payments, in any, set forth in the Specific Terms.

*Accreted Value Scheduled Payments* means those Scheduled Payments identified as such in the Specific Terms.

*Act of Council* means the ordinance or resolution of the City Council identified in the Specific Terms as the "Act of Council".

*Additional Service Payment* means an amount payable as General Corporate Expenses or pursuant to **Section 9.09** *other* than Contract Administrator Payments.

*Ancillary Amounts* means the Costs of Issuance, Prepaid Service Charges and Underwriter's Discount.

*Authorized Investments* means

>    (i)    direct obligations of, or obligations unconditionally guaranteed by, the United States of America (**US Governments**) and

>    (ii)    repurchase agreements whereby the counterparty agrees to repurchase obligations described in **clause (i)** *so long as* the obligations to be repurchased are under the exclusive "control" (as defined in Article 8 of the applicable Uniform Commercial Code or correlative Treasury Regulations) of the Corporation.

STRIPS issued by the United States Treasury are Authorized Investments for the purposes of **clause (i)**, *but* private proprietary stripped US Governments, whether interest or principal strips, are not Authorized Investments.

*Business Day* means any day on which both City and the Trustee are open for the transaction of business and in respect of any Service Charge Class has the meaning given in accordance with the Funding Rate Methodology for such Service Charge Class for actions taken in respect of such Funding Rate Methodology.

*Certificates* or *Certificates of Participation* mean the Certificates of Participation issued by the Funding Trust representing beneficial interests in the Service Payments *other* than Hedge Payables, Contract Administrator Payments and Additional Service Payments.

*Closing* means the delivery of particular Certificates to the Underwriters upon receipt of payment therefor and the other actions contemplated by the Underwriting Agreement to occur in connection therewith.

*Closing Date* means, with respect to particular Certificates, the date provided for in the particular Specific Terms on which the Closing occurs pursuant to the Underwriting Agreement.

*Contract Payments* means Service Payments and Additional Service Payments.

*Contract Administration Agreement* means the agreement identified in the Specific Terms as the "Contract Administration Agreement".

*Contract Administrator* means the Person serving as the "Contract Administrator" under the Contract Administration Agreement.

*Contract Administrator Payments* means amounts equal to amounts payable as fees, expenses and indemnification of the Contract Administrator pursuant to **Section 9.09**.

*Costs of Issuance* means the amount set forth in the particular Specific Terms as the "Costs of Issuance".

*Credit Insurance* means any insurance intended to protect owners of Certificates from loss arising from a failure of the City to timely pay Service Charges or Scheduled Payments. *Credit Insurance* also means any financial arrangement intended to protect a Hedge Counterparty from a failure of the Corporation to timely pay any Hedge Payable.

*Disclosure Document* means any preliminary or final offering document or other disclosure document prepared for use by the Underwriters in connection with the initial public offering of Certificates.

*Finance Director* has the meaning given that term in the Act of Council.

*Fixed Rate Funding Portion* means that the portion, if any, of the amount to be funded pursuant to the particular Specific Terms equal to the total of the Scheduled Payments set forth for Fixed Rate Service Charges.

*Funding Cost Supplement* means the document or particular provisions, if any, identified in the particular Specific Terms as a "Funding Cost Supplement".

*Funding* means the Initial Funding or an Additional Funding.

*Funding Rate Methodology* means the Fixed Rate Funding Methodology, any Variable Rate Funding Methodology or the Accreted Value Funding Methodology, as the context may require.

*Funding Rate Portion* means the Fixed Rate Funding Portion, the Variable Rate Funding Portion or the Accreted Value Funding Rate Portion as the context may require.

*Funding Trust* means the trust established by the Trust Agreement.

*General Corporate Expenses* means such periodic amounts as may be necessary to provide for the general administrative expenses of the Corporation as authorized or permitted by Ordinance No. 05-05, as in effect on the date hereof.

*Hedge* means an interest rate swap or other derivative instrument authorized or permitted by the Act of Council.

*Hedge Counterparty* means, as to any Stated Hedge, the Person identified in the particular Specific Terms as the "Hedge Counterparty".

*Hedge Payable* means, after giving effect to any netting under the particular Stated Hedge, any Hedge Periodic Payable or any Hedge Termination Payable as the context may require.

*Hedge Periodic Payable* means, after giving effect to any netting under the particular Stated Hedge, a periodic amount owing by the Corporation under a Stated Hedge to the respective Hedge Counterparty.

*Hedge Periodic Receivables* means, after giving effect to any netting under the particular Stated Hedge, periodic payments owing by the Hedge Counterparty under a Stated Hedge.

*Hedge Receivable* means any Hedge Periodic Receivable or Hedge Termination Receivable as the context may require.

*Hedge Termination Payable* means, after giving effect to any netting under the particular Stated Hedge, any termination payment owing by the Corporation under a Stated Hedge to the respective Hedge Counterparty.

*Hedge Termination Receivable* means, after giving effect to any netting under the particular Stated Hedge, any termination payment owing by the Hedge Counterparty under a Stated Hedge.

*Insurer* means the Person obligated under Credit Insurance to make payments with respect to Certificates or a Stated Hedge.

*Investable Funds* means amounts representing Costs of Issuance and Prepaid Service Charges.

*Payment Time* means noon (12:00), Detroit time.

*Person* means any natural person, firm, association, corporation, trust, partnership, joint venture, joint-stock company, municipal corporation, public body or other entity, however organized.

*Prepaid Service Charges* means the amount set forth in the particular Specific Terms as the "Prepaid Service Charges".

*Regular Scheduled Payment* means the amount of a Scheduled Payment due on its Scheduled Payment Date.

*Representative* means the Person identified in the particular Specific Terms as the "Representative".

*Scheduled Payment Dates* means the dates set forth in the particular Specific Terms as the "Scheduled Payment Dates".

1974114 0069\401794

3

13-53846-swr    Doc 3601-3 Filed 03/06/14 Entered 03/06/14 01:59:30 Page 41 of 62    213
13-53846-tjt    Doc 1140-6    Filed 10/10/13 Entered 10/10/13 14:54:54    Page 13 of 100

*Scheduled Payments* means the amounts set forth in the particular Specific Terms as the "Scheduled Payments".

*Service Charge Payment Date* means a Fixed Rate Service Charge Payment Date or a Variable Rate Service Charge Payment Date for a particular Variable Rate Funding Type, as the context may require.

*Service Charge Class* means all Scheduled Payments that have the same Funding Rate Methodology.

*Service Contract* means the 2006 Service Contract between the City and the Corporation consisting of these General Terms and the 2006 Specific Terms.

*Service Contract Deficiency* means any unsatisfied amount under a Service Contract Deficiency Clause.

*Service Contract Deficiency Clause* means the following **clauses** set forth in **Section 8.03: First** (to the extent any fees, expenses and indemnity is at the time due and unpaid to the Contract Administrator), **Second, Fourth** and **Sixth**.

*Service Payment* means any Contract Administrator Payment, Service Charge (regardless of Funding Rate Methodology), Regular Scheduled Payment or Sinking Fund Installment, amounts in respect of any Hedge Payable, Optional Prepayment or Accrued Service Charge as the context may require.

*Specific Terms* means that part of the Service Contract that provides the particulars of the a Funding.

*Stated Funding Amount* means the amount identified in the particular Specific Terms as the "Stated Funding Amount".

*Stated Hedge* means a Hedge identified in the particular Specific Terms as a "Stated Hedge".

*Third Party Beneficiary* means any Person so identified in **Section 9.12.**

*Transaction Amount* means the amount set forth in the Specific Terms as the "Transaction Amount".

*Trust Agreement* means the Trust Agreement identified in the particular Specific Terms.

*Trust Estate* means the property identified as the "Trust Estate" in the Trust Agreement.

*Trustee* means the Person acting as trustee under the Trust Agreement.

*Type* as in *Variable Rate Funding Type* (and correlative usages) means a method by which Variable Funding Rates are determined, such as by Dutch auction, by reference to an identified index (such as the London Interbank Offered Rate or "LIBOR") or by remarketing or any other means customarily used to determine variable rates in municipal or corporate finance. "Type" when used with respect to a Service Charge Class has the correlative meaning.

*Underwriters* means the Representative and the other Persons identified in the Underwriting Agreement as the "Underwriters".

*Underwriters' Discount* means the amount set forth in the particular Specific Terms as the "Underwriters' Discount".

1974114 0069\401794

4

13-53846-swr   Doc 36613-3 Filed 08/06/21 13 Entered 08/06/21 13 2015 9 36 20 Page 14 of 62   214
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 14 of 100

*Underwriting Agreement* means the agreement among the Corporation, the City and the Underwriters providing for the public offering of Certificates to fund a Funding.

*Variable Rate Funding Portion* means all or that portion, if any, of the Stated Funding Amount equal to the total of the Scheduled Payments set forth for all types of Variable Rate Service Charge Classes.

## Section 1.02. Other Definitions

Terms defined elsewhere in these General Terms include the following:

| *Term* | *Defined In* |
|---|---|
| Accreted Value | Section 6.05 |
| Accreted Value Day Count Convention | Section 6.05 |
| Accreted Value Funding Rate Methodology | Section 6.05 |
| Accreted Value Service Charge Rates | Section 6.05 |
| Accreted Value Service Charges | Section 6.01 |
| Accrued Service Charges | Section 5.03 |
| Additional Funding | Section 4.01 |
| Component | Section 1.03 |
| Corporation | General Terms, First Paragraph |
| Day Count Convention | Section 6.04 |
| Delivery Notice | Section 5.04 |
| Eligible Certificates | Section 5.04 |
| Fixed Rate Funding Methodology | Section 6.03 |
| Fixed Rate Scheduled Payments | Section 6.03 |
| Fixed Rate Service Charge Payment Date | Section 6.03 |
| Fixed Rate Service Charges | Section 6.01 |
| Funding Costs | Section 6.01 |
| Hedge Amount | Section 5.03 |
| Initial Funding | Section 4.01 |
| Initial Funding Contract Payments | Section 3.02 |
| Invest | Section 7.04 |
| Investment | Section 7.04 |
| Labor Law or Regulations | Section 3.03 |
| Maturity Value | Section 6.05 |
| Optional Prepayment Amount | Section 5.03 |
| Optional Prepayment Dates | Section 5.03 |
| Optional Prepayment Notice | Section 5.03 |
| Optional Prepayments | Section 5.03 |
| Prepayment Notice | Section 5.03 |
| Prepayment Receipt Day | Section 5.03 |
| Rating Agency | Section 9.02 |
| Related Service Payment | Section 7.03 |
| Service Charges | Section 6.01 |
| Service Charge Determination Dates | Section 6.04 |
| Service Payment | Section 1.01 |
| Service Payment Component | Section 1.03 |

| Term | Defined In |
|------|-----------|
| Sinking Fund Installment Dates | Section 2.01 |
| Sinking Fund Installments | Section 2.01 |
| Total Prepayment Amount | Section 5.03 |
| Valuation Dates | Section 6.05 |
| Variable Rate Funding Methodology | Section 6.04 |
| Variable Rate Scheduled Payments | Section 6.04 |
| Variable Rate Service Charge Payment Dates | Section 6.04 |
| Variable Rate Service Charges | Section 6.01 |

## Section 1.03.   Service Payment Components

Service Payments consist of the following components (each, a *Component* or *Service Payment Component*):

- Contract Administrator Payments
- Service Charges (regardless of Funding Rate Methodology)
- Regular Scheduled Payments
- Sinking Fund Installments
- amounts in respect of Hedge Periodic Payables
- amounts in respect of Hedge Termination Payables
- Optional Prepayments
- Accrued Service Charges

## Section 1.04.   Business Days

If the Service Contract requires an act to be performed on a day that is not a Business Day then such act shall be performed on the first day thereafter that is a Business Day with the same effect as if such act were performed on the day that such act was otherwise required to be performed.

## Section 1.05.   Certificates Held in Book-Entry Form

(a)    Actions under the Service Contract to be taken with regard to a Certificate in physical form include analogous actions under Article 8 of the applicable Uniform Commercial Code with respect the indirect holding system (commonly referred to as "book-entry system").

(b)    Any such analogous action shall be full satisfaction of its physical analogue.

(c)    The Corporation and the City may conclusively presume that any such action analogous to a physical action has been taken in due time and manner as required by law, and neither of them has any duty to enquire with respect thereto.

## Section 1.06.   Interpretation

(a)    Words of the masculine gender include correlative words of the feminine and neuter genders.

(b)    Unless the context otherwise indicates, words importing the singular include the plural and vice versa.

1974114 0069401794

6

13-53846-swr   Doc 3618-3   Filed 09/02/14   Entered 09/02/14 17:36:20   Page 71 of 62   216
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 16 of 100

(c)     Articles, Sections, Schedules and Attachments referred to by number or name refer to the corresponding Articles, Sections, Schedules and Attachments of the Service Contract unless otherwise provided.

(d)     The terms *hereby, hereof, hereto, herein, hereunder* and any similar terms used in the Service Contract refer to the Service Contract as a whole and not to any particular portion thereof.

(e)     The word *or* is not exclusive.

(f)     The enumeration of things after the word *including* is to be interpreted as illustrative and not as restrictive.

(g)     References to sections of a Public Act, or to a Public Act as a whole, also include any amendments thereto unless otherwise indicated and analogous sections or Public Acts enacted as substitutes therefor.

## Article II — Terms of Service Contract

### Section 2.01.  Particulars of Specific Terms

(a)     The Specific Terms for the Initial Funding shall:

(1)     Incorporate by reference these General Terms;

(2)     State the Stated Funding Amount and the Transaction Amount and Ancillary Amount components thereof;

(3)     Set forth the Scheduled Payments to be made pursuant to the Service Contract and classify the Scheduled Payments by Service Charge Class;

(4)     Set forth any Scheduled Payments subject to mandatory prepayment (***Sinking Fund Installments***), the amount of the Sinking Fund Installments and the Scheduled Payment Dates on which such Sinking Fund Installments are due (***Sinking Fund Installment Dates***);

(5)     Provide for the terms required by **Section 6.03** if the particular Specific Terms provides for Fixed Funding Rate Portion;

(6)     Identify the Funding Cost Supplement (which shall include the terms required by **Section 6.04**) for each Type of Variable Funding Rate Service Charge Class if the particular Specific Terms provides for a Variable Rate Funding Portion;

(7)     Identify the Funding Trust for Certificates and the Trust Agreement establishing such Funding Trust;

(8)     Identify any Hedge and any Credit Insurance to be entered into by the Corporation with respect to one or more Service Charge Classes and state that any such Hedge or Credit Insurance is acceptable to the Finance Director;

(9)     Identify the Representative;

(10)     Provide for the Closing Date and the disposition of the proceeds of the particular funding;

(11)  Identify the Contract Administration Agreement, if any; and

(12)  Contain such other particulars as agreed to by the Corporation and the City.

(b)  The Specific Terms for an Additional Funding shall contain particulars to the same effect as the Initial Funding so far as necessary or appropriate and such other particulars as shall relate to the particular Additional Funding.

(c)  Specific Terms for an Additional Funding do not constitute an amendment of the Service Contract to provide new services but rather an implementation of services agreed to be provided on the date of the Service Contract. The Service Contract may be restated to include the Specific Terms for an Additional Funding for convenience of reference.

## Section 2.02.  Variation of General Terms; Conflict with General Terms

(a)  Specific Terms may not change **this Section** of these General Terms.

(b)  *Except* as provided above, Specific Terms may delete, modify or otherwise vary these General Terms *but only* as related to a particular Funding *and then only* so long as such does not adversely affect any of the rights of successors to any interest of the Corporation or the rights of any Third Party Beneficiary arising in any prior Funding.

(c)  Any conflict between these General Terms and the terms set forth in any Specific Terms of the Service Contract shall be resolved in favor of the particular Specific Terms so far as not in conflict with **this Section**.

## Article III — Representations and Warranties

Each of the Corporation and the City represent and warrant as set forth in this Article for the mutual benefit of each other and for the benefit of the Funding Trust and the holders from time to time of the Certificates.

## Section 3.01.  Representations of the Corporation

The Corporation makes the following representations and warranties on the date hereof and shall make the same on and as of the Closing Date:

(a)  Corporate Existence and Power.  The Corporation is a nonprofit corporation duly incorporated, validly existing and in good standing under the laws of the State of Michigan.

(b)  Corporate and Governmental Authorization; Contravention.  The execution, delivery and performance by the Corporation of the Service Contract are within the Corporation's corporate powers, have been duly authorized by all necessary corporate action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of applicable law or regulation or of the articles of incorporation or bylaws of the Corporation or of any agreement, judgment, injunction, order, decree or other instrument binding upon the Corporation.

(c)  Binding Effect.  The Service Contract constitutes a valid and binding agreement of the Corporation enforceable in accordance with its terms *except* as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(d)  Litigation.  There is no action, suit or proceeding pending against, or to the knowledge of the Corporation threatened against or affecting the Corporation before any court or

arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely the ability of the Corporation to perform its obligations under the Service Contract or which in any manner questions the validity of the Service Contract.

(e)    <u>No Taxation.</u>  The Corporation is not subject to federal income tax or taxation by the State of Michigan.

(f)    <u>Not an Investment Corporation</u>.  The Corporation is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

## Section 3.02.  Representations of the City

The City makes the following representations and warranties on the date hereof and shall make the same on and as of the Closing Date:

(a)    <u>Corporate and Governmental Authorization; Contravention</u>.  The execution, delivery and performance by the City of the Service Contract are within the City's powers, have been duly authorized by all necessary action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of applicable law or regulation or of the City Charter or of any agreement, judgment, injunction, order, decree or other instrument binding upon the City.

(b)    <u>Conditions Precedent</u>.  All acts, conditions and things required by the Constitution and laws of the State of Michigan or the Act of Council to exist, to have happened and to have been performed precedent to and in the execution and delivery of the Service Contract by the City and the authorization of the Contract Payments in connection with the Initial Funding (*Initial Funding Contract Payments*) exist, have happened and been performed in due time, form and manner required by the Constitution or law in order to make the Service Contract a valid and binding obligation of the City, including the obligation to make the Initial Funding Contract Payments.

(c)    <u>No Indebtedness</u>.  The obligation of the City to make Contract Payments does not constitute or create any indebtedness of the City within the meaning of the limitation of The Home Rule City Act or any Michigan constitutional or other non-tax statutory or City charter limitation.

(d)    <u>Valid and Binding Agreement</u>.  The Service Contract constitutes a valid and binding agreement of the City enforceable in accordance with its terms *except* as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(e)    <u>Transaction Amount</u>.  The amount of the Transaction Amount does not exceed the amount for which City is authorized by the Act of Council to engage the services of the Corporation by entering into the Service Contract.

(f)    <u>Ancillary Amounts</u>.  The Costs of Issuance, Prepaid Service Charges and Underwriters' Discount represent the costs, fees and expenses that the City is authorized to pay by the Act of Council for the respective purposes and do not exceed the amounts permitted by the Act of Council.

