the amounts of the Hedge Payables as such amounts may now or hereafter become due and payable.

*Hedge Payables* means, collectively, the Hedge Payables as defined in each Service Contract.

*Hedge Periodic Payables* means, collectively, the Hedge Periodic Payables as defined in each Service Contract.

*Pledged Property* means the Revenues, any investments made from time to time thereof, the Receipts Account and the Holdback Account, all amounts standing to the credit thereof from time to time, and any and all proceeds of any thereof.

*Revenues* means, collectively, Developer Payments and Wagering Tax Property.

*Wagering Tax Revenue Statute* means the Michigan Gaming Control and Revenue Act, being MCL 432.201 *et seq.*, MSA 18.969(201), *et seq.*, as amended.

## Section 1.3. Definition of *Counterparty*

(a) *Counterparty* means a Person designated as "Party A" in a Hedge, and any successor thereto or assignee of, or subrogee under, such Hedge pursuant to the terms thereof, except as otherwise provided in **this Section**.

(b) The definition of Counterparty includes the Transfer Party:

(i) for the purpose of executing and delivering this Agreement.

(ii) for purposes of receiving notices and giving any consent that is provided to be given by the Counterparties hereunder and

(iii) for all purposes of this Agreement on and after a Transfer Party Accession Event.

(c) The definition of Counterparty does not include SBS for any purpose of this Agreement on and after a Transfer Party Accession Event *except* for the purpose of executing and delivering this Agreement.

(d) The Custodian may conclusively presume in the absence of actual knowledge to the contrary that a Transfer Party Accession Event has not occurred unless and until it has received notice that a Transfer Party Accession Event has occurred from a Person entitled to give such notice under a Service Contract.

## Section 1.4. Definition of *Developer Payments* and Ancillary Definitions

The following terms are defined in the <u>Authorizing Ordinance</u>, as in effect on the date hereof, and are used herein as therein defined as of the date hereof. Such terms are set forth below for convenience of reference:

(a) *Developer Payments* means:

(i) amounts payable under each Existing Payment Section,

(ii) as of any particular date, the aggregate amounts payable under any New Payment Section up to but not exceeding the aggregate amounts that would have been payable under the applicable Existing Payment Section as of such date,

(iii) any interest payable, in respect of amounts payable under each Payment Section, and

(iv) any amounts payable under any Guaranty or in respect of any amounts payable under any Payment Section.

For the avoidance of doubt, **Developer Payments** does not include any other payments or rights to reimbursement made or to be made under any Development Agreement.

(b) Ancillary Definitions

**Developer** means any Existing Developer and any New Developer.

**Development Agreement** means any Existing Development Agreement and any New Development Agreement.

**Existing Casino** means any of the following casinos as the context may require:

(i) the casino currently known as the Greektown Casino and currently located at 555 E. Lafayette Boulevard in Detroit, Michigan;

(ii) the casino currently known as the MGM Grand Detroit Casino and currently located at 1300 John C. Lodge in Detroit, Michigan; and

(iii) the casino currently known as the MotorCity Casino and currently located at 2901 Grand River Avenue in Detroit, Michigan.

**Existing Developer** means each of Detroit Entertainment, L.L.C., Greektown Casino, L.L.C., MGM Grand Detroit, L.L.C. and any successor to any of them or assignee of any of their respective Existing Development Agreements.

**Existing Development Agreement** means any of the Revised Development Agreements among the City, The Economic Development Corporation of the City of Detroit and an Existing Developer, as in effect on the effective date of the Authorizing Ordinance, as such Revised Development Agreement may be modified or revised from time to time thereafter, and any substitute for such Revised Development Agreement with an Existing Developer.

**Existing Payment Section** means each of the following sections and any substitute for any such section in an Existing Development Agreement:

(i) Section 3.16(a)(iv) of the Existing Development Agreement with Greektown Casino, L.L.C. as the Existing Developer,

(ii) Section 3.16(a)(iv) of the Existing Development Agreement with MGM Grand Detroit, L.L.C. as the Existing Developer, and

(iii) Section 3.14(a)(iv) of the Existing Development Agreement with Detroit Entertainment, L.L.C. as the Existing Developer.

**New Developer** means a Person (that is not a public body) other than an Existing Developer.

**New Development Agreement** means an agreement with respect to an Existing Casino to which the City and a New Developer are parties and which contains a New Payment Section.

*New Payment Section* means a section in a New Development Agreement that provides for the calculation of payments similar to the calculation of payments made under an Existing Payment Section.

*Payment Section* means any Existing Payment Section and any New Payment Section.

## Section 1.5. Definition of *Holdback Requirement* and Ancillary Definitions.

(a) *Holdback Requirement* means:

    (i) for any Month *except* a Month occurring in a Ratings Upgrade Period, an amount equal to the Standard Holdback Requirement for such Month and

    (ii) for any Month occurring in a Ratings Upgrade Period, means an amount equal to the Reduced Holdback Requirement for such Month.

(b) Definitions Related to the Amount of the Holdback Requirement

    *Reduced Holdback Requirement* means an amount equal to the Regular Custodial Payment for the applicable Month.

    *Standard Holdback Requirement* means the sum of:

    (i) the Regular Custodian Payment payable during such Month *plus*

    (ii) one-third of the aggregate of the Fixed Amounts payable by the Service Corporations under the Hedges during the Quarterly Period in which such Month falls without giving effect to any netting for the Floating Amounts due from the Counterparties under the Hedges.

(c) Definitions Related to a Ratings Upgrade Period

    *Ratings Downgrade* means, after a Ratings Upgrade, (i) a reduction of the unenhanced ratings of the 2006 Pension Funding Securities to below BBB by Standard & Poor's or to below Baa2 by Moody's Investors Service, or (ii) the unenhanced rating of the 2006 Pension Funding Securities has been withdrawn or suspended by either Standard & Poor's or Moody's Investors Service.

    *Ratings Upgrade* means the reinstatement of the unenhanced ratings of the 2006 Pension Funding Securities to not less than A- by Standard & Poor's and to not less than A3 by Moody's Investors Service.

    *Ratings Upgrade Period* means a period of days beginning on (and including) the day that a Ratings Upgrade occurs and ending on (and including) the day on which the earlier of the following occur:

    (i) a Ratings Downgrade or

    (ii) a Termination Event or Event of Default under a Hedge where the Counterparty is not the sole Affected Party or Defaulting Party.

**Section 1.6.  Definition of *Wagering Tax Property* and Ancillary Definitions**

The following terms are defined in the Authorizing Ordinance, as in effect on the date hereof, and are used herein as therein defined as of the date hereof. Such terms are set forth below for convenience of reference:

(a) *Wagering Tax Property* means, collectively, the Wagering Taxes, Additional Wagering Taxes and Alternative Taxes, including any interest and penalties thereon as provided for under Detroit City Code Section 18-14-6(c) and any and all proceeds of any thereof. For the avoidance of doubt, *Wagering Tax Property* does not include any municipal service fees authorized to be imposed by the City pursuant to Section 13 of the Wagering Tax Revenue Statute.

(b) Ancillary Definitions

*Additional Wagering Taxes* means taxes collected or to be collected by the City pursuant to Section 12(5) of the Wagering Tax Revenue Statute.

*Alternative Taxes* means all proceeds of taxes to which the City is at any time or from time to time entitled under Section 12(1) of the Wagering Tax Revenue Statute on account of the City rescinding or otherwise being unable to exercise its option to collect Wagering Taxes and all other amounts payable to the City pursuant to Section 12 of the Wagering Tax Revenue Statute.

*Wagering Taxes* means taxes levied or imposed or to be levied or imposed by Detroit City Code Section 18-14-3 pursuant to Section 12(4)(b) of the Wagering Tax Revenue Statute.

**Section 1.7.  Time**

*Unless* otherwise indicated, all references to time herein refer to such time in Detroit, Michigan.

**Section 1.8.  Business Days**

If this Agreement requires an act to be performed on a day that is not a Business Day then such act shall be performed on the first day thereafter that is a Business Day with the same effect as if such act were performed on the day that such act was otherwise required to be performed.

**Section 1.9.  Interpretation**

(a) Capitalized terms used herein have the meanings given or provided for such terms herein *unless* the context clearly otherwise requires.

(b) Words of the masculine gender include correlative words of the feminine and neuter genders.

(c) Unless the context otherwise indicates, words importing the singular include the plural and vice versa.

(d) Articles, Sections and Exhibits referred herein refer to the corresponding Articles and Sections of this Agreement and Exhibits to this Agreement *unless* otherwise provided.

(e) The terms *hereby, hereof, hereto, herein, hereunder* and any similar terms used in this Agreement refer to this Agreement as a whole and not to any particular portion thereof.

(f) The word *or* is not exclusive.

(g) The enumeration of things after the word *including* is to be interpreted as illustrative and not as restrictive.

(h) References herein or in the preamble hereto to any Public Act, or codification thereof, or any section, subsection or paragraph thereof include any amendments to such Public Act, or codification thereof, or to any section, subsection or paragraph thereof and any substitute therefor.

(i) References herein or in the preamble hereto to any section, subsection or paragraph of either the Wagering Tax Revenue Statute or the Detroit City Code include any amendments to such section, subsection or paragraph as the same may be amended from time to time and any substitute therefor.

# Article II. Effectiveness of this Agreement

## Section 2.1.    Closing Date

The Closing shall occur on a date on or before June 26, 2009.

## Section 2.2.    Satisfaction of Conditions Precedent

This Agreement shall become effective on and after the Closing Date.

## Section 2.3.    Factual Conditions Precedent

(a) The Existing Developers shall have received the Irrevocable Instructions.

(b) The Service Corporations and the Counterparties shall have entered into the Hedge Amendments.

(c) The City, the Service Corporations and the Counterparties shall have entered into the Service Contract Amendments.

(d) The Third Party Beneficiaries (as defined in the 2006 Service Contracts) shall have consented to the Service Contract Amendments and the Hedge Amendments.

(e) The Custodian has established the Accounts.

(f) The City Council shall have adopted a resolution to implement the Authorizing Ordinance and authorize the Definitive Documents.

## Section 2.4.    Documentary Conditions Precedent

The parties hereto shall have received and then hold such instruments, other documents and opinions in form and substance acceptable to each of the parties.

# Article III. General Provisions; Irrevocable Instructions

## Section 3.1.    Appropriation

(a) The payment by the City of the City Payments and amounts payable pursuant to **Section 5.6** (if not appropriated at the time thereby required to be paid) are subject to appropriation by the City Council.

(b) The City Pledge, the Irrevocable Instructions and the deposit of Revenues in the Receipts Account are not subject to appropriation by the City Council.

## Section 3.2.    No Indebtedness

The obligations of the City under this Agreement shall not constitute or create any indebtedness of the City within the meaning of the limitation of The Home Rule City Act, being Act 279 of the Public Acts of Michigan of 1909, as amended, or any Michigan constitutional or other non-tax statute or City Charter limitation.

## Section 3.3.    Contractual Obligations

(a) The City Hedge Payables Related Obligations and all obligations of the City under this Agreement are contractual obligations, enforceable in the same manner as any other contract of the City and are not general obligations of the City to which the City has pledged its full faith and credit or ad valorem taxing power.

(b) **This Section** does not impair any lien or security interest in any Pledged Property.

## Section 3.4.    Irrevocable Instructions

(a) The City shall give effect to its obligations contained in **Section 5.1(a)** by means of the Irrevocable Instructions in the form attached hereto as **Exhibit 3.4** as modified with the consent of the Counterparties to take into account whether the addressee is a Casino Licensee, Developer or Obligor (the ***Irrevocable Instructions***).

(b) The City shall deliver an Irrevocable Instruction to each Casino Licensee and each Existing Developer on or before the Closing Date. *If* a Casino Licensee and a Developer are the same Person *then* the Irrevocable Instruction as to Wagering Tax Property and Developer Payments may be combined in a single Irrevocable Instruction.

(c) The City shall deliver an Irrevocable Instruction on or before the Closing Date to each Person who is an obligor (an ***Obligor***) under a Guaranty and from whom payment is required in lieu of or in substitution for an amount otherwise payable by a Developer as a Developer Payment

(d) The City shall deliver an Irrevocable Instruction to each New Developer on or before the date of effectiveness of each New Development Agreement.

(e) Upon reasonable request by any Counterparty during the term of this Agreement and in any event when requested by a Counterparty following the occurrence of a Hedge Event, the City also shall deliver or redeliver an Irrevocable Instruction to any Developer, Casino Licensee or Obligor, as identified by the Counterparty.

(f) Each Casino Licensee, Developer or Obligor owing any Revenues to the City, when notified by the Irrevocable Instructions, shall be discharged *pro tanto* by making payment in accordance with the Irrevocable Instructions.

(g) The City shall not revoke or otherwise act to effect any change to an Irrevocable Instruction without the prior written consent of each Counterparty.

(h) The City shall take all actions necessary to ensure that Irrevocable Instructions remain in effect during the term of this Agreement, including with respect to any Wagering Tax

Property or Developer Payments payable by any Developer or Obligor, whether or not an addressee of the Irrevocable Instructions.

(i) The failure of a Casino Licensee, Developer or Obligor to comply with an Irrevocable Instruction shall not relieve the City of its obligations contained in **Section 5.1**.

### Section 3.5.    Payments from Accounts

Any amount paid to the City from the General Receipts Subaccount or released to the City from the Holdback Account, in each case, pursuant to the terms of this Agreement shall be free and clear of any pledge or lien created by this Agreement.

## Article IV. Pledges and Grant of Security Interests

### Section 4.1.    City Pledge

(a) The City Pledge as set forth in the <u>Authorizing Ordinance</u>, as in effect on the Closing Date, and as set forth below is an essential term of this Agreement.

(b) The City pledges to the Service Corporations and creates a first priority lien upon all of the City's right, title and interest in, to and under the Pledged Property, whether received or to be received, in order to secure the payment of all City Hedge Payables Related Obligations (the *City Pledge*).

(c) The City Pledge shall be valid, binding and enforceable as of the Closing Date, and the Pledged Property and other property pledged pursuant to the City Pledge shall immediately be subject to the lien of the City Pledge without any physical delivery thereof or further act.

(d) The lien of the City Pledge shall be valid, binding and enforceable as against all parties having claims of any kind in tort, contract or otherwise against the City irrespective of whether such claims are voluntary or involuntary or any such claimants have notice of the City Pledge.

(e) Neither the Authorizing Ordinance nor this Agreement nor any other document or any statement, or instrument by which the City Pledge is created or evidenced nor any financing statement or other notice need be recorded or filed.

### Section 4.2.    Service Corporation Grant of Security Interests

(a) Each Service Corporation grants a security interest to the Counterparties in all of the Service Corporation's right, title and interest in, to and under the City Hedge Payables Related Obligations and the City Pledge (the *Service Corporation Property*), in order to secure the payment of the Hedge Payables as the same may now or hereafter become due and payable by such Service Corporation under its respective Hedge and all other amounts owing to the Counterparties under this Agreement (the *Service Corporation Security Interest*).

(b) The Service Corporation Security Interest is an essential term of this Agreement.

### Section 4.3.  Alternative Service Corporation Pledge

(a) **This Section** is applicable *if and to the extent* that a Service Corporation is deemed a "governmental unit" or a "governmental subdivision or agency" as such terms are used in Article 9 (the ***Government Exception***)

(b) The Service Corporation Pledge as set forth in the <u>Authorizing Ordinance</u>, as in effect on the Closing Date, and as set forth below is an essential term of this Agreement.

(c) Each Service Corporation pledges to the Counterparties and creates a first priority lien upon all of the Service Corporation's right, title and interest in, to and under the Service Corporation Property, in order to secure the payment of the Hedge Payables as the same may now or hereafter become due and payable by such Service Corporation under its respective Hedge (the ***Service Corporation Pledge***).

(d) The Service Corporation Pledge shall be valid, binding and enforceable as of the Closing Date, and the Service Corporation Property shall immediately be subject to the lien of the Service Corporation Pledge without any physical delivery thereof or further act.

(e) The lien of the Service Corporation Pledge of each Service Corporation shall be valid, binding and enforceable as against all parties having claims of any kind in tort, contract or otherwise against such Service Corporation irrespective of whether such claims are voluntary or involuntary or any such claimants have notice of the Service Corporation Pledge.

(f) Neither the Authorizing Ordinance nor this Agreement nor any other document or any statement, or instrument by which the Service Corporation Pledge is created or evidenced nor any financing statement or other notice need be recorded or filed.

## Article V.  Certain Payments

### Section 5.1.  Payment of Revenues

(a) The City shall pay all Revenues to the Custodian.

(b) The City shall not take any action to redirect the payment of the Revenues contrary to the Irrevocable Instructions.

(c) *If* the City shall receive any Revenues from or on behalf of a Casino Licensee or Developer or an Obligor under a Guaranty notwithstanding the giving of the Irrevocable Instructions, *then* the City shall transfer such Revenues to the Custodian for deposit to the credit of the Developer Subaccount within two Business Days following the earlier to occur of:

(i) the Finance Director having actual knowledge of such payment and

(ii) receipt by the City of notice from the Custodian that such payment was erroneously paid to the City.

(d) Until the Pledged Property has been released from the lien of the City Pledge, the City shall not transfer to the revenue division of the Michigan Department of Treasury, pursuant to <u>Detroit Code Section 18-14-6(a)</u>, the responsibility and function of administering and collecting Revenues on behalf of the City.

## Section 5.2.  Monthly Payments by City

(a)  Monthly, on or before the Payment Date of such Month, the City shall pay to the Custodian in one or more payments an aggregate amount from the City's general fund (collectively, a *City Payment*) for deposit to the credit of the Holdback Account as provided below:

(1)  *Except* as provided in **paragraph (2)** or **(3)**, **below**, the City Payment shall equal the Holdback Requirement for the Month in which such City Payment is made.

(2)  *Subject* to **Section 5.2(e)**, the City Payment shall equal the Relevant Amount for each Month during the Term Payment Period.

(3)  The City Payment shall equal the amount of the Final Payment for the Month in which occurs an Unqualified Hedge Event or the Term Period End Date.

(b)  The City shall make the City Payment at or before the Payment Time on the date such payment is made.

(c)  The City has no obligation to make more than one City Payment in any Month *except* as otherwise provided in **subsection (d)**, **below**.

(d)  *If* the City has made a City Payment equal to the Holdback Requirement in any Month and after making such payment the City becomes obligated to make a City Payment equal to the Relevant Amount or Final Payment during such Month, *then* on or before the Payment Date of such Month, the City shall pay a City Payment equal to the difference between the Holdback Requirement already paid by the City during such Month and the amount of such Relevant Amount or Final Payment, as the case may be.

(e)  To the extent that, following the commencement of the Term Payment Period, payment of the amount referred to in **clause (iii)** of the **definition of "Relevant Amount"** requires a Supplemental Appropriation, the City may defer the payment of such amount until the earliest to occur of:

(i)  the date on which the Supplemental Appropriation is obtained,

(ii)  the Outside Supplemental Appropriations Date,

(iii)  the date on which an Unqualified Hedge Event occurs and

(iv)  the Term Period End Date.

For each Month in the deferral period, the amount so deferred shall not be included in the Relevant Amount, or as a City Payment, for that Month, *but* upon the expiration of the deferral period, an amount equal to the interest at the Interest Rate accrued and remaining unpaid to the Counterparties under the Hedges from the commencement of the deferral period shall be included in the Relevant Amount, and as a City Payment, in the Month in which the deferral period expires.

## Section 5.3.  Payments to City from General Receipts Subaccount

(a)  Payments shall be made to the City from the General Receipts Subaccount as follows *except* during a Ratings Upgrade Period or as provided in **Section 5.4**:

(1)  For any Month in which the Custodian receives the full amount of a City Payment required by **Section 5.2**, the Custodian shall, without notice to or consent by the Coun-

terparties, pay to the City an amount from the General Receipts Subaccount equal to such City Payment.

(2) Beginning on the second Business Day following the date on which the Custodian gives its Monthly Holdback Compliance Notice to the City and the Counterparties, the Custodian shall remit daily to the City all amounts standing to the credit of the General Receipts Subaccount during the Month covered by such Monthly Holdback Compliance Notice.

(b) *Except* as provided in **Section 5.4**, the Custodian shall remit daily to the City all amounts standing to the credit of the General Receipts Subaccount during a Ratings Upgrade Period.

## Section 5.4.    When Payments from General Receipts Subaccount Prohibited

(a) No payment shall be made to the City from the General Receipts Subaccount

(i) on and after the Term Period End Date or

(ii) on or after the occurrence of a Termination Event under a Hedge where the related Counterparty is not the sole Affected Party *except* as otherwise permitted by **subsection (b)**, **below** or

(iii) while an Event of Default is continuing under a Hedge where the related Counterparty is not the sole Defaulting Party.

(b) No payment shall be made to the City from the General Receipts Subaccount on or after a Qualified Hedge Event *unless and until* the (i) City enacts the correlative Supplemental Appropriation and (ii) the Finance Director delivers to the Custodian and the Counterparties a certification that such Supplemental Appropriation has been duly enacted and is in the amounts required by this Agreement.

## Section 5.5.    Payments to City from Holdback Account

(a) *Except* as otherwise provided in **subsection (b)**, **below**, on each Release Date, the Custodian shall pay to the City the balance in excess of $5,000 standing to the credit of the Holdback Account at the end of the correlative Quarterly Period.

(b) No payment shall be made to the City from the Holdback Account if at the time a Final Payment is due and owing.

(c) *Release Date* means, as to any Quarterly Period, the latest to occur of:

(i) the date on which all payments to the Counterparties and the Custodian required by **Section 5.7** have been paid,

(ii) the date of the delivery by the Custodian, in accordance with **Section 12.9**, of the Quarterly Coverage Report for the immediately ended Quarterly Period and

(iii) the date of delivery by the Custodian, in accordance with **Section 12.9**, of the Monthly Coverage Report for the last Month in the immediately ended Quarterly Period.

### Section 5.6. Payments by City to Holdback Account

(a) *If* a Quarterly Accounting shows that amounts standing to the credit of the Holdback Account are not sufficient to make all payments to the Counterparties and the Custodian required by **subsections (a)** through **(d) of Section 5.7**, then the City shall then pay to the Custodian an amount from its general fund equal to the amount of such insufficiency.

(b) *If* at any time amounts standing to the credit of the Holdback Account are not sufficient to pay all Regular Custodian Payments and City Payments due at the time, then the City shall then pay to the Custodian an amount from its general fund equal to the amount of such insufficiency.

