as reasonably necessary to implement and carry out the intent of this Agreement.

## 3. Right to Direct Termination.

**3.1.** *Optional Termination Right.* Subject to the terms and conditions of this Agreement:

(a) UBS and the City hereby agree that the City shall have the right, but not the obligation, exercisable on any Business Day during the Exercise Period, to direct UBS to exercise its Optional Termination Right, under all (but not less than all) of the UBS Swap Agreements (the "**UBS Termination Right**").

(b) MLCS and the City hereby agree that the City shall have the right, but not the obligation, exercisable on any Business Day during the Exercise Period, to direct MLCS to exercise or cause to be exercised the Optional Termination Right under all (but not less than all) of the MLCS/SBS Swap Agreements (the "**MLCS Termination Right**" and together with the UBS Termination Right, the "**Termination Rights**"). MLCS hereby acknowledges that MLCS has the right to direct SBS to exercise the Optional Termination Right.

**3.2.** *Exercise of Termination Rights.*

(a) The City may exercise the Termination Rights only once, by providing both UBS and MLCS with written notice (the "**Optional Termination Notice**") on a day (the "**Optional Termination Notice Date**") that is at least seven (7) Business Days and not more than ten (10) Business Days prior to the proposed date of termination set forth in the Optional Termination Notice (the "**Optional Termination Date**"). The Optional Termination Date must be the same date for both the UBS Termination Right and the MLCS Termination Right and shall occur prior to the Exercise Period End Date. Such Optional Termination Notice shall be accompanied by evidence reasonably satisfactory to each of UBS and MLCS that the City will have funds on the Optional Termination Date sufficient to pay in cash the Optional Termination Amounts as set forth in Section 3.3 below (the "**Supporting Information**"). Delivery of an Optional Termination Notice, if accompanied by proper Supporting Information, shall be irrevocable.

(b) Provided that an Optional Termination Notice and the Supporting Information are properly delivered pursuant to Section 3.2(a) above, and provided further that no Event of Default or Termination Event is then occurring with respect to which any Swap Counterparty is the Defaulting Party or sole Affected Party under any Swap Agreement (it being understood that, subject to Section 3.2(d) hereof, the Service Corporations may waive any such Event of Default or Termination Event), each of UBS

11

and MLCS shall (i) deliver or cause to be delivered written notice to each Service Corporation exercising its Optional Termination Right in accordance with the terms of its Optional Termination Provision as of the Optional Termination Date and (ii) take such other actions as may be necessary or required to give effect to the Optional Termination Provision.

(c)     If the City exercises the Termination Rights and complies with all the terms of this Agreement, (i) no Swap Counterparty will present any payment notice, notice of nonpayment, or other presentation of claim under a Swap Insurance Policy to a Swap Insurer as a result of the exercise of the Termination Rights and (ii) each Swap Counterparty will irrevocably waive all future rights to do so. In furtherance of the foregoing, each Swap Counterparty hereby agrees, severally and not jointly, to indemnify and hold harmless each Service Corporation and the City from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees (in each case, regardless of whether such rights arise by way of contribution, reimbursement, subrogation or otherwise), resulting directly from and caused by a breach by such Swap Counterparty of its obligations under this Section 3.2(c).

(d)     The City hereby agrees that if it exercises the Termination Rights with respect to any Swap Agreement, it must exercise the Termination Rights with respect to the full notional amount of all Swap Agreements with respect to the Swap Counterparties simultaneously.

(e)     If the City has not exercised the Termination Rights on or prior to the termination of the Exercise Period, the Termination Rights shall expire.

**3.3.**     *Payment of Optional Termination Amount.*

(a)     On or before the second Business Day following the Optional Termination Date, the City shall pay to UBS an amount in cash equal to the Optional Termination Amount with respect to all UBS Swap Agreements.

(b)     On or before the second Business Day following the Optional Termination Date, the City shall pay to MLCS an amount in cash equal to the Optional Termination Amount with respect to all MLCS/SBS Swap Agreements.

(c)     For the avoidance of doubt, each party hereto acknowledges that no Service Corporation will owe an amount to any Swap Counterparty under any Swap Agreement in connection with the election to exercise the Optional Termination Right other than any Unpaid Amounts (without duplication of Unpaid Amounts paid by the City as a component of the Optional Termination Amount).

(d)     If a third party (including, without limitation, any Controlled Entity) alleges through litigation, judicial action, or otherwise, that all or a portion of the Optional Termination Amount paid to UBS or MLCS hereunder

12

must be shared with other creditors of the City or of either Service Corporation (or any person acting for or on behalf of such creditors), then the City shall, at the request of the Swap Counterparties, support any reasonable action by the Swap Counterparties in defending against any such litigation or other judicial action that is threatened or commenced by such third party to the extent such action does not impose any further duty or liability on the City.

(e) The City, the Service Corporations and the Swap Counterparties agree that the payment by the City and acceptance by the Swap Counterparties of the Optional Termination Amounts shall constitute the application of funds by the Swap Counterparties pursuant to the contract rights granted hereunder.

**3.4.** *Effect of Payment of Optional Termination Amount.*

Upon payment in full by the City of the Optional Termination Amount to each of the Swap Counterparties:

(a) each of the Swap Counterparties and the Service Corporations shall be released and discharged from further obligations to each other under the Swap Agreements and their respective rights against each other thereunder shall be terminated;

(b) the City Pledge, the Service Corporation Security Interest and the Service Corporation Pledge shall be satisfied and discharged;

(c) this Agreement shall terminate *without* giving effect to Section 2 of this Agreement; *provided*, that such termination shall not affect the respective obligations of the parties under Sections 3.3(c), 3.3(d), 5, 8, 10 and 11 of this Agreement, which shall survive; and

(d) in accordance with Section 14.4(a) of the Collateral Agreement, the Swap Counterparties shall deliver to the Collateral Agreement Custodian, and MLCS shall cause SBS to deliver to the Collateral Agreement Custodian, confirmation of the payment in full of all obligations of the Service Corporations and the City to the Swap Counterparties and SBS under the Swap Agreements and the Collateral Agreement.

**3.5.** *Definitions related to Optional Termination Right.*

"**Applicable Percentage**" shall mean, with regard to the delivery of an Optional Termination Notice by the City in accordance with Section 3.2, (i) if the Optional Termination Notice Date occurs on or prior to the First Payment Adjustment Date, 75%, (ii) if the Optional Termination Notice Date occurs after the First Payment Adjustment Date and on or prior to the Second Payment Adjustment Date, 77%, and (iii) if the Optional Termination Notice Date occurs after the Second Payment Adjustment Date and prior to the Exercise Period End Date, 82%; *provided, however,* that if the City shall have received a Non-Final Court Order and the Swap

13

Counterparties do not expressly waive the requirement of a Court Order to begin the Exercise Period, the Applicable Percentage shall be determined with respect to the Non-Final Court Order Date rather than the Optional Termination Notice Date.

"**Exercise Period**" shall mean the period from and including the Exercise Period Start Date to but excluding the Exercise Period End Date.

"**Exercise Period End Date**" shall mean the earlier to occur of (i) a Forbearance Period Termination Event and (ii) March 14, 2014.

"**Exercise Period Start Date**" shall mean the date of this Agreement; *provided, however*, that if the City shall have not exercised the Termination Rights and paid in full in cash to each Swap Counterparty its respective Optional Termination Amount prior to the City filing a petition for relief under the Bankruptcy Code, the Exercise Period Start Date shall mean the date on which the City obtains a Court Order, unless the requirement for such order is expressly waived in writing by each Swap Counterparty.

"**First Payment Adjustment Date**" shall mean October 31, 2013.

"**Mid-Market Amount**" shall mean an amount for each Swap Agreement determined by the Swap Counterparties as of the Optional Termination Date according to a methodology that is agreed to by the City and based upon the present value of amounts due under the Swap Agreement using a discount curve calculated from swap rates published on Reuters Screen Page "ISDAFIX3" at 11:30 a.m. New York Time on the Optional Termination Date, as adjusted to take into account three (3) basis points of breakage costs.

"**Non-Final Court Order**" shall mean an order from the Bankruptcy Court that, but for such order not being final and non-appealable, would constitute a Court Order.

"**Non-Final Court Order Date**" shall mean the date on which the Bankruptcy Court issues a Non-Final Court Order.

"**Optional Termination Amount**" shall mean the sum of (a) the product of the Mid–Market Amount and the Applicable Percentage and (b) all Unpaid Amounts due and owing to the Swap Counterparties under the Swap Agreements.

"**Optional Termination Provision**" shall mean (i) with respect to the MLCS/SBS Swap Agreements, Part 5(t) of the Schedule to such Swap Agreements and (ii) with respect to the UBS Swap Agreements, Part 5(xx) of the Schedule to such Swap Agreements.

"**Optional Termination Right**" shall mean a Swap Counterparty's right to optionally terminate all transactions, in whole, pursuant to the applicable Optional Termination Provision.

"**Second Payment Adjustment Date**" shall mean November 15, 2013.

14

USActive 27967693.30

4. **Representations and Agreements of the Parties.**

(a)    Each Service Corporation represents to the Swap Counterparties (which representations shall be deemed to be repeated as of the date on which the City delivers an Optional Termination Notice and on the Optional Termination Date) that:

    i.    It is duly organized and validly existing under the laws of Michigan;

    ii.    It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken all necessary action to authorize such execution, delivery and performance;

    iii.    Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    iv.    All governmental (including, without limitation, from the Treasurer of the State of Michigan) and Emergency Manager consents and approvals except as otherwise contemplated by Section 2.1(d) hereof that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with; and

    v.    Its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject to enforceability to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)    The City represents to the Swap Counterparties (which representations shall be deemed to be repeated as of the date on which the City delivers an Optional Termination Notice and on the Optional Termination Date) that:

    i.    It is a municipal corporation of the State of Michigan;

    ii.    It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken all necessary action to authorize such execution, delivery and performance;

15

iii.      Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets; and

iv.      All governmental (including, without limitation, from the Treasurer of the State of Michigan) and Emergency Manager consents and approvals except as otherwise contemplated by Section 2.1(d) hereof that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with; and

v.      Its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject to enforceability to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(c)      Each Swap Counterparty represents to the Service Corporations and the City (which representations shall be deemed to be repeated as of the Optional Termination Date) that:

i.      It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and in good standing;

ii.      It has the power to execute this Agreement, to deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary action to authorize such execution, delivery and performance;

iii.      Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court o other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

iv.      All governmental consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

16

v.  Its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject to enforceability to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(d)  Each of the parties hereto acknowledges that the representations contained herein relate solely to this Agreement and that nothing contained herein shall be or be deemed to be a representation with respect to any other agreement or transaction.

## 5. Forbearance not a waiver.

Except as expressly provided herein, each party hereby expressly reserves the right to exercise at any time any rights and/or remedies such party has and/or to which such party is entitled under the Transaction Documents. The parties acknowledge and agree that one or more Event(s) of Default, Potential Event(s) of Default and/or Termination Event(s) may have occurred under the Transaction Documents, and may occur from time to time after the date hereof, and this Agreement (except to the limited extent expressly provided herein) preserves, and does not constitute a waiver of any right, power or privilege that the parties to this Agreement are entitled to exercise as a result of any such Event of Default, Potential Event of Default or Termination Event under the Transaction Documents. The failure of a party to exercise at any time any rights and/or remedies it has and/or to which it is entitled under the Transaction Documents, including any right to designate an Early Termination Date or to give notice under, or to insist on the strict performance of the Transaction Documents by any other party to, such Transaction Document (including, without limitation, the Collateral Agreement Custodian) will not be construed as an estoppel, waiver, modification or limitation on any right (including, without limitation, any right to designate in the future an Early Termination Date based upon the occurrence of any Event of Default or Termination Event).

**6.  Public Disclosure.**  The City agrees to make the terms of this Agreement publicly available not later than July 19, 2013 and shall not object to or interfere with the public disclosure of such terms by the Swap Counterparties on or after such date.

**7.  Time is of the Essence**Time is of the essence as to the performance of all obligations herein.

**8.  Governing Law and Jurisdiction**THIS AGREEMENT, AS WELL AS ANY MATTER ARISING OUT OF, RELATING TO OR INCIDENTAL TO THIS AGREEMENT, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY PRINCIPLES OF CONFLICTS OF LAW THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION, PROVIDED, HOWEVER, THAT THE CORPORATE POWERS AND LEGAL CAPACITY OF THE CITY AND EACH SERVICE CORPORATION SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN.

17

With respect to any suit, action or proceedings relating to this Agreement, each party irrevocably submits to the extent permitted by law the non-exclusive jurisdiction of the courts of the State of New York and United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

9.      **Notices** Any notice provided for hereunder shall be given in accordance with Section 14.1 of the Collateral Agreement and shall be effective within the time periods set forth therein. A copy of each notice given hereunder shall be given contemporaneously to all other parties to this Agreement. Nothing in this Agreement (including any reference to the Collateral Agreement or otherwise) shall require any notice hereunder to be given to any person not a party to this Agreement.

10.     **Successors and Assigns** Prior to the expiration of the Forbearance Period, neither Swap Counterparty may assign its rights or obligations under this Agreement to another party without the prior written consent of the City and the other Swap Counterparty. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective, successors transferees and assigns.

11.     **WAIVERS OF JURY TRIAL** TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

12.     **Counterpart Execution** This Agreement may be executed in one or more counterparts, including electronically transmitted counterparts, which when taken together, shall constitute one and the same original. Facsimile or other forms of electronic signatures shall be binding, the same of as the original of such document.

13.     **Miscellaneous** (a)     This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supercedes all oral communications with respect thereto.

(b)     No modification, amendment or waiver of this Agreement shall be effective for any purpose unless it is made by written instrument signed by all of the parties hereto; provided that the Emergency Manager shall not be required to be a party to such amendment at any time that the City has full power and authority to sign such amendment without any authorization or approval of the Emergency Manager.

(c)     No person or entity, other than the parties who have signed this Agreement, shall have any rights or interests hereunder, regardless of whether such person or entity is a party to, or has any rights or interests under, any agreement or instrument referenced herein, whether as third party beneficiary or otherwise.

(d)     A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and (except as expressly provided herein) a single or partial exercise of any right, power or privilege will not be presumed to

18

preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

19

USActive 27967693.30

DETROIT GENERAL RETIREMENT
SYSTEM SERVICE CORPORATION

By: _____
    Name: Cheryl R. Johnson
    Title: President

DETROIT POLICE AND FIRE RETIREMENT
SYSTEM SERVICE CORPORATION

By: _____
    Name: Cheryl R. Johnson
    Title: President

THE CITY OF DETROIT

By: _____
    Name:
    Title:

EMERGENCY MANAGER OF THE CITY OF
DETROIT

By: _____
    Name:

DETROIT GENERAL RETIREMENT
SYSTEM SERVICE CORPORATION

By:_____
    Name:
    Title:

DETROIT POLICE AND FIRE RETIREMENT
SYSTEM SERVICE CORPORATION

By:_____
    Name:
    Title:

THE CITY OF DETROIT

By:_____
Name: _KEVYN D. ORR_
Title: _EMERGENCY MANAGER_

EMERGENCY MANAGER OF THE CITY OF
DETROIT

By:_____
Name: _KEVYN D. ORR_

USActive 27967693.30

MERRILL LYNCH CAPITAL SERVICES, INC.

