### E.  The City's Temporary Restraining Order

Syncora's conduct had severe consequences.  Faced with competing demands from the City and Syncora, U.S. Bank, opted to withhold the Casino Revenues from the City.  Without access to these funds, the City could not guarantee essential services to its residents, and the cloud over the City's continuing access to its casino revenues had a severe chilling effect on the City's negotiations with its creditors, including its negotiations of its settlement with the swap counterparties.  Because of Syncora's intransigence, the City had little choice but to take legal action.  On July 5, it brought this lawsuit in the Circuit Court for Wayne County and moved for entry of a TRO.  After considering the City's papers, reviewing Mr. Orr's accompanying affidavit, and hearing argument from the City's counsel, Judge Annette Berry issued a TRO enjoining Syncora and the other defendants from further withholding casino revenues from the City, unless directed to do so by the swap counterparties.  Judge Berry also set a hearing on preliminary injunctive relief for July 26, 2013.

In the ten days since the entry of the TRO, U.S. Bank remitted to the City the monies in the General Receipts Subaccount, which have totaled about $15 million.

### F.  Proceedings Before This Court

Syncora removed the case to this Court on July 11, 2013.  That evening, Syncora's counsel notified us that they wished to confer about their demand for dissolution of the TRO and scheduling of expedited discovery relating to the preliminary injunction hearing.  There were two conference calls the next afternoon.  During the first call, the City agreed to dissolution of the TRO and adjournment of the preliminary injunction hearing indefinitely on the ground that the City was not in a position to shoulder the burdens of the extensive discovery Syncora had

demanded.[6]  In addition—although counsel for the City were not free to disclose it to Syncora's counsel that day—the City's counsel were aware that the City was close to a final settlement agreement with the swap counterparties that would moot much of the case.

After learning that the City would consent to its demands, Syncora's counsel quickly added a new condition on the  second call, namely, that the City should return to the General Receipts Subaccount the monies it had been paid in the previous week.  The City rejected this condition.  At 5:17 p.m., Syncora's counsel served an emergency motion to dissolve the TRO and conduct expedited discovery.  Accompanying the motion were extensive document requests and deposition notices.

### G.  Forbearance Agreement

The City executed a forbearance agreement with the swap counterparties as of July 15.  Although the terms of the agreement are not public, it provides that, so long as the City continues to make its monthly payments to the Holdback Account, it will continue to have access to the Casino Revenues that accumulate in the General Receipts Subaccount.  In addition, the agreement provides that the City can buy out the swaps in the coming years at attractive values and, when it does so, the swap counterparties agree that they will make no claims against Syncora relating to the swaps.  In other words, the forbearance agreement will have the effect of completely relieving Syncora of its potential liability for insuring the swaps.

Thus, the posture of the case now is that the City has (a) agreed to dissolve the TRO, (b) agreed to adjourn the preliminary injunction hearing indefinitely and (c) entered into an

---

[6]  This was confirmed in an email we sent to Syncora's counsel at 2:18 pm.  Syncora misstates the record in saying that the City's counsel stated that they "would probably be amenable" to dissolving the TRO.  *See* Syncora Motion at 3.  Instead, counsel wrote that its offer was subject to the consent of our client, which we expected to (and did) receive promptly. *See* Email Communications Between the City of Detroit's Counsel and Syncora's Counsel (July 11-12, 2013) (DiPompeo Decl., Ex. 4).

13

13-53846-swr   Doc 146-18   Filed 08/19/13   Entered 08/19/13 07:53:54   Page 22 of 69
13-53846-swr   Doc 146-18   Filed 08/19/13   Entered 08/19/13 07:53:54   Page 22 of 69   902

agreement with the swap counterparties that should protect Syncora from exposure on its swaps insurance.  Nevertheless, Syncora believes there is a present emergency, has moved to dissolve the TRO, seeks injunctive relief ordering the City to return up to $15 million to the General Receipts Subaccount, and asks for an expedited schedule for the extensive discovery it has served.[7]

## ARGUMENT

### I.   THERE IS NO EMERGENCY TO JUSTIFY EXPEDITED RESOLUTION OF THIS CASE

A lynchpin of Syncora's motion is that there is an emergency that the Court must immediately address and that the ordinary provisions and procedures of the Federal Rules of Civil Procedure, this Court's own rules, and standard practices should be ignored.  This clearly is not the case:  Syncora's emergency is self-created.

The main relief Syncora seeks is dissolution of the Circuit Court's TRO and entry of an order enjoining the City to return to the General Receipts Subaccount the $15 million or so the City has received since the Circuit Court entered its TRO on July 5.  *See* Defendant Syncora Guarantee Inc.'s Emergency Motion To Dissolve The Temporary Restraining Order And Conduct Expedited Discovery ("Syncora Motion"), at 2.  The City already has consented to the first part of this—dissolution of the TRO—since it believes this week's settlement between the City and the swap counterparties is likely to moot much of the case anyway.  Yet even if the Court were persuaded to treat Syncora's request as a cross-motion for the return of funds and that Syncora had somehow established a right to this relief, Syncora still would have failed to explain why resolution of this dispute requires *expedited* consideration.  Syncora asserts that expedited

---

[7] We have separately moved under Federal Rule of Civil Procedure 26(c) for entry of a protective order against Syncora's discovery requests.  *See* City Of Detroit's Motion For Protective Order, dated July 17, 2013.

resolution of this request is necessary "before all of the funds are dissipated, never to be recovered."  *See* Defendant Syncora Guarantee Inc.'s Reply To The City's Preliminary Response To Its Emergency Motion at 2 ("Syncora Reply").  However, as noted below, *see infra*, at 23, even the dissipation of these funds will cause Syncora no harm because the amounts taken from the General Receipts Subaccount to the City are replenished every month.  And Syncora's harm is entirely hypothetical, since it has never had to pay on account of the swaps and is unlikely to ever have to do so.

Moreover, the contracts and other documents underlying this dispute are complex and the consequences to the City of a mistake are severe.  This is not a dispute that should be resolved in a few days, as Syncora seems to insist.  Instead, Syncora should be required to file a competent counterclaim, the City should be given the opportunity to answer or move with regard to it, and the case should proceed like any other civil case for money damages.  Without a strong justification for expedited review, there is no reason to truncate an important and complex case.

There similarly is no emergency requiring expedited discovery and disregard of the requirements of Federal Rules of Civil Procedure 26(a) and 26(f) and the normal periods for responding to discovery under Rule 30.  The evident purpose of this discovery was to allow Syncora to prepare for the preliminary injunction hearing originally scheduled for July 26, but that is now adjourned indefinitely.  This is an invented crisis.

## II.   SYNCORA'S REQUEST FOR THE RETURN OF FUNDS FROM THE CITY IS PROCEDURALLY IMPROPER

In essence,  Syncora seeks disgorgement of money received by the City as a result of the City's allegedly improper actions in obtaining the TRO.  Syncora has not, however, filed a counterclaim for this relief as required by Federal Rule of Civil Procedure 13.  Instead, Syncora asserts that the Court should grant this relief "as a condition of its order dissolving the temporary

restraining order." Syncora Reply at 2.  Recognizing the procedural deficiency of its request,

Syncora asserts that "a court has the inherent authority to treat a motion to dissolve as a cross-

motion for injunctive relief." Syncora Reply at 4.  However, even if a federal court *may* do so,

Syncora has presented no compelling reason *why* the court should treat its improper request as a

cross-motion for injunctive relief rather than enforcing the requirements of the Federal Rules of

Civil Procedure.  The City should have, and does have, the right to demand that Syncora's claims

be properly presented and the opportunity to move against those claims upon proper papers

under Rules 12(b) and (c).

Syncora also invokes the equitable power of the court to fashion an appropriate remedy

and suggests that "a court that dissolves a temporary restraining order has broad authority to

return parties to the status quo," either upon a motion by the parties or *sua sponte*.  Syncora

Reply at 2-3, 5.  For support, Syncora cites *Taylor v. Taylor*, 2013 WL 1183290 (N.D.N.Y. Mar.

21, 2013), and *Moore v. State Farm Mutual Automobile Ins. Co.*, 2005 WL 399395 (E.D. La.

Feb. 14, 2005), but neither of these cases stands for the proposition Syncora asserts.

In *Taylor*, the plaintiff sought a TRO and preliminary injunction after the plaintiff's bank

transferred $71,000 from the plaintiff's account to the IRS under a tax levy.  The state court

issued a TRO prohibiting the bank from transferring any of the plaintiff's remaining $100,000 to

the IRS under the tax levy, as well as an order to show cause why the court should not grant a

preliminary injunction ordering the return of the $71,000.  Before an order to return the funds

was entered, however, the IRS removed the case, and the federal court determined that the TRO

was improper because of a jurisdictional defect.  But the court did not order any "affirmative

steps to restore the status quo" as Syncora suggests.  *See* Syncora Reply at 3-4.  Rather, it simply

dissolved the TRO and order to show cause "insofar as those orders in any way interfere with the

IRS's levy against Defendant–Movant Taylor, including prohibiting [the bank] from disbursing assets to the IRS," *id.* at *5.  Far from ordering any affirmative actions, the Court's order actually removed the only impediment to the bank's ability to resume transferring funds to the IRS.

In *Moore*, the defendant sought and obtained a TRO to seal certain documents entered into the record by the plaintiff on the ground that they contained confidential trade secrets.  The plaintiff eventually sought to dissolve the TRO on the ground that the documents did not actually contain protected trade secrets.  The court reviewed the documents and determined that only two exhibits contained trade secrets.  As a result, the court dissolved the TRO as to the unprotected documents and ordered "that documents 31, 34, 35, 36, 38, 39, 40, 42, 43, 45, and 46 be UNSEALED and placed in the record, and that document 27 be UNSEALED and placed in the record with the exception of Exhibits 'C' and 'D' which shall remain sealed."  *Id.* at *9.  Syncora curiously asserts that the court's decision to unseal the documents was a form of affirmative relief similar to their request for disgorgement from the City.  But the *Moore* court's routine decision to clarify that dissolution of a TRO sealing certain documents meant that that those documents would now be unsealed is a far cry from the extraordinary relief Syncora seeks here.

Neither *Moore* nor *Taylor* contemplated anything like Syncora's request for the disgorgement of up to $15 million from a cash-strapped city after a state court judge determined on a competent record that a TRO was necessary to avoid immediate and irreparable harm.  Syncora has failed to identify any case even remotely supporting the relief it now seeks.  The court should decline Syncora's invitation to depart from the requirements of the Federal Rules of Civil Procedure, and should require Syncora, if it desires to pursue relief against the City, to do so in accordance with the Rules.

### III.   SYNCORA'S REQUEST FOR THE RETURN OF FUNDS FROM THE CITY IS SUBSTANTIVELY IMPROPER

Besides the procedural irregularities, Syncora's motion also fails substantively.  Thus, even if this Court were to treat Syncora's request as a motion or cross-claim, the request should fail because Syncora mischaracterizes the *status quo ante*, seeks to assert rights Syncora does not have, and cannot satisfy the factors necessary for injunctive relief to issue.

#### A.   Syncora Mischaracterizes The *Status Quo Ante*

The premise of Syncora's request is a claim that the Court should return the parties to the *status quo ante*, which, in Syncora's view, consists of funds being trapped in the General Receipts Subaccount.  According to Syncora, "Syncora never instructed or demanded that U.S. Bank take any action" with respect to the money in the General Receipts Subaccount, and "the *status quo* just prior to filing of the Motion [for a TRO] was that U.S. Bank was properly trapping cash under section 5.4 of the Collateral Agreement."  *See* Syncora Motion at 12.  These assertions are simply not supportable by the documented facts and blatantly mischaracterize the *staus quo ante*.

Prior to Syncora's letters, U.S. Bank had for years paid the funds in the General Receipts Subaccount to the City after the City made its monthly payment to the Holdback Account, because of the swap counterparties' decision not to declare an event of default.  When U.S. Bank received Syncora's June 17 letter, however, it began for the first time to trap the funds because it had received conflicting instructions.  According to U.S. Bank, as a custodian it was not entitled to determine whether Syncora's actions were proper and thus was compelled to trap the funds until the matter could be resolved.  *See* Orr Aff., Ex. E.  The City, however, could not remain in this state of limbo and thus sought a TRO to preserve its ability to access the Casino Revenues.

