**Docket No. 157**
**Case No. 13-53846**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-----------------------------------------------------x
                                      :
In re                                 : Chapter 9
                                      :
CITY OF DETROIT, MICHIGAN,            : Case No. 13- 53846
                                      :
                   Debtor.            : Hon. Steven W. Rhodes
                                      :
                                      :
-----------------------------------------------------x
```

## MOTION OF DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT RULE 9019, AND (III) GRANTING RELATED RELIEF

The City of Detroit, Michigan ("Detroit" or the "City"), as the debtor

in the above-captioned case, hereby submits this motion (the "Motion") for entry of

an order (i) authorizing the assumption of that certain Forbearance and Optional

Termination Agreement (the "Forbearance Agreement"), dated as of July 15, 2013,

by and among the City of Detroit, Michigan, the Emergency Manager of the City,

the Detroit General Retirement System Service Corporation, and the Detroit Police

and Fire Retirement System Service Corporation, on the one hand, and UBS AG

and Merrill Lynch Capital Services, Inc., on the other, pursuant to section 365(a) of

title 11 of the United States Code (the "Bankruptcy Code"), (ii) approving the

Forbearance Agreement pursuant to Bankruptcy Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and (iii) granting related relief.[1] As set forth in more detail below, the Forbearance Agreement will allow the City to access much needed cash flows, provides for a workable unwind of the City's swap obligations at a discounted price, and avoids potentially protracted litigation involving the swap transactions.   In support of this Motion, the City respectfully represents as follows:

### Background

1.      Incorporated in 1806, Detroit is the largest city in Michigan. As of December 2012, the City had a population of less than 685,000 (down from a peak population of nearly 2 million in 1950).

2.      Over the past several decades, the City has experienced significant economic challenges that have negatively impacted employment, business conditions and quality of life.  These challenges include, among other things, (a) a contraction of its historic manufacturing base, (b) a declining population, (c) high unemployment, (d) an erosion of the City's income and

---

[1]      This Motion includes certain attachments that are labeled in accordance with Rule 9014-1(b)(1) of the Local Rules of the Bankruptcy Court for the Eastern District of Michigan (the "Local Rules").  Consistent with Local Rule 9014-1(b), a copy of the proposed form of order granting this Motion is attached hereto as Exhibit 1.  A summary identifying each included attachment by exhibit number is appended to this Motion.

property tax bases, (e) a reduction in state revenue sharing and (f) a lack of adequate reinvestment in the City and its infrastructure.

3.     As of June 30, 2013 — the end of the City's 2013 fiscal year — the City's liabilities exceeded $18 billion (including, among other things, general obligation and special revenue bonds, unfunded actuarially accrued pension and other postemployment benefit liabilities, pension obligation certificate liabilities and related derivative liabilities).  Excluding the proceeds of debt issuances, the City has incurred large and unsustainable operating deficits for each of the past six years.  As of June 30, 2013, the City's accumulated unrestricted general fund deficit was approximately $237.0 million.  Excluding the impact of a recent debt issuance, this represents an increase of approximately $47.4 million over fiscal year 2012.

4.     On February 19, 2013, a review team appointed by Rick Snyder, Governor of the State of Michigan (the "Governor"), pursuant to Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, MCL § 141.1201, et seq. ("PA 72"), issued its report with respect to the City and its finances (the "Review Team Report").  The Review Team Report concluded that a local government financial emergency exists within the City.

5.     On March 14, 2013, in response to the Review Team Report and the declining financial condition of the City and at the request of the Governor,

the Local Emergency Financial Assistance Loan Board of the State of Michigan (the "Loan Board") appointed Kevyn D. Orr as emergency financial manager with respect to the City under PA 72, effective as of March 25, 2013.

6. On March 28, 2013, upon the effectiveness of Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, et seq. ("PA 436"), Mr. Orr became, and continues to act as, emergency manager with respect to the City under PA 436 (in such capacity, the "Emergency Manager"). Pursuant to PA 436, the Emergency Manager acts "for and in the place and stead of the governing body and the office of chief administrative officer" of the City. MCL § 141.1549. In addition, the Emergency Manager acts exclusively on behalf of the City with respect to the filing of a case under chapter 9 of the Bankruptcy Code upon receiving authorization from the Governor. MCL § 141.1558.

7. On July 18, 2013, the Governor issued his written decision (the "Authorization") approving the Emergency Manager's recommendation that the City be authorized to proceed under chapter 9 of the Bankruptcy Code. Thereafter, also on July 18, 2013, the Emergency Manager issued an order approving the filing of the City's chapter 9 case consistent with the Authorization (the "Approval Order"). True and correct copies of the Approval Order and the Authorization are attached as Exhibit A to the Statement of Qualifications Pursuant

to Section 109(c) of the Bankruptcy Code, filed contemporaneously with this Motion.

8.      In accordance with the Authorization and the Approval Order, on the date hereof (the "<u>Petition Date</u>"), the City commenced a case under chapter 9 of the Bankruptcy Code.  Additional details regarding the City and the events leading to the commencement of this chapter 9 case are set forth in the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code, filed contemporaneously with this Motion.

## <u>Jurisdiction</u>

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## <u>Relief Requested</u>

10.      By this Motion, the City respectfully requests the entry of an order (i) authorizing the assumption of the Forbearance Agreement pursuant to section 365(a) of the Bankruptcy Code, (ii) approving the Forbearance Agreement pursuant to Bankruptcy Rule 9019, and (iii) granting related relief.

## Facts Relevant to This Motion

### *The COPs and Swap Transactions*

11.    In 2005 and 2006, the City entered into a series of financing transactions to fund the unfunded actuarial accrued liabilities ("UAAL") related to each of its two retirement systems—the General Retirement System (the "GRS") and the Police and Fire Retirement System (the "PFRS" and, together with the GRS, the "Systems")—through arranging for the issuance of certificates of participation supported by services contracts between the City and each of the General Retirement System Service Corporation and the Police and Fire Retirement System Service Corporation (the "Service Corporations"), i.e., specially created vehicles for each of the Systems.  (Malhotra Dec. ¶ 35).

12.    As of the end of fiscal year 2012, the aggregate outstanding amount of such certificates approximated $1.45 billion and, by series, are as follows:

- Series 2005-A in the aggregate amount of $503,365,000 bearing interest at 4.50-4.95% (the "2005 COPs");

- Series 2006-A in the aggregate amount of $148,540,000 bearing interest at 5.989% (the "2006-A COPs"); and

- Series 2006-B in the aggregate amount of $800,000,000 bearing interest at a floating rate (the "2006-B COPs" and, together with the 2006-A COPs, the "2006 COPs", and the 2006 COPS together with the 2005 COPs, the "COPs").

(Malhotra Dec. ¶ 36).

13.     Concurrently with the issuance of the 2006 B COPs, the Service Corporations entered into various pay fixed, receive variable interest rate swap transactions under eight separate 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) (collectively, the "Swap Contracts") with either (a) UBS AG or (b) SBS Financial Products Company LLC ("SBS" and, together with UBS AG, the "Swap Counterparties"), with Merrill Lynch Capital Services, Inc. ("MLCS") as credit support provider to SBS, with an aggregate notional amount equal to the outstanding amount of the 2006 B COPS, or $800 million. (Malhotra Dec. ¶ 37).

14.     Under these swaps, the Service Corporations and Swap Counterparties agreed to effectively convert the floating interest rate exposure of the Service Corporations into a fixed payment. (Mich. Aff. ¶ 9.)[2] This was done through an arrangement whereby, as part of agreeing to exchange floating rate obligations for fixed rate obligations, the Swap Counterparties agreed to make payments to the Service Corporations in the event the floating rates on the COPs exceeded certain levels. (Mich. Aff. ¶ 9.) Conversely, if interest rates fell below certain levels, the Service Corporations would be forced to make payments to the Swap Counterparties. (Mich. Aff. ¶ 9.)

---

[2]     Affidavit in Support of the City's Verified Complaint for Declaratory and Injunctive Relief, Case No. 13-cv-12987-LPZ-MKM (E.D. Mich.) (Docket No. 20) (hereinafter, the "Mich. Aff."), at ¶ 9.

15.     The Swap Counterparties required protection against the possibility that the Service Corporations might default on their quarterly swap payments.  (Mich. Aff. ¶ 10.)   The City arranged for insurance policies to guaranty certain of the payments on the Swap Contracts with the Financial Guaranty Insurance Company and Syncora Guarantee Inc. ("Syncora"), as successor to XL Capital Assurance Inc.  (Orr. Dec. ¶ 48.)   For instance, with respect to the policies issued by Syncora, if the Service Corporations fail to perform under the Swap Contracts, Syncora may be called upon to pay most of the quarterly swap payment, which is no more than, and can be significantly less than, approximately $12.6 million.   If the Swap Counterparty elects to terminate the Swap Contracts, Syncora is either not responsible for such payments or, if such terminations are premised on an additional termination event, then Syncora's total exposure with respect to the Swap Contracts is capped at a predetermined limit of $27 million.  (Orr Dec. ¶ 48.)

16.     As part of a 2009 restructuring of the City's swap obligations, the City entered into a "Collateral Agreement" with the Swap Counterparties, the Service Corporations, and U.S. Bank, N.A., which was to serve as the custodian for the new collateral arrangement. (Mich. Aff. ¶ 11.)  Under this agreement the City pledged a specific revenue stream: (i) payments from the developers of the City's casinos, and (ii) taxes upon each casino's gross receipts (together,

the "Casino Revenue") as collateral to secure the City's obligations under the swap agreements. (Mich. Aff. ¶ 11.)

17. Under this new collateral arrangement, U.S. Bank oversees two accounts: the "General Receipts Subaccount" and the "Holdback Account." (Mich. Aff. ¶ 12.) Each day, on average, approximately $500,000 in Casino Revenue is deposited into the General Receipts Subaccount which, after 30 days, amounts to approximately $15 million. (Mich. Aff. ¶ 12.) Under the Collateral Agreement, U.S. Bank releases the Casino Revenue accumulating in the General Receipts Subaccount to the City *only after* it deposits approximately $4 million (one-third of its quarterly swap payment) into the Holdback Account. (Mich. Aff. ¶ 12.) Once the City makes this deposit into the Holdback Account, U.S. Bank gives the City complete access to the Casino Revenue that continues to accumulate in the General Receipts Subaccount, as it is deposited, until the beginning of the next payment period. (Mich. Aff. ¶ 12.)

18. If the City fails to make a quarterly swap payment, the Swap Counterparties are empowered under the Collateral Agreement to notify U.S. Bank that it should not release—or should "trap"—the Casino Revenue owed to the City. (Mich. Aff. ¶ 13.)

19.     Approximately $45 million will be owed each year for the next ten years for payment on the Swap Contracts based on current interest rates. (Malhotra Dec. ¶ 38).

**The Casino Revenues & the Restructuring**

20.     As set forth in the Ten-Year Projections attached as <u>Exhibit B</u> to the Malhotra Declaration, the City's wagering tax revenues are projected to remain steady at approximately $170 million to $180 million annually for the next ten years, which is similar to the City's gaming tax receipts for the past five years. (Malhotra Dec. ¶ 24).

21.     Eleven million dollars—the net monthly amount of casino revenues less the monthly swap payments—is roughly the equivalent of 30% of the City's total available cash on hand as of June 30, 2013. (Mich. Aff. ¶ 24.)  To illustrate, $11 million represents: (i) the salaries and wages for nearly two months of fire fighter services; or (ii) the salaries and wages for nearly one month of police officer services. (Mich. Aff. ¶ 24.)  Not having access to this significant percentage of the City's money of course adversely affects the City's current operations. (Mich. Aff. ¶ 24.)  With 4 of the top 10 most dangerous neighborhoods in the nation, the City needs access to that money immediately to ensure public safety and keep its police on the streets and its firefighters responding to fires.  (Mich. Aff. ¶ 24.)  Vital City operations such as these are functioning at a marginal level,

at best, and further constraints on the City's financial resources will only further degrade the health, safety and welfare of the City.  (Mich. Aff. ¶ 24.)

22.    The restructuring plan outlined by the Emergency Manager on June 14, 2013 contemplates a substantial investment in the City—$1.25 billion over the next 10 years—and includes spending approximately $500 million in the next 6 years to remediate urban blight and increase property values and the City's appearance and over $100 million in improvements to the performance and infrastructure of the City's public safety departments (police, fire, EMS).  (Mich. Aff. ¶ 26.)  Among others, the proposed plan provides for:

- Removing abandoned and blighted structures, which comprise 20% of the City's housing stock, to fundamentally transform the urban landscape and make the City a more attractive place to live, decrease crime and increase property values. Moreover, removing blight will allow public safety departments to allocate resources to more meaningful activities (60% of the 11,000 to 12,000 fires that the City experiences each year occur in blighted and unoccupied structures).

- Investing in new fire, police and EMS infrastructure, assets and personnel to address the chronically dilapidated buildings (average age of the City's fire stations is 80 years old with over $1 million in annual maintenance), fleet of vehicles (many with well over 250,000 miles and that break down frequently) and overworked employees (the fire department's apparatus division has a mechanic to vehicle ratio of 1 to 39 resulting in an inability to complete  preventative maintenance on schedule).

The Emergency Manager's proposed restructuring plan cannot be effected if the Casino Revenue, which was greater than $180 million during the City's 2012 fiscal year or nearly 17% of the City's annual revenue, is trapped. (Mich. Aff. ¶ 26.)

***The Negotiation of the Forbearance Agreement***

23. In March 2012, the City suffered ratings downgrades with respect to its unlimited tax GO bonds, which gave rise to the risk that the Swap Counterparties could terminate the Swap Contracts and seek a termination payment from the City. (Orr Dec. ¶ 86.) A termination payment could be in the range of hundreds of millions of dollars. (Mich. Aff. ¶ 26.) A recent marked-to-market valuation provided by a third party provider of valuation services for financial products estimated the negative net value of the Swap Contracts at approximately $296.5 million as of June 28, 2013. (Malhotra Dec. ¶ 37). As reported in the 2012 CAFR, the City commenced negotiations with the Swap Counterparties to resolve issues arising in connection with the credit rating downgrade. (Orr Dec. ¶ 86.)

24. Following the appointment of the Emergency Manager, discussions with the Swap Counterparties intensified to find a resolution that would enable the City to exit the Swap Contracts with no impact on the Swap Insurers and assure the City continued access to the wagering tax revenues. (Orr Dec. ¶ 87.) The negotiations included (a) several in-person and telephonic meetings among the City, Swap Counterparties and their respective advisors,

(b) the exchange of various economic offers between the parties and (c) the generation of numerous draft agreements memorializing such offers. (Orr Dec. ¶ 87.)

25. Despite the significant time and effort devoted to reaching a resolution that would permit the City access to the wagering tax revenues, following the assertion of alleged rights by Syncora, the City's access to funds was blocked, and the negotiations with the Swap Counterparties stalled. (Orr Dec. ¶ 88.) Accordingly, the City acted to protect its interests and preserve its access to its wagering tax revenues – a critical funding source for the City – by commencing litigation against Syncora (among others) in the Circuit Court for Wayne County, Michigan to seek (a) the release of revenues held by U.S. Bank as custodian and (b) the recovery of damages suffered by the City due to Syncora's interference with its banking relationships. (Orr Dec. ¶ 88.) On July 5, 2013, the City obtained a temporary restraining order against Syncora and U.S. Bank, thus temporarily preserving its access to wagering tax revenues. (Orr Dec. ¶ 88.)

26. Following those activities, the City was able to make timely payment on its swap obligations, making the required deposit into the Holdback Account and triggering the release of wagering tax revenues to the City. (Orr Dec. ¶ 89.) Concurrently, the City was able to restart negotiations with the Swap Counterparties. Negotiations culminated in the Forbearance and Optional

Termination Agreement, dated as of July 15, 2013, by and among the City, the Swap Counterparties and the Service Corporations. (Orr Dec. ¶ 89.)

27.     The key provisions of the Forbearance Agreement[3] are as follows:

| | |
|---|---|
| **Forbearance.** (§ 1.1) | During the Forbearance Period, the Swap Counterparties will forbear from (a) terminating the Swap Agreements, and (b) instructing the Custodian to cease making payments of the casino revenues from the General Receipts Subaccount to the City in accordance with Section 5.4 of the Collateral Agreement or giving notice to the Custodian to cease making such payments. |
| **Affirmative Obligations of Swap Counterparties During Forbearance Period.** (§ 1.2) | During the Forbearance Period, if, among other things, the City has not received the casino revenues from the General Receipts Subaccount or has reasonable grounds to believe that the Custodian may not remit such payments, then the Swap Counterparties must, subject to certain exceptions, use their best efforts to take any action reasonably requested by the City to cure such non-payment or insecurity.<br><br>In the bankruptcy context, the Swap Counterparties also must generally (a) support the City's efforts to obtain turnover of the casino revenues, (b) consent to certain uses of cash collateral, and (c) consent to the remittance to the City of the casino revenues contemplated by the letter from the City to the Custodian. |

---

[3]     Capitalized terms in this section are accorded the meanings given to them in the Forbearance Agreement. This section of the Motion is a summary of the salient terms of the Forbearance Agreement and is qualified in its entirety by the terms of the Forbearance Agreement. If there are any inconsistencies between the summary contained herein and the Forbearance Agreement, the Forbearance Agreement shall control. Parties are strongly encouraged to read the Forbearance Agreement attached hereto as <u>Exhibit 6</u> in its entirety.

| | |
|---|---|
| **Forbearance Period Termination Events.** (§ 1.3) | The Forbearance Period may end upon: (a) June 30, 2014, (b) a payment default under the Swap Agreements or the voluntary bankruptcy filing of the Service Corporations, (c) the involuntary filing of the Service Corporations, (d) certain credit support defaults under the Swap Agreements, (e) certain Additional Termination Events under the Swap Agreements – specifically including third party challenges to validity or the City's attempt to reduce the casino taxes, (f) breach of the covenants or representations in the Agreement, (g) a judgment of a court rendering documents relating to the transaction invalid or holding the certain COPs should be paid prior to maturity, (h) certain legislative acts with similar effects, (i) the failure to obtain a final, non-appealable order, approving the settlement within 60 days of the filing, the denial of this Motion, the dismissal of the City's petition for relief (if not re-filed within 30 days), and a failure to include a stay waiver within the approval order, or (j) the occurrence of the effective date of the City's plan of adjustment.

In addition, the City may terminate the Forbearance Period if the City has not received the casino revenues from the General Receipts Subaccount or has reasonable grounds to believe that the Custodian may not remit such payments by July 31, 2013 or in certain situations where the Bankruptcy Court does not approve the Forbearance Agreement. |
| **Consequences of Forbearance Period Termination** (§ 1.4) | Upon a termination of the Forbearance Period, among other things, the Swap Counterparties are no longer obligated to forbear from exercising their rights and the City is no longer entitled to exercise its option to terminate the Swap Agreements. Further, the covenants of the City, the Service Corporations and the Emergency Manager survive in certain instances when the Swap Counterparties terminate the Forbearance Period based on certain occurrences. In other instances, a termination of the forbearance period reverts the parties' rights to the *status quo ante*. |
| **Covenants of the City and Service** | The City and the Service Corporations covenant to, among other things: (a) not take certain acts to set aside, avoid, |

-15-

13-53846-tjt   Doc 11-5   Filed 10/10/13   Entered 10/10/13 16:26:54   Page 16 of 123
13-53846-swr   Doc 14?1-9   Filed 10/10/13   Entered 10/10/13 14:57:54   Page 16 of 123

| | |
|---|---|
| **Corporations** (§ 2.1) | reject, modify, terminate, disapprove, limit or render ineffective the transaction documents or cause payment to certain of the COPs prior to the scheduled payment date, (b) defend against any litigation or other judicial action by a third party that may have the effect described immediately above, (c) ratify and agree to comply with all provisions of the transaction documents and take certain steps to assure that the transaction documents continue in full force and effect as binding obligation to the extent the failure would not have certain adverse effects on the Swap Counterparties, (d) file an assumption motion to assume the Agreement or a 9019 motion to authorize the settlement, and use best efforts to obtain a final non-appealable order granting the motion, (e) schedule any amounts due and owing to any Swap Counterparty as undisputed, fully secured claims, and (f) to the extent the forbearance period terminates in certain situations, support the reasonable actions of the Swap Counterparties in realizing upon the pledged collateral and having the Custodian make such payments. |
| **Covenants of the Emergency Manager** (§ 2.2) | The Emergency Manager covenants to, among other things, (a) not take, or cause to be taken, certain acts to set aside, avoid, reject, modify, terminate, disapprove, limit or render ineffective the transaction documents or cause payment to certain of the COPs prior to the scheduled payment date, <br> (b) exercise all powers, authorities and privileges vested in the Emergency Manager under applicable law: (i) subject to certain exceptions, to cause the City and the Service Corporations to perform all covenants, obligations and duties of the City and the Service Corporations, under the transaction documents and to pay the City Payments (subject to Section 2.2(b)(iii) of the Agreement), (ii) to cause the City or the Service Corporations to avoid the occurrence of certain Forbearance Period Termination Events, (iii) to cause the City to make all City Payments as and when required under the Collateral Agreement and, to the extent necessary, to make one or more appropriations or make one or more amendments to then existing appropriations in amounts that are sufficient to pay in full, and which may be used exclusively for payment of, such City Payments, and |

| | |
|---|---|
| | (iv) following the occurrence of both the termination of the Forbearance Period and the Swap Agreements, to make one or more appropriations or make one or more amendments to then existing appropriations of the Pledged Property in amounts that are sufficient to pay in full, and which may be used exclusively for payment of, the obligations owing to the Swap Counterparties. |
