# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

CITY OF DETROIT, a Municipal
Corporation Organized and Existing
Under the Laws of the State of Michigan,

          Plaintiff,

   v.

SYNCORA GUARANTEE INC.,
a New York corporation,

and

U.S. BANK, N.A.,

and

MGM GRAND DETROIT, LLC,

and

DETROIT ENTERTAINMENT, LLC
d/b/a MOTORCITY CASINO HOTEL,

and

GREEKTOWN CASINO, LLC,

          Defendants.

Case No.:  2:13-cv-12987-LPZ-MKM

Hon. Lawrence P. Zatkoff

## DEFENDANT SYNCORA GUARANTEE INC.'S FIRST SET OF DOCUMENT REQUESTS TO THE CITY OF DETROIT

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant Syncora Guarantee Inc. ("Syncora") requests that Plaintiff City of Detroit (the "City") produce for its inspection and copying all documents and tangible things requested below in accordance with the Definitions and Instructions set forth below at the offices of their counsel, Mantese

Honigman Rossman and Williamson, P.C., 1361 E. Big Beaver Rd., Troy, Michigan 48083, by July 18, 2013.  Each of the following requests is continuing in nature, such that if the plaintiff obtains or discovers additional responsive documents and things at a later date, such documents and things are to be made available to defendant for inspection and copying.

## DEFINITIONS

1.      The terms "you" or "The City of Detroit" or "The City" mean Plaintiff City of Detroit, or any other persons or entities acting or purporting to act for or on its behalf, including but not limited to Emergency Manager Kevyn Orr and his advisors.

2.      The term "Complaint" means the July 5, 2013 Verified Complaint filed by Plaintiff in the Circuit Court for the County of Wayne in Case No. 13-00858-CZ.

3.      The term "Syncora" means Syncora Guarantee Inc..

4.      The term "Swap Counterparties" means UBS AG, SBS Financial Products Company, LLC, and Merrill Lynch Capital Services, Inc., the parties to the Collateral Agreement dated June 15, 2009.

5.      "Service Corporations" means the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation.

6.      "U.S. Bank" means U.S. Bank National Association.

7.      The term "Service Contracts" has the same meaning given to that term in paragraph 12 of the Complaint.

8.      The term "Swaps" has the same meaning given to that term in paragraph 14 of the Complaint, but extends to and includes any amendments to the Swaps.

9.      The term "Certificates of Participation" has the same meaning given to that term in paragraph 12 of the Complaint.

10.    "Syncora's June 17, 2013" letter means the letter from Claude LeBlanc attached as Exhibit D to Kevyn Orr's July 4, 2013 affidavit.

11.    "Communication" means every contact of any nature, whether oral or written, from one person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other documents concerning such contacts.

12.    "Document" shall have the full meaning ascribed to it by Rule 34(a) of the Federal Rules of Civil Procedure, and in particular includes (but is not limited to) every writing or record of every type and description, including letters, correspondence, diaries, memoranda, tapes, electronic data or storage, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures, films, reports, financial statements, applications, emails, and tests, however produced or reproduced, in the City's possession, custody, or control.  "Document" also includes all copies and drafts of every writing or record when the copy or draft is not identical to the original.

13.    "Concerning," "relating to," and "referring to" are synonymous for the purposes of these Requests, and mean reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, contradicting, incorporating, affecting, including or otherwise pertaining—either directly or indirectly—to the subject matter of the inquiry.

14.    The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The singular form of a noun or pronoun includes the plural form and vice versa.

3

15.     The terms "including," "include" or "includes" mean including, but not limited to.

16.     The terms "each," "any," and "all" shall be construed to mean "each and every."

17.     The use of the singular form of a noun includes the plural form, and vice versa.

## INSTRUCTIONS

1.      Each Request extends to all documents in the City's possession, custody, or control or in the possession, custody, or control of anyone acting on the City's behalf.  A document is to be deemed in the City's possession, custody, or control if it is in the City's physical custody, or if it is in the physical custody of any person and the City (i) owns such document in whole or in part; (ii) has a right, by contract, statute, or otherwise to use, inspect, examine, or copy such document on any terms; (iii) has an understanding, express or implied, that the City may use, inspect, examine, or copy such document on any terms; or (iv) has, as a practical matter, been able to use, inspect, examine or copy such document when the City sought to do so.

2.      If the location of any requested document is known but the document is not produced on the ground that the document is not in the City's possession, custody, or control, identify the document and identify the person believed to have possession, custody, or control of the document.

3.      The response shall expressly indicate if no responsive documents are known to exist.

4.      The original of each document requested herein shall be produced together with any drafts, revisions, or copies of the same that bear any mark or notation not present in the original or that otherwise differ from the original.

5.      All documents should be produced in their entirety without redaction and should include all attachments and enclosures.  Documents that are attached to each other should not be separated.

6.      The response should state whether the City will produce documents as they are kept in the usual course of business or organized and labeled to correspond with the categories in the Request.

7.      The response to each Request shall state, with respect to each item or category, that production will be made or inspection will be permitted as requested, unless the Request is objected to, in which event the reason(s) for objection shall be stated.  If objection is made to part of a Request, the part shall be specified; documents responsive to the remainder of the Request shall be produced.  Any such objection shall not extend the time within which the City must otherwise respond to a Request to which no specific objection has been made.

8.      With respect to any documents or information withheld on a claim of attorney–client privilege, the attorney work product doctrine, or any other applicable privilege, the response shall provide an express statement of the asserted privilege that includes the following information: (i) the applicable date; (ii) the identity of the author(s), including the business or legal title(s) or position(s); (iii) the identity of the recipient(s), including business or legal title(s) or position(s); (iv) the subject matter of the document; (v) the identity of all other persons who received copies; and (vi) the specific factual basis of the claimed privilege or other protection from discovery.

9.      Each Request shall operate and be construed independently and, unless otherwise stated, no request limits the scope of any other request.

10.     In responding to any of these Requests, set forth any matter deemed ambiguous and the construction used in answering the Request.  These requests are to be liberally construed, and any doubts about whether a document is responsive to these Requests should be resolved in favor of production.

11.     These Requests shall be deemed continuing in nature to the extent permitted by Rule 26(e) of the Federal Rules of Civil Procedure.

## DOCUMENT REQUESTS

1.     All documents or communications relating to the City's negotiations with the Swap Counterparties regarding termination of the Swaps, including, but not limited to, documents and communications relating to:

      a.     The date that the negotiations commenced;

      b.     The participants in any portion of the negotiations;

      c.     The role of the casino revenues in the negotiations;

      d.     The effect of Syncora's June 17, 2013 letter on the negotiations;

      e.     The current and ongoing status of the negotiations;

      f.     The Service Corporations' knowledge of or involvement in the negotiations;

      g.     U.S. Bank's knowledge of or involvement in the negotiations;

      h.     The substance of the negotiations.

2.     All documents or communications relating to the "final settlement" referenced in paragraph 40 of the Complaint.

3.     All documents or communications relating to the City's "promises to stakeholders" as alleged in paragraph 46 of the Verified Complaint.

4.     All documents or communications relating to the City's use of the gambling revenues remitted to them from the General Receipts Subaccount prior to June 14, 2013.

6

5.     All documents or communications relating to the City's potential uses of the gambling revenues remitted to them from the General Receipts Subaccount.

6.     All documents or communications relating to U.S. Bank's obligations under the Collateral Agreement, including, but not limited to, documents and communications relating to:

      a.     U.S. Bank's obligations under Section 5.4 of the Collateral Agreement;

      b.     U.S. Bank's actions under Section 5.4 of the Collateral Agreement.

7.     All documents or communications between the City and the Service Corporations regarding the City's and the Service Corporations' obligations under the Service Contracts, the Swaps, and the Collateral Agreement.

8.     All documents or communications relating to Syncora's June 17, 2013 letter.

9.     All documents or communications relating to Syncora's insurance of the Certificates of Participation and Swaps.

10.     All documents or communications relating to the harm the City claims it will experience due to Syncora's actions.

11.     All documents or communications relating to the City's attempts to realize additional sources of cash or revenue.

12.     All documents or communications relating to the City's June 14, 2013 decision to not make a payment to the Service Corporations.

13.     All documents or communications relating to the current or potential uses of the approximately $40 million that the City decided not to pay to the Service Corporations.

14.     All documents or communication relating to the City's Swaps termination obligations to the Service Corporations.

15.     All documents or communications relating to the casino taxes and developer payments that the City has received and expects to receive.

7

16.     All documents or communications relating to any termination events or events of default under the Collateral Agreement.

17.     All documents or communications relating to or supporting the "ten-year projections" in paragraph 25 of the Complaint.

18.     All documents or communications relating to the City's ongoing negotiations and proposed settlements between the City and its Stakeholders.  (*See, e.g.,* Compl. ¶ 39.)

19.     All documents or communications relating to the City's efforts and abilities to deliver municipal services.

20.     All documents or communications relating to the City's allegation that Syncora acted in bad faith and without legal justification.

21.     Documents or communications sufficient to show the City's available cash-on-hand as of June, 2013 and the previous 12 months.

22.     Documents or communications sufficient to show that the City is expected to run out of funds by December 31, 2013.

23.     All documents or communications relating to the impact of the "cash trap" effectuated by U.S. Bank.

24.     All documents or communications relating to the City's claim that it will lose "unique and irreplaceable opportunities" if it cannot quickly reach settlements with its stakeholders.

25.     All documents or communications relating to the "comprehensive plan" referenced in paragraph 4 of Kevyn Orr's July 4, 2013 Affidavit.

26.     All documents or communications relating to Syncora's rights under the Collateral Agreement.

27.    All documents or communications relating to the irreparable harm the City would have suffered if it had given notice to Syncora's counsel of the hearing on the City's Motion for an *Ex Parte* Temporary Restraining Order and an Order to Show Cause Why a Preliminary Injunction Should Not Issue.

28.    All documents or communications relating to the allegations in paragraphs 53-61, 63-68, 70-73, and 74-79 of the Complaint.

29.    All documents or communications relating to the damages the City alleges it has or will suffer as a result of Syncora's actions.

30.    All documents the City intends to introduce at the preliminary injunction hearing.

31.    All documents or communications relating to Kevyn Orr's authority over the Service Corporations.

9

Dated:  July __, 2013                              Respectfully submitted,

                                          By:  _____

Stephen C. Hackney                              Gerard V. Mantese
Ryan Blaine Bennett                             Mantese Honigman Rossman and
William E. Arnault                              Williamson, P.C.
Lally A. Gartel                                 1361 East Big Beaver Road
KIRKLAND & ELLIS LLP                            Troy, Michigan 48083
300 North LaSalle                               Phone: 248-457-9200
Chicago, Illinois 60654                         Fax: 248-457-9201
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
                                                *ATTORNEYS FOR DEFENDANT*
                                                *SYNCORA GUARANTEE, INC.*
*ATTORNEYS FOR DEFENDANT*
*SYNCORA GUARANTEE, INC.*

10

## Schedule A to Third-Party Subpoena to the Detroit General Retirement System Service Corporation

### DEFINITIONS

1.     The terms "you," "your," or "GRS Service Corporation" mean the Detroit General Retirement System Service Corporation, or any other persons or entities acting or purporting to act for or on its behalf.

2.     The terms "The City of Detroit" or "The City" mean the City of Detroit, or any other persons or entities acting or purporting to act for or on its behalf, including but not limited to Emergency Manager Kevyn Orr and his advisors.

3.     The term "Complaint" means the July 5, 2013 Verified Complaint filed by Plaintiff in the Circuit Court for the County of Wayne in Case No. 13-00858-CZ, attached as Exhibit A.

4.     The term "Syncora" means Syncora Guarantee Inc.

5.     The term "Swap Counterparties" means UBS AG, SBS Financial Products Company, LLC, and Merrill Lynch Capital Services, Inc.

6.     "Service Corporations" means the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation.

7.     "U.S. Bank" means U.S. Bank National Association.

8.     The term "Swaps" has the same meaning given to that term in paragraph 14 of the Complaint, but extends to and includes any amendments to the Swaps.

9.     The term "Service Contracts" has the same meaning given to that term in paragraph 12 of the Complaint.

10.     The term "Certificates of Participation" has the same meaning given to that term in paragraph 12 of the Complaint.

11.    "Syncora's June 17, 2013" letter means the letter from Claude LeBlanc attached as Exhibit D to Kevyn Orr's July 4, 2013 affidavit, attached as Exhibit B.

12.    "Communication" means every contact of any nature, whether oral or written, from one person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other documents concerning such contacts.

13.    "Document" shall have the full meaning ascribed to it by Rule 34(a) of the Federal Rules of Civil Procedure, and in particular includes (but is not limited to) every writing or record of every type and description, including letters, correspondence, diaries, memoranda, tapes, electronic data or storage, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures, films, reports, financial statements, applications, emails, and tests, however produced or reproduced, in GRS Service Corporation's possession, custody, or control. "Document" also includes all copies and drafts of every writing or record when the copy or draft is not identical to the original.

14.    "Concerning," "relating to," and "referring to" are synonymous for the purposes of these Requests, and mean reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, contradicting, incorporating, affecting, including or otherwise pertaining—either directly or indirectly—to the subject matter of the inquiry.

15.    The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The singular form of a noun or pronoun includes the plural form and vice versa.

2

16.    The terms "including," "include" or "includes" mean including, but not limited to.

17.    The terms "each," "any," and "all" shall be construed to mean "each and every."

18.    The use of the singular form of a noun includes the plural form, and vice versa.

## INSTRUCTIONS

1.    Each Request extends to all documents in GRS Service Corporation's possession, custody, or control or in the possession, custody, or control of anyone acting on GRS Service Corporation's behalf.  A document is to be deemed in GRS Service Corporation's possession, custody, or control if it is in GRS Service Corporation's physical custody, or if it is in the physical custody of any person and GRS Service Corporation (i) owns such document in whole or in part; (ii) has a right, by contract, statute, or otherwise to use, inspect, examine, or copy such document on any terms; (iii) has an understanding, express or implied, that GRS Service Corporation may use, inspect, examine, or copy such document on any terms; or (iv) has, as a practical matter, been able to use, inspect, examine or copy such document when GRS Service Corporation sought to do so.

2.    If the location of any requested document is known but the document is not produced on the ground that the document is not in GRS Service Corporation's possession, custody, or control, identify the document and identify the person believed to have possession, custody, or control of the document.

3.    The response shall expressly indicate if no responsive documents are known to exist.

4.    The original of each document requested herein shall be produced together with any drafts, revisions, or copies of the same that bear any mark or notation not present in the original or that otherwise differ from the original.

5.     All documents should be produced in their entirety without redaction and should include all attachments and enclosures.  Documents that are attached to each other should not be separated.

6.     The response should state whether GRS Service Corporation will produce documents as they are kept in the usual course of business or organized and labeled to correspond with the categories in the Request.

7.     The response to each Request shall state, with respect to each item or category, that production will be made or inspection will be permitted as requested, unless the Request is objected to, in which event the reason(s) for objection shall be stated.  If objection is made to part of a Request, the part shall be specified; documents responsive to the remainder of the Request shall be produced.  Any such objection shall not extend the time within which GRS Service Corporation must otherwise respond to a Request to which no specific objection has been made.

8.     With respect to any documents or information withheld on a claim of attorney–client privilege, the attorney work product doctrine, or any other applicable privilege, the response shall provide an express statement of the asserted privilege that includes the following information: (i) the applicable date; (ii) the identity of the author(s), including the business or legal title(s) or position(s); (iii) the identity of the recipient(s), including business or legal title(s) or position(s); (iv) the subject matter of the document; (v) the identity of all other persons who received copies; and (vi) the specific factual basis of the claimed privilege or other protection from discovery.

9.     Each Request shall operate and be construed independently and, unless otherwise stated, no request limits the scope of any other request.

4

10.     In responding to any of these Requests, set forth any matter deemed ambiguous and the construction used in answering the Request.  These requests are to be liberally construed, and any doubts about whether a document is responsive to these Requests should be resolved in favor of production.

11.     These Requests shall be deemed continuing in nature to the extent permitted by Rule 26(e) of the Federal Rules of Civil Procedure.

## DOCUMENT REQUESTS

1.     All documents or communications relating to the City's negotiations with the Swap Counterparties regarding termination of the Swaps.

2.     All documents or communications relating to the obligations of the City and the Service Corporations under the Service Contracts, Swaps, and Collateral Agreement.

3.     All documents or communications relating to Syncora's June 17, 2013 letter.

4.     All documents or communications relating to Syncora's insurance of the Certificates of Participation and Swaps.

5.     All documents or communications relating to the City's June 14, 2013 decision to not make a payment to the Service Corporations.

6.     All documents or communication relating to the City's Swap termination obligations to the Service Corporations.

7.     All documents or communications relating to any termination events or events of default under the Collateral Agreement.

8.     All documents or communications relating to the impact of the "cash trap" effectuated by U.S. Bank.

9.     All documents or communications relating to Syncora's rights under the Collateral Agreement.

5

10.     All documents or communications relating to the Service Corporations' rights, duties, and obligations under the Collateral Agreement, including but not limited to documents or communications regarding:

    a.     The City's payment obligations to the Service Corporations.

    b.     The Service Corporations' payment obligations to the Swap Counterparties.

11.     All documents or communications relating to the City's obligations to the Service Corporations under the agreements governing the Certificates of Participation, including but not limited to:

    a.     The Service Contracts dated June 7, 2006;

    b.     The Contract Administration Agreement dated June 7, 2006;

    c.     The Trust Agreement dated June 12, 2006.

12.     All documents or communications relating to any waivers that U.S. Bank received regarding the provisions in the Collateral Agreement.

13.     All documents or communications relating to Kevyn Orr's authority over the Service Corporations.

Dated:  July __, 2013                              Respectfully submitted,

                                            By: _____

Stephen C. Hackney                               Gerard V. Mantese
Ryan Blaine Bennett                              Mantese Honigman Rossman and
William E. Arnault                               Williamson, P.C.
Lally A. Gartel                                  1361 East Big Beaver Road
KIRKLAND & ELLIS LLP                             Troy, Michigan 48083
300 North LaSalle                                Phone: 248-457-9200
Chicago, Illinois 60654                          Fax: 248-457-9201
Telephone: (312) 862-2000
Facsimile: (312) 862-2200                         *ATTORNEYS FOR DEFENDANT*
                                                 *SYNCORA GUARANTEE INC.*

*ATTORNEYS FOR DEFENDANT*
*SYNCORA GUARANTEE INC.*

## Schedule A to Third-Party Subpoena to Detroit Police and
## Fire Retirement System Service Corporation

## DEFINITIONS

1.      The terms "you," "your," or "PFRS Service Corporation" means the Detroit Police and Fire Retirement System Service Corporation, or any persons or entities acting or purporting to act for or on its behalf.

2.      The term "The City of Detroit" or "the City" means City of Detroit, or any other persons or entities acting or purporting to act for or on its behalf, including but not limited to Emergency Manager Kevyn Orr and his advisors.

3.      The term "Complaint" means the July 5, 2013 Verified Complaint filed by Plaintiff in the Circuit Court for the County of Wayne in Case No. 13-00858-CZ, attached as Exhibit A.

4.      The term "Syncora" means Syncora Guarantee Inc.

5.      The term "Swap Counterparties" means UBS AG, SBS Financial Products Company, LLC, and Merrill Lynch Capital Services, Inc.

6.      "Service Corporations" means the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation.

7.      "U.S. Bank" means U.S. Bank National Association.

8.      The term "Swaps" has the same meaning given to that term in paragraph 12 of the Complaint, but extends to and includes any amendments to the Swaps.

9.      The term "Service Contracts" has the same meaning given to that term in paragraph 12 of the Complaint.

10.      The term "Certificates of Participation" has the same meaning given to that term in paragraph 12 of the Complaint.

11.    "Syncora's June 17, 2013" letter means the letter from Claude LeBlanc attached as Exhibit D to Kevyn Orr's July 4, 2013 affidavit, attached as Exhibit B.

12.    "Communication" means every contact of any nature, whether oral or written, from one person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other documents concerning such contacts.

13.    "Document" shall have the full meaning ascribed to it by Rule 34(a) of the Federal Rules of Civil Procedure, and in particular includes (but is not limited to) every writing or record of every type and description, including letters, correspondence, diaries, memoranda, tapes, electronic data or storage, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures, films, reports, financial statements, applications, emails, and tests, however produced or reproduced, in PFRS Service Corporation's possession, custody, or control. "Document" also includes all copies and drafts of every writing or record when the copy or draft is not identical to the original.

14.    "Concerning," "relating to," and "referring to" are synonymous for the purposes of these Requests, and mean reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, contradicting, incorporating, affecting, including or otherwise pertaining—either directly or indirectly—to the subject matter of the inquiry.

15.    The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The singular form of a noun or pronoun includes the plural form and vice versa.

16.     The terms "including," "include" or "includes" mean including, but not limited to.

17.     The terms "each," "any," and "all" shall be construed to mean "each and every."

18.     The use of the singular form of a noun includes the plural form, and vice versa.

## INSTRUCTIONS

1.      Each Request extends to all documents in PFRS Service Corporation's possession, custody, or control or in the possession, custody, or control of anyone acting on PFRS Service Corporation's behalf.  A document is to be deemed in PFRS Service Corporation's possession, custody, or control if it is in PFRS Service Corporation's physical custody, or if it is in the physical custody of any person and PFRS Service Corporation (i) owns such document in whole or in part; (ii) has a right, by contract, statute, or otherwise to use, inspect, examine, or copy such document on any terms; (iii) has an understanding, express or implied, that PFRS Service Corporation may use, inspect, examine, or copy such document on any terms; or (iv) has, as a practical matter, been able to use, inspect, examine or copy such document when PFRS Service Corporation sought to do so.

2.      If the location of any requested document is known but the document is not produced on the ground that the document is not in PFRS Service Corporation's possession, custody, or control, identify the document and identify the person believed to have possession, custody, or control of the document.

3.      The response shall expressly indicate if no responsive documents are known to exist.

4.      The original of each document requested herein shall be produced together with any drafts, revisions, or copies of the same that bear any mark or notation not present in the original or that otherwise differ from the original.

3

5.     All documents should be produced in their entirety without redaction and should include all attachments and enclosures.  Documents that are attached to each other should not be separated.

6.     The response should state whether PFRS Service Corporation will produce documents as they are kept in the usual course of business or organized and labeled to correspond with the categories in the Request.

7.     The response to each Request shall state, with respect to each item or category, that production will be made or inspection will be permitted as requested, unless the Request is objected to, in which event the reason(s) for objection shall be stated.  If objection is made to part of a Request, the part shall be specified; documents responsive to the remainder of the Request shall be produced.  Any such objection shall not extend the time within which PFRS Service Corporation must otherwise respond to a Request to which no specific objection has been made.

8.     With respect to any documents or information withheld on a claim of attorney–client privilege, the attorney work product doctrine, or any other applicable privilege, the response shall provide an express statement of the asserted privilege that includes the following information: (i) the applicable date; (ii) the identity of the author(s), including the business or legal title(s) or position(s); (iii) the identity of the recipient(s), including business or legal title(s) or position(s); (iv) the subject matter of the document; (v) the identity of all other persons who received copies; and (vi) the specific factual basis of the claimed privilege or other protection from discovery.

9.     Each Request shall operate and be construed independently and, unless otherwise stated, no request limits the scope of any other request.

4

10.     In responding to any of these Requests, set forth any matter deemed ambiguous and the construction used in answering the Request.  These requests are to be liberally construed, and any doubts about whether a document is responsive to these Requests should be resolved in favor of production.

11.     These Requests shall be deemed continuing in nature to the extent permitted by Rule 26(e) of the Federal Rules of Civil Procedure.

## DOCUMENT REQUESTS

1.     All documents or communications relating to the City's negotiations with the Swap Counterparties regarding termination of the Swaps.

2.     All documents or communications relating to the obligations of the City and Service Corporations under the Service Contracts, the Swaps, and the Collateral Agreement.

3.     All documents or communications relating to Syncora's June 17, 2013 letter.

4.     All documents or communications relating to Syncora's insurance of the Certificates of Participation and Swaps.

5.     All documents or communications relating to the City's June 14, 2013 decision to not make a payment to the Service Corporations.

6.     All documents or communication relating to the City's Swap termination obligations to the Service Corporations.

7.     All documents or communications relating to any termination events or events of default under the Collateral Agreement.

8.     All documents or communications relating to the impact of the "cash trap" effectuated by U.S. Bank.

9.     All documents or communications relating to Syncora's rights under the Collateral Agreement.

5

10.     All documents or communications relating to the Service Corporations' rights, duties, and obligations under the Collateral Agreement, including but not limited to documents or communications regarding:

      a.     The City's payment obligations to the Service Corporations.

      b.     The Service Corporations' payment obligations to the Swap Counterparties.

11.     All documents or communications relating to the City's obligations to the Service Corporations under the agreements governing the Certificates of Participation, including but not limited to:

      a.     The Service Contracts dated June 7, 2006;

      b.     The Contract Administration Agreement dated June 7, 2006;

      c.     The Trust Agreement dated June 12, 2006.

12.     All documents or communications relating to any waivers that U.S. Bank received regarding the provisions in the Collateral Agreement.

13.     All documents or communications relating to Kevyn Orr's authority over the Service Corporations.

Dated:  July __, 2013                           Respectfully submitted,

                                                By: _____

Stephen C. Hackney                                   Gerard V. Mantese
Ryan Blaine Bennett                                  Mantese Honigman Rossman and
William E. Arnault                                   Williamson, P.C.
Lally A. Gartel                                      1361 East Big Beaver Road
KIRKLAND & ELLIS LLP                                 Troy, Michigan 48083
300 North LaSalle                                    Phone: 248-457-9200
Chicago, Illinois 60654                              Fax: 248-457-9201
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*ATTORNEYS FOR DEFENDANT*                            *ATTORNEYS FOR DEFENDANT*
*SYNCORA GUARANTEE INC.*                             *SYNCORA GUARANTEE INC.*

## Schedule A to Third-Party Subpoena to UBS AG

## DEFINITIONS

1.      The terms "you" or "UBS" shall mean UBS AG, or any other persons or entities acting or purporting to act for or on its behalf.

2.      The terms "The City of Detroit" or "The City" mean the City of Detroit, or any other persons or entities acting or purporting to act for or on its behalf, including but not limited to Emergency Manager Kevyn Orr and his advisors

3.      The term "Complaint" means the July 5, 2013 Verified Complaint filed by Plaintiff in the Circuit Court for the County of Wayne in Case No. 13-00858-CZ, attached as Exhibit A.

4.      The term "Syncora" means Syncora Guarantee Inc.

5.      The term "Swap Counterparties" means UBS AG, SBS Financial Products Company, LLC, and Merrill Lynch Capital Services, Inc.

6.      "Service Corporations" means the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation.

7.      "U.S. Bank" means U.S. Bank National Association.

8.      The term "Swaps" has the same meaning given to that term in paragraph 14 of the Complaint, but extends to and includes any amendments to the Swaps.

9.      The term "Service Contracts" has the same meaning given to that term in paragraph 12 of the Complaint.

10.     The term "Certificates of Participation" has the same meaning given to that term in paragraph 12 of the Complaint.

11.     "Syncora's June 17, 2013" letter means the letter from Claude LeBlanc attached as Exhibit D to Kevyn Orr's July 4, 2013 affidavit, attached as Exhibit B.

12.     "Communication" means every contact of any nature, whether oral or written, from one person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other documents concerning such contacts.

13.     "Document" shall have the full meaning ascribed to it by Rule 34(a) of the Federal Rules of Civil Procedure, and in particular includes (but is not limited to) every writing or record of every type and description, including letters, correspondence, diaries, memoranda, tapes, electronic data or storage, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures, films, reports, financial statements, applications, emails, and tests, however produced or reproduced, in UBS's possession, custody, or control.  "Document" also includes all copies and drafts of every writing or record when the copy or draft is not identical to the original.

14.     "Concerning," "relating to," and "referring to" are synonymous for the purposes of these Requests, and mean reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, contradicting, incorporating, affecting, including or otherwise pertaining—either directly or indirectly—to the subject matter of the inquiry.

