# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

## DECLARATION OF MICHAEL ARTZ

I, Michael Artz, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.     I am Associate General Counsel of the American Federation of State, County & Municipal Employees, AFL-CIO ("**AFSCME**"), and I submit this declaration in support of *The Michigan Council 25 Of The American Federation Of State, County & Municipal Employees, AFL-CIO And Sub-Chapter 98, City Of Detroit Retirees' Amended Objection To The City Of Detroit's Eligibility To Obtain Relief Under Chapter 9 of The Bankruptcy Code* (the "**Objection**").

2.     Attached to my Declaration are the following Exhibits referenced in the Objection:

| Exhibit A | A copy of a transcript of the deposition testimony given by Governor Richard D. Snyder on October 9, 2013. |
|---|---|
| Exhibit B | A copy of a transcript of the deposition testimony given by Emergency Manager Kevyn Orr on September 16, 2013. |
| Exhibit C | A copy of a transcript of the deposition testimony given by Gaurav Malhotra on September 20, 2013. |

| | |
|---|---|
| Exhibit D | A copy of a transcript of the deposition testimony given by Charles Moore on September 18, 2013. |
| Exhibit E | A copy of a transcript of the continued deposition testimony given by Emergency Manager Kevyn Orr on October 4, 2013. |

Executed on this 11th day of October, 2013      _/s/ Michael Artz_ _____
                                                        Michael Artz, Esq.

# EXHIBIT  A

*In Re: City of Detroit, Debtor*

---

*Governor Richard D. Snyder*
*October 9, 2013*

---

*Moretti Group*
*471 W. South Street*
*Suite 41B*
*Kalamazoo, MI 49007*
*800-536-0804*



Original File 100913RS.TXT
Min-U-Script® with Word Index

## Page 1

1  UNITED STATES BANKRUPTCY COURT
2  FOR THE EASTERN DISTRICT OF MICHIGAN
   SOUTHERN DIVISION - DETROIT
   ----------------------------------
3  In re:                    Chapter 9
4  CITY OF DETROIT, MICHIGAN,   Case No. 13-53846
5        Debtor,              Hon. Steven W. Rhodes
   ----------------------------------
6  V I D E O T A P E D   D E P O S I T I O N   O F
7  WITNESS:    GOVERNOR RICHARD D. SNYDER
8  LOCATION:   The Romney Building
9              111 S. Capitol Avenue
               Lansing, Michigan
10 DATE:       Wednesday, October 9, 2013
               8:38 a.m.
11
12 APPEARANCES:
   FOR PLAINTIFFS FLOWERS:
13
14              LAW OFFICE OF WILLIAM A. WERTHEIMER
                30515 Timberbrook Lane
15              Bingham Farms, Michigan 48025
                248.644.9200
16              billwertheimer@gmail.com
                BY: WILLIAM A. WERTHEIMER (P26275)
17 FOR INTERNATIONAL UNION, UAW:
18              COHEN, WEISS and SIMON, LLP
19              330 West 42nd Street
                New York, New York 10036-6976
20              212.563.4100
                pdechiara@cwsny.com
21              BY: PETER D. DeCHIARA, ESQUIRE
22 FOR THE RETIREES COMMITTEE:
23              DENTONS US LLP
                1221 Avenue of the Americas
24              New York, New York 10020-1089
                212.768.6881
25              arthur.ruegger@dentons.com
                BY: ARTHUR H. RUEGGER, ESQUIRE

## Page 2

1  APPEARANCES, CONTINUING:
2  FOR AFSCME, AMERICAN FEDERATION OF STATE, COUNTY and
   MUNICIPAL EMPLOYEES, AFL-CIO:
3
4              AFSCME GENERAL COUNSEL'S OFFICE
               1101 17th Street, NW, Suite 900
5              Washington, D.C. 20036
               202.775.5900
6              martz@afscme.org
               BY: MICHAEL L. ARTZ, ESQUIRE
7              LOWENSTEIN SANDLER, LLP
8              65 Livingston Avenue
               Roseland, New Jersey 07068
9              973.597.2374
               slevine@lowenstein.com
10             BY: SHARON L. LEVINE, ESQUIRE
11 FOR GENERAL RETIREMENT SYSTEM; CITY OF DETROIT POLICE AND
   FIRE RETIREMENT SYSTEM:
12
13             CLARK HILL
               212 E. Grand River Avenue
14             Lansing, Michigan 48906
               517.318.3060
15             sgallagher@clarkhill.com
               BY: SEAN PATRICK GALLAGHER (P73108)
16             CLARK HILL
17             500 Woodward Avenue, Suite 3500
               Detroit, Michigan 48226
18             313.965.8274
               jgreen@clarkhill.com
19             BY: JENNIFER K. GREEN (P69019)
20 FOR THE FINANCIAL GUARANTY INSURANCE CORPORATION:
21             WILLIAMS WILLIAMS RATTNER &
               PLUNKETT, PC
22             380 North Old Woodward Avenue
               Suite 300
23             Birmingham, Michigan 48009
               248.642.0333
24             eje@wwwrplaw.com
               BY: ERNEST J. ESSAD, JR. (P32572)
25

## Page 3

1  APPEARANCES, CONTINUING:
2  FOR THE STATE OF MICHIGAN:
3              MICHIGAN DEPT. OF ATTORNEY GENERAL
               Assistant Attorney General
4              Solicitor General Bureau
5              7th Floor G. Mennen Williams Building
               525 West Ottawa Street
6              P.O. Box 30212
               Lansing, Michigan 48909
7              517.373.1124
               nelsonm9@michigan.gov
8              BY: MARGARET A. NELSON (P30342)
9              MICHIGAN DEPT. OF ATTORNEY GENERAL
               Chief Legal Counsel
               Executive Division
10             7th Floor G. Mennen Williams Building
               525 West Ottawa Street
11             P.O. Box 30212
               Lansing, Michigan 48909
12             517.373.1110
               schneiderm7@michigan.gov
13             BY: MATTHEW SCHNEIDER (P62190)
14             OFFICE OF THE GOVERNOR-LEGAL DIVISION
               George W. Romney Building
15             111 South Capitol Avenue
               P.O. Box 30013
16             Lansing, Michigan 48909
               517.241.5630
17             gadolam@michigan.gov
               BY: MICHAEL F. GADOLA (P43960)
18             DICKINSON WRIGHT, PLLC
19             215 South Washington Square, Suite 200
               Lansing, Michigan 48933-1816
20             517.487.4710
               pellsworth@dickinsonwright.com
21             BY: PETER H. ELLSWORTH (P23657)
22
23
24
25

## Page 4

1  APPEARANCES, CONTINUING:
2  FOR THE CITY OF DETROIT:
3              JONES DAY
4              51 Louisiana Avenue, NW
               Washington, D.C. 20001-2113
5              202.879.3939
               gshumaker@jonesday.com
6              BY: GREGORY M. SHUMAKER, ESQUIRE
7  VIDEO BY:    Tim Reitman, Reitman Video Specialists
8  REPORTED BY: Laurel A. Jacoby, CSR-5059, RPR
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1                I N D E X
2   WITNESS: GOVERNOR RICHARD D. SNYDER          PAGE NO.
3   Examination by Ms. Levine                        10
4   Examination by Mr. DeChiara                      51
5   Examination by Mr. Wertheimer                   106
6
7
8
9
10              E X H I B I T   I N D E X
11
12  EXHIBIT NO.          DESCRIPTION          PAGE NO.
13  Exhibit 1    July 16, 2013 Letter
14               Re: Recommendation Pursuant to
15               Section 18(1) of PA 436            51
16  Exhibit 2    July 18, 2013 Letter
17               Re: Authorization to Commence
18               Chapter 9 Bankruptcy Proceeding   59
19  Exhibit 3    City of Detroit Proposal for
20               Creditors, June 14, 2013          60
21  Exhibit 4    Free Press article
22               "Michigan Attorney General
23               Bill Schuette files on behalf of
24               retirees in Detroit bankruptcy"   75
25

Page 7

1             E X H I B I T   I N D E X
2
3   EXHIBIT NO.          DESCRIPTION          PAGE NO.
4
5   Exhibit 10   July 18, 2013 email
6                Re: High Priority with attached
7                July 18, 2013 Letter
8                Re: Authorization to Commence
9                Chapter 9 Bankruptcy Proceeding
10               (Bates Nos. DTMI00116442-445)    153
11
12  Exhibit 11   Oct. 9, 2013 email
13               Subject: High Priority           159
14               (Exhibit marked post deposition)
15
16
17
18               (Exhibits attached to transcript.)
19                       -   -   -
20
21
22
23
24
25

Page 6

1             E X H I B I T   I N D E X
2
3   EXHIBIT NO.          DESCRIPTION          PAGE NO.
4   Exhibit 5    Jones Day Presentation to
5                the City of Detroit on
6                January 29, 2013
7                (Bates Nos. DTMI00128731-8805)    96
8   Exhibit 6    City of Detroit Chapter 9
9                Communications Rollout Plan
10               (Bates No. SOM200001331)         126
11  Exhibit 7    June 3-7, 2013 email chain
12               Re: Financial & Operating Plan
13               Power Point
14               (Bates No. SOM20001327-28)       126
15  Exhibit 8    July 8, 2013 email
16               Re: Detroit
17               (Bates No. SOM200003601)         141
18  Exhibit 9    July 9, 2013 email
19               Re: Detroit
20               (Bates No. SOM200003657)         141
21
22
23
24
25

Page 8

1            Lansing, Michigan
2            October 9, 2013
3            8:38 a.m.
4                   -   -   -
5       MR. WERTHEIMER: William Wertheimer on
6   behalf of the Flowers Plaintiffs.
7       I would like to put on the record the fact
8   that the order that Judge Rhodes entered under which
9   we're conducting this and the other State
10  depositions provides at Paragraph 7 that the State
11  would complete its document production by October 5
12  provided the parties could mutually agree to extend
13  that date.
14      That date has not been extended by
15  agreement.  As late as last night at 10:15 -- I woke
16  up this morning to find that the State had produced
17  a fourth production that is not in compliance with
18  the order.
19      I want to make clear on the record that we
20  may take the position that we may need to continue
21  the Governor and the other State's depositions after
22  we have reviewed those documents as we have not
23  looked at any of those documents as of now.
24      MS. NELSON: This is Margaret Nelson on
25  behalf of the State.

13-53846-tjt   Doc 1159   Filed 10/11/13   Entered 10/11/13 15:46:01   Page 6 of 264

Page 9

1    The fourth production of documents was made
2  under the State's continuing obligation to
3  supplement its discovery responses. So the fact
4  that our production was completed by the fifth,
5  pursuant to the court order, is irrelevant to the
6  fact that we have an ongoing duty to supplement, and
7  that was the purpose for the additional document
8  production yesterday.
9    MR. WERTHEIMER: I'll leave further
10  argument for later.
11    VIDEO TECHNICIAN: Today's date -- hold on.
12  I have to start over again. Give me a second.
13    (A pause was had in the proceedings.)
14    VIDEO TECHNICIAN: Today's date is
15  October 9th, 2013, and we're on the record at
16  8:42 a.m.
17    This is the video deposition of Governor
18  Richard Snyder. We're at the Romney Office
19  Building, 111 South Capitol Avenue in Lansing,
20  Michigan.
21    Could the reporter administer the oath to
22  the Governor, please.
23    - - -
24    -GOVERNOR RICHARD D. SNYDER-
25  called as a witness, being first duly sworn, was

Page 10

1  examined and testified as follows:
2    EXAMINATION
3  BY MS. LEVINE:
4  Q.  Good morning, Governor.
5  A.  Good morning.
6  Q.  My name is Sharon Levine. I'm with the law firm of
7    Lowenstein Sandler. I'm here on behalf of AFSCME,
8    and we appreciate your appearing for your deposition
9    today, so thank you.
10    Just for the record, when did you take
11    office as Governor of the State of Michigan?
12  A.  January 1, 2011.
13  Q.  And at the time you took office, was the State
14    providing greater financial -- a greater level of
15    financial support to the City of Detroit than it is
16    today?
17  A.  I would have to check that.
18  Q.  Would you be willing to support having the State
19    provide a greater level of financial support than it
20    is today in order to help the City of Detroit with
21    its plan of adjustment and particularly in order to
22    help fund the pension issues?
23  A.  In terms of we have many competing interests for the
24    State of Michigan with respect to our budget. I
25    don't make those decisions by myself. It goes

Page 11

1  through the appropriations process with the
2  legislature and the Governor.
3  Q.  My question was would you support an additional
4    level of support?
5  A.  I said I've been supportive of improved services for
6    citizens, not necessarily the repayment of debts.
7  Q.  That might have been responsive so I don't mean to
8    be argumentative, but the narrower question is would
9    you support an additional level of support for
10    Detroit in order to help deal with the so-called
11    underfunding pension issue?
12    MS. NELSON: Asked and answered. Go ahead.
13    Go ahead.
14    THE WITNESS: Oh. I view that as a --
15    that's a question that I couldn't answer because
16    it's a hypothetical. It would depend on the entire
17    situation for the facts depending on the potential
18    plan of adjustment for the debts.
19  BY MS. LEVINE:
20  Q.  Well, between March 28, 2013 and June 14, 2013, did
21    you have discussions with Kevyn Orr about a business
22    plan or a restructuring plan or a redevelopment plan
23    for the City of Detroit?
24  A.  Kevyn Orr was building a plan for creditors they
25    presented in June of this year.

Page 12

1  Q.  Did you have discussions with him with regard to
2    that plan before the June presentation?
3  A.  I had discussions that would have been subject to
4    attorney-client privilege.
5  Q.  Is it your understanding that that plan includes a
6    two billion dollar note for unsecured creditors?
7  A.  Yes.
8  Q.  And what's your understanding of what that plan
9    includes with regard to vested pension benefits for
10    the citizens of Detroit?
11  A.  The proposal includes some portion of that note
12    being allocated towards pensioners.
13  Q.  So the plan does not include just leaving the vested
14    pension benefits alone, does it?
15  A.  Well, with respect to the funded piece of pension
16    plans, that's available. There's an open question
17    with respect to the unfunded portion.
18  Q.  Do you understand that in a Chapter 11 corporate
19    bankruptcy case that the Pension Benefit Guaranty
20    Corporation or the PBGC provides federal insurance
21    for beneficiaries of a pension if a defined benefit
22    plan is terminated?
23  A.  Yes.
24  Q.  And is it your understanding that in a Chapter 9
25    bankruptcy case there is no similar protection for

Page 13

1      vested pension benefits?
2  A.  Yes.
3  Q.  What's your understanding of how the Detroit
4      citizens, the AFSCME retirees will support
5      themselves assuming that there's a diminution in the
6      current level of pension benefit provided?
7  A.  Could you clarify your question because you had
8      conflicting statements.
9           You asked about the citizens of Detroit and
10      then you asked about the retirees.
11  Q.  Well, let's go with the retired citizens of Detroit
12      first.
13           To the extent that their pensions are
14      diminished and there is no PBGC or federal
15      protection for them, what's your understanding under
16      the plan of -- the proposed plan how they will
17      support themselves?
18           MS. NELSON: Objection; calls for
19      speculation, form, foundation.
20           THE WITNESS: Given that we're in the
21      Chapter 9 process, there's been no plan presented at
22      this point in time.
23  BY MS. LEVINE:
24  Q.  We already had a little bit of a discussion that
25      you're aware of the plan that was presented to

Page 14

1      creditors in June of 2013, correct?
2  A.  That was part of going through a process from the
3      City of Detroit asking its creditors for good faith
4      negotiations.
5  Q.  Right. And under that plan, to the extent there was
6      an underfunding with regard to the pensions, there
7      was going to be some change made to the pension
8      benefits, correct?
9  A.  That would depend on mutual agreement between the
10      parties.
11  Q.  Well, assuming that there is a reduction for the
12      moment in pension benefits, have you had any
13      conversations with Kevyn Orr with regard to whether
14      or not there would be any other benefit or provision
15      made to the retirees of the City of Detroit that
16      were going to lose pension benefits as a result of
17      that plan?
18  A.  Those discussions would have been subject to
19      attorney-client privilege.
20  Q.  What's your understanding of the options that are
21      available to the City of Detroit?
22  A.  Well, again, we're in bankruptcy now so there's been
23      no plan presented by the City at this point in time,
24      so that's a hypothetical.
25  Q.  Do you believe it's fair to have the bankruptcy

Page 15

1      attorney and other bankruptcy professionals paid
2      ahead of retirees in connection with the Chapter 9
3      process?
4  A.  I view that as a legal matter because that's a
5      subject matter of how Chapter 9 bankruptcies work.
6  Q.  The question I was asking was whether or not you
7      believe it's fair. I'm not asking you whether or
8      not it's a legal matter.
9  A.  Well, I view it as just speculation on my part
10      because we're in Chapter 9, so that would be part of
11      the legal process.
12  Q.  Is it your understanding that the Wall Street
13      creditors, municipal bond holders will share in this
14      two billion dollar note alongside of the retirees
15      with regard to their unsecured claims?
16  A.  Again, there has been no plan presented in
17      bankruptcy, so that would be a hypothetical. If you
18      go back to the proposal to the creditors, that was
19      to be part of good faith negotiations, and there was
20      an attempt to do that so that would have all been
21      consentual.
22  Q.  Do you believe it's fair to pay Wall Street-type
23      municipal bond creditors ahead of retirees?
24  A.  Again, that's part of the mutual negotiations that
25      were part of the proposal for creditors.

Page 16

1  Q.  Prior to the time that Detroit filed for bankruptcy,
2      is it your understanding that House Speaker Bolger
3      had any involvement or discussions with Kevyn Orr
4      with regard to the bankruptcy filing?
5  A.  I don't recall.
6  Q.  Did he have discussions with you with regard to the
7      bankruptcy filing?
8  A.  In terms of speaking to Speaker Bolger, occasionally
9      I would give updates on what was going on with the
10      City of Detroit.
11  Q.  And did he express any views with regard to the
12      Chapter 9 filing?
13  A.  Not that I recall.
14  Q.  Did you have any conversations with Randy
15      Richardville prior to the Chapter 9 filing?
16  A.  It would be the same with Speaker Bolger, that as
17      part of the normal process I would give updates on
18      where the situations stood.
19  Q.  Do you have any recollection of what he said to you
20      with regard to those updates?
21  A.  No.
22  Q.  On or about July 18, when you authorized Detroit's
23      Chapter 9 filing, what was your understanding of the
24      dollar amount of the pension obligations that were
25      underfunded?

1  A.  It would be in the approximate three-and-a-half
2      billion dollar range based on the financial
3      statements.
4  Q.  What was your source of the underfunding figure when
5      you say financial statements? What financial
6      statements are you referring to?
7  A.  The statements that would have been provided by the
8      City of Detroit that would have been included in the
9      review team report.
10 Q.  As we sit here today, do you -- is it your
11     understanding that that number is still the number
12     that you're working with?
13 A.  My understanding is that there's been further work
14     done by actuaries and consultants that have come up
15     with differing numbers.
16 Q.  And as you sit here today, what's your understanding
17     of what the underfunding obligation is with regard
18     to the Detroit pensions?
19 A.  Potentially, these other reports could say the
20     underfunded amount was significantly larger.
21 Q.  And by significantly larger, do you have a dollar
22     figure or an estimate that you could give us?
23 A.  I wouldn't want to speculate. That's known in the
24     report.
25 Q.  And what reports specifically are you referring to?

1  A.  I believe there's a report that Kevyn Orr had
2      commissioned with respect by actuaries to assess the
3      Detroit pension plans.
4  Q.  And were those actuaries Milliman?
5  A.  I believe so.
6  Q.  Do you recall the date of the report?
7  A.  No.
8  Q.  Was it commissioned after the Chapter 9 filing?
9  A.  Again, I didn't -- I was not partaking in the
10     commissioning of the plan itself. You'd have to ask
11     Kevyn Orr.
12 Q.  Are you familiar with the litigations, specifically
13     three lawsuits commenced on or around July 3, 2013,
14     challenging the constitutionality of the appointment
15     of the emergency manager and/or certain aspects of
16     the emergency manager law, PA 436?
17 A.  Generally, yes.
18 Q.  During the period from July 3 to July 18, did you
19     follow this litigation?
20 A.  To some degree.
21 Q.  Did there come a point in time between July 3 and
22     July 18 that you learned that Kevyn Orr was putting
23     together a request for authorization to file
24     bankruptcy for Detroit?
25 A.  That would have been subject to attorney-client

1      privilege.
2  Q.  Well, actually, I'm asking you your understanding
3      and not anything that you've discussed with your
4      lawyers.
5          I'm asking you your understanding of
6      whether sometime between July 3 and July 18 you
7      learned that Kevyn Orr was putting together a
8      request for authorization to file Detroit's
9      Chapter 9 petition?
10 A.  He was considering a Chapter 9 request to me.
11 Q.  Do you recall when you first learned that he was
12     considering a Chapter 9 request to you?
13 A.  It would have been sometime between those dates. I
14     don't recall what specific date.
15 Q.  But it was sometime between July 3 and July 18?
16 A.  It would have been closer to the 18th.
17 Q.  And the request came to you on July 16; is that
18     correct?
19 A.  Yes.
20 Q.  Did you ask Kevyn Orr to send you that request?
21 A.  I left it to Kevyn Orr to make the decision.
22 Q.  At the time that you received the request, did you
23     agree with the request for the authorization?
24 A.  I wanted to review the request.
25 Q.  On July 16, was it your understanding that the filed

1      state court lawsuits, the so-called Flowers and
2      Webster litigations, were requesting injunctions
3      against among other things your authorizing the
4      Chapter 9 filing?
5  A.  Yes.
6  Q.  Did you believe that if the injunctions were granted
7      it would have interfered with Kevyn Orr's efforts at
8      restructuring Detroit?
9  A.  I didn't consider that.
10 Q.  You didn't consider at all the impact of whether or
11     not injunctions issued in those lawsuits would
12     impact the restructuring effort made by Kevyn Orr?
13 A.  My concern was is when I received a request from
14     Kevyn, I wanted to make sure I appropriately
15     reviewed that request and in a thoughtful fashion
16     and responded appropriately was my primary concern.
17 Q.  Was one of the criteria you used in your thoughtful
18     deliberation the status of those pending
19     litigations?
20 A.  Not with respect to injunctions but with respect to
21     the sheer fact of many cases of litigation were
22     going on and that we were ending up in potentially
23     many different courts over many issues that could go
24     beyond the scope of just those lawsuits.
25 Q.  So it's your testimony that you -- that although you

1 took into account the volume of litigation, you did
2 not take into account the impact of the injunctions
3 which were being sought in those particular
4 litigations?
5 A. I view those as speculative. Again, there were
6 requests -- and those are common requests in many
7 lawsuits.
8 Q. Changing topics for a minute. NERDs, is that an
9 acronym for New Energy to Reinvest Diversity Fund?
10 A. Yes.
11 Q. Do you know who the donors are to the NERDs Fund?
12 MS. NELSON: Objection; outside the scope
13 of the protective order and the eligibility
14 objections for purposes of this deposition.
15 MS. LEVINE: You can answer.
16 MS. NELSON: No, he can't answer. It's
17 outside the protective order and the scope of this
18 deposition.
19 MS. LEVINE: How is it outside the
20 protective order?
21 MS. NELSON: The protective order limits
22 the scope of the deposition to the issues identified
23 in the eligibility objections, and there's nothing
24 in AFSCME's eligibility objections related to the
25 NERD Fund or specifically the donors to the NERD

1 Fund.
2 MS. LEVINE: Okay. Well, I'm going to run
3 through my questions for the record, and if at the
4 end of the series of questions on the NERDs Funds
5 your position is the same, then we can have the
6 Governor not answer, but for the record since we
7 only have three hours I'm going to go through it.
8 BY MS. LEVINE:
9 Q. Do you know who any of the donors are?
10 MS. NELSON: Same objection.
11 BY MS. LEVINE:
12 Q. Was Kevyn Orr a donor?
13 MS. NELSON: Same objection.
14 BY MS. LEVINE:
15 Q. Is Jones Day a donor?
16 A. (No response.)
17 Q. Do you know if any of the retained professionals by
18 the City of Detroit, either the firms or the
19 individuals, are donors or any of the creditors of
20 Detroit donors or any of the SWOP party's donors?
21 A. (No response.)
22 Q. Would you be willing to produce those names?
23 A. (No response.)
24 Q. If it's not within your control, would you be
25 willing to ask NERDs to produce those names?

1 A. (No response.)
2 Q. Do you know if any of the emergency manager's costs
3 or expenses are being paid for or reimbursed by the
4 NERDs Fund?
5 A. (No response.)
6 Q. Do you know if NERD made any other payments to or on
7 behalf of Kevyn Orr?
8 A. (No response.)
9 Q. Do you know if any of the NERDs donors also made
10 political contributions to your campaign? If so,
11 whom and how much?
12 A. (No response.)
13 Q. Do you know if any of the NERDs donors also
14 contributed to the campaign against PA 4, and, if
15 so, which donors were those?
16 A. (No response.)
17 MS. LEVINE: Is it still the State's
18 position that this is unrelated to eligibility?
19 MS. NELSON: Yes. Unless you can identify
20 specifically the objections in your eligibility
21 statement that they relate to.
22 MS. LEVINE: It's good faith. It goes to
23 good faith and it goes to conflict of interest with
24 regard to good faith.
25 MS. NELSON: In what context?

1 MS. LEVINE: Well, I'm not going to use my
2 three hours to have that --
3 MS. NELSON: No, I understand that. I -- I
4 don't believe that it is -- if you'll let me confer
5 with my client, I'll ask him.
6 MS. LEVINE: I've learned how to use my
7 timer, so that's good my daughter taught me that.
8 VIDEO TECHNICIAN: Going off the record
9 then?
10 MS. LEVINE: Yes. Yes.
11 VIDEO TECHNICIAN: Off the record 8:58 a.m.
12 (A brief recess was taken.)
13 VIDEO TECHNICIAN: We are back on the
14 record at 9 a.m.
15 MS. NELSON: I've conferred with my client,
16 and in the spirit of cooperation and to move these
17 proceedings along, he's agreed to respond to your
18 questions and can do so fairly quickly.
19 THE WITNESS: Yeah, with respect to your
20 questions as to who the donors were and those --
21 that category of questioning, my answer would be I
22 don't know. There's an independent board that does
23 that work.
24 With respect to the question of expenses,
25 Kevyn Orr's agreement is such that some of his

Page 25

1    expenses can be reimbursed by the NERD Fund because
2    it was created to offset the burdens of government
3    and does similar things such as process auditorium
4    upgrades, help with expenses for travel.
5  BY MS. LEVINE:
6  Q.  Do you know whether or not the NERD Fund contributed
7    to the campaign against PA 4?
8  A.  I don't know.
9  Q.  Or in favor of PA 4?
10 A.  I don't know.
11 Q.  Did you prepare for today's deposition?
12 A.  I had time with my counsel.
13 Q.  And who was that counsel?
14 A.  The fine group you're seeing on the other side of
15    this table.
16 Q.  Just because we have a transcript, and I don't know
17    if everybody's going to be seeing the videotape but
18    the lawyers aren't on the videotape, so for the
19    record could you just give the names of your
20    lawyers?
21 A.  Yeah.  My attorney, Margaret, who has already been
22    identified; Matthew Schneider and Mike Gadola and
23    Peter Ellsworth.
24 Q.  Did you also meet with attorneys for the City of
25    Detroit to prepare for today's deposition?

Page 26

1  A.  No.
2  Q.  Did you review any documents to prepare for today's
3    deposition?
4  A.  Yes.
5  Q.  And what documents did you review?
6        MS. NELSON: Objection.  That's privileged
7    and work product.
8        MS. LEVINE: Are you directing the witness
9    not to answer?
10       MS. NELSON: Yes.
11 BY MS. LEVINE:
12 Q.  Was anybody else present at any of the meetings that
13    you had to prepare for the deposition besides you
14    and your counsel?
15 A.  No.
16 Q.  Is it your understanding that Kevyn Orr was
17    appointed emergency manager effective March 28,
18    2013?
19 A.  I don't recall the specific date, but it sounds like
20    you have that.
21 Q.  Do you recall whether or not Kevyn Orr was appointed
22    in or around March of 2013?
23 A.  Yes.
24 Q.  Is it your understanding that PA 436 became
25    effective in or around March of 2013?

Page 27

1  A.  Yes.
2  Q.  Is it your understanding that PA 436 was enacted in
3    December of 2012?
4  A.  Yes.
5  Q.  Is it your understanding that PA 4 was struck by
6    voter referendum in November of 2012?
7  A.  Yes.
8  Q.  Are you familiar with press coverage that indicates
9    that there's some sentiment that PA 436 was
10    criticized as a dictatorship or takeover mechanism
11    when it was enacted?
12 A.  I'm aware there were many comments with respect to
13    many pieces of legislation.
14 Q.  I'm asking specifically about those comments with
15    regard to PA 436.
16 A.  Yes.
17 Q.  Did you have any involvement in bringing PA 436 into
18    law?
19 A.  Yes.
20 Q.  What was your understanding of the purpose of PA
21    436?
22 A.  It was to be responsive to the voters to actually
23    improve on a process that goes back a very long
24    time.  It goes back to 1988 originally; that in 1990
25    Public Act 72 came into law under Governor

Page 28

1    Blanchard.  That was an emergency manager law that
2    was in effect for a very long time and had been
3    utilized by several prior governors.
4  Q.  So was --
5  A.  Then beyond that --
6  Q.  I'm sorry.
7  A.  Excuse me.  Public Act 72 came into place and was
8    used for quite a few years including my predecessor
9    who had appointed a number of the emergency managers
10    that were in place when I took office.
11       Following Public Act 72, I thought it was
12    important to make improvements to Public 72 because
13    it had two major challenge points.  One, emergency
14    managers could be in place for too long, and there
15    was no early warning system to help avoid ever
16    needing an emergency manager.
17       So Public Act 4 was an improvement on
18    Public Act 72 to put in an early warning system
19    again --
20 Q.  Let me -- I appreciate the commentary, but I only
21    have an hour and a half.  Let me ask a more pointed
22    question.  My mistake for not narrowing the
23    question.
24 A.  Uh-huh.
25 Q.  Was PA 436 enacted in part to overcome what were

Page 29

1 perceived to be the deficiencies or the cause for
2 the voter referendum with regard to PA 4?
3 A.  Plus additional improvements over what was Public
4 Act 4 or Public Act 72.
5 Q.  Did you have any involvement in drafting PA 4?
6 A.  Yes.
7 Q.  Was the hope that PA 436 would avoid a referendum by
8 the voters striking it down as well?
9 A.  No.
10 Q.  Is one of the differences between PA 4 and PA 436
11 the treatment of vested pension benefits?
12 A.  Not that I recall.
13 Q.  Is it your understanding that PA 436 prohibits any
14 changes to vested pension benefits?
15 A.  Could you state that again because I'm not sure PA
16 436 really references pension benefits in terms of
17 what it covers.
18 Q.  Okay.  Is it your understanding that PA 436
19 authorizes the Governor, you, to authorize the
20 emergency manager to file for bankruptcy protection
21 under Chapter 9 of the Bankruptcy Code?
22 A.  Yes.
23 Q.  Is it your understanding that PA 436 among other
24 things authorizes the Governor to place
25 contingencies on the municipal proceeding under

Page 30

1 Chapter 9?
2 A.  Yes.
3 Q.  Is it your understanding as we sit here today that
4 one of the challenges to Detroit's Chapter 9
5 bankruptcy filing is that it was filed without
6 imposing as a condition a prohibition against
7 modifying the existing pension benefits?
8 A.  Yes.  I understand that's one of the elements of
9 objections.
10 Q.  Is it your understanding that Article 9 Section 24
11 of the Michigan Constitution prohibits tampering
12 with the vested pension benefits?
13 A.  That's not my understanding of what the Constitution
14 says.  It does not literally say that.
15 Q.  What's your understanding of what the Constitution
16 says with regard to vested pension benefits?
17 A.  It talks about accrued financial benefits from the
18 State or a political subdivision being treated as
19 contractual obligations, and in that context they
20 shouldn't be impaired or diminished, which is
21 different than what you stated.
22 Q.  Did you include -- using your definition, did you
23 include that limitation in -- let me ask this
24 differently.
25    Using your statement, why didn't you

Page 31

1 include that as a contingency or limitation on your
2 authorization to Kevyn Orr with regard to the
3 Chapter 9 filing for Detroit?
4 A.  In terms of -- I didn't believe it was appropriate
5 to put contingencies in it because, as I stated in
6 my letter authorizing it, I believe that the process
7 is required to be a legal process, which would
8 address any legal questions through the bankruptcy
9 process, either through the plan or the judge's
10 review of the plan.
11 Q.  So is it your understanding that any limitation on
12 the ability to impair or change vested pension
13 benefits under state law would also apply to the
14 Chapter 9 process?
15 A.  That's starting to get into legal opinions, and I
16 thought it was best to leave to the judicial branch,
17 particularly a bankruptcy judge.
18 Q.  I'm actually asking you what your understanding is.
19 A.  My understanding is that would be resolved through
20 the bankruptcy process with the bankruptcy judge.
21 Q.  Did you take an oath of office when you became
22 Governor?
23 A.  Yes.
24 Q.  Wasn't part of that oath to uphold the law?
25 A.  It was to uphold the Constitutions of Michigan and

Page 32

1 the United States.
2 Q.  Isn't this a provision of the Constitution of
3 Michigan?
4 A.  And it also involves the Constitution of the United
5 States when you're talking Chapter 9 bankruptcy, and
6 I thought it best to leave to a judge, the judicial
7 branch, to make a determination of a legal question.
8 Q.  When you signed the authorization letter, were you
9 concerned about how the pension issue would
10 ultimately get resolved through the Chapter 9
11 process?
12 A.  It involved citizens of the State of Michigan, so
13 yes.
14 Q.  Did you have any involvement in the selection of
15 Kevyn Orr as emergency manager or emergency
16 financial manager for Detroit?
17 A.  Yes.
18 Q.  When did the emergency manager or the emergency
19 financial manager process that resulted in Kevyn
20 Orr's selection begin?
21 A.  You can argue that began sometime back in 2011.  It
22 was a continuation of a process that goes back to a
23 preliminary review that started in 2011, that went
24 to a review team in 2012, that resulted in a consent
25 agreement in early 2012.  It continued throughout

Page 33

1 that year.
2     When it was clear the consent agreement
3 wasn't working, there was a subsequent review
4 started in December of late 2012. The review team
5 came up with a determination that there's a
6 financial emergency without a sufficient plan. I
7 agreed with that conclusion. There was then a
8 hearing and a review process of that. That was
9 appropriately done.
10     I reaffirmed my review after receiving a
11 report that concluded the same measure, that there
12 was a financial emergency without a sufficient plan.
13 And given that circumstance, then we had a need for
14 an emergency manager.
15 Q. Okay. So the last step in that process, was that
16   the point at which you were interviewing candidates
17   that resulted in the selection of Kevyn Orr?
18 A. We started some -- the interview process prior to
19   that to be prepared as a contingency in case that
20   was the outcome of the review and the hearing
21   process.
22 Q. Were you involved personally in that selection
23   process?
24 A. Yes.
25 Q. Who else was involved with you?

Page 34

1 A. Rich Baird and several other people from the staff.
2   The Mayor of Detroit was involved in the process.
3 Q. Mayor Bing was involved?
4 A. Yes.
5 Q. Was Mr. Dillon involved?
6 A. Yes.
7 Q. Was your chief of staff involved?
8 A. Yes.
9 Q. Did you rely on any outside consultants, bankruptcy
10   attorneys, financial advisors in making this
11   decision also?
12 A. I didn't personally during that process.
13 Q. Did you establish a list of criteria or
14   qualifications that you were looking for that you'd
15   think favorably upon in making the selection as to
16   who should be the emergency manager for Detroit?
17 A. There was criteria we discussed to go through this
18   process.
19 Q. Did that criteria include familiarity with
20   bankruptcy?
21 A. It wasn't necessarily required. It could be viewed
22   as a positive and not in the context of bankruptcy
23   but bankruptcy and restructuring experience.
24 Q. Did you view as a positive ties to Detroit?
25 A. Yes.

Page 35

1 Q. Were you looking at residency?
2 A. Not necessarily residency but familiarity with
3   Detroit.
4 Q. Did you take into account political affiliations?
5 A. No.
6 Q. Race?
7 A. Again, that would be a factor that could be of some
8   consideration.
9 Q. Did you take into account any history of political
10   party ties, political involvement or political
11   appointments?
12 A. What I would say, those would be viewed as
13   negatives.
14 Q. Did you take into account any municipal
15   redevelopment background?
16 A. In terms of restructuring or having municipal
17   experience, that would be a positive.
18 Q. Would that also include municipal budgeting or
19   financial planning?
20 A. It could.
21 Q. Did you take into account any land use or zoning
22   experience?
23 A. We didn't get to that degree of specificity, as I
24   recall.
25 Q. Were there in-person interviews in connection with

Page 36

1   the selection process that resulted in the selection
2   of Kevyn Orr?
3 A. Yes.
4 Q. Who ran that process for you?
5 A. Rich Baird.
6 Q. And were you personally involved in the in-person
7   interviews?
8 A. Some.
9 Q. Did you personally interview Kevyn Orr?
10 A. Yes.
11 Q. Where did that interview take place?
12 A. I met with him more than once. I believe -- I don't
13   recall specifically which location.
14 Q. Was there a list or a slate of candidates that you
15   personally interviewed for the emergency manager
16   position?
17 A. I interviewed more than one candidate in person.
18 Q. How many candidates did you interview in person?
19 A. I recall two for sure.
20 Q. Were there more than two?
21 A. Not that I recall.
22 Q. Was Kevyn Orr a candidate before Jones Day was
23   interviewed as counsel for Detroit?
24 A. I don't believe so.
25 Q. Was he asked to be -- to consider the emergency

1 manager position during the Jones Day interview?

2 A. I wasn't part of the Jones Day interview process.

3 Q. No. My question, was it your understanding that he

4 was asked to consider the emergency manager position

5 during the Jones Day interview?

6 A. Again, I couldn't speak to a process that I wasn't a

7 participant in.

8 Q. Do you know if he was offered by Jones Day as a

9 candidate?

10 A. He was not offered by Jones Day as a candidate. We

11 asked permission if we could talk to Kevyn Orr.

12 Q. Why in your mind was he better than the other

13 candidates you were considering?

14 A. That was an extensive process. What I would say is

15 a number of candidates sort of withdrew their

16 interest in participation also during this process.

17 But I think Kevyn Orr had very strong

18 criteria and a very strong background in terms of he

19 had ties to Michigan and Detroit both in terms of

20 family and school, he had extensive experience in

21 restructuring and bankruptcy, and he had very fine

22 communication skills.

23 Q. Isn't it true that Kevyn Orr also expressed a

24 hesitancy about accepting a position as emergency

25 manager?

1 A. That would be speculative.

2 Q. Did he ever express to you a concern that he was

3 perhaps uncertain about accepting the position of

4 emergency manager if it was offered to him?

5 A. I would say -- I wouldn't -- I can't speak for

6 Kevyn. I think this is one of the most challenging

7 positions, to be emergency manager, in the United

8 States, and I think that most people would have some

9 degree of concern about taking this position.

10 Q. While he was grappling with that decision, did you

11 personally reach out to him and have any

12 conversations with him with regard to why you wanted

13 him to take the position?

14 A. I had several discussions with Kevyn about the

15 challenges of this position. And, to be open, I

16 made quite clear to him that I viewed this as one of

17 the most challenging positions in our country.

18 Q. Did you indicate to him that you thought it was

19 important that he accept because of his bankruptcy

20 experience?

21 A. In terms of emphasizing his bankruptcy experience as

22 a reason to do this, no. I viewed it as his overall

23 experience in terms of being a person dealing with

24 turnarounds, restructuring and bankruptcy was very

25 relevant to this situation.

1 His experience with Chrysler I thought was

2 very helpful in terms of dealerships, of

3 understanding how to turn around a situation and see

4 it be successful.

5 Q. When did you make the final decision on Kevyn Orr?

6 A. I didn't make the final decision. I recommended

7 someone. The decision was made by the Emergency

8 Loan Board.

9 Q. Did anybody else recommend Kevyn Orr to the

10 Emergency Loan Board?

11 A. Well, I think some of the other people as part of

12 the interview process probably did, but I think I

13 was the one really making the recommendation.

14 Q. Were you involved in the decision to retain Jones

15 Day as restructuring attorneys to the City?

16 A. That was a decision by the City of Detroit.

17 Q. Try again. Were you involved in the decision to

18 retain Jones Day as restructuring attorneys for the

19 City?

20 A. No.

21 Q. Was Mr. Baird, Mr. Dillon or any other State

22 official involved in the interview process or the

23 decision-making process with regard to the retention

24 of Jones Day by the City of Detroit?

25 A. I don't know.

1 Q. From June 2012 through the present, does Jones Day

2 provide any services or is it retained or an

3 approved attorney for the State?

4 A. I don't know. My understanding is Jones Day's

5 relationship is with the City of Detroit.

6 Q. Did you ever consider disqualifying either Jones Day

7 or Kevyn Orr because Kevyn Orr was a partner at

8 Jones Day?

9 A. They were separate processes. That the City of

10 Detroit was making a determination to retain Jones

11 Day, and they were making that through their own

12 decision-making processes.

13 We were looking for candidates for

14 emergency manager, and we specifically asked

15 permission if we could contact Kevyn Orr and have

16 that discussion. So I viewed them as separate

17 discussions.

18 Q. Did you ever consider that the close relationship

19 between Kevyn Orr and Jones Day created a conflict

20 or appearance of conflict?

21 A. Kevyn Orr, part of the requirement was is he

22 resigned as a partner and severed his ties with the

23 firm as part of becoming emergency manager to avoid

24 any conflict of interest.

25 Q. Well, were you concerned that he might be

1 deferential to his partners or recent former
2 partners at Jones Day?
3 A. No. Because, in fact, the City of Detroit made the
4 determination to hire Jones Day, and they went
5 through with that process, and that was a separate
6 independent process that I believe actually occurred
7 prior to Kevyn Orr joining the City of Detroit as
8 emergency manager.
9 Q. Did you consider whether it would be difficult for
10 Mr. Orr to favor the interests of the City over the
11 interests of Jones Day?
12 A. I don't understand your question because I don't
13 understand why Jones Day would be in conflict with
14 the City of Detroit. They're representing the City
15 of Detroit.
16 Q. And aren't they being compensated by the City of
17 Detroit?
18 A. They are being compensated by the City of Detroit.
19 Q. Isn't there less of an appearance of conflict if it
20 had been a different law firm that had been retained
21 by the City of Detroit than Kevyn Orr's prior firm?
22 A. And that's why it was important that he resigned and
23 severed all ties.
24 Q. During the discussions that you had with Kevyn Orr
25 prior to the time that he was appointed as emergency

1 manager or after he was appointed as emergency
2 manager but before July 18th, did you ever discuss
3 with Kevyn Orr outsourcing for the City of Detroit?
4 A. Could you explain what you mean by outsourcing?
5 Q. As part of the business plan for the City of
6 Detroit, the City of Detroit is looking at --
7 potentially looking at outsourcing some of the
8 services that are currently performed by City
9 employees; is that correct?
10 A. They're looking at the most efficient ways to
11 deliver services to the citizens of Detroit.
12 Q. Is that yes?
13 A. That would include that. In terms of looking at
14 other alternatives, some of those were outlined, in
15 fact, during the consent agreement in terms of
16 looking at opportunities such as having the Detroit
17 Economic Growth Corporation handle the planning and
18 zoning activities of the City of Detroit, and that
19 was done in the context of the Mayor and the City
20 Council approving that consent agreement.
21 Q. I'm going to try again.
22 Did you have any conversations with Kevyn
23 Orr prior to the time that he was appoint -- prior
24 to the time that he was -- during the interview
25 process, prior to the time that he was appointed as

1 emergency manager or at any time during the period
2 of time that he was appointed as emergency manager
3 on July 18th with regard to outsourcing?
4 A. I don't recall with respect to the interview
5 process, and there has been discussions about
6 looking at providers of services in both internal
7 and external services for the City of Detroit since
8 that date.
9 Q. For that same period of time, during the interview
10 process and up to and including July 18th or 19th,
11 did you have any conversation with Kevyn Orr with
12 regard to selling or monetizing assets such as the
13 art, Belle Isle and water and sewer and other assets
14 of Detroit?
15 A. Those discussions would have been subject to
16 attorney-client privilege.
17 Q. Is it your understanding that the sale of assets are
18 one of the things that are under consideration in
19 connection with the restructuring plan that Kevyn
20 Orr proposed during June of 2013?
21 A. I don't recall that portion of the proposal.
22 Q. What's your view on monetizing these assets as part
23 of a restructuring plan including the art, Belle
24 Isle and water and sewer and some of the other
25 assets of Detroit?

1 A. Again, that's a hypothetical discussion because it
2 would really come down to what's presented in the
3 plan of adjustment within the context of the
4 bankruptcy court, and it hasn't been done at this
5 point.
6 Q. Well, I'm asking your view of whether or not those
7 items should be on the table in connection with the
8 structuring of that plan?
9 A. I view those as primarily Kevyn Orr's decisions
10 because he's the emergency manager for the City of
11 Detroit.
12 Q. During the interview process, prior to Kevyn Orr's
13 selection but during the period of time you were
14 talking to him, did you ever express a view that
15 vested pension benefits should not be modified by
16 the emergency manager for the City of Detroit?
17 A. I don't recall.
18 Q. Did you have discussions prior to the time that
19 Kevyn Orr was selected with regard to your views
20 about whether or not vested pension benefits should
21 be modified?
22 A. I think that's just what -- what's different than
23 the prior question?
24 Q. Are you saying you don't recall?
25 A. I don't recall.

1 Q. After the time that Kevyn Orr was engaged but before
2 July 18th, did you have any conversations with Kevyn
3 Orr with regard to your views on whether vested
4 pension benefits should be modified or not modified
5 as part of a restructuring for Detroit?
6 A. Those would have been subject to attorney-client
7 privilege.
8 Q. As we sit here today, what is your view of whether
9 vested pension benefits should be modified or not
10 modified as a result of a restructuring or plan of
11 adjustment for Detroit?
12 A. I view that that's part of the bankruptcy process.
13 Those are not my decisions to make. There's a plan
14 of adjustment that will be presented by the City,
15 assuming Chapter 9 goes forward, and that would be
16 adjudicated by Judge Rhodes.
17 Q. So is it your testimony today that you do not have a
18 view?
19 A. I would -- I'm not a decisionmaker in that process
20 with respect to deciding that the plan would be
21 adopted or not, and there has not been a plan even
22 presented at this point in time, so anything else
23 would be speculative.
24 Q. I'm asking you your view as to whether as part of
25 that process vested pension benefits should be

1 modified or should not be modified?
2 A. Again, I view those as primarily legal questions.
3 Q. Did you review the June 14 proposal made by Kevyn
4 Orr before the June 14 meeting with the creditors of
5 Detroit?
6 A. I'd seen drafts.
7 Q. Did you approve it?
8 A. It wasn't mine to approve or not approve. That was
9 a decision of Kevyn Orr and the City of Detroit.
10 Q. Did you express a view about it before it was
11 presented?
12 A. I don't recall. Not any significant discussions, in
13 my view.
14 Q. Did you tell them not to present any aspect of it?
15 A. I don't recall.
16 Q. Did you participate at all in the development of the
17 proposal?
18 A. Those discussions would have been subject to
19 attorney-client privilege in terms of any meetings.
20 Q. I'm not asking what was said. I'm asking if you
21 participated in the development of the proposal.
22 A. Again, I saw early drafts. I don't -- I wouldn't
23 describe that as developing the proposal.
24 Q. Is it your understanding that the proposal complies
25 with the Michigan Constitution?

1 A. The proposal was an effort to go talk to creditors.
2 It wasn't a plan of adjustment. It was simply a
3 document to say here's a beginning point to have
4 mutual negotiations over issues. That would have to
5 be consentual to arrive at a conclusion.
6 Q. At any time during the interview process for Kevyn
7 Orr did you discuss with Kevyn Orr the potential for
8 federal assistance in order to assist Detroit with
9 its restructuring efforts?
10 A. I don't recall.
11 Q. Do you believe it would be appropriate to seek
12 federal assistance to assist Detroit with its
13 restructuring efforts?
14 A. I'm publicly on the record saying that I didn't
15 believe it would be appropriate to go ask the
16 federal government for a bailout with respect to the
17 debts of the City of Detroit; that I thought it
18 would be appropriate to say are there normal
19 assistance procedures available to help improve
20 services to citizens.
21 Q. Have you assisted Kevyn Orr in going after federal
22 assistance in the places where you've identified it
23 as appropriate?
24 A. I have been part of that process, not only with
25 Kevyn Orr but with Mayor Bing.

1 Q. Specifically, how have you been part of that
2 process?
3 A. Well, in fact, we just had a press conference where
4 several cabinet members came to Detroit along with
5 Gene Sperling from the Whitehouse and they announced
6 a package of federal programs. I was present
7 through that process.
8 Q. Was Mayor Bing present through that process as well?
9 A. Yes.
10 Q. And Kevyn Orr?
11 A. Yes.
12 Q. Do you believe there should be state assistance with
13 regard to the restructuring plan for Detroit?
14 A. We have been providing assistance with improved
15 services to the citizens.
16 Q. Give some examples of some of that assistance.
17 A. Sure. We've been active on the blight front in
18 terms of dealing with removing structures. We've
19 put significant resources towards that.
20 Another one is we did the new Detroit
21 Detention Center. The Department of Corrections did
22 that in partnership with the Detroit Police
23 Department.
24 Q. Have you looked at any avenues to use state
25 assistance to deal with the pension underfunding

Page 49

1    issue?
2 A.  Not at this point in time.
3 Q.  During the interview process with Kevyn Orr, did you
4    discuss the potential for a Chapter 9 filing?
5 A.  In terms of those discussions, what I would say is
6    as a last resort we had to be aware that Chapter 9
7    might be the only available option.
8 Q.  Did you discuss with Kevyn Orr whether vested
9    pension benefits could be reduced or modified in
10   Chapter 9?
11 A. I don't recall.
12 Q. Do you recall any discussions with Kevyn Orr during
13   the interview process with regard to vested pension
14   benefits?
15 A. I don't recall.
16 Q. During the period of time that you were interviewing
17   Kevyn Orr for emergency manager, did you have any
18   discussions with Mayor Bing with regard to your
19   proposed selection of Kevyn Orr?
20 A. Yes.
21 Q. What was discussed?
22 A. In terms of working relationships and did Mayor Bing
23   think Kevyn Orr could be a good candidate to be
24   emergency manager.
25 Q. And what did Mayor Bing say to you?

Page 50

1 A. I didn't speak to him specifically after that, but I
2    helped talk to him during that process. My
3    understanding was is he was supportive of Kevyn Orr.
4 Q. Were you personally involved in those discussions or
5    was it somebody on your behalf?
6 A. In terms of I had spoken to Mayor Bing about Kevyn
7    Orr being part of the process and some of the
8    feedback that he had early in the process, but by
9    the end of the process there were other people also
10   participating in that such as Rich Baird.
11 Q. Did you meet with Mayor Bing personally?
12 A. I spoke to him on the phone, as I recall.
13 Q. Prior to the time that you selected Kevyn Orr, did
14   you meet with any of the unions for the City of
15   Detroit to solicit their input with regard to the
16   selection of the emergency manager?
17 A. No.
18 Q. Did you speak with any retiree groups?
19 A. No.
20 Q. Did you speak to any of the City's so-called
21   Wall Street creditors, bond holders, larger
22   creditors?
23 A. No.
24 Q. Did you speak to the pension funds?
25 A. No.

Page 51

1    MS. LEVINE: Thank you, Governor.
2    THE WITNESS: Thank you.
3    VIDEO TECHNICIAN: Take a break, switch?
4 Off the record 9:31 a.m.
5    (A brief recess was taken.)
6
7    (Deposition Exhibit 1 was marked.)
8
9    VIDEO TECHNICIAN: Go back on the record at
10   9:40 a.m.
11   EXAMINATION
12 BY MR. DeChIARA:
13 Q. Good morning, Governor. My name is Peter DeChiara.
14   I'm an attorney with the law firm of Cohen, Weiss
15   and Simon LLP. We represent the United Auto Workers
16   International Union in this proceeding.
17   I'd like to show you a document that I've
18   asked the court reporter to mark as Exhibit Number
19   1. It's -- I'll identify it for the record. It's a
20   July 16th, 2013 letter that was from Emergency
21   Manager Kevyn Orr to you and to Treasurer Andrew
22   Dillon.
23   You're familiar with this letter; are you
24   not?
25 A. Yes.

Page 52

1 Q. I'd like you to turn to the second page of the
2    letter and in particular the bottom of the letter.
3    The third line from the bottom in the middle of the
4    line there's a sentence that I'll read out loud. It
5    says "The City has over $18 billion in accrued
6    obligations, including: (a) 3.5 billion in
7    underfunding pension liabilities based on the most
8    recent actuarial analysis;..."
9    I'll finish the quote there. The sentence
10   goes on, and you can feel free to read the rest of
11   the sentence, but I just want to ask you about the
12   portion that I quoted.
13   When you received this July 16th letter
14   from Mr. Orr, did you read it?
15 A. Yes.
16 Q. Okay. And did you read this line that I just
17   quoted?
18 A. Yes.
19 Q. And did you take it as true that the City had over
20   $18 billion in accrued obligations, including 3.5
21   billion in underfunding pension liabilities?
22 A. The answer is yes, but it was also in the context of
23   the most recent evaluation, to say that there was an
24   open question did there need to be more evaluations
25   or additional work done.

1  Q.  I'm sorry.  Your answer is yes, you did take that
2      statement as true?
3  A.  Yes.  Uh-huh.
4  Q.  Okay.  Did you undertake any independent
5      investigation or cause any independent investigation
6      to be undertaken to determine whether the statement
7      that I quoted was true?
8  A.  I also looked back to prior review team reports
9      which in many cases had very similar information.
10 Q.  Did -- were you aware that at the time this
11     July 16th letter was written, the pension funds
12     themselves were disputing the statement that the
13     amount of underfunding of the pension liabilities
14     was 3.5 billion?  Were you aware of that fact?
15 A.  I was aware that people were disputing it in terms
16     of both being higher or lower.
17 Q.  Were you aware that the pension funds themselves
18     were saying the number was lower?
19 A.  I don't recall that.
20 Q.  Did Mr. Orr ever tell you that?
21 A.  I don't recall.
22 Q.  He might have told you that?
23 A.  Again, I don't recall.
24 Q.  Okay.  Do you think it was important in your
25     determination as to whether to authorize Detroit to

1      file for bankruptcy to know the correct amount of
2      the City's underfunded pension liabilities?  Did you
3      think that was important?
4  A.  I think that was one element of a much larger
5      question.
6          As you pointed out in the sentence, the
7      sentence talks about $18 billion of liabilities.
8  Q.  But my question, Governor, is did you think at the
9      time you made your decision about whether or not to
10     authorize the Detroit bankruptcy filing that it was
11     important to know the amount of the City's
12     underfunded pension liabilities?
13 A.  I would say it was important to know that there was
14     an underfunded amount of an order of magnitude in
15     relationship to the $18 billion.  Again, people were
16     saying that number could be lower, it could be
17     higher, so I didn't assume that was necessarily the
18     exact number.
19         But in the context of $18 billion of
20     liabilities, there was clearly a problem that I
21     concurred with the recommendation.
22 Q.  Well, if the amount of the underfunded pension
23     liabilities had been lower, the overall accrued
24     obligations would have been lower as well, correct?
25 A.  One of the things I looked at --

1  Q.  Am I correct, Your Honor?  I mean Governor.
2  A.  The overall number would be lower.  In terms of
3      context, though, one of the things I looked at was
4      prior reports that showed the current -- the City of
5      Detroit was paying $.38 on the dollar towards
6      historic or legacy liabilities; that there were
7      projections to show that by 2017 that number would
8      raise to $.60 on the dollar.
9  Q.  Do you know whether -- at the time that you received
10     the July 16th letter from Mr. Orr, do you know
11     whether Mr. Orr or his staff at that time had
12     undertaken an analysis of the assets of the City of
13     Detroit to see what assets could be monetized to
14     address the City's financial problems?
15 A.  There was -- it was clear that there was a need to
16     do a survey of assets and valuation of the assets of
17     the City whether those were to be monetized or not,
18     but there was a need to do an inventory of assets
19     and value those assets.
20 Q.  My question is at the time you received the
21     July 16th letter, were you aware of whether Mr. Orr
22     or his staff had undertaken an analysis of the
23     assets of the City of Detroit to see which might be
24     monetized?
25 A.  My understanding was a lot of that work still needed

1      to be done.
2  Q.  Okay.  Did you think when you received the
3      July 16th, 2013 letter that it would be important to
4      know whether the City had assets that could be
5      monetized, and if so what those assets might be?
6          Did you think that was something important
7      to know?
8  A.  Can you repeat that again?
9  Q.  Sure.  At the time you received the July 16th, 2013
10     letter from Mr. Orr, did you think at that time that
11     it would be important to know whether the City had
12     assets that could be monetized?  And when I say
13     important, I mean important in the context of your
14     making your decision on whether to authorize the
15     bankruptcy filing.
16 A.  I didn't view the valuation of assets being nearly
17     as relevant as understanding what the liabilities
18     were because the issue was were the liabilities so
19     large that there needed to be something done to
20     address them.
21         Understanding that, again, we had a $18
22     billion give or take kind of number that needed to
23     be addressed and that it would take some time to
24     understand what assets, what values they may have
25     and what might be available.

Page 57

1  Q.  Have you ever been involved in a business, Governor
2      Snyder?
3  A.  Yes.
4  Q.  Isn't it true to assess the financial picture of a
5      business you need to know both the assets and the
6      liabilities of the business?
7  A.  This is a different situation in terms --
8  Q.  Could you answer my question?
9  A.  Yes.
10 Q.  The answer to my question is yes?
11 A.  Yes.
12 Q.  Okay.  At the time you received Mr. Orr's July 16th,
13     2013 letter, do you know whether Mr. Orr or his
14     staff had undertaken an analysis such that they knew
15     with specificity the City's cash flow?
16 A.  There had -- there was extensive work done doing
17     cash flow analysis of the City.  Some of that work
18     was included in the proposal to creditors back in
19     June --
20 Q.  Okay.
21 A.  -- in addition to reports that had been provided
22     under his obligation as emergency manager.
23 Q.  But at the time that you received the July 16th,
24     2013 letter, do you know whether Mr. Orr or his
25     staff had done an analysis which allowed them to

Page 58

1      know with specificity the extent of the City's cash
2      flow?
3  A.  I believe they had.
4  Q.  Okay.  Did you ever discuss that with Mr. Orr?
5  A.  That would be a matter of attorney-client privilege.
6  Q.  Well, whether it's a matter of attorney-client
7      privilege is a legal question, and you have counsel
8      here who can object if she believes that a question
9      infringes on the attorney-client privilege, so I
10     would ask you to answer the question.
11         MS. NELSON: You can answer yes or no.
12         THE WITNESS: Yes.
13 BY MR. DeCHIARA:
14 Q.  Yes, you did have discussions?
15 A.  Yeah.
16 Q.  And were those discussions -- were other people
17     present other than you and Mr. Orr in those
18     discussions?
19 A.  Yes.
20 Q.  Isn't it true you had one-on-one conversations with
21     Mr. Orr prior to the bankruptcy filing?
22 A.  Yes.
23 Q.  Okay.  In any of those one-on-one conversations with
24     Mr. Orr did you ever have a discussion of the City's
25     cash flow?

Page 59

1  A.  Not that I recall.
2  Q.  Do you know whether a significant portion of
3      Detroit's unfunded pension liability is allocable to
4      the City's Water and Sewer Department?
5  A.  I'm not aware of that relationship.
6  Q.  Okay.  Is that something that you think would be
7      relevant to a determination about whether or not the
8      City should pursue a bankruptcy?
9  A.  I haven't considered that as a question.
10 Q.  Okay.  Let me now refer you to page six of
11     Exhibit 1, and at the bottom paragraph of the page
12     there's a reference to the June 14th creditor
13     proposal.  Do you see that?
14 A.  Yes.
15 Q.  Okay.  And you were familiar with that proposal when
16     you received this letter on July 16th?
17 A.  Generally familiar.  It's a 128-page document.
18 Q.  Okay.
19
20         (Deposition Exhibit 2 was marked.)
21
22 BY MR. DeCHIARA:
23 Q.  I'd like to mark as -- well, I've already marked as
24     Exhibit 2, and I'll ask you to identify what I'll
25     identify for the record as a July 18th, 2013 letter

Page 60

1      from you to Mr. Orr and Mr. Dillon.
2          Is Exhibit 2 your response to what's been
3      marked as Exhibit 1?
4  A.  Yes.
5
6          (Deposition Exhibit 3 was marked.)
7
8  BY MR. DeCHIARA:
9  Q.  Governor, I've had the court reporter mark as
10     Exhibit 3 a document which bears the title City of
11     Detroit Proposal for Creditors, June 14th, 2013.
12         Let me represent to you that this document
13     was attached to the Orr Declaration that was filed
14     in the bankruptcy proceeding as the City's proposal
15     for creditors.
16         Let me -- did you see this document in any
17     prior form before it was made public on or about
18     June 14th, 2013?
19 A.  Yes.
20 Q.  And do you plan -- were you shown drafts of the
21     document?
22 A.  I'd seen a draft or so.  I can't recall whether it
23     was one or more.
24 Q.  Okay.  And who showed them to you?
25 A.  Again, I don't recall.

1 Q. Okay. Did you comment on the draft?
2 A. I generally reviewed it and just gave general
3    feedback.
4 Q. To whom did you give feedback?
5 A. It would have been subject to attorney-client
6    privilege.
7 Q. Well, again, that's a legal question.
8 A. Yeah, it would have been to Kevyn Orr.
9 Q. To Kevyn Orr. Okay.
10 A. Yeah.
11 Q. How did you convey your comments to Kevyn Orr? Did
12    you speak to him?
13 A. Yes.
14 Q. Okay. By phone?
15 A. I don't recall.
16 Q. Okay. You don't recall whether it was by phone or
17    in person?
18 A. Correct.
19 Q. Okay. Do you recall who if anyone else was present
20    either on the phone or in person when you had those
21    communications?
22 A. There could have been several people including legal
23    counsel.
24 Q. Okay, but you don't know that for a fact; is that
25    correct?

1 A. I know there would have been other people including
2    legal counsel.
3 Q. So you're sure that -- well, let's talk about in
4    the -- so the conversation you say may have been on
5    the phone?
6 A. Yeah.
7 Q. Are you sure that while you were on the phone with
8    Kevyn Orr speaking about the proposal for creditors
9    that there were legal counsel on the phone?
10 A. Yeah, I'm quite confident of that. Typically,
11    again, almost every time or every time I recall
12    there were a group of people, there was legal
13    counsel present. The only time I met separately
14    with Kevyn Orr was on subject matters that didn't
15    relate to matters like this.
16 Q. What did you tell Kevyn Orr when you spoke to him
17    about the June 14th, 2013 proposal?
18       MS. NELSON: Objection; attorney-client
19    privilege.
20 BY MR. DeCHIARA:
21 Q. Are you refusing to answer the question, Governor?
22 A. Yeah. There was counsel present.
23 Q. All right. Just for the record, to be clear, you're
24    refusing to answer the question?
25 A. Yes.

1 Q. Okay. Let me direct your attention -- strike that.
2    Let me back up.
3       Did you put your comments in writing to
4    anyone -- your comments about the June 14th, 2013
5    proposal, did you put your comments in writing to
6    anyone whether by letter or email or phone text or
7    in any other written format?
8 A. I don't believe so. I don't believe so.
9 Q. Let me now turn your attention to page 109 of
10    Exhibit 3, and I'm going to in particular read the
11    second line of the third bullet point from the
12    bottom. It says "There must be significant cuts in
13    accrued vested pension amounts for both active and
14    currently retired persons."
15       Were you aware that the proposal said this?
16 A. I'm aware the proposal said that in the context that
17    this was to be a negotiation and a mutual agreement
18    between parties.
19 Q. My only question was --
20 A. Yeah.
21 Q. -- were you aware that this proposal said this?
22 A. Yes.
23 Q. And you were aware that at the time that you signed
24    what's been marked as Exhibit 2, the July 18th
25    letter, you were aware that the proposal contained

1    the language I just read, correct?
2 A. Yes.
3 Q. So you were aware when you signed the July 18th,
4    2013 letter that it was Kevyn Orr's view that there
5    had to be significant cuts in accrued pension
6    liabilities, correct?
7 A. I would say it was Kevyn Orr putting a proposal out
8    to parties to say he believed this was necessary to
9    achieve an outcome, that they would need to agree to
10    that.
11 Q. I'm not sure that was responsive. Let me try that
12    question again.
13 A. Okay.
14 Q. Isn't it correct that at the time that you signed
15    your July 18th letter that you were aware that it
16    was Kevyn Orr's position that there had to be
17    significant cuts in accrued pension benefits?
18 A. Yes.
19 Q. Did you speak to Kevyn Orr about -- strike that.
20       Did you agree with that position as of
21    July 18th? And by the position I mean that there
22    had to be significant cuts in accrued pension
23    liabilities?
24 A. The approval of my letter was not addressing that as
25    an issue. It was about authorizing a bankruptcy.

Page 65

1    It doesn't say I agree with that or disagree with
2    that.  It simply says I authorized it to go forward
3    where a plan would be presented to a judge that
4    could be the result of further negotiations,
5    mediations, all kinds of work that ultimately a
6    judge would decide.
7  Q.  Okay.  I'm not addressing your July 18th letter.
8  A.  Yeah.
9  Q.  I'm just pegging the question --
10 A.  Okay.
11 Q.  -- by time frame as of July 18th.
12 A.  Okay.
13 Q.  So as of July 18th, did you share Mr. Orr's view
14     that there had to be significant cuts in pension
15     liabilities?
16 A.  Based on the current situations with negotiations,
17     that continued to be the position that would be on
18     the table going into bankruptcy.
19 Q.  Again, I'm not sure that was responsive.
20 A.  Uh-huh.
21 Q.  As of July 18th, 2013, did you share Mr. Orr's view
22     that whether through negotiation or other means that
23     there as an end result had to be significant cuts in
24     accrued pension liabilities?
25 A.  I wouldn't use the word had to be but likely could

Page 66

1    be.
2  Q.  Okay.  Well, Mr. Orr used the word "there must be".
3  A.  Uh-huh.
4  Q.  Did you share that view that there had to be?
5  A.  Not necessarily.
6  Q.  Okay.
7  A.  Just as I said.
8  Q.  Okay.  So did you think about this issue as of -- or
9      as of the July 18th, 2013 time frame, had you given
10     thought to whether or not there had to be cuts to
11     accrued pension benefits?
12 A.  I gave thought to the issue because I have concern
13     for the retirees, and that was why one of the
14     important questions in my view was to have a retiree
15     representative in the bankruptcy.
16 Q.  And what was your -- since you said you gave thought
17     to it, can you articulate what your position was as
18     to whether or not there had to be cuts to accrued
19     pension liabilities?  And I'm focusing on your views
20     on the matter as of July 18th, 2013.
21 A.  My view going back prior to that is is I had hoped
22     that there would be negotiations to resolve this
23     short of bankruptcy because bankruptcy was a last
24     resort; that I hoped that people could come to the
25     table and come up with a mutual understanding and

Page 67

1    negotiation that would be satisfactory to the
2    parties involved.
3        That didn't happen in terms of that regard
4    but I still had hope to say that as you go through
5    the bankruptcy process I viewed it as likelihood
6    that there was less flexibility under the bankruptcy
7    process just because of the nature of federal
8    bankruptcy law than there probably was before.
9  Q.  Was it your view that as of July 18th in the
10     bankruptcy one way or another accrued pension
11     liabilities would have to be reduced?
12 A.  Based on the facts going into it, it was one of
13     those questions, as you said, there was a likelihood
14     of that happening.
15 Q.  That's not my question.
16 A.  Yes.  Yeah, I believe there's a likelihood there
17     could be reductions in unfunded pension liabilities.
18 Q.  Okay.  I'm not asking --
19 A.  Yeah.
20 Q.  Governor, I'm not asking you to predict the
21     likelihood of what might have happened.
22 A.  Okay.
23 Q.  I'm asking you whether you believed that in
24     bankruptcy there would have had to be one way or
25     another reductions in Detroit's accrued pension

Page 68

1    liabilities?
2  A.  I would say it's not a hundred percent belief.
3  Q.  But was it a less than 100 percent belief that there
4      had to be reductions?
5  A.  Again, if you looked at the numbers, as we discussed
6      earlier, those are significant numbers, and it would
7      be hard to see how it could be a hundred percent.
8  Q.  Let me -- did you discuss with anyone other than
9      your legal counsel and Mr. Orr whether there had to
10     be cuts to Detroit's accrued pension liability?
11 A.  When you say other people, there would be people
12     from the administration in the meetings that we had.
13 Q.  Who did you discuss that issue with?
14 A.  There could be any number of people that would
15     include my chief of staff, Andy Dillon, and other
16     people of the administration.
17 Q.  And what did you and Andy Dillon discuss on that
18     issue?
19         MS. NELSON: I'm going to object on the
20     grounds of attorney-client privilege.  These
21     discussions occurred in the meetings with Mr. Orr
22     and his counsel.
23         MR. DeCHIARA: Well, there hasn't been
24     testimony to that effect.
25         MS. NELSON: He just said it.

Page 69

1 THE WITNESS: Yeah. I said those were
2 meetings -- in those same meetings.
3 BY MR. DeCHIARA:
4 Q. The discussions you had with Mr. Orr, were those in
5 the presence of legal counsel?
6 A. Yes.
7 Q. Did you have any discussions with Mr. -- I'm sorry,
8 the discussions you had with Mr. Dillon, were those
9 in the presence of legal counsel?
10 A. They were in the same meeting in terms of --
11 Q. Did you have any discussions with Mr. Dillon outside
12 of the presence of legal counsel?
13 A. Mr. Dillon would on occasion bring forward ideas and
14 thoughts.
15 Q. On whether or not the pension liabilities had to be
16 cut?
17 A. On pensions in general. In terms of valuation and
18 pension plans.
19 Q. And did you discuss those with him?
20 A. I listened to him.
21 Q. Did you -- well, what did he say? What was his
22 views?
23 A. I don't recall all the details.
24 Q. Give me the best that you can recall.
25 A. Again, it was a question of them being underfunded

Page 70

1 and were there other alternatives or other ways to
2 deal with this and being concerned about retirees.
3 Q. Did Mr. Dillon say that in his view the pension
4 liabilities had to be cut?
5 MS. NELSON: Outside of this meeting you
6 mean?
7 BY MR. DeCHIARA:
8 Q. Yeah, I'm talking about meetings outside of the
9 presence of legal counsel the Governor has testified
10 occurred.
11 A. He was trying to bring forward ideas and thoughts
12 about were there other alternatives.
13 Q. That's not my question. It's actually a yes or no
14 question.
15 Did Mr. Dillon express to you the view that
16 the pension liabilities had to be cut?
17 A. I don't recall in terms of all the pieces. Again,
18 in some ways yes, but also he was trying to be
19 creative in saying are there other options or
20 alternatives.
21 Q. Was he saying that the pension liabilities had to be
22 cut but that alternatives to doing it --
23 A. Yeah.
24 Q. -- had to be explored?
25 A. It was more exploring alternatives.

Page 71

1 Q. Okay.
2 A. That's why I'm not trying to be difficult here.
3 It's more the --
4 Q. I appreciate it, and I'm not suggesting you're
5 trying to be difficult, Governor. I appreciate your
6 effort. And I know I'm posing questions that, you
7 know, take careful response, so I'm not suggesting
8 you're being difficult.
9 But we spoke over each other, and I'm not
10 sure the record was clear so let me just try it one
11 more time.
12 Is it fair to characterize Mr. Dillon's
13 comments to you on the subject to say that he said
14 to you that he thought the pensions had to be cut
15 but that there should be alternatives that should be
16 explored in connection with the pensions?
17 A. Yes.
18 Q. And did you respond to him when he said that?
19 A. I thanked him for his confidence.
20 Q. Did you say anything more substantive than that?
21 Did you express your own view?
22 A. What I did is I appreciated him coming forward with
23 trying to solve problems and that I said I would
24 follow up. And my followup was to make sure that
25 his comments were shared in the broader meeting

Page 72

1 context that we discussed earlier with Kevyn Orr,
2 other people and counsel.
3 Q. Did you -- are you aware that Attorney General Bill
4 Schuette has taken the position that --
5 A. Schuette.
6 Q. Schuette, thank you. I'm not from Michigan so
7 please excuse my mispronunciation. Schuette. Let
8 me write that down. I'll just say the Attorney
9 General.
10 Are you aware that the Attorney General has
11 taken the position that the Michigan Constitution
12 prohibits the reduction of accrued pension
13 liability?
14 A. I was aware the Attorney General filed a brief on
15 pensions.
16 Q. Okay. Before he filed that brief, were you aware --
17 well, do you know whether he had that position
18 before he filed the brief?
19 A. He contacted me before he filed the brief.
20 Q. How long before he filed the brief?
21 A. I don't -- it could have been a day, a few days.
22 Q. Okay. And did he before he -- did you speak to him
23 on that occasion?
24 A. Yes.
25 Q. Was it a telephone call?

Page 73

1  A.   Yes.

2  Q.   Who else was on the phone, if anyone?

3  A.   Just the two of us.

4  Q.   Okay.  Before that phone call, did you speak to the

5       Attorney General on any prior occasion about his

6       position on whether the Michigan Constitution

7       prohibited the cutting of pension benefits?

8  A.   I don't recall.

9  Q.   What was said in that phone call?

10 A.   I don't recall the specific exchange.  The basic

11      gist of the call was is he was looking to file a

12      brief on this and he wanted to make sure I was aware

13      of it, and I thanked him for that because I said

14      you're exercising what you believe is appropriate as

15      a constitutional officer of the State of Michigan; I

16      appreciate you sharing that with you [verbatim], and

17      you should follow through with your duties just as

18      I'm responsible for following through with my

19      duties.

20 Q.   Do you believe that the opinion of the Attorney

21      General of the State of Michigan on questions of

22      Michigan state law are entitled to weight?

23 A.   Well, that's a separate issue.  This was not an

24      opinion of the Attorney General.  This was a brief

25      filed in a case.

Page 74

1  Q.   Well, if you could answer my question, Governor.

2            MS. NELSON:  Well, I'm going to object

3       because an Attorney General opinion has very

4       specific meaning here in Michigan under state law,

5       and that's what you're asking is an opinion, and

6       that's not what this is.

7            MR. DeCHIARA:  Okay.  Okay.  I'm not --

8       when I use opinion I don't mean it in the sense of a

9       formal legal opinion.

10           THE WITNESS:  Oh, that's why I take it when

11      you said that --

12           MR. DeCHIARA:  I'm sorry, miscommunication.

13      It's miscommunication.

14           THE WITNESS:  Because he does do formal

15      opinions.

16 BY MR. DeCHIARA:

17 Q.   Okay.  Let me use the word view.  Okay?

18 A.   Uh-huh.

19 Q.   Do you believe that the view of the Attorney General

20      on questions of interpretation of Michigan state law

21      are -- should be accorded weight?

22 A.   In terms of -- I respect the Attorney General.  Many

23      parties submit briefs, and I assume The Court will

24      make the decision as to how to weight the brief of

25      the Attorney General.

Page 75

1  Q.   I'm not sure you answered my question.

2  A.   Yeah.

3  Q.   Do you think the view of the Attorney General of the

4       State of Michigan on questions of Michigan state law

5       should be accorded weight?

6  A.   Again, that's a very subjective thing.  I don't view

7       them as being the same as Michigan law.

8  Q.   No, I'm not suggesting they are.  I'm asking in your

9       view should they be accorded weight?

10 A.   Again, I would just hold out I have respect for the

11      Attorney General and their work product.  They're

12      representing me here today.

13           MR. DeCHIARA:  Let me ask the court

14      reporter to mark as Exhibit 4 an article that

15      appeared in the Detroit Free Press on July 29th,

16      2013.

17

18       (Deposition Exhibit 4 was marked.)

19

20 BY MR. DeCHIARA:

21 Q.   And in the middle of the article that's Exhibit 4,

22      there's a -- the sixth paragraph, there's a quote at

23      the end of the paragraph.  And the article purports

24      to quote the Attorney General as saying "The

25      Michigan Constitution is crystal clear on this.

Page 76

1       Article 9 Section 24 says pensions may not be

2       impaired, and I will fight to defend the

3       Constitution and the citizens it protects."

4            Governor, are you prepared to fight to

5       defend the Constitution and the citizens it

6       protects?

7  A.   I do that every day.

8  Q.   Are you prepared to revoke your authorization for

9       the bankruptcy filing of the City of Detroit?

10 A.   I don't know why I would do that.

11 Q.   Let me refer you back to Exhibit 1, and in -- it's

12      the July 16th letter, and in particular let me refer

13      your attention to the top of page 11.

14           On the second line starting in the middle

15      of the line and going onto the next line it says,

16      and I'm reading the middle of a sentence but feel

17      free, Governor, to read the entire sentence or the

18      entire document, but let me just quote what I want

19      to draw your attention to.

20 A.   Which paragraph?

21 Q.   It's page 11.

22 A.   Yeah.

23 Q.   The very top paragraph.

24 A.   Okay.

25 Q.   It's the -- I'm going to start reading from the

1  middle of the second line on the top of page 11. It
2  says "The City has negotiated in good faith with the
3  creditors willing to engage in a discussion..."
4       And then I'll stop the quote there but,
5  again, feel free to read the rest of the sentence.
6       My question is did you accept as true
7  Mr. Orr's representation to you that the City had
8  negotiated in good faith with the creditors willing
9  to engage in discussions?
10 A.  Yes. Excuse the delay. I just wanted to make
11 sure -- I was going to point out that in the letter
12 he actually gave examples of where they tried to do
13 that on page eight.
14 Q.  Okay. Okay. Apart from the letter -- well, first
15 of all, did you think when you received and read
16 this letter on July 16th that it was important to
17 your decisionmaking whether or not the City had, in
18 fact, engaged in good faith negotiations?
19 A.  Yes.
20 Q.  Okay. And did you undertake any independent
21 investigation or cause to be undertaken any
22 independent investigation to determine whether, in
23 fact, Mr. Orr's representation to you that there had
24 been good faith negotiations, whether that was a
25 true representation?

1 A.  Yes.
2 Q.  What was your -- what independent investigation did
3  you cause to be undertaken?
4 A.  What I would say is I looked at this in addition to
5  the facts of what had been publicly filed, which
6  would include the lawsuits that -- I apologize, I
7  can't remember who's representing which lawsuits,
8  but it showed that rather than people continuing
9  negotiations that some of the parties that were in
10 negotiations with the City elected to go file
11 lawsuits, which showed there was a breakdown in
12 negotiations, that people were going to court rather
13 than continuing dialogue.
14 Q.  Okay. So just so I understand your answer, your
15 acceptance of the truth of the assertion that there
16 had been good faith negotiations were based on what
17 you read in the July 16th letter?
18 A.  Uh-huh.
19 Q.  And also the fact that certain lawsuits had been
20 filed?
21 A.  Yes.
22 Q.  Okay. Was there anything else that you relied on to
23 conclude that there had been good faith
24 negotiations?
25 A.  No.

1 Q.  Okay. Were you expecting to receive the July 16th,
2  2013 letter before you received it?
3 A.  It was a work in process in terms of I didn't know
4  it was coming for sure, but I knew he was putting
5  together a letter.
6 Q.  Who told you that -- I assume when you say he you
7  mean Mr. Orr?
8 A.  Yes.
9 Q.  Who told you Mr. Orr was putting together a letter?
10 A.  That would have been Kevyn Orr himself.
11 Q.  Okay. And how did he tell you that? Was it in
12 writing or spoken words?
13 A.  It would have been in a meeting where we had
14 attorneys present.
15 Q.  Okay. And at this meeting, he indicated to you that
16 he was going to be sending you a letter seeking
17 authorization to file for bankruptcy?
18 A.  He said he was going to begin work on that.
19 Q.  Okay. Apart from that communication at that
20 meeting, did you receive any other heads up, if I
21 can use that term, that the letter was on its way?
22 A.  Well, again, there were people in that meeting that
23 were also aware of that, so there were discussions
24 if a letter was to come how would we respond.
25 Q.  Okay. But apart from that meeting where you

1  testified Mr. Orr told you that he was going to send
2  the letter -- first of all, when was that meeting,
3  do you know?
4 A.  It was in the prior week.
5 Q.  So it was a week before July 16?
6 A.  Yeah.
7 Q.  Okay. Between that meeting -- do you remember the
8  day?
9 A.  No.
10 Q.  Do you remember the date?
11 A.  No.
12 Q.  Okay. Between that meeting and when you received
13 the letter, did anyone else communicate to you that
14 the letter was coming?
15 A.  Again, the context I would put it in is there
16 were people looking -- people on my staff that were
17 looking to say if a letter was to come, how would we
18 communicate that in terms of if I was to respond and
19 what time would I respond to the public.
20      So it was more looking at the timeline of a
21 communications plan.
22 Q.  I'm sorry, I'm not sure I understood.
23 A.  So --
24 Q.  Let me just ask a more specific question.
25      After the meeting that you've testified

Page 81

1  about and before you got the letter, did anyone tell
2  you that the letter was coming?
3 A.  They didn't give me any information different than I
4  had received from Kevyn Orr.
5 Q.  And the information from Kevyn Orr is what you
6  received at the meeting?
7 A.  Yeah, an updated -- well, again, we continued to
8  talk after that so that wouldn't have been the only
9  discussion.
10 Q.  Okay.  You and Kevyn Orr continued to talk after the
11  meeting?
12 A.  Yes.
13 Q.  Was it a one-on-one conversation?
14 A.  No.
15 Q.  Was it in the context of subsequent meetings?
16 A.  Or calls.
17 Q.  Were there attorneys on those calls?
18 A.  Yes.
19 Q.  On each of the calls?
20 A.  Yes.
21 Q.  Okay.  When you received the July 16th letter, which
22  asked for you to approve a bankruptcy filing, did
23  you immediately upon reading the letter know how you
24  were going to respond?
25 A.  No.

Page 82

1 Q.  And did you give consideration to anything before
2  you made the decision that is set forth in your
3  July 18th letter?
4 A.  I contemplated.  Actually, I said this was a major
5  decision, a very significant decision about Detroit
6  and implications for our state and for a number of
7  parties.
8 Q.  And what were your -- what did you -- what were your
9  contemplations on?
10 A.  It was, again, reviewing the letter that had been
11  provided.  It included going back to the review team
12  reports.  It had been looking at the totality,
13  because this is a situation again -- let me know if
14  you want to stop, but this is a process that I've
15  been addressing since becoming Governor that goes
16  back to 2011 going through preliminary reviews,
17  reviews, consent agreements.  This has been a highly
18  structured process for close to three years.
19 Q.  Between the time you received the July 16th letter
20  and when you signed your July 18th letter, did you
21  speak to anyone about your decisionmaking thinking
22  outside of the context or outside of the presence of
23  legal counsel?
24 A.  No.
25 Q.  Did you undertake or cause anyone to undertake any

Page 83

1  investigation of any facts or legal conclusions that
2  were in the July 16th letter before you made your
3  decision to sign the July 18th letter?
4 A.  Well, I mentioned the lawsuit issue, but besides
5  that it was more looking at the consistency of what
6  was in this letter with prior reports from Kevyn Orr
7  and prior reports from the review team.  Review
8  teams I should say.
9 Q.  Let me refer you to page four of the July 18th
10  letter.  At the top there's a paragraph that bears
11  the heading contingencies.
12 A.  Uh-huh.
13 Q.  And I'm going to read the first sentence.  It says
14  "2002 PA 436 provides that my approval of the
15  recommendation to commence a Chapter 9 proceeding
16  may place contingencies on such a filing."  That's
17  the end of the sentence.  Then there's a legal
18  citation, and then the next sentence says "I am
19  choosing not to impose any such contingencies
20  today."
21       Did you consider at any point after you
22  received the July 16th letter placing any
23  contingencies on the City's bankruptcy filing?
24 A.  My legal counsel made me aware that contingencies
25  were permitted under the law, but I chose not to

Page 84

1  place any.
2 Q.  Okay.
3 A.  Yeah.
4 Q.  It's clear from your letter that you chose not to
5  place any.
6       My question is before you made that
7  decision not to place any, was there any period when
8  you considered placing any -- any contingencies on
9  the filing?
10 A.  I'm not trying to be difficult, but the matter was
11  brought to my attention and I dismissed it without
12  major discussion with my legal counsel because the
13  way I viewed it was placing contingencies could only
14  cause -- most likely cause more delay or confusion
15  in the bankruptcy process; that I have confidence in
16  the bankruptcy process itself in terms of being a
17  legal process, an appropriately legal process; and
18  that's why, in fact, I wanted that sentence added.
19 Q.  What sentence are you referring to?
20 A.  The sentence about federal law already contains the
21  most important contingency, a requirement that the
22  plan be legally executable.
23 Q.  Okay.  And I'm going to ask you about that in a
24  minute, but I just want to focus first on your
25  decision not to place any contingencies.

Page 85

1 A.  Well, that's why I didn't.  I simply said I thought
2     that was the one contingency that was appropriate,
3     that it be in line with being legal.
4 Q.  Okay.  You were aware of July 18th that some
5     people, some entities, argued that the Michigan
6     Constitution prohibited the reduction of accrued
7     pension benefits?
8          Were you aware of that as of July 18th?
9 A.  Yes.
10 Q. Did you consider making the Detroit City bankruptcy
11     filing contingent on the City not seeking to cut
12     accrued pension liabilities?  Did you consider that?
13 A.  I considered it by adding this sentence, which
14     basically says it's a matter -- it's a legal
15     question to say Michigan Constitution versus federal
16     law versus other Michigan statutes, and I was going
17     to leave that, that's a legal question that I
18     thought best left to the courts.
19 Q. So is it your testimony that you did consider
20     putting that contingency on but you decided not to
21     because of the reason you just said?
22 A.  Well, again, I viewed this as an overriding
23     statement that I thought whatever came out of this
24     process through the bankruptcy needed to be a legal
25     answer, because I do follow the law.

Page 86

1 Q.  Okay.  I just want to be clear --
2 A.  Yeah.
3 Q.  -- I'm understanding your testimony.
4          You did consider at some point before you
5     signed -- is it true that at some point before you
6     signed the July 18th letter that you considered
7     making the bankruptcy filing contingent on the City
8     not seeking to cut accrued pension benefits?
9 A.  I would say -- I wouldn't describe it that way.  I
10     would describe it not just on pensions or anything
11     else, just the totality of the situation to say that
12     there are many legal questions that are being
13     litigated through this bankruptcy process, as you
14     can see.
15          In terms of objections and my overriding
16     concern is that anything that should come out of
17     this needed to be legal.  So that's where I did
18     basically -- rather than specifically than
19     considering contingencies on one area or another,
20     because I viewed that as a troublesome area to say
21     should there -- if you put one contingency could you
22     end up with 15 contingencies versus saying the
23     overriding concern is that this plan be legal, and
24     that's already provided for under federal bankruptcy
25     law.

Page 87

1 Q.  Was it your understanding that you could have placed
2     just one contingency on the filing which is that the
3     City could not seek to cut accrued pension benefits?
4 A.  Again, my concern is --
5 Q.  I'm not asking your concern.
6 A.  Yes.
7 Q.  Was it your understanding that you, if you had
8     chosen to, could have placed just one contingency?
9 A.  Yes.
10 Q. Okay.  Let me now refer you to the last sentence of
11     the paragraph that says "Federal law already
12     contains the most important contingency, a
13     requirement that the plan be legally executable, and
14     then it cites 11 USC 943(b)(4)."
15          What was your understanding, if you had one
16     as of July 18th when you signed this letter, of what
17     11 USC 943(b)(4) was?
18 A.  The statement was my primary concern.  I had very
19     good legal counsel.  My legal advisors work on the
20     citation.  They thought it would be helpful.
21 Q. Okay.  So whose -- I should have asked you earlier.
22          Who prepared this letter that's the
23     July 18th letter?
24 A.  I did in conjunction with my legal counsel.
25 Q. Okay.  Was it just you and legal counsel that

Page 88

1     prepared the letter?
2 A.  Yes.
3 Q.  Okay.  And so it was legal counsel that suggested
4     putting in this citation to Section 943(b)(4)?
5 A.  Yeah.
6 Q.  And whose idea was it that -- to say that federal
7     law already contains the most important contingency,
8     a requirement that the plan be legally executable?
9          Was that your idea to put that in or was
10     that legal counsel's?
11 A.  I'm not sure if we're getting into an area where
12     this would be more attorney-client privilege.
13          MS. NELSON:  Absolutely.  In terms of
14     actual analysis of what was going on, it's
15     attorney-client privilege.  The letter stands for
16     itself.
17 BY MR. DeCHIARA:
18 Q.  Did you think that making the -- the requirement
19     that the plan be legally executable was more
20     important than protecting the pensions of the
21     employees and retirees of the City of Detroit?
22 A.  I don't view those as conflicting statements.  I
23     view that as the legal process, there are legal
24     questions that needed to be addressed and that the
25     plan needed to be legal.  Just what it says.

Page 89

1 Q.  Did you -- why did you within two days of receiving
2      the July 16th letter issue your response?  Why
3      didn't you -- if it was a major decision, as you
4      said, why didn't you wait longer?
5 A.   That was an appropriate time period.  When I got the
6      letter, I actually said I was going to wait some
7      time in terms of a day or two to look at it, and in
8      fact I did.
9 Q.   Did you speak to Mr. Orr about the timing of when
10     the bankruptcy petition should be filed?
11 A.  Again, we had -- there were general discussions,
12     yes.
13 Q.  And was it more than one discussion with Mr. Orr on
14     that subject?
15 A.  Yes.
16 Q.  And were these -- were any of these in the
17     presence -- outside the presence of legal counsel?
18 A.  No.
19 Q.  I'd like to read to you from the transcript of the
20     deposition that Mr. Orr gave in this case on
21     September 16th, 2013, and I'm going to read from
22     page 210 of the transcript beginning line nine.
23          And this is Mr. Orr's testimony.  It says
24     "I think we generally -- and he's referring to
25     discussions with you, Governor Snyder.

Page 90

1          He says "I think we generally discussed
2      the ongoing operational restructuring, the status
3      at a very high level.  The Governor, you know, we
4      don't -- we typically do not discuss how many
5      meetings, who attended, what was said went back and
6      forth, it was just a very high level of how things
7      were going with the restructuring efforts and that
8      the lawsuits, this is just with the Governor, were
9      beginning to create the risk that we would lose the
10     initiative and I might be unable to discharge my
11     obligations under 436."
12          Did you have a one-on-one conversation just
13     with Mr. Orr, as he testified, in which you
14     discussed certain lawsuits beginning to create a
15     risk that Mr. Orr would lose the initiative and
16     might be unable to discharge his obligations under
17     436?
18 A.  Yeah, I'm not sure what time frame you're talking to
19     with respect to -- you did mention that you were
20     giving me some quote.
21 Q.  And let me represent that the questioning put the
22     time frame as best as I can tell as between July 3rd
23     and July 17th, 2013.
24          Did you have a one-on-one conversation with
25     Mr. Orr during that time frame in which you

Page 91

1      discussed certain lawsuits in connection to when the
2      bankruptcy filing should take place?
3 A.   I don't recall.
4 Q.   Okay.  Do you dispute Mr. Orr's testimony that he
5      had that discussion with you?
6 A.   I -- I have a -- I don't recall any discussion of
7      lawsuits.
8          We would talk about how is he doing in
9      terms of the position, you know, the challenges, the
10     stress and operational issues when we did our
11     one-on-ones.
12 Q.  But is your testimony that Mr. Orr is wrong when he
13     testified that this conversation with you occurred
14     or is your testimony that it might have occurred,
15     you just don't remember?
16 A.  I wouldn't dispute him, but I clearly don't recall
17     that.
18 Q.  Okay.  You were aware of certain lawsuits that were
19     being filed against Mr. Orr in the time period of
20     July -- the first half of July of 2013, correct?
21 A.  Yes.
22 Q.  Okay.  And you were aware that in those lawsuits
23     injunctive -- interim injunctive relief was being
24     sought?
25          MS. NELSON: I'm going to object because it

Page 92

1      mischaracterizes -- and I'm not exactly sure what
2      lawsuits you are referencing.  In that time period
3      there was only one lawsuit filed against Mr. Orr,
4      and that was General Retirement System.  I believe,
5      and perhaps we can correct for the record, on the
6      Flowers and Webster lawsuits were against -- only
7      against the Governor and the Treasurer.
8          MR. DeCHIARA: Okay.  Let me just question
9      the Governor on the best of his memory.
10 BY MR. DeCHIARA:
11 Q.  Governor, were you aware of there being one or more
12     lawsuits against Mr. Orr?
13 A.  Again, I'm not sure which party was being sued, but
14     there were lawsuits, yes.
15 Q.  Okay.  You were aware -- and let me speak more
16     generally.  You were aware that in the first part of
17     July there were certain lawsuits filed concerning
18     issues related to Detroit's ability to file for
19     bankruptcy?
20 A.  Yes.
21 Q.  Okay.  And in those lawsuits, were you aware --
22     strike that.
23          Were you aware that in those lawsuits there
24     was interim injunctive relief sought by the
25     plaintiff or plaintiffs?

Page 93

1 A.  Yes.
2 Q.  Okay.  And did that knowledge have any impact on
3      your view about when the bankruptcy petition should
4      be filed?
5 A.  No.
6 Q.  Okay.  Did you ever discuss with anyone those --
7      apart from your legal counsel the fact that in one
8      or more of those lawsuits there were requests for
9      interim injunctive relief?
10 A.  Again, those discussions would have been subject to
11     attorney-client privilege.
12 Q.  Well, again, without the legal conclusion --
13 A.  Yeah.
14 Q.  -- were those -- did you have any discussions about
15     that subject outside of discussions with legal
16     counsel?
17 A.  They're discussions about the lawsuits.
18 Q.  Yes.
19 A.  Yes.
20 Q.  We're speaking past each other.
21 A.  Yeah.  Yeah.
22 Q.  Did you have any conversations outside of the
23     presence of your legal counsel about the fact --
24 A.  No.  Legal counsel was --
25 Q.  Let me finish just to clarify.

Page 94

1      MS. NELSON:  Let him -- Governor, let him
2  finish the question again so that it's clear on the
3  record what he's asking.
4      THE WITNESS:  Okay.  Okay.
5  BY MR. DeCHIARA:
6 Q.  Okay.  Apart from any conversations you may have had
7      with your legal counsel, did you have any
8      discussions with anyone else about the fact that in
9      these lawsuits there were requests for injunctive
10     interim relief?
11 A.  In any meeting, legal counsel would have been
12     present.
13     Sorry, there's a lot of attorneys involved
14     here.
15 Q.  Goes with the territory.
16     MR. WERTHEIMER:  We can all agree on that.
17 BY MR. DeCHIARA:
18 Q.  Are you aware that -- this is going back a few
19     months -- on January 29th, 2013, there was a meeting
20     at which various law firms made a pitch to be hired
21     by the City of Detroit as their restructuring
22     counsel?
23 A.  Could you repeat that?
24 Q.  Were you aware that on or about January 29th, 2013,
25     there was a meeting at which various law firms made

Page 95

1      a pitch to be hired by the City of Detroit as the
2      City's restructuring counsel?
3 A.  I couldn't speak to the specific date but,
4      generally, yes.
5 Q.  Okay.  You were aware that there was this meeting at
6      which certain law firms made pitches?
7 A.  Yeah, and I wasn't sure it was one meeting or more
8      meetings because I was not part of that process, but
9      I was aware the City of Detroit was talking to law
10     firms.
11 Q.  Okay.  Richard Baird was part of that process,
12     correct?
13 A.  I'm -- I'm not sure.  I don't know.
14 Q.  You don't know whether Richard Baird attended any
15     meetings at which --
16 A.  I know he attended some meetings involving that
17     process, but I don't know if he had attended that
18     meeting.
19 Q.  Okay.  Well, do you know whether Richard Baird
20     attended a meeting at which the Jones Day law firm
21     made a pitch to be hired by the City of Detroit?
22 A.  Yes.
23 Q.  Okay.  And did Mr. Baird speak to you about the
24     meeting at which Jones Day made a pitch to be hired
25     by the City of Detroit?

Page 96

1 A.  I don't recall him coming to me about the meeting
2      per se with Jones Day and what they pitched.
3 Q.  Did he ever show you what's been referred to in this
4      case and other depositions as a pitch book, a series
5      of slides that Jones Day presented at that meeting?
6      Did he ever show you that?  Any document
7      like that?
8 A.  I don't recall that.
9 Q.  Okay.  Let me show you a document I'll ask to have
10     marked as Exhibit 5.
11
12     (Deposition Exhibit 5 was marked.)
13
14 BY MR. DeCHIARA:
15 Q.  Governor, have you ever -- let me just identify for
16     the record that Exhibit 5 is a document that says
17     Presentation to the City of Detroit; Detroit,
18     Michigan; January 29, 2013.  There's date stamp on
19     it DTMI 00128731.
20     Governor, have you ever seen Exhibit 5?
21 A.  I don't recall it.
22 Q.  Okay.  Did Mr. Baird speak to you about -- strike
23     that.
24     Did Mr. Baird express to you any views he
25     had about whether or not the City should hire Jones

Page 97

1    Day?
2 A.  I don't recall that.
3 Q.  Okay.  Do you remember speaking to him about that
4     subject, about whether or not the City should hire
5     Jones Day?
6 A.  No.
7 Q.  Okay.  Did Mr. Baird ever speak to you about whether
8     Kevyn Orr should be the emergency manager of
9     Detroit?
10 A.  That was the context that I spoke to Mr. Baird
11     about.  It was not being the emergency manager but
12     being a candidate for emergency manager.
13 Q.  Okay.  And were these discussions you had with
14     Mr. Baird about the subject of Mr. Orr's candidacy,
15     where did those discussions take place?
16 A.  I don't recall.
17 Q.  Were they phone calls or face-to-face meetings?
18 A.  That's where I don't recall.  I do many meetings and
19     phone calls.
20 Q.  Do you recall with any certainty whether legal
21     counsel was present in any discussions you had with
22     Mr. Baird concerning the candidacy of Mr. Orr?
23 A.  They very likely could have been for some of those
24     but I don't recall.
25 Q.  Okay.  Is it likely that there were at least some

Page 98

1     where it was just you and Mr. Baird speaking?
2 A.  Yes.
3 Q.  Okay.  Do you recall in any of the meetings you had
4     with Mr. Baird what you two discussed when it was
5     just the two of you about Mr. Orr's candidacy?
6 A.  Generally, what I would say is I was not involved in
7     this process at all other than understanding that
8     generally the City of Detroit was looking for
9     attorneys and that in that context Mr. Baird
10     identified Kevyn Orr as a potential candidate to be
11     emergency manager, and he brought up the concept of
12     going to the firm at some point and asking their
13     permission to -- on whether he could speak to him
14     separately in that capacity.
15 Q.  Did Mr. Baird when he said that to you indicate why
16     he thought Mr. Orr should be contacted and spoken to
17     as a potential candidate?
18 A.  Very impressed with his credentials and
19     presentation.
20 Q.  Did Mr. Baird say anything, discuss with you at all
21     the views that Jones Day had or that Mr. Orr had
22     about Detroit's pension liabilities?
23 A.  I don't recall any.
24 Q.  Okay.  Did Mr. Baird speak to you at all about any
25     views that Jones Day may have had or that Mr. Orr

Page 99

1     may have had about the Michigan Constitution?
2 A.  I don't believe so.
3 Q.  After Mr. Orr was appointed as emergency manager,
4     you had regular meetings with him, correct?
5 A.  Correct.
6 Q.  And those were formal meetings with legal counsel
7     and staff present, correct?
8 A.  Yes, and informal meetings.
9 Q.  Okay.  At the informal meetings, were legal counsel
10     present?
11 A.  No.
12 Q.  Okay.  Who was present at the informal meetings?
13 A.  Generally, it was just Kevyn and myself.
14     Occasionally, it could have been Dennis Muchmore
15     with Kevyn and I.  That would be much less frequent,
16     and more recently, potentially Greg Tedder.
17 Q.  Who were the two people you just named?
18 A.  Dennis Muchmore is chief of staff.
19 Q.  Who was the other person?
20 A.  Greg Tedder is essentially the person from our
21     office that's working with Kevyn Orr on his staff --
22 Q.  Okay.
23 A.  -- as a liaison between the Governor's office and
24     the City of Detroit.
25 Q.  Okay.  In any of the informal meetings, as you

Page 100

1     refer to them, were Mr. Muchmore and Mr. Tenor
2     acting as --
3 A.  Tedder.  Tedder.  T-E-D-D-E-R.  Sorry, I'm --
4 Q.  Okay.  Thank you.  I appreciate it.
5 A.  A lot like being out of state with the names.
6 Q.  At any of the informal meetings, were Mr. Muchmore
7     and Mr. Tedder acting in the capacity as attorneys
8     for the City or the State?
9 A.  No.
10 Q.  Okay.  Would there -- how often were these informal
11     meetings?
12 A.  As I said, most of the meetings were just Kevyn Orr
13     and myself.  The frequency was probably about every
14     two weeks or so.
15 Q.  Over what period of time?
16 A.  Since his appointment as emergency manager, and when
17     I say two weeks it wasn't necessarily every two
18     weeks but that was sort of the normal schedule
19     process.
20 Q.  And when was he appointed emergency manager?  Do you
21     remember the date?
22 A.  March.
23 Q.  Do you remember the date, specifically?
24 A.  Again, there's appointment dates, effective dates.
25 Q.  Right.  Gets confusing.

1 And up -- so it began -- these informal
2 meetings that occurred every two weeks or so began
3 in March, and have they continued through the
4 present?
5 A. Yes.
6 Q. Okay. In the informal meetings you had with Mr. Orr
7 prior to July 18th, 2013, did you ever speak with
8 him about the issue of Detroit's pension
9 liabilities?
10 A. In those meetings, no.
11 Q. What did you speak to him about in those meetings?
12 A. Two general topics that were reserved for those
13 meetings. One is is just personally how he's
14 dealing with the position that he's in and in terms
15 of how he's interacting with staff, his family
16 challenges given that his family is in Washington
17 D.C.
18 So it was more as an advisor helper kind of
19 person to help him support through that process and
20 then on operational matters, because the way it's
21 traditionally defined in our meetings, there are
22 three tracks that get discussed. One is the
23 bankruptcy process, one is the operational process,
24 and the third is about what would happen
25 posttransition when he is no longer emergency

1 manager.
2 And so the tracks discussed in those other
3 meetings, the meetings we've just been discussing,
4 would tend to be on the operational track. And we
5 wouldn't discuss matters on the bankruptcy track
6 because, again, those should be reserved for where
7 there was legal counsel present.
8 Q. In the informal meetings, did you speak to Mr. Orr
9 about the prospect of the City filing for
10 bankruptcy?
11 A. Again, those would have been in the bankruptcy track
12 meetings with legal counsel present.
13 The operational track meetings, the topics
14 that would be -- things that would be discussed
15 potentially would be there's a request for proposal
16 for solid waste garbage pickup. Topics like that
17 that are important to the citizens in terms of
18 improved services.
19 Q. I'd like to read testimony by Mr. Orr from his
20 September 16th deposition. It's on page 84 of the
21 September 16th deposition. I'll begin on line 13.
22 Question: Now, at some point after you
23 became the emergency manager, did you have
24 discussions with the Governor about a Chapter 9
25 filing to among other things get out of the pension

1 obligations that the City owed?
2 Mr. Shumaker: Objection to form.
3 Answer: Yes, I believe so.
4 Question: And when did those take place?
5 Answer: Since becoming emergency manager
6 on the 25th, I've had regular conversations with the
7 Governor, typically weekly. I don't recall the
8 specific conversations when they came up. I will
9 say that it wasn't within our initial conversations.
10 Did -- having heard me read Mr. Orr's
11 testimony, let me ask you, Governor, did you have
12 discussions with Mr. Orr about a Chapter 9 filing to
13 among other things get out of the pension
14 obligations that the City owed?
15 A. Again, in terms of getting out of pension
16 obligations, we had discussions that were these
17 larger meetings or meetings where counsel was
18 present that would discuss the prospect of
19 bankruptcy, and in many cases during the earlier
20 days it was how to avoid bankruptcy by going through
21 a negotiation process.
22 Q. In any of the informal meetings where counsel
23 wasn't present, was there any discussion about a
24 bankruptcy -- a possible bankruptcy filing?
25 A. Again, the topic would come up, but then we would

1 try to move back to operational issues and not get
2 into bankruptcy track issues because they were
3 reserved for the other meetings.
4 Q. But sometimes the topic came up at the informal
5 meetings?
6 A. Well, again, that it's something that's been out
7 there because it would most likely be in the context
8 of press accounts.
9 Q. My question is in your informal meetings with
10 Mr. Orr, did the topic come up, the topic of
11 Detroit's bankruptcy filing?
12 A. Did the word bankruptcy come up, yes. In terms of
13 discussing bankruptcy, no.
14 Q. Well -- okay. You interviewed Mr. Orr, did you not,
15 in the middle of February 2013?
16 A. Yes.
17 Q. I believe you went out to lunch with him with
18 Mr. Baird?
19 A. I don't believe I went out to lunch with him but I
20 did interview him.
21 Q. Okay. Thank you. I may have misspoken.
22 In that meeting, did you speak about
23 Detroit's pension liabilities?
24 A. I don't recall.
25 Q. Did you speak about Detroit's -- possibility of

Page 105

1    Detroit filing for bankruptcy?
2 A. Generally, yes.
3 Q. And what was your recollection of what you and
4    Mr. Orr said about that subject during the
5    interview?
6 A. A big part of it was making sure he understood the
7    history here, that this had been a process going on
8    for over two years and in a very methodical way;
9    again, review teams, consent agreement, going
10   through that whole process so he'd get the context
11   and make sure it was clear that bankruptcy was to be
12   a last resort; that the real question here is
13   there a way to work this out in a mutual fashion;
14   that would be extremely challenging because there
15   are a large number of parties, but we should make a
16   very good faith effort to work this out.
17 Q. Governor, I'd ask you to focus on what words you
18   said in the interview on that subject --
19 A. Yeah.
20 Q. -- and what words Mr. Orr said.
21   Do you have a recollection of what words
22   you said?
23 A. I just recounted generally this has been my position
24   that I wanted to really make it clear to him. I
25   also made it clear to him that I viewed it as he was

Page 106

1    the -- in this context, not in terms of just
2    bankruptcy, but he was responsible for really
3    helping make those decisions for the City of Detroit
4    in terms of going through the negotiation process,
5    working with people, working through the process;
6    that I was to be a supportive resource.
7 Q. Did you speak to him about or did he speak to you in
8    that interview when a bankruptcy filing might take
9    place?
10 A. Again, it would be after a good faith effort to try
11   to resolve these issues short of bankruptcy.
12 Q. And who said those words that you just said?
13   I'm focusing on what was said in the
14   interview. So did someone say that?
15 A. Yeah. I couldn't tell you who said them first, but
16   we both -- I believe -- my recollection is we would
17   both agree that was a very important criteria.
18   MR. DeCHIARA: Could we go off the record
19   for a second?
20   VIDEO TECHNICIAN: Off the record
21   10:47 a.m.
22   (A brief recess was taken.)
23   VIDEO TECHNICIAN: We're back on the record
24   at 10:58 a.m.
25   EXAMINATION

Page 107

1    BY MR. WERTHEIMER:
2 Q. Governor, we met before. My name is
3    Bill Wertheimer, and I represent the Flowers group
4    of plaintiffs who were plaintiffs in one of those
5    early state court lawsuits and are now creditors in
6    the bankruptcy proceeding.
7 A. Uh-huh.
8 Q. I'd like to ask you a couple of follow-up questions.
9    You were asked early on about conversations
10   you had with Mr. Bolger and Mr. Richardville.
11 A. Uh-huh.
12 Q. They are Republican political figures in Michigan;
13   are they not?
14 A. Yes.
15 Q. I just don't know who is who --
16 A. Okay.
17 Q. -- so I'm not trying to be pejorative.
18 A. No. Jase Bolger is Speaker of the House and Randy
19   Richardville is the Senate Majority Leader.
20 Q. And you did indicate that you had some conversations
21   with them early on about the possibility of Detroit
22   going into bankruptcy?
23 A. It wasn't in the context of Detroit being bankrupt.
24   I would try to give them regular updates on what was
25   going on over the last two or three years; for

Page 108

1    example, going back to the review team, going on the
2    consent agreement, the whole process.
3 Q. In any of these conversations did either or both of
4    them ever communicate to you that they would not be
5    in favor of the State taking any responsibility for
6    the pension benefits of the City?
7 A. I don't recall.
8 Q. They might have -- one or both of them might have,
9    you just don't recall one way or the other?
10 A. I don't recall one way or the other.
11 Q. Okay. Fair enough.
12   You were asked a couple of questions about
13   your preparation for this deposition.
14   On how many occasions did you prepare?
15 A. I believe it was two. Or three. I'm sorry, three.
16 Q. Three? And when did they occur? When were they?
17 A. One was a couple weeks ago and then yesterday and
18   then this morning.
19 Q. And how long in total did you take to prepare, if
20   you can add up the time, or we can go through the
21   three.
22 A. In terms of meeting with counsel?
23 Q. Yes. Yes.
24 A. Yeah.
25 Q. I'm not going to get into the content, but I'd like

Page 109

1  to know how long you met with your attorneys talking
2  about your deposition.
3  A.  Yeah.  No, that's fine.  I just wanted to make sure
4  I ask.
5  Q.  Yes.  Yes.
6  A.  I would say probably three hours, three and a half
7  hours.
8  Q.  Total?
9  A.  Total.
10 Q.  Okay.  Now, you were asked some questions about
11     conversations you had with Mr. Orr, and counsel read
12     you a question and answer which indicated that
13     Mr. Orr recalls a conversation after he became
14     emergency manager but before the Chapter 9 filing
15     where, quoting, "Among other things, the talk was to
16     get out of the pension obligations that the City
17     owed."
18         Do you recall that subject coming up with
19     Mr. Orr after he became emergency manager and before
20     the Chapter 9 filing?
21 A.  Yeah, I don't recall that outside the context of a
22     meeting where we would have had counsel present.
23 Q.  Well --
24 A.  And, again, I don't believe I would characterize it
25     as getting out of pension obligations.

Page 110

1  Q.  But a discussion of the fact that you would -- it
2      would be easier to deal with the pension issue in
3      bankruptcy than not in bankruptcy?  Did you have any
4      such discussions like that with Mr. Orr?
5  A.  Again, those would have been in attorney-client
6      meetings.
7  Q.  Well, for the record, Mr. Orr has testified as to
8      those -- that conversation, at least one, and has
9      not asserted the attorney-client privilege.  So it's
10     my position that any attorney-client privilege would
11     have been waived.
12 A.  I don't recall anything outside those meetings.
13 Q.  No, I understand.
14 A.  Okay.
15 Q.  But what I'm suggesting to your counsel is that you
16     should answer the question even as to those meetings
17     because Mr. Orr, who is asserting a common interest
18     privilege with the State of Michigan, has answered
19     that question and has not asserted the
20     attorney-client privilege.
21         So I'd ask you to answer the question as to
22     the meeting the attorneys were present at.
23         MS. NELSON:  I disagree with that analysis,
24     number one.  Number two, the context in which that
25     conversation occurred has not been explained, the

Page 111

1  foundation for it, or when that meeting happened or
2  who else was present.
3      I disagree that it waives attorney-client
4  privilege, and having read the deposition it was
5  very clear that Mr. Orr on the 16th of September and
6  in his next subsequent deposition on October 4th was
7  very careful to preserve attorney-client privilege.
8      The question of whether there was a
9  specific discussion about getting out of pensions
10 was answered by the Governor just now.  He did not
11 recall it in that context, so ask your next
12 question.
13     MR. WERTHEIMER:  No, but he -- the Governor
14 excluded conversations with attorneys present.
15     And you're correct, Mr. Orr was very
16 careful to assert the attorney-client privilege at
17 his deposition.  He did not assert it as to this
18 question.  And your characterization that the
19 context isn't clear is wrong.
20 BY MR. WERTHEIMER:
21 Q.  As counsel read the Governor, the question was:  At
22     some point after you became emergency manager, did
23     you have discussions with the Governor about a
24     Chapter 9 filing to among other things get out of
25     the pension obligations that the City owed?

Page 112

1      Object to form.
2      Answer:  Yes, I believe so.
3      Question:  And when did these take place?
4      Answer:  Since becoming emergency manager.
5      Which is exactly how I phrased my question;
6  that is, between the time that Mr. Orr became
7  emergency manager and the time of a Chapter 9
8  filing, do you recall any conversations including
9  conversations at which attorneys were present in
10 which you and Mr. Orr discussed among other things
11 getting out of the pension obligations that the City
12 owed?
13     MS. NELSON:  You can answer yes or no to
14 that.  That's the question.  Yes, do you recall it;
15 no, you don't recall it.
16     THE WITNESS:  Well, I wish it was that
17 simple.  I sort of object.  I don't believe I had
18 discussions about getting out of pension
19 obligations.  We had discussions regarding pension
20 obligations.
21     That would be yes to discussing pension
22 obligations, and the context of getting out of --
23 BY MR. WERTHEIMER:
24 Q.  Okay.  Fair enough.
25 A.  -- I'm not -- I would not accept that as a

Page 113

1  characterization.
2  Q. Let me rephrase the question then or ask another
3     question.
4  A. Yes.
5  Q. Do you recall any conversations you had with Mr. Orr
6     with or without attorneys present between the time
7     that he became emergency manager and the Chapter 9
8     filing relating to the pension issue that he might
9     have construed in such a way that he would answer
10    affirmatively a question about getting out of the
11    pension obligations that the City owed?
12         MS. NELSON: Objection; form, foundation,
13    calls for speculation. He can't testify about how
14    Mr. Orr might have thought or formed or understood a
15    question.
16         MR. WERTHEIMER: Go ahead, you can answer,
17    Governor.
18         MS. NELSON: Go ahead.
19         THE WITNESS: I just want to make sure I
20    understand it. You're saying whether it was
21    potentially covered by privilege or not.
22  BY MR. WERTHEIMER:
23  Q. Yes, whether it's covered by privilege or not.
24  A. Yes. Was there a discussion on pension liabilities?
25  Q. Well, yes, or any other kind of discussion where

Page 114

1  somebody of Mr. Orr's sophistication might have as a
2  result of that conversation answered a question
3  affirmatively about getting out of pension
4  obligations.
5         MS. NELSON: Same objection. Go ahead.
6         THE WITNESS: Yes.
7  BY MR. WERTHEIMER:
8  Q. Okay. And what do you remember you said and what
9     did he say relative to that, as best you remember?
10         MS. NELSON: If you --
11         THE WITNESS: Okay.
12         MS. NELSON: You can answer that.
13         THE WITNESS: I'm just checking. I'm
14    sorry.
15  BY MR. WERTHEIMER:
16  Q. No, no. That's okay.
17  A. You guys have been objecting enough, I'm trying to
18    figure out --
19  Q. For what it's worth, after she makes an objection
20    unless she instructs you not to answer --
21  A. Yeah.
22  Q. -- she's making an objection for the record.
23  A. No, I was just double-checking.
24  Q. I understand, yeah. No, that's fine.
25  A. Could you run it by me one more time then, and I

Page 115

1  won't look at her this time.
2  Q. Feel free to look at her.
3         I'd like to know what you can tell me you
4     said and Mr. Orr said in the conversation you did
5     have, the one or more conversations you had, between
6     the time he became emergency manager and the
7     Chapter 9 filing relative to the pension obligations
8     that the City owed?
9  A. Yeah, I would say there would be two or three pieces
10    to that. One is a concern about who is representing
11    the retirees.
12  Q. Who's saying what -- to the extent you can,
13    Governor, and I understand you're not going to
14    remember exact words, but to the extent you can I'd
15    like you to break down what you're saying and what
16    Mr. Orr is saying so that we can identify who is
17    saying what to the extent you remember.
18  A. Okay.
19  Q. Go ahead.
20  A. Sure. Well, let me start at the terms of the
21    discussion. One is is there is clearly a concern
22    for the retirees. These are people that worked for
23    the City for many years. And I shared this thought
24    that I am concerned about the retirees.
25         The second piece ties into what was the

Page 116

1  situation about representing the retirees. Mr. Orr
2  brought that to my attention because he was having
3  difficulty finding people to represent the retirees.
4  The way it was described to me is there are a number
5  of unions that were not willing to potentially
6  represent the retirees versus their active members;
7  that all the retirees were not going to have
8  representation in some capacity during the
9  negotiation process with creditors. And that was a
10  concern because there are many parties to this.
11  This is very complex. We're talking potentially
12  20,000 retirees.
13         In terms of that, again, I'm kind of --
14  time frame, we had a general discussion about that
15  being a problem. When it ultimately came down to
16  looking at the bankruptcy -- possibility of a
17  bankruptcy filing, one of the things that he brought
18  forward and I really pushed was the issue about
19  asking very quickly that there be representation for
20  the retirees as part of the bankruptcy process
21  because I believe it's important.
22         And I've been public with that in addition
23  to those private discussions that it's very
24  important that they have a seat at the table so
25  their voice can be heard during this process and

1    they can have adequate legal representation. So
2    that would be one track in terms of that.
3         In terms of the pension liabilities
4    themselves, there was discussion about the funding
5    in terms of the actuarial assessment of the pension.
6    The stated numbers according to the review team and
7    the other reports was approximately three and a half
8    billion dollars. Again, there was work to be done
9    following that to say -- I can't remember if
10   Milliman or whoever was doing the report, to do an
11   assessment, other people are doing assessments,
12   there's a real issue of the valuation of the pension
13   plans and how the pension plans were operated.
14        Again, there's many questions. Again,
15   there's other litigation going on about 13 Month
16   Checks.
17 Q. Okay. But it's pretty clear, isn't it, from the
18   question and answer that was posed to Mr. Orr that
19   he recalls a conversation in one way or another
20   where there's an advantage to a Chapter 9 filing?
21        He's not talking about I understand the
22   advantage of then you can deal with the retirees
23   because you set up a committee and you have somebody
24   to bargain with. I get that. But he's answering
25   affirmatively a question that just ties the

1    Chapter 9 filing to getting out of pension
2    obligations.
3         Do you recall any conversation you had with
4    Mr. Orr in any way, shape or form that related to
5    that subject; that is, Chapter 9 would give you some
6    advantages vis-a-vis getting out of pension
7    obligations that another route would not have?
8         MS. NELSON: Objection; asked and answered.
9    Go ahead, answer it again.
10 BY MR. WERTHEIMER:
11 Q. Go ahead.
12 A. Yeah, the context of something that would -- could
13   be viewed as a positive during the process is it
14   could be -- there could be certainty as to
15   resolution by going through a bankruptcy in the
16   sense that the judge addressing the plan and
17   approving the plan could resolve it as opposed to
18   having multiple continuing lawsuits that could go on
19   even if it was done in a consentual fashion if some
20   party didn't agree or some party had a different
21   version; that one of the potential advantages of
22   bankruptcy, again viewing bankruptcy as a last
23   resort, could be is there could be more a finality
24   of a resolution to this issue as opposed to having
25   lawsuits continue for multiple years.

1 Q. Do you recall anything anymore specific than that
2    that would relate at all to Mr. Orr's view that the
3    discussion related to getting out of the pension
4    obligations that the City owed or not?
5 A. Again, in terms of looking at it, there could be --
6    this is -- are there other options or alternatives
7    in terms of looking at the pension plans. Again,
8    waiting for an assessment of how these reports come
9    back, and what I hope could be mediations during
10   this process.
11        Are there other things possible in terms of
12   continuing the existing pension plans, looking at
13   alternatives to the pension plan versus health care
14   liabilities or other liabilities. Again, this is
15   where I view it as hopefully an open discussion that
16   would be reviewed by a judge because this then gets
17   into legal opinions as to the relative class of
18   different types of creditors.
19        And this is beyond my area of expertise.
20   One of my concerns about not going into bankruptcy,
21   wanting to avoid it, is I was concerned you could
22   have less flexibility in bankruptcy than outside
23   because if mutual parties agreed and everyone agreed
24   you could have a resolution.
25 Q. Well, in terms of your background, you did -- you've

1    graduated from law school, correct?
2 A. Thank you.
3 Q. I meant it -- I phrased it that way only because I
4    understand that you've not --
5 A. I've never --
6 Q. You don't practice law, correct?
7 A. Yes.
8 Q. Or have never practiced law.
9 A. Yes.
10 Q. Sorry for wording. Unintentional.
11        At the time you were talking to Emergency
12   Manager Orr between the time he's an emergency
13   manager and you file Chapter 9 --
14 A. Yes.
15 Q. -- you knew, did you not, that Article 9 Section 24
16   of the State Constitution existed?
17 A. Yes.
18 Q. And that it provided certain rights for pensioners?
19 A. Yes.
20 Q. Didn't you also know at that point in time that the
21   best way to reconcile Article 9 Section 24 -- let me
22   rephrase it.
23        Didn't you know at the time you were
24   talking to Mr. Orr that bankruptcy was the only
25   place where you could at least even arguably, in the

Page 121

1 words of Mr. Orr, trump that state constitutional
2 provision? Didn't you kind of know that as a
3 general matter?
4 A. No.
5 Q. Okay. Did you think there were other places where
6 you could -- other ways in which you could trump
7 Article 9 Section 24 other than getting the
8 agreement of the retirees, which you've acknowledged
9 had not happened and was going to be very difficult
10 given trying to deal with thousands of people
11 outside the bankruptcy arena?
12 A. I'm trying to see if that was a yes no question or
13 you were asking for --
14 (Reporter read pending question.)
15 MS. NELSON: Objection; form, foundation,
16 use of the word trump. You can answer the question
17 if you can.
18 THE WITNESS: Yeah, in terms of one area
19 that this is a legal question that I thought would
20 be good to get resolved and could be resolved inside
21 or outside of bankruptcy. I don't believe it had to
22 go to bankruptcy to solve the question, and that is
23 in regard to what the constitutional provision
24 actually says which treats it as a contractual
25 obligation, which in many cases -- we've seen cases

Page 122

1 with emergency managers they could set aside
2 contractual obligations.
3 BY MR. WERTHEIMER:
4 Q. Well, let's move to that. If you were looking for a
5 legal answer, you knew as of July 3rd or shortly
6 thereafter that you were going to get a legal answer
7 in state court; did you not?
8 A. I was not going to speculate as to the timing of how
9 State lawsuits get resolved.
10 Q. Well, you knew, did you not, that the Flowers
11 plaintiffs filed their suit on July 3rd. You knew
12 that shortly after that; did you not?
13 A. Yes.
14 Q. I mean --
15 A. Or one of those.
16 Q. -- it was all over the press?
17 A. Yes.
18 Q. And that Webster and another group of individuals
19 filed suit the same day, July 3rd, correct?
20 A. Yes.
21 Q. It was also all over the papers that the same day
22 that suit was filed Judge Aquilina signed orders to
23 show cause why injunctive relief should not issue
24 and scheduled those hearings for July 22nd.
25 You knew that at least generally; did you

Page 123

1 not? That is, that there was going to be a date at
2 which the judge would make a preliminary decision as
3 to the issues in front of her?
4 A. A preliminary decision on an injunction is much
5 different than an adjudication of a legal issue that
6 would be resolved through a court trial process.
7 Q. But you did know that there would be a state court
8 resolution -- that the issue you were concerned
9 with, that is the relationship between Article 9
10 Section 24 of the State Constitution and these
11 efforts to try and bring the City back, were going
12 to be resolved in state court based on these
13 lawsuits if nothing else was done; did you not?
14 A. That could take a year or longer to get that
15 resolution.
16 Q. I didn't -- I did not ask you any question about
17 length. I asked you whether you didn't know as
18 someone trained in the law and knowing that these
19 suits were pending and knowing kind of generally
20 what they were about, you knew that the state courts
21 were dealing with the issue?
22 A. I knew I would not get a short-term final answer.
23 Q. You did understand that in -- and then a few days
24 after those first two suits were filed, just so
25 we've got the record -- and your counsel is correct.

Page 124

1 Those two suits were against you as the Governor,
2 not personally, and the State Treasurer.
3 And then a few days later the pension
4 funds, or whatever the technical name is for them,
5 filed a lawsuit that did include Mr. Orr. Do you
6 recall that?
7 A. Yes.
8 Q. And then at that point there were multiple suits
9 pending?
10 A. Yes.
11 Q. Correct?
12 A. Yes.
13 Q. And did you understand that all -- each of those
14 suits dealt one way or another with Article 9
15 Section 24 of the State Constitution; that is, the
16 pension issue?
17 A. Yes.
18 Q. Okay. Between the time that those suits were filed
19 and the filing of the bankruptcy, which is about two
20 weeks plus a day or two, did you have any
21 discussions with anyone about what the likely
22 outcome of those cases would be on the merits; that
23 is, on the issue of does Article 9 Section 24 apply
24 even if the State goes into bankruptcy?
25 MS. NELSON: I'm going to object to the

Page 125

1    extent that it calls for a discussion of
2    conversations he had with his legal counsel, as
3    those are attorney-client privilege.
4    BY MR. WERTHEIMER:
5 Q.  Outside of conversations you had with attorneys
6    present, did you have any conversations -- well, let
7    me ask specifically.
8         Did you have any conversations with
9    Treasurer Dillon without attorneys present about
10   what the chances were as to the results of these
11   state court suits?
12 A.  No, I don't recall.
13 Q.  Did you have conversations with anyone else
14   excluding conversations you had either with
15   attorneys or with attorneys present between the time
16   those suits were filed and the filing of the
17   bankruptcy?
18 A.  I'm sorry, without attorneys present?
19 Q.  Without attorneys present.
20 A.  Yeah, I don't recall.
21 Q.  Okay.  You did know, did you not, shortly after
22   those suits were filed, it was all over the papers,
23   that Judge Aquilina was going to hold a hearing on
24   whether to issue an injunction Monday, July 22nd;
25   did you not?

Page 126

1 A.  Yes.
2 Q.  And the initial plan was to file the bankruptcy
3    Friday the 19th; was it not?
4 A.  There was a timetable for communications that said
5    it would be on Friday the 19th.
6 Q.  And that timetable came out of your office or was
7    done for you --
8 A.  Yes.
9 Q.  -- as the Governor of the State, correct?
10 A.  Yes.
11 Q.  And that timetable was written up on the 17th, was
12   it not, at least one version of it?
13        I've got it here as an exhibit.  I can show
14   you if -- I'm not trying to --
15 A.  No, I don't -- I -- that's fine.  I would say yes.
16 Q.  Okay.  Fair enough.
17
18        (Deposition Exhibit 6 and 7 marked.)
19
20        MR. WERTHEIMER: And let's just -- I'll
21   move the admission of Exhibit 6, Margaret.
22        MS. NELSON: May I see Exhibit 6?
23        MR. WERTHEIMER: That's the one I think you
24   took.
25        MS. NELSON: No, you gave me Exhibit 7.

Page 127

1         MR. WERTHEIMER: I'm sorry, I apologize,
2    yes.
3         MS. NELSON: I don't have Exhibit 6.
4         MR. WERTHEIMER: You will.
5         MS. NELSON: And would you please show it
6    to the Governor?
7         MR. WERTHEIMER: Yeah, sure.  Absolutely.
8    BY MR. WERTHEIMER:
9 Q.  Okay.
10 A.  Yes.
11 Q.  That's consistent with your memory?
12 A.  Yes.
13 Q.  And this is the document or something like it is
14   what you were just referring to?
15 A.  Yes.
16 Q.  Would I be correct in reading the upper right
17   V71713 is indicating that this document was prepared
18   on that date?  Is that what that is?
19 A.  I can't speak to that.
20 Q.  Oh, okay.  You don't know?
21 A.  Yeah, I didn't do the document so I can't speak to
22   that.
23 Q.  You -- this is a normal document that is used in
24   your role as Governor to deal with --
25 A.  I would say this was not a normal circumstance so

Page 128

1    this would not be a normal document.
2 Q.  Okay.  The only reason I ask that is I did see some
3    other kind of rollout documents.
4 A.  Yeah.
5 Q.  For example, there's a similar document, is there
6    not, for the June 14th creditors proposal that
7    Mr. Orr was coming out with?  There's a similar
8    document from your end; is there not?
9 A.  Yeah.  I'm not aware of that.
10 Q.  Oh, okay.  Fair enough.  Fair enough.
11 A.  Yeah.
12 Q.  So you don't know whether the 717 up in the upper
13   right is the normal place that the author of the
14   document would advise people reading it as to its
15   date of its origin?
16 A.  Yeah, I'd have to say I don't know.
17 Q.  You don't know.  Okay.
18        In any event, the document gives a lot of
19   detail as to what's going to happen before and after
20   this filing, which the document assumes is going to
21   be on the 19th, correct?
22 A.  Uh-huh.  Yes.
23 Q.  Now, there are -- were press reports that indicated
24   that the reason for the 19th filing was to have it
25   precede the 22nd hearing in front of Judge Aquilina.

Page 129

1 Do you have any knowledge first or
2 secondhand as to whether that is true or not?
3 A. I don't recall that.
4 Q. Do you recall a reason that the 19th was selected as
5 the date that Mr. Orr would file bankruptcy?
6 A. One of the factors most likely was probably my
7 schedule, because this was a major media rollout, in
8 terms of availability.
9 Q. Okay.
10 A. At that -- the letter was coming and I wanted time
11 to contemplate and then we would look at the
12 schedule to say when is there a good opportunity to
13 have good communications.
14 Q. Leaving aside conversations you had with your
15 attorneys --
16 A. Uh-huh.
17 Q. -- in the days preceding the 17th say, say earlier
18 that week --
19 A. Yeah.
20 Q. -- were you privy to any conversations where the
21 idea was thrown out that if we have the filing on
22 the 19th that would oust Aquilina of jurisdiction on
23 the 22nd? Do you understand what I'm asking, or
24 words to that effect?
25 A. Yeah, I don't recall it.

Page 130

1 Q. You don't recall?
2 A. And again, that would be -- this is where we're back
3 to if there were other discussions, it would've been
4 attorney-client privilege, but I don't recall even
5 in that context.
6 Q. We know that, in fact, the filing was made on the
7 18th?
8 A. Uh-huh.
9 Q. Correct?
10 A. Correct.
11 Q. That would be an unusual circumstance; would it not?
12 That is, that you put together this very detailed
13 rollout down to what's going to happen at 11 a.m. a
14 couple days later and what's happening at noon and
15 1:30. It would be rare in terms of your work as
16 Governor for a significant event like this for the
17 date to move at the last minute; would it not?
18 A. Well, this is a unique circumstance.
19 Q. Yeah. On that we agree.
20 Was the unique circumstance the fact that
21 the litigants in the three cases were in court on
22 the 18th in front of Judge Aquilina in the afternoon
23 seeking emergency injunctive relief?
24 A. I had signed my letter prior to that.
25 Q. It's not what I asked you, Governor.

Page 131

1 A. Well, you did ask me. You said they were in the
2 courtroom, did then I act. And I acted prior to
3 them being in the courtroom.
4 Q. No. Okay. Fair enough.
5 A change was made between the 19th and the
6 18th as to the filing itself. You understand that?
7 A. Uh-huh.
8 Q. Correct?
9 A. Yes.
10 Q. And I'll represent to you that at Mr. Orr's
11 deposition he confirmed that the typed in date of
12 the 19th on the bankruptcy petition, the handwritten
13 eight was his handwriting.
14 Do you know anything about why the change
15 was made from the 19th to the 18th?
16 A. Yes.
17 Q. What do you know about it? Just tell me.
18 A. I made the decision that I was comfortable in my
19 conclusion that it was appropriate to file.
20 When the letter came to me on the 16th in
21 terms of recommending bankruptcy, I had set aside to
22 say I wanted an extended period of time to review
23 and to contemplate the situation. So I actually set
24 aside enough time that would have led to the Friday
25 morning situation to say I wanted more than one

Page 132

1 night to sleep on this because the importance of
2 this act.
3 And as I proceeded through the thought
4 process to say do I concur, am I going to authorize
5 the bankruptcy, I started discussions with my legal
6 counsel on how we would prepare a letter, how we
7 would go through that process and my thought
8 process, and I felt I didn't need to wait. I had
9 made my decision, I had consulted with legal
10 counsel, we had prepared a letter authorizing
11 bankruptcy, and I said we should just go ahead and
12 get this done.
13 Q. And as far as you know, that decision, the fact that
14 there was -- were requests for immediate injunctive
15 relief on that day in state court had nothing to do
16 with moving up the time?
17 A. People showed up in state court after that, and what
18 I would say is the consideration I had was the
19 filing of -- the lawsuits being filed in the prior
20 week or two weeks had some impact on my
21 decision-making process.
22 Q. Right.
23 A. And the reason I said that is because I could see
24 lawsuits being filed not only on pension issues but
25 could be filed by other creditors, by financial

Page 133

1 institutions, by many other parties to say it is
2 clear there's a breakdown of what I believe were
3 good faith negotiations, and given that there is a
4 breakdown of good faith negotiations we were at that
5 last resort point.
6 And this is a financial emergency, I'm
7 concerned about the citizens of Detroit, and I was
8 going to move forward with this because I'm stepping
9 up for the citizens of Detroit and Michigan.
10 Q. You've talked generally about the lawsuits and the
11 role they played?
12 A. Uh-huh.
13 Q. I'm trying to get your recollection specifically as
14 to the fact that parties were in court on the 18th
15 and that the Pension Board was there formally with a
16 request for an injunction that day.
17 A. That was after the fact, and I don't speculate on
18 what happens in court hearings.
19 Q. What is your basis for saying that that was after
20 the fact?
21 A. Well, you told me that.
22 Q. No.
23 MS. NELSON: I'm going to object at this
24 point. He's asked and answered.
25 Your question was was the unique situation

Page 134

1 the result of the fact that attorneys were in the
2 courtroom seeking a TRO and he answered no and he
3 signed the authorization before the attorneys were
4 in the courtroom.
5 So what is it that you're now asking? He's
6 already answered that question, so asked and
7 answered.
8 MR. WERTHEIMER: Are you done?
9 MS. NELSON: I'm done.
10 MR. WERTHEIMER: Okay.
11 BY MR. WERTHEIMER:
12 Q. Do you have any -- are there any documents that the
13 State has that can confirm the time of day that your
14 letter was signed on the 18th? Do you know?
15 A. I'm happy to attest when I signed that.
16 Q. You already have.
17 A. I'm under oath. I signed that --
18 Q. What time did you sign it?
19 A. I signed it in the afternoon.
20 Q. What time in the afternoon?
21 A. It was earlier rather than later, but I don't have
22 the specific time.
23 Q. Okay. I believe the Pension Board had filed their
24 papers the day before and were scheduled to go into
25 court that afternoon. So it was out there that at

Page 135

1 least in one of those lawsuits that a request was
2 going to be made that afternoon.
3 MS. NELSON: Objection.
4 BY MR. WERTHEIMER:
5 Q. And you moved up your filing -- or you moved up --
6 well, the filing was moved up from the 19th to the
7 18th.
8 MS. NELSON: Objection; assumes facts not
9 in evidence. There had not been any motion filed
10 with the -- if you're referring to the General
11 Retirement System case, that was filed on the 17th,
12 but there had not been a TRO filed with the
13 Complaint, and that was not filed until late in the
14 afternoon on --
15 MR. WERTHEIMER: Margaret --
16 MS. NELSON: I'm correcting your facts.
17 There had not been a TRO filed the day before when
18 the General Retirement System Complaint was filed.
19 MR. GALLAGHER: Objection to counsel's
20 testimony.
21 MR. WERTHEIMER: Margaret.
22 MS. NELSON: I'm objecting to form and
23 foundation and speculation.
24 MR. WERTHEIMER: No, you're providing
25 testimony and you're providing facts which are not

Page 136

1 accurate.
2 MS. NELSON: Well, you are too,
3 Mr. Wertheimer. So if you're going to ask
4 speculative inappropriate questions, at least have
5 your facts correct.
6 So my objection is form, foundation, calls
7 for speculation.
8 The Governor has answered this question in
9 terms of his understanding of the timing.
10 MR. WERTHEIMER: Margaret, I would not
11 otherwise testify, but I will tell you that the
12 Pension Board was in front of Aquilina in the
13 morning and that I drove from Detroit to Lansing and
14 got there about three in the afternoon; that the
15 AG's office asked us to please delay, and we ended
16 up in front of Judge Aquilina eight minutes after
17 the bankruptcy petition was filed, and I'm entitled
18 to find out from the Governor whether all that is
19 coincidental.
20 MS. NELSON: Well, I will correct you --
21 MR. WERTHEIMER: Now, if you're done, I'll
22 ask --
23 MS. NELSON: No. Well, I will correct you
24 then also because the AG's office did not learn of
25 the TRO applications and anybody coming to court

1    until after 3:00 in the afternoon.
2            It was approximately 3:05 when I received
3    the phone call that attorneys were coming to court
4    to present motions for TRO to the judge. There was
5    no conversation or information about anything being
6    filed that morning. It was after 3:00 when the call
7    was made to our office and attorneys were sent over
8    to respond if appropriate.
9    BY MR. WERTHEIMER:
10   Q.   What time did you sign on the 18th, Governor?
11   A.   Again, the specific time -- one of the ways to look
12        at that is I would have signed it prior to the email
13        transmission to Kevyn Orr.
14   Q.   And do you recall when the email transmission was?
15   A.   No, but that's --
16   Q.   That's somewhere that we can find out?
17   A.   Yes. Yes.
18   Q.   Okay. Fair enough.
19            When was it that Attorney General Schuette
20        called you to let you know what legal position he
21        was going to be taking in the bankruptcy? He filed
22        it August 19th, if that helps.
23   A.   It would have been a couple -- again, within the two
24        or three days before that.
25   Q.   I take it it sounds like it's kind of a courtesy

1    call?
2    A.   It was a courtesy call because we have a working
3        relationship.
4    Q.   Had you ever consulted with Attorney General
5        Schuette about this issue of whether Article 9
6        Section 24 would apply in bankruptcy before that
7        courtesy call?
8    A.   I don't recall.
9    Q.   You may have?
10   A.   I don't recall.
11   Q.   Do you recall whether when Attorney General Schuette
12        made his position public or when he told you about
13        it that you were surprised in any way?
14            In other words, was it news to you at that
15        point that the Attorney General was going to take
16        the position that Article 9 Section 24 applied in
17        bankruptcy?
18   A.   I would say -- could you repeat the question?
19   Q.   Do you recall whether --
20   A.   Yeah.
21   Q.   -- you knew any time before this courtesy call that
22        the Attorney General's position was that Article 9
23        Section 24 applied in bankruptcy; in other words,
24        that bankruptcy would not trump it but that rather,
25        according to the Attorney General, Emergency Manager

1    Orr would be required to propose a plan consistent
2    with Article 9 Section 24?
3            Did you know that or anything like it any
4    time before he made this courtesy call to you?
5    A.   Yeah, I'm not being difficult. I started becoming
6        more aware as the call was being scheduled. Why was
7        the Attorney General wanting to talk, because I was
8        out on the road.
9    Q.   Okay. So you may have learned just before?
10   A.   Again, it's like I was traveling in the upper
11        peninsula, as I recall, and I need to talk to
12        call -- I need to talk to the Attorney General.
13        That gets my attention.
14   Q.   You knew before this that this was a serious issue,
15        did you not, that is how -- what's the interplay
16        between the State constitutional provision and any
17        potential filing? As a general matter, you knew
18        that; did you not?
19   A.   Yes.
20   Q.   Did you ever consult with the Attorney General about
21        that?
22   A.   Not directly.
23   Q.   Did you consult indirectly?
24   A.   Again, my legal counsel may have had discussions. I
25        didn't participate in those.

1    Q.   Do you recall asking either directly or indirectly
2        for the Attorney General's opinion?
3    A.   I don't recall.
4    Q.   Could you identify Exhibit 7 for me?
5    A.   This is an email from Greg Tedder to me regarding a
6        Power Point presentation that Kevyn Orr was going to
7        use as part of his 45-day plan that he was going to
8        do I believe from later on it appears two public
9        meetings.
10   Q.   And would I be correct in reading it as indicating
11        that you were involved in detail to the extent that
12        you didn't like a particular slide; that is, slide
13        22?
14   A.   I believe, if my email is incorporated in this, that
15        they --
16   Q.   I think it is.
17   A.   Yeah. They sent me the Power Point presentation and
18        I made a very brief review and just gave them three
19        points of feedback.
20   Q.   And those are indicated on the exhibit?
21   A.   Yes.
22   Q.   Okay. Do you recall communications you had with
23        Treasurer Dillon in early July after the suits were
24        filed but before the bankruptcy?
25   A.   I don't recall.

Page 141

1 　　　MS. NELSON: Which one is which?
2 　　　MR. WERTHEIMER: Eight is July 8th.
3
4 　　　(Deposition Exhibit 8 and 9 marked.)
5
6 　BY MR. WERTHEIMER:
7 Q. Since we're doing it this way, why don't you take a
8 　　look at Exhibit 8, Governor, please. It's a July 8
9 　　email that was produced in discovery from Treasurer
10 　　Dillon to you.
11 　　　Might as well just read it and then I'll
12 　　ask you a question or two about it.
13 A. Okay. Want me --
14 Q. Yes. If you would, just read it to yourself.
15 A. Thanks. I was trying to figure out what --
16 Q. No, that's fine. I understand.
17 　　　As to the July 8 email, do you recall
18 　　receiving it?
19 A. Yes.
20 Q. Do you know what -- can you explain to us what the
21 　　reference is to the pension fund recent suits
22 　　against he and you? Is that a reference to the
23 　　suits we've been talking about?
24 A. I would assume so, but I can't definitively say that
25 　　because I didn't write the email.

Page 142

1 Q. Fair enough. Did you talk to Treasurer Dillon about
2 　　it?
3 A. Yes, I believe so.
4 Q. Did the conversation relate at least in part to
5 　　those lawsuits?
6 A. No. Well, it was really he was just re -- as I
7 　　recall, he was recalling what's in that second
8 　　paragraph, just to say that there's an issue here,
9 　　that the consultants were coming up with a different
10 　　answer.
11 Q. And he was indicating the pensions -- the
12 　　consultants were saying that pensions were going to
13 　　have to be cut significantly; was he not?
14 A. Again, yes.
15 Q. Okay. And you knew at that point in time, did you
16 　　not, that the only practical way you were going to
17 　　be able to cut those pensions would be by filing a
18 　　Chapter 9; did you not?
19 　　　At that point, in other words, July 8
20 　　Treasurer Dillon tells you we're going to have to
21 　　cut pensions significantly. You knew that that
22 　　meant you've got to file Chapter 9; did you not?
23 A. I wouldn't necessarily conclude that. I would, in
24 　　fact, cite the second email you gave us, Exhibit 9,
25 　　towards the bottom where the bottom paragraph second

Page 143

1 　　sentence and third sentence: In my view, which is
2 　　Andy Dillon speaking, it's way too early in the
3 　　process to respond to hypothetical questions, remain
4 　　in many ways at the informational point.
5 Q. Well, isn't that just his effort to kind of deal
6 　　with the politics and say there's no reason you have
7 　　to get out there publicly and say that pensions are
8 　　going to be reduced?
9 A. Not necessarily. Again, this is --
10 Q. Okay. Isn't that one reading of his --
11 A. I'm not going to speculate on his reading.
12 Q. All right.
13 A. I'm saying this is the information from consultants
14 　　that's in the early stages. It's informational, and
15 　　he was giving me a heads up to know that there could
16 　　be an issue ultimately coming about because of work
17 　　of consultants that had not been fully reviewed and
18 　　vetted.
19 Q. Do you recall this second email?
20 A. Yes.
21 Q. Did you have any conversations with Treasurer Dillon
22 　　about either of these emails at around this time?
23 A. As I mentioned earlier --
24 Q. I'm sorry, go ahead.
25 A. I recall a phone call that night of the 8th after

Page 144

1 　　the first email.
2 Q. Go ahead.
3 A. Sort of reiterating what's in the email, saying he's
4 　　concerned about this, and then the second email
5 　　said -- sort of answered a lot of the questions to
6 　　say that the meeting's going ahead and there's work
7 　　to be done, that we're in the early stages.
8 Q. Okay. He's calling you?
9 A. I believe he called me.
10 Q. Okay.
11 A. I can't tell you whether I had to call him back or
12 　　not but I believe we had a conversation that night.
13 Q. He initiated it as a followup to his first email?
14 A. Yes. Yes.
15 Q. And then he sent you another email the next day?
16 A. Sort of answering a number of questions he raised
17 　　the night before and in the email.
18 Q. Fair enough. And there were no other lawsuits that
19 　　you can think of that were out there that he could
20 　　have been referencing as far as you know than the
21 　　three we've been talking about?
22 A. As far as I know.
23 Q. Okay. Just a couple more questions.
24 　　　We have requested what's called a 30(b)(6)
25 　　deposition of the State; that is, that the State

1  produce a witness -- one or more witnesses on
2  various issues. And on a couple of them the State
3  has indicated that they -- without designating you
4  as a 30(b)(6) witness and requiring you to do the
5  kind of preparation that would be involved with that
6  otherwise, that you would be the best person to ask
7  these questions.
8  A. Okay.
9  Q. So I'd like to ask the question exactly as it's
10  framed in the deposition notice and have you answer
11  that question as best you can.
12  A. Okay.
13  Q. Okay? The question is or the matter for examination
14  is "The reason or reasons the Governor decided not
15  to place contingencies on this bankruptcy filing, as
16  expressly permitted by Section 18(1) of 2012 Public
17  Act 436; particularly why no contingency related to
18  Article 9 Section 24 of the Michigan Constitution
19  was placed on the filing.
20  Can you state that?
21  A. Yes. I had -- I placed no contingencies because I
22  had a concern that it would add complexity,
23  confusion or delay to the bankruptcy process given
24  that this is an emergency situation.
25  It's about taking care of the best

1  interests of the citizens of Detroit. And the
2  reason I felt confident and comfortable in doing
3  that act is why we reviewed -- I reviewed with my
4  legal counsel and added that statement to say any
5  plan that has to come out of this process of the
6  bankruptcy has to be legally executable.
7  Q. That's going to be the next question, but okay.
8  Let me just ask a followup.
9  A. Sorry I was giving you --
10  Q. That's okay. We're on the same wavelength.
11  At the time you authorized the filing, you
12  knew, did you not, that if you placed the
13  contingency relating to Article 9 Section 24 on the
14  filing it would make it more difficult to deal with the
15  Detroit emergency manager to deal with the pension
16  issue; did you not?
17  A. I did not know that. That would be a legal
18  conclusion.
19  Q. But didn't you generally understand that?
20  I understand it technically may be a legal
21  conclusion, but didn't you understand that if you
22  had done a contingency that said as to this 3.5
23  billion in unfunded liabilities, the Michigan
24  Constitution says you're going to have to -- you're
25  not going to be able to get any relief from that?

1  A. No, I didn't believe that. Again, you asked my
2  question. I answered it.
3  Q. I'm just not sure I got an answer to that. Could
4  you -- and I apologize if I'm asking the same
5  question, but --
6  A. No, I didn't believe it -- again, I believed -- I
7  didn't -- state your question again so we can make
8  sure we get this.
9  Q. Didn't you understand at the time you authorized the
10  filing that if you had placed a contingency on the
11  filing telling the Detroit emergency manager that in
12  bankruptcy, for example, consistent with Schuette's
13  opinion, that any plan he proposed would have to
14  recognize the applicability of Article 9 Section 24?
15  Didn't you understand that if you did
16  something like that it would make Emergency Manager
17  Orr's job more difficult?
18  A. I did not consider that.
19  Q. Okay. What did you consider relative to not
20  including Article 9 Section 24 as a contingency?
21  A. I viewed it as is that's something that the legal
22  questions were being appropriately framed by
23  lawsuits, by parties, by various people being
24  represented in this process, and that as Governor of
25  the State of Michigan I take my responsibility

1  seriously. It's to execute the laws of the State of
2  Michigan.
3  That these were multiple legal questions
4  that were being framed through multiple lawsuits
5  that were going to continue in the bankruptcy
6  process, and I thought the best answer is the
7  judicial branch should be resolving these questions
8  to give me clarity as to best how to follow through
9  in implementing what comes out of this process.
10  Q. You did not check with Attorney General Schuette at
11  the time you filed to determine what his view was as
12  to whether any contingency related to Article 9
13  Section 24 should put -- should be put on your
14  authorization, did you?
15  A. I did not.
16  Q. The -- back to the 30(b)(6) Notice.
17  A. Uh-huh.
18  Q. And you partially answered this, but again, I think
19  it would be helpful if I just read the question and
20  you answer it in full. And don't assume that you've
21  already answered part of it even though you have.
22  A. Okay.
23  Q. The reason or reasons the Governor included the
24  following statement in his 18 July 2013
25  authorization to commence Chapter 9 bankruptcy

proceeding "Federal law already contains the most
important contingency - a requirement that -- a
requirement that the plan be legally executable,
11 USC section number."

Can you answer that?

A. Yeah. I thought it was important to include that
because coming out of this process, I thought the
bankruptcy judge would go through an analysis and
make decisions that would come out with a plan that
was appropriate in the context of the legal process
in terms of answering these difficult legal
questions with certainty and resolution, so then
there could be a plan because this is a crisis.

The City of Detroit is having huge issues,
and I wanted to make sure that it was being done in
a thoughtful fashion, being reviewed by the
judiciary that then could be executed so we could
provide the best services to the citizens, take care
of the citizens of the State as quickly and as best
possible.

Q. At the time you put that contingency on --

A. I didn't put a contingency on.

Q. I'm sorry. At the time you -- I stand corrected.

Q. Okay.

Q. At the time you made the reference to the federal

law contingency, shall we say --

A. Uh-huh.

Q. -- you knew, did you not, that Emergency Manager Orr
was publicly stating that federal law would trump
the State Constitution? Trump, that was the
word he used. It was in the Free Press, I believe
in the News. It was all over.

You knew that at the time you thought that
this language about federal law being the most
important contingency was put in your authorization;
did you not?

A. Yes. But, ultimately, Judge Rhodes makes that
decision, not Kevyn Orr.

Q. Did you know at the time that only -- that under
Chapter 9 only the debtor can propose a plan?

A. Subject to approval by the judge.

Q. And the debtor is represented by Kevyn Orr, correct?

A. He represents the City of Detroit, yes.

Q. And you knew that the debtor was taking the position
that the pensions would have to be cut; did you not?

A. That's not a correct statement. There had been no
plan proposed and there still has not been a plan
proposed. Until there is a plan proposed, it would
be speculative on anything with respect to how the
City is going to present a plan.

Q. Well, in the creditor's plan back in June, didn't
Emergency Manager Orr make very clear that to the
extent the pension benefits were funded that those
monies couldn't be touched, which is legally of
course correct, but to the extent that they weren't
funded that the retirees would become unsecured
creditors like everybody else?

Wasn't that part of the June presentation?

A. The June presentation was to be part of a mutual
negotiation that would require consent of all
parties.

Q. Are you saying --

A. That was not a plan of adjustment and bankruptcy.

Q. Are you saying, Governor, that at the time you put
this provision in your authorization that you --
that there was some question in your mind as to
whether Emergency Manager Orr would honor or not
honor Article 9 Section 24 in the bankruptcy?

Let me ask it a different way.

A. Okay.

Q. I think it was a little confusing.

Wouldn't you have had every reason to know
by the point you put this language in that Emergency
Manager Orr was going to propose a plan that did not
recognize the fact that pensions could not be

reduced because of Article 9 Section 24?

A. I don't necessarily come to that conclusion because
a plan has not been presented.

Q. But this -- the guy who is going to present the plan
is publicly stating that federal law trumps
Article 9 Section 24. You knew that; did you not?

A. Yes.

Q. Wouldn't you suppose that that means that one of the
reasons -- one of the things that Emergency Manager
Orr is going to do in the bankruptcy is make an
argument to Judge Rhodes that federal law trumps
Article 9 Section 24?

A. It is possible for him to make that argument.
Again, I view this as legal speculation because
there are multiple mediations going on and multiple
discussions going on short of going to the judge and
asking for opinions.

Q. And you now know that that speculation is
inconsistent with the Attorney General of the State
of Michigan's position, which is that Orr has no
right to do that. You know that now; do you not?

MS. NELSON: Objection; form, foundation.
What do you mean by speculation?

MR. WERTHEIMER: I was using the word the
Governor used, so I was using however he used it. I

Page 153

1       was trying to be helpful, Margaret.
2           Can you read it back? Let me just look at
3       it and maybe I can just rephrase it.
4   BY MR. WERTHEIMER:
5 Q.   You now know that the Attorney General is of the
6       view that Article 9 Section 24 applies in
7       bankruptcy?
8 A.   He filed a brief to that effect.
9 Q.   Okay. That's all I have. Thank you. I have no
10      further questions.
11       MS. NELSON: Okay.
12       MR. WERTHEIMER: Just take a minute. I
13      assume there will be other questions. I just want
14      to make sure that I'm done.
15       VIDEO TECHNICIAN: Off the record
16      11:55 a.m.
17       (A brief recess was taken.)
18
19       (Deposition Exhibit 10 was marked.)
20
21       VIDEO TECHNICIAN: Back on the record at
22      11:59 a.m.
23   BY MR. WERTHEIMER:
24 Q.   Let me show you what's been marked, Governor, as
25      Exhibit 10. Would you take a look at -- actually,

Page 154

1       you'll see the -- it's a transmittal letter of your
2       July 18 letter.
3 A.   Uh-huh.
4 Q.   Are you with me?
5 A.   Yes.
6 Q.   And you had indicated in your earlier testimony that
7       we should find the email transmission, and I'm
8       wondering if this is it. That is, is this the email
9       transmission where you communicate to Emergency
10      Manager Orr that you have signed the authorization?
11 A.   Actually, it would have been much earlier, so this
12      is where -- just to clarify I would say is I
13      don't -- I would have to double-check. Normally, it
14      could have been by email, but it might have been
15      faxed or otherwise communicated, but I know it was
16      much earlier than this during the day because this
17      says 7:47 at night.
18 Q.   And it's within 13 minutes of what your rollout
19      communications plan indicates when you're going to
20      sign. That is, it indicates 8 p.m. correct?
21 A.   Again, are you going to the earlier exhibit?
22 Q.   I'm sorry. That exhibit with the rollout indicates
23      that you're going to actually sign the letter at
24      8 p.m. on the 18th, correct?
25 A.   I signed it much earlier than that.

Page 155

1 Q.   That's not what I asked.
2 A.   Yes.
3       MS. NELSON: Here, you have it.
4   BY MR. WERTHEIMER:
5 Q.   The communications rollout plan document indicates
6       that the filing was going to be on the 19th but that
7       you were going to sign the letter at 8 p.m. on the
8       18th, correct?
9 A.   That's what this exhibit says.
10 Q.   All right. And you indicated in earlier testimony
11      when I asked you if you could give me the time that
12      you signed the letter that I should look for the
13      email where you transmitted it. Did you not?
14 A.   Yes.
15 Q.   Okay. And I have found that email, have I not, or
16      someone on this side has found that email. And it
17      indicates that you sent the authorization letter to
18      Emergency Manager Orr at 7:47 p.m.; does it not?
19 A.   Yes. And that's why I wanted to clarify.
20      Apparently, our main transmission would have been
21      earlier in that day and it would have been done by
22      some other means.
23       So I'd want to clarify and correct that to
24      say we should go look to find out when the earliest
25      transmission was.

Page 156

1 Q.   I agree, and I assume your counsel will do that, and
2       I would make that request on the record that you
3       provide --
4 A.   Yeah.
5 Q.   -- whatever documentary support in whatever form it
6       is.
7 A.   I apologize for having you go through an effort to
8       find --
9 Q.   That's okay. We need to get straight on it and
10      that's fine.
11 A.   Yeah.
12 Q.   With that I have nothing further. Thank you,
13      Governor. I appreciate it.
14       MS. NELSON: To the best of my knowledge
15      it's in the production that we sent out.
16       MR. WERTHEIMER: Well, Margaret, no offense
17      but there's X hundred thousand --
18       MS. NELSON: No, I understand that, but so
19      it has been produced. It's my understanding it has
20      been produced.
21       MR. WERTHEIMER: I am not suggesting that
22      it has not been produced, but it would be helpful
23      if --
24       MS. NELSON: Hold it. We have a hand up.
25       VIDEO TECHNICIAN: No, I was just moving

Page 157

1 the camera.
2        MR. WERTHEIMER: It would be helpful if you
3 could identify it for us. Right now all we have on
4 the record is 7:47 p.m.
5        MS. GREEN: I will say on the record that
6 that email was given to me by Jones Day in response
7 to the request made by Retirement Systems that the
8 City produce the email that transmitted the
9 authorization letter to Kevyn Orr.
10        That was the only email that was
11 specifically produced.
12        MS. NELSON: Well, it might not have been
13 an email. It could have been a fax earlier in the
14 afternoon. So I guess we'll produce the document
15 that we have but obviously it was transmitted before
16 the filing and the filing was at 4:06 p.m.
17        So we'll find it. If you want us to search
18 for it, we will look amongst and get it to you.
19        MR. WERTHEIMER: Why?
20        MS. NELSON: Well, it could have been by
21 other than an email.
22        MR. WERTHEIMER: Margaret, no offense.
23        MS. NELSON: No, I'm saying --
24        MR. WERTHEIMER: We want you to look for
25 it. We now have on the record that the Governor

Page 158

1 said it was in an email and we have the email being
2 7:47 so I would suggest --
3        MS. NELSON: He just corrected that. He
4 indicated it could have been by some other means and
5 that it was earlier than this time frame, so we'll
6 get it to you.
7        MS. LEVINE: Let's talk for a second. We
8 have a lot of attorneys testifying. I think they
9 should stop it.
10        MS. NELSON: Correct.
11        MS. LEVINE: To the extent that there's a
12 transmittal other than this one that exists, we'll
13 ask the State to produce it to us. In response to
14 the direct request, we've got the production from
15 Jones Day with regard to the transmittal.
16        MR. GADOLA: I'm confident we can do that.
17        MR. SCHNEIDER: That's fine.
18        MR. WERTHEIMER: Thank you.
19        MS. NELSON: Absolutely.
20        MR. WERTHEIMER: Thank you, Governor.
21        THE WITNESS: All done?
22        MR. WERTHEIMER: All done.
23        THE WITNESS: Okay. Thank you.
24        VIDEO TECHNICIAN: Deposition's concluded
25 at 12:04 p.m.

Page 159

1        MS. GREEN: The Retirement Systems join the
2 prior objection and reservation of rights placed on
3 the record earlier. We also received documents late
4 last night from the City, and those documents relate
5 to both City and State officials.
6        To the extent our rights have been
7 prejudiced and those documents reveal a need for
8 further deposition testimony, we hereby join the
9 prior objection placed on the record by counsel.
10        (Deposition concluded at 12:05 p.m.)
11              -   -   -
12
13        (Deposition Exhibit 11 was marked post deposition)
14
15
16
17
18
19
20
21
22
23
24
25

Page 160

1                    CERTIFICATE
2 STATE OF MICHIGAN       )
3                         ) SS:
   COUNTY OF OAKLAND       )
4
5        I, LAUREL A. JACOBY, Certified Shorthand
6 reporter, a Notary Public, hereby certify that I recorded
7 in shorthand the examination of GOVERNOR RICHARD D.
8 SNYDER, the deponent in the foregoing deposition; and that
9 prior to the taking of said deposition the deponent was
10 first duly sworn, and that the foregoing is a true,
11 correct and complete transcript of the testimony of said
12 deponent.
13        I further certify that no request was made for
14 submission of the transcript to the deponent for reading
15 and signature and that no such submission was made.
16        I also certify that I am not a relative or
17 employee of a party or an attorney for a party; or
18 financially interested in the action.
19
20
21
   _____
22 LAUREL A. JACOBY, CSR-5059, RPR
23 Notary Public, Oakland County, Michigan
24 My commission expires: 9/1/18
25 Dated:  This 11th day of October, 2013.

**$**

**$18 (6)**
52:5,20;54:7,15,19;
56:21
**$38 (1)**
55:5
**$60 (1)**
55:8

**[**

**[verbatim] (1)**
73:16

**A**

**ability (2)**
31:12;92:18
**able (2)**
142:17;146:25
**Absolutely (3)**
88:13;127:7;158:19
**accept (3)**
38:19;77:6;112:25
**acceptance (1)**
78:15
**accepting (2)**
37:24;38:3
**accorded (3)**
74:21;75:5,9
**according (2)**
117:6;138:25
**account (6)**
21:1,2;35:4,9,14,21
**accounts (1)**
104:8
**accrued (19)**
30:17;52:5,20;
54:23;63:13;64:5,17,
22;65:24;66:11,18;
67:10,25;68:10;72:12;
85:6,12;86:8;87:3
**accurate (1)**
136:1
**achieve (1)**
64:9
**acknowledged (1)**
121:8
**acronym (1)**
21:9
**Act (11)**
27:25;28:7,11,17,18;
29:4,4;131:2;132:2;
145:17;146:3
**acted (1)**
131:2
**acting (2)**
100:2,7
**active (3)**
48:17;63:13;116:6
**activities (1)**

42:18
**actual (1)**
88:14
**actually (13)**
19:2;27:22;31:18;
41:6;70:13;77:12;
82:4;89:6;121:24;
131:23;153:25;154:11,
23
**actuarial (2)**
52:8;117:5
**actuaries (1)**
17:14;18:2,4
**add (2)**
108:20;145:22
**added (2)**
84:18;146:4
**adding (1)**
85:13
**addition (3)**
57:21;78:4;116:22
**additional (5)**
9:7;11:3,9;29:3;
52:25
**address (3)**
31:8;55:14;56:20
**addressed (2)**
56:23;88:24
**addressing (4)**
64:24;65:7;82:15;
118:16
**adequate (1)**
117:1
**adjudicated (1)**
45:16
**adjudication (1)**
123:5
**adjustment (7)**
10:21;11:18;44:3;
45:11,14;47:2;151:13
**administer (1)**
9:21
**administration (2)**
68:12,16
**admission (1)**
126:21
**adopted (1)**
45:21
**advantage (2)**
117:20,22
**advantages (2)**
118:6,21
**advise (1)**
128:14
**advisor (1)**
101:18
**advisors (2)**
34:10;87:19
**affiliations (1)**
35:4
**affirmatively (3)**
113:10;114:3;
117:25

**AFSCME (2)**
10:7;13:4
**AFSCME's (1)**
21:24
**afternoon (9)**
130:2;134:19,20,
25;135:2,14;136:14;
137:1;157:14
**again (74)**
9:12;14:22;15:16,
24;18:9;21:5;28:19;
29:15;35:7;37:6;
39:17;42:21;44:1;
46:2,22;53:23;54:15;
56:8;21;60:25;61:7;
62:11;64:12;65:19;
68:5;69:25;70:17;
75:6,10;77:5;79:22;
80:15;81:7;82:10,13;
85:22;87:4;89:11;
92:13;93:10,12;94:2;
100:24;102:6,11;
103:15,25;104:6;
105:9;106:10;109:24;
110:5;116:13;117:8,
14,14;118:9,22;119:5,
7,14;130:2;137:11,23;
139:10,24;142:14;
143:9;147:1,6,7;
148:18;152:14;154:21
**against (11)**
20:3;23:14;25:7;
30:6;91:19;92:3,6,7,
12;124:1;141:22
**ago (1)**
108:17
**agree (10)**
8:12;19:23;64:9,20;
65:1;94:16;106:17;
118:20;130:19;156:1
**agreed (4)**
24:17;33:7;119:23,
23
**agreement (11)**
8:15;14:9;24:25;
32:25;33:2;42:15,20;
63:17;105:9;108:2;
121:8
**agreements (1)**
82:17
**AG's (2)**
136:15,24
**ahead (14)**
11:12,13;15:2,23;
113:16,18;114:5;
115:19;118:9,11;
132:11;143:24;144:2,6
**allocable (1)**
59:3
**allocated (1)**
12:12
**allowed (1)**
57:25

**almost (1)**
62:11
**alone (1)**
12:14
**along (2)**
24:17;48:4
**alongside (1)**
15:14
**alternatives (9)**
42:14;70:1,12,20,22,
25;71:15;119:6,13
**although (1)**
20:25
**among (7)**
20:3;29:23;102:25;
103:13;109:15;
111:24;112:10
**amongst (1)**
157:18
**amount (7)**
16:24;17:20;53:13;
54:1,11,14,22
**amounts (1)**
63:13
**analysis (9)**
52:8;55:12,22;
57:14,17,25;88:14;
110:23;149:8
**and/or (1)**
18:15
**Andrew (1)**
51:21
**Andy (3)**
68:15,17;143:2
**announced (1)**
48:5
**answered (15)**
11:12;75:1;110:18;
111:10;114:2;118:8;
133:24;134:2,6,7;
136:8;144:5;147:2;
148:18,21
**anymore (1)**
119:1
**Apart (5)**
77:14;79:19,25;
93:7;94:6
**apologize (4)**
78:6;127:1;147:4;
156:7
**Apparently (1)**
155:20
**appearance (2)**
40:20;41:19
**appeared (1)**
75:15
**appearing (1)**
10:8
**appears (1)**
140:8
**applicability (1)**
147:14
**applications (1)**

136:25
**applied (2)**
138:16,23
**applies (1)**
153:6
**apply (3)**
31:13;124:23;138:6
**appoint (1)**
42:23
**appointed (9)**
26:17,21;28:9;
41:25;42:1,25;43:2;
99:3;100:20
**appointment (2)**
18:14;100:16,24
**appointments (1)**
35:11
**appreciate (7)**
10:8;28:20;71:4,5;
73:16;100:4;156:13
**appreciated (1)**
71:22
**appropriate (11)**
31:4;47:11,15,18,23;
73:14;85:2;89:5;
131:19;137:8;149:10
**appropriately (5)**
20:14,16;33:9;
84:17;147:22
**appropriations (1)**
11:1
**approval (3)**
64:24;83:14;150:16
**approve (4)**
46:7,8,8;81:22
**approved (1)**
40:3
**approving (2)**
42:20;118:17
**approximate (1)**
17:1
**approximately (2)**
117:7;137:2
**Aquilina (7)**
122:22;125:23;
128:25;129:22;
130:22;136:12,16
**area (5)**
86:19,20;88:11;
119:19;121:18
**arena (1)**
121:11
**arguably (1)**
120:25
**argue (1)**
32:21
**argued (1)**
85:5
**argument (3)**
9:10;152:11,13
**argumentative (1)**
11:8
**around (5)**

18:13;26:22,25;
39:3;143:22
**arrive (1)**
47:5
**art (2)**
43:13,23
**Article (25)**
30:10;75:14,21,23;
76:1;120:15,21;121:7;
123:9;124:14,23;
138:5,16,22;139:2;
145:18;146:13;147:14,
20;148:12;151:18;
152:1,6,12;153:6
**articulate (1)**
66:17
**aside (4)**
122:1;129:14;
131:21,24
**aspect (1)**
46:14
**aspects (1)**
18:15
**assert (2)**
111:16,17
**asserted (2)**
110:9,19
**asserting (1)**
110:17
**assertion (1)**
78:15
**assess (2)**
18:2;57:4
**assessment (3)**
117:5,11;119:8
**assessments (1)**
117:11
**assets (18)**
43:12,13,17,22,25;
55:12,13,16,16,18,19,
23;56:4,5,12,16,24;
57:5
**assist (2)**
47:8,12
**assistance (8)**
47:8,12,19,22;48:12,
14,16,25
**assisted (1)**
47:21
**assume (7)**
54:17;74:23;79:6;
141:24;148:20;
153:13;156:1
**assumes (2)**
128:20;135:8
**assuming (3)**
13:5;14:11;45:15
**attached (1)**
60:13
**attempt (1)**
15:20
**attended (5)**
90:5;95:14,16,17,20

**attention (7)**
63:1;9;76:13,19;
84:11;116:2;139:13
**attest (1)**
134:15
**attorney (31)**
15:1;25:21;40:3;
51:14;72:3,8,10,14;
73:5,20,24;74:3,19,22,
25;75:3,11,24;137:19;
138:4,11,15,22,25;
139:7,12,20;140:2;
148:10;152:19;153:5
**attorney-client (24)**
12:4;14:19;18:25;
43:16;45:6;46:19;
58:5,6,9;61:5;62:18;
68:20;88:12,15;93:11;
110:5,9,10,20;111:3,7,
16;125:3;130:4
**attorneys (26)**
25:24;34:10;39:15,
18;79:14;81:17;94:13;
98:9;100:7;109:1;
110:22;111:14;112:9;
113:6;125:5,9,15,15,
18,19;129:15;134:1,3;
137:3,7;158:8
**auditorium (1)**
25:3
**August (1)**
137:22
**author (1)**
128:13
**authorization (15)**
18:23;19:8,23;31:2;
32:8;76:8;79:17;
134:3;148:14,25;
150:10;151:15;
154:10;155:17;157:9
**authorize (5)**
29:19;53:25;54:10;
56:14;132:4
**authorized (4)**
16:22;65:2;146:11;
147:9
**authorizes (2)**
29:19,24
**authorizing (4)**
20:3;31:6;64:25;
132:10
**Auto (1)**
51:15
**availability (1)**
129:8
**available (5)**
12:16;14:21;47:19;
49:7;56:25
**Avenue (1)**
9:19
**avenues (1)**
48:24
**avoid (5)**

28:15;29:7;40:23;
103:20;119:21
**aware (38)**
13:25;27:12;49:6;
53:10,14,15,17;55:21;
59:5;63:15,16,21,23,
25;64:3,15;72:3,10,14,
16;73:12;79:23;83:24;
85:4,8;91:18,22;92:11,
15,16,21,23;94:18,24;
95:5,9;128:9;139:6

## B

**back (27)**
15:18;24:13;27:23,
24;32:21,22;51:9;
53:8;57:18;63:2;
66:21;76:11;82:11,16;
90:5;94:18;104:1;
106:23;108:1;119:9;
123:11;130:2;144:11;
148:16;151:1;153:2,21
**background (3)**
35:15;37:18;119:25
**bailout (1)**
47:16
**Baird (21)**
34:1;36:5;39:21;
50:10;95:11,14,19,23;
96:22,24;97:7,10,14,
22;98:1,4,9,15,20,24;
104:18
**bankrupt (1)**
107:23
**bankruptcies (1)**
15:5
**bankruptcy (119)**
12:19,25;14:22,25;
15:1,17;16:1,4,7;
18:24;29:20,21;30:5;
31:8,17,20,20;32:5;
34:9,20,22,23;37:21;
38:19,21,24;44:4;
45:12;54:1,10;56:15;
58:21;59:8;60:14;
64:25;65:18;66:15,23,
23;67:5,6,8,10,24;
76:9;79:17;81:22;
83:23;84:15,16;85:10,
24;86:7,13,24;89:10;
91:2;92:19;93:3;
101:23;102:5,10,11;
103:19,20,24,24;
104:2,11,12,13;105:1,
11;106:2,8,11;107:6,
22;110:3,3;116:16,17,
20;118:15,22,22;
119:20,22;120:24;
121:11,21,22;124:19,
24;125:17;126:2;
129:5;131:12,21;
132:5,11;136:17;

137:21;138:6,17,23,
24;140:24;145:15,23;
146:6;147:12;148:5,
25;149:8;151:13,18;
152:10;153:7
**bargain (1)**
117:24
**based (6)**
17:2;52:7;65:16;
67:12;78:16;123:12
**basic (1)**
73:10
**basically (2)**
85:14;86:18
**basis (1)**
133:19
**bears (2)**
60:10;83:10
**became (9)**
26:24;31:21;102:23;
109:13,19;111:22;
112:6;113:7;115:6
**become (1)**
151:6
**becoming (5)**
40:23;82:15;103:5;
112:4;139:5
**began (3)**
32:21;101:1,2
**begin (3)**
32:20;79:18;102:21
**beginning (4)**
47:3;89:22;90:9,14
**behalf (5)**
8:6,25;10:7;23:7;
50:5
**belief (2)**
68:2,3
**believes (1)**
58:8
**Belle (2)**
43:13,23
**beneficiaries (1)**
12:21
**Benefit (4)**
12:19,21;13:6;14:14
**benefits (29)**
12:9,14;13:1;14:8,
12,16;29:11,14,16;
30:7,12,16,17;31:13;
44:15,20;45:4,9,25;
49:9,14;64:17;66:11;
73:7;85:7;86:8;87:3;
108:6;151:3
**besides (2)**
26:13;83:4
**best (16)**
31:16;32:6;69:24;
85:18;90:22;92:9;
114:9;120:21;145:6,
11,25;148:6,8;149:18,
19;156:14
**better (1)**

37:12
**beyond (3)**
20:24;28:5;119:19
**big (1)**
105:6
**Bill (2)**
72:3;107:3
**billion (14)**
12:6;15:14;17:2;
52:5,6,20,21;53:14;
54:7,15,19;56:22;
117:8;146:23
**Bing (8)**
34:3;47:25;48:8;
49:18,22,25;50:6,11
**bit (1)**
13:24
**Blanchard (1)**
28:1
**blight (1)**
48:17
**board (6)**
24:22;39:8,10;
23:15;134:23;136:12
**Bolger (5)**
16:2,8,16;107:10,18
**bond (3)**
15:13,23;50:21
**book (1)**
96:4
**both (10)**
37:19;43:6;53:16;
57:5;63:13;106:16,17;
108:3,8;159:5
**bottom (6)**
52:2,3;59:11;63:12;
142:25,25
**branch (3)**
31:16;32:7;148:7
**break (2)**
51:3;115:15
**breakdown (3)**
78:11;133:2,4
**brief (4)**
24:12;51:5;72:14,
16,18,19,20;73:12,24;
74:24;106:22;140:18;
153:8,17
**briefs (1)**
74:23
**bring (3)**
69:13;70:11;123:11
**bringing (1)**
27:17
**broader (1)**
71:25
**brought (4)**
84:11;98:11;116:2,
17
**budget (1)**
10:24
**budgeting (1)**
35:18

(2) arrive - budgeting

Min-U-Script®

**Building (2)**
9:19;11:24
**bullet (1)**
63:11
**burdens (1)**
25:2
**business (5)**
11:21;42:5;57:1,5,6

## C

**cabinet (1)**
48:4
**call (15)**
72:25;73:4,9,11;
137:3,6;138:1,2,7,21;
139:4,6,12;143:25;
144:11
**called (4)**
9:25;137:20;144:9,
24
**calling (1)**
144:8
**calls (9)**
13:18;81:16,17,19;
97:17,19;113:13;
125:1;136:6
**came (11)**
19:17;27:25;28:7;
33:5;48:4;85:23;
103:8;104:4;116:15;
126:6;131:20
**camera (1)**
157:1
**campaign (3)**
23:10,14;25:7
**can (44)**
21:15;22:5;23:19;
24:18;25:1;32:21;
52:10;56:8;58:8,11;
66:17;69:24;79:21;
86:14;90:22;92:5;
94:16;108:20,20;
112:13;113:16;
114:12;115:3,12,14,
16;116:25;117:1,22;
121:16,17;126:13;
134:13;137:16;
141:20;144:19;145:11,
20;147:7;149:5;
150:15;153:2,3;158:16
**candidacy (3)**
97:14,22;98:5
**candidate (8)**
36:17,22;37:9,10;
49:23;97:12;98:10,17
**candidates (6)**
33:16;36:14,18;
37:13,15;40:13
**capacity (3)**
98:14;100:7;116:8
**Capitol (1)**
9:19

**care (3)**
119:13;145:25;
149:18
**careful (3)**
71:7;111:7,16
**case (7)**
12:19,25;33:19;
73:25;89:20;96:4;
135:11
**cases (7)**
20:21;53:9;103:19;
121:25,25;124:22;
130:21
**cash (4)**
57:15,17;58:1,25
**category (1)**
24:21
**cause (8)**
29:1;53:5;77:21;
78:3;82:25;84:14,14;
122:23
**Center (1)**
48:21
**certain (8)**
18:15;78:19;90:14;
91:1,18;92:17;95:6;
120:18
**certainty (3)**
97:20;118:14;
149:12
**challenge (1)**
28:13
**challenges (4)**
30:4;38:15;91:9;
101:16
**challenging (4)**
18:14;38:6,17;
105:14
**chances (1)**
125:10
**change (4)**
14:7;31:12;131:5,14
**changes (1)**
29:14
**Changing (1)**
21:8
**Chapter (42)**
12:18,24;13:21;
15:2,5,10;16:12,15,23;
18:8;19:9,10,12;20:4;
29:21;30:1,4;31:3,14;
32:5,10;45:15;49:4,6,
10;83:15;102:24;
103:12;109:14,20;
111:24;112:7;113:7;
115:7;117:20;118:1,5;
120:13;142:18,22;
148:25;150:15
**characterization (2)**
111:18;113:1
**characterize (2)**
71:12;109:24
**check (2)**

10:17;148:10
**checking (1)**
114:13
**Checks (1)**
117:16
**chief (3)**
34:7;68:15;99:18
**choosing (1)**
83:19
**chose (2)**
83:25;84:4
**chosen (1)**
87:8
**Chrysler (1)**
39:1
**circumstance (5)**
33:13;127:25;
130:11,18,20
**citation (3)**
83:18;87:20;88:4
**cite (1)**
142:24
**cites (1)**
87:14
**citizens (17)**
11:6;12:10;13:4,9,
11;32:12;42:11;47:20;
48:15;76:3,5;102:17;
133:7,9;146:1;149:18,
19
**City (89)**
10:15,20;11:23;
14:3,15,21,23;16:10;
17:8;22:18;25:24;
39:15,16,19,24;40:5,9;
41:3,7,10,14,14,16,18,
21;42:3,5,6,8,18,19;
43:7;44:10,16;45:14;
46:9;47:17;50:14;
52:5,19;55:4,12,17,23;
56:4,11;57:17;59:8;
60:10;76:9;77:2,7,17;
78:10;85:10,11;86:7;
87:3;88:21;94:21;
95:1,9,21,25;96:17,25;
97:4;98:8;99:24;
100:8;102:9;103:1,14;
106:3;108:6;109:16;
111:25;112:11;
113:11;115:8,23;
119:4;123:11;149:14;
150:18,25;157:8;
159:4,5
**City's (11)**
50:20;54:2,11;
55:14;57:15;58:1,24;
59:4;60:14;83:23;95:2
**claims (1)**
15:15
**clarify (5)**
13:7;93:25;154:12;
155:19,23
**clarity (1)**

148:8
**class (1)**
119:17
**clear (18)**
8:19;33:2;38:16;
55:15;62:23;71:10;
75:25;84:4;86:1;94:2;
105:11,24,25;111:5,
19;117:17;133:2;
151:2
**clearly (3)**
54:20;91:16;115:21
**client (2)**
24:5,15
**close (2)**
40:18;82:18
**closer (1)**
19:16
**Code (1)**
29:21
**Cohen (1)**
51:14
**coincidental (1)**
136:19
**comfortable (2)**
131:18;146:2
**coming (13)**
71:22;79:4;80:14;
81:2;96:1;109:18;
128:7;129:10;136:25;
137:3;142:9;143:16;
149:7
**commence (2)**
83:15;148:25
**commenced (1)**
18:13
**comment (1)**
61:1
**commentary (1)**
28:20
**comments (8)**
27:12,14;61:11;
63:3,4,5;71:13,25
**commissioned (2)**
18:2,8
**commissioning (1)**
18:10
**committee (1)**
117:23
**common (2)**
2:6;110:17
**communicate (4)**
80:13,18;108:4;
154:9
**communicated (1)**
154:15
**communication (2)**
37:22;79:19
**communications (7)**
61:21;80:21;126:4;
129:13;140:22;
154:19;155:5
**compensated (2)**

41:16,18
**competing (1)**
10:23
**Complaint (2)**
135:13,18
**complete (1)**
8:11
**completed (1)**
9:4
**complex (1)**
116:11
**complexity (1)**
145:22
**compliance (1)**
8:17
**complies (1)**
46:24
**concept (1)**
98:11
**concern (14)**
20:13,16;38:2,9;
66:12;86:16,23;87:4,5,
18;115:10,21;116:10;
145:22
**concerned (8)**
32:9;40:25;70:2;
115:24;119:21;123:8;
133:7;144:4
**concerning (2)**
92:17;97:22
**concerns (1)**
119:20
**conclude (2)**
78:23;142:23
**concluded (3)**
33:11;158:24;
159:10
**conclusion (7)**
33:7;47:5;93:12;
131:19;146:18,21;
152:2
**conclusions (1)**
83:1
**concur (1)**
132:4
**concurred (1)**
54:21
**condition (1)**
30:6
**conducting (1)**
8:9
**confer (1)**
24:4
**conference (1)**
48:3
**conferred (1)**
24:15
**confidence (2)**
71:19;84:15
**confident (3)**
62:10;146:2;158:16
**confirm (1)**
134:13

**confirmed (1)**
131:11
**conflict (6)**
23:23;40:19,20,24;
41:13,19
**conflicting (2)**
13:8;88:22
**confusing (2)**
100:25;151:21
**confusion (2)**
84:14;145:23
**conjunction (1)**
87:24
**connection (6)**
15:2;35:25;43:19;
44:7;71:16;91:1
**consent (8)**
32:24;33:2;42:15,
20;82:17;105:9;108:2;
151:10
**consensual (3)**
15:21;47:5;118:19
**consider (14)**
20:9,10;36:25;37:4;
40:6,18;41:9;83:21;
85:10,12,19;86:4;
147:18,19
**consideration (4)**
35:8;43:18;82:1;
132:18
**considered (4)**
59:9;84:8;85:13;
86:6
**considering (4)**
19:10,12;37:13;
86:19
**consistency (1)**
83:5
**consistent (3)**
127:11;139:1;
147:12
**Constitution (20)**
30:11,13,15;32:2,4;
46:25;72:11;73:6;
75:25;76:3,5;85:6,15;
99:1;120:16;123:10;
124:15;145:18;
146:24;150:5
**constitutional (4)**
73:15;121:1,23;
139:16
**constitutionality (1)**
18:14
**Constitutions (1)**
31:25
**construed (1)**
113:9
**consult (2)**
139:20,23
**consultants (6)**
17:14;34:9;142:9,
12;143:13,17
**consulted (2)**

132:9;138:4
**contact (1)**
40:15
**contacted (2)**
72:19;98:16
**contained (1)**
63:25
**contains (4)**
84:20;87:12;88:7;
149:1
**contemplate (2)**
129:11;131:23
**contemplated (1)**
82:4
**contemplations (1)**
82:9
**content (1)**
108:25
**context (28)**
23:25;30:19;34:22;
42:19;44:3;52:22;
54:19;55:3;56:13;
63:16;72:1;80:15;
81:15;82:22;97:10;
98:9;104:7;105:10;
106:1;107:23;109:21;
110:24;111:11,19;
112:22;118:12;130:5;
149:10
**contingencies (14)**
29:25;31:5;83:11,
16,19,23,24;84:8,13,
25;86:19,22;145:15,21
**contingency (21)**
31:1;33:19;84:21;
85:2,20;86:21;87:2,8,
12;88:7;145:17;
146:13,22;147:10,20;
148:12;149:2,21,22;
150:1,10
**contingent (2)**
85:11;86:7
**continuation (1)**
32:22
**continue (3)**
8:20;118:25;148:5
**continued (5)**
32:25;65:17;81:7,
10;101:3
**continuing (5)**
9:2;78:8,13;118:18;
119:12
**contractual (3)**
30:19;121:24;122:2
**contributed (2)**
23:14;25:6
**contributions (1)**
23:10
**control (1)**
22:24
**conversation (16)**
43:11;62:4;81:13;
90:12,24;91:13;

109:13;110:8,25;
114:2;115:4;117:19;
118:3;137:5;142:4;
144:12
**conversations (30)**
14:13;16:14;38:12;
42:22;45:2;58:20,23;
93:22;94:6;103:6,8,9;
107:9,20;108:3;
109:11;111:14;112:8,
9;113:5;115:5;125:2,5,
6,8,13,14;129:14,20;
143:21
**convey (1)**
61:11
**cooperation (1)**
24:16
**corporate (1)**
12:18
**Corporation (2)**
12:20;42:17
**corrected (2)**
149:23;158:3
**correcting (1)**
135:16
**Corrections (1)**
48:21
**costs (1)**
23:2
**Council (1)**
42:20
**counsel (53)**
25:12,13;26:14;
36:23;58:7;61:23;
62:2,9,13,22;68:9,22;
69:5,9,12;70:9;72:2;
82:23;83:24;84:12;
87:19,24,25;88:3;
89:17;93:7,16,23,24;
94:7,11,22;95:2;97:21;
99:6,9;102:7,12;
103:17,22;108:22;
109:11,22;110:15;
111:21;123:25;125:2;
132:6,10;139:24;
146:4;156:1;159:9
**counsel's (2)**
88:10;135:19
**country (1)**
38:17
**couple (7)**
107:8;108:12,17;
130:14;137:23;
144:23;145:2
**course (1)**
151:5
**court (22)**
9:5;20:1;44:4;51:18;
60:9;74:23;75:13;
78:12;107:5;122:7;
123:6,7,12;125:11;
130:21;132:15,17;
133:14,18;134:25;

136:25;137:3
**courtesy (5)**
137:25;138:2,7,21;
139:4
**courtroom (4)**
131:2,3;134:2,4
**courts (3)**
20:23;85:18;123:20
**coverage (1)**
27:8
**covered (2)**
113:21,23
**covers (1)**
29:17
**create (2)**
90:9,14
**created (2)**
25:2;40:19
**creative (1)**
70:19
**credentials (1)**
98:18
**creditor (1)**
59:12
**creditors (25)**
11:24;12:6;14:1,3;
15:13,18,23,25;22:19;
46:4;47:1;50:21,22;
57:18;60:11,15;62:8;
77:3,8;107:5;116:9;
119:18;128:6;132:25;
151:7
**creditor's (1)**
151:1
**crisis (1)**
149:13
**criteria (6)**
20:17;34:13,17,19;
37:18;106:17
**criticized (1)**
27:10
**crystal (1)**
75:25
**current (3)**
13:6;55:4;65:16
**currently (2)**
42:8;63:14
**cut (12)**
69:16;70:4,16,22;
71:14;85:11;86:8;
87:3;142:13,17,21;
150:20
**cuts (9)**
63:12;64:5,17,22;
65:14,23;66:10,18;
68:10
**cutting (1)**
73:7

**D**

**date (19)**
8:13,14;9:11,14;

18:6;19:14;26:19;
43:8;80:10;95:3;
96:18;100:21,23;
123:1;127:18;128:15;
129:5;130:17;131:11
**dates (3)**
19:13;100:24,24
**daughter (1)**
24:7
**Day (44)**
22:15;36:22;37:1,2,
5,8,10;39:15,18,24;
40:1,6,8,11,19;41:2,4,
11,13;72:21;76:7;
80:8;89:7;95:20,24;
96:2,5;97:1,5;98:21,
25;122:19,21;124:20;
132:15;133:16;134:13,
24;135:17;144:15;
154:16;155:21;157:6;
158:15
**days (8)**
72:21;89:1;103:20;
123:23;124:3;129:17;
130:14;137:24
**Day's (1)**
40:4
**DC (1)**
101:17
**deal (9)**
11:10;48:25;70:2;
110:2;117:22;121:10;
127:24;143:5;146:15
**dealerships (1)**
39:2
**dealing (4)**
38:23;48:18;101:14;
123:21
**dealt (1)**
124:14
**debtor (3)**
150:15,17,19
**debts (3)**
11:6,18;47:17
**December (2)**
27:3;33:4
**DeCHIARA (21)**
51:12,13;58:13;
59:22;60:8;62:20;
68:23;69:3;70:7;74:7,
12,16;75:13,20;88:17;
92:8,10;94:5,17;96:14;
106:18
**decide (1)**
65:6
**decided (2)**
85:20;145:14
**deciding (1)**
45:20
**decision (26)**
19:21;34:11;38:10;
39:5,6,7,14,16,17;
46:9;54:9;56:14;

74:24;82:2,5,5;83:3;
84:7,25;89:3;123:2,4;
131:18;132:9,13;
150:13
**decisionmaker (1)**
45:19
**decisionmaking (2)**
77:17;82:21
**decision-making (3)**
39:23;40:12;132:21
**decisions (5)**
10:25;44:9;45:13;
106:3;149:9
**Declaration (1)**
60:13
**defend (2)**
76:2,5
**deferential (1)**
41:1
**deficiencies (1)**
29:1
**defined (2)**
12:21;101:21
**definition (1)**
30:22
**definitively (1)**
141:24
**degree (3)**
18:20;35:23;38:9
**delay (4)**
77:10;84:14;136:15;
145:23
**deliberation (1)**
20:18
**deliver (1)**
42:11
**Dennis (2)**
99:14,18
**Department (3)**
48:21,23;59:4
**depend (2)**
11:16;14:9
**depending (1)**
11:17
**deposition (32)**
9:17;10:8;21:14,18,
22;25:11,25;26:3,13;
51:7;59:20;60:6;
75:18;89:20;96:12;
102:20,21;108:13;
109:2;111:4,6,17;
126:18;131:11;141:4;
144:25;145:10;
153:19;159:8,10,13,13
**depositions (3)**
8:10,21;96:4
**Deposition's (1)**
158:24
**describe (3)**
46:23;86:9,10
**described (1)**
116:4
**designating (1)**

145:3
**detail (2)**
128:19;140:11
**detailed (1)**
130:12
**details (1)**
69:23
**Detention (1)**
48:21
**determination (6)**
32:7;33:5;40:10;
41:4;53:25;59:7
**determine (3)**
53:6;77:22;148:11
**Detroit (96)**
10:15,20;11:10,23;
12:10;13:3,9,11;14:3,
15,21;16:1,10;17:8,18;
18:3,24;20:8;22:18,20;
25:25;31:3;32:16;
34:2,16,24;35:3;36:23;
37:19;39:16,24;40:5,
10;41:3,7,14,15,17,18,
21;42:3,6,6,11,16,18;
43:7,14,25;44:11,16;
45:5,11;46:5,9;47:8,
12,17;48:4,13,20,22;
50:15;53:25;54:10;
55:5,13,23;60:11;
75:15;76:9;82:5;
85:10;88:21;94:21;
95:1,9,21,25;96:17,17;
97:9;98:8;99:24;
105:1;106:3;107:21,
23;133:7,9;136:13;
146:1,15;147:11;
149:14;150:18
**Detroit's (12)**
16:22;19:8;30:4;
59:3;67:25;68:10;
92:18;98:22;101:8;
104:11,23,25
**developing (1)**
46:23
**development (2)**
46:16,21
**dialogue (1)**
78:13
**dictatorship (1)**
27:10
**differences (1)**
29:10
**different (11)**
20:23;30:21;41:20;
44:22;57:7;81:3;
118:20;119:18;123:5;
142:9;151:19
**differently (1)**
30:24
**differing (1)**
17:15
**difficult (10)**
41:9;71:2,5,8;84:10;

121:9;139:5;146:14;
147:17;149:11
**difficulty (1)**
116:3
**Dillon (18)**
34:5;39:21;51:22;
60:1;68:15,17;69:8,11,
13;70:3,15;125:9;
140:23;141:10;142:1,
20;143:2,21
**Dillon's (1)**
71:12
**diminished (2)**
13:14;30:20
**diminution (1)**
13:5
**direct (2)**
63:1;158:14
**directing (1)**
26:8
**directly (2)**
139:22;140:1
**disagree (3)**
65:1;110:23;111:3
**discharge (2)**
90:10,16
**discovery (2)**
9:3;141:9
**discuss (14)**
42:2;47:7;49:4,8;
58:4;68:8,13,17;69:19;
90:4;93:6;98:20;
102:5;103:18
**discussed (13)**
19:3;34:17;49:21;
68:5;72:1;90:1,14;
91:1;98:4;101:22;
102:2,14;112:10
**discussing (3)**
102:3;104:13;
112:21
**discussion (21)**
13:24;40:16;44:1;
58:24;77:3;81:9;
84:12;89:13;91:5,6;
103:23;110:1;111:9;
113:24,25;115:21;
116:14;117:4;119:3,
15;125:1
**discussions (51)**
11:21;12:1,3;14:18;
16:3,6;38:14;40:17;
41:24;43:5,15;44:18;
46:12,18;49:5,12,18;
50:4;58:14,16,18;
77:9;79:23;89:11,25;
93:10,14,15,17;94:8;
97:13,15,21;102:24;
103:12,16;110:4;
111:23;112:18,19;
116:23;124:21;130:3;
132:5;139:24;152:16

**dismissed (1)**
84:11
**dispute (2)**
91:4,16
**disputing (2)**
53:12,15
**disqualifying (1)**
40:6
**Diversity (1)**
21:9
**document (25)**
8:11;9:7;47:3;51:17;
59:17;60:10,12,16,21;
76:18;96:6,9,16;
127:13,17,21,23;
128:1,5,8,14,18,20;
155:5;157:14
**documentary (1)**
156:5
**documents (10)**
8:22,23;9:1;26:2,5;
128:3;134:12;159:3,4,
7
**dollar (7)**
12:6;15:14;16:24;
17:2,21;55:5,8
**dollars (1)**
117:8
**done (24)**
17:14;33:9;42:19;
44:4;52:25;56:1,19;
57:16,25;117:8;
118:19;123:13;126:7;
132:12;134:8,9;
136:21;144:7;146:22;
149:15;153:14;
155:21;158:21,22
**donor (2)**
22:12,15
**donors (10)**
21:11,25;22:9,19,20,
20;23:9,13,15;24:20
**double-check (1)**
154:13
**double-checking (1)**
114:23
**down (6)**
29:8;44:2;72:8;
115:15;116:15;130:13
**draft (2)**
60:22;61:1
**drafting (1)**
29:5
**drafts (3)**
46:6,22;60:20
**draw (1)**
76:19
**drove (1)**
136:13
**DTMI (1)**
96:19
**duly (1)**
9:25

**During (26)**
18:18;34:12;37:1,5,
16;41:24;42:15,24;
43:1,9,20;44:12,13;
47:6;49:3,12,16;50:2;
90:25;103:19;105:4;
116:8,25;118:13;
119:9;154:16
**duties (2)**
73:17,19
**duty (1)**
9:6

## E

**earlier (17)**
68:6;72:1;87:21;
103:19;129:17;
134:21;143:23;154:6,
11,16,21,25;155:10,
21;157:13;158:5;
159:3
**earliest (1)**
155:24
**early (12)**
28:15,18;32:25;
46:22;50:8;107:5,9,21;
140:23;143:2,14;144:7
**easier (1)**
110:2
**Economic (1)**
42:17
**effect (4)**
28:2;68:24;129:24;
153:8
**effective (3)**
26:17,25;100:24
**efficient (1)**
42:10
**effort (7)**
20:12;47:1;71:6;
105:16;106:10;143:5;
156:7
**efforts (5)**
20:7;47:9,13;90:7;
123:11
**eight (4)**
77:13;131:13;
136:16;141:2
**either (8)**
22:18;31:9;40:6;
61:20;108:3;125:14;
140:1;143:22
**elected (1)**
78:10
**element (1)**
54:4
**elements (1)**
30:8
**eligibility (5)**
21:13,23,24;23:18,
20
**Ellsworth (1)**

25:23
**else (14)**
26:12;33:25;39:9;
45:22;61:19;73:2;
78:22;80:13;86:11;
94:8;111:2;123:13;
125:13;151:7
**email (29)**
63:6;137:12,14;
140:5,14;141:9,17,25;
142:24;143:19;144:1,
3,4,13,15,17;154:7,8,
14;155:13,15,16;
157:6,8,10,13,21;
158:1,1
**emails (1)**
143:22
**emergency (73)**
18:15,16;23:2;
26:17;28:1,9,13,16;
29:20;32:15,15,18,18;
33:6,12,14;34:16;
36:15,25;37:4,24;38:4,
7;39:7,10;40:14,23;
41:8,25;42:1;43:1,2;
44:10,16;49:17,24;
50:16;51:20;57:22;
97:8,11,12;98:11;99:3;
100:16,20;101:25;
102:23;103:5;109:14,
19;111:22;112:4,7;
113:7;115:6;120:11,
12;122:1;130:23;
133:6;138:25;145:24;
146:15;147:11,16;
150:3;151:2,17,23;
152:9;154:9;155:18
**emphasizing (1)**
38:21
**employees (2)**
42:9;88:21
**enacted (3)**
27:2,11;28:25
**end (7)**
22:4;50:9;65:23;
75:23;83:17;86:22;
128:8
**ended (1)**
136:15
**ending (1)**
20:22
**Energy (1)**
21:9
**engage (2)**
77:3,9
**engaged (2)**
45:1;77:18
**enough (11)**
108:11;112:24;
114:17;126:16;128:10,
10;131:4,24;137:18;
142:1;144:18
**entered (1)**

8:8
**entire (3)**
11:16;76:17,18
**entities (1)**
85:5
**entitled (2)**
73:22;136:17
**essentially (1)**
99:20
**establish (1)**
34:13
**estimate (1)**
17:22
**evaluation (1)**
52:23
**evaluations (1)**
52:24
**even (8)**
45:21;86:18;110:16;
118:19;120:25;
124:24;130:4;148:21
**event (2)**
128:18;130:16
**everybody (1)**
151:7
**everybody's (1)**
25:17
**everyone (1)**
119:23
**evidence (1)**
135:9
**exact (2)**
54:18;115:14
**exactly (3)**
92:1;112:5;145:9
**EXAMINATION (4)**
10:2;51:11;106:25;
145:13
**examined (1)**
10:1
**example (3)**
108:1;128:5;147:12
**examples (2)**
48:16;77:12
**exchange (1)**
73:10
**excluded (1)**
111:14
**excluding (1)**
125:14
**Excuse (3)**
28:7;72:7;77:10
**executable (6)**
84:22;87:13;88:8,
19;146:6;149:3
**execute (1)**
148:1
**executed (1)**
149:17
**exercising (1)**
73:14
**Exhibit (36)**
51:7,18;59:11,20,24;

60:2,3,6,10;63:10,24;
75:14,18,21;76:11;
96:10,11,16,20;
126:13,18,21,22,25;
127:3;140:4,20;141:4,
8;142:24;153:19,25;
154:21,22;155:9;
159:13
**existed (1)**
120:16
**existing (2)**
30:7;119:12
**exists (1)**
158:12
**expecting (1)**
79:1
**expenses (4)**
23:3;24:24;25:1,4
**experience (8)**
34:23;35:17,22;
37:20;38:20,21,23;
39:1
**expertise (1)**
119:19
**explain (2)**
42:4;141:20
**explained (1)**
110:25
**explored (2)**
70:24;71:16
**exploring (1)**
70:25
**express (7)**
16:11;38:2;44:14;
46:10;70:15;71:21;
96:24
**expressed (1)**
37:23
**expressly (1)**
145:16
**extend (1)**
8:12
**extended (2)**
8:14;131:22
**extensive (3)**
37:14,20;57:16
**extent (12)**
13:13;14:5;58:1;
115:12,14,17;125:1;
140:11;151:3,5;
158:11;159:6
**external (1)**
43:7
**extremely (1)**
105:14

## F

**face-to-face (1)**
97:17
**fact (27)**
8:7;9:3,6;20:21;
41:3;42:15;48:3;

53:14;61:24;77:18,23;
78:19;84:18;89:8;
93:7,23;94:8;110:1;
130:6,20;132:13;
133:14,17,20;134:1;
142:24;151:25
**factor (1)**
35:7
**factors (1)**
129:6
**facts (8)**
11:17;67:12;78:5;
83:1;135:8,16,25;
136:5
**fair (13)**
14:25;15:7,22;
71:12;108:11;112:24;
126:16;128:10,10;
131:4;137:18;142:1;
144:18
**fairly (1)**
24:18
**faith (15)**
14:3;15:19;23:22,
23,24;77:2,8,18,24;
78:16,23;105:16;
106:10;133:3,4
**familiar (5)**
18:12;27:8;51:23;
59:15,17
**familiarity (2)**
34:19;35:2
**family (3)**
37:20;101:15,16
**far (3)**
132:13;144:20,22
**fashion (4)**
20:15;105:13;
118:19;149:16
**favor (3)**
25:9;41:10;108:5
**favorably (1)**
34:15
**fax (1)**
157:13
**faxed (1)**
154:15
**February (1)**
104:15
**federal (19)**
12:20;13:14;47:8,
12,16,21;48:6;67:7;
84:20;85:15;86:24;
87:11;88:6;149:1,25;
150:4,9;152:5,11
**feedback (4)**
50:8;61:3,4;140:19
**feel (4)**
52:10;76:16;77:5;
115:2
**felt (2)**
132:8;146:2
**few (5)**

28:8;72:21;94:18;
123:23;124:3
**fifth (1)**
9:4
**fight (2)**
76:2,4
**figure (4)**
17:4,22;114:18;
141:15
**figures (1)**
107:12
**file (13)**
18:23;19:8;29:20;
54:1;73:11;78:10;
79:17;92:18;120:13;
126:2;129:5;131:19;
142:22
**filed (41)**
16:1;19:25;30:5;
60:13;72:14,16,18,19,
20;73:25;78:5,20;
89:10;91:19;92:3,17;
93:4;122:11,19,22;
123:24;124:5,18;
125:16,22;132:19,24,
25;134:23;135:9,11,
12,13,17,18;136:17;
137:6,21;140:24;
147:1;148:1;153:8
**filing (59)**
16:4,7,12,15,23;
18:8;20:4;30:5;31:3;
49:4;54:10;56:15;
58:21;76:9;81:22;
83:16,23;84:9;85:11;
86:7;87:2;91:2;102:9,
25;103:12,24;104:11;
105:1;106:8;109:14,
20;111:24;112:8;
113:8;115:7;116:17;
117:20;118:1;124:19;
125:16;128:20,24;
129:21;130:6;131:6;
132:19;135:5,6;
139:17;142:17;145:15,
19;146:11,14;147:10,
11;155:6;157:16,16
**final (3)**
39:5,6;123:22
**finality (1)**
118:23
**financial (17)**
10:14,15,19;17:2,5,
5;30:17;32:16,19;33:6,
12;34:10;35:19;55:14;
57:4;132:25;133:6
**find (7)**
8:16;136:18;137:16;
154:7;155:24;156:8;
157:17
**finding (1)**
116:3
**fine (8)**

25:14;37:21;109:3;
114:24;126:15;
141:16;156:10;158:17
**finish (3)**
52:9;93:25;94:2
**firm (7)**
10:6;40:23;41:20,
21;51:14;95:20;98:12
**firms (5)**
22:18;94:20,25;
95:6,10
**first (14)**
9:25;13:12;19:11;
77:14;80:2;83:13;
84:24;91:20;92:16;
106:15;123:24;129:1;
144:1,13
**flexibility (2)**
67:6;119:22
**flow (4)**
57:15,17;58:2,25
**Flowers (5)**
8:6;20:1;92:6;107:3;
122:10
**focus (2)**
84:24;105:17
**focusing (2)**
66:19;106:13
**follow (5)**
18:19;71:24;73:17;
85:25;148:8
**Following (4)**
28:11;73:18;117:9;
148:24
**follows (1)**
10:1
**followup (3)**
71:24;144:13;146:8
**follow-up (1)**
107:8
**form (11)**
13:19;60:17;103:2;
112:1;113:12;118:4;
121:15;135:22;136:6;
152:22;156:5
**formal (3)**
74:9,14;99:6
**formally (1)**
133:15
**format (2)**
63:7
**formed (1)**
113:14
**former (1)**
41:1
**forth (2)**
82:2;90:6
**forward (7)**
45:15;65:2;69:13;
70:11;71:22;116:18;
133:8
**found (2)**
155:15,16

**foundation (7)**
13:19;111:1;113:12;
121:15;135:23;136:6;
152:22
**four (1)**
83:9
**fourth (2)**
8:17;9:1
**frame (7)**
65:11;66:9;90:18,
22,25;116:14;158:5
**framed (3)**
145:10;147:22;
148:4
**free (6)**
52:10;75:15;76:17;
77:5;115:2;150:6
**frequency (1)**
100:13
**frequent (1)**
99:15
**Friday (3)**
126:3,5;131:24
**front (6)**
48:17;123:3;128:25;
130:22;136:12,16
**full (1)**
148:20
**fully (1)**
143:17
**fund (9)**
10:22;21:9,11,25;
22:1;23:4;25:1,6;
141:21
**funded (3)**
12:15;151:3,6
**funding (1)**
117:4
**Funds (5)**
22:4;50:24;53:11,
17;124:4
**further (6)**
9:9;17:13;65:4;
153:10;156:12;159:8

**G**

**Gadola (2)**
25:22;158:16
**GALLAGHER (1)**
135:19
**garbage (1)**
102:16
**gave (8)**
61:2;66:12,16;
77:12;89:20;126:25;
140:18;142:24
**Gene (1)**
48:5
**general (35)**
61:2;69:17;72:3,9,
10,14;73:5,21,24;74:3,
19,22,25;75:3,11,24;

89:11;92:4;101:12;
116:14;121:3;135:10,
18;137:19;138:4,11,
15,25;139:7,12,17,20;
148:10;152:19;153:5
**Generally (16)**
18:17;59:17;61:2;
89:24;90:1;92:16;
95:4;98:6,8;99:13;
105:2,23;122:25;
123:19;133:10;146:19
**General's (2)**
138:22;140:2
**Gets (3)**
100:25;119:16;
139:13
**gist (1)**
73:11
**Given (8)**
13:20;33:13;66:9;
101:16;121:10;133:3;
145:23;157:6
**gives (1)**
128:18
**giving (3)**
90:20;143:15;146:9
**goes (11)**
10:25;23:22,23;
27:23,24;32:22;45:15;
52:10;82:15;94:15;
124:24
**Good (24)**
10:4,5;14:3;15:19;
23:22,23,24;24:7;
49:23;51:13;77:2,8,18,
24;78:16,23;87:19;
105:16;106:10;
121:20;129:12,13;
133:3,4
**government (2)**
25:2;47:16
**Governor (65)**
8:21;9:17,22,24;
10:4,11;11:2;22:6;
27:25;29:19,24;31:22;
51:1,13;54:8;55:1;
57:1;60:9;62:21;
67:20;70:9;71:5;74:1;
76:4,17;82:15;89:25;
90:3,8;92:7,9,11;94:1;
96:15,20;102:24;
103:7,11;105:17;
107:2;111:10,13,21,
23;113:17;115:13;
124:1;126:9;127:6,24;
130:16,25;136:8,18;
137:10;141:8;145:14;
147:24;148:23;
151:14;152:25;
153:24;156:13;
157:25;158:20
**governors (1)**
28:3

**Governor's (1)**
99:23
**graduated (1)**
120:1
**granted (1)**
20:6
**grappling (1)**
38:10
**greater (3)**
10:14,14,19
**GREEN (2)**
157:5;159:1
**Greg (3)**
99:16,20;140:5
**grounds (1)**
68:20
**group (4)**
25:14;62:12;107:3;
122:18
**groups (1)**
50:18
**Growth (1)**
42:17
**Guaranty (1)**
12:19
**guess (1)**
157:14
**guy (1)**
152:4
**guys (1)**
114:17

**H**

**half (4)**
28:21;91:20;109:6;
117:7
**hand (1)**
156:24
**handle (1)**
42:17
**handwriting (1)**
131:13
**handwritten (1)**
131:12
**happen (4)**
67:3;101:24;128:19;
130:13
**happened (3)**
67:21;111:1;121:9
**happening (2)**
67:14;130:14
**happens (1)**
133:18
**happy (1)**
134:15
**hard (1)**
68:7
**heading (1)**
83:11
**heads (2)**
79:20;143:15
**health (1)**

119:13
**heard (2)**
103:10;116:25
**hearing (4)**
33:8,20;125:23;
128:25
**hearings (2)**
122:24;133:18
**help (7)**
10:20,22;11:10;
25:4;28:15;47:19;
101:19
**helped (1)**
50:2
**helper (1)**
101:18
**helpful (6)**
39:2;87:20;148:19;
153:1;156:22;157:2
**helping (1)**
106:3
**helps (1)**
137:22
**hereby (1)**
159:8
**here's (1)**
47:3
**hesitancy (1)**
37:24
**high (2)**
90:3,6
**higher (2)**
53:16;54:17
**highly (1)**
82:17
**himself (1)**
79:10
**hire (3)**
41:4;96:25;97:4
**hired (4)**
94:20;95:1,21,24
**historic (1)**
55:6
**history (2)**
35:9;105:7
**hold (3)**
9:11;75:10;125:23;
156:24
**holders (2)**
15:13;50:21
**Honor (3)**
55:1;151:17,18
**hope (3)**
29:7;67:4;119:9
**hoped (2)**
66:21,24
**hopefully (1)**
119:15
**hour (1)**
28:21
**hours (4)**
22:7;24:2;109:6,7
**House (2)**

16:2;107:18
**huge (1)**
149:14
**hundred (3)**
68:2,7;156:17
**hypothetical (5)**
11:16;14:24;15:17;
44:1;143:3

## I

**idea (3)**
88:6,9;129:21
**ideas (2)**
69:13;70:11
**identified (4)**
21:22;25:22;47:22;
98:10
**identify (8)**
23:19;51:19;59:24,
25;96:15;115:16;
140:4;157:3
**immediate (1)**
132:14
**immediately (1)**
81:23
**impact (5)**
20:10,12;21:2;93:2;
132:20
**impair (1)**
31:12
**impaired (2)**
30:20;76:2
**implementing (1)**
148:9
**implications (1)**
82:6
**importance (1)**
132:1
**important (25)**
28:12;38:19;41:22;
53:24;54:3,11,13;56:3,
6,11,13,13;66:14;
77:16;84:21;87:12;
88:7,20;102:17;
106:17;116:21,24;
149:2,6;150:10
**impose (1)**
83:19
**imposing (1)**
30:6
**impressed (1)**
98:18
**improve (2)**
27:23;47:19
**improved (3)**
11:5;48:14;102:18
**improvement (1)**
28:17
**improvements (2)**
28:12;29:3
**inappropriate (1)**
136:4

**include (11)**
12:13;30:22,23;
31:1;34:19;35:18;
42:13;68:15;78:6;
124:5;149:6
**included (4)**
17:8;57:18;82:11;
148:23
**includes (3)**
12:5,9,11
**including (9)**
28:8;43:10,23;52:6,
20;61:22;62:1;112:8;
147:20
**inconsistent (1)**
152:19
**incorporated (1)**
140:14
**independent (7)**
24:22;41:6;53:4,5;
77:20,22;78:2
**indicate (3)**
38:18;98:15;107:20
**indicated (8)**
79:15;109:12;
128:23;140:20;145:3;
154:6;155:10;158:4
**indicates (6)**
27:8;154:19,20,22;
155:5,17
**indicating (3)**
127:17;140:10;
142:11
**indirectly (2)**
139:23;140:1
**individuals (2)**
22:19;122:18
**informal (12)**
99:8,9,12,25;100:6,
10;101:1,6;102:8;
103:22;104:4,9
**information (5)**
53:9;81:3,5;137:5;
143:13
**informational (2)**
143:4,14
**infringes (1)**
58:9
**initial (2)**
103:9;126:2
**initiated (1)**
144:13
**initiative (2)**
90:10,15
**injunction (3)**
123:4;125:24;
133:16
**injunctions (5)**
20:2,6,11,20;21:2
**injunctive (8)**
91:23,23;92:24;
93:9;94:9;122:23;
130:23;132:14

**in-person (2)**
35:25;36:6
**input (1)**
50:15
**inside (1)**
121:20
**institutions (1)**
133:1
**instructs (1)**
114:20
**insurance (1)**
12:20
**interacting (1)**
101:15
**interest (4)**
23:23;37:16;40:24;
110:17
**interests (4)**
10:23;41:10,11;
146:1
**interfered (1)**
20:7
**interim (1)**
91:23;92:24;93:9;
94:10
**internal (1)**
43:6
**International (1)**
51:16
**interplay (1)**
139:15
**interpretation (1)**
74:20
**interview (21)**
33:18;36:9,11,18;
37:1,2,5;39:12,22;
42:24;43:4,9;44:12;
47:6;49:3,13;104:20;
105:5,18;106:8,14
**interviewed (4)**
36:15,17,23;104:14
**interviewing (2)**
33:16;49:16
**interviews (2)**
35:25;36:7
**into (21)**
21:1,2;27:17,25;
28:7;31:15;35:4,9,14,
21;65:18;67:12;88:11;
104:2;107:22;108:25;
115:25;119:17,20;
124:24;134:24
**inventory (1)**
55:18
**investigation (6)**
53:5,5;77:21,22;
78:2;83:1
**involved (18)**
32:12;33:22,25;
34:2,3,5,7;36:6;39:14,
17,22;50:4;57:1;67:2;
94:13;98:6;140:11;
145:5

**involvement (5)**
16:3;27:17;29:5;
32:14;35:10
**involves (1)**
32:4
**involving (1)**
95:16
**irrelevant (1)**
9:5
**Isle (2)**
43:13,24
**issue (30)**
11:11;32:9;49:1;
56:18;64:25;66:8,12;
68:13,18;73:23;83:4;
89:2;101:8;110:2;
113:8;116:18;117:12;
118:24;122:23;123:5,
8,21;124:16,23;
125:24;138:5;139:14;
142:8;143:16;146:16
**issued (1)**
20:11
**issues (13)**
10:22;20:23;21:22;
47:4;91:10;92:18;
104:1,2;106:11;123:3;
132:24;145:2;149:14
**items (1)**
44:7

## J

**January (4)**
10:12;94:19,24;
96:18
**Jase (1)**
107:18
**job (1)**
147:17
**join (2)**
159:1,8
**joining (1)**
41:7
**Jones (30)**
22:15;36:22;37:1,2,
5,8,10;39:14,18,24;
40:1,4,6,8,10,19;41:2,
4,11,13;95:20,24;96:2,
5,25;97:5;98:21,25;
157:6;158:15
**Judge (21)**
8:8;31:17,20;32:6;
45:16;65:3,6;118:16;
119:16;122:22;123:2;
125:23;128:25;
130:22;136:16;137:4;
149:8;150:12,16;
152:11,16
**judge's (1)**
31:9
**judicial (3)**
31:16;32:6;148:7

**judiciary (1)**
149:17
**July (76)**
16:22;18:13,18,18,
21,22;19:6,6,15,15,17,
25;42:2;43:3,10;45:2;
51:20;52:13;53:11;
55:10,21;56:3,9;57:12,
23;59:16,25;63:24;
64:3,15,21;65:7,11,13,
21;66:9,20;67:9;
75:15;76:12;77:16;
78:17;79:1;80:5;
81:21;82:3,19,20;83:2,
3,9,22;85:4,8;86:6;
87:16,23;89:2;90:22,
23;91:20,20;92:17;
101:7;122:5,11,19,24;
125:24;140:23;141:2,
8,17;142:19;148:24;
154:2
**June (18)**
11:20,25;12:2;14:1;
40:1;43:20;46:3,4;
57:19;59:12;60:11,18;
62:17;63:4;128:6;
151:1,8,9
**jurisdiction (1)**
129:22

## K

**Kevyn (93)**
11:21,24;14:13;
16:3;18:1,11,22;19:7,
20,21;20:7,12,14;
22:12;23:7;24:25;
26:16,21;31:2;32:15,
19;33:17;36:2,9,22;
37:11,17,23;38:6,14;
39:5,9;40:7,7,15,19,
21;41:7,21,24;42:3,22;
43:11,19;44:9,12,19;
45:1,2;46:3,9;47:6,7,
21,25;48:10;49:3,8,12,
17,19,23;50:3,6,13;
51:21;61:8,9,11;62:8,
14,16;64:4,7,16,19;
72:1;79:10;81:4,5,10;
83:6;97:8;98:10;
99:13,15,21;100:12;
137:13;140:6;150:13,
17;157:9
**kind (10)**
56:22;101:18;
113:25;116:13;121:2;
123:19;128:3;137:25;
143:5;145:5
**kinds (1)**
65:5
**knew (19)**
57:14;79:4;120:15;
122:5,10,11,25;

123:20,22;138:21;
139:14,17;142:15,21;
146:12;150:3,8,19;
152:6
**knowing (2)**
123:18,19
**knowledge (3)**
93:2;129:1;156:14
**known (1)**
17:23

# L

**land (1)**
35:21
**language (3)**
64:1;150:9;151:23
**Lansing (3)**
8:1;9:19;136:13
**large (2)**
56:19;105:15
**larger (5)**
17:20,21;50:21;
54:4;103:17
**last (11)**
8:15;33:15;49:6;
66:23;87:10;105:12;
107:25;118:22;
130:17;133:5;159:4
**late (4)**
8:15;33:4;135:13;
159:3
**later (5)**
9:10;124:3;130:14;
134:21;140:8
**law (37)**
10:6;18:16;27:18,
25;28:1;31:13,24;
41:20;51:14;67:8;
73:22;74:4,20;75:4,7;
83:25;84:20;85:16,25;
86:25;87:11;88:7;
94:20,25;95:6,9,20;
120:1,6,8;123:18;
149:1;150:1,4,9;152:5,
11
**laws (1)**
148:1
**lawsuit (3)**
83:4;92:3;124:5
**lawsuits (38)**
18:13;20:1,11,24;
21:7;78:6,7,11,19;
90:8,14;91:1,7,18,22;
92:2,6,12,14,17,21,23;
93:8,17;94:9;107:5;
118:18,25;122:9;
123:13;132:19,24;
133:10;135:1;142:5;
144:18;147:23;148:4
**lawyers (3)**
19:4;25:18,20
**Leader (1)**

107:19
**learn (1)**
136:24
**learned (5)**
18:22;19:7,11;24:6;
139:9
**least (8)**
97:25;110:8;120:25;
122:25;126:12;135:1;
136:4;142:4
**leave (4)**
9:9;31:16;32:6;
85:17
**leaving (2)**
12:13;129:14
**led (1)**
131:24
**left (2)**
19:21;85:18
**legacy (1)**
55:6
**legal (75)**
15:4,8,11;31:7,8,15;
32:7;46:2;58:7;61:7,
22;62:2,9,12;68:9;
69:5,9,12;70:9;74:9;
82:23;83:1,17,24;
84:12,17,17;85:3,14,
17,24;86:12,17,23;
87:19,19,24,25;88:3,
10,23,23,25;89:17;
93:7,12,15,23,24;94:7,
11;97:20;99:6,9;102:7,
12;117:1;119:17;
121:19;122:5,6;123:5;
125:2;132:5,9;137:20;
139:24;146:4,17,20;
147:21;148:3;149:10,
11;152:14
**legally (7)**
84:22;87:13;88:8,
19;146:6;149:3;151:4
**legislation (1)**
27:13
**legislature (1)**
11:2
**length (1)**
123:17
**less (5)**
41:19;67:6;68:3;
99:15;119:22
**letter (72)**
31:6;32:8;51:20,23;
52:2,2,13;53:11;55:10,
21;56:3,10;57:13,24;
59:16,25;63:6,25;64:4,
15,24;65:7;76:12;
77:11,14,16;78:17;
79:2,5,9,16,21,24;80:2,
13,14,17;81:1,2,21,23;
82:3,10,19,20;83:2,3,6,
10,22;84:4;86:6;87:16,
22,23;88:1,15;89:2,6;

129:10;130:24;
131:20;132:6,10;
134:14;154:1,2,23;
155:7,12,17;157:9
**level (7)**
10:14,19;11:4,9;
13:6;90:3,6
**LEVINE (21)**
10:3,6;11:19;13:23;
21:15,19;22:2,8,11,14;
23:17,22;24:1,6,10;
25:5;26:8,11;51:1;
158:7,11
**liabilities (33)**
52:7,21;53:13;54:2,
7,12,20,23;55:6;56:17,
18;57:6;64:6,23;65:15,
24;66:19;67:11,17;
68:1;69:15;70:4,16,21;
85:12;98:22;101:9;
104:23;113:24;117:3;
119:14,14;146:23
**liability (3)**
59:3;68:10;72:13
**liaison (1)**
99:23
**likelihood (4)**
67:5,13,16,21
**likely (5)**
65:25;84:14;97:23,
25;104:7;124:21;
129:6
**limitation (3)**
30:23;31:1,11
**limits (1)**
21:21
**line (11)**
52:3,4,16;63:11;
76:14,15,17;77:1;85:3;
89:22;102:21
**list (2)**
34:13;36:14
**listened (1)**
69:20
**literally (1)**
30:14
**litigants (1)**
130:21
**litigated (1)**
86:13
**litigation (4)**
18:19;20:21;21:1;
117:15
**litigations (4)**
18:12;20:2,19;21:4
**little (2)**
13:24;151:21
**LLP (1)**
51:15
**Loan (2)**
39:8,10
**location (1)**
36:13

**long (6)**
27:23;28:2,14;
72:20;108:19;109:1
**longer (3)**
89:4;101:25;123:14
**look (12)**
89:7;115:1,2;
129:11;137:11;141:8;
153:2,25;155:12,24;
157:18,24
**looked (7)**
8:23;48:24;53:8;
54:25;55:3;68:5;78:4
**looking (21)**
34:14;35:1;40:13;
42:6,7,10,13,16;43:6;
73:11;80:16,17,20;
82:12;83:5;98:8;
116:16;119:5,7,12;
122:4
**lose (3)**
14:16;90:9,15
**lot (6)**
55:25;94:13;100:5;
128:18;144:5;158:8
**loud (1)**
52:4
**Lowenstein (1)**
10:7
**lower (6)**
53:16,18;54:16,23,
24;55:2
**lunch (2)**
104:17,19

# M

**magnitude (1)**
54:14
**main (1)**
155:20
**major (5)**
28:13;82:4;84:12;
89:3;129:7
**Majority (1)**
107:19
**makes (2)**
114:19;150:12
**making (1)**
34:10,15;39:13;
40:10,11;56:14;85:10;
86:7;88:18;105:6;
114:22
**manager (62)**
18:15,16;26:17;
28:1,16;29:20;32:15,
16,18,19;33:14;34:16;
36:15;37:1,4,25;38:4,
7;40:14,23;41:8;42:1,
2;43:1,2;44:10,16;
49:17,24;50:16;51:21;
57:22;97:8,11,12;
98:11;99:3;100:16,20;

102:1,23;103:5;
109:14,19;111:22;
112:4,7;113:7;115:6;
120:12,13;138:25;
146:15;147:11,16;
150:3;151:2,17,24;
152:9;154:10;155:18
**managers (3)**
28:9,14;122:1
**manager's (1)**
23:2
**many (21)**
10:23;20:21,23,23;
21:6;27:12,13;36:18;
53:9;74:22;86:12;
90:4;97:18;103:19;
108:14;115:23;
116:10;117:14;
121:25;133:1;143:4
**March (6)**
11:20;26:17,22,25;
100:22;101:3
**Margaret (9)**
8:24;25:21;126:21;
135:15,21;136:10;
153:1;156:16;157:22
**mark (4)**
51:18;59:23;60:9;
75:14
**marked (14)**
51:7;59:20,23;60:3,
6;63:24;75:18;96:10,
12;126:18;141:4;
153:19,24;159:13
**matter (11)**
15:4,5,8;58:5,6;
66:20;84:10;85:14;
121:3;139:17;145:13
**matters (4)**
62:14,15;101:20;
102:5
**Matthew (1)**
25:22
**may (15)**
8:20,20;56:24;62:4;
76:1;83:16;94:6;
98:25;99:1;104:21;
126:22;138:9;139:9,
24;146:20
**maybe (1)**
153:3
**Mayor (10)**
34:2,3;42:19;47:25;
48:8;49:18,22,25;50:6,
11
**mean (10)**
11:7;42:4;55:1;
56:13;64:21;70:6;
74:8;79:7;122:14;
152:23
**meaning (1)**
74:4
**means (4)**

65:22;152:8;155:22;
158:4
**meant (2)**
120:3;142:22
**measure (1)**
33:11
**mechanism (1)**
27:10
**media (1)**
129:7
**mediations (3)**
65:5;119:9;152:15
**meet (3)**
25:24;50:11,14
**meeting (30)**
46:4;69:10;70:5;
71:25;79:13,15,20,22,
25;80:2,7,12,25;81:6,
11;94:11,19,25;95:5,7,
18,20,24;96:1,5;
104:22;108:22;
109:22;110:22;111:1
**meetings (45)**
26:12;46:19;68:12,
21;69:2,2;70:8;81:15;
90:5;95:8,15,16;97:17,
18;98:3;99:4,6,8,9,12,
25;100:6,11,12;101:2,
6,10,11,13,21;102:3,3,
8,12,13;103:17,17,22;
104:3,5,9;110:6,12,16;
140:9
**meeting's (1)**
144:6
**members (2)**
48:4;116:6
**memory (2)**
92:9;127:11
**mention (1)**
90:19
**mentioned (2)**
83:4;143:23
**merits (1)**
124:22
**met (4)**
36:12;62:13;107:2;
109:1
**methodical (1)**
105:8
**Michigan (34)**
8:1;9:20;10:11,24;
30:11;31:25;32:3,12;
37:19;46:25;72:6,11;
73:6,15,21,22;74:4,20;
75:4,4,7,25;85:5,15,
16;96:18;99:1;107:12;
110:18;133:9;145:18;
146:23;147:25;148:2
**Michigan's (1)**
152:20
**middle (6)**
52:3;75:21;76:14,
16;77:1;104:15

**might (20)**
11:7;40:25;49:7;
53:22;55:23;56:5,25;
67:21;90:10,16;91:14;
106:8;108:8,8;113:8,
14;114:1;141:11;
154:14;157:12
**Mike (1)**
25:22
**Milliman (2)**
18:4;117:10
**mind (2)**
37:12;151:16
**mine (1)**
46:8
**minute (4)**
21:8;84:24;130:17;
153:12
**minutes (2)**
136:16;154:18
**mischaracterizes (1)**
92:1
**miscommunication (2)**
74:12,13
**mispronunciation (1)**
72:7
**misspoken (1)**
104:21
**mistake (1)**
28:22
**modified (9)**
44:15,21;45:4,4,9,
10;46:1,1;49:9
**modifying (1)**
30:7
**moment (1)**
14:12
**Monday (1)**
125:24
**monetized (5)**
55:13,17,24;56:5,12
**monetizing (2)**
43:12,22
**monies (1)**
151:4
**Month (1)**
117:15
**months (1)**
94:19
**more (32)**
28:21;36:12,17,20;
52:24;60:23;70:25;
71:3,11,20;80:20,24;
83:5;84:14;88:12,19;
89:13;92:11,15;93:8;
95:7;99:16;101:18;
114:25;115:5;118:23;
131:25;139:6;144:23;
145:1;146:14;147:17
**morning (8)**
8:16;10:4,5;51:13;
108:18;131:25;
136:13;137:6

**most (15)**
38:6,8,17;42:10;
52:7,23;84:14,21;
87:12;88:7;100:12;
104:7;129:6;149:1;
150:9
**motion (1)**
135:9
**motions (1)**
137:4
**move (6)**
24:16;104:1;122:4;
126:21;130:17;133:8
**moved (1)**
135:5,5,6
**moving (2)**
132:16;156:25
**much (7)**
23:11;54:4;99:15;
123:4;154:11,16,25
**Muchmore (4)**
99:14,18;100:1,6
**multiple (7)**
118:18,25;124:8;
148:3,4;152:15,15
**municipal (7)**
15:13,23;29:25;
35:14,16,18
**must (2)**
63:12;66:2
**mutual (8)**
14:9;15:24;47:4;
63:17;66:25;105:13;
119:23;151:9
**mutually (1)**
8:12
**myself (3)**
10:25;99:13;100:13

### N

**name (4)**
10:6;51:13;107:2;
124:4
**named (1)**
99:17
**names (4)**
22:22,25;25:19;
100:5
**narrower (1)**
11:8
**narrowing (1)**
28:22
**nature (1)**
67:7
**nearly (1)**
56:16
**necessarily (9)**
11:6;34:21;35:2;
54:17;66:5;100:17;
142:23;143:9;152:2
**necessary (1)**
64:8

**need (12)**
8:20;33:13;52:24;
55:15,18;57:5;64:9;
132:8;139:11,12;
156:9;159:7
**needed (7)**
55:25;56:19,22;
85:24;86:17;88:24,25
**needing (1)**
28:16
**negatives (1)**
35:13
**negotiated (2)**
77:2,8
**negotiation (7)**
63:17;65:22;67:1;
103:21;106:4;116:9;
151:10
**negotiations (16)**
14:4;15:19,24;47:4;
65:4,16;66:22;77:18,
24;78:9,10,12,16,24;
133:3,4
**NELSON (60)**
8:24,24;11:12;
13:18;21:12,16,21;
22:10,13;23:19,25;
24:3,15;26:6,10;58:11;
62:18;68:19,25;70:5;
74:2;88:13;91:25;
94:1;110:23;112:13;
113:12,18;114:5,10,
12;118:8;121:15;
124:25;126:22,25;
127:3,5;133:23;134:9;
135:3,8,16,22;136:2,
20,23;141:1;152:22;
153:11;155:3;156:14,
18,24;157:12,20,23;
158:3,10,19
**NERD (5)**
21:25,25;23:6;25:1,
6
**NERDs (7)**
21:8,11;22:4,25;
23:4,9,13
**New (2)**
21:9;48:20
**news (2)**
138:14;150:7
**next (6)**
76:15;83:18;111:6,
11;144:15;146:7
**night (7)**
8:15;132:1;143:25;
144:12,17;154:17;
159:4
**nine (1)**
89:22
**noon (1)**
130:14
**normal (7)**
16:17;47:18;100:18;

127:23,25;128:1,13
**Normally (1)**
154:13
**note (3)**
12:6,11;15:14
**notice (2)**
145:10;148:16
**November (1)**
27:6
**number (19)**
17:11,11;28:9;
37:15;51:18;53:18;
54:16,18;55:2,7;56:22;
68:14;82:6;105:15;
110:24,24;116:4;
144:16;149:4
**numbers (4)**
17:15;68:5,6;117:6

### O

**oath (4)**
9:21;31:21,24;
134:17
**object (8)**
58:8;68:19;74:2;
91:25;112:1,17;
124:25;133:23
**objecting (2)**
114:17;135:22
**Objection (20)**
13:18;21:12;22:10,
13;26:6;62:18;103:2;
113:12;114:5,19,22;
118:8;121:15;135:3,8,
19;136:6;152:22;
159:2,9
**objections (6)**
21:14,23,24;23:20;
30:9;86:15
**obligation (4)**
9:2;17:17;57:22;
121:25
**obligations (24)**
16:24;30:19;52:6,
20;54:24;90:11,16;
103:1,14,16;109:16,
25;111:25;112:11,19,
20,22;113:11;114:4;
115:7;118:2,7;119:4;
122:2
**obviously (1)**
157:15
**occasion (3)**
69:13;72:23;73:5
**occasionally (2)**
16:8;99:14
**occasions (1)**
108:14
**occur (1)**
108:16
**occurred (7)**
41:6;68:21;70:10;

91:13,14;101:2;110:25

**October (4)**
8:2,11;9:15;111:6

**off (6)**
24:8,11;51:4;
106:18,20;153:15

**offense (2)**
156:16;157:22

**offered (3)**
37:8,10;38:4

**Office (11)**
9:18;10:11,13;
28:10;31:21;99:21,23;
126:6;136:15,24;137:7

**officer (1)**
73:15

**official (1)**
39:22

**officials (1)**
159:5

**offset (1)**
25:2

**often (1)**
100:10

**once (1)**
36:12

**one (65)**
20:17;28:13;29:10;
30:4,8;36:17;38:6,16;
39:13;43:18;48:20;
54:4,25;55:3;60:23;
66:13;67:10,12,24;
71:10;85:2;86:19,21;
87:2,8,15;89:13;92:3,
11;93:7;95:7;101:13,
22,23;107:4;108:8,9,
10,17;110:8,24;
114:25;115:5,10,21;
116:17;117:2,19;
118:21;119:20;
121:18;122:15;
124:14;126:12,23;
129:6;131:25;135:1;
137:11;141:1;143:10;
145:1;152:8,9;158:12

**one-on-one (5)**
58:20;81:13;
90:12,24

**one-on-ones (1)**
91:11

**ongoing (2)**
9:6;90:2

**only (18)**
22:7;28:20;47:24;
49:7;62:13;63:19;
81:8;84:13;92:3,6;
120:3,24;128:2;
132:24;142:16;150:14,
15;157:10

**onto (1)**
76:15

**open (4)**
12:16;38:15;52:24;

119:15

**operated (1)**
117:13

**operational (7)**
90:2;91:10;101:20,
23;102:4,13;104:1

**opinion (8)**
73:20,24;74:3,5,8,9;
140:2;147:13

**opinions (4)**
31:15;74:15;119:17;
152:17

**opportunities (1)**
42:16

**opportunity (1)**
129:12

**opposed (2)**
118:17,24

**option (1)**
49:7

**options (3)**
14:20;70:19;119:6

**order (12)**
8:8,18;9:5;10:20,21;
11:10;21:13,17,20,21;
47:8;54:14

**orders (1)**
122:22

**origin (1)**
128:15

**originally (1)**
27:24

**Orr (157)**
11:21,24;14:13;
16:3;18:1,11,22;19:7,
20,21;20:12;22:12;
23:7;26:16,21;31:2;
32:15;33:17;36:2,9,22;
37:11,17,23;39:5,9;
40:7,7,15,19,21;41:7,
10,24;42:3,23;43:11,
20;44:19;45:1,3;46:4,
9;47:7,7,21,25;48:10;
49:3,8,12,17,19,23;
50:3,7,13;51:21;52:14;
53:20;55:10,11,21;
56:10;57:13,24;58:4,
17,21,24;60:1,13;61:8,
9,11;62:8,14,16;64:7,
19;66:2;68:9,21;69:4;
72:1;79:7,9,10;80:1;
81:4,5,10;83:6;89:9,
13,20;90:13,15,25;
91:12,19;92:3,12;97:8,
22;98:10,16,21,25;
99:3,21;100:12;101:6;
102:8,19;103:12;
104:10,14;105:4,20;
109:11,13,19;110:4,7,
17;111:5,15;112:6,10;
113:5,14;115:4,16;
116:1;117:18;118:4;
120:12,24;121:1;

124:5;128:7;129:5;
137:13;139:1;140:6;
150:3,13,17;151:2,17,
24;152:10,20;154:10;
155:18;157:9

**Orr's (22)**
20:7;24:25;32:20;
41:21;44:9,12;57:12;
64:4,16;65:13,21;77:7,
23;89:23;91:4;97:14;
98:5;103:10;114:1;
119:2;131:10;147:17

**otherwise (3)**
136:11;145:6;
154:15

**oust (1)**
129:22

**out (46)**
38:11;52:4;54:6;
64:7;75:10;77:11;
85:23;86:16;100:5;
102:25;103:13,15;
104:6,17,19;105:13,
16;109:16,25;111:9,
24;112:11,18,22;
113:10;114:3,18;
118:1,6;119:3;126:6;
128:7;129:21;134:25;
136:18;137:16;139:8;
141:15;143:7;144:19;
146:5;148:9;149:7,9;
155:24;156:15

**outcome (3)**
33:20;64:9;124:22

**outlined (1)**
42:14

**outside (18)**
21:12,17,19;34:9;
69:11;70:5;82:8;22,22;
89:17;93:15,22;
109:21;110:12;
119:22;121:11,21;
125:5

**outsourcing (4)**
42:3,4,7;43:3

**over (16)**
9:12;20:23;29:3;
41:10;47:4;52:5,19;
71:9;100:15;105:8;
107:25;122:16,21;
125:22;137:7;150:7

**overall (3)**
38:22;54:23;55:2

**overcome (1)**
28:25

**overriding (3)**
85:22;86:15,23

**owed (8)**
103:1,14;109:17;
111:25;112:12;
113:11;115:8;119:4

**own (2)**
40:11;71:21

124:5;128:7;129:5;

**P**

**PA (22)**
18:16;23:14;25:7,9;
26:24;27:2,5,9,15,17,
20;28:25;29:2,5,7,10,
10,13,15,18,23;83:14

**package (1)**
48:6

**page (32)**
52:1;59:10,11;63:9;
76:13,21;77:1,13;83:9;
89:22;102:20

**paid (2)**
15:1;23:3

**papers (3)**
122:21;125:22;
134:24

**Paragraph (10)**
8:10;59:11;75:22,
23;76:20,23;83:10;
87:11;142:8,25

**part (31)**
14:2;15:9,10,19,24,
25;16:17;28:25;31:24;
37:2;39:11;40:21,23;
42:5;43:22;45:5,12,24;
47:24;48:1;50:7;
92:16;95:8,11;105:6;
116:20;140:7;142:4;
148:21;151:8,9

**partaking (1)**
18:9

**partially (1)**
148:18

**participant (1)**
37:7

**participate (2)**
46:16;139:25

**participated (1)**
46:21

**participating (1)**
50:10

**participation (1)**
37:16

**particular (5)**
21:3;52:2;63:10;
76:12;140:12

**particularly (3)**
10:21;31:17;145:17

**parties (15)**
8:12;14:10;63:18;
64:8;67:2;74:23;78:9;
82:7;105:15;116:10;
119:23;133:1,14;
147:23;151:11

**partner (2)**
40:7,22

**partners (2)**
41:1,2

**partnership (1)**
48:22

**party (4)**
35:10;92:13;118:20,
20

**party's (1)**
22:20

**past (1)**
93:20

**pause (1)**
9:13

**pay (1)**
15:22

**paying (1)**
55:5

**payments (1)**
23:6

**PBGC (2)**
12:20;13:14

**pegging (1)**
65:9

**pejorative (1)**
107:17

**pending (4)**
20:18;121:14;
123:19;124:9

**peninsula (1)**
139:11

**pension (102)**
10:22;11:11;12:9,
14,15,19,21;13:1,6;
14:7,12,16;16:24;18:3;
29:11,14,16;30:7,12,
16;31:12;32:9;44:15,
20;45:4,9,25;48:25;
49:9,13;50:24;52:7,21;
53:11,13,17;54:2,12,
22;59:3;63:13;64:5,17,
22;65:14,24;66:11,19;
67:10,17,25;68:10;
69:15,18;70:3,16,21;
72:12;73:7;85:7,12;
86:8;87:3;98:22;
101:8;102:25;103:13,
15;104:23;108:6;
109:16,25;110:2;
111:25;112:11,18,19,
21;113:8,11,24;114:3;
115:7;117:3,5,12,13;
118:1,6;119:3,7,12,13;
124:3,16;132:24;
133:15;134:23;
136:12;141:21;
146:15;151:3

**pensioners (2)**
12:12;120:18

**pensions (18)**
13:13;14:6;17:18;
69:17;71:14,16;72:15;
76:1;86:10;88:20;
111:9;142:11,12,17,
21;143:7;150:20;
151:25

**people (31)**
34:1;38:8;39:11;

50:9;53:15;54:15;
58:16;61:22;62:1,12;
66:24;68:11,11,14,16;
72:2;78:8,12;79:22;
80:16,16;85:5;99:17;
106:5;115:22;116:3;
117:11;121:10;
128:14;132:17;147:23
**per (1)**
96:2
**perceived (1)**
29:1
**percent (3)**
68:2,3,7
**performed (1)**
42:8
**perhaps (3)**
38:3;92:5
**period (11)**
18:18;43:1,9;44:13;
49:16;84:7;89:5;
91:19;92:2;100:15;
131:22
**permission (3)**
37:11;40:15;98:13
**permitted (2)**
83:25;145:16
**person (9)**
36:17,18;38:23;
61:17,20;99:19,20;
101:19;145:6
**personally (10)**
33:22;34:12;36:6,9,
15;38:11;50:4,11;
101:13;124:2
**persons (1)**
63:14
**Peter (2)**
25:23;51:13
**petition (5)**
19:9;89:10;93:3;
131:12;136:17
**phone (15)**
50:12;61:14,16,20;
62:5,7,9;63:6;73:2,4,9;
97:17,19;137:3;143:25
**phrased (2)**
112:5;120:3
**pickup (1)**
102:16
**picture (1)**
57:4
**piece (2)**
12:15;115:25
**pieces (3)**
27:13;70:17;115:9
**pitch (5)**
94:20;95:1,21,24;
96:4
**pitched (1)**
96:2
**pitches (1)**
95:6

**place (18)**
28:7,10,14;29:24;
36:11;83:16;84:1,5,7,
25;91:2;97:15;103:4;
106:9;112:3;120:25;
128:13;145:15
**placed (8)**
87:1,8;145:19,21;
146:12;147:10;159:2,9
**places (2)**
47:22;121:5
**placing (3)**
83:22;84:8,13
**plaintiff (1)**
92:25
**Plaintiffs (5)**
8:6;92:25;107:4,4;
122:11
**plan (67)**
10:21;11:18,22,22,
22,24;12:2,5,8,13,22;
13:16,16,21,25;14:5,
17,23;15:16;18:10;
31:9,10;33:6,12;42:5;
43:19,23;44:3,8;45:10,
13,20,21;47:2;48:13;
60:20;65:3;80:21;
84:22;86:23;87:13;
88:8,19,25;118:16,17;
119:13;126:2;139:1;
140:7;146:5;147:13;
149:3,9,13;150:15,22,
22,23,25;151:1,13,24;
152:3,4;154:19;155:5
**planning (2)**
35:19;42:17
**plans (7)**
12:16;18:3;69:18;
117:13,13;119:7,12
**played (1)**
133:11
**please (5)**
9:22;72:7;127:5;
136:15;141:8
**Plus (2)**
29:3;124:20
**pm (8)**
154:20,24;155:7,18;
157:4,16;158:25;
159:10
**point (26)**
13:22;14:23;18:21;
33:16;44:5;45:22;
47:3;49:2;63:11;
77:11;83:21;86:4,5;
98:12;102:22;111:22;
120:20;124:8;133:5,
24;138:15;140:6,17;
142:15,19;151:23
**pointed (2)**
28:21;54:6
**points (2)**
28:13;140:19

**Police (1)**
48:22
**political (7)**
23:10;30:18;35:4,9,
10,10;107:12
**politics (1)**
143:6
**portion (5)**
12:11,17;43:21;
52:12;59:2
**posed (1)**
117:18
**posing (1)**
71:6
**position (30)**
8:20;22:5;23:18;
36:16;37:1,4,24;38:3,
9,13,15;64:16,20,21;
65:17;66:17;72:4,11,
17;73:6;91:9;101:14;
105:23;110:10;
137:20;138:12,16,22;
150:19;152:20
**positions (2)**
38:7,17
**positive (4)**
34:22,24;35:17;
118:13
**possibility (3)**
104:25;107:21;
116:16
**possible (4)**
103:24;119:11;
149:20;152:13
**post (1)**
159:13
**posttransition (1)**
101:25
**potential (7)**
11:17;47:7;49:4;
98:10,17;118:21;
139:17
**Potentially (8)**
17:19;20:22;42:7;
99:16;102:15;113:21;
116:5,11
**Power (2)**
140:6,17
**practical (1)**
142:16
**practice (1)**
120:6
**practiced (1)**
120:8
**precede (1)**
128:25
**preceding (1)**
129:17
**predecessor (1)**
28:8
**predict (1)**
67:20
**prejudiced (1)**

159:7
**preliminary (4)**
32:23;82:16;123:2,4
**preparation (2)**
108:13;145:5
**prepare (7)**
25:11,25;26:2,13;
108:14,19;132:6
**prepared (7)**
33:19;76:4,8;87:22;
88:1;127:17;132:10
**presence (8)**
69:5,9,12;70:9;
82:22;89:17,17;93:23
**present (34)**
26:12;40:1;46:14;
48:6,8;58:17;61:19;
62:13,22;79:14;94:12;
97:21;99:7,10,12;
101:4;102:7,12;
103:18,23;109:22;
110:22;111:2,14;
112:9;113:6;125:6,9,
15,18,19;137:4;
150:25;152:4
**presentation (7)**
12:2;96:17;98:19;
140:6,17;151:8,9
**presented (12)**
11:25;13:21,25;
14:23;15:16;44:2;
45:14,22;46:11;65:3;
96:5;152:3
**preserve (1)**
111:7
**press (7)**
27:8;48:3;75:15;
104:8;122:16;128:23;
150:6
**pretty (1)**
117:17
**primarily (2)**
44:9;46:2
**primary (2)**
20:16;87:18
**Prior (30)**
16:1,15;28:3;33:18;
41:7,21,25;42:23,23,
25;44:12,18,23;50:13;
53:8;55:4;58:21;
60:17;66:21;73:5;
80:4;83:6,7;101:7;
130:24;131:2;132:19;
137:12;159:2,9
**private (1)**
116:23
**privilege (26)**
12:4;14:19;19:1;
43:16;45:7;46:19;
58:5,7,9;61:6;62:19;
68:20;88:12,15;93:11;
110:9,10,18,20;111:4,
7,16;113:21,23;125:3;

130:4
**privileged (1)**
26:6
**privy (1)**
129:20
**probably (5)**
39:12;67:8;100:13;
109:6;129:6
**problem (2)**
54:20;116:15
**problems (2)**
55:14;71:23
**procedures (1)**
47:19
**proceeded (1)**
132:3
**proceeding (6)**
29:25;51:16;60:14;
83:15;107:6;149:1
**proceedings (2)**
9:13;24:17
**process (97)**
11:1;13:21;14:2;
15:3,11;16:17;25:3;
27:23;31:6,7,9,14,20;
32:11,19,22;33:8,15,
18,21,23;34:2,12,18;
36:1,4;37:2,6,14,16;
39:12,22,23;41:5,6;
42:25;43:5,10;44:12;
45:12,19,25;47:6,24;
48:2,7,8;49:3,13;50:2,
7,8,9;67:5,7;79:3;
82:14,18;84:15,16,17,
17;85:24;86:13;88:23;
95:8,11,17;98:7;
100:19;101:19,23,23;
103:21;105:7,10;
106:4,5;108:2;116:9,
20,25;118:13;119:10;
123:6;132:4,7,8,21;
143:3;145:23;146:5;
147:24;148:6,9;149:7,
10
**processes (2)**
40:9,12
**produce (6)**
22:22,25;145:1;
157:8,14;158:13
**produced (6)**
8:16;141:9;156:19,
20,22;157:11
**product (2)**
26:7;75:11
**production (7)**
8:11,17;9:1,4,8;
156:15;158:14
**professionals (2)**
15:1;22:17
**programs (1)**
48:6
**prohibited (2)**
73:7;85:6

**prohibition (1)**
30:6
**prohibits (3)**
29:13;30:11;72:12
**projections (1)**
55:7
**proposal (25)**
12:11;15:18,25;
43:21;46:3,17,21,23,
24;47:1;57:18;59:13,
15;60:11,14;62:8,17;
63:5,15,16,21,25;64:7;
102:15;128:6
**propose (3)**
139:1;150:15;
151:24
**proposed (7)**
13:16;43:20;49:19;
147:13;150:22,23,23
**prospect (2)**
102:9;103:18
**protecting (1)**
88:20
**protection (3)**
12:25;13:15;29:20
**protective (4)**
21:13,17,20,21
**protects (2)**
76:3,6
**provide (4)**
10:19;40:2;149:18;
156:3
**provided (7)**
8:12;13:6;17:7;
57:21;82:11;86:24;
120:18
**providers (1)**
43:6
**provides (3)**
8:10;12:20;83:14
**providing (4)**
10:14;48:14;135:24,
25
**provision (6)**
14:14;32:2;121:2,
23;139:16;151:15
**Public (14)**
27:25;28:7,11,12,17,
18;29:3,4;60:17;
80:19;116:22;138:12;
140:8;145:16
**publicly (5)**
47:14;78:5;143:7;
150:4;152:5
**purports (1)**
75:23
**purpose (2)**
9:7;27:20
**purposes (1)**
21:14
**pursuant (1)**
9:5
**pursue (1)**

59:8
**pushed (1)**
116:18
**put (18)**
8:7;28:18;31:5;
48:19;63:3,5;80:15;
86:21;88:9;90:21;
130:12;148:13,13;
149:21,22;150:10;
151:14,23
**putting (7)**
18:22;19:7;64:7;
79:4,9;85:20;88:4

**Q**

**qualifications (1)**
34:14
**quickly (3)**
24:18;116:19;
149:19
**quite (3)**
28:8;38:16;62:10
**quote (6)**
52:9;75:22,24;
76:18;77:4;90:20
**quoted (3)**
52:12,17;53:7
**quoting (1)**
109:15

**R**

**Race (1)**
35:6
**raise (1)**
55:8
**raised (1)**
144:16
**ran (1)**
36:4
**Randy (2)**
16:14;107:18
**range (1)**
17:2
**rare (1)**
130:15
**rather (5)**
78:8,12;86:18;
134:21;138:24
**re (1)**
142:6
**reach (1)**
38:11
**read (23)**
52:4,10,14,16;63:10;
64:1;76:17;77:5,15;
78:17;83:13;89:19,21;
102:19;103:10;
109:11;111:4,21;
121:14;141:11,14;
148:19;153:2
**reading (8)**

76:16,25;81:23;
127:16;128:14;
140:10;143:10,11
**reaffirmed (1)**
33:10
**real (2)**
105:12;117:12
**really (7)**
29:16;39:13;44:2;
105:24;106:2;116:18;
142:6
**reason (11)**
38:22;85:21;128:2,
24;129:4;132:23;
143:6;145:14;146:2;
148:23;151:22
**reasons (3)**
145:14;148:23;
152:9
**recall (89)**
16:5,13;18:6;19:11,
14;26:19,21;29:12;
35:24;36:13,19,21;
43:4,21;44:17,24,25;
46:12,15;47:10;49:11,
12,15;50:12;53:19,21,
23;59:1;60:22,25;
61:15,16,19;62:11;
69:23,24;70:17;73:8,
10;91:3,6,16;96:1,8,
21;97:2,16,18,20,24;
98:3,23;103:7;104:24;
108:7,9,10;109:18,21;
110:12;111:11;112:8,
14,15;113:5;118:3;
119:1;124:6;125:12,
20;129:3,4,25;130:1,4;
137:14;138:8,10,11,
19;139:11;140:1,3,22,
25;141:17;142:7;
143:19,25
**recalling (1)**
142:7
**recalls (2)**
109:13;117:19
**receive (2)**
79:1,20
**received (20)**
19:22;20:13;52:13;
55:9,20;56:2,9;57:12,
23;59:16;77:15;79:2;
80:12;81:4,6,21;82:19;
83:22;137:2;159:3
**receiving (3)**
33:10;89:1;141:18
**recent (4)**
41:1;52:8,23;141:21
**recently (1)**
99:16
**recess (4)**
24:12;51:5;106:22;
153:17
**recognize (2)**

147:14;151:25
**recollection (5)**
16:19;105:3,21;
106:16;133:13
**recommend (1)**
39:9
**recommendation (3)**
39:13;54:21;83:15
**recommended (1)**
39:6
**recommending (1)**
131:21
**reconcile (1)**
120:21
**record (34)**
8:7,19;9:15;10:10;
22:3,6;24:8,11,14;
25:19;47:14;51:4,9,19;
59:25;62:23;71:10;
92:5;94:3;96:16;
106:18,20,23;110:7;
114:22;123:25;153:15,
21;156:2;157:4,5,25;
159:3,9
**recounted (1)**
105:23
**redevelopment (2)**
11:22;35:15
**reduced (4)**
49:9;67:11;143:8;
152:1
**reduction (3)**
14:11;72:12;85:6
**reductions (3)**
67:17,25;68:4
**refer (6)**
59:10;76:11,12;
83:9;87:10;100:1
**reference (4)**
59:12;141:21,22;
149:25
**references (1)**
29:16
**referencing (2)**
92:2;144:20
**referendum (3)**
27:6;29:2,7
**referred (1)**
96:3
**referring (6)**
17:6,25;84:19;
89:24;127:14;135:10
**refusing (2)**
62:21,24
**regard (28)**
12:1,9;14:6,13;
15:15;16:4,6,11,20;
17:17;23:24;27:15;
29:2;30:16;31:2;
38:12;39:23;43:3,12;
44:19;45:3;48:13;
49:13,18;50:15;67:3;
121:23;158:15

147:14;151:25
**regarding (3)**
112:19;140:5
**regular (3)**
99:4;103:6;107:24
**reimbursed (2)**
23:3;25:1
**Reinvest (1)**
21:9
**reiterating (1)**
144:3
**relate (3)**
23:21;62:15;119:2;
142:4;159:4
**related (6)**
21:24;92:18;118:4;
119:3;145:17;148:12
**relating (2)**
113:8;146:13
**relationship (6)**
40:5,18;54:15;59:5;
123:9;138:3
**relationships (1)**
49:22
**relative (4)**
114:9;115:7;119:17;
147:19
**relevant (3)**
38:25;56:17;59:7
**relied (1)**
78:22
**relief (8)**
91:23;92:24;93:9;
94:10;122:23;130:23;
132:15;146:25
**rely (1)**
34:9
**remain (1)**
143:3
**remember (12)**
78:7;80:7,10;91:15;
97:3;100:21,23;114:8,
9;115:14,17;117:9
**removing (1)**
48:18
**repayment (1)**
11:6
**repeat (3)**
56:8;94:23;138:18
**rephrase (3)**
113:2;120:22;153:3
**report (6)**
17:9,24;18:1,6;
33:11;117:10
**reporter (5)**
9:21;51:18;60:9;
75:14;121:14
**reports (11)**
17:19,25;53:8;55:4;
57:21;82:12;83:6,7;
117:7;119:8;128:23
**represent (7)**
51:15;60:12;90:21;
107:3;116:3,6;131:10

**representation (6)**
77:7,23,25;116:8,19;
117:1
**representative (1)**
66:15
**represented (2)**
147:24;150:17
**representing (5)**
41:14;75:12;78:7;
115:10;116:1
**represents (1)**
150:18
**Republican (1)**
107:12
**request (17)**
18:23;19:8,10,12,17,
20,22,23,24;20:13,15;
102:15;133:16;135:1;
156:2;157:7;158:14
**requested (1)**
144:24
**requesting (1)**
20:2
**requests (5)**
21:6,6;93:8;94:9;
132:14
**require (1)**
151:10
**required (3)**
31:7;34:21;139:1
**requirement (7)**
40:21;84:21;87:13;
88:8,18;149:2,3
**requiring (1)**
145:4
**reservation (1)**
159:2
**reserved (3)**
101:12;102:6;104:3
**residency (2)**
35:1,2
**resigned (2)**
40:22;41:22
**resolution (6)**
118:15,24;119:24;
123:8,15;149:12
**resolve (3)**
66:22;106:11;
118:17
**resolved (7)**
31:19;32:10;121:20,
20;122:9;123:6,12
**resolving (1)**
148:7
**resort (5)**
49:6;66:24;105:12;
118:23;133:5
**resource (1)**
106:6
**resources (1)**
48:19
**respect (16)**
10:24;12:15,17;

18:2;20:20,20;24:19,
24;27:12;43:4;45:20;
47:16;74:22;75:10;
90:19;150:24
**respond (8)**
24:17;71:18;79:24;
80:18,19;81:24;137:8;
143:3
**responded (1)**
20:16
**response (13)**
22:16,21,23;23:1,5,
8,12,16;60:2;71:7;
89:2;157:6;158:13
**responses (1)**
9:3
**responsibility (2)**
108:5;147:25
**responsible (2)**
73:18;106:2
**responsive (4)**
11:7;27:22;64:11;
65:19
**rest (2)**
52:10;77:5
**restructuring (20)**
11:22;20:8,12;
34:23;35:16;37:21;
38:24;39:15,18;43:19,
23;45:5,10;47:9,13;
48:13;90:2,7;94:21;
95:2
**result (6)**
14:16;45:10;65:4,
23;114:2;134:1
**resulted (4)**
32:19,24;33:17;36:1
**results (1)**
125:10
**retain (3)**
39:14,18;40:10
**retained (3)**
22:17;40:2;41:20
**retention (1)**
39:23
**retired (2)**
13:11;63:14
**retiree (2)**
50:18;66:14
**retirees (21)**
13:4,10;14:15;15:2,
14,23;66:13;70:2;
88:21;115:11,22,24;
116:1,3,6,7,12,20;
117:22;121:8;151:6
**Retirement (5)**
92:4;135:11,18;
157:7;159:1
**reveal (1)**
159:7
**review (22)**
17:9;19:24;26:2,5;
31:10;32:23,24;33:3,4,

8,10,20;46:3;53:8;
82:11;83:7,7;105:9;
108:1;117:6;131:22;
140:18
**reviewed (8)**
8:22;20:15;61:2;
119:16;143:17;146:3,
3;149:16
**reviewing (1)**
82:10
**reviews (2)**
82:16,17
**revoke (1)**
76:8
**Rhodes (4)**
8:8;45:16;150:12;
152:11
**Rich (3)**
34:1;36:5;50:10
**Richard (5)**
9:18,24;95:11,14,19
**Richardville (3)**
16:15;107:10,19
**Right (10)**
14:5;62:23;100:25;
127:16;128:13;
132:22;143:12;
152:21;155:10;157:3
**rights (3)**
120:18;159:2,6
**risk (2)**
90:9,15
**road (1)**
139:8
**role (2)**
127:24;133:11
**rollout (6)**
128:3;129:7;130:13;
154:18,22;155:5
**Romney (1)**
9:18
**route (1)**
118:7
**run (2)**
22:2;114:25

**S**

**sale (1)**
43:17
**same (14)**
16:16;22:5,10,13;
33:11;43:9;69:2,10;
75:7;114:5;122:19,21;
146:10;147:4
**Sandler (1)**
10:7
**satisfactory (1)**
67:1
**saw (1)**
46:22
**saying (20)**
44:24;47:14;53:18;

54:16;70:19,21;75:24;
86:22;113:20;115:12,
15,16,17;133:19;
142:12;143:13;144:3;
151:12,14;157:23
**schedule (3)**
100:18;129:7,12
**scheduled (3)**
122:24;134:24;
139:6
**Schneider (2)**
25:22;158:17
**school (2)**
37:20;120:1
**Schuette (8)**
72:4,5,6,7;137:19;
138:5,11;148:10
**Schuette's (1)**
147:12
**scope (4)**
20:24;21:12,17,22
**se (1)**
96:2
**search (1)**
157:17
**seat (1)**
116:24
**second (13)**
9:12;52:1;63:11;
76:14;77:1;106:19;
115:25;142:7,24,25;
143:19;144:4;158:7
**secondhand (1)**
129:2
**Section (25)**
30:10;76:1;88:4;
120:15,21;121:7;
123:10;124:15,23;
138:6,16,23;139:2;
145:16,18;146:13;
147:14,20;148:13;
149:4;151:18;152:1,6,
12;153:6
**seeing (2)**
25:14,17
**seek (2)**
47:11;87:3
**seeking (5)**
79:16;85:11;86:8;
130:23;134:2
**selected (3)**
44:19;50:13;129:4
**selection (10)**
32:14,20;33:17,22;
34:15;36:1,1;44:13;
49:19;50:16
**selling (1)**
43:12
**Senate (1)**
107:19
**send (2)**
19:20;80:1
**sending (1)**

79:16
**sense (2)**
74:8;118:16
**sent (5)**
137:7;140:17;
144:15;155:17;156:15
**sentence (18)**
52:4,9,11;54:6,7;
76:16,17;77:5;83:13,
17,18;84:18,19,20;
85:13;87:10;143:1,1
**sentiment (1)**
27:9
**separate (4)**
40:9,16;41:5;73:23
**separately (2)**
62:13;98:14
**September (4)**
89:21;102:20,21;
111:5
**series (2)**
22:4;96:4
**serious (1)**
139:14
**seriously (1)**
148:1
**services (10)**
11:5;40:2;42:8,11;
43:6,7;47:20;48:15;
102:18;149:18
**set (5)**
82:2;117:23;122:1;
131:21,23
**several (5)**
28:3;34:1;38:14;
48:4;61:22
**severed (2)**
40:22;41:23
**sewer (3)**
43:13,24;59:4
**shall (1)**
150:1
**shape (1)**
118:4
**share (4)**
15:13;65:13,21;66:4
**shared (2)**
71:25;115:23
**sharing (1)**
73:16
**Sharon (1)**
10:6
**sheer (1)**
20:21
**short (3)**
66:23;106:11;
152:16
**shortly (3)**
122:5,12;125:21
**short-term (1)**
123:22
**show (9)**
51:17;55:7;96:3,6,9;

122:23;126:13;127:5;
153:24
**showed (5)**
55:4;60:24;78:8,11;
132:17
**shown (1)**
60:20
**Shumaker (1)**
103:2
**side (2)**
25:14;155:16
**sign (6)**
83:3;134:18;137:10;
154:20,23;155:7
**signed (19)**
32:8;63:23;64:3,14;
82:20;86:5,6;87:16;
122:22;130:24;134:3,
14,15,17,19;137:12;
154:10,25;155:12
**significant (12)**
46:12;48:19;59:2;
63:12;64:5,17,22;
65:14,23;68:6;82:5;
130:16
**significantly (4)**
17:20,21;142:13,21
**similar (5)**
12:25;25:3;53:9;
128:5,7
**Simon (1)**
51:15
**simple (1)**
112:17
**simply (3)**
47:2;65:2;85:1
**sit (4)**
17:10,16;30:3;45:8
**situation (10)**
11:17;38:25;39:3;
57:7;82:13;86:11;
116:1;131:23,25;
133:25;145:24
**situations (2)**
16:18;65:16
**six (1)**
59:10
**sixth (1)**
75:22
**skills (1)**
37:22
**slate (1)**
36:14
**sleep (1)**
132:1
**slide (2)**
140:12,12
**slides (1)**
96:5
**Snyder (3)**
9:18;57:2;89:25
**SNYDER- (1)**
9:24

**so-called (3)**
11:10;20:1;50:20
**solicit (1)**
50:15
**solid (1)**
102:16
**solve (2)**
71:23;121:22
**somebody (3)**
50:5;114:1;117:23
**someone (4)**
39:7;106:14;123:18;
155:16
**sometime (4)**
19:6,13,15;32:21
**sometimes (1)**
104:4
**somewhere (1)**
137:16
**sophistication (1)**
114:1
**sorry (16)**
28:6;53:1;69:7;
74:12;80:22;94:13;
100:3;108:15;114:14;
120:10;125:18;127:1;
143:24;146:9;149:23;
154:22
**sort (6)**
37:15;100:18;
112:17;144:3,5,16
**sought (3)**
21:3;91:24;92:24
**sounds (2)**
26:19;137:25
**source (1)**
17:4
**South (1)**
9:19
**speak (28)**
37:6;38:5;50:1,18,
20,24;61:12;64:19;
72:22;73:4;82:21;
89:9;92:15;95:3,23;
96:22;97:7;98:13,24;
101:7,11;102:8;
104:22,25;106:7,7;
127:19,21
**Speaker (4)**
16:2,8,16;107:18
**speaking (6)**
16:8;62:8;93:20;
97:3;98:1;143:2
**specific (11)**
19:14;26:19;73:10;
74:4;80:24;95:3;
103:8;111:9;119:1;
134:22;137:11
**specifically (14)**
17:25;18:12;21:25;
23:20;27:14;36:13;
40:14;48:1;50:1;
86:18;100:23;125:7;

133:13;157:11
**specificity (3)**
35:23;57:15;58:1
**speculate (4)**
17:23;122:8;133:17;
143:11
**speculation (8)**
13:19;15:9;113:13;
135:23;136:7;152:14,
18,23
**speculative (5)**
21:5;38:1;45:23;
136:4;150:24
**Sperling (1)**
48:5
**spirit (1)**
24:16
**spoke (4)**
50:12;62:16;71:9;
97:10
**spoken (3)**
50:6;79:12;98:16
**staff (12)**
34:1,7;55:11,22;
57:14,25;68:15;80:16;
99:7,18,21;101:15
**stage (1)**
143:4
**stages (2)**
143:14;144:7
**stamp (1)**
96:18
**stand (1)**
149:23
**stands (1)**
88:15
**start (3)**
9:12;76:25;115:20
**started (5)**
32:23;33:4,18;
132:5;139:5
**starting (2)**
31:15;76:14
**State (58)**
8:9,10,16,25;10:11,
13,18,24;20:1;29:15;
30:18;31:13;32:12;
39:21;40:3;48:12,24;
73:15,21,22;74:4,20;
75:4,4;82:6;100:5,8;
107:5;108:5;110:18;
120:16;121:1;122:7,9;
123:7,10,12,20;124:2,
15,24;125:11;126:9;
132:15,17;134:13;
139:16;144:25,25;
145:2;147:7,25;148:1;
149:19;150:5;152:19;
158:13;159:5
**stated (3)**
30:21;31:5;117:6
**statement (10)**
23:21;30:25;53:2,6,

12;85:23;87:18;146:4;
148:24;150:21
**statements (6)**
13:8;17:3,5,6,7;
88:22
**States (3)**
32:1,5;38:8
**State's (3)**
8:21;9:2;23:17
**stating (2)**
150:4;152:5
**status (2)**
20:18;90:2
**statutes (1)**
85:16
**step (1)**
33:15
**stepping (1)**
133:8
**still (5)**
17:11;23:17;55:25;
67:4;150:22
**stood (1)**
16:18
**stop (3)**
77:4;82:14;158:9
**straight (1)**
156:9
**Street (2)**
15:12;50:21
**Street-type (1)**
15:22
**stress (1)**
91:10
**strike (4)**
63:1;64:19;92:22;
96:22
**striking (1)**
29:8
**strong (2)**
37:17,18
**struck (1)**
27:5
**structured (1)**
82:18
**structures (1)**
48:18
**structuring (1)**
44:8
**subdivision (1)**
30:18
**subject (20)**
12:3;14:18;15:5;
18:25;43:15;45:6;
46:18;61:5;62:14;
71:13;89:14;93:10,15;
97:4,14;105:4,18;
109:18;118:5;150:16
**subjective (1)**
75:6
**submit (1)**
74:23
**subsequent (3)**

33:3;81:15;111:6
**substantive (1)**
71:20
**successful (1)**
39:4
**sued (1)**
92:13
**sufficient (2)**
33:6,12
**suggest (1)**
158:2
**suggested (1)**
88:3
**suggesting (5)**
71:4,7;75:8;110:15;
156:21
**suit (3)**
122:11,19,22
**suits (7)**
123:19,24;124:1,8,
14,18;125:11,16,22;
140:23;141:21,23
**supplement (2)**
9:3,6
**support (11)**
10:15,18,19;11:3,4,
9,9;13:4,17;101:19;
156:5
**supportive (3)**
11:5;50:3;106:6
**suppose (1)**
152:8
**sure (32)**
20:14;29:15;36:19;
48:17;56:9;62:3,7;
64:11;65:19;71:10,24;
73:12;75:1;77:11;
79:4;80:22;88:11;
90:18;92:1,13;95:7,13;
105:6,11;109:3;
113:19;115:20;127:7;
147:3,8;149:15;153:14
**surprised (1)**
138:13
**survey (1)**
55:16
**switch (1)**
51:3
**SWOP (1)**
22:20
**sworn (1)**
9:25
**system (5)**
28:15,18;92:4;
135:11,18
**Systems (2)**
157:7;159:1

**T**

**table (5)**
25:15;44:7;65:18;
66:25;116:24

**takeover (1)**
27:10
**talk (8)**
37:11;47:1;50:2;
62:3;81:8,10;91:8;
109:15;139:7,11,12;
142:1;158:7
**talked (1)**
133:10
**talking (12)**
32:5;44:14;70:8;
90:18;95:9;109:1;
116:11;117:21;120:11,
24;141:23;144:21
**talks (2)**
30:17;54:7
**tampering (1)**
30:11
**taught (1)**
24:7
**team (8)**
17:9;32:24;33:4;
53:8;82:11;83:7;
108:1;117:6
**teams (2)**
83:8;105:9
**technical (1)**
124:4
**technically (1)**
146:20
**TECHNICIAN (13)**
9:11,14;24:8,11,13;
51:3,9;106:20,23;
153:15,21;156:25;
158:24
**Tedder (6)**
99:16,20;100:3,3,7;
140:5
**T-E-D-D-E-R (1)**
100:3
**telephone (1)**
72:25
**telling (1)**
147:11
**tells (1)**
142:20
**tend (1)**
102:4
**Tenor (1)**
100:1
**term (1)**
79:21
**terminated (1)**
12:22
**terms (54)**
10:23;16:8;29:16;
31:4;35:16;37:18,19;
38:21,23;39:2;42:13,
15;46:19;48:18;49:5,
22;50:6;53:15;55:2;
57:7;67:3;69:10,17;
70:17;74:22;79:3;
80:18;84:16;86:15;

88:13;89:7;91:9;
101:14;102:17;
103:15;104:12;106:1,
4;108:22;115:20;
116:13;117:2,3,5;
119:5,7,11,25;121:18;
129:8;130:15;131:21;
136:9;149:11
**territory (1)**
94:15
**testified (7)**
10:1;70:9;80:1,25;
90:13;91:13;110:7
**testify (2)**
113:13;136:11
**testifying (1)**
158:8
**testimony (16)**
20:25;45:17;68:24;
85:19;86:3;89:23;
91:4,12,14;102:19;
103:11;135:20,25;
154:6;155:10;159:8
**thanked (2)**
71:19;73:13
**Thanks (1)**
141:15
**thereafter (1)**
122:6
**thinking (1)**
82:21
**third (4)**
52:3;63:11;101:24;
143:1
**though (2)**
55:3;148:21
**thought (24)**
28:11;31:16;32:6;
38:18;39:1;47:17;
66:10,12,16;71:14;
85:1,18,23;87:20;
98:16;113:14;115:23;
121:19;132:3,7;148:6;
149:6,7;150:8
**thoughtful (3)**
20:15,17;149:16
**thoughts (2)**
69:14;70:11
**thousand (1)**
156:17
**thousands (1)**
121:10
**three (19)**
18:13;22:7;24:2;
82:18;101:22;107:25;
108:15,15,16,21;
109:6,6;115:9;117:7;
130:21;136:14;
137:24;140:18;144:21
**three-and-a-half (1)**
17:1
**throughout (1)**
32:25

**thrown (1)**
129:21
**ties (7)**
34:24;35:10;37:19;
40:22;41:23;115:25;
117:25
**timeline (1)**
80:20
**timer (1)**
24:7
**timetable (3)**
126:4,6,11
**timing (3)**
89:9;122:8;136:9
**title (1)**
60:10
**today (10)**
10:9,16,20;17:10,16;
30:3;45:8,17;75:12;
83:20
**Today's (5)**
9:11,14;25:11,25;
26:2
**together (5)**
18:23;19:7;79:5,9;
130:12
**told (6)**
53:22;79:6,9;80:1;
133:21;138:12
**took (4)**
10:13;21:1;28:10;
126:24
**top (4)**
76:13,23;77:1;83:10
**topic (4)**
103:25;104:4,10,10
**topics (4)**
21:8;101:12;102:13,
16
**total (3)**
108:19;109:8,9
**totality (2)**
82:12;86:11
**touched (1)**
151:4
**towards (4)**
12:12;48:19;55:5;
142:25
**track (6)**
102:4,5,11,13;104:2;
117:2
**tracks (2)**
101:22;102:2
**traditionally (1)**
101:21
**trained (1)**
123:18
**transcript (3)**
25:16;89:19,22
**transmission (6)**
137:13,14;154:7,9;
155:20,25
**transmittal (3)**

154:1;158:12,15
**transmitted (3)**
155:13;157:8,15
**travel (1)**
25:4
**traveling (1)**
139:10
**Treasurer (9)**
51:21;92:7;124:2;
125:9;140:23;141:9;
142:1,20;143:21
**treated (1)**
30:18
**treatment (1)**
29:11
**treats (1)**
121:24
**trial (1)**
123:6
**tried (1)**
77:12
**TRO (5)**
134:2;135:12,17;
136:25;137:4
**troublesome (1)**
86:20
**true (10)**
37:23;52:19;53:2,7;
57:4;58:20;77:6,25;
86:5;129:2
**trump (6)**
121:1,6,16;138:24;
150:4,5
**trumps (2)**
152:5,11
**truth (1)**
78:15
**Try (8)**
39:17;42:21;64:11;
71:10;104:1;106:10;
107:24;123:11
**trying (14)**
70:11,18;71:2,5,23;
84:10;107:17;114:17;
121:10,12;126:14;
133:13;141:15;153:1
**turn (3)**
39:3;52:1;63:9
**turnarounds (1)**
38:24
**two (29)**
12:6;15:14;28:13;
36:19,20;73:3;89:1,7;
98:4,5;99:17;100:14,
17,17;101:2,12;105:8;
107:25;108:15;
110:24;115:9;123:24;
124:1,19,20;132:20;
137:23;140:8;141:12
**typed (1)**
131:11
**types (1)**
119:18

**Typically (3)**
62:10;90:4;103:7

## U

**ultimately (5)**
32:10;65:5;116:15;
143:16;150:12
**unable (2)**
90:10,16
**uncertain (1)**
38:3
**under (18)**
8:8;9:2;13:15;14:5;
27:25;29:21,25;31:13;
43:18;57:22;67:6;
74:4;83:25;86:24;
90:11,16;134:17;
150:14
**underfunded (7)**
16:25;17:20;54:2,
12,14,22;69:25
**underfunding (8)**
11:11;14:6;17:4,17;
48:25;52:7,21;53:13
**understood (5)**
80:22;105:6;113:14
**undertake (4)**
53:4;77:20;82:25,25
**undertaken (6)**
53:6;55:12,22;
57:14;77:21;78:3
**unfunded (4)**
12:17;59:3;67:17;
146:23
**Unintentional (1)**
120:10
**Union (1)**
51:16
**unions (2)**
50:14;116:5
**unique (3)**
130:18,20;133:25
**United (4)**
32:1,4;38:7;51:15
**Unless (2)**
23:19;114:20
**unrelated (1)**
23:18
**unsecured (3)**
12:6;15:15;151:6
**unusual (1)**
130:11
**up (32)**
8:16;17:14;20:22;
33:5;43:10;63:2;
66:25;71:24;79:20;
86:22;98:11;101:1;
103:8,25;104:4,10,12;
108:20;109:18;
117:23;126:11;
128:12;132:16,17;
133:9;135:5,5,6;

136:16;142:9;143:15;
156:24
**updated (1)**
81:7
**updates (4)**
16:9,17,20;107:24
**upgrades (1)**
25:4
**uphold (2)**
31:24,25
**upon (2)**
34:15;81:23
**upper (3)**
127:16;128:12;
139:10
**USC (3)**
87:14,17;149:4
**use (10)**
24:1,6;35:21;48:24;
65:25;74:8,17;79:21;
121:16;140:7
**used (7)**
20:17;28:8;66:2;
127:23;150:6;152:25,
25
**using (1)**
30:22,25;152:24,25
**utilized (1)**
28:3

**V**

**V71713 (1)**
127:17
**valuation (4)**
55:16;56:16;69:17;
117:12
**value (1)**
55:19
**values (1)**
56:24
**various (4)**
94:20,25;145:2;
147:23
**version (2)**
118:21;126:12
**versus (5)**
85:15,16;86:22;
116:6;119:13
**vested (16)**
12:9,13;13:1;29:11,
14;30:12,16;31:12;
44:15,20;45:3,9,25;
49:8,13;63:13
**vetted (1)**
143:18
**VIDEO (14)**
9:11,14,17;24:8,11,
13;51:3,9;106:20,23;
153:15,21;156:25;
158:24
**videotape (2)**
25:17,18

**view (41)**
11:14;15:4,9;21:5;
34:24;43:22;44:6,9,14;
45:8,12,18,24;46:2,10,
13;56:16;64:4;65:13,
21;66:4,14,21;67:9;
70:3,15;71:21;74:17,
19;75:3,6,9;88:22,23;
93:3;119:2,15;143:1;
148:11;152:14;153:6
**viewed (12)**
34:21;35:12;38:16,
22;40:16;67:5;84:13;
85:22;86:20;105:25;
118:13;147:21
**viewing (1)**
118:22
**views (8)**
16:11;44:19;45:3;
66:19;69:22;96:24;
98:21,25
**vis-a-vis (1)**
118:6
**voice (1)**
116:25
**volume (1)**
21:1
**voter (2)**
27:6;29:2
**voters (2)**
27:22;29:8

**W**

**wait (3)**
89:4,6;132:8
**waiting (1)**
119:8
**waived (1)**
110:11
**waives (1)**
111:3
**Wall (3)**
15:12,22;50:21
**warning (2)**
28:15,18
**Washington (1)**
101:16
**waste (1)**
102:16
**water (3)**
43:13,24;59:4
**wavelength (1)**
146:10
**way (22)**
67:10,24;79:21;
84:13;86:9;101:20;
105:8,13;108:9,10;
113:9;116:4;117:19;
118:4;120:3,21;
124:14;138:13;141:7;
142:16;143:2;151:19
**ways (6)**

42:10;70:1,18;
121:6;137:11;143:4
**Webster (3)**
20:2;92:6;122:18
**week (4)**
80:4,5;129:18;
132:20
**weekly (1)**
103:7
**weeks (7)**
100:14,17,18;101:2;
108:17;124:20;132:20
**weight (5)**
73:22;74:21,24;
75:5,9
**Weiss (1)**
51:14
**weren't (1)**
151:5
**Wertheimer (49)**
8:5,5;9:9;94:16;
107:1,3;111:13,20;
112:23;113:16,22;
114:7;115:18;10;
122:3;125:4;126:20,
23;127:1,4,7,8;134:8,
10,11;135:4,15,21,24;
136:3,10,21;137:9;
141:2,6;152:24;153:4,
12,23;155:4;156:16,
21;157:2,19,22,24;
158:18,20,22
**what's (20)**
12:8;13:3,15;14:20;
17:16;30:15;43:22;
44:2,22;60:2;63:24;
96:3;128:19;130:13,
14;139:15;142:7;
144:3,24;153:24
**Whitehouse (1)**
48:5
**whole (2)**
105:10;108:2
**who's (2)**
78:7;115:12
**whose (2)**
87:21;88:6
**William (1)**
8:5
**willing (6)**
10:18;22:22,25;
77:3,8;116:5
**wish (1)**
112:16
**withdrew (1)**
37:15
**within (6)**
22:24;44:3;89:1;
103:9;137:23;154:18
**without (10)**
30:5;33:6,12;84:11;
93:12;113:6;125:9,18,
19;145:3

**witness (21)**
9:25;11:14;13:20;
24:19;26:8;51:2;
58:12;69:1;74:10,14;
94:4;112:16;113:19;
114:6,11,13;121:18;
145:1,4;158:21,23
**witnesses (1)**
145:1
**woke (1)**
8:15
**wondering (1)**
154:8
**word (7)**
65:25;66:2;74:17;
104:12;121:16;150:6;
152:24
**wording (1)**
120:10
**words (11)**
79:12;105:17,20,21;
106:12;115:14;121:1;
129:24;138:14,23;
142:19
**work (19)**
15:5;17:13;24:23;
26:7;52:25;55:25;
57:16,17;65:5;75:11;
79:3,18;87:19;105:13,
16;117:8;130:15;
143:16;144:6
**worked (1)**
115:22
**Workers (1)**
51:15
**working (7)**
17:12;33:3;49:22;
99:21;106:5,5;138:2
**worth (1)**
114:19
**write (2)**
72:8;141:25
**writing (3)**
63:3,5;79:12
**written (3)**
53:11;63:7;126:11
**wrong (2)**
91:12;111:19

**Y**

**year (3)**
11:25;33:1;123:14
**years (6)**
28:8;82:18;105:8;
107:25;115:23;118:25
**yesterday (2)**
9:8;108:17

**Z**

**zoning (2)**
35:21;42:18

**0**

**00128731 (1)**
96:19

**1**

**1 (6)**
10:12;51:7,19;
59:11;60:3;76:11
**1:30 (1)**
130:15
**10 (2)**
153:19,25
**10:15 (1)**
8:15
**10:47 (1)**
106:21
**10:58 (1)**
106:24
**100 (1)**
68:3
**109 (1)**
63:9
**11 (9)**
12:18;76:13,21;
77:1;87:14,17;130:13;
149:4;159:13
**11:55 (1)**
153:16
**11:59 (1)**
153:22
**111 (1)**
9:19
**12:04 (1)**
158:25
**12:05 (1)**
159:10
**128-page (1)**
59:17
**13 (3)**
102:21;117:15;
154:18
**14 (3)**
11:20;46:3,4
**14th (6)**
59:12;60:11,18;
62:17;63:4;128:6
**15 (1)**
86:22
**16 (3)**
19:17,25;80:5
**16th (24)**
51:20;52:13;53:11;
55:10,21;56:3,9;57:12,
23;59:16;76:12;77:16;
78:17;79:1;81:21;
82:19;83:2,22;89:2,21;
102:20,21;111:5;
131:20
**17th (4)**
90:23;126:11;

129:17;135:11
**18 (7)**
    16:22;18:18,22;
    19:6,15;148:24;154:2
**181 (1)**
    145:16
**18th (37)**
    19:16;42:2;43:3,10;
    45:2;59:25;63:24;
    64:3,15,21;65:7,11,13,
    21;66:9,20;67:9;82:3,
    20;83:3,9;85:4,8;86:6;
    87:16,23;101:7;130:7,
    22;131:6,15;133:14;
    134:14;135:7;137:10;
    154:24;155:8
**1988 (1)**
    27:24
**1990 (1)**
    27:24
**19th (13)**
    43:10;126:3,5;
    128:21,24;129:4,22;
    131:5,12,15;135:6;
    137:22;155:6

## 2

**2 (4)**
    59:20,24;60:2;63:24
**20,000 (1)**
    116:12
**2002 (1)**
    83:14
**2011 (4)**
    10:12;32:21,23;
    82:16
**2012 (7)**
    27:3,6;32:24,25;
    33:4;40:1;145:16
**2013 (35)**
    8:2;9:15;11:20,20;
    14:1;18:13;26:18,22,
    25;43:20;51:20;56:3,
    9;57:13,24;59:25;
    60:11,18;62:17;63:4;
    64:4;65:21;66:9,20;
    75:16;79:2;89:21;
    90:23;91:20;94:19,24;
    96:18;101:7;104:15;
    148:24
**2017 (1)**
    55:7
**210 (1)**
    89:22
**22 (1)**
    140:13
**22nd (4)**
    122:24;125:24;
    128:25;129:23
**24 (22)**
    30:10;76:1;120:15,
    21;121:7;123:10;

124:15,23;138:6,16,
    23;139:2;145:18;
    146:13;147:14,20;
    148:13;151:18;152:1,
    6,12;153:6
**25th (1)**
    103:6
**28 (2)**
    11:20;26:17
**29 (1)**
    96:18
**29th (3)**
    75:15;94:19,24

## 3

**3 (8)**
    18:13,18,21;19:6,15;
    60:6,10;63:10
**3.5 (4)**
    52:6,20;53:14;
    146:22
**3:00 (2)**
    137:1,6
**3:05 (1)**
    137:2
**30b6 (3)**
    144:24;145:4;
    148:16
**3rd (4)**
    90:22;122:5,11,19

## 4

**4 (12)**
    23:14;25:7,9;27:5;
    28:17;29:2,4,5,10;
    75:14,18,21
**4:06 (1)**
    157:16
**436 (18)**
    18:16;26:24;27:2,9,
    15,17,21;28:25;29:7,
    10,13,16,18,23;83:14;
    90:11,17;145:17
**45-day (1)**
    140:7
**4th (1)**
    111:6

## 5

**5 (5)**
    8:11;96:10,12,16,20

## 6

**6 (4)**
    126:18,21,22;127:3

## 7

**7 (4)**

8:10;126:18,25;
    140:4
**7:47 (4)**
    154:17;155:18;
    157:4;158:2
**717 (1)**
    128:12
**72 (6)**
    27:25;28:7,11,12,18;
    29:4

## 8

**8 (8)**
    141:4,8,8,17;142:19;
    154:20,24;155:7
**8:38 (1)**
    8:3
**8:42 (1)**
    9:16
**8:58 (1)**
    24:11
**84 (1)**
    102:20
**8th (2)**
    141:2;143:25

## 9

**9 (67)**
    8:2;12:24;13:21;
    15:2,5,10;16:12,15,23;
    18:8;19:9,10,12;20:4;
    24:14;29:21;30:1,4,10;
    31:3,14;32:5,10;45:15;
    49:4,6,10;76:1;83:15;
    102:24;103:12;109:14,
    20;111:24;112:7;
    113:7;115:7;117:20;
    118:1,5;120:13,15,21;
    121:7;123:9;124:14,
    23;138:5,16,22;139:2;
    141:4;142:18,22,24;
    145:18;146:13;147:14,
    20;148:12,25;150:15;
    151:18;152:1,6,12;
    153:6
**9:31 (1)**
    51:4
**9:40 (1)**
    51:10
**943b4 (3)**
    87:14,17;88:4
**9th (1)**
    9:15

# EXHIBIT  B

Page 1

1        IN THE UNITED STATES BANKRUPTCY COURT
2            EASTERN DISTRICT OF MICHIGAN
3               SOUTHERN DIVISION
4
5   In re                    Chapter 9
6   CITY OF DETROIT, MICHIGAN,    Case No. 13-53846
7        Debtor.         Hon. Steven W. Rhodes
8   _____/
9            VIDEOTAPED DEPOSITION
10
11  DEPONENT:  KEVYN ORR
12  DATE:    Monday, September 16, 2013
13  TIME:    10:08 a.m.
14  LOCATION:  MILLER CANFIELD PADDOCK & STONE PLC
15          150 West Jefferson, Suite 2500
16          Detroit, Michigan
17  REPORTER:  Jeanette M. Fallon, CRR/RMR/CSR-3267
18
19
20
21
22
23
24
25

Page 2

1   APPEARANCES:
2
3   JONES DAY
4   By:  Gregory M. Shumaker
5        Dan T. Moss
6   51 Louisiana Avenue, NW
7   Washington, D.C. 20001.2113
8   202.879.3939
9        Appearing on behalf of the Debtor
10
11  DENTONS
12  By:  Anthony B. Ullman
13  620 Fifth Avenue
14  New York, NY 10020.2457
15  212.632.8342
16        Appearing on behalf of Retirees Committee
17
18  COHEN WEISS AND SIMON LLP
19  By:  Peter D. DeChiara
20  330 West 42nd Street
21  New York, NY 10036.6979
22  212.356.0216
23        Appearing on behalf of UAW
24
25

Page 3

1   APPEARANCES (continued):
2
3   LOWENSTEIN SANDLER LLP
4   By:  Sharon L. Levine
5   65 Livingston Avenue
6   Roseland, NJ 07068
7   973.597.2374
8   -and-
9   AFSCME
10  By:  Michael L. Artz
11       Tiffany Ricci
12  1101 17th Street, NW
13  Suite 900
14  Washington, D.C. 20036
15  202.775.5900
16        Appearing on behalf of AFSCME
17
18  CLARK HILL PLC
19  By:  Jennifer K. Green
20  500 Woodward Avenue, Suite 3500
21  Detroit, MI 48226
22  313.965.8274
23        Appearing on behalf of Retirement Systems
24
25

Page 4

1   APPEARANCES (continued):
2
3   WILLIAMS WILLIAMS RATTNER & PLUNKETT PC
4   By:  Ernest J. Essad, Jr.
5   380 N Old Woodward Ave Ste 300
6   Birmingham, MI 48009
7   248.642.0333
8        Appearing on behalf of FGIC
9
10  SIDLEY AUSTIN LLP
11  By:  Guy S. Neal (appearing via LiveNote Streaming)
12  1501 K St., NW
13  Washington, D.C.
14  202.736.8000
15        Appearing on behalf of National Public Finance
16        Guarantee Corp.
17
18  WINSTON & STRAWN LLP
19  By:  Bianca M. Forde (appearing via LiveNote Streaming)
20  200 Park Avenue
21  New York, NY 10166.4193
22  212.294.4733
23        Appearing on behalf of Assured Guaranty Municipal
24        Corp.
25  ALSO PRESENT:  Mark Meyers, videographer

Page 5

TABLE OF CONTENTS

WITNESS                                          PAGE
KEVYN ORR
Examination by Mr. Ullman                          7
Examination by Ms. Levine                        192
Examination by Mr. DeChiara                      237
Reexamination by Mr. Ullman                      277
Examination by Ms. Green                         279

E X H I B I T S

NUMBER      IDENTIFICATION                       PAGE
Exhibit 1   JD-RD-0000113                          24
Exhibit 2   JD-RD-0000303                          26
Exhibit 3   JD-RD-0000300 through 302              32
Exhibit 4   JD-RD-0000295 through 296              43
Exhibit 5   Text from Article 9, Section 24        52
Exhibit 6   JD-RD-0000216 through 218              57
Exhibit 7   JD-RD-0000459-464                      64
Exhibit 8   Financial and Operating Plan
            May 12, 2013                           94

Page 6

E X H I B I T S

NUMBER       IDENTIFICATION                      PAGE
Exhibit 9    Proposal For Creditors
             June 14, 2013                        102
Exhibit 10   July 16, 2013 Letter from Orr
             to Snyder and Dillon                 115
Exhibit 11   July 18, 2013 Letter from Snyder
             to Orr and Dillon                    115
Exhibit 12   July 12, 2013 Letter from DFFA       134
Exhibit 13   July 17, 2013 Letter from Jones Day  138
Exhibit 14   Retiree Legacy Cost Restructuring
             September 11, 2013                   153
Exhibit 15   Declaration of Mr. Orr               157
Exhibit 16   Detroit News Article, 7/16/2013      200
Exhibit 17   City of Detroit, Michigan's Objections and
             Responses to Detroit Retirement Systems'
             First Requests for Admission Directed to
             the City of Detroit, Michigan        251
Exhibit 18   June 27, 2013 Letter from Jones Day  266
Exhibit 19   City of Detroit, Michigan's Objections and
             Responses to Detroit Retirement Systems'
             First Set of Interrogatories Directed to
             the City of Detroit, Michigan        300

Page 7

1    Detroit, Michigan
2    Monday, September 16, 2013
3    * * *
4    THE VIDEOGRAPHER: This is tape number one
5    to the videotaped depositions of Kevyn Orr being heard
6    before the U.S. Bankruptcy Court, Eastern District of
7    Michigan, Case Number 0227543.0001. This deposition
8    is being held at 150 West Jefferson, Detroit, Michigan
9    on September 16, 2013 at 10:08 a.m.
10   My name is Mark Meyers, I am the
11   videographer, the court reporter is Jeanette Fallon.
12   And will the court reporter please swear in the
13   witness.
14   KEVYN ORR
15   was thereupon called as a witness herein, and after having
16   first been duly sworn to tell the truth, the whole truth,
17   and nothing but the truth, was examined and testified as
18   follows:
19   EXAMINATION
20   BY MR. ULLMAN:
21   Q. Good morning, Mr. Orr.
22   A. Good morning.
23   Q. My name is Anthony Ullman, I represent the Retirees
24   Committee. I'm going to be asking you some questions
25   this morning, as will some others.

Page 8

1    A. Okay.
2    MR. ULLMAN: Before we begin I would just
3    like to note for the record that we received the
4    document production that the City made on Friday and
5    it was in image file, essentially TIF images, over a
6    hundred thousand pages which were essentially, as the
7    City knows, very difficult to work with. We obviously
8    have not been able to get through them all in time for
9    this morning's deposition. We're going to continue to
10   review the documents and we're reserving our rights to
11   recall Mr. Orr for further deposition if after review
12   of the documents we feel it's appropriate to do so.
13   MR. SHUMAKER: We'd just note for the
14   record that we're abiding by the schedule set by the
15   Court and that the documents that were produced were
16   responsive to the more than hundred document requests
17   that the City received in connection with this motion
18   and so we reserve all rights and I'm sure we'll oppose
19   any effort to continue the deposition.
20   MR. ULLMAN: Duly noted.
21   Q. Mr. Orr?
22   A. Yes.
23   Q. You've been deposed before; correct?
24   A. Yes.
25   Q. So you know I will ask questions and I would

Page 9

1  appreciate if you wait until I finish before you
2  answer; and likewise, I'll wait until you finish
3  answering before starting the next question.
4  A.  Yes.
5  Q.  And if there's any question of mine you don't
6  understand, please let me know and I'll rephrase it.
7  A.  Okay.
8  Q.  You were appointed Emergency Manager on March 14th,
9  2013; is that right?
10  A.  No.
11  Q.  Okay, technically you were appointed Emergency
12  Financial Manager on March 14th; is that right?
13  A.  No.
14  Q.  Okay.  When were you appointed the Emergency Financial
15  Manager?
16  A.  I think the final papers were signed on March 25th or
17  the 26th.  The announcement or rollout was on the 13th
18  and 14th.
19  Q.  Okay.  So it was announced on the 13th or 14th that
20  you were going to be the Emergency Manager?
21  A.  Yes, effective March 25th.
22  Q.  And then when -- you're familiar with PA 436?
23  A.  Yes.
24  Q.  So your original appointment was as the Emergency
25  Financial Manager; is that right?

Page 10

1  A.  Yes.
2  Q.  And then when PA 436 became effective, you became the
3  financial manager?
4  A.  No.
5  Q.  I'm sorry, the Emergency Manager; is that right?
6  A.  Yes.
7  Q.  And PA 436 became effective on March 28th; is that
8  right?
9  A.  Yes, I believe so.
10  Q.  Okay.  And PA 436 followed PA 4.  Are you familiar
11  with PA 4?
12  A.  Yes.
13  Q.  And were you aware that PA 4 was struck by
14  referendum -- by voter referendum in Michigan in
15  November 2012?
16  A.  Yes.
17  Q.  Now, did you have any involvement in Public Act 4 in
18  Michigan?
19  A.  No.
20  Q.  Was there any involvement by Jones Day to your
21  knowledge?
22  A.  Not to my knowledge.
23  Q.  Now, PA 436 was enacted in December of 2012; is that
24  right?
25  A.  I believe the statute speaks for itself, but I do

Page 11

1  believe that's right.
2  Q.  Okay.  And among other things it authorized the
3  governor to give authorization to the Emergency
4  Manager to file for bankruptcy under Chapter 9; is
5  that right?
6  A.  Yes.
7  Q.  And the text authorizes but does not require the
8  governor to place contingencies on the municipalities
9  proceeding under Chapter 9; is that right?
10  A.  Statute speaks for itself, but I believe that's
11  correct.
12  Q.  And when did you first became aware of those
13  provisions in PA 436?
14  A.  Probably mid to late January or February.
15  Q.  Now, did you have any involvement in the drafting of
16  PA 436?
17  A.  No, none whatsoever.
18  Q.  Did Jones Day to your knowledge?
19  A.  No, none whatsoever.
20  Q.  Now, prior to the enactment of 436 did you have any
21  communications, written or oral, with anyone from the
22  city of Michigan -- I'm sorry, the City of Detroit or
23  the State of Michigan regarding PA 436?
24  A.  I believe that's a compound question, but I'll answer
25  it.  No.

Page 12

1  Q.  Now, at the time that you indicated you were
2  effectively made the -- became known that you would be
3  the Emergency Manager around the 13th or 14th of
4  March, you were a practicing lawyer; is that right?
5  A.  Yes.
6  Q.  And you were at Jones Day; correct?
7  A.  Yes.
8  Q.  And you've been engaged in the practice of law for a
9  number of years prior to 2013; correct?
10  A.  Yes, since 1983.  I was licensed in February 1984.
11  Q.  And your expertise was bankruptcy law; is that right?
12  A.  Started out as a trial attorney, eventually became a
13  bankruptcy litigator, eventually into all aspects of
14  bankruptcy law.
15  Q.  So as of 2013 is it fair to say that you have
16  expertise with bankruptcy law?
17  A.  Yes.
18  Q.  In fact that's what you're best known for; isn't it?
19  A.  At this point I think so.
20  Q.  And you worked on the Chrysler bankruptcy in 2009; is
21  that right?
22  A.  Yes, 2008 through 2013.
23  Q.  Okay.
24  A.  Okay.
25  Q.  And you also spent a number of years at the office for

Page 13

1    the US trustee; is that right?
2  A.  Yes.
3  Q.  And what was your role there?
4  A.  I was initially brought in as deputy director of the
5      US Trustee's office and upon the retirement of my
6      mentor and prior director, Jerry Patchan, I became
7      director of that office.
8  Q.  Okay.  And was your role there in a legal capacity in
9      terms of working with the department?
10  A.  No, I was one of -- I was a component head of one of
11      the 36 components in the United States Department of
12      Justice, which was more in the nature of managerial as
13      opposed to legal responsibility.
14  Q.  Okay.  So did you ever serve as an actual trustee in a
15      bankruptcy case?
16  A.  At the US Trustee's office?
17  Q.  Yes.
18  A.  No.
19  Q.  And you also work for the RTC; is that right?
20  A.  Yes.
21  Q.  And that was in a litigation capacity?
22  A.  Yes, litigation and supervisory.
23  Q.  Now, you've never -- prior to becoming the Emergency
24      Manager you never ran a city; did you?
25  A.  No.

Page 14

1  Q.  Did you -- prior to becoming the Emergency Manager did
2      you have any position that had responsibility for the
3      operations of a municipality?
4  A.  I'm just thinking through the various career positions
5      I had.  Let me correct something.  I think your
6      question was was I ever receiver or bankruptcy
7      receiver?  Which one was it?
8  Q.  I think I asked whether you were ever a trustee.
9      While you were at the --
10  A.  Not as the US Trustee, but I had served in Florida as
11      a receiver and a trustee in a matter whose name
12      escapes me, it was some years ago.  Had I ever done
13      anything in the operations of a city inside?  No.
14  Q.  And as of 2013 did you have any experience or
15      expertise with local or state budgeting?
16  A.  Yes.
17  Q.  What was that?
18  A.  At various times in my practice in Florida I was also
19      a land use attorney and from time to time would be
20      involved with various officials regarding planning and
21      zoning issues.
22  Q.  Okay, but -- and the involvement was limited to
23      planning and zoning?
24  A.  No, planning, land use and zoning, not inside the
25      government as a private practitioner.

Page 15

1  Q.  Okay.  Did you have any involvement or experience in
2      actual budgeting for general, state or local
3      operations for all the various departments that are
4      involved in the running of a state or a city?
5  A.  I'm trying to be accurate without overstating my prior
6      experience.
7  Q.  Uh-huh.
8  A.  There were times where I was involved in various
9      campaigns, political campaigns, and as I said, land
10      use, planning and zoning, which would look at various
11      functions, but not for an entire city.
12  Q.  Okay, not for budgeting the various operations for
13      sanitation, for police, for all the functions that go
14      into a city or a state?
15  A.  No, let me be clear.  If your question is was I ever
16      responsible for budgeting all the operations like in
17      Detroit, which has 44 departments, the answer is no.
18  Q.  Did you ever run a corporation?
19  A.  I actually think I did.
20  Q.  What was that?
21  A.  With the RTC I was appointed as an officer for one of
22      the financial institutions.
23  Q.  Okay, and when was that?
24  A.  I was at the RTC from '91 through '96 so sometime in
25      that period.

Page 16

1  Q.  And what position did you hold?
2  A.  I don't recall.
3  Q.  And what were your responsibilities; do you remember
4      -- first of, all do you remember what corporation it
5      was?
6  A.  I don't.  It was one of the many savings and loans
7      that we had.  I think it was in New Orleans.  The head
8      of the division sent me down to take it over with a
9      team.
10  Q.  Do you remember the name of the S&L?
11  A.  I do not.
12  Q.  How long that lasted?
13  A.  I think I was commuting off and on for two to four
14      years.
15  Q.  Do you recall how many people worked for you at the
16      S&L?
17  A.  Several hundred.
18  Q.  And that was obviously focused solely on the business
19      of that particular S&L; correct?
20  A.  Yeah, there were a bunch of other issues, regulatory
21      issues, liability issues, insurance, but the business
22      of a savings and loan or holding -- could have been
23      the holding company for a savings and loan.
24  Q.  Outside of that have you ever worked in business?
25  A.  At a managerial level?



Page 17

1  Q.  Yeah.
2  A.  As I said, I think I was a receiver in another case in
3     Florida and perhaps a special master in another matter
4     in Florida.
5  Q.  But just as a regular, working for a company?
6  A.  No, I've been an attorney all my professional career.
7  Q.  Do you have any particular expertise in finance?
8  A.  Other than being a bankruptcy attorney, no, my degrees
9     are in political science and law.
10 Q.  And you indicated that you served as a trustee or
11    receiver once in Florida and what was the nature of
12    the company that you acted as receiver for?
13 A.  I don't recall.  I would be speculating.  It was
14    affiliated with real estate in some fashion.
15 Q.  Okay.  And do you have an accounting degree?
16 A.  No.
17 Q.  Are you an actuary?
18 A.  No.
19 Q.  Is it fair to say that as of the time of your
20    appointment as Emergency Manager, your sole expertise
21    was in law and particularly in bankruptcy law?
22 A.  No.  I think that while my principal expertise was in
23    law and bankruptcy law that in that capacity we
24    obviously as bankruptcy professionals deal with
25    financial issues and requirements that require us to

Page 18

1     make judgment calls.  I would not say that that
2     typically would include the level of expertise as an
3     actuary.
4  Q.  Okay.  And your sole -- your involvement in financial
5     issues as you indicated was gained in your capacity as
6     a bankruptcy lawyer; is that right?
7  A.  Well, gained in my capacity as I said through the arc
8     of my career having to do with first trial attorney,
9     business law, banking and finance at the FDIC, then
10    the RTC, then the Department of Justice and
11    bankruptcy.
12 Q.  Now, you had discussions with the governor of Michigan
13    or people working with or for him prior to becoming
14    Emergency Manager; is that right?
15 A.  Yes.
16 Q.  Can you tell me about those?
17 A.  Yeah, I believe when you say people either working
18    with or for him, the initial discussion was at the end
19    of January, could have been early February, but I
20    think it was the end of January when we came in to
21    pitch for the restructuring work for the City of
22    Detroit before a restructuring team of advisors, which
23    excluded -- the governor was not involved in that
24    presentation.
25 Q.  And when was it first discussed -- when was the

Page 19

1     possibility of your acting as Emergency Manager first
2     raised?
3  A.  I believe it was raised within a few days of us coming
4     back from that presentation.
5  Q.  And how did that come about?  What was said?
6  A.  Someone called my managing partner, as I understand
7     it, I wasn't on that call, and asked if I might be
8     interested in serving as Emergency Manager and my then
9     managing partner relayed that conversation to me.
10 Q.  And that -- is that the first time that you became
11    aware that you were being considered for the Emergency
12    Manager position?
13 A.  Yes, I believe that was in February.
14 Q.  Now, you had attended the presentation or the pitch
15    for Jones Day that you just referred to before the
16    restructuring committee of advisors?
17 A.  Yes, Jones Day was one of I believe 21 law firms that
18    made presentations to that group about representing
19    the City.
20 Q.  And what were the qualifications of Jones Day that
21    were presented at that presentation?
22 A.  We had prepared a book of the qualifications of the
23    various attorney and the law firm and other
24    representations both in court and out of court
25    restructuring, having to do with healthcare, employee

Page 20

1     benefits, labor issues, having to do with
2     environmental, bankruptcy, litigation, analyses,
3     negotiations, mediation, the full panoply of work that
4     the firm did.
5  Q.  And did you make any personal presentation at that
6     meeting, did you pitch anything?
7  A.  We all spoke.
8  Q.  Okay, and what did you speak about as regards what you
9     would bring to the table?
10 A.  No, there were no presentations made so much with
11    regard to what I personally might bring to the table.
12 Q.  Okay.
13 A.  Although we did discuss the experience of the team.
14    There was no presentation for why any of us, for
15    instance, should be Emergency Manager.  There was
16    discussion about what we perceived to be the difficult
17    status of the City and how our law firm could provide
18    representation to the City.
19 Q.  And was anything said to the committee at the meeting
20    either through the book or orally as to your
21    particular credentials and expertise?
22 A.  My credentials were included in the book, as were the
23    other attorneys at the presentation.
24 Q.  Okay.  And your --
25 A.  Please.



Page 21

1  Q.  Did I -- were you done?
2  A.  No, no, I was done, yeah.
3  Q.  Okay.  And were your credentials presented that
4      presented you as primarily as a bankruptcy lawyer?
5  A.  As primary as a bankruptcy and restructuring attorney,
6      yes.
7  Q.  And was there any discussion specifically of the
8      possibility of a Chapter 9 filing at this
9      presentation?
10 A.  I don't think so.  I don't recall -- I don't -- I
11     don't -- I don't recall, and the reason I say I don't
12     recall is there -- no, wait a minute.  I don't know if
13     there was a discussion about the City.  There was a
14     discussion about other Chapter 9 cases, other cities.
15 Q.  And what specifically do you recall being said about
16     the Chapter 9 filings in the other cases?  Let me put
17     it this way.  Did Jones Day refer to experience it had
18     in doing other Chapter 9 filings?
19 A.  Yes, yes, various members of the team referred to that
20     experience, yes.
21 Q.  And is it fair to say that the Chapter 9 experience
22     was a substantial part of the pitch that Jones Day was
23     making to this committee?
24 A.  No.
25         MR. SHUMAKER:  Object to the form.

Page 22

1  A.  No, it was a component of the presentation.
2  Q.  That -- you said there was a written presentation or
3      written material?
4  A.  There was a book, yes, there were written materials.
5  Q.  And do you know whether that's been produced?
6  A.  I do not.
7          MR. ULLMAN:  I would like to call for the
8      production of that, please.
9          MR. SHUMAKER:  We'll look into it.  I would
10     ask here that if you're going to ask for documents
11     throughout the deposition, that you follow-up with a
12     letter and email.
13         MR. ULLMAN:  Sure.
14 Q.  And do you recall whether there was any discussion at
15     this presentation as to the major problems that were
16     facing Detroit at the time?
17 A.  I think there were discussions about Detroit's issues,
18     various issues at the time, yes.
19 Q.  And do you recall any discussion about the issues that
20     Detroit was facing regarding its pension liabilities?
21 A.  I don't recall specific discussions and -- no, I don't
22     recall specific discussions but there may have been.
23 Q.  Okay.  And the same question for retirement benefits
24     in general apart from pension benefits.  Do you recall
25     any discussion of that?

Page 23

1  A.  I don't recall specific discussions, but there may
2      have been.  The discussions were more at a high level
3      as opposed to detailed level.
4  Q.  And do you recall at a general level there being
5      discussion that Detroit was facing major issues
6      regarding its pension and other retirement benefit
7      liabilities?
8  A.  I know, to be candid with you, the pitch book
9      contained the information regarding employee benefits
10     and labor attorneys.  One of the attorneys on the team
11     was a labor attorney, but I don't recall there being
12     specific discussions in detail about those issues.
13 Q.  Do you recall in general at the committee discussion
14     being raised that Detroit was in fact facing
15     substantial issues concerning its pension and other
16     retirement benefits and needed to find a way to deal
17     with those?
18 A.  Here again I don't recall specific discussions.  There
19     may have been.  I just don't recall.
20 Q.  Okay.  Let me show you some documents, Mr. Orr.
21 A.  Thank you.
22 Q.  You can't thank me until you've seen the documents.
23 A.  It may refresh my recollection.  I just don't recall.
24         MR. ULLMAN:  Let's mark the first one as
25     Orr 1.

Page 24

1          (Marked Exhibit No. 1.)
2  Q.  Are there other copies of that?  Thanks.
3  A.  Okay.
4  Q.  Okay, what we're marked as Orr Number 1 is an email,
5      bears the Bates stamp ending in 113.
6  A.  Yes.
7  Q.  Now, these either -- there are a couple of emails on
8      this chain from January of 30 -- January 30, 2013.
9  A.  Yes.
10 Q.  And the bottom one states that it's from Richard Baird
11     to Corinne Ball.  Who is Richard Baird?
12 A.  Richard Baird is the governor's transition manager on
13     contract to the State of Michigan.
14 Q.  And he says -- the message is to Corinne, sorry I
15     missed your call.  Basically says, I'm inquiring about
16     the potentiality of actually hiring a member of your
17     team for the Detroit EM spot.
18 A.  Yes.
19 Q.  And is this what you were referring to before in your
20     testimony?
21 A.  Yes.  Says, was on the phone with Steve Brogan.  He
22     can fill you in, but basically thinking about
23     potential -- yes, that's what I was talking about.
24 Q.  And it's your testimony that prior to this you had not
25     had discussions with anyone from the State of Michigan

Page 25

1    or the city of Michigan (sic) about the possibility of
2    becoming Emergency Manager?
3  A.  Absolutely not.
4  Q.  And at the top it says, bet he asked if Kevyn could be
5    EM, and that in fact is why he was calling?
6  A.  Yes, I see that.
7  Q.  And then that's what happened?  He did call and -- he
8    had called Corinne Ball to ask about you being the EM?
9         MR. SHUMAKER:  Object to the form.
10  A.  This document -- I don't know.  My testimony is that I
11    believe Rich had called my managing partner, who was
12    Steve Brogan.  I don't know if he called Corinne Ball.
13    This seems to be an email exchange between him and
14    Corinne Ball and then Heather Lennox and Amy Ferber.
15  Q.  Okay, fair enough.  But you recall around that day
16    someone telling you that Baird had called talking
17    about the EM position and then shortly thereafter you
18    in fact got a call; is that right?
19         MR. SHUMAKER:  Object to the form.
20  A.  Yeah.  I don't know if it was -- it was soon
21    thereafter.  I don't know if it was that specific day,
22    but it was soon thereafter.
23  Q.  And you then got -- did you get a call from Mr. Baird
24    directly?
25  A.  No.

Page 26

1  Q.  Who did you get a call from?
2  A.  Steve Brogan.
3  Q.  Okay, that's your managing partner?
4  A.  Yes.
5  Q.  And he told you that Baird wanted you to be the EM?
6  A.  He told me that they had inquired whether I was
7    interested in applying to become the EM.
8  Q.  Okay, and your response was?
9  A.  No.
10  Q.  Okay.  And I take it there were further conversations?
11  A.  Yes.  That conversation was no.  I did not want to
12    leave the firm and that we would tell them that.
13  Q.  And did you have a conversation with Richard Baird
14    concerning the possibility of your becoming the EM on
15    or about this time frame at the end of January of
16    2013?
17  A.  Yeah, I don't know if it was end of January, here
18    again being in February, but I recall having a
19    conversation with Rich Baird soon thereafter.
20  Q.  Okay, let's look at the next document, which we'll
21    mark as Orr 2.
22         (Marked Exhibit No. 2.)
23  Q.  What we've marked as Orr 2 is a document ending in
24    Bates number 303.
25  A.  Yes.

Page 27

1  Q.  You've seen this email chain before, Mr. Orr?
2  A.  Yes.
3  Q.  And in fact you are on both emails; are you?
4  A.  I think I wrote the top one.
5  Q.  Okay.  Now, what is the role of Jones Day at this
6    time?  Does it have an official role with Detroit or
7    with the State of Michigan?
8  A.  No, at this time, as far as I recall, Jones Day was a
9    candidate to be the attorneys for the City.
10  Q.  Now, starting with the bottom email, this is from
11    Corinne Ball to you.
12  A.  Yes.
13  Q.  And she goes on to talk about food for thought for
14    your conversation with Baird.  Obviously referring to
15    a conversation expected between you and Baird.  She
16    makes reference to the Bloomberg Foundation and
17    talking about whether someone should ask Baird about
18    financial support for the project and in particular
19    the EM.  Can you tell me what that's referring to?
20  A.  This is Corinne's email to me and I think she was
21    talking in some form about the Bloomberg Foundation
22    supporting Detroit efforts with the EM.  And I think
23    -- I don't know if in this email or subsequently said
24    something along the lines of I don't want anything to
25    be extraordinary, but I think at that point -- as I

Page 28

1    said, on the 31st, so it wasn't on the 30th, it was
2    the 31st -- that I wasn't interested in the job.
3  Q.  Do you know what financial support she's referring to?
4    Did you have a conversation with her about this?
5  A.  He we did not have a -- well, we may have had a
6    subsequent conversation about financial support.  We
7    -- I don't want to speculate but there may have been a
8    conversation about supplementing the EM salary.
9  Q.  An additional salary that would be funded privately?
10    Is that what you're saying?
11  A.  Yeah, I think the statute allows the EM to have
12    additional compensation and that may have been what
13    this was referring to or it may have been about the
14    Bloomberg Foundation helping Detroit directly.  I'm
15    not sure, but there may have been that discussion.
16    That seems to remind me of something along those
17    lines.
18  Q.  The next statement from -- or the last sentence in
19    Ms. Ball's email says, I can ask Harry for contact
20    information.  This kind of support in ways
21    nationalizes the issue in the project.
22         Do you have an understanding of what she's
23    referring to?
24  A.  I do not.
25  Q.  You don't know what she meant when she said -- she



Page 29

1    used the word nationalized?
2  A.  No, I don't know if she meant raises the profile of
3    the issues to help Detroit, I don't know.
4  Q.  And you never asked her what she meant?
5  A.  I don't recall asking her what she meant.
6  Q.  In the top email in this exhibit you say that you had
7    a good conversation with Rich Baird this morning.
8    This is the 31st of January?
9  A.  Yes.
10  Q.  So obviously either you called him or you called him
11    as of the 31st of January?
12  A.  Yes, yes.
13  Q.  It says in this email that you told him you were
14    interested in the job but there were some things that
15    made it impractical.  Is that a fair summary of
16    your --
17  A.  Yes.
18  Q.  -- your conversation with Baird?
19  A.  Yes.
20  Q.  And then he suggested you give it additional
21    consideration and you said you could say that there's
22    a glimmer of hope you would take it?
23  A.  Right.
24  Q.  And then you agreed to get back in touch next week?
25  A.  Right.

Page 30

1  Q.  He said -- you go on to say that he tells you, he
2    Baird, that he likes your presentation, he's pulling
3    for us to represent the City.
4  A.  Yes.
5  Q.  Is that what he told you?
6  A.  Yes.
7  Q.  Do you remember anything else about that conversation
8    with Mr. Baird?
9  A.  No, I remember we had a conversation.  I said I was
10    flattered, but I really wasn't interested in the job,
11    I was very comfortable at Jones Day, didn't want to
12    leave my family, I had young children, but I would
13    give it some consideration and I think we ended it by
14    saying, you know, I probably don't want to take the
15    job but I am committed to working and I did say
16    working in lockstep with the City and would be willing
17    to take any role in this respect.
18  Q.  And was there any discussion during this conversation
19    as to what you would do if you ultimately did take the
20    job of EM?
21  A.  No.  As I recall in this conversation based upon this,
22    the discussion was very high level and I think
23    Mr. Baird asked me to at least give it some reflection
24    and consideration and not turn it down outright.
25  Q.  And you accommodated that request; right?

Page 31

1  A.  I started considering it, yes.
2  Q.  Now, when he says we're pulling for us to represent
3    the City, that's as a restructuring counsel as you
4    talked about before?
5  A.  Yes.
6  Q.  And there was a program, wasn't there, that had been
7    designed to solicit counsel to act as restructuring
8    counsel for Detroit?
9  A.  I don't know if it was a program.  I know that there
10    was a process that we and 20 other firms participated
11    in.  I believe it was one day, maybe two, where we
12    flew out to the airport and presented our credentials
13    over 45 minutes.
14  Q.  And was there a particular firm that had designed or
15    that oversaw that process?
16  A.  I don't know.
17  Q.  Were you aware that Buckfire -- are you familiar with
18    Buckfire?
19  A.  I know Miller Buckfire.  They were at the
20    presentation.  I don't know if they designed it.
21  Q.  Were you aware they were playing a role in the --
22  A.  Selection process?
23  Q.  -- in the selection process?
24  A.  Yes.
25  Q.  And are you aware that they were in fact effectively

Page 32

1    assigning points to the various firms that
2    participated and doing some sort of tally to help a
3    decision be made?
4  A.  Yes.
5         MR. SHUMAKER:  Objection, foundation.
6  Q.  And is it correct that Miller Buckfire was a banker
7    for Chrysler in the Chrysler bankruptcy?
8  A.  No.
9  Q.  They weren't?
10  A.  No.  I'm trying to think.  Did Miller Buckfire play a
11    role in Chrysler?  I -- let's put it this way, I had
12    not met anyone from Miller Buckfire in the Chrysler
13    representation.
14  Q.  Okay.  Let me show you the next document, which we'll
15    mark as, what are we up to, 3?
16         (Marked Exhibit No. 3.)
17  Q.  What we've marked as Exhibit 3 is a chain of emails,
18    the first page ends in Bates number 300.  Have you
19    seen these before, Mr. Orr?
20  A.  Yes.
21  Q.  Let's first look at the first three emails in this
22    chain.
23  A.  Uh-huh.
24         MR. SHUMAKER:  The last chronologically or
25    the first ones?

13-53846-tjt   Doc 1159   Filed 10/11/13   Entered 10/11/13 15:46:01   Page 71 of 264

Page 33

1      MR. ULLMAN: No, the 207.
2 A.  These are follow-on from the prior email?
3 Q.  Uh-huh.
4 A.  Okay.
5 Q.  If we look at the one that's at the bottom of Bates
6     300 that carries over to the next one, this is an
7     email from Mr. Moss, from Daniel Moss, to you?
8 A.  Yes.
9 Q.  And I take it Mr. Moss is someone you worked with at
10    Jones Day; is that right?
11 A.  Yes.
12 Q.  And were you still at Jones Day at this time?
13 A.  Yes.
14 Q.  And Mr. Moss writes that nationalizing this -- making
15    this a national issue is not a bad idea. He goes on
16    to say it gets political cover for the State
17    politicians. He goes on to say that if it succeeds,
18    there will be more than enough patronage to allow
19    either Bing or Snyder to look for higher callings
20    whether a cabinet, senate or corporate. Further this
21    would give you cover and options on the back end to
22    make up for lost time there.
23      Can you tell me what he's referring to?
24      MR. SHUMAKER: Objection, form, foundation.
25 A.  Yeah, I would have to say that the document speaks for

Page 34

1     itself. I think it also says that indeed this gives
2     them either greater incentive to do this right. I
3     think my response says no.
4 Q.  Let me ask you questions about this. Mr. Moss says,
5     making this a national issue is not a bad idea. Do
6     you have an understanding as to what he's referring to
7     when he says making this a national issue?
8 A.  No. What I think he's probably referring to is
9     raising the profile of Detroit and the crisis it's in
10    so it can get some help.
11 Q.  Did you have any conversations with Mr. Moss about
12    what he meant when he wrote this email?
13 A.  No, other than this email exchange I don't recall any.
14    I think we probably did, though. We talk on a regular
15    basis.
16 Q.  Do you recall anything more specific about what he
17    meant when he wrote this is a national issue based on
18    the conversations you had with him?
19 A.  No. There were emails going back and forth and I
20    think my email back to him approximately eight minutes
21    later addressed the issue.
22 Q.  Well, he goes on to say that if this gives them -- it
23    provides political cover to state politicians and it
24    gives them even greater incentive to do this right.
25    Do you have an understanding as to what the this is,

Page 35

1     to do what right?
2 A.  I think this is trying to fix Detroit right in a broad
3     sense.
4 Q.  And is that based on your conversations with Mr. Moss
5     or is that based on your reading of this email?
6 A.  That's based on probably my reading of this email.
7     But let me think about conversations. It could have
8     meant to do this process right, whatever that is,
9     restructuring, out of court or in court.
10 Q.  So as you sit here now, you don't have a specific
11    recollection or understanding as to exactly what
12    Mr. Moss meant; is that right?
13 A.  I have worked closely with Dan Moss for a number of
14    years. We have conversations about a number of
15    issues, but when you say do this right, I don't want
16    to give the wrong impression that there was some
17    conversation about what this right exactly meant. I
18    assumed it meant to do the process right, whatever
19    that is.
20 Q.  But you don't know what specifically Mr. Moss had in
21    mind because you never actually asked?
22 A.  No. If you're trying to ascribe a specific thing or
23    process to it, no.
24 Q.  In the last sentence Mr. Moss writes, this would give
25    you cover and options on the back end to make up for

Page 36

1     lost time there.
2 A.  Yeah.
3 Q.  Do you have an understanding as to what he was
4     referring to when he wrote that, he Mr. Moss?
5 A.  No, but I think what my -- my impression is, I think
6     what he was trying to say is if you can get -- make
7     the issue a national issue and elevate it so that you
8     get national support, that you may have greater
9     success and be able to get back to my life.
10 Q.  You mean success as Emergency Manager?
11 A.  Success for the City of Detroit, yeah.
12 Q.  Well, he writes this would give you cover and options
13    on the back end, you Kevyn Orr?
14 A.  Yeah, but I think if you read it in conjunction -- I'm
15    sorry, I didn't mean to cut you off.
16 Q.  So my question was he talking about you, Kevyn Orr,
17    in the context of being an Emergency Manager as you
18    understood it?
19 A.  No, I don't want to parse the email and try to ascribe
20    meaning to it that's not true. You asked for my
21    understanding and my testimony is I think this is Dan
22    saying to me if you nationalize the issue, that it
23    brings greater attention and perhaps the opportunity
24    for people to do this, meaning the project, right and
25    if it succeeds, then the other political members will

Page 37

1    be given acknowledgment for the success.  Further, it
2    might give me the ability to come back to the firm and
3    make up for the time that I'd lose if I did this job.
4  Q.   The job being the Emergency Manager job?
5  A.   Yes.
6  Q.   Okay.  Now, in the next email that's going up the
7    chain that is on the first page you say you wouldn't
8    do it.
9  A.   Yes.
10 Q.   And when you say you wouldn't do it, again, do you
11   have -- what is the it that's being referred to?  So
12   far no one's ever really identified what nationalizing
13   meant.
14 A.   I'm telling you what I can think, what I meant by this
15   writing.
16 Q.   Okay.
17 A.   What I meant was I wouldn't necessarily make it a
18   national issue and I think I say it would just bring
19   in the Demo/Republican polarization on a national
20   scale and make Detroit a fall for the agendas of both
21   sides, meaning that people would try to use it as an
22   allegory for whatever their particular perception was.
23   I go on to say that the president would have to
24   criticize the trampling of democracy, and that's been
25   done here, not by the president I might add, and the

Page 38

1    Republicans would rail against any further federal
2    bailouts and that's been said, plus if the feds did
3    anything for Detroit, a number of other municipals
4    would have their hands out at a time when no one's in
5    the mood to dole out federal largess.  I think I go on
6    to say this is a morass of problems.
7          So my thought was there, to be clear, that
8    I did not think it, meaning to try to give the issues
9    of Detroit national prominence, was particularly
10   productive.
11 Q.   Now, in the top email you write -- or I'm sorry,
12   Mr. Moss writes back to you and in the second
13   paragraph he goes on to say, it seems the ideal
14   scenario would be that Snyder and Bing both agree that
15   the best option is simply to go through an orderly
16   Chapter 9.  And then he goes on to say that
17   avoids a political fight over the scope of any
18   appointed Emergency Manager, moves the ball forward.
19   And then he goes on to say, appointing Emergency
20   Manager whose ability to actually do anything is
21   questionable, would only serve to kick the can down
22   the wrong path.
23 A.   Yes.
24 Q.   And can you tell me -- obviously this is -- Mr. Moss
25   here is referring to the possibility of a Chapter 9

Page 39

1    filing?
2  A.   Yes.
3  Q.   And was this something that you discussed specifically
4    with Mr. Moss?
5  A.   We probably did.
6  Q.   Okay.  And did you discuss the possibility -- so at
7    this point it was understood that one possibility, one
8    potential route of action, would be to file a Chapter
9    9 for Detroit if you took the Emergency Manager job;
10   is that right?
11 A.   Yeah, I think that since we have been reviewing
12   background information on Detroit and the possibility
13   of a Chapter 9 filing had been mentioned in 2005,
14   2006, 2009, 2011, 2012, up until this point, in fact I
15   think it was, as I said, I testified earlier this
16   morning, the possibility of Chapter 9s in other cities
17   have been discussed, that the issue of a potential
18   Chapter 9 filing for the City of Detroit was not a
19   particularly surprising discussion.  That had been
20   discussed on many levels in the national press, in the
21   local press, it had been recommended by a prior -- in
22   2005 I think it was recommended by a prior employee --
23   senior employee of the City, so I think that
24   discussion was the typical type of discussion that
25   you'd have with your colleagues.

Page 40

1  Q.   And were you in fact at this time having those types
2    of discussions with your colleagues at Jones Day as to
3    the possibilities of a Chapter 9 filing if you took
4    the Emergency Manager job and how that would be
5    implemented?
6  A.   Yes, but I don't want to give you the wrong impression
7    because I think based upon what I've seen from some of
8    the briefing and some of the interrogatories the
9    impression is that that was predetermined and that's
10   not true.  The reality is there was much discussion
11   about what the alternatives would be and the need to
12   bring something that would bring order and efficiency
13   to the process given the number of interests that were
14   involved.
15 Q.   But it was certainly one of the possibilities that was
16   on the table as a course that might need to be
17   followed; is that right?
18 A.   Oh, sure, it had been discussed for the better part of
19   the prior decade.
20 Q.   And in fact, Mr. Moss is recommending the simplest
21   thing, the best option would be to have the -- Snyder
22   and Bing, the mayor and the governor, both agree to go
23   through an orderly Chapter 9?
24        MR. SHUMAKER:  Object to form, calls for
25   speculation.

Page 41

1  Q.  That's what it says here; doesn't it?
2  A.  Well, I mean, the document speaks for itself.
3  Q.  My question is did you agree with that?
4  A.  No.  In fact, I think we had discussions back and
5     forth about, one, me not wanting to take the job and
6     two, whether or not the parties could reach concession
7     short of a Chapter 9, which would provide benefit to
8     the City in an orderly way.
9  Q.  And ultimately that didn't happen; did it?  The City
10    did file Chapter 9; didn't they?
11 A.  Well, I mean, I think that we took a lot of time, I
12    took 30 days when I came into the City, I said --
13 Q.  Mr. Orr, I don't mean to interrupt you, but I don't
14    want to waste time.  My question was pretty simple.  I
15    was simply asking ultimately the City did file a
16    Chapter 9; didn't it?
17 A.  Yes, and I was giving you an explanation for why that
18    occurred.
19 Q.  I'll get to that later.
20 A.  Okay.
21 Q.  Now, in this email Mr. Moss goes on to say, appointing
22    of Emergency Manager whose ability to do anything
23    questionable would only serve to kick the can down the
24    wrong path.  And he's referring there to the can of
25    the Chapter 9 filing; isn't he?

Page 42

1            MR. SHUMAKER:  Objection, form.  Calls for
2     speculation.
3  A.  No, no.
4  Q.  Now, in this email Mr. Moss recommends or suggests the
5     best path would be for Snyder and Bing to voluntarily
6     go through a Chapter 9 and not go through the
7     Emergency Manager process; is that right?
8  A.  No, you've asked that question before but you put a
9     little color on it this time and I don't think that's
10    accurate.
11 Q.  Well --
12 A.  Perhaps you can rephrase it.
13 Q.  Certainly.  He says, he Moss says, it seems the ideal
14    scenario would be that Snyder and Bing both agree that
15    the best option is to simply go through an orderly
16    Chapter 9.  This avoids an unnecessary political fight
17    over the scope of authority of any appointed Emergency
18    Manager.  I'm not going to read the rest.
19          You see his recommendation, his advice, his
20    belief that the best option is for Bing and Snyder to
21    file Chapter 9?
22            MR. SHUMAKER:  Objection to form.
23 A.  I think you're coloring the email.  As I said before,
24    this is pretty typical banter between co-workers and
25    colleagues about what could happen.  You said it was

Page 43

1     advice and recommendation.  To the best of my
2     knowledge we hadn't been retained then and we were
3     just going back and forth about potential options.
4  Q.  Okay.
5  A.  So I don't want to give -- my testimony to give this
6     email more import and lead to the conclusion as some
7     have already said in this litigation, that there was a
8     predetermination to file Chapter 9.
9  Q.  But ultimately it was the Emergency Manager, the
10    appointed Emergency Manager, who filed the Chapter 9,
11    not Bing and Snyder; is that right?
12 A.  Yes, after he had been sued multiple times and didn't
13    get a comprehensive proposal from any interested party
14    or creditor.
15 Q.  Let me show you another document, which we'll mark as
16    Exhibit 4.
17          (Marked Exhibit No. 4.)
18 Q.  This is a chain of emails, it starts with Bates number
19    295.
20 A.  Yes.
21 Q.  Have you seen this before, Mr. Orr?
22 A.  Yes.
23 Q.  In fact, you wrote some of this; didn't you?
24 A.  Yes.
25 Q.  If we focus on the top email --

Page 44

1  A.  Yes.
2  Q.  -- you're talking again -- at this point in time had
3     you decided whether to accept the Emergency Manager
4     job?  This is later in the afternoon on January 31.
5  A.  No, I didn't.  I -- no, there was no time in the
6     initial two days that this came up that I decided to
7     accept the Emergency Manager job.
8  Q.  Okay.  And in this email you're giving some thoughts
9     on some of the issues that pertain to that; aren't
10    you?
11 A.  Yes.
12 Q.  And in particular you start talking about the
13    legislation that pertains to the EM position.  You
14    said you went back and reviewed various laws; do you
15    see that?
16 A.  Yes.
17 Q.  And you talked about some laws in DC control board and
18    then you go on in the last sentence -- or I'm sorry,
19    the second to the last sentence to write, and I quote,
20    "By contrast Michigan's new EM law is a clear
21    end-around the prior initiative that was rejected by
22    the voters in November."
23          You wrote that?
24 A.  Yes.
25 Q.  And by the new EM law, you were referring to PA 436?



13-53846-tjt    Doc 1159    Filed 10/11/13    Entered 10/11/13 15:46:01    Page 74 of 264

Page 45
1  A.  Yes, I believe so.
2  Q.  And by the end run you're talking about the voter --
3      the fact that PA 436 was enacted in response to the
4      fact that the voters had rejected the prior law, PA 4;
5      is that right?
6  A.  Yes.
7  Q.  And PA 436 was able to avoid another referendum by
8      including tacking onto it a relatively minor
9      appropriation provision; is that right?
10         MR. SHUMAKER:  Objection, calls for
11     speculation.
12  A.  I don't know if that's the sum total of the difference
13     between 436 and the prior law, but that was one of the
14     components, yes.
15  Q.  And when you wrote this question, Michigan's new EM
16     law is a clear end-around the prior initiative, it was
17     rejected by the voters in November, were you writing
18     truthfully?
19  A.  I think I was writing my opinion at that time, yes.
20  Q.  And then you go on and you say, the -- and that was
21     based on the analysis that you had done as of that
22     date?
23  A.  Yeah, I think you would recognize that between the
24     30th when this first came up and the 31st, I think
25     this is later that afternoon, I spent some time just

Page 46
1      going through the other laws on a very cursory basis
2      to try to get a better understanding of what was being
3      asked.
4  Q.  And the conclusion you reach is what you set out in
5      the email here; correct?
6  A.  At that time.
7  Q.  You go on to say, the new EM law gives local
8      governments four choices and you go on to list them?
9  A.  Yes.
10  Q.  And that is the list of the four choices you have,
11     that comes from the statute PA 436; doesn't it?
12  A.  I believe so.  I don't have it in front of me, I have
13     it here, but I believe so without looking at it.
14  Q.  And so at that point in time you obviously were
15     familiarizing yourself with 436 and had read it;
16     correct?
17  A.  Yes, I think what happened during this day is that I
18     initially thought of rejecting the concept of being an
19     EM, I then went back and said let me start informing
20     myself on what's required EM in looking under the law,
21     and then I was providing musings and streams of
22     consciousness about what my initial conclusions were.
23  Q.  And you mention that in your writing here that one
24     option is a Chapter 9 bankruptcy with the governor's
25     approval; correct?

Page 47
1  A.  Yes.
2  Q.  And you also make note that another option is
3      Emergency Manager; is that right?  State appointed EM
4      is what you say?
5  A.  Yes.
6  Q.  And under PA 436 the Emergency Manager also had the
7      authority with the governor's approval to file for
8      Chapter 9; is that right?
9         MR. SHUMAKER:  Objection, calls for legal
10     conclusion.
11  A.  Yeah, the statute speaks for itself, but yes.
12  Q.  And you were aware of that at the time you wrote this
13     email; correct?
14  A.  I don't know if I read through the entire statute at
15     this time.  As I said, I have trying to get some
16     familiarity.  I think it's fair to say that I at some
17     point pretty close -- if I wasn't aware of it at that
18     time, I pretty closely became aware of it.
19  Q.  Because you would certainly want to know what powers
20     the Emergency Manager would have if you decided to
21     take the job; correct?
22  A.  I began to inform myself about the powers that the
23     Emergency Manager would have.  But please understand
24     here again at this time I was trying to avoid taking
25     the job.

Page 48
1  Q.  And you go on then in the -- and you were -- I guess
2      -- were you aware that for either the case of the
3      Chapter 9 being filed with the governor's approval
4      without the Emergency Manager being involved or the
5      Chapter 9 filing with the Emergency Manager, that in
6      either case PA 436 did not require the governor to
7      impose any contingencies on the bankruptcy filing?
8         MR. SHUMAKER:  Objection, calls for legal
9      conclusion.
10  A.  I don't recall if I had done a deep dive in that
11     question at this time.  Please understand, counselor,
12     at this time I was doing a preliminary review of the
13     statute based upon I believe some published reports
14     and a look at it online.  I may have gotten to that
15     point, I just don't recall if at this time during that
16     day I had.
17  Q.  Okay.
18  A.  But I did at some point.
19  Q.  But you certainly knew that ultimately?
20  A.  At some point I did, sure.
21  Q.  Obviously.  And then you go on in the next sentence in
22     this email to say, "So although the new law provides
23     the thin veneer of a revision, it is essentially a
24     redo of the prior rejected law and appears to merely
25     adopt the conditions necessary for Chapter 9 filing."

Page 49

1  A.  Yes, I said that.
2  Q.  And were you writing truthfully when you said that?
3  A.  Yeah, and I think the balance of the paragraph, the
4      news reports state that opponents of the prior law are
5      already lining up to challenge this law.  So as I just
6      testified, this was my preliminary analysis based upon
7      a number of sources, some of them were the news
8      reports.
9  Q.  And you were aware in fact that as you just indicated
10      that there were either challenges already made or that
11      were going to be made to the law?
12  A.  I was not aware that there were challenges already
13      made.  I was aware the news report states that
14      opponents of the prior law were already lining up to
15      challenge the law.
16  Q.  And did you have any understanding at this time as to
17      what those grounds of challenge were or may be?
18  A.  No.  As I said, this was, you know, within the span of
19      a day when this was going back and forth about what it
20      may require, I was beginning to familiarize myself to
21      some degree with the statute.
22  Q.  Your email goes on to say you're going to speak with
23      Baird in a few minutes and see what his thinking is.
24  A.  Yes.
25  Q.  Did you speak with Mr. Baird that day?

Page 50

1  A.  I don't recall, but I probably did.
2  Q.  And do you recall any discussions with Mr. Baird that
3      day on the subject of the possibility of a Chapter 9
4      filing by the City?
5  A.  No.  I don't recall any discussions with Rich Baird
6      about the possibility of a Chapter 9 filing at this
7      point, no.
8  Q.  Okay.  But clearly at this point in time one of the
9      things you were focused on was the possibility of a
10      Chapter 9 filing and the legal issues that might
11      pertain to that as reflected in this email; correct?
12  A.  As I have said before, the issue of a Chapter 9 filing
13      had been discussed many, many times with regard to
14      Detroit for the better part of the prior decade, so in
15      doing my sort of due diligence of what the statute
16      required, part of what I was doing was reading some of
17      those very articles that I mentioned earlier today
18      where some of the prior City employees were
19      recommending that there was a filing in 2005 in
20      connection with the cops, 2006 with the cops, 2009
21      with the SWAPs, so yes, Chapter 9 had been discussed
22      many, many times in the papers I was reading.
23  Q.  And from all the discussions that you had to date with
24      various people including those at Jones Day, were you
25      aware that one of the issues with PA 436, one

Page 51

1      potential ground for challenge, was that it allowed
2      the governor to authorize a bankruptcy filing without
3      imposing a condition that would prevent pension
4      obligations from being impaired?
5  A.  I don't know if I was aware of that issue at this
6      time, no.
7  Q.  Well, were you aware -- you became aware of it if not
8      then at some point shortly thereafter; correct?
9  A.  Yeah, let me say this.  There was no broad based
10      concern at this point about with what the authority
11      was with regards to pensions so any sort of
12      insinuation that that was the focus at this point is
13      just inaccurate.  That wasn't true.  This as I said
14      before was a very cursory and initial sort of review
15      of what I was being asked to do so when I had a
16      discussion with Mr. Baird later I would have some
17      information and that's what I gleaned based upon a few
18      hours since apparently I got the call -- I was
19      informed that day, that morning or the day before to
20      the time I was going to have a call that afternoon.
21  Q.  But I take it at some point in time you became aware
22      that Article 9, Section 24 of the Michigan
23      Constitution protects pension benefits from being
24      diminished or impaired?
25  A.  I believe at some point in time I became aware that

Page 52

1      Article 9, Section 24 purports to protect pensions and
2      benefits in certain circumstances, yes.
3          MR. ULLMAN:  Let's mark Exhibit 5.
4          (Marked Exhibit No. 5.)
5  Q.  Exhibit 5 is just a printout of Article 9, Section 24
6      of the Michigan Constitution.  Do you recognize it as
7      such?
8  A.  I mean, the document speaks for itself, but that
9      appears to be what it is, yes.
10  Q.  Okay, and I think your last answer you said that in
11      your view Section 24, Article 9 purports to protect
12      pensions and benefits in certain circumstances.
13  A.  Yes.
14  Q.  And are you contending that the words of Article 9,
15      Section 24 means something other than what they say?
16          MR. SHUMAKER:  Objection, calls for legal
17      conclusion.
18  A.  Yeah, I -- here again, I think the document speaks for
19      itself.  I think that my response to that issue is
20      throughout the arc of my career, whether in federal
21      government or in private practice at the Chrysler
22      case, there have been many state laws, some of them
23      quite sacrosanct, that have been abrogated by federal
24      law, not just bankruptcy law.  At the RTC we preempted
25      state, New York state, rent control litigation, law;

Page 53

1    we preempted California state escheat law; we
2    preempted -- and that was the model for 50s.  In
3    Chrysler, we preempted 50 states have dealer franchise
4    laws that were preempted.  So when I said I recognize
5    this, there are federal laws that preempt state laws.
6         MR. ULLMAN:  I'm going to move to strike as
7    nonresponsive.
8    Q.  Mr. Orr, I appreciate your perhaps trying to be
9    helpful, but my question was really very limited and I
10   would appreciate it if you could just answer it.
11        MR. ULLMAN:  Could I have my question read
12   back, please?
13        (Record read back as requested.)
14   A.  I think that calls for a legal conclusion and I
15   contend that they speak for themselves.
16   Q.  Now, you made mention in your -- I think when you were
17   giving your prior response, you made some allusion to
18   federal law.
19   A.  Uh-huh.
20   Q.  Is there any question in your mind that apart from
21   anything that may come into play under federal law,
22   that the constitution of Michigan, Article 9, Section
23   24, prohibits pension rights from being diminished or
24   impaired?
25        MR. SHUMAKER:  Objection, calls for legal

Page 54

1    conclusion.
2    A.  The document, as I said, speaks for itself.  Certainly
3    I think I've said before that parties can negotiate a
4    resolution of contracts.
5    Q.  That's -- that's not my question.
6         MR. ULLMAN:  Could you -- can you read my
7    question back?  If there's anything about it you don't
8    understand, I would be glad to rephrase.
9         THE WITNESS:  Uh-huh.
10        (Record read back as requested.)
11        MR. SHUMAKER:  Objection to form, calls for
12   legal conclusion.  You can answer.
13   A.  Yeah, I think it does call for legal conclusion, but
14   as I said, contractual obligations can be negotiated
15   at any time.
16   Q.  Let me rephrase it.
17        You understand what the constitution is
18   talking about is diminishing or impairing is
19   nonconsensual; correct?
20        MR. SHUMAKER:  Objection, calls for legal
21   conclusion.
22   Q.  Let me rephrase it so there can't be any ambiguity.
23   Clearly parties can if they so choose change their
24   contract; rights?
25   A.  Yes.

Page 55

1    Q.  Is there any question in your mind that Article 9,
2    Section 24 of the Michigan Constitution protects
3    pension rights from being diminished or impaired if
4    the beneficiaries of those rights do not agree
5    consensually to such diminishment or impairment?
6         MR. SHUMAKER:  Objection, calls for legal
7    conclusion.
8    A.  I think I've answered that before.  I think there's
9    certain federal laws that allow for preemption --
10   Q.  I'm asking about independent of any federal law.  The
11   Michigan Constitution on its own, apart from any
12   overlay that you say may apply from federal law, is
13   there any question that the Michigan Constitution,
14   assuming that the beneficiaries of the retirement
15   obligations don't consent, any question that in that
16   circumstance the Michigan Constitution prohibits
17   pension rights from being diminished or impaired?
18        MR. SHUMAKER:  Objection, calls for legal
19   conclusion.
20   A.  Here again, Mr. Ullman, you're asking me -- I'm a fact
21   30(b)(6) witness, you're asking me for a legal
22   conclusion about what the statute says.  I'll say that
23   the statute speaks for itself and I certainly have
24   heard that people take that position.
25   Q.  Okay, and I'm asking you -- I'm not asking you to give

Page 56

1    a legal view.  You took the position as an Emergency
2    Manager, which is a nonlegal position; correct?
3    A.  Yes.
4    Q.  And I'm asking whether in your position as Emergency
5    Manager you came to an understanding as to what the
6    Michigan Constitution provides in the course of
7    carrying out your duties as a Michigan -- or City of
8    Detroit Emergency Manager.
9    A.  Let me put it to you this way.  I certainly have heard
10   that parties maintain that you cannot diminish based
11   upon this constitutional provision.  For a whole host
12   of reasons whether that's accurate or not there are
13   legal arguments being made.  I understand you want me
14   to say that I understand what this statute says or
15   what the constitution says and I say the language
16   speaks for itself.  I understand what it says in plain
17   language.
18   Q.  So you really just won't answer the question; will
19   you?
20        MR. SHUMAKER:  Objection to form.
21   A.  No, I've answered your question the best I can.
22   Q.  So is it your contention that apart from getting
23   advice from others, from counsel, as to what it means,
24   it the Michigan Constitution, you yourself have no
25   independent view as to what the import of the Michigan

Page 57

1   Constitution is as regards pension rights?
2   A.   I think the Michigan Constitution speaks for itself
3       and as I've said many times, I have a view in other
4       matters I've been involved with where state laws have
5       been preempted and I have a view that people can
6       negotiate contractual obligations. If you're asking
7       for a legal conclusion as to what the constitution, I
8       don't think that's appropriate for me to make. I do
9       understand what the statute says, though.
10  Q.   Fair enough.
11          Let's go onto the next email, which is --
12      will be marked as Exhibit 6.
13          (Marked Exhibit No. 6.)
14  Q.   This is an email, you were involved in it.
15  A.   Uh-huh.
16  Q.   It ends -- the first page ends in Bates number 216.
17      These are emails between Richard Baird and you; do you
18      see that?
19  A.   Yes.
20  Q.   Now, is it correct that as of this time it had been at
21      least informally decided that you would take the EM
22      position?
23  A.   I don't know if that's correct as of February 20th.
24      What I do know -- let me -- well, let me read the
25      email.

Page 58

1          I don't know if I had actually informally
2       agreed to take the job at that time. What I do know
3       is that there were discussions about me taking the job
4       and that I believe the mayor had said that he wanted
5       to meet me and have a discussion about what the
6       relationship between the Emergency Manager and the
7       mayor would be.
8   Q.   Let me look -- and direct your attention to the bottom
9       email, second sentence. This is from Baird to you.
10  A.   Yeah.
11  Q.   It's talking about a conversation Baird had with the
12      mayor. He says, he Baird, writes, told him, the
13      mayor, that there were certain things I would not
14      think we could agree to without your review.
15          He's writing to you?
16  A.   Yes.
17  Q.   So this is Kevyn Orr's review?
18  A.   Yes.
19  Q.   Assessment and determination (such as keeping the
20      executive team in its entirety).
21  A.   Yes.
22  Q.   Aren't those -- the ability to have the mayor's
23      executive team kept on in its entirety, isn't that
24      something that's within the authority of the Emergency
25      Manager?

Page 59

1   A.   Yes.
2   Q.   And so in saying that we can't make this determination
3       without Kevyn Orr's review and determination, does
4       that not indicate that by this time that you had at
5       least told them you would take the position of EM?
6   A.   No.
7   Q.   So if that's the case, why, as you understand it,
8       would Mr. Baird be telling the mayor that there are
9       things he couldn't agree with without getting your
10      sign-off on?
11  A.   As I recall at this time, we were still discussing
12      whether or not I would take the job. I don't recall
13      how it came up, but there was some discussion about
14      what the EM's, quote unquote, partnership would be
15      like with the mayor. I also recall at this time I was
16      told that there were other candidates that were being
17      reviewed, but that they wanted to, meaning Rich,
18      wanted to continue to have discussions going forward
19      and this is one of the issues that came up in those
20      discussions.
21  Q.   You agree that he, Baird, is writing this email that
22      he couldn't agree to changing the mayor executive team
23      without your, Kevyn Orr's, review and determination;
24      correct?
25          MR. SHUMAKER: Objection, form.

Page 60

1   A.   I think the document speaks for itself. That's what
2       it says, but in February, as I said, it was still
3       preliminary and in fact I think the discussion that we
4       were having at that time was that even the mayor
5       wanted to meet me, I have certainly interested in
6       meeting him, prior to me deciding to take the job.
7   Q.   And this email does not say that Baird can't make --
8       may reach an agreement without the assessment, review
9       and determination of whoever it is that ends up taking
10      the EM position; does he?
11  A.   No, the document speaks for itself, but I have no way
12      of knowing if similar emails were sent to other
13      candidates. I don't know.
14  Q.   Now, at the end of this email Mr. Baird writes, we'll
15      broker a meeting via note between you and the mayor's
16      personal assistant that is not FOIAble.
17          Do you have an understanding of what that
18      means to be nonFOIAble?
19  A.   I think that means that whatever discussions they have
20      aren't subject to the Freedom of Information Act
21      either state or federal.
22  Q.   And you have an understanding as to why Mr. Baird
23      wanted meetings between you and the mayor's personal
24      assistant to be not subject to FOIA?
25  A.   I don't -- I don't read this email as saying a meeting

Page 61

1   meeting between me and the mayor's personal assistant.
2 Q.  He says, we'll broker a meeting via note between you
3   and the mayor's personal assistant who is not FOIAble?
4 A.  Yeah, as I read this email -- I never met with the
5   mayor's personal assistant so let's get that out of
6   the way. As I read this email, we were talking about
7   a meeting between me and the mayor.
8 Q.  Right, and isn't he -- fair enough. And isn't Baird
9   saying that he wants to set up a meeting via going
10   through the mayor's personal assistant who is not
11   FOIAble?
12 A.  I think that's a fair reading.
13 Q.  And do you know why he wanted to go through the route
14   of setting up this meeting through someone who is not
15   FOIAble?
16 A.  No.
17 Q.  Did you subsequently have a meeting with the mayor?
18 A.  Yes.
19 Q.  And what was said at that meeting?
20 A.  I think the first meeting was -- my impression of the
21   first meeting was just a meet and greet. I think the
22   mayor wanted to get an assessment of who I was as
23   potentially coming into the City as a potential
24   Emergency Manager and to sort of get to know me, start
25   to get to mow me.

Page 62

1 Q.  How many meetings were there with the mayor before you
2   became the EM?
3 A.  At least two.
4 Q.  Do you recall when they took place?
5 A.  I do not.
6 Q.  Okay.
7 A.  Somewhere around this time frame.
8 Q.  And was the subject of Chapter 11 filing discussed at
9   either of those meetings?
10 A.  No.
11 Q.  Was the subject of a potential Chapter 11 filing
12   discussed at either of those meetings? I'm sorry.
13   Let me rephrase my question.
14 A.  I can answer your question. No, neither Chapter 9 nor
15   Chapter 11.
16 Q.  So you didn't discuss even the potentiality of a
17   Chapter 9 filing at either of those meetings with the
18   mayor; is that your testimony?
19 A.  Yes. I don't recall -- let me. We may have -- I was
20   a bankruptcy attorney, we may have discussed it, but I
21   don't recall discussing specific issues regarding
22   Chapter 9 or to the extent people are suggesting that
23   that was predetermined. I don't recall those kinds of
24   discussions.
25 Q.  Do you recall any discussion with the mayor as to the

Page 63

1   issues that the City faced as a result of the pension
2   obligations?
3 A.  No. Frankly, our first meeting was more me telling
4   him how happy I was to meet him, I was a basketball
5   fan, particular fan of his for many years, getting his
6   understanding of the City --
7 Q.  I'm sorry, Mr. Orr, I don't mean to interrupt you, but
8   that really wasn't responsive. My question was really
9   a yes or no question. I didn't ask tell me everything
10   you said. I asked a specific question.
11       MR. ULLMAN: Why don't you read it back?
12       THE WITNESS: What was your question again?
13       (Record read back as requested.)
14 A.  No, I don't recall that discussion.
15 Q.  And the same question for both meetings, so I'm not
16   sure if that question was limited to the first
17   meeting.
18 A.  I don't recall having those discussions in either
19   meeting.
20 Q.  Do you recall any discussion in either meeting with
21   the mayor about the issues the City was facing with
22   its obligations for healthcare benefits for retirees?
23 A.  No, I don't recall either meeting having those
24   discussions.
25 Q.  Show you the next document, which we'll mark as

Page 64

1   Exhibit 7.
2       (Marked Exhibit No. 7.)
3 Q.  And I would like you to in particular if you would to
4   focus on the email at the top of -- let me identify
5   this first. This is an email chain beginning at Bates
6   page 459 and what I would like you to do, Mr. Orr, is
7   focus on Bates 461, the email at the top of that
8   page.
9 A.  461?
10 Q.  Please.
11 A.  Yes.
12 Q.  You see at the top there's an email from you to
13   Mr. Baird?
14 A.  Yes.
15 Q.  Eight o'clock, 8:17 at night?
16 A.  Yes.
17 Q.  And you talk among other things about what would be
18   expected on day one. Do you see that at the bottom?
19 A.  Yes.
20 Q.  So is it fair to say that by this time you had already
21   known that you were going to take the EM job?
22 A.  No.
23 Q.  So why were you then asking about what you can expect
24   on day one?
25 A.  Because at this point I was still considering whether



Page 65

1    or not I would take the job, but I was doing my due
2    diligence.  As you can see from the email, there was
3    this proposed partnership agreement that the mayor
4    submitted.  I say that my intent is not to undermine
5    the mayor's role or the good faith with which I
6    suspect all parties will move forward, but I wanted to
7    include qualifications not just from my role as EM but
8    also for the future.  So there was still no
9    determination that I would take the job, but I was
10   moving forward on trying to get an idea of what was
11   expected of me if I were to take the job and also, for
12   instance, when I look at the documents, representative
13   samples of the CBAs and the SWAP and related
14   agreements.
15 Q.  You write in the last paragraph that you've been
16   pouring over the law and the board's findings to
17   assure that you have some idea about what's
18   permissible and expected on day one; correct?
19 A.  Yes.
20 Q.  And by permissible and pouring over the law you meant
21   you wanted to understand and be aware of what was
22   permissible under the law; is that right?
23 A.  Yes.  As I said earlier today, my initial look was
24   very high level and cursory and then as this
25   discussion evolved, I started digging down more into

Page 66

1    the law.
2  Q.  And on the attachment that we have here, which begins
3    at Bates page 463, the attachment to this email chain;
4    do you see that?
5  A.  Yes.
6  Q.  And this is a list of various items that are under
7    discussion; is that right?
8  A.  Yes.
9  Q.  And you see item 7?
10 A.  Yes.
11 Q.  It says labor, retiree and benefit initiatives will be
12   pursued jointly by the mayor and the manager to the
13   extent permitted by law?
14 A.  Yes.
15 Q.  And that was part of the current thinking at the time,
16   was it, that that's one of the things the EM was going
17   to do?
18 A.  Yes, I think it was envisioned in the statute and this
19   I believe came off of the mayor's initial proposal,
20   but yes.
21 Q.  And the retirees and benefit initiatives, those
22   included initiatives to deal with pension and
23   healthcare costs; is that right?
24 A.  To be honest with you, as you can see from my email on
25   page 461, I was still trying to get an idea of exactly

Page 67

1    what they included by asking for the CBAs and the
2    background documentation so I don't want to give you
3    the wrong impression that item number 7 has the level
4    of specificity that you seem to be suggesting.  I was
5    still getting an idea of what they were.
6  Q.  I'm -- I wasn't suggesting anything.  I was asking
7    whether the retiree and benefit initiatives that are
8    referred to in item 7 included initiatives related to
9    the pension and retirement healthcare costs?
10       MR. SHUMAKER:  Objection, form.
11 A.  They might, but to be honest with you, at this time
12   there wasn't that level of specificity.  Seven
13   certainly -- the document speaks for itself.  Seven
14   says labor retiree and benefits initiative, but to the
15   extent your question is trying to suggest that there
16   were detailed levels, no, I was still doing my due
17   diligence.
18 Q.  There was some general understanding that there were
19   issues pertaining to pension and healthcare benefits;
20   is that right?
21 A.  I -- yes, I think there had been issues concerning
22   pension and healthcare benefits for years as I poured
23   over the consent decree and the various reports made
24   by the State from 2010 forward, yes.
25 Q.  You were aware that the pension costs and healthcare

Page 68

1    costs were among the more pressing issues that the
2    City of Detroit was facing at the time?
3  A.  I'm not sure I was aware that they were among the more
4    pressing issues at that time.  I certainly knew that
5    they were significant.  Frankly, at that time I was
6    looking at debt.
7  Q.  And at this point in time did you do any analysis as
8    to what was permissible under law regarding retiree
9    benefits?
10 A.  No, I think my prior email at Bates stamp 461 says I
11   needed to get more documentation to get an
12   understanding.
13 Q.  And your email here at the top of page 461 says, I've
14   been pouring over the law --
15 A.  Yes.
16 Q.  -- to find out about what is permissible.  And my
17   question was did that involve any consideration of
18   what was permissible under the law as regards pension
19   and healthcare benefits?
20 A.  It might have, but the permissible that I was
21   referring to was permissible writ large as far as what
22   were the Emergency Manager's duties, which necessarily
23   could have included, but I don't want to give you the
24   wrong impression that that was the fundamental focus
25   or the primary focus of what I was saying here.  It

Page 69

1 wasn't. It was the Emergency Manager's duties writ
2 large.
3 Q. And when you say you were pouring over the law, you
4 yourself were doing legal analysis, reading various
5 laws; is that right?
6 A. Yes, I was trying to get background information, yes.
7 Q. And as part of that background information did you
8 read Article 9, Section 24 of the Michigan
9 Constitution?
10 A. I may have.
11 Q. Is there any question in your mind that you didn't?
12 A. I -- if you have a document to refresh my
13 recollection, I'm happy to look at it. Sitting here
14 on this day on February 20th, I don't recall whether
15 or not I read that article of the constitution.
16 Q. There's no question that at some point after February
17 20th you read Article 9, Section 24 of the Michigan
18 Constitution; correct?
19 A. My testimony is it may have been before or after the
20 20th. I don't recall whether I did that sitting here
21 today.
22 Q. Okay, but it was either one or the other, but you
23 certainly have read it?
24 A. Yes, I've read it. I read it today.
25 Q. And you read it before you became Emergency Manager;

Page 70

1 didn't you?
2 A. Yes.
3 Q. One other question on this document actually. As you
4 look at page 460, at the bottom there's a February 21
5 email.
6 A. Yes.
7 Q. And it refers to point 8 of the attachment. This
8 again has to do with the mayor's existing executive
9 team; right?
10 A. Yes.
11 Q. And in this time -- this is from Mr. Baird again;
12 right?
13 A. Yes.
14 Q. And he's really explicit. He says, other than a few
15 grammatical nits, and some more language around point
16 8, so we can manage expectations if Kevyn needs to
17 make some personnel changes. So he's clearly
18 referring here to you making personnel changes that
19 could affect the mayor's existing executive team;
20 isn't he?
21 A. Yes, this wasn't written to me, but I'll read it. I
22 mean to myself. Yes, document speaks for itself, but
23 that seems to say that.
24 Q. Isn't it clear at this point that it was envisioned
25 and understood that Kevyn Orr, you Mr. Orr, were in

Page 71

1 fact going to be the Emergency Manager for the City of
2 Detroit?
3        MR. SHUMAKER: Objection, calls for
4 speculation.
5 A. No.
6 Q. And you agree the document speaks for itself; don't
7 you?
8 A. I just said that.
9        MR. ULLMAN: Maybe this would be a good
10 time for a break.
11        THE VIDEOGRAPHER: Going off the record at
12 11:28 a.m.
13        (A brief recess was taken.)
14        THE VIDEOGRAPHER: We're back on the record
15 at 11:42 a.m.
16 BY MR. ULLMAN:
17 Q. Mr. Orr, is it correct that prior to the official
18 announcement that you said was in March -- on March
19 13th or 14th you had had conversations with the State
20 where you said that you would take the OM job -- I'm
21 sorry, the EM job?
22 A. I think at that time in all fairness it was EFM.
23 Q. Correct.
24 A. Prior to the official announcement? I think at some
25 point I became the candidate select, but I don't think

Page 72

1 that I actually accepted the job -- that I was going
2 to take the job until the day I resigned, which was
3 March 15th. I mean, I may have said yes, I'm all in
4 or something like that, subject to background
5 investigation and stuff like that.
6 Q. And that would have been sometime prior to March 13th?
7 A. I think I became the finalist sometime prior to March
8 13th, yes.
9 Q. And that's when it became final subject to passing the
10 background, yes?
11 A. Right, and resigning from the firm and some other
12 things.
13 Q. Now, at that point and time and up to the time that it
14 became official that you were going to be the EM, did
15 you have any conversations with anyone at the state or
16 city level about the possibility of the Chapter 9
17 filing?
18 A. Probably, yes.
19 Q. And can you tell me with whom those conversations took
20 place and when?
21 A. No, I don't think I had them -- those types of
22 conversations with Rich Baird, those were more about
23 the job requirements and background. If you have
24 something to refresh my recollection.
25 Q. I'm just asking a question.

Page 73

1  A.  Yeah, I don't recall -- I may have had about filing a
2      Chapter 9 or about the possibility of a Chapter 9?
3  Q.  Either, both.
4  A.  Okay.  I don't recall.
5  Q.  Okay.  Now, at some point you -- when you became the
6      Emergency Manager or the Emergency Financial Manager,
7      you became an officer of the state and subject to the
8      state laws; is that right?
9  A.  No.  I am a contractor to the state.
10 Q.  But you do -- you are subject to the state laws; are
11     you not?
12 A.  Yes, I think --
13 Q.  And in fact, you're obligated to uphold the state
14     laws; are you not?
15 A.  I don't know if my contract says that I'm obligated --
16     I think my contract says I'm obligated to do my duties
17     to the best of my abilities and I think it requires me
18     not to have any obligations due to the state, but I
19     don't know if it requires me to uphold state laws.
20 Q.  Is it your view that as Emergency Manager you are not
21     required to comply with state laws and obey state
22     laws?
23 A.  I think it's my view as the Emergency Manager that I'm
24     required to discharge my duties as the best of my
25     ability to rectify the financial emergency of the

Page 74

1      City.
2  Q.  Okay, thank you.
3          MR. ULLMAN:  Can you have my question read
4      back, please?  And I would like an answer.
5          (Record read back as requested.)
6  A.  The reason I said what I said is because I think the
7      statute allows me to abrogate certain state laws and
8      so when you say you comply with state laws, 436
9      clearly allows me not to comply with certain laws,
10     so --
11 Q.  And -- okay, so it's your view that under PA 436 you
12     have the ability not to comply with certain state
13     laws?
14 A.  Yes.
15 Q.  And what section of 436 gives you that ability?
16 A.  There's section 12 gives me the authority to abrogate
17     contracts, to readdress financial agreements, there
18     are a number of powers in the statute, take over
19     underfunded pensions, if that's what you're looking
20     for.  There are a number of provisions in the statute
21     that mean I don't have to comply with state law.
22 Q.  Okay.  And PA 436 is itself part of state law; right?
23 A.  Yes.
24 Q.  So if you did something that's specifically authorized
25     under PA 436, would it be in violation of state law?

Page 75

1  A.  No.
2          MR. ULLMAN:  Objection, calls for legal
3      conclusion.
4  Q.  So I'm asking you is there anything in PA 436 that
5      specifically says that you're entitled to not comply
6      with state law?
7  A.  I -- we're being somewhat circular here.
8  Q.  It's like cat and mouse.  Is there a general provision
9      in PA 436 that says the Emergency Manager need not
10     comply with the laws of Michigan State?
11 A.  My testimony is --
12 Q.  Can you just answer my question?  You could say yes,
13     no or I don't know.
14 A.  I'm trying to answer your question, if you let me.
15 Q.  No, I would like a direct answer to my question, not a
16     speech.
17 A.  I'm trying to give you a direct answer.
18 Q.  Okay, let's hear it.
19 A.  I was going to give it to you.  The statute allows the
20     Emergency Manager to take certain actions which by
21     definition would impact certain state laws.  Your
22     question was whether there's a general prohibition
23     that exempts.  That may be a legal conclusion, because
24     there are many powers under 436 and someone may
25     conclude, the Court for instance, that generally the

Page 76

1      intent is to allow the Emergency Manager to do certain
2      things in a financial emergency.  I'm trying to
3      respond to your question as the Emergency Manager.
4      There are certain laws that clearly under 436 I have
5      the authority to abrogate.
6  Q.  Is the constitution of the State of Michigan one of
7      those?
8  A.  I think that's a legal conclusion.
9  Q.  No, I'm asking your understanding as the Emergency
10     Manager.
11 A.  My understanding is that's a legal conclusion.
12 Q.  You -- apart from saying it's a legal conclusion, do
13     you have a view on that one way or the other?  I'm not
14     asking for your legal opinion, I'm asking for your
15     view in your capacity as Emergency Manager whether PA
16     46 allows you to disregard the strictures of the
17     Michigan Constitution?
18 A.  I think that's a legal conclusion.  I'll explain it,
19     if you want me to.
20 Q.  I'm just asking whether you have a view.
21 A.  Yes, I think it's a legal conclusion.
22 Q.  And what is the legal conclusion that you believe
23     exists?
24 A.  Without going into discussions with attorneys and
25     others, the legislature of the State of Michigan is

Page 77

1     presumed to have an active 436 with a full
2     understanding of other state laws including the
3     constitution prohibition you're focusing on.
4  Q. I didn't focus on the constitution prohibition.
5  A. Well, you focused on it today.
6  Q. In my question I asked a general question. I did not
7     focus on a specific provision.
8  A. Okay, then we'll do it generally. My understanding is
9     that the Michigan legislature is presumed to have
10     understood the requirement of other state laws and in
11     choosing to enact 436 gave the Emergency Manager
12     certain powers which may conflict with those state
13     laws.
14  Q. I'm asking about the constitution now.
15  A. Including the constitution. I said it was.
16  Q. Does the legislature of the State of Michigan have the
17     power through an enacted law to allow people acting
18     for the state or for the local governments of the
19     state to disregard the Michigan Constitution?
20        MR. ULLMAN: Object to form, calls for
21     legal conclusion.
22  A. Here -- that's why I started this discussion by saying
23     to you that calls for a legal conclusion. In fact,
24     some of those issues are being briefed now.
25  Q. And it's your position that the Michigan legislature

Page 78

1     does have that authority?
2  A. It's my position that that calls for a legal
3     conclusion.
4  Q. Okay, so you won't answer my question?
5  A. No, I think it calls for a legal conclusion.
6  Q. That's an objection your counsel can make. I'm asking
7     you what your view is. I'm entitled to your view.
8     Whether it's a legal conclusion goes to the weight of
9     it.
10  A. I just gave you my view.
11  Q. Your only view is that it's a legal conclusion?
12  A. No, my view is that the Michigan legislature is
13     presumed to have understood what it was doing when it
14     enacted it --
15  Q. That's not my --
16  A. You're not allowing me to answer.
17        MR. ULLMAN: Why don't you read the
18     question again?
19        MR. SHUMAKER: Why don't you read the
20     question back?
21        (Record read back as requested.)
22  Q. That is, the authority to allow people acting for the
23     state or the local governmental units to disregard the
24     constitution of the State of Michigan?
25        MR. ULLMAN: Objection, calls for a legal

Page 79

1     conclusion.
2  A. I would suggest that since these issues are being
3     briefed, my opinion is that I am acting within my
4     authority as Emergency Manager that allows me to
5     abrogate certain provisions, which may or may not
6     include the constitution.
7  Q. And I'm simply asking for your understanding as to the
8     question I asked which is whether it is your
9     understanding, your understanding and belief, that the
10     legislature of Michigan has the power to allow those
11     acting for the state or the local governments to
12     disregard the Michigan Constitution. Your
13     understanding, Mr. Orr.
14  A. I think the legislature might, but here again, that's
15     a legal conclusion.
16  Q. Now, we have been talking more specifically about
17     Section 24 of Article 9 of the Michigan Constitution;
18     is that right?
19  A. Yes.
20  Q. Is there anything in PA 436 that makes specific
21     reference to the Emergency Manager being able to
22     disregard the strictures of Article 9, Section 24?
23  A. I'm going to say again, within the powers afforded the
24     Emergency Manager one of those powers is to abrogate
25     contracts. The Article 9, Section 24 you're speaking

Page 80

1     to says it's contractual obligation. That's what it
2     said. The reason I'm saying it calls for legal
3     conclusion is because 436 says the Emergency Manager
4     can break contracts and you're talking in Article 9,
5     Section 24 about a contractual obligation. Judges
6     will ultimately have to decide this issue, I suppose,
7     but the way the statute is written it could be
8     interpreted that way.
9  Q. Are you aware that there are provisions in PA 436 that
10     specifically require the Emergency Manager not to
11     violate Article 9, Section 24, do anything that would
12     diminish pension rights that are protected by that
13     article?
14  A. If you could point me to a specific provision.
15  Q. Okay. So you're not aware is your answer?
16  A. No, I'm -- that's why I keep telling you. This area
17     that you're in calls for legal conclusions that are
18     currently being briefed and quite frankly I'm
19     reluctant to give you a legal conclusion as far as my
20     understanding. My understanding is 436 gives the
21     Emergency Manager certain powers. My understanding is
22     that the statute that you're talking about, Article 9,
23     Section 24, speaks for itself. But amongst those
24     powers in 436 is the ability to breach contracts.
25  Q. Let me ask you this and then we'll move on. Are you

Page 81

1    aware of any words in PA 436 that specifically
2    authorize the Emergency Manager to disregard the
3    strictures of Article 9, Section 24? I'm asking about
4    words, in haec verba, I'm not asking interpolations or
5    extrapolations. I'm asking whether to your knowledge
6    if there is anything in PA 436 that explicitly says
7    that.
8    A.   I'm going to stay away from explicitly, but I'll try
9    to answer your question. If your question is is there
10   anything in 436 that says the Emergency Manager is
11   exempt from Article 9, Section 24, I've not read that
12   in the statute. But when you say explicitly, as I've
13   said several times now, those interpretations require
14   legal conclusions that are in fact being discussed and
15   briefed as we want, so I'm being very careful not to
16   give an interpretation as the Emergency Manager that's
17   contrary to what the statute provides. Ultimately I
18   suspect a jurist will have to resolve that issue.
19   Q.   You took an oath of office when you became the
20   Emergency Manager; did you not?
21   A.   Yes, yes, I did.
22   Q.   And I think these are the words you swore. You said,
23   I do solemnly swear that I will support the
24   constitution of the United States and the constitution
25   of this state and that I will faithfully discharge the

Page 82

1    duties of the office of Emergency Financial Manager,
2    City of Detroit, according to the best of my ability.
3            Do you remember giving that oath?
4    A.   Yes.
5    Q.   And were you speaking truthfully when you gave that
6    oath?
7    A.   Yes.
8    Q.   And did the oath you give apply equally to how you've
9    conducted yourself as Emergency Manager when PA 436
10   became effective?
11   A.   I believe so.
12   Q.   Now, after you became the Emergency Manager, you
13   certainly specifically considered the question of a
14   Chapter 9 filing; right?
15   A.   Yes.
16   Q.   Okay. And did you consider specifically the issue of
17   whether the City had in the course of a Chapter 9
18   filing the right to seek relief that would adversely
19   affect pensions that were vested?
20   A.   Yes.
21   Q.   And isn't it correct that the retirement obligations
22   were among the largest obligations that are facing the
23   City of Detroit?
24           MR. ULLMAN: Objection, form.
25   A.   Retired -- retired obligations meaning both OPEB and

Page 83

1    what we call unfunded pension obligations.
2    Q.   Both, I'm asking collectively.
3    A.   Yes, they're the largest cohort of unsecured claims.
4    Q.   And at the time that you became the EM, how large did
5    you understand the un -- I'm sorry?
6    A.   No, I'm just saying at the time it came to me, how
7    large I understand the unfunded amount to be?
8    Q.   The unfunded retirement obligations to both the
9    pension and what you call OPEB.
10   A.   It was unclear, because at the time I became Emergency
11   Financial Manager, there were reports issued by the
12   State that put the total debt of the City at
13   12 billion I believe it is, then there were subsequent
14   reports that followed on that and put it at
15   14 billion. So at various times the figure grew.
16   Q.   And the two aspect components I've asked about, the
17   pension and the OPEB, those were very large; were they
18   not?
19   A.   I don't think they're large. There were still several
20   billions of dollars.
21   Q.   They were in the billions of dollars?
22   A.   Yes.
23   Q.   And those were among -- there were obviously a number
24   of issues but those were among the financial issues
25   that were impediments to Detroit's fiscal health; is

Page 84

1    that right?
2    A.   I believe so.
3    Q.   And did the governor share that view with you?
4    A.   No.
5    Q.   He thought that the pension and OPEB obligations were
6    not impediments to Detroit's fiscal health?
7    A.   No, the governor -- the only discussion I had with the
8    governor was at a very high level about the dire
9    straits of the City and the need for some -- it was
10   actually the dire straits of the City and the need for
11   some reform. There was no specific discussion about
12   pension or OPEB.
13   Q.   Now, at some point after you became the Emergency
14   Manager, did you have discussions with the governor
15   about a Chapter 9 filing to among other things get out
16   of the pension obligations that the City owed?
17           MR. SHUMAKER: Object to form.
18   A.   Yes, I believe so.
19   Q.   And when did those take place?
20   A.   Since becoming Emergency Manager on the 25th I've had
21   regular conversations with the governor. Typically
22   weekly. I don't recall the specific conversation when
23   they came up. I will say that it wasn't within our
24   initial conversations.
25   Q.   Okay. And we're talking -- these conversations, are

Page 85

1  we talking about from the time you became the
2  Emergency Financial Manager or the EM?  In other
3  words, would it be -- are we talking about the early
4  or the late March time frame?
5  A.  Yeah, I don't think after the rollout and me becoming
6  effective on the 25th, I think the new statute came
7  into play within days of that.  I don't think the
8  governor and I had any discussions from the -- I'm not
9  trying to draw a gap between EFM and EM.
10  Q.  So this would have been within a few weeks?
11  A.  Yes.
12  Q.  After you became the EM would it be fair to say by
13  then you certainly had the discussions with the
14  governor?
15  A.  Yeah, but here again they weren't specific discussions
16  about pension and OPEB, they were more discussions
17  about getting to what the numbers were and the initial
18  processes of getting into the City.
19  Q.  Okay.  And in the course there were discussions that
20  you indicated about the possibility of filing a
21  Chapter 9?
22  A.  Yes, those discussions came on later.
23  Q.  And one of the things the Chapter 9 filing would
24  potentially allow you to do is get out of the pension
25  obligations; is that right?

Page 86

1  A.  Yes.
2        MR. SHUMAKER:  Object to form.
3  Q.  Now, I take it after you became Emergency Manager you
4  explored what the issues and the options were with,
5  among other things, the pension liabilities that the
6  City faced?
7  A.  Not -- no, the initial thing we started to do was to
8  try to drill down on the extent of the City's
9  financial obligations.
10  Q.  That really wasn't my question.  I didn't ask what the
11  first thing you did was.
12        MR. ULLMAN:  So why don't you just read
13  back my question?
14        (Record read back as requested.)
15  A.  At some point.
16  Q.  And do you recall when -- scratch that.
17        And did you look at various options that
18  were available to you as EM to reduce the pension
19  liabilities that existed for the City?
20  A.  Among other things.
21  Q.  And did you look at what avenues existed under state
22  law without recourse to any federal law?  In other
23  words, independent of what any federal law might
24  apply, what remedies or relief if any was available
25  under state law only?

Page 87

1  A.  I'm taking my time because I'm trying to remember.
2  There were a number of different analyses and briefing
3  papers and -- that would come across the desk and I'm
4  not sure any of them focused solely on state law.
5  Q.  Okay.  And what else -- what other law did they focus
6  on if not solely state law?
7  A.  They may have focused on state law and federal law.
8  Q.  So you don't recall if there was any analysis that
9  just looked at state law?
10  A.  No, sitting here today, I don't recall.  There may
11  have been, but I don't recall.
12  Q.  And were you aware prior to the bankruptcy filing that
13  under state law alone the pension obligations could
14  not be diminished or impaired?
15  A.  This is the discussion we had about five to ten
16  minutes ago about whether or not state law permitted
17  it and I will go back to my answer with that.  It
18  seems to suggest a legal conclusion based upon what
19  the statute 436 provides and the intent of the
20  legislature.
21  Q.  Let me ask you a different question.
22        Is there anything in PA 436 that allows in
23  your view the Emergency Manager to impact or adversely
24  affect pension rights in the absence of a Chapter 9
25  bankruptcy filing?

Page 88

1        MR. SHUMAKER:  Objection, calls for legal
2  conclusion.
3  A.  It's the same discussion we had five to ten minutes
4  ago that I want to be very careful with and I don't
5  want to draw legal conclusion that says there's
6  nothing there.  It's a discussion we had about 436,
7  the intent of the legislature and Article 9.
8  Q.  I'm asking independent of Article 9, Mr. Orr.  Please
9  focus on the question.
10  A.  I don't -- I don't understand your question because
11  parties can negotiate anything.
12  Q.  I'm asking -- okay, putting aside negotiation --
13  A.  Uh-huh.
14  Q.  -- I'm asking apart from the possibility of a Chapter
15  9 filing, and by the way when we talk about impair or
16  diminish, understand that if the state is impairing or
17  diminishing, it's nonconsensual.  Right?  That's the
18  whole point?
19  A.  No, that's -- that's a conclusion that you're making.
20  Parties can agree to I am -- an impaired class can
21  agree to diminish their interests.  If you're reading
22  it that way that says it's nonconsensual, that's a
23  conclusion you're drawing but the language itself --
24  Q.  We don't need to get into this.
25  A.  Okay.



Page 89

1 Q. Let's put aside consensual reduction in benefits.
2 A. Okay.
3 Q. Is there anything in PA 436 as you understand it that
4 allows the Emergency Manager without going through a
5 Chapter 9 filing - so I'm taking Chapter 9 off the
6 table; okay? Anything in PA 436 without consideration
7 of Chapter 9 that allows the Emergency Manager to
8 reduce or adversely affect pension rights?
9 MR. SHUMAKER: Objection, calls for legal
10 conclusion.
11 A. It's the discussion we had a few minutes ago that it
12 might and subject to briefing and a conclusion, the
13 Court could conclude that 436 after it was enacted --
14 duly enacted by the legislature intended to have that
15 very result.
16 Q. Can you point to any provision in PA 436, and I can
17 show you the statute if you would like to take a look,
18 that specifically says that the Emergency Manager can
19 abrogate or impair pension rights, again without
20 reference to either consensual diminishment or the
21 filing of a Chapter 9 bankruptcy?
22 MR. SHUMAKER: When you say explicitly, do
23 you mean expressly?
24 MR. ULLMAN: Yes, those words.
25 A. We discussed that ten minutes ago.

Page 90

1 Q. And I never got a straight answer. So are you aware
2 of any --
3 A. I'll give you the same answers that I gave then.
4 MR. SHUMAKER: Object to form. Calls for
5 legal conclusion.
6 Q. Why don't we get out the statute? We can take a quick
7 look.
8 MR. SHUMAKER: Sure.
9 Q. I've highlighted some parts but that won't affect
10 anything. You can take a quick look and tell me if
11 there's anything that you can point to that allows the
12 Emergency Manager, again this is without the regard to
13 the possibility of a Chapter 9 filing and putting
14 aside consensual diminishment of pension rights, that
15 allows the Emergency Manager to abrogate or diminish
16 vested pension rights.
17 MR. SHUMAKER: Objection, calls for legal
18 conclusion.
19 A. We had this discussion a few minutes ago and I'll try
20 to be responsive. I said that within certain
21 provisions of the statute you had --
22 Q. Just for the record I see that Mr. Orr has his own
23 copy --
24 A. I do.
25 Q. -- of PA 436 with his own annotations.

Page 91

1 A. I do.
2 Q. Okay, could we have that introduced as an exhibit?
3 A. No.
4 Q. Well, you're looking at it.
5 A. Well, no, it's confidential. I'll tell you what --
6 MR. ULLMAN: It's not confidential now that
7 he's looked at it as a deposition exhibit.
8 THE WITNESS: No.
9 MR. ULLMAN: Mr. Shumaker, I would request
10 that you please have that marked as a deposition
11 exhibit.
12 THE WITNESS: That has interlineations and
13 comments. It wasn't intended to --
14 MR. ULLMAN: I would like that marked as an
15 exhibit.
16 THE WITNESS: I would say we go to the
17 judge with that. This is my private copy and I was
18 trying to assist you and --
19 MR. SHUMAKER: And it will reflect
20 communications with -- attorney-client communications.
21 So if you want to ask questions based upon that
22 exhibit, please do.
23 MR. ULLMAN: Okay, we're reserving our
24 rights to have that document produced to us and so we
25 don't hold up the deposition, I'll show you another

Page 92

1 copy.
2 THE WITNESS: Okay. I was just trying to
3 help you. Okay. And your question is?
4 Q. Is there anything in PA 436, and putting aside
5 consensual diminishment of pension rights or the
6 possibility of a Chapter 9 filing, that allows the
7 Emergency Manager to abrogate or diminish pension
8 rights that are protected by Article 9, Section 24 of
9 the Michigan Constitution?
10 MR. SHUMAKER: Objection, calls for legal
11 conclusion.
12 A. I would point out to you and I see you have
13 highlighted in section 12(1)(M)(2), that it says the
14 -- the language speaks for itself. The Emergency
15 Manager shall fully comply with Public Employee
16 Retirement System Investment Act; okay? And Section
17 24, Article 9 of the State Constitution of 1968; okay?
18 But the provision that you were talking to, talking
19 about earlier today, okay, has that constitutional
20 provision. But as I said, and I'll say again, there
21 may be legal reasons; for instance, in section 5 where
22 the legislature specifically talked about pensions;
23 okay? There may be legal arguments that apply here.
24 So rather than draw a legal conclusion I'll say to you
25 again; okay? There may be an explanation for what is

Page 93

1    provided in the statute subject to a determination by
2    a court. The language of the statute speaks for
3    itself.
4  Q.  And since it does speak for itself and you have read
5    it, and putting aside -- I understand your position
6    that there may be arguments that can be made, did you
7    see anything in that statute that, putting aside
8    Chapter 9 and putting aside the possibility of
9    consensual diminishment, states that the Emergency
10   Manager has the authority to diminish or impair
11   pension rights that are protected under Article 9,
12   Section 24?
13        MR. SHUMAKER: Objection, this witness
14   certainly has not had time to review the entire
15   statute as he sits here. You're talking about ever?
16  Q.  How many -- how many times have you reviewed the
17   statute, Mr. Orr?
18  A.  I don't know. Certainly several dozen.
19  Q.  Okay. And you have your heavily annotated copy there?
20  A.  I have a copy of the statute.
21  Q.  So I assume if there were words in the statute that
22   specifically said, yeah, the Emergency Manager can
23   violate Article 9, Section 24, you would know where
24   they are; wouldn't you?
25        MR. SHUMAKER: Objection to form.

Page 94

1  A.  I don't know if they say violate. But here again, I
2    keep saying to you again and again these issues calls
3    for legal conclusions. Statute speaks for itself. I
4    think we discussed earlier today was there anything
5    that expressly said that and we said no, but I don't
6    want to be in a position where we foreclose any
7    potential arguments. I'm being very careful.
8  Q.  In your consideration of the pension issue is it
9    correct that the conclusion that you reach was that
10   one way to get -- for the City to diminish and get out
11   of its pension obligations would be to go through a
12   Chapter 9 filing?
13        THE WITNESS: Could you read the question
14   back?
15        (Record read back as requested.)
16  A.  Yes, I think at some point that we reached that
17   conclusion.
18  Q.  And do you recall when that conclusion was reached?
19  A.  No.
20  Q.  Let me show you another document. We'll mark this as,
21   what are we up to, 8?
22  A.  Uh-huh.
23        (Marked Exhibit No. 8.)
24  Q.  You're familiar with Exhibit 8; aren't you? It's the
25   financial and operating plan of May 12th, 2013?

Page 95

1  A.  Yes.
2  Q.  And this is something that you put out; isn't it?
3  A.  Yes.
4  Q.  And this was after you were Emergency Manager; yeah?
5  A.  Yes.
6  Q.  Okay. And do you recall giving an interview on radio
7    about the plan?
8  A.  I gave many interviews on the radio. Is there a
9    specific one?
10  Q.  Yeah, there is. There is one that was made on May
11   12th, 2013 on WWJ and there's one piece of it that I
12   would like to focus on in particular. I'll read it to
13   you. I have the article in which it's quoted, but
14   maybe you remember saying this.
15  A.  Okay.
16  Q.  The quotation is -- about this plan, I believe it's
17   this plan, you said the public can comment but it is
18   under the statute, it is my plan and it's within my
19   discretion and obligation to do it. This isn't a
20   plebiscite. We are not like negotiating the terms of
21   the plan. It's what I'm obligated to do.
22        Do you recall making that statement on the
23   radio?
24  A.  Yes.
25  Q.  And you were talking about the May 12th plan when you

Page 96

1    said that?
2  A.  Yes, financial and operating plan.
3  Q.  And the May 12th plan referred to the possibility of
4    reducing or eliminating retirement benefits; didn't
5    it?
6  A.  Yes.
7  Q.  And in fact, just going through this briefly on pages
8    16 through 17, if I have this right, you're reporting
9    about 5-point billion in unfunded medical costs; is
10   that right?
11  A.  Yes.
12        MR. SHUMAKER: Get to the page. I'm sorry,
13   what page was that, counsel?
14        MR. ULLMAN: Sixteen.
15        MR. SHUMAKER: Sixteen. At the bottom.
16  A.  Yes.
17  Q.  Then on the next page you wrote that as part of the
18   comprehensive restructuring plan, the Emergency
19   Manager will evaluate options to reduce or eliminate
20   certain healthcare costs for both active and retired
21   employees?
22  A.  Yes.
23  Q.  And that was a true statement?
24  A.  Yes.
25  Q.  And then if you turn back a little to page 3 of this

Page 97

1     document, I think you indicate that the pension
2     liabilities are underfunded by at least 600 million
3     and possibly more, possibly significantly more?
4            MR. SHUMAKER: Can you direct his
5     attention?
6            MR. ULLMAN: Yeah, it's in the first full
7     paragraph, the last three lines.
8  Q.  It says, the city's pensions are underfunded by at
9     least 0.6 billion and perhaps significantly more once
10    appropriate actuarial assumptions and current data are
11    considered?
12 A.  Yes.
13 Q.  And that was -- you view that as an accurate statement
14    also; correct?
15 A.  Yes.
16 Q.  And then if you go to page 20 to 21, beginning on page
17    20 you sort of resummarize these obligations, these
18    liabilities and then you make a couple statements on
19    page 21 at the top you say, restructuring the City's
20    liabilities in a fair and equitable manner across all
21    relevant stakeholders is necessary for the City's
22    operational and financial survival. Do you see that?
23 A.  Yes.
24 Q.  You go on to say that the restructuring of the City's
25    debt and other liabilities is essential to provide the

Page 98

1     City with a strong balance sheet and it continues. Do
2     you see that? It's kind of in the middle of that top
3     paragraph.
4  A.  Yes.
5  Q.  And then the next paragraph that says, this plan
6     recognizes that interest rates, amortization, it
7     mentions some other things, continues with security
8     interests, legacy liabilities and all other aspects of
9     short- and long-term debt must be evaluated as part of
10    the City's comprehensive restructuring. It goes on,
11    significant and fundamental debt relief must be
12    obtained to allow the City's revitalization to
13    continue and succeed?
14 A.  Yes.
15 Q.  In all those statements they all applied to
16    obligations that were owed as well to retirees; is
17    that right?
18 A.  I believe so. I believe we were talking about we
19    needed to do something to address those obligations.
20 Q.  And that's what you refer to here as legacy
21    liabilities, the pension and healthcare obligations?
22 A.  In part, yes.
23 Q.  They're included in legacy liabilities; right?
24 A.  Yes.
25 Q.  And the plan here was, as you're saying here, that the

Page 99

1     plan is to reduce them; true?
2  A.  No, I think what we said here is that they must be
3     adjusted in a fair and equitable manner across all
4     stakeholders which would necessarily mean an
5     adjustment, yes.
6  Q.  In your view didn't that mean they had to be adjusted
7     downwards?
8  A.  What we have said and what I said at May 12th and
9     subsequently throughout is we needed -- we needed to
10    have a dialogue about what the status of an adjustment
11    would be, because it was clear the City couldn't pay.
12 Q.  That's all I'm getting at, Mr. Orr. The question was
13    very simple. That what you are saying here is that
14    you needed to get these benefits reduced?
15 A.  Yes, that's what I said.
16 Q.  And is it correct that under Michigan law, again just
17    under Michigan law without reference to the bankruptcy
18    statute, you didn't have the authority or the ability
19    to reduce pension benefits?
20           MR. SHUMAKER: Objection, calls for legal
21    conclusion.
22 A.  This is the same line of inquiry that we've gone
23    through before. I'll state the same response, if you
24    would like.
25 Q.  No, I can accept that your response would be the same.

Page 100

1  A.  Okay.
2  Q.  Let me ask you a different question.
3  A.  Thank you.
4  Q.  Prior to the bankruptcy filing did you identify any
5     course of action under Michigan law, putting aside the
6     possibility of a consensual resolution, that would
7     allow the Emergency Manager to reduce pension benefits
8     without going through Chapter 9?
9  A.  Here again, to the extent it calls for legal
10    conclusion, my prior answer, but I'll try to be
11    responsive. Yes, we did.
12 Q.  And what were those alternatives?
13 A.  Well, that's why we continued to say to the various
14    interested groups we needed to engage in a dialogue.
15 Q.  I'm saying apart from a consensual resolution.
16 A.  Okay.
17 Q.  Okay. And what I'm asking is apart from the idea that
18    people could get together and agree --
19 A.  Uh-huh.
20 Q.  -- did you come up with any other course of action
21    under Michigan law that did not involve a bankruptcy
22    filing and that would allow the Emergency Manager to
23    reduce pension benefits to retirees?
24 A.  I don't mean to be evasive or trulish, but there were
25    a number of different alternatives that were

1    discussed.  Some of them, frankly, by keeping the City
2    in a steady state would have effectively reduced those
3    pension obligations, yes.
4  Q.  So the course that was considered was simply not
5    meeting the pension obligations as they came due; is
6    that right?
7  A.  No, it's just what I said.  By keeping it in a steady
8    state we weren't meeting our obligations there
9    currently.
10  Q.  And that would include also not meeting the pension
11    obligations?
12  A.  Yes.  As I said, keeping in a steady state would by
13    definition reduce liabilities.  That's what the City
14    was already doing.
15  Q.  And was there any other avenue that was considered as
16    potentially viable to reduce the pension benefits
17    apart from what you just said and apart from going
18    through a Chapter 9 filing and again putting aside
19    some sort of negotiated resolution?
20  A.  Well, we didn't consider the steady state alternative
21    viable.
22  Q.  Uh-huh.
23  A.  We thought that was quite problematic.  Putting aside
24    the discussion we had earlier this morning about legal
25    conclusions and what we possibly could do under the

1    statute, were there any other -- other than
2    consensually inviting resolutions, a potential Chapter
3    9 filing, any other alternatives?  And a steady state,
4    those three, any other?  I don't think there were any
5    other alternatives.
6  Q.  Okay.  Let's move on to the next document, which we'll
7    mark as Exhibit 9.
8        (Marked Exhibit No. 9.)
9        (Discussion held off the record.)
10  Q.  Okay, let's look at Exhibit 9.  This is a proposal for
11    creditors, June 14, 2013.  You've indicated you're
12    familiar with it?
13  A.  Yes.
14  Q.  Now, this document, as I understand it, spells out in
15    general terms what you thought the problems were
16    facing Detroit and what you wanted to do about them?
17  A.  Well, it spells out in general terms what we think the
18    problems are and it makes a proposal to what we think
19    we should do about them.
20  Q.  Okay.  And among the significant issues facing the
21    City were retirement obligations we've discussed;
22    right?
23  A.  Yes.
24  Q.  And the proposal refers to cutting them; correct?
25  A.  Point me to a specific page, please.

1  Q.  Doesn't it say that they need to be reduced?  Doesn't
2    it say that?
3  A.  Yes.
4  Q.  And it says they're unsustainable; doesn't it?
5  A.  Yes.  I think generally speaking it says that, yes.
6  Q.  And we'll go through some of the specifics.
7  A.  Okay.
8  Q.  I think in here early on, around pages 23 to 24, you
9    note -- I think we discussed this a little bit -- that
10    the unfunded pension liability right now as of June
11    14th is more or less on the books as 643 million, but
12    it could be as large as 3.5 billion; is that right?
13  A.  Yes.
14  Q.  And that figure, that 3.5 billion figure, that's work
15    that's been done for the City by the Milliman firm; is
16    that right?
17  A.  Well, among others, I think Milliman worked off on
18    initial Gabriel Rotors projections and then did their
19    own, yes.
20  Q.  And are you aware that that number, the 3.5 billion,
21    has been disputed by various parties or objectors as
22    regards the actuarial assumptions that were used?
23  A.  Yes.
24  Q.  And at least one firm has taken the position that the
25    number should be much less than 3.5 billion?

1  A.  I think several entities and firms have taken that
2    position yes.
3  Q.  And you indicated you're not an actuary; correct?
4  A.  That's correct.
5  Q.  So you have no expertise in that?
6  A.  I rely on our professionals and consultants, yes, who
7    are actuaries.
8  Q.  So the accuracy of the 3.5 billion or some other
9    figure will be an issue that's going to be ultimately
10    decided by a court if this matter proceeds; is that
11    right?
12  A.  We think it's accurate, but it may ultimately be
13    decided by a court.
14  Q.  Now, on pages 90 to 91, if I understand this, and
15    particularly on 91, this is showing the current
16    projections, right, as I understand this particular
17    schedule?
18  A.  Yes, it's the ten-year projections.
19  Q.  Right.  Under what I think has been referred to as a
20    steady state?  In other words, this is without the
21    restructuring?
22  A.  Yes, I think this is the ten-year steady state General
23    fund only projection.
24  Q.  If you look at page 91, it shows, if nothing changes,
25    projections for both pension, contributions and

1   healthcare benefits, right, and then the top headings?
2  A.  Yes.
3  Q.  And for pensions, just using 2014 as an example, we
4   see the number is 199.5 million?
5  A.  Yes.
6  Q.  And for the health benefits for 2014 it's
7   140.7 million?
8  A.  Yes.
9  Q.  And obviously if you look over the next several years,
10   it goes up?
11  A.  Yes.
12  Q.  Okay. And then so that I understand this, if you look
13   at pages 97 to 98, this is the same spreadsheet but
14   now showing what the figures would look like if this
15   proposal for restructuring were to go through; is that
16   right?
17  A.  Yes.
18  Q.  And so if we look again comparably for 2014, let's
19   see, and let's start with -- I guess we can start with
20   the pensions. On page 97, for 2014, we now see an
21   item DC pension contribution.
22  A.  Uh-huh.
23  Q.  And that's -- that DC stands for what?
24  A.  You mean the DC?
25  Q.  Yeah, what do the words stand for?

1  A.  Defined contribution.
2  Q.  Defined contribution?
3  A.  Uh-huh.
4  Q.  Now, the existing -- the pension plan that exists
5   under the steady state projections, is that defined
6   contribution plan?
7  A.  That would be switched over. No, no, defined -- the
8   steady state scenario?
9  Q.  That's a defined benefit?
10  A.  That's a defined benefit plan.
11  Q.  So what you're projecting here is a switch over to a
12   defined contribution program and for 2014 we see the
13   number for the city's contributions is now
14   25.4 million; is that right?
15  A.  Yes, that's -- yes.
16  Q.  And that compares with the -- what was the figure?
17   199.5 million that we saw under the as is?
18  A.  Yes, projections.
19  Q.  Yes. So the diminution it looks just on the rough
20   math that the City's pension contributions under the
21   restructuring are being cut by about 80 percent; is
22   that right?
23  A.  Under 75 million, 80 percent, sure, roughly.
24  Q.  And for health, the health benefits, which we saw that
25   were, what, under the current scenario something like

1   147 million?
2  A.  Retiree health, yes.
3  Q.  For retiree health?
4  A.  Uh-huh.
5  Q.  Under this proposal, the restructuring proposal, I
6   don't see any line entry for the retiree health
7   benefits.
8  A.  Yes.
9  Q.  So they're essentially being cut; correct?
10  A.  Well, the obligation is being provided with a
11   different program, but yes, the City would not have an
12   obligation going forward of that magnitude.
13  Q.  And going back to the pension contributions, you know,
14   we had talked about a diminution on the order of 80
15   percent from the 199.5 figure, and I think it's the
16   City's contention that the 199.5 figure is really
17   understated, right, because the obligations are really
18   a lot higher?
19  A.  I think we think the liabilities -- this is the steady
20   state projection on 91. I think we think the
21   liabilities are higher because what we represented on
22   the second page of 98 is the estimated underunsecured
23   claims for out years as opposed to a ten-year
24   projection.
25  Q.  Right. And if the liabilities were really greater

1   than the diminution from the steady state to the
2   restructuring scenario would be greater than 80
3   percent; wouldn't it?
4  A.  It might be. I mean, we've said 80 percent. I mean,
5   199.5 less 25, you know, you just roughly cut those in
6   half, that's a 12 and 1/2 percent, but you know, 88
7   percent, somewhere in that neighborhood.
8  Q.  Now, the people who are -- the retirees who are
9   getting impacted from these -- by these cuts in the
10   proposed restructuring, these are who? These are men
11   and women who previously served the City and are now
12   retired?
13  A.  Yeah, they're two pension plans: one for General
14   services and the other for Police and Fire.
15  Q.  And these individuals that serve the City in both
16   public safety and nonpublic safety capacities?
17  A.  Uniform and nonuniform, yes.
18  Q.  And were these -- I guess the issue comes because the
19   pension liabilities and the healthcare benefits that
20   may be due are not -- there's not sufficient funding
21   that was put into them; correct?
22  A.  Well, the healthcare benefit has no funding, the
23   $5.7 billion. And the pension underfunding has our
24   estimate of the level of underfunding, the unfunded
25   portion of the pensions, in them. There are assets

Page 109

1   within both pension funds, it's the level of
2   underfunding that we're talking to.
3   Q.   Right. And it's the underfunding that's resulting in
4       the cuts to the retirees; correct?
5   A.   Well, this is a proposal I'll say again. We have said
6       again and again we want to have a discussion so we can
7       figure out what the rightsizing is.
8   Q.   Can you please just answer the question, Mr. Orr?
9   A.   I am, but you say cuts, you say cuts and that has a
10      different connotation and I'm trying to explain it
11      fully.
12  Q.   This proposal the benefits get cut substantially;
13      don't they?
14  A.   Yes, but we need to have a discussion.
15  Q.   Now, the individuals whose rights and expectations and
16      benefits are being impacted under this, they weren't
17      themselves responsible for the lack of funding that's
18      resulted in these problems; were they?
19          MR. SHUMAKER: Objection, form, foundation.
20  A.   That's -- that's a loaded question about
21      responsibility and --
22  Q.   I'm asking if the individual retirees whose pensions
23      and healthcare benefits may be impacted under this.
24  A.   That's a loaded question.
25          MR. SHUMAKER: Same objection.

Page 110

1   A.   I'm going to be very careful here because while
2       recognizing that these are typically rank and file
3       employees, there's a whole bunch of issues regarding
4       responsibility and some of it has been written about
5       quite extensively.
6   Q.   And you're aware that at least the vast majority of
7       the City employees, the retirees, count on their
8       pension and healthcare benefits in order to help make
9       ends meet?
10  A.   I don't know if I'm aware of that as a fact. I know
11      certainly that pensions are important to retirees.
12  Q.   Now, going back to page 98 of this restructuring
13      proposal, you pointed to a box --
14  A.   Yes.
15  Q.   -- that shows a very large unsecured claim amount for
16      unsecured pension and OPEB?
17  A.   Yes.
18  Q.   And that's 9.2 billion?
19  A.   Yes.
20  Q.   And as I understand this proposal, the retirees who
21      fall into this category whose pensions and healthcare
22      benefits are being cut back by this would end up with
23      unsecured claims and get a share of the notes that the
24      City is intending to issue; is that right?
25  A.   The retirees whose pensions and healthcare benefits we

Page 111

1   propose to reduce would get a share of the note, yes.
2   Q.   And is there any way to tell from this document how
3       much any individual retiree would ultimately get if
4       the notes go ahead and are issued?
5   A.   Not from this document.
6   Q.   There's no way to tell how much cash value any retiree
7       would receive under this plan that's laid out here
8       where they get notes?
9   A.   It is my understanding that there are a number of
10      different plans and benefits and factors that go into
11      that determination for any specific retiree.
12  Q.   Okay. Now, Chapter 9 is not referred to in this
13      restructuring plan; is it?
14  A.   I don't think we did.
15  Q.   And I think you indicated before that if this was not
16      agreed to by the various constituencies, then the only
17      way to implement this restructuring plan would be, if
18      at all, would be to try to go ahead and do that
19      through Chapter 9; is that right?
20  A.   I think what I said before, I think you're referring
21      to the May 12th 45-day operating plan, but I think
22      what I said before on June 10th and June 14th is we
23      needed to engage in a dialogue, because we didn't want
24      to go to Chapter 9.
25          MR. ULLMAN: That wasn't my question. Can

Page 112

1   you read my question back?
2          (Record read back as requested.)
3   A.   Yeah, I indicated that here today.
4   Q.   I'll just ask the question again. As you understood
5       it, if the proposal here were not agreed to or some
6       other consensual resolution was not reached, was there
7       any way for you as Emergency Manager to implement this
8       plan other than to try to get it put in place through
9       a Chapter 9 filing?
10  A.   Subject to the discussion that we've had a couple of
11      times earlier today, what I have said is that Chapter
12      9 is an option to achieve these goals.
13  Q.   And were you at this point aware of any option to
14      achieve these goals other than Chapter 9 if a
15      consensual resolution was not reached?
16  A.   There were various briefing memos and discussions, but
17      given the time frames that we were under, and I said
18      this at the June 10th meeting and I said it at the
19      June 14th meeting and I want to be responsive, that if
20      we didn't, Chapter 9 was an alternative.
21  Q.   And I don't think that's fully responsive at this
22      point. Had you identified anything else as of June 14
23      to get this plan implemented, any other course,
24      putting aside consensual resolution, other than a
25      chapter 9 file?

Page 113

1  A.  Nothing that would give us an orderly and
2      comprehensive resolution of these problems.
3  Q.  Now, you gave an interview, that I'm sure you're
4      familiar with, with the Detroit Free Press on or
5      around June 14th.  Do you remember it?  I'll just tell
6      you what -- I believe you said -- and I'm sure you
7      remember this one and you can tell me.  If not, I have
8      the quote.
9  A.  Yeah, you can give me the quote.  There's so many
10     interviews, but I'll trust your quote.
11 Q.  Okay.
12 A.  Okay.
13 Q.  This is the quotation.  Question, you said in this
14     report, referring to the June 14th proposal, that you
15     don't believe there is an obligation under our state
16     constitution to pay pensions if the City can't afford
17     it?  Answer, the reason we said it that way is to
18     quantify the bankruptcy question.  We think federal
19     supremacy trumps state law.
20 A.  Yes.
21 Q.  You don't deny making that statement?
22 A.  No, I think I've said that several times.
23 Q.  And the state law you were referring to that you
24     referred to as being trumped was Article 9, Section 24
25     of the state constitution; is that right?

Page 114

1  A.  I believe so.
2  Q.  There's no other state law that you view as relevant
3      to the pension issue; is there?
4  A.  Subject to the discussions that we had earlier today.
5  Q.  As being trumped?  There's no other state law that you
6      regarded as being trumped; is there?
7  A.  No, there's no other as being trumped.
8  Q.  Trumped.
9  A.  Right.
10 Q.  So the answer to my question -- just so the record is
11     clear, the answer to my question is no other?
12 A.  We're not referring to another state law.
13 Q.  Okay, thank you.
14 A.  Okay.
15 Q.  Now, ultimately -- so when the subsequent bankruptcy
16     filing was made -- which it was; right?
17 A.  Yes.
18 Q.  The intention -- specific intention was indeed to
19     trump Article 9, Section 24 of the state constitution;
20     correct?
21 A.  That wasn't the only intention.
22 Q.  But that was an intention; was it not?
23 A.  That was one of the objectives.
24 Q.  Now, ultimately you did request authorization for the
25     governor to file; right?

Page 115

1  A.  Yes.
2  Q.  I'm just going to put these letters into the record so
3      we have them.
4  A.  Okay.
5  Q.  I'm not sure I'm going to ask you much about them.
6          The first one is what we're going to mark
7      as Exhibit 10.
8          (Marked Exhibit No. 10.)
9  Q.  This is 10.  This is 10.
10 A.  Thank you.
11          MR. ULLMAN:  And I might as well mark 11
12     also.  They kind of go together.
13          THE WITNESS:  Okay.
14          (Marked Exhibit No. 11.)
15 Q.  Okay, what we've marked as Exhibits 10 and 11
16     respectively are the July 16th, 2013 letter from you
17     to the governor and to the treasurer and then the
18     governor's response letter of July 18, 2013.
19 A.  Yes.
20 Q.  And you're obviously familiar with these documents?
21 A.  Yes.
22 Q.  And you wrote Exhibit 10, you signed it at least?
23 A.  Yes.
24 Q.  And Exhibit 11 is the governor's response; correct?
25 A.  Yes.

Page 116

1  Q.  Now, did you have discussions with the governor's
2      office or anyone on the governor's team leading up to
3      the request letter that you sent in?
4          MR. SHUMAKER:  Objection to form.
5  A.  Leading up to?
6  Q.  Yeah, before.
7  A.  Before that.  I think there were discussions with the
8      treasurer and even the governor that if we weren't
9      making progress on negotiations, I might have to
10     submit the letter.
11 Q.  Okay.  And in those conversations was there any
12     mention of the impact that the bankruptcy filing might
13     have or was intended to have as regards the pension
14     benefits?
15 A.  Probably, yes.
16 Q.  And do you recall anything specific about that?
17 A.  I -- um -- as I said, I had regular meetings of the
18     governor and his staff, we probably discussed this.  I
19     don't recall a specific discussion.
20 Q.  Do you recall telling the governor and his staff in
21     general that one of the purposes, I'm not saying the
22     only purpose, one of the purposes or intentions of the
23     Chapter 9 filing would be to allow you to cut back the
24     pension benefits?
25 A.  Yeah, I don't want to give the misimpression that that

Page 117

1  was the singular focus. I think most of our
2  discussions were about the need for the City to deal
3  overall with its balance sheet and its obligations,
4  which would include pensions.
5       MR. ULLMAN: Uh-huh. Okay, can you read my
6  question back? Listen a little more closely because I
7  was really -- it was a little more specific of a
8  question.
9       THE WITNESS: Okay.
10       (Record read back as requested.)
11 A.  We probably had that discussion. I don't recall
12  anything specific, but we probably did.
13 Q.  And do you recall any discussion during those same
14  conversations with the governor or anyone from his
15  staff as to the impact, if any, of Article 9, chapter
16  -- Section 24 of the Michigan Constitution as regards
17  pension benefits?
18 A.  I don't recall having discussions in that regard. No.
19 Q.  Now, if you look at the governor's response letter,
20  okay, and the last page, you see at the top there's a
21  heading called contingencies?
22 A.  Yes.
23 Q.  And it says 2012 PA 436 provides that my approval of
24  the recommendation to commence a Chapter 9 proceeding
25  may place contingencies on such a filing and it gives

Page 118

1  the citation. It continues, I am choosing not to
2  impose any such contingencies today. Federal law
3  already contains the most important contingency, a
4  requirement that the plan be legally executable,
5  11 U.S.C. Section 943(b)(4). Do you see that?
6 A.  Yes.
7 Q.  And did you have any discussions with the governor or
8  anyone from his staff about that language before you
9  received this letter back?
10 A.  No.
11 Q.  Were you -- did you have any understanding before
12  receiving this that as to whether or not the governor
13  was going to place any contingencies on the bankruptcy
14  filing?
15 A.  No, but I was concerned about it.
16 Q.  And what were you concerned about?
17 A.  I was concerned that the governor might place some
18  contingency in any regards, not just related to the
19  pensions and others, but that the inner array on
20  limiting what authority I might have would impact what
21  discretion I would have under either 436 or Chapter 9.
22  I was just concerned about contingencies.
23 Q.  And was one of the contingencies that you were
24  concerned about the contingency that could impair your
25  ability or restrict your ability to cut back the

Page 119

1  pensions?
2 A.  I was concerned about all contingencies. I didn't
3  know what the governor was going to say.
4 Q.  That's really not my question. Can you read my
5  question?
6 A.  Yes, I was concerned about all of them. That's what I
7  said.
8 Q.  And that includes specifically the one about not being
9  able to affect the pensions; correct?
10 A.  All contingencies.
11 Q.  Thank you.
12       Had you discussed within your staff the
13  possibility of the governor putting a contingency that
14  would prohibit the Emergency Manager from taking
15  actions that would impair pensions?
16 A.  My staff, including my legal counsel and consultants,
17  the entirety of staff at large?
18 Q.  Yes.
19 A.  Yes.
20 Q.  And did you view the risk as substantial, that the
21  governor was going to do that?
22 A.  Without disclosing any attorney-client confidences, I
23  don't know if we handicapped the risk. It was just a
24  general discussion. I had submitted a letter, I
25  wasn't sure what I was going to get back.

Page 120

1 Q.  And did you have any plan in place as to what you
2  would do if the letter came back that imposed a
3  contingency that in any Chapter 9 filing nothing could
4  be done that would affect pension rights that were
5  protected under the Michigan Constitution?
6 A.  No.
7 Q.  Now, in his letter the governor -- the portion we've
8  just looked at on the back of page 5, the governor
9  says, having a legally executable plan under Section
10  943(b)(4). That's a reference, 943(b)(4), the
11  bankruptcy code; isn't it?
12 A.  I believe so.
13 Q.  So he says, he the governor says, having a legally
14  executable plan under Section 943(b)(4) of the
15  bankruptcy code is a contingency for Detroit's filing
16  a bankruptcy petition. Correct?
17       MR. SHUMAKER: Objection, document speaks
18  for itself.
19 A.  That's -- I was going to say the document speaks for
20  itself. You're sort of reading it, you know, just
21  inversing it, but it says federal law already contains
22  the most important contingency requirement that the
23  plan is legally executable.
24 Q.  Right. And this is in the context of him asking or
25  noting that under PA 436 he could, he the governor,

Page 121

1    could place contingencies on a Chapter 9 filing;
2    right?
3  A. Yes.
4  Q. And he goes on to say that federal law also contains
5    what he calls the most important contingency on the
6    Chapter 9 filing, that it be legally executable;
7    correct?
8  A. Yes, the letter speaks -- that's the language of the
9    letter.
10 Q. Did you agree with the governor's analysis here?
11 A. I -- do I agree? Yes, I mean, I agree that that's the
12   most important contingency that we get to, yes.
13 Q. Now, petition was filed -- the bankruptcy petition was
14   filed on July 18th, like at 4 in the afternoon, 4:05,
15   something like that?
16 A. That's what I was told. I don't know the specific
17   time.
18 Q. Now, in doing -- in making your bankruptcy filing,
19   were you intending to do something that was in
20   violation of state law?
21         MR. SHUMAKER: Objection, calls for legal
22   conclusion.
23 A. Here again, subject to all the discussions that we had
24   earlier today, I was intending to aleve the City of a
25   very dire situation and provide it with the maximum

Page 122

1    ability to restructure itself.
2          MR. ULLMAN: I'm going to move to strike as
3    nonresponsive. Can you read back my question, please,
4    and can you answer it, Mr. Orr?
5          (Record read back as requested.)
6  A. No.
7  Q. And at this time were you aware that a bankruptcy
8    filing that would allow you to impair pension benefits
9    was at least arguably in violation of state law?
10 A. I was aware that various parties had taken that
11   position, yes.
12 Q. So you were aware there was an argument? I'm not
13   saying you were agreeing with it.
14 A. I didn't agree with it, but there was an argument.
15 Q. Now, did you give consideration to that argument?
16 A. Yes, I suppose I did.
17 Q. And what did you do to give consideration to that
18   argument?
19 A. I discussed it with counsel.
20 Q. Okay, which counsel?
21 A. My legal counsel.
22 Q. Legal counsel being?
23 A. Jones Day.
24 Q. Jones Day.
25 A. Uh-huh.

Page 123

1  Q. Did you make any inquiries of the State Attorney
2    General?
3  A. I know at some point -- and I'm going to be careful
4    here because as a state contractor, I want to be very
5    careful about whether or not the Attorney General also
6    is my counsel. I know at some point I met with the
7    Attorney General, but I don't recall when that was. I
8    don't recall if it was before or it was after the
9    filing. It might have been before.
10 Q. Okay. Well, if it was before, do you recall what
11   advice you got from the State Attorney General as to
12   whether it was legal under Michigan law for you to go
13   ahead with the bankruptcy filing but didn't protect
14   the pensions?
15         MR. SHUMAKER: Objection. I caution the
16   witness that to the extent it calls for
17   attorney-client communication, not to reveal those
18   communications.
19 A. I don't think I can answer the question without going
20   into attorney-client communications.
21 Q. But you don't recall specifically whether you actually
22   consulted the State Attorney General prior to the
23   filing; do you?
24 A. I recall meeting with the Attorney General at one -- I
25   may have had a couple -- I think I've had a couple of

Page 124

1    telephone conversations with him and I recall meeting
2    with him. I don't recall whether it was prior or
3    after the filing. I know from time to time -- I just
4    don't recall when it was.
5  Q. Would there have been any reason for you not to
6    consult the Attorney General prior to the bankruptcy
7    filing on that issue?
8  A. No, I think the State Attorney General made his
9    position known prior to the filing.
10 Q. Now, as of this time the petition was filed there were
11   various state court litigations that had been begun?
12 A. Yes.
13 Q. And those challenged, among other things, PA 436;
14   correct?
15 A. Yes.
16 Q. And its constitutionality?
17 A. Yes.
18 Q. And in fact, the petition was filed just prior to the
19   start of a TRO hearing in one of those state
20   litigations; wasn't it?
21 A. I was told that either that night or the following
22   day.
23 Q. And are you aware that certain objectors in this
24   proceeding have stated that the bankruptcy petition
25   was filed just before the judge in the case was about

Page 125

1  to issue a TRO prohibiting the bankruptcy filing from
2  taking place?
3  A.  I heard that after the fact, yes.
4  Q.  And are you aware that these objectors have stated
5     that in fact the state lawyers asked for a short delay
6     before the ruling was issued so they could get the
7     bankruptcy filing in before the judge came down with a
8     TRO?
9  A.  I don't know if I heard it -- I may have read that
10    later.  I don't know if I heard it.
11 Q.  Did you have any involvement in those actions?
12 A.  No, no.
13 Q.  Do you deny that that's what occurred?
14 A.  I only know what I've heard and I have no personal
15    knowledge, I just know what I've heard and what I've
16    read.
17 Q.  And isn't it correct that you wanted to get the
18    bankruptcy petition filed as soon as possible because
19    you knew there was a risk that the state might rule it
20    was illegal -- the state court might rule it was
21    illegal under state law for the bankruptcy proceeding
22    to be filed?
23 A.  No, that wasn't the reason.
24 Q.  Is there a particular reason that the bankruptcy
25    filing was made at 4:06 in the afternoon of the same

Page 126

1     day a TRO was being heard in the state court other
2     than to get the jump on the state court ruling?
3        MR. SHUMAKER:  Object to the form.
4  A.  Not to the best of my knowledge.
5  Q.  Now, you're aware that the state court in that
6     litigation in fact later issued a ruling that PA 436
7     is unconstitutional to the extent that it authorizes a
8     proceeding under Chapter 9 in the way that could
9     threaten to impair or diminish accrued pension
10    benefits?
11 A.  Yes, I was informed that there are I believe three
12    TROs after the bankruptcy filing.
13 Q.  And you have proceeded with the bankruptcy petition
14    notwithstanding; correct?
15 A.  Well, the bankruptcy petition had been filed.  There
16    were open questions about the application of the stay.
17    There was also a question about an appeal, which was
18    taken up I believe by the Attorney General's office.
19    So when you say you proceeded with the petition, we
20    filed the petition, there was a ruling, and there were
21    appeals.
22 Q.  Okay.  And in light of the state court ruling that
23    PA 436 was unconstitutional, you did not take any
24    steps to withdraw the bankruptcy petition from filing;
25    did you?

Page 127

1  A.  No.
2  Q.  And you have not taken any steps to stop the
3     bankruptcy proceeding from going forward; have you?
4  A.  No.
5        MR. ULLMAN:  Would this be a good time to
6     stop for lunch, a quick lunch?
7        MR. SHUMAKER:  Sure.
8        MR. ULLMAN:  I'm ready to continue but I
9     know --
10       THE WITNESS:  You got another -- how much
11    -- do you have another line of inquiry?  Whatever
12    everybody --
13       MR. ULLMAN:  I'm about to switch subject
14    matters.
15       THE VIDEOGRAPHER:  Going off the record at
16    12:52 p.m.
17       (Luncheon recess between
18    12:52 p.m. and 1:30 p.m.)
19       THE VIDEOGRAPHER:  We're back on the record
20    at 1:35 p.m.
21 BY MR. ULLMAN:
22 Q.  Welcome back, Mr. Orr.
23 A.  Good afternoon.
24 Q.  One other question about the June 14th proposal.
25    Referring to page 98, we talked about the defined

Page 128

1     contribution benefit plan?
2  A.  Yes.
3  Q.  Okay.  Is it correct that under that plan
4     contributions are being made only for people who would
5     be current City employees?
6  A.  Will the plan be closed?
7  Q.  Yes.
8  A.  Yes, I believe so.
9  Q.  So under the restructuring plan there would be no
10    pension contributions made for retirees; correct?
11 A.  I believe that's correct.
12 Q.  Now, you I believe said that the June 14th proposal
13    was presented at a meeting to representatives of
14    various creditors, I think you said that in your
15    declaration?
16 A.  On June 14th, yes.
17 Q.  Okay.  Did you speak at that meeting?
18 A.  Yes.
19 Q.  And who else spoke?
20 A.  I believe all -- several members of our team, I
21    believe it was Mr. Heiman, David Heiman, I believe it
22    was Ken Buckfire, I believe Heather Lennox was on, I
23    believe Bruce Bennett was there, I believe Ken
24    Buckfire may have spoken.  I'm trying to recall if
25    there was anyone else.

Page 129

1  Q.  And this meeting took about two hours total; is that
2      right?
3  A.  Approximately that time.
4  Q.  And you indicated in your -- the declaration that you
5      filed here that at the June 14th meeting you presented
6      the proposal and you presented the executive summary
7      and people got the full proposal as they exited and I
8      think you said that you answered questions posed by
9      the attendees?
10 A.  I believe that's correct.
11 Q.  Is that an accurate and truthful description of what
12     happened at the June 14th meeting?
13 A.  Yes.
14 Q.  There were no actual negotiations at that meeting;
15     were they?
16 A.  I don't think that -- you know, be careful of the word
17     negotiations, but no, not as it's generally
18     understood.
19 Q.  Now, the next meeting that I believe took place was on
20     June 20; is that right?
21 A.  Are you reading through my declaration?
22 Q.  Uh-huh.
23 A.  Page 55 has a list of meetings, around that
24     approximate time.
25 Q.  Uh-huh.

Page 130

1  A.  Okay, yes.
2  Q.  So the next one was June 20; is that right?
3  A.  If that's what it says in my declaration, yes.
4  Q.  And there were both morning and afternoon sessions; is
5      that right?
6  A.  Yes.
7  Q.  And this was six days after the proposal had been
8      presented; correct?
9  A.  Yeah, I haven't done the counting, but 14th to 20th,
10     yeah, it would be six calendar days, yes.
11 Q.  And it was a two-hour morning session and about 90
12     minutes for the afternoon session?
13 A.  That sounds about right.
14 Q.  And in your affidavit or your declaration you
15     indicated that at this meeting, these meetings, the
16     City presented a more in-depth look at its analysis of
17     the health and pension obligations and suggested for
18     proposals -- suggested proposals for the modification
19     thereof that the City could fund within its means
20     going forward and you provided handouts of the
21     presentations.  Are those accurate descriptions of
22     what --
23 A.  Yes.
24 Q.  So there were no actual negotiations at that meeting
25     either; were there?

Page 131

1  A.  I'm going to defer as to whether or not those
2      constitute negotiations.  There was a give and take is
3      my understanding, but I'm not going to testify that
4      those did not constitute negotiations.
5  Q.  Well, was there any actual sit down, you know, and
6      bargaining as to what the City would agree to as an
7      alternative to what was put in the June 4th (sic)
8      proposal and what it would not?
9  A.  Here again, let me be careful here.  The obligation to
10     collectively bargain is suspended for five years so I
11     just want to state that for the record.  We are not in
12     any way by answering this question seeking to waive
13     that right, as it is traditionally understood.  That
14     being said, I think at those meetings and all the
15     meetings I've referenced we generally asked during
16     those meetings for proposals which could be
17     characterized as negotiations.
18 Q.  Did the City make any counterproposals to the June
19     14th proposal at the June 20 meetings?
20 A.  Well, we wouldn't bargain against ourselves.
21 Q.  It's a yes or no question; okay?
22 A.  Sir, throughout the day I'm trying to give you a
23     response.  I know you want yes or no questions for
24     purposes of your briefing, I suppose, but I'm trying
25     to give you an accurate response.

Page 132

1  Q.  I would appreciate it if you could answer the question
2      without making speeches.
3          MR. ULLMAN:  Can you have the question
4      read back, please?
5          THE WITNESS:  It's not a speech, it's a
6      response.
7          MR. ULLMAN:  Question read back.
8          (Record read back as requested.)
9          MR. SHUMAKER:  Object to the form.
10 A.  We didn't receive any counterproposals so there was
11     nothing to counter.
12 Q.  And did you make any further mod -- did you make any
13     modifications on June 20 to the proposal you had made
14     on June 14th?
15 A.  Here again, I'm going to be careful as to whether or
16     not what we discussed at the 20 referred to
17     modifications but suffice it to say we went over in
18     detail as I said in my declaration our proposal on the
19     14th and asked for responses.
20 Q.  Okay.  The next meeting I believe took place in July;
21     is that right?  July 10th and 11th?
22 A.  Yes, here again, if you're reading my declaration,
23     that's what I said.
24 Q.  Now, in this set of meetings there were -- first of
25     all, were you present there?



Page 133

1  A.  I don't -- I don't recall which of those meetings.  I
2      know I attended the 14th in person, I had my June 10th
3      meeting in person, and I know I attended one or some
4      of these other meetings, but I don't recall if I was
5      present at that meeting.
6  Q.  Okay.  So I take it then that you have no personal
7      recollection as you sit here now as to what happened
8      at those meetings?
9  A.  No, only as reported to me by my staff or consultants.
10 Q.  Okay.  And so what is set out in your declaration that
11     you filed in the bankruptcy case regarding the July
12     10th and 11 meetings is essentially a recitation of
13     facts that were reported to you by others?
14 A.  Yeah, my information and belief, yes.
15 Q.  And so far as you were aware, the description of the
16     meetings that you put in your declaration were full
17     and complete and accurate?
18         MR. SHUMAKER:  Object to the form.
19 A.  Yes.
20 Q.  And we're talking about the meetings for July 10th and
21     11th just to be clear?
22 A.  Yes.
23 Q.  Okay.
24         MR. ULLMAN:  I'm going to show you a
25     document that we will mark as --

Page 134

1          THE COURT REPORTER:  Eleven -- excuse me,
2      12.
3          THE WITNESS:  Twelve.
4          MR. ULLMAN:  Twelve.
5          (Marked Exhibit No. 12.)
6  Q.  Exhibit 12 is a letter on the letterhead of the
7      Detroit Firefighters Association dated July 12, 2003
8      (sic) to Evan Miller and David Heiman of Jones Day.
9  A.  Yes.
10 Q.  Are you familiar with this letter?
11 A.  I've seen this letter before, yes.
12 Q.  Okay.  And in this letter the authors refer to the
13     July 10 meeting and say that in the third paragraph
14     you stated you wish to discuss pension restructuring
15     proposals, you were then asked by the DPOA president,
16     Mark Diaz, for specific City pension restructuring
17     proposals -- I'm sorry, I think I omitted the word
18     benefit.  For specific City benefit restructuring
19     proposals.  You declined to give any specific
20     proposals.
21         As far as you're aware, is that an accurate
22     statement?
23 A.  Yes.
24 Q.  And they go on to say, we are reviewing and will
25     provide the City with specific proposals.

Page 135

1          As of this time, has the City received any
2      specific proposals from any of the potentially
3      interested parties?
4  A.  Not to the best of my knowledge.
5  Q.  And the authors go on to say it would be productive if
6      the City could provide us with its specific proposals
7      on pension benefit restructuring as soon as possible.
8      We have had only two meetings -- I'm sorry, we have
9      had two meetings where the similar pension benefits
10     were addressed and still have only the general
11     observation that pension benefits must be reduced.
12         Is that a fair characterization as to the
13     status as of July 12th?
14 A.  Well, I'm assuming that it's fair to say there were
15     two meetings.  I'm not sure that they have the City's
16     general observation.  My understanding was that there
17     were discussions besides the meetings and follow-up
18     regarding pension benefits, but that's to the best of
19     my knowledge.
20 Q.  And they go on to say, sufficient -- we hope
21     sufficiently provide to our next meeting the City will
22     provide us with specific proposals on pension benefit
23     restructuring so that our meetings can be genuine,
24     good faith negotiations on the City's debt.
25 A.  Yes, I see that.

Page 136

1  Q.  And I think you indicated at this time the City had
2      not provided any specific proposals to these
3      gentlemen?
4  A.  No.  No, no, that's not what I indicated.
5  Q.  Okay.
6  A.  No, I think we did provide a proposal on June 14th and
7      I think the testimony was that we flushed those out
8      subsequently.
9  Q.  So the only proposal that had been provided so far is
10     a proposal on June 14th and nothing beyond that?
11         MR. SHUMAKER:  Object to the form.
12 A.  No, I think we said that there were other discussions;
13     in fact, you said based upon my declaration that there
14     were further discussions that followed up after June
15     14th.
16 Q.  Maybe I was unclear in my question.
17 A.  Okay.
18 Q.  There were no proposals that had been put out by the
19     City subsequent to the June 14th proposal; correct?
20         THE WITNESS:  I guess someone was on the
21     call.  Are we okay?
22 A.  No proposals put out by -- well, you keep saying
23     proposals.  There's nothing as comprehensive that was
24     proposed as we put on June 14th.  There was additional
25     data and additional information that was provided

Page 137

1  after June 14th.
2  Q.  So we're clear, no additional proposals that provided
3      for the pension cuts or the health benefit cuts in a
4      way that was different from what was in substance set
5      out on June 14?
6  A.  Well, you say what was different.
7  Q.  You haven't changed what was set out in the June 14th
8      proposal; have you?
9  A.  You're not letting me respond.  Can I respond?
10 Q.  Let me withdraw the question.
11 A.  Okay.
12 Q.  Had there been any modifications to the June 14
13     proposal as of July 12, 2003 -- '13?
14         MR. SHUMAKER:  Object to the form.
15 A.  There could have been discussions that could qualify
16     as modifications, but generally speaking, the broad
17     outline of the proposal we submitted on June 14th was
18     still the proposal that we were talking about.
19 Q.  Okay, and what were the discussions that you were
20     referring to that you said could qualify as
21     modifications?
22 A.  Discussions we had with all members at the due
23     diligence follow-up sessions where we requested their
24     input.
25 Q.  And was there any bargaining that took place at those

Page 138

1      sessions where the City said it would be willing to
2      agree to something that was different from what was in
3      June 14?
4  A.  Here again, I'm going to stay away from bargaining as
5      a legal conclusion, duty to bargain is suspended.  I
6      will say there was a back and forth and my
7      understanding discussions and invitations for further
8      information.
9  Q.  Thank you.
10         I'm going to show you the next document,
11     which is a response to the one that we have as Exhibit
12     12, which we'll mark as Exhibit 13.
13         (Marked Exhibit No. 13.)
14 Q.  Exhibit 13 a letter from Jones Day in response to what
15     we have marked as Exhibit 12; do you see that?
16 A.  Yes, I believe so.
17 Q.  And you see this is -- the letter starts out by
18     thanking the authors for their letter of July 12th?
19 A.  Yes.
20 Q.  And then in the second paragraph Jones Day goes on to
21     say, consistent with the position Dave Heiman and I
22     expressed at the meeting, we still think it makes
23     sense to first try to reach common ground with key
24     unions and association leaders on actuarial
25     assumptions and methods and the amount of PFRS

Page 139

1      underfunding and then tackle contributions and
2      attendant benefit changes.  Do you see that?
3  A.  Yes, it speaks for itself.
4  Q.  And was that the position of the City as of July 17,
5      2013?
6  A.  Yes, we said that before.
7  Q.  As of July 17th now, 2013, had the City presented any
8      proposals that were different from the proposals set
9      out in the June 14th document?
10 A.  As I said previously, subject to that testimony about
11     discussions that were had at these meetings, I think
12     this letter speaks for itself.  We were requesting
13     input from the various interested parties as far as
14     our June 14th proposal.
15 Q.  And the discussions were the same ones that you
16     answered about in the very last question --
17 A.  Yes.
18 Q.  -- when I asked you what the discussions were?
19 A.  Yes.
20 Q.  And as of June 17th -- I'm sorry, July 17th, had the
21     City actually sat down with any union or retiree
22     association to attempt to reach an agreement on a
23     restructuring plan that had terms that were different
24     from the terms in the June 14th proposal?
25 A.  July 17th?

Page 140

1  Q.  I'm sorry, yes.
2  A.  Yes.
3  Q.  If I misspoke, I'm asking as of July 17th.
4  A.  Yes, we may have.
5  Q.  You say you may have.  Did you?
6  A.  I was aware that there were ongoing confidential
7      negotiations with at least one union --
8  Q.  Okay.
9  A.  -- about a proposal.
10 Q.  Okay.  Were you present during those negotiations --
11     those discussions?
12 A.  I have -- I have not -- I have met with members'
13     representatives of those unions.  I'm not sure I was
14     in on all negotiations.
15 Q.  Are these discussions that the City has stated are
16     subject to privilege under Federal Rule of Evidence
17     408?
18 A.  Yes.
19 Q.  Okay.  And other -- so will you tell me what was said
20     at those sessions?
21         MR. SHUMAKER:  Objection to the extent it
22     calls you to reveal privileged communications.
23 A.  Yeah, those discussions are ongoing and so I'm -- I
24     have to be a little circumspect.  Suffice it to say
25     there were discussions along the line of this exchange

1  of letters of what could be addressed based upon our
2  June 14th proposal.
3  Q.  Okay.  And with whom were those discussions?  Which
4  groups?  You said you met with one or two groups or
5  you were aware of meetings with one or two groups.
6  A.  I think those are confidential, because as I said,
7  those discussions are ongoing, so I don't want to
8  interfere with settlement negotiations or breach
9  confidentiality so I'm reluctant to answer your
10 question.
11 Q.  Okay, well, will you answer my question or will you
12 not?
13 A.  I don't think I can.  I think they're supposed to be
14 confidential.
15 Q.  Well, you know, you have to answer the question unless
16 your counsel instructs you not to.
17       MR. SHUMAKER:  If you think it's going to
18 reveal privileged communications, I'm going to
19 instruct you not to answer.
20       THE WITNESS:  I'll be -- I don't know so
21 much -- can I consult with my counsel?
22       MR. ULLMAN:  Yes.
23       THE WITNESS:  Can we go off the record?
24       MR. ULLMAN:  Yes.
25       THE WITNESS:  Let's step out.

1        THE VIDEOGRAPHER:  Going off the record at
2  1:53 p.m.
3        (A brief recess was taken.)
4        THE VIDEOGRAPHER:  We're back on the record
5  at 1:57 p.m.
6  BY MR. ULLMAN:
7  Q.  Okay, will you answer my question, Mr. Orr?
8  A.  No, I think this is -- concerns commercially sensitive
9  potentially confidential settlement negotiations and
10 implicates the attorney-client privilege so I cannot
11 answer your question.
12 Q.  Okay, so apart from the discussions that you won't
13 tell me about, would the City actually sit down with
14 any union or retiree association in an attempt to
15 reach an agreement on a structuring plan on terms that
16 are different than the terms set out in the June 14th
17 proposal as of July 17th?
18 A.  As I said before, subject to the meetings we've had,
19 we've exchanged information which may constitute the
20 type of sit down you're talking about.  Other than the
21 ones that have been recounted and phone calls and
22 meetings I may not be aware of, this is what I know in
23 my declaration.
24 Q.  And as of June 17th then, I take it you had not
25 received any actual proposal -- I'm sorry, I keep

1  saying June.
2  A.  July.
3  Q.  As of July 17th, you had not received any actual
4  proposal outside possibly with the settlement
5  discussions you were talking about from any union or
6  retiree association; is that right?
7  A.  Outside of those settlement negotiations --
8  Q.  Yes.
9  A.  -- that is correct.
10 Q.  Now, as of July 17, had the City told any union or
11 retiree association that it would in fact be willing
12 to proceed with the restructuring on terms that did
13 not include the elimination of ongoing pension
14 contributions for retirees?
15 A.  When you mean the City, you mean all of my consultants
16 and others; correct?
17 Q.  Yes.
18 A.  There may have been discussions in that regard.  I
19 think I recall hearing that there was -- I can't
20 recall a specific meeting, a discussion about how that
21 would be arranged, but I'm not sure.
22 Q.  So you personally did not make any such statement; did
23 you?
24 A.  Statement about?
25 Q.  Saying to anyone -- to any union or retiree

1  association that the City would in fact be willing to
2  agree to a restructuring that did not involve the
3  elimination of ongoing pension contributions for
4  retirees.
5  A.  No, I didn't say that.
6  Q.  And do you know in fact whether anyone working on your
7  team ever said that to any union or retiree
8  association?
9  A.  No.
10 Q.  Okay.  During the time from June 14th to July 17, did
11 you or anyone else from your team tell any union or
12 retiree association that the City acknowledged that
13 under Michigan law pension rights were explicitly
14 protected from being impaired or diminished?
15 A.  I don't --
16       MR. SHUMAKER:  Objection, form, calls for
17 speculation.
18 A.  I don't recall anyone saying that, but it may have
19 happened.
20 Q.  But you personally didn't make that statement; did
21 you?
22 A.  I don't recall saying that.  I may -- you know,
23 anything is possible, I just don't recall saying it.
24 Q.  And as of July 17, had the City, you or anyone working
25 for you, told any union or retiree association that it

Page 145

1  would in fact be willing to agree to a restructuring
2  plan that did not effectively eliminate the prior
3  existing health benefits for retirees?
4         MR. SHUMAKER:  Objection, foundation, calls
5  for legal speculation.
6  A.  Healthcare benefit for retirees?
7  Q.  Yeah.
8  A.  That did not eliminate it?
9  Q.  Yeah, that you --
10  A.  Did not adjust it in some fashion?
11  Q.  Did not essentially cut it out the way it was being
12     cut out in the June 14th proposal.
13  A.  Yeah, I want to be careful with the frame cut out,
14     because I think there were subsequent discussions
15     about what would be provided instead --
16  Q.  Uh-huh.
17  A.  -- as a proposal, so I don't want my testimony to seem
18     as if we were not proposing an alternative to the
19     existing healthcare plan and that had not been
20     discussed prior to July 17th, but subject to those
21     qualifications the answer to your question is yes.
22  Q.  Now, I've been asking you as of July 17 and then the
23     bankruptcy filing was the very next day; correct?
24  A.  Yes.
25  Q.  Now, in your declaration do you recall making

Page 146

1     statements to the effect that there were expressions
2     by certain union representatives that they would not,
3     and I quote, countenance discussions over proposals to
4     modify either retiree healthcare or pensions.
5  A.  Yes, I think those are quite publicly stated.
6  Q.  And you refer in your declaration to newspaper reports
7     from June 20 and 21?
8  A.  Yes, and I'm trying to recall if people said that to
9     me personally as well.  Yes, but I do recall the press
10     reports, yes.
11  Q.  And those are in fact press reports that you referred
12     to as you said?
13  A.  Yeah, but I think -- and I'm just -- was your question
14     asked about union representatives or union members?
15  Q.  Union representatives.
16  A.  Could that include members?
17  Q.  I'm not asking about people who are just members and
18     not officials in the union.
19  A.  So you're talking about union officials?
20  Q.  Union officials.
21  A.  Okay.  That they would not countenance any change
22     to --
23  Q.  I think the language from your declaration is that
24     they would not countenance discussions over proposals
25     to modify either retiree healthcare or pensions.

Page 147

1  A.  Yeah, I don't think that was just a function of press
2     reports, I think that was relayed to me upon my
3     information and belief by others as well.
4  Q.  Upon your information and belief sounds like you
5     didn't hear it personally?
6  A.  No, I just don't recall whether I heard it personally.
7     I have heard it personally in other meetings from
8     union representatives prior to July 17th, sure.
9  Q.  With respect to the statements that you quote in the
10     newspaper, those are just newspaper reports; right?
11  A.  Well, if they're newspaper -- they speak for
12     themselves if they're newspaper reports, but have I
13     heard that from union representatives?
14  Q.  I'm --
15  A.  I'm responding to your question.  Have I heard that
16     from union representative?  Yes.
17  Q.  I'm going to get these in two phases; okay?
18  A.  Okay.
19  Q.  For the newspaper reports, you're relying on what was
20     said in the newspaper?
21  A.  Yes.
22  Q.  So you have no personal knowledge as to whether the
23     quotation in the newspaper was accurate or anything
24     like that?
25  A.  Unless I was there, I'm not the reporter, yes.

Page 148

1  Q.  Now, what statements were made to you outside of what
2     you read in the newspaper?
3  A.  Quite early on I heard from union representatives,
4     I believe at DFFA, DPLSA, DPOA, I'm not sure it
5     includes AFSCME, UAW, but I had heard statements in
6     that regard in many of the meetings that I've had with
7     them previously prior to July 17th.
8  Q.  And did they specifically -- what statements, saying
9     specifically what?
10  A.  Generally -- you know, I don't know the exact quotes,
11     but generally speaking what I said.  They would not
12     countenance cuts to healthcare and benefits.
13  Q.  That wasn't actually what you said in your
14     declaration.
15  A.  That's what I said generally.
16  Q.  What you said in your declaration is they would not
17     countenance discussions over proposals to modify
18     either retiree healthcare or pensions.
19  A.  Yeah, healthcare, okay, yes.
20  Q.  So who said what -- I would like to know specific as
21     to who said what to you when?
22  A.  As I said, I had meetings early on with DFFA, I don't
23     recall the specific members, but I recall the meeting,
24     they were quite heated.  Might have been one with
25     Mr. McNamara, Mr. Shinsky and others.  I've had many

Page 149

1    meetings with DPLSA, Rodney Sizemore and Mark Young.
2    I've had meetings with DPOA, Mark Diaz, where that was
3    said prior to July 17th.
4  Q.  Okay.  And you're aware that the -- at least two of
5    the individuals that you mentioned are signatories to
6    what we've marked as Exhibit 12?
7  A.  Yes.
8  Q.  So you're not suggesting, are you, that those people
9    were saying that their unions would not in any event
10    negotiate with the City; were you?
11  A.  I didn't -- that's not my testimony.  That's what I
12    say in my declaration.  I think most of the
13    discussions that were had were, here again, staying
14    away from the traditional concept of negotiating
15    because I'm not waiving any rights, but the general
16    concern is we're not going to change pension and
17    healthcare benefits, there were a lot of discussions,
18    these are affecting people's lives, these are promises
19    that the City has made, all the things you've heard
20    before.  Those were recounted to me many times.
21  Q.  Okay.  And as we saw from the document we've marked as
22    Exhibit 12, the DFFA was in fact interested in getting
23    specific proposals from the City and said it would be
24    making its own proposal; correct?
25           MR. SHUMAKER:  Objection, calls for

Page 150

1    speculation.
2  A.  The letter speaks for itself, but it says it would be
3    productive if the City could provide us with specific
4    proposals on pension benefit restructuring as soon as
5    possible.  I think that there had been discussions in
6    some of those meetings about pension benefits, but I
7    guess they're asking for more detailed information.
8  Q.  And it also says as we went through before in the
9    fourth paragraph, we are reviewing and will provide
10    the City with specific proposals; correct?
11  A.  Yeah, that's the information I got and they said they
12    were going to provide us with specific proposals.
13  Q.  Okay.  And -- okay.
14        And then we saw the response to that was in
15    Exhibit 13 again; correct?
16  A.  Yes, this is the given for the discussions I talked
17    about.
18  Q.  And then the bankruptcy filing was the very next day;
19    correct?
20  A.  Yes.
21  Q.  Did you personally have any discussions with
22    representatives of any retiree associations?
23  A.  Yes.
24  Q.  Which ones?
25  A.  Fire, Detroit -- Police and Fire I think, yes.  Early

Page 151

1    on with --
2  Q.  The Police and Fire?
3  A.  Yes.
4  Q.  And what was the substance of those discussions?
5  A.  This was concerns expressed about potential impact to
6    pensions and healthcare obligations.
7  Q.  And are you aware that the police and firefighters
8    association, RDPP -- I'm sorry, RDPFFA, that's who
9    you're referring to?
10  A.  Right, RDPFFA, yes.
11  Q.  Retired Detroit Police and Firefighters Association,
12    they represent retired police and firefighters;
13    correct?
14  A.  Yes.  I assume.  That's their name, yeah.
15  Q.  Did anyone from that organization tell you that they
16    were refusing to negotiate with the City?
17  A.  No, I don't think the discussion was of that nature
18    and character about refusing to negotiate.  I think it
19    was quite -- by some members of that meeting made
20    quite clear that they were not interested -- refusing
21    is a big word.  It was made quite clear they were not
22    interested in hearing about adjustments to pension
23    benefits.
24  Q.  But you're not saying that that organization said it
25    refused to negotiate with the City; are you?

Page 152

1  A.  Like I said, refused is a big word.  There was a lot
2    of stridency in the conversations.
3  Q.  But to be clear, your testimony is not that the
4    retiree association for the police and firefighters
5    said that they would refuse to enter into any
6    negotiations with the City?
7  A.  No, I keep saying it's not a question of refusing, it
8    was that you can't do this.  So they didn't say and
9    we're not going to ever talk to you again.  That did
10    not occur.  What was was very strident about you can't
11    do this.
12  Q.  And you could understand why they were strident about
13    what was being done to their retirement benefits;
14    can't you?
15  A.  Well, nothing's been done to their retirement
16    benefits.  We've held them harmless for the balance of
17    this entire year.  There was a proposal.
18  Q.  You can understand about the retirees would be upset
19    about what was proposing to be done; can't you?
20  A.  I've said that before, sure.
21  Q.  I want to show you another document.  Was that the
22    only retiree association you had discussions with?
23    Any discussions with the Detroit Retired City
24    Employees Association?
25  A.  I'm trying to think.  None that I recall.  None that I

Page 153

1  recall.

2  Q.  Okay.  Let me show you another document.

3  A.  There may -- none that I recall with specificity.

4  Q.  Okay.  And you were aware that they represented other

5  nonuniformed retirees?

6  A.  Yes.

7  Q.  But you can't recall anything --

8  A.  None I recall with specificity.

9      MR. ULLMAN:  Okay.  Let's mark the next

10  document, which is, what, 15?

11     THE COURT REPORTER:  Fourteen.

12     MR. ULLMAN:  Fourteen.

13     (Marked Exhibit No. 14.)

14  Q.  Okay, 14 is a document entitled retiree legacy cost

15  restructuring, September 11, 2013.

16  A.  Yes.

17  Q.  Are you familiar with this document?

18  A.  Yes.

19  Q.  And does this represent the City's current position as

20  to what it's going to do, what it's going to provide

21  for retirees?

22  A.  This represents the slide deck that we proposed last

23  week at the initial meeting with the retiree

24  committee.

25  Q.  Okay, and does it represent the position for the City

Page 154

1  currently as to what it's --

2  A.  Yes, this is the current --

3  Q.  -- planning to propose or planning to put through?

4  A.  Yes, this is the City's current thinking.

5  Q.  And as I understand this roughly, on the health side

6  what the City was saying it will do is essentially the

7  retirees who are Medicare qualified can sign up for

8  some various Medicare plans and the City will help

9  them with the payment of the premium for that?

10  A.  Yes.

11     MR. SHUMAKER:  Objection, document speaks

12  for itself.

13  A.  But yeah, on page 4 it starts that discussion, yes.

14  Q.  Okay.  And essentially for nonMedicare retirees in

15  terms of getting healthcare, they're on their own and

16  the City says it will give them $125 stipend; is that

17  right?

18     MR. SHUMAKER:  Objection to form.

19  A.  Yeah, you say they're on their own, but I think

20  there's a proposal here that they be able to go onto

21  the exchanges provided by the Affordable Care Act and

22  the City would give them a stipend.

23  Q.  Right, and that's if to the extent they can do it, but

24  it's up to them to do something like that; right?

25  A.  Yeah, like Harris Teeter did last week, yes.

Page 155

1  Q.  And on the pension side of things has there been any

2  change from what was set out in the June 14th

3  proposal?  As I understand this, it's still a defined

4  contribution plan for current employees and no

5  contributions being made by the City for retired --

6  for retirees; is that right?

7      MR. SHUMAKER:  Object to the form.

8  A.  Yeah, the general consensus is that you would close

9  the plan and there would be contributions for

10  currents, yes.

11  Q.  And so again, just to be clear, that means for

12  retirees no ongoing contributions provided by the

13  City?

14  A.  None other than their participation in the note that's

15  proposed in the June 14th proposal.

16  Q.  And with no new funding for their pensions the

17  payments will stop -- to the retirees would stop being

18  made when the retirement funds run out; is that right?

19  A.  That's a loaded question.  I mean, the -- and the

20  reason I say it's a loaded question, some of the

21  retirement funds have said their payments won't run

22  out so that's why we want to have a dialogue.  We

23  think they're at risk.  They've told us they're not.

24  Q.  And by the City's estimation the pension funding will

25  run out when?  If no new funds are put in?

Page 156

1  A.  Well, as you can see from our proposal, we have -- not

2  so much from the proposal but June 14th as well, we

3  made certain assumptions as to when the funds might

4  run out if nothing is adjusted one way or the other.

5  We've been told that we're wrong so --

6  Q.  I'm asking.  I'm asking the City's point of view.

7  A.  The City's point of view is that we've made an

8  accurate and fair assumption that the funds will run

9  out at some point within the next two decades.

10  Q.  And that's if no new money is contributed?

11  A.  If -- well, and I'm being very careful.  It's not just

12  if there's no new money, it depends upon actuarial

13  rates, it depends upon rate of return.  Pensions could

14  invest in the Microsoft of their day and have more

15  than enough funds for the foreseeable future.  But

16  assuming certainly reasonable assumptions that is the

17  conclusion of the City.

18  Q.  And just to be clear, and that assumption as to when

19  it would run out assumes no further contributions by

20  the City; correct?

21  A.  Yes, it assumes we close the plan.  Other than the

22  note.

23  Q.  And do you have any more specific recollection as to

24  when the funds would run out other than within the

25  next two decades?

Page 157

1   A.   It's in my papers.  If you want to point me to it,
2        that's fine, but I'll stand by what's in the papers.
3   Q.   Now, you recall of course putting in a declaration in
4        the bankruptcy?
5   A.   Yes.
6   Q.   I guess I can actually give you a copy in case you
7        want to refer to it.
8   A.   Okay.
9            MR. ULLMAN:  Which we'll mark as 15.
10           (Marked Exhibit No. 15.)
11  Q.   Okay, and Exhibit 15 is your declaration?
12  A.   Yes.
13  Q.   There's a lot of financial information that you put
14       out in your declaration; right?
15  A.   Yes.
16  Q.   One thing I didn't see in here is a balance sheet
17       showing the assets and liabilities of the City.
18  A.   That is correct.
19  Q.   Does one exist?
20  A.   Not in the traditional sense that you're speaking of.
21       I think in our June 14th proposal we try to provide --
22       and in other proposals we try to provide for some
23       listing of the City's potential assets of any
24       substantial form.  But is their traditional corporate
25       balance sheet, for instance, for the City, no, not

Page 158

1        yet.
2   Q.   Do you have schedules of assets and liabilities that
3        exist, though?
4   A.   Yes, yes.
5   Q.   Have those been produced?
6   A.   I don't know if we've completed the schedules so --
7        you're talking about the schedules of assets and
8        liabilities?  I don't know.
9            MR. ULLMAN:  I'll call for their
10       production.
11           MR. SHUMAKER:  We will see.
12           MR. ULLMAN:  I'm sorry?
13           MR. SHUMAKER:  We'll look into it.  I'm not
14       sure whether they've been produced or not right now as
15       I sit here.
16  A.   Well, just to be clear, as you know, under Chapter 9
17       the time frame of it --
18  Q.   That wasn't my question.
19  A.   But I'm answering your question so it won't be unclear
20       on the record.
21  Q.   But there isn't a question.
22  A.   No, I'm being responsive.  So it won't be unclear on
23       the record.  Under Chapter 9 they're actually not due
24       yet, so let's just be clear.
25  Q.   Now, at paragraphs 52 through 57 of your declaration

Page 159

1        you make a number of statements about insolvency?
2            MR. SHUMAKER:  What page?
3            MR. ULLMAN:  Sure, it's 37.
4   A.   Yes.
5   Q.   And in particular you cite a lot of figures with
6        respect to cash flow and you give projections?
7   A.   Yes.
8   Q.   Now, I think you indicated you're not an accountant?
9   A.   No, I'm not.
10  Q.   And is it correct that you yourself did not prepare
11       the cash flow numbers and projections?
12  A.   That is correct.
13  Q.   The underlying work was done by others?
14  A.   Yes.
15  Q.   And in your declaration you cite a number of sources
16       for the figures that you give in paragraphs 54 through
17       57?
18  A.   Yes.
19  Q.   You don't cite Ernst & Young as one of the sources?
20  A.   No, that's because Ernst & Young submitted a parallel
21       affidavit at the time of this filing of Gaurav
22       Malhotra.
23  Q.   Didn't the City in fact retain Ernst & Young to
24       prepare these cash flow projections?
25  A.   The City retained Ernst & Young I believe over two

Page 160

1        years ago to work on liquidity, cash flow and
2        analysis.  I don't think it was limited to just cash
3        flow projections.
4   Q.   But that's one of the things that Ernst & Young did?
5   A.   Yes.
6   Q.   And that's one of the things in fact that -- what's
7        his name -- Gaurav Malhotra did?
8   A.   Gaurav Malhotra.
9   Q.   I'm sorry.
10  A.   No problem.
11  Q.   And Mr. Malhotra was in fact one of the lead Ernst &
12       Young players involved in working with the City;
13       wasn't he?
14  A.   Yes, he's a principal at Ernst & Young.
15  Q.   And is it correct that the figures that you're citing
16       in these paragraphs of your declaration in fact come
17       from work that come from Mr. Malhotra?
18           MR. SHUMAKER:  Which figures are we talking
19       about, counsel?
20           MR. ULLMAN:  Basically by my recollection
21       all of -- pretty much all of the figures.  Certainly
22       in 54 these numbers about the 225 million, the
23       schedule that appears on page 39, the information
24       about the retiree legacy obligations being 8 percent
25       of revenues and this was all -- and going on, I just

1    tried to chart it out briefly.  It looked to me
2    basically all this was taken or appeared also in the
3    affidavit or declaration of Mr. Malhotra.
4        MR. SHUMAKER:  I object to all this.
5    That's why I'm trying to ask you to be specific so
6    that the witness can give a responsive answer.
7  A.  Yeah, let me say --
8        MR. SHUMAKER:  Paragraphs 54 through what?
9        MR. ULLMAN:  Fifty-seven.
10       THE WITNESS:  Fifty-seven.
11       MR. SHUMAKER:  Through 57.
12 A.  Let me say this generally.  If you look at Gaurav
13    Malhotra's declaration, he states that this
14    information is compiled by him in conversations with
15    City employees and other consultants as well.  So I
16    don't want to give the impression that he's the sole
17    source for the data that we recovered.  It is a
18    compilation of data from a number of different sources
19    and I relied on those same sources too and as this is
20    reported in the various footnotes to source the
21    material, they may have come from Mr. Malhotra but
22    they may have come from a number of different sources
23    in the process of him developing the work.
24 Q.  But either way they were not done by you personally?
25 A.  No, they were not done by me personally.

1  Q.  Did you do anything to verify the numbers, the
2    figures, the calculations done in paragraphs 52
3    through 57 of your declaration were accurate?
4  A.  Yes.
5  Q.  What did you do?
6  A.  I discussed them with Mr. Malhotra and a number of
7    different consultants.  We discussed them with the
8    economists at Ernst & Young and other accountants.  I
9    discussed some of them with City employees.
10 Q.  Okay, so you essentially satisfied yourselves that the
11    people who prepared these numbers did what they were
12    supposed to do and made what you thought were
13    reasonable assumptions in coming to them; is that
14    fair?
15 A.  Yes.  I mean, some of them are just factual
16    statements, but yes, to the extent there were
17    assumptions and work being done, there was some
18    participation in the organic work.
19 Q.  Okay, and you relied on the information that was being
20    provided to you?
21 A.  Yes, by the professionals.
22 Q.  By the people -- by the professionals you hired to
23    perform that task?
24 A.  Yes.
25 Q.  Now, is it correct that in the years prior to the time

1    you got there Detroit was subject to various scandals
2    including financial mismanagement?
3  A.  Yes.
4  Q.  And one of the former mayors in fact went to jail for
5    corruption; isn't that right?
6  A.  He's been convicted.  I don't know if he's sentenced,
7    but certainly that's been widely written about.
8  Q.  Right.  And do you know whether the books and records
9    that survived that administration were complete and
10    accurate?
11 A.  I know that the, for instance, the CAFR, Consolidated
12    Annual Financial Report, was based on certain books
13    and records.  I know that there have been questions
14    raised about the quality and competence of Detroit's
15    books and records.  My testimony would be that to the
16    best extent possible based upon the data that we got
17    we relied on those books and records.
18 Q.  And is it correct that the books and records -- and
19    those were the same books and records that
20    Mr. Malhotra relied on; right?
21 A.  Yes, I think --
22       MR. SHUMAKER:  Objection, calls for
23    speculation.
24 A.  I think Mr. Malhotra's declaration states that Ernst &
25    Young did not audit the books and records of the City.

1  Q.  And did anyone else audit the books and records of the
2    City before these numbers that appear in your
3    declaration were prepared?
4  A.  There may have been.  I'm not sure, because depending
5    upon at any given time where the numbers come from
6    they may have been subject to an audit or they may
7    have been subject to a review, for instance the
8    pension numbers.  Gabriel Rotor, which was GRS's
9    traditional actuary, may have done some balance.  So
10    in my understanding based upon both the information I
11    received and discussion from Malhotra's declaration,
12    Ernst & Young did not audit them and I'm not an
13    auditor so that's my understanding.
14 Q.  But do you know whether or not anyone else audited --
15 A.  I don't know.
16 Q.  And is it correct that if the underlying data of the
17    books and records that were being used to prepare
18    these cash flow numbers and projections have material
19    inaccuracies, that those would affect the projections
20    and the figures as well?
21       MR. SHUMAKER:  Object to the form.
22 A.  That's a hypothetical, but I think it's fair to say
23    that if they had material inaccuracies, they would
24    have an impact, but I'm unaware that they are
25    materially inaccurate.

Page 165

1  Q.  But that's never been subject to an audit; has it?
2  A.  To the best of my knowledge I don't know when they
3      have or when they haven't.
4  Q.  Okay.  And I think you indicated that in coming up
5      with these figures various people were consulted in
6      various fields and a number of assumptions were made;
7      is that right?
8  A.  I believe so.
9  Q.  And I think you also indicated in your structuring
10     proposal from June 14th that the numbers are subject
11     to various assumptions which could or could not prove
12     right; correct?
13 A.  Well, I think in June 14th we've said that it's a
14     proposal and there may be various issues that may or
15     may not be correct.
16 Q.  Yeah.  Okay, and obviously if any of the assumptions
17     that went into the underlying numbers that appear in
18     your declaration are wrong, then the numbers
19     themselves would also be subject to inaccuracy; true?
20 A.  Let me say this about that.  Both in June 14th
21     presentation and in this declaration, we've tried to
22     present an accurate picture of the City's books and
23     records and status to the best extent possible that we
24     have.  Where there were questions we have tried to err
25     on the side of reasonable assumptions as opposed to

Page 166

1      unreasonable assumptions either way.  But your general
2      question as to whether or not if the information going
3      in was inaccurate, revealed an inaccurate result, I
4      think it's true as a matter of just common sense and
5      logic.
6  Q.  And the same thing as to assumptions.  If the
7      assumption made was wrong, then the output would be
8      wrong also?
9  A.  I think that's why we asked several times to have a
10     discussion about the assumptions that are necessary
11     for pension benefits.
12 Q.  Now, the cash flows that are being reported in your
13     declaration, those do not include any assumptions as
14     to the monetization of various assets that the City
15     continues to hold; is that right?
16     MR. SHUMAKER:  This is paragraph 56 that
17     you're referring to, counsel?
18     MR. ULLMAN:  Yeah, I'm looking in general.
19     MR. SHUMAKER:  In cash flow?
20     MR. ULLMAN:  Yeah, cash flow.
21 A.  You're talking about generally do the cash flows
22     include any monetization of any City assets?
23 Q.  Yeah.
24 A.  No, they do not.
25 Q.  And obviously if assets currently held by the City

Page 167

1      were monetized, that would provide additional cash to
2      pay obligations including retirement and health
3      obligations; correct?
4  A.  Well, additional cash from onetime asset sales may not
5      necessarily equal cash flows.  As I understand the
6      analysis we've tried to present is cash flows based
7      upon a recurring basis as opposed to onetime assets
8      but it would yield additional cash.
9  Q.  Yes.  If you sold an asset and had money, you would
10     have the money available to pay something?
11 A.  Yeah, you might have a onetime -- I'm not an
12     accountant, but you might have a onetime cash charge,
13     yes.
14 Q.  And if the cash, the amount you got was large, it
15     could last for a long period of time; correct?
16 A.  Well, it depends upon what --
17     MR. SHUMAKER:  Objection, form.
18 A.  Depends upon what it was used for.  I mean, what are
19     you talking about?  When you say could last for a long
20     period of time, it could be a one -- you could sell
21     one asset for $5 million and that wouldn't last a
22     month.
23 Q.  Yes, and depending on the amount of assets that were
24     sold, if you got a substantial amount of money, that
25     could enable the City of Detroit to pay ongoing bills

Page 168

1      for some period of time; true?
2      MR. SHUMAKER:  Objection to form.
3  A.  Here again, depending upon the size of the asset, but
4      anything is possible.
5  Q.  Okay.  Now, the City of Detroit owns certain pieces of
6      art that are stored at the Detroit Institute of Art;
7      is that right?
8  A.  Yes.
9  Q.  And how many is that?
10 A.  I think the City owns approximately 66,000 pieces of
11     art.
12 Q.  Now, those --
13 A.  No, strike that.  Let me be clear so we can move on.
14 Q.  Yeah.
15 A.  I think there are 66,000 pieces of art over at Detroit
16     Institute of Art.  I'm not sure the City owns all
17     66,000 pieces.  I've been informed that it owns 35,000
18     of those pieces in an undisputed capacity.
19 Q.  Okay, that's what I was getting at.  And that's
20     distinct from art that is subject to a public -- or is
21     or may be subject to a public trust or something like
22     that.  This is 35,000 pieces that the City owns, as
23     you said, in an undisputed capacity?
24 A.  Outright, yes.
25 Q.  Outright.  Now, is it correct that the City has

Page 169

1  retained Christie's to appraise this City-owned art?
2  A.  Yes.
3  Q.  And have you gotten back any information yet from
4      Christie's as to the appraised value?
5  A.  No.
6  Q.  And do you have any understanding as to the value of
7      the appraised -- of the art that's being appraised
8      independent of what -- of Christie's as a source?
9  A.  Only what I've read in various news articles and
10     blogs.
11 Q.  And I think you've seen press reports indicating that
12     for some of the most important works alone the value
13     could be at least 2.5 billion or something on that
14     order?
15 A.  We talked about press reports earlier and I was
16     cautioned to be careful so I'm going to say the same.
17 Q.  I'm just asking.
18 A.  I'm trying to respond to your question.  I'm going to
19     say the same thing about press reports here.  I have
20     seen press reports reporting various values for the
21     art.
22 Q.  And have you seen press reports reporting for the most
23     important pieces alone values on the order of
24     2.5 billion?
25 A.  I don't recall if I've seen those specific press

Page 170

1  reports.
2  Q.  Do you have any reason to believe that the value of
3      the City-owned art is less than something on that
4      order of magnitude?
5  A.  I'm relatively agnostic on the value of the art at
6      this point.  I'm waiting to see the appraisal.
7  Q.  Do you have any understanding as you sit here today as
8      to what the value of the City-owned art is?
9  A.  No.
10 Q.  Are you considering selling the City-owned art to
11     generate cash?
12 A.  What I've said consistently is all options on the
13     table, but we first have to decide what we're talking
14     about.
15 Q.  Do you have any understanding as to how long it would
16     take to sell the art if a decision were made to sell
17     it?
18 A.  No.
19 Q.  Have you considered other ways to monetize the art
20     besides an outright sale?
21 A.  All options are on the table.
22 Q.  Well, have you considered any others in particular?
23 A.  We have not made -- meaning my team and I have not
24     made any decisions with regard to the art contained at
25     DIA.

Page 171

1  Q.  I'm not asking about decisions, I'm just asking what
2      you considered.
3  A.  We considered a lot of things, yes.
4  Q.  And have you -- well, then can you answer my question
5      more specifically?  What if any ways to monetize the
6      art have you considered other than an outright sale?
7  A.  I think there's been discussions about some form of --
8      and I'm not clear because to be direct, I know that
9      some of my -- I've never been to DIA, I don't think
10     I've ever spoken with their board, I know that some of
11     my consultants have been over there and have had
12     various discussions about the art.  I think the
13     discussions were very high level and very general.
14     That's what I know.
15 Q.  Okay, that's really very nonspecific.  Are you aware
16     of any specific consideration given to any form of
17     monetizing the art other than an outright sale?
18 A.  No, nothing specific.
19 Q.  Could be a lease -- sorry, but nothing has been
20     identified as a possible route to monetize?
21 A.  Nothing specific.  There have been discussions, but
22     nothing specific.
23 Q.  Have there been discussions of leasing as a possible
24     way to monetize?
25 A.  Possibly, yes.

Page 172

1  Q.  Okay.  And do you have any understanding of the amount
2      of cash flow that could be generated on an annual
3      basis if the art were leased?
4  A.  Sitting here today, no.
5  Q.  Has that number been talked about?  Is there a
6      document that might discuss that?
7  A.  No, no, there's no document.  I -- I -- in an effort
8      to be accurate, I think I had a discussion with one of
9      the representatives at Christie's that was generally
10     speaking leasing is a very difficult thing to do.
11     That's the nature of the discussion, that you would
12     have to have the right pieces at the right time at the
13     right market to generate cash.
14 Q.  So there was no discussion about the amount of money
15     it could generate?
16 A.  No, no, it -- there was some discussion about
17     $1 million, for instance, or something like that, but
18     it's nothing substantive.
19 Q.  Okay.  Now, the City also has a department of water
20     and sewers; is that right?
21 A.  Yes.
22 Q.  And as I understand it, the department of water and
23     sewers operates as a separate entity for accounting
24     and operating purposes?
25 A.  As a result of Judge Cox's opinion, it has separate



Page 173

1    procurement, accounting and managerial
2    responsibilities, but as it's stated in that opinion,
3    it remains an asset in the department of the City.
4    Q.   And is it correct that the water and sewer department
5         has issued secured bonds?
6    A.   Yes, they're in my June 14th proposal.
7    Q.   Okay, and I don't recall.  What was the value of the
8         bonds that were issued?
9    A.   The secured portion of the bonds all in, but this also
10        includes some parking -- parking was 95 million, some
11        dedicated state revenue bonds was a couple hundred
12        million, but generally speaking about 5.7 billion.
13   Q.   And those bonds -- the 5.7 billion is secured by the
14        assets of the department?
15   A.   Yes, yes.
16   Q.   And as you understand it, does the value of the assets
17        of the department of water and sewers exceed the
18        values of the secured bonds?
19   A.   I don't know if there's been a formal appraisal, but I
20        certainly would hope so.
21   Q.   Do you have an understanding of the value of the water
22        and sewer assets?
23   A.   Not sitting here today.
24   Q.   Do you have a general understanding, a general
25        recollection?

Page 174

1    A.   When you talk about asset values, you're talking about
2         switches, pipes, valves, things along that nature.  I
3         don't think I've ever seen an appraisal of the value
4         of the assets of the water and sewer department.
5    Q.   Do you have a general understanding of what the value
6         of the assets --
7    A.   No.
8    Q.   -- is worth?
9    A.   No.
10   Q.   Have you taken any steps to monetize the value of the
11        assets owned by the water and sewer department?
12   A.   When you say monetize, I'm going to respond to the
13        question on the basis that monetize is in the broad
14        sense --
15   Q.   Uh-huh.
16   A.   -- not whether it's a lease, whether it's a sale,
17        getting authority.
18   Q.   Just get money for it.
19   A.   Get money for it, get some dough, okay, just want to
20        be clear.  Discussions are ongoing in that regard.
21   Q.   What are those discussions in a nutshell?
22   A.   Those are commercially sensitive so I don't want to
23        interfere.  Suffice it to say, the -- Judge Cox's
24        opinion spoke to the possibility of creating an
25        authority that would remove the water and sewer

Page 175

1    department's operations, not the assets, from the City
2    and perhaps increase additional value as a byproduct
3    of that process.
4    Q.   And this is what is referred to in the June 14th
5         proposal or this transaction with this new authority?
6    A.   Yes.
7    Q.   And that would involve some sort of payment by the
8         authority to the City?
9    A.   Yes, some sort of lease payment or like kind payment.
10   Q.   Do you have any understanding -- can you give me any
11        idea as to the value that would be achieved by that,
12        the amount of cash that the City would be achieving,
13        realizing, if that went through?
14   A.   Judge Cox's opinion, and I'm referencing the opinion
15        to state what's already in the record, references I
16        believe a $62 million payment, which he called wildly
17        speculative.  But there may be payments in that
18        regard, somewhere between 40 or lower to maybe up to
19        100.  It's unclear.
20   Q.   Right now who has control over the revenues that are
21        taken in by the department of water and sewers?
22   A.   City does.
23   Q.   Now, the department of water and sewers also had
24        retirement obligations for its --
25   A.   Well, they have employees that are members of the

Page 176

1    General retirement fund.
2    Q.   Right.  And how were payments to the retirement fund
3         for those employees to be made?  In other words, were
4         they to be made directly by the department of water
5         and sewer, to the Retirement Systems or were they made
6         by the department of water and sewer to the City,
7         which then was to remit them to the Retirement
8         Systems?
9    A.   You're talking about the transaction or steady state
10        now?
11   Q.   The steady state.
12   A.   Steady state now.  My understanding is that's part of
13        the City's obligation.
14   Q.   So the DWS, department of water and sewers, is to give
15        the money for the retirement to the City, the City
16        was --
17   A.   City makes it.
18   Q.   -- was then supposed to make the payment to the
19        Retirement Systems?
20   A.   Uh-huh.
21   Q.   And are you aware of any funds that were transmitted
22        by the department of water and city (sic) to the City
23        for the purpose of funding pensions that were then
24        used by the City for other purposes?
25   A.   I don't know if you can identify specific water and

Page 177

1  sewer funds and transactions. I know that the City
2  has borrowed from the General Retirement System from
3  time to time.
4       MR. ULLMAN: So that's not really answering
5  my question. Can I have my question read back please?
6       THE WITNESS: Okay, sure.
7       (Record read back as requested.)
8  A. Am I aware? It would be speculative. I've -- no.
9  Q. So is it your testimony that all monies that were
10    transmitted by department of water and sewer to the
11    City to make payment for pension benefits were in fact
12    properly applied to the Retirement Systems as pension
13    contributions?
14 A. No, that's a conclusion on my statement I wasn't
15    aware. That may have occurred, but sitting here
16    today, without speculating, I'm not aware of a
17    specific transaction or transactions.
18 Q. So it may have occurred, you just don't know one way
19    or the other?
20 A. I just don't know.
21 Q. Now, you indicated that the City has control over the
22    money that's taken in by the department of water and
23    sewers; yes?
24 A. City has control over the department of water and
25    sewer. There are certain obligations due from the

Page 178

1  department of water and sewer, but yes.
2  Q. Okay. So if the department of water and sewer has
3  money that it wants to spend for a particular purpose,
4  is it correct that the City could decide that the
5  money should not be spent for that purpose and used
6  for something else?
7  A. That would depend upon the nature of the bond
8  obligations at department of water and sewer because
9  although the department remains a department of the
10    City, the bond obligations that are secured have
11    certain security interests in that revenue stream.
12 Q. Okay. Is there anything that restricts the City from
13    taking money from the department of water and sewer
14    that the department of water and sewer wishes to use
15    for and has earmarked for capital improvements to the
16    water and sewer system?
17 A. Yes, there's probably restrictions in the bond
18    instruments.
19 Q. And other than what may be in the bond instruments is
20    there any legal prohibition on the City taking the
21    money that the DWS would otherwise use for capital
22    improvements?
23 A. Yes, there might be under Judge Cox's opinion.
24 Q. But without reviewing the specifics of Judge Cox's
25    opinion, you don't know that?

Page 179

1  A. I don't know that.
2  Q. Now, are you aware that in its most current proposals
3  the department of water and sewer is proposing over
4  the next several years to spend hundreds of millions
5  of dollars on capital projects?
6  A. Yes.
7  Q. And have you given any consideration to not having
8  that money used for capital improvements to water and
9  sewer including new projects but in fact to have that
10    money used to satisfy other existing City obligations,
11    which may include but not be limited to pension or
12    healthcare obligations?
13 A. Have we given some consideration? Here again, this is
14    wrapped up in the potential transaction that is being
15    discussed and I think it's been reported with a number
16    of counties and other parties so I want to be careful
17    that I don't impact commercially sensitive
18    information. I know that the capital improvement plan
19    at DWSD is a component of ensuring that its
20    creditworthiness remains separate and apart from the
21    City and is at a higher rate. Your question was have
22    I given any consideration to not having them make that
23    capital improvements?
24 Q. Or to having make a lesser capital improvement,
25    thereby obtaining money for the City to use for other

Page 180

1  purposes?
2  A. And my response to that would be that's all wrapped up
3  in the discussions regarding transaction and what's
4  necessary to maximize the ability of that department
5  to generate income for the benefit of the City.
6  Q. So is that something that you're looking at and
7  considering to take money that would otherwise be used
8  for capital improvements and apply it to satisfy
9  existing obligations?
10 A. As this is a potential transaction that we talked
11    about on June 14th, that's currently under discussion
12    with some of our customer base including other
13    counties. I want to be very careful that I don't
14    interfere with those negotiations by saying something
15    that would not enhance the value or maintain the value
16    of that asset. Suffice it to say, we are aware of the
17    situation and it is wrapped up in the discussions
18    we're having about a potential transaction.
19 Q. Okay, and at this potential transaction, take that off
20    the table, assume it doesn't go through or is
21    withdrawn, have you given any consideration to simply
22    looking at the capital monies that are available at
23    DWSD and using some or all of them to fund existing
24    obligations rather than new capital improvements or
25    capital improvements to existing work at the

Page 181

1    department?
2 A.  Let me say it this way.  We have examined a number of
3    options and alternatives related to DWSD including
4    those that might be implicated by your question.
5 Q.  So is the answer to my question yes, you have
6    considered that?
7 A.  We have considered all operations at DWSD including
8    those that might be implicated by your question.  I
9    said before I'm going to be very careful so I don't
10   interfere with the commercial aspects with what's
11   going on now.
12 Q.  And can you tell me how much you believe or understand
13   the City can take from the capital fund from DWSD in
14   order to satisfy its ongoing obligations if it chose
15   to do that?
16 A.  I didn't say --
17       MR. SHUMAKER:  Objection to form.
18 A.  I didn't say that we would take any capital, I said
19   we'd consider it.
20 Q.  I didn't -- I'm asking can you tell me how much would
21   you understand is available to take if the City
22   decides to go down that route?
23 A.  No, I can't tell you that.
24 Q.  Have you done any analysis of that?
25 A.  Analysis is a strong word.  Have we looked at the

Page 182

1    options and related to the transaction all
2    potentialities, but I can't tell you what that number
3    would be.
4 Q.  Who within the City would be most knowledgeable about
5    the capital funds that are available at the DWSD?
6 A.  At the City?
7 Q.  Yeah.
8 A.  Probably the operations at DWSD.
9 Q.  You also made reference in the June 14th proposal to
10   the parking systems that the City owns.
11 A.  Yes.
12 Q.  And as I understand it there are nine garages?
13 A.  Yes.
14 Q.  Two lots with over 1,200 spaces?
15 A.  Yes.
16 Q.  And over 3,400 meters?
17 A.  Yes.
18 Q.  Do you have an understanding as to the value of those
19   assets?
20 A.  No, we're currently doing our analysis as to the value
21   of those assets now.
22 Q.  And you have no preliminary view as to what they're
23   worth?  Nothing's been reported back to you on at
24   least a tentative basis?
25 A.  No, nothing has been reported back to me on -- because

Page 183

1    when you talk about values, there's a range of values
2    from asset disposition and outright sale and
3    privatization to creating an operation or an authority
4    where someone has brought in, as has been done in
5    Washington, D.C., to actually operate the garages and
6    meters.  So we're looking at a range of alternatives
7    to determine what those values could be.
8 Q.  What's the range of values you're looking at so far?
9 A.  We don't have that yet.
10 Q.  How concrete have you -- let me withdraw that.
11       What specific steps have been taken so far?
12 A.  Our investment advisors and consultants are beginning
13   discussions with various parties that undertake these
14   types of operations within a range of alternatives to
15   try to assess values.
16 Q.  And the investment advisors, would that be Buckfire?
17 A.  Yeah, it would be our investment banker, Ken Buckfire,
18   Miller Buckfire.
19 Q.  Okay.  In the June 14th proposal you also make
20   reference to about 22 square miles of land that the
21   City owns.
22 A.  City-owned land, yes.
23 Q.  Do you have an understanding as to the value of that
24   land?
25 A.  I've been informed that some of the value is at best

Page 184

1    nominal, but no, sitting here today, I do not have a
2    number as to the value of the land.
3 Q.  Have any steps been taken to try to monetize that
4    value, to get dough as you put it?
5 A.  Yeah.  Well, here again, you're -- to get income
6    realization perhaps I should say more articulately,
7    but here again, we're at the preliminary steps of
8    examining potential alternatives regarding land.
9 Q.  So you don't know yet?
10 A.  No.
11 Q.  The Belle Isle Park, that's also referenced in the
12   June 14th proposal?
13 A.  Yes.
14 Q.  It's indicated that there's a prospective lease to the
15   state?
16 A.  Yes.
17 Q.  Okay.  And do you expect that to go through?
18 A.  I'm going to ask for it.  It was proposed and was not
19   accepted in time so the state withdrew it, but I do
20   believe we're going to intend to ask that that lease
21   be renewed.
22 Q.  And what's the annual rent the City would get under
23   that lease?
24 A.  The City has a $6 million maintenance obligation and
25   that would be taken up by the state so that wouldn't

Page 185

1    be cash to the City, that would relieve us of an
2    obligation. It has several millions to tens of
3    millions of dollars in deferred maintenance at some of
4    the structures on the island and the state would
5    undertake that obligation as well.
6 Q.  So it would essentially relieve the City of Detroit --
7 A.  Take it off.
8 Q.  -- of debt burden it would otherwise bear?
9 A.  Yes.
10 Q.  You also mention the Joe Louis Arena?
11 A.  Yes.
12 Q.  Any steps taken to monetize that?
13 A.  Here again, we're under initial analysis and
14    appraisals about what can be done with that.
15 Q.  Do you have any understanding so far as to what the
16    potential cash value is that could be gotten from the
17    use of that stadium?
18 A.  Well, there are existing statements regarding cash
19    flows and use of that stadium, but we're reviewing
20    different ways to look at it in some fashion.
21 Q.  Do you have any understanding or belief as to the
22    value that can be realized from that?
23 A.  No.
24 Q.  Now, in your June 14th proposal you also make
25    reference to trying to increase the tax collection

Page 186

1    rate.
2 A.  Yes.
3 Q.  Does the City keep a ledger, a line item, for
4    uncollected taxes?
5 A.  The City keeps many line items. I think we -- you
6    mean uncollected taxes?
7 Q.  Yeah, listing of --
8 A.  Yes.
9 Q.  -- this is the amount for uncollected taxes?
10 A.  Yes.
11 Q.  Are you aware of any uncollected taxes that have in
12    the past been written off the City's books in the
13    recent tax but may in fact be collectible?
14        MR. SHUMAKER: Objection to form.
15 A.  No. No. In fact, discussions that I've had is that
16    that -- the 50 percent compliance rate is not linear,
17    that is for every dollar put in to collect additional
18    taxes doesn't necessarily mean you're going to yield a
19    dollar plus in doing it. It might actually be a loss
20    leader so we're examining ways of trying to increase
21    collections. I assume you're talking about real
22    estate property taxes or income taxes?
23 Q.  Or income, any kind of taxes.
24 A.  Yeah, we're examining a number of different
25    alternatives in that regard, but we're trying to

Page 187

1    determine whether or not it would yield a net positive
2    benefit.
3 Q.  Are you aware in the recent past of a tax write-off,
4    an actual write-off of taxes, on the order of around
5    700 million?
6 A.  I have -- I didn't hear that particular figure. I had
7    heard that there was a write-off. Am I aware of it?
8    Yes, I'm aware of it.
9 Q.  And what's your understanding as to what that
10    write-off was? Was it 700 million, 800 million?
11    What's the figure you heard?
12 A.  I don't know what the figure was, but I heard that it
13    was based on noncollectibles. That the probability of
14    collecting it was very low.
15 Q.  Are you aware of any report that indicates that there
16    was a write-off on the order of 700 million, possibly
17    more, the figure I heard was 700 million, that may in
18    fact be collectible?
19 A.  I've heard that some people have maintained that is
20    collectible, but I've also heard that the general
21    consensus is it may not be.
22 Q.  Okay, and is there a specific set of taxes that that
23    pertains to, this figure we're talking about, seven or
24    800?
25 A.  I don't know. I know that that is one of the -- in

Page 188

1    the presentation we talk about various City assets,
2    airport, Belle Isle, parking, City-owned land,
3    City-owned buildings, others, we also have talked
4    about account receivables and I know that that fits in
5    that bucket, potential account receivables.
6 Q.  Are you aware that the treasurer, Andy Dillon, has
7    acknowledged that there's a report that exists that
8    talks about the 700 or so million figure written off
9    that really is collectible?
10 A.  That's what I had heard. That's what I meant when I
11    said I heard to that extent, yeah.
12 Q.  And do you know what this report is?
13 A.  No, I just -- I just heard about it coming in in the
14    process of doing some due diligence, but one, I
15    haven't seen it; two, we're looking into it.
16 Q.  So you're in the process of trying to run down that
17    report and see what it is?
18 A.  We're trying to run down a number of reports, rumors
19    and suggestions that there are account receivables due
20    the City.
21        MR. ULLMAN: And I would like to request a
22    copy of that report.
23        MR. SHUMAKER: We'll look into it.
24        THE WITNESS: If we have it.
25 Q.  Now, did the City put in place tax programs -- tax

Page 189

1     amnesty programs?
2  A.  Has the City put in place?
3  Q.  Yes.
4  A.  Since I've been here?
5  Q.  Yes.
6  A.  A tax amnesty program?
7  Q.  Yes, to try to get people who owe money --
8  A.  No, not yet, no.
9  Q.  Is that something you're considering?
10  A.  We have had discussions in that regard. I know that
11     it's done for parking tickets and tax amnesty and
12     other municipalities, particularly in Washington,
13     D.C., but we have not done that yet.
14  Q.  And I think you indicated that the City has not been
15     very efficient in collecting taxes; has it?
16  A.  I think that's a fair statement.
17  Q.  Do you have an understanding as to how much tax there
18     is that's collectible, in fact could be collected if
19     the City did a more efficient job in going after tax
20     debtors?
21  A.  Yeah, as I said, the discussions we've had is that
22     collection efforts are not necessarily linear; that
23     is, for every dollar spent you're going to get more in
24     taxes. And in fact, there have been some discussions
25     that to the extent you try, it could actually be

Page 190

1     deleterious to the billion dollars of revenue that we
2     anticipate -- on average that we anticipate receiving
3     in the out years. So we're examining those
4     discussions to see if you can get more recovery by
5     additional collection efforts or if you can be more
6     efficient in your ongoing collection efforts as well
7     as more user-friendly for those who want to pay their
8     taxes. We're looking at the full range of enhancing
9     both tax collections as well as tax payments.
10  Q.  Do you have any understanding as to how much value
11     could be achieved if those goals were realized?
12  A.  Not sitting here today.
13  Q.  And are there any ongoing reports that have been
14     prepared or documentation talking about what the
15     realization to the City could be if it got its tax
16     collection act more in line?
17  A.  I don't know if it's a report. I've seen some
18     correspondence about tax rates, yes.
19         MR. ULLMAN: Okay, I would like to request
20     copies of those documents also.
21  Q.  Okay, and then, Mr. Orr, in your testimony this
22     morning I think you made reference to some other cases
23     that you were aware of where you said that as a result
24     of going into Chapter 9, state laws were effectively
25     trumped and you gave some examples of things, Escheat

Page 191

1     law and rent control law; is that right?
2  A.  No, the -- those were Chapter 9 cases. The cases I
3     was talking about having rent control and Escheat was
4     while I was at RTC. The state dealer law cases was a
5     Chapter 11 case for Chrysler.
6  Q.  Okay.
7  A.  So it was federal law under FIRREA. If you remember
8     the discussion, I said Financial Institution Reform
9     Recovery Enforcement Act of 1989 as amended trumps
10     state laws.
11  Q.  So are you aware of any cases involving a Chapter 9
12     bankruptcy where as a result of going into Chapter 9 a
13     state law was held unenforceable or was held not to
14     apply in a particular situation?
15  A.  I remember reading -- well, this is a communication
16     from counsel.
17         MR. SHUMAKER: Let me caution you.
18         THE WITNESS: Okay.
19         MR. SHUMAKER: Don't reveal a communication
20     from counsel.
21         THE WITNESS: Okay.
22         MR. SHUMAKER: The question is are you
23     aware of any cases.
24  A.  Am I aware of any cases, yes.
25  Q.  And what is that case?

Page 192

1  A.  I can't -- it was an attorney-client communication.
2  Q.  And are you aware of any cases where, to use your
3     phraseology, as a result of a Chapter 9 filing by a
4     municipality the state constitution was trumped?
5  A.  Chapter 9 filing?
6  Q.  Yes.
7  A.  I'm not sure, because the case I'm aware of, I don't
8     know if it was a state constitution. I don't recall.
9         MR. ULLMAN: Okay, I have no more questions
10     at this time. But I may reserve the right, we have
11     some other people that are going to ask questions, at
12     the end of that to ask some follow-ups, if that's
13     possible.
14         THE WITNESS: Okay.
15         MR. SHUMAKER: You want to take a quick
16     break?
17         MR. ULLMAN: Yeah, why don't we take a
18     break. Someone else has to sit here.
19         THE VIDEOGRAPHER: Going off the record at
20     2:53 p.m.
21         (A brief recess was taken.)
22         THE VIDEOGRAPHER: We're back on record at
23     3:07 p.m.
24         EXAMINATION
25  BY MS. LEVINE:

Page 193

1  Q.  Good afternoon, Mr. Orr.  Thank you for appearing
2     today.  Your deposition is continued, you're still
3     under oath.  To save some time I'm not going to repeat
4     some of the instructions we went through at the
5     beginning of the deposition.
6          For the record Sharon Levine, Lowenstein
7     Sandler, for the American Federation of State, County
8     and Municipal Employees and with me Michael Artz,
9     in-house counsel of AFSCME.
10 A.  Okay.  Thank you and I understand.
11         (Discussion held off the record.)
12 Q.  Okay, sorry for that.
13 A.  Okay.
14 Q.  Mr. Orr, there was some colloquy --
15         MR. SHUMAKER:  Mic.
16 Q.  There was some colloquy this morning with regard to
17     negotiations or discussions --
18 A.  Yes.
19 Q.  -- prior to the filing of the bankruptcy case.
20 A.  Yes.
21 Q.  Are you familiar with concessionary bargaining
22     historically in Detroit?
23 A.  Could you -- I have read to some degree about the
24     labor history and concessionary bargaining in Detroit
25     stemming from Walter Reuther on forward, even

Page 194

1     concessionary bargaining going forward from I would
2     say Mayor Kilpatrick, Mayor Cockrel and Mayor Bing and
3     in specific the 10 percent wage cuts and other
4     concessions, but if there's something else that you
5     would like to talk about, please explain it.
6  Q.  So that's yes?
7  A.  Yes.
8  Q.  Generally?
9  A.  Well, generally, but if there's something specific,
10     please, yes.
11 Q.  Is it your view that concessionary bargaining can
12     result in concessions with the -- with regard to
13     benefits without a Chapter 9?
14         MR. SHUMAKER:  Objection, calls for legal
15     conclusion.
16 A.  It was my hope -- and here again, I'm going to say the
17     same statement that I said earlier today, collective
18     bargaining and concessionary bargaining, however you
19     call it, is suspended under Paris.  I don't want to
20     waive any rights the City may have under 436.  Do
21     I recognize people certainly aren't in agreement.
22     Um --
23 Q.  Let me rephrase the question.  I just want to clarify.
24 A.  Okay.
25 Q.  I was asking for your view.  I'm not asking for a

Page 195

1     legal conclusion.  We don't have to do the reservation
2     of rights.
3  A.  Okay.
4  Q.  I'm just asking Mr. Orr, as he's sitting here today,
5     his understanding of whether or not it's possible
6     without a legal conclusion to arrive at a consensual
7     agreement, with or without calling it negotiations,
8     discussions or proposals, with regard to retiree --
9     with regard to benefits without a Chapter 9?
10 A.  Is it possible?
11 Q.  Yes.
12 A.  Yes, anything a possible.  I think I've said that.
13 Q.  Okay, now, historically in Detroit isn't it a fact
14     that there were concessionary provisions made with
15     regard to benefits that impacted retirees previously
16     that did not involve Chapter 9?
17         MR. SHUMAKER:  Objection, foundation.
18 A.  Over what period of time?
19 Q.  Is it your understanding that at any point in time?
20 A.  As I said --
21 Q.  No, no, it's a very -- it's a yes or no question.  At
22     any point in time prior to the bankruptcy filing have
23     there been concessionary discussions, negotiations,
24     whatever, in Detroit that have resulted in
25     concessionary changes to benefits that impacted

Page 196

1     retirees?
2         MR. SHUMAKER:  Objection, foundation.
3  A.  Not within the time frame that I have.
4  Q.  So you're not aware of that?
5  A.  No, I'm aware there have been concessionary bargaining
6     changes.  My testimony is in my view that they
7     appeared to not being able to occur within the time
8     frame I had to work with.
9  Q.  I wasn't asking you what you did or didn't do.  I was
10     just asking you if you're aware that there -- whether
11     or not there have been in the history of Detroit
12     concessionary changes to benefits that were
13     implemented that impacted retiree benefits without
14     there having to be a Chapter 9?
15         MR. SHUMAKER:  Same objection.
16 A.  Well, the reason I said not within my -- you're asking
17     my view.
18 Q.  I'm not asking you --
19 A.  Are you now going away from my view?
20 Q.  No, I'm asking -- this is the question.
21 A.  Okay.
22 Q.  The question is --
23         MS. LEVINE:  Can you read back the
24     question?
25         (Record read back as requested.)

Page 197

1  A.  Yes, I am aware that in the history of Detroit there
2      have been concessionary bargains to certain benefits
3      without a Chapter 9.
4  Q.  Okay, now, prior to the filing of this Chapter 9 --
5  A.  Uh-huh.
6  Q.  -- are you aware of any concessionary bargaining
7      changes that affected retirees?
8  A.  I'm hesitating because I'm trying to recall the
9      briefing papers I went through and your specific
10     question is retirees.  I'm well aware of concessionary
11     bargaining changes for actives, now I'm thinking about
12     retirees.  I don't know.
13 Q.  Prior to the filing of this Chapter 9 petition you
14     previously discussed what I believe were four
15     meetings, June 10, June 20, July 10 and July 11; is
16     that correct?
17 A.  Yes.  I think we were talking about -- there were more
18     meetings than that, but I think we were talking about
19     the four meetings that were referenced on page I
20     believe 55 I believe of my declaration.  Well,
21     actually it starts on 54.  Okay.
22 Q.  What other meetings were there?
23 A.  I had had -- meetings with?
24 Q.  Meetings -- well, my understanding is that the
25     meetings on June 10, 20, July 10 and July 11 were with

Page 198

1      employees or retirees.  Did you have other meetings
2      with employees or retirees?
3  A.  You mean in a time frame?
4  Q.  Yes.
5  A.  Yes.  Those were the formal structured meetings that
6      we recounted.  My understanding is there were other
7      meetings that occurred outside of a formal process and
8      certainly a number of phone calls.
9  Q.  With whom -- who is the counterparty to those
10     meetings?
11 A.  I'm not sure I can capture every counterparty to every
12     meeting because my professional team and staff would
13     have various discussions, but I tried to recount ones
14     that I'm aware of and who the counterparties were in
15     my declaration.
16 Q.  Was AFSCME one of the counterparties that you met with
17     outside of the four meetings we were previously
18     discussing?
19 A.  I didn't meet with them, but I understand that there
20     may have been meetings or telephone calls with others.
21 Q.  Were there meetings with others?
22 A.  I don't know if there were meetings or phone calls.
23     There may have been meetings or phone calls.
24 Q.  Were there phone calls?
25 A.  I don't know.  I understand there may have been.

Page 199

1  Q.  Who would have placed those phone calls on your
2      behalf?
3  A.  I don't know if they would have placed or if they
4      would have received them.  I'm not sure, but if they
5      would have been, it would have been somebody probably
6      on labor benefits team, Evan Miller, Brian Easley or
7      others who work with them or others on the City's
8      labor department.
9  Q.  If they were substantive meetings with anybody on
10     behalf of AFSCME, would that have been reported to
11     you?
12 A.  More than likely, yes.
13 Q.  Were there any substantive meetings with AFSCME prior
14     to the filing?
15         MR. SHUMAKER:  Objection to form.
16 A.  I'm going to -- outside of the meetings I mention in
17     my declaration?
18 Q.  Outside of what we'll call the big four.
19 A.  Okay, big four.  Thank you.  Sitting here today none
20     that I recall.
21 Q.  Are you familiar with the so-called Webster
22     litigation?
23 A.  Yes.
24 Q.  Okay, that litigation was filed on July 3?
25 A.  I believe so.

Page 200

1  Q.  And you sent your request to Governor Snyder on July
2      16th?
3  A.  Yes.
4  Q.  And Governor Snyder authorized the Chapter 9 filing on
5      July 18th?
6  A.  Yes.
7          MS. LEVINE:  Could we have it marked as Orr
8      16?
9          (Marked Exhibit No. 16.)
10         (Discussion held off the record.)
11 Q.  We've just marked a document as Orr 16.  It's
12     really -- it's just a Detroit News report from July
13     18th or July 17th actually at 11:00 p.m.
14         MR. SHUMAKER:  I'm sorry, counsel.  I see a
15     July 16 reference at the bottom.
16         MS. LEVINE:  Sorry, July 16th at 11:00 p.m.
17         MR. SHUMAKER:  Yeah.
18 Q.  Mr. Orr, do you recall reading this press coverage at
19     the time that it was -- that it came out?
20 A.  I do not recall reading this, but I can read it now.
21 Q.  The -- is it your understanding that as of the date of
22     this article, the governor was not thinking about --
23     actually I'm going to correct myself.  It looks like
24     according to the printout at the bottom of the page
25     it's September 13 -- no -- that's when it was printed,

Page 201

1    never mind.

2          Was it your -- is it your understanding

3    that as of the time of this press coverage, Governor

4    Snyder was not yet recommending a Chapter 9 filing for

5    Michigan --

6          MR. SHUMAKER: Objection, foundation.

7  Q.  -- for Detroit?

8          MR. SHUMAKER: Sorry. Objection,

9    foundation, form.

10  A.  I don't think -- I think I was the one recommending

11    and Governor Snyder was either going to approve or

12    disapprove of my request. This is 11:00 p.m. I

13    haven't seen this and it appears to be 11:00 p.m. It

14    says -- so give me your question again.

15  Q.  What was your understanding at this point in time of

16    Governor Snyder's view with regard to whether or not

17    he would recommend -- he would accept your

18    recommendation that Detroit file a Chapter 9 petition?

19  A.  It was unclear. I had gotten to the point at least on

20    the 16th of thinking it was time for me to make the

21    recommendation. It was unclear what the response was

22    going to be.

23  Q.  Did you discuss the Webster litigation with the

24    governor?

25  A.  I don't think so.

Page 202

1  Q.  Did you discuss the Webster litigation with anybody in

2    the governor's office?

3  A.  Was the Webster litigation the first lawsuit filed

4    against the governor and the treasurer on the 3rd?

5    And then the next week AFSCME joined that litigation?

6    Was that by the UAW the first litigation and AFSCME

7    joined that litigation the next week?

8  Q.  One was Flowers and one was Webster.

9  A.  Right. So I want to make sure we're talking about the

10    right one. So you're talking about Webster?

11  Q.  Did you discuss either the Flowers or the Webster

12    litigation with the governor?

13  A.  No, I didn't discuss it with the governor.

14  Q.  Did you discuss either the Webster or the Flowers

15    litigation with anybody at the state?

16  A.  You mean on the 16th?

17  Q.  No, at any point in time.

18  A.  At any time. Let me -- let me -- let me then clarify

19    my answer. I think -- my recollection is that there

20    were lawsuits being filed when we did not discuss at

21    the beginning of July. I think there was a piece of

22    litigation that had been filed the morning of the 16th

23    -- in direct response to your question did I discuss

24    the litigation with the governor? At some point, yes.

25  Q.  Do you recall whether you had that discussion with the

Page 203

1    governor before July 18th?

2  A.  Yes, I believe I did.

3  Q.  And was it before July 18th?

4  A.  Yeah, I believe it was.

5  Q.  What did you discuss?

6  A.  Well, was it? I think generally, and here I'm going

7    to be very careful, there were discussions I had --

8    I'm not sure I had any discussions with the governor

9    without either my counsel being on the line or counsel

10    on behalf of the state and the governor being on the

11    line so I don't know if that implicates

12    attorney-client.

13          MR. SHUMAKER: It certainly could.

14          THE WITNESS: Okay.

15  A.  Without disclosing what was discussed, we had

16    discussions.

17  Q.  Okay, so it's your position -- well, let's go back.

18          So on July 3rd, for example, who was your

19    counsel?

20  A.  Well, my restructuring counsel was Jones Day, but --

21  Q.  And who was the governor's counsel?

22  A.  The governor's counsel would be -- I believe in the

23    governor's office generally heading up that group

24    would be Mike Gadola and Valerie Brader and I think

25    this corrects the discussion I had earlier this

Page 204

1    morning. I may clarify a discussion I had earlier

2    this morning but I -- well, direct response to your

3    question, those are the people in the governor's

4    office.

5  Q.  Okay, so if you and the governor were on the phone --

6  A.  Right.

7  Q.  -- then those conversations -- I'm not asking you

8    about conversations that you had just you and

9    Jones Day, I'm asking you what conversations you had

10    with representatives -- with either the governor or

11    representatives of the state prior to July 18th after

12    the Webster and Flowers litigations were filed on July

13    3.

14  A.  Okay. I think we did have conversations. I'm not

15    sure they're not protected by attorney-client

16    because --

17          MR. SHUMAKER: If you believe lawyers were

18    on those phone calls.

19          THE WITNESS: I know lawyers were on the

20    phone, I just don't -- I'm not acting as an attorney

21    so I don't know -- I know there were lawyers on the

22    phone. I know my lawyers were on the phone so I

23    don't --

24          MR. ULLMAN: The fact that there were

25    lawyers on the phone doesn't make it a privileged

Page 205

1    conversation.
2          MS. LEVINE: Well, let him get the
3    statement out and then we'll --
4          THE WITNESS: I believe there was a common
5    interest. Can I consult my attorneys?
6          MR. SHUMAKER: Certainly. You want to take
7    a quick break?
8          THE VIDEOGRAPHER: Going off the record at
9    3:24 p.m.
10         (Discussion held off the record.)
11         THE VIDEOGRAPHER: We're back on the record
12   at 3:31 p.m.
13   BY MS. LEVINE:
14   Q.  Did you reach a --
15         MS. LEVINE: Can you read back my last
16   question?
17         Actually I'll rephrase it.
18   Q.  Prior to July 17th did you have conversations with the
19   governor or anybody in the governor's office?
20   A.  Prior to July 17th?
21   Q.  But since July 3.
22         MR. SHUMAKER: About?
23   Q.  About Flowers and Webster.
24   A.  Oh.
25         MR. SHUMAKER: Yes or no?

Page 206

1    A.  Yes.
2    Q.  Prior to July 17th but after July 3, did you have any
3    discussions with the governor or anybody in the
4    governor's office about filing a -- filing for Chapter
5    9 for Detroit?
6    A.  Between the 3rd and 17th?
7    Q.  Yes.
8    A.  Yes.
9    Q.  With whom did you have the discussions about the
10   Flowers litigation, the Flowers/Webster litigations?
11   A.  Attorneys in the governor's office.
12   Q.  Which ones?
13   A.  I believe Valerie Brader and Mike Gadola.
14   Q.  Anybody else?
15   A.  I'm trying to recall if in one of my discussions with
16   the governor we discussed that specific litigation or
17   just that there were cases being filed and I don't --
18   I don't recall any specific discussion about that
19   particular piece of litigation, just that there were
20   lawsuits being filed.
21   Q.  So you discussed with Valerie Brader and Mike Gadola
22   the Flowers and the Webster litigation, you discussed
23   with the governor just the fact that there was the --
24   the litigations were pending now? And we're still
25   within the July 3 through July 17 time frame.

Page 207

1    A.  I don't know if I ever discussed both cases. I think
2    I discussed one with Brader and/or Gadola.
3    Q.  Okay, and what did you discuss about the litigation
4    with Brader or Gadola?
5          MR. SHUMAKER: Objection. I'm going to --
6    the question calls for the witness to reveal
7    privileged attorney-client communications as part of a
8    common interest agreement with the state and therefore
9    I'm going to instruct him not to answer.
10         MS. LEVINE: Okay, we'll reserve our
11   rights.
12         MR. SHUMAKER: Understood.
13   Q.  With regard to the conversations that you had with the
14   governor with regard to July 3 through July 17, with
15   regard to the potential for filing for Chapter 9, do
16   you recall specifically on what days you had those
17   conversations?
18   A.  No.
19         MR. SHUMAKER: Objection to form.
20         THE WITNESS: Oh, okay.
21         MR. SHUMAKER: Counsel, you're saying just
22   between him and the governor? No one else?
23   Q.  Did you have conversations that involved the governor
24   between July 3 and July 17 with regard to the
25   potential for filing a Chapter 9 for Detroit?

Page 208

1          MR. SHUMAKER: Where counsel was not a part
2    of the conversation?
3          MS. LEVINE: No, no, I'm just asking if he
4    had conversations. I haven't asked him yet who's
5    participating and it's not privileged even with a
6    joint defense agreement, which we're reserving our
7    rights about, for him to tell me that conversations
8    took place, then we will get into who participated and
9    which conversations and then we'll decide whether or
10   not he can talk to me about them.
11         MR. SHUMAKER: Okay, I'm just making sure
12   the witness doesn't reveal anything.
13         THE WITNESS: Okay, and waive anything.
14         MR. SHUMAKER: And waive anything.
15         THE WITNESS: For the record there is no
16   effort to waive anything. But I'm trying to be
17   accurate.
18   Q.  Let me try to ask it more succinctly so that we can
19   parse it, because I'm going to ask you questions with
20   regard to conversations where you and the governor
21   participated and there were other people present.
22   A.  Right.
23   Q.  I'm going to ask you questions with regard to you and
24   other people --
25   A.  Right.

Page 209

1 Q.  -- in the governor's office.

2 A.  Right.

3 Q.  And then we'll find out whether or not lawyers were

4     present at some or all of those conversations and then

5     we'll figure out what we do about that.

6 A.  Okay, okay.

7 Q.  Okay?

8 A.  Okay.

9        MR. SHUMAKER:  Okay.

10 Q.  So let's start with just you and the governor.  Did

11     you have conversations with just the governor between

12     July 3 and July 17th with regard to filing Chapter 9

13     for Detroit?

14 A.  There's no mystery, I just don't want to run up

15     against a privilege.  I believe at one of my -- when

16     was -- this was July 3rd?  Oh, this is -- okay.  Now,

17     it -- I think that both the governor and I were on

18     vacation over the 4th of July weekend so we may not

19     have had -- and he was on vacation I believe the

20     following week, so we probably did not have our weekly

21     meeting.  That's why there was a gap.  At some point

22     it is possible for us to have had a meeting after --

23     just the governor and I -- and when I say just the

24     governor and I'm including other nonlawyers, his chief

25     of staff, his deputy chief of staff, people along

Page 210

1     those lines, I'm not thinking any of those are

2     attorneys and if they are, I'm not waiving any

3     privilege --

4 Q.  Okay.

5 A.  -- but it's possible we had meetings after that time

6     with just the governor.  Okay.

7 Q.  What did you discuss?

8 A.  Because he's waived the deliver the process privilege.

9     I think we generally discussed the ongoing operational

10     restructuring, the status at a very high level the

11     governor, you know, we don't -- we typically do not

12     discuss how many meetings, who attended, what was

13     said, went back and forth, it was just a very high

14     level of how things were going with the restructuring

15     efforts and that the lawsuits, this is just with the

16     governor, were beginning to create the risk that we

17     would lose the initiative and I might be unable to

18     discharge my obligations under 436.

19 Q.  Did you have any conversations without counsel between

20     you and the governor between June 14 and July 3?

21 A.  June 14 and July 3?

22 Q.  The big four was June 14, June 20, July 10 and July

23     11.

24 A.  Without counsel?

25 Q.  Uh-huh.

Page 211

1 A.  I may have.

2 Q.  Did you discuss the June 14 meeting with the governor?

3 A.  Yes, I believe, but that may have been -- between July

4     -- give me the dates again.

5 Q.  Well, let's make it easier.  Anytime after the June 14

6     meeting --

7 A.  Yes.

8 Q.  -- did you discuss the June 14th with just the

9     governor?

10 A.  Well, with just the governor.  I typically --

11     occasionally I will meet with just the governor, but

12     whenever you say just the governor, my answer should

13     include those meetings where I have members of his

14     senior staff as well.

15 Q.  When you say members of his senior staff, who are you

16     referring to?

17 A.  His chief of staff.

18 Q.  What's the name?

19 A.  Dennis Muchmore; John Roberts, his deputy chief of

20     staff; sometimes my chief of staff, Shani Penn; my

21     senior advisor, Sonya Mays; occasionally Treasurer

22     Dillon.  Is Andy an attorney?

23        MR. ESSAD:  Yes.

24 A.  Yes, he is, so I've got to be careful.  So -- huh.  I

25     think Andy was sometimes at those meetings so I've got

Page 212

1     to be careful.

2 Q.  Okay, so at meetings where there were no counsel

3     between June 14 and July 3, did you have any

4     discussions with regard to the June 14 or the June 20

5     meeting?

6 A.  I don't think there were any meetings where there were

7     no counsel between June 14th and July 3.

8 Q.  Okay, how many times did you meet between June 14 and

9     July 3 with the governor by in person or by telephone?

10 A.  I am not sure.

11 Q.  More than once?

12 A.  Probably.

13 Q.  More than twice?

14 A.  Likely.

15 Q.  More than six times?

16 A.  I don't think -- I don't think more than that.

17 Q.  Okay, so somewhere between two and six and at every

18     single one of those meetings you believe counsel was

19     present or on telephone if it was a telephonic

20     meeting?

21 A.  Yes, sometimes we would do conference calls and there

22     would be counsel present on the phone so I'm being

23     very careful here, yes, there's a possibility there

24     was counsel present at each of those meetings.

25 Q.  I'm going to ask a question, but your counsel has to

Page 213

1   speak first. Are you claiming the joint defense for
2   the Flowers and the Webster litigation or are you
3   claiming joint defense with regard to the thought
4   process leading up to the filing of the Chapter 9?
5       MR. SHUMAKER: Claim --
6       MS. LEVINE: Let me ask the question and
7   then you can assert it, but I don't want to be tricky,
8   I'm not trying to be tricky.
9       THE WITNESS: Thank you, thank you.
10  Q.  During those conversations that took place prior to
11      the filing of the Webster and the Flowers litigation
12      from June 14 through July 3, did you have any -- did
13      any of the conversations that you had with the
14      governor in person or by telephone conference involve
15      discussions with regard to the filing of the Chapter 9
16      petition?
17  A.  Between the 14th and the 3rd?
18  Q.  Uh-huh.
19  A.  I don't recall any specific discussions, but they may
20      have.
21  Q.  Did you have conversations with the governor during
22      June about the -- about filing for Chapter 9 at which
23      counsel wasn't present either in person or by
24      telephone? And when I say meetings, I'm talking about
25      either in person or by telephone.

Page 214

1   A.  I think I can say this. My weekly Detroit subject
2       meetings typically include the governor, his chief of
3       staff or deputy chief of staff, Treasurer Dillon and
4       one of his employees, Tom Saxon, and/or some of our
5       advisors and attorneys. I do not recall a meeting or
6       a phone conference with the governor, it may have
7       happened, I just -- I'm not recalling it and I'm
8       trying very hard to. I do not recall a meeting or
9       phone conference where, for instance, Treasurer Dillon
10      was not either there or on the phone. And I'm trying
11      to -- in the few times that the governor and I have
12      occasion just one-on-one meetings, I'm trying to
13      recall if we discussed a Chapter 9 filing. I'm now
14      just talking about the governor of one-on-one
15      meetings. It is possible not in terms of timing, just
16      generally speaking, because here again, it was not at
17      the grand level.
18  Q.  Just to clarify, I believe that your counsel will
19      allow you to answer whether or not there's been
20      discussions with regards to a Chapter 9 filing with
21      the governor so long as counsel wasn't on the phone.
22      MR. SHUMAKER: Correct.
23  A.  Yes, these are the meetings I'm talking about.
24  Q.  Treasurer Dillon is not counsel.
25  A.  Well, he's an attorney and I don't know if the

Page 215

1   privilege attaches.
2       MR. SHUMAKER: If you believe he was acting
3   as an attorney, then I would caution you and instruct
4   you not to answer. If Mr. Dillon was acting as the
5   treasurer and the treasurer alone --
6       THE WITNESS: Right.
7       MR. SHUMAKER: -- as a businessperson, then
8   you can answer.
9       THE WITNESS: Okay. Okay. That -- okay.
10  A.  Yes, then that means at some of those meetings we
11      probably did discuss potential Chapter 9 filing
12      without attorneys but with Treasurer Dillon.
13  Q.  Prior to July 3 what was the timing that you were
14      discussing with regard to a potential Chapter 9
15      filing?
16  A.  We weren't. Generally it was consistent with what I
17      had said at the June 10th and June 14th meetings,
18      which is after June 14th we will use the next 30 days
19      to assess where we are and what progress we're making
20      and if we're making progress and I think I said at
21      that June 14th meeting in the nature of a term sheet
22      agreement in principles or concepts moving forward,
23      that we might be a position to be able to extend that.
24      I said that at June 14th assuming a steady state.
25  Q.  After July 3 but before July 17 --

Page 216

1   A.  Uh-huh.
2   Q.  -- did you have any conversations with the governor or
3       his senior staff at which counsel wasn't present?
4   A.  Excluding Treasurer Dillon or --
5   Q.  Excluding.
6   A.  Acting as -- I don't think he was acting as an
7       attorney, I think he was acting as treasurer.
8   Q.  Correct.
9   A.  Okay. Yes, I believe so.
10  Q.  And did you -- during -- how many of those meetings
11      did you have?
12  A.  Here again, we -- the meeting of the week after the
13      4th of July holiday I think we did not have, because I
14      went the week before and I think the governor was on
15      Mackinac the week after so I don't know if we had a
16      meeting then. That would leave you said July 17?
17  Q.  July 3 to July 17.
18  A.  Okay, so that would leave roughly another week or two.
19      There may have been a meeting the following week and
20      I'm trying to recall if any attorneys were at that
21      meeting. There was probably a meeting the following
22      week or the week thereafter. There may have been
23      attorneys at one of those meetings from the governor's
24      staff.
25  Q.  How many meetings did you participate in between July

1    3 and July 17 at which -- with the governor at which
2    attorneys were present as opposed to meetings with the
3    governor where attorneys were not present?
4  A. I think we only had one or two meetings and attorneys
5    were present at either one or both of those meetings.
6    Excluding Treasurer Dillon. I'm talking about
7    attorney attorneys, not lawyers.
8  Q. Who drafted your July 16th letter? Was that you?
9  A. No, I got a draft and I edited it.
10 Q. Who prepared the draft for you?
11 A. I think it was a number of folks. It was -- I
12   forgot --
13 Q. Was it Jones Day?
14 A. It was more than likely Jones Day, yes, restructuring
15   guys.
16 Q. Did you direct the draft be prepared?
17 A. Yes, we --
18       MR. SHUMAKER: You can say. You can
19   testify to that.
20 A. Without discussing exactly what was said, yes, I did.
21 Q. What was the date that you gave Jones Day that
22   direction?
23 A. I think that direction was either to start getting the
24   letter in shape that Friday, I'm not sure, either that
25   preceding week or over the weekend. Yes.

1  Q. But after the commencement -- but that would have been
2    after July 3?
3  A. Yes, yes, it was after July 3.
4  Q. Did you advise the governor that you had started the
5    process of drafting that letter?
6  A. I don't recall --
7        MR. SHUMAKER: If -- if -- if the
8    communications with the governor were with counsel
9    present, then I don't want you to reveal what was
10   said.
11       THE WITNESS: Okay. Okay.
12       MR. SHUMAKER: If at another meeting where
13   there was not counsel present, that's a different
14   story.
15       THE WITNESS: Right.
16 A. Within that time frame, because I believe that was a
17   weekend, I do not recall communications with the
18   governor or communications with the governor where
19   counsel was not present. There may have been a
20   discussion with the governor -- no, I don't recall an
21   independent discussion with the governor.
22 Q. In addition to conversations in which you participated
23   in, were there conversations between your consultants
24   and the governor's office and/or his counsel between
25   July 3 and July 17?

1  A. I believe -- well, when you say the governor's office,
2    that includes the treasurer?
3  Q. Yes.
4  A. Yes, I believe so.
5  Q. The state?
6  A. The state, yes, I believe so.
7  Q. How many of those meetings are you aware of where you
8    did not participate?
9  A. I --
10       MR. SHUMAKER: Object to foundation, but --
11 A. Where any meetings I didn't. There were -- the
12   investment bankers, for instance, will talk with
13   treasury from time to time about a number of matters
14   and I'm sure that I wasn't on all of those
15   conversations. And my legal team might talk with the
16   governor's attorney on various matters and I'm pretty
17   confident I wasn't involved in all those discussions
18   either. So it's not like it happened every day or it
19   was happening every half hour, but I'm sure there were
20   discussions between them that I was either not
21   involved with or aware of.
22 Q. Did any of those discussions between either the
23   investment bankers directly or your counsel and the
24   state governor's office or whomever involve
25   discussions with regard to the filing of the Chapter 9

1    for Detroit and/or the timing of that filing?
2        MR. SHUMAKER: Object to form.
3  A. Yes, they probably did.
4  Q. When you say they probably did, were you getting
5    reports from your investment banker and your counsel
6    with regard to the conversations they were having with
7    the governor and other representatives of the state?
8  A. Not necessarily every -- not necessarily every
9    conversation, but generally speaking, so I was getting
10   reports, but I cannot testify that I was privy to
11   every conversation that everyone either on legal side
12   or the investment side -- banking side or them
13   together had.
14 Q. When did you first start thinking that the timing for
15   the Chapter 9 filing was going to be sooner rather
16   than later?
17 A. As opposed to?
18 Q. Let me rephrase.
19       When did you decide that the timing of the
20   Chapter 9 filing should be July 18th or July 19th?
21 A. Well, I didn't. I decided to make the request and my
22   intent was to have the ability to file available and
23   possibly executed as soon as I got it. It was without
24   talking or waiving privileges from my counsel or
25   counsel and investment bankers, the concerns about us

Page 221

1    losing control or being put in a situation because of
2    the ongoing litigation where I would not be able to
3    discharge my duties in an orderly fashion, in a
4    comprehensive matter to put the city on a sustainable
5    footing because of the litigation grew throughout June
6    and it was made clear to me that my desire to try to
7    continue to engage in discussions was running the risk
8    of putting my obligations under the statute in peril
9    and I think I was even counseled that I was being
10   irresponsible.
11 Q.  When did you first advise or have your consultants
12    first advise the governor or anybody affiliated with
13    the state that you were starting to draft your July
14    16th request?
15 A.  Outside of attorney-client communications?
16       MR. SHUMAKER: No.
17 Q.  No, no, I'm talking about when did you tell the
18    governor. I'm not sure it's you or --
19 A.  But I may have --
20 Q.  -- or I'm not sure if it's your counsel who made that
21    request for you or your investment banker who made
22    that request for you --
23       MR. SHUMAKER: Objection.
24 A.  When did I transmit the request?
25 Q.  Yes.

Page 222

1       MR. SHUMAKER: Object to the form.
2 Q.  Let me rephrase it.
3       When did somebody on behalf of the
4    Emergency Manager advise somebody on behalf of the
5    state that the Emergency Manager and his team was
6    starting to draft the July 16 request?
7       THE WITNESS: Can I answer that if it's to
8    an attorney at the governor?
9       MR. SHUMAKER: When.
10      THE WITNESS: Oh, when.
11      MR. SHUMAKER: Yeah.
12 A.  Oh, that was probably Monday. Monday, the 16th.
13 Q.  You testified previously that you were concerned you
14    wouldn't be able to carry out your obligations in an
15    orderly fashion. What do you mean by that?
16 A.  The lawsuits that were being filed were requesting --
17    my understanding from reading them what I was informed
18    were requesting injunctions against me with any
19    options I might have available including the Chapter 9
20    filing and were refocusing our attention on litigation
21    risk. They were also -- it wasn't just the -- what --
22    for lack of a better word what we'll call the Flowers
23    and related litigations, we were also in -- we had --
24    had defaulted on the cops' payment on June 14th and
25    had announced a settlement with Bank of America,

Page 223

1    Merrill Lynch commensurate with that day. One of the
2    insurers had begun to interfere with that process from
3    June until July. So we were getting hit on all sides
4    both on the creditors' side but also on, for lack of a
5    better word, the labor side with risk and threats and
6    lawsuits and were sued three times in June -- well,
7    sued once, one joined in the suit and sued again I
8    think on the 16th and also the Syncora of threats for
9    which we had to file litigation where I was counseled
10    that given the chaos in a sense that was erupting --
11       MR. SHUMAKER: Hold on right there.
12      THE WITNESS: Okay.
13      MR. SHUMAKER: What you were counseled, I
14    want to make sure you're not going into an area that's
15    protected by the privilege.
16      THE WITNESS: Okay.
17 Q.  You can give me your understanding. You can't tell me
18    what --
19 A.  As I said before, my understanding was I was at risk
20    of losing the ability to try to pursue a restructuring
21    in an orderly fashion.
22 Q.  Wasn't the Syncora issue settled sometime in prior to
23    the Chapter 9 filing, though?
24 A.  No.
25 Q.  The risk that you felt from the Webster/Flowers I

Page 224

1    think what you referred to as three litigations --
2 A.  Uh-huh.
3 Q.  -- when did you communicate that risk to the governor
4    or the state or when did somebody communicate that
5    risk on behalf of the Emergency Manager to the
6    governor or the state?
7       MR. SHUMAKER: Objection, foundation, form.
8 A.  Probably the preceding week of the 16th or maybe even
9    a week before that. Let me --
10 Q.  So when you say the preceding week, just looking at a
11    calendar for a minute, what was the date there?
12 A.  Can I look at the calendar on my checkbook without it
13    being classified as an exhibit?
14 Q.  No, I won't ask you.
15 A.  I just want to make sure I'm not in trouble. Okay. I
16    don't want you to see my checkbook. It would make you
17    cry.
18       MR. SHUMAKER: July 8th was a Monday.
19      THE WITNESS: Yeah, I'm --
20 Q.  So was it --
21 A.  It was probably the week of July.
22 Q.  July 8th? I know I can't see either.
23 A.  I -- yeah, it was probably that week, July 8th week.
24 Q.  Okay, so --
25 A.  It may have been -- the reason I'm hesitating, as I

Page 225

1    said before, I think my family and I were out that
2    preceding Friday, Saturday and Sunday and we actually
3    ran into the governor's family coming onto the island
4    I believe that Sunday so I don't think we had that
5    meeting that week so it may have actually been the
6    following week.
7    Q.  Meaning sometime during the week of July 15th?
8    A.  No, or the end of --
9    Q.  So it was during --
10   A.  -- the week of the 8th.  The 8th.  But I did not have
11       a meeting with the governor that week.
12   Q.  Well --
13       Now that I look at the calendar.
14   Q.  Okay.
15   A.  Okay.
16   Q.  So just to clarify, it appears more likely than not
17       that you did not have a meeting between you and the
18       governor the week of July 8th but your understanding
19       is that during the week of July 8th, probably the
20       latter part of that week, somebody on behalf of the
21       Emergency Manager let the governor or the state know
22       that you were drafting or starting to draft the July
23       16th request and that you had concerns about the
24       Flower s/Webster litigations?
25   A.  Yeah, and here again, I don't know if so much concerns

Page 226

1    -- it wasn't like we were focused on Flowers/Webster,
2    we were saying in the universe of the world that
3    litigation, whatever name, and the Syncora struggle,
4    were creating a situation that was untenable and
5    threatening what we had wanted to do.
6    Q.  Lamont Satchel.
7    A.  Yes.
8    Q.  He's your -- what's his title?
9    A.  He is the, I believe, labor negotiator for the City.
10   Q.  And what's his scope of authority?
11   A.  His scope of authority initially as labor negotiator
12       was to oversee, monitor and lead labor relationships
13       with the City and its labor partners.
14   Q.  And to whom -- and who is his direct report?
15   A.  At this point Lamont's direct report -- well, it is --
16       the org chart is being revised, but his direct report
17       would have been to the chief operating officer.
18   Q.  And who was that?
19   A.  At that time it would have been Gary Brown.
20   Q.  And who is it today?
21   A.  It still goes through Gary Brown, but I am intimately
22       involved with the process.
23   Q.  And do you know whether or not during the month of
24       June prior and up through -- starting with June 1
25       through July 18th --

Page 227

1    A.  Yes, July 18th.
2    Q.  -- did Lamont Satchel have any meetings with the labor
3        organizations?
4    A.  Do I know?  I know that during this time the CBAs,
5        some of the City's Collective Bargaining Agreements
6        were expiring and I believe that Lamont did have
7        meetings during that time not just related with that
8        but with other issues as well.
9    Q.  During your prior testimony -- and I apologize for
10       skipping around, but I don't want to duplicate what's
11       already been done.
12   A.  That's okay.
13   Q.  You spoke about Jones Day doing a presentation or
14       interview to the state back in January, the end of
15       February.
16   A.  Yeah, the documents I was shown this morning would
17       make it January.
18   Q.  And with whom did Jones Day meet at that time, who
19       physically was in the room?
20   A.  Treasurer Dillon, then CFO Jack Martin, Rich Baird,
21       Kriss Andrews, Ken Buckfire and one of his colleagues.
22   Q.  Any other outside consultants besides Miller Buckfire?
23   A.  Well, Rich Baird is on contract to the state, but I
24       don't -- I think -- I don't recall if Ernst & Young
25       was there.  There was a member of the financial

Page 228

1    advisory board.
2    Q.  Do you recall who that was?
3    A.  As soon as you said that, it went out of my head.
4        Very, very sharp, as -- Ken -- Ken Whipple was there.
5        I'm just going through the room.  Andy, Ken Whipple,
6        Jack Martin, Kriss Andrews, Rich Baird.  That's all
7        that I recall off the top of my head and Miller
8        Buckfire and one of his colleagues.
9    Q.  And who was there from Jones Day?
10   A.  Aaron Agenbroad -- they were all partners.  Aaron
11       Agenbroad, Bruce Bennett, Heather Lennox, myself,
12       Corinne Ball, Steve Brogan, and I think that was -- I
13       think that was our team.
14   Q.  What was Aaron's last name again?
15   A.  Agenbroad, A-G-E-N-B-R-O-A-D.
16   Q.  What department is he in?
17   A.  Aaron Agenbroad is a partner in charge of the
18       San Francisco office.  He is in the labor.
19   Q.  He's in the labor group?
20   A.  Uh-huh.
21   Q.  Corinne, all the rest of the attorneys on the team
22       were bankruptcy?
23   A.  No.  Bruce Bennett is in the bankruptcy group.
24       Corinne Ball was in the bankruptcy group.  Heather
25       Lennox is in the structured finance and bankruptcy.

Page 229

1    Steve Brogan is managing partner for the firm.
2  Q.  But he was intimately involved in Chrysler; correct?
3  A.  Steve Brogan?
4  Q.  Yes.
5  A.  Steve Brogan oversaw Chrysler representation generally
6     but he wasn't day-to-day counsel.  Actually I think
7     you were.  And I'm trying to think who else was there
8     if anybody.  There was a pitch book, but that's who I
9     recall.
10 Q.  Turning back to Orr 6 for a minute.
11         MR. SHUMAKER:  What is that, counsel?
12     Which one?
13 A.  Is that the letter or the --
14 Q.  It's the summary of partnership, Governor of Michigan,
15     Mayor of Detroit, Emergency Manager.
16 A.  Okay.
17         MR. SHUMAKER:  Thank you.
18 Q.  I'm on the page that ends 464.
19         MR. SHUMAKER:  464?  I'm sorry, I'm not --
20         MS. LEVINE:  The Bates stamp number 464.
21 A.  464.
22         MR. SHUMAKER:  Orr 4 or 7 are you looking
23     at?
24         MS. LEVINE:  Oh, sorry.
25         THE WITNESS:  Orr 7?

Page 230

1         MS. LEVINE:  Yes, I guess so.
2         THE WITNESS:  Yes.
3  Q.  Who drafted this document?  It says draft date
4     2/21/2013.
5         MR. SHUMAKER:  Objection, foundation.
6  A.  Yeah, I don't know who drafted this document.  I think
7     the email chain shows this was a document that was
8     forwarded to me and I think there's -- in an email
9     this morning I asked for it to be sent to me in a Word
10    format.  I don't know who drafted it.
11 Q.  And did you comment on this document?
12 A.  Yes, I did.
13 Q.  Was it ever reduced to a final form?
14 A.  I don't recall seeing a final form, but there's
15    nothing signed, but this may be the final form, if
16    there is such a thing.
17 Q.  Paragraph 7 reads --
18 A.  Yes.
19 Q.  -- labor, retiree and benefit initiatives will be
20    pursued jointly by the mayor and the manager to the
21    extent permitted by law.
22 A.  Yes.
23 Q.  What's your understanding of what that means?
24 A.  That was under -- the extent permitted by law was put
25    in there, I believe, by me.  As you see in paragraph

Page 231

1     6, there's the to the extent permitted by law is a
2     different typeset.  And my understanding there was --
3     that this was I think in the document of emails it
4     talks about it being an aspirational agreement but not
5     requirement and I just wanted to reserve the right of
6     the manager to exercise his duties as permitted by law
7     as he saw fit.
8  Q.  What were the -- what was your understanding of what
9     the labor, retiree and benefit initiatives were to be?
10 A.  Well, there were some initiatives that were ongoing
11    and at this time there were the reductions, there was
12    an Act 312 award that had come up for DPOA I believe
13    and there were ongoing issues regarding the Act 312s
14    for the other police divisions, but I know there were
15    -- I know there were other initiatives going on, but
16    this document at this time was not intended to be a
17    detailed recitation of what those initiatives were.
18    It was generally, as I understood it, to be a -- based
19    off the consent agreement.
20 Q.  Were these to be cost cutting initiatives?
21 A.  It wasn't -- here again, this was aspirational.  It
22    wasn't clear at this time as to what those initiatives
23    were going to be.
24 Q.  Were these initiatives going to include cost cutting
25    initiatives?

Page 232

1  A.  They might have included cost cutting initiatives,
2     yes.
3  Q.  Was it your understanding or intent in your world as
4     Emergency Manager or at the time EFM?
5  A.  At this time?
6  Q.  Yes.
7  A.  No.  This was handed to me, I had -- as I said I think
8     in the prior email chain, I was doing my due diligence
9     at this time.  I had not made any decision regarding
10    cost cutting initiatives.
11 Q.  On -- we had some discussion earlier with regard to
12    some of your thinking just prior to the filing, that
13    first and second or second and third week of July.
14 A.  Right.
15 Q.  And you raised as one of the concerns, and I
16    understand that there is Syncora and a lot of other
17    things going on, but you raised as one of concerns
18    that if certain orders were entered in connection with
19    the Webster/Flowers litigation, that you would lose
20    the ability to do some of the things that you wanted
21    to do as the Emergency Manager.
22 A.  Yes.
23 Q.  What were you afraid you were going to lose the
24    ability to do?
25         MR. SHUMAKER:  Object to the form.  I

Page 233

1    object to the summary.
2  A.  Let me say this. It wasn't just limited to labor
3       issues. I mean, we were trying to --
4  Q.  No, no, I understand that, but with regard to the
5       labor issues.
6  A.  Oh, labor issues?
7  Q.  Yeah.
8  A.  We wanted to -- and they would include cost cutting
9       measures perhaps, pensions and benefits, but also
10      streamlining job efficiencies, moving into the CETs.
11      If you're talking about just labor --
12 Q.  Narrowly and specifically, what were you afraid you
13      were not going to be able to do if the orders that
14      were being sought were entered or enforced from the
15      Webster and Flowers litigation?
16 A.  Yeah, everything. We were concerned that the orders
17      had the possibility of delaying the overall
18      operational financial restructuring that we were
19      pursuing because they're all interrelated and if we
20      had the same cash spend, for instance, on some issues
21      that we did on others, then even the savings we were
22      trying to get in Syncora and others we might not be
23      able to service, so we were concerned about
24      everything. It wasn't just one specific issue.
25          MS. LEVINE: Can I have a short break?

Page 234

1          THE WITNESS: Sure.
2          MR. SHUMAKER: Sure.
3          THE VIDEOGRAPHER: Going off the record at
4      4:12 p.m.
5          (A brief recess was taken.)
6          THE VIDEOGRAPHER: We're back on the record
7      at 4:23 p.m.
8  BY MS. LEVINE:
9  Q.  Mr. Orr, was one of the concerns with regard to the
10      Flowers and Webster litigation that 436 would be found
11      unconstitutional by the state court?
12          MR. SHUMAKER: Object to the form.
13 A.  Not -- not particularly. Frankly, it wasn't more of a
14      concern that ultimately the statute found
15      unconstitutional, no. It was more of a concern of
16      just being caught up in the uncertainty of litigation
17      and appeals.
18 Q.  Then let me put a finer point on it. Were you
19      concerned that if in fact 436 were found
20      unconstitutional at the state court level, the lower
21      level court --
22 A.  Uh-huh.
23 Q.  -- that there would be the delay in the time to run
24      through the appeal process on that issue?
25 A.  Yes, that was one of the concerns.

Page 235

1  Q.  Your counsel has asserted a joint defense?
2  A.  Yes.
3          MR. SHUMAKER: Common interest.
4  Q.  Common interest. Just want to clarify to make sure I
5       understand. We're obviously reserving our rights, but
6       I want to understand whether you're claiming common
7       interest with regard to discussions relating to the
8       entire Chapter 9 filing or whether you are claiming
9       common interest just with regard to the state court
10      litigation?
11          MR. SHUMAKER: Well, it would be to both.
12      I mean, the common interest agreement captures what
13      Mr. Orr's been doing since he became Emergency Manager
14      where there was a common interest between the state
15      and the Emergency Manager's office. So both of those
16      would fall within to the extent that counsel was
17      involved in the communications.
18          MS. LEVINE: Okay.
19          MR. SHUMAKER: If that helps.
20          MS. LEVINE: Mr. Orr was not a defendant in
21      the Flowers and Webster litigation so I just want to
22      understand what the basis is for claiming joint
23      defense or a common interest agreement between July 3
24      and I think it was July 17 or 18 when the retirement
25      system named Mr. Orr as a party.

Page 236

1          MR. SHUMAKER: Well, the common interest is
2       there's a common interest between the state and the
3       Emergency Manager's office to a whole number of things
4       regarding the requests and the provision of legal
5       advice. So if you're talking about any possible
6       communications between Mr. Orr and the governor's
7       office where counsel was present about any of the
8       subjects you name, whether it be the Flowers or the
9       Webster or the Chapter 9 filing, we will assert the
10      privilege. I -- your -- the fact that Mr. Orr was not
11      a defendant in the first two actions doesn't change
12      the assertion of the privilege that we're making.
13          MS. LEVINE: Okay, slightly different
14      topic.
15 Q.  Are you aware of a coalition among certain of the
16      City's unions put together in order to try and deal
17      with some of the restructuring issues with regard to
18      labor that you've been focused on?
19 A.  A coalition? Can you please explain? Informal
20      coalition or the retiree committee or --
21 Q.  Not the retire committee. A coalition of unions with
22      regard to trying to deal with some of the labor issues
23      that you --
24 A.  Under the AFSCME umbrella?
25 Q.  No, no, no.

Page 237

1  A.  Or separate union?  I'm trying to -- I'm trying to
2    understand.
3  Q.  Well, I think your answer indicates to me that perhaps
4    the answer is no.
5  A.  Yeah.  Okay.
6       MS. LEVINE:  I have no further questions.
7       MR. SHUMAKER:  Thank you, counsel.
8       THE VIDEOGRAPHER:  Going off the record at
9    4:27 p.m.
10      (Discussion held off the record.)
11      THE VIDEOGRAPHER:  We are back on the
12   record at 4:29 p.m.
13           EXAMINATION
14  BY MR. DeCHIARA:
15  Q.  Good afternoon, Mr. Orr.
16  A.  Good afternoon.
17  Q.  My name is Peter DeChiara.  I'm an attorney with the
18    law firm of Cohen Weiss & Simon, LLP.  We represent
19    the United Auto Workers in this proceeding.
20        Prior to January of 2013 were you
21    acquainted with the governor, Rick Snyder?
22  A.  Personally acquainted?  I knew he was governor of
23    Michigan but --
24  Q.  Personally acquainted.
25  A.  Remotely.  We overlapped in law school.

Page 238

1  Q.  Did you maintain -- since law school did you maintain
2    any friendship or other social connection?
3  A.  Hadn't seen him since 1982.
4  Q.  Until --
5  A.  Until sometime earlier this year in March.
6  Q.  Did you have any professional or other dealings with
7    him between the time you were in law school until you
8    saw him in connection with -- until after January
9    2013?
10  A.  No, none that I'm aware of.
11  Q.  Before you were appointed as Emergency Manager, did
12    you have occasion to speak to the governor about what
13    could or should be done about Detroit's pension
14    liabilities?
15  A.  Before I was appointed?
16  Q.  Yes.
17  A.  No, I don't believe the governor and I talked at that
18    level of detail.
19  Q.  Okay.  Same question for any of the governor's senior
20    staff.  Did you speak to any of the governor's senior
21    staff before you were appointed as EM regarding what
22    could or should be done about Detroit's pension
23    liabilities?
24  A.  No, I don't recall having discussions of that
25    specificity.

Page 239

1  Q.  What about with Andrew Dillon?  Same question, same
2    time period.
3  A.  Right.  No, I don't think we talked at that
4    specificity.
5  Q.  Same question for Mr. Baird?
6  A.  No, no, not with Rich Baird.
7  Q.  Before you were appointed EM did you speak with anyone
8    at Jones Day about what could or should be done about
9    Detroit's pension liabilities?
10  A.  I'm trying to think back.  Before my appointment?  Did
11    I speak with anyone about pension liabilities?
12  Q.  Anyone at Jones Day, yes.
13  A.  Anyone at Jones Day?  I may have, but I don't recall
14    specifically.  I may have.  Um, I think I probably
15    did, yes, I think I probably did.
16  Q.  Do you recall who you may have spoken to?
17  A.  No.  It could have been -- no, I don't recall who I
18    spoke to.  It could have been a number of people.
19  Q.  Did you speak to Corinne Ball?
20  A.  Corinne Ball, it may have been Corinne.
21  Q.  Do you recall any discussions you had with her about
22    that topic?
23  A.  I don't.
24  Q.  What about the -- what's the name of the managing
25    partner?

Page 240

1  A.  Steve Brogan?
2  Q.  Did you speak to him about that topic?
3  A.  No, we didn't speak at that level of specificity, no.
4  Q.  Anyone else in the bankruptcy group that you worked
5    with at Jones Day about that topic?
6  A.  About that specific topic?
7  Q.  Right, about what could or should be done about --
8  A.  Could or should be done.
9  Q.  -- about Detroit's pension liabilities?
10  A.  I don't recall having that level of specificity, no.
11  Q.  You've testified earlier today about a -- what I'll
12    call a pitch meeting that Jones Day made to the City
13    in order to be considered as counsel for the City.  Do
14    you recall that testimony?
15  A.  Yes.
16  Q.  Okay.  Apart from that pitch meeting, prior to
17    Jones Day being retained by the City, do you know
18    whether there were any communications by Jones Day to
19    the City about what could or should be done about
20    Detroit's pension liabilities?
21  A.  To the City?
22  Q.  Yes.
23  A.  None that I'm aware of.
24  Q.  What about to the state -- I'm sorry, go ahead.
25  A.  Well, I had two meetings with Mayor Bing, but I don't

Page 241

1  think we discussed pensions.
2  Q.  Do you recall what you did discuss?
3  A.  Just generally the state of the City, the difficulties
4      that he had encountered, they were more getting to
5      know each other meetings.  There wasn't any plan being
6      worked out or any detailed discussions.
7  Q.  Other than the pitch book that you testified about
8      earlier, prior to Jones Day being retained by the
9      City, do you know whether Jones Day provided or shared
10     with the City any analysis, memos, reports or any
11     documents of that sort with the City concerning the
12     issue of Detroit's pension liabilities?
13 A.  Other than the pitch book?
14 Q.  Yes.
15 A.  None that I'm aware of.
16 Q.  Do you know -- before Jones Day was retained by the
17     City, do you know whether Jones Day spoke to anyone at
18     the state including the governor and his senior staff
19     about what could or should be done about Detroit's
20     pension liabilities?
21 A.  Prior to their retention?
22 Q.  Yes.
23 A.  I think I need to explain my answer.  Between the
24     pitch which occurred I believe now on the end of
25     January until sometime in -- at some point in

Page 242

1      February, I recused myself from the retention, the
2      pitch process, so during the time that I was involved
3      for the few weeks, I don't know of anything; I
4      wouldn't know nothing after I recused myself.
5  Q.  Okay, when was Jones Day retained by the City?  Do you
6      know what date?
7  A.  I think they were ultimately selected prior to the
8      time I got there.  I remember the -- I think it was
9      the first couple of weeks it went through city
10     council, I stepped out of that process as Emergency
11     Manager, it then went to the mayor, I think or vice
12     versa, he approved and went to council, council
13     approved it, there were press reports of that time
14     frame, I believe it was approximately March -- mid
15     March.
16 Q.  Okay.
17 A.  Or was it -- no, no, no.  They had been selected in
18     March, but I don't think city council approved it
19     until later.  So I think I had been selected and
20     retained, but it had to go to the city council
21     certification and approval process for some period of
22     time after that.
23 Q.  Okay.  And since I had earlier asked you whether you
24     were aware of communications by Jones Day to the state
25     concerning what could or should be done about

Page 243

1      Detroit's pension liabilities --
2  A.  Right.
3  Q.  -- is the answer to your (sic) question you're not
4      aware of any?
5  A.  Other than the pitch book?
6  Q.  Yes.
7  A.  I'm not aware of any.
8  Q.  Okay.  Are you aware of any reports or presentations
9      or memos or analysis presented by Jones Day to the
10     state concerning what could or should be done about
11     Detroit's pension liabilities that occurred before you
12     became EM?
13 A.  No, I don't recall any.
14 Q.  Are you aware of any that have occurred since you've
15     become EM?
16 A.  Oh, I think, yes.  I mean, I think there have been
17     presentations to the state about the City's pension
18     obligations, yes.
19 Q.  Made by Jones Day?
20 A.  Made by Jones Day and Miller Buckfire and others, yes,
21     yes.
22 Q.  Okay.  And what are they?  Can you tell me what those
23     are?
24 A.  Um --
25         MR. SHUMAKER:  Objection, we're going to

Page 244

1      get into the same area that's covered by the common
2      interest agreement so if you're going to -- and ask
3      him about what he knows from a general level, but if
4      it's what was the specific content of the
5      communication, we're going to assert the privilege and
6      I'm going to instruct him not to answer.  So subject
7      to that admonition you can answer.
8  Q.  Okay, so without getting into the substance of any
9      documents, can you answer the question?
10 A.  Yes.  Without waiving any privilege, generally there
11     were discussions about -- and this may have included
12     attorneys and investment advisors as well as attorneys
13     and representatives of the state.  Without discussing
14     what was said, generally the pension obligation and
15     healthcare obligation and the City's lack of funding
16     to meet them as discussed, you know, I'll just
17     reference the June 14th presentation as that type of
18     discussion.
19 Q.  Were these discussions that occurred prior to the
20     issuance of the -- prior to June 14th?
21 A.  Yes, I believe they may have been, yes.
22 Q.  Did the state participate in the formulation of the
23     proposal that is the June 14th proposal?
24 A.  When you say participate, I want to be careful.  You
25     know, it generally may have been discussed at a high

Page 245

1    level but the state to the best of my knowledge didn't
2    participate in any authorship.
3  Q.  Okay, I'm not talking about the drafting of the
4    document --
5  A.  Yeah, yeah.
6  Q.  -- but the formulation of the actual ideas or
7    proposals that are contained in the document.
8  A.  No.
9  Q.  Did the state have input into that?
10  A.  No.  The -- well, let me say it this way without
11    talking about what was said.  Generally the -- some of
12    the advisors have been in the City for years if not
13    months and have been reviewing this issue so I'm
14    talking about from the time I was there and what I'm
15    aware of.  Generally the process once I became
16    involved was we, meaning my immediate restructuring
17    team, reviewed the issues and prepared proposals and
18    then may have discussed them at a high level with the
19    state, but as I said, there wasn't authorship in those
20    proposals at the state level to the best of my
21    knowledge.
22  Q.  Okay.  Let me refer you to the June 14th proposal,
23    which is Exhibit 9 of your deposition.
24  A.  Yes.
25  Q.  And let me refer you in particular to page 109.

Page 246

1  A.  Original 109?
2  Q.  Yeah, not the stamp.
3  A.  Not the Bates stamp, yes.
4  Q.  Right.  There's the third bullet point from the bottom
5    of the page.  You can read that.  It's a two line
6    bullet point, you can read it, but what I want to
7    focus on is the language that there must be
8    significant cuts in accrued benefit pension amounts
9    for both active and currently retired persons.  Do you
10    see that language?
11  A.  Yes.
12  Q.  Okay.  And did you believe that what I just read out
13    loud, that statement, to be true as of June 14th?  Did
14    you believe that there had to be, the cuts that are
15    referred to there?
16  A.  Yes, based upon our analysis, yes.
17  Q.  And did you believe that at the time that the City
18    filed for bankruptcy?
19  A.  Did I believe that at the time the City filed for
20    bankruptcy?
21  Q.  At the time the City filed for bankruptcy --
22  A.  Yes.
23  Q.  Let me just finish the question for the clarity of the
24    record.
25  A.  I'm sorry.

Page 247

1  Q.  At the time the City filed for bankruptcy, was it your
2    view that there had to be significant cuts in accrued
3    vested pension amounts for both active and currently
4    retired persons?
5  A.  Yes.
6  Q.  And is it still -- still your view today?
7  A.  Yes, based upon our analysis, yes.
8  Q.  This conclusion that there must be significant cuts in
9    accrued vested pension amounts for both active and
10    currently retired persons, was that assertion or that
11    idea or that notion discussed by you with the governor
12    at any time before June 14th, 2013?
13  A.  Outside of meetings with attorneys?
14      MR. SHUMAKER:  Outside of meetings or calls
15    with attorneys present.
16  Q.  Yeah, I'm not looking to infringe your attorney-client
17    privilege.
18  A.  I know.  I just don't recall all of the meetings.  It
19    may have been discussed outside those meetings.
20  Q.  Well, do you have a recollection?
21  A.  I do not have a recollection of specific discussions.
22  Q.  Just so I understand your testimony, are you saying it
23    was -- it may have been discussed but you're not sure
24    whether or not it was discussed in meetings that were
25    outside the attorney-client privilege?  Is that your

Page 248

1    testimony?
2  A.  Yes.  It -- well, to clarify, I think it -- some
3    concept probably was discussed, but I'm not sure it
4    was discussed outside of attorney-client meetings --
5  Q.  Okay.
6  A.  -- attorney-client privilege.  I want to be clear.
7  Q.  Again, without infringing attorney-client privilege,
8    did the state, and when I say the state, I mean the
9    governor, his senior staff, Mr. Dillon, his staff,
10    ever speak to you or your team asserting that there
11    had to be significant cuts in accrued vested pension
12    amounts?
13  A.  I don't recall the state ever, as you say, asserting
14    that there had to be.
15  Q.  At the time you filed for bankruptcy or when the City
16    filed for bankruptcy, was it your intent absent a
17    consensual deal with the relevant stakeholders that
18    accrued vested pension amounts for both active and
19    currently retired persons would be cut?
20  A.  Well, first it was our intent that we reach some sort
21    of understanding with stakeholders, that's why we
22    asked for the formation of a retiree committee,
23    because we recognize we needed to have representation
24    on those issues.  Secondly, what we're asking for and
25    what we proposed in this proposal was the size of the

Page 249

1   unfunded pension obligation and to have discussions
2   about that amount. We did not want to imposes it,
3   we've said that many times, so in direct response to
4   your question, I don't know what we will do absent
5   consent.
6   Q.  Okay, I'm not sure you answered my question so let me
7       ask you again.
8   A.  Uh-huh.
9   Q.  Putting aside -- or assuming that there is no
10      consensual deal that would occur --
11  A.  Right.
12  Q.  -- was it your intent at the time the City filed for
13      bankruptcy that there would be a -- nonconsensual
14      significant cuts in accrued vested pension amounts?
15  A.  No.
16  Q.  That was not your intent?
17  A.  No.
18  Q.  Did you have -- at the time of the bankruptcy filing,
19      did you have an intention as to what you wanted to
20      happen vis-a-vis the Detroit's pension liabilities
21      were you enable to achieve a consensual deal?
22  A.  Did we have an intent as to what was going to happen?
23  Q.  Yeah, what did you hope would happen or what did you
24      intend to happen to the pension liabilities in
25      bankruptcy if you were unable to get a deal?

Page 250

1   A.  Yeah, I think you're --
2           MR. SHUMAKER:  I'll object, it calls for
3       speculation, but you can --
4   A.  Yeah.
5   Q.  Let me -- I'm not asking you to speculate, I'm asking
6       you what your actual intent was at the time you filed
7       for bankruptcy.
8   A.  Our intent was to seek a consensual deal.
9   Q.  Did you have -- did you think about the possibility
10      that you might not be able to achieve a consensual
11      deal? Did that cross your mind?
12  A.  Yes.
13  Q.  Okay. And when that thought crossed your mind that
14      you might not be able to have a consensual deal, did
15      you then have an intent as to what you wanted to have
16      happen with the pension liabilities in bankruptcy?
17  A.  No. We were going to cross that bridge when we got to
18      it.
19  Q.  Okay, just so I understand your testimony, you filed
20      for bankruptcy -- the City filed for bankruptcy at
21      your request, you contemplated the possibility that
22      there would be no consensual deal --
23  A.  Right.
24  Q.  -- but you had no plan or intention as to what would
25      happen to the pension liabilities if there were no

Page 251

1   deal?
2           MR. SHUMAKER:  Object to the form. It was
3       at the governor's request but --
4           MR. DeCHIARA:  Okay, I accept that
5       modification.
6   Q.  But can you answer the question?
7   A.  Yes. No, because we've never made a -- well, we've
8       never made a threat that what will happen if we don't
9       reach a consensual deal. We will address that issue
10      if and when it arises.
11  Q.  Yeah, just to be clear, I'm not asking you about
12      threats, I'm not suggesting there were any threats.
13      I'm just asking what was your intent, what was going
14      on in your head?
15  A.  We don't have an intent in that respect.
16  Q.  Mr. Orr, I would like to show you a document I'll have
17      marked as Orr Exhibit 17. I apologize, I only have
18      one copy so let me show it to your counsel first.
19          MR. DeCHIARA:  Let me read what it is.
20      It's a document that's on the docket, it's a document
21      849, it's the City of Detroit, Michigan's Objections
22      and Responses to Detroit Retirement Systems' First
23      Request For Admission Directed to the City of Detroit,
24      Michigan.
25          (Marked Exhibit No. 17.)

Page 252

1           MR. SHUMAKER:  Thanks.
2       Okay.
3           THE WITNESS:  Okay.
4   Q.  First of all, are you familiar with that document,
5       Mr. Orr?
6           MR. SHUMAKER:  Take a look at the first
7       page.
8           THE WITNESS:  Okay.
9   Q.  And I will represent that there's a box that's circled
10      and that's my handwriting from this morning.
11  A.  Okay. Okay. Yes.
12  Q.  Are you familiar with this document?
13  A.  Yes.
14  Q.  Did you review it before it was filed by the City?
15  A.  Yes, I did.
16  Q.  Let me refer you to -- let me just read. I'll read it
17      over your shoulder so we can all read it together.
18      And request for admission 12 says, admit, the City
19      intends to seek or diminish -- seek to diminish or
20      impair the accrued financial benefits of the
21      participants in the retirement system through this
22      Chapter 9 case. The response is admitted. Were you
23      aware of that admission made by the City?
24  A.  Yes, I reviewed these before they were filed.
25  Q.  Okay. And am I reading this correctly that the City

1     does -- or at least as of the date of this document,
2     which looks like it was entered on the docket on
3     September 13th, that the City intends to seek or
4     diminish to impair accrued pension benefits of Detroit
5     pensioners?
6 A.   Yes, that's admitted.
7 Q.   Okay. And so when did -- when did the City first --
8     when did that intent by the City first come into
9     existence? Was it in existence at the time of the
10    bankruptcy filing?
11 A.  Well, I think we said in June 14th that we need to
12    adjust pensions, I think we said it several
13    meetings after that so when you say intent as in the
14    legal conclusion of that document, I think we've said
15    that. I think what we've consistently said, though,
16    we want to do that consensually by a consensual plan.
17 Q.  I understand that you've said that, but I'm just
18    trying to nail down, if you will, this intent that's
19    expressed, that's admitted in response to request for
20    admission 12 in Exhibit 17. I'm just trying to nail
21    down when that intent first came into existence. Did
22    it come into existence at the time of the bankruptcy,
23    sometime before the bankruptcy was filed? If you can
24    shed whatever light you can on the timing of when that
25    intent came into existence.

1 A.  Other than what I've said, we said at June 14th we
2    have to adjust the pensions, we asked for a consensual
3    plan, so I suppose you can say -- without getting
4    caught in the legal conclusion of the intent, I
5    suppose you could say that from our proposal to the
6    time of that admissions the intent as you say without
7    drawing a legal conclusion occurred.
8 Q.  Okay, so that intent existed at least -- at least at
9    the time of the June 14th proposal; is that a fair
10    characterization of your testimony?
11 A.  No, I said sometime between the June 14th testimony
12    till the entry of those admissions. The intent as you
13    say could have occurred upon the execution of that
14    admission.
15 Q.  Okay. And is it -- and you don't know when that
16    intent came into existence?
17 A.  No, I think it came -- frankly, if you're using the
18    word intent, I think it came when that admission was
19    supplied.
20 Q.  So your testimony -- so your testimony is this intent
21    arose at the time that this answer was drafted or
22    submitted by the City onto the docket? That's when
23    the City developed the intent?
24 A.  I don't know if it was on the docket. What I know is
25    the question says, a legal conclusion, the question

1     asked do you intend to benefit (sic) and we admitted
2     it, and I guess in response to your question as to
3     when that intent arose, I guess it's at the point of
4     admission.
5 Q.   Okay. And so you're saying prior to the City
6     preparing this document, the intent that's referred to
7     in the document did not exist?
8 A.   I'm not sure we prepared that document.
9 A.   Well, it's a filing in this case --
10 A.   It's a response.
11 Q.   -- by the City of Detroit?
12 A.   Right, but it's a response to a request for admission.
13 Q.   Right.
14 A.   Okay.
15 Q.   But the relevant part where it says admitted.
16 A.   Since you're using intent it sounds like you're using
17     as a legal conclusion. I'm saying that the -- using
18     your words, the formal intent occurred at the point of
19     admission. That's what an admission is.
20 Q.   Okay. So -- let me describe my understanding, you
21     tell me if you agree with my understanding.
22 A.   Uh-huh.
23 Q.   So this is a request for admission that asks whether
24     -- that asks the City whether it admits that the City
25     has a certain intent and the City admitted that;

1     correct?
2 A.   Yes, yes, that's correct.
3 Q.   Okay -- so okay. So as of the moment that the City
4     made that admission in this document, the City had
5     that intent?
6 A.   I think -- I think that's an admission, yes.
7 Q.   Right. So we're in agreement.
8 A.   Okay.
9 Q.   My question is the intent that's referred to, did it
10     exist at any moment before the City made the
11     admission?
12 A.   In my mind, no. I mean, the time of admission is when
13     it admits to the intent.
14 Q.   And so in the June 14th proposal when it says there
15     must be significant cuts in accrued vested pension
16     amounts, it was not your intent that there be such
17     cuts absent a consensual deal?
18 A.   What I'm saying is your letter -- your request for
19     admissions asks when does the City intend to diminish.
20     The proposal said there must be cuts, but throughout
21     that time we said we wanted a consensual resolution.
22     By using the word intent I'm saying it just as a
23     matter of practicality the expressed intent is upon
24     that admission.
25 Q.   Let me ask you about Article 9, Section 25 (sic) of

Page 257

1  the Michigan Constitution. There was a great deal of
2  colloquy earlier today about that topic. Do you
3  recall that?
4  A.  Yes, I do.
5  Q.  Okay. Did you have any discussions with the governor
6  or the governor's staff or Mr. Dillon or Mr. Baird at
7  any time about the meaning or import of Article 9,
8  Section 25 of the Michigan Constitution?
9        MR. SHUMAKER:  Without counsel present?
10       MR. DeCHIARA:  Yeah, without invading
11  attorney-client privilege.
12  Q.  Oh, I'm sorry, I'm misspeaking. Section 24.
13  A.  I understood, yes, okay.
14  Q.  Yes.
15  A.  I don't recall any of those discussions without
16  counsel present.
17  Q.  Prior to your being appointed as Emergency Manager did
18  you speak to any of your colleagues at Jones Day about
19  Article 9, Section 24 of the Michigan Constitution?
20  A.  Yes, I believe I did.
21  Q.  And with whom did you speak --
22  A.  With whom did I speak --
23  Q.  -- about it?
24  A.  Let me clarify. I don't know if I spoke, I think I
25  saw some research on that article.

Page 258

1  Q.  Okay, and this was research that you saw while you
2  were a partner at Jones Day?
3  A.  Yes.
4  Q.  And it was research shown to you by your colleagues at
5  Jones -- one or more of your colleagues at Jones Day?
6  A.  Yeah, I'm -- I'm not a Michigan law constitutional
7  scholar, but I think there are various research papers
8  that were circulated. I don't think anybody came in
9  and said, here, read this. I think I just saw a paper
10  that discussed it.
11  Q.  Where did -- did you see it as a result of your own
12  research --
13  A.  No.
14  Q.  -- or did someone show it to you?
15  A.  I think somebody else was doing research on it and I
16  think it was either through a distribution or --
17  sometimes distributions come through the office, you
18  don't know who, you know, they just come through
19  interoffice mail and you read the distribution and it
20  may have been a research memo that came through my
21  office, came to my office.
22  Q.  Do you have in your mind a particular document?
23  A.  Yes, I do.
24  Q.  And was it a hard -- did it land on your desk in hard
25  copy or did it come through your email?

Page 259

1  A.  No, I think it came in hard copy.
2  Q.  And do you recall what it said?
3        MR. SHUMAKER:  To the extent that it's not
4  a privileged memo.
5        THE WITNESS:  No, it was marked
6  attorney-client privilege, attorney work product so I
7  don't think I can speak to it. That's what I recall
8  about it.
9        MR. SHUMAKER:  Certainly if it was a memo
10  involving attorney-client advice, you're not going to
11  -- you're not going to testify about it. I'm going to
12  instruct you not to --
13       THE WITNESS:  Right, I think it can be
14  characterized as that, yes.
15  Q.  Without going into the substance of the document, was
16  it a document that was prepared for a client of
17  Jones Day? Do you know?
18  A.  It may have been prepared in contemplation for a
19  client. I'm being careful because the attorney-client
20  privilege can attach prior to a formal relationship so
21  I'm just being very careful, but I think it -- I think
22  it implicates attorney-client privilege. I recall
23  seeing a memo, but I also recall up in the right-hand
24  corner that it had all of the instructions about
25  privilege and work product.

Page 260

1  Q.  Apart from that document did you see any other
2  documents --
3  A.  No, no.
4  Q.  Okay. Do you recall any conversations you had with
5  any of your colleagues at Jones Day while you were
6  still at Jones Day about the Michigan Constitution?
7  A.  No.
8  Q.  Did you attend the June 14, 2013 meeting that's
9  referenced in paragraph 80 of your declaration?
10  A.  Yes.
11  Q.  And did you speak at that meeting?
12  A.  Yes.
13  Q.  Did you say anything to the effect that -- did you say
14  anything at the meeting to the effect that this
15  meeting was not a negotiation?
16  A.  I don't recall if I said that. I may have, but I
17  don't recall.
18  Q.  If there was testimony by others that you did say
19  that, would you be in a position to deny that you said
20  it?
21  A.  No, I don't recall that I said it or not.
22  Q.  What about the June 20th meeting? Did you attend
23  that?
24  A.  I attended one of those meetings. It may have been
25  the June 20th.

Page 261

1  Q.  Are you saying --
2  A.  The following week, yes.
3  Q.  When you say one of those meetings, are you sure you
4      attended June 14th?
5  A.  No, no, no, when I say one, I mean one of the
6      subsequent.  I'm sure I attended June 14th.  June 10th
7      was Monday, June 14th was Friday, my public meeting
8      was Monday, June 14th was the all creditors meeting.
9      There was subsequent due diligence meetings the
10     following week and I recall attending at least one of
11     those that week.  That was the those I was referring
12     to.
13 Q.  I'm a little confused.  Are you sure you attended June
14     14th?
15 A.  Yes.
16 Q.  Okay.  So do you recall whether you attended June
17     20th?
18 A.  I think I did, but I don't recall.
19 Q.  Okay.  What about July 11th?
20 A.  I don't recall.
21 Q.  Okay.  So I already asked you about whether at the
22     June 14th meeting you said anything to the effect of
23     that this was not a negotiation.  Let me ask you the
24     same question for the June 20th and July 11th.  Do you
25     recall at that -- at those meetings saying anything to

Page 262

1      the effect of this is not a negotiation?
2  A.  I may have.  As I've said several times today, you
3      know, bargaining negotiations is suspended for five
4      years so I may have said that, but I don't recall.
5  Q.  And again, if there were witnesses who testified they
6      heard you say that at one or more of these meetings,
7      would you be in a position to deny that?
8  A.  I don't know if I would deny it or if I would confirm
9      it.  I mean, their recollection of what was said could
10     be different than mine or what they heard.
11 Q.  Did you attend a meeting on July 10th with creditors?
12 A.  I may have.
13 Q.  Same question for July 10th.  Do you recall saying
14     anything to the effect that that meeting was not a
15     negotiation?
16 A.  I think I generally, when I would go to these
17     meetings, say we're having discussions and exchange,
18     but I would try -- if I said this is not a
19     negotiation, I would try to make sure that I did not
20     waive the suspension of bargaining under 436, so I may
21     have said that, yes.
22 Q.  You may have said what?
23 A.  This is not a negotiation, yeah, I may have said that.
24 Q.  Okay.  Apart from you there were others who attended
25     those meetings on behalf of the City; correct?

Page 263

1  A.  Yes, I believe so.
2  Q.  Okay.  And some of those individuals spoke?
3  A.  Yes.
4  Q.  Okay.  Do you recall whether at any of those meetings
5      that you attended whether any of the other individuals
6      who were there on behalf of the City said words to the
7      effect of this is not a negotiation?
8  A.  Do I recall?  No.
9  Q.  At the June 20th meeting, is it true that the
10     attendees, and by the attendees I mean the people who
11     were not there on behalf of the City but the other
12     people, that in order to be heard they needed to fill
13     out a card and submit the card to someone who was
14     running the meeting?  Is that how things worked?
15 A.  Where was the June 20th meeting?
16 Q.  I don't know.
17 A.  I -- I know at my June 10th meeting that we had
18     speakers.  I don't recall.  I don't recall June 20.
19 Q.  Let me clarify.  Let's talk about the June 14th
20     meeting, the one you're sure you attended.
21 A.  Right.
22 Q.  Was there a system in place at that meeting where for
23     an attendee to be heard he or she had to write -- fill
24     out a card and submit it?
25 A.  Yes, I believe so.

Page 264

1  Q.  Okay, and describe how -- how did that -- what was
2      that process, how did that work?
3  A.  That process was arranged by my staff.  My
4      understanding is that if people wanted to speak, they
5      could fill out a card and a question would be asked
6      and members who were on the DS on the panel would
7      answer the question.
8  Q.  Who would read out the card?
9  A.  Initially it was the -- someone I believe on my staff
10     or some of my consultant's staff, but toward the end
11     of the meeting people just started asking questions
12     outright.
13 Q.  Did -- that same process of attendees having to fill
14     out a card, did that occur at any of the other
15     meetings?  And by the other meetings I mean either
16     June 20th, July 10th or July 11th?
17 A.  I don't recall.
18 Q.  It may have?
19 A.  It may have, but I don't recall.
20 Q.  Okay.  Have you ever in your career as an attorney
21     attended a negotiation session of any kind?
22 A.  Yes.
23 Q.  Have you ever been at a negotiation session where one
24     side or the other has to fill out a card and have it
25     read by someone else to be heard?

Page 265

1 A. You're using the phrase negotiation session, and I
2    want to be clear that what we we saying is make sure
3    that we did not waive any rights under 436. I have
4    been at meetings where for purposes of to engage in
5    oral discussion, yes, you've had to fill out cards to
6    be heard, yes. I have been at auctions. Yes, I have
7    been at meetings like that.
8 Q. At auctions?
9 A. Yeah, I've been at auctions, been at meetings, been at
10   negotiations, yes, many different types of meetings.
11 Q. What kind of negotiations where those where
12   participants had to fill out a card to be heard?
13 A. They could have been negotiations for finance, they
14   could have been negotiations for procedures, they
15   could have been negotiations for a number of different
16   subjects, but it's happened on more than one occasion.
17 Q. Have you ever attended a collective bargaining
18   negotiation?
19 A. Yeah, I think I have.
20 Q. Okay. Did you ever see that type of system used in a
21   collective bargaining negotiation?
22 A. I don't think I saw it at the one I attended, but
23   collective bargaining is suspended.
24 Q. Did you -- before any of these meetings -- and by
25   these meetings, I mean the June 14th, June 20th, July

Page 266

1    10th or July 11th meetings -- did you consult with the
2    governor or any other state official about how the
3    meetings would be conducted?
4 A. No, not to the best of my knowledge.
5 Q. Did you consult with anyone, the governor or anyone,
6    any state official, regarding what the purpose or
7    nature of the meetings would be?
8 A. When you say consult, you know, I've testified earlier
9    today that we had regular communications with the
10   governor's office, but my understanding was that how
11   we ran meetings was substantially left up to me and my
12   team. So no, we didn't consult in that regard on how
13   the meetings were run.
14 Q. Okay, just to clarify what I mean by consult. I mean
15   did you talk?
16 A. Not at that level of detail how we're going to run, no
17   we didn't talk, no.
18      MR. DeCHIARA: Let me mark a document,
19   which I'll mark as -- ask the court reporter to mark
20   as Exhibit 18.
21      (Marked Exhibit No. 18.)
22 Q. Have you -- have you ever seen this document before?
23 A. Yes.
24 Q. And let me just identify it for the record. It's a
25   letter from Jones Day to Larry Stewart dated June 27,

Page 267

1    2013.
2 A. I'm --
3      MR. SHUMAKER: We have a different letter I
4    think.
5 A. I have John Cunningham.
6      MR. SHUMAKER: We have John Cunningham.
7      MR. DeCHIARA: I'm sorry, let's use that
8    one.
9      THE WITNESS: Okay.
10     MR. DeCHIARA: Thank you.
11 Q. Orr Exhibit 18 will be a Jones Day letter to John
12   Cunningham dated June 27, 2013. Let me ask you, have
13   you seen this Orr Exhibit 18 before?
14 A. Yes.
15 Q. And the first sentence of the letter says, thank you
16   for participating in the June 20th, 2013 informational
17   meetings pertaining to the City of Detroit's, and then
18   it continues --
19 A. Uh-huh.
20 Q. -- and you can read the rest --
21 A. Yes.
22 Q. -- but I won't read it aloud.
23      Do you concur with the description in the
24   sentence that I read of the June 20th meeting as an
25   informational meeting?

Page 268

1 A. Yes.
2 Q. Let me refer you back to your June 14th, 2013
3    proposal.
4 A. Yes.
5 Q. And to page -- the original page 109. And the third
6    to the last bullet point which we read earlier and
7    again I'm going to focus on the bottom line of that
8    bullet point that says, "There must be significant
9    cuts in accrued vested pension amounts for both active
10   and currently retired persons."
11      At the time of the meetings that I've been
12   referring to, the June 14th, June 20th, July 10th and
13   July 11th meetings, were -- would you have been
14   willing had there been negotiations that took place to
15   compromise and accept -- accept an outcome of the
16   restructuring effort that resulted in there not being
17   cuts in accrued vested pension amounts for both active
18   and currently retired persons?
19 A. Well, that's a hypothetical question that could depend
20   upon a number of things. I don't know. I would have
21   to see the proposal. We were willing to listen to any
22   proposal or counter that came in.
23 Q. Okay, and I'm not trying to phrase it as a
24   hypothetical, I want to focus on what was in your mind
25   at the time of these meetings. So let me ask you.

Page 269

1    Did you ever consider at the time of these meetings
2    whether you would accept in some scenario that
3    resulted from negotiations that there would be an
4    outcome to the restructuring where there would not be
5    cuts to accrued vested pension amounts?
6  A.  That depends upon the proposal and the circumstances
7    of that proposed outcome.
8  Q.  I think we're maybe misunderstanding each other.  I'm
9    not asking you what you would have done --
10 A.  Uh-huh.
11 Q.  -- had you gotten a certain proposal or what you would
12   have done under some circumstances that did not occur.
13   What I'm asking you is as to what your actual state of
14   mind was at the time of these meetings.  In your
15   actual state of mind --
16 A.  Uh-huh.
17 Q.  -- did you have -- did you consider and did you think
18   about that had there been certain negotiations that
19   led down a certain path, did you in your mind consider
20   that you might accept an outcome of the restructuring
21   where there would not be cuts to accrued vested
22   pension amounts?
23 A.  I was receptive as we said to anything, but that would
24   depend upon the proposal.
25 Q.  Did you say at any of these meetings that you would be

Page 270

1    receptive to anything?
2  A.  No, I think we did say that, yes.
3  Q.  So you would have been receptive to an outcome where
4    there would be no cuts in accrued vested pension
5    amounts?
6  A.  That depends upon what the proposal was.  We were
7    receptive to hearing anything which we haven't heard,
8    so yes.
9  Q.  And is that true today?  Are you willing to consider
10   an outcome to this restructuring effort where there
11   would be no cuts to accrued vested pension amounts?
12 A.  That depends upon the terms of the proposal.  That's
13   -- that's -- we'll listen to -- we have said before
14   and we'll say again, we'll listen to anything, but it
15   depends upon the terms.
16 Q.  Okay.
17 A.  Your question's a hypothetical so I -- I don't -- it
18   depends upon what the terms are.
19 Q.  Okay, well, we have a disagreement with whether my
20   question is a hypothetical, but it is what it is.
21 A.  Okay.
22 Q.  I can only ask you to answer it to the best of your
23   ability.
24 A.  That's the best of my ability.
25 Q.  Let me now ask you about what you actually said at the

Page 271

1    June 14th meeting.
2  A.  Okay.
3  Q.  Do you have a recollection of any words you used to
4    communicate to those in attendance that you were open
5    to consider anything, if that's a fair
6    characterization of your prior testimony?  Did you use
7    words to that effect and if so what were those words?
8  A.  I don't remember the exact words, but I think we
9    expressed the sentiment that this is a proposal and
10   we're open to discussions.
11 Q.  Well, that's a little different.  I mean, to be open
12   to discussion.  I'm not asking you -- I think you
13   testified a few minutes ago that you were open to
14   anything and if I'm mischaracterizing that, correct
15   me.
16 A.  Well, no, anything -- and I meant anything meaning
17   anything in terms of discussions, that's why we styled
18   this, we never called this a plan, we never called
19   this a deal, we always called it a proposal because we
20   were open for discussions, any response, meaning
21   anything, so I think they're the same thing.  I'm not
22   trying to be cute in any fashion, I'm just saying we
23   were open to responses, yes.
24 Q.  Did you ever say to the attendees at the meetings or
25   communicate to the attendees in writing that the City

Page 272

1    would consider an outcome to the restructuring effort
2    whereby there would be no cuts to accrued vested
3    pension amounts?
4  A.  Did we ever communicate?  I'm not sure that anyone on
5    my team did.  To the best of my knowledge, I don't
6    recall doing that.
7  Q.  Okay.  Did you ever -- you or your team ever
8    communicate at the meetings or in writing to the
9    creditors that you would be open to a result of the
10   restructuring effort that would result in something
11   less than significant cuts in accrued vested pension
12   amounts?
13 A.  Let me -- this line of questioning, let me respond
14   this way.  I think it's fair to say that we
15   communicated that we were open to discussions and
16   suggestions and counterproposals.  Depending upon what
17   the term of those discussions, suggestions and
18   counterproposals or anything were, we were willing to
19   discuss them.
20 Q.  Let me turn your attention back to page 109 of the --
21   of Exhibit 9, which is the June 14th proposal for
22   creditors.
23 A.  Yes.
24 Q.  And I believe you were questioned about this earlier
25   so I'll keep this short, but the fifth bullet point



Page 273

1    from the bottom of the page makes reference to an
2    underfunding of $3.5 billion.
3  A.  Yes.
4  Q.  Do you see that?
5  A.  Yes.
6  Q.  And is it that assessment of -- is it that assessment
7    that that's the level of underfunding that caused you
8    to conclude two bullet points down that there had to
9    be significant cuts in accrued pension benefits?
10        MR. SHUMAKER:  Object to form.
11 Q.  I mean accrued pension liability.
12        MR. SHUMAKER:  Object to the form.
13 A.  Yes, we believe there are insufficient funds, yes.
14 Q.  Okay.  And the pension systems themselves believed,
15   and continue to believe, that the amount of
16   underfunding is less than 3.5 billion; correct?
17 A.  Yes.
18        MR. SHUMAKER:  Objection, foundation.
19 A.  I believe they recognize they're underfunding but
20   there have been statements that it's less than
21   3.5 billion.
22 Q.  Statements by them?
23 A.  By them.
24 Q.  Okay.  Did you ever speak to the governor or his staff
25   or any state officials about what was the -- or what

Page 274

1    is the correct amount of underfunding?
2  A.  Yes, I believe so.
3  Q.  Who did you speak to about that?
4  A.  Putting aside any discussions with attorneys, as we've
5    done --
6        MR. SHUMAKER:  Same admonition as before.
7        THE WITNESS:  Same admonition.
8  A.  -- I believe I may have spoke with -- me personally
9    may have spoken with the treasurer.
10 Q.  When was that?
11 A.  I don't recall.
12 Q.  Was it before or after June 14th?
13 A.  Probably before.
14 Q.  And was it a face-to-face meeting?
15 A.  It may have been.  It may have been.
16 Q.  Where was the meeting?
17 A.  I -- I -- there were so many meetings with so many
18   different parties, not just with the treasurer, but it
19   may have been here in Detroit.  We sometimes meet in
20   Detroit.
21 Q.  Do you recall the substance of your conversation?
22 A.  I do not.
23 Q.  Did he say to you that he believed the pension funds'
24   assessment of the amount of underfunding was
25   unrealistic or words to that effect?

Page 275

1  A.  No, not that I recall.  I think -- no.
2  Q.  Did you say that to him?
3  A.  I think I said something along the lines we believe
4    it's 3.5, some of the pension funds have asserted it's
5    different, we need to have a dialogue to derive a
6    number.
7  Q.  So you were the one who brought up the --
8  A.  Yes.
9  Q.  -- topic?
10 A.  Yes.
11 Q.  And what caused you to believe that the pension funds
12   were underestimating the amount of liability?
13 A.  As has been discussed both in the presentation and
14   many other times, we looked at a number of factors.
15   First from Gabriel Rotor, then from Milliman's initial
16   analysis of the Gabriel Rotor report, then from
17   Milliman's independent report and the unfunded actual
18   liability, the expected rate of return on assets, the
19   proposed amortization rate, how much we have to pay
20   out over time --
21        THE COURT REPORTER:  I'm sorry.  Start
22   again.  The expected rate of assets.
23 A.  The expected rate of return, the market value of
24   assets, the proposed amortization rate and other
25   factors, which led us to conclude that they were

Page 276

1    underfunded at this level to meet the anticipated
2    actuarial liabilities in out years.
3  Q.  So you were advised by certain experts who were
4    consulting you --
5  A.  Yes.
6  Q.  -- about this matter?
7  A.  Yes.  As was testified to this morning, I'm not an
8    actuary.  I relied on my team, yes.
9  Q.  But what initially caused you to look into this issue?
10   Did someone come to you and say -- suggest that the
11   pension liability's underfunded or is this something
12   that you yourself decided to seek out an opinion from
13   experts on?
14 A.  I -- I think that this issue had been discussed prior
15   to my becoming Emergency Manager in various forms with
16   financial stability agreement, perhaps even in a
17   consent agreement.  When we're looking at all
18   obligations of the City, I seem to recall those
19   documents started out at $12 billion of total debt,
20   then a subsequent one having to do before I got here
21   in 2012 came up with $14 billion of debt, and then the
22   first 30 days that I was appointed one of the
23   obligations under 436 is get a true assessment of the
24   City's financial condition, we did a deeper dive and
25   that's when we derived these numbers.  So that was

Page 277

1  based upon historical calculations and my obligations
2  under the statute.
3         MR. DeCHIARA:  I would like to go off the
4  record just for a minute.  I may be done, I just want
5  to consult with co-counsel.
6         MR. SHUMAKER:  Sure.
7         THE VIDEOGRAPHER:  Going off the record at
8  5:26 p.m.
9         (A brief recess was taken.)
10        THE VIDEOGRAPHER:  We're back on the record
11 at 5:39 p.m.
12             REEXAMINATION
13 BY MR. ULLMAN:
14 Q.  Mr. Orr?
15 A.  Yes.
16 Q.  Just a few more questions for you.
17 A.  Sure, Mr. Ullman.
18 Q.  You are the -- let me withdraw that.
19        The June 14th proposal that we've looked at
20 was put forward by you in your capacity as Emergency
21 Manager?
22 A.  Yes.
23 Q.  Does anyone besides you have authority to change or
24 modify the terms of the proposal?
25 A.  Well, it's my proposal and under statute I have

Page 278

1  substantial discretion, but ultimately I report to the
2  governor, but as far as this, no one else in the City
3  does, no.
4  Q.  No one other than you?
5  A.  No one other than me.
6  Q.  Now, in connection with a Chapter 9 proceeding that's
7  ongoing, in the event that you are unable to reach a
8  consensual resolution, do you intend to withdraw the
9  bankruptcy filing?
10        MR. SHUMAKER:  Objection, calls for
11 speculation.
12 A.  Yeah, I don't know what we'll do at that point.
13 Suffice it to say, if we can't reach a consensual
14 resolution, there are serious questions about the City
15 for a number of reasons.
16 Q.  And if the creditors and objectors do not agree to the
17 terms that are set out in the June 14th proposal, do
18 you intend to put forward a plan in the Chapter 9
19 proceeding that treats pension contributions for
20 retirees differently than the way those contributions
21 are treated in the June 14th proposal?
22        MR. SHUMAKER:  Same objection.
23 A.  Yeah, I don't know what we intend to do.  Suffice it
24 to say, I think the proposal speaks for itself and
25 we'll stand by that.  We're hoping to get some

Page 279

1  movement on it.
2  Q.  So as things now stand, there's no plan to put forward
3  anything else if the creditors and in particular the
4  retirees do not agree to what's set out in the June
5  14th proposal?
6  A.  As it stands right now, we don't have a plan.
7         MR. ULLMAN:  I have nothing further.  Thank
8  you, Mr. Orr.
9         MR. SHUMAKER:  Thank you, counsel.
10        THE WITNESS:  Thank you.
11        THE VIDEOGRAPHER:  Going off the record at
12 5:41 p.m.
13        (Discussion held off the record.)
14        THE VIDEOGRAPHER:  We're back on the record
15 at 5:43 p.m.
16             EXAMINATION
17 BY MS. GREEN:
18 Q.  Hi, Mr. Orr.  We've met before.
19 A.  Yes.
20 Q.  My name is Jennifer Green, I represent the two
21 Retirement Systems for the City of Detroit.
22 A.  Yes, Jennifer -- Ms. Green.  Good to see you again.
23 Q.  Thank you.  Nice to see you again too.
24        I have a question about Exhibit 11.  I
25 don't know if you have it in front of you or not.

Page 280

1  A.  Okay.
2         MR. SHUMAKER:  Which one is that?
3         MS. GREEN:  It's the July 18th letter from
4  the governor.
5         MR. SHUMAKER:  Thank you.
6  A.  Okay.  It's in here.  Here it is, got it.  Okay.
7  Q.  Do you happen to know who within the governor's office
8  drafted this letter?
9  A.  No, I do not.
10 Q.  Do you know if Jones Day had any input in drafting the
11 July 18th letter?
12 A.  To the best of my knowledge I don't think they did.
13 Q.  Do you know if they had any input or saw a preview of
14 the letter before it was delivered on the 18th?
15 A.  To the best of my knowledge they did not.  I know I
16 did not.
17 Q.  Did you have any specific conversations with the
18 governor about this letter between July 16th and July
19 18th?
20        MR. SHUMAKER:  Without counsel present?
21        MS. GREEN:  With the caveat without counsel
22 present.
23 A.  Without counsel present?  No.
24 Q.  Did you have any with counsel present?
25 A.  Yes, I believe on the morning of the 18th.

Page 281

1 Q. Okay. You testified earlier that you were expecting
2 the letter on the 18th and you really didn't know what
3 to expect until you actually received the letter?
4 A. I was expecting a letter at any time. After I
5 received it, I and my staff, Mr. Nowling, Ms. Penn,
6 would spend the 17th and the morning of the 18th for
7 that matter wondering if the letter was going to be
8 forthcoming. I didn't know when I was going to
9 receive the letter.
10 Q. And did you know what the contents of the letter would
11 be with respect to any contingencies?
12 A. No.
13 Q. Were contingencies anything that were discussed during
14 the meeting with the governor between the 16th and the
15 18th?
16 MR. SHUMAKER: Again, only without counsel
17 present. If there were any such discussions.
18 A. No, there were none, not without counsel.
19 Q. Without disclosing the substance of what the
20 attorney-client privilege communications would be, can
21 you at least confirm whether contingencies in general
22 were discussed with the governor prior to this letter
23 being delivered to you on the 18th?
24 A. No, they were not.
25 Q. I notice that the 18th letter says that it was

Page 282

1 delivered via hand and electronic delivery.
2 A. Yes.
3 Q. What time did you get the letter on the 18th?
4 A. I don't know, but I think it was around lunchtime.
5 Q. Did you receive it via email or did you receive it via
6 hand-delivery?
7 A. I don't recall depending upon which office. I think
8 someone came in and handed it to me. I think someone
9 on my staff gave it to me.
10 Q. Do you recall receiving it via email?
11 A. I think I probably did receive it, I just think
12 somebody got it before I got into my emails and
13 brought it into me.
14 Q. Do you know if the email that this letter was attached
15 to has been produced to date?
16 A. I do not.
17 Q. Would you be willing to produce the email that
18 attached this letter as part of this?
19 MR. SHUMAKER: Certainly willing to look
20 into it, sure. And it may well very --
21 MS. GREEN: Have already been.
22 MR. SHUMAKER: -- been produced.
23 Q. Earlier we were discussing the common interest
24 agreement between the City and the state. Do you have
25 an actual written common interest agreement?

Page 283

1 A. That's handled by my counsel. I -- I believe we do.
2 Q. Do you know if you reviewed the common interest
3 agreement?
4 A. I don't recall if I reviewed it.
5 Q. Were you the one that would have executed it on behalf
6 of the City?
7 A. I might have been.
8 Q. Do you know if you've produced the common interest
9 agreement as part of this litigation?
10 A. I don't know.
11 Q. Would you produce the common interest agreement?
12 MR. SHUMAKER: Look into that one too.
13 MS. GREEN: Thank you.
14 Q. We earlier were discussing some email correspondence
15 from January of 2013 and you had commented in an email
16 -- you characterized PA 436 as a "clear end-around the
17 prior initiative that was rejected by the voters in
18 November."
19 A. Yes.
20 Q. What did you mean when you said that it was a "clear
21 end-around?"
22 A. I had read that in one of the articles and as I said
23 during that discussion, that was my cursory review of
24 the statute and I had read that somewhere. That was
25 the conclusion during that day of going back and forth

Page 284

1 based upon what I had read at that time.
2 Q. So someone else had concluded that it was a clear
3 end-around and you were agreeing with that
4 characterization?
5 A. I was -- I was parroting in a sense what I had heard
6 and I was expressing the belief that I felt that
7 that's what was said, so yes, at that time that's what
8 I was saying.
9 Q. Who else had said that it was a clear end-around?
10 A. I forget which article that was in. It could have
11 been a Free Press article or News article. I was
12 reading or it could have been a WDIV or Fox 2
13 commentary. I was -- I was trying to find out what
14 was going on because of -- this subject came up me
15 possibly being a candidate for the Emergency Manager.
16 Q. Are you now trying to say that you did not agree with
17 that characterization?
18 A. No, at that time --
19 MR. SHUMAKER: Object to the form. Go
20 ahead.
21 A. What I'm saying is at that time that was my
22 characterization.
23 Q. Have you similarly expressed any reservations about
24 PA 436 also being a clear end-around of Article 9,
25 Section 24 of the Michigan Constitution?

Page 285

1 A. No, at that time I hadn't even -- I hadn't even
2 thought about the Michigan constitutional questions at
3 that time.
4 Q. Have you since expressed any similar reservations?
5 A. No, I have not.
6 Q. Earlier you were handed Exhibit 17 I believe it was,
7 which was a copy of the City's request for admissions.
8 A. Yes.
9 Q. I'm sorry, the City's responses to the Retirement
10 Systems' request for admissions.
11 A. Yes.
12 Q. Do you have a copy in front of you?
13       MR. SHUMAKER: He has the only copy right
14 now.
15       MS. GREEN: I have a few extras because
16 they were --
17       THE COURT REPORTER: He took it back. He
18 took the original back.
19       MR. DeCHIARA: Oh, I have it? I have it.
20       MS. GREEN: He's got it. We're fine.
21       MR. SHUMAKER: Was it marked?
22       MS. GREEN: It was marked.
23       MR. SHUMAKER: It was marked. You need it
24 for the record.
25       THE WITNESS: Okay.

Page 286

1       MR. SHUMAKER: Peter, you want to take this
2 one?
3       MR. DeCHIARA: Thanks.
4 Q. A few moments ago you stated, and I don't want to
5 mischaracterize your testimony, I believe you said if
6 you can't reach a consensual deal, there are "serious
7 questions about the City for a number of reasons."
8 A. Yes.
9 Q. What did you mean when you said that?
10 A. Oh, I meant what do we do? We have a lot of liability
11 on pension and OPEB, we simply don't have the money,
12 we can't go to the capital markets and borrow that
13 magnitude of money, we'd have to try to figure out
14 what to do next. That's all I meant.
15 Q. Okay. I would like to direct your attention to
16 request for admission number five, it's on page 10 of
17 Exhibit 17. The request to admit asked the City to
18 admit that the restructuring proposal proposes to
19 impair or diminish accrued financial benefits of the
20 participants of the Retirement Systems and the City
21 stated it admits that the restructuring proposal
22 contemplates a reduction in accrued financial benefits
23 to participants of the Retirement Systems but seeks
24 agreement and acceptance by plan beneficiaries. The
25 City's intention are to gain consensus with its

Page 287

1 creditors and propose a confirmable plan.
2       Did I read that correctly?
3 A. Yes.
4 Q. And similarly with respect to number 6, the request
5 was for the City to admit that the bankruptcy
6 recommendation proposes among other things to diminish
7 or impair accrued financial benefits of the
8 participants in the Retirement Systems. And the
9 response is the same; correct?
10 A. Yes.
11 Q. Number 12 asks the City to admit that you intend to
12 seek to diminish or impair the accrued financial
13 benefits of the participants in the Retirement Systems
14 through the Chapter 9 case?
15 A. Yes.
16 Q. And you see that distinction between the three
17 questions?
18 A. Yes.
19 Q. Your response to number 5 and number 6 both state that
20 the City seeks a consensual agreement; correct?
21 A. Yes.
22 Q. Your response to number 12, which is whether you would
23 seek to diminish or impair through the Chapter 9 case,
24 does not have the caveat regarding a consensual deal
25 being reached; correct?

Page 288

1 A. Yes.
2 Q. Why is there that difference? Is it because the City
3 intends to use the cramdown provisions of the
4 bankruptcy code to force a nonconsensual deal?
5       MR. SHUMAKER: Object to the form.
6 A. Without getting into discussions with counsel, I think
7 I can -- I think I can safely say without any waiver
8 that the City intends to preserve all of its rights in
9 answer number 12.
10 Q. A few moments ago when asked about what the City's
11 plan was if a consensual agreement could not be
12 reached, I believe your response was the City
13 currently has no plan if a consensual agreement is not
14 reached; correct?
15 A. That is correct, yes.
16 Q. Sitting here today is it your testimony the City has
17 no backup plan if a consensual deal is not reached?
18       MR. SHUMAKER: Object to the form.
19 A. Sitting here today it's my testimony that we have no
20 plan other -- first we have no plan, but we have no
21 plan or no effort other than to try to reach a
22 consensual resolution.
23 Q. If you don't get that consensual resolution, would you
24 resort to the cramdown provisions that are contained
25 within the bankruptcy code?

1  A.  I don't know.  We'll have to -- as I've said before,
2      we'll have to cross that bridge when we get to it.
3  Q.  So the City has no present intent to resort to any
4      cramdown provisions?
5  A.  We haven't formulated a plan based upon consensus or
6      not yet.
7  Q.  Maybe you haven't formulated a plan but have you
8      discussed the option?
9  A.  Oh, we've discussed a lot of options.  That's why I
10     say we want to reserve all rights.
11 Q.  Let's get into the discussions.  When was your first
12     discussion regarding using the cramdown provisions if
13     a nonconsensual agreement was not reached?
14         MR. SHUMAKER:  Objection.  I want to
15     caution the witness about getting into any
16     attorney-client communications.  Subject to not
17     revealing anything along those lines, you can answer.
18 A.  Without getting into any communications, I'm not sure
19     there was a specific discussion about the cramdown
20     provision.
21 Q.  A moment ago I thought you said, and I'm quoting from
22     right in front of me, we discussed a lot of options,
23     that's why I say we want to reserve all rights and you
24     had mentioned that there was an analysis about
25     cramdown provision.  So there either was or there was

1      not.
2  A.  I'm not -- what I'm trying to -- my testimony is I'm
3      not sure that we specifically discussed if we can't
4      get a consensual resolution, we go to cramdown.  There
5      were other options that were discussed --
6  Q.  Okay.
7  A.  -- including that.  I don't want to give you a binary
8      response.
9  Q.  So I have two follow-up questions then.
10 A.  Uh-huh.
11 Q.  Number one, when was the cramdown issue discussed?
12 A.  I don't recall a -- we -- without discussing what was
13     said with counsel, I don't recall --
14         MR. SHUMAKER:  The question is when.
15         THE WITNESS:  When?
16 A.  We haven't -- I don't want to be unclear.  There
17     hasn't been a specific cramdown discussion, but
18     cramdown is one of the options has been mentioned.  We
19     have not sought to make a determination of if and when
20     we would pursue that alternative.
21 Q.  Well, I don't suppose you're willing to offer any sort
22     of assurance today that the City would not resort to
23     the cramdown provisions if a consensual deal was not
24     struck?
25 A.  I just said we want to preserve all options.  I can't

1      do that.
2  Q.  And is it also true that you cannot remember the first
3      time that that option was discussed?
4  A.  Ah --
5  Q.  Let's put it this way.  Was it prior to the filing on
6      July 18th or is it something you have discussed after
7      the filing?
8  A.  I mean, the reason I'm hesitant is I'm a bankruptcy
9      practitioner, I'm certainly aware of nonconsensual
10     creditors being subject to cramdown, I'm just not
11     recalling a specific discussion.  I'm not sure we had
12     to have a discussion.
13 Q.  Okay.
14 A.  Okay, I mean.
15 Q.  What other options were discussed?  You said you
16     discussed multiple options?
17 A.  Well, without getting into negotiations, options
18     regarding which if any classes you could get, which
19     participants, other alternatives, anything short of
20     consensual, what else you might be able to offer,
21     whether you would listen to different factors that go
22     into the payout, whether the beneficiaries would come
23     with a different proposal.  A number of things were
24     discussed.
25 Q.  Who did you discuss those options with?

1  A.  Our counsel and investment bankers.
2  Q.  Have you ever discussed -- so internally you discussed
3      those options?
4  A.  Yes, yes, yes, yes.
5  Q.  Have you discussed those options with the Retirement
6      Systems?
7  A.  Have I personally discussed those with the Retirement
8      Systems?  I don't recall.  I don't think so.
9  Q.  Have you discussed those options with any of the
10     actual individuals within the Retirement Systems?
11 A.  I may have.
12 Q.  And who would that be?
13 A.  I don't remember.  There are so -- I've had over -- I
14     think at this point I've had over 200 meetings, some
15     of those including individual members of the various
16     groups and that may have come up.
17 Q.  So you've said several times throughout today and in
18     your responses to our discovery that the City's intent
19     and the City's hope, I think you used the word hope,
20     would be to get a consensual agreement.
21 A.  Yes.
22 Q.  And I think I recall you saying that your reading of
23     Article 9, Section 24 is that it would permit
24     consensual contractual negotiations?
25 A.  I believe that's a fair characterization.

1   Q.  If that cannot be achieved, would you agree that
2       Article 9, 24, Section 24, would prohibit any other
3       impairment or diminution of the pension benefits?
4   A.  No.
5           MR. SHUMAKER:  Objection, calls for
6       speculation and for a legal conclusion.
7   Q.  And why would you disagree with that?
8   A.  For all the reasons we discussed earlier today and in
9       addition I think it calls for a legal conclusion as
10      far as what the import of 436 versus that provision
11      is.
12  Q.  Let's talk a little bit about the Chapter 9 process
13      itself.
14  A.  Yes.
15  Q.  You seek authorization from the governor, step one?
16  A.  Yes.
17  Q.  Step two, the governor gives his authorization?
18  A.  Yes.
19  Q.  And then the City, you acting on behalf of the City,
20      are responsible for filing the Chapter 9 case itself;
21      correct?
22  A.  Yes.
23  Q.  And after you file the case, you and your attorneys
24      are responsible for the day-to-day activities in
25      carrying out that Chapter 9 case; correct?

1   A.  Yes.
2   Q.  And in a Chapter 9 case only the municipality itself
3       can propose a plan of adjustment; correct?
4   A.  Correct.
5   Q.  So ultimately it will be the City that proposes a plan
6       of adjustment?
7   A.  I believe so.
8   Q.  And ultimately it will be the City that places in
9       front of the Court a method to deal with its pension
10      debt?
11  A.  I believe so.
12  Q.  And it is only the Court -- after the City has first
13      proposed the plan, it is the Court that can confirm
14      that plan?
15  A.  Yes.
16  Q.  But all the steps leading up to that confirmation are
17      acts taken by the City; correct?
18  A.  I believe that's the Chapter 9 scheme.
19  Q.  You mentioned earlier in the June time frame
20      there were certain pieces of litigation that were all
21      coming to a head; correct?  I'm referring to the
22      Syncora litigation and the Michigan state court
23      litigation.
24  A.  Yeah, but I think we were talking about July when the
25      state court litigation began.

1   Q.  That's true.  The state court litigation was not until
2       July, you mentioned in your testimony that you were
3       throughout the month of June there were concerns about
4       "losing control."
5   A.  June through -- I think the testimony was at various
6       time frames, June 14th through July 3rd and June 1
7       through July 18th, and I was saying those time frames
8       there are a number of different issues.  In the June
9       time frame I seem to remember, as in the prior
10      deposition you attended, we reached an agreement in
11      principal, then things started to go off the rails
12      with Syncora the following Monday on June 17th so
13      that's what my discussion was.
14  Q.  And so consistent with that you said you agreed there
15      were concerns that throughout June things were
16      beginning to spin out of control and I think you used
17      the words losing control?
18  A.  Yes, in June we were dealing with a number of
19      different issues, but we were trying to manage them as
20      best we could and then for the better part of
21      June/July we started being hit with a number of pieces
22      of litigation that just kept coming over the transom
23      and it appeared that we were starting to lose the
24      initiative.
25  Q.  Okay.  You mentioned earlier when you were

1       characterizing the losing control phase of what was
2       going on --
3   A.  Uh-huh.
4   Q.  -- you said that someone counseled you that it was
5       irresponsible to be delaying the bankruptcy filing?
6           MR. SHUMAKER:  Object to the form.
7   A.  Uh-huh.
8   Q.  Who was it that accused you of being irresponsible for
9       holding off on the bankruptcy filing?
10  A.  Well, I wouldn't characterize it as accusation.
11  Q.  Who counseled you that it was irresponsible?
12  A.  It was --
13          MR. SHUMAKER:  To the extent that it was
14      counsel, I don't want you to get into the
15      communication.
16  A.  Okay, it was a privileged communication.
17  Q.  So an attorney at Jones Day?
18  A.  No, not necessarily.  It -- various discussions with a
19      number of my team members including attorneys,
20      investment bankers and consultants.
21  Q.  So during that time frame what was the event that
22      finally pushed you to actually start preparing the
23      documents to file the bankruptcy petition?
24  A.  I don't know if there was an event that pushed me, but
25      I think there was a general consensus that if things

Page 297

1 continued with a number of different lawsuits going on
2 simultaneously, our own litigation against Syncora,
3 that things were spiralling out of control.
4 Q. And I'm assume that during that time frame it was you
5 that directed Jones Day to begin preparing the actual
6 documents that would eventually be filed in the
7 bankruptcy court; correct?
8 A. Yes.
9 Q. Do you know when you told them to go ahead and start
10 preparing the paperwork?
11 MR. SHUMAKER: Objection, asked and
12 answered, but you can answer again.
13 A. I'm not sure the exact date, but it was probably
14 sometime in that July time frame. Yeah.
15 Q. And I'm sure we don't just throw documents like that
16 together. Do you know how long they worked on the
17 documents before they were filed?
18 MR. SHUMAKER: Object to the form.
19 A. No, but I suspect it was at least several weeks.
20 Q. Do you recall when the first draft of the petition or
21 the accompanying documents was provided to you for
22 your review?
23 A. No. But I suspect it may have been -- I don't recall.
24 Q. Do you recall reviewing multiple drafts, for instance?
25 A. Oh, I think I saw several drafts, yeah.

Page 298

1 Q. If the governor had included a contingency on his July
2 18th letter --
3 A. Uh-huh.
4 Q. -- would you have had to rework the petition and the
5 corresponding papers?
6 MR. SHUMAKER: Objection, calls for
7 speculation.
8 A. That -- that depends upon what the contingency was.
9 Q. If there was, for example, some sort of contingency
10 regarding the pensions, did you have a separate
11 version of the documents --
12 A. Oh.
13 Q. -- in case there have a contingency placed by the
14 governor?
15 A. I don't -- I don't recall if it would have required a
16 separate version or if it would have required any
17 editing if any at that point.
18 Q. Well, you testified that you got his -- the governor's
19 approval letter somewhere around lunchtime.
20 A. Right.
21 Q. The petition was filed just a few hours later.
22 A. Right.
23 Q. So I'm assuming that the papers were ready to go
24 because it was just a few hours of turnaround time;
25 correct?

Page 299

1 MR. SHUMAKER: Objection to form.
2 A. Well, that's your assumption, but the reality is you
3 can commence a bankruptcy as you know by filing a
4 petition without other documents. So if the
5 contingency you're talking about, depending upon what
6 it is, there may have been other things we would have
7 had to factor too and edit, I just don't know.
8 Q. You were asked earlier about an email from
9 Corinne Ball --
10 A. Yes.
11 Q. -- where she mentioned the Bloomberg Foundation?
12 A. Yes.
13 Q. Did the Bloomberg Foundation ever end up providing any
14 funds with regard to either your salary or the
15 Emergency Manager -- the Emergency Manager --
16 A. Effort.
17 Q. -- project, if you will?
18 A. No, in fact --
19 MR. SHUMAKER: Object to form.
20 A. -- in fact, I think the memo that followed on that
21 memo said no, I don't want to do that.
22 Q. Do you know if any other private party has provided
23 funding in addition to your salary which has already
24 been made public? Do you know if there were any other
25 private parties that provided funding in addition to

Page 300

1 that?
2 A. Not to me.
3 (Marked Exhibit No. 19.)
4 Q. I would like to give you Exhibit Number 19. This is
5 the City's interrogatory responses --
6 A. Yes.
7 Q. -- to the Retirement Systems' discovery requests.
8 A. Yes.
9 Q. After page 12 there's a verification by you.
10 A. Yes.
11 Q. Is that your signature?
12 A. Yes, should be.
13 Q. On page 10.
14 A. Yes.
15 Q. On page 10 there's an interrogatory regarding private
16 funds as defined in Section 93(F) of PA 436.
17 A. Right.
18 MR. SHUMAKER: You're referring to number
19 6, counsel?
20 MS. GREEN: Yes.
21 Q. At this time are you aware of any private funds as
22 defined in PA 436 that have been used to supplement
23 your salary or compensation?
24 A. Subject to the answer, there are no private funds.
25 All I get is the compensation that's provided to me

Page 301

1    pursuant to my contract and in fact I have not been
2    seeking any benefits under that contract such as
3    commuting expense, healthcare, malpractice insurance,
4    directors and officers insurance. In fact, I've been
5    subsidizing my efforts out of my own pocket.
6         MS. GREEN: If that situation changes and
7    private funds are provided, I would request a standing
8    request for supplementation to be made aware if that
9    happens.
10        MR. SHUMAKER: I'm sure --
11        MS. GREEN: I'm directing that to your
12   counsel. You don't have to personally let me know.
13        MR. SHUMAKER: We'll look into that if that
14   would happen.
15        MS. GREEN: I appreciate that.
16        THE WITNESS: I have not asked and there is
17   no intent or expectation in that regard.
18 Q. The -- I have one last question.
19        We talked about the draft of the petition
20   being prepared by Jones Day. There were media reports
21   that the City was planning to file on Friday, July
22   19th. Do you recall seeing those?
23 A. Yes.
24 Q. What was it that made the City -- that prompted the
25   City to file them instead on July 18th at 4:06 p.m.?

Page 302

1 A. Counselor, just because they're media reports doesn't
2    mean that that was accurate.
3 Q. Was there ever a plan to file them on the 19th?
4    Setting aside what the media reported, was there a
5    plan to file them on the 19th?
6 A. No, my plan was to have the permission, the authority,
7    to file them and make that call at some point after I
8    transmitted my letter of July 16.
9 Q. Were any of your conversations on the 18th or the 17th
10   relating to the timing of the petition?
11 A. Outside of communications with counsel?
12        MR. SHUMAKER: I'm going to object to the
13   form just -- I'm not following your question,
14   counselor.
15 Q. Were any of the conversations that you had on the 17th
16   or the 18th with, for instance, the governor, we've
17   talked about these conversations, were any of those
18   conversations relating to the timing of the filing
19   itself?
20        MR. SHUMAKER: Again, to the extent that
21   you're going to go into the content of the
22   conversations where counsel was present between
23   Mr. Orr and the governor, I'm going to instruct him
24   not to answer.
25 Q. Were there any conversations that you had without

Page 303

1    counsel present?
2 A. No.
3 Q. And are you not willing to answer even what topics --
4    in broad categories of topics that were discussed?
5         MR. SHUMAKER: Again, to the extent that
6    they reveal what the communications are, I'm going to
7    instruct him not to answer.
8 Q. Do you know if anyone else from your team had
9    conversations, outside of conversations with counsel,
10   relating to the timing of the filing?
11 A. There may have been conversations. I'm not aware of
12   any specific ones.
13        MS. GREEN: I don't have any further
14   questions. Do you have follow-up?
15        MR. SHUMAKER: Thank you, counsel.
16        THE VIDEOGRAPHER: This concludes the
17   deposition and we're going off the record at 6:12 p.m.
18        (Deposition adjourned at 6:12 p.m.)
19             *   *   *
20
21
22
23
24
25

Page 304

1    State of Michigan)
2    County of Genesee)
3             Certificate of Notary Public
4        I certify that this transcript is a complete, true and
5    correct record of the testimony of the witness held in this
6    case.
7        I also certify that prior to taking this deposition,
8    the witness was duly sworn or affirmed to tell the truth.
9        I further certify that I am not a relative or an
10   employee of or an attorney for a party; and that I am not
11   financially interested, directly or indirectly, in the
12   matter.
13        WITNESS my hand this 19th day of September,
14   2013.
15
16
17   _Jeanette M. Fallon_
18   Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267
19   Certified Realtime Reporter
20   Registered Merit Reporter
21   Certified LiveNote Reporter
22   Certified Shorthand Reporter
23   Notary Public, Genesee, Michigan
24   Acting in Oakland County, Michigan
25   My Commission Expires:  9-19-18

Page 305

```
1                DEPOSITION ERRATA SHEET
2
3    Our Assignment No. 471048/NYC 337176
4    Case Caption:  In re City of Detroit, Michigan
5
6           DECLARATION UNDER PENALTY OF PERJURY
7
8        I declare under penalty of perjury that I have read
9    the entire transcript of my Deposition taken in the
10   captioned matter or the same has been read to me, and the
11   same is true and accurate, save and except for changes
12   and/or corrections, if any, as indicated by me on the
13   DEPOSITION ERRATA SHEET hereof, with the understanding that
14   I offer these changes as if still under oath.
15   Signed on the _____ day of _____, 20___.
16   _____
17   KEVYN ORR
18
19
20
21
22
23
24
25
```

Page 306

```
1                DEPOSITION ERRATA SHEET
2
3    Page No.____Line No.____Change to:_____
4    _____
5    Reason for change:_____
6    Page No.____Line No.____Change to:_____
7    _____
8    Reason for change:_____
9    Page No.____Line No.____Change to:_____
10   _____
11   Reason for change:_____
12   Page No.____Line No.____Change to:_____
13   _____
14   Reason for change:_____
15   Page No.____Line No.____Change to:_____
16   _____
17   Reason for change:_____
18   Page No.____Line No.____Change to:_____
19   _____
20   Reason for change:_____
21   Page No.____Line No.____Change to:_____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25   KEVYN ORR
```

Page 307

```
1                DEPOSITION ERRATA SHEET
2
3    Page No.____Line No.____Change to:_____
4    _____
5    Reason for change:_____
6    Page No.____Line No.____Change to:_____
7    _____
8    Reason for change:_____
9    Page No.____Line No.____Change to:_____
10   _____
11   Reason for change:_____
12   Page No.____Line No.____Change to:_____
13   _____
14   Reason for change:_____
15   Page No.____Line No.____Change to:_____
16   _____
17   Reason for change:_____
18   Page No.____Line No.____Change to:_____
19   _____
20   Reason for change:_____
21   Page No.____Line No.____Change to:_____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25   KEVYN ORR
```

# EXHIBIT  C

**Page 1**

1        IN THE UNITED STATES BANKRUPTCY COURT

2          EASTERN DISTRICT OF MICHIGAN

3            SOUTHERN DIVISION

4

5  ------------------------------x

6        :

7  In re       : Chapter 9

8  CITY OF DETROIT, MICHIGAN,  : Case No. 13-53846

9      Debtor.    : Hon. Steven W. Rhodes

10  ------------------------------x

11

12        The videotaped deposition of GAURAV

13  MALHOTRA, called for examination, taken pursuant to

14  the Federal Rules of Civil Procedure of the United

15  States District Courts pertaining to the taking of

16  depositions, taken before JULIANA F. ZAJICEK, CSR No.

17  84-2604, a Certified Shorthand Reporter of said State

18  of Illinois, at the offices of Jones Day, Suite 3500,

19  77 West Wacker Drive, Chicago, Illinois, on

20  September 20, 2013, at 9:30 a.m.

21

22

23

24

**Page 2**

1  APPEARANCES:

2    JONES DAY,

3    (51 Louisiana Avenue, N.W.,
  Washington, D.C. 20001-2113,
  202-897-3939), by:

4    MR. GEOFFREY S. STEWART,
  gstewart@jonesday.com;

5    MR. CHRISTOPHER DiPOMPEO,
  cdipompeo@jonesday.com,

6

7      appeared on behalf of the Debtor
    and the witness;

8    LATHAM & WATKINS LLP,

9    (355 South Grand Avenue,
  Los Angeles, California 90071-1560,
  213-485-1234), by:

10    MR. WAYNE S. FLICK,
  wayne.s.flick@lw.com,

11

12      appeared telephonically on behalf of
    Ernst & Young;

13    DENTONS,

14    (233 South Wacker Drive, Suite 7800,
  Chicago, Illinois 60606-6306,
  312-876-2572), by:

15    MS. LEAH R. BRUNO,
  leah.bruno@dentons.com;

16    MS. MELISSA A. ECONOMY,
  melissa.economy@dentons.com,

17

18      appeared on behalf of Retirees Committee;

19    COHEN WEISS AND SIMON LLP,
  (330 West 42nd Street,

20    New York, NY 10036-6979,
  212-356-0216), by:

21    MR. PETER D. DeCHIARA,
  pdechiara@cwsny.com,

22      appeared telephonically on behalf of the
    International Union, UAW;

23

24

**Page 3**

1  APPEARANCES: (Continued)

2    LOWENSTEIN SANDLER LLP,

3    (65 Livingston Avenue,
  Roseland, New Jersey 07068,
  973-597-2346), by:

4    MR. S. JASON TEELE,
  steele@lowenstein.com,

5

6      appeared on behalf of AFSCME;

7    CLARK HILL PLC,
  (151 South Old Woodward, Suite 200,

8    Birmingham, Michigan 48009,
  248-642-9692), by:

9    MR. JOHN R. STEVENSON,
  jstevenson@clarkhill.com,

10      appeared telephonically on behalf of the

11      Police and Fire Retirement System of the
    City of Detroit and the General Retirement

12      System of the City of Detroit;

  WEIL, GOTSHAL & MANGES LLP,

13    (767 Fifth Avenue,
  New York, New York 10153,

14    212-310-8257), by:

15    MS. DANA KAUFMAN,
  dana.kaufman@weil.com,

16      appeared telephonically on behalf of

17      Fidelity Guaranty Insurance Company;

18    LIPPITT O'KEEFE, PLLC,
  (370 East Maple, 3rd Floor,

19    Birmingham, Michigan 48009,
  248-646-8292), by:

20    MR. RYAN C. PLECHA,
  rplecha@lippittokeefe.com,

21      appeared telephonically on behalf of the

22      Detroit Retired Police and Fire Fighters
    Association, Detroit Retired City

23      Employees Association, Don Taylor,
    individually and as president of the

24      RDPFFA, and Shirley Lightsey, individually
    and as president of the DRCEA;

**Page 4**

1  APPEARANCES: (Continued)

2    STROBL & SHARP, P.C.,

3    (300 East Long Lake Road, Suite 200,
  Bloomfield Hills, Michigan 48304-2376,
  248-540-2300), by:

4    MS. MEREDITH E. TAUNT,
  mtaunt@stroblpc.com,

5      appeared telephonically on behalf of the
    Retired Detroit Police Members

6      Association.

7

8

9

10  REPORTED BY:  JULIANA F. ZAJICEK, C.S.R.
        CERTIFICATE NO. 84-2604.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 5

1      MS. BRUNO:  Do you want to swear in the witness.
2           (WHEREUPON, the witness was duly
3                sworn.)
4      MS. BRUNO:  Good morning, Mr. Malhotra.  My name
5  is Leah Bruno.  I am at the Dentons firm representing
6  the Committee.  And we are here to take your
7  deposition today.
8           Before we go into the preliminaries, I'm
9  going to ask that everyone in the room and on the
10  phone just identify themselves for the record.
11           We'll start to my left.
12      MR. STEELE:  Jason Steele from Lowenstein
13  Sandler.  I represent AFSCME.
14      MR. DiPOMPEO:  Christopher DiPompeo from Jones
15  Day.  We represent the Debtor, the City of Detroit,
16  and the witness.
17      MR. STEWART:  Jeff Stewart, Jones Day, the
18  Debtor and the witness.
19      THE WITNESS:  Gaurav Malhotra.  Ernst & Young.
20      MS. BRUNO:  That's everybody in the room.  So if
21  the people on the phone want to give it a try.
22      MR. FLICK:  This is Wayne Flick from Latham &
23  Watkins, unfortunately stuck in Los Angeles due to
24  flight problems.

Page 6

1           (WHEREUPON, there was a short
2                interruption.)
3      MS. BRUNO:  Why don't we pick up where we left
4  off.
5      MR. FLICK:  This is Wayne Flick from Latham &
6  Watkins on behalf of Ernst & Young.
7      MR. DeCHIARA:  Peter DeChiara from Cohen, Weiss
8  & Simon, LLC on behalf of the International Union,
9  UAW.
10      MR. STEVENSON:  John Stevenson from Clark Hill
11  on behalf of the Police and Fire Retirement System of
12  the City of Detroit and the General Retirement System
13  of the City of Detroit.
14      MR. PLECHA:  Ryan Plecha from Lippitt O'Keefe
15  representing the Retiree Association parties.
16      MS. TAUNT:  Meredith Taunt from Strobl & Sharp
17  representing the Retired Detroit Police Members
18  Association.
19      MS. BRUNO:  Is that everyone on the phone?
20      MS. KAUFMAN:  This is Dana Kaufman from Weil
21  Gotshal & Manges representing Financial Guaranty
22  Insurance Company.
23      MS. BRUNO:  Okay.  If that's everyone, we'll
24  move forward, finally, here.

Page 7

1           GAURAV MALHOTRA,
2  called as a witness herein, having been first duly
3  sworn, was examined and testified as follows:
4           EXAMINATION
5  BY MS. BRUNO:
6      Q.  Mr. Malhotra, I understand that you were
7  deposed recently, so I know you've been through the
8  drill, but we'll just set a couple of the ground rules
9  here.
10           If I ask you any questions that you don't
11  understand, please ask me.  I'm not trying to trick
12  you.  I want us to understand one another.  So if you
13  need me to clarify any of my questions, I'm happy to
14  do so.
15           When responding to any questions that I
16  ask you, please wait for me to finish the question and
17  respond with a verbal answer so the court reporter can
18  get your answer and we can have an accurate
19  transcript.
20           Do those sound okay to you?
21      A.  Yes.
22      Q.  Okay.  What did you do to prepare for your
23  deposition today?
24      A.  I had a call with the team here at -- from

Page 8

1  Jones Day and Latham & Watkins a couple of days ago
2  for about an hour and a half.
3      Q.  Was anyone from the City, a non-lawyer on
4  the call?
5      A.  No.
6      Q.  Let me backtrack.
7           Anyone not at Jones Day or Latham &
8  Watkins on the call?
9      A.  From EY, I think we had somebody attending
10  from our general counsel's office, Marg Hosbach, yes.
11      Q.  I'm sorry.  Who was that?
12      A.  Marg Hosbach is her name.
13      Q.  Thank you.
14           Anyone else?
15      A.  No.
16      Q.  And how long was that call?
17      A.  About an hour and a half.
18      Q.  What did you discuss during that
19  conversation?
20      MR. STEWART:  Objection; instruct him not to
21  answer.
22      MR. FLICK:  Join.
23  BY MS. BRUNO:
24      Q.  What day did you have that call?

Page 9

1    A.    We had it on Wednesday of this week.
2    Q.    Did you review anything in preparation for
3 today?
4    A.    For today?
5    Q.    Yes.
6    A.    I looked at my declaration and I think
7 that's generally about it, in terms of reviewing
8 information for today.
9    Q.    Did you review your prior deposition?
10    A.    No.
11    Q.    Have you seen your prior deposition?
12    A.    I think I received it, but I haven't gone
13 through it.
14    Q.    Have you reviewed any of the other
15 depositions taken in this matter?
16    A.    In this matter?
17    Q.    In this bankruptcy.
18    A.    I have received them. I haven't gone
19 through them.
20    Q.    Have you discussed the testimony given
21 with anyone -- excuse me. Let me rephrase that.
22        Have you discussed the contents of those
23 depositions with anyone?
24    MR. STEWART: You can answer yes or no.

Page 10

1 BY THE WITNESS:
2    A.    No.
3 BY MS. BRUNO:
4    Q.    I've read your prior deposition, so I'm
5 going to endeavor not to tread the same ground that
6 you've already covered. There may be some overlap due
7 to necessity, but I am going to do my best not to ask
8 you the same series of questions and cover the same
9 territory as previously discussed of you. So, if you
10 give me a little leeway, I will do my best not to
11 waste your time today. Okay.
12        I understand that you -- that was your
13 first deposition two weeks ago, is that correct?
14    A.    That is correct.
15    Q.    And have you ever provided sworn testimony
16 in any setting outside of a deposition?
17    A.    No.
18    Q.    Your deposition on September 9th was the
19 first time you've provided any type of sworn testimony
20 in a bankruptcy proceeding?
21    A.    Yes.
22    Q.    Are there instances where you have
23 submitted written reports in other bankruptcies?
24    MR. STEWART: Can you define so he is clear what

Page 11

1 you mean by "report"?
2 BY MS. BRUNO:
3    Q.    A written declaration or report on behalf
4 of your corporation that you are working for.
5    A.    I think so. I don't recall off the top of
6 my head, but I have other bankruptcy cases that are
7 ongoing where I have submitted written reports or --
8 yeah, specific information that is pertinent to the
9 case or -- or Ernst & Young's engagement in connection
10 with a case. So, I don't know if that's what you are
11 referring to with specific questions on sworn
12 testimony, but I have provided specific information in
13 other Chapter 11 cases that I'm involved in.
14    Q.    Focusing on Chapter 9 bankruptcies, can
15 you tell me what Chapter 9 bankruptcies you have
16 provided such information in?
17    A.    None.
18    Q.    Is this the first Chapter 9 bankruptcy
19 you've done work on?
20    A.    Yes.
21    Q.    Before your work for the City of Detroit
22 in this matter, do you have experience with working
23 with other governmental clients?
24    A.    I do.

Page 12

1    Q.    Approximately how many?
2    A.    I would say the most relevant one is
3 Detroit public schools.
4    Q.    Are there others besides Detroit Public
5 Schools?
6    A.    I am involved in other situations that are
7 in the public sector currently.
8    Q.    Can you tell me what those are?
9    A.    No. Those are confidential.
10    Q.    You have not been disclosed publicly in
11 any of those matters?
12    A.    That is correct.
13    Q.    Outside of the City of Detroit matter, are
14 there -- and the ones that you are working on
15 currently, are there any other governmental clients
16 you have done work for?
17    A.    Personally, no. I think those are the
18 ones that -- that I can recall.
19    Q.    Focusing on the Detroit Public Schools,
20 what type of work did you personally do on that
21 matter?
22    A.    I think the -- our engagement letter and
23 the contents thereof are what we did at Detroit Public
24 Schools. The overall specific scope is I would

Page 13

1  believe generally confidential.  However, I can give
2  you a broad understanding that it was generally
3  related to liquidity forecasting and looking at
4  different assumptions with respect to cost saving
5  measures, and I think that's all I will say on that.
6      Q.   Is that engagement still ongoing?
7      A.   I'd rather not answer that.
8      Q.   When did that engagement begin?
9      A.   It was in 2011, is my recollection.  It
10  could have been earlier, but that's my general
11  recollection.
12      Q.   Mr. Malhotra, I'm going to direct you to
13  your declaration, which was previously marked as
14  Exhibit 1 in your prior deposition.
15          Do you have a copy of it or would you like
16  me to provide it to you?
17      A.   I would like you to provide it to me,
18  please.
19              (WHEREUPON, the document was tendered
20              to the witness.)
21  BY MS. BRUNO:
22      Q.   Directing your attention to Paragraph 6,
23  Mr. Malhotra, you are describing some of your
24  experience in Paragraph 6.  And the second sentence

Page 14

1  states, "In addition, in the public sector, I was
2  involved in the recent restructuring efforts of
3  Detroit Public Schools," as you previously testified,
4  that's correct, correct?
5      A.   Yes.
6      Q.   Is there any other experience outside of
7  Detroit Public Schools that you can publicly disclose?
8      A.   In the government sector?
9      Q.   In the public sector.
10      A.   In the public sector, I would not want to
11  disclose any of the other engagements.
12      Q.   And those are all engagements that are
13  currently ongoing?
14      A.   Up to a certain extent, yes, there is work
15  that's pending or about to get initiated or in certain
16  cases, certain aspects have been completed, but in
17  general, yes.
18      Q.   Paragraph 7 of your declaration states
19  that you were engaged by the City in May of 2011,
20  correct?
21      A.   That's what it states, yes.
22      Q.   Is that an accurate statement?
23      A.   Yes.
24      Q.   How was that engagement undertaken?

Page 15

1      MR. STEWART:  Objection.
2  BY MS. BRUNO:
3      Q.   My -- what I'm trying to get to, was there
4  an RFP or how were you contacted about that engagement
5  initially?
6      A.   It was based on the work we did at Detroit
7  Public Schools is the way that we had discussions with
8  the Mayor's office, with the State Treasurer's office
9  and thereby our engagement or our work got initiated
10  with respect to liquidity forecasting.
11      Q.   I just need some clarification on your
12  answer.
13          When you say that you had discussions with
14  the Mayor's office and the State Treasurer's office,
15  were those discussions related to Detroit Public
16  Schools or are these new discussions that were
17  initiated with respect to the City of Detroit
18  bankruptcy?
19      A.   The latter.
20      Q.   The latter?
21      A.   I'm sorry.  Nothing related to the
22  bankruptcy.  It was related to the City of Detroit.
23  Just to clarify, it wasn't related to the City of
24  Detroit bankruptcy.

Page 16

1      Q.   Correct.
2          And what was the nature of those
3  discussions?  Can you give me so more information?
4      A.   Sure.  It was generally to see how -- how
5  EY could help with looking at the City's liquidity
6  position and helping forecast what the liquidity
7  position could be over a short period of time.
8      Q.   Approximately when were those discussions?
9  When did those discussions take place?
10      A.   I think it was right around this
11  particular timeframe, around the May of 2011, is my
12  recollection.
13      Q.   Who were those discussions -- who did
14  those discussions involve?  Did they -- from the
15  Ernst & Young side, did they involve you?
16      A.   Yes.
17      Q.   Or someone else?
18      A.   Me.
19      Q.   You solely or you in addition to other
20  people?
21      A.   It was generally myself.
22      Q.   On the side of the City, who was involved
23  in those initial discussions?
24      A.   Now we are going back some time, but I

1 would think it would have been the former Chief of
2 Staff Kirk Lewis, it would have been the former Chief
3 Operating Officer Chris Brown. I think those are the
4 folks at least I remember. It could have been the
5 Mayor, but I don't recall at this juncture.
6    Q.   And can you give me some more detail on
7 what you understood your engagement would include in
8 those initial discussions?
9    A.   Sure. It was just to get an understanding
10 of what the City's cash flow position was and what the
11 short-term outlook for the City's liquidity
12 projections could look like.
13    Q.   Was there any discussion about the
14 prospect of the City filing Chapter 9 bankruptcy in
15 those initial discussions?
16    A.   No.
17    Q.   Prior to entering into the engagement, was
18 there any formal presentation or pitch provided by
19 Ernst & Young?
20    A.   I do not recall.
21    Q.   If there was one, would you have been part
22 of it?
23    A.   Yes.
24    Q.   Mr. Malhotra, I'm going to hand you what

1 we're going to mark as Exhibit 8.
2    MR. TEELE: I'm sorry. What number?
3    MS. BRUNO: 8.
4       (WHEREUPON, a certain document was
5       marked Malhotra Deposition
6       Exhibit No. 8, for identification, as
7       of 09/20/13.)
8 BY MS. BRUNO:
9    Q.   And you can take your time to look at this
10 document. I'm going to ask you some questions about
11 it. Let me know when you are ready to proceed with
12 some questions.
13    A.   Sure. I'm ready.
14    Q.   Mr. Malhotra, I'll represent to you that
15 I've handed you what is titled Amendment No. 7 to
16 Statement of Work.
17       Can you tell me what this document is?
18    A.   This is our most recent engagement letter
19 with the City.
20    Q.   And reviewing the introductory paragraph,
21 it is clear that there was an original agreement,
22 correct?
23    A.   That is correct.
24    Q.   And that this is Amendment No. 7 to that

1 original agreement, correct?
2    A.   That is correct.
3    Q.   In your prior deposition, there was a
4 request made for the production of the original
5 engagement letter.
6       Do you recall that?
7    A.   Possibly. I don't recall specifically
8 because there were a lot of requests, but this -- I
9 assume this is the engagement letter you are referring
10 to, but if there is more, probably --
11    MR. STEWART: It was memorialized in a letter
12 you responded to.
13    THE WITNESS: Okay.
14 BY MS. BRUNO:
15    Q.   Mr. Malhotra, I'll represent to you this
16 is the only document that we've been able to locate
17 with respect to the Ernst & Young engagement, so I'm
18 going to have to use this to kind of backtrack because
19 I don't have a copy of the original engagement letter.
20    A.   Sure.
21    Q.   And we'll request that an additional
22 effort be made to produce that to your counsel.
23    MR. STEWART: If you could, just do that in a
24 letter after we are done, so otherwise it gets

1 confusing to try and go back to the transcript.
2    MS. BRUNO: We will do that.
3 BY MS. BRUNO:
4    Q.   Can you tell me, Mr. Malhotra, in the
5 original SOW or original agreement, was there similar
6 to what's in this a bullet point listing of the items
7 that would be included in the original statement of
8 work?
9    A.   Yes.
10    Q.   Who drafted the specific items that would
11 be involved in the original statement of work?
12    A.   It would have been myself along with the
13 rest of the team.
14    Q.   When you say "the rest of the team," who
15 are you referring to?
16    A.   I would say the rest of the EY team that
17 would have gone through all of our quality review team
18 that looks at any scope of work with respect to what
19 we are putting out in general would be the folks from
20 our EY standpoint.
21    Q.   How is that process, and what I'm
22 referring to is the identify -- let me start over.
23       How does that process work, and I'm
24 talking about the identification of the specific

Page 21

1  elements of the statement of work, what was the
2  process used in this matter?
3      MR. STEWART:  Objection.
4  BY THE WITNESS:
5      A.   In -- well, maybe if I can give you
6  specifics, so in terms of how this statement of work
7  is put together, which in general is the process that
8  we go through for any statement of work, is that we
9  highlight what work the client may require and what
10  work we may be -- what we will be willing to do.
11  Generally the statement of work is sometimes then, of
12  course, all reviewed by other members of the team in
13  terms of the deal team.  It is reviewed by our general
14  counsel's office, unless they are -- unless the
15  amendments are fairly basic in nature are generally
16  just extending some of the prior work, but it's
17  reviewed by our quality review folks.  And then the
18  engagement letter is submitted to the client for --
19  for what they need to sign on, not necessarily are all
20  aspects of the scope of work defined with any sort of
21  a specific deliverable.  So sometimes there are
22  components of a statement of work that are not
23  undertaken and sometimes they are -- and most of the
24  times they are, but, so, I don't know if that answers

Page 22

1  your question or not.
2      Q.   That's part of it.  And I was interested
3  in that, so that's helpful.
4          But where I'm trying to get to, is there a
5  negotiation process with, for example, in this case
6  the City where you provide the original statement of
7  work and they come back to you and say, we want this
8  or we don't want that?  Did that process take place in
9  this engagement?
10      A.   I'll tell you at least with respect to
11  this particular statement of work, there was feedback
12  that we received in the context of fees, but not
13  necessarily in the context of the scope of work.
14      Q.   And I'm seeking a clarification here.
15          Are you talking about Amendment No. 7 or
16  are you talking about the original statement of work
17  or the original agreement?
18      A.   I was talking about Amendment No. 7.
19      Q.   Okay.
20      A.   But in general, going back, I don't recall
21  of specific discussions or back and forth in terms of
22  the contents of the scope of work.  I have not gone
23  through the seven amendments going back for this
24  process, but I'm sure there would be certain aspects

Page 23

1  of that statement of work, of the different statements
2  of work that would have been completed in its entirety
3  and there would be certain that wouldn't have been
4  kicked off at all, depending on these are long-term
5  engagements and the needs of the client change over a
6  course of time.
7      Q.   If you look to the first sentence of the
8  Amendment No. 7, Statement of Work, halfway through it
9  states -- I want to make sure I give you the right
10  dates here before --  well, I have a couple of
11  questions.
12          So, in this case, Amendment No. 7 is dated
13  July 17th, is that correct?
14      A.   That's correct.
15      Q.   But it's effective as of June 1st?
16      A.   That is correct.
17      Q.   Which is approximately six weeks prior,
18  correct?
19      A.   Yes.
20      Q.   What is the reason for that lapse of time?
21  Why is it essentially backdated or effective as of a
22  prior date?
23      A.   Because our work that is involved in the
24  statement of work started right around the June 1st

Page 24

1  timeframe.  And -- but, however, between the process
2  of getting the actual engagement letter signed, it
3  took roughly that six weeks process.  But in general,
4  the work that's contained in Amendment No. 7 started
5  by around that June 1st timeframe.
6      Q.   What was the cause for the six-week time
7  delay?
8      A.   It likely was between us getting the
9  letter together and the City having a view in terms of
10  what the fees associated with this work would be and
11  us coming back with a revised proposal on lower fees.
12  And so I think it was -- it was that timeframe between
13  the back and forth of the discussions that took place
14  to get the engagement letter signed.
15      Q.   There is a fee schedule amended -- or
16  attached to this amendment, is that correct?
17      A.   Yes.
18      Q.   And it's at page -- what is marked page 8
19  of 8 in this document.
20          Are these the fees that you were
21  discussing with the City?
22      A.   Yeah, these were -- these were the fees
23  that we were discussing with the City, yes.
24      Q.   And then based on the information in this

1  Amendment No. 7, I understand these are 65 percent
2  Ernst & Young's normal rates, is that correct?
3      A.   These are 65 percent of the standard
4  rates, yes.
5      Q.   Of the standard rates?
6      A.   Of the standard rates with respect to, you
7  know, different people and the different sub service
8  lines working on this engagement.
9      Q.   And I know that you are a principal,
10  Mr. Malhotra, so is your rate at the top end of this
11  chart here?
12      A.   Yes.
13      Q.   Is your rate $805 an hour?
14      A.   I believe the rate that is being charged
15  to the City is going to be $800 an hour for my time.
16  And, however, it is subject to an additional holdback
17  amount that is clarified in the fee arrangement as
18  proposed here depending on how long this case goes.
19      Q.   Is this rate schedule a reduction from the
20  rates that Ernst & Young was charging the City prior
21  to this amendment?
22      A.   Can you reask that question, please?
23      Q.   Is this rate schedule provided in the
24  Amendment No. 7, is this a reduction in the rates that

1  Ernst & Young was charging the City prior to the
2  Amendment No. 7?
3      A.   Through the seven amendments, Ernst &
4  Young has gone through a variety of discounts and rate
5  structures that the City has been provided, in
6  addition to hourly rates, in addition to fixed fee
7  rates. So it's a variety of overall rate structures
8  that have been used to provide the City discounts in
9  the context of the work that EY has done.
10      Q.   Who on behalf of Ernst & Young negotiates
11  those rates?
12      A.   Negotiates those rates with whom?
13      Q.   I assume the City. Is there someone else?
14      A.   No. I meant if your question was
15  internally or in terms of what rates are being
16  discussed or externally?
17          If the answer is internally, our rates are
18  standard rates. With the client, it was generally a
19  discussion that I had with respect to what our fees
20  were after discussing them with our team internally.
21      Q.   And who at the client have you had those
22  discussions with?
23      A.   It has been a variety given the fact that
24  we've been assisting the City for a while. It has

1  been a variety of folks. It included the Chief
2  Operating Officer Chris Brown; it included the
3  Emergency Manager, currently Kevyn Orr, with respect
4  to some of those discussions in general, in fact. So
5  it -- it has been generally the City, but I would say
6  in terms of Amendment No. 7, the -- we also got some
7  feedback from the State with respect to our scope of
8  work in the context of our fees.
9      Q.   What feedback did you get from the State
10  on Amendment No. 7?
11      A.   It was to lower the fees.
12      Q.   And who at the State did you have that
13  contact with?
14      A.   Rich Baird.
15      Q.   Amendment No. 7 is signed by Kevyn Orr,
16  correct?
17      A.   Yes.
18      Q.   And this is your signature on the -- on
19  page 7, correct?
20      A.   Yes.
21      Q.   Who signed the original statement of work,
22  do you recall?
23      A.   I do not. It would have either been
24  myself or Dave Williams who is our restructuring team

1  leader. It could have been either one of us, but I
2  don't recall.
3      Q.   On behalf of the City, who signed?
4      A.   I do not remember.
5      Q.   Did there -- when you entered into the
6  original engagement, who was your direct report at the
7  City?
8      A.   It was the Chief of Staff Kirk Lewis, and
9  the Chief Operating Officer -- the former Chief
10  Operating Officer Chris Brown.
11      Q.   Did there come a time where that direct
12  reporting person changed?
13      A.   Kirk Lewis has since moved on and so has
14  Chris Brown. So the answer is yes.
15      Q.   When did it change in terms of who you
16  reported to?
17      A.   It would have changed when they moved on
18  from the City.
19      Q.   And when they moved on from the City, who
20  became the people that you reported directly to?
21      A.   Generally it was Chris Andrews, the
22  Program Management Director, and the -- who was the
23  former Program Management Director and the former
24  Chief Financial Officer Jack Martin.

Page 29

1    Q.   How often would you directly communicate
2  with any of the people you directly reported to, the
3  four individuals you just named?
4    A.   It was on a weekly basis in general,
5  sometimes more often, sometimes less.
6    Q.   And let me ask:  Are you still directly
7  reporting to Chris Andrews and Jack Martin or someone
8  else?
9    A.   Chris Andrews and Jack Martin have moved
10  on from the City.  So, now it's generally Kevyn Orr
11  along with updates given to Gary Brown who is the
12  Chief Operating Officer and Jim Bonsall, the Chief
13  Financial Officer, and Kevyn Orr, of course, in terms
14  of the team that we are dealing with.
15    Q.   And how frequently do you directly
16  communicate with those individuals?
17    A.   Generally weekly, sometimes more,
18  sometimes less.  It depends on a particular week.
19    Q.   If I can direct your attention back to the
20  first paragraph of Amendment No. 7, it states that the
21  original contract is dated October 28th, 2011, but was
22  effective as of May 16th, 2011.
23        What was taking place during that
24  five-month time period with respect to the original

Page 30

1  statement of work?
2    A.   I don't recall specifically.  However, our
3  work started right around May 16th of 2011.  But
4  between the process of getting an engagement letter in
5  place that was acceptable to the City and in
6  conjunction with the template that Ernst & Young uses
7  with respect to an engagement letter, there was a lot
8  of communication between, I would say, the legal team
9  at the City and EY and the attorneys that we had
10  working on this particular engagement letter to just
11  make sure that both the City and Ernst & Young were
12  comfortable with the construct of the letter given the
13  fact that EY did not have a previous engagement letter
14  in place with the City of Detroit.
15    Q.   We discussed -- earlier in your deposition
16  we discussed the process of drafting and exchanging
17  the specific deliverables identified in Amendment
18  No. 7.
19        Do you recall that testimony?
20    A.   Can you repeat that question again,
21  please?
22    Q.   You and I just previously discussed the
23  back and forth between Ernst & Young and the City with
24  respect to the specific deliverables identified in

Page 31

1  Amendment No. 7 here.
2        Do you recall taking me through that
3  process?
4    A.   I think if you go back to the testimony, I
5  just want to make sure that I understand your specific
6  questions in terms of the back and forth.  I did
7  mention to you that there was discussions with respect
8  to the fees, but I do not recall a lot of the specific
9  back and forth on specific deliverables in
10  Amendment 7.
11    Q.   Okay.  I'm not trying to trick you.
12    A.   I'm just saying what I recall.
13    Q.   And so what I guess is the real question
14  I'm getting to was:  In the original statement of
15  work, is there a similar listing as contained on
16  Amendment 7 deliverables or anticipated deliverables
17  that E&Y would provide to the City?
18    A.   I believe they should be, yes.
19    Q.   And do you recall whether there was a
20  negotiation or process of exchanging the documents for
21  purposes of discussing the deliverables between
22  Ernst & Young and the City, with respect to the
23  original SOW?
24    A.   In terms of exchanging documents

Page 32

1  between -- discussions within EY or discussions with
2  EY and the City?
3    Q.   Discussions between EY and the City.
4    A.   I don't remember specifically in terms of
5  we had discussions back and forth around specific
6  deliverables.  I think there was a general
7  understanding in terms of the work that EY would do,
8  which would be around construct of the -- the
9  liquidity forecasting and any other cost saving
10  assumptions, trying to quantify those.  And I don't --
11  I don't believe there was a lot of back and forth with
12  respect to scope of work that EY was going to assist
13  with.
14    Q.   And, of course, there are six amendments
15  prior to the one that we're looking at now.
16        Does each of those amendments have a
17  similar listing of deliverables?
18    A.   They generally -- every amendment would
19  generally have either an extension of a scope of work
20  that's being provided or if anything new is --
21  potentially needs to get added, it would have, yes.
22    Q.   In this case does each of the prior
23  amendments, to the best of your recollection, have a
24  similar listing of deliverables or anticipated

Page 33

1  deliverables by Ernst & Young?
2      A.    Just to make sure, when you say "similar
3  deliverables," whether those deliverables or the
4  statement of work was exactly the content of what's in
5  Amendment No. 7, the answer is no.  If your question
6  is with respect to whether generally some specificity
7  around what EY would be doing, the answer is yes.
8      Q.    Okay.  Thank you.  That is what I meant.
9          What was the reason why Ernst & Young
10  provided these six prior amendments?
11      A.    It's generally to provide the same or
12  similar type of work that we started off doing with
13  liquidity forecasting, assisting in the quantification
14  of certain cost concessions that the City was having
15  discussions with -- with its union leadership, looking
16  at alternatives in terms of how liquidity could be
17  boosted, and that those were generally -- and just
18  looking at overall restructuring alternatives
19  specifically for the City in terms of how to address
20  the dire financial position that the City was faced
21  with.
22      Q.    Let me ask the question a different way.
23          How does it come about, and we'll talk
24  specifically about this engagement, how does it come

Page 34

1  about that Ernst & Young, or if it's the City, tell me
2  that, how does it come about that a decision is made
3  that an amendment needs to be made to the original
4  SOW?
5      A.    It was generally when the timeframe
6  associated with an amendment was expiring or the fees
7  associated with an amendment were not -- were not
8  being able to cover the scope of work and if there
9  were any additions that were being made to the scope
10  of work.  I would say those were the three -- or would
11  have been, in my recollection, one of the three
12  reasons why a statement of work would be extended
13  through an amendment.
14      Q.    With your experience on this engagement,
15  is it -- has it been Ernst & Young stating an
16  amendment is necessary or is it -- has it been the
17  City?
18      A.    My general recollection is that it's EY
19  that has been -- that has said that either, you know,
20  the timeframe on the engagement letter has expired,
21  and which has generally been, I would say, the -- the
22  norm, or the aspect with respect to the fees need to
23  change in the context of the scope of work.  But I
24  would say it is generally EY.

Page 35

1      Q.    If I can direct your attention to page 5
2  of the Amendment 7 SOW.  And you'll see a section
3  entitled Timetable.  And it states that you expect
4  that this -- and this is the additional summer 2013
5  services that are identified in this SOW, is that your
6  understanding?
7      A.    Yes.
8      Q.    That it will extend until December 31st,
9  2014, is that correct?
10      A.    Yes.
11      Q.    Do you anticipate an Amendment No. 8 being
12  necessary?
13      A.    That's a hypothetical question.  It
14  depends on what the City -- where the City is in terms
15  of its overall restructuring and, you know, how EY can
16  continue to add value and assist the City.
17      Q.    Turning to page 6 -- I'm sorry.  I'm
18  sorry.  Page 4 is what I wanted to send you to.
19          The last sentence on the bottom of page 4
20  states, "For the avoidance of doubt, the Services do
21  not" -- and Services with a capital S -- "do not
22  include EY serving as an expert witness in connection
23  with your Chapter 9 proceedings or otherwise."
24          Do you see that?

Page 36

1      A.    Yes.
2      Q.    And that is referring to -- the Services
3  in that sentence are referring to the services
4  identified above it and in this Amendment No. 7,
5  correct?
6      A.    Yes.
7      Q.    Are you currently providing work to --
8  scratch that.  Let me strike that.
9          Is your deposition here today considered
10  part of the services included in Amendment No. 7?
11      A.    I'm here, so my -- my assumption unless,
12  you know, Wayne Flick from Latham tells me otherwise,
13  that would be my general understanding, it would be in
14  connection with the work that we are doing on the
15  statement -- the Amendment No. 7.
16      Q.    Are there any services being provided by
17  Ernst & Young to the City right now that you are aware
18  of that fall outside of the services identified in
19  Amendment No. 7?
20      A.    I do not know of any other specific
21  increment -- additional statements of work that have
22  been executed.  There are other opportunities that EY
23  is providing some services to the City.  However, it's
24  not -- that work is just in an evaluative mode versus

Page 37

1 I believe I do not know of a specific letter or an
2 amendment that has been signed yet.
3     Q.   I want to understand your answer a little
4 better.
5         This additional work that you state is in
6 an evaluative mode, is that work that E&Y is providing
7 in connection to the bankruptcy?
8     A.   Well, I can tell you what the work is.  It
9 is not necessarily in connection with the bankruptcy.
10 The work is to look at the revenues that are
11 attributable to the City from the Detroit-Windsor
12 Tunnel and our team I believe is starting to look at
13 that.  I do not know if we have a specific signed
14 letter yet, but our team is starting to look at that
15 just to make sure the City is -- whether the City is
16 getting its proportionate share of the revenues that
17 come from the Detroit-Windsor Tunnel.  That's the one
18 that sort of, you know, is top of mind.
19        From an evaluative perspective, the City
20 is -- and EY is looking at other ways that they can
21 continue to assist the City.
22     Q.   And would you consider that work that E&Y
23 is undertaking with respect to the Detroit-Windsor
24 Tunnel, would you consider that work to be something,

Page 38

1 a separate line of work than what you are doing on
2 behalf of the City with respect to Amendment No. 7?
3     A.   I think it would generally be in line with
4 the work that we would be doing.  However, what we
5 always want to provide clarity and specificity around
6 the work stream.  So it would generally be in line
7 with the services in Amendment No. 7.  However, we
8 would always clarify and specify that these would be
9 the specific items we would be undertaking because
10 they are not necessarily clearly articulated in the
11 scope of work.
12     Q.   Approximately how much money has the City
13 paid Ernst & Young to this date in connection with
14 this engagement?
15     MR. STEWART:  Are you referring to the entire
16 engagement or No. 7?
17 BY MS. BRUNO:
18     Q.   The entire engagement.
19     A.   I do not know the exact number right now,
20 but it is somewhere in the neighborhood of 6-1/2 to $7
21 million.
22     Q.   Returning back to that last sentence on
23 page 4 of 8, do you consider what you are doing today
24 as providing expert testimony?

Page 39

1     MR. STEWART:  Objection; asking for a legal
2 conclusion.
3 BY MS. BRUNO:
4     Q.   You can answer.
5     A.   No.
6     Q.   Are you aware of any individual at Ernst &
7 Young who would be serving as an expert to the City?
8     MR. STEWART:  Objection; same objection.
9        Do you mean an expert as defined by the
10 Federal Rules?
11     MS. BRUNO:  I mean an expert as defined in
12 Amendment No. 7.
13     MR. STEWART:  So why don't you ask him what that
14 means in Amendment No. 7.
15 BY THE WITNESS:
16     A.   Could you ask your question again, please?
17 BY MS. BRUNO:
18     Q.   Sure.  That question is actually better.
19        What does Ernst & Young mean when they
20 state, "For avoidance of doubt, the Services do not
21 include Ernst & Young serving as an expert in
22 connection with the Chapter 9 proceedings"?
23     A.   I think the -- what it says is that EY is
24 basically providing its services in connection with

Page 40

1 the facts that EY has and our professionals have and
2 our team has in terms of providing services for
3 Chapter 9.  And so it's -- we are sort of assisting
4 this overall situation in the context of the overall
5 facts as have been provided to us and that information
6 that has been provided to us, which is what we have
7 used to prepare the analysis.
8     MS. BRUNO:  I'm about to go to a new area.  Do
9 you want to take a quick break?
10     MR. STEWART:  Let's keep going unless others
11 need a break.
12     MS. BRUNO:  All right.  Is that all right with
13 you, Mr. Malhotra?
14     THE WITNESS:  Sure.
15 BY MS. BRUNO:
16     Q.   Okay.  Why don't we turn back to your
17 declaration, which is Exhibit 1.
18        And I'll direct your attention to what is
19 provided at Paragraph 10 of the declaration, which is
20 on page 4.  And this paragraph discusses the cash flow
21 forecasts.
22        Who developed the actual forecast at
23 Ernst & Young?
24     A.   It was a team of EY professionals in

Page 41

1  collaboration with the team at the City and other
2  advisers that the City has retained in the preparation
3  of these cash flow forecasts.
4      Q.   Were you personally involved in that work?
5      A.   Yes.
6      Q.   And who was personally -- who are the
7  individuals that you worked with at the City on that
8  work?
9      A.   The City or EY?
10     Q.   At the City.
11     A.   At the City, it would have been the former
12 Chief Financial Officer Jack Martin, it would have
13 been the former Program Management Director Chris
14 Andrews, it would have been one of the controllers, I
15 think Rick Drumb, it would have been other members
16 from specific departments that the EY team
17 collaborated with in order to prepare those cash flow
18 forecasts and also used assumptions from what was the
19 information being provided by the other advisers the
20 City had hired.
21     Q.   What are the underlying demographic
22 assumptions for the City in the revenue forecasting?
23     MR. STEWART:  Objection.
24 BY THE WITNESS:

Page 42

1      A.   You have to repeat that question or
2  rephrase it in terms of the demographic assumptions.
3  BY MS. BRUNO:
4      Q.   In terms of the population of the City.
5      A.   The general assumptions are that there is
6  a slight population decline in the context of the
7  revenue assumptions, but I think you have to look at
8  the demographics in a greater amount of detail which
9  has been provided on the City's data site with respect
10 to the assumptions around growth of revenues from
11 residents versus non-residents in terms of the makeup
12 of the order of revenue profile.
13     Q.   I guess I'll ask for a clarification.
14         What is the assumption going forward on
15 behalf -- what is the assumption that Ernst & Young
16 has used going forward in these forecasts with respect
17 to population?
18     A.   I think it's -- it's a general decline.
19     Q.   And what is that assumption based on?
20     A.   Based on all of the trends that are very
21 evident over the last few years and looking at that
22 trend and at least adjusting as to what that decline
23 would be here in the near future and then, you know,
24 over the course of the ten years does that decline

Page 43

1  continue to go at the current rate or not.  So I think
2  you have to look at these assumptions over a longer
3  timeframe and I think you have to look at it from the
4  standpoint of what's applicable here in the next -- in
5  the short term versus what's applicable in the long
6  term.
7      Q.   Did Ernst & Young develop any scenarios
8  with a more optimistic demographic assumption?
9      A.   In terms of having?
10     Q.   Population increasing.
11     A.   I do not recall of the team having a
12 scenario in which in the short term population is
13 increasing.  And I would think that if you look at it
14 over a longer timeframe, you know, maybe there are
15 assumptions where the population decline slows, but I
16 don't recall of a scenario where in the short term
17 population is increasing.
18     Q.   In the context of your answer here, what
19 do you mean by short term?
20     A.   In the next three or four or five years.
21     Q.   Did you do any kind of ten-year
22 forecasting that assumed that the population decline
23 would either slow down or even there could be actual
24 growth in population?

Page 44

1      A.   I think that generally is what's
2  reflective in the forecasts with respect to that there
3  is a -- a reduction in the pace of the decline over
4  the -- in the outer years.  I think that is currently
5  reflective in the forecast.
6      Q.   But there are no scenarios that would
7  include an actual rise in the population, is that
8  correct?
9      A.   I don't recall.
10     Q.   You would agree that if the population
11 does grow, it would affect the results of any
12 forecasts, correct?
13     A.   If you change the assumptions, the numbers
14 will change, yes.
15     Q.   And, in fact, it could dramatically affect
16 it, correct?
17     MR. STEWART:  Objection.
18 BY THE WITNESS:
19     A.   I don't know about that.
20 BY MS. BRUNO:
21     Q.   Returning to your declaration in
22 Paragraph 10, it states that, "The work conducted by
23 Ernst & Young developing the cash flow forecasts as
24 well as the ten-year projection" -- "projections,"

Page 45

1  excuse me, "were limited to the City's general fund,"
2  is that correct?
3      A.   That is correct.
4      Q.   In other words, the projections assume
5  that there are no other funds available to the City
6  beyond the general fund, is that correct?
7      A.   It -- it assumes that the general fund
8  will not have additional funds from other funds, yeah,
9  that's generally correct.
10     Q.   What about the City having available --
11 other available funds outside of the general fund?
12     A.   The City has multiple funds outside the
13 general fund. The main one is the water and sewer,
14 which we did not perform a ten-year projection on the
15 water and sewer funds. My understanding is that those
16 funds are not necessarily available to the general
17 fund.
18     Q.   To the general fund that may be correct,
19 but it would be available to the City, would it not?
20     MR. STEWART:  Objection.
21 BY THE WITNESS:
22     A.   It would be available to the City for the
23 purposes those funds were raised for, which is
24 generally maintenance and capital improvements on the

Page 46

1  water and sewer side.
2  BY MS. BRUNO:
3      Q.   Let's backtrack a little bit. I think
4  we've gone in a different direction than I'm trying to
5  focus on.
6          My question to you is: The forecasts that
7  you provided in this declaration are limited solely to
8  the general fund, is that correct?
9      A.   They are generally limited to the general
10 fund, other than if they were other enterprise funds
11 the City was subsidizing, like the Department of
12 Transportation, those would have been included in the
13 general fund as it is a -- a fund that the City
14 subsidizes and has historically subsidized.
15     Q.   So you would agree, though, that subject
16 to your exception there that the assumptions and
17 forecasts provided in this declaration do not take
18 into account other funds available to the City?
19     MR. STEWART:  Objection.
20 BY THE WITNESS:
21     A.   You have to rephrase your question.
22 BY MS. BRUNO:
23     Q.   The forecasts and cash flows, the
24 projections, the information that is discussed in your

Page 47

1  declaration here are solely limited with the caveat
2  that you provided to the general fund, is that
3  correct?
4      MR. STEWART:  Objection.
5  BY THE WITNESS:
6      A.   The cash flow forecasts and the ten-year
7  projections with respect to the receipts and
8  disbursements and the revenues and expenses are
9  generally reflective of the general fund and the
10 Department of Transportation. That's the way I would
11 characterize it.
12 BY MS. BRUNO:
13     Q.   You would agree that the City does have
14 access to other funds, correct?
15     MR. STEWART:  Objection.
16 BY THE WITNESS:
17     A.   I don't understand when you say the City
18 has access to.
19 BY MS. BRUNO:
20     Q.   There is other enterprise funds available
21 to the City, correct?
22     MR. STEWART:  Objection.
23 BY THE WITNESS:
24     A.   Available to the City for what?

Page 48

1  BY MS. BRUNO:
2      Q.   Well, if you are talking about the cash
3  available to the City, certainly there is other
4  sources of cash available to the City outside of the
5  general fund, you would agree with that?
6      MR. STEWART:  Objection.
7  BY THE WITNESS:
8      A.   No. It depends on what purpose you are
9  asking the question, the context of.
10 BY MS. BRUNO:
11     Q.   You would agree with me that the general
12 fund is not the only source of available cash to the
13 city, would you not?
14     MR. STEWART:  Objection.
15 BY THE WITNESS:
16     A.   The general fund -- the cash that is
17 available to the general fund is generally the only
18 cash that is available to the City for its core
19 operations that are not related to any other
20 enterprise funds. So, my answer would be, that the
21 cash flows that are reflective in here and are
22 generally available for the general fund is the City's
23 operating cash in general.
24 BY MS. BRUNO:

Page 49

1  Q.  How do you have that understanding?
2  A.  That is my general understanding.  So,
3  my -- my understanding is that the monies that are
4  available or are attributable to the bank accounts of
5  the enterprise funds have specific reasons for what
6  that cash can be spent.  So we have made the
7  assumption that that cash is not available for the
8  general fund.  But I would think that would be a
9  further legal determination.  It is our understanding
10  that that cash is not available to fund the operations
11  of the general fund.
12  Q.  And how did you obtain that understanding?
13  That's what I'm trying to get to.
14  A.  I don't recall.  That's our general
15  understanding that there are revenue bonds that have
16  been issued at the Water and Sewer Department, and
17  those revenue bonds are associated with specific
18  maintenance and capital improvements for the Water and
19  Sewer Department, and that those funds are generally
20  not available to fund the operations of the general
21  fund.
22  Q.  Do you recall having a conversation with
23  anyone at the City to that effect?
24  A.  Yes.  I'm -- I think all of the

Page 50

1  discussions from the very front end of our engagement
2  would have been in the context that, you know, whether
3  any other cash is available, so the answer would be
4  yes.
5  Q.  Who at the City do you recall having that
6  conversation with?
7  A.  I don't recall of a specific conversation,
8  but I'm sure that the discussions would have been with
9  Chris Brown and with Kirk Lewis and any of the other
10  folks that we have reported to during the City, but I
11  do not recall of a specific conversation in terms of
12  the funds available to the Water and Sewer Department.
13  Q.  If I turn your attention to Exhibit 8,
14  which is the Amendment 7 to the SOW, on page 2 there
15  are a number of specific references to work and
16  analysis of the City's general fund.  And it's in many
17  places defined General Fund with a capital G and a
18  capital F.
19  Do you see what I'm referring to?
20  A.  Yes.  I'm trying to find the capital G and
21  the capital F, but I generally -- I'm on page 2, that
22  the context is for the general fund.
23  Q.  Sure.  Just if you look at the second bold
24  bullet point, "Preparation of 10-Year tax revenue

Page 51

1  estimates for the General Fund."
2  A.  Okay.
3  Q.  That's one example that I can see.
4  Are there similar -- my question is -- I'm
5  trying to get to the original SOW.  I'm using the
6  Amendment 7 to discuss the original SOW.
7  Did the original SOW limit the work to the
8  general fund in the same way that Amendment No. 7
9  does?
10  A.  I don't recall specifically.  But I can
11  say that earlier on in our engagement, I would say in
12  the 2011 timeframe, we were looking at the cash flows
13  of the water and sewer fund and the other enterprise
14  funds as well.  But that process stopped, I would say,
15  in the first four or five or six months of the
16  engagement because there was sort of water and sewer
17  funds were tracking their cash on their own, and so
18  were some of the other enterprise funds, that our
19  focus really was on the general fund.
20  But just for clarity, the work that would
21  have been done in the front end was to look at the
22  funds that water and sewer had and the receipts and
23  disbursements associated with that versus any
24  transfers that were coming back to the general fund.

Page 52

1  So they were looking at those forecasts in isolation.
2  But that work sort of stopped I think right around in
3  the first four or five months of the engagement.
4  Q.  And why did that work stop?
5  A.  It was because the focus continued to be
6  on the general fund and these were self-sustaining
7  funds with respect to at least the Water and Sewer
8  Department.  And so they were monitoring their -- and
9  dealing with their cash activity, although connected
10  to the City, but we weren't helping forecast receipts
11  and disbursements because they were not impacting the
12  general fund.
13  Q.  You previously testified in your prior
14  deposition that Ernst & Young was not asked to look at
15  possible disposition of City assets, is that correct?
16  A.  That's correct.
17  Q.  Why -- did you have a discussion with the
18  City regarding whether that would be valuable work for
19  Ernst & Young to provide?
20  MR. STEWART:  Objection.
21  BY THE WITNESS:
22  A.  I -- I'm not sure I follow the question.
23  BY MS. BRUNO:
24  Q.  How did it come about that Ernst & Young

Page 53

1  didn't evaluate the value of disposition of some of
2  the City assets?
3      A.   It was not a part of our scope of work.
4      Q.   You would agree that there could be cash
5  value to the disposition of some of those assets,
6  would you not?
7      MR. STEWART:  Objection.
8  BY THE WITNESS:
9      A.   I think that's a better question to ask
10  for the City's investment banker.
11  BY MS. BRUNO:
12      Q.   Well, I'm not talking about the specific
13  numbers here, but you know what some of the assets
14  available to the City are, correct?
15      A.   In general, yes.
16      Q.   And you understand that some of those
17  assets could be valuable or quite valuable, correct?
18      MR. STEWART:  Objection.
19  BY THE WITNESS:
20      A.   It depends on what assets you are talking
21  about.
22  BY MS. BRUNO:
23      Q.   Why don't we look at Exhibit No. 4 -- oh,
24  I'm sorry.  I'll hand it to you.  Exhibit No. 4 from

Page 54

1  your prior deposition, I'll hand it to you.  It was
2  the Proposal For Creditors --
3      A.   Okay.
4      Q.   -- dated June 14.
5           And I believe the assets are identified on
6  90.  And it is 90 of the computer generated numbers on
7  the bottom.
8           And on pages 90 through 96, the
9  presentation discussed various assets that the City
10  could derive some cash benefit from, correct?
11      MR. STEWART:  Objection.
12  BY THE WITNESS:
13      A.   Yes.
14  BY MS. BRUNO:
15      Q.   And, well, I don't want to quarrel or even
16  discuss with you what the actual specific value of any
17  one of those assets are, but you would agree that the
18  implementation of any of these proposals would improve
19  the City's cash position, would it not?
20      MR. STEWART:  Objection.
21  BY THE WITNESS:
22      A.   Here is what I would say.  The current
23  ten-year projections right now do not include any
24  incremental proceeds that could be available to the

Page 55

1  City from asset sales.  And that's where I -- because
2  that's what's very clearly laid out in the proposal.
3           If there are proceeds available that are
4  available to the City, those numbers would change.
5  But I can at least highlight and articulate what the
6  assumptions are with respect to the ten-year forecast
7  that the City has put out.
8  BY MS. BRUNO:
9      Q.   And so your assumptions include that none
10  of these assets will be disposed of in any way, is
11  that correct?
12      A.   That's generally correct.
13      Q.   Sticking with Exhibit No. 4 before you, if
14  you'd turn to page 80 of the document.  I'm sorry.  I
15  should say 87 of the computer generated numbers.
16           And this is a portion of the presentation
17  that discusses increasing the tax collection.  You
18  look like you are on a different page than I am here.
19      A.   87.
20      Q.   You've got it?
21      A.   Yes.
22      Q.   You would agree that increasing the tax
23  collection rates and improving the collection of past
24  due taxes could materially improve the City's

Page 56

1  financial position, could it not?
2      MR. STEWART:  Objection.
3  BY THE WITNESS:
4      A.   Yeah, I can't answer that because I do not
5  know the magnitude of what you are referring to in
6  terms of your question and what the definition of
7  material is.
8  BY MS. BRUNO:
9      Q.   Well, the presentation here, the June 14th
10  presentation discussed at the fourth bullet down
11  identifies approximately $250 million of unpaid or
12  outstanding tax debts.  If those debts would be --
13  could be addressed and collected, that would be a
14  material improvement in the cash position, would it
15  not?
16      MR. STEWART:  Objection.
17  BY THE WITNESS:
18      A.   This amount that has been identified by a
19  third party, Compuware, for $250 million, I do not
20  know what portion of it has been included specifically
21  in the work with respect to collection efforts that
22  Conway MacKenzie has done, but my assumption is it
23  wouldn't have been to the magnitude of $250 million.
24           So, if $250 million were collected, it

Page 57

1 would improve the overall profile is my assumption.
2 BY MS. BRUNO:
3     Q.   I have heard estimates that a more
4 accurate estimate of outstanding tax debt is
5 significantly higher than $250 million.
6          Are you familiar with these higher
7 estimates that are being discussed?
8     MR. STEWART:  Objection.
9 BY MS. BRUNO:
10    Q.   Have been discussed?
11    MR. STEWART:  Objection.
12 BY THE WITNESS:
13    A.   No.
14 BY MS. BRUNO:
15    Q.   You have not heard that the outstanding
16 tax debt available to the City could be as much as
17 $700 million?
18    A.   I have not heard that, that I recall.
19    Q.   To be clear, your forecasts don't account
20 for the collection, any type of truly significant to
21 this degree of outstanding debt, is that correct?
22    MR. STEWART:  Objection.
23 BY THE WITNESS:
24    A.   That's correct.

Page 58

1     MS. BRUNO:  Why don't we take a quick break.  I
2 don't -- I only need about ten minutes for a break.
3          (WHEREUPON, a recess was had
4              from 10:57 to 11:08 a.m.)
5 BY MS. BRUNO:
6     Q.   Mr. Malhotra, when we were talking about
7 funds available to the enterprise, I believe you
8 discussed the water and sewer funds.
9          Are you aware of other funds available to
10 the enterprise?
11    A.   Other funds that are available to
12 enterprise funds?
13    Q.   Enterprise funds available to the City.
14 I'm sorry.
15    MR. STEWART:  Objection, by the way, to the
16 phrase "available to the city."
17 BY THE WITNESS:
18    A.   I do not believe that there are, that I
19 know of, other enterprise funds' funds that are
20 available to the City.
21 BY MS. BRUNO:
22    Q.   Returning to your declaration, I'll direct
23 your attention to Paragraph 14.
24          In that paragraph you discuss that E&Y's

Page 59

1 forecasts and analysis was based upon the
2 comprehensive annual finance report of the City, the
3 C-A-F-R, CAFR.
4          Do you see where you discuss that in this
5 paragraph?
6     MR. STEWART:  Objection.
7 BY THE WITNESS:
8     A.   It was one of the documents that -- that
9 we used in terms of helping pull together the
10 forecast.
11 BY MS. BRUNO:
12    Q.   Was -- it was the primary document,
13 correct, primary document, wasn't it?
14    MR. STEWART:  Objection.
15 BY THE WITNESS:
16    A.   No.
17 BY MS. BRUNO:
18    Q.   What would you consider to be the primary
19 document then?
20    A.   There was not one single primary document.
21 It was a compilation of all of the different sources
22 of data that we got that included the CAFR, that
23 included the raw files that we got from the City, that
24 included some of the information we saw in terms of

Page 60

1 bank activity, in terms of looking at, you know, a lot
2 of the information together, but I can't recall that
3 there was one primary document that we relied upon.
4     Q.   The 2012 CAFR is relied upon and
5 identified over 30 times in your declaration.
6          Does that seem like a reasonable estimate
7 to you in terms of how many times it's cited in your
8 declaration?
9     MR. STEWART:  Objection.
10 BY THE WITNESS:
11    A.   It's cited in the context of the
12 outstanding debt balances that the City has, and so I
13 think it's a reasonable assumption with respect to the
14 outstanding indebtedness of the City, which is where
15 the CAFR has been referenced as a document.
16 BY MS. BRUNO:
17    Q.   And thus you would agree then that Ernst &
18 Young relied upon this information in creating its
19 assumptions and forecasts, correct?
20    A.   It was one of the documents that we refer
21 to, yes.
22    Q.   But you did not audit that information,
23 did you?
24    A.   That is correct.

Page 61

1    Q.   And what kind of stress testing or
2    analysis did you undertake with respect to that
3    information to ensure that it was accurate?
4        MR. STEWART:  By that information, you mean CAFR
5    or something else?
6        MS. BRUNO:  I mean CAFR.  Thank you.
7    BY THE WITNESS:
8        A.   The CAFR is the City's audited financial
9    statement.  We did not run separate stress tests on
10   the -- or the information that was applicable from the
11   CAFR, but like I said, it was one of the documents
12   that we used in terms of coming up and assisting the
13   City come up with the forecast.
14   BY MS. BRUNO:
15       Q.   You are aware, though, that it is well
16   documented that the City's financial recordkeeping was
17   both inadequate and contained numerous deficiencies,
18   correct?
19       MR. STEWART:  Objection.
20   BY THE WITNESS:
21       A.   The information that we were generally
22   looking at was for the context of cash in which the
23   CAFR was not a primary source.  With respect to
24   looking at the debt balances that the City had, we did

Page 62

1    look at the CAFR.  I am not aware of specific
2    deficiencies in the context of the debt balances the
3    City was reporting in the CAFR, but I have not audited
4    any of that data.
5    BY MS. BRUNO:
6        Q.   You are aware that the Financial Review
7    Team that undertook work for the City found many
8    deficiencies with the recordkeeping of the financials
9    of the City, are you not?
10       MR. STEWART:  Objection.
11   BY THE WITNESS:
12       A.   I don't recall specifically, but generally
13   the -- the quality of information from the systems
14   that have been available, you know, has -- has to be,
15   you know, reviewed in order to make sure that we are
16   using reasonable assumptions.
17   BY MS. BRUNO:
18       Q.   And what review was undertaken by Ernst &
19   Young to ensure that this was reliable information to
20   generate assumptions from?
21       A.   When you say "this," is it --
22       Q.   CAFR, in this instance.
23       A.   From the CAFR, it's the -- the information
24   that has been reported with respect to the outstanding

Page 63

1    indebtedness of the City.  We did not go back and do
2    original debt documents to try and ascertain whether
3    the documentation of the CAFR was accurate or not.
4        Q.   I'm going to hand you what was previously
5    marked as Exhibit 3 at your deposition.  Hold on.
6        I'll give you a moment to look at this,
7    Mr. Malhotra, but this is the February 19th memorandum
8    generated by the Detroit Financial Review Team.
9        Have you seen this document before,
10   Mr. Malhotra?
11       A.   Yes, I have.
12       Q.   And if I can direct your attention to --
13   the number is going to be hard to follow, but it's
14   marked 2 at the bottom of the page, but it's -- it is
15   an attachment to the actual memoranda.  So the top of
16   the page says "Finding 2012-02."  Let me know when --
17       A.   I'm there.
18       Q.   You are there, okay.
19       And the "Finding 2012-02" relates to
20   reconciliations, transaction processing, account
21   analysis and document retention.  Is that what you
22   read there?
23       A.   Yes.
24       Q.   I'm going to read from the last sentence

Page 64

1    of the first paragraph, and the findings of the
2    Detroit Financial Review Team were that, "During the
3    audit, we noted deficiencies in the areas of
4    transaction processing, account analysis, data
5    integrity, reconciliation performance, and document
6    retention."
7        Do you see where it says that?
8        A.   Yes.
9        Q.   Did you understand that that was the state
10   of the financial recordkeeping of the City when you
11   undertook your work for the City?
12       MR. STEWART:  Objection.
13   BY THE WITNESS:
14       A.   I can't recall.
15   BY MS. BRUNO:
16       Q.   Another finding, and I'm going to the next
17   immediate paragraph, is:  "The City's process to
18   identify accrued expenses is not adequate.  Our audit
19   procedures identified expenditures related to fiscal
20   year 2012 that were not appropriately recorded as
21   expenditures in fiscal year 2012."
22       Do you see that?
23       A.   I see it, yes.
24       Q.   Would you agree with me that there are

Page 65

1 noted issues and problems with the recordkeeping of
2 the City?
3     MR. STEWART: Objection; the document speaks for
4 itself. There is no evidence he wrote it.
5 BY THE WITNESS:
6     A. That's what the statement says. So, I'm
7 not sure I fully understand what your question is.
8 BY MS. BRUNO:
9     Q. Did Ernst & Young do anything to ensure
10 that the information that they evaluated and relied
11 upon was accurate information to draw assumptions
12 from?
13     A. Who is "they"?
14     Q. Ernst & Young. The question -- let me
15 rephrase the question. That might help.
16         Did Ernst & Young do anything to ensure
17 that the information that Ernst & Young evaluated and
18 relied upon as received from the City was accurate
19 information that you could draw assumptions from?
20     A. EY did -- our team based on the data that
21 was received did go through the information to make
22 sure that the assumptions we were using were
23 reasonable.
24     Q. And what would be the process that Ernst &

Page 66

1 Young would go through to make sure that information
2 used was reasonable?
3     A. Well, it would generally have been that if
4 we were receiving some information, we would try and
5 review what other documentation may or may not be
6 available to support any trends from a historical
7 perspective and whether the information was
8 consistent, and if it was not consistent, if there
9 were any major outliers, speak to the team at the City
10 to try and understand what changes may be happening.
11         So, I'm comfortable that what we undertook
12 as an analysis of the information that was presented
13 by the City after asking questions that we were using
14 reasonable assumptions.
15     Q. This process that you just outlined, can
16 you recall any specific instances where Ernst & Young
17 determined that the financial information received
18 from the City contained either an outlier or an error?
19     A. This was generally a collaborative
20 process. So, there was exchange of information
21 between the City and the EY team on a regular basis.
22 And so I can't recall something off the top of my
23 head, but my point is that this was generally an
24 iterative and a collaborative process of exchanging

Page 67

1 information and assumptions back and forth.
2     Q. Just to be clear, are you aware of any
3 instance or any specific circumstance of -- at all
4 where Ernst & Young went back to the City and said, I
5 think there is a problem with the information you
6 provided?
7     A. I am sure there were several conversations
8 in which we were challenging and asking questions with
9 respect to the data that we were receiving, but I
10 don't recall of any one specific instance off the top
11 of my head that stands out versus not.
12     Q. Can you give me one example of any
13 instance where Ernst & Young challenged the
14 information received and went back to any department
15 in the City where the information came from to verify
16 or better understand a problem with the information
17 received?
18     MR. STEWART: Objection to form.
19 BY THE WITNESS:
20     A. There were instances when we were
21 receiving reports on cash collections that were not
22 appropriately categorized and which -- and which we
23 went back and, you know, further evaluated as to, you
24 know, what the -- where those cash receipts really

Page 68

1 actually belonged in terms of income taxes or property
2 taxes. They were -- that's one example.
3         There were questions with respect to the
4 amount of accounts payable outstanding that the City
5 was reporting and, you know, if there were more
6 invoices than that were actually entered into the
7 system or not. So, there have been a variety of
8 back-and-forth conversations on different topics which
9 is part of what we actually are helping at the City
10 with is to try and get our arms around reasonable
11 assumptions around the data that is available.
12 BY MS. BRUNO:
13     Q. Why don't we turn back to Exhibit 4, which
14 is the June 14 proposal. And I'll direct your
15 attention to what is page 68 of 135 in the electronic
16 numbering. And this relates -- the questions that I'm
17 going to ask you relate to the restructuring and
18 reinvesting initiatives.
19         Why is the City spending $1.25 billion on
20 these initiatives?
21     A. I think it's in general to improve the
22 quality of safety as well as blight removal in the
23 City. The specifics of that as to how that number was
24 brought about is something that should be discussed

Page 69

1 with the Conway MacKenzie team as they were looking at
2 the reinvestment portion to the City.
3    Q.   Did Ernst & Young have any role in
4 determining the amount the City would spend on these
5 reinvestment initiatives?
6    A.   In aggregate, no.
7    Q.   How about in specific to any one
8 initiative?
9    A.   Not -- not in the context of the $1.25
10 billion.
11       Just for clarity, there were assumptions
12 that were involved in the base case with respect to
13 what initiatives or certain initiatives the City had
14 already started.  And so that part was clarified with
15 respect to what assumptions were already included in
16 the base case versus not, that would have been
17 included in the reinvestment costs into the City.
18    Q.   I guess I'm not sure that we communicated
19 on that.
20       Did E&Y have any role in determining the
21 amount of money that would go into any particular
22 investment -- initiative or investment --
23 reinvestment?  Excuse me.
24    MR. STEWART:  Objection.

Page 70

1 BY THE WITNESS:
2    A.   In the context of the $1.25 billion, I
3 don't recall of a specific initiative where EY
4 articulated a certain dollar amount that needed to be
5 invested for a specific initiative.
6 BY MS. BRUNO:
7    Q.   Were there specific initiatives that E&Y
8 took a more significant role in providing guidance or
9 advice for?
10    MR. STEWART:  Objection.
11 BY THE WITNESS:
12    A.   Not as a part of the $1.25 billion that's
13 been highlighted here.  I do not recall -- there were
14 conversations so that all of the team members
15 understood the assumptions with respect to what was
16 already included in the base case, but I do not recall
17 of any specific guidance in which EY played a greater
18 role in one line item versus the other in the context
19 of that 1.25 billion.  That's my recollection.
20    Q.   What is the -- what is the impact of these
21 initiatives on revenue collection?
22    A.   With respect to the revenue collection,
23 there are two components.  One is the overall increase
24 that may come about from the overall improvement in

Page 71

1 the services that are provided as -- and
2 correspondingly the revenues that are associated with
3 increased fees or fines or some collection rates that
4 may be attributable to specific investments.  There is
5 another source of potential upside, which EY was
6 involved in, with respect to making certain
7 assumptions on if there is a cleaner and safer City,
8 should the overall recovery in terms of the tax
9 collections the City will have are potentially better
10 than in a scenario where there is no investment in
11 either public safety or blight removal.
12    Q.   And what was Ernst & Young's involvement
13 in that second assumption?
14    A.   Like I said, EY helped formulate the
15 assumptions with respect to how that there could be a
16 scenario where the revenues could increase based on
17 making some of these investments because the
18 likelihood of having a cleaner and safer City, that
19 will likely rebound faster than a City that is not.
20 Those assumptions are reflected in the current
21 ten-year proposal.
22    Q.   How are they reflected in the ten-year
23 proposal?
24    A.   If you look at page -- if you look at

Page 72

1 page -- I'm trying to find the page.
2       On page 105 of 135 -- or actually, 104 of
3 135, under the "reinvestment expenditures and
4 adjustments," under the line item that says "increased
5 tax revenues," that amounted to over a ten-year period
6 roughly $334.5 million.  That was the assumption that
7 overall can the growth rate assumptions that are
8 incorporated in the baseline, can they be made -- will
9 they likely get better in the scenario that you have a
10 restructured city with better operations and a cleaner
11 and safer city.
12    Q.   And that is why the increased tax revenues
13 are increasing over the course of that ten-year
14 period, is that correct?
15    A.   That is correct, that's generally the
16 trend.
17    Q.   State revenue sharing is a source of
18 revenue for the City, correct?
19    A.   Yes.
20    Q.   Do you know why it declined from $250
21 million in 2008 to $173 million in 2012?
22    A.   I believe that was what Detroit's share of
23 the reduction was as the State reduced state revenue
24 sharing --

Page 73

1        (WHEREUPON, there was a short
2        interruption.)
3        MR. STEWART:  Why don't we repeat the question
4   and partial answer.
5        MS. BRUNO:  Sure.
6   BY MS. BRUNO:
7        Q.    Do you know why that amount declined from
8   $250 million in 2008 to $173 million in 2012?
9        A.    That was a part of the overall reduction
10  for Detroit's part as the State reduced state revenue
11  sharing for a significant number of cities and
12  municipalities and schooling districts.  That was what
13  Detroit's relevant share of the decline was.
14       Q.    Do you know how Detroit's relevant share
15  was determined?
16       A.    No.
17       Q.    Do you know whether it was determined by a
18  specific decision or a formula?
19       A.    No.
20       Q.    Wouldn't the City be in a better position
21  today if it continued to receive the same level of
22  contribution it received years ago?
23       MR. STEWART:  Objection.
24  BY THE WITNESS:

Page 74

1        A.    If you change the assumptions in terms of
2   the revenues and assuming that there are no changes in
3   any of the expenses, I would say the answer would be
4   yes.
5   BY MS. BRUNO:
6        Q.    What are you aware of with respect to
7   actions taken by the City to support -- to pursue
8   support from the State of Michigan, including pension
9   contribution -- contributions and other support?
10       A.    I'm sorry.  I don't understand your
11  question.
12       Q.    What are you aware of with respect to
13  actions taken by the City to pursue support from the
14  State of Michigan regarding pension contributions and
15  other support?
16       MR. STEWART:  Objection.
17  BY THE WITNESS:
18       A.    Can you rephrase that question, please?
19  BY MS. BRUNO:
20       Q.    Sure.  Maybe we're not communicating here.
21       Are you aware of actions taken by the City
22  to pursue support from the State of Michigan,
23  including pension contributions and other support?
24  Are you aware of actions taken by the City to pursue

Page 75

1   that type of support?
2        Q.    When you say "including pension
3   contributions," what is your question, is the City --
4   I mean, asking the State for support for what?
5        Q.    To make contributions to the pension, to
6   any other financial support additional that they would
7   provide to the City?
8        A.    Just let me make sure I understand.
9        Is your question, has the City asked the
10  State to fund the City's pension contributions?
11       Q.    Any actions taken by the City to seek
12  support from the State.
13       A.    All right.  So that was -- I just --
14       MR. STEWART:  I think -- I think it is her job
15  to ask you questions.  You don't need to ask questions
16  of yourself.  Why don't you just have her ask you a
17  new question that you can understand.
18       So, ask a new question.
19  BY MS. BRUNO:
20       Q.    Are you aware of actions taken by the City
21  to seek support from the State?
22       A.    Yes.
23       Q.    And what are you aware of, what actions
24  are you aware that the City has taken?

Page 76

1        A.    That is a part of the financial stability
2   agreement in which I believe Annex E was where the
3   City and the State would collaborate to move on
4   certain initiatives.
5        Q.    What role have you had in those
6   conversations or that relationship?
7        MR. STEWART:  Objection.
8   BY THE WITNESS:
9        A.    Not much, if any, that I recall.
10  BY MS. BRUNO:
11       Q.    I'm going to return your attention back to
12  Amendment No. 7.  And, again, this amendment is dated
13  July 17, 2013, correct?
14       A.    Yes.
15       Q.    And the Chapter 9 filing was made by the
16  City on July 18, is that correct?
17       A.    Yes.
18       Q.    When did Ernst & Young determine that
19  Amendment No. 17 would be necessary?
20       MR. STEWART:  Do you mean Amendment No. 7?
21       MS. BRUNO:  Amendment No. 7, yeah.
22  BY THE WITNESS:
23       A.    I would say it would be in this May, June
24  timeframe.  I don't remember of a specific date in the

Page 77

1  context of, you know, when Amendment No. 7 was
2  initiated.
3  BY MS. BRUNO:
4      Q.   And Amendment No. 7 clearly contemplates
5  the filing of a Chapter 9 bankruptcy, does it not?
6      MR. STEWART:  Objection.
7  BY THE WITNESS:
8      A.   It contemplates a contingency plan.
9  BY MS. BRUNO:
10     Q.   Specifically including a filing for
11 Chapter 9?
12     A.   That is right, as one of the scenarios,
13 yes.
14     Q.   And when this agreement was signed,
15 Ernst & Young understood that a Chapter 9 filing was
16 going to be made, did it not?
17     A.   No.
18     Q.   When did Ernst & Young understand that the
19 Chapter 9 filing was going to be made?
20     A.   We do not -- I do not recall of a specific
21 date when we knew that this would be a date when the
22 City would have to file for Chapter 9.  When we
23 prepared the amendment in the June timeframe, which is
24 when we were talking about, we did try to ascertain if

Page 78

1  one of the contingency scenarios would be a Chapter 9.
2  So that scope was included.
3      Q.   When did Ernst & Young become aware that
4  the City was going to file for Chapter 9 bankruptcy?
5      A.   I do not recall of a specific date.
6      Q.   Your declaration is dated July 18th,
7  correct?
8      A.   That's when it was signed, yes.
9      Q.   And how long did you spend drafting this
10 declaration?
11     A.   I don't recall.  It could have been
12 probably a week or two is -- I don't recall
13 specifically.
14     Q.   You discussed that Chapter 9 was
15 considered -- filing of the Chapter 9 was considered a
16 contingency or one of the alternatives, correct?
17     A.   That is correct.
18     Q.   At this time, and by that I mean the June,
19 July timeframe or perhaps if it helps to say the -- I
20 want to use the term that you use -- additional summer
21 of 2013 services, what were the other alternatives
22 Ernst & Young analyzed?
23     A.   It was essentially in the construct of the
24 June 14th proposal is if a restructuring was possible

Page 79

1  out of court, but so I think the key aspect was to at
2  least frame what the financial information was and
3  articulate that to -- to all of the stakeholders up to
4  the best information we had available.
5      Q.   Outside of the June 14th proposal and the
6  information contained therein, were there other
7  alternatives that Ernst & Young considered?
8      A.   Through the work that EY had done for the
9  City, it was -- and all of the concessions that have
10 been made by various stakeholders at the City
11 including first and foremost the City's active
12 employee base, the Ernst & Young was constantly
13 assisting the City in evaluating what restructuring
14 efforts from a cost reduction standpoint, what sort of
15 savings could be quantified.  However, some
16 rationalization or restructuring of the City's legacy
17 liabilities started to become more and more apparent
18 given the declining revenues and combined with the
19 significant amount of concessions the City's active
20 employee base had already endured over the last couple
21 of years.
22         So we looked at different sorts of cost
23 reduction efforts, but a lot of those cost reduction
24 efforts had already and were undertaken over the

Page 80

1  course of the last few months.
2      Q.   Any other alternatives?
3      A.   Those are the ones that come to mind in
4  terms of looking at this proposal, other cost
5  reduction efforts that generally come to mind.
6      Q.   We discussed at length of forecasting for
7  the general fund as discussed in your declaration.
8         Did Ernst & Young conduct or analyze any
9  additional forecasting for any of the other enterprise
10 funds --
11     MR. STEWART:  Objection.
12 BY MS. BRUNO:
13     Q.   -- for the city?
14     A.   Not other than that timeframe, the
15 short-term timeframe I already talked about earlier,
16 but we did not make any other assumptions with respect
17 to enterprise fund forecasting other than what I
18 articulated earlier.
19     Q.   Do you anticipate providing any additional
20 supporting information or declaration to the City in
21 support of its statement of qualifications?
22     A.   Not -- I do not anticipate that as of yet.
23     MS. BRUNO:  I think that's all of the questions
24 that I have for this witness at this time.

Page 81

1       MR. TEELE:  I have a few questions.
2               EXAMINATION
3   BY MR. TEELE:
4       Q.   Mr. Malhotra, I am Jason Steele from the
5   Lowenstein Sandler firm.  We represent AFSCME in this
6   case.
7            I'm going to do my best not to cover any
8   of the ground that Ms. Bruno covered this morning.  So
9   bear with me for a moment.  It might be a little bit
10  shaky.
11           First, did you review personally any of
12  the pleadings that were filed by any of the parties in
13  the bankruptcy case objecting to the City's
14  eligibility to file Chapter 9 bankruptcy?
15      A.   Not specifically.  I may have glanced
16  through a couple, but not any that I recall off the
17  top of my head.
18      Q.   And you have reviewed the June 14th
19  creditor proposal, Exhibit 4, is that right?
20      A.   Yes.
21      Q.   And, in fact, you actually had some input
22  into the creation of this proposal, is that right?
23      A.   That's correct.
24      Q.   But ultimately the proposal was prepared

Page 82

1   by whom, the Emergency Manager?
2       A.   It was a proposal that was made by the
3   City to its different creditors.
4       Q.   And the Emergency Manager is the one who
5   was the proponent of the proposal, is that right?
6       A.   I would say it was the City in terms of
7   making the proposal to the creditors.
8       Q.   So, EY is retained by the City of Detroit,
9   is that correct?
10      A.   That's correct.
11      Q.   And that was the original retention and
12  that's the way it stands today, right?
13      A.   Yes.
14      Q.   And you report to -- ultimately to the
15  Emergency Manager currently, is that right?
16      A.   That is correct.
17      Q.   And the Emergency Manager acts for the
18  City of Detroit in place of the City's Mayor and
19  Council or other elected representatives, is that
20  right?
21      MR. STEWART:  Objection.
22  BY THE WITNESS:
23      A.   I can't answer that.
24  BY MR. TEELE:

Page 83

1       Q.   Is that your understanding?
2       A.   My understanding is that our client is the
3   City of Detroit and we are reporting ultimately to
4   Kevyn Orr currently.
5       Q.   And who -- if you know, who appointed
6   Mr. Orr to his position?
7       A.   I can't answer that.
8       Q.   So you don't know?
9       A.   Yeah, it is either -- my assumption is
10  it's -- whether it's the Emergency Loan Board or the
11  Governor, that that would be my understanding.
12      Q.   Would it be your understanding that the
13  Emergency Manager is appointed by the State of
14  Michigan as opposed to elected by the people in
15  Detroit, is that correct?
16      MR. STEWART:  Objection.
17  BY MR. TEELE:
18      Q.   Do you know?
19      A.   I can't answer that.
20      Q.   Do you currently or does E&Y currently
21  report to the Mayor of Detroit?
22      A.   In terms of the daily activities, our main
23  interaction has been with Kevyn Orr and his team in
24  the construct of the Proposal For Creditors.

Page 84

1       Q.   And do you report currently to the City
2   Council of Detroit?
3       A.   Our work is in the connection with the
4   Proposal For Creditors is generally reported to Kevyn
5   Orr and his team.
6       Q.   Do you meet regularly, you personally or
7   any members of your team meet regularly with either
8   the Mayor of Detroit or the City Council of Detroit?
9       A.   Not generally at the current time.
10      Q.   When was the last time that you had a
11  meeting with the Mayor?
12      A.   Actually, probably just a -- maybe three
13  weeks ago or somewhere around that timeframe.
14      Q.   Do you meet with anybody representing the
15  governor of the State of Michigan?
16      A.   At times we've had meetings with the State
17  Treasurer, but I don't recall the last one.
18      Q.   Have you had any meetings with any state
19  representative, state official, such as the Treasurer,
20  since the Chapter 9 petition was filed by the City?
21      A.   Yeah, I think so.
22      Q.   And who did you meet with at that time?
23      A.   I think we met with Andy Dillon.
24      Q.   I'm sorry.  Who is --

Page 85

1    A.    Andy is the State Treasurer.
2    Q.    Anybody else?
3    A.    Probably Tom Saxton at some point in time.
4    Q.    And who is Mr. Saxton?
5    A.    I believe he is the Deputy State
6 Treasurer, I think.
7    Q.    Did you meet with any state representative
8 prior to the filing of the Chapter 9 petition
9 specifically to discuss whether the Chapter 9 petition
10 should be filed?
11    A.    Not to discuss the specific Chapter 9
12 filing.
13    Q.    Was your opinion -- when I say your, I'm
14 referring to you as well as your E&Y team.
15        Was your opinion about the filing of the
16 Chapter 9 petition solicited by anybody prior to
17 filing?
18    A.    Not specifically in connection with
19 whether the City has to file or does not have to file.
20 I don't remember of a specific conversation whether
21 that was put forth or not.
22    Q.    Was it -- did you have a conversation
23 previous -- prior to the filing with respect to
24 whether E&Y believes it would be advisable or

Page 86

1 inadvisable for the City to file Chapter 9?
2    A.    No.  EY specifically, our team analyzed
3 that given all of the concessions, the active work
4 force and the cost reduction efforts that had been
5 taking place in addition to some of the efforts with
6 respect to reducing the active work force as well as
7 wage reductions and combined with the declining
8 revenues, that a rationalization or a restructuring of
9 the long-term liabilities of the City may be required.
10 But EY did not specifically have an input whether
11 Chapter 9 was or was not the only alternative.
12    Q.    Going back in time just a little bit, in
13 2011 and 2012, an agreement in principle, it is called
14 a tentative agreement, was reached between the City of
15 Detroit and the unions representing its active
16 employees, is that correct?
17    A.    Yes, that is my understanding.
18    Q.    And E&Y was involved in the negotiations
19 leading to that tentative agreement, is that right?
20    A.    E&Y was involved in assisting quantify
21 some of the savings in conjunction and collaboration
22 with the City as the City negotiated with the -- its
23 unions.
24    Q.    And based on your involvement, are you

Page 87

1 generally familiar with the terms of the tentative
2 agreement?
3    A.    This was a while ago, so I'm not -- I have
4 not gone back and refreshed specific terms of the
5 tentative agreement.
6    Q.    At the time you were familiar with it?
7 Were you?
8    A.    I was generally familiar with it at the
9 time, yeah.
10    Q.    And to the best of your recollection,
11 recognizing it was a while ago, the terms of the
12 tentative agreement included changes in employment
13 terms and benefits for active employees as well as
14 retirees, is that correct?
15    A.    I don't remember specifically on the
16 construct of the retirees.  I do remember that there
17 were changes to the overall compensation and benefits
18 provided to the active employees.
19    Q.    But you don't recall specifically whether
20 it dealt at all with retirees?
21    A.    Not that I can recall.
22    Q.    Do you recall modeling for the City's
23 benefit any impact of these negotiated changes on
24 retiree costs to the City?

Page 88

1    A.    Not that I recall with respect to
2 retirees.
3    Q.    In approximately late 2012, approximately
4 October of 2012, the Mayor and City Council were
5 working on revenue enhancement measures, is that
6 right?  Do you recall that?
7    A.    I don't remember of a specific timeframe,
8 but there is always actions that are being undertaken
9 to ascertain and figure out ways to improve the City's
10 revenue position.
11    Q.    Once the Detroit Financial Review Team
12 submitted its report to the Governor, and I'm
13 referring to Exhibit 3 from your previous deposition,
14 I think it was handed to you before?
15    MR. STEWART:  What is that?
16    MR. TEELE:  3.
17    MR. STEWART:  Oh, got it.
18 BY MR. TEELE:
19    Q.    When this report was issued to the
20 Governor, do you recall whether the Mayor and City
21 Council publicly responded to the findings?
22    A.    I do not recall of the specific response
23 on the findings to the Financial Review Team.
24        (WHEREUPON, a certain document was

Page 89

1          marked Malhotra Deposition
2      Exhibit No. 9, for identification, as
3      of 09/20/13.)
4      MR. STEWART: So what's the question?
5      MR. TEELE: Does he have the document now? I'm
6  sorry.
7      MR. STEWART: Yes.
8  BY MR. TEELE:
9      Q.   Mr. Malhotra, I guess first of all, have
10  you seen this document before?
11     A.   I'm sure I have it somewhere. I don't
12  remember reading it with too much detail, but I have
13  it in front of me now.
14     Q.   Okay. If you look down at the bottom of
15  page 1 under 1.a, it indicates that, "The
16  Administration, Council President Pugh, Council
17  President Pro-Tem Brown, Councilmember Cockrel, Fiscal
18  staff, Ernst & Young consultants, along with Miller
19  Canfield met over December holiday break to come up
20  with a cash plan with countermeasures to get the City
21  through June 30, 2013."
22          Do you see that?
23     A.   Yes, I do.
24     Q.   First of all, June 30, 2013, is that the

Page 90

1  end of the fiscal year for the City?
2      A.   That's correct.
3      Q.   Is that why June 30 is the magic date
4  there?
5      MR. STEWART: Objection.
6  BY THE WITNESS:
7      A.   It is -- it is the end of the fiscal year
8  for the City. I'll leave it at that.
9  BY MR. TEELE:
10     Q.   Were you part of the Ernst & Young
11  consultants referenced here who met over the
12  December holiday break to come up with a plan?
13     A.   Yes.
14     Q.   And then if you continue reading in that
15  same bullet point on page 2, it says, "The conclusion
16  of the group was that full savings from City
17  Employment Terms, any new contract adjustments and
18  other cash savings measures would materialize in FY
19  2014 to absorb one time reversals without the use of
20  remaining $50 million in the escrow account."
21          Do you recall whether that is an accurate
22  representation of what the conclusion of the group
23  was?
24     A.   I don't recall at this juncture, but I can

Page 91

1  tell you that during that particular timeframe the
2  City alongside us was evaluating other significant
3  scenarios as to how further costs could be reduced or
4  cash deferrals could be made in order to assist the
5  City from running out of cash during this timeframe.
6  I do not recall specifically of the conclusion.
7      Q.   Okay. And in -- is it true that the City
8  of Detroit would not have run out of cash to fund its
9  operations in fiscal year 2013?
10     MR. STEWART: Objection.
11  BY THE WITNESS:
12     A.   Based on what assumptions?
13  BY MR. TEELE:
14     Q.   Based on whatever measures the City had
15  been taking to reduce costs or defer expenses.
16     A.   It, again, depends. I would have to go
17  back and look at that, the cash flows from that
18  timeframe for fiscal year 2013. But what my
19  recollection is that there were various scenarios that
20  we were looking at, that the City was evaluating,
21  which were predominantly related to cash deferrals or
22  some significant further changes to the compensation
23  of the active employees.
24     Q.   Would you agree that the City did not face

Page 92

1  the exhaustion of its cash before the end of calendar
2  year 2013?
3      A.   Can you reask that question, please?
4      Q.   Do you agree from the perspective of today
5  or, more specifically, from the perspective of the day
6  that the Chapter 9 petition was filed, do you agree
7  that the City did not face exhaustion of its cash
8  until before the end of 2013 calendar year?
9      MR. STEWART: Objection.
10  BY THE WITNESS:
11     A.   I would have to go back and look.
12          What I can tell you is in terms of
13  exhaustion in cash accounts on a particular day, the
14  City's general fund is a billion dollar enterprise in
15  which there is daily cash activity. That being said,
16  the amount of cash that the City has which has been
17  publicly reported has pooled cash in there, i.e., cash
18  belonging to other funds potentially and including the
19  deferral of potentially in excess of $100 million
20  worth of pension payments already and pooling cash
21  from other funds.
22          So, at any particular point in time on
23  that date the overall cash position of the City could
24  have been negative if the City had actually disbursed

Page 93

1  and the accounts that were either commingled or
2  pooled.  But I do not know of that specific time at
3  this juncture.
4  BY MR. TEELE:
5      Q.   I'm trying to figure out, would you agree
6  with the statement that the City would not exhaust its
7  cash before the end of calendar year 2013?
8      MR. STEWART:  Objection.
9  BY THE WITNESS:
10     A.   I don't agree with that because it's based
11  on assumptions and how you look at those assumptions.
12  BY MR. TEELE:
13     Q.   If the City took that position, if the
14  City took the position that it would not run out of
15  cash before the end of calendar year 2013, in a
16  pleading filed with the bankruptcy court, would you
17  disagree with that?
18     A.   I'm sorry.  Are you asking calendar year
19  2013 or fiscal year 2013?
20     Q.   I'm asking calendar year 2013.
21     A.   That's a hypothetical question.  All I can
22  give you in answer is in terms of the assumptions that
23  the City was using with respect to what cash will or
24  will not be available over the course of the next few

Page 94

1  months in terms of the assumptions that were being
2  used.  If that means significant deferrals and
3  continuing to increase the indebtedness, there are
4  various assumptions that can be used.  So I do not
5  know of the specific assumptions you are referring to.
6      Q.   Now, you know that the City filed a brief,
7  a legal pleading in the bankruptcy court arguing that
8  the City is eligible to file Chapter 9 under the
9  Bankruptcy Code; are you aware of that?
10     A.   Yes.
11     Q.   Did you review that brief before it was
12  filed with the bankruptcy court?
13     A.   Not extensively, that I recall.
14     MR. STEWART:  Jason, if you don't have enough
15  copies, I will have to insist that I have one.  I
16  can't have my witness being examined with a document
17  that I can't look at.
18     MR. TEELE:  You can have mine when I'm done.
19     MS. BRUNO:  Okay.
20     MR. TEELE:  No problem.
21         (WHEREUPON, a certain document was
22         marked Malhotra Deposition
23         Exhibit No. 10, for identification,
24         as of 09/20/13.)

Page 95

1  BY MR. TEELE:
2      Q.   Have you seen the document that's in front
3  of you that's been marked as Exhibit 10?
4      A.   No.
5      Q.   You've never seen this.
6      MS. BRUNO:  Jason, can you identify for the
7  record the Bates number on Exhibit 10.
8      MR. TEELE:  Yes.  It is DTM100117210 through
9  7215.
10     MS. BRUNO:  Thank you.
11  BY MR. TEELE:
12     Q.   I'm sorry.  Mr. Malhotra, did you say you
13  have never seen this document before?
14     A.   That's what I said, no.
15     Q.   If you've never seen it, then I'm not
16  going to waste your time asking you questions about
17  it.
18         (WHEREUPON, a certain document was
19         marked Malhotra Deposition
20         Exhibit No. 11, for identification,
21         as of 09/20/13.)
22  BY MR. TEELE:
23     Q.   Before we go very far, can you just tell
24  me if you have ever seen this document before?

Page 96

1      A.   I generally recall seeing this.
2      Q.   Okay.  This document does not have Bates
3  numbers, but it is identified as City of Detroit
4  Restructuring Plan, Mayor's Implementation Progress
5  Report, dated March 2013.
6          Were you -- was Ernst & Young involved in
7  preparing this report?
8      A.   This format generally looks like what we
9  were using, but I do not know -- remember specifically
10  what parts of this report we may or may not have
11  assisted in.
12     Q.   And if you look at page 5 of the report,
13  that slide deals with the topic Financial Stability.
14         Do you see that?
15     A.   Uh-huh.
16     Q.   And it says that the City has a plan "to
17  address the City's $150 million annual structural
18  deficit."
19         Do you see that at the top of that page?
20     A.   Yes.
21     Q.   At the time this was prepared, did E&Y
22  have a view, an opinion as to whether the $150 million
23  of revenue and cost savings that are identified on
24  this slide were sufficient to get the City through

Page 97

1  fiscal year 2013?
2      A.   So you are stretching back to fiscal year
3  2013.
4      Q.   Well, to be fair, the next question will
5  be what about calendar year 2013.  If you want to
6  address it all at once, go ahead.
7      A.   I don't know about the calendar year 2013.
8  In terms of view with respect to running out of cash,
9  I don't remember whether this would or would not have
10  been enough, but from a fiscal year 2013 standpoint,
11  depending on the assumptions that you use.  That being
12  said, that, you know, these revenue enhancement
13  initiatives and some of these cost savings may, you
14  know, have -- some of these have been already
15  incorporated, i.e., these achieved cost savings of
16  $150 million says it's achieved, so my assumption is
17  they would have already been incorporated in whatever
18  assumptions we had.
19      Q.   I'm going to jump ahead a little bit.
20          Are you aware whether the Emergency
21  Manager met with stakeholders regarding the Proposal
22  For Creditors, which is Exhibit 4?
23      A.   Yes, there was -- the Emergency Manager
24  was present at the June 14 proposal in which the

Page 98

1  majority of creditors, if not all -- a significant
2  number of creditors were present.
3      Q.   And were you present for that meeting?
4      A.   Yes, I was.
5      Q.   Where was that meeting?
6      A.   That was at the Westin Hotel by the
7  airport.
8      Q.   In Detroit?
9      A.   That is correct.
10      Q.   Were there other meetings that you are
11  aware of between the Emergency Manager and individual
12  stakeholders regarding the Proposal For Creditors?
13      A.   You would have to ask the Emergency
14  Manager that.  I do not know of his specific calendar.
15      Q.   No.  I'm asking if you are aware of any
16  meetings?
17      A.   I'm not aware of whether he did or did not
18  have meetings.  I do not maintain his calendar.
19      Q.   And you were not present at any
20  meetings -- any such meetings, correct?
21      A.   Any what such meetings?
22      Q.   Between the Emergency Manager or his
23  representatives and individual stakeholders regarding
24  the Proposal For Creditors outside of the June 14th

Page 99

1  meeting at the Westin Hotel?
2      A.   So, when you say individual stakeholders,
3  can you explain what you are referring to?
4      Q.   Let's take a step back.
5          So the June 14th meeting at the Westin
6  Hotel, that was with many creditors, right?
7      A.   That's right.
8      Q.   Was it open to the public, anybody who
9  wanted to come and listen to come or was it more
10  discrete than that?
11      A.   I don't recall specifically how the
12  logistics of it were handled.  I do not think it was
13  open to all of the general public, but I'm not sure.
14  I do not believe it was.
15      Q.   But there were different -- there were
16  several different creditors in -- in attendance, as
17  far as you know, correct?
18      A.   That is correct, yes.
19      Q.   So there would have been financial
20  creditors like bondholders present, do you know?
21      A.   That's my assumption, yes.
22      Q.   And were employee representatives, such as
23  unions, like AFSCME, my client, do you know if those
24  kinds of creditors were also present?

Page 100

1      A.   I think they were.
2      Q.   So, after that meeting, are you aware --
3  did you attend any meetings with the Emergency Manager
4  and any individual creditor group regarding this
5  Proposal For Creditors?
6      A.   We've had meetings subsequent to the June
7  14th proposal.  I do not recall if the Emergency
8  Manager was present in person or not, but along with
9  the other advisers that have been helping the City,
10  there have been meetings with other stakeholders to
11  discuss things like healthcare plans, both on the
12  active and retiree side, but if -- I do not recall if
13  there was a specific meeting where Kevyn was or was
14  not involved.
15      Q.   Okay.  And do you recall who you met with
16  in terms of the stakeholder group?
17      A.   I think in general at the meetings for
18  the -- on the healthcare side were with some of the
19  union representatives and that there were similar
20  meetings on the retiree side.  However, at that point
21  in time, there was not an official retiree committee
22  that was appointed, at least as of June 20th from what
23  I recall.
24      Q.   Do you remember approximately when the

1  last of those meetings occurred?
2      A.    When the last of which meetings
3  specifically?
4      Q.    The meetings with the Emergency Manager's
5  representatives or consultants, such as EY, and
6  individual stakeholder groups?
7      A.    There was a meeting a week or ten days ago
8  with the Official Committee of the Retirees and their
9  respective advisers along with Kevyn Orr and his
10  advisers.
11      Q.    And was that meeting specifically to
12  discuss the Proposal For Creditors or was that a
13  meeting generally to discuss, you know, what's
14  happening in the bankruptcy case?
15      A.    I think that that's -- when you asked --
16  your question was when was the last meeting, that's
17  what I thought you said.
18      Q.    The question was when was the last such
19  meeting, such meeting being the meeting where the
20  Proposal For Creditors was discussed with individual
21  stakeholders?
22      MR. STEWART:  I think that reveals the defect in
23  the form because the client couldn't follow the
24  question.  Why don't you start over again so we don't

1  have this ambiguity in the record.
2  BY MR. TEELE:
3      Q.    Hopefully that clarifies it.
4          Do you understand the question now?
5      A.    I think I would like you to ask me the
6  question again, please.
7      Q.    So, on June 14th there was a meeting
8  between the emergency manager and his representatives
9  and various stakeholders in the City's bankruptcy
10  case -- or potential bankruptcy case regarding the
11  Proposal For Creditors, correct?
12      A.    Yes.
13      Q.    And I think you testified that subsequent
14  to June 14th, you're aware of meetings between
15  representatives of the Emergency Manager and
16  individual creditors regarding the Proposal For
17  Creditors.  Did I --
18      A.    That is correct.
19      Q.    And I'm asking you, when was -- to the
20  best of your knowledge, when was the last meeting --
21  when did the last meeting take place at which either
22  the Emergency Manager or his representatives were
23  present along with individual creditors of Detroit for
24  the specific purpose of discussing the Proposal For

1  Creditors?
2      MR. STEWART:  Can I have the question reread,
3  please.
4          (WHEREUPON, the record was read
5          by the reporter as requested, as
6          follows:
7          "Q.  And I'm asking you, when
8          was -- to the best of your knowledge,
9          when was the last meeting -- when did
10          the last meeting take place at which
11          either the Emergency Manager or his
12          representatives were present along
13          with individual creditors of Detroit
14          for the specific purpose of
15          discussing the Proposal For
16          Creditors?")
17  BY MR. TEELE:
18      Q.    That's a horrible question.  Let's ask it
19  this way.
20          To your knowledge, when was the last
21  meeting with stakeholders before the Chapter 9 filing?
22      A.    There were a series of meetings that were
23  happening between the June 14th timeframe and when the
24  Chapter 9 filing took place.  I do not know if -- and

1  I was not present in every single meeting.  So I do
2  not know of the last specific date.  But there were a
3  series of meetings between the June 14 proposal and
4  the filing date with not only, as you said, the banks
5  as one of the stakeholders, but also discussions with
6  union members or, you know, potentially some retirees.
7      Q.    Do you know whether the June 14th proposal
8  for creditors has been revised at all?
9      A.    Not -- not -- not to my knowledge
10  specifically that it has been revised from an overall
11  structure standpoint.  I mean, are you -- do you have
12  a specific question on that June 14th proposal?
13      Q.    I just want to know if any changes have
14  been made based on any meetings with stakeholders,
15  that you are aware of?
16      A.    I do not -- I do not know -- I need to
17  just give some thought through all of the back and
18  forth where the City was soliciting input and from its
19  different stakeholders, you know, what the revisions,
20  if any, have been.  But I'm just trying to recall if I
21  know of any specific changes that have already been
22  incorporated based on either recommendations of
23  proposals, if any, that were made by some of the
24  different stakeholders.

Page 105

1    Q.   Going back a little bit, with respect to
2 the ten-year projections, do you recall who instructed
3 EY to begin compiling or preparing the ten-year
4 projections?
5    A.   I think it was generally the former CFO
6 and the former program management director.
7    Q.   And they did that prior to or after the
8 appointment of the Emergency Manager?
9    A.   I have to recall.  We started with a
10 five-year projection that we would start figuring out
11 whether we do a five-year or a ten-year and then we
12 transitioned from five-year to ten-year.  I don't
13 recall specifically at what timeframe.
14    Q.   And then why did you transition from
15 five-year to ten-year?
16    A.   Just from the nature of looking at the
17 City's liabilities, having a longer term view was more
18 relevant versus having a shorter term view.
19    Q.   Generally speaking, the longer you project
20 financial performance of an entity, government entity
21 or even a private entity, does your confidence in the
22 results shown in the projections decrease with the
23 longer period?  In other words -- I'm sorry.
24       Did you understand that question?

Page 106

1    A.   I did.
2    Q.   Okay.
3    A.   As long as you are making reasonable
4 assumptions for a five-year or a ten-year timeframe,
5 the comfort along certain assumptions in the short
6 term when they are based on recent trends is always
7 higher than projections that are in the long term.
8 That being said, it also depends on the reasonableness
9 of the assumptions in terms of the comfort level.
10    Q.   And is it true that EY did not compile the
11 data that is included in the buildup to the ten-year
12 projections?
13    A.   We did not audit the data.  When you say
14 compile the data, if you can rephrase your question.
15    Q.   You took data from other sources, for
16 example, from the CAFR, the Comprehensive Annual
17 Financial Report, right?
18    A.   That was one source.
19    Q.   Right.  That's one source.  And there are
20 other sources.
21       And you took data that was compiled by
22 other consultants retained by the City, for example,
23 by Milliman, is that right?
24    A.   For certain assumptions.

Page 107

1    Q.   And you used information that you were
2 able to obtain directly from the City's -- directly
3 from the City, the different agencies and departments
4 of the City in your ten-year projections, right?
5    A.   Not necessarily.  The City does not have
6 any ten-year projections currently.  The data that we
7 used was based on ascertaining what historical
8 information was available and then using those --
9 using that data alongside some of the assumptions that
10 we got from the other advisers, helping pull together
11 ten-year assumptions.  I do not know of any ten-year
12 assumptions the City had historically that we would
13 have used as a starting point.
14    Q.   But you didn't create the historical -- in
15 other words, you didn't -- again, you didn't create
16 the historical data yourself from -- from original
17 sources, did you?  You took -- did you?
18    A.   When you -- you've got to rephrase that
19 question.
20    Q.   You took the historical data directly from
21 the City?
22    A.   The City's historical data, we took the
23 data that the City gave us and then made sure that
24 what data was reasonable, how we would actually look

Page 108

1 at the assumptions and that historical data.  So we
2 had to look at the data, look at what the assumptions
3 were with respect to how that data was classified, how
4 that data was categorized to make sure that we could
5 actually use that data.  So there wasn't just a raw
6 data dump in which we could use that data in its
7 original form without having to analyze it further.
8    Q.   All right.  See, that's where my confusion
9 is, because I thought that you had testified earlier
10 that you didn't really audit data?
11    A.   That's right.
12    Q.   And you didn't go back to --
13    MR. STEWART:  You have to wait for a question.
14 He is not asking you a question.
15 BY MR. TEELE:
16    Q.   And you didn't, for example -- and I think
17 you gave this example, you didn't go back to the
18 original bond offering documents to make sure that the
19 amounts stated in the data that you were using was
20 correct, right?
21    MR. STEWART:  Well, wait a minute.  What's the
22 question?  That was a speech essentially.  Just ask a
23 question.
24 BY MR. TEELE:

Page 109

1  Q.  I'm going to move on.  It's a point of
2  confusion in my head, but I'll move on.
3     MR. STEWART:  I think the transcript will clear
4  it up.  I think it was covered.
5     MR. TEELE:  I don't have anything further.
6  Thank you.
7     MR. STEWART:  Does anyone else have questions?
8     MS. BRUNO:  Why don't we take a short break so I
9  can communicate with everyone on the phone.
10    MR. STEWART:  Okay.
11    MS. BRUNO:  And then we can come back to you.
12    MR. STEWART:  Okay.
13       (WHEREUPON, a recess was had
14          from 12:22 to 12:30 p.m.)
15    MS. BRUNO:  We are back on.
16       Counsel on the phone, we are back on the
17  record.  And I believe when we went off the record, we
18  were going through the people on the phone on a roll
19  call to see if anyone has any questions for
20  Mr. Malhotra.
21    MR. PLECHA:  Ryan Plecha from the Association
22  Parties, we do not have any questions.
23    MR. STEVENSON:  This is John Stevenson from
24  Clark Hill.  I do not have any questions.

Page 110

1     MS. TAUNT:  Meredith Taunt on behalf of the
2  Retired Detroit Police Members Association.  We do not
3  have any questions.
4     MS. BRUNO:  Anyone else on the phone?
5     MS. KAUFMAN:  This is Dana Kaufman for Financial
6  Guaranty Insurance Company.  We do not have any
7  questions.
8     MR. STEWART:  This is Jeff Stewart, I have just
9  a few questions of Mr. Malhotra, from Jones Day.  I
10 represent the witness and also the City, just a few
11 questions.
12          EXAMINATION
13 BY MR. STEWART:
14    Q.  Mr. Malhotra, you were asked in your
15 deposition about a document called the Comprehensive
16 Annual Financial Report of the City of Detroit.
17       Do you remember being asked about that?
18    A.  Yes.
19    Q.  That's sometimes called a CAFR, C-A-F-R?
20    A.  Yes.
21    Q.  Did E&Y audit the CAFR?
22    A.  No.
23    Q.  Or audit the accounts that led to the
24 creation of the CAFR?

Page 111

1     A.  No.
2     Q.  Was the CAFR audited?
3     A.  Yes.
4     Q.  Audited by who?
5     A.  KPMG.
6     Q.  And tell us who or what is KPMG?
7     A.  KPMG is the City's auditor and it is
8  another Big 4 accounting firm.
9     Q.  Is it one of the international accounting
10 firms that is known in the United States and
11 elsewhere?
12    A.  Yes.
13    Q.  Comparable to E&Y in terms of what it
14 does?
15    A.  Generally, yes.
16    MR. STEWART:  Okay.  That's all I have.
17       Thank you.
18    MR. TEELE:  I have no questions.
19    MR. STEWART:  So is the record closed?
20    MS. BRUNO:  It is at this time.
21    MR. STEWART:  Okay.
22       (Time Noted:  12:32 p.m.)
23       FURTHER DEPONENT SAITH NOT.
24

Page 112

1        REPORTER'S CERTIFICATE
2     I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,
3  a Certified Shorthand Reporter, do hereby certify:
4        That previous to the commencement of the
5  examination of the witness herein, the witness was
6  duly sworn to testify the whole truth concerning the
7  matters herein;
8        That the foregoing deposition transcript
9  was reported stenographically by me, was thereafter
10 reduced to typewriting under my personal direction and
11 constitutes a true record of the testimony given and
12 the proceedings had;
13       That the said deposition was taken before
14 me at the time and place specified;
15       That I am not a relative or employee or
16 attorney or counsel, nor a relative or employee of
17 such attorney or counsel for any of the parties
18 hereto, nor interested directly or indirectly in the
19 outcome of this action.
20       IN WITNESS WHEREOF, I do hereunto set my
21 hand on this 21st day of September, 2013.
22
23       _Juliana F. Zajicek_
24       JULIANA F. ZAJICEK, Certified Reporter

## Page 113

```
 1              I N D E X
 2   WITNESS:                          PAGE:
 3     GAURAV MALHOTRA
 4        EXAM BY MS. BRUNO.................    7
 5        EXAM BY MR. TEELE.................   81
 6        EXAM BY MR. STEWART...............  110
 7
 8              *****
 9
10            E X H I B I T S
11   MALHOTRA EXHIBIT            MARKED FOR ID
12
13     No. 8    Amendment No. 7 to Statement of    18
               Work: DTF0TA0000001 - 008..........
14     No. 9    Letter dated February 22, 2013,    89
               To: Councilmembers; From: Irvin
15               Corley, Jr., Director Fiscal
               Analysis Division and David D.
16               Whitaker, Director Research &
               Analysis Division; Re: Comments
17               on the Report of the Detroit
               Financial Review Team;
18               DTM100097150 - 154...............
19     No. 10   Document titled: Detroit City      94
               Council Rational for Appeal;
20               DTM100117210 - 215...............
21     No. 11   37-page document titled: City of   95
               Detroit - Restructuring Plan,
22               Mayor's Implementation Progress
               Report, March 2013...............
23
24            REQUEST FOR DOCUMENTS
                   Page 16
```

## Page 114

```
 1            DEPOSITION ERRATA SHEET
 2
 3   Assignment No.  472371
 4   Case Caption:  In Re: City of Detroit, Michigan
 5
 6        DECLARATION UNDER PENALTY OF PERJURY
 7
 8        I hereby certify that I have read the
 9   foregoing transcript of my deposition given at the
10   time and place aforesaid, consisting of Pages 1 to
11   111, inclusive, and I do again subscribe and make
12   oath that the same is a true, correct and complete
13   transcript of my deposition so given as aforesaid,
14   and includes changes, if any, so made by me.
15
16                    GAURAV MALHOTRA
17
18   SUBSCRIBED AND SWORN TO
19   before me this      day
20   of            , A.D. 200 .
21
22        Notary Public
23
24
```

## Page 115

```
 1            DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24            GAURAV MALHOTRA
```

## Page 116

```
 1            DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24            GAURAV MALHOTRA
```

# EXHIBIT  D

Page 1

1      IN THE UNITED STATES BANKRUPTCY COURT
2          EASTERN DISTRICT OF MICHIGAN
3              SOUTHERN DIVISION
4
5   In re                    Chapter 9
6   CITY OF DETROIT, MICHIGAN,    Case No. 13-53846
7          Debtor.        Hon. Steven W. Rhodes
8   _____/
9
10  DEPONENT:  CHARLES M. MOORE
11  DATE:      Wednesday, September 18, 2013
12  TIME:      10:02 a.m.
13  LOCATION:  MILLER CANFIELD PADDOCK & STONE PLC
14             150 West Jefferson, Suite 2500
15             Detroit, Michigan
16  REPORTER:  Jeanette M. Fallon, CRR/RMR/CSR-3267
17
18
19
20
21
22
23
24
25

Page 2

1   APPEARANCES:
2
3   JONES DAY
4   By:  Evan Miller
5   51 Louisiana Avenue, NW
6   Washington, D.C. 20001.2113
7   202.879.3939
8   -and-
9   MILLER CANFIELD PADDOCK AND STONE PLC
10  By:  Jonathan S. Green
11  150 West Jefferson, Suite 2500
12  Detroit, MI 48226.4415
13  313.496.7997
14      Appearing on behalf of the Debtor
15
16  DENTONS US LLP
17  By:  Arthur H. Ruegger
18  1221 Avenue of the Americas
19  New York, NY 10020.1089
20  212.768.6881
21      Appearing on behalf of Retirees Committee
22
23
24
25

Page 3

1   APPEARANCES (continued):
2
3   COHEN WEISS AND SIMON LLP
4   By:  Thomas N. Ciantra
5   330 West 42nd Street
6   New York, NY 10036.6979
7   212.356.0216
8       Appearing on behalf of UAW
9
10  LOWENSTEIN SANDLER LLP
11  By:  Sharon L. Levine
12  65 Livingston Avenue
13  Roseland, NJ 07068
14  973.597.2374
15  -and-
16  Michael L. Artz (appearing telephonically)
17      Appearing on behalf of AFSCME
18
19  CLARK HILL PLC
20  By:  Andrew Mast
21      Ed Hammond (appearing telephonically)
22  500 Woodward Avenue, Suite 3500
23  Detroit, MI 48226
24  313.965.8384
25      Appearing on behalf of Retirement Systems

Page 4

1   APPEARANCES (continued):
2
3   WILLIAMS WILLIAMS RATTNER & PLUNKETT PC
4   By:  Ernest J. Essad, Jr.
5   380 N Old Woodward Ave Ste 300
6   Birmingham, MI 48009
7   248.642.0333
8       Appearing on behalf of FGIC
9
10  WINSTON & STRAWN LLP
11  By:  Bianca M. Forde (appearing telephonically)
12  200 Park Avenue
13  New York, NY 10166.4193
14  212.294.4733
15      Appearing on behalf of Assured Guaranty Municipal
16      Corp.
17
18  STROBL & SHARP
19  By:  Meredith Cox (appearing telephonically)
20  300 East Long Lake Road, Suite 200
21  Bloomfield Hills, MI 48304
22  248.540.2300
23      Appearing on behalf of Retired Detroit Police Members
24      Association
25

Page 5

1    APPEARANCES (continued):

2

3    SILVERMAN & MORRIS PLLC

4    By:  Thomas Morris (appearing telephonically)

5    30500 Northwestern Hwy Ste 200

6    Farmington Hills, MI 48334

7    248.539.1330

8         Appearing on behalf of Detroit Retired City Employees

9         Association and Retired Detroit Police and

10        Firefighters Association

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1                    E X H I B I T S

2    NUMBER       IDENTIFICATION                         PAGE

3    Exhibit 11   DTMI00078909 through 78969              90

4    Exhibit 12   DTMI00103661 through 103663            112

5    Exhibit 13   FAB Discussion Document, 3/1/2013      115

6    Exhibit 14   Restructuring Recommendations,

7                 4/5/2013                               116

8    Exhibit 15   FAB Discussion Document, 4/8/2013      117

9    Exhibit 16   DTMI00066196 through 66200             132

10   Exhibit 17   DTMI00066201 through 66210             135

11   Exhibit 18   DTMI00066218 through 66223             141

12   Exhibit 19   DTMI00066224 through 66230             147

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                 TABLE OF CONTENTS

2

3    WITNESS                                             PAGE

4    CHARLES M. MOORE

5    Examination by Mr. Ruegger                          10

6    Examination by Ms. Levine                           69

7    Examination by Mr. Ciantra                         127

8    Examination by Mr. Ruegger (continued)             163

9

10                   E X H I B I T S

11   NUMBER       IDENTIFICATION                         PAGE

12   Exhibit 1    Declaration of Charles M. Moore         11

13   Exhibit 2    Memorandum in Support                   39

14   Exhibit 3    Proposal for Creditors, 6/14/2013       50

15   Exhibit 4    DTMI00106352 through 6353               70

16   Exhibit 5    DTMI00106348 through 6349               72

17   Exhibit 6    DTMI00078512 through 8514               73

18   Exhibit 7    DTMI00106319 through 106320             81

19   Exhibit 8    DTMI00079527                            82

20   Exhibit 9    DTMI00079526                            83

21   Exhibit 10   DTMI00079528 through 79530              88

22

23

24

25

Page 8

1                    Detroit, Michigan

2              Wednesday, September 18, 2013

3                      *   *   *

4                   CHARLES M. MOORE

5    was thereupon called as a witness herein, and after having

6    first been duly sworn to tell the truth, the whole truth,

7    and nothing but the truth, was examined and testified as

8    follows:

9              MR. RUEGGER:  Good morning, everyone.  My

10   name is Arthur Ruegger from the Dentons firm, we

11   represent the Retirees Committee.  I guess I'll be the

12   first one to ask the questions today, but there should

13   be others later on.

14             Good morning, Mr. Moore.

15             THE WITNESS:  Good morning.

16             MR. RUEGGER:  A couple of preliminaries.

17   But I guess even before that, let's do a roll call.

18   We'll go around the table first and then ask for

19   people on the phone to identify themselves.  Why don't

20   we start with you, Sharon.

21             MS. LEVINE:  Sharon Levine, Lowenstein

22   Sandler, for AFSCME.

23             MR. CIANTRA:  I'm Thomas Ciantra, I'm with

24   Cohen Weiss and Simon, LLP, for the UAW.

25             MR. MAST:  Drew Mast, Clark Hill, for the

Page 9

1    Retirement Systems.
2              MR. ESSAD:  Ernest Essad, Williams,
3    Williams, on behalf of FGIC.
4              MR. GREEN:  Jonathan Green, Miller
5    Canfield, Paddock and Stone, for the City.
6              MR. MILLER:  Evan Miller, Jones Day, for
7    the City.
8              THE WITNESS:  Charles Moore,
9    Conway MacKenzie, the deponent.
10             MR. RUEGGER:  Okay, that takes care of
11   people at the table.  On the phone, please?
12             MR. MILLER:  Ladies and gentlemen on the
13   phone, please identify yourselves.
14             MR. FORDE:  Bianca Forde, Winston & Strawn,
15   on behalf of Assured Guaranty Municipal Corp.
16             MR. HAMMOND:  Ed Hammond, Clark Hill, for
17   the Retirement Systems.
18             MS. COX:  Meredith Cox, Strobl & Sharp, on
19   behalf of the Retired Detroit Police Members
20   Association.
21             MR. MORRIS:  Thomas Morris of Silverman &
22   Morris on behalf of the retired Detroit cities
23   employees association and the -- I'm sorry, let me
24   restate that.  The Detroit Retired City Employees
25   Association and the Retired Detroit Police and

Page 10

1    Firefighters Association.
2              MR. RUEGGER:  Okay, that's probably
3    everyone then.
4                   EXAMINATION
5    BY MR. RUEGGER:
6    Q.  As I said, good morning, Mr. Moore.
7    A.  Good morning.
8    Q.  I want to cover a couple of preliminary customs so
9        that everybody understands.  A number of us are going
10       to ask you questions today.  I'm going to ask that you
11       allow each of us to complete the questions before you
12       answer.  The court reporter will have trouble taking
13       two people at the same time.  Similarly, if people
14       have objections, I would ask that they allow the
15       question to be completed before they interpose the
16       objection.
17             Mr. Moore, if you don't understand a
18       question that any of us asks, please say so and we
19       will try to rephrase it.  If you don't mention that
20       you don't understand it, we'll assume that you do
21       understand the question.  Is that fair enough?
22   A.  It is, yes.
23   Q.  And there may be other customs.  The only other one I
24       want to mention is that I ask that you respond
25       audibly, because the court reporter can't record the

Page 11

1    nodding or the shaking of the head --
2    A.  Yes.
3    Q.  -- do you understand that one?  I would like to
4        start --
5              MR. MILLER:  Well, excuse me, Mr. Ruegger.
6    This is Evan Miller and I would like to make an
7    introductory note on the record.  Mr. Moore is being
8    made available today for this deposition in compliance
9    with the bankruptcy court's September 12th order
10   respecting discovery and in compliance with subpoenas
11   that were issued by both Council 25 of AFSCME and the
12   UAW.  Mr. Moore is also being made available today by
13   the City as the City's representative in part in
14   connection with a 30(b)(6) deposition notice that
15   AFSCME has issued to the City and in connection with
16   certain but not all of the topics that AFSCME in that
17   notice identified.  In connection with the deposition
18   today all objections are reserved except as to form.
19             MR. RUEGGER:  I'm going to ask the court
20   reporter to mark as Moore Exhibit 1 a copy of
21   Mr. Moore's declaration dated July 18th, 2013.  I have
22   four copies for people.  People probably have copies,
23   but to the extent they don't, there are some here.
24       (Marked Exhibit No. 1.)
25   Q.  Mr. Moore, is that your declaration that's been marked

Page 12

1        as Moore Exhibit 1?
2    A.  Yes, it appears to be.
3    Q.  Are you presently employed, Mr. Moore?
4    A.  Yes.
5    Q.  By whom?
6    A.  Conway MacKenzie, Inc.
7    Q.  And how long have you been with Conway MacKenzie,
8        Inc.?
9    A.  For 12 years.
10   Q.  What was your position when you first started with
11       Conway MacKenzie?
12   A.  I was a senior associate.
13   Q.  And can you tell us what positions you held at
14       Conway MacKenzie between that position and the one you
15       currently hold?
16   A.  I believe I held the titles of senior associate and
17       then director, managing director and eventually senior
18       managing director, which is my current title.
19   Q.  When did you become a senior managing director?
20   A.  I don't recall exactly, but I think it was January 1st
21       of 2008.
22   Q.  Your declaration refers to your educational background
23       and I'll direct your attention to paragraph 4.
24       Declaration is accurate, I take it, that you have a
25       bachelor's of arts and a master's of business

Page 13

1    administration from Michigan State?
2  A.  Yes, sir.
3  Q.  When did you get your bachelor's degree?
4  A.  In 1994.
5  Q.  And when did you get your master's degree?
6  A.  The same year.  I was enrolled in a five-year program
7    which essentially granted both degrees at the same
8    time.
9  Q.  Did you have any specialty or concentration with
10    regard to your bachelor of arts degree?
11  A.  Yes, accounting.
12  Q.  And what about your MBA?
13  A.  Yes, the track was professional accounting.
14  Q.  What was your first job after you received your
15    degrees in 1994?
16  A.  I was employed by Deloitte and Touche.
17  Q.  And what was your position at Deloitte and Touche?
18  A.  I believe the title may have been associate.
19  Q.  And how long were you with Deloitte and Touche?
20  A.  Approximately five-and-a-half years.
21  Q.  And what areas did you concentrate in at Deloitte and
22    Touche?
23  A.  I spent the majority of my time in the middle market
24    consulting group doing performance improvement and
25    other consulting services for middle market companies.

Page 14

1  Q.  And when you left Deloitte and Touche, what was your
2    next employer?
3  A.  I became the chief financial officer for Horizon
4    Technology.
5  Q.  Can you spell that?  Horizon, H-O-R --
6  A.  Yes, sir.  H-O-R-I-Z-O-N.
7  Q.  And what was the business of Horizon Technology?
8  A.  Horizon had a variety of businesses.  The bulk of the
9    operations were automotive supply operations.  We
10    produced various metal formed parts, but it was a
11    privately owned business and it had a variety of other
12    interests as well including real estate and retail
13    along with a few other very minor businesses.
14  Q.  Just so we get a sense for the size of business, what
15    were the annual revenues in general terms of Horizon
16    Technology?
17  A.  Approximately $60 million per year.
18  Q.  Thank you.  And how long were you with Horizon
19    Technology?
20  A.  Just under two years.
21  Q.  So if you were with Deloitte and Touche for
22    five-and-a-half years, you left Deloitte in Touche in
23    or around 1999 or year 2000; is that correct?
24  A.  Very beginning of year 2000, yes, sir.
25  Q.  And you were with Horizon Technology until when?

Page 15

1  A.  Until October of 2001.
2            MR. RUEGGER:  Okay, did someone just join
3    the deposition?
4            MR. ARTZ:  Yes, this is Michael Artz from
5    AFSCME on the phone.
6            MR. RUEGGER:  Thank you, Michael.
7            MS. LEVINE:  Hi, Michael.
8            MR. ARTZ:  Good morning.
9  Q.  So now we're October 2001.  Where did you go then?
10  A.  That is when I joined Conway MacKenzie.
11  Q.  And have you undertaken any area of special
12    concentration at Conway MacKenzie?
13  A.  There are a number of industries that I tend to focus
14    a lot of my time on as well as certain services that
15    the firm provides.
16  Q.  And what are the industries that you focus on?
17  A.  Automotive, gaming and hospitality, governmental,
18    construction and real estate, financial services and
19    there are a few others as well but those are the major
20    ones.
21  Q.  And does that list include the services that you also
22    concentrate in at Conway MacKenzie?
23  A.  The service lines that I participate in are separate
24    from industries.  The service lines tend to be in the
25    area of turnaround consulting, performance

Page 16

1    improvement, restructuring, crisis management,
2    litigation support and investment banking.
3  Q.  Before your work for the City of Detroit did you have
4    any experience working with governmental clients?
5  A.  Yes, sir.
6  Q.  Approximately how many?
7  A.  Approximately five.
8  Q.  Can you identify them?
9  A.  Yes, sir.  Detroit Public Schools, Jefferson County
10    Alabama, Wayne County Circuit Court, others are
11    slipping my mind right now -- oh, the Commonwealth of
12    Puerto Rico and I'm -- those are the ones that I can
13    recall at this point.
14  Q.  And that's fine.  If you remember any others in the
15    course of today's proceeding, I would ask that you
16    identify them then.
17  A.  I will.
18  Q.  When did you do the work with the Detroit Public
19    Schools?
20  A.  In 2011.
21  Q.  Is that work ongoing or is it completed?
22  A.  No, sir, it's completed.
23  Q.  And so how long did you do work for the Detroit Public
24    Schools?
25  A.  Approximately three months.

1 Q. And what generally did you do for the Detroit Public
2    Schools?
3 A. We worked under then Emergency Manager Robert Bobb
4    looking at operational improvements including shared
5    services as well as outsourcing of certain operations.
6 Q. What about Jefferson County Alabama, when did you do
7    the work for that county?
8 A. In 2012 into 2013.
9 Q. And how long did you work with Jefferson County
10   Alabama?
11 A. That engagement, while somewhat dormant right now, is
12   still active, so approximately a year.
13 Q. And what -- was Conway MacKenzie engaged by Jefferson
14   County Alabama?
15 A. No, we were specifically engaged by one of the
16   monoline insurers through counsel.
17 Q. And which insurer was that?
18 A. National.
19 Q. And what did -- I understand it may be ongoing to some
20   extent or perhaps suspended now, but what work has
21   Conway MacKenzie done for or in the Jefferson County
22   Alabama case?
23 A. We assisted National and counsel to National in the
24   evaluation of plans put together by the county and
25   negotiations related to the plan of adjustment.

1 Q. Let's turn to Wayne County Circuit Court.
2 A. Yes, sir.
3 Q. What state is Wayne County is?
4 A. The State of Michigan.
5 Q. And when did you do work with Wayne County Circuit
6    Court?
7 A. I believe this was in 2005 or 2006. I can't recall
8    exactly.
9 Q. And approximately how long was the work for that
10   circuit court?
11 A. There were a couple of different assignments. I think
12   that the work extended over a period of perhaps six
13   months.
14 Q. And can you summarize for us what the work was --
15 A. Our work --
16 Q. -- that -- excuse me -- that your firm did?
17 A. Yes, our work revolved mainly around budget issues
18   that the court was having and providing analyses that
19   were used in negotiations between the court and Wayne
20   County.
21 Q. Was your firm's client the Wayne County Circuit Court?
22 A. Yes, sir. Just as -- Mr. Ruegger, just as a
23   clarification, Wayne County Circuit Court is also
24   known as 3rd Judicial Circuit Court of Michigan.
25 Q. Thank you.

1        Were any of these entities we've talked
2    about so far that you've done work with in the
3    governmental areas, the Detroit Public Schools,
4    Jefferson County Alabama, and Wayne County Circuit
5    Court, were any of them either in bankruptcy or
6    reorganization or rehabilitation?
7 A. Yes, sir, Jefferson County was in Chapter 9 and
8    Detroit Public Schools were operating under an
9    Emergency Manager. And just to clarify there was a
10   time when while I was involved with Detroit Public
11   Schools that Mr. Robert Bobb was the Emergency
12   Financial Manager and there was a time where he was
13   the Emergency Manager.
14 Q. When you were working with Mr. Bobb for the Detroit
15   Public Schools, he was Emergency Manager or was he
16   also the Emergency Financial Manager or both?
17 A. When Conway MacKenzie was first engaged, Public Act 72
18   was in effect in Michigan and he was acting as the
19   Emergency Financial Manager. During the course of our
20   engagement, Public Act 4 came into existence and he
21   became the Emergency Manager.
22 Q. Thank you.
23        I believe the fourth governmental matter
24   you identified was Puerto Rico?
25 A. Yes, sir.

1 Q. Who was Conway MacKenzie's client in the Puerto Rico
2    matter?
3 A. The Government Development Bank of Puerto Rico.
4 Q. Is that a publicly -- a public bank or a private bank?
5 A. It's a public bank.
6 Q. Under the control directly or indirectly of the
7    Commonwealth of Puerto Rico?
8 A. Yes, sir, it's a government agency.
9 Q. And when did you do the work for the Government
10   Development Bank?
11 A. I believe that was 2010.
12 Q. And for how long approximately?
13 A. Approximately three to four months.
14 Q. And what did you and your firm do for the Government
15   Development Bank?
16 A. Conway MacKenzie was engaged specifically related to
17   the employee retirement system for the Commonwealth of
18   Puerto Rico.
19 Q. Can you be somewhat more specific then about the
20   employment retirement system and work you did related
21   to that?
22 A. We were asked to conduct an investigation and an
23   analysis of factors that influenced the unfunded
24   position of the employee retirement system.
25 Q. Did you complete your work in that regard?

Page 21

1  A.  Yes, sir.
2  Q.  And just so I'm clear, I apologize, it was the
3      employment retirement system of the Government
4      Development Bank that you did this work for?
5  A.  The Government Development Bank was the engaging
6      entity.  The pension system for which our work related
7      was the employee retirement system.
8  Q.  For what entity or group?
9  A.  For the Commonwealth of Puerto Rico.
10  Q.  Thank you.
11  A.  It was a public pension plan.  Mr. Ruegger, I'll just
12      clarify as well that my firm did work -- other work
13      related to the Commonwealth of Puerto Rico for a
14      different client prior to the assignment where we
15      worked for the government.
16  Q.  All right.  Can you identify what that other client
17      was?
18  A.  Yes.  We were engaged by both AFSCME and UAW.
19  Q.  And what were you engaged to do for those unions?
20  A.  Assist in analysis related to a plan that the governor
21      had prepared and analysis of the upcoming budget.
22  Q.  Do you remember approximately when that work was done?
23  A.  I believe that may have been in 2009.
24  Q.  And how long did you work in the engagement for those
25      two unions?

Page 22

1  A.  Approximately two months, if I recall correctly.
2  Q.  It's set out in your declaration that -- and I believe
3      it's paragraph 6 --
4          (Discussion held off the record.)
5  Q.  -- that you're a Certified Public Accountant.  That's
6      accurate; correct?
7  A.  Yes, sir.
8  Q.  And you are also a certified turnaround professional?
9  A.  Yes, sir.
10  Q.  Do you have any other formal certificates?
11  A.  I am also, as is listed here, certified in financial
12      forensics.
13  Q.  Any others that you recall?
14  A.  No, sir.
15  Q.  Other than -- any other formal training that you've
16      had or certifications?
17  A.  Can you define formal training?
18  Q.  Sure.  We'll try to break it down.  How about any
19      other classroom training or work at an educational
20      institution?
21  A.  Through the course of my certifications as well as
22      professional organizations to which I belong I
23      regularly attend educational sessions every year.
24  Q.  So seminars, conferences, those kind of things you
25      attend on a regular basis?

Page 23

1  A.  Yes, sir.
2  Q.  Anything other than seminars and conferences and what
3      you've mentioned already?
4  A.  Over the course of my career I've also spent time with
5      a few other certifications related to operational
6      items; as an example, I don't believe it's called this
7      anymore, but formerly the American Production
8      Inventory Control Society, APICS, A-P-I-C-S.  And I
9      have been certified in certain operational information
10      system applications used by businesses.
11  Q.  Can you identify any of the operational information
12      system applications that you just mentioned?
13  A.  Yes, I have multiple certifications from QAD is the
14      name of the company related to its software enterprise
15      resource planning application known as MFG Pro.
16  Q.  Any others you can recall right now?
17  A.  No, I think that's it.
18  Q.  We're going to come back to the declaration in a
19      second, but have you ever testified under oath before,
20      Mr. Moore?
21  A.  Yes, sir.
22  Q.  Approximately how many times?
23  A.  If you count testifying in the same matter multiple
24      times as each individual instance, it would be perhaps
25      15 -- 10 to 15 I think would be a fair number.

Page 24

1  Q.  And of the 10 to 15 how many were in court?
2  A.  I've testified in court perhaps five to eight times.
3  Q.  Any instances where you testified in an arbitration
4      proceeding?
5  A.  Not that I can recall.
6  Q.  And approximately how many of those instances were
7      deposition testimony?
8  A.  I have been deposed approximately five times.
9  Q.  Other than the court and the deposition instances,
10      have you testified under oath in any other context?
11  A.  Not that I can recall.
12  Q.  I'm going to ask you to identify for us the cases that
13      you've testified -- in which you've testified, so
14      let's start with the instances in court.  When was the
15      first time you testified in court?
16  A.  The matter would have been DCT, Inc., and I believe I
17      testified in 2002.
18  Q.  Were you a fact or an expert witness?
19  A.  I was a fact witness.
20  Q.  And what issues did you testify to?
21  A.  This goes back 11 years so I'm stretching my memory
22      here.
23  Q.  Just do the best you can, sir.
24  A.  But this was an involuntary bankruptcy filing where
25      Conway MacKenzie was engaged on behalf of the debtor



Page 25

1    and I believe that I was testifying to certain events
2    leading up to the involuntary bankruptcy filing.
3 Q. Was there -- was the filing contested by creditors or
4    any other group?
5 A. It was an involuntary bankruptcy filing.
6 Q. So -- very well.
7        How many times did you testify in the DCT
8    case?
9 A. Once.
10 Q. Did you testify in that case in deposition at all?
11 A. No, sir.
12 Q. Just the one instance of court testimony?
13 A. Yes.
14 Q. When was the next time you testified in court?
15 A. I believe that was 2003.
16 Q. Can you tell us the name of the case?
17 A. The name of the case was Wohlert Corporation.
18 Q. Can you spell that, please?
19 A. W-O-H-L-E-R-T.
20 Q. And were you a fact or expert witness?
21 A. I was a fact witness.
22 Q. And who was your -- were you -- who was
23    Conway MacKenzie's client in that case?
24 A. Conway MacKenzie was engaged by Wohlert Corporation.
25    Wohlert Corporation had filed Chapter 11.

Page 26

1 Q. And what court did Wohlert file for Chapter 11?
2 A. The Western District of Michigan.
3 Q. And what issues did you address in your testimony?
4 A. I testified multiple times for different issues in the
5    case. There was a motion to convert the case to
6    Chapter 7 that was filed, I testified related to
7    postpetition financing, I testified related to a sale
8    transaction, I believe.
9 Q. In each instance there was a separate incident of
10    testimony in court?
11 A. Yes, sir.
12 Q. Any other cases where you testified in court other
13    than the two you've mentioned?
14 A. Yes, sir. The next matter was Hastings Manufacturing
15    and that was a Chapter 11 in the Western District of
16    Michigan.
17 Q. And who was Conway MacKenzie's client there?
18 A. Hastings Manufacturing.
19 Q. And what issues did you address in your testimony?
20 A. I believe that I testified -- I'm just skipping my
21    mind on the specific testimony, but I think I
22    testified related to a sale transaction that was
23    occurring and this would have been in perhaps 2005 --
24    2005 or 2006.
25 Q. So you testified in support of a proposed sale

Page 27

1    transaction?
2 A. Yes, sir.
3 Q. Any other court cases you testified -- where you
4    testified in court other than the three you've
5    mentioned?
6 A. Yes, sir. Greektown Casino and Hotel.
7 Q. And who was Conway MacKenzie's client in that case?
8 A. Greektown Casino.
9 Q. And what issues did you address in your testimony?
10 A. I testified multiple times during that Chapter 11 case
11    related to postpetition financing, plans of
12    reorganization, disclosure statements, and a variety
13    of other issues. There were many instances of
14    testimony in that case.
15 Q. So when you say -- you said multiple or many, can you
16    give me an approximate number of times you testified
17    in court in that case?
18 A. Perhaps five or six.
19 Q. Thank you.
20        Other than the four cases we've identified
21    so far, have you testified in court in any other
22    instance?
23 A. Not that I can recall right now.
24 Q. Fair enough.
25        I believe you said you testified in

Page 28

1    deposition approximately five times?
2 A. Yes, sir.
3 Q. Were any of those depositions in the four court cases
4    that you've identified so far?
5 A. Yes, sir.
6 Q. In which of the cases that you identified so far have
7    you also testified in a deposition?
8 A. Greektown Casino.
9 Q. And approximately how many times were you deposed in
10    Greektown Casino?
11 A. At least two.
12 Q. Related to the same issues that you had mentioned
13    earlier that you testified to in court?
14 A. Yes, sir.
15 Q. Other than the depositions in the Greektown Casino
16    case can you give us the names and subject matters of
17    any -- of other cases where you were -- testified in a
18    deposition?
19 A. Yes, sir. Synergy Data, which was a Chapter 11 case
20    in the district of Delaware, and I don't believe,
21    Mr. Ruegger, that I testified in court in that
22    instance; however, I was deposed. I can't recall
23    exactly if I testified in court in that one or not.
24 Q. Do you remember what issues you addressed when you
25    testified in the Synergy Data case?

Page 29

1  A.  The issue related to a matter that was being litigated
2      between a creditor of Synergy Data and the estate.  I
3      was the chief operating -- or chief restructuring
4      officer for the estate and then I became the
5      liquidating trustee.
6  Q.  And what was the issue that was being litigated?
7  A.  It was a dispute over amounts owed.
8  Q.  Okay.  Any other cases that you recall where you
9      testified in a deposition?
10  A.  Yes, there was a case, this would have been in 2012,
11     it was General Motors Corporation versus Weber
12     Automotive, W-E-B-E-R.
13  Q.  Who was Conway MacKenzie's client in that matter?
14  A.  Counsel for General Motors.
15  Q.  And what was the subject matter of your testimony?
16  A.  This was a commercial dispute.
17  Q.  Can you give us just a general description of what the
18     dispute related to?
19  A.  Related to contractual terms, potential breach or
20     alleged breach of contract between the two parties.
21  Q.  Was your testimony as an expert in the GM versus Weber
22     Automotive or as a fact witness?
23  A.  As an expert.
24  Q.  And do you recall what your -- what areas of expert
25     testimony you gave -- withdrawn.

Page 30

1          What were you -- what subjects were you an
2      expert on in that case?
3  A.  I was an expert related to the automotive industry and
4      supplier relations.
5  Q.  Back to the subject of what deposition testimony
6      you've given.  Other than the cases you've identified
7      so far, have you testified in a deposition in any
8      other case?
9  A.  Not that I can recall.  I think that takes us to about
10     five or so, which is what I thought I had done before
11     in depositions.
12  Q.  Thank you.
13          You mentioned that you testified as an
14     expert in the GM versus Weber Automotive matter and
15     have you testified as an expert in any other matter?
16  A.  I testified as an expert in the Greektown case.
17  Q.  And on what subjects were you proffered an expert
18     in the Greektown Casino case?
19  A.  Plan confirmation.
20  Q.  Did you have a position or a title with the Greektown
21     Casino case?
22  A.  I believe the title was either restructuring advisor
23     or chief restructuring advisor.  I was specifically
24     named as this individual.
25  Q.  And did -- was a plan of reorganization confirmed for

Page 31

1      the Greektown Casino debtor?
2  A.  Yes, sir.
3  Q.  And was that in the Delaware bankruptcy court or some
4      other court?
5  A.  That was Eastern District of Michigan.
6  Q.  Thank you.
7          And do you recall the year or years where
8      the Greektown Casino bankruptcy was pending?
9  A.  2008 through 2010.
10  Q.  Am I correct then that -- withdrawn.
11          Other than the GM V. Weber Automotive and
12     the Greektown Casino cases, have you testified as an
13     expert in any other cases?
14  A.  Not that I can recall.
15  Q.  Have you submitted an expert report in any other
16     cases?
17  A.  Yes, sir.
18  Q.  How many other cases?
19  A.  Off the top of my head, approximately perhaps two.
20  Q.  And are these instances where you signed the expert
21     report as the head of the Conway MacKenzie team?
22  A.  Yes, sir.
23  Q.  In which two matters did you submit those expert
24     reports?
25  A.  One matter would be MuniVest.

Page 32

1  Q.  And can you tell us what that matter is or was?
2  A.  That was an alleged Ponzi scheme and I worked on
3      behalf of the trustee that was appointed in that case.
4  Q.  And where was that case pending?
5  A.  That was Eastern District of Michigan.
6  Q.  And I take it the subject of your testimony -- or the
7      subject of your report was whether in fact there was a
8      Ponzi scheme?
9  A.  Yes, sir.
10  Q.  Did you conclude that there was a Ponzi scheme?
11  A.  Yes, sir.
12  Q.  And you never testified, though, in that case, either
13     in deposition or in court?
14  A.  Not yet.
15  Q.  It's pending?
16  A.  There are still open issues, many -- many matters have
17     settled, but the case is still open.
18  Q.  And the second instance where you've submitted a
19     report, can you describe that case for us, please?
20  A.  I don't believe that this was a signed report and I am
21     actually forgetting the official name of the case but
22     this was a -- the general name of the matter was
23     ConTech, C-O-N-T-E-C-H, and this involved preference
24     litigation.
25  Q.  Who is the client in the ConTech matter?

Page 33

1  A.  I believe -- I work mainly with counsel and if I
2      recall correctly, counsel was working for the trustee,
3      the Chapter 7 trustee.
4  Q.  Okay.  You've testified to this and I don't mean to go
5      over what you've already covered, but I'm trying to
6      now identify the cases -- the prior cases related to
7      Chapter 9 bankruptcy that you've worked with and I
8      believe you testified that the Jefferson County
9      Alabama matter was a Chapter 9 matter.  Any other
10     Chapter 9 filings that you've worked in?
11 A.  No, sir.
12 Q.  Related to the Jefferson County Alabama work you've
13     done, can you be a little more specific about the work
14     you did in evaluating the plans on behalf of National?
15 A.  Sure.  Conway MacKenzie first sought to receive
16     detailed information supporting plans that had been
17     put together by the county including its proposed
18     budget.  Conway MacKenzie met with the county to go
19     through various assumptions, ask about certain areas
20     that had been considered for improving the operation,
21     participated in strategy sessions with counsel related
22     to the plan of adjustment or proposed terms of the
23     plan of adjustment prior to the county actually filing
24     the plan, and those would have been the more specifics
25     as to the areas that Conway MacKenzie participated.

Page 34

1  Q.  What was -- I think you said your client in that
2      matter was National?
3  A.  National Public Finance -- National Public Finance
4      Guaranty, NPFG.
5  Q.  And what had National Public Finance guaranteed in the
6      Jefferson County case?
7  A.  The bulk of National's exposure related to a couple of
8      bond offerings from just over ten years ago.  There
9      was a -- if I recall correctly, there was another
10     element where there was some exposure that National
11     had, but the two bond offerings that I was referring
12     to constituted about $100 million in exposure and this
13     other area, if I recall correctly, had about
14     $3 million of exposure.
15 Q.  Thank you.
16         You mention in paragraph 5 of your
17     declaration that you have extensive experience with
18     defined benefit pension plans and other postretirement
19     employee benefits.  Can you give us a little more
20     specifics on that experience?
21 A.  I have in the course of my career on many engagements
22     come across issues related to defined benefit pension
23     plans as well as other postretirement employee
24     benefits and have consulted with clients related to
25     those two items.

Page 35

1  Q.  Can you name some of those engagements?
2  A.  Sure.  I will focus on public engagements.  Many of my
3      engagements are private in nature so I'm not able to
4      necessarily disclose the names, but several that I've
5      already discussed which are public I'm able to
6      indicate.  With Wohlert Corporation there was a
7      pension plan and we dealt directly with the IRS and
8      the PPGC as well as unions related to that pension
9      plan.
10         Hastings Manufacturing also had a pension
11     plan.
12         The Commonwealth of Puerto Rico, obviously
13     our primary involvement with them related to the
14     employee retirement system.
15 Q.  Any others come to mind --
16 A.  Um --
17 Q.  -- of public engagements?
18 A.  Yeah, of those that I mentioned, I don't think any of
19     the others had pension or retiree healthcare, which is
20     what I'm referring to on the other postretirement
21     employee benefits.  I don't think that those came into
22     play on any of the other public matters.
23 Q.  So as best you recall right now it's the Wohlert,
24     Hastings Manufacturing and the Puerto Rico cases where
25     pension or other OPEB issues were part of your

Page 36

1      engagement?
2  A.  Of those that I mentioned, yes.
3          MR. MILLER:  In connection with the public?
4  A.  Of those that I mentioned in connection with publicly
5      -- or public engagements, if you will, yes, sir.
6  Q.  Okay, yeah, we're putting aside the private ones for
7      confidential reasons, I understand.
8  A.  Yes, sir.
9  Q.  You're not an actuary; correct?
10 A.  That is correct, I am not actuary.
11 Q.  Have you had any formal training in actuarial areas?
12 A.  No, sir.
13 Q.  You mentioned in paragraph 6 of your declaration that
14     you were appointed to serve on the Legislative
15     Commission on Government Efficiency?  That's correct;
16     is it not?
17 A.  Yes, sir.
18 Q.  When were you appointed?
19 A.  My appointment was at the end of 2007 and it was a
20     two-year commission.
21 Q.  Who appointed you?
22 A.  If I recall correctly, I was appointed by both the
23     speaker of the house for the State of Michigan and the
24     senate majority leader for the State of Michigan.
25          MR. RUEGGER:  Let's go off the record for a

Page 37

1    second.
2         (A brief recess was taken.)
3         MR. RUEGGER:  Back on the record.
4         Drew, you want to say something?
5         MR. MAST:  Yes, before we continue, just
6    briefly, I would like to make a statement on behalf of
7    the Retirement Systems that as to any and all
8    questioning by others today regarding pension and
9    actuarial issues, including underfunding, calculations
10   and assumptions, Detroit -- the Retirement Systems are
11   not participating today and reserve all rights with
12   regard to those issues.  That's all.
13        MR. RUEGGER:  Very well.
14   BY MR. RUEGGER:
15   Q.  We were talking about the commission that was
16       referenced in your declaration when we left.
17   A.  Yes, sir.
18   Q.  What was the subject matter of that commission as you
19       recall?
20   A.  The commission was created as part of a budget
21       standoff that took place within the State of Michigan
22       prior to the start of its fiscal year 2008.  The State
23       was not able to pass a balanced budget prior to the
24       start of the fiscal year on October 1st, 2007.  As
25       part of the final compromise, there was the -- to be

Page 38

1    the creation of a commission called the Legislative
2    Commission on Government Efficiency which would
3    consist of nine members that would look for
4    efficiencies in the State of Michigan's operations.
5    Q.  And did that commission issue a report or
6        recommendation?
7    A.  Yes, sir.
8    Q.  At the end of that two-year period?
9    A.  Yes.
10   Q.  Who was the speaker who appointed -- you mentioned the
11       speaker and the house majority leader both appointed
12       you to that commission?
13   A.  Speaker of the house was Andy Dillon and the senate
14       majority leader was Mike Bishop.
15   Q.  Last name, sir?
16   A.  Bishop.
17   Q.  Bishop?
18   A.  Bishop, B-I-S-H-O-P.
19   Q.  Prior to the Legislative Commission on Government
20       Efficiency, had you served on any commissions or other
21       organizations on behalf of the government?
22   A.  The State government?
23   Q.  Yes, sir.
24   A.  Not that I can recall.
25   Q.  Subsequent to your work on the Legislative Commission

Page 39

1    on Government Efficiency have you served on any State
2    commissions?
3    A.  No, sir.
4         (Marked Exhibit No. 2.)
5    Q.  I want to try to explore what you know about some
6        other references to various teams or panels that are
7        in the pleadings so -- because we're on the subject of
8        commissions now and I've asked the court reporter to
9        mark as Moore Exhibit 2 a copy of the Memorandum in
10       Support of Statement of Qualifications Pursuant to
11       Section 109(c) of the Bankruptcy Code, which was filed
12       July 18th, 2013.
13        MR. RUEGGER:  And if anybody wants to look
14       at a copy.
15   Q.  I'm not going to spend a lot of time on this, but if
16       you could, Mr. Moore, turn to page 1 of that document.
17       You can certainly review it to be familiar if you
18       want.  You have that page, sir?
19   A.  Yes, sir.
20   Q.  You'll notice in the first line under the introduction
21       it says -- there's a reference to a State appointed
22       "financial review team."  Do you know what that
23       reference is to?
24   A.  Yes.
25   Q.  What is the financial review team that's referenced

Page 40

1    there?
2    A.  This refers to, I believe, without going through the
3        entire document, the review team that was appointed by
4        the State to conduct a review of the City of Detroit's
5        finances to determine if an emergency exists.
6    Q.  Were you part of this financial review team that's
7        referenced here?
8    A.  No.
9    Q.  Do you know who was on that financial review team?
10   A.  I seem to recall a couple of the members, but I don't
11       know all of the people that were on the review team.
12   Q.  Fair enough.  Can you just identify those that you do
13       remember?
14   A.  Fred Headen and Darrell Burks.
15   Q.  Did this State appointed financial review team issue a
16       report or recommendation in writing?
17   A.  Yes, sir.
18   Q.  And when was that issued?
19   A.  I don't recall the exact date.
20   Q.  Was it 2013?
21   A.  Yes, sir.
22   Q.  Mr. Orr testified in deposition two days ago and he
23       mentioned that as part of the engagement process his
24       firm at the time Jones Day appeared before what I
25       believe the reference -- his -- he called a

Page 41

1  restructuring team of advisors for the City of
2  New York?
3          MS. LEVINE:  City of Detroit?
4          MR. RUEGGER:  City of Detroit, excuse me,
5  thank you.
6  Q.  Were you part of any team that entertained pitches
7      from law firms as the potential counsel to the City of
8      Detroit?
9          MR. MILLER:  Object to form.
10 A.  I participated in a day long session where
11     representatives of the City met with some law firms at
12     Metro Airport.
13 Q.  Do you remember approximately when that occurred?
14 A.  I believe it was the end of January of 2013.
15 Q.  And who else participated with you and the
16     representatives of the City of Detroit on that day?
17         MR. MILLER:  Object to form.
18 A.  From the standpoint of who were the people that were
19     meeting with the law firms?
20 Q.  Yeah, putting aside the various law firm people who
21     were appearing, but who on behalf of the City or in
22     coordination with the City were there and heard from
23     the law firms?
24 A.  From the City there was Jack Martin and Kriss Andrews.
25     I can't recall if there was anyone else there that was

Page 42

1  an employee of the City of Detroit.  And then there
2  were representatives from Miller Buckfire, Ernst &
3  Young and the State of Michigan.
4  Q.  Do you remember who was there from Miller Buckfire?
5  A.  Ken Buckfire, I believe Kyle Herman.
6  Q.  Anyone else?
7  A.  I don't recall if there was anyone else.
8  Q.  Who was there from E&Y?
9  A.  Gaurav Malhotra.
10 Q.  Anyone else?
11 A.  Not that I recall.
12 Q.  And from the State?
13 A.  Andy Dillon, Rich Baird, Brom Stibitz.  I can't recall
14     if there was anyone else there from the State.
15 Q.  At the time of the meetings at the airport, had
16     Conway MacKenzie been engaged by the City of New -- of
17     Detroit?
18 A.  Yes, sir.
19 Q.  Was that pursuant to an engagement letter or
20     agreement?
21 A.  It was pursuant to a contract that was approved by
22     city council and then executed by the City.
23 Q.  Do you happen to know -- this may be a question better
24     addressed to counsel that may not be here, but do you
25     know whether that contract is part of the data room in

Page 43

1  this case?
2          MR. MILLER:  Let me answer.  I don't know.
3          MR. RUEGGER:  Okay.
4          MR. MILLER:  And if you would like, just
5  email me and we'll confirm one way or the other.
6          MR. RUEGGER:  Before we trouble you we'll
7  try to see if we can find it in the data room.
8          MR. MILLER:  Okay.
9          MR. RUEGGER:  But thank you.
10 Q.  Had Conway MacKenzie been engaged by the City in any
11     role prior to the January contract with the City that
12     we just referenced?
13 A.  Not engaged, but Conway MacKenzie did do some pro bono
14     work for the City during 2012.
15 Q.  And what was the nature of that work in 2012?
16 A.  We assisted with a review and assessment of five areas
17     that involved cashiering operations to identify
18     recommendations for improvement.
19 Q.  And were these cashiering operations citywide or in
20     one specific geographic or operational area?
21         MR. MILLER:  Object to form.
22 A.  They were in specific operational areas.
23 Q.  And which specific operational areas were those?
24 A.  If I recall correctly, there was parking, building
25     safety engineering and environmental department.  I'm

Page 44

1  blanking on the other three areas, but they were
2  specific -- or department specific.
3  Q.  Has Conway MacKenzie ever been engaged by the State to
4      do work on a State matter, State of Michigan I mean?
5  A.  Not that I'm aware of.  Obviously I've been with the
6      firm for only 12 years, the firm's been around 26
7      years so I can't say before my time.  During my time I
8      don't believe that is the case.
9  Q.  So to the best of your understanding the first
10     engagement for Conway MacKenzie for either the State
11     or the city other than the pro bono work you
12     referenced was the contract that's currently in effect
13     for the City of Detroit that was signed in or around
14     January of 2013; is that correct?
15 A.  Yes, sir.
16         MS. LEVINE:  Good question.
17         MR. RUEGGER:  Sometimes it gets a little
18  carried away.
19 Q.  Were you involved in the discussions with the City
20     that predated the Conway MacKenzie engagement?
21         MR. MILLER:  Object to form.
22 A.  Can you be more specific about the conversations?
23 Q.  I'll try, I'll try.
24     Were there discussions between
25     Conway MacKenzie and the City of Detroit

Page 45

1    representatives related to the potential engagement of
2    Conway MacKenzie prior to the actual contract being
3    executed?
4  A.  Yes, sir.
5  Q.  When approximately did those contacts commence?
6  A.  Well, there was an RFP that went out in November -- I
7    think it was in November of 2012 that Conway MacKenzie
8    responded to and there were multiple meetings and
9    multiple correspondence with the City related to our
10    RFP response.  Prior to that RFP there were
11    discussions that took place with the City regarding
12    potential ways that Conway MacKenzie could assist the
13    City.
14  Q.  So there were communications prior to the RFP going
15    out?
16  A.  Yes, sir.
17  Q.  Who initiated those to the best of your recollection?
18  A.  Probably our firm and probably me.
19  Q.  And who at the City did you contact?
20  A.  I spoke with Kriss Andrews.
21  Q.  Did you know Mr. Andrews previously?
22  A.  Yes, sir.
23  Q.  How did you first meet Mr. Andrews?
24  A.  In the restructuring business when he was with his
25    previous firm.

Page 46

1  Q.  And what was his previous firm?
2  A.  BBK.
3  Q.  And do you recall what matter you first met
4    Mr. Andrews related to?
5  A.  No, I don't.
6  Q.  And can you tell us in summary what you said to
7    Mr. Andrews and what he said to you in that first
8    conversation?
9  A.  I reached out to Kriss when his appointment as program
10    manager director was made public to offer advice and
11    to share with him some ideas about issues that he
12    would be heading into with the City.
13  Q.  And what advice did you offer Mr. Andrews?
14  A.  One item that I had put out to him is a segregation of
15    the operating initiatives that were contained within
16    the financial stability agreement into different
17    categories and some potential approaches to those
18    categories.
19  Q.  What was the financial stability agreement that you
20    just mentioned?
21  A.  The financial stability agreement is sometimes
22    referred to by people as the consent agreement that
23    was entered into between the State of Michigan and the
24    City of Detroit around the beginning of April of 2012.
25  Q.  And you are familiar with that consent agreement?

Page 47

1  A.  Yes, sir.
2  Q.  How did you become familiar with that agreement?
3  A.  That is a public document that I reviewed after it was
4    executed.
5  Q.  So you just went into the public records to pull it
6    up?
7  A.  Yes, sir.
8  Q.  In addition to the advice you offered Mr. Andrews in
9    that first conversation -- was this on the phone?
10  A.  I believe that I had phone conversations with Kriss.
11    Prior to him starting with the City I took him to
12    breakfast to share some ideas with him and then as
13    part of the cashiering work that we were doing, there
14    may have been times that I provided a comment here or
15    there while we were at the City.
16  Q.  Approximately how many times did you speak with
17    Mr. Andrews before the RFP was issued?
18  A.  Related to the cashiering work or in total?
19  Q.  In any context.
20  A.  Very hard for me to say.
21  Q.  The cashiering work that Conway MacKenzie did for the
22    city spanned what time period?
23  A.  Approximately September of 2012 until November of
24    2012.
25  Q.  Approximately how many conversations either in person

Page 48

1    or on the phone did you have with Mr. Andrews related
2    to issues other than the cashiering work?
3        MR. MILLER:  Object to form.
4  A.  Maybe three or four.
5  Q.  Appearing these three or four were all before the RFP
6    was issued?
7  A.  Yes, sir.
8  Q.  During that period of time, again prior to the RFP
9    being issued, did you have any conversations with any
10    other representatives of the City relating to
11    potential Conway MacKenzie work for the City?
12  A.  One of my partners and a cofounder of the firm,
13    Van Conway, had a conversation with Mayor Bing at some
14    point prior to the financial stability agreement being
15    executed and Van Conway and I had a meeting with
16    Kirk Lewis when he was deputy mayor.
17  Q.  Other than the meeting with Mr. Lewis and Mr. Conway's
18    conversation with Mayor Bing, did anyone from your
19    firm have any contacts with City representatives to
20    your knowledge related to potential Conway MacKenzie
21    work for the City before the RFP was issued?
22  A.  Not that I'm aware of.
23  Q.  Approximately how many Conway MacKenzie professionals
24    have worked on -- related to the contract between
25    Conway MacKenzie and the City that was executed in

Page 49

1    January?
2  A.  Approximately 13.
3  Q.  And are you the lead for that effort?
4  A.  Yes, sir.
5  Q.  Can you describe generally what Conway MacKenzie's
6      done in connection with its -- withdrawn.
7          Starting in -- withdrawn.
8          Is it correct that Conway MacKenzie's work
9      for the City started in January of 2013?
10 A.  Under the contract that we previously discussed, yes,
11     sir.
12 Q.  Yes.  Okay.  And can you describe generally what
13     Conway MacKenzie did over the first three to four
14     months of that work?
15 A.  Yes, sir.  Conway MacKenzie is the operational
16     restructuring advisor to the City of Detroit.  The
17     first 90 days we spent going through the majority of
18     the departments of the City to identify the
19     deficiencies in those departments and to put together
20     an operational improvement plan.
21 Q.  And did Conway MacKenzie prepare that operational
22     improvement plan?
23 A.  Yes, sir.
24 Q.  And approximately when was that plan finished?
25 A.  June 14th.

Page 50

1          MR. RUEGGER:  I'm going to ask the court
2      reporter to mark as Moore Exhibit 3 the City of
3      Detroit proposal for creditors dated June 14th, 2013.
4          (Marked Exhibit No. 3.)
5  Q.  The first page of it is titled Exhibit C, because I
6      believe it was an exhibit to a court filing.
7          Do you recognize either the document or
8      some portion of that document, Mr. Moore?
9  A.  This appears to be the document that was handed out at
10     the June 14th meeting of the creditors, June 14th of
11     2013.
12 Q.  Okay.  Did you have -- withdrawn.
13         Did you and/or Conway MacKenzie have any
14     role in the preparation of this document?
15 A.  Yes, sir.
16 Q.  Can you describe generally what that role was?
17 A.  We provided assistance with various information
18     included in the body of the document and then the
19     creation of the restructuring and reinvestment
20     initiatives that are included in the ten-year
21     projection.
22 Q.  So and can you be more specific?  I mean, I understand
23     the ten-year projections are at page 90 from the table
24     of contents, but can you be more specific about what
25     portions of this document Conway MacKenzie had a role

Page 51

1      in preparing?
2          MR. MILLER:  It's a large document.  Do you
3      want him to go through it?
4          MR. RUEGGER:  Well, I don't need to have
5      him go through every page or even every section, but
6      he could actually just look at the table of contents
7      and probably give me enough of a sense.
8          MR. MILLER:  Why don't you spend some time
9      looking at the document?
10 A.  Mr. Ruegger, if I recall correctly, Conway MacKenzie
11     provided information that was used in the first
12     section, Detroit faces strong economic headwinds.  I
13     believe that we would have provided comments under the
14     key objectives for financial restructuring and
15     rehabilitation of Detroit.  The restructuring and
16     reinvesting in city government.  And then the ten-year
17     projections.
18 Q.  Of the four topics that you just mentioned, did
19     Conway MacKenzie prepare the original draft of any of
20     those sections or were those sections prepared by some
21     other group or entity and your group -- your firm gave
22     comments to that prior form?
23         MR. MILLER:  Object to form.
24 A.  If I recall correctly, we provided comments to a
25     document that was already started.

Page 52

1  Q.  Who started that document, if you know?
2  A.  We provided comments to counsel.
3  Q.  Counsel being Jones Day?
4  A.  Yes, sir.
5  Q.  Turning to the ten-year projections, which is page 90,
6      do you have that page, sir?  I'm sorry.
7  A.  Yes, sir.
8  Q.  Do you know where the figures on this page came from?
9  A.  I believe that these were prepared by Ernst & Young.
10 Q.  And you'll see there's a reference in the
11     parenthetical there saying general fund only.  How
12     many separate funds exist within the City of Detroit
13     if you know?
14 A.  I don't know the exact number offhand, but the general
15     fund, as you can see, revenue wise is between a
16     billion and a billion one.  Total revenue across all
17     funds for the City is about two and a half billion.
18 Q.  So you've got about another billion and a half in
19     other funds in the City?
20 A.  Yes.
21 Q.  And you said you did not know the specific number of
22     other funds.  Do you have a general understanding as
23     to the number of other funds?
24 A.  If we're talking about enterprise funds, I think that
25     there are maybe five other enterprise funds.

Page 53

1  Q.  And what about not enterprise funds?
2  A.  Other agencies, under five.
3  Q.  I've read somewhere, and I've been wrong many times,
4     but I've read somewhere that there are quite a number
5     of agencies within the City of Detroit government.  Do
6     you have an understanding of how many different
7     agencies the City of Detroit currently has?
8        MR. MILLER:  Object to form.
9        MR. RUEGGER:  Well, okay, I'll try it
10    again.
11  Q.  How many agencies within the City of Detroit
12    government to your knowledge?
13  A.  I don't know the exact number.
14  Q.  Is it more than 40?
15  A.  That seems very high to me.
16  Q.  Do you know whether each agency within the City of
17    Detroit has its own fund?
18        MR. MILLER:  Object to form.
19  A.  I don't believe that it does.
20  Q.  On the same subject you mentioned that the general
21    fund has approximately a billion dollars in total
22    revenues --
23  A.  Yes, sir.
24  Q.  -- right?  And your testimony will speak for itself.
25    You thought there might be another billion and a half

Page 54

1     of revenues that are outside the general fund, inside
2     within the City of Detroit.  Can you -- is that fair?
3  A.  Yes, sir.
4  Q.  Can you describe where those other funds were?
5  A.  You have --
6        MR. MILLER:  Let me just object to form.
7     Go ahead.
8  A.  You have the water and sewer department, Detroit
9     department of transportation, public lighting
10    department, parking.  Those are the primary ones that
11    come to mind.
12  Q.  Thank you.
13        You mentioned earlier that you attended a
14    meeting on around June 14th, 2013.  Where was that
15    meeting?
16  A.  The meeting I was referring to was -- I believe that
17    you asked when we completed our plan, I indicated June
18    14th.  That is the date that there was a meeting of
19    the creditors to present this proposal and that was
20    held at Metro Airport.
21  Q.  As best you recall who attended that meeting?  And if
22    you don't know the individuals' names, if you could
23    identify who they represented, that would be fine.
24  A.  Mr. Ruegger, there were about 200 people there so I
25    certainly don't know the names of all the people that

Page 55

1     attended.
2  Q.  All right.  What groups did you understand were
3     attending?
4  A.  My understanding is that representatives of all the
5     unions were invited, representatives of other
6     creditors, monoline insurers, I believe the pension
7     funds, possibly retiree associations.  I'm not sure if
8     there were any other groups.
9  Q.  And there were representatives of the City there too?
10  A.  Yes, sir.
11  Q.  Who attended on behalf of the City either as their
12    advisors or as employees of the City?
13  A.  Mr. Orr was there, the Emergency Manager.  Jack
14    Martin, the CFO.  The City's restructuring advisors
15    including counsel, so that would be representatives of
16    Jones Day, Conway MacKenzie, Miller Buckfire, Ernst &
17    Young.  I'm not sure if anyone else was there on
18    behalf of the City.
19  Q.  Did you speak at the meeting?
20  A.  Yes, sir.
21  Q.  What subjects did you address in your comments?
22  A.  I can't recall offhand which pages I covered.
23  Q.  Do you recall generally what your responsibility was
24    at that meeting?
25  A.  I think generally I was to cover some of the issues

Page 56

1     that exist today and then the foundation of the
2     restructuring initiatives.
3  Q.  Prior to the meeting on June 14th had you attended any
4     meetings with creditors or unions of the City?
5  A.  In the course of our work we, we being
6     Conway MacKenzie, would have met with employees of
7     departments that are part of unions.
8  Q.  So as part of your investigation, you were talking to
9     people who happened to be union members but working
10    for the City?
11  A.  Yes, sir.
12  Q.  Fair enough.  Did you meet with any representatives of
13    unions in that capacity during the period from January
14    till June 14th?
15  A.  Can you be clearer when you say in that capacity?
16  Q.  Yes, you pointed out a distinction that's fair, that
17    you met with union members but really as City
18    employees, not in their union status.  I'm now asking
19    whether you met with the unions, for example, people
20    who were there representing the union?
21  A.  Yes, sir.
22  Q.  In how many instances?
23        MR. MILLER:  This is still during the time
24    period you had previously said?
25        MR. RUEGGER:  Yeah, January to June.

Page 57

1   A.   That would be hard for me to estimate.  I myself
2        participated in meeting, members of my team
3        participated in a lot of meetings that I was not in,
4        so I don't know what that number would be.
5   Q.   Do you recall what the purpose of those meetings was
6        or purposes of those meetings?
7   A.   The meetings that I attended it was to understand from
8        the union standpoint some of the primary issues that
9        existed from an operational standpoint that they
10       wanted to see addressed.
11  Q.   Did you meet with any representatives of any retiree
12       associations during that same period?
13  A.   Not that I can recall.
14  Q.   Subsequent to the June 14th meeting did you or others
15       at Conway MacKenzie to your knowledge meet with
16       representatives of unions for any purpose?
17  A.   Yes, sir.
18  Q.   Do you recall approximately how many times?
19  A.   Again, it's very hard for me to estimate the total
20       number of meetings that would have taken place by the
21       entire team.
22  Q.   And am I correct the subject matter of those meetings
23       would have been the proposals and other information
24       that's basically contained in what's been marked as --
25       I believe it's Moore Exhibit 3?

Page 58

1        MR. MILLER:  Object to form.
2   A.   Yes, sir.
3   Q.   Did you meet with any representatives of any retirees
4        associations or groups after the time of June 14th?
5   A.   Yes, sir.
6   Q.   Do you recall approximately how many times?
7   A.   Well, beginning on June 20th there were meetings with
8        two different meetings held on June 20th that involved
9        retiree associations.
10  Q.   And you attended those meetings?
11  A.   Yes, sir.
12  Q.   Other than those two meetings do you recall any other
13       meetings with retiree associations in the period after
14       June 14th?
15  A.   Yes, there was -- there were meetings on July 10th
16       that I participated in where retiree associations were
17       represented.
18  Q.   Any others?
19  A.   I don't recall specifically.  We -- from a due
20       diligence standpoint the number of meetings that took
21       place in the time period that you're referencing post
22       June 14th were substantial.
23  Q.   When you say from a due diligence standpoint, was that
24       due diligence being undertaken by the retiree groups
25       or by Conway MacKenzie or by some other group?

Page 59

1   A.   These are due diligence sessions being undertaken by
2        creditor constituents where we would meet, discuss in
3        more detail the plan and hopefully share ideas as to
4        what people were thinking about the plan.
5   Q.   I want to switch subjects now and turn to your
6        declaration again, which is Moore Exhibit 1.
7            If you could turn, sir, to paragraph 11,
8        which is on page 5.  And you'll see the first sentence
9        in paragraph 11 reads, the combined reported UAAL for
10       the systems, however, is premised upon a host of
11       valuation assumptions and methods that in the City's
12       view serve to substantially understate the systems'
13       unfunded liabilities.
14           Do you see that sentence, sir?
15  A.   I do.
16  Q.   Can you identify what valuation assumptions and
17       methods you refer to in that sentence?
18  A.   If you continue on in that paragraph, I mention the
19       assumed rate of return on the plan assets.
20  Q.   That's one, yes, sir.
21  A.   Yes.
22  Q.   Any others?
23  A.   Another is referred to in the next paragraph,
24       paragraph 12, which discusses the process of asset
25       smoothing and specifically over a seven-year period.

Page 60

1   Q.   Any others?
2   A.   Those are the only two that I've referenced here in
3        the declaration.  In the course of determining the
4        UAAL or just the underfunded position of the pension,
5        there are a wide variety of assumptions and looking at
6        every one of those assumptions separately one could
7        make a determination as to whether that is
8        conservative, realistic or aggressive and there are
9        certainly, like I say, a number of other assumptions
10       that I did not get into in this document that
11       certainly could come into play with that sentence at
12       the beginning of paragraph 11.
13  Q.   And it's those assumptions and methods that I would
14       like to discuss now.  So other than the ones that you
15       address in the declaration, do you recall now any
16       other assumptions that you believe serve to
17       substantially understate the systems' unfunded
18       liabilities?
19  A.   The underfunded calculations take into account
20       contributions that were supposed to have been made by
21       the City that were not actually made.
22  Q.   And is that the subject that you address in paragraph
23       20 of your declaration?
24  A.   Yes.
25  Q.   Any others that come to mind?



Page 61

1  A.  The rate of payouts is another area where the
2      actuaries make assumptions as to what benefits will be
3      paid in what periods and to the extent that those are
4      underestimated, that can impact the funded position as
5      well.  Tying into previous assumptions that I had
6      indicated.
7  Q.  So is it -- is it your position that the City views
8      the actuarial payout assumptions as understating
9      unfunded liabilities?
10         MR. MILLER:  Object to form.  Go ahead.
11  A.  As an example, Mr. Ruegger, the actuarial valuation
12      assumes certain payouts.  The actual payouts in the
13      most recent completed year of plan assets were
14      substantially higher than what was anticipated prior
15      to that valuation being done and so at a minimum that
16      would indicate that there were more assets that were
17      paid out than what was assumed by the actuary.
18  Q.  Other than the assumptions and methods you've
19      identified, are there any other assumptions and
20      methods that to your understanding the City views as
21      understating the systems' unfunded liabilities?
22  A.  The City and most importantly its actuary has not
23      completed its analysis on the unfunded position.  The
24      City is trying to undertake a process to actually
25      develop a more concrete valuation model on its own so

Page 62

1      it's been relying on the valuation model of the
2      pension systems' actuary.  As such we have focused on
3      a few items here, but until the City completes its
4      analysis and completes its own actuarial valuation,
5      neither the City nor its actuary nor I would be able
6      to say what all the assumptions are that could be used
7      to either overstate or understate the funded position.
8  Q.  Very well.
9          Let's turn to one of the assumptions that
10      you address in your declaration and specifically in
11      paragraph 11 you talk about the projected net rate of
12      return.  The 7.0 percent or 7.25 percent figure, do
13      you see that in paragraph 11?
14  A.  Yes, sir.
15  Q.  Those were not figures that were recommended by a
16      particular actuary; were they?
17  A.  The 7 percent is actually higher than the rate that
18      Milliman, the City's actuary, had originally put
19      forward, which in its view would result -- the rate at
20      which there was a fifty-fifty chance of achieving that
21      rate.
22         MR. RUEGGER:  All right.  I'm going to move
23      to strike, because with all respect that was not
24      responsive to my question, Mr. Moore.
25  Q.  I understand Milliman has prepared a variety of

Page 63

1      letters and reports and we'll take those up with the
2      Milliman folks, but I'm trying now to focus on the 7.0
3      figure.  That was a figure selected by the City for
4      illustrative purposes; correct?
5         MR. MILLER:  Object to form.
6  A.  Yes.
7  Q.  And that was not the specific figure or a specific
8      figure recommended by Milliman or any other actuary;
9      correct?
10  A.  I can't speak to any other actuary, but going back to
11      the previous question, yes, 7 percent was used for
12      illustrative purposes.
13  Q.  The -- and the Milliman analysis that's been
14      undertaken so far, to your understanding, that hasn't
15      been the product of work on the actual data for the
16      systems; has it?
17         MR. MILLER:  Object to form.
18         MR. RUEGGER:  Okay, that was a poor
19      question, I'll try again.  Actually withdrawn.
20  Q.  Related to the projected net return, in paragraph 15
21      of your declaration, I believe it's 15, you have a --
22      we'll get to it.
23         Let's talk now about the concept of
24      smoothing that you reference in paragraph 12.  In your
25      understanding smoothing is a common calculation used

Page 64

1      by actuaries related to pension projections; correct?
2  A.  I would clarify your question from the standpoint of
3      typically pension boards will decide on the policies
4      and then actuaries will perform calculations based on
5      the policies that a board will decide to use.
6  Q.  But smoothing is a common practice for actuaries; is
7      it not?
8         MR. MILLER:  Object to form.
9  A.  Based on my experience, yes, there is a number of
10      plans that I've looked at that involve a smoothing.
11  Q.  And would you agree that smoothing is a method to
12      manage the effect of investment volatility on
13      contributions and to provide a more consistent measure
14      of plan funding over time?
15         MR. MILLER:  Object to form.
16  A.  Generally speaking, yes.  What's important to note is
17      that smoothing is a concept, and I agree with the
18      purpose of that concept.  The number of years over
19      which a pension system may smooth can differ
20      significantly.
21  Q.  Based on the -- well, withdrawn.
22         To your knowledge is smoothing generally
23      consistent with the actuarial standards of practice?
24         MR. MILLER:  Object to form.
25  A.  Well, I can tell you, Mr. Ruegger, later this year new

Page 65

1    GASB standards go into effect, GASB 67 and 68, that
2    actually for financial reporting purposes will not
3    allow smoothing.
4    Q.  Okay, so then go back to my question, which related to
5        actuary standards or practice.  Is not smoothing
6        consistent and endorsed by actuarial standards of
7        practice?
8            MR. MILLER:  Object to form.
9    A.  As we established earlier, I'm not an actuary so I
10       can't comment on that.  I am a CPA so I can comment on
11       financial reporting standards.
12   Q.  Do you -- there's some reference here.
13           You'll see in paragraph 14, the first
14       sentence references the City's estimated underfunding
15       of approximately $3.5 billion.  Do you see that
16       reference?
17   A.  Yes, sir.
18   Q.  Do you know whether that calculation was based on the
19       assumption the systems would continue or that they
20       would be frozen?
21           MR. MILLER:  Object to form.
22   A.  My understanding is that this is based on the
23       assumption that the plans would continue.
24   Q.  And if the plans were to continue, would, in your
25       view, it be more appropriate to use actuarial values

Page 66

1        for assets and liabilities or market figures for
2        assets and liabilities?
3            MR. MILLER:  Object to form.
4    A.  It depends on for what purpose the calculation is
5        being made.
6    Q.  Okay.  And can you explain that answer?
7    A.  If you are referring to for financial reporting
8        purposes, I can comment on the basis that is included
9        in GASB Statements 67 and 68 that are coming out.  As
10       to whether it is appropriate from an actuarial
11       standpoint, again, because I'm not an actuary, I can't
12       comment on that.
13   Q.  When you refer to the City in these -- starting in
14       paragraph 11, who at the City are you referring to?
15           MR. MILLER:  Object to form.
16   Q.  Or I'll try it again.
17           Who working within or for the City do you
18       include when you make a reference such as in the
19       beginning of paragraph 11 related to the City's view?
20           MR. MILLER:  Object to form.
21   A.  My primary contact at this point within the City is
22       Mr. Kevyn Orr.
23   Q.  So when you reference the City's view or the City's
24       position in your declaration in Moore Exhibit 1, you
25       mean Mr. Orr?

Page 67

1            MR. MILLER:  Object to form.
2    A.  Based on the discussions that would have taken place
3        with Mr. Orr, yes, he is in agreement with these
4        statements.
5    Q.  In paragraph 15 of your declaration you address the
6        systems' use of 29- and 30-year amortization periods
7        for funding the underfunding.  Do you see that
8        discussion, sir?
9    A.  Yes, sir.
10           MR. MILLER:  Let me object to form in
11       connection with the prior question.
12           MR. RUEGGER:  That's fine.
13   Q.  Do you have any understanding whether amortization
14       periods of 29 and 30 years are commonly used for
15       governmental pension plans?
16   A.  Commonly used I think is difficult to say, because
17       there are obviously probably thousands of pension
18       plans in the United States, so not having the data to
19       understand how often that's used, I am aware of other
20       plans, other governmental plans, that use 29- or
21       30-year amortizations.
22   Q.  Do you have any understanding whether the amortization
23       periods used for the PFRS and the GRS are matters that
24       were voted on by the Detroit city council?
25   A.  I don't know how the board comes to decide on its

Page 68

1        policies.
2    Q.  And the board you're talking about here is the board
3        that -- of the systems, the respective systems --
4        withdrawn.
5            And when you say the board, do you mean the
6        board of the GRS, the General Retirement System, or
7        the -- and/or the PFRS?
8    A.  Yes, sir.
9    Q.  So the policy -- withdrawn.
10           So the amortization period in your view is
11       approved by the board of the respective systems;
12       correct?
13   A.  That's my understanding.
14   Q.  And if I'm understanding your testimony, you don't --
15       you do not have an understanding of whether the city
16       council also weighs in on that amortization period;
17       correct?
18   A.  Correct, I do not have visibility if there are other
19       individuals that influence the boards' decisions as to
20       policies.
21           MR. RUEGGER:  All right.  It's noon so I
22       would like to go off the record and discuss the
23       process for a second.
24           (Discussion held off the record.)
25           MR. RUEGGER:  Back on the record.  Off the

Page 69

1    record we just discussed how counsel is trying to
2    allocate various time, shared time with Mr. Moore and
3    with Mr. Moore's consent, we're going to let
4    Ms. Levine ask questions now.  I am not done, but
5    we're hopeful after Ms. Levine and Mr. Ciantra and
6    whoever else wants to ask questions that we can get
7    back to my questions and not take too much time from
8    Mr. Moore and Evan.
9         MR. MILLER:  And that's acceptable to us
10    and the deponent.
11              EXAMINATION
12    BY MS. LEVINE:
13    Q.  Good afternoon.  Sharon Levine, Lowenstein Sandler,
14    for AFSCME.  Thank you for appearing today.
15    A.  Thank you.
16    Q.  In preparation for today's deposition did you speak to
17    anyone at the -- about the City's Chapter 9 case or
18    your declaration?
19    A.  Yes.
20    Q.  And with whom did you speak?
21    A.  I spoke with Mr. Miller.
22    Q.  Anybody else?
23    A.  No.
24    Q.  Did you speak with Mr. Orr?
25    A.  No.

Page 70

1    Q.  Did you speak with any city or State employees?
2    A.  No.
3    Q.  And when did you speak with Mr. Miller?
4    A.  On Monday and I also spoke with him yesterday.
5    Q.  When you spoke on Monday, what did you discuss?
6         MR. MILLER:  Objection.  And Sharon, let's
7    see how we can parse this in a way that doesn't reveal
8    confidential attorney-client communications.  How
9    about if the question is rephrased so that Mr. Moore
10    generally addresses the topics that were discussed.
11         MS. LEVINE:  We can get to that, but first
12    instance is -- let's go -- let's try this first.
13    Q.  By whom were you retained?
14    A.  City of Detroit.  And I assume when you say you,
15    you're referring to Conway MacKenzie?
16    Q.  Conway MacKenzie.  By whom is Conway MacKenzie
17    retained?
18    A.  The City of Detroit in this matter.
19              (Marked Exhibit No. 4.)
20    Q.  I'm going to show you what's been marked Moore 4 for
21    identification.  Do you recognize that email?
22         MR. MILLER:  Is this your only copy?
23         MS. LEVINE:  Apologize.  Well, I don't have
24    a lot, but a couple.
25    Q.  Have you seen it?

Page 71

1         MR. MILLER:  What is -- I don't believe
2    there was a question pending.
3    Q.  No, there wasn't, I'm just asking.  Have you seen this
4    email before today?
5    A.  I am on this email so it certainly appears that I
6    would have seen it.
7    Q.  But judging by the nature of your answer, you don't
8    have an independent recollection; correct?
9    A.  Correct.
10    Q.  Mr. Baird is copied in the -- Mr. Baird is referenced
11    in the email change; correct?
12    A.  Mr. Baird?
13    Q.  Yeah, Mr. Baird.
14    A.  At the bottom I see that there is a --
15    Q.  You realize on the transcript it's going to be tomato
16    tomato?
17    A.  Oh, I see, it's on the back as well.  So yes, I do see
18    that.
19    Q.  Okay, Mr. Baird is in the governor's office; correct?
20    A.  That's my understanding, yes.
21    Q.  Did you discuss your retention in this matter with
22    anyone in the governor's office?
23         MR. MILLER:  Object to form.
24    A.  At which time, Ms. Levine?
25    Q.  In or about May of 2012.

Page 72

1    A.  Our interest in being retained in the case, yes.
2              (Marked Exhibit No. 5.)
3    Q.  I'm going to show you what's been marked Moore 5 for
4    identification.  Do you recognize this email?
5         MR. MILLER:  There's more than one email.
6    Q.  Do you recognize -- well, actually it's one email with
7    forwards.  Do you recognize the email chain on Moore
8    5?
9    A.  Yes, ma'am.
10    Q.  Were you continuing to discuss the possibility of
11    Conway MacKenzie's retention by the City with
12    Mr. Baird?
13         MR. MILLER:  Object to form.
14    A.  Exhibit 4 and Exhibit 5 appear to be the same thing,
15    at least from the standpoint of the original email
16    exchange.
17    Q.  Okay, so you were having conversations with Mr. Baird
18    in or about May of 2012 with regard to your engagement
19    -- with regard to you, meaning Conway MacKenzie's
20    engagement by the City?
21         MR. MILLER:  Object to form.
22    A.  Yes.  As I had stated earlier, and it appears these
23    emails all were on May 21st, that we were discussing
24    our interest in having a role with the City of
25    Detroit.

Page 73

1  Q. Were there conversations that involved you, anybody
2     from the -- somebody from the State and somebody from
3     the City in or about that same time frame with regard
4     to Conway MacKenzie's engagement by the City?
5        MR. MILLER: Object to form.
6  A. You're referring to at the same time?
7  Q. Yes.
8  A. Not that I can recall.
9  Q. Were you having separate conversations with Mayor Bing
10    or anybody else on behalf of the City with regard to
11    your engagement in or about the May/June time frame
12    2012?
13       MR. MILLER: Object to form.
14 A. In around May I don't think so. As I had indicated in
15    previous questioning, my partner, Van Conway, had
16    spoken to Mr. Bing -- or Mayor Bing, but that would
17    have been before the financial stability agreement and
18    my next interaction with the City would have been
19    after Kriss Andrews was identified as the program
20    management director, which wasn't until, if I recall
21    correctly, June of 2012.
22       (Marked Exhibit No. 6.)
23 Q. I'm going to show you what's been marked Moore 6 for
24    identification. Mr. Ciantra made a fair request. The
25    document number is DTMI00078512.

Page 74

1        Do you recognize this email?
2  A. No, I don't.
3  Q. Okay. There's a discussion in this email of two or
4     three firms providing financial restructuring services
5     to the City. In or about December of 2012 was
6     Conway MacKenzie being considered for a role with the
7     City?
8        MR. MILLER: Well -- are you finished with
9     your question? I'm sorry.
10       MS. LEVINE: There was -- that was the end
11    of the question.
12       MR. MILLER: Object to form.
13 A. Ms. Levine, if you can just give me a minute to review
14    the email.
15       Ms. Levine, can you repeat your question?
16 Q. Let me do it a different way.
17       There's a -- were you being considered for
18    the role of restructuring advisor to the City?
19 A. In December of 2012?
20 Q. Yes.
21 A. That's my understanding, yes.
22 Q. Were you also being considered for the role of
23    operational advisor?
24 A. If I recall correctly, the RFP that went out was just
25    for restructuring advisory services. There was not a

Page 75

1     specification for operational at that point.
2  Q. What's the reference in the second sentence then?
3     Conway MacKenzie prefers a role as restructuring
4     advisor but will consider a role as operating advisor
5     if asked.
6        MR. MILLER: I'm sorry, in connection
7     with --
8        MS. LEVINE: Page 3 of Moore --
9        MR. RUEGGER: Six?
10       MS. LEVINE: Six.
11 A. The --
12       MR. MILLER: Wait. Can you repeat the
13    question?
14       (Record read back as requested.)
15 A. As I mentioned, Ms. Levine, the RFP that went out in
16    November was just for restructuring advisor and there
17    was a scope of services associated with that. At some
18    point subsequent to that we were approached about
19    having a specific role on the operational side, which
20    as Mr. Andrews apparently wrote here we indicated that
21    we would consider that role.
22 Q. What were the scope of services to be provided by the
23    restructuring advisor to the City according to the RFP
24    you just referenced?
25 A. I don't recall offhand.

Page 76

1  Q. Generally what are the scope of services or what's
2     your understanding of the scope of services a firm
3     like Conway MacKenzie would perform as a restructuring
4     advisor?
5        MR. MILLER: Object to form.
6  A. Rather than speculate on what was in that RFP --
7  Q. No, I changed the question. What's your understanding
8     of what a firm like yours, what would be the scope of
9     services you would perform as a restructuring advisor?
10 A. You're asking me in general if a company or a
11    governmental entity is asking for restructuring
12    advisory services, what --
13 Q. Conway MacKenzie prefers a role as restructuring
14    advisor. I'm asking you what's your understanding of
15    the services a firm like Conway MacKenzie would
16    perform in the role of restructuring advisor?
17 A. Ms. Levine, you're asking a question that is somewhat
18    vague and so I'm just trying to clarify. My -- and
19    what I want to understand is are you asking about the
20    services --
21 Q. Let me ask it a different --
22 A. -- the services --
23       MR. MILLER: No, let him finish.
24 A. Are you asking about the services that we would
25    provide in this situation or in any situation?

Page 77

1  Q.  Let me ask it a different way.
2       Are the services provided by a
3   restructuring -- is it your understanding that the
4   services that are provided by a restructuring advisor
5   are broader in scope and greater than the services
6   that would be provided as an operational advisor?
7  A.  I don't know if I have an opinion on that.  Those are
8   two different terms.  These are not defined terms.
9  Q.  Why -- what's your understanding of why
10   Conway MacKenzie would prefer the role of
11   restructuring advisor over the role of operational
12   advisor?
13       MR. MILLER:  Object to form.
14  A.  As it was presented to us in this specific situation,
15   the operational role was slightly more narrow in scope
16   than what was contained in the overall restructuring
17   advisor RFP.  The City ended up selecting multiple
18   firms and parsing out the different responsibilities.
19  Q.  So but at this point in time it was your understanding
20   that the restructuring advisor role was basically a
21   bigger, more broad role than the role that the City
22   was then contemplating for the operational advisor?
23  A.  The services that were listed in the RFP --
24  Q.  It's a yes or no question.
25       MS. LEVINE:  Can you read back my question,

Page 78

1   please?
2       (Record read back as requested.)
3  A.  Ms. Levine, the reason why I can't answer it as a yes
4   or no is because you're referring to a specific role
5   and what I'm trying to clarify is that in the RFP
6   there was a scope of services, restructuring services,
7   that were being asked for.  The operational advisor
8   was to address a specific part of those scope of
9   services.
10  Q.  We'll try again.
11       Conway MacKenzie prefers a role as
12   restructuring advisor but will consider a role as
13   operating advisor if asked.  What's your understanding
14   of why Conway MacKenzie prefers the role of
15   restructuring advisor over the role of operational
16   advisor?
17  A.  It was our understanding when the RFP went out that
18   the City would be selecting one firm to provide those
19   services.  As time went on, the City considered and
20   eventually did assign those responsibilities to
21   multiple firms.
22  Q.  So the restructuring advisory role at that time it was
23   your understanding was going to be a bigger role?
24  A.  The restructuring advisor role is not a defined role.
25   The scope of services that was in the RFP was greater

Page 79

1   than what our scope ended up being as operational
2   advisor.
3       MS. LEVINE:  Let me try it a different way.
4  Q.  Was it your understanding back -- at the point in time
5   that Conway MacKenzie was indicating it preferred a
6   role as restructuring advisor but would consider a
7   role as operational advisor, was it your understanding
8   that the restructuring advisor role if given to just
9   one firm would have been a more lucrative engagement?
10  A.  How do you define lucrative?
11  Q.  Would your firm have earned more fees as restructuring
12   advisor as originally -- as you understood it -- as
13   you understood -- let me start again.
14       Would your firm have earned more fees in
15   the role of restructuring advisor as you understood it
16   in December of 2012 than as you've understood the role
17   of operational advisor at that time?
18  A.  That's unclear to me.
19  Q.  When you say the role of restructuring advisor was a
20   bigger role or was a -- had you indicated the role of
21   restructuring advisor was a broader role and a role
22   that was then split up among other firms and you were
23   interested in the role when you thought it was going
24   to be just one firm, did you believe that that role
25   was going to be requiring more services than the role

Page 80

1   of operational advisor?
2       MR. MILLER:  Object to form.
3  A.  Ms. Levine, you keep using the word role and I keep
4   going back to there was not a restructuring advisor
5   role.  There was an RFP that went out in November
6   which contained a number of potential services and the
7   role, the operational advisor role that we ended up
8   getting engaged for, was a subset of the services.
9   There was no guaranty though that the firm -- that the
10   City was going to engage one firm for all those
11   services.  Those services were potential services.
12  Q.  I'll try again.  Conway MacKenzie prefers a role as
13   restructuring advisor but will consider a role as
14   operational advisor.  What's your understanding of
15   what that sentence means?
16       MR. MILLER:  Object to form.
17  A.  If you have two options, on the one hand it is a
18   broader scope of services versus a more narrow scope
19   of services, then our understanding, if there was
20   going to be one firm with that, there would be a
21   broader scope of services than if it was parsed out
22   into individual firms.
23  Q.  Okay.
24       MS. LEVINE:  Hungry?
25       THE WITNESS:  Not yet.



Page 81

1       (Marked Exhibit No. 7.)
2   Q.  I'm going to show you what's been marked as Moore 7.
3       This is an email dated December 19th, 2012
4       between you and Van Conway.  Do you see that?
5   A.  Yes, ma'am.
6   Q.  There's an email chain, which has another email
7       attached.  Is that correct?
8   A.  Yes.
9   Q.  Is this -- who is -- who's Van Conway?
10  A.  Van Conway is a partner of mine and cofounder of the
11      firm, Conway MacKenzie.
12  Q.  And who -- and what did you enclose in this email?
13  A.  The email from Van to me?
14  Q.  No, what did you enclose in -- sorry, it attaches an
15      email from you to Kriss Andrews; correct?
16  A.  Yes.
17  Q.  What did you enclose in the email?
18  A.  Well, it says, here attached is a draft Exhibit A
19      containing the proposed scope of services for
20      Conway MacKenzie as part of its contract with the City
21      of Detroit, so I'm assuming that I attached a draft
22      Exhibit A.
23  Q.  Do you recall what the scope of services you were
24      proposing as an attachment to this email?
25  A.  I don't.

Page 82

1   Q.  Did you understand what you meant by the word scope in
2       that email?
3           MR. MILLER:  Object to form.
4   A.  Can you please clarify your question?
5   Q.  Well, were you responding to the RFP in the email or
6       is there a separate understanding of what you meant by
7       scope of services?
8   A.  The RFP response that was submitted by our firm was
9       back in November and so this is a specific scope of
10      services related to our potential contract.
11          (Marked Exhibit No. 8.)
12  Q.  I'm going to show you what's been marked Moore 8 for
13      identification.
14          MR. MILLER:  Do you have another copy?
15          MS. LEVINE:  Yes, it's right here.  Sorry.
16          MR. MILLER:  Thank you.
17  Q.  DTMI00079527.
18          Do you recognize that email?
19  A.  Looks like an email from me to Kriss Andrews.
20  Q.  And what's enclosed and does it reference an
21      enclosure?
22  A.  It references a draft Exhibit A containing the
23      proposed scope of services for Conway MacKenzie.
24  Q.  Okay, do you recall what the scope of services were
25      that you included in that draft Exhibit A?

Page 83

1   A.  No, I don't.
2   Q.  Was it for restructuring advisors?
3   A.  I don't recall.
4           (Marked Exhibit No. 9.)
5   Q.  I'm going to show you what's been marked Moore 9 for
6       identification.  DTMI00079526.
7           Do you recognize this email?
8   A.  No, I don't.
9   Q.  Okay, it appears to be an email from Kriss Andrews to
10      Mr. Baird attaching a scope of work from
11      Conway MacKenzie, also dated December 2012?
12  A.  I -- I understand that, yes.
13  Q.  Is that -- does that refresh your recollection as to
14      whether or not you saw the email?
15  A.  No, Ms. Levine, I'm not on this email.  I don't recall
16      receiving this email.
17  Q.  Okay.  The email references the need to get a contract
18      on the council agenda for the 8th.  Is that for
19      January 8th?
20  A.  I would assume so, since that is when council actually
21      took up our contract.
22  Q.  Did you have any conversations with Mr. Baird with
23      regard to getting retained and in connection with --
24      in regard to getting retained in or about this time
25      frame?

Page 84

1           MR. MILLER:  Object to form.
2   A.  I believe I did, yes.
3   Q.  And did you also have conversations with Kriss
4       Andrews?
5   A.  Yes.
6   Q.  Did you ever conversations with anybody else on behalf
7       of the State in or about this time frame with regard
8       to your engagement?
9   A.  Yes.
10  Q.  And did you have other conversations with anybody else
11      on behalf of the City with regard to your engagement?
12  A.  I don't believe so.  I think just Kriss Andrews.
13  Q.  And prior to the time of the -- let me put it this
14      way.  Is the agenda for the 8th, is that a city
15      council meeting?
16  A.  Well, it says council agenda for the 8th and city
17      council took up our proposed contract on January 8th
18      so I'm assuming that that's what he's referring to,
19      but again, I did not write this email.
20  Q.  Did you negotiate the proposed terms of your
21      engagement with anybody at the State level?
22  A.  Could you be more specific on terms of the contract?
23  Q.  No, I didn't -- that wasn't the question.  Did you
24      negotiate your proposed terms of engagement with
25      anybody at the State level --

Page 85

1    MR. MILLER: Object --
2  Q.  -- in or about December 2012?
3  A.  If you can just be clear on when you say negotiate,
4      what you are referring to?
5  Q.  Did you have any discussions with -- okay, we're -- I
6      forgot, negotiate's a big word in this case. Strike
7      that, I'll rephrase it.
8          Did you have any discussions with anybody
9      at the State with regard to the terms of your
10     engagement in or about December of 2012?
11 A.  I seem to recall, yes.
12 Q.  With whom did you have those discussions?
13 A.  Rich Baird and probably Andy Dillon.
14 Q.  Anybody else?
15 A.  Not that I can recall.
16 Q.  Did you have discussions with anybody at the City
17     level with regard to the terms of your engagement in
18     or about December of 2012?
19         MR. MILLER: Object to form.
20 A.  As I indicated before, Kriss Andrews.
21 Q.  Anybody else?
22 A.  Not that I can recall.
23         MR. MILLER: Object to form.
24 Q.  Were any of these discussions either with
25     representatives of the State or representatives of the

Page 86

1      City in person?
2  A.  I believe so, yes.
3  Q.  Who was present in the in person meetings?
4          MR. MILLER: Object to form.
5          MR. CIANTRA: Can you specify, Mr. Miller,
6      what your formal objection is to that question so we
7      can obviate any dispute in the future?
8          MR. MILLER: Yes, it doesn't parse as to
9      whether the in person meetings are with
10     representatives of the State or representatives of the
11     City.
12         MR. CIANTRA: Thank you.
13 Q.  Did you have any meetings with either representatives
14     of the State or the City in or about December of 2012
15     with regard to the terms of your -- or the scope of
16     your engagement by the City?
17 A.  In person?
18 Q.  Yes.
19 A.  Yes.
20 Q.  How many meetings took place?
21 A.  I don't recall.
22 Q.  Were there any meetings that took place just with
23     representatives of the State?
24 A.  Yes.
25 Q.  Do you recall how many of those meetings took place?

Page 87

1  A.  Perhaps two.
2  Q.  Who was present?
3  A.  At one meeting I met with Rich Baird and Darrell Burks
4      was present in his capacity as a member of the
5      financial advisory board and then in another meeting
6      that would have been with Andy Dillon.
7  Q.  Was anybody else present at the meeting you were at
8      with Andy Dillon?
9  A.  I recall Andy's assistant was in the room and I think
10     Tom Saxton was on the phone.
11 Q.  Who's Tom Saxton?
12 A.  Tom, as I understand it, works in Andy's area, the
13     treasury department for the State of Michigan.
14 Q.  Were there any meetings in or about this same time
15     frame with just representatives of the City?
16 A.  Yes.
17 Q.  And how many of those meetings took place?
18 A.  I don't recall.
19 Q.  More than five?
20 A.  Face-to-face meetings, I don't think so.
21 Q.  How many -- were there more than five meetings
22     telephone and face-to-face?
23 A.  Very possibly. This was -- the RFP -- our response to
24     the RFP went out early in November and this is
25     obviously mid to later December so that's a lot of

Page 88

1      time to have discussions.
2  Q.  Were there any discussions that took place between you
3      in which both the State and City representatives
4      participated?
5  A.  The initial meetings that all of the firms -- or at
6      least the firms that the State and the City invited in
7      as a result of the responses to the RFPs were both the
8      City and the State. There was at least one follow-up
9      interview with representatives of both the City and
10     the State, there may have been two follow-up
11     interviews, I can't recall.
12 Q.  Were there any telephone conferences where
13     representatives of both the City and the State
14     participated in or about December of 2012?
15 A.  I don't recall if there were telephone calls where
16     both the City and the State were on.
17         (Marked Exhibit No. 10.)
18 Q.  I'm going to show you what's been marked Moore 11.
19     Document DTMI00079528.
20         MR. MILLER: There's no Moore 10 that's
21     been introduced.
22         MS. LEVINE: I'm sorry, this is Moore 10
23     and this one, I don't know, I must have gotten ahead
24     of myself.
25 Q.  Okay, Exhibit A, scope of services, do you see that

Page 89

1    document?
2    A.  Yes, ma'am.
3    Q.  Is this --
4         MR. MILLER:  Wait one moment because of the
5    confusion generated by the identification of this
6    document, let's specifically identify it as
7    DTMI00079528 through 530.
8    Q.  Do you see that document in front of you?  It's
9    Exhibit A, scope of services?
10   A.  Yes, ma'am.
11   Q.  Does this -- is this the Exhibit A that was attached
12      to the emails we were just discussing?
13   A.  I have no idea.
14        MR. MILLER:  Wait.
15   Q.  Okay.  Do you recall providing this document to the
16      State and the City in or about December of 2012?
17   A.  I don't recall.
18   Q.  I want to show you the first paragraph where it says,
19      the terms of this contract shall begin on January 9,
20      2013 and shall terminate on December 31, 2013.
21        Did you respond to an RFP for the City to
22      provide services during that time frame?
23   A.  Yes, ma'am.
24   Q.  Did you provide -- did you provide -- respond to an
25      RFP to provide services as the chief restructuring

Page 90

1    officer for the City of Detroit?
2         MR. MILLER:  Object to form.
3    Q.  During that time frame?
4    A.  Chief restructuring officer?
5    Q.  Sorry, chief restructuring advisor.
6    A.  I don't recall if the RFP asked specifically for that.
7    Q.  Well, the document that we're looking at says, the
8       services to be performed, the contractor will serve as
9       chief restructuring advisor to the City of Detroit.
10      In its capacity as CRA, contractor will be the lead
11      restructuring agent for the City of Detroit and will
12      coordinate activities of the various City of Detroit
13      advisors.
14        Does that refresh your recollection?
15   A.  Ms. Levine, this is a document that could have been
16      drafted by Conway MacKenzie, it could have been
17      drafted by the City of Detroit, I'm not sure.  What
18      does appear to me, though, is based on what you just
19      read this is not the scope of services that wound up
20      in the final contract.
21        (Marked Exhibit No. 11.)
22   Q.  I'm going to show you what's been marked Moore 11.
23      Document number DTMI00078909.  Do you recognize this
24      document?
25   A.  This appears to be the final contract that was entered

Page 91

1    into between Conway MacKenzie and the City of Detroit.
2    Q.  Did you participate in the negotiation of this final
3       contract?
4    A.  Yes.
5    Q.  Did you review this final contract before it was
6       executed?
7    A.  Yes.
8    Q.  Did you sign-off on the terms of this contract before
9       it was executed?
10   A.  Yes.
11   Q.  On the page marked DTMI00078925, it appears to be a
12      January 7, 2013 letter, which is part of -- is it your
13      understanding that this letter is part of the
14      contract?
15        MR. MILLER:  Object to form.
16   A.  Ms. Levine, I would just point out that that appears
17      to me to be a bit of a legal question as to whether
18      this is part of a contract and I don't know if I'm
19      able to answer that question.
20   Q.  Okay.  Is it your understanding that the City is
21      responsible for half of your fees and the State is
22      responsible for half of your fees?
23   A.  That is my understanding, yes.
24   Q.  How did you -- how did that agreement come into being
25      if you're -- and well, let me do it a different way.

Page 92

1         Are you engaged by the City?
2    A.  Yes, ma'am.
3    Q.  How did it come to pass that the State pays for half
4       of your fees?
5    A.  I don't know if I actually can respond to that.  When
6       the City decided to issue an RFP for restructuring
7       services, it had been indicated, at least I read
8       through public reports, that the State was going to
9       pay for half of that.
10   Q.  Is it your understanding that the City is your client?
11   A.  Yes, ma'am.
12        MR. MILLER:  Wait, object to form.
13        MS. LEVINE:  What's the objection to the
14      form?
15        MR. MILLER:  Among other things it calls
16      for a legal conclusion.
17        MS. LEVINE:  I'm asking him his
18      understanding.
19   Q.  Is it your understanding that the City is your client?
20        MR. MILLER:  Go ahead.
21   A.  Yes.
22   Q.  Who did you -- upon you -- upon becoming engaged
23      initially, to whom did you report on behalf of the
24      City?
25   A.  I reported primarily to Kriss Andrews.  I interacted

Page 93

1    with Jack Martin a fair amount, but Kriss Andrews was
2    my primary point of contact.
3  Q.  Did you also report immediately upon being engaged to
4       anybody at the State?
5  A.  Can you refer to or define what you mean by report to?
6  Q.  Did you have conversations with people at the State
7       after being engaged by the City without the City on
8       the phone?
9           MR. MILLER: Object to form.
10          MS. LEVINE: What's the objection?
11          MR. MILLER: It doesn't indicate whether
12      the conversations are in connection with the contract
13      or what the conversations are in connection with.
14 Q.  Immediately after becoming engaged by the City -- you
15      were engaged in or about January what?
16 A.  9th, I believe.
17 Q.  Okay. From the period of January 9th through July
18      18th, did there come -- did you have any conversations
19      with anybody at the City at which the State -- sorry,
20      with anybody at the State at which the City was not on
21      the phone with regard to the Detroit situation?
22      Anything with regard to the Detroit situation?
23 A.  I'm sure that I did.
24 Q.  Did there come a point in time where you had the
25      conversations with people at the State at which the

Page 94

1       City was not on the phone with regard to filing
2       Detroit's Chapter 9 petition?
3  A.  Not that I --
4           MR. MILLER: Let me just pay attention to
5       this question. Go ahead. No objection.
6  A.  Could you now repeat the question?
7           MS. LEVINE: Can you repeat the question?
8           (Record read back as requested.)
9  A.  Not that I can recall.
10 Q.  Did you have any -- did you attend any meetings with
11      representatives of the State at which the City wasn't
12      present with regard to Detroit's filing its Chapter 9
13      petition?
14 A.  No, ma'am.
15 Q.  Okay. So now going back. We discussed earlier and
16      got sidetracked with regard to the conversation you
17      had with Mr. Miller with regard to preparing for
18      today's deposition. Are you -- according to this
19      contract you're engaged by the City; correct?
20 A.  Yes, ma'am.
21 Q.  Is that engagement contract with the City or is that
22      engagement contract with Jones Day?
23 A.  It's with the City.
24 Q.  What did you discuss with Mr. Miller to prepare for
25      today's deposition at the two meetings you previously

Page 95

1  identified yesterday and the day before?
2           MR. MILLER: Objection, and I'm going to
3  instruct the witness not to respond.
4           MS. LEVINE: Lunchtime.
5           (Luncheon recess between
6           12:55 p.m. and 1:30 p.m.)
7           MS. LEVINE: Mr. Moore, before we go onto
8  another topic I just want to clarify. Your counsel
9  directed you not to answer just prior to the lunch
10 break. Are you asserting the attorney-client
11 privilege?
12          MR. MILLER: Yes, Mr. Moore has consented
13 to having Jones Day represent him in connection with
14 this deposition and if I recall, you, AFSCME, have
15 consented to have the City put Mr. Moore forward as a
16 representative of the City in connection with the
17 30(b)(6) deposition. So yes, we represent Mr. Moore
18 in connection with this deposition and I am
19 instructing him not to answer the question on the
20 grounds of attorney-client privilege.
21          MS. LEVINE: And just to clarify so you're
22 not representing Conway MacKenzie, you're representing
23 Mr. Moore in his capacity as the 30(b)(6) witness for
24 the City --
25          MR. MILLER: In --

Page 96

1           MS. LEVINE: -- on behalf of the City?
2           MR. MILLER: In his capacity as a 30(b)(6)
3  witness and in his capacity as a subpoenaed person in
4  connection with the independent subpoena, he has
5  agreed to have us represent him.
6           MS. LEVINE: What do you mean by to have us
7  represent him? Is that Jones Day representing him
8  individually, representing Conway MacKenzie?
9           MR. MILLER: We're not representing
10 Conway MacKenzie. That's not -- well, let me take a
11 break and speak to my client about that.
12          MS. LEVINE: Okay.
13          (A brief recess was taken.)
14          MR. MILLER: Back on the record.
15          Let me clarify for the record that
16 Jones Day does not represent Conway MacKenzie, we are
17 representing Mr. Moore as a witness in this
18 deposition.
19 BY MS. LEVINE:
20 Q.  Moving on. You testified previously I believe that
21      you testified twice as an expert -- in two cases as an
22      expert witness. One with regard to GM and one with
23      regard to the casino downtown, the Greektown Casino;
24      is that correct?
25 A.  Yes, ma'am.

Page 97

1 Q. Have you testified in court as an expert witness other
2     than in connection with those two cases?
3         MR. MILLER: Object to form. Asked and
4     answered.
5         MS. LEVINE: I'm not -- I wanted to
6     streamline and not go over again what he went through.
7 A. I don't believe so.
8 Q. Okay. What was the court where GM was pending?
9 A. I believe that was a Federal District Court, Eastern
10     District of Michigan.
11 Q. Okay. And where -- and were you qualified by the
12     judge? Were you found to be an expert? In other
13     words, was there a specific finding that you qualified
14     as an expert?
15 A. I don't know.
16 Q. Do you -- okay. What were you offered to testify
17     about?
18 A. The automotive industry and supplier relations.
19 Q. But you don't recall whether or not the judge
20     specifically found you to be an expert in those two
21     areas?
22 A. I don't know.
23         MR. MILLER: Well, object to form.
24 A. From the standpoint of I certainly was not involved in
25     every hearing that would have gone on. I don't

Page 98

1     know --
2 Q. No, no. Sometimes when an expert takes the stand,
3     first you do voir dire and then he starts to testify
4     and in between asking about your background and CV and
5     starting the substantive testimony the judge will say
6     I qualify you as an expert or no I don't qualify you
7     as an expert. What I'm trying to understand is in
8     those two cases did the judge qualify you as an expert
9     and if so in what categories?
10 A. Yes, I understand that process exactly. As I
11     indicated before, the GM case settled before I had to
12     testify.
13 Q. Okay.
14 A. So I was deposed in that case.
15 Q. Okay, so you were deposed but you didn't have to take
16     the stand in court?
17 A. Yes, ma'am.
18 Q. Okay, good.
19         In regard to Greektown did you have to take
20     the stand in the courthouse?
21 A. Yes, ma'am.
22 Q. And did the judge in that case qualify you as an
23     expert?
24 A. Yes, ma'am.
25 Q. And this what area did the judge qualify you as an

Page 99

1     expert?
2 A. As it relates to the restructuring -- bankruptcy
3     restructuring of Greektown.
4 Q. And the -- were you qualified as an expert in relation
5     to pensions?
6 A. Pensions were not an issue with Greektown.
7 Q. Were you qualified as an expert with regard to
8     actuarial findings?
9 A. Actuarial findings were not an issue in Greektown.
10 Q. So for both of those questions then the answer is no?
11 A. Correct.
12 Q. Did you have any role in the hiring of Kevyn Orr as
13     the Emergency Manager or the Emergency Financial
14     Manager for the City of Detroit?
15 A. No, ma'am.
16 Q. Did Conway MacKenzie have any role in the hiring of
17     Kevyn Orr in either of those two capacities?
18 A. No, ma'am.
19 Q. Did you have any role in the financial review team?
20 A. No, ma'am.
21 Q. Did Conway MacKenzie have any role in the financial
22     review team?
23 A. No.
24 Q. From -- when was the first time you had a conversation
25     with anybody with the City with regard to Detroit

Page 100

1     filing for Chapter 9 protection?
2 A. Can you just clarify that just the -- whether that was
3     a possibility or --
4 Q. I want to know the first time the word Chapter 9 came
5     up in discussions with regard to the City of Detroit.
6     Possibility, options, alternatives, any context.
7         MR. MILLER: But the conversation is with
8     somebody in the City?
9         MS. LEVINE: Yes.
10 A. I don't recall specifically.
11 Q. Do you recall if it was before the end of 2012?
12 A. I don't recall.
13 Q. When was the first time you had a conversation with
14     anybody from the State or on behalf of the State with
15     regard to the potential for Detroit filing for Chapter
16     9 bankruptcy protection?
17 A. I don't recall.
18 Q. Did those conversations come up during the interview
19     process with the State and Conway MacKenzie?
20         MR. MILLER: Object to form.
21 A. I don't recall.
22 Q. So when you interviewed with the State for your role
23     with the City, you don't recall having discussions
24     with regard to Chapter 9 as an alternative?
25         MR. MILLER: Object to form.

Page 101

1  A.  To go back to how I had answered before, there were at
2      least two if not three interview sessions and those
3      were jointly held with City and State representatives.
4      I can't recall at this point whether Chapter 9 was
5      discussed during those meetings or not.
6  Q.  What's the first conversation you recall having with
7      anybody from the City or the State with regard to the
8      possibility of Detroit filing for Chapter 9
9      protection?
10 A.  I don't recall what the -- I guess around the time
11     that the creditor plan was being discussed, certainly
12     the potential for a Chapter 9 filing had been
13     discussed and that was communicated publicly by
14     Mr. Orr, so I certainly recall that, but nothing
15     really before that.
16 Q.  And when you use the word creditor plan, are you
17     referring to the June 14 creditor proposal?
18 A.  Yes, ma'am.
19 Q.  Between June 14 and January 17, that's the -- sorry,
20     June 14 and July 17, that's the time period we're
21     talking about, did you have any conversations with
22     anybody at the State with regard to Detroit filing for
23     Chapter 9 protection?
24 A.  I don't believe I did.
25 Q.  Between June 14 and July 17, did you have any

Page 102

1      conversations with anybody at the City with regard to
2      Detroit filing for Chapter 9 protection?
3  A.  Yes.
4  Q.  During that time period did you have any conversations
5      with representatives of the City at which the State
6      were present -- at which representatives of the State
7      were present with regard to Detroit filing for Chapter
8      9 bankruptcy protection?
9  A.  I don't recall.
10 Q.  Between June 14 and July 17, what was the first
11     conversation that you had with anybody from the City
12     with regard to filing for Chapter 9 bankruptcy
13     protection on July 19?
14     MR. MILLER:  Mr. Moore, in connection with
15     that question be careful to consider not revealing
16     attorney-client communications to the extent that
17     those conversations may have included attorneys.
18     MS. LEVINE:  Wait, let's clarify that for a
19     second.  How is it that if he's present there's an
20     attorney-client privilege if he did not sign an
21     engagement letter with Jones Day but signed it
22     directly with the City and the State?
23     MR. MILLER:  He's the -- he and
24     Conway MacKenzie are the City's professional advisors
25     and Jones Day is taking the position that the

Page 103

1      attorney-client privilege attaches to meetings in
2      which Jones Day attorneys were providing advice to the
3      City at which Conway MacKenzie personnel were present.
4      And I will instruct him not to answer.
5      MS. LEVINE:  Can you read back my question?
6      (Record read back as requested.)
7      MS. LEVINE:  Actually let me rephrase that
8      so we can parse the attorney-client privilege
9      assertion.
10 Q.  The first thing I'm going to ask you is when the
11     conversations took place, then I'm going to ask you
12     who participated in the conversations, and then I'm
13     going to ask you what was discussed; okay?  So we'll
14     -- we can get two of the three and perhaps three out
15     of the three.
16     MR. MILLER:  Unlikely.
17 Q.  So with regard to this line of questioning, between
18     July -- June 14 and July -- what was the filing date?
19     The 18th or 19th?
20     MR. RUEGGER:  The 18th.
21 Q.  And July 18th, when was the first conversation you had
22     with representatives -- when was the first
23     conversation you had with representatives of the City
24     with regard to Detroit's Chapter 9 bankruptcy filing?
25 A.  I can only recall one conversation during that time

Page 104

1      period.
2  Q.  And what was the date?
3  A.  I don't know the date.
4  Q.  Was it in June or was it in July?
5  A.  I honestly don't know.
6  Q.  Do you recall who participated -- wait, who
7      participated in that conversation?
8  A.  The conversation which I'm recalling was with Sonya
9      Mays.
10 Q.  What's her title?
11 A.  She is -- I believe her title is strategic advisor to
12     Kevyn Orr.
13 Q.  And what was -- were there lawyers present during that
14     conversation?
15 A.  No.
16 Q.  What did you and she discuss?
17 A.  She had asked me what I thought the potential was that
18     the City was going to have to file.
19 Q.  And what was your answer?
20 A.  I think I said I don't know and I gave a few reasons
21     why the City may not have to and a few reasons why the
22     City may have to.
23 Q.  During the period of June 14 through July 17, was
24     Conway MacKenzie at all involved in preparing the
25     filings for the July 18th Chapter 9 filing?

Page 105

1  A. Can you define filings?
2  Q. Pleadings that were filed on the docket in connection
3     with the Chapter 9 filing including, for example, your
4     declaration.
5  A. Only one and that is my declaration.
6  Q. And what was the -- what was the date of the first
7     meeting you had -- actually let me say this
8     differently.
9           What was the date of the first discussion
10    you had with regard to preparing that declaration?
11 A. I don't recall.
12 Q. Was it in June?
13 A. I don't believe so.
14 Q. Was it in July?
15 A. I would assume so, yes.
16 Q. Was it before the actual filing occurred?
17 A. Yes.
18 Q. Was it a week before the actual filing occurred?
19 A. It may have been, I don't recall.
20 Q. Was it more than ten days before the actual filing
21    occurred?
22 A. It may have been.
23 Q. Was it before or after the July 4th weekend?
24          MR. MILLER: If you recall.
25 A. I don't recall.

Page 106

1           MS. LEVINE: Let's not coach the witness.
2  Q. Did you receive -- after having the initial
3     conversation -- was that initial conversation with
4     Jones Day?
5  A. Yes, ma'am.
6  Q. Did you receive a draft of your declaration to review?
7           MR. MILLER: You can answer that question.
8  A. At some point I received a draft, but I recall having
9     an initial conversation first with an attorney from
10    Jones Day laying out a number of the key issues
11    relating to pensions.
12 Q. When was that conversation?
13 A. I don't recall.
14 Q. Who participated in it?
15 A. An attorney from Jones Day.
16 Q. Do you recall the name of the attorney?
17 A. I actually don't at this point.
18 Q. Was anybody else on the phone with you from Conway?
19 A. No, ma'am.
20 Q. Was anybody else on the phone with you from the City?
21 A. No.
22 Q. Was anybody else on the phone with you?
23 A. Just the attorney from Jones Day.
24 Q. Did that conversation take place after the July 4th
25    weekend?

Page 107

1  A. I don't recall.
2  Q. How long before you had this initial conversation were
3     you provided with a first draft of your declaration?
4  A. I don't recall how long.
5  Q. Was it more than a week?
6  A. I don't recall.
7  Q. Was it more than two weeks?
8  A. I don't recall.
9  Q. Did you read -- did you have your declaration -- did
10    you review your declaration over the July 4th weekend?
11 A. I don't recall.
12 Q. Did you have the declaration as of the July 4th
13    weekend?
14 A. I don't recall.
15          MR. MILLER: Wait. Objection. Object to
16    form. Asked and answered.
17 Q. When did you sign your declaration?
18 A. I can't recall if it was July 17th or 18th.
19 Q. And how many drafts did it go through before you
20    actually signed it?
21 A. I don't recall that.
22 Q. More than one?
23 A. Yes.
24 Q. More than three?
25 A. Could have been.

Page 108

1  Q. More than five?
2  A. I don't know.
3  Q. No or you don't know?
4  A. I don't know.
5  Q. More than ten?
6           MR. MILLER: Objection, asked and answered.
7           MS. LEVINE: No, it's not. It's absolutely
8     not and when he -- and it's almost, to be honest,
9     inconceivable that he has no recollection of whether
10    it took a day, two days or a month to prepare the
11    declaration or when he first learned of the bankruptcy
12    filing.
13          MR. MILLER: That mischaracterizes his
14    testimony. We can go over his testimony, if you would
15    like.
16          MS. LEVINE: We will after we finish it.
17    Can you read back my question, please?
18    (Record read back as requested.)
19          THE WITNESS: Could you go back? More than
20    ten what?
21    (Record read back as requested.)
22 A. I don't think it would be more than ten.
23 Q. Prior to the time that Detroit filed for Chapter 9
24    protection, did you become aware of the Flowers
25    litigation?

Page 109

1  A.  Could you be more specific on Flowers litigation?
2  Q.  Have you heard the term the Flowers litigation before?
3  A.  Ms. Levine, I come across so much on a day-to-day
4      basis.  I need something more to spur my memory to
5      know whether I've heard of it or not.
6  Q.  Does the name Webster litigation mean anything to you?
7  A.  Again, if you could please provide a little bit more
8      detail, I can tell you if I've heard of it or not.
9  Q.  What's your understanding of the reason why Detroit
10     determined to file for Chapter 9 protection on July 18
11     as opposed to some other day?
12 A.  I don't have an under --
13        MR. MILLER:  Object to form.
14 A.  I don't have an understanding.  I was not involved in
15     that decision.
16 Q.  So after you -- so when you first learned that you
17     were going to do a declaration, was it your
18     understanding that Detroit had already made the
19     decision to file in July?
20 A.  No.
21 Q.  When you first started working on your declaration,
22     was it in anticipation of a specific filing date?
23 A.  No.  Just add too I've had a number of clients where I
24     have prepared something -- a pleading for a potential
25     bankruptcy filing that has never happened.

Page 110

1  Q.  Were you aware of any litigation pending just prior to
2      the Chapter 9 filing with regard to the question of
3      authorization for the City to actually file a Chapter
4      9 petition?
5        MR. MILLER:  Object to form.
6  A.  I am generally aware --
7        MS. LEVINE:  Wait, what's the form
8      objection?
9        MR. MILLER:  Vague and ambiguous with
10     respect to the question of authorization for the City
11     to actually file a Chapter 9 petition and foundation.
12 Q.  Prior to the time of the bankruptcy filing were you
13     aware that there was litigation pending challenging
14     the authorization for the City to file for Chapter 9
15     protection?
16 A.  I am generally aware of litigation filed in a state
17     court where I believe that that was one of the
18     elements of the litigation.
19 Q.  When did you first become aware of that state court
20     litigation?
21 A.  Sometime within the week before the actual filing
22     perhaps.
23 Q.  Did you -- had you prepared your declaration before or
24     after you became aware of that state court litigation?
25 A.  Because I can't recall specifically when I started

Page 111

1      working on my declaration, I don't know.
2  Q.  Did you begin preparing your declaration at or about
3      the same time you became aware of the state court
4      litigation?
5  A.  I don't know.
6  Q.  Was it months before you became aware of the state
7      court litigation?
8        MR. MILLER:  Object to form.
9  A.  Ms. Levine, I think I've already answered that I don't
10     believe that there was anything done preparation wise
11     on my declaration in the month of June.
12 Q.  Okay.
13        Were you involved in any restructuring
14     initiatives in or about February of 2013 with regard
15     to the removal of blighted homes in the City of
16     Detroit?
17 A.  Was I specifically involved or was Conway MacKenzie
18     involved?
19 Q.  Well, starting with you and then we're going to ask
20     about Conway MacKenzie.
21 A.  Blight has been an area of focus that our firm has had
22     and I have been involved in some of those activities.
23 Q.  Were you point on the issue with regard to the
24     blighted homes?
25 A.  Generally speaking there was another individual on the

Page 112

1      team that I delegated some items to.
2  Q.  And with -- and on the other side of that, who was the
3      point person for the State on that issue?
4        MR. MILLER:  Objection to form, foundation.
5  Q.  Did you contact -- were you in contact with the State
6      with regard to this issue?
7  A.  There have been numerous people at the State with whom
8      blight has been discussed.
9  Q.  Do you recall who was the point person for that
10     initiative?
11 A.  From the State?
12 Q.  Yes.
13 A.  I don't know if the State actually has a point person
14     for blight.  There is the Michigan -- Michigan State
15     Housing Development Agency or Authority, MSHDA, that
16     is involved with some of these activities.  Treasury
17     department has had some involvement.  The department
18     that Moore Corrigan heads up, which I can't recall the
19     name of it right now, has been involved.
20        (Marked Exhibit No. 12.)
21 Q.  I'm going to show you what's been marked Moore 12 for
22     identification.  It's an email chain but the second
23     email has three CCs with Michigan email addresses and
24     I was just wondering if you recognize those names and
25     could identify those people.  Document number

Page 113

1 DTMI00103661.
2 A. Ms. Levine, you're referring to these three names?
3 Q. Right.
4 A. And the question is do I recognize the names?
5 Q. Yes. I'm going to ask you to identify who they are.
6 A. I recognize one for sure and two other people I'm
7    generally aware of, but I don't know their specific
8    roles.
9 Q. Right, who's the first one? Just so the record's
10   clear can you tell us the name of the first person
11   that you do recognize and what their title is?
12 A. The email address is --
13 Q. No, no, no, I'm asking you the person's name.
14 A. There's not a name on here, Ms. Levine.
15 Q. No, I'm asking you if you recognize the name.
16      MR. MILLER: From the email address.
17 Q. Does the email address trigger a name? I want to find
18   out who the person is, then I'm going to ask you what
19   their involvement was with regard to the blighted
20   homes.
21 A. Just so we're clear for the record, Ms. Levine, you've
22   given me an email address that is only the address and
23   not the name and I'm going to speculate as to who that
24   relates to.
25      MR. MILLER: Don't speculate.

Page 114

1 Q. Don't speculate.
2      MR. MILLER: Don't speculate. If you know
3    the name, identify the name.
4 Q. It's not a trick question. If the answer is I have no
5    clue who this person is -- for example, if it says
6    rbaird, there's a pretty good idea we know who it is.
7    I don't recognize those names, I'm asking you to help
8    me out. If the answer is I don't know who they are,
9    then you don't know who they are.
10 A. muchmored is probably Dennis Muchmore.
11 Q. And what's his title?
12 A. I think his title is chief of staff for the governor.
13 Q. And was he involved in this project with regard to
14   blighted homes?
15 A. I've never had any conversations with Dennis.
16      MR. MILLER: Object to form.
17 Q. Okay, what's the next one?
18 A. Allison Scott.
19 Q. Yes. And have you had conversations with her?
20 A. No.
21 Q. Okay. Do you know her title?
22 A. No, I don't.
23 Q. What's the last name?
24 A. Harvey Hollins.
25 Q. Have you had conversations with him?

Page 115

1 A. No.
2 Q. Do you know his title?
3 A. No, I don't know his title.
4 Q. Okay, thank you.
5      (Marked Exhibit No. 13.)
6 Q. I'm going to show you what's been marked Moore 13. Do
7    you recognize this document?
8 A. This appears to be a document that was used in the
9    presentation to the financial advisory board in March
10   of 2013.
11 Q. Did you prepare this document?
12 A. I assisted in preparing some of it.
13 Q. Did you prepare the summary of Conway MacKenzie
14   engagement next steps that appears on page 14?
15 A. I would have reviewed this.
16 Q. What is your understanding of the meaning under the
17   very last bullet point of legal limitations?
18      MR. MILLER: Wait a moment. You're moving
19   too fast for me. We're on page 12, summary of
20   Conway MacKenzie.
21      MS. LEVINE: No, we're on page 14.
22      MR. MILLER: Sorry, that's why I asked.
23   And the pending question? Can you read it back?
24      (Record read back as requested.)
25 A. That was referring to constraints that were faced

Page 116

1    related to some of the HR related items that we were
2    looking at and specifically the inability to move out
3    individuals that we felt should be removed from
4    whichever department they were working in.
5 Q. Did this relate to unionized employees?
6 A. Yes.
7 Q. So was there a concern -- never mind.
8      Did this legal limitations relate to
9    constraints with regard to privatization?
10      MR. MILLER: Object to form.
11 A. Not that I recall.
12      (Marked Exhibit No. 14.)
13 Q. Do you recognize this document?
14 A. This appears to be our assessment of the restructuring
15   -- proposed restructuring of city council department.
16 Q. Who asked you to prepare this?
17 A. First the City obviously engaged us to conduct a
18   review and identify recommendations for departments.
19   This was specifically put together because the
20   financial advisory board at the March meeting asked us
21   to bring in a couple of departments in April and
22   present on restructuring activities there.
23 Q. Did you prepare more than one of these reports?
24 A. This report that you handed me appears to be the
25   longer version for the financial advisory board

Page 117

1      meeting I believe that this was summarized.
2  Q.  Prior to this report, which makes reference to
3      restructuring pensions and OPEB, had you previously
4      considered or made recommendations with regard to
5      restructuring pensions and OPEB?
6          MR. MILLER: Object to form.
7  A.  Where are you referring to that this makes reference
8      to restructuring pension and OPEB?
9  Q.  Well, let me ask the question a different way.
10         Does this report suggest restructuring
11     pension and OPEB?
12 A.  Not that I recall.
13 Q.  Okay. Did you discuss with the city council
14     restructuring recommendations that included pension
15     and OPEB?
16         MR. MILLER: Object to form.
17 Q.  Prior to the Chapter 9 filing did you discuss with the
18     city council restructuring recommendations that
19     included pension and OPEB?
20 A.  No.
21 Q.  When was the first -- did you ever discuss with the
22     city council recommendations for pensions and OPEB?
23 A.  No.
24         (Marked Exhibit No. 15.)
25 Q.  I'm going to show you what's been marked Moore 15.

Page 118

1          MR. MILLER: Yes.
2          MS. LEVINE: Sorry, I gave you my copy too.
3  Q.  Do you recall seeing that document before today?
4  A.  Yes.
5  Q.  What is it?
6  A.  This appears to be the presentation document for the
7      financial advisory board meeting on April 8th.
8  Q.  Okay, would you turn to page 12, please? I'm reading
9      from the bottom of the page CM -- which I'm assuming
10     is an abbreviation for Conway MacKenzie; is that
11     correct?
12 A.  Yes, ma'am.
13 Q.  -- is also working on various work streams that span
14     across the City or multiple departments including
15     pension and OPEB restructuring.
16         Do you see where I'm reading?
17 A.  Yes, ma'am.
18 Q.  Does that refresh your recollection with regard to
19     whether or not you were working on pension and OPEB
20     restructuring?
21 A.  I don't believe you asked me that before.
22 Q.  Were you during this time period working on pension
23     and OPEB restructuring?
24 A.  Yes.
25 Q.  When did you first raise with the City pension and

Page 119

1      OPEB restructuring?
2          MR. MILLER: Object to form.
3  A.  When I came -- when I was first engaged, the City had
4      already started a process related to healthcare for
5      both active and retired employees at various cost
6      reduction efforts and the pension topics I believe
7      began maybe in the beginning of March or thereabouts.
8  Q.  In connection with the work that you did with regard
9      to pension and OPEB, did you review the City's history
10     with regard to negotiations with the unions with
11     regard to the OPEB issues?
12 A.  When you say history, are you referring to recent
13     history or what period of time?
14 Q.  Prior to your engagement, what was the last time that
15     the City entered into concessionary agreements with
16     its unions or concessionary negotiation with its
17     unions just prior?
18         MR. MILLER: Objection to form, foundation.
19 A.  Just to clarify, Ms. Levine, I am not the primary
20     point person on OPEB. I certainly have participated
21     in meetings where OPEB has been discussed. My
22     understanding is that the most recent time related to
23     changes in healthcare would have been the
24     implementation of the City Employment Terms during
25     2012.

Page 120

1  Q.  Are you familiar with those employment terms?
2  A.  Generally.
3  Q.  Okay. Were there OPEB concessions made as part of
4      those terms?
5  A.  I don't recall if the changes to the actives were
6      pushed through to retired employees or not.
7  Q.  Did your role with regard to the pensions increase
8      over -- at any point in time in April?
9  A.  I don't know about during the month of April. It may
10     have been in April, but essentially as pension issues
11     certainly became a focal point, there was the
12     establishment of a task force and I was asked by
13     Kriss Andrews to lead that task force.
14 Q.  Did Milliman participate in that task force?
15 A.  Yes, ma'am.
16 Q.  Who else participated in that task force?
17 A.  Attorneys from Jones Day and Miller Canfield.
18 Q.  And what exactly was the role of the pension task
19     force?
20 A.  I believe it states in my declaration, but essentially
21     we were to look at causes of the underfunding,
22     evaluate the underfunding amount and options that may
23     exist as it relates to the defined benefit pension
24     plans.
25 Q.  Was there -- was any -- was anybody on behalf of the

Page 121

1    City who was not a consultant participating in the
2    task force?
3  A.  Initially I reported to Kriss Andrews and then upon
4    Kriss' departure I now report to Sonya Mays as the
5    point person for pension related issues.
6  Q.  Does anybody who's not a consultant participate on
7    behalf of -- actually let me take that back.
8        Does anybody participate on behalf of the
9    State?
10  A.  No, ma'am.
11  Q.  Has the task force reported to the State?
12  A.  I have been in meetings where people from the City and
13    the State have been present where questions have been
14    asked about pensions where I have provided answers.
15  Q.  Since April 18th forward how many meetings have you
16    participated as a member of the pension task force
17    where representatives of the State were present?
18        MR. MILLER:  Object to form.
19        MS. LEVINE:  What?
20        MR. MILLER:  It assumes that --
21        MS. LEVINE:  Actually never mind.
22  Q.  Go ahead, you can answer.
23  A.  Just to clarify, the task force itself did not meet
24    with the State.  The State was involved in meetings
25    with the City where pension topics would be asked and

Page 122

1    I would provide answers to pension related topics, but
2    the task force to the best of my knowledge never met
3    specifically with the State.
4  Q.  Well, did the task force have a goal?  In other words,
5    did it have a deliverable it was supposed to provide
6    to the City?
7  A.  The first item that we were looking at was done in
8    conjunction with the projections and restructuring
9    plan and that was to identify what the potential
10    unfunded amount of the pension plans may be and what
11    the future contribution requirements to both plans may
12    be.
13  Q.  In connection with your work with the task force, did
14    you or anybody else on the task force meet with union
15    representatives?
16  A.  In the course of my involvement with the City I've had
17    a lot of meetings with union people where pension
18    topics have come up.
19        MS. LEVINE:  Can you read back my question,
20    please?
21        (Record read back as requested.)
22  Q.  So can you answer that narrow question, please?
23        MR. MILLER:  Objection, asked and answered.
24        MS. LEVINE:  No, he --
25  Q.  Can you answer that narrow question?

Page 123

1  A.  I thought I did, but can you please read it back?
2  Q.  I'll do it a different way.
3        You testified you had various meetings at
4    which unions were present and you discussed pensions.
5    Were every single one of those meetings related to
6    your work on the as being force?
7  A.  No.
8  Q.  How many meetings did you have with union
9    representatives in connection with the task force?
10  A.  I spoke to individuals, union members, related to the
11    pensions maybe five to seven times.
12  Q.  And when did those meetings take place?
13  A.  Between April and July 18th, which is the time period
14    that you were referring to.
15  Q.  And those five to seven meetings, who was on the other
16    side of those meetings?
17  A.  Most of my interaction was with members of the Police
18    and Fire Retirement System board.
19  Q.  And who on the Police and Fire Retirement System board
20    did you speak to?
21  A.  George Orzech and Mark Diaz.
22  Q.  And what did you talk about with George Orzech and
23    Mark Diaz?
24  A.  The conversations would have been anywhere from this
25    is what I'm doing with the pension task force, this is

Page 124

1    what we're seeing, and then answering questions that
2    they had as a result of the June 14th creditor plan.
3  Q.  Okay, when you talked to them about this is what you
4    were doing, what did you tell them you were doing?
5  A.  I indicated that we were performing some analyses
6    related to the pensions to try to get our arms around
7    the funded position and most importantly the future
8    contribution requirements.
9  Q.  And when you say we, who are you referring to?
10  A.  The task force.
11  Q.  That included Milliman?
12  A.  Yes, ma'am.
13  Q.  And when you said what you were finding, what did you
14    tell them you were finding?
15  A.  Well, I expressed quite a bit of shock as to some of
16    the practices that had taken place and questioning how
17    these things could have happened along with the nature
18    of some of the indictments of the trustees that had
19    happened.
20  Q.  What time frame are you talking about?
21  A.  For what?
22  Q.  For the shock that you were -- for the conduct that
23    you found shocking.
24  A.  Well, I began my activities on the pension in March, I
25    started to get shocked in March and --

Page 125

1  Q.  No, no, I'm asking when did the -- you know, was the
2      conduct happening in March and April?
3  A.  Not that I saw.
4  Q.  Okay, when -- so the conduct was historical.  Did you
5      give them any information with regard to current
6      findings with regard to the status of the pensions?
7          MR. MILLER:  Object to form.
8  A.  We discussed after the June 14th meeting the
9      information presented in that June 14th creditor plan.
10 Q.  How many times did you discuss it with them?
11 A.  A handful.  I would say five perhaps, maybe under.
12 Q.  And how long did those discussions take place?
13 A.  Typically fairly brief conversations.  Fifteen
14     minutes.
15 Q.  They had questions and you gave them just answers?
16 A.  Generally speaking, yes.
17 Q.  And what did you discuss in those conversations post
18     June 14?
19 A.  I think I've already answered, but essentially they
20     would ask questions about the calculations, what the
21     City was looking to do, is the City open to this type
22     of idea?  And generally speaking my answer was always,
23     we're open to looking at anything.
24 Q.  What specific ideas did they offer to you to look at?
25 A.  One was a hybrid plan.  Two was whether the pension

Page 126

1      would not be frozen -- this is again referring to the
2      Police and Fire, that the pension would not be frozen.
3      I think that those were a few of the ideas that I
4      recall.
5  Q.  Did you have any conversations with anybody from
6      AFSCME during that same time period?
7  A.  Not that I recall.  Outside of the meetings that I
8      referred to earlier.
9  Q.  So the June 14th and June 20th, the July 10th and the
10     July 11th meeting?
11 A.  Yes, although I was not at the July 11th meeting.
12 Q.  Did you make any effort to reach out to anybody from
13     AFSCME prior to finalizing the June 14 proposal?
14 A.  This actually goes back a little bit, but during 2012
15     when you discussed obviously previous efforts or
16     activities that my firm had made to try to offer our
17     assistance to the City, we had reached out to AFSCME
18     at that time because we had previously done work with
19     AFSCME and unfortunately I left a few messages but
20     AFSCME never called back.
21 Q.  I'll try again.
22         In connection with the June 14 proposal did
23     you reach out to anybody from AFSCME with regard to
24     input into that proposal?
25 A.  In the role specifically related to AFSCME, no, but

Page 127

1      certainly as employees through the development of the
2      restructuring plans by departments.
3  Q.  So did you talk to anybody -- did you talk to Steve
4      Kreisberg, for example, with regard to the preparation
5      of the June 14 proposal?
6  A.  No, ma'am.
7  Q.  Following the presentation on June 14 did you talk to
8      anybody from AFSCME with regard to the content of the
9      proposal?
10 A.  Outside of those meetings, no, the meetings that we
11     referred to earlier, June 14th, June 20th, July 10th.
12 Q.  Did you reach out to anybody from AFSCME to get
13     feedback from them with regard to that proposal?
14 A.  No, ma'am.
15         MS. LEVINE:  I think I'm done.  I have no
16     further questions.  Thank you.
17         MR. RUEGGER:  Take a five-minute break.
18         MR. MILLER:  Let's take a five-minute
19     break.
20     (A brief recess was taken.)
21         MR. MILLER:  Back on the record.
22             EXAMINATION
23 BY MR. CIANTRA:
24 Q.  Good afternoon, Mr. Moore.  I'm Thomas Ciantra, I'm
25     with Cohen Weiss and Simon, I'm counsel to the UAW.

Page 128

1  A.  Good afternoon.
2  Q.  Let me go back just a little bit in terms of your
3      background.  You had indicated that back in or around
4      2007, 2008 you were named to a commission to look at
5      governmental operations here in the State of Michigan?
6  A.  Yes, sir.
7  Q.  And as I understand it, that appointment was made by
8      the then speaker of the Michigan house of
9      representatives, Mr. Dillon, and the majority leader
10     of the Michigan senate; is that correct?
11 A.  Yes, sir, Mike Bishop.
12 Q.  Okay.  Had you known Mr. Dillon before that
13     appointment?
14 A.  No.
15 Q.  Or Mr. Bishop?
16 A.  No.
17 Q.  And at that time had you actually done any work in
18     terms of restructuring of governmental operations?
19 A.  Yes, sir, I had been involved in my engagement with
20     the Wayne County Circuit Court.
21 Q.  Okay.  And the Wayne County Circuit Court and you had
22     mentioned that you had done some work for the Detroit
23     Public School System?
24 A.  Yes.
25 Q.  Those are your -- that's your governmental

Page 129

1 restructuring responsibility?
2 A. No, I've had additional engagements that I mentioned
3 earlier as well.
4 Q. The Development Bank in Puerto Rico?
5 A. Yes, and then work on behalf of AFSCME and the UAW
6 related to Puerto Rico.
7 Q. To Puerto Rico, okay.
8 A. And Jefferson County Alabama.
9 Q. Right. There had been a number of -- or several
10 Michigan municipalities that have had either a
11 Financial Manager or an Emergency Manager appointed in
12 the past several years; is that correct?
13 A. I believe the number is somewhere between five and
14 seven.
15 Q. Okay, is Flint who's one of them?
16 A. Yes, sir.
17 Q. Benton Harbor?
18 A. Yes, sir.
19 Q. Has the county -- has your firm been involved in any
20 of those cases?
21 A. No.
22 Q. And you haven't?
23 A. Correct.
24 Q. Now, you indicated -- do you have your declaration
25 handy? I think it's been marked as Exhibit 1.

Page 130

1 A. Yes.
2 Q. And in paragraph 5 you mention your work analyzing the
3 City of Detroit's pension liabilities and you've
4 testified with respect to the task force that you were
5 a part of that looked at that?
6 A. Paragraph 5 --
7 Q. I'm sorry, paragraph 8. If you'll excuse me, I got up
8 at 4 o'clock this morning to get here so I'm going to
9 be a little slower than Ms. Levine. Okay.
10 A. Could you restate the question?
11 Q. Sure. Who tasked you to be involved in looking at the
12 City's pension liabilities?
13 A. Kriss Andrews.
14 Q. And that was you said in March or so of 2013?
15 A. I think that's right, yes.
16 Q. Now, there were a series of -- well, let me ask.
17 Was the Milliman firm working for the City
18 of Detroit at that time?
19 A. Yes, sir.
20 Q. Okay. Do you know when they were retained?
21 A. I don't.
22 Q. But they were in place at the time you were given this
23 assignment by Mr. Andrews?
24 A. Yes.
25 Q. There are a series of letters from the Milliman firm

Page 131

1 that are addressed to Mr. Miller, your counsel here
2 today. The first one that I have is from April 18th,
3 2013 and you're copied on those letters. Are you
4 familiar with them?
5 A. Generally, yes. There are, as you say, a number of
6 them. I would have to remember what specifically was
7 discussed in that one.
8 Q. Okay. There were -- as a general matter, they seem to
9 involve analyses of particular scenarios that were put
10 to them?
11 A. Yes, sir.
12 Q. Okay. Who -- were those scenarios developed by the
13 task force that you were part of?
14 A. Yes.
15 Q. And who would have had -- who would have been the
16 decider as it were with respect to what the Milliman
17 firm was tasked to do?
18 A. The task force would lay out scenarios and I would
19 communicate with Kriss Andrews updates as to what the
20 task force was looking to do and then as Mr. Andrews
21 transitioned out, the tasks given to Milliman were
22 covered with Mr. Orr and Sonya Mays.
23 Q. Okay. Let me start by --
24 MR. CIANTRA: I don't know, what's the next
25 number we're up to?

Page 132

1 MR. MILLER: Sixteen.
2 (Marked Exhibit No. 16.)
3 Q. Here's what I marked as 16.
4 Now, why don't you take a moment or two,
5 however long you wish, Mr. Moore, to look over that
6 letter, number 16, Moore Exhibit 16.
7 A. Yes, sir.
8 Q. Okay. I gather from the first paragraph that your
9 task force asked the Milliman firm to determine the
10 adjusted funded status under PA 436, Section 12(1)(M)
11 for the two pension systems reflecting the value of
12 the pension operating certificates?
13 A. Just to be --
14 MR. MILLER: I'll object to form.
15 MR. CIANTRA: What's the basis of the
16 objection?
17 MR. MILLER: No foundation.
18 Q. Well, did you ask -- did your task force ask the
19 Milliman firm to determine the adjusted funded status
20 under PA 436, Section 12(1)(M), for the two Retirement
21 Systems reflecting the value of the pension obligation
22 certificates?
23 A. The only clarification I was going to provide in my
24 answer is yes, we asked Milliman to calculate the
25 funded status pursuant to 12(1)(M) of PA 436. That

Page 133

1    does include an adjustment for pension obligation
2    bonds or pension obligation certificates which they
3    did in their calculation, but it was simply a request
4    to calculate the funded status under 12(1)(M).
5  Q.  Okay, and why was that done?
6  A.  At this point the City was operating under an
7       Emergency Manager pursuant to PA 436.
8  Q.  Right.
9  A.  And it was important that we had that piece of
10      information.
11 Q.  Why was that important?
12 A.  That is one item that the Emergency Manager has to
13      look at while operating as the Emergency Manager and
14      so that's obviously you need to calculate that in
15      order to carry out his duties.
16 Q.  And there's a particular threshold in that provision
17      of the statute, Section 12(1)(M), with respect to the
18      funded status of a plan that is involved in the
19      Emergency Manager's responsibilities?
20 A.  I believe you're referring to the 80 percent
21      threshold?
22 Q.  Yes.
23 A.  Yes, sir.
24 Q.  And if the funding of the plan is below the 80 percent
25      threshold, the Emergency Manager is at liberty to

Page 134

1    remove the trustees of the plan?
2  A.  I don't recall the exact --
3            MR. MILLER:  Well, object to form.  It
4    calls for a legal conclusion.
5  Q.  I'm just asking your understanding of it.  I
6    understand you're not a lawyer, not an actuary, just
7    your understanding.  You were working on the task
8    force, you asked these folks to look into this.  What
9    was your understanding of what the Emergency Manager
10   could do if the funding threshold was below 80
11   percent?
12 A.  I can't recall the exact language, whether the
13      Emergency Manager can act or if the Emergency Manager
14      can submit a petition or a request to the State
15      treasurer, but yes, if a pension plan falls below that
16      80 percent funded threshold, that allows that item to
17      occur.
18 Q.  Okay.  And I gather from Moore 16 that with respect at
19      least to the General Retirement System, the conclusion
20      of the Milliman firm as of April 19th was that its
21      funded status was 61.49 percent?
22 A.  Yes, sir.
23 Q.  Is it correct that the Emergency Manager has not taken
24      any steps pursuant to Section 12(1)(M) of the statute
25      to have the trustees of that Retirement System

Page 135

1    replaced?
2  A.  That is my understanding.
3  Q.  Were you involved in discussions as to whether that
4    should be pursued or not?
5  A.  We have identified publicly one of the objectives that
6       the task force has is to ensure good governance for
7       both pension systems going forward and so one element
8       of that could be looked at.  As it relates to
9       governance is a change in the composition of the Board
10      of Trustees, no decisions have been made in that
11      regard, but that certainly is something that has been
12      talked about as one possible element of governance.
13 Q.  And that was -- so that was something that was -- was
14      on the radar screen of your task force at least back
15      in April?
16 A.  Yes, sir.
17          MR. CIANTRA:  Let me mark this as number
18   17.
19          (Marked Exhibit No. 17.)
20 Q.  This is another of a series of letters.  This one is
21      dated June 9th.  It's also addressed to Mr. Miller.
22      And you are -- you can check on, I guess, the fifth
23      page of the document you appear to be copied on that.
24 A.  Yes, sir.
25 Q.  And am I correct that this letter reflects a further

Page 136

1    analysis by Milliman of the issue we were just
2    discussing with respect to the April 18th letter?
3  A.  Yes, 12(1)(M) calls for the calculation based on the
4       last published actuarial valuation report, so between
5       April 18th and June 9th the actuarial valuation report
6       for the Police and Fire Retirement System was
7       finalized for the fiscal year-ending June 30th, 2012.
8  Q.  So there we see on the first page that the funded
9       status for that plan has, at least as reflected in
10      that final valuation report, is also under 80 percent;
11      correct?
12 A.  Yes, sir.
13 Q.  Can you explain to me what the Milliman folks did with
14      respect to the outstanding value of the pension
15      obligation certificates when conducting this analysis?
16          MR. MILLER:  Object to form.  It calls for
17   speculation.
18 Q.  Well, what did you understand that they were asked to
19      do with respect to the outstanding value of the
20      pension obligation certificates with respect to this
21      analysis?
22 A.  My understanding was that pursuant to 12(1)(M) that
23      the funding calculation would take into account the
24      outstanding balances of any pension obligation
25      certificates as of the measurement date.

Page 137

1  Q.  And that outstanding balance would be subtracted from
2      the asset balance in the pension plan?
3  A.  There are a couple of ways that you could do it, but
4      yes, if you subtract that from the assets.
5  Q.  So it would be netted out in someway?
6  A.  Yes, sir.
7  Q.  I understand there are probably different ways that
8      one could do it and you would have to allocate them as
9      between the two plans, but the idea would be you would
10     look at the funded status by netting out the
11     outstanding balance of those pension obligation
12     certificates?
13 A.  Yes, sir.
14 Q.  And so when you do that, you -- I gather that you get
15     to the valuation -- the funded percentage that's shown
16     on the first page of the letter as opposed to the
17     funded percentages that are shown on the second page
18     of the letter for the two plans?
19 A.  Yes, sir.
20 Q.  And did the task force take a position as to whether
21     netting out the pension obligation certificates in the
22     manner that the Milliman firm did here was the
23     appropriate measure under the statute?
24         MR. MILLER:  Object to form.
25 A.  The task force looked at this and as I seem to recall

Page 138

1      concluded that Milliman had performed the calculation
2      consistent with how 12(1)(M) is defined.
3  Q.  Okay.  So the percentages there on the first page are
4      from your task force perspective the operative numbers
5      under that provision of the statute?
6  A.  Yes, sir.
7  Q.  Now, you testified this morning with respect to
8      several issues that you identified as contributing to
9      the -- several actuarial assumptions that contribute
10     to the underfunding of the two pension systems here in
11     Detroit?
12 A.  I would just clarify that those are two different
13     things.  There are activities that have happened in
14     the past --
15 Q.  Right.
16 A.  -- which in my view have contributed to the unfunded
17     position of the plans and then there are actuarial
18     assumptions that when you vary those will impact the
19     underfunding calculation.
20 Q.  Okay.  And you identified with respect to the
21     actuarial assumptions the assumed rate of return on
22     investments, the smoothing technique that the
23     actuaries had adopted with respect to amortizing
24     experiencing gains and losses and the amortization
25     period that they adopted, the 30-year period, at least

Page 139

1      with the GRS; correct?
2  A.  As it relates to the funded position, the first two
3      you mentioned, yes, were modified in our calculation
4      that I call out in the declaration.
5  Q.  Okay.  Is the position -- has the task force looked
6      at the question of whether any of those assumptions
7      are inconsistent with actuarial standards of practice?
8  A.  Yes, the task force has had discussions about the
9      range of options available for actuarial assumptions.
10 Q.  Okay.  Have you formed -- has the task force formed an
11     opinion that any of the assumptions that you identify
12     are inconsistent with actuarial standards of practice?
13 A.  I'm not sure that I can answer that.  That I think
14     calls for us to take one step further.
15 Q.  Well, you participated in the task force meetings;
16     right?
17 A.  Yes.
18 Q.  So I'm just asking you a question of fact whether the
19     task force has taken or adopted a view that any of the
20     actuarial assumptions that you identified in your
21     prior testimony are contrary to actuarial standards of
22     practice?
23         MR. MILLER:  I'll object to form.
24 Q.  You can answer the question.
25 A.  Could you define what you mean by contrary to

Page 140

1      actuarial standards?
2  Q.  Well, there are actuarial -- you're familiar with
3      actuarial standards of practice?
4  A.  Generally, yes.
5  Q.  So there are professional standards that actuaries
6      operate under, you're aware of that; right?
7  A.  Yes, sir.
8  Q.  And there are particular standards that govern, for
9      example, earnings assumptions.  You're familiar with
10     those?
11 A.  Yes, sir.
12 Q.  And you're familiar with actuarial -- an actuarial
13     standard that deals with the smoothing issue, dealing
14     with volatility and market returns?
15 A.  Yes, sir.
16 Q.  So my question is has the task force taken a view as
17     to whether any of the assumptions that you identified
18     in your testimony are contrary to actuarial standards
19     of practice?
20         MR. MILLER:  Object to form.
21 A.  I would say that the task force has come to the same
22     view that's contained in my declaration, which is that
23     the assumptions used, there -- it would be more
24     appropriate to use different assumptions, but I don't
25     think that we've ever said that -- or come to the

1    conclusion as a task force that the actuarial
2    valuations don't comply with actuarial standards.
3  Q.  Right. I mean, your declaration does not take the
4    position that any of the assumptions that you identify
5    in it are in fact inconsistent with actuarial
6    standards of practice; isn't that right?
7  A.  That's correct.
8  Q.  Have you asked for -- has your task force asked for
9    any -- have you asked the Milliman firm for an opinion
10    as to whether the actuarial standards that you discuss
11    in your declaration and were the subject of your
12    testimony earlier, have you asked them whether -- for
13    an opinion as to whether those assumptions are
14    consistent or inconsistent with actuarial standards of
15    practice?
16  A.  We have discussed that, yes, and they have opined, if
17    I recall correctly, that they are -- there is not a --
18    they don't breach, if you will, or go against
19    actuarial standards.
20  Q.  Okay. And was that opinion rendered in writing or was
21    that an oral discussion?
22  A.  That would have been an oral discussion.
23       (Marked Exhibit No. 18.)
24  Q.  And I'm back to the series of letters where I'm
25    handing what I've marked as Moore Exhibit 18. This is

1    another letter from Milliman to Mr. Miller, copied to
2    you. This one's dated July 26.
3       So just so that make sure I have the time
4    sequence right. This is -- this is after the
5    presentation to creditors; correct?
6  A.  Yes, sir.
7  Q.  Like a week or two? That was the 14th?
8  A.  This is July 26.
9       MR. MILLER: This is July.
10  Q.  Right.
11  A.  The initial meeting with the creditors, the one that
12    we're referring to as the June 14th meeting.
13  Q.  Right. So this is six weeks or so later?
14  A.  Yes, sir.
15  Q.  Okay. Why don't you tell me what was the discussion
16    that led up to tasking the Milliman firm with what is
17    discussed in Moore Exhibit 18?
18  A.  This analysis related to a scenario that we asked
19    Milliman to evaluate, which is what is the impact on
20    plan assets based on certain contribution assumptions.
21  Q.  Okay. And in the context of freezing the plan?
22  A.  In the context of freezing the plan, that's correct.
23  Q.  At the risk of offending benefits lawyers that may be
24    present here, freezing the plan I understand to mean
25    that as of the date that the plan is frozen, no

1    further benefits accrue going forward?
2  A.  That's correct.
3  Q.  Okay. So that was the assumption that's being made
4    here. And then you wanted to ask them essentially
5    when is the General Retirement System going to run out
6    of money if we make certain further other assumptions
7    with respect to the amount of its investment return,
8    etc., as specified on page 1 of the letter?
9  A.  Yes, sir.
10  Q.  Where did the -- I notice the third bullet point there
11    on page 1, annual city contributions of 13.6 million.
12    Do you see that?
13  A.  Yes, sir.
14  Q.  Where did that number come from?
15  A.  That was a calculation based on one scenario taking
16    into account an allocation of funds available based on
17    percentage of claims.
18  Q.  Okay, so why don't you spell that out for me? How did
19    you get -- how did you get to 13.6 million? What was
20    the claim assumption?
21  A.  I don't recall what the exact amount was for the claim
22    assumption.
23  Q.  So would I be correct that the 13.6 million reflects a
24    distribution on the underfunding claim to the pension
25    fund?

1  A.  Yes, sir.
2  Q.  So if we were to take the -- I guess the present value
3    of that $13.6 million stream of payments through the
4    2022, 2023 fiscal year, we'd come up with the
5    distribution on the underfunding claim?
6       MR. MILLER: Before you answer that, let me
7    just review this question for a moment.
8       No objection.
9  A.  Not necessarily. This is a certain amount of cash
10    that would go towards that underfunded claim. There
11    certainly could be other assets that could also go
12    towards that claim.
13  Q.  Okay, but I guess when you -- when you were doing this
14    analysis, were you assuming that the 13 -- that
15    $13.6 million stream of payments represented all of
16    the consideration that would go towards the
17    underfunding claim or some of it?
18  A.  I don't think we made an assumption either way.
19  Q.  So how did you come up with the 13.6 as opposed to
20    14.6 or 12.6? Just help me out if you can.
21       MR. MILLER: Object to form. Asked and
22    answered.
23  A.  As I indicated before, the -- this scenario looked at
24    cash available over a certain period of time and then
25    allocating that cash based on a relative percentage of

1    total claims, but that does not mean what the total
2    treatment of the claim would receive.
3  Q.  Okay.  So there could be a debt component to it as
4      opposed to just a cash component?
5  A.  There could be a variety of items.  As was indicated
6      in our creditor plan, we laid out a $2 billion note of
7      which the various unsecured creditors would receive a
8      portion.
9  Q.  So is the $13.6 million payment stream some portion of
10     the proceeds of that note?
11 A.  No, that's just -- that was just relating to cash that
12     we had projected over the next ten years in the
13     creditor plan.
14 Q.  Okay.  And so where would I find that cash projection?
15 A.  That's in the creditor plan.
16 Q.  Okay.
17 A.  The June 14th creditor plan, in the cash projection,
18     it shows the amount of cash available or extra cash,
19     if you will, that the City has over the next ten
20     years.
21 Q.  Okay, why don't you take a look at Moore Exhibit 3 and
22     help me work it through.  The ten-year projections,
23     page 90, is that where I would find the number?
24 A.  I think you're going to want to go a few pages back.
25 Q.  Okay.

1  A.  If you go to page 98.
2  Q.  Okay.
3  A.  In about the middle of the page, the last row of the
4      first area that's boxed where it says funds available
5      for unsecured claims --
6  Q.  Yep.
7  A.  -- with opportunities.  Over the ten-year period that
8      shows 803.3 million.  That is anticipated cash from
9      operations of the City that could go towards unsecured
10     claims.
11 Q.  And from that 803 you in this scenario, Moore 18, you
12     allocated 13.6 million of that over one, two -- looks
13     like eight years?
14 A.  There would actually be ten years.
15 Q.  Ten years, okay.  So you allocated 136 million of the
16     803?
17 A.  Yes, sir.
18 Q.  And that -- how did you come to the particular
19     percentage of the recovery for the pension
20     underfunding plan, the relationship between 803 and
21     136?
22 A.  There are -- I think for this particular scenario, and
23     again, there are a lot of scenarios that get looked at
24     all the time, but for this scenario it contemplated
25     from the $803 million cash that would be used to

1    service retiree healthcare, cash to service the
2    interest on the $2 billion note, and then the
3    remaining cash was allocated amongst claims and that's
4    -- I don't recall the exact calculation, but that's
5    how 13.6 per year or 136 million total towards GRS was
6    determined.
7  Q.  So is it just a pro rata distribution based on the
8      size of the claims, the anticipated claim pool?
9  A.  Essentially, yes, after taking into account those
10     first two items that I mentioned.
11 Q.  Okay, so you drop those off the top and then the rest
12     of it you're allocating pro rata?
13 A.  Yes, sir.
14 Q.  Going back to Exhibit 18, whose idea was it to
15     contemplate a freeze of the pension plan?
16 A.  The --
17         MR. MILLER:  Wait.  Object to form.
18 A.  The City has actually -- had undertaken efforts in
19     this regard prior to or around the time of my initial
20     engagement passing ordinances or an ordinance that
21     temporarily froze service credits, so this is
22     something that the City has actually looked at even
23     prior to the formation of the pension task force.
24         (Marked Exhibit No. 19.)
25 Q.  Here's what I've marked as Moore 19 is another in this

1    series of letters.  This is -- this one's dated August
2    2nd to Mr. Miller.  It has you copied there on the
3    fifth page and in this letter there was a scenario of
4    contemplating a onetime $895 million City contribution
5    into these plans?
6  A.  Yes, sir.
7  Q.  Tell me what the thinking was behind that scenario,
8      announcing that scenario.
9  A.  GRS hasn't published its final actuarial valuation
10     report as of June 30th, 2012, but there is a draft of
11     that.
12 Q.  Right.
13 A.  And that shows an under -- a UAAL as of June 30th of
14     2012 of approximately $830 million.  So this was
15     rolled forward by one year.
16 Q.  Got it.
17 A.  So from June 30th, 2012 to June 30th of 2013, using
18     the 7.9 percent assumed rate of return such that if
19     either $830 million had been contributed at June 30 of
20     2012 or $895 million was contributed June 30th of
21     2013, in order to bring the plan up to 100 percent
22     funded on an actuarial basis, what would the potential
23     impact on plan assets be over a future time period.
24 Q.  So why was that -- why was that done?  I assume -- let
25     me ask.  I assume we haven't found $895 million in the

Page 149

1    City of Detroit to put into that pension fund as of
2    July of next year; correct? July of this year;
3    correct?
4          MR. MILLER: Object to form. Go ahead.
5  A. Obviously there are a number of potential sources of
6    cash that are still uncertain.
7  Q. Okay.
8  A. But to answer your question about why this was done --
9  Q. Yeah.
10 A. -- there were a number of comments that were made
11   indicating that the plan is only $830 million
12   underfunded or some people refer to the June 30th of
13   2011 number and our point on this was to indicate that
14   even if the plan was topped off from an actuarial
15   standpoint, meaning that it was funded at 100 percent,
16   if you roll forward using certain assumptions, what
17   potentially happens to plan assets.
18 Q. I see. But one of the assumptions is there's going to
19   be no further contributions into the plan after that
20   lump sum; correct?
21 A. Yes. And what that is getting at is there's no future
22   accrual of benefits. So you fully fund it based on
23   the benefits that have been accrued --
24 Q. Okay.
25 A. -- which if that was the case, if it was fully funded

Page 150

1    from an actuarial standpoint and no new benefits
2    accrued and you experience a 7.9 percent assumed rate
3    of return -- or actual rate of return, what would
4    happen to the plan assets.
5  Q. Let me ask you if you have Moore Exhibit 3 there, I
6    want to ask you a few questions with regard to that.
7          Let me direct you to page 95 of that
8    presentation. Hang on for a second. I'm sorry, I was
9    in the wrong place. Page 109. Looking at the heading
10   there, claims for unfunded pension liabilities.
11 A. Yes, sir.
12 Q. Were you involved at all in the drafting of that part
13   of this presentation?
14 A. I don't think I wrote that, but I was aware of this
15   language.
16 Q. Okay. How about the specifically the language of the
17   third bullet point? Because the amounts realized on
18   the underfunding claims would be substantially less
19   than the underfunding amount, there must be
20   significant cuts in accrued vested pension amounts for
21   both active and currently retired persons. Were you
22   involved in formulating that?
23 A. Yes, sir.
24 Q. And has the City -- I noticed in this presentation
25   there's no quantification of what -- of the cuts that

Page 151

1    would be -- that in the City's view must occur;
2    correct?
3  A. Correct.
4  Q. Has there been a specification of those level of cuts
5    that the City contends must occur?
6          MR. MILLER: Object to form.
7  Q. I mean, have you put a dollar amount on it?
8  A. No, and our analysis of this continues. Right now we
9    still don't know what assets could be available to put
10   towards the pensions. We still have not had the type
11   of dialogue that we would like to have related to the
12   calculation of the unfunded amount, so because of
13   those two uncertainties among others we don't know
14   what cuts, if any, there may need to be.
15 Q. Well, doesn't it say there must be significant cuts?
16   Am I -- are you saying that there's some -- that the
17   City's position may be that there are no cuts that are
18   necessary in accrued vested pension amounts?
19          MR. MILLER: Object to form.
20 A. We don't know. That's where we want to continue to
21   engage in discussions and negotiations with the
22   parties, but depending on what the unfunded amount is
23   and what assets may be available for those claims, it
24   certainly is possible.
25 Q. So maybe that should have been worded there may be

Page 152

1    significant cuts rather than must?
2          MR. MILLER: Object to form. It asks for
3    speculation.
4          MR. CIANTRA: I don't think it asks for
5    speculation at all.
6          MR. MILLER: It asks for speculation, but
7    you can go ahead and speculate.
8  A. Possibly.
9  Q. But in any event, there's been no specific
10   quantification of any level of cuts to accrued vested
11   pension amounts that the City has formulated in this
12   restructuring process to date; isn't that correct?
13 A. Correct.
14 Q. And I would assume from that that you have not
15   provided the unions or any of the retiree groups with
16   any -- any quantification of cuts that the City would
17   like to see made?
18 A. No, we have met with parties regarding the pension
19   multiple times and we've laid out a process that we
20   propose to follow; however, that process really has
21   not been started unfortunately.
22 Q. Are you aware of provisions of the Michigan State
23   Constitution that affect the ability of the State or
24   its municipalities to alter accrued pension benefits?
25 A. Generally, yes.

Page 153

1    Q.   How did you become aware of those provisions?
2    A.   I have been aware of that provision or provisions for
3         multiple years.  I don't recall how I originally
4         became aware of them, but I've been aware of them for
5         quite sometime.
6    Q.   So you were aware of those provisions at least
7         generally when you undertook the assignment for the
8         City in this case?
9    A.   Yes, sir.
10   Q.   Have there been discussions of those provisions of the
11        State Constitution in the various discussions among
12        members of your pension task force?
13   A.   Can you clarify?
14   Q.   You indicated earlier that you were part of a pension
15        task force that's been considering pension issues
16        since I guess the spring of this year and my question
17        is during the discussions, the meetings of that task
18        force, have you -- has that provision of the Michigan
19        State Constitution been a subject of discussion?
20   A.   Yes.
21   Q.   In what context?
22   A.   The existence of it.
23   Q.   And how did it -- who brought that up?
24   A.   I don't recall.
25   Q.   What was discussed about it?

Page 154

1    A.   The acknowledgment of the existence of it to make sure
2         that everyone on the task force was aware of it and we
3         also discussed an Attorney General opinion regarding
4         that provision back from the late 1970s, I believe,
5         and whether that provision constitutes -- you know,
6         how far those protections go.
7    Q.   And who brought up that subject?
8    A.   I don't recall who would have brought it up.
9    Q.   Were those discussions before the City made its
10        Chapter 9 filing?
11   A.   Yes.
12   Q.   And were there discussions that you were party to with
13        respect to the Chapter 9 filings that involved the
14        question of the -- those provisions of the Michigan
15        State Constitution?
16             MR. MILLER:  Object to form.
17   A.   I believe that that would have come up, yes.
18   Q.   It came up in discussions you were party to?
19   A.   Yes.
20   Q.   With whom?
21   A.   When there were discussions about the potential for a
22        Chapter 9 filing, a variety of topics were discussed
23        and I seem to recall that element coming up.
24   Q.   When were those discussions, Mr. Moore?
25   A.   In the June/July time period.

Page 155

1    Q.   And was there more than one such discussion or did it
2         just come up on one occasion?
3    A.   It probably came up more than -- I seem to recall more
4         than one occasion where a discussion about whether the
5         City would have to file for Chapter 9 took place and
6         the pension element was discussed.
7    Q.   And what was the -- was there consensus that was
8         developed with respect to that issue?
9             MR. MILLER:  I'm going to object and ask
10        the witness before he answers that question whether in
11        connection with any discussion that might have led to
12        a consensus that discussion included lawyers and
13        counsel --
14             MR. CIANTRA:  I'm not asking him --
15             MR. MILLER:  -- and counsel that was
16        provided by those lawyers.
17             MR. CIANTRA:  I'm not asking about
18        discussions with counsel, I'm asking him whether this
19        task force that was looking at the pension issues
20        reached a consensus as to the question of the effect
21        of this provision of the Michigan State Constitution
22        on a Chapter 9 filing.
23             MR. MILLER:  But the task force included
24        counsel.  He's testified to that.
25             MR. CIANTRA:  Well, I'm not interested in

Page 156

1         the discussions, I'm interested was there a consensus
2         reached on this issue, not necessarily what your
3         counsel might have advised or said or any of that.
4             MR. MILLER:  But -- but to the extent that
5         the -- a consensus was reached and that consensus was
6         based on legal advice, that consensus would be in my
7         judgment privileged.  So that's why I asked him
8         whether in connection with discussions and discussions
9         that may have reached a consensus as to the question
10        of the effect of the provision of the State
11        Constitution on Chapter 9 filing, whether that
12        consensus was reached based on advice of counsel.
13             MR. CIANTRA:  I'm not asking him that.
14             MR. MILLER:  And if so, then I instruct
15        you, Mr. Moore, not to expound.
16             MR. CIANTRA:  So let me ask the question
17        again.  Let's make the record straight.
18   Q.   Did the task force that you were a part of reach a
19        consensus on the question of what the effect of the
20        provision of the Michigan State Constitution that
21        protects accrued pension benefits would have on a
22        Chapter 9 filing?
23   A.   No.
24   Q.   There was no consensus?
25   A.   No.

Page 157

1  Q.  There were different views that were expressed?
2  A.  There wasn't -- there wasn't a consensus that we tried
3      to come up with.  As I indicated before, the existence
4      of the provision was acknowledged and it was
5      discussed, but the pension task force did not come to
6      an opinion as it relates to anything regarding that
7      provision in the Michigan Constitution.
8  Q.  Was it something that you were concerned about?
9  A.  Can you clarify in terms of concern?
10 Q.  You were aware of this provision; right?  You were
11     aware at least from the actuarial reports that the
12     plans were underfunded; correct?
13 A.  Yes.
14 Q.  And you were aware that in the proposal to creditors
15     that we just looked at the Emergency Manager states
16     that there must be significant cuts in accrued vested
17     pension amounts for both active and currently retired
18     persons.  So my question is were you concerned about
19     that in light of your understanding of the Michigan
20     State Constitution?
21 A.  To the extent that retirees would face some sort of
22     cut, certainly as a human being I would be concerned
23     about that.
24 Q.  I'm not asking as a human being, I'm asking in light
25     of your understanding of the State's Constitution.

Page 158

1          MR. MILLER:  Objection to form.  Calls for
2      a legal conclusion.
3  Q.  You can answer the question.
4  A.  I'm not sure that I understand the question.  You
5      asked if I was concerned and I sought clarification
6      for that and I'm not sure I understand what additional
7      you're asking about concern.
8  Q.  Were you concerned that the -- let me ask
9      specifically.
10         Were you concerned that the position that
11     the Emergency Manager took with respect to accrued
12     pension benefits was inconsistent with your
13     understanding of what the State Constitution requires?
14 A.  That to me is a legal opinion that I'm not equipped to
15     make.
16 Q.  Did you have any discussions with anyone in the State
17     government with respect to this issue that -- the
18     interplay between the Michigan State Constitution
19     provisions and the Chapter 9 filing by the City?
20 A.  Not that I can recall.
21 Q.  So there may have been such discussions?
22 A.  There may have been.
23 Q.  And if there had been such discussions, who from the
24     State would likely have been involved in it?
25 A.  My interactions have been essentially exclusively with

Page 159

1      the treasury department for the State of Michigan, so
2      if there were discussions, it would have been with the
3      treasury department.
4  Q.  So that would have been Mr. Dillon or one of his
5      subordinates?
6  A.  Yes.
7  Q.  With --
8          MR. MILLER:  Tom, excuse me, are you going
9      to shortly wrap up?  Because otherwise, I need a
10     five-minute break.
11         MR. CIANTRA:  Take your five-minute break.
12     I won't be that long, Evan, afterwards.
13         MR. MILLER:  Yes, that's fine.  Thanks.
14         (A brief recess was taken.)
15         MR. MILLER:  Back on the record?
16         MR. CIANTRA:  Yeah, whenever you're ready.
17     Sharon?
18         MS. LEVINE:  No, I'm good.  I'm just
19     stretching.
20         MR. CIANTRA:  You're just stretching.
21     Okay, back on the record.
22 BY MR. CIANTRA:
23 Q.  In connection with your work on the pension task
24     force, Mr. Moore, did you inquire as to the level of
25     benefits that pensioners were receiving from the two

Page 160

1      pension plans?
2  A.  Just to clarify, are you referring to those in pay
3      status?
4  Q.  Yeah, in pay status, right.
5  A.  Yes, sir.
6  Q.  And am I correct that with respect to the General
7      Retirement System the average annual benefit is a
8      little less than $20,000 a year?
9  A.  We never calculated the average across all people on
10     pay status.  We looked at it in different increments
11     in terms of the number of people at various ages
12     receiving certain monthly amounts.
13 Q.  Okay.  What's the -- do you recall what's the median?
14 A.  We never calculated the median.
15 Q.  Okay, how about the mean?
16 A.  We never calculated the mean.
17 Q.  Did you do that with respect to the Police and Fire
18     plan?
19 A.  Yes, sir.
20 Q.  Okay, what was the average that was received under
21     that plan?
22 A.  We did not calculate the average, similar -- we pulled
23     similar data to -- for both plans.
24 Q.  You don't recall a presentation by Mr. Orr where
25     certain representations were made as to what the

Page 161

1  average pension benefit was under these two systems?
2  A.  Not offhand.
3  Q.  Let me ask.  With respect to -- my understanding is at
4      least with respect to the police officers and firemen
5      in the City that they are not covered by the Social
6      Security system?
7  A.  Participants in the Police and Fire Retirement System
8      do not participate in Social Security, that's correct.
9  Q.  To this day; correct?
10 A.  Yes, sir.
11 Q.  So for their earnings, a police officer in the City of
12     Detroit would -- for their earnings from the City of
13     Detroit would have no Social Security; correct?
14 A.  They don't pay in and then they don't receive,
15     correct.
16 Q.  Okay.  And is that the case for certain of the
17     retirees in the General Retirement System as well?
18 A.  I don't believe so.  The reason for two different
19     pension systems is specifically because one system is
20     for those that participate in Social Security and one
21     system is for those that do not.
22 Q.  Okay, so your understanding is that none of the
23     participants in the General Retirement System are not
24     eligible for Social Security?
25 A.  That could -- there could be people in GRS that don't

Page 162

1  participate in the Social Security based on their age
2      or when they worked for the City, that's a
3      possibility, I don't know for sure.
4  Q.  Okay, so there may be some of the retirees who are
5      covered by that plan who have -- whose earnings were
6      not subject to Social Security?
7  A.  It's possible.
8  Q.  But you don't know?
9  A.  I don't know for sure.
10 Q.  And is that something that someone was tasked to find
11     out?
12 A.  Not that I recall.
13 Q.  Would you agree that that might be a relevant
14     consideration in evaluating what to do with that --
15     with those accrued -- the accrued pension benefits of
16     folks in that plan?
17 A.  It may be relevant, yes, depending on what gets looked
18     at.
19         MR. CIANTRA:  I have no further questions.
20 Thank you.
21         MR. MILLER:  Can we go off the record?
22         (Discussion held off the record.)
23         MR. MILLER:  Back on the record.
24         MR. RUEGGER:  Yes, this won't take too
25 long.

Page 163

1  BY MR. RUEGGER (continued):
2  Q.  Do you have your declaration in front of you,
3      Mr. Moore?
4  A.  Yes, sir.
5  Q.  If you could open it up to page 10 where you start a
6      discussion of past practices?
7  A.  Yes.
8  Q.  I'd first like to talk about the annuity savings plan,
9      which you discuss in paragraph 18.  Do you know what
10     years the annuity savings plan was in active mode or
11     being pursued?
12 A.  Based on our investigation it appears that it has been
13     available since at least 1973 and we have reviewed
14     certain documentation that would suggest that some
15     form of annuity savings plan has been in existence all
16     the way back perhaps into the 1930s.
17 Q.  I take it -- well, withdrawn.
18         Do you know whether the annuity savings
19     plan in any form is continuing at present?
20 A.  Yes, it is.
21 Q.  Is it continuing in the format described in your
22     declaration in paragraph 18?
23 A.  Could you be more specific in terms of -- there are --
24     is a number or there's a lot of information in
25     paragraph 18.

Page 164

1  Q.  Sure.  You'll see the third sentence where you say,
2      under the terms of the GRS plan, active city employees
3      may elect to invest 3, 5 or 7 percent of their
4      paychecks into an annuity savings plan.
5         Does that aspect of the annuity savings
6      plan continue to this day?
7  A.  Yes.
8  Q.  And is that available to all GRS covered active
9      employees?
10 A.  I believe so.
11 Q.  And the next part of that sentence says that the
12     investment earns interest based on a rate of return
13     established at the discretion of the GRS Board of
14     Trustees.
15         Is that still accurate?
16 A.  Yes; however, there was an ordinance passed in 2011
17     that provides parameters within which the board may
18     specify the interest.
19 Q.  Do you know what interest rate is current -- has
20     currently been specified by the board?
21 A.  As I understand it, it's 7.9 percent.
22 Q.  And is it true -- okay, turning to the next page,
23     we're still on paragraph 18, you state in the sentence
24     that begins but in many years.  Do you see that
25     sentence?

Page 165

1  A.  Yes.

2  Q.  The GRS trustees chose to credit these annuity savings

3      plan employee accounts with rates of return that were

4      far greater than the actual GRS rate of return earned

5      on the investments.

6          So I take it from your prior testimony that

7      that is still an accurate aspect of the annuity

8      savings plan; correct?

9          MR. MILLER:  Object to form.

10 A.  The ordinance passed in 2011 that I just referred to

11     addresses this issue.

12 Q.  And what does it provide generally?  I know you don't

13     have it in front of you but to your memory.

14 A.  Yes, generally it provides that the interest rate

15     credited to the annuity savings fund accounts cannot

16     exceed the assumed rate of return on the plan assets.

17 Q.  Only active employees were allowed to participate in

18     this plan; correct?

19 A.  Yes, sir.  From the standpoint of making new

20     contributions, when an employee retires, the employee

21     has the choice of taking a lump sum of their annuity

22     savings fund account or having it paid in an annuity,

23     so there could be retired employees that are still

24     getting payments from the annuity savings fund but

25     they would not be contributing to it.

Page 166

1  Q.  In the last sentence of paragraph 18 you say that

2      hundreds of millions of dollars of plan assets

3      intended to support the City's traditional defined

4      benefit pension arrangements were converted by GRS

5      trustees to provide a windfall to the annuity savings

6      accounts of active employees outside of a defined

7      benefit pension plan.

8          Has Conway MacKenzie or any other firm to

9      your knowledge quantified the dollar amount of plan

10     assets that were converted to the annuity savings

11     accounts?

12 A.  Yes.

13 Q.  And what is that amount, if you remember?

14 A.  One analysis that I've looked at was performed by

15     Joe Esuschanko, E-S-U-S-C-H-A-N-K-O.

16 Q.  Okay.

17 A.  And he analyzed the impact from both the annuity

18     savings fund as well as 13th checks between 1985 and

19     2008 and he quantified that to be, based on the

20     principal amount as well as the lost interest earnings

21     on those funds, to be approximately $1.9 billion.

22 Q.  Okay.  I want to make sure I understand what you --

23     that last answer.  That would be both the annuity

24     savings plan and the 13th check program that you

25     reference in paragraph 19?

Page 167

1  A.  Yes.  Amounts that were used to credit interest on the

2      annuity savings fund accounts and pay 13th checks.

3  Q.  The 1.9 billion does not include any principal or the

4      3 or the 5 or the 7 percent of the paycheck that was

5      invested; correct?

6  A.  That's correct.

7  Q.  But the interest being calculated there, is that all

8      interest or just the amount of interest in excess of

9      the interest earned under the plan?

10 A.  In excess.  The interest in excess of what was earned

11     by plan assets.

12 Q.  And of the 1.9 billion, did Mr. Esuschanko break it

13     down between the 13th check and the annuity savings

14     plan?

15 A.  Yes.

16 Q.  How much of the 1.9 was attributable to the annuity

17     savings plan?

18 A.  I don't recall that breakdown.

19 Q.  Do you know what documents or records might contain

20     that breakdown?

21 A.  Yes, there was a memo that was prepared by the city

22     council fiscal analysis division in around November of

23     2011 in support of the ordinance that I just

24     previously mentioned that has attached to it

25     Mr. Esuschanko's report.

Page 168

1  Q.  Thank you.  And do you recall whether Mr. Esuschanko's

2      report breaks down the amounts on each year or was it

3      an accumulation of 2005 through 2008?

4  A.  It shows by year.

5  Q.  Turning to the 13th check subject, which is in

6      paragraph 19 of your declaration, do you have an

7      understanding as to what years the 19th check program

8      was pursued?

9  A.  Just to clarify, you had indicated -- you just said

10     19th check, I think you're referring to the 13th

11     check.

12 Q.  I'm sorry, my apologies.  Strike that again.  I'll

13     answer it again -- or I'll ask it again.

14         Do you recall in what years the 13th check

15     program was utilized?

16 A.  Mr. Esuschanko's analysis I believe has 13th check

17     amounts in that same time period, 1985 through 2008.

18     I have seen information that would suggest that 13th

19     checks may have occurred before 1985 for the GRS

20     system.

21 Q.  And if I understand your declaration correctly, this

22     13th check program was used for both the GRS and the

23     PFRS systems?

24 A.  The 13th check, if we use that term as it relates to

25     the Police and Fire Retirement System, is also -- or

Page 169

```
1    has also been referred to as gain sharing.
2  Q.  So it's only referred to as gain sharing related to
3      the PFRS system?
4  A.  I have seen references to both 13th checks and gain
5      sharing for PFRS.  The reason why there's a
6      distinction is payouts that happen from PFRS went to
7      both active and retired employees whereas on the GRS
8      side those payments just went to retired employees.
9  Q.  Are you aware whether a portion of the 13th check
10     program or payments pursuant to the 13th check program
11     were made to the City itself?
12  A.  Well, the 13th check didn't go to the City, but
13     typically the board would approve a total amount and
14     allocate a portion to annuity savings fund interest,
15     another portion to 13th checks and then a third
16     portion to be used as a credit to the City.
17  Q.  And are you aware -- you may have already addressed
18     this in your testimony, I apologize -- but are you
19     aware of whether any payments among those allocated
20     went to active employees other than the -- not in the
21     annuity savings plan context but in the 13th check
22     program?
23  A.  Speaking just about GRS, if we exclude the crediting
24     of the annuity savings fund accounts, I'm not aware of
25     13th checks going to active employees.
```

Page 170

```
1            MR. CIANTRA:  I believe this has been the
2      subject of discussion between people in your firm and
3      my firm, but I just want to confirm with Mr. Moore
4      what his understanding is as to the October 23rd
5      hearing.
6  Q.  Do you have any understanding as to whether you are
7      expected to testify at the October 23rd hearing?
8  A.  It has not been discussed.
9  Q.  So I take it that if you haven't discussed whether
10     you're going to testify, you similarly have not
11     discussed what you might testify to; is that correct?
12  A.  Correct.
13            MR. RUEGGER:  I don't have any other
14     questions.
15            MR. MILLER:  Thank you.  No questions.
16       (Deposition concluded at 4:06 p.m.)
17                    *   *   *
18
19
20
21
22
23
24
25
```

Page 171

```
1  State of Michigan)
2  County of Genesee)
3            Certificate of Notary Public
4      I certify that this transcript is a complete, true and
5  correct record of the testimony of the witness held in this
6  case.
7      I also certify that prior to taking this deposition,
8  the witness was duly sworn or affirmed to tell the truth.
9      I further certify that I am not a relative or an
10 employee of or an attorney for a party; and that I am not
11 financially interested, directly or indirectly, in the
12 matter.
13      WITNESS my hand this 20th day of September,
14 2013.
15
16
17
18     Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267
19     Certified Realtime Reporter
20     Registered Merit Reporter
21     Certified LiveNote Reporter
22     Certified Shorthand Reporter
23     Notary Public, Genesee, Michigan
24     Acting in Oakland County, Michigan
25     My Commission Expires:  9-19-18
```

Page 172

```
1            DEPOSITION ERRATA SHEET
2
3  Our Assignment No. 471793/NYC337236
4  Case Caption:  In re City of Detroit, Michigan
5
6        DECLARATION UNDER PENALTY OF PERJURY
7
8      I declare under penalty of perjury that I have read
9  the entire transcript of my Deposition taken in the
10 captioned matter or the same has been read to me, and the
11 same is true and accurate, save and except for changes
12 and/or corrections, if any, as indicated by me on the
13 DEPOSITION ERRATA SHEET hereof, with the understanding that
14 I offer these changes as if still under oath.
15 Signed on the _____ day of _____, 20___.
16 _____
17 CHARLES M. MOORE
18
19
20
21
22
23
24
25
```

Page 173

```
1              DEPOSITION ERRATA SHEET
2
3    Page No._____Line No._____Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25   CHARLES M. MOORE
```

Page 174

```
1              DEPOSITION ERRATA SHEET
2
3    Page No._____Line No._____Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25   CHARLES M. MOORE
```

# EXHIBIT  E

Page 308

```
 1            UNITED STATES BANKRUPTCY COURT
 2            EASTERN DISTRICT OF MICHIGAN
 3                 SOUTHERN DIVISION
 4    -------------------------------X
 5    IN RE                    ) Chapter 9
 6    CITY OF DETROIT, MICHIGAN,    ) Case No. 13-53846
 7           Debtor.           ) Hon. Steven W. Rhodes
 8    -------------------------------X
 9
10
11         CONTINUED VIDEOTAPED DEPOSITION of
12                  KEVYN D. ORR
13                    Volume II
14               Washington, D.C.
15             Friday, October 4, 2013
16
17
18    Pages:  308 - 496
19    Reported by:  Cindy L. Sebo, RMR, CSR, RPR, CRR,
20                 CCR, CLR, RSA
21    Assignment Number:  14008
22    File Number:  105824
```

Page 309

```
 1                  October 4, 2013
 2                   11:11 a.m.
 3
 4
 5         Continued Videotaped Deposition of KEVYN D.
 6    ORR held at the law offices of:
 7
 8
 9                     Jones Day
10         51 Louisiana Avenue, Northwest
11              Washington, D.C. 20001
12
13
14
15
16         Pursuant to notice, before Cindy L. Sebo,
17    Registered Merit Reporter, Certified Shorthand
18    Reporter, Registered Real-Time Professional Reporter,
19    Certified Real-Time Reporter, Certified Court
20    Reporter, Certified LiveNote Reporter, Real-Time
21    Systems Administrator, a Notary Public in and for
22    the District of Columbia.
```

Page 310

```
 1    APPEARANCES:
 2
 3    JONES DAY
 4      For the Debtor:
 5           51 Louisiana Avenue, Northwest
 6           Washington, D.C. 20001-2113
 7           202.879.3939
 8      BY:   GREGORY M. SHUMAKER, ESQUIRE
 9            gshumaker@jonesday.com
10      BY:   DAN T. MOSS, ESQUIRE
11            dtmoss@jonesday.com
12
13    DENTONS US LLP
14      For the Retirees Committee:
15           1221 Avenue of the Americas
16           New York, New York 10020-1089
17           212.632.8342
18      BY:   ANTHONY B. ULLMAN, ESQUIRE
19            anthony.ullman@dentons.com
20
21
22
```

Page 311

```
 1    APPEARANCES (Continued):
 2
 3    LOWENSTEIN SANDLER LLP
 4      For the AFSCME:
 5           65 Livingston Avenue
 6           Roseland, New Jersey 07068
 7           973.597.2374
 8      BY:   SHARON L. LEVINE, ESQUIRE
 9            slevine@lowenstein.com
10
11    COHEN, WEISS AND SIMON LLP
12      For the United Auto Workers Union:
13           330 West 42nd Street
14           New York, New York 10036-6979
15           212.356.0216
16      BY:   PETER D. DECHIARA, ESQUIRE
17            pdechiara@cwsny.com
18
19
20
21
22
```

Page 312

1  APPEARANCES (Continued):
2
3  WINSTON & STRAWN LLP
4     For the Assured Municipal Guaranty Corporation:
5        200 Park Avenue
6        New York, New York 10166-4193
7        212.294.3520
8  BY:   STACEY L. FOLTZ, ESQUIRE (via telephone)
9        SFoltz@winston.com
10 BY:   BIANCA M. FORDE, ESQUIRE
11       (via LiveNote Stream)
12       bforde@winston.com
13
14 CLARK HILL PLC
15    For the General Retirement System of the City
16       of Detroit and the Police and Fire Retirement
17       System of the City of Detroit:
18       500 Woodward Ave, Suite 3500
19       Detroit, Michigan 48009
20       313.965.8274
21 BY:   JENNIFER K. GREEN, ESQUIRE
22       (via telephone)

Page 313

1  APPEARANCES (Continued):
2
3  Weil, Gotshal & Manges LLP
4     For the Financial Guaranty Insurance Company:
5        767 Fifth Avenue
6        New York, New York 10153-0119
7        212.310.8257
8  BY:   DANA KAUFMAN, ESQUIRE
9        dana.kaufman@weil.com
10
11
12 ALSO PRESENT:
13       NOONAH ETTEHAD, Videographer
14       MICHAEL NICHOLSON, UAW
15
16
17
18
19
20
21
22

Page 314

1              C O N T E N T S
2  EXAMINATION OF KEVYN D. ORR:           PAGE:
3     By Ms. Levine                         316
4     By Mr. Ullman                    358, 477
5     By Mr. DeChiara                  382, 489
6     By Ms. Green                          483
7
8              E X H I B I T S
9  ORR DEPOSITION EXHIBITS:               PAGE:
10     20      E-mail string               352
11
12     21      Jones Day Presentation to the
13             City of Detroit; Detroit,
14             Michigan, January 29, 2013   359
15     22      City of Detroit — Restructuring
16             Plan, Mayor's Implementation
17             Progress Report, March 2013  369
18     23      E-mail string               457
19
20     24      Excerpt from report         462
21
22     25      E-mail string               464

Page 315

1              EXHIBITS (Continued):
2  ORR DEPOSITION EXHIBITS:               PAGE
3     26      Contract for Emergency
4             Financial Manager Services   471
5
6
7
8
9     * (Exhibits Attached to Original Transcript.)
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 316

1    PROCEEDINGS

2

3        Washington, D.C.

4        Friday, October 4, 2013; 11:11 a.m.

5

6            - - -

7            KEVYN D. ORR

8    after having been previously duly sworn, was

9    examined and testified further as follows:

10           - - -

11       THE VIDEOGRAPHER: This is the

12   continuation of the deposition of Kevyn Orr on

13   Friday, October the 4th of 2013 at 11:12 a.m.

14       (Sotto voce discussion.)

15       THE VIDEOGRAPHER: Yeah. The witness

16   is still sworn.

17       MS. LEVINE: Okay.

18           - - -

19   EXAMINATION (CONTINUED) BY COUNSEL FOR AFSCME

20           - - -

21   BY MS. LEVINE:

22       Q.   Mr. Orr, thank you for coming back.

Page 317

1    Again, we --

2        A.   Sure --

3        Q.   -- appreciate it.

4        A.   -- um-hum.

5        Q.   As we understand from the court

6    reporter before we started the deposition, you've

7    been previously sworn. You're continued to be

8    sworn, and we're not going to go through again,

9    unless you'd like me to repeat it, the ground

10   rules for the deposition.

11       A.   No, that's fine. I understand I'm

12   still under oath.

13       Q.   Good.

14       Mr. Orr, we were talking the last

15   time we met about some of the discussions that you

16   had with the Governor leading up to the filing of

17   the bankruptcy, and some of those discussions, as

18   the Court has directed, are protected by the

19   common interest agreement --

20       A.   Yes.

21       Q.   -- but -- but our understanding is

22   that some of them may not be.

Page 318

1    So I'm going to ask you a series of

2    questions. I'm assuming you'll take a breath and

3    let your -- let -- let your attorney tell you

4    whether or not you can answer --

5        A.   Okay.

6        Q.   -- and depending upon his direction,

7    we'll go to the next question.

8        A.   That's fine.

9        Q.   Did you consider, just prior to the

10   filing of the Chapter 9 petition, whether there

11   were political ramifications associated with

12   dealing with the pension's retiree benefits, other

13   employee issues in the course of the Chapter 9?

14       MR. SHUMAKER: Go ahead.

15       THE WITNESS: Did I consider?

16   BY MS. LEVINE:

17       Q.   (No audible response.)

18       A.   No.

19       Q.   Was it your understanding that any of

20   the City's elected officials were concerned about

21   political considerations impacting their workforce

22   pension's retiree benefits as a result of the

Page 319

1    Chapter 9 filing?

2        A.   Was it my understanding that any of

3    the City officials were concerned?

4        Q.   The Mayor, anybody working with the

5    Mayor.

6        A.   I'd be speculating. They might have

7    been, but I don't know for sure.

8        Q.   Did you have any discussions with the

9    Mayor or any of the City officials about the

10   political ramifications of a Chapter 9 filing?

11       A.   No, not really political

12   ramifications, no.

13       Q.   Did you discuss with the Governor any

14   of the political ramifications surrounding a

15   Chapter 9 filing?

16       A.   Outside of any attorney-client

17   communications?

18       Q.   (No audible response.)

19       A.   You're shaking your head, so I

20   don't --

21       Q.   Well, the political -- I'm -- I'm

22   asking the question about political ramifications,

Page 320

1  so I'm intentionally not asking the question with
2  regard to any --
3      A.    Okay.
4      Q.    -- legal discussions.
5      A.    Explain for me, if you will, what you
6  mean by "political ramifications."  Just -- just
7  so I make sure I understand what --
8      Q.    Well, let's put it this way --
9      A.    -- what you mean.
10     Q.    -- what would -- what's your
11 understanding of political ramifications?
12     A.    Well, I'm -- I'm not sure.  That's
13 why I'm asking you.
14     Q.    Did you consider any political
15 consequences at all in connection with the
16 Chapter 9 filing?
17     A.    Did I consider?
18     Q.    Yes.
19     A.    No.
20     Q.    Do you believe that -- do you
21 understand -- did you have any discussions with
22 regard to whether or not the Governor was

Page 321

1  considering any political ramifications as a
2  result of the Chapter 9 filing?
3      A.    I'm -- I'm trying to understand --
4  let me put it to you this way:  The answer would
5  be no, because I believe the Governor wasn't
6  concerned about political ramifications as you
7  asked.
8      Q.    Okay.
9            And what do you base that
10 understanding on?
11           Why do you believe the Governor
12 wasn't concerned about political ramifications?
13     A.    Without -- and -- and let me just say
14 this throughout the deposition.  It is not my
15 intent to waive or in any way impact the
16 attorney-client privilege.
17           So I'm going to try to be responsive,
18 but I don't want to bleed over into any arguments
19 later that I somehow waived the privilege.
20           My impression is in any of my
21 discussions outside of attorney-client
22 communications with the Governor, he never

Page 322

1  demonstrated any concern about political
2  ramifications as they're being used today.
3      Q.    Did you understand that reductions in
4  vested pension benefits would be a necessary part
5  of any restructuring for Detroit?
6      A.    I think that was certainly
7  anticipated, yes.
8      Q.    Is it your understanding that the
9  Governor understood that the reduction in vested
10 pension benefits would be part of any
11 restructuring for Detroit?
12           MR. SHUMAKER:  Objection: foundation.
13           MS. LEVINE:  I'm asking him his
14 understanding.
15           THE WITNESS:  I'm not sure what the
16 Governor understood.  You'd have to ask him.
17 BY MS. LEVINE:
18     Q.    Did the Governor ever communicate to
19 you that he expected that vested pension benefits
20 would be part of any restructuring for Detroit?
21     A.    The Governor communicated to me that
22 he expected -- no.

Page 323

1      Q.    Did you discuss the reduction in
2  vested in pension benefits with the Governor prior
3  to the filing of the Chapter 9 petition?
4      A.    Not outside of any attorney-client
5  communications.
6      Q.    Did you discuss the reduction of
7  vested pension benefits, without going into what
8  was discussed, prior to the filing of the
9  Chapter 9 petition with the Governor?
10     A.    Without waiving the attorney-client
11 privilege, we may have.
12     Q.    You -- when you say "we may have,"
13 you don't recall?
14     A.    I -- I don't recall a specific
15 conversation with the Governor outside of
16 attorney-client communications talking about
17 reductions in pension benefits.
18           The Governor generally -- without
19 waiving the privilege, would generally say, you
20 make the decision that's best for the City in your
21 mind.
22     Q.    Was it your understanding, prior to

Page 324

1 the bankruptcy filing, that there was an issue
2 with regard to whether or not pension benefit
3 reductions would violate Michigan's State law or
4 the State constitution?
5     A.    Can you repeat the question?
6         MS. LEVINE: Can you read back the
7 question, please?
8         THE WITNESS: Yeah.
9             - - -
10       (Whereupon, the court reporter read
11        back the pertinent part of the
12        record.)
13             - - -
14         THE WITNESS: Yes.
15 BY MS. LEVINE:
16     Q.    And was it -- and did the Governor
17 also have an understanding that that was an issue?
18         MR. SHUMAKER: Objection: foundation.
19 BY MS. LEVINE:
20     Q.    Was it your understanding that the
21 Governor also had an understanding that that was
22 an issue?

Page 325

1     A.    Without speculating as to what the
2 Governor would understand, I believe -- to the
3 extent I believe the Governor was aware that --
4 what was being reported in the press and being
5 discussed, I would say yes.
6     Q.    Was it your understanding that the
7 only way to reduce pension benefits was to use
8 or -- use Chapter 9 or file for Chapter 9
9 protection?
10     A.    No.
11     Q.    Was it the Governor's understanding
12 that the only way to reduce pension benefits or
13 to -- was to use Chapter 9 or to file for
14 Chapter 9 bankruptcy protection?
15         MR. SHUMAKER: Objection: foundation;
16 calls for speculation.
17         THE WITNESS: Yeah. Here again, I
18 don't know what the Governor's understanding was.
19         MS. LEVINE: That's fine. I'm
20 expecting objections, but please don't coach the
21 witness. The objections --
22         MR. SHUMAKER: I'm not coaching the

Page 326

1 witness --
2         MS. LEVINE: -- the objection --
3         MR. SHUMAKER: -- I'm just stating my
4 objection.
5         MS. LEVINE: I don't want -- yeah,
6 but objection as to speculation, then, suddenly,
7 he doesn't -- he -- his answer is I'm -- I don't
8 want to speculate.
9         Objections to form are fine.
10         THE WITNESS: I -- I think I said
11 before I want to be very careful about testifying
12 to what the Governor's state of mind was. I can
13 only testify as to what I understood.
14 BY MS. LEVINE:
15     Q.    And that's all I'm asking --
16     A.    Okay.
17     Q.    -- we're only asking for your
18 understanding --
19     A.    Okay.
20     Q.    -- I'm trying to use your
21 understanding to avoid legal conclusions or
22 speculation or anything else.

Page 327

1         I just want to -- I'm -- I just -- I
2 just want to understand your understanding.
3     A.    Okay.
4         MR. SHUMAKER: If you phrase the
5 question that way, that will help us all out.
6 BY MS. LEVINE:
7     Q.    What's your understanding of the
8 Mayor's view with regard to the reduction in
9 pension benefits?
10     A.    I don't have an understanding what
11 the Mayor's view is.
12     Q.    Did you discuss, prior to the
13 Chapter 9 filing, pension reductions with the
14 Mayor?
15     A.    I don't believe so.
16     Q.    Did you discuss, prior to the
17 Chapter 9 filing, pension reductions with anybody
18 on behalf of the City Government?
19     A.    Let -- let me -- let me phrase my
20 an -- outside of any public discussions and
21 presentations I may have made at, say, for
22 instance, the June 10th creditor's meeting or the

Page 328

1 June 14th meeting for creditors, I don't recall
2 any specific discussions with anyone on behalf of
3 the City about reductions.
4    Q.    You -- you testified at your last
5 deposition that, in your view, concessionary
6 bargaining changes to pensions could not occur
7 within the time frame that you had to work with.
8        And I have an extra copy here if you
9 want to see the -- the transcript, but --
10    A.    Um-hum.
11    Q.    -- the question is what time period
12 were you talking about?
13    A.    I think I said at the June 10th
14 public meeting and, again, at the June 14th
15 proposal for creditors -- I think I was fairly
16 clear that we would need to have some agreements
17 in principle or term sheets and the like within
18 the next 30 days, and that if we were making
19 movement, we might be willing to have further
20 discussions for an additional 30 days.
21        In fact, I believe at the back of the
22 June 14th proposal, we learned -- we -- we

Page 329

1 identified an evaluation time frame.  So that's
2 the time frame that I thought I was being fairly
3 clear about.
4    Q.    And were either the June 14 or the
5 June 20 meetings audiotaped?
6    A.    The June 10th or the June 14th
7 meeting --
8    Q.    Right.  Was -- were -- were either
9 the June 10th or the June 14th meeting audiotaped?
10    A.    I believe the June 10th meeting was
11 audio and videotaped.  I think I've seen that on
12 the Internet.
13        I don't know about the June 14th
14 meeting for creditors.
15    Q.    Did -- did you videotape those
16 meetings or did the EM -- were they videotaped on
17 behalf of EM?
18    A.    To be honest with you, that -- that
19 would have been done at a staff level.  I don't
20 know.
21        I just know that I've seen the
22 June 10th meeting -- my June 10th presentation on

Page 330

1 various Internet sites.  I don't recall seeing my
2 June 14th presentation.
3        MS. LEVINE:  Can we request a copy of
4 that if -- if it exists?
5        MR. MOSS:  Which one?  It's --
6        MR. SHUMAKER:  Both of them if you
7 have them.
8        THE WITNESS:  I think they're on
9 YouTube.
10        MR. SHUMAKER:  I'd ask you to put the
11 request into writing so we have that.
12 BY MS. LEVINE:
13    Q.    When you gave the presentation at the
14 June 10th and the June 14th meeting, did you
15 believe that it was possible to reach consensual
16 agreements within the 30-day period that you
17 outlined?
18        MR. SHUMAKER:  Can I just state an
19 objection here?  Where are you're going, Counsel?
20 I'm going to be patient and allow you to -- to
21 ask -- ask questions, but let's be very clear from
22 the outset as to what Judge Rhodes ordered and

Page 331

1 what ASME requested in its -- its motion to compel
2 additional testimony from Mr. Orr.
3        The request that you made was -- to
4 the Judge was that Mr. Orr reappear for three
5 hours of deposition testimony concerning his
6 communications with State officials in the
7 presence of legal counsel since his appointment as
8 emergency manager.
9        That is what the subject of today's
10 deposition is.
11        MS. LEVINE:  Right.  And this is a
12 foundation question.
13        MR. SHUMAKER:  Okay.  I just want --
14 I -- I'm just going to caution you from the --
15 from the get-go that we're not going to meander
16 all over that -- that's what the order is and
17 that's why we're here.
18        MS. LEVINE:  Can you read back the
19 question, please?
20            - - -
21        (Whereupon, the court reporter read
22        back the pertinent part of the

Page 332

1          record.)
2                - - -
3          THE WITNESS:  Yes.
4    BY MS. LEVINE:
5      Q.    Did you discuss that with the
6    Governor before the June 10th meeting?
7      A.    Let -- as I think I said at my
8    September 16th deposition, I would have regular
9    meetings with the Governor, typically weekly.
10   There were attorneys present at all of those
11   meetings.
12         I am not -- and I'll take guidance
13   from my counsel, but this is in terms of how I
14   intend to respond today.
15         I am not trying to assert the
16   privilege for people who have legal degrees but
17   were not acting as attorneys.  For instance, the
18   Governor has a JD, and the Treasurer has a JD.  So
19   I'm not trying to say that the privilege attaches
20   for their capacity as Governor and Treasurer, not
21   acting as attorneys.  But there are attorneys in
22   those meetings on the Governor's staff acting as

Page 333

1    attorneys.
2          Without violating the privilege
3    during those meetings, what I can say is that --
4    well, if I could have the question again.
5      Q.    It's really a simple -- it -- it's
6    a -- it's a narrow question --
7      A.    Right.
8      Q.    -- I understand the concern, but it's
9    a narrow question.
10     A.    Right.
11     Q.    Did you discuss -- you -- as I
12   understand your testimony, you indicated on
13   June 10th and June 14th that you were looking at
14   a 30-day time frame.
15     A.    Um-hum.
16     Q.    Did you discuss that 30-day time
17   frame prior to the June 10 meeting with the
18   Governor?
19     A.    I'll look for a little guidance.  If
20   I had discussions, they probably were during
21   meetings where attorneys were present.
22         Without disclosing what those

Page 334

1    communications were, we typically would have
2    discussed what we would have needed to present --
3    I don't recall so much for the June 10th public
4    meeting, so the answer is no for there.
5          For the June 14th meeting, we
6    probably would have discussed at a very high level
7    the nature of the presentation.  I don't recall
8    discussing with specificity the exact time frames.
9      Q.    In order to meet the 30-day time
10   frame that you're discussing, were there any
11   benchmarks or criteria that you thought would have
12   to be meet -- would have to be met within that
13   30-day period in order to conclude what you needed
14   to conclude at the end of the 30-day period?
15     A.    Well, I think what I said was that
16   that was an initial 30-day period, but if we were
17   moving forward and making progress, we'd be
18   willing to extend it for another 30-day period or
19   so.  I think that's what I said.
20         So when you say "benchmarks," we were
21   looking for good-faith negotiations and movements
22   in the nature, I think I said on June 14th,

Page 335

1    agreements in principle, term sheets and the like.
2          So it's -- it's not as stringent as I
3    think -- I don't want to give the impression that
4    our expectation was as stringent as there had to
5    be specific benchmarks, but we wanted for people
6    to come in with good-faith, credible proposals to
7    show that we were moving forward on these issues,
8    and we would continue to negotiate on those
9    issues.
10     Q.    Did you have -- following the June 10
11   and June 14 meeting, did you have any discussions
12   with the Governor with regard to the progress or
13   lack of progress being made in that regard?
14     A.    Probably.  Without violating the
15   privilege, we probably had discussions without
16   saying what those discussions were, because there
17   would have been -- would have been attorneys
18   present.
19     Q.    When did those discussions take
20   place?
21     A.    They would typically have taken
22   place, as I've said, at the weekly meetings that

Page 336

1 the Governor and I and his team and members of my
2 team would have.
3     Q.    So after June 14, when was your next
4 weekly meeting?
5     A.    I don't know specifically, but I'm --
6 I said it's typically weekly.
7     So I'm -- I think we probably had one
8 the next week.
9     Q.    Do you recall what day the next week?
10     A.    I do not.
11     Q.    Do you recall if there was one
12 because it was -- do you recall if there was one
13 the following week?
14     A.    I do not.
15     Q.    Were there one or two meetings with
16 the Governor from the time of the June 14 meeting
17 to the time of the filing of the Webster
18 litigation on June 3?
19     A.    Well, there could well have been more
20 than two. I do recall, and I think I said on
21 September 16th, I don't think we had one the 4th
22 of July -- week of the 4th of July, which was a

Page 337

1 Thursday.
2     Q.    Understood. Not the question.
3     The question is, from June 14 up
4 until July 3, how many times did you meet with the
5 Governor?
6     A.    No. Your question was did we have
7 one or two meetings, and my answer was I believe
8 we probably had more than two.
9     Q.    And did you discuss the pension
10 and/or healthcare benefit issues that you had
11 discussed during the June 10 and June 14 meeting
12 with the Governor during those two, maybe more,
13 meetings?
14     A.    Ms. Levine, let me -- let me say
15 this: We probably discussed them broadly, but
16 there were no discussions that I recall in detail
17 about what our plan would have to be in those
18 meetings, such as what level of cuts they would be
19 and the like, if any.
20     Q.    Did -- did you get any proposals
21 during that two-week period in response to those
22 meetings?

Page 338

1     A.    I think I said on June 16th, we've
2 had some discussions with some bargaining units.
3 I don't recall if they were between the June 14th
4 time frame -- if they were -- I think we were in
5 discussions with some bargaining units during that
6 time. So, yes, I believe we did get some
7 proposals.
8     Q.    Did you report on those proposals to
9 the Governor?
10     A.    I -- generally speaking, yes.
11     Q.    Did you indicate to the Governor that
12 you were making progress?
13     A.    I probably indicated that we were
14 making some progress, yes.
15     Q.    Did you discuss with the Governor
16 whether there were additional proposals you were
17 hoping to receive?
18     A.    We probably did express a wish for
19 additional proposals. We were hoping for a global
20 solution.
21     Q.    Did you come up with an action plan
22 to solicit further proposals?

Page 339

1     A.    I thought we began that on June 14th,
2 a proposal for creditors, where we ended it by
3 saying we're interested in responses.
4     Q.    In any of the meetings that you had
5 with the Governor between June 14th and July 3rd
6 where you didn't get proposals, for -- did you
7 discuss constituents from whom you didn't get
8 proposals that you wish you would have gotten
9 proposals from?
10     A.    No, I didn't --
11     MR. SHUMAKER: Objection to the form.
12     THE WITNESS: -- no, I don't recall
13 discussing at that level of specificity.
14 BY MS. LEVINE:
15     Q.    The Governor authorized the Chapter 9
16 filing on July 18th.
17     Do you know who drafted the
18 Governor's authorization?
19     A.    I do not.
20     Q.    Do you know whether the language in
21 the Governor's authorization was discussed with
22 your attorneys at Jones Day?

Page 340

1     A.    I do not.
2     Q.    Did the Governor ask you to request
3 authorization to file the Chapter 9 or was it your
4 independent decision on July 16th?
5     A.    It was my independent decision.
6     Q.    Did you have any specific discussions
7 with the Governor concerning the conditions or
8 the -- or with respect to specific directions or
9 the Governor with regard to pension benefits?
10          MR. SHUMAKER:  Object to the form.
11          THE WITNESS:  No, not with the
12 Governor.
13 BY MS. LEVINE:
14     Q.    Was it your understanding that the
15 Governor was seeking political cover by not taking
16 a position with respect to pension reductions, but
17 only citing to Section 943 of the Bankruptcy Code?
18          MR. SHUMAKER:  Objection: form.
19          THE WITNESS:  No.
20 BY MS. LEVINE:
21     Q.    Did -- did you suggest the citing
22 to 943 of the Bankruptcy Code to the Governor?

Page 341

1     A.    No.  I had no involvement in the
2 letter -- the Governor's letter.
3     Q.    Were there any discussions about
4 citing to 943 of the Bankruptcy Code outside of
5 the letter as a -- as of -- as a way to deal with
6 issues with regard to pension reductions?
7          MR. SHUMAKER:  I'm just going to
8 caution the witness again.  To the extent you can
9 answer the question without revealing
10 attorney-client communications, you may do so.
11          THE WITNESS:  The -- there were none
12 with the Governor.
13 BY MS. LEVINE:
14     Q.    Is it your understanding that the
15 language regarding conditions, specifically the
16 use of the reference to 943 of the Bankruptcy
17 Code, authorizes you to alter vested pension
18 benefits?
19     A.    That seems to call for a legal
20 conclusion.
21          Let -- let me just say this
22 generally --

Page 342

1     Q.    I'm just asking your understanding.
2     A.    Let me -- let me just say this
3 generally.
4          I was not involved in any fashion in
5 drafting the Governor's response.  My
6 understanding is that without citing to a specific
7 section of the code, because I have not analyzed
8 it, that the letter grants me authority to use any
9 resources that are available to propose a plan of
10 adjustment.
11     Q.    After you got the letter, did you
12 discuss with the Governor what the meaning was in
13 the letter of the reference to Section 543 [sic]
14 of the Bankruptcy Code?
15     A.    No.
16     Q.    943, I'm sorry.
17     A.    Yeah, I knew -- I knew what you
18 meant.
19          No.
20     Q.    Between June 14th -- or June 10th and
21 the filing on July 18th, besides legal
22 conclusions, besides pension benefits, did you

Page 343

1 discuss with the Governor certain ideas that you
2 had with regard to how to restructure or deal with
3 the financial situation in Detroit?
4     A.    Yes, we likely did without divulging
5 any privileges, yes.
6     Q.    I'm looking for the business
7 financial terms, not the legal terms.
8          In other words, did you --
9     A.    Um-hum.
10     Q.    -- discuss, for example, selling
11 assets?
12     A.    No.
13     Q.    Did you discuss generating additional
14 revenue with the Governor?
15     A.    Here again, some of these
16 discussions, in fact, every meeting we had on a
17 regular basis would have had attorneys present, so
18 I want to be very careful.
19          For instance -- for instance, if
20 there are discussions about a millage rate and the
21 maximum legal millage amount, I would not want
22 those to bleed over into disclosing

Page 344

1    attorney-client protected communications.
2        What I can say is that at -- at a
3    high level, we discussed ways to potentially
4    generate revenue.
5        Q.    Did you discuss privatization with
6    the Governor during that same time frame from
7    June 10th through the filing?
8        MR. SHUMAKER:  I'll just caution the
9    witness, if you had discussions with the Governor
10   where counsel was present in connection with a
11   request for an indicia of legal advice --
12       THE WITNESS:  Right.
13       MR. SHUMAKER:  -- I don't want you to
14   answer to that; but if you can do so outside of
15   any such request or provision of legal advice, you
16   can answer.
17       THE WITNESS:  Okay.
18           Without disclosing legal advice, we
19   may have discussed nonlegal-related issues, for
20   instance, with an outstanding solid waste RFP and
21   how that could save the City money and produced a
22   higher level of services for the City.

Page 345

1            Legal issues regarding the RFP, I --
2    I won't talk about, but, for instance, the --
3    those privatization in that sense would have been
4    discussed.
5            Privatization in a broader sense, I
6    don't recall having discussions of a philosophical
7    issue about privatization.  We probably would have
8    had discussions about specific RFPs outstanding.
9    BY MS. LEVINE:
10       Q.    Did you have any other specific
11   discussions with regard to RFPs or outsourcing in
12   connection with improving the financial
13   condition -- or allegedly improving the financial
14   condition of the City?
15       A.    Well, improving it.  Like I said,
16   I -- I do recall discussions about the solid waste
17   RFP which we were somewhat excited about, save
18   money and increase quality of services.
19           I'm trying to think of anything else
20   that could be called privatization.  That's the
21   one that sticks out in my mind.  I don't recall
22   anything else.

Page 346

1        Q.    During the course of these
2    conversations, did you have any conversations with
3    the Governor about preserving jobs for the
4    citizens of Detroit?
5        A.    Yes.
6        Q.    And what were those conversations?
7        A.    Well, for instance, in the solid
8    waste RFP, one of the bidders -- I -- we probably
9    discussed that one of the bidders had come in who
10   had done this before and was able to move the City
11   jobs over to private sector jobs with the same
12   employees.  And so there would be no net loss of
13   jobs.
14       Q.    Did you discuss how that might impact
15   vested benefits and vested pension rights?
16       A.    No, we really didn't have -- no.
17       Q.    You -- you approved the retention of
18   Jones Day under EM Order Number 4 and officially
19   approved Jones Day's contract on April 20 --
20       THE COURT REPORTER:  I -- I'm sorry.
21   I can't hear you here.
22       MS. LEVINE:  Sorry.

Page 347

1    BY MS. LEVINE:
2        Q.    You approved the retention of
3    Jones Day under EM Order Number 4 and officially
4    approved Jones Day's contract on April 23, 2010;
5    is that correct?
6        A.    If your represent -- representation
7    is accurate, yes.  I don't independently recall
8    the dates, but that sounds correct.
9        Q.    Okay.  So after April 23, 2013, you
10   and Jones Day had an attorney-client relationship,
11   yes?
12       A.    I think that's a legal conclusion.
13   The attorney-client relationship could attach
14   before then.
15       Q.    What was your understanding of when
16   your legal attorney-client relationship with
17   Jones Day attached?
18       A.    I don't know.  That's what I'm saying
19   it calls for a legal conclusion.
20           My understanding of the days I
21   practiced law is that the attorney-client
22   relationship can attach prior to the actual

1  formalization of an attorney-client relationship.
2      Q.    When did you first -- all right.
3            Let me ask you this:  Did Jones Day
4  represent the City in any capacity before
5  April 23, 2013?
6      A.    I don't know.  That's why I keep
7  saying it could be a legal conclusion.
8            I know that their contract was before
9  City -- the Mayor had selected them, and their
10  contract was below -- before City Council before
11  then.
12      Q.    What was the date that the Mayor
13  selected Jones Day to represent the City?
14      A.    I don't recall.
15      Q.    Was it prior to February of 2013?
16      A.    I -- I don't recall.  I don't recall.
17  I don't think so.
18      Q.    Did Jones Day represent the State of
19  Michigan in any capacity before April 2000 --
20  April 2013?
21            MR. SHUMAKER:  Objection: foundation.
22            THE WITNESS:  Jones Day may have --

1  I -- I don't know.  They may have represented the
2  State in other matters, but if you're talking
3  about with regard to this matter, I don't recall.
4  BY MS. LEVINE:
5      Q.    What does NERD stand for?
6            MR. SHUMAKER:  Object to the form.
7  BY MS. LEVINE:
8      Q.    Do you know what NERD -- do you --
9  have you heard the phrase "NERD" in connection
10  with the New Energy to Reinvest Diversity Fund?
11      A.    Yeah.  When you said "NERD," it
12  stands for a kid who was like me when he was
13  growing up, sort of a geek.
14            But if you're talking about the
15  acronym related to something affiliated with the
16  Governor, then, yes, I've heard of that.
17      Q.    All right.
18            Do you know what it is -- let me
19  ask --
20      A.    I --
21      Q.    -- it this way:  What's your
22  understanding of what it is?

1      A.    I -- I -- only what I've read in the
2  papers.  I know nothing about the NERD Fund other
3  than what I've read in the papers.
4      Q.    Do you know who any of the donors are
5  to the NERD Fund?
6      A.    I haven't got a clue.
7      Q.    So it's not you?
8      A.    It is -- I've never donated to the
9  NERD Fund, no.
10      Q.    Has Jones Day?
11      A.    Not that I know of.
12      Q.    Has any City retained professional?
13      A.    I have no idea.
14      Q.    Do you know whether any of the City's
15  creditors are -- have donated to the NERD Fund?
16      A.    I know nothing about the NERD Fund
17  other than what I've read in the papers.  The
18  first time I heard about the NERD Fund is when I
19  read about it in the paper --
20      Q.    So do --
21      A.    -- I know nothing about the donors.
22      Q.    Do you know whether any -- do you

1  know whether any of the SWAP parties have donated?
2      A.    No, I do not.
3      Q.    If you had access to the
4  information -- if you have access to the
5  information, would you be willing to disclose the
6  donors?
7      A.    I don't have access to the
8  information, and I think that's a question -- if
9  it's a fund run by someone else, that's their
10  decision.  I don't have access to any information
11  related to the NERD Fund.
12      Q.    Would you be willing to ask the
13  Governor to have that information disclosed?
14      A.    Sitting here today, no.
15      Q.    Have any of your expenses as
16  emergency manager been paid or reimbursed by the
17  NERD Fund?
18      A.    Not --
19            MR. SHUMAKER:  I think we're getting
20  pretty far afield here -- here, Counsel.  This is
21  not really --
22            MS. LEVINE:  Yeah, it is --

Page 352

1    MR. SHUMAKER: It's starting to
2 get --
3    MS. LEVINE: -- I'll be bring it
4 back.
5    MR. SHUMAKER: Okay.
6    THE WITNESS: What I read in the
7 paper is that my housing is paid for by the
8 NERD Fund. I've never seen the lease, and I've
9 never seen a payment.
10    That's the extent of what I know of
11 the NERD Fund and its involvement with me.
12    MS. LEVINE: This is Exhibit 20.
13    MR. SHUMAKER: Do you have an extra
14 copy?
15    MS. LEVINE: Yeah, one.
16    MR. SHUMAKER: Thank you.
17    - - -
18    (Whereupon, an e-mail string was
19    marked, for identification purposes,
20    as Orr Deposition Exhibit
21    Number 20.)
22    - - -

Page 353

1    MS. LEVINE: For -- for the record,
2 the -- the Bates number is JD-RD-0000334.
3    (Whereupon, the witness reviews the
4    material provided.)
5 BY MS. LEVINE:
6    Q.    Mr. Orr, there are two e-mails on the
7 first page of this document.
8    A.    Um-hum, yes.
9    Q.    I'm going to ask you to look at the
10 second e-mail.
11    It's from --
12    A.    Yes.
13    Q.    -- Richard Baird to you?
14    A.    Yes.
15    Q.    Dated February 12, 2013, correct?
16    A.    Yes.
17    Q.    And it discusses -- well, let me ask
18 the question.
19    Is this e-mail discussing your
20 potential retention as the emergency manager?
21    A.    Yes, it appears to do that.
22    Q.    Do you recall receiving this e-mail?

Page 354

1    A.    Yeah, I do. Yes, I do.
2    Q.    And it discusses the base
3 compensation of $275,000 a year?
4    A.    Yes, among other things.
5    Q.    And contract period of -- include --
6 including a contract period not to
7 exceed 18 months?
8    A.    Yes.
9    Q.    Did your final contract have an
10 incentive if the job was completed sooner?
11    A.    No.
12    Q.    It also discusses an intent to raise
13 private funding for performance measure/outcome
14 bonus?
15    A.    Yes.
16    Q.    Does your final contract have a
17 performance measure/outcome bonus?
18    A.    No. We never talked about it yet.
19    Q.    Did you discuss the private funding
20 referenced in that e-mail?
21    A.    No.
22    Q.    Did you under -- do you -- did you

Page 355

1 have any understanding of what the source of that
2 private funding would be?
3    A.    Not at all.
4    Q.    It discusses a sublease for a
5 furnished apartment in the City?
6    A.    Yes.
7    Q.    And that made it to the final
8 contract?
9    A.    Actually, it's not in my contract, I
10 believe.
11    Q.    But you have a subleased apartment in
12 the City -- or a leased apartment in the City?
13    A.    I -- I have an apartment that I stay
14 in in the City; the arrangement I -- I can't speak
15 to.
16    Q.    How did you learn that there was an
17 apartment available to you?
18    A.    I believe the first day, I stayed in
19 a hotel room, and the next day, someone -- and I
20 really can't tell you if it was on behalf of the
21 State or if it was someone related to the hotel --
22 when I came back from work that day, took me to --

Page 356

1 and my suitcase to the apartment.
2    Q.    Is it your understanding that the
3 City's paying for that apartment?
4    A.    I -- I don't know who's paying for
5 the apartment.
6    Q.    And you get your expenses reimbursed?
7    A.    I haven't had any of my expenses
8 reimbursed.
9    Q.    Does anybody -- who pays for your
10 flying, for example, back and forth from D.C.?
11    A.    I do.
12    Q.    And that -- and none of those have
13 been reimbursed?
14    A.    Not a dime.
15    Q.    And you get a security detail?
16    A.    Yes.
17    Q.    24/7?
18    A.    Certainly -- well, they say 24/7, but
19 I -- they walk me to my apartment and lock me in,
20 and then I see them in the morning.  So I assume
21 it's 24/7.  That's -- that's my detail.
22    Q.    Do you know who's paying for that

Page 357

1 security detail?
2    A.    I do not, but they are Michigan State
3 Police; they're not private.
4    Q.    So there was no discussion, though,
5 back in or around February of 2013 with regard to
6 the source of any funding to help subsidize the
7 cost of the emergency manager?
8    A.    No.  In fact, I think there's an
9 e-mail that has been produced somewhere where I
10 say back I -- you know, the -- the -- something to
11 the effect the job is the job is, and I'm not
12 expecting anything supplemental.
13    Q.    No, I'm not asking you if you were
14 expecting anything supplemental.  I'm asking the
15 source of the funding to pay for you --
16    A.    Oh, I've --
17    Q.    -- as a --
18    A.    -- had -- yeah, I -- I -- I -- my
19 checks come from a -- a Michigan State Government
20 Web site.  I assume that's from the State, but I
21 have no idea if -- if there's any other
22 arrangement -- my direct deposits.

Page 358

1        MS. LEVINE:  I have no further
2 questions.  Thank you.
3        THE WITNESS:  Okay.
4        THE VIDEOGRAPHER:  Go off the record?
5        Going off the record at 11:50.
6              - - -
7        (Whereupon, a discussion was held off
8         the record.)
9              - - -
10        THE VIDEOGRAPHER:  Going back on the
11 record at 11:53.
12              - - -
13        EXAMINATION (CONTINUED) BY COUNSEL
14            FOR RETIREES COMMITTEE
15              - - -
16 BY MR. ULLMAN:
17    Q.    Good morning, Mr. Orr.
18    A.    Good morning.
19    Q.    As you know, I'm Anthony Ullman
20 and -- for the Retirees Committee from Dentons,
21 and I have some additional questions for you this
22 morning.

Page 359

1    A.    Good morning, Mr. Ullman.
2    Q.    First of all, I'd like to put a
3 document before you which we will mark as
4 Exhibit --
5        MR. ULLMAN:  Are we up to 21?
6        THE COURT REPORTER:  Yes.
7        THE WITNESS:  Twenty-one.
8        MR. ULLMAN:  Twenty-one.  I need a
9 sticker for that.
10              - - -
11        (Whereupon, Jones Day Presentation to
12         the City of Detroit; Detroit,
13         Michigan, January 29, 2013 was
14         marked, for identification purposes,
15         as Orr Deposition Exhibit
16         Number 21.)
17              - - -
18        MR. ULLMAN:  Here's a copy for you.
19 I want to get rid of my extras.
20        MR. SHUMAKER:  Let me state on the
21 record a couple of things.  One, I'm not sure
22 technically whether the Retirees even joined

Page 360

1 ASME's motion, so I'm not even certain that it's
2 proper that Mr. Ullman be asking questions.
3         Secondly, this is -- Mr. Ullman can
4 identify it, but this document is the Jones Day
5 presentation to the City of Detroit on January
6 29th, 2013.
7         I don't see how that funnels into the
8 request that was made to Judge Rolls -- Rhodes
9 regarding three hours of deposition testimony
10 concerning Mr. Orr's communications with State
11 officials in the presence of legal counsel since
12 his appointment as emergency manager.
13         That said, this document was produced
14 after the deposition, and I'm going to let you go
15 into it. But I am going to say --
16         MR. ULLMAN: I --
17         MR. SHUMAKER: -- within reason --
18         MR. ULLMAN: -- I don't -- I don't
19 intend to dwell very long on it --
20         MR. SHUMAKER: Okay.
21         MR. ULLMAN: -- and I appreciate your
22 recognition. This was produced after the last

Page 361

1 deposition.
2 BY MR. ULLMAN:
3     Q.    Okay. Mr. --
4         THE COURT REPORTER: I have to mark
5 it there first.
6 BY MR. ULLMAN:
7     Q.    Okay. Mr. Orr, what we've marked as
8 Exhibit 21 is entitled, Presentation to the City
9 of Detroit; Detroit, Michigan, January 29, 2013
10 from Jones Day.
11         Can you identify this document for
12 me, Mr. Orr?
13     A.    Yes.
14     Q.    Okay. And what is it, please?
15     A.    I believe it's a slide deck
16 presentation to the City of Detroit for a -- in
17 response to a solicitation the firm received for
18 representation regarding potential restructuring
19 work on behalf of the City dated January 29th,
20 2013 marked confidential.
21     Q.    Okay. And this is in connection with
22 the presentation that you testified about last

Page 362

1 time; is that correct?
2     A.    Yes, when I said the end of January.
3 It's commonly referred to as a "pitch book."
4     Q.    Okay. And you -- you were part of
5 the Jones Day team, and your picture appears on
6 Page 3 of this document; is that right?
7     A.    Yes, I was part of the presentation
8 team, yes.
9     Q.    Okay. And did you have any role in
10 the preparation of this document?
11     A.    Yes. I mean, it -- it was a
12 collaborative effort from a number of different
13 attorneys in the Jones Day law firm, but I was
14 involved in that process as well.
15     Q.    Okay. And did you review the
16 document -- can we refer to this as the pitch
17 book?
18     A.    Yes.
19     Q.    Okay. Did you -- did you review the
20 pitch book, Exhibit 21, before it -- before the
21 presentation?
22     A.    Yes.

Page 363

1     Q.    Okay. And I just note -- I'm not
2 going to go into my particular specifics here, but
3 if, for example, just picking one, if you look at
4 Page 18, there's what's called Speaker Notes,
5 which -- I assume this was a PowerPoint
6 presentation, so someone would be talking --
7 speaking orally as a slide goes on the screen; is
8 that right?
9     A.    Well, it was -- it -- it -- it -- it
10 could have been a PowerPoint. As I recall, we did
11 not -- there weren't PowerPoint capabilities, so
12 we intended to work off the document --
13     Q.    Um-hum.
14     A.    -- but the discussion, within a
15 minute or two, veered away from the document and
16 more was a dialogue, so . . .
17     Q.    Okay. So what we have as Exhibit 21
18 was the -- the internal -- at least was this
19 internal version of the pitch book; in other
20 words, were there speaker notes?
21     A.    Yes, were the speaker -- this --
22 the -- the speaker notes were not presented to --

Page 364

1    Q.    That's --
2    A.    -- the review team.
3    Q.    -- that's what I wanted to clarify.
4    A.    Yes.
5    Q.    Okay.  And when you say that you
6  reviewed the document before -- before it went out
7  in its final form to the -- to the people you were
8  pitching to at the meeting, you know, with the
9  City, you reviewed the speaker notes as well?
10    A.    Mr. Ullman, to be honest, I -- I
11  reviewed -- I can't be -- this document was not
12  generated solely by me --
13    Q.    I understand.
14    A.    -- it was generated by a team effort.
15         I think I reviewed a number of
16  different drafts of the document.  I'm not -- I --
17  I believe I reviewed the final draft of the pitch
18  book that went out.  I am not sure I reviewed the
19  final draft of the draft of the speaker notes,
20  because at that time, I think I was involved in
21  the actual mediation of another matter.  So I was
22  doing this in between some other matters.

Page 365

1         But generally speaking, I'm familiar
2  with this document.
3    Q.    Okay.  And was there -- was there
4  anything in the document that you disagreed with?
5         MR. SHUMAKER:  Object to the form.
6         THE WITNESS:  Without reviewing it
7  today, generally speaking, no.
8  BY MR. ULLMAN:
9    Q.    Okay.  And can you tell me were there
10  any particular portions of Exhibit 21 that you had
11  primary responsibility for preparing?
12    A.    No.  The -- the document evolved
13  through -- as you are probably familiar with the
14  pitch books for attorneys seeking legal work, the
15  document evolves as you go through it, a number of
16  conversations, e-mails with a number of different
17  sources.
18         I don't recall being -- I don't
19  recall looking at this document and saying, oh, I
20  only did Pages 23 through 23 [verbatim], for
21  instance.  I may have commented and edited
22  different pages.  I may have made suggestions on

Page 366

1  who should be on the team, who should be on the
2  representation team, what -- what potential legal
3  services might be necessary.
4         And, for instance, at the back, you
5  have team members, things along those lines,
6  but -- but there was no specific section that was
7  dedicated solely to me.
8    Q.    Okay.  I'm not asking whether it was
9  dedicated solely to you, but whether you had
10  primary responsibility for preparing.
11    A.    No.
12    Q.    Okay.
13    A.    No.
14    Q.    And I think you indicated that the
15  slides themselves were given over to the City at
16  the meeting or -- was it the City or the State?
17  I'm trying to remember, did you --
18    A.    It -- it was a review team composed
19  of I think --
20    Q.    Buckfire was there?
21    A.    -- the -- the investment bankers were
22  there --

Page 367

1    Q.    Yeah.
2    A.    -- for the City who had been
3  retained, the City representatives were there and
4  the State representatives were there.
5    Q.    Okay.  I'll talk -- call that the --
6  the review team --
7    A.    Review team --
8    Q.    -- is that the term you like?
9         Okay --
10    A.    -- yeah.
11    Q.    -- so as I understand what you're
12  saying, the -- the -- the slides themselves were
13  present -- given over to the review team as a --
14  a -- a bound --
15    A.    Yes.
16    Q.    -- volume or attached in some way?
17    A.    Yes, the -- the -- the slide deck as
18  the pitch book was given to the review team.
19    Q.    Okay.  And then, at the presentation,
20  were -- how did that work?  Did you -- did people
21  sort of go through the slides orally and then --
22  and -- and make comments as they were going

Page 368

1 through the different pages in the pitch book?
2    A.    No.  As I recall, we handed out the
3 pitch book and began sort of going through the
4 slide, but within the first page or two, the
5 discussion exceeded the slides.  And we really
6 ended up not going through the pitch book in any
7 meaningful manner --
8    Q.    Okay.
9    A.    -- at the presentation.
10    Q.    Okay.  And this -- at the time of the
11 presentation, you were indeed still part of
12 Jones Day --
13    A.    Yes.
14    Q.    -- and part of the pitch team?
15    A.    Yes, absolutely.
16    Q.    Okay.
17        Okay.  I'm going to mark another
18 document, Mr. Orr, and ask if you've ever seen
19 this, which is Number 22.
20    A.    Two.
21        MR. ULLMAN:  Here's a copy for you,
22 two copies for you, and an extra, and an extra.  I

Page 369

1 don't want to bring these back with me is all.
2                - - -
3        (Whereupon, City of Detroit —
4         Restructuring Plan, Mayor's
5         Implementation Progress Report was
6         marked, for identification purposes,
7         as Orr Deposition Exhibit
8         Number 22.)
9                - - -
10        THE WITNESS:  Thank you.
11 BY MR. ULLMAN:
12    Q.    Okay.  What we've marked as
13 Exhibit 22, Mr. Orr, is entitled, City of Detroit
14 — Restructuring Plan, Mayor's Implementation
15 Progress Report, with the date of March 2013.
16        Have you ever seen this document
17 before?
18    A.    I think I've seen it before, but I
19 think that was after I became emergency manager.
20    Q.    Okay.  That's fine.
21        And what I'd like to do is try to
22 just ask you about one page of this.

Page 370

1    A.    Um-hum.
2    Q.    If you could look at Page 6.
3    A.    Okay.
4    Q.    Okay.  What we --
5        MR. SHUMAKER:  Of the -- of the
6 actual document?
7        MR. ULLMAN:  Of the -- yes.  I'm
8 sorry, yeah.
9        And just for clarity, this document
10 bears Bates Number DTMI00129416, and Page 6 of the
11 document bears the Bates number ending in 422.
12        THE WITNESS:  Um-hum.
13 BY MR. ULLMAN:
14    Q.    Okay.  And this page, in general, is
15 entitled, The Mayor's plan includes strategies to
16 implement changes that will significantly reduce
17 general fund long-term liabilities.
18        I'd like you to focus on Number -- or
19 Letter (b) --
20    A.    Yes.
21    Q.    -- you see 3(b)?
22    A.    Um-hum.

Page 371

1    Q.    It says, Pension unfunded
2 liabilities, and the first bullet point says,
3 Approximately 650 million of unfunded liability as
4 of fiscal year 2012, of which only 250 million
5 relates to general fund.
6    A.    Yes, I see that.
7    Q.    And do you have an understanding as
8 to what's being said there and what that reference
9 is?
10        MR. SHUMAKER:  Objection: foundation.
11        THE WITNESS:  Yeah.  I was obviously
12 not responsible for drafting, developing or the
13 due diligence behind the document.  The document
14 speaks for itself.
15        But what I think is being said there
16 is that the unfunded liability for the -- and I
17 assume it's speaking to both pension funds; it may
18 be one or the other --
19 BY MR. ULLMAN:
20    Q.    Um-hum.
21    A.    -- but the unfunded liability for
22 fiscal year 2012 is 250, and 250 million of that

Page 372

1  is somehow an obligation of the general fund.
2      Q.   Okay.  Did you say 250?  It's -- you
3  meant to say 650, right?
4      A.   No, no.  It's 650 total --
5      Q.   Right.
6      A.   -- but 250 million of that is an
7  obligation of the general fund.
8      Q.   You had misspoken and said 250 both
9  times --
10     A.   Oh, I'm sorry --
11     Q.   -- so --
12     A.   -- oh, no -- okay.  650 and 250, I'm
13  sorry.  I was --
14     Q.   Okay.
15     A.   -- thinking ahead, thinking quicker
16  than my mouth moved.
17     Q.   Okay.  And as I -- I understand that
18  the 650 million that's referred here -- to here by
19  the Mayor corresponds pretty closely, if I recall,
20  to the $644 million figure that was referred to in
21  the June 14th proposal; is that right?
22     A.   I would -- I -- yes, I -- I would

Page 373

1  think it does --
2      Q.   Okay.
3      A.   -- I'm -- I'm -- here again, I'm
4  not -- I'm assuming it -- it speaks for itself and
5  it's facially correct; but, yes, I would think
6  that's the reference.
7      Q.   Okay.  And so can you tell me what --
8  what is your understanding when the Mayor says
9  here that 250 million relates to the general fund,
10  what the other 300 --
11     A.   400.
12     Q.   -- 400 million relates to?  And
13  what's -- what is the distinction being drawn
14  between what relates to the general fund versus
15  what relates to something other than the general
16  fund?
17     A.   I'm not sure.
18     Q.   Well, is it correct that -- that some
19  portion -- let's just stick with the -- we can use
20  the $644 million number --
21     A.   Um-hum.
22     Q.   -- because I think that's what you

Page 374

1  would probably say is more accurate.
2      That's the number that's cited in the
3  June 14th proposal, right?
4      A.   Yeah, they may have -- they may have
5  rounded up here --
6      Q.   Okay.
7      A.   -- but we'll -- it's -- it's
8  approximately that amount.
9      Q.   Okay.  Is it correct that for the
10  approximately 644 million unfunded pension
11  liability that you refer to in the June 14th
12  proposal, that some portion of that is allocable
13  to a payment source other than the general fund?
14     A.   I think that's correct.
15     Q.   Okay.  And what are those --
16  what is -- what are the other payment sources to
17  which the total 650 -- or I'm sorry -- 644 million
18  is allocable other than the general fund?
19     A.   Well, there are other sources, but it
20  could be principally related to the Water
21  department.
22     Q.   Okay.  And what is your understanding

Page 375

1  as to how much of the approximately 644 million
2  unfunded pension liability relates to liability
3  for personnel from the Department of Water and
4  Sewer?
5      A.   Approximately that difference.
6      Q.   Okay.  So it's about 450 million?
7      A.   Approximately, yeah.
8      Q.   Okay.  And I'm trying to recall from
9  your last testimony.
10      For the -- the pension monies that
11  are due relative to personnel from the Department
12  of Water and Sewer, are the pension payments made
13  directly by the Department of Water Sewer to the
14  retirement systems, or is the money paid first by
15  the retirement -- I'm sorry -- by the Water and
16  Sewer Department to the City, which then transmits
17  it to the retirement system, or is there another
18  mechanism for the payment?
19      MR. SHUMAKER:  Objection to form.
20      THE WITNESS:  I believe it's the -- I
21  believe it's the latter.
22

Page 376

1 BY MR. ULLMAN:
2    Q.    "The latter" meaning there's
3 another --
4    A.    To the City --
5    Q.    -- payment mechanism?
6    A.    -- no, no, no, not -- the latter --
7 not the -- not the discount; "the latter" meaning
8 to the City and then to the fund.
9    Q.    Okay.
10    A.    I could be wrong, because may be --
11 but I believe it's -- I believe it's that process.
12    Q.    Okay. I'm asking because I thought I
13 had seen some other document which said that
14 the -- maybe it's the same thing -- the City gets
15 the money or has the right to bill the -- the
16 funds or the -- the liabilities to the Department
17 -- Department of Water and Sewer, and then the
18 Department of Water and Sewer would pay the City.
19        That's your understanding?
20    A.    Yeah, that -- that's -- that's what I
21 was saying; that's the approximate mechanism.
22    Q.    Okay.

Page 377

1    A.    I could go back and check it to be
2 sure, but I think that's the approximate mechanism
3 as I understand it.
4    Q.    Okay. Now, by my math -- I make no
5 representations as to my math, but just looking at
6 the numbers, it looked -- actually, do I have a
7 calculator here? I don't think I do.
8        What percentage is 250 over 650? I
9 actually didn't do the math.
10    A.    Four -- it's 40-some odd.
11    Q.    It's 40-some -- yeah, we can get it
12 precisely.
13        Zero? Oh.
14        250 divided by 6 -- let's say 650 --
15 shoot, I didn't do that right. I apologize. Let
16 me try to clear this and do it again.
17        250 divided -- 6. This isn't right.
18        Okay. It looks like about
19 38 percent.
20    A.    Right.
21    Q.    Okay. You recall that -- that during
22 the last deposition, you indicated that you

Page 378

1 thought that the actual unfunded liability was --
2 was higher than the 644 number and could be as
3 much as 3.5 billion or something like that?
4    A.    Yes.
5    Q.    Okay. My question is, does the --
6 does the -- is the proportion of unfunded
7 liability allocable to the general fund versus the
8 Department of Water Sewer personnel constant if
9 you -- if you use a higher liability figure?
10        In other words --
11    A.    If we went up to 3.5 --
12    Q.    Yeah, yeah --
13    A.    -- million, would it be --
14    Q.    -- would the Department of Water and
15 Sewer still be approximately 38 percent of the
16 total unfunded liability?
17    A.    I'm -- I'm not sure. I would think
18 that a rough estimate might be. But as I said, I
19 think, in September 16th, part of those
20 calculations had to do with a number of factors,
21 so I don't want to say that my testimony is as
22 exactly proportioned.

Page 379

1    Q.    Okay. And is it correct that the
2 Department of Water and Sewer itself, I think you
3 indicated last time, is run as a separate entity,
4 even though it's, I think, technically part of the
5 City, but it has its own books and records?
6    A.    The Department of Water and Sewer is
7 a department of the City both technically and
8 practically. Pursuant to Judge Cox's order, it
9 has certain functions, which it can run
10 semiautonomously, but it remains a department of
11 the City.
12    Q.    Okay. And as -- as a separate --
13 as -- as an entity or a department of the City
14 that keeps its own books and records, the
15 Department of Water and Sewer itself shows a
16 profit for its own operations; is that right?
17    A.    I'm not sure it shows a profit for
18 its own operations. I -- I'd have to look into
19 the word "profit" --
20    Q.    Okay.
21    A.    -- but -- but it -- it stands -- it
22 generates revenue of its own and pays its

Page 380

1    obligations as they become due.
2        Q.    Okay.  And is it correct the
3    Department of Water and Sewer also has the
4    ability, if it -- if it exercises it, to increase
5    its revenues by raising the rates?
6        A.    I'm not sure.  There are a number of
7    things that go into rate increases --
8        Q.    Um-hum.
9        A.    -- it -- it might well have that
10   capacity.
11           You also have to consider the impact
12   on customers, but I don't want to mislead you.  It
13   does have some capacity, yes.
14       Q.    Okay.  Now, prior to the filing of
15   the bankruptcy petition on July 18th, did you have
16   any discussions with the Governor concerning the
17   allocation of the unfunded pension liability
18   between the general fund and the Department of
19   Water and Sewer?
20       A.    No.
21       Q.    Did you have any such discussions
22   with the Governor after the filing of the

Page 381

1    bankruptcy petition?
2        A.    No.
3            MR. ULLMAN:  Yeah.  Good idea.
4        Okay.  Greg, could I ask you to
5    produce the final version of the pitch book,
6    the -- the one that was actually given over to the
7    review team?
8            MR. SHUMAKER:  We'll look into it.
9    I -- I believe that has been produced, but
10   we'll --
11           MR. ULLMAN:  Okay.
12           MR. SHUMAKER:  -- certainly check.
13           MR. ULLMAN:  Okay.  I appreciate it.
14       Okay.  I think, at least for the
15   moment, that's all I have.
16           THE WITNESS:  Okay.  Thank you.
17           MR. ULLMAN:  Peter?
18       I'll pass the baton.
19
20
21
22

Page 382

1            - - -
2        EXAMINATION (CONTINUED) BY COUNSEL
3        FOR UNITED AUTO WORKERS UNION
4            - - -
5    BY MR. DECHIARA:
6        Q.    Good afternoon, Mr. Orr.
7    Peter DeChiara from the law firm of Cohen, Weiss
8    and Simon LLP for the United Auto Workers
9    International Union.
10       A.    Good afternoon -- well, good
11   afternoon.
12       Q.    Is -- is it your testimony that you
13   don't know who's paying for your housing in
14   Detroit while you serve as emergency manager?
15       A.    Yes.  I'd -- I've read in the papers
16   that it's the aforementioned NERD Fund, but I've
17   never seen a list -- a lease, and I've never
18   really inquired into it.
19       Q.    Okay.  You testified when Mr. Ullman
20   was questioning you about a meeting at which there
21   was discussion in connection with Exhibit 21,
22   which is what you refer to as "the pitch book."

Page 383

1            Do you remember that testimony?
2        A.    Yes.
3        Q.    Do you -- do you know whether
4    Richard Baird was present when Jones Day made its
5    presentation?
6        A.    Yes, he was present.
7        Q.    Do you recall whether he said
8    anything, whether statements or questions, at the
9    meeting?
10       A.    Oh, I think he -- he asked some
11   questions, yes.
12       Q.    What did he ask?
13       A.    I don't recall with specificity;
14   generally about the firm's qualifications to do
15   the work.
16       Q.    Was there discussion at the meeting
17   about accrued pension liabilities of the City of
18   Detroit?
19       A.    Not that I recall.
20       Q.    Was there any discussion about the
21   Michigan Constitution?
22       A.    No.

Page 384

1    Q.   Did you have any one-on-one or
2  less-than-the-full-room-of-people conversations
3  immediately following the pitch presentation with
4  any of the -- at -- people who were attending on
5  behalf of the City or the State?
6    A.   No.  The only conversations I had
7  were, as a tested to -- testified to last time,
8  telephone conversations with Mr. Baird that
9  followed up.  But we had no other conversations
10  with anyone else.
11    Q.   When was the next time after
12  the -- well, was the presentation that Jones Day
13  made to the City on January 29th, 2013?
14    A.   I believe so.
15    Q.   Okay.  When would -- was the next
16  time -- when, after January 29th, 2013, did you
17  speak to Mr. Baird?
18    A.   I think it was a series of e-mail
19  exchanges that we went through on September 16th,
20  which was in a day or two after -- it was the 30th
21  of January or the 1st of February.  It's that
22  whole discussion chain.

Page 385

1    Q.   Okay.  So within a day or two of the
2  pitch book presentation by Jones Day, Mr. Baird
3  calls Jones Day to make inquiries about having you
4  serve -- having you possibly serve as emergency --
5  emergency manager, correct?
6    A.   Yeah, I think it's that discussion,
7  yes.
8    Q.   Okay.  And did you speak to Mr. Baird
9  on that occasion?  And when I say "that occasion,"
10  I'm referring to one or two days after
11  January 29th.
12    A.   Yes.  I think, on September 16th, we
13  discussed that he reached out to Steve Brogan --
14      MR. SHUMAKER:  Just so we're clear --
15  I don't mean to interrupt -- September 16th was
16  your deposition.
17      THE WITNESS:  Yes.
18      MR. SHUMAKER:  I want you to make
19  sure you get your dates right in your testimony.
20      THE WITNESS:  Oh, you -- oh, you
21  mean -- I'm -- let me be clear.  As we discussed
22  on September 16th during my deposition, that those

Page 386

1  conversations occurred within a day or two after.
2  And -- and I haven't read my deposition or looked
3  at it, but I recall there was a call made.
4      I was asked; I said I'm not
5  interested; they asked -- I assume it was
6  Mr. Baird asked that I at least talk to them; and
7  there was that whole discussion chain that
8  occurred after that.
9  BY MR. DECHIARA:
10    Q.   Is it accurate that you were
11  appointed as EFM on March 15th, 2013?
12    A.   No.
13    Q.   When were you appointed EFM?
14    A.   I think my appointment was March 25th
15  or 26th as EFM, yes.
16    Q.   You were appointed EFM before you
17  were appointed EM, correct?
18    A.   Yeah.  I believe the statute changed.
19  Public Act 4, I believe, had been invalidated, so
20  it was under Public Act 72, which described an
21  EFM.  And then under Public Act 436, you become an
22  EM.

Page 387

1    Q.   Okay.  So my question was -- and
2  maybe your answer is the same, but just -- I just
3  want to be sure -- what is the date you were
4  appointed EFM?
5    A.   I believe it was the 25th or the
6  26th.
7    Q.   Of March --
8    A.   March --
9    Q.   -- 2013?
10    A.   -- March 2013.
11    Q.   Okay.  Before you were appointed EFM,
12  did you have any written exchanges -- and by
13  "written exchanges," I mean e-mails, letters,
14  exchange of memos -- with the Governor?
15    A.   No.
16    Q.   Did you have any such exchanges
17  before you were appointed EFM with
18  Treasurer Dillon?
19    A.   No -- well, strike that.
20      I may have had an exchange with
21  Treasurer Dillon or the Governor just a -- a
22  courtesy, you know, hear you're a candidate, hope

Page 388

1 you're interested, hope you'll consider this, but
2 nothing substantive. There may have been courtesy
3 exchanges.
4    Q.    Okay. So let me -- let me go back.
5    A.    Right.
6    Q.    So let me ask just about the
7 Governor.
8    A.    Right.
9    Q.    So to the best of your
10 recollection -- well, strike that.
11        Is it your testimony that you did
12 have written exchanges with the Governor before
13 you became EFM?
14    A.    I believe so.
15    Q.    Okay. To the best of your ability,
16 can you tell me what those exchanges were?
17    A.    As I said, they were courtesy --
18 there were no substantive discussions; they were
19 more like one line, hear you're interested, hope
20 you consider this, something along those lines.
21    Q.    Okay. And were those e-mails?
22    A.    There may have been e-mails.

Page 389

1    Q.    Okay. Do you -- do you recall them
2 being in any form other than e-mails?
3    A.    No. I'm just -- I'm trying to
4 distinguish whether they were e-mails or whether
5 they were texts.
6        And I -- I think I recall -- I think
7 I recall e-mails. There may have been a voice
8 mail. I'm not sure.
9        But it -- it was just, you know --
10 it's what I call, you know, sort of a -- a -- a
11 good -- good -- good home training. I mean, you
12 follow-up and say, hey, glad you're interested,
13 hope you consider it, something like that.
14    Q.    Okay. Is it your testimony you're
15 not sure whether those exchanges with the Governor
16 before you were EFM were e-mails, voice mails or
17 texts? And when I say "texts" --
18    A.    Yeah.
19    Q.    -- I assume you're talking about --
20 and tell me if -- if I'm mistaken --
21    A.    Right.
22    Q.    -- the kind of texts you would send

Page 390

1 over a cell phone.
2    A.    Yeah, that's what I'm talking
3 about --
4    Q.    Okay.
5    A.    -- I -- I -- there could have been a
6 voice mail, and there could have been an e-mail or
7 two, or it could have been a text. It wasn't,
8 like, every day or every week. I just seem to
9 recall that there was a text or two and a voice
10 mail or two after the meeting -- after -- or after
11 discussions with Rich.
12    Q.    Okay.
13        MR. DECHIARA: The UAW would call for
14 the production of any cell phone texts that are
15 otherwise responsive to our document request.
16        MR. SHUMAKER: If you can put that
17 into an letter. We're not certain it hasn't
18 already been produced, but we'll certainly look
19 into it.
20        MR. DECHIARA: We'll be happy to put
21 it into the letter.
22

Page 391

1 BY MR. DECHIARA:
2    Q.    Let me now ask you the same question
3 regarding Treasurer Dillon --
4    A.    Um-hum.
5    Q.    -- again, before you were appointed
6 EFM, did you have any written exchanges in the
7 form of cell phone texts, e-mails or hard copy
8 documents with Treasurer Dillon?
9    A.    There may have been one.
10    Q.    And what -- do you have a specific --
11    A.    -- same -- it was the same, hey, you
12 know, I hope you're interested, please consider it
13 or something like that.
14        I don't recall quite as clearly
15 anything with Treasurer Dillon, but there may have
16 been one.
17    Q.    Okay. But not more than one?
18    A.    I don't think more than one, no.
19    Q.    Okay. And what about -- same
20 question for exchanges with Mr. Baird?
21    A.    I think I've seen some of those
22 exchanges during my September 16th, 2013

Page 392

1  deposition; so yes.
2      Q.   And what -- what's your recollection
3  as you sit here today of what your exchange --
4  written exchanges were with Mr. Baird before you
5  were EFM?
6      A.   Kevyn, heard you're not interested --
7  just generally speaking -- hope you'll reconsider;
8  the e-mail exchange that we went through today;
9  things of that -- if you're considering, this is
10  what the job would entail; gee, Rich, I'd have to
11  take myself out of the firm.  I'd be willing to
12  work with anyone side by side, but, you know, I
13  don't want to leave my firm.  Well, this is an
14  important undertaking.  Okay, I'll consider it;
15  public service.  Here, we'll propose what the job
16  entails.  That's fine, whatever it is, it is.
17      That's the extent of those exchanges.
18      Q.   Okay.  So the description you just
19  gave of your exchanges with Mr. Baird exhausts
20  your recollection --
21      A.   Yeah.
22      Q.   -- let me just finish the question --

Page 393

1      A.   I'm sorry.
2      Q.   -- exhausts your recollection of the
3  written exchanges you had with Mr. Baird before
4  you were appointed EFM?
5      A.   Yes.  I think you have those
6  exchanges.
7      Certainly, I've seen several of them.
8      Q.   Okay.  Now, I'm going to ask you the
9  same question, but instead of just limiting the
10  question to the Governor, Mr. Dillon and
11  Mr. Baird, I'm going to expand it --
12      A.   Um-hum.
13      Q.   -- to include their assistants or
14  their staff or people who work for them.
15      Again, did you have any written
16  exchanges of any form with any of those people
17  before you were appointed EFM that you recall?
18      A.   I don't recall specifically, but in
19  an effort to be responsive, I think there must
20  have been probably at least one or two talking
21  about the March 13th-14th press conference.
22      Q.   Okay.  And what -- to the best of

Page 394

1  your recollection, what -- who were those
2  exchanges with?  Do you -- do you recall?
3      A.   I don't recall, but probably someone
4  in the Governor's scheduling office or -- or
5  communications office.  I mean, I didn't -- I
6  didn't know who those -- I didn't know who those
7  people were at the time --
8      Q.   Okay.
9      A.   -- okay?  But there was -- it was
10  something about, you know, you need to be here on
11  this date, and we'll have the rollout, something
12  like that.
13      Q.   Okay.  Was there anything more
14  substantive than scheduling matters?
15      A.   No.  Nope.
16      Q.   Okay.  Now, I'm going to change the
17  question -- series of questions and ask about the
18  time period after you were appointed EFM.
19      A.   Right.
20      Q.   So let me begin with the Governor.
21      A.   Okay.
22      Q.   Did you have any written exchanges,

Page 395

1  meaning e-mails, texts or hard copy
2  correspondence, with the Governor after you were
3  appointed EFM until today?
4      A.   Yes, I believe so.
5      Q.   And can you tell me what those
6  were -- or what those have been?
7      A.   Well, generally, the 25th and 26th
8  was glad you're on board -- they're
9  congratulatory --
10      Q.   I understand.  So the 26th -- 20 --
11      A.   March --
12      Q.   -- of what month?
13      A.   -- of March --
14      Q.   Okay.
15      A.   -- after I was actually appointed.
16      I think they were more courtesy and
17  protocol, congratulatory e-mails.
18      After that, there weren't -- after
19  the first day or so, there weren't a lot of
20  e-mails.  And sitting here today, I don't recall
21  the last time I got an e-mail or text from the
22  Governor.

Page 396

1    Q.    Okay.  So my question was not limited
2  to e-mails; it was not limited to the last time
3  you got a text --
4    A.    Okay.
5    Q.    -- the question is, other than the
6  congratulate -- congratulatory exchange in --
7  around March 26th to 27th with the Governor, do
8  you have any recollection of any other exchanges
9  in written form that you've had with the Governor?
10    A.    I don't -- I don't have any
11  recollection.  I would think that there probably
12  are some, but they weren't very frequent -- it's
13  not like -- the Governor and I meet more than the
14  written exchanges, so it's not like there were a
15  lot of written exchanges or I would have had -- or
16  I would expect there to be a lot.
17    Q.    Okay.  Well, sitting here today, can
18  you testify as to the substance of any -- let --
19  let me finish --
20    A.    Yeah.
21    Q.    -- please --
22    A.    Um-hum.

Page 397

1    Q.    -- the substance of any written
2  exchange you've had with the Governor since you
3  became EFM apart from the congratulatory exchange
4  you had with him on March 26th or 27th?
5    A.    Generally, I would -- I would
6  classify -- there were no substantive exchanges
7  that I recall.  They were more in the nature of an
8  attaboy.
9         If there was a -- a press conference,
10  or something along those lines, or a meeting of
11  creditors -- or -- I'm just saying, for
12  instance, I don't recall anything with
13  specificity.
14         But there's nothing substantive and
15  there were no directive, do this, do this, do
16  this, something like that -- there was nothing
17  like that.  It was more like good job yesterday,
18  nice seeing you again, things along those lines.
19    Q.    And who would be -- who would be
20  saying that to whom?  The Governor would be saying
21  that to you?
22    A.    Yeah.  The Governor would typically

Page 398

1  reach out, and I'd typically respond, thanks,
2  Governor, I enjoyed our discussion, or something
3  along those lines.
4    Q.    Okay.  Same question for
5  Treasurer Dillon.
6         Since you were appointed EFM through
7  the present, have you had any written exchanges,
8  whether electronic or in hard copy --
9    A.    Yes.
10    Q.    -- with Governor Dillon?
11    A.    With Treasurer?
12    Q.    I'm sorry.  Strike that.
13         With Treasurer Dillon.  Sorry --
14    A.    Yes.
15    Q.    -- I didn't mean to give him a
16  promotion.
17    A.    Right.
18    Q.    Can you tell me what those were?
19    A.    Those were initially the attaboy
20  e-mails.
21         I think, since then, for instance,
22  with regard to contracting of restructuring

Page 399

1  professionals, I generally have to send an e-mail
2  to the Treasurer and/or his staff seeking
3  permission to retain those professionals, and
4  we've done that --
5    Q.    Let me just pause you there.
6         Did one of those exchanges have to do
7  with the retention of Jone- -- the law firm of
8  Jones Day?
9    A.    I believe so.
10    Q.    And did you -- what was the nature of
11  that exchange?
12    A.    That -- that would be a -- a
13  technical -- Treasurer Dillon, attached is the
14  contract of insert restructuring professional.  It
15  has been vetted by the City Council or it's been
16  reviewed by my staff.  It provides X, Y, Z.  Under
17  my contract and statute, I have to seek your
18  approval.  Accordingly, I'm requesting your
19  approval of the contract.
20    Q.    Okay.  So you sought the approval of
21  Treasurer Dillon for the City to retain Jones Day?
22    A.    Yes.

1    Q.    And he approved it?
2    A.    Yes.
3    Q.    Okay.  Okay.
4          I'm sorry.  I had interrupted you --
5    A.    Yeah.
6    Q.    -- you -- if you could please
7 continue with giving your recollection of the
8 exchanges you've had with Treasurer Dillon.
9    A.    Those are the ones that -- that stick
10 out in my mind.  There -- there may have been --
11 let's see.  There are the contract approval
12 process.  There are the attaboys, like, good job,
13 Kevyn, that sort of thing.  They're
14 nonsubstantive.
15         There may have been others.  None
16 stick out in my mind and none were particularly
17 substantive.  For instance, if there was a group
18 or organization that the treasury [verbatim]
19 thought could provide a service to the City, for
20 instance, benefits enrollment, he might send me an
21 e-mail along the lines of this is someone who
22 might be able to help you with your benefit

1 outreach.  You may want to talk with them.
2          Similarly, if there was someone who
3 had reached out to the State or reached out to the
4 treasury this is someone who asked that I put you
5 in touch with them, things of that nature.
6          Those were probably more regular.
7    Q.    Did you have any written exchanges
8 with the Treasurer about the City's unfunded
9 pension liability?
10   A.    Well, the reason I'm -- I'm
11 hesitating -- I'm -- I think we had regular
12 reports to the -- okay.  I'm obligated to submit
13 regular -- 30-day, 180-day reports, which I do,
14 and those are published in public.  So I'm going
15 to --
16   Q.    And who do you submit those to?
17   A.    To -- to the Treasurer Dillon and, in
18 some cases, the Governor.
19         So my -- my reports that I'm required
20 to submit, you know, I -- the staff submits them,
21 but I'm going to include them in an effort to be
22 responsive in your question.

1          I don't technically send them;
2 somebody on my staff sends them out.  I sign the
3 letter, and they -- they e-mail it.
4          So I'm going to -- the public
5 technical reporting requirements are -- could be
6 qualified in your question.
7    Q.    Yes.
8          So let me clarify my question --
9    A.    Okay.
10   Q.    -- I'm not limiting it to documents
11 that you draft yourself, but documents that are
12 prepared for you.
13   A.    Okay.  I'm sure there are a lot of
14 communications between my staff and the treasury
15 having to do with the reports that we have.  And
16 when I say "a lot," I don't know how many, but
17 I'm -- I'm taking them out of the attaboy, good
18 luck questions and putting them in more to the
19 substantive questions.
20         I think my staff or people at my
21 direction, my contractors, may submit cash flow
22 projections and cash flows, projections over

1 actuals, things like that, not
2 necessarily directly -- I'm trying not to be
3 technical --
4    Q.    Okay.
5    A.    -- not necessarily to
6 Treasurer Dillon, but to his staff as well.
7    Q.    Okay.  So let me --
8    A.    Okay.
9    Q.    -- I -- I appreciate your -- your --
10   A.    Um-hum.
11   Q.    -- your efforts to respond.
12         Let me --
13   A.    Okay.
14   Q.    -- see if I can limit my question
15 now.
16   A.    Um-hum.
17   Q.    So I'm not interested in
18 correspondence that's official correspondence --
19   A.    Okay.
20   Q.    -- that's required -- you're required
21 by your official duties to make, but so setting
22 apart, you know, officially required

Page 404

1    correspondence --
2        A.    Right.
3        Q.    -- so let me -- let me limit my
4    question in that regard.
5            So --
6        A.    Okay.
7        Q.    -- so let me go back.
8        A.    Okay.
9        Q.    Do you recall any exchange -- written
10   exchanges with Treasurer Dillon regarding the
11   City's unfunded -- unfunded pension liabilities?
12       A.    Outside of the official
13   correspondence?
14       Q.    Right.
15       A.    No, I don't recall any specific
16   correspondence between me and Treasurer Dillon
17   regarding unfunded pension liabilities, no.
18       Q.    Okay.  Do you recall ever seeing an
19   e-mail by Treasurer Dillon in the early part of
20   July 2013 where he says he speak -- he spoke to
21   the City consultants and he didn't realize how
22   significant the unfunded pension liabilities were?

Page 405

1            Do -- do you have any recollection of
2    ever seeing an e-mail like that?
3        A.    Was I copied on it?
4        Q.    I -- I -- I'm just asking if you
5    have --
6        A.    Do I have any recollection?
7        Q.    -- any recollection of an e-mail like
8    that.
9        A.    I have no recollection.  If you have
10   a writing, I'd be happy to look at it, but I
11   don't.
12       Q.    Okay.  Other than what you've
13   testified so far in response to my questions about
14   written exchanges with Treasurer Dillon, do you
15   have any recollection of any other written
16   exchanges with Treasurer Dillon?
17       A.    No.  We -- we have a -- we have --
18   you know, we have reporting requirements; we try
19   to make those.  We have approval requirements; we
20   try to make those.
21           If you're looking for, like,
22   exchanges between us that are besides the

Page 406

1    congratulatory protocol attaboys, specifically
2    with related to pension liabilities, I don't have
3    any recollection of those exchanges.  There might
4    be, I just -- we did not have specific exchanges
5    focused just solely on pension liabilities, and I
6    don't recall any.
7        Q.    Okay.  So now let me ask about
8    Mr. Baird.
9        A.    Yes.
10       Q.    Subsequent to your being appointed to
11   EFM --
12       A.    Right.
13       Q.    -- through to the present, have you
14   had any written exchanges, electronic or hard
15   copy, with Mr. Baird?
16       A.    Yes.
17       Q.    And can you tell me what those have
18   been?
19       A.    Those are generally about staffing
20   decisions; how's it going with your staff; how's
21   it's going with restructuring City operations;
22   good job; generally staffing.

Page 407

1            I don't think I've had any exchanges
2    with Mr. Baird about pension liabilities.
3        Q.    Okay.  Have you had any exchanges
4    with Mr. Baird about any provisions of the
5    Michigan Constitution?
6        A.    No, I don't recall.  No, I don't
7    think I've had any of those exchanges with
8    Mr. Baird.
9        Q.    Okay.  Now, let me ask you whether
10   you've had any written exchanges with any State
11   officials or staff of the Governor or the
12   Treasurer or Mr. Baird after you were EFM apart
13   from any official documents -- any correspondence
14   that was required by law that touched on, in any
15   way, the City's unfunded pension liabilities?
16       A.    Outside of attorney-client
17   communications?
18       Q.    Well, I'm going to ask you about any
19   of them.  If you -- if you're going to assert or
20   your attorney is going to assert a privilege,
21   that's your -- your option to do so, but I'm just
22   going to ask the question.

Page 408

1     A.    Okay.  I'll -- I'll answer two
2  ways -- well, three ways.
3          You said with anyone else in -- in
4  Government?
5     Q.    In the State Government, right.
6     A.    In the State Government.
7          One I may have had -- I certainly
8  recall a call, but I don't recall -- I recall a
9  courtesy call from the Attorney General that he
10 was going to be taking a stand on the
11 constitutionality of pensions.  I don't recall a
12 writing.
13         So I'm -- I'm trying to be responsive
14 and going a little broad.  You didn't ask about
15 calls, but I'll give it to you.
16         I am confident there are likely
17 communications either between me and my staff and
18 the Governor's office legal team not necessarily
19 about pension obligations, but regarding a
20 potential plan.  I think those are privileged.
21 Not a lot.
22    Q.    Okay.  So -- I'm sorry --

Page 409

1     A.    Okay.
2     Q.    -- anything else come to mind?
3     A.    And -- and just -- just -- here
4  again, I'm -- I'm -- you know, I'll lump them in
5  in the protocol calls -- not calls, protocol memos
6  from the Judge's scheduler, can you do this
7  meeting here with the Governor, can you -- just
8  generally protocol discussions like that.
9     Q.    Okay.  Let me go back to the -- the
10 telephone call you had with the Attorney General.
11    A.    Right.
12    Q.    When was that?
13    A.    I think it was either the -- I think
14 it was the day before he made his public
15 announcement.  I don't recall a specific day.
16    Q.    Do you know what month it was in?
17    A.    I -- I -- I -- I didn't -- it -- it's
18 in the public record.  I just don't recall which
19 one.  It wasn't March.
20    Q.    It was after the bankruptcy filing?
21    A.    No.  It may have been before.  I just
22 don't recall the date.

Page 410

1     Q.    Okay.  So he made a public filing.
2          And when in time in relation to
3  the -- when he made the filing did he call you?
4     A.    I'm not sure it was a filing.  I'm
5  just saying there was a -- I recall there was a
6  position he was going to take publicly, and he
7  made a courtesy call to me and left a message.
8     Q.    Okay.  And you don't recall when he
9  took that position publicly?
10    A.    No, I don't.
11    Q.    Do you remember what the position
12 was?
13    A.    Whatever's been reported in the
14 papers as far as his position.
15    Q.    Well, I'm asking you do you -- do you
16 remember what his position was?
17    A.    I -- I remember his position was that
18 he believed that the Michigan State Constitution
19 protected pensions.
20    Q.    Okay.  And did he call you or did you
21 call him?
22    A.    No.  I believe he called me and left

Page 411

1  a message.
2     Q.    And did you speak to him at some
3  point?
4     A.    Not at that -- I think I called him
5  back that afternoon and said thank you, and that
6  was the extent of our conversation -- or that
7  evening, and that was the extent of our
8  conversation.
9     Q.    So other than you're saying thank you
10 for the message, there's no other exchange between
11 you and the Attorney General?
12    A.    No.  It was of the nature of thank
13 you, Attorney General, I understand that you're
14 going to be taking this position.  Thank you for
15 the courtesy call.
16    Q.    Okay.  Did you discuss the substance
17 of his position?
18    A.    No, we did not.
19    Q.    Okay.  Have you ever discussed the
20 substance of his position with him?
21    A.    Yes.
22    Q.    When did you do that?

Page 412

1    A.    I think in a meeting with my attorney
2  and someone from his office.
3    Q.    Okay.  And when was that?
4    A.    I don't recall the day.  I don't -- I
5  don't recall the -- it was after March.  It may
6  have been prior to or after the bankruptcy filing.
7  I don't recall.
8    Q.    Okay.  And who was at the meeting?
9    A.    I was at the meeting;
10  Attorney General Schuette was at the meeting; an
11  attorney from his office, Matt, was there -- I
12  forget his last name -- and my attorney,
13  David Heiman, was on the phone.
14    Q.    Okay.  And who -- how did the meeting
15  come about?  Did someone ask to have the meeting?
16    A.    I think -- yes, I think the Attorney
17  General's Office contacted my office and asked to
18  schedule a meeting.
19    Q.    Did the person who asked to schedule
20  the meeting explain why they -- the Attorney
21  General wanted a meeting?
22    A.    No.

Page 413

1    Q.    Did you have an understanding of why
2  he wanted a meeting?
3    A.    I don't think so.  I think -- you
4  know -- no, I don't think so until we got to the
5  meeting.  It was in Lansing.
6    Q.    Okay.  Do you recall the meeting?
7    A.    Yes.
8    Q.    What was said in the meeting?
9    A.    Is that privileged?
10    MR. SHUMAKER:  To -- to the extent
11  that there was a common interest between what the
12  Attorney General and his counsel was relating with
13  you and Mr. Heiman, I'm going to ask you --
14  instruct you not to answer.
15    If it related to issues where there
16  was no common interest, you can testify to that.
17    MR. DECHIARA:  I -- I just -- can we
18  just pause?  Are we on -- is there -- are you out
19  of tape or what's --
20    THE VIDEOGRAPHER:  I've got
21  five minutes on the tape.
22    MR. DECHIARA:  Okay.  You'll tell me

Page 414

1  when the tape runs out?
2    THE VIDEOGRAPHER:  Two minutes.
3    MR. DECHIARA:  Okay.
4    Why don't -- why don't we take a --
5  maybe this is a good time -- do you have to -- how
6  long does it take to change the -- change --
7    THE VIDEOGRAPHER:  I can go off the
8  record now and change.
9    MR. DECHIARA:  Okay.
10    MR. ULLMAN:  Why don't we take a
11  break and --
12    MR. DECHIARA:  Why don't we take a
13  break now?  Is that --
14    THE WITNESS:  Sure.
15    MR. DECHIARA:  -- is that good?  He
16  has to change the tape.
17    THE VIDEOGRAPHER:  Going off the
18  record at 12:42.  This marks the end of Tape
19  Number 1.
20          - - -
21    (Whereupon, a brief recess was taken
22          from 12:42 p.m. to 1:06 p.m.)

Page 415

1          - - -
2    THE VIDEOGRAPHER:  Going back on the
3  record at 1306.  This marks the beginning of
4  Tape Number 2.
5    MR. DECHAIRA:  Okay.
6  BY MR. DECHAIRA:
7    Q.    Mr. Orr, before we broke, I was
8  asking you about a meeting you had with the
9  Michigan Attorney General.
10    And my question was, what was said at
11  that meeting?
12    A.    Yes.
13    With Attorney General Schuette, I
14  don't recall the exact date; but, generally
15  speaking, the Attorney General -- at the meeting,
16  as I said, was Mr. Heiman on the phone, the
17  Attorney General and an attorney from his office,
18  Matt, whose last name escapes me right now.  And
19  generally what was said, the Attorney General
20  wanted to express why he felt duty-bound to take a
21  position that the Michigan State Constitution
22  protected vested pension obligations.

Page 416

1    I believe our side expressed to him
2 that we believed Federal law allowed those
3 obligations to be adjusted.
4    The meeting was cordial, and the
5 meeting concluded fairly quickly with everybody
6 saying their -- their goodbyes.
7    Q.    Did you, at the time, have an
8 understanding about the authority of the Attorney
9 General of the State of Michigan to interpret the
10 Michigan Constitution?
11    A.    My understanding is that the Attorney
12 General is the chief legal officer of the State.
13 And I presumed -- did I have an understanding of
14 his authority?
15    My -- my understanding was, as chief
16 legal officer of the State, he has the ability to
17 determine what positions he believes he should
18 take on behalf of the State, subject to a ruling
19 by a court of law.
20    Q.    Okay.  Would it be fair to say that
21 in your mind, the opinions of the Attorney General
22 of the State of Michigan regarding questions of

Page 417

1 Michigan State law are -- should be accorded
2 considerable weight?
3    A.    No.
4    Q.    Okay.  And who -- who was it -- were
5 you receiving legal advice from somebody that was
6 contrary to the position that was being asserted
7 by the Attorney General?
8    A.    Yes.
9    Q.    And was that the Jones Day law firm
10 that was advising you?
11    A.    I believe amongst others.
12    Q.    Who else?
13    A.    Our local counsel at, um -- I'm --
14 I'm -- I'm -- I'm -- I'm drawing a blank on the
15 firms now -- Bob Hurwitz (phonetic) -- our local
16 counsel.
17    Q.    Okay.  Anyone else?
18    A.    Yeah, I don't -- I don't want to
19 violate any attorney-client confidences --
20    Q.    No, I'm just asking you to
21 identity -- I'm not asking --
22    A.    Okay.

Page 418

1    Q.    -- you what was said --
2    A.    Okay.
3    Q.    -- I'm just asking you the identity
4 of the attorneys who were telling you that what
5 the Attorney General was telling you was not
6 correct.
7    And you've identified Jones Day.
8 You've identified your local counsel.
9    I'm just asking you, was there anyone
10 else giving you advice on that matter?
11    A.    I wouldn't call it "advice."  I mean,
12 I've -- you know, at various meetings and events,
13 other attorneys will come up to me as recently as
14 yesterday and said that the position that we're
15 asserting is the correct one.
16    Q.    Who said that to you yesterday?
17    A.    An attorney from -- I forget his law
18 firm; but, you know, at various places, different
19 people come up to me and offer their opinions as
20 to what the position should be --
21    Q.    Let me --
22    A.    -- I wouldn't call that "advice,"

Page 419

1 though; it's just, you know, public commentary.
2    Q.    Okay.  So the -- the lawyers who were
3 giving you -- giving you advice in their capacity
4 as attorneys for the City or as attorneys for the
5 emergency manager were the Jones Day law firm and
6 a local counsel?
7    A.    Yes.
8    Q.    Okay.  Let me now refer you to the
9 June 14th, 2013 meeting with creditors.
10    Do you recall that meeting?
11    A.    Yes.
12    Q.    Okay.  Do you recall being asked a
13 question at that meeting about Article IX,
14 Section 24 of the Michigan Constitution?
15    A.    Do I recall?
16    There -- there -- I think there was a
17 question.  I don't know if -- I don't think that
18 meeting was recorded.  So I don't know if there's
19 something to refresh my recollection.  But I don't
20 specifically recall.  I think there probably was a
21 question.  I just don't recall it with
22 specificity.

1    Q.    Okay.  And do you recall if there
2  were any questions about Detroit's pensions?
3    A.    I believe there were.
4    Q.    Okay.  Do you -- in -- do you recall
5  responding to any of those questions?
6    A.    I don't recall specifically what I
7  said, but I believe I probably did.
8    Q.    Okay.  Do you recall -- go ahead.
9  I'm sorry.
10    A.    No, I'll answer your question.
11        I -- I think I did recall to a
12  question about pensions, and I think I mentioned
13  that in other cases in which I've been involved,
14  that Federal preemption dealt with states'
15  rights -- states' protections.  I think there was
16  that discussion, excuse me, on June 14th.
17    Q.    Do you recall making a reference to
18  legislative -- legislative relief?
19    A.    Yeah.  Yes, I do.
20    Q.    Can you tell me what you said in that
21  connection?
22    A.    I think it was a pretty short offhand

1  comment, that I said, well, it could be either
2  Federal preemption, or it might require some
3  legislative relief.
4    Q.    And what did you mean by "legislative
5  relief"?
6    A.    I didn't really mean anything with
7  specificity other than to say there might be an
8  opportunity to seek some sort of legislative
9  relief.  I didn't really have a plan or anything
10  with specifics in mind at that time.
11    Q.    Let me now refer you to the
12  bankruptcy petition --
13    A.    Yes.
14    Q.    -- that was filed on behalf of the
15  City.
16        Do you recall that document?
17    A.    Yes.
18        MR. SHUMAKER:  You're getting pretty
19  far afield here, Counsel.  I hope you can tie it
20  in with the State officials.
21  BY MR. DECHAIRA:
22    Q.    Did -- do you recall that that

1  petition was originally dated July 19th and it
2  said July 19th, 2013 in print on it, and that it
3  was then changed by hand to say July 18th?
4        MR. SHUMAKER:  Object to the form.
5        THE WITNESS:  I -- I don't recall
6  that then.  But I think we talked about this at my
7  September 16th, 2013 deposition.  I think someone
8  asked me that question.
9        So I -- I -- I recall it from that
10  deposition.
11  BY MR. DECHAIRA:
12    Q.    Well, do you have an independent
13  recollection --
14    A.    I -- I don't --
15    Q.    Let me just finish for the clarity of
16  the record.
17        Do you have an independent
18  recollection of the bankruptcy petition saying
19  July 19th in print on it and then someone changing
20  it by hand to say the 18th?
21        Do you have an independent
22  recollection of that?

1    A.    It's a little fuzzy, but I think in
2  signing it, I'm the one who changed it.
3    Q.    You changed it to the 18th?
4    A.    Yeah.  Whatever day I signed it, I
5  think I -- I routinely will get documents that are
6  dated with different dates, and I'll change them,
7  interlineate on them the correct date.
8    Q.    Okay.  Let me just -- I had been
9  asking you a line of questions about written
10  communications you were having with State
11  officials.
12    A.    Yes.
13    Q.    Let me go back and ask you, do you
14  recall written communications with staff or
15  other -- officials other than the Governor, the
16  Treasurer or Mr. Baird, after you were appointed
17  as EFM, that touched on or concerned in any way
18  the issue of Detroit City pensions?
19    A.    No, not really.
20        No.
21    Q.    Prior to your being appointed as EFM,
22  did you have any oral exchanges, spoken exchanges,

1 whether by telephone or in person, with the
2 Governor?
3     A.    Yeah, I think I testified this
4 morning that he may have called me prior to my
5 actual appointment to say we hope you consider it
6 and would like you to come on board, things along
7 those lines.
8     Q.    Was it -- did it -- was that just one
9 exchange you had with him?
10     A.    No, I think I said there may have
11 been one or two along those lines.
12     Q.    Were there any exchanges other than
13 where the exchange was limited to, you know,
14 welcome on board?
15     A.    There -- there were no substantive
16 exchanges.  Mostly exchanges I -- I had --
17 conversations I had with the Governor were
18 pleasantries.
19     Q.    Okay.
20         Now let me ask the same question, but
21 I'm going to change the time frame from between
22 the time you were appointed EFM until the Governor

1 authorized the bankruptcy filing.
2         So --
3     A.    Um-hum.
4     Q.    -- in that period, did you have any
5 spoken exchanges with the Governor?
6     A.    Yes.
7     Q.    And do you know how many you had?
8     A.    Well, I've said we've -- we've had
9 regular meetings with the Governor.  My contract
10 requires me to keep the Governor and the Treasurer
11 apprised as to what we're doing.  We have those
12 meetings almost weekly.  There may have been a
13 week here or there that we missed, but we have
14 regular weekly meetings.
15     Q.    And those are face-to-face meetings
16 with -- with --
17     A.    They're typically face-to-face.
18 Occasionally, they're by phone.
19     Q.    Okay.  Have you had any meetings
20 during that period -- actually, I'm not even going
21 to call them meetings.
22         Have you had any spoken exchanges

1 with the Governor between the time you were
2 appointed as EFM until the Governor authorized the
3 bankruptcy filing where it was just you and the
4 Governor speaking with no one else present?
5     A.    Yes.
6     Q.    And how many times did that occur?
7     A.    More than a couple.  Sometimes after
8 the weekly meetings, if they're in person, the
9 Governor and I -- the Governor will take me aside
10 into his office and we'll have separate one-on-one
11 meetings.
12     Q.    And do you have a specific memory of
13 any of those meetings?
14     A.    Yeah, those meetings are typically
15 just an opportunity for the Governor -- they --
16 they comprise a combination of -- of
17 personal -- you know, personal inquiries:  How's
18 your family doing; do you need anything; how are
19 you holding up; how's your staff; do you need any
20 help in any way fashion, things along those lines.
21         They're not -- they're not really
22 substantive follow-ups of the actual meetings that

1 we've had just prior to those meetings.
2     Q.    Have you ever, in those one-on-one
3 meetings with the Governor, spoken about the issue
4 of Detroit's unfunded pension liability?
5     A.    Not that I recall, no.
6     Q.    Did you ever discuss with the
7 Governor, in those one-on-one meetings, anything
8 having to do with restrictions or prohibitions in
9 the Michigan Constitution?
10     A.    No.
11     Q.    Did you ever speak to him about the
12 Attorney General's position on the issue of
13 pensions?
14     A.    I -- I may have.
15     Q.    And what was said?
16     A.    The substance of those conversations,
17 the one-on-one meetings, was that, you know, I
18 understand the Attorney General believes he has to
19 take a position, obviously --
20     Q.    Who is speaking when you're saying
21 that?
22     A.    Oh, me.  I'm -- the Governor and I

Page 428

1  are speaking, just the two of us in the room. I
2  think it was something along the lines, I
3  understand he's taken a position; we disagree with
4  it; ultimately, this will be sorted out in court.
5      Q.   And that's -- that's what you said?
6      A.   Yeah, pretty much what I said.
7      Q.   Okay. And did the Governor respond,
8  or did he say anything?
9      A.   No; the Governor responded, yeah, I
10 understand you have to take the position that you
11 have to take in your case.
12     Q.   Has the Governor ever expressed to
13 you, in a one-on-one meeting, his view of the
14 Attorney General's position?
15     A.   No.
16     Q.   So it was just a -- when you and the
17 Governor had a meeting where the issue of the
18 Attorney General's position came up, it was just a
19 one-way communication by you saying what it is you
20 just said?
21     A.   Yeah, as I said, these are not
22 substantive meetings. These are more sort of what

Page 429

1  I call the personal meetings, where the Governor
2  just takes time out of his schedule to ask me how
3  things are going; how am I holding up; how my
4  staff is; and, you know, I -- I would occasionally
5  say, yeah, you know, I met -- for instance, the
6  meeting I had with the Attorney General, met with
7  the Attorney General. He expressed his interests
8  in the position he has to take. We obviously
9  disagree with it.
10        The Governor would take no position
11 on that. He would say, okay, I understand, you
12 know, you have to do what you think is appropriate
13 on behalf of the City.
14        That was the extent of the
15 conversations.
16     Q.   So am I correct that the Governor
17 never actually told you that the Attorney
18 General's position was wrong?
19     A.   I -- yeah, I don't believe the
20 Governor ever opined as to the Attorney General's
21 position.
22     Q.   Let me now speak beyond the -- in the

Page 430

1  same time frame between when you were appointed as
2  EFM until the Governor authorized the bankruptcy
3  filing.
4      Let me now refer to meetings you've
5  had with the Governor where there were other
6  people present.
7      A.   Yes.
8      Q.   Were there any discussions in any of
9  those meetings about Detroit's pension
10 liabilities?
11     A.   Now, these are where attorneys are
12 present or covered by the common interest
13 privilege?
14     Q.   Well, I'm just going to ask you about
15 what was said in those meetings, and if you want
16 to refuse to answer or if your attorney wants to
17 instruct you -- you to refuse to answer, that's --
18     A.   Okay.
19     Q.   -- a decision you have to make.
20        MR. SHUMAKER: You -- you can -- you
21 can answer that question.
22        THE WITNESS: Yeah. There were

Page 431

1  meetings. As I said before, we have, typically,
2  weekly meetings. Occasionally, we've missed a
3  week or two, but typically, weekly.
4  BY MR. DECHAIRA:
5      Q.   Okay. And in any of those meetings,
6  were Detroit's pension liabilities discussed?
7        MR. SHUMAKER: You can answer that.
8        THE WITNESS: Yes.
9  BY MR. DECHAIRA:
10     Q.   And what was said?
11        MR. SHUMAKER: I'm -- I'm going to
12 object here and caution the witness to the extent
13 that any of the communications called for by the
14 question ask for information relating to your
15 seeking or the provision of legal advice, I
16 instruct you not to answer. Outside of that, you
17 can.
18        THE WITNESS: Those -- I think
19 those -- those conversations are covered by the
20 attorney-client privilege and the common interest
21 privilege.
22 BY MR. DECHAIRA:

Page 432

1      Q.    Okay.  So just so the record's clear,
2  Mr. Orr, you're declining to respond to the
3  question, what was said in those meetings
4  regarding Detroit's pension liabilities?
5      A.    Yes, I -- I think, without waiving
6  the privilege -- I want to be very careful here,
7  because I have both the attorney-client privilege
8  and common interest agreement and I don't want to
9  abridge either of those; but without waiving,
10  there were discussions and those discussions
11  probably concerned our perception of what -- what
12  the issues that have been talked about in the
13  public domain concerned regarding vested pension
14  rights.
15      Q.    Did the Governor ever say to you
16  whether in a one-on-one -- let me start with a
17  one-on-one meeting.
18          Did the Governor ever say to you in a
19  one-on-one meeting that it was his view that
20  Detroit's pension liability -- strike that -- that
21  Detroit's accrued pension liabilities had to be
22  cut?

Page 433

1          Did the Governor ever say that to
2  you?
3      A.    No.
4      Q.    Okay.  And did he ever say that to
5  you in any meeting where there were other people
6  present?
7          MR. SHUMAKER:  Again, I'm going to
8  caution the witness to the extent that attorneys
9  were at such meetings and there were -- you were
10  seeking legal advice or legal advice was being
11  given in connection with the Governor's comments,
12  I would instruct you not to answer.
13          If that is not the case, you are free
14  to answer.
15          THE WITNESS:  I want to be
16  responsive, but I don't want to waive the
17  privilege.
18          Those discussions were always held in
19  the presence of attorneys generally in discussion
20  of what the rights and positions would be in the
21  case.  I can say this, I think -- can I just
22  consult my attorney briefly?

Page 434

1  BY MR. DECHAIRA:
2      Q.    Not while there's a question pending.
3      A.    Okay.
4      Q.    Your attorney is free to -- he's
5  already given you guidance on the record.
6      A.    I'm -- I'm trying to be responsive to
7  you.
8          I think those discussions are covered
9  by the attorney-client privilege.
10      Q.    Okay.  So just to be clear, you're --
11  you're declining to answer my question?
12      A.    Without further guidance, I think I
13  have to.
14      Q.    Okay.
15          Let me now change the time frame to
16  after the Governor authorized the bankruptcy
17  filing.
18          Did you have any one-on-one spoken
19  exchanges with the Governor -- or have you had?
20      A.    Yes, I believe so.
21      Q.    And one or more than one?
22      A.    Maybe more than one.

Page 435

1      Q.    And what was the context for those?
2      A.    Here again, the same nature of the
3  discussions.  They were more general check-in:
4  How's things going; how's staff going; how's City
5  operations going; new chief seems to be doing very
6  well, things along those natures.
7      Q.    In -- in any of those one-on-one
8  meetings you've had with the Governor since he
9  authorized the bankruptcy filing, did
10  the Governor -- has the Governor ever expressed
11  the view to you that Detroit's accrued pension
12  liabilities should be cut?
13      A.    No.
14          The Governor's never expressed the
15  view to me in any of those meetings that Detroit
16  pension liabilities need to be cut either before
17  or after the filing.
18      Q.    Okay.  And has he ever expressed a
19  view to you regarding whether he agrees or doesn't
20  agree with the position that was publicly taken by
21  the Attorney General that you testified about
22  earlier?

Page 436

1    A.    No, I don't recall him ever doing
2  that.
3    Q.    Did you ever, in any one-on-one
4  conversation with the Governor, speak about any
5  prohibitions or restrictions in the Michigan
6  Constitution?
7    A.    No, I don't recall us speaking about
8  that.
9    Q.    Okay.  Now -- now I'm going to ask
10  you about Treasurer Dillon --
11    A.    Yes.
12    Q.    -- I'm going to ask you another --
13  the same line of questions -- questions about
14  spoken exchanges --
15    A.    Um-hum.
16    Q.    -- the time frame is now between --
17  well, let's say before you were appointed EFM.
18        Did you have any spoken exchanges
19  with -- with the Treasurer?
20    A.    Yes.
21    Q.    And can you tell me what those were?
22    A.    Those were more in the nature of,

Page 437

1  here again, pleasantries; enjoy you considering
2  being a candidate; I had early on hoped and
3  encouraged you to do so; thank you for doing so,
4  along those lines.
5    Q.    Did the -- did the Treasurer in any
6  of those spoken exchanges you had with him ever
7  express any views about the economic distress that
8  was facing the City of Detroit?
9    A.    Oh, I think he -- I think we may have
10  discussed the -- yes -- yeah, I think we probably
11  discussed the fact that Detroit was under a
12  consent agreement, things of that nature, but it
13  was very high level; it wasn't with any
14  specificity.
15    Q.    Well, did you ever speak to him
16  during that time frame about the burden of accrued
17  pension liabilities that was going on in the City?
18    A.    Yeah -- no, not that I recall.  There
19  were never any discussions in -- in that level of
20  detail.
21    Q.    In the time frame after you were
22  appointed EFM, but before the State authorized the

Page 438

1  bankruptcy filing, did you have any spoken
2  exchanges with the Treasurer?
3    A.    Yes.
4    Q.    And what was the context for those?
5    A.    Those discussions were, here again as
6  I said before, generally around retention of
7  professionals, cash flow projections, actuals over
8  projected, potential help that we could get from
9  contractors, sending out the RFP for solid waste,
10  standing up the Public Lighting Authority,
11  standing up the Detroit Land Bank Authority in
12  conjunction with MSHDA, things of that nature.
13    Q.    Were these exchanges that you had in
14  the context of meetings with other people present?
15    A.    Some of them were, yes.
16    Q.    Were any of them one-on-one?
17    A.    The Treasurer and I would -- would
18  sometimes -- we -- our meetings were -- the
19  Governor and I would try to have one-on-one
20  meetings after our Detroit team meetings.  The
21  Treasurer and I would have one-on-one meetings in
22  a much more irregular ad-hoc basis, if you will.

Page 439

1  If he was in the office building, in the Cadillac
2  office building, at the same time, he might stop
3  by my office.  But there was no regular --
4  regularly set meeting between me and the
5  Treasurer.
6    Q.    Okay.  Do you -- do you recall those
7  one-on-ones that you had with the Treasurer on
8  those occasions?
9    A.    I recall some of them, yes.
10    Q.    Okay.  And in those, did you ever
11  speak to him about Detroit's accrued pension
12  liability?
13    A.    Not specifically.  We may have talked
14  about the -- what I call the "balance sheet
15  issues," the amount of debt that the City had,
16  including pension funds, OPEB and GO bond debt; we
17  may have talked about the -- here again, actuals
18  over projections, things -- financial
19  transactions, yes.
20    Q.    Did he ever express the view to you
21  in those one-on-one meetings that Detroit's
22  accrued pension liabilities should be -- could be

Page 440

1  or should be reduced?
2      A.    I don't recall any specific
3  conversations about what should happen with
4  Detroit pension liabilities.
5      Q.    Do you remember the Treasurer talking
6  about that, whether specifically or generally or
7  in any other way, about that subject?
8      A.    Not in the one-on-one meetings.
9      Q.    Did he talk about that in meetings
10 where there were other people present?
11     A.    Yes.  The Treasurer attended the
12 Detroit team meetings that we had weekly with the
13 Governor.
14     Q.    And did he, at any of those meetings,
15 express the view that -- did he -- strike that.
16         Did he, at those meetings, say
17 anything about whether Detroit's accrued pension
18 liabilities should be reduced?
19         MR. SHUMAKER:  Again, I'm going to
20 caution the witness to the extent that any of
21 these communications occurred when counsel was
22 present in connection with the provision or the

Page 441

1  seeking of legal advice, I will instruct him not
2  to answer.
3          If that's not the case or there's
4  some nonlegal component to it, you can answer.
5          THE WITNESS:  Okay.  Let me -- let me
6  try to respond this way.  Any of the Detroit team
7  meetings with the Governor would have counsel
8  present, oftentimes several layers of counsel; in
9  fact, I think there were meetings where either my
10 counsel was on the phone or counsel on behalf of
11 the Governor and his office on the phone.  There
12 were no team meetings where counsel was not
13 present.
14          In any of those discussions, those
15 discussions would implicate attorney-client
16 communications because we would be seeking legal
17 advice either from my counsel or from State
18 counsel or from both.  So I'm going to be very
19 careful with those discussions where the
20 Treasurer, the Governor and counsel were present.
21          So I -- I -- I can't answer about
22 those discussions.

Page 442

1  BY MR. DECHAIRA:
2      Q.    Okay.  Just to be clear.  For -- for
3  the reasons you just expressed, you're not going
4  to answer the question?
5      A.    Yes.
6      Q.    Yes, you're not going to answer?
7      A.    Yes, I'm not going to answer the
8  question.
9      Q.    Did the Governor -- did the Treasurer
10 in any way -- let me ask you about one-on-one.
11          In any one-on-one meeting you've ever
12 had with him, did he ever express a view about
13 whether the Attorney General's position, that you
14 testified about earlier, was correct or not?
15     A.    No.
16     Q.    Okay.  And if I asked you whether he
17 ever expressed an opinion on that topic in -- in
18 one of the Detroit team meetings, would you
19 decline to answer the question on the grounds that
20 you just declined to answer my prior question?
21          MR. SHUMAKER:  I would give the
22 witness the same admonition.

Page 443

1          THE WITNESS:  Yes, I would decline to
2  answer your question on the grounds it's protected
3  by the attorney-client privilege and joint --
4  and/or joint interest privilege.
5  BY MR. DECHAIRA:
6      Q.    Okay.  Let me now ask you about
7  Mr. Baird.
8      A.    Yes.
9      Q.    Prior to your being appointed EFM,
10 did you have any spoken exchanges with Mr. Baird?
11     A.    Yes.
12     Q.    And can you tell me what those were?
13     A.    Yes, I think as I testified on
14 September 16th and, again, earlier today, and as
15 has been represented in the e-mail chains that
16 were gone over on September 16th and the ones that
17 were discussed this day, they were about my
18 potentially becoming the emergency financial
19 manager, subsequently emergency manager for the
20 City of Detroit.
21     Q.    Did you have any exchanges with him
22 before you -- spoken exchanges with him before you

Page 444

1  were appointed EFM on any topic other than what
2  you just testified to?
3      A.   That was generally the broad topic.
4  He -- he may have asked me about how my family
5  would hold up, how I could extricate myself from
6  my then law firm, things of that nature, but no
7  substantive discussions.
8      Q.   And when you say "no substantive
9  discussions," would that also mean that you did
10  not discuss anything having to do with Detroit's
11  pension liabilities?
12     A.   I -- I don't recall really ever
13  talking to Mr. Baird about Detroit's pension
14  liabilities.
15     Q.   At any time?
16     A.   At any time.
17     Q.   Did you ever speak to Mr. Baird at
18  any time about the issue of the Michigan
19  Constitution?
20     A.   I don't recall ever speaking to
21  Mr. Baird about the issue of the Michigan
22  Constitution.

Page 445

1      Q.   Did Mr. Baird ever express to you a
2  view about whether or not Detroit's accrued
3  pension liabilities could or should be cut?
4      A.   No.
5      Q.   Did Mr. Baird ever express a view to
6  you about whether or not the position taken by the
7  Attorney General that you testified about earlier
8  was correct or incorrect?
9      A.   No.
10     Q.   In any one-on-one meetings that
11  you've ever had with the Governor, the Treasurer
12  or Mr. Baird, was there any discussion about when
13  Detroit should file for bankruptcy?
14     A.   Well, there are three questions.  Not
15  with Mr. Baird; I don't recall any with
16  Treasurer Dillon; and none with specificity with
17  the Governor.
18     Q.   Do you do -- do you have any -- when
19  you say "none with specificity," do you mean your
20  recollection is not specific or what was discussed
21  was not specific?
22     A.   What was discussed was not specific.

Page 446

1      Q.   Okay.  What was discussed, to the
2  best of your recollection, with the Governor about
3  when Detroit should file for bankruptcy?
4      A.   Generally, after -- and I'll just
5  give it to you generally after the June 14th
6  meeting, on the one-on-one meetings, we discussed
7  my hope that we get some settlements in.  We were
8  having discussions with some parties.
9          We discussed that, you know, time was
10  drawing -- was -- seemed to be moving quite
11  quickly, but we were hopeful, and we were -- had
12  some initial discussions.  Later we discussed, I
13  think June -- I'll do it this way -- June 14th
14  through July 3rd, we continued to have discussions
15  along those lines.
16         In July, in the one-on-one meetings,
17  the one or two that we might have had, the general
18  discussion was there was this litigation, but we
19  were still hoping that we could resolve some
20  issues.  And we continued to have those
21  discussions up until a day or so -- no, not until
22  a day or so -- until the week before the filing.

Page 447

1      Q.   So -- so am I correct that you had
2  multiple one-on-one exchanges with the Governor
3  about the question about when the City should file
4  for bankruptcy?
5      A.   We -- as I said, we may have had one
6  or two.  I remember one week in there in July was
7  the 4th of July holiday week, and I don't think we
8  had a meeting there.  But I -- I don't recall
9  specifically the dates of the meeting.  I think we
10  may have had one or two one-on-ones.
11     Q.   Okay.
12         So in those one-on -- one-on-ones,
13  those one or two one-on-ones --
14     A.   Um-hum.
15     Q.   -- to the best of your recollection,
16  what did you say to the Governor in connection
17  with the issue about when the petition should be
18  filed?
19     A.   All I said to the Governor is we
20  continue -- I understand that we're trying to work
21  towards some resolutions; we hope people take us
22  seriously; we hope they're listening to what we're

1 saying. I'm really not hearing any debate on the
2 level of debt. I'm hearing some people being
3 concerned about, you know, what our proposal is.
4 We hope they make a resolution. Towards the end,
5 the question was hopefully we will be able to work
6 things out.
7      Q.    And did -- what did the Governor say,
8 to the best of your recollection, in those
9 one-on-ones?
10      A.    Thank you for the information. You
11 know, I appreciate your trying to do -- you're
12 doing a good job; I appreciate the job you're
13 trying to do. This is going to be difficult.
14 Keep trying to work towards a resolution. You
15 know, it -- make the right decision; it's
16 ultimately your call.
17      Q.    Did he ever give you any view as to
18 what he thought you should do or what the City
19 should do in connection with the timing of the
20 filing?
21      A.    No.
22      Q.    Did you ever have any one-on-one

1 meetings with the Governor in which he or you
2 discussed what the political implications might be
3 of a bankruptcy filing?
4      A.    It's -- the discussion we had earlier
5 this morning about political implications, and I'm
6 going to -- you know, that's -- that's a broad
7 discussion from people being angry to editorial
8 pages, things like that.
9          So there -- there may have been some
10 discussion in that regard. But I don't recall
11 anything particularly political about our
12 discussions.
13      Q.    Okay. Well, I -- I -- I didn't mean
14 to ask you about whether there's anything
15 political about your discussions. But my question
16 was, in any one of your one-on-ones with the
17 Governor, was there any discussion between the two
18 of you, whether you were saying something or
19 whether he was saying something, about what might
20 be the political implications of the bankruptcy
21 filing?
22          And when I say "political

1 implications," I mean that in a broad sense, so
2 public reaction is --
3      A.    Oh.
4      Q.    -- broadly -- broadly, would it --
5 would it be included within that?
6      A.    Well, if you say "public reaction,"
7 yeah, we probably did have discussions about
8 potential public reaction.
9      Q.    And what -- and what did you -- what
10 did you say, or what did he say about that?
11      A.    Generally, you know, this -- this
12 would be -- and this is towards the end -- well,
13 you know, I don't know if -- I'm trying to recall
14 now. I don't know if we had discussions about
15 that prior to the week of the filing. Because I
16 don't think we had that many one-on-one meetings
17 in -- in between June 14th and July because of the
18 holiday.
19          So there may have been a discussion,
20 but I don't think it was in a one-on-one meeting.
21 I think it was in one of the Detroit team meetings
22 the week before the filing --

1      Q.    Okay.
2      A.    -- that was the Friday.
3      Q.    So at one of -- your testimony is
4 that at one of the Detroit team meetings, there
5 was -- before the filing, there was the discuss
6 -- a discussion about what might have been the
7 political implications of the filing?
8      A.    The political implications as you
9 just defined it meaning public reaction.
10      Q.    Well, let -- let me just be clear --
11      A.    Okay.
12      Q.    -- it -- it would include public
13 reaction.
14      A.    Okay.
15          Well, without getting into
16 discussions, because there were attorneys at that
17 meeting, and I don't -- here again, I want to be
18 careful about the privilege. If you include the
19 definition spanning from political implications
20 meaning potential public reaction, I believe there
21 were discussions in that regard, but not in the
22 sense that political reactions should in any way

Page 452

1   impact the decision that we needed to make.
2          The discussions were always about
3   what's the best decision; are we making progress;
4   the discretion is up to me, within my authority,
5   to make a recommendation; and if I make a
6   recommendation, the Governor would take it up in
7   due course.
8       Q.    What was said at -- was this said --
9   was this discussion that you just testified about
10  at one or more of the Detroit -- the Detroit team
11  meetings?
12         MR. SHUMAKER:  You say "this
13  discussion," are you talking about the discussion
14  about the political --
15         MR. DECHAIRA:  Yeah, right.
16         MR. SHUMAKER:  -- implications?
17         MR. DECHAIRA:  Correct.
18         THE WITNESS:  I believe that when you
19  say "political implications," you know, I don't
20  want to give the impression that there was
21  something overt -- there was some overt concern
22  about the political implications.  Our general

Page 453

1   discussions were we were going to do the right
2   thing as we saw fit --
3   BY MR. DECHAIRA:
4       Q.    Okay.
5       A.    -- they were not being driven by
6   political concerns.  We were aware that it would
7   garner public attention, but we were still going
8   to do the right thing.
9       Q.    Can you tell me who said what at
10  those meetings about that -- the issue that you're
11  talking about?
12      A.    Here again, there were attorneys
13  present at that meeting giving legal advice, so
14  I'm going to see if I can answer the question
15  without implicating any of the legal advice.
16         And as I just said, the discussion
17  generally centered around we're not getting the
18  progress that we want.  As I said at the June 14th
19  meeting, we're not getting the progress we need.
20  We had to make some difficult decisions.  As I
21  said at the June 10th meeting, bankruptcy is
22  potentially an option, but we don't want to use

Page 454

1   it.
2          We were being involved in litigation,
3   as I said before on September 16th, and the
4   general discussion was we need to make some
5   decisions, let's make the right decision
6   irrespective of any political considerations.
7       Q.    Mr. Orr, are you paid by the State of
8   Michigan?
9       A.    I believe so.
10      Q.    Okay.  Is it -- is it correct that
11  you're a -- you're an employee -- are you an
12  employee of the State of Michigan?
13      A.    No, I'm a contractor to the State of
14  Michigan.
15      Q.    Okay.  You're an -- you're an
16  agent -- are you an agent of the State of
17  Michigan?
18         MR. SHUMAKER:  Objection --
19         THE WITNESS:  I --
20         MR. SHUMAKER:  -- calls for a legal
21  conclusion.
22         THE WITNESS:  Yeah, that's what I was

Page 455

1   going to say.
2   BY MR. DECHAIRA:
3       Q.    Okay.
4          Do you consider yourself bound by the
5   laws and the Constitution of the State of
6   Michigan?
7       A.    I consider myself bound by the laws
8   in the Constitution of the United States and the
9   State of Michigan.
10      Q.    And do you consider yourself bound by
11  the interpretations of the laws and Constitution
12  of the State of Michigan that are made by the
13  Michigan Attorney General?
14      A.    I consider myself bound by the laws
15  of the U.S. Constitution and the State of Michigan
16  as interpreted by the Federal courts.
17      Q.    But not the Attorney -- Attorney
18  General of the State of Michigan?
19      A.    Not necessarily.  If -- if there's a
20  law or a ruling by a Court, I would think that
21  supersedes the interpretation of an attorney
22  general.

1    Q.    Okay.  In the absence of a ruling by
2  a Court, do you consider yourself as -- in your
3  capacity as an emergency manager, bound by the
4  interpretations of the Michigan Constitution made
5  by the Michigan Attorney General?
6    A.    As I just said, I consider myself
7  bound by the laws of the United States and the
8  State of Michigan as interpreted ultimately by a
9  Court.
10   Q.    Right.
11         But my question is, in the absence of
12  a Court ruling on a particular question, do you
13  consider yourself -- on a particular question of
14  Michigan law, do you consider yourself bound by
15  the interpretation of the Michigan Attorney
16  General?
17   A.    I'll repeat my answer.
18         I understand what you're getting at.
19  But I'll repeat my answer.
20         I feel ultimately the question has to
21  resolve -- be resolved by the courts of the
22  United States.  And I've said that before, and

1  that's the position we've taken.
2    Q.    Did you ever speak to the Governor in
3  a one-on-one meeting about the absence of
4  contingencies in his authorization letter?
5    A.    No.
6    Q.    I'd like to show you what I'll ask to
7  have marked as Exhibit 23.
8              - - -
9         (Whereupon, e-mail string was marked,
10          for identification purposes, as Orr
11          Deposition Exhibit Number 23.)
12              - - -
13       MR. DECHIARA:  And for the record --
14       THE COURT REPORTER:  Hold on.
15       (Sotto voce comments by counsel and
16          court reporter.)
17       MR. DECHIARA:  Are we on the record?
18  BY MR. DECHIARA:
19   Q.    Mr. Orr, if you look at Exhibit 23,
20  do you see that the bottom two-thirds of the page
21  is in -- appears to be an e-mail from
22  Richard Baird to various people, dated

1  February 7th, 2013?
2         Do you see that?
3    A.    Yes.
4    Q.    Okay.
5         And then you see there appears to be
6  a schedule under that?
7    A.    Yes.
8    Q.    Okay.  Did you meet with Andy Dillon,
9  or did you go out to lunch with Andy Dillon and
10  another person on Monday, February 11th?
11   A.    Yes.
12   Q.    And who was the other person?
13   A.    I went out to lunch, actually, with
14  three people: Andy Dillon, Brom Stibitz, and
15  Tom Saxton.
16   Q.    Who are those two other people?
17   A.    Two other people are employees of the
18  Treasury Department and work under Andy Dillon.
19   Q.    Okay.  And what was discussed at that
20  lunch?
21   A.    Me potentially --
22       MR. SHUMAKER:  Let me just -- they're

1  not lawyers; is that correct?
2       THE WITNESS:  I don't know if Brom
3  and Tom are.
4  BY MR. DECHIARA:
5    Q.    Well, I guess that was the question,
6  is, were they acting in -- in their capacity as
7  attorneys for the State during that lunch?
8    A.    I don't know if Brom and -- and Tom
9  Saxton are attorneys.
10       MR. SHUMAKER:  You can -- you can
11  answer.
12       THE WITNESS:  Okay.
13       This -- my understanding what this is
14  was a schedule for me to come and discuss their
15  interests in me applying to become the emergency
16  manager for the City of Detroit.
17  BY MR. DECHIARA:
18   Q.    Right.
19         But what was -- do you have a
20  recollection of what you talked about at lunch?
21   A.    Yeah, generally, what the statute
22  required, the financial stability agreement

Page 460

1  provisions, potentially when I would be able to --
2  to -- to apply; generally, sort of high-level
3  preliminary discussions about becoming the EM.
4      Q.   Did you talk about pensions?
5      A.   No, we didn't talk about the detail.
6  I wish I had.
7      Q.   Did you -- after lunch, did you meet
8  with the Governor and Mr. Baird?
9      A.   Yes.
10     Q.   And who else was present at --
11  present, if anyone, at that meeting?
12     A.   I -- I believe his scheduler,
13  Allison, walked me into the room, and it was just
14  me, the Governor and Rich Baird.
15     Q.   And do you recall what you talked
16  about in that meeting?
17     A.   Very high level.  This was a -- a --
18  a meet-and-greet, as I call it; get to know you;
19  are you interested?  Frankly, at this time, I was
20  still on the fence as to whether or not I would
21  apply for the job, and this -- these were
22  discussions about, well, this is what the job

Page 461

1  would entail.  We're doing our due diligence.
2  There's some other candidates we're considering,
3  but we would like you to be interested, things
4  along those lines.
5      Q.   Did they say who the other candidates
6  were?
7      A.   No, they did not.
8      Q.   Did they talk about the pitch meeting
9  that you participated in earlier?
10     A.   No, not so much -- tangentially, I
11  mean, that -- that discussions were about, you
12  know, we -- we -- we saw your firm's pitch at the
13  meeting; we were impressed with your passion for
14  the City; how you had been a Michigander; the work
15  you did on other cases related to the City; you
16  know, would you -- would you at least -- and this
17  was more -- as I interpreted it, this was more
18  getting me to -- I was still taking a position I
19  don't want the job, but this was more me trying to
20  explore it a little bit and see what it would
21  entail, and them saying that it's probably -- we
22  would appreciate it if you would consider it.

Page 462

1      Q.   Did they -- did Mr. Baird or the
2  Governor express any views about what they thought
3  of the substance of the ideas that were put forth
4  in the Jones Day pitch book?
5      A.   No, not really.  They -- they -- I
6  mean, all they ever said was it -- it was a good
7  pitch book, but there was not -- there was no
8  substantive discussion during these meetings.
9      Q.   Mr. Orr, I would like to show you
10  what I'll now mark as Exhibit 24.  It's a
11  document -- it's a two-page document.  It says at
12  the top, Is the Emergency Manager Moving Fast
13  Enough, question mark.  It's Bates stamped
14  DTMI00113909 --
15     A.   Right.
16     Q.   -- and -10 --
17         THE COURT REPORTER:  Do you want me
18  to mark it?
19         MR. DECHAIRA:  Yes, please, as
20  Exhibit 24.
21              - - -
22         (Whereupon, Excerpt from report of

Page 463

1         Emergency Manager was marked, for
2         identification purposes, as
3         Deposition Exhibit Number 24.)
4              - - -
5         THE WITNESS:  Thank you.
6         THE COURT REPORTER:  Um-hum.
7  BY MR. DECHAIRA:
8      Q.   Can you identify what this document
9  is?
10     A.   Is this an excerpt from one of my
11  reports --
12     Q.   I'm --
13     A.   -- you're asking me?
14     Q.   I'm asking you.
15     A.   Yeah, because I'd -- I'd -- I'm --
16  no.  Can I identify this document is?
17         No, it speaks for itself.
18     Q.   Well, let me -- I mean, have you ever
19  seen this document before?
20     A.   I think I've seen this document
21  before, but I don't think this is from -- I don't
22  know if this is from my office.

Page 464

1    Q.    You don't know who prepared this?
2    A.    No.
3    Q.    And you don't know what purpose this
4  document was used for?
5    A.    No.  Now, that's not saying it could
6  have been prepared from my office, but it could
7  have been done in our communications division.  I
8  just -- there's so many documents that are
9  prepared in my office, I'm not -- I don't see all
10 of them.
11   Q.    I don't want you to guess or
12 speculate.
13   A.    Yeah; no, I don't -- I don't --
14   Q.    You don't know?
15   A.    -- yeah, I don't know.
16   Q.    Okay.
17          I'd like to show you what I'll ask to
18 have marked as Exhibit 25, which is a set of
19 e-mail exchanges stamped JD-RD-0000354.
20               - - -
21          (Whereupon, e-mail string was marked,
22          for identification purposes, as

Page 465

1          Deposition Exhibit Number 25.)
2               - - -
3          THE COURT REPORTER:  Hold on.
4          THE WITNESS:  Thank you.
5  BY MR. DECHAIRA:
6    Q.    Let me refer you to the bottom of the
7  first page.  Do you see there's an e-mail from you
8  to the Governor?
9    A.    Yes.
10   Q.    Dated February 13th, 2013?
11   A.    Yes.
12   Q.    It refers to a meeting you had
13 with -- with the Governor.
14          Do you see that?
15   A.    Yes.
16   Q.    When was that meeting or was -- was
17 there a meeting?
18   A.    I think this refers to the meeting
19 schedule that you showed me on -- for
20 February 11th.  I think this is a follow-up to
21 that meeting.
22   Q.    Okay.  So this is the meeting --

Page 466

1  this -- this -- in this e-mail, you're referring
2  to the meeting you had with Mr. -- with the
3  Governor and Mr. Baird?
4    A.    Yeah, I think the e-mail chain is, as
5  I said today, there may have been back-and-forth
6  pleasantries, and this is the type of stuff that
7  I -- the type of e-mails I was talking about.
8  It's the Governor saying to me, you know, nice to
9  meet you; excited about the prospect of working
10 with you; job is difficult.  I mean, it speaks for
11 itself.
12          He talks about the job, the -- the --
13 the collaborative irrational acts.  That's people
14 doing things that seem --
15   Q.    And --
16   A.    -- insurmountable.
17   Q.    -- Mr. Orr, I don't mean to cut you
18 off.  I just asked if this was the meeting that
19 you were referring to --
20   A.    Yeah, I think -
21   Q.    -- I think the answer is yes --
22   A.    -- this all speaks for it itself.

Page 467

1  Yeah, this all speaks for itself.
2    Q.    Let me refer -- show you a document
3  I'll ask to have marked as Exhibit 26.  This is a
4  two-page document stamped at the bottom
5  JD-RD-0000334 and -35 on the second page.
6    A.    I think this is -- I think this is
7  Exhibit 20.
8    Q.    Oh, it may be.
9    A.    I think we already talked about this.
10   Q.    Okay.  Well --
11   A.    Yeah.  Yeah, it's the same -- no, I
12 have it.  It's the same thing.
13   Q.    Okay.  I don't have Exhibit 20.
14          Okay.  Thank you for pointing that
15 out.
16   A.    Yeah.
17   Q.    Let me refer you to Exhibit 20.
18   A.    Okay.
19          Yeah, it's the same -- yes, it's the
20 same document.
21   Q.    So if you look in the e-mail that you
22 wrote to Mr. Baird at the top of Exhibit 20 --

Page 468

1    A.    Um-hum.
2    Q.    -- towards the bottom of the
3  paragraph -- that block of text that's at the top
4  of the first page, it says -- there's a sentence
5  that says, In the interim, when you have time, I'd
6  like to speak with you about the timing and
7  process for the retention of the EM and legal
8  counsel --
9    A.    Yes.
10    Q.    -- you wrote that?
11    A.    Yes.
12    Q.    And what -- what -- did you -- what
13  did you mean when you wrote that?
14    A.    Oh, I just meant -- what I had said I
15  think at the February 11th meeting is that my
16  consideration as EM -- there were a number of news
17  reports going around about how I would not have to
18  resign from my firm, and what I said in order to
19  remove issues -- because trustees and bankers, as
20  I suspect you know, don't typically resign from
21  their law firm -- in order to remove any issues
22  with that regard, that I'd probably have to resign

Page 470

1        I just want it to be neutral if I'm
2  going to consider this, because I don't want to
3  put my interests above the interests of my then
4  law firm.
5    Q.    Okay.  And then in -- in the e-mail
6  you write, I'd like to speak with you --
7    A.    Yes.
8    Q.    -- did you subsequently speak to
9  Mr. Baird about this topic?
10    A.    I don't know if I spoke to him about
11  this topic.  I was probably -- I don't recall if I
12  spoke to him about this topic.  I think I probably
13  did speak to him subsequent to this e-mail.
14    Q.    Let me show you what I'll mark as
15  Exhibit 27 --
16        THE COURT REPORTER:  Twenty-six.
17        MR. DECHAIRA:  -- 26, thank you.
18  Right.
19        What I had offered as 26 I'm not
20  offering because, as Mr. Orr correctly pointed
21  out, the e-mail was already in -- it had already
22  been marked as Exhibit 20.

Page 469

1  from my law firm.
2        And what I was saying here is -- and
3  what I said at the February 11th meeting was,
4  look, I don't want my potential candidacy as EM to
5  either help or hurt Jones Day, who originally came
6  into this for pitching the legal work.  I want it
7  to be neutral as far as what I do.
8        And -- and to that regard, I think
9  there's an e-mail that we talked about,
10  September 16th, where I recused myself from the
11  Jones Day selection process and I was considering,
12  you know, how I would extricate myself from my
13  firm.
14        I was involved in -- in a couple of
15  very important matters -- in the midst of them, as
16  a matter of fact -- and all I was saying here is
17  let's talk about the process for both the
18  retention of the EM and legal counsel --
19        And what I said February 11th was
20  just, look, whoever -- I'll work with whoever it
21  is, but I don't want this to hurt Jones Day in any
22  way.  I don't necessarily want it to help.

Page 471

1                - - -
2        (Whereupon, Contract for Emergency
3          Financial Manager Services was
4          marked, for identification purposes,
5          as  Deposition Exhibit Number 26.)
6                - - -
7  BY MR. DECHAIRA:
8    Q.    And I'll identify Exhibit 26 as a
9  multipage document, the first page is stamped
10  DTMI00113325.
11        Mr. Orr, is this your employment
12  contract?
13    A.    No.
14    Q.    Is -- what is this document?  Do you
15  know?
16    A.    This document is -- this document is
17  substantially similar to my ultimate employment
18  contract.  My employment contract, which I think
19  is on the Web site, has the names written in.
20        My employment contract, the initial
21  one, I think was executed on the 25th or 26th, and
22  then a subsequent one was executed on the 28th.

Page 472

1    Q.    And the subsequent one sets out what
2  your compensation is from the City?
3    A.    Yes, substantially, the -- my actual
4  contract is substantially similar.  You said "from
5  the City."  The subsequent one -- the com -- the
6  compensation on Page 3.2 is the same --
7    Q.    Okay.
8    A.    -- but it's substantially similar to
9  my contract.  But the actual contract is different
10  from this document (indicating).
11    Q.    Okay.  And then the last sentence on
12  Section 3.2 says, The emergency financial manager
13  shall not receive or accept any compensation from
14  the City except as provided for in this contract.
15        My question is, do you receive any
16  compensation from anybody or any entity for your
17  services as emergency manager other than what's
18  set out in Section 3.2 here or in the analogous
19  3.2 of what -- of your current contract?
20    A.    Not one dime.
21    Q.    Well, you may -- you may receive
22  housing, a pay for your housing -- pay for your

Page 473

1  housing, correct?
2    A.    Yeah; but I think you said as set out
3  in the contract.  Maybe you meant 3.2.  But
4  whatever we've discussed today, the housing, but I
5  don't receive that.  That's -- I receive the
6  housing.  I don't get four -- $4,200 or whatever
7  the rent is; I've never seen it.  I get the
8  compensation as stated in the contract, and that's
9  it.
10    Q.    Right.  But you -- you have -- you
11  live in the housing, correct?
12    A.    I live in the housing, yes.
13    Q.    And you don't pay for it, correct?
14    A.    I don't pay for it --
15    Q.    Okay.
16    A.    -- that's correct.
17        MR. DECHAIRA:  If we -- if I can just
18  have a minute.
19        MR. SHUMAKER:  Sure.
20        (Pause.)
21        THE VIDEOGRAPHER:  Do you want to go
22  off the record?

Page 474

1        MR. DECHAIRA:  Yes, please.
2        THE VIDEOGRAPHER:  Going off the
3  record at 1359.
4              - - -
5        (Whereupon, a discussion was held off
6         the record.)
7              - - -
8        THE VIDEOGRAPHER:  Going back on the
9  record at 1401.
10  BY MR. DECHAIRA:
11    Q.    Mr. Orr, do you know what other law
12  firms pitched for the job of restructuring counsel
13  for the City besides Jones Day?
14    A.    I -- I don't know them all.  I -- I
15  know that there were approximately 20 other law
16  firms, but I don't -- I -- I think Foley was one.
17  I think Weil was one.  I -- I don't recall them
18  all, no.
19    Q.    Okay.  Do you know who else was
20  considered for the EM position besides yourself?
21    A.    I do not.
22    Q.    Okay.

Page 475

1    A.    There was some published reports, but
2  I don't recall early on.  That's all --
3    Q.    Would --
4    A.    -- I -- I don't know with specificity
5  who it was.  I just remember there were some
6  reports.
7    Q.    Okay.  Whether -- whether from any
8  source, whether public or otherwise, do you have
9  any -- as you sit here today, do you remember any
10  names of anyone who was considered as EM other
11  than yourself?
12    A.    The -- the only report that I
13  remember with specificity is that Andy Williams,
14  the -- the -- essentially the counterpart in the
15  D.C. control board was reported had been
16  considered, and he turned it down.  He's a lot
17  smarter than me.
18    Q.    Anyone else?
19    A.    Not that I remember.
20        (Sotto voce discussion.)
21        THE WITNESS:  He has better judgment
22  than me.

Page 476

1  BY MR. DECHAIRA:
2     Q.    Do you know who Bill Brandt is?
3     A.    I've -- I've heard that name before.
4  I -- I think he was -- he's a bankruptcy trustee.
5     Q.    Do you know whether he was considered
6  for any -- for the EM position?
7     A.    I do not.
8     Q.    Do you know whether he was considered
9  for any position as -- any professional position
10  in connection with the restructuring of the City
11  of Detroit?
12    A.    I do not.
13    Q.    Okay.
14          MR. DECHAIRA:  Thank you for your
15  time, Mr. Orr.  I have no further questions.
16          THE WITNESS:  Thank you.
17          MR. ULLMAN:  I have a few follow-ups.
18
19
20
21
22

Page 477

1                    - - -
2          EXAMINATION (CONTINUED)
3      BY COUNSEL FOR RETIREES COMMITTEE
4                    - - -
5  BY MR. ULLMAN:
6     Q.    Hello, Mr. Orr.
7     A.    Hello, Mr. Ullman.
8     Q.    I just have a few questions for you
9  just to clarify the record, because I saw when I
10  was looking at the transcript that as sometimes
11  happens when lawyers do math, I got some numbers
12  transposed.
13    A.    Okay.
14    Q.    So if you could turn back to
15  Exhibit 22.
16    A.    Okay.
17          Um-hum.
18          Okay.
19    Q.    And if you could look at the Bates
20  page that we were looking at before which ends in
21  422.
22    A.    Yes.

Page 478

1     Q.    Okay.  And you see we had talked
2  about the 250 million general fund relative to the
3  650 million total unfunded liability?
4     A.    Yes.
5     Q.    And we had calculated ratio
6  approximately 38-1/2 percent?
7     A.    Right.
8     Q.    And I think previously, when I was
9  asking about this, I had referred to the
10  38.5 percent as being the amount of the unfunded
11  liability allocable to the Department of Water and
12  Sewer.  I think I -- I misspoke in that, because
13  the 250 would be -- the 38.5 percent would be the
14  amount allocable to the general fund, correct?
15    A.    Yes, I -- I think that's accurate,
16  yes, we were talking about the numbers, but --
17    Q.    We had them backwards?
18    A.    -- we had them backwards.
19    Q.    And so if the -- if the math is right
20  and it was about 38.5 percent, then the percentage
21  of the unfunded liability allocable to the
22  Department of Water and Sewer would be

Page 479

1  approximately 61.5 percent?
2     A.    But, remember, I said that you have
3  to be careful with trying to draw a straight-line
4  comparison between the two numbers you may
5  calculate in.  But generally speaking, if we're
6  just talking about the math, that -- that --
7     Q.    Right --
8     A.    -- would be the estimate.
9     Q.    -- I'm right here just talking about
10  the ratio on the -- the number that's referred to
11  as the 650 -- the approximately 650 by the Mayor.
12    A.    Yes.
13    Q.    And then I think the next question I
14  asked you, which I think is what you were alluding
15  to, that if you assumed a larger liability figure,
16  would that ratio continue to hold; and my
17  recollection is, your answer was roughly it would,
18  but you may have to, you know, fine-tune the math.
19    A.    It -- it -- it might roughly hold,
20  but you need to be careful to not draw the
21  conclusion that is -- it's exactly comparable.
22    Q.    Okay.  I understand.

1    A.    Okay.

2    Q.    Okay.

3          And then the other question I have

4    for you -- this is referring to the unfunded

5    pension liability --

6    A.    Um-hum.

7    Q.    -- you're also familiar with the

8    medical benefits for retirees --

9    A.    Yes.

10   Q.    -- the health -- and I think that's

11   sometimes referred to as OPEB?

12   A.    Yes, other [sic] employee benefits.

13   Q.    Okay.  And for the OPEB is -- are --

14   is the -- is the situation similar that some

15   amount of the total OPEB liability that the City

16   faces is allocable to sources other than the

17   general fund?

18   A.    You -- you know, I think it is; but

19   I'm not recalling that mechanism as well as I

20   recall the pension mechanism, but I think it is.

21   Q.    Okay.  And would then some portion of

22   the total OPEB unfunded liability be allocable

1    also to the Department of Water and Sewer to their

2    retirees?

3    A.    It might well be, but I'd need to

4    confirm that.

5    Q.    Okay.  And have you done any analysis

6    of that question?

7    A.    Yes --

8    Q.    Okay.

9    A.    -- well, our contractors have done an

10   analysis of the question.

11   Q.    Okay.  And who specifically has done

12   an analysis of that?

13   A.    Oh, I think our team at -- the entire

14   team: Conway MacKenzie, Ernst & Young,

15   Miller Buckfire.

16   Q.    And do you recall their general

17   conclusions to what percentage of the total

18   unfunded OPEB liability is allocable to the -- A,

19   to the Department of Water of Sewer; or, B, some

20   other fund or entity apart from the general fund?

21   A.    I'm -- I'm not -- I don't recall if

22   it is, and I don't recall the percentage.

1          MR. ULLMAN:  Okay.  Could I ask for

2    any documents relating to that to be produced,

3    Greg?

4          MR. SHUMAKER:  You can certainly put

5    that in writing and look into it.  I'm pretty sure

6    that that has already been produced, but we'll

7    certainly look into it.

8          MR. ULLMAN:  Okay.

9          I don't believe I have anything else,

10   so --

11         THE WITNESS:  Okay.

12         MR. ULLMAN:  -- anything further

13   from -- no.

14         MR. DECHIARA:  I think Jennifer

15   Green.

16         MR. ULLMAN:  Jennifer, are you there?

17         MS. GREEN:  No.

18         MR. ULLMAN:  Okay.

19         MS. GREEN:  My turn?

20         MR. ULLMAN:  Yeah, if you are

21   ready -- if you have questions and you want to go.

22         MS. GREEN:  I literally have a

1    handful.  Very quickly.

2          MR. ULLMAN:  Go -- go ahead.  I'm

3    done.

4          Thank you very much, Mr. Orr.

5          THE WITNESS:  Thank you very much,

6    Mr. Ullman.

7          Hello, Jennifer -- hello, Ms. Green.

8              - - -

9          EXAMINATION (CONTINUED) BY COUNSEL FOR

10   GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT AND

11       THE POLICE AND FIRE RETIREMENT SYSTEM OF THE

12                CITY OF DETROIT

13              - - -

14   BY MS. GREEN:

15   Q.    Hi, how are you?

16   A.    Just fine.

17   Q.    You began acting as emergency manager

18   as of March 26th, and Jones Day was hired to

19   represent the City after you became emergency

20   manager, correct?

21   A.    The relationship was formalized after

22   I became emergency manager, yes.

Page 484

1    Q.    Are you saying there was an informal
2  relationship before then?
3    A.    No.  As -- as I said before today,
4  the -- the question of when the attorney-client
5  privilege attaches isn't necessarily based upon
6  just a formalization of a relationship; it's based
7  upon one of confidence and reposed and -- and a
8  relationship is accepted.  An exact date of that,
9  I don't know sitting here today from a legal
10  perspective.
11    Q.    Can you tell me, from your view as
12  emergency manager, was the firm of Jones Day
13  acting as legal representation -- giving legal
14  representation to the City prior to your being
15  appointed EM on March 26th?
16    A.    I don't -- I don't know.
17    I -- as I testified earlier today, I
18  recused myself from that process, so I don't know
19  when that relationship arose.
20    Q.    Well, let me ask you this:  You
21  worked at Jones Day, and you worked on the pitch
22  materials, correct?

Page 485

1    A.    Yes.
2    Q.    And so you were involved with the
3  process of the pitch and the PowerPoint?
4    A.    Yes; but that was in early -- that
5  was in late January and early February, sometime
6  in February, and I think the e-mails have been
7  discussed in my prior deposition.
8    I -- I pulled myself out of that
9  process, it was in early February prior to the
10  meeting we discussed today.  So I don't know what
11  happened after I recused myself.
12    Q.    I understand that.  I understand
13  that.
14    But what I'm saying is, the pitch
15  that occurred, you were not acting as legal
16  counsel when you did the pitch, right?
17    A.    No, no, we were not --
18    Q.    Okay.
19    A.    -- we were soliciting becoming legal
20  counsel.
21    Q.    Exactly.
22    So at least it was some point after

Page 486

1  the pitch, correct?
2    A.    Yes.
3    Q.    And similar to that, Jones Day was
4  never hired by the State of Michigan at any point
5  for any sort of representation, correct?
6    MR. SHUMAKER:  Object to the form:
7  Foundation.
8    THE WITNESS:  Yeah, I think I
9  testified earlier today -- I said earlier today,
10  I -- I don't know if Jones Day has ever
11  represented the State of Michigan, but -- but with
12  regard to this matter, I don't -- I don't know of
13  Jones Day representing the State of Michigan other
14  than --
15  BY MS. GREEN:
16    Q.    Okay.
17    A.    -- through my office.
18    Q.    So in 2011 and in 2012, and prior to
19  spring of 2013, you have no knowledge of there
20  being any attorney-client relationship between
21  Jones Day and the State of Michigan, correct?
22    A.    I have no knowledge.

Page 487

1    Q.    Okay.
2    And, certainly, I would assume if you
3  were preparing pitch materials in a PowerPoint,
4  where you were pitching Jones Day to the State and
5  to the City, you would've, I assume, included any
6  prior representation of the City and the State,
7  correct?
8    MR. SHUMAKER:  Objection: calls for
9  speculation.
10    THE WITNESS:  Calls for speculation,
11  that's what I was going to say.
12    It -- you know, I -- I don't know.
13  It would be speculative on my part to say that --
14  that it may or may not included it.  We -- I would
15  like to think that we -- before the retention, I
16  would like to think that any law firm would have
17  run a conflicts check.
18    I'm not sure whether or not that
19  would have been included in the pitch material.
20  BY MS. GREEN:
21    Q.    Well, during the pitch, was there any
22  point where any of the Jones Day attorneys that

Page 488

1  you were doing the pitch with said, oh, by the
2  way, we were -- we were once your legal counsel,
3  State of Michigan, or we were once your legal
4  counsel, City of Detroit?
5          MR. SHUMAKER:  Objection to the form.
6          THE WITNESS:  As I said earlier
7  today, the discussion quickly went off the pitch
8  materials in the far-ranging; so I don't recall
9  any -- any statement in that respect.
10 BY MS. GREEN:
11     Q.    Okay.
12           So you have no evidence that there
13 was ever any attorney-client relationship between
14 Jones Day and the State of Michigan; is that
15 correct?
16          MR. SHUMAKER:  Object to the form.
17          THE WITNESS:  All -- all the
18 questions I said earlier today, there -- there
19 could have been.  I'm not aware of any.
20          MS. GREEN:  Okay.  That's the only
21 question I have.
22          THE WITNESS:  Okay.

Page 489

1          MR. SHUMAKER:  Thank you, Jennifer.
2          MR. DECHAIRA:  I have one question.
3                  - - -
4  EXAMINATION (CONTINUED) BY COUNSEL FOR
5          UNITED AUTO WORKERS UNION
6                  - - -
7  BY MR. DECHAIRA:
8      Q.    Mr. Orr, do you know whether any of
9  the liabilities of the Detroit -- Detroit's
10 general pension fund are attributable to the
11 pensions of employees or retirees of the Detroit
12 public library system?
13          MR. SHUMAKER:  Getting pretty far
14 afield here, Counselor.
15          You can answer that one.
16          THE WITNESS:  I -- I -- specifically,
17 library employees?
18          I don't -- I don't know that.  I know
19 that they're attributable to GRS.  Service
20 employees are typically nonuniform.  I don't know
21 if it includes library employees.  It might; it
22 might not.

Page 490

1          MR. DECHAIRA:  Thank you.
2          THE WITNESS:  Um-hum.
3          MR. SHUMAKER:  Thank you, Counsel.
4          THE WITNESS:  Okay.  Thank you.
5          THE VIDEOGRAPHER:  Going off the
6  record at 1412.  This marks the end of
7  Tape Number 2.  This also marks the end of the
8  deposition.
9              (Whereupon, at 2:12 p.m., the
10             deposition was concluded.)
11
12
13
14
15
16
17
18
19
20
21
22

Page 491

1              C E R T I F I C A T E
2  DISTRICT OF COLUMBIA:
3          I, Cindy L. Sebo, a Notary Public within
4  and for the Jurisdiction aforesaid, do hereby
5  certify that the foregoing deposition was taken
6  before me, pursuant to notice, at the time and place
7  indicated; that said deponent was by me duly sworn
8  to tell the truth, the whole truth, and nothing but
9  the truth; that the testimony of said deponent was
10 correctly recorded in machine shorthand by me and
11 thereafter transcribed under my supervision with
12 computer-aided transcription; that the deposition is
13 a true record of the testimony given by the witness;
14 and that I am neither of counsel nor kin to any
15 party in said action, nor interested in the outcome
16 thereof.
17
18
19
20
21          Cindy L. Sebo, RMR, CRR, RPR, CSR,
22             CCR, CLR, RSA, Notary Public

Cindy L. Sebo
District of Columbia, Notary Public
My Commission Expires
April 14, 2015

**Page 492**

```
1   Gregory M. Shumaker, Esquire
    Jones Day
2   51 Louisiana Avenue, Northwest
    Washington, D.C. 20001-2113
3
4            IN RE:  City of Detroit, Michigan
5   Dear Mr. Shumaker:
6     Enclosed please find your copy of the continued
7   deposition of KEVYN D. ORR, along with the original
8   signature page.
9     As agreed, you will be responsible for
10  contacting the witness regarding reading and
11  signing the transcript.
12    Within 30 days of receipt, please forward errata
13  sheet and original signature page signed to
14  opposing counsel.
15    If you would like to change this procedure or if
16  you have any questions, please do not hesitate to
17  call.
18  Thank you.
19  Yours,
20  Cindy L. Sebo, RMR, CRR, CSR, RPR, CCR, CLR, RSA
21  Reporter/Notary
22
```

**Page 493**

```
1                   CAPTION
2            The Continued Deposition of KEVYN D.
3   ORR taken in the matter, on the date, and at the
4   time and place set out on the title page hereof.
5            It was requested that the deposition
6   be taken by the reporter and that same be reduced
7   to typewritten form.
8            It was agreed by and between counsel
9   and the parties that the Deponent will read and
10  sign the transcript of said deposition.
11
12
13
14
15
16
17
18
19
20
21
22
```

**Page 494**

```
1                 CERTIFICATE
2   STATE OF            :
3   COUNTY/CITY OF      :
4        Before me, this day, personally appeared,
5   KEVYN D. ORR, who, being duly sworn, states that the
6   foregoing transcript of his/her Deposition, taken in
7   the matter, on the date, and at the time and place
8   set out on the title page hereof, constitutes a true
9   and accurate transcript of said deposition.
10
11        _____
12             KEVYN D. ORR
13        SUBSCRIBED and SWORN to before me this
14  _____day of_____, 20_____ in the
15  jurisdiction aforesaid.
16
17  _____    _____
18  My Commission Expires        Notary Public
19   *If no changes need to be made on the following
20  two pages, place a check here ____, and return only
21  this signed page.
22            DEPOSITION ERRATA SHEET
```

**Page 495**

```
1   RE:  Esquire Deposition Services, L.L.C.
2   File No.        105824
3   Case Caption:    In Re:  City of Detroit, Michigan
4   Deponent:        KEVYN D. ORR (Volume II)
5   Deposition Date:  Friday, October 4, 2013
6
7   To the Reporter:
8     I have read the entire transcript of my
9   Deposition taken in the captioned matter or the same
10  has been read to me.
11    I request that the following changes be entered
12  upon the record for the reasons indicated.  I have
13  signed my name to the Errata Sheet and the
14  appropriate Certificate and authorize you to attach
15  both to the original transcript.
16  Page No.____Line No.____Change to:_____
17  _____
18  Page No.____Line No.____Change to:_____
19  _____
20  Page No.____Line No.____Change to:_____
21  _____
22
```

Page 496

```
 1    DEPOSITION OF:  KEVYN D. ORR
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Page No._____Line No._____Change to:_____
 5    _____
 6    Page No._____Line No._____Change to:_____
 7    _____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Page No._____Line No._____Change to:_____
11    _____
12    Page No._____Line No._____Change to:_____
13    _____
14    Page No._____Line No._____Change to:_____
15    _____
16    Page No._____Line No._____Change to:_____
17    _____
18    Page No._____Line No._____Change to:_____
19    _____
20
21    SIGNATURE:_____DATE:_____
22                 KEVYN D. ORR
```