## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

### NOTICE OF FILING OF MARKED VERSION OF <u>AMENDED</u> OBJECTION TO THE CITY OF DETROIT'S ELIGIBILITY TO OBTAIN RELIEF UNDER CHAPTER 9 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE THAT**, on the date hereof pursuant to the *First Amended Order Regarding Eligibility Objections Notices of Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b)* [Docket No. 821] (the "**Scheduling Order**"), The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees (collectively, "**AFSCME**") by and through its undersigned counsel, has submitted *The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees' <u>Amended</u> Objection to the City of Detroit's Eligibility to Obtain Relief Under Chapter 9 of the Bankruptcy Code* (the "**AFSCME Amended Objection**"), filed with the Court today. Attached hereto as **Exhibit A** is a marked version of the AFSCME Amended Objection, marked against *The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees' Objection to the City of Detroit's Eligibility to Obtain Relief Under Chapter 9 of the Bankruptcy Code* [Docket No. 505], previously filed with this Court on August 19, 2013.

Dated: October 11, 2013

LOWENSTEIN SANDLER LLP

By: /s/  Sharon L. Levine
    Sharon L. Levine, Esq.
    John K. Sherwood, Esq.
    Philip J. Gross, Esq.
    Keara M. Waldron, Esq.
    65 Livingston Avenue
    Roseland, New Jersey 07068
    (973) 597-2500 (Telephone)
    (973) 597-6247 (Facsimile)
    slevine@lowenstein.com
    jsherwood@lowenstein.com
    pgross@lowenstein.com

    -and-

    Herbert A. Sanders, Esq.
    THE SANDERS LAW FIRM PC
    615 Griswold St., Suite 913
    Detroit, MI 48226
    (313) 962-0099 (Telephone)
    (313) 962-0044 (Facsimile)
    hsanders@miafscme.org

    -and-

    Richard G. Mack, Jr., Esq.
    Miller Cohen, P.L.C.
    600 West Lafayette Boulevard
    4th Floor
    Detroit, MI 48226-3191

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub-Chapter 98, City of Detroit Retirees*

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

**THE MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO AND SUB-CHAPTER 98, CITY OF DETROIT RETIREES' AMENDED OBJECTION TO THE CITY OF DETROIT'S ELIGIBILITY TO OBTAIN RELIEF UNDER CHAPTER 9 OF THE BANKRUPTCY CODE**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ iv

PRELIMINARY STATEMENT ................................................................................................ 2

RELEVANT BACKGROUND ................................................................................................. 9

      A.    The Webster Litigation And The Governor's Unconditional
           Authorization ......................................................................................... 10

           (i)    The Governor (And Other State Officials) And City
                   Intended Through The Chapter 9 Filing To Impair And/Or
                   Terminate Pension Obligations, And The Governor Was
                   Aware Of This Prior To His Authorizing The Chapter 9
                   Filing ......................................................................................... 14

      B.    The City's Pre-petition Machinations And Subsequent Meetings
           (But Not Negotiations) With Creditors Such As AFSCME .................. 16

           (i)    The City's Bankruptcy Was Orchestrated Based On The
                   Advice Of The City's Lead Bankruptcy Counsel And
                   Discussed Before The EM Was Even Hired ............................. 16

           (ii)    No Good Faith Negotiations Took Place Following The
                   Appointment Of The EM With Parties Such As AFSCME
                   Prior To The City's Chapter 9 Filing ...................................... 19

           (iii)    The City's Bad Faith Refusal To Negotiate With Unions
                   Such As AFSCME Has Continued Following The City's
                   Bankruptcy Filing .................................................................. 23

           (iv)    The City Has Previously Negotiated Labor Concessions
                   With Unions That Modified Both Active And Retiree
                   Benefits .................................................................................. 24

      C.    The City Has Failed to Establish It Is Insolvent, And The City's
           Chapter 9 Case Was Not Commenced Due to Any Imminent
           Financial Emergency, Rather To Avoid The Webster Litigation
           (And Other State Court Proceedings) ................................................... 25

ARGUMENT .......................................................................................................................... 30

I.    THE CITY'S PETITION VIOLATES THE UNITED STATES
    CONSTITUTION ........................................................................................................ 30

A.  Chapter 9 Violates The Federal Structure Of Government .................................30

    (i)  A Federal Municipal Bankruptcy Statute Is No Longer Necessary To Accomplish An Adjustment Of Municipal Debts.......................................................................32

    (ii)  The Supreme Court's Development Of Constitutional Federalism Doctrine Has Effectively Overruled Bekins ..........................33

    (iii)  AFSCME Does Not Seek To Relitigate Bekins And The City's Reply Brief Arguments Regarding The Constitutionality Of Chapter 9 Ignore And Misapply the Relevant Authority Discussed Above ......................43

B.  AFSCME's Active And Retired Members Have Individual Standing To Assert That Chapter 9 Violates Their Individual Rights To A Federal System Of Government .......................................51

C.  This Court Lacks The Authority Or Jurisdiction To Decide Whether Chapter 9 Violates The United States Constitution Or Whether Pa 436 Violates The Michigan Constitution...........................53

II.  THE CITY IS NOT ELIGIBLE TO FILE FOR CHAPTER 9 PROTECTION UNDER SECTION 109(C) OF THE BANKRUPTCY CODE .............................................................................................................56

A.  The City Is Not Authorized By Michigan State Law To Be A Debtor Under Chapter 9 .......................................................................59

    (i)  Governor Snyder's Authorization Of The City's Petition Under Section 18 Of PA 436 Violated Article IX, Section 24 Of The Michigan State Constitution..............................60

    (ii)  PA 436 Violates The Strong Home Rule Provisions Of The Michigan Constitution...............................................76

    (iii)  Neither The City Nor State Pleadings Answer How Detroit's Voters Could Have Constitutionally Lost Their Right To Local Self-Government Entirely, And The Loss Of That Right Invalidates Actions By The Emergency Manager Inextricably Intertwined With The Chapter 9 Petition And The Case Itself....................................80

    (iv)  Despite Arguments To The Contrary By The State And City, The EM Is Not A State Agent And Therefore His Use of Unlimited Power To Pass Local Acts Which Led To This Bankruptcy Violated The State Constitution ...............86

     (v)     The City And State Cannot Evade The Non-Delegation Doctrine Because The EM Acts With The State Legislature's Authority In Bankruptcy Without Any Standards Or Judicial Review ....................................................... 90

B.     The City Failed To Participate In Any Good Faith Negotiations With Creditors Prior To Filing For Bankruptcy As Required For Eligibility Under Chapter 9 .................................................................. 92

     (i)     The City Failed To Negotiate With Creditors Such As AFSCME .............................................................................. 93

     (ii)     Even Assuming That The City Engaged In Negotiations, Such Negotiations Did Not Relate To A Plan That Is In The Best Interests Of Creditors As Required By Section 109(c)(5)(B) ....................................................................... 97

     (iii)     Negotiations With Certain Categories Of Creditors Such As AFSCME Were Not Impracticable ........................... 101

C.     The City's Petition Should Be Dismissed Under Section 921(c) As Filed In Bad Faith ....................................................................... 104

D.     The City Has Failed To Meet Its Burden Of Proving Its Insolvency, And Only Does So Based On Assumptions Used By The City To Show Its Insolvency ..................................................... 108

CONCLUSION .................................................................................................... 114

# TABLE OF AUTHORITIES

**PAGES**

## CASES

*Advisory Opinion re Constitutionality of*
 *1972 PA 258,* 389 Mich. 659 (1973) ...................................................59

*Advisory Opinion on Constitutionality of 1975 PA 301,* 400 Mich. 270, 254 N.W. 2d
 528 (1977) ...........................................................................................84

*AFT Michigan v. State,*
 297 Mich. App. 595, 825 N.W.2d 595 (2012) .................................31, 71

*AFT Michigan v. State,*
 297 Mich. App. 597, 825 N.W.2d 595 (2012) ....................................60

*In re Alabama State Fair Authority,*
 232 B.R. 252 (N.D. Ala. 1999)...........................................................36

*Alden v. Maine,*
 527 U.S. 706 (1999) .......................................................................33, 38

*APTE v. Detroit,*
 154 Mich. App. 440, 398 N.W.2d 436 (1986) ....................................59

*Ashton v. Cameron County Water Improvement Dist. No. 1,*
 298 U.S. 513 (1936) ...................................................................passim

*Attorney General v. Lacy,*
 180 Mich. 329, 146 N.W. 871 (1914) ................................................85

*Avery v. Midland County, Texas,*
 390 U.S. 474 (1970) ..........................................................................84

*BCBSM v. Governor,*
 367 NW 2d 1 (Mich. 1985) ................................................................87

*BCBSM v. Governor,*
 422 Mich. 1, 367 N.W.2d 1 (1985) ...............................................passim

*Bd. of Trs. v. Cary,*
 373 So. 2d 841 (Ala. 1979) ................................................................74

*Bivens v. Grand Rapids,*
 443 Mich. 391 (1993) .........................................................................75

*Blank v. Dep't of Corrections,*
   462 Mich. 103, 611 N.W.2d 530 (2000) ............................................................. 85

*Bond v. United States,*
   131 S. Ct. 2355 (2011) ........................................................................... 38, 50, 51

*Brandt v. Samuel, Son & Co., Ltd. (In re Longview Aluminum, L.L.C.),*
   Case No. 03B12184, 2005 Bankr. LEXIS 1312 (Bankr. N.D. Ill. July 14, 2005) ............... 108

*Brouwer v. Bronkema,*
   377 Mich. 616, 141 N.W.2d 98 (1966) ................................................. 75, 76, 77, 82

*Buckley v. Valeo,*
   424 U.S. 1 (1976) ................................................................................................ 40

*Butner v. United States,*
   440 U.S. 48 (1979) .............................................................................................. 73

*In re City of Bridgeport,*
   129 B.R. 332 (Bankr. D. Conn. 1991) ............................................... 106, 107, 110

*In re City of Harrisburg, PA,*
   465 B.R. 744 (Bankr. M.D. Pa. 2011) ............................................................... 58

*City of New York v. New York, N. H. & H. R. Co.,*
   344 U.S. 293 (1953) ........................................................................................... 46

*In re City of Stockton,*
   475 B.R. 720 (Bankr. E.D. Cal. 2012) ................................................... 55, 68, 73

*In re City of Stockton,*
   493 B.R. 772 (Bankr. E.D. Cal. 2013) ............................................. 68, 74, 103, 104

*In re City of Stockton, California,*
   Case No. 12-32118-C-9 (Bankr. E.D. Cal. Feb. 5, 2012) ..................................... 88

*City of Taylor v. Detroit Edison Co.,*
   475 Mich. 109 (2006) ......................................................................................... 81

*In re City of Vallejo,*
   408 B.R. 280 (B.A.P. 9th Cir. 2009) ........................................................... passim

*Clinton v. New York,*
   524 U.S. 417 (1998) ...................................................................................... 61, 65

*In re Cottonwood Water and Sanitation Dist.,*
   138 B.R. 973 (Bankr. D. Colo. 1992) ......................................................... passim

*In re County of Orange,*
 183 B.R. 594 (Bankr. C.D. Cal. 1995) ............................................................55, 103

*In re County of Orange,*
 191 B.R. 1005 (Bankr. C.D. Cal. 1996) .......................................................................37

*Davis v. Emergency Manager for Detroit Public Schools,*
 491 Mich. 899 (Young, C.J., concurring).................................................................83

*Detroit City Council v. Detroit Mayor,*
 238 Mich. App. 442 (2009) ........................................................................................81

*Detroit Police Officers Ass'n v. Detroit,*
 391 Mich. 44, 214 N.W.2d 803 (1974) ....................................................................59

*Donohue v. Mangano,*
 886 F. Supp. 2d 126 (E.D.N.Y. 2012) ................................................................66, 67

*Dunn Const. Co. v. State Board of Adjustment,*
 234 Ala. 372 (1937)....................................................................................................74

*In re Ellicott School Building Authority,*
 150 B.R. 261, 266 (Bankr. D. Colo. 1992)................................................93, 94, 99, 101

*Faitoute Iron & Steel Co. v. City of Asbury Park,*
 316 U.S. 502 (1942) ..........................................................................................passim

*Fun 'N Sun RV, Inc. v. Michigan (In re Certified Question),*
 527 N.W. 2d 468 (Mich. 1994) .................................................................................72

*In re Global Indus. Technologies, Inc.,*
 645 F.3d 201 (3d Cir. 2011) (en banc) .....................................................................65

*Granfinanciera, S.A. v. Nordberg,*
 492 (U.S. 33) (1989).............................................................................................53, 54

*Gregory v. Ashcroft,*
 501 U.S. 452 .................................................................................................................35

*In re Hamilton Creek Metro. Dist.,*
 143 F.3d 1381 (10th Cir. 1998) ...............................................................................107

*Hanover Nat'l Bank v. Moyses,*
 186 U.S. 181 (1902) .....................................................................................................39

*INS v. Chadha,*
 462 U.S. 919 (1983) .....................................................................................................40

*Klein v. Tabatchnick,*
    610 F.2d 1043 (2d Cir. 1979) ........................................................................108

*Kosa v. State Treasurer,*
    292 N.W. 2d 452 (Mich. 1980) ......................................................................71

*Lansing School Educ. Ass'n v Lansing Bd. of Educ.,*
    487 Mich. 349.................................................................................................63

*Lawson v. Ford Motor Co. (In re Roblin Indus.),*
    78 F.3d 30 (2d Cir. 1996) ..............................................................................108

*Le Roy v. Hurlbut,*
    24 Mich. 44 (1871) ...............................................................................passim

*In re Little Creek Dev. Co.,*
    779 F.2d 1068 (5th Cir. 1986) .......................................................................104

*Manning v. City of Hazel Park,*
    202 Mich. App 685 ........................................................................................79

*In re McCurtain Municipal Authority,*
    2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4, 2007).........................56, 103, 106

*In re Mendocino Coast Recreation and Park District,*
    No. 12-cv-02591-JST, 2013 U.S. Dist. LEXIS 139697 (N.D. Cal. Sept. 27, 2013) ...............98

*In re Mount Carbon Metropolitan Dist.,*
    242 B.R. 18 (Bankr. D. Colo. 1999) ..............................................................97

*Nat. Fed'n of Indep. Business v. Sibelius,*
    132 S. Ct. 2566 (2012) (Roberts, C.J.) ............................................................35

*New York v. United States,*
    505 U.S. 144 (1992) ...............................................................................passim

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,*
    458 U.S. 50 (1982) ........................................................................................53

*Opinion of the Justices,* 598 So.2d 1362, 1365 (Ala. 1992).....................................74

*In re Pierce County Housing Authority,*
    414 B.R. 702 (Bankr. W.D. Wash. 2009).................................................99, 104

*Printz v. United States,*
    521 U.S.898, 531 n. 15 (1997) ................................................................passim

*Railway Labor Executives Ass'n v. Gibbons,*
    455 U.S. 457 (1982) .................................................................................49, 50

*Reiter v. Sonotone Corp.,*
442 U.S. 330 (1979) ..................................................................................70

*In re Sanitary & Improvement District, No. 7,*
98 B.R. 970 (Bankr. D. Neb. 1989) ..............................................67, 69, 73, 97

*Seitz v. Probate Judges Retirement System,*
189 Mich. App. 445, 474 N.W. 2d 125 (1991) ..........................................59, 63, 70

*South Dakota v. Dole,*
483 U.S. 203 (1987) (Rehnquist, C.J.) ......................................................40

*Stern v. Marshall,*
131 S. Ct. 2594, 2609 (2011) ..............................................................passim

*In re Sullivan County Regional Refuse Disposal Dist.,*
165 B.R. 60 (Bankr. D.N.H. 1994) ..........................................................passim

*Sweet v. Wilkinson,*
252 Ala. 343 (1949) ....................................................................................74

*Taxpayers of Michigan Against Casinos v. State,*
478 Mich. 99 (2007) ................................................................................61, 63

*In re Town of Westlake, Tex.,*
211 B.R. 860 (Bankr. N.D. Tex. 1997) ......................................91, 107, 109, 110

*U. S. Term Limits, Inc. v. Thornton,*
514 U. S. 779 (1995) ..................................................................................34

*Uecker & Assocs. v. Tenet Healthsystem Hosps., Inc. (In re West Contra Costa
Healthcare Dist.),*
No. 06-41774 T, 2010 Bankr. LEXIS 994, at *8 (Bankr. N.D. Cal. Mar. 26, 2010) ...........107

*United States Trust Co. of N.Y. v. New Jersey,*
431 U.S. 1 (1977) ................................................................................32, 44, 46

*United States v. Bekins,*
304 U.S. 27 (1938) ..................................................................................passim

*United States v. Lopez,*
514 U.S. 549 (1995) ..........................................................................34, 35, 51

*United States v. Morrison,*
529 U.S. 598 (2000) ....................................................................................34

*Utica State Sav. Bank v. Village of Oak Park,*
279 Mich. 568, 273 N.W. 271 (1937) ........................................................78

*In re Valley Health Sys.,*
    383 B.R. 156 (Bankr. C.D. Cal. 2008) .................................................... 55, 99, 100

*In re Villages at Castle Rock Metro. Dist. No. 4,*
    145 B.R. 76 (Bankr. D. Colo. 1990) ........................................................... 91, 103

*Webster v. State of Mich.,*
    No. 13-734-CZ (Ingham County Cir. Ct. July 3, 2013) ............................... 11

**STATUTES**

11 U.S.C. § 101(32)(C) .................................................................................... 107

11 U.S.C. § 105 .................................................................................................. 53

11 U.S.C. § 109 ............................................................................................. passim

11 U.S.C. § 362 ............................................................................................. 88, 92

11 U.S.C. § 365 ................................................................................................... 7

11 U.S.C. § 503 ................................................................................................. 37

11 U.S.C. § 506 ................................................................................................. 37

11 U.S.C. § 507 ................................................................................................. 37

11 U.S.C. § 510 ................................................................................................. 97

11 U.S.C. § 544(b) ............................................................................................. 97

11 U.S.C. § 548(a) ............................................................................................. 97

11 U.S.C. § 901(a) ........................................................................................ 37, 79

11 U.S.C. § 902(a) ............................................................................................. 88

11 U.S.C. § 903 ........................................................................................... passim

11 U.S.C. § 904 ................................................................................................. 89

11 U.S.C. § 921(c) ....................................................................................... passim

11 U.S.C. § 926(b) ............................................................................................. 36

11 U.S.C. § 928(b) ............................................................................................. 97

11 U.S.C. § 943 ........................................................................................... passim

11 U.S.C. § 941 ...................................................................................................92, 96, 99

28 U.S.C. § 2403(a) & (b) .................................................................................................1

MCL 141.1501 et seq. ......................................................................................................83

MCL 141.1549 ...........................................................................................................77, 86

MCL 141.1550(1) ............................................................................................................77

MCL 141.1551(1)(d) .......................................................................................................61

MCL 141.1552 ...........................................................................................................passim

MCL 141.1553 .................................................................................................................61

MCL 141.1558 .............................................................................................39, 58, 77, 88

MCL § 141.1549 .....................................................................................................83, 86, 90

MCL § 141.1552(1)(d) .....................................................................................................87

MCL § 141.1558 ..........................................................................................................50, 89, 90

Second, Michigan Public Act 436 of 2012, the Local Financial Stability and Choice
    Act, MCL § 141.1541, *et seq.* ....................................................................................3

**RULES**

Rule 408..........................................................................................................................21

Rule 9019..........................................................................................................................89

**OTHER AUTHORITIES**

Darryl B. Simko, *Emerging Issue in State Constitutional Law: Of Public Pensions,
    State Constitutional Contract Protection* ....................................................................73

David J. Barron, *The Promise of Cooley's City: Traces of Local Constitutionalism* ...................76

Detroit Charter, § 1-102 .............................................................................................77, 81

Section 7-5-203 of the Detroit City Charter .................................................................88

Detroit Free Press ........................................................................................................9, 59

*Detroit's Current Pension Assumptions Fall Within Standards: Morningstar, available
    at* http://www.mandatepipeline.com/news/detroits-current-pension-assumptions-
    fall-within-standards-morningstar-242817-1.html ....................................................28

Janie Anderson Castle, *The People's Mayor for London?* ............................................................... 39

Kate Long, *Who is representing Detroit?*
http://blogs.reuters.com/muniland/2013/07/25/who-is-representing-detroit/ ........................ 18

Michael W. McConnell & Randal C. Picker, *When Cities Go Broke: A Conceptual
Introduction to Municipal Bankruptcy*, 60 U. Chi. L. Rev. 425, 462 (1993) .......................... 44

*State Signs Deal To Lease Belle Isle, available at*
http://detroit.cbslocal.com/2013/10/01/reports-state-signs-deal-to-lease-belle-isle/ ............. 28

The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees (the AFSCME retiree chapter for City of Detroit retirees) (collectively, "**AFSCME**") -- the representative of the interests of between at least forty and fifty percent (40-50%) of the about 11,943 retired City of Detroit (the "**City**" or "**Debtor**") non-uniformed employees (the "**Retired AFSCME Employees**"), and about 2,523 active City employees (the "**Active AFSCME Employees**", or about seventy percent (70%) of the active non-uniformed union-represented employees, and together with the Retired AFSCME Employees, collectively, the "**AFSCME Detroit Employees**") -- through its counsel ~~submits this~~ and in accordance with the Court's *First Amended Order Regarding Eligibility Objections Notices of Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b)* [Docket No. 821] (the "**Scheduling Order**") submits this **amended**[1] objection (the "**Objection**") to the City's eligibility for relief under chapter 9 of the Bankruptcy Code and opposition to the City's (A) *Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [Docket No. 10] (the "**Statement of Eligibility**"); (B) *Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [Docket No. 14] (the "**Eligibility Brief**"); ~~and~~ (C) declarations of Kevyn D. Orr [Docket No. 11] (the "**Orr Declaration**"), Gaurav Malhotra [Docket No. 12] (the "**Malhotra Declaration**") and Charles M. Moore [Docket No. 13] (the "**Moore Declaration**");

---

[1] Pursuant to Section VII. of the Scheduling Order, "[b]ased on evidence obtained during discovery, any objecting party may file an amended objection by October 11, 2013. Any such amended objection shall supersede the party's original objection." Given that this objection supersedes AFSCME's original eligibility brief (*The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub Chapter 98, City of Detroit Retirees' Objection to the City Of Detroit's Eligibility to Obtain Relief Under Chapter 9 of the Bankruptcy Code* [Docket No. 505] (the "**Original AFSCME Objection**")), AFSCME has included all legal and factual arguments asserted in the Original AFSCME Objection in this Objection, and further has supplemented and added additional arguments based, *inter alia,* on developments in the discovery process. Given that discovery remains ongoing, and AFSCME continues to learn new facts and information daily, AFSCME reserves the right to assert additional factual and legal arguments at trial.

(D) *City of Detroit's Consolidated Reply to Objections to the Entry of an Order for Relief* (the "**Debtor's Reply**") [Docket No. 765]; and (E) *The State of Michigan's Response to Eligibility Objections Raising Only Legal Issues* [Docket No. 756] (the "**State's Response**"). In support of its Objection, AFSCME (a) relies on the previously submitted *Declaration of Steven Kreisberg* [Docket No. 509] (the "**Kreisberg Declaration**"); (b) submits the (i) *Supplemental Declaration of Steven Kreisberg* (the "**Supp. Kreisberg Declaration**") and (b, and (ii) *Declaration of Michael Artz* (the "**Artz Declaration**"); and (c) respectfully states as follows:

<u>**PRELIMINARY STATEMENT**</u>

> "The public can comment [on the City's proposed financial restructuring plan], but it is under the statute, it is my plan and it's within my discretion and obligation to do it. **This isn't a plebiscite, we are not, like, negotiating the terms of the plan.** It's what I'm obligated to do." --Kevyn D. Orr, May 12, 2013[2]

1. The City's petition for relief under chapter 9 of the Bankruptcy Code should be dismissed. First, chapter 9 of the Bankruptcy Code violates federalism under the United States Constitution through an unholy alliance permitting federal encroachment on the states' governance rights over fiscal affairs in exchange for an unlawful extension of state power powers in excess of those the state would otherwise possess under the law and which denies Michigan citizens their constitutional right to make the rules for their own bankruptcy. Second, Michigan Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, *et seq.* ("**PA 436**"), purportedly authorizing the Emergency Manager to file for chapter 9 protection runs afoul of the Michigan Constitution as applied in this chapter 9 case by not explicitly prohibiting the diminishment or impairment of vested pension rights in bankruptcy, which rights are prescribed in the Michigan Constitution, and further offends the

---

[2] Kevyn D. Orr Interview to Detroit WWJ Newsradio 950/AP, *Detroit EM Releases Financial Plan; City Exceeding Budget By $100M Annually,* May 12, 2013,2013, available at http://detroit.cbslocal.com/2013/05/12/kevin-orr-releases-financial-plan-for-city-of-detroit/.

Constitutional rights of individual Detroit citizens to local self-governance. Third, the City fails to establish that it engaged in good faith negotiations with the City's creditors or that these negotiations were impracticable under section 109(c) of the Bankruptcy Code, and indeed the entire chapter 9 petition was filed in bad faith. Fourth, the City does not qualify for chapter 9 relief because it failed to establish that it is insolvent. Further, the Bankruptcy Court lacks authority or jurisdiction over matters related to the federal constitutionality of chapter 9 of the Bankruptcy Code or the state constitutionality of PA 436.

2. The City, led by its unelected, politically appointed Emergency Manager, Kevyn D. Orr ("**Orr**" or the "**EM**"), hastily commenced this unconstitutional, unlawfully authorized chapter 9 proceeding seeking the haven of bankruptcy to illegally attempt to slash pension and other post-employment benefit obligations and cram such reductions down the throats of current and former City employees such as the AFSCME Detroit Employees. These proceedings were commenced without **any** good faith negotiations with the City's retirees or unions such as AFSCME, and the chapter 9 filing was a *fait accompli* long prior to the appointment of Orr as the City's EM – in fact, at a time when Orr was still a partner at the City's lead counsel's law firm.

3. While AFSCME expects that the City's witnesses will testify that chapter 9 bankruptcy was always the last option and the City preferred an out-of-court settlement, those are nothing more than talking points. In reality, the City's strategy of holding "check the box" meetings with creditors pre-petition at which the City purposefully refused to bargain in good faith was for the sole purpose of "making its record". Indeed, the City's eventual strategy (under the leadership of Orr) was first suggested by the City's lead bankruptcy counsel (the "**Law Firm**") beginning with a "pitch" presentation made by the Law Firm to the City on

January 29, 2013 (the "**Pitch Presentation**", a copy of which is attached to the Supp. Kreisberg Declaration, Exhibit B) in the presence of State of Michigan (the "**State**" or "**Michigan**") officials who wanted to steer the City towards chapter 9.  As part its presentation, the Law Firm provided a roadmap to chapter 9.  The Pitch Presentation provided in part:

- an out-of-court restructuring was "[e]xtremely difficult to achieve in practice" (Pitch Presentation, p. 13);

-  "Ultimately, the Emergency Manager could be used as political cover for difficult restructuring decisions."  (Pitch Presentation, p. 16);

- "Bolster Eligibility for – and Success in – Chapter 9 By Establishing Good-Faith Record of Seeking Creditor Consensus" (Pitch Presentation, p. 17);

- "[a] good-faith effort to pursue an out of court restructuring plan will establish a clear record of seeking creditor consensus before seeking chapter 9 relief.  This will deflect any eligibility complaints based on alleged failure to negotiate or bad faith." (Pitch Presentation, p. 18);

- "Include All Constituents in Planning and Negotiations" (Pitch Presentation, p. 22);

- "Establish a Strong Record of Inclusiveness and Consideration of All Options" (Pitch Presentation, p. 22);

- "Input should be obtained from all sources, documented and treated seriously, even if proposals appear unreaslistic.  Good listening skills are helpful."  (Pitch Presentation, p. 23);

- "Establish a strong record (i.e., for future litigation) of (i) inclusiveness with respect to all constituencies and (ii) consideration of all options and proposals received."  (Pitch Presentation, p. 23);

- "A record should be established that all avenues have been explored . . . to support the City's case for debt reduction if a Chapter 9 ultimately is commenced." (Pitch Presentation, p. 28);

- "unique and creative structures for asset monetization can and should be explored. . .  Regional initiatives also could be explored (joint redevelopment, sharing of services, joint purchasing arrangements).  Note: Asset monetization outside of bankruptcy may implicate eligibility requirement that City be insolvent (e.g., measured by short-term cash)." (Pitch Presentation, p. 17); and

- "OPEB [retiree health benefits] has less legal protections under state law than pensions, providing a greater ability to cut and equitably restructure" and "[i]f needed, chapter 9 could be used as a means to further cut back or compromise 'accrued financial benefits' [*i.e.* accrued pension obligations] otherwise protected under the Michigan Constitution." (Pitch Presentation, pp. 39; 41).

