## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| *In re:* )<br><br>CITY OF DETROIT, MICHIGAN, )<br>     *Debtor.* )<br>_____ ) | Chapter 9<br>Case No. 13-53846<br>Hon. Steven W. Rhodes |

## REPLY IN SUPPORT OF OBJECTION OF THE DETROIT RETIREMENT SYSTEMS TO THE ELIGIBILITY OF THE CITY OF DETROIT, MICHIGAN TO BE A DEBTOR UNDER CHAPTER 9 OF THE BANKRUPTCY CODE

  The Police and Fire Retirement System of the City of Detroit ("PFRS") and

the General Retirement System of the City of Detroit ("GRS") (together, the

"Retirement Systems") respectfully submit this Reply in support of their Objection

to the eligibility of the City of Detroit, Michigan (the "City") to be a debtor under

Chapter 9 of the Bankruptcy Code [Doc. No. 519] (the "Objection").[1]

---

[1]  This Reply is in reply to the City's omnibus response to eligibility objections [Doc. No. 765] and the City's response to the Retiree Committee's eligibility objection [Doc. No. 918]. It is also based on discovery obtained from the City subsequent to filing the Objection. To the extent that this Reply is required to be submitted as part of an amended objection, per Section VII of the Court's First Amended Order Regarding Eligibility Objections [Doc. No. 821], the Objection is hereby incorporated in full by reference.

# TABLE OF CONTENTS

INTRODUCTION………………………………………………………………....1

ARGUMENT ...…………………………………………………………………… 2

I.    The City's Claim That Pension Benefits Have Not Been Impaired *Yet* Is Unavailing Because the City Admits the Purpose of This Case Is To Impair Pension Benefits ……..……………………………………………….. 2

II.    Michigan's Pensions Clause Imposes an Absolute Bar to the Governor's Consenting on Behalf of the State to Diminishing or Impairing Pension Benefits ……………………………………………………………. .... 6

    A.    The Pensions Clause Provides Broader Protection Than the Contracts Clause. …...…………………………………………….7

    B.    The State and City Cannot Use Bankruptcy To Impair Pensions Indirectly ……………....……………………………………12

    C.    The Michigan Legislature Cannot Effectively Authorize the Governor, the Emergency Manager, or the City To Violate the Michigan Constitution ..………………………………………16

        1.    The State's Consent to the City's Bankruptcy Petition Was Ineffective Because It Abrogates the Michigan Constitution ……………………………………………………..16

        2.    The Existence of the Pensions Clause as an Express Constitutional Bar to Eligibility Is Unique In this Case…….. 19

        3.    The *Harrisburg* Case Holds Mere Compliance With An Authorizing Statute Is Insufficient to Authorize a Filing Where Authorization Violates Other State Law……………………..20

    D.    State Law Is Not Preempted In Determining Eligibility ………..... 22

        1.    The Bankruptcy Clause's "Uniformity" Requirement Recognizes That State Law Governs Eligibility……………..22

        2.    The Tenth Amendment Bars Federal Interference With Public Pension Rights In Bankruptcy Or Otherwise ………………..25

i

3. Substantive Due Process and the Takings Clause Bar the City from Impairing Vested Pension Rights ……..……………..27

III. The City's Arguments Regarding Collateral Estoppel Are Unavailing……30

    A. The *Webster* Court Had Jurisdiction To Decide Questions of State Law …………..……………………………………………..31

    B. The *Webster* Judgment Did Not Violate the Automatic Stay………32

    C. The Elements of Collateral Estoppel Are Satisfied ..……………36

    CONCLUSION…………………………………………………………..38

9719247.1 14893/165083

# INTRODUCTION

The City does not dispute that Michigan state law controls the threshold question of whether, under Bankruptcy Code section 109(c)(2), the City is "specifically authorized . . . by State law" to be a Chapter 9 debtor. The City also does not dispute that Article IX, Section 24 of the Michigan Constitution (the "Pensions Clause") forbids both the City and the State from taking any action that would "diminish or impair" accrued public pension benefits. Nevertheless, contrary to the views of both the Michigan Attorney General (the "AG") and the only Michigan state court that has addressed this question of Michigan law, the City contends it may file a Chapter 9 case to "diminish or impair" constitutionally protected public pension benefits.

To reach this counterintuitive result, the City argues that (1) merely authorizing and filing for bankruptcy under Chapter 9 does not "diminish or impair" pension benefits because filing bankruptcy merely seeks to have a court impair the obligations, but (2) the City may then propose a Chapter 9 plan with the express purpose and effect of diminishing and impairing pension benefits without regard to the Pensions Clause. Both arguments are demonstrably wrong.

First, the City has admitted in discovery and through statements on the record that diminishing and impairing pension benefits is indeed a primary aim of the City. Thus, the question of whether the City is properly authorized under State

1

law to proceed any further with this case and seek to diminish or impair accrued pension benefits must be decided at the eligibility stage.

Second, Michigan's Pensions Clause categorically prohibits pension benefits from being diminished or impaired, separate and apart from the protection for contractual obligations under Michigan's Contract Clause. Both the AG and the State Court for Ingham County, Michigan (the "<u>State Court</u>") have unequivocally concluded that the Pensions Clause of the Michigan Constitution prohibits the City from proceeding with Chapter 9 bankruptcy in any manner that threatens to diminish or impair pension benefits.

In addition, the State Court's declaratory judgment in *Webster v. Michigan*, No. 13-734-CZ (Ingham Cty. Cir. Ct. July 19, 2013) (the "<u>*Webster* Judgment</u>"), constitutes a valid, final judgment interpreting Michigan law and precludes the City from re-litigating the Governor's ability to authorize this bankruptcy under Michigan's Pensions Clause. Nothing in the City's briefs justifies denying collateral estoppel effect to the *Webster* Judgment.

## ARGUMENT

### I. The City's Claim That Pension Benefits Have Not Been Impaired *Yet* Is Unavailing Because the City Admits the Purpose of This Case Is To Impair Pension Benefits

The City argues that the "state's authorization of Chapter 9 did not violate the pensions clause" because the authorization and filing of the City's Chapter 9

2

petition are "simply steps that begin the bankruptcy process, where pensions *may* be impaired by order of a federal bankruptcy court at some later date." (Doc. No. 765, pg. 21) (emphasis in original).

This argument is disingenuous. The City's admissions in discovery remove any conceivable doubt that the City seeks to diminish or impair pension benefits:

- The City candidly admitted in written discovery responses that it "intends to seek to diminish or impair the Accrued Financial Benefits of the participants in the Retirement Systems through this Chapter 9 case." (Doc. No. 849, pg. 12);

- The City likewise admitted that each of its Restructuring Proposal and Bankruptcy Recommendation, which formed the basis for its Chapter 9 petition, "contemplates a reduction in Accrued Financial Benefits to participants of the Retirement Systems." (*Id.* at 10-11); and

- The Emergency Manager testified at deposition that if pension recipients do not consent to a restructuring plan that impairs their benefits, the City likely will try to force an involuntary resolution under the Code's cram down provisions. (Ex. A, 9/16/2013 Orr Dep, pg. 287-291).

