# EXHIBIT A

## Page 1

IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re
CITY OF DETROIT, MICHIGAN,
Debtor.

Chapter 9
Case No. 13-53846
Hon. Steven W. Rhodes

VIDEOTAPED DEPOSITION

DEPONENT: KEVYN ORR
DATE: Monday, September 16, 2013
TIME: 10:08 a.m.
LOCATION: MILLER CANFIELD PADDOCK & STONE PLC
150 West Jefferson, Suite 2500
Detroit, Michigan
REPORTER: Jeanette M. Fallon, CRR/RMR/CSR-3267

## Page 2

1  APPEARANCES:
2
3  JONES DAY
4  By: Gregory M. Shumaker
5     Dan T. Moss
6  51 Louisiana Avenue, NW
7  Washington, D.C. 20001.2113
8  202.879.3939
9     Appearing on behalf of the Debtor
10
11 DENTONS
12 By: Anthony B. Ullman
13 620 Fifth Avenue
14 New York, NY 10020.2457
15 212.632.8342
16    Appearing on behalf of Retirees Committee
17
18 COHEN WEISS AND SIMON LLP
19 By: Peter D. DeChiara
20 330 West 42nd Street
21 New York, NY 10036.6979
22 212.356.0216
23    Appearing on behalf of UAW
24
25

## Page 3

1  APPEARANCES (continued):
2
3  LOWENSTEIN SANDLER LLP
4  By: Sharon L. Levine
5  65 Livingston Avenue
6  Roseland, NJ 07068
7  973.597.2374
8  -and-
9  AFSCME
10 By: Michael L. Artz
11    Tiffany Ricci
12 1101 17th Street, NW
13 Suite 900
14 Washington, D.C. 20036
15 202.775.5900
16    Appearing on behalf of AFSCME
17
18 CLARK HILL PLC
19 By: Jennifer K. Green
20 500 Woodward Avenue, Suite 3500
21 Detroit, MI 48226
22 313.965.8274
23    Appearing on behalf of Retirement Systems
24
25

## Page 4

1  APPEARANCES (continued):
2
3  WILLIAMS WILLIAMS RATTNER & PLUNKETT PC
4  By: Ernest J. Essad, Jr.
5  380 N Old Woodward Ave Ste 300
6  Birmingham, MI 48009
7  248.642.0333
8     Appearing on behalf of FGIC
9
10 SIDLEY AUSTIN LLP
11 By: Guy S. Neal (appearing via LiveNote Streaming)
12 1501 K St., NW
13 Washington, D.C.
14 202.736.8000
15    Appearing on behalf of National Public Finance
16    Guarantee Corp.
17
18 WINSTON & STRAWN LLP
19 By: Bianca M. Forde (appearing via LiveNote Streaming)
20 200 Park Avenue
21 New York, NY 10166.4193
22 212.294.4733
23    Appearing on behalf of Assured Guaranty Municipal
24    Corp.
25 ALSO PRESENT: Mark Meyers, videographer

### Page 285

1  A. No, at that time I hadn't even -- I hadn't even
2  thought about the Michigan constitutional questions at
3  that time.
4  Q. Have you since expressed any similar reservations?
5  A. No, I have not.
6  Q. Earlier you were handed Exhibit 17 I believe it was,
7  which was a copy of the City's request for admissions.
8  A. Yes.
9  Q. I'm sorry, the City's responses to the Retirement
10  Systems' request for admissions.
11  A. Yes.
12  Q. Do you have a copy in front of you?
13      MR. SHUMAKER: He has the only copy right
14  now.
15      MS. GREEN: I have a few extras because
16  they were --
17      THE COURT REPORTER: He took it back. He
18  took the original back.
19      MR. DeCHIARA: Oh, I have it? I have it.
20      MS. GREEN: He's got it. We're fine.
21      MR. SHUMAKER: Was it marked?
22      MS. GREEN: It was marked.
23      MR. SHUMAKER: It was marked. You need it
24  for the record.
25      THE WITNESS: Okay.

