UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                          Chapter 9

City of Detroit, Michigan,                      No. 13-53846

      Debtor.                                 Hon. Steven W. Rhodes

_____/

**AMENDED OBJECTION OF THE DETROIT FIRE FIGHTERS
ASSOCIATION, THE DETROIT POLICE OFFICERS ASSOCIATION,
THE DETROIT POLICE LIEUTENANTS & SERGEANTS ASSOCIATION
AND THE DETROIT POLICE COMMAND OFFICERS ASSOCIATION
TO DEBTOR'S BANKRUPTCY PETITION AND STATEMENT OF
QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)**

The Detroit Fire Fighters Association (the "DFFA"), the Detroit Police
Officers Association (the "DPOA"), the Detroit Police Lieutenants & Sergeants
Association (the "DPLSA") and the Detroit Police Command Officers Association
(the "DPCOA") (collectively, the "Detroit Public Safety Unions"), through their
counsel, Erman, Teicher, Miller, Zucker & Freedman, P.C., pursuant to this
Court's First Amended Order Regarding Eligibility Objections, Notices of
Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b) [Docket No.
821] state their Amended Objection to Debtor's Bankruptcy Petition and Statement
of Qualifications under 11 U.S.C. Section 109(c) (the "Amended Objection") as
follows:

## INTRODUCTION

1.    The City of Detroit (the "City") cannot establish that it is eligible to
be a chapter 9 debtor under Section 109(c) of the Bankruptcy Code.  First, the City
cannot demonstrate that its petition was  "specifically authorized by State law . . .
or by a governmental officer . . . empowered by State law to authorize such entity
to be a debtor . . ." as required by Section 109(c)(2)  because one of the City's
express purposes in seeking authorization to file the petition is to attempt to use
these chapter 9 bankruptcy proceedings to illegally  impair the constitutionally
protected pension rights of the Detroit Public Safety Union employees,[1] other City
employees and City retirees, in direct violation of  the Michigan Constitution, Art.
IX, Sec. 24 and Public Act 436, MCL 141.1541, *et seq*. Second, the City's failure

---

[1] The Public Safety Unions, as set forth more fully herein, strenuously disagree that
any of the Emergency Manager, the City or the Governor can use the protections
afforded by Chapter 9 of the Bankruptcy Code as limited by the 10th Amendment
of the United States Constitution to enlarge their state and federal constitutionally
limited authority in direct violation of that authority.  Nevertheless, the Emergency
Manager, supported by the Governor, has repeatedly and publicly articulated an
intention to do so, and, given that the filing of the Petition was temporally related
to efforts by City retirees and the Retirement Systems to obtain state court orders
that would unequivocally declare that the Governor and the Emergency Manager
lacked the constitutional authority to impair those pension rights in any venue. See
State Court Complaints, Filed July 8, 2013 and July 17, 2013, Exhibit 6.1 to
Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code For Entry of
An Order Extending the Chapter 9 Stay [Docket No. 56, pp. 26-62].

(and, indeed, in many instances, its refusal) to negotiate in good faith with the Detroit Public Safety Unions prior to filing the petition as required by Section 109(c)(5)(B) should render the City ineligible to be a Debtor in these proceedings. Third, in light of the City's refusal to negotiate with the Detroit Public Safety Unions and the minimal time the City allotted for such negotiations to occur, the City should not now be permitted to claim that such negotiations were impractical under Section 109(c)(5)(C). Finally, given the haste with which this chapter 9 filing occurred, the absence of any evidence of specific, give-and-take negotiations in any of the declarations and documentary evidence submitted in support of the City's petition, and given the Governor, the City and the Emergency Manager's express purpose in attempting to use these chapter 9 proceedings to illegally impair the constitutionally protected, accrued pension rights of the Detroit Public Safety Unions' active members, retirees (as well as those of other City employees and retirees), the City has failed to meet its burden under Section 109(c) of the Bankruptcy Code, its petition was not filed in good faith, as required by Section 921(c) of the Bankruptcy Code and, therefore, must be dismissed.

2.     In filing their Amended Objection, the Detroit Public Safety Unions restate their original objections to the City's eligibility for chapter 9 bankruptcy protection [Docket No. 512], incorporate the additional facts set forth as set forth in the Michigan Council 25 of the American Federation of State, County &

3

Municipal Employees, AFL-CIO and Sub-Chapter 98, Retirees' ("AFSCME") Amended Objection to the City's Eligibility to Seek Relief Under Chapter 9 of the Bankruptcy Code (the "AFSCME Amended Objection") [Docket No. 1163], in further support of their arguments that the City's refusal to negotiate with the Detroit Public Safety Unions and other affected unions and creditors renders the City ineligible under Section 109(c)(5)(B) and that the City filed the petition in bad faith in violation of Section 921(c) of the Bankruptcy Code.

3.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper before this Court under 28 U.S.C. §1409(a).

4.     The Detroit Public Safety Unions, whose collective members provide police and fire protection to the City on a daily basis under extremely difficult conditions, acknowledge that the City faces serious and severe financial challenges that must be addressed, and the Detroit Public Safety Unions have been and are prepared to work with the City to tackle those challenges. However, for the reasons set forth herein, the Detroit Public Safety Unions believe that the filing of the Petition was defectively authorized and premature.

5.     As a result of the severe economic challenges facing the City, the members of the Detroit Public Safety Unions must do more with fewer active members and less resources under increasingly difficult conditions. At the same

4

time, the active members of each of the Detroit Public Safety Unions have seen their wages and benefits, including their future pension benefits, unilaterally reduced by the City, even as they attempted to negotiate with the City.

6.     Contrary to certain statements made by the City in the papers filed with this Court and other statements made to the public by the Emergency Manager and the Governor, the Emergency Manager has not negotiated in good faith with the Detroit Public Safety Unions.  In the weeks leading up to the City's chapter 9 filing, there were no negotiations.  Rather, the City and the Emergency Manager held two publicly trumpeted "informational meetings" with the Detroit Public Safety Unions.  Both occurred within a week of the filing of the Chapter 9 petition. As set forth more fully herein, the timing of these meetings, and the content of the meetings, was insufficient to satisfy the requirements of 11 U.S.C. §109(c)(5)(B).

7.     Furthermore, prior to the filing of the petition, as set forth more fully herein, the City and the Emergency Manager have consistently refused to negotiate with the Detroit Public Safety Unions over terms and conditions of employment under both the former Emergency Manager Law, PA 4, MCL 141.1501, *et seq*, (which was overwhelmingly repealed by Michigan voters in 2012) and since the Emergency Manager's appointment under Public Act 436, MCL 141.1541, *et seq*.

