UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

------------------------------------------------------- x
            :

In re:                      :    Chapter 9

CITY OF DETROIT, MICHIGAN,    :    Case No.: 13-53846

                        :    Hon. Steven W. Rhodes
             Debtor.    :
------------------------------------------------------- x

## AMENDED JOINT OBJECTION OF INTERNATIONAL UNION, UAW AND THE *FLOWERS* PLAINTIFFS TO THE CITY OF DETROIT, MICHIGAN'S ELIGIBILITY FOR AN ORDER FOR <u>RELIEF UNDER CHAPTER 9 OF THE BANKRUPTCY CODE</u>

The International Union, United Automobile, Aerospace and

Agricultural Implement Workers of America ("UAW") and Robbie Flowers,

Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman, as plaintiffs

in the suit *Flowers v. Snyder*, No. 13-729 CZ (Ingham County Circuit Court) (the

"*Flowers* plaintiffs")[1] hereby amend their respective August 19, 2013 objections to

the City of Detroit's (the "City") eligibility for an order of relief under chapter 9 of

the U.S. Bankruptcy Code and state for their amended objection as follows:

---

[1] The *Flowers* plaintiffs hereby restate and incorporate their *Objection of Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman to the Putative Debtor's Eligibility to be a Debtor* [DE 504] herein.

## Preliminary Statement

1.　　Less than three months after his appointment by State of Michigan Governor Richard Snyder ("Governor Snyder" or "Snyder"), and barely one month before filing the City of Detroit's chapter 9 petition, the City's Emergency Manager Kevyn Orr ("EM Orr" or "Orr") released a detailed proposal for creditors which he claims will transform Detroit and its operations. The June 14, 2013 "Proposal for Creditors" (the "Proposal") laid out an ambitious program of upgrades and improvements for the City's residents and businesses but spelled deep trouble for the City's employees and retirees. Orr proposed radical changes in pension and health care benefits for City workers who have already been subjected to reductions in force and wage and benefit cuts under the City's imposed employment terms. Orr's plan took particularly brutal aim at the City's retirees, proposing drastic cuts in the City's retiree health care program, and, in derogation of Article 9, Section 24 of the Michigan Constitution which expressly prohibits the impairment of accrued pension benefits, a pension funding proposal that would force "significant cuts" in accrued, vested pension benefits. Under the Proposal, the City would pay no further contributions to the retirement systems and turn enlarged estimates of the retirement plans' underfunding into bankruptcy claims to be paid pennies on the dollar. Without funding, the retirement plans would run out of

money; thus, according to the Orr's Proposal "significant cuts" in accrued vested benefits would be required.

2.      That the City landed in chapter 9 so soon after Orr launched his Proposal was entirely predictable and in all likelihood the intended result in any event.  The Emergency Manager and his team are gambling on federal bankruptcy law to wipe out the City's pension obligations, taking vested pension benefits earned by the City's retirees and employees down in the process.  Unfortunately for the City, this strategy fatally undermines its eligibility for chapter 9 bankruptcy.

3.      As we demonstrate below, the City is ineligible for chapter 9 relief on four grounds.  First, there was no valid authorization for the filing as required by Section 109(c)(2) of the Bankruptcy Code.  The Governor failed to condition the authorization on adherence to Article 9, Section 24 of the Michigan State Constitution and lacked authority to authorize a chapter 9 filing that would be used to impair pensions in derogation of the protections afforded by Article 9, Section 24.

4.      By its design, chapter 9 reflects our system of dual federal and state sovereignty.  Initially declared an unconstitutional exercise of Congressional power, *see Ashton v. Cameron County Water Improvement District*, 298 U.S. 513 (1936), the lawful exercise of federal municipal bankruptcy hinges on strict adherence to deep-rooted principles of dual sovereignty.  Moreover, Michigan

citizens have the right under the Tenth Amendment to insist that chapter 9 not be used to deprive them of their Michigan constitutional rights.

5.     The Governor could not authorize a chapter 9 proceeding brought in order to force cuts in accrued pensions because the Governor has no authority to ignore, or waive, the protections of Article 9, Section 24 of the Michigan Constitution; only the citizens of Michigan are empowered to amend the State's Constitution.  And, without that authority himself, he was powerless to take action that would permit the City to do so through the actions of the Emergency Manager.

6.     Second, the City cannot meet the requirement of Section 109(c)(4) because EM Orr has plainly shown that the City desires to "effect a plan to adjust" its debts through an unlawful proposal that would lead to cuts in accrued pension benefits.  Orr and his team devised a proposal premised upon, among other things, no further pension contributions to the retirement system.  The plan offers only a miniscule recovery on a bankruptcy claim for the underfunding, and declares that, without adequate funding, accrued benefits would have to be cut significantly. A plan of adjustment incorporating these features of the Proposal could not be confirmed under Section 943 of the Bankruptcy Code, because the City could not show that "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 U.S.C. § 943(b)(4).  Such a plan would plainly run afoul of

Article 9, Section 24 of the Michigan Constitution. Cutting off the City's retirement system contributions was Orr's plan from at least the time he presented his Proposal (and likely earlier). Therefore, because EM Orr sought authorization to commence a chapter 9 case in order to effect a plan that would be patently *unlawful* for the state to implement, the City cannot meet the threshold eligibility requirement that a debtor "desire[s] to effect a plan to adjust its debts" under Section 109(c)(4).

7.     Third, the City cannot demonstrate compliance with the requirements of Section 109(c)(5)(B) or (C) in its pre-bankruptcy interactions regarding its Proposal. The City's pension proposal to force cuts in accrued vested pension benefits in derogation of the protections under the Michigan Constitution was, on its face, a proposal the City intended would lead to a result that contravened Article 9, Section 24 and, as such, was a proposal that could not be accepted. Moreover, its pension proposal was jerry-built on an incomplete picture of the pension plan underfunding, seemingly to create the specter of a large, insurmountable obligation. After a brief period of stakeholder meetings designed more to give the appearance of discussions than serve as substantive negotiations, Orr sought the Governor's approval for a chapter 9 filing barely 30 days after the launch of the Proposal.

