**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

-------------------------------------------------------------------x

In re

                                         :   Chapter 9

CITY OF DETROIT, MICHIGAN,
                                         :   Case No. 13-53846

                           Debtor.      :   Hon. Stephen W. Rhodes

-------------------------------------------------------------------x

**SUPPLEMENTAL OBJECTION OF THE OFFICIAL COMMITTEE OF RETIREES**
**TO ELIGIBILITY OF THE CITY OF DETROIT, MICHIGAN TO**
**BE A DEBTOR UNDER CHAPTER 9 OF THE BANKRUPTCY CODE**

NewYork 1628490.4

# TABLE OF CONTENTS

TABLE OF SUPPLEMENTAL AUTHORITIES ............................................................................i

INTRODUCTION ........................................................................................................................1

D.    The City Cannot Satisfy Bankruptcy Code Section 109(c)(5) and is Subject to Dismissal Under Bankruptcy Code 921(c). ...............................................................3

      1.    The City Cannot Meet Its Burden Under 109(c)(5) of Demonstrating That it Negotiated With Creditors in Good Faith or That Negotiations Were Impracticable.................................................................................................3

            a.    The City Cannot Establish That It Negotiated In Good Faith Under Section 109(c)(5)(B) .........................................................................4

            b.    The City Cannot Establish That Negotiations Were Impracticable Under Section 109(c)(5)(C) ...............................................................9

      2.    The City Cannot Meet Its Burden Under 921(c) of Demonstrating That It Filed Its Chapter 9 Petition In Good Faith ....................................................12

            a.    The Chapter 9 Petition Was Not Filed in Good Faith Because The Emergency Manager Intends to Use Chapter 9 to Impair Pension Obligations in Violation of His Duty to Uphold the Michigan Constitution, Which Prohibits Such Impairment ...............................13

            b.    The Chapter 9 Petition Was Not Filed in Good Faith Because the City's Assertions Regarding the Amount of its Underfunded Pension Obligations Were Untrue, Misleading or Made Without a Reasonable Basis. ...........................................................................15

# TABLE OF SUPPLEMENTAL AUTHORITIES

**CASES**                                                                                      **Page(s)**

*City of Pontiac Retired Emps. Ass'n. v. Schimmel*,
    No. 12-2087, 2013 WL 4038582 (6th Cir. Aug. 9, 2013) ......................................................12

*In re City of Bridgeport*,
    129 B.R. 332 (Bankr. D. Conn. 1991) ...............................................................................12

*In re the City of Wellston*,
    42 B.R. 282 (Bankr. E.D. Mo. 1984) ................................................................................10

*In re Cnty. of Orange*,
    183 B.R. 594 (Bankr. C.D. Cal. 1995) ..............................................................................15

*In re Cottonwood Water and Sanitation Dist*,
    138 B.R. 973 (Bankr. D. Colo. 1992) ..............................................................................4, 5

*In re Ellicott Sch. Bldg. Auth.*, 150 B.R. 261 (Bankr. D.Colo. 1992).........................................4, 7

*In re Joyce, Don & Assoc.'s Inc.*,
    No. 6:07-bk-04878-ABB, 2008 WL 343265, at *3 (Bankr. M.D. Fla. Jan. 30, 2008)............15

*In re McCurtain Mun. Auth.*,
    No. 07-80363, 2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4, 2007) ....................................15

*In re New York City Off-Track Betting Corp.*,
    427 B.R. 256 (Bankr. S.D.N.Y. 2010)............................................................................4, 14

*In re Panache Dev. Co., Inc.*,
    123 B.R. 929 (Bankr. S.D. Fla. 1991)...............................................................................15

*In re Sullivan Cnty. Reg'l 1 Refuse Disposal Dist.*,
    165 B.R. 60 (Bankr. D.N.H. 1994) ..........................................................................3, 4, 7, 12

*In re Valley Health Sys.*,
    383 B.R. 156 (Bankr. C.D. Cal. 2008)................................................................................8

*In re Vills. at Castle Rock Metro. Dist. No. 4*,
    145 B.R. 76 (Bankr. D. Colo. 1990) .............................................................................10, 12

*Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*,
    408 B.R. 280 (9th Cir. B.A.P. 2009)...................................................................................8

*Marhsall v. Marshall (In re Marshall)*,
    403 B.R. 668 (C.D. Cal. 2009) ....................................................................................14, 18

NewYork 1628490.4

*Pacific Rim. Invs., LLP v. Oriam, LLC (In re Pacific Rim Inves., LLP),*
    243 B.R. 768 (D. Colo. 2000) ...................................................................................15

*Westamerica Bank v. Mendocino Coast Recreation and Park Dist. (In re Mendocino*
    *Coast Recreation and Park Dist.),*
    Case No. 12-cv-02591, 2013 WL 5423788 (Bankr. N.D. Cal. Sept. 27, 2013) ........................4

STATUTES

11 U.S.C. § 101 .................................................................................................................1

11 U.S.C. § 109(c)(4) .......................................................................................................4

11 U.S.C. § 109(c)(5) ................................................................................................2, 4, 5

11 U.S.C. § 109(c)(5)(A) .................................................................................................2

11 U.S.C. § 109(c)(5)(B) .......................................................................................... passim

