UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,      .      Docket No. 13-53846
        MICHIGAN,             .
                              .      Detroit, Michigan
                              .      October 8, 2013
                    Debtor.   .      9:00 a.m.
. . . . . . . . . . . . . . .


EVIDENTIARY HEARING RE. AMENDED MOTION OF CREDITOR
DEBORAH RYAN, AN INTERESTED PARTY, FOR RELIEF FROM
THIS COURT'S ORDER STAYING PROCEEDINGS
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:      Miller, Canfield, Paddock & Stone, PLC
                     By:  ERIC D. CARLSON
                          TIMOTHY A. FUSCO
                     150 West Jefferson, Suite 2500
                     Detroit, MI  48226
                     (313) 963-6420


For Deborah Ryan:    Goodman & Hurwitz, P.C.
                     By:  WILLIAM H. GOODMAN
                     1394 East Jefferson Avenue
                     Detroit, MI  48207
                     (313) 567-6170


For the Detroit      Erman, Teicher, Miller, Zucker &
Fire Fighters          Freedman, P.C.
Association, the     By:  BARBARA A. PATEK
Detroit Police       400 Galleria Officentre, Suite 444
Officers Associa-    Southfield, MI  48034
tion and the         (248) 827-4100
Detroit Police
Lieutenants &
Sergeants
Association:

```
Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1    THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3    THE COURT:  Good morning.  Appearances, please.

4    MR. CARLSON:  Good morning, your Honor.  Eric

5  Carlson from Miller Canfield on behalf of the City of

6  Detroit.

7    MR. GOODMAN:  William Goodman appearing with my

8  partner, Julie Hurwitz, on behalf of Deborah Ryan.

9    MR. FUSCO:  Timothy Fusco, Miller Canfield, on

10  behalf of the City of Detroit.

11    MS. PATEK:  Your Honor, Barbara Patek on behalf of

12  the Police Lieutenants & Sergeants Association and the Police

13  Command Officers Association.

14    THE COURT:  Okay.  Thank you.  Can we go straight to

15  our testimony and waive further opening arguments?

16    MR. CARLSON:  That's fine with the city, your Honor.

17    MR. GOODMAN:  Okay.

18    THE COURT:  Okay.  Let's do that then.

19    MR. CARLSON:  Good morning, your Honor.  Again, for

20  the record, Eric Carlson, Miller Canfield, on behalf of the

21  City of Detroit.  I would like to call as the city's witness

22  Mr. Edward Keelean.

23    THE COURT:  What's the last name, sir?

24    MR. CARLSON:  Keelean.

25    THE COURT:  All right.  Step forward, please, sir.

1    Before you take your seat, please raise your right hand.

2                EDWARD KEELEAN, DEBTOR'S WITNESS, SWORN

3                THE COURT:  Please sit down right there.  And you

4    may proceed.

5                MR. CARLSON:  Thank you, your Honor.

6                               DIRECT EXAMINATION

7    BY MR. CARLSON:

8    Q    Good morning, Mr. Keelean.

9    A    Good morning.

10   Q    Could you please state your full name for the record?

11   A    Full name is Edward Victor Keelean.

12   Q    And could you describe for the Court your educational

13   background, please?

14   A    I have four years in the U.S. Navy, a high school degree,

15   four years -- graduate of CMU, and three years of law school

16   at Wayne State University graduating in 1978.

17   Q    Thank you.  And your Bar admissions?

18   A    I was admitted to the Bar in November of 1978.  I'm

19   admitted to the Federal Bar here and the Sixth Circuit Bar,

20   Wayne County, City of Detroit, et cetera, et cetera.

21   Q    Okay.  And your place of employment currently?

22   A    I am currently employed as the deputy corporation counsel

23   for the City of Detroit Law Department.

24   Q    And so your official title is again?

25   A    Deputy corporation counsel.

1　Q　And have you held any other positions at the city in the

2　past?

3　A　I started out with the city in November 2001 as a senior

4　assistant corporation counsel.  I was selected as the deputy

5　corporation counsel in February of 2009.  From January the

6　8th until July the 1st of this year, I was the acting

7　corporation counsel at the point in time when we had no

8　appointed corporation counsel, and I'm still deputy

9　corporation counsel today as I sit here.

10　Q　Thank you.

11　　　　MR. CARLSON:  Your Honor, the city has a proposed

12　exhibit.  May I approach the witness?

13　　　　THE COURT:  Yes.

14　BY MR. CARLSON:

15　Q　Mr. Keelean, do you recognize this document?

16　A　I do.

17　Q　Was it prepared at your direction?

18　A　It was.

19　Q　Can you describe what it is, please?

20　A　It is an organization chart dated August 27th, 2013,

21　which sets forth in the various rectangles on the chart the

22　organization of the City of Detroit Law Department.  It has

23　the practice areas along with the supervisors of every

24　practice area.  It has the individuals by name and their

25　capacities.  It also has rectangles for the various vacancies

1    that we have.  I believe there are 96 rectangles on this
2    chart of which there are actual persons in 82 of those
3    rectangles.
4    Q   Thank you.
5            MR. CARLSON:  Your Honor, at this time I'd move to
6    have this admitted as City Exhibit A.
7            THE COURT:  Any objections?
8            MR. GOODMAN:  No objection, your Honor.
9            MR. CARLSON:  May I approach?
10           THE COURT:  It is admitted.
11       (Exhibit A received at 9:04 a.m.)
12   BY MR. CARLSON:
13   Q   Looking back at the chart, Mr. Keelean, approximately how
14   many attorneys are represented on that chart as employees and
15   attorneys for the City of Detroit?
16   A   At present there are 50 attorneys.  I've numbered them
17   just to be sure.  We have a budget for 58, but only 50 are
18   actually filled at the present time.
19   Q   So just to clarify, it's your testimony that you're not
20   fully staffed at this point?
21   A   Correct.
22   Q   Okay.  Has the understaffing of the city law department
23   affected the city's ability to handle its caseload in the
24   past?
25   A   Absolutely.

1  Q   What steps does the city take to deal with overload of

2  caseload?

3  A   Well, over the last two years principally we've lost a

4  host of senior litigators and senior attorneys, so we have

5  made every effort to add new people, which has been very

6  cumbersome, very slow, and very -- of limited success, and

7  also to reallocate the resources among the various portions

8  of our organization into the high-intensity areas, which are

9  litigation traditionally, and beginning in December and

10  January, most recently, we were forced to seek outside

11  counsel to handle several high-profile, high-impact, high-

12  risk cases because we just didn't have the senior staff in-

13  house to take care of them.

14  Q   Thank you.  So turning now -- looking at the chart, can

15  you -- let's talk about your position within this department.

16  The chart represents, as you described earlier, I believe,

17  eight different divisions.  Is that correct?

18  A   Well, seven practicing law divisions, and then the

19  financial management unit is a staff support function.

20  That's the one almost directly under the corporation

21  counsels.

22  Q   Okay.  And you oversee, based on this chart, all of those

23  divisions?

24  A   I do, along with the corporation counsel.

25  Q   What type of oversight does that entail?

1  A    Every aspect of the practice of the city law department.

2  I mean there is nothing that doesn't cross our desks

3  eventually, although obviously we have some quality people in

4  the supervisory ranks that take care of the day-to-day

5  mundane stuff, but ultimately the decisions that need to get

6  made come to either Portia Roberson, the current corporation

7  counsel, or me or both.

8  Q    Okay.  So in your position as deputy corporate counsel,

9  are you obligated to maintain familiarity with the cases

10  being handled by your subordinates?

11  A    Absolutely, but as a -- on a level of detail that's not

12  nearly as informed as the individuals handling the cases.

13  Q    So you would be familiar generally with tort cases, for

14  instance?

15  A    Yes.

16  Q    Okay.  As represented by the chart, maybe you can

17  describe for the Court out of the 50 attorneys or so that you

18  described previously, how many of those attorneys fall within

19  tort litigation divisions?

20  A    Essentially, the two branches to the right of the

21  chart -- there's one segment that's entitled "litigation,"

22  which is supervised by Krystal Crittendon, and then there's

23  another branch to the right of that, which is C&T, which

24  stands for commercial and tort litigation, supervised by Jim

25  Noseda, and we had to combine that branch, commercial and

1  tort, in order to serve the demands of our caseload and the
2  diminishing number of senior staff, so Mike Muller, for
3  example, who's representing the city in the case we're
4  talking about today, is in the commercial and tort litigation
5  team.  At sometime prior -- a couple years ago, I think -- he
6  was under the litigation branch but moved over for reasons
7  that I won't go into, but it was basically trying to
8  reallocate resources.  However, with the number of people
9  we've lost, Mike had to step up and do a lot more of the tort
10 litigation than he had done for the 12 months prior.
11 Q   So just to clarify, how many are -- how many attorneys
12 specifically are litigation or tort --
13 A   I think I counted yesterday the supervisors are expected
14 to maintain about a half of their activity as managing of
15 cases, so you count the two of them together as one.  I think
16 it ends up being about 17 or 18 litigators.
17 Q   Okay.
18 A   However, I encompassed in there some of the labor and
19 employment litigation, which there's about four or five over
20 there, so 12 or 13 if you want to talk about tort litigation
21 truly.
22 Q   So out of the 17 or 18 you described, are there varying
23 levels of abilities?