1974114 0069\401794

9

13-53846-swr  Doc 3613-3  Filed 08/06/14  Entered 08/06/14 21:57:36  Page 401 of 62    219
13-53846-tjt  Doc 1140-6  Filed 10/10/13  Entered 10/10/13 14:54:54  Page 19 of 100

## Section 3.03.  Labor Related Representations of City and Corporation

Each of the City and the Corporation respectively represents and warrants as to itself, severally and not jointly, that none of the

(1)     execution, delivery and performance of the Service Contract by the City or the Corporation;

(2)     the execution, delivery and performance of the Trust Agreement by the Corporation;

(3)     the conveyance of the Corporation's interests in the Service Charges and Scheduled Payments to the Funding Trust (or the granting of a security interest therein to the Funding Trust) and the issuance and sale of the Certificates; or

(4)     the performance by the Trustee of its duties under the Trust Agreement in respect of the Certificates

requires any action by or in respect of, or filing with any labor union or any governmental body, agency or official responsible for enforcing federal or State of Michigan labor laws or regulations (collectively, *Labor Laws or Regulations*), or contravenes or constitutes a default under, any provision of applicable Labor Laws or Regulations or any collective bargaining agreement (as the same may have been modified by custom or practice) or other labor agreement, or any judgment, injunction, order or decree or other instrument in respect of any Labor Laws or Regulations.

## Article IV  — Service and Funding Arrangements

## Section 4.01.  Provision of Services

(a)     The services of the Corporation are described in the preamble to the Act of Council. The Corporation shall provide its services through taking the actions set forth below.

(1)     The Corporation shall fund the Stated Funding Amount on the Closing Date in the manner set forth in the Specific Terms (the *Initial Funding*).

(2)     The Corporation shall fund any Hedge Termination Payable in whole or in part as requested of the City and approved by the City Council.

(3)     The Corporation shall fund payment of some or all Service Payments as are requested by the City and approved by City Council to provide future financial benefits to the City (funding pursuant to **this paragraph** or **paragraph (2), above**, an *Additional Funding*).  An Additional Funding shall be accomplished under one or more other service contracts and not under this Service Contract.

(4)     An Additional Funding may include such things in the nature of Costs of Issuance, Prepaid Service Charges and Underwriters' Discount as authorized or permitted by the approval of the City Council of the Additional Funding.

(b)     "Funding", as used above, means the provision of money through the issuance of Certificates and does not mean or imply any further authorization of the City to make any Contract Payment *other than* Contract Payments in connection with any Additional Funding.

**Section 4.02.  Payment Obligation**

(a)     The City agrees to make Contract Payments to the Corporation in return for the present and future services of the Corporation under **Section 4.01** as and when Contract Payments become due and payable.

(b)     The obligations of the City hereunder, including its obligation to make Contract Payments, are contractual obligations of the City, enforceable in the same manner as any other contractual obligation of the City, and are *not* general obligations of the City to which the City has pledged its full faith and credit.

**Section 4.03.  Funding Obligation**

(a)     The obligation of the Corporation to provide the Initial Funding or any Additional Funding is subject to the receipt by the Corporation of proceeds sufficient for the Funding from the sale of Certificates.

(b)     The Corporation shall use its best efforts to cause the consummation of the offering and sale by the Underwriters of Certificates to provide sufficient proceeds for the particular Funding.

(c)     The City agrees to provide such information about the City of Detroit as may be reasonably required by the Underwriters for inclusion in the Disclosure Document and to *otherwise reasonably cooperate in the offering and sale of Certificates by the Underwriters.*

(1)     The City agrees to become a party to the Underwriting Agreement if the Underwriting Agreement is satisfactory in form and substance to the Finance Director.

(2)     The City agrees to enter into a continuing disclosure agreement and take such other actions as shall be necessary or appropriate to assist the Underwriters in meeting their obligations under Rule 15c2-12 of the Securities and Exchange Commission.

**Section 4.04.  Disposition of Certificate Proceeds**

The Corporation shall apply the proceeds of the sale of Certificates as provided in the Specific Terms for the particular Funding.

**Article V — Scheduled Payments**

**Section 5.01.  Scheduled Payments**

The City agrees to pay the Scheduled Payments of each Funding Rate Portion to the Corporation on the respective Scheduled Payment Dates for such Funding Rate Portion.  For the avoidance of doubt, Scheduled Payments do not include Hedge Payables.

**Section 5.02.  Mandatory Prepayment by Sinking Fund Installments**

The City agrees to prepay such Scheduled Payments as Sinking Fund Installments of each Funding Rate Portion on such Sinking Fund Installment Dates as shall be set forth in the Specific Terms.

**Section 5.03. Optional Prepayment of Scheduled Payments**

(a)     The City shall not voluntarily prepay any Scheduled Payments of a Funding Rate Portion (an *Optional Prepayment*) in whole or in part *unless* (i) such voluntary prepayment is expressly permitted in the Service Contract, (ii) it concurrently pays the Hedge Amount to the Corporation and (iii) it has met the condition precedent contained in **subsection (d)**, below.

(b)     The following terms have the following respective meanings:

*Accrued Service Charges* means, *if* an Optional Prepayment Date is *not* a Service Charge Payment Date, the amount of Service Charges accrued on the amount of the Scheduled Payment to be prepaid from the last Service Charge Payment Date before the Optional Prepayment Date to the Optional Prepayment Date.

*Hedge Amount* means the amount, if any, of any Hedge Termination Payable that will be owed by the Corporation pursuant to any Stated Hedge relating to the Scheduled Payments being prepaid as a result of any required reduction in the notional amount of such Stated Hedge due to such prepayment and the Hedge Periodic Payable, if any, accrued to the date of termination.

*Optional Prepayment Amount* means the sum of (i) the amount of the prepayment premium, if any, required by the Service Contract in connection with the prepayment of any selected Scheduled Payments *and* (ii) the amount of Scheduled Payments selected to be prepaid.

*Optional Prepayment Notice* means a notice of the City to the Corporation stating its intention to prepay the Scheduled Payments specified therein by the Payment Time on the Prepayment Receipt Date for the Optional Prepayment Date specified in such notice.

*Prepayment Receipt Day* means the day before the Optional Prepayment Date.

*Total Prepayment Amount* means, as to any Optional Prepayment, the amount of the Optional Prepayment Amount, Accrued Service Charges, if any, and the Hedge Amount, if any.

(c)     If the City elects to make an Optional Prepayment that is permitted by **subsection (a)**, above to be made, the City shall deliver an Optional Prepayment Notice *at least* 45 days (or such fewer days as is acceptable to the Corporation) before the Prepayment Receipt Date on which the City shall pay the Total Prepayment Amount to the Corporation in connection with such Optional Prepayment. Such Optional Prepayment Notice shall state:

(1)     The Scheduled Payments of the particular Funding Rate Portion to be prepaid in whole or in part by such Optional Prepayment and the date on which such Scheduled Payments are to be prepaid (*Optional Prepayment Date*) *subject* to the following:

(i)     a Scheduled Payment may be selected by the City *only if* it is permitted by the Service Contract to be prepaid on the particular Optional Prepayment Date and

(ii)     a Scheduled Payment may be selected by the City for partial prepayment only in an amount of at least $100,000 *unless* otherwise provided in the Service Contract;

(2)     the Optional Prepayment Amount;

(3)     the Accrued Service Charges, if any;

(4)     the Hedge Amount, if any;

(5)     such information in tabular or other form so as to readily permit the Corporation to identify:

   (i)   the Scheduled Payments of the particular Funding Rate Portion selected for prepayment,

   (ii)  the provisions of the Service Contract authorizing or permitting such prepayment,

   (iii) the prepayment premium, if any, required to be paid in connection with the prepayment of each such Scheduled Payment;

   (iv)  Accrued Service Charges, if any, due in respect of the prepayment of the particular Scheduled Payments; and

   (v)   the Hedge Amount, if any, due in respect of the prepayment of the particular Scheduled Payments.

(d)     It is a condition precedent to the City giving an Optional Prepayment Notice to the Corporation with respect to any Optional Prepayment that would obligate the Corporation to pay a Hedge Amount that the City provide reasonable evidence satisfactory to the Corporation that such Hedge Amount will be paid when due and such prepayment will not cause the Corporation to be in default under any agreement to which it is party in connection with the particular Funding.

(e)     The "reasonable evidence satisfactory to the Corporation" in **subsection (d)**, above, shall be such evidence as the Corporation is informed by the Hedge Counterparty or Counterparties and the Insurer (if the Insurer is not in default under its Credit Insurance at the time) is reasonably satisfactory to them.

(f)     The delivery by the City of an Optional Prepayment Notice to the Corporation is a statement of the intention of the City to pay the Total Prepayment Amount to the Corporation by the Payment Time on the Prepayment Receipt Day for the Optional Prepayment Date stated therein but does not obligate the City to so pay the Total Prepayment Amount to the Corporation, and no default shall occur by the City not so paying the Total Prepayment Amount or by the Optional Prepayment not otherwise being effected on the Prepayment Receipt Day.

(g)     The City may not make any Optional Prepayment that it is otherwise entitled to make under **this Section** *unless* it pays the Total Payment Amount in respect of such Optional Prepayment to the Corporation by the Payment Time (or such later time as may be acceptable to the Corporation) on the Prepayment Receipt Date.

(h)     Any Total Prepayment Amount received by the Corporation shall be used by the Payment Time (or as soon thereafter as is practicable) on the Prepayment Receipt Date to the satisfaction of each of the priorities set forth in **Section 8.03** higher than **clause Eighth**.

(1)     *If* none of the Total Prepayment Amount is used as provided above, *then* the Optional Prepayment shall be effectuated by using such Total Prepayment Amount to satisfy the Optional Prepayment Amount, the Accrued Service Charges, if any, and the Hedge Amount, if any.

(2)     If any part of the Total Prepayment Amount is used as provided above, *then* the Optional Prepayment shall *not* be effectuated, and the balance, if any of the Total Prepayment Amount shall be returned to the City on the Prepayment Receipt Date.

(3)     Use of the Total Prepayment Amount is subject to **Section 8.02**.

(i)     The City shall *not* pay the Total Prepayment Amount to the Corporation on any day prior to the particular Prepayment Receipt Day.

## Section 5.04.   Satisfaction of Scheduled Payments by Delivery of Certificates

(a)     The City may deliver or cause to be delivered Certificates to the Corporation in satisfaction (whether in whole or in part) of Scheduled Payments at any time and in any denomination upon 45 day's prior notice to the Corporation (or such fewer days as is acceptable to the Corporation) (a *Delivery Notice*) subject to the following limitations.

(1)     A Scheduled Payment may be satisfied by delivery of Certificates entitled to payment from such Scheduled Payment (*Eligible Certificates*).

(2)     The amount of a Scheduled Payment deemed paid shall be equal to the denominations of the particular Eligible Certificates.

(3)     No Certificate shall be delivered in payment in whole or in part of the respective Scheduled Payment (whether as payment of a Sinking Fund Installment or as other prepayment) more than 45 days before the respective due date *if* at the time of such delivery the City has not paid all Service Payments then and theretofore due.

(4)     No Scheduled Payment shall be satisfied by the delivery of Certificates until such Certificates have been delivered to the Trustee.

(b)     If Sinking Fund Installments are to be satisfied (whether in whole or in part) by the delivery of Eligible Certificates, the City shall indicate in the respective Delivery Notice the particular Sinking Fund Installments and amounts thereof to be so satisfied.

(c)     All Certificates received by the Corporation in payment of Scheduled Payments pursuant to **this Section** shall be immediately delivered to the Trustee for cancellation.

## Article VI — Service Charges

## Section 6.01.   Agreement to Pay Service Charges; Funding Costs

(a)     The City agrees to pay amounts (*Service Charges*) to the Corporation on Service Charge Payment Dates sufficient to pay the costs of capital (*Funding Costs*) for the particular Funding.  For the avoidance of doubt, it is acknowledged that Service Charges do not include Hedge Payables.

(b)     Funding Costs shall be determined by the particular Funding Rate Methodology.

(1)     Funding Costs for any Fixed Rate Funding Portion shall be determined and paid in accordance with the Fixed Rate Funding Methodology described in **Section 6.03**, and the corresponding Service Charges shall be *Fixed Rate Service Charges*.

(2)     Funding Costs for a Variable Rate Funding Portion shall be periodically determined and paid in accordance with the Variable Rate Funding Methodology described in **Section 6.04**, and the corresponding periodic Service Charges shall be *Variable Rate*

1974114 0069401794

*Service Charges* and may be referred to by the particular Type of Variable Rate Service Charges; e.g., Index Rate Service Charges.

(3)    Funding Costs for an Accreted Value Funding Portion shall be determined and paid in accordance with **Section 6.05** and the corresponding Service Charges shall be *Accreted Value Service Charges* (as to which, see also **Section 6.05**).

## Section 6.02. Prepaid Service Charges; Hedge Receivables

(a)    Prepaid Service Charges shall be used to meet the City's obligation to pay the first occurring Service Charges and Hedge Periodic Payables of the Corporation *except* as otherwise may be provided in the Specific Terms.

(b)    Hedge Receivables received by the Corporation shall be used to satisfy the City's obligation in respect of then existing Service Contract Deficiencies in accordance with **Section 7.05** or then current Service Charges not otherwise paid.

## Section 6.03. Fixed Rate Funding Methodology

(a)    The provisions of **this Section** constitute the *Fixed Rate Funding Methodology.*

(b)    The particular Specific Terms shall state the rates (*Fixed Service Charge Rates*) at which the Fixed Rate Service Charges are computed for the respective Scheduled Payments comprising the Fixed Rate Funding Portion (*Fixed Rate Scheduled Payments*). Fixed Service Charge Rates may be different for different Fixed Rate Scheduled Payments.

(c)    The particular Specific Terms shall also state the dates (*Fixed Rate Service Charge Payment Dates*) on which the Fixed Rate Service Charges are payable.

(d)    Fixed Rate Service Charges shall be computed as if the Fixed Rate Scheduled Payments bore interest at the respective Fixed Rates and computed on the basis of a 360-day year consisting of 12, 30-day months.

(e)    On each Fixed Rate Service Charge Payment Date the City shall pay a Fixed Rate Service Charge equal to the Fixed Rate Service Charge accrued on the respective unpaid Fixed Rate Scheduled Payments from the later of the Closing Date or the last Fixed Rate Service Charge Payment Date on which Fixed Rate Service Charges were paid in full by the City.

## Section 6.04. Variable Rate Funding Methodology

(a)    The provisions of **this Section** constitute the *Variable Rate Funding Methodology*.

(b)    The periodic Variable Rate Service Charge for each Scheduled Payment set forth under a particular type of Service Charge Class in the Variable Rate Funding Portion (*Variable Rate Scheduled Payments*) shall be determined in accordance with the particular Type of Variable Rate Funding.

(c)    Each Funding Cost Supplement for a Type of Variable Rate shall provide for a procedure by which the Variable Rate Service Charges are determined for the particular Variable Rate Funding Type and shall further provide:

(1)    The *Variable Rate Service Charge Payment Dates*: the dates on which the Variable Rate Service Charges are payable for such Type;

1974114 0069401794

15

13-53846-swr    Doc 3618-3    Filed 08/06/14    Entered 08/06/14 15:35:20    Page 26 of 62    225
13-53846-tjt    Doc 1140-6    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 25 of 100

(2)    The *Service Charge Determination Dates*: the dates on which the Variable Rate Service Charges of such Type are determined;

(3)    The *Service Charge Adjustment Dates*: the dates on which the Variable Rate Service Charges of such Type are adjusted; and

(4)    The *Day Count Convention*: the number of days in a month and in a year used to determine the amount of the Variable Rate Funding Service Charges of such Type.

(d)    Variable Rate Service Charges for each Variable Rate Funding Type in the Variable Rate Funding Portion shall be computed as if the Variable Rate Scheduled Payments of the particular Variable Rate Type bore interest at a rate (the *Variable Service Charge Rate*) (i) determined as of each Service Charge Determination Date for such Type and effective as of the respective Service Charge Adjustment Date for such Type and (ii) computed using the applicable Day Count Convention for such Type.

(e)    Variable Rate Funding Costs for any Variable Rate Funding Type may be tranched such that not all Variable Rate Funding Scheduled Payments of the particular Type are computed in the same manner; e.g., some may be determined on a weekly basis and others may be determined on a monthly basis.

(f)    On each Variable Rate Service Charge Payment Date for a particular Type the City shall pay a Variable Rate Service Charge equal to the applicable Variable Rate Funding Costs accrued on the unpaid Variable Rate Funding Scheduled Payments of that Type from the later of the Closing Date or the last applicable Variable Rate Funding Service Charge Payment Date on which the Variable Rate Funding Service Charges of that Type were paid in full by the City.

**Section 6.05.  Accreted Value Funding Methodology**

(a)    The provisions of **this Section** constitute the *Accreted Value Funding Methodology*. The *Accreted Value Day Count Convention* for purposes of the Accreted Value Funding Rate Methodology is 12, 30-day months in a year of 360 days *unless* otherwise stated in the particular Specific Terms.

(b)    The particular Specific Terms shall state:

(1)    the Accreted Value Scheduled Payments,

(2)    the rates at which the Accreted Values will be computed (the *Accreted Value Service Charge Rates*),

(3)    Accreted Value Day Count Convention *if* the convention to be applied is different than the Accreted Value Day Count Convention defined in **subsection (a) above**.

(4)    the dates on which the Accreted Values (the *Valuation Dates*) are to be computed and

(5)    the Accreted Value for each $5,000 (*unless* a different amount is set forth in the particular Specific Terms) of Maturity Value of each Accreted Value Scheduled Payment on each Valuation Date.

1974114 0069401794

16

13-53846-swr    Doc 3061-3  Filed 03/06/14  Entered 03/06/14 01:59:36  Page 26 of 62  226
13-53846-tjt    Doc 1140-6    Filed 10/10/13  Entered 10/10/13 14:54:54    Page 26 of 100

(c)     The Accreted Value Funding Methodology consists of computing the future value (*Maturity Value*) of the Accreted Value Scheduled Payments from the particular Closing Date to their respective Scheduled Payment Dates using their respective Accreted Value Service Charge Rates and computed on the basis of compounding on each of the Valuation Dates and the Accreted Value Day Count Convention.

(1)     The result obtained by application of the Accreted Value Funding Methodology to any Accreted Value Scheduled Payment is its *Accreted Value*.

(2)     The Accreted Value of any Accreted Value Service Payment between any two, consecutive Valuation Dates shall be determined by interpolation between such Valuation Dates using the Accreted Value Day Count Convention.

(3)     The Accreted Values set forth in the particular Specific Terms shall be conclusive in the absence of manifest error for all purposes of the Service Contract.

(d)     *Accreted Value Service Charges* on any date of determination with respect to any Accreted Value Service Payment are equal to the Accreted Value of such Accreted Value Service Payment *less* such Accreted Value Scheduled Payment.

(1)     Accreted Value Service Charges are due and payable on the Scheduled Payment Dates for the respective Accreted Value Scheduled Payments.

(2)     Accreted Value Service Charges are not payable prior to their respective due dates *except* as in accordance with **Section 9.01.**

## Article VII — General Provisions Governing Service Payments and Contract Administrator Payments

### Section 7.01.  Time of Service Payments

The City shall make all Service Payments other than Contract Administrator Payments by the Payment Time on the day immediately before the date when due.  The City shall make all Contract Administrator Payments on the date when due.

### Section 7.02.  Hedge Payables

The City agrees to pay the amount of any Hedge Payable to the Corporation promptly upon receipt of notice thereof from the Corporation; *provided* that the City is not required to pay such amount before the Payment Time on the day before the due date of the particular Hedge Payable.

### Section 7.03.  Subrogation

(a)     No payment of any amount to a holder of Certificates or a Hedge Counterparty made from an amount paid by an Insurer under its Credit Insurance (a *Credit Insurance Payment*) shall discharge the City's obligation to pay any Service Payment in respect of which such Credit Insurance Payment was paid (a *Related Service Payment*).