(c) All amounts received by the Custodian from the City pursuant to **this Section** shall be deposited to the credit of the Holdback Account and applied to the insufficiency giving rise to the reason for such payment.

### Section 5.7. Payments to the Counterparties and the Custodian from Holdback Account

(a) The Custodian shall pay to the Counterparties from the Holdback Account:

(i) at the end of each Quarterly Period, except during the Term Payment Period or after the occurrence of an Unqualified Hedge Event or the Term Period End Date, an amount equal to all Hedge Periodic Payables payable for such Quarterly Period; and

(ii) at the end of each Month during the Term Payment Period, an amount equal to the Relevant Amount for the Month, excluding the amount of any Regular Custodian Payment included in the Relevant Amount;

(b) Upon the occurrence of an Unqualified Hedge Event or the Term Period End Date, the Custodian shall pay the Final Payment from the Holdback Account.

(c) All amounts paid to the Counterparties pursuant to **Section 5.7(a)(ii)** shall be credited toward payment by the City of the amounts due and owing to the Counterparties under the Hedges as to which payment is deferred during the Term Payment Period due to the Limitation on Remedies.

(d) At the end of the Quarterly Period or at such other time or times as the payments are then due and owing, the Custodian shall pay to itself from the Holdback Account all Regular Custodial Payments then due and owing.

(e) If the funds in the Holdback Account are not sufficient to make the payments required by this **Section 5.7**, the amounts referred to in **Section 5.7(d)** shall be paid first, and any balance shall be paid to the Counterparties.

### Section 5.8. Payment Determinations

(a) For purposes of the Custodian determining the amount or timing of payments to be made under this **Article V**, the Custodian may rely upon the written notice delivered by either Counterparty as to the occurrence of any Rating Upgrade, Rating Downgrade, Unqualified Hedge Event, Qualified Hedge Event, Outside Supplemental Appropriation Date, Term Period End Date or any other event affecting the determination of the amount or timing of payment under this **Article V**.

(b) Any such notice or determination shall not affect the right of the City to seek a refund or other payment from the Counterparties based on the City's belief that the information contained in the notice was incorrect.

## Article VI. Representations and Warranties of the City

The City makes the representations and warranties contained in **this Article** for the benefit of the Custodian, the Service Corporations and the Counterparties on and as of the Closing Date.

### Section 6.1.    General Representations and Warranties

(a) Organization and Existence

(1) The City is a municipal corporation of the State of Michigan, with home rule powers, duly existing under the laws of the State of Michigan and pursuant to the City Charter.

(2) The City Charter and all amendments thereto were duly approved by a majority of the City electors voting thereon, and the City Charter and any such amendments have not been rescinded in whole or in part.

(b) Valid and Binding Agreement, Obligations and City Pledge

(1) This Agreement and each other Definitive Document to which the City is a party, constitutes a valid and binding agreement of the City enforceable in accordance with its terms *except* as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(2) The obligations of the City under the Authorizing Ordinance constitute a valid and binding agreement of the City enforceable in accordance with its terms except as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(3) The City Pledge as set forth in the Authorizing Ordinance and herein is valid, binding and enforceable in accordance with its terms *except* as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(c) Corporate and Governmental Authorization; No Contravention

(1) The execution, delivery and performance by the City of this Agreement and each other Definitive Document to which the City is a party are within the City's powers, have been duly authorized by all necessary action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of applicable law or regulation or of the City Charter or of any agreement, judgment, injunction, order, decree or other instrument binding upon the City.

(2) Article XIV of Chapter 18 of the Detroit City Code and the Authorizing Ordinance are in full force and effect in accordance with all applicable City Charter, constitutional and statutory requirements, are within the City's powers, require no action by or in respect of, or filing with any governmental body, agency or official, and do not contravene or constitute a default under any provision of applicable law or regulation or of the City Charter or of any agreement, judgment, injunction, order, decree or other instrument binding upon the City.

(3) The representation regarding performance set forth in **paragraph (1)**, above is qualified to the extent that appropriations are required as set forth in **Section 3.1**.

(d) No Litigation

There is no action, suit or proceeding pending against, or to the knowledge of the City threatened against, or affecting the City, the Authorizing Ordinance or the Pledged Property before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely the ability of the City to perform its obligations under this Agreement or any other Definitive Document to which the City is a party or the Authorizing Ordinance or which in any manner questions the validity of this Agreement or any other Definitive Document to which the City is a party, the Authorizing Ordinance or the City Pledge.

(e) Conditions Precedent

All acts, conditions and things required by the Michigan Constitution, the City Charter, the Detroit City Code and laws of the State of Michigan to exist, to have happened and to have been performed precedent to and in the execution and delivery of this Agreement and the other Definitive Documents by the City exist, have happened and been performed in due time, form and manner required by the Michigan Constitution, the City Charter, the Detroit City Code or laws of the State of Michigan in order to make this Agreement a valid and binding obligation of the City.

**Section 6.2.    Revenues**

(a)  The use and application of the Revenues as provided in the Authorizing Ordinance and this Agreement are in compliance with the Development Agreements and the Wagering Tax Revenue Statute.

(b)  The statement of Revenues delivered with and as referenced in the Closing Certificate is a true and complete statement of all Revenues collected by the City for each year from 2003 – 2008 and for the year to date period in 2009 showing as to each Developer:  (1) Wagering Taxes, (2) Alternative Taxes, (3) Additional Wagering Taxes, and (4) Developer Payments.

**Section 6.3.    Developer Agreements and Guaranties**

(a)  A true and complete copy of each Development Agreement (including all amendments thereto) has been delivered with the Closing Certificate as referenced therein.

(b)  A true and complete copy of each Guaranty (including all amendments to each such Guaranty) has been delivered with the Closing Certificate as referenced therein.

(c)  There are no Guaranties or Development Agreements *except* the Guaranties and Development Agreements delivered with the Closing Certificate.

**Section 6.4.    No Other Liens, Charges or Encumbrances**

(a)  The Pledged Property is not subject to any lien, charge or encumbrance *except* the City Pledge and either the Service Corporation Pledge (if the Government Exception is applicable) or the Service Corporation Security Interest (if the Government Exception is not applicable) granted by this Agreement.

(b) No financing statement is on file in any public office covering any of the Pledged Property *except* in favor of the Counterparties.

### Section 6.5. No Control Granted

The City has not granted control (for purposes of Article 8 and, if applicable, Article 9 of the UCC) over the Pledged Property, or any account in which the Pledge Property is held, to any Person other than the Custodian.

## Article VII. Representations and Warranties of Service Corporations

Each Service Corporation makes the representations and warranties contained in **this Article** for the benefit of the City, the Custodian, the other Service Corporation and the Counterparties on and as of the Closing Date.

### Section 7.1. General Representations and Warranties

(a) Corporate Existence and Power

The Service Corporation is a nonprofit corporation duly incorporated, validly existing and in good standing under the laws of the State of Michigan.

(b) Corporate and Governmental Authorization; Contravention

The execution, delivery and performance by the Service Corporation of this Agreement and each other Definitive Document to which the Service Corporation is a party are within the Service Corporation's corporate powers, have been duly authorized by all necessary corporate action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of applicable law or regulation or of the articles of incorporation or bylaws of the Service Corporation or of any agreement, judgment, injunction, order, decree or other instrument binding upon the Service Corporation.

(c) Valid and Binding Agreement and Service Corporation Pledge

(1) This Agreement and each other Definitive Document to which the Service Corporation is a party, constitutes a valid and binding agreement of the Service Corporation enforceable in accordance with its terms *except* as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(2) If the Government Exception is applicable, the Service Corporation Pledge as set forth in the Authorizing Ordinance and herein is valid, binding and enforceable in accordance with its terms *except* as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(d) <u>No Litigation</u>

There is no action, suit or proceeding pending against, or to the knowledge of the Service Corporation threatened against, or affecting the Service Corporation or the Service Corporation Property before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely the ability of the Service Corporation to perform its obligations under this Agreement or any other Definitive Document to which the Service Corporation is a party or which in any manner questions the validity of this Agreement or any other Definitive Document to which the Service Corporation is a party, the Service Corporation, the Service Corporation Security Interest, or the Service Corporation Pledge.

(e) <u>No Taxation</u>

The Service Corporation is not subject to federal income tax or taxation by the State of Michigan.

(f) <u>Not an Investment Company</u>

The Service Corporation is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(g) <u>Conditions Precedent</u>

All acts, conditions and things required by the Michigan Constitution, the City Charter, the Detroit City Code and laws of the State of Michigan to exist, to have happened and to have been performed precedent to and in the execution and delivery of this Agreement and the other Definitive Documents by the Service Corporation exist, have happened and been performed in due time, form and manner required by the Michigan Constitution, the City Charter, the Detroit City Code or laws of the State of Michigan in order to make this Agreement a valid and binding obligation of the Service Corporation.

**Section 7.2.  Concerning the Security Interests**

(a) <u>Corporate Name</u>

The Service Corporation's name as indicated on the signature page of this Agreement is such Service Corporation's name as indicated on the public record of the Service Corporation's jurisdiction of organization which shows the Service Corporation to have been organized.

(b) <u>Registered Organization</u>

The Service Corporation is a "registered organization," within the meaning of Article 9 of the UCC, of the type and organized under the laws of the State of Michigan.

(c) <u>Place of Business</u>

<u>Section 9.04</u> of the respective <u>Service Contract</u> accurately sets forth the Service Corporation's place of business or, if more than one place of business, its chief executive office as well as such Service Corporation's mailing address if different and such Service Corporation has not had any other place of business or, if more than one place of business, any other chief executive office since its formation.

(d) Corporate Identification

Each Service Corporation represents only as to its own organizational identification number as follows:

(1) The organizational identification number of GRS Service Corporation is 793781.

(2) The organizational identification number of PFRS Service Corporation is 793782.

(e) Validity, Perfection and Priority of Security Interest

(1) As of the Closing Date, the security interest granted to the Counterparties in the Service Corporation Property is a valid security interest to the extent of the rights of such Service Corporation's interests therein, and such security interest is a perfected, first priority security interest.

(2) The Service Corporation Security Interest is valid, binding and enforceable as of the Closing Date, and the Service Corporation Property is immediately subject to the Service Corporation Security Interest without any physical delivery thereof or further act.

(3) The Service Corporation shall not be in breach of the representation contained in **paragraph (1) above** by reason of the Government Exception.

(f) No Other Liens, Charges or Encumbrances

(1) The Service Corporation's interest in the Service Corporation Property is not subject to any lien, charge or encumbrance *except* the Service Corporation Security Interest or, if the Government Exception is applicable, the Service Corporation Pledge.

(2) No financing statement is on file in any public office covering any Service Corporation Property.

(g) No Control Granted

The Service Corporation has not granted control (for purposes of Articles 8 and 9 of the UCC) over the Service Corporation Property, or any bank account or securities account in which the Service Corporation Property or any proceeds thereof are held, to any Person other than the Counterparties.

## Article VIII.  The Accounts

### Section 8.1.    Establishment of Accounts

(a) There is established with the Custodian the following accounts to be held as custodial accounts:

- Receipts Account
- Holdback Account

(b) The Custodian shall establish the Developer Subaccounts as required by **Section 8.2** in the Receipts Account.

(c) The Custodian shall establish the General Receipts Subaccount in the Receipts Account.

(d) The Accounts shall be held at an office of the Custodian located in the City and State of New York.

## Section 8.2.  Developer Subaccounts

(a) The Custodian shall establish a Developer Subaccount in the Receipts Account with respect to each Developer.

(b) The initial Existing Developers and the initial Developer Subaccounts to be established with respect thereto are:

- Detroit Entertainment Subaccount with respect to Detroit Entertainment, L.L.C.
- Greektown Subaccount with respect to Greektown Casino, L.L.C.
- MGM Grand Subaccount with respect to MGM Grand Detroit, L.L.C.

(c) The Custodian shall establish a new Developer Subaccount in the Receipts Account for each assignee of an Existing Developer and for each New Developer.

(d) ***Predecessor Developer*** means, as the context may require, (i) an Existing Developer that is the assignor of an Existing Development Agreement or (ii) an Existing Developer of an Existing Casino for which there is a New Developer.

(e) Upon the establishment of a new Developer Subaccount, the Custodian shall take the following actions.

(1) All amounts, if any, standing to the credit of the Developer Subaccount established in respect of the Predecessor Developer shall be deposited to the credit of the General Receipts Subaccount.

(2) Upon making such deposit, if any, such Developer Subaccount established in respect of the Predecessor Developer shall be closed.

(f) For the avoidance of doubt, the Developer Subaccounts are established for the purpose of convenience of administering this Agreement, and the establishment thereof does not give the Developers any rights to the respective Developer Subaccount or the amounts or investments credited thereto.

## Section 8.3.  Receipt of Revenues

(a) Promptly upon receipt of any Revenues in respect of a Developer on a Receipt Day, the Custodian shall deposit the same to the credit of the Developer Subaccount established in respect of such Developer.

(b) Revenues that consist of investment earnings of amounts credited to the General Receipts Subaccount or Holdback Account shall be a part of, respectively, the General Receipts Subaccount or Holdback Account and shall not be deposited to the credit of any Developer Subaccount.

## Section 8.4.  Transfer of Revenues to General Receipts Subaccount

Upon the deposit of any Revenues to the credit of a Developer Subaccount, the Custodian shall promptly thereafter transfer the same to the General Receipts Subaccount.

### Section 8.5.    Receipt of City Payments

Whenever the Custodian receives an amount as a City Payment or portion thereof, the Custodian shall deposit the same to the credit of the Holdback Account.

### Section 8.6.    General Receipts Account

The Custodian shall make the payments to the City from the General Receipts Subaccount at the times and in the amounts provided in **Article V**.

### Section 8.7.    Holdback Account

(a)  The Custodian shall not deposit any amounts to the credit of the Holdback Account other than amounts paid by the City from its general fund.

(b)  The Custodian shall make the payments to the Counterparties from the Holdback Account at the times and in the amounts provided in **Section 5.7**.

(c)  The Custodian shall make the payments to the City from the Holdback Account at the times and in the amounts provided in **Section 5.5**.

### Section 8.8.    Investments

(a)  Amounts standing to the credit of either Account shall be held in cash *unless* invested in Authorized Investments as provided in **subsection (b), below**.

(b)  Amounts standing to the credit of either Account shall be invested by the Custodian at the direction of the Finance Director in Authorized Investments maturing on or before the date and in such amounts as will be needed to provide for amounts to be expended for the purposes for which the particular Account was established.

(c)  The investment of amounts credited to an Account shall be held by the Custodian and shall be deemed at all times a part of such Account, and the interest accruing thereon and any profit realized therefrom shall be credited thereto, and any losses resulting from such investment shall be charged thereto.

(d)  The Custodian may make such investments through its own investment or bond department.

## Article IX.  City Covenants

The City covenants with the other parties hereto as provided in **this Article**.

### Section 9.1.    No Senior or Parity Pledges or Liens

The City shall not grant or permit to exist any pledge of or other lien on, or security interest in, the Pledged Property that is senior to or of an equal priority with the City Pledge.

### Section 9.2.    Junior Pledges or Liens

The City may pledge or otherwise grant a lien on, or security interest in the Pledged Property that is junior to the pledge and lien granted by this Agreement *if, but only if*, (i) such pledge, lien or security interest is authorized by ordinance or resolution of the City Council and

(ii) as a condition to the grant, be subject to intercreditor arrangements satisfactory to the Counterparties (***Permitted Liens***).

### Section 9.3.    Further Assurances

(a)  The City shall furnish to the Counterparties all information regarding the Pledged Property that any Counterparty from time to time may reasonably request.

(b)  To the extent permitted by law, the City shall sign, file, or record all agreements and documents and shall take all other actions, that either Service Corporation or a Counterparty reasonably considers necessary or appropriate to perfect, to continue perfection of, or to maintain first priority of, the Service Corporation's security interest in the Pledged Property.

(c)  In the event that the City receives conflicting instructions from the Counterparties regarding an action to be taken pursuant to **subsection (b), above**, the City may rely upon advice of counsel to the City whether such action is necessary or appropriate to perfect, to continue perfection of, or to maintain first priority of, the Service Corporation's security interest in the Pledged Property.

(d)  The City authorizes each of the Service Corporations to file in any Uniform Commercial Code recording office a financing statement in favor the Service Corporation as secured party and covering the collateral under the City Pledge.

### Section 9.4.    No Control Granted

The City shall not grant control (for purposes of Article 8 and, if applicable, Article 9 of the UCC) over the Pledged Property or any Account other than to the Custodian or the Counterparties.

### Section 9.5.    Excluded Property

(a)  For the avoidance of doubt, Excluded Property is not subject to **Sections 9.1** through **9.4**, inclusive.

(b)  No pledge of or other lien on, or security interest in, Excluded Property shall be granted by the City *except* pursuant to ordinance or resolution of City Council.

### Section 9.6.    No Development Agreement Amendments

The City will not enter into any amendment, supplement or other modification of any Development Agreement without the consent of the Counterparties that:

(i)  changes the formula for calculating any Developer Payment, which change has the effect of reducing the amount of any Developer Payment or

(ii)  has the effect of changing the frequency of any Developer Payment or

(iii)  affects the making of Developer Payments in accordance with the Irrevocable Instructions.

# Article X.  Service Corporation Covenants

Each Service Corporation covenants with the other parties hereto as provided in **this Article**.

## Section 10.1.  No Pledges of Liens of Service Corporation Property

(a)  No Service Corporation shall grant or permit to exist a pledge or lien on, or security interest in, any Service Corporation Property other than the Service Corporation Security Interest or, if the Government Exception is applicable, the Service Corporation Pledge.

(b)  For the avoidance of doubt, **this Section** does not apply to Excluded Property.

## Section 10.2.  No Control Granted

The Service Corporation shall not grant control (for purposes of Articles 8 and 9 of the UCC) over the Service Corporation Property, or any bank account or securities account in which the Service Corporation Property or any proceeds thereof are held, to any Person other than the Custodian or the Counterparties.

## Section 10.3.  Excluded Property

No Service Corporation shall grant a pledge of or lien on, or security interest in, Excluded Property *except* pursuant to ordinance or resolution of the City Council.

## Section 10.4.  Alternative Taxes

(a)  *If and when* Alternative Taxes become payable, the City shall, effective on or before the date of first payment, enter into an agreement with the State of Michigan providing for the payment of Alternative Taxes to the Custodian for deposit to the General Receipts Subaccount.

(b)  Such agreement shall be in form and substance acceptable to the Counterparties.

## Section 10.5.  Alternative Payment of Developer Payments

(a)  *If and when* a Developer begins to pay Additional Wagering Taxes to the State of Michigan, the City shall, effective on or before the date of first payment enter into an agreement with the State of Michigan providing for the payment of such Additional Wagering Taxes to the Custodian for deposit to the General Receipts Subaccount.

(b)  Such agreement shall be in form and substance acceptable to the Counterparties.

## Section 10.6.  Further Assurances

(a)  The Service Corporations shall furnish to the Counterparties all information regarding the Service Corporation Property that either Counterparty from time to time reasonably requests.

(b)  The Service Corporations shall sign, file or record all agreements and documents and shall take all other actions, that either Counterparty reasonably considers necessary or appropriate to perfect, to continue perfection of, or to maintain first priority of, the Counterparty's security interest in the Service Corporation Property.

(c)  In the event that the Service Corporations receive conflicting instructions from the Counterparties regarding an action to be taken pursuant to **subsection (b), above**, the Service Corporations may rely upon advice of counsel to the City whether such action is necessary or appropriate to perfect, to continue perfection of, or to maintain first priority of, the Counterparties' security interest in the Service Corporation Property.

(d)  Each of the Service Corporations authorizes each of the Counterparties to file in any Uniform Commercial Code recording office (i) a financing statement in favor the Counterparty as secured party and covering the collateral under the Service Corporation Pledge and the Service Corporation Security Interest and (ii) an assignment to the Counterparty of any financing statement in favor of the Service Corporation covering collateral under the City Pledge.

## Article XI.  Remedies

### Section 11.1.  Remedies under Hedges

Following the occurrence of a Termination Event or Event of Default under a Hedge, the respective Counterparty (or the Service Corporations, if a Counterparty is the sole Affected Party or Defaulting Party in respect of such Termination Event or Event of Default under such respective Hedge), has all remedies available to it under its Hedge or otherwise by contract or applicable law *except* with respect to the exercise of remedies against the Pledged Property as provided in **Section 11.3**.

### Section 11.2.  Remedies as Secured Party

(a)  In addition to a Counterparty's remedies under a Hedge, following the occurrence of a Termination Event or Event of Default under a Hedge where the Counterparty is not the sole Affected Party or Defaulting Party thereunder, each Counterparty has the remedies available to it as a secured party to enforce the Service Corporation Pledge, the Service Corporation Security Interest and the City Pledge.  Such remedies of the Counterparties as secured parties under the Service Corporation Pledge and Service Corporation Security Interest shall include the exercise of all rights and remedies otherwise available to the Service Corporations as secured parties under the City Pledge, including the right to cause the Pledged Property to be applied to the obligations owing to the Counterparties under the Hedges up to the amounts then appropriated.

(b)  Such remedies include the right to cause the Pledged Property to be applied to the obligations owing to the Counterparties under the Hedges up to the amounts then appropriated and, to the extent that not all amounts for all obligations owing to the Counterparties have been appropriated, the right to use judicial process to obtain appropriations and to exercise any other equitable remedies available to the Counterparties against the Service Corporations and the City, as a Michigan home rule city, in respect of such unappropriated amounts.

(c)  *Subject* to such appropriation as may be required, judicial remedies shall be available to the extent necessary for the Counterparties to recognize all the rights and benefits of a first priority secured party with respect to the Service Corporation Property and the Pledged Property, including, as appropriate, by writ of mandamus or other equitable remedy that would result in release of funds from the Accounts to be applied to the obligations owing to the Counterparties under the Hedges and this Agreement.

(d) In exercising remedies the Counterparties may act jointly or independently of each other.

## Section 11.3. Limitation on Remedies

(a) *If* any Hedge is terminated by the respective Counterparty on account of any Specified Additional Termination Event *then* such Counterparty shall forbear (such forbearance being hereinafter referred to as the ***Limitation on Remedies***) from exercising any remedies as a secured party against the Pledged Property during the Term Payment Period.