By: _____
Name: James Nacus
Title: Authorized Signatory

UBS AG

By: _____

Name: William W. Chandler

Title: Managing Director


By: _____

Name: James Fagan

Title: Managing Director

SCHEDULE A

SCHEDULE OF SWAP AGREEMENTS

1. ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005, between PFRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0010) and the related Transaction Transfer Agreement by and among PFRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

2. ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between PFRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0011) and the related Transaction Transfer Agreement by and among PFRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

3. ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between DGRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0009) and the related Transaction Transfer Agreement by and among DGRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

4. ISDA Master Agreement (including the Schedule thereto) dated as of June 7, 2006 between DGRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0012) and the related Transaction Transfer Agreement by and among DGRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

5. ISDA Master Agreement between DGRS and UBS, dated as of June 7, 2006, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380291 (as amended, modified or supplemented to the date hereof).

6. ISDA Master Agreement between PFRS and UBS, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380351 as amended, modified or supplemented to the date hereof).

7. ISDA Master Agreement between PFRS and UBS, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS Reference No. 37380313 as amended, modified or supplemented to the date hereof).

8. ISDA Master Agreement between DGRS and UBS, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations

thereunder, dated June 7, 2006, bearing UBS Reference No. 37380341 as amended, modified or supplemented to the date hereof).

USActive 27967693.30

SCHEDULE B

WRITTEN INSTRUCTIONS TO CUSTODIAN UNDER COLLATERAL AGREEMENT

July [_], 2013

<u>Via Email, Facsimile and Courier</u>

U.S. Bank National Association
535 Griswold, Suite 550
Detroit, Michigan 48226
Attention: Susan T. Brown

To Whom It May Concern:

Reference is made to the Collateral Agreement dated as of June 15, 2009, among the City of Detroit, the Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation, severally and not jointly, U.S. Bank National Association, as Custodian and the Other Persons Party thereto (the "*Collateral Agreement*"). Capitalized terms used but not defined herein have the meanings assigned to such terms in the Collateral Agreement.

The City of Detroit hereby instructs the Custodian to release the amounts in the General Receipts Subaccount to the City in the amount of the City Payment for each Month and, after receipt by the Custodian of the City Payment for that Month and beginning on the second Business Day following the date on which the Custodian gives its Monthly Holdback Compliance Notice to the City and the Counterparties for that Month, remit to the City daily all amounts standing to the credit of the General Receipts Subaccount during that Month.

IN WITNESS WHEREOF, the undersigned has duly executed these Written Instructions to Custodian Under Collateral Agreement as of the date first above written.

THE CITY OF DETROIT

By:_____
    Name:
    Title:

USActive 28305513.1

13-53846   Doc 17   Filed 07/18/13   Entered 07/18/13 23:47:19   Page 242 of 245
13-53846-swr   Doc 3601-6   Filed 04/24/13   Entered 04/24/13 13:54:54   Page 16 of 60   516
100

[Counterparties' Signature Page Follows]

The Counterparties consent to the remittance to the City of the funds contemplated by the above instructions, subject to the Counterparties' right to withdraw such consent prospectively upon notice to the City and the Custodian.

MERRILL LYNCH CAPITAL SERVICES, INC.

By: _____
    Name:
    Title:

UBS AG

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

cc: City of Detroit Law Department
First National Building, Suite 1650
660 Woodward Avenue
Detroit, Michigan 48226
Attn: Corporation Counsel

Jones Day
222 East 41st Street
New York, NY 10017
Attn: Corinne Ball
Joel Telpner

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Attn: Lary Stromfeld

Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022-4689
Attn: Edwin Smith

McDermott Will & Emery
227 West Monroe Street
Chicago, IL 60606-5096
Attn: William P. Smith

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attn: Ryan Blaine Bennett
James H.M. Sprayregen

Syncora Capital Assurance Inc.
135 West 50th Street
New York, NY 10022
Attn: Claude LeBlanc

**Exhibit 9**

**City's Verified Complaint (Compl.)**

| STATE OF MICHIGAN 3rd JUDICIAL CIRCUIT COUNTY OF WAYNE | NOTICE OF ASSIGNMENT TO THE BUSINESS COURT | CASE NO. |
|---|---|---|

**Court address**
2 Woodward Ave.    Detroit, MI 48226

| Plaintiff's name(s), address(es), and telephone number(s) | | Defendant's name(s), address(es), and telephone number(s) |
|---|---|---|
| City of Detroit, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan | v | Syncora Guarantee Inc., U.S. Bank, N.A., MGM Grand Detroit, LLC, Detroit Entertainment, LLC d/b/a Motorcity Casino Hotel and Greektown Casino, LLC |

| Plaintiff's attorney, bar no., address, telephone no., and email address | Defendant's attorney, bar no., address, telephone no., and email address |
|---|---|
| Pepper Hamilton LLP Robert S. Hertzberg (P30261) Deborah Kovsky-Apap (P68258) 4000 Town Center, Ste 1800, Sfld, MI 48075 248.359.7300 | 13-008858-CZ FILED IN MY OFFICE WAYNE COUNTY CLERK 7/5/2013 11:01:23 AM CATHY M. GARRETT |

The ☒ Plaintiff ☐ Defendant requests assignment of the above captioned matter to the Business Court as it qualifies for the Business Court pursuant to MCL 600.8031 and MCL 600.8035 as indicated below.

***Both 1 and 2 must be completed for the case to be accepted by the Court. Check all that apply.***

1) The case is a qualifying business or commercial dispute as defined at MCL 600.8031(c) because:
   - ☒ All of the parties are business enterprises;
   - ☐ One or more of the parties is a business enterprise and the other parties are its or their present or former owners, managers, shareholders, members, directors, officers, agents, employees, suppliers, or competitors, and the claims arise out of those relationships;
   - ☐ One of the parties is a nonprofit organization and the claims arise out of that party's organizational structure, governance, or finances; or
   - ☐ the case involves the sale, merger, purchase, combination, dissolution, liquidation, structure, governance, or finances of a business enterprise.

**AND**

2) The business or commercial dispute involves:
   - ☐ Information technology, software, or website development, maintenance or hosting;
   - ☐ The internal organization of business entities and the rights or obligations of shareholders, partners, members, owners, officers, directors, or managers;
   - ☒ Contractual agreements or other business dealing, including licensing, trade secrets, intellectual property, antitrust issues, securities, non-compete agreements, non-solicitation agreements, and confidentiality agreements, if all available administrative remedies are completely exhausted, including, but not limited to alternative dispute resolution processes prescribed in the agreements;
   - ☒ Commercial transactions, including commercial bank transactions;
   - ☒ Business or commercial insurance policies; and/or
   - ☐ Commercial real property
   - ☐ Other:(Please explain)

3) List any and all cases currently **pending** involving the same transaction and/or occurrence (if none, state "none"):

   None

**Providing false or inaccurate information on this form may result in the imposition of sanctions.**

| July 5, 2013 | /s/ Robert S. Hertzberg |
|---|---|
| Date | Name |
| | City of Detroit |
| | Attorney for: _____ |

WCBC01 (06/13) NOTICE OF ASSIGNMENT TO THE BUSINESS COURT
100

CITY OF DETROIT, a Municipal
Corporation Organized and Existing
Under the Laws of the State of Michigan

Case No.: -CZ
Hon.

   Plaintiff,

 v.

SYNCORA GUARANTEE INC., a New
York Corporation,

and

U.S. BANK, N.A.,

and

MGM GRAND DETROIT, LLC,

and

DETROIT ENTERTAINMENT, LLC
d/b/a MOTORCITY CASINO HOTEL,

and

GREEKTOWN CASINO, LLC,

   Defendants.

---

ROBERT S. HERTZBERG (P30261)
DEBORAH KOVSKY-APAP (P68258)
Pepper Hamilton LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
(248) 359-7300 - Telephone
(248) 359-7700 - Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

THOMAS F. CULLEN, JR. (*pro hac vice* pending)
GREGORY M. SHUMAKER (*pro hac vice* pending)
GEOFFREY S. STEWART (*pro hac vice* pending)
Jones Day
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

*Attorneys for Plaintiff*

---

There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this Complaint pending in this Court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge.

## **VERIFIED COMPLAINT**

Plaintiff, the City of Detroit, for its complaint seeking declaratory relief, compensatory and exemplary damages, and preliminary, temporary, and permanent injunctive relief says:

### **PARTIES**

1. The City of Detroit is a Michigan municipal corporation located in Wayne County. The City is a home rule city organized under PA 279 of 1909, as amended, the Home Rule City Act, MCL 117.1, *et seq.* The City has comprehensive home rule power under the State Constitution of 1963, PA 279, and the 2012 Charter of the City of Detroit,

subject to the limitations on the exercise of that power contained in the Constitution, Charter, or imposed by statute.

2.   Defendant Syncora Guarantee Inc. is a New York corporation headquartered at 135 W. 50th Street, New York, N.Y.  Syncora is a monoline financial guarantee insurance provider that insures and provides credit enhancement for the obligations of debt issuers.  Syncora has provided credit insurance to instrumentalities of the City in connection with the so-called COPs and swaps transactions detailed below.

3.   Nominal defendant U.S. Bank, N.A., is a nationally chartered bank with its principal place of business at 800 Nicollet Mall, Minneapolis, Minnesota.  U.S. Bank is a wholly-owned subsidiary of U.S. Bancorp.  U.S. Bank has served as the custodian under the Collateral Agreement detailed below, and as the trustee and contract administrator in connection with the COPs and swaps transactions.

4.   MGM Grand Detroit, LLC ("MGM") is a Delaware limited liability company with a principal place of business at 1300 John C. Lodge, Detroit, Michigan.  MGM is a casino licensed and operating in the City.

5.   Detroit Entertainment, LLC d/b/a MotorCity Casino Hotel ("MotorCity") is a Michigan limited liability company with a principal place of business at 2901 Grand River Avenue, Detroit, Michigan.  MotorCity is a casino licensed and operating in the City.

6.   Greektown Casino, LLC ("Greektown" and, together with MGM and MotorCity, the "Casino Defendants") is a Michigan limited liability company with a principal place of business at 555 East Lafayette, Detroit, Michigan.  Greektown is a casino licensed and operating in the City.

## VENUE AND JURISDICTION

7. The Court has subject matter jurisdiction over this complaint for damages, declaratory, and injunctive relief pursuant to MCL 600.605, MCR 2.605, and MCR 3.310. The amount in controversy exceeds $25,000.

8. The Court has personal jurisdiction over Syncora for purposes of this complaint pursuant to MCL 600.715 because Syncora contracted to insure the City's obligations under the Collateral Agreement within the State of Michigan. The Court has personal jurisdiction over U.S. Bank and MGM under MCL 600.711 because they carry on a continuous and systemic part of their respective businesses within the State of Michigan, and because U.S. Bank consented to the jurisdiction of this Court in § 14.11 of the Collateral Agreement. The Court has personal jurisdiction over MotorCity and Greektown under MCL 600.711 because they were incorporated under the laws of the State of Michigan and because they carry on a continuous and systemic part of their respective businesses within the State of Michigan.

9. Venue is properly laid in this County pursuant to MCL 600.1621 and MCL 600.1629 because plaintiff City of Detroit is located in Wayne County, Michigan, each of the defendants conducts business with the City in Wayne County, defendant U.S. Bank has consented to venue here, the Casino Defendants do business here and are found here, and the injuries complained of by the City occurred in Wayne County.

10. This case is uniquely well-suited for resolution in Michigan because it involves issues critical to the City of Detroit and the State of Michigan, tort claims under Michigan law, and events occurring within the City of Detroit and the State of Michigan.

11.  Because this action involves a business or commercial dispute and an amount in controversy that is greater than $25,000, assignment to the Business Court is appropriate.

## GENERAL ALLEGATIONS

### Certificates of Participation

12.  In 2005 and 2006, the City arranged to enter into a series of transactions for the purpose of raising over $1.4 billion to remedy the underfunding of the City's two pension funds—the General Retirement System and the Police and Fire Retirement System.  The transactions were structured as follows:

(a)  The City arranged for the organization of two non-profit "Service Corporations" to serve as intermediaries in the financing.  One Service Corporation was associated with the General Retirement System and the other with the Police and Fire Retirement System.

(b)  The City entered into  a "service contract" with each Service Corporation, in 2005 and again in 2006, pursuant to which the City agreed to make certain payments in return for that Service Corporation's assistance in transactions designed to fund the City's unfunded liabilities to the retirement systems.

(c)  The Service Corporations arranged for the creation of Funding Trusts in 2005 and 2006, and assigned to the Funding Trusts their right to receive the City's payments.

(d) The Funding Trusts issued debt obligations called "Pension Obligation Certificates of Participation" ("COPs") to investors, each of which

13-53846-swr   Doc 1610-6   Filed 09/18/13   Entered 09/18/13 17:55:05   Page 72 of 526

represented an undivided proportionate interest in the payments to be made by the City to the Service Corporations pursuant to the service contracts.

(e)  The two Funding Trusts issued and sold COPs to investors in 2005 and 2006.

13.  To make the COPs more attractive to investors, the City arranged for the purchase of insurance against a payment default on the COPs by the Funding Trusts, caused by a failure of the City to make payments to the Service Corporations under the service contracts.  The predecessor of defendant Syncora (an entity then known as XL Capital Assurance, Inc.) was one of two monoline insurers who were paid for, and provided, this insurance.  Syncora continues to be the surety for these payments.

**Swaps**

14.  Some of the 2006 COPs paid a floating interest rate.  To protect themselves from the risk of fluctuating interest rates on these floating rate 2006 COPs, the Service Corporations entered into hedging arrangements with UBS A.G. and SBS Financial Products Company, LLC (together, and with Merrill Lynch Capital Services, Inc., as credit support provider to SBS, the "Counterparties").  Under the hedges—which are commonly called "swaps"—the Service Corporations and the Counterparties agreed to a transaction that effectively converted each Service Corporation's floating interest rate exposure into a fixed payment.  This was done through an arrangement whereby, in return for each side "betting" against the other on interest rates, the Counterparties agreed to make payments to the Service Corporations in the event the floating interest rates on the COPs exceeded certain levels.  Conversely, if interest rates fell below certain levels, the Service Corporations would be forced to make payments to the Counterparties.

15.  The swaps transaction has been very expensive for the City.  When interest rates fell—which they did dramatically after 2008—the Service Corporations and the City did not benefit with lower payments on the COPs.  They remained obligated under the terms of the swaps to make substantial quarterly fixed payments to the Counterparties while continuing to receive lower floating rate payments in return.  Moreover, the City remained vulnerable in the event there were an "event of default" or a "termination event" under the swaps agreements, including for those that it did not cause.  If there were an event of default or a termination event, the swaps documents gave the Counterparties the right to terminate the swaps and demand a potentially enormous termination payment.  As of May 31, 2013, the City faced a termination obligation to the Counterparties exceeding $340 million if an event of default were declared and the Counterparties exercised their right to terminate.