Satisfied that the preservation of the *status quo* meant that the funds would freely flow to the City as they always had, the state court issued a TRO to that effect.

That the parties—including Syncora—recognized that the *status quo* involved the release of funds from U.S. Bank to the City is confirmed by the communications between Syncora and U.S. Bank's counsel, Bill Smith, on June 24, 2013.  U.S. Bank responded to Syncora's June 17 letter by informing Syncora that,

> *[i]n the normal course of events*, U.S. Bank as Custodian would advise the City [that the funds in the General Receipts Subaccount exceeded the City's monthly swaps payment], receive from the City a like amount which would be credited to the Holdback Account (the monthly 'City Payment'), and then remit to the City the Holdback Requirement Amount from the General Receipts Subaccount.  Thereafter, as casino revenues are received, they are to be remitted to the City during the remainder of the month.

Orr Aff., Ex. E (emphasis added).  Smith instructed Syncora and the City that "to the degree that you request U.S. Bank as Custodian *to deviate from the ordinary course of business*, kindly explain the legal reasoning and support therefore . . . ."  *Id.* (emphasis added).  And Syncora's counsel then renewed its unequivocal demand that the money in the General Receipts Subaccount be trapped:  "Please understand . . . that our position on the cash trap has not changed from that provided in our letter.  Pursuant to the Collateral Agreement, *the cash should have been trapped and should continue to be trapped absent our consent*."  *Id.* (emphasis added).

There can be no question that Syncora instructed U.S. Bank to withhold the funds from the City.  Syncora elides this uncomfortable fact, focusing exclusively on its June 17 letter and failing even to mention the parties' subsequent communications.  But as the City made clear to

the state court, there was no question that Syncora repeatedly and clearly instructed U.S. Bank

not to release funds and threatened to sue if U.S. Bank ignored those instructions.[8]

Moreover, Syncora's assertion that U.S. Bank "expressed its independent view that the

Service Corporation's default . . . led to *automatic* cash trapping under the Collateral

Agreement," Syncora Motion at 7, is flatly untrue.  In fact, U.S. Bank has made an appearance in

this case specifically to respond to Syncora's "inaccurate[]" portrayal of its actions in response to

the Syncora letters, and to make clear that it has never taken a position on whether funds should

be trapped in the General Receipts Subaccount.  *See* U.S. Bank National Association's Brief In

Response To Syncora Guarantee Inc.'s Emergency Motion To Dissolve The Temporary

Restraining Order And Conduct Expedited Discovery at 3.

The relief Syncora now seeks is thus not a return to the *status quo ante*, but rather a

judicial imprimatur on its effort to deviate from the *status quo* to serve its unrelated interests as

an insurer of the COPs.  Indeed, Syncora's entire assertion that the funds must be returned to

make it whole seems to be a contrived platform for its burdensome and unnecessary discovery

demands.  It was not until the City consented to dissolution of the TRO that Syncora first raised

this condition, and Syncora continues to make this demand even though this week's settlement

between the City and the swap counterparties is likely to relieve Syncora of any exposure on the

swaps at all.

---

[8] *See* Orr Aff., Ex. E  ("Pursuant to the Collateral Agreement, the cash should have been trapped and should continue to be trapped absent [Syncora's] consent."); *id.*, Ex. F (directing that "U.S. Bank, in its capacity as Custodian, is clearly required by the unambiguous terms of the Collateral Agreement, to retain all funds that were in the General Receipts Subaccount upon the occurrence of the Cross Default EOD" and that "Syncora does not consent to any divergence by U.S. Bank from that duty"); *id.* ("[Syncora] will hold U.S. Bank responsible for any release of funds from the General Receipts Subaccount in contravention of the plain terms of the Collateral Agreement.").

**B.  Syncora Has No Rights Over The Collateral In The General Receipts Subaccount**

Syncora does not now have—and never has had—any right to the funds in the General Receipts Subaccount.  Syncora is not a party to the Collateral Agreement, which establishes the rights of the parties to the Casino Revenues that secure the City's swaps obligations.  Nor does the Collateral Agreement otherwise give Syncora the right to direct the custodian's conduct with respect to the collateral.  Syncora is merely an insurer on the swaps agreements, and, like any insurer, has no rights until it is called upon to make a payment.[9]  Syncora has never made any such payment on the swaps and, indeed, under the terms of the settlement with the swap counterparties, it probably will never be required to do so.  Syncora thus cannot override the swap counterparties' decision to forbear from enforcing rights they may have under the Collateral Agreement.

Syncora has been unable to identify any argument to the contrary.  Early on, Syncora asserted in its letters to U.S. Bank that its rights arose on account of a cross-default under the swaps (*see* Orr Aff., Ex. F at 2), but Syncora now appears to have abandoned that argument.  And for good reason:  the cross-default provision in the swaps is triggered only upon certain circumstances not present here.  *See* 1992 ISDA Master Agreement § 5(a)(vi), attached as Exhibit D to the Syncora Motion.  And the Collateral Agreement also is of no help to Syncora, since Syncora is not a party to it and the Agreement has no cross-default provision.  Moreover, as the City has stated before, Syncora cannot rely upon the cross-default provision of the swap contracts because Syncora has never been called upon to make a payment under the swap

---

[9] The only right Syncora possesses under the Collateral Agreement before having paid under its insurance policy is the right to consent to any amendment of the Collateral Agreement that affects its rights, remedies, or obligations.  *See* Collateral Agreement § 14.5 (Orr Aff., Ex. B).

insurance policies.  Until it makes such a payment Syncora has no rights as a subrogee and does not stand in the shoes of the swap counterparties.

Syncora's new argument is that the swap counterparties' decision to forbear from demanding that U.S. Bank trap funds amounted to a waiver or amendment of the Collateral Agreement, and that this trespassed the Agreement's provision that it could not be amended without Syncora's consent.  *See* Syncora Motion at 14-15; Collateral Agreement § 14.5 (Orr Aff., Ex. B).  The right to consent to amendment is indeed the only right Syncora possesses under the Collateral Agreement, but this argument goes no further.  The Collateral Agreement specifically distinguishes between forbearance on rights under the contract and waiver or amendment of the contract, expressly providing "[n]o failure on the part of any party hereto to exercise, and no delay in exercising, any right hereunder shall be a waiver thereof."  *Id.* § 14.7.  Clearly, the swap counterparties' decision to refrain from exercising their rights to order the trapping of the City's Casino Revenues was an act of forbearance, and not an amendment of the Collateral Agreement.  Thus, even under Syncora's own argument, it has no right to direct U.S. Bank's control of the collateral.

## C.  Syncora Cannot Establish The Factors Necessary For Injunctive Relief

Syncora asserts that to the extent the Court treats its request as a cross-motion for injunctive relief, it can satisfy the traditional factors for such relief—a likelihood of success on the merits, irreparable harm absent the injunction, the harm to others if the injunction is granted, and the public interest.  *See* Syncora Reply at 4 n.1 (citing *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007)).  Even apart from the obvious fact that a state court has already found otherwise, Syncora's arguments should fail.

First, as Syncora's shifting arguments regarding its rights under the Collateral Agreement demonstrate, Syncora has been unable to identify any persuasive argument in favor of its ability to control U.S. Bank's handling of funds in the General Receipts Subaccount.  Thus, as the state court found, Syncora is unlikely to prevail on the merits of this dispute.

Second, even if Syncora had any rights in the Casino Revenues collateral, the likelihood that it would suffer irreparable harm from the dissipation of the money received by the City is extremely remote.  The City has never defaulted on its swap payments and, indeed, would face severe consequences if it were to do so, including the loss of its recent settlement with the swap counterparties and the payment of an enormous termination fee.  Unless the City defaults, Syncora is not required to pay out under its insurance policies, is not subrogated to the swap counterparties' rights and has no claim of need for the money in the General Receipts Subaccount.  Moreover, the Casino Revenues are a steady, replenishing stream of money that will be unchanged by the City's financial restructuring.  Every month, on average, an additional $15 million of Casino Revenues accumulates in the Subaccount and this is expected to continue for at least the next ten years.  *See* Orr Aff., Ex. A at 47.  Thus, if Syncora were ever called upon to pay a missed quarterly swaps payment—which is now even more unlikely given the recent settlement—there will be sufficient cash in the General Receipts Subaccount to reimburse it.

Third, balanced against the extremely remote possibility that Syncora will suffer any harm, let alone irreparable harm, the City detailed before the state court the immediate and irreparable consequences that would result from the monthly loss of up to $15 million in revenue.  Indeed, the consequences of losing that amount of money to a large city with only $40 million cash on hand at the end of May are not difficult to imagine.  As the state court recognized, and as the Emergency Manager has averred in his affidavit, *see* Orr Aff. ¶¶ 21-24,

such a loss would put at risk the City's ability to adequately provide police, fire, and other public services to its residents and to successfully negotiate with key stakeholders. Although, as a result of the TRO, the City has been able to complete negotiations with the swap counterparties, an order to disgorge up to $15 million would have severe repercussions for the City's already precarious financial condition.

Finally, there can be little doubt that the public interest weighs strongly against the relief sought by Syncora. Granting Syncora's request would put at risk the health and welfare of the citizens of Detroit and erect a significant road block to a successful financial restructuring. The immediate and irreparable harm that the City of Detroit and its residents would suffer if the City were not given uninterrupted access to these funds significantly outweighs any potential interest of a private insurance company that has a hypothetical claim of monetary damages in the future.

## CONCLUSION

For the reasons set forth above, plaintiff City of Detroit respectfully submits that Syncora's motion should be denied in its entirety.

Dated:      July 17, 2013

/s/ Deborah Kovsky-Apap
Robert S. Hertzberg
Deborah Kovsky-Apap
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
(248) 359-7300  -  Telephone
(248) 359-7700  -  Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com


Thomas F. Cullen, Jr.
Gregory M. Shumaker
Geoffrey S. Stewart
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2013, I electronically filed the foregoing *City of Detroit's Brief In Opposition to Defendant Syncora Guarantee Inc.'s Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedited Discovery* and this *Certificate of Service* with the clerk of the court using the ECF system, which will send electronic notice to the following ECF participants:

Andrea L. Hansen    ahansen@honigman.com

Brendan H. Frey    bfrey@manteselaw.com, ssikorski@manteselaw.com

Dirk H. Beckwith    dbeckwith@fosterswift.com, jdickinson@fosterswift.com

Gerard V. Mantese    gmantese@manteselaw.com, bren@manteselaw.com

Ian M. Williamson    iwilliamson@manteselaw.com, ssikorski@manteselaw.com

Jennifer Z. Belveal    jbelveal@honigman.com, mjohnson@honigman.com

Robert S. Hertzberg    hertzbergr@pepperlaw.com


Dated:  July 17, 2013                         /s/ Deborah Kovsky-Apap
                                              Deborah Kovsky-Apap
                                              PEPPER HAMILTON LLP
                                              4000 Town Center, Suite 1800
                                              Southfield, MI  48075
                                              (248) 359-7300  -  Telephone
                                              (248) 359-7700  -  Fax
                                              kovskyd@pepperlaw.com

<u>**Exhibit 13**</u>

**City's Preliminary Response to Motion
and Notice of City's Consent to Dissolution**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

| | | |
|---|---|---|
| **CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan** | ) ) ) ) | **Case No.:  2:13-cv-12987-LPZ-MKM** |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Hon. Lawrence P. Zatkoff** |
| **SYNCORA GUARANTEE INC., a New York Corporation,** | ) ) ) | |
| **and** | ) ) | |
| **U.S. BANK, N.A.,** | ) ) | |
| **and** | ) ) | |
| **MGM GRAND DETROIT, LLC,** | ) ) | |
| **and** | ) ) | |
| **DETROIT ENTERTAINMENT, LLC, d/b/a MOTORCITY CASINO HOTEL,** | ) ) ) | |
| **and** | ) ) | |
| **GREEKTOWN CASINO, LLC,** | ) ) | |
| **Defendants.** | ) ) ) | |

**PRELIMINARY RESPONSE TO MOTION AND NOTIFICATION OF THE CITY'S
CONSENT TO DISSOLUTION OF TEMPORARY RESTRAINING ORDER AND
WITHDRAWAL OF REQUEST FOR HEARING ON PRELIMINARY INJUNCTION**

The City of Detroit believes that most of the pending activities in this case have become

moot.  During the afternoon of Friday, July 12, 2013, we advised counsel for Syncora that,

subject to the approval of the Emergency Manager, the City would (a) consent to the dissolution

1

of the temporary restraining order; (b) indefinitely postpone the hearing on a preliminary injunction; and (c) agree to an indefinite suspension of discovery relating to such a hearing. Nevertheless, a few hours later, Syncora served the City with a large set of motion papers and extensive discovery requests.