| ***Optional Termination Right*** (§§ 3.1 – 3.5) | The City may direct UBS and MLCS to exercise their optional termination rights under the Swap Agreements, prior to the expiration of the Exercise Period, upon 7 business days to 10 business days prior notice (with evidence that the City will have the funds sufficient to pay in cash the optional termination amounts). Provided that no Event of Default or Termination Event is then occurring with respect to which any Swap Counterparty is the Defaulting Party, the Swap Counterparties will be obligated to deliver a written notice exercising their Optional Termination Rights.<br><br>The Service Corporations will be relieved of any payment obligations to the Swap Counterparties under the Swap Agreements. No Swap Counterparty will present any payment notice to a Swap Insurer as a result of the exercise of the Termination Rights and will irrevocably waive all future rights to do so. If the City has not exercised the Termination Rights on or prior to the termination of the Exercise Period, the Termination Rights shall expire.<br><br>The City will pay 75% of the then mid-market value of the swaps if the option is exercised between the date of the Agreement and October 31, 2013, 77% if the option is exercised after October 31, 2013 but on or before November 15, 2013, and 82% if exercised after November 15, 2013 and on or before March 13, 2014. In addition, the City will pay any unpaid amounts then owing under the Swap Agreements. |
| ***Waiver of Claims Against Insurers*** | If the City exercises its termination right and complies with the Agreement, the Swap Counterparties shall not present |

| | |
|---|---|
| (§ 3.2(c)) | any payment notice or other presentation of claim under a Swap Insurance Policy to a Swap Insurer as a result of the exercise of the Termination Rights, and each Swap Counterparty will irrevocably waive all future rights to do so. |
| *Representations* (§ 4) | Each of the City, the Service Corporations, the Swap Counterparties make certain representations to the other regarding such entity's existence, its power to enter into the Agreement, the execution, delivery and performance of the Agreement, the necessary consents for entering into the Agreement, and the legality and validity of the Agreement. |

## Basis for Relief Requested

### I.     Relevant Standards Governing The Relief Requested Herein

28.     The City seeks assumption of the Forbearance Agreement pursuant to section 365(a) of the Bankruptcy Code, the standards for which are set forth below.  In addition, the City seeks approval of the Forbearance Agreement pursuant to Bankruptcy Rule 9019, the standards for which are likewise set forth below.

29.     While the City does not believe it is required to seek approval of its agreements under Bankruptcy Rule 9019, it nonetheless believes that good reason exists under the circumstances to request approval of the Forbearance Agreement pursuant to Bankruptcy Rule 9019 and, thus, elects to seek such approval solely with respect to such agreement.

**Standards Governing Assumption Of The Forbearance Agreement Pursuant To Section 365(a).**

30. Section 365(a) of the Bankruptcy Code, which specifically applies to this proceeding pursuant to section 901(a) of the Bankruptcy Code, provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a). Courts apply the same "business judgment" test in chapter 9 proceedings as they do in proceedings under chapter 7 or 11 of the Bankruptcy Code. See Moran v. City of Central Falls, 475 B.R. 323, 331-33 (D.R.I. 2012) (holding business judgment test applied in a chapter 9 proceeding).

31. Under this test, courts routinely approve motions to assume or reject executory contracts or unexpired leases upon a showing that the debtor's decision is an exercise of sound business judgment and will benefit the debtor's estate or, in the chapter 9 context, the debtor. See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993) (stating that section 365 of the Bankruptcy Code "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject."); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (stating that the traditional standard applied by courts under section 365 is that of "business

13-53846-swr Doc 1401-9 Filed 10/30/13 Entered 10/30/13 16:26:54 Page 20 of 207
13-53846-swr Doc 1427 Filed 10/30/13 Entered 10/30/13 16:26:54 Page 20 of 207
123

judgment"); <u>Edwin C. Levy Co. v. McLouth Steel Corp. (In re McLouth Steel Corp.)</u>, 20 B.R. 688, 692 (Bankr. E.D. Mich. 1982) ("In determining whether a certain contract should be assumed or rejected, the decision should rest on the business judgment of the debtor.").

32.      Courts generally will not second-guess a debtor's business judgment concerning the assumption or rejection of an executory contract or unexpired lease.  <u>See</u> <u>In re Riodizio, Inc.</u>, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997) ("[A] court will ordinarily defer to the business judgment of the debtor's management"); <u>accord</u> <u>Phar-Mor, Inc. v. Strouss Bldg. Assocs.</u>, 204 B.R. 948, 951-52 (Bankr. N.D. Ohio 1997) ("Whether an executory contract is 'favorable' or 'unfavorable' is left to the sound business judgment of the debtor . . . .  Courts should generally defer to a debtor's decision whether to reject an executory contract.").

33.      The "business judgment" test is not a strict standard; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor.  <u>See</u>, <u>e.g.</u>, <u>In re Greektown Holdings, L.L.C.</u>, No. 08-53104, 2009 WL 1653461, at *1 (Bankr. E.D. Mich. May 13, 2009) ("Courts initially apply a 'business judgment' and 'benefit to the estate' test under § 365(a) to determine whether or not a debtor should be allowed to assume an executory contract.").

**B.    Standards Governing Approval Of The Forbearance Agreement Pursuant To Bankruptcy Rule 9019.**

34.    Settlements and compromises are, likewise, "a normal part of the process of reorganization." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 130 (1939)).  Bankruptcy Rule 9019, which applies to this proceeding pursuant to Bankruptcy Rule 1001, provides the procedural mechanism for approval of such compromises.  It states, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  FED. R. BANKR. P. 9019(a).

35.    A chapter 9 debtor  is entitled—but not required—to seek approval of a compromise pursuant to this mechanism.  See Ass'n of Retired Employees of the City of Stockton v. City of Stockton, Ca. (In re City of Stockton, Ca.), 486 B.R. 194, 200 (Bankr. E.D. Cal. 2012) (finding that city, while it could not be obligated to seek approval pursuant to Bankruptcy Rule 9019, could choose to consent to judicial approval pursuant to that rule).  While requiring a chapter 9 debtor to seek the Court's approval of a compromise would impermissibly violate the terms of section 904 of the Bankruptcy Code by interfering with the municipality's property and revenues without its consent, a municipality may consent to judicial involvement.  See 11 U.S.C. § 904 ("Notwithstanding any

power of the court, *unless the debtor consents* . . . the court may not . . . interfere with . . . any of the property or revenues of the debtor . . . .") (emphasis added).

36.     The decision to approve a compromise or settlement is subject to the sound discretion of the bankruptcy court.  Engman v. Boyd, No. 09-cv-151, 2009 WL 1974460, at *2 (W.D. Mich. July 6, 2009) ("The bankruptcy court has wide discretion to approve or disapprove settlement agreements.").  Courts apply the same "fair and equitable" analysis in chapter 9 proceedings as in proceedings under other chapters of the Bankruptcy Code.  See In re Bamberg Cnty. Mem'l Hosp., No. 11-03877, 2013 WL 1686675, at *2 (Bankr. D.S.C. Apr. 18, 2013) (noting that the chapter 9 debtor "may not have been required to seek approval of the settlement" pursuant to Bankruptcy Rule 9019, but since it did, applying "fair and equitable" analysis and considering same four factors); In re Barnwell Cnty. Hosp., 491 B.R. 408, 417-18 (Bankr. D.S.C. Apr. 2013) (same).

37.     In exercising its discretion, a bankruptcy court must determine that the proposed settlement is fair and equitable and in the best interests of the debtor.  See Reynolds v. Comm'r, 861 F.2d 469, 473 (6th Cir. 1988) ("[T]he bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable."); see also Stark v. Moran (In re Moran), 385 B.R. 799, 2008 WL 1766874, at *4 (B.A.P. 6th Cir. Apr. 18, 2008) (unpublished

table decision) (applying "fair and equitable standard"), <u>appeal dismissed for lack of standing</u>, 408 B.R. 698 (B.A.P. 6th Cir. 2009); <u>Lyndon Prop. Ins. Co. v. Katz</u>, 196 Fed. Appx. 383, 387 (6th Cir. 2006) (same); <u>In re Bard</u>, 49 Fed. Appx. 528, 530 (6th Cir. 2002) (same); <u>Rankin v. Dault (In re Rankin)</u>, 396 B.R. 203, 209 (E.D. Mich. 2008) (same), <u>aff'd on other grounds</u>, 438 Fed. Appx. 420 (6th Cir. 2011).

38.　　However, "[a] bankruptcy judge need not conduct a mini-trial or write an extensive opinion every time he approves or disapproves a settlement. The judge need only be apprised of the relevant facts and law so that he can make an informed and intelligent decision and set out the reasons for that decision." <u>Fishell v. Soltow (In re Fishell)</u>, 47 F.3d 1168, 1995 WL 66622, at *3 (6th Cir. Feb. 16, 1995) (unpublished table decision) (<u>quoting</u> <u>LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.)</u>, 841 F.2d 159, 163 (7th Cir. 1987)).  Ultimately, "the obligation of the court is to 'canvas the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'" <u>In re Dow Corning</u>, 192 B.R. 415, 421 (Bankr. E.D. Mich. 1996) (<u>quoting</u> <u>In re Drexel Burnham Lambert</u>, 134 B.R. 493, 497 (Bankr. S.D. N.Y. 1991)).

39.　　The bankruptcy judge's approval of a compromise is reviewed deferentially, and the "abuse of discretion standard allows the bankruptcy judge to consider myriad factors that may bear on his notion of fairness and equity."

Engman, 2009 WL 1974460, at *3.  In evaluating whether the proposed agreement is fair and equitable, courts in this district generally consider four factors:  (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. Bard, 49 Fed. Appx. at 530; see also In re MQVP, Inc., 477 Fed. Appx. 310, 313 (6th Cir. 2012) (applying Bard factors).

## II.    Application Of The Relevant Standards

40.    The City submits that, in light of the factual circumstances and reality of the City's condition, both assumption pursuant to section 365 of the Bankruptcy Code and approval pursuant to Bankruptcy Rule 9019 are warranted. In addition to assumption, the City has determined that its interests will be served by submitting to judicial approval of the Forbearance Agreement and accordingly, with the filing of this Motion, has consented to this Court passing on the approval of the Forbearance Agreement pursuant to Bankruptcy Rule 9019.   See Forbearance Agreement at § 2.1(d); see also Stockton, 486 B.R. at 199 (listing reasons why a chapter 9 debtor may choose to seek Bankruptcy Rule 9019 approval, including the insistence of counterparties and a desire for transparency).

41.     The City respectfully submits that its assumption of the Forbearance Agreement is a sound exercise of its business judgment, and that the Forbearance Agreement should be approved under Bankruptcy Rule 9019 because it is fair, equitable and in the best interests of the City and its Creditors.  The Forbearance Agreement allows the City to access much needed cash flows, provides for a workable unwind of its swap obligations at a discounted price, and avoids potentially protracted litigation involving the swap transactions.

42.     The agreement provides that the Swap Counterparties will forbear from exercising remedies that would limit the City's ability to access much-needed cash.  As all parties are aware, the City is cash-starved and insolvent. Notwithstanding the aggressive actions of Syncora, the City submits that, with the Swap Counterparties consent to use of cash collateral, the City will be able to access a significant revenue stream going forward—the Casino Revenue.

43.     Even net of the amount of the City's monthly swaps payments—amounts the City would no longer be required to pay after termination—the stream of funds relating to the Casino Revenue is substantial, on average around $11 million each month.  $11 million is the equivalent of 30% of the City's available cash-on-hand as of June 30, 2013, and would allow the City to pay for nearly two months of fire fighter salaries and wages or nearly one month of police officer salaries and wages.  The agreement of the Swap Counterparties to

-25-

13-53846-swr   Doc 1498   Filed 11/05/13   Entered 11/05/13 16:55:54   Page 26 of
13-53846-swr   Doc 14-15   Filed 10/09/13   Entered 10/09/13 14:57:54   Page 26 of 27
129

forbear from instructing the Custodian to "trap" these revenues will provide the City with crucial liquidity and cash flow going forward. This is a critical concession given the City's liquidity crisis and limited other sources of revenue at this time.

44.    The value to the City of continued access to the Casino Revenue cannot be understated. Promoting reinvestment in the City to improve Detroit residents' quality of life is an essential touchstone of any restructuring plan. Those critical reinvestments cannot happen without access to the City's Casino Revenue.

45.    In addition to the liquidity relief, the Forbearance Agreement also provides for a mechanism for the City to unwind the Swap Contracts at a discounted value. Absent the Forbearance Agreement, the City anticipates that the Swap Counterparties would terminate or seek to terminate the Swap Contracts, resulting in a termination payment obligation of hundreds of millions of dollars.[4]

---

[4]    Even if the Swap Counterparties did not terminate the Swap Contracts, it is unworkable that the Swap Contracts would continue to be in effect during the pendency of the case. As set forth above, the Swap Contracts were originally entered into in order to hedge interest rate exposure on certain variable interest rate COPs. Pursuant to section 502(b)(2) of the Bankruptcy Code,  claims for unmatured interest are not allowable against the City. Thus, the original intent of the Swap Contracts, namely, to hedge interest rate exposure for the COPs, has disappeared. On a post-bankruptcy basis, the hedge the Swap Contracts were intended to provide is no longer needed.

The amount of any such termination payment fluctuates daily, but as of the end of June 2013, the City estimated the negative value of the swaps at $296.5 million.

46.     In contrast, the Forbearance Agreement allows the City to elect to terminate the Swap Contracts at an approximately 18% – 25% discount.  While the termination fee varies daily, the City estimated the savings associated with the discount, as of the end of June 2013, as in excess of $70 million.  Given that the Collateral Agreement provides that the City pledged the Casino Revenue to secure its obligations to the Swap Counterparties, this discount represents significant value to the City and its creditors.

47.     Further, while the City has examined whether there are viable actions to challenge the Swap Contracts or the City's pledge of the Casino Revenue to secure its obligations to the Swap Counterparties, litigation would be protracted, expensive and, in terms of success, uncertain.  The Swap Contracts and related documents are exceedingly complex, as is any determination of the amounts owing and the rights of the parties thereunder.  While certain creditors have informed the City of their views on these arrangements, regardless of the merits of these positions, the issues are extremely complicated and, accordingly, subject to a high degree of uncertainty.  Prior to commencing any litigation, the City would be required to engage in substantial additional legal and financial analysis, itself a costly and lengthy undertaking.  Further, even if the City made the decision to

-27-
13-53846-swr   Doc 1401-9   Filed 10/29/13   Entered 10/29/13 14:57:59   Page 28 of 129
13-53846-swr   Doc 11-9   Filed 10/29/13   Entered 10/29/13 14:57:59   Page 28 of 129
123

pursue litigation, such litigation would be lengthy and expensive. The parties would be required to engage in extensive factual and expert discovery, together with briefing and testimony, with no guarantee of a positive result for the City. Given the amounts at issue, a lengthy appellate process is all but certain. The Forbearance Agreement obviates the need to pursue a litigation path and avoids the costs and risks associated therewith.

48. The Forbearance Agreement will also moot the issues raised in the litigation brought by the City against Syncora and others in the Circuit Court for Wayne County, Michigan concerning the City's access to the Casino Revenue. The Forbearance Agreement assures that the City will continue to make payments under the Swap Contracts pending exercise of the termination option. Further, upon exercise of the termination option, the City's obligations under the Swap Contracts will be discharged and the Swap Counterparties will waive their claims against the insurers. Therefore, Syncora would have no payment obligation to the Swap Counterparties under the Swap Contracts.

49. In a chapter 7 or chapter 11 case, certain creditors might favor "rolling the dice" on litigation, even if such litigation were commenced against well-funded and well-advised adversaries. Such creditors might even accept spending years in court proceedings with the hopes of a significant end-game payday, even if the chances of such payday were uncertain. However, the City's

paramount concern is the health and safety of its residents. There will be nothing left if literally hundreds of millions of dollars of the City's tax revenues are tied up during the course of a multi-year litigation. Accordingly, the relief afforded under the Forbearance Agreement is in the best interest of the City.

50. The Forbearance Agreement is the result of substantial good faith, arm's length negotiations between the City and the Swap Counterparties. Each of the parties was represented throughout these negotiations by sophisticated financial advisors and legal counsel. The result is an agreement that is fair and equitable to all parties, including the City's creditors. As described above, the ability to access, and use, the Casino Revenue will be essential to the City's continued ability to survive and ultimately to create value for all of its creditors. In addition, the ability to terminate the Swap Contracts in the short term, and at a discount, represents significant value to the City and its creditors.

51. The foregoing demonstrates that the City's decision to assume the Forbearance Agreement is an appropriate exercise of its business judgment, such that this Court should approve the assumption.[5] Likewise, in avoiding the

---

[5] Section 365(b)(1) of the Bankruptcy Code provides that "if there has been a default in an executory contract….the trustee may not assume such contract…unless, at the time of assumption of such contract…the trustee (A) cures…such default..." 11 U.S.C. § 365(b)(1). Here, there has not been a default under the Forbearance Agreement, and therefore the City is not obligated to pay any cure amounts.

uncertain and extremely complex litigation that would ensue, while simultaneously serving the paramount interests of the City's creditors by bringing immediate relief and value, the Forbearance Agreement easily satisfies the factors considered by courts in connection with Bankruptcy Rule 9019, such that it should be approved.

## III.    Limited Waiver of the Automatic Stay

52.    In connection with the assumption and approval of the Forbearance Agreement, the City respectfully seeks a waiver of the automatic stay imposed under section 362 of the Bankruptcy Code as described herein.

53.    The Forbearance Agreement provides,  "in the event of nonperformance under this Section 2, it is acknowledged that mandamus is an appropriate remedy and the Emergency Manager shall not contest such mandamus remedy, and if the City is then a debtor under the Bankruptcy Code, the Emergency Manager shall promptly seek to waive the automatic stay with respect to such remedy."  (Forbearance Agreement, § 2.3)  Section 1.3(j) of the Forbearance Agreement also provides that it is a Forbearance Agreement Termination Event if the court order authorizing and approving the Forbearance Agreement "does not contain a waiver of the automatic stay as specified in Section 2.3 herein."

54.    The City respectfully submits that it is appropriate to grant a limited waiver of the stay as contemplated by the Forbearance Agreement.  First, if

the waiver of the stay is not granted, the Swap Counterparties may seek to terminate the Forbearance Agreement.   Second, the City believes the waiver of the stay is limited as it is only implicated if this Court approves the Forbearance Agreement and, thereafter, the City does not perform its obligations under Section 2 of the then-assumed agreement.

55.     The City submits that a waiver of the automatic stay to allow the Swap Counterparties to seek the remedy of mandamus under that specific factual scenario is appropriate and consistent with section 365 of the Bankruptcy Code.  See In re Multech Corp., 47 B.R. 747, 749 (Bankr. D. Iowa 1985) (court order provided for relief from the automatic stay upon non-compliance with court assumption order). Cf. U.S., Dept. of Air Force v. Carolina Parachute Corp., 907 F.2d 1469, 1475 (4th Cir. 1990) ("[I]ssuing an injunction that bars a party from exercising contractual rights provided in assumed executory contracts may conflict with the rule that executory contracts are assumed *cum onere*.").

## Notice

56.     Notice of this Motion has been given to the following (or their counsel if known):  (a) the trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d); (c) the unions representing certain of the City's employees and retirees; (d) the four

associations of which the City is aware representing certain retirees of the City;

(e) the City's pension trusts; (f) the insurers of the City's bonds; (g) the insurers of

the certificates of participation issued with respect to the City's pension funds

(the "COPs"); (h) certain significant holders of the COPs; (i) the counterparties

under the swap contracts entered into in connection with the COPs (collectively,

the "Swaps"); and (j) the insurers of the Swaps.  In addition, a copy of the Motion

was served on the Office of the United States Trustee.  The City submits that no

other or further notice need be provided.

## No Prior Request

57.     No prior request for the relief sought in this Motion has been

made to this or any other Court.

WHEREFORE, the City respectfully requests that this Court: (a) enter an order substantially in the form attached hereto as <u>Exhibit 1</u> granting the relief sought herein; and (b) grant such other and further relief to the City as the Court may deem proper.

Dated: July 18, 2013    Respectfully submitted,

        <u>/s/ David G. Heiman     </u>
        David G. Heiman (OH 0038271)
        Heather Lennox (OH 0059649)
        JONES DAY
        North Point
        901 Lakeside Avenue
        Cleveland, Ohio  44114
        Telephone:  (216) 586-3939
        Facsimile:  (216) 579-0212
        dgheiman@jonesday.com
        hlennox@jonesday.com

        Bruce Bennett (CA 105430)
        JONES DAY
        555 South Flower Street
        Fiftieth Floor
        Los Angeles, California 90071
        Telephone:  (213) 243-2382
        Facsimile:  (213) 243-2539
        bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
   STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

-34-
13-53846-swr  Doc 11915  Filed 10/10/18  Entered 10/10/13 14:57:54  Page 35 of
13-53846-tjt  Doc 11915  Filed 10/10/18  Entered 10/10/13 16:26:54  Page 35 of
129

# SUMMARY OF ATTACHMENTS

The following documents are attached to this Motion, labeled in accordance with Local Rule 9014-1(b).

| | |
|---|---|
| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Notice |
| Exhibit 3 | None [Brief Not Required] |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | Re-Submitted - Affidavit in Support of the City's Verified Complaint for Declaratory and Injunctive Relief, Case No. 13-cv-12987-LPZ-MKM (E.D. Mich.) |
| Exhibit 6 | Forbearance Agreement |

13-53846-swr   Doc 1419-5  Filed 10/29/13  Entered 10/29/13 14:57:54   Page 36 of
129
13-53846-swr   Doc 1419-5  Filed 10/29/13  Entered 10/29/13 16:26:24   Page 36 of
129

# **EXHIBIT 1**

13-53846-swr   Doc 14-15   Filed 10/10/13   Entered 10/10/13 14:57:54   Page 37 of
13-53846-swr   Doc 157-9   Filed 10/10/13   Entered 10/10/13 16:26:24   Page 37 of 207
129
128

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-----------------------------------------------------x
                                        :
In re                                   : Chapter 9
                                        :
CITY OF DETROIT, MICHIGAN,              : Case No. 13- 53846
                                        :
                    Debtor.             : Hon. _____
                                        :
                                        :
-----------------------------------------------------x
```

## ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT RULE 9019, AND (III) GRANTING RELATED RELIEF

This matter coming before the Court on the motion (the "Motion")[1]
for entry of an order (i) authorizing the assumption of that certain forbearance
and optional termination agreement pursuant to section 365(a) of the Bankruptcy
Code, (ii) approving such agreement pursuant Bankruptcy Rule 9019, and (iii)
granting related relief; the Court having reviewed the Motion and having
considered the statements of counsel and the evidence adduced with respect to the
Motion at a hearing before the Court (the "Hearing"); and the Court having

---

[1]     Capitalized terms used herein are accorded the meanings given to them in
the Motion.

determined that the legal and factual bases set forth in the Motion and at the

Hearing establish just cause for the relief granted herein;

## THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:

A.     <u>Jurisdiction and Venue</u>.  This Court has jurisdiction to consider

this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28

U.S.C. § 157(b).  Venue of these cases and the Motion in this District is proper

under 28 U.S.C. §§ 1408 and 1409.

B.     <u>Notice</u>.  Notice of the Motion and the Hearing was sufficient

under the circumstances.  As evidenced by the certificate of service, notice of the

Motion and Hearing has been given to the following:  (a) the trustees, transfer

agents and/or paying agents, as applicable, for the City's secured and unsecured

bonds; (b) the City's largest unsecured creditors as identified on the list filed under

Bankruptcy Rule 1007(d); (c) the unions representing certain of the City's

employees and retirees; (d) the four associations of which the City is aware

representing certain retirees of the City; (e) the City's pension trusts; (f) the

insurers of the City's bonds; (g)  the COPs; (h) certain significant holders of the

COPs; (i)  the Swaps; and (j) the insurers of the Swaps.  In addition, a copy of the

Motion was served on the Office of the United States Trustee.  Cause exists to

modify the requirement under Bankruptcy Rule 2002(a) that a hearing on approval

of a compromise or settlement shall be given to all creditors and, accordingly, no other or further notice is required under the circumstances.

C. <u>Assumption Appropriate</u>. The assumption of the Forbearance Agreement and other relief sought in the Motion will benefit the City and is a sound exercise of the City's business judgment, is in the best interest of the City, its creditors and other parties in interest and is based on good, sufficient and sound business purposes and justifications. As of the date hereof, no defaults exist under the Forbearance Agreement and the City is not obligated to pay any cure amounts in connection with the assumption of the Forbearance Agreement.

D. <u>Rule 9019 Authorization</u>. The City was authorized, but not required, to seek approval of the Forbearance Agreement pursuant to Bankruptcy Rule 9019. The Forbearance Agreement is fair, reasonable and equitable.

E. <u>Consent to Use of Casino Revenues</u>. Pursuant to Section 1.2 of the Forbearance Agreement, UBS AG and MLCS consent to the City's use of the Casino Revenue as set forth in the Forbearance Agreement. The consent of UBS AG and MLCS will allow the City immediate access to its Casino Revenue as set forth in Forbearance Agreement, and no other or further consents are required.

F. <u>Modification of Automatic Stay</u>. Good cause exists to modify the automatic stay, pursuant to section 362(d) of the Bankruptcy Code, solely to

permit UBS AG and MLCS to petition for a writ of mandamus as a remedy for nonperformance under Section 2 of the Forbearance Agreement.

G. Arm's-Length Agreement. The Forbearance Agreement was negotiated at arm's length and in good faith by all parties. UBS AG and MLCS are not insiders of the City as that term is defined in Bankruptcy Code section 101(31). The parties' entry into and performance under the Forbearance Agreement does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against the parties thereto, except as may be expressly set forth in this Order or in such agreements.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The Motion is GRANTED as set forth herein.

2. Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3. Pursuant to section 365(a) of the Bankruptcy Code, the City is authorized to assume the Forbearance Agreement, attached as Exhibit 6 to the Motion.

4. The Forbearance Agreement is approved in its entirety. The City is authorized to perform its obligations that arise from the Forbearance

13-53846-swr Doc 1412-5 Filed 10/30/13 Entered 10/30/13 16:56:24 Page 41 of
13-53846-swr Doc 1419-1 Filed 10/30/13 Entered 10/30/13 18:26:54 Page 42 of
123

Agreement pursuant to Bankruptcy Rule 9019, and any actions taken heretofore in furtherance of these obligations are hereby ratified.

5.    The Custodian under the Collateral Agreement is hereby authorized to rely upon the terms of this Order and UBS AG and MLCS' consent to the use by the City of the Casino Revenue.

6.    The automatic stay imposed pursuant to section 362 of the Bankruptcy Code is modified solely to permit UBS AG and MLCS to petition a court of competent jurisdiction for a writ of mandamus as a remedy for nonperformance under Section 2 of the Forbearance Agreement.

7.    The City is authorized to take any and all actions necessary or appropriate to implement the terms of this Order and the Forbearance Agreement.

8.    The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, enforcement or interpretation of this Order.

13-53846-swr   Doc 1119   Filed 10/10/13   Entered 10/10/13 14:56:54   Page 42 of
13-53846-swr   Doc 1519-1   Filed 10/10/13   Entered 10/10/13 16:26:24   Page 42 of
123

# EXHIBIT 2

## *[NOTICE]*

Form B20A(Official Form 20A)
12/1/10

# UNITED STATES BANKRUPTCY COURT
## Eastern District of Michigan

In re:

**CITY OF DETROIT, MICHIGAN**

Chapter: 9

Case No.: 13- 53846

Debtor.

Judge: Steven W. Rhodes

Address: <u>N/A</u>

Last four digits of Social Security or Employer's Tax Identification (EIN) No(s).(if any): <u>N/A</u>

### NOTICE OF MOTION OF DEBTOR FOR ENTRY
### OF  AN ORDER (I) AUTHORIZING THE ASSUMPTION
### OF  THAT CERTAIN  FORBEARANCE AND OPTIONAL
### TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF
### THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT
### <u>PURSUANT RULE 9019, AND (III) GRANTING RELATED RELIEF</u>

The City of Detroit, Michigan ("<u>Detroit</u>" or the "<u>City</u>") has filed papers with the court seeking entry of an order (i) authorizing the assumption of that certain Forbearance and Optional Termination Agreement (the "<u>Forbearance Agreement</u>"), dated as of July 15, 2013, by and among the City of Detroit, Michigan, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, and the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other, pursuant to section 365(a) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), (ii) approving the Forbearance Agreement pursuant to Bankruptcy Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and (iii) granting related relief.

**<u>Your rights may be affected</u>.  You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case.  (If you do not have an attorney, you may wish to consult one.)**

If you do not want the court to grant the relief sought in the motion, or if you want the court to consider your views on the motion, within 21 days, you or your attorney must:

1.        File with the court a written response or an answer, explaining your position at:[1]

### United States Bankruptcy Court
United States Bankruptcy Court
211 W. Fort Street, Suite 2100
Detroit, MI 48226

If you mail your response to the court for filing, you must mail it early enough so that the court will **receive** it on or before the date stated above. All attorneys are required to file pleadings electronically.

You must also mail a copy to:

---

[1]        Any response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

2.  If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

Dated:     July 18, 2013                          Respectfully submitted,


                                                   /s/ David G. Heiman
                                                  David G. Heiman (OH 0038271)
                                                  Heather Lennox (OH 0059649)
                                                  JONES DAY
                                                  North Point
                                                  901 Lakeside Avenue
                                                  Cleveland, Ohio  44114
                                                  Telephone:  (216) 586-3939
                                                  Facsimile: (216) 579-0212
                                                  dgheiman@jonesday.com
                                                  hlennox@jonesday.com

                                                  Bruce Bennett (CA 105430)
                                                  JONES DAY
                                                  555 South Flower Street
                                                  Fiftieth Floor
                                                  Los Angeles, California 90071
                                                  Telephone:  (213) 243-2382
                                                  Facsimile: (213) 243-2539
                                                  bbennett@jonesday.com

                                                  Jonathan S. Green (MI P33140)
                                                  Stephen S. LaPlante (MI P48063)
                                                  MILLER, CANFIELD, PADDOCK AND
                                                     STONE, P.L.C.
                                                  150 West Jefferson
                                                  Suite 2500
                                                  Detroit, Michigan  48226
                                                  Telephone:  (313) 963-6420
                                                  Facsimile: (313) 496-7500
                                                  green@millercanfield.com
                                                  laplante@millercanfield.com

                                                  ATTORNEYS FOR THE CITY

# EXHIBIT 4

## *[CERTIFICATE OF SERVICE]*

-2-

18-58846-tii   Doc 11495   Filed 10/19/18   Entered 10/19/18 14:57:54   Page 47 of
18-58846-swr   Doc 1519   Filed 10/19/18   Entered 10/19/18 16:26:21   Page 47 of
129
129

## CERTIFICATE OF SERVICE

I, David G. Heiman, hereby certify that the foregoing Corrected Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief was filed and served via the Court's electronic case filing and noticing system on this 24th day of July, 2013.


/s/ David G. Heiman_____

# EXHIBIT 5

## *[AFFIDAVIT IN SUPPORT OF THE CITY'S VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF]*

-3-
128
13-53846-tjt Doc 1140-5 Filed 10/10/13 Entered 10/10/13 14:57:54 Page 49 of 207
13-53846-swr Doc 157-9 Filed 10/10/13 Entered 10/10/13 18:26:21 Page 49 of 207

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

| | | |
|---|---|---|
| CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan | ) ) ) ) | Case No.: 2:13-cv-12987-LPZ-MKM |
| **Plaintiff,** | ) ) | |
| v. | ) ) | Hon. Lawrence P. Zatkoff |
| SYNCORA GUARANTEE INC., a New York Corporation, | ) ) ) | |
| and | ) ) | |
| U.S. BANK, N.A., | ) ) | |
| and | ) ) | |
| MGM GRAND DETROIT, LLC, | ) ) | |
| and | ) ) | |
| DETROIT ENTERTAINMENT, LLC, d/b/a MOTORCITY CASINO HOTEL, | ) ) ) | |
| and | ) ) | |
| GREEKTOWN CASINO, LLC, | ) ) | |
| **Defendants.** | ) ) ) | |

**[RESUBMITTED]**
**AFFIDAVIT OF KEVYN D. ORR**
<u>**EMERGENCY MANAGER FOR THE CITY OF DETROIT**</u>

**STATE OF MICHIGAN**
**IN THE 3RD JUDICIAL CIRCUIT COURT**
**FOR THE COUNTY OF WAYNE**

CITY OF DETROIT, a Municipal
Corporation Organized and Existing
Under the Laws of the State of Michigan

         Plaintiff,

     v.

SYNCORA GUARANTEE INC., a New
York Corporation,

and

U.S. BANK, N.A.,

and

MGM GRAND DETROIT, LLC,

and

DETROIT ENTERTAINMENT, LLC
d/b/a MOTORCITY CASINO HOTEL,

and

GREEKTOWN CASINO, LLC,

        Defendants.

Case No.:   13-008858-CZ
Hon.      Jeanne Stempien

13-008858-CZ

FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/5/2013 12:02:00 PM
CATHY M. GARRETT

---

ROBERT S. HERTZBERG (P30261)
DEBORAH KOVSKY-APAP (P68258)
Pepper Hamilton LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
(248) 359-7300 - Telephone
(248) 359-7700 - Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

1

THOMAS F. CULLEN, JR.
GREGORY M. SHUMAKER
GEOFFREY S. STEWART
Jones Day
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

*Attorneys for Plaintiff*

---

### AFFIDAVIT OF KEVYN D. ORR
### EMERGENCY MANAGER FOR THE CITY OF DETROIT

Now comes the Affiant, Kevyn D. Orr, a natural person, being first duly sworn and deposed and under the penalty of perjury states the following:

1.      I submit this Affidavit in support of the City of Detroit's Verified

Complaint for Declaratory and Injunctive Relief (the "Complaint") filed

contemporaneously herewith.[1]

2.      I am the Emergency Manager for the City of Detroit ("Detroit" or the

"City"). I was appointed to the position of "emergency financial manager" for the City

on March 15, 2013, by the Local Emergency Financial Assistance Loan Board created

under the Emergency Municipal Loan Act, Michigan Complied Laws ("M.C.L.")

§§ 141.931-141.942, pursuant to Public Act 72 of 1990 of the State of Michigan, also

known as the Local Government Fiscal Responsibility Act, M.C.L. §§ 141.1201

141.1291 ("PA 72"). I formally took office as the emergency financial manager for the

City under PA 72 on March 25, 2013. On March 28, 2013, PA 72 was repealed and

---

[1]      Capitalized words not otherwise defined herein shall have the meaning given to them in the Complaint.

replaced by Public Act 436 of the State of Michigan, also known as the Local Financial

Stability and Choice Act, MCL 141.1541-141.1575 ("PA 436"), and I became the

Emergency Manager of the City pursuant to Section 2(e) of PA 436.

3.      In my capacity as Emergency Manager I act for, and in the place and stead

of, the City's elected Mayor and City Council.  Pursuant to PA 436, I exercise authority

over nearly all aspects of the City's government and management, including budgeting,

operations, financial affairs, contracts, appropriations, collective bargaining and the use,

sale and lease of assets.  In the nearly four months since assuming the position of

Emergency Manager, I have become familiar with the history, day-to-day functions and

operations, and financial affairs of the City.

**<u>History</u>**

4.      Since being named Emergency Manager, I have developed a

comprehensive plan to address the City's numerous financial and operational problems.

The primary goals of my proposed plan are to:  (i) ensure that the City is able to provide

or procure governmental services essential to the public health, safety and welfare of its

citizens; (ii) assure the fiscal accountability and stability of the City; and (iii) promote

private investment in the City and revitalization of the community in a sustainable

fashion.  In short, my proposed plan would enable the City to pay its employees and its

bills, live within its means, provide meaningful (but modest relative to the overall need)

reinvestment in the City, satisfy secured obligations and restructure unsecured

obligations.

5.      On June 14, 2013, I proposed this plan to approximately 150

representatives of the City's stakeholders at the Westin Detroit Metropolitan Airport (the

"June 14 Creditor Meeting").  A true and correct copy of the Proposal for Creditors

3

Executive Summary that was distributed at the June 14 Creditor Meeting is attached hereto as Exhibit A. Those in attendance included, among others, representatives of: (i) all of the City's unions; (ii) certain retiree associations; (iii) both of the City's pension trusts; (iv) all of the City's funded debt; (v) the insurers of such debt, including Syncora Guarantee Inc. or an affiliate ("Syncora") and its counsel and financial advisor; and (vi) many individual bondholders.

6.        During the June 14 Creditor Meeting, I outlined the City's desperate financial situation and my proposal to address the City's difficulties with the resources available to me. I made clear that the City will not have the financial resources to pay all of its stakeholders in full. My proposal reflected that the City would pay claims secured by specific revenue streams, but recoveries on other claims were going to be very limited. I also made clear the urgency of the situation and the need for prompt discussions with the City's stakeholders. I told the attendees that discussions with stakeholders would ensue but that the City had very limited time to stem the decline. I also announced that the City would not be financing its unsecure debt and legacy obligations (including the COPs, which I will address later in this affidavit), but that such claims would be compromised. At the conclusion of this meeting, with the help of my advisors, I tried to answer all of the questions posed by the attendees. I also solicited feedback and input on, or alternatives to, my proposal that will achieve the City's goals in the same timeframe.

7.        Before and after the June 14 Creditor Meeting, my advisors and I have embarked on a series of meetings and engaged in substantive negotiations with various stakeholders in an effort to reach an out-of-court solution to the City's financial and operational problems. Many of these conversations—with unions, pension funds,

4

bondholders, monoline insurers and other stakeholders—are ongoing.  The purpose of these negotiations is to restructure the City's obligations so that the City can resume providing basic and essential services to its residents and revitalize the City to reverse or stabilize its current downward trajectory.