15.     The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The singular form of a noun or pronoun includes the plural form and vice versa.

16.     The terms "including," "include" or "includes" mean including, but not limited to.

17.     The terms "each," "any," and "all" shall be construed to mean "each and every."

18.     The use of the singular form of a noun includes the plural form, and vice versa.

## <u>INSTRUCTIONS</u>

1.     Each Request extends to all documents in UBS's possession, custody, or control or in the possession, custody, or control of anyone acting on the UBS's behalf.  A document is to be deemed in UBS's possession, custody, or control if it is in UBS's physical custody, or if it is in the physical custody of any person and UBS (i) owns such document in whole or in part; (ii) has a right, by contract, statute, or otherwise to use, inspect, examine, or copy such document on any terms; (iii) has an understanding, express or implied, that UBS may use, inspect, examine, or copy such document on any terms; or (iv) has, as a practical matter, been able to use, inspect, examine or copy such document when UBS sought to do so.

2.     If the location of any requested document is known but the document is not produced on the ground that the document is not in UBS's possession, custody, or control, identify the document and identify the person believed to have possession, custody, or control of the document.

3.     The response shall expressly indicate if no responsive documents are known to exist.

4.     The original of each document requested herein shall be produced together with any drafts, revisions, or copies of the same that bear any mark or notation not present in the original or that otherwise differ from the original.

5.     All documents should be produced in their entirety without redaction and should include all attachments and enclosures.  Documents that are attached to each other should not be separated.

6.     The response should state whether UBS will produce documents as they are kept in the usual course of business or organized and labeled to correspond with the categories in the Request.

3

7.      The response to each Request shall state, with respect to each item or category, that production will be made or inspection will be permitted as requested, unless the Request is objected to, in which event the reason(s) for objection shall be stated.  If objection is made to part of a Request, the part shall be specified; documents responsive to the remainder of the Request shall be produced.  Any such objection shall not extend the time within which UBS must otherwise respond to a Request to which no specific objection has been made.

8.      With respect to any documents or information withheld on a claim of attorney–client privilege, the attorney work product doctrine, or any other applicable privilege, the response shall provide an express statement of the asserted privilege that includes the following information: (i) the applicable date; (ii) the identity of the author(s), including the business or legal title(s) or position(s); (iii) the identity of the recipient(s), including business or legal title(s) or position(s); (iv) the subject matter of the document; (v) the identity of all other persons who received copies; and (vi) the specific factual basis of the claimed privilege or other protection from discovery.

9.      Each Request shall operate and be construed independently and, unless otherwise stated, no request limits the scope of any other request.

10.      In responding to any of these Requests, set forth any matter deemed ambiguous and the construction used in answering the Request.  These requests are to be liberally construed, and any doubts about whether a document is responsive to these Requests should be resolved in favor of production.

11.      These Requests shall be deemed continuing in nature to the extent permitted by Rule 26(e) of the Federal Rules of Civil Procedure.

## **DOCUMENT REQUESTS**

1.      All documents or communications relating to the City's negotiations with the Swap Counterparties regarding termination of the Swaps, including, but not limited to, documents and communications relating to:

      a.      The date that the negotiations commenced;

      b.      The participants in any portion of the negotiations;

      c.      The role of the casino revenues in the negotiations;

      d.      The effect of Syncora's June 17, 2013 letter on the negotiations;

      e.      The current and ongoing status of the negotiations;

      f.      The Service Corporations' knowledge of or involvement in the negotiations;

      g.      U.S. Bank's knowledge of or involvement in the negotiations;

      h.      The substance of the negotiations.

2.      All documents or communications relating to the "final settlement" referenced in paragraph 40 of the Complaint.

3.      All documents or communications relating to U.S. Bank's obligations under the Collateral Agreement, including, but not limited to, documents and communications relating to:

      a.      U.S. Bank's obligations under Section 5.4 of the Collateral Agreement;

      b.      U.S. Bank's actions under Section 5.4 of the Collateral Agreement.

4.      All documents or communications relating to Syncora's June 17, 2013 letter.

5.      All documents or communications relating to Syncora's insurance of the Certificates of Participation and Swaps.

6.      All documents or communications relating to the City's attempts to realize additional sources of cash or revenue.

7.      All documents or communications relating to the City's Swap termination obligations to the Service Corporations.

8.      All documents or communications relating to any termination events or events of default under the Collateral Agreement.

9.      All documents and communications relating to the impact of the "cash trap" effectuated by U.S. Bank.

10.      All documents and communications relating to Syncora's rights under the Collateral Agreement.

11.      All documents or communications relating to any waivers that U.S. Bank received regarding the provisions in the Collateral Agreement.

Dated:  July __, 2013                                    Respectfully submitted,

                                                         By: _____

Stephen C. Hackney                                            Gerard V. Mantese
Ryan Blaine Bennett                                           Mantese Honigman Rossman and
William E. Arnault                                            Williamson, P.C.
Lally A. Gartel                                               1361 East Big Beaver Road
KIRKLAND & ELLIS LLP                                          Troy, Michigan 48083
300 North LaSalle                                             Phone: 248-457-9200
Chicago, Illinois 60654                                       Fax: 248-457-9201
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*ATTORNEYS FOR DEFENDANT*                                *ATTORNEYS FOR DEFENDANT*
*SYNCORA GUARANTEE INC.*                                 *SYNCORA GUARANTEE INC.*

## Schedule A to Third-Party Subpoena to Ernst & Young LLP

## DEFINITIONS

1.      The terms "you," "your," or "E&Y" means Ernst & Young LLP.

2.      The terms "The City of Detroit" or "the City" mean the City of Detroit, or any other persons or entities acting or purporting to act for or on its behalf, including but not limited to Emergency Manager Kevyn Orr and his advisors.

3.      The term "Complaint" means the July 5, 2013 Verified Complaint filed by Plaintiff in the Circuit Court for the County of Wayne in Case No. 13-00858-CZ, attached as Exhibit A.

4.      The term "Syncora" means Syncora Guarantee, Inc.

5.      The term "Swap Counterparties" means UBS AG, SBS Financial Products Company, LLC, and Merrill Lynch Capital Services, Inc.

6.      "Service Corporations" means the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation.

7.      "U.S. Bank" means U.S. Bank National Association.

8.      The term "Swaps" has the same meaning given to that term in paragraph 14 of the Complaint.

9.      The term "Service Contracts" has the same meaning given to that term in paragraph 12 of the Complaint.

10.     The term "Certificates of Participation" has the same meaning given to that term in paragraph 12 of the Complaint.

11.     "Syncora's June 17, 2013" letter means the letter from Claude LeBlanc attached as Exhibit D to Kevyn Orr's July 4, 2013 affidavit, attached as Exhibit B.

12.    "Communication" means every contact of any nature, whether oral or written, from one person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other documents concerning such contacts.

13.    "Document" shall have the full meaning ascribed to it by Rule 34(a) of the Federal Rules of Civil Procedure, and in particular includes (but is not limited to) every writing or record of every type and description, including letters, correspondence, diaries, memoranda, tapes, electronic data or storage, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures, films, reports, financial statements, applications, emails, and tests, however produced or reproduced, in E&Y's possession, custody, or control. "Document" also includes all copies and drafts of every writing or record when the copy or draft is not identical to the original.

14.    "Concerning," "relating to," and "referring to" are synonymous for the purposes of these Requests, and mean reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, contradicting, incorporating, affecting, including or otherwise pertaining—either directly or indirectly—to the subject matter of the inquiry.

15.    The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive. The singular form of a noun or pronoun includes the plural form and vice versa.

16.    The terms "including," "include" or "includes" mean including, but not limited to.

17.    The terms "each," "any," and "all" shall be construed to mean "each and every."

18.    The use of the singular form of a noun includes the plural form, and vice versa.

## <u>INSTRUCTIONS</u>

1.       Each Request extends to all documents in E&Y's possession, custody, or control or in the possession, custody, or control of anyone acting on E&Y's behalf.  A document is to be deemed in E&Y's possession, custody, or control if it is in E&Y's physical custody, or if it is in the physical custody of any person and E&Y (i) owns such document in whole or in part; (ii) has a right, by contract, statute, or otherwise to use, inspect, examine, or copy such document on any terms; (iii) has an understanding, express or implied, that E&Y may use, inspect, examine, or copy such document on any terms; or (iv) has, as a practical matter, been able to use, inspect, examine or copy such document when E&Y sought to do so.

2.       If the location of any requested document is known but the document is not produced on the ground that the document is not in E&Y's possession, custody, or control, identify the document and identify the person believed to have possession, custody, or control of the document.

3.       The response shall expressly indicate if no responsive documents are known to exist.

4.       The original of each document requested herein shall be produced together with any drafts, revisions, or copies of the same that bear any mark or notation not present in the original or that otherwise differ from the original.

5.       All documents should be produced in their entirety without redaction and should include all attachments and enclosures.  Documents that are attached to each other should not be separated.

6.       The response should state whether E&Y will produce documents as they are kept in the usual course of business or organized and labeled to correspond with the categories in the Request.

3

7.      The response to each Request shall state, with respect to each item or category, that production will be made or inspection will be permitted as requested, unless the Request is objected to, in which event the reason(s) for objection shall be stated.  If objection is made to part of a Request, the part shall be specified; documents responsive to the remainder of the Request shall be produced.  Any such objection shall not extend the time within which E&Y must otherwise respond to a Request to which no specific objection has been made.

8.      With respect to any documents or information withheld on a claim of attorney–client privilege, the attorney work product doctrine, or any other applicable privilege, the response shall provide an express statement of the asserted privilege that includes the following information: (i) the applicable date; (ii) the identity of the author(s), including the business or legal title(s) or position(s); (iii) the identity of the recipient(s), including business or legal title(s) or position(s); (iv) the subject matter of the document; (v) the identity of all other persons who received copies; and (vi) the specific factual basis of the claimed privilege or other protection from discovery.

9.      Each Request shall operate and be construed independently and, unless otherwise stated, no request limits the scope of any other request.

10.     In responding to any of these Requests, set forth any matter deemed ambiguous and the construction used in answering the Request.  These requests are to be liberally construed, and any doubts about whether a document is responsive to these Requests should be resolved in favor of production.

11.     These Requests shall be deemed continuing in nature to the extent permitted by Rule 26(e) of the Federal Rules of Civil Procedure.

4

## DOCUMENT REQUESTS

1.      All documents or communications relating to the City's use of the gambling revenues remitted to them from the General Receipts Subaccount prior to June 14, 2013.

2.      All documents or communications relating to the City's potential uses of the gambling revenues remitted to them from the General Receipts Subaccount.

3.      All documents or communications relating to Syncora's insurance of the Certificates of Participation and Swaps.

4.      All documents or communications relating to the harm the City claims it will experience due to Syncora's actions.

5.      All documents or communications relating to the City's attempts to realize additional sources of cash or revenue.

6.      All documents or communications relating to the City's June 14, 2013 decision to not make a payment to the Service Corporations.

7.      All documents or communications relating to the current or potential uses of the approximately $40 million that the City decided not to pay to the Service Corporations.

8.      All documents or communication relating to the City's Swap termination obligations to the Service Corporations.

9.      All documents and communications relating to the casino taxes and developer payments that the City has received and expects to receive.

10.     All documents or communications relating to or supporting the "ten-year projections" in paragraph 25 of the Complaint.

11.     All documents or communications relating to the City's ongoing negotiations and proposed settlements between the City and its Stakeholders.  (*See, e.g.,* Compl. ¶ 39.)

5

12.     All documents or communications relating to the City's efforts and abilities to deliver municipal services.

13.     Documents and communications sufficient to show the City's available cash-on-hand as of June, 2013 and the previous 12 months.

14.     Documents and communications sufficient to show that the City is expected to run out of funds by December 31, 2013.

15.     All documents and communications relating to the impact of the "cash trap" effectuated by U.S. Bank.

16.     All documents and communications relating to the City's claim that it will lose unique and irreplaceable opportunities if it cannot quickly reach settlements with its stakeholders.

17.     All documents and communications relating to the "comprehensive plan" referenced in paragraph 4 of Kevyn Orr's Affidavit.

18.     All documents and communications relating to Syncora's rights under the Collateral Agreement.

19.     All documents and communications relating to the impact of the cash trap on the City's provision of municipal services.

Dated:  July __, 2013                              Respectfully submitted,

                                                   By: _____

Stephen C. Hackney                                      Gerard V. Mantese
Ryan Blaine Bennett                                     Mantese Honigman Rossman and
William E. Arnault                                      Williamson, P.C.
Lally A. Gartel                                         1361 East Big Beaver Road
KIRKLAND & ELLIS LLP                                    Troy, Michigan 48083
300 North LaSalle                                       Phone: 248-457-9200
Chicago, Illinois 60654                                 Fax: 248-457-9201
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*ATTORNEYS FOR DEFENDANT*                               *ATTORNEYS FOR DEFENDANT*
*SYNCORA GUARANTEE INC.*                                *SYNCORA GUARANTEE INC.*

## Schedule A to Third-Party Subpoena to Jones Day LLP

### DEFINITIONS

1.      The term "you," "your," or "Jones Day" means Jones Day LLP.

2.      The term "The City of Detroit" or "the City" means the City of Detroit, or any other persons or entities acting or purporting to act for or on its behalf, including but not limited to Emergency Manager Kevyn Orr and his advisors.

3.      The term "Complaint" means the July 5, 2013 Verified Complaint filed by Plaintiff in the Circuit Court for the County of Wayne in Case No. 13-00858-CZ, attached as Exhibit A.

4.      The term "Syncora" means Syncora Guarantee Inc.

5.      The term "Swap Counterparties" means UBS AG, SBS Financial Products Company, LLC, and Merrill Lynch Capital Services, Inc.

6.      "Service Corporations" means the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation.

7.      "U.S. Bank" means U.S. Bank National Association.

8.      The term "Swaps" has the same meaning given to that term in paragraph 14 of the Complaint.

9.      The term "Service Contracts" has the same meaning given to that term in paragraph 12 of the Complaint.

10.      The term "Certifications of Participation" has the same meaning given to that term in paragraph 12 of the Complaint.

11.      "Syncora's June 17, 2013" letter means the letter from Claude LeBlanc attached as Exhibit D to Kevyn Orr's July 4, 2013 affidavit, attached as Exhibit B.

12.     "Communication" means every contact of any nature, whether oral or written, from one person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other documents concerning such contacts.

13.     "Document" shall have the full meaning ascribed to it by Rule 34(a) of the Federal Rules of Civil Procedure, and in particular includes (but is not limited to) every writing or record of every type and description, including letters, correspondence, diaries, memoranda, tapes, electronic data or storage, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures, films, reports, financial statements, applications, emails, and tests, however produced or reproduced, in Jones Day's possession, custody, or control.  "Document" also includes all copies and drafts of every writing or record when the copy or draft is not identical to the original.

14.     "Concerning," "relating to," and "referring to" are synonymous for the purposes of these Requests, and mean reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, contradicting, incorporating, affecting, including or otherwise pertaining—either directly or indirectly—to the subject matter of the inquiry.

15.     The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The singular form of a noun or pronoun includes the plural form and vice versa.

16.     The terms "including," "include" or "includes" mean including, but not limited to.

17.     The terms "each," "any," and "all" shall be construed to mean "each and every."

18.     The use of the singular form of a noun includes the plural form, and vice versa.

## INSTRUCTIONS

1.     Each Request extends to all documents in Jones Day's possession, custody, or control or in the possession, custody, or control of anyone acting on Jones Day's behalf.  A document is to be deemed in Jones Day's possession, custody, or control if it is in Jones Day's physical custody, or if it is in the physical custody of any person and Jones Day (i) owns such document in whole or in part; (ii) has a right, by contract, statute, or otherwise to use, inspect, examine, or copy such document on any terms; (iii) has an understanding, express or implied, that Jones Day may use, inspect, examine, or copy such document on any terms; or (iv) has, as a practical matter, been able to use, inspect, examine or copy such document when Jones Day sought to do so.

2.     If the location of any requested document is known but the document is not produced on the ground that the document is not in Jones Day's possession, custody, or control, identify the document and identify the person believed to have possession, custody, or control of the document.

3.     The response shall expressly indicate if no responsive documents are known to exist.

4.     The original of each document requested herein shall be produced together with any drafts, revisions, or copies of the same that bear any mark or notation not present in the original or that otherwise differ from the original.

5.     All documents should be produced in their entirety without redaction and should include all attachments and enclosures.  Documents that are attached to each other should not be separated.

3

6.      The response should state whether Jones Day will produce documents as they are kept in the usual course of business or organized and labeled to correspond with the categories in the Request.

7.      The response to each Request shall state, with respect to each item or category, that production will be made or inspection will be permitted as requested, unless the Request is objected to, in which event the reason(s) for objection shall be stated. If objection is made to part of a Request, the part shall be specified; documents responsive to the remainder of the Request shall be produced. Any such objection shall not extend the time within which Jones Day must otherwise respond to a Request to which no specific objection has been made.

8.      With respect to any documents or information withheld on a claim of attorney–client privilege, the attorney work product doctrine, or any other applicable privilege, the response shall provide an express statement of the asserted privilege that includes the following information: (i) the applicable date; (ii) the identity of the author(s), including the business or legal title(s) or position(s); (iii) the identity of the recipient(s), including business or legal title(s) or position(s); (iv) the subject matter of the document; (v) the identity of all other persons who received copies; and (vi) the specific factual basis of the claimed privilege or other protection from discovery.

9.      Each Request shall operate and be construed independently and, unless otherwise stated, no request limits the scope of any other request.

10.     In responding to any of these Requests, set forth any matter deemed ambiguous and the construction used in answering the Request.  These requests are to be liberally construed, and any doubts about whether a document is responsive to these Requests should be resolved in favor of production.

4

11.     These Requests shall be deemed continuing in nature to the extent permitted by Rule 26(e) of the Federal Rules of Civil Procedure.

## DOCUMENT REQUESTS

1.     All documents or communications relating to the City's negotiations with the Swap Counterparties regarding termination of the Swaps, including, but not limited to, documents and communications relating to:

     a.     The date that the negotiations commenced;

     b.     The participants in any portion of the negotiations;

     c.     The role of the casino revenues in the negotiations;

     d.     The effect of Syncora's June 17, 2013 letter on the negotiations;

     e.     The current and ongoing status of the negotiations;

     f.     The Service Corporations' knowledge of or involvement in the negotiations;

     g.     U.S. Bank's knowledge of or involvement in the negotiations;

     h.     The substance of the negotiations.

2.     All documents or communications relating to the "final settlement" referenced in paragraph 40 of the Complaint.

3.     All documents or communications relating to the City's "promises to stakeholders" as alleged in paragraph 46 of the Verified Complaint.

4.     All documents or communications relating to the City's use of the gambling revenues remitted to them from the General Receipts Subaccount prior to June 14, 2013.

5.     All documents or communications relating to the City's potential uses of the gambling revenues remitted to them from the General Receipts Subaccount.

6.     All documents or communications relating to U.S. Bank's obligations under the Collateral Agreement, including, but not limited to, documents and communications relating to:

5

a.      U.S. Bank's obligations under Section 5.4 of the Collateral Agreement;

b.      U.S. Bank's actions under Section 5.4 of the Collateral Agreement

7.      All documents or communications between the City and the Service Corporations regarding the City and Service Corporations' obligations under the Service Contracts, the Swaps, and the Collateral Agreement.

8.      All documents or communications relating to Syncora's June 17, 2013 letter.

9.      All documents or communications relating to Syncora's insurance of the Certificates of Participation and Swaps.

10.     All documents or communications relating to the harm the City claims it will experience due to Syncora's actions.

11.     All documents or communications relating to the City's attempts to realize additional sources of cash or revenue.

12.     All documents or communications relating to the City's June 14, 2013 decision to not make a payment to the Service Corporations.

13.     All documents or communications relating to the current or potential uses of the approximately $40 million that the City decided not to pay to the Service Corporations.

14.     All documents or communication relating to the City's Swap termination obligations to the Service Obligations.

15.     All documents or communications relating to the casino taxes and developer payments that the City has received and expects to receive.

16.     All documents or communications relating to any termination events or events of default under the Collateral Agreement.

17.     All documents or communications relating to or supporting the "ten-year projections" in paragraph 25 of the Complaint.

6

18.     All documents or communications relating to the City's ongoing negotiations and proposed settlements between the City and its Stakeholders.  (*See, e.g.,* Compl. ¶ 39.)

19.     All documents or communications relating to the City's efforts and abilities to deliver municipal services.

20.     All documents or communications relating to the City's allegation that Syncora acted in bad faith and without legal justification.

21.     Documents or communications sufficient to show the City's available cash-on-hand as of June, 2013 and the previous 12 months.

22.     Documents or communications sufficient to show that the City is expected to run out of funds by December 31, 2013.

23.     All documents or communications relating to the impact of the "cash trap" effectuated by U.S. Bank.

24.     All documents or communications relating to the City's claim that it will lose unique and irreplaceable opportunities if it cannot quickly reach settlements with its stakeholders.

25.     All documents or communications relating to the "comprehensive plan" referenced in paragraph 4 of Kevyn Orr's Affidavit.

26.     All documents or communications relating to Syncora's rights under the Collateral Agreement.

27.     All documents or communications relating to the impact of the cash trap on the City's provision of municipal services.

28.     All documents or communications relating to the irreparable harm the City would have suffered if it had given notice to Syncora's counsel of the hearing on the City's Motion for

7

an *Ex Parte* Temporary Restraining Order and an Order to Show Cause Why a Preliminary Injunction Should Not Issue.

      29.    All documents or communications relating to the allegations in paragraphs 53-61, 63-68, 70-73, and 74-79 of the Complaint.

      30.    All documents or communications relating to the damages the City alleges it suffered as a result of Syncora's actions.

8

Dated:  July __, 2013

Respectfully submitted,

By: _____

| | |
|---|---|
| Stephen C. Hackney | Gerard V. Mantese |
| Ryan Blaine Bennett | Mantese Honigman Rossman and |
| William E. Arnault | Williamson, P.C. |
| Lally A. Gartel | 1361 East Big Beaver Road |
| KIRKLAND & ELLIS LLP | Troy, Michigan 48083 |
| 300 North LaSalle | Phone: 248-457-9200 |
| Chicago, Illinois 60654 | Fax: 248-457-9201 |
| Telephone: (312) 862-2000 | |
| Facsimile: (312) 862-2200 | |

*ATTORNEYS FOR DEFENDANT
SYNCORA GUARANTEE INC.*

*ATTORNEYS FOR DEFENDANT
SYNCORA GUARANTEE INC.*

**Schedule A to Third-Party Subpoena to SBS Financial Products Company, LLC**

**DEFINITIONS**

1.      The terms "you," "your," or "SBS" shall mean SBS Financial Products Company, LLC, or any other persons or entities acting or purporting to act for or on its behalf.

2.      The terms "The City of Detroit" or "the City" mean the City of Detroit, or any other persons or entities acting or purporting to act for or on its behalf, including but not limited to Emergency Manager Kevyn Orr and his advisors.

3.      The term "Complaint" means the July 5, 2013 Verified Complaint filed by the City in the Circuit Court for the County of Wayne in Case No. 13-00858-CZ, attached as Exhibit A.

4.      The term "Syncora" means Syncora Guarantee Inc.

5.      The term "Swap Counterparties" means UBS AG, SBS Financial Products Company, LLC, and Merrill Lynch Capital Services, Inc.

6.      "Service Corporations" means the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation.

7.      "U.S. Bank" means U.S. Bank National Association.

8.      The term "Swaps" has the same meaning given to that term in paragraph 14 of the Complaint, but extends to and includes any amendments to the Swaps.

9.      The term "Service Contracts" has the same meaning given to that term in paragraph 12 of the Complaint.

10.      The term "Certificates of Participation" has the same meaning given to that term in paragraph 12 of the Complaint.

11.     "Syncora's June 17, 2013" letter means the letter from Claude LeBlanc attached as Exhibit D to Kevyn Orr's July 4, 2013 affidavit, attached as Exhibit B.

12.     "Communication" means every contact of any nature, whether oral or written, from one person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other documents concerning such contacts.

13.     "Document" shall have the full meaning ascribed to it by Rule 34(a) of the Federal Rules of Civil Procedure, and in particular includes (but is not limited to) every writing or record of every type and description, including letters, correspondence, diaries, memoranda, tapes, electronic data or storage, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures, films, reports, financial statements, applications, emails, and tests, however produced or reproduced, in SBS's possession, custody, or control.  "Document" also includes all copies and drafts of every writing or record when the copy or draft is not identical to the original.

14.     "Concerning," "relating to," and "referring to" are synonymous for the purposes of these Requests, and mean reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, contradicting, incorporating, affecting, including or otherwise pertaining—either directly or indirectly—to the subject matter of the inquiry.

15.     The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The singular form of a noun or pronoun includes the plural form and vice versa.

16.     The terms "including," "include" or "includes" mean including, but not limited to.

2

17.     The terms "each," "any," and "all" shall be construed to mean "each and every."

18.     The use of the singular form of a noun includes the plural form, and vice versa.

## INSTRUCTIONS

1.     Each Request extends to all documents in SBS's possession, custody, or control or in the possession, custody, or control of anyone acting on SBS's behalf.  A document is to be deemed in SBS's possession, custody, or control if it is in SBS's physical custody, or if it is in the physical custody of any person and SBS (i) owns such document in whole or in part; (ii) has a right, by contract, statute, or otherwise to use, inspect, examine, or copy such document on any terms; (iii) has an understanding, express or implied, that SBS may use, inspect, examine, or copy such document on any terms; or (iv) has, as a practical matter, been able to use, inspect, examine or copy such document when SBS sought to do so.

2.     If the location of any requested document is known but the document is not produced on the ground that the document is not in SBS's possession, custody, or control, identify the document and identify the person believed to have possession, custody, or control of the document.

3.     The response shall expressly indicate if no responsive documents are known to exist.

4.     The original of each document requested herein shall be produced together with any drafts, revisions, or copies of the same that bear any mark or notation not present in the original or that otherwise differ from the original.

5.     All documents should be produced in their entirety without redaction and should include all attachments and enclosures.  Documents that are attached to each other should not be separated.

6.    The response should state whether SBS will produce documents as they are kept in the usual course of business or organized and labeled to correspond with the categories in the Request.

7.    The response to each Request shall state, with respect to each item or category, that production will be made or inspection will be permitted as requested, unless the Request is objected to, in which event the reason(s) for objection shall be stated.  If objection is made to part of a Request, the part shall be specified; documents responsive to the remainder of the Request shall be produced. Any such objection shall not extend the time within which SBS must otherwise respond to a Request to which no specific objection has been made.

8.    With respect to any documents or information withheld on a claim of attorney–client privilege, the attorney work product doctrine, or any other applicable privilege, the response shall provide an express statement of the asserted privilege that includes the following information: (i) the applicable date; (ii) the identity of the author(s), including the business or legal title(s) or position(s); (iii) the identity of the recipient(s), including business or legal title(s) or position(s); (iv) the subject matter of the document; (v) the identity of all other persons who received copies; and (vi) the specific factual basis of the claimed privilege or other protection from discovery.

9.    Each Request shall operate and be construed independently and, unless otherwise stated, no request limits the scope of any other request.

10.    In responding to any of these Requests, set forth any matter deemed ambiguous and the construction used in answering the Request.  These requests are to be liberally construed, and any doubts about whether a document is responsive to these Requests should be resolved in favor of production.

11.     These Requests shall be deemed continuing in nature to the extent permitted by Rule 26(e) of the Federal Rules of Civil Procedure.

## **DOCUMENT REQUESTS**

1.      All documents or communications relating to the City's negotiations with the Swap Counterparties regarding termination of the Swaps, including, but not limited to, documents and communications relating to:

      a.      The date that the negotiations commenced;

      b.      The participants in any portion of the negotiations;

      c.      The role of the casino revenues in the negotiations;

      d.      The effect of Syncora's June 17, 2013 letter on the negotiations;

      e.      The current and ongoing status of the negotiations;

      f.      The Service Corporations' knowledge of or involvement in the negotiations;

      g.      U.S. Bank's knowledge of or involvement in the negotiations;

      h.      The substance of the negotiations.