4. Apparently, as discussed further below, the State officials at the January 29, 2013 pitch (including the Governor's Transformation Manager, Richard Baird ("**Baird**")) liked what they heard and decided that the Law Firm would be their firm of choice, with Orr and his extensive bankruptcy experience being utilized as the EM to complement the Law Firm's legal ability to move the City swiftly into chapter 9. Thus, the day after the Pitch Presentation was given, on January 30, 2013, Baird reached out to The Law Firm about the potential of hiring Orr as the EM, and this led to discussions between the Governor, Baird, Orr, other State officials and the Law Firm, and the ultimate hiring of both Orr and the Law Firm to guide the City into chapter 9.

5. 3.This is all against the backdrop of:

- the The average non-uniformed employee pension currently at an average of averages slightly less than $18,000 per year (according to a June 30, 2012 General Retirement System of the City of Detroit pension valuation report); and

- The AFSCME Retirees and AFSCME Active Employees look to their government pension and City-provided medical benefits for retiree benefits. Unlike private sector employees and retirees with defined benefit pension benefits, whose pension benefits are protected even in bankruptcy by government insurance through the Pension Benefit Guaranty Corporation, or those with multiemployer pension benefits, where even if one employer withdraws or goes bankrupt the vested pension benefits to the retirees continue unchanged by that withdrawal, the AFSCME Retirees and AFSCME Active Employees' pensions are not backstopped. **Therefore, if this Court allows the chapter 9 proceeding to go forward with the ultimate result of the pension or other retiree benefits being lost, they are lost without a safety net.**

6. 4.In light of recent Supreme Court precedent, chapter 9 of the Bankruptcy Code violates the United States Constitution and should be struck down by an Article III Court with authority and jurisdiction to make this crucial Constitutional law determination. Under *Stern v.*

*Marshall*, 131 S. Ct. 2594 (2011), such a decision is plainly outside the realm of authority properly delegated to an Article I tribunal like this Court.

7. ~~5.~~However, to the extent this Court disagrees and determines that it has jurisdiction to uphold the Constitutionality of chapter 9 generally, this Court should find that the City is not eligible for relief under chapter 9 pursuant to sections 109(c) and 921(c) of the Bankruptcy Code for the following reasons.

8. ~~6.~~*First*, under section 109(c)(2) of the Bankruptcy Code, **as already determined by at least one state court ruling** issued against ~~the~~ Michigan Governor Richard D. Snyder (the "**Governor**") prior to entry of the Stay Extension Order [Docket No 166], the purported authorization by the Governor permitting the chapter 9 filing by the EM was and remains an overt act by the Governor and others in violation of the Michigan Constitution, as the filing seeks to impair or diminish the AFSCME Detroit Employees' pension benefits. ~~Additionally~~Indeed, the very law purporting to allow the EM to unconditionally file for chapter 9 protection, PA 436, violates several provisions of the Michigan Constitution as applied in this chapter 9 case, including (i) Article IX, Section 24 because PA 436 does not explicitly prohibit the diminishment or impairment of vested pension rights in bankruptcy, which is the goal sought in this chapter 9 proceeding; (ii) Article VI, Section 29 because PA 436 delegates power to the EM in excess of that possessed by the legislature; and (iii) Article VII because PA 436 strips power from the electors of each city and village and runs ramshackle over the principles of local self-government firmly embedded in Michigan law.

9. ~~7.~~*Second*, despite factual arguments to the contrary in the City's Eligibility Brief and Debtor's Reply, the City has failed to establish that it has negotiated in good faith or that such negotiations were impracticable as required under section 109(c)(5) of the Bankruptcy

Code.  In fact, AFSCME submits ~~that based on facts AFSCME is aware of now (discussed herein and in the Kreisberg Declaration) and further facts AFSCME expects to develop through discovery, the evidence shows~~ (and AFSCME expects ~~will~~ to show further ~~show~~ at trial) that the City conducted **no good faith negotiations** with significant unions such as AFSCME prior to the filing.  Rather, the City commenced this proceeding in **bad faith** and in haste in violation of section 921(c) of the Bankruptcy Code, with the sole goal of preventing a "bad" state court ruling (i) upholding the Michigan Constitution and (ii) preventing the City from taking the very inappropriate and unconstitutional journey it now seeks to embark on.

10. ~~8.~~ If the Court ultimately were to find that the City satisfied the eligibility requirements, the EM will seek (i) to unconstitutionally and illegally abridge vested pension and other AFSCME Detroit Employee benefits; (ii) to proceed under section 365 of the Bankruptcy Code and illegally seek to reject vested pension and other retiree benefits; and/or ultimately (iii) to propose a chapter 9 plan of adjustment that reduces vested pension and other benefits but that cannot possibly be better for creditors like AFSCME Detroit Employees than the alternative of staying out of chapter 9 where pensions are guaranteed protection under the state constitution - a clear breach of the chapter 9 "best interests test."  Such an outcome should not be countenanced.

~~9.Finally, AFSCME reserves the right to argue, following additional discovery, that the City is solvent and does not qualify for chapter 9 relief pursuant to section 109(c)(3) of the Bankruptcy Code, particularly when certain un-monetized assets and other financial considerations which may be revealed through discovery are taken into account.  The City's assertions in the Eligibility Brief that it is insolvent must be highly and independently~~

~~scrutinized and challenged, including through the efforts of the Retiree Committee, once appointed, and its retained professionals.~~

11.     Finally, AFSCME submits that the City has failed to satisfy its high burden of proving – through expert evidence or otherwise – insolvency pursuant to section 109(c)(3) of the Bankruptcy Code.  In reality, the evidence reveals (and AFSCME expects to further demonstrate at trial) that the City may well be solvent, particularly when (i) discounting the City's unproven assertions regarding the unfunded amount of the City's pension and other retiree benefits actuarial underfunding; (ii) taking into account un-monetized assets that the City purposefully ignored (as suggested in the Pitch Presentation given by the City's lead counsel) to make the City appear insolvent; (iii) considering the possibility of funding sources not included in the City's financial projections, which projections lack any expert evidence as to their reliability and indeed do not have any reliable evidentiary basis; and (iv) considering the significant swap deal reached and finalized by the City immediately prior to the chapter 9 filing which itself helped significantly with cash flow issues.  The City filed for chapter 9 protection on July 18, 2013 not because of any true budgetary insolvency or inability to pay its debts as they came due, rather because the City (i) disliked the direction in which the various pre-petition state court litigations (including the Webster Litigation, as defined below) were proceeding and (ii) worried that failure to file when it did – despite having failed to negotiate in good faith – would potentially limit or forestall the City's clear goal, as guided by the Law Firm, the EM, and other high ranking State officials, of attacking the City's pension obligations in chapter 9.  It is telling (and should be shocking to all citizens of Detroit and Michigan) that despite spending millions of dollars of taxpayer funds on the City's chapter 9 cases to hire a

multitude of bankruptcy and restructuring professionals, the City fails to offer even one person to stand up as an *expert* and testify to the City's insolvency.

12.     In addition the City, by proceeding on its current course, has ignored some of the advice provided by its own counsel that that the "City should characterize its residents as 'customers,' a class of constituents that ordinarily is accorded significant benefits in business reorganizations" and that "[a] viable restructuring for a strong and vibrant Detroit must treat its citizens with respect, just as a successful business in the private sector treats its customers." Pitch Presentation, p. 27.  Based on all of the reasons set forth herein, this Court (to the extent it finds that it has authority and/or jurisdiction) should deny the Debtor's requested eligibility for chapter 9.  By doing so, the ordinary residents and citizens of Detroit (including the many dedicated AFSCME Detroit Employees) will regain their voices in government and be protected from the mistaken path of the EM.

### RELEVANT BACKGROUND

13.     ~~10.~~Orr currently serves as the EM of the City under PA 436.

14.     ~~11.~~The Governor appointed Orr as EM for the City on March 14, 2013, effective as of March 25, 2013.  On March 28, 2013, upon the purported effectiveness of PA 436, Orr became, and continues to act as, EM for the City under PA 436.

15.     ~~12.~~On June 14, 2013, Orr issued a "Proposal for Creditors" which expressly stated that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons."  The same day, Orr publicly threatened, in an interview with the Detroit Free Press Editorial Board,[23] that vested pension benefits would not be protected in a chapter 9 proceeding authorized by the Governor pursuant to PA 436, and that any state laws

---

[23] *See Q&A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, Detroit Free Press (June 16, 2013),  *available   at*   http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-detroit-emergency-manager-creditors-fiscal-crisis.

protecting vested pension benefits would "not . . . protect" retirees in bankruptcy court. The EM stated as follows in the interview:

> Q     You said in this report that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?
>
> A.     The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law. Which the Ninth Circuit agrees with for now.
>
> ***
>
> A.     It is what it is - so we said that in a soft way of saying, "Don't make us go into bankruptcy." If you think your state-vested pension rights, either as an employee or a retiree - that's not going to protect you. If we don't reach an agreement one way or the other, we feel fairly confident that the state federal law, federalism, will trump state law or negotiate. The irony of the situation is we might reach a deal with creditors quicker because employees and retirees think there is some benefit and that might force our hand. That might force a bankruptcy.

~~The City has since filed with this Court its *Motion for the Entry of an Order Directing the Appointment of a Committee of Retired Employees* [Docket No. 20], the plain intent of which is to seek to negotiate a reduction or impairment of accrued pension benefits.~~

16.    As discussed below, the Governor (and other State officials) and the EM were well aware both prior to and subsequent to the issuance of the letter on July 18, 2013 from the Governor to the EM authorizing the EM to have the City commence its chapter 9 case without any conditions or limits (the "**Governor's Authorization Letter**") of the City's intentions to modify and/or terminate vested pension obligations in chapter 9 without limit in derogation of the Michigan Constitution.

A.    The Webster Litigation **And The Governor's Unconditional Authorization**

17.    ~~13.~~On July 3, 2013, against the backdrop of the threatening statements made by Orr regarding Michigan state law and protected pension benefits, plaintiffs (the "**Webster**

**Plaintiffs**") Gracie Webster (a City retiree) and Veronica Thomas (a current employee of the City vested in her pension) commenced a lawsuit against the State of Michigan, the Governor and the State Treasurer seeking: (a) a declaratory judgment that PA 436 violated the Constitution of the State of Michigan to the extent that it purported to authorize chapter 9 cases within which vested pension benefits might be sought to be compromised; and (b) an injunction preventing the defendants from authorizing any chapter 9 case for the City within which vested pension benefits might be sought to be reduced. *See Webster v. State of Mich.*, No. 13-734-CZ (Ingham County Cir. Ct. July 3, 2013) (the "**Webster Litigation**").[34]

18.      14.In briefing submitted in support of a preliminary injunction and declaratory order against the Governor, the Webster Plaintiffs explained that Article IX, Section 24 of the Michigan Constitution provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby;" that there could not be a more clear and plain constitutional mandate; and that Article IX, Section 24 means what it says: accrued pension benefits shall not be reduced.

19.      15.Further, as the Webster Plaintiffs noted, the Official Record of the 1963 Michigan Constitutional Convention makes clear that no governmental entity or its officials can do anything to diminish or impair vested pension benefits: "This is a new section that requires that accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions be a contractual obligation which cannot diminished or impaired by the action of its officials or governing body." 2 Official Record, Constitutional Convention 1961, p. 3402.

---

[34] Two additional lawsuits were also filed raising similar issues in addition to the Webster Litigation.

20.    ~~16.~~The Webster Plaintiffs also noted that PA 436 explicitly recognizes that accrued pension benefits shall not be diminished or impaired outside the bankruptcy context. For example:

- Section 11 of PA 436 requires that an emergency manager develop a written financial and operating plan for the local government and that such plan "shall provide" for "the timely deposit of required payments to the pension fund for the local government."

- Section 13 of PA 436 authorizes the emergency manager to eliminate the salary, wages or other compensation  and benefits of the chief administrative officer and members of the governing body of the local government, but expressly provides that "[t]his section does not authorize the impairment of vested pension benefits."

- Section 12(m) of PA 436 authorizes an emergency manager under certain circumstances to be appointed as the sole trustee of a local pension board and to replace the existing trustees, and requires that "the emergency manager shall fully comply with . . . Section 24 of Article IX of the state constitution . . ." when acting as the sole trustee.

21.    ~~17.~~But, in violation of Article IX, Section 24 of the Michigan Constitution, PA 436 fails to similarly forbid the Governor explicitly from authorizing a chapter 9 bankruptcy filing if accrued pension benefits may be sought to be diminished or impaired as a consequence of that filing.  Section 18 of PA 436, which purportedly empowers the Governor to authorize a municipality to file for bankruptcy under chapter 9, nowhere prohibits the Governor from authorizing such a filing if accrued pension benefits may be sought to be diminished or impaired.  Clearly, the Legislature understood and honored the Michigan constitutional mandate not to diminish or impair accrued pension benefits outside of bankruptcy.  Just as clearly, the Legislature omitted any constitutional protection against the impairment or diminishment of accrued pension benefits when the Governor purports to authorize a chapter 9 bankruptcy filing under Section 18 of PA 436.

22. ~~18.~~In other words, if accrued pension benefits may be diminished or impaired, in violation of Article IX Section 24 of the Michigan Constitution, the section of PA 436 purporting to authorize this bankruptcy, Section 18, must be unconstitutional as applied.

23. ~~19.~~On July 18, 2013, the same date this chapter 9 case was commenced, the Ingham County Circuit Court for the State of Michigan (the "**State Court**") entered a temporary restraining order (the "**TRO**", attached to the Kreisberg Declaration, Exhibit A) enjoining the Governor, the State Treasurer and the other defendants in the Webster Litigation from authorizing a chapter 9 filing and taking any further action "with respect to any filing which has already occurred" including the authorizing of an "unconditional" chapter 9 filing (*i.e.* one in which the EM would represent himself as having authority to modify and/or terminate pension obligations without limit in derogation of the Michigan Constitution).

24. ~~20.~~Despite the issuance of the TRO and the State Court's clear directive to the Governor regarding not authorizing any further filings by the City, the Governor did not seek to prevent the City from filing all of its "first day pleadings."  Indeed, the Governor authorized and the EM directed the chapter 9 filing just minutes before the July 18, 2013 TRO hearing was set to begin (and during a brief delay in the TRO hearing requested by the Governor's attorney) in order to potentially "cut off" any argument that the filing was not properly authorized (because the Governor knew and the EM expected that the State Court Judge was prepared to grant the TRO).

25. ~~21.~~On July 19, 2013, the State Court held a further hearing on the Webster Litigation and entered an Order of Declaratory Judgment (the "**Declaratory Judgment**," attached to the Kreisberg Declaration as Exhibit B).  The Declaratory Judgment (a) finds PA 436 unconstitutional and of no force and effect to the extent it permits the Governor to

authorize the EM to proceed under chapter 9 in any manner that threatens to diminish or impair pension benefits and (b) rules that the Governor must direct the EM "to immediately withdraw the chapter 9 petition … and … not authorize any further chapter 9 filing which threatens to diminish or impair accrued pension benefits." *See* Declaratory Judgment at 3.

26. 22. To the extent there was any authorization for the chapter 9 filing, the State Court clearly ordered that the Governor revoke it to the extent it was intended to lead to the diminishment or impairment of accrued pension benefits. However, subsequent to the issuance of the Declaratory Judgment, on July 25, 2013, this Court granted the City's motion to extend the automatic stay, which, *inter alia*, stayed pending appeals of the Declaratory Judgment (and other similar state court proceedings). *See* Docket No. 166.

> **(i)** **The Governor (And Other State Officials) And City Intended Through The Chapter 9 Filing To Impair And/Or Terminate Pension Obligations, And The Governor Was Aware Of This Prior To His Authorizing The Chapter 9 Filing**

27. The evidence obtained to date (as will be further demonstrated at trial) reveals that the Governor (and other State officials) and the EM were well aware both prior to and subsequent to the issuance of the Governor's Authorization Letter of the City's intentions to modify and/or terminate vested pension obligations in chapter 9 without limit in derogation of the Michigan Constitution.

28. First, the June 14 Restructuring Plan (defined below) expressly provided that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons", and the Governor has admitted in deposition testimony to (i) having viewed drafts of the June 14 Restructuring Plan; (ii) being specifically aware that the Restructuring Plan provided for significant cuts to accrued, vested pensions for active and retired employees; and (iii) being specifically aware when he signed the July 18 letter authorizing the City's

chapter 9 filing that Orr's position was "that there had to be significant cuts in accrued pension benefits."  *See* Governor Snyder October 9, 2013 Transcript (the "**Governor 10/9 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit A),[5] at 46:3-23; 63:9-64:18. Furthermore, in a letter dated July 16, 2013 from Orr to the Governor (and Treasurer Andy Dillon) recommending that the City be authorized to immediately commence a chapter 9 bankruptcy case, Orr noted that the City met with all of the City's unions and four retiree associations to "solicit the unions and retirees' view on their preferred way to address the **dramatic, but necessary, benefit modifications**."  *See* Orr Declaration, Exhibit J, p. 8 (emphasis added).  The Governor admitted to reading this letter.  *See* Governor 10/9 Transcript, at 52:13-15.

29.    Additionally, the City has unequivocally admitted that it intends to impair or diminish pension benefits of City active and retired employees through this chapter 9 proceeding.  *See, e.g., City of Detroit, Michigan's Objections and Responses to Detroit Retirement Systems' First Requests for Admission Directed to the City of Detroit Michigan* [Docket No. 849], at p. 12 (admitting that "City intends to seek to diminish or impair the Accrued Financial Benefits of the participants in the Retirement Systems through this Chapter 9 Case."); *see also* Kevyn Orr September 16, 2013 Transcript (the "**Orr 9/16 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit B), at 252:25-253:16; 288:2-9 (admitting that City intended to diminish or impair accrued pension benefits of Detroit pensioners, preferably through a consensual plan but preserving all rights to do so possibly through the use of the cramdown provisions of the bankruptcy code).

---

[5] Throughout this Objection, AFSCME has cited deposition testimony provided by various witnesses in connection with the City's chapter 9 eligibility litigation.  AFSCME relies on the relevant portions of these various depositions as evidence, and will be attaching copies of the full deposition transcripts to the Artz Declaration filed contemporaneously with this Objection.

**B.** **The City's Pre-petition Machinations And Subsequent Meetings (But Not Negotiations) With Creditors Such As AFSCME**

**(i)** **The City's Bankruptcy Was Orchestrated Based On The Advice Of The City's Lead Bankruptcy Counsel And Discussed ~~Prior To~~ Before The EM Was Even Hired**

30.   ~~23.~~In emails–, documents and deposition testimony that surfaced following the City's chapter 9 filing going back to late January 2013, long prior to any alleged good faith negotiations with creditors (more about this point below), secret discussions were being held between Detroit and officials in the Governor's office and the City's legal counsel suggesting that the best course for the City would be to send it through chapter 9 bankruptcy. These ~~emails~~facts collectively expose Orr's and the City's charade of pre-petition "negotiations" (in reality, one-sided meetings) in the month prior to the City's chapter 9 filing. In fact, all along–, the clear goal was for the City to end up in chapter 9.

31.   For example, the Law Firm was among a number of firms to provide a "pitch" presentation made to the City on January 29, 2013 in the presence of State officials. *See* Pitch Presentation (dated January 29, 2013); *see also* Orr 9/16 Transcript, at 18:12-21:20 (discussing how Orr came with the Law Firm in late January to pitch for the City's restructuring work before a "restructuring team [of] advisors"). During that pitch, Orr (among other lawyers that would be working on the proposed engagement) was presented primarily as a "bankruptcy and restructuring attorney." Orr 9/16 Transcript, at 21:3-6. As part of the Pitch Presentation, as discussed extensively *supra*, ¶ 3, the City's lead bankruptcy counsel presented, in part, the following playbook for the City's road to chapter 9: (i) the difficulty of achieving an out of court settlement and steps to bolster the City's ability to qualify for chapter 9 by establishing a good faith record of negotiations (Pitch Presentation, pp. 13; 16-18; 22-23; 28); (ii) the EM could be used as political cover for difficult decisions such as an ultimate chapter 9 filing (Pitch

Presentation, p. 16); (iii) warning that pre-chapter 9 asset monetization could implicate the chapter 9 eligibility requirement regarding insolvency, thus effectively advising the City *against* raising money in order to will itself into insolvency (Pitch Presentation, p. 17); and (iv) describing protections under state law for retiree benefits and accrued pension obligations and how chapter 9 could be used as means to further cut back or compromise accrued pension obligations otherwise protected by the Michigan constitution ((Pitch Presentation, pp. 39; 41).

32.    24.For example, Orr communicated as early as January 2013 regarding his proposed Following the Law Firm's pitch in late January 2013, State officials (including Baird) informed attorneys at the Law Firm and Orr that they were interested in bringing Orr on board as EM, and Orr began to consider the offer. *See* Orr 9/16 Transcript, at 24:24-25:31:5). Orr commented regarding his proposed consideration for appointment as EM and discussed with his law firm at the time how to go about leading the City into chapter 9. In an email (attached to the Kreisberg Declaration, Exhibit 1) dated January 31, 2013, Orr's colleague at the firm stated in an email to Orr that the "ideal scenario would be that [Michigan Governor] Snyder and [Detroit Mayor] Bing both agree that the best option is simply to go through an orderly Chapter 9. This avoids an unnecessary political fight over the scope/authority of any appointed Emergency Manager appointed and, moreover, moves the ball forward on setting Detroit on the right track." *Id*[46]. Indeed, this was the exact suggestion by the City's current lead bankruptcy counsel in its pitch presentation. *See* Pitch Presentation, p. 16 ("Ultimately, the Emergency Manager could be used as political cover for difficult restructuring decisions.").

---

[46]*See also* Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was hired, e-mails show,* http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-bankruptcy-emails (last visited on August 19, 2013).

33.    25.Orr's colleague then stated his own reservations about whether an emergency manager would be useful outside of bankruptcy where his "ability to actually do anything is questionable given the looming political and legal fights"  *Id.*  In contrast, he observed in an earlier email, "[m]aking this a national issue . . . provides political cover for the state politicians" and gives them an "incentive to do this right" because "if it succeeds, there will be more than enough patronage to allow [them] to look for higher callings—whether Cabinet, Senate, or Corporate."  *See* Kreisberg Declaration, Exhibit 2.[57]

34.    26.Others As noted above, others involved in the discussions prior to the chapter 9 filing included Baird, the Governor's Transformation Manager, Richard Baird ("**Baird**").  In an email also dated January 31, 2013, Orr, in anticipated anticipation of a conversation he was to have meet with Baird "in a few minutes" about whether to accept the EM position, observed that PA 436 "is a clear end-around the prior initiative" to repeal the previous Emergency Manager statute, Public Act 4, "that was rejected by the voters in November." *See* Kreisberg Declaration, Exhibit 3.[68]  According to Orr "although the new law provides the thin veneer of a revision it is essentially a redo of the prior rejected law and appears to merely adopt the conditions necessary for a chapter 9 filing."  *Id.*

35.    27.In a further email dated January 31, 2013, Orr indicated that Baird wanted Orr to be hired as the EM and his firm to represent the City (regardless of whether Orr took the EM job), and that Orr indicated that he would be glad to work together with the City, even if

---

[57] *See also* Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was hired, e-mails show,* http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-bankruptcy-emails  (last visited on August 19, 2013).

[68] *See also* Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was hired, e-mails show,* http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-bankruptcy-emails (last visited on August 19, 2013).

not as EM, indicating that "I [Orr] and the firm are committed to working in lockstep with the [C]ity."  *See* Kreisberg Declaration, Exhibit 4.[79]

> **(ii)** **No Good Faith Negotiations Took Place Following The Appointment Of The EM With Parties Such As AFSCME Prior To The City's Chapter 9 Filing**

36.  ~~28.~~ As indicated above, the die was cast for the City's inevitable chapter 9 filing prior to the March appointment of Orr as EM.  Following Orr's appointment, the City and Orr maneuvered to establish the veneer of formal pre-petition creditor negotiations, when in reality, Orr and the Governor knew all along that the non-interactive meetings would be held on a *pro forma* basis so the City could attempt to establish alleged good faith negotiations.

37.  The facts belie the notion of any pre-filing negotiations, whether in good faith or otherwise.  Indeed, the City itself admitted both in letters and at the meetings held in the month or so prior to the filing that the City was only interested in one-way discussions, not negotiations.  As discussed below, **evidence obtained in discovery reveals that while these meetings were ongoing – indeed, before ever meeting face-to-face with union representative alone – the City had already made a determination as early as the beginning of July 2013 that it would be filing for chapter 9 protection on or about July 19, 2013**.

38.  ~~30.~~On June 14, 2013, the City held a meeting of representatives of the City's creditors (the "**June 14 Meeting**") to present the City's comprehensive restructuring plan/ "Proposal for Creditors" (the "**Restructuring Plan**", attached to the Kreisberg Declaration as Exhibit C).  Even prior to these meetings, Orr confirmed that the City's discussions of a predecessor to its ultimate Restructuring Plan~~–~~, the EM's May 12, 2013 "Financial and

---

[79] See also Kate Long, *Who is representing Detroit?*  http://blogs.reuters.com/muniland/2013/07/25/who-is-representing-detroit/ (last visited on August 19, 2013).

Operating Plan", would not involve any negotiations, explaining that "it is under the [PA 436] statute, it is my plan and it's within my discretion and obligation to do it.  **This isn't a plebiscite, we are not, like, negotiating the terms of the plan**.  It's what I'm obligated to do."  *See* Kevyn Orr Interview to Detroit WWJ Newsradio 950/AP, *Detroit EM Releases Financial Plan; City Exceeding Budget By $100M Annually*, May 12, 2013, *available at* http://detroit.cbslocal.com/2013/05/12/kevin-orr-releases-financial-plan-for-city-of-detroit/ (emphasis added).

39. ~~31.~~On June 17, 2013, Steven Kreisberg, AFSCME's director of collective bargaining and health care policy, submitted a letter requesting from the EM various categories of information, assumptions, and data for AFSCME to honestly review all the information presented and begin good faith negotiations.  *See* Kreisberg Declaration, Exhibit 5.  AFSCME made this request prior to a scheduled June 20, 2013 meeting with unions (including AFSCME) representing the City's non-uniform employees regarding the City's pensions.  At that meeting, the City represented that the meeting was "not a negotiation."  *See* Kreisberg Declaration, ¶ 17.  Furthermore, the letter inviting AFSCME to the June 20 meeting characterized the purpose of the meeting as being to "review" the Restructuring Plan (not negotiate it) and to have AFSCME "learn" about the Restructuring Plan.  Kreisberg Declaration, Exhibit 6.

40. ~~32.~~In a letter dated June 27, 2013 to an AFSCME local union, the City indicated that it was posting certain information to a data room and was looking forward to the unions' "feedback" (again not negotiation) with respect to the EM's retiree benefits restructuring proposal.  *See* Kreisberg Declaration, Exhibit 7.

41. ~~33.~~In a follow up letter to the City dated July 2, 2013, Mr. Kreisberg again reiterated his request for information and data, including the backup data supporting the City

retiree benefits proposal (support for which previously consisted of only a one-page financial summary). AFSCME requested relevant information and the opportunity (in conjunction with a meeting scheduled with the City's unions on July 10-11) to begin meaningfully engaging "in a good faith negotiation of these issues." *See* Kreisberg Declaration, Exhibit 8.

42. ~~34.~~In a response letter to Mr. Kreisberg on July 3, 2013, the City advised that it would not meet separately with AFSCME, and that the July 10, 2013 scheduled meeting with the unions would be a "discussion" (again not a negotiation). *See* Kreisberg Declaration, Exhibit 9. Similarly, in an email dated June 28, 2013, the City confirmed that it wanted to meet on July 10, 2013 to "discuss" its "developing pension restructuring proposal," clearly implying that the proposal itself was not even complete yet. *See* Kreisberg Declaration, Exhibit 10. Additionally, and tellingly, at that July 10, 2013 meeting, counsel for the City attempted to invoke Rule 408 confidentiality provisions stating that doing so was a tool used in every bankruptcy, so it should be invoked that day. *See* Supp. Kreisberg Declaration, ¶ 7. This statement made more than a week before bankruptcy was authorized or filed further demonstrating that the City intended to file for bankruptcy in any event.

43. ~~35.~~At the July 10, 2013 meeting, the City announced at the inception that the meeting would be a discussion but not a negotiation. *See* Kreisberg Declaration, ¶ 18. At a similar meeting ~~held~~ with ~~AFSME~~ AFSCME and certain and other unions held on July 11, 2013, again there was no negotiation.

44. Despite this evidence, it appears that the City now seeks to characterize its limited requests to creditors for feedback – but admitted refusal to bargain with them – on the Restructuring Plan at the four meetings held regarding that plan as satisfying chapter 9's good faith negotiation requirement. Yet, in the City's reply brief regarding eligibility and recent

deposition testimony by Orr, the City and Orr have explicitly denied that the City's discussions with creditors were negotiations. *See* Debtor's Reply, at p. 55 n.49; Orr 9/16 Transcript, at 137:25-138:8 ("Q. And was there any bargaining that took place at those sessions [on June 20th, July 10th, and July 11th] where the City said it would be willing to agree to something that was different from what was in June 14? A. Here again, I'm going to stay away from bargaining as a legal conclusion, duty to bargain is suspended. I will say there was a back and forth and my understanding discussions and invitations for further information.").