Likewise, the Governor admitted that at the time he authorized the bankruptcy, he knew that "[b]ased on the facts going into it" there was a "likelihood" accrued pension benefits would be reduced. (Ex. B, Snyder Dep, pg. 66-67).

Accordingly, any suggestion that the impairment of pensions in this case is merely hypothetical is frivolous. The City's argument that the authorization and filing of this Chapter 9 case were merely "steps" toward impairing pension benefits

9719247.1 14893/165083

also fails because even preliminary steps violate the Pensions Clause when the purpose and effect of the City's actions is to impair pension benefits. Michigan courts have struck down numerous attempts by the State to *embark* on a course that ultimately would diminish or impair pension benefits. *See, e.g.*, *Musselman v. Governor of Mich.*, 533 N.W.2d 237, 244-45 (Mich. 1995), *vacated on other grounds*, 545 N.W.2d 346, 346 (1996) (governor's issuance of an executive order changing future mechanism for funding pensions violated the Pensions Clause); *Tinsman v. City of Southfield*, 1999 Mich. App. Lexis 2112, at *10 (Dec. 3, 1999) (unpublished) ("By changing the formula and applying it to all current employees, *the net effect* was to diminish or benefits in the pension plan, contrary to Mich. Const. 1963, art. 9, § 24.") (emphasis added); *Murphy v. Wayne County Employees Retirement Bd. of Trustees*, 35 Mich. App. 480, 485-486 (1971) (affirming summary judgment for plaintiff granting specific relief in the form of reinstatement of his retirement benefits which were unconstitutionally diminished and impaired by legislative act).

Thus, any attempt by the City to distinguish between a *current* reduction in pension benefits versus a *future* reduction in benefits is futile, because either reduction violates the Pensions Clause. *See Kosa v. Treasurer of the State of Michigan*, 292 N.W.2d 452, 460 (Mich. 1980) (noting the question under the

4

Pensions Clause is whether "full pension payments are being or **will be** timely made") (emphasis added).

The City further argues that requiring the Governor to condition his authorization of a Chapter 9 filing upon the explicit preservation of the protections under the Pensions Clause is unnecessarily speculative and places an unwarranted affirmative obligation on the Governor. However, as discussed both above and below, such a contingency is necessary, because the affirmative obligation already exists. Indeed, the Governor admitted in his deposition that he could have placed such a contingency on his authorization of the City's filing. (Ex. B, Snyder Dep, pg. 84-87).

The Governor has solemnly sworn to "support" the Michigan Constitution. The City's simplistic argument that the Governor's authorization of the City's Chapter 9 filing does not itself impair or diminish accrued pension benefits reduces the Governor's solemn oath to "wink and a nod" that does not comport with the weighty obligation of supporting the sanctity of the State's highest laws. Moreover, in light of the City's admissions in discovery confirming its intent to impair and diminish benefits in the Restructuring Proposal, in the Bankruptcy Recommendation, and in this Chapter 9 case, it is pointless to proceed as if the City has any other intent. The better question is, in light of the Governor's affirmative obligation to support the Pensions Clause, and his admission in his

5

deposition that he could have conditioned the City's bankruptcy filing on the preservation of pension obligations (Ex. B, Snyder Dep. pg. 84-87) why did he not take advantage of that option instead of leaving the Pensions Clause exposed to violation?

If the City's debts consisted *only* of pension obligations, it would not be possible to separate the application of the Pensions Clause from a determination of the City's eligibility to be a Chapter 9 debtor – it would be meaningless to continue to administer a Chapter 9 case until that issue was resolved. Yet the Pensions Clause has the same force and effect whether the City has one creditor or thousands, and the fact that the City has other creditors does nothing to lessen the need to resolve the impact of the Pensions Clause on the City's eligibility now.

## II. Michigan's Pensions Clause Imposes an Absolute Bar to the Governor's Consenting on Behalf of the State to Diminishing or Impairing Pension Benefits

The City argues that the Pensions Clause poses no obstacle to the City becoming a Chapter 9 debtor now and later diminishing or impairing constitutionally protected pensions benefits through its plan of adjustment. (Doc. No. 765, pg. 25). As an initial matter, the City's narrow reading of the Pensions Clause directly conflicts with the views of both the Michigan AG and the State Court, which is the only state court that has considered this question of state law. The AG thus explained that the Pensions Clause "is an impermeable imperative"

6

and "innate to the People of Michigan—not subject to discharge by exigency including a Chapter 9 proceeding under the federal Bankruptcy Code." (Doc. No. 481, pg. 15). The AG further explained that while the Contracts Clause yields to accommodate certain state interests, because of the Pensions Clause "under Michigan law, there is no such accommodation when it comes to the accrued financial benefits of a public pension plan or retirement system. The constitutional protection is absolute." (*Id.* at 4).

The State Court in *Webster* similarly held that:

> PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under chapter 9 in any manner which threatens to diminish or impair accrued pension benefits .
> . . .

(Doc. No. 370, Declaratory Judgment, Exhibit 2, pg. 2). This Court should reject the City's attempt to override the views of the State's top legal officer and its courts in interpreting state law in this regard. In any event, the City's position is wrong.

### A. The Pensions Clause Provides Broader Protection Than the Contracts Clause

The City argues that the only effect of the Pensions Clause is to make pension obligations contractual obligations, and therefore, pension benefits are entitled to no greater protection than under an ordinary Contract Clause analysis.

7

(Doc. No. 765, pg. 22-28). Not so.

The City's interpretation of the Pensions Clause pays lip service to, but ultimately ignores, the fundamental rules of statutory construction. "When interpreting statutory language, courts must ascertain the legislative intent that may reasonably be inferred from the words in a statute" and "must give effect to every word, phrase, and clause in a statute and avoid an interpretation that renders nugatory or surplusage any part of a statute." *People v. Couzens*, 747 N.W.2d 849, 855 (Mich. 2008) (citing *Koontz v. Ameritech Services, Inc.*, 645 N.W.2d 34 (2002)). If the City's argument that the Pensions Clause merely places pension obligations on par with any other contractual obligation was correct, then the second half of the Pensions Clause would be mere surplusage. The City wants this Court to read the Pensions Clause as ending after the statement that "accrued financial benefits. . . shall be a contractual obligation thereof[.]" MICH. CONST. art. IX, § 24. But the Pensions Clause goes on to say that pension benefits "shall not be diminished or impaired thereby." *Id.* The City's construction of the Pensions Clause renders this latter phrase nugatory. The only construction that reconciles *all* of the words in the Pensions Clause is the Retirement Systems' interpretation—the Pensions Clause means that, unlike *other* contractual obligations of the State, this *particular* contractual obligation "shall not be diminished or impaired." *Id.* "The Legislature's use of the word 'shall' generally indicates a mandatory

8

directive, not a discretionary act." *Smitter v. Thornapple Twp.*, 494 Mich. 121, 136 (2013).