### Page 286

1      MR. SHUMAKER: Peter, you want to take this
2  one?
3      MR. DeCHIARA: Thanks.
4  Q. A few moments ago you stated, and I don't want to
5  mischaracterize your testimony, I believe you said if
6  you can't reach a consensual deal, there are "serious
7  questions about the City for a number of reasons."
8  A. Yes.
9  Q. What did you mean when you said that?
10  A. Oh, I meant what do we do? We have a lot of liability
11  on pension and OPEB, we simply don't have the money,
12  we can't go to the capital markets and borrow that
13  magnitude of money, we'd have to try to figure out
14  what to do next. That's all I meant.
15  Q. Okay. I would like to direct your attention to
16  request for admission number five, it's on page 10 of
17  Exhibit 17. The request to admit asked the City to
18  admit that the restructuring proposal proposes to
19  impair or diminish accrued financial benefits of the
20  participants of the Retirement Systems and the City
21  stated it admits that the restructuring proposal
22  contemplates a reduction in accrued financial benefits
23  to participants of the Retirement Systems but seeks
24  agreement and acceptance by plan beneficiaries. The
25  City's intention are to gain consensus with its

### Page 287

1  creditors and propose a confirmable plan.
2  Did I read that correctly?
3  A. Yes.
4  Q. And similarly with respect to number 6, the request
5  was for the City to admit that the bankruptcy
6  recommendation proposes among other things to diminish
7  or impair accrued financial benefits of the
8  participants in the Retirement Systems. And the
9  response is the same; correct?
10  A. Yes.
11  Q. Number 12 asks the City to admit that you intend to
12  seek to diminish or impair the accrued financial
13  benefits of the participants in the Retirement Systems
14  through the Chapter 9 case?
15  A. Yes.
16  Q. And you see that distinction between the three
17  questions?
18  A. Yes.
19  Q. Your response to number 5 and number 6 both state that
20  the City seeks a consensual agreement; correct?
21  A. Yes.
22  Q. Your response to number 12, which is whether you would
23  seek to diminish or impair through the Chapter 9 case,
24  does not have the caveat regarding a consensual deal
25  being reached; correct?

### Page 288

1  A. Yes.
2  Q. Why is there that difference? Is it because the City
3  intends to use the cramdown provisions of the
4  bankruptcy code to force a nonconsensual deal?
5      MR. SHUMAKER: Object to the form.
6  A. Without getting into discussions with counsel, I think
7  I can -- I think I can safely say without any waiver
8  that the City intends to preserve all of its rights in
9  answer number 12.
10  Q. A few moments ago when asked about what the City's
11  plan was if a consensual agreement could not be
12  reached, I believe your response was the City
13  currently has no plan if a consensual agreement is not
14  reached; correct?
15  A. That is correct, yes.
16  Q. Sitting here today is it your testimony the City has
17  no backup plan if a consensual deal is not reached?
18      MR. SHUMAKER: Object to the form.
19  A. Sitting here today it's my testimony that we have no
20  plan other -- first we have no plan, but we have no
21  plan or no effort other than to try to reach a
22  consensual resolution.
23  Q. If you don't get that consensual resolution, would you
24  resort to the cramdown provisions that are contained
25  within the bankruptcy code?