8.     Contrary to the City's claimed efforts to negotiate in good faith, at least with regard to the Detroit Public Safety Unions, the City has consistently sought to block the Detroit Public Safety Unions' efforts to negotiate terms and conditions of employment. The City has yet to provide the Detroit Public Safety Unions with a concrete restructuring proposal.

9.     At the direction of the Emergency Manager, the City instead successfully convinced the Michigan Employment Relations Commission to dismiss petitions filed by some of the Detroit Public Safety Unions seeking arbitration under Public Act 312, MCL 423.231, *et seq* ("Act 312")[2], on the basis that the City has no duty to bargain with the Detroit Public Safety Unions. Subsequent to the successful dismissals, the City indicated its intent to unilaterally impose less favorable terms and conditions of employment on the Union members, including reduced pay, increased health care premiums, deductibles and co-pays and reduced future pension benefits, and, in the case of some of the Detroit Public Safety Unions, in fact imposed such terms.

---

[2] Act 312 is based on ". . . the public policy of this state . . .," which recognizes, ". . . that in public police and fire departments, where the right of employees to strike is by law prohibited, it is requisite to the high morale of such employees and the efficient operation of such departments to afford an alternative, expeditious, effective and binding procedure for the resolution of disputes." Act 312 provides the remedy for police and firefighter bargaining units if the municipality refuses to negotiate or negotiations are otherwise unsuccessful.

10. The Emergency Manager, prior to filing the chapter 9 Petition, stated his intention to use chapter 9 to significantly impair the vested pension rights and benefits of City employees and retirees.[3] These pre-petition statements provide the basis for establishing both the lack of proper legal authorization for the Petition and the Emergency Manager's intent to avoid the required pre-petition good faith negotiation process.

11. Because the City cannot satisfy the requirements of 11 U.S.C. §109(c), it therefore does not qualify to be a debtor under chapter 9.

## FACTUAL BACKGROUND

12. The background narrative of the City's financial problems does not need to be repeated in this objection. All parties understand that the City is in a woeful financial condition. Nonetheless, that financial condition does not relieve the City of the need to satisfy the requirements of 11 U.S.C. §109(c).

13. In the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code [Doc. No. 11] (the "Orr Declaration"), and in the Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code [Doc. No. 14] (the "Memorandum"), the City asserts that it has

---

[3] See, for example, the Proposal for Creditors, Doc. 11-1, page 76 -78, "Labor Costs and Terms and Conditions", "Salaries and Wages", "Operational Efficiencies/Work Rules"; page 109 "Claims for Unfunded Pension Liabilities."

satisfied the requirements of §109(c)(5)(B) and (C). The Detroit Public Safety Unions contest this assertion. Specifically, the Detroit Public Safety Unions believe that the City cannot satisfy the requirements of §109(c)(2) or (5), as set forth in more detail below.

14.    On March 14, 2013, the Governor appointed Kevyn Orr as Detroit's Emergency Financial Manager pursuant to 1990 PA 72, MCL 141.1201, *et seq*, Orr assumed that role on March 24, 2013 (Orr Declaration, ¶78). On March 28, 2013, PA 436, MCL 141.1541, *et seq*. became effective and Orr became the Emergency Manager under PA 436.

15.    Since the Emergency Manager's appointment, the City has steadfastly declined to negotiate with the Detroit Public Safety Unions, claiming it has no obligation to do so under PA 436. See, generally, Exhibit A, Declaration of Mark Diaz (the "Diaz Declaration") [Docket No. 512-1] and Exhibits 1 and 2 thereto [Docket Nos. 512-2 through 512-5]; Exhibit B, Declaration of Daniel McNamara (the "McNamara Declaration") and Exhibits 1 and 2 thereto [Docket No. 512-6] ; Exhibit C, Declaration of Mark Young  (the "Young Declaration") [Docket No. 512-7] and Exhibit D, Declaration of Mary Ellen Gurewitz, Esq. (the "Gurewitz Declaration") [Docket No. 512-8].

16.    However, on June 14, 2013, the Emergency Manager held a meeting at the Westin Hotel at Detroit Metropolitan Airport with the City's creditors,

including the Detroit Public Safety Unions. That meeting was an en masse event at which the City presented certain general information about its restructuring intentions; questions were answered, but no negotiations took place. See "City of Detroit Proposal for Creditors" dated June 14, 2013 (the "June 14 Creditor Proposal") to all creditors in attendance [See Doc. No. 11-1] (Orr Declaration ¶ 80). The June 14 Creditor Proposal was a general overview of the financial condition of the City, the condition of city services and issues regarding payment of personnel, including the members of the Detroit Public Safety Unions. It also had broad proposals for creditor treatment including proposals that would significantly impair the accrued financial benefits of the Detroit Public Safety Union members and retirees. See Restructuring Proposal, [Docket 11-1, p. 60] (attached as Exhibit to Orr Declaration).

17.    On June 20, 2013, the Emergency Manager held a second meeting with various unions and their representatives, including the Detroit Public Safety Unions, at which the City informed the Detroit Public Safety Unions of its intent to propose steep cuts to their pension and health care benefits.

18.    A third meeting took place with each of the Detroit Public Safety Unions during the week of July 12, 2013 regarding these proposed cuts. Again the City made it clear that it was not negotiating with the Detroit Public Safety Unions although they were welcome to propose their own restructuring plan. The City

9

also indicated that it would be unwilling to negotiate any terms of such a restructuring plan unless agreement was first reached on actuarial assumptions— one of the central and most hotly disputed issues in these Chapter 9 proceedings. See Exhibit 2 to Exhibit B, McNamara Declaration.

19. Nevertheless, in response, on July 12, 2013, the Detroit Public Safety Unions jointly wrote to the City's counsel, asking for a more concrete restructuring proposal to which they could respond. See Exhibit 1 to Exhibit B, McNamara Declaration.

20. On July 16, 2013, the Emergency Manager sought the Governor's authorization to file these Chapter 9 proceedings. Orr Declaration, Exhibit J [Docket 11-10].

21. On July 17, 2013, the Detroit Public Safety Unions received a letter from the Emergency Manager's counsel, which indicated that the Emergency Manager wanted to first reach agreement on actuarial assumptions and which provided no substantive proposals. See Exhibit B, ¶8 and Exhibit 2 to Exhibit B.

22. The following day, July 18, 2013, the City filed its Chapter 9 Petition.

23. As set forth more fully herein, with regard to the Detroit Public Safety Unions, the content of the discussions at the June 14th meeting and the follow up meetings were very general, and the City continued to indicate, through the Emergency Manager, that the meetings should not be construed as negotiations.