8.     Nor can the City demonstrate that further attempts to negotiate were impractical under Section 109(c)(5)(C). Impracticality, for purposes of Section

109(c)(5), cannot mean putting up a proposal that could not lawfully be implemented or accepted and then tallying up the problems associated with engaging the affected stakeholders.[2]

9. For the foregoing reasons as well, the City's chapter 9 petition was not filed in good faith. *See* 11 U.S.C. § 921(c). The City's pre-bankruptcy course of conduct shows that it determined to pursue a plan to cut its pension funding obligation that would force the retirement systems to significantly slash already modest pension benefits, rushing into bankruptcy where it thought its plan could be pursued through the processes of the Bankruptcy Code. Raising the specter of an unwieldy underfunding obligation, the City declared it would walk away from that its pension funding obligation, leaving behind a miniscule recovery, while diverting resources (and identifying other assets to monetize) for its modernization projects. The City simply wrote off inconvenient state constitutional protections as

---

[2] Such active disrespect for the Michigan Constitution by itself invalidates the City's chapter 9 proceedings. *See* Think Progress, July 23, 2013, "Banking on Bankruptcy: Emails Suggest Negotiations With Detroit Retirees Were Designed to Fail," (*e.g.*, "In one email, an assistant to Snyder promises to set a meeting with someone 'who is not FOIAble,' suggesting an intent to evade transparency laws"), *available at*: http://www.thinkprogress.org/economy/2013/07/23/2342511/banking-on-bankruptcy-emails-suggest-negotiations-with-detroit-retirees-were-designed-to-fail/. Because the parties' pre-trial discovery remains ongoing, the UAW reserves its rights to further amend and supplement its eligibility objections, including in connection with the submission of its pre-trial brief pursuant to this Court's case management order.

irrelevant under its weak federal supremacy theory, perhaps counting on the legal uncertainties of the bankruptcy process as a source of leverage.[3]

10.     In sum, absent a lawful state authorization for the filing, absent a plan of adjustment that the City can lawfully execute, and without the requisite showing of good faith and required pre-bankruptcy negotiations, the City of Detroit is ineligible for chapter 9 relief.  The City's chapter 9 petition therefore must be dismissed.

## Background

### The UAW

11.     International Union, UAW is a labor organization headquartered in Detroit, Michigan whose members include both City of Detroit employees and retirees and employees and retirees of public entities related to the City of Detroit that participate in common with City of Detroit employees in retirement benefit plans, including the City of Detroit General Retirement System pension plan.  UAW is representing the interests of these active and retired employees in this bankruptcy case.  There are approximately 200 retirees from UAW-represented bargaining units of City of Detroit component units.  There are, additionally, many active UAW-

---

[3] *See* Jeffrey B. Ellman, Daniel J. Merrett, *Pensions and Chapter 9:  Can Municipalities Use Bankruptcy to Solve Their Pension Woes?*  27 Emory Bankr. Dev. J. 365 (2011) (hereafter, "Ellman and Merrett, *Pensions and Chapter 9*") (federal bankruptcy law offers "significant" sources of leverage which can be used to "force[]" pensioners to bargain and "place[] substantial pressure" on them to "reach a resolution as quickly as possible.")

represented employees who are vested in their retirement benefits, all of whose pensions are at risk under EM Orr's Proposal. UAW-represented employees and retirees are drawn from the following units: Civilian Police Investigators, City Law Department attorneys, City of Detroit Law Department paralegals, Water & Sewer waste water treatment operators, Detroit librarians and associated skilled trades workers.

<u>Michigan's Constitution Protects Accrued Pensions</u>

12.     Article 9, Section 24 of the Constitution of the State of Michigan makes clear that neither the state nor a municipality may reduce accrued pension benefits:  "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."[4]  Thus, "under this

---

[4] The address to the people accompanying the 1963 Constitution states that Article 9, Section 24 "requires that accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions be a contractual obligation *which cannot be diminished or impaired by the action of its officials or governing body*." 2 Official Record, Constitutional Convention 1961, p. 3402 (emphasis added). The Constitution also requires benefits to be funded in the year they are accrued and prohibits the legislature and municipalities from using those funds for other unfunded liabilities.  Mich. Comp. Laws Const. Art. 9, § 24.  The debates concerning what is not Article 9, Section 24 confirm that municipal employees have the entire assets of their employer at their disposal for these benefits:  "Mr. VAN DUSEN:  An employee who continued in the service of the public employer in reliance upon the benefits which the plan says he would receive would have the contractual right to receive those benefits, and would have the entire assets of the employer at his disposal from which to realize those benefits."  1 Official Record, Constitutional Convention 1961, p. 774.

constitutional limitation the legislature cannot diminish or impair accrued financial

benefits." *In re Enrolled Senate Bill 1269*, 209 N.W.2d 200, 202 (Mich. 1973). *See*

*also In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*,

806 N.W.2d 683, 694 (Mich. 2011) ("The obvious intent of § 24 … was to ensure

that public pensions be treated as contractual obligations that, once earned, could not

be diminished."); *Detroit Police Officers Ass'n v. City of Detroit*, 214 N.W.2d 803,

816 (Mich. 1974) ("With this paramount law of the state as a protection, those

already covered by a pension plan are assured that their benefits will not be

diminished by future collective bargaining agreements.").

The Emergency Manager and Pre-Bankruptcy Events

13.     The Emergency Manager serves under the Local Financial

Stability and Choice Act Public Law 436 (2012) Mich. Comp. Laws § 141.1541 *et*

*seq.* ("PA 436").  PA 436 is the most recent in a series of emergency manager laws

Michigan has enacted concerning Michigan's local government units. *See City of*

*Pontiac Retired Employees Ass'n v. Schimmel, et al.*, No. 12-2087, 2013 WL

4038582, *1-*2 (6th Cir. August 9, 2013) (hereafter, "*Pontiac Retired Employees*

*Ass'n*") (summarizing the State's Emergency Manager laws).  In 1990, Michigan

enacted Public Act 72, known as the "Local Government Fiscal Responsibility Act."

Mich. Comp. Laws § 141.151(1)(j)(2005).  In 2011, Public Act 72 was repealed

with the enactment of Public Act 4, the "Local Government and School District

Fiscal Accountability Act," Mich. Comp. Laws §§ 141.1501-1531, in March 2011.

"Unlike P[ublic] A[ct] 72, PA 4 gave emergency managers the power to temporarily

reject, modify or terminate existing collective bargaining agreements." *Pontiac*

*Retired Employees Ass'n*, 2013 WL 4038582 at 3. Public Act 4 was rejected by

Michigan voters under the state's voter rejection procedures in November, 2012. *Id.*

at 4. In the words of the Sixth Circuit, "[a]pparently unaffected that the voters had

just rejected Public Act 4, the Michigan Legislature enacted, and the Michigan

Governor signed, Public Act 436. Public Act 436 largely reenacted the provisions of

Public Act 4, the law that Michigan citizens had just revoked. In enacting Public

Act 436, the Michigan Legislature included a minor appropriation provision,

apparently to stop Michigan voters from putting Public Act 436 to a referendum."

*Id.* (citations omitted).

      14.    Public Act 436 became effective on March 28, 2013. As

detailed in EM Orr's Declaration, a number of legal challenges to Public Act 436

have been filed and remain pending.[5] Declaration of Kevyn Orr ("Orr Decl."),

---

[5] The lawsuits raise serious challenges affecting the legality of the EM's appointment and other actions taken under the statute, including whether the Emergency Manager's appointment violated Michigan's Open Meetings laws, or was otherwise defective as a result of the voters' repeal of PA 4; whether PA 436 violates the U.S. Constitution and the federal Voting Rights Act. Other litigation, such as the *Pontiac Retiree Employees Association* case recently decided by the Sixth Circuit, involve challenges to emergency managers appointed in other towns. To the extent Governor Snyder's appointment of EM Orr was ineffective, as UAW

Exhibit A, pp. 57-59.  Mr. Orr was appointed Emergency Manager and took office on or about March 25, 2013, under the predecessor Emergency Manager law and now serves under PA 436.  *Id*. at p. 57.