11 U.S.C. § 109(c)(5)(C) .......................................................................................... passim

11 U.S.C. § 109(c)(5)(D) .................................................................................................2

11 U.S.C. § 921(c) ......................................................................................................11, 12

11 U.S.C. § 941 ......................................................................................................... passim

28 U.S.C. § 2403(a) ..........................................................................................................1

28 U.S.C. § 2403(b) ..........................................................................................................1

STATE LEGISLATURE

124 Cong. Rec., H 11091 (Daily Ed. Sept. 28, 1978), p. IX-108 ....................................5

MICH. CONST. art. IX, § 24 .......................................................................................11, 13

Pub. L. No. 94-260, 90 Stat. 315, § 84 ........................................................................5, 9

S. REP. NO. 95-989 (1978) ............................................................................................10

OTHER AUTHORITIES

Chris Christoff, *Christie's Will Appraise Detroit Art Institute Collection,*
    BLOOMBERG (Aug. 6, 2013, 6:22 PM) ........................................................................17

Randy Kennedy, *The Agony of Suspense in Detroit: Detroit Institute of Arts Copes With*
    *Threat of Art Selloff*, N.Y. TIMES (Oct. 2, 2013) .......................................................17

ii

Mark Stryker, *Christie's Appraisal Will Reveal Value of Detroit Institute of Arts'*
   *Collection*, DETROIT FREE PRESS (Aug. 18, 2013)...................................................................17

NewYork 1628490.4

## INTRODUCTION

Pursuant to the Bankruptcy Court's First Amended Order Regarding Eligibility Objections, Notice of Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b), dated September 12, 2013 (the "First Amended Order"). The Official Committee of Retirees (the "Committee") hereby files this supplement (the "Supplemental Objection") to the "Objection of the Official Committee of Retirees to Eligibility of the City of Detroit, Michigan to be a Debtor Under Chapter 9 of the Bankruptcy Code," dated September 10, 2013 (Dkt. 805) (the "Objection") contesting the eligibility of the City of Detroit, Michigan (the "City") to be a debtor under Chapter 9 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").

This Supplemental Objection is based upon new facts learned during discovery, including but not limited to the deposition discovery of the Emergency Manager and Mr. Charles M. Moore, a 30(b)(6) witness for the City and a principal of the City's operational restructuring advisor, Conway MacKenzie, Inc. These facts include, but are not limited to, the testimony described in this Supplemental Objection as well as deposition testimony from these and other witnesses that is not specifically cited herein.

Per the Bankruptcy Court's First Amended Order, this Supplemental Objection supplements and supersedes only section II.D (paragraphs 74-77) of the Objection. The Committee does not intend this Supplemental Objection to supersede any other section of the Objection which remains pending. The Committee further reserves its right to rely, at the eligibility hearing, on any and all evidence as may pertain to the subject matter of its Objection, including evidence from depositions other than those specifically referred to herein.

Subject to the foregoing, in support of its Objection, and as and for its Supplement thereto, the Committee states that Section II.D of its Objection is deleted in its entirety and replaced by the following:

NewYork 1628490.4

**D.** **The City Cannot Satisfy Bankruptcy Code Section 109(c)(5) and is Subject to Dismissal Under Bankruptcy Code 921(c).**

      1.    **The City Cannot Meet Its Burden Under 109(c)(5) of Demonstrating That it Negotiated With Creditors in Good Faith or That Negotiations Were Impracticable.**

74.    Section 109(c)(5) requires that a municipal debtor affirmatively establish that it:

(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title. 11 U.S.C. § 109(c)(5).

75.    The City does not assert that it obtained agreement from creditors (Section 109(c)(5)(A)) or that it sought to prevent a preferential transfer (Section 109(c)(5)(D)); instead, the City contends that it satisfied the conditions of Section 109(c)(5)(B) and/or (C) because it purports to have attempted to negotiate with its creditors in good faith and contends that negotiation with creditors was impracticable. However, as set forth below, the City did not in fact meet the requirements of either of those subsections. Specifically: (i) the City failed to meet the requirements of Section 109(c)(5)(B) because did not come forward a plan of adjustment as required by that subsection, and in any event did not engage in good faith negotiations with various unions and retiree associations; and, (ii) the City failed to meet the requirements of Section 109(c)(5)(C) because it never came forward with a plan of adjustment as required by that

subsection as well and has not shown that negotiations with various of the unions and retiree associations were impracticable.

76.     The City bears the burden of proof on showing that it meets the standards set forth in Sections 109(c)(5)(B) and (C).  *In re Sullivan Cnty. Reg'l 1 Refuse Disposal Dist.*, 165 B.R. 60, 79 (Bankr. D.N.H. 1994).  Having failed to meet its burden on eligibility, the City's petition for bankruptcy must be denied.