24 A   Oh, absolutely, and it's -- we have some excellent
25 assistant corporation counsels, which are generally the entry

1  level and the less experienced.  We have some excellent

2  ACC's.  However, the senior ACC's, such as Mr. Muller, are

3  ones that have been around the block enough times and have a

4  higher level of familiarity with the type of cases that we're

5  talking about today and are experienced enough to manage a

6  very demanding litigation.

7  Q   We're here today on a motion filed by Deborah Ryan

8  seeking relief from stay based upon a case that Ms. Ryan

9  filed against the City of Detroit.  Are you familiar with

10 that case?

11 A   I am.

12 Q   Can you describe for me your understanding with respect

13 to the issues and the overall complexity of that case?

14 A   It is what we call generally a Section 1983 litigation

15 based on alleged violations of the Constitution by the City

16 of Detroit and by Canton Township based on a very tragic

17 event in Canton where two Detroit police officers were caught

18 up in a murder suicide, and the claims by the plaintiffs

19 involve gross negligence claims under state law and also

20 violations of the U.S. Constitution based on equal protection

21 and the like, so it's -- it is a extremely difficult case for

22 a lot of reasons, and it demands a lot of activity and a lot

23 of attention.  That's why we've assigned it to one of our

24 senior -- most senior litigators.

25 Q   So you described previously out of the 17 or 18

1  litigators, there's varying degrees of ability.  How many
2  litigators would you say, in your position as the responsible
3  person for these staff members, would have the capability or
4  the experience that the city would give them this level of
5  case?
6  A   At the risk of offending some of my colleagues, I would
7  suggest that Mr. Muller, Mr. Gaabo, Mr. Ashford would be the
8  three go-to people for cases of this type.  Mr. Bailey could
9  handle it as well if pressed into service, but I would prefer
10 it go to one of the three I just named.
11 Q   Okay.  So three, maybe four.  Okay.
12 A   Um-hmm.
13 Q   Do you normally keep track or in your position are you
14 normally aware of how many cases are currently pending
15 against the City of Detroit at any one given time?
16 A   Yeah, in a very broad sense.  We are routinely -- or have
17 been routinely required to prepare a quarterly report to the
18 financial advisory board, which lists some broadly defined
19 open matters and claims and things of that nature, so yes.
20 Q   Okay.  And do you, based upon that knowledge, in your
21 position have any idea roughly how many cases were pending
22 against the city on the date the city filed bankruptcy?
23 A   In terms of litigation matters as we talk about
24 litigation, I think it's in the neighborhood of 500.  Again,
25 it's a little bit elusive trying to figure out what an open

1  matter is because there's a long shelf life of typical

2  litigation matters.  If often takes months for cases that

3  have been settled, for all practical purposes, to be closed

4  out because of the cumbersome settlement process we

5  undertake, and so Mr. Ashford, for example, because of the

6  filing, I'm pretty sure he had right around 55 or so cases,

7  some of them in very intense discovery and typical

8  litigation, others of them waiting to be concluded, others of

9  them just warming up.  Mr. Muller has a lower number, but

10 some of his cases are all-consuming, so it's a broad range,

11 but on average probably 50 cases per senior litigator.

12 Q   So on the date the debtor filed bankruptcy, the debtor --

13 were you helpful in preparing any of the debtor's schedules?

14 A   Well, I guided Ernst & Young and Jones Day to our

15 software program, which accumulates that data on a daily

16 basis.

17 Q   Schedule G represented that there were approximately 700

18 cases against the city at the date of filing.  Is there any

19 justification for you saying 500 versus 700?  Can you explain

20 the discrepancy maybe?

21 A   Well, I looked through Schedule G, and it encompasses

22 some cases and claims, so I was more comfortable with

23 projecting a four or 500 range, 500 range as being cases that

24 are actually -- something happening or something has got to

25 get done before they're officially closed.

1  Q   Um-hmm.

2  A   Some of the matters on Schedule G were not as active as I

3  would consider to be for open litigation.

4  Q   Okay.

5          THE COURT:  Excuse me.  What is Schedule G?

6          MR. CARLSON:  There was a schedule that we

7  referenced in our papers, your Honor, that the city filed

8  that was a list of the open matters against the City of

9  Detroit, pending litigation.

10          THE COURT:  And when and in -- when was that?

11          THE WITNESS:  That was attached to the original

12  bankruptcy filing, if I understand it.

13          MR. CARLSON:  Yeah.

14          THE COURT:  So attached to the petition itself --

15          MR. CARLSON:  Yeah.

16          THE COURT:  -- was a Schedule G?

17          MR. CARLSON:  I believe it was attached to the

18  petition.  I have a copy if the Court would like one.

19          THE COURT:  Any objection, Mr. Goodman?

20          MR. GOODMAN:  No objection.

21          THE COURT:  All right.

22          MR. CARLSON:  You would like a copy?

23          THE COURT:  Please.

24          MR. CARLSON:  May I approach?

25          THE COURT:  Yes, please.

1          MR. GOODMAN:  Your Honor, I assume that Mr. Carlson

2    will make a copy of that available to us at some point, so --

3          MR. CARLSON:  Absolutely.

4          THE COURT:  All right.

5          MR. CARLSON:  I don't have an extra copy.

6          MR. GOODMAN:  I don't get to cross-examine the

7    witness with my blistering questions based upon it?

8          MR. CARLSON:  Unless the Court would like to take a

9    recess, and we can make a copy of it.

10          THE COURT:  We can all share this one.

11          MR. CARLSON:  Okay.

12          MR. GOODMAN:  Thank you, your Honor.

13          THE COURT:  For what it's worth to you, I don't know

14    that it makes any difference, but I am looking at the

15    original petition here on line, and this is not attached to

16    it.

17          MR. CARLSON:  Okay.

18          THE WITNESS:  I believe it was included in a

19    supplemental attachment or -- about two weeks after the

20    initial petition was filed they then filed a whole revised

21    list of schedules.  As I recall, there was a problem

22    initially with the data that was included --

23          THE COURT:  You're talking -- yeah.  You're talking

24    about the list of creditors.

25          THE WITNESS:  Possibly.

1      THE COURT:  Okay.  All right.

2      MR. CARLSON:  And I'm sorry I don't have the docket

3  number for you.  I should have written down the docket number

4  for you.

5      THE COURT:  I can find it now that I know what

6  you're referring to, so let me return this to you.  Chris,

7  counsel can use that.  Okay.  Just give me one second,

8  please.

9      MR. CARLSON:  Sure.

10      THE COURT:  No.  That's not it either.  One more

11  second, please.  Okay.  I think I have found it.  Okay.  So I

12  think what you are referring to, just so the record is

13  crystal clear here, is Docket Number 258 filed August 1st,

14  which is the amended list of creditors, and there is a

15  Schedule G here.  Let me find that.  Hold on.  Yes.  That's

16  it.  Okay.  So you may proceed.  I have that list here on my

17  computer.

18      MR. CARLSON:  Thank you, your Honor.

19  BY MR. CARLSON:

20  Q   Mr. Keelean, out of the 500, 700 we've established, I

21  think that it's a somewhat moving number depending on how you

22  define active cases, I guess.  How many of those cases,

23  roughly, in your estimation, in your position as deputy

24  corporation counsel, are assigned to the 17 or 18 litigators

25  in the tort divisions?  Do you have any feel for that number?

1  A   It's probably 70 percent in very round figures --

2  Q   Okay.

3  A   -- 70 percent of that number.

4  Q   Seventy percent of the number?  Okay.  Let's turn, if we

5  could, to the bankruptcy filing for City of Detroit.  Has the

6  filing and the resulting implementation or impact of the

7  automatic stay affected the workload of your city attorneys?

8  A   Only to the extent that it has given us some breathing

9  room, especially in the litigation arena, so that we can try

10  to get our arms around the cases that are pending that we

11  were having a hard time keeping up with during -- prior to

12  July 18th, 2013.  It has also in a peculiar sort of way added

13  to the workload in the sense that we spend a lot of time

14  interacting with outside bankruptcy counsel, consultants,

15  Ernst & Young, et cetera, et cetera, for background data that

16  touches on every aspect of the city operation, which the law

17  department is equipped to talk about because they touch on

18  practically every aspect of the city operation.

19  Q   Okay.  In the papers that were filed and from the motion

20  that we were -- that we're here today on, there's an

21  allegation that the city has nothing to do right now

22  essentially, especially the 1983 specialists, because of the

23  filings.  Is that true?

24  A   No.

25  Q   Okay.

1  A    Absolutely not.

2  Q    And you described earlier -- and we also -- the city also

3  filed in its papers that the bankruptcy has provided a

4  valuable breathing spell.  Has that breathing spell also

5  resulted in cessation of outside counsel responsibilities on

6  these cases at the time?

7  A    No, not at all.  I'm assuming that there will come a time

8  when all these cases are going to be dealt with through the

9  claims adjustment process or some other process, so the

10  outside counsel and the inside counsel that are handling

11  litigation and things in general are taking advantage of this

12  stay and lull to basically get our arms around what we have,

13  be prepared to hit the deck running, so to speak, when they

14  are reactivated in whatever claims format or claims

15  adjustment format or litigation format they end up going to.

16  Q    And so specifically, as I mentioned earlier, the

17  allegation was that your 1983 specialists -- and I'm not sure

18  what that term means, but let's specifically turn to the

19  three or four attorneys you have described previously that

20  have significant experience and can handle very complex

21  cases.  Are they sitting around doing nothing?