(b)     An Insurer making a Credit Insurance Payment shall be subrogated to the rights of Certificateholders or a Hedge Counterparty, as the case may be, to receive the Related Service Payment and shall be entitled to exercise all rights and remedies that the Person to which it is the subrogee would have otherwise been entitled to exercise.

1974114 0069401794                                17

13-53846-swr    Doc 3613-3  Filed 08/09/21213  Entered 08/09/21213
13-53846-tjt    Doc 1140-6    Filed 10/10/13  Entered 10/10/13 14:54:54    Page 27 of 100

**Section 7.04. Investment**

(a)     The Corporation shall not invest any amounts received by it under the Service Contract *except* as provided in **this Section.** *Invest* means the transfer, disposition or other use of such amounts in expectation of gain, and *Investment* means any investment of Investable Funds.

(b)     Investable Funds shall be invested by the Corporation as directed by the City in Authorized Investments that mature in the amounts and at the times the related Investable Funds are needed to make the payments for which such Investable Funds were received by the Corporation.

(c)     Investments shall be made by Funding Rate Portion but may be commingled for investment purposes *so long as* records are kept showing each particular Funding Rate Portion and the gain and loss attributable to it.

(d)     No Investment shall be sold prior to the maturity thereof.

(e)     All Investments shall be made directly by the Corporation having exclusive control over the related securities entitlement (as "control" and "security entitlement" are defined in Article 8 of the applicable Uniform Commercial Code or correlative Treasury Regulations) *except* that Investments may also be made through one or more investment companies registered under the Investment Companies Act of 1940, as amended, *if* (i) such investment company has a rating by Standard & Poor's Corporation or any national statistical ratings organization (as defined by the Securities and Exchange Act of 1934, as amended, or any successor to it) at least equal to the rating of the Authorized Investment *and* (ii) such registered investment company invests only in debt instruments.

(f)     Gain and loss from Investments shall be attributed to the type of Investable Funds giving rise to it.

(1)     Gain shall be paid to the City when realized to the extent it is not needed to satisfy any then existing Service Contract Deficiency in accordance with **Section 7.05** or satisfy any then current Service Payment.

(2)     The City is responsible for all such loss and shall reimburse the Corporation for such loss upon demand by the Corporation.

**Section 7.05.  Satisfying Service Contract Deficiencies**

(a)     **This Section** governs the use of certain amounts to satisfy Service Contract Deficiencies. *If* the City has not provided funds sufficient to satisfy the requirements of **Section 8.03,** *then* the amounts subject to this Section, in an amount not exceeding any Service Contract Deficiency, shall be applied in accordance with **Section 8.03.**

(b)     The amounts subject to this Section and the order of use are (ı) Hedge Receivables and (ii) gain from Investments

(c)     Such amounts are subject to **Section 8.02.**

## Section 7.06. No Set-Off

The obligation of the City to make payments hereunder shall be absolute and uncondi-tional, irrespective of any defense or any rights of set-off, recoupment or counterclaim or deduc-tion and without any rights of suspension, deferment, diminution or reduction it might otherwise have against the Corporation, the Trustee, any holder or beneficial owner of any Certificate or any other person whether in connection herewith or with any unrelated transaction and the obli-gation of the City to make such payments shall not be conditioned on its receipt of future ser-vices of the Corporation under **Sections 4.01(a)(2)** through **(4)**. The City will not suspend or discontinue its obligation to make any such payment for any cause whatsoever, and, to the extent permitted by law, the City waives all rights now or hereafter conferred by statute or otherwise to quit, terminate, cancel or surrender any such obligation of the City under the Service Contract or to any abatement, suspension, deferment, diminution or reduction in such payments.

## Article VIII — Satisfaction of Service Payments and Contract Administrator Payments

## Section 8.01. Certain Defined Terms

An amount is ***about to become due*** for the purposes of **Section 8.03** on the Busi-ness Day before its due date *except* when the amount is payable daily, in which case the term "about to become due" is inapplicable.

***all Service Contracts*** means the Service Contract and the Other Service Contract.

***each Service Contract*** means the Service Contract or the Other Service Contract as the context may require.

***each Service Corporation*** means the Service Corporation or the Other Service Corporation as the context may require.

***Other Service Contract*** means a service contract between the City and the Other Service Corporation, certain payments under which Other Service Contract are part of the Trust Estate.

***Other Service Corporation*** means the nonprofit corporation party to the Other Service Contract.

***pro-rata*** for the purposes of **this Article** means for any priority class under **Sec-tion 8.03** and as of any computation date, a fraction, the numerator of which is the amount owing to any particular Person who is entitled to a payment in such priority class and the denominator of which is the total of all such payments owing to all such Persons in such priority class.

## Section 8.02. Preservation of Parity among Service Contracts

All Service Payments payable under this Service Contract shall be made and the Corpora-tion shall be entitled to receive such payments on a pro-rata basis with the Service Payments un-der the Other Service Contract so that each Service Payment Component having a specified pri-ority under **Section 8.03** is made on a pro-rata basis with the Service Payment Components hav-ing the same defined term under Section 8.03 of the Other Service Contract, and no Service Pay-ment Component shall be satisfied *until* all Service Payment Components under all Service Con-tracts having the same defined term but having a greater priority under **Section 8.03** of each Service Contract are first satisfied in full.

**Section 8.03.  Satisfaction of Service Payments**

Service Payments under all Service Contracts shall be satisfied in the following order and priority:

**First:**  Contract Administrator Payments; *then*

**Second:**  all theretofore due and unpaid Service Charges (regardless of the Funding Rate Methodology, including any Accreted Value Funding Methodology) and amounts in respect of Hedge Periodic Payables; *then*

**Third:**  all then due or about to become due Service Charges (regardless of the Funding Rate Methodology, including any Accreted Value Funding Methodology) and amounts in respect of Hedge Periodic Payables; *then*

**Fourth:**  all theretofore due and unpaid Regular Scheduled Payments and Sinking Fund Installments; *then*

**Fifth:**  all then due or about to become due Regular Scheduled Payments and Sinking Fund Installments; *then*

**Sixth:**  all theretofore due and unpaid amounts in respect of Hedge Termination Payables; *then*

**Seventh:**  all then due or about to become due amounts in respect of Hedge Termination Payables; *then*

**Eighth:**  all then due or about to become due Optional Prepayment Amounts and Accrued Service Charges.

## Article IX — Miscellaneous

**Section 9.01.  Acceleration on Bankruptcy**

*If* the City shall (i) commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, (ii) consent to the institution of any such proceeding or the filing of any such petition or (iii) make a general assignment for the benefit of creditors, *then* all payments due hereunder shall become immediately due and payable without presentment, demand, protest or notice of any kind, all of which are expressly waived notwithstanding anything to the contrary herein.

**Section 9.02.  Termination or Assignment of Stated Hedges**

(a)  At the request of the City and with the prior written consent of the Insurer that has Credit Insurance in respect of the particular Stated Hedge, the Corporation shall terminate any Stated Hedge or assign its interest in any Stated Hedge to a Person that agrees to perform and observe all of the duties and obligations of the Counterparty to such Stated Hedge.

(b)  Any such substitute Hedge Counterparty shall have the rating required by Public Act 34 of the Public Acts of 2001, as amended, *as if* the City were a party to the particular Stated Hedge.

(c)  No such termination or substitution of a Hedge Counterparty shall take effect unless each Rating Agency confirms its rating of the particular Certificates.

13-53846-swr   Doc 3618-3 Filed 08/06/24 13 Entered 08/06/24 13:01:59 06:20 Page 30 of 62   230
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 30 of
100

(d) **Rating Agency** means each national statistical rating organization (as defined in the Securities and Exchange Act of 1934, as amended) that at the time has a rating of the Certificates in effect.

## Section 9.03. Required Ratings of Hedge Counterparties

(a) The Corporation shall only enter into Hedges with Persons who have, on the date the Hedge is entered into, or, alternatively, whose Hedge obligations are guaranteed by a Person who has on the date the Hedge is entered into, a rating of its long-term, senior secured debt at least A- by Standard & Poor's Corporation and at least A3 by Moody's Investment Service.

(b) It is not a breach of **subsection (a)**, above if the Hedge is subject to an Insurer approved transaction transfer agreement with a Person who qualifies, or whose Hedge obligations are guaranteed by a Person who qualifies, under **subsection (a)**, above.

## Section 9.04. Addresses for Notices.

All notices and other communications provided for hereunder shall be in writing unless otherwise stated herein mailed, sent or delivered

if to the City, at
     City of Detroit, Michigan – Finance Department
     1200 Coleman A. Young Municipal Center
     2 Woodward Avenue
     Detroit, Michigan 48226
     Attention: Finance Director

if to the Corporation, at
     c/o Lewis & Munday, P.C.
     Suite 2490
     660 Woodward Avenue
     Detroit, Michigan
     Attention: President

or to such other address as such Person may specify to the other Person and shall be effective (i) if given by mail, 3 Business Days after such communication is deposited in the mails with first class postage prepaid or (ii) if given by any other means, when delivered at the address specified in or pursuant to **this Section**.

## Section 9.05. Amendment

The Service Contract may be amended only by written instrument signed by the parties hereto *except* that no amendment shall be valid:

(i) *if* such amendment diminishes the rights and remedies of any Third Party Beneficiary without the prior written consent of such Third Party Beneficiary;

(ii) *unless* the Trustee of any Funding Trust that is a transferee of or successor to any rights or entitlements hereunder and that received an opinion of counsel in connection with the organization of the Funding Trust to the effect that such Funding Trust will qualify as a grantor trust under Subpart E, Part I of Sub-

1974114 0069\401794

21

13-53846-swr Doc 3618-3 Filed 04/06/14 Entered 04/06/14 21:57:20 Page 23 of 62 231
13-53846-tjt Doc 1140-6 Filed 10/10/13 Entered 10/10/13 14:54:54 Page 31 of 100

chapter J of the Internal Revenue Code of 1986, as amended, shall have received an opinion reasonably acceptable in form and substance to such Trustee of counsel reasonably acceptable to such Trustee to the effect that such amendment shall not result in such Funding Trust being treated as other than such a grantor trust;

(iii) *unless* the Trustee has received an opinion in form and substance reasonably satisfactory to the Trustee of counsel reasonably acceptable to the Trustee to the effect that such amendment will not result in the Service Charges and Scheduled Payments failing to constitute payments in respect of indebtedness for U.S. federal income tax purposes; and

(iv) *unless* every Insurer who is not in default under its Credit Insurance at the time has consented to the amendment, including such prior written consent as may be set forth in the Contract Administration Agreement or any other agreement to which the Corporation is a party.

## Section 9.06. No Waiver; Remedies.

No failure on the part of the Corporation or any permitted successor or assign or any Third Party Beneficiary to exercise, and no delay in exercising, any right hereunder shall be a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other further exercise thereof or the exercise of any other right.

## Section 9.07. Binding Obligation.

The Service Contract is a continuing obligation of the City and shall until the date on which all amounts due and owing hereunder are paid in full (i) be binding upon the City and its successors and (ii) inure to the benefit of and be enforceable by the Corporation, its successors and permitted assigns, and by Third Party Beneficiaries.

## Section 9.08. General Corporate Expenses

The City shall pay the General Corporate Expenses of the Corporation as and when they become due.

## Section 9.09. Fees and Expenses.

(a) The Corporation shall pay compensation, expenses and indemnification due the Trustee in accordance with the Trust Agreement, including reasonable fees and expenses of counsel, in connection with any waiver or consent thereunder or any amendment thereof, or in connection with the enforcement thereof.

(b) The Corporation shall pay compensation, expenses and indemnification due the Contract Administrator and the Enforcement Officer (defined in the Contract Administration Agreement), if any, in accordance with the Contract Administration Agreement, including reasonable fees and expenses of counsel, in connection with any waiver or consent hereunder or any amendment hereof or thereof, or in connection with the enforcement hereof.

(c) The Corporation shall pay the fees of remarketing agents, auction agents and broker-dealers, or any of them, as provided for any particular Variable Rate Funding Type.

1974114 0069\401794

22

13-53846-swr   Doc 1140-3   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 32 of 62   232
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 32 of 100

(d)     The Corporation shall pay the expenses and other amounts due each Insurer in accordance with **Section 10.5** of the **Contract Administration Agreement**;

(e)     The Corporation shall pay all amounts due the Enforcement Officer under **Section 8.19** of the **Contract Administration Agreement** and not otherwise paid by an Affected Party (as such terms defined in the Contract Administration Agreement), *but* the Corporation shall have no obligation to pay any indemnity required by the Enforcement Officer;

(f)     The Corporation shall pay all other payments required to be paid by the Corporation under Contract Administration Agreement and not otherwise paid.

**Section 9.10.  Permitted Assignment.**

(a)     The Service Contract shall be binding upon the parties hereto and their respective successors and permitted assigns.  No assignment by either party of its interests herein shall be valid *except* as provided in this Section.

(b)     The Corporation may transfer (as defined below in **this subsection**) the Scheduled Payments and Service Charges to the Funding Trust, *provided* that the Corporation shall not do so without:

(1)     delivering prior written notice thereof to the City,

(2)     listing the Funding Trust as the owner of the Scheduled Payments and Service Charges on the registration book (described below), and

(3)     obtaining the agreement of the Funding Trust not to effect any subsequent transfer of any Scheduled Payments and/or the Service Charges without

(i)     delivering to the City prior written notice of any such transfer(s) of the Scheduled Payments and/or the Service Charges and

(ii)     obtaining the agreement of the transferee (*x*) not to effect any further transfer without prior delivery to the Corporation of notice thereof in the manner of the notice described in **clause (i)** above, and (*y*) to obtain the same agreement of any further transferee (i.e., to give such notice and obtain such agreement of further transferees).

For the avoidance of doubt, the prior written notice referred to in **this subsection** only applies to the holder of legal title to the Scheduled Payments and the Service Charges and not to owners of Certificates.

A provision in the Trust Agreement to the effect, "For the avoidance of doubt, the Trustee acknowledges that it has no power to transfer, assign or otherwise convey legal title to the Funding Trust Receivables and that beneficial interests in the Funding Trust Receivables may be transferred as transfers of Certificates." shall satisfy the agreement referred to in **clause (ii)**, above.

1974114 0069401794

23

13-53846-swr   Doc 3613-3  Filed 08/02/13  Entered 08/02/13 15:53:20  Page 33 of 62   233
13-53846-tjt   Doc 1140-6   Filed 10/10/13  Entered 10/10/13 14:54:54   Page 33 of 100

The City shall record each such transfer of the Scheduled Payments and/or the Service Charges for which it receives any such notice in its official records (which shall constitute the "registration book" referred to in **this subsection**), and such recording shall identify the subsequent transferee.

The term *transfer* in **this subsection** means a sale, assignment, transfer or conveyance.

(c)    No assignment of the Service Contract or any amounts receivable thereunder shall include the right to receive Additional Service Payments, Contract Administrator Payments or Hedge Payables except that the Corporation may assign or grant a security interest in amounts received by it as payment of Hedge Payables to the Hedge Counterparties.

## Section 9.11.   Direct Payment of Service Payments; "Successor" Defined

(a)    Additional Service Payments shall be payable by the City to the Persons originally entitled to receive them or their successors on the dates when due.

(b)    The term *successor* in **this Article** means either a successor to a particular Person by law (e.g., the surviving corporation in a merger) or a successor to the particular office for which Additional Service Payments or Contract Administrator Payments are payable (e.g., a new Person, not by operation of law, becomes successor Trustee). *Successor* does *not* include any other Person without the written consent of the City.

## Section 9.12.   Third Party Beneficiaries

(a)    <u>Persons that are Third Party Beneficiaries</u>

(1)    The Persons, including the Trustee and the Contract Administrator, originally entitled to Additional Service Payments or Contract Administrator Payments and their respective successors are third party beneficiaries of the Service Contract as to the City's promises to pay Additional Service Payments or Contract Administrator Payments to the Service Corporation.

(2)    Hedge Counterparties, and their respective successors and subrogees, are third party beneficiaries of the Service Contract as to the City's promises to pay amounts in respect of Hedge Payables to the Corporation.

(3)    Insurers are third party beneficiaries of the Service Contract.

(4)    The Funding Trust is a third party beneficiary of the Corporation's promises in respect of Service Charges and Scheduled Payments.

(5)    The Contract Administrator and the Enforcement Officer (as defined in the Contract Administrator Agreement) are third party beneficiaries as to the Corporation's promises in **Section 9.09**.

(b)    <u>Rights of Third Party Beneficiaries</u>

Third Party Beneficiaries have the right to enforce the respective promises made in the Service Contract as if such promises were made directly to them. As between the Insurers, any Insurer that has the right, pursuant to **Section 6.9** of the **Contract Administration Agreement**, to control enforcement proceedings instituted pursuant to the Contract Administration Agree-

13-53846-swr    Doc 36018-3  Filed 08/06/21  Entered 08/06/21 15:36:20   Page 534 of
13-53846-tjt    Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54    Page 34 of
100                                                                               234

ment shall also have the right to control enforcement proceedings instituted by an Insurer pursuant to the Service Contract.

(c) Effect of Amendments on Third Party Beneficiaries

Any amendment that diminishes the rights and remedies of any Third Party Beneficiary without the prior written consent of such Third Party Beneficiary is acknowledged to have the effect in fact of hindering, delaying and defrauding such Third Party Beneficiary in the collection of an obligation owed to it.

## Section 9.13. Reliance on Representations and Warranties

(a) Each permitted assignee and any subrogee of any rights hereunder and Third Party Beneficiary shall have the benefit of the representations and warranties of the City and the Corporation made herein as if such representations and warranties had been made directly to it.

(b) Each permitted assignee and any subrogee of any rights hereunder and Third Party Beneficiary shall be conclusively presumed to have relied upon such representations and warranties, and such reliance shall survive any investigation made by such permitted assignee or Third Party Beneficiary.

## Section 9.14. Contract Administration

(a) Nothing in the Service Contract shall prohibit the Corporation from employing one or more agents and attorneys-in-fact to collect Service Payments or to otherwise administer the Contract.

(b) The City agrees to make Service Payments due the Corporation to any such agent or attorney-in-fact upon receipt of notice of its appointment.

## Section 9.15. Governing Law

The rights and obligations of the parties hereunder shall be governed by and construed in accordance with the law of the State of Michigan exclusive of its conflicts of law rules.

## Section 9.16. Headings

Article and Section headings in the Service Contract are included herein for convenience of reference only and do not constitute a part of the Service Contract for any other purpose.

## Section 9.17. Integration

The Service Contract is intended by the parties as the final, complete and exclusive statement of the transactions evidenced by the Service Contract. All prior contemporaneous promises, agreements and understandings relating to such transaction, whether oral or written, are deemed to be superseded by the Service Contract, and no party is relying on any promise, agreement or understanding not set forth or referred to in the Service Contract.

1974114 0069401794

25

13-53846-swr   Doc 3618-3   Filed 08/06/14   Entered 08/06/14 21:59:06   Page 35 of 62   235
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 35 of 100

**Section 9.18.  Counterparts**

The Service Contract may be executed in multiple counterparts, *but* all such counterparts taken together shall evidence by one and the same original.