(b) The Limitation on Remedies does not apply on or after a Term Period End Date.

## Section 11.4. Failure to Appropriate

In the event that the City fails to make an appropriation in the City's final annual budget adopted by the City Council pursuant to and in compliance with the City Charter for any Fiscal Year, and to maintain such provision without limitation, transfer or reduction throughout such Fiscal Year, on a line item basis and as a "first budget" obligation, an amount that is sufficient to pay in full, and which may be used exclusively for payment of, the City Payments for a particular Fiscal Year, mandamus may be an appropriate remedy for the Counterparties.

## Section 11.5. Indemnity

(a) To the extent permitted by law, the City shall defend and hold harmless the Counterparties from and against any and all losses, damages, liabilities, and expenses incurred and paid (each, a liability) by either Counterparty arising out of or resulting from the commencement or continuation of any litigation, judicial action, or legislative action of the kind described in **paragraph 4** of **Section 11.6**.

(b) *If*, for so long as this Agreement is in effect, a Counterparty has actual notice or knowledge of any claim or loss for which indemnification by the City is asserted, the Counterparty shall give to the City written notice within such time as is reasonable under the circumstances, describing such claim or loss in reasonable detail. *However*, any delay or failure of the Counterparty to give the notice shall not affect the City's indemnification obligations except to the extent that the City was prejudiced by the delay or failure.

(c) *If* a demand or claim for indemnification is made hereunder with respect to losses the amount or extent of which is not yet known or certain, *then* the notice of demand for indemnification shall so state, and, where practicable, shall include an estimate of the amount of the losses.

(d) In the case of actual notice of indemnification hereunder involving any litigation, arbitration or legal proceeding, the City shall have responsibility to, and shall employ counsel, and shall assume all expense with respect to, the defense or settlement of such claim.

(e) *Notwithstanding* the City's assumption of the defense, the Counterparty shall have the right to employ separate counsel and to participate in the defense of such action, and the City shall bear the reasonable out of pocket fees, costs and expenses of such separate counsel *if*:

> (i) other than under **Paragraph (4)** of **Section 11.6**, a Termination Event or Event of Default under a Hedge has occurred other than or resulting from a Specified Event,

(ii) other than under **Paragraph (4)** of **Section 11.6**, the Term Period End Date has occurred,

(iii) the result of the use of counsel chosen by the City to represent the Counterparty would present such counsel with a conflict of interest;

(iv) the actual or potential defendants in, or targets of, any such action include the Counterparty and the Counterparty shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the City,

(v) the City shall not have employed counsel reasonably satisfactory to the Counterparty to represent the Counterparty within a reasonable time after notice of the institution of such action or

(vi) the City, in its discretion, shall authorize the Counterparty to employ separate counsel at the City's expense.

The City shall not be liable under this Agreement for any amount paid by the Counterparty to settle any claims or actions if the settlement is entered into without the City's consent, which may not be unreasonably withheld or delayed.

**Section 11.6.** *Specified Event* means any of the following events:

(1) The City fails to pay any Relevant Amount to the Custodian as required by **Section 5.2**.

(2) The City fails to make an appropriation by the Outside Supplemental Appropriations Date in the City's final annual budget for the then current Fiscal Year and to maintain such appropriation without limitation, transfer or reduction throughout the balance of such Fiscal Year, on a line item basis and as a "first budget" obligation, of any supplemental amount necessary to provide exclusively for the payment of the Relevant Amount each Month during the balance of such Fiscal Year to the extent that there is not an appropriation then in effect.

(3) Commencing with the Fiscal Year beginning on July 1, 2009, the City fails to make an appropriation in the City's final annual budget adopted pursuant to and in compliance with the City Charter prior to the commencement of any Fiscal Year subsequent to the Fiscal Year in which the termination of the Hedges occurs and to maintain such appropriation without limitation, transfer or reduction throughout such Fiscal Year, on a line item basis authorizing exclusively payment of the City Payments and as a "first budget" obligation, of an amount at least equal to:

(i) the *greater* of (x) $50,736,975 and (y) the sum of the Notional Holdback Amounts for the Months ending in such Fiscal Year,

(ii) *plus* an amount equal to interest at the Interest Rate to accrue and to be payable during such Fiscal Year to the Counterparties under the Hedges,

(iii) *plus* the Regular Custodian Payments to be paid during such Fiscal Year.

(4) The City, a Service Corporation, or a third party commences litigation or takes any other judicial action, or any legislative action is taken, to set aside or avoid or limit the

2006 Transaction, the City Pledge, the Service Corporation Security Interest, or the Service Corporation Pledge or any other part of the Definitive Documents or the Settlement Transaction. This **paragraph (4)** does not apply to the City challenging the release of funds from the General Receipts Subaccount for payment of the obligations owing to the Counterparties under the Hedges if such challenge (i) is based solely on the grounds that such amounts have not yet been appropriated by the City for such purpose and (ii) does not challenge the "first budget" obligation of the City to make such appropriation.

(5) The Authorizing Ordinance or any part thereof is amended (without the consent of the Counterparties), revoked, rescinded, nullified or suspended for any reason.

(6) The City rescinds, reduces or ceases to impose the tax imposed as of the Closing Date pursuant to Section 18-14-3 of the Detroit City Code or if the City, within two Business Days following the earlier to occur of (i) notice from the Custodian that a taxpayer has inadvertently or erroneously paid Wagering Tax Property directly to the City or (ii) the Finance Director learning of such payment, the City fails to transfer by wire transfer in same day funds to the Custodian for deposit to the credit of the General Receipts Subaccount such payment. *However*, the rescinding of such tax shall not cause the expiration of the Term Payment Period if the such tax is then collected by the State of Michigan pursuant to Section 12(1) of the Wagering Tax Revenue Statute and an amount of such collections equal to or greater than the tax currently imposed is paid to the Custodian under arrangements satisfactory to the Counterparties.

(7) The City fails to pay any Service Charges, Accrued Service Charges, Regular Scheduled Payments and Sinking Fund Installments as and when due and payable under either Service Contract.

(8) The City fails to pay when due any principal of, or interest on, any indebtedness for borrowed money, other than Excluded Indebtedness, aggregating $5,000,000 or more or any other event shall occur the effect of which is to cause, or to permit the holder or holders of such indebtedness (or a trustee or agent on behalf of such holder or holders) to cause such indebtedness to become due, or to be prepaid in full (whether by redemption, purchase, offer to purchase or otherwise), prior to its stated maturity, in each case after giving effect to any applicable grace period requiring notice or the lapse of time or both.

(9) The City fails to pay any judgment or judgments aggregating $5,000,000 or more, *excluding* judgments:

(i) on appeal and being contested in good faith or

(ii) for which the City has reached an agreement with the judgment creditor as to the timing and manner of payment that does not involve the imposition of any additional ad valorem property taxes above the Threshold and with which agreement the City is in compliance or

(iii) for which the City is diligently making arrangements for payment *and* the delay in payment will not result in the City being held in contempt of court for nonpayment or in the imposition of a lien on the City's general funds or the imposition of any additional ad valorem property taxes above the Threshold or

(iv) in favor of the Counterparties on any unpaid amounts owing to the Counterparties under the Hedges and this Agreement.

(10) The occurrence of an Unqualified Hedge Event.

(11) The City:

(i) commences a case or files a petition seeking relief under the Bankruptcy Code or any other insolvency law or procedure or

(ii) consents to an order of relief in any such proceeding or to the filing of any such petition or

(iii) seeks or is subject to the appointment of a receiver or an emergency financial manager for all or any substantial part of its assets or makes an assignment for the benefit of its creditors.

(12) The Governor of the State of Michigan determines that a financial emergency exists in the City.

## Article XII. The Custodian

### Section 12.1. No Fiduciary Duties or Responsibilities

The Custodian has no fiduciary duty or responsibility to any other party hereto or to any other Person.

### Section 12.2. Duties and Responsibilities

(a) The Custodian undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against the Custodian and no permissive power or authority available to the Custodian shall be considered a duty.

(b) In the absence of bad faith on its part, the Custodian may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, documents, other instruments or opinions furnished to the Custodian and conforming to the requirements of this Agreement; *but* in the case of any such certificates, documents, other instruments or opinions which by any provision hereof or thereof are specifically required to be furnished to the Custodian, the Custodian is under a duty to examine the same to determine whether or not they conform to the requirements of this Agreement.

(c) No provision of this Agreement shall be construed to relieve the Custodian from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, *except* as provided below.

(1) The Custodian is not be liable for any error of judgment made in good faith by an authorized officer of the Custodian, *unless* it is proved that the Custodian was negligent in ascertaining the pertinent facts;

(2) The Custodian is not liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Counterparties and

(3) No provision of this Agreement requires the Custodian to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for

believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

### Section 12.3.    Certain Rights of Custodian.

(a)  The Custodian may rely and is protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture. or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b)  Whenever in the administration of this Agreement the Custodian deems it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Custodian (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon a certificate of a representative of a Counterparty.

(c)  The Custodian may consult with counsel, and the written advice of such counsel is full and complete authorization and protection in respect of any action taken, suffered or omitted by the Custodian hereunder in good faith and in reliance thereon.

(d)  The Custodian is under no obligation to exercise any of the rights or powers vested in it by this Agreement at the request or direction of any of the Counterparties pursuant to this Agreement, *unless* such Counterparties shall have offered to the Custodian reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

(e)  The Custodian is not required to make any investigation into the existence or occurrence of any facts referred to herein but is entitled to rely upon a certificate delivered by a representative of a Counterparty.

(f)  The Custodian is not obligated to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, or other paper or document, *but* the Custodian, in its sole discretion, may make such further inquiry or investigation into such facts or matters as it may see fit.

(g)  The Custodian may execute any of its powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Custodian shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

(h)  The Custodian has no duty to see to the recording, filing or registration of any instrument or document (including financing or continuation statements or filings under tax or security laws) or any rerecording, refiling or re-registration.

(i)  The Custodian shall have the right at any time to seek instructions concerning the administration of this Agreement from any court of competent jurisdiction.

### Section 12.4.    May Hold 2006 Pension Funding Securities.

The Custodian, in its individual or any other capacity, may become the owner or pledgee of 2006 Pension Funding Securities with the same rights it would have if it were not Custodian.

## Section 12.5.  Reporting of City Payments

Within one Business Day after the Custodian deposits the full amount of a City Payment to the credit of the Holdback Account, the Custodian shall notify the City and the Counterparties of such deposit.

## Section 12.6.  Weekly Reports

On the second Business Day of a calendar week, the Custodian shall deliver to the City and the Counterparties a report setting forth the amount of Revenues received in the General Receipts Subaccount during the preceding calendar week.

## Section 12.7.  Monthly Holdback Compliance Notice

On the Business Day in a Month on which the Holdback Requirement has been met for such Month, the Custodian shall give notice (a *Monthly Holdback Compliance Notice*) to the City and the Counterparties that such Holdback Requirement has been met.

## Section 12.8.  Quarterly Accounting

By the second Business Day preceding the end of a Quarterly Period, the Custodian shall notify the Counterparties, the City and the Service Corporations whether the Custodian has on deposit in the Holdback Account an amount sufficient to pay the Quarterly Payment (a *Quarterly Accounting*).

## Section 12.9.  Coverage Reports

(a)  The Custodian shall provide a report to the Counterparties and the City no later than 4:00 p.m. on the second Business Day following the last day (whether or not a Business Day) of each Month (a *Monthly Coverage Report*) and of each Quarterly Period (a *Quarterly Coverage Report*) and at such other time or times as are reasonably requested by any Counterparty or the City for an immediately prior Reporting Period.

(b)  *Reporting Period* means:

(i)  for a Monthly Coverage Report, the Month immediately ended (the *Subject Month*) and

(ii)  for a Quarterly Coverage Report, the Quarterly Period immediately ended (the *Subject Quarter*).

(c)  *Monthly Coverage* means, as to any Subject Month, the total amount of Revenues received by the Custodian during such Subject Month *divided* by the *sum* of:

(i)  one-third of the Hedge Periodic Payables (without giving effect to any netting) payable by the Service Corporations during the Quarterly Period in which such Subject Month falls and

(ii)  any Hedge Periodic Payables remaining unpaid from any Quarterly Period.

(d)  *Quarterly Coverage* means, as to any Subject Quarter, the total amount of Revenues received by the Custodian during the immediately preceding three Months *divided* by the *sum* of:

(i) Hedge Periodic Payables payable by the Service Corporations during such three month period (without giving effect to any netting) and

(ii) any Hedge Periodic Payables remaining unpaid from any prior Subject Quarter.

(e) Each Monthly Coverage Report and each Quarterly Coverage Report shall meet the requirements of **this subsection**.

(1) Each Monthly Coverage Report and Quarterly Coverage Report shall include:

(i) the total Revenues received by the Custodian during the Reporting Period,

(ii) the total amount of Wagering Tax Property received by the Custodian during the Reporting Period, with respect to each casino that provides such information,

(iii) the total amount of Developer Payments received by the Custodian during the Reporting Period, with respect to each casino that provides such information,

(iv) the balance of each Account as of the end of the Reporting Period and as of the end of the immediately preceding Reporting Period and

(v) any disbursements from each Account made during the Reporting Period in reasonable detail.

(2) In addition to the requirements of **paragraph (1), above**, each Monthly Coverage Report shall include:

(i) the Monthly Coverage for the Subject Month and

(ii) the Quarterly Coverage for the three immediately preceding three Months.

(3) In addition to the requirements of **paragraph (1), above**, each Quarterly Coverage Report shall set forth any amounts to be released from the Holdback Account to the City or a Service Corporation in respect of the Subject Quarter.

(f) The Custodian shall provide a copy of each Monthly Coverage Report and Quarterly Coverage Report to the Insurers concurrently with providing such Monthly Coverage Report and Quarterly Coverage Report to the Counterparties.

## Section 12.10. Compensation, Reimbursement and Indemnification

(a) The Custodian is entitled to payment or reimbursement by the City:

(i) *from time to time for reasonable compensation for all services rendered by it hereunder* (which compensation shall not be limited by any provision of law in regard to the compensation of a Custodian of an express trust); and

(ii) *except* as otherwise expressly provided herein, upon its request, for all reasonable expenses, disbursements and advances incurred or made by the Custodian in accordance with any provision of this Agreement (including, without limitation, the reasonable compensation and the expenses and disbursements of its agents and counsel), *except* any such expense, disbursement or advance as may be attributable to the Custodian's negligence, willful misconduct or bad faith.

(b) The Custodian is also entitled to indemnification by the City for, and to be held harmless by the City against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on its part, arising out of or in connection with the acceptance or administration of the this Agreement, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

## Section 12.11. Prior Payment of Regular Custodian Payments

The Custodian is entitled to payment for Regular Custodian Payments prior to any payment to the Counterparties from any Accounts.

## Section 12.12. Corporate Custodian Required; Eligibility.

(a) There shall at all times be a Custodian hereunder which is a bank eligible to be a depositary of City funds with (i) an office located in the City and State of New York and (ii) a combined capital and surplus of at least $50,000,000. *If* such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of such supervising or examining authority, *then* for the purposes of **this Section**, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.

(b) The Custodian shall resign promptly in the manner and with the effect specified in **this Article** if it becomes ineligible under **this Section**.

## Section 12.13. Replacement of Custodian.

(a) No Vacancy

No resignation or removal of the Custodian and no appointment of a successor Custodian pursuant to this Article shall be effective until the successor Custodian accepts its appointment as provided in **subsection (f), below**.

(b) Resignation

The Custodian may resign at any time, but such resignation shall become effective only in accordance with **subsection (f), below**. A resigning Custodian shall give notice of its resignation to each Insurer and each of the parties hereto.

(c) Removal by Counterparties

(1) The Counterparties acting together may remove the Custodian by so notifying the Custodian.

(2) If the Custodian becomes ineligible under **Section 12.12**, any Counterparty may petition a court of competent jurisdiction for the appointment of a successor.

(d) Appointment of Successor

(1) The retiring Custodian or the City may appoint a successor at any time prior to the date on which a successor Custodian takes office *provided* that the Counterparties have provided their prior written consent to the appointment of such successor Custodian.

(2) If a successor Custodian does not take office within 45 days after the retiring Custodian resigns or is removed, the City or any Counterparty may petition a court of competent jurisdiction for the appointment of a successor Custodian.

(3) Within one year after a successor Custodian appointed by the retiring Custodian, the City or a court of competent jurisdiction takes office, the Counterparties acting together may appoint a successor Custodian to replace such successor Custodian.

(e) Acceptable to the City and the Counterparties

No appointment of a successor Custodian shall be effective *unless* such successor Custodian is acceptable to the Finance Director and to each Counterparty, as evidenced by prior written consent.

(f) Acceptance of Appointment

(1) A successor Custodian shall deliver written acceptance of its appointment to the retiring Custodian, each of the other parties hereto and to each Insurer. Thereupon the resignation or removal of the retiring Custodian shall be effective, and the successor Custodian shall have all the rights, powers and duties of the Custodian hereunder.

(2) Upon the appointment of a successor Custodian becoming effective as provided in **this subsection**, the retiring Custodian shall promptly transfer all property held by it as Custodian to the successor Custodian.

## Section 12.14. Merger, Consolidation and Succession to Business.

If the Custodian consolidates, merges or converts into, or transfers all or substantially all its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Custodian *if* such successor corporation is eligible under **Section 12.12**.

## Article XIII. Interest Rate Limitation

The following provisions apply only if any amount (a ***Stated Amount***) payable by the City under this Agreement is limited by a maximum rate of interest permitted to be paid by the City under applicable law:

(a) The term ***Permitted Amount***, as used in **this Article**, means the maximum amount that could be paid by the City during any Month without exceeding the interest rate limitation. The Permitted Amount in any Month may be greater or less than the Stated Amount.

(b) Subject to **subsections (c)** and **(d) below**, if the Permitted Amount payable by the City during any Month (the ***Current Month***) is less than the Stated Amount payable during the Current Month, the City may satisfy its obligation to pay the Stated Amount for the Current Month by paying the Permitted Amount.

(c) The amount payable by the City during the Current Month under **subsection (b)** shall be increased, to the extent permitted by the applicable law, by the lesser of:

(1) the difference between the Stated Amount for the Current Month and the Permitted Amount for the Current Month and

(2) the aggregate excess of the total of the Permitted Amounts for all prior Months over the aggregate of the Stated Amounts for the prior Months, minus the sum of all amounts that the City has previously paid pursuant to **this subsection (c)**.

(d) The amount payable by the City during all Months subsequent to the Current Month up to the time of determination shall be increased, to the extent permitted by the applicable law, by the lesser of:

(1) the difference between the Stated Amount for the Current Month and the Permitted Amount for the Current Month, and

(2) the aggregate excess of the total of the Permitted Amounts for all subsequent Months up to the time of determination over the aggregate of the Stated Amounts for the subsequent Months, minus the sum of all amounts that the City has previously paid pursuant to **subsection (c)** and **this subsection (d)**.

(e) **This Article** shall not affect the legal interpretation of whether any amount payable by the City hereunder is or is not "interest" to which any law limiting interest would apply.

## Article XIV. Miscellaneous

### Section 14.1. Addresses for Notices

(a) All notices and other communications provided for hereunder shall be in writing unless otherwise stated herein mailed, sent or delivered:

(1) if to the City, at its address set forth in a Service Contract

(2) if to the City Law Department, at
    City of Detroit Law Department
    First National Building, Suite 1650
    660 Woodward Avenue
    Detroit, Michigan 48226
    Attention: Corporation Counsel

(3) if to a Service Corporation, at its address set forth in the respective Service Contract

(4) if to the Custodian, at
    U.S. Bank National Association
    535 Griswold, Suite 550
    Detroit, Michigan 48226
    Attention: Susan T. Brown

(5) if to Financial Guaranty Insurance Company at
    125 Park Avenue
    New York, NY 10017
    Attention: Risk Management

(6) if to Syncora Guaranty Inc. at
    1221 Avenue of the Americas
    New York, NY 10020
    Attention: Surveillance

(7) if to a Counterparty, at its address shown beneath its signature on a signature page hereto,

or to such other address as such Person may specify to the other Person and shall be effective (i) if given by mail, three Business Days after such communication is deposited in the mails with first class postage prepaid or (ii) if given by any other means, when delivered at the address specified in or pursuant to **this Section**.

## Section 14.2. Copies of Notices

A copy of each notice given hereunder shall be given contemporaneously to the City's Law Department.

## Section 14.3. Expenses

(a) Each of the City and the Counterparties shall pay its own fees and expenses in connection with consummating the Settlement Transaction, including outside legal fees and expenses and outside consulting fees.

(b) *Except* in connection with consummating the Settlement Transaction, each of the City and the Counterparties shall continue to be responsible for the payment of any fees and expenses that it is required to pay under the Hedges, either Service Contract or the Contract Administration Agreement.

(c) The City shall pay the fees and expenses of the Service Corporations in connection with consummating the Settlement Transaction, including outside legal fees and expense and outside consulting fees.

(d) The City shall pay all of its fees and expenses and the fees and expenses of the Service Corporations (including outside legal fees and expense and outside consulting fees of any of them) in connection with the administration and enforcement of this Agreement.

(e) The City shall pay all compensation, reimbursement and indemnification to which the Custodian is entitled pursuant to **Section 12.10.**

## Section 14.4. Termination

(a) This Agreement shall terminate upon the termination or expiration of the Hedges and each Counterparty's delivery of confirmation to the Custodian of the payment in full of all obligations of the Service Corporations and the City to each Counterparty thereunder and hereunder.

(b) The City Pledge and, as applicable, the Service Corporation Security Interest or the Service Corporation Pledge shall terminate upon the termination of this Agreement.

(c) Upon the termination of this Agreement, the Custodian shall:

(i) pay to the City all amounts standing to the credit of each Account and

(ii) give notice to the Developers and Obligors that the Irrevocable Instructions are no longer in effect.

(d) The obligations of the City to pay amounts owing to the Service Corporations or the Custodian shall survive the termination of this Agreement.

### Section 14.5. Amendment

No amendment of this Agreement shall be effective for any purpose unless it is made by written instrument signed by all of the parties hereto and consented to by each Insurer *provided* that the consent of an Insurer shall only be required to the extent that an amendment affects the rights, remedies or obligations of such Insurer.

### Section 14.6. Rights of Insurer

An Insurer may exercise any right or power given it by this Agreement *only if* it is not then in default under its Credit Insurance (as defined in the Service Contracts).