16.  As part of the swaps transactions, the Counterparties required protection against the possibility that the Service Corporations might default on their quarterly swaps payments.  Accordingly, the parties arranged to purchase insurance to protect the Counterparties against a default of a payment on the swaps.  The predecessor of defendant Syncora—XL Capital Assurance, Inc.—was one of two monoline insurers who were paid for, and provided, this swaps default insurance.  Syncora continues to be the surety for swaps payments, however its payment liability in the event that the Counterparties terminate the swaps is capped, in aggregate, at $50 million, notwithstanding the fact that the Counterparties' claims will be in the hundreds of millions of dollars.

17.  The insurance purchased to protect against a default under the swaps was entirely separate from and independent of the insurance purchased to protect against a default under the COPs.

**Casino Revenues**

18.  In 1996, Michigan voters authorized, and in 1997 the City approved, the development and operation of gambling casinos within the City limits.  *See* Initiated Law 1 of 1996, codified as amended by PA 69 of 1997 as the Michigan Gaming Control and Revenue Act, MCL 432.201, *et seq.*; Detroit City Council Ordinance 17-97 (June 18, 1997).  Ultimately, defendants MGM, MotorCity, and Greektown built casinos within the City limits.

19.  Michigan law authorizes the City to impose and collect taxes upon the casinos' gross receipts and also to require the casino developers to make periodic "developer payments" to the City.  These amounts have proven to be substantial.  In fiscal year 2012, the City received over  $180 million in casino taxes and developer payments from the casinos.  The City projects that it will receive a similar amount annually in each of the next ten years.  *See* Affidavit of Kevyn D. Orr, Emergency Manager for the City of Detroit, Ex. A at 47 (hereinafter "Orr Aff.").

**2009 Restructuring of the Swaps**

20.  As the City's financial health continued to deteriorate and the 2008 financial crisis worsened, a potential termination event under the swaps contracts occurred.

21.   To avoid payment of the significant termination amount, the City, the Service Corporations, and the Counterparties entered into a series of interlocking agreements in June 2009.  One of these documents was the Collateral Agreement, which

was executed by the City, the Service Corporations, the Counterparties, and U.S. Bank as custodian.[1] Under the Collateral Agreement, the City agreed to make the swaps payments to the Counterparties through a "lockbox" arrangement, and to pledge certain Casino Revenues as collateral to secure the City's obligations under the swaps agreements, as follows:

(a) U.S. Bank was appointed custodian of two accounts: a "Holdback Account" and a "General Receipts Subaccount."

(b) The casinos were instructed to pay developer payments and casino tax payments (collectively, "Casino Revenues") daily to the General Receipts Subaccount.

(c) The City was obligated each month to deposit into the Holdback Account one-third of the quarterly payment owed by the Service Corporations to the Counterparties. Once the City did so, U.S. Bank would release to the City the Casino Revenues that had accumulated in the General Receipts Subaccount—which on a monthly basis would far exceed the amount of the monthly swaps obligation—and would continue to remit Casino Revenues to the City as they were deposited, until the beginning of the next payment period.

(d) If there were an event of default by the City or a termination event under the contract, the Collateral Agreement gave the Counterparties—UBS and SBS/Merrill Lynch—the right to serve a notice upon U.S. Bank. Upon receiving a notice from the Counterparties, U.S. Bank would be required to

---

[1] The validity of the Collateral Agreement is not at issue in this case. It is therefore assumed for purposes of this complaint that the Collateral Agreement is valid and enforceable.

hold—or "trap"—in the General Receipts Subaccount the monies that had

accumulated there and not disburse them to the City.

22.  Syncora was not a party to the Collateral Agreement and had no independent

rights under it.  The Collateral Agreement did not change Syncora's obligations as an

insurer on the swaps.  Nor did the Collateral Agreement in any way purport to secure

payment under the COPs.

**Detroit's Financial Emergency**

23.  The City's financial distress is well known.  On March 14, 2013, Kevyn Orr

was appointed Emergency Financial Manager for the City of Detroit, to assume control of

major operations of the City.  The Emergency Manager took office on March 25, 2013.

24.  The Emergency Manager has been working for nearly four months to bring

order to the City's finances and operations and to resolve claims and disputes with the

many claimants against the City.  Nonetheless, the City is currently insolvent and unable

to pay its debts when they become due.

25.  On June 14, 2013, the Emergency Manager met with representatives of the

City's stakeholders, including the City's unions, retiree associations, pension trusts, debt

holders, and insurers.  Representatives of Syncora attended this meeting.  The Emergency

Manager outlined the City's financial distress, and the fact that the City did not have the

money to pay all stakeholders in full.  The Emergency Manager underscored the urgent

need for quick action to address the financial emergency and made clear that recoveries

would be limited on unsecured debt and legacy obligations, such as the COPs, but that

the City would pay obligations secured by specific revenue streams.  The Emergency

Manager shared the City's ten-year projections detailing the revenues—including the

Casino Revenues—necessary to support the City's operations, provide full payment of secured debt, and permit the non-payment of unsecured debt and legacy obligations (other than health care).  The Emergency Manager underscored the urgent need for quick action to address the financial emergency.  Given the urgency facing the City, the Emergency Manager has publicly stated that he has extremely limited time in which to engage in discussions.  These discussions are currently pending, but the City is approaching the end of the timeframe envisioned by the Emergency Manager for such discussions.

26.  That same day, the City's liquidity crisis made it unable to make a payment of approximately $40 million due to the Service Corporations for onward payment to holders of the COPs.

27.  It is the City's understanding that, as one of the two sureties for these payments, Syncora is now responsible to make payments to some holders of the COPs issues that Syncora insured.  Syncora's exposure will continue to grow if and when the City is unable to make future payments with regard to the COPs.

28.  Notwithstanding its inability to make the June 14, 2013, payment related to the COPs, through the date of this Complaint, the City has made all of its required payments on the swaps to the Counterparties through the Holdback Account.

29.  The Counterparties have not served a notice of default under the swaps upon U.S. Bank.

30.  Thus, Syncora currently has no liability to the Counterparties or to anyone else with respect to the swaps and no rights under the Collateral Agreement.

**Syncora's Letters to U.S. Bank**

31.  On June 17, 2013, Syncora sent a letter to U.S. Bank, as custodian of the General Receipts Subaccount under the Collateral Agreement.  Counsel to U.S. Bank responded, advising Syncora that in the ordinary course it would have released Casino Revenues, and inquiring as to the basis for Syncora's "letter of instruction" to hold Casino Revenues.  U.S. Bank made clear to Syncora that the City and the Counterparties had been in settlement discussions, and that U.S. Bank was reluctant to interfere. Despite the facts that there had been no payment default on the swaps and that Syncora was not a party to, and had no rights under, the Collateral Agreement, its counsel responded to U.S. Bank that Syncora believed there was an event of default under the swaps and repeated Syncora's demand that U.S. Bank therefore trap in the General Receipts Subaccount all monies that otherwise would flow to the City under the Collateral Agreement.  Counsel for Syncora then sent a letter to U.S. Bank on June 24, 2013, threatening to hold U.S. Bank responsible for any release of funds from the General Receipts Subaccount.

32.  On June 25, 2013, the Emergency Manager objected to Syncora's notice.  On June 26, 2013, however, Syncora refused to withdraw its letter and continued to insist that U.S. Bank trap the monies in the General Receipts Subaccount.

33.  On June 27, the City's advisors met with Syncora, urging it to rescind its demands, making clear that the Counterparties were willing to release the Casino Revenues, and again advising Syncora that its actions were clearly injuring the City.

34.  Advisors for Syncora and the City held a teleconference on June 29, 2013, during which no progress in this dispute was made.  It then became apparent to the

Emergency Manager that further discussions with Syncora would not have been productive.

35. As a result of the letters Syncora has sent, U.S. Bank has trapped the monies in the General Receipts Subaccount and refused to disburse them to the City, even though Syncora is not a party to the Collateral Agreement, has no right to direct U.S. Bank's handling of the collateral, and has no rights in that collateral.

### Lack of Privilege or Justification for Syncora's Actions

36. Although Syncora has taken intentional and deliberate steps to trap money in the General Receipts Subaccount, Syncora has no rights in that collateral unless and until the City fails to make a payment to the swaps Counterparties, which it has not done.

37. Similarly, although Syncora is the insurer of both the COPs payments and the swaps payments, it has no right to interfere with the Collateral Agreement's custodial arrangement for the swaps payments because of the City's default on its COPs payments. Put differently, the City's obligations to the Service Corporations with respect to the COPs are independent of, and not secured under, the Collateral Agreement.

38. No document or doctrine of law or equity permits Syncora to use its contractual rights as surety to the swaps to bootstrap its position as surety to the COPs.

39. Syncora's letters to U.S. Bank have been sent in an illegal and improper attempt to exert leverage upon the City and force it to make concessions to Syncora with respect to the COPs default by (a) sabotaging ongoing negotiations and proposed settlements between the City and its stakeholders, (b) forcing the City to default on the swaps, and (c) thwarting the City's efforts to deliver essential fire, police, EMS, and other municipal services, causing harm to the health and welfare of the citizens of Detroit.

13-53846-swr   Doc 616-6   Filed 04/24/13   Entered 04/24/13 21:45:40   Page 34 of 534
100

40. In particular, as Syncora was aware, prior to its letters that the Emergency Manager had been in serious discussions with the Counterparties for a negotiated termination of the swaps contracts, which would have reduced the City's exposure to the Counterparties and removed any cloud upon the City's ability to rely upon an uninterrupted flow of Casino Revenues. Within the past week, the Emergency Manager was close to a final settlement with the Counterparties. Syncora's letter, however, brought these negotiations to a standstill because unimpeded access to the Casino Revenues is a significant part of the basis for the bargain.

41. Syncora's letters are a deliberate interference with these negotiations in an effort to exert leverage over the City. In the event the Emergency Manager succeeds in negotiating such a settlement with the Counterparties, the effect of the settlement would be to terminate the swaps, thus relieving Syncora of its obligations as an insurer of the swaps payments. In other words, Syncora stands to benefit immensely from the Emergency Manager's negotiations and possible settlement with the Counterparties. Syncora's intentional interference with these negotiations reveals that Syncora's true motive is to obtain leverage concerning its greater exposure resulting from the City's default on the COPs. Syncora's actions are a deliberate attempt to put the City to the horns of a dilemma—either offer concessions to Syncora on their COPs obligations or default on the swaps payment and risk a several hundred million dollar termination payment to the Counterparties for which Syncora has only a limited responsibility.

42. Syncora took these actions in bad faith, without legal justification, for the purpose of individual aggrandizement, and to avoid its contractual liabilities as a surety for COPs payments.

**Irreparable Harm from Syncora's Actions**

43.   The City is insolvent and unable to pay its debts as they become due.  The City's ability to receive the Casino Revenues it is owed from the General Receipts Subaccount is essential to the City's financial survival.  Even net of the amount of the City's monthly swaps payments, the stream of funds from the General Receipts Subaccount is substantial, on average around $11 million each month.  To put this amount in perspective, $11 million is the equivalent of 30% of the City's available cash-on-hand as of June 30, 2013, and would allow the City to pay for nearly two months of fire fighter salaries and wages or nearly one month of police officer salaries and wages.

44.  Even with the Casino Revenues, the City is expected to run out of funds by December 31, 2013.  If the City is not able to access those funds—around $11 million per month net of the City's swaps obligations—a general default by the City will occur earlier, potentially forcing the City to file for bankruptcy under Chapter 9 of the Bankruptcy Code, 11 U.S.C. § 901 *et seq.*

45.   Moreover, because of its threatened financial collapse, the City  has a limited window of time in which to negotiate with creditors and other claimants.  At the June 14, 2013,  meeting the Emergency Manager made clear that the City could not meet all of its obligations and that it had a limited window of time in which to reach negotiated settlements with its stakeholders.  Syncora's June 17 letter to U.S. Bank, however, has essentially brought those negotiations to a standstill because the cloud over the Casino Revenues caused by Syncora has created uncertainty over how much money the City has to spend.

13-53846-tjt   Doc 11-6   Filed 04/12/13   Entered 04/12/13 21:57:52   Page 36 of 100   536

46.  Unless the City is able to enter into such negotiations and reach settlements quickly, its ability to resolve its financial emergency will be in jeopardy and the City will lose unique and irreplacable opportunities.  Assurance that the City will continue to have access to the Casino Revenues is critical to negotiations with these stakeholders because the Emergency Manager cannot make promises to stakeholders that he does not have the funds to satisfy.

47.  In particular, the trapping of the monies in the General Receipts Subaccount has already threatened negotiations with the Counterparties, who are among the City's largest secured creditors.  Unless the City can regain access to those funds quickly, the potentially significant benefits of these negotiations for the City will be irretrievably lost.

48.  Syncora's actions, moreover, will force the City to default on the swaps payment on July 11, 2013.  Previously, the City's $4 million monthly swaps payment was associated with the return of at least an equivalent amount in Casino Revenues the next day.  By tying up the Casino Revenues, Syncora has deprived the City of the ability to make the swaps payment, which will lead to a default when the payment is due, irreparably harming the City.

49.  The City's strained financial resources have already resulted in a collapse of essential City services, including police, fire, and emergency medical services.  The loss of $11 million in revenue per month further jeopardizes the City's ability to adequately provide essential services to its citizens and to effectuate the early stages of the Emergency Manager's restructuring plan.

50.  Meanwhile, even if Syncora had rights over the collateral, it would face no serious harm from the release of the Casino Revenues that have already accumulated in

16

the General Receipts Subaccount because a steady stream of Casino Revenues that is more than three-times as large as the City's swaps obligation is deposited in the General Receipts Subaccount each month, and will continue to be deposited in that account each month for the foreseeable future.

51. Without immediate and unimpeded access to its Casino Revenues in the General Receipts Subaccount, including the monies trapped by Syncora's letters, the City will be unable to deliver essential City services, successfully negotiate with and resolve disputes with claimants, and implement the initial stages of the Emergency Manager's restructuring plan, causing the City irreparable harm.

### COUNT I – INTERFERENCE WITH CONTRACTUAL RELATIONS

52. The City repeats and realleges paragraphs 1 through 51.

53. The City is a party to the Collateral Agreement and is entitled to the benefits of the terms, conditions, provisions and protections of that contract.

54. Syncora is not a party to the Collateral Agreement and has no right to interfere with or defeat the purposes of that contract.

55. The letters Syncora has sent to U.S. Bank had the purpose and effect of defeating the system the Collateral Agreement established for the orderly management of the periodic payments from the City to the Counterparties and for the orderly and reliable remission to the City of the monies in the General Receipts Subaccount and of the Casino Revenues.

56. Neither the Collateral Agreement nor any other agreement appointed or authorized Syncora to send notices, letters, or similar documents to U.S. Bank for the purpose or effect of trapping Casino Revenues in the General Receipts Subaccount.