We are preparing appropriate responses to the motion and discovery requests, which we intend to file in the next few days. The purpose of this filing is to inform the Court as follows:

1. As we notified Syncora on Friday, the City is willing to consent to the dissolution of the temporary restraining order. We will agree to an appropriate stipulated order to effect the dissolution.

2. The City reached in principle an important settlement with certain of its creditors late Friday afternoon, which we understand will be executed later today. We believe this settlement moots many of the issues in this case, including those Syncora used as a pretext for interfering with the City's banking relationships, which in turn required the City to seek preliminary relief on July 5, 2013. In view of this development, the City believes it does not need to go forward with the preliminary injunction hearing scheduled for July 26, 2013.

3. As a result of the foregoing, there are no pending actions of the court requested by the City and no need for expedited proceedings or expedited discovery.

4. The discovery served upon us and others Friday afternoon is exceptionally broad and burdensome and will come at high cost to the City. The document requests alone consist of 138 categories of documents (not including subparts) from the City, the City's counsel, defendant U.S. Bank, and five non-parties to the case, and demand that these documents be produced to Syncora this Thursday, July 18, 2013. The burdens of this unreasonably short response time are compounded by the fact that many of Syncora's requests appear to seek documents protected by

attorney-client and work-product privilege.  In addition, Syncora has served notices for depositions of seven witnesses for the week of July 22.  Because this discovery is premature, if not altogether unnecessary, we are in the process of preparing a motion for a protective order.

5.  In addition to its other arguments, Syncora demanded for the first time on Friday afternoon that the City immediately disgorge up to $15 million and included that demand in the motion papers it served at the close of business that day.  We believe that motion is procedurally improper and substantively defective.  However, it comes at a time when the City is desperately in need of cash and raises issues of great importance to the City.  We respectfully request leave of the Court to file our papers in opposition to Syncora's emergency motion by the close of business on Wednesday, July 17, 2013.

3

Dated:      July 15, 2013

/s/ Deborah Kovsky-Apap
_____
Robert S. Hertzberg
Deborah Kovsky-Apap
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
(248) 359-7300  -  Telephone
(248) 359-7700  -  Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com


Thomas F. Cullen, Jr.
Gregory M. Shumaker
Geoffrey S. Stewart (application pending)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

*Attorneys for Plaintiff*

**Exhibit 14**

**City's Response to Defendant's Proposed Order Dissolving TRO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

---

| | |
|---|---|
| **CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan** )<br>)<br>)<br>)<br><br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**SYNCORA GUARANTEE INC., a New York Corporation,** )<br>)<br>**and** )<br>)<br>**U.S. BANK, N.A.,** )<br>)<br>**and** )<br>)<br>**MGM GRAND DETROIT, LLC,** )<br>)<br>**and** )<br>)<br>**DETROIT ENTERTAINMENT, LLC, d/b/a MOTORCITY CASINO HOTEL,** )<br>)<br>**and** )<br>)<br>**GREEKTOWN CASINO, LLC,** )<br>)<br>**Defendants.** )<br>) | **Case No.:  2:13-cv-12987-LPZ-MKM**<br><br>**Hon. Lawrence P. Zatkoff** |

---

### PLAINTIFF CITY OF DETROIT'S RESPONSE TO DEFENDANT SYNCORA'S NOTICE OF PROPOSED ORDER DISSOLVING THE <u>JULY 5, 2013, TEMPORARY RESTRAINING ORDER</u>

Syncora's submission further underscores the need for this proceeding to be transferred to the Bankruptcy Court pursuant to Local Rule 83.50(a). The issue in this case is whether the City can expect continued access to much-needed revenue while it develops a plan of adjustment in bankruptcy, or whether this revenue will be subject to interference by a party with a weak and contrived claim. This is a central issue in the City's bankruptcy case; it is one that the Bankruptcy Court will necessarily resolve within a few weeks in adjudicating the City's pending motion to assume and approve its recent, crucial Settlement with its swap counterparties;[1] and it is one that Syncora has already appeared before the Bankruptcy Court to contest. It is precisely to avoid this sort of duplicative litigation and the danger of inconsistent rulings that underpins this Court's standing order for automatic referral to the Bankruptcy Court of proceedings that are at least "related to" a bankruptcy case.

---

[1] The settlement ("Settlement") between the City and the swap counterparties provides that the City will have the option to buy-out its interest rate swap contracts with the counterparties at an attractive discount. In return, the counterparties will release their claims upon the casino revenues the City receives from taxes and "developer payments" that it imposes upon Detroit's three casinos. Since 2009, those casino revenues have been pledged to the counterparties as security for the City's obligations to the counterparties. Upon approval of the Settlement, however, the counterparties will release their security interest in the casino revenues, enabling the City to have untrammeled access to the revenues. As part of the Settlement, the counterparties also will relinquish any rights they might have to pursue claims against Syncora, which is an insurer of the City's swap payments.

1.   Contrary to Syncora's assertions, the temporary restraining order
("TRO") issued by the Wayne County Circuit Court was not limited in duration.
Rather, that court recognized the emergency circumstances facing the City and
entered a TRO of indefinite duration.  There are sound reasons for this.  The
lockbox system with which Syncora interfered provides for monthly payouts to the
City and monthly replenishment of those funds.  Unless enjoined, Syncora would
have interfered with this system repeatedly, causing the City irreparable harm.  In
fact, Syncora's recent conduct suggests that this is precisely what it plans to do if
the TRO is dissolved.

2.   As this Court is aware, two weeks ago, the City offered to voluntarily
dissolve the TRO pursuant to an appropriate stipulated order.  The City made this
offer because it had recently concluded its Settlement with the swap counterparties
and because it was about to file its bankruptcy petition, which the City thought
would moot this case and, in all events, move it to the Bankruptcy Court.
However,  Syncora rejected that offer, and instead interposed the obviously
unacceptable condition that the City return to the lockbox the $15 million it had
received while the TRO was in place.  The City could not accept this condition,
and we made clear in our July 15 filing in this Court that the City would agree to
"an *appropriate* stipulated order" dissolving the TRO.  *See* Preliminary Response
to Motion and Notification of the City's Consent to Dissolution of Temporary

Restraining Order and Withdrawal of Request for Hearing on Preliminary Injunction, at ¶ 1 (ECF Doc. # 11) (emphasis added).  Syncora did not respond to this invitation for over two weeks.  On July 30—in connection with a broader strategy of litigating on no fewer than three fronts—Syncora offered a proposed order that would dissolve the TRO, but continued to reserve its demand for the return of casino revenues.

    3.  In the meantime, there have been a series of significant developments:

    a)  On July 18, the City filed for bankruptcy protection under chapter 9 of the Bankruptcy Code, 11 U.S.C. § 901 *et seq.*

    b)  That same day, the City filed a motion in the Bankruptcy Court for an order authorizing the assumption of the City's Settlement with the swap counterparties pursuant to section 365(a) of the Bankruptcy Code and approving the Settlement pursuant to Bankruptcy Rule 9019.  *See* Docket No. 17, *In re City of Detroit, Michigan*, No. 13-53846 (Bankr. E.D. Mich.).  The Settlement, if approved, should moot this case.  Nevertheless, Syncora filed objections to the Settlement in the Bankruptcy Court and has requested expedited discovery.  (The discovery, in fact, substantially overlaps with the set of discovery demands Syncora previously served and has pending in this action.)  The Bankruptcy Court will hear Syncora's motion for discovery tomorrow, August 2.

c)  On July 15, despite the pendency of the TRO, Syncora sent letters

to the swap counterparties expressing its position that the swaps could not be

terminated without its consent and indicating that Syncora would not

consent to a termination of the swaps pursuant to the Settlement.[2]

d)  On July 24, Syncora filed yet another lawsuit, this time in New

York state court against the swap counterparties.  In that suit—which was

removed by the counterparties to federal court and stayed yesterday

afternoon—Syncora attempted to enjoin the Settlement as a violation of

Syncora's rights under the swap agreements, notwithstanding the fact that

Syncora had a parallel effort underway in the Bankruptcy Court, was

attempting to proceed in this Court as well, and, in all events, was subject to

the automatic stay of 11 U.S.C. § 362(a)(3).[3]

---

[2] This letter, and the response of SBS Financial Products Company, L.L.C., are attached as Exhibits 5 and 7 to the Declaration of Christopher J. DiPompeo in Opposition to Defendant's Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedited Discovery (ECF Doc. # 19).

[3] The City filed a notice of its bankruptcy case in the New York state court on July 31.  That same day, the swap counterparties removed the case to federal court and moved for a transfer of venue to the Eastern District of Michigan, so that the suit could be considered by the Bankruptcy Court in conjunction with the assumption motion.  Judge Lewis A. Kaplan, of the United States District Court for the Southern District of New York, then stayed the proceedings while the court considered whether to transfer the case to the Bankruptcy Court.  The court directed the parties to file briefs regarding the swap counterparties' transfer motion on August 10 and 15.  *See Syncora Guarantee Inc. v. UBS AG, et al.*, No. 1:13-cv-05335-LAK (S.D.N.Y.).

4.  The centerpiece of all three of these matters is the City's right to access the casino revenues that are protected by the lockbox system established by the Collateral Agreement.  The Bankruptcy Court has already scheduled a hearing on the City's motion to assume the Settlement, and will entertain any objections to the Settlement in that proceeding—including those raised by Syncora in the instant litigation.  Having independent litigation in this Court over the very same matters already pending in the Bankruptcy Court will waste judicial resources, increase costs, and risk inconsistent results.  Avoiding such disorder is, of course, the purpose of Local Rule 83.50(a).

5.  Second, based on Syncora's repeated actions over the past two weeks, the City believes that Syncora would again attempt to restrict the City's access to its casino revenues if the TRO were dissolved.[4]  Yet this question—the ability of a cash-strapped debtor to access its own funds—is one of the core issues in any bankruptcy and, we submit, a matter that in the end should be resolved by the Bankruptcy Court.

---

[4] Although we believe Syncora's actions already may have violated the automatic stay, even that issue would have to be resolved by the Bankruptcy Court. *See* 11 U.S.C. § 362(a)(3) (providing that a bankruptcy filing operates as an automatic stay of "any act to obtain possession of property of the estate . . . or to exercise control over property of the estate"); *In re Jefferson County, Alabama*, 484 B.R. 427, 446-47 (N.D. Ala. 2012) ("Any action that affects property of the debtor in a manner within the automatic stay's sphere, including a declaratory judgment action, is subject to § 362(a)(3), even if the debtor is not named in the action.").

    6. In sum, the state court chose to enter a TRO of unlimited duration. The
City offered to dissolve the TRO before commencing its bankruptcy case, but
Syncora at first refused and then, almost two weeks later, belatedly attempted to
accept the City's offer, but with reservations. Syncora's actions during the interim,
however, have proven the importance of the TRO, and the City believes that this
issue should be resolved as part of the Bankruptcy Court's oversight of the City's
chapter 9 proceeding. Rather than litigate the same question in three different
forums, the City requests that this Court transfer this proceeding to the Bankruptcy
Court so that the issue of dissolving the TRO may be addressed by that court.

s/ Robert S. Hertzberg
Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
(248) 359-7300  -  Telephone
(248) 359-7700  -  Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

Thomas F. Cullen, Jr.
Gregory M. Shumaker
Geoffrey S. Stewart
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Dated:      August 1, 2013

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of August, 2013, I caused to be electronically filed the foregoing Plaintiff City of Detroit's Response to Defendant Syncora's Notice of Proposed Order Dissolving the July 5, 2013, Temporary Restraining Order and this Certificate of Service with the United States District Court, Eastern District of Michigan, and notice will be sent by operation of the Court's electronic filing system to all ECF participants.