8.      As detailed more fully in the Complaint being filed today, in 2005 and 2006, the City's two pension funds, the General Retirement System and the Police and Fire Retirement System, were terribly underfunded.  To remedy this situation, the City entered into a series of transactions to raise over $1.4 billion to fund the pension funds. As part of this effort, the City organized two "Service Corporations" and entered into a "service contract" with each pursuant to which the City agreed to make certain payments in return for the Service Corporations' future assistance in funding transactions for the City's two pension funds.  The Service Corporations in turn created "Funding Trusts" that issued "Pension Obligation Certificates of Participation" (the so-called "COPs") to investors.  The COPs are not secured by any specific revenue stream of the City, but instead are funded as a general unsecured obligation of the City.

9.      Some of the COPs entered in 2006 paid a floating interest rate.  To contain the risk of these floating rates, the Service Corporations entered into hedging arrangements, commonly known as "swaps," with UBS A.G. and SBS Financial Products Company, LLC (the "Swap Counterparties").  Under these swaps, the Service Corporations and Swap Counterparties agreed to effectively convert the floating interest rate exposure of the Service Corporations into a fixed payment.  This was done through an arrangement whereby, in return for each side betting against the other on interest rates, the Swap Counterparties agreed to make payments to the Service Corporations in the

5

event the floating rates on the COPs exceeded certain levels. Conversely, if interest rates fell below certain levels, the Service Corporations would be forced to make payments to the Swap Counterparties.

10.    The Swap Counterparties required protection against the possibility that the Service Corporations might default on their quarterly swap payments. The parties agreed to purchase insurance to address this risk. The predecessor to Syncora—XL Capital Assurance, Inc.—was one of two monoline insurers who were paid for, and provided, the swap default insurance. Syncora continues to insure these swap payments.

11.    As part of a 2009 restructuring of the City's swap obligations, the City entered into a "Collateral Agreement" with the Swap Counterparties, the Service Corporations, and U.S. Bank, N.A., which was to serve as the custodian for the new collateral arrangement. A true and correct copy of the Collateral Agreement is attached hereto as Exhibit B. Under this agreement the City pledged a specific revenue stream: (i) payments from the developers of the City's casinos, and (ii) taxes upon each casino's gross receipts (together, the "Casino Revenue") as collateral to secure the City's obligations under the swap agreements.

12.    Under this new collateral arrangement, U.S. Bank oversees two accounts: the "General Receipts Subaccount" and the "Holdback Account." Each day, on average, approximately $500,000 in Casino Revenue is deposited into the General Receipts Subaccount which, after 30 days, amounts to approximately $15 million. Under the Collateral Agreement, U.S. Bank releases the Casino Revenue accumulating in the General Receipts Subaccount to the City *only after* it deposits approximately $4 million (one-third of its quarterly swap payment) into the Holdback Account. Once the City

6

makes this deposit into the Holdback Account, U.S. Bank gives the City complete access to the Casino Revenue that continues to accumulate in the General Receipts Subaccount, as it is deposited, until the beginning of the next payment period.

13.     If the City fails to make a quarterly swap payment, the Swap Counterparties are empowered under the Collateral Agreement to notify U.S. Bank that it should not release—or should "trap"—the Casino Revenue owed to the City.  The Swap Counterparties are permitted to do this even if the amounts in the General Receipts Subaccount are greater than the missed swap payment.  Through the date of this Affidavit, the City has not defaulted on making any of its swap payments.

14.     Unlike the swaps, the COPs are not covered by the Collateral Agreement and are not secured by the Casino Revenue.  Prior to June 17, 2013, the COPs were funded through an unsecured contract claim against the City.

15.     On June 13, 2013, to conserve the City's dwindling cash, I directed the City not to make the prescribed monthly payment due under the COPs agreements and consistent with that direction told U.S. Bank not to pay the unsecured interest obligation due on the floating rate COPs.  A true and correct copy of this letter is attached hereto as Exhibit C.

16.     On June 17, 2013, Syncora sent a letter to U.S. Bank purportedly to direct the custodian to trap all funds in the General Receipts Subaccount.  A true and correct copy of this letter is attached hereto as Exhibit D.

17.     On June 24, 2013, U.S. Bank emailed counsel to both Syncora and the City to inform each that "it expects to be in receipt of [C]asino [R]evenues in the General Receipts Subaccount equal to the" amount the City would pay on the monthly swap

7

payment.  In light of this fact, U.S. Bank asked if the City and Syncora wanted U.S. Bank to make the monthly swap payment and release the Casino Revenue to the City as "seemingly required in the ordinary course of business."  *Id.*  A true and correct copy of this email is attached hereto as Exhibit E.

18.     Later that same day, in an email and letter from its counsel to U.S. Bank's attorney, Syncora continued to assert that the Casino Revenue should be trapped and threatened to hold the U.S. Bank responsible for the release of any funds from the General Receipts Subaccount.  A true and correct copy of Syncora's email and letter are attached hereto as Exhibits E and F, respectively.

19.     In a letter dated June 25, 2013, I urged Syncora to take immediate corrective action and rescind its June 17, 2013 letter on the grounds that it is not a party to the Collateral Agreement and has no right whatsoever to direct U.S. Bank's conduct.  A true and correct copy of this letter is attached hereto as Exhibit G.  Syncora responded the following day, June 26, 2013, disagreeing with my position. A true and correct copy of this letter is attached hereto as Exhibit H.  On June 27, 2013, the City's legal and financial advisors,  Syncora's legal and financial advisors and Syncora's Chief Financial Officer and Chief Restructuring Officer, and others, met in person in New York City and expressed their respective positions.  On Saturday, June 29, 2013, the City's financial advisor and Syncora's financial advisor conferred by telephone regarding our respective positions.  After the call, I was informed that there was no progress made towards resolving this dispute and that Syncora would not change its position.

20.     Despite my efforts to resolve this matter amicably, Syncora's calculated conduct requires that I initiate this litigation and ask for immediate equitable relief.  As I

outlined at the June 14 Creditor Meeting, Detroit is insolvent, both financially and operationally. Due to the City's precarious cash situation, every day that passes without my having access to the General Receipts Subaccount is another day that the City may have to delay or cut back on the provision of essential services and I cannot possibly negotiate and resolve creditors' claims with any degree of certainty. The situation is straightforward: as Emergency Manager I need every dollar available—including those that continue to accumulate in the General Receipts Subaccount—at my disposal to help restructure the City and continue to ensure that critical services are provided to Detroit's citizens.

### Immediate Consequences and Irreparable Harm

21.     As of May 31, 2013, the City had approximately $40 million in available cash on hand with outstanding deferrals and amounts due to other funds and entities of over $200 million. To preserve the City's limited cash, I did not make a required $39.7 million payment to the Service Corporations for payment to the COPs holders that was due on June 14, 2013. Absent near term intervention, the City is expected to run out of cash by the end of the 2013 calendar year, with a projected cash balance before required distributions of approximately negative $18 million. It has become abundantly clear to me that the City cannot make it through the next six months without immediate and fundamental changes to its finances and operations. These changes cannot be effected and implemented unless they are negotiated now. I cannot meaningfully negotiate with the necessary parties if the City does not have access to the trapped Casino Revenue that will continue to accumulate in the General Receipts Subaccount in the amount of approximately $170 million annually for the foreseeable future.

9

22.     Any delay in reaching negotiated settlements with the City's stakeholders could have disastrous consequences for the City.  The City is insolvent and is unable to pay its debts as they come due. Thus, it is imperative that I attempt to fundamentally alter the City's financial position through consensual agreements in the next few weeks because each day that passes without a restructuring of the City's balance sheet is a day closer to a bankruptcy filing.  Syncora's decision to interject itself into the Collateral Agreement and try to intimidate U.S. Bank into trapping the Casino Revenue—one of the City's largest revenue sources—hijacks my negotiations with certain other creditors.  I cannot commit resources in any meaningful way to settle or address certain creditors' claims because I have no idea how long the Casino Revenue might be trapped or how they might ultimately be distributed as a result of Syncora's deliberately disruptive conduct.  At this juncture, while an Emergency Manager is in place after the declaration of a financial emergency, the City has a unique opportunity to resolve various creditors' claims in an attempt to avoid bankruptcy.  Syncora's effort to assert rights to collateral it has no right to is preventing Detroit from seizing this critical opportunity.

23.     In addition to undermining my ability to negotiate with the City's other creditors, Syncora's decision to trap the City's Casino Revenue has other immediate consequences that will inflict irreparable harm on the City.  Currently, there are approximately $7.5 million in the General Receipts Subaccount.  If Syncora had not taken the position that U.S. Bank should trap the City's assets in the General Receipts Subaccount with its June 17, 2013 letter, I would have already authorized the City on or around June 24, 2013, to make the monthly swap payment under the Collateral Agreement of approximately $4 million.  This authorization and payment would have

allowed me to access, under the terms of the Collateral Agreement, the approximate $3 million over and above that was required for the monthly swap payment in the General Receipts Subaccount.  I would also now have access to the Casino Revenue deposited each day subsequent to June 24, 2013 in the General Receipts Subaccount until the next monthly payment cycle begins on or around July 16, 2013.  By July 15, 2013, the Casino Revenue deposited in the General Receipts Subaccount will have grown to approximately $15 million, of which approximately $11 million would otherwise have been available for the City to use after deducting the monthly swap payment.  The City cannot use these funds—or commit to using these funds in my negotiations with creditors—due to Syncora's actions.

24.     The $11 million I will not be able to use absent immediate relief from this Court is roughly the equivalent of 30% of the City's total available cash on hand as of June 30, 2013.  To illustrate, $11 million represents:  (i) the salaries and wages for nearly two months of fire fighter services; or (ii) the salaries and wages for nearly one month of police officer services.  Not having access to this significant percentage of the City's money of course adversely affects the City's current operations.  With 4 of the top 10 most dangerous neighborhoods in the nation, the City needs access to that money immediately to ensure public safety and keep its police on the streets and its firefighters responding to fires.  Vital City operations such as these are functioning at a marginal level, at best, and further constraints on the City's financial resources will only further degrade the health, safety and welfare of the City.

25.     Syncora's unauthorized and intentional actions above are preventing me from finalizing and implementing a settlement with one of the City's largest creditor

11

groups—the Swap Counterparties.  If a settlement can be reached with these creditors, the City's exposure to the Swap Counterparties will be removed and the City will have unimpaired use of the Casino Revenue.  I understand from my advisors that Syncora is aware that the Swap Counterparties are amenable to releasing the Casino Revenue to the City.  A concerted campaign (letters and emails) to arrest Casino Revenue has brought negotiations with these groups, particularly the Swap Counterparties, to a virtual standstill.  A settlement with the Swap Counterparties would assure the City of having Casino Revenue to fund its operations, enable a negotiated resolution of the swaps with no effect on Syncora and allow the City to avoid a termination payment in the hundreds of millions of dollars.

26.    The restructuring plan I outlined on June 14, 2013, contemplates a substantial investment in the City—$1.25 billion over the next 10 years, and includes spending approximately $500 million in the next 6 years to remediate urban blight and increase property values and the City's appearance and over $100 million in improvements to the performance and infrastructure of the City's public safety departments (police, fire, EMS).  Among others, the proposed plan provides for:

- Removing abandoned and blighted structures, which comprise 20% of the City's housing stock, to fundamentally transform the urban landscape and make the City a more attractive place to live, decrease crime and increase property values.  Moreover, removing blight will allow public safety departments to allocate resources to more meaningful activities (60% of the 11,000 to 12,000 fires that the City experiences each year occur in blighted and unoccupied structures).

- Investing in new fire, police and EMS infrastructure, assets and personnel to address the chronically dilapidated buildings (average age of the City's fire stations is 80 years old with over $1 million in annual maintenance), fleet of vehicles (many with well over 250,000 miles and break down frequently) and overworked employees (the fire department's apparatus

12

> division has a mechanic to vehicle ratio of 1 to 39 resulting in an inability
> to complete preventative maintenance on schedule).

My proposed restructuring plan cannot be effected if Syncora's unauthorized actions

allow it to trap the Casino Revenue, which was greater than $180 million during the

City's 2012 fiscal year, nearly 17% of the City's annual revenue. The trapping of

roughly $11 million a month at Syncora's urging makes it impossible to move forward

with a comprehensive restructuring plan for the City. Syncora's actions have placed into

legal limbo all of the Casino Revenue that are now being deposited to the General

Receipts Subaccount. Immediate access to this money is needed if the City's 139-square

mile footprint—one that is larger than Boston, Manhattan, and San Francisco

*combined*—is to be saved.

     27.     Detroit is in a state of crisis. I am here to help avert this crisis and am

being constrained from doing so by a private party using an intentional and unauthorized

effort to hold the City's revenue hostage. If there is any hope for a meaningful path

forward in the near term, the City must have immediate access to all of the funds

remaining funding sources it has.

Dated: July 4, 2013         By: _____
      Detroit, Michigan          Kevyn D. Orr
                             Emergency Manager
                             City of Detroit

Subscribed and sworn to before me this __4th__ day of __July__, 20_13_.

_____
Notary Public

My Commission Expires: _4/3/2019_

MARYELLEN LEOPOLD
Notary Public, State of Michigan
County of Oakland
My Commission Expires Apr. 03, 2019

13-008858-CZ

FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/5/2013 12:02:00 PM
CATHY M. GARRETT

# EXHIBIT A

CITY OF DETROIT

# PROPOSAL FOR CREDITORS

## EXECUTIVE SUMMARY

JUNE 14, 2013

13-53846-swr   Doc 157-9   Filed 05/24/13   Entered 05/24/13 15:02:26   Page of 247
13-53846-swr   Doc 1140-8   Filed 10/10/13   Entered 10/10/13 15:02:26   Page of 247
248

**This proposal is based on numerous projections and assumptions concerning future uncertain events including estimates of tax revenues and forecasts of future business and economic conditions in the City, all of which are beyond the control of the City. Actual results may differ from the assumptions and projections presented herein, and such differences could be material.**

**Additional data are being gathered or developed, and various critical financial and operational analyses remain in process. Thus, this proposal remains subject to material change.**

OFFICE OF THE EMERGENCY MANAGER



248

# Table of Contents

I. Detroit Faces Strong Economic Headwinds   3

II. Key Objectives for a Financial Restructuring and Rehabilitation of Detroit   33

III. Current Financial Status   34

IV. The City Has Taken Action to Address Its Financial Challenges   39

V. Restructuring and Reinvesting in City Government   41

VI. Realization of Value of Assets   46

VII. Ten Year Projections (General Fund Only)   47

VIII. Restructuring Proposal   50

IX. Calendar and Contacts   61

OFFICE OF THE EMERGENCY MANAGER



# I. Detroit Faces Strong Economic Headwinds.

**Deteriorating Macroeconomic Conditions.** During the past several decades, the City of Detroit (the "City") has experienced changes that have adversely affected the economic circumstances of the City and its residents.

**Employment in Detroit**





OFFICE OF THE EMERGENCY MANAGER

1

# I. Detroit Faces Strong Economic Headwinds.

**Unemployment Rate in Detroit**

OFFICE OF THE EMERGENCY MANAGER

2

13-53846-swr   Doc 157-9  Filed 05/24/13  Entered 05/24/13 18:26:17  Page 69 of 247
13-53846-tjt   Doc 1140-15   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 69 of 129

248



# I. Detroit Faces Strong Economic Headwinds.

- *Eroding Tax Base and Reductions in State Revenue Sharing.*

  - **Property Taxes.** Property tax revenues have decreased by approximately 19.7% over the past six years as a result of declining assessed values ($1.6 billion from 2008 to 2012) and lower collection rates (from 76.6% in 2008 to 68.3% in 2012).

  - **Income Taxes.** Income tax revenues have decreased by $91 million since 2002 (approximately 30%) and by $44 million (approximately 15%) since 2008. The primary cause of these decreases has been high unemployment.

  - **The City is currently levying all taxes at or near statutory maximum rates.**



OFFICE OF THE EMERGENCY MANAGER

3

13-53846-swr   Doc 157-9  Filed 07/24/13   Entered 07/24/13 18:27:26   Page 49 of 247
248

# I. Detroit Faces Strong Economic Headwinds.

**Residents and businesses are leaving Detroit to escape High Taxes and Insurance Costs.**

- *Comparative Tax Burden.*

  - **Per Capita Tax Burden.** Detroit's per capita tax burden on City residents is the highest in Michigan. This tax burden is particularly severe because it is imposed on a population that has relatively low levels of per capita income.

  - **Resident Income Tax.** The income tax burden on Detroit residents is greater than that of residents in the surrounding area. The City's income tax — 2.4% for residents, 1.2% for nonresidents and 2.0% for businesses — is the highest in Michigan.

  - **Property Taxes.** Detroit residents pay the highest total property tax rates (inclusive of property taxes paid to all overlapping jurisdictions; e.g., the City, the State, Wayne County) of those paid by residents of Michigan cities having a population over 50,000. The total property tax rate (including property taxes assessed by the City, the State and various special authorities) imposed on Detroit homeowners is approximately 67.07 mills; for businesses, the total property tax rate is approximately 85.35 mills.

    - **At more than 19.95 mills, the City's property tax rate for general operations is close to the statutory maximum of 20.00 mills.**

  - Utility Users Tax. Detroit is the only city in Michigan that levies an excise tax on utility users (at a rate of 5%).

OFFICE OF THE EMERGENCY MANAGER

4



248

# I. Detroit Faces Strong Economic Headwinds.

## The City is Insolvent

### Continuing Budget Deficits.

- Excluding the effect of recent debt issuances (e.g., $75 million in FY 2008, $250 million in FY 2010 and $129.5 million in FY 2013) that funded the City's operating deficits, the City's accumulated general fund deficit has grown continuously over an extended period.



*$ in millions*

Legend:
- LTGO Series 2012C ($130m)
- LTGO Series 2010 ($250m)
- LTGO Series 2008A ($75m)
- Accumulated deficit (unrestricted)

- At the end of FY 2012, the City's accumulated general fund deficit was $326.6 million.

- If not for the City's recent debt issuances, the projected accumulated deficit for FY 2013 would have been approximately $700 million.

OFFICE OF THE EMERGENCY MANAGER

5



## I. Detroit Faces Strong Economic Headwinds.

**Liquidity Crisis.** The City is insolvent. Absent ongoing cash intervention (primarily in the form of payment deferrals and cost cutting), the City would have run out of cash before the end of FY 2013.

- The City had negative cash flows of $115.5 million in FY 2012, excluding the impact of proceeds from short-term borrowings. In March 2012, to avoid running out of cash, the City borrowed $80 million on a secured basis (of which the City spent $50 million in FY 2012).

- The City is projecting to have positive cash flows of $4.0 million in FY 2013 after deferring approximately $120 million of current and prior year pension contributions and other payments.

- Absent intervention and/or restructuring, the City is projecting to have negative cash flows of $198.5 million in FY 2014.

- As of the end of May 2013, the City had $68 million of cash before property tax distributions, but had outstanding deferrals and amount due to other funds and entities of approximately $216 million. These are effectively borrowings and must be repaid.



OFFICE OF THE EMERGENCY MANAGER

6

# I. Detroit Faces Strong Economic Headwinds.

## The City is Not Paying Its Debts as They Come Due

- The City is not making its pension contributions as they come due. The City has deferred payment of its year-end Police and Fire Retirement System ("PFRS") contributions (and finances such deferrals at a rate of 8%). As of May 2013, the City had deferred approximately $54 million in pension contributions related to current and prior periods and will defer approximately $50 million on June 30, 2013 for current year PFRS pension contributions. Therefore, by fiscal year end, the City will have deferred over $100 million of pension contributions.

- The City will not make the scheduled $39.7 million payments due on its pension-related certificates of participation on June 14, 2013.