2.      All documents or communications relating to the "final settlement" referenced in paragraph 40 of the Complaint.

3.      All documents or communications relating to U.S. Bank's obligations under the Collateral Agreement, including, but not limited to, documents and communications relating to:

      a.      U.S. Bank's obligations under Section 5.4 of the Collateral Agreement;

      b.      U.S. Bank's actions under Section 5.4 of the Collateral Agreement

4.      All documents or communications relating to Syncora's June 17, 2013 letter.

5.      All documents or communications relating to Syncora's insurance of the Certificates of Participation and Swaps.

5

6.      All documents or communications relating to the City's attempts to realize additional sources of cash or revenue.

7.      All documents or communication relating to the City's Swap termination obligations to the Service Corporations.

8.      All documents or communications relating to any termination events or events of default under the Collateral Agreement.

9.      All documents and communications relating to the impact of the "cash trap" effectuated by U.S. Bank.

10.      All documents and communications relating to Syncora's rights under the Collateral Agreement.

11.      All documents or communications relating to any waivers that U.S. Bank received regarding the provisions in the Collateral Agreement.

Dated:  July __, 2013                      Respectfully submitted,

                                  By: _____

Stephen C. Hackney                       Gerard V. Mantese
Ryan Blaine Bennett                      Mantese Honigman Rossman and
William E. Arnault                       Williamson, P.C.
Lally A. Gartel                          1361 East Big Beaver Road
KIRKLAND & ELLIS LLP                     Troy, Michigan 48083
300 North LaSalle                        Phone: 248-457-9200
Chicago, Illinois 60654                  Fax: 248-457-9201
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*ATTORNEYS FOR DEFENDANT*                 *ATTORNEYS FOR DEFENDANT*
*SYNCORA GUARANTEE INC.*                  *SYNCORA GUARANTEE INC.*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CITY OF DETROIT, a Municipal
Corporation Organized and Existing
Under the Laws of the State of Michigan,

         Plaintiff,

    v.

SYNCORA GUARANTEE INC.,
a New York corporation,

and

U.S. BANK, N.A.,

    Case No.: 2:13-cv-12987-LPZ-MKM

and

    Hon. Lawrence P. Zatkoff

MGM GRAND DETROIT, LLC,

and

DETROIT ENTERTAINMENT, LLC
d/b/a MOTORCITY CASINO HOTEL,

and

GREEKTOWN CASINO, LLC,

         Defendants.

## DEFENDANT SYNCORA GUARANTEE INC.'S
## FIRST SET OF DOCUMENT REQUESTS TO U.S. BANK

      Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant Syncora

Guarantee, Inc. ("Syncora") requests that Defendant U.S. Bank, N.A. ("U.S. Bank") produce for

its inspection and copying all documents and tangible things requested below in accordance with

the Definitions and Instructions set forth below at the offices of their counsel, Mantese

Honigman Rossman and Williamson, P.C., 1361 E. Big Beaver Rd., Troy, Michigan 48083, by July 18, 2013. Each of the following requests is continuing in nature, such that if U.S. Bank obtains or discovers additional responsive documents and things at a later date, such documents and things are to be made available to defendant for inspection and copying.

## DEFINITIONS

1.      The terms "you" or "U.S. Bank" or U.S. Bank National Association, or any other persons or entities acting or purporting to act for or on its behalf.

2.      The terms "The City of Detroit" or "The City" mean Plaintiff City of Detroit, or any other persons or entities acting or purporting to act for or on its behalf, including but not limited to Emergency Manager Kevyn Orr and his advisors.

3.      The term "Complaint" means the July 5, 2013 Verified Complaint filed by Plaintiff in the Circuit Court for the County of Wayne in Case No. 13-00858-CZ.

4.      The term "Syncora" means Syncora Guarantee Inc., the defendant.

5.      The term "Swap Counterparties" means UBS AG, SBS Financial Products Company, LLC, and Merrill Lynch Capital Services, Inc.

6.      "Service Corporations" means the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation.

7.      The term "Service Contracts" has the same meaning given to that term in paragraph 12 of the Complaint.

8.      The term "Swaps" has the same meaning given to that term in paragraph 14 of the Complaint, but extends to and includes any amendments to the Swaps.

9.      The term "Certificates of Participation" has the same meaning given to that term in paragraph 12 of the Complaint.

10. "Syncora's June 17, 2013" letter means the letter from Claude LeBlanc attached as Exhibit D to Kevyn Orr's July 4, 2013 affidavit.

11. "Syncora's June 24, 2013" letter means the letter from Ryan Bennett attached as Exhibit F to Kevyn Orr's July 4, 2013 affidavit.

12. "U.S. Bank's June 24, 2013" email means the email from William Smith attached as Exhibit E to Kevyn Orr's July 4, 2013 affidavit.

13. "Communication" means every contact of any nature, whether oral or written, from one person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other documents concerning such contacts.

14. "Document" shall have the full meaning ascribed to it by Rule 34(a) of the Federal Rules of Civil Procedure, and in particular includes (but is not limited to) every writing or record of every type and description, including letters, correspondence, diaries, memoranda, tapes, electronic data or storage, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures, films, reports, financial statements, applications, emails, and tests, however produced or reproduced, in U.S. Bank's possession, custody, or control. "Document" also includes all copies and drafts of every writing or record when the copy or draft is not identical to the original.

15. "Concerning," "relating to," and "referring to" are synonymous for the purposes of these Requests, and mean reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, contradicting,

incorporating, affecting, including or otherwise pertaining—either directly or indirectly—to the subject matter of the inquiry.

16.     The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The singular form of a noun or pronoun includes the plural form and vice versa.

17.     The terms "including," "include" or "includes" mean including, but not limited to.

18.     The terms "each," "any," and "all" shall be construed to mean "each and every."

19.     The use of the singular form of a noun includes the plural form, and vice versa.

## INSTRUCTIONS

1.     Each Request extends to all documents in U.S. Bank's possession, custody, or control or in the possession, custody, or control of anyone acting on U.S. Bank's behalf.  A document is to be deemed in U.S. Bank's possession, custody, or control if it is in U.S. Bank's physical custody, or if it is in the physical custody of any person and U.S. Bank (i) owns such document in whole or in part; (ii) has a right, by contract, statute, or otherwise to use, inspect, examine, or copy such document on any terms; (iii) has an understanding, express or implied, that U.S. Bank may use, inspect, examine, or copy such document on any terms; or (iv) has, as a practical matter, been able to use, inspect, examine or copy such document when U.S. Bank sought to do so.

2.     If the location of any requested document is known but the document is not produced on the ground that the document is not in U.S. Bank's possession, custody, or control, identify the document and identify the person believed to have possession, custody, or control of the document.

3.     The response shall expressly indicate if no responsive documents are known to exist.

4.     The original of each document requested herein shall be produced together with any drafts, revisions, or copies of the same that bear any mark or notation not present in the original or that otherwise differ from the original.

5.     All documents should be produced in their entirety without redaction and should include all attachments and enclosures.  Documents that are attached to each other should not be separated.

6.     The response should state whether U.S. Bank will produce documents as they are kept in the usual course of business or organized and labeled to correspond with the categories in the Request.

7.     The response to each Request shall state, with respect to each item or category, that production will be made or inspection will be permitted as requested, unless the Request is objected to, in which event the reason(s) for objection shall be stated.  If objection is made to part of a Request, the part shall be specified; documents responsive to the remainder of the Request shall be produced.  Any such objection shall not extend the time within which U.S. Bank must otherwise respond to a Request to which no specific objection has been made.

8.     With respect to any documents or information withheld on a claim of attorney–client privilege, the attorney work product doctrine, or any other applicable privilege, the response shall provide an express statement of the asserted privilege that includes the following information: (i) the applicable date; (ii) the identity of the author(s), including the business or legal title(s) or position(s); (iii) the identity of the recipient(s), including business or legal title(s) or position(s); (iv) the subject matter of the document; (v) the identity of all other persons who received copies; and (vi) the specific factual basis of the claimed privilege or other protection from discovery.

5

9.      Each Request shall operate and be construed independently and, unless otherwise stated, no request limits the scope of any other request.

10.     In responding to any of these Requests, set forth any matter deemed ambiguous and the construction used in answering the Request.  These requests are to be liberally construed, and any doubts about whether a document is responsive to these Requests should be resolved in favor of production.

11.     These Requests shall be deemed continuing in nature to the extent permitted by Rule 26(e) of the Federal Rules of Civil Procedure.

### DOCUMENT REQUESTS

1.      All documents or communications relating to U.S. Bank's obligations under the Collateral Agreement, including, but not limited to, documents and communications relating to:

      a.      U.S. Bank's obligations under Section 5.4 of the Collateral Agreement;

      b.      U.S. Bank's actions under Section 5.4 of the Collateral Agreement

2.      All documents or communications relating to U.S. Bank's knowledge of or involvement in any negotiations occurring between the City and the Swap Counterparties.

3.      All documents or communications relating to the City's negotiations with the Swap Counterparties regarding termination of the Swaps.

4.      All documents or communications relating to Syncora's June 17, 2013 letter.

5.      All documents or communications relating to Syncora's June 24, 2013 letter.

6.      All documents or communications relating to U.S. Bank's June 24, 2013 email.

7.      All documents or communications relating to Syncora's rights under the Collateral Agreement.

8.      All documents or communications relating to any termination events or events of default under the Collateral Agreement.

6

9.      All documents or communications relating to the "cash trap" effectuated by U.S. Bank.

10.     All documents or communications relating to any waivers that U.S. Bank received regarding the provisions in the Collateral Agreement.

Dated:  July __, 2013                              Respectfully submitted,

                                         By: _____

Stephen C. Hackney                           Gerard V. Mantese
Ryan Blaine Bennett                          Mantese Honigman Rossman and
William E. Arnault                           Williamson, P.C.
Lally A. Gartel                              1361 East Big Beaver Road
KIRKLAND & ELLIS LLP                         Troy, Michigan 48083
300 North LaSalle                            Phone: 248-457-9200
Chicago, Illinois 60654                      Fax: 248-457-9201
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*ATTORNEYS FOR DEFENDANT*                     *ATTORNEYS FOR DEFENDANT*
*SYNCORA GUARANTEE INC.*                      *SYNCORA GUARANTEE INC.*

## Schedule A to 30(b)(6) Deposition of Detroit General Retirement System Service Corporation

### INSTRUCTIONS

1.     Pursuant to Rule 30(b)(6), Detroit General Retirement System Service Corporation ("DGRS Service Corporation") is required to designate and produce one or more officers, directors, managing agents, or other persons who consent to testify on its behalf with respect to the matters set forth below.  The person(s) so designated shall be required to testify as to each of those matters known or reasonably available to DGRS Service Corporation.

### DEFINITIONS

1.     The terms "you," "your," or "GRS Service Corporation" mean the Detroit General Retirement System Service Corporation, or any other persons or entities acting or purporting to act for or on its behalf.

2.     The terms "The City of Detroit" or "The City" mean the City of Detroit, or any other persons or entities acting or purporting to act for or on its behalf, including but not limited to Emergency Manager Kevyn Orr and his advisors.

3.     The term "Complaint" means the July 5, 2013 Verified Complaint filed by Plaintiff in the Circuit Court for the County of Wayne in Case No. 13-00858-CZ, attached as Exhibit A.

4.     The term "Syncora" means Syncora Guarantee Inc.

5.     The term "Swap Counterparties" means UBS AG, SBS Financial Products Company, LLC, and Merrill Lynch Capital Services, Inc.

6.     "Service Corporations" means the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation.

7.     "U.S. Bank" means U.S. Bank National Association.

8.     The term "Swaps" has the same meaning given to that term in paragraph 14 of the Complaint, but extends to and includes any amendments to the Swaps.

9.     The term "Service Contracts" has the same meaning given to that term in paragraph 12 of the Complaint.

10.    The term "Certificates of Participation" has the same meaning given to that term in paragraph 12 of the Complaint.

11.    "Syncora's June 17, 2013" letter means the letter from Claude LeBlanc attached as Exhibit D to Kevyn Orr's July 4, 2013 affidavit, attached as Exhibit B.

12.     "Communication" means every contact of any nature, whether oral or written, from one person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other documents concerning such contacts.

13.    "Concerning," "relating to," and "referring to" are synonymous for the purposes of these Requests, and mean reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, contradicting, incorporating, affecting, including or otherwise pertaining—either directly or indirectly—to the subject matter of the inquiry.

14.    The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The singular form of a noun or pronoun includes the plural form and vice versa.

15.    The terms "including," "include" or "includes" mean including, but not limited to.

16.    The terms "each," "any," and "all" shall be construed to mean "each and every."

17.     The use of the singular form of a noun includes the plural form, and vice versa.

## **DEPOSITION TOPICS**

1.      Any discussions between the City and DGRS Service Corporation regarding the obligations of the City and the Service Corporations under the Certificates of Participation and Swaps.

2.      DGRS Service Corporation's obligations under the Collateral Agreement.

3.      DGRS Service Corporation's knowledge of and involvement in any negotiations between the City and the Swap Counterparties.

4.      Communications between the DGRS Service Corporation and the City concerning Syncora, Syncora's letter dated June 17, 2013, or any other matter relating to Syncora's insurance of the Certificates of Participation or the swaps.

5.      Kevyn Orr's authority with respect to the Service Corporations.

## Schedule A to 30(b)(6) Deposition of the Detroit Police and Fire Retirement System Service Corporation

### INSTRUCTIONS

1.     Pursuant to Rule 30(b)(6), Detroit Police and Fire Retirement System Service Corporation ("DPRFS Service Corporation") is required to designate and produce one or more officers, directors, managing agents, or other persons who consent to testify on its behalf with respect to the following matters set forth below.  The person(s) so designated shall be required to testify as to each of those matters known or reasonably available to DPRFS Service Corporation.

### DEFINITIONS

1.     The terms "you," "your," or "PFRS Service Corporation" means the Detroit Police and Fire Retirement System Service Corporation, or any persons or entities acting or purporting to act for or on its behalf.

2.     The term "The City of Detroit" or "the City" means City of Detroit, or any other persons or entities acting or purporting to act for or on its behalf, including but not limited to Emergency Manager Kevyn Orr and his advisors.

3.     The term "Complaint" means the July 5, 2013 Verified Complaint filed by Plaintiff in the Circuit Court for the County of Wayne in Case No. 13-00858-CZ, attached as Exhibit A.

4.     The term "Syncora" means Syncora Guarantee Inc.

5.     The term "Swap Counterparties" means UBS AG, SBS Financial Products Company, LLC, and Merrill Lynch Capital Services, Inc.

6.     "Service Corporations" means the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation.

7.     "U.S. Bank" means U.S. Bank National Association.

8.      The term "Swaps" has the same meaning given to that term in paragraph 12 of the Complaint, but extends to and includes any amendments to the Swaps.

9.      The term "Service Contracts" has the same meaning given to that term in paragraph 12 of the Complaint.

10.     The term "Certificates of Participation" has the same meaning given to that term in paragraph 12 of the Complaint.

11.     "Syncora's June 17, 2013" letter means the letter from Claude LeBlanc attached as Exhibit D to Kevyn Orr's July 4, 2013 affidavit, attached as Exhibit B.

12.      "Communication" means every contact of any nature, whether oral or written, from one person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other documents concerning such contacts.

13.     "Concerning," "relating to," and "referring to" are synonymous for the purposes of these Requests, and mean reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, contradicting, incorporating, affecting, including or otherwise pertaining—either directly or indirectly—to the subject matter of the inquiry.

14.     The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The singular form of a noun or pronoun includes the plural form and vice versa.

15.     The terms "including," "include" or "includes" mean including, but not limited to.

16.     The terms "each," "any," and "all" shall be construed to mean "each and every."

17.     The use of the singular form of a noun includes the plural form, and vice versa.

## DEPOSITION TOPICS

1.     Any discussions between the City and DPRFS Service Corporation regarding the obligations of the City and the Service Corporations under the Certificates of Participation and Swaps.

2.     DPRFS Service Corporation's obligations under the Collateral Agreement.

3.     DPRFS Service Corporation's knowledge of and involvement in any negotiations between the City and the Swap Counterparties.

4.     Communications between the DPRFS Service Corporation and the City concerning Syncora, Syncora's letter dated June 17, 2013, or any other matter relating to Syncora's insurance of the Certificates of Participation or the Swaps.

5.     Kevin Orr's authority with respect to the Service Corporations.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

CITY OF DETROIT,
a Municipal Corporation Organized
and Existing Under the Laws of the
State of Michigan,

              Plaintiff,

     v.

SYNCORA GUARANTEE INC.,
a New York Corporation,

and

U.S. BANK, N.A.,

and

MGM GRAND DETROIT, LLC,

and

DETROIT ENTERTAINMENT, LLC,
d/b/a MOTORCITY CASINO HOTEL,

and

GREEKTOWN CASINO, LLC,

              Defendants.

Case No.:  2:13-cv-12987-LPZ-MKM

Hon. Lawrence P. Zatkoff

<u>**DEFENDANT SYNCORA GUARANTEE INC.'S NOTICE OF
DEPOSITION OF KEVYN D. ORR**</u>

PLEASE TAKE NOTICE THAT, pursuant to Rule 30 of the Federal Rules of Civil

Procedure, defendant Syncora Guarantee Inc. ("Syncora") will take deposition upon oral

examination of Kevyn D. Orr at 9:00 am EST on July 23, 2013 at the law offices of Mantese

Honigman Rossman and Williamson, P.C., 1361 E. Big Beaver Rd., Troy, Michigan 48083 or at

such other time and place as may be agreed upon by counsel for the parties. The deposition will be recorded by videotape and stenographer. The deposition will continue from day to day until completed.

Dated: July __, 2013

Respectfully submitted,

By: _____

Stephen C. Hackney
Ryan Blaine Bennett
William E. Arnault
Lally A. Gartel
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*ATTORNEYS FOR DEFENDANT
SYNCORA GUARANTEE INC.*

Gerard V. Mantese
Mantese Honigman Rossman and
Williamson, P.C.
1361 East Big Beaver Road
Troy, Michigan 48083
Phone: 248-457-9200
Fax: 248-457-9201

*ATTORNEYS FOR DEFENDANT
SYNCORA GUARANTEE INC.*

2

### Schedule A to 30(b)(6) Deposition of
### SBS Financial Products Company, LLC

## INSTRUCTIONS

1.      Pursuant to Rule 30(b)(6), SBS Financial Products Company, LLC ("SBS") is required to designate and produce one or more officers, directors, managing agents, or other persons who consent to testify on its behalf with respect to the matters set forth in Schedule A. The person(s) so designated shall be required to testify as to each of those matters known or reasonably available to SBS

## DEFINITIONS

1.      The terms "you" or "SBS" shall mean SBS Financial Products Company, LLC.

2.      The terms "The City of Detroit" or "The City" mean the City of Detroit, or any other persons or entities acting or purporting to act for or on its behalf, including, but not limited to, Emergency Manager Kevyn Orr and his advisors.

3.      The term "Complaint" means the July 5, 2013 Verified Complaint filed by the City in the Circuit Court for the County of Wayne in Case No. 13-00858-CZ, attached as Exhibit A.

4.      The term "Syncora" means Syncora Guarantee Inc.

5.      The term "Swap Counterparties" means UBS AG, SBS Financial Products Company, LLC, and Merrill Lynch Capital Services, Inc.

6.      "Service Corporations" means the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation.

7.      "U.S. Bank" means U.S. Bank National Association.

8.      The term "Swaps" has the definition given to that term in paragraph 14 of the Complaint, but extends to and includes any amendments to the Swaps.

9.      The term "Service Contracts" has the same meaning given to that term in paragraph 12 of the Complaint.

10.      The term "Certificates of Participation" has the same meaning given to that term in paragraph 12 of the Complaint.

11.      "Syncora's June 17, 2013" letter means the letter from Claude LeBlanc attached as Exhibit D to Kevyn Orr's July 4, 2013 affidavit, attached as Exhibit B.

12.      "Communication" means every contact of any nature, whether oral or written, from one person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other documents concerning such contacts.

13.      "Concerning," "relating to," and "referring to" are synonymous for the purposes of these Requests, and mean reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, contradicting, incorporating, affecting, including or otherwise pertaining—either directly or indirectly—to the subject matter of the inquiry.

14.      The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The singular form of a noun or pronoun includes the plural form and vice versa.

15.      The terms "including," "include" or "includes" mean including, but not limited to.

16.      The terms "each," "any," and "all" shall be construed to mean "each and every."

17.      The use of the singular form of a noun includes the plural form, and vice versa.

## DEPOSITION TOPICS

1.      The negotiations between UBS, SBS, and the City regarding the termination of the Swaps.

2.      All communications relating to Syncora's June 17, 2013 letter.

3.      Syncora's insurance of the Certificates of Participation and the Swaps.

4.      SBS's consent or negotiation relating to the casino revenues, both prior and subsequent to June 17, 2013.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan, | |
| Plaintiff, | |
| v. | |
| SYNCORA GUARANTEE INC., | |
| and | |
| U.S. BANK, N.A., | Case No.:  2:13-cv-12987-LPZ-MKM |
| and | Hon. Lawrence P. Zatkoff |
| MGM GRAND DETROIT, LLC, | |
| and | |
| DETROIT ENTERTAINMENT, LLC d/b/a MOTORCITY CASINO HOTEL, | |
| and | |
| GREEKTOWN CASINO, LLC, | |
| Defendants. | |

**NOTICE OF DEPOSITION OF U.S. BANK NATIONAL ASSOCIATION**
**PURSUANT TO RULE 30(b)(6)**

PLEASE TAKE NOTICE THAT, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, defendant Syncora Guarantee Inc. ("Syncora") will take the deposition upon oral examination of U.S. Bank National Association ("U.S. Bank") at 9:00 am EST on July 23, 2013 at the law offices of Mantese Honigman Rossman and Williamson, P.C., 1361 E. Big Beaver Rd., Troy, Michigan 48083 or at such other time and place as may be agreed upon by counsel for

the parties.  The deposition will be recorded by videotape and stenographer.  The deposition will continue from day to day until completed.  You are invited to attend and cross-examine the witness(es).

PLEASE TAKE FURTHER NOTICE THAT, pursuant to Rule 30(b)(6), U.S. Bank National Association is required to designate and produce one or more officers, directors, managing agents, or other persons who consent to testify on its behalf with respect to the matters set forth in Schedule A.  The person(s) so designated shall be required to testify as to each of those matters known or reasonably available to U.S. Bank National Association.

Dated:  July __, 2013

Respectfully submitted,

By: _____

Stephen C. Hackney
Ryan Blaine Bennett
William E. Arnault
Lally A. Gartel
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*ATTORNEYS FOR DEFENDANT
SYNCORA GUARANTEE INC.*

Gerard V. Mantese
Mantese Honigman Rossman and
Williamson, P.C.
1361 East Big Beaver Road
Troy, Michigan 48083
Phone: 248-457-9200
Fax: 248-457-9201

*ATTORNEYS FOR DEFENDANT
SYNCORA GUARANTEE INC.*

2

## SCHEDULE A

## DEFINITIONS

1.      The term "you" shall mean "U.S. Bank" or U.S. Bank National Association.

2.      "The City of Detroit" or "The City" means Plaintiff City of Detroit, or any other persons or entities acting or purporting to act for or on its behalf, including but not limited to Emergency Manager Kevyn Orr and his advisors.

3.      The term "Complaint" means the July 5, 2013 Verified Complaint filed by Plaintiff in the Circuit Court for the County of Wayne in Case No. 13-00858-CZ.

4.      The term "Syncora" means Syncora Guarantee Inc., the defendant.

5.      The term "Swap Counterparties" means UBS AG, SBS Financial Products Company, LLC, and Merrill Lynch Capital Services, Inc.

6.      "Service Corporations" means the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation.

7.      The term "Swaps" has the definition given to that term in paragraph 14 of the Complaint, but extends to and includes any amendments to the Swaps.

8.      The term "Certificates of Participation" has the same meaning given to that term in paragraph 12 of the Complaint.

9.      "Syncora's June 17, 2013" letter means the letter from Claude LeBlanc attached as Exhibit D to Kevyn Orr's July 4, 2013 affidavit.

10.      "Syncora's June 24, 2013" letter means the letter from Ryan Bennett attached as Exhibit F to Kevyn Orr's July 4, 2013 affidavit.

11.      "U.S. Bank's June 24, 2013" email means the email from William Smith attached as Exhibit E to Kevyn Orr's July 4, 2013 affidavit.

12.     "Communication" means every contact of any nature, whether oral or written, from one person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other documents concerning such contacts.

13.     "Concerning," "relating to," and "referring to" are synonymous for the purposes of these Requests, and mean reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, contradicting, incorporating, affecting, including or otherwise pertaining—either directly or indirectly—to the subject matter of the inquiry.

14.     The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The singular form of a noun or pronoun includes the plural form and vice versa.

15.     The terms "including," "include" or "includes" mean including, but not limited to.

16.     The terms "each," "any," and "all" shall be construed to mean "each and every."

17.     The use of the singular form of a noun includes the plural form, and vice versa.

## **DEPOSITION TOPICS**

1.     Any discussions within U.S. Bank relating to Syncora, including Syncora's insurance of the Certificates of Participation and the Swaps.

2.     Communications between U.S. Bank and the City, Swap Counterparties, or Service Corporations relating to Syncora, including Syncora's insurance of the Certificates of Participation and the Swaps.

3.      Any negotiations between the City and the Swap Counterparties regarding termination of the swap agreements.

4.      U.S. Bank's understanding of and actions under any Section of the Collateral Agreement, including Section 5.4.

5.      U.S. Bank's understanding of and communications about Syncora's correspondences, including Syncora's letter dated June 17, 2013.

6.      Any allegations in the Complaint in which U.S. Bank is mentioned.

7.      Any allegations in the Complaint with respect to which U.S. Bank has personal knowledge.

8.      Internal and external discussions relating to Syncora's June 17, 2013 letter.

9.      Internal and external discussions relating to Syncora's June 24, 2013 letter.

10.      Internal and external discussions relating to U.S. Bank's June 24, 2013 email.

## Schedule A to 30(b)(6) Deposition of UBS AG

### INSTRUCTIONS

1.      Pursuant to Rule 30(b)(6), UBS AG ("UBS") is required to designate and produce one or more officers, directors, managing agents, or other persons who consent to testify on its behalf with respect to the matters set forth in Schedule A.  The person(s) so designated shall be required to testify as to each of those matters known or reasonably available to UBS.

### DEFINITIONS

1.      The terms "you" or "UBS" shall mean UBS AG, or any other persons or entities acting or purporting to act for or on its behalf.

2.      The terms "The City of Detroit" or "The City" mean the City of Detroit, or any other persons or entities acting or purporting to act for or on its behalf, including but not limited to Emergency Manager Kevyn Orr and his advisors

3.      The term "Complaint" means the July 5, 2013 Verified Complaint filed by Plaintiff in the Circuit Court for the County of Wayne in Case No. 13-00858-CZ, attached as Exhibit A.

4.      The term "Syncora" means Syncora Guarantee Inc.

5.      The term "Swap Counterparties" means UBS AG, SBS Financial Products Company, LLC, and Merrill Lynch Capital Services, Inc.

6.      "Service Corporations" means the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation.

7.      "U.S. Bank" means U.S. Bank National Association.

8.      The term "Swaps" has the same meaning given to that term in paragraph 14 of the Complaint, but extends to and includes any amendments to the Swaps.

9.     The term "Service Contracts" has the same meaning given to that term in paragraph 12 of the Complaint.

10.     The term "Certificates of Participation" has the same meaning given to that term in paragraph 12 of the Complaint.

11.     "Syncora's June 17, 2013" letter means the letter from Claude LeBlanc attached as Exhibit D to Kevyn Orr's July 4, 2013 affidavit, attached as Exhibit B.

12.      "Communication" means every contact of any nature, whether oral or written, from one person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other documents concerning such contacts.