45.    Furthermore, and critically, Orr recently testified that media reports prior to the City's chapter 9 filing that the City was planning on filing on July 19, 2013 were inaccurate. Orr 9/16 Transcript, at 301:19-302:8 (indicating that there was no plan for the City to file on July 19, 2013 and that Orr's plan was "to have the permission, the authority, to file them and make that call at some point after I transmitted my letter of July 16 [requesting authorization from the Governor to file for chapter 9].").  Yet, evidence produced in discovery includes an Excel/spreadsheet document attached to e-mails circulated (i) to and from Bill Nowling (who works in the EM's office) sent to individuals in the Governor's office, entitled "Chapter 9 Communications Rollout" which makes clear that during the same time period that the City was purporting to conduct ongoing "good faith negotiations" with creditors regarding the Restructuring Plan, **in fact the City was, as early as July 1, 2013 planning on filing for chapter 9 on Friday, July 19, 2013**. *See* Supp. Kreisberg Declaration, Exhibit C (spreadsheet document dated July 4, 2013 attached to e-mail from EM's office to State officials entitled "Chapter 9 Communications Rollout" indicated that Friday, July 19, 2013 was "FILING DAY").

**(iii) The City's Bad Faith Refusal To Negotiate With Unions Such As AFSCME Has Continued Following The City's Bankruptcy Filing**

46. ~~36.~~The City's pattern of bad faith refusal to negotiate any of its proposals regarding pensions or health insurance benefits changes has continued ~~postpetition~~post-petition.

47. ~~37.~~For example, on August 2, 2013, the City convened a meeting of local union representatives and discussed active health insurance. *See* Kreisberg Declaration, ¶ 19. However, during that meeting, the City specifically advised those in attendance (including AFSCME representatives) that the meeting was not a negotiation. *Id* at ¶ 20. Mr. Kreisberg sent a follow up letter to the City on August 6, 2013 requesting good faith bargaining, and referenced cost savings estimates which AFSCME previously proposed in prior negotiations with the City before the development of the Emergency Manager's initial financial restructuring plan in May. *See* Kreisberg Declaration, Exhibit 11. In an August 8, 2013 response, the City advised that it would not engage in collective bargaining with AFSCME, but rather simply "discuss any feedback they may have regarding its health care restructuring plans." *See* Kreisberg Declaration, Exhibit 12.

48. ~~38.~~On ~~august 14,1013~~August 14, 2013, the City held a follow up meeting with AFSCME on the subject of active medical benefits but did not accept any counterproposals or suggestions, but simply responded by further explaining its current intention with respect to active medical benefits.

49. ~~39.~~Given Orr's repeated statements to the media about the City's willingness to bargain with its unions, AFSCME has been surprised by the City's unwillingness to negotiate, pre or ~~postpetition~~post-petition. While AFSCME has ~~re-~~repeatedly stated its desire to move forward with constructive negotiations with the City on behalf of all AFSCME Detroit

Employees, AFSCME cannot negotiate with an employer that is unwilling to come to the table for arms-length talks.

(iv)     **The City Has Previously Negotiated Labor Concessions With Unions That Modified Both Active And Retiree Benefits**

50.     The City argues, in part, that negotiations with its retirees were impractical or impossible as the City could not bind the disparate group of retirees in any agreement. However, the City should be well aware (and indeed its advisors have admitted) that in February 2012, City labor negotiators reached a tentative agreement (the "**Tentative Agreement**") with a "Coalition of City of Detroit Unions", including several AFSCME local bargaining units.  *See* Supp. Kreisberg Declaration, ¶ 4, Exhibit A (attaching copy of the Tentative Agreement).  Pursuant to deposition testimony given by Gaurav Malhotra of Ernst & Young ("**E&Y**") on September 20, 2013 (one of the City's restructuring advisors), E&Y was actively involved "in assisting quantify some of the savings in conjunction and collaboration ·with the City as the City negotiated with the – its unions [regarding the Tentative Agreement]."  *See* Gaurav Malhotra September 20, 2013 Transcript (the "**Malhotra 9/20 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit C), at 86:20-23.

51.     While the Tentative Agreement was never implemented, changes with respect to benefits in the proposed Tentative Agreement would have directly impacted retiree benefits, and indeed, based on projections at the time, AFSCME understands that the Tentative Agreement could have saved the City approximately $50 million annually, a number which included retiree health benefit changes.  *See* Supp. Kreisberg Declaration, ¶¶ 5-6.

52.     Despite this evidence, Orr has now testified that he was unaware of the Tentative Agreement (and, thus implicitly, unaware of the City's prior success at bargaining in

good faith with the City's unions, which led to changes to both active and retired employees' benefits):

> 15· ·Q.· ·Are you aware of a coalition among certain of the
> 16· · · · City's unions put together to try and deal
> 17· · · · with some of the restructuring issues with regard to
> 18· · · · labor that you've been focused on?
> 19· ·A.· ·A coalition?· Can you please explain?· Informal
> 20· · · · coalition or the retiree committee or --
> 21· ·Q.· ·Not the retire committee.· A coalition of unions with
> 22· · · · regard to trying to deal with some of the labor issues
> 23· · · · that you --
> 24· ·A.· ·Under the AFSCME umbrella?
> 25· ·Q.··No, no, no.
>
> Page 237
>
> ·1· ·A.· ·Or separate union?· I'm trying to -- I'm trying to
> ·2· · · · understand.
> ·3· ·Q.· ·Well, I think your answer indicates to me that perhaps
> ·4· · · · the answer is no.
> ·5· ·A.· ·Yeah.· Okay.

Orr 9/16 Transcript, at 237:15-237:5.  Given that Orr himself was unaware of the City's ability to negotiate deals affecting both active employees and retirees outside of bankruptcy, the City's assertion that negotiations regarding changes to retiree and pension benefits were "impracticable (if not impossible)" is misguided.  Orr could not possibly have attempted to negotiate in good faith if he had not done even the most preliminary investigation as to whether Detroit's several unions had ever negotiated with the city collectively in the past, indeed the very recent past.

> **C.** **The City Has Failed to Establish It Is Insolvent, And The City's Chapter 9 Case Was Not Commenced Due to Any Imminent Financial Emergency, Rather To Avoid The Webster Litigation (And Other State Court Proceedings)**

53.     The City at first glance seems to provide thick volumes which it calls evidence regarding its alleged insolvency.  *See, e.g.*, Orr Declaration, ¶¶ 52-57; Malhotra Declaration, ¶¶

10-26; Moore Declaration, ¶¶ 9-20. However, what becomes apparent from reviewing these declarations (which serve as the basis for the City's insolvency arguments) is that (i) each often cross-relies (as purported evidence as to the truth of particular statements) on other (non-expert) testimony, other documents prepared by the City, or other assumptions/evidence convenient to the City but without any real foundation. *See, e.g.*, Orr Declaration, ¶¶ 52-57 (citing, in part, the June 14 Restructuring Plan and Malhotra Declaration as evidence); Moore Declaration, ¶¶ 13-14 (estimating pension underfunding using what the "City" believes are more realistic assumption)); Malhotra Declaration, ¶¶ 11; 15; 21-22 (discussing manner in which City's financial forecasts and projections were prepared based on certain complex assumptions, calculations and input from other City officials). Furthermore, the City offers no expert witness to testify regarding the City's asserted insolvency despite the City having spent millions of dollars and having gone out and hired a multitude of legal, financial, actuarial and restructuring advisors. Ultimately, the fact remains that **despite the pile of "evidence" submitted by the City, the City does not have a single witness who can stand up as an expert and testify as to the City's insolvency**.

54. Furthermore, the City misleadingly cited its insolvency as what drove its chapter 9 filing, not the imminent state court rulings in the Webster Litigation and other state court proceeding, futher casting doubt on the reality of its conclusion that it is insolvent. *See, e.g.,* Debtor's Reply, at pp. 65-66. Yet, in reality (and as will be further demonstrated at trial), the discovery process has revealed several interesting facts that cut against insolvency as the true basis for the filing (*see* Debtor's Reply, at p. 65-66), and indeed Orr's recent testimony indicates that insolvency was not the driving factor behind the filing on July 18, 2013, rather the filing at that time was driven by the state court litigations. Orr testified:

19    When did you decide that the timing of the
20· · · Chapter 9 filing should be July 18th or July 19th?
21· ·A.· ·Well, I didn't.· I decided to make the request and my
22· · · intent was to have the ability to file available and
23· · · possibly executed as soon as I got it.· It was without
24· · · talking or waiving privileges from my counsel or
25· · · counsel and investment bankers, the concerns about us

Page 221

·1· · · losing control or being put in a situation because of
·2· · · the ongoing litigation where I would not be able to
·3· · · discharge my duties in an orderly fashion, in a
·4· · · comprehensive matter to put the city on a sustainable
·5· · · footing because of the litigation grew . . .
·6· · · and it was made clear to me that **my desire to try to**
·7· · · **continue to engage in discussions was running the risk**
·8· · · **of putting my obligations under the statute in peril**
·9· · · **and I think I was even counseled that I was being**
10· · · **irresponsible.**

Orr 9/16 Transcript, at 220:19-221:6-10.

     55.    In addition, the City's evidence regarding insolvency is built upon unproven assertions regarding, *inter alia,* the alleged unfunded amount of the City's pension and other retiree benefits.  Indeed, in the June 14 Restructuring Plan discussing the actuarial accounting underfunding on the City's pension plans, the City suggested that such underfunding using more "realistic assumptions" would be approximately $3.5 billion, up from the $644 million from the City's 2011 reported underfunding.  Restructuring Plan, pp. 23, 109 (noting that "preliminary analysis indicates that the underfunding in the GRS and the PFRS is approximately $3.5 billion); *see also* Orr Letter Dated July 16, 2013 to Governor Snyder and Treasurer Dillon (copy attached as Exhibit J to Eligibility Brief (recommending chapter 9 filing and discussing $3.5 billion in underfunding of pension liabilities)).

     56.    However, these allegedly "realistic assumptions" were directly dictated by the City to their actuarial advisor, Milliman, Inc. For example, Charles Moore of Conway

MacKenzie admitted in his deposition that the City really had no idea what the underfunded portion of the pension obligations might be (as of September 18, 2013) because "until the City completes its analysis [which is had not yet done] and completes its own actuarial valuation, neither the City nor its actuary [Milliman] nor I would be able to say what all the assumptions are that could be used to either overstate or understate the funded position [of the pensions]." *See* Charles Moore September 18, 2013 Transcript (the "**Moore 9/18 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit D), at 62:2-7; *see also* Moore 9/18 Transcript, at 63:10-12 (indicating that 7 percent rate of return figure used by Milliman in running certain calculations regarding pension underfunding "was used for illustrative purposes" only and was not recommended by any specific actuary). Furthermore, in an e-mail dated July 9, 2013 from Treasurer Dillon to the Governor and others regarding a meeting Orr would be having with the Detroit retirement systems on July 10, 2013, Treasurer Dillon indicated that "[b]ecause pensions have such a long life there are a lot of creative options we can explore to address how they [the pensions] will be treated in a restructuring." *See* Supp. Kreisberg Declaration, Exhibit D. In fact, experts that reviewed the actuarial assumptions of Detroit's pension systems conclude that the current assumptions generally fall within industry standards. *See, e.g., Detroit's Current Pension Assumptions Fall Within Standards: Morningstar, available at* http://www.mandatepipeline.com/news/detroits-current-pension-assumptions-fall-within-standards-morningstar-242817-1.html (last visited October 8, 2013).

57. Furthermore, as discussed above, the Law Firm highlighted at the January 29, 2013 pitch that "Asset monetization outside of bankruptcy may implicate eligibility requirement that City be insolvent (e.g., measured by short-term cash)" (Pitch Presentation, p. 17), and the City accordingly chose not to monetize certain assets prior to the filing to limit the

appearance of short-term cash on the books. This is evidenced, in part, by the (i) recent announcement by the EM of the deal to lease Belle Isle to the Governor and (ii) Orr's strong hints that he is considering monetizing artwork at the Detroit Institute of Arts.[10]

58. Additionally, the City's financial projections which serve, in part, as the City's basis for establishing insolvency (which themselves were built on various assumptions not established by any **expert** testimony) fail to consider the possibility of possible funding sources outside those included in the City's financial projections. For example, Malhotra testified that the City's financial projections assume that the City will have no other funds beyond the City's general fund and that the water and sewer fund was not incorporated into the City's projections. *See* Malhotra 9/20 Transcript, at 44:21-45:17. Yet, Orr testified that with respect to the pension underfunding (which is cited throughout the City's Eligibility Brief and included as one of the major factors in the City's insolvency in numerous documents and pleadings), of the estimated $644 million in underfunding (based on the pensions funds' 2012 calculations), the majority of that underfunding is attributable to the water and sewer fund which generates its own revenue and which "does have some capacity" to raise rates to generate more funds. *See* Kevyn Orr October 4, 2013 Transcript (the "**Orr 10/4 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit E), at 377:1-380:13.

59. Finally, it bears noting that on July 16, 2013, the City reached a deal with its swap counterparties, which provided for such parties to (i) forbear from pursuing remedies and (ii) allowed the City to redeem the swaps until October 31, 2013 which would result in the City saving between $70 and $85 million. *See* Supp. Kreisberg Declaration, Exhibit E (e-mail from

---

[10] *See State Signs Deal To Lease Belle Isle, available at* http://detroit.cbslocal.com/2013/10/01/reports-state-signs-deal-to-lease-belle-isle/ (last visited October 8, 2013); *Orr tells DIA to earn money from its treasures; long-term leases of artworks next?, available at* http://www.freep.com/article/20131003/NEWS01/310030115/Kevyn-Orr-Economic-Club-Detroit (last visited October 8, 2013).

Ken Buckfire dated July 17, 2013). Given these immediate savings and other possible avenues (noted above) for the City avoiding bankruptcy, it is clear that the City's filing had very little to do with any purported insolvency and everything to do with the City's plan to impair or modify its pension obligations.

## ARGUMENT

I.    **THE CITY'S PETITION VIOLATES THE UNITED STATES CONSTITUTION**

B.    ~~CHAPTER 9 VIOLATES THE FEDERAL STRUCTURE OF GOVERNMENT~~

B.    **Chapter 9 Violates The Federal Structure Of Government**

60.    ~~40.~~Chapter 9 of the Bankruptcy Code is an unconstitutional violation of federalism because chapter 9 allows Congress to set rules controlling State fiscal self-management – an area of exclusive state sovereignty – as part of an unholy alliance in which the State receives in exchange powers in excess of those it would otherwise possess under the law. The losers here are citizens, such as the AFSCME Employees, who, particularly as creditors of the State, benefit from the State and Congress acting within their constitutionally defined roles so that the State remains accountable during the trying process of a municipal debt adjustment.

61.    ~~41.~~The Supreme Court recognized this violation explicitly in 1936 when the Court declared the first federal municipal bankruptcy statute unconstitutional for the following two independent reasons: (1) the goal of a municipal bankruptcy is to enable state governments to unconstitutionally escape their debts, but states cannot accomplish the "end" of an unconstitutional act simply "by granting any permission necessary to enable Congress to do so"; and (2) municipal bankruptcy represents an incursion by Congress into the "sovereignty of the State" and its political subdivisions, which renders them "no longer free to manage their

own affairs" independent of "interference" by Congress, yet the Constitution does not permit Congress to "pass laws inconsistent with the idea of sovereignty." *Ashton v. Cameron County Water Improvement Dist. No. 1,* 298 U.S. 513, 530-32 (1936).

62. 42.*Ashton* applies with ~~equal~~ even greater force to chapter 9 ~~as~~ than it did to the first federal bankruptcy statute. Chapter 9, like the municipal bankruptcy statute struck down in *Ashton,* is designed to empower municipalities – whose "fiscal affairs are those of the State, not subject to control or interference by the National Government," *id.* at 528 –to "change, modify or impair the obligation of their contracts" in ways not permissible outside of bankruptcy. *Id.* at 530-31. Under chapter 9 but not under the prior federal municipal bankruptcy statute at issue in *Ashton*, states are explicitly barred from designing their own process for municipal debt adjustment, further infringing on the constitutionally defined role of the states to manage their own financial affairs. See 11 U.S.C. § 903.

63. As *Ashton* recognized, that municipalities may not, unlike states, be immune from suit under the 11th Amendment is entirely unrelated to the question of whether their essential role in the federal system of government has been unconstitutionally diminished by an act of Congress. *Ashton*, 298 U.S. at 531. The Supreme Court recently reaffirmed this distinction in *Printz v. United States*: "[T]he distinction in our Eleventh Amendment jurisprudence between States and municipalities . . . is peculiar to the question of whether a governmental entity is entitled to Eleventh Amendment sovereign immunity, [and does not] apply [] to the question of whether a governmental entity is protected by the Constitution's guarantees of federalism, including the Tenth Amendment." 521 U.S.898, 531 n. 15 (1997) (citations omitted).

64. ~~43.~~To take just one extremely salient example, the City seeks to reduce its retiree health care obligations *permanently* in bankruptcy, which the Michigan Court of Appeals has held it could not do under state or federal law. *See AFT Michigan v. State,* 297 Mich. App. 595, 825 N.W.2d 595 (2012). ~~This point is uncontroversial: the entire purpose of bankruptcy is to adjust debts which would otherwise be binding outside of bankruptcy. Under chapter 9, for the privilege of skirting~~ Thus, under chapter 9 the City seeks to skirt the laws governing its debts outside of bankruptcy~~, the State submits~~ in exchange for submitting to the rules enacted by Congress for a chapter 9 filing ~~and~~, thereby ~~cedes~~ ceding sovereign control over some of its own fiscal affairs to the federal judiciary during the bankruptcy process.

65. ~~44.~~Neither of the justifications provided by the Supreme Court less than two years after *Ashton* when it upheld Congress's next, substantially similar, municipal bankruptcy statute in *United States v. Bekins*, 304 U.S. 27 (1938) – (1) that the contracts clause of the federal constitution makes the passage of a state law adjusting municipal debts impossible and thus the need for a federal law providing for municipal bankruptcy pressing, and (2) that a State has a right to consent to federal intrusion into its own fiscal affairs – remains valid. This is because intervening Supreme Court precedent holds that states can fashion their own municipal reorganization statutes but cannot consent to any derogation of their sovereign powers.

### (iii) ~~(ii)~~A Federal Municipal Bankruptcy Statute Is No Longer Necessary To Accomplish An Adjustment Of Municipal Debts

66. ~~45.~~As a threshold matter, the Supreme Court has held since *Bekins* that states *can* pass legislation to adjust municipal debts in a financial emergency. *See Faitoute Iron & Steel Co. v. City of Asbury Park,* 316 U.S. 502 (1942). In doing so, the Supreme Court scoffed at the presumption that the federal government could "completely absorb" from a State a power "so peculiarly local as the fiscal management of its own household." *Asbury Park,* 316 U.S. at

508-09.  *See also United States Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1 (1977) (recognizing that state legislation ~~adjusting a state's~~ repealing a contractual ~~obligations~~ obligation of a state may not violate the contracts clause under certain circumstances).  For this reason alone, *Bekins,* which relied heavily on the Supreme Court's perception that some mechanism was needed to permit states to adjust their debts during the "[e]conomic disaster" of the Great Depression, 316 U.S. at 53-54, is no longer binding.

### (iv)    ~~(iii)~~The Supreme Court's Development Of Constitutional Federalism Doctrine Has Effectively Overruled *Bekins*

67.    ~~46.~~Over the past two decades the Supreme Court issued a series of opinions clarifying both the importance of the federal system of government to *individual* liberty and, concomitantly, the inability of a state to consent to an affront by Congress to that federal system.  The fountainhead of these cases is *New York v. United States,* 505 U.S. 144 (1992).  There, Justice O'Connor, writing for the majority, explained at length that any statute exercising federal control over a power which "is an attribute of state sovereignty" – as is the case here with respect to a state's management of the fiscal affairs of its political subdivisions, *see Ashton, supra* – is "necessarily" an exercise of "a power the Constitution has not conferred on Congress" and therefore unconstitutional.  505 U.S. at 156.  "The States 'form distinct and independent portions of the supremacy, no more subject, within their respective spheres, to the general authority than the general authority is subject to them, within its own sphere.'"  *Alden v. Maine,* 527 U.S. 706, 714 (1999) (quoting The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison)).  Thus the Supreme Court's duty, Justice O'Connor has explained, is to "invalidate[] measures deviating from" the federalist "form of government" set forth in the Constitution, however "formalistic" the result may appear in light of "the era's perceived necessity."  *New York,* 505 U.S. at 187.

**(a)** **Chapter 9 Impinges On The AFSCME Employees' Individual Rights To Federalism By Eviscerating The Accountability Of Michigan To Its Citizens And Creditors**

68. ~~47.~~*New York* and its progeny represent a direct rebuff to *Bekins* and other Depression-era cases, which softened the requirements of federalism in moments of perceived peril, by setting forth since then a robust vision of federalism which "divides authority between federal and state governments for the protection of individuals." *New York,* 505 U.S. at 181. That vision begins with the "incontestable" truth "that the Constitution established a system of 'dual sovereignty,'" under which the sovereignty reserved to a State and its citizens is "'inviolable.'" *Printz*, 521 U.S. at 918-20 (quoting The Federalist No. 39, at 245 (J. Madison)) (other citations omitted). "Residual state sovereignty was also implicit, of course, in the Constitution's conferral upon Congress of not all governmental powers, but only discrete, enumerated ones, Art. I, § 8, which implication was rendered express by the Tenth Amendment's assertion that '[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.'" *Printz,* 521 U.S. at 920.

69. ~~48.~~The premise of the federal constitutional structure is that "Congress would exercise its legislative authority directly over individuals rather than over States." *New York*, 505 U.S. at 166 (citing 1 Records of the Federal Convention of 1787, p. 313 (M. Farrand ed. 1911) (explaining the "rejection of the New Jersey Plan in favor of the Virginia Plan")). As a corollary, individual citizens possess a vested right in the guarantee of a strongly demarcated separation of power between the state and federal government to ensure that each remains responsible to the citizens for the tasks with which it was charged:

> The great innovation of this design was that "our citizens would have two political capacities, one state and one federal, each

protected from incursion by the other"—"a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it." [*Printz,* 521 U.S. at 920 (quoting *U. S. Term Limits, Inc. v. Thornton*, 514 U. S. 779, 838 (1995) (Kennedy, J., concurring)).]

70. 49. This structural separation of powers protects individual liberty in myriad ways by creating a "'double security as to the rights of the people.'" *Printz,* 521 U.S. at 922 (quoting The Federalist No. 51, at 323 (J. Madison)). It ensures that neither branch will accumulate "excessive power," thereby reducing "the risk of tyranny and abuse from either front." *Printz,* 521 U.S. at 921 (quotation omitted). The separation of powers principle further "contemplates that a State's government will represent and remain accountable to its own citizens." *Printz,* 521 U.S. at 920 (citations omitted). For "[i]f, as Madison expected, the Federal and State Governments are to control each other, see The Federalist No. 51, and hold each other in check by competing for the affections of the people, see The Federalist No. 46, those citizens must have some means of knowing which of the two governments to hold accountable for the failure to perform a given function." *United States v. Lopez,* 514 U.S. 549, 576-77 (1995) (Kennedy, J., concurring). *See also United States v. Morrison,* 529 U.S. 598, 615-16 (2000) (citing the bulk of Justice Kennedy's concurrence in *Lopez* and holding that Congress may not "use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority"). Accordingly, "[t]he Framers thus ensured that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy." *Nat. Fed'n of Indep. Business v. Sibelius,* 132 S. Ct. 2566, 2578 (2012) (Roberts, C.J.) (quoting The Federalist No. 45, at 293 (J. Madison)).

71. ~~50.~~Chapter 9 does unconstitutional violence to the federal structure by obfuscating the system of direct accountability protected by federalism. By outsourcing to the federal judiciary the problem of a state reorganizing its obligations, chapter 9 provides states with unconstitutional – as well as unnecessary, given *Asbury Park* – cover from its citizens by confusing them as to whom to accord "blame" and "credit" for the results. *Printz,* 521 U.S. at 931; *New York,* 505 U.S. at 169. *See also Gregory v. Ashcroft,* 501 U.S. 452, 459 ("These twin powers will act as mutual restraints only if both are credible."). "The resultant inability to hold either branch of the government answerable to the citizens is more dangerous even than devolving too much authority to the remote central power." *Lopez,* 514 U.S. at 576-77 (Kennedy, J., concurring) (citations omitted).

72. ~~51.~~In point of fact, on January 31, 2013, Orr's colleague himself touted the deflection of accountability for state and city politicians as a benefit. "Making this a national idea is not a bad thing," he wrote, because "[i]t provides political cover for the state politicians. Indeed, this gives them an even greater incentive to do this right because, if it succeeds, there will be more than enough patronage to allow either [Mayor] Bing or [Governor] Snyder to look for higher callings—whether Cabinet, Senate or Corporate." Kreisberg Declaration, Exhibit 2. In a subsequent reply to Orr later that day, Orr's colleague provided a clear indication of his idea of the "right" way to do "this," stating: "the ideal scenario would be that Snyder and Bing both agree that the best option is simply to go through an orderly chapter 9." Kreisberg Declaration, Exhibit 1.

73. ~~52.~~This veil over accountability is woven into the very structure of chapter 9. While the City must consent to a chapter 9 filing and retains some control over the chapter 9 process, even before the City proposes a plan the Bankruptcy Judge is able to commandeer the

City's operation in exchange for the protection of the Bankruptcy Code by using its equitable powers, as it already has in this case, to order the City to, *inter alia,* turn over documents and engage in mediation and negotiations which the ~~State~~ City would not need to submit to outside of Bankruptcy. *See Mediation Order* [Docket No. 322] ("the Court concludes that it is necessary and appropriate to **order** the parties to engage in the facilitative mediation of any matters that the Court refers in this case," moreover, the mediator is "authorized to enter any order necessary for the facilitation of mediation proceedings", including regarding discovery issues).

74. ~~53.~~Moreover, Bankruptcy Code section 926 provides that "[i]f the debtor refuses to pursue a cause of action under section 544, 545, 547, 548, 549(a) or 550 of this title, then on request of a creditor, the court may appoint a trustee to pursue such cause of action." 11 U.S.C. § 926(b). In at least one reported case, *In re Alabama State Fair Authority*, 232 B.R. 252 (N.D. Ala. 1999), the bankruptcy court appointed a trustee to pursue preference actions. Thus, the bankruptcy court has discretion, despite a municipal debtor having made the policy choice to settle a pre-petition debt, to appoint a third-party trustee to ignore the municipality's decision and pursue avoidance of such a settlement. With regard to preference avoidance, this is a power an individual creditor could not independently assert under state law. This power also exerts a strong effect on the City throughout bankruptcy as to what actions it can and cannot take, long before ever proposing a plan, without being rebuked by the bankruptcy judge.

75. ~~54.~~If the City wishes to obtain the true spoils of bankruptcy – a plan of adjustment – it must submit to a much greater degree of federal interference, thus further blurring the line between Congress and the State as to who is to blame for the contents of that plan. This is because, in order for a debtor's plan to receive approval under chapter 9, it must

incorporate priorities of distribution according to the Bankruptcy Code. The tension between chapter 9 and state law rights was highlighted in *In re County of Orange,* 191 B.R. 1005 (Bankr. C.D. Cal. 1996), where the court, on preemption grounds, invalidated California's law providing for the establishment of a trust with respect to certain securities. Relying on the doctrine of preemption alone, the County of Orange court held that "The California legislature cannot rewrite the bankruptcy priorities." *Id.* at 1017.

76. 55. If the people of Michigan were to enact their own laws for adjusting municipal debts – as is their constitutional right, but which they have been unconstitutionally prevented from doing by chapter 9 as amended since *Asbury Park* – those laws might have very different priorities than chapter 9. Chapter 9, for instance, allows administrative expenses under Bankruptcy Code section 503 and gives them priority under Bankruptcy Code section 507(a)(2), and adopts the definition of secured claims from Bankruptcy Code section 506, to name a few. 11 U.S.C. § 901(a). Importantly, in contrast, the people of Michigan might very well decide to treat issues such as claim priority quite differently. For instance, they might choose to place unsecured retiree health claims before administrative expenses, thus benefitting the AFSCME retirees. This is, after all, a state whose constitution explicitly protects pension rights. But once the state accesses chapter 9, prevents the AFSCME employees are denied the from exercising their right to petition their state government to enact a municipal debt adjustment law of this nature, and in turn allowing the state can to shirk its responsibility to the voice of its citizens by blaming injustice any unjust result in bankruptcy on the claim priorities, rules, and procedures of the Bankruptcy Code. Until chapter 9 is struck down as unconstitutional, state officials can tell their constituents that they had no other choice besides chapter 9 to adjust municipal debts

77. ~~56.~~That the City retains some autonomy over its affairs under chapter 9 is irrelevant, for the mere incursion into territory reserved to the states is sufficient to violate the Constitution.  "[W]here, as here, it is the whole object of the law to direct the functioning of the state [government], and hence to compromise the structural framework of dual sovereignty . . . a 'balancing' analysis is inappropriate.  It is the very principle of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect."  *Printz*, 521 U.S. at 932.