Further, the Pensions Clause is more recent and specific than the general prohibition in the Contract Clause against the impairment of contracts, and it therefore is treated as an *exception* to the Contract Clause. "[S]pecific provisions. . . prevail over any arguable inconsistency with the more general rule." *Miller v. Allstate Ins. Co.*, 751 N.W.2d 463, 470 (Mich. 2008). "[W]hen two statutes or provisions conflict and one is specific to the subject matter while the other is only generally applicable, the specific statute prevails." *People v. Ellis*, 569 N.W.2d 917, 919 (Mich. Ct. App. 1997). In such cases, "[t]he specific statute is treated as an exception to the general one." *Id.* at 917 (citing *People v. Rogers*, 475 N.W.2d 717 (Mich. 1991)). "Similarly, a more recently enacted law has precedence." *Id*. These rules are particularly persuasive where "one statute is both the more specific and the more recent." *Id.*

In this case, the Pensions Clause is both more specific and more recent than the general Contract Clause. It is more recent, because the Contract Clause was contained in Michigan's original constitution of 1835, while the Pensions Clause was not added until 1963. It is also more specific, because the Pensions Clause delineates pension obligations as a specific form of contractual obligations ***that cannot be diminished or impaired***.

9

Thus, the Pensions Clause does not simply elevate pension obligations from the status of gifts to ordinary contractual obligations. It goes further and also forbids them from being diminished. The People of Michigan chose to elevate protection of pension benefits to the highest law in Michigan—the Constitution—and to clarify that this particular contractual obligation was not subject to the whims of the Legislature and could not be impaired by the State. *See Detroit Police Officers Ass'n v. Detroit*, 214 N.W.2d 803, 816 (Mich. 1974) ("With this paramount law of the state as a protection, those already covered by a pension plan are assured that their benefits will not be diminished by future collective bargaining agreements"); *Campbell v. Judges' Retirement Board*, 143 N.W.2d 755, 757 (Mich. 1966) ("Vested rights acquired under contract may not be destroyed by subsequent state legislation or even by an amendment to the State Constitution").

Moreover, the Michigan Contracts Clause, like its federal counterpart, is subject to limited exceptions, such as the State's police powers. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 21 (1977); *Att'y Gen. v. Michigan Public Serv. Comm'n,* 642 N.W.2d 691, 698 (Mich. App. 2002) (Michigan's Contract Clause is interpreted in the same manner as the federal Contract Clause).[2] If the

---

[2] To the extent the City is attempting to justify its violation of the Pensions Clause by relying on the State's reserved general police powers, this attempt fails. No exception to the Pensions Clause exists under Michigan law. Further, the State's power to impair contractual obligations under its reserved police power is limited by other co-equal provisions of the

10

Pensions Clause merely extends the Contracts Clause's protections to pension obligations, it would be nonsensical and confusing to include an express prohibition of impairment in the Pensions Clause that conflicts with the established understanding that there are limited exceptions to the Contracts Clause. The only logical interpretation is to follow both the AG and the State Court in reading the Pensions Clause as a free-standing and absolute protection of accrued pension obligations and, per the State Court, a protection which the Governor may not place in harm's way by authorizing a Chapter 9 bankruptcy without conditioning that authorization upon the preservation of the Pensions Clause.

---

constitution:

> The primary determination of public need and character of remedy in the exercise of the police power is in the legislature, and its statutes must be sustained *unless* the remedy is palpably unreasonable and arbitrary so as needlessly *to invade property or personal rights as protected by the Constitution.*

*Grocers Dairy Co. v. Dep't of Agric. Dir.*, 138 N.W.2d 767, 770 (Mich. 1966) (quoting *Carolene Products Co. v. Thomson*, 267 N.W. 608 (Mich. 1936)) (emphasis added); see also *Mich. Beer & Wine Wholesalers Ass'n. v. Attorney General*, 370 N.W.2d 328, 337 (Mich. Ct. App. 1985), *cert denied* 479 U.S. 939 (1986) (the State's police power cannot justify restricting the advertisement of alcohol prices due to freedom of speech guarantees, hence "we do not believe that the police power, however strong, permits a state to enact measures for the welfare of its citizens which violated personal freedoms protected by both state and federal constitutions.").

Thus, as the Attorney General aptly explained in its papers: "[T]he City can no more authorize a plan that reduces accrued obligations to public pensions than a plan that discriminates on the basis of religion." (Doc. No. 481, pg. 4). "In other words, article IX, § 24 is an impermeable imperative, and its place in the pantheon of Michigan constitutional rights is akin to the prohibition on taking property without just compensation, Mich. Const. art. X, § 2, or any other constitutional prohibition on the power of a government to affect the life, liberty, and property of its citizenry. Constitutional provisions of this nature are innate to the People of Michigan—not subject to discharge by exigency including a Chapter 9 proceeding under the federal Bankruptcy Code." (*Id.* at pg. 15). Accordingly, the State's general police powers are tempered by other constitutional protections, such as the Pensions Clause.

11

The core fallacy in the City's analysis lies in its assertion that it really does not matter exactly what the Pensions Clause says because it is overridden by the federal bankruptcy power once the City is in bankruptcy just as the Michigan Contracts Clause is overridden. This cannot be the law. For example, if the Pensions Clause expressly specified that pension obligations could not be diminished or impaired in a *chapter 9 bankruptcy case*, surely the City could not plausibly argue that the Legislature could enact PA 436 or any other statute that could ignore such a constitutional prohibition. Similarly, if the Michigan Constitution expressly prohibited the filing of *any chapter 9 case*, presumably the City could not plausibly argue that statutory authorization would be sufficient. Thus, contrary to the City's facile arguments, the express prohibition on any diminishment or impairment of pension obligations must be given effect in the eligibility analysis to determine whether, and under what conditions, a Michigan municipality may file.

## B.     The State and City Cannot Use Bankruptcy To Impair Pensions Indirectly

Knowing that it cannot *itself* impair pensions, the City attempts to shift the focus entirely to what it will ask the Court to do after the City is in bankruptcy. By focusing on the words "thereof" and "thereby," the City concludes that only the "state and its political subdivisions" are precluded from impairing pensions. The

12

City argues in its reply to the Retiree Committee's objection that "[t]he only ways impairment can occur in chapter 9 are (a) if the relevant parties agree to modify benefits, or (b) by order of the bankruptcy court[.]" (Doc. No. 918, pgs. 3-4). In other words, the City recognizes that it is powerless to unilaterally and directly impair pensions. Indeed, the Governor's authority (and by extension, the Emergency Manager's) is undisputedly limited by the Pensions Clause. *Kosa*, 292 N.W.2d at 465 ("neither the Legislature nor the Executive can apply funded reserves to meet unfunded retirement obligations").