### 289

1  A. I don't know. We'll have to -- as I've said before,
2     we'll have to cross that bridge when we get to it.
3  Q. So the City has no present intent to resort to any
4     cramdown provisions?
5  A. We haven't formulated a plan based upon consensus or
6     not yet.
7  Q. Maybe you haven't formulated a plan but have you
8     discussed the option?
9  A. Oh, we've discussed a lot of options. That's why I
10    say we want to reserve all rights.
11 Q. Let's get into the discussions. When was your first
12    discussion regarding using the cramdown provisions if
13    a nonconsensual agreement was not reached?
14        MR. SHUMAKER: Objection. I want to
15    caution the witness about getting into any
16    attorney-client communications. Subject to not
17    revealing anything along those lines, you can answer.
18 A. Without getting into any communications, I'm not sure
19    there was a specific discussion about the cramdown
20    provision.
21 Q. A moment ago I thought you said, and I'm quoting from
22    right in front of me, we discussed a lot of options,
23    that's why I say we want to reserve all rights and you
24    had mentioned that there was an analysis about
25    cramdown provision. So there either was or there was

### 290

1     not.
2  A. I'm not -- what I'm trying to -- my testimony is I'm
3     not sure that we specifically discussed if we can't
4     get a consensual resolution, we go to cramdown. There
5     were other options that were discussed --
6  Q. Okay.
7  A. -- including that. I don't want to give you a binary
8     response.
9  Q. So I have two follow-up questions then.
10 A. Uh-huh.
11 Q. Number one, when was the cramdown issue discussed?
12 A. I don't recall a -- we -- without discussing what was
13    said with counsel, I don't recall --
14        MR. SHUMAKER: The question is when.
15        THE WITNESS: When?
16 A. We haven't -- I don't want to be unclear. There
17    hasn't been a specific cramdown discussion, but
18    cramdown is one of the options has been mentioned. We
19    have not sought to make a determination of if and when
20    we would pursue that alternative.
21 Q. Well, I don't suppose you're willing to offer any sort
22    of assurance today that the City would not resort to
23    the cramdown provisions if a consensual deal was not
24    struck?
25 A. I just said we want to preserve all options. I can't

### 291

1     do that.
2  Q. And is it also true that you cannot remember the first
3     time that that option was discussed?
4  A. Ah --
5  Q. Let's put it this way. Was it prior to the filing on
6     July 18th or is it something you have discussed after
7     the filing?
8  A. I mean, the reason I'm hesitant is I'm a bankruptcy
9     practitioner, I'm certainly aware of nonconsensual
10    creditors being subject to cramdown, I'm just not
11    recalling a specific discussion. I'm not sure we had
12    to have a discussion.
13 Q. Okay.
14 A. Okay, I mean.
15 Q. What other options were discussed? You said you
16    discussed multiple options?
17 A. Well, without getting into negotiations, options
18    regarding which if any classes you could get, which
19    participants, other alternatives, anything short of
20    consensual, what else you might be able to offer,
21    whether you would listen to different factors that go
22    into the payout, whether the beneficiaries would come
23    with a different proposal. A number of things were
24    discussed.
25 Q. Who did you discuss those options with?

### 292

1  A. Our counsel and investment bankers.
2  Q. Have you ever discussed -- so internally you discussed
3     those options?
4  A. Yes, yes, yes, yes.
5  Q. Have you discussed those options with the Retirement
6     Systems?
7  A. Have I personally discussed those with the Retirement
8     Systems? I don't recall. I don't think so.
9  Q. Have you discussed those options with any of the
10    actual individuals within the Retirement Systems?
11 A. I may have.
12 Q. And who would that be?
13 A. I don't remember. There are so -- I've had over -- I
14    think at this point I've had over 200 meetings, some
15    of those including individual members of the various
16    groups and that may have come up.
17 Q. So you've said several times throughout today and in
18    your responses to our discovery that the City's intent
19    and the City's hope, I think you used the word hope,
20    would be to get a consensual agreement.
21 A. Yes.
22 Q. And I think I recall you saying that your reading of
23    Article 9, Section 24 is that it would permit
24    consensual contractual negotiations?
25 A. I believe that's a fair characterization.