10

See Exhibits A, B and C. The specifics of the City's dealings with each of the Detroit Public Safety Unions during the time period leading up to and immediately following the Chapter 9 filing are set forth below. Those dealings and the declarations that support them make it clear that the City did not meet its pre-filing obligation of good faith negotiations with the Detroit Public Safety Unions, or, upon information and belief, other unions or the Retirement Systems about a plan of adjustment.[4]

## THE DPOA

24. The DPOA consists of nearly 2000 active Detroit police officers. The DPOA's experience is addressed first because, while the DPOA has also experienced the City's refusal to negotiate, it is the only one of the Detroit Public Safety Unions who managed to obtain an Act 312 arbitration award which sets forth the terms and conditions of an employment contract with the City. Specifically, on March 25, 2013, only days before the effective date of PA 436, the Act 312 memorializing the terms and conditions of employment between the City

---

[4] The March 26, 2012 Report of the Financial Review Team [Doc. No. 11-4] references the participation between the Review Team and officers of the DPOA, DPCOA, DPLSA and DFFA. The Public Safety Unions were clearly known to the City prior to June 14, 2013.

11

and the DPOA was issued (the "Award").[5]  A copy of the award is attached  to Exhibit A, Diaz Declaration as Exhibit 1.

25.    Significantly, the Award recognized the record number of issues presented for arbitration were the direct result of the City's refusal to negotiate and its insistence on imposing on the DPOA a series of demoralizing and not necessarily cost-saving City Employment Terms ("CETs") under the now-repealed Public Act 4, former MCL 141.1501, *et seq*.  Exhibit 1 to Exhibit A, Award at p. 28. Among the Award's specific findings were:

> . . . The number of issues are as a result of the fact the City imposing in July 2012 without further negotiation the City Employment Terms which in many details had little rhyme or reason in addressing the City's financial crisis as applied to public safety and by any definition was an attempt to "gut" the Master Agreement between the City of Detroit and the Detroit Police Officers Association, a product of 40 years of negotiations and Act 312 proceedings.  Such an approach brought forth approximately 37 issues proffered by the DPOA attempting to seek economic improvements in a financially distressed city, creating an unrealistic labor relations atmosphere, and had the effect of overlooking the welfare of the public, *i.e.*, the need for an efficient, effective Detroit Police Department.  This goal can best be established by the comparables, namely, the marketplace for Police Officers even among the more distressed communities and a recognition even by the Legislature that the Legislature has given special recognition to police unions of the duty to bargain in the current labor climate in Michigan.  It is for this reason that the Chairman, concurred in by the Union Delegate, will address the issues based upon the expired Master Agreement and will

---

[5]  A portion of the Award (a 5% wage increase awarded to DPOA members, effective January 1, 2014) has been challenged by the City and is the subject of pending but stayed litigation.  See Diaz Declaration, ¶5.

.

12

reject in total the City Employment Terms as those terms were not negotiated terms and were terms implemented under Public Act 4, which act was rejected by the people of the State of Michigan.

26.     The Award further found that, " . . . if there had been negotiations as in the case of the Tentative Agreement, presumably even if on an around-the-clock basis, a number of the issues would have been reduced." Exhibit 1 to Exhibit A, Award at p. 29.

27.     The Award further provided for a 5% pay raise, effective January 1, 2014 for DPOA members and for the reopening of the Act 312 proceedings to address health care issues after June 30, 2013.   However, the City, through the Emergency ¶Manager, filed a complaint for judicial review of the 5% pay raise, which remains pending but stayed by these proceedings.   Exhibit A, Diaz Declaration, ¶5.  Relying on Public Act 436, the City has declined to reopen the Act 312 proceedings to address health care issues, and instead seeks to unilaterally impose new health care terms on the DPOA.  Exhibit A, Diaz Declaration, ¶ ¶ 8-10.

## THE DFFA

28.     The DFFA consists of all active Detroit fire fighters of all ranks.  It has just under 800 current members.  Relying on PA 436 and claiming it had neither a duty to negotiate or to arbitrate under Public Act 312, the City successfully blocked the DFFA's efforts, as well as the efforts of the DPLSA and

the DPCOA to pursue Act 312 arbitration. See Exhibit B, McNamara Declaration, In a 2-1 decision, the Michigan Employment Relations Commission ruled that, as a result of the Emergency Manager's appointment, it lacked the authority to conduct Act 312 hearings. See Exhibit C, Young Declaration, pp. 2-3.

29. While, during communications at this time, the City declined to disclose what conditions it intended to impose and made clear its unwillingness to negotiate, the DFFA continued to attempt to engage the City in meaningful discussions regarding its restructuring. See Exhibit 1(7/12/13 Letter) to Exhibit A. By letter dated July 25, 2013, the City informed the DFFA that, effective August 16, 2013, its members wages would be cut by 10% across the board, and at a meeting on August 2, 2013 which the City emphatically indicated was not a negotiation, the City presented the terms of new health care plans it intends to impose, which will increase the out of pocket health care costs to be borne by DFFA members by as much as $3000 a year for families. See McNamara Declaration, ¶¶7, 12- 13.

<u>THE DPLSA</u>

30. Like the DFFA, the DPLSA was blocked in its efforts to engage the City in Act 312 arbitration proceedings. On June 25, 2013, the City notified the DPLSA of the termination of its collective bargaining agreement effective July 6, 2013 and that it was not requesting bargaining at that time. After informing the

DPLSA that it had no duty to bargain, the Emergency Manager notified the DPLSA that changes to its wages, benefits and working conditions would be forthcoming after August 1, 2013. Exhibit C, Young Declaration, p. 3.

31. Shortly after the chapter 9 petition was filed, the City's Labor Relations Director informed the DPLSA that the City was prepared to impose terms on its members. In July 31, 2013 correspondence and without any prior negotiation, the City identified 17 terms it intended to implement. Exhibit C, Young Declaration, p. 3.

32. In response to an August 1, 2013 request from the DPLSA, the City has delayed imposing the 17 terms as of the date of this Objection. Exhibit C, Young Declaration, p. 4.

THE DPCOA

33. The DPCOA has been blocked from negotiating with the City and has been subjected to unilaterally imposed City Employment Terms (the "CET") since July of 2012. Its last contract expired in 2009. The CET were a unilaterally imposed set of working conditions, including a 10% wage cut for all DPCOA members. Exhibit D, Gurewitz Declaration, ¶¶4-5.