15.     The Creditor's Proposal was released by the Emergency Manager on June 14, 2013.  Orr Decl., Exhibit A.  As relevant to the UAW's objection, the Proposal takes broad aim at the City's workers and retirees; city employees have already been subjected to headcount reductions and "City Employment Terms" (the "CETs") imposed a year ago which cut wages and benefits and unilaterally changed work rules.  *See* Orr Decl., Exhibit A, pp. 53-54 (describing the imposition of the CETs).  The proposal indicates that these imposed changes will serve as a "baseline" for the City in its contract talks with the unions, although the City may seek cuts and changes "beyond those included in the CETs."  *Id.* p. 76.  Additional reductions in staffing levels and outsourcing functions are also contemplated.  *Id.* p. 78.  Regarding retiree obligations, the City intends to modify retiree medical benefits through a replacement program and indicates that "claims will result from the modification of benefits."  *Id.* p. 109.

_____

believes and asserts, the City's Chapter 9 filing is void, as this Court would be bound to find.

16.     The City's pension proposal garnered immediate and significant

opposition, including at least three lawsuits commenced prior to the chapter 9 filing.[6]

Although PA 436 directs that the Emergency Manager's financial and operating plan

"shall provide for" the "timely deposit of required payments to the pension fund for

the local government or in which the local government participates," Mich. Comp.

Laws 141.1551 Sec. 11(1)(d), the Emergency Manager's proposal announced that

annual contributions required to fully fund currently accrued, vested benefits "will

not be made under the plan."  Orr Decl., Exhibit A, p. 109.  The Creditors' Proposal

provides that the retirement system underfunding, which Orr and his team claimed

was understated, would be "exchanged for a pro rata … principal amount of New

Notes."[7]  *Id.*  Put another way, the Emergency Manager proposed to transform the

---

[6] *Flowers, et al. v. Snyder, et al.,* No. 13-734-CZ (Ingham County Circuit Court July 3, 2013); *General Ret. Sys. of the City of Detroit v. Kevyn D. Orr*, No. 13.768-CZ (Ingham County Circuit Court); *Webster v. State of Michigan*, 13-734-CZ (Ingham County Circuit Court July 3, 2013).  The City and the State make much of the lawsuit activity in connection with the bankruptcy filing.  But Orr's proposal left the affected parties little choice given the City's blatant disregard of the State Constitution.

[7] What we know from the discovery to date, and expect the evidence at trial will show, is that the City engaged an actuarial consulting firm, Milliman, in 2012, which also assisted EM Orr and his team.  Milliman prepared several analyses based on different scenarios fed to the firm by a "pension task force" consisting of lawyers and Conway MacKenzie's Charles Moore.  *See* Declaration of Charles M. Moore [DE 13], ¶¶ 8, 13.  Among other things, the analyses were run to show the effects of various hypothetical changes in funding and funding policy, investment rate assumptions and, perhaps most critically, the use of a market value of assets more appropriate to a terminated plan analysis than to a valuation of an ongoing pension

plan's underfunding into a bankruptcy claim which will share a $2 billion recovery pro-rata with billions of dollars in additional general obligation bond and other general unsecured claims. The Proposal then goes on to state that "[b]ecause the amounts realized on the underfunding claims will be substantially less than the underfunding amount there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." *Id.*

17.     Labor unions and retiree organizations attended a series of presentations attended by representatives of the Emergency Manager and various stakeholders. Only a handful of presentations were scheduled with labor groups despite the breadth of the proposals affecting workers and retirees. *See* Orr Decl., ¶¶ 90-96 (describing post-June 14, 2013 meetings attended by stakeholders). Abruptly, on July 18, 2013 (and apparently only one day earlier than planned, *see* Orr Decl., Exhibit L) the City filed its chapter 9 petition following a written submission by Governor Snyder issued in response to Mr. Orr's July 16, 2013 request for approval to commence the bankruptcy. Although PA 436 expressly permits the Governor to condition the authorization for a chapter 9 filing, *see* Mich. Comp. Laws 141.1558(1), he did not do so. *See* Orr Decl., Exhibit L.

---

plan. One or two of these analyses were made public and the results drew fire as controversial. *See, e.g.*, Economic Policy Institute, August 1, 2013, *Detroit's Pension Problems: Not as Bad as They're Portrayed, available at* http://www.epi.org/blog/truthiness-detroit. At best, the studies present an incomplete picture of the retirement system underfunding.

**Argument**

**The Petition Must Be Dismissed Because the City Is Not Eligible For Chapter 9 Relief**

The Bankruptcy Petition Must Be Dismissed
for Lack of Lawful Authorization by the State

*Chapter 9 Reflects Our System of Dual Sovereignty*

18.    In deference to dual sovereignty principles, "[b]ankruptcy courts should review chapter 9 petitions with a jaded eye." *In re N.Y. Off-Track Betting Corp.*, 427 B.R. 256, 264 (Bankr. S.D.N.Y. 2010).  The debtor bears the burden of proof as to each element of eligibility under Section 109(c).  *See In re City of Harrisburg, PA,* 465 B.R. 744, 752 (Bankr. M.D. Penn. 2011).  *See also id*. at 754 (when authority to file is questioned, "bankruptcy courts exercise jurisdiction carefully, 'in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment'").  Under Section 109(c)(2), to qualify for Chapter 9 protection, a debtor must be "specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter."  11 U.S.C. § 109(c)(2).  *See In re City of Harrisburg, PA,* 465 B.R. at 754.  ("Express authority is defined as that which confers power to do a particular identical thing set forth and declared exactly, plainly and directly with well-defined limits").

19.     Because the Governor's authorization of Detroit's chapter 9 petition did not require adherence to Article 9, Section 24 of the Michigan Constitution, the state's authorization is invalid.  In the absence of a valid state authorization duly recognizing the protections of Article 9, Section 24, chapter 9 as applied here is unconstitutional.

20.     The power of the federal courts under chapter 9 is necessarily limited by principles of federalism inherent in our Constitutional structure and reflected in the Tenth Amendment.[8]  "Principles of dual sovereignty, deeply embedded in the fabric of this nation and commemorated in the Tenth Amendment of the United States Constitution, severely curtails the power of bankruptcy courts to act once a petition is filed."  *In re N.Y. Off-Track Betting Corp.*, 427 B.R. 256 (Bankr. S.D.N.Y. 2010).  Thus, as this Court has observed, "[a] primary distinction between chapter 11 and chapter 9 proceedings is that in the latter, the law must be sensitive to the issue of the sovereignty of the states."  *In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 649 (Bankr. E.D. Mich. 1994).