> a.     The City Cannot Establish That It Negotiated In Good Faith Under Section 109(c)(5)(B)

77.     The City asserts that its June 14th proposal and certain discussion sessions with creditors prior to the Petition Date are sufficient to constitute good faith negotiations under Section 109(c)(5)(B).  However, the City's assertion ignores that, in order to come within the scope of Section 109(c)(5)(B),  the City must show that it put forward a plan of adjustment to be negotiated.  The evidence is undisputed that the City intends to try to use its Chapter 9 filing as a vehicle to impair protected pension rights. Indeed, the City has expressly admitted this in response to a Request for Admission served on it in these proceedings.  At the same time, the evidence also is undisputed that, prior to its filing, the City did not submit an actual plan of adjustment to creditors.  The City's Emergency Manager has admitted that the "proposal to creditors" that it submitted on June 14, 2013 was **not** a plan of adjustment, but was rather a mere "proposal" intended to elicit "feedback" from creditors.  Moreover, even if the City had proposed a plan of adjustment, as more fully set forth in the objections filed by certain Committee members and their affiliated organizations,[1] the City's discussion sessions did not in any event

---

[1]  Certain members of the Committee, including the (i) Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees and (ii) International Union, UAW to the City of Detroit, filed their own objections to the City of Detroit's Eligibility Under Chapter 9 on behalf of their constituents. Other members of the Committee, including (i) Shirley V. Lightsey (Detroit Retired City

4

constitute good faith negotiations because they were merely advisory, did not afford retiree representatives a meaningful opportunity to respond, and in fact presented what discovery has uncovered to be a misleading depiction of both the unfunded pension liability and the funds potentially available to meet it.

      i.      The City Failed To Set Forth A Plan Of Adjustment As Is Required Under Section 109(c)(5)(B)

78.     To meet the requirements of Section 109(c)(5)(B), it is not enough that, prior to filing a bankruptcy petition, a municipality merely "negotiate" in the abstract; rather, Section 109(c)(5)(C) requires that a municipality must, specifically, negotiate over the substantive terms of a proposed bankruptcy "plan of adjustment." *See Westamerica Bank v. Mendocino Coast Recreation and Park Dist. (In re Mendocino Coast Recreation and Park Dist.)*, Case No. 12-cv-02591, 2013 WL 5423788, at *4 (Bankr. N.D. Cal. Sept. 27, 2013) (citing *In re Sullivan*, 165 B.R. at 79; *In re Ellicott Sch. Bldg. Auth.*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992); *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 275-76 (Bankr. S.D.N.Y. 2010)).

79.     The conclusion that Section 109(c)(5)(B) requires a municipal debtor to set forth what is, in substance, a plan of adjustment under Section 941 is supported by both Section 109(c)'s text and legislative history. *See In re Sullivan.*, 165 B.R. at 78 (citing *In re Cottonwood Water and Sanitation Dist,*, 138 B.R. 973, 974 (Bankr. D. Colo. 1992)).

80.     The requirements of Section 109(c)(5) are appropriately read together in conjunction with Section 109(c)(4), which requires that a municipality must "desire[] to effect a plan to adjust [its] debts" to be eligible for Chapter 9. *See e.g.*, *In re Cottonwood*, 138 B.R. at

---

Employees Association), (ii) Robert A. Shinske (Detroit Fire Fighters Association), (iii) Donald Taylor (Detroit Police and Fire Fighters Association) and (iv) Gail Turner (Detroit Police Members Association) are constituents of organizations that filed objections to the City of Detroit's Eligibility Under Chapter 9. The Committee joins in the pre-trial briefs submitted by

NewYork 1628490.4

974 (citing 11 U.S.C. § 109(c)(4)).  The term "plan to adjust [a municipality's] debts is in turn

defined in 11 U.S.C. § 941.  Reading these provisions together, "the concept is that the entity

must desire to effect a 'plan' within the meaning of section 941 and must have negotiated in good

faith concerning that proposed plan." *In re Cottonwood,* 138 B.R. at 975.

81.     The legislative history to Section 109(c)(5) confirms Congress's intent that

Section 109(c)(5)(B) requires a municipal debtor to set forth a plan of adjustment, as prerequisite

to good faith negotiations.  The predecessor statute to Section 109(c)(5) under the Bankruptcy

Act set forth that a debtor must "negotiate[ ] in good faith with its creditors and … fail[ ] to

obtain, ***with respect to a plan of adjustment of its debts***, the agreement of creditors holding at

least a majority in amount of the claims of each class which are claims affected by that plan."

Pub. L. No. 94-260, 90 Stat. 315, § 84 (emphasis added).  When Section 109(c)(5) was enacted

in 1978,[2] Congress expressly indicated that it was intended to follow prior law and that any

changes to the text  were "stylistic" only.[3]  Accordingly, the weight of authority is consistent

with Congress' intent that the current version of Section 109(c)(5)(C) should be construed in the

same way as its predecessor, which expressly stated that a Debtor must negotiate a "plan of

adjustment."

82.     The City admits that it did not propose a plan of adjustment under Section 941 of

the Bankruptcy Code and, therefore, cannot satisfy the "negotiation" requirement of Section

---

these organizations and refers the Court to such briefs for the facts relating to communications
between the City and retiree representatives prior to the petition.

[2] As set forth above, 11 U.S.C. § 109(c)(5)(B) now sets forth that a debtor can satisfy the
negotiation requirement of Section 109(c)(5) if it "has negotiated in good faith with creditors and
has failed to obtain the agreement of creditors holding at least a majority in amount of the claims
of each class that such entity intends to impair under a plan in a case under such chapter…".