22  A    No.

23  Q    What kind of activities would they be performing on a

24  daily basis right now?

25  A    Well, as I said, we still have the undertaking to try to

1  get all our ducks in a row of the cases that we have in
2  place.  We have also taken advantage of their being available
3  to funnel their efforts in other directions.  We have had a
4  long need for more attorneys in certain areas of the
5  practice, for example, Kimberly James.  We just moved her
6  over to the property tax section to relieve some
7  oversubscription there.  We have plans of helping -- of
8  having the litigators help out the governmental affairs
9  section, which is constantly being bombarded with lawsuits
10 arising from the election's campaign and from an increase in
11 requests for what we call third-party depositions throughout
12 the city government, policemen, firemen.  Those that are not
13 involved in litigation are constantly called upon to give
14 testimony or depositions in unrelated litigation.  They are
15 entitled to have an attorney represent them in those matters.
16 We provide that attorney.  We are -- we have suffered for a
17 long time a shortage of manpower being able to manage that,
18 so we reallocated some of our litigators to do that.
19 Q   Okay.
20 A   Also, in the prosecution unit -- local prosecution unit
21 we've had -- the current receiver of the 36th District Court
22 has been putting extreme pressure on us to provide more staff
23 over there to help them catch their docket up, so we've done
24 that with some of the folks that would otherwise have been in
25 the litigation segment.

1    Q   Okay. Thank you. If we could turn our focus back to a

2    case that I mentioned earlier, which is the reason we're

3    here, the case that Deborah Ryan -- Ms. Deborah Ryan filed

4    against the City of Detroit, you mentioned that you're

5    familiar with that case. Have you reviewed that file?

6    A   I have.

7    Q   Okay. And based upon your review, what's the status of

8    that case currently procedurally?

9    A   Mr. Muller filed a motion for summary judgment on July

10    15th, three days before the filing.

11    Q   And Mr. Muller is -- represents --

12    A   He represents the City of Detroit.

13    Q   Okay.

14    A   He's seated in the courtroom. And he filed a motion

15    after extensive discovery and deposition practice, and it's

16    my understanding that that is -- that was poised to be

17    briefed by the plaintiff and ready for oral argument anytime,

18    so --

19    Q   Okay.

20    A   -- that's my understanding of where it stands.

21    Q   Do you have any knowledge of whether or not discovery is

22    closed in that case?

23    A   My understanding from my conversations with Mr. Muller,

24    that there is the possibility that --

25         MR. GOODMAN: Your Honor, I want to object based

1   upon hearsay at this point if this is based upon

2   conversations with Mr. Muller, but --

3           MR. CARLSON:  Your Honor, he's represented that he

4   reviewed the file.  He's directly responsible for Mr. Muller

5   and his caseload, and he has firsthand knowledge.

6           THE COURT:  The objection is sustained.

7   BY MR. CARLSON:

8   Q   So you have identified that Mr. Muller is -- you said

9   Mr. Muller is responsible for this case; correct?

10  A   Correct.

11  Q   Okay.  Is he one of the three or four senior litigators

12  that you referenced earlier that has ability to handle

13  complex cases?

14  A   He is.

15  Q   Okay.  Do you know on the date of bankruptcy filing

16  approximately how many active cases he was handling as a city

17  attorney?

18  A   I believe it was right around 30, 35.

19  Q   Okay.  And based upon your understanding and your

20  position as Mr. Muller's boss and his caseload, do you have

21  any idea how many other cases he's handling which are

22  somewhat similar in complexity and size to Ms. Ryan's case?

23  A   Oh, I'm going to say about ten, but that's kind of in the

24  nature of a guesstimate.

25  Q   Okay.  And based upon your position and your

1  understanding of Ms. Ryan's case and Mr. Muller's abilities,

2  if this Court were to grant relief from stay and allow Ms.

3  Ryan's case to go forward, would that overload Mr. Muller?

4  A   I'm sure he would be able to devote the amount of

5  attention that it would require to get it through the summary

6  judgment phase, argument, and whatever subsequent proceedings

7  there would be attendant on that.  One case is not going to

8  bring the world to an end, but two cases maybe.  I mean this

9  could be the beginning, I would assume, of a whole slew of

10  motions to relieve the stay, so that would be a problem.  One

11  case he can handle.  We will support him with an additional

12  attorney and staff and so on, but --

13  Q   So you would be required to add additional staff or the

14  city would allocate additional resources to help?

15  A   True.

16  Q   Then why is the city so concerned?  If this one case will

17  not overload Mr. Muller or the law department, what's the

18  concern of the city?

19  A   Because I'm sure there are hundreds, if not -- well,

20  there's several hundred other cases of similar import, if you

21  will, to the plaintiffs and the plaintiff's attorneys, and I

22  expect we will have a steady drumbeat of similar requests,

23  and I'm not sure why they shouldn't also request such relief

24  if it's granted in this case.

25  Q    Are you aware of other cases and other plaintiffs that

1  are requesting --

2  A    I have daily conversations with various distinguished

3  plaintiffs' lawyers around town about what we're going to do

4  about the pending matters.  On the day the matter -- the

5  petition was filed, the Law Office of Sam Bernstein had a $3

6  million judgment become final.  They call me practically

7  daily asking me what we might be able to do with that.

8  Q    So in your position as deputy corporation counsel and

9  based upon your knowledge of the workloads and the attorneys

10 you oversee, if all of the bankrupt -- or all of the pending

11 tort cases were granted relief from stay and allowed to go

12 forward, would the city be overloaded?

13          MR. GOODMAN:  Objection, your Honor.  It's pure

14 speculation since that's not the issue before the Court.

15          THE COURT:  Overruled.  Go ahead.

16          THE WITNESS:  Yes.

17          THE COURT:  Please answer the question.

18 BY MR. CARLSON:

19 Q    Please answer the question.

20 A    Yes.

21          MR. CARLSON:  I have nothing further at this point,

22 your Honor.

23          MR. GOODMAN:  One moment, your Honor.

24          THE COURT:  Yes, sir.

25                         CROSS-EXAMINATION

1    BY MR. GOODMAN:

2    Q    You've indicated -- first of all, good morning --

3    A    Good morning.

4    Q    -- Mr. Keelean.  You and I know one another, do we not?

5    A    We do.

6    Q    And you have indicated, I believe, that there's been a

7    considerable amount of work done in the Deborah Ryan matter;

8    is that correct?

9    A    That's my belief.

10   Q    Do you have any idea how many depositions have been

11   taken?

12   A    Seems to me 20 was mentioned.  I saw you around our

13   office.

14   Q    If I said 29, would you disagree with me?

15   A    (No verbal response)

16   Q    And in that regard, the City of Detroit Law Department

17   has been represented at each of these depositions; is that

18   right?

19   A    Correct.

20   Q    And corporation counsel has shown up in each of these

21   depositions; is that correct?

22   A    Correct.

23   Q    And that has been an ongoing matter for at least two to

24   three years.  Am I right about that?

25   A    My belief.

1  Q   And over those two to three years, the city has not --

2  the staffing for the City of Detroit Law Department has not

3  been notably different than it is at present; is that

4  correct?

5  A   Not true.

6  Q   When is it that the -- let me put it this way.  In 2011

7  how many attorneys were working for the City of Detroit Law

8  Department?

9  A   Let me answer the question this way.  Over the last two

10 years we have had 27 lawyers depart representing over 500

11 years of law department experience.  To replace them we have

12 hired six lawyers, who have collectively 20-some years'

13 experience and none of it in the law department.

14 Q   When did they -- when did the City of Detroit file for

15 bankruptcy?

16 A   July 18th.

17 Q   And how many lawyers have resigned since July 18th?

18 A   Have resigned since 18th?

19 Q   Or have left the department -- left your department.

20 A   I don't think -- I don't think any.  One lady left around

21 about that time.  I don't know whether it was before or

22 after.

23 Q   Zero or one; right?

24 A   Since July 18th?

25 Q   Yeah.

1   A   Correct.

2   Q   So leading up to that point, the staffing for the law

3   department was not notably any different than it is at

4   present.  Am I correct?

5   A   "Leading up" is an elusive word.  Toward the end of 2012,

6   we had an exodus of people retiring -- submitting their

7   retirement paperwork.  For a period of time from January

8   through March of 2013, they were still running out their

9   vacation time.  They would answer the phone when you'd call.

10  They'd tell you where the files were if you asked, but they

11  weren't there daily actively, so no.

12  Q   And how many of these 29 depositions were taken in the

13  year 2013?  Do you know?

14  A   That I don't know.

15  Q   How many were taken in 2012?  Do you know?

16  A   No.

17  Q   There were many, though, were there not?

18  A   I would assume.

19  Q   Even with the burdens of staffing that you've described;

20  is that correct?

21  A   That is correct.

22  Q   And Mr. Muller and before him Mr. Schapka were able to do

23  all the work that was necessary to defend the City of Detroit

24  in this case.  Am I correct about that?

25  A   Yes.

1  Q    And, in fact, they did all of the -- all of the motion

2  work and pleading work that was necessary to defend the City

3  of Detroit; is that correct?

4  A    That is correct.

5  Q    And, in fact, Mr. Muller prepared an extensive motion for

6  summary judgment and briefed it and did a competent, in fact,

7  excellent job in doing so; is that correct?