*[End of General Terms]*

# First Amendment to GRS Service Contact 2006

### THIS AMENDMENT IS ENTERED INTO FOR SETTLEMENT PURPOSES

**First Amendment to GRS Service Contract 2006** (the *Amendment*), dated as of June 15, 2009, between the **Detroit GRS Retirement System Service Corporation**, a Michigan nonprofit corporation (the *Service Corporation*), and the **City of Detroit**, a municipal corporation organized and existing under the laws of the State of Michigan (the *City*),

## W I T N E S S E T H:

**Whereas**, the Service Corporation entered into the GRS Service Contract 2006, dated as of June 7, 2006 (the *Service Contract*), with the City as part of the 2006 Transaction (the *2006 Transaction*) described in Ordinance No. 05-09 (the *Authorizing Ordinance*) undertaken by the City as part of its Pension System Funding Program (the *Pension System Funding Program*) described therein;

**Whereas**, also as part of the 2006 Transaction the Service Corporation entered into certain interest rate swap agreements (each, a *2006 Hedge* and collectively, the *2006 Hedges*) with **UBS AG** (*UBS*), **SBS Financial Products Company, LLC** (*SBS* and collectively with UBS, the *2006 Counterparties*) and **Merrill Lynch Capital Services, Inc.**, as credit support provider to SBS as part of the 2006 Transaction;

**Whereas**, the Service Contract, among other things, provided for the City to make payments to the Service Corporation sufficient to pay amounts owing by the Service Corporation under the 2006 Hedges;

**Whereas**, in January 2009, the 2006 Counterparties notified the City and the Service Corporation that they believed that an event had occurred which entitled them to declare a certain "additional termination event" (the *2006 Additional Termination Event*) under the 2006 Hedges;

**Whereas**, the declaration of the 2006 Additional Termination Event could have resulted in the imposition of an immediate obligation on the City to make a combined payment to the Service Corporations in the range, estimated in January 2009, of $300 million to $400 million;

**Whereas**, the City Council adopted the Authorizing Ordinance on May 26, 2009, in contemplation of settlement with the Counterparties;

**Whereas**, this amendment to the Service Contract is one of the documents contemplated by the Authorizing Ordinance;

**Whereas**, the Corporation was created as part of the Pension System Funding Program to reduce the City's burdens of government by meeting and managing the City's obligations under the Michigan Constitution to maintain the actuarial integrity of the GRS Retirement System of the City of Detroit (the *GRS Retirement System*), in respect of which the Corporation was established;

**Whereas**, the declaration of the 2006 Additional Termination Event would substantially impair the City's ability to meet its constitutional obligations with respect to the GRS Retirement System;

**Now, Therefore,** in exchange for a waiver of the rights of each Counterparty to declare the 2006 Additional Termination Event and for a rescission of any declaration of the 2006 Additional Termination Event by a Counterparty made through the date on which the transaction of which this Amendment is a part closes (the ***Closing Date***), and in the interest of avoiding fees and expenses of litigation and the delays that would result should litigation ensue, the parties hereto agree as follows:

## Section 1. Definitions

Capitalized terms not defined in this Amendment and defined in the Service Contract are used herein as therein defined.

## Section 2. Amendments to Service Contract

(a) Amendments to Section 1.01 of the General Terms

(1) The following definition is added to Section 1.01 of the General Terms in proper alphabetical order:

***Collateral Agreement*** means the Collateral Agreement, dated as of June 15, 2009, among the City, the Corporation and the other parties thereto.

(2) The definition of "Service Payment" appearing in Section 1.01 of the General Terms is amended by adding the language indicated thus and as amended shall read as follows:

***Service Payment*** means any Contract Administrator Payment, Service Charge (regardless of Funding Rate Methodology), Regular Scheduled Payment or Sinking Fund Installment, amounts in respect of any Hedge Payable, Optional Prepayment or Accrued Service Charge as the context may require. ***Service Payment*** does not include any amounts payable or paid under the Collateral Agreement.

(3) The definition of "Stated Hedge" appearing in Section 1.01 of the General Terms is amended to read as follows:

***Stated Hedge*** means a Hedge identified in the Specific Terms as a "Stated Hedge" as amended by the amendments to the 2006 Hedges with an effective date that corresponds to the Closing Date.

(b) Amendments to Section 7.02 of the General Terms

Section 7.02 of the General Terms is amended by adding the subsection designation and language indicated thus and as amended shall read as follows:

### Section 7.02 Hedge Payables

(a) The City agrees to pay the amount of any Hedge Payable to the Corporation promptly upon receipt of notice thereof from the Corporation; *provided* that the City is not required to pay such amount before the Payment Time on the day before the due date of the particular Hedge Payable.

(b) The City's obligation to pay the amount of any Hedge Payable to the Corporation includes an obligation to pay to the Corporation the amount of any interest, enforcement costs or expenses and indemnification payments for which the Corporation may be liable to the Hedge Counterparty or any successor under the Stated Hedge or the Collateral Agreement.

(c) The City shall receive a credit for any Hedge Payable to the extent of any amount paid in respect of such Hedge Payable under the Collateral Agreement.

## Section 3. Validity of Amendments

The validity of the amendments set forth in **Section 2** hereof are subject to Section 9.05 of the General Terms.

## Section 4. Ratification of Service Contract

The Service Contract as amended by **Section 2** hereof is ratified and confirmed.

## Section 5. Governing Law

The rights and obligations of the parties hereunder shall be governed by and construed in accordance with the law of the State of Michigan exclusive of its conflicts of law rules.

## Section 6. Headings

The Section and subsection headings herein are included for convenience of reference only and do not constitute a part of the this Amendment for any other purpose.

## Section 7. Counterparts

This Amendment may be executed in multiple counterparts, *but* all such counterparts taken together shall evidence by one and the same original.

**In Witness Whereof,** the parties hereto have set their respective hands on the date first set forth above.

*[Signatures appear on pages S-1 et seq.]*

*[Signature Page to the First Amendment to the XRS Service Contract 2006 between the City of Detroit and the GRS Retirement System Service Corporation]*

**City of Detroit,**

By _____

Norman L. White
Finance Director

S-1

13-53846-swr Doc 3618-3 Filed 08/09/14 Entered 08/09/14 01:59:36 Page 14 of 62    240
13-53846-tjt    Doc 1140-6    Filed 10/10/13  Entered 10/10/13 14:54:54    Page 40 of 100

**GRS Retirement System Service Corporation**

By _____

Norman L. White
President

S-2

13-53846-swr   Doc 3618-3   Filed 08/09/24   Entered 08/09/24 13:15:53   Page 24 of 62   241
13-53846-tjt   Doc 1140-6   Filed 10/10/18   Entered 10/10/13 14:54:54   Page 41 of 100

**Exhibit 3**

**Swaps (ISDA MA)**

139083v1
**(Local Currency-Single Jurisdiction)**

# ISDA®

**International Swaps and Derivatives Association, Inc.**

# MASTER AGREEMENT

dated June 7, 2006

SBS Financial Products Company, LLC and Detroit General Retirement System Service Corporation have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement (the "Master Agreement"), which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

## 1.     Interpretation

(a) *Definitions*.  The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b) *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c) *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

## 2.     Obligations

(a) General Conditions.

(i)     Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)     Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)     Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other

13-53846-swr   Doc 10115-3   Filed 08/04/20   Entered 08/04/20 20:52:20   Page 43 of   243
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 43 of
100

(b) *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c) *Netting*. If on any date amounts would otherwise be payable:—

      (i)     in the same currency; and

      (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d) *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.      Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that:—

(a) *Basic Representations*.

      (i)     *Status*. It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

      (ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support

Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance;

(iii) **No Violation or Conflict**. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv) **Consents**. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) **Obligations Binding**. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b) **Absence of Certain Events**. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c) **Absence of Litigation**. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d) **Accuracy of Specified Information**. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

## 4.   Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a) **Furnish Specified Information**. It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b) **Maintain Authorizations**. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c) **Comply with Laws**. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

## 5.    Events of Default and Termination Events

(a) *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver*.  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement*.  Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default.*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation*.  A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction*.  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to

13-53846-swr    Doc 3613-3    Filed 08/04/13    Entered 08/04/13 20:53:52    Page 46 of    246
13-53846-tjt    Doc 1140-6    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 46 of
100

Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) **Bankruptcy**. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) **Merger Without Assumption**. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b) **Termination Events**. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below

13-53846-swr   Doc 3613-3   Filed 08/24/13   Entered 08/24/13 20:53:20   Page 47 of 40   247
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 47 of
100

constitutes an Illegality if the event is specified in (i) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below:—

(i)  *Illegality*.  Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)  *Credit Event Upon Merger*.  If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(iii)  *Additional Termination Event*.  If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality*.  If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

## 6.  Early Termination

(a) *Right to Terminate Following Event of Default*.  If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions.  If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

13-53846-swr   Doc 3013-3   Filed 09/24/13   Entered 09/24/13 20:35:20   Page 48 of   248
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 48 of
100

(b) **Right to Terminate Following Termination Event.**

 (i)  **Notice**. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

 (ii)  **Two Affected Parties**. If an Illegality under Section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

 (iii)  **Right to Terminate**. If:—

  (1)  an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

  (2)  an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) **Effect of Designation.**

 (i)  If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

 (ii)  Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) **Calculations.**

 (i)  **Statement.** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

 (ii)  **Payment Date.** An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the

13-53846-swr Doc 1140-6 Filed 09/24/13 Entered 09/24/13 20:53:20 Page 49 of
13-53846-tjt Doc 1140-6 Filed 10/10/13 Entered 10/10/13 14:54:54 Page 49 of
100 249

amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss," and a payment method, either the "First Method" or the "Second Method." If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method," as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

    (i)    *Events of Default.* If the Early Termination Date results from an Event of Default:—

        (1)    *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

        (2)    *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

        (3)    *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

        (4)    *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

    (ii)    *Termination Events.* If the Early Termination Date results from a Termination Event:—

        (1)    *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

        (2)    *Two Affected Parties.* If there are two Affected Parties:—

13-53846-swr   Doc 1161-3   Filed 09/24/13   Entered 09/24/13 20:59:20   Page 50 of   250
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 50 of
100

(A)    if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

(B)    if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    **Adjustment for Bankruptcy.**  In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    **Pre-Estimate.**  The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.    Transfer

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a) a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b) a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.    Miscellaneous

(a) *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b) *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

13-53846-swr   Doc 3618-3   Filed 03/06/14   Entered 03/06/14 15:39:20   Page 51 of 40
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 51 of
100
251

(c) *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d) *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e) *Counterparts and Confirmations.*

    (i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

    (ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f) *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g) *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 9.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 10.    Notices

(a) *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)    if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)    if sent by telex, on the date the recipient's answerback is received;

    (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery ) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b) *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 11.    Governing Law and Jurisdiction

(a) *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b) *Jurisdiction.*    With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c) *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 12.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

      (a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

      (b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

      (c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

      (d)    in all other cases, the Termination Rate.

*"consent"* includes a consent, approval, action, authorization, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iii).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"law"* includes any treaty, law, rule or regulation and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is

13-53846-swr Doc 3618-3 Filed 09/24/13 Entered 09/24/13 01:57:20 Page 35 of 40 254
13-53846-tjt Doc 1140-6 Filed 10/10/13 Entered 10/10/13 14:54:54 Page 54 of
100

to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

13-53846-swr Doc 3618-3 Filed 03/31/14 Entered 03/31/14 13:15:36 Page 455 of 40    255
13-53846-tjt    Doc 1140-6    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 55 of
100

***"Reference Market-makers"*** means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

***"Scheduled Payment Date"*** means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

***"Set-off"*** means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

***"Settlement Amount"*** means, with respect to a party and any Early Termination Date, the sum of:—

(a)     the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)     such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

***"Specified Entity"*** has the meaning specified in the Schedule.

***"Specified Indebtedness"*** means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

***"Specified Transaction"*** means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

***"Terminated Transactions"*** means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

***"Termination Event"*** means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

***"Termination Rate"*** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

***"Unpaid Amounts"*** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early

Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

SBS FINANCIAL PRODUCTS COMPANY, LLC, a Delaware limited liability company

By: _____
    Name: John Carter
    Title:  President

DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION

By: _____
    Name:
    Title:

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

SBS FINANCIAL PRODUCTS COMPANY, LLC, a
Delaware limited liability company

By: _____
    Name: John Carter
    Title:  President

DETROIT GENERAL RETIREMENT
SYSTEM SERVICE CORPORATION

By: _____
    Name: Roger Short
    Title:  President

Detroit General (XL)/Master Agreement

13-53846-swr   Doc 3618-3   Filed 03/06/14   Entered 03/06/14 01:59:30   Page 259 of 440
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 59 of 100
259

138941v2

<div align="center">

**SCHEDULE**
**TO THE**
**1992 ISDA MASTER AGREEMENT**
**LOCAL CURRENCY SINGLE JURISDICTION**
**DATED AS OF**
**JUNE 7, 2006**

(General Retirement System/XL)

**BETWEEN**

</div>

| | | |
|---|---|---|
| **SBS FINANCIAL PRODUCTS COMPANY, LLC,** a Delaware limited liability company | and | **DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION,** a not-for-profit corporation organized under the laws of the State of Michigan |
| ("Party A") | | ("Party B") |

<div align="center">

**Part 1.**

**Termination Provisions**

</div>

In this Agreement:

(a)     "*Specified Entity*" means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | NONE |
| Section 5(a)(vi), | NONE |
| Section 5(a)(vii), | NONE |
| Section 5(b)(ii), | NONE |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | NONE |
| Section 5(a)(vi), | NONE |
| Section 5(a)(vii), | NONE |
| Section 5(b)(ii), | NONE |

(b)     "*Specified Transaction*" will have the meaning specified in Section 12 of this Agreement.

(c)     The "*Cross Default*" provisions of Section 5(a)(vi) of this Agreement, as modified below, will apply to Party A and to Party B.  Section 5(a)(vi) of this Agreement is hereby amended by the addition of the following at the end thereof:

13-53846-swr   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 60 of 40
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 60 of 40
100   260

"provided, however, that notwithstanding the foregoing, an Event of Default shall not occur under either (1) or (2) above if, as demonstrated to the reasonable satisfaction of the other party, (a) the event or condition referred to in (1) or the failure to pay referred to in (2) is a failure to pay caused by an error or omission of an administrative or operational nature; and (b) funds were available to such party to enable it to make the relevant payment when due; and (c) such relevant payment is made within three Business Days following receipt of written notice from an interested party of such failure to pay."

If such provisions apply:

*"Specified Indebtedness"* means any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) for the payment or repayment of any money.

*"Threshold Amount"* means:

(i) with respect to Party A, an amount equal to 2% of shareholders' equity (howsoever described) of Party A as shown on the most recent annual audited financial statements of Party A and

(ii) with respect to Party B, $10,000,000.

(d) *The "Credit Event Upon Merger"* provisions of Section 5(b)(ii) will apply to Party A and Party B, amended as follows:

"Credit Event Upon Merger" shall mean that a Designated Event (as defined below) occurs with respect to a party, any Credit Support Provider of the party or any applicable Specified Entity (any such party or entity, "X"), and such Designated Event does not constitute an event described in Section 5(a)(viii) but the creditworthiness of X, or, if applicable, the successor, surviving or transferee entity of X, is materially weaker than that of X immediately prior to such event. In any such case the Affected Party shall be the party with respect to which, or with respect to the Credit Support of which, the Designated Event occurred, or, if applicable, the successor, surviving or transferee entity of such party. For purposes hereof, a Designated Event means that, after the date hereof:

(i) X consolidates, amalgamates with or merges with or into, or transfers all or substantially all its assets to, or receives all or substantially all the assets or obligations of, another entity; or

(ii) any person or entity acquires directly or indirectly the beneficial ownership of equity securities having the power to elect a majority of the board of directors of X or otherwise acquires directly or indirectly the power to control the policy-making decisions of X."

(e) *The "Automatic Early Termination"* provision of Section 6(a) will not apply to Party B and will apply to Party A; provided, however, that with respect to a party, where the Event of Default specified in Section 5(a)(vii)(1), (3), (4), (5), (6) or to the extent analogous thereto, (8) is governed by a system of law which does not permit termination to take place after the occurrence

2

of the relevant Event of Default, then the Automatic Early Termination provisions of Section 6(a) will apply to such party or Party B.

(f) **"Payments on Early Termination"**. For the purpose of Section 6(e) of this Agreement:

(i) Market Quotation will apply.

(ii) The Second Method will apply, except as modified as provided in Parts 6 and 7 hereof.

(g) "Termination Currency" means U.S. Dollars.

(h) There shall be added to Section 5(a) of the Agreement the following Events of Default:

"(ix) Authority; Repudiation. Party B shall cease to have authority to make payments under this Agreement or any Transaction subject to this Agreement, or any government entity having jurisdiction over Party B shall enact any legislation which would have the effect of repudiating this Agreement or any Transaction subject to this Agreement."

"(x) Amounts payable by Party B to Party A hereunder shall cease to be payable and secured in accordance with the terms specified in Part 4(b)(ii)(h) of this Schedule."

(i) **"Additional Termination Event"** will apply (Part 5 of this Schedule).

## Part 2.

### Agreement to Deliver Documents

For the purpose of Sections 3(d) and 4(a) of this Agreement, each party agrees to deliver the following documents:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Evidence of the authority and true signatures of each official or representative signing this Agreement or, as the case may be, a Confirmation, on its behalf. | On or before execution of this Agreement and each Confirmation forming a part of this Agreement. | Yes |
| Party A | Opinion of Counsel to Party A in a form reasonably satisfactory to Party B. | On or before execution of this Agreement. | No |
| Party B | Covered Indenture as | On or before | Yes |

3

13-53846-swr   Doc 3618-3   Filed 03/09/14   Entered 03/09/14 13:59:20   Page 162 of   262
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 62 of
100

| Party required to deliver document | Form/Document/Certificate hereinafter defined. | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | | execution of this Agreement. | |
| Party B | Certified copy of the resolution of Party B's Board of Directors (or equivalent authorizing documentation) authorizing the execution and delivery of this Agreement and each Confirmation and performance of its obligation hereunder. | On or before execution of this Agreement. | Yes |
| Party B | A copy of Party B's audited annual financial statements prepared in accordance with generally accepted accounting principles within the United States. | On or before the 365th day after the end of Party B's fiscal year. | Yes |
| Party B | A copy of the City of Detroit's audited annual financial statements prepared in accordance with generally accepted accounting principles within the United States. | Within 15 days of public availability, but in any case no later than 365 days after the end of the City of Detroit's fiscal year. | Yes |
| Party B | A copy of the City of Detroit's quarterly financial statements. | If and when the City of Detroit prepares such quarterly reports, when such quarterly reports become publicly available. | Yes |
| Party B | Opinion of legal counsel to Party B in form and substance satisfactory to Party A. | On or before execution of this Agreement. | No |
| Party B | Commitment to issue each Swap Policy (as such term is defined in Part 4 hereof). | On or before the execution of this Agreement with | No |

4

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | | respect to the initial Insured Transaction hereunder, and thereafter on or before the Trade Date of each subsequent Insured Transaction. | |
| Party B | Swap Policy and the Opinion of counsel to the Insurer with respect to such Swap Policy in form and substance satisfactory to Party A. | On or before the delivery of the related Certificates to the underwriters with respect to the initial Insured Transaction hereunder, and thereafter on or before execution of the Confirmation evidencing each subsequent Insured Transaction. | No |
| Party B | Confirmations, updates and additional documentation concerning the opinion of counsel, board resolutions and certificates delivered pursuant to each of the foregoing documents to be delivered as Party A may reasonably request. | Prior to the Effective Date of each Transaction after the initial Transaction hereunder. | Yes |
| Party B | Certified copy of the Service Contract together with an opinion of Certificate Counsel in form and substance satisfactory to Party A which addresses each of the Sources of Payment set forth in Part 4(b)(ii)(h). | On or before execution of the Service Contract. | No |

5

**Part 3.**

**Miscellaneous**

(a)    *Addresses for Notices.*  For the purposes of Section 10(a) of this Agreement:

(i)    All notices or communications to Party A shall, with respect to a particular Transaction, be sent to the address, telex number, or facsimile number reflected in the Confirmation of that Transaction, and any notice for purposes of Sections 5 or 6 shall be sent to:

> SBS Financial Products Company, LLC
> Wall Street, 22nd Floor
> New York, NY 10005
> Attention: John Carter
> Telephone: (646) 775-4880
> Facsimile: (646) 576 - 9684

(ii)    All notices or communications to Party B shall be sent in care of the Contract Administrator to the address as set forth in Section 10.1 of the Contract Administration Agreement:

(iii)    A copy of all notices or communications to either Party A or Party B shall be sent to the address, or facsimile number reflected below:

> XL Capital Assurance Inc.
> 1221 Avenue of the Americas
> New York, New York  10020
> Attention:  Surveillance
> Telephone: (212) 478-3400
> Facsimile:  (212) 478-3597

(b)    *Offices.*  Party A, if it enters into a Transaction through an Office other than its head or home office represents to Party B that, notwithstanding the place of booking office or jurisdiction of incorporation or organization, the obligations of Party A are the same as if it had entered into the Transaction through its head or home office.  This representation will be deemed to be repeated by Party A on each date on which a Transaction is entered into.