### Section 14.7. No Waiver

No failure on the part of any party hereto to exercise, and no delay in exercising, any right hereunder shall be a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other further exercise thereof or the exercise of any other right.

### Section 14.8. Binding Obligation

This Agreement is binding upon the parties hereto and their successors and their assigns to the extent permitted by **Section 14.8**.

### Section 14.9. Assignment

(a) No transfer by any party of its interests herein without the consent of the other parties hereto shall be valid *except* that a Counterparty may assign its rights hereunder as provided in **subsection (b), below**.

(b) Any Counterparty may transfer its rights hereunder in connection with a transfer of its Hedge to the same extent and under the same conditions as the transfer of the Hedge is permitted by the terms thereof.

### Section 14.10. Governing Law

(a) The rights and obligations of the parties under this Agreement shall be governed by and construed in accordance with the laws of the State of New York; provided, however, that the corporate powers and legal capacity of the City and each Service Corporation shall be governed by and construed in accordance with the laws of the State of Michigan.

(b) Notwithstanding anything to the contrary contain in **subsection (a), above,** the governing law for purposes of the UCC is the law of the State of Michigan determined without reference to its conflicts of law rules.

### Section 14.11. Venue

With respect to any suit, action or proceedings relating to this Agreement, each party irrevocably submits to the extent permitted by law to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

**Section 14.12. WAIVERS OF JURY TRIAL**

TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

**Section 14.13. Headings and Table of Contents**

Article and Section headings herein and the table of contents hereto are included herein for convenience of reference only and do not constitute a part of this Agreement for any other purpose.

**Section 14.14. Entire Agreement**

(a) This Agreement, the Definitive Documents, and the Hedges, the Service Contracts and the Contract Administration Agreement, as modified by the Definitive Documents, contain the entire agreement among the parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous oral and written agreements and discussions with respect thereto, and none of the parties shall be bound by any conditions, inducements or representations with respect thereto other than as expressly provided for herein.

(b) There are no agreements, understandings, representations or warranties between the parties with respect to the subject matter hereof other than those set forth or referred to herein.

(c) All of the terms and conditions of the Definitive Documents and of the Hedges, the Service Contracts and the Contract Administration Agreement, as modified by the Definitive Documents, shall remain in full force and effect.

(d) This Section does not apply to any rights or obligations of the Insurers.

**Section 14.15. Counterparts**

(a) This Agreement may be executed in multiple counterparts, *but* all such counterparts taken together shall evidence one and the same original. It is not necessary in making proof of this Agreement to produce or account for more than one counterpart.

(b) Delivery of an executed counterpart of this Agreement by facsimile or other method of electronic transmission shall be equally effective as delivery of a manually executed counterpart.

**In Witness Whereof**, the parties hereto have set their respective hands on and as of the date first written above.

[*Signatures appear on pages S-1* et seq.]

*[**Signature Page** to the Collateral Agreement among the **City of Detroit**, the **Detroit General Retirement System Service Corporation**, the **Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association** and other Persons]*

**CITY OF DETROIT**

By _____

Norman L. White
Finance Director

*[Exhibit to the Collateral Agreement among the City of Detroit, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association and other Persons]*

**U.S. Bank National Association,**

as Custodian

By _____

Susan T. Brown
Vice President

S - 2

*[Signature Page to the Collateral Agreement among the City of Detroit, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association and other Persons]*

**DETROIT GENERAL RETIREMENT SYSTEM
SERVICE CORPORATION**

By _____

Norman L. White
President

**DETROIT POLICE AND FIRE RETIREMENT SYSTEM
SERVICE CORPORATION**

By _____

Norman L. White
President

*[Signature Page to the Collateral Agreement among the City of Detroit, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association and other Persons*

**UBS AG**

By _Mari-Anne Clavu_
        Authorized Signatory

By _____
        Authorized Signatory

UBS notice address is:

UBS Securities LLC
677 Washington Boulevard
Stamford, CT 06901
Attn: Municipal Derivatives
Tel: 203-719-1689
Fax: 203-719-1417

and with a copy to:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, CT 06901
Attn: Legal Department
Fax: 203-719-0680

S-4

*[Signature Page to the Collateral Agreement among the **City of Detroit**, the **Detroit General Retirement System Service Corporation**, the **Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association** and other Persons]*

**SBS FINANCIAL PRODUCTS COMPANY, LLC**

By _____
              Authorized Signatory

SBS Financial Products Company, LLC notice address is:

SBS Financial Products Company, LLC
100 Wall Street, 22ND Floor
New York, New York 10005
Attention: John Carter
Facsimile: (646) 576-9684

*[Signature Page to the Collateral Agreement among the City of Detroit, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association and other Persons]*

## MERRILL LYNCH CAPITAL SERVICES, INC.

By _____

Authorized Signatory

Merrill Lynch Capital Services, Inc. notice address is:

Merrill Lynch Capital Services, Inc.
Merrill Lynch World Headquarters
4 World Financial Center, 18TH Floor
New York, New York 10080
Attention: Swap Group
Facsimile: (646) 805-0218

with a copy to:

GMI Counsel
Merrill Lynch World Headquarters
4 World Financial Center, 12TH Floor
New York, New York 10080
Attention: Swaps Legal
Facsimile: (212) 449-6993

Exhibit 3.4

# FORM OF IRREVOCABLE INSTRUCTIONS

June ●, 2009

[Developer]
[Developer's Address]
Attention: ●

**Re: Payments to be made to the City of Detroit (the *City*) in respect of the below identified Casino**

Dear Sir/Madam:

**1. References to *You* and *Your***

    1.1. [Name of Developer] is hereinafter referred to as *you*. *Your* has the correlative meaning.

    1.2. As used herein, "you" and "your" also refer to your successors, if any, and any assigns of the below identified Development Agreement.

**2. Applicability of these Instructions**

These Instructions are applicable with respect to the casino currently known as _____ and currently located at _____ in Detroit, Michigan.

**3. Certain Definitions**

    3.1. ***Development Agreement*** means the Revised Development Agreement, dated [_____,] among the City, The Economic Development Corporation of the City of Detroit and you, any amendments thereto and any substitute for such Development Agreement.

    3.2. Gaming Act means the Michigan Gaming Control and Revenue Act, MCL 432.201, *et seq;* MSA 18.969(201), *et seq.*, as amended.

    3.3. ***Wagering Tax Revenue Statute*** means Section 12 of the Gaming Act, being MCL 432.212, as amended.

**4. Payments Subject to these Instructions**

    4.1. The following payments (collectively, the ***Payments***)only are subject to these Instructions:

        4.1.1. taxes payable pursuant to Detroit City Code Section 18-14-3 pursuant to the Wagering Tax Revenue Statute; and

        4.1.2. interest and penalties payable pursuant to Detroit City Code Section 18-14-6(c); and

4.1.3. amounts payable pursuant to <u>Section</u> **[3.14(a)(iv) for Detroit Entertainment, 3.16(a)(iv) for Greektown Casino, 3.16(a)(iv) for MGM]** of the <u>Development Agreement</u>

4.2. For the avoidance of doubt, ***Payments*** does not include:

4.2.1. any payments pursuant to any other section of the Development Agreement or rights to reimbursement made or to be made under any Development Agreement; and

4.2.2. any municipal service fees authorized to be imposed by the City pursuant to <u>Section 13</u> of the Gaming Act.

4.3. References to such sections of the Gaming Act, Wagering Tax Revenue Statute, Detroit City Code or the Development Agreement include any amendments thereto or any substitutes therefor.

## 5. Place and Manner of Payment

5.1. All Payments to be paid to the City shall be paid to U.S. Bank National Association (the ***Custodian***) for the benefit of the City by wire transfer in immediately available funds at the office of the Custodian in New York, New York, for credit to the below identified account.

Wiring Instructions:     ●

Account Number:     ●

## 6. Discharge of Liability

Payments made to the Custodian pursuant to these Instructions shall have the same force and effect as if made to the City, and you shall have no further liability with respect to such Payments if made as herein provided.

## 7. Changes to these Instructions

7.1. No change to these Instructions shall be effective for any purpose without the prior written consent of the Counterparties.

7.2. The initial Counterparties are:

7.2.1. UBS AG

7.2.2. SBS Financial Products Company, LLC

7.2.3. Merrill Lynch Capital Services, Inc.

7.3. As used herein, "Counterparties" includes any successors of the initial Counterparties and any assigns of certain interest rate swap agreements.

7.4. You are entitled to rely on any consent stating that it is signed by a financial institution stating that it is a "Counterparty" as such term is used herein without making any independent investigation.

## 8. Instructions are Irrevocable

These Instructions are irrevocable and shall continue in full force and effect unless changed in writing by the City with the prior written consent of the Counterparties as provided in **Section 7**

and you have received prior written notice of such change from the City and copies of the written consents of each Counterparty delivered as set forth in **Section 10**.

## 9. Termination

These Instructions shall terminate upon written notice of the Custodian to you as set forth in Section 10 stating that the Custodial Agreement has terminated.

## 10. Communications and Notices

All communications and Notices hereunder shall be in writing and, unless otherwise stated herein, mailed, sent or delivered:

(1) if to <u>the Custodian</u>, at

U.S. Bank National Association
535 Griswold, Suite 550
Detroit, Michigan 48226
Attention:  Susan T. Brown

(2) if to <u>you</u> at

[Address]
Detroit, Michigan ●[Zip Code]●
Attention: ●

or to such other address as may be specified to the other in accordance with the provisions of this Section and shall be effective (i) if given by mail, three business days after such communication is deposited in the mail with first class postage prepaid or (ii) if given by overnight courier or personally delivered, when delivered to the person identified at the address specified in or pursuant to **this Section**.

## 11. Binding Effect

These Instructions are binding on you, your successors, if any, and any assigns of the Development Agreement.

## 12. Captions

The captions of the sections of these Instructions are for convenience of reference and do not affect the meaning of these Instructions.

CITY OF DETROIT

By _____
Norman L. White
Finance Director

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313-224-3491
FAX 313-224-4466
WWW.DETROITMI.GOV

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION

June 23, 2009

MotorCity Casino Hotel
2901 Grand River
Detroit, MI 48201

Attn: Rhonda Cohen, Chief Operating Officer

Re: Payments to be made to the City of Detroit, Michigan (the *City*) pursuant
to the Revised Development Agreement, dated August 2, 2002 among the
City, Economic Development Corporation of the City of Detroit and
MotorCity Casino Hotel

Reference is made to the IRREVOCABLE INSTRUCTIONS, attached, that
payments to be paid to the City shall be paid to U.S. Bank N.A. (the Custodian)
for the benefit of the City.

**The new wire instructions should be used for wires beginning on
Wednesday, June 24, 2009.**

Should you have any questions, do not hesitate to call (313 224-3491.

Very truly yours,

Norman L. White
Finance Director

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313•224•3491
FAX 313•224•4466
WWW.DETROITMI.GOV

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION                    **IRREVOCABLE INSTRUCTIONS**

June 23, 2009

MotorCity Casino Hotel
2901 Grand River
Detroit, MI 48201

Attention: Rhonda Cohen, Chief Operating Officer

**Re: Payments to be made to the City of Detroit (the *City*) in respect of the below identified Casino**

Dear Madam:

1. **References to *You* and *Your***

   1.1. MotorCity Casino Hotel is hereinafter referred to as *you*. *Your* has the correlative meaning.

   1.2. As used herein, "you" and "your" also refer to your successors, if any, and any assigns of the below identified Development Agreement.

2. **Applicability of these Instructions**

   These Instructions are applicable with respect to the casino currently known as MotorCity Casino Hotel and currently located at 2901 Grand River in Detroit, Michigan.

3. **Certain Definitions**

   3.1. *Development Agreement* means the Revised Development Agreement, dated August 2, 2002 among the City, The Economic Development Corporation of the City of Detroit and you, any amendments thereto and any substitute for such Development Agreement.

   3.2. *Gaming Act* means the Michigan Gaming Control and Revenue Act, MCL 432.201, *et seq;* MSA 18.969(201), *et seq.*, as amended.

   3.3. *Wagering Tax Revenue Statute* means Section 12 of the Gaming Act, being MCL 432.212, as amended.

4. **Payments Subject to these Instructions**

   4.1. The following payments (collectively, the *Payments*)only are subject to these Instructions:

   4.1.1. taxes payable pursuant to Detroit City Code Section 18-14-3 pursuant to the Wagering Tax Revenue Statute; and

   4.1.2. interest and penalties payable pursuant to Detroit City Code Section 18-14-6(c); and

   4.1.3. amounts payable pursuant to Section 3.14(a)(iv) of the Development Agreement

   4.2. For the avoidance of doubt, *Payments* does not include:

      4.2.1.  any payments pursuant to any other section of the Development Agreement or rights to reimbursement made or to be made under any Development Agreement; and

      4.2.2.  any municipal service fees authorized to be imposed by the City pursuant to Section 13 of the Gaming Act.

  4.3.  References to such sections of the Gaming Act, Wagering Tax Revenue Statute, Detroit City Code or the Development Agreement include any amendments thereto or any substitutes therefor.

## 5. Place and Manner of Payment

  5.1.  All Payments to be paid to the City shall be paid to U.S. Bank National Association (the *Custodian*) for the benefit of the City by wire transfer in immediately available funds at the office of the Custodian in New York, New York, for credit to the below identified account.

| Wiring Instructions: | ABA=U.S. BANK, Minneapolis (091000022)<br>FBO=FOR FURTHER CREDIT TO U.S. BANK, N.A.<br>AC=180121167365<br>Trust # 132742003 Detroit (MotorCity) Revenues<br>Contact: Renee Poradek (651) 495-4132 |
|---|---|

## 6. Discharge of Liability

Payments made to the Custodian pursuant to these Instructions shall have the same force and effect as if made to the City, and you shall have no further liability with respect to such Payments if made as herein provided.

## 7. Changes to these Instructions

  7.1.  No change to these Instructions shall be effective for any purpose without the prior written consent of the Counterparties.

  7.2.  The initial Counterparties are:

      7.2.1.  UBS AG

      7.2.2.  SBS Financial Products Company, LLC

      7.2.3.  Merrill Lynch Capital Services, Inc.

  7.3.  As used herein, "Counterparties" includes any successors of the initial Counterparties and any assigns of certain interest rate swap agreements.

  7.4.  You are entitled to rely on any consent stating that it is signed by a financial institution stating that it is a "Counterparty" as such term is used herein without making any independent investigation.

## 8. Instructions are Irrevocable

These Instructions are irrevocable and shall continue in full force and effect unless changed in writing by the City with the prior written consent of the Counterparties as provided in **Section 7** and you have received prior written notice of such change from the City and copies of the written consents of each Counterparty delivered as set forth in **Section 10**.

Page 2 of 3 Pages

## 9. Termination

These Instructions shall terminate upon written notice of the Custodian to you as set forth in Section 10 stating that the Custodial Agreement has terminated.

## 10. Communications and Notices

All communications and Notices hereunder shall be in writing and, unless otherwise stated herein, mailed, sent or delivered:

      (a) if to the Custodian, at

          U.S. Bank National Association
          535 Griswold, Suite 550
          Detroit, Michigan 48226
          Attention: Susan T. Brown

      (b) if to you at

          MotorCity Casino Hotel
          2901 Grand River
          Detroit, MI 48201
          Attention: Chief Financial Officer

          with copies to:

          MotorCity Casino Hotel
          2901 Grand River
          Detroit, MI 48201
          Attention: General Counsel

or to such other address as may be specified to the other in accordance with the provisions of this Section and shall be effective (i) if given by mail, three business days after such communication is deposited in the mail with first class postage prepaid or (ii) if given by overnight courier or personally delivered, when delivered to the person identified at the address specified in or pursuant to this Section.

## 11. Binding Effect

These Instructions are binding on you, your successors, if any, and any assigns of the Development Agreement.

## 12. Captions

The captions of the sections of these Instructions are for convenience of reference and do not affect the meaning of these Instructions.

City of Detroit,

By _____

                    Norman L. White
                    Finance Director

1122685_1.DOC

13-53846-swr    Doc 3613-5  Filed 09/24/13  Entered 09/24/13 15:35:20  Page 47 of 72
13-53846-tjt    Doc 1140-8    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 47 of
100

447

**Receipt re:**
**Irrevocable Instructions**
**dated June 23, 2009**

TO:     Norman L. White, Finance Director
        City of Detroit


The undersigned hereby acknowledges receipt of certain Irrevocable Instructions dated June 23, 2009, addressed to MotorCity Casino Hotel, a copy of which is attached hereto.


Dated: June 23, 2009

                        MOTORCITY CASINO HOTEL

                        By: _Beverly T. Clark, Paralegal_
                              signature

                        _Beverly L. Cook_
                        (please print name)

1122741_1.DOC

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313•224•3491
FAX 313•224•4466
WWW.DETROIT.MI.GOV

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION

June 23, 2009

Greektown Casino
555 East Lafayette
Detroit, MI 48226

Attn: Cliff Vallier, Chief Financial Officer

Re: Payments to be made to the City of Detroit, Michigan (the *City*) pursuant
to the Revised Development Agreement, dated August 2, 2002 among the
City, Economic Development Corporation of the City of Detroit and
Greektown Casino

Reference is made to the IRREVOCABLE INSTRUCTIONS, attached, that
payments to be paid to the City shall be paid to U.S. Bank N.A. (the Custodian)
for the benefit of the City.

**The new wire instructions should be used for wires beginning on
Wednesday, June 24, 2009**.

Should you have any questions, do not hesitate to call (313 224-3491.

Very truly yours,

Norman L. White
Finance Director

13-53846-swr Doc 1140-8 Filed 10/10/13 Entered 10/10/13 14:54:54 Page 49 of
100                                                                      449
13-53846-tjt   Doc 1140-8   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 49 of
100

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313•224•3491
FAX 313•224•4466
WWW.DETROITMI.GOV

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION **IRREVOCABLE INSTRUCTIONS**

June 23, 2009

Greektown Casino
555 East Lafayette
Detroit, MI 48226

Attention: Cliff Vallier, Chief Financial Officer

**Re: Payments to be made to the City of Detroit (the *City*) in respect of the below identified Casino**

Dear Sir:

**1. References to *You* and *Your***

    1.1. Greektown Casino is hereinafter referred to as *you*. *Your* has the correlative meaning.

    1.2. As used herein, "you" and "your" also refer to your successors, if any, and any assigns of the below identified Development Agreement.

**2. Applicability of these Instructions**

These Instructions are applicable with respect to the casino currently known as Greektown Casino and currently located at 555 East Lafayette in Detroit, Michigan.

**3. Certain Definitions**

    3.1. *Development Agreement* means the Revised Development Agreement, dated August 2, 2002 among the City, The Economic Development Corporation of the City of Detroit and you, any amendments thereto and any substitute for such Development Agreement.

    3.2. *Gaming Act* means the Michigan Gaming Control and Revenue Act, MCL 432.201, *et seq;* MSA 18.969(201), *et seq.*, as amended.

    3.3. *Wagering Tax Revenue Statute* means Section 12 of the Gaming Act, being MCL 432.212, as amended.

**4. Payments Subject to these Instructions**

    4.1. The following payments (collectively, the *Payments*) only are subject to these Instructions:

        4.1.1. taxes payable pursuant to Detroit City Code Section 18-14-3 pursuant to the Wagering Tax Revenue Statute; and

        4.1.2. interest and penalties payable pursuant to Detroit City Code Section 18-14-6(c); and

        4.1.3. amounts payable pursuant to Section 3.16(a)(iv) of the Development Agreement

    4.2. For the avoidance of doubt, *Payments* does not include:

  4.2.1. any payments pursuant to any other section of the Development Agreement or rights to reimbursement made or to be made under any Development Agreement; and

  4.2.2. any municipal service fees authorized to be imposed by the City pursuant to <u>Section 13</u> of the Gaming Act.

 4.3. References to such sections of the Gaming Act, Wagering Tax Revenue Statute, Detroit City Code or the Development Agreement include any amendments thereto or any substitutes therefor.

## 5. Place and Manner of Payment

 5.1. All Payments to be paid to the City shall be paid to U.S. Bank National Association (the *Custodian*) for the benefit of the City by wire transfer in immediately available funds at the office of the Custodian in New York, New York, for credit to the below identified account.

  Wiring Instructions:  ABA=U.S. BANK, Minneapolis (091000022)
          FBO=FOR FURTHER CREDIT TO U.S. BANK, N.A.
          AC=180121167365
          Trust # 132742002 Detroit (Greektown) Revenues
          Contact: Renee Poradek (651) 495-4132

## 6. Discharge of Liability

Payments made to the Custodian pursuant to these Instructions shall have the same force and effect as if made to the City, and you shall have no further liability with respect to such Payments if made as herein provided.

## 7. Changes to these Instructions

 7.1. No change to these Instructions shall be effective for any purpose without the prior written consent of the Counterparties.

 7.2. The initial Counterparties are:

  7.2.1. UBS AG

  7.2.2. SBS Financial Products Company, LLC

  7.2.3. Merrill Lynch Capital Services, Inc.

 7.3. As used herein, "Counterparties" includes any successors of the initial Counterparties and any assigns of certain interest rate swap agreements.

 7.4. You are entitled to rely on any consent stating that it is signed by a financial institution stating that it is a "Counterparty" as such term is used herein without making any independent investigation.

## 8. Instructions are Irrevocable

These Instructions are irrevocable and shall continue in full force and effect unless changed in writing by the City with the prior written consent of the Counterparties as provided in **Section 7** and you have received prior written notice of such change from the City and copies of the written consents of each Counterparty delivered as set forth in **Section 10**.

Page 2 of 3 Pages

## 9. Termination

These Instructions shall terminate upon written notice of the Custodian to you as set forth in Section 10 stating that the Custodial Agreement has terminated.

## 10. Communications and Notices

All communications and Notices hereunder shall be in writing and, unless otherwise stated herein, mailed, sent or delivered:

      (a) if to the Custodian, at

              U.S. Bank National Association
              535 Griswold, Suite 550
              Detroit, Michigan 48226
              Attention: Susan T. Brown

      (b) if to you at

              Greektown Casino
              555 East Lafayette
              Detroit, MI 48226

              Attention: Cliff Vallier, Chief Financial Officer

              with copies to:

              Andrea Hansen, Esq.
              222 N. Washington Square, Suite 400
              Lansing, MI 48933

or to such other address as may be specified to the other in accordance with the provisions of this Section and shall be effective (i) if given by mail, three business days after such communication is deposited in the mail with first class postage prepaid or (ii) if given by overnight courier or personally delivered, when delivered to the person identified at the address specified in or pursuant to this Section.