13-53846-tjt   Doc 11-6   Filed 01/04/13   Entered 01/04/13 21:45:54   Page 38 of 538
100

57. Syncora's letters have caused U.S. Bank to refuse to remit funds in the General Receipts Subaccount to the City upon payment by the City of its monthly payment as required by the Collateral Agreement.

58. Syncora sent these notices without legal right or justification and for the purpose of interfering with the Collateral Agreement's system for management of the Casino Revenues.

59. Syncora's actions were intentional, malicious, and unjustified in law.

60. The City has been injured in an amount that cannot now be determined, and will continue to be injured so long as the default notices are honored by U.S. Bank.

61. The City is entitled to compensatory and exemplary damages.

**COUNT II – INTERFERENCE WITH ADVANTAGEOUS RELATIONS**

62. The City repeats and realleges paragraphs 1 through 61.

63. The City has been engaged for many weeks in intensive negotiations with the Counterparties and others to resolve claims against the City and/or to permit the City to resolve its financial crisis.

64. The City has reached an agreement in principle with the Counterparties, but cannot conclude this agreement without ongoing access to the monies in the General Receipts Subaccount and guaranteed access in the future to the Casino Revenues.

65. Syncora was aware that the City was engaged in discussions with the Counterparties and other stakeholders, and sent these notices intentionally, without legal right or justification and for the purpose of interfering with the City's ability to pursue negotiations with these claimants and to conclude agreements with them.

66. Syncora's notices have, in fact, had the effect of interfering with these negotiations and with the City's ability to conclude agreements with the Counterparties and other stakeholders.

67. The City has been injured in an amount that cannot now be determined, and will continue to be injured so long as the default notices are honored by U.S. Bank.

68. The City is entitled to compensatory and exemplary damages.

### COUNT III – DECLARATORY JUDGMENT

69. The City repeats and realleges paragraphs 1 through 68.

70. An actual and existing controversy has arisen between the City of Detroit and Defendants as to whether Syncora had or has the legal right to send default notices under the Collateral Agreement. A declaratory judgment is necessary to guide the parties' future conduct and in order to preserve the City's legal rights.

71. Unless this dispute is timely resolved, the City and its residents will suffer irreparable harm.

72. The City prays for a decree pursuant to MCR 2.605 that Syncora is not entitled under the Collateral Agreement or otherwise to send notices to U.S. Bank or to take other actions with the purpose or effect of limiting the City's access to monies in the General Receipts Subaccount or Casino Revenues.

73. The City further prays for a decree pursuant to MCR 2.605 that U.S. Bank may not accept any direction from Syncora with respect to any funds in the General Receipts Subaccount or the Holdback Account.

### COUNT IV – INJUNCTIVE RELIEF

74. The City repeats and realleges paragraphs 1 through 73.

75. Syncora's letters will cause the City immediate and irreparable harm by depriving it of funds that are necessary for the City to successfully negotiate with and resolve disputes with its stakeholders, deliver essential City services to its citizens, and implement the initial stages of the Emergency Manager's restructuring plan.

76. Syncora will suffer no hardship from a release of the funds in the General Receipts Subaccount because it has no rights under the Collateral Agreement to the Casino Revenues, no current payment obligations under the swaps insurance agreements to the Counterparties, and no potential injury that cannot be remedied at law by money damages from the continually accumulating Casino Revenues.

77. The City is likely to succeed on the merits of its claims, because Syncora is not a party to the Collateral Agreement and has no right under that or any other document to direct U.S. Bank's handling of the collateral in the General Receipts Subaccount.

78. The public interest favors the City because the inability to withdraw $11 million in net revenue each month from the City's balance sheet will significantly hinder the City's ability to provide essential police, fire, and other city services to its residents, and will impede its ability to resolve successfully the financial emergency.

79. Plaintiff seeks preliminary, temporary and permanent injunctive relief, pursuant to MCR 3.310, restraining Defendants from taking any action contrary to the declaration of rights sought by the plaintiff.

**JURY DEMAND**

80. Plaintiff demands trial by jury on all issues to which it is entitled to a trial by jury.

**WHEREFORE**, Plaintiff prays for judgment:

(a)  Awarding money damages against Syncora, in an amount to be determined at trial, for compensation for the injury caused by defendant;

(b)  Awarding exemplary damages against Syncora, in an amount to be determined at trial, for defendant's tortious, intentional and unjustified conduct;

(c)  Declaring that Syncora has and had no right to take any action under the Collateral Agreement or any other document or authority purporting to limit the City's access to Casino Revenues or the funds in the General Receipts Subaccount;

(d)  Declaring that the Collateral Agreement permits U.S. Bank to rely on notices provided only by the Counterparties which are signatories to the Collateral Agreement;

(e)  Entering preliminary, temporary and permanent injunctive relief enjoining Syncora from taking any action to limit the City's access to Casino Revenues or the funds in the General Receipts Subaccount;

(f)  Entering preliminary, temporary, and permanent injunctive relief enjoining U.S. Bank to make payments to the City from the General Receipts Subaccount, unless instructed to do otherwise by the Counterparties pursuant to the terms of the Collateral Agreement, without regard to any assertion of rights by Syncora;

(g)  Entering preliminary, temporary, and permanent injunctive relief against the Casino Defendants, in the event this Court is unable to fashion appropriate relief against Syncora and U.S. Bank, enjoining the Casino

Defendants to make payment of Casino Revenues directly to the City rather than to the General Receipts Subaccount, or establishing another mechanism for payment mutually acceptable to the City and the Counterparties;

(h)  Entering preliminary, temporary, and permanent injunctive relief against all Defendants, enjoining Defendants from instituting or maintaining litigation in any other court or otherwise taking any steps to defeat the jurisdiction of this Court; and

(i)  Awarding such other relief as the Court deems just and proper.


Dated:  July 5, 2013

**CITY OF DETROIT**


 /s/ Robert S. Hertzberg
ROBERT S. HERTZBERG (P30261)
DEBORAH KOVSKY-APAP (P68258)
Pepper Hamilton LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
(248) 359-7300  -  Telephone
(248) 359-7700  -  Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

THOMAS F. CULLEN, JR. (*pro hac vice* pending)
GREGORY M. SHUMAKER (*pro hac vice* pending)
GEOFFREY S. STEWART (*pro hac vice* pending)
Jones Day
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

*Attorneys for Plaintiff*

## VERIFICATION

I, _KEVIN D ORR_, hereby certify that I am the

_EMERGENCY MANAGER_ of the City of Detroit (the "City"). I am authorized to verify

the foregoing Complaint for injunctive relief, declaratory judgment and other relief on

behalf of the City and do so based upon my personal knowledge, the records of the

City, and matters made known to me by other employees, representatives or agents of

the City. Therefore, I verify that the facts stated in the foregoing Complaint are true

and correct to the best of my personal knowledge, information and belief.

STATE OF MICHIGAN    )
                                  ) ss.
COUNTY OF WAYNE       )

The foregoing was acknowledged under oath before me this _4th_ day of July,

2013, by _Kevin D. Orr_ on behalf of the City of Detroit.

_____
Notary Public

MARYELLEN LEOPOLD
Notary Public, State of Michigan
County of Oakland
My Commission Expires Apr. 03, 2019
Acting in the County of _____

**Exhibit 10**

**Affidavit of Kevyn D. Orr**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan )<br><br>Plaintiff, )<br><br>v. )<br><br>SYNCORA GUARANTEE INC., a New York Corporation, )<br><br>and )<br><br>U.S. BANK, N.A., )<br><br>and )<br><br>MGM GRAND DETROIT, LLC, )<br><br>and )<br><br>DETROIT ENTERTAINMENT, LLC, d/b/a MOTORCITY CASINO HOTEL, )<br><br>and )<br><br>GREEKTOWN CASINO, LLC, )<br><br>Defendants. ) | Case No.:  2:13-cv-12987-LPZ-MKM<br><br>Hon. Lawrence P. Zatkoff |

## [RESUBMITTED]
## AFFIDAVIT OF KEVYN D. ORR
## <u>EMERGENCY MANAGER FOR THE CITY OF DETROIT</u>

**STATE OF MICHIGAN**
**IN THE 3ᴿᴰ JUDICIAL CIRCUIT COURT**
**FOR THE COUNTY OF WAYNE**

CITY OF DETROIT, a Municipal
Corporation Organized and Existing
Under the Laws of the State of Michigan

        Plaintiff,

    v.

SYNCORA GUARANTEE INC., a New
York Corporation,

and

U.S. BANK, N.A.,

and

MGM GRAND DETROIT, LLC,

and

DETROIT ENTERTAINMENT, LLC
d/b/a MOTORCITY CASINO HOTEL,

and

GREEKTOWN CASINO, LLC,

        Defendants.

Case No.:    13-008858-CZ
Hon.        Jeanne Stempien

13-008858-CZ

FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/5/2013 12:02:00 PM
CATHY M. GARRETT

---

ROBERT S. HERTZBERG (P30261)
DEBORAH KOVSKY-APAP (P68258)
Pepper Hamilton LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
(248) 359-7300  -  Telephone
(248) 359-7700  -  Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

1

THOMAS F. CULLEN, JR.
GREGORY M. SHUMAKER
GEOFFREY S. STEWART
Jones Day
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

*Attorneys for Plaintiff*

---

### AFFIDAVIT OF KEVYN D. ORR
### EMERGENCY MANAGER FOR THE CITY OF DETROIT

Now comes the Affiant, Kevyn D. Orr, a natural person, being first duly sworn and deposed and under the penalty of perjury states the following:

1.      I submit this Affidavit in support of the City of Detroit's Verified

Complaint for Declaratory and Injunctive Relief (the "Complaint") filed

contemporaneously herewith.[1]

2.      I am the Emergency Manager for the City of Detroit ("Detroit" or the

"City").  I was appointed to the position of "emergency financial manager" for the City

on March 15, 2013, by the Local Emergency Financial Assistance Loan Board created

under the Emergency Municipal Loan Act, Michigan Complied Laws ("M.C.L.")

§§ 141.931-141.942, pursuant to Public Act 72 of 1990 of the State of Michigan, also

known as the Local Government Fiscal Responsibility Act, M.C.L. §§ 141.1201

141.1291 ("PA 72").  I formally took office as the emergency financial manager for the

City under PA 72 on March 25, 2013.  On March 28, 2013, PA 72 was repealed and

---

[1]      Capitalized words not otherwise defined herein shall have the meaning given to them in the Complaint.

2

replaced by Public Act 436 of the State of Michigan, also known as the Local Financial

Stability and Choice Act, MCL 141.1541-141.1575 ("PA 436"), and I became the

Emergency Manager of the City pursuant to Section 2(e) of PA 436.

3.      In my capacity as Emergency Manager I act for, and in the place and stead

of, the City's elected Mayor and City Council.  Pursuant to PA 436, I exercise authority

over nearly all aspects of the City's government and management, including budgeting,

operations, financial affairs, contracts, appropriations, collective bargaining and the use,

sale and lease of assets.  In the nearly four months since assuming the position of

Emergency Manager, I have become familiar with the history, day-to-day functions and

operations, and financial affairs of the City.

### History

4.      Since being named Emergency Manager, I have developed a

comprehensive plan to address the City's numerous financial and operational problems.

The primary goals of my proposed plan are to:  (i) ensure that the City is able to provide

or procure governmental services essential to the public health, safety and welfare of its

citizens; (ii) assure the fiscal accountability and stability of the City; and (iii) promote

private investment in the City and revitalization of the community in a sustainable

fashion.  In short, my proposed plan would enable the City to pay its employees and its

bills, live within its means, provide meaningful (but modest relative to the overall need)

reinvestment in the City, satisfy secured obligations and restructure unsecured

obligations.

5.      On June 14, 2013, I proposed this plan to approximately 150

representatives of the City's stakeholders at the Westin Detroit Metropolitan Airport (the

"June 14 Creditor Meeting").  A true and correct copy of the Proposal for Creditors

Executive Summary that was distributed at the June 14 Creditor Meeting is attached hereto as Exhibit A. Those in attendance included, among others, representatives of: (i) all of the City's unions; (ii) certain retiree associations; (iii) both of the City's pension trusts; (iv) all of the City's funded debt; (v) the insurers of such debt, including Syncora Guarantee Inc. or an affiliate ("Syncora") and its counsel and financial advisor; and (vi) many individual bondholders.

6.      During the June 14 Creditor Meeting, I outlined the City's desperate financial situation and my proposal to address the City's difficulties with the resources available to me. I made clear that the City will not have the financial resources to pay all of its stakeholders in full. My proposal reflected that the City would pay claims secured by specific revenue streams, but recoveries on other claims were going to be very limited. I also made clear the urgency of the situation and the need for prompt discussions with the City's stakeholders. I told the attendees that discussions with stakeholders would ensue but that the City had very limited time to stem the decline. I also announced that the City would not be financing its unsecure debt and legacy obligations (including the COPs, which I will address later in this affidavit), but that such claims would be compromised. At the conclusion of this meeting, with the help of my advisors, I tried to answer all of the questions posed by the attendees. I also solicited feedback and input on, or alternatives to, my proposal that will achieve the City's goals in the same timeframe.

7.      Before and after the June 14 Creditor Meeting, my advisors and I have embarked on a series of meetings and engaged in substantive negotiations with various stakeholders in an effort to reach an out-of-court solution to the City's financial and operational problems. Many of these conversations—with unions, pension funds,

bondholders, monoline insurers and other stakeholders—are ongoing.  The purpose of these negotiations is to restructure the City's obligations so that the City can resume providing basic and essential services to its residents and revitalize the City to reverse or stabilize its current downward trajectory.

8.      As detailed more fully in the Complaint being filed today, in 2005 and 2006, the City's two pension funds, the General Retirement System and the Police and Fire Retirement System, were terribly underfunded.  To remedy this situation, the City entered into a series of transactions to raise over $1.4 billion to fund the pension funds.  As part of this effort, the City organized two "Service Corporations" and entered into a "service contract" with each pursuant to which the City agreed to make certain payments in return for the Service Corporations' future assistance in funding transactions for the City's two pension funds.  The Service Corporations in turn created "Funding Trusts" that issued "Pension Obligation Certificates of Participation" (the so-called "COPs") to investors.  The COPs are not secured by any specific revenue stream of the City, but instead are funded as a general unsecured obligation of the City.

9.      Some of the COPs entered in 2006 paid a floating interest rate.  To contain the risk of these floating rates, the Service Corporations entered into hedging arrangements, commonly known as "swaps," with UBS A.G. and SBS Financial Products Company, LLC (the "Swap Counterparties").  Under these swaps, the Service Corporations and Swap Counterparties agreed to effectively convert the floating interest rate exposure of the Service Corporations into a fixed payment.  This was done through an arrangement whereby, in return for each side betting against the other on interest rates, the Swap Counterparties agreed to make payments to the Service Corporations in the

event the floating rates on the COPs exceeded certain levels.  Conversely, if interest rates fell below certain levels, the Service Corporations would be forced to make payments to the Swap Counterparties.

10.    The Swap Counterparties required protection against the possibility that the Service Corporations might default on their quarterly swap payments.  The parties agreed to purchase insurance to address this risk.  The predecessor to Syncora—XL Capital Assurance, Inc.—was one of two monoline insurers who were paid for, and provided, the swap default insurance.  Syncora continues to insure these swap payments.