I further certify that I caused to be delivered a courtesy copy of the aforesaid to the Hon. Lawrence P. Zatkoff, 526 Water Street, Port Huron, MI 48226, via Federal Express.


s/Robert S. Hertzberg
ROBERT S. HERTZBERG (P30261)

#20334732 v1 (140967.2)

**Exhibit 15**

**Transaction Diagram and Summaries of Agreements**

# Diagram of Transactions and Tables Summarizing Agreements



**SWAPS / CERTIFICATES COLLATERALIZATION TRANSACTION STRUCTURE & FLOWS**

**Service Contracts**

| | |
|---|---|
| *Parties* | GRS Service Corporation and the City. |
| | PFRS Service Corporation and the City. |
| *Purpose* | To establish and govern the City's obligation to provide the Service Corporations with the funds necessary to pay the amounts due under the COPs and the Swaps. |
| *Section 7.03 Subrogation* | After making an insurance payment, Syncora is subrogated to the rights of COP-holders or a Swap Counterparty. |
| *Section 8.03 Priority Scheme* | The priority of payments under the Service Contracts is as follows: |
| | Contract Administration Payments; |
| | All theretofore due and unpaid Service Charges and amounts in respect of Hedge Periodic Payables (COP interest payment and Quarterly Swap Payment; |
| | All then due or about to become due Service Charges and amounts due in respect of Hedge Periodic Payables (COP interest payment and Quarterly Swap Payment); |
| | All theretofore due and unpaid Regular Scheduled Payments (COP principal payment); |
| | All then due or about to become due Regular Scheduled Payments (COP principal payment); |
| | All theretofore due and unpaid amounts in respect of Hedge Termination Payables (Swap termination payments); |
| | All then due or about to become due amounts in respect of Hedge Termination Payables (Swap termination payments); |
| | All then due or about to become due Option Prepayment Amounts and Accrued Service Charges. |
| *Section 9.02 Termination or Assignment of Stated Hedges* | The City may not direct the Service Corporation to terminate a Swap without Syncora's consent. |
| *Section 9.05 Amendment* | The Service Contract cannot be amended without the prior written consent of Syncora (as a third-party beneficiary). [why as third-party beneficiary - see *9.05(iv)*] |
| *Section 9.06 No Waiver; Remedies* | The failure of a third-party beneficiary (*i.e.*, Syncora) to exercise any of its rights under the Service Contract does not constitute a waiver. |

| | |
|---|---|
| **Section 9.07 Binding Obligation** | The Service Contract is a continuing obligation of the City and shall inure to the benefit of and be enforceable by Syncora as third-party beneficiary. |
| **Section 9.12 Third Party Beneficiaries** | Syncora is a third-party beneficiary of the Service Contract and has the right to enforce the promises made in the Service Contract. Any amendment that diminishes the rights and remedies of Syncora as third party beneficiary without Syncora's prior written consent is acknowledged to have the effect in fact of hindering, delaying and defrauding Syncora. |
| **Section 9.17 Integration** | The Service Contract is intended by the parties as the final, complete, and exclusive statement of the transactions evidenced by the Service Contract. |

## Swaps (Master Agreement) (ISDA MA)

| | |
|---|---|
| **Parties** | GRS Service Corporation and SBS. GRS Service Corporation and UBS. PFRS Service Corporation and SBS. PFRS Service Corporation and UBS. |
| **Purpose** | To serve as a hedge and fix the interest rate on the Floating-Rate COPs. |
| **Part 5 Events of Default and Termination Events** | Events of Default/Termination Events include: (a) the Service Corporations' failure to make any payment due under the Swaps; (b) the Service Corporations' failure to make any payments when due in excess of $10 million; (c) the City's commencement of bankruptcy proceedings; and (d) the City's appointment of an administrator of its assets. |

## Contract Administration Agreement (CAA)

| | |
|---|---|
| **Parties** | Funding Trusts, GRS Service Corporation, PFRS Service Corporation, and US Bank (as Contract Administrator). |
| **Purpose** | To (i) appoint an administrator to collect amounts from the City (on behalf of the Service Corporations) and distribute Service Payments and Swap Payments; (ii) allow Service Corporations to make pledges; and (iii) set forth parties' control rights after an Event of Default. |
| **Section 6.9.2(1) Control by Majority** | Syncora is treated the same as the COP-holders it insures and has the right to provide the same consents, directions, and waivers as those COP-holders. |

| | |
|---|---|
| ***Section 6.9.2(2) Control by Majority*** | Syncora controls all actions that may be taken by a Swap Counterparty, including all directions, consents, and waivers that a Swap Counterparty may provide. |
| ***Section 9.2 Independent Action by Parties*** | Syncora has the right to enforce any remedies relating to any collateral provided by the City and Service Corporations. |
| ***Section 10.2 Party In Interest*** | Syncora is a party-in-interest and may (i) notify the Service Corporation or U.S. Bank of an Event of Default and (ii) request that U.S. Bank intervene in judicial proceedings that affect the COPs, the Swaps, or the security. U.S. Bank is required to accept notice of an Event of Default from Syncora. |
| ***Section 10.3 Amendments*** | Any amendment or supplement to the Contract Administration Agreement or either Service Contract is subject to Syncora's consent. |
| ***Section 11.6 Third Party Beneficiaries*** | Any amendment entered into diminishing Syncora's rights and remedies (as third party beneficiary) without its consent is acknowledged to have hindered and defrauded Syncora. |
| ***Section 11.10 Integration*** | The Contract Administration Agreement is intended to be the final, complete, and exclusive statement of the transactions evidenced by the agreement. |

## Trust Agreement (TA)

| | |
|---|---|
| ***Parties*** | GRS Service Corporation, PFRS Service Corporation, and US Bank (as Trustee). |
| ***Purpose*** | To appoint U.S. Bank as trustee and to provide for the issuance of certificates of participation representing undivided interests in certain of the respective payments made under the Service Contracts. |
| ***Section 802 Insurer Treated As Certificate-holder*** | Any Insurer not then in default under its Credit Insurance shall be treated as the holder if the Certificates insured by it for the purposes of actions to be taken by Certificateholders under the Trust Agreement and for the purpose of giving all other consents, directions and waivers that Certificateholders may give. |

## Collateral Agreement (CA)

| | |
|---|---|
| ***Parties*** | The City, GRS Service Corporation, PFRS Service Corporation, U.S. Bank (as Custodian), and the Swap Counterparties. |

| | |
|---|---|
| **Purpose** | To provide collateral to secure the City's payment obligations to the Service Corporations under the Service Contracts in exchange for a waiver of the rights of the Swap Counterparties to terminate the Swaps as a result of a default by the City. |
| **Section 5.1 Payment of Revenues** | The City shall not take any action to redirect the payment of the casino revenues. |
| **Section 5.4 When Payments from GRSA Prohibited** | No payment shall be made to the City from the General Receipts Subaccount during certain Termination Events and/or Events of Default. (*See, e.g.,* A&R Part 1(i); ISDA MA § 5; CA § 11.6.). |
| **Section 14.5 No Amendment** | No amendment to the Collateral Agreement that would affect Syncora's rights is effective without Syncora's written consent. |
| **Section 14.6 Rights of Insurer** | Syncora, as insurer, may exercise any right given to it in the Collateral Agreement. |
| **Section 14.14 Integration** | The Collateral Agreement incorporates the provisions of the Swaps, the Service Contracts, and the Contract Administration Agreement. |
| **Irrevocable Instructions** | The City must provide irrevocable instructions to each casino to deposit into the General Receipts Subaccount the funds that it pays to satisfy the City's wagering tax. |


### Amended Swaps (Amended and Restated Schedule to the 1992 ISDA Master Agreement) (A&R)

| | |
|---|---|
| **Parties** | The Service Corporations and the Swap Counterparties. |
| **Purpose** | To serve as a hedge and to fix the interest rate on the Floating-Rate COPs. |
| **Part 5(iv) Swap Insurer Consent** | Syncora must consent, in writing, to any modification, waiver, or amendment of the Swap Agreement or the Collateral Agreement. |
| **Part 5(i) Designation of Early Termination Event** | If a Termination Event or Event of Default occurs, neither the Service Corporations nor the Swap Counterparties can designate an Early Termination Event without Syncora's prior written consent. |

| | |
|---|---|
| ***Part 5(x) Represent-ations and Agreements*** | Each party's representations and agreements in the Swaps are expressly made to and for the benefit of Syncora. |
| ***Part 5(xi) Third-Party Beneficiary*** | Syncora is an express third-party beneficiary of the Swaps with the power to enforce the terms of the agreement. |
| ***Part 5(xiii) Subrogation*** | Syncora is subrogated to the rights of the Swap Counterparties against the Service Corporations to the extent Syncora must make insurance payments. |
| ***Part 5(xiv) Designating an Early Termination Event*** | Syncora must consent in writing to a party's attempt to terminate the Swaps due to an Event of Default or Termination Event. |
| ***Part 5(xx) Optional Early Termination*** | Swap Counterparty may designate early termination date if it is not a sole defaulting party by providing five (5) business days' notice and setting an early termination date. |

## Forbearance Agreement (FA)

| | |
|---|---|
| ***Parties*** | The City, the Service Corporations, UBS A.G., Merrill Lynch Capital Services. |
| ***Recitals*** | The Parties admit that Events of Default have occurred and are continuing under the Swaps. |
| ***Section 1.1 Forbearance*** | The Swap Counterparties agree to forbear from terminating the Swaps and instructing U.S. Bank, as Custodian, to cease making payments to the City from the General Receipts Subaccount. (This is contrary to the automatic cash-trapping provision of the **Collateral Agreement (CA) §5.4(a)**.) |
| ***Section 1.2 Forbearance Period*** | The Forbearance Agreement creates a Forbearance Period, which is a period of ongoing obligation by the Swap Counterparty to support the City's efforts to receive payments of casino revenues from the General Receipts Subaccount. The underlying agreements (*i.e.*, the Swaps, Service Contracts, Contract Administration Agreement, and Collateral Agreement) are otherwise operable during this period, including the provisions in those agreements regarding insurance obligations of Swap Insurers such as Syncora (notwithstanding the release of collateral). (This is contrary to **Amended Swaps (A&R) § 5(iv), 5(d)**. No amendments, modifications, *or waivers* of the Swaps or the Collateral Agreement are effective unless Syncora consents in writing.) |

| | |
|---|---|
| ***Section 3.1 Right to Direct Swap Counter-parties to Terminate*** | The City may direct the Swap Counterparties to exercise optional termination rights, which relieve the Service Corporations of their payment obligations. The Forbearance Agreement contains no provisions addressing or requiring Syncora's consent to any such termination. (This is contrary to **Contract Administration Agreement (CAA) § 6.9.2(2)**. Syncora has the right to direct the actions of the Swap Counterparties.) |
| ***Section 3.5 Decreased Termination Amount*** | If the City chooses to exercise its optional termination rights, the City pays between 75% and 82% of the mid-market value of the Swaps, with the value to be determined on the date of the exercise of the termination option. This payment is a direct payment to the Swap Counterparties. (This is contrary to the **Swaps (ISDA MA) § 6(e)**. If the Swap is terminated early, the termination value is determined by reference to either market quotation by leading dealers in the market or the full value of the loss of the Swap.) |

**Exhibit 16**

**Declaration of William E. Arnault**

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

**DECLARATION OF WILLIAM E. ARNAULT IN SUPPORT OF OBJECTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. TO MOTION OF DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT RULE 9019, AND (III) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, William E. Arnault, hereby submit this declaration under penalty of perjury:

1.     I am an associate at Kirkland & Ellis, counsel to Syncora Guarantee Inc. and Syncora Capital Services Inc. ("Syncora").  I submit this declaration in support of Syncora's objection to the debtor City of Detroit's ("City's") *Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief*, dated July 18, 2013, [Docket No. 17] (the "Assumption Motion").