OFFICE OF THE EMERGENCY MANAGER

7



8

# I. Detroit Faces Strong Economic Headwinds.

## FY 2013 Forecasted Cashflow to Year End

| $ in millions | Actual FY 2012 | Actual Jul-12 | Actual Aug-12 | Actual Sep-12 | Actual Oct-12 | Actual Nov-12 | Actual Dec-12 | Actual Jan-13 | Actual Feb-13 | Actual Mar-13 | Actual Apr-13 | Actual May-13 | Forecast Jun-13 | 11A + 1F FY 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | |
| Property taxes | $567.0 | $34.0 | $198.0 | $14.8 | $6.9 | $4.2 | $24.4 | $139.1 | $42.3 | $5.4 | $1.3 | $3.1 | $58.0 | $531.6 |
| Income & utility taxes | 276.2 | 23.1 | 25.1 | 21.5 | 25.8 | 23.6 | 21.9 | 25.4 | 23.9 | 20.4 | 30.2 | 30.8 | 18.4 | 290.1 |
| Gaming taxes | 177.5 | 12.4 | 15.2 | 17.2 | 12.4 | 20.8 | 11.0 | 11.5 | 19.6 | 14.4 | 12.8 | 16.5 | 9.2 | 173.0 |
| Municipal service fee to casinos | 19.8 | - | 7.6 | - | - | 4.0 | 4.0 | 1.8 | - | - | - | - | - | 17.4 |
| State revenue sharing | 194.3 | 28.5 | - | 28.7 | - | 30.9 | - | 30.4 | - | 30.6 | - | 29.7 | - | 178.9 |
| Other receipts | 480.8 | 26.1 | 37.8 | 26.0 | 22.5 | 26.6 | 31.7 | 16.7 | 58.0 | 25.6 | 29.3 | 41.4 | 19.4 | 361.2 |
| Refinancing proceeds | 50.0 | - | - | - | - | - | 10.0 | - | - | - | - | - | 20.0 | 30.0 |
| **Total operating receipts** | **1,765.5** | **124.2** | **283.8** | **108.2** | **67.5** | **110.1** | **103.1** | **225.0** | **143.9** | **96.5** | **73.6** | **121.4** | **125.0** | **1,582.2** |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll, taxes, & deductions | (454.2) | (37.5) | (35.0) | (32.5) | (28.0) | (41.1) | (30.1) | (23.6) | (30.1) | (25.9) | (26.3) | (36.2) | (27.2) | (373.6) |
| Benefits | (203.4) | (18.3) | (21.0) | (20.4) | (16.7) | (16.2) | (19.5) | (9.7) | (15.8) | (17.7) | (4.7) | (14.9) | (16.0) | (191.0) |
| Pension contributions | (103.9) | (0.6) | (11.7) | (7.2) | - | - | - | (1.9) | (5.7) | (5.0) | (3.9) | - | - | (30.8) |
| Subsidy payments | (50.0) | (0.9) | (4.9) | (6.2) | (2.1) | - | (8.8) | (0.2) | - | (14.7) | (0.6) | - | - | (40.1) |
| Distributions - tax authorities | (374.4) | - | (110.1) | (34.3) | - | (5.3) | (1.5) | (8.1) | (79.4) | - | - | (1.6) | (50.7) | (283.2) |
| Distributions - UTGO | (8.6) | - | (1.5) | (11.0) | (1.3) | - | - | - | (1.3) | (52.1) | (1.3) | - | - | (68.6) |
| Distributions - DDA increment | - | - | - | - | - | - | - | (5.9) | - | - | - | - | (5.5) | (11.4) |
| Income tax refunds | (16.9) | (1.9) | (3.3) | (0.6) | (1.8) | (2.1) | (1.0) | (0.5) | (0.4) | (0.4) | (1.9) | (1.6) | - | (17.2) |
| A/P and other disbursements | (477.5) | (43.8) | (48.1) | (34.5) | (32.0) | (37.0) | (25.2) | (24.2) | (34.7) | (29.2) | (29.1) | (38.6) | (28.9) | (405.3) |
| Professional fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sub-total operating disbursements | (1,688.9) | (103.1) | (235.7) | (146.8) | (80.6) | (101.7) | (86.1) | (74.1) | (167.4) | (145.0) | (66.5) | (91.3) | (122.8) | (1,421.1) |
| POC and debt related payments | (142.1) | (4.2) | (5.4) | (4.9) | (9.0) | (7.9) | (14.9) | (3.1) | (8.5) | (4.8) | (32.2) | (25.6) | (36.6) | (157.1) |
| **Total disbursements** | **(1,831.0)** | **(107.3)** | **(241.1)** | **(151.7)** | **(89.6)** | **(109.6)** | **(101.0)** | **(77.2)** | **(175.9)** | **(149.8)** | **(98.8)** | **(116.9)** | **(159.4)** | **(1,578.2)** |
| Net cash flow | (65.5) | 16.9 | 42.6 | (43.5) | (22.0) | 0.5 | 2.1 | 147.8 | (32.1) | (53.3) | (25.2) | 4.6 | (34.4) | 4.0 |
| Cumulative net cash flow | (65.5) | 16.9 | 59.5 | 16.0 | (6.0) | (5.5) | (3.4) | 144.4 | 112.3 | 59.0 | 33.9 | 38.4 | 4.0 | 4.0 |
| Beginning cash balance | 95.3 | 29.8 | 46.7 | 89.3 | 45.8 | 23.8 | 24.3 | 26.4 | 174.2 | 142.1 | 88.8 | 63.7 | 68.2 | 29.8 |
| Net cash flow | (65.5) | 16.9 | 42.6 | (43.5) | (22.0) | 0.5 | 2.1 | 147.8 | (32.1) | (53.3) | (25.2) | 4.6 | (34.4) | 4.0 |
| **Cash before required distributions** | **29.8** | **46.7** | **89.3** | **45.8** | **23.8** | **24.3** | **26.4** | **174.2** | **142.1** | **88.8** | **63.7** | **68.2** | **33.8** | **33.8** |
| Accumulated property tax distributions | (27.9) | (48.1) | (77.8) | (31.8) | (32.9) | (31.5) | (48.0) | (149.8) | (89.5) | (26.9) | (26.0) | (28.5) | (19.7) | (19.7) |
| **Cash net of distributions** | **$1.9** | **$(1.4)** | **$11.5** | **$14.0** | **$(9.1)** | **$(7.1)** | **$(21.5)** | **$24.4** | **$52.6** | **$61.9** | **$37.6** | **$39.7** | **$14.1** | **$14.1** |
| *Memo:* | | | | | | | | | | | | | | |
| Accumulated deferrals | (64.4) | (66.2) | (56.3) | (50.9) | (52.7) | (53.2) | (46.3) | (44.2) | (53.9) | (57.7) | (61.5) | (65.8) | (118.7) | (118.7) |
| Refunding bond proceeds in escrow | 28.6 | 28.6 | 81.7 | 81.7 | 81.7 | 81.7 | 71.7 | 71.7 | 71.7 | 71.7 | 71.7 | 51.7 | 51.7 | 51.7 |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd |

9

# I. Detroit Faces Strong Economic Headwinds.

## FY 2014 Forecasted Cash Flow to Year End

*$ in millions*

| | Forecast Jul-13 | Forecast Aug-13 | Forecast Sep-13 | Forecast Oct-13 | Forecast Nov-13 | Forecast Dec-13 | Forecast Jan-14 | Forecast Feb-14 | Forecast Mar-14 | Forecast Apr-14 | Forecast May-14 | Forecast Jun-14 | Forecast FY 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | |
| Property taxes | $37.8 | $166.6 | $13.0 | $6.6 | $3.1 | $21.5 | $139.1 | $20.8 | $4.8 | $1.3 | $2.5 | $51.1 | $468.4 |
| Income & utility taxes | 28.7 | 22.7 | 22.3 | 28.3 | 22.7 | 22.3 | 28.3 | 23.5 | 22.7 | 28.3 | 22.3 | 22.7 | 294.7 |
| Gaming taxes | 14.6 | 14.1 | 8.9 | 23.1 | 10.4 | 9.4 | 22.1 | 9.9 | 15.1 | 17.4 | 13.2 | 11.8 | 170.0 |
| Municipal service fee to casinos | 7.6 | - | - | 4.0 | | 4.0 | 1.8 | | | | | | 17.4 |
| State revenue sharing | 30.7 | - | 30.7 | - | 30.7 | - | 30.7 | - | 30.7 | - | 30.7 | - | 184.3 |
| Other receipts | 27.2 | 25.8 | 25.9 | 32.9 | 26.3 | 25.9 | 32.9 | 27.1 | 26.3 | 32.9 | 25.9 | 26.3 | 335.9 |
| Refinancing proceeds | - | | | | | | | | | | | | - |
| **Total operating receipts** | 139.1 | 236.9 | 100.9 | 91.0 | 97.2 | 83.2 | 255.0 | 81.3 | 99.6 | 80.0 | 94.6 | 111.9 | 1,470.7 |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Payroll, taxes, & deductions | (31.0) | (26.6) | (26.6) | (35.5) | (26.6) | (26.6) | (31.0) | (26.6) | (26.6) | (35.5) | (26.6) | (26.6) | (345.6) |
| Benefits | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (14.0) | (14.0) | (14.0) | (14.0) | (14.0) | (178.6) |
| Pension contributions | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (175.9) |
| Subsidy payments | (7.6) | (5.0) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (75.6) |
| Distributions - tax authorities | (14.8) | (72.4) | (40.0) | (5.7) | (1.0) | (1.3) | (57.3) | (20.9) | (14.0) | (1.7) | | (24.0) | (253.1) |
| Distributions - UTGO | | (12.0) | | | | | | | (44.9) | | | | (56.9) |
| Distributions - DDA increment | | | | | | (8.0) | | | | | | (1.0) | (9.0) |
| Income tax refunds | (2.5) | (2.7) | (.06) | (0.3) | (1.5) | (1.0) | (0.6) | (0.3) | (0.4) | (2.3) | (1.2) | (3.7) | (17.0) |
| A/P and other disbursements | (36.3) | (37.9) | (29.3) | (37.1) | (30.1) | (25.6) | (40.8) | (23.0) | (33.5) | (39.7) | (30.0) | (30.0) | (393.2) |
| Sub-total operating disbursements | (122.3) | (186.7) | (132.8) | (115.1) | (95.6) | (98.9) | (166.0) | (105.8) | (154.4) | (114.3) | (92.8) | (120.3) | (1,504.9) |
| POC and debt related payments | (7.4) | (4.2) | (5.8) | (8.5) | (7.3) | (15.4) | (7.3) | (4.2) | (5.7) | (51.9) | (7.3) | (39.1) | (164.2) |
| **Total disbursements** | (129.6) | (191.0) | (138.6) | (123.5) | (102.9) | (114.3) | (173.4) | (110.0) | (160.2) | (166.1) | (100.1) | (159.3) | (1,669.1) |
| **Net cash flow** | 9.5 | 45.9 | (37.7) | (32.6) | (5.7) | (31.1) | 81.6 | (28.7) | (60.6) | (86.1) | (5.5) | (47.4) | (198.5) |
| Cumulative net cash flow | 9.5 | 55.4 | 17.7 | (14.9) | (20.6) | (51.7) | 29.9 | 1.1 | (59.4) | (145.6) | (151.0) | (198.5) | |
| Beginning cash balance | 33.8 | 43.3 | 89.2 | 51.5 | 18.9 | 13.2 | (17.9) | 63.7 | 34.9 | (25.6) | (111.8) | (117.2) | 33.8 |
| Net cash flow | 9.5 | 45.9 | (37.7) | (32.6) | (5.7) | (31.1) | 81.6 | (28.7) | (60.6) | (86.1) | (5.5) | (47.4) | (198.5) |
| **Cash before required distributions** | $43.3 | $89.2 | $51.5 | $18.9 | $13.2 | $(17.9) | $63.7 | $34.9 | $(25.6) | $(111.8) | $(117.2) | $(164.7) | $(164.7) |
| Accumulated property tax distributions | (29.8) | (55.4) | (24.0) | (22.7) | (23.7) | (38.6) | (86.5) | (82.2) | (27.1) | (26.5) | (28.5) | (19.7) | (19.7) |
| **Cash net of distributions** | $13.5 | $33.8 | $27.4 | $(3.8) | $(10.5) | $(56.5) | $(22.8) | $(47.2) | $(52.7) | $(138.2) | $(145.7) | $(184.4) | $(184.4) |
| *memo:* | | | | | | | | | | | | | |
| Accumulated deferrals | (119.3) | (112.4) | (112.8) | (113.5) | (113.9) | (114.4) | (115.0) | (115.5) | (116.0) | (116.6) | (117.1) | (117.6) | (117.6) |
| Refunding bond proceeds in escrow | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd |

## I. Detroit Faces Strong Economic Headwinds.

### Current Levels of Municipal Services to Residents and Businesses are Severely Inadequate.

**The City Must Reduce Its High Crime Rates.**

- In 2012, the City had the highest rate of violent crime of any U.S. city having a population over 200,000. The City's violent crime rate is five times the national average.

- EMS and Detroit Fire Department ("DFD") response times are extremely slow when compared to other cities (15 minutes and 7 minutes, respectively).

**The City Must Provide Functioning Street Lights.**

- As of April 2013, approximately 40% of the City's street lights were not functioning. The lights that are functioning are scattered across an outdated population footprint (and thus are not focused to meet the current population's actual needs).

**The City Must Overhaul Its Dysfunctional Operations.**

- Police Department ("DPD").

  - Over the last five years, the DPD has had five different police chiefs, all having varying approaches to DPD's operations.

  - DPD's efficiency (response times), effectiveness (case closure rate, crime reduction) and employee morale are extremely low.

  - Data driven policing has not been fully adopted within DPD.



OFFICE OF THE EMERGENCY MANAGER                                    10

13-53846-swr   Doc 1157-9   Filed 10/24/13   Entered 10/24/13 13:52:26   Page 40 of 247
13-53846-swr   Doc 1157-9   Filed 10/24/13   Entered 10/24/13 13:52:26   Page 40 of 247
248

13-53846-tjt   Doc 1140-15   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 77 of 129

# I. Detroit Faces Strong Economic Headwinds.

- DPD receives over 700,000 calls for service annually. DPD response times are extremely high.

- The DPD's extremely low 8.7% case clearance rate is driven by the DPD's lack of a case management system, lack of accountability for detectives, unfavorable work rules imposed by collective bargaining agreements and a high attrition rate in the investigative operations unit.

- The DPD's manpower has been reduced by approximately 40% over the last 10 years causing constant strain on the organization; the DPD needs to evaluate appropriate uniform staffing levels.

- Community policing efforts are underfunded, uncoordinated and have been deemphasized by the DPD.

- **Assessor's Office and Property Tax Division.**

  - The City lacks a state-required Level IV Assessor and currently has a former employee contractor in the position, whose contract expires in June 2013. Due to inadequate compensation, among other things, there are no available candidates to fill this position.

  - The Assessor's Office has approximately 15,000 parcels per employee. The State recommends 4,000 parcels per employee.

- **Other Departments.**

  - Many other City departments function suboptimally and inefficiently.



# I. Detroit Faces Strong Economic Headwinds.

## The Physical Deterioration of the City Must be Addressed.

- There are approximately (i) 78,000 abandoned and blighted structures in the City, nearly half of which are considered "dangerous" and (ii) 66,000 blighted and vacant lots within the City limits.

- The number of City parks is dwindling, and many are in poor or fair condition as a result of neglect due to lack of funding.

  - The closure of 210 parks in the 2008-09 fiscal year reduced the City's park portfolio by 66% — from 317 parks to 107 parks.

- Approximately 70 superfund sites have been established in Detroit.

- The City's electricity grid has not been adequately maintained and is deteriorating.

- The City's fire stations are old and are not adequately maintained.

- The vehicles and equipment employed by the City's police, fire, EMS and transportation personnel are aging, poorly maintained and lack adequate information technology.



OFFICE OF THE EMERGENCY MANAGER

12

# I. Detroit Faces Strong Economic Headwinds.

## Detroit Has Endured Inadequate Investment in Infrastructure and Equipment for Years.

### Fire Department.

- **Fire Apparatus.** The DFD fleet includes (i) 26 engines; (ii) 15 ladder trucks; (iii) six squads (specialized rescue vehicles); (iv) one hazardous material apparatus; (v) one TAC unit (a mini-pumper) and (vi) 36 ambulances and other light vehicles.

- DFD's fleet has "many mechanical issues," contains no reserve vehicles and lacks equipment ordinarily regarded as standard.

  – The Apparatus Division's mechanic to vehicle ratio of 1:39 (once staffed with 63 people; currently 26) results in an inability to complete preventative maintenance on schedule.

  – Detroit firefighters frequently operate shorthanded due to a lack of serviceable equipment.

- **EMS Fleet.**

  – During the first quarter of 2013, frequently only 10 to 14 of the City's 36 ambulances were in service.

  – Some of the City's EMS vehicles have been driven 250,000 to 300,000 miles, and break down frequently.

13



# I.  Detroit Faces Strong Economic Headwinds.

**Police Department.**

- **Age of Police Cars**

  - The DPD operates with an "extremely old fleet" of 1,291 vehicles.  Most DPD police cruisers lack necessary information technology.

  - A majority of vehicles in the fleet remain in service beyond a normal three-year replacement cycle.  Operating with an aged fleet drives up maintenance costs.

- **Facilities**

  - The DPD has not invested in or maintained its facility infrastructure for many years, contributing to low employee and citizen morale.

**Information Systems**

- **Challenges generally:**

  - Old and obsolete technology assets and applications must be upgraded.

  - IT infrastructure is not integrated within Departments (e.g., police precincts and districts cannot share information across IT systems) or between departments and functions (e.g., little to no integration between core City finance system and Department level systems).

  - City *urgently* needs to upgrade or replace the following IT systems, among others: payroll; financial; budget development; property information and assessment; income tax; and DPD operating system.



# I. Detroit Faces Strong Economic Headwinds.

- **DPD, DFD and EMS**

  - DPD, DFD and EMS information technology systems are obsolete; vendors do not provide full support; core functions are sporadic.

  - DPD has no IT systems for jail management, electronic ticketing and activity logs. DPD vehicles lack necessary IT infrastructure.

- **Payroll System**

  - The City uses multiple, non-integrated payroll systems. A majority of employees are on an archaic payroll system that has limited reporting capability and no ability to clearly track, monitor or report expenditures by category.

  - The cost of payroll administration for the City is significantly higher than for comparable entities – almost 3.5 times more costly than other public sector organizations, which average $18 per paycheck.

- **Income Tax Division**

  - Income tax collection and data management are highly manual.

  - The City's Income Tax System is outdated (purchased in the mid-1990s), has little to no automation capability and is "catastrophic" per an IRS audit completed in July 2012.



## I. Detroit Faces Strong Economic Headwinds.

- **Budgeting, Accounting & Financial Reporting Systems**

  - Oracle-based Financial Reporting system was implemented in 1999. It is not being utilized to its full capabilities and is no longer supported by its manufacturer.

  - Approximately 70% of journal entries are booked manually.

- **Grant Management System**

  - Grant tracking systems are fragmented. Thus, the City is unable to comprehensively track citywide grant funds and status.

  - Grant reporting is not standardized, such that the City is unable to prevent disallowed costs.

- **Permitting**

  - The Buildings, Safety Engineering and Environmental Department's system for licensing and permitting is more than ten years old and needs to be upgraded.

  - The Fire Marshall Division's system for inspections and permitting is more than 20 years old and needs to be replaced.

  - Current information technology system deficiencies lead to bottlenecks in permit invoicing and collection of fees.

- **Department of Transportation.** DDOT fleet is aged and maintenance is consistently deferred; approximately one-third of DDOT fleet is out of service.



# I. Detroit Faces Strong Economic Headwinds.

## Electrical Transmission Grid and Fixtures

* The City owned Mistersky power plant has been idle for approximately 2-3 years, but has not been decommissioned. In addition, the City has 31 sub-stations that would need to be decommissioned. The City is in the process of obtaining estimates for decommissioning costs.

* Approximately 40% of Detroit's 88,000 streetlights are not functioning due, in large part, to disrepair and neglect; outages exist on both DTE Energy Company ("DTE") and PLD-powered lights.