13.     "Concerning," "relating to," and "referring to" are synonymous for the purposes of these Requests, and mean reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, contradicting, incorporating, affecting, including or otherwise pertaining—either directly or indirectly—to the subject matter of the inquiry.

14.     The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The singular form of a noun or pronoun includes the plural form and vice versa.

15.     The terms "including," "include" or "includes" mean including, but not limited to.

16.     The terms "each," "any," and "all" shall be construed to mean "each and every."

17.     The use of the singular form of a noun includes the plural form, and vice versa.

## **DEPOSITION TOPICS**

1.      The negotiations between UBS, SBS, and the City regarding the termination of the Swaps.

2.      All communications relating to Syncora's June 17, 2013 letter.

3.      Syncora's insurance of the Certificates of Participation and the Swaps.

4.      UBS's consent or negotiation relating to the casino revenues, both prior and subsequent to June 17, 2013.

3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CITY OF DETROIT, a Municipal
Corporation Organized and Existing
Under the Laws of the State of Michigan,

        Plaintiff,

    v.

SYNCORA GUARANTEE INC.,

and

U.S. BANK, N.A.,

and

MGM GRAND DETROIT, LLC,

and

DETROIT ENTERTAINMENT, LLC
d/b/a MOTORCITY CASINO HOTEL,

and

GREEKTOWN CASINO, LLC,

        Defendants.

Case No.: 2:13-cv-12987-LPZ-MKM

Hon. Lawrence P. Zatkoff

**NOTICE OF DEPOSITION OF PLAINTIFF CITY OF DETROIT**
**PURSUANT TO RULE 30(b)(6)**

PLEASE TAKE NOTICE THAT, pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, defendant Syncora Guarantee Inc. ("Syncora") will take the deposition upon oral

examination of plaintiff City of Detroit (the "City") at 9:00 am EST on July 22, 2013 at the law

offices of Mantese Honigman Rossman and Williamson, P.C., 1361 E. Big Beaver Rd., Troy,

Michigan 48083 or at such other time and place as may be agreed upon by counsel for the

parties.  The deposition will be recorded by videotape and stenographer.  The deposition will continue from day to day until completed.  You are invited to attend and cross-examine the witness(es).

PLEASE TAKE FURTHER NOTICE THAT, pursuant to Rule 30(b)(6), the City is required to designate and produce one or more officers, directors, managing agents, or other persons who consent to testify on its behalf with respect to the matters set forth in Schedule A. The person(s) so designated shall be required to testify as to each of those matters known or reasonably available to U.S. Bank National Association.

Dated:  July __, 2013                                            Respectfully submitted,

                                                   By: _____

Stephen C. Hackney                                      Gerard V. Mantese
Ryan Blaine Bennett                                     Mantese Honigman Rossman and
William E. Arnault                                      Williamson, P.C.
Lally A. Gartel                                         1361 East Big Beaver Road
KIRKLAND & ELLIS LLP                                    Troy, Michigan 48083
300 North LaSalle                                       Phone: 248-457-9200
Chicago, Illinois 60654                                 Fax: 248-457-9201
Telephone: (312) 862-2000
Facsimile: (312) 862-2200                               *ATTORNEYS FOR DEFENDANT*
                                                        *SYNCORA GUARANTEE INC.*
*ATTORNEYS FOR DEFENDANT*
*SYNCORA GUARANTEE INC.*

## SCHEDULE A

## DEFINITIONS

1.      The terms "you" or "The City of Detroit" or "The City" mean Plaintiff City of Detroit, or any other persons or entities acting or purporting to act for or on its behalf, including but not limited to Emergency Manager Kevyn Orr and his advisors.

2.      The term "Complaint" means the July 5, 2013 Verified Complaint filed by Plaintiff in the Circuit Court for the County of Wayne in Case No. 13-00858-CZ.

3.      The term "Syncora" means Syncora Guarantee Inc..

4.      The term "Swap Counterparties" means UBS AG, SBS Financial Products Company, LLC, and Merrill Lynch Capital Services, Inc., the parties to the Collateral Agreement dated June 15, 2009.

5.      "Service Corporations" means the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation.

6.      "U.S. Bank" means U.S. Bank National Association.

7.      The term "Service Contracts" has the same meaning given to that term in paragraph 12 of the Complaint.

8.      The term "Swaps" has the same meaning given to that term in paragraph 14 of the Complaint, but extends to and includes any amendments to the Swaps.

9.      The term "Certificates of Participation" has the same meaning given to that term in paragraph 12 of the Complaint.

10.     "Syncora's June 17, 2013" letter means the letter from Claude LeBlanc attached as Exhibit D to Kevyn Orr's July 4, 2013 affidavit.

3

11.     "Communication" means every contact of any nature, whether oral or written, from one person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other documents concerning such contacts.

12.     "Concerning," "relating to," and "referring to" are synonymous for the purposes of these Requests, and mean reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, contradicting, incorporating, affecting, including or otherwise pertaining—either directly or indirectly—to the subject matter of the inquiry.

13.     The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The singular form of a noun or pronoun includes the plural form and vice versa.

14.     The terms "including," "include" or "includes" mean including, but not limited to.

15.     The terms "each," "any," and "all" shall be construed to mean "each and every."

16.     The use of the singular form of a noun includes the plural form, and vice versa.

## DEPOSITION TOPICS

1.     The City's negotiations with the Swap Counterparties regarding termination of the Swaps, including:

    (a)     The date that the negotiations commenced;

    (b)     The participants in any portion of the negotiations;

    (c)     The role of the casino revenues in the negotiations;

    (d)     The effect of Syncora's June 17, 2013 letter on the negotiations;

    (e)     The current and ongoing status of the negotiations;

4

       (f)     The Service Corporations' knowledge of or involvement in the negotiations;

       (g)     U.S. Bank's knowledge of or involvement in the negotiations;

       (h)     The substance of the negotiations.

2.     The "final settlement" referenced in paragraph 40 of the Complaint.

3.     The City's "promises to stakeholders" as alleged in paragraph 46 of the Verified Complaint.

4.     The City's use of the gambling revenues remitted to them from the General Receipts Subaccount prior to June 14, 2013.

5.     The City's potential uses of the gambling revenues remitted to them from the General Receipts Subaccount.

6.     U.S. Bank's obligations under the Collateral Agreement.

7.     The City's and the Service Corporations' obligations under the Service Contracts, the Swaps, and the Collateral Agreement.

8.     Internal and external communications relating to Syncora's June 17, 2013 letter.

9.     The harm the City claims it will experience due to Syncora's actions and the June 17, 2013 letter.

10.     All of the City's attempts to realize additional sources of cash or revenue.

11.     The reasons behind the City's June 14, 2013 decision to not make a payment to the Service Corporations.

12.     The current or potential uses of the approximately $40 million that the City decided not to pay to the Service Corporations.

13.     All of the City's Swaps termination obligations to the Service Corporations.

14.    The casino taxes and developer payments that the City has received and expects to receive.

15.    Any termination events or events of default under the Collateral Agreement that have occurred.

16.    The "ten-year projections" in paragraph 25 of the Complaint.

17.    The City's ongoing negotiations and proposed settlements between the City and its Stakeholders.  (*See, e.g.,* Compl. ¶ 39.)

18.    The City's efforts and abilities to deliver municipal services.

19.    The City's allegation that Syncora acted in bad faith and without legal justification.

20.    The City's available cash-on-hand as of June, 2013 and the previous 12 months.

21.    The City's cash projections.

22.    All of the effects of the "cash trap" effectuated by U.S. Bank.

23.    All of the "unique and irreplaceable opportunities" that the City will lose if it cannot quickly reach settlements with its stakeholders.

24.    The "comprehensive plan" referenced in paragraph 4 of Kevyn Orr's July 4, 2013 Affidavit.

25.    Syncora's rights under the Collateral Agreement.

26.    The irreparable harm the City would have suffered if it had given notice to Syncora's counsel of the hearing on the City's Motion for an *Ex Parte* Temporary Restraining Order and an Order to Show Cause Why a Preliminary Injunction Should Not Issue.

27.    All of the damages the City alleges it has or will suffer as a result of Syncora's actions.

28.     Kevyn Orr's authority over the Service Corporations.

7

**Exhibit 6(B)**

**City's Response to Emergency Motion to Dissolve the TRO**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

| | |
|---|---|
| CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan ) ) ) ) | Case No.:  2:13-cv-12987-LPZ-MKM |
| **Plaintiff,** ) | |
| v. ) | Hon. Lawrence P. Zatkoff |
| SYNCORA GUARANTEE INC., a New York Corporation, ) ) ) | |
| and ) | |
| U.S. BANK, N.A., ) ) | |
| and ) | |
| MGM GRAND DETROIT, LLC, ) ) | |
| and ) | |
| DETROIT ENTERTAINMENT, LLC, d/b/a MOTORCITY CASINO HOTEL, ) ) ) | |
| and ) | |
| GREEKTOWN CASINO, LLC, ) ) | |
| **Defendants.** ) ) | |

**PRELIMINARY RESPONSE TO MOTION AND NOTIFICATION OF THE CITY'S
CONSENT TO DISSOLUTION OF TEMPORARY RESTRAINING ORDER AND
WITHDRAWAL OF REQUEST FOR HEARING ON PRELIMINARY INJUNCTION**

The City of Detroit believes that most of the pending activities in this case have become

moot.  During the afternoon of Friday, July 12, 2013, we advised counsel for Syncora that,

subject to the approval of the Emergency Manager, the City would (a) consent to the dissolution

of the temporary restraining order; (b) indefinitely postpone the hearing on a preliminary injunction; and (c) agree to an indefinite suspension of discovery relating to such a hearing. Nevertheless, a few hours later, Syncora served the City with a large set of motion papers and extensive discovery requests.

We are preparing appropriate responses to the motion and discovery requests, which we intend to file in the next few days.  The purpose of this filing is to inform the Court as follows:

1.  As we notified Syncora on Friday, the City is willing to consent to the dissolution of the temporary restraining order.  We will agree to an appropriate stipulated order to effect the dissolution.

2.  The City reached in principle an important settlement with certain of its creditors late Friday afternoon, which we understand will be executed later today.  We believe this settlement moots many of the issues in this case, including those Syncora used as a pretext for interfering with the City's banking relationships, which in turn required the City to seek preliminary relief on July 5, 2013.  In view of this development, the City believes it does not need to go forward with the preliminary injunction hearing scheduled for July 26, 2013.

3.  As a result of the foregoing, there are no pending actions of the court requested by the City and no need for expedited proceedings or expedited discovery.

4.  The discovery served upon us and others Friday afternoon is exceptionally broad and burdensome and will come at high cost to the City.  The document requests alone consist of 138 categories of documents (not including subparts) from the City, the City's counsel, defendant U.S. Bank, and five non-parties to the case, and demand that these documents be produced to Syncora this Thursday, July 18, 2013.  The burdens of this unreasonably short response time are compounded by the fact that many of Syncora's requests appear to seek documents protected by

attorney-client and work-product privilege.  In addition, Syncora has served notices for depositions of seven witnesses for the week of July 22.  Because this discovery is premature, if not altogether unnecessary, we are in the process of preparing a motion for a protective order.

5.  In addition to its other arguments, Syncora demanded for the first time on Friday afternoon that the City immediately disgorge up to $15 million and included that demand in the motion papers it served at the close of business that day.  We believe that motion is procedurally improper and substantively defective.  However, it comes at a time when the City is desperately in need of cash and raises issues of great importance to the City.  We respectfully request leave of the Court to file our papers in opposition to Syncora's emergency motion by the close of business on Wednesday, July 17, 2013.

3

Dated:        July 15, 2013

/s/ Deborah Kovsky-Apap
Robert S. Hertzberg
Deborah Kovsky-Apap
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
(248) 359-7300  -  Telephone
(248) 359-7700  -  Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com


Thomas F. Cullen, Jr.
Gregory M. Shumaker
Geoffrey S. Stewart (application pending)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

*Attorneys for Plaintiff*

4

## Exhibit 6(C)

**Syncora's Reply to Response re Emergency Motion to Dissolve TRO**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITY OF DETROIT,
a Municipal Corporation Organized
and Existing Under the Laws of the
State of Michigan,

        Plaintiff,

    v.

SYNCORA GUARANTEE INC.,
a New York Corporation,

and

U.S. BANK, N.A.,

and

MGM GRAND DETROIT, LLC,

and

DETROIT ENTERTAINMENT, LLC,
d/b/a MOTORCITY CASINO
HOTEL,

and

GREEKTOWN CASINO, LLC,

        Defendants.

Case No.: 2:13-cv-12987-LPZ-MKM

Hon. Lawrence P. Zatkoff

## DEFENDANT SYNCORA GUARANTEE INC.'S REPLY TO THE CITY'S PRELIMINARY RESPONSE TO ITS EMERGENCY MOTION

Understandably loath to subject its actions and allegations to judicial

scrutiny, the City offers to dissolve the temporary restraining order and requests

that the Court "indefinitely postpone" the hearing on its preliminary injunction and any related discovery. Though the City claims that its willingness to dissolve the temporary restraining order moots Syncora's Emergency Motion, the City refuses to restore the parties to the *status quo ante* and return the $15 million improperly distributed to it from the General Receipts Subaccount pursuant to the temporary restraining order. The City's refusal to do so — coupled with its stated intentions to disburse those funds — necessitates the expedient resolution of this dispute before all of the funds are dissipated, never to be recovered.

Accordingly, as a condition of its order dissolving a temporary restraining order both parties agree should be dissolved, the Court should require the City to return all monies distributed to it from the General Receipts Subaccount subsequent to July 5, 2013.

## THE COURT HAS THE AUTHORITY TO RESTORE THE *STATUS QUO ANTE* AND ORDER THE CITY TO RETURN THE $15 MILLION.

Syncora's Emergency Motion requests that the Court dissolve the temporary restraining order and restore the *status quo ante* by ordering the City to return the $15 million that U.S. Bank released. Though these funds were released when the temporary restraining order was granted, the City maintains that it need not return those funds upon the dissolution of the temporary restraining order. While the City does not provide any explanation for its position, it nonetheless contends that Syncora's request to restore the *status quo ante* is "procedurally and substantively

2

defective." However, the law clearly establishes that, as part of the Court's dissolution of the temporary restraining order, it has the authority to restore the *status quo ante* and order the City to return the funds distributed to it during the pendency of the temporary restraining order.

*First*, "[f]ederal courts are courts in law and equity, and a court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case." *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999); *see also Rankin v. Coleman*, 401 F. Supp. 664, 665 (E.D. N.C. 1975) ("It is well-established that a trial court may fashion injunctive relief to fit the particular facts, circumstances and equities of the case before it."). Here, if the Court grants Syncora's motion and dissolves the temporary restraining order, equity demands that the City return its $15 million windfall until a hearing on the merits occurs. Without restoration of these funds, dissolution of the temporary restraining order will <u>not</u> restore the *status quo ante*.

*Second*, a court that dissolves a temporary restraining order has broad authority to return parties to the status quo. *See, e.g., Taylor v. Taylor*, 2013 WL 1183290 (N.D.N.Y. Mar. 21, 2013); *Moore v. State Farm Mutual Automobile Ins. Co.*, 2005 WL 399395 (E.D. La. Feb. 14, 2005). In both *Taylor* and *Moore*, the Court dissolved a temporary restraining order and, as part of that dissolution, ordered the parties to take affirmative steps to restore the status quo. *Taylor*, 2013

3

WL 1183290, at *5 (order prohibiting broker from withholding funds from IRS); *Moore*, 2005 WL 399395, at * 9 (order unsealing pleadings and exhibits that had been sealed as a result of temporary restraining order).   With its Emergency Motion, this is all Syncora is asking the Court to do — return the parties to the positions they were in prior to the entry of the temporary restraining order.

*Third*, a court has the inherent authority to treat a motion to dissolve as a cross-motion for injunctive relief.   In *Moore*, for example, the court converted the party's motion to dissolve a temporary restraining order into an application for injunctive relief.   2005 WL 399395, at *2.   Similarly, in *Taylor*, the court treated a motion to remove as a motion to dissolve and as a demonstration to show cause not to enter a preliminary injunction and order recovery of levied money.   2013 WL 1183290, at *1.   Thus, in this case, if the Court concludes that it lacks the power to order the City to take affirmative steps as part of a dissolution motion under Rule 65(b)(4), the Court should treat Syncora's motion to dissolve as a motion for injunctive relief, and order the return of the money under Rule 65(a).[1]

---

[1] The four factors that a court must balance and consider before issuing a temporary restraining order or preliminary injunction include (1) the likelihood of the movant's success on the success on the merits; (2) whether the moving party will suffer irreparable injury without the injunction; (3) the harm to others that will occur if the injunction is granted; and (4) whether the injunction would serve the public interest.   *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F. 3d 535, 540 (6th Cir. 2007).   As described in Syncora's Emergency Motion, each of these factors weighs in favor of Syncora.

4

*Fourth*, a court may, when appropriate, *sua sponte* grant a temporary restraining order or modify injunctive relief.  *See, e.g.*, *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 420 F. App'x 97, 100 (2d Cir. 2011) ("We emphasize that the district court retains the power to reconsider its order granting the preliminary injunction, upon request or *sua sponte*."); *Cayuga Indian Nation of New York v. Village of Union Springs*, 293 F. Supp. 2d 183, 185 (N.D.N.Y. 2003) (*sua sponte* issuing a temporary restraining order until arguments regarding the preliminary injunction motion could be heard); *Medical Professional Corp. v. Taft*, 199 F.R.D. 597 (S.D. Ohio 2000).   Here, the circumstances surrounding the City's temporary restraining order, including, *inter alia*, the City's improper *ex parte* actions, are reason enough for the court to *sua sponte* grant injunctive relief requiring the City to return the $15 million.

Dated:  July 15, 2013

Respectfully submitted,

By:  /s/ Gerard V. Mantese

Stephen C. Hackney
Ryan Blaine Bennett
William E. Arnault
Lally A. Gartel
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Gerard V. Mantese
Mantese Honigman Rossman and
Williamson, P.C.
1361 East Big Beaver Road
Troy, Michigan 48083
Phone: 248-457-9200
Fax: 248-457-9201

*ATTORNEYS FOR DEFENDANT
SYNCORA GUARANTEE, INC.*

*ATTORNEYS FOR DEFENDANT
SYNCORA GUARANTEE, INC.*

5

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CITY OF DETROIT, a Municipal
Corporation Organized and Existing
Under the Laws of the State of Michigan,

        Plaintiff,

   v.

SYNCORA GUARANTEE INC.,

and

U.S. BANK, N.A.,

and

MGM GRAND DETROIT, LLC,

and

DETROIT ENTERTAINMENT, LLC
d/b/a MOTORCITY CASINO HOTEL,

and

GREEKTOWN CASINO, LLC,

        Defendants.

Case No.:  2:13-cv-12987

## CERTIFICATE OF SERVICE

    I hereby certify that on July 15, 2013, I caused the foregoing papers to be filed with the

Clerk of the Court using the ECF system which will send electronic service to counsel of record

for City of Detroit and U.S. Bank, N.A. and served the following parties via U.S. Mail at the

following addresses:

**MGM Grand Detroit, LLC**
Resident Agent: CSC-Lawyers
Incorporating Service Co.
601 Abbot Road
East Lansing, MI 48823

**Greektown Casino, LLC**
Resident Agent: Olisaeloka Dallah
555 E. Lafayette Street
Detroit, MI 48226

**Detroit Entertainment, LLC d/b/a Motorcity**
**Casino Hotel**
Resident Agent: Cheryl Scott-Dube
2901 Grand River Ave.
Detroit, MI 48201

I declare under the penalty of perjury that the foregoing statements are true to the best of

my knowledge, information, and belief.

_/s/Gerard V. Mantese_____
Gerard V. Mantese

**Exhibit 6(D)**

**City's Brief in Opposition to Emergency Motion to Dissolve TRO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan | ) ) ) ) | Case No.: 2:13-cv-12987-LPZ-MKM |
| Plaintiff, | ) ) | |
| v. | ) ) | Hon. Lawrence P. Zatkoff |
| SYNCORA GUARANTEE INC., a New York Corporation, | ) ) ) | |
| and | ) ) | |
| U.S. BANK, N.A., | ) ) | |
| and | ) ) | |
| MGM GRAND DETROIT, LLC, | ) ) | |
| and | ) ) | |
| DETROIT ENTERTAINMENT, LLC, d/b/a MOTORCITY CASINO HOTEL, | ) ) ) | |
| and | ) ) | |
| GREEKTOWN CASINO, LLC, | ) ) | |
| Defendants. | ) ) | |
| | ) | |

**CITY OF DETROIT'S BRIEF IN OPPOSITION TO DEFENDANT SYNCORA GUARANTEE INC.'S EMERGENCY MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER AND CONDUCT EXPEDITED DISCOVERY**

1

This case arises from Syncora's improper interference with the City of Detroit's banking relationships. Those relationships, which were established in June 2009, operated smoothly for years despite the City's financial challenges. Last month, Syncora—whose only involvement in those relationships is that of an insurer upon whom no claim has yet been made—saw fit to threaten the custodian bank in order to freeze (or "trap") money that the City desperately needed. Syncora's admitted motive was to exert leverage upon the City to obtain concessions on a different front, and it offered a flimsy legal justification for its actions. Unable to negotiate a solution with Syncora, the City brought this action on July 5 in the Circuit Court for Wayne County. Upon an extensive record, Judge Annette Berry determined that the City was likely to prevail upon its claims that Syncora had acted illegally and entered a temporary restraining order ("TRO") that gave the City access to the trapped money to prevent the immediate and irreparable harm facing the City if it could not access these funds. She also set July 26 for a hearing on a preliminary injunction.

The TRO permitted the City to have uninterrupted access—as it had for the previous four years—to the $15 million or so that accumulates each month in a bank account known as the General Receipts Subaccount. On Friday, July 12, Syncora demanded that the City agree to dissolve the TRO and adjourn the preliminary injunction hearing indefinitely. When counsel for the City unexpectedly agreed to do so, Syncora's counsel added a new demand, namely, that the City return to the General Receipts Subaccount the money it had been paid during the pendency of the TRO. The City refused, and a few hours later Syncora served lengthy emergency motion papers and extensive discovery demands.

There obviously is no emergency. The City has consented to dissolution of the TRO and adjournment of the preliminary injunction hearing. Although the City's declaratory judgment

action and tort claims remain pending, those claims can and should proceed on the normal

schedule called for by this Court's procedures and the Rules of Civil Procedure.  Syncora's sole

argument for exigency is the claim it devised for the first time late Friday afternoon that the City

should pay $15 million into the General Receipts Subaccount.  Yet this claim for monetary

damages, is clearly not emergent, and Syncora's claim is procedurally and substantively

defective for many reasons.

# ISSUES PRESENTED

1. Whether good cause exists for expedited proceedings, given the fact that the City has consented to the dissolution of the State Court's TRO and an indefinite adjournment of the preliminary injunction hearing and that the monies in the General Receipts Subaccount are fully replenished each month?

2. Whether defendant Syncora may properly make a claim for disgorgement of money in motion papers without filing a counterclaim as required by Federal Rule of Civil Procedure 13?

3. Whether preservation of the *status quo* should involve protecting the City of Detroit's rights to casino tax revenues as they were exercised for the four years between June 2009 and June 2013 or instead permitting Syncora to cause the freezing of this money as it did between June 17 and July 5, 2013?

4. Whether Syncora has the rights of a secured party under the Collateral Agreement between the City and the swap counterparties?

5. Whether Syncora has met the requirements for entry of injunctive relief?

## RELEVANT AUTHORITY

**A. Syncora's Request That The Court Order The City To Return Funds Is Procedurally Improper**

Federal Rule of Civil Procedure 13(a) provides that "[a] pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim:  (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction."  Rule 13(c) provides that "[a] counterclaim need not diminish or defeat the recovery sought by the opposing party.  It may request relief that exceeds in amount or differs in kind from the relief sought by the opposing party."

**B. Syncora Cannot Meet The Traditional Standards For Injunctive Relief**

"When considering a motion for preliminary injunction, a district court must balance four factors:  (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction."  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007).

# FACTUAL BACKGROUND

## A. The COPs and Swaps Transactions

This case has its origins in complex financings the City of Detroit closed in 2005 and 2006 to fund its obligations to two retirement systems. The financing culminated in the sale to the public of "Pension Obligation Certificates of Participation" ("COPs").[1]

### 1. The COPs

The contractual arrangements underlying the COPs transactions hinge upon promises by the City to make periodic payments to two non-profit Service Corporations it established. The Service Corporations in turn created Funding Trusts, to which they assigned their interests in this income stream. Finally, the Funding Trusts sold "Certificates Of Participation" in the income stream to the public, with each certificate representing a proportional right to the City's payments.

To make the COPs attractive to investors, the Service Corporations purchased insurance against a default by the City on payments of interest or principal. The predecessor of defendant Syncora—an entity known as XL Capital Assurance, Inc.—was one of two monoline insurers that sold this insurance to the Service Corporations.

### 2. The Swaps

Some of the COPs had floating interest rates. Fearing rising interest rates, the City hedged its risk by having the Service Corporations enter into interest rate "swap" agreements

---

[1] Details of the transactional documents are set forth with particularity at Detroit City Code §§ 18-16-1 through 18-16-7, attached as Exhibit A to the City of Detroit's Motion and Brief in Support Of Its Motion For An Ex Parte Temporary Restraining Order And An Order To Show Cause Why A Preliminary Injunction Should Not Issue ("State Court Motion for a TRO"), included as Exhibit 2 to the Declaration of Christopher J. DiPompeo ("DiPompeo Decl."), filed concurrently herewith.

with two banks, commonly known as the "swap counterparties."[2]  Under the swaps, the Service Corporations and the swap counterparties agreed to a transaction that effectively converted each Service Corporation's floating interest rate exposure into a fixed payment.  This was done through an arrangement whereby, in return for each side "betting" against the other on interest rates, the Service Corporations agreed to pay periodic, fixed amounts to the swap counterparties, and the counterparties agreed to make payments to the Service Corporations in the event that floating interest rates exceeded certain levels.

As part of the swaps transaction, the swap counterparties required the Service Corporations to buy insurance against any default on their swaps payments.  The Service Corporations bought the insurance from the same two sureties—including Syncora's predecessor, XL Capital—that they had used for the insurance on the COPs.  Thus, Syncora is the surety for both the COPs and swaps.  These, however, are two different sets of insurance policies; they are separately documented; and Syncora's obligations and rights under the two policies are separate and independent.

### B.  2009 Collateral Agreement

The swaps documents gave the swap counterparties the right to terminate the swaps agreements and demand a large termination payment under certain conditions.  One such event was (a) if the rating on the COPs were ever reduced to below investment grade (b) at the same time the credit ratings of the two insurers fell below certain levels.  In January 2009, this happened, giving the swap counterparties the right to demand early termination of the swap agreements and a termination payment then estimated to be between $300 and $400 million.

---

[2] The banks were UBS A.G. and SBS Financial Products Company, LLC.  SBS had a credit support arrangement with Merrill Lynch Capital Services.

The City lacked the resources to make this termination payment, so it renegotiated the swaps with the swap counterparties. The renegotiated deal resulted in a Collateral Agreement between the City, the Service Corporations, the swap counterparties, and U.S. Bank as custodian that was signed in June 2009.[3] The essence of the Collateral Agreement was to secure the City's obligations to the swap counterparties by pledging the tax revenues and developer payments the City collected from Detroit's three casinos (collectively the "Casino Revenues"). The Collateral Agreement created a "lockbox" system to hold these pledged revenues until the City made its swaps payment each month.[4]

The Collateral Agreement created two bank accounts—a "Holdback Account" and a "General Receipts Subaccount," with U.S. Bank as custodian of both. *See* Collateral Agreement § 8.1 (Orr Aff., Ex. B). The casinos were instructed to remit every day to the General Receipts Subaccount all casino revenues they owed the City, where the revenues would sit until the conditions for releasing them to the City had been met.