78. ~~57.~~Ultimately, the allocation of state resources as between competing creditors of the City should be determined "by the political process established by the citizens of the State, not by judicial decree mandated by the Federal Government."  *Alden,* 527 U.S. at 751.  "When the Federal Government asserts authority over a State's most fundamental political processes, it strikes at the heart of the political accountability so essential to our liberty and republican form of government."  *Id.*  While the road to adjusting the City's debts may be longer if it must first involve "greater citizen involvement in democratic processes . . . in shaping the destiny of" the City's reorganization process via state law, rather than ~~that accessing the process~~ set forth in chapter 9 , as a result of "the political processes that control a remote central power," *Bond v. United States,* 131 S. Ct. 2355, 2364 (2011), "the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day."  *New York,* 505 U.S. at 187.

79. ~~58.~~The unconstitutionality of chapter 9 is further confirmed by its unsuccessful attempt to preserve some independence for state sovereigns within the constraint of the grant of power to Congress by Article I, Section 8 Clause 4 (the "Bankruptcy Clause") to establish

"uniform" bankruptcy laws.  Although the bankruptcy code for private debtors may treat debtors differently in different states due to variations in state law and still pass muster as "uniform," within a state there must be "geographical" uniformity for debtors.  *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 188 (1902).  But by ceding to each state the ability to define its own qualifications for a municipality to declare bankruptcy, chapter 9 permits the promulgation of non-uniform bankruptcies within states – as in Michigan, where Act 436 has wildly divergent effects on different cities, whose authority to declare bankruptcy purports to rest on the discretion of a Governor who can attach whichever contingencies he wishes.  *See* MCL 141.1558.  ~~It is no surprise that this attempt to elude the demands of federalism thereby fails for this additional reason, for municipal bankruptcy would have been an entirely foreign concept to the framers who modeled much of our federal Constitution on British law which did not then, and still does not today, even contemplate municipal bankruptcy.~~  ~~*See, e.g.,* Janie Anderson Castle, *The People's Mayor for London?*, 5 J. Loc. Gov't L. 29, 32 (2002); Annerose Tashiro, *Sovereign Insolvency*, 99 Eur. Law. 5 (2010) ("There is no such thing today anywhere in Europe as a sovereign insolvency regime.") (advocating implementation of a bankruptcy regime mirroring that of chapter 9 in the EU).~~As a result, nationwide the basic eligibility for an entire class of debtors – municipalities – has no uniform federal law.  This is not a question of which state substantive law applies to a class of debtors which is universally eligible for chapter 9, rather it is a foundational problem of who among the class of debtors is even covered by the federal statute in the first place.

80.     It is no surprise that this attempt to elude the demands of federalism thereby fails for this additional reason of non-uniformity, for municipal bankruptcy would have been an entirely foreign concept to the framers who modeled much of our federal Constitution on

British law which did not then, and still does not today, even contemplate municipal bankruptcy. *See, e.g.,* Janie Anderson Castle, *The People's Mayor for London?*, 5 J. Loc. Gov't L. 29, 32 (2002); Annerose Tashiro, *Sovereign Insolvency*, 99 Eur. Law. 5 (2010) ("There is no such thing today anywhere in Europe as a sovereign insolvency regime.") (advocating implementation of a bankruptcy regime mirroring that of chapter 9 in the EU).

81. 59. It cannot be adequately emphasized that under *Asbury Park* the State has the authority to amend its own laws to allow for its municipalities to adjust their debts without resorting to a coercive federal statute which unconstitutionality denies the state that right, obscures accountability and is not a uniform bankruptcy law. It can The State could even, furthermore, seek federal financial assistance to help meet those debts – as indeed it already has. *See, e.g., South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (Rehnquist, C.J.) ("[O]bjectives not thought to be within Article I's enumerated legislative fields may nevertheless be attained through the use of the spending power and the conditional grant of federal funds." (internal quotation omitted)). What the State cannot do – but what chapter 9 demands – is to submit to federal rules which would not merely incentivize the State's use of lawful power, but engorge that power at the expense of its citizens' inviolable right to control the operation of their sovereign by setting the rules by which it adjusts its own debts.

(b) **Chapter 9's Requirement Of State Consent Cannot Cure The Violation Of Individual Rights**

82. 60. The Supreme Court squarely held in *New York* that "[t]he constitutional authority of Congress cannot be expanded by the 'consent' of the governmental unit whose domain is thereby narrowed, whether that unit is the Executive Branch or the States." 505 U.S. at 182. Even when such consent is accomplished by statute. *See, e.g., Buckley v. Valeo*, 424 U.S. 1 (1976) (Congress infringed the President's appointment power via a law signed by the

President); *INS v. Chadha,* 462 U.S. 919 (1983) (legislative veto violated the constitutional requirement of presentment even where President signed law with legislative veto provision).

83. ~~61.~~The decision in *Bekins* therefore erred in concluding that the then-operative municipal bankruptcy statute was not unconstitutional simply because the statute required the municipality's petition and plan of composition to be authorized by state law. 304 U.S. at 52. To the contrary, the conclusion in *Bekins* that the only "obstacle" to the exercise of federal bankruptcy over state political subdivisions "lies in the right of the State to *oppose* federal interference," 304 U.S. at 52-54, is squarely foreclosed by the Court's subsequent decision in *New York*. Thus the prior rule from *Ashton* – "Neither consent nor submission by the States can enlarge the powers of Congress," and therefore states cannot "accomplish" an unavailable "end by granting any permission necessary to enable Congress to do so," 298 U.S. at 531 – ~~is~~ remains the correct one.

84. ~~62.~~The Court concluded in *New York* that State consent cannot cure an otherwise unconstitutional infringement of state sovereignty for the same reason that municipal bankruptcy violates constitutional federalism in the first place: the design of federalism is meant "for the protection of individuals," not States. *New York,* 505 U.S. at 181 ("The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States."). State government officers may even have "powerful incentives" to consent to a diminishment of state sovereignty to evade one of the core benefits federalism promises to individual citizens: direct accountability of political officials for actions taken in their clearly demarcated domains of authority. *Id.* at 182-83 ("[I]t is likely to be in the political interest of each individual official to avoid being held accountable to the voters."). Therefore

13-53846-tjt   Doc 1163   Filed 10/11/13   Entered 10/11/13 16:08:06   Page 57 of 138

state consent cannot not be allowed to dismantle the delicate balance of powers protecting the accountability of each dual sovereign to its citizens.

C.   AFSCME'S ACTIVE AND RETIRED MEMBERS HAVE INDIVIDUAL STANDING TO ASSERT THAT CHAPTER 9 VIOLATES THEIR INDIVIDUAL RIGHTS TO A FEDERAL SYSTEM OF GOVERNMENT

(v)   AFSCME Does Not Seek To Relitigate *Bekins* And The City's Reply Brief Arguments Regarding The Constitutionality Of Chapter 9 Ignore And Misapply the Relevant Authority Discussed Above

85.   While the City argues (*see* Debtor's Reply, at p. 10) that AFSCME (among other objectors) seeks to "relitigate" *Bekins*, this is simply not the case.  As a threshold matter, when the Supreme Court decided *Bekins,* it reasoned that a federal municipal bankruptcy statute was constitutional in large part because "[t]he natural and reasonable remedy through composition of the debts of the district was not available under state law by reason of the restriction imposed by the Federal Constitution upon the impairment of contracts by state legislation."  304 U.S. 27 at 54.  Four years later, the Supreme Court reversed course and held that states can pass state statutes for composition of municipal debts, an area of law it now deemed to be "peculiarly local" because it involved "the fiscal management of its own household."  *Asbury Park,* 316 U.S. at 309.  Had *Asbury Park* been decided at the time of *Bekins,* certainly the litigation of the issues would have taken a very different form.

86.   Nor have the "relevant statutory provisions remained substantially unchanged" since *Bekins.*  Debtor's Reply, at p. 9.  To the contrary, the federal municipal bankruptcy statute has been amended numerous times, most notably four years after *Asbury Park* to undo the victory for states' rights won by the city of Asbury Park in that case.  Since then, the federal municipal bankruptcy has prohibited state composition procedures such as those upheld in *Asbury Park*.  *See* 6-903 Collier on Bankruptcy P 903.LH[2]; 11 U.S.C. § 903(1) ("[A] State

law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition.").  The harm, emphasized by AFSCME above and below, is that chapter 9 after *Asbury Park* represents "an unholy alliance in which the State receives in exchange [for its consent] powers in excess of those it would otherwise possess under the law."  *See supra,* ¶ 60.  *See also infra,* ¶¶ 100-103 ("[B]ecause chapter 9 allows the City a process for adjusting its debts which is not identical to the process for doing so under state law – either as it currently exists or if the state were to pass its own municipal composition law" – AFSCME's members rights to the protection of dual sovereign governments have been violated).  This harm is enhanced by the provision of chapter 9 forbidding the states from adopting their own municipal debt adjustment laws, which coerces states into accessing chapter 9 just to receive a constitutional right it already possesses under *Asbury Park.*

87.     With respect to the continued constitutionality of chapter 9, the City's core contentions are that (1) the Court's ruling in *Asbury Park* provides no meaningful opportunity for debt adjustment to municipalities, (2) chapter 9 is essential to states because they need it to sidestep the otherwise-applicable constitutional limit that "they are *not* at liberty under the Contracts Clause to impair their own contracts"; and (3) chapter 9 cannot violate federalism principles because it does not compel state or local governments to take any action.  Debtor's Reply at 13-15.  The first two of these arguments only further confirms the unconstitutionality of chapter 9, and the third is off-target.

88.     First, the City is technically correct that a chapter 9 bankruptcy is currently the "one viable option" for a "financially prostrate municipal government" wishing to "resolve debts in a non-consensual manner," (Debtor's Reply. at pp. 13-14 (citation omitted)), but that is

only because chapter 9 itself unconstitutionally bars – as a matter of statute – the type of state statute approved by the Supreme Court in *Asbury Park* which would allow adjustment of municipal debts over the objections of creditors under state law. The municipal debt adjustment legislation in *Asbury Park,* for example, required that any plan of adjustment only be "approved by 85 percent in amount of the creditors" of the municipality. 316 U.S. at 505.

89. It is for this reason – and *not,* as the City misleadingly contends, for any reason of constitutional law stemming from the *United States Trust* line of cases – that it "comes as no surprise" that *Asbury Park* is the only case sustaining the alteration of a municipal bond contract outside a bankruptcy case. *See* Debtor's Reply at 13-14. *United States Trust* did not consider the constitutionality of a state municipal reorganization statute enacted "for the purpose of benefiting" creditors by adjusting their debts – the issue in *Asbury Park* – but rather the statutory "repeal" of a discrete contractual promise made by state obligors to bondholders, with no state-law process for the bondholders to adjust their debts. *United States Trust Co. of NY v. New Jersey,* 431 U.S. 1, 28 (1977).

90. The City is thus wrong to argue that AFSCME's argument "would actually impede, rather than protect, States' sovereignty." Debtor's Reply, at p. 16. Rather, it is Bankruptcy Code section 903 that impedes state sovereignty. Prior to the addition of section 903 to chapter 9 of the federal municipal bankruptcy statute, the Supreme Court held in *Asbury Park* that that statute could not preempt New Jersey's state municipal reorganization law because New Jersey was not "powerless in [the] field" of "the autonomous regulation of problems so peculiarly local as the fiscal management of its own household[.]" 316 U.S. at 509. The "explicit limitation" on state municipal reorganization statutes now found at Section 903 "was added to overturn the holding in *Asbury Park*." *See* Michael W. McConnell &

Randal C. Picker, *When Cities Go Broke: A Conceptual Introduction to Municipal Bankruptcy*, 60 U. Chi. L. Rev. 425, 462 (1993). As such, it represents "congressional overreaching in violation of the Tenth Amendment." 6-903 Collier on Bankrupty P 903.03[2]. In the wake of *Asbury Park* and its subsequent Congressional overruling, the states' sovereign power to control municipal reorganization are not aided by chapter 9, they are unconstitutionally limited.

91. Second – after misleading the Court to believe that *Asbury Park* represents a jurisprudential "outlier" whose rule has been ineffective rather than a watershed decision which Congress rushed to nullify by statute only four years later in "one of the more interesting turnabouts in the history of bankruptcy legislation," 6-903 Collier on Bankruptcy P 903.LH[2] – the City pivots to argue that because the state municipal adjustment statute sanctioned in *Asbury Park* must still satisfy the Contracts Clause of the United State Constitution, U.S. Const., Article I, § 10 (the "**Contracts Clause**"), states need chapter 9 "to impair their own contracts" in violation of the Contracts Clause. Debtor's Reply, at p. 15. AFSCME, in contrast, maintains that the Contracts Clause continues to constrain all municipal bankruptcies.

92. Having thus conceded, in a surprising display of candor, that the purpose of the City's bankruptcy filing is not merely to accomplish what it cannot accomplish under a state municipal composition law as a matter of preemption by Section 903, but what it is expressly prohibited from accomplishing as a matter of unconstitutionality by the Contracts Clause, the City's papers effectively also concede that chapter 9 and/or PA 436 are unconstitutional. The reason: the State of Michigan cannot "impair contracts" beyond what the Contracts Clause allows, and Congress lacks the power under Article I to consent to Michigan doing so.

93. Neither *Bekins* nor *Asbury Park* directly addressed this question: whether Congress exceeded its Article I powers by passing a municipal bankruptcy law purporting to

empower states to violate the Contracts Clause. *Bekins,* instead, considered "whether the exercise of the federal bankruptcy power in dealing with a composition of the debts of [a municipality] . . . must be deemed to be an unconstitutional interference with the essential independence of the State," *i.e.*, the federalism question raised in *Ashton* and at issue in *Bekins*. 304 U.S. at 49; *see also When Cities Go Broke, supra,* at 451-52 (noting that "a plausible argument against the Act might have been based on the rights of the creditors" to complain "that Congress could not extend its own Contracts Clause immunity to a state or local government," but that argument was not raised in *Ashton*). *Asbury Park,* meanwhile, unequivocally held that the Contracts Clause applied to state municipal reorganization legislation, and also gave every indication that a state's authority to pass municipal reorganization laws was coextensive with Congress's. 316 U.S. at 507-08. The only time a member of the Supreme Court has ever identified a potential Contracts Clause problem with the federal municipal bankruptcy statute is found in Justice Cardozo's dissent in *Ashton* but the Court in *Bekins* declined to follow Justice Cardozo's lead. *See* 298 U.S. at 541-42 (rejecting argument that federal municipal bankruptcy law violated Contracts Clause). This leaves the majority opinion in *Ashton* – which effectively rejected Justice Cardozo's argument, and which was not explicitly overruled by *Bekins* – as the only evidence consideration by a majority of the Court.

94.     The Constitution does not simply disappear once a bankruptcy petition is filed, even for holders of unsecured claims. *See, e.g., City of New York v. New York, N. H. & H. R. Co.,* 344 U.S. 293 (1953) (unsecured creditors possess right to notice and hearing under Fifth Amendment before debts can be discharged). So too with the Contracts Clause found at Article I, Section 10 of the U.S. Constitution. Article I, Section 10 contains three clauses, the last two

of which permit Congress to consent to a number of otherwise-unconstitutional state acts, for example the right to "enter into any Agreement or Compact with another State," an example of which was the contract at issue in *United States Trust*. The Contracts Clause, however, is found in the first clause of Section 10, which grants Congress no right to consent to a violation thereof. Thus, assuming *arguendo* that the City is correct that the intent of chapter 9 and PA 436 are both to skirt the constraints of the Contracts Clause by means of Congressional consent, Congress lacks the authority under Article I to grant that consent, and the Contracts Clause further prevents the State from passing a law like PA 436 intending to end-run the Contracts Clause. The result would be equally unconstitutional, and absurd, if Congress were to pass a statute, under its Section 8 power to coin money, which set up Article I courts to approve applications from individual states to coin their own money despite the blanket prohibition in Article I, Section 10 against states doing so.

95. Third, no state, as argued *supra*, can "consent" to "enlarge the powers of Congress; none can exist except those which are granted." *Ashton*, 298 U.S. at 531. The City's attempt to distinguish the Court's line of federalism cases since *New York v. United States* completely misses this point by insisting that chapter 9 does not violate the federalism principles articulated in those cases merely because "chapter 9 is 'administered' by the federal bankruptcy court, not the States." Debtor's Reply, at p. 16. But these cases cannot be oversimplified and read in a vacuum as the City suggests. The Court's new federalism stands not for the narrow proposition that Congress cannot force states to administer federal regulatory programs, but for a broader constitutional rule: "if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress," and "the Constitution has never been understood to confer upon Congress the

ability to require the States to govern according to Congress' instructions" even with "the 'consent' of the governmental unit whose domain is thereby narrowed." *New York,* 505 U.S. at 156, 162, 182.

96.     As described *supra,* chapter 9 does exactly that – if a state consents, a federal bankruptcy judge enforces a set of instructions from the Code, most notably the requirements for plan confirmation, and takes over municipal decision-making during the bankruptcy by controlling the municipality's right not to engage in discovery or mediation and by wielding the power to appoint a trustee to recover preferential transfers over the municipality's objection. These elements of chapter 9 – which the City entirely ignores in its brief – violate the Supreme Court's clear direction that ""[t]he Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment." *Id.* at 182.  The City points to general language in Section 903 prohibiting interference with "political or governmental powers," (Debtor's Reply, at p. 18), but that language is belied by other provisions of the Code explicitly permitting interference by the bankruptcy judge.

97.     The City's related argument that "chapter 9 operates much like federal programs that extend the benefits of federal money to States that voluntarily submit to federal requirements," (Debtor's Reply, at pp. 16-17) is inapposite because the state does not obtain money in exchange for taking some action clearly within its power but desired by the federal government, rather the state *reacquires* its inherent power under *Asbury Park* to access a process for adjusting its debts.  In exchange for a power it already would possess in the absence of chapter 9, the state is forced to give the federal government control over state sovereign functions not available to Congress under the Constitution.

98.     This aspect of chapter 9 – its nullification of all state laws for municipal debt adjustment in favor of an exclusive federal remedy which subjects state and local officials to federal rules – highlights the accountability problem of allowing state and local officials to represent to their constituents that the only way to escape financial catastrophe is to access chapter 9 and accept the rules therein, such as claim priorities in the Code, which voters in the state might wish to alter.  For if a state declines Congress's offer of access to chapter 9, it has no recourse to adjust municipal debts *en masse* as a result of Section 903.  Yet if a municipality is as financially distressed as the City contends it is, it faces the problem which motivated the Court in *Asbury Park* to find that states can design their own debt adjustment statutes consistent with the Contracts Clause: the City has no reasonable alternative.[11]  Under such circumstances, state and local government officials face an unconstitutional conundrum: accept federal interference with their sovereign fiscal self-management, or default on municipal debt in violation of the Contracts Clause.  If the former is chosen, the City accepts rules and instructions from a federal judge, which state and local officials can refer to when attempting to shift blame for the hard decisions of municipal reorganization instead of confronting a local debate over legislation at the state level about how to adjust municipal debt.

99.     Finally, the City is incorrect that chapter 9 is a uniform bankruptcy law.  As noted *supra* – but ignored in the City's reply – a municipal bankruptcy law would have been inconceivable to the framers.  But even had they imagined the unimaginable, they surely would have recognized that chapter 9 is a non-uniform law because it fails to "apply uniformly to a

---

[11]    In *Asbury Park,* the Court observed that "the practical value of an unsecured claim against the city is inseparable from reliance upon the effectiveness of the city's taxing power."  316 U.S. at 509-10.  Where, as in *Asbury Park,* financial crisis has rendered "the effective taxing power of the municipality prostrate without state intervention to revive the famished finances of the city," *id.* at 516, the Court recognized that "what is needed is a temporary scheme of public receivership over a subdivision of the State" allowing for the "discharge[]" of municipal debt obligations, *id.* at 510-11.  The City, like the municipality in *Asbury Park,* has contended that its need for bankruptcy protection stems from it having exhausted its ability to raise revenue through taxation.  *See* Eligibility Brief, pp. 28-30.

defined class of debtors." *Railway Labor Executives Ass'n v. Gibbons*, 455 U.S. 457, 473 (1982).  Surely, as the City notes, the Code can give way to state substantive law, such as the exemptions at issue in *Hanover National Bank*, which apply generally within a state as to all debtors in the same class.  But by outsourcing to the states the decision of *who* is eligible for chapter 9 protection, Congress has enacted a bankruptcy law that, rather than "define classes of debtors and . . . structure relief accordingly," *Gibbons*, 455 U.S. at 473, fails to define a class of debtors under federal law.  This yields statutes like PA 436, which is not uniform within Michigan because it does not grant the right to file for bankruptcy to all municipalities who meet defined criteria, but rather leaves the eligibility question to the unchecked discretion of the Governor.  *See* MCL § 141.1558 (placing no standards on gubernatorial decision whether or not to grant permission to file).  Whether on its face because it allows such a result, or as applied here in the context of PA 436, chapter 9 therefore violates the limitation that Congress only pass bankruptcy laws which are uniform.

**C.**     **AFSCME's Active And Retired Members Have Individual Standing To Assert That Chapter 9 Violates Their Individual Rights To A Federal System Of Government**

100.    ~~63.~~The Supreme Court has squarely held that individuals – and not just states – have standing to challenge that Congress has "exceeded its powers under the Constitution, thus intruding upon the sovereignty and authority of the States."  *Bond v. United States,* 131 S. Ct. 2355 (2011).  As also analyzed *supra,* individuals have their "own constitutional interests" to "assert injury from governmental action taken in excess of the authority that federalism defines," and their "rights in this regard do not belong to the State."  *Id.* at 2363-64.

101.    ~~64.~~Two aspects of the Court's conclusion in *Bond* are of special relevance to the instant case.  First, the Court emphasized that federalism protects not just "the integrity of the [state and federal] governments themselves," but also, distinctly, "the people, from whom all

governmental powers are derived." *Id.* at 2464. Individual citizens' interests in pressing federalism complaints include the "liberties that derive from the diffusion of sovereign power," such as (1) "greater citizen involvement in democratic processes" and citizens' consequent ability to use their voices "in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power"; and (2) the promise that "laws enacted in excess of delegated governmental power cannot direct or control their actions" and the consequent protection of citizens from the "arbitrary power" caused by giving any one government too much sway over "the concerns of public life." The City's chapter 9 petition threatens AFSCME's members with both of these harms insofar as it (1) shields the City from a democratic process of resolving its fiscal crisis by rejecting the accountability of local politicians responsive to Detroit's citizenry in favor of an unelected federal judiciary, and (2) allows the federal government to concoct rules for the resolution of disputes in an "area of traditional state concern." *Lopez,* 514 U.S. at 580 (Kennedy, J., concurring).

102. ~~65.~~ Second, the *Bond* Court rejected the argument, pressed by the respondent, that a state's waiver of any interference with its sovereignty should trump objections by individual citizens on Tenth Amendment grounds. *See* Brief for the Amicus Curiae Appointed to Defend the Judgment Below at 25, *Bond v. United States*, 131 S. Ct. 2355 (2011) (No. 09-1227) ("Particularly when the private party's interests are not aligned with those of the State, as may well be true in this very case . . . private party suits have the potential to frustrate and undermine state policies and decisions."). To the contrary, the Court held, a claim that "a law was enacted in contravention of constitutional principles of federalism . . . need not depend on the vicarious assertion of a State's constitutional interests, even if a State's constitutional interests are also implicated." *Bond,* 131 S. Ct. at 2365. Whether the State has invited the

federal incursion upon State authority is irrelevant. Only whether the individual claimant's injury so much as "*might* not have come about if the matter were left for the [State] to decide" on its own matters to the analysis. *Id.* at 2366.

103. ~~66.~~No doubt exists that if the State of Michigan were left to devise its own scheme for adjusting municipal debts – as is squarely within its authority under *Asbury Park* – the State *might* devise a system different from the United States Bankruptcy Code. Under the microscope of "greater citizen involvement" at the local level, the City, fulfilling the promise of federalism to its citizens, would be more directly constrained to create a process responsive to their needs – including, perhaps, the same needs which prompted the passage of the state constitutional amendment protecting the very diminishment or impairment of vested pension rights which the City now seeks to accomplish under the cover of chapter 9. Regardless, because chapter 9 ~~allows~~ creates for the City ~~a~~ an exclusive process for adjusting its debts which is not identical to the process for doing so under state law – either as it currently exists or as it would exist if the state were to pass its own municipal composition law – AFSCME's members, as ~~debtors~~ creditors of the City, have standing to object to the City's use of chapter 9 on federalism grounds.

**D.** ~~**THIS COURT LACKS JURISDICTION TO DECIDE WHETHER CHAPTER 9 VIOLATES THE UNITED STATES CONSTITUTION**~~

**D.** **This Court Lacks The Authority Or Jurisdiction To Decide Whether Chapter 9 Violates The United States Constitution Or Whether Pa 436 Violates The Michigan Constitution**

104. ~~67.~~This Court lacks jurisdiction to decide whether chapter 9 violates the U.S. Constitution (or for that matter whether PA 436 and the authorization for the City's chapter 9 filing violates the Michigan constitution). As the Supreme Court recently explained in *Stern v. Marshall,* Article III of the Constitution assigns the job of resolving questions of constitutional

law to the "judicial power of the United States." 131 S. Ct. at 2609. Because bankruptcy judges are appointed under Article I–unlike judges appointed under Article III, who have life tenure and protection from removal or diminishment of salary – Congress may not grant to bankruptcy judges the right to exercise that power. *Id.*

105. 68.No doubt exists either that the resolution of federal constitutional questions comes under the "judicial power" and is not subject to any exception thereto. *Stern,* building on the Court's decisions in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50 (1982), and *Granfinanciera, S.A. v. Nordberg,* 492 (U.S. 33) (1989), held that any narrow "public rights" exception permitting bankruptcy judges to issue certain final orders does not apply to any legal claim "independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy." 131 S. Ct. at 2611. The federal constitutional claims of AFSCME's members stem from the Constitution, not the Bankruptcy Code, and cannot be resolved by the very claims process whose legality is the subject of the constitutional challenge. Though technically an objection to eligibility, AFSCME's state and federal constitutional claims in fact sound as affirmative allegations that their constitutional rights have been violated by the City's filings, such as would be brought under Section 1983 (and were brought in the Webster Litigation) but for the automatic stay and its extension by this Court pursuant to Section 105 of the Code

106. 69.Moreover, the instant constitutional challenge to chapter 9 has challenges have nothing to do with a federal regulatory scheme. *Stern* is quite clear that the "public rights" exception is limited to claims asserting rights "integrally related to particular federal government action," *i.e.*, claims challenging action undertaken pursuant to "a federal regulatory scheme" or whose resolution "by an expert government agency is deemed essential to a limited

regulatory objective within the agency's authority." *Id.* at 2613. Where, as is the case with this purely constitutional argument, the determination of a legal question has nothing to do with the contours of federal regulations or expert agency fact-finding, the argument must be resolved by an Article III judge.

107. ~~70.~~At its core, the "public rights" exception is designed to address situations where – unlike here – a party seeks to enforce rights which Congress has created by statute. *See Granfinanciera,* 492 U.S. at 51 (citations omitted). ~~This~~ The constitutional ~~challenge to chapter 9 invokes~~ challenges raised herein invoke no such public right; "Congress has nothing to do with it." *Stern,* 131 S. Ct. at 2613. Nor do bankruptcy judges possess any special expertise at resolving constitutional challenges to their own authority or jurisdiction. "The experts in the federal system at resolving" constitutional questions such as this one "are the Article III courts, and it is with those courts that [this] claim must stay." *Id.* at 2615. The words of the Supreme Court in *Stern* apply with equal force here:

> What is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment by a court with broad substantive jurisdiction, on a [constitutional] cause of action, when the action neither derives from nor depends upon any agency regulatory regime. If such an exercise of judicial power may nonetheless be taken from the Article III Judiciary simply by deeming it part of some amorphous "public right," then Article III would be transformed from the guardian of individual liberty and separation of powers we have long recognized into mere wishful thinking. [*Id.*]

108. While the City argues (*See* Debtor's Reply, at pp. 5-8) that AFSCME seeks to radically expand *Stern* ~~and~~that no private rights are at issue in this Court's determination regarding the federal constitutional issues raised above and the state constitutional issues raised extensively below, in fact, critical private rights (including rights of City pension plan participants) are ultimately at issue here, including rights specifically raised prior to the City's

filing of its chapter 9 petition by parties in, *inter alia*, the Webster Litigation (and other state court proceedings).