While the City took great pains in its papers to point out that it will be a court order that ultimately authorizes any impairment or diminishment of the accrued pension benefits (Doc. No. 765. pg 24-25), this stance is fatally undermined by the fact that every step necessary to procure that order must and will be taken *by the City*—not by this Court. Only the City may file a Chapter 9 case in the first place; involuntary petitions are proscribed. Only the City may file a Chapter 9 plan of arrangement; creditors are barred from doing so. The Court cannot confirm any Chapter 9 plan of adjustment unless and until the City asks for it. Thus, it is simply inaccurate to say that it is the Court, rather than the City, that would be effectuating any impairment or diminishment of accrued pension benefits under a City-proposed plan.

Indeed, at the Emergency Manager's deposition, he confirmed:

> Q. And after you file the case[,] you and your attorneys are responsible for the day-to-day activities in carrying out that Chapter 9 case; correct?
>
> A. Yes.
>
> Q. And in a Chapter 9 case only the municipality itself can propose a plan of adjustment; correct?
>
> A. Correct.
>
> Q. So ultimately it will be the city that proposes a plan of adjustment?
>
> A. I believe so.
>
> Q. And ultimately it will be the city that places in front of the court a method to deal with its pension debt?
>
> A. I believe so.
>
> Q. And it is only the Court after the city has first proposed the plan, it is the court that can confirm that plan?
>
> A. Yes.
>
> Q. But all the steps leading up to that confirmation are acts taken by the city; correct?
>
> A. I believe that's the Chapter 9 scheme.

(Ex. A, Orr Dep, pg. 293) (emphasis added).

As the Emergency Manager acknowledged, the only source of the City's plan (a plan which *will* contain an impairment of pension benefits, as admitted by the City several times now) will be the City, not the Court. This directly undercuts the City's contention that it is the Court who will be imposing pension benefit reductions. In fact, a bankruptcy court cannot *sua sponte* take any action that would impair the City's pension benefits.

14

If the Governor and the City are unable to impair pensions directly, they are also unable to impair them indirectly by attempting to use the Chapter 9 process to circumvent this constitutional limit on their power. *See Attorney Gen ex rel. Eaves v. State Bridge Com.*, 269 N.W. 388, 392 (Mich. 1936) ("It is a fundamental and familiar proposition of law that the State may not do indirectly that which it is forbidden to do directly."); *Blank v. Dep't of Corrections,* 564 N.W.2d 130, 136 (Mich. App. 1997) ("The Legislature may not do indirectly what it cannot do directly."); *Socialist Workers Party v. Secretary of State*, 317 N.W. 1, 11 (Mich. 1982) (holding that the Legislature could not "do indirectly what art 2, § 4, forbids it from doing directly"); *Regents of University of Mich. v. State*, 235 N.W.2d 1, 17 (Mich. 1975) ("The condition may not be designed to permit the Legislature to indirectly accomplish that which it may not do directly.").

As a result, the City's tortured reading of the Pensions Clause as permitting impairment by someone other than the "State and its political subdivisions" is not only counter-factual (insofar as the City ascribes responsibility for such impairment to the bankruptcy court), it is also irrelevant—because it is solely a question of whether the *State* and the *City* have the authority under the Michigan Constitution to do so.

15

**C.    The Michigan Legislature Cannot Effectively Authorize the Governor, the Emergency Manager, or the City To Violate the Michigan Constitution**

The only way for PA 436 to be constitutional under the Michigan Constitution is to construe it as requiring that the Governor impose contingencies protecting pension obligations from diminution or impairment. Under section 109(c)(2), a *State* must *consent* to the municipality's entrance to the bankruptcy court. The crux of the eligibility question here is whether the *State* has effectively consented to the filing of a Chapter 9 petition that is, by the City's own admission, intended to evade the constitutional protections of the Pensions Clause. The Legislature and the Governor may have taken steps to "consent" to the City's Chapter 9 filing, but their consent is void, because it has been given in direct violation of a constitutional mandate under state law. *Young v. Ann Arbor*, 255 N.W. 579, 581 (Mich. 1934) (noting the State's legislative power is subject to "the restraints and limitations imposed by the people upon such power by the Constitution of the State itself").

**1.    The State's Consent to the City's Bankruptcy Petition Was Ineffective Because It Abrogates the Michigan Constitution**

Thus, the question is not whether a state, through its officials, "has" consented, it is also a question of whether the state "may" consent, within the constraints of its own constitution:

16

> In the bankruptcy realm, part of the balancing of state versus federal interests encompasses whether a state ***may and has*** **consented** to an act by the federal government regarding an action that otherwise is one reserved to the states under the Constitution as well as whether the federal government may and has agreed to allow a state to take an action otherwise reserved to it under the Constitution.

*In re Jefferson County*, 474 B.R. 228, 279 (Bankr. N.D. Ala. 2012) (emphasis added). In this case, the City makes a misleadingly simple argument: that by passing PA 436, the State of Michigan has consented to a process under which the City may impair pensions under federal bankruptcy law in violation of the Pensions Clause. But the Legislature did not have authority to simply "consent," by enacting PA 436, to an abrogation of the Michigan Constitution. *Young v. Ann Arbor*, 255 N.W. at 580. This is not the kind of effective state authorization required by Chapter 9 to be in compliance with applicable Supreme Court jurisprudence. *See United States v. Bekins*, 304 U.S. 27, 50-51 (1938) (in enacting predecessor to Chapter 9 "Congress was especially solicitous" that authorizations to file municipal bankruptcies be in accordance with State law); *Ashton v. Cameron County Dist.*, 298 U.S. 513, 531-32 (1936) (Congress may not override State sovereignty on the matter of the authority of an instrumentality of the state to file bankruptcy).

17

Instead, PA 436 expressly requires the Pensions Clause be upheld. PA 436 mandates that any financial and operating plan developed by the Emergency Manager shall provide for "[t]he timely deposit of required payments to the pension fund for the local government or in which the local government participates." M.C.L. § 141.1551(1)(d). PA 436 also expressly mandates that the Emergency Manager "shall fully comply" with the Pensions Clause if he becomes the sole trustee of either of the Retirement Systems. M.C.L. § 141.1552(1)(m)(ii).

In summary, the City ignores the analysis of whether the State "may" consent to bankruptcy and simply argues that the State "has" consented through PA 436. But that is not enough. *See Jefferson Cty.*, 474 B.R. at 279; *In re City of Harrisburg*, 465 B.R. 744 (Bankr. M.D. Pa. 2011) (holding that (i) a state's laws— all of them, not just the authorizing statute—must be considered and the authorizing statute alone cannot override conflicting state law and (ii) the Supremacy Clause has no application at the eligibility phase, because Congress expressly granted the states the power to act as gatekeepers under section 109(c)(2)); *see also In re Suffolk Regional Off-Track Betting Corp.*, 462 B.R. 397, 420 (Bankr. E.D.N.Y. 2011) (a court may not "turn a blind eye" to law governing the scope of authority to file a municipal bankruptcy case).