### 293

1. Q. If that cannot be achieved, would you agree that
2. Article 9, 24, Section 24, would prohibit any other
3. impairment or diminution of the pension benefits?
4. A. No.
5.     MR. SHUMAKER: Objection, calls for
6. speculation and for a legal conclusion.
7. Q. And why would you disagree with that?
8. A. For all the reasons we discussed earlier today and in
9. addition I think it calls for a legal conclusion as
10. far as what the import of 436 versus that provision
11. is.
12. Q. Let's talk a little bit about the Chapter 9 process
13. itself.
14. A. Yes.
15. Q. You seek authorization from the governor, step one?
16. A. Yes.
17. Q. Step two, the governor gives his authorization?
18. A. Yes.
19. Q. And then the City, you acting on behalf of the City,
20. are responsible for filing the Chapter 9 case itself;
21. correct?
22. A. Yes.
23. Q. And after you file the case, you and your attorneys
24. are responsible for the day-to-day activities in
25. carrying out that Chapter 9 case; correct?

### 294

1. A. Yes.
2. Q. And in a Chapter 9 case only the municipality itself
3. can propose a plan of adjustment; correct?
4. A. Correct.
5. Q. So ultimately it will be the City that proposes a plan
6. of adjustment?
7. A. I believe so.
8. Q. And ultimately it will be the City that places in
9. front of the Court a method to deal with its pension
10. debt?
11. A. I believe so.
12. Q. And it is only the Court -- after the City has first
13. proposed the plan, it is the Court that can confirm
14. that plan?
15. A. Yes.
16. Q. But all the steps leading up to that confirmation are
17. acts taken by the City; correct?
18. A. I believe that's the Chapter 9 scheme.
19. Q. You mentioned earlier that in the June time frame
20. there were certain pieces of litigation that were all
21. coming to a head; correct? I'm referring to the
22. Syncora litigation and the Michigan state court
23. litigation.
24. A. Yeah, but I think we were talking about July when the
25. state court litigation began.

### 295

1. Q. That's true. The state court litigation was not until
2. July, you mentioned in your testimony that you were
3. throughout the month of June there were concerns about
4. "losing control."
5. A. June through -- I think the testimony was at various
6. time frames, June 14th through July 3rd and June 1
7. through July 18th, and I was saying those time frames
8. there are a number of different issues. In the June
9. time frame I seem to remember, as in the prior
10. deposition you attended, we reached an agreement in
11. principal, then things started to go off the rails
12. with Syncora the following Monday on June 17th so
13. that's what my discussion was.
14. Q. And so consistent with that you said you agreed there
15. were concerns that throughout June things were
16. beginning to spin out of control and I think you used
17. the words losing control?
18. A. Yes, in June we were dealing with a number of
19. different issues, but we were trying to manage them as
20. best we could and then for the better part of
21. June/July we started being hit with a number of pieces
22. of litigation that just kept coming over the transom
23. and it appeared that we were starting to lose the
24. initiative.
25. Q. Okay. You mentioned earlier when you were

### 296

1. characterizing the losing control phase of what was
2. going on --
3. A. Uh-huh.
4. Q. -- you said that someone counseled you that it was
5. irresponsible to be delaying the bankruptcy filing?
6.     MR. SHUMAKER: Object to the form.
7. A. Uh-huh.
8. Q. Who was it that accused you of being irresponsible for
9. holding off on the bankruptcy filing?
10. A. Well, I wouldn't characterize it as accusation.
11. Q. Who counseled you that it was irresponsible?
12. A. It was --
13.     MR. SHUMAKER: To the extent that it was
14. counsel, I don't want you to get into the
15. communication.
16. A. Okay, it was a privileged communication.
17. Q. So an attorney at Jones Day?
18. A. No, not necessarily. It -- various discussions with a
19. number of my team members including attorneys,
20. investment bankers and consultants.
21. Q. So during that time frame what was the event that
22. finally pushed you to actually start preparing the
23. documents to file the bankruptcy petition?
24. A. I don't know if there was an event that pushed me, but
25. I think there was a general consensus that if things