34. As with the DFFA and the DPLSA, the City successfully blocked the DPCOA's efforts to proceed to Act 312 arbitration. Following the suspension of PA 4, the DPCOA filed for Act 312 arbitration, an arbitrator was appointed,

15

hearing dates were scheduled for March of 2013, and there were several days of productive negotiations prior to the appointment of the Emergency Manager. However, all negotiations terminated with the Emergency Manager's appointment. Exhibit D, Gurewitz Declaration, ¶6.

35.    The Emergency Manager has consistently taken the position that there is no duty to bargain and has refused to bargain or negotiate with the DPCOA. Exhibit D, Gurewitz Declaration, ¶8.

## ALLEGED IMPRACTICALITY

36.    The City also asserts that negotiations were "impracticable" [Memorandum at p. 40]. The Detroit Public Safety Unions assert that there were, and remain, even absent the creation of a Retirees' Committee, sufficient creditor participants with whom the Emergency Manager could have had meaningful negotiations.    The City self-imposed an extremely limited time frame for negotiations during which it elected not to negotiate with the Detroit Public Safety Unions. It should not now be permitted to claim those negotiations were impractical.

37.    As set forth in the accompanying brief, based upon these facts and applicable bankruptcy, state and federal law, the City cannot meet its burden of showing it is eligible to be a Debtor under Section 109(c).

## RELIEF REQUESTED

WHEREFORE, the Detroit Public Safety Unions respectfully request that the City of Detroit's chapter 9 petition be dismissed.

Respectfully submitted,

ERMAN, TEICHER, MILLER,
ZUCKER & FREEDMAN, P.C.

By: _/s/ Barbara A. Patek_
      Earle I. Erman  (P24296)
      Craig E. Zucker  (P39907)
      Barbara A. Patek (P34666)
      Counsel for the Detroit Public Safety Unions
      400 Galleria Officentre, Suite 444
      Southfield, MI  48034
      Telephone: (248) 827-4100
      Facsimile:  (248) 827-4106
      E-mail:  bpatek@ermanteicher.com

DATED:   October 11, 2013

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                                Chapter 9

City of Detroit, Michigan,                            No. 13-53846

        Debtor.                                Hon. Steven W. Rhodes

_____/

**BRIEF IN SUPPORT OF AMENDED OBJECTION OF THE DETROIT
FIRE FIGHTERS ASSOCIATION, THE DETROIT POLICE OFFICERS
ASSOCIATION, THE DETROIT POLICE LIEUTENANTS & SERGEANTS
ASSOCIATION AND THE DETROIT POLICE COMMAND OFFICERS
ASSOCIATION TO DEBTOR'S BANKRUPTCY PETITION AND
<u>STATEMENT OF QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)</u>**

# TABLE OF CONTENTS

Index of Authorities ................................................................................. iii

Statement of Facts .................................................................................. 1

Argument.................................................................................................2

    A.  Burden of Proof for Eligibility.................................................2

    B.  Failure to Comply with the Requirements of 11 U.S.C. §109(c)(5) ........3

    C.  11 U.S.C.§921(c) Must Be Looked At In Conjunction With the
Requirements Of §109(c) ..................................................... 18
Relief Requested ..................................................................... 18

# INDEX OF AUTHORITIES

## Cases

*Ashton v. Cameron County Water Improvement District Number One*, 236 U.S. 513 (1936) ................................................................................ 3

*Bond v. United States*, 131 S. Ct. 2355 (2011) ................................................... 3, 4

*In re City of Stockton, California*, 2013 WL 2629129 (Bankr. E.D. Cal. 2013)....2

*In re City of Vallejo*, 408 B.R. 280 (BAP 9th Cir. 2009).................................. 18

*In re Cottonwood Water and Sanitation District, Douglas County, Colorado*, 138 B.R. 973 (Bankr. D.Colo. 1992) ......................................................... 7, 16

*In re County of Orange*, 183 B.R. 594 (Bankr. C.D. Cal. 1995) ..................... 2, 18

*In re Ellicot School Building Authority*, 150 B.R. 261(Bankr. D. Colo. 1992)...............................................14, 15

*In re New York City Off-Track Betting Corp.*, 427 B.R. 256 (Bankr. S.D.N.Y. 2010)................................................................................6, 7, 16

*In re Sullivan County Regional Refuse Disposal District*, 25 B.R. 60 (Bankr. D. N.H. 1994)....................................................................... ... 15

*In re Sullivan County Regional Refuse Disposal District*, 165 B.R. 60 (Bankr. D.N.H. 1994)...............................................................7, 17

*In re Valley Health System*, 383 B.R. 156 (Bankr. C.D. Cal. 2008)......2, 17, 18

*In re Villages at Castle Rock Metropolitan District No. 4*, 145 B.R. 76 (Bankr. D. Colo. 1990)..................................................................17

*United States v. Bekins*, 304 U.S. 27 (1938)...................................4

iii

## Statutes

28 U.S.C. § 959(b) ........................................................................ 5

11 U.S.C. § 943(b)(4)..................................................................... 5

11 U.S.C. § 921(c)...................................................................... 5, 18

11 U.S.C. § 109(c).................................................................*passim*

Michigan Public Act 436, MCL 141.1541, *et seq* ............................. 3

## Other

Black's Law Dictionary, (9th ed. 2009)............................................ 13

United States Constitution, Art. 1, Sec. 8, Clause 4 ............................ 3

United States Constitution, Am. X...........................................3, 4, 6, 7

Michigan Constitution, Art. IX, Sec. 24 ........................................ 3, 5

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                          Chapter 9

City of Detroit, Michigan,                      No. 13-53846

         Debtor.                                Hon. Steven W. Rhodes

_____/

## BRIEF IN SUPPORT OF AMENDED OBJECTION OF THE DETROIT FIRE FIGHTERS ASSOCIATION, THE DETROIT POLICE OFFICERS ASSOCIATION, THE DETROIT POLICE LIEUTENANTS & SERGEANTS ASSOCIATION AND THE DETROIT POLICE COMMAND OFFICERS ASSOCIATION TO DEBTOR'S BANKRUPTCY PETITION AND STATEMENT OF QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)

The Detroit Fire Fighters Association (the "DFFA"), the Detroit Police Officers Association (the "DPOA"), the Detroit Police Lieutenants & Sergeants Association (the "DPLSA") and the Detroit Police Command Officers Association (the "DPCOA") (collectively, the "Detroit Public Safety Unions"), through their counsel, Erman, Teicher, Miller, Zucker & Freedman, P.C., state for their Brief in Support of Objection to Debtor's Bankruptcy Petition and Statement of Qualifications under 11 U.S.C. Section 109(c) as follows:

### STATEMENT OF FACTS

The Detroit Public Safety Unions rely on the facts as set forth in their Amended Objection, including those incorporated therein by reference.