21.     The U.S. Supreme Court has twice considered the constitutionality of federal municipal bankruptcy legislation with reference to the

---

[8] The Tenth Amendment provides:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.  U.S. Const. amend X.

dual sovereignty principles embodied in the Tenth Amendment. In 1934, Congress,

enacted the first federal legislation providing for municipal debt adjustments. The

Supreme Court held the 1934 Act unconstitutional in *Ashton v. Cameron County*

*Water Improvement District No. 1*, 298 U.S. 513 (1936) on the ground that the

federal bankruptcy power is "impliedly limited by the necessity of preserving the

independence of the States," and thus did not extend to the states or their

subdivisions. *Id.* at 530. The Court held that the provisions would

unconstitutionally impinge upon the "indestructible" "separate and independent

existence" of the states by restricting municipal debtors' control over their fiscal

affairs. *Id*. at 528, 530.

22. Congress enacted modified municipal bankruptcy provisions in

1937 which the Court upheld in *Bekins*, rejecting a claim that the statute violated the

Tenth Amendment and state sovereignty principles. The Court distinguished its

earlier decision in *Ashton* by emphasizing that Congress in the 1937 Act had been

"especially solicitous" to avoid interference with the autonomy of municipalities.

*Bekins*, 304 U.S. at 50. The Court stressed that under the revised legislation, the

federal bankruptcy power may be exercised only where the actions of the municipal

agency are authorized by state law:

> The statute is carefully drawn so as not to impinge upon the
> sovereignty of the State. The State retains control of its fiscal affairs.
> The bankruptcy power is exercised in relation to a matter normally
> within its province and ***only in a case where the action of the taxing***

> *agency in carrying out a plan of composition approved by the*
> *bankruptcy court is authorized by state law.*

*Id.* at 51 (emphasis added).

23.     For purposes of the present case, the most significant aspect of

the *Bekins* opinion is that the Court itself determined that the relief sought by the

local agency was authorized by California law.  The Court's ultimate conclusion that

the State had given its consent to the bankruptcy proceeding was based on its own

analysis of the relevant provisions of the state statute:

> [T]he State has given its consent.  We think that this sufficiently
> appears from the statute of California enacted in 1934. St. of 1934, Ex.
> Sess., c. 4, p. 5.  This statute (section 1) adopts the definition of 'taxing
> districts' as described in an amendment of the Bankruptcy Act, to wit
> chapter 9 approved May 24, 1934, 11 U.S.C. §§ 301-303, and further
> provides that the Bankruptcy Act and 'acts amendatory and
> supplementary thereto,' as the same may be amended from time to
> time, are herein referred to as the 'Federal Bankruptcy Statute.'
> Chapter 10 of the Bankruptcy Act is an amendment and appears to be
> embraced within the state's definition.  We have not been referred to
> any decision to the contrary.  Section 3 of the state act then provides
> that any taxing district in the State is authorized to file the petition
> mentioned in the Federal Bankruptcy Statute.  Subsequent sections
> empower the taxing district upon the conditions stated to consummate a
> plan of readjustment in the event of its confirmation by the federal
> court.

*Id.* at 47-48 (internal citations and quotations omitted).

24.     The teaching of *Bekins* is clear.  This Court's exercise of

jurisdiction over the City's petition cannot rest on the mere fact that the Emergency

Manager (and based upon the Governor's authorization) filed the petition

voluntarily.  Rather, the Court must itself determine that the filing of the petition is authorized by, *and consistent with*, the law of Michigan, in this case, the Constitution of the State of Michigan.  If the Court finds that the petition is inconsistent with state law, then the further exercise of its jurisdiction is barred by the Then Amendment.

25.     In its Consolidated Reply, the City seeks to draw a distinction between the filing of the instant petition, which must admittedly be authorized by state law, and any subsequent relief granted by the Court.  It supports this distinction by citing *In re Sanitary & Improvement Dist., No. 7*, 98 B.R. 970, 973 (Bankr. D. Neb. 1989) for the proposition that the Bankruptcy Code permits federal courts through confirmation of a Chapter 9 plan to impair contract rights and "such impairment is not a violation by the state or the municipality of [the Contracts Clause] which prohibits a state from impairing such contract rights."  (Consolidated Reply, pp. 24-25.)

26.     But this attempt to analogize the Contracts Clause with the Tenth Amendment is wholly unavailing.  The Contracts Clause of the U.S. Constitution applies solely to the States.[9]  By contrast, the Tenth Amendment is an explicit limitation on the power of the Federal Government, including this Court, to displace

_____

[9] U.S. Const., Art. I, Sec. 10 provides: "No state shall … pass any … Law impairing the Obligation of Contracts."

state law.[10]  As the Supreme Court has put it, "the Tenth Amendment confirms that

the power of the Federal Government is subject to limits that may, in a given

instance, reserve power to the States.  The Tenth Amendment thus directs us to

determine, as in this case, whether an incident of state sovereignty is protected by a

limitation on an Article I power."  *New York v. United States*, 505 U.S. 144, 157

(1992).

      27.    The Court's Tenth Amendment decisions clearly show that the

power of the federal courts under Chapter 9 is necessarily limited by principles of

federalism inherent in our Constitutional structure and reflected in the Tenth

Amendment.  This dual system of sovereignty increases democratic governance:

> The federal structure allows local policies 'more sensitive to the diverse needs of a heterogeneous society,' permits 'innovation and experimentation,' enables greater citizen 'involvement in democratic processes,' and makes government 'more responsive by putting the States in competition for a mobile citizenry.'  *Gregory v. Ashcroft,* 501 U.S. 452, 458, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991).  Federalism secures the freedom of the individual.  It allows States to respond, through the enactment of positive law, to the initiative of those who seek a voice in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power.

*Bond v. United States*, 131 S.Ct. 2355, 2364 (2011) (emphasis added).  Accordingly,

as the Court held in *Bond*, not only the states, but state citizens themselves have

---

[10] In fact the court ruled that the debtor's chapter 9 plan could not be confirmed under Section 943(b)(4) for lack of compliance with *state law*. *In re Sanitary & Improvement Dist. No. 7,* 98 B.R at 973.

standing to assert that federal law contravenes the Tenth Amendment precisely because of the vital relationship between freedom of the individual and the federal structure of our government.  *Id.*

28.     Under the Bankruptcy Code, strict adherence to State sovereignty principles is intrinsic to the lawful functioning of chapter 9.  Chapter 9 "was drafted to assure that application of federal bankruptcy power would not infringe upon the sovereignty, powers and rights of the states."  *In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 226 (Bankr. N.D. Cal. 1991).  "Both Congress and the Supreme Court have thus been careful to stress that the federal municipal Bankruptcy Act is not in any way intended to infringe on the sovereign power of a state to control its political subdivisions; for as the Supreme Court held in the *Ashton* and *Bekins* cases, to the extent that the federal Bankruptcy Act does infringe on a state or a municipality's function it is unconstitutional."  *Ropico, Inc v. City of N.Y.*, 425 F.Supp. 970, 983 (S.D.N.Y. 1976).