[3] 124 Cong. Rec., H 11091 (Daily Ed. Sept. 28, 1978), p. IX-108 (stating with respect to
the 1978 changes that Chapter 9 "follows current law with respect to the adjustment of debts of a

NewYork 1628490.4

109(c)(5)(B). For example, the City's Emergency Manager testified explicitly that the proposal that the City presented to creditors on June 14, 2013 was merely a "proposal," not a plan. The Emergency Manager testified that, as regards the June 14th creditor proposal, "we never called this a plan, we never called this a deal, we always called it a proposal." Deposition of Kevyn Orr, dated September 16, 2013 and October 4, 2013, Case No. 13-53846 ("Orr Dep."), at 271: 18-19.[4] The Emergency Manager further testified that the City does not know whether it will ever present the June 14 proposal as such to the Bankruptcy Court. *Id.* at 279: 6.

83.     The Emergency Manager's concession that at the time of filing the City had only a proposal, and not a plan, is hardly surprising. With respect to pensions in particular, discovery has established that, notwithstanding the City's avowed and admitted intend to cut the retirees' pension rights (discussed further at ¶¶ 102-05 below), the City does not know the true amount of the unfunded pension liability or the scope of the cash flows it has to work with. *See* p. 108-110 below. Likewise, and more generally, as the Emergency Manager presumably understood, it would have been premature to prepare a plan of adjustment when the City lacked information about funds that could be made available to pay its debts through the monetization of existing assets including, but not limited to, the City-owned art maintained at the Detroit Institute of Arts. Orr Dep. at 170:10-172: 18.

84.     Because the City admittedly did not present a plan of adjustment to creditors prior to its July 18, 2013 bankruptcy filing, the City cannot satisfy the eligibility condition set forth in 11 U.S.C. § 109(c)(5)(B).

---

municipality. Stylistic and minor substantive revisions have been made in order to conform this chapter with other new chapters of the bankruptcy code.")

[4] The Kevyn Orr deposition transcript is attached as Exhibit A to the Declaration of Claude D. Montgomery, Esq., dated October 11, 2013, filed in support of this Supplemental Objection. ("Montgomery Dec.").

NewYork 1628490.4

ii.    The City Failed To Negotiate With The Retiree Unions In Good
Faith As Required Under Section 109(c)(5)(B)

85.    Even assuming, *arguendo*, that the City had filed a plan of adjustment under Section 941 (which the Emergency Manager admits it did not), the City still cannot meet its burden under Section 109(c)(5)(B) because the City failed to negotiate in good faith with retiree representatives. As more fully set forth in the objections filed by certain members of the Committee and their affiliated organizations, the City's discussions with creditors were non-interactive, one-way discussions. Such a "take it or leave it" approach cannot satisfy section 109(c)(5)(B). *See In re Ellicott*, 138 B.R. at 979.

86.    Moreover, any purported "negotiations" with unions and retiree associations were not in good faith because the City failed to disclose that, *inter alia*:

(a) the City did not know the amount of the unfunded pension liability; (b) the figures the City cited for high-end actuarial estimates of the unfunded pension liability were in truth founded only on "rough guesses"; and (c) a substantial percentage of the amount the City was representing to be "unfunded" pension liability was in fact allocable not to the City's general fund but instead to individual City agencies or departments that, themselves, had or could raise sufficient cash to cover the required pension contributions. *See* ¶110 below.

87.    The City's lack of good faith in its purported negotiations is further demonstrated by its failure to acknowledge, during its discussions with creditors, that the retirees have rights that are clearly and constitutionally protected under Michigan law. *E.g.*, Orr Dep. at 144: 10-145: 24.

88.    The City's failure to engage in good faith negotiations is shown by the fact that, as the Emergency Manager has admitted, it never provided creditors with information sufficient to allow them to know the actual monetary impact, on creditors, of the cuts the City stated that it

NewYork 1628490.4

wanted to impose, which is a prerequisite for any meaningful discussion. (Orr Dep. at 111:2-19); Deposition of Lamont Satchel, dated September 19, 2013, Case No. 13-53846, at 88:14-89:18.[5]

> b.    The City Cannot Establish That Negotiations Were Impracticable Under Section 109(c)(5)(C)

89.    The City alternatively asserts that good faith negotiations with creditors were not necessary because such negotiations were rendered "impracticable" under section 109(c)(5)(C) by the following four circumstances: (i) the City is a major American city; (ii) the City's creditors are numerous and fragmented; (iii) in many instances, the City was unable to negotiate with representatives with authority to bind creditors; and (iv) the City did not have time to conduct extended creditor negotiations. (Dkt. 14, at 40-53). The City's purported impracticability justifications ignore the clear intent of Congress that Section 109(c)(5)(C) requires that the City both set forth a plan of adjustment[6] and negotiate with impaired creditor classes for which negotiations **are** practicable.

> i.    The City Failed To Set Forth A Plan Of Adjustment As Required Under Section 109(c)(5)(C)

90.    Like Section 109(c)(5)(B), Section 109(c)(5)(C) requires that a municipal debtor put forward a plan of adjustment under Section 941 of the Bankruptcy Code as a prerequisite to assessing whether good faith negotiations are practicable.