8  A    It was an excellent job; correct.

9  Q    And that was done under the burdens -- the staffing

10 burdens that you've already described.  Am I correct about

11 that?

12 A    Yes, sir.

13 Q    And have you looked at the witness list that your client

14 has -- or the City of Detroit has filed in this case?

15 A    I did, but I'm not sure how recently.  It's been awhile.

16 Q    Do you have any idea how many police officers have been

17 listed as witnesses in this case?

18 A    I don't.

19 Q    I'm going to hand you what has been marked Exhibit 1 and

20 ask you if you can identify it.

21 A    I can identify it by looking at the various footers and

22 the pleading nature as the witness list -- or a witness list

23 filed by the defendant, City of Detroit, Dwayne Blackmon and

24 Barbara Kozloff.

25          THE COURT:  Do you actually recognize the document?

1          THE WITNESS:  To the extent I just testified to.  I

2     recognize it as originating from the law department.  I can

3     see that it's a pleading filed in the Wayne -- in the --

4          THE COURT:  Well, but do you remember having seen it

5     before or not?

6          THE WITNESS:  I don't.

7     BY MR. GOODMAN:

8     Q    Do you have any reason to disagree with the authenticity

9     of this document as a witness list filed on behalf of your

10    client in this case?

11    A    None.

12         MR. GOODMAN:  I offer it into evidence, your Honor.

13         MR. CARLSON:  No objection.

14         THE COURT:  All right.  Exhibit 1 is admitted.

15         (Exhibit 1 received at 9:34 a.m.)

16    BY MR. GOODMAN:

17    Q    Now, taking a look at that, can you tell me how many of

18    the witnesses that you have listed in this case are City of

19    Detroit police officers or supervisors?

20    A    I can't really say that because I assume some of these

21    include Canton police.

22    Q    Some of them -- I believe you're correct -- are Canton

23    officers, but if I were to tell you that there are at least

24    13 officers who the City of Detroit has listed as witnesses

25    in this case, would you have any reason to disagree with

1   that?

2   A    No.

3   Q    So that there -- you would agree then with the

4   proposition that there are at least 13 Detroit police

5   officers who are percipient witnesses in this litigation; is

6   that correct?

7   A    I'm sorry.  Your word was what?

8   Q    Percipient, that they have knowledge of things as they

9   went on.

10  A    I can't comment on that.  They may have some greater or

11  lesser knowledge than percipient, but --

12  Q    But they were listed by your office as witnesses.

13  A    I can see that, yes.

14  Q    Right.  And you understand that there is ongoing

15  litigation in this matter as to the -- as to Canton Township

16  and Canton police officers; is that correct?

17  A    That is my understanding.

18  Q    And if that matter goes to trial, all of these witnesses

19  may be called as witnesses --

20  A    Yes.

21  Q    -- in the Canton case?

22  A    Yes.

23  Q    And if that were to happen, City of Detroit Law

24  Department attorneys would probably have to attend those

25  hearings with those witnesses in order to follow what they

1   have to say; is that correct?

2   A   Are you presuming that the City of Detroit will still be

3   a defendant, active defendant in that matter?

4   Q   No.  Even with the city -- if the City of Detroit is in

5   its current status of a stayed defendant here in Bankruptcy

6   Court, their interests will have to be attended to in court

7   by City of Detroit Law Department attorneys; isn't that

8   right?

9   A   That is likely, yes.

10          MR. CARLSON:  Your Honor, objection.  That calls for

11  a legal conclusion regarding the impact of the automatic stay

12  on these police officers and their testimony in another case.

13          THE COURT:  No.  I don't think so.  The objection is

14  overruled.  The answer will stand.

15          MR. GOODMAN:  Thank you.

16  BY MR. GOODMAN:

17  Q   Now, you mentioned that there are -- I think you said

18  several hundred cases that are similar to this particular

19  case, and you indicated some concern about a floodgate

20  phenomenon occurring if the stay were to be lifted in this

21  case.  Do you recall that testimony, sir?

22  A   I don't believe I said hundreds of this nature.  I said

23  there were several, and I was concerned about the floodgate

24  nature, yes.

25  Q   When you say "several," how many do you mean?

1  A    Well, I have at least two more with your office, as a

2  matter of fact, and so "several" would be probably 30.

3  Q    And by the way, our office has a small handful of cases

4  compared to other offices that have dozens and dozens of such

5  cases; right?  Isn't that right?

6  A    Well, yeah, but other offices don't have dozens and

7  dozens of 1983 actions of this magnitude.  Let's put it that

8  way.

9  Q    So that leads me to my next question.  Given the fact

10  that this is a 1983 action, how many cases are there similar

11  to this one, 1983 cases, in which there is ongoing litigation

12  against a co-defendant and in which the action as to the City

13  of Detroit and its employees have been stayed?

14  A    I don't really know that number.  That could be a very --

15  you know, that would be subject to being reviewed.

16  Q    Can you --

17  A    I don't know how many times we're a codefendant.  I think

18  not so many times are we codefendant with other police

19  departments.

20  Q    Can you think of any other case similar to this one with

21  that structural dynamic to it?

22  A    I can't name you a case, but I'm sure there's at least a

23  few that are of similar ilk.

24  Q    By the way, we talked about Mr. Muller's excellent motion

25  and brief for summary judgment.  Have you expressed any

1  confidence in the outcome of that motion and believe that it

2  has a reasonable or good chance of success?

3  A   I was persuaded by it.

4  Q   All right.  Given that, how much work is there for the

5  City of Detroit Law Department doing this case once the -- if

6  the plaintiff were allowed to file a response?  What other

7  work has to be done by your office?

8  A   Well, I presume that if you did a response, a reply would

9  be required, so there would be some level of activity there.

10 If the matter was then decided on a motion, there would be

11 oral argument, preparation, et cetera.  Hopefully, if the

12 city were to prevail, that would be probably the first stage

13 of what would become an appellate process and so on down the

14 road.

15 Q   Relatively --

16 A   If the motion is denied, then we are on for the duration

17 till trial.

18 Q   If the motion is denied, you may appeal.

19 A   Likely so.

20 Q   Regardless, given Mr. Muller's capabilities -- and I

21 think you indicated he is here in court today, is that right,

22 sir?

23 A   He is.

24 Q   Given his capabilities, I'm sure you're confident that he

25 can handle the responsibility of replying to anything I might

1    be able to generate and argue effectively in front of Judge

2    Goldsmith if this matter were to be before him again.

3    A    I am.

4    Q    And that would take a relatively small amount of work and

5    time on his part compared to his other responsibilities and

6    duties, would it not?

7    A    I don't agree with that.

8    Q    All right.  I think you've indicated that one of the

9    benefits of the bankruptcy filing for your department has

10   been that you've been given some breathing room I think was

11   the phrase you used, is that correct, sir --

12   A    Correct.

13   Q    -- so that you could get your arms -- your lawyers could

14   get their arms around their responsibilities and figure out

15   where to go when next they have to engage in litigation, is

16   that correct, sir?

17   A    There you're right.

18   Q    And in those cases, you, your office, your client, are

19   defendants in actions that are being prosecuted by plaintiffs

20   and plaintiffs' attorneys, is that right, almost exclusively?

21   A    I believe that's true.

22   Q    I mean there are cases in which the city becomes a

23   plaintiff and --

24   A    Sure.

25   Q    But that's rare; is that right?

1  A    There are some.  I don't know what the percentage is, but

2  it happens.

3  Q    So what you have expressed as breathing room is something

4  that every defense attorney or every defendant is looking for

5  in any case, which is some relief from the pressure and

6  ongoing pressure of litigation; isn't that right?

7  A    Especially if they're short-staffed at the time.

8       MR. CARLSON:  Objection.  Calls for speculation of

9  what other attorneys want.

10      THE COURT:  The objection is sustained.

11      MR. GOODMAN:  All right.  Excuse me, your Honor.  I

12  apologize.

13  BY MR. GOODMAN:

14  Q    You indicated that now that you have this breathing room,

15  you, your staff, your attorneys, are spending a certain level

16  of their time working with debtor's counsel, bankruptcy

17  counsel in this matter, is that correct, sir?

18  A    Correct.

19  Q    Have you quantified that at all?  Can you give us any

20  percentage whatsoever as to what that is?

21  A    In terms of hours or --

22  Q    Yeah, in terms of percentage of time.

23      THE COURT:  I'm sorry.  Percentage of time what?

24      MR. GOODMAN:  A percentage of the time of the staff

25  or the time of any particular attorney.  Any quantification

1 whatsoever is all I'm looking for.

2       THE COURT:  But a percentage of time doing what?

3       MR. GOODMAN:  Helping bankruptcy counsel.

4       THE COURT:  Thank you.

5       THE WITNESS:  Well, we spend -- the time that I'm

6 thinking about are both bankruptcy counsel such as Jones Day

7 and Miller Canfield but also Conway MacKenzie, the

8 consultants, Ernst & Young.  There's a whole gamut of them.

9 I would guesstimate that my time is upwards to 40 percent, 50

10 percent devoted to that activity.  Others like Mr. Muller and

11 others get called in to respond to specific factual inquiries

12 about specific cases such as the Ryan matter, so I don't know

13 as I can give you a percentage on their behalf.  I can tell

14 you that I spend a lot of time doing it.