(c)    *Calculation Agent.*  The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(d)    *Credit Support Document.*  With respect to Party A:  (i) the Credit Support Annex dated the date hereof between Party B and Merrill Lynch Capital Services, Inc. ("MLCS"); (ii) the Transaction Transfer Agreement (the "Transfer Agreement") dated the date hereof between Party A, Party B and MLCS; and (iii) the Guarantee of Merrill Lynch & Co., Inc. ("ML&Co.") with respect to the Transfer Agreement.  With respect to Party B, the Service Contracts and the Contract Administration Agreement (collectively, the "Covered Indenture").

6

(e)    **_Credit Support Provider._**  Credit Support Provider means:  With respect to Party A, MLCS and ML&Co. and with respect to Party B, none.

(f)    **_Governing Law._**  This Agreement will be governed by and construed in accordance with the laws of the State of New York; provided, however, that the corporate powers and legal capacity of Party B shall be governed by and construed in accordance with the laws of the State of Michigan.

(g)    **_Jurisdiction._** Section 11(b)(i) of this Agreement is deleted in its entirety and replaced by the following:

> (i)    submits to the extent permitted by law to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

(h)    **_Waiver of Immunities._**  Section 11(c) of this Agreement is deleted in its entirety and replaced by the following:

> "**_Waiver of Immunities._**  Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues, all immunity on the grounds of sovereignty or other similar grounds from (i) suit in a breach of contract action, (ii) relief by way of injunction, order for specific performance or for recovery of property and (iii) execution or enforcement of any judgment to which it or its revenues might otherwise be entitled in any Proceedings, and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any such Proceedings."

(i)    **_Netting of Payments._**  Subparagraph (ii) of Section 2(c) of this Agreement will apply.

(j)    **_"Affiliate"_** will have the meaning specified in Section 12 of this Agreement.

<div align="center">

**Part 4.**

**Other Provisions**

</div>

(a)    **_Intentionally Omitted._**

(b)    **_Additional Representations._**

> (i)    The first sentence of Section 3 is amended to read in its entirety as follows:

>> "Each party represents to each other party (which representations will be deemed to be repeated on each date on which a Transaction is entered into and, in the case of the representations in Section 3(a), (e) and (f) of this Agreement, at all times until the termination of this Agreement) the following:"

<div align="center">7</div>

13-53846-swr   Doc 3618-3   Filed 03/06/14   Entered 03/06/14 15:93:20   Page 256 of 40   266
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 66 of
100

(ii)     Section 3 is amended by adding the following subsections (e), (f) and (g) thereto:

(e)     Non-Speculation.  Party B represents and warrants to Party A that this Agreement has been, and each Transaction hereunder will be, entered into for purposes of managing of its borrowings or investments or in connection with a line of business and not for the purpose of speculation;

(f)     Eligible Contract Participant.  Each party is an "eligible contract participant" under, and as defined in, Section 1a(12) of the Commodity Exchange Act, as amended (7 U.S.C. § 1a(12)); and

(g)     Sources of Payment.   As provided in the Contract Administration Agreement, all payments due under this Agreement from Party B to Party A are payable from and secured by amounts owing by the City of Detroit to Party B pursuant to the Service Contract in respect of Hedge Payables.  Such amounts are payable by the City of Detroit from all available revenues of the City of Detroit's General Fund (as delineated in the City's audited financial statements).  If the City were to fail to pay any amount owing in respect of a Hedge Payable when due, Party A (or the Contract Administrator, if authorized by Party A to so act on Party A's behalf) could pursue remedies against the City to enforce that contractual obligation and the City would be required to pay any resulting judgment against it.  If the City were to fail to provide for payment of any such judgment, a court can compel the City to raise the payment through the levy of taxes, as provided in the Revised Judicature Act of 1961, Act No. 236 of the Michigan Public Acts of 1961, as amended (Michigan Compiled Laws Section 600.6093), without limit as to rate or amount.

(c)   ***Additional Agreements.***

Compliance with Covered Indenture.  Party B will observe, perform and fulfill each provision in the Covered Indenture applicable to Party B.  Party B hereby agrees not to amend, supplement, modify or waive any provision of the Covered Indenture without the consent of Party A if such amendment, supplement, modification or waiver would: (i) change any of the payment times, amounts, obligations, terms or any other payment-related provision in any Service Contract applicable to the City of Detroit; (ii) impair any right Party B may have under the Service Contract to enforce payments from the City of Detroit, or impair any right Party A may have under the Covered Indenture to enforce its security interest granted therein or any other right thereunder; or (iii) permit the creation of

8

13-53846-swr   Doc 1140-3   Filed 10/10/13   Entered 10/10/13 14:53:20   Page 667 of   267
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 67 of
100

any new lien ranking prior to or on a parity with, or terminate, or deprive Party A of the security afforded to it by Sections 8.02 and 8.03 of the Service Contracts or Section 2.4 of the Contract Administration Agreement (collectively, the "Incorporated Provisions"). The Incorporated Provisions are hereby incorporated by reference and made a part of this Agreement to the same extent as if such provisions were set forth herein. Any amendment, supplement, modification or waiver of any of the Incorporated Provisions without the prior written consent of the other party hereto shall have no force and effect with respect to this Agreement. Any amendment supplement or modification for which such consent is obtained shall be part of the Incorporated Provisions for purposes of this Agreement. Party B shall not assign or transfer its right or obligations under the Covered Indenture without the prior written consent of the other party hereto and the Insurer.

(d) ***Relationship Between Parties.*** Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i) Non-Reliance. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii) Assessment and Understanding. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii) Status of Parties. The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(e) ***Waiver of Jury Trial.*** **EACH PARTY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS RELATING TO THIS AGREEMENT OR ANY CREDIT SUPPORT DOCUMENT.**

(f) ***Consent to Recording.*** Each party (i) consents to the recording of all telephone conversations between trading, operations and marketing personnel of the parties and their Affiliates in connection with this Agreement or any potential Transaction; (ii) agrees to give notice to such personnel of it and its Affiliates that their calls will be recorded; and (iii) agrees

9

that in any Proceedings, it will not object to the introduction of such recordings in evidence on grounds that consent was not properly given.

(g) *Scope of Agreement.* The Transactions entered into between the parties June 6, 2006 and June 2, 2005 and any other specific Specified Transactions designated in writing by the parties hereto after the date hereof, shall be subject to the terms hereof.

(h) *Indemnification Limited to Extent of Applicable Law.* The parties acknowledge that Party B's authority to indemnify Party A, as required by Section 9 of the Agreement, for expenses, fees and taxes may be limited by Michigan law and Party B's obligation to indemnify Party A could be limited to the extent of applicable law.

(i) *Additional Definitions.* Section 12 is hereby amended by adding the following definitions:

"Certificates" means the $948,540,000 Taxable Certificates of Participation Series 2006 issued by the Detroit Retirement Systems Funding Trust 2006.

"City of Detroit" means the City of Detroit, Michigan.

"Contract Administration Agreement" means the Contract Administration Agreement 2006 dated June 12, 2006 among Detroit Retirement Systems Funding Trust 2006, Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation, severally and not jointly, U.S. Bank National Association, separately and not as Trustee of the Detroit Retirement Systems Funding Trust 2006 and the Hedge Counterparties Named Therein.

"Covered Indenture" means the Service Contracts together with the Contract Administration Agreement.

"Detroit General Retirement System Service Contract" means the Detroit General Retirement System Service Contract dated June 7, 2006 between Party B and the City of Detroit.

"Detroit Police and Fire Retirement System Service Contract" means the PFRS Service Contract dated June 7, 2006 between the Detroit Police and Fire Retirement System Service Corporation and the City of Detroit.

"Moody's" means Moody's Investors Service, Inc.

"Office" means a branch or office of a party, which may be such party's head or home office.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Service Contracts" means the Detroit General Retirement System Service Contract and the Detroit Police and Fire Retirement System Service Contract.

10

13-53846-swr Doc 1140-3 Filed 10/10/13 Entered 10/10/13 14:54:54 Page 69 of 269
13-53846-tjt Doc 1140-6 Filed 10/10/13 Entered 10/10/13 14:54:54 Page 69 of 100
100

"Swap Insurance Policy" means the Financial Guaranty Insurance Policy issued by the Swap Insurer with respect to the Transaction(s) between Party A and Party B entered into pursuant to this Agreement.

"Swap Insurer" means XL Capital Assurance Inc..

## Part 5.

## Insurer Provisions

The following provisions shall apply to any Transactions for which the Swap Insurance Policy has been issued by the Swap Insurer, for the account of Party B, as principal, and Party A, as beneficiary (the "Insured Rate Swap Transactions"):

(a)  ***Designation of Early Termination Date.*** Notwithstanding anything to the contrary in Section 6 of this Agreement, if any:

(i)  Event of Default in respect of any Insured Rate Swap Transaction under this Agreement occurs; or

(ii)  Termination Event (other than the Additional Termination Events set forth in Part 5(b) below) in respect of any Insured Rate Swap Transaction under this Agreement occurs;

then, in either such case, neither Party A nor Party B shall designate an Early Termination Date pursuant to Section 6 of this Agreement in respect of any such Insured Rate Swap Transaction without the prior written consent of the Swap Insurer.

(b)  ***Party B Additional Termination Events.*** The following shall each constitute an Additional Termination Event:

(i)  Insurer fails to meet its payment obligations under the Swap Insurance Policy and such failure is continuing with respect to Insurer under the Swap Insurance Policy; or

(ii)  Insurer fails to have a claims-paying ability rating of at least A- from S&P or a financial strength rating of at least A3 from Moody's; provided, however, that additionally:

(1)  an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party; or

(2)  a Termination Event has occurred or is continuing with respect to Party B as the Affected Party; or

(3)  the unenhanced rating on Party B's Certificates from (a) Standard & Poor's Rating Services is withdrawn, suspended or falls below "BBB-", or

11

13-53846-swr  Doc 1140-3  Filed 10/10/13  Entered 10/10/13 14:54:54  Page 70 of
100
13-53846-tjt  Doc 1140-6  Filed 10/10/13  Entered 10/10/13 14:54:54  Page 70 of
100

270

(b) Moody's Investors Service, Inc. is withdrawn, suspended or falls below "Baa3"; and

provided further, however, that no Additional Termination Event shall occur under this clause (ii) unless Party A has notified Party B that an Insurer ratings downgrade has occurred and Party B has not, within 30 days of receiving such notice provided a Credit Support Provider acceptable to Party A whose obligations are pursuant to a Credit Support Document acceptable to Party A; or

(iii)     An Insurer Event has occurred and is continuing provided, however, that additionally:

    (1)     an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party; or

    (2)     a Termination Event has occurred or is continuing with respect to Party B as the Affected Party; or

    (3)     the rating on Party B's Certificates from (a) Standard & Poor's Rating Services is withdrawn, suspended or falls below "BBB-", or (b) Moody's Investors Service, Inc. is withdrawn, suspended or falls below "Baa3"; and

provided further, however, that no Additional Termination Event shall occur under this clause (iii) unless Party A has notified Party B that an Insurer Event has occurred and Party B has not within 30 days of receiving such notice provided a Credit Support Provider acceptable to Party A whose obligations are pursuant to a Credit Support Document acceptable to Party A.

Any of the following shall be considered an "Insurer Event":

    (1)     the Swap Insurer is in conservation, liquidation or receivership under the New York Insurance Laws; or

    (2)     Insurer (a) fails to have (1) a claims-paying ability rating of at least "AAA" from S&P, or (2) a financial strength rating of at least "Aaa" from Moody's; and (b) fails to pay obligations for indebtedness for money borrowed or to meet then-current policy obligations for which claims have been properly presented in a aggregate amount in excess of $100,000,000, which failure to make payment (in whole or in part) is not due to: (u) administrative error; (v) Insurer action to contest a claim; (w) an order from, or action by, a regulator of Insurer which forbids, delays or impedes such payment, except in connection with an Insurer insolvency, conservation or receivership; (x) the occurrence of an act of God which prevents such payment; (y) the usual mechanisms or channels employed to make such payment being unavailable to Insurer through no fault of Insurer; (z) a statute, rule or order (including, but not limited to exchange

12

13-53846-swr   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 71 of
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 71 of
100
271

controls) which forbids, delays or impedes either (i) such payment, other than in connection with an Insurer insolvency, conservation or receivership, or (ii) the acquisition of, or payment in, a currency required in order to make such payment; or

For purposes of any Additional Termination Event described under clause (i), (ii), or (iii), the sole "Affected Party" shall be Party B.

(c)     *Party A Additional Termination Event.*     Party A or its guarantor's long-term senior unsecured debt rating from (a) Standard & Poor's Rating Services is withdrawn, suspended or falls below "BBB-", or (b) Moody's Investors Service, Inc. is withdrawn, suspended or falls below "Baa3".

For purposes of the foregoing Termination Event the "Affected Party" shall be Party A.

(d)     *Insurer Directed Termination.*     Notwithstanding anything in this Agreement, if an Event of Default under this Agreement occurs with respect to Party B as the Defaulting Party or any Termination Event under this Agreement occurs with respect to Party B as the Affected Party, then the Swap Insurer (so long as it has not failed to make any payment under the terms and conditions of the Swap Policy) shall have the right (but not the obligation) upon notice to Party A to designate an Early Termination Date with respect to Party B with the same effect as if such designation were made by Party A.  For purposes of the foregoing sentence, an Event of Default with respect to Party B shall be considered to be continuing, notwithstanding any payment by the Swap Insurer under the Swap Insurance Policy. Party A and Party B acknowledge that, except as the Swap Policy may be otherwise endorsed, unless (x) the Swap Insurer designates an Early Termination Date (as opposed to merely consenting to such designation by one of the parties) or (y) an Additional Termination Event specified in Part 5(b)(i) or (ii) has occurred, payments due from Party B because an Early Termination Date has been designated will not be insured.  In any event, the parties acknowledge that pursuant to the Swap Insurance Policy that (i) the amount payable by the Swap Insurer in respect of payments due from Party B because an Early Termination Date has been designated by the Swap Insurer shall not be limited in amount, and (ii) the amount payable by the Swap Insurer in respect of payments due from Party B because an Early Termination Date has been designated by Party A shall not exceed the amount specified in the Swap Insurance Policy.

(e)     *Amendments.* Section 8(b) of the Agreement is hereby amended by (A) adding the words "or any Credit Support Document" after the word "Agreement" in the first line thereof and (B) adding the phrase "and the Swap Insurer" following the words "parties" in the third line thereof.

(f)     *Transfers/Assignments.* Notwithstanding Section 7 of the Agreement, except as provided in Part 6(c) hereof, neither party may transfer, assign or delegate its rights or duties with respect to an XL Insured Rate Swap Transaction under the Agreement, unless it receives the prior written consent of the Swap Insurer, provided, however, Party A may assign or delegates its rights and duties without the Swap Insurer's prior written consent to a party (a) that meets the definition of "Reference Market Maker" (other than the ratings requirement set forth therein) and that has long-term senior unsecured debt ratings at least in the single –A category from Moody's and S&P

13

or the Credit Support Provider of such party has claims paying ability ratings or financial strength ratings at least in the single –A category from Moody's and S&P and (b) that assumes the rights and duties of Party A pursuant to a master agreement that is substantially similar to this Agreement and in form and substance satisfactory to the Swap Insurer, and provided, further, Party A may make such an assignment or delegation to an affiliate of Party A if Party A or its Credit Support Provider, provides a guarantee of the XL Insured Rate Swap Transaction that is reasonably acceptable in form and substance to the Swap Insurer.

(g)     *No Suspension of Payments.*  Notwithstanding Section 2(a)(iii) of this Agreement, Party A shall not suspend any payments due under an Insured Rate Swap Transaction under Section 2(a)(iii) of the Agreement unless Party A has designated an Early Termination Date pursuant to the terms hereof.

(h)     *No Netting.*  Notwithstanding Section 2(c) of this Agreement, in no event shall either Party A or Party B be entitled to net its payment obligations in respect of the Insured Rate Swap Transactions against the payment obligations of the other party in respect of other Transactions under this Agreement if such Transactions are not Insured Rate Swap Transactions, nor may either Party A or Party B net the payment obligations of the other party under Transactions that are not Insured Rate Swap Transactions against the payment obligations of such party under Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under Insured Rate Swap Transactions be treated separate and apart from all other Transactions. Section 6(e) of this Agreement shall apply to all Insured Rate Swap Transactions with the same effect as if the Insured Rate Swap Transactions constituted a single master agreement. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Rate Swap Transactions shall be determined without regard to any Transactions other than the Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under the Insured Rate Swap Transactions be treated separate and apart from all other Transactions unless otherwise agreed to in writing by the Swap Insurer.

(i)     *No Set-off for Counterclaim.*  In no event shall either Party A or Party B be entitled to set-off its payment obligations in respect of an Insured Rate Swap Transaction against the payment obligations of the other party (whether by counterclaim or otherwise) under any other agreement(s) between Party A and Party B or instrument(s) or undertaking(s) issued or executed by one party to, or in favor of, the other party, if such obligations are not Insured Rate Swap Transactions, or net the payment obligations of the other party that are not with respect to Insured Rate Swap Transactions against the payment obligations of such party under Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under Insured Rate Swap Transactions be treated separate and apart from all other obligations. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Rate Swap Transaction shall be determined without regard to any obligation other than those under the Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under the Insured Rate Swap Transactions be treated separate and apart from all other obligations unless otherwise specified in such other obligation and agreed to in writing by the Swap Insurer.