## 11. Binding Effect

These Instructions are binding on you, your successors, if any, and any assigns of the Development Agreement.

## 12. Captions

The captions of the sections of these Instructions are for convenience of reference and do not affect the meaning of these Instructions.

                **City of Detroit,**

                By _____

                          Norman L. White
                          Finance Director

1122670_1.DOC

**Receipt re:**
**Irrevocable Instructions**
**dated June 23, 2009**

TO:     Norman L. White, Finance Director
        City of Detroit

The undersigned hereby acknowledges receipt of certain Irrevocable Instructions dated June 23, 2009, addressed to Greektown Casino, a copy of which is attached hereto.

Dated: June 23, 2009

GREEKTOWN CASINO

By: _____
             signature

_____
(please print name)

1122742_1.DOC

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313•224•3491
FAX 313•224•4466
WWW.DETROITMI.GOV

June 23, 2009

MGM Grand Detroit, LLC
1777 3rd Street
Detroit, MI 48226

Attn: Ronald K. Holloway, V.P. and General Counsel

Re: Payments to be made to the City of Detroit, Michigan (the *City*) pursuant
to the Revised Development Agreement, dated August 2, 2002 among the
City, Economic Development Corporation of the City of Detroit and MGM
Grand Detroit, LLC.

Reference is made to the IRREVOCABLE INSTRUCTIONS, attached, that
payments to be paid to the City shall be paid to U.S. Bank N.A. (the Custodian)
for the benefit of the City.

**The new wire instructions should be used for wires beginning on
Wednesday, June 24, 2009.**

Should you have any questions, do not hesitate to call (313 224-3491.

Very truly yours,

Norman L. White
Finance Director

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313•224•3491
FAX 313•224•4466
WWW.DETROITMI.GOV

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION                    **IRREVOCABLE INSTRUCTIONS**

June 23, 2009

MGM Grand Detroit, LLC
1777 3rd Street
Detroit, MI 48226

Attention:  Ronald K. Holloway, Vice President and General Counsel

**Re: Payments to be made to the City of Detroit (the *City*) in respect of the below identified Casino**

Dear Sir:

**1. References to *You* and *Your***

1.1.  MGM Grand Detroit, LLC is hereinafter referred to as *you*. *Your* has the correlative meaning.

1.2.  As used herein, "you" and "your" also refer to your successors, if any, and any assigns of the below identified Development Agreement.

**2. Applicability of these Instructions**

These Instructions are applicable with respect to the casino currently known as MGM Grand Detroit, LLC and currently located at 1777 3rd Street in Detroit, Michigan.

**3. Certain Definitions**

3.1.  *Development Agreement* means the Revised Development Agreement, dated August 2, 2002 among the City, The Economic Development Corporation of the City of Detroit and you, any amendments thereto and any substitute for such Development Agreement.

3.2.  *Gaming Act* means the Michigan Gaming Control and Revenue Act, MCL 432.201, *et seq;* MSA 18.969(201), *et seq.*, as amended.

3.3.  *Wagering Tax Revenue Statute* means Section 12 of the Gaming Act, being MCL 432.212, as amended.

**4. Payments Subject to these Instructions**

4.1.  The following payments (collectively, the *Payments*)only are subject to these Instructions:

4.1.1.  taxes payable pursuant to Detroit City Code Section 18-14-3 pursuant to the Wagering Tax Revenue Statute; and

4.1.2.  interest and penalties payable pursuant to Detroit City Code Section 18-14-6(c); and

4.1.3.  amounts payable pursuant to Section 3.16(a)(iv) of the Development Agreement

4.2.  For the avoidance of doubt, *Payments* does not include:

13-53846-swr  Doc 3613-5  Filed 03/31/14  Entered 03/31/14 15:03:20  Page 55 of 72
13-53846-tjt  Doc 1140-8  Filed 10/10/13  Entered 10/10/13 14:54:54  Page 55 of 100

455

      4.2.1.  any payments pursuant to any other section of the Development Agreement or rights to reimbursement made or to be made under any Development Agreement; and

      4.2.2.  any municipal service fees authorized to be imposed by the City pursuant to Section 13 of the Gaming Act.

  4.3.  References to such sections of the Gaming Act, Wagering Tax Revenue Statute, Detroit City Code or the Development Agreement include any amendments thereto or any substitutes therefor.

## 5. Place and Manner of Payment

  5.1.  All Payments to be paid to the City shall be paid to U.S. Bank National Association (the *Custodian*) for the benefit of the City by wire transfer in immediately available funds at the office of the Custodian in New York, New York, for credit to the below identified account.

      Wiring Instructions:   ABA=U.S. BANK, Minneapolis (091000022)
                                 FBO=FOR FURTHER CREDIT TO U.S. BANK, N:A.
                                 AC=180121167365
                                 Trust # 132742001 Detroit (MGM Grand) Revenues
                                 Contact: Renee Poradek (651) 495-4132

## 6. Discharge of Liability

Payments made to the Custodian pursuant to these Instructions shall have the same force and effect as if made to the City, and you shall have no further liability with respect to such Payments if made as herein provided.

## 7. Changes to these Instructions

  7.1.  No change to these Instructions shall be effective for any purpose without the prior written consent of the Counterparties.

  7.2.  The initial Counterparties are:

      7.2.1.  UBS AG

      7.2.2.  SBS Financial Products Company, LLC

      7.2.3.  Merrill Lynch Capital Services, Inc.

  7.3.  As used herein, "Counterparties" includes any successors of the initial Counterparties and any assigns of certain interest rate swap agreements.

  7.4.  You are entitled to rely on any consent stating that it is signed by a financial institution stating that it is a "Counterparty" as such term is used herein without making any independent investigation.

## 8. Instructions are Irrevocable

These Instructions are irrevocable and shall continue in full force and effect unless changed in writing by the City with the prior written consent of the Counterparties as provided in **Section 7** and you have received prior written notice of such change from the City and copies of the written consents of each Counterparty delivered as set forth in **Section 10**.

13-53846-swr   Doc 3013-5   Filed 03/06/14   Entered 03/06/14 15:38:20   Page 56 of 72   456
13-53846-tjt   Doc 1140-8   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 56 of
100

## 9. Termination

These Instructions shall terminate upon written notice of the Custodian to you as set forth in Section 10 stating that the Custodial Agreement has terminated.

## 10. Communications and Notices

All communications and Notices hereunder shall be in writing and, unless otherwise stated herein, mailed, sent or delivered:

(a) if to the Custodian, at

U.S. Bank National Association
535 Griswold, Suite 550
Detroit, Michigan 48226
Attention: Susan T. Brown

(b) if to you at

Mr. Ronald K. Holloway
Vice President and General Counsel
MGM Grand Detroit, LLC
1777 3rd Street
Detroit, MI 48226

or to such other address as may be specified to the other in accordance with the provisions of this Section and shall be effective (i) if given by mail, three business days after such communication is deposited in the mail with first class postage prepaid or (ii) if given by overnight courier or personally delivered, when delivered to the person identified at the address specified in or pursuant to **this Section.**

## 11. Binding Effect

These Instructions are binding on you, your successors, if any, and any assigns of the Development Agreement.

## 12. Captions

The captions of the sections of these Instructions are for convenience of reference and do not affect the meaning of these Instructions.

**City of Detroit,**

By _____

Norman L. White
Finance Director

1122690_1.DOC

Page 3 of 3 Pages

13-53846-swr Doc 1140-5 Filed 10/10/13 Entered 10/10/13 14:54:54 Page 57 of 72    457
13-53846-tjt   Doc 1140-8   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 57 of
100

**Receipt re:**
**Irrevocable Instructions**
**dated June 23, 2009**

TO:     Norman L. White, Finance Director
        City of Detroit


The undersigned hereby acknowledges receipt of certain Irrevocable Instructions dated

June 23, 2009, addressed to MGM Grand Detroit, LLC, a copy of which is attached hereto.

Dated: June 23, 2009

MGM GRAND DETROIT, LLC

By: _____
        signature     *LOIS GRECCO*

        _____
        (please print name)
                *for Ron Holloway*
                *6-23-09*

1122744_1.DOC



JENNIFER M. GRANHOLM
GOVERNOR

STATE OF MICHIGAN
**MICHIGAN GAMING CONTROL BOARD**
DETROIT

RICHARD S. KALM
EXECUTIVE DIRECTOR

June 18, 2009

Mr. Michael Shaller
Shefsky & Froelich, Ltd.
111 East Wacker Dr., Suite 2800
Chicago, IL 60601

RE: Irrevocable Instructions directing the three licensed Detroit casinos to electronically transfer City taxes to a custodial account

Dear Mr. Schaller:

We are in receipt of a letter from Shefsky & Froelich Ltd., the City's outside gaming counsel, (i) transmitting to and advising the Board of certain irrevocable instructions (the "Irrevocable Instructions") directing the three licensed Detroit casinos to electronically transfer (the "Transfer") the portion of the City's money due under the Gaming Act and the Revised Development Agreement to a custodial account (the "Account") held by U.S. Bank National Association (the "Custodian") in connection with a certain Collateral Agreement dated as of June 15, 2009, by and among the City of Detroit, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, the Custodian and certain counterparties; and (ii) advising the Board that the City Council of the City of Detroit has enacted an ordinance and taken all related action necessary to direct the three licensed Detroit casinos to make the Transfer to the Account.

Upon review of this matter, I do not find any compliance issues at this time and since no goods or services are being provided to the casinos, no licensing is required.

Sincerely,

Richard S. Kalm
Executive Director

RSK/db

Cc: Cindy Bliss, MGM Grand Detroit, LLC
Mike Roy & Cheryl Scott Dube, MotorCity Casino, LLC
Olisaeloka Dallah, Greektown Casino, LLC
John Page, MGCB
Andrea Hansen, Honigman, Miller, Schwartz & Cohn, LLP
Peter Ellsworth, Dickinson Wright, PLLC

3062 W. Grand Boulevard, Suite L-700, Detroit, MI 48202-6062

13-53846-swr Doc 1140-8 Filed 06/24/13 Entered 06/24/13 15:36:20 Page 25 of 72     459
13-53846-tjt   Doc 1140-8   Filed 10/10/13 Entered 10/10/13 14:54:54   Page 59 of 100

**<u>Exhibit 7</u>**

**Amended Swamps (A&R)**

## AMENDED AND RESTATED SCHEDULE
## DATED AS OF JUNE 26, 2009
to the
1992 ISDA Master Agreement
Local Currency Single Jurisdiction

dated as of
June 7, 2006
between

**UBS AG**               and               **DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION,**
a not-for-profit corporation organized
("Party A")                                under the laws of the State of Michigan
("Party B")

### Part 1.
### Termination Provisions

In this Agreement:

(a)     **"Specified Entity"** means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | NONE |
| Section 5(a)(vi), | NONE |
| Section 5(a)(vii), | NONE |
| Section 5(b)(ii), | NONE |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | NONE |
| Section 5(a)(vi), | NONE |
| Section 5(a)(vii), | NONE |
| Section 5(b)(ii), | NONE |

(b)     **"Specified Transaction"** will have the meaning specified in Section 12 of this Agreement.

(c)     The **"Cross Default"** provisions of Section 5(a)(vi) of this Agreement, as modified below, will apply to Party A and to Party B. Section 5(a)(vi) of this Agreement is hereby amended by the addition of the following at the end thereof:

"provided, however, that notwithstanding the foregoing, an Event of Default shall not occur under either (1) or (2) above if, as demonstrated to the reasonable satisfaction of the other party, (a) the event or condition referred to in (1) or the failure to pay referred to in (2) is a failure to pay caused by an error or omission of an administrative or operational nature; and (b) funds were available to such party to enable it to make the relevant payment when due; and (c)

such relevant payment is made within three Business Days following receipt of written notice from an interested party of such failure to pay."

If such provisions apply:

**"Specified Indebtedness"** means any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) for the payment or repayment of any money.

**"Threshold Amount"** means:

(i)      with respect to Party A, an amount equal to 2% of shareholders' equity (howsoever described) of Party A as shown on the most recent annual audited financial statements of Party A and

(ii)     with respect to Party B, $10,000,000.

(d)    **The "Credit Event Upon Merger"** provisions of Section 5(b)(ii) will apply to Party A and Party B, amended as follows:

"Credit Event Upon Merger' shall mean that a Designated Event (as defined below) occurs with respect to a party, any Credit Support Provider of the party or any applicable Specified Entity (any such party or entity, "X"), and such Designated Event does not constitute an event described in Section 5(a)(viii) but the creditworthiness of X, or, if applicable, the successor, surviving or transferee entity of X, is materially weaker than that of X immediately prior to such event. In any such case the Affected Party shall be the party with respect to which, or with respect to the Credit Support of which, the Designated Event occurred, or, if applicable, the successor, surviving or transferee entity of such party. For purposes hereof, a Designated Event means that, after the date hereof:

(i)      X consolidates, amalgamates with or merges with or into, or transfers all or substantially all its assets to, or receives all or substantially all the assets or obligations of, another entity; or

(ii)     any person or entity acquires directly or indirectly the beneficial ownership of equity securities having the power to elect a majority of the board of directors of X or otherwise acquires directly or indirectly the power to control the policy-making decisions of X,"

(e)    **The "Automatic Early Termination"** provision of Section 6(a) will not apply to Party A or Party B.

(f)    **"Payments on Early Termination".** For the purpose of Section 6(e) of this Agreement:

(i)      Market Quotation will apply.

(ii)     The Second Method will apply.

(g)    **"Termination Currency"** means U.S. Dollars.

Detroit/Amended and Restated Schedule GRS-UBS (Syncora)

2

13-53846-swr   Doc 3034-5   Filed 09/24/13   Entered 09/24/13 20:53:20   Page 62 of 30   462
13-53846-tjt   Doc 1140-8   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 62 of 100

(h)     There shall be added to Section 5(a) of the Agreement the following Events of Default:

"(ix)    Authority; Repudiation. Party B shall cease to have authority to make payments under this Agreement or any Transaction subject to this Agreement, or any government entity having jurisdiction over Party B shall enact any legislation which would have the effect of repudiating this Agreement or any Transaction subject to this Agreement,"

"(x)    Amounts payable by Party B to Party A hereunder shall cease to be payable and secured in accordance with the terms specified in Part 4(b)(ii)(g) of this Schedule."

(i)    *"Additional Termination Event"* will apply to Party A and to Party B. In addition to the Additional Termination Events set forth in Part 5 of this Schedule, the following shall constitute Additional Termination Events.

(i)    *Party A Additional Termination Events.* Party A or its Credit Support Provider's long-term senior unsecured debt rating from (a) S&P is withdrawn, suspended or falls below "BBB-", or (b) Moody's is withdrawn, suspended or falls below "Baa3".

For purposes of the foregoing Termination Event in this Part 1(i)(i), the sole Affected Party shall be Party A and all Transactions shall be Affected Transactions.

(ii)    *Party B Additional Termination Events.*

(1)    The City Payments made in any Month, in aggregate, are less than the Holdback Requirement for such Month; or

(2)    The City fails to make an appropriation in the City's final annual budget adopted pursuant to and in compliance with the City Charter prior to the commencement of any Fiscal Year and to maintain such appropriation without limitation, transfer or reduction throughout such Fiscal Year, on a line item basis authorizing exclusively payment of the City Payments and as a "first budget" obligation, of an amount at least equal to the Regular Custodian Payments scheduled to become due during the Fiscal Year plus an amount equal to *the greater* of (X) the amount of the Hedge Periodic Payables under the Hedges scheduled to become due during the Fiscal Year without giving effect to any netting and (Y) for the first Fiscal Year commencing July 1, 2009, $49,936,975 and, for each subsequent Fiscal Year thereafter, $50,736,975; or

(3)    The Quarterly Coverage as of the end of any Month is less than 1.75; or

(4)    Either (1) the unenhanced rating on the 2006 Pension Funding Securities assigned by S&P falls below "BB" or the unenhanced rating on the 2006 Pension Funding Securities assigned by Moody's falls below "Ba2" <u>and</u> as of the immediately preceding Month's end the Quarterly Coverage is 2.15

or less, or (2) the unenhanced rating on the 2006 Pension Funding Securities assigned by S&P is withdrawn, suspended or reduced below "BB-" or the unenhanced rating on the 2006 Pension Funding Securities assigned by Moody's is withdrawn, suspended or reduced below "Ba3"; or

(5)    At any time following a Ratings Upgrade, the unenhanced rating on the 2006 Pension Funding Securities is withdrawn, suspended or reduced below "BBB-" by S&P or withdrawn, suspended or reduced below "Baa3" by Moody's; or

(6)    The City, a Service Corporation, or a third party shall commence litigation or take any other judicial action, or any legislative action is taken, to set aside or avoid or limit the 2006 Transaction, the City Pledge, the Service Corporation Security Interest, or the Service Corporation Pledge or any other part of the Definitive Documents or the Settlement Transaction (other than with respect to a Developer Agreement), or if the Authorizing Ordinance or any part thereof shall be amended (without the consent of Party A), revoked, rescinded, nullified or suspended for any reason; or

(7)    The City shall rescind, reduce or cease to impose the tax currently imposed as of the Amendment Effective Date by Section 18-14-3 of the Detroit City Code or the City, within two Business Days following the earlier to occur of notice from the Collateral Agreement Custodian that a taxpayer has inadvertently or erroneously paid the Wagering Tax Property directly to the City or the Finance Director learning of such payment, shall fail to transfer by wire transfer in same day funds to the Collateral Agent Custodian for deposit into the General Receipts Subaccount such payment. However, the rescinding of such tax shall not result in a Termination Event hereunder if such tax is then collected by the State of Michigan pursuant to Section 12(1) of the Wagering Tax Revenue Statute and an amount of such collections equal to or greater than the tax imposed as of the Amendment Effective Date is paid to the Collateral Agreement Custodian under arrangements satisfactory to Party A; or

(8)    The City fails to pay any Service Charges, Accrued Service Charges, Regular Scheduled Payments or Sinking Fund Installments as and when due and payable under either Service Contract; or

(9)    The City fails to pay when due any principal of, or interest on, any indebtedness for borrowed money, other than Excluded Indebtedness, aggregating $1,000,000 or more or any other event shall occur the effect of which is to cause, or to permit the holder or holders of such indebtedness (or a trustee or agent on behalf of such holder or holders) to cause such indebtedness to become due, or to be prepaid in full (whether by redemption, purchase, offer to purchase or otherwise), prior to its stated maturity, in each case after giving effect to any applicable grace period requiring notice or the lapse of time or both; or

13-53846-swr   Doc 3648-5   Filed 09/24/13   Entered 09/24/13 20:53:20   Page 64 of   464
13-53846-tjt   Doc 1140-8   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 64 of 100

(10)    The City fails to pay any judgment or judgments aggregating $1,000,000 or more, excluding judgments (1) on appeal and being contested in good faith, (2) for which the City has reached an agreement with the judgment creditor as to the timing and manner of payment that does not involve the imposition of any additional ad valorem property taxes above the Property Tax Threshold and with which agreement the City is in compliance or (3) for which the City is diligently making arrangements for payment and the delay in payment will not result in the City being held in contempt of court for nonpayment or in the imposition of a lien on the City's general funds or the imposition of any additional ad valorem property taxes in excess of the Property Tax Threshold; or

(11)    The City commences a case or files a petition seeking relief under the Bankruptcy Code or any other insolvency law or procedure, consents to an order of relief in any such proceeding or to the filing of any such petition, seeks or is subject to the appointment of a receiver or an emergency financial manager for all or any substantial part of its assets or makes an assignment for the benefit of its creditors, or if the Governor of the State of Michigan determines that a financial emergency exists in the City.

For purposes of the foregoing Termination Events in this Part 1(i)(ii), the sole Affected Party shall be Party B and all Transactions shall be Affected Transactions.

(j)    **Default Rate.**    Notwithstanding anything to the contrary in the Agreement, the Default Rate applicable to any amount owed by Party B to Party A during the Term Payment Period shall be LIBOR plus 9% (the "Specified Default Rate"), where "LIBOR" is determined (i) with respect to the remainder of the first Fiscal Year following a Specified Additional Termination Event, as the arithmetic average of USD-LIBOR-BBA (as defined in the 2006 ISDA Definitions, with a Designated Maturity of three months) as of the close of business on the fifteenth (15th) day of the three calendar months immediately preceding such Specified Additional Termination Event and, (ii) with respect to each subsequent Fiscal Year, as the arithmetic average of USD-LIBOR-BBA (as defined in the 2006 ISDA Definitions, with a Designated Maturity of three months) as of the close of business on the fifteenth (15th) day of March, April and May of the immediately preceding Fiscal Year.

(k)    **Remedies.**    In addition to all other remedies available hereunder and which remain unaffected hereby, following the designation of an Early Termination Date hereunder resulting from an Event of Default or Termination Event with respect to which Party B is the Defaulting Party or sole Affected Party, as the case may be, Party A shall have the remedies available to it as a secured party to enforce the Service Corporation Pledge, the Service Corporation Security Interest and the City Pledge. Such remedies of Party A as a secured party under the Service Corporation Pledge and Service Corporation Security Interest shall include the exercise of all rights and remedies otherwise available to the Service Corporations as secured parties under the City Pledge, including the right to cause the Pledged Property to be applied to the obligations owing to Party A hereunder up to the amounts then appropriated. Furthermore, such remedies include the right to cause the Pledged Property to be applied to the obligations owing to the

Detroit/Amended and Restated Schedule GRS-UBS (Syncora)

5

13-53846-swr    Doc 1140-8    Filed 09/24/13    Entered 09/24/13 20:59:20    Page 65 of    465
13-53846-tjt    Doc 1140-8    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 65 of 100

Swap Counterparties under the Hedges up to the amounts then appropriated and, to the extent that not all amounts for all obligations owing to the Swap Counterparties have been appropriated, the right to use judicial process to obtain appropriations and to exercise any other equitable remedies available to the Swap Counterparties against the Service Corporations and the City, as a Michigan home rule city, in respect of such unappropriated amounts; provided, however, that if an Early Termination Date is designated by Party A as a result of a Specified Additional Termination Event, Party A shall forbear from exercising any remedies as a secured party against the Pledged Property during the Term Payment Period.