11.    As part of a 2009 restructuring of the City's swap obligations, the City entered into a "Collateral Agreement" with the Swap Counterparties, the Service Corporations, and U.S. Bank, N.A., which was to serve as the custodian for the new collateral arrangement.  A true and correct copy of the Collateral Agreement is attached hereto as Exhibit B.  Under this agreement the City pledged a specific revenue stream: (i) payments from the developers of the City's casinos, and (ii) taxes upon each casino's gross receipts (together, the "Casino Revenue") as collateral to secure the City's obligations under the swap agreements.

12.    Under this new collateral arrangement, U.S. Bank oversees two accounts: the "General Receipts Subaccount" and the "Holdback Account."  Each day, on average, approximately $500,000 in Casino Revenue is deposited into the General Receipts Subaccount which, after 30 days, amounts to approximately $15 million.  Under the Collateral Agreement, U.S. Bank releases the Casino Revenue accumulating in the General Receipts Subaccount to the City *only after* it deposits approximately $4 million (one-third of its quarterly swap payment) into the Holdback Account.  Once the City

makes this deposit into the Holdback Account, U.S. Bank gives the City complete access to the Casino Revenue that continues to accumulate in the General Receipts Subaccount, as it is deposited, until the beginning of the next payment period.

13.     If the City fails to make a quarterly swap payment, the Swap Counterparties are empowered under the Collateral Agreement to notify U.S. Bank that it should not release—or should "trap"—the Casino Revenue owed to the City.  The Swap Counterparties are permitted to do this even if the amounts in the General Receipts Subaccount are greater than the missed swap payment.  Through the date of this Affidavit, the City has not defaulted on making any of its swap payments.

14.     Unlike the swaps, the COPs are not covered by the Collateral Agreement and are not secured by the Casino Revenue.  Prior to June 17, 2013, the COPs were funded through an unsecured contract claim against the City.

15.     On June 13, 2013, to conserve the City's dwindling cash, I directed the City not to make the prescribed monthly payment due under the COPs agreements and consistent with that direction told U.S. Bank not to pay the unsecured interest obligation due on the floating rate COPs.  A true and correct copy of this letter is attached hereto as Exhibit C.

16.     On June 17, 2013, Syncora sent a letter to U.S. Bank purportedly to direct the custodian to trap all funds in the General Receipts Subaccount.  A true and correct copy of this letter is attached hereto as Exhibit D.

17.     On June 24, 2013, U.S. Bank emailed counsel to both Syncora and the City to inform each that "it expects to be in receipt of [C]asino [R]evenues in the General Receipts Subaccount equal to the" amount the City would pay on the monthly swap

payment.  In light of this fact, U.S. Bank asked if the City and Syncora wanted U.S. Bank to make the monthly swap payment and release the Casino Revenue to the City as "seemingly required in the ordinary course of business."  *Id.*  A true and correct copy of this email is attached hereto as Exhibit E.

18.     Later that same day, in an email and letter from its counsel to U.S. Bank's attorney, Syncora continued to assert that the Casino Revenue should be trapped and threatened to hold the U.S. Bank responsible for the release of any funds from the General Receipts Subaccount.  A true and correct copy of Syncora's email and letter are attached hereto as Exhibits E and F, respectively.

19.     In a letter dated June 25, 2013, I urged Syncora to take immediate corrective action and rescind its June 17, 2013 letter on the grounds that it is not a party to the Collateral Agreement and has no right whatsoever to direct U.S. Bank's conduct. A true and correct copy of this letter is attached hereto as Exhibit G.  Syncora responded the following day, June 26, 2013, disagreeing with my position. A true and correct copy of this letter is attached hereto as Exhibit H.  On June 27, 2013, the City's legal and financial advisors,  Syncora's legal and financial advisors and Syncora's Chief Financial Officer and Chief Restructuring Officer, and others, met in person in New York City and expressed their respective positions.  On Saturday, June 29, 2013, the City's financial advisor and Syncora's financial advisor conferred by telephone regarding our respective positions.  After the call, I was informed that there was no progress made towards resolving this dispute and that Syncora would not change its position.

20.     Despite my efforts to resolve this matter amicably, Syncora's calculated conduct requires that I initiate this litigation and ask for immediate equitable relief.  As I

8

outlined at the June 14 Creditor Meeting, Detroit is insolvent, both financially and operationally.  Due to the City's precarious cash situation, every day that passes without my having access to the General Receipts Subaccount is another day that the City may have to delay or cut back on the provision of essential services and I cannot possibly negotiate and resolve creditors' claims with any degree of certainty.  The situation is straightforward:  as Emergency Manager I need every dollar available—including those that continue to accumulate in the General Receipts Subaccount—at my disposal to help restructure the City and continue to ensure that critical services are provided to Detroit's citizens.

### Immediate Consequences and Irreparable Harm

21.     As of May 31, 2013, the City had approximately $40 million in available cash on hand with outstanding deferrals and amounts due to other funds and entities of over $200 million.  To preserve the City's limited cash, I did not make a required $39.7 million payment to the Service Corporations for payment to the COPs holders that was due on June 14, 2013.  Absent near term intervention, the City is expected to run out of cash by the end of the 2013 calendar year, with a projected cash balance before required distributions of approximately negative  $18 million.  It has become abundantly clear to me that the City cannot make it through the next six months without immediate and fundamental changes to its finances and operations.  These changes cannot be effected and implemented unless they are negotiated now.  I cannot meaningfully negotiate with the necessary parties if the City does not have access to the trapped Casino Revenue that will continue to accumulate in the General Receipts Subaccount in the amount of approximately $170 million annually for the foreseeable future.

9

22.     Any delay in reaching negotiated settlements with the City's stakeholders could have disastrous consequences for the City.  The City is insolvent and is unable to pay its debts as they come due. Thus, it is imperative that I attempt to fundamentally alter the City's financial position through consensual agreements in the next few weeks because each day that passes without a restructuring of the City's balance sheet is a day closer to a bankruptcy filing.  Syncora's decision to interject itself into the Collateral Agreement and try to intimidate U.S. Bank into trapping the Casino Revenue—one of the City's largest revenue sources—hijacks my negotiations with certain other creditors.  I cannot commit resources in any meaningful way to settle or address certain creditors' claims because I have no idea how long the Casino Revenue might be trapped or how they might ultimately be distributed as a result of Syncora's deliberately disruptive conduct.  At this juncture, while an Emergency Manager is in place after the declaration of a financial emergency, the City has a unique opportunity to resolve various creditors' claims in an attempt to avoid bankruptcy.  Syncora's effort to assert rights to collateral it has no right to is preventing Detroit from seizing this critical opportunity.

23.     In addition to undermining my ability to negotiate with the City's other creditors, Syncora's decision to trap the City's Casino Revenue has other immediate consequences that will inflict irreparable harm on the City.  Currently, there are approximately $7.5 million in the General Receipts Subaccount.  If Syncora had not taken the position that U.S. Bank should trap the City's assets in the General Receipts Subaccount with its June 17, 2013 letter, I would have already authorized the City on or around June 24, 2013, to make the monthly swap payment under the Collateral Agreement of approximately $4 million.  This authorization and payment would have

10

allowed me to access, under the terms of the Collateral Agreement, the approximate $3 million over and above that was required for the monthly swap payment in the General Receipts Subaccount.  I would also now have access to the Casino Revenue deposited each day subsequent to June 24, 2013 in the General Receipts Subaccount until the next monthly payment cycle begins on or around July 16, 2013.  By July 15, 2013, the Casino Revenue deposited in the General Receipts Subaccount will have grown to approximately $15 million, of which approximately $11 million would otherwise have been available for the City to use after deducting the monthly swap payment.  The City cannot use these funds—or commit to using these funds in my negotiations with creditors—due to Syncora's actions.

24.      The $11 million I will not be able to use absent immediate relief from this Court is roughly the equivalent of 30% of the City's total available cash on hand as of June 30, 2013.  To illustrate, $11 million represents:  (i) the salaries and wages for nearly two months of fire fighter services; or (ii) the salaries and wages for nearly one month of police officer services.  Not having access to this significant percentage of the City's money of course adversely affects the City's current operations.  With 4 of the top 10 most dangerous neighborhoods in the nation, the City needs access to that money immediately to ensure public safety and keep its police on the streets and its firefighters responding to fires.  Vital City operations such as these are functioning at a marginal level, at best, and further constraints on the City's financial resources will only further degrade the health, safety and welfare of the City.

25.      Syncora's unauthorized and intentional actions above are preventing me from finalizing and implementing a settlement with one of the City's largest creditor

groups—the Swap Counterparties.  If a settlement can be reached with these creditors, the City's exposure to the Swap Counterparties will be removed and the City will have unimpaired use of the Casino Revenue.  I understand from my advisors that Syncora is aware that the Swap Counterparties are amenable to releasing the Casino Revenue to the City.  A concerted campaign (letters and emails) to arrest Casino Revenue has brought negotiations with these groups, particularly the Swap Counterparties, to a virtual standstill.  A settlement with the Swap Counterparties would assure the City of having Casino Revenue to fund its operations, enable a negotiated resolution of the swaps with no effect on Syncora and allow the City to avoid a termination payment in the hundreds of millions of dollars.

26.    The restructuring plan I outlined on June 14, 2013, contemplates a substantial investment in the City—$1.25 billion over the next 10 years, and includes spending approximately $500 million in the next 6 years to remediate urban blight and increase property values and the City's appearance and over $100 million in improvements to the performance and infrastructure of the City's public safety departments (police, fire, EMS).  Among others, the proposed plan provides for:

- Removing abandoned and blighted structures, which comprise 20% of the City's housing stock, to fundamentally transform the urban landscape and make the City a more attractive place to live, decrease crime and increase property values.  Moreover, removing blight will allow public safety departments to allocate resources to more meaningful activities (60% of the 11,000 to 12,000 fires that the City experiences each year occur in blighted and unoccupied structures).

- Investing in new fire, police and EMS infrastructure, assets and personnel to address the chronically dilapidated buildings (average age of the City's fire stations is 80 years old with over $1 million in annual maintenance), fleet of vehicles (many with well over 250,000 miles and break down frequently) and overworked employees (the fire department's apparatus

12

division has a mechanic to vehicle ratio of 1 to 39 resulting in an inability to complete preventative maintenance on schedule).

My proposed restructuring plan cannot be effected if Syncora's unauthorized actions allow it to trap the Casino Revenue, which was greater than $180 million during the City's 2012 fiscal year, nearly 17% of the City's annual revenue. The trapping of roughly $11 million a month at Syncora's urging makes it impossible to move forward with a comprehensive restructuring plan for the City. Syncora's actions have placed into legal limbo all of the Casino Revenue that are now being deposited to the General Receipts Subaccount. Immediate access to this money is needed if the City's 139-square mile footprint—one that is larger than Boston, Manhattan, and San Francisco *combined*—is to be saved.

27. Detroit is in a state of crisis. I am here to help avert this crisis and am being constrained from doing so by a private party using an intentional and unauthorized effort to hold the City's revenue hostage. If there is any hope for a meaningful path forward in the near term, the City must have immediate access to all of the funds remaining funding sources it has.

Dated: July 4, 2013
    Detroit, Michigan

By: _____
Kevyn D. Orr
Emergency Manager
City of Detroit

Subscribed and sworn to before me this __4th__ day of __July__, 20_13_.

_____
Notary Public

My Commission Expires: _4/3/2019_

MARYELLEN LEOPOLD
Notary Public, State of Michigan
County of Oakland
My Commission Expires Apr. 03, 2019

13-008858-CZ

FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/5/2013 12:02:00 PM
CATHY M. GARRETT

# EXHIBIT A

CITY OF DETROIT

# PROPOSAL FOR CREDITORS

EXECUTIVE SUMMARY

JUNE 14, 2013

This proposal is based on numerous projections and assumptions concerning future uncertain events including estimates of tax revenues and forecasts of future business and economic conditions in the City, all of which are beyond the control of the City. Actual results may differ from the assumptions and projections presented herein, and such differences could be material.

Additional data are being gathered or developed, and various critical financial and operational analyses remain in process. Thus, this proposal remains subject to material change.



OFFICE OF THE EMERGENCY MANAGER

# Table of Contents

I. Detroit Faces Strong Economic Headwinds     3

II. Key Objectives for a Financial Restructuring and Rehabilitation of Detroit     33

III. Current Financial Status     34

IV. The City Has Taken Action to Address Its Financial Challenges     39

V. Restructuring and Reinvesting in City Government     41

VI. Realization of Value of Assets     46

VII. Ten Year Projections (General Fund Only)     47

VIII. Restructuring Proposal     50

IX. Calendar and Contacts     61

OFFICE OF THE EMERGENCY MANAGER



# I.   Detroit Faces Strong Economic Headwinds.

**Deteriorating Macroeconomic Conditions.**  During the past several decades, the City of Detroit (the "City") has experienced changes that have adversely affected the economic circumstances of the City and its residents.



**Employment in Detroit**



OFFICE OF THE EMERGENCY MANAGER

1

## I. Detroit Faces Strong Economic Headwinds.



**Unemployment Rate in Detroit**



# I. Detroit Faces Strong Economic Headwinds.

- *Eroding Tax Base and Reductions in State Revenue Sharing.*

  - **Property Taxes.** Property tax revenues have decreased by approximately 19.7% over the past six years as a result of declining assessed values ($1.6 billion from 2008 to 2012) and lower collection rates (from 76.6% in 2008 to 68.3% in 2012).

  - **Income Taxes.** Income tax revenues have decreased by $91 million since 2002 (approximately 30%) and by $44 million (approximately 15%) since 2008. The primary cause of these decreases has been high unemployment.

  - **The City is currently levying all taxes at or near statutory maximum rates.**



# I. Detroit Faces Strong Economic Headwinds.

**Residents and businesses are leaving Detroit to escape High Taxes and Insurance Costs.**

- *Comparative Tax Burden.*

  - **Per Capita Tax Burden.** Detroit's per capita tax burden on City residents is the highest in Michigan. This tax burden is particularly severe because it is imposed on a population that has relatively low levels of per capita income.

  - **Resident Income Tax.** The income tax burden on Detroit residents is greater than that of residents in the surrounding area. The City's income tax — 2.4% for residents, 1.2% for nonresidents and 2.0% for businesses — is the highest in Michigan.

  - **Property Taxes.** Detroit residents pay the highest total property tax rates (inclusive of property taxes paid to all overlapping jurisdictions; e.g., the City, the State, Wayne County) of those paid by residents of Michigan cities having a population over 50,000. The total property tax rate (including property taxes assessed by the City, the State and various special authorities) imposed on Detroit homeowners is approximately 67.07 mills; for businesses, the total property tax rate is approximately 85.35 mills.

    - At more than 19.95 mills, the City's property tax rate for general operations is close to the statutory maximum of 20.00 mills.

  - Utility Users Tax. Detroit is the only city in Michigan that levies an excise tax on utility users (at a rate of 5%).