2.     Attached as Exhibit 2 is a true and correct copy of the Service Contract dated June 7, 2006.

3.     Attached as Exhibit 3 is a true and correct copy of the ISDA Master Agreement dated June 7, 2006.

4.     Attached as Exhibit 4 is a true and correct copy of the Contract Administration Agreement dated June 12, 2006.

5.     Attached as Exhibit 5 is a true and correct copy of the Trust Agreement dated June 12, 2006.

6.     Attached as Exhibit 6 is a true and correct copy of the Collateral Agreement dated June 25, 2009.

7.     Attached as Exhibit 7 is a true and correct copy of the Amended and Restated Schedule to the ISDA Master Swap Agreement dated June 7, 2006.

8.     Attached as Exhibit 8 is a true and correct copy of the Forbearance Agreement dated July 15, 2013.

Chicago, IL
Dated:  August 16, 2013

William E. Arnault

2

| | | |
|---|---|---|
| In re | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |

## STATEMENT OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. IN ADVANCE OF STATUS CONFERENCE

Over the past weeks, the City of Detroit (the "City") has submitted multiple filings assailing the motivations of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora"). According to the City, Syncora's efforts to ensure the proper operation of the Collateral Agreement and its opposition to the Assumption Motion are (a) improper attempts to exert leverage over the City and (b) contrary to Syncora's own self-interest.

Syncora submits this statement to clarify the purposes behind its efforts to secure the City's compliance with the legal agreements comprising the COPs/Swaps structure and to demonstrate that Syncora's economic interests are being directly impaired by the City's efforts to terminate the Swaps and gain access to the Casino Revenues. In addition, Syncora responds to the City's suggestion that the automatic stay prohibits the normal operation of the Collateral Agreement. Last, Syncora rebuts the City's argument that the City will be crippled without immediate access to the Casino Revenues that are supposed to be trapped under the Collateral Agreement.

## I. Syncora Will Suffer Injury if the Swaps Are Terminated.

1. Lost in the City's various filings is the fact that the COPs/Swaps structure is fundamentally an economic one that is embedded with numerous terms intended to protect

Syncora's rights and interests.[1]  The City has asked the Court to approve and authorize the assumption of the Forbearance Agreement — even though this agreement is contrary to the operation of the COPs/Swaps structure and threatens Syncora's bargained-for rights and interests.  Though Syncora addresses the failings of the Forbearance Agreement in greater detail in its Objection, three points are worth noting.

2.    *First*, the existence and proper functioning of the Swaps is critical to Syncora's insurance obligations.  As the City concedes, the purpose behind the Swaps is to hedge against rising interest rates on the floating-rate COPs.  While this hedge provides a benefit to the City and the Service Corporations should interest rates rise above 6%, it also benefits Syncora, who has insured both the COPs and the Swaps since the inception of the COPs/Swaps structure.  Syncora has always viewed its obligations conjunctively precisely <u>because</u> the COPs and the Swaps are integrated legally and economically.

3.    As a result, contrary to the City's assertions that Syncora's position is "clearly a tactical ploy to obtain leverage over the City with respect to the City's other relationships with Syncora,"[2] Syncora does not want the Swaps to terminate *even if* it means the release of its Swaps obligations.  The Swaps are an important protection against rising interest rates on the COPs obligations that Syncora insures.  Thus, Syncora's position is not some calculated ploy to

---

[1]  For a more detailed discussion of the COPs/Swap structure, please refer to *Objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of That Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(A) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant Rule 9019, and (III) Granting Related Relief* [Docket No. 366] (the "<u>Objection</u>").  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Objection.

[2]  *Motion of Debtor City of Detroit to Schedule Status Conference, Set Briefing Schedules and Maintain Status Quo* [Adv. Pro. Docket No. 51] (the "<u>Status Quo Motion</u>") ¶ 5(a); *see also Debtor's Reply in Support of its Motion for Protective Order* [Adv. Pro. Docket No. 55] (the "<u>Protective Order Reply</u>") at 7 (describing Syncora's opposition to the Forbearance Agreement as "a pure leverage play").

exert leverage over the City vis-à-vis unrelated matters.  Rather, it is a good-faith attempt to protect its economic self-interest in respect of the COPs/Swaps structure.

4.     *Second*, the City, the Service Corporations, and the Swap Counterparties consistently ignore that, under Part 5(i) of the amended and restated schedules to the Swaps (the "Amended Swaps"), Syncora can refuse to consent to the termination of the Swaps as long as an Event of Default is outstanding under the Swaps.  Events of Default under the Swaps include the insolvency of the Service Corporations as well as payment defaults by them in excess of $10 million.  (CA § 5.4(a)(iii); Swaps §§ 5(a)(i), 5(vi).)  Both types of Events of Default have occurred here.  Until these Events of Default are cured, the Casino Revenues are supposed to automatically accumulate in the General Receipts Subaccount.  This accumulation in turn provides the City with a powerful incentive to satisfy its obligations to the Service Corporations so that the Service Corporations can cure any outstanding Events of Default under the Swaps.  In this case, that would mean drawing current on the Service Corporations' payment obligations to the COPs.  This, in turn, minimizes Syncora's Swaps and COPs insurance obligations.

5.     Under the Forbearance Agreement, however, the City, the Service Corporations, and the Swap Counterparties are attempting to overthrow the proper operation of the COPs/Swaps structure.  Their agreement runs contrary to the very system described above, as it deprives Syncora of the ability to (a) prevent termination of the Swaps and (b) trap the Casino Revenues in the General Receipts subaccount.  As a result, the City's attempt to abrogate Syncora's consent rights — with the justification that "Syncora is not prejudiced" — ignores the integrated nature of the COPs/Swaps structure and Syncora's rights as a COP-holder and COP-insurer.  Put simply, Syncora's exposure will grow dramatically if the City and the Swap Counterparties are allowed to avoid the operation of the Collateral Agreement and Syncora's

3

consent rights under the Swaps — and that exposure will easily outstrip the ostensible "release" Syncora will obtain if the Swaps are allowed to terminate over its objection.

6.      *Third*, the Forbearance Agreement divests Syncora of its collateral protection without actually releasing Syncora from its Swap insurance obligations. Assuming *arguendo* that the Forbearance Agreement is valid — even though it is not — the agreement is nothing more than an option contract pursuant to which the City can direct termination of the Swaps by a specified date. However, whether the City will ultimately exercise this right — or if it even has the ability to do so — is unknown.

7.      In the interim though, while the City seeks financing and debates whether to cleave the COPs/Swaps structure, Syncora remains obligated on its Swap insurance. Syncora is justifiably unwilling to see the collateral that secures its insurance obligations released to the City for any amount of time while it remains liable for the Swaps. Thus, even viewed solely from the vantage point of its role as Swap insurer, Syncora needs to enforce its rights regarding retention of the Casino Revenues in the General Receipts Subaccount.

8.      In short, the City's repeated efforts to portray Syncora as a bad actor ignore the principled economic and legal motivations it has for seeing the legal agreements comprising the COPs/Swaps structure enforced according to their terms.

## II.      The Automatic Stay Does not Apply to the Casino Revenues.

9.      Despite its current representations to the contrary, the City is aware that the automatic stay does not apply to the Casino Revenues. That is, after all, why the City has been touting the Forbearance Agreement as an agreement that will give the City much-needed liquidity via access to the Casino Revenues.[3] If the automatic stay applied, the City would have

---

[3] *See, e.g.*, Forbearance Agreement Motion ¶ 41.

gained access to the Casino Revenues upon commencement of these chapter 9 proceedings and would not now need to press the Court for expedited approval of the Forbearance Agreement.[4]

10.     The City now, however, takes the position that the automatic stay *does* apply to the Casino Revenues.  This is demonstrably incorrect for four reasons.  *First*, the Casino Revenues in the General Receipts Subaccount are not subject to the automatic stay because they are not property of the City.  *Second*, the accumulation of the Casino Revenues in the General Receipts Subaccount is not an act to "obtain possession" or "exercise control" under section 362(a)(3) of the Bankruptcy Code.  *Third,* the accumulation of the Casino Revenues in the General Receipts Subaccount is exempt from the stay as an application of pledged special revenues under section 922(d) of the Bankruptcy Code.  *Fourth*, the Casino Revenues are swap collateral and any actions by swap participants to enforce their contractual right to such collateral is exempted from the automatic stay under section 362(b)(17) of the Bankruptcy Code.

### A.     The Casino Revenues are not Subject to the Automatic Stay because they are not Property of the City.

11.     The Casino Revenues held in the General Receipts Subaccount are not property of the City and therefore the automatic stay does not protect them.  *See In re RCS Engineered Prod. Co., Inc.*, 102 F.3d 223, 227 (6th Cir. 1996) (holding that the automatic stay did not apply because the property interest at issue was not property of the estate).  Contrary to the City's conclusory assertion that "there can be no question" that the funds held in the General Receipts Subaccount are the City's property,[5] such Casino Revenues, like funds held in escrow, are not

---

[4] *See also Debtor's Ex Parte Motion for an Order Shortening Notice, Staying Further Briefing and Scheduling an Expedited Hearing with respect to Motion of Debtor City of Detroit to Schedule Status Conference, Set Briefing Schedules and Maintain Status Quo* [Adv. Pro. Docket No. 52] (the "Status Quo Procedural Motion") ¶ 9 ("The City believes that full consideration of whether to dissolve the TRO can only be made after determining whether the automatic stay prevents Syncora from attempting to interfere with the City's casino revenues.").

[5] Status Quo Motion ¶ 11.

property of the City unless and until the City satisfies all applicable conditions precedent that entitle it to possession of the Casino Revenues pursuant to the Collateral Agreement.

12. Under New York law, a valid escrow requires (a) a written agreement where (b) the grantor deposits property with, and relinquishes control to, an escrowee and (c) subsequent delivery of the property by an escrowee to the grantee is conditioned upon the happening of an event or the performance of an act. *See*, *e.g.*, *In re AppOnline.com, Inc.*, 315 B.R. 259 (Bankr. E.D.N.Y. 2004); *In re Royal Bus. Sch., Inc.*, 157 B.R. 932, 938 (Bankr. E.D.N.Y. 1993). And, it is well-established that funds held in escrow are not property of the debtor subject to the automatic stay. *See Creative Data Forms, Inc. v. Penn. Minority Bus. Dev. Auth.*, 72 B.R. 619, 624 (E.D. Pa. 1985) aff'd, 800 F.2d 1132 (3d Cir. 1986) (escrow account was not property of the estate even when the debtor was both the grantor and grantee of the account); *see also In re Atlantic Gulf Cmty. Corp.*, 369 B.R. 156, 163 (Bankr. D. Del. 2007) (escrow account was not estate property where debtor was a contingent grantee, entitled to the funds only upon the satisfaction of certain conditions); *In re Cannon*, 277 F.3d 838, 856 (6th Cir. 2002) (escrow account held by an attorney was not property of the attorney-debtor's estate).

13. The Collateral Agreement established an escrow for the Casino Revenues. Casino licensees pay the Casino Revenues directly into the General Receipts Subaccount, which is a custodial account maintained by U.S. Bank, a third-party custodian. Meanwhile, the City makes monthly payments on account of the Swaps into a holdback account, which is a separate custodial account U.S. Bank maintains that also contains funds that have been pledged under the Collateral Agreement.

14. Significantly, the City does not own or control either of these custodial accounts. In fact, the City only gains a right to possess the Casino Revenues once U.S. Bank certifies that

the City has made the requisite monthly payments on account of the Swaps and otherwise has satisfied all of the conditions precedent set forth in the Collateral Agreement (such as curing any Events of Default under § 5.4(a)(iii)). At that time, U.S. Bank typically pays the Casino Revenues from the General Receipts Subaccount to the City. If, however, the City has not satisfied its obligations (*e.g.*, payment into the holdback account) or there is a continuing Event of Default under the Collateral Agreement, the Casino Revenues must remain in the General Receipts Subaccount as cash collateral securing the City's performance in accordance with, and by automatic operation of, the Collateral Agreement. (CA §§ 5.2, 5.4.) Any modification, amendment, or waiver of these terms requires Syncora's consent, which has not been given.