OFFICE OF THE EMERGENCY MANAGER

17

# I. Detroit Faces Strong Economic Headwinds.

## The City's Debt and Legacy Liabilities Have Grown Considerably Over Time.

### Balance Sheet Liabilities

- The City estimates that, as of the close of its 2013 fiscal year, the City will have liabilities reflected on its balance sheet of approximately $9.05 billion, including:

  - $5.85 billion in special revenue obligations;

  - $1.43 billion in pension-related Certificate of Participation ("COPs") liabilities;

  - $343.6 million in marked-to-market swap liabilities related to COPs (as of May 31, 2013 valuation);

  - $1.13 billion in unlimited and limited tax general obligation bond liabilities and notes and loans payable; and

  - $300 million in other liabilities.



OFFICE OF THE EMERGENCY MANAGER

18

# I. Detroit Faces Strong Economic Headwinds.

**Off-Balance Sheet Liabilities**

- OPEB Liabilities.

  - Unfunded other post-employment benefit ("OPEB") liabilities increased from $4.8 billion to $5.7 billion from June 30, 2007 through June 30, 2011 (the most recent actuarial data available). 99.6% of the City's OPEB liabilities are unfunded.

  - As of June 30, 2011 (the most recently published actuarial valuation), there were 19,389 retirees eligible to receive benefits under the City's OPEB plans. The number of retirees receiving benefits from the City is expected to increase over time.

  - _Weiler Class OPEB Benefits._

  - In July 2006, the City made a number of unilateral changes to the healthcare benefits for unionized police and firefighter retirees. Alan Weiler filed a class action lawsuit on behalf of approximately 7,000 retirees alleging violations of collective bargaining agreements.

  - The City and the <u>Weiler</u> class settled before trial, and the court entered a Consent Judgment approving the parties' settlement agreement.

  - The Weiler class retirees/beneficiaries currently cost the City approximately $75 million per year, representing over 40% of retiree benefits costs under the Health and Life Insurance Plan.

OFFICE OF THE EMERGENCY MANAGER



248

# I. Detroit Faces Strong Economic Headwinds.

- **Pension Liabilities**

  - The City's reported pension UAAL (based on 2011 actuarial valuations) of $639,871,444 is **substantially** understated. Further analysis using more realistic assumptions (including by reducing the discount rate by one percentage point) suggests that pension UAAL will be approximately $3.5 billion as of June 30, 2013.

  - UAAL under the City's two pension systems — the General Retirement System ("GRS") and the PFRS — increased by over $1 billion between June 30, 2007 and June 30, 2011, even (i) using actuarial assumptions used to calculate 2011 UAAL and (ii) after consideration of the contribution of the COPs proceeds in 2005 and 2006.

  - **For the five-year period ending on June 30, 2012, pension payments and costs of administration have exceeded contributions and investment income, resulting in liquidation of pension trust principal. Continuing on this path will eventually lead to the pension plans' insolvency.**

| System | Benefit Payments | Contribution / Investment Income | Net Trust Loss |
|--------|------------------|----------------------------------|----------------|
| GRS | $1,601,193,045 | ($60,113,101) | $1,661,306,146 |
| PFRS | $1,445,581,026 | ($127,803,339) | $1,573,384,365 |



# I. Detroit Faces Strong Economic Headwinds.

- **Increasing Legacy Liabilities as a Percentage of General Fund Revenue.** During FY 2012, more than 38% of the City's actual revenue was consumed servicing legacy liabilities. Going forward, legacy liabilities are expected to consume increasing portions of City revenues.

## Legacy Expenditures (Assuming No Restructuring)

($ in millions)

| | \
Fiscal year ended actual | | | | | | \
Preliminary forecast | | | | |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Legacy expenditures** | | | | | | | | | | |
| Debt service (LTGO) | $ (66.6) | $ (106.2) | $ (63.5) | $ (64.5) | $ (62.6) | $ (70.8) | $ (70.9) | $ (61.8) | $ (61.8) | $ (38.5) |
| Debt service (UTGO) | (67.2) | (71.5) | (72.4) | (72.8) | (73.0) | (70.6) | (64.9) | (62.5) | (57.6) | (57.6) |
| POC - principal and interest (GF) | (24.6) | (20.9) | (23.6) | (33.5) | (33.0) | (46.8) | (51.4) | (53.3) | (55.0) | (56.9) |
| POC - principal and interest (EF, excl. DDOT) | (1.8) | (1.4) | (1.5) | (1.8) | (2.0) | (5.3) | (5.9) | (6.1) | (6.4) | (6.6) |
| POC - principal and interest (DDOT) | (3.5) | (2.8) | (3.0) | (3.6) | (4.0) | (3.3) | (3.7) | (3.8) | (3.9) | (4.1) |
| POC - swaps (GF) | (38.6) | (43.9) | (44.7) | (44.7) | (44.8) | (42.9) | (42.8) | (42.8) | (42.7) | (42.7) |
| POC - swaps (EF, excl. DDOT) | (2.3) | (2.0) | (2.0) | (2.0) | (2.0) | (4.8) | (4.8) | (4.8) | (4.9) | (4.9) |
| POC - swaps (DDOT) | (4.5) | (4.0) | (4.0) | (4.0) | (4.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) |
| Pension contributions - Public Safety | (58.9) | (31.4) | (32.8) | (81.6) | (49.8) | (46.1) | (139.0) | (163.0) | (180.0) | (198.0) |
| Pension contributions - Non-Public Safety | (10.6) | (27.0) | (11.1) | (28.3) | (25.4) | (19.9) | (36.9) | (42.5) | (47.7) | (53.1) |
| Pension contributions - DDOT | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (12.3) | (23.6) | (27.7) | (31.2) | (34.8) |
| Health benefits - retiree - Public Safety | (73.7) | (80.2) | (70.4) | (79.6) | (90.6) | (91.5) | (88.6) | (95.2) | (101.7) | (108.0) |
| Health benefits - retiree - Non-Public Safety | (47.4) | (51.6) | (50.6) | (49.0) | (49.2) | (49.7) | (38.8) | (41.5) | (44.6) | (47.7) |
| Health benefits - retiree - DDOT | (8.2) | (11.8) | (11.2) | (11.1) | (10.3) | (10.4) | (13.3) | (14.3) | (15.3) | (16.3) |
| **Total legacy expenditures** | $ (414.6) | $ (462.0) | $ (397.9) | $ (486.1) | $ (461.6) | $ (477.3) | $ (587.6) | $ (622.4) | $ (655.9) | $ (672.3) |
| | | | | | | | | | | |
| **Total revenues (excl. financing proceeds)** | $ 1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 |
| | | | | | | | | | | |
| **Total legacy expenditures as a % of total revenues** | 29.7% | 33.9% | 30.8% | 36.9% | 38.6% | 42.5% | 54.3% | 59.5% | 63.0% | 64.6% |



# I. Detroit Faces Strong Economic Headwinds.

**Obligations Secured by Special Revenues**

- **The City estimates that, as of the end of FY 2013, it will have:**

  - $5.34 billion in outstanding principal amount of revenue bonds; and

  - $494 million in related state revolving loans.

- **The revenue bonds and the revolving loans are related to the following funds:**

  - **Sewage Disposal Fund**

    - $2.82 billion in outstanding principal amount of notes maturing July 1, 2013 through July 1, 2039, as of June 30, 2013.

    - $472.8 million in outstanding principal amount of state revolving loans, as of June 30, 2013.

    - Substantially all revenues of the sewage disposal system, net of operating expenses, pledged to secure payment of principal and interest.

    - Net system revenues of $227,447,337 versus debt service requirements of $199,990,125 in FY 2012.



OFFICE OF THE EMERGENCY MANAGER

22



# I. Detroit Faces Strong Economic Headwinds.

**– Water Fund**

- $2.52 billion in outstanding principal amount of various series of notes maturing July 1, 2013 through July 1, 2041, as of June 30, 2013.

- $21.4 million in outstanding principal amount of state revolving loans, as of June 30, 2013.

- Substantially all of the revenues of the City's water system, net of operating expenses, pledged to secure payment of principal and interest.

- Net system revenues of $178,842,057 versus debt service requirements of $153,441,666 in FY 2012.

**– Automobile Parking Fund**

- $9.3 million in outstanding principal amount of Detroit Building Authority Revenue Refunding Bonds: Parking System, Series 1998-A maturing July 1, 2010 through July 1, 2019, as of June 30, 2013.

- Substantially all revenues of the parking system, net of operating expenses, pledged to secure payments of principal and interest.

- Net system revenues of $2,708,223 versus debt service requirements of $2,923,454 in FY 2012.

## I. Detroit Faces Strong Economic Headwinds.

### General Fund Obligations

- **GO Bonds.** The City estimates that, as of the close of FY 2013 (<u>i.e.</u>, June 30, 2013), it will have $1.01 billion in outstanding principal amount of limited and unlimited tax general obligation bonds, consisting of:

  - $469.1 million in outstanding principal amount of unlimited tax general obligation ("UTGO") bonds maturing from April 1, 2013 through November 1, 2035.

    - $100 million of the foregoing bonds are secured by a second lien on distributable state aid.

  - $540.3 million in outstanding principal amount of limited tax general obligation ("LTGO") bonds maturing April 1, 2013 through November 1, 2035.

    - Issuance of LTGO bonds do not require voter approval. They are payable from general non-restricted funds.

    - $249.8 million of the LTGO bonds are secured by a first lien on distributable state aid. $129.5 million of the LTGO bonds are secured by a third lien on distributable state aid.



## I. Detroit Faces Strong Economic Headwinds.

- **Notes and Loans Payable.** The City estimates that, as of June 30, 2013, the City will have $121.5 million in other outstanding installment notes and loans payable related to various public improvement projects.

  - $87.8 million in notes payable (which notes were issued in connection with the "Section 108" HUD Loan Guarantee Program and are secured by future "Block Grant" revenues).

  - $33.7 million in loans payable ($33.6 million of which is a non-interest bearing unsecured loan payable to the Downtown Development Authority as general operating funds become available).

- On August 23, 2012, the City issued $129.5 million of LTGO bonds at a $9.1 million premium (generating $137 million in proceeds after issuance costs) in part to defease short term bonds issued March 2012. The remaining proceeds of these issuances were set aside with a trustee bank in an escrow account to provide funds for reforms and liquidity in FY 2013. The current amount of the escrow is approximately $80 million.



# I. Detroit Faces Strong Economic Headwinds.

- **Certificates of Participation (Pension)**

  - In 2005, service corporations established by the GRS and PFRS created a trust that issued the COPs. The proceeds of the COPs were contributed to the City's pension trusts.

  - Principal and interest on the COPs is payable solely from payments made by the City to the service corporations pursuant to service contracts.

  - The City estimates that, as of the close of FY 2013, the following amounts were outstanding under the COPs:

    - $480.3 million in outstanding principal amount of $640,000,000 Certificates of Participation Series 2005 A maturing June 15, 2013 through 2025; and

    - $948.54 million in outstanding principal amount of $948,540,000 Certificates of Participation Series 2006 A and B maturing June 15, 2019 through 2035.

  - The City has identified certain issues related to the validity and/or enforceability of the COPs that may warrant further investigation.

OFFICE OF THE EMERGENCY MANAGER



# I. Detroit Faces Strong Economic Headwinds.

- **Swap Liabilities Related to Certificates of Participation.**

  - In connection with the COPs, the City entered into eight pay-fixed, receive-variable interest rate swaps effective as of June 12, 2006 having a total notional amount of $800 million.

  - Recent valuations establish the negative fair value of the swaps at approximately $343.6 million (as of May 31, 2013).

  - January 2009 — The City received notice from the swap contract counterparties that downgrading of the COPs and certain swap insurers would constitute an "Additional Termination Event" under the swap contracts if not cured.

  - June 2009 — The City and the swap contract counterparties agreed on an amendment to the swap agreements, eliminating the Additional Termination Event and the potential for an immediate demand for payment. Pursuant to the amendment, the swap counterparties waived their right to termination payments, and the City agreed to:

    - direct certain wagering tax revenues to a trust as collateral for the quarterly payments owing to the swap counterparties;

    - increase the interest rate of the swap agreements by 10 basis points effective July 1, 2010; and

    - include new termination events, including if COP ratings were withdrawn, suspended or downgraded.

OFFICE OF THE EMERGENCY MANAGER



## I. Detroit Faces Strong Economic Headwinds.

- March 2012 — COPs were further downgraded which triggered another Termination Event; the City and the swap counterparties are in negotiations regarding the Termination Event.

- March 2013 – Appointment of Emergency Manager constitutes an event of default triggering another Termination Event.

- Although this proposal reflects treating the swap obligations as special revenue debt secured by the wagering tax revenues, that treatment is still being reviewed by the Emergency Manager.



OFFICE OF THE EMERGENCY MANAGER

28

## I. Detroit Faces Strong Economic Headwinds.

**Other Liabilities.**

- The City estimates that, as of the end of FY 2013, the City will have $300 million in other liabilities outstanding.

- As of June 30, 2012, the City owed at least $264.6 million in other liabilities, consisting primarily of:

  - $101.2 million in accrued compensated absences, including unpaid, accumulated vacation and sick leave balances;

  - $86.5 million in accrued workers' compensation for which the City is self-insured;

  - $63.9 million in claims and judgments, including lawsuits and claims other than workers' compensation claims; and

  - $13.0 million in capital leases and accrued pollution remediation.



OFFICE OF THE EMERGENCY MANAGER

29

13-53846-swr   Doc 157-9   Filed 05/24/13   Entered 05/24/13 15:02:26   Page 47 of
248

# I. Detroit Faces Strong Economic Headwinds.

## Labor Costs and Restrictive Employment Terms

- The City is or was a party to 48 collective bargaining agreements ("CBAs") and has made great strides under the Consent Agreement in reducing costs imposed by its numerous active and expired CBAs between the City and various labor organizations representing City employees, many of which had been amended by interest arbitration awards issued by arbitrators appointed pursuant to Public Act 312. Under the Consent Agreement, the City has unilaterally implemented City Employment Terms ("CETs"), which were approved by the Financial Advisory Board (the "FAB") appointed by the Governor, the Treasurer, the Mayor and City Council under former Public Act 4 (now repealed). Currently, a substantial percentage of the City's employees are not governed by current CBAs, and many are working under CET terms and conditions of employment and/or those terms and conditions implemented or established through statutory interest arbitrations.

- During the last three years, the City has implemented compensation reductions to its work force in the form of budget-required furlough days ("BRF"), wage reductions and reductions in other wage related items, such as vacation days, sick days, longevity payments and overtime rules. The City implemented BRFs equivalent to 10% of wages (one furlough day every other week) to non-uniform employees in September 2009. In August 2012, as part of the CET implementation, BRFs were eliminated for non-uniform employees and replaced with a permanent 10% wage reduction. Additional BRFs were implemented in February 2013 affecting certain non-uniform employees.



OFFICE OF THE EMERGENCY MANAGER

# I. Detroit Faces Strong Economic Headwinds.

- The CETs also imposed a 10% wage reduction on Detroit Police Officer Association ("DPOA") members in August 2012. DPOA challenged the CETs as part of an Act 312 arbitration process; a decision in that arbitration reduces the 10% wage reduction to 5% effective January 2014.

- The CETs, implemented on all unions with contracts expired on or before June 30, 2012, also included compensation reductions, as follows:

  - Freezing sick leave banks and eliminating reserve sick leave accrual;
  - Eliminating sick time cash payouts for future earned time;
  - Eliminating the ability to reinstate furlough days;
  - Eliminating the $3-per-day allowance for daily car usage;
  - Eliminating four to six annual bonus vacation days; and
  - Reducing vacation accrual to 160 hours from 320 hours.

- The following additional CET changes were implemented on DPOA members:

  - Limiting paid time for court if less than two hours;
  - Eliminating educational reimbursement;
  - Requiring 80 hours to be worked in the prior work period to be eligible for overtime;
  - Changing payment of holiday earnings;

---



OFFICE OF THE EMERGENCY MANAGER

31

# I. Detroit Faces Strong Economic Headwinds.

- Suspending the 2% wage differential while on promotional roster;

- Eliminating the option to receive pay for court and returning to banking the first 60 hours of court time;

- Eliminating bonus vacation days; and

- Delaying separation payments.

• Unilaterally implemented CETs imposed numerous concessions on City employees, including freezing, reducing or eliminating active employee benefits, reducing or eliminating pension and retiree medical benefits and reducing wages by 10%. The CETs also negated seniority protections in various CBAs by expanding management rights, modifying methods and processes by which work is performed, changing shifts, hours of operation and overtime procedures; and revising or eliminating job classifications. In addition to concessions imposed by the CETs, in some cases and as noted above, concessions have been granted through statutory interest arbitration processes.

• These labor cost concessions have not been uniformly applied to all bargaining units, and some City employees have not been affected by these measures. The restructuring plan seeks to ensure that any concessions are equitably distributed across all bargaining units (as well as across unrepresented employees) and that the impact of these concessions on employees are mitigated to the extent possible.

OFFICE OF THE EMERGENCY MANAGER

13-53846-swr   Doc 1157-9   Filed 10/24/13   Entered 10/24/13 15:02:16   Page 52 of 247
248



## II. Key Objectives for a Financial Restructuring and Rehabilitation of Detroit

**To the fullest extent possible under all of the circumstances:**

- Provide incentives (and eliminate disincentives) for businesses and residents to locate and/or remain in the City.

  - The City cannot stabilize or pay creditors meaningful recoveries if it continues to shrink.

  - Achieving this goal requires improvements in City services, particularly in the area of public safety and tax reform, to reduce the cost of living in the city to more closely approximate costs of living in nearby areas.

- Maximize recoveries for creditors.

  - Since the City will not generate sufficient cash to pay all liabilities, alternatives will have to be considered.

- Provide affordable pension and health insurance benefits, and restructure governance of pension arrangements.

- Eliminate blight to assist in stabilizing and revitalizing neighborhoods and communities within the City.

- Reform the City government operations to improve efficiency and reduce costs.

  - In many areas, longer term benefits will require immediate increases in capital investment.

- Maximize collection of taxes and fees that are levied or imposed.

- Generate value from City assets where it is appropriate to do so.



OFFICE OF THE EMERGENCY MANAGER

33

## III. Current Financial Status

### General Fund Summary

| ($ in millions) | Fiscal year ended actual | | | | | Prelim. |
| --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Total revenues | $ 1,397.7 | $ 1,363.3 | $ 1,291.0 | $ 1,316.8 | $ 1,196.9 | $ 1,121.9 |
| Operating expenditures | (1,111.1) | (1,025.3) | (964.7) | (887.5) | (857.1) | (692.0) |
| Legacy expenditures | (414.6) | (462.0) | (397.9) | (486.1) | (461.6) | (477.3) |
| Deficit (excl. financing proceeds) | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (47.4) |
| Financing proceeds | 75.0 | - | 250.0 | - | - | 137.0 |
| Total surplus (deficit) | $ (52.9) | $ (124.1) | $ 178.3 | $ (56.9) | $ (121.8) | $ 89.6 |
| Accumulated unrestricted General Fund deficit | $ (219.2) | $ (331.9) | $ (155.7) | $ (196.6) | $ (326.6) | $ (237.0) |

- The City has made significant progress decreasing operating costs; however, revenues have declined more quickly and legacy costs have increased.

- Excluding proceeds from debt issuances, the City's expenditures have exceeded revenues from FY 2008 to FY 2012 by an average of $100 million annually.