The swaps contracts required the Service Corporations to make fixed payments to the swap counterparties on a quarterly basis. The Collateral Agreement, however, provided that the City would fund those quarterly payments directly, and would do so by depositing one-third of the Service Corporations' quarterly payment into the Holdback Account each month.[5] Once the City put this money into the Holdback Account, U.S. Bank would (a) release to the City the casino revenues that had already accumulated in the General Receipts Subaccount and (b) for the

---

[3] See Exhibit B to the Affidavit of Kevyn D. Orr, Emergency Manager for the City of Detroit ("Orr Aff."), filed concurrently herewith. The Orr Affidavit originally was filed with the Circuit Court, but for the convenience of the Court the City has resubmitted it with its present papers.

[4] A schematic of this lockbox arrangement is attached as Exhibit B to the City of Detroit's State Court Motion for a TRO (DiPompeo Decl., Ex. 2).

[5] At the end of each quarter, U.S. Bank would transfer funds from the Holdback Account to the swap counterparties to satisfy the Service Corporations' obligations under the swaps.

rest of the month continue to remit casino revenues to the City as they were deposited every day. If, however, there were an event of default or a termination event under the swaps transactions, the Collateral Agreement gave the swap counterparties—and only the swap counterparties—the right to serve a notice requiring U.S. Bank to hold—or "trap"—in the General Receipts Subaccount the monies that had accumulated there and not disburse them to the City.

Syncora was not a party to the Collateral Agreement, did not sign it, and has no general rights under it. Instead, Syncora's rights under the document are limited to those one would expect of a third-party insurer and potential subrogee, namely, that the City and the swap counterparties could not amend the Collateral Agreement without Syncora's consent, and even then only when the amendment would affect Syncora's interests. Collateral Agreement § 14.5 (Orr. Aff., Ex. B). Moreover, the Collateral Agreement did not purport to affect in any way the structure of, or rights under, the COPs transaction. As before, the two transactions were separate, distinct and unentangled.

### C. Negotiations Between the City and the Swap Counterparties

On March 14, 2013, Kevyn D. Orr was appointed Emergency Financial Manager for the City of Detroit pursuant to Public Act 72 of 1990, *replaced and repealed by* Public Act 436 of 2012, MCL 141.1541 *et seq.* Under the swaps contracts, Orr's appointment arguably was an Event of Default and possibly gave the swap counterparties the right to terminate the swaps, demand a termination payment, and direct U.S. Bank to trap the Casino Revenues in the General Receipts Subaccount. However, despite the Emergency Manager's appointment and its difficult financial situation, the City never defaulted on its monthly payments into the Holdback Account and never failed to make its required swaps payments. As a result, since March 2013, the swap counterparties have not declared an event of default under the swap contracts, have not sought to

terminate the swap contracts, have not sought to trap the cash in the General Receipts Subaccount, and have not sought to make any claims for payment from the swap insurers. Instead the swap counterparties have pursued a negotiated solution with the City.

These negotiations were productive and by June 17 the parties had agreed in principle to a settlement under which the swap counterparties would agree not to seek to have U.S. Bank trap the Casino Revenues in return for the City's promise to continue making swaps payments. In addition, the City would be given an option to buy out its swaps obligations at a discount. This buyout would be a major step forward in the City's restructuring effort, since the swap counterparties are among the City's largest secured creditors. More fundamentally, the settlement would give the City continued access to the Casino Revenues.

### D. Syncora's Efforts to Trap Casino Revenues

As described before, the COPs and the swaps were two different and distinct transactions. They had separate documentation and dealt with different things. Because of the 2009 Collateral Agreement, the City's obligations under the swaps were collateralized; by contrast, its obligations under the COPs were unsecured.

On June 14, the City failed to make a payment of approximately $40 million due to the Service Corporations for payment to holders of the COPs. This meant that Syncora became liable for a portion of this amount and thus became subrogated to that extent to the Service Corporations' rights against the City. However, the City did ***not*** default on its swaps payments, and instead continued to make timely payments to the Holdback Account as required by the Collateral Agreement. As a result, there has been no payment default under the swaps, Syncora has incurred no payment obligations as insurer of the swaps, and Syncora is not subrogated to the rights of the swap counterparties.

13-53846-tjt   Doc 1449-13   Filed 10/30/13   Entered 10/30/13 14:54:51   Page 112 of 27
13-53846-swr   Doc 1449-13   Filed 10/30/13   Entered 10/30/13 14:54:51   Page 112 of 27
190

Nonetheless, on June 17, Syncora sent a letter to U.S. Bank, notifying the bank that Syncora believed there was an event of default under the swaps and demanding that U.S. Bank therefore trap the monies in the General Receipts Subaccount.  *See* Orr Aff., Ex. D.  U.S. Bank's counsel responded that the bank would have released Casino Revenues but for Syncora's letter and inquiring as to the basis for Syncora's "letter of instruction" to trap Casino Revenues rather than release them to the City.  *Id.*, Ex. E.  U.S. Bank also informed Syncora that release of the funds in the General Receipts Subaccount would have been "the normal course of events" and asked for Syncora's explanation why U.S. Bank should "deviate from the ordinary course of business."  *Id.*  Counsel for Syncora replied with another letter to U.S. Bank on June 24, repeating their prior demands and threatening to hold U.S. Bank responsible for any release of funds from the Subaccount.  *See id.*, Ex. F.

 On June 25, the Emergency Manager objected to Syncora's notice.  *See id.*, Ex. G.  He reemphasized the City's severe liquidity crisis and need for unimpeded access to the casino revenues in the General Receipts Subaccount.  He also made clear that no payment default had occurred under the swaps and, because it was not a party to the Collateral Agreement, Syncora had no right to instruct U.S. Bank regarding the Casino Revenues.

Syncora rejected the Emergency Manager's request on June 26, continuing to insist that U.S. Bank trap the monies.  *See id.*, Ex. H.  Syncora asserted that its purpose was to protect its contractual rights as insurer of the swaps, due to the City's default on the ***COPs*** payment and Syncora's possible payment as a COPs insurer.  The City's advisors met with Syncora on June 27 and 29, but made no progress.

### E.  The City's Temporary Restraining Order

Syncora's conduct had severe consequences.  Faced with competing demands from the City and Syncora, U.S. Bank, opted to withhold the Casino Revenues from the City.  Without access to these funds, the City could not guarantee essential services to its residents, and the cloud over the City's continuing access to its casino revenues had a severe chilling effect on the City's negotiations with its creditors, including its negotiations of its settlement with the swap counterparties.  Because of Syncora's intransigence, the City had little choice but to take legal action.  On July 5, it brought this lawsuit in the Circuit Court for Wayne County and moved for entry of a TRO.  After considering the City's papers, reviewing Mr. Orr's accompanying affidavit, and hearing argument from the City's counsel, Judge Annette Berry issued a TRO enjoining Syncora and the other defendants from further withholding casino revenues from the City, unless directed to do so by the swap counterparties.  Judge Berry also set a hearing on preliminary injunctive relief for July 26, 2013.

In the ten days since the entry of the TRO, U.S. Bank remitted to the City the monies in the General Receipts Subaccount, which have totaled about $15 million.

### F.  Proceedings Before This Court

Syncora removed the case to this Court on July 11, 2013.  That evening, Syncora's counsel notified us that they wished to confer about their demand for dissolution of the TRO and scheduling of expedited discovery relating to the preliminary injunction hearing.  There were two conference calls the next afternoon.  During the first call, the City agreed to dissolution of the TRO and adjournment of the preliminary injunction hearing indefinitely on the ground that the City was not in a position to shoulder the burdens of the extensive discovery Syncora had

demanded.[6]  In addition—although counsel for the City were not free to disclose it to Syncora's counsel that day—the City's counsel were aware that the City was close to a final settlement agreement with the swap counterparties that would moot much of the case.

After learning that the City would consent to its demands, Syncora's counsel quickly added a new condition on the  second call, namely, that the City should return to the General Receipts Subaccount the monies it had been paid in the previous week.  The City rejected this condition.  At 5:17 p.m., Syncora's counsel served an emergency motion to dissolve the TRO and conduct expedited discovery.  Accompanying the motion were extensive document requests and deposition notices.

### G.  Forbearance Agreement

The City executed a forbearance agreement with the swap counterparties as of July 15.  Although the terms of the agreement are not public, it provides that, so long as the City continues to make its monthly payments to the Holdback Account, it will continue to have access to the Casino Revenues that accumulate in the General Receipts Subaccount.  In addition, the agreement provides that the City can buy out the swaps in the coming years at attractive values and, when it does so, the swap counterparties agree that they will make no claims against Syncora relating to the swaps.  In other words, the forbearance agreement will have the effect of completely relieving Syncora of its potential liability for insuring the swaps.

Thus, the posture of the case now is that the City has (a) agreed to dissolve the TRO, (b) agreed to adjourn the preliminary injunction hearing indefinitely and (c) entered into an

---

[6]  This was confirmed in an email we sent to Syncora's counsel at 2:18 pm.  Syncora misstates the record in saying that the City's counsel stated that they "would probably be amenable" to dissolving the TRO.  *See* Syncora Motion at 3.  Instead, counsel wrote that its offer was subject to the consent of our client, which we expected to (and did) receive promptly. *See* Email Communications Between the City of Detroit's Counsel and Syncora's Counsel (July 11-12, 2013) (DiPompeo Decl., Ex. 4).

agreement with the swap counterparties that should protect Syncora from exposure on its swaps insurance.  Nevertheless, Syncora believes there is a present emergency, has moved to dissolve the TRO, seeks injunctive relief ordering the City to return up to $15 million to the General Receipts Subaccount, and asks for an expedited schedule for the extensive discovery it has served.[7]

## ARGUMENT

### I.   THERE IS NO EMERGENCY TO JUSTIFY EXPEDITED RESOLUTION OF THIS CASE

A lynchpin of Syncora's motion is that there is an emergency that the Court must immediately address and that the ordinary provisions and procedures of the Federal Rules of Civil Procedure, this Court's own rules, and standard practices should be ignored.  This clearly is not the case:  Syncora's emergency is self-created.

The main relief Syncora seeks is dissolution of the Circuit Court's TRO and entry of an order enjoining the City to return to the General Receipts Subaccount the $15 million or so the City has received since the Circuit Court entered its TRO on July 5.  *See* Defendant Syncora Guarantee Inc.'s Emergency Motion To Dissolve The Temporary Restraining Order And Conduct Expedited Discovery ("Syncora Motion"), at 2.  The City already has consented to the first part of this—dissolution of the TRO—since it believes this week's settlement between the City and the swap counterparties is likely to moot much of the case anyway.  Yet even if the Court were persuaded to treat Syncora's request as a cross-motion for the return of funds and that Syncora had somehow established a right to this relief, Syncora still would have failed to explain why resolution of this dispute requires *expedited* consideration.  Syncora asserts that expedited

---

[7] We have separately moved under Federal Rule of Civil Procedure 26(c) for entry of a protective order against Syncora's discovery requests.  *See* City Of Detroit's Motion For Protective Order, dated July 17, 2013.

resolution of this request is necessary "before all of the funds are dissipated, never to be recovered."  *See* Defendant Syncora Guarantee Inc.'s Reply To The City's Preliminary Response To Its Emergency Motion at 2 ("Syncora Reply").  However, as noted below, *see infra*, at 23, even the dissipation of these funds will cause Syncora no harm because the amounts taken from the General Receipts Subaccount to the City are replenished every month.  And Syncora's harm is entirely hypothetical, since it has never had to pay on account of the swaps and is unlikely to ever have to do so.

Moreover, the contracts and other documents underlying this dispute are complex and the consequences to the City of a mistake are severe.  This is not a dispute that should be resolved in a few days, as Syncora seems to insist.  Instead, Syncora should be required to file a competent counterclaim, the City should be given the opportunity to answer or move with regard to it, and the case should proceed like any other civil case for money damages.  Without a strong justification for expedited review, there is no reason to truncate an important and complex case.

There similarly is no emergency requiring expedited discovery and disregard of the requirements of Federal Rules of Civil Procedure 26(a) and 26(f) and the normal periods for responding to discovery under Rule 30.  The evident purpose of this discovery was to allow Syncora to prepare for the preliminary injunction hearing originally scheduled for July 26, but that is now adjourned indefinitely.  This is an invented crisis.

## II.   SYNCORA'S REQUEST FOR THE RETURN OF FUNDS FROM THE CITY IS PROCEDURALLY IMPROPER

In essence,  Syncora seeks disgorgement of money received by the City as a result of the City's allegedly improper actions in obtaining the TRO.  Syncora has not, however, filed a counterclaim for this relief as required by Federal Rule of Civil Procedure 13.  Instead, Syncora asserts that the Court should grant this relief "as a condition of its order dissolving the temporary

restraining order." Syncora Reply at 2. Recognizing the procedural deficiency of its request, Syncora asserts that "a court has the inherent authority to treat a motion to dissolve as a cross-motion for injunctive relief." Syncora Reply at 4. However, even if a federal court *may* do so, Syncora has presented no compelling reason *why* the court should treat its improper request as a cross-motion for injunctive relief rather than enforcing the requirements of the Federal Rules of Civil Procedure. The City should have, and does have, the right to demand that Syncora's claims be properly presented and the opportunity to move against those claims upon proper papers under Rules 12(b) and (c).

Syncora also invokes the equitable power of the court to fashion an appropriate remedy and suggests that "a court that dissolves a temporary restraining order has broad authority to return parties to the status quo," either upon a motion by the parties or *sua sponte*. Syncora Reply at 2-3, 5. For support, Syncora cites *Taylor v. Taylor*, 2013 WL 1183290 (N.D.N.Y. Mar. 21, 2013), and *Moore v. State Farm Mutual Automobile Ins. Co.*, 2005 WL 399395 (E.D. La. Feb. 14, 2005), but neither of these cases stands for the proposition Syncora asserts.

In *Taylor*, the plaintiff sought a TRO and preliminary injunction after the plaintiff's bank transferred $71,000 from the plaintiff's account to the IRS under a tax levy. The state court issued a TRO prohibiting the bank from transferring any of the plaintiff's remaining $100,000 to the IRS under the tax levy, as well as an order to show cause why the court should not grant a preliminary injunction ordering the return of the $71,000. Before an order to return the funds was entered, however, the IRS removed the case, and the federal court determined that the TRO was improper because of a jurisdictional defect. But the court did not order any "affirmative steps to restore the status quo" as Syncora suggests. *See* Syncora Reply at 3-4. Rather, it simply dissolved the TRO and order to show cause "insofar as those orders in any way interfere with the

IRS's levy against Defendant–Movant Taylor, including prohibiting [the bank] from disbursing assets to the IRS," *id.* at *5. Far from ordering any affirmative actions, the Court's order actually removed the only impediment to the bank's ability to resume transferring funds to the IRS.

In *Moore*, the defendant sought and obtained a TRO to seal certain documents entered into the record by the plaintiff on the ground that they contained confidential trade secrets. The plaintiff eventually sought to dissolve the TRO on the ground that the documents did not actually contain protected trade secrets. The court reviewed the documents and determined that only two exhibits contained trade secrets. As a result, the court dissolved the TRO as to the unprotected documents and ordered "that documents 31, 34, 35, 36, 38, 39, 40, 42, 43, 45, and 46 be UNSEALED and placed in the record, and that document 27 be UNSEALED and placed in the record with the exception of Exhibits 'C' and 'D' which shall remain sealed." *Id.* at *9. Syncora curiously asserts that the court's decision to unseal the documents was a form of affirmative relief similar to their request for disgorgement from the City. But the *Moore* court's routine decision to clarify that dissolution of a TRO sealing certain documents meant that that those documents would now be unsealed is a far cry from the extraordinary relief Syncora seeks here.

Neither *Moore* nor *Taylor* contemplated anything like Syncora's request for the disgorgement of up to $15 million from a cash-strapped city after a state court judge determined on a competent record that a TRO was necessary to avoid immediate and irreparable harm. Syncora has failed to identify any case even remotely supporting the relief it now seeks. The court should decline Syncora's invitation to depart from the requirements of the Federal Rules of Civil Procedure, and should require Syncora, if it desires to pursue relief against the City, to do so in accordance with the Rules.

### III.   SYNCORA'S REQUEST FOR THE RETURN OF FUNDS FROM THE CITY IS SUBSTANTIVELY IMPROPER

Besides the procedural irregularities, Syncora's motion also fails substantively.  Thus, even if this Court were to treat Syncora's request as a motion or cross-claim, the request should fail because Syncora mischaracterizes the *status quo ante*, seeks to assert rights Syncora does not have, and cannot satisfy the factors necessary for injunctive relief to issue.

#### A.   Syncora Mischaracterizes The *Status Quo Ante*

The premise of Syncora's request is a claim that the Court should return the parties to the *status quo ante*, which, in Syncora's view, consists of funds being trapped in the General Receipts Subaccount.  According to Syncora, "Syncora never instructed or demanded that U.S. Bank take any action" with respect to the money in the General Receipts Subaccount, and "the *status quo* just prior to filing of the Motion [for a TRO] was that U.S. Bank was properly trapping cash under section 5.4 of the Collateral Agreement."  *See* Syncora Motion at 12.  These assertions are simply not supportable by the documented facts and blatantly mischaracterize the *staus quo ante*.

Prior to Syncora's letters, U.S. Bank had for years paid the funds in the General Receipts Subaccount to the City after the City made its monthly payment to the Holdback Account, because of the swap counterparties' decision not to declare an event of default.  When U.S. Bank received Syncora's June 17 letter, however, it began for the first time to trap the funds because it had received conflicting instructions.  According to U.S. Bank, as a custodian it was not entitled to determine whether Syncora's actions were proper and thus was compelled to trap the funds until the matter could be resolved.  *See* Orr Aff., Ex. E.  The City, however, could not remain in this state of limbo and thus sought a TRO to preserve its ability to access the Casino Revenues.

Satisfied that the preservation of the *status quo* meant that the funds would freely flow to the City as they always had, the state court issued a TRO to that effect.

That the parties—including Syncora—recognized that the *status quo* involved the release of funds from U.S. Bank to the City is confirmed by the communications between Syncora and U.S. Bank's counsel, Bill Smith, on June 24, 2013.  U.S. Bank responded to Syncora's June 17 letter by informing Syncora that,

> **[i]n the normal course of events**, U.S. Bank as Custodian would advise the City [that the funds in the General Receipts Subaccount exceeded the City's monthly swaps payment], receive from the City a like amount which would be credited to the Holdback Account (the monthly 'City Payment'), and then remit to the City the Holdback Requirement Amount from the General Receipts Subaccount.  Thereafter, as casino revenues are received, they are to be remitted to the City during the remainder of the month.

Orr Aff., Ex. E (emphasis added).  Smith instructed Syncora and the City that "to the degree that you request U.S. Bank as Custodian ***to deviate from the ordinary course of business***, kindly explain the legal reasoning and support therefore . . . ."  *Id.* (emphasis added).  And Syncora's counsel then renewed its unequivocal demand that the money in the General Receipts Subaccount be trapped:  "Please understand . . . that our position on the cash trap has not changed from that provided in our letter.  Pursuant to the Collateral Agreement, ***the cash should have been trapped and should continue to be trapped absent our consent***."  *Id.* (emphasis added).

There can be no question that Syncora instructed U.S. Bank to withhold the funds from the City.  Syncora elides this uncomfortable fact, focusing exclusively on its June 17 letter and failing even to mention the parties' subsequent communications.  But as the City made clear to

the state court, there was no question that Syncora repeatedly and clearly instructed U.S. Bank not to release funds and threatened to sue if U.S. Bank ignored those instructions.[8]

Moreover, Syncora's assertion that U.S. Bank "expressed its independent view that the Service Corporation's default . . . led to *automatic* cash trapping under the Collateral Agreement," Syncora Motion at 7, is flatly untrue. In fact, U.S. Bank has made an appearance in this case specifically to respond to Syncora's "inaccurate[]" portrayal of its actions in response to the Syncora letters, and to make clear that it has never taken a position on whether funds should be trapped in the General Receipts Subaccount. *See* U.S. Bank National Association's Brief In Response To Syncora Guarantee Inc.'s Emergency Motion To Dissolve The Temporary Restraining Order And Conduct Expedited Discovery at 3.

The relief Syncora now seeks is thus not a return to the *status quo ante*, but rather a judicial imprimatur on its effort to deviate from the *status quo* to serve its unrelated interests as an insurer of the COPs. Indeed, Syncora's entire assertion that the funds must be returned to make it whole seems to be a contrived platform for its burdensome and unnecessary discovery demands. It was not until the City consented to dissolution of the TRO that Syncora first raised this condition, and Syncora continues to make this demand even though this week's settlement between the City and the swap counterparties is likely to relieve Syncora of any exposure on the swaps at all.

---

[8] *See* Orr Aff., Ex. E ("Pursuant to the Collateral Agreement, the cash should have been trapped and should continue to be trapped absent [Syncora's] consent."); *id.*, Ex. F (directing that "U.S. Bank, in its capacity as Custodian, is clearly required by the unambiguous terms of the Collateral Agreement, to retain all funds that were in the General Receipts Subaccount upon the occurrence of the Cross Default EOD" and that "Syncora does not consent to any divergence by U.S. Bank from that duty"); *id.* ("[Syncora] will hold U.S. Bank responsible for any release of funds from the General Receipts Subaccount in contravention of the plain terms of the Collateral Agreement.").

## B. Syncora Has No Rights Over The Collateral In The General Receipts Subaccount

Syncora does not now have—and never has had—any right to the funds in the General Receipts Subaccount. Syncora is not a party to the Collateral Agreement, which establishes the rights of the parties to the Casino Revenues that secure the City's swaps obligations. Nor does the Collateral Agreement otherwise give Syncora the right to direct the custodian's conduct with respect to the collateral. Syncora is merely an insurer on the swaps agreements, and, like any insurer, has no rights until it is called upon to make a payment.[9] Syncora has never made any such payment on the swaps and, indeed, under the terms of the settlement with the swap counterparties, it probably will never be required to do so. Syncora thus cannot override the swap counterparties' decision to forbear from enforcing rights they may have under the Collateral Agreement.

Syncora has been unable to identify any argument to the contrary. Early on, Syncora asserted in its letters to U.S. Bank that its rights arose on account of a cross-default under the swaps (*see* Orr Aff., Ex. F at 2), but Syncora now appears to have abandoned that argument. And for good reason: the cross-default provision in the swaps is triggered only upon certain circumstances not present here. *See* 1992 ISDA Master Agreement § 5(a)(vi), attached as Exhibit D to the Syncora Motion. And the Collateral Agreement also is of no help to Syncora, since Syncora is not a party to it and the Agreement has no cross-default provision. Moreover, as the City has stated before, Syncora cannot rely upon the cross-default provision of the swap contracts because Syncora has never been called upon to make a payment under the swap

---

[9] The only right Syncora possesses under the Collateral Agreement before having paid under its insurance policy is the right to consent to any amendment of the Collateral Agreement that affects its rights, remedies, or obligations. *See* Collateral Agreement § 14.5 (Orr Aff., Ex. B).

insurance policies.  Until it makes such a payment Syncora has no rights as a subrogee and does not stand in the shoes of the swap counterparties.

Syncora's new argument is that the swap counterparties' decision to forbear from demanding that U.S. Bank trap funds amounted to a waiver or amendment of the Collateral Agreement, and that this trespassed the Agreement's provision that it could not be amended without Syncora's consent.  *See* Syncora Motion at 14-15; Collateral Agreement § 14.5 (Orr Aff., Ex. B).  The right to consent to amendment is indeed the only right Syncora possesses under the Collateral Agreement, but this argument goes no further.  The Collateral Agreement specifically distinguishes between forbearance on rights under the contract and waiver or amendment of the contract, expressly providing "[n]o failure on the part of any party hereto to exercise, and no delay in exercising, any right hereunder shall be a waiver thereof."  *Id.* § 14.7.  Clearly, the swap counterparties' decision to refrain from exercising their rights to order the trapping of the City's Casino Revenues was an act of forbearance, and not an amendment of the Collateral Agreement.  Thus, even under Syncora's own argument, it has no right to direct U.S. Bank's control of the collateral.

**C. Syncora Cannot Establish The Factors Necessary For Injunctive Relief**

Syncora asserts that to the extent the Court treats its request as a cross-motion for injunctive relief, it can satisfy the traditional factors for such relief—a likelihood of success on the merits, irreparable harm absent the injunction, the harm to others if the injunction is granted, and the public interest.  *See* Syncora Reply at 4 n.1 (citing *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007)).  Even apart from the obvious fact that a state court has already found otherwise, Syncora's arguments should fail.

First, as Syncora's shifting arguments regarding its rights under the Collateral Agreement demonstrate, Syncora has been unable to identify any persuasive argument in favor of its ability to control U.S. Bank's handling of funds in the General Receipts Subaccount. Thus, as the state court found, Syncora is unlikely to prevail on the merits of this dispute.

Second, even if Syncora had any rights in the Casino Revenues collateral, the likelihood that it would suffer irreparable harm from the dissipation of the money received by the City is extremely remote. The City has never defaulted on its swap payments and, indeed, would face severe consequences if it were to do so, including the loss of its recent settlement with the swap counterparties and the payment of an enormous termination fee. Unless the City defaults, Syncora is not required to pay out under its insurance policies, is not subrogated to the swap counterparties' rights and has no claim of need for the money in the General Receipts Subaccount. Moreover, the Casino Revenues are a steady, replenishing stream of money that will be unchanged by the City's financial restructuring. Every month, on average, an additional $15 million of Casino Revenues accumulates in the Subaccount and this is expected to continue for at least the next ten years. *See* Orr Aff., Ex. A at 47. Thus, if Syncora were ever called upon to pay a missed quarterly swaps payment—which is now even more unlikely given the recent settlement—there will be sufficient cash in the General Receipts Subaccount to reimburse it.

Third, balanced against the extremely remote possibility that Syncora will suffer any harm, let alone irreparable harm, the City detailed before the state court the immediate and irreparable consequences that would result from the monthly loss of up to $15 million in revenue. Indeed, the consequences of losing that amount of money to a large city with only $40 million cash on hand at the end of May are not difficult to imagine. As the state court recognized, and as the Emergency Manager has averred in his affidavit, *see* Orr Aff. ¶¶ 21-24,

such a loss would put at risk the City's ability to adequately provide police, fire, and other public services to its residents and to successfully negotiate with key stakeholders. Although, as a result of the TRO, the City has been able to complete negotiations with the swap counterparties, an order to disgorge up to $15 million would have severe repercussions for the City's already precarious financial condition.

Finally, there can be little doubt that the public interest weighs strongly against the relief sought by Syncora. Granting Syncora's request would put at risk the health and welfare of the citizens of Detroit and erect a significant road block to a successful financial restructuring. The immediate and irreparable harm that the City of Detroit and its residents would suffer if the City were not given uninterrupted access to these funds significantly outweighs any potential interest of a private insurance company that has a hypothetical claim of monetary damages in the future.

## CONCLUSION

For the reasons set forth above, plaintiff City of Detroit respectfully submits that Syncora's motion should be denied in its entirety.