109.     The arguments against this Court's authority or jurisdiction to render any decision regarding the constitutionality of chapter 9 or, for that matter, the constitutionality of PA 436 have (since the filing of the Original AFSCME Objection) been extensively briefed in the Official Committee of Retiree's (the "**Retiree Committee**") (i) *Motion to Withdraw the Reference* [Docket No. 806] (the "**Withdrawal Motion**") and (ii) *Reply Memorandum of Law in support of the Withdrawal Motion* (Case No. 13-cv-13873, Docket No. 12] (the "**Reply Withdrawal Motion**").  The Withdrawal Motion is now pending before the United States District Court for the Eastern District of Michigan and rather than duplicate efforts, AFSCME hereby adopts **as if fully set forth herein** all of the arguments raised by the Retiree Committee in both the Withdrawal Motion and Reply Withdrawal Motion in support of why this Court lacks the authority or jurisdiction to render any decision regarding the federal constitutional questions raised above or the state constitutional issues raised below.

110.     71.Accordingly, and with respect, this Court should immediately refer this constitutional challenge to chapter 9 to the along with the state constitutional challenges (raised below) to the United States District Court for the Eastern District of Michigan for adjudication.

## II.     THE CITY IS NOT ELIGIBLE TO FILE FOR CHAPTER 9 PROTECTION UNDER SECTION 109(C) OF THE BANKRUPTCY CODE

111.     72.The City, as a purported municipal debtor, bears the burden of establishing it is eligible for relief under chapter 9.  *See, e.g.*, *In re City of Stockton*, 475 B.R. 720, 725-26 (Bankr. E.D. Cal. 2012) (citing cases); *In re Valley Health Sys.*, 383 B.R. 156, 161 (Bankr. C.D. Cal. 2008); *In re County of Orange*, 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995); *In re Sullivan County Regional Refuse Disposal Dist.*, 165 B.R. 60, 72 (Bankr. D.N.H. 1994).

"[A]ccess to Chapter 9 relief has been designed to be an intentionally difficult task." *Sullivan County*, 165 B.R. at 82; *see also In re Cottonwood Water and Sanitation Dist.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992) (explaining that, although the Bankruptcy Code, as remedial legislation, is generally broadly construed, "municipal bankruptcies involve significant problems . . . not encountered in the private sector" and raise important constitutional issues, so that "Congress consciously sought to 'limit accessibility to the bankruptcy court' by municipalities." (internal citation omitted)). As a result, "[t]he bankruptcy court's jurisdiction should not be exercised lightly in chapter 9 cases." *Sullivan County*, 165 B.R. at 82.

112. 73.As demonstrated below and as will be further demonstrated at trial, the City necessarily fails to carry its burden with respect to the following eligibility requirements: (i) valid authorization under Michigan state law (section 109(c)(2) of the Bankruptcy Code); and (ii) good faith negotiations or impracticability of such negotiations (section 109(c)(5) of the Bankruptcy Code ). AFSCME also reserves the right to argue (following completion of discovery) that the City does not ). Further, as has become apparent through discovery and as shown below (and AFSCME expects will be further shown at trial), the City's evidence regarding insolvency is woefully inadequate, supported by no expert testimony or other reliable evidence, and accordingly the City fails to satisfy the insolvency requirement under section 109(c)(3) of the Bankruptcy Code.

113. 74.FurthermoreFinally, the evidence reveals that the City's bankruptcy petition was filed in bad faith and not motivated by a proper purpose under chapter 9 and should be dismissed pursuant to section 921(c) of the Bankruptcy Code. *See e.g.*, *In re McCurtain Municipal Authority*, 2007 WL 4287604 at *3 (Bankr. E.D. Okla. Dec. 4, 2007) (holding that "the inability to pay debts as they become due depend[s] upon the inescapable quality of the

obligation and the certainty that it cannot be met. Mere possibility or even speculative probability is not enough.") (citations omitted).

114.    Before proceeding to address the merits of each of these arguments regarding (i) valid authorization, (ii) good faith negotiations/impracticability of such negotiations, and (iii) bad faith filing, it bears noting that during Orr's original deposition on September 16, 2013 (and subsequent October 4, 2013 deposition), Orr continued to hide behind the common interest privilege to essentially cover up any discussions or communications Orr had with State government officials under an alleged common interest privilege.

115.    While this Court determined the common interest privilege may apply to such communications, AFSCME believes that the discussions and deliberations between City and State officials leading up to the City's filing for chapter 9 in the period prior to July 18, 2013 – discussions which the City and State have clearly worked hard to keep secret –  relate to the crux of AFSCME's (and other objectors') arguments set forth below that the City filed its chapter 9 petition in bad faith, without real negotiations with significant creditors, and that the authorization was tailored by City and State officials to circumvent the Michigan constitution's Pensions Clause.  Given the presumption that government is supposed to be transparent (*e.g.*, FOIA statutes), and the fact that significant e-mails between the State, City and the Law Firm (including between the State and Orr) were already produced in this and other litigations, to the extent that the common interest ever applied, such privilege has been waived and AFSCME **asserts its continued objection to the City and State refusing to give deposition testimony or provide documents** (some of which may have been waived by prior documents produced and deposition testimony given by the State and City in this and other proceedings) subject to an asserted common interest privilege.

116.     AFSCME believes that it already has sufficient evidence to rebut the City's case regarding authorization, good faith negotiations, general bad faith filing, and insolvency, but notes that the City and State's continued reliance on a purported common interest should be reconsidered and AFSCME provided further testimony and documents prior to trial so AFSCME can have proper due process.[12]

### A.     The City Is Not Authorized By Michigan State Law To Be A Debtor Under Chapter 9

117.     ~~75.~~ The City contends that it is authorized to be a debtor under state law because Section 18 of PA 436, M.C.L. 141.1558, provides that "[u]pon receipt of the written approval [of the Governor], the emergency manager is authorized to proceed under chapter 9," and further "empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9."  *See* Eligibility Brief, p. 10.  However, the Governor's blanket grant of permission to file for bankruptcy under Section 18 of PA 436 violated the Michigan Constitution because it failed to explicitly prohibit the impairment or diminishment of vested pension rights, which the Governor was fully aware was the intention of the instant chapter 9 petition.  Moreover, the appointment of the Emergency Manager under PA 436 violates the "strong home rule" provisions of the Michigan Constitution.  Where, as here, a state constitution bars the purported state law authorization, a chapter 9 petition must be dismissed.  *See In re City of Harrisburg, PA*, 465 B.R. 744 (Bankr. M.D. Pa. 2011) (analyzing Pennsylvania Constitution to determine whether city was authorized to file under chapter 9).

---

[12] AFSCME did not appeal the Court's common interest ruling which was interlocutory, but reserves the right to argue on appeal that the City and State's failure to testify and produce documents on relevant subject matters, including regarding the EM and State's plans for the EM commencing the City's chapter 9 case, prevent AFSCME from a full and fair opportunity to litigate its objections to the City's eligibility.  Accordingly, AFSCME reserves all rights in this regard, including all appellate rights upon entry of a final appealable order regarding the City's eligibility.

### (iv) ~~(iii)~~Governor Snyder's Authorization Of The City's Petition Under Section 18 Of PA 436 Violated Article IX, Section 24 Of The Michigan State Constitution

118. ~~76.~~As a Michigan Circuit Court Judge has already held, Michigan State law forbids authorization of the City's bankruptcy petition insofar as it seeks to reduce accrued pension benefits in violation of the State Constitution.  Yet the Emergency Manager has been very clear that he intends to use this chapter 9 proceeding to do just that.  Indeed, the Emergency Manager had made that intent known well prior to requesting the Governor's permission to file under chapter 9.  For instance, on June 14, 2013 he both (a) issued a "Proposal for Creditors" expressly stating that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons," and (b) publicly threatened, in an interview with the Detroit Free Press Editorial Board, that vested pension benefits will not be protected in a chapter 9 proceeding authorized by the Governor pursuant to PA 436, and that any state laws protecting vested pension benefits will "not . . . protect" retirees in bankruptcy court.

119. ~~77.~~Article IX, Section 24 of the Michigan Constitution (the "**Pensions Clause**") provides: "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."  It means what it says: "[U]nder Art. 9, § 24, a retirement benefit *cannot be reduced.*"  *Seitz v. Probate Judges Retirement System,* 189 Mich. App. 445, 474 N.W. 2d 125, 128 (1991) (emphasis added); see *also id.* at 127 ("Article IX, § 24 protects those persons covered by a state or local pension or retirement plan from having their benefits reduced." (citing *Detroit Police Officers Ass'n v. Detroit,* 391 Mich. 44, 69, 214 N.W.2d 803 (1974))).

120. ~~78.~~Article IX, Section 24 completely protects the "receipt of pension benefits related to work already performed by" any City employees, whether active or retired – i.e., any pension benefits which have "accrued" and thus become "vested pension benefits" – from being diminished *at all.* *APTE v. Detroit,* 154 Mich. App. 440, 398 N.W.2d 436, 439-40 (1986); *Advisory Opinion re Constitutionality of 1972 PA 258,* 389 Mich. 659, 663 (1973) (holding that "the intention of the people in adopting" Article 9, Section 24 was that "the benefits of pension plans are in a sense deferred compensation for work performed . . . which should not be diminished by the employing unit after the service has been performed." (quoting 1 Official Record, Constitutional Convention 1961, 770-71)). Vested pensions rights covered by Article IX, Section 24 differ in this important respect from contractual benefits protected solely by Article I, Section 10 of the Michigan Constitution (the State's "Contracts Clause"), which in a narrow set of cases may not prohibit the State from effecting "a modest, temporary impairment" of those other types of "governmental contracts . . . as a matter of last resort to address a fiscal emergency." *AFT Michigan v. State,* 297 Mich. App. 597, 602, 825 N.W.2d 595 (2012) (noting that "[a]ll parties agree that . . . accrued financial benefits under Const. 1963, art. 9, § 24 . . . may not be impaired," but concluding that the retiree health benefits in question were not "accrued financial benefits" within the wholesale protection of Article IX, Section 24 and thus proceeding to consider whether they could be impaired under the Contracts Clause); *BCBSM v. Governor,* 422 Mich. 1, 22-23, 367 N.W.2d 1 (1985) ("The federal balancing approach has been adopted by our Court for purposes of adjudicating state Contract Clause claims as well as federal Contract Clause claims.").

121. ~~79.~~Governor Snyder violated Article IX, Section 24 – and with it the requirement, set forth at 11 U.S.C. § 109(c)(2), that he be "empowered by State law to

authorize" the City to become a debtor – when he failed to condition the City's chapter 9 petition on the complete preservation of vested pension rights despite the ~~clearly available public information~~ Governor's clear knowledge (admitted to by the Governor in deposition testimony provided on October 9, 2013, *see supra,* ¶28) that the Emergency Manager intended to use the Governor's authorization to diminish constitutionally sacrosanct pension benefits.[8] Section 18 allows the Governor to "place contingencies on a local government in order to proceed under Chapter 9," but does not explicitly require that compliance with Article IX, Section 24 be one of those contingencies. In this case, the Governor explicitly chose "not to impose such contingencies." *See* Docket No. 1 at p. 16.

122. ~~80.~~Section 18 is unconstitutional as applied where, as here, the Governor has abused his discretion by purporting to authorize a bankruptcy which "would violate the constitution." *Taxpayers of Michigan Against Casinos v. State,* 478 Mich. 99, 107-08 & n.3 (2007) (even "broad discretion" granted to Governor by statute to act unilaterally must be exercised "within the limits of the constitution"). Moreover, Governor Snyder's authorization has itself unconstitutionally caused an "immediate, concrete injury" to Council 25's members by creating a "contingent liability" that their inviolable rights will be disregarded, causing them to reorder their financial affairs. *See Clinton v. New York,* 524 U.S. 417 (1998) (plaintiffs had standing to challenge constitutionality of executive action which, if left unchecked, would leave undisturbed potential future harm posing, by virtue of its magnitude, immediate and direct financial consequences to plaintiffs).

123. ~~81.~~The strings left unattached to the Governor's sign-off speak volumes because PA 436 is not ignorant of Article IX, Section 24. To the contrary, other sections of the Act

---

[8] ~~To the extent the unconstitutionality of the Governor's authorization turns on the question of whether he was on notice of the Emergency Manager's intent to unconstitutionally diminish vested pension rights, AFSCME will seek discovery regarding information possessed by the Governor, including any other applicable discovery.~~

explicitly reiterate that accrued pension benefits shall not be diminished or impaired outside the bankruptcy context. *See, e.g.,* MCL 141.1551(1)(d) (requiring that the Emergency Manager's financial and operating plan provide for "[t]he timely deposit of required payments to the pension fund for the local government"); MCL 141.1552(i)(m)(ii) (allowing the Emergency Manager in certain circumstances to serve as the sole trustee of a municipality's pension fund, but requiring that he "fully comply with . . . section 24 of article IX of the state constitution"); MCL 141.1553 (eliminating the "the accrual of postemployment benefits" of local government officers but prohibiting "the impairment of vested pension benefits"). Thus the Governor's contingency-free permission reads like an open invitation to the Emergency Manager to violate the State Constitution in bankruptcy, and therefore is unconstitutional.

124. 82.In the alternative, this Court should hold that any authorization the Governor sought to provide under Section 18 carried with it the implicit contingency that all actions taken pursuant to it by the Emergency Manager, including the proposal of any plan of adjustment under 11 U.S.C. § 943, must comply with the State Constitution, including Article IX, Section 24. In his letter to the Emergency Manager giving unconditional permission to file under chapter 9, Governor Snyder observed that the Bankruptcy Code "contains the most important contingency – a requirement that the plan be legally executable" under 11 U.S.C. § 943(b)(4). Docket No. 1 at p. 16. Because a plan of adjustment which would reduce vested benefits would not be legally executable under the Michigan Constitution – and because, as Governor, Snyder is forbidden from authorizing any violation of the state constitution – his letter to the EM should, in the alternative, be construed as requiring compliance with Article IX, Section 24.

125. 83.AFSCME and its members must not be made to wait to raise a § 943(b)(4) argument until the moment a plan is proposed – though of course they reserve the right to do so

– because of the harm being suffered by the AFSCME Detroit Employees *now* as a result of their credible fear that the Emergency Manager will force them to accept the unconstitutional impairment or diminishment of their vested pension rights - the threat of which he is attempting to use as leverage against then *now*.  Thus, if this Court plans to find the City eligible to file for bankruptcy under chapter 9, it should hold on the record *now* that any plan proposed by the City will have to comply with Article IX, Section 24 because the Governor could not have given permission to file under chapter 9 without including the implicit contingency that the City's plan of adjustment not reduce vested pension benefits.  Otherwise creditors with vested pension rights will continue to suffer an unconstitutional injury throughout the course of this bankruptcy as a result of the threats of the Emergency Manager , and the Court will be virtually powerless to prevent that harm unless and until the City proposes its plan of adjustment.  To prevent that harm *now*, the Court at the very least should clarify, as a preliminary condition of eligibility, that these bankruptcy proceedings cannot reduce vested pension benefits.  *Cf. Seitz*, 189 Mich. App. at 456 (declining to "throw out" a pension-reform statute in its entirety where none of the plaintiff state court judges could show that they would receive reduced pension benefits under said statute, but clarifying that the state was required "to honor its obligations" not to enforce the statute wherever doing so would in fact result in a reduction to a retired judge's vested pension rights).  *See also Lansing School Educ. Ass'n v Lansing Bd. of Educ.*, 487 Mich. 349, 372 n.20; 792 N.W.2d. 686 (2010) (declaratory judgment appropriate under Michigan law to accomplish a "sharpening of the issues raised" (quotation omitted)).

126.  84.Whatever its route – either by holding that the Governor violated Article IX, Section 24 by granting the City blanket permission to file under chapter 9 despite knowing full well that the Emergency Manager plans to use chapter 9 to cram down unconstitutional pension

reductions, or that the Governor's permission carried with it the implicit condition that Article IX, Section 24 not be violated in bankruptcy– this Court must, when applying state law, hold the Governor to the truism that he cannot take actions "that would violate the constitution" even where he is acting with "broad discretion" delegated to him by statute. *See Taxpayers of Michigan Against Casinos, supra.*

        **(b)**    **Despite the City's Arguments to the Contrary, Parties Have Already Been Unconstitutionally Harmed By The Governor's Authorization**

    127.    Addressing the above arguments, the City in the Debtor's Reply does not contest that (1) "the Emergency Manager has been very clear that he intends to use this chapter 9 proceeding to" "reduce accrued pension benefits" and "had made that intent known well prior to requesting the Governor's permission to file under chapter 9," *supra* at ¶ 118; (2) Governor Snyder's grant of permission to file under chapter 9 has caused an "'immediate, concrete injury' to Council 25's members by creating a 'contingent liability' that" they will have to "reorder their financial affairs" to address possible diminution to their pensions, *supra* at ¶ 122; (3) the EM is using this harm, which is being suffered by the AFSCME Detroit Employees now, as leverage against them in this bankruptcy, *supra* at ¶ 125; and (4) the Governor "cannot take actions that would violate the constitution even where he is acting with broad discretion delegated to him by statute," *supra* at ¶ 126. Moreover, since the City filed its reply brief, the Governor has testified to the fact that he was entirely aware that his purported authorization of this bankruptcy was intended to enable the reduction of vested pension benefits which would not be possible outside of bankruptcy court due to Article IX, Section 24 of the Michigan Constitution.

    128.    These four uncontested points, taken together with the Governor's testimony, are dispositive in answering the City's chief counterargument – made multiple times in only

slightly varied terms (*see, e.g.,* Debtor's Reply, at pp. 21-22; 28-31) – that the Governor cannot have violated the state constitution's "Pensions Clause" by granting the City permission for bankruptcy, and the EM could not have done so by filing the chapter 9 petition, because, the City contends, neither act in and of itself impaired or diminished any vested pension rights.

129.    Boiled down, the City's claim is that no retiree has yet suffered any injury as a result of the Governor's action.  *See, e.g.,* Debtor's Reply, at p. 22 (emphasizing that "the City's pension obligations have remained unimpaired").  Not so.  Contrary to the City's argument – and left entirely unaddressed in its briefing – is the fact that the threat of diminishment posed by the Governor's grant of permission is presently causing real economic harm to vested pensioners, diminishing the value of their vested pensions right now due to the uncertainty surrounding continued vitality of those pensions in bankruptcy.

130.    An imminent threat of future harm provides standing to assert a constitutional injury, even where that injury stems from the contingent effects caused by a plan of reorganization in bankruptcy.  *In re Global Indus. Technologies, Inc.,* 645 F.3d 201, 213 (3d Cir. 2011) (en banc) ("[A]n injury's having a contingent aspect does not necessarily make that injury incognizable.").  Thus, in *Clinton v. New York,* the Supreme Court made crystal clear that where an executive branch officer takes an action which could cost a private party money, but where that cost remains contingent on the actions of another branch of government, the private party has already experienced real, justiciable harm to its "borrowing power, financial strength, and fiscal planning."   *Clinton,* 524 U.S. at 430-31.  The Court in *Clinton* analogized this injury to the injury stemming from a pending trial in a "multibillion dollar" case, *id.,* which is not unlike the harm here.  Indeed, the testimony of many individual objectors before this

Court on September 19 confirmed the real harm being caused right now to the pension rights of retirees. *See generally* September 19 Hearing Transcript.

131.    For an act of a state to impair a contract, that act need not change the contract terms itself; it is enough that the state act makes impairment possible in the future. Just as "the First Amendment is implicated whenever free speech is *either threatened* or impaired," so too is "the Contract Clause []implicated whenever the *passage* of a law impairs the ability to negotiate and enter into contracts" even if no term of a contract currently in effect has yet been altered pursuant to the challenged law. *Donohue v. Mangano,* 886 F. Supp. 2d 126, 151 (E.D.N.Y. 2012). In *Donahue,* the County passed a law which, much like PA 436, permitted the cancellation of CBAs upon the order of a county executive. *Id.* at 134. Although no such executive order had yet been issued, the court found that the underlying law had caused an irreparable harm warranting a preliminary injunction because the specter of future contract cancellation had effectively impaired a number of existing contracts.

132.    In reaching its conclusion, the *Donahue* court made two crucial observations about the harm caused by the law at issue there, despite the law itself not yet having caused the formal cancellation of any actual contracts. First, "[i]f a public employer can gain through legislation what it gave up during good faith negotiations . . . the negotiations that bore [that] agreement become meaningless." *Id.* at 153. Second, "even if' no further action is taken to cancel or alter a particular contract, "this law arguably places a knife to the throat of the unions to coerce them into making certain concessions, under the threat of the [government] taking more egregious actions" in the future pursuant to the passed law. *Id.* The same, of course, is true as a result of the Governor's grant of permission and the filing of the City's bankruptcy petition: regardless of what happens to vested pension rights in bankruptcy, the mere

13-53846-tjt    Doc 1163    Filed 10/11/13    Entered 10/11/13 16:08:06    Page 82 of 138

availability of bankruptcy to the City "places a knife to the throat of the unions" and retirees "to coerce them into making certain concessions" of their vested pension benefits. The retirees experience this harm whether or not their pensions are cut in bankruptcy pursuant to a voluntary settlement or a cram-down. As such, it violates the Pensions Clause under any reasonable analysis.

133. In any case, this Court can only confirm a plan if "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 U.S.C. § 943(b). In *In re Sanitary & Improvement District, No. 7*, 98 B.R. 970 (Bankr. D. Neb. 1989), the court held that a plan could not be confirmed where that plan required less than full payment to bondholders, because although such a plan is generally permissible under chapter 9, Nebraska law required full payment to bondholders. *Id.* at 974-75. The important insight of *Sanitary & Improvement District* is that implementation of a plan of adjustment ultimately requires "action" *attributable to the debtor*, which must honor the requirements of state law. Accordingly, any reduction to pension benefits ordered by this Court would ultimately require acts attributable to the City, and thus would violate the Pensions Clause and be unconfirmable under section 943 of the Bankruptcy Code. This is especially true with respect to pension benefits because the state and its instrumentalities are forbidden by the language of the Pensions Clause from reducing vested pensions by any means whatsoever ("shall not be diminished or impaired *thereby*"). With respect to other contractual rights, the plain language of the contracts clauses of the federal and state constitutions require only that no "law" impairing such rights "be enacted."

134. No doubt aware that any plan reducing vested pension benefits could be effectively challenged under section 943 of the Bankruptcy Code, the City argues that such a determination must wait until the City proposes a plan, so that the City in the meantime can

wield the uncertainty of the outcome of such a challenge as leverage over the retirees to force them to agree to a plan which unconstitutionally reduces their pensions. This is precisely the type of injury which the *Donohue* court found to constitute an impairment warranting an injunction, and therefore this issue should be addressed *now*.

135. *In re City of Stockton,* 493 B.R. 772 (Bankr. E.D. Cal. 2013) – which the City contends stands for the proposition that "the 'main event' of pension impairment is not properly addressed until well after the eligibility stage," (Debtor's Reply, at p. 22) – is easily distinguishable. In *Stockton,* no creditor challenged that the city's petition was not authorized by state law as it related to pensions. The actual statement which the City relies on is mere *dicta* in *Stockton* referring to the fact that there, unlike here, the pension system (CalPERS) was "bellowing and pawing the sidelines during the eligibility phase" rather than challenging eligibility. 493 B.R. at 797. Thus, the *Stockton* eligibility opinion is completely inapposite. AFSCME, meanwhile, has identified no other bankruptcy court which has held that a state constitutional protection for pensions is not relevant at the eligibility stage. This Court thus writes on a clean slate.

136. Relatedly, the City completely misunderstands AFSCME's argument as to why the Governor's failure to attach conditions to his grant of permission to the EM to file under chapter 9 has harmed the Detroit AFSCME Employees' rights to their vested pensions. Contrary to the City's mischaracterization, AFSCME's argument is *precisely* that the State must "*refrain* from [diminishing or] impairing pensions," Debtor's Reply at 29 – it is just that once the Governor was aware of the unconstitutional threat to pension rights posed by the EM's plan to file under chapter 9, the Governor *failed to refrain* from injuring retirees by purporting to authorize the petition *without* exercising his discretion to avoid an unconstitutional result by

attaching contingencies thereto.  As noted above, the City has not contested that the Governor's exercise of his discretion is no excuse for taking actions which violate the state constitution. *See* ¶ 126, *supra.*

137.    The City's fallback argument that any such conditions would have been pre-empted by the Bankruptcy Code ignores the requirement in section 903 of the Bankruptcy Code that a State may "control . . . a municipality of or in such State" with respect to chapter 9. Section 903, of course, is the provision on which the City excessively relies in its attempt to ward off AFSCME's federalism challenge to chapter 9 writ large.  But the City cannot have it both ways.  Especially if section 903 of the Bankruptcy code is anywhere close to as forceful as the City contends elsewhere in its papers (*see, e.g.,* Debtor's Reply, at pp. 17-18), the correct rule from *Sanitary & Improvement District* is as follows: because Section 943(b) ultimately requires that any confirmable plan not cause the debtor to violate state law, state law does definitively constrain a chapter 9 debtor.  98 B.R. at 974-75.  Any other rule leads inexorably to an unconfirmable plan, or else redoubles the inherent federalism problems of chapter 9, regardless of pre-emption issues.

### (c)    Michigan's Pensions Clause Absolutely Protects Vested Pension Rights

138.    The City's second core counterargument in the Debtor's Reply – that Michigan's Pensions Clause does not absolutely protect vested pension rights (Debtor's Reply, at pp. 22-31) – contradicts both the plain language of the clause and state court decisions based thereon.  For starters, the text of the Pensions Clause differs significantly from both the federal and state contracts clauses (together, the "**Contracts Clauses**").  While the contracts clauses, each found in Article I of its respective constitution, only prohibit any "law *impairing* the obligation of contract," the Pensions Clause, found in Article IX of the Michigan Constitution,

states that pension benefits "shall be a contractual obligation thereof *which shall not be diminished or impaired* thereby."

139. As the Attorney General has noted, "[t]he Constitution and the language of § 24 is understood according to its plain meaning," by virtue of which it "is an impermeable imperative." *See Attorney General Bill Schuette's Statement Regarding the Michigan Constitution and the Bankruptcy of the City of Detroit* [Docket No. 481], at pp. 14-15. Importantly, Section 24 prohibits not only the impairment of pensions – arguably a prohibition coextensive with the contracts clauses, which also speak in terms of impairment – but *also* their diminishment. Because the drafters of the amendment used the disjunctive word "or" to separate the word "diminished" from the word "impaired" in Section 24, "[c]anons of construction" require that each mean something different. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). As emphasized by AFSCME – but entirely ignored by the City – that difference is reflected in the Michigan Court of Appeals' holding that "under Art. 9, § 24, a retirement benefit *cannot be reduced.*" *Seitz*, 474 N.W. 2d at 18.

140. The City's "strained construction," in contrast, "would have us ignore the disjunctive 'or' and rob the term" *diminished* "of its independent and ordinary significance[.]" *Reiter*, 442 U.S. at 338-39. Had the framers of the Pensions Clause wished it to mirror the Contracts Clause, they could easily have ended the Pensions Clause with the phrase "shall be a contractual obligation." Or they could have limited the clause to read "shall be a contractual obligation thereof which shall not be impaired thereby." But they did not.

141. Instead, the framers drafted, and the People of Michigan ratified, broader language, which they placed in an entirely different section of the Constitution – one which expressly controls, in minute detail, the financial decision-making of state and local

governments. For example, and further indicating how strongly the people of Michigan sought to protect their pensions through constitutional amendment, Article IX, § 24 also includes an affirmative requirement that all pension benefits "arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities." The Pensions Clause must be read in the context of the entirety of Art. IX, § 24, and its comprehensive dual protection of vested pension rights both from diminishment and from underfinancing.

142. Thus properly read, Art. IX, § 24 belies the City's contention that the limited intent of the Pensions Clause is to make pension benefits akin to any other contract. To the contrary, as explained by one of its chief drafters, § 24 was designed to acknowledge that pension benefits constitute "deferred compensation for work performed . . . *which should not be diminished by the employing unit after the service has been performed.*" 1 Official Record of the State of Michigan Constitutional Convention of 1961, 770–71. As such – and as argued *supra* in ¶ 120, but, yet again, entirely unanswered by the City – Michigan courts have held that vested pensions are different from other types of "government contracts," which may be subject to "a modest, temporary impairment . . . as a matter of last resort to address a fiscal emergency." *AFT Michigan,* 297 Mich. App. at 602. Ironically, the sole precedential Michigan opinion that the City cites in support of its argument that § 24 merely grants "contractual status" to pension benefits – *Kosa v. State Treasurer,* 292 N.W. 2d 452 (Mich. 1980) – uses that phrase offhandedly in prefatory language, *see id.* at 455, and then goes on to emphasize in its substantive discussion "the firmly established right of public employees to receive pension payments as those payments become due." *Id.* at 460.