18

### 2. The Existence of the Pensions Clause as an Express Constitutional Bar to Eligibility Is Unique In this Case

The City argues that "[n]o court has ever held that a State's constitutional protection of pensions poses any obstacle to a municipality's eligibility to be a chapter 9 debtor" and cites cases from California and Alabama as supporting examples. (Doc. No. 765, pg. 26-27). The City fails to mention that ***no bankruptcy court has ever considered the novel questions presented here***. The City's reliance on cases from other states is misplaced. California and Alabama do *not* have *constitutional* provisions like Michigan's Pensions Clause. Rather, they only have general Contract Clauses.

*Olson v. Cory*, 609 P.2d 991 (Cal. 1980), was mischaracterized by the City, which cited it for the proposition that "in California, the state Constitution prohibits the diminishment or impairment of pension benefits unless some 'new or comparable or offsetting benefit appear[s] in the modified plan.'" (Doc. No. 765, pg. 26-27 (citation omitted)). But *Olson* is a judicial gloss on California's constitution, and does not rely upon nor cite any provision of the California Constitution expressly protecting pensions from impairment. Similarly misplaced is the City's reliance on *In re Stockton*, 493 B.R. 772 (Bankr. E.D. Cal. 2013) and *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280 (B.A.P. 9th Cir. 2009). Neither case considered whether authorization

19

under state law to file a Chapter 9 petition was valid if such authorization violated a specific state constitutional prohibition against the impairment of pensions. In *Stockton*, the eligibility objection was based on the good faith requirement, *Stockton*, 493 B.R. at 784-785, and in *Vallejo*, the objecting parties appealed the bankruptcy court's determination that the city "desire[d] to effect a plan" under section 109(c)(4) and that the good faith negotiation requirement of section 109(c)(5) was met. Section 109(c)(2) was not at issue.

Like the California Constitution, the Alabama Constitution lacks any equivalent to Michigan's Pensions Clause. The opinion *In Bd. Of Trs. v. Cary*, 373 So.2d 841, 842 (Ala. 1979) does not interpret or apply an express constitutional protection for pensions. Alabama has only a general contracts clause in its state constitution and no provision analogous to the Pensions Clause. Any reliance upon *In re City of Prichard,* No. 99-13465 (Bankr. S.D. Ala. October 6, 2000) (Docket No. 123) at p. 6-7 is similarly misplaced, as the bankruptcy court did not address a state *constitutional* provision at odds with the bankruptcy petition.

     **3.**    **The *Harrisburg* Case Holds Mere Compliance With An Authorizing Statute Is Insufficient to Authorize a Filing Where Authorization Violates Other State Law**

In the *Harrisburg* case, the court observed that:

20

> [The authorizing statute] is intended to address the needs of financially distressed cities. Its provisions, however, are not intended to replace the entire scheme of governance set forth in the Charter Law and the Third Class City Code. *Statutory provisions should be construed with reference to similar enactments and not simply read in a vacuum.*

*In re City of Harrisburg*, 465 B.R. at 764-765 (emphasis added). *Harrisburg* stands for the proposition that compliance with an authorizing statue alone is insufficient to satisfy § 109(c)(2). Accordingly, this Court must examine the entire scheme of Michigan governance in determining whether the City is specifically authorized to be a debtor under Chapter 9 as required by § 109(c)(2). PA 436 cannot be "read in a vacuum." *Id.* Examination of PA 436 in conjunction with the Pensions Clause demonstrates that the City cannot satisfy §109(c)(2) because state law prohibits the City from taking any action, including filing a Chapter 9 bankruptcy petition, that will diminish or impair accrued financial benefits in violation of the Michigan Constitution.

The City's Reply fails to address the *Harrisburg* case at all, and the State of Michigan's Response to Eligibility Objections Raising Only Legal Issues [Doc. No. 756] (the "State's Response") feebly attempts to distinguish *Harrisburg* by arguing that Pennsylvania law expressly precluded Harrisburg from being a chapter 9 debtor while Michigan law permits the City to proceed under chapter 9. State's Response at p. 8. The State reads *Harrisburg* too narrowly.

21

In *Harrisburg*, the court considered three different state laws and determined that the city council did not have authority under those state laws to commence a bankruptcy on behalf of the city of Harrisburg as required by §109(c)(2). *Harrisburg*, 465 B.R. at 765. Although the authorizing statute in *Harrisburg* (Act 26) explicitly restricted the ability of distressed cities of the third class to file chapter 9 bankruptcy, this fact was not outcome determinative. Instead, it was the "entire scheme of governance" under Pennsylvania law, and the fact that the city council violated Act 26, violated the Charter Law, and usurped authority from the mayor when it authorized the filing under Act 47, that led the court to conclude that Harrisburg was not specifically authorized to be a debtor as required by § 109(c)(2).

### D. State Law Is Not Preempted In Determining Eligibility

As set forth in detail in the Retirement Systems' original objection (Doc. No. 370, pg. 19-23), federal law does not trump state law with respect to eligibility under section 109(c)(2); indeed, under both the Bankruptcy Clause's "uniformity" requirement and the Tenth Amendment, *Michigan law* must determine the City's eligibility.

### 2. The Bankruptcy Clause's "Uniformity" Requirement Recognizes That State Law Governs Eligibility

The City argues that the Bankruptcy Code is a "comprehensive federal

9719247.1 14893/165083

scheme" that "displaces any contrary state-law provisions that purport to alter or impair a debtor's powers under the Bankruptcy Code." (City's Response, pg. 30). Thus, the City concludes that incorporating any state law, such as permitting a contingency on the filing "would be prohibited by federal law" and would offend the "uniformity" aspect of the Bankruptcy Clause.[3]

The Bankruptcy Clause's "uniformity" requirement has no impact when Congress in the Bankruptcy Code has specifically recognized state law. The Supreme Court long has held that "[n]otwithstanding this requirement as to uniformity, the bankruptcy acts of Congress may recognize the laws of the State in certain particulars, although such recognition may lead to different results in different states. . . . Such recognition in the application of state laws does not affect the constitutionality of the Bankruptcy Act, although in these particulars the operation of the act is not alike in all the states." *Stellwagen v. Clum*, 245 U.S. 605, 613 (1918). Thus, while the Bankruptcy Clause creates a "presumption of uniformity against incorporating state law as the rule of decision," the presumption does not apply where "the language or context of a particular provision requires otherwise." *In re Whipple*, 417 B.R. 86, 89-90 (Bankr. C.D. Ill. 2009). "Where

---

[3]     The federal Constitution's Bankruptcy Clause grants Congress the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States" and the Supremacy Clause makes the laws that Congress passes pursuant to that power the "supreme Law of the Land[.]" *Richardson v. Schafer (In re Schafer)*, 689 F.3d 601, 603 (6th Cir. 2012), *cert denied* 133 S. Ct. 1244 (2013) (quoting U.S. CONST. ART. I, § 8, cl. 4; U.S. CONST. ART. VI, cl. 2).