1

# ARGUMENT

## A. Burden of Proof for Eligibility.

11 U.S.C. §109(c) provides:

An entity may be a debtor under chapter 9 of this title if and only if such entity ---
(1) is a municipality;
(2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;
(3) is insolvent;
(4) desires to effect a plan to adjust such debts; and
(5)   (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
(C) is unable to negotiate with creditors because such negotiation is impracticable; or
(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

The City, as the proponent of the chapter 9 petition, bears the burden of proof to show that it is satisfies the elements of 11 U.S.C. §109(c) and is therefore eligible to file a chapter 9 petition.  *In re City of Stockton, California,* 2013 WL 2629129 at *19 (Bankr. E.D.Cal. 2013); *In re County of Orange,* 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995), *In re Valley Health System,* 383 B.R 156, 161 (Bankr. C.D.Cal. 2008).  This Objection focuses on the requirements of §109(c)(2) and (5) and the good faith requirement of Section 921(c).

**B.     The City cannot meet the requirements of §109(c)(2) because Section 109(c)(2) must be read in light of the 10th Amendment of the United States Constitution and principles of federalism.  To the extent 109(c)(2) can be read to allow impairment of the Detroit Public Safety Union members and retirees' accrued financial benefits under the PFRS in violation of the Emergency Manager and the Governor's oaths of office, the Michigan Constitution, Art. IX, Sec. 24 and PA 436[1], Section 109(c)(2) would violate the Detroit Public Safety Union members' and retirees' rights under the 10th Amendment of the United States Constitution, to be free from federal intrusion on matters related to the State's administration of its fiscal affairs.**

While the United States Constitution, Art. 1, Sec. 8, Clause 4, authorizes Congress to enact "uniform Laws on the subject of Bankruptcies throughout the United States," the Supreme Court has held that such authority is subject to the limits of the 10th Amendment. *Ashton v. Cameron County Water Improvement District Number One*, 236 U.S. 513 (1936).   *Ashton* has never been overruled. Furthermore, both the express language of the 10th Amendment[2] and recent Supreme Court case law recognize that the 10th Amendment protects not only states' sovereignty but also the individual liberties of citizens.  *See, e.g. Bond v. United States*, 131 S. Ct. 2355 (2011), recognizing that principles of federalism give individuals the right to challenge unconstitutional intrusions into state

---

[1] MCL 141.1541, *et seq.*

[2] "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, *or to the people.*" U.S. Const., Am. X (emphasis added).

3

sovereign authority even when the state does not object (or as here "consents") to those intrusions.[3]

One of the stated goals of the June 14 Creditor Proposal, and a position repeatedly and publicly articulated by the Emergency Manager and the Governor, is that chapter 9 will allow the Emergency Manager to dispense with his sworn constitutional obligation to preserve the accrued financial benefits of City employees and retirees, including Detroit Public Safety Union members and retirees, under the City Retirement Systems. Such a reading of chapter 9 is not consistent with the 10th Amendment, which not only protects state sovereignty, but also protects the rights of individuals to be free from federal interference with their vested, state constitutional rights. *See Bond, supra.*

Based upon the City's articulated goal of using the chapter 9 plan it intends to propose to impair the accrued financial benefits to which the Detroit Public Safety Union members and retirees (as well as other City employees and retirees) are entitled, the City cannot put forth a confirmable plan of adjustment. A plan which contains such provisions would be in violation of the Michigan Constitution and the restrictions placed on the Emergency Manager by PA 436 and his oath of

---

[3] To the extent *United States v. Bekins*, 304 U.S. 27 (1938) can be read to allow a State or municipality to use Chapter 9 to breach an express state constitutional obligation to its citizens in violation of individual rights protected by the 10th Amendment, *Bekins* is no longer good law. In support of this argument, the Detroit Public Safety Unions adopt the arguments of other objectors that, as applied

4

office, and, as such would not be confirmable. If the goal of the chapter 9 is to file a plan which will not be able to be confirmed, the plan, and the proposal of such a plan, is a meaningless event. As such, the proposal of a non-confirmable plan should not be sufficient to satisfy the requirements of 11 U.S.C. §921(c).

Article IX, Section 24 of the Michigan Constitution states:

The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

28 U.S.C. §959(b) states:

**(b)** Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

11 U.S.C. §943(b)(4) addresses confirmation of a chapter 9 plan. The section, written in the affirmative, states that "the court shall confirm the plan if— (4) the debtor is **not** prohibited by law from taking any action necessary to carry out the plan" (emphasis added).

The June 14 Creditor Proposal is based on modifying Michigan constitutionally protected rights. The City has been clear that it is wedded to the

5

June 14 Creditor Proposal. However, the Creditor Proposal violates the Michigan constitution in that it seeks a unilateral modification of the Detroit Public Safety Union members and retirees' pension rights and employment benefits. As such, it cannot be confirmed. While there is no requirement that the pre-petition plan proposed by a possible chapter 9 debtor be the plan that is ultimately confirmed (*In re New York City Off-Track Betting Corp.,* 427 at 274), it is clear that the June 14 Creditor Proposal is the general template that the City seeks to use as its chapter 9 plan. It is illogical for the City to be able to obtain an Order for Relief when its proposed course of action, in fact, the very core of what it is seeking to accomplish, is the improper impairment of constitutional rights.

> Bankruptcy courts should review chapter 9 petitions with a jaded eye. Principles of dual sovereignty, deeply embedded in the fabric of this nation and commemorated in the Tenth Amendment of the United States Constitution, severely curtail the power of bankruptcy courts to compel municipalities to act once a petition is approved. 6 COLLIER ON BANKRUPTCY 900.01 ¶ [2][c] (observing bankruptcy courts' limited power over municipalities due to the Tenth Amendment). *See also New York v. United States,* 505 U.S. 144, 155–66, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (reviewing development of Tenth Amendment jurisprudence, recognizing dual sovereignty and observing that 'the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions'). This fundamental constitutional principle halts bankruptcy courts from regulating or otherwise controlling expenditures or activities of municipalities. 5 WILLIAM J. NORTON, JR. & WILLIAM L. NORTON III, NORTON BANKRUPTCY LAW AND PRACTICE § 90:4 (3d ed. 2009) ('Without the consent of the municipality,
> the court may not interfere with any of the political or governmental powers of the debtor, any property or revenues of the debtor, or the

6

debtor's use or enjoyment of any income-producing property.'); H.R.REP. NO. 95–595, at 263 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6221 ('[T]he powers of the court are subject to a strict limitation—that no order or decree may in any way interfere with the political or governmental powers of the petitioner, the property or revenue of the petitioner, or any income-producing powers.'). Congress deemed this principle so important it explicitly recognized the limits of bankruptcy courts' powers in section 904.