29.     The municipal bankruptcy provisions of the Bankruptcy Code chart a carefully circumscribed course limiting the power that can be lawfully exercised by the federal bankruptcy court.  First, the municipality must be "specifically authorized" to be a debtor under *State* law "or by a governmental officer or organization *empowered by State law* to authorize such entity to be a debtor under" chapter 9.  11 U.S.C. § 109(c)(2) (emphasis added).  *See In re City of*

*Bridgeport*, 128 B.R. 688, 692 (Bankr. D. Conn. 1991). In addition, Section 903 of the Bankruptcy Code establishes that chapter 9 "does not impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality including expenditures by such exercise.…" 11 U.S.C. § 903. Section 903 "'is the constitutional mooring' for municipal debt adjustment and makes clear that nothing in chapter 9 should be construed to limit a State's power to control its municipalities." *In re N.Y. City Off-Track Betting Corp.*, 434 B.R. 131, 144 (Bankr. S.D.N.Y. 2010); *see also City of Richmond*, 133 B.R. at 226 (describing Section 903 as a "reaffirmation that Chapter 9 does not limit or impair the power of the states to control municipalities").

30. Similarly, Section 904 prevents the bankruptcy court from interfering with "any of the political or governmental powers of the debtor" or "any of the property or revenues of the debtor" or "the debtor's use and enjoyment of any income-producing property." 11 U.S.C. § 904; *see In re Addison Cmty. Hosp. Auth.*, 175 B.R. at 649 (the "foundation" of Section 904 "is the doctrine that neither Congress nor the courts can change the existing system of government in this country" and that, in recognition of the Constitutional limitations on the power of the federal government, "chapter 9 was created to give courts only enough jurisdiction

to provide meaningful assistance to municipalities that require it, not to address the policy matters that such municipalities control.").[11]

31.     State sovereignty interests also operate to require that the bankruptcy court find that the debtor's plan of adjustment be consistent with state law.  The bankruptcy court shall only confirm the plan if, among other requirements, "the debtor is not prohibited by law from taking any action necessary to carry out the plan."  11 U.S.C. § 943(b)(4).  Indeed, in *In re Sanitary & Improvement District*, # 7, 98 B.R. 970, 975-76 (Bankr. D. Neb. 1989) cited by the City, the court held that a plan of adjustment could not be confirmed because it conflicted with the terms of state law that required that bondholders be paid in full before warrantholders could receive compensation.[12]  *See also In re City of Colorado Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 694 (Bankr. D. Colo. 1995) (ruling that plan of adjustment could not be confirmed unless and until it was approved under the elections provisions of state law: "[w]here a plan proposes action not authorized by state law, or without satisfying state law requirements, the plan cannot be

---

[11] "The effect [of Sections 903 and 904] is to preserve the power of political authorities to set their own domestic spending priorities, without restraint from the bankruptcy court."  M. McConnell, *When Cities Go Broke: A Conceptual Introduction to Municipal Bankruptcy*, 60 U. Chi. L. Rev. 425, 462-63 (1993).

[12] Thus, contrary to the City's assertions, the reorganization power is necessarily confined by the state's paramount authority over the governance of the municipality itself, and by such state constitutional limits as the state's citizens have placed on the power of the state itself.

confirmed.").[13] *See also* 11 U.S.C. § 943(b)(6) (stating as additional plan confirmation requirement that "any regulatory approval or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval"). The Bankruptcy Code recognizes both that the state necessarily controls the actions of its subdivisions and the content of the any plan of adjustment.

32. In sum, the Tenth Amendment case law belies the City's contention that the Bankruptcy Court is free to set aside the protections of a state's constitution. The state sovereignty principles that form the fabric of chapter 9 are at the core of the bankruptcy court's constitutional exercise of authority over a municipal debtor, whether as a matter of eligibility or otherwise.[14]

---

[13] The court further explained that this is because "[u]nlike any other chapter of the Bankruptcy Code, Chapter 9 places federal law in juxtaposition to the rights of states to create and govern their own subdivisions." *Id*. at 693. "Though Congress intended Chapter 9 to be a forum for reorganization of municipalities, it is clear that Congress did not intend for federal bankruptcy law to supersede or impair the power of the state to create, limit, authorize or control a municipality in the exercise of its political or governmental powers." *Id*.

[14] The State of Michigan makes a similarly unavailing argument that because it is not the filing of the petition itself that impairs the pension benefits, the Governor's authorization was valid. However, for chapter 9 to be applied in a manner consistent with the federal Constitution, specifically, the Tenth Amendment, there is no lawful or practical distinction between disregarding state law for purposes of the City's authorization to file the petition and disregarding state law with respect to the plan that it may lawfully pursue while in chapter 9. If the City's filing is not properly authorized, then each day the City remains in chapter 9 is a day it is not authorized to be there.

33.     Moreover, dual sovereignty principles are not merely the states' province to enforce.  The Supreme Court has extended the protections of federalism to individual citizens: "An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when enforcement of those laws causes injury that is concrete, particular, and redressable.  Fidelity to principles of federalism is not for the States alone to vindicate." *Bond v. United States*, 131 S.Ct. at 2364.

*The City's Reliance on Federal Preemption is Unavailing*

34.     Apart from misreading *Bekins*, the City also relies on a line of pre-emption cases to justify its position.  But the pre-emption case law actually shows that there is no legal basis for setting aside the protections of Article 9, Section 24 of the Michigan Constitution.  Chapter 9 does not "preempt" or otherwise displace the positive requirements of Michigan's Constitution or its laws.  Indeed, as shown above, because of core federalism concerns, state law defining the governmental powers of a municipality *must be honored* under chapter 9 to preserve the constitutionality of municipal reorganizations.  This is reflected even in the threshold eligibility requirement that a chapter 9 petition be specifically authorized to be a debtor under state law.  *See In re Harrisburg, PA,* 465 B.R. at 755 (rejecting City Council's contention that Supremacy Clause to bar state law prohibition filing and motive that the state "serves as a municipality as gatekeeper into Chapter 9").

The City's contention is fundamentally undermined by those specific provisions of chapter 9, *e.g.*, Sections 903 and 904, and the applicable plan confirmation requirements which plainly refute the notion that the limits on the bankruptcy court's authority imposed by the reservation of state sovereignty are somehow *superseded* with a chapter 9 filing.[15]

35. Aside from Tenth Amendment and other federal constitutional limitations, "[i]n determining whether a state statute is pre-empted by federal law" the analysis follows three tracks, where the touchstone "is to ascertain the intent of Congress." *California Federal Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987).

> First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation....
>
> As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands

---

[15] *See* Thomas Moers Mayer, *State Sovereignty, State Bankruptcy, and a Reconsideration of Chapter 9,*" 85 Am. Bankr. L. J. 363, 384-5 (Fall, 2011) (raising the "serious question" whether an interpretation of chapter 9 that renders section 903 a "dead letter" is "consistent with" the Tenth Amendment and state sovereignty). To the extent that it were do so, chapter 9 would be unconstitutional under the Tenth Amendment, and we ask the Court to so find.