91.    Congress' intent in this respect is clear from Section's 109(c)(5)(C)'s legislative history. As noted above, in 1976, Congress modified the requirement that a municipal debtor

---

[5] The deposition transcript of Lamont Satchel is attached as Exhibit C to the Montgomery Dec.

[6] The Committee recognizes that other bankruptcy courts have decided this issue differently. *E.g. Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280 (9th Cir. B.A.P. 2009); *In re Valley Health Sys.*, 383 B.R. 156, 161-62 (Bankr. C.D. Cal. 2008). None of those decisions is binding upon this court. Moreover, the Committee submits that its interpretation of Section 109(c)(5)(C) is textually accurate and in accordance with Congress's specific intent as reflected by legislative history.

9

must receive 51% creditor consent as a condition of eligibility. The creditor consent requirement

was replaced with the following four prong eligibility test:

> "An entity is not eligible for relief under this chapter unless:
>
> …
>
> (1) it has successfully negotiated a plan of adjustment of its debts with creditors holding at least a majority in amount of the claims of each class which are claims affected by that plan;
>
> (2) it has negotiated in good faith with its creditors and has failed to obtain, with respect to a plan of adjustment of its debts, the agreement of creditors holding at least a majority in amount of the claim of each class which are claims affected by that plan;
>
> (3) such negotiation is impracticable; or
>
> (4) it has a reasonable fear that a creditor may attempt to obtain a preference."

Pub. L. No. 94-260, 90 Stat. 315, § 84. The third prong of the test that "**such negotiation** is

impracticable" (emphasis added) necessarily referred back to and incorporated the antecedent

good faith negotiation clause in the preceding subsection (2), which specifically contemplated

negotiation with each class of claims affected by a **plan of adjustment**. *See* discussion at p. 6

above. As set forth above, the post-1976 amendments to subsection (3), now codified in the

form of present Section 109(c)(5)(C), were merely "stylistic" and intended to remain consistent

with prior law. Thus, Congress intended that, in accordance with its predecessors, Section

109(c)(5)(C) requires that a municipal debtor first present a plan of adjustment.

92. As set forth in §§ 82-84 above, the City admits that it did not propose a plan of

adjustment under Section 941 of the Bankruptcy Code. Therefore, it cannot satisfy the

"impracticability" criterion of Section 109(c)(5)(C).

NewYork 1628490.4

ii.   The City Also Fails Under Section 109(c)(5)(C) Because It
      Did Not  Negotiate With Retiree Representatives

93.    Even if a plan of adjustment were not required for an "impracticability" finding

under Section 109(c)(5)(C), the City cannot establish "impracticability" because it failed to

negotiate with representatives of the retirees, a class of creditors for which negotiation was

practicable.  Section 109(c)(5)(C) only excuses a debtor from negotiating with those individual

classes of impaired creditors for which good faith negotiation would be impracticable; it does not

eliminate the requirement that the City negotiate in good faith with classes of creditors with

which negotiation **is** practicable.  *See In re the City of Wellston*, 42 B.R. 282, 285 (Bankr. E.D.

Mo. 1984) (stating that "the Bankruptcy Code anticipates that a municipality will have attempted

to negotiate in good faith with its creditors prior to the filing of a Chapter 9 petition"); *see also In

re Vills. at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) (eligibility

upheld where debtor showed on a class by class basis either good faith negotiation or

impracticability).

94.    Section 109(c)(5)'s legislative history confirms that the eligibility test set therein

is intended to require a Debtor to negotiate in good faith to the extent practicable.  In discussing

enactment of Section 109(c), which as set forth above only made "stylistic" changes to the

predecessor Bankruptcy Act provision, Senator DeConcini stated, without qualification, that the

"creditor protection provision, requiring a municipality to attempt a good faith negotiation with

its creditors before a petition is filed, is retained."  S. REP. NO. 95-989, at 8-9 (1978).

95.    The City cannot meet its burden under Section 109(c)(5)(C) because it cannot

show that negotiations with associations representing the retiree class of creditors were

impracticable or that negotiations with unions were impracticable.  For example, although the

City has not put forward a plan of adjustment, the economic rights and interests of retiree claims

NewYork 1628490.4

are clearly distinct from other creditors in that, at a minimum, retiree claims are protected from impairment by the Constitution of the State of Michigan. MICH. CONST. art. IX, § 24. Further, in its course of dealings following the June 14 proposals, the City itself treated retiree organizations and unions separately and distinctly, holding separate meeting and discussions apart from discussions with other creditors. Recognizing the distinct rights and interests of the retiree creditors in particular, this Court ordered the appointment of an Official Committee of Retirees.

96. Notwithstanding the City's conclusory assertions, at least two retiree associations, constituting the natural representatives of retiree creditors, stood ready, willing and able to negotiate with the City. (Dkt. 497 at ¶¶ 69-72). The City never pursued or even allowed good faith negotiations with those organizations. *Id.* at ¶ 71. Having failed to attempt good faith negotiations with a ready and willing creditor class, the City cannot demonstrate that negotiations were "impracticable" under 11 U.S.C. § 109(c)(5)(C).