15 BY MR. GOODMAN:

16 Q   And I appreciate that, and you are an important person in

17 the department, but you're only one person, isn't that right,

18 sir?

19 A   Correct.

20 Q   When you say that Mr. Muller got called on the Ryan

21 case -- and I presume that he did -- how many other such

22 cases, if you know, has Mr. Muller been called on and

23 consulted with regard to?

24 A   I'm not aware of any others wherein the plaintiffs have

25 sought a relief from stay.

1  Q   And given that, let's just use Mr. Muller as an

2  example -- and I apologize to him now for referring to him in

3  these ways, but what other matters is Mr. Muller working on

4  in addition to having advised counsel in this matter with

5  regard to the Ryan matter?

6  A   Well, he has been principally responsible for resolving

7  the ongoing dispute with the owner of the Wurlitzer Building

8  on Broadway.  That was quite an accomplishment on his part.

9  Q   I'm familiar with that, yeah.

10 A   There are other cases of that nature that he's involved

11 in, nontort-related, more commercial-type litigation.

12 Q   And Mr. Muller was involved in the Wurlitzer Building

13 litigation long before --

14 A   Oh, yes.

15 Q   -- the bankruptcy filing; isn't that right?

16 A   Right.

17 Q   And, in fact, that matter has more or less been resolved,

18 as I understand it, has it not?

19 A   Well, given the history of that case, I'll believe it's

20 resolved when it's resolved.

21 Q   Okay.

22        MR. GOODMAN:  One moment more, your Honor.  I'm

23 almost done.

24        THE COURT:  Yes, sir.

25 BY MR. GOODMAN:

1   Q   You mentioned before outside counsel, is that correct,
2   sir?
3   A   Yes, sir.
4   Q   And you and I can both think of at least one case in
5   which there have been a number of outside counsel --
6   A   Yes.
7   Q   -- retained.  Those counsel have an ongoing relationship
8   with the law department, is that correct, continuing?
9   A   Hopefully, yes.
10  Q   And have they continued to work with you since the
11  bankruptcy filing?
12  A   Yes, but it's been only to call and say what's going on,
13  how come our bills aren't getting paid and so on.
14  Q   Um-hmm.
15  A   They recognize the stay for what it is, so they're --
16  they are collecting their thoughts as well.
17  Q   So they've got breathing room as well, is that correct,
18  sir?
19  A   Yes.
20  Q   All right.  Other than this matter, can you think of any
21  other similar cases, 1983 cases or personal injury cases of
22  any sort, in which the former plaintiff has become a movant
23  before this Court and asked for relief from the stay as Ms.
24  Ryan has?
25  A   Yes.  I believe there was one just last week, Devery

1   Jones.  There was also one involving Mr. Beydoun, who has a

2   multi-million dollar verdict that he'd like to collect on.

3   I'm told that there -- oh, there was a matter involving

4   AFSCME and their right to the 13th check, and --

5   Q   Well, of course, that's not a case such as Ms. Ryan's

6   personal injury or 1983 case; right?

7   A   True.

8   Q   Okay.  So you can think of two others; is that correct?

9   A   Yes.

10       MR. GOODMAN:  All right.  That's all I have, your

11  Honor.  Thank you.

12                      CROSS-EXAMINATION

13  BY MS. PATEK:

14  Q   Good morning, Mr. Keelean.

15  A   Good morning.

16  Q   Barbara Patek on behalf of the Detroit Command Officers

17  Association and the Lieutenants & Sergeants Association.  Am

18  I correct that Sergeant Barbara Kozloff is a current employee

19  of the City of Detroit?

20  A   That's my understanding.

21  Q   And Inspector Dwayne Blackmon is also currently employed

22  by the City of Detroit?

23  A   That's my understanding.

24  Q   And are you familiar with the city ordinance 13-11-b and

25  the city employment terms which give the city certain

1  obligations with respect to Sergeant Kozloff and Inspector

2  Blackmon?

3  A   I am broadly aware of both of those, yes.

4  Q   And can you generally describe for the Court what those

5  rights are?

6  A   That they are entitled to an indemnity and defense for

7  those activities undertaken in the good faith performance of

8  their duties.

9  Q   And currently the -- currently those individuals are

10  protected by the extended stay; is that correct?

11  A   That is correct.

12  Q   If the stay were lifted and there were a judgment in this

13  case against Sergeant Kozloff and Inspector Blackmon, am I

14  correct that the city's obligation to indemnify them would

15  remain stayed?

16  A   That's my belief.

17       MS. PATEK:  That's all I have, your Honor.

18       MR. CARLSON:  I have nothing further, your Honor.

19       MR. GOODMAN:  One moment, your Honor.  Just one

20  other matter, your Honor, if I may, just to clear up one

21  thing.

22       THE COURT:  Go ahead, sir.

23                    RECROSS-EXAMINATION

24  BY MR. GOODMAN:

25  Q   I think you indicated that Mr. Muller had moved over from

1  general litigation to commercial and tort litigation, is that

2  correct, sir --

3  A   Yes.

4  Q   -- at some point?

5  A   Yes.

6  Q   Was this the only 1983 case he was working on then as of

7  the filing of the bankruptcy in this matter?

8  A   I don't think so, but I am not entirely sure.

9          MR. GOODMAN:  All right.  Thank you.  That's all I

10  have.

11          THE COURT:  Stand by one second, please.  You

12  suggested in your testimony, sir, that you and your

13  department have used the opportunity that the automatic stay

14  provided in this bankruptcy case to get your arms around the

15  cases that you have so that you could be prepared to deal

16  with whatever process would be invoked to liquidate these

17  claims.  Is that a fair summary?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Okay.  And, of course, it's been two or

20  three months now since the bankruptcy has been filed, so my

21  question for you is at what point in time or how much longer

22  would your office need to complete that process of preparing

23  for whatever procedures are invoked to liquidate these

24  claims?

25          THE WITNESS:  Let me answer it this way.  For those

1   that had gone far enough along in the process to be

2   completely -- completed the discovery and the like, I believe

3   we are prepared to go back to where we were on July 18th

4   whenever the Court says so.  For those that were in the early

5   stages of the discovery process, assembling of data and so on

6   and so forth, I don't know as we can ever get our arms around

7   what we're going to need to know if and when the stay is

8   resolved without getting additional data on those cases so we

9   can evaluate and work through the appraisal process.

10          THE COURT:  What additional data?

11          THE WITNESS:  Well, I'm envisioning cases through --

12   in the inventory of cases, there's a whole host of them which

13   we may only have a complaint, and without any background

14   data, how do you defend a case of this magnitude or this type

15   without knowing more about the facts underlying the

16   complaint, the event that led to the lawsuit, et cetera, et

17   cetera?  That's what I'm talking about, those -- seems to me

18   whenever this Court resolves --

19          THE COURT:  It strikes me that you have perhaps

20   misunderstood my question.  My question was not when will the

21   city be ready to go to trial on these cases.  That's

22   obviously a case-by-case determination; right?

23          THE WITNESS:  Right.

24          THE COURT:  My question was when will the city be in

25   a position to begin the process again or reopen the process

1  again of litigating these matters, which means trying those

2  that are ready for trial, going to discovery on those that

3  are ready to go to discovery, going to answer on those that

4  need answers filed; in other words, to get back to the normal

5  process of defending these actions?

6          THE WITNESS:  Well, we wouldn't be ready to go the

7  day after you dissolve the stay.  We have several vacancies

8  that were not filled and can't be filled currently or they're

9  not going to be filled currently that would otherwise be

10  engaged in trying to deal with these 500 cases.

11          THE COURT:  Um-hmm.

12          THE WITNESS:  So I guess the answer is if you can

13  tell me that at a date certain that everything is going to be

14  back in the litigation mode again, then I can give you a 30-,

15  90-, 60-day window at which we should have the ability to

16  deal with that, but it's going entail adding personnel,

17  reallocating resources.

18          THE COURT:  Well, let's talk about that.  As I look

19  at the chart, it looks like in litigation and C&T litigation,

20  in those two columns, there are 18 attorneys presently

21  employed.  Is that right?

22          THE WITNESS:  Sounds right.

23          THE COURT:  And there -- it looks to me like there

24  are two attorney vacancies in those two columns.  Is that

25  right?

1      THE WITNESS:  It is, but the vacancy blocks don't

2   necessarily mean that there shouldn't be more people added to

3   that branch.  We left the vacancy blocks where they were when

4   the prior occupant left, but if I were to redesign the

5   vacancy allocation, there would be more in the litigation

6   and -- commercial and tort litigation as it exists right now.

7      THE COURT:  Just focusing on the two that are there

8   for this one question, what are the obstacles you face in

9   filling those vacancies?

10      THE WITNESS:  Well, there is a laborious process

11   that entails getting the human resources director, the budget

12   director, the finance director, the department head, the EM,

13   et cetera, et cetera, to sign off on one sheet that says you

14   can go fill one position, and once that's done, then you have

15   a 30- to 60- to 90-day lag time before you actually get the

16   suitable replacement to do that, so there's that type of

17   challenge.

18      THE COURT:  Okay.  So have you embarked upon that

19   process for either of these two vacancies?