13-53846-swr   Doc 3618-3   Filed 03/06/14   Entered 03/06/14 13:59:20   Page 273 of 40
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 73 of
100
273

(j)    *Party A – Notice of Rating Downgrade, Suspension or Withdrawal.*  Party A shall provide written notice to Party B and to the Swap Insurer of any downgrade, withdrawal or suspension of Party A's Credit Support Provider's long-term senior unsecured debt rating, within 15 Business Days of the occurrence of such event.  Failure of Party A to provide such notice shall not constitute an Event of Default under this Agreement.

(k)    *Representations and Agreements.* Each party agrees that each of its representations and agreements in this Agreement is expressly made to and for the benefit of the Swap Insurer.

(l)    *Third-party Beneficiary.* Party A and Party B hereby each acknowledge and agree that the Swap Insurer shall be an express third-party beneficiary (and not merely an incidental third-party beneficiary) of this Agreement and of the obligations of each such party under any Insured Rate Swap Transaction, and as such, entitled to enforce the Agreement and the terms of any such Insured Rate Swap Transaction against such party on its own behalf and otherwise shall be afforded all remedies available hereunder or otherwise afforded by law against the parties hereto to redress any damage or loss incurred by the Swap Insurer including, but not limited to, fees (including professional fees), costs and expenses incurred by the Swap Insurer which are related to, or resulting from any breach by such party of its obligations hereunder.

(m)    *Policy Coverage.* Party A and Party B hereby acknowledge and agree that the Swap Insurer's obligation with respect to Insured Rate Swap Transactions shall be limited to the terms of the Swap Insurance Policy. Notwithstanding Section 2(d) or any other provision of this Agreement, the Swap Insurer shall not have any obligation to pay interest on any amount payable by Party B under this Agreement.

(n)    *Subrogation.* Party A and Party B hereby acknowledge that to the extent of payments made by the Swap Insurer to Party A under the Swap Insurance Policy, the Swap Insurer shall be fully subrogated to the rights of Party A against Party B under the Insured Rate Swap Transaction to which such payments relate, including, but not limited to, the right to receive payment from Party B and the enforcement of any remedies. Party A hereby agrees to assign to the Swap Insurer its right to receive payment from Party B under any Insured Rate Swap Transaction to the extent of any payment thereunder by the Swap Insurer to Party A. Party B hereby acknowledges and consents to the assignment by Party A to the Swap Insurer of any rights and remedies that Party A has under any Insured Rate Swap Transaction or any other document executed in connection herewith.

(o)    *Isolation of Insured Rate Swap Transactions in Designating an Early Termination Date.*

(i)    Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of non-Swap Insurer Insured Rate Swap Transactions by Party A or Party B shall not apply to any Insured Rate Swap Transactions under this Agreement, unless expressly provided in such designation and agreed to in writing by the Swap Insurer.

(ii)    Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of the Insured Rate Swap Transactions by the Swap Insurer

15

or by Party A or Party B shall apply only to the Insured Rate Swap Transactions and not to any other Transaction under this Agreement, unless expressly provided in such designation and agreed to in writing by the Swap Insurer. Nothing contained in this Part 5(o) shall affect the rights of Party A under this Agreement to designate an Early Termination Date in respect of any Transaction that is not an Insured Rate Swap Transaction, which designation shall not apply to the Insured Rate Swap Transactions.

(p)    *Expenses.* Party B agrees to reimburse the Swap Insurer immediately and unconditionally upon demand for all reasonable expenses incurred by the Swap Insurer in connection with the issuance of the Swap Insurance Policy and the enforcement by the Swap Insurer of Party B's obligations under this Agreement and any other documents executed in connection with the execution and delivery of this Agreement, including, but not limited to, fees (including professional fees), costs and expenses incurred by the Swap Insurer which are related to, or resulting from, any breach by Party B of its obligations hereunder.

(q)    *Notices.* A copy of each notice or other communication between the parties with respect to this Agreement must be forwarded to the Swap Insurer by the party distributing such notice or other communication and any such notice or other communication shall not be effective as to the parties hereto until it has been received by the Swap Insurer.

(r)    *Reference Market-makers.* The definition of "Reference Market-makers" set forth in Section 12 of the Agreement shall be amended in its entirety to read as follows:

> "Reference Market-makers" means four (4) leading dealers in the relevant swap market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time of deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among dealers having an office in the same metropolitan area. The rating classification assigned to any outstanding long-term senior debt securities of such dealers shall be at least (1) "A1" or higher as determined by Moody's, (2) "A+" or higher as determined by S&P or if not rated by one of S&P or Moody's, (3) an equivalent investment grade rating determined by a nationally-recognized rating service acceptable to both parties, provided, however, that in any case, if Market Quotations cannot be determined by four (4) such dealers, the party making the determination of the Market Quotation may designate, with the consent of the other party and the Swap Insurer, one (1) or more leading dealers whose long-term senior debt bears a lower investment grade rating or the parties may agree, with the consent of the Swap Insurer, to use fewer than four (4) leading dealers.

(s)    *Party A Delivery of Legal Opinion.* Party A will be required to deliver a legal opinion with respect to its power and authority to enter into the Agreement and to the enforceability of the Agreement, satisfactory in form and substance to the Swap Insurer, with the Swap Insurer as an addressee.

(t)    *Additional Representations of Party B.* Party B hereby further represents to Party A (which representations will be deemed to be repeated by Party B at all times until the termination of this Agreement) that:

(i)     This Agreement has been, and each Transaction hereunder will be (and, if applicable, has been), entered into for the purposes of managing its borrowings and not for purposes of speculation.

(ii)    Party B has taken all steps necessary or advisable to create the security and source of payment for Party B's obligations hereunder described in Section 4(f) of the Agreement.

(iii)   Any Transaction entered into pursuant to this Agreement together with any transactions that Party B has or may enter into with Party A and/or with any or all other parties does not and will not violate or exceed any limits or restrictions contained in any authorizations, approvals or resolutions of the board of directors, shareholders or other authorized body of Party B.

(iv)    The execution and delivery by Party B of this Agreement, each Confirmation and any other documentation relating hereto, and the performance of Party B of its obligations hereunder and thereunder, are in furtherance, and not in violation, of the municipal purposes for which Party B is organized pursuant to the laws of the State of Michigan.

(v)     This Agreement and each Transaction hereunder do not constitute any kind of investment by Party B that is proscribed by any constitution, charter, law, rule, regulation, government code, constituent or governing instrument, resolution, guideline, ordinance, order, writ, judgment, decree, charge, or ruling to which Party B (or any of its officials in their respective capacities as such) or its property is subject.

## Part 6.

### Transaction Transfer Provisions.

(a)     ***Bankruptcy Code.***  It is the express intention of Party A, Party B and each Credit Support Provider of any party that (i) this Agreement and all Transactions hereunder, the Transaction Transfer Agreement (including, without limitation, the option granted therein), and any Credit Support Annex that may be entered into between Party B and the Credit Support Provider shall collectively constitute a single agreement; (ii) the foregoing, together with the Transfer Swap Agreement and Transfer Transactions thereunder (as such terms are defined in the Transaction Transfer Agreement) shall each constitute a "swap agreement" as defined in section 101(53B) of Title 11 of the United States Code, Sections 101-1330 (the "Bankruptcy Code"); and (iii) each of the parties constitutes a "swap participant" under section 101(53C) of the Bankruptcy Code, in each case subject to and entitled to the exemptions and protections afforded by, among other things, sections 362(b)(17), 546(g), 548(d) and 560 of the Bankruptcy Code.

(b)     ***Transaction Transfer Agreement.***  Notwithstanding anything contained herein to the contrary, neither Credit Support Provider shall have any obligations under this Agreement (other than as a result of the operation of Part 6(c) below, if applicable) and shall only have such obligations as are expressly provided for in the Transaction Transfer Agreement. The parties hereto agree that the Credit Support Providers shall be express third party beneficiaries of this Agreement, including but not limited to all of the representations, covenants, agreements and

17

other obligations of the parties to this Agreement. Additionally, notwithstanding anything contained herein to the contrary, the parties hereby agree that in the event Credit Support Providers are replaced as the "Credit Support Provider" by a Substitute Credit Support Provider (as defined in the Transaction Transfer Agreement) under the Transaction Transfer Agreement in accordance with the terms thereof, then the Substitute Credit Support Provider shall be deemed to be the Credit Support Provider hereunder and all references herein to either Credit Support Provider or both shall be deemed to be references to such Substitute Credit Support Provider.

(c)     *Assignment.*

     (i)     Notwithstanding Part 5 of this Agreement, Party B, Party A and the Insurer (by its delivery of the Swap Policy is deemed to have agreed) each hereby acknowledges and agrees that (A) provided that Party A is not a Defaulting Party or the sole Affected Party, Party A shall have at any time, other than following the occurrence of an Event of Default under this Agreement where Party B is the Defaulting Party or a Termination Event under this Agreement where Party B is the Affected Party or any event which with the giving of notice and/or the passage of time would constitute an Event of Default under this Agreement where Party B is the Defaulting Party or a Termination Event under this Agreement where Party B is the Affected Party, the right to transfer and assign all of Party A's rights, interests and obligations in, to and under this Agreement and all Transactions hereunder to MLCS by written notice to Party B and the Credit Support Providers specifying the effective date (such effective date, the "Assignment Date") of such transfer and assignment (and such transfer and assignment shall automatically occur as of the Assignment Date without the need for further action by any party), and (B) MLCS shall have the right, at any time and for any reason in its sole discretion, to request that Party A transfer and assign all of Party A's rights, interests and obligations in, to and under this Agreement and all Transactions hereunder to MLCS by written notice to Party B and Party A specifying the Assignment Date of such transfer and assignment (and such transfer and assignment shall automatically occur as of the Assignment Date without the need for further action by any party).

     (ii)     Upon the Assignment Date of any transfer and assignment specified in accordance with Part 6(c)(i) above, (A) the Provider shall be deemed to have transferred and assigned all of its rights, interests and obligations in, to and under this Agreement and all Transactions hereunder to MLCS, (B) MLCS shall have all the rights that the Provider would have under this Agreement and all Transactions hereunder, (C) MLCS shall be obligated to perform all existing and unperformed obligations of the Provider under this Agreement and all Transactions hereunder, including those obligations arising before the Assignment Date but not yet performed, (D) Party B shall remain obligated to perform all of its existing and unperformed obligations under this Agreement and all Transactions hereunder, including those obligations arising before the Assignment Date but not yet performed, (E) the Provider and Party B shall be released and discharged from all obligations to each other with respect to this Agreement and all Transactions hereunder, and their

18

13-53846-swr   Doc 3618-3   Filed 03/06/14   Entered 03/06/14 20:57:30   Page 67 of 40   277
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 77 of
100

respective rights and obligations hereunder and thereunder shall be cancelled with no payments owed by either party to the other, (F) on and after the Assignment Date, the provisions set forth in Exhibit B to the Transaction Transfer Agreement shall be applicable to this Agreement and all Transactions hereunder, (G) the Transaction Transfer Agreement shall simultaneously automatically terminate without the need for further action by any party thereto, and (H) the guarantee of ML & Co. (as set forth in the Transaction Transfer Agreement) shall apply to the Agreement as assigned (and shall no longer apply to the terminated Transaction Transfer Agreement).

(iii)    Party B, Party A and Credit Support Provider shall execute such instruments of assignment, assumption and release or discharge, of a ministerial nature, as any of them may reasonably request to evidence or effectuate the provisions in this Part 6(c).

## Part 7.

## Credit Support Provisions.

(a)    In the event that a Settlement Amount would be payable by Party A to Party B, Party B agrees that (i) the termination of this Agreement concurrently with the entry by MLCS into a Transfer Swap Agreement (as defined in Paragraph 2 of the Transaction Transfer Agreement) with Party B in accordance with Paragraph 2 of the Transaction Transfer Agreement, (ii) the agreement by Party A to pay such Settlement Amount to MLCS in consideration of MLCS entering into such Transfer Swap Agreement (and Party A hereby agrees to pay such Settlement Amount); *provided,* that the Transaction Transfer Agreement shall be effective irrespective of the nonpayment of such Settlement Amount by Party A to MLCS, and (iii) the payment by MLCS to Party B of any net Unpaid Amounts owing to Party B (which MLCS agrees to pay pursuant to the Transaction Transfer Agreement), shall constitute full satisfaction of any payment otherwise owing from Party A to Party B pursuant to Section 6(e) of this Agreement, and that Party A shall be fully discharged from any and all obligations under Section 6(e) of this Agreement. In the event that any net Unpaid Amounts would be owing by Party B to Party A (such that clause (iii) of the preceding sentence would not be applicable), Party A hereby assigns to MLCS, absolutely and not for purposes of security, all of Party A's right to receive any such net Unpaid Amounts from Party B, and Party A agrees that only MLCS shall be entitled to receive any such net Unpaid Amounts from Party B, and that Party A shall have no recourse to Party B with respect thereto.

(b)    In the event that a Settlement Amount would be payable by Party B to Party A, Party A agrees that (i) the termination of this Agreement concurrently with the entry by MLCS into a Transfer Swap Agreement with Party B in accordance with Paragraph 2 of the Transaction Transfer Agreement, (ii) the agreement by MLCS to pay such Settlement Amount to Party B in consideration of Party B entering into such Transfer Swap Agreement (which MLCS agrees to pay pursuant to the Transaction Transfer Agreement), (iii) the absolute assignment by Party B to Party A of Party B 's right to receive such Settlement Amount from Credit Support Provider, and (iv) the payment by MLCS to Party B of any net Unpaid Amounts owing to Party B (which MLCS agrees to pay pursuant to the Transaction Transfer Agreement) shall constitute full

satisfaction of any payment otherwise owing from Party B to Party A pursuant to Section 6(e) of this Agreement, and that Party B shall be fully discharged from any and all obligations under Section 6(e) of this Agreement. In accordance with clause (iii) of the preceding sentence, Party B hereby assigns to Party A, absolutely and not for purposes of security, all of Party B's right to receive any such Settlement Amount from MLCS pursuant to clause (ii) of the preceding sentence, and Party A agrees that only MLCS shall be obligated to pay such Settlement Amount to Party A, and that Party A shall have no recourse to Party B with respect thereto. In the event that any net Unpaid Amounts would be owing by Party B to Party A (such that clause (iv) of the first sentence of this Part 7(b) would not be applicable), Party A hereby assigns to MLCS, absolutely and not for purposes of security, all of Party A's right to receive any such net Unpaid Amounts from Party B, and Party A agrees that only MLCS shall be entitled to receive any such net Unpaid Amounts from Party B, and that Party A shall have no recourse to Party B with respect thereto.

(c)     In the event that a Settlement Amount is to be determined, the parties agree that such Settlement Amount shall be determined by MLCS on behalf of, and for the benefit of, the Non-defaulting Party or the party which is not the Affected Party (as applicable), and that such Settlement Amount shall be conclusive. For purposes of determining such Settlement Amount, MLCS shall not be obligated to obtain quotations from more than one Reference Market-maker, which Reference Market-maker may be MLCS. Notwithstanding the foregoing, if an Event of Default or Termination Event shall have occurred with respect to which Party A is the Defaulting Party or an Affected Party, and such Event of Default or Termination Event (x) is triggered by the occurrence of an event which, by definition of such Event of Default or Termination Event, occurs with respect to MLCS or the Credit Support Document, and (y) arises solely by reason of an event or condition that is directly attributable to MLCS under this Agreement or the Transaction Transfer Agreement, then Party B, and not Credit Support Provider, shall determine such Settlement Amount.

20

13-53846-swr   Doc 3661-3   Filed 03/06/14   Entered 03/06/14 15:39:20   Page 79 of 40   279
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 79 of
100

Please confirm your agreement to the terms of the foregoing Schedule by signing below.

DETROIT GENERAL RETIREMENT SYSTEM
SERVICE CORPORATION

By:_____

Name: Roger Short
Title: President


SBS FINANCIAL PRODUCTS COMPANY, LLC,
a Delaware limited liability company

By:_____

Name: John M. Carter
Title: President

Detroit General 2006 (XL)/Schedule

Please confirm your agreement to the terms of the foregoing Schedule by signing below.

DETROIT GENERAL RETIREMENT SYSTEM
SERVICE CORPORATION

By:_____
Name:
Title:


SBS FINANCIAL PRODUCTS COMPANY, LLC,
a Delaware limited liability company

By:_____
Name: John M. Carter
Title:   President

Detroit General 2006 (XL)/Schedule

13-53846-swr   Doc 13618-3 Filed 03/09/21 Entered 03/09/21 13:05:20   Page 81 of 40
13-53846-tjt   Doc 1140-6   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 81 of 100
281

**Exhibit 4**

**Contract Administration Agreement (CAA)**

# Contract Administration Agreement 2006

among

## Detroit Retirement Systems Funding Trust 2006,

## Detroit General Retirement System Service Corporation

and

## Detroit Police and Fire Retirement System Service Corporation,

severely and not jointly,

## U.S. Bank National Association,

separately and not as Trustee of the Detroit Retirement Systems Funding Trust 2006

and the

## Other Persons Party Hereto

---

**Dated June 12, 2006**

---

## Table of Contents

**Article I -- Definitions and Related Matters**    **1**
  **Section 1.1.**   Certain Definitions ................................................................. 1
  **Section 1.2.**   Other Definitions — This Agreement .................................... 2
  **Section 1.3.**   Other Definitions — Service Contracts ................................ 2
  **Section 1.4.**   Other Definitions — Trust Agreement .................................. 3
  **Section 1.5.**   Business Days ......................................................................... 3
  **Section 1.6.**   Interpretation ......................................................................... 3

**Article II — Appointment; Grant of Security Interest**    **4**
  **Section 2.1.**   Collection of Receivables ...................................................... 4
  **Section 2.2.**   Appointment by Funding Trust .............................................. 4
  **Section 2.3.**   Appointment by Each Corporation ......................................... 4
  **Section 2.4.**   Grant of Security Interests .................................................... 4

**Article III — Representations and Warranties**    **6**
  **Section 3.1.**   Incorporation by Reference .................................................... 6
  **Section 3.2.**   Corporation Property ............................................................. 7
  **Section 3.3.**   General Representations and Warranties ............................... 7
  **Section 3.4.**   Conveyance and Security Interests to the Funding Trust ...... 7
  **Section 3.5.**   Security Interests Granted the Specified Hedge Counterparties ......... 8
  **Section 3.6.**   Corporate Identification ........................................................ 8

**Article IV — Receipt and Disposition of Receivables**    **9**
  **Section 4.1.**   Property Acknowledgments; Payment Entitlements ............ 9
  **Section 4.2.**   Receipt of Service Payments; Determination of Property Interests ......... 9
  **Section 4.3.**   Prepaid Service Charges; Hedge Payables ......................... 10
  **Section 4.4.**   Receipt and Disposition of Hedge Receivables and Investment Gain ....... 10
  **Section 4.5.**   Books and Records; Funds and Accounts; Trust Funds and Accounts ........ 10
  **Section 4.6.**   Distribution Dates ............................................................... 11
  **Section 4.7.**   Distributions of Service Payments ...................................... 11
  **Section 4.8.**   Satisfaction and Priority of Payments ................................ 12

**Article V — Corporation Covenants**    **12**
  **Section 5.1.**   Concerning the Security Interests ....................................... 12
  **Section 5.2.**   No Conveyance or Assignment ........................................... 13
  **Section 5.3.**   Negative Pledge ................................................................... 13
  **Section 5.4.**   Defense of Interests; Further Assurance ............................ 13

**Article VI — Events of Default; Remedies**    **14**
  **Section 6.1.**   Right of Enforcement .......................................................... 14
  **Section 6.2.**   Events of Default ................................................................. 14
  **Section 6.3.**   Remedies ............................................................................. 14
  **Section 6.4.**   Contract Administrator May File Proofs of Claim .............. 14
  **Section 6.5.**   Application of Money Collected ......................................... 15
  **Section 6.6.**   No Duty of Inquiry .............................................................. 15
  **Section 6.7.**   Notice of Defaults ............................................................... 15
  **Section 6.8.**   Limitation on Suits by Certificateholders .......................... 15
  **Section 6.9.**   Control by Majority ............................................................ 16

**Article X Concerning Each Insurer**      **31**
   **Section 10.1.** Actions by Insurer .................................................................... 31
   **Section 10.2.** Party in Interest ...................................................................... 31
   **Section 10.3.** Amendments; Notice to Rating Agencies ...................................... 31
   **Section 10.4.** Reporting ............................................................................... 31
   **Section 10.5.** Fees and Expenses .................................................................. 32

**Article XI Miscellaneous**      **32**
   **Section 11.1.** Addresses for Notices................................................................ 32
   **Section 11.2.** Amendment ............................................................................. 33
   **Section 11.3.** No Waiver; Remedies. ............................................................... 33
   **Section 11.4.** Binding Obligation. ................................................................... 33
   **Section 11.5.** Assignment. ............................................................................ 33
   **Section 11.6.** Third Party Beneficiaries .......................................................... 34
   **Section 11.7.** Reliance on Representations and Warranties .................................. 34
   **Section 11.8.** Governing Law ........................................................................ 34
   **Section 11.9.** Headings ................................................................................ 34
   **Section 11.10.** Integration ............................................................................ 34
   **Section 11.11.** Counterparts ......................................................................... 34

**Article XII**      **34**
   **Section 12.1.** Supplements ........................................................................... 34
   **Section 12.2.** Duties of Contract Administrator ................................................ 34

<u>Supplements</u>
   Non-Tender Escrow Account
   Tender Account Supplement

**Contract Administration Agreement 2006**, dated June 12, 2006 (the *Agreement*), among the **Detroit Retirement Systems Funding Trust 2006** (the *Funding Trust*), the **Detroit General Retirement System Service Corporation** (the *GRS Corporation*) and the **Detroit Police and Fire Retirement System Service Corporation** (the *PFRS Corporation*), each a Michigan nonprofit corporation acting severally and not jointly, **U.S. Bank National Association**, separately and not as trustee of the Funding Trust (the *Contract Administrator*), and the **Persons** whose signatures appear on the signature pages hereto;

In consideration of the mutual promises contained herein and intending to be legally bound hereby, the parties hereto agree as follows:

## Article I -- Definitions and Related Matters

### Section 1.1.    Certain Definitions

The following terms have the following respective meanings unless the context otherwise clearly requires:

*Collateral* means the Funding Trust Receivable Collateral, the Hedge Payables Collateral and the Hedge Receivables Collateral.