(l)    *Waiver and Rescission.*  As of the Amendment Effective Date, Party A waives its right to declare an Early Termination Date, and hereby rescinds any previously delivered notice of Termination Event and/or designation of an Early Termination Date, in connection with the Additional Termination Event set forth, prior to the Amendment Effective Date, in Part 5(ii)(b)(Z) of the Schedule to this Agreement.

(m)    *Amendment Effective Date Representations of Party B.*  Party B hereby further represents that, as of the Amendment Effective Date:

   (i)    The City has given an Irrevocable Instruction to each Casino Licensee and Developer.

   (ii)    No action, proceeding or investigation has been instituted, nor has any order, judgment or decree been issued or proposed to be issued by any court, agency or authority to set aside, restrain, enjoin or prevent the consummation of any transaction contemplated hereby or seeking material damages against the City, a Service Corporation or either Swap Counterparty in connection with the amendment and restatement of the Schedule to this Agreement or the Settlement Transaction.

(n)    *Indemnification.*

   (i)    To the extent permitted by law, Party B shall defend and hold harmless Party A from and against any and all losses, damages, liabilities, and expenses incurred and paid (each, a "liability") by Party A arising out of or resulting from the commencement or continuation of any litigation, judicial action, or legislative action of the kind described in Part 1(i)(ii)(6) hereof.

   (ii)    If, for so long as this Agreement is in effect, Party A has actual notice or knowledge of any claim or loss for which indemnification by Party B is asserted, Party A shall give to Party B written notice within such time as is reasonable under the circumstances, describing such claim or loss in reasonable detail. However, any delay or failure of Party A to give the notice shall not affect Party B's indemnification obligations except to the extent that Party B was prejudiced by the delay or failure.

   (iii)    If a demand or claim for indemnification is made hereunder with respect to losses the amount or extent of which is not yet known or certain, then the notice of demand for indemnification shall so state, and, where practicable, shall include an estimate of the amount of the losses.

(iv)     In the case of actual notice of indemnification hereunder involving any litigation, arbitration or legal proceeding, Party B shall have responsibility to, and shall employ counsel, and shall assume all expense with respect to, the defense or settlement of such claim.

(v)      Notwithstanding Party B's assumption of the defense, Party A shall have the right to employ separate counsel and to participate in the defense of such action, and Party B shall bear the reasonable out of pocket fees, costs and expenses of such separate counsel if:

(1)     other than under Part 1(i)(ii)(6) hereof, a Termination Event or Event of Default has occurred hereunder, other than a Specified Additional Termination Event;

(2)     other than under Part 1(i)(ii)(6) hereof, the Term Period End Date has occurred;

(3)     the result of the use of counsel chosen by Party B to represent Party A would present such counsel with a conflict of interest;

(4)     the actual or potential defendants in, or targets of, any such action include Party A and Party A shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to Party B;

(5)     Party B shall not have employed counsel reasonably satisfactory to Party A to represent Party B within a reasonable time after notice of the institution of such action; or

(6)     Party B, in its discretion, shall authorize Party A to employ separate counsel at Party B's expense.

Party B shall not be liable under this Agreement for any amount paid by Party A to settle any claims or actions if the settlement is entered into without Party B's consent which may not be unreasonably withheld or delayed. Each of Party A and Party B hereby agrees and acknowledges that any amount in respect of indemnification payable by Party B to Party A in accordance with this Part 1(n) is an expense that may not be claimed and is not payable under the Swap Insurance Policy.

## Part 2.
## Agreement to Deliver Documents

For the purpose of Sections 3(d) and 4(a) of this Agreement, each party agrees to deliver the following documents:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Evidence of the authority and true signatures of each official or representative signing this Agreement or, as the case may be, a Confirmation, on its behalf. | On or before execution of this Agreement and each Confirmation forming a part of this Agreement. | Yes |
| Party A | Opinion of Counsel to Party A in a form reasonably satisfactory to Party B. | On or before execution of this Agreement. | No |
| Party B | Covered Indenture as hereinafter defined. | On or before execution of this Agreement. | Yes |
| Party B | Certified copy of the resolution of Party B's Board of Directors (or equivalent authorizing documentation) authorizing the execution and delivery of this Agreement and each Confirmation and performance of its obligation hereunder. | On or before execution of this Agreement. | Yes |
| Party B | A copy of Party B's audited annual financial statements prepared in accordance with generally accepted accounting principles within the United States. | On or before the 365th day after the end of Party B's fiscal year. | Yes |
| Party B | A copy of the City's audited annual financial statements prepared in accordance with generally accepted accounting principles within the United States. | Within 15 days of public availability, but in any case no later than 365 days after the end of the City's fiscal year. | Yes |
| Party B | A copy of the City's quarterly financial statements. | If and when the City prepares such quarterly reports, when such quarterly reports become | Yes |

Detroit/Amended and Restated Schedule GRS-UBS (Syncora)

8

13-53846-swr    Doc 1140-8    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 68 of    468
13-53846-tjt    Doc 1140-8    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 68 of 100

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | | publicly available. | |
| Party B | Opinion of legal counsel to Party B substantially in the form and substance acceptable to Party A. | On or before execution of this Agreement. | No |
| Party B | Commitment to issue each Swap Insurance Policy (as such term is defined in Part 4 hereof). | On or before the execution of this Agreement with respect to the initial Insured Rate Swap Transaction hereunder, and thereafter on or before the Trade Date of each subsequent Insured Rate Swap Transaction. | No |
| Party B | Swap Insurance Policy and the Opinion of counsel to the Swap Insurer with respect to such Swap Insurance Policy. | On or before the delivery of the related 2006 Pension Funding Securities to the underwriters with respect to the initial Insured Rate Swap Transaction hereunder, and thereafter on or before execution of the Confirmation evidencing each subsequent Insured Rate Swap Transaction. | No |
| Party B | Confirmations, updates and additional documentation concerning the opinion of counsel, board resolutions and certificates delivered pursuant to each of the foregoing documents to be delivered as Party A may | Prior to the Effective Date of each Transaction after the initial Transaction hereunder. | Yes |

Detroit/Amended and Restated Schedule GRS-UBS (Syncora)

9

13-53846-swr    Doc 1140-8    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 69 of 100
13-53846-tjt    Doc 1140-8    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 69 of 100

469

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | reasonably request. | | |
| Party B | Certified copy of the Service Contract together with an opinion of Certificate Counsel in form and substance satisfactory to Party A which addresses each of the Sources of Payment set forth in Section 3(g) of this Agreement. | On or before execution of the Service Contract. | No |
| Party B | Authorizing Ordinance | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of Lewis & Munday, a Professional Corporation, special counsel to the City and Party B, in form and substance satisfactory to Party A, including customary opinions given in connection with municipal financing transactions and addressing the items identified on Exhibit A hereto next to such counsel's name | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of the City Corporation Counsel, in form and substance satisfactory to Party A, addressing the items identified on Exhibit A hereto next to such counsel's name. | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of Orrick, Herrington & Sutcliffe LLP, special counsel to the City, in form and substance satisfactory to Party A, addressing the items identified on Exhibit A hereto next to such counsel's name. | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of special tax counsel to the City, in form and substance | On or prior to the Amendment Effective | No |

Detroit/Amended and Restated Schedule GRS-UBS (Syncora)

10

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | satisfactory to Party A, addressing the items identified on Exhibit A hereto next to such counsel's name. | Date | |
| Party B | To the extent not duplicative with any other document to be delivered in this Part 2, each document required to be delivered under Section 2.4 of the Collateral Agreement. | On or prior to the Amendment Effective Date | Yes |

## Part 3.
## Miscellaneous

(a)  ***Addresses for Notices.*** For the purposes of Section 10(a) of this Agreement:

(i)  All notices or communications to Party A shall, with respect to a particular Transaction, be sent to the address, telex number, or facsimile number reflected in the Confirmation of that Transaction, and any notice for purposes of Sections 5 or 6 shall be sent to:

> UBS Securities LLC
> 677 Washington Boulevard
> Stamford, Connecticut 06901
> Attn: Municipal Derivatives
> Tel: 203-719-1689
> Fax: 203-719-1417
>
> and
>
> UBS AG, Stamford Branch
> 677 Washington Boulevard
> Stamford, Connecticut 06901
> Attn: Legal Department
> Fax: 203-719-0680

(ii)  All notices or communications to Party B shall be sent in care of the Contract Administrator to the address as set forth in Section 11.1 of the Contract Administration Agreement.

(iii)  A copy of all notices or communications to either Party A or Party B shall be sent to the address, or facsimile number reflected below:

Detroit/Amended and Restated Schedule GRS-UBS (Syncora)

11

13-53846-swr    Doc 36618-5 Filed 08/06/24 13 Entered 08/06/24 12 01 5936 20 Page 27 of 30    471
13-53846-tjt    Doc 1140-8    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 71 of 100

Syncora Guarantee Inc.
(formerly known as XL Capital Assurance Inc.)
1221 Avenue of the Americas
New York, New York 10020-1001
Attention: Surveillance
Facsimile: (212) 478-3597

(b)  **Offices.** Party A, if it enters into a Transaction through an Office other than its head or home office represents to Party B that, notwithstanding the place of booking office or jurisdiction of incorporation or organization, the obligations of Party A are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by Party A on each date on which a Transaction is entered into.

(c)  **Calculation Agent.** The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(d)  **Credit Support Document.** The Credit Support Annex attached hereto is a Credit Support Document with respect to Party A for all purposes hereunder and is incorporated herein by this reference. The Service Contracts and the Contract Administration Agreement (collectively, the "Covered Indenture") and the Collateral Agreement are Credit Support Documents with respect to Party B.

(e)  **Credit Support Provider.** Credit Support Provider means: None.

(f)  **Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of New York; provided, however, that the corporate powers and legal capacity of Party B shall be governed by and construed in accordance with the laws of the State of Michigan.**

(g)  **Jurisdiction.** Section 11(b)(i) of this Agreement is deleted in its entirety and replaced by the following:

> "submits to the extent permitted by law to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan; and"

(h)  **Waiver of Immunities.** Section 11(c) of this Agreement is deleted in its entirety and replaced by the following:

> **"Waiver of Immunities.** Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues, all immunity on the grounds of sovereignty or other similar grounds from (i) suit in a breach of contract action, (ii) relief by way of injunction, order for specific performance or for recovery of property and (iii) execution or enforcement of any judgment to which it or its revenues might otherwise be entitled in any Proceedings, and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings."

(i)  **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will apply.

(j)  **"Affiliate"** will have the meaning specified in Section 12 of this Agreement.

## Part 4.
## Other Provisions

(a)  **Set-off.** Without affecting the provisions of the Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without set-off or counterclaim; provided, however, that upon the designation of any Early Termination Date, in addition to and not in limitation of any other right or remedy (including any right to set off, counterclaim, or otherwise withhold payment or any recourse to any Credit Support Document) under applicable law the Non-defaulting Party or Non-affected Party (in either case, "X") may without prior notice to any person set off any sum or obligation (whether or not arising under this Agreement and whether matured or unmatured, whether or not contingent and irrespective of the currency, place of payment or booking office of the sum or obligation) owed by the Defaulting Party or Affected Party (in either case, "Y") to X or any Affiliate of X against any sum or obligation (whether or not arising under this Agreement, whether matured or unmatured, whether or not contingent and irrespective of the currency, place of payment or booking office of the sum or obligation) owed by X or any Affiliate of X to Y and, for this purpose, may convert one currency into another at a market rate determined by X. If any sum or obligation is unascertained, X may in good faith estimate that sum or obligation and set-off in respect of that estimate, subject to X·or Y, as the case may be, accounting to the other party when such sum or obligation is ascertained.

(b)  **Additional Representations.**

(i)  The first sentence of Section 3 is amended to read in its entirety as follows:

"Each party represents to each other party (which representations will be deemed to be repeated on each date on which a Transaction is entered into and, in the case of the representations in Section 3(a), 3(e) and 3(f) of this Agreement, at all times until the termination of this Agreement) the following:"

(ii)  Section 3 is amended by adding the following subsections (e), (f) and (g) thereto:

(e)  Non-Speculation. Party B represents and warrants to Party A that this Agreement has been, and each Transaction hereunder will be, entered into for purposes of managing of its borrowings or investments or in connection with a line of business and not for the purpose of speculation;

(f)  Eligible Contract Participant. Each party is an "eligible contract participant" under, and as defined in, Section 1a(12) of the Commodity Exchange Act, as amended (7 U.S.C. § 1a(12)); and

(g)  Sources of Payment. As provided in the Contract Administration Agreement, all payments due under this Agreement from Party B to Party A are payable from and secured by amounts owing by the City to Party B pursuant to

Detroit/Amended and Restated Schedule GRS-UBS (Syncora)

13

13-53846-swr    Doc 3618-5 Filed 08/06/14  Entered 08/06/14 15:56:20  Page 74 of 90    473
13-53846-tjt    Doc 1140-8    Filed 10/10/13  Entered 10/10/13 14:54:54    Page 73 of 100

the Service Contract in respect of Hedge Payables. Such amounts are payable by the City from all available revenues of the City's General Fund (as delineated in the City's audited financial statements). If the City were to fail to pay any amount owing in respect of a Hedge Payable when due, Party A (or the Contract Administrator, if authorized by Party A to so act on Party A's behalf) could pursue remedies against the City to enforce that contractual obligation and the City would be required to pay any resulting judgment against it. If the City were to fail to provide for payment of any such judgment, a court can compel the City to raise the payment through the levy of taxes, as provided in the Revised Judicature Act of 1961, Act No. 236 of the Michigan Public Acts of 1961, as amended (Michigan Compiled Laws Section 600.6093), without limit as to rate or amount. In addition, all amounts due from Party B hereunder are secured by and payable from the Pledged Property (including, but not limited to, amounts held in the Holdback Account) in accordance with the terms of the Collateral Agreement.

(c)     ***Additional Agreement.***

Compliance with Covered Indenture. Party B will observe, perform and fulfill each provision in the Covered Indenture applicable to Party B. Party B hereby agrees not to amend, supplement, modify or waive any provision of the Covered Indenture without the consent of Party A if such amendment, supplement, modification or waiver would: (i) change any of the payment times, amounts, obligations, terms or any other payment-related provision in any Service Contract applicable to the City; (ii) impair any right Party B may have under the Service Contract to enforce payments from the City, or impair any right Party A may have under the Covered Indenture to enforce its security interest granted therein or any other right thereunder; or (iii) permit the creation of any new lien ranking prior to or on a parity with, or terminate, or deprive Party A of the security afforded to it by Sections 8.02 and 8.03 of the Service Contracts or Section 2.4 of the Contract Administration Agreement (collectively, the "Incorporated Provisions"). The Incorporated Provisions are hereby incorporated by reference and made a part of this Agreement to the same extent as if such provisions were set forth herein. Any amendment, supplement, modification or waiver of any of the Incorporated Provisions without the prior written consent of the other party hereto shall have no force and effect with respect to this Agreement. Any amendment supplement or modification for which such consent is obtained shall be part of the Incorporated Provisions for purposes of this Agreement. Party B shall not assign or transfer its right or obligations under the Covered Indenture without the prior written consent of the other party hereto and the Swap Insurer.

(d)     ***Relationship Between Parties.*** Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i)     Non-Reliance. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a

Detroit/Amended and Restated Schedule GRS-UBS (Syncora)

14

13-53846-swr    Doc 3618-5   Filed 08/09/21   Entered 08/09/21 15:56:20   Page 57 of 90    474
13-53846-tjt    Doc 1140-8   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 74 of 100

recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii) <u>Assessment and Understanding</u>. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii) <u>Status of Parties</u>. The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(e) *Waiver of Jury Trial*. **EACH PARTY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS RELATING TO THIS AGREEMENT OR ANY CREDIT SUPPORT DOCUMENT.**

(f) *Consent to Recording*. Each party (i) consents to the recording of all telephone conversations between trading, operations and marketing personnel of the parties and their Affiliates in connection with this Agreement or any potential Transaction; (ii) agrees to give notice to such personnel of it and its Affiliates that their calls will be recorded; and (iii) agrees that in any Proceedings, it will not object to the introduction of such recordings in evidence on grounds that consent was not properly given.

(g) *Scope of Agreement*. The Transactions entered into between the parties between June 7, 2006 and June 13, 2006 and any other specific Specified Transactions designated in writing by the parties hereto after the date hereof, shall be subject to the terms hereof.

(h) *Indemnification Limited to Extent of Applicable Law*. The parties acknowledge that Party B's authority to indemnify Party A, as required by Section 9 of the Agreement, for expenses, fees and taxes may be limited by Michigan law and Party B's obligation to indemnify Party A could be limited to the extent of applicable law.

(i) *Additional Definitions*. Section 12 is hereby amended by adding the following definitions:

"2006 Funding Trust" shall have the meaning specified in the Collateral Agreement.

"2006 Pension Funding Securities" shall have the meaning specified in the Collateral Agreement.

"2006 Transactions" shall have the meaning specified in the Collateral Agreement.

"Accounts" shall have the meaning specified in the Collateral Agreement.

Detroit/Amended and Restated Schedule GRS-UBS (Syncora)

15

13-53846-swr   Doc 3618-5   Filed 08/09/24   Entered 08/09/24 15:59:20   Page 675 of   475
13-53846-tjt   Doc 1140-8   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 75 of 100

"Accrued Service Charges" shall have the meaning specified in the Service Contracts.

"Amendment Effective Date" means June 26, 2009.

"Authorizing Ordinance" shall have the meaning specified in the Collateral Agreement.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

"Casino Licensee" shall have the meaning specified in the Collateral Agreement.

"City" means the City of Detroit, Michigan.

"City Charter" means the Charter of the City of Detroit, Michigan.

"City Clerk" means the Clerk of the City of Detroit, Michigan.

"City Council" means the Council of the City of Detroit, Michigan.

"City Payment" shall have the meaning specified in the Collateral Agreement.

"City Pledge" shall have the meaning specified in the Collateral Agreement.

"Closing Date" shall have the meaning specified in the Collateral Agreement.

"Collateral Agreement" means that certain Collateral Agreement dated as of June 15, 2009, among Party A, Party B, PFRS, SBS, the City, U.S. Bank National Association and Merrill Lynch Capital Services, Inc.

"Collateral Agreement Custodian" means the person identified as the "custodian" under the Collateral Agreement and any successor thereto.

"Contract Administration Agreement" means the Contract Administration Agreement 2006 dated June 12, 2006 among Detroit Retirement Systems Funding Trust 2006, Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation, severally and not jointly, U.S. Bank National Association, separately and not as Trustee of the Detroit Retirement Systems Funding Trust 2006 and the Hedge Counterparties Named Therein.

"Counterparty(ies)" shall have the meaning specified in the Collateral Agreement.

"Covered Indenture" means the Service Contracts together with the Contract Administration Agreement.

"Definitive Documents" shall have the meaning specified in the Collateral Agreement.

"Detroit General Retirement System Service Contract" means the Detroit General Retirement System Service Contract dated June 7, 2006 between Party B and the City.

"Detroit Police and Fire Retirement System Service Contract" means the PFRS Service Contract dated June 7, 2006 between the Detroit Police and Fire Retirement System Service Corporation and the City.

"Developer" shall have the meaning specified in the Collateral Agreement.

"Developer Agreement" shall have the meaning specified in the Collateral Agreement.

"Excluded Indebtedness" shall have the meaning specified in the Collateral Agreement.

"Finance Director" shall have the meaning specified in the Collateral Agreement.

"Fiscal Year" shall have the meaning specified in the Collateral Agreement.

"General Receipts Subaccount" shall have the meaning specified in the Collateral Agreement.

"Hedge" shall have the meaning specified in the Collateral Agreement.

"Hedge Payable" shall have the meaning specified in the Service Contracts.

"Hedge Periodic Payables" shall have the meaning specified in the Service Contracts.

"Holdback Account" shall have the meaning specified in the Collateral Agreement.

"Holdback Requirement" shall have the meaning specified in the Collateral Agreement.

"Irrevocable Instructions" shall have the meaning specified in the Collateral Agreement.

"MCL" means the Michigan Compiled Laws.

"Month" shall have the meaning specified in the Collateral Agreement.

"Moody's" means Moody's Investors Service, Inc.

"Office" means a branch or office of a party, which may be such party's head or home office.

"PFRS" means the Detroit Police and Fire Retirement System Service Corporation.

"Pledged Property" shall have the meaning specified in the Collateral Agreement.

"Property Tax Threshold" shall have the meaning specified for the "Threshold" in the Collateral Agreement.

"Quarterly Coverage" shall have the meaning specified in the Collateral Agreement.

"Ratings Upgrade" shall have the meaning specified in the Collateral Agreement.

"Regular Custodian Payment" shall have the meaning specified in the Collateral Agreement.

"Regular Scheduled Payments" shall have the meaning specified in the Service Contracts.

"Revenues" shall have the meaning specified in the Collateral Agreement.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"SBS" means SBS Financial Products Company, LLC.

"Service Charges" shall have the meaning specified in the Service Contracts.

"Service Contracts" means the Detroit General Retirement System Service Contract and the Detroit Police and Fire Retirement System Service Contract.

"Service Corporations" means Party B and PFRS.

"Service Corporation Pledge" shall have the meaning specified in the Collateral Agreement.

"Service Corporation Security Interest" shall have the meaning specified in the Collateral Agreement.

"Settlement Transaction" shall have the meaning specified in the Collateral Agreement.

"Sinking Fund Installments" shall have the meaning specified in the Service Contracts.

"Specified Additional Termination Event" means each of the Additional Termination Events specified in Parts 1(i)(ii)(3), 1(i)(ii)(4), 1(i)(ii)(5), 1(i)(ii)(9) and 1(i)(ii)(10) of this Amended and Restated Schedule.

"Specified Event" shall have the meaning specified in the Collateral Agreement.

"Swap Counterparties" means, collectively, Party A and SBS and their respective successors and assigns.

"Swap Insurance Policy" means the Insurance Policy issued by the Swap Insurer with respect to the Transaction(s) between Party A and Party B entered into pursuant to this Agreement.

"Swap Insurer" means Syncora Guarantee Inc. (formerly known as XL Capital Assurance Inc).

"Term Payment Period" shall have the meaning specified in the Collateral Agreement.

"Term Period End Date" shall have the meaning specified in the Collateral Agreement.

"Wagering Taxes" shall have the meaning specified in the Collateral Agreement.

"Wagering Tax Property" shall have the meaning specified in the Collateral Agreement.