OFFICE OF THE EMERGENCY MANAGER



# I. Detroit Faces Strong Economic Headwinds.

## The City is Insolvent

### Continuing Budget Deficits.

- Excluding the effect of recent debt issuances (e.g., $75 million in FY 2008, $250 million in FY 2010 and $129.5 million in FY 2013) that funded the City's operating deficits, the City's accumulated general fund deficit has grown continuously over an extended period.



*$ in millions*

Legend:
- LTGO Series 2012C ($130m)
- LTGO Series 2010 ($250m)
- LTGO Series 2008A ($75m)
- Accumulated deficit (unrestricted)

- At the end of FY 2012, the City's accumulated general fund deficit was $326.6 million.

- If not for the City's recent debt issuances, the projected accumulated deficit for FY 2013 would have been approximately $700 million.



# I. Detroit Faces Strong Economic Headwinds.

**Liquidity Crisis.** The City is insolvent. Absent ongoing cash intervention (primarily in the form of payment deferrals and cost cutting), the City would have run out of cash before the end of FY 2013.

- The City had negative cash flows of $115.5 million in FY 2012, excluding the impact of proceeds from short-term borrowings. In March 2012, to avoid running out of cash, the City borrowed $80 million on a secured basis (of which the City spent $50 million in FY 2012).

- The City is projecting to have positive cash flows of $4.0 million in FY 2013 after deferring approximately $120 million of current and prior year pension contributions and other payments.

- Absent intervention and/or restructuring, the City is projecting to have negative cash flows of $198.5 million in FY 2014.

- As of the end of May 2013, the City had $68 million of cash before property tax distributions, but had outstanding deferrals and amount due to other funds and entities of approximately $216 million. These are effectively borrowings and must be repaid.



# I. Detroit Faces Strong Economic Headwinds.

## The City is Not Paying Its Debts as They Come Due

- The City is not making its pension contributions as they come due. The City has deferred payment of its year-end Police and Fire Retirement System ("PFRS") contributions (and finances such deferrals at a rate of 8%). As of May 2013, the City had deferred approximately $54 million in pension contributions related to current and prior periods and will defer approximately $50 million on June 30, 2013 for current year PFRS pension contributions. Therefore, by fiscal year end, the City will have deferred over $100 million of pension contributions.

- The City will not make the scheduled $39.7 million payments due on its pension-related certificates of participation on June 14, 2013.



OFFICE OF THE EMERGENCY MANAGER

7

8

# I. Detroit Faces Strong Economic Headwinds.

## FY 2013 Forecasted Cashflow to Year End

| $ in millions | Actual FY 2012 | Actual Jul-12 | Actual Aug-12 | Actual Sep-12 | Actual Oct-12 | Actual Nov-12 | Actual Dec-12 | Actual Jan-13 | Actual Feb-13 | Actual Mar-13 | Actual Apr-13 | Actual May-13 | Forecast Jun-13 | 11A + 1F FY 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | |
| Property taxes | $567.0 | $34.0 | $198.0 | $14.8 | $6.9 | $4.2 | $24.4 | $139.1 | $42.3 | $5.4 | $1.3 | $3.1 | $58.0 | $531.6 |
| Income & utility taxes | 276.2 | 23.1 | 25.1 | 21.5 | 25.8 | 23.6 | 21.9 | 25.4 | 23.9 | 20.4 | 30.2 | 30.8 | 18.4 | 290.1 |
| Gaming taxes | 177.5 | 12.4 | 15.2 | 17.2 | 12.4 | 20.8 | 11.0 | 11.5 | 19.6 | 14.4 | 12.8 | 16.5 | 9.2 | 173.0 |
| Municipal service fee to casinos | 19.8 | | 7.6 | | | 4.0 | 4.0 | 1.8 | | | | | | 17.4 |
| State revenue sharing | 194.3 | 28.5 | | 28.7 | | 30.9 | | 30.4 | | 30.6 | | 29.7 | | 178.9 |
| Other receipts | 480.8 | 26.1 | 37.8 | 26.0 | 22.5 | 26.6 | 31.7 | 16.7 | 58.0 | 25.6 | 29.3 | 41.4 | 19.4 | 361.2 |
| Refinancing proceeds | 50.0 | | | | | | 10.0 | | | | | | 20.0 | 30.0 |
| **Total operating receipts** | 1,765.5 | 124.2 | 283.8 | 108.2 | 67.5 | 110.1 | 103.1 | 225.0 | 143.9 | 96.5 | 73.6 | 121.4 | 125.0 | 1,582.2 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll, taxes, & deductions | (454.2) | (37.5) | (35.0) | (32.5) | (28.0) | (41.1) | (30.1) | (23.6) | (30.1) | (25.9) | (26.3) | (36.2) | (27.2) | (373.6) |
| Benefits | (203.4) | (18.3) | (21.0) | (20.4) | (16.7) | (16.2) | (19.5) | (9.7) | (15.8) | (17.7) | (4.7) | (14.9) | (16.0) | (191.0) |
| Pension contributions | (103.9) | | | | | | | | | | | | | (30.8) |
| Subsidy payments | (50.0) | | | | | | | | | | | | | (40.1) |
| Distributions - tax authorities | (374.4) | | | | | | | | | | | | | (283.2) |
| Distributions - UTGO | (8.6) | | | | | | | | | | | | | (68.6) |
| Distributions - DDA increment | | | | | | | | | | | | | | (11.4) |
| Income tax refunds | (16.9) | | | | | | | | | | | | | (17.2) |
| A/P and other disbursements | (477.5) | (43.8) | (48.1) | (34.5) | (31.4) | (37.1) | (25.2) | (24.3) | (34.7) | (29.3) | (27.7) | (36.9) | (32.2) | (405.3) |
| Professional fees | | | | | | | | | | | | | | |
| Sub-total operating disbursements | (1,688.9) | (103.1) | (235.7) | (146.8) | (80.6) | (101.7) | (86.1) | (74.1) | (167.4) | (145.0) | (66.5) | (91.3) | (122.8) | (1,421.1) |
| POC and debt related payments | (142.1) | (4.2) | (5.4) | (4.9) | (9.0) | (7.9) | (14.9) | (3.1) | (8.5) | (4.8) | (32.2) | (25.6) | (36.6) | (157.1) |
| **Total disbursements** | (1,831.0) | (107.3) | (241.1) | (151.7) | (89.6) | (109.6) | (101.0) | (77.2) | (175.9) | (149.8) | (98.8) | (116.9) | (159.4) | (1,578.2) |
| **Net cash flow** | (65.5) | 16.9 | 42.6 | (43.5) | (22.0) | 0.5 | 2.1 | 147.8 | (32.1) | (53.3) | (25.2) | 4.6 | (34.4) | 4.0 |
| Cumulative net cash flow | (65.5) | 16.9 | 59.5 | 16.0 | (6.0) | (5.5) | (3.4) | 144.4 | 112.3 | 59.0 | 33.9 | 38.4 | 4.0 | 4.0 |
| Beginning cash balance | 95.3 | 29.8 | 46.7 | 89.3 | 45.8 | 23.8 | 24.3 | 26.4 | 174.2 | 142.1 | 88.8 | 63.7 | 68.2 | 29.8 |
| Net cash flow | (65.5) | 16.9 | 42.6 | (43.5) | (22.0) | 0.5 | 2.1 | 147.8 | (32.1) | (53.3) | (25.2) | 4.6 | (34.4) | 4.0 |
| **Cash before required distributions** | 29.8 | 46.7 | 89.3 | 45.8 | 23.8 | 24.3 | 26.4 | 174.2 | 142.1 | 88.8 | 63.7 | 68.2 | 33.8 | 33.8 |
| Accumulated property tax distributions | (27.9) | (48.1) | (77.8) | (31.8) | (32.9) | (31.5) | (48.0) | (149.8) | (89.5) | (26.9) | (26.1) | (28.5) | (19.7) | (19.7) |
| **Cash net of distributions** | $1.9 | $(1.4) | $11.5 | $14.0 | $(9.1) | $(7.1) | $(21.5) | $24.4 | $52.6 | $61.9 | $37.6 | $39.7 | $14.1 | $14.1 |
| *Memo:* | | | | | | | | | | | | | | |
| Accumulated deferrals | 64.4 | 66.2 | 56.3 | 50.9 | 52.7 | 53.2 | 46.3 | 44.2 | 53.9 | 57.7 | 61.5 | 65.8 | 118.7 | 118.7 |
| Refunding bond proceeds in escrow | 28.6 | 28.6 | 81.7 | 81.7 | 81.7 | 81.7 | 71.7 | 71.7 | 71.7 | 71.7 | 71.7 | 51.7 | 51.7 | 51.7 |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd |

# I. Detroit Faces Strong Economic Headwinds.

## FY 2014 Forecasted Cash Flow to Year End

*$ in millions*

| | Forecast Jul-13 | Forecast Aug-13 | Forecast Sep-13 | Forecast Oct-13 | Forecast Nov-13 | Forecast Dec-13 | Forecast Jan-14 | Forecast Feb-14 | Forecast Mar-14 | Forecast Apr-14 | Forecast May-14 | Forecast Jun-14 | Forecast FY 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | |
| Property taxes | $37.8 | $166.6 | $13.0 | $6.6 | $3.1 | $21.5 | $139.1 | $20.8 | $4.8 | $1.3 | $2.5 | $51.1 | $468.4 |
| Income & utility taxes | 28.7 | 22.7 | 22.3 | 28.3 | 22.7 | 22.3 | 28.3 | 23.5 | 22.7 | 28.3 | 22.3 | 22.7 | 294.7 |
| Gaming taxes | 14.6 | 14.1 | 8.9 | 23.1 | 10.4 | 9.4 | 22.1 | 9.9 | 15.1 | 17.4 | 13.2 | 11.8 | 170.0 |
| Municipal service fee to casinos | - | 7.6 | - | - | 4.0 | 4.0 | 1.8 | - | - | - | - | - | 17.4 |
| State revenue sharing | 30.7 | - | 30.7 | - | 30.7 | - | 30.7 | - | 30.7 | - | 30.7 | - | 184.3 |
| Other receipts | 27.2 | 25.8 | 25.9 | 32.9 | 26.3 | 25.9 | 32.9 | 27.1 | 26.3 | 32.9 | 25.9 | 26.3 | 335.9 |
| Refinancing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total operating receipts** | 139.1 | 236.9 | 100.9 | 91.0 | 97.2 | 83.2 | 255.0 | 81.3 | 99.6 | 80.0 | 94.6 | 111.9 | 1,470.7 |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Payroll, taxes, & deductions | (31.0) | (26.6) | (26.6) | (35.5) | (26.6) | (26.6) | (31.0) | (26.6) | (26.6) | (35.5) | (26.6) | (26.6) | (345.6) |
| Benefits | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (14.0) | (14.0) | (14.0) | (14.0) | (14.0) | (178.6) |
| Pension contributions | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (175.9) |
| Subsidy payments | (7.6) | (5.0) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (75.6) |
| Distributions - tax authorities | (14.8) | (72.4) | (40.0) | (5.7) | (1.0) | (1.3) | (57.3) | (20.9) | (14.0) | (1.7) | - | (24.0) | (253.1) |
| Distributions - UTGO tax authorities | - | (12.0) | - | - | - | - | - | - | (44.9) | - | - | - | (56.9) |
| Distributions - DDA increment | - | - | - | - | - | (8.0) | - | - | - | - | - | (1.0) | (9.0) |
| Income tax refunds | (2.5) | (2.7) | (0.6) | (0.3) | (1.5) | (1.0) | (0.6) | (0.3) | (0.4) | (2.3) | (1.2) | (3.7) | (17.0) |
| A/P and other disbursements | (36.3) | (37.9) | (29.3) | (37.1) | (30.1) | (25.6) | (40.8) | (23.0) | (33.5) | (39.7) | (30.0) | (30.0) | (393.2) |
| Sub-total operating disbursements | (122.3) | (186.7) | (132.8) | (115.1) | (95.6) | (98.9) | (166.0) | (105.8) | (154.4) | (114.3) | (92.8) | (120.3) | (1,504.9) |
| POC and debt related payments | (7.4) | (4.2) | (5.8) | (8.5) | (7.3) | (15.4) | (7.3) | (4.2) | (5.7) | (51.9) | (7.3) | (39.1) | (164.2) |
| **Total disbursements** | (129.6) | (191.0) | (138.6) | (123.5) | (102.9) | (114.3) | (173.4) | (110.0) | (160.2) | (166.1) | (100.1) | (159.3) | (1,669.1) |
| **Net cash flow** | 9.5 | 45.9 | (37.7) | (32.6) | (5.7) | (31.1) | 81.6 | (28.7) | (60.6) | (86.1) | (5.5) | (47.4) | (198.5) |
| Cumulative net cash flow | 9.5 | 55.4 | 17.7 | (14.9) | (20.6) | (51.7) | 29.9 | 1.1 | (59.4) | (145.6) | (151.0) | (198.5) | (198.5) |
| Beginning cash balance | 33.8 | 43.3 | 89.2 | 51.5 | 18.9 | 13.2 | (17.9) | 63.7 | 34.9 | (25.6) | (111.8) | (117.2) | 33.8 |
| Net cash flow | 9.5 | 45.9 | (37.7) | (32.6) | (5.7) | (31.1) | 81.6 | (28.7) | (60.6) | (86.1) | (5.5) | (47.4) | (198.5) |
| **Cash before required distributions** | $43.3 | $89.2 | $51.5 | $18.9 | $13.2 | $(17.9) | $63.7 | $34.9 | $(25.6) | $(111.8) | $(117.2) | $(164.7) | $(164.7) |
| Accumulated property tax distributions | (29.8) | (55.4) | (24.0) | (22.7) | (23.7) | (38.6) | (86.5) | (82.2) | (27.1) | (26.5) | (28.5) | (19.7) | (19.7) |
| **sh net of distributions** | $13.5 | $33.8 | $27.4 | $(3.8) | $(10.5) | $(56.5) | $(22.8) | $(47.2) | $(52.7) | $(138.2) | $(145.7) | $(184.4) | $(184.4) |
| **mo:** | | | | | | | | | | | | | |
| Accumulated deferrals | (119.3) | (112.4) | (112.8) | (113.5) | (113.9) | (114.4) | (115.0) | (115.5) | (116.0) | (116.6) | (117.1) | (117.6) | (117.6) |
| Refunding bond proceeds in escrow | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd |

## I. Detroit Faces Strong Economic Headwinds.

### Current Levels of Municipal Services to Residents and Businesses are Severely Inadequate.

**The City Must Reduce Its High Crime Rates.**

- In 2012, the City had the highest rate of violent crime of any U.S. city having a population over 200,000. The City's violent crime rate is five times the national average.

- EMS and Detroit Fire Department ("DFD") response times are extremely slow when compared to other cities (15 minutes and 7 minutes, respectively).

**The City Must Provide Functioning Street Lights.**

- As of April 2013, approximately 40% of the City's street lights were not functioning. The lights that are functioning are scattered across an outdated population footprint (and thus are not focused to meet the current population's actual needs).

**The City Must Overhaul Its Dysfunctional Operations.**

- Police Department ("DPD").