15. Accordingly, this structure satisfies all of the requirements of an escrow. Therefore, the Casino Revenues held in the General Receipts Subaccount are not property of the City and the automatic stay does not apply.

**B.    Even if the Casino Revenues are the City's Property, the Mere Accumulation thereof in the General Receipts Subaccount Pursuant to the Self-Executing Terms of the Collateral Agreement is not an Act to "Obtain Possession" or "Exercise Control" under Section 362(a)(3) of the Bankruptcy Code.**

16. Assuming *arguendo* that the Casino Revenues are property of the City, the mere accumulation of cash in the General Receipts Subaccount is not an action "to obtain possession" or "to exercise control" over that property under section 362(a)(3) of the Bankruptcy Code. The Supreme Court has recognized that freezing a debtor's bank account is not an exercise of control over the debtor's property. *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 21 (1995) (finding that placing an administrative hold on debtor's bank account was "neither a taking of possession of [the debtor's] property nor an exercising of control over it"). Under section 5.4 of the Collateral Agreement, the Custodian is obligated to place a hold on the General Receipts

948

Subaccount if, as here, an Event of Default has occurred. Such a self-effectuating hold is outside the scope of section 362(a)(3) of the Bankruptcy Code.

## C. The Casino Revenues and the Operation of the Collateral Agreement are Exempt from the Automatic Stay Pursuant to Section 922(d) of the Bankruptcy Code.

17. Section 922(d) of the Bankruptcy Code provides that "a petition filed under this chapter does not operate as a stay of application of pledged special revenues in a manner consistent with section [928] of this title to payment of indebtedness secured by such revenues." Section 902(2)(B) of the Bankruptcy Code defines special revenues to include "special excise taxes imposed on particular activities or transactions."

18. Although not defined under section 902(2)(B), "excise tax" has been defined in other bankruptcy contexts as "an indirect tax that is not directly imposed upon persons or property, but one that is imposed on the performance of an act, engaging in an occupation, or the enjoyment of a privilege." *New Neighborhoods, Inc. v. West Va. Comp. Ins. Fund*, 886 F.2d 714, 719 (4th Cir. 1989) (holding that premiums owed to a workers' compensation fund were excise taxes entitled to priority under section 507 of the Bankruptcy Code). Michigan law provides that an excise tax is "any tax which does not fall within the classical definition of a poll tax or property tax, and embraces every form of burden not laid directly upon persons or property . . . [including] a tax imposed upon the performance of an act, the engaging in an occupation, or the enjoyment of a privilege." *Dooley v. City of Detroit*, 370 Mich. 194, 206-07 (1963).

19. Here, each component of the Casino Revenues is a specific tax on the act of gaming.[6] The City Ordinance clearly states that Wagering Taxes are an excise tax. Detroit City

---

[6] The Casino Revenues comprise (a) Developer Payments imposed under the casino licensee's development agreements with the City (the "Developer Payments"); (b) Wagering Taxes imposed by City ordinance (the "City Ordinance"); (c) Additional Wagering Taxes imposed by state law (the "Wagering Tax Revenue Statute"); and (d)

Code § 18-14-3 (imposing "an excise tax upon the adjusted gross receipts of a casino licensee."). Additionally, though neither the Wagering Tax Revenue Statute nor the Developer Agreements specifically call for an "excise tax," both impose a tax on the adjusted gross receipts of casino licensees, which, like the Wagering Taxes, is a tax on a specific activity — gaming. Accordingly, the Casino Revenues are excise taxes and, thus, "special revenues" under section 902(2)(B) of the Bankruptcy Code that were pledged (as discussed below) under the Collateral Agreement. The Casino Revenues are therefore property of the type exempted from the stay under section 922(d) of the Bankruptcy Code.

20.    As further evidence of the nature of the Casino Revenues, both Orrick Herrington & Sutcliffe LLP ("Orrick"), special counsel to the City for the execution of the Collateral Agreement, and the City have acknowledged that the Wagering Taxes are special revenues. In conjunction with the execution of the Collateral Agreement, Orrick issued an opinion stating that "if the matter were properly briefed and presented to a court, the court would hold that the Wagering Taxes constitute 'special revenues' under [s]ection 902(2) of the Bankruptcy Code." (Ex. 1, Orrick Opinion, p 7.) The City recently adopted a similar position, stating in its June 2013 initial proposal to creditors that the City was "treating the swap obligations as special revenue debt secured by the wagering tax revenues." (City Proposal, June 14, 2013 p. 28.)

21.    Not only are all of the Casino Revenues special revenues, they are all pledged special revenues as well. The Collateral Agreement granted the Service Corporations a lien on all the Casino Revenues. (CA § 4.1(b) ("The City pledges to the Service Corporations and creates a first priority lien upon all of the City's right, title and interest in, to and under the

---

in the event the City repeals the City Ordinance, an Alternative Tax also imposed by the Wagering Tax Revenue Statute.

Pledged Property,[7] whether received or to be received, in order to secure the payment of all City Hedge Payables Related Obligations).) The Service Corporations then pledged all of their secured interests in the Casino Revenues to the Swap Counterparties. (CA § 4.2(a).)

22. Finally, accumulation of the Casino Revenues in the General Receipts Subaccount constitutes "application of the pledged special revenues in a manner consistent with section [928]." Section 928 of the Bankruptcy Code provides that "special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 928(a). Accumulation of the Casino Revenues in the General Receipts Subaccount is in accordance with the terms of the Collateral Agreement pursuant to which the lien was granted and in support of such lien. Accordingly, the automatic stay does not apply.

23. Further, if the Casino Revenues could not be held in the General Receipts Subaccount postpetition in accordance with the terms of the Collateral Agreement, the underlying purpose of section 922(d)'s exemption from the automatic stay for pledged special revenues would be undermined. Before the addition of sections 902, 922, and 928 to the Bankruptcy Code, as the City has admitted, section 552 of the Bankruptcy Code operated to extinguish prepetition liens of municipal creditors. Municipalities, unlike companies, generally cannot grant liens on specific assets. Rather, municipalities can generally only grant liens on the proceeds of assets. *See In re Jefferson Cnty., Ala.*, 474 B.R. 228, 267-71 (Bankr. N.D. Ala. 2012) (explaining the legislative history of sections 902, 922, and 928 of the Bankruptcy Code). Section 552(a) of the Bankruptcy Code, which states that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any

---

[7] Pledged Property includes the Casino Revenues. (CA §§ 1.2, 1.4, 1.6.)

security agreement entered into by the debtor before the commencement of the case," effectively nullifies prepetition liens on proceeds of assets of a municipality. Furthermore, such liens are not protected by section 522(b) of the Bankruptcy Code which creates an exception to section 552(a) for prepetition liens on proceeds of an asset that extent to the underlying asset. In recognition of this problem, Congress enacted sections 902, 922, and 928 of the Bankruptcy Code to ensure that municipal financial creditors would realize the benefit of their bargains in the event of a chapter 9 filing. *See* S. Rep. No. 100-506, at 12 (1988) ("[T]he [section 902, 922, and 928] amendments insure that revenue bondholders receive the benefit of their bargain with the municipal issuer, namely they will have unimpaired rights to the project revenue pledged to them.").

24.     If, notwithstanding the basic operation of the Collateral Agreement, the Casino Revenues cannot remain in the General Receipts Subaccount and are instead paid to the City, then the Swap Counterparties, and, by extension, the Swap Insurers, will lose their security interest in the Casino Revenues. Once paid to the City and placed in the City's general fund, the Casino Revenues will not be traceable. As a result, in the event the Swap Counterparties or Swap Insurers needed to draw on their cash collateral, they would not be able to trace the funds to which they are entitled. Moreover, even if the Casino Revenues were traceable, the Swap Counterparties and Swap Insurers may not be able to compel the City to turn them over because the Court may not have the authority to make the City do so. *See* 11 U.S.C. § 904. As a result, without the ability to trap the Casino Revenues in the General Receipts Subaccount in accordance with the terms of the Collateral Agreement, the Swap Counterparties' prepetition lien on the Casino Revenues effectively would be nullified in contravention of Congress's objectives in enacting sections 902, 922, and 928 of the Bankruptcy Code. Accordingly, retention of the

Casino Revenues in the General Receipts Subaccount is an application of pledged special revenues in accordance with section 928 of the Bankruptcy Code and therefore exempt from the automatic stay pursuant to section 922(d) of the Bankruptcy Code. To be sure, Syncora seeks nothing more than the continued enforcement of the terms of the Collateral Agreement with respect to the Casino Revenues. Specifically, Syncora seeks continued enforcement of section 5.4 of the Collateral Agreement, which operates automatically to trap cash upon the occurrence of certain Termination Events and Events of Default. (CA § 5.4.) And several Termination Events and Events of Default have occurred.

      **D.     The Casino Revenues and the Operation of the Collateral Agreement are Exempt from the Automatic Stay Pursuant to Section 362(b)(17) of the Bankruptcy Code.**

      25.    Section 362(b)(17) was enacted to "ensure that the swap and forward contract financial markets are not destabilized by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code." H.R. Rep. No. 484, H.R. REP. 101-484. It provides an exception to the automatic stay for "the exercise by a swap participant . . . of any contractual right . . . under any security agreement or arrangement . . . forming a part of or related to any swap agreement." 11 U.S.C. § 362(b)(17); *see also In re Mirant Corp.*, 314 B.R. 347, 353 (Bankr. N.D. Tex. 2004) (holding that counterparty's postpetition exercise of its contract rights under swap agreement was exempted from the automatic stay).

      26.    A "swap participant" is "an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor." 11 U.S.C. § 101(53C). The term "swap agreement" includes, among other things, "any security agreement or arrangement or other credit enhancement related to any agreements or transactions [in connection with interest rate swaps]." *Id.* at § 101(53B)(A)(vi). A "security agreement" is any "agreement that creates or provides for a security interest." 11 U.S.C. § 101(50).

12

27.     The Swap Counterparties are swap participants because they and the City are parties to the Collateral Agreement. The Collateral Agreement is a security agreement because it provides for a security interest. *See id.* And it is a swap agreement because it relates to interest rate swaps. *See id.* at § 101(53B)(A)(vi). Accordingly, the Swap Counterparties may exercise any contractual rights under the Collateral Agreement under section 362(b)(17) of the Bankruptcy Code. *See id.* at §§ 101(53C), 362(b)(17).

28.     The Swap Counterparties therefore have the contractual right, exempted from the automatic stay, to enforce section 5.4(a)(iii) under the Collateral Agreement, which provides that "[n]o payment shall be made to the City from the General Receipts Subaccount . . . while an Event of Default is continuing under a Hedge where the related Counterparty is not the sole Defaulting Party."

29.     Furthermore, under the Contract Administration Agreement, Syncora has the right to direct the actions of the Swap Counterparties under the Collateral Agreement. (CAA § 6.9.2(2) ("[A]ny Insurer not then in default under its Credit Insurance [*i.e.*, Syncora] shall . . . control all actions that may be taken by any Specified Hedge Counterparty that is the beneficiary of such Credit Insurance, including for purposes of actions permitted to be taken by such Specified Hedge Counterparty under this Agreement for the purposes of giving all other directions, consents and waivers that such Specified Hedge Counterparty may give.").) As a result, any direction from Syncora to the Swap Counterparties to ensure that the Casino Revenues are trapped in the General Receipts Subaccount would not be subject to the automatic stay.