2:13-cv-12987-LPZ-MKM   Doc # 157-19   Filed 06/24/13   Entered 06/24/13 15:32:26   Page 101 of 247
248

# III. Current Financial Status

## Revenues

($ in millions)

|  | Fiscal year ended actual | | | | | Prelim. |
|---|---|---|---|---|---|---|
|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Municipal income tax | $ 276.5 | $ 240.8 | $ 216.5 | $ 228.3 | $ 233.0 | $ 238.7 |
| State revenue sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.3 | 182.8 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 173.0 |
| Sales and charges for services | 191.3 | 166.7 | 154.1 | 155.0 | 145.4 | 120.4 |
| Property taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 134.9 |
| Utility users' and other taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 54.8 |
| Other | 271.8 | 281.0 | 265.6 | 269.8 | 258.8 | 217.4 |
| Total revenues | $ 1,397.7 | $ 1,363.3 | $ 1,291.0 | $ 1,316.8 | $ 1,196.9 | $ 1,121.9 |

## Operating expenditures

($ in millions)

|  | Fiscal year ended actual | | | | | Prelim. |
|---|---|---|---|---|---|---|
|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Salaries/overtime/fringe | $ (509.9) | $ (506.6) | $ (466.4) | $ (454.8) | $ (431.5) | $ (357.3) |
| Health benefits - active | (49.9) | (54.4) | (70.8) | (64.6) | (54.3) | (43.1) |
| Professional and contractual services | (66.9) | (73.5) | (54.2) | (48.5) | (43.1) | (42.7) |
| Materials & supplies | (85.8) | (70.9) | (60.1) | (67.1) | (62.2) | (63.6) |
| Utilities | (35.6) | (38.6) | (27.8) | (30.1) | (27.1) | (25.5) |
| Other | (362.9) | (281.2) | (285.4) | (222.4) | (238.9) | (159.8) |
| Operating expenditures | $ (1,111.1) | $ (1,025.3) | $ (964.7) | $ (887.5) | $ (857.1) | $ (692.0) |

## Legacy expenditures

($ in millions)

|  | Fiscal year ended actual | | | | | Prelim. |
|---|---|---|---|---|---|---|
|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Debt service (LTGO & UTGO) | $ (133.8) | $ (177.6) | $ (135.9) | $ (137.3) | $ (135.6) | $ (141.4) |
| POC - principal and interest | (29.8) | (25.1) | (28.1) | (38.9) | (39.0) | (55.4) |
| POC swaps | (45.3) | (49.9) | (50.7) | (50.7) | (50.7) | (50.6) |
| Pension contributions | (76.3) | (65.7) | (50.8) | (119.5) | (86.1) | (78.3) |
| Health benefits - retiree | (129.3) | (143.7) | (132.3) | (139.7) | (150.1) | (151.6) |
| Legacy expenditures | $ (414.6) | $ (462.0) | $ (397.9) | $ (486.1) | $ (461.6) | $ (477.3) |



OFFICE OF THE EMERGENCY MANAGER

35

## III. Current Financial Status

- **Pension contributions.**
  - City has consistently deferred year-end PFRS contributions by using a payment plan financing arrangement including accrual of 8% interest (~$50 million for FY 2012)

- **Health Benefits - Retiree.**
  - The total cost of healthcare benefits City-wide in FY 2012 was approximately $275 million, of which approximately $177 million related to retirees.
  - The General Fund's portion of healthcare costs in FY 2012 was approximately $204 million, of which approximately $150 million related to retirees.

OFFICE OF THE EMERGENCY MANAGER



## III. Current Financial Status

### In the Absence of a Comprehensive Financial Restructuring, Budget Deficits Will Continue for the Foreseeable Future.

**The City Has Limited Options for Further Revenue Generation and, in the Absence of a Comprehensive Financial Restructuring, Cost-Saving Measures.**

- Legacy obligations continue to increase;
- Limited or no access to debt capital markets;
- Diminishing, if any, returns from further tax increases; and
- Minimal potential for further payroll related reductions.

**Absent Structural Changes, the City's Accumulated Deficit is Expected to Grow to Unprecedented Levels.**

- At the City's current run rate, its accumulated deficit could grow to 3-4 times its current level of $326.6 million to over $1.35 billion by FY 2017.



OFFICE OF THE EMERGENCY MANAGER

37

# III. Current Financial Status

## A Look at the Future in the Absence of Restructuring Initiatives

*Note:  The following projections were prepared based solely on the City's current levels of operating expenses and capital expenditures and do not account for (i) increases in expenditures necessary to restore City services to adequate levels, (ii) additional investment by the City in services, assets or infrastructure or (iii) any changes to legacy liabilities.

($ in millions)

| | Fiscal year ended actual | | | | | | Preliminary forecast | | | | 5-year total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | |
| **Revenues** | | | | | | | | | | | |
| Municipal income tax | $ 276.5 | $ 240.8 | $ 216.5 | $ 228.3 | $ 233.0 | $ 238.7 | $ 243.4 | $ 247.3 | 249.0 | 250.7 | $ 1,229.1 |
| State revenue sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.3 | 182.8 | 184.3 | 186.1 | 187.9 | 189.5 | 930.4 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 173.0 | 170.0 | 168.3 | 170.0 | 171.7 | 853.0 |
| Sales and charges for services | 191.3 | 166.7 | 154.1 | 155.0 | 145.4 | 120.4 | 124.8 | 119.4 | 118.2 | 117.0 | 599.7 |
| Property taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 134.9 | 118.4 | 110.2 | 105.7 | 100.8 | 570.0 |
| Utility users' and other taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 54.8 | 47.2 | 40.9 | 40.9 | 41.3 | 225.0 |
| Other revenue | 156.9 | 142.7 | 134.2 | 152.4 | 125.5 | 93.4 | 75.6 | 55.8 | 55.8 | 55.9 | 336.4 |
| General Fund reimbursements | 34.7 | 55.7 | 47.6 | 32.3 | 47.6 | 31.2 | 30.3 | 30.3 | 30.3 | 30.3 | 152.2 |
| Transfers in (UTGO millage & non-General Fund) | 80.1 | 82.5 | 83.8 | 85.1 | 85.8 | 92.8 | 89.0 | 87.9 | 83.8 | 84.4 | 438.0 |
| Total revenues | 1,397.7 | 1,363.3 | 1,291.0 | 1,316.8 | 1,196.9 | 1,121.9 | 1,082.8 | 1,046.2 | 1,041.5 | 1,041.4 | 5,333.8 |
| **Expenditures** | | | | | | | | | | | |
| Salaries/overtime/fringe | (509.9) | (506.6) | (466.4) | (454.8) | (431.5) | (357.3) | (341.5) | (341.9) | (346.4) | (352.5) | (1,739.7) |
| Health benefits - active | (49.9) | (54.4) | (70.8) | (64.6) | (54.3) | (43.1) | (51.2) | (54.0) | (57.4) | (61.0) | (266.7) |
| Other operating expenses | (551.2) | (464.3) | (427.5) | (368.2) | (371.3) | (291.6) | (292.9) | (288.2) | (295.9) | (301.5) | (1,470.2) |
| Operating expenditures | (1,111.1) | (1,025.3) | (964.7) | (887.5) | (857.1) | (692.0) | (685.7) | (684.1) | (699.7) | (715.0) | (3,476.6) |
| Net operating surplus | 286.7 | 338.0 | 326.3 | 429.2 | 339.8 | 429.9 | 397.2 | 362.0 | 341.8 | 326.3 | 1,857.2 |
| Debt service (LTGO & UTGO) | (133.8) | (177.6) | (135.9) | (137.3) | (135.6) | (141.4) | (135.9) | (124.4) | (119.4) | (96.1) | (617.2) |
| POC - principal and interest | (29.8) | (25.1) | (28.1) | (38.9) | (39.0) | (55.4) | (61.0) | (63.2) | (65.4) | (67.6) | (312.6) |
| POC swaps | (45.3) | (49.9) | (50.7) | (50.7) | (50.7) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (253.1) |
| Pension contributions | (76.3) | (65.7) | (50.8) | (119.5) | (86.1) | (78.3) | (199.5) | (233.1) | (258.9) | (285.9) | (1,055.8) |
| Health benefits - retiree | (129.3) | (143.7) | (132.3) | (139.7) | (150.1) | (151.6) | (140.7) | (151.1) | (161.6) | (172.0) | (776.9) |
| Legacy expenditures | (414.6) | (462.0) | (397.9) | (486.1) | (461.6) | (477.3) | (587.6) | (622.4) | (655.9) | (672.3) | (3,015.6) |
| Deficit (excl. financing proceeds) | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (47.4) | (190.5) | (260.4) | (314.1) | (346.0) | (1,158.4) |
| Financing proceeds | 75.0 | - | 250.0 | - | - | 137.0 | - | - | - | - | 137.0 |
| Total surplus (deficit) | $ (52.9) | $ (124.1) | $ 178.3 | $ (56.9) | $ (121.8) | $ 89.6 | $ (190.5) | $ (260.4) | $ (314.1) | $ (346.0) | $ (1,021.4) |
| Accumulated unrestricted General Fund deficit | $ (219.2) | $ (331.9) | $ (155.7) | $ (196.6) | $ (326.6) | $ (237.0) | $ (427.5) | $ (687.9) | $ (1,002.0) | $ (1,348.0) | |

38

# IV. The City Has Taken Action to Address Its Financial Challenges

**Headcount Reductions**

- Since 2011, the City has reduced its headcount by more than 2,700 employees (from 12,302 employees as of close of FY 2010 to approximately 9,560 as of May 31, 2013).

- The City's headcount reductions have resulted in *annual savings of over $100 million*.

**Reductions of Labor Costs through Implementation of City Employment Terms ("CETs")**

- Implementation of the CETs provides for an *estimated $102 million in annual savings*.

**Revenue Generating Initiatives**

- **Increased Corporate Tax Rate.** In January 2012, the City's corporate income tax rate was raised to 2.0% from 1.0%. This increased rate was projected to generate an estimated $6 million in additional annual revenue.

- **Enhanced Tax Collection Initiatives.** The City has implemented, and is implementing, initiatives designed to (i) improve collection of past due taxes and (ii) enhance collection efforts on a prospective basis. These efforts to enhance collection of taxes could generate an estimated $13 million in additional annual revenue.

- **Increased Lighting Rates.** In January 2013, the City's Public Lighting Department increased its rates to more closely align with market rates/eliminate practice of charging customers less for power than the City itself was paying. Increased PLD rates could generate an estimated $9 million in additional annual revenue.



OFFICE OF THE EMERGENCY MANAGER

39

# IV. The City Has Taken Action to Address Its Financial Challenges

## Significantly Reduced Operating Expenses

- **Reductions in Vendor Costs.** The City is implementing an initiative to reduce its vendor-related costs by 10%. Reductions in vendor costs are expected to save an estimated $10 million annually.

- **Reduction in Subsidy to DDOT.** In 2012, the City undertook steps to improve the efficiency of the Detroit Dep't of Transportation (e.g., through route rationalization), thereby reducing the subsidy from the City's General Fund to the DDOT enterprise fund by approximately $15 million annually.

## Deferred Capital Expenditures

- **The City has deferred capital expenditures.**

  - Average aggregate capital outlays for the fiscal years 2008 – 2012 were only $82.98 million. Average aggregate capital outlays for the preceding fiscal years 2003 – 2007 were $151.94 million.

  - For fiscal years 2014 – 2023, it is estimated that General Fund necessary capital expenditures will average approximately $145 million.

**Demolition Initiative.** Program launched in April 2010 with the goal of demolishing 10,000 vacant structures in three years.

- Over 5,000 structures have been demolished; the remaining portion of the 10,000 structures in the program are planned to be demolished by December 2013.



# V. Restructuring and Reinvesting in City Government

- To address the crises confronting the City and remedy the deficiencies in services addressed above (including, in particular, deficiencies in services relating to public safety), and to achieve a sustainable restructuring that promotes the long term health, safety and growth of the City, the City must aggressively pursue – and devote substantial resources to – the objectives described below.

- The City proposes to spend approximately $1.25 billion over the next ten years to, among other things, (i) improve the performance and infrastructure of its Police, Fire, EMS and Transportation Departments, (ii) comprehensively address and remediate urban blight, (iii) modernize its information technology systems on a City-wide basis and (iv) address lingering issues plaguing the City's electrical grid and lighting.



OFFICE OF THE EMERGENCY MANAGER

41

# V. Restructuring and Reinvesting in City Government

**Public Safety**

- **Police**

  - **Objectives**

    - Reduce response times to the national average.
    - Improve closure rates and first responder investigations.
    - Update and overhaul police fleet and facilities.
    - Modernize the Department's information technology.
    - Achieve compliance with federal consent decrees.
    - Refine structure, staffing and organization of department to better serve citizens; hold all members (sworn and civilian) of the department accountable to effectively maintain core responsibilities of policing.

- **Fire/EMS**

  - **Objectives**

    - Modernize fleet and facilities to ensure that DFD has adequate and reliable infrastructure and equipment to perform its duties.
    - Modernize information technology.
    - Improve operating efficiency and cost structure.



OFFICE OF THE EMERGENCY MANAGER

42

# V. Restructuring and Reinvesting in City Government

- **Street lights**
  - **Objectives**
    - Implement current population-based streetlight footprint.
    - Outsource operations and maintenance to the newly-created Public Lighting Authority structure (with oversight from the City).
    - Improve service to citizens and better cost management.

**Blight Removal.**

- **Objectives**
  - Stabilize and revitalize neighborhoods and communities within the City and improve quality of life.
  - Decrease incidence of crime and fire in blighted buildings and areas.
  - Increase property values.
  - Improvement in appearance of City.



# V. Restructuring and Reinvesting in City Government

**Electrical Transmission Grid**

- **Objectives**
  - Improvement in performance of grid and services to citizens.
  - Decommissioning of grid, sub-stations and idled power plant.
  - Increase revenue collection from customers.

**Information Systems Upgrades**

- Investment by the City in upgraded information technology is an indispensable aspect of the restructuring and reinvestment proposals and is critical to achieving almost all of the objectives described herein.

- **Objectives**
  - Enhance City-wide IT infrastructure to assist with effectuating change and augmenting workflows.
  - Increase integration between finance and operational systems City-wide resulting in lower labor costs and improved efficiencies.
  - Improve financial and operational reporting, resulting in:
    - Ability to monitor and improve operating performance.
    - More timely and accurate financial reporting to interested parties.
    - Improved revenue and collection efforts as a result of streamlined processes.



OFFICE OF THE EMERGENCY MANAGER

44

248

# V. Restructuring and Reinvesting in City Government

**Detroit Department of Transportation.**

- **Objectives**
  - Reduce general fund subsidy through increased revenue and reduced costs.
  - Determine best strategic direction for DDOT.



OFFICE OF THE EMERGENCY MANAGER

45

# VI. Realization of Value of Assets

- The Emergency Manager currently is evaluating the City's assets to determine the most advantageous course of action to preserve or maximize the value of such assets for the long-term benefit of the City. The City will evaluate all options, including preserving the status quo, entering into partnerships with other public entities, outsourcing of operations and transferring non-core assets to other private or public entities in sale, lease or other transactions.

- No decisions have been made regarding any particular asset, and the Emergency Manager will continue to evaluate options for inclusion in his comprehensive restructuring plan.



OFFICE OF THE EMERGENCY MANAGER

46

248

# VII. Ten Year Projections (General Fund Only) (Steady State)

| ($ in millions) | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-year total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Preliminary forecast | | | | | | |
| **Revenues** | | | | | | | | | | | |
| Municipal income tax | $ 243.4 | $ 247.3 | $ 249.0 | $ 250.7 | $ 252.4 | $ 254.0 | $ 255.6 | $ 257.8 | $ 260.9 | $ 264.0 | $ 2,535.0 |
| State revenue sharing | 184.3 | 186.1 | 187.9 | 189.5 | 191.2 | 193.0 | 194.8 | 188.3 | 190.0 | 191.7 | 1,896.4 |
| Wagering taxes | 170.0 | 168.3 | 170.0 | 171.7 | 173.4 | 175.1 | 176.9 | 178.7 | 180.4 | 182.2 | 1,746.7 |
| Sales and charges for services | 124.8 | 119.4 | 118.2 | 117.0 | 115.7 | 114.5 | 113.4 | 112.3 | 113.2 | 114.2 | 1,162.6 |
| Property taxes | 118.4 | 110.2 | 105.7 | 100.8 | 100.5 | 99.6 | 99.7 | 100.2 | 100.8 | 102.1 | 1,038.0 |
| Utility users' and other taxes | 47.2 | 40.9 | 40.9 | 41.3 | 41.7 | 42.1 | 42.5 | 43.4 | 43.4 | 43.8 | 426.8 |
| Other revenue | 75.6 | 55.8 | 55.8 | 55.9 | 55.9 | 56.0 | 56.0 | 56.0 | 56.1 | 56.1 | 579.2 |
| General Fund reimbursements | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 302.6 |
| Transfers in (UTGO millage & non-General Fund | 89.0 | 87.9 | 83.8 | 84.4 | 83.9 | 81.2 | 80.6 | 80.0 | 65.0 | 61.2 | 797.1 |
| **Total revenues** | 1,082.8 | 1,046.2 | 1,041.5 | 1,041.4 | 1,045.0 | 1,045.7 | 1,049.8 | 1,046.3 | 1,040.1 | 1,045.7 | 10,484.5 |
| **Expenditures** | | | | | | | | | | | |
| Salaries/overtime/fringe | (341.5) | (341.9) | (346.4) | (352.5) | (358.8) | (365.1) | (371.4) | (378.4) | (386.0) | (393.7) | (3,635.7) |
| Health benefits - active | (51.2) | (54.0) | (57.4) | (61.0) | (64.5) | (67.9) | (71.2) | (74.6) | (78.4) | (82.3) | (662.5) |
| Other operating expenses | (292.9) | (288.2) | (295.9) | (301.5) | (309.7) | (313.5) | (320.0) | (326.5) | (335.3) | (339.7) | (3,123.2) |
| Operating expenditures | (685.7) | (684.1) | (699.7) | (715.0) | (733.1) | (746.5) | (762.5) | (779.5) | (799.6) | (815.7) | (7,421.5) |
| **Net operating surplus** | 397.2 | 362.0 | 341.8 | 326.3 | 311.9 | 299.2 | 287.2 | 266.8 | 240.5 | 230.0 | 3,063.0 |
| Debt service (LTGO & UTGO) | (135.9) | (124.4) | (119.4) | (96.1) | (95.0) | (92.5) | (91.8) | (74.8) | (74.8) | (70.9) | (992.4) |
| POC - principal and interest | (61.0) | (63.2) | (65.4) | (67.6) | (69.9) | (68.1) | (69.0) | (69.9) | (70.7) | (71.4) | (676.3) |
| POC swaps | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (49.8) | (48.9) | (48.1) | (47.4) | (498.0) |
| Pension contributions | (199.5) | (233.1) | (258.9) | (285.9) | (314.7) | (321.4) | (331.5) | (337.2) | (339.5) | (343.0) | (2,964.8) |
| Health benefits - retiree | (140.7) | (151.1) | (161.6) | (172.0) | (182.3) | (192.3) | (201.9) | (212.0) | (222.6) | (233.7) | (1,870.0) |
| Legacy expenditures | (587.6) | (622.4) | (655.9) | (672.3) | (712.6) | (725.0) | (744.0) | (759.5) | (755.8) | (766.4) | (7,001.5) |
| **Deficit (excl. financing proceeds)** | (190.3) | (260.4) | (314.1) | (346.0) | (400.7) | (425.8) | (456.8) | (492.6) | (515.3) | (536.4) | (3,938.5) |
| Financing proceeds | - | - | - | - | - | - | - | - | - | - | - |
| **Total surplus (deficit)** | $ (190.5) | $ (260.4) | $ (314.1) | $ (346.0) | $ (400.7) | $ (425.8) | $ (456.8) | $ (492.6) | $ (515.3) | $ (536.4) | $ (3,938.5) |
| Accumulated unrestricted General Fund deficit | (427.5) | (687.9) | (1,002.0) | (1,348.0) | (1,748.7) | (2,174.5) | (2,631.3) | (3,123.9) | (3,639.2) | (4,175.6) | |
| **Reinvestment in the City** | | | | | | | | | | | |
| Department revenue initiatives | $ 22.9 | $ 22.1 | $ 24.4 | $ 24.2 | $ 24.5 | $ 24.7 | $ 25.0 | $ 25.3 | $ 25.6 | $ 25.9 | $ 244.6 |
| Additional operating expenditures | (53.7) | (37.0) | (21.3) | (22.0) | (21.7) | (22.7) | (29.3) | (29.3) | (29.7) | (30.7) | (297.4) |
| Capital investments | (107.7) | (74.5) | (38.8) | (51.9) | (33.3) | (30.8) | (28.4) | (29.5) | (28.5) | (29.0) | (452.3) |
| Blight (excludes heavy commercial) | (50.0) | (50.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| Total reinvestment in the City | (188.5) | (139.3) | (135.7) | (149.7) | (130.5) | (128.8) | (32.8) | (33.4) | (32.6) | (33.8) | (1,005.2) |
| **Adjusted surplus (deficit)** | $ (379.0) | $ (399.7) | $ (449.8) | $ (495.6) | $ (531.2) | $ (554.6) | $ (489.6) | $ (526.1) | $ (547.9) | $ (570.2) | $ (4,943.7) |
| Adj. accumulated unrestricted General Fund deficit | (615.9) | (1,015.6) | (1,465.4) | (1,961.0) | (2,492.2) | (3,046.8) | (3,536.4) | (4,062.5) | (4,610.4) | (5,180.6) | |