Dated:       July 17, 2013

/s/ Deborah Kovsky-Apap
Robert S. Hertzberg
Deborah Kovsky-Apap
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
(248) 359-7300  -  Telephone
(248) 359-7700  -  Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com


Thomas F. Cullen, Jr.
Gregory M. Shumaker
Geoffrey S. Stewart
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2013, I electronically filed the foregoing *City of Detroit's Brief In Opposition to Defendant Syncora Guarantee Inc.'s Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedited Discovery* and this *Certificate of Service* with the clerk of the court using the ECF system, which will send electronic notice to the following ECF participants:

Andrea L. Hansen      ahansen@honigman.com

Brendan H. Frey      bfrey@manteselaw.com, ssikorski@manteselaw.com

Dirk H. Beckwith      dbeckwith@fosterswift.com, jdickinson@fosterswift.com

Gerard V. Mantese      gmantese@manteselaw.com, bren@manteselaw.com

Ian M. Williamson      iwilliamson@manteselaw.com, ssikorski@manteselaw.com

Jennifer Z. Belveal      jbelveal@honigman.com, mjohnson@honigman.com

Robert S. Hertzberg      hertzbergr@pepperlaw.com


Dated:  July 17, 2013                    /s/ Deborah Kovsky-Apap
                                         Deborah Kovsky-Apap
                                         PEPPER HAMILTON LLP
                                         4000 Town Center, Suite 1800
                                         Southfield, MI  48075
                                         (248) 359-7300  -  Telephone
                                         (248) 359-7700  -  Fax
                                         kovskyd@pepperlaw.com

**<u>Exhibit 6(E)</u>**

**City's Motion for Protective Order**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

| | |
|---|---|
| CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan ) ) ) ) | Case No.: 2:13-cv-12987-LPZ-MKM |
| Plaintiff, ) | |
| v. ) | Hon. Lawrence P. Zatkoff |
| SYNCORA GUARANTEE INC., a New York Corporation, ) ) | |
| and ) | |
| U.S. BANK, N.A., ) | |
| and ) | |
| MGM GRAND DETROIT, LLC, ) | |
| and ) | |
| DETROIT ENTERTAINMENT, LLC, d/b/a MOTORCITY CASINO HOTEL, ) ) | |
| and ) | |
| GREEKTOWN CASINO, LLC, ) | |
| Defendants. ) | |

_____

## CITY OF DETROIT'S MOTION FOR PROTECTIVE ORDER

On Friday, July 12, 2013 at 5:17 pm the City received emergency motion papers from
Syncora seeking Court approval to dissolve a temporary restraining order and conduct broad and
expansive discovery on a breakneck schedule.  Syncora served these demands notwithstanding
the fact that the City had earlier that afternoon expressed its willingness to dissolve the TRO and

1

indefinitely postpone a preliminary injunction hearing that had been scheduled.  Syncora demanded that the City and seven additional parties and non-parties, including U.S. Bank, each of the City's two service corporations, Ernst & Young, UBS AG, SBS Financial Products Company, and even the City's outside lawyers respond to 138 document requests in less than a week.  Additionally, Syncora sought to depose City of Detroit Emergency Manager Kevyn Orr and six corporate representatives from parties and non-parties on or before July 26, 2013.

As the Court is aware from the City's Preliminary Response and Notification of Consent, the emergency that necessitated the TRO against Syncora has now passed, and a settlement with the swap counterparties has been effectuated.  As a result, the City does not require injunctive relief against Syncora at this time.  The City has not only agreed to dissolve the TRO issued by the Wayne County Circuit Court on July 5, 2013, but also to postpone its request for a preliminary injunction indefinitely.

In light of these developments, none of Syncora's proposed discovery even arguably relates to the only outstanding request for immediate attention from the Court, namely Syncora's last minute, unsubstantiated demand that the City return the $15 million of Casino Revenues to which it gained access as a result of the state court's TRO.  As demonstrated by the City's separate filing today, none of this discovery is required for the Court to dispense with this baseless request.  And even though the vast majority of the discovery Syncora seeks relates solely to the City's efforts to get a TRO that it has agreed to dissolve, Syncora refuses to withdraw its discovery requests.  The reason is clear: this discovery was intended to harass the City for obtaining a TRO that kept Syncora from continuing its effort to financially strangle the City.

Against this background, there is no good reason why discovery should not proceed in this matter under the standard schedule contemplated by the Federal Rules of Civil Procedure, the local rules of this District, and the Court's Practice Guidelines.  To wit, this case was removed on Thursday, July 11, 2013, just 4 business days ago.  No answer or dispositive motion has been filed, and by the rules of this Court no Federal Rule 16(b) initial scheduling conference will be set until such time.  Notwithstanding the City's initial need to obtain a TRO, this lawsuit is still very much in its infancy.

Absent Court order, Federal Rule 26(d)(1) prohibits parties from propounding discovery until they have conferred under Rule 26(f).  A Rule 26(f) discovery conference, which ordinarily occurs at least 21 days before the initial scheduling conference under Rule 16(b), serves a number of important purposes.  It allows the parties to exchange views on discovery scope, timing, and limitations, and in complex cases such as this to plan for the orderly schedule and sequencing of bilateral discovery.  With enough time and notice, counsel for the parties can have a reasoned exchange of views, engage on important topics and likely disputes, and resolve differences without the need for Court intervention.  None of that has happened here.

Unable to make the necessary showing of good cause for expedited discovery, Syncora still refuses to withdraw or limit its Emergency Motion and related discovery requests.  Ex. A, Irwin Decl. at ¶¶ 2-7.  A good faith effort to resolve this dispute without Court intervention under Federal Rule 26(c) and Local Rule 7.1(a) having proven unsuccessful, the City has no choice but to seek an appropriate protective order from the Court.

## **BRIEF IN SUPPORT OF MOTION FOR PROTECTIVE ORDER**

### **ISSUE PRESENTED**

Whether good cause exists for Syncora's expansive discovery on an expedited basis and prior to a Rule 26(f) discovery conference when the City has agreed to dissolve the temporary restraining order at issue here and withdraw its request for a preliminary injunction.

## RELEVANT AUTHORITIES

Federal Rule of Civil Procedure 26(d)(1) provides that "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order."

*Psychopathic Records Inc. v. Anderson*, No. 08-13407, 2008 BL 251694, at *2 (E.D. Mich. Nov. 7, 2008) and other decisions in the Eastern District of Michigan impose a requirement that, in addition to a showing of good cause, expedited discovery must be "narrowly tailored to only seek the discovery that is warranted at [this] early stage of the litigation." *See also Dassault Systemes, S.A. v. Childress*, No. 09-10534, 2009 BL 232734, at *4 (E.D. Mich. Oct. 27, 2009).

Federal Rule of Civil Procedure 26(c) permits a Court, for good cause, to "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery; (B) specifying terms, including time and place, for the disclosure or discovery; (C) prescribing a discovery method other than the one selected by the party seeking discovery; (D) forbidding inquiry into certain matters, or limiting the scope of discovery or disclosure to certain matters ...."

## ARGUMENT

On Monday morning, July 15, 2013, the City filed a preliminary response to Syncora's emergency motions confirming what it told Syncora's counsel on Friday afternoon: it is willing to dissolve the outstanding temporary restraining order.  Syncora responded later that day and continued to press forward on its Emergency Motions on the pretext that the City's refusal to return $15 million of Casino Revenues to its bank account at U.S. Bank necessitates emergency attention from this Court.  Thus, even according to Syncora, the only possible dispute requiring this Court's immediate focus is now the return of these funds.

We address why Syncora has no rights to the funds in the City's Brief in Opposition to Defendant Syncora Guarantee Inc.'s Emergency Motion To Dissolve The Temporary Restraining Order And Conduct Expedited Discovery filed separately today.  This Motion for Protective Order addresses the oppressive discovery demanded by Syncora in support of its improper request for disgorgement.

The discovery that Syncora seeks in its Emergency Motion is remarkably expansive and overbroad under any standard, but when considered in the context of an action where there is no outstanding request for preliminary injunctive relief, it has no justification whatsoever.  Syncora seeks 138 categories of documents—exclusive of subparts—covering a wide range of topics. With no limitation as to time period, Syncora seeks broad discovery with regard to the City's financial condition, its plans for dealing with its current financial difficulties, its negotiations with all of its creditors, all of its duties and obligations under numerous financial agreements, its

decisionmaking and use of funds from various revenue streams, and other generalized categories. *See* Ex. B (summarizing document requests)[1].

The targets of this discovery would not only be the City and U.S. Bank, but also the City's lawyers, and five other non-parties as well.  Moreover, if the City's July 18, 2013 return date is any guide (giving it just four business days to comply), Syncora's schedule would be virtually impossible for any of the parties to meet even with infinite resources.

Even if compliance were requested over the course of a reasonable time period, the burden and cost to the City would be extreme.  The requests to the City—without any narrowing that a Rule 26(f) conference, for example, would afford—do not contain a standing instruction or limitation of any sort on the time period for responsive documents.  In other words, as currently framed the document requests on these topics are essentially limitless.  The time and expense associated with reviewing and identifying such records and preparing them for production would be massive, not to mention the time and expense that would be required for the City to review and analyze the document productions from other parties and non-parties.  Ex. A, Irwin Decl. ¶¶ 8-9.  Preparation and attendance at seven depositions would be equally time-consuming, all at a time when the City can ill-afford significant distractions from the financial crisis that its Emergency Financial Manager is attempting to resolve.[2]  *Id.* ¶¶ 10-11.

---

[1] For the Court's convenience, in Exhibit B the City has summarized and grouped by category the various document requests that have been directed to all intended recipients.  Copies of the proposed discovery requests themselves are also attached as Exhibits C-Q.

[2] It is noteworthy that the Court of Appeals for the State of Michigan has determined that Mr. Orr, whose deposition is one of seven that Syncora seeks, is a high-ranking public official whose deposition may only be taken in a state court proceeding upon a showing that the information "cannot be obtained from any other discovery source or mechanism" and "that such deposition is essential to prevent prejudice or injustice."  *See* Ex. 1 to Irwin Decl., Order, *Davis v. Local Emergency Financial Assistance Loan Board*, L.C No. 13-00281-NZ, (Mich. Ct. App. May 13, 2013) (reversing decision to allow deposition of Orr and others).

As the City has demonstrated by separate filing today, Syncora's request is neither legally sound nor procedurally proper. *See* Brief in Opposition to Defendant Syncora Guarantee Inc.'s Emergency Motion To Dissolve The Temporary Restraining Order And Conduct Expedited Discovery, dated July 17, 2013, at 14-22. Even if it could make a request for equitable disgorgement in the manner it has, the issue would largely be a legal question. To the extent any factual discovery is necessary to establish the *status quo ante*—including the parties' course of dealing in allowing the City to have access to Casino Revenues for four years prior to Syncora's illegal instruction to U.S. Bank—it can certainly be accomplished without the vast majority of the vexatious discovery that Syncora has proposed be completed in the next few days.[3]

Federal courts in Michigan require a party seeking expedited discovery in advance of a Rule 26(f) conference to carry the burden of "showing good cause in order to justify deviation from the normal timing of discovery." *Gen. Ret. Sys. of City of Detroit v. Onyx Capital Advisors, LLC*, No. 10-cv-11941, 2010 BL 124373, at *4 (E.D. Mich. June 3, 2010) (denying plaintiffs' request for expedited discovery because they failed to show good cause or need to deviate from a normal discovery schedule); *Diplomat Pharmacy, Inc. v. Humana Health Plan, Inc.*, No. 1:08-CV-620, 2008 BL 155256, at *1-2 (W.D. Mich. July 24, 2008) (denying plaintiff's request for expedited discovery because it did not meet its burden of showing good cause or need for expedited discovery).

---

[3] The Sixth Circuit has repeatedly held that Federal Rule of Civil Procedure 26 permits a district court to issue a protective order to protect a party from "annoyance, embarrassment, oppression, or undue burden or expense" upon a showing of good cause. *See, e.g.*, *Graves v. Bowles*, 419 Fed. Appx. 640, 645 (6th Cir. 2011) (district court did not abuse its discretion in issuing a protective order); *Nix v. Sword*, 11 Fed. Appx. 498, 500 (6th Cir. 2001) (affirming the district court's grant of a motion for a protective order); *Coleman v. Am. Red Cross*, 979 F.2d 1135, 1138 (6th Cir. 1992) (affirming the district court's protection order).

In cases where this Court has permitted expedited discovery, the discovery requests have been narrowly tailored so as to avoid undue burden and expense. *See*, *e.g.*, *Psychopathic Records Inc. v. Anderson*, No. 10-cv-11941, 2008 BL 251694, at *2 (E.D. Mich. Nov. 7, 2008) (granting expedited discovery in part because plaintiffs' request was narrowly tailored, seeking only the discovery that was warranted at an early stage of litigation); *Dassault Systemes, S.A. v. Childress*, No. 09-10534, 2009 BL 232734, at *4 (E.D. Mich. Oct. 27, 2009) (granting plaintiff's request for expedited discovery because it was directed at a third party in possession of defined and pre-existing collection of materials).

The overbroad discovery that Syncora seeks here is neither narrowly tailored nor relevant to any aspect of its disgorgement request. In fact, many of the requests fail to satisfy any conceivable test for relevance or the threshold discoverability standards under Federal Rule 26(b)(1). A number of Syncora's requests, for example, inquire into the City's discussions with any and all of its creditors or stakeholders, regardless of context. Requests seeking "all documents or communications" relating to the City's "promises to stakeholders," its ten-year financial projections, or its "ongoing negotiations or proposed settlements" with its creditors (*see* Ex. B at 2-3), plainly exceed what would be necessary or relevant to test the limited issues that would come up in any expedited proceeding required here, and bear little, if any, relevance to the issues that require ultimate resolution. Similarly, Syncora's broad requests into the City's general financial health, or the Emergency Manager's plan to address the City's short- and long-term financial needs are not only grossly overbroad, but also have nothing to do with what is now at issue in this lawsuit. *See* Ex. B at 1-2.

Other requests similarly relate to subjects that are neither emergent nor relevant at this early time. For example, certain requests focus on the harm that Syncora's conduct has caused

the City.  *See* Ex. B at 11-12.  Whatever may be pertinent to the question of damages at a later

date, there is no present request by the City for temporary or preliminary injunctive relief against

Syncora, and no need in the next 10 days for either party to conduct widescale discovery on the

question of what injuries the City has suffered due to Syncora's conduct.   Similarly, Syncora has

requested documents relating to the City's position that it faced irreparable harm without notice

to Syncora of its application for injunctive relief from the Wayne County Circuit Court on July 5.

*See* Ex. B at 12.  Since the City has agreed to dissolve the TRO, that question is entirely moot.

Even if they were not premature, many of Syncora's other requests lack any focus or

specificity.  One such request seeks all documents or information relating to "the allegations in

paragraphs 53-61, 63-68, 70-73, and 74-79 of the Complaint."  *See* Ex. B at 13.  These are

references to all of the substantive paragraphs pled in connection with each of the City's counts

against Syncora.  Even a casual review of the paragraphs in the Complaint demonstrates that this

kind of potentially limitless, catch-all request will inevitably sow confusion and disagreement.

This type of request far exceeds what could possibly be relevant to any issue in need of

immediate attention from this Court.

Similarly, document requests seeking "all documents or communications relating to the

City's attempts to realize additional sources of cash or revenue," or those "relating to Kevyn

Orr's authority over the Service Corporations" (*see* Ex. B at 11, 14), are both confusing and

absurdly overbroad.  By the same token, other requests are potentially limitless, such as

Syncora's request for any and all documents "relating to the City's efforts and abilities to deliver

municipal services."  *See* Ex. B at 1-2.  The unlikely return of any documents that are actually

relevant to this dispute in response to such requests cannot justify the enormous burden of

compliance on the City.  *See* Ex. A, Irwin Decl. ¶¶ 8-9.

Still other requests seek information that has no bearing on this dispute whatsoever. Syncora's interest in documents and information surrounding the City's decision not to make a June 14, 2013 payment to certain holders of debt instruments entitled Certificates of Participation, or "COPs", is particularly misguided. *See* Ex. B at 6. Non-payment either did or did not constitute an event of default under the Collateral Agreement at issue here, but the reasons behind the City's decision have nothing to do with that analysis. There is similarly no good reason why Syncora needs to know "the current or potential uses of the approximately $40 million" that the City declined to pay. *See* Ex. B at 6. Forcing the City to search for and produce "all documents or communications" relating to Syncora's insurance of the COPs payments or the City's "obligations to the Service Corporations" under any of the COPs-related agreements (*id.*) would be equally oppressive and vexatious in light of their dubious relevance now or in the future.

Even if Syncora's emergency motion could somehow be properly converted into a TRO application and the Court were required to address Syncora's likelihood of success on the merits of its claim for the City's return of $15 million, the core issues in any such proceeding would be fairly narrow. In fact, liability would turn almost entirely on two questions: (1) does Syncora have a contractual right under the Collateral Agreement to instruct U.S. Bank to withhold Casino Revenues from the City under Section 5.4; and (2) did the City's failure to make a $40 million payment to COPs-holders on June 14, 2013 constitute an event of default under the same section? Particularly since the threshold issue is a question of pure contractual construction (even according to Syncora itself, *see* Emergency Motion at 14-16), it is unfathomable as to why Syncora needs the documents it has requested.

Perhaps there is no better example of the true motives behind Syncora's oppressive discovery demands than its desire to propound extensive document requests directly on Jones Day, counsel to the City on numerous issues relating to the City's financial crisis broadly and litigation counsel to the City in this lawsuit.  In fact, of the 31 document requests that Syncora proposes to deliver to the City directly, no fewer than 30 of those requests are also directed verbatim to Jones Day.  *See generally*, Ex. B.  Notwithstanding the rather obvious overlap between the two sources of information, Syncora's callous disregard for the degree to which its requests to Jones Day call for privileged materials and information is staggering.  The privilege log alone would take weeks to create.  Plainly this is an attempt to harass and burden the City and its lawyers with intrusive discovery where Syncora has no reasonable expectation of a responsive production.

What is apparent from Syncora's recent tactics is that, without Court intervention, Syncora will deploy abusive discovery practices in order to inflict maximum disruption on the City and its efforts to navigate these difficult times.  These are not requests seeking "only that information which is necessary to determine whether injunctive relief is necessary."  Emergency Motion at 24.  They are far broader, and they do not meet the discovery standards under Federal Rule 26.  Particularly in light of the City's agreement to stand down on its request for injunctive relief, there is no good reason to impose such a crushing burden on parties and non-parties alike.

For all of these reasons, the City seeks an appropriate protective order under Federal Rule 26(c).  Specifically, the City requests an order relieving it of any obligation to respond to the instant discovery requests from Syncora.  Further, the City seeks a Court order prohibiting Syncora from initiating any discovery from any source until the parties have conferred under

Federal Rule 26(f) and agreed upon a schedule for the orderly conduct of mutual discovery in this matter.

## CONCLUSION

For the reasons set forth above, this Court should deny Syncora's motion for expedited discovery and issue a protective order in the form requested.

Dated:       July 17, 2013

/s/Deborah Kovsky-Apap
_____
Robert S. Hertzberg
Deborah Kovsky-Apap
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
(248) 359-7300  -  Telephone
(248) 359-7700  -  Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com


Thomas F. Cullen, Jr.
Gregory M. Shumaker
Geoffrey S. Stewart
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2013, I electronically filed the foregoing *City of Detroit's Motion for Protective Order*, *Brief in Support of Motion for Protective Order* and this *Certificate of Service* with the clerk of the court using the ECF system, which will send electronic notice to the following ECF participants:

Andrea L. Hansen      ahansen@honigman.com

Brendan H. Frey      bfrey@manteselaw.com, ssikorski@manteselaw.com

Dirk H. Beckwith      dbeckwith@fosterswift.com, jdickinson@fosterswift.com

Gerard V. Mantese      gmantese@manteselaw.com, bren@manteselaw.com

Ian M. Williamson      iwilliamson@manteselaw.com, ssikorski@manteselaw.com

Jennifer Z. Belveal      jbelveal@honigman.com, mjohnson@honigman.com

Robert S. Hertzberg      hertzbergr@pepperlaw.com


Dated:  July 17, 2013                    /s/ Deborah Kovsky-Apap
                                         Deborah Kovsky-Apap
                                         PEPPER HAMILTON LLP
                                         4000 Town Center, Suite 1800
                                         Southfield, MI  48075
                                         (248) 359-7300  -  Telephone
                                         (248) 359-7700  -  Fax
                                         kovskyd@pepperlaw.com

**Exhibit 6(F)**

**Syncora's Notice of Proposed Stipulated Order**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

CITY OF DETROIT,
a Municipal Corporation Organized
and Existing Under the Laws of the
State of Michigan,

        Plaintiff,

    v.

SYNCORA GUARANTEE INC.,
a New York Corporation,

and

U.S. BANK, N.A.,

and

MGM GRAND DETROIT, LLC,

and

DETROIT ENTERTAINMENT, LLC,
d/b/a MOTORCITY CASINO HOTEL,

and

GREEKTOWN CASINO, LLC,

        Defendants.

Case No.: 2:13-cv-12987-LPZ-MKM

Hon. Lawrence P. Zatkoff

## NOTICE OF PROPOSED ORDER DISSOLVING
## THE JULY 5, 2013 TEMPORARY RESTRAINING
## ORDER OBTAINED BY PLAINTIFF CITY OF DETROIT
## AND PLAINTIFF'S REFUSAL TO CONSENT TO DISSOLUTION

Defendant Syncora Guarantee, Inc. ("Syncora"), by the undersigned attorneys and for its Notice of Proposed Order Dissolving the July 5, 2013 Temporary Restraining Order Obtained by Plaintiff City of Detroit and Plaintiff's Refusal to Consent to Dissolution, states as follows:

Plaintiff, the City of Detroit ("the City"), has represented in numerous filings in this case that it agrees to the dissolution of the temporary restraining order ("TRO") entered against Syncora by the Wayne County Circuit Court on July 5, 2013, and has also acknowledged that there is no reason for the TRO to remain in place.  Furthermore, the City explicitly stated that it would agree to a stipulated order to effect the dissolution.  See, *e.g.*, *Preliminary Response to Motion and Notification of the City's Consent to Dissolution of Temporary Restraining Order and Withdrawal of Request for Hearing on Preliminary Injunction* [DE 11], p. 2: "We will agree to an appropriate stipulated order to effect the dissolution."

On July 30, 2013, Syncora attempted to memorialize this limited agreement through a proposed stipulated order that would dissolve the TRO, but would reserve, for a later order or orders from the Court, the issues that remain in dispute with respect to Defendant Syncora Guarantee Inc.'s Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedited Discovery [DE 10].  (Ex 1, *Proposed Stipulated Order*).  The proposed order also explicitly reserves all other disputed issues in this case.  (Ex 1).  Surprisingly, the City now

refuses to consent to dissolution of the TRO and refuses to enter into an appropriate stipulated order.

Syncora has been living under the TRO, that the City obtained on an *ex parte* basis and which the City has admitted is unnecessary, for nearly one month. Under Michigan law, a temporary restraining order typically cannot exceed 14 days. MICHIGAN COURT RULE 3.310(B)(3). Syncora respectfully requests entry of an order dissolving the TRO, even if the remaining issues are decided at a later date, and/or an order setting an expedited hearing on Defendant Syncora Guarantee Inc.'s Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedited Discovery [DE 10].

Dated:  July 31, 2013                              Respectfully submitted,

                                                  By:  /s/ Gerard V. Mantese
                                                       Gerard V. Mantese (P34424)
Stephen C. Hackney                                     Brendan H. Frey (P70893)
Ryan Blaine Bennett                                    Mantese Honigman Rossman
William E. Arnault                                        and Williamson, P.C.
Lally A. Gartel                                        1361 East Big Beaver Road
KIRKLAND & ELLIS LLP                                   Troy, Michigan 48083
300 North LaSalle                                      Phone: 248-457-9200
Chicago, Illinois 60654                                Fax: 248-457-9201
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*ATTORNEYS FOR DEFENDANT*                          *ATTORNEYS FOR DEFENDANT*
*SYNCORA GUARANTEE, INC.*                          *SYNCORA GUARANTEE, INC.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2013, I caused the foregoing papers to be electronically filed with the Clerk of the Court using the ECF system which will send electronic notices of same to all counsel of record.

I declare under the penalty of perjury that the foregoing statements are true to the best of my knowledge, information, and belief.

/s/ Gerard V. Mantese
Gerard V. Mantese

4

**Exhibit 6(G)**

**Syncora's Proposed Stipulated Order**



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITY OF DETROIT,
a Municipal Corporation Organized
and Existing Under the Laws of the
State of Michigan,

                Plaintiff,

        v.

SYNCORA GUARANTEE INC.,
a New York Corporation,

and

U.S. BANK, N.A.,

and

MGM GRAND DETROIT, LLC,

and

DETROIT ENTERTAINMENT, LLC,
d/b/a MOTORCITY CASINO HOTEL,

and

GREEKTOWN CASINO, LLC,

                Defendants.

Case No.: 2:13-cv-12987-LPZ-MKM

Hon. Lawrence P. Zatkoff

## [PROPOSED] STIPULATED ORDER DISSOLVING THE JULY 5, 2013 TEMPORARY RESTRAINING ORDER OBTAINED BY PLAINTIFF CITY OF DETROIT

Consistent with the Stipulation of the Parties, by and through their attorneys, and the Court being advised in the premises;

**IT IS HEREBY ORDERED** that the temporary restraining order (the "TRO") obtained by Plaintiff City of Detroit (the "City") on July 5, 2013 in the Circuit Court for the County of Wayne, Case No. 13-008858-CZ is dissolved.

**IT IS FURTHER ORDERED** that this Order does not resolve, and the parties reserve their rights regarding, any of the issues in the above-entitled matter that are currently in dispute, including, but not limited to, whether the City must restore monies received during the pendency of the TRO.

**IT IS SO ORDERED.**

_____
LAWRENCE P. ZATKOFF
United States District Judge

Stipulated to by:

_/s/ Stephen C. Hackney_____
STEPHEN C. HACKNEY
Attorney for Syncora Guarantee Inc.

_____
GREGORY M. SHUMAKER
Attorney for City of Detroit

**Exhibit 6(H)**

**City's Response to Proposed Stipulated Order**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

———————

| | |
|---|---|
| **CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan** ) ) ) ) | **Case No.:  2:13-cv-12987-LPZ-MKM** |
| **Plaintiff,** ) | **Hon. Lawrence P. Zatkoff** |
| **v.** ) ) | |
| **SYNCORA GUARANTEE INC., a New York Corporation,** ) ) ) | |
| **and** ) ) | |
| **U.S. BANK, N.A.,** ) ) | |
| **and** ) ) | |
| **MGM GRAND DETROIT, LLC,** ) ) | |
| **and** ) ) | |
| **DETROIT ENTERTAINMENT, LLC, d/b/a MOTORCITY CASINO HOTEL,** ) ) ) ) | |
| **and** ) ) | |
| **GREEKTOWN CASINO, LLC,** ) ) | |
| **Defendants.** ) ) | |

———————

## PLAINTIFF CITY OF DETROIT'S RESPONSE TO DEFENDANT SYNCORA'S NOTICE OF PROPOSED ORDER DISSOLVING THE JULY 5, 2013, TEMPORARY RESTRAINING ORDER

1

Syncora's submission further underscores the need for this proceeding to be transferred to the Bankruptcy Court pursuant to Local Rule 83.50(a). The issue in this case is whether the City can expect continued access to much-needed revenue while it develops a plan of adjustment in bankruptcy, or whether this revenue will be subject to interference by a party with a weak and contrived claim. This is a central issue in the City's bankruptcy case; it is one that the Bankruptcy Court will necessarily resolve within a few weeks in adjudicating the City's pending motion to assume and approve its recent, crucial Settlement with its swap counterparties;[1] and it is one that Syncora has already appeared before the Bankruptcy Court to contest. It is precisely to avoid this sort of duplicative litigation and the danger of inconsistent rulings that underpins this Court's standing order for automatic referral to the Bankruptcy Court of proceedings that are at least "related to" a bankruptcy case.

---

[1] The settlement ("Settlement") between the City and the swap counterparties provides that the City will have the option to buy-out its interest rate swap contracts with the counterparties at an attractive discount. In return, the counterparties will release their claims upon the casino revenues the City receives from taxes and "developer payments" that it imposes upon Detroit's three casinos. Since 2009, those casino revenues have been pledged to the counterparties as security for the City's obligations to the counterparties. Upon approval of the Settlement, however, the counterparties will release their security interest in the casino revenues, enabling the City to have untrammeled access to the revenues. As part of the Settlement, the counterparties also will relinquish any rights they might have to pursue claims against Syncora, which is an insurer of the City's swap payments.

1.   Contrary to Syncora's assertions, the temporary restraining order
("TRO") issued by the Wayne County Circuit Court was not limited in duration.
Rather, that court recognized the emergency circumstances facing the City and
entered a TRO of indefinite duration.  There are sound reasons for this.  The
lockbox system with which Syncora interfered provides for monthly payouts to the
City and monthly replenishment of those funds.  Unless enjoined, Syncora would
have interfered with this system repeatedly, causing the City irreparable harm.  In
fact, Syncora's recent conduct suggests that this is precisely what it plans to do if
the TRO is dissolved.