143.     Against this overwhelming evidence that the people of Michigan ratified Article IX, Section 24 in order to render public pension benefits inviolable, the City contends that because the amendment fails to mention municipal bankruptcy, it must not have been intended to be able to forestall a filing under chapter 9.  Debtor's Reply at 25-26.  In support of this argument, the City cites to an advisory opinion of the Michigan Supreme Court holding that the Pensions Clause does not create a right to receive pensions tax-free.  *Id.* (citing *In re Constitutionality of 2011 PA 38,* 806 N.W.2d at 697, n.24).  This argument confuses the right with the remedy.  The issue in *In re Constitutionality of 2011 PA 38* was the scope of the right protected by the Pensions Clause, not the ability of that constitutional right to trump a particular state statute.  As with other constitutional rights, the absolute right to vested pension benefits constrains all state statutes when they come into conflict with the right, as here.  With respect to an *as applied* challenge like AFSCME's, concluding otherwise would be akin to saying that the Governor could grant an emergency manager permission to file under chapter 9 knowing full well that the EM proposed to seek approval from the bankruptcy judge for a plan loaning Detroit's credit to private investors in violation of Art. VII, § 26 – a right only protected by the state constitution.

144.     Therefore, even assuming *arguendo* that the City is correct that the contracts clause in the U.S. Constitution "does not pose any obstacle to chapter 9," (*see* Debtor's Reply, at p. 24), these important differences between the contracts clauses and the Pensions Clause would avoid what the City characterizes as the "absurd result" that no Michigan municipality "could ever enter chapter 9, where the impairment of contracts is always on the table." Debtor's Reply, at pp. 27-28.  For as the City admits, Michigan courts interpret Michigan's contracts clause and the federal contracts clause "as having the same effect."  Debtor's Reply,

at p. 23 n.25 (citing *Fun 'N Sun RV, Inc. v. Michigan (In re Certified Question),* 527 N.W. 2d 468, 473-74 (Mich. 1994)).  This would also presumably be true in most other states, because contracts clauses in state constitutions have largely been interpreted as "mirroring provision[s]" subject to the same Supreme Court jurisprudence as the federal contracts clause, a result "consistent with the notion that a substantively identical state constitutional protection against impairment could not supplement the federal protection."  *See* Darryl B. Simko, *Emerging Issue in State Constitutional Law: Of Public Pensions, State Constitutional Contract Protection*, and Fiscal Constraint, 69 Temple L. Rev. 1059, 1077-78 (1996).

145.    When dealing with state law other than a state constitutional provision which only reiterates its federal counterpart, state law constraints on bankruptcy should govern unless expressly rejected by the Code.  *See In re Sanitary & Improvement Dist., No.7,* 98 B.R. 970 (Bankr. D. Neb. 1989).  Chapter 9 explicitly recognizes this fact by requiring in Section 109(c)(2) that petitions be "specifically authorized . . . by State law" at the outset, and in Section 943(b)(4) that a plan not be confirmed in the end unless "the debtor is not prohibited by law from taking any action necessary to carry out the plan."  After all, even though federalism concerns are less of a concern for bankruptcies filed under other chapters of the Code, in those proceedings too incorporation of substantive state law constraints is common.  *See, e.g., Butner v. United States,* 440 U.S. 48, 56 (1979) ("[T]he federal bankruptcy court should take whatever steps are necessary to ensure that the mortgagee is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued.").

146.    The recent reported *Stockton* and *Vallejo* decisions cited by the City, *see* Debtor's Reply at 26-27, are not to the contrary.  In the *Stockton* case, as noted *supra*, no party contended that a constitutional protection for pensions rendered the state ineligible for chapter

9 for want of state-law authorization under Section 109(c)(2). In fact, the opposite was true at the eligibility stage: prior to bankruptcy, the municipal debtor did *not* propose "to impair its pension obligation to the California Public Employees' Retirement System ("CalPERS")," and other creditors therefore complained that the debtor had failed to negotiate in good faith because the debtor should have been "more aggressively attacking its pensioners by way of CalPERS." 493 B.R. at 782, 786. Nor was a § 109(c)(2) challenge brought in *Vallejo. See In re City of Vallejo*, 408 B.R. 280, 285 (B.A.P. 9th Cir. 2009) (addressing eligibility problems solely under §§ 109(c)(4) and 109(c)(5)).

147. Finally, the City is flat wrong that *Prichard* approved reductions to vested pension benefits despite "[s]imilar constitutional protection for pensions" in Alabama. Debtor's Reply, at p. 27. In support of the purported similarity between Michigan and Alabama law, the City cites to *Bd. of Trs. v. Cary*, 373 So. 2d 841 (Ala. 1979), which held that vested pension benefits could not be altered by state legislation by virtue of Art. 1, § 22 of the Alabama Constitution of 1901. 373 So. 2d at 842 (per curiam). But Art. 1, § 22 of the Alabama Constitution is merely Alabama's catch-all contracts clause, which, like Art. 1, § 10 of the Michigan Constitution, just "reaffirms . . . the inhibitions of the Federal Constitution (art. 1, § 10) against ex post facto laws, or laws impairing the obligations of contracts." *Dunn Const. Co. v. State Board of Adjustment*, 234 Ala. 372, 386 (1937). *See also Opinion of the Justices*, 598 So.2d 1362, 1365 (Ala. 1992) (interpreting Art. I, Section 10 of the United States Constitution and Article I, Section 22 of the Alabama Constitution in tandem); *Sweet v. Wilkinson*, 252 Ala. 343, 348 (1949) (applying Supreme Court precedent about the federal contracts clause to interpret Article I, Section 22 of Alabama Constitution). Alabama thus has no explicit protection for pensions in its state constitution distinct from the federal contracts

clause. Moreover, the City cites no evidence to suggest that pensioners objected either to (a) Prichard's eligibility to file for chapter 9 due to lack of state-law authorization under § 109(c)(2), or (b) Prichard's plan of reorganization due to violation of state law under § 943(b). Accordingly, the City's reliance on *Prichard* is simply incorrect, and the City's arguments in this regard should be rejected.

### (v) (iv)PA 436 Violates The Strong Home Rule Provisions Of The Michigan Constitution

148. 85."Michigan is strongly committed to the concept of home rule," a structural state-local federalism under which "[t]he charter of a city stands as its 'constitution,'" and "once adopted by a vote of the electors, a city's charter may be amended only by a vote of the electors." *Bivens v. Grand Rapids*, 443 Mich. 391, 400-01 (1993) (quotations omitted) (striking down local ordinance which conflicted with local charter because local government could not "effectively amend the charter without subjecting the amendment to the scrutiny and approval of the local electorate"). This "strong home rule" regime reflects a bedrock principle of state law, which has been true for each of Michigan's three Constitutions beginning with the Constitution of 1850 and continuing through the current Constitution of 1963: all officers of cities are to "'be elected by the electors *thereof*, or appointed by such authorities *thereof*,'" not by the central State Government. *See Brouwer v. Bronkema*, 377 Mich. 616, 652, 141 N.W.2d 98 (1966) (quoting *People ex re. Le Roy v. Hurlbut*, 24 Mich. 44, 65 (1871) (Cooley Court)).

149. 86.In blatant disregard of this constitutional mandate, PA 436 – pursuant to which the Emergency Manager contends he has authority to file under chapter 9 on behalf of the City – strips the local electorate of its constitutional right to select its own officials, as well as to "frame, adopt and amend its charter" under Article VII, Section 22; to approve, by a two-thirds majority, any local act of the state legislature under Article IV, Section 9; and to be

subject to administrative authority only where that authority is guided by standards created by the legislature and subject to due process of law, see *BCBSM v. Governor*, 367 N.W. 2d 1, 51 (Mich. 1985). For each of these reasons, PA 436 offends the "strong home rule" of Detroit, and the Emergency Manager is not lawfully authorized to file for bankruptcy on behalf of the City or to act as its representative during chapter 9 proceedings

> (c) (b)**PA 436 Violates The Right Of The People Of Detroit To Select Their Own Local Officers And To Structure Their Own Government Via Charter**

150. 87.In one of its first cases interpreting the meaning of Michigan's current Constitution, the Michigan Supreme Court reaffirmed the hallmark holding of the legendary Cooley Court: city residents have the state constitutional right to select their own local representatives. *Brouwer,* 377 Mich. at 651-61. As Justice Cooley held in his seminal *Hurlbut* opinion – the wellspring of the so-called "Cooley Doctrine" of local government, *see* David J. Barron, *The Promise of Cooley's City: Traces of Local Constitutionalism,* 147 Univ. Penn. L. Rev. 487 (1999) – the right "to choose in some form the persons who are to administer the local regulations" is a right of local electors so basic to the "traditions, practice and expectations" of Michigan that it undergirds the State's Constitution even in the absence of express constitutional language to that effect. *Hurlbut,* 24 Mich. at 29-33.

151. 88.Having lived under the Cooley doctrine for 90 years at the time of Michigan's most recent constitutional convention, the framers of the 1963 Constitution would have understood *Hurlbut* as an even more foundational constitutional norm than Cooley himself. Indeed, the framers sought, in adopting the strong home rule regime which as now set forth in Article VII, to continue the "trend . . . toward strengthening inherent local government powers" which Justice Cooley "led" when he set forth the "rule" of local self-government in *Hurlbut.* 1 Official Record, Constitutional Convention 1961, 1052-53. As a result, Article VII

provides that "[t]he legislature *shall* provide by general laws for the incorporation of cities and villages," Art. VII, § 21; that under those general laws, "the electors of each city and village *shall* have the power and authority to frame, adopt and amend its charter," Art. VII, § 22; and that "[t]he provisions of this constitution and law concerning counties, townships, *cities* and villages *shall* be liberally construed *in their favor*," Art. VII, § 34. (Emphases added.)

152. ~~89.~~PA 436 offends Article VII in myriad ways. First, it effectively adopts a new charter for Detroit which substitutes the *unelected* Emergency Manager for the Mayor *and* City Council collectively – including by granting the EM the power to, *inter alia,* issue orders directing the mayor and city council; set the local government budget unilaterally; enter into, and break, contractual agreements for the City, including CBAs, loans, and property transfers; seize control of the pension fund from its trustees; and, most relevant here, act "exclusively on the local government's behalf in . . . . chapter 9." *See* MCL 141.1549(2) ("Upon appointment, an emergency manager shall act for and in the place and stead of the governing body and the office of chief administrative officer of the local government."); MCL 141.1550(1) ("An emergency manager shall issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary[.]"); MCL 141.1552 (EM may amend local government budget; make contracts; terminate CBAs; enter loan agreements; transfer property); MCL 141.1558 (EM directs bankruptcy).

153. ~~90.~~It is a direct violation of *Hurlbut* and *Brouwer* that the EM serves in the role of mayor and city council without being selected by Detroit.

154. ~~91.~~Moreover, despite the existence of detailed procedures in the Detroit Charter concerning the method of passing local laws and the interplay of authority between the local

legislative and executive officers, the EM may even exercise, according to PA 436, all authority of the mayor and city council *simultaneously* "concerning the adoption, amendment, and enforcement of ordinances or resolutions of the local government" and "[t]ake any other action or exercise any power or authority of any officer, employee, department, board, commission, or other similar entity of the local government, whether elected or appointed, relating to the operation of the local government."  MCL 141.1552(1)(dd-ee).

155.    92. To the drafters of the current Michigan Constitution, PA 436 would appear to parody Article VII.  The provisions of Article VII directing the legislature to provide for the incorporation of cities to be governed by charters written by the cities' voters is "mandatory," and even before the 1963 Constitution – which *increased* the home rule powers of cities – it was well-established that, in executing that mandate, ""under the Constitution the legislature [does] not have the power to change the law as embodied in the charter [of a local government] without a ratifying vote of the village electors."  *Utica State Sav. Bank v. Village of Oak Park*, 279 Mich. 568, 273 N.W. 271, 274 (1937) (state statute retroactively ratifying all contracts for purchase of lands by local governments could not ratify land contract which was unlawful under local charter).  This is because "the power vested in the [local] electors by the Constitution" to amend their own charter necessarily requires that "the Legislature does not have the power to alter or amend a [local] charter without the approval of the [local] electors."  *Id.* at 577.  Nor does the Legislature have the power to enter into contracts on behalf of the local government.  *Id.* at 578.  Yet PA 436 purports to empower Emergency Manager to assume all the powers of the local charter – including the ability to bind a city by contract for generations to come – without the core structural accountability for those powers baked into the charter in the form of local elections and separation of powers.

156. ~~93.~~While it cannot be denied that the state possesses a robust role in demarcating the limits within which a municipality may structure the form of its government via charter, PA 436 swallows whole the rights reserved to local electors in Article VII to execute, within limits, their own vision of local government.  For instance, typically "municipal officers can bind a municipality only if they are empowered to do so by the city charter."  *Manning v. City of Hazel Park*, 202 Mich. App 685, 691; 509 N.W. 2d 874 (1993).  The Emergency Manager, however, possesses no such constraint under the terms of PA 436, which grants him his extreme powers "notwithstanding any charter provision to the contrary."  MCL 141.1552(1).  Under PA 436, therefore, the Emergency Manager not only violates the charter by purporting to act with all of the power of the entire municipal government simultaneously as a matter of procedure, but also by doing so in direct violation of any substantive limitation that charter places on the local government.  In effect, each time the Emergency Manager takes an act which contravenes the City Charter – a charter which, to be clear, has not formally been repealed – he decrees an amendment to that charter.  But, as discussed *supra*, Detroit's citizens have a constitutional right to be the ones to amend their own charters.  Here too PA 436 egregiously violates Article VII.

157. ~~94.~~Article VII does not permit such a scorched earth approach to local democracy. The Emergency Manager's purported statutory authority to act for the City is antithetical to Article VII, and therefore the Emergency Manager was never authorized by state law to file the City's chapter 9 petition.  As fundamentally, the "City" has therefore not *voluntarily* filed a petition under Section 301 as incorporated by Section 901(a) of the Bankruptcy Code.

       (vi)    **Neither The City Nor State Pleadings Answer How Detroit's Voters Could Have Constitutionally Lost Their Right To**

**Local Self-Government Entirely, And The Loss Of That Right Invalidates Actions By The Emergency Manager Inextricably Intertwined With The Chapter 9 Petition And The Case Itself**

158.     Contrary to the City's assertion in the City's reply brief (*see* Debtor's Reply, at p. 39), the EM's power to set budgets, pass ordinances, and approve contracts under PA 436 is inextricably intertwined with the lawfulness of the City's chapter 9 petition.  The EM wielded these core local government powers as he allegedly endeavored (unsuccessfully, in AFSCME's view) to satisfy the requirements for a chapter 9 filing: negotiations with creditors, work on the City's budget as related to solvency, and so forth.  The bankruptcy filing resulted from a process directed by the EM using the virtually absolute powers accorded him by PA 436, despite his having not been elected.  The exercise of those powers under PA 436 is not severable from the EM's power to file for bankruptcy under Section 18.  Because he lacked the power to take those predicate acts, and for the independent reason that he was not selected by Detroit's voters, the culminating chapter 9 filing was unlawful.  For the same reason, the City did not voluntarily file its petition.

159.     The pre-filing orders of the EM, which are part of the public record, demonstrate the breadth of the EM's exercise of purely local powers, ranging from his explicit suspension of the City Charter, to discrete financial decisions about City expenditures, to control over potential attempts by the City to raise revenue.  For example, the Order No. 10, issued by the EM on July 8, 2013, suspends the Detroit Charter's requirement for filling vacancies on City Council.  *See* http://www.detroitmi.gov/Portals/0/docs/EM/Order%2010.pdf (last accessed Oct. 7, 2013).  Order No. 6, issued by the EM on May 2, 2013, directs the precise amount of deposits from the City to the Public Lighting Authority.  *See* http://www.detroitmi.gov/Portals/0/docs/EM/Order%206.pdf  (last  accessed  Oct.  7,  2013).

Order No. 5, issued by the EM April 11, 2013, requires that the EM approve in writing of any transfers of the City's real property. http://www.detroitmi.gov/Portals/0/docs/EM/Order%205.pdf (last accessed Oct. 7, 2013).

160.     While the State correctly asserts that Article VII, § 21 of the Michigan Constitution subjects municipalities to general laws related to taxation and debt (*see* State's Response, at p. 14), the State Constitution contains no like limitation for run-of-the-mill real estate contracts, public service expenditures, and other purely local acts related to the City's budget and fiscal self-management. Yet, as the State also admits, PA 436 "transfers authority to perform these duties and responsibilities to the Emergency Manager" (*see* State's Response, at p. 14), thus diverting municipal self-governance at the purely local level from the City's elected officials to an unelected "contractor to the State of Michigan" as the EM has described himself. *See* Orr 10/4 Transcript, at 454:10-14. This is not a case in which a particular local ordinance collides with a statewide regulatory scheme, as in *City of Taylor v. Detroit Edison Co.*, 475 Mich. 109 (2006). It is, instead, a comprehensive seizure of the City's right to self-governance in all areas, no matter how local the question at hand.

161.     Similarly, while the City may be right that, at a broad level, the Detroit Charter, Home Rule Cities Act, and case law recognize limitations on the "exercise of [City] power" stemming from general state laws, Detroit Charter, § 1-102, such general state laws do not determine *who* exercises the powers granted by the State to the City or inherent to the City's purely local affairs. Even assuming such limitations make it lawful for the legislature to pass a general statute granting certain powers to city councils rather than mayors, s*ee, e.g., Detroit City Council v. Detroit Mayor*, 238 Mich. App. 442 (2009), it is another thing entirely for the state legislature to designate *who* those city council members are, how they are selected, or who

is to manage quintessentially local affairs on a day-to-day basis. These are questions "of purely local character" assigned by Article VII to the will of the Detroit voters regardless of whether PA 436 is a general law. *See id.* at 175 (As against the City Charter, a general state "statute controls in all matters *which are not of purely local character.*" (emphasis added)). The EM has nevertheless wielded his power under PA 436 in purely local matters, even suspending the City Charter requirements for the selection of City Council members.

162.     On such basic questions of self-determination, the rule remains that the local electors must select their own local government officials, whatever the powers of those officials may be, and retain control over purely local matters. *See Brouwer,* 377 Mich. at 652. As the State concedes, the powers of the legislature to amend City Charters are limited "to matters of general concern," and "the power to amend a charter is vested in the local electors in purely local matters." *See* State's Response, at p. 12. Who is to govern them is one such "purely local matter," firmly established by the Cooley Doctrine as ratified by Article VII.

163.     The City's two attempts to shield PA 436 from the Cooley Doctrine both fail. Its first response – that the State may destroy a municipality entirely (*see* Debtor's Reply, at p. 40) – is inapposite, because, of course, the State has done no such thing here, and Detroit retains the rights granted to it by the State Constitution as a municipality.

164.     The City's second response – that the legislature has authority to temporarily replace local officials (*see* Debtor's Reply, at p. 40) – mischaracterizes the *Hurlbut* opinion. In *Hurlbut,* Justice Cooley stated in dicta that during the "inauguration and modification of local government" forms – *i.e.,* when creating entirely new formats for permanent local government – the State may make "provisional appointments to put the new system in operation." 1871 WL 3042, at *35. PA 436, in contrast, makes no provision for any new or modified permanent

form of municipal government in Detroit. Instead, it simply seizes the existing reins of power from elected officials and transfers them to an unelected individual.

165. Moreover, while the appointment of the EM *may* prove to be temporary – if, for instance, the financial emergency ends or the City Council removes the EM by a 2/3 vote after he completes 18 months of service (*see* MCL § 141.1549) – it may also prove to be indefinite if the financial crisis is not deemed to have ended and the local government cannot muster the 2/3 of City Council votes and the mayoral approval which are both required for removal. Where, as here, the EM has asserted the power to suspend the charter as it pertains to the makeup of City Council, the ability of the EM to perpetuate his tenure is all the more real. Moreover, the Governor might simply try to reappoint the EM, as he successfully did the Emergency Manager of the Detroit Public Schools. *See Davis v. Emergency Manager for Detroit Public Schools,* 491 Mich. 899, 903 (Young, C.J., concurring) ("Neither MCL 141.1501 et seq. nor the statutes applicable to emergency managers preclude reappointment of a person to the office of emergency manager if that person previously held the position.").

166. As to the State's Response, it is curious – and telling – that the State's otherwise comprehensive and strongly worded reply to AFSCME's home rule objections neglects to cite either the *Hurlbut* case or the Cooley Doctrine at all. The State does appeal to federal case law holding that local governments are not sovereign entities subject to the "one person, one vote" rule of the federal Equal Protection Clause and are subordinates of the State for federal constitutional purposes. State's Response, at pp. 15-16. However, the case on which the State relies, *Sailors v. Board of Education of Kent County,* considered *only* whether federal constitutional law created a *federal* right to elect "state or local officers of the *nonlegislative character.*" *See* 387 U.S. 105, 108 (1967) (emphasis added). The Cooley Doctrine, in contrast,

is a rule of *state* constitutional law, and *Sailors* certainly does not cast doubt on the right to elect local officials if state law so provides, as in the case of the Michigan Constitution.

167. Furthermore, because the City Council and Mayor whose duties the EM has captured possess "general government powers over an entire geographic area," they could in fact be subject to the "one person, one vote" rule. *Avery v. Midland County, Texas,* 390 U.S. 474, 485-86 (1970) (distinguishing *Sailors*). If anything, subjecting the people of Detroit to governance by an Emergency Manager who has been appointed by the Governor – over whose election Detroit electors have only a fractional influence – violates the "one person, one vote" rule when compared to other cities in Michigan who still possess the right to elect their own local government.

### (d) (c)PA 436 Purports To Delegate Authority To The Emergency Manager In Excess Of That Possessed By The Legislature

168. 95.Section VII is not the exclusive mechanism protecting the "home rule" rights of local electors in the Michigan Constitution. Municipalities are further protected by Article IV, Section 29, which forbids the legislature from passing a local act both (a) "in any case where a general act can be made applicable, and (b) "until approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected." "The requirement of a 2/3 vote of both houses and a majority vote in the area affected protects localities against arbitrary action." *Advisory Opinion on Constitutionality of 1975 PA 301,* 400 Mich. 270, 287, 254 N.W. 2d 528 (1977) (quoting 2 Official Record, Constitutional Convention 1961, p 2415).

169. 96.PA 436 allows the Emergency Manager to adopt local ordinances and take purely local legal acts which would otherwise be assigned to the local government. *See* MCL 141.1552. Before the EM takes a local act of this nature, however, neither he nor the

legislature makes any determination whether a general act could accomplish the same purpose; seeks the approval of two-thirds of the legislature; or submits the proposed act to the local electors for ratification. PA 436 therefore delegates to the EM power that the legislature simply does not possess. For even assuming *arguendo* that PA 436 is a general as opposed to local law, it contemplates the future passage of limitless local ordinances without the prophylactic mechanisms built into Artice IV, Section 29 to preserve "the settled purpose of the framers of the [Constitution] and of the people who adopted it to forever insure to the people the right to control their affairs purely local." *Attorney General v. Lacy,* 180 Mich. 329, 337, 146 N.W. 871 (1914) (striking down local law passed by legislature).

170. 97.The legislature cannot delegate power beyond that which it possesses. "That the Michigan Legislature may legislate absent constitutional limitations does not mean that it may wield legislative power in a manner other than that carefully prescribed by the Michigan Constitution." *Blank v. Dep't of Corrections,* 462 Mich. 103, 119, 611 N.W.2d 530 (2000). Yet PA 436 does just that, subjecting Detroit's citizens to purely local acts – including the instant chapter 9 petition – taken by a central authority without the protection of Article IV, Section 29. In this case that local legislation includes not only this illegal bankruptcy, but all of the legislative acts undertaken by the ~~Emergency Manager~~ EM leading up to and in support of the chapter 9 petition~~, the extent and content of which will be further developed in discovery and at trial~~.

### (vii)    Despite Arguments To The Contrary By The State And City, The EM Is Not A State Agent And Therefore His Use of Unlimited Power To Pass Local Acts Which Led To This Bankruptcy Violated The State Constitution

171.    The City's reply brief attempts to insulate its chapter 9 petition from these impermissibly local acts of the Emergency Manager (*see* Debtor's Reply, at p. 41), in the

process again ignoring the crucial fact that the petition was the culmination of the EM's exercise of total control over the City's local affairs during the course of four crucial months. *See* ¶¶ 158 - 159, *supra.*  As demonstrated, the EM pursued a chapter 9 filing for the City as a foregone conclusion.  Had the City's voters, rather than the State, remained in control of Detroit's own local affairs – as required by Article IV, Section 29 of the State Constitution – the City's elected officials could have used that power in ways which might have taken the City off the path to bankruptcy designed by the EM.  But the EM explicitly took that power away by Order No. 5, a local act removing from City Council and the Mayor any ability to raise revenue using City property.  By delegating the power to legislate locally entirely to the EM, the State effectively robbed the City of its local lawmaking ability and instead transferred that power – a power the State legislature cannot exercise under the State Constitution without approval of the local electors – to the EM.

172.    The City concedes that the State legislature may not pass local acts under Article IV, Section 29, but nevertheless contends that there is no violation of that provision when the EM exercises that power because *municipalities* are free to do so. *See* Debtor's Reply, at pp. 41-42.  The State makes essentially the same argument.  *See* State's Response, at pp. 17-18 ("This is no different from the authority generally granted by law to local elected officials but exercised locally.").  Both are wrong, however, that the EM exercises the "local government's powers, not the State legislature's."  Debtor's Reply, at p. 42; *see also* State's Response, at p. 18-19.

173.    PA 436 gives every indication that the EM exercises power as an officer of the State, not the City.  He is appointed by the Governor.  MCL § 141.1549(1).  The EM serves "at the pleasure of the governor," making him accountable to the State, not the City.  MCL §

141.1549(3)(d).  The State pays his salary.  MCL § 141.1549(3)(e).  The EM is "subject to" the Michigan "Conflict of Interest" statute – which applies to "members of the legislature *and state officers*," 1968 PA 318 – "as if he or she were a state officer."  MCL 141.1549(9)(c).  That PA 436 elsewhere states that the EM exercises his powers "for and on behalf of the local government," MCL § 141.1552(1)(d), does not alter the reality of whose authority he exercises.  The EM's powers derive not from the people of Detroit, but from the State Legislature which passed PA 436 to enable the transfer of those powers from Detroit voters to the EM as a state officer – or "contractor to the State of Michigan" as the EM has described himself.  *See* Orr 10/4 Transcript, at 454:10-14.

174.     The core issue here is not whether PA 436 itself is a general law, as the State insists (*see* State's Response, at pp. 13-14), but instead whether that general law includes within it an additional delegation of power permitting limitless local acts to be undertaken in the future with absolutely no limitation as to scope.  The limitation placed on the legislature's power to pass local legislation by Article IV, Section 29 would be entirely meaningless if the legislature could simply delegate the power to legislate locally, without any limitation, to a State appointee.  Yet that is exactly what PA 436 does, and therefore the authority exercised by the EM under PA 436 is unconstitutional and the bankruptcy petition filed as part of the exercise of that authority by the EM in violation of state law.

**(e)     (d)PA 436 Unconstitutionally Delegates Legislative Authority To The Emergency Manager Because It Lacks Adequate Standards To Guide The Emergency Manager's Actions In Bankruptcy, Which Are Not Subject To Judicial Review**

175.     98.Even assuming *arguendo* that the legislature had the authority to delegate its illegally asserted control over local self-governance, that delegation must still have included include (1) "sufficient standards and safeguards" to "direct[] and check[] the exercise of

delegated power," as well as (2) "due process requirements" ensuring judicial review of the delegated action. *BCBSM v. Governor,* 367 NW 2d 1, 51-52 (Mich. 1985). PA 436 lacks both with respect to ~~the~~ an Emergency Manager's control of the City during bankruptcy.

176. ~~99.~~First, PA 436 provides no standards whatsoever to the Emergency Manager – other than any "contingencies" which the Governor, and not the legislature, may ~~have,~~ (but did not in this case~~, designated~~ ) designate – for how to exercise the City's affairs under chapter 9. MCL 141.1558. Thus the Emergency Manager is unfettered, for example, to enter into settlements resolving claims by creditors – settlements which, under Section 7-5-203 of the Detroit City Charter, are legislative acts of the City which must be approved by the City Council – without following any guidelines provided by the State. While the Bankruptcy Court may apply its own *federal law* constraints in the course of approving, or not, such settlements – though the authority of a bankruptcy judge to do so is questionable in light of federalism principles, *see infra* – there is simply no *state law* standard to refer to evaluate whether the Emergency Manager, in entering the settlements, is effectively legislating in bankruptcy within the intent of the legislature. "This complete lack of standards is constitutionally impermissible." *BCBS,* 367 N.W. 2d at 55, and therefore the Emergency Manager is not authorized under state law to carry out the Legislature's attempted delegation of authority under chapter 9.