23

Congress finds a reason for variation, even the requirement of geographically uniform federal action can be relaxed." *In re Sullivan*, 11 B.R. 432 (Bankr. C.D. Ill. 1981) (citing *Stellwagen* and *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102 (1974)).

In the chapter 9 context, Congress found a "reason for variation," because it expressly granted the power of consent and "authorization" to the states. *See* 11 U.S.C. 109(c)(2). As a result, honoring Michigan law at the eligibility stage does not *offend* the Bankruptcy Clause—it is actually *required* by the Bankruptcy Clause, because this is how Congress intended chapter 9 to work. This conclusion is bolstered by the cases cited in the Retirement Systems' principal objection, which demonstrate that there are provisions of the Bankruptcy Code expressly reserved to the states (such as a debtor's exemptions under section 522 of the Code), and those cases hold that where the Bankruptcy Code grants authority to the States, the State's law is entitled to be upheld by the Bankruptcy Court.[4]

In this context, the City's reliance on *In re City of Vallejo*, 403 B.R. 72, 76-77 (Bankr. E.D. Cal. 2009) and *County of Orange v. Merrill Lynch & Co.* (*In re County of Orange*), 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996) is inapposite because both cases were predicated on a valid authorization under state law.

---

[4]    *See e.g., Rhodes*, 705 F.2d at 163; *Storer v. French (In re Storer)*, 58 F.3d 1125, 1127 (6th Cir. 1995); see also *Richardson v. Schafer (In re Schafer),* 689 F.3d 601, 603 (6th Cir. 2012), *cert denied* 133 S. Ct. 1244 (2013).

*Vallejo*, 403 B.R. at 76; *County of Orange*, 191 B.R. at 1021. Those cases dealt with issues of the applicability of certain provisions of the Bankruptcy Code (section 365 in *Vallejo* and section 507 in *County of Orange*) in a validly authorized case, not the threshold issue of eligibility.[5]

### 2. The Tenth Amendment Bars Federal Interference With Public Pension Rights In Bankruptcy Or Otherwise

Congress lacks authority under Article I, including the Bankruptcy Clause, to authorize the elimination of state and municipal pension benefits because the Tenth Amendment reserves the power to regulate such benefits exclusively to the States. *A fortiori* Congress cannot authorize the elimination of municipal pension debt or the modification of pension plans and benefits when a State such as Michigan has not consented to federal regulation. Congress and courts long have recognized that the Tenth Amendment bars federal interference with public pension rights. For instance, ERISA governs only private pension plans and expressly excludes public pension plans, which "evinces 'Congress' intent to refrain from interfering with the manner in which state and local governments operate employee benefit systems.'" *Roy v. Teachers Ins. & Annuity Assoc.*, 878 F.2d 47, 49 (2d Cir. 1989) (quoting *Feinstein v. Lewis*, 477 F. Supp. 1256, 1261

---

[5] The same distinction between eligibility and the application of substantive provisions of the Bankruptcy Code applies to the *Mission Indep. Sch. Dist. V. Texas*, 116 F.2d 175 (5th Cir. 1940), which involved a validly authorized proceeding under the Bankruptcy Act. *Id.* at 178-79.

25

(S.D.N.Y. 1979), *aff'd* 622 F.2d 573 (2d Cir. 1980)). "Plans established by state and local governments are generally excluded from coverage under ERISA because of concerns of federalism. State and local governments must be allowed to make their own determinations of the best method to protect the pension rights of municipal and state employees. These are questions of state and local sovereignty and the Federal Government should not interfere." *Feinstein*, 477 F. Supp. at 1261 (quoting 1 Legislative History of the Employee Retirement Income Security Act of 1974, at 220 (1976)).

When the Tenth Amendment reserves a sphere of authority to the States, Congress cannot interfere in that sphere, even in the exercise of its enumerated powers under Article I. As the Supreme Court recently held, "[t]he principles of limited national powers and state sovereignty are intertwined. While neither originates in the Tenth Amendment, both are expressed by it. *Impermissible interference with state sovereignty is not within the enumerated powers of the National Government*, and action that exceeds the National Government's enumerated powers undermines the sovereign interests of States." *Bond v. United States*, 131 S. Ct. 2355 (2011) (citing *New York v. United States*, 505 U.S. 144, 155-59 (1992); *United States v. Lopez*, 514 U.S. 549, 564 (1995)) (emphasis added). Thus, neither the Bankruptcy Clause nor any other Article I enumerated power authorizes Congress to regulate state and municipal pension benefits. This

26

principle alone forecloses the City's attempt to discharge pension debt through this Chapter 9 proceeding.

Beyond the right to regulate public pensions, the Tenth Amendment also gives States the right to control whether and on what terms their municipalities can enter bankruptcy, thus mandating the eligibility limitation in section 109(c)(2) of the Code. *See Bekins*, 304 U.S. at 51-52 ("The [predecessor of Chapter 9] is carefully drawn so as not to impinge upon the sovereignty of the State"). The State of Michigan is therefore fully within its sovereign right both to enact a state constitutional protection for public pension benefits, and also to insist upon enforcement of that protection notwithstanding a Chapter 9 bankruptcy. Allowing the City to proceed in Chapter 9 with the express purpose and effect of impairing public pension benefits thus would run afoul of Michigan's Pensions Clause and section 109(c)(2) of the Code, and also the Tenth Amendment. On the other hand, respecting Michigan's Pensions Clause at the eligibility stage does not offend federal law, but rather comports with the Tenth Amendment reserving to States the right to regulate public pensions and serve as gatekeepers to Chapter 9 bankruptcy.

### 3. Substantive Due Process and the Takings Clause Bar the City from Impairing Vested Pension Rights

Allowing the City to proceed under Chapter 9 in a manner that impairs vested pension benefits also would violate pension recipients' substantive due

27

process rights and the Takings Clause. At a minimum, the prospect of impairing vested pension benefits through this case raises serious constitutional questions that strongly support construing Michigan law not to authorize the City to proceed under Chapter 9 with the purpose and effect of impairing pension benefits. Where a possible interpretation of a statute raises "serious doubts" as to its constitutionality, a court should construe the statute to avoid the constitutional problem absent an "affirmative intention . . . clearly expressed" to raise the serious constitutional question. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 584 (1988). Here, interpreting Michigan law to authorize the City to proceed under Chapter 9 in a manner that impairs pension benefits would raise serious constitutional doubts regarding substantive due process and the Takings Clause. No provision of Michigan law expresses the requisite clear intention to violate substantive due process and the Takings Clause by authorizing the City to impair vested pension benefits in bankruptcy.