In light of these concerns, bankruptcy courts scrutinize petitions for relief under chapter 9. *See In re Sullivan County Reg'l Refuse Disposal Dist.,* 165 B.R. 60, 82 (Bankr.D.N.H.1994) (observing that the jurisdiction of bankruptcy courts 'should not be exercised lightly in chapter 9 cases, in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment'); *In re Cottonwood Water and Sanitation Dist.,* 138 B.R. 973, 979 (Bankr.D.Colo.1992) (noting that constitutional issues in chapter 9 cases caused Congress 'to limit accessibility to the bankruptcy court by municipalities.') (quoting H.R.REP. NO. 94–938, at 10 (1976)) (internal quotation marks omitted).

*In re New York City Off-Track Betting, 427 B.R. at 264-265 (footnotes omitted).*

The concern about the limitations of chapter 9 by the Tenth Amendment was also expressed in *In re Sullivan County Regional Refuse Disposal District,* 165 B.R. at 82-83:

The bankruptcy court's jurisdiction should not be exercised lightly in Chapter 9 cases, in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment. Considering the bankruptcy court's severely limited control over the debtor, once the petition is approved, access to Chapter 9 relief has been designed to be an intentionally difficult task.

Although the law is rarely painted in strokes of black and white, there are occasionally cases and situations in which there is a need and justification for a 'bright line' rule on a particular legal

7

question. This is such a situation. Municipalities that wish to come into bankruptcy under Chapter 9 in my judgment must, at a minimum, demonstrate that before filing they either used their assessment or taxing powers to a reasonable extent, or in their pre-petition negotiations have committed to the use of those powers as part of a comprehensive and appropriate work out of their financial problems. If they have undertaken that endeavor in good faith, and nevertheless have failed to reach an accommodation with their creditors, they then may be entitled to Chapter 9 relief if they are otherwise qualified.

## C. Failure to comply with the requirements of 11 U.S.C. §109(c)(5).

As stated above, 11 U.S.C. §109(c)(5) contains four (4) requirements as part of the qualifications for an entity to be a debtor under chapter 9. Because the City concedes that it has not satisfied §109(c)(5)(A), [Memorandum, page 40, fn. 12], and there is no suggestion that Section 109(c)(5)(D) applies, only Sections 105(c)(5)(B) and (C) are relevant here, and the Detroit Public Safety Unions assert that the City has not satisfied the remaining requirements of those sections.

Specifically, §109(c)(5)(B) requires the City to show that it:

. . . has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

The Emergency Manager submitted the June 14 Creditor Proposal to creditors just five weeks before obtaining authorization to file. However, well prior to that time, and almost a year prior to the date of the Emergency Manager's appointment on March 14, 2013, the City Financial Review Team issued its initial

8

Report, dated March 26, 2012, advising that the City "is in a condition of severe financial stress". [See Doc. No. 11-4.] This report was supplemented on February 19, 2013. [See doc. No. 11-7.].

The June 14 Creditor Proposal presented general proposals (identified by the Emergency Manager as the "Executive Summary" [Orr Declaration ¶81]) for dealing with creditors, including the Detroit Public Safety Unions' constituents. It did not provide any substantive information as to how these proposals would be put in place, the timing of any employment and/or benefit modifications, or otherwise give more than a general statement of proposed treatment. In the context of the significant issues facing the Detroit Public Safety Unions' constituents, this was "bare bones" at best. Nonetheless, the Detroit Public Safety Unions were interested in engaging in a dialogue with the Emergency Manager and his team, in an effort to work on the difficult financial issues facing the City. However, there was limited, or no, opportunity to do so, nor was there any meaningful outreach by the Emergency Manager to the representatives of the Detroit Public Safety Unions to negotiate a mutually agreeable settlement. In his Declaration, the Emergency Manager states:

> 84. The June 14 Creditor Proposal further suggested the City's good faith view of stakeholders' recoveries upon their various claims based upon the City's actual and projected financial condition. The City proposed: (a) treatment of secured debt commensurate with the value of the collateral securing such debt, including the repayment or refinancing of its Revenue Bonds, secured unlimited and limited tax

9

GO bonds, secured installment notes and liabilities arising in connection with the Swap Obligations; and (b) the *pro rata* distribution of $2 billion in principal amount of interest-only, limited recourse participation notes to holders of unsecured claims (i.e., holders of unsecured unlimited and limited tax GO bonds; the Service Corporations (on account of the COPs); the Pension Systems (in account of pension underfunding); retirees (on account of OPEB benefits); miscellaneous other unsecured claimants) with the potential for amortization of the principal of such notes in the event that, e.g., future City revenues exceeded certain thresholds, certain assets were monetized and/or certain grants were received. See June 14 Creditor Proposal, at pp. 101-109.

85. Having provided the facts and strategies contained in the presentation to its creditor body *en masse*, the City followed up with individual meetings with attendees during the period between June 14, 2013 and the commencement of this case. At these meetings, further data and legal viewpoints were exchanged and many questions were answered; however, no meaningful progress toward a comprehensive resolution of the City's obligations occurred. Importantly, following the June 14 presentation, the City: (a) sought a resolution of various issues related to its pension-related Swap Contracts through extensive negotiations with the Swap Counterparties thereto and the insurers of the Swap Obligations; and (b) held several follow-up meetings with various creditor representatives.

. . .

91. On June 20, 2013, certain of these advisors met in Detroit with representatives of all of the City's unions and four retiree associations. These meetings were conducted in discrete morning and afternoon sessions (addressing "non-uniformed" and "uniformed" personnel/retirees, respectively) at which the City: (a) presented a more in-depth look at its analysis of its retiree health and pension obligations; and (b) suggested proposals for the modification thereof that the City could fund within its means going forward. Representatives and advisors of the Pension Systems attended both meetings.

92. Approximately 100 union and retiree representatives attended the two-hour morning session for non-uniformed employees and retirees. Questions were solicited, and the City's advisors answered as many of them as could be answered before the meeting time concluded. Approximately 35 union and retiree representatives attended the afternoon session for uniformed employees and retirees, which lasted approximately 90 minutes. Questions were solicited, and the City's advisors answered all questions posed. The City provided handouts of the presentations at both meetings and, after the meetings, posted such presentations in the Data Room . . . that the City has established as a repository for information that creditors may find relevant in their evaluation of the City's proposals.