> "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Nevertheless, pre-emption is not to be lightly presumed.

*Id*. at 280-82.

36.     Here, as shown above, federal displacement of the power of the State of Michigan and its citizens — through the State Constitution and otherwise — to control the authority of Governor Snyder and the discretion of the Emergency Manager should not "be lightly presumed" because it would violate the sovereignty of the state. Nothing in chapter 9 provides for an express federal displacement of the prerogative of the state and its citizens to define the powers of its Governor and the Emergency Manager. *Cf. Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 557 (6th Cir. 2012) (express federal preemption of state law claims which relate to an employee benefit plan under 29 U.S.C. §1144(a)).

37.     Indeed, Sections 903 and 904 are to the contrary because they expressly recognize that the Code does not "impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality[.]" Under Section 943(b)(4), the terms of the plan of adjustment must comport with the terms of state law.

Nothing in chapter 9 supports an express preemption of the state law defining the

scope and authority of Governor Snyder and EM Orr.[16]

38. For the same reason, there is no basis to conclude from chapter 9

that Congress left no room for the operation of the constitutions of the several states,

and of their legislation. This, too, is recognized in Sections 903 and 904 expressly

recognize the continued vitality of state law. Indeed, in *Faitoute Iron & Steel*

*Company v. City of Asbury Park*, 316 U.S. 502, 508 (1942), the Supreme Court held

that Congress has not completely dominated the field of municipal reorganization as

to preclude the operation of a state municipal insolvency statute. *Cf. Molosky v.*

*Washington Mutual, Inc.*, 664 F.2d 109, 113-14 (6th Cir. 2011) (federal Home

Owners' Loan Act preempts claim under Michigan statute because Congress

intended the federal act to occupy the entire field of lending regulation for federal

savings associations and leave no room for state regulatory control); *Modin v. New*

---

[16] The City's reliance on *In re City of Stockton, California,* 478 B.R. 8 (Bankr. E.D. Cal. 2012) and *In re City of Vallejo,* 403 B.R. 72 (Bankr. E.D. Cal. 2009) is misplaced. The Supremacy clause analysis in these cases is turned on its head: fundamentally, chapter 9 reflects *dual* sovereignty and must be applied with due regard for the sovereignty of *the state*. Neither federal supremacy nor the Uniformity Clause operate to negate state sovereignty principles which, as we show above, must be given effect for chapter 9 to operate constitutionally. Indeed, the Uniformity requirement does *not* mean that bankruptcy must look alike in every state, and the courts have so held. *E.g., Schultz v. United States*, 529 F.3d 343, 351 (6th Cir. 2008) (rejecting uniformity challenge based on means-test tied to median income in debtor's state). *In re Kulp*, 949 F.2d 1106, 1103 n.3 (10th Cir. 1991) (no uniformity violation where "11 U.S.C. § 522 expressly delegates to states the power to create bankruptcy exemptions.").

*York Cent. Co.*, 650 F.2d 829, 835 (6th Cir. 1981) (Interstate Commerce

Commission creates a comprehensive scheme of federal regulation of railroads that

preempts state law).

39.     Adherence to the impairment prohibition in Article 9, Section 24

of the Michigan Constitution is not "physically impossible," nor would it stand as an

obstacle to a successful chapter 9 plan (where, in fact, state law compliance is

*required* for confirmation).  The objectives of chapter 9 must be read consistently

with basic constitutional principles that recognize the autonomy of the state and its

citizens to control the political affairs of its subdivision as reflected in Sections 903

and 904.  While the Michigan Constitution forbids the choice of the citizens who

enacted Article 9, Section 24 of the Michigan Constitution must be honored

consistent with Sections 903, 904 and 943 of the Bankruptcy Code and the Tenth

Amendment.[17]

*The State's Authorization Was Unlawful Under Michigan's Constitution and Laws*

40.     Governor Snyder was fully aware that part of the Emergency

Manager's bankruptcy authorization request was a plan to impair accrued vested

---

[17] Article 9, Section 24 of the Michigan Constitution is plainly an exercise by its
citizens of their Tenth Amendment-based right "to control a municipality of or in
such state in the exercise of the political or governmental powers of such
municipality" under Section 903.

pensions.[18] Yet the Governor placed no contingencies on his July 18, 2013

bankruptcy authorization. *See* Orr Decl., Exhibit J. The Governor's failure to

condition his authorization on adherence to Article 9, Section 24 breached the

State's constitution. *See* 2 Official Record, Constitutional Convention 1961, p. 3402

(accrued pensions are obligations "*which cannot be diminished or impaired by the*

*action of its officials or governing body.*") (emphasis added). Governor Snyder

lacks any authority to ignore Michigan's constitutional proscription against the

impairment of accrued pensions, and the Michigan Supreme Court has made clear

that the Governor is bound by the Michigan Constitution.[19] *See Wood v. State*

*Admin. Bd.*, 238 N.W. 16 (Mich. 1931) (Governor's reduction of appropriations in

bill approved by legislature invalid due to violation of constitution's veto clause);

*Dullam v. Wilson*, 19 N.W. 112 (Mich. 1884) (Governor may not remove public

---

[18] *See, e.g.*, Orr Declaration, Exhibit J, EM Orr's letter of July 16, 2013 to
Governor Snyder and Michigan Treasurer Dillon, p. 8.

[19] Indeed, the Michigan Constitution can be altered only as set forth therein,
notably, with respect to each permitted process, requiring the approval of Michigan
voters. Under Article 12, Section 1, the Legislature, by two-thirds vote of each
chamber, can place a proposed constitutional amendment on the ballot. The
proposed amendment becomes effective only if approved by a majority of the
voters. Pursuant to Article 12, Section 2, a citizen petition for a proposed
amendment can be placed on the ballot, which becomes effective only if approved
by a majority of the voters; or 3. Pursuant to Article 12, Section 3, a duly called
constitutional convention may place a proposed constitutional amendment on the
ballot. The proposed amendment becomes effective only if approved by a majority
of the voters. *See* Mich. Comp. Laws Const. Art. 12 §§ 1-3.

official without due process required by constitution); *see also Buback v. Romney*, 156 N.W.2d 49 (Mich. 1968) (statute permitting Governor to use judicial officers to adjudicate removal of executive branch officials violated constitutional separation of powers and was invalid).

41.    The Governor's statement in his July 18, 2013 letter that the plan of adjustment must be legally executable, under Section 943(b)(4), Orr Decl., Exhibit K,  was insufficient because the Governor nonetheless authorized the filing knowing that EM Orr was pursuing the pension proposal.  The reference to Section 943(b)(4) — which applies to confirmation of the plan — does not provide the requisite gatekeeping "specific authorization" that is required by Section 109(c)(2). *See In re City of Harrisburg, PA,* 465 B.R at 754-55.