> 2. **The City Cannot Meet Its Burden Under 921(c) of Demonstrating That It Filed Its Chapter 9 Petition In Good Faith**

97. Cause for dismissal pursuant to 11 U.S.C. § 921(c) exists for two reasons. First, cause exists because the Emergeny Manager admittedly commenced these proceedings with the purpose of "trumping" the Michigan Constitution, which the Emergency Manager and the Governor swore to uphold, by using Chapter 9 as a vehicle to impair constitutionally protected pension benefits. Second, cause exists because of the City's misrepresentations concerning the magnitude of the City's underfunded pension obligations and its ability to meet them.

NewYork 1628490.4

a. The Chapter 9 Petition Was Not Filed in Good Faith Because The Emergency Manager Intends to Use Chapter 9 to Impair Pension Obligations in Violation of His Duty to Uphold the Michigan Constitution, Which Prohibits Such Impairment

98. Section 921(c) of the Bankruptcy Code requires that a petition be filed in good faith. Specifically, it provides that "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor *did not file the petition in good faith* or if the petition does not meet the requirements of [the Bankruptcy Code]." 11 U.S.C. § 921(c) (emphasis added). The City bears the burden of demonstrating that it filed its petition in "good faith." *In re City of Bridgeport*, 129 B.R. 332, 334 (Bankr. D. Conn. 1991) (holding that the City failed to meet its burden of proving insolvency). The essence of the good faith requirement is to "prevent abuse of the bankruptcy process." *Vills. at Castle Rock*, 145 B.R. at 81. Under 921(c) dismissal is warranted if the filing is "at odds with the legislatively intended scope of the chapter involved." *In re Sullivan*, 165 B.R. at 81.

99. The prepetition actions of the Emergency Manger indicate that at all times since his appointment the City was on a path careening towards a Chapter 9 filing in order to impair pension benefits in violation of the Michigan Constitution. Both the Governor and Emergency Manager evidenced a desire to achieve a result that they knew was unconstitutional as a matter of Michigan law. Even before his appointment as Emergency Manager, Mr. Orr put in writing his views that the planning for a chapter 9 proceeding was a "run around" the Michigan Constitution and the repeal of PA 4, which had been crafted with the intent of impairing retirement compensation due to retired municipal employees. *City of Pontiac Retired Emps. Ass'n. v. Schimmel*, No. 12-2087, 2013 WL 4038582, at *3 (6th Cir. Aug. 9, 2013). The Emergency Manager's June 14, 2013 City Proposal specifically stated "there *must be significant cuts in*

*accrued, vested pension amounts for both active and currently retired persons.*" (Dkt. 11, Ex. A at 116) (emphasis added).

100.    The Emergency Manager's deposition testimony makes clear that the he specifically intended to use the City's Chapter 9 filing to avoid its constitutional obligations to protect accrued pension benefits.  He testified that he had read Article IX, Section 24 of the Michigan Constitution (the "Pension Clause") prior to becoming Emergency Manager.  Orr Dep. at 69:16-70:2.  Orr further testified that the language of the Pension Clause is unambiguous and speaks for itself.  *Id.* at 51: 25- 52: 17.  The Emergency Manager admitted that using Chapter 9 to trump the Pension Clause of the Michigan Constitution, Article IX, Section 24 to impair pension benefits was one of his "objectives" in filing the City's Chapter 9 petition and that it was this specific provision of the Michigan Constitution, and no other provisions of Michigan law, that he was seeking to trump.  *Id.* at 113: 13 - 114: 23.  He stated that impairing the pension rights referred to in Article IX, Section 24 of the Michigan Constitution was, in his view, a necessary part of any restructuring plan.  *Id.* at 322: 3-7.  He was unaware of any court decision upholding the use of Chapter 9 to "trump" a state constitution and was aware, at a minimum, that the Michigan Attorney General believed that the course of action he was charting was contrary to Michigan law.  *Id.* at 415: 13-22.

101.    The ability to impair pensions was both a motivation for, and also a "but for" of, the Chapter 9 filing.  The Emergency Manager testified that he would have had no alternative plan had the Governor made a filing contingent upon the preservation of pension benefits.  *Id.* at 120: 1-5.  He did not recall that there was any analysis done of how to impair pensions outside a bankruptcy context and purely as a matter of state law.  *Id.* at 87: 8-11.  As of June 14, other than a consensual chapter 9 filing, the City had not identified any other manner of implementing the Emergency Manager's proposal to cut pension benefits.  *Id.* at 112: 21 - 113: 2.  At the time of

the Chapter 9 filing, the Emergency Manager believed that there would have to be "significant cuts" in pension benefits. *Id.* at 247: 1-7. The City's proposed plan will cease pension contributions for current retirees. *Id.* at 128: 9-11.