20      THE WITNESS:  We have -- we took a -- we undertook

21   the process of replacing the vacancies we had starting, I

22   think, in February of this year, so we interviewed ten

23   potential assistant corporation counsel.  We were able to

24   add, I believe, three off of that list.  That's part of the

25   six I alluded to earlier.  We have two more on that list, one

1  more right on the list that I would like to bring in tomorrow

2  if we could do it, but then again we would have to

3  reinterview several people, especially if we go to the senior

4  ranks.  That's the areas where we need the help, so that

5  would be starting a new list, so to speak.  It could be done,

6  but it would take, you know, some period of time to do that.

7      THE COURT:  And in your judgment, how many

8  attorneys, including the two that are shown in these two

9  columns, would you have to hire in order to provide the city

10  with adequate defense of all of the litigation pending

11  against it now?

12      THE WITNESS:  I would like to fill all the eight

13  positions that are in our budget.  We have gone back and

14  forth with the administration, Conway MacKenzie, et al.,

15  about the right number for the law department.  They have, I

16  think, come to the conclusion that 96 is the right number,

17  which has been our request for two years.  I would like to

18  fill in the eight attorney vacancies that we are entitled to

19  under that allocation.

20      THE COURT:  And your testimony is that the obstacle

21  to filling those eight is the approvals necessary within the

22  city and with the city's consultants and its emergency

23  manager?

24      THE WITNESS:  And the recognition that the law

25  department is going to exist in this format after they exit

 1   the bankruptcy.

 2         THE COURT:  Is there a question about that?

 3         THE WITNESS:  On any given day, I assume somebody is

 4   asking that question.  That's been a question I've gotten for

 5   the last three years almost daily.

 6         THE COURT:  Counsel, any further questions?

 7         MR. CARLSON:  Nothing from the city, your Honor.

 8         MR. GOODMAN:  Just one moment, your Honor.

 9         THE COURT:  Yes, sir.  Take your time.

10         MR. GOODMAN:  Just, if I may, one follow-up, your

11   Honor.  I want to ask about --

12         THE COURT:  Stand by a microphone for me, please.

13         MR. GOODMAN:  What was this exhibit number?  Do you

14   remember?

15         MR. CARLSON:  I didn't make it an exhibit.

16         MR. GOODMAN:  Oh, it's not an exhibit, but it's

17   Schedule D, I think.

18         THE COURT:  Schedule G attached to the list of

19   creditors.

20                    RECROSS-EXAMINATION

21   BY MR. GOODMAN:

22   Q   Do you have a copy with you?

23   A   I don't.

24         MR. GOODMAN:  Can I use your copy?  We only have one

25   copy, I guess.

1      THE COURT:  Is there just the one copy here in

2  court?

3      MR. GOODMAN:  May I approach the witness, your

4  Honor?

5      THE COURT:  There's just the one copy here in court.

6      MR. GOODMAN:  May I approach the witness?

7      THE COURT:  Yes.

8      MR. GOODMAN:  I think you -- can you hear me, your

9  Honor, on this microphone?

10      THE COURT:  Turn it facing more -- there you go.

11  Now we're all set.  Go ahead.

12  BY MR. GOODMAN:

13  Q   As we look at this document, Mr. Keelean, are all of the

14  matters that are set forth in the column on the left

15  individual matters that are counted as the four, five, or

16  several hundred that you've mentioned in your testimony?

17  A   I'm not sure I can vouch for that precisely because I

18  haven't gone through this exhibit -- or this Attachment G

19  with that kind of fine-tooth comb.

20  Q   Well, let me ask you a question about it.  If we turn to

21  any page here, let's say -- is this the second or third

22  page -- the third page of this document, we see long lists of

23  matters or items with no case name and no description

24  whatsoever.  Do you see that?

25  A   I do.

1  Q   And that's true on every page in this document; is that

2  correct?

3  A   I'll take your word for it.

4  Q   And that being the case, can you tell us what those

5  matters are with no description or no case names attached to

6  them?

7  A   I would assume that they are, as indicated by the column

8  entitled "claim number," a lot of the ones that are missing

9  any description are numbered such that they would be claims.

10  We have a claims section in our law department, so they get

11  the tree falls on the sidewalk or those kind of claims.

12  Property damage claims come in.  They're given numbers that

13  have the department, which is A32 -- that's the law

14  department -- and then 950 tells me that's a claim, not an

15  open litigation necessarily.  It may become and may have

16  become --

17  Q   It may or may not?

18  A   No.  It may become a litigation claim.

19  Q   Or it may not.

20  A   Yeah.

21  Q   These are inchoate matters; is that correct?

22  A   That would be a word -- well, not all of them.  Not all

23  the claims are inchoate.  There may be parallel litigation

24  involving that matter.

25          MR. GOODMAN:  All right.  That's all I have, your

1  Honor.  Thank you.

2       THE COURT:  Sir, you may step down.  Thank you very

3  much for coming today.

4     (Witness excused at 10:00 a.m.)

5       THE COURT:  Mr. Carlson.

6       MR. CARLSON:  I have nothing further to add, your

7  Honor.  You know, the --

8       THE COURT:  No further witnesses?

9       MR. CARLSON:  No further witnesses.

10      THE COURT:  Mr. Goodman, any witnesses?

11      MR. GOODMAN:  We have no witnesses, your Honor.

12      THE COURT:  I'd like to call Mr. Muller.

13            MICHAEL MULLER, WITNESS, SWORN

14      THE COURT:  Please sit down.

15                   EXAMINATION

16 BY THE COURT:

17 Q   And what is your name, sir?

18 A   Michael Muller.

19 Q   Muller.  All right.  My apologies to you.  And you are a

20 senior assistant corporation counsel for the City of Detroit?

21 A   I am.

22 Q   At this point in time, say within this week or last week

23 or next week, what percentage of your time are you spending

24 on matters or issues or questions that result directly from

25 the bankruptcy filing as opposed to normal City of Detroit

1  litigation?

2  A   I field questions every day from plaintiffs' attorneys

3  who are aggravated by the stay, and we also have to deal with

4  folks who are on a continuing basis.  They somehow don't know

5  that there's a stay or so they say or that serving a subpoena

6  or scheduling a deposition violates the stay, so I have to

7  deal with that, too.  On my caseload, as do all the

8  litigation attorneys with their own caseloads, I would

9  estimate that's probably -- I don't know -- 15 percent, 10

10 percent.  It's a small percent.

11 Q   Of course, if relief from stay were granted in all those

12 cases, you wouldn't be getting those phone calls or those

13 stay violation issues.

14 A   That's absolutely correct, although it's not -- I was

15 litigating the matters before the stay, so I can certainly

16 litigate them after, but, again, the whole discovery process

17 and everything involves far more than me.  It involves a

18 tremendous amount of time that's put in by my clients,

19 whatever department I'm defending, like the police officers.

20 When I'm asked to produce thousands of documents by Mr.

21 Goodman, who's an extremely thorough attorney, my clients

22 have to go out and actually dig those documents up, and that

23 takes a lot of time.

24 Q   Um-hmm.  Okay.  But just to get back to my first

25 question, is there any other kind of issue or question that

1  takes your time that arises from the bankruptcy itself as

2  opposed to general litigation that you would have been

3  involved in if the bankruptcy hadn't been filed?

4  A   Well, no, not really.  I mean we have to evaluate our

5  cases and place them in a position where we can explain to

6  the bankruptcy lawyers for the claims process what the --

7  give them a good evaluation on the case so that they can --

8  Q   Right.

9  A   -- do whatever they have to do in bankruptcy -- I don't

10 know what they do -- but apart from that, no.

11 Q   Um-hmm.  And in any given period of time, what percentage

12 of your time do you spend doing precisely that?

13 A   For me personally, that process on the cases where enough

14 has been done where they can be evaluated is concluded for

15 me.  I have a number of 1983 cases that I'm defending that

16 just started, and, as a result, I'm unable to evaluate them

17 properly.  I do have our end of it, but I don't have the

18 plaintiff's end of it, so --

19 Q   Right.  You just have what they say in the complaint?

20 A   That's correct.

21 Q   Okay.

22 A   And our documents.

23 Q   So I feel compelled to ask you how are you spending your

24 time these days?

25 A   Well, as my boss indicated, I have other cases that are

1  kind of still active because they involve injunctive relief
2  and the like.
3  Q   Are these cases that would not be stayed by the automatic
4  stay?
5  A   They would, but they're still ongoing like the Wurlitzer
6  Building case.  We need to make that building safe or it's
7  going to kill somebody, and so while it technically may be
8  stayed, it's in closed -- it's hard to explain.  It's in
9  closed status, final status in Wayne County Circuit Court,
10  yet I meet on it -- well, last week I met every single
11  morning with Judge Colombo at eight o'clock in the morning.
12  And for the last two years we've met in chambers every Monday
13  at eight in the morning.  It's just an ongoing thing because
14  we have to make the building safe or it's going to kill
15  somebody, so --
16  Q   Um-hmm.
17  A   -- yeah, that -- those kinds of things are ongoing.  I'm
18  also -- I've been directed to appear for transactional
19  lawyers in the election's matters.  Robert Davis just keeps
20  filing lawsuit after lawsuit every day, and so -- TRO
21  matters.  When matters come up like that, my time is
22  allocated to it because I do -- I do have extra time now that
23  the stay --
24  Q   Aren't Mr. Davis' matters stayed by the automatic stay?
25  A   It doesn't seem to affect him at all.

1   Q   Well, but answer my question.

2   A   I do believe that they -- at least some of them are

3   stayed, yes.  It's my understanding -- I am far from a

4   bankruptcy expert, but it's my understanding --

5   Q   Okay.

6   A   -- that injunctive actions are stayed under 362, but I do

7   not know much about bankruptcies.