*Contract Administrator* means the bank identified in the first paragraph of this Agreement as the "Contract Administrator" *unless and until* a successor is appointed successor Contract Administrator pursuant to applicable provisions of this Agreement; *thereafter*, *Contract Administrator* means such successor.

*Contract Agreement Deficiency* means as of any date, an amount referred to in **clause Second, Fourth** or **Sixth** of **Section 8.03** of either **Service Contract**.

*Corporation* means, as the context may require, the GRS Corporation or the PFRS Corporation.

*Creditor Liens* means any and all liens and security interests granted by this Agreement in the Hedge Payables Collateral and by the Trust Agreement in the Funding Trust Receivables.

*Default* means any Event of Default or event that with the passage of time or the giving of notice, or both, would constitute an Event of Default.

*Entitled Person* or *Person Entitled* means the Person entitled to receive the proceeds of a specific Component.

*Funding Rate* means the rate at which Service Charges are determined for each Service Charge Class according to the applicable Funding Rate Methodology.

*Funding Trust Receivable Collateral* means the Funding Trust Receivables and all rights and interests with respect thereto granted by Article 9 of the UCC, including rights to proceeds and rights of enforcement.

*GRS Corporation* means the Person so defined in the first paragraph of this Agreement and the successors of such Person.

*Hedge Payables Collateral* means the amounts payable by the City under the Service Contracts in respect of Hedge Payables and all rights and interests with respect thereto granted by Article 9 of the UCC, including rights to proceeds and rights of enforcement.

*Hedge Receivables Collateral* means the amounts payable by any Specified Hedge Counterparty as Hedge Receivables and all rights and interests with respect thereto granted by Article 9 of the UCC, including rights to proceeds and rights of enforcement.

*PFRS Corporation* means the Person so defined in the first paragraph of this Agreement and the successors of such Person.

*Receipt Day* means a day on which the Contract Administrator receives an amount of money at or before the Payment Time *or if* the Contract Administrator receives an amount of money after the Payment Time on a day *then* the following day.

*Service Contract* means the GRS Service Contract or the PFRS Service Contract as the context may require.

*Service Contract Priority Sections* means Sections 8.02 and 8.03 of the each Service Contract.

*Specified Hedge Counterparties* means the Persons named in **Schedule 5** to the **Specific Terms** *subject* to **Section 8** of the **Specific Terms**.

*UCC* means the Uniform Commercial Code as in effect in the State of Michigan.

## Section 1.2.    Other Definitions — This Agreement

Terms defined elsewhere in this Agreement include the following:

| Term | Defined In |
| --- | --- |
| Affected Certificate | Section 6.3 |
| Deficit Interest Related Payments | Section 4.7 |
| Deficit Principal Related Payments | Section 4.7 |
| Distribution Date | Section 4.6 |
| Interest Related Payments | Section 4.7 |
| Principal Related Payments | Section 4.7 |
| Redemption Related Payments | Section 4.7 |
| Sinking Fund Related Payments | Section 4.7 |
| Transfer Party Accession Event | Section 2.4 |

## Section 1.3.    Other Definitions — Service Contracts

Capitalized terms not defined herein and defined in either Service Contract are used herein as therein defined unless the context clearly otherwise requires.  Such terms include:

| Term | Defined In |
| --- | --- |
| Accrued Service Charges | Section 5.03 |
| Closing Date | Section 3 |
| Component | Section 1.03 |
| Credit Insurance | Schedule of Credit Insurance to Specific Terms |
| Funding Rate Portion | Section 1.01 |
| Funding Trust | Section 4 |
| Hedge Counterparty | Section 1.01 |
| Hedge Periodic Payable | Section 1.01 |

| Term | Defined In |
|------|-----------|
| Hedge Payable | Section 1.01 |
| Hedge Periodic Receivable | Section 1.01 |
| Hedge Receivable | Section 1.01 |
| Hedge Termination Payable | Section 1.01 |
| Hedge Termination Receivable | Section 1.01 |
| Index Rate Service Charges | Section 3 |
| Insurer | Schedule of Credit Insurance to Specific Terms |
| Notice of Transfer Event | Section 8 |
| Payment Time | Section 1.01 |
| Rating Agency | Section 9.02 |
| Service Payment | Section 1.03 |
| Siebert | Section 8 |
| Stated Hedge | Section 1.01 |
| Third Party Beneficiary | Section 9.12 |
| Transfer Party | Section 8 |
| Trust Agreement | Section 1 |
| Trustee | Section 1 |

Section numbers with a leading zero (e.g., 1.01) refer to sections in a Service Contract General Terms. Section numbers without a leading zero (e.g., 1) refer to sections in a Service Contract Specific Terms.

## Section 1.4.    Other Definitions — Trust Agreement

Capitalized terms not defined herein and defined in the Trust Agreement are used herein as therein defined unless the context clearly otherwise requires. Such terms include:

| Term | Defined In |
|------|-----------|
| Principal Amount | Section 101 |
| Funding Trust Receivable | Section 101 |
| Corporation Request, Corporation Order or Corporation Consent | Section 101 |

## Section 1.5.    Business Days

If this Agreement requires an act to be performed on a day that is not a Business Day then such act shall be performed on the first day thereafter that is a Business Day with the same effect as if such act were performed on the day that such act was otherwise required to be performed.

## Section 1.6.    Interpretation

*1.6.1.*  Words of the masculine gender include correlative words of the feminine and neuter genders.

*1.6.2.*  Unless the context otherwise indicates, words importing the singular include the plural and vice versa.

*1.6.3.*  Articles and Sections referred to by number or name refer to the corresponding Articles and Sections of this Agreement *unless* otherwise provided.

*1.6.4.* The terms *hereby, hereof, hereto, herein, hereunder* and any similar terms used in this Agreement refer to this Agreement as a whole and not to any particular portion thereof.

*1.6.5.* The word *or* is not exclusive.

*1.6.6.* The enumeration of things after the word *including* is to be interpreted as illustrative and not as restrictive.

*1.6.7.* References to sections of a Public Act, or to a Public Act as a whole, also include any amendments thereto unless otherwise indicated and analogous sections of Public Acts enacted as substitutes therefor.

## Article II — Appointment; Grant of Security Interest

### Section 2.1.    Collection of Receivables

Each of the Corporations, the Specified Hedge Counterparties and the Funding Trust hereby appoint the Contract Administrator as its respective agent and attorney-in-fact to receive Service Payments.

### Section 2.2.    Appointment by Funding Trust

*2.2.1.* The Funding Trust hereby also appoints the Contract Administrator as its agent and attorney-in-fact to take such actions and exercise such rights and remedies as to Funding Trust Receivables as the Funding Trust is or may become entitled to exercise under law and in equity to enforce the payment thereof and otherwise realize Funding Trust Receivables. For the avoidance of doubt, all parties to this Agreement shall be entitled to enforce their respective rights.

### Section 2.3.    Appointment by Each Corporation

*2.3.1.* Each Corporation hereby also appoints the Contract Administrator as its agent and attorney-in-fact to enforce such Corporation's rights and remedies under the Stated Hedges, including the collection of Hedge Receivables from the Specified Hedge Counterparties under the respective Stated Hedges, and to take all such actions and exercise such rights and remedies as the respective Corporation is or may become entitled to exercise under the particular Stated Hedge and otherwise at law or in equity.

*2.3.2.* Each Corporation also appoints the Contract Administrator as its agent and attorney to take to perform all ministerial acts in the name and stead of such Corporation that are called for to be performed by such Corporation under the Service Contract subject to the specific limitations contained in **Article VII**.

*2.3.3.* Each Corporation further appoints the Contract Administrator to invest amounts received by the Contract Administrator as Costs of Issuance and Prepaid Service Charges in Authorized Investments in accordance with the Service Contract.

### Section 2.4.    Grant of Security Interests

*2.4.1.* Hedge Periodic Payables

2.4.1(1).   Effective as of the Closing Date, to secure its payment obligations under its Stated Hedges, each Corporation hereby grants to each Specified Hedge Counterparty and the Transfer Party a security interest in and lien upon all of its right, title and interest

in, to and under the amounts payable by the City under **Section 7.02** of either **Service Contract** in respect of Hedge Periodic Payables, any interest earned thereon and all rights and interests with respect thereto granted by Article 9 of the UCC, including rights to proceeds and rights of enforcement (collectively, the ***Hedge Periodic Payables Security Interest***).

2.4.1(2). All of the parties hereto acknowledge that the Hedge Periodic Payables Security Interest granted by each Corporation shall be deemed to give to each Specified Hedge Counterparty and the Transfer Party a first priority security interest in and an equal and parity first lien upon, all of the Corporations' right, title and interest in, to and under the amounts payable by the City under **Section 7.02** of either **Service Contract** in respect of Hedge Periodic Payables. Each Specified Hedge Counterparty agrees and acknowledges the parity first priority security interest and parity first lien upon such amounts granted to it, the other Specified Hedge Counterparties and the Transfer Party by each Corporation.

2.4.1(3). The Transfer Party acknowledges and agrees that the Hedge Periodic Payables Security Interest granted it is enforceable against the Hedge Periodic Payables Collateral *if but only if* it accedes to the status of Stated Hedge Counterparty under the Service Contract (the ***Transfer Party Accession Event***).

2.4.1(4). Each Specified Hedge Counterparty agrees that the Transfer Party shall accede to all of the rights and remedies and be bound by all of the obligations of Siebert as a Specified Hedge Counterparty hereunder upon the occurrence of the Transfer Party Accession Event and that thereupon Siebert shall have no further rights, obligations or remedies hereunder as a Specified Hedge Counterparty.

***2.4.2.*** Hedge Termination Payables

2.4.2(1). Effective as of the Closing Date, to secure its payment obligations under its Stated Hedge, each Corporation hereby grants to each Specified Hedge Counterparty and the Transfer Party a security interest in and lien upon all of its right, title and interest in, to and under the amounts payable by the City under **Section 7.02** of either **Service Contract** in respect of Hedge Termination Payables, any interest earned thereon and all rights and interests with respect thereto granted by Article 9 of the UCC, including rights to proceeds and rights of enforcement (collectively, the ***Hedge Termination Payables Security Interest***).

2.4.2(2). All of the parties hereto acknowledge that the Hedge Termination Payables Security Interest granted by each Corporation shall be deemed to give each Specified Hedge Counterparty and the Transfer Party a first priority security interest in and an equal and parity first lien upon all of the Corporations' right, title and interest in, to and under the amounts payable by the City under **Section 7.02** of either **Service Contract** in respect of Hedge Termination Payables, and each Specified Hedge Counterparty agrees and acknowledges the parity first priority security interest and parity first lien upon such amounts granted to it, the other Specified Hedge Counterparties and the Transfer Party by each Corporation.

2.4.2(3).   The Transfer Party acknowledges and agrees that the Hedge Termination Payables Security Interest granted it is enforceable against the Hedge Termination Payables Collateral *only* on and after the occurrence of the Transfer Party Accession Event.

2.4.2(4).   Each Specified Hedge Counterparty agrees that the Transfer Party shall accede to all of the rights and remedies and be bound by all of the obligations of Seibert as a Specified Hedge Counterparty hereunder with respect to the Hedge Termination Payables Collateral upon the occurrence of the Transfer Party Accession Event and that thereupon Siebert shall have no further rights, obligations or remedies hereunder as a Specified Hedge Counterparty.

*2.4.3.*  Hedge Periodic Receivables

2.4.3(1).   Effective as of the Closing Date, to secure the City's obligations to the Funding Trust in respect of Service Charges, each Corporation hereby grants to the Funding Trust a security interest in and lien upon all of its right, title and interest in, to and under the amounts payable by any Specified Hedge Counterparty as a Hedge Periodic Receivable (a **Hedge Periodic Receivable Amount**), any interest earned thereon and all rights and interests with respect thereto granted by Article 9 of the UCC, including rights to proceeds and rights of enforcement (collectively, the **Hedge Periodic Receivables Security Interest**).

2.4.3(2).   All of the parties hereto acknowledge that the Hedge Periodic Receivables Security Interest granted by each Corporation shall be deemed to give Funding Trust a first priority security interest in and an equal lien upon, all of the Corporations' right, title and interest in, to and under Hedge Periodic Receivable Amounts.

*2.4.4.*  Hedge Termination Receivables

2.4.4(1).   Effective as of the Closing Date, to secure the City's obligations to the Funding Trust in respect of Service Charges, each Corporation hereby grants to the Funding Trust a security interest in and lien upon all of its right, title and interest in, to and under the amounts payable by any Specified Hedge Counterparty as a Hedge Termination Receivable (a **Hedge Termination Receivable Amount**), any interest earned thereon and all rights and interests with respect thereto granted by Article 9 of the UCC, including rights to proceeds and rights of enforcement (collectively, the **Hedge Termination Receivables Security Interest**).

2.4.4(2).   All of the parties hereto acknowledge that the Hedge Termination Receivables Security Interest granted by each Corporation shall be deemed to give the Funding Trust a first priority security interest an equal lien upon, all of the Corporations' right, title and interest in, to and under Hedge Termination Receivable Amounts.

## Article III — Representations and Warranties

Each Corporation makes the representations and warranties contained in **this Article** for only itself and not for the other Corporation.

## Section 3.1.   Incorporation by Reference

*3.1.1.*  Each of the Corporations makes the representations and warranties made by it in its Service Contract, on and as of the dates therein made, for the benefit of the Contract Adminis-

trator as if any reference therein to the "Service Contract" also included a reference to this Agreement for the mutual benefit of each other and for the benefit of the Underwriters, the Specified Hedge Counterparties, the Funding Trust and the holders from time to time of the Certificates.

*3.1.2.* Such representations and warranties, together with related definitions and ancillary provisions, are hereby incorporated herein, *mutatis mutandis*, with the same force and effect as if set forth in full herein.

## Section 3.2.    Corporation Property

Each Corporation represents and warrants for the benefit of the Contract Administrator, the Underwriters, the Funding Trust, the Specified Hedge Counterparties, the holders from time to time of the Certificates and the other Corporation that on the date hereof and on and as of the Closing Date its respective Service Contract and Stated Hedges are its property subject to no lien, charge, encumbrance or other interest *except* the rights of Third Party Beneficiaries as set forth in the Service Contracts and (i) the rights of the Funding Trust on and after the Closing Date to Funding Trust Receivables and Hedge Receivables, and ancillary rights, (ii) the rights of the Specified Hedge Counterparties on and after the Closing Date to Hedge Payables and ancillary rights and (iii) the security interest granted on and after the Closing Date to the Transfer Party in Hedge Payables.

## Section 3.3.    General Representations and Warranties

Each Corporation represents and warrants as follows for the benefit of the Contract Administrator, the Underwriters, the Funding Trust, the Specified Hedge Counterparties, the holders from time to time of the Certificates and the other Corporation.

*3.3.1.* The Corporation's name as indicated on the signature page of this Agreement is such Corporation's name as indicated on the public record of the Corporation's jurisdiction of organization which shows the Corporation to have been organized.

*3.3.2.* The Corporation is a "registered organization," within the meaning of Article 9 of the UCC, of the type and organized under the laws of the State of Michigan.

*3.3.3.* **Section 9.04** of the respective **Service Contract** accurately sets forth the Corporation's place of business or, if more than one place of business, its chief executive office as well as such Corporation's mailing address if different and such Corporation has not had any other place of business or, if more than one place of business, any other chief executive office since its formation.

## Section 3.4.    Conveyance and Security Interests to the Funding Trust

*3.4.1.* Each Corporation represents and warrants as follows for the benefit of the Contract Administrator, the Funding Trust and the other Corporation on and as of the Closing Date.

3.4.1(1).    The transfer and assignment of the Funding Trust Receivables that the Trust Agreement purports to transfer, assign and otherwise convey to the Funding Trust is a valid and binding absolute transfer of the Funding Trust Receivables *provided* that such Corporation shall not be in breach of this representation and warranty if, contrary to

the intent of such Corporation, such transfer is hereafter determined to be a pledge of such property to the Funding Trust.

3.4.1(2). The security interest granted to the Funding Trust in the Funding Trust Receivables is a valid security interest to the extent of the rights of such Corporation's interests therein, and such security interest is a perfected, first priority security interest.

3.4.1(3). The security interest granted to the Funding Trust in the Hedge Receivables is a valid security interest therein, and such security interest is a perfected, first priority security interest.

*3.4.2.* (i) Each Corporation has not granted control (for purposes of Articles 8 and 9 of the UCC) over the Funding Trust Receivables and the Hedge Receivables, or any bank account or securities account in which they are held, to any Person other than the Funding Trust and (ii) each Corporation has not entered into any agreement granting control (for purposes of Articles 8 and 9 of the UCC) over the Hedge Receivables other than this Agreement or over the Funding Trust Receivables other than the Trust Agreement.