"Wagering Tax Revenue Statute" means the Michigan Gaming Control and Revenue Act, being MCL 432.201 et seq., MSA 18.969(201), et seq., as amended.

## Part 5.
## Insurer Provisions

The following provisions shall apply to any Transactions for which the Swap Insurance Policy has been issued by the Swap Insurer, for the account of Party B, as principal, and Party A, as beneficiary (the "Insured Rate Swap Transactions"):

*(i)* ***Designation of Early Termination Date.*** Notwithstanding anything to the contrary in Section 6 of this Agreement, if any:

    (a)    Event of Default in respect of any Insured Rate Swap Transaction under this Agreement occurs; or

    (b)    Termination Event (other than the Additional Termination Events set forth in Part 5(ii) below) in respect of any Insured Rate Swap Transaction under this Agreement occurs;

then, in either such case, neither Party A nor Party B shall designate an Early Termination Date pursuant to Section 6 of this Agreement in respect of any such Insured Rate Swap Transaction without the prior written consent of the Swap Insurer.

*(ii)* ***Party B Additional Termination Events.*** The following shall each constitute an Additional Termination Event:

    (a)    the Swap Insurer fails to meet its payment obligations under the Swap Insurance Policy and such failure is continuing with respect to the Swap Insurer under the Swap Insurance Policy; or

    (b)    the Swap Insurer fails to have a claims-paying ability rating of at least "A-" from S&P or a financial strength rating of at least "A3" from Moody's; provided, however, that additionally:

        (X)    an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party; or

        (Y)    a Termination Event has occurred or is continuing with respect to Party B as the Affected Party; or

    (c)    An Insurer Event has occurred and is continuing provided, however, that additionally:

        (X)    an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party: or

        (Y)    a Termination Event has occurred or is continuing with respect to Party B as the Affected Party.

Any of the following shall be considered an "Insurer Event":

(1)      the Swap Insurer is in conservation, liquidation or receivership under the New York Insurance Laws; or

(2)      the Swap Insurer (a) fails to have (1) a claims-paying ability rating of at least "AAA" from S&P, or (2) a financial strength rating of at least "Aaa" from Moody's; and (b) fails to pay obligations for indebtedness for money borrowed or to meet then-current policy obligations for which claims have been properly presented in a aggregate amount in excess of $100,000,000, which failure to make payment (in whole or in part) is not due to: (u) administrative error; (v) Swap Insurer action to contest a claim; (w) an order from, or action by, a regulator of the Swap Insurer which forbids, delays or impedes such payment, except in connection with a Swap Insurer insolvency, conservation or receivership; (x) the occurrence of an act of God which prevents such payment; (y) the usual mechanisms or channels employed to make such payment being unavailable to the Swap Insurer through no fault of the Swap Insurer; (z) a statute, rule or order (including, but not limited to exchange controls) which forbids, delays or impedes either (i) such payment, other than in connection with a Swap Insurer insolvency, conservation or receivership, or (ii) the acquisition of, or payment in, a currency required in order to make such payment.

For purposes of any Additional Termination Event described under this Part 5(ii), the sole "Affected Party" shall be Party B.

***(iii)    Insurer Directed Termination.*** Notwithstanding anything in this Agreement, if an Event of Default under this Agreement occurs with respect to Party B as the Defaulting Party or any Termination Event under this Agreement occurs with respect to Party B as the Affected Party, then the Swap Insurer (so long as it has not failed to make any payment under the terms and conditions of the Swap Insurance Policy) shall have the right (but not the obligation) upon notice to Party A to designate an Early Termination Date with respect to Party B with the same effect as if such designation were made by Party A. For purposes of the foregoing sentence, an Event of Default with respect to Party B shall be considered to be continuing, notwithstanding any payment by the Swap Insurer under the Swap Insurance Policy. Party A and Party B acknowledge that, except as the Swap Insurance Policy may be otherwise endorsed, unless (x) the Swap Insurer designates an Early Termination Date (as opposed to merely consenting to such designation by one of the parties) or (y) an Additional Termination Event specified in Part 5(ii)(a) or (b) has occurred, payments due from Party B because an Early Termination Date has been designated will not be insured. In any event, the parties acknowledge that pursuant to the Swap Insurance Policy that (i) the amount payable by the Swap Insurer in respect of payments due from Party B because an Early Termination Date has been designated by the Swap Insurer shall not be limited in amount, and (ii) the amount payable by the Swap Insurer in respect of payments due from Party B because an Early Termination Date has been designated by Party A shall not exceed the amount specified in the Swap Insurance Policy.

*Detroit/Amended and Restated Schedule GRS-UBS (Syncora)*

*(iv)* ***Amendments.*** Section 8(b) of the Agreement is hereby amended by (A) adding the words "or any Credit Support Document" after the word "Agreement" in the first line thereof and (B) adding the phrase "and the Swap Insurer" following the words "parties" in the third line thereof.

*(v)* ***Transfers/Assignments.*** Notwithstanding Section 7 of the Agreement, neither party may transfer, assign or delegate its rights or duties with respect to an Insured Rate Swap Transaction under the Agreement, unless it receives the prior written consent of the Swap Insurer; provided, however, that Party A may assign or delegates its rights and duties without the Swap Insurer's prior written consent to a party (a) that meets the definition of "Reference Market Maker" (other than the ratings requirement set forth therein) and that has long-term senior unsecured debt ratings at least in the single –A category from Moody's and S&P or the Credit Support Provider of such party has claims paying ability ratings or financial strength ratings at least in the single – A category from Moody's and S&P and (b) that assumes the rights and duties of Party A pursuant to a master agreement that is substantially similar to this Agreement and in form and substance satisfactory to the Swap Insurer; and provided, further, that Party A may make such an assignment or delegation to an affiliate of Party A if Party A or its Credit Support Provider, provides a guarantee of the Insured Rate Swap Transaction that is acceptable in form and substance to the Swap Insurer.

*(vi)* ***No Suspension of Payments,*** Notwithstanding Section 2(a)(iii) of this Agreement, Party A shall not suspend any payments due under an Insured Rate Swap Transaction under Section 2(a)(iii) of the Agreement unless Party A has designated an Early Termination Date pursuant to the terms hereof.

*(vii)* ***No Netting.*** Notwithstanding Section 2(c) of this Agreement, in no event shall either Party A or Party B be entitled to net its payment obligations in respect of the Insured Rate Swap Transactions against the payment obligations of the other party in respect of other Transactions under this Agreement if such Transactions are not Insured Rate Swap Transactions, nor may either Party A or Party B net the payment obligations of the other party under Transactions that are not Insured Rate Swap Transactions against the payment obligations of such party under Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under Insured Rate Swap Transactions be treated separate and apart from all other Transactions. Section 6(e) of this Agreement shall apply to all Insured Rate Swap Transactions with the same effect as if the Insured Rate Swap Transactions constituted a single master agreement, Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Rate Swap Transactions shall be determined without regard to any Transactions other than the Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under the Insured Rate Swap Transactions be treated separate and apart from all other Transactions unless otherwise agreed to in writing by the Swap Insurer.

*(viii)* ***No Set-off for Counterclaim.*** In no event shall either Party A or Party B be entitled to set-off its payment obligations in respect of an Insured Rate Swap Transaction against the payment obligations of the other party (whether by counterclaim or otherwise) under any other agreement(s) between Party A and Party B or instrument(s) or undertaking(s) issued or executed by one party to, or in favor of, the other party, if such obligations are not Insured Rate Swap Transactions, or net the payment obligations of the other party that are not with respect to

Detroit/Amended and Restated Schedule GRS-UBS (Syncora)

21

13-53846-swr    Doc 3618-5    Filed 08/09/24    Entered 08/09/24 13:15:36:20    Page 23 of 30    481
13-53846-tjt    Doc 1140-8    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 81 of 100

Insured Rate Swap Transactions against the payment obligations of such party under Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under Insured Rate Swap Transactions be treated separate and apart from all other obligations. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Rate Swap Transaction shall be determined without regard to any obligation other than those under the Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under the Insured Rate Swap Transactions be treated separate and apart from all other obligations unless otherwise specified in such other obligation and agreed to in writing by the Swap Insurer.

*(ix)* ***Party A — Notice of Rating Downgrade, Suspension or Withdrawal.*** Party A shall provide written notice to Party B and to the Swap Insurer of any downgrade, withdrawal or suspension of Party A's long-term senior unsecured debt rating, within 15 Business Days of the occurrence of such event. Failure of Party A to provide such notice shall not constitute an Event of Default under this Agreement.

*(x)* ***Representations and Agreements.*** Each party agrees that each of its representations and agreements in this Agreement is expressly made to and for the benefit of the Swap Insurer.

*(xi)* ***Third-party Beneficiary.*** Party A and Party B hereby each acknowledge and agree that the Swap Insurer shall be an express third-party beneficiary (and not merely an incidental third-party beneficiary) of this Agreement and of the obligations of each such party under any Insured Rate Swap Transaction, and as such, entitled to enforce the Agreement and the terms of any such Insured Rate Swap Transaction against such party on its own behalf and otherwise shall be afforded all remedies available hereunder or otherwise afforded by law against the parties hereto to redress any damage or loss incurred by the Swap Insurer including, but not limited to, fees (including professional fees), costs and expenses incurred by the Swap Insurer which are related to, or resulting from any breach by such party of its obligations hereunder.

*(xii)* ***Policy Coverage.*** Party A and Party B hereby acknowledge and agree that the Swap Insurer's obligation with respect to Insured Rate Swap Transactions shall be limited to the terms of the Swap Insurance Policy, Notwithstanding Section 2(d) or any other provision of this Agreement, the Swap Insurer shall not have any obligation to pay interest on any amount payable by Party B under this Agreement.

*(xiii)* ***Subrogation.*** Party A and Party B hereby acknowledge that to the extent of payments made by the Swap Insurer to Party A under the Swap Insurance Policy, the Swap Insurer shall be fully subrogated to the rights of Party A against Party B under the Insured Rate Swap Transaction to which such payments relate, including, but not limited to, the right to receive payment from Party B and the enforcement of any remedies. Party A hereby agrees to assign to the Swap Insurer its right to receive payment from Party B under any Insured Rate Swap Transaction to the extent of any payment thereunder by the Swap Insurer to Party A. Party B hereby acknowledges and consents to the assignment by Party A to the Swap Insurer of any rights and remedies that Party A has under any Insured Rate Swap Transaction or any other document executed in connection herewith.

*(xiv)*  *Isolation of Insured Rate Swap Transactions in Designating an Early Termination Date.*

(a)  Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of non-Swap Insurer Insured Rate Swap Transactions by Party A or Party B shall not apply to any Insured Rate Swap Transactions under this Agreement, unless expressly provided in such designation and agreed to in writing by the Swap Insurer.

(b)  Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date In respect of the Insured Rate Swap Transactions by the Swap Insurer or by Party A or Party B shall apply only to the Insured Rate Swap Transactions and not to any other Transaction under this Agreement, unless expressly provided in such designation and agreed to in writing by the Swap Insurer. Nothing contained in this Part 5(xiv) shall affect the rights of Party A under this Agreement to designate an Early Termination Date in respect of any Transaction that is not an Insured Rate Swap Transaction, which designation shall not apply to the Insured Rate Swap Transactions.

*(xv)*  *Expenses.* Party B agrees to reimburse the Swap Insurer immediately and unconditionally upon demand for all reasonable expenses incurred by the Swap Insurer in connection with the issuance of the Swap Insurance Policy and the enforcement by the Swap Insurer of Party B's obligations under this Agreement and any other documents executed in connection with the execution and delivery of this Agreement, including, but not limited to, fees (including professional fees), costs and expenses incurred by the Swap Insurer which are related to, or resulting from, any breach by Party B of its obligations hereunder.

*(xvi)*  *Notices.* A copy of each notice or other communication between the parties with respect to this Agreement must be forwarded to the Swap Insurer by the party distributing such notice or other communication and any such notice or other communication shall not be effective as to the parties hereto until it has been received by the Swap Insurer.

*(xvii)*  *Reference Market-makers.* The definition of "Reference Market-makers" set forth in Section 12 of the Agreement shall be amended in its entirety to read as follows:

"Reference Market-makers" means four (4) leading dealers in the relevant swap market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time of deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among dealers having an office in the same metropolitan area. The rating classification assigned to any outstanding long-term senior debt securities of such dealers shall be at least (1) "Al" or higher as determined by Moody's, (2) "A+" or higher as determined by S&P or if not rated by one of S&P or Moody's, (3) an equivalent investment grade rating determined by a nationally-recognized rating service acceptable to both parties, provided, however, that in any case, if Market Quotations cannot be determined by four (4) such dealers, the party making the determination of the Market Quotation may designate, with the consent of the other party and the Swap Insurer, one (1) or more leading dealers whose long-term senior debt bears a lower investment grade rating or the parties may agree, with the consent of the Swap Insurer, to use fewer than four (4) leading dealers.

*(xviii)* ***Party A Delivery of Legal Opinion.*** Party A will be required to deliver a legal opinion with respect to its power and authority to enter into the Agreement and to the enforceability of the Agreement, satisfactory in form and substance to the Swap Insurer, with the Swap Insurer as an addressee.

*(xix)* ***Additional Representations of Party B.*** Party B hereby further represents to Party A (which representations will be deemed to be repeated by Party B at all times until the termination of this Agreement) that:

(i)  This Agreement has been, and each Transaction hereunder will be (and, if applicable, has been), entered into for the purposes of managing its borrowings and not for purposes of speculation.

(ii)  Party B has taken all steps necessary or advisable to create the security and source of payment for Party B's obligations hereunder described in Section 3(g) of the Agreement.

(iii)  Any Transaction entered into pursuant to this Agreement together with any transactions that Party B has or may enter into with Party A and/or with any or all other parties does not and will not violate or exceed any limits or restrictions contained in any authorizations, approvals or resolutions of the board of directors, shareholders or other authorized body of Party B.

(iv)  The execution and delivery by Party B of this Agreement, each Confirmation and any other documentation relating hereto, and the performance of Party B of its obligations hereunder and thereunder, are in furtherance, and not in violation, of the municipal purposes for which Party B is organized pursuant to the laws of the State of Michigan.

(v)  This Agreement and each Transaction hereunder do not constitute any kind of investment by Party B that is proscribed by any constitution, charter, law, rule, regulation, government code, constituent or governing instrument, resolution, guideline, ordinance, order, writ, judgment, decree, charge, or ruling to which Party B (or any of its officials in their respective capacities as such) or its property is subject.

*(xx)* ***Optional Early Termination.*** Party A shall have the right to terminate one or more Transactions hereunder, either in whole or in part, on any Business Day; *provided* that no Event of Default or Termination Event is then occurring with respect to which Party A is the Defaulting Party or sole Affected Party, by providing at least five (5) Business Days' prior written notice to Party B of its election to terminate and its designation of the effective date of termination (the "Party A Optional Early Termination Date"). On the Party A Optional Early Termination Date, Party A shall determine the amount payable in connection with such termination as the greater of (i) zero and (ii) the amount calculated in accordance with Section 6(e) of the Agreement, as if (A) the Party A Optional Early Termination Date were the Early Termination Date with respect to the terminated Transaction(s) or portion thereof, (B) the terminated Transaction(s) were the sole Affected Transaction(s), (C) Party B were the sole Affected Party and (D) Second Method

Detroit/Amended and Restated Schedule GRS-UBS (Syncora)

24

and Loss applied.  For the avoidance of doubt, in no event will Party B owe any amount to Party A in connection with an election by Party A to exercise its option under this Part 5(xx), other than any Unpaid Amounts

[Intentionally left blank. Signature page follows.]

Detroit/Amended and Restated Schedule GRS-UBS (Syncora)

25

13-53846-swr    Doc 3618-5  Filed 08/09/13   Entered 08/09/13 15:53:20   Page 85 of 90    485
13-53846-tjt    Doc 1140-8    Filed 10/10/13   Entered 10/10/13 14:54:54    Page 85 of 100

Please confirm your agreement to the terms of the foregoing Schedule by signing below.

**UBS AG**

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

By: _Marie-Anne Clarke_      By: _____

Name:                    Marie-Anne Clarke    Name: Norman L. White

Title:                      Executive Director and Counsel   Title: President

Date: June 26, 2009    Region Americas Legal   Date: June 26, 2009

Fixed Income Section

By: _____

Name:                    James B. Fuqua

Title:                      Managing Director and Counsel

Date: June 26, 2009    Region Americas Legal

Detroit/Amended and Restated Schedule GRS-UBS (Syncora)

26

13-53846-swr   Doc 3618-5   Filed 08/06/14   Entered 08/06/14 20:59:30   Page 73 of 90   486
13-53846-tjt    Doc 1140-8    Filed 10/10/13   Entered 10/10/13 14:54:54    Page 86 of 100

Please confirm your agreement to the terms of the foregoing Schedule by signing below.

**UBS AG**

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

By:_____

By:_____

    Name:

    Name:  Norman L. White

    Title:

    Title:  President

    Date:

    Date:  June 26, 2009

By:_____

    Name:

    Title:

    Date:

## SCHEDULE OF OPINIONS

| Lewis & Munday, a Professional Corporation | <ul><li>The Settlement Transaction will not cause the City to violate or exceed any applicable debt limit or constitute or create any "indebtedness" of the City within the meaning of any limitation of the Home Rule City Act (Act 279 of the Public Acts of Michigan of 1909, as amended) or any Michigan constitutional or other non-tax statutory or City Charter limitation,</li><li>the Authorizing Ordinance was duly adopted in accordance with state law and City Charter requirements, is in effect as of the Closing Date, has not been amended, and is valid, binding, and enforceable (subject, in each case, to bankruptcy and other customary exceptions),</li><li>the City Pledge, including the lien of the City Pledge established pursuant to the Authorizing Ordinance, is valid, binding and enforceable and the Service Corporation Pledge is valid, binding, enforceable and perfected (subject, in each case, to bankruptcy and other customary exceptions),</li><li>the definitive agreements entered into in connection with the Settlement Transaction are valid, binding and enforceable (subject, in each case, to bankruptcy and other customary exceptions),</li><li>the pledge and use of Pledged Property as contemplated in the Settlement Transaction will constitute authorized purposes under the Wagering Tax Revenue Statute (including, if applicable at the time, any regulation or ordinance, other than the Authorizing Ordinance, relating thereto), the Authorizing Ordinance and Section 18-14-1 et seq. of the Detroit City Code,</li><li>the pledge and use of the Pledged Property as contemplated by the Settlement Transaction does not and shall not "supplant existing...local expenditures" as prohibited by Section 12(14) of the Wagering Tax Revenue Statute,</li><li>the Settlement Transaction and any other transactions to be consummated in connection therewith are not subject to approval by vote of the electors of the City and are not</li></ul> |
|---|---|

Detroit/Amended and Restated Schedule GRS-UBS (Syncora)

27

13-53846-swr   Doc 3618-5   Filed 04/02/14   Entered 04/02/14 15:39:20   Page 88 of 100
13-53846-tjt   Doc 1140-8   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 88 of 100

488

| | |
|---|---|
| | subject to any right of referendum by City electors; and |
| | • any actions taken by the City Council, in connection with the Settlement Transaction, by resolution, in lieu of ordinance, are fully valid, binding and enforceable against the City, notwithstanding that such actions were taken by resolution instead of by ordinance (subject, in each case, to bankruptcy and other customary exceptions). |
| Orrick, Herrington & Sutcliffe LLP | The Wagering Tax Property constitute "special revenues" as defined in Bankruptcy Code §902(2) with respect to any case under Chapter 9 of the Bankruptcy Code in which the City or a Service Corporation is the debtor (subject to assumptions, qualifications, and limitations as are customary for bankruptcy opinions). |
| Special tax counsel to the City | Consummation of the Settlement Transaction (including any amendments of the Service Contracts in connection therewith) will not result in (i) the 2006 Funding Trust being treated as other than a grantor trust under Subpart E, Part I of Subchapter J of the Internal Revenue Code of 1986, as amended, (ii) the Service Charges and Regular Scheduled Payments failing to constitute payments in respect of indebtedness for U.S. federal income tax purposes, or (iii) otherwise any modifications, adverse to the City, the Service Corporations, the holders of the 2006 Pension Funding Securities or the Counterparties, to the conclusions reached in the tax opinions given in connection with the outstanding transactions. |
| City Corporation Counsel | Relying upon certifications of the City Clerk, the City Charter and any amendments thereto were duly approved by a majority of the City electors voting thereon and the City Charter and any such amendments have not been rescinded in whole or in part as of the Closing Date (subject to bankruptcy and other customary exceptions). |

Capitalized terms used but not otherwise defined in this Exhibit A shall have the meanings ascribed to them in them in the Collateral Agreement.

Detroit/Amended and Restated Schedule GRS-UBS (Syncora)

28

13-53846-swr Doc 3618-5 Filed 08/09/2413 Entered 08/09/2413 15:53:20 Page 89 of 90    489
13-53846-tjt    Doc 1140-8    Filed 10/10/13    Entered 10/10/13 14:54:54    Page 89 of 100

**Exhibit 8**

**Forbearance Agreement (FA)**

## FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT

This FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT (this "**Agreement**") is entered into as of this 15th day of July, 2013, by and among Detroit General Retirement System Service Corporation, a Michigan nonprofit corporation ("**DGRS**"), Detroit Police and Fire Retirement System Service Corporation, a Michigan nonprofit corporation ("**PFRS**" and, together with DGRS, each a "**Service Corporation**" and collectively the "**Service Corporations**"), the City of Detroit (the "**City**"), the Emergency Manager of the City (the "**Emergency Manager**"), and UBS AG ("**UBS**") and Merrill Lynch Capital Services, Inc. ("**MLCS**" and, together with UBS, each a "**Swap Counterparty**" and collectively the "**Swap Counterparties**").

Capitalized terms used herein and not otherwise defined have the meanings ascribed to them under the Swap Agreements (as defined below).