  - Over the last five years, the DPD has had five different police chiefs, all having varying approaches to DPD's operations.

  - DPD's efficiency (response times), effectiveness (case closure rate, crime reduction) and employee morale are extremely low.

  - Data driven policing has not been fully adopted within DPD.



OFFICE OF THE EMERGENCY MANAGER

13-53846-swr   Doc 3068-6   Filed 08/24/13   Entered 08/24/13 20:38:03   Page 29 of 100

# I. Detroit Faces Strong Economic Headwinds.

- DPD receives over 700,000 calls for service annually. DPD response times are extremely high.

- The DPD's extremely low 8.7% case clearance rate is driven by the DPD's lack of a case management system, lack of accountability for detectives, unfavorable work rules imposed by collective bargaining agreements and a high attrition rate in the investigative operations unit.

- The DPD's manpower has been reduced by approximately 40% over the last 10 years causing constant strain on the organization; the DPD needs to evaluate appropriate uniform staffing levels.

- Community policing efforts are underfunded, uncoordinated and have been deemphasized by the DPD.

- **Assessor's Office and Property Tax Division.**

  - The City lacks a state-required Level IV Assessor and currently has a former employee contractor in the position, whose contract expires in June 2013. Due to inadequate compensation, among other things, there are no available candidates to fill this position.

  - The Assessor's Office has approximately 15,000 parcels per employee. The State recommends 4,000 parcels per employee.

- **Other Departments.**

  - Many other City departments function suboptimally and inefficiently.

OFFICE OF THE EMERGENCY MANAGER

11



# I. Detroit Faces Strong Economic Headwinds.

**The Physical Deterioration of the City Must be Addressed.**

- There are approximately (i) 78,000 abandoned and blighted structures in the City, nearly half of which are considered "dangerous" and (ii) 66,000 blighted and vacant lots within the City limits.

- The number of City parks is dwindling, and many are in poor or fair condition as a result of neglect due to lack of funding.

  - The closure of 210 parks in the 2008-09 fiscal year reduced the City's park portfolio by 66% — from 317 parks to 107 parks.

- Approximately 70 superfund sites have been established in Detroit.

- The City's electricity grid has not been adequately maintained and is deteriorating.

- The City's fire stations are old and are not adequately maintained.

- The vehicles and equipment employed by the City's police, fire, EMS and transportation personnel are aging, poorly maintained and lack adequate information technology.

OFFICE OF THE EMERGENCY MANAGER



13-53846-swr   Doc 1068-6   Filed 09/24/13   Entered 09/24/13 10:50:38   Page 31 of 100

# I. Detroit Faces Strong Economic Headwinds.

## Detroit Has Endured Inadequate Investment in Infrastructure and Equipment for Years.

### Fire Department.

- **Fire Apparatus.** The DFD fleet includes (i) 26 engines; (ii) 15 ladder trucks; (iii) six squads (specialized rescue vehicles); (iv) one hazardous material apparatus; (v) one TAC unit (a mini-pumper) and (vi) 36 ambulances and other light vehicles.

- DFD's fleet has "many mechanical issues," contains no reserve vehicles and lacks equipment ordinarily regarded as standard.

  - The Apparatus Division's mechanic to vehicle ratio of 1:39 (once staffed with 63 people; currently 26) results in an inability to complete preventative maintenance on schedule.

  - Detroit firefighters frequently operate shorthanded due to a lack of serviceable equipment.

- **EMS Fleet.**

  - During the first quarter of 2013, frequently only 10 to 14 of the City's 36 ambulances were in service.

  - Some of the City's EMS vehicles have been driven 250,000 to 300,000 miles, and break down frequently.



# I. Detroit Faces Strong Economic Headwinds.

**Police Department.**

- **Age of Police Cars**

  - The DPD operates with an "extremely old fleet" of 1,291 vehicles. Most DPD police cruisers lack necessary information technology.

  - A majority of vehicles in the fleet remain in service beyond a normal three-year replacement cycle. Operating with an aged fleet drives up maintenance costs.

- **Facilities**

  - The DPD has not invested in or maintained its facility infrastructure for many years, contributing to low employee and citizen morale.

**Information Systems**

- **Challenges generally:**

  - Old and obsolete technology assets and applications must be upgraded.

  - IT infrastructure is not integrated within Departments (e.g., police precincts and districts cannot share information across IT systems) or between departments and functions (e.g., little to no integration between core City finance system and Department level systems).

  - City *urgently* needs to upgrade or replace the following IT systems, among others: payroll; financial; budget development; property information and assessment; income tax; and DPD operating system.



## I. Detroit Faces Strong Economic Headwinds.

- **DPD, DFD and EMS**
  - DPD, DFD and EMS information technology systems are obsolete; vendors do not provide full support; core functions are sporadic.
  - DPD has no IT systems for jail management, electronic ticketing and activity logs. DPD vehicles lack necessary IT infrastructure.

- **Payroll System**
  - The City uses multiple, non-integrated payroll systems. A majority of employees are on an archaic payroll system that has limited reporting capability and no ability to clearly track, monitor or report expenditures by category.
  - The cost of payroll administration for the City is significantly higher than for comparable entities – almost 3.5 times more costly than other public sector organizations, which average $18 per paycheck.

- **Income Tax Division**
  - Income tax collection and data management are highly manual.
  - The City's Income Tax System is outdated (purchased in the mid-1990s), has little to no automation capability and is "catastrophic" per an IRS audit completed in July 2012.



# I. Detroit Faces Strong Economic Headwinds.

- **Budgeting, Accounting & Financial Reporting Systems**
  - Oracle-based Financial Reporting system was implemented in 1999. It is not being utilized to its full capabilities and is no longer supported by its manufacturer.
  - Approximately 70% of journal entries are booked manually.

- **Grant Management System**
  - Grant tracking systems are fragmented. Thus, the City is unable to comprehensively track citywide grant funds and status.
  - Grant reporting is not standardized, such that the City is unable to prevent disallowed costs.

- **Permitting**
  - The Buildings, Safety Engineering and Environmental Department's system for licensing and permitting is more than ten years old and needs to be upgraded.
  - The Fire Marshall Division's system for inspections and permitting is more than 20 years old and needs to be replaced.
  - Current information technology system deficiencies lead to bottlenecks in permit invoicing and collection of fees.

- **Department of Transportation.** DDOT fleet is aged and maintenance is consistently deferred; approximately one-third of DDOT fleet is out of service.



OFFICE OF THE EMERGENCY MANAGER                                                    16

# I. Detroit Faces Strong Economic Headwinds.

## Electrical Transmission Grid and Fixtures

- The City owned Mistersky power plant has been idle for approximately 2-3 years, but has not been decommissioned. In addition, the City has 31 sub-stations that would need to be decommissioned. The City is in the process of obtaining estimates for decommissioning costs.

- Approximately 40% of Detroit's 88,000 streetlights are not functioning due, in large part, to disrepair and neglect; outages exist on both DTE Energy Company ("DTE") and PLD-powered lights.

OFFICE OF THE EMERGENCY MANAGER

17



# I. Detroit Faces Strong Economic Headwinds.

## The City's Debt and Legacy Liabilities Have Grown Considerably Over Time.

### Balance Sheet Liabilities

- The City estimates that, as of the close of its 2013 fiscal year, the City will have liabilities reflected on its balance sheet of approximately $9.05 billion, including:

  - $5.85 billion in special revenue obligations;

  - $1.43 billion in pension-related Certificate of Participation ("COPs") liabilities;

  - $343.6 million in marked-to-market swap liabilities related to COPs (as of May 31, 2013 valuation);

  - $1.13 billion in unlimited and limited tax general obligation bond liabilities and notes and loans payable; and

  - $300 million in other liabilities.



# I. Detroit Faces Strong Economic Headwinds.

**Off-Balance Sheet Liabilities**

- OPEB Liabilities.

  - Unfunded other post-employment benefit ("OPEB") liabilities increased from $4.8 billion to $5.7 billion from June 30, 2007 through June 30, 2011 (the most recent actuarial data available). 99.6% of the City's OPEB liabilities are unfunded.

  - As of June 30, 2011 (the most recently published actuarial valuation), there were 19,389 retirees eligible to receive benefits under the City's OPEB plans. The number of retirees receiving benefits from the City is expected to increase over time.

  - *Weiler Class OPEB Benefits.*

  - In July 2006, the City made a number of unilateral changes to the healthcare benefits for unionized police and firefighter retirees. Alan Weiler filed a class action lawsuit on behalf of approximately 7,000 retirees alleging violations of collective bargaining agreements.

  - The City and the Weiler class settled before trial, and the court entered a Consent Judgment approving the parties' settlement agreement.

  - The Weiler class retirees/beneficiaries currently cost the City approximately $75 million per year, representing over 40% of retiree benefits costs under the Health and Life Insurance Plan.



# I. Detroit Faces Strong Economic Headwinds.

- **Pension Liabilities**

  - The City's reported pension UAAL (based on 2011 actuarial valuations) of $639,871,444 is **substantially** understated. Further analysis using more realistic assumptions (including by reducing the discount rate by one percentage point) suggests that pension UAAL will be approximately $3.5 billion as of June 30, 2013.

  - UAAL under the City's two pension systems — the General Retirement System ("GRS") and the PFRS — increased by over $1 billion between June 30, 2007 and June 30, 2011, even (i) using actuarial assumptions used to calculate 2011 UAAL and (ii) after consideration of the contribution of the COPs proceeds in 2005 and 2006.

  - **For the five-year period ending on June 30, 2012, pension payments and costs of administration have exceeded contributions and investment income, resulting in liquidation of pension trust principal. Continuing on this path will eventually lead to the pension plans' insolvency.**

| System | Benefit Payments | Contribution / Investment Income | Net Trust Loss |
|--------|------------------|----------------------------------|----------------|
| GRS | $1,601,193,045 | ($60,113,101) | $1,661,306,146 |
| PFRS | $1,445,581,026 | ($127,803,339) | $1,573,384,365 |



OFFICE OF THE EMERGENCY MANAGER

20

# I. Detroit Faces Strong Economic Headwinds.

- **Increasing Legacy Liabilities as a Percentage of General Fund Revenue.** During FY 2012, more than 38% of the City's actual revenue was consumed servicing legacy liabilities. Going forward, legacy liabilities are expected to consume increasing portions of City revenues.

## Legacy Expenditures (Assuming No Restructuring)

($ in millions)

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| **Legacy expenditures** | | | | | | | | | | |
| Debt service (LTGO) | $ (66.6) | $ (106.2) | $ (63.5) | $ (64.5) | $ (62.6) | $ (70.8) | $ (70.9) | $ (61.8) | $ (61.8) | $ (38.5) |
| Debt service (UTGO) | (67.2) | (71.5) | (72.4) | (72.8) | (73.0) | (70.6) | (64.9) | (62.5) | (57.6) | (57.6) |
| POC - principal and interest (GF) | (24.6) | (20.9) | (23.6) | (33.5) | (33.0) | (46.8) | (51.4) | (53.3) | (55.0) | (56.9) |
| POC - principal and interest (EF, excl. DDOT) | (1.8) | (1.4) | (1.5) | (1.8) | (2.0) | (5.3) | (5.9) | (6.1) | (6.4) | (6.6) |
| POC - principal and interest (DDOT) | (3.5) | (2.8) | (3.0) | (3.6) | (4.0) | (3.3) | (3.7) | (3.8) | (3.9) | (4.1) |
| POC - swaps (GF) | (38.6) | (43.9) | (44.7) | (44.7) | (44.8) | (42.9) | (42.8) | (42.8) | (42.7) | (42.7) |
| POC - swaps (EF, excl. DDOT) | (2.3) | (2.0) | (2.0) | (2.0) | (2.0) | (4.8) | (4.8) | (4.8) | (4.9) | (4.9) |
| POC - swaps (DDOT) | (4.5) | (4.0) | (4.0) | (4.0) | (4.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) |
| Pension contributions - Public Safety | (58.9) | (31.4) | (32.8) | (81.6) | (49.8) | (46.1) | (139.0) | (163.0) | (180.0) | (198.0) |
| Pension contributions - Non-Public Safety | (10.6) | (27.0) | (11.1) | (28.3) | (25.4) | (19.9) | (36.9) | (42.5) | (47.7) | (53.1) |
| Pension contributions - DDOT | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (12.3) | (23.6) | (27.7) | (31.2) | (34.8) |
| Health benefits - retiree - Public Safety | (73.7) | (80.2) | (70.4) | (79.6) | (90.6) | (91.5) | (88.6) | (95.2) | (101.7) | (108.0) |
| Health benefits - retiree - Non-Public Safety | (47.4) | (51.6) | (50.6) | (49.0) | (49.2) | (49.7) | (38.8) | (41.5) | (44.6) | (47.7) |
| Health benefits - retiree - DDOT | (8.2) | (11.8) | (11.2) | (11.1) | (10.3) | (10.4) | (13.3) | (14.3) | (15.3) | (16.3) |
| **Total legacy expenditures** | $ (414.6) | $ (462.0) | $ (397.9) | $ (486.1) | $ (461.6) | $ (477.3) | $ (587.6) | $ (622.4) | $ (655.9) | $ (672.3) |
| | | | | | | | | | | |
| **Total revenues (excl. financing proceeds)** | $ 1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 |
| | | | | | | | | | | |
| **Total legacy expenditures as a % of total revenues** | 29.7% | 33.9% | 30.8% | 36.9% | 38.6% | 42.5% | 54.3% | 59.5% | 63.0% | 64.6% |



# I. Detroit Faces Strong Economic Headwinds.

**Obligations Secured by Special Revenues**

- **The City estimates that, as of the end of FY 2013, it will have:**
  - $5.34 billion in outstanding principal amount of revenue bonds; and
  - $494 million in related state revolving loans.
- **The revenue bonds and the revolving loans are related to the following funds:**
  - **Sewage Disposal Fund**
    - $2.82 billion in outstanding principal amount of notes maturing July 1, 2013 through July 1, 2039, as of June 30, 2013.
    - $472.8 million in outstanding principal amount of state revolving loans, as of June 30, 2013.
    - Substantially all revenues of the sewage disposal system, net of operating expenses, pledged to secure payment of principal and interest.
    - Net system revenues of $227,447,337 versus debt service requirements of $199,990,125 in FY 2012.



OFFICE OF THE EMERGENCY MANAGER

13-53846-swr   Doc 1066   Filed 08/24/13   Entered 08/24/13 20:50:38   Page 41 of 100

# I. Detroit Faces Strong Economic Headwinds.

**- Water Fund**

- $2.52 billion in outstanding principal amount of various series of notes maturing July 1, 2013 through July 1, 2041, as of June 30, 2013.

- $21.4 million in outstanding principal amount of state revolving loans, as of June 30, 2013.

- Substantially all of the revenues of the City's water system, net of operating expenses, pledged to secure payment of principal and interest.

- Net system revenues of $178,842,057 versus debt service requirements of $153,441,666 in FY 2012.

**- Automobile Parking Fund**

- $9.3 million in outstanding principal amount of Detroit Building Authority Revenue Refunding Bonds: Parking System, Series 1998-A maturing July 1, 2010 through July 1, 2019, as of June 30, 2013.