30.     Finally, as set forth in Syncora's Objection, though it is not a signatory to the Collateral Agreement, Syncora has various rights under the Swaps and the Collateral Agreement

13

by virtue of its status as an insurer and third-party beneficiary.  First, Syncora insures the Swaps, and, as such, provides a "credit enhancement."  *See In re Macklin*, No. 10-446010, 2012 WL 8250012, at *11 (Bankr. E.D. Cal. Feb. 16, 2012) (noting that insurance is a form of credit enhancement).  As noted, a credit enhancement in connection with an interest rate swap is itself a swap agreement.  *See* 11 U.S.C. § 101(53B)(A)(iv).  Second, Syncora is a third-party beneficiary under the Collateral Agreement, and is therefore a swap participant.  Because Syncora is a swap participant, it can enforce the terms of the Collateral Agreement and may, for example, send U.S. Bank, as custodian, a notice of an event triggering retention of the Casino Revenues in the General Receipts Subaccount, unhindered by the automatic stay.  *See id.* at § 362(b)(17).

31.     Accordingly, for the above reasons, the Casino Revenues and the operation of the Collateral Agreement are exempt from the automatic stay pursuant to section 362(b)(17) of the Bankruptcy Code.

## III.     The City Overstates Its Immediate Need to Access the Casino Revenues.

32.     Given the unambiguous language of the operative documents, whether the City needs the Casino Revenues or not, they must be automatically trapped.  Nonetheless, in numerous filings, the City claims that, without immediate access to the funds in the General Receipts Subaccount, it will suffer immediate and irreparable harm.[8]  This claim, however, is belied by the proposal that Mr. Orr provided to the City's creditors as part of his June 14, 2013 presentation, which reveals that the City's immediate access to the Casino Revenues is *not* essential to the day-to-day operations of the City.  (Ex. A to Orr Aff.)

33.     As part of this proposal, Mr. Orr detailed the current financial status of the City. According to this presentation, the City forecasts 2014 revenues of approximately $1.083 billion,

---

[8] Status Quo Motion ¶ 10; *see also id.* at ¶ 4 (describing the cash trap as an "untenable loss"); Status Quo Procedural Motion ¶ 8 (describing the effect of the cash trap as "immediate and irreparable harm to the City and its creditors").

with approximately $170 million derived from Casino Revenues. (*Id.* at 38.) The City forecasts approximately $685.7 million in operating expenditures for 2014. (*Id.*) Thus, even if the City did not receive any of the Casino Revenues for all of 2014 — approximately $170 million — the City still projects a net operating surplus of approximately $227.2 million.[9]

34.       In light of the above calculations, the City is projected to be cash-flow positive for 2014. This is relevant because the City has argued that its dire need for liquidity necessitates that the funds in the General Receipts Subaccount not be trapped. As demonstrated herein, however, the City's contention is contradicted by its own projections.

35.       The City may not be satisfied with the current level of services it is providing to its citizens. But its claim that the current level of services will be materially threatened by the normal operation of the Collateral Agreement is not supported by the record. In any event, the City's desire for cash is not a basis to disregard the plain language of the Collateral Agreement, which was designed to operate automatically.

[*Remainder of this page intentionally left blank*]

---

[9]   The City's summary of its current financial status also details its funded debt and legacy liability related expenditures. However, Mr. Orr has stated that he will (a) not be making debt service payments to the general obligation bonds; (b) not be contributing to the pensions; (c) treat the retirees as unsecured creditors; and (d) not be making the COP-related service payments to the COP-holders. In addition, if the Casino Revenues are trapped, then there is no need for the City to make the Swap-related payments to the Service Corporations. Finally, none of the expenditures referenced above are necessary to the City's day-to-day operations. Accordingly, they were not considered in the calculations described in paragraph 33.

15

Dated: August 20, 2013       /s/ *Ryan Blaine Bennett*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:     (248) 646-5070
Facsimile:     (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

16

**<u>Exhibit 1</u>**

**Orrick Opinion**



ORRICK, HERRINGTON & SUTCLIFFE LLP
666 FIFTH AVENUE
NEW YORK, NY 10103-0001
tel 212-506-5000
fax 212-506-5151
WWW.ORRICK.COM

JUNE 26, 2009

THE PARTIES LISTED ON SCHEDULE A HERETO

      Re:    Collateral Agreement, dated as of June 15, 2009, among the City of
            Detroit, certain Service Corporations, acting severally and not jointly,
            <u>U.S. Bank National Association, as Custodian, and certain Counterparties</u>

Ladies and Gentlemen:

      We have acted as special counsel to the City of Detroit, Michigan (the "City"), the
Detroit General Retirement System Service Corporation ("GRS") and the Detroit Police and Fire
Retirement System Service Corporation ("PFRS" and, together with GRS, the "Service
Corporations") in connection with the settlement and release of certain claims that could have
been asserted against the City and the Service Corporations under certain interest rate exchange
agreements that were entered into by the Service Corporations in connection with the
$948,540,000 Taxable Certificates of Participation, Series 2006, issued by the Detroit Retirement
Systems Funding Trust 2006 (the "Certificates"). The Certificates are payable solely from
certain Service Payments to be made by the City pursuant to certain Service Contracts between
the City and the Service Corporations. In connection with the issuance of the Certificates, the
Service Corporations entered into several interest rate exchange agreements (collectively, the
"Swap Agreements") with UBS AG, SBS Financial Products Company, LLC (SBS), and Merrill
Lynch Capital Services, Inc., as credit support provider to SBS, (collectively, the
Counterparties). Additionally, certain payments under the Swap Agreements were guaranteed
under insurance policies issued either by Financial Guaranty Insurance Company ("FGIC") or
XL Capital Assurance Inc., now Syncora ("XL") (collectively, the "Insurers"). As the result of a
series of rating downgrades of the Certificates and Insurers in 2008 and 2009, the Service
Corporations were notified by the Counterparties that they believed that an Additional
Termination Event had occurred under each respective Swap Agreement, providing the
Counterparties the right to seek termination of their respective Swap Agreement.



ORRICK

The Parties Listed on Schedule A
Hereto
June 26, 2009
Page Two


        Pursuant to an ordinance adopted by the City Council of the City on May 19,
2009, Ordinance 05-09 (the "Ordinance") and a resolution adopted by the City Council on June
23, 2009 (the "Resolution"), the City and the Service Corporations were authorized to execute
and deliver that certain Collateral Agreement, dated as of June 15, 2009, among the City, the
Service Corporations, acting severally and not jointly, U.S. Bank National Association, as
Custodian, and the Counterparties (the "Collateral Agreement"). Unless otherwise defined
herein, capitalized terms used herein that are defined in the Collateral Agreement shall have the
meanings herein as given to such terms in the Collateral Agreement. Pursuant to the Ordinance,
the City has pledged to the Service Corporations the City's rights to, among other property,
certain wagering taxes levied or imposed by Detroit City Code Section 18-4-3 pursuant to
Section 12(4)(b) of the Wagering Tax Revenue Statute (the "Wagering Taxes"), now or hereafter
receivable by the City to secure payment of the obligations under the Swap Agreements as and
when the same become due and payable. Pursuant to the Ordinance and the Collateral
Agreement, each Service Corporation, in turn, pledged to the Counterparties, severally and not
jointly, as security for such Service Corporation's obligations  under the respective Swap
Agreements, its rights to the City Pledge. Pursuant to certain Irrevocable Instructions, dated
June [25], 2009, the City has instructed each Casino Licensee to make payment of the Wagering
Taxes and other amounts owed to the City to the Custodian for credit to a specially designated
account as set forth in such Irrevocable Instructions.

        You have requested our opinion as to whether, if the City or a Service
Corporation were to become a debtor in a case under Chapter 9 of the United States Bankruptcy
Code (Title 11, U.S.C.) (the "Bankruptcy Code"), the Wagering Taxes would constitute "special
revenues" under section 902(2) of the Bankruptcy Codes.

        In connection with our role as special counsel  to the City and the Service
Corporations, we have reviewed (i) the Collateral Agreement; (ii) the Irrevocable Instructions;
(iii) the Hedge; and (iv) the Service Contracts (collectively, the "Documents"). We have also
reviewed the Ordinance and the Resolution.  In addition, we have examined and relied on such
agreements, documents, instruments and other certificates of officials, officers and
representatives of the City and the Service Corporations and we have made such investigations of
law as we have deemed appropriate as a basis for the opinions and conclusions expressed herein.
For purposes of this opinion, we have not reviewed any documents other than the Documents. In
particular, we have not reviewed any document (other than the Documents) that is referred to in
or incorporated by reference into any Document. We have assumed without investigation that
there exists no provision in any document that we have not reviewed that is inconsistent with the



**ORRICK**

The Parties Listed on Schedule A
Hereto
June 26, 2009
Page Three

opinions stated herein. We have conducted no independent factual investigation of our own, but rather have relied solely upon the Documents, the statements and information set forth therein, and the additional matters recited or assumed therein, all of which we have assumed to be true, complete, and accurate in all material respects. We have also assumed without investigation the accuracy of all representations and warranties as to matters of fact contained in the Documents. Because the opinions set forth herein are based solely upon our review of the Documents, we express no opinion herein as to the effect of any transaction other than, or any act or omission of any person or entity other than the parties to, the transactions contemplated by the Documents.

For purposes of this opinion, we have assumed, without investigation, that the following statements are correct:

1. Each of the Documents has been duly authorized, executed, and delivered by each of the·parties thereto, constitutes the valid and binding obligation of each of the parties thereto, the executed Documents as to which we have reviewed forms will conform in all respects with the form reviewed, and will be enforceable against each such party in accordance with the terms thereof. Each of the Documents, and the transactions contemplated thereby, is performed by each of the parties thereto and complies with all applicable laws, and each of the parties to the transactions contemplated by the Documents complies in all material respects with applicable laws.

2. As of the date hereof, the City and each of the Service Corporation has sufficient working capital to satisfy its uncontested liabilities as such liabilities become due.

3. The City and each Service Corporation is eligible to be a debtor only under Chapter 9 of the Bankruptcy Code. Less than 80 percent of the value of the assets of the City or a Service Corporation consist of assets relating to farming operations. Neither the City nor either Service Corporation is a bank. Neither the City nor a Service Corporation owns trackage facilities that are leased by a common carrier by railroad engaged in the transportation of individuals or property. Neither the City nor a Service Corporation is a common carrier by railroad engaged in the transportation of individuals or property. Neither the City nor a Service Corporation is a corporation organized under Section 25A of the Federal Reserve Ordinance that operates, or that operates as, a multilateral clearing organization pursuant to Section 409 of the Federal Deposit Insurance Corporation Improvement Ordinance of 1991.



ORRICK

The Parties Listed on Schedule A
Hereto
June 26, 2009
Page Four


    4.  The obligation of the City and each Service Corporation under the Ordinance constitute  valid and binding obligations of the City and each Service Corporation enforceable in accordance with their terms under the Ordinance.

    5.  The City Pledge, as set forth in the Ordinance, is valid, binding and enforceable.

    6.  Article XIV of Chapter 18 of the Detroit City Code is in full force and effect in accordance with all applicable City Charter, constitutional and statutory requirements, and is within the City's powers, require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of applicable law or regulation or of the City Charter or of any agreement, judgment, injunction, order, decree or other instrument binding upon the City.  The City has not rescinded, reduced or ceased to impose the Wagering Taxes.

    Chapter 9 of the Bankruptcy Code affords special protection to certain creditors having a lien on "special revenues" from the effect of Section 552(a).  Under Bankruptcy Code Section 552(a), property acquired by a debtor after filing bankruptcy is not subject to any lien created prior to bankruptcy.  See, e.g., United Sav. Ass'n v. Timbers of Inwood Forest, 484 U.S. 365, 374 (1988).  Section 552(a) is incorporated into Chapter 9 of the Bankruptcy Code through Bankruptcy Code § 901.  In 1988, Congress enacted a limited exception to the application of Section 552(a) by making Bankruptcy Code § 552(a) inapplicable to "special revenues".  Thus, under Bankruptcy Code § 928, bondholders secured by a lien on special revenues retain their lien on the special revenues that arise post-petition.  See, In re County of Orange, 179 B.R. 185, 191-192 (Bankr. C.D. Cal. 1995) ("Code § 928 was enacted [to] mak[e] § 552(a) inapplicable to revenue bonds."

    Section 902(2) defines "special revenues, in relevant part, as:

". . . special excise taxes imposed on particular activities or transactions."