# VII. Ten Year Projections (General Fund Only)

## Restructuring Scenario.

($ in millions)

| | | | | | Preliminary forecast | | | | | | 10-year total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| Total revenues | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 | $1,045.0 | $1,045.7 | $1,049.8 | $1,046.3 | $1,040.1 | $1,045.7 | $10,486.5 |
| Department revenue initiatives | 22.9 | 22.1 | 24.4 | 24.2 | 24.5 | 24.7 | 25.0 | 25.3 | 25.6 | 25.9 | 244.6 |
| Operating expenditures | (685.7) | (684.1) | (699.7) | (715.0) | (733.1) | (746.5) | (762.5) | (779.5) | (799.6) | (815.7) | (7,421.5) |
| Additional operating expenditures | (53.7) | (37.0) | (21.3) | (22.0) | (21.7) | (22.7) | (29.3) | (29.3) | (29.7) | (30.7) | (297.4) |
| **Net operating surplus** | **$ 366.4** | **$ 347.2** | **$ 344.9** | **$ 328.5** | **$ 314.6** | **$ 301.2** | **$ 282.9** | **$ 262.9** | **$ 236.4** | **$ 225.2** | **$ 3,010.2** |
| *Restructuring expenditures/adjustments* | | | | | | | | | | | |
| Reorganization (Capital investments & Professional fees) | (167.0) | (111.7) | (38.8) | (51.9) | (33.3) | (30.8) | (28.4) | (29.5) | (28.5) | (29.0) | (548.8) |
| Blight (excludes heavy commercial) | (50.0) | (50.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| DC Pension contribution (10% Police/Fire, 5% other) | (25.4) | (25.7) | (26.2) | (26.6) | (27.2) | (27.7) | (28.2) | (28.7) | (29.3) | (29.9) | (274.8) |
| POC reimbursements | (24.1) | (25.4) | (26.2) | (26.8) | (27.5) | (27.1) | (27.3) | (27.4) | (27.4) | (27.4) | (266.7) |
| PLD decommission | - | (25.0) | (25.0) | (25.0) | - | - | - | - | - | - | (75.0) |
| Increased tax revenues | 7.4 | 12.2 | 16.4 | 23.8 | 28.3 | 36.0 | 42.0 | 48.5 | 56.3 | 63.8 | 334.5 |
| Total restructuring | (259.1) | (225.6) | (199.8) | (206.6) | (159.6) | (149.6) | (42.0) | (37.1) | (29.0) | (22.6) | (1,330.9) |
| **Funds available for legacy liabilities** | 107.3 | 121.6 | 145.2 | 122.0 | 155.0 | 151.6 | 240.9 | 225.7 | 207.4 | 202.6 | 1,679.3 |
| *Payments to secured claims* | | | | | | | | | | | |
| LTGO - secured | (18.7) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (281.6) |
| UTGO - secured | (8.0) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.0) | (9.8) | (96.4) |
| POC swaps (1) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (49.8) | (48.9) | (48.1) | (47.4) | (498.0) |
| Notes/loans payable | | | | | | | | | | | |
| Total payments to secured claims | (77.3) | (89.7) | (89.7) | (89.7) | (89.7) | (89.7) | (88.9) | (88.0) | (87.2) | (86.4) | (876.0) |
| Funds available for unsecured claims | $ 30.0 | $ 31.9 | $ 55.5 | $ 32.3 | $ 65.4 | $ 62.0 | $ 152.1 | $ 137.7 | $ 120.2 | $ 116.2 | $ 803.3 |
| Asset monetization / revenue opportunities | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | - |
| Funds available for unsecured claims w/ opportunities | $ 30.0 | $ 31.9 | $ 55.5 | $ 32.3 | $ 65.4 | $ 62.0 | $ 152.1 | $ 137.7 | $ 120.2 | $ 116.2 | $ 803.3 |

**Estimated unsecured claims**

| Unsecured debt | |
|---|---|
| LTGO - unsecured | $ 161.0 |
| UTGO - unsecured | 369.1 |
| POC principal balance | 1,428.8 |
| Notes/loans payable | 33.6 |
| Sub-total: Unsecured debt | 1,992.5 |
| Unsecured pension & OPEB | |
| OPEB liability | 5,718.3 |
| Pension unfunded liability (PFRS) | 1,437.0 |
| Pension unfunded liability (DGRS) | 2,037.0 |
| Sub-total: Pension & OPEB | 9,192.3 |
| Other unsecured items | |
| Other liabilities (FY 2012 CAFR) | 264.6 |
| Other potential claims | tbd |
| Sub-total: Other | 264.6 |
| **Estimated total unsecured claims** | **$11,449.4** |

*Footnote:*
(1) Assumes continued payments as scheduled. Treatment to be determined.



OFFICE OF THE EMERGENCY MANAGER

48

# VII. Ten Year Projections (General Fund Only)

## Conclusions Based Upon Projections

- The City acknowledges that it must exert reasonable efforts to maximize recoveries for all creditors.

- As demonstrated by the 10-year projections, however, the City's expected revenues will fall significantly short of the levels required to fund the City's operations and fully satisfy its liabilities.

- Given the City's (i) substantial debt levels (LTGO; UTGO; COPs; Swaps), (ii) significant labor related liabilities and (iii) continuing operating expenses, shared sacrifice will be required from all stakeholders to achieve the City's dual (and complementary) goals of maximizing returns for its stakeholder constituencies while simultaneously establishing the framework for a healthy and growing Detroit moving forward.

- All of the City's stakeholders can benefit from a restructured and revitalized Detroit.



OFFICE OF THE EMERGENCY MANAGER

49

13-53846-swr   Doc 157-1   Filed 06/24/13   Entered 06/24/13 20:26:27   Page 15 of 247
248

# VIII. Restructuring Proposal

## Summary of Treatment of Debt

- **Secured Debt**

  - **DWSD Debt.** The existing DWSD water and sewer bond debt may be divided into two classes, *if applicable*:

    - **DWSD Class A Debt Claims**

      - DWSD Class A Debt Claims shall consist of claims under or evidenced by certain debt that may be paid prior to the effective date of the City's comprehensive restructuring plan without incurring a material premium or penalty.

      - On the effective date of the City's comprehensive restructuring plan, accrued principal and interest for DWSD Class A Debt Claims accrued through the restructuring plan's effective date will either (i) be repaid in full in cash or (ii) receive such treatment as may be agreed upon by the parties.



OFFICE OF THE EMERGENCY MANAGER

50

248

# VIII. Restructuring Proposal

- *Source of funds for repayment*: New long-term bond issuances with a newly-formed Metropolitan Area Water and Sewer Authority, or "MAWSA," as the issuer.

    i. New Series A Bond Principal: An amount equal to the sum of the principal of the outstanding debt that was issued to redeem the DWSD Class A Debt Bonds plus interest thereon accrued through the restructuring plan's effective date and fees incurred in connection with the new financings.

    ii. New Series A Bond Collateral: Lien on net revenues generated by MAWSA assets with the same priorities as the DWSD Class A Debt, but subordinate to the operating and maintenance costs of the system, including the Transaction Payment.

    iii. New Series A Bond Interest Rate: Prevailing market rate for similar long-term municipal bonds at the time of issuance.

    iv. New Series A Bond Maturities: The various series of new municipal bonds would have long-term maturities determined at the time of issuance on the basis of then-existing market conditions.

- **DWSD Class B Debt Claims.**

- DWSD Class B Debt Claims shall consist of all claims under or evidenced by each series of existing water or sewer bond debt (whether callable or not) that are not DWSD Class A Debt Claims.



# VIII. Restructuring Proposal

i.  On the effective date of the City's comprehensive restructuring plan, holders of DWSD Class B Debt Claims shall receive Series B Restructured Bonds or such treatment as may be agreed upon by the parties.

- ***Series B Restructured Bond Terms:*** Series B Restructured Bonds would be issued by MAWSA to holders of outstanding DWSD Class B Debt Claims.

i.  <u>Series B Restructured Bond Principal</u>: For each series of Series B Restructured Bonds, an amount equal to the sum of the principal of the outstanding DWSD Class B Debt Bonds for which such Series B Restructured Bonds are to be exchanged plus interest thereon accrued through the restructuring plan Effective Date.

ii.  <u>Series B Restructured Bond Collateral</u>: Lien on net revenues generated by MAWSA assets in the same priorities as currently exist for the DWSD Class B Debt Bonds for which such Series B Restructured Bonds are to be exchanged, subordinate to the operating and maintenance costs of the system, including the Transaction Payment.

iii.  <u>Series B Restructured Bond Interest Rate</u>:  Prevailing market rate for similar long-term municipal bonds at the time of issuance.

iv.  <u>Series B Restructured Bond Maturities</u>:  The same maturity dates as the DWSD Class B Debt Bonds for which the Series B Restructured Bonds will be exchanged.



# VIII. Restructuring Proposal

- **Secured General Obligation Debt**

  - There are six series of secured General Obligation Debt:

    - $100,000,000 original principal amount Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds-Direct Payment).

    - $249,790,000 original principal amount Distributable State Aid General Obligation Limited Tax Bonds, Series 2010.

    - $38,865,000 original principal amount Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2).

    - $30,730,000 original principal amount Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2).

    - $6,405,000 original principal amount General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B).

    - $53,520,000 original principal amount Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A2-B).

  - Total annual debt service is approximately $39 million per year from FY 2015 through FY 2033.

  - Treatment: Subject to negotiation with holders.



OFFICE OF THE EMERGENCY MANAGER

53

# VIII.  Restructuring Proposal

- <u>Secured Claims Arising in Connection with Installment Notes Payable</u>

  - The City has $87.8 million outstanding in connection with notes payable related to various public improvement projects, which notes were issued in connection with the "Section 108" HUD Loan Guarantee Program and are secured by future "Block Grant" revenues.

  - Treatment:  Subject to negotiation with holders.

- <u>Secured Claims Arising under Service Agreements Related to COP-Related Interest Rate Swaps</u>

  - Treatment:  Subject to negotiation with holders.

- <u>Secured Automobile Parking Fund Claims</u>

  - $9.3 million in outstanding principal amount of Detroit Building Authority Revenue Refunding Bonds: Parking System, Series 1998-A are secured by a pledge of all revenues of the parking system, net of operating expenses.

  - Treatment:  Principal and interest accrued through the effective date will be paid in full in cash using proceeds of sales of City's parking-related assets.  In the event that sales are not negotiated and consummated prior to the effective date, claims will be subject to negotiations with holders.



13-53846-swr  Doc 157-19  Filed 10/24/13  Entered 10/24/13 15:08:26  Page 122 of 247
248

# VIII. Restructuring Proposal

- **Consideration for Unsecured Claims:** Holders of general unsecured claims will receive limited recourse participation notes (the "Notes").

  - Claims Under Unsecured General Obligation Bonds/Notes.

    - Aggregate amount: Approximately $650 million.

    - Treatment: Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

  - Claims of Service Corporations (or affiliated trusts) on Account of COPs.

    - Aggregate amount: Approximately $1.4 billion.

    - Treatment: Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

  - Claims for Unfunded OPEB Liabilities.

    - Current retirees will receive modified medical benefits plans utilizing either the exchanges to be created by January 1, 2014 under the Patient Protection and Affordable Care Act or Medicare, as applicable. The proposed replacement program is preliminarily estimated to have a cost to the City of between $27.5 million and $40 million annually depending on choices to be made.

    - Claims will result from the modification of benefits. The amount of such claims has not been finally determined.

  - Treatment for Allowed Claims: Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.



# VIII. Restructuring Proposal

- <u>Claims for Unfunded Pension Liabilities.</u>

  - As set forth above, preliminary analysis indicates that the underfunding in the GRS and the PFRS is approximately $3.5 billion. At this level of underfunding, the City would have to contribute approximately $200 million - $350 million annually to fully fund currently accrued, vested benefits. Such contributions will not be made under the plan.

  - Claims for the underfunding will be exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

  - Because the amounts realized on the underfunding claims will be substantially less than the underfunding amount, there must be **significant** cuts in accrued, vested pension amounts for **both active and currently retired** persons.

- <u>Claims on account of Other Liabilities.</u>

  - Aggregate Amount:  Approximately $300 million.

  - Treatment:  Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

OFFICE OF THE EMERGENCY MANAGER



248

13-53846-swr   Doc 157-9   Filed 10/24/13   Entered 10/24/13 17:53:26   Page 127 of
13-53846-tjt   Doc 1140-15   Filed 10/10/13   Entered 10/10/13 14:54:54   Page 123 of
129

# VIII. Restructuring Proposal

- **Description of Limited Recourse Participation Notes.**

  - **Relevant Definitions:**

    - "Adjusted Base Covered Revenues" means for a Fiscal Year following the Initial Revenue Participation Year, Base Covered Revenues adjusted for inflation for the period beginning on the first day of the Initial Revenue Participation Year and ending on the first day of the Fiscal Year using the positive change, if any, in the Consumer Price Index during such period.

    - "Base Covered Revenues" means one half of the sum of Covered Revenues for the first two Fiscal Years beginning after the Effective Date.

    - "Covered Revenues" means amounts actually collected by the City's General Fund in a Fiscal Year on account of (a) Property Taxes, Income Taxes and Gaming Taxes levied for such Fiscal Year and (b) Revenue Sharing Payments, determined based upon the City's audited financial statements.

    - "Dutch Auction" means a method for pricing the Notes whereby the price of the Notes offered by the City is the lowest price (the "Auction Price") at which there are bids to sell Notes for an aggregate purchase price equal to the amount the City is required to pay in respect of Revenue Participation Payments and/or Asset Disposition Proceeds then due and payable. During bidding, each Noteholder will indicate how many Notes it is willing to sell to the City and the price such Noteholder is willing to accept. All Notes offered at the Auction Price or at a lower price will be sold to the City at the Auction Price.

OFFICE OF THE EMERGENCY MANAGER



# VIII. Restructuring Proposal

- "Effective Date" means the closing date of a comprehensive restructuring of the City's finances on which the Notes shall be issued.

- "Final Participation Year" means the Fiscal Year beginning on the 20th anniversary of the first day of the Initial Participation Year.

- "Fiscal Year" means a period commencing on July 1 of a year and ending on June 30 of the following year. For greater certainty, the Fiscal Year beginning on July 1, 2014 and ending on June 30, 2015 is the 2015 Fiscal Year.

- "Initial Participation Year" means the second full Fiscal Year following the Effective Date.

- "Trustee" means an indenture trustee or other agent for the Noteholders as defined in definitive documentation for the Notes.

- **Terms:**

- Initial Principal Amount: $2,000,000,000.00.

- Interest Rate:  1.5% per annum on the outstanding principal amount of the Notes, payable semiannually. No interest shall be paid or accrued for any period following the end of the Final Participation Year.

- Maturity Date:  The first September 30 following the Final Participation Year.  The City shall have no obligation to pay any amounts other than the Revenue Participation Payment in respect of the Final Participation Year on the maturity date. The Notes may be prepaid in whole or in part at any time without premium or penalty.



# VIII.  Restructuring Proposal

- On the September 30 after the end of each Fiscal Year beginning with the Initial Participation Year, an amount equal to the product of (a) 30% (0.30), multiplied by (b) (i) the amount by which Covered Revenues for such Fiscal Year exceed (ii) Adjusted Base Covered Revenues shall be applied to reduce the principal amount of the Notes.  No Revenue Participation Payments shall be made for any Fiscal Year after the Final Participation Year.

- Grants and Other Amounts Received to Offset Costs of Addressing Blight:  If the City receives any cash grants or other cash payments after the Effective Date and before the Maturity Date from the State of Michigan, the Federal government, or any other government or nonprofit entity not affiliated in any way with the City for the purpose of funding programs or activities to address blight that are included in the 10 Year Plan ("Blight Revenues") and that can be utilized in place of the General Fund sums in the 10 Year Plan projections, an amount equal to 75% of the General Fund revenues that would otherwise be spent on blight but for the outside funds shall be applied to reduce the principal amount of the Notes.

- Asset Disposition Proceeds:  If the City receives cash consideration in connection with the transfer of Specified Assets after the Effective Date and before the Maturity Date, an amount equal to 75% of such cash shall be applied to reduce the principal amount of the Notes.  For greater certainty, the assumption of indebtedness shall not constitute cash consideration.

- The City shall make distributions of Blight Revenues and Asset Disposition Proceeds when the amount of such payments that are due equal or exceed $50 million or at the time a Revenue Participation Payment is due, whichever is sooner.



OFFICE OF THE EMERGENCY MANAGER

59

# VIII. Restructuring Proposal

- **Dutch Auctions:** Any Revenue Participation Payment, Blight Revenues, Asset Disposition Proceeds and other amounts made available by the City may be used to fund offers to purchase Notes through a Dutch Auction process. The City shall give notice of its intent to conduct such a Dutch Auction using a Revenue Participation Payment on or before the July 15th following the end of the pertinent Fiscal Year and shall conclude the auction and purchase notes offered and accepted in the auction no later than 90 days following the date such notice is given. The City shall give notice of its intent to conduct such a Dutch Auction using Asset Disposition Proceeds or Blight Revenues on or before the 30 days following the date when the City becomes obligated to apply Asset Disposition Proceeds and shall conclude the auction and purchase notes offered and accepted in the auction no later than 90 days following the date such notice is given. The City may give notice of its intent to conduct a Dutch Auction using funds provided by the City which are not otherwise required to be applied to repayment of the Notes at any time.

- **Limited Recourse:** The City's obligation to pay interest on the Notes shall be a general obligation of the City. The City shall have no obligation to pay the principal amount of the Notes except to the extent that Revenue Participation Payments, Blight Revenues or Asset Disposition Proceeds become due in accordance with the terms hereof.

- **Requirements of Law.** The terms of the Notes may be revised to conform with requirements of law.



## IX. Calendar and Contacts

- Requests for additional information: June 17, 2013 - June 24, 2013.

  - Please direct all requests for information and general inquiries to:

    Kyle Herman
    MILLER BUCKFIRE & CO., LLC
    601 Lexington Avenue, 22nd Floor
    New York, NY 10022
    (212) 895-1800
    kyle.herman@millerbuckfire.com

- Initial round of discussions with stake holders:  June 17, 2013 -July 12, 2013.

- Evaluation: July 15, 2013 - July 19, 2013.



OFFICE OF THE EMERGENCY MANAGER

61

# IX. Calendar and Contacts

- **Contacts:**

  - MILLER BUCKFIRE & CO., LLC
    601 Lexington Avenue, 22nd Floor
    New York, NY 10022
    (212) 985-1800

    - Kenneth Buckfire
      Co-President & Managing Director.

    - James Doak
      Managing Director.

  - JONES DAY

    David G. Heiman, Esq.
    901 Lakeside Avenue
    North Point
    Cleveland, Ohio 44114-1190
    (216) 586-3939

    Bruce Bennett, Esq.
    555 South Flower Street, 50th Floor
    Los Angeles, CA 90071
    (213) 489-3939

    Heather Lennox, Esq.
    222 East 41st Street
    New York, NY 10017
    (212) 326-3939



OFFICE OF THE EMERGENCY MANAGER