2.   As this Court is aware, two weeks ago, the City offered to voluntarily
dissolve the TRO pursuant to an appropriate stipulated order.  The City made this
offer because it had recently concluded its Settlement with the swap counterparties
and because it was about to file its bankruptcy petition, which the City thought
would moot this case and, in all events, move it to the Bankruptcy Court.
However,  Syncora rejected that offer, and instead interposed the obviously
unacceptable condition that the City return to the lockbox the $15 million it had
received while the TRO was in place.  The City could not accept this condition,
and we made clear in our July 15 filing in this Court that the City would agree to
"an *appropriate* stipulated order" dissolving the TRO.  *See* Preliminary Response
to Motion and Notification of the City's Consent to Dissolution of Temporary

Restraining Order and Withdrawal of Request for Hearing on Preliminary Injunction, at ¶ 1 (ECF Doc. # 11) (emphasis added).  Syncora did not respond to this invitation for over two weeks.  On July 30—in connection with a broader strategy of litigating on no fewer than three fronts—Syncora offered a proposed order that would dissolve the TRO, but continued to reserve its demand for the return of casino revenues.

3.  In the meantime, there have been a series of significant developments:

a)  On July 18, the City filed for bankruptcy protection under chapter 9 of the Bankruptcy Code, 11 U.S.C. § 901 *et seq*.

b)  That same day, the City filed a motion in the Bankruptcy Court for an order authorizing the assumption of the City's Settlement with the swap counterparties pursuant to section 365(a) of the Bankruptcy Code and approving the Settlement pursuant to Bankruptcy Rule 9019.  *See* Docket No. 17, *In re City of Detroit, Michigan*, No. 13-53846 (Bankr. E.D. Mich.). The Settlement, if approved, should moot this case.  Nevertheless, Syncora filed objections to the Settlement in the Bankruptcy Court and has requested expedited discovery.  (The discovery, in fact, substantially overlaps with the set of discovery demands Syncora previously served and has pending in this action.)  The Bankruptcy Court will hear Syncora's motion for discovery tomorrow, August 2.

c)  On July 15, despite the pendency of the TRO, Syncora sent letters
to the swap counterparties expressing its position that the swaps could not be
terminated without its consent and indicating that Syncora would not
consent to a termination of the swaps pursuant to the Settlement.[2]

d)  On July 24, Syncora filed yet another lawsuit, this time in New
York state court against the swap counterparties.  In that suit—which was
removed by the counterparties to federal court and stayed yesterday
afternoon—Syncora attempted to enjoin the Settlement as a violation of
Syncora's rights under the swap agreements, notwithstanding the fact that
Syncora had a parallel effort underway in the Bankruptcy Court, was
attempting to proceed in this Court as well, and, in all events, was subject to
the automatic stay of 11 U.S.C. § 362(a)(3).[3]

---

[2] This letter, and the response of SBS Financial Products Company, L.L.C.,
are attached as Exhibits 5 and 7 to the Declaration of Christopher J. DiPompeo
in Opposition to Defendant's Emergency Motion to Dissolve the Temporary
Restraining Order and Conduct Expedited Discovery (ECF Doc. # 19).

[3] The City filed a notice of its bankruptcy case in the New York state court
on July 31.  That same day, the swap counterparties removed the case to federal
court and moved for a transfer of venue to the Eastern District of Michigan, so that
the suit could be considered by the Bankruptcy Court in conjunction with the
assumption motion.  Judge Lewis A. Kaplan, of the United States District Court for
the Southern District of New York, then stayed the proceedings while the court
considered whether to transfer the case to the Bankruptcy Court.  The court
directed the parties to file briefs regarding the swap counterparties' transfer motion
on August 10 and 15.  *See Syncora Guarantee Inc. v. UBS AG, et al.*, No. 1:13-cv-
05335-LAK (S.D.N.Y.).

4. The centerpiece of all three of these matters is the City's right to access the casino revenues that are protected by the lockbox system established by the Collateral Agreement. The Bankruptcy Court has already scheduled a hearing on the City's motion to assume the Settlement, and will entertain any objections to the Settlement in that proceeding—including those raised by Syncora in the instant litigation. Having independent litigation in this Court over the very same matters already pending in the Bankruptcy Court will waste judicial resources, increase costs, and risk inconsistent results. Avoiding such disorder is, of course, the purpose of Local Rule 83.50(a).

5. Second, based on Syncora's repeated actions over the past two weeks, the City believes that Syncora would again attempt to restrict the City's access to its casino revenues if the TRO were dissolved.[4] Yet this question—the ability of a cash-strapped debtor to access its own funds—is one of the core issues in any bankruptcy and, we submit, a matter that in the end should be resolved by the Bankruptcy Court.

---

[4] Although we believe Syncora's actions already may have violated the automatic stay, even that issue would have to be resolved by the Bankruptcy Court. *See* 11 U.S.C. § 362(a)(3) (providing that a bankruptcy filing operates as an automatic stay of "any act to obtain possession of property of the estate . . . or to exercise control over property of the estate"); *In re Jefferson County, Alabama*, 484 B.R. 427, 446-47 (N.D. Ala. 2012) ("Any action that affects property of the debtor in a manner within the automatic stay's sphere, including a declaratory judgment action, is subject to § 362(a)(3), even if the debtor is not named in the action.").

6. In sum, the state court chose to enter a TRO of unlimited duration. The City offered to dissolve the TRO before commencing its bankruptcy case, but Syncora at first refused and then, almost two weeks later, belatedly attempted to accept the City's offer, but with reservations. Syncora's actions during the interim, however, have proven the importance of the TRO, and the City believes that this issue should be resolved as part of the Bankruptcy Court's oversight of the City's chapter 9 proceeding. Rather than litigate the same question in three different forums, the City requests that this Court transfer this proceeding to the Bankruptcy Court so that the issue of dissolving the TRO may be addressed by that court.

s/ Robert S. Hertzberg
Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
(248) 359-7300  -  Telephone
(248) 359-7700  -  Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

Thomas F. Cullen, Jr.
Gregory M. Shumaker
Geoffrey S. Stewart
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Dated:     August 1, 2013

*Attorneys for Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of August, 2013, I caused to be electronically filed the foregoing Plaintiff City of Detroit's Response to Defendant Syncora's Notice of Proposed Order Dissolving the July 5, 2013, Temporary Restraining Order and this Certificate of Service with the United States District Court, Eastern District of Michigan, and notice will be sent by operation of the Court's electronic filing system to all ECF participants.

I further certify that I caused to be delivered a courtesy copy of the aforesaid to the Hon. Lawrence P. Zatkoff, 526 Water Street, Port Huron, MI 48226, via Federal Express.

s/Robert S. Hertzberg
ROBERT S. HERTZBERG (P30261)

#20334732 v1 (140967.2)

**<u>Exhibit 6(I)</u>**

**Syncora's Response to Motion for Protective Order**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**CITY OF DETROIT,**
**a Municipal Corporation Organized**
**and Existing Under the Laws of the**
**State of Michigan,**

        **Plaintiff,**

     **v.**

**SYNCORA GUARANTEE INC.,**
**a New York Corporation,**

**and**

**U.S. BANK, N.A.,**

**and**

**MGM GRAND DETROIT, LLC,**

**and**

**DETROIT ENTERTAINMENT, LLC,**
**d/b/a MOTORCITY CASINO**
**HOTEL,**

**and**

**GREEKTOWN CASINO, LLC,**

        **Defendants.**

**Case No.: 2:13-cv-12987-LPZ-MKM**

**Hon. Lawrence P. Zatkoff**

## SYNCORA GUARANTEE INC.'S RESPONSE IN OPPOSITION
## TO CITY OF DETROIT'S MOTION FOR A PROTECTIVE ORDER

The City of Detroit's (the "City") Motion for a Protective Order has, at its core, one central argument: Syncora Guarantee Inc. ("Syncora") should not be permitted to conduct expedited discovery because "the City has agreed to dissolve the temporary restraining order at issue here and withdraw its request for a preliminary injunction." (Mot. at 4.)  Relying on its agreement to dissolve the TRO, the City argues that Syncora no longer has good cause to conduct discovery on an expedited basis.  This argument, however, suffers from a fundamental flaw — *there is no such agreement*.  While it is true that, on numerous occasions, the City has expressed its willingness to enter into a stipulated order dissolving the TRO, when Syncora asked the City to do so, the City abruptly reversed course and refused to enter into such a stipulation.  The City's about-face continued when it took the position that the TRO is of "indefinite duration" — a position that is directly contrary to its prior statements and federal law.

Given the City's unwillingness to dissolve the TRO, the central argument in its Motion for a Protective Order — that the existence of an agreement to dissolve the TRO moots the need for expedited discovery — no longer applies.  In fact, because the TRO is still effective, good cause exists for this Court to order expedited discovery relating to Syncora's *Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedited Discovery* ("Emergency Motion").  Accordingly, the City's Motion for a Protective Order should be denied

2

or, in the alternative, the Court should dissolve the TRO and deny the City's

request for a preliminary injunction.

3

**BRIEF IN SUPPORT OF**
**SYNCORA GUARANTEE INC.'S RESPONSE IN OPPOSITION**
**TO CITY OF DETROIT'S MOTION FOR PROTECTIVE ORDER**

**ISSUE PRESENTED**

Whether good cause exists for expedited discovery where the City has

refused to dissolve a temporary restraining order that it obtained *ex parte* and under

false pretenses and which, according to the City, is of "indefinite duration."

4

## MOST APPROPRIATE AUTHORITIES

**Good Cause Exists for Expedited Discovery in Injunctive Proceedings**

Federal Rule of Civil Procedure 26(d)(1) states that "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order."

The 1993 advisory committee notes to Rule 26 state that orders authorizing expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction."

*Ellsworth Associates, Inc. v. United States*, 917 F. Supp. 841, 844 (D. D.C 1996), states that "[e]xpedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *See also U.S. Securities and Exchange Commission v. Wilson*, 2012 WL 5874456, at *4 (E.D. Mich. Nov. 20, 2012).[1]

---

[1] Unpublished opinions cited herein are attached as Exhibit 1.

5

13-53846-swr   Doc 1142-18   Filed 10/09/13   Entered 10/09/13 14:54:57   Page 168 of 190

# ARGUMENT

Tellingly, the City's Motion for a Protective Order does not dispute that expedited discovery is appropriate where, as here, a party has obtained a TRO and is seeking injunctive relief. Rather, the thrust of the City's argument is that Syncora no longer requires expedited discovery because the City has agreed to dissolve the TRO and withdraw its request for injunctive relief. There is, however, a significant flaw in this argument — *the City has not agreed to dissolve the TRO or withdraw its request for injunctive relief.* As a result, the entire factual premise underlying the City's Motion for a Protective Order fails, and Syncora should therefore be permitted to conduct limited discovery surrounding its pending *Emergency Motion to Dissolve the Temporary Restraining Order and Conduct Expedited Discovery.*

Given that the fundamental argument in the City's Motion for a Protective Order no longer applies, the only issue presented by the City's motion is the scope of Syncora's discovery requests. The City claims that it need not provide *any* discovery because of the purported burden of Syncora's discovery requests. The City cannot, however, escape *all* of its discovery obligations simply because it perceives certain requests to be overly broad or unduly burdensome. Furthermore,

6

as described below, Syncora's requests are relevant to the issues necessary to resolve Syncora's Emergency Motion to dissolve the TRO.

**I.      Until the City Abides by its Representations and Agrees to Dissolve the TRO, Good Cause Exists for Expedited Discovery.**

Upon a showing of good cause, courts allow a party to conduct expedited discovery prior to a *Rule 26(f)* conference.  *Dassault Systemes, S.A. v. Keith Childress d/b/a Practical Catia Training*, case no. 09-10534, 2009 U.S. Dist. LEXIS 99708, at *10 (E.D. Mich. Oct. 27, 2009).  "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings."  *Ellsworth Associates, Inc. v. United States*, 917 F. Supp. 841, 844 (D. D.C. 1996); *see also U.S. Securities and Exchange Commission v. Wilson*, case no. 12-cv-15062, 2012 U.S. Dist. LEXIS 165248, at *11 (E.D. Mich. Nov. 20, 2012).

In this case, the City sought and obtained an *ex parte* TRO.  (*Ex Parte Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue*.)  Recognizing that the City obtained the TRO under false pretenses, Syncora promptly moved to dissolve the TRO and obtain limited discovery regarding the allegations supporting the City's claim for injunctive relief.  (Emergency Motion.)  Because the City had already reaped the benefits of this improper TRO (*i.e.*, the release of the $15 million in casino gaming revenues), it informed Syncora and the Court that it was willing to dissolve the TRO and enter

7

into a stipulated order effectuating that dissolution.   (*Preliminary Response to Motion and Notification of the City's Consent to Dissolution of Temporary Restraining Order and Withdrawal of Request for Hearing on Preliminary Injunction*, ¶ 1.)   Yet, when Syncora requested that the City do just that, the City quickly changed course and refused to dissolve the TRO.   (*Plaintiff City of Detroit's Response to Defendant Syncora's Notice of Proposed Order Dissolving the July 5, 2013 Temporary Restraining Order*.)   Worse still, the City asserted — contrary to its prior representations — that the TRO was of "indefinite duration." (*Id.* ¶ 1.)

Though the City's current position is that the TRO should remain in place indefinitely, this reversal undercuts the arguments in its Motion for Protective Order.   In that motion, the City claims that Syncora no longer requires expedited discovery because the City has agreed to dissolve the TRO and withdraw its request for a preliminary injunction.   (Mot. at 4.)   As noted, however, the City has since reneged on that agreement and now refuses to dissolve the TRO.   Thus, by the City's own logic, Syncora has good cause to conduct expedited discovery.

In short, the City cannot have it both ways.   It must either (a) agree to dissolve the TRO or (b) allow Syncora to conduct expedited discovery.   Because the City is now unwilling to dissolve the TRO, Syncora should be entitled to conduct limited discovery relating to its Emergency Motion to dissolve the TRO.

Or, in the alternative, the Court should dissolve the TRO and the City's request for a preliminary injunction.

## II.   The Expedited Discovery Proposed by Syncora is Specific and Narrowly Tailored to Obtain Information Relevant to Syncora's Request for Dissolution of the TRO.

Where good cause for expedited discovery exists, courts allow discovery that is narrowly tailored and reasonably calculated to lead to the discovery of relevant evidence. *Dassault Systemes,* 2009 U.S. Dist. LEXIS 99708, *10 (Granting expedited discovery where "[t]he Court finds that Plaintiff's request is narrowly tailored to include evidence that is available through civil discovery and relevant to its allegations[.]").

Because this dispute involves the propriety of the City's request for injunctive relief, the Court will likely need to balance and consider four factors: (1) the likelihood of success on the merits; (2) whether the City will suffer irreparable injury without the injunction; (3) the harm to others that will occur if the injunction is granted; and, (4) whether the injunction would serve the public interest. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F. 3d 535, 540 (6th Cir. 2007).   To that end, Syncora's proposed discovery is narrowly tailored to address each of these factors.  The City refuses, however, to provide *any* discovery, claiming that the discovery Syncora seeks is irrelevant, overbroad, and unduly burdensome.   Yet, as demonstrated below, the discovery that Syncora

9

requested is relevant to the propriety of the TRO and Syncora's pending Emergency Motion.

Syncora's emergency motion [DE10] attached the specific discovery Syncora will be seeking. (*Emergency Motion* [DE 10], exhibits E-S). In its Motion for a Protective Order, the City attached a summary of Syncora's discovery requests. This exhibit groups Syncora's proposed discovery into nine categories. As explained below, each of these categories relates to at least one of the factors the City must establish to obtain injunctive relief and is therefore relevant to Syncora's pending emergency motion to dissolve the TRO:

### i.    City Finances

Discovery relating to the City's finances is relevant to the City's claims of irreparable harm. Though the City's claims of irreparable harm are conclusory and amorphous, they appear to fall into two categories: (1) The financial harm the City will allegedly suffer if it is unable to obtain money from the General Receipts Subaccount; and (2) the harm that the City will allegedly suffer if it cannot complete its negotiations with creditors. Thus, discovery relating to the City's finances will allow Syncora to better understand how and why the City will — or will not — suffer irreparable harm if the TRO is lifted.

### ii.    General Creditor Negotiations

Discovery relating to the general creditor negotiations is relevant to the City's claims of irreparable harm.  As noted above, the City alleges that it was likely to suffer irreparable harm if it could not complete its negotiations with creditors.  The City further argued that the $15 million from the General Receipts Subaccount was a necessary part of these negotiations.  Syncora therefore seeks discovery relating to these negotiations.

### iii.    Rights and Obligations Under Different Agreements

Discovery relating to the parties' rights and obligations under the various transaction documents is relevant to the City's likelihood of success on the merits. These various transaction documents set forth the rights and obligations of the parties and thus are essential to the present dispute, which hinges on Syncora's rights under these agreements.

### iv.    Certificates of Participation ("COPs")

Discovery relating to the COPs is relevant to the City's likelihood of success on the merits.  As explained in Syncora's *Emergency Motion* [DE 10] and *Syncora Guarantee Inc.'s Motion to Dismiss Plaintiff City of Detroit's Verified Complaint* [DE 38] ("*Motion to Dismiss*"), which is fully incorporated and relied on herein, the Service Corporations' failure to make a $40 million payment to the COP-holders triggered a cross-default under the Swap Agreement that led to automatic

cash trapping under the Collateral Agreement.  This discovery therefore directly relates to the present dispute.

### v.    Negotiations and Settlement with Swap Counterparties

Discovery relating to the City's negotiations and settlement with the Swap Counterparties is relevant the City's likelihood of success on the merits, the City's allegations of irreparable harm, and the potential harm that Syncora suffered as a result of the injunction.  The City claims that it needed an *ex parte* temporary restraining order because the cash trapping in the General Receipts Subaccount was allegedly harming its negotiations with creditors, including the swap counterparties.  The City does not, however, describe in any detail how these negotiations were harmed.

### vi.    Use of Casino Revenues

Discovery relating to use of Casino Revenues is relevant to the harm that Syncora will experience as a result of the TRO.  In particular, Syncora seeks discovery relating to the use of the casino revenues — *i.e.*, Syncora's collateral — that should, under the Collateral Agreement, be trapped and yet, because of the TRO, are currently being released to the City.

### vii.    Cash Trap Conduct

Discovery relating to the decision by U.S. Bank to trap the funds in the General Receipts Subaccount is relevant to the City's likelihood of success on the

merits.  This category of discovery goes directly to Syncora's alleged wrongdoing, which includes the City's allegation that Syncora tortiously interfered with the Collateral Agreement and caused U.S. Bank to improperly trap the cash in the General Receipts Subaccount.

### viii.  The City's Harm

Discovery relating to the City's claims of the harm that it suffered as a result of Syncora's actions is relevant to the City's irreparable harm and likelihood of success on the merits.

### ix.  Miscellaneous

The City includes five subcategories under its miscellaneous heading, requiring consideration of each separately.

**a.**  "All documents or communications relating to the allegations in paragraphs 53-61, 63-68, 70-73, and 74-79 of the Complaint."  This request is relevant to the City's likelihood of success on the merits.  As the City explains in its Motion for Protective Order, "[t]hese are references to all of the substantive paragraphs pled in connection with each of the City's counts against Syncora."  This is a standard discovery request directed specifically at the allegations in the Verified Complaint that form the basis for the City's request for injunctive relief.

**b.**    "All documents or communications relating to any termination events or events of default under the Collateral Agreement."  This request is relevant to the City's likelihood of success on the merits.

**c.**    "All documents or communications relating to the City's allegation that Syncora acted in bad faith and without legal justification."  One of the City's main claims in this dispute is that Syncora tortiously interfered with the City's contractual and advantageous relations.  Discovery related to the intent element of this claim is therefore relevant to the City's likelihood of success on the merits.

**d.**    "All documents the City intends to introduce at the preliminary injunction hearing."  This is a standard request that should pose no burden to the City.

**e.**    "All documents or communications relating to Kevyn Orr's authority over the Service Corporations."  This request is intended to explore the scope of Mr. Orr's powers and thus is relevant to the City's likelihood of success on the merits, Syncora's potential harm, and the potential harm to the public interest.

## CONCLUSION

For the foregoing reasons, Syncora respectfully requests that the Court deny the City's Motion for a Protective Order or, in the alternative, dissolve the TRO and deny the City's request for a preliminary injunction.

Dated:  August 5, 2013                             Respectfully submitted,

                                                   By:  /s/ Gerard V. Mantese

Stephen C. Hackney                                     Gerard V. Mantese
Ryan Blaine Bennett                                    Mantese Honigman Rossman and
William E. Arnault                                     Williamson, P.C.
Lally A. Gartel                                        1361 East Big Beaver Road
KIRKLAND & ELLIS LLP                                   Troy, Michigan 48083
300 North LaSalle                                      Phone: 248-457-9200
Chicago, Illinois 60654                                Fax: 248-457-9201
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*ATTORNEYS FOR DEFENDANT*                              *ATTORNEYS FOR DEFENDANT*
*SYNCORA GUARANTEE, INC.*                              *SYNCORA GUARANTEE, INC.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 5, 2013, I caused the foregoing papers to be electronically filed with the Clerk of the Court using the ECF system which will send electronic notices of same to all counsel of record.

I declare under the penalty of perjury that the foregoing statements are true to the best of my knowledge, information, and belief.

<u>/s/ Gerard V. Mantese</u>
Gerard V. Mantese

16





1 of 50 DOCUMENTS

**U.S. SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v. JOEL WILSON et al., Defendants.**

Case Number 12-cv-15062

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, NORTHERN DIVISION

*2012 U.S. Dist. LEXIS 165248*

November 20, 2012, Decided
November 20, 2012, Filed

**COUNSEL:** [*1] For **U.S. Securities** and **Exchange Commission,** Plaintiff: Steven L. Klawans, John E. Birkenheier, **U.S. Securities** and **Exchange Commission,** Chicago, IL.

**JUDGES:** Honorable THOMAS L. LUDINGTON, United States District Judge.

**OPINION BY:** THOMAS L. LUDINGTON

**OPINION**

**OPINION AND ORDER GRANTING IN PART AND HOLDING IN ABEYANCE IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION, ASSET FREEZE, AND OTHER EMERGENCY RELIEF**

"The mission of the **U.S. Securities** and **Exchange Commission** is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation." [1] The principal way that the SEC fulfills its mission is by enforcing federal **securities** laws, including by bringing civil lawsuits.

> 1 **Securities** and **Exchange Commission,** *The Investor's Advocate: How the SEC Protects Investors, Maintains Market Integrity, and Facilitates Capital Formation,* http://www.sec.gov/about/whatwedo.shtml (last visited November 20, 2012).

This is such a case. On November 15, 2012, Plaintiff **Securities** and **Exchange Commission** filed suit in this Court against Defendant Joel **Wilson** and two of his

companies, Defendants Diversified Group Partnership Management, LLC, and American Realty. Plaintiff alleges that Defendants violated [*2] several federal **securities** laws, including making an unregistered offer and sale of **securities** in violation of *15 U.S.C. § 77e,* and committing fraud in the offer and sale of **securities** in violation of *15 U.S.C. § 77q.*

The same day as Plaintiff filed its complaint, it filed a motion for a preliminary injunction, asset freeze, and other emergency relief. For reasons detailed below, the motion will be granted in part and held in abeyance in part. The request for expedited discovery will be granted. The request for a preliminary injunction and an asset freeze will be held in abeyance pending a hearing, which will be scheduled for December 10, 2012, at 10 am.

I

The following allegations are taken from the complaint and are recounted here by way of background. No presumption of truth should be inferred from their inclusion here.

A

**Wilson** is in the business of flipping houses in Bay City, Michigan. Compl. ¶ 2. His business model is straightforward. Buy a property. Fix it up. Resell it via land contract for a profit. Simple enough. The manner that he organizes and funds his business, however, is far less simple.

**Wilson** conducts his business through at least four companies -- W R Rice; Diversified [*3] Group Advi-

2012 U.S. Dist. LEXIS 165248, *

sory Firm; Defendant Diversified Group Partnership Management, LLC; and Defendant American Realty Funds Corporation -- and as many as 17 limited partnerships. *Id.* ¶¶ 2, 10.

W R Rice is a registered broker-dealer. *Id.* ¶ 10. Diversified Group Advisory Firm is a registered investment advisor. *Id.* Diversified Group Partnership Management, a Michigan limited liability company, serves as the general partner of each of the 17 limited partnerships. *Id.*

**Wilson** funds his business through soliciting investments. Compl. ¶ 3. It is this public involvement that has brought the scrutiny of Plaintiff and the Financial Industry Regulatory Authority (FINRA).

**B**

Since 2009, **Wilson** has obtained about $6.7 million from 120 investors. Compl. ¶ 3. Diversified Group Partnership Management has raised about $900,000; American Realty, $5.8 million. *Id.*

Diversified Group Partnership Management raised the funds by selling debentures, a type of unsecured promissory note. Compl. ¶ 3. Prospective investors were told that the debentures would carry a ten year term and offer a 10 percent interest payment disbursed semi-annually. *Id.* ¶ 27. They were also told "that their money would be used for the purchase, renovation, [*4] and sale of Michigan real estate, and that the proceeds from the sale of these properties would be used to pay investors their interest payments." *Id.* ¶ 32.

American Realty raised the funds by selling limited partnership interests. Prospective investors were given an "offering document" claiming to describe both "the use to be made of investor funds" and "the Diversified Group's financial condition." Compl. ¶ 35. The investor funds would be used, the offering document explained, to facilitate land contracts on the refurbished houses. Specifically, the funds would be given by the limited partnerships to Diversified Group Partnership Management. *Id.* ¶ 38. In return, the limited partnerships would receive "(1) a secured interest in the underlying property in the event of a default through a repurchase agreement executed by Diversified Group, and (2) the monthly payment stream received from the homebuyers." *Id.* Thus, the investment promised a steady, secured revenue stream.

The offering document went on, however, to caution that the funds could be put to another use "if no suitable land contracts were available." Compl. ¶ 44. The offering document specified: "Diversified Group may loan the [*5] proceeds to American Realty via a nine month note at an annual interest rate of 9.9% amortized over 30 years in order to mimic the return on a land contract." *Id.*

(brackets and quotation marks omitted). Rather than a backup plan, however, **Wilson** soon made this the primary use of the investors' funds. *Id.* ¶ 45.

**C**

The first three limited partnerships, as promised in the offering document, invested in land contracts. Compl. ¶ 45. These partnerships were dissolved in 2011. *Id.* The next fourteen limited partnerships "did not purchase any land contract servicing rights but instead entered into promissory notes under which the investors' money was loaned to either Diversified Group or American Realty." *Id.* ¶ 46. For limited partnerships 4 through 17, that is, "unsecured loans to **Wilson's** companies had become the exclusive use of investor money." *Id.* ¶ 47. **Wilson** has since "admitted that he decided in April or May 2011 to change the structure of the LP investments from purchasing land contract revenue for the LPs to making unsecured loans to [Diversified Group Partnership Management and American Realty] via promissory notes." *Id.* ¶ 83.

**D**

Despite this repurposing, however, **Wilson** was not able "generate [*6] enough income to make the monthly payments owed to investors." Compl. ¶ 52. Presently, the principal and accrued interest due to **Wilson's** investors is $6.7 million. *Id.* ¶ 56. **Wilson** does not have it. "As of October 31, 2012, the known bank accounts for **Wilson's** companies, Diversified Group, American Realty and W R Rice, held only $42,528." *Id.* ¶ 57.

A challenging market and unsuccessful business model is only partly to blame for the shortfall. Compl. ¶ 60. **Wilson** has also diverted at least $582,000 of investor money to his own personal benefit. To take three examples, "**Wilson** spent approximately $352,653 from an account containing investor money to pay bonuses to himself and his Diversified Group co-owner." *Id.* ¶ 61. "**Wilson** spent approximately $46,780 from an account containing investor money on personal travel, including $4,472 he paid for a birthday trip to Las Vegas in May 2012." *Id.* ¶ 63. And "**Wilson** spent approximately $7,914 from an account containing investor money to buy tickets to Red Wings games." *Id.* ¶ 68.