177. ~~100.~~Second, and relatedly, even assuming *arguendo* that PA 436 does contain standards constraining the absolute power of the Emergency Manager to act for the City under chapter 9, those standards are not subject to the requisite judicial review. As a result of the automatic stay, the Emergency Manager's actions during chapter 9 can only be litigated to the bankruptcy court, which itself lacks authority to decide freestanding state-law claims. *See* 11

U.S.C. §§ 902(a), 362 (automatic stay); *Stern v. Marshall, supra* (Article I judge prohibited from deciding independent state law claims unhinged from bankruptcy). But the City can arguably enter into settlements with creditors under chapter 9 *without* receiving approval from the Bankruptcy Judge, even if a competing creditor requests judicial review. *See In re City of Stockton, California,* Case No. 12-32118-C-9 (Bankr. E.D. Cal. Feb. 5, 2012) ("11 U.S.C. § 904 gives a chapter 9 debtor freedom to decide whether to ignore or to follow Rule 9019 compromise-approval procedure[.]"). The Emergency Manager thus acts in a legal vacuum, accountable neither in state court nor federal court for exercising the legislative power delegated to him by the State. The Michigan Constitution does not permit such insulation.

(viii)   **The City And State Cannot Evade The Non-Delegation Doctrine Because The EM Acts With The State Legislature's Authority In Bankruptcy Without Any Standards Or Judicial Review**

178.   Here, again, the City and State in their respective reply briefs seek refuge in the assertion that the EM exercises the powers of the City in chapter 9, not the powers of the State Legislature. And here too, for the same reasons explained *supra,* the City and State arguments fail. The EM may have been tasked by the State with governing the City, but he does so with the authority of the State as delegated by statute, not the authority of Detroit's voters. Neither the City nor State cites any case in which a Michigan Court has held that the non-delegation doctrine did not apply because the delegated powers were of either an "executive" or "local" character. *See, e.g.,* State's Response, at p. 19. The simple fact is that whatever powers the EM exercises, he does so by virtue of the State legislature's delegation of its own authority.

179.   The alternative contention by the City and State that PA 436 does provide "reasonably precise" standards to the EM for use in chapter 9 fails because it relies on standards applicable to the EM only outside of bankruptcy. *See* Debtor's Reply, at p. 43;

State's Response, at pp. 19-20. The City and State each cite to MCL § 141.1558, but that provision only provides a standard for use by the EM in exercising his discretion to recommend chapter 9 to the Governor. Once the EM makes that recommendation and the Governor approves it, the EM is granted power "to act exclusively on the local government's behalf in any such case under chapter 9" with no state-law standards whatsoever to guide him, including in the ultimate determination of whether to file for bankruptcy or not after receiving permission. *See* MCL § 141.1558(1). Nor does MCL § 141.1549(2), which the City and State also rely on, provide the EM any governing standards in bankruptcy. The City only partially quotes MCL § 141.1549(2) (*see* Debtor's Reply, at p. 43), but the full relevant quote from MCL § 141.1549(2) grants the EM virtually limitless powers rather than constraining him to any meaningful standards. MCL § 141.1549(2) states: "The emergency manager *shall have broad powers* in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and local government's capacity to provide or cause to be provided necessary government services essential to the public health, safety, and welfare." Put otherwise: the EM is to do whatever he needs to run the City as he sees fit. This is a grant of absolute power, not a limiting standard.

180. In any case, the City does not explain how either of the standards it asserts as governing the EM's actions in chapter 9 is enforceable by judicial review during the bankruptcy. The City claims that "this Court will review actions of the Emergency Manager," (Debtor's Reply, at p. 44), but does not explain how or whether this Court's review includes application of any standards contained in PA 436. Instead, the City admits that the only authority this Court has over the City consists of "*implementing provisions of the Bankruptcy Code* that may involve determination of state law issues." Debtor's Reply, at p. 44 n.38. The

City cites to no provision of the Code which would require this Court to assess whether the EM has followed the alleged state-law standards in PA 436 for his actions during chapter 9 which have been identified by the City.

181. The State, meanwhile, alone asserts that judicial review is possible because AFSCME can move for relief from the automatic stay to sue the City in state court if the EM violates the standards set forth in PA 436. This argument fails for two reasons. First, the ability to *request* that the Bankruptcy Judge grant relief from the automatic stay provides no *right* of judicial review of the EM's actions during the course of the bankruptcy, as this Court could readily deny the stay and thus foreclose any hearing on the merits of a claim that the EM has violated PA 436. Indeed, this Court has already extended the automatic stay to cover the State precisely to *prevent* creditors from obtaining judicial review of actions taken by the EM under PA 436. Second, and just as important, PA 436 itself "provides no administrative or judicial review to challenge" the EM's decisions, either inside or outside of bankruptcy. *See BCBSM,* 367 N.W.2d at 53. Thus, even if relief from the stay were to be granted, there is no sure route to judicial review of actions undertaken by the EM pursuant to PA 436.

**B. The City Failed To Participate In Any Good Faith Negotiations With Creditors Prior To Filing For Bankruptcy As Required For Eligibility Under Chapter 9**

182. ~~101.~~The City cannot meet its burden under section 109(c)(5) of the Bankruptcy Code of proving that it conducted good faith negotiations with its creditors or that such negotiations were impracticable.

183. ~~102.~~Congress enacted the "negotiation" requirement of section 109(c) to prevent capricious filings of chapter 9 petitions, and Courts do not "view lightly the negotiation requirements of 11 U.S.C. § 109(c)(5)." *See In re Villages at Castle Rock Metro. Dist. No. 4,* 145 B.R. 76, 85 (Bankr. D. Colo. 1990); *In re Town of Westlake, Tex.,* 211 B.R. 860, 867-68

(Bankr. N.D. Tex. 1997) (suggesting that section 109(c)(5) requires that a municipality have an intent to negotiate with creditors it intends to impair). "The 'creditor protection' provided by section 109(c)(5). . . insures that the creditors have an opportunity to negotiate concerning a plan on a level playing filed with the debtor before their rights are further impaired by the provisions of section 362 of the Code." *Sullivan County,* 165 B.R. at 78-79).

184. ~~103.~~In *Cottonwood Water*, the Court explained the good faith negotiation requirement under section 109(c)(5) of the Bankruptcy Code as follows:

> Congress consciously sought to limit accessibility to the bankruptcy court by municipalities [by requiring] . . . the municipal entity, before rushing to . . . Court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under section 941 of the [Bankruptcy] Code. . . . The 'creditor protection' provided by section 109(c)(5) . . . insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired by the provisions of section 362 of the [Bankruptcy] Code.

138 B.R. at 979.

185. ~~104.~~Accordingly, the burden is on the City to demonstrate (i) that it engaged in good faith negotiations with its creditors concerning the possible terms of a plan or (ii) why it was unable to engage in such negotiations. ASFSCME respectfully submits that the City cannot demonstrate any negotiations with creditors such as AFSCME, let alone "good faith" negotiations, and further given that the City conducted no pre-petition negotiations with significant creditors such as AFSCME, the City should not be heard to argue that negotiations were impracticable.

### (v)   ~~(iv)~~The City Failed To Negotiate With Creditors Such As AFSCME

186. ~~105.~~The City claims it satisfies the section 109(c)(5)(B) requirement for negotiating with its creditors prior to the bankruptcy filing by negotiating with creditors,

including unions such as AFSCME, ~~via several~~ in a few meetings held with its unions where the City discussed its restructuring proposals and took certain questions. *See* ~~Eligiblity~~ Eligibility Brief, pp. 53-61 (citing, *inter alia*, Orr Declaration, ¶¶ 90-96). What the City fails to mention is that, as discussed extensively above and as indicated by Orr himself prior to the scheduling of these meetings, it was made clear throughout these series of 3 or 4 relatively short meetings that the meetings were "discussions" and the City was not willing to conduct **any** negotiations. The City ~~has~~ argued that the EM "openly invited the City's creditors to contact the City and its advisors to begin negotiations." ~~Eligiblity~~ Eligibility Brief, p. 55. In fact, the City rebuffed negotiations, which require concessions from both sides and collaboration between the debtor and its significant creditors. The City (acting through Orr) simply was not interested in negotiations (and as Orr indicated regarding the predecessor to the ultimate Restructuring Plan, the EM's May 12, 2013 "Financial and Operating Plan", "[t]his isn't a plebiscite, we are not, like, negotiating the terms of the plan").

187. 106. *In re Ellicott School Building Authority* is directly on point. There, the debtor held three public meetings with large creditors regarding its proposed restructuring, although creditors were advised that the economic provisions of the proposed plan were not negotiable. 150 B.R. 261, 266 (Bankr. D. Colo. 1992). The court held that even though the debtor conducted three public meetings explaining its proposed plan of restructuring to bondholders, it did not negotiate in good faith because it indicated that the economic terms of its proposed plan were non-negotiable. *Id.* (debtor must be open to negotiating the substantive terms of a proposed plan); *cf. Int'l Ass'n of Firefightes, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 289 (9th Cir. B.A.P. 2009) (finding that the city did not satisfy section 109(c)(5)(B) because it "never negotiated with Unions or any of its creditors over the

possible terms of a plan of adjustment."); *Sullivan County*, 165 B.R. at 78-79 ("The 'creditor protection' provided by section 109(c)(5) . . . insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired . . . ." (citation omitted)).

188.   107. The City's a "take it or leave it" Restructuring Plan proposal that was not really open to any negotiations (good faith or otherwise) should be rejected as the court did in *Ellicott School*.  The City failed to engage in **any** negotiations with its significant creditors such as AFSCME regarding the Restructuring Plan.  Flatly refusing to conduct any negotiations (despite repeated requests by AFSCME both prior to and subsequent to the City's bankruptcy filing) falls far short of the standard required under section 109(c)(5) of the Bankruptcy Code.

189.   108. The City has publicly proclaimed its willingness to negotiate, yet it and its representatives' (i) statements that the meetings held to discuss the Restructuring Proposal Plan were not negotiations and (ii) continued bad faith refusal postpetition for a period of time post-petition (until required mediation began) to hold negotiations (despite requests from AFSCME to jump start negotiations) makes it more than clear that the City has conducted no good faith negotiations with AFSCME and similarly situated creditors.

190.   Moreover, as described extensively *supra* (¶¶ 3, 36, 45), to the extent that the City held a series of pre-petition meetings with creditors to discuss its Restructuring Plan, such meetings were simply scheduled as part of the EM and City's plan to bolster the City's "record (i.e. for future litigation)" as suggested by the City's lead bankruptcy counsel in the Pitch Presentation back in January 2013.  In addition, the evidence further reveals that the City had planned on filing for chapter 9 as of early July 2013 by the specific date of Friday, July 19, 2013 – even as alleged creditor "negotiations" were ongoing – regardless of how the

discussions were progressing. *See* Supp. Kreisberg Declaration, Exhibit C (spreadsheet document dated July 4, 2013 attached to e-mail from EM's office to State officials entitled "Chapter 9 Communications Rollout" indicated that Friday, July 19, 2013 was "FILING DAY"). This evidence further establishes that the City was not really interested in any serious negotiations.

<div align="right">

(d)     **Despite The City's Creative Arguments To The Contrary, The City Cannot Escape The Fact That It Refused To Negotiate In Good Faith**

</div>

191.    In the City's reply brief and in recent deposition testimony provided by Orr on October 4, 2013, the City and Orr have now taken the position that while the City may have made statements that its pre-petition meetings with the unions regarding its Restructuring Plan were not a "negotiation", such characterizations were simply to avoid any argument that the City triggered obligations to collectively bargain, which obligations may be suspended by PA 436. *See* Debtor's Reply, at p. 55 n.49; *supra*, ¶ 44. The City now argues that it was flexible in its negotiations and willing to consider other proposals, but received no counter-proposals from creditors, despite requests for same. The City's statements in that regard, however, do not establish the good faith **negotiations** required by the Bankruptcy Code. Requesting "feedback" or "invitations for further information" simply does not satisfy the City's burden of proof.

192.    AFSCME (and other objectors) offered on more than one occasion to engage in good faith bargaining and negotiations which were continually rebuffed by the City, and indeed as of late June/early July 2013, the City did not even have any complete proposal with respect to the restructuring of pension and other retiree benefits. Rather, the City's proposal to its creditors was no more than an ultimatum, with the City showing no real intention of negotiating economic or substantive terms. As noted, the City was interested in and spent months mapping out its path to chapter 9, and never had any real intention of bargaining in good faith.

13-53846-tjt    Doc 1163    Filed 10/11/13    Entered 10/11/13 16:08:06    Page 111 of 138

### (vi) (e) Even Assuming That The City Engaged In Negotiations, Such Negotiations Did Not Relate To A Plan That Is In The Best Interests Of Creditors As Required By Section 109(c)(5)(B)

193. ~~109.~~ While AFSCME submits that the City did not engage in any good faith negotiations with creditors such as AFSCME prior to the City's chapter 9 filing, even assuming this Court were to find otherwise, the City also has not satisfied section 109(c)(5)(B) of the Bankruptcy Code because the plan or terms of a plan being negotiated must be a plan that can be effectuated in chapter 9. *See Sullivan County*, 165 B.R. at 78 (debtor failed to meet burden of showing that it negotiated in good faith because the plan that was proposed was not a plan that could be effectuated in chapter 9); *Cottonwood Water*., 138 B.R. at 979 (finding that "in order for this Debtor to be entitled to the entry of an order for relief, it must be prepared to show that it engaged in good faith negotiations with its creditors concerning the possible terms of a plan to be effected pursuant to section 941 of the Bankruptcy Code.").

194. ~~110.~~ Here, the proposed Restructuring Plan is patently unconfirmable because ~~the plan seeks to~~ it unconstitutionally ~~wipe out~~ looks to reduce or eliminate guaranteed vested pension benefits pursuant to a plan that would presumably be crammed down on creditors, including those City retirees and employees that participate in the various pension and other retirement benefit plans, without their consent. Given that creditors owed pension obligations have absolute rights to ~~such obligations~~ those vested pension benefits under Michigan law as set forth extensively above, and one of the main goals of this proceeding is to modify vested pension and other retiree benefits, the City has no ability to confirm any plan of adjustment modifying such rights. *See* 11 U.S.C. §943(b)(4) (stating that the Court shall confirm a chapter 9 plan only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan.").

195. 111.Additionally, the Restructuring Plan is not in the "best interests of creditors" and thus could not be confirmed pursuant to section 943(b)(7) of the Bankruptcy Code. The "best interests of creditors" test in the context of a chapter 9 case does not compare treatment under a plan of liquidation, but rather to other alternatives to creditors to the plan. *See, e.g., In re Sanitary & Improvement Dist., #7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989); ("Section 943(b)(7) [with respect to the best interest of creditor's provision] ... simply requires the court to make a determination of whether or not the plan as proposed is better than the alternatives."); *In re Mount Carbon Metropolitan Dist.*, 242 B.R. 18, 34 n.50 (Bankr. D. Colo. 1999) ("The 'best interest' requirement of § 943(b)(7) is generally regarded as requiring that a proposed plan provide a better alternative for creditors than what they already have.") (citing 4 Collier on Bankruptcy, 943.03[7] (Lawrence P. King, ed., 15th ed.1999)).

196. 112.Had there been no chapter 9 filing by the City, pension creditors could not be impaired under the Michigan Constitution, and thus any impairment of such those rights under a plan of adjustment would violate Michigan law and be patently non-confirmable. Accordingly, because the Restructuring Proposal Plan proposes to unconstitutionally wipe out guaranteed vested pension benefits, the proposal cannot satisfy the requirements of good faith negotiations over a plan that could be effectuated in chapter 9.

197. 113.Orr failed to consider before filing for bankruptcy protection or since the filing, an equitable argument for the pension fund beneficiaries that other creditors extending debt after funding concerns surfaced publically should be subject to equitable subordination/fraudulent conveyance under Bankruptcy Code sections 510(c) and 544(b)/548(a) and pension benefits should take priority over those claims.

198. ~~114.~~Further, under Bankruptcy Code section 928(b), Orr should be exploring whether certain other creditors should bear the burden of some of the City's operating expenses during bankruptcy process, before benefit cuts are implemented.

199. The City in its reply brief (*see* Debtor's Reply, at p. 58 n.50) argues that AFSCME is incorrect that to satisfy the good faith negotiation requirement of section 109(c)(5)(B), negotiations must be conducted regarding the terms of a confirmable plan. The City cites no authority for rejecting AFSCME's arguments in this regard, and the weakness of the City's argument is belied by its relegation to a footnote. There can be no doubt that the reference to good faith negotiations of the terms of a plan in section 109(c)(5)(B) of the Bankruptcy Code is to negotiations of the terms of a plan that can be effectuated in chapter 9, *i.e.*, a confirmable plan, as argued above. It is illogical for the statute to reference negotiations regarding an unconfirmable plan. Were that the case, then the whole point of good-faith negotiations would be meaningless and rendered moot, or simply, be deemed bad faith. As one recent court has explained in the chapter 9 context:

> The structure of the sentence [*i.e.* section 109(c)(5)(B)] strongly implies that in the negotiations, municipalities are seeking the creditors' agreement *to a bankruptcy plan*. **What other agreements can they be seeking?**

*In re Mendocino Coast Recreation and Park District*, No. 12-cv-02591-JST, 2013 U.S. Dist. LEXIS 139697, at *19 (N.D. Cal. Sept. 27, 2013) (*emphasis* in original; **emphasis** added).

200. The City attempts to rebut AFSCME's reliance on *Sullivan County* and *Cottonwood, supra*, with respect to the meaning of a plan in section 109(c)(5)(B) of the Bankruptcy Code. Debtor's Reply, at p. 58 n.50. Although *Sullivan* does acknowledge that a *formal* plan is not required, that court states that, to be in good faith, negotiations must "revolve around the negotiating of the terms of a plan that could be effectuated if resort is required to

chapter 9 of the Bankruptcy Code."  *Sullivan*, at 78.  For a plan to be effectuated under chapter 9, it clearly must satisfy the parameters of and be confirmable under section 943(b) of the Bankruptcy Code and be in the best interests of creditors.  The *Sullivan* court's statement that the plan need not be a "formal plan", *id.*, at 78, is underscored by the language that follows (and conveniently omitted by the City):

> While the statutory requirement does not require a formal plan as such, some sort of comprehensive plan is required as one of the 'screening factors' to avoid a too early and rapid resort to the bankruptcy courts by municipalities.

*Sullivan*, 165 B.R. at 78 (emphasis added).  This language is telling and clearly negates the City's position with respect to the nature of the "plan."  Both the *Sullivan*, *supra*, and *Cottonwood*, *supra*, courts concluded that, even where the parties engaged in good-faith pre-petition negotiations, the municipality failed to satisfy section 109(c)(5)(B) because the negotiations did not include the terms of a plan under chapter 9 of the Bankruptcy Code.  The City would further have this Court ignore the finding in *Elliott*, adopting the well-reasoned analysis of *Cottonwood*, that a municipality must establish that "'it engaged in good faith negotiations with creditors *concerning the possible terms of a plan to be effected under section 941 of the Bankruptcy Code*.'"  *Ellicott*, 150 B.R. at 266 (citing *Cottonwood*, 138 B.R at 138) (emphasis added).  The City failed to negotiate in good faith as any purported negotiations were not related to a plan that could be effectuated under section 941 and 943(b) of the Bankruptcy Code.  The City, therefore, does not satisfy section 109(c)(5)(B) of the Bankruptcy Code.

### (vii) ~~(v)~~Negotiations With Certain Categories Of Creditors Such As AFSCME Were Not Impracticable

201. ~~115.~~The City alleges that it alternatively qualifies for eligibility under section 109(c)(5)(C) of the Bankruptcy Code because negotiations were impracticable.

202. ~~116.~~As with the other eligibility requirements, the burden of proving impracticability rests with the City. *See In re Pierce County Housing Authority,* 414 B.R. 702, 713 (Bankr. W.D. Wash. 2009); *Vallejo*, 408 B.R. at 289 (citing *Valley Health*, 383 B.R. at 161). Courts considering section 109(c)(5)(C) define the ordinary meaning of "impracticable" as "'not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible.'" *See, e.g.*, *Vallejo*, 408 B.R. at 298 (citing Valley *Health*, 383 B.R. at 163). Whether negotiations were impracticable is fact specific and depends upon the circumstances of the case. *See Vallejo*, 408 B.R. at 298.

203. ~~117.~~The City alleges that negotiations were impracticable because, in part, the City had (i) numerous series of bonds and indebtedness held by multiple holders and (ii) approximately 20,000 retirees not represented by any formal agent or committee and other potential involuntary creditors. Furthermore, the City claims that the refusal of certain creditor constituencies to engage in good faith negotiations rendered negotiations impracticable.

204. ~~118.~~In fact, AFSCME believes that the exact opposite is true here. The City predetermined that its pre-bankruptcy negotiations (which, as discussed above, were not negotiations) would fail. As discussed extensively above, the Governor and his staff ~~plotted~~ orchestrated for several months prior to the hiring of Orr as EM to bring in Orr, as an experienced bankruptcy ~~counsel~~attorney, to lead the City on a clear path towards a chapter 9 filing, and any negotiations were a façade – the City went through the motions of pre-petition

meetings but, as is evident from its pre-petition conduct *vis a vis* AFSCME, never had any intention of negotiating outside of bankruptcy.

205. ~~119.~~While the City alleges that it has over 100,000 creditors, it is clear that the main creditors the City had to negotiate with were the unions, its retirees, and the bond trustees.

206. Moreover, as discussed extensively *supra* (¶¶ 50-51), ~~120.~~The City itself has in the past negotiated ~~for retiree health benefits and pension~~ with its unions with respect to concessionary agreements which changes impacted retiree benefits outside of a chapter 9 proceeding. ~~It~~ (even where such unions were not explicitly representing their retirees). Thus, it is a red herring to say that negotiating medical benefits or pensions is impractical *per se*.

207. ~~121.~~While courts have made clear that impracticability can be demonstrated by the volume of creditors to negotiate with, in no case AFSCME is aware of did a court find that negotiations were impracticable where the Debtor did not even attempt to negotiate pre-petition with its largest creditors such as AFSCME (and after repeated requests to do so). In *Ellicott School*, the court determined that the debtor holding "public meetings to which all bondholders were invited" showed that negotiations were practicable.

208. ~~122.~~AFSCME is not suggesting that pre-petition negotiations could have bound everyone or must have involved all of the City's thousands of creditors. Rather, some level of negotiation with principal creditors could have led the City to a non-bankruptcy solution. By way of analogy, section 109(c)(5)(B) of the Bankruptcy Code contemplates pre-bankruptcy negotiations with creditors that municipality intends to impair, not all creditors.[9][13]

---

[9][13] Importantly, the City describes in the Orr Declaration that of the City has nearly $12 billion in unsecured debt, but 75% of that (approximately $9.2 billion) relates to <u>accounting</u> liabilities for post-employment benefit or underfunded pension liabilities.

209.    ~~123.~~Given the City's lack of negotiations with creditors such as AFSCME and similar union representatives that could have negotiated regarding the largest portion of the City's unsecured debt, the City's arguments that negotiations were impracticable should be rejected.

210.    In the City's reply brief, the City cites only one case (and no cases to support its rejection of AFSCME's arguments *supra*) to support its position that negotiations were impracticable, and mainly relies on, in part, various facts, including (i) the large number of unrepresented entities holding substantial amounts of bond debt which required unanimous consent to restructure; and (ii) the apparent refusal of certain parties, including AFSCME, to negotiate on behalf of retirees.  *See* Debtor's Reply, at pp. 45-46; 50-52.

211.    However, the City ignores that serious bargaining and negotiations with bond trustees (even where bondholders could not have been bound 100%) and the City's unions could have yielded the major deals necessary to prevent the crash landing in chapter 9 that occurred.  Additionally, while local unions may have refused to represent the interests of retirees, AFSCME never refused to bargain or negotiate in connection with the City's Restructuring Plan;[14] to the extent that the City had other organizations actively representing retirees, the City could have negotiated in good faith with such parties.  In reality, the City was

---

[14] The City (Debtor's Reply, at p. 50 n.43) cites a May 24, 2013 letter sent by Ed McNeil on AFSCME Council 25's behalf **several weeks** prior to any good faith negotiations of the actual Restructuring Plan began as evidence of AFSCME's refusal to negotiate.  Mr. McNeil indicated that at that time, AFSCME had "no authority in which to renegotiate the Pension or Medical Benefits that members" of AFSCME currently receive, but would be willing to meet with the City anyway.  The letter then went on to indicate that "we stand ready to meet and negotiate in an effort to save the City."  Furthermore, the fact that AFSCME as of early July 2013 was not formally representing retirees did not mean that AFSCME could not negotiate an agreement on behalf of actives or retirees.  Other parties were explicitly representing retirees, and AFSCME had previously (in 2012 via the Tentative Agreement and in earlier agreements) negotiated agreements which effectuated changes that affected both active and retired employees.  Subsequently, AFSCME attended all of the public meetings offered it by the City and attempted to engage the City.  Thus, the City clearly had parties to negotiate with if it truly desired to reach a negotiated non-bankruptcy solution.

not truly interested in negotiating in good faith (whether or not such negotiations were impractical) because the City strongly desired a swift landing in chapter 9.

C. **The City's Petition Should Be Dismissed Under Section 921(c) As Filed In Bad Faith**

212. ~~124.~~The City's bankruptcy petition is subject to dismissal pursuant to section 921(c) of the Bankruptcy Code because the filing was in bad faith. Section 921(c) of the Bankruptcy Code provides that "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title."

213. ~~125.~~"Good faith is not defined in the Bankruptcy Code." *In re McCurtain Mun. Auth.*, No. 07-80363, 2007 WL 4287604, at *4 (Bankr. E.D. Okla. Dec. 4, 2007). Courts have determined, however, that the primary function of the good faith requirement in chapter 9 is to "ensure the integrity of the reorganization process by limiting access to its protection to those situations for which it was intended." *Sullivan County*, 165 B.R. at 80 (citation omitted); *see also In re City of Stockton, California*, 493 B.R. 772, 794 (Bankr. E.D. Cal. 2013) ("Section 921(c) "good faith" serves a policy objective of assuring that the chapter 9 process is being used in a manner consistent with the reorganization purposes of the Bankruptcy Code"); *Villages at Castle Rock*, 145 B.R. at 81 (describing good faith as requirement that "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes") (internal quotation marks and citation omitted).

214. ~~126.~~While good faith in the chapter 9 context is not defined in the Bankruptcy Code, courts have looked to discussions of good faith in the chapter 11 context to determine whether a chapter 9 petition has been filed in good faith. *McCurtain Mun. Auth.*, 2007 WL

4287604, at *4 (referencing chapter 11 good faith standards to determine whether chapter 9 petition was filed in good faith) (quoting *Villages at Castle Rock*, 145 B.R. at 81); *County of Orange*, 183 B.R. at 608 (observing that "courts have ... applied to chapter 9 cases the judicial reasoning that developed in chapter 11 cases" regarding good faith); *Sullivan County*, 165 B.R. at 82 (examining and applying chapter 11 good faith requirements to chapter 9 petition)).

215.     ~~127.~~ In the chapter 11 context, courts ~~have explained~~ explain that the requirement of good faith

> prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes. Moreover, a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons . . . available only to those debtors and creditors with 'clean hands.'

*In re Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986).

216.     ~~128.~~ Relevant considerations regarding good faith under chapter 9 include "whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing are consistent with chapter 9, the extent of the City's pre-petition efforts to address the issues, the extent that alternatives to chapter 9 were considered, and whether the City's residents would be prejudiced by denying chapter 9 relief." *Stockton*, 493 B.R. at 794.

217.     ~~129.~~ Here, a review of the various relevant factors considered by courts when analyzing good faith under section 921(c) lead to the inescapable conclusion that the City's chapter 9 case was filed in bad faith and with unclean hands.

218.     ~~130.~~ First, the City's filing came several minutes prior to a Michigan State Court issuing a TRO enjoining the Governor from authorizing the filing. The State lawyers at the hearing on the TRO asked for a short delay when they realized that an adverse ruling was forthcoming with respect to the City's ability to authorize any chapter 9 authorization which

did not proscribe the reduction of pension benefits violated the Michigan constitution.  During that recess, the City filed for chapter 9 protection.  Thus, the City commenced this proceeding "in the dark of night" to avoid a ruling it viewed as not in its favor.  Such a filing is the antithesis of the careful, deliberative decision to file required under chapter 9, as "[t]he legislative history indicates that the strict hurdles to filing Chapter 9 were implemented to ensure that it was considered by a municipality only as a last resort."  *Pierce County*, 414 B.R. at 714 (citation omitted) (noting debtor decided to file a chapter 9 petition only after several years of failed negotiations and attempts at mediation); *cf. Valleo*, 408 B.R. at 295 ("The evidence needs to show that the 'purpose of the filing of the chapter 9 petition not simply be to buy time or evade creditors.'").  The City ~~simply~~ filed chapter 9 to evade what it viewed as an imminent negative state court ruling. ~~The City simply does not have "clean hands".~~ – enjoining this very filing.

219.    Moreover, as discussed above, while the City was purporting to negotiate with its creditors in good faith by holding several meetings, such meetings were employed as a mere strategy to bolster the record and never truly given the chance to succeed.   The City simply does not have "clean hands".