At least one district court within the Sixth Circuit has held that stripping retired city employees of vested retirement benefits "shocks the conscience of the Court" and thus violated the retirees' substantive due process rights under the Fourteenth Amendment. *Mayborg v. City of St. Bernard*, No. 1:04-CV-00249, 2006 U.S. Dist. LEXIS 85276, at *11-12 (S.D. Ohio Nov. 22, 2006). As the court explained, the Supreme Court and Sixth Circuit have held that "the property

28

interests in a person's means of livelihood is one of the most significant that an individual can possess." *Id.* at * 12 (quoting *Ramsey v. Bd. of Educ., Whitley Co., Ky.*, 844 F.2d 1268, 1273 (6th Cir. 1988) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U .S. 532, 543 (1985)). The court further found that the retirees had "adequately established a due process violation of a constitutionally protected property interest, because they have shown that governmental conduct deprived them of a right previously held under state law"—*i.e.*, "a retirement benefit that had been promised, assured, contracted, confirmed and earned." *Id.* at *11. After the retirees' decades of "loyal, dedicated and, at times life-threatening, service to the City," the court concluded that substantive due process was violated because the retirees not only lost their benefits, but also "suffer[ed] the social stigma of having the City diminish the value of their public service, reduce the amount of the pension available, and the loss of economic autonomy their public careers were expected to provide." *Id.* at *12.

In addition, because vested public pension benefits are constitutionally protected property rights, diminishing those benefits would constitute a taking without just compensation in violation of the Takings Clause. The Fifth Amendment provides, in pertinent part, that private property shall not "be taken for public use, without just compensation." U.S. CONST. AMEND. V; *see also Chicago Burlington & Quincy R.R. Co. v. Chicago*, 166 U.S. 226, 239 (1897) (holding that

29

the Takings Clause applies to the states). "The Supreme Court has held that certain statutes can effect a per se taking of funds." *McCarthy v. City of Cleveland*, 626 F.3d 280, 284 (6th Cir. 2010) (discussing *Webb's Fabulous Pharms., Inc. v. Beckwith*, 449 U.S. 155 (1980), and *Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003)). In each of those cases, "the state law at issue operated to seize a sum of money from a specific fund." *Id.* In addition, "in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), five Justices indicated that the Takings Clause is implicated only by laws that 'appropriate, transfer, or encumber' an estate in land, intellectual property, or other specific 'identified property interest[s],' such as a bank account or accrued interest." *Id.* (quoting *Eastern Enters.*, 524 U.S. at 540 (Kennedy, J., concurring in the judgment and dissenting in part)). Here, the City expressly proposes to eliminate pension recipients' rights to their vested and accrued pension benefits without paying just compensation. Doing so would violate the Takings Clause.[6]

## III. The City's Arguments Regarding Collateral Estoppel Are Unavailing

The State Court in *Webster* found that "PA 436 is unconstitutional and in violation of [the Pensions Clause] to the extent that it permits the Government to

---

[6] For the avoidance of doubt, this and any other argument herein is intended at this stage in the bankruptcy case to address whether there is valid State authorization of the City's bankruptcy petition and is not intended to preclude similar and additional arguments that may be made in connection with any plan adjustment that may be proposed by the City in the event that the Court finds the City eligible to be a debtor in this case, including without limitation any arguments in the Bankruptcy Code section 943(b).

authorize the emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits," and that "[t]he Governor is prohibited by [the Pensions Clause] from authorizing the emergency manager under PA 436 to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and any such action by the Government is without authority and in violation of [the Pensions Clause]." (Doc. No. 370, Declaratory Judgment, Exhibit 2, pg. 2). Hence, the State Court concluded, "[b]y authorizing the Emergency Manager to proceed under Chapter 9 to diminish or impair accrued pension benefits, Defendant Snyder acted without authority under Michigan law and in violation of [the Pensions Clause]." (*Id.* at 3). The City is precluded from re-litigating those determinations under the doctrine of collateral estoppel.

## A. The *Webster* Court Had Jurisdiction To Decide Questions of State Law

The City argues that collateral estoppel does not apply because the State Court in *Webster* supposedly "lacked jurisdiction" to decide whether PA 436 violates Michigan's Pensions Clause and whether Michigan state law permitted the Governor to authorize the Emergency Manager to proceed under Chapter 9. (Doc. No. 765, pg. 32). In the City's view, federal courts have "exclusive jurisdiction" to decide these questions of Michigan state law because they bear upon whether

31

the City is eligible to be a Chapter 9 debtor under section 109(c)(2) of the Bankruptcy Code. *Id.* The City's argument has no merit. The State Court in *Webster* did not analyze the City's eligibility to be a Chapter 9 debtor under section 109(c)(2). Rather, the *Webster* Judgment rules squarely on the constitutionality of PA 436 and the Governor's authorization of the Emergency Manager to proceed under Chapter 9 in light of the Pensions Clause in the Michigan Constitution. No credible argument can be made that a Michigan state court lacks jurisdiction to rule upon the validity of a state statute and an issue of state constitutional law.

## B. The *Webster* Judgment Did Not Violate the Automatic Stay

The City next argues that the *Webster* Judgment is "invalid because it was entered in violation of the automatic stay imposed . . . as of the filing of the Petition." (Doc. No. 765, pg. 34). To the contrary, the automatic stay did not apply to the *Webster* case because the City was not a party in *Webster*. And this Court did not extend the automatic stay to cover the defendants in *Webster* (the State, the Governor, and the Treasurer) until July 19, 2012, five days *after* the State Court entered the *Webster* Judgment. The *Webster* Judgment is thus a final, valid state law precedent. *See* MCR 2.605(E) ("Declaratory judgments have the force and effect of, and are reviewable as, final judgments").

9719247.1 14893/165083

Because the City was not a party in *Webster*, the automatic stay did not apply to *Webster* as of the filing of the Petition. The automatic stay is only "automatic" as to the debtor, not non-debtor third parties. *See* 11 U.S.C. 362(a)(1) (noting the stay applies to "the commencement or continuation. . . of a judicial. . . action or proceeding *against the debtor* ....") (emphasis added); *see also In re Pitts*, 2009 Bankr. LEXIS 4023, 14 (Bankr. E.D.N.Y. Dec. 8, 2009) ("Subsection 362(a)(1) is generally not available to non-debtors") (citing *Teachers Ins. & Annuity Ass'n of America v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986); *In re Bidermann Industries U.S.A., Inc.*, 200 B.R. 779, 782 (Bankr. S.D.N.Y. 1996)). This is precisely why the City had to file a motion to ***extend*** the automatic stay to apply to the defendants in *Webster*. In an analogous case, the bankruptcy court in *Bidermann Industries* rejected the same argument the City raises here, holding that "section 362(a)(1) does not apply automatically to stay actions against non-debtors. The debtor must obtain a stay order from the bankruptcy court, *and until it does, the action against the non-debtor may proceed*." 200 B. R. at 782 (emphasis added). In this case, the order extending the stay to the Webster Defendants was not entered until July 24, after the Declaratory Judgment was entered on July 19. The automatic stay did not apply to the *Webster* case until this order was entered, and thus there was no violation of the stay.