93. Both at the beginning and at the conclusion of each meeting, the City's advisors stressed that the City welcomed the unions' and retirees' views. Because the modifications proposed by the City are dramatic (albeit necessary), the City clearly expressed its desire to engage in a dialogue regarding the unions' and the retirees' preferred approach to address the required changes that are expected to be severely dislocating for retirees.

94. Understandably, the employees' and retirees' reactions to these meetings were less than enthusiastic; there were expressions of distress and, in some cases, anger. Certain union representatives publicly called for litigation and swore that they would not countenance discussions over proposals to modify either retiree healthcare or pensions. Others took a more constructive approach. On June 27, 2013, the City's advisors contacted all union representatives that had attended any prior presentations by, or meetings with, the City and/or its advisors to invite additional requests for information and diligence from such parties.

95. On July 10, 2013, the City and certain of its advisors held separate meetings with: (a) representatives and advisors of the GRS, as well as representatives and counsel for certain non-uniformed unions and retiree associations; and (b) representatives and advisors of the PFRS, as well as representatives and counsel for certain uniformed unions and retiree associations. Each meeting lasted approximately two hours. The purposes of each meeting were to: (a) provide additional information on the City's pension restructuring proposal;

11

and (b) discuss a process for reaching a consensual agreement on (i) pension underfunding issues and (ii) the treatment of any related claims. At each meeting, the parties generally discussed: (a) the actuarial assumptions underlying the Pension Systems' claims related to underfunding (and that will be used for funding purposes going forward); (b) the City's prospective ability to make contributions to the Pension Systems; and (c) adjustments to pension benefit design necessary to reduce liabilities, and consequent underfunding, to a level that will allow the City to fund the Pension Systems going forward.

96. On July 11, 2013, the City and its advisors held separate follow-up meetings with representatives and advisors for: (a) select non-uniform unions and retiree associations and the GRS; and (b) certain uniformed unions and retiree associations and the PFRS to discuss retiree health issues. At each of these meetings, the City's advisors reviewed the proposals for the modification of retiree health benefits that previously had been presented and discussed at the prior meetings on June 20, 2013. Further information describing, among other things, the premium costs of proposed replacement health insurance (which costs would be an obligation of the City) and key benefit plan design terms was distributed to all attendees. The meeting with uniformed unions and PFRS personnel involved an extensive (and relatively heated) question and answer session, which session primarily addressed retiree concerns over: (a) the lack of replacement coverage in the City's proposal for retirees under the age of 55; and (b) the vesting of certain pensions in the event the PFRS were frozen.

97. Meetings with Funded Debt and Pension Representatives. On June 25, 2013, the City's advisors and my Senior Advisor staff member held meetings in New York for representatives and advisors for: (a) all six of the insurers of the City's funded bond debt (any such insurer, a "Bond Insurer"); (b) the Pension Systems; and (c) U.S. Bank, the trustee or paying agent on all of the City's bond issuances. Approximately 70 individuals attended this meeting. At this five-hour meeting, the City's advisors discussed: (a) the 10-year financial projections and cash flows presented in the June 14 Creditor Proposal (together with the assumptions and detail underlying those projections and cash flows); (b) the City's contemplated reinvestment initiatives and related costs; and (c) the retiree benefit and pension information

12

and proposals that had been presented to the City's unions and pension representatives on June 20, 2013. All questions asked were answered.

[Emphasis added][footnotes omitted]

It is clear from the Emergency Manager's Statement that the June 14, 2013 meeting and the follow up meetings were not for the purposes of negotiation of a settlement, but for the sole purposes of providing information on the changes that the City sought to unilaterally put in place and the treatment of the City's debt. This read of the Orr Declaration is corroborated by the experience of the Detroit Public Safety Unions, as documented by the Diaz, McNamara, Young and Gurewitz Declarations, Exhibits A, B, C and D [Docket Nos. 512-1 through 512-8]. This is not negotiation as contemplated by the Bankruptcy Code, nor in any other context.

According to Black's Law Dictionary, (9th ed. 2009),

> Negotiation means
> **1.** A consensual bargaining process in which the parties attempt to reach agreement on a disputed or potentially disputed matter.
> **2.** (*usu. pl.*) Dealings conducted between two or more parties for the purpose of reaching an understanding.

According to the Memorandum,

> ...the City convened the June 14 Meeting . . .for the purpose of engaging its creditors with respect to a consensual restructuring of the City's various classes of debt within the framework of the June 14 Creditor Proposal.  At the June 14 Meeting, the Emergency Manager openly invited the City's creditors to contact the City and its advisors to begin negotiations. [Memorandum, page 54-55]

13

This statement, in conjunction with the Emergency Manager's Declaration, supports that the June 14 Creditor Proposal was the only proposal discussed. Despite the invitation to contact the City, the June 14 Creditor Proposal was essentially presented as a "take it or leave it" proposal. The manner of presentation and the subsequent meetings only invited inquiry, and did not invite any deliberation or discussion. There was nothing to suggest that there was any kind of a "consensual bargaining process". Thus, the June 14th meeting and the subsequent meetings do not qualify as "negotiations". See Diaz, McNamara, Young and Gurewitz Declarations, Exhibits A-D.

Further, the City did not engage with all of the required creditors including, specifically, the Detroit Public Safety Unions. The City repeatedly stressed that meetings were not negotiations and that it had no duty to bargain or negotiated. In particular, as the Diaz, McNamara, Young and Gurewitz Declarations make clear (and consistent with the Orr Declaration), there was no negotiation, whether actual or purported, prior to July 18, 2013, when the City filed its chapter 9 Petition.

11 U.S.C. §109(c)(5)(B) requires that the entity "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter." Meetings at which the debtor explains its proposed plan of restructuring do not constitute negotiations, especially when a

proposal is not open to discussion. There are no good faith negotiations when creditors are presented a plan as a "take it or leave it" proposal. *In re Ellicot School Building Authority,* 150 B.R. 261, 266 (Bankr. D. Colo. 1992), (even though the court held that the School Building Authority was not qualified to be a chapter 9 debtor, the judge still analyzed the requirements of 11 U.S.C. §109(c)(5)(B) and stated that a "take it or leave it" approach is not a good faith negotiation). Moreover, there is no good faith negotiation if a party "chooses to ignore clear, unambiguous contractual rights of the other party" (*In re Sullivan County Regional Refuse Disposal District,* 25 B.R. 60, 78 (Bankr. D. N.H. 1994).