42.    Nor did PA 436 authorize EM Orr to contravene Article 9, Section 24 in issuing his request to file the chapter 9 case.[20]  The power of the Emergency Manager is defined by Michigan law and is subject to the Michigan

---

[20] The Governor's authorization does not — and cannot — increase the Emergency Manager's powers shown above, the Governor has no authority to disregard the Michigan Constitution or to change Michigan's laws. Indeed, the Governor has sworn to *uphold* the state Constitution.  As mandated by Article XI, section 1 of the Michigan Constitution and section 64 of the Michigan Election Law, 1954 P.A. 116, M.C.L. §168.1 *et seq.*, the Governor swore the following oath, later filed with the Michigan Secretary of State:  *"I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Governor according to the best of my ability."*

Constitution as well. Under PA 436, the Emergency Manager exercises the power of the government of the City of Detroit. The Emergency Manager "Act[s] for and in the place and stead of the governing body and the office of chief administrative officer of the local government." Mich. Comp. Laws § 141.1549(2). Like the Governor, EM Orr has no authority to pursue cuts in accrued pension benefits through chapter 9 nor, consistent with the Michigan Constitution, could the Michigan legislature lawfully have given him such authority. *See In re Enrolled Senate Bill 1269*, 209 N.W.2d 200, 202 (Mich. 1973) ("under this constitutional limitation the legislature cannot diminish or impair accrued financial benefits"); *see also Pontiac Retired Employees Ass'n*, No. 12-2087, 2013 WL 4038582, *1-*2 (6th Cir. August 9, 2013) (noting that State Legislature could not end the Michigan Constitution's two-thirds vote requirement to give PA 4 immediate effect because "[t]o conclude otherwise would effectively allow the Michigan Legislature to unilaterally amend the Michigan Constitution."); *Webster v. State of Michigan*, No. 13-734-CZ (Ingham County Circuit Court July 19, 2013) (order declaring "PA 436 is unconstitutional and in violation of Article 9 Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits").[21]

---

[21] The *Webster* lawsuit is stayed as a result of this Court's July 25, 2013 order.

43.     Indeed, PA 436 itself expressly references Article 9, Section 24, for example, in enumerating the Emergency Manager powers in the event a municipality's pension fund became underfunded (authority EM Orr has not exercised, notwithstanding his team's review of the underfunding).  Under Section 141.1552(1)(m), "[t]he emergency manager shall fully comply with the public employee retirement system investment act, 1965 PA 314, Mich. Comp. Laws § 38.1132 to 38.1140m, *and section 24 of article IX of the state constitution of 1963,* and any actions taken shall be consistent with the pension fund's qualified plan status under the federal internal revenue code."  Mich. Comp. Laws § 141.1552(1)(m)(ii)(emphasis added).  And, in authorizing the EM to suspend certain compensation of local officials, the statute also makes clear that "[t]his section does not authorize the impairment of vested pension benefits."  Mich. Comp. Laws 141.1553.

44.     Thus, in the exercise of their respective authority under Michigan law, Governor Snyder and EM Orr are bound by the prohibition against impairment of accrued pensions set forth in the Michigan Constitution.  And, because the state legislature could not permit otherwise, the state legislature necessarily must limit the circumstances under which a chapter 9 filing could be

---

Nevertheless, the ruling was issued by a court of competent jurisdiction as a result of litigation in which those in privity with the City and EM Orr participated.

pursued under the financial emergency laws. Thus the legislature could not purport to authorize either the Governor nor the Emergency Manager to take steps in contravention of the Michigan State Constitution. Nevertheless, both EM Orr and Governor Snyder unlawfully acted beyond those limits in seeking and granting, respectively, authorization for the chapter 9 filing.

45. Accordingly, because the Emergency manager has sought to use chapter 9 to impair accrued pensions and because the Governor's authorization did not condition the bankruptcy filing on adherence to Article 9, Section 24 of the Michigan Constitution, the authorization was invalid under Michigan law. The authorization is, therefore, of no force and is ineffective under Section 109(c)(2). *See In re Harrisburg*, 465 B.R. at 765 (dismissing petition because the City of Harrisburg was not "specifically authorized under state law to be a debtor" under Chapter 9).

The Bankruptcy Petition Must be Dismissed Because
the City Seeks to Effect an Unlawful Plan to Adjust Debts

46. To be eligible for Chapter 9, a debtor must demonstrate that it "desires to effect a plan to adjust [its] debts." 11 U.S.C. § 109(c)(4). For purposes of Section 109(c)(4), the debts intended for adjustment are to be measured as of the petition date. *See In re Town of Westlake, Tex.*, 211 B.R. 860, 867 (Bankr. N.D. Tex. 1997). Here, well before the petition date, the Emergency Manager made known that his plan was to use chapter 9 bankruptcy to turn the retirement system

underfunding obligations into bankruptcy claims, pay them on a pro-rata basis with other unsecured debt and, based on the shortfall created in the retirement system, cut vested pension benefits and accruals.  *See* Orr Decl., Exhibit A, p. 109.

47.     This strategy plainly violates the Michigan Constitution's prohibition under Article 9, Section 24 against the impairment of accrued pensions, and, as we show above, invalidates the Governor's authorization and the chapter 9 petition.  As such, it also violates the eligibility requirement that the debtor must "desire[] to effect a plan of adjustment" under Section 109(c)(4), in that a plan that the City pursues in order to impair accrued pensions that are protected against impairment by the Michigan Constitution could not be confirmed in any event because such a plan would require that debtor take an action that is "prohibited by law."  *See Bekins*, 304 U.S. at 815 (approving municipality's bankruptcy plan where action of the taxing agency in carrying out the plan "is authorized by state law."); *see also In re Sanitary & Improvement Dist.*, # 7, 98 B.R. at 975-76; *In re City of Colorado Springs Spring Creek General Improvement District*, 177 B.R. at 694. Arguably, a proposal is a proposal and not the plan of adjustment and courts have permitted various forms of plans or indicia of proposed plans to fulfill their requirements.  *E.g., In re Stockton, Cal.,* 973 B.R. 772, 791 (Bankr. E.D. Cal. 2013). But here, the City devised a pension proposal that it could not ultimately achieve under Section 943(b).  The City gave no indication that its proposal was hypothetical

or tentative; instead it was determined to fulfill it, the confirmation issue notwithstanding.[22]  Accordingly, the City cannot be said to desire to effect a *lawful* plan of adjustment.  The City thus fails to meet the requirement of Section 109(c)(4).

<u>The Bankruptcy Petition Must be Dismissed Because the Petition Was Not Filed in Good Faith and the City Cannot Demonstrate That It Has Complied With Section 109(c)(5)</u>

48.     The Court must dismiss a chapter 9 petition "if the debtor did not file the petition in good faith" or otherwise meet the requirements of Title 11. 11 U.S.C. § 921(c).  Specifically with respect to the eligibility requirements, where a municipality has not obtained the agreement of creditors holding at least a majority in amount of the claims of each class that it intends to impair under its adjustment plan — which is the case here — then, in order to be eligible for Chapter 9, the municipality must demonstrate (as relevant here) that it "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan," or that it is "unable to negotiate with creditors because such negotiation is impracticable[.]" 11 U.S.C. § 109(c)(5).