102. The Emergency Manager also stated that to the "best of [his] knowledge," there was no particular reason that the Chapter 9 petition was filed in the afternoon of July 18th, other than to file the petition before the commencement of a TRO hearing being held in the Michigan Circuit Court in which the legitimacy of PA 436 was being challenged, in order to get a jump on the expected decision by the Circuit Court. *Id.* at 125: 24-127: 4. He further admitted that notwithstanding the Circuit Court's ruling that PA 436 is unconstitutional, he has not taken any steps to withdraw the bankruptcy petition from filing. *Id.*

103. The Emergency Manager's testimony clearly demonstrates that he commenced Chapter 9 proceedings with the specific intent to impair constitutionally protected pension obligations. constitutes cause for dismissal. Here, the Emergency Manager consciously and deliberately not only disregarded but sought, through the specific vehicle of a Chapter 9 filing, the Michigan constitutional proscriptions under the Pension Clause. As a result, the Chapter 9 petition cannot be deemed to have been filed in good faith and dismissal is therefore warranted.

        b.     The Chapter 9 Petition Was Not Filed in Good Faith Because the City's Assertions Regarding the Amount of its Underfunded Pension Obligations Were Untrue, Misleading or Made Without a Reasonable Basis.

104. In determining whether a petition was filed in good faith courts also look "to whether the debtor misrepresented facts in the petition." *Marhsall v. Marshall* (*In re Marshall*), 403 B.R. 668, 692 (C.D. Cal. 2009).[7] A debtor's "honesty and candor" are factors in determining

---

[7] "Good faith" is not defined in Chapter 9. As a result, bankruptcy courts look to the Chapter 11 good faith requirements for guidance in determining whether a Chapter 9 Petition has been filed in good faith. *See, e.g., In re New York City Off-Track Betting*, 427 B.R. at 278-79;

whether a petition is filed in good faith. *See*, *e.g.*, *Pacific Rim. Invs., LLP v. Oriam, LLC (In re Pacific Rim Inves., LLP)*, 243 B.R. 768, 773 (D. Colo. 2000); *see also In re Joyce, Don & Assoc.'s Inc.*, No. 6:07-bk-04878-ABB, 2008 WL 343265, at *3 (Bankr. M.D. Fla. Jan. 30, 2008) (court dismissed chapter 11 petition in part due the debtor's vice president's "lack of candor in his testimony"); *In re Panache Dev. Co., Inc.*, 123 B.R. 929, 932-33 (Bankr. S.D. Fla. 1991) (misstatements and omissions in debtor's schedules constituted "cause" for dismissal of Chapter 11 petition). Such misrepresentations and omissions were made here.

105.    Mr. Orr filed a Declaration in support of the Chapter 9 Petition. In it, he states, as an objective fact, that the City has approximately "$3.5 billion in underfunding pension liabilities." (Dkt. 11 at p. 6 n.3). This statement followed the Emergency Manager's prior representation to the Governor, made in the a letter of July 16, 2013, also attached to his Declaration, that the City has "$3.5 billion in underfund[ed] pension liabilities based on most recent actuarial estimates." (Dkt. 11, Ex. J, at 2). Similar representations have been made by the Emergency Manager in briefs filed by him in this Court. (Dkt. 14, at 2). In his June 14, 2013 proposal to creditors, attached to his Declaration, the Emergency Manager stated that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." (Dkt 11, Ex. A at 109).

106.    Deposition discovery has revealed that the Emergency Manager's representations about the magnitude of the City's unfunded pension liability, and its ability to meet that liability, were untrue or, at a minimum, made without any reasonable basis. Charles Moore, a principal of Conway MacKenzie, Inc., the City's restructuring advisor, and a 30(b)(6) witness for the City,

---

*see*, *e.g.*, *In re McCurtain Mun. Auth.*, No. 07-80363, 2007 WL 4287604, at *4 (Bankr. E.D. Okla. Dec. 4, 2007) (chapter 11 good faith standards applied to determine whether chapter 9 petition was filed in good faith); *In re Cnty. of Orange*, 183 B.R. 594, 608 (Bankr. C.D. Cal.

NewYork 1628490.4

has testified that, contrary to the Emergency Manager's representations, there has been no reliable actuarial analysis placing the City's unfunded pension liability at $3.5 billion. Transcript of Deposition of Charles Moore, dated September 18, 2013, Case No. 13-53846 ("Moore Dep."), at 61: 18-25; 1-7.[8] In fact, Mr. Moore testified that as of September 18, 2013, two months after the petition was filed, the actuarial firm retained by the City, Milliman, Inc. ("Milliman"), had not completed its actuarial analysis of the unfunded pension liabilities and did not even have the information required to undertake such an analysis. *Id.* Mr. Moore further testified that, for this reason, the City did not know the actual size of the unfunded pension liability. *Id.* at 150: 24-151: 24. Mr. Moore added that the City did not in fact know what assets were available to pay pensions. *Id.* Further, Glenn Bowen of Milliman, the City's actuary, testified that the figures the City has cited for the high-end estimates of unfunded pension liability were predicated only on "rough guesses." Transcript of Deposition of Glenn Bowen, dated September 24, 2013, Case No. 13-53846, at 146:8-18.[9] Similarly, Treasurer Andy Dillon testified in his deposition (transcript not yet available) that the actual size of the underfunded pension liability was not known. Deposition of Andy Dillon, dated October 10, 2013, Case No. 13-53846, at 108: 15-19.[10]

107. Related to the above, during his deposition the Emergency Manager acknowledged that the City has numerous assets that could be monetized to provide additional cash and that he was exploring ways to achieve monetization. Orr Dep. at 170: 10-21 (art

---

1995) (observing that "courts have ... applied to chapter 9 cases the judicial reasoning that developed in chapter 11 cases" regarding good faith).