8   Q   You know enough to know that if his lawsuit violates the

9   automatic stay, you have remedies with this Court?

10   A   Yes.  That's what I've been telling --

11         THE COURT:  All right.  That's all the questions I

12   have.  Any questions for the witness?

13         MR. GOODMAN:  One moment, your Honor.

14         THE COURT:  Mr. Carlson, I'll offer you first.

15         MR. CARLSON:  One second.  No, your Honor.

16         THE COURT:  Mr. Goodman, any questions?

17         MR. GOODMAN:  One moment.

18         THE COURT:  Yes, sir.  Take your time.

19                  CROSS-EXAMINATION

20   BY MR. GOODMAN:

21   Q   Good morning, Mr. Muller.

22   A   Good morning, Bill.  How are you?

23   Q   I'm well.  Thank you.  Let me ask you this.  You

24   understand that this matter, the Ryan matter, is ongoing as

25   to Canton and the Canton defendants; is that correct?

1   A    That's correct.

2   Q    And if it does proceed to trial, there will be a number

3   of witnesses from Canton and from the City of Detroit Police

4   Department who will have information that will render them --

5   make them witnesses in the matter; right?

6   A    Maybe 18 to 24 months down the road it would proceed to

7   trial after it comes back from the Sixth Circuit.

8   Q    Well, that's if Canton -- if Judge Goldsmith denies

9   Canton's motions for summary judgment and if Canton decides

10  to engage in an interlocutory appeal; is that right?

11  A    Yes, and the same would hold true for me.  Either way

12  that the summary judgment is ruled on, it's going to the

13  Sixth Circuit.  If it's granted, you're taking it to the

14  Sixth Circuit.  If it's denied, Canton and the City of

15  Detroit are taking it to the Sixth Circuit.  And it'll sit

16  there right till the time of discharge in this case.

17  Q    Just for the moment now --

18  A    We'll never liquidate the claim.

19  Q    Let me please complete my thought here.  Just for the

20  moment, Detroit is not in the matter anymore.  It's been

21  administratively closed as to Detroit and Blackmon and

22  Kozloff.  Is that right?

23  A    That's right.

24  Q    All right.  So we have a case against Canton.  They have

25  a motion for summary judgment; is that right?

1   A    Right.

2   Q    If that motion is denied, then Canton can either decide

3   to engage in an immediate interlocutory appeal or they can go

4   to trial and appeal that ruling after trial; is that correct?

5   A    Absolutely.

6   Q    And that could happen fairly quickly; isn't that right?

7        THE COURT:  When you say "that could happen," could

8   you specify what --

9        MR. GOODMAN:  Trial.  I'm sorry, your Honor.

10       THE COURT:  Trial?

11       MR. GOODMAN:  Trial.

12       THE WITNESS:  I don't think that that -- well, you

13  could have a trial probably, I think -- I think the

14  scheduling is for April of 2014.

15  BY MR. GOODMAN:

16  Q    I think the current trial is scheduled for November 4th,

17  2013, but it could change.

18  A    Yeah.  It probably will change because I believe Judge

19  Goldsmith has -- because of this very proceeding, has stayed

20  everything against Canton.

21  Q    I don't believe that's correct, but we can talk about

22  that outside of court.  And the docket can speak for itself,

23  and the Court can access the docket in that matter, but

24  assume that it goes to trial fairly promptly and Canton does

25  not appeal.  That being the case, there will be numerous

1  witnesses from the City of Detroit who will be or could be
2  called as witnesses in that matter; isn't that right?
3  A   I don't know.  I would have to consult our bankruptcy
4  counsel as to whether or not the stay would preclude them
5  from being subpoenaed in that trial.  However, that would be
6  of no moment.
7           THE COURT:  Let me consult with you.  The answer is
8  no.
9           THE WITNESS:  Oh, okay.
10 BY MR. GOODMAN:
11 Q   But you, in fact, have told me until we've just heard the
12 definitive ruling on this point that there was some question
13 until just now; isn't that right?
14 A   Well, yeah.  I can't not consult with our bankruptcy
15 counsel.  I mean I told you that that was the question.  But
16 in any event, even if they couldn't be there live, you, of
17 course, have their depositions, which can be used when
18 they're not available.
19 Q   But it sounds as though they may be there live, and if
20 they are there live, you will be representing them in that
21 proceeding; isn't that right?
22 A   Certainly I'll be there, yeah.
23 Q   And if the matter is appealed to the Sixth Circuit
24 immediately by Canton or, in fact, by Detroit if Detroit --
25 if the stay were to be lifted and Detroit were to get into

1  the case and -- back into the case and your motion were to be

2  ruled upon, you might engage in interlocutory appeal as well;

3  isn't that right?

4  A   Not might, absolutely 100 percent would.

5  Q   I will remember that.  That being the case, it may well

6  be that there will -- we'll be one step closer to a

7  resolution of this matter either through Judge Goldsmith's

8  rulings or through rulings from Cincinnati; isn't that right?

9  A   Before the discharge takes place in this case?  We'll be

10 sitting in the Sixth Circuit.

11 Q   Okay.  And one step closer --

12 A   That's 18 months.

13 Q   One step closer to resolution or at least clarification;

14 correct?

15 A   Not really.  I mean from my perspective, Mr. Goodman, if

16 it was remanded for trial, then we would undertake a trial in

17 18 months.  If it's not remanded for trial, then we would

18 prevail.

19 Q   Yeah.

20 A   So I guess in a sense you're right.  It would be one step

21 closer to resolution.

22 Q   Just one moment.  Other than this case, how many other

23 1983 cases do you have at the moment?

24         THE COURT:  You mean the witness personally?

25         MR. GOODMAN:  Yes.

1        THE WITNESS:  That I'm defending?

2  BY MR. GOODMAN:

3  Q   Yeah, that you're the attorney for.

4  A   The vast majority of my caseload, due to necessity,

5  switched from commercial to police.  Police are unique cases,

6  and almost every one of them is a 1983 case.

7  Q   How many is that?

8  A   I don't know.  Mr. Keelean had the count.  He said

9  somewhere around 30, 35.

10  Q   And those are all 1983 cases?

11  A   Yes, they are.

12  Q   Okay.  So you're quite a specialist or expert in that

13  field.

14        THE COURT:  Would you stand by the microphone,

15  please?

16        MR. GOODMAN:  I apologize, your Honor.

17  BY MR. GOODMAN:

18  Q   So you are quite an expert or a specialist in that field.

19  I'll say so.

20  A   Well, I know the law in that area.  I don't know that I

21  would refer to myself as a specialist.

22        MR. GOODMAN:  Thank you.

23        THE COURT:  Sir, you may step down.

24    (Witness excused at 10:15 a.m.)

25        THE COURT:  Any further witnesses by either side?

1        MR. CARLSON:  None from the city, your Honor.

2        MR. GOODMAN:  We have none.

3        THE COURT:  All right.  Closing, please.

4        MR. CARLSON:  Thank you, your Honor.

5                    CLOSING ARGUMENT

6        MR. CARLSON:  We're here on one motion on one case

7   for relief from stay for one plaintiff.  As you heard from

8   Mr. Keelean, that is one of many that are pending and were

9   pending on the day that this case was filed.  You also heard

10  from Mr. Keelean that prior to the filing, the bankruptcy

11  department was in overload and was becoming increasingly

12  reliant upon outside counsel at a significant cost.  You also

13  heard from Mr. Keelean that this automatic stay has given the

14  city some breathing room to allocate resources in other

15  directions necessary to accomplish the activities required to

16  run this bankruptcy and hopefully move this bankruptcy

17  towards resolution and a plan of adjustment that makes sense

18  and in that light also evaluate cases, move them toward some

19  understanding that will help in the overall claims resolution

20  process that has yet to be developed or proposed or approved

21  by this Court but presumably will be done shortly, as

22  testified in the original hearing in this case or as

23  represented by Jones Day in this case.

24           You've also heard that, contrary to the assumption

25  or the allegation that the attorneys in the City of Detroit

1  were sitting around doing nothing, they are, indeed, doing

2  things and are busy at some level.  The automatic stay, did

3  it slow down their workload?  Absolutely.  That's what it's

4  for.  And, your Honor, the attorneys' workload may increase,

5  likely will once the claims resolution process is

6  established, whether it be mediation, whether it be some sort

7  of other liquidating procedures.

8          So the point is, your Honor, would this one case

9  cause a hardship?  Would this one case create Mr. Muller's

10 workload to expand exponentially?  No.  That's not the point.

11 The point is where does it end?  Is it a race to the

12 courthouse?  Whoever gets here first gets to go.  That's the

13 issue.  That's the point.  And that's why the city says at

14 this early stage in this proceeding, relief from stay is not

15 warranted.  Will it be in the future?  Maybe, but we should

16 resolve eligibility, at a minimum.  We should also resolve

17 some level of a claims resolution process so we know where

18 we're going with all the cases and all the claimants can be

19 treated fairly.