*3.4.3.* Each Corporation has never granted or permitted to exist, any lien, mortgage, pledge, charge, claim, encumbrance, easement, lease or security interest on the Hedge Receivables and Funding Trust Receivables, or any bank account or securities account in which they are held, in favor of any Person other than the Funding Trust.

### Section 3.5.  Security Interests Granted the Specified Hedge Counterparties

*3.5.1.* Each Corporation represents and warrants for the benefit of the Specified Hedge Counterparties and the other Corporation on and as of the Closing Date that the security interest granted to the Specified Hedge Counterparties in the Hedge Payables Collateral is a valid security interest therein, and such security interest is a perfected, first priority security interest.

*3.5.2.* (i) Each Corporation has not granted control (for purposes of Articles 8 and 9 of the UCC) over the Hedge Payables Collateral, or any bank account or securities account in which they are held, to any Person other than the Hedge Counterparties and (ii) each Corporation has not entered into any agreement granting control (for purposes of Articles 8 and 9 of the UCC) over the Hedge Payables Collateral other than this Agreement.

*3.5.3.* Each Corporation has never granted or permitted to exist, any lien, mortgage, pledge, charge, claim, encumbrance, easement, lease or security interest on the Hedge Payables Collateral, or any bank account or securities account in which they are held, in favor of any Person other than the Specified Hedge Counterparties.

### Section 3.6.  Corporate Identification

Each Corporation represents only as to its own organizational identification number as follows:

*3.6.1.* The organizational identification number of GRS Corporation is 793781.

*3.6.2.* The organizational identification number of PFRS Corporation is 793782.

## Article IV — Receipt and Disposition of Receivables

### Section 4.1.    Property Acknowledgments; Payment Entitlements

For the avoidance of doubt, the following are statements of the property interests of the parties hereto in the Components of Service Payments.

4.1.1(1).    Contract Administrator Payments are property of the Contract Administrator, and the Contract Administrator is the Person Entitled thereto.

4.1.1(2).    Funding Trust Receivables are property of the Funding Trust, and the Funding Trust is the Person Entitled thereto.

4.1.1(3).    Amounts payable by the City under **Section 7.02** of either **Service Contract** in respect of Hedge Periodic Payables are property of the Corporations, and pursuant to **Section 4.3.2** the Specified Hedge Counterparties are the Persons Entitled thereto.

4.1.1(4).    Amounts payable by the City under **Section 7.02** of either **Service Contract** in respect of Hedge Termination Payables are property of the Corporations, and pursuant to **Section 4.3.3** the Specified Hedge Counterparties are the Persons Entitled thereto.

4.1.1(5).    Hedge Periodic Receivables are the property of the Corporations, and pursuant to **Section 4.4.1**, the Funding Trust is the Person Entitled thereto, to the extent provided in such Section, and thereafter, pursuant to **Section 4.4.2**, each Corporation is the Person Entitled to any remaining portion of its respective Hedge Periodic Receivables.

4.1.1(6).    Hedge Termination Receivables are the property of the Corporations, and pursuant to **Section 4.4.1**, the Funding Trust is the Person Entitled thereto, to the extent provided in such Section, and, thereafter, each Corporation is the Person Entitled to any remaining portion of its respective Hedge Termination Receivables.

### Section 4.2.    Receipt of Service Payments; Determination of Property Interests

*4.2.1.*    Service Payments (including Prepaid Service Charges) shall be applied in accordance with the priorities set forth in the Service Contract Priority Sections.

*4.2.2.*    On each Receipt Day that the Contract Administrator receives a Service Payment, the Contract Administrator shall properly determine the Components and pro-rata application thereof satisfied under the Service Contract Priority Sections by such Service Payment, and the Persons Entitled thereto, in accordance with the Service Contract and shall distribute such payments in accordance with **Section 4.7**.

*4.2.3.*    At least one day prior to each Distribution Date for any Service Charges or Scheduled Payments, the Contract Administrator shall determine whether the amount available under this Agreement for such payment is sufficient to make the distribution as if no Contract Agreement Deficiency existed.  If the Contract Administrator determines that the amount available under this Agreement for such payment is insufficient to make such distribution on such Distribution Date, the Contract Administrator shall deliver a notice (a ***Shortfall Notice***) to each Insurer and the Trustee that states the amount of the shortfall and the respective amounts thereof attributable to Service Charges and Scheduled Payments.

*4.2.4.* At least one day prior to each Distribution Date for a Hedge Periodic Payable, the Contract Administrator shall determine whether the amount available under this Agreement for such payment is sufficient to pay such Hedge Periodic Payable. If the Contract Administrator determines that the amount available under this Agreement for such payment is insufficient to make such payment on such Distribution Date, the Contract Administrator shall deliver a notice to the Insurer and the applicable Specified Hedge Counterparty or Counterparties that states the amount of the shortfall.

## Section 4.3. Prepaid Service Charges; Hedge Payables

*4.3.1.* Prepaid Service Charges received by the Contract Administrator shall be used to pay the first occurring Service Charges and Hedge Periodic Payables of each Corporation.

*4.3.2.* Receipts by the Contract Administrator of amounts paid by the City under **Section 7.02** of either **Service Contract** in respect of Hedge Periodic Payables shall be used to pay current and past due Hedge Periodic Payables, and once credited to the account referred to in **Section 4.5.1** shall not be subject to direction to any other use by the Corporation.

*4.3.3.* Receipts by the Contract Administrator of amounts paid by the City under **Section 7.02** of either **Service Contract** in respect of Hedge Termination Payables shall be used to pay current and past due Hedge Termination Payables and once credited to the account referred to in **Section 4.5.1** shall not be subject to direction to any other use by the Corporation.

## Section 4.4. Receipt and Disposition of Hedge Receivables and Investment Gain

*4.4.1.* Hedge Receivables received by the Contract Administrator shall be used to satisfy the City's obligations in respect of then current or past due Service Charges not otherwise paid.

*4.4.2.* To the extent that a balance of a paid Hedge Receivable remains after application in accordance with **Section 4.4.1**, such balance shall be the property of the respective Corporation.

*4.4.3.* Gain from Authorized Investments received by the Contract Administrator from the investment of Costs of Issuance and Prepaid Service Charges shall be paid to the City.

## Section 4.5. Books and Records; Funds and Accounts; Trust Funds and Accounts

*4.5.1.* The Contract Administrator shall maintain books and records properly showing satisfied Components. To facilitate maintaining proper records of ownership, the Contract Administrator shall establish the funds and accounts named in **Exhibit 4.5** and shall credit the respective Components pending distribution and shall distribute the amounts credited thereto on the respective Distribution Dates to the respective Entitled Persons.

*4.5.2.* In addition to bearing the name of the particular fund or account, each fund or account shall be captioned *Detroit Retirement Systems Funding Trust 2005* and shall identify the property owner(s) as set forth in **Exhibit 4.5**.

*4.5.3.* In addition to the funds and accounts required by **Exhibit 4.5**, the Contract Administrator may establish such other funds and accounts as it determines necessary or appropriate.

13-53846-swr Doc 3618-3 Filed 08/06/14 Entered 08/06/14 15:39:20 Page 95 of 46 295
13-53846-tjt Doc 1140-6 Filed 10/10/13 Entered 10/10/13 14:54:54 Page 95 of 100
1974114.0069/401796
10 100

*4.5.4.* The funds and accounts required by **Exhibit 4.5**, and such other funds and accounts that the Contract Administrator establishes hereunder shall be held and administered as trust funds and accounts.

### Section 4.6. Distribution Dates

Each of the following dates is a ***Distribution Date***.

| Date | Component |
|------|-----------|
| As and When Due ................................... | Contract Administrator Payments Amounts in respect of Hedge Periodic Payables Amounts in respect of Hedge Termination Payables |
| First day of a calendar month............. | Any Contract Agreement Deficiency |
| Service Charge Payment Dates........................................... | Service Charges |
| Scheduled Payments Dates ........................... | Regular Scheduled Payments |
| Sinking Fund Installment Dates......................... | Sinking Fund Installments |
| Optional Prepayment Dates ....................... | Optional Prepayment Amounts Accrued Service Charges |

### Section 4.7. Distributions of Service Payments

On each Distribution Date, the Contract Administrator shall distribute the amount of the Components satisfied since the last such Distribution Date to the respective Entitled Persons.

4.7.1(1). If the Entitled Person is the Contract Administrator, the amounts of satisfied Components shall be paid to the Contract Administrator.

4.7.1(2). If the Entitled Person is the Funding Trust, the amounts of satisfied Components shall be distributed to the Funding Trust to be applied in accordance with the Trust Agreement.

(i) Amounts distributed to the Trustee representing satisfied Components constituting Service Charges and Accrued Service Charges described in **clause Second** of **Section 8.03** of each **Service Contract** shall be identified to the Trustee as ***Deficit Interest Related Payments***;

(ii) Amounts distributed to the Trustee representing satisfied Components constituting Regular Scheduled Payments described in **clause Fourth** of **Section 8.03** of each **Service Contract** shall be identified to the Trustee as ***Deficit Principal Related Payments***;

(iii) Amounts distributed to the Trustee representing satisfied Components constituting Sinking Fund Installments described in **clause Fourth** of **Section 8.03** of each **Service Contract** shall be identified to the Trustee as ***Deficit Principal Related Payments***;

(iv) Amounts distributed to the Trustee representing satisfied Components constituting Service Charges described in **clause Third** of **Section 8.03** of each **Service Contract** shall be identified to the Trustee as ***Interest Related Payments***;

(v) Amounts distributed to the Trustee representing satisfied Components constituting Regular Scheduled Payments and Sinking Fund Installments described in **clause Fifth** of **Section 8.03** of each **Service Contract** shall constitute and be identified to the Trustee as, respectively, ***Principal Related Payments*** and ***Sinking Fund Related Payments***; and

(vi) Amounts distributed to the Trustee representing satisfied Components constituting Optional Prepayment Amounts and Accrued Service Charges described in **clause Eighth** of **Section 8.03** of each **Service Contract** shall be identified to the Trustee as ***Redemption Related Payments***.

4.7.1(3). If the Entitled Persons are the Specified Hedge Counterparties, the amounts of satisfied Components constituting amounts in respect of Hedge Payables shall be paid to the Specified Hedge Counterparties to whom such amounts are owing in proportion to the amounts owed to each under the respective Stated Hedges.

4.7.1(4). If distributions are to be made on the same Distribution Date for two or more different priorities of Components pursuant to the Service Contract Priority Sections, no distribution shall be made in respect of a lower priority to the extent that each of the higher priorities is not satisfied in full.

### Section 4.8. Satisfaction and Priority of Payments

*4.8.1.* Each party acknowledges that the Service Contract Priority Sections establish the order and priority of the payment of Components and the Persons Entitled to Components are entitled to receive those Components in the order and priority set forth in the Service Contract Priority Sections. Each party acknowledges it is undertaking and entering into the transaction which is the subject of this Agreement based on the understanding, and with the intent and effect of the Service Contract Priority Sections. Each party hereto agrees to be bound by the order and priority of the payments of Components set forth in Service Contract Priority Sections and the terms and provisions of the Service Contract Priority Sections are hereby incorporated into this Agreement by this reference as if the same were recited in its entirety.

*4.8.2.* Notwithstanding any other provision hereof, upon the occurrence of a payment default under the Service Contracts or this Agreement, to the extent that a party enforces its rights with respect to Collateral on which it has a Creditor Lien, such Collateral or the proceeds thereof may only be applied to satisfy payments of Components due and owing to the parties that have a Creditor Lien that secures payments of such Components.

## Article V — Corporation Covenants

Each Corporation covenants with the Contract Administrator, the Funding Trust, the Specified Hedge Counterparties and with the other Corporation as provided in this Article.

### Section 5.1. Concerning the Security Interests

*5.1.1.* The Corporation will not change its name, its place of business or, if more than one place of business, its chief executive office, or its mailing address or organizational identification number, if it has one, without providing prior written notice to the parties hereto at least ten Business Days prior to the effective date of any such change.

*5.1.2.* The Corporation will not, except as expressly permitted by this Agreement, change its type of organization, its jurisdiction of organization, its legal structure or its "location" as determined in Article 9 of the UCC, without the prior written consent of each of the other parties hereto (other than a Corporation).

## Section 5.2.    No Conveyance or Assignment

*5.2.1.* The Corporation shall not convey, transfer or assign Funding Trust Receivables under its Service Contract or any interest therein to any Person *other than* the Funding Trust as provided in the Trust Agreement.

*5.2.2.* The Corporation shall not convey, transfer or assign Hedge Payables under its Service Contract or any interest therein to any Person *other than* the Specified Hedge Counterparties as provided herein.

*5.2.3.* The Corporation shall not convey, transfer or assign any Stated Hedge or any interest therein to any Person *other than* as provided in the Service Contract.

## Section 5.3.    Negative Pledge

*5.3.1.* The Corporation hereby covenants never to grant, or permit to exist, any other pledge of, security interest in or lien upon the amounts payable by the City under **Section 7.02** of its **Service Contract** in respect of Hedge Periodic Payables, any "securities account" and/or any "deposit account" (as such terms are defined in Sections 8-501(1) and 9-102(cc) of the UCC).

*5.3.2.* The Corporation hereby covenants never to grant, or permit to exist, any other pledge of, security interest in or lien upon the amounts payable by the City under **Section 7.02** of its **Service Contract** in respect of the Hedge Termination Payables, any "securities account" and/or any "deposit account" (as such terms are defined in Sections 8-501(1) and 9-102(cc) of the UCC).

*5.3.3.* The Corporation hereby covenants never to grant, or permit to exist, any other pledge of, security interest in or lien upon the Funding Trust Receivables, any "securities account" and/or any "deposit account" (as such terms are defined in Sections 8-501(1) and 9-102(cc) of the UCC).

## Section 5.4.    Defense of Interests; Further Assurance

The Corporation agrees that it will, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all financing statements, if applicable, and will take all actions or cause all such actions to be taken as may be required by law or as shall reasonably be requested by any Hedge Counterparty or the Trustee for respectively, the attachment, perfection and/or continuance of any security interests granted by this Agreement or the Trust Agreement for the preservation and protection of all rights of, respectively, the Specified Hedge Counterparties under this Agreement or the Funding Trust under the Trust Agreement.

13-53846-swr    Doc 3061-3    Filed 08/09/21    Entered 08/09/21 15:53:20    Page 79 of 46
13-53846-tjt    Doc 1140-6    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 98 of 13    100    298
1974114.0069/401796

## Article VI — Events of Default; Remedies

### Section 6.1.    Right of Enforcement

For the avoidance of doubt, all parties to this Agreement shall be entitled to enforce their respective rights except as otherwise provided in **Section 6.9** and **Article VIII**.

### Section 6.2.    Events of Default

Each of the following constitutes an "Event of Default":

6.2.1(1).    the City fails to pay any Funding Trust Receivables as and when the same shall become due under either Service Contract; or

6.2.1(2).    an event occurs described in clause (i), (ii) or (iii) of Section 9.01 of either Service Contract (each, a *Service Contract Acceleration Clause*).

### Section 6.3.    Remedies

Upon the occurrence of an Event of Default and during the continuance thereof, the Contract Administrator may and shall, at the request of Certificateholders representing either:

(i)    at least 25 percent in principal amount of Outstanding Certificates, the payments on which have not been made as a result of such Event of Default (*Affected Certificates*), or

(ii)    at least 50 percent in principal amount of all Outstanding Certificates,

enforce the Service Contract under which the Event of Default occurred by such remedies as are available to the Contract Administrator.

### Section 6.4.    Contract Administrator May File Proofs of Claim

*6.4.1.*    If an event occurs described in any Service Contract Acceleration Clause and a judicial proceeding is commenced in connection therewith, the Contract Administrator is entitled and empowered, by intervention in such proceeding:

6.4.1(1).    to file and prove a claim for the whole amount of the Funding Trust Receivables then due and payable and to file such papers and documents as may be necessary or desirable in order to have the claims of the Contract Administrator (including any claim for reasonable compensation, expenses, disbursements and advances of the Contract Administrator, its agents or counsel) and of the Certificateholders allowed in such judicial proceeding; and

6.4.1(2).    to collect and receive any amounts payable or deliverable on any such claims and to distribute the same;

and any trustee (or similar official) in any such judicial proceeding is hereby authorized by the Funding Trust to make such payments to the Contract Administrator, and in the event the Contract Administrator shall consent to making of such payments directly to the Trustee, to pay to the Contract Administrator any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Contract Administrator, its agents or counsel.

*6.4.2.*    Nothing herein contained shall authorize the Contract Administrator to authorize or consent to or accept or adopt on behalf of any Certificateholder any plan of adjustment or

13-53846-swr    Doc 3061-3    Filed 08/09/24    Entered 08/09/24 15:59:36    Page 99 of 46    299
13-53846-tjt    Doc 1140-6    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 99 of 100
1974114.0069401796    14
100

composition affecting the Certificateholders or the rights of any Holder, or to authorize the Contract Administrator to vote in respect of the claim of any Certificateholder in any such proceeding.

## Section 6.5.    Application of Money Collected.

Any money collected or received by the Contract Administrator pursuant to this Article shall be applied in the order of the Service Contract Priority Sections *except* as otherwise provided in **Section 4.8.2**.

## Section 6.6.    No Duty of Inquiry

*6.6.1.*    The Contract Administrator is under no duty to inquire into the performance by the City of its obligations under the Service Contracts; however, *if* the Contract Administrator receives notice (a *Default Notice*) from Holders of either

> (i)    at least 25 percent in principal amount of the Outstanding Affected Certificates or

> (ii)    at least 50 percent in principal amount of all Outstanding Certificates

specifying the failure of the City to pay Funding Trust Receivables *then* the Contract Administrator shall give notice of such failure to the City and demand that such failure be remedied.

*6.6.2.*    Upon receipt of any Default Notice, the Contract Administrator shall give notice to all Certificateholders and the Specified Hedge Counterparties that did not join in such Default Notice.

## Section 6.7.    Notice of Defaults.

*6.7.1.*    Promptly upon obtaining actual knowledge of the occurrence of any Event of Default, the Contract Administrator shall give written notice of such Event of Default by mail to all Certificateholders, Specified Hedge Counterparties and Rating Agencies *unless* such Event of Default has been cured or waived.

*6.7.2.*    Any Insurer who is not then in default under its Credit Insurance shall be entitled to receive all notices in respect of Certificates insured by it, and no notices under **Section 6.7.1** shall be sent to the Holders of such Certificates.

## Section 6.8.    Limitation on Suits by Certificateholders.

No Certificateholder shall have any right to institute any proceeding, judicial or otherwise, under or with respect to the Service Contract *unless*

> 6.8.1(1).    such Holder has previously given written notice to the Contract Administrator of an Event of Default that is then continuing;

> 6.8.1(2).    the Holders of either

> > (i)    at least 25 percent in principal amount of the Outstanding Affected Certificates or

> > (ii)    at least 50 percent in principal amount of all Outstanding Certificates

have made written request to the Contract Administrator to institute proceedings in respect of such Event of Default in its own name as Contract Administrator;

13-53846-swr    Doc 1618-3    Filed 08/24/13    Entered 08/24/13 20:59:20    Page 100 of 300
13-53846-tjt    Doc 1140-6    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 100 of 100
1974145.06 948496
100