## RECITALS

WHEREAS, the Service Corporations and Swap Counterparties are party to swap transactions under certain ISDA Master Agreements (including, in the case of MLCS, pursuant to Transaction Transfer Agreements and, in any case, including the related Schedule and Credit Support Annex thereto and any Confirmations thereunder) as set forth in Schedule A attached to this Agreement (as applicable, the "**MLCS Swap Agreements**" and the "**UBS Swap Agreements**") and the Service Corporations are party to transactions under certain ISDA Master Agreements (including the related Schedule and Credit Support Annex thereto and any Confirmations thereunder) entered into with SBS Financial Products Company, LLC as set forth in Schedule A attached to this Agreement (the "**SBS Swap Agreements**" and together with the MLCS Swap Agreements, the "**MLCS/SBS Swap Agreements**"; the MLSC/SBS Swap Agreements and UBS Swap Agreements are referred to collectively herein as the "**Swap Agreements**");

WHEREAS, the City, the Service Corporations, U.S. Bank, National Association (as custodian) and the Swap Counterparties are party to a Collateral Agreement dated as of June 15, 2009 (the "**Collateral Agreement**");

WHEREAS, the City is obligated pursuant to the Service Contracts to make certain payments thereunder in an amount equal to the amount due from the Service Corporations to the Swap Counterparties;

WHEREAS, pursuant to the Collateral Agreement, the City has pledged to the Service Corporations a first priority lien upon all of the City's right, title and interest in the Pledged Property (as such term is defined in the Collateral Agreement) in order to secure the payment of all City Hedge Payables Related Obligations (as such term is defined in the Collateral Agreement);

WHEREAS, pursuant to the Collateral Agreement, the Service Corporations have

granted to the Swap Counterparties a security interest in all of their right, title and interest in, to and under the City Hedge Payable Related Obligations and the City Pledge (as such term is defined in the Collateral Agreement);

WHEREAS, the Governor of the State of Michigan determined on March 1, 2013 that a financial emergency existed in the City, and the Emergency Manager was appointed for the City on March 14, 2013;

WHEREAS, pursuant to the terms of each Swap Agreement, it is the view of the Swap Counterparties that one or more Events of Default and/or Additional Termination Events has occurred, with the Service Corporation as the Defaulting Party or sole Affected Party, and therefore each of SBS and UBS has the right to designate an Early Termination Date for the related Swap Agreements;

WHEREAS, pursuant to the terms of the UBS Swap Agreements, it is the view of UBS that UBS has the right (but not the obligation) to terminate the UBS Swap Agreements as described in Part 5(xx) of the Schedules to the UBS Swap Agreements;

WHEREAS, pursuant to the terms of the MLCS/SBS Swap Agreements, it is the view of MLCS that SBS has the right (but not the obligation) to terminate the SBS Swap Agreements as described in Part 5(t) of the Schedules to the SBS Swap Agreements; provided that SBS may not exercise such right without the consent of MLCS and is required to exercise such right at the direction of MLCS;

WHEREAS, the Service Corporations and City have asked each Swap Counterparty to forbear from exercising certain rights, including without limitation, rights under the Swap Agreements, during a certain period pursuant to this Agreement; and

WHEREAS, each Swap Counterparty is willing to do so upon the terms and subject to the conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Forbearance.**

    1.1.    *Forbearance*.  During the period (the "**Forbearance Period**") commencing on the date hereof and terminating upon the occurrence of a Forbearance Period Termination Event (as defined in Section 1.3 below), each Swap Counterparty shall, subject to the terms and conditions hereof, forbear from:

    (a)    issuing any notice designating an Early Termination Date with respect to any Swap Agreement; and

2

(b)    (i) instructing the Collateral Agreement Custodian to cease making payments to the City from the General Receipts Subaccount in accordance with Section 5.4 of the Collateral Agreement and (ii) giving notice to the Collateral Agreement Custodian pursuant to the Collateral Agreement of its obligation to cease making such payments.

**1.2.**    *Affirmative Obligations During Forbearance Period.*

(a)    During the Forbearance Period, if a Liquidity Event has occurred and is continuing, the Swap Counterparties shall (a) use their best efforts to take any action reasonably requested by the City to cure such Liquidity Event, including supporting any action by the City or Service Corporations to obtain a turnover to the City of all amounts that would be paid to the City under the Collateral Agreement but for the application, or alleged application, of Section 5.4 of the Collateral Agreement or but for any action by the Collateral Agreement Custodian, whether or not such action has been purported to have been taken pursuant to Section 5.4, to withhold or delay such payments, *provided, however*, such best efforts shall not include any act that would, in the commercially reasonable judgment of the Swap Counterparties, (i) impose material costs, expenses or burden on the Swap Counterparties, (ii) impose reputational risk or material liability on either Swap Counterparty, or (iii) have an Adverse Effect (as such term is defined in Section 1.3(d) below) on the Swap Counterparties, (b) in the event of a bankruptcy with respect to the City, (x) support a motion or adversary proceeding for turnover to the City of all amounts that would be paid to the City under the Collateral Agreement but for the application, or alleged application, of Section 5.4 of the Collateral Agreement or but for any action by the Collateral Agreement Custodian, whether or not such action has been purported to have been taken pursuant to Section 5.4, to withhold or delay such payments, and (y) consent to use of cash collateral by the City of any amounts held under the Collateral Agreement that would be paid to the City but for the application, or alleged application, of Section 5.4 of the Collateral Agreement or but for any action by the Collateral Agreement Custodian, whether or not such action has been purported to have been taken pursuant to Section 5.4, to withhold or delay such payments, and (c) consent to the remittance to the City of the funds contemplated by the letter from the City to the Collateral Agreement Custodian in the form attached as Schedule B hereto.

(b)    For purposes of this Agreement, a **"Liquidity Event"** shall mean that (i) the City has not received payment of any and all amounts under the Collateral Agreement that would have been paid to the City from the General Receipts Subaccount or Holdback Account under the Collateral Agreement but for the application, or alleged application, of Section 5.4 of the Collateral Agreement or but for any action by the Collateral Agreement Custodian, whether or not such action has been purported to have been taken pursuant to Section 5.4, to withhold or delay such payments, or (ii) the Collateral Agreement Custodian has stated that it will not, or the City has reasonable grounds to believe that the Collateral Agreement Custodian may not, (a) make payment to the City from the General Receipts

3

Subaccount equal to the City Payment for such Month if the City were to pay the Collateral Agreement Custodian for deposit to the credit of the Holdback Account an amount equal to the Standard Holdback Requirement, (b) issue a Monthly Holdback Compliance Notice, or (c) remit to the City daily all amounts standing to the credit of the General Receipts Subaccount after issuance of a Monthly Holdback Compliance Notice.  The existence of an outstanding instruction or direction by any person to the Collateral Agreement Custodian to refrain from paying amounts under the Collateral Agreement to the City shall constitute reasonable grounds for such belief.

(c)     Upon termination of the Forbearance Period, any and all rights of the City and the Service Corporations under this Section 1.2 shall terminate immediately without notice and the Swap Counterparties shall have the right to revoke any consents described herein and otherwise exercise any rights or remedies they may have under the Transaction Documents except with respect to amounts previously used by or remitted to the City in accordance with the terms of this Section 1.2.

**1.3.**     *Forbearance Period Termination Events.*     Each of the following events constitutes a "**Forbearance Period Termination Event**" upon delivery by a Swap Counterparty to the City and each Service Corporation of written notice of the occurrence thereof (provided that in lieu of such notice, notice of the occurrence of the Forbearance Period Termination Events in Sections 1.3(a), 1.3(l) or 1.3(m) below shall be given as set forth therein):

(a)     Delivery to the City and each Service Corporation of a written notice from a Swap Counterparty (given in its sole discretion and with a copy to the other parties hereto) terminating the Forbearance Period; provided that such notice may not be given prior to June 30, 2014.

(b)     (i) The occurrence of any Event of Default under Section 5(a)(i) of any Swap Agreement, (ii) any Service Corporation seeks to become a debtor under title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), or (iii) a petition to cause a Service Corporation to become a debtor under the Bankruptcy Code is filed by a Controlled Entity (as such term is defined in Section 2.1(a) hereof) and the City or the Emergency Manager caused such filing to be made.

(c)     A petition to cause a Service Corporation to become a debtor under the Bankruptcy Code is filed by a third party (except as provided in Section 1.3(b)(iii) above).

(d)     Occurrence of any Event of Default under Section 5(a)(iii) of any Swap Agreement, provided that such occurrence has an Adverse Effect on the Swap Counterparties. For purposes of this Agreement, an "**Adverse Effect**" on the Swap Counterparties shall (i) mean the occurrence or existence of any act, event or condition that, in the reasonable judgment of the Swap Counterparties, is likely to adversely affect their rights or

4

interests under any of the Transaction Documents in any material respect and (ii) exclude (1) any failure or refusal to pay any amounts under the 2006 Pension Funding Securities when due, and (2) the filing of a petition for relief under the Bankruptcy Code by the City.

(e) Occurrence of any Additional Termination Event under Part 1(i)(ii)(1), (2), (6), or (7) of the Schedule to any Swap Agreement; provided, however, (x) an Additional Termination Event under Part 1(i)(ii)(1) of the Schedule to any Swap Agreement shall not constitute a Forbearance Period Termination Event if it occurs during the continuation of a Liquidity Event and prior to July 31, 2013, (y) the occurrence of an Additional Termination Event under Part 1(i)(ii)(2) of the Schedule to any Swap Agreement shall not constitute a Forbearance Period Termination Event to the extent the appropriation referenced therein equals at least the amount specified in clause (X) of such Part 1(i)(ii)(2) and (z) the occurrence of an Additional Termination Event under Part 1(i)(ii)(6) of the Schedule to any Swap Agreement shall not constitute a Forbearance Period Termination Event to the extent any third party litigation does not have an Adverse Effect on the Swap Counterparties.

(f) Breach of any of the covenants contained in Section 2.1(a), 2.1(b), 2.1(d) or 2.2(a) herein

(g) Other than as set forth in Section 1.3(f) above, breach (other than breach solely by the Swap Counterparties) of any of the covenants contained in Section 2 herein or any representations contained in Section 4 herein.

(h) Without prejudice to Section 1.3(f) or (g) above, issuance by any court of competent jurisdiction of a judgment or order that would (i) render unlawful or invalid any of the Swap Agreements, Collateral Agreement or this Agreement or the performance thereunder or hereunder by the Emergency Manager, the City or a Service Corporation or any party acting for or on behalf of the Swap Counterparties, (ii) render unlawful or invalid any other Transaction Documents or the performance thereunder by the City or a Service Corporation or any party acting for or on behalf of the Swap Counterparties, if the impact thereof would impair the ability of a Service Corporation to make any payments when due under any Swap Agreements or impair any arrangement securing such payments, or (iii) require or allow any payment of principal or interest on the 2006 Pension Funding Securities to be paid prior to the scheduled payment date therefor.

(i) Proposal of an ordinance by the Emergency Manager or the giving of public notice of a meeting of the City Council of the City at which an ordinance will be considered for adoption (provided the City Council of the City had at such time the requisite power and authority for such adoption), or approval by either house of any federal or state legislature of legislation, that if enacted or adopted into law would (i) render unlawful or

invalid any of the Swap Agreements, Collateral Agreement or this Agreement or the performance thereunder or hereunder by the Emergency Manager, the City or a Service Corporation or any party acting for or on behalf of the Swap Counterparties, (ii) render unlawful or invalid any other Transaction Documents or the performance thereunder by the City or a Service Corporation or any party acting for or on behalf of the Swap Counterparties, if the impact thereof would impair the ability of a Service Corporation to make any payments when due under any Swap Agreements or impair any arrangement securing such payments, or (iii) require or allow any payment of principal or interest on the 2006 Pension Funding Securities to be paid prior to the scheduled payment date therefor.

(j)     The City files a petition for relief under the Bankruptcy Code and any one of the following occurs: (i) within 60 days of filing the City fails to obtain a Court Order (as defined in Section 2.1(d) hereof), (ii) the Assumption Motion (as defined in Section 2.1(d) hereof) is denied, (iii) the petition for relief is dismissed and a new petition is not filed within 30 days following such dismissal, or (iv) the Court Order does not contain a waiver of the automatic stay as specified in Section 2.3 herein.

(k)     The effective date of the confirmation of the plan of adjustment in connection with any bankruptcy proceedings of the City.

(l)     Delivery on or before July 31, 2013 to the Swap Counterparties of a written notice from the City (given in its sole discretion and with a copy to the other parties hereto) terminating the Forbearance Period; provided that on such date a Liquidity Event has occurred and is continuing.

(m)     Delivery to the Swap Counterparties of a written notice from the City (given in its sole discretion and with a copy to the other parties hereto) terminating the Forbearance Period; provided that (A) on such date an event described in 1.3(j)(ii) or (iii) has occurred or (B) the City files a petition for relief under the Bankruptcy Code and any one of the following occurs: (i) within 75 days of the filing the City fails to obtain a Non-Final Court Order or (ii) the City fails to obtain a Court Order prior to the Exercise Period End Date; provided further that the City has used its best efforts to obtain a Court Order in accordance with Section 2.1(d) hereof.

**1.4.**     *Rights Following Forbearance Period.*

(a)     Upon the occurrence of a Forbearance Period Termination Event pursuant to Section 1.3(a), 1.3(b) or 1.3(f) hereof, the parties hereto shall be restored to their original rights and positions as they existed immediately prior to the Forbearance Period, and each Swap Counterparty shall immediately be entitled to exercise any rights and remedies in respect of any Event of Default, Termination Event, or Additional Termination Event that has occurred under the applicable Swap Agreement together

USActive 27967693.30

with any rights and remedies under the Definitive Documents relating thereto and giving effect to Section 2 of this Agreement.

(b)     If (i) the City has complied with Section 3.2 hereof but either Swap Counterparty is prohibited from exercising its Optional Termination Right (as defined in Section 3.5 hereof) because an Event of Default or Termination Event is then occurring with respect to which any Swap Counterparty is the Defaulting Party or sole Affected Party under any Swap Agreement or (ii) a Forbearance Period Termination Event (other than as set forth in Section 1.4(a) above) has occurred, the parties hereto shall be restored to their original rights and positions as they existed immediately prior to the Forbearance Period, and each Swap Counterparty shall immediately be entitled to exercise any rights and remedies in respect of any Event of Default, Termination Event, or Additional Termination Event that has occurred under the applicable Swap Agreement together with any rights and remedies under the Definitive Documents relating thereto *without* giving effect to Section 2 of this Agreement.

## 2.     Covenants of the Parties.

**2.1.**     *Covenants of the City and Service Corporations.* Each of the City and the Service Corporations hereby covenants and agrees, which covenants and agreements shall, except as otherwise provided in Section 1.4, survive the termination of the Forbearance Period, as follows:

(a)     Unless the Swap Counterparties have given their express written consent, and so long as the Swap Counterparties are not in breach of their obligations hereunder, the City and each Service Corporation (i) shall not commence litigation, assert any defense in litigation or take any other judicial, legislative, or executive action that may have the effect of (A) setting aside, avoiding, rejecting, modifying, terminating, amending, revising, disapproving, limiting, or otherwise disrupting or rendering ineffective any of this Agreement, the Collateral Agreement, the Swap Insurance Policies, the Swap Agreements, the 2006 Transaction, the City Pledge, the Service Corporation Security Interest, the Service Corporation Pledge, the lien created by the Authorizing Ordinance, or any other part of the Definitive Documents or the Settlement Transaction (collectively, the **"Transaction Documents"**) to the extent such litigation or action would have an Adverse Effect on the Swap Counterparties or (B) causing any payment of principal or interest on the 2006 Pension Funding Securities to be paid prior to the scheduled payment date therefor, it being agreed and understood that neither (1) any failure or refusal to pay any amounts under the 2006 Pension Funding Securities when due nor (2) the filing of a petition for relief under the Bankruptcy Code by the City shall constitute a breach or violation of this clause (B) and (ii) shall not cause the City, a Service Corporation or any entity or person under the control of the City

7

or the Emergency Manager (any such entity or person, a "**Controlled Entity**") to commence litigation, assert any defense in litigation or take any other judicial, legislative, or executive action that may have any of the effects referenced in Section 2.1(a)(i)(A) or (B).

(b)     Unless the Swap Counterparties have given their express written consent, and so long as the Swap Counterparties are not in breach of their obligations hereunder, the City and each Service Corporation shall timely and diligently defend against any litigation or other judicial action that is commenced by a third party (including, without limitation, any Controlled Entity), or any legislative action that is taken, that may have any of the effects referenced in Section 2.1(a)(i)(A) or (B).

(c)     Each of the City and each Service Corporation hereby ratifies and agrees to comply with all applicable provisions of the Transaction Documents to the extent that failure to do so would have an Adverse Effect on the Swap Counterparties.

(d)     If the City or a Service Corporation seeks to become or becomes a debtor under the Bankruptcy Code, the City and such Service Corporation (as applicable) shall (A) (i) file a motion, in form and substance reasonably satisfactory to the Swap Counterparties, to assume this Agreement (the "**Assumption Motion**") pursuant to section 365 of the Bankruptcy Code on the date of the filing of a petition for relief under the Bankruptcy Code and (ii) use best efforts to obtain entry of a final and non-appealable order, in form and substance reasonably satisfactory to the Swap Counterparties, granting the Assumption Motion (an "**Assumption Order**") or (B) use best efforts to obtain entry of a final and non-appealable order, in form and substance reasonably satisfactory to the Swap Counterparties, with respect to this Agreement pursuant to Rule 9019 under the Bankruptcy Code (a "**Rule 9019 Order**" and together with the Assumption Order, a "**Court Order**").

(e)     If the City or a Service Corporation seeks to become or becomes a debtor under the Bankruptcy Code, the City and such Service Corporation (as applicable) shall schedule any amounts due and owing to any Swap Counterparty (or its transferees or assigns) pursuant to or related to the Swap Agreements, the Collateral Agreement and this Agreement as undisputed, fully secured claims pursuant to section 506 of the Bankruptcy Code and treat any amounts due thereunder or hereunder as allowed, fully secured claims for any and all purposes under any plan for the City or such Service Corporation (as applicable).

(f)     The City and each Service Corporation shall provide each Swap Counterparty with immediate oral and written notice of the occurrence of any Forbearance Period Termination Event.

8

USActive 27967693.30

(g) At the request of the Swap Counterparties following the occurrence of both (i) a Forbearance Period Termination Event described in Section 1.4(a) above and (ii) either a Termination Event or Event of Default under a Hedge where the Swap Counterparty is not the sole Affected Party or Defaulting Party, the City and each Service Corporation shall authorize, approve and consent to payment to the Swap Counterparties from the Pledged Property to meet the obligations owing to the Swap Counterparties under the Hedges and the Transaction Documents; subject to prior appropriation by either the City Council of the City (provided the City Council of the City had at such time the requisite power and authority for such appropriation) or by the Emergency Manager pursuant to Section 2.2 (b)(iv) of the Pledged Property in an amount sufficient to pay the obligations owing to the Swap Counterparties under the Hedges and the Transaction Documents.

(h) At the request of the Swap Counterparties following the occurrence of a Forbearance Period Termination Event described in Section 1.4(a) above, if the Collateral Agreement Custodian refuses or fails to make a payment from the Pledged Property as provided in Section 2.1(g) above, the City and each Service Corporation shall support any reasonable action by the Swap Counterparties to obtain relief, including relief pursuant to the remedies specified in Section 11.2 of the Collateral Agreement.

**2.2.** *Covenants of the Emergency Manager.* The Emergency Manager hereby covenants and agrees, which covenants and agreements shall, except as otherwise provided in Section 1.4, survive the termination of the Forbearance Period, as follows:

(a) Unless the Swap Counterparties have given their express written consent, and so long as the Swap Counterparties are not in breach of their obligations hereunder, the Emergency Manager (i) shall not, and shall not authorize or permit the City to, commence litigation, assert any defense in litigation or take any other judicial, legislative, or executive action that may have any of the effects referenced in Section 2.1(a)(i)(A) or (B) and (ii) shall not cause the City, a Service Corporation or any Controlled Entity to commence litigation, assert any defense in litigation or take any other judicial, legislative, or executive action that may have any of the effects referenced in Section 2.1(a)(i)(A) or (B).

(b) Unless the Swap Counterparties have given their express written consent, and so long as the Swap Counterparties are not in breach of their obligations hereunder, the Emergency Manager shall exercise all powers, authorities and privileges vested in the Emergency Manager under applicable law and, as required from time to time in the performance thereof, shall immediately execute and deliver each authorization, approval, appropriation, direction, instruction or consent by the

9

USActive 27967693.30

Emergency Manager, acting in the official capacity as Emergency Manager, that is necessary:

(i)      subject to Section 2.2(b)(iii) with respect to the City Payments, to cause the City and the Service Corporations to perform all covenants, obligations and duties of the City and the Service Corporations, respectively, under the Transaction Documents, unless the failure to perform will not have an Adverse Effect on the Swap Counterparties,

(ii)     to cause the City or the Service Corporations to avoid the occurrence of a Forbearance Period Termination Event described in Sections 1.3(b), 1.3(d), 1.3(e), 1.3(f), 1.3(g) or 1.3(i) of this Agreement,

(iii)    to cause the City to make all City Payments as and when required under the Collateral Agreement and, to the extent necessary, to make one or more appropriations or make one or more amendments to then existing appropriations in amounts that are sufficient to pay in full, and which may be used exclusively for payment of, such City Payments, and

(iv)    following the occurrence of both (A) a Forbearance Period Termination Event described in Section 1.4(a) above and (B)  either a Termination Event or Event of Default under a Hedge where the Counterparty is not the sole Affected Party or Defaulting Party thereunder, to make one or more appropriations or make one or more amendments to then existing appropriations of the Pledged Property in amounts that are sufficient to pay in full, and which may be used exclusively for payment of,  the obligations owing to the Swap Counterparties under the Hedges and the Transaction Documents.

**2.3.**    *Specific Performance of Covenants.* The City, the Service Corporations and the Emergency Manager acknowledge and agree that the rights acquired by the Swap Counterparties under this Section 2 are unique and that irreparable damage to the Swap Counterparties would occur in the event that any of the provisions of this Section 2 were not performed in accordance with their specific terms as required by the Agreement or were otherwise breached.    Accordingly, the Swap Counterparties shall be entitled to an injunction or injunctions to prevent any breach or nonperformance of this Section 2 and to an order or orders of specific performance of the terms and provisions of this Section 2. Furthermore, in the event of nonperformance under this Section 2, it is acknowledged that mandamus is an appropriate remedy and the Emergency Manager shall not contest such mandamus remedy, and if the City is then a debtor under the Bankruptcy Code, the Emergency Manager shall promptly seek to waive the automatic stay with respect to such remedy.

2.4.    *Further Assurances.*   Each party hereto hereby covenants and agrees, which covenant and agreement shall survive the termination of the Forbearance Period, that such party will execute such further documents and take such further actions

10