- Substantially all revenues of the parking system, net of operating expenses, pledged to secure payments of principal and interest.

- Net system revenues of $2,708,223 versus debt service requirements of $2,923,454 in FY 2012.



# I. Detroit Faces Strong Economic Headwinds.

## General Fund Obligations

- **GO Bonds.** The City estimates that, as of the close of FY 2013 (i.e., June 30, 2013), it will have $1.01 billion in outstanding principal amount of limited and unlimited tax general obligation bonds, consisting of:

  - $469.1 million in outstanding principal amount of unlimited tax general obligation ("UTGO") bonds maturing from April 1, 2013 through November 1, 2035.

    - $100 million of the foregoing bonds are secured by a second lien on distributable state aid.

  - $540.3 million in outstanding principal amount of limited tax general obligation ("LTGO") bonds maturing April 1, 2013 through November 1, 2035.

    - Issuance of LTGO bonds do not require voter approval.  They are payable from general non-restricted funds.

    - $249.8 million of the LTGO bonds are secured by a first lien on distributable state aid.  $129.5 million of the LTGO bonds are secured by a third lien on distributable state aid.



# I. Detroit Faces Strong Economic Headwinds.

- **Notes and Loans Payable.** The City estimates that, as of June 30, 2013, the City will have $121.5 million in other outstanding installment notes and loans payable related to various public improvement projects.

  - $87.8 million in notes payable (which notes were issued in connection with the "Section 108" HUD Loan Guarantee Program and are secured by future "Block Grant" revenues).

  - $33.7 million in loans payable ($33.6 million of which is a non-interest bearing unsecured loan payable to the Downtown Development Authority as general operating funds become available).

- On August 23, 2012, the City issued $129.5 million of LTGO bonds at a $9.1 million premium (generating $137 million in proceeds after issuance costs) in part to defease short term bonds issued March 2012. The remaining proceeds of these issuances were set aside with a trustee bank in an escrow account to provide funds for reforms and liquidity in FY 2013. The current amount of the escrow is approximately $80 million.



# I. Detroit Faces Strong Economic Headwinds.

- **Certificates of Participation (Pension)**

  - In 2005, service corporations established by the GRS and PFRS created a trust that issued the COPs. The proceeds of the COPs were contributed to the City's pension trusts.

  - Principal and interest on the COPs is payable solely from payments made by the City to the service corporations pursuant to service contracts.

  - The City estimates that, as of the close of FY 2013, the following amounts were outstanding under the COPs:

    - $480.3 million in outstanding principal amount of $640,000,000 Certificates of Participation Series 2005 A maturing June 15, 2013 through 2025; and

    - $948.54 million in outstanding principal amount of $948,540,000 Certificates of Participation Series 2006 A and B maturing June 15, 2019 through 2035.

  - The City has identified certain issues related to the validity and/or enforceability of the COPs that may warrant further investigation.

OFFICE OF THE EMERGENCY MANAGER



# I. Detroit Faces Strong Economic Headwinds.

- **Swap Liabilities Related to Certificates of Participation.**

  - In connection with the COPs, the City entered into eight pay-fixed, receive-variable interest rate swaps effective as of June 12, 2006 having a total notional amount of $800 million.

  - Recent valuations establish the negative fair value of the swaps at approximately $343.6 million (as of May 31, 2013).

  - January 2009 — The City received notice from the swap contract counterparties that downgrading of the COPs and certain swap insurers would constitute an "Additional Termination Event" under the swap contracts if not cured.

  - June 2009 — The City and the swap contract counterparties agreed on an amendment to the swap agreements, eliminating the Additional Termination Event and the potential for an immediate demand for payment. Pursuant to the amendment, the swap counterparties waived their right to termination payments, and the City agreed to:

    - direct certain wagering tax revenues to a trust as collateral for the quarterly payments owing to the swap counterparties;

    - increase the interest rate of the swap agreements by 10 basis points effective July 1, 2010; and

    - include new termination events, including if COP ratings were withdrawn, suspended or downgraded.



## I. Detroit Faces Strong Economic Headwinds.

- March 2012 — COPs were further downgraded which triggered another Termination Event; the City and the swap counterparties are in negotiations regarding the Termination Event.

- March 2013 — Appointment of Emergency Manager constitutes an event of default triggering another Termination Event.

- Although this proposal reflects treating the swap obligations as special revenue debt secured by the wagering tax revenues, that treatment is still being reviewed by the Emergency Manager.



OFFICE OF THE EMERGENCY MANAGER

28

# I.  Detroit Faces Strong Economic Headwinds.

**Other Liabilities.**

- The City estimates that, as of the end of FY 2013, the City will have $300 million in other liabilities outstanding.

- As of June 30, 2012, the City owed at least $264.6 million in other liabilities, consisting primarily of:

  - $101.2 million in accrued compensated absences, including unpaid, accumulated vacation and sick leave balances;

  - $86.5 million in accrued workers' compensation for which the City is self-insured;

  - $63.9 million in claims and judgments, including lawsuits and claims other than workers' compensation claims; and

  - $13.0 million in capital leases and accrued pollution remediation.



OFFICE OF THE EMERGENCY MANAGER

# I. Detroit Faces Strong Economic Headwinds.

## Labor Costs and Restrictive Employment Terms

- The City is or was a party to 48 collective bargaining agreements ("CBAs") and has made great strides under the Consent Agreement in reducing costs imposed by its numerous active and expired CBAs between the City and various labor organizations representing City employees, many of which had been amended by interest arbitration awards issued by arbitrators appointed pursuant to Public Act 312. Under the Consent Agreement, the City has unilaterally implemented City Employment Terms ("CETs"), which were approved by the Financial Advisory Board (the "FAB") appointed by the Governor, the Treasurer, the Mayor and City Council under former Public Act 4 (now repealed). Currently, a substantial percentage of the City's employees are not governed by current CBAs, and many are working under CET terms and conditions of employment and/or those terms and conditions implemented or established through statutory interest arbitrations.

- During the last three years, the City has implemented compensation reductions to its work force in the form of budget-required furlough days ("BRF"), wage reductions and reductions in other wage related items, such as vacation days, sick days, longevity payments and overtime rules. The City implemented BRFs equivalent to 10% of wages (one furlough day every other week) to non-uniform employees in September 2009. In August 2012, as part of the CET implementation, BRFs were eliminated for non-uniform employees and replaced with a permanent 10% wage reduction. Additional BRFs were implemented in February 2013 affecting certain non-uniformed employees.

OFFICE OF THE EMERGENCY MANAGER



## I. Detroit Faces Strong Economic Headwinds.

- The CETs also imposed a 10% wage reduction on Detroit Police Officer Association ("DPOA") members in August 2012. DPOA challenged the CETs as part of an Act 312 arbitration process; a decision in that arbitration reduces the 10% wage reduction to 5% effective January 2014.

- The CETs, implemented on all unions with contracts expired on or before June 30, 2012, also included compensation reductions, as follows:

  - Freezing sick leave banks and eliminating reserve sick leave accrual;
  - Eliminating sick time cash payouts for future earned time;
  - Eliminating the ability to reinstate furlough days;
  - Eliminating the $3-per-day allowance for daily car usage;
  - Eliminating four to six annual bonus vacation days; and
  - Reducing vacation accrual to 160 hours from 320 hours.

- The following additional CET changes were implemented on DPOA members:

  - Limiting paid time for court if less than two hours;
  - Eliminating educational reimbursement;
  - Requiring 80 hours to be worked in the prior work period to be eligible for overtime;
  - Changing payment of holiday earnings;

OFFICE OF THE EMERGENCY MANAGER



13-53846-swr   Doc 3068-6   Filed 08/26/13   Entered 08/28/13 20:50:38 Page 90 of 100

# I. Detroit Faces Strong Economic Headwinds.

- Suspending the 2% wage differential while on promotional roster;

- Eliminating the option to receive pay for court and returning to banking the first 60 hours of court time;

- Eliminating bonus vacation days; and

- Delaying separation payments.

• Unilaterally implemented CETs imposed numerous concessions on City employees, including freezing, reducing or eliminating active employee benefits, reducing or eliminating pension and retiree medical benefits and reducing wages by 10%. The CETs also negated seniority protections in various CBAs by expanding management rights, modifying methods and processes by which work is performed, changing shifts, hours of operation and overtime procedures; and revising or eliminating job classifications. In addition to concessions imposed by the CETs, in some cases and as noted above, concessions have been granted through statutory interest arbitration processes.

• These labor cost concessions have not been uniformly applied to all bargaining units, and some City employees have not been affected by these measures. The restructuring plan seeks to ensure that any concessions are equitably distributed across all bargaining units (as well as across unrepresented employees) and that the impact of these concessions on employees are mitigated to the extent possible.



OFFICE OF THE EMERGENCY MANAGER

## II. Key Objectives for a Financial Restructuring and Rehabilitation of Detroit

**To the fullest extent possible under all of the circumstances:**

- Provide incentives (and eliminate disincentives) for businesses and residents to locate and/or remain in the City.

  - The City cannot stabilize or pay creditors meaningful recoveries if it continues to shrink.

  - Achieving this goal requires improvements in City services, particularly in the area of public safety and tax reform, to reduce the cost of living in the city to more closely approximate costs of living in nearby areas.

- Maximize recoveries for creditors.

  - Since the City will not generate sufficient cash to pay all liabilities, alternatives will have to be considered.

- Provide affordable pension and health insurance benefits, and restructure governance of pension arrangements.

- Eliminate blight to assist in stabilizing and revitalizing neighborhoods and communities within the City.

- Reform the City government operations to improve efficiency and reduce costs.

  - In many areas, longer term benefits will require immediate increases in capital investment.

- Maximize collection of taxes and fees that are levied or imposed.

- Generate value from City assets where it is appropriate to do so.

OFFICE OF THE EMERGENCY MANAGER

33



## III. Current Financial Status

### General Fund Summary

($ in millions)

| | 2008 | 2009 | Fiscal year ended actual 2010 | 2011 | 2012 | Prelim. 2013 |
|---|---|---|---|---|---|---|
| Total revenues | $ 1,397.7 | $ 1,363.3 | $ 1,291.0 | $ 1,316.8 | $ 1,196.9 | $ 1,121.9 |
| Operating expenditures | (1,111.1) | (1,025.3) | (964.7) | (887.5) | (857.1) | (692.0) |
| Legacy expenditures | (414.6) | (462.0) | (397.9) | (486.1) | (461.6) | (477.3) |
| Deficit (excl. financing proceeds) | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (47.4) |
| Financing proceeds | 75.0 | - | 250.0 | - | - | 137.0 |
| Total surplus (deficit) | $ (52.9) | $ (124.1) | $ 178.3 | $ (56.9) | $ (121.8) | $ 89.6 |
| | | | | | | |
| Accumulated unrestricted General Fund deficit | $ (219.2) | $ (331.9) | $ (155.7) | $ (196.6) | $ (326.6) | $ (237.0) |

- The City has made significant progress decreasing operating costs; however, revenues have declined more quickly and legacy costs have increased.
- Excluding proceeds from debt issuances, the City's expenditures have exceeded revenues from FY 2008 to FY 2012 by an average of $100 million annually.



# III. Current Financial Status

## Revenues
($ in millions)

| | Fiscal year ended actual | | | | | Prelim. |
| --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Municipal income tax | $ 276.5 | $ 240.8 | $ 216.5 | $ 228.3 | $ 233.0 | $ 238.7 |
| State revenue sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.3 | 182.8 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 173.0 |
| Sales and charges for services | 191.3 | 166.7 | 154.1 | 155.0 | 145.4 | 120.4 |
| Property taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 134.9 |
| Utility users' and other taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 54.8 |
| Other | 271.8 | 281.0 | 265.6 | 269.8 | 258.8 | 217.4 |
| Total revenues | $ 1,397.7 | $ 1,363.3 | $ 1,291.0 | $ 1,316.8 | $ 1,196.9 | $ 1,121.9 |

## Operating expenditures
($ in millions)

| | Fiscal year ended actual | | | | | Prelim. |
| --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Salaries/overtime/fringe | $ (509.9) | $ (506.6) | $ (466.4) | $ (454.8) | $ (431.5) | $ (357.3) |
| Health benefits - active | (49.9) | (54.4) | (70.8) | (64.6) | (54.3) | (43.1) |
| Professional and contractual services | (66.9) | (73.5) | (54.2) | (48.5) | (43.1) | (42.7) |
| Materials & supplies | (85.8) | (70.9) | (60.1) | (67.1) | (62.2) | (63.6) |
| Utilities | (35.6) | (38.6) | (27.8) | (30.1) | (27.1) | (25.5) |
| Other | (362.9) | (281.2) | (285.4) | (222.4) | (238.9) | (159.8) |
| Operating expenditures | $ (1,111.1) | $ (1,025.3) | $ (964.7) | $ (887.5) | $ (857.1) | $ (692.0) |

## Legacy expenditures
($ in millions)

| | Fiscal year ended actual | | | | | Prelim. |
| --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Debt service (LTGO & UTGO) | $ (133.8) | $ (177.6) | $ (135.9) | $ (137.3) | $ (135.6) | $ (141.4) |
| POC - principal and interest | (29.8) | (25.1) | (28.1) | (38.9) | (39.0) | (55.4) |
| POC swaps | (45.3) | (49.9) | (50.7) | (50.7) | (50.7) | (50.6) |
| Pension contributions | (76.3) | (65.7) | (50.8) | (119.5) | (86.1) | (78.3) |
| Health benefits - retiree | (129.3) | (143.7) | (132.3) | (139.7) | (150.1) | (151.6) |
| Legacy expenditures | $ (414.6) | $ (462.0) | $ (397.9) | $ (486.1) | $ (461.6) | $ (477.3) |



## III. Current Financial Status

- **Pension contributions.**

  - City has consistently deferred year-end PFRS contributions by using a payment plan financing arrangement including accrual of 8% interest (~$50 million for FY 2012)

- **Health Benefits - Retiree.**

  - The total cost of healthcare benefits City-wide in FY 2012 was approximately $275 million, of which approximately $177 million related to retirees.

  - The General Fund's portion of healthcare costs in FY 2012 was approximately $204 million, of which approximately $150 million related to retirees.



OFFICE OF THE EMERGENCY MANAGER

## III.  Current Financial Status

**In the Absence of a Comprehensive Financial Restructuring, Budget Deficits Will Continue for the Foreseeable Future.**

**The City Has Limited Options for Further Revenue Generation and, in the Absence of a Comprehensive Financial Restructuring, Cost-Saving Measures.**

- Legacy obligations continue to increase;
- Limited or no access to debt capital markets;
- Diminishing, if any, returns from further tax increases; and
- Minimal potential for further payroll related reductions.

**Absent Structural Changes, the City's Accumulated Deficit is Expected to Grow to Unprecedented Levels.**

- At the City's current run rate, its accumulated deficit could grow to 3-4 times its current level of $326.6 million to over $1.35 billion by FY 2017.

OFFICE OF THE EMERGENCY MANAGER