    While there is no specific definition of excise taxes under the Bankruptcy Code, particularly under Section 902(2), excise taxes have been defined in other sections under the Bankruptcy Code as "an indirect tax that is not directly imposed upon persons or property, but one that is imposed on the performance of an act, the engaging in any occupation, or the enjoyment of a privilege."  New Neighborhoods, Inc. v. West. Va. Workers Comp. Ins. Fund,



ORRICK

The Parties Listed on Schedule A
Hereto
June 26, 2009
Page Five


886 F.2d 714 (4th Cir. 1989) (premiums owed to a workers' compensation fund were excise taxes entitled to priority under Bankruptcy Code § 507(a)(7)).

In In re Lorber Industries of California, Inc., 675 F.2d 1062, 1066 (9th Cir. 1982), the Ninth Circuit set forth the following four-prong test to determine whether an exaction should be characterized as a tax:

    (a)    an involuntary pecuniary burden, regardless of name, laid upon individuals or property;

    (b)    imposed by, or under authority of the legislature;

    (c)    for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it;

    (d)    under the police or taxing power of the state.

Here, the Wagering Tax Revenue Statute authorized the City to impose both a wagering tax and a municipal services fee upon a person who is licensed by the Michigan Gaming Control Board to operate a casino within the City of Detroit. The Wagering Taxes were imposed by the City on each of the Casino Licensees, the proceeds of which are required to be used by the City for the purposes authorized and set forth in the Wagering Tax Revenue Statute. Pursuant to Detroit City Code Section 18-4-3, adopted pursuant to Section 12(4)(b) of the Wagering Tax Revenue Statute, the City imposed the Wagering Taxes. Detroit City Code Section 18-4-3 specifically provides that:

"(a) a wagering tax is hereby imposed **as an excise tax** upon the adjusted gross receipts of a casino licensee.

(b) The wagering tax that is imposed pursuant to this section shall be equal to nine and nine-tenths percent (9.9%) of the **adjusted gross receipts** which are received by a casino licensee and subject to tax under subsection (a) of this section.

(c) The wagering tax that is imposed pursuant to this section shall be applied against all **adjusted gross** receipts received in 1999 and each year thereafter in which a casino licensee is licensed by the



**ORRICK**

The Parties Listed on Schedule A
Hereto
June 26, 2009
Page Six

board to conduct a gambling operation within the city." (emphasis added)

Thus, a court should conclude that the Wagering Taxes are excise taxes within the meaning of Bankruptcy Code § 902(2). As described in the legislative history, the term "special revenues" was intended "to cover special excise taxes imposed on particular activities or transactions---such as an excise tax on hotel or motel rooms imposed by some municipalities or an excise tax on the sale of alcoholic beverages." H.R. Rep. 100-1011, 100th Cong., 2d Sess. 6-7 (1988); S. Rep. 100-506, 100th Cong., 2d Sess. 21 (1988); and see Collier on Bankruptcy 4-507 ¶ 507.10[6] (15th ed. Rev.) (The legislative history to the Bankruptcy Code suggests that excise taxes includes sales taxes, estate and gift taxes, gasoline and special fuel taxes, and wagering and truck taxes). See United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 323, 326 n.1 (1st Cir. 2003) (quoting Black's Law Dictionary at 585 (7th ed. 1999) ("[a]n excise tax is '[a] tax imposed on the manufacture, sale, or use of goods ... or an occupation or activity....' " ); In re Albion Health Servs., 339 B.R. 171, 178-79 (Bankr. W.D. Mich. 2006) (contributions to the Michigan Unemployment Compensation Fund was not a "tax" entitled to priority; court stated that "An excise tax is: [a] tax imposed on the performance of an act, the engaging in an occupation, or the enjoyment of a privilege. [citation omitted] A tax on the manufacture, sale, or use of goods or on the carrying on of an occupation or activity, or a tax on the transfer or property. In current usage the term has been extended to include various license fees and practically every internal revenue tax except the income tax (e.g., federal alcohol and tobacco excise taxes, IRC § 5001 et seq.)) (citing Black's Law Dictionary (6th Edition)).

In In re Juvenile Shoe Corporation of America, 99 F.3d 898 (8th Cir. 1996), the Eighth Circuit held that a 15% flat tax levied on funds reverted to an employer from an over-funded employer pension fund constitutes an excise tax because it was designed to capture the tax benefit the employer received at the expense of the government while the funds were held in the tax-exempt pension trust. Thus, it had the same effect as assessing the tax prior to the employer's placement of the funds in the pension plan and accordingly the primary objective was to support the government rather than to penalize an unlawful act. But see United States v. Reorganized CF&I Fabricators of Utah, Inc., 518 U.S. 213 (1996) (an IRS provision imposing a ten percent "tax" on any accumulated funding deficiency of certain pension plans was not an excise tax but instead was, for bankruptcy purposes, a penalty to be dealt with as an ordinary unsecured claim); and In re Jenny Lynn Min. Co., 780 F.2d 585, 588 (6th Cir. 1986) (a tax is an exaction for public purposes; fee for obtaining a strip mining permit is not an excise tax).



**ORRICK**

The Parties Listed on Schedule A
Hereto
June 26, 2009
Page Seven


Based on and subject to the foregoing, as well as the limitations set forth below and the further qualification that there is no case directly on point, we are of the opinion that if the matter were properly briefed and presented to a court, the court would hold that the Wagering Taxes constitute "special revenues" under Section 902(2) of the Bankruptcy Code.

We express no opinion whether Bankruptcy Code § 928 applies with respect to the City Pledge. We note that some courts have held that Bankruptcy Code § 928 is not unlimited. See In re County of Orange, 179 B.R. at 191-192 ("Section 928 was narrowly crafted to apply only to special revenue bonds)." One noted treatise has indicated that the purpose of Section 928 "was to protect liens granted to secure financings which related to the purpose for the financing" and "should not be construed as authorizing the special treatment . . . on special revenues unrelated to the project, system or works for which the bonds were issued." Collier on Bankruptcy ¶ 507.10[6]. Collier goes on to say "For example, a lien on receipts from an existing hotel/motel tax to secure bonds issued to build a new city college facility, or a lien on sewer tax revenues to secure bonds for an electric generating station, should not qualify for the special treatment afforded revenue bonds by the 1988 Amendments." Id.

We express no opinion concerning the laws of any jurisdiction other than the Bankruptcy Code and, of the Bankruptcy Code, Chapter 9 of the Bankruptcy Code. We do not express any opinion herein as to any bankruptcy case affecting any entity other than the City or a Service Corporation, or as to any case involving the City or either Service Corporation under any other chapter of the Bankruptcy Code. We also do not express any opinion as to any wagering taxes other than the Wagering Taxes or whether the municipal services fee imposed by Detroit City Code Section 18-14-4 pursuant to Section 12(4)(b) of the Wagering Tax Revenue Statute constitutes "special revenues". We express no opinion as to whether a Service Corporation is eligible to be a debtor under Chapter 9 of the Bankruptcy Code.

The opinions set forth above are given as of the date hereof and we disavow any undertaking or obligation to advise you of any changes in law or any facts or circumstances that may hereafter occur or come to our attention that could affect such opinions. Furthermore, it is our and your understanding that the foregoing opinions are not intended to be a guaranty as to what a particular court would actually hold, but an opinion as to the decision a court should reach if the issue were properly presented to it and the court followed what we believe to be the applicable legal principles. In that regard, you should be aware that all of the foregoing opinions are subject to inherent limitations because of the pervasive equity powers of bankruptcy courts,



**ORRICK**

The Parties Listed on Schedule A
Hereto
June 26, 2009
Page Eight


the overriding goal of reorganization to which other legal rights and policies may be subordinated, the potential relevance to the exercise of judicial discretion of future-arising facts and circumstances and the nature of the bankruptcy process. This opinion is solely for your benefit in connection with the transactions described in the first paragraph hereof and may not be relied upon or used by, circulated, quoted or referred to, nor may copies hereof be delivered to, any other person without our prior written approval.

Very truly yours,

*Orrick, Herrington & Sutcliffe LLP*

ORRICK, HERRINGTON & SUTCLIFFE LLP



**ORRICK**

SCHEDULE A

| | |
|---|---|
| The City of Detroit<br>City of Detroit Law Department<br>First National Building, Suite 1650<br>660 Woodward Avenue<br>Detroit, Michigan 48226 | U.S. Bank, National Association<br>535 Griswold, Suite 550<br>Detroit, Michigan 48226 |
| UBS Securities LLC<br>677 Washington Boulevard<br>Stamford, CT 06901 | SBS Financial Products Company, LLC<br>100 Wall Street, 22nd Floor<br>New York, New York 10005 |
| Merrill Lynch Capital Services, Inc.<br>Merrill Lynch World Headquarters<br>4 World Trade Center, 18th Floor<br>New York, New York 10080 | Financial Guaranty Insurance Company<br>125 Park Avenue<br>New York, New York 10017 |
| Syncora Guaranty Inc.<br>1221 Avenue of the Americas<br>New York, New York 10020 | |
| | |

13-53846-tjt   Doc 1140-13   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 67 of 69

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

## Order Party: Name, Address and Telephone Number

Name  Syncora Guarantee & Syncora Capital Assurance

Firm            Kirkland & Ellis LLP

Address            300 N. LaSalle

City, State, Zip            Chicago, IL 60654

Phone            312.862.3200

Email            dustin.paige@kirkland.com

**Case/Debtor Name:** City of Detroit, MI

**Case Number:**        13-53846

**Chapter:**        9

**Hearing Judge** _ Hon. Steven Rhodes

◉ Bankruptcy      ○ Adversary

○ Appeal      Appeal No: _____

## Hearing Information (A separate form must be completed for **each** hearing date requested.)

Date of Hearing: 08/21/2013   Time of Hearing: 10, 3:00   Title of Hearing: Hearing re Detroit Bankruptcy

Please specify portion of hearing requested:  ◉ Original/Unredacted   ○ Redacted     ○ Copy (2nd Party)

◉ Entire Hearing     ○ Ruling/Opinion of Judge     ○ Testimony of Witness          ○ Other

Special Instructions: _____

## Type of Request:

○ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25 per page (14 calendar days)

◉ Expedited Transcript - $4.85 per page (7 working days)

○ CD - $30; FTR Gold format - You must download the free
  FTR Record Player™ onto your computer from
  www.ftrgold.com

### FOR COURT USE ONLY

Transcript To Be Prepared By

|  | Date | By |
|---|---|---|
| Order Received: | | |
| Transcript Ordered | | |
| Transcript Received | | |

## Signature of Ordering Party:

_Dustin Paige_            Date: 8/26/2013

By signing, I certify that I will pay all charges upon completion
of the transcript request.

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name  Syncora Guarantee & Syncora Capital Assurance

Firm  Kirkland & Ellis LLP

Address  300 N. LaSalle

City, State, Zip  Chicago, IL 60654

Phone  312.862.3200

Email  dustin.paige@kirkland.com

**Case/Debtor Name:** City of Detroit, MI

**Case Number:** 13-53846

**Chapter:** 9

**Hearing Judge** Hon. Steven Rhodes

⦿ Bankruptcy   ◯ Adversary

◯ Appeal   **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 08/28/2013   **Time of Hearing:** 10:00 AM   **Title of Hearing:** Hearing re Detroit Bankruptcy

Please specify portion of hearing requested:   ⦿ Original/Unredacted   ◯ Redacted   ◯ Copy (2nd Party)

⦿ Entire Hearing   ◯ Ruling/Opinion of Judge   ◯ Testimony of Witness   ◯ Other

Special Instructions: _____

---

**Type of Request:**

◯ Ordinary Transcript - $3.65 per page (30 calendar days)

◯ 14-Day Transcript - $4.25 per page (14 calendar days)

⦿ Expedited Transcript - $4.85 per page (7 working days)

◯ CD - $30; FTR Gold format - You must download the free
FTR Record Player™ onto your computer from
www.ftrgold.com

**FOR COURT USE ONLY**

Transcript To Be Prepared By

Date   By

Order Received:

Transcript Ordered

Transcript Received

**Signature of Ordering Party:**

_Dustin Paige_   Date: 8/29/2013

By signing, I certify that I will pay all charges upon completion
of the transcript request.

969