To conceal the shortfall, **Wilson** tried to convince the limited partnership investors "to roll over their accrued monthly income and to use that income to acquire additional [*7] units in the LPs." Compl. ¶ 50. Most agreed. He then sent them monthly account statements that "misrepresented that the real estate business had earned sufficient income to make the payments." *Id.* 54.

In the fall 2011, **Wilson** realized that even this was not going to be sufficient to conceal the shortfall. Compl.

2012 U.S. Dist. LEXIS 165248, *

¶ 74. So he unilaterally changed the terms of the promissory notes, deferring repayment to the investors. Specifically, Diversified Group Partnership Management, acting as the general partner for each of the 17 limited partnerships, extended the maturity of the promissory notes that Diversified Group and American Realty had executed in favor of the limited partnerships (which, in turn, would repay the investors). *Id.* ¶¶ 76-80. **Wilson** has since "admitted that he extended the maturity dates on some of the promissory notes held by the LPs because the business had insufficient funds to repay the principal on the notes." *Id.* ¶ 89. Investors were not told of the change until Plaintiff and FINRA commenced their investigations. *Id.* ¶ 78.

**E**

American Realty is a publicly traded corporation, and it is therefore required to file quarterly reports with Plaintiff (SEC Form 10-Q reports). [*8] Compl. ¶ 93. On its Form 10-Q for the first quarter of 2012, American Realty reported that it "had entered into promissory notes with Diversified LPs 5 through 11 and that American Realty is obligated to make interest payments to the LPs on a monthly basis." *Id.* ¶ 100. The report was filed on March 31, 2012. *Id.* Bank records reveal that American Realty missed making its monthly interest payment in March 2012. *Id.* This missed payment was not disclosed on the Form 10-Q. *Id.* ¶ 102.

American Realty's finances experienced continued strain in the months that followed. April 2012, another missed interest payment. Compl. ¶ 101. *Id.* May, June, July, August, and September 2012, more missed payments. *Id.* Collectively, American Realty missed making payments of about $140,000.

**F**

Still searching for capital, **Wilson** hit upon a stock offering. In August 2012, he filed with Plaintiff a notice of intent to offer 2.5 million shares of American Realty stock. Compl. ¶ 103. The notice (filed on SEC Form S-11) specifies that "the proceeds from its stock offering would not be used to pay off . . . any of American Realty's existing promissory notes." *Id.* ¶ 104. **Wilson** has since "admitted under oath that contrary [*9] to the statement in the Form S-11, he actually intended to use the offering proceeds to pay down or buy out the promissory notes his companies issued to the Diversified LPs." *Id.* ¶ 105.

**G**

After Plaintiff and FINRA began investigating his activities, **Wilson** sent a packet to his investors notifying them of changes he was going to make to their invest-

ments. Compl. ¶ 111. Effective October 1, 2012, **Wilson** informed them, the promissory notes that Diversified Group Partnership Management and American Realty had executed in their favor would be "forgiven." *Id.* In **exchange, Wilson** explained, "investors were going to receive shares in American Realty stock plus a promissory note that would make quarterly interest payments at an annual rate of 8.5% with a termination date in 30 years." *Id.* Investors were not given the opportunity to opt out of this modification. Id. ¶ 113. The practical effect of this change was an investment haircut -- it shaved 30 to 40 percent off the investment's value. *Id.*

**H**

On November 15, 2012, Plaintiff filed suit against Defendants in this Court alleging violations of federal **securities** laws. The complaint alleges that Defendants: (1) made an unregistered offer and sale [*10] of **securities** in violation of *15 U.S.C. § 77e*; (2) committed fraud in the offer and sale of **securities** in violation of *15 U.S.C. § 77q*; (3) committed fraud in the purchase and sale of **securities** in violation of *15 U.S.C. § 78j*; (4) filed false and misleading reports with Plaintiff in violation of *15 U.S.C. § 78m*; (5) filed false certifications with Plaintiff in violation of *15 U.S.C. § 78m*; and (6) committed investment advisor fraud in violation of *15 U.S.C. § 80b-6*.

The same day, Plaintiff filed a motion for a preliminary injunction, asset freeze, and other emergency relief (ECF No. 2) and a motion for the appointment of a receiver (ECF No. 6). No proof of service on Defendants has yet been filed.

**II**

The motion for a preliminary injunction, asset freeze, and other emergency relief seeks five types of relief in two stages. The five types of relief sought are: (1) a preliminary injunction and temporary restraining order; (2) a freeze of Defendants' assets; (3) an accounting; (4) a prohibition on the alteration or destruction of documents; and (5) expedited discovery.

Plaintiff does not, however, request that the relief all be granted immediately. Rather, Plaintiff explains that it "seeks [*11] to depose witnesses, subpoena bank and brokerage records and other documents, and take other discovery on an expedited basis prior to a preliminary injunction hearing." Pl.'s Br. Supp. Preliminary Inj. Mot. 15, ECF No. 3. Similarly, regarding the preservation of documents, Plaintiff explains: "Several courts have entered document preservation directives at the inception of SEC enforcement actions." *Id.* at 15 (collecting cases). Plaintiff thus seeks a stepped remedial approach -- some types of relief immediately, others after the hearing.

2012 U.S. Dist. LEXIS 165248, *

**A**

*Federal Rule of Civil Procedure 26* provides: "A party may not seek discovery from any source before the parties have conferred as required by *Rule 26(f)*, except . . . when authorized by these rules, by stipulation, or by court order." *Fed. R. Civ. P. 26(d)(1)*. The advisory committee notes explain that orders authorizing expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction." *Fed. R. Civ. P. 26* advisory committee notes (1993).

This is such a case. Accordingly, following the filing of proof of service on Defendants, the parties will be granted leave to immediately schedule depositions, issue [*12] subpoenas, and serve interrogatories, requests for documents, and requests for admissions. The time to respond to such discovery requests will be shortened to seven calendar days after a request is served. Service of all discovery, including subpoenas, may be effected via overnight mail, facsimile, or electronic means. Additionally, Defendants will be prohibited from the alteration or destruction of documents or other information relating to Plaintiff's allegations in the complaint.

**B**

Plaintiff's motion does not expressly specify whether it seeks an asset freeze prior to the preliminary injunction hearing. But Plaintiff does specify what it would like frozen. In a proposed order submitted by Plaintiff with its motion, Plaintiff proposes that this Court order

that until otherwise ordered by this Court any and all assets of defendants Joel I. **Wilson**, Diversified Group Partnership Management, LLC, and American Realty Funds Corporation (referred to below as "Defendants"), in whatever form such assets may presently exist and wherever located (including funds, accounts, insurance policies, real estate, automobiles, marine vessels, contents of safe deposit boxes, precious metals, other personal [*13] property, cash, **securities**, free credit balances, fully paid-for **securities**, and/or property pledged or hypothecated as collateral for loans, and all other assets), held in the name of the Defendants, and/or held for the Defendants' benefit or on their behalf, including through corporations, companies, trusts, partnerships, agents, nominees, friends or relatives; and all other funds, accounts, and other assets to which proceeds from the Defendants' violations can be traced or which were acquired with proceeds of the Defendants' violations are hereby frozen.

One condition precedent to depriving Defendants of their property in this manner, however, is Defendants having notice and an opportunity to be heard. *See Warren v. City of Athens, 411 F.3d 697, 708 (6th Cir. 2005)* ("Procedural due process generally requires that the state provide a person with notice and an opportunity to be heard before depriving that person of a property or liberty interest."); *Elliott v. Kiesewetter, 98 F.3d 47, 60 (3d Cir. 1996)* (discussing due process in asset freeze context). Moreover, the Second Circuit cautions, "the decision to order a temporary freeze on defendants' assets as ancillary relief in an SEC [*14] enforcement action requires particularly careful consideration by the district court." *SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1105 (2d Cir. 1972)*.

Here, Plaintiff has not demonstrated that it has provided Defendants notice of Plaintiff's demands. Likewise, Defendants have not yet been afforded an opportunity to be heard on those demands. Thus, any demand for an asset freeze is premature. Accordingly, the request for an asset freeze, like the request for a preliminary injunction and accounting, will be held in abeyance pending a hearing on the motion.

**III**

Accordingly, it is **ORDERED** that Plaintiff's motion for a temporary injunction, asset freeze, and other emergency relief is **GRANTED IN PART AND HELD IN ABEYANCE IN PART.**

It is further **ORDERED** that Plaintiff is directed to serve a copy of this opinion and order on Defendants and file proof of service on this Court's docket.

It is further **ORDERED** that following the filing of proof of service on Defendants, the parties are granted leave to immediately schedule depositions, issue subpoenas, and serve interrogatories, requests for documents, and requests for admissions. The time to respond to such discovery requests is shortened to [*15] seven calendar days after a request is served. Service of all discovery, including subpoenas, may be effected via overnight mail, facsimile, or electronic means.

It is further **ORDERED** that Defendants are prohibited from altering or destroying documents or other information regarding Plaintiff's allegations in the complaint.

It is further **ORDERED** that Plaintiff's request for a preliminary injunction, asset freeze, and accounting are

2012 U.S. Dist. LEXIS 165248, *

**HELD IN ABEYANCE** pending a hearing on the motion.

It is further **ORDERED** that a hearing will be held on the motion on **Monday, December 10, 2012, at 10 am.**

Dated: November 20, 2012

/s/ Thomas L. Ludington

THOMAS L. LUDINGTON

United States District Judge



DASSAULT SYSTEMES, S.A., Plaintiff, v. KEITH CHILDRESS d/b/a PRAC-
TICAL CATIA TRAINING, Defendant.

Case No. 09-10534

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION

*2009 U.S. Dist. LEXIS 99708*

October 27, 2009, Argued
October 27, 2009, Decided
October 27, 2009, Filed

**SUBSEQUENT HISTORY:** Motion denied by, Motion granted by, in part *Dassault Systemes, S.A. v. Childress, 2010 U.S. Dist. LEXIS 3180 ( E.D. Mich., Jan. 15, 2010)* Affirmed by *Dassault Systemes, SA v. Childress, 2011 U.S. App. LEXIS 24582 (6th Cir.) (6th Cir. Mich., 2011)*

**PRIOR HISTORY:** *Dassault Systemes, S.A. v. Childress, 2009 U.S. Dist. LEXIS 43478 ( E.D. Mich., May 22, 2009)*

**COUNSEL:** [*1] For Dassault Systemes, SA, Plaintiff: Douglas P. LaLone, Rader, Fishman, Bloomfield Hills, MI.

Keith Childress, Doing business as Practical Catia, Defendant, Pro se, Algonac, MI.

**JUDGES:** PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** LAWRENCE P. ZATKOFF

**OPINION**

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse, in the City of Port Huron, State of Michigan, on October 27, 2009

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on Plaintiff's "Motion for Protective Order and Privacy Act Order and for Leave to Serve Subpoena on FBI" [dkt 12]; Defendant's "Motion for Protective Order and to Strike Certain Information from Complaint" [dkt 16]; and Plaintiff's motion for default judgment [dkt 19]. The parties have fully briefed the motions. [1] The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(e)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted. For the following reasons, Plaintiff's Motion [*2] for Protective Order and Privacy Act Order and for Leave to Serve Subpoena on FBI [dkt 12] is GRANTED; Defendant's Motion for Protective Order and to Strike Certain Information from Complaint [dkt 16] is DENIED; and Defendant is ordered to SHOW CAUSE as to why Plaintiff's motion for default judgment [dkt 19] should not be granted.

1    The Court DENIES Defendant's motion to exceed the 5-page limit on reply briefs [dkt 22] and has considered only the first 5 pages of that brief. The Court also DENIES Defendant's motions for leave to file sur-replies [dkts 24 & 27], as such filings are not anticipated by the local pleading rules. Finally, the Court ORDERS that Defendant's sur-replies [dkts 24 & 27] be STRICKEN from the record.

**II. BACKGROUND**

Plaintiff, a French corporation, is the developer of a computer software design program known as CATIA.

2009 U.S. Dist. LEXIS 99708, *

Plaintiff has held a registered trademark, U.S. Reg. No. 1,274,136, on its CATIA software since 1984. *See* Compl. Ex. A. Plaintiff also holds a registered copyright on CATIA Version 5, Release 12 ("Release 12"), Registration No. 5-856-769, and has a pending copyright registration for its most recent release, CATIA Version 5, Release 14 ("Release 14"). *See* [*3] Compl. Ex. C; P16.

Defendant, appearing *pro se*, is a design engineer. Defendant, along with some familial assistance, operates a business under the name of Practical CATIA Training. Practical CATIA Training provides its customers instruction in the use of CATIA software.

CATIA software requires a license and Target ID in order to execute the program on a computer. Plaintiff alleges that Defendant purchased one license for Release 12 and was assigned a corresponding Target ID. Plaintiff further contends that Defendant cloned the software and Target IDs onto 20 computers, which Defendant used to operate his business. Plaintiff maintains that these actions infringe its copyright and trademark rights and violate the Michigan Consumer Protection Act, *Mich. Comp. Laws. § 445.901*.

Defendant responded to Plaintiff's complaint by filing a motion for a more definite statement, stay of the proceedings, and evidentiary hearing. In that motion, Defendant alleged that Plaintiff was in possession of secret grand jury information and had used said information in its complaint, all in violation of *Fed. R. Crim. P. 6(e)(2)*. The Court denied the motion, finding that Defendant had not adequately explained  [*4] how the information contained in the complaint implicated matters occurring before a grand jury or how Plaintiff was subject to discipline under *Fed. R. Crim. P. 6(e)(2)*.

While Defendant's motion was pending, Defendant became aware that Plaintiff had served a subpoena on the Federal Bureau of Investigation (FBI) seeking access to evidence that the FBI had seized from Defendant. Defendant filed a motion to quash the subpoena [dkt 10], arguing that the subpoena was untimely under *Fed. R. Civ. P. 26* and that the information sought by Plaintiff was protected under *Fed. R. Crim. P. 6(e)(2)*. The parties stipulated [dkt 11] that Plaintiff would withdraw its subpoena and Defendant would withdraw his motion to quash, and the Court entered a corresponding order [dkt 13].

Plaintiff has now moved for the Court's permission to serve its subpoena prior to a *Rule 26(f)* conference and for a protective order and Privacy Act order. Defendant challenges this motion and has filed his own motion for a protective order, and he seeks to strike certain information from the complaint. Plaintiff also seeks a default judgment because Defendant has not yet filed an answer to the complaint.

## III. ANALYSIS

### A. Plaintiff's  [*5] Motion for Leave to File Subpoena

Plaintiff seeks leave pursuant to *Fed. R. Civ. P. 26(d)* to serve a subpoena on the FBI to procure computers and documents seized from Defendant. Plaintiff also seeks the entry of a protective order under *Rule 26(c)(1)*, and a Privacy Act order pursuant to a FBI request. Defendant continues to insist that this evidence is protected by *Fed. R. Crim. P. 6(e)(2)*.

#### i. Fed. R. Crim. P. 6(e)

This analysis requires a detailed discussion of *In re Grand Jury Proceedings, 851 F.2d 860 (6th Cir. 1988)*, this circuit's seminal case on the subject. In that case, the Sixth Circuit adopted a "rebuttable presumption" approach to issues of grand jury secrecy:

> The general rule, however, must be that confidential documentary information not otherwise public obtained by the grand jury by coercive means is presumed to be "matters occurring before the grand jury" just as much as testimony before the grand jury. The moving party may seek to rebut that presumption by showing that the information is public or was not obtained through coercive means or that disclosure would be otherwise available by civil discovery and would not reveal the nature, scope, or direction of the grand jury  [*6] inquiry, but it must bear the burden of making that showing, just as it bears the burden of showing that there is a "particularized need."

*Id.* at 866-67.

The Court denied Defendant's original motion because Defendant had not presented any evidence that the alleged secret grand jury information was procured through the grand jury's coercive powers. Defendant now presents evidence strongly suggesting that the FBI and grand jury investigations are intertwined. Attached to Defendant's response to Plaintiff's motion are three grand jury subpoenas to produce documents, along with a search warrant for Defendant's business address. *See* Def.'s Resp. Br. Exs. 1-4. All four documents bear the same date of issuance. The search warrant was issued to the same FBI special agent who is listed as the investigative agent on the subpoenas. Thus, the Court finds that Defendant's computers and documents were procured by

2009 U.S. Dist. LEXIS 99708, *

the grand jury's coercive powers as defined by the Sixth Circuit.

As the evidence Plaintiff seeks was not public information, and Defendant has proffered evidence suggesting that his computers were seized by the coercive powers of the grand jury, the Court is constrained by the Sixth Circuit's [*7] holding in *In re Grand Jury Proceedings*--a rule more stringent than those of its sister circuits. *Compare id. with United States v. Dynavac, Inc., 6 F.3d 1407, 1412 (9th Cir. 1993)* ("[W]e think that the disclosure of business records independently generated and sought for legitimate purposes would not 'seriously compromise the secrecy of the grand jury's deliberations'") (citations omitted); *DiLeo v. C.I.R., 959 F.2d 16, 20 (2d Cir. 1992)* ("The records . . . were sought for their own sake and not to learn what took place before the grand jury and clearly did not compromise the secrecy of the grand jury's deliberations."). Accordingly, the presumption of non-disclosure applies.

"Mere contact with a grand jury, however, does not change every document into a matter 'occurring before a grand jury' within the meaning of *Rule 6*," and the seeking party has the opportunity to rebut the presumption of non-disclosure. *United States v. Rutherford, 509 F.3d 791, 795 (6th Cir. 2007); see also In re Grand Jury Proceedings, 196 F.R.D. 57, 64 (S.D. Ohio 2000)* (moving party met burden that subpoenaed documents were available through civil discovery and did not reveal the scope or direction of the grand [*8] jury's inquiry).

Plaintiff contends that the evidence which it seeks is otherwise discoverable because it consists of Defendant's business records and was prepared prior to any grand jury action. Further, Plaintiff disputes that the evidence at issue would reveal the nature, scope, or direction of the grand jury's inquiry.

The Court agrees that the seized evidence is otherwise available through civil discovery. Defendant's business records are undoubtedly discoverable evidence. *See, e.g., In re Grand Jury Proceedings, 196 F.R.D. at 64* (holding that presumption of grand jury secrecy was rebutted because business records were otherwise available through discovery). Furthermore, inspection of a computer's contents is frequently permitted in cases involving copyright infringement of computer files or programs. *See, e.g., Capitol Records, Inc. v. Alaujan, Nos. 03CV11661-NG, 07cv11446-NG, 2009 U.S. Dist. LEXIS 110626, 2009 WL 1292977, at *2 (D. Mass. May 6, 2009)* (ordering inspection of computer that had a "sufficiently close" connection to the alleged copyright violation); *Fharmacy Records v. Nassar, 248 F.R.D. 507, 516 (E.D. Mich. 2008)* (noting that magistrate judge had granted motion to compel production of computers [*9] in music copyright case); *Xpel Techs. Corp. v. Amer.*

*Filter Film Distribs., No. SA-08-CV-0175, 2008 U.S. Dist. LEXIS 111837, 2008 WL 744837, at *1 (W.D. Tex. Mar. 17, 2008)* (granting order for expedited computer forensic imaging in copyright case). Finally, the Court cannot conceive how allowing Plaintiff access to this evidence would reveal anything about the nature, direction, or scope of the grand jury's inquiry.

Therefore, Plaintiff has overcome the presumption of non-disclosure, and the evidence at issue is not protected by *Fed. R. Civ. P. 6(e)(2)*. *See In re Grand Jury Subpoenas, 454 F.3d 511, 522 (6th Cir. 2006)* (noting that the "discovery exception to grand jury secrecy has been interpreted somewhat broadly"). To hold otherwise would allow Defendant to use the shield of *Fed. R. Crim. P. 6(e)(2)* as a sword to prevent Plaintiff from obtaining evidence that would be discoverable but for the grand jury proceedings.

### ii. *Fed. R. Civ. P. 26(d)(1)*

Plaintiff maintains that Defendant refuses to participate in a *Rule 26(f)* conference until the outstanding motions have been decided. Plaintiff insists that expedited discovery is necessary to obtain access to the computers before they are returned to Defendant in order to [*10] "preserve the integrity of the original material that was seized by the FBI." Plaintiff's proposed subpoena seeks "[a]ll computers, materials, and documents that were seized at Keith Childress' business, Practical Catia."

*Rule 26(d)(1)* prevents a party from seeking discovery materials "from any source before the parties have conferred as required by *Rule 26(f)* except . . . when authorized by these rules, by stipulation, or by court order." A party must show good cause when seeking expedited discovery prior to a *Rule 26(f)* conference. *See Arista Records, LLC v. Does 1-4, No. 1:07-cv-1115, 2007 U.S. Dist. LEXIS 85652, 2007 WL 4178641, at *1 (W.D. Mich. Nov. 20, 2008)*.

The Court finds that Plaintiff has shown good cause for expedited discovery in this matter. Defendant's refusal to file an answer or participate in a *Rule 26(f)* conference has greatly impeded discovery. Further, Defendant's argument that Plaintiff's proposed subpoena is not "narrowly tailored" is without merit. The Court finds that Plaintiff's request is narrowly tailored to include evidence that is available through civil discovery and relevant to its allegations of copyright infringement.

Therefore, Plaintiff's motion for leave to serve subpoena on [*11] the FBI is GRANTED. The Court also GRANTS Plaintiff's motion for a protective order and Privacy Act order, and it will enter Plaintiff's proposed protective order contemporaneously with this order. In addition to the requirements and limitations contained in the protective order, Plaintiff shall not in any manner

destroy, alter, or otherwise tamper with Defendant's computers and other materials, and the evidence shall be returned in the same condition as it was received.

## B. Defendant's Motion for Protective Order and to Strike

Defendant has moved (1) for a protective order barring Plaintiff from acquiring secret grand jury information; and (2) to strike certain paragraphs of Plaintiff's complaint pursuant to *Fed. R. Civ. P. 12(f)*. Plaintiff challenges the motion on several procedural grounds.

### 1. Motion for Protective Order

The Court construes Defendant's motion for a protective order as a request to protect the evidence currently in the possession of the FBI. As discussed *supra*, the seized evidence is not protected by *Fed. R. Civ. P. 6(e)(2)* as matters occurring before a grand jury. Therefore, Defendant's motion for a protective order is DENIED.

### 2. Motion to Strike

Defendant also requests [*12] that the Court strike paragraphs 17, 18, 19, and 21 from Plaintiff's complaint. These paragraphs state as follows:

17. In 2003, Defendant Keith Childress, purchased one license for CATIA(R) Version 5, Release 12. On information and belief, Defendant Childress and his company were able to crack and clone the Target IDs on the license and clone the software on twenty machines on order to train students on the software.

18. On October 30, 2006, Defendant Childress and his company Practical Catia were raided by the Federal Bureau of Investigation. The Federal Bureau of Investigation confiscated 20 computers with the cloned software which are reproductions of, or derivations of, Plaintiff's CATIA(R); software. The raid took place at Defendants' office which continues to be located in Algonac, Michigan.

19. Following the raid in Defendants' office, the FBI discovered that computers that were confiscated at Defendants' office had installed thereon Plaintiff's CATIA(R); Version 5, Release 14 software. Each computer had the same license information and Target ID for the one license Defendants had purchased. The same Target ID on each of the machines

indicates that the software was cloned and is [*13] a bootlegged copy.

21. On or about April 2007, Defendants requested a license to use the CATIA(R); software on multiple machines. The request was denied because of the FBI's investigation of Defendant's illegal usage of Plaintiff's software.

In support of his motion to strike, Defendant cites *Finn v. Schiller, 72 F.3d 1182 (4th Cir. 1996)*, and he avers that many similarities exist between information withdrawn from the record in that case and the information Defendant seeks to strike.

Defendant fails to note a detail of great importance, however, that distinguishes *Finn* from the present case. In *Finn*, the defendant was an Assistant United States Attorney (*i.e.*, a party subject to *Rule 6(e)(2)*). Plaintiff here is a private corporation not implicated by the restrictions of *Rule (6)(e)(2)*. "No obligation of secrecy may be imposed on any person except those listed in the Rule []." 1 Charles Alan Wright and Andrew D. Leipold, *Federal Practice and Procedure*, § 106 pp. 362-63 (4th ed. 2008). That is, Plaintiff cannot be sanctioned under *Rule 6(e)(2)* for further dissipating secret grand jury material even if the complaint contained such information. *See United States v. Jeter, 775 F.2d 670, 675 (6th Cir. 1985)*; [*14] *In re Polypropylene Carpet Antitrust Litig., 181 F.R.D. 680, 689 (N.D. Ga. 1998)*.

Defendant also contends that the allegations in the complaint are "immaterial" and "scandalous" within the meaning of *Fed. R. Civ. P. 12(f)*. Defendant argues that the paragraphs at issue are immaterial because any evidence relating to the FBI search and grand jury investigation is undiscoverable and inadmissible. Pleadings are immaterial when the material contained within "has no essential or important relationship to the claim for relief . . ." 5C Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure*, § 1382 p. 458 (4th ed. 2008). The referenced allegations form the basis of Plaintiff's claim for relief and are therefore material to the pleadings.

Nor are the allegations scandalous within the meaning of *Rule 12(f)*. Under the Rule, "[i]t is not enough that the matter offends the sensibilities of the objecting party of the person who is the subject of the statement in the pleading, if the challenged allegations describe acts or events that are relevant to the action." *Id.* at 466-67. The allegations in the challenged paragraphs are highly relevant to Plaintiff's claim; in fact, striking [*15] the paragraphs would eviscerate Plaintiff's cause of action. Therefore, the allegations are not scandalous.

2009 U.S. Dist. LEXIS 99708, *

Plaintiff cites other procedural violations to support a denial of Defendant's motion, including Defendant's alleged failure to seek concurrence pursuant to *Fed. R. Civ. P. 26(c)(1)* and *E.D. Mich. L.R. 7.1*, and it observes that Defendant is barred from seeking further relief by *Fed. R. Civ. P. 12(g)(2)* (limiting further *Rule 12* motions). The Court finds that the above reasons fully justify the denial of Defendant's motion, and Plaintiff's additional arguments need not be addressed.

### C. Plaintiff's Motion for Default Judgment

Plaintiff has requested that the Court enter a default judgment, noting that Defendant did not comply with the Court's May 22, 2009, order requiring Defendant to file an answer to Plaintiff's complaint within 30 days. Defendant maintains that he did not file his answer because of the outstanding issues that necessitated the current motions.

Defendant violated the Court's direct order that he file his answer within 30 days of the May 22, 2009, order. Accordingly, it is **HEREBY ORDERED** that Defendant **SHOW CAUSE**, in writing, no later than 5 p.m. on Tuesday, November **[*16]** 3, 2009, as to why the Court should not grant Plaintiff's motion for default judgment. Failure to comply with this order may result in the entry of a default judgment and/or the imposition of sanctions. Defendant's response shall contain specific and accurate legal support, including pinpoint citations to authority relied on and shall be limited to five pages and comply with *E.D. Mich. L.R. 5.1*. Additionally, Defendant shall fax his response to Judge Zatkoff's Chambers in Port Huron, at 810-984-1480.

### IV. CONCLUSION

Accordingly, and for the above reasons, IT IS HEREBY ORDERED that Plaintiff's Motion for Protective Order and Privacy Act Order and for Leave to Serve Subpoena on FBI [dkt 12] is GRANTED;

IT IS FURTHER ORDERED that Defendant's Motion for Protective Order and to Strike Certain Information from Complaint [dkt 16] is DENIED;

IT IS FURTHER ORDERED that Defendant SHOW CAUSE by 5 p.m. on Tuesday, November 3, 2009, as to why Plaintiff's motion for default judgment [dkt 19] should not be granted.

IT IS SO ORDERED.

/s/ Lawrence P. Zatkoff

LAWRENCE P. ZATKOFF

UNITED STATES DISTRICT JUDGE

Dated: October 27, 2009