220.    ~~131.~~Additionally, as discussed extensively above, the City did not reasonably consider any alternatives to chapter 9, did not give negotiations any real chance to succeed, and was preparing for a chapter 9 filing months before any creditor meetings to discuss restructuring options even started (and indeed had finalized a decision to file as of early July 2013 well before significant creditor meetings were scheduled to take place), and refused to negotiate with major creditors such as AFSCME as required.  Simply put, the predetermined filing was done in bad faith and should be dismissed.

**F.** ~~AFSCME Reserves The Right To Argue, Following Discovery, That The City Is Solvent~~

221.    The City argues in its reply brief that the reason for filing the chapter 9 petition was not the imminent entry of the State Court TRO, but rather "to adjust its debts and resolve its liquidity crises [consistent] with the rehabilitative purposes of Chapter 9." Debtor's Reply, at p. 65.  The City states further that it was no secret that Chapter 9 was an option if negotiations with creditors proved impracticable (which, of course, AFSCME disputes as set forth *supra*).  *Id.* at 65-66.  However, the City has not and cannot establish that negotiations with its creditors were impracticable under Section 109(c)(5)(C).  Thus, any reliance by the City on the impracticability of negotiations with creditors to establish good faith is misplaced.

222.    Moreover, the City's attempts to lay blame on the movants in the state court TRO proceeding by suggesting that it was the City's preparation for bankruptcy that prompted the request for the TRO (*see* City Reply, at 66, n. 56), rather than the opposite (*i.e.* that the imminent entry of the TRO prompted the chapter 9 filing) is incorrect.  Indeed, as discussed above, Orr admitted that the filing was being driven by the state court litigations and that he was being "irresponsible" by not authorizing the filings when he did.

223.    The City relies on the *McCurtain Municipal Authority*, decision to support its position regarding the timing of its filing and the state court TRO hearing.  In *McMurtain*, a creditor filed an application for the appointment of a receiver the day before the trustees of the municipal authority met to discuss a chapter 9 filing.  Notice of the trustees' meeting was provided before the filing of the application for the receiver.  The municipal authority argued that the potential appointment of a receiver may have been a concern, but it was not the only reason for the authority to ultimately file its petition.  *McCurtain* at *5 (identifying other concerns considered by the authority trustees that precipitated the chapter 9 filing).

224.     Here, in contrast, the evidence show that the City very much sought to avoid the effects of the State Court litigation and a ruling that the Governor could not authorize a filing that did not place contingencies on the EM from changing pension benefits in a chapter 9.  The City likely would have considered giving creditors more time to negotiate (as was required for any significant bargaining to take place), and there was no cash crisis and the City had actually as of July 17, 2013 inked a deal with its swap counterparties which helped the City's anticipated liquidity.  The City has simply not proceeded in good faith.

**D.     The City Has Failed To Meet Its Burden Of Proving Its Insolvency, And Only Does So Based On Assumptions Used By The City To Show Its Insolvency**

225.     ~~132.~~The Bankruptcy Code does not offer relief to a city simply because it is suffering economic difficulties.  *See, e.g.*, *In re City of Bridgeport*, 129 B.R. 332, 339 (Bankr. D. Conn. 1991) (although City projected $16 million budget deficit, it was not insolvent, and "financial difficulties short of insolvency are not a basis for chapter 9 relief"); *In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1386 (10th Cir. 1998) (debtor not eligible for relief simply because it was severely economically distressed).

226.     ~~133.~~In order to carry its burden on insolvency, the City must prove either that it is "(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C).  The test under the first prong requires current non-payment of obligations, but the test under the second prong is prospective, looking to the debtor's future inability to pay.  *Bridgeport*, 129 B.R. at 336-37.  Solvency is measured as of the petition date.  *See, e.g., In re Town of Westlake, Texas*, 211 B.R. 860, 866 (Bankr. N.D. Tex. 1997) (citing cases).

227.     ~~134.~~The purposeful refusal to make a few payments comprising a relatively small part of the City's budget does not satisfy the definition of "insolvent" under 11 U.S.C. §

101(32)(C)(i). *See, e.g., Uecker & Assocs. v. Tenet Healthsystem Hosps., Inc. (In re West Contra Costa Healthcare Dist.)*, No. 06-41774 T, 2010 Bankr. LEXIS 994, at *8 (Bankr. N.D. Cal. Mar. 26, 2010) (failure to pay $1.3 million out of $10-$11 million total operating expenses did not mean the debtor was "generally not paying its debts")

135.   While the City alleges that it was forced to suspend certain payments to "conserve its dwindling cash", such allegations are highly factual and need to be further probed through proper discovery.

136.   Furthermore, the City has not demonstrated it was unable to pay its debts as they came due as of the petition date under 11 U.S.C. § 101(32)(C)(ii) for several reasons.

228.   137. First, the City "deliberately budget[ed and] spen[t] itself into insolvency (so as to qualify under § 101(32)(C)(ii)), when other realistic avenues and scenarios [were] possible." *Town of Westlake*, 211 B.R. at 867.  Second, "[t]he mere fact that a municipality has adopted a budget that reflects a cash flow shortfall is not independently sufficient to meet the requirement of the 'unable to pay' test."   COLLIER ON BANKRUPTCY ¶ 900.02[2][c][i] (16th ed. 2011).   Such a A municipal budget "must be evaluated in light of past and current practices, the practices of similar municipalities, and the extant facts and circumstances." *Id.*

229.   The City puts forward three declarations from Orr, Malhotra and Moore which appear to provide a voluminous amount of data to "establish" the City's insolvency, including on the basis of budget and service delivery insolvency, negative cash flows and inability to increase revenues or reduce expenses.

230.   However, as discussed above, when one digs into all of the "facts" cited by these three declarants, it becomes apparent that the City failed to provide this Court or the citizens of Detroit evidence to establish insolvency.

231.     It is telling (and should be shocking to all citizens of Detroit and Michigan) that despite spending millions of dollars of taxpayer funds on the City's chapter 9 cases to hire a multitude of bankruptcy and restructuring professionals, the City fails to offer even one person to stand up as an *expert* and testify to the City's insolvency.  Courts in the non-chapter 9 context note that "[i]t is generally accepted that whenever possible, a determination of insolvency should be based on . . .  expert testimony . . ."  *Brandt v. Samuel, Son & Co., Ltd. (In re Longview Aluminum, L.L.C.),* Case No. 03B12184, 2005 Bankr. LEXIS 1312, at \*18-\*19 (Bankr. N.D. Ill. July 14, 2005); *see also Lawson v. Ford Motor Co. (In re Roblin Indus.),* 78 F.3d 30, 38 (2d Cir. 1996); *Klein v. Tabatchnick,* 610 F.2d 1043, 1048 (2d Cir. 1979) (stating that "a finding on the issue of insolvency often depends upon the factual inferences and conclusions of expert witnesses").

232.     Here, the insolvency "evidence" offered by the City focuses on the non-expert testimony of Orr, Malhotra, and Moore.  This testimony relies on unaudited and unfounded assumptions, unsupported statements and a complete lack of expert opinion.  For example, as purported evidence for the City's insolvency, Orr (*see* Orr Declaration, ¶¶ 52-57) cites to the June 14 Restructuring Plan prepared by the City and to conclusory statements by Malhotra, one of the City's restructuring advisors (who of course all had one goal in mind:  demonstrating insolvency).

233.     ~~budget "must be evaluated in light of past and current practices, the practices of similar municipalities, and the extant facts and circumstances." Id.~~ While the City alleges that it was forced to suspend certain payments to "conserve its dwindling cash", the main portion of the payments not made revolve around the City's pension obligations, and those obligations are subject to dispute as to the ultimate amount required to be paid, and indeed evidence (discussed

*supra*, ¶ 53-59) shows that (i) the City may have funds (or be able to raise funds from other sources such as revenues generated from the water and sewer fund) not calculated as part of its financial projections to cover such shortfalls and (ii) the City apparently chose to not actually calculate through an expert report the correct underfunding liability with respect to the pension obligations (despite presenting "definitive" numbers of such underfunding in the Restructuring Plan and other documents produced by the EM and his staff). Thus, the City "deliberately budget[ed and] spen[t] itself into insolvency (so as to qualify under § 101(32)(C)(ii)), when other realistic avenues and scenarios [were] possible." *Town of Westlake*, 211 B.R. at 867.

234. Second, "[t]he mere fact that a municipality [adopts] a budget that reflects a cash flow shortfall is not independently sufficient to meet the requirement of the 'unable to pay' test." COLLIER ON BANKRUPTCY ¶ 900.02[2][c][i] (16th ed. 2011). The City's budget "must be evaluated in light of past and current practices, the practices of similar municipalities, and the extant facts and circumstances." *Id.*

235. Here, the City's past and current practices, as well as current facts and circumstances, not only show that the City has many available (but unexplored) options to enable it to pay its debts as they become due, but also that the City ~~simply may have less than a reliable handle on its finances. Thus,~~ the information provided in the City's current budget may (upon completing of proper discovery) be chose to deliberately not monetize certain assets (or explore the value of such assets) prior to the filing to limit the appearance of cash or revenue on its books. It is telling that the City's prized artwork collection and potential deal to lease Bell Isle are only now on the table – if these assets and other possible increased tax revenue collection could have collectively solved all of the City's short term cash issues. But, as indicated above, the City did not want such assets monetized because the City's goal and

clear path was to end up in chapter 9, which the City believed provided the only means to attack its vested pension obligations.

236. 138.Thus, in light of all of the above, the information provided in the City's current budget provides at most only "insufficient credible proof" of insolvency. *Town of Westlake*, 211 B.R. at 867; *see also Bridgeport*, 129 B.R. at 338 (requiring concrete proof "that [the city] will be unable to pay its debts as they become due in its current fiscal year or, based on an adopted budget, in its next fiscal year" and noting that "[o]bviously, it is necessary for cities to make informed financial projections").

237. 139.The City's current financial difficulties currently are actually less severe than in some prior years, and AFSCME preliminarily believes (subject to discovery) that there may be numerous other available means the City entered into a deal prior to the chapter 9 filing with its swap counterparties which potentially freed up significant cash and did not make the filing imminent, and AFSCME believes (and as will be further demonstrated at trial) that there are numerous means already show to be available to solve the City's current financial difficulties and generate sufficient funds to pay its debts coming due in the coming fiscal year. These include enhancing revenues by aggressively collecting obligations owed, aggressively pursuing repayment of millions of dollars in loans owed to the general fund (including through the hiring of more employees in the City's collections area), and taking further steps to reduce costs. AFSCME recognizes that all parties (including current and former employees) will be required to sacrifice, but reasonable concessions outside of bankruptcy – which is not necessary and which the City does not and cannot qualify for based on all the reasons discussed above – from all significant creditors would easily bring the City closer to back to financial stability.

140. Given the highly fact intensive inquiry related to insolvency and the lack of any discovery available on these issues to AFSCME, AFSCME reserves the right to make additional arguments about the City's insolvency (or lack thereof) pending the completion of discovery.

## <u>CONCLUSION</u>

For the reasons set forth herein, AFSCME respectfully requests that this Court issue an order dismissing the City's chapter 9 petition and granting such other and further relief as is just and proper under the circumstances.

Dated: ~~August 19~~October 11, 2013

<div style="margin-left:40%">

**LOWENSTEIN SANDLER LLP**
By: <u>/s/ Sharon L. Levine</u>
Sharon L. Levine, Esq.
~~Wojciech F~~John K. ~~Jung~~Sherwood, Esq.
Philip J. Gross, Esq.
Ira M. Levee, Esq.
Keara M. Waldron, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-6247 (Facsimile)
slevine@lowenstein.com
wjung@lowenstein.com
pgross@lowenstein.com

-and-

Herbert A. Sanders, Esq.
THE SANDERS LAW FIRM PC
615 Griswold St., Suite 913
Detroit, MI 48226
(313) 962-0099 (Telephone)
(313) 962-0044 (Facsimile)
hsanders@miafscme.org

-and-

Richard G. Mack, Jr., Esq.
Miller Cohen, P.L.C.
600 West Lafayette Boulevard
4th Floor
Detroit, MI 48226-3191

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub-Chapter 98, City of Detroit Retirees*

</div>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................... 2

RELEVANT BACKGROUND ......................................................................................... 9

    A.    The Webster Litigation And The Governor's Unconditional
         Authorization ................................................................................... 10

        (i)    The Governor (And Other State Officials) And City
             Intended Through The Chapter 9 Filing To Impair And/Or
             Terminate Pension Obligations, And The Governor Was
             Aware Of This Prior To His Authorizing The Chapter 9
             Filing ..................................................................................... 14

    B.    The City's Pre-petition Machinations And Subsequent Meetings
         (But Not Negotiations) With Creditors Such As AFSCME .................. 16

        (i)    The City's Bankruptcy Was Orchestrated Based On The
             Advice Of The City's Lead Bankruptcy Counsel And
             Discussed ~~Prior To~~ Before The EM Was Even Hired ............................... 16

        (ii)    No Good Faith Negotiations Took Place Following The
             Appointment Of The EM With Parties Such As AFSCME
             Prior To The City's Chapter 9 Filing ......................................... 19

        (iii)    The City's Bad Faith Refusal To Negotiate With Unions
             Such As AFSCME Has Continued Following The City's
             Bankruptcy Filing ..................................................................... 23

        (iv)    The City Has Previously Negotiated Labor Concessions
             With Unions That Modified Both Active And Retiree
             Benefits ................................................................................... 24

    C.    The City Has Failed to Establish It Is Insolvent, And The City's
         Chapter 9 Case Was Not Commenced Due to Any Imminent
         Financial Emergency, Rather To Avoid The Webster Litigation
         (And Other State Court Proceedings) ................................................ 25

ARGUMENT ........................................................................................................... 30

I.    THE CITY'S PETITION VIOLATES THE UNITED STATES
    CONSTITUTION ........................................................................................... 30

B.    ~~CHAPTER 9 VIOLATES THE FEDERAL STRUCTURE OF GOVERNMENT~~ ................................................................30

B.    Chapter 9 Violates The Federal Structure Of Government ...................................30

      (iii)    ~~(ii)~~A Federal Municipal Bankruptcy Statute Is No Longer Necessary To Accomplish An Adjustment Of Municipal Debts..........................................................................................32

      (iv)    ~~(iii)~~The Supreme Court's Development Of Constitutional Federalism Doctrine Has Effectively Overruled *Bekins* ............................33

C.    ~~AFSCME'S ACTIVE AND RETIRED MEMBERS HAVE INDIVIDUAL STANDING TO ASSERT THAT CHAPTER 9 VIOLATES THEIR INDIVIDUAL RIGHTS TO A FEDERAL SYSTEM OF GOVERNMENT~~ .............................................43

      (v)    AFSCME Does Not Seek To Relitigate *Bekins* And The City's Reply Brief Arguments Regarding The Constitutionality Of Chapter 9 Ignore And Misapply the Relevant Authority Discussed Above .......................................43

C.    AFSCME's Active And Retired Members Have Individual Standing To Assert That Chapter 9 Violates Their Individual Rights To A Federal System Of Government ......................................51

D.    ~~THIS COURT LACKS JURISDICTION TO DECIDE WHETHER CHAPTER 9 VIOLATES THE UNITED STATES CONSTITUTION~~ ................................................................53

D.    This Court Lacks The Authority Or Jurisdiction To Decide Whether Chapter 9 Violates The United States Constitution Or Whether Pa 436 Violates The Michigan Constitution...........................................53

II.    THE CITY IS NOT ELIGIBLE TO FILE FOR CHAPTER 9 PROTECTION UNDER SECTION 109(C) OF THE BANKRUPTCY CODE ..................................................................................................56

    A.    The City Is Not Authorized By Michigan State Law To Be A Debtor Under Chapter 9 .......................................................59

      (iv)    ~~(iii)~~Governor Snyder's Authorization Of The City's Petition Under Section 18 Of PA 436 Violated Article IX, Section 24 Of The Michigan State Constitution........................................60

      (v)    ~~(iv)~~PA 436 Violates The Strong Home Rule Provisions Of The Michigan Constitution .......................................................76

(vi)     Neither The City Nor State Pleadings Answer How Detroit's Voters Could Have Constitutionally Lost Their Right To Local Self-Government Entirely, And The Loss Of That Right Invalidates Actions By The Emergency Manager Inextricably Intertwined With The Chapter 9 Petition And The Case Itself ..................................................... 80

(vii)    Despite Arguments To The Contrary By The State And City, The EM Is Not A State Agent And Therefore His Use of Unlimited Power To Pass Local Acts Which Led To This Bankruptcy Violated The State Constitution ............................ 86

(viii)   The City And State Cannot Evade The Non-Delegation Doctrine Because The EM Acts With The State Legislature's Authority In Bankruptcy Without Any Standards Or Judicial Review ................................................... 90

B.    The City Failed To Participate In Any Good Faith Negotiations With Creditors Prior To Filing For Bankruptcy As Required For Eligibility Under Chapter 9 ................................................................... 92

(v)     (iv)The City Failed To Negotiate With Creditors Such As AFSCME ...................................................................... 93

(vi)    (c)Even Assuming That The City Engaged In Negotiations, Such Negotiations Did Not Relate To A Plan That Is In The Best Interests Of Creditors As Required By Section 109(c)(5)(B) ........................................... 97

(vii)   (v)Negotiations With Certain Categories Of Creditors Such As AFSCME Were Not Impracticable .......................................... 101

C.    The City's Petition Should Be Dismissed Under Section 921(c) As Filed In Bad Faith ...................................................................... 104

F.    ~~AFSCME Reserves The Right To Argue, Following Discovery, That The City Is Solvent~~ ...................................................................... 107

D.    The City Has Failed To Meet Its Burden Of Proving Its Insolvency, And Only Does So Based On Assumptions Used By The City To Show Its Insolvency ...................................................................... 108

CONCLUSION ...................................................................... 114

13-53846-tjt   Doc 1163   Filed 10/11/13   Entered 10/11/13 16:08:06   Page 132 of 138

TABLE

# TABLE OF AUTHORITIES

|  | Pages |
|---|---|

CASES

*Advisory Opinion re Constitutionality of 1972 PA 258,* 389 Mich. 659 (1973) ............................ 34

*AFT Michigan v. State,* 297 Mich. App. 595, 825 N.W.2d 595 (2012) .................................. 17, 35

*In re Alabama State Fair Authority,* 232 B.R. 252 (N.D. Ala. 1999) .................................. 23

*Alden v. Maine,* 527 U.S. 706 (1999) .................................. 19, 24, 25

*APTE v. Detroit,* 154 Mich. App. 440, 398 N.W.2d 436 (1986).................................. 34

*Ashton v. Cameron County Water Improvement Dist. No. 1,* 298 U.S. 513 (1936)..... 17, 18, 19, 27

*Attorney General v. Lacy,* 180 Mich. 329, 146 N.W. 871 (1914) .................................. 44

*BCBSM v. Governor,* 367 NW 2d 1 (Mich. 1985) .................................. 45

*BCBSM v. Governor,* 422 Mich. 1, 367 N.W.2d 1 (1985) .................................. 35, 39, 45

*Bivens v. Grand Rapids,* 443 Mich. 391 (1993) .................................. 39

*Blank v. Dep't of Corrections,* 462 Mich. 103, 611 N.W.2d 530 (2000) .................................. 44

*Bond v. United States,* 131 S. Ct. 2355 (2011).................................. passim

*Brouwer v. Bronkema,* 377 Mich. 616, 141 N.W.2d 98 (1966) .................................. 39, 40, 41

*Buckley v. Valeo,* 424 U.S. 1 (1976).................................. 26

*In re City of Bridgeport,* 129 B.R. 332 (Bankr. D. Conn. 1991).................................. 56, 57

*In re City of Harrisburg, PA,* 465 B.R. 744 (Bankr. M.D. Pa. 2011) .................................. 33

*In re City of Stockton,* 475 B.R. 720 (Bankr. E.D. Cal. 2012) .................................. 32

*In re City of Stockton, California,* 493 B.R. 772 (Bankr. E.D. Cal. 2013).................................. 53, 55

*In re City of Stockton, California,*
    Case No. 12-32118-C-9 (Bankr. E.D. Cal. Feb. 5, 2012) .................................. 46

*Clinton v. New York,*
    524 U.S. 417 (1998) .................................. 36

*In re Cottonwood Water and Sanitation Dist.*,138 B.R. 973 (Bankr. D. Colo. 1992).......32, 47, 50

*In re County of Orange*,183 B.R. 594 (Bankr. C.D. Cal. 1995)................................................32, 54

*In re County of Orange*,191 B.R. 1005 (Bankr. C.D. Cal. 1996).......................................................23

*Detroit Police Officers Ass'n v. Detroit*,391 Mich. 44, 214 N.W.2d 803 (1974) .........................34

*In re Ellicott School Building Authority*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992) .................48

*Faitoute Iron & Steel Co. v. City of Asbury Park*,316 U.S. 502 (1942).....................18, 21, 26, 29

*Granfinanciera, S.A. v. Nordberg*,492 (U.S. 33) (1989) ..........................................................30, 31

*Gregory v. Ashcroft*,501 U.S. 452 ................................................................................................22

*In re Hamilton Creek Metro. Dist.*,143 F.3d 1381 (10th Cir. 1998) ...........................................56

*Hanover Nat'l Bank v. Moyses*,186 U.S. 181 (1902) ...................................................................25

*INS v. Chadha*,462 U.S. 919 (1983)..............................................................................................27

*Int'l Ass'n of Firefightes, Local 1186 v. City of Vallejo (In re City of Vallejo)*,
    408 B.R. 280 (9th Cir. B.A.P. 2009)..............................................................................48, 51, 55

*Lansing School Educ. Ass'n v Lansing Bd. of Educ.*,487 Mich. 349 .........................................38

*re. Le Roy v. Hurlbut*,24 Mich. 44 (1871).........................................................................39, 40, 41

*In re Little Creek Dev. Co.*,779 F.2d 1068 (5th Cir. 1986) ..........................................................54

*Manning v. City of Hazel Park*,202 Mich. App 685.....................................................................43

*In re McCurtain Municipal Authority*,2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4,
    2007)..............................................................................................................................33, 53, 54

*In re Mount Carbon Metropolitan Dist.*,242 B.R. 18 (Bankr. D. Colo. 1999)............................51

*Nat. Fed'n of Indep. Business v. Sibelius*,132 S. Ct. 2566 (2012) (Roberts, C.J.) .......................21

*New York v. United States*,
    505 U.S. 144 (1992) ...........................................................................................................passim

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*,458 U.S. 50 (1982) .................30

*In re Pierce County Housing Authority*,414 B.R. 702 (Bankr. W.D. Wash. 2009) ...............51, 55

*Printz v. United States*, 521 U.S.898, 531 n. 15 (1997) ................................................................17

*In re Sanitary & Improvement Dist., #7*,98 B.R. 970 (Bankr. D. Neb. 1989)................................50

*Seitz v. Probate Judges Retirement System*,189 Mich. App. 445, 474 N.W. 2d 125
   (1991) ...................................................................................................................................34, 38

*South Dakota v. Dole*,483 U.S. 203 (1987) (Rehnquist, C.J.)...............................................26

*Stern v. Marshall*, 131 S. Ct. 2594, 2609 (2011)..........................................................3, 30

*In re Sullivan County Regional Refuse Disposal Dist.*,
   165 B.R. 60 (Bankr. D.N.H. 1994)..............................................................................passim

*Taxpayers of Michigan Against Casinos v. State*,478 Mich. 99 (2007).......................36, 38

*In re Town of Westlake, Tex.*,211 B.R. 860 (Bankr. N.D. Tex. 1997) ..........................47, 56, 57

*U. S. Term Limits, Inc. v. Thornton*,514 U. S. 779 (1995) ...............................................20

*Uecker & Assocs. v. Tenet Healthsystem Hosps., Inc. (In re West Contra Costa
   Healthcare Dist.)*,No. 06-41774 T, 2010 Bankr. LEXIS 994, at *8 (Bankr. N.D. Cal.
   Mar. 26, 2010) ...........................................................................................................56

*United States Trust Co. of N.Y. v. New Jersey*,431 U.S. 1 (1977)......................................18

*United States v. Bekins*,304 U.S. 27 (1938) ......................................................18, 19, 27

*United States v. Lopez*,514 U.S. 549 (1995)...............................................................21, 22, 29

*United States v. Morrison*,529 U.S. 598 (2000) ...............................................................21

*Utica State Sav. Bank v. Village of Oak Park*,279 Mich. 568, 273 N.W. 271 (1937)...................42

*In re Valley Health Sys.*,383 B.R. 156 (Bankr. C.D. Cal. 2008) ............................................32, 51

*In re Villages at Castle Rock Metro. Dist. No. 4*,145 B.R. 76 (Bankr. D. Colo. 1990) ..........47, 54

*Webster v. State of Mich.*,No. 13-734-CZ (Ingham County Cir. Ct. July 3, 2013) ........................7

**STATUTES**

11 U.S.C. § 101(32)(C) ......................................................................................................56

11 U.S.C. § 101(32)(C)(i)...................................................................................................56

11 U.S.C. § 101(32)(C)(ii) ..................................................................................................57

11 U.S.C. § 901(a)..........................................................................................................24, 43

11 U.S.C. §§ 902(a), 362 ..................................................................................................46

11 U.S.C. § 904 ................................................................................................................ 46

11 U.S.C. § 926(b) ........................................................................................................... 23

11 U.S.C. § 943 ................................................................................................................ 37

11 U.S.C. § 943(b)(4) ................................................................................................. 37, 50

*section 109(c) of the Bankruptcy Code* .......................................................... 1, 2, 32, 46

section 109(c)(2) of the Bankruptcy Code ................................................... 4, 32, 35

section 109(c)(3) of the Bankruptcy Code ....................................................... 5, 32

section 109(c)(5) of the Bankruptcy Code ................................................. passim

section 109(c)(5)(B) of the Bankruptcy Code .................................. 48, 49, 53

section 109(c)(5)(C) of the Bankruptcy Code ........................................... 51

sections 109(c) and 921(c) of the Bankruptcy Code ................................... 4

section 365 of the Bankruptcy Code ........................................................ 5

section 503 of the Bankrutcy Code .......................................................... 24

section 507(a)(2) of the Bankruey Code ................................................. 24

section 921(c) of the Bankruptcy Code ...................................... 5, 33, 53, 55

section 929 of the Bankruptcy Code ........................................................ 23

section 941 of the Bankruptcy Code ................................................... 50, 47

section 943(b)(7) of the Bankruptcy Code .......................................... 50, 51

section 362 of the Code ............................................................................ 47

Loc. Gov't L. 29, 32 (2002) ..................................................................... 26

MCL 141.1549(2) ....................................................................................... 41

MCL 141.1550(1) ....................................................................................... 41

MCL 141.1551(1)(d) ................................................................................... 36

MCL 141.1552 ....................................................................................... 41, 44

MCL 141.1552(1) ....................................................................................... 43

MCL 141.1552(1)(dd-ee) ............................................................................................42

MCL 141.1552(i)(m)(ii) .............................................................................................36

MCL 141.1553 ............................................................................................................37

MCL 141.1558 .........................................................................................25, 33, 41, 45

Second, Michigan Public Act 436 of 2012, the Local Financial Stability and Choice
    Act, MCL § 141.1541, *et seq.* ..............................................................................2

**REGULATIONS**

*Advisory Opinion on Constitutionality of 1975 PA 301,* 400 Mich. 270, 287, 254 N.W.
    2d 528 (1977) .......................................................................................................44

**OTHER AUTHORITIES**

Annerose Tashiro, *Sovereign Insolvency,*99 Eur. Law. 5 (2010) ...............................26

David J. Barron, *The Promise of Cooley's City: Traces of Local Constitutionalism,* 147
    Univ. Penn L. Rev. 487 (1999)............................................................................40

Section 7-5-203 of the Detroit City Charter ...............................................................45

Detroit Free Press (June 16, 2013), *available at*
    http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-detroit-
    emergency-manager-creditors-fiscal-crisis. .........................................................6

Janie Anderson Castle*, The People's Mayor for London?,* 5 J. Loc. Gov't L. 29, 32
    (2002) ...................................................................................................................26

Kate Long, *Who is representing Detroit?*
    http://blogs.reuters.com/muniland/2013/07/25/who-is-representing-detroit/.........12

Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was
    hired, e-mails show,*
    http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-
    bankruptcy-emails ............................................................................................11, 12

May 12, 2013,*available at* http://detroit.cbslocal.com/2013/05/12/kevin-orr-releases-
    financial-plan-for-city-of-detroit/.......................................................................2, 13

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |

### <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 11, 2013, the *Notice of Filing of Marked Version of Amended Objection to the City of Detroit's Eligibility to Obtain Relief Under Chapter 9 of the Bankruptcy Code* was filed with the Clerk of the Court using the CM/ECF system, which provides electronic notification of such filing to all counsel of record.

Dated:   October 11, 2013

*/s/ Lisa M. Bonito*
Lisa M. Bonito
**LOWENSTEIN SANDLER LLP**
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
lbonito@lowenstein.com