33

Nor did this Court's extension of the automatic stay somehow operate retroactively to invalidate the *Webster* Judgment. Indeed, the City's motion did not ask for retroactive effect. Thus, in extending the automatic stay, this Court expressly cautioned that it was "not ruling on whether the state court orders should be given preclusive effect under principles of res judicata, collateral estoppel, Rooker-Feldman, or any other preclusive doctrine. ***The Court is not ruling on whether any orders entered by the state court after this bankruptcy case was filed violated the automatic stay.***" (7/24/2013 Hrg. Tr., pg. 84) (emphasis added). In similar circumstances, however, other bankruptcy courts have held that their orders extending the automatic stay cannot operate retroactively to void state court judgments. For instance, in *In re Pitts*, the bankruptcy court explained:

> To the extent the Debtor requests that this Court use its powers under § 105(a) to extend the automatic stay to the [non-debtor] Defendants, the Court denies the request. . . ***such injunctive relief would not apply nunc pro tunc, but would be prospective in nature***. Because any relief under § 105(a) would be prospective, granting injunctive relief to stay the State Court Action would not provide the Debtor with any real relief ***because the State Court has already made its rulings, which cannot be voided under this section.*** Therefore, even if the Court were to find that the Debtor has established grounds for extending the stay to the [non-debtor]Defendants under § 105(a), the judgment against the [non-debtor]Defendants would still stand[.]

*Id.* at *8 (citations omitted) (emphases added).

34

Likewise, the court in *In re Union Trust Philadelphia, LLC*, 460 B.R. 644 (E.D. Pa. 2011), echoed *Pitts* and noted that a bankruptcy court's power under section 105 does not extend to voiding state court judgments:

> [A] bankruptcy court generally is considered to possess the power to enjoin a pending state action that violates the automatic stay. This authorization is not without limits, however. While a bankruptcy court has the power to stay proceedings in state court, it does not possess any power to vacate a judgment of the state court.

*Id.* at 659-60 (citations omitted).

This Court's July 24 order specifically did *not* void the Declaratory Judgment, but rather limited its scope and effect to prospective relief, as the foregoing authorities confirm was appropriate. The City did not ask for retroactive relief in its motion. However, the City vainly attempts to now read into the July 24 order the kind of relief that this Court expressly declined to provide and that the *Pitts* and *Union Trust* courts found improper—using a section 105(a) injunction to retroactively vacate a state court judgment. The City cannot enlist section 105(a) to enlarge this Court's powers. *In re Yadidi*, 274 B.R. 843, 848 (B.A.P. 9th Cir. 2006) ("§ 105 is not a roving commission to do equity or to do anything inconsistent with the Bankruptcy Code"). Any attempt to vacate or re-litigate the *Webster* court's declaratory judgment would, in addition to exceeding the Court's equitable powers under section 105(a), effectively constitute federal court review

of a state court judgment in violation of federal law. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 291-292 (2005) (district courts lack jurisdiction to act as appellate courts over state court judgments under 28 U.S.C. 1257). Thus, the City cannot use section 105(a) as an excuse to override otherwise well-established rules (such as the Full Faith & Credit clause, which demands that a federal court enforce a state court judgment). *See Union Trust,* 460 B.R. 659-60.

### C. The Elements of Collateral Estoppel Are Satisfied

Finally, the City argues that collateral estoppel does not apply on the grounds that there was no "full and fair opportunity to litigate the issue" in *Webster*, and the City lacks privity with the defendants in *Webster*. (Doc. No. 765, pg. 36). Both arguments fail.

Contrary to the City's contention, the timing of the *Webster* Judgment was not "unusual" or unreasonably "expedited." (*Id*). In the *Webster* Judgment, the State Court explained that "Plaintiffs have requested, ***and Defendants have agreed in their Response***, that the hearing in this matter may be advanced pursuant to MCR 2.605(D) and the court finds that expedited treatment is appropriate and that final declaratory relief is proper at this time." (Emphasis added). The State Court, moreover, entered the *Webster* Judgment after "having reviewed the parties filings and submissions, and having heard oral argument by counsel for the parties, and being otherwise fully advised in the premises . . . ."

36

Nor can the City reasonably dispute that it is in privity with the State, which was a defendant in *Webster*. Collateral estoppel applies to nonparties who are in privity with parties to the underlying case. *See Dearborn Heights Sch. Dist. No. 7 v. Wayne County MEA/NEA*, 592 N.W.2d 408, 412 (Mich. App. 1998) (nonparty may be bound if "that party controlled the earlier proceeding or if the party's interests were adequately represented in the original matter"). For these purposes, privity exists where there is a "substantial identity of interests" and a "working or functional relationship . . . in which the interests of the non-party are presented and protected by the party in the litigation." *Phinisee v. Rogers*, 582 N.W.2d 852, 854 (Mich. App. 1998). Applying that standard, privity between the City and the State has now been established beyond reasonable dispute. At a court hearing on September 19, 2013, representatives for the City asserted a "common interest" existed between the City and State. In the Common Interest Agreement entered into between the State and the City, they admitted that the City and the State "share certain common interests including, but not limited to, those in connection with the legal and policy issues that arise as a result of and in relation to the City's Financial Emergency, the appointment of the Emergency Manager, and the Bankruptcy Case." (Doc. No. 940, Exhibit B, pg. 2). These admissions satisfy the privity requirement for application of collateral estoppel.

9719247.1 14893/165083

## CONCLUSION

The Pensions Clause of the Michigan Constitution is an absolute bar to any attempt by the City to diminish or impair its pension obligations. It cannot be overridden simply due to public necessity or financial exigency. Any valid authorization by the State sovereign of the filing of a Chapter 9 petition by a political subdivision must therefore support and protect the Pensions Clause as the will of the people of the State. Accordingly, the Retirement Systems respectfully submit that the Court must either follow the State Court and hold PA 436 unconstitutional, in which case the City is not eligible to be a debtor under Chapter 9, or determine that PA 436 is limited by the Pensions Clause of the Michigan Constitution, in which case the City's Chapter 9 case can proceed, but only on the express condition that the City's accrued pension obligations may not be impaired.

Respectfully submitted,

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Jennifer K. Green (P69019)
Evan J. Feldman (P73437)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

38

-and-

ARNOLD & PORTER LLP
Lisa Hill Fenning (admitted *pro hac vice*)
777 South Figueroa Street
44th Floor
Los Angeles, California 90017
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
lisa.fenning@aporter.com

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

Dated:  October 11, 2013

9719247.1 14893/165083