It is required that negotiations with creditors, sufficient to satisfy 11 U.S.C. §109(c)(5)(B), provide creditors sufficient time to evaluate a proposed plan.

> In general, the Bankruptcy Code, as remedial legislation, should be broadly construed in order to provide the intended relief. However, municipal bankruptcies involve significant problems which are not encountered in the private sector. Important constitutional issues arise when a municipality enters the bankruptcy arena. Recognizing these problems, Congress consciously sought "to limit accessibility to the bankruptcy court" by municipalities. H.R. Conference Report, 94–938, p. 10, U.S.Code Cong. & Admin.News 1976, p. 539. One way to do so was to require the municipal entity, before rushing to this Court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under section 941 of the Code.

> The conditioned entry to this Court which is afforded by section 109(c) recognizes that the negotiating posture of the parties changes once the bankruptcy petition is filed. It is one thing to negotiate when the debtor is being confronted with the pressures of defaults on public debt and the requirement of certifying ever-increasing mill levies in

order to provide for the payment of such debt. It is another when the entity is being protected by the stay of section 362 of the Code and the bondholders are being faced with an indeterminate period of nonpayment of their bonds. The 'creditor protection' provided by section 109(c)(5), as interpreted by this Court, insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired by the provisions of section 362 of the Code.

*In re Cottonwood Water and Sanitation District, Douglas County, Colorado,* 138 B.R.     973, 979 (Bankr. D.Colo. 1992).

In addition to the lack of meaningful discussion, the short time period between the June 14 Creditor Proposal and the July 18, 2013 filing date of the chapter 9 petition did not leave any time for any serious or meaningful negotiations. The combination of all of these factors demonstrates that the City did not fulfill the requirement of 11 U.S.C. §109(c)(5)(B).

Neither can the City rely on 11 U.S.C. §109(c)(5)(C) to excuse its failure to negotiate in good faith. That section provides: "[the entity] is unable to negotiate with creditors because such negotiation is impracticable."

A determination of "impracticability" must be made on a case-by case basis, and requires a "fact sensitive inquiry". *In re New York City Off-Track Betting Corporation,* 427 B.R. 256, 277 (Bankr. S.D.N.Y. 2010). In the present matter, the Detroit Public Safety Unions assert that the limited amount of time between the June 14 Creditor Proposal and the filing date of July 18, left little time for the City to engage the necessary constituents. The number of constituents is not, in and of

16

itself, and should not be, an impediment to negotiations. It is impossible for the Emergency Manager to say that with additional time outside of the bankruptcy process, he could not engage the necessary creditors to formulate a workable plan. The difficulty in the negotiation process is the result of an artificial time constraint, not necessarily the result of the number of creditors. The Court should not find that negotiations were "impracticable", because the City created the impediment to continued negotiations based on the artificial time constraint created by the filing on July 18th. (See *Sullivan,* 165 B.R. at 82 ("the decision [to file chapter 9] appears to be a late hour litigation tactic to hold off Wheelabrator's threatened shut-out and an attempt to position the Districts to force some compromises.")) It should also be axiomatic that an entity should not be able to claim that it is impracticable to negotiate if, as here, there is no sincere intent to negotiate or there was such a limited time for negotiations. (*In re Villages at Castle Rock Metropolitan District No. 4,*145 B.R. 76, 85 (Bankr. D. Colo. 1990), six months of conceptual discussions with largest bondholder was sufficient to satisfy §109(c)(5)(C).)

The Memorandum justifies terminating negotiations based on projections of year end cash shortages and the possible end of term of the Emergency Manager. However, there still is cash for operations, and the Emergency Manager's appointment would not terminate, absent extension, until mid-September, 2014. The Emergency Manager has not claimed that the City's assets would be at risk if

some reasonable time were spent negotiating with the City's creditors. *In re Valley Health System,* 383 B.R. 156, 163 (Banrk. C.D.Cal. 2008). The requirement of 11 U.S.C. §109(c)(5)(C) has not been satisfied.

**D. 11 U.S.C. §921(c) must be looked at in conjunction with the requirements of §109(c).**

11 U.S.C. §921(c) states:

> After any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title.

While this section is written in the permissive ("may dismiss"), courts have held that this section requires dismissal if the chapter 9 petition was not filed in good faith or the debtor does not meet the requirements of chapter 9. *In re Valley Health System,* 383 B.R. at 160, *In re County of Orange,* 183 B.R. at 599, *In re City of Vallejo,* 408 B.R. 280, 289 (BAP 9th Cir. 2009).

## RELIEF REQUESTED

WHEREFORE, based on the facts of this matter and the arguments set forth herein, the Detroit Public Safety Unions request that the chapter 9 Petition be dismissed.

18

Respectfully submitted,

ERMAN, TEICHER, MILLER,
ZUCKER & FREEDMAN, P.C.

By:  */s/ Barbara A. Patek*
       Earle I. Erman  (P24296)
       Craig E. Zucker  (P39907)
       Barbara A. Patek (P34666)
       Counsel for the Detroit Public Safety
       Unions
       400 Galleria Officentre, Suite 444
       Southfield, MI  48034
       Telephone: (248) 827-4100
       Facsimile:  (248) 827-4106
       E-mail:  bpatek@ermanteicher.com

DATED:   October 11, 2013

F:\CHAP9\DETROIT\Brief in support of amended objection to eligibility.docx

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                      Chapter 9

City of Detroit, Michigan,                  Case No. 13-53846

     Debtor.

_____/

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 11, 2013, the Amended Objection of the Detroit Fire Fighters Association, The Detroit Police Officers Association, The Detroit Police Lieutenants & Sergeants Association and The Detroit Police Command Officers Association to Debtor's Bankruptcy Petition and Statement of Qualifications Under 11 U.S.C. Section 109(c), Brief in Support and Certificate of Service were electronically filed with the Clerk of the Court for the United States Bankruptcy Court, Eastern District of Michigan, Southern Division using the CM/ECF System, which will send notification of such filing to all attorneys and parties of record registered electronically.

                                    /s/ Barbara A. Patek_____
                                    BARBARA A. PATEK (P34666)
                                    Erman, Teicher, Miller,
                                    Zucker & Freedman, P.C.
                                    400 Galleria Officentre, Ste. 444
                                    Southfield, MI 48034
                                    Telephone: 248-827-4100
                                    Facsimile: 248-827-4106
                                    Email: bpatek@ermanteicher.com

Dated: October 11, 2013

F:\CHAP9\DETROIT\COS amended objection eligibility.docx