---

[22] The City's Proposal reflects deliberate steps to leading to the forced cuts in benefits.  *See*  Orr Decl., Exhibit A, p. 109.  Although, as has become clear in discovery, the legwork under pinning the proposal was incomplete at best, the City's intent was clear:  show the underfunding to be prohibitively larger than expected, and stop the funding.

49.     Enforcing the "good faith" requirement serves "[i]mportant constitutional issues that arise when a municipality enters the bankruptcy arena" by requiring that, "before rushing to" bankruptcy court, the municipality first sought to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan. *In re Cottonwood Water and Sanitation Dist.,* 138 B.R. 973, 979 (Bankr. D. Colo. 1992). Thus, a debtor who adopts a "take it or leave it" approach to prepetition negotiations fails to satisfy the good faith element. *In re Ellicott School Bldg. Auth.*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992). There, the court noted that the debtor "h[e]ld three public meetings at which it 'explained' its proposed plan of restructuring to the bondholders" but creditors "were advised that the 'economic provisions' of that proposed plan were not negotiable." *Id.* at 266. *See also id*. (court reasoned that "[i]t is difficult to imagine that any true negotiations [can] take place in an environment where the substantive terms of a proposal were not open to discussion" and dismissed the petition in part because the good faith requirement was not satisfied.). *Id.* In other words, there must be genuine substantive negotiations over the terms of a repayment plan, and Section 109(c)(5)(B) will not be satisfied where a debtor fails to negotiate prepetition over "a comprehensive workout plan dealing with all of their liabilities and all of their assets in terms comparable to a plan of adjustment that could be effectuated under Chapter 9 of the Bankruptcy Code." *See also In re Pierce County Housing Auth.*,

414 B.R. 702 (Bankr. W.D. Wash. 2009) (requirement not met where "there is no evidence that the Debtor ever negotiated prepetition with any of its creditors over the possible terms of a plan of adjustment").

50.     The City's efforts to negotiate with stakeholders over their pension proposal fall far short of the "good faith" requirement.  First, as noted above, Orr's Proposal was obviously crafted with chapter 9 in mind (or, the City's flawed view of what could be lawfully accomplished in chapter 9) and with no effort whatsoever to acknowledge the legitimacy of Article 9, Section 24 of the Michigan Constitution.  By completely disregarding the State Constitution's prohibition on impairing vested benefits, the City tendered a proposal that the affected stakeholders could not possibly accept consistent with applicable State law.

51.     The evidence will show that Orr, aided by the Governor, embarked on a direct path to chapter 9 to implement a proposal designed to shed its pension and retiree health obligations as general unsecured claims and promote an ambitious program of improvements for the City.  We show above how this gamble plays havoc with core principles of federalism and the right of the citizenry to enact State Constitutional provisions — a right protected by the Tenth Amendment.  In addition, because of the City's rush to file, its Proposal was deeply flawed.  For example, the City had barely identified certain assets that might be available either for creditors or for its program of improvements. *See*  Orr Decl., Exhibit A, pp. 83-

89.  The pension funding estimate, likewise, was based on scenarios deemed "more realistic" by the City's turnaround consultant but requiring additional work that is to this day not yet complete.  As such, the Emergency Manager's Proposal and short march toward chapter 9 indicate that the City's efforts were not intended to engage in a good faith process with their stakeholders.  Instead, the use of bankruptcy specifically to achieve its transformation proposal was always the intended goal of the process.[23]  The Proposal was not designed as a plan for discussion among stakeholders but a milepost in the road to chapter 9.  The City's filing cannot be said to be in good faith where the bankruptcy filing is, in effect, the goal of the process.

52.      The City relies upon the impracticability of negotiations available as an alternative grounds under Section 109(c)(5)(C).  *See* Consolidated Reply, pp. 45-53.  But the issues cited by the City, *i.e.*, who to identify as "representatives" of various retiree groups, competing bargaining authority, or the extent to which legal authority would be considered binding, are by-products of the proposals that involved forced cuts in accrued pensions protected from impairment under the Michigan State Constitution.  The City cannot, on the one hand, tender a

---

[23] *See* Ellman and Merrett, *Pensions and Chapter 9* at 370 (noting that "there are many unanswered questions about what can and cannot be achieved in a chapter 9 case" and "the reality that this area of the law [whether chapter 9 is an available means to address protected pensions] is largely untested in the courts and very little is certain."); *see also id.* at 391 (noting that through the use of bankruptcy tools, such as the automatic stay "chapter 9 debtors have exerted substantial pressure on retirees to negotiate over a reduction in benefits.").

proposal designed to yield an unlawful result and then attempt to shield itself behind "impracticability" to claim eligibility under Section 109. That negotiations may have been, technically speaking, "impracticable" did not so much stem from the unwieldy size and scope of the stakeholder population, as from the impossibility of lawfully engaging in negotiations over the pension proposal.

53. Accordingly, the City cannot show that its filing was made in good faith, or that is has complied with the requirements of Section 109(c)(5). Where the debtor is unable to demonstrate that all elements have been satisfied, "[t]he petition must be dismissed." *In re Harrisburg*, 465 B.R. at 752.[24]

---

[24] UAW and the *Flowers* plaintiffs reserve their right to further supplement their objections, including in connection with the pre-trial brief in this matter, in light of continuing discovery and potential challenges UAW and the *Flowers* plaintiffs may pursue with respect to material withheld on the grounds of attorney-client and other privileges.

## Conclusion

For the foregoing reasons, the City of Detroit, Michigan's Chapter 9

Petition should be dismissed.

Dated:     New York, NY
        October 11, 2013

Respectfully submitted,

International Union, UAW

By: /s/ Babette A. Ceccotti
Cohen, Weiss and Simon LLP
Babette A. Ceccotti
Keith E. Secular
Thomas N. Ciantra
Peter D. DeChiara
Joshua J. Ellison
330 West 42nd Street
New York, New York 10036-6976
T: 212-563-4100
F: 212-695-5436
bceccotti@cwsny.com

- and -

Niraj R. Ganatra (P63150)
Michael Nicholson (P33421)
8000 East Jefferson Avenue
Detroit, Michigan  48214
T: (313) 926-5216
F: (313) 926-5240
nganatra@uaw.net
mnicholson@uaw.net

*Attorneys for International Union,*
*UAW*

- and -

  /s/ William A. Wertheimer

William A. Wertheimer
30515 Timberbrook Lane
Bingham Farms, MI 48025
T: (248) 644-9200
billwertheimer@gmail.com

Andrew A. Nickelhoff
Sachs Waldman, P.C.
2211 East Jefferson Avenue
Deoit, MI 48207
T: (313) 965-3464
F: (313) 965-0268
anickelhoff@sachswaldman.com

*Attorneys for Flowers Plaintiffs*