        [8] The Moore deposition transcript is attached as Exhibit B to the Montgomery Dec.

        [9] The deposition transcript of Glenn Bowen is attached as Exhibit E to the Montgomery Dec.

        [10] The deposition transcript of Andy Dillon is attached as Exhibit D to the Montgomery Dec.

NewYork 1628490.4

collection of Detroit Institute of Arts); 174: 10-20 (Detroit Water & Sewer Department) ("DWSD"); 183: 19- 184: 10 (City-owned land).  For example, the City-owned art that is maintained at the Detroit Institute of Arts has been estimated in press reports as being worth billions of dollars.[11]  However, none of these potential cash infusions were factored into the City's assessment of whether it could meet is underfunded pension liabilities (which would not be payable until some time in the future), or indeed its liabilities in general.   *Id.*, 166: 12-24.

108.    In addition, in the June 14th Creditor Proposal, attached to Mr. Orr's Declaration, the Emergency Manager represented that the unfunded pension liability calculated under the actuarial valuation done in 2011 (which the City believes was understated) was approximately $644 million. (Dkt. 11, Ex. A at 23).  However, during his deposition Mr. Orr testified that only $250 million of that $644 million total was allocable to the City and its general fund and that the approximately $450 million balance was allocable to other City funds or Departments, such as the Detroit Water and Sewerage Department ("DWSD").  Orr Dep. at 369: 12- 375: 7.  The Emergency Manager further testified that the DWSD in fact bears financial responsibility for a substantial portion of the $644 million total (which the Emergency Manager testified at his deposition was on the order of 62%), and that the DWSD, which is run as an independent department, is financially sound and has the ability to pay its share of the pension obligations.

---

[11] *See, e.g.,* Mark Stryker, *Christie's Appraisal Will Reveal Value of Detroit Institute of Arts' Collection*, DETROIT FREE PRESS, (Aug. 18, 2013),
http://www.freep.com/article/20130818/ENT05/308180068/dia-detroit-bankruptcy-art-christie-s (art has a value of "at least $10 billion to $20 billion); Chris Christoff, *Christie's Will Appraise Detroit Art Institute Collection*, BLOOMBERG, (Aug. 6, 2013, 6:22 PM),
http://www.bloomberg.com/news/2013-08-06/christie-s-to-appraise-detroit-art-institute-s-holdings.html (collection may be worth at least $2.5 billion); Randy Kennedy, *The Agony of Suspense in Detroit: Detroit Institute of Arts Copes With Threat of Art Selloff*, N.Y. TIMES, (Oct. 2, 2013) (collection could be worth "more than $2 billion").

NewYork 1628490.4

Orr Dep. at 377: 21-378: 22; HT, 479: 13-22.[12]  The Emergency Manager further testified that, if the unfunded pension liability were subsequently determined to be more than $644 million, including as much as $3.5 billion, these same principles -- that DWSD would be responsible for its ratable share of the increased amount --  would continue to apply.  *Id.* at 377: 21-378: 22. Thus, the facts are that a very significant portion of the City's asserted unfunded pension liability is allocable to source that has the financial wherewithal to meet it.  However, none of this was disclosed in the Petition or made known to the City's creditors, including the retirees whose pension rights the City is threatening to eliminate entirely.

109.    As apparent from the above, in filing its Petition, the City made representations that were incomplete, misleading or outright false.  The City has not acted with good faith, and its   petition   therefore   be   dismissed.    *See In re Marshall*, 403 B.R. at 692.

---

[12] Mr. Orr further testified that "some portion" of total unfunded other post-employment benefits ("OPEB") might be allocable to DWSD, but he did not recall the percentage.  HT, 480: 10 - 481 - 22.

NewYork 1628490.4

Dated:     October 11, 2013
           New York, New York


Carole Neville                  Sam J. Alberts                  By: /s/ Claude D. Montgomery
DENTONS US LLP                  DENTONS US LLP                  Claude D. Montgomery (P29212)
1221 Avenue of the Americas     1301 K. Street, NW              DENTONS US LLP
New York, New York 10020        Suite 600, East Tower           1221 Avenue of the Americas
Tel:  (212) 768-6700            Washington, DC 2005-3364        New York, New York 10020
Fax:  (212) 768-6800            Tel:   (202) 408-6400           Tel:          (212) 768-6700
carole.neville@dentons.com      Fax:   (202) 408-6399           Fax:          (212) 768-6800
                                sam.alberts@dentons.com         claude.montgomery@dentons.com

Matthew E. Wilkins (P56697)
Paula A. Hall (P61101)
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan  48009
Direct: (248) 971-1711
Cell: (248) 882-8496
Fax: (248) 971-1801
wilkins@bwst-law.com
hal@bwst-law.com


*Counsel for the Official Committee of Retirees*

**CERTIFICATE OF SERVICE**

I, Claude D. Montgomery, hereby certify that service of the Supplemental Objection of the Official Committee of Retirees to Eligibility of the City of Detroit, Michigan to be a Debtor Under Chapter 9 of the Bankruptcy Code was filed and served via the Court's electronic case filing and noticing system on October 11, 2013.

/s/ Claude D. Montgomery

NewYork 1628490.4