20                    CLOSING ARGUMENT

21         MS. PATEK:  Your Honor, the Detroit Police

22 Lieutenants & Sergeants Association and the Police Command

23 Officers Association, two of the unions that recommend -- or

24 represent the public safety officers in the City of Detroit,

25 have -- are opposing this motion, and we have a very

1　significant concern.  And our focus -- and if I can refer to

2　the Court's order of October 2nd -- is on item five, the cost

3　of defense or other potential burden to the bankruptcy

4　estate and the impact of the litigation on other creditors.

5　As the Court is aware, we are currently engaged in a

6　mediation process with the City of Detroit; that it's in --

7　it is in its early stages.  Among the issues that we are

8　dealing with is the global resolution of grievances and terms

9　of a collective bargaining agreement.  This stay issue has

10　become a recurring theme.  We have come to an agreement with

11　the city and have recently filed a motion to, in fact, extend

12　the extended stay to former employees who have rights under

13　those agreement to have their defense from the city and who

14　need to be protected by the stay if that defense obligation

15　is not going to be triggered.

16　　　　　Our concern if the stay is lifted here is that the

17　city, one, would continue to provide a defense to these

18　officers, but more concerning to the public safety unions is

19　the concept that if there were, in fact, a judgment -- and we

20　heard testimony here today that the city is really not ready

21　to go forward with its claims adjustment process -- that

22　these individual officers could be exposed potentially to a

23　significant judgment with no right of stay and with their

24　right of indemnification as to the city being stayed or

25　potentially, worst case scenario, you've got a very large

1  judgment and you've got a proof of claim in the Bankruptcy

2  Court of some classification for Sergeant Kozloff and

3  Inspector Blackmon.  I would suggest to the Court that that

4  would be a disastrous result.

5        We are opposing lifting the stay in its entirety.

6  In the event that the Court decides to lift the stay for the

7  purpose of liquidating the claim, we would request that the

8  order be specific as to the individual officer.  Any effort

9  to execute or take any post-judgment action, which is what

10  the original motion asked for, would also be stayed as to

11  these individuals.

12        THE COURT:  Thank you.

13              CLOSING ARGUMENT

14        MR. GOODMAN:  Your Honor, we have heard testimony

15  and argument along the lines of a global picture within the

16  City of Detroit Law Department with regard to some concern

17  about a floodgate problem, if this stay -- stay is lifted in

18  this case, why not all other cases -- similar cases, although

19  the uniqueness of this case has also been noted and testified

20  to on the record.  And we have heard about how the law

21  department is using the breathing room, which it has received

22  as a result of the filing, but the specifics of that, I

23  think, have been unclear.  Mr. Muller testified that he

24  fields telephone calls from plaintiffs' attorneys who want to

25  know what's going on with their case.  Mr. Keelean testified

1  that he gets a call every day from Sam Bernstein.  All of

2  these things, it seems to me, are relatively trivial within

3  the context of a full-time legal practice and certainly

4  within the context of the seriousness of the case involving

5  Ms. Ryan and her family.  And, therefore, I think that the

6  terms -- I apologize for having said that the law department

7  has nothing to do.  Obviously these are people who are

8  professional and who use their time productively I'm sure.

9  However, the terms "breathing room" and "getting their arms

10  around things" it seems to me is really a way of

11  characterizing the fact that there is a considerable amount

12  of time that could be used productively in litigating a case

13  such as this, in fact, in particular, in this case, and that

14  if this case does go to trial as to Canton only and the

15  Canton defendants only, the law department is going to be

16  very involved in defending its witnesses in that matter, who

17  may or may not become agents of the defendant, City of

18  Detroit, or actually defendants in some subsequent litigation

19  either here or elsewhere.

20       That being the case, it seems to me -- or I would

21  urge the Court to consider granting the stay.  Consider the

22  constitutional context, which was pointed out previously, and

23  I appreciate the Court's time and patience.  Thank you.

24       THE COURT:  Thank you.  Mr. Carlson, anything

25  further?

1    MR. CARLSON:  No, your Honor.

2    THE COURT:  The Court will take this matter under

3    advisement and come back into court and give you a decision.

4    Let's just say 11 o'clock.

5    MR. GOODMAN:  Thank you.

6    THE CLERK:  All rise.  Court is in recess.

7    (Recess at 10:24 a.m., until 11:11 a.m.)

8    THE CLERK:  Court is in session.  Please be seated.

9    Recalling Case Number 13-53846, City of Detroit, Michigan.

10    THE COURT:  The record should reflect that all

11    counsel are present.  The matter before the Court is a motion

12    for relief from stay filed on behalf of Ms. Ryan.  She seeks

13    relief from the stay so that she can continue to pursue her

14    constitutional and tort claims against the City of Detroit

15    that have been filed in the District Court for this district.

16    The standard for relief from the stay is whether

17    there is cause for relief from the stay.  The matter is

18    obviously addressed to the discretion of the Court.  In

19    determining whether there is cause for relief from the stay,

20    the Court must weigh and balance the interests of the

21    parties, the interests of the movant, who is the plaintiff,

22    in pursuing her personal injury claim and in recovering on

23    it, to the extent the law allows, as promptly as possible,

24    and, of course, on the other side the Court must weigh and

25    balance the interests of the city in having an opportunity to

1  reorganize and in that process of reorganizing liquidating

2  all of the claims against it, not just those of Ms. Ryan, in

3  as efficient a way as possible.

4          The city's interest in efficiency here is, of

5  course, shared by all of the creditors, including Ms. Ryan,

6  because there are only limited resources available, and the

7  more money that's spent on liquidating claims, the less money

8  is available to pay on those claims in the end.

9          So the Court must conclude that in determining this

10  issue of cause in this case, it really is inappropriate to

11  consider the cases on a case-by-case basis, and it is only

12  appropriate to consider the issue of cause in the context of

13  the entire case and perhaps more particularly in the context

14  of all of the tort claims that the city faces.

15          After weighing and balancing these, the Court

16  concludes that a conditional granting of the motion is

17  appropriate, the condition being that the motion is granted

18  unless the city files a motion to establish an efficient

19  process for liquidating all of the tort claims by a deadline

20  the Court will set.  Then the motion for relief from stay

21  filed by Ms. Ryan is granted, and she may proceed with her

22  claims.

23          In setting this deadline, the Court must express a

24  couple of points to the city.  First, it was clear enough

25  from the testimony of the witnesses, whose credibility this

1  Court has no reason to doubt, that neither counsel for the
2  city nor management of the city has yet spent any time
3  focusing on this very issue of what should the process be to
4  liquidate these claims or at least if any time has been spent
5  on this issue, that certainly did not come through the
6  testimony that was presented here today.  Certainly if the
7  witnesses had been consulted about such a process, they would
8  have so testified, and they should be consulted because they,
9  likely more than Jones Day, are the ones who have the
10  expertise in these cases.  And here I will acknowledge
11  Mr. Muller as an expert despite his protestations to the
12  contrary.

13      So I'm going to allow the city 35 days within which
14  to file this motion subject to an extension upon a motion
15  establishing good cause, and if such an extension is
16  requested alleging good cause, the Court will expect a full
17  showing of what efforts the city has made in the meantime to
18  come up with such a plan, including what efforts it has made
19  to consult with the attorneys in the city law department who
20  deal with these cases day-in and day-out.

21      I leave it to the city in its discretion to propose
22  the plan that it determines is in the best interest of the
23  city and of the tort claimants that it has to deal with.  The
24  motion, when it's filed, should be noticed out to all of the
25  attorneys in all of the tort claims cases so that they have

1  an opportunity to be heard regarding the process and an

2  opportunity to object.  One such process which this Court

3  suggested to the city previously and which the Court would

4  again ask the city to consider would involve the appointment

5  of a tort claims committee whose fiduciary obligation would

6  be in representing the interests of all tort claimants in the

7  case to come up with and work with the city on coming up with

8  a process through negotiation and then also equally

9  importantly, if not more importantly, negotiating with the

10 city on how tort claims would be dealt with in a plan of

11 adjustment, but it's not for me to dictate that.  I do not

12 intend to dictate that.  It's just a suggestion.  There are

13 an infinite variety of potential plans for liquidating tort

14 claims that the city could come up with.

15          That's all I've got.  I will enter an order to this

16 effect promptly.  Anything further?

17          MR. CARLSON:  Not from the city, your Honor.

18          MR. GOODMAN:  Your Honor, just one question, which

19 is, as I understand your order, you are lifting the stay now

20 subject to the condition --

21          THE COURT:  No, no, no.  That's not how this works.

22 The stay will remain in effect for 35 days.  If the city

23 files the motion that I have indicated it is required to

24 file, then the stay will remain in effect pending the Court's

25 determination of the motion because presumably the motion

1  will result in some process for the liquidation of your

2  client's claim.  If they don't file, then the stay is lifted

3  as of the 36th day.

4          MR. GOODMAN:  Thank you.

5          THE COURT:  All right.  We'll be in recess.

6          THE CLERK:  All rise.  Court is adjourned.

7      (Proceedings concluded at 11:21 a.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Edward Keelean | 4 | 22/37 | | 38/44 |
| Michael Muller | 47 | 51 | | |

| | | |
|---|---|---|
| Closing argument by Mr. Carlson | | 57 |
| Closing argument by Ms. Patek | | 58 |
| Closing argument by Mr. Goodman | | 60 |

| EXHIBITS: | Received |
|---|---|
| Exhibit A | 6 |
| Exhibit 1 | 27 |

        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.

/s/ Lois Garrett                    October 12, 2013
_____       _____
Lois Garrett