**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |

**THE MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO AND SUB-CHAPTER 98, CITY OF DETROIT RETIREES' <u>PRETRIAL BRIEF</u> REGARDING THE CITY OF DETROIT'S ELIGIBILITY TO OBTAIN RELIEF UNDER CHAPTER 9 OF <u>THE BANKRUPTCY CODE</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................iv

PRELIMINARY STATEMENT .............................................................................................2

STATEMENT OF FACTS .......................................................................................................4

    A.    The Webster Litigation And The Governor's Unconditional
        Authorization ........................................................................................................6

        (i)    The Governor (And Other State Officials) And City
            Intended Through The Chapter 9 Filing To Impair And/Or
            Terminate Pension Obligations, And The Governor Was
            Aware Of This Prior To His Authorizing The Chapter 9
            Filing........................................................................................................9

    B.    The Facts In The Record And To Be Further Adduced At Trial
        Demonstrate Why PA 436, As Applied To The Facts And
        Circumstance Here, Violates The Strong Home Rule Provisions
        Of The Michigan Constitution................................................................................11

    C.    The City's Pre-petition Machinations And Subsequent Meetings
        (But Not Negotiations) With Creditors Such As AFSCME.................................13

        (i)    The City's Bankruptcy Was Orchestrated Based On The
            Advice Of The City's Lead Bankruptcy Counsel And
            Discussed Before The EM Was Even Hired ............................................13

        (ii)   No Good Faith Negotiations Took Place Following The
            Appointment Of The EM With Parties Such As AFSCME
            Prior To The City's Chapter 9 Filing ......................................................16

        (iii)  The City's Bad Faith Refusal To Negotiate With Unions
            Such As AFSCME Has Continued Following The City's
            Bankruptcy Filing....................................................................................20

        (iv)  The City Has Previously Negotiated Labor Concessions
            With Unions That Modified Both Active And Retiree
            Benefits....................................................................................................21

    D.    The City Has Failed to Establish It Is Insolvent, And The City's
        Chapter 9 Case Was Not Commenced Due to Any Imminent
        Financial Emergency, Rather To Avoid The Webster Litigation
        (And Other State Court Proceedings)....................................................................23

-i-

ARGUMENT ...................................................................................................29

I.    THE CITY'S PETITION VIOLATES THE UNITED STATES
      CONSTITUTION ........................................................................................29

II.   THE CITY IS NOT ELIGIBLE TO FILE FOR CHAPTER 9
      PROTECTION UNDER SECTION 109(C) OF THE BANKRUPTCY
      CODE ...........................................................................................................33

      A.    The City Is Not Authorized By Michigan State Law To Be A
            Debtor Under Chapter 9 .....................................................................35

      B.    The City Failed To Participate In Any Good Faith Negotiations
            With Creditors Prior To Filing For Bankruptcy As Required For
            Eligibility Under Chapter 9 ...............................................................36

            (i)    The City Failed To Negotiate With Creditors Such As
                   AFSCME ................................................................................37

            (ii)   Even Assuming That The City Engaged In Negotiations,
                   Such Negotiations Did Not Relate To A Plan That Is In
                   The Best Interests Of Creditors As Required By Section
                   109(c)(5)(B)............................................................................41

            (iii)  Negotiations With Certain Categories Of Creditors Such
                   As AFSCME Were Not Impracticable .....................................44

      C.    The City's Petition Should Be Dismissed Under Section 921(c)
            As Filed In Bad Faith .........................................................................47

      D.    The City Has Failed To Meet Its Burden Of Proving Its
            Insolvency, And Only Does So Based On Assumptions Used By
            The City To Show Its Insolvency .......................................................51

CONCLUSION ..............................................................................................................56

# TABLE OF AUTHORITIES

PAGES

CASES

*Ashton v. Cameron County Water Improvement Dist. No. 1,*
 298 U.S. 513 (1936) ............................................................................................... 31

*Brandt v. Samuel, Son & Co., Ltd. (In re Longview Aluminum, L.L.C.),*
 Case No. 03B12184, 2005 Bankr. LEXIS 1312 (Bankr. N.D. Ill. July 14, 2005) ................. 52

*In re City of Bridgeport,*
 129 B.R. 332 (Bankr. D. Conn. 1991) ............................................................. 51, 54

*In re City of Harrisburg, PA,*
 465 B.R. 744 (Bankr. M.D. Pa. 2011) ..................................................................... 35

*City of New York v. New York, N. H. & H. R. Co.,*
 344 U.S. 293 (1953) ............................................................................................... 30

*In re City of Stockton, California,*
 493 B.R. 772 (Bankr. E.D. Cal. 2013) ............................................................. 47, 48

*In re Ellicott School Building Authority,*
 150 B.R. 261, 266 (Bankr. D. Colo. 1992) ....................................... 38, 39, 44, 46

*Faitoute Iron & Steel Co. v. City of Asbury Park,*
 316 U.S. 502 (1942) .................................................................................. 30, 32, 33

*In re Hamilton Creek Metro. Dist.,*
 143 F.3d 1381 (10th Cir. 1998) ............................................................................. 51

*Int'l Ass'n of Firefightes, Local 1186 v. City of Vallejo (In re City of Vallejo),*
 408 B.R. 280 (9th Cir. B.A.P. 2009) .............................................................. passim

*Klein v. Tabatchnick,*
 610 F.2d 1043 (2d Cir. 1979) ................................................................................. 52

*Lawson v. Ford Motor Co. (In re Roblin Indus.),*
 78 F.3d 30 (2d Cir. 1996) ...................................................................................... 52

*In re Little Creek Dev. Co.,*
 779 F.2d 1068 (5th Cir. 1986) ............................................................................... 48

*In re McCurtain Mun. Auth.,*
 No. 07-80363, 2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4, 2007) .............. 47, 50

*In re Mendocino Coast Recreation and Park District*,
No. 12-cv-02591-JST, 2013 U.S. Dist. LEXIS 139697 (N.D. Cal. Sept. 27, 2013) .........43, 44

*In re Mount Carbon Metropolitan Dist.*,
242 B.R. 18 (Bankr. D. Colo. 1999) ......................................................................................42

*New York v. United States*,
505 U.S. 144 (1992) ................................................................................................31, 32

*In re Pierce County Housing Authority*,
414 B.R. 702 (Bankr. W.D. Wash. 2009) .........................................................................44, 49

*In re Sanitary & Improvement Dist., #7*,
98 B.R. 970 (Bankr. D. Neb. 1989) ......................................................................................42

*In re Town of Westlake, Tex.*,
211 B.R. 860 (Bankr. N.D. Tex. 1997) ...........................................................................passim

*Uecker & Assocs. v. Tenet Healthsystem Hosps., Inc. (In re West Contra Costa Healthcare Dist.)*,
No. 06-41774 T, 2010 Bankr. LEXIS 994, at *8 (Bankr. N.D. Cal. Mar. 26, 2010) ..............51

*United States Trust Co. of N.Y. v. New Jersey*,
431 U.S. 1 (1977) ................................................................................................................30

*United States v. Bekins*,
304 U.S. 27 (1938) ..............................................................................................................30

*In re Villages at Castle Rock Metro. Dist. No. 4*,
145 B.R. 76 (Bankr. D. Colo. 1990) ...............................................................................36, 47

*Webster v. State of Mich.*,
No. 13-734-CZ (Ingham County Cir. Ct. July 3, 2013) ......................................................6, 15

**STATUTES**

11 U.S.C. § 101(32)(C) .........................................................................................................51

11 U.S.C. § 101(32)(C)(i).......................................................................................................51

11 U.S.C. § 903(1)...........................................................................................................29, 32

11 U.S.C. § 943(b)(4).............................................................................................................2

11 U.S.C. § 943(b)(4)...........................................................................................................41

Second, Michigan Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, *et seq.* ..................................................................................................2

**RULES**

Rule 408................................................................................................................18, 20

The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees (the AFSCME retiree chapter for City of Detroit retirees) (collectively, "**AFSCME**") -- the representative of the interests of between at least forty and fifty percent (40-50%) of the about 11,943 retired City of Detroit (the "**City**" or "**Debtor**") non-uniformed employees (the "**Retired AFSCME Employees**"), and about 2,523 active City employees (the "**Active AFSCME Employees**", or about seventy percent (70%) of the active non-uniformed union-represented employees, and together with the Retired AFSCME Employees, collectively, the "**AFSCME Detroit Employees**") -- through its counsel and in accordance with the Court's *First Order Establishing Dates and Deadlines* [Docket No. 280] (the "**Scheduling Order**") submits this **pretrial brief** (the "**Pretrial Brief**") regarding the upcoming trial on the City's eligibility for relief under chapter 9 of the Bankruptcy Code[1] and respectfully states as follows:

---

[1] AFSCME previously submitted extensive legal and factual arguments in *The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees'* **Amended** *Objection to the City of Detroit's Eligibility to Obtain Relief Under Chapter 9 of the Bankruptcy Code* [Docket No. 1156] (the "**AFSCME Eligibility Objection**"). The AFSCME Eligibility Objection was submitted in opposition to the City's (A) Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code [Docket No. 10] (the "**Statement of Eligibility**"); (B) Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code [Docket No. 14] (the "**Eligibility Brief**"); (C) declarations of Kevyn D. Orr [Docket No. 11] (the "**Orr Declaration**"), Gaurav Malhotra [Docket No. 12] (the "**Malhotra Declaration**") and Charles M. Moore [Docket No. 13] (the "**Moore Declaration**"); (D) City of Detroit's Consolidated Reply to Objections to the Entry of an Order for Relief (the "**Debtor's Reply**") [Docket No. 765]; and (E) The State of Michigan's Response to Eligibility Objections Raising Only Legal Issues [Docket No. 756] (the "**State's Response**"), and in support of the AFSCME Eligibility Objection, AFSCME relied on the (a) Declaration of Steven Kreisberg [Docket No. 509] (the "**Kreisberg Declaration**"); (b) Supplemental Declaration of Steven Kreisberg [Docket No. 1162] (the "**Supp. Kreisberg Declaration**"); and (c) Declaration of Michael Artz [Docket No. 1159] (the "**Artz Declaration**").

Given AFSCME's extensive AFSCME Eligibility Objection, **AFSCME incorporates by reference as if fully set forth herein all facts presented (or otherwise incorporated therein) and arguments asserted in the AFSCME Eligibility Objection which will be presented at trial, and AFSCME further reserves the right to argue and rely upon all evidence and arguments presented to this Court in filed pleadings, oral argument, and at trial.**

**To the extent this Pretrial Brief addresses issues previously covered by other filings or oral argument, this Pretrial Brief is intended to supplement but in no way to limit any of those prior filings or arguments.**

## PRELIMINARY STATEMENT

1. For all the reasons set forth in the AFSCME Eligibility Objection, and as will be demonstrated at trial and as further set forth herein, the City's petition for relief under chapter 9 of the Bankruptcy Code should be dismissed. First, chapter 9 of the Bankruptcy Code violates federalism under the United States Constitution through an unholy alliance permitting federal encroachment on the states' governance rights over fiscal affairs in exchange for an unlawful extension of state powers in excess of those the state would otherwise possess under the law and which denies Michigan citizens their constitutional right to make the rules for their own bankruptcy. Second, Michigan Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, *et seq*. ("**PA 436**") and Governor Snyder's (the "**Governor**") purported authorization thereunder authorizing the Emergency Manager to file for chapter 9 protection runs afoul of the Michigan Constitution **as applied** in this chapter 9 case by not explicitly prohibiting the diminishment or impairment of vested pension rights in bankruptcy, which rights are prescribed in the Michigan Constitution, and further offends the Constitutional rights of individual Detroit citizens to local self-governance. Third, the evidence presented in the AFSCME Eligibility Objection, additional evidence presented herein, and evidence to be adduced at trial collectively will demonstrate that the City has failed to establish that it engaged in good faith negotiations with the City's creditors or that these negotiations were impracticable under section 109(c) of the Bankruptcy Code, and indeed the entire chapter 9 petition was filed in bad faith. Fourth, the City does not qualify for chapter 9 relief because it failed to establish that it is insolvent. Finally, the Bankruptcy Court lacks authority or jurisdiction over matters related to the federal constitutionality of chapter 9 of the Bankruptcy Code or the state constitutionality of PA 436.

2.      The evidence discussed herein and further to be presented at trial will demonstrate that the City, led by its unelected, politically appointed Emergency Manager, Kevyn D. Orr ("**Orr**" or the "**EM**"), hastily commenced this unconstitutional, unlawfully authorized chapter 9 proceeding seeking the haven of bankruptcy to illegally attempt to slash pension and other post-employment benefit obligations and cram such reductions down the throats of current and former City employees such as the AFSCME Detroit Employees.  These proceedings were commenced without **any** good faith negotiations with the City's retirees or unions such as AFSCME, and the chapter 9 filing was a *fait accompli* long prior to the appointment of Orr as the City's EM – in fact, at a time when Orr was still a partner at the City's lead bankruptcy counsel's law firm (the "**Law Firm**").

3.      While AFSCME expects that the City's witnesses will testify that chapter 9 bankruptcy was always the last option and the City preferred an out-of-court settlement, those are nothing more than talking points.  In reality, the City's strategy of holding "check the box" meetings with creditors pre-petition at which the City purposefully refused to bargain in good faith was for the sole purpose of "making its record".  Indeed, the City's eventual strategy (under the leadership of Orr) was first suggested by the Law Firm beginning with a "pitch" presentation made by the Law Firm to the City on January 29, 2013 (the "**Pitch Presentation**", a copy of which is attached to the Supp. Kreisberg Declaration, Exhibit B) in the presence of State of Michigan (the "**State**" or "**Michigan**") officials who wanted to steer the City towards chapter 9.

4.      Apparently, as discussed further below, the State officials at the January 29, 2013 pitch (including the Governor's Transformation Manager, Richard Baird ("**Baird**")) liked what they heard and decided that the Law Firm would be their firm of choice, with Orr and his

extensive bankruptcy experience being utilized as the EM to complement the Law Firm's legal ability to move the City swiftly into chapter 9. Thus, the day after the Pitch Presentation was given, on January 30, 2013, Baird reached out to The Law Firm about the potential of hiring Orr as the EM, and this led to discussions between the Governor, Baird, Orr, other State officials and the Law Firm, and the ultimate hiring of both Orr and the Law Firm to guide the City into chapter 9.

5.      As discussed extensively in the AFSCME Eligibility Objection and for the reasons further set forth herein, in light of recent Supreme Court precedent, chapter 9 of the Bankruptcy Code violates the United States Constitution and should be struck down by an Article III Court with authority and jurisdiction to make this crucial Constitutional law determination.

6.      However, to the extent this Court disagrees and determines that it has jurisdiction to uphold the Constitutionality of chapter 9 generally, this Court should find that the City is not eligible for relief under chapter 9 pursuant to sections 109(c) and 921(c) of the Bankruptcy Code.

## STATEMENT OF FACTS

7.      Orr currently serves as the EM of the City under PA 436.

8.      The Governor appointed Orr as EM for the City on March 14, 2013, effective as of March 25, 2013. On March 28, 2013, upon the purported effectiveness of PA 436, Orr became, and continues to act as, EM for the City under PA 436.

9.      On June 14, 2013, Orr issued a "Proposal for Creditors" which expressly stated that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." The same day, Orr publicly threatened, in an interview with the

Detroit Free Press Editorial Board,[2] that vested pension benefits would not be protected in a chapter 9 proceeding authorized by the Governor pursuant to PA 436, and that any state laws protecting vested pension benefits would "not . . . protect" retirees in bankruptcy court. The EM stated as follows in the interview:

> Q       You said in this report that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?
>
> A.       The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law. Which the Ninth Circuit agrees with for now.
>
> ***
>
> A.        It is what it is - so we said that in a soft way of saying, "Don't make us go into bankruptcy." If you think your state-vested pension rights, either as an employee or a retiree - that's not going to protect you. If we don't reach an agreement one way or the other, we feel fairly confident that the state federal law, federalism, will trump state law or negotiate. The irony of the situation is we might reach a deal with creditors quicker because employees and retirees think there is some benefit and that might force our hand. That might force a bankruptcy.

    10.    As discussed below and as will be further established at trial, the Governor (and other State officials) and the EM were well aware both prior to and subsequent to the issuance of the letter on July 18, 2013 from the Governor to the EM authorizing the EM to have the City commence its chapter 9 case without any conditions or limits (the "**Governor's Authorization Letter**") of the City's intentions to modify and/or terminate vested pension obligations in chapter 9 without limit in derogation of the Michigan Constitution.

---

[2] *See Q&A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, Detroit Free Press (June 16, 2013), *available at* http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-detroit-emergency-manager-creditors-fiscal-crisis.

**A.  The Webster Litigation And The Governor's Unconditional Authorization**

11.  On July 3, 2013, against the backdrop of the threatening statements made by Orr regarding Michigan state law and protected pension benefits, plaintiffs (the "**Webster Plaintiffs**") Gracie Webster (a City retiree) and Veronica Thomas (a current employee of the City vested in her pension) commenced a lawsuit against the State of Michigan, the Governor and the State Treasurer seeking: (a) a declaratory judgment that PA 436 violated the Constitution of the State of Michigan to the extent that it purported to authorize chapter 9 cases within which vested pension benefits might be sought to be compromised; and (b) an injunction preventing the defendants from authorizing any chapter 9 case for the City within which vested pension benefits might be sought to be reduced. *See Webster v. State of Mich.*, No. 13-734-CZ (Ingham County Cir. Ct. July 3, 2013) (the "**Webster Litigation**").[3]

12.  In briefing submitted in support of a preliminary injunction and declaratory order against the Governor, the Webster Plaintiffs explained that Article IX, Section 24 of the Michigan Constitution provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby;" that there could not be a more clear and plain constitutional mandate; and that Article IX, Section 24 means what it says: accrued pension benefits shall not be reduced.

13.  Further, as the Webster Plaintiffs noted, the Official Record of the 1963 Michigan Constitutional Convention makes clear that no governmental entity or its officials can do anything to diminish or impair vested pension benefits: "This is a new section that requires that accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions be a contractual obligation which cannot diminished or impaired by the

---

[3] Two additional lawsuits were also filed raising similar issues in addition to the Webster Litigation.

action of its officials or governing body." 2 Official Record, Constitutional Convention 1961, p. 3402.

14.     The Webster Plaintiffs also noted that PA 436 explicitly recognizes that accrued pension benefits shall not be diminished or impaired outside the bankruptcy context.  For example:

- Section 11 of PA 436 requires that an emergency manager develop a written financial and operating plan for the local government and that such plan "shall provide" for "the timely deposit of required payments to the pension fund for the local government."

- Section 13 of PA 436 authorizes the emergency manager to eliminate the salary, wages or other compensation  and benefits of the chief administrative officer and members of the governing body of the local government, but expressly provides that "[t]his section does not authorize the impairment of vested pension benefits."

- Section 12(m) of PA 436 authorizes an emergency manager under certain circumstances to be appointed as the sole trustee of a local pension board and to replace the existing trustees, and requires that "the emergency manager shall fully comply with . . . Section 24 of Article IX of the state constitution . . ." when acting as the sole trustee.

15.     But, in violation of Article IX, Section 24 of the Michigan Constitution, PA 436 fails to similarly forbid the Governor explicitly from authorizing a chapter 9 bankruptcy filing if accrued pension benefits may be sought to be diminished or impaired as a consequence of that filing.  Section 18 of PA 436, which purportedly empowers the Governor to authorize a municipality to file for bankruptcy under chapter 9, nowhere prohibits the Governor from authorizing such a filing if accrued pension benefits may be sought to be diminished or impaired.  Clearly, the Legislature understood and honored the Michigan constitutional mandate not to diminish or impair accrued pension benefits outside of bankruptcy.  Just as clearly, the Legislature omitted any constitutional protection against the impairment or

diminishment of accrued pension benefits when the Governor purports to authorize a chapter 9 bankruptcy filing under Section 18 of PA 436.

16.     In other words, if accrued pension benefits may be diminished or impaired, in violation of Article IX Section 24 of the Michigan Constitution, the section of PA 436 purporting to authorize this bankruptcy, Section 18, must be unconstitutional as applied.

17.     On July 18, 2013, the same date this chapter 9 case was commenced, the Ingham County Circuit Court for the State of Michigan (the "**State Court**") entered a temporary restraining order (the "**TRO**", attached to the Kreisberg Declaration, Exhibit A) enjoining the Governor, the State Treasurer and the other defendants in the Webster Litigation from authorizing a chapter 9 filing and taking any further action "with respect to any filing which has already occurred" including the authorizing of an "unconditional" chapter 9 filing (*i.e.* one in which the EM would represent himself as having authority to modify and/or terminate pension obligations without limit in derogation of the Michigan Constitution).

18.     Despite the issuance of the TRO and the State Court's clear directive to the Governor regarding not authorizing any further filings by the City, the Governor did not seek to prevent the City from filing all of its "first day pleadings."  Indeed, the Governor authorized and the EM directed the chapter 9 filing just minutes before the July 18, 2013 TRO hearing was set to begin (and during a brief delay in the TRO hearing requested by the Governor's attorney) in order to potentially "cut off" any argument that the filing was not properly authorized (because the Governor knew and the EM expected that the State Court Judge was prepared to grant the TRO).

19.     On July 19, 2013, the State Court held a further hearing on the Webster Litigation and entered an Order of Declaratory Judgment (the "**Declaratory Judgment**,"

attached to the Kreisberg Declaration as Exhibit B). The Declaratory Judgment (a) finds PA 436 unconstitutional and of no force and effect to the extent it permits the Governor to authorize the EM to proceed under chapter 9 in any manner that threatens to diminish or impair pension benefits and (b) rules that the Governor must direct the EM "to immediately withdraw the chapter 9 petition … and … not authorize any further chapter 9 filing which threatens to diminish or impair accrued pension benefits." *See* Declaratory Judgment at 3.

20. To the extent there was any authorization for the chapter 9 filing, the State Court clearly ordered that the Governor revoke it to the extent it was intended to lead to the diminishment or impairment of accrued pension benefits. However, subsequent to the issuance of the Declaratory Judgment, on July 25, 2013, this Court granted the City's motion to extend the automatic stay, which, *inter alia*, stayed pending appeals of the Declaratory Judgment (and other similar state court proceedings). *See* Docket No. 166.

> **(i)** **The Governor (And Other State Officials) And City Intended Through The Chapter 9 Filing To Impair And/Or Terminate Vested Pension Benefits, And The Governor Was Aware Of This Prior To His Authorizing The Chapter 9 Filing**

21. The evidence obtained to date (and as will be further demonstrated at trial) reveals that the Governor (and other State officials) and the EM were well aware both prior to and subsequent to the issuance of the Governor's Authorization Letter of the City's intentions to modify and/or terminate vested pension obligations in chapter 9 without limit in derogation of the Michigan Constitution.

22. First, the June 14 Restructuring Plan (defined below) expressly provided that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons", and the Governor has admitted in deposition testimony to (i) having viewed drafts of the June 14 Restructuring Plan; (ii) being specifically aware that the Restructuring

Plan provided for significant cuts to accrued, vested pensions for active and retired employees; and (iii) being specifically aware when he signed the July 18 letter authorizing the City's chapter 9 filing that Orr's position was "that there had to be significant cuts in accrued pension benefits." *See* Governor Snyder October 9, 2013 Transcript (the "**Governor 10/9 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit A),[4] at 46:3-23; 63:9-64:18. Furthermore, in a letter dated July 16, 2013 from Orr to the Governor (and Treasurer Andy Dillon) recommending that the City be authorized to immediately commence a chapter 9 bankruptcy case, Orr noted that the City met with all of the City's unions and four retiree associations to "solicit the unions and retirees' view on their preferred way to address the **dramatic, but necessary, benefit modifications**." *See* Orr Declaration, Exhibit J, p. 8 (emphasis added). The Governor admitted to reading this letter. *See* Governor 10/9 Transcript, at 52:13-15.

23.     Additionally, the City has unequivocally admitted that it intends to impair or diminish vested pension benefits of City active and retired employees through this chapter 9 proceeding. *See, e.g., City of Detroit, Michigan's Objections and Responses to Detroit Retirement Systems' First Requests for Admission Directed to the City of Detroit Michigan* [Docket No. 849], at p. 12 (admitting that "City intends to seek to diminish or impair the Accrued Financial Benefits of the participants in the Retirement Systems through this Chapter 9 Case."); *see also* Kevyn Orr September 16, 2013 Transcript (the "**Orr 9/16 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit B), at 252:25-253:16; 288:2-9

---

[4] Throughout this Objection, AFSCME has cited deposition testimony provided by various witnesses in connection with the City's chapter 9 eligibility litigation. AFSCME relies on the relevant portions of these various depositions as evidence, and has attached copies of the full deposition transcripts from the depositions of Governor Snyder, Kevyn Orr, Charles Moore, and Guarav Malhotra to the Artz Declaration filed in connection with the AFSCME Eligibility Objection. Additionally, AFSCME relies herein on the deposition transcripts of (i) Richard Baird (the "**Baird 10/10 Transcript**"), (ii) Andrew Dillon (the "**Dillon 10/10 Transcript**"), and (iii) Mayor David Bing (rough transcript only, the "**Bing 10/14 Transcript**"), copies of which are attached as Exhibits to the **Supplemental Declaration of Michael Artz** filed in connection with this Pretrial Brief.

(admitting that City intended to diminish or impair accrued pension benefits of Detroit pensioners, preferably through a consensual plan but preserving all rights to do so possibly through the use of the cramdown provisions of the bankruptcy code).

**B.     The Facts In The Record And To Be Further Adduced At Trial Demonstrate Why PA 436, As Applied To The Facts And Circumstance Here, Violates The Strong Home Rule Provisions Of The Michigan Constitution**

24.     PA 436 effectively, but unconstitutionally, adopts a new charter for Detroit which substitutes the unelected Emergency Manager for the Mayor and City Council collectively – including by granting the EM the power to, *inter alia*, issue orders directing the mayor and city council; set the local government budget unilaterally; enter into, and break, contractual agreements for the City, including CBAs, loans, and property transfers; seize control of the pension fund from its trustees; and, most relevant here, act exclusively on the local government's behalf in chapter 9.

25.     Here, the evidence shows (as will be further adduced at trial) that the EM (and the City's agents directed by the EM) has exercised a variety of purely local governmental powers – despite being a "contractor to the State of Michigan", as the EM has described himself (*See* Orr 10/4 Transcript, at 454:10-14) – ranging from his explicit suspension of the City Charter, to discrete financial decisions about purely local City expenditures, to control over potential attempts by the City to raise revenue.  For example: (i) Order No. 10, issued by the EM on July 8, 2013, suspends the Detroit Charter's requirement for filling vacancies on City Council.  *See* http://www.detroitmi.gov/Portals/0/docs/EM/Order%2010.pdf (last accessed Oct. 7, 2013); (ii)  Order No. 6, issued by the EM on May 2, 2013, directs the precise amount of deposits from the City to the Public Lighting Authority.  *See* http://www.detroitmi.gov/Portals/0/docs/EM/Order%206.pdf (last accessed Oct. 7, 2013); and

(iii) Order No. 5, issued by the EM April 11, 2013, requires that the EM approve in writing of any transfers of the City's real property. http://www.detroitmi.gov/Portals/0/docs/EM/Order%205.pdf (last accessed Oct. 7, 2013).

26. Furthermore, Mayor Bing has testified extensively that following the appointment of the EM, (i) the Mayor was no longer involved in discussions with unions or coalitions of unions because "that was under the purview of the Emergency Manager"; (ii) the EM (and the consultants retained by the EM) were involved in City's budgeting functions to the exclusion of the Mayor; and (iii) among other concerns, the EM and the City's consultants (like Conway MacKenzie) were exploring outsourcing and reaching conclusions with regard to numbers prior to completing the RFP process first. *See* Bing 10/14 Transcript, at 106:11-108:9.

27. In addition to undertaking the aforementioned purely local acts, which are reserved by Article VII of the Michigan Constitution to the local electors rather than the state which appointed and controls the EM, the EM has continued to exert complete control over all aspects of the City's local affairs during the instant bankruptcy proceedings. This includes the EM's unilateral direction of the bankruptcy process itself, which he has controlled without being subject to any state-law standard of review for his discretion or judicial review thereof.

28. The EM's actions in removing control over the City's operations and finances from elected officials has prevented the City from taking actions designed to raise revenue and avoid insolvency and instead has facilitated the EM's attempt to will the City into insolvency, as discussed below (and to be further supported by facts adduced at trial), thus rendering this entire bankruptcy proceeding a harm stemming from the unconstitutionality of PA 436's grant of authority to the EM (and the consultants controlled by the EM, including Ernst & Young and Conway MacKenzie) of the means of controlling all aspects of the City's finances.

## C. The City's Pre-petition Machinations And Subsequent Meetings (But Not Negotiations) With Creditors Such As AFSCME

### (i) The City's Bankruptcy Was Orchestrated Based On The Advice Of The City's Lead Bankruptcy Counsel And Discussed Before The EM Was Even Hired

29. As demonstrated herein and will be further shown at trial, in emails, documents and deposition testimony that surfaced following the City's chapter 9 filing going back to late January 2013, long prior to any alleged good faith negotiations with creditors (more about this point below), secret discussions were being held between Detroit and officials in the Governor's office and the Law Firm suggesting that the best course for the City would be to send it through chapter 9 bankruptcy. These facts collectively expose Orr's and the City's charade of pre-petition "negotiations" (in reality, one-sided meetings) in the month prior to the City's chapter 9 filing. In fact, all along, the clear goal was for the City to end up in chapter 9.

30. For example, the Law Firm was among a number of firms to provide a presentation made to the City on January 29, 2013 in the presence of State officials. *See* Pitch Presentation (dated January 29, 2013); *see also* Orr 9/16 Transcript, at 18:12-21:20 (discussing how Orr came with the Law Firm in late January to pitch for the City's restructuring work before a "restructuring team [of] advisors"); Baird 10/10 Transcript, at 13:11-15:10. During that pitch, Orr (among other lawyers that would be working on the proposed engagement) was presented primarily as a "bankruptcy and restructuring attorney." Orr 9/16 Transcript, at 21:3-6; *see also* Bing 10/14 Transcript, at 12:7-13:7 (indicating that Baird explained to Mayor Bing that Baird was "impressed with him [Orr], that he had been part of the bankruptcy team representing Chrysler" and that Orr primarily had restructuring experience in the context of bankruptcy).

31.     As part of the Pitch Presentation, the Law Firm presented, in part, the following playbook for the City's road to chapter 9:  (i) the difficulty of achieving an out of court settlement and steps to bolster the City's ability to qualify for chapter 9 by establishing a good faith record of negotiations (Pitch Presentation, pp. 13; 16-18; 22-23; 28); (ii) the EM could be used as "political cover" for difficult decisions such as an ultimate chapter 9 filing (Pitch Presentation, p. 16); (iii) warning that pre-chapter 9 asset monetization could implicate the chapter 9 eligibility requirement regarding insolvency, thus effectively advising the City *against* raising money in order to will itself into insolvency (Pitch Presentation, p. 17); and (iv) describing protections under state law for retiree benefits and accrued pension obligations and how chapter 9 could be used as means to further cut back or compromise accrued pension obligations otherwise protected by the Michigan constitution (Pitch Presentation, pp. 39; 41).

32.     Following the Law Firm's pitch in late January 2013, State officials (including Baird) informed attorneys at the Law Firm and Orr that they were interested in bringing Orr on board as EM, and Orr began to consider the offer.  *See* Orr 9/16 Transcript, at 24:24-25:31:5; Baird 10/10 Transcript, at 19:2-20.  Orr commented regarding his proposed consideration for appointment as EM and discussed with his law firm at the time how to go about leading the City into chapter 9.  In an email (attached to the Kreisberg Declaration, Exhibit 1) dated January 31, 2013, Orr's colleague at the firm stated in an email to Orr that the "ideal scenario would be that [Michigan Governor] Snyder and [Detroit Mayor] Bing both agree that the best option is simply to go through an orderly Chapter 9.  This avoids an unnecessary political fight over the scope/authority of any appointed Emergency Manager appointed and, moreover, moves the ball forward on setting Detroit on the right track."   Kreisberg Declaration, Exhibit

1.[5]  Indeed, this was a similar suggestion made by the Law Firm in the Pitch Presentation. *See* Pitch Presentation, p. 16 ("Ultimately, the Emergency Manager could be used as political cover for difficult restructuring decisions.").

33.    Orr's colleague then stated his own reservations about whether an emergency manager would be useful outside of bankruptcy where his "ability to actually do anything is questionable given the looming political and legal fights" *Id*.  In contrast, he observed in an earlier email, "[m]aking this a national issue . . . provides political cover for the state politicians" and gives them an "incentive to do this right" because "if it succeeds, there will be more than enough patronage to allow [them] to look for higher callings—whether Cabinet, Senate, or Corporate."  *See* Kreisberg Declaration, Exhibit 2.[6]

34.    As noted above, others involved in the discussions prior to the chapter 9 filing included Baird, the Governor's Transformation Manager.  In an email also dated January 31, 2013, Orr, in anticipation of a conversation he was to meet with Baird "in a few minutes" about whether to accept the EM position, observed that PA 436 "is a clear end-around the prior initiative" to repeal the previous Emergency Manager statute, Public Act 4, "that was rejected by the voters in November."  *See* Kreisberg Declaration, Exhibit 3.[7]  According to Orr "although the new law provides the thin veneer of a revision it is essentially a redo of the prior rejected law and appears to merely adopt the conditions necessary for a chapter 9 filing."  *Id*.

---

[5]*See also* Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was hired, e-mails show,* http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-bankruptcy-emails (last visited on August 19, 2013).

[6] *See also* Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was hired, e-mails show,* http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-bankruptcy-emails  (last visited on August 19, 2013).

[7] *See also* Matt Helms, *Detroit bankruptcy, Kevyn Orr's doubts discussed weeks before EM was hired, e-mails show,* http://www.freep.com/article/20130722/NEWS01/307220086/Kevyn-Orr-Detroit-bankruptcy-emails (last visited on August 19, 2013).

35.     In a further email dated January 31, 2013, Orr indicated that Baird wanted Orr to be hired as the EM and his firm to represent the City (regardless of whether Orr took the EM job), and that Orr indicated that he would be glad to work together with the City, even if not as EM, indicating that "I [Orr] and the firm are committed to working in lockstep with the [C]ity." *See* Kreisberg Declaration, Exhibit 4.[8]

> **(ii)     No Good Faith Negotiations Took Place Following The Appointment Of The EM With Parties Such As AFSCME Prior To The City's Chapter 9 Filing**

36.     As indicated above, the die was cast for the City's inevitable chapter 9 filing prior to the March appointment of Orr as EM.  Following Orr's appointment, the City and Orr maneuvered to establish the veneer of formal pre-petition creditor negotiations, when in reality, Orr and the Governor knew all along that the non-interactive meetings would be held on a *pro forma* basis so the City could attempt to establish alleged good faith negotiations.

37.     The facts belie the notion of any pre-filing negotiations, whether in good faith or otherwise.  Indeed, the City itself admitted both in letters and at the meetings held in the month or so prior to the filing that the City was only interested in one-way discussions, not negotiations.  As discussed below, **evidence obtained in discovery reveals (as will be further established at trial) that while these meetings were ongoing – indeed, before ever meeting face-to-face with union representatives alone – the City had already made a determination as early as the beginning of July 2013 that it would be filing for chapter 9 protection on or about July 19, 2013**.

38.     On June 14, 2013, the City held a meeting of representatives of the City's creditors (the "**June 14 Meeting**") to present the City's comprehensive restructuring plan/

---

[8] See also Kate Long, *Who is representing Detroit?*   http://blogs.reuters.com/muniland/2013/07/25/who-is-representing-detroit/ (last visited on August 19, 2013).

"Proposal for Creditors" (the "**Restructuring Plan**", attached to the Kreisberg Declaration as Exhibit C). Even prior to these meetings, Orr confirmed that the City's discussions of a predecessor to its ultimate Restructuring Plan, the EM's May 12, 2013 "Financial and Operating Plan", would not involve any negotiations, explaining that "it is under the [PA 436] statute, it is my plan and it's within my discretion and obligation to do it. **This isn't a plebiscite, we are not, like, negotiating the terms of the plan**. It's what I'm obligated to do." *See* Kevyn Orr Interview to Detroit WWJ Newsradio 950/AP, *Detroit EM Releases Financial Plan; City Exceeding Budget By $100M Annually*, May 12, 2013, *available at* http://detroit.cbslocal.com/2013/05/12/kevin-orr-releases-financial-plan-for-city-of-detroit/ (emphasis added).

39.     On June 17, 2013, Steven Kreisberg, AFSCME's director of collective bargaining and health care policy, submitted a letter requesting from the EM various categories of information, assumptions, and data for AFSCME to honestly review all the information presented and begin good faith negotiations. *See* Kreisberg Declaration, Exhibit 5. AFSCME made this request prior to a scheduled June 20, 2013 meeting with unions (including AFSCME) representing the City's non-uniform employees regarding the City's pensions. At that meeting, the City represented that the meeting was "not a negotiation." *See* Kreisberg Declaration, ¶ 17. Furthermore, the letter inviting AFSCME to the June 20 meeting characterized the purpose of the meeting as being to "review" the Restructuring Plan (not negotiate it) and to have AFSCME "learn" about the Restructuring Plan. Kreisberg Declaration, Exhibit 6.

40.     In a letter dated June 27, 2013 to an AFSCME local union, the City indicated that it was posting certain information to a data room and was looking forward to the unions'

"feedback" (again not negotiation) with respect to the EM's retiree benefits restructuring proposal. *See* Kreisberg Declaration, Exhibit 7.

41.    In a follow up letter to the City dated July 2, 2013, Mr. Kreisberg again reiterated his request for information and data, including the backup data supporting the City retiree benefits proposal (support for which previously consisted of only a one-page financial summary). AFSCME requested relevant information and the opportunity (in conjunction with a meeting scheduled with the City's unions on July 10-11) to begin meaningfully engaging "in a good faith negotiation of these issues." *See* Kreisberg Declaration, Exhibit 8.

42.    In a response letter to Mr. Kreisberg on July 3, 2013, the City advised that it would not meet separately with AFSCME, and that the July 10, 2013 scheduled meeting with the unions would be a "discussion" (again not a negotiation). *See* Kreisberg Declaration, Exhibit 9. Similarly, in an email dated June 28, 2013, the City confirmed that it wanted to meet on July 10, 2013 to "discuss" its "developing pension restructuring proposal," clearly implying that the proposal itself was not even complete yet. *See* Kreisberg Declaration, Exhibit 10. Additionally, and tellingly, at that July 10, 2013 meeting, counsel for the City attempted to invoke Rule 408 confidentiality provisions stating that doing so was a tool used in every bankruptcy, so it should be invoked that day. *See* Supp. Kreisberg Declaration, ¶ 7. This statement made more than a week before bankruptcy was authorized or filed further demonstrating that the City intended to file for bankruptcy in any event.

43.    At the July 10, 2013 meeting, the City announced at the inception that the meeting would be a discussion but not a negotiation. *See* Kreisberg Declaration, ¶ 18. At a similar meeting with AFSCME and certain and other unions held on July 11, 2013, again there was no negotiation.

44.     Despite this evidence, it appears that the City now seeks to characterize its limited requests to creditors for feedback – but admitted refusal to bargain with them – on the Restructuring Plan at the four meetings held regarding that plan as satisfying chapter 9's good faith negotiation requirement.  Yet, in the City's reply brief regarding eligibility and recent deposition testimony by Orr, the City and Orr have explicitly denied that the City's discussions with creditors were negotiations.  *See* Debtor's Reply, at p. 55 n.49; Orr 9/16 Transcript, at 137:25-138:8 ("Q.  And was there any bargaining that took place at those sessions [on June 20th, July 10th, and July 11th] where the City said it would be willing to agree to something that was different from what was in June 14?  A.  Here again, I'm going to stay away from bargaining as a legal conclusion, duty to bargain is suspended.  I will say there was a back and forth and my understanding discussions and invitations for further information.").

45.     Furthermore, and critically, Orr recently testified that media reports prior to the City's chapter 9 filing that the City was planning on filing on July 19, 2013 were inaccurate.  Orr 9/16 Transcript, at 301:19-302:8 (indicating that there was no plan for the City to file on July 19, 2013 and that Orr's plan was "to have the permission, the authority, to file them and make that call at some point after I transmitted my letter of July 16 [requesting authorization from the Governor to file for chapter 9].").  Yet, evidence produced in discovery includes an Excel/spreadsheet document attached to e-mails circulated (i) to and from Bill Nowling (who works in the EM's office) sent to individuals in the Governor's office, entitled "Chapter 9 Communications Rollout" which makes clear that during the same time period that the City was purporting to conduct ongoing "good faith negotiations" with creditors regarding the Restructuring Plan, **in fact the City was, as early as July 1, 2013 planning on filing for chapter 9 on Friday, July 19, 2013**.  *See* Supp. Kreisberg Declaration, Exhibit C (spreadsheet

document dated July 4, 2013 attached to e-mail from EM's office to State officials entitled "Chapter 9 Communications Rollout" indicated that Friday, July 19, 2013 was "FILING DAY").

46.     Additionally, Treasurer Dillon, one of the state officials intimately involved in the hiring of the EM and in advising to the Governor to authorize the chapter 9 filing, testified that his understanding of the June 14 Restructuring Plan was that the document was not really a proposal (even though it was so labeled), rather the EM was just "laying out the facts for creditors so they could understand the financial condition of [the] City. . . This is the economic reality of the City of Detroit.  From there, as you know, there was various meetings with various creditors to discuss can we get this thing settled out of court." Dillon 10/10 Transcript, at 65:4-24.

> ### (iii)     The City's Bad Faith Refusal To Negotiate With Unions Such As AFSCME Has Continued Following The City's Bankruptcy Filing

47.     The City's pattern of bad faith refusal to negotiate any of its proposals regarding pensions or health insurance benefits changes has continued post-petition.

48.     For example, on August 2, 2013, the City convened a meeting of local union representatives and discussed active health insurance.  *See* Kreisberg Declaration, ¶ 19. However, during that meeting, the City specifically advised those in attendance (including AFSCME representatives) that the meeting was not a negotiation.  *Id* at ¶ 20.  Mr. Kreisberg sent a follow up letter to the City on August 6, 2013 requesting good faith bargaining, and referenced cost savings estimates which AFSCME previously proposed in prior negotiations with the City before the development of the Emergency Manager's initial financial restructuring plan in May.  *See* Kreisberg Declaration, Exhibit 11.  In an August 8, 2013 response, the City advised that it would not engage in collective bargaining with AFSCME, but

rather simply "discuss any feedback they may have regarding its health care restructuring plans." *See* Kreisberg Declaration, Exhibit 12.

49.     On August 14, 2013, the City held a follow up meeting with AFSCME on the subject of active medical benefits but did not accept any counterproposals or suggestions, but simply responded by further explaining its current intention with respect to active medical benefits.

50.     Given Orr's repeated statements to the media about the City's willingness to bargain with its unions, AFSCME has been surprised by the City's unwillingness to negotiate, pre or post-petition. While AFSCME has repeatedly stated its desire to move forward with constructive negotiations with the City on behalf of all AFSCME Detroit Employees, AFSCME cannot negotiate with an employer that is unwilling to come to the table for arms-length talks.

**(iv)     The City Has Previously Negotiated Labor Concessions With Unions That Modified Both Active And Retiree Benefits**

51.     The City argues, in part, that negotiations with its retirees were impractical or impossible as the City could not bind the disparate group of retirees in any agreement. However, the City should be well aware (and indeed its advisors have admitted) that in February 2012, City labor negotiators reached a tentative agreement (the "**Tentative Agreement**") with a "Coalition of City of Detroit Unions", including several AFSCME local bargaining units. *See* Supp. Kreisberg Declaration, ¶ 4, Exhibit A (attaching copy of the Tentative Agreement). Pursuant to deposition testimony given by Gaurav Malhotra of Ernst & Young ("**E&Y**") on September 20, 2013 (one of the City's restructuring advisors), E&Y was actively involved "in assisting quantify some of the savings in conjunction and collaboration ·with the City as the City negotiated with the – its unions [regarding the Tentative Agreement]." *See* Gaurav Malhotra September 20, 2013 Transcript (the "**Malhotra 9/20**

**Transcript**", a copy of which is attached to the Artz Declaration, Exhibit C), at 86:20-23. Mayor Bing also testified that he was well aware of the Tentative Agreement ratified by the unions and that would have resulted in savings for the City, but such agreement was ultimately never implemented by the State. *See* Bing 10/14 Transcript, at 100:15-101:13

52.     While the Tentative Agreement was never implemented, changes with respect to benefits in the proposed Tentative Agreement would have directly impacted retiree benefits, and indeed, based on projections at the time, AFSCME understands that the Tentative Agreement could have saved the City approximately $50 million annually, a number which included retiree health benefit changes. *See* Supp. Kreisberg Declaration, ¶¶ 5-6.

53.     Despite this evidence, Orr has testified that he was unaware of the Tentative Agreement (and, thus implicitly, unaware of the City's prior success at bargaining in good faith with the City's unions, which led to changes to both active and retired employees' benefits):

```
15  Q.   Are you aware of a coalition among certain of the
16       City's unions put together in order to try and deal
17       with some of the restructuring issues with regard to
18       labor that you've been focused on?
19  A.   A coalition?  Can you please explain?  Informal
20       coalition or the retiree committee or --
21  Q.   Not the retire committee.  A coalition of unions with
22       regard to trying to deal with some of the labor issues
23       that you --
24  A.   Under the AFSCME umbrella?
25  Q.   No, no, no.

    Page 237

 1  A.   Or separate union?  I'm trying to -- I'm trying to
 2       understand.
 3  Q.   Well, I think your answer indicates to me that perhaps
 4       the answer is no.
 5  A.   Yeah.  Okay.
```

Orr 9/16 Transcript, at 237:15-237:5.  Given that Orr himself was unaware of the City's ability to negotiate deals affecting both active employees and retirees outside of bankruptcy, the City's assertion that negotiations regarding changes to retiree and pension benefits were "impracticable (if not impossible)" is misguided.  Orr could not possibly have attempted to negotiate in good faith if he had not done even the most preliminary investigation as to whether Detroit's several unions had ever negotiated with the city collectively in the past, indeed the very recent past.

> D. **The City Has Failed to Establish It Is Insolvent, And The City's Chapter 9 Case Was Not Commenced Due to Any Imminent Financial Emergency, Rather To Avoid The Webster Litigation (And Other State Court Proceedings)**

54. The City at first glance seems to provide thick volumes which it calls evidence regarding its alleged insolvency.  *See, e.g.,* Orr Declaration, ¶¶ 52-57; Malhotra Declaration, ¶¶ 10-26; Moore Declaration, ¶¶ 9-20.  However, as demonstrated below (and will be further shown at trial), what becomes apparent from reviewing these declarations (which serve as the basis for the City's insolvency arguments) is that (i) each often cross-relies (as purported evidence as to the truth of particular statements) on other (non-expert) testimony, other documents prepared by the City, or other assumptions/evidence convenient to the City but without any real foundation.  *See, e.g.*, Orr Declaration, ¶¶ 52-57 (citing, in part, the June 14 Restructuring Plan and Malhotra Declaration as evidence); Moore Declaration, ¶¶ 13-14 (estimating pension underfunding using what the "City" believes are more realistic assumption)); Malhotra Declaration, ¶¶ 11; 15; 21-22 (discussing manner in which City's financial forecasts and projections were prepared based on certain complex assumptions, calculations and input from other City officials).  Furthermore, the City offers no expert witness to testify regarding the City's asserted insolvency despite the City having spent millions of

dollars and having gone out and hired a multitude of legal, financial, actuarial and restructuring advisors. Ultimately, the fact remains that **despite the pile of "evidence" submitted by the City, the City does not have a single witness who can stand up as an expert and testify as to the City's insolvency**.

55. Furthermore, the City misleadingly cited its insolvency as what drove its chapter 9 filing, not the imminent state court rulings in the Webster Litigation and other state court proceeding, futher casting doubt on the reality of its conclusion that it is insolvent. *See, e.g.,* Debtor's Reply, at pp. 65-66. Yet, in reality (and as will be further demonstrated at trial), the discovery process has revealed several interesting facts that cut against insolvency as the true basis for the filing (*see* Debtor's Reply, at p. 65-66), and indeed Orr's recent testimony indicates that insolvency was not the driving factor behind the filing on July 18, 2013, rather the filing at that time was driven by the state court litigations. Orr testified:

```
19    When did you decide that the timing of the
20        Chapter 9 filing should be July 18th or July 19th?
21  A.   Well, I didn't.  I decided to make the request and my
22        intent was to have the ability to file available and
23        possibly executed as soon as I got it.  It was without
24        talking or waiving privileges from my counsel or
25        counsel and investment bankers, the concerns about us
```

Page 221

```
1         losing control or being put in a situation because of
2         the ongoing litigation where I would not be able to
3         discharge my duties in an orderly fashion, in a
4         comprehensive matter to put the city on a sustainable
5         footing because of the litigation grew . . .
6         and it was made clear to me that my desire to try to
7         continue to engage in discussions was running the risk
8         of putting my obligations under the statute in peril
9         and I think I was even counseled that I was being
10        irresponsible.
```

Orr 9/16 Transcript, at 220:19-221:6-10.

56.     In addition, the City's evidence regarding insolvency is built upon unproven assertions regarding, *inter alia*, the alleged unfunded amount of the City's pension and other retiree benefits.  Indeed, in the June 14 Restructuring Plan discussing the actuarial accounting underfunding on the City's pension plans, the City suggested that such underfunding using more "realistic assumptions" would be approximately $3.5 billion, up from the $644 million from the City's 2011 reported underfunding.  Restructuring Plan, pp. 23, 109 (noting that "preliminary analysis indicates that the underfunding in the GRS and the PFRS is approximately $3.5 billion); *see also* Orr Letter Dated July 16, 2013 to Governor Snyder and Treasurer Dillon (copy attached as Exhibit J to Eligibility Brief (recommending chapter 9 filing and discussing $3.5 billion in underfunding of pension liabilities)).

57.     However, these allegedly "realistic assumptions" were directly dictated by the City to their actuarial advisor, Milliman, Inc. For example, Charles Moore of Conway MacKenzie admitted in his deposition that the City really had no idea what the underfunded portion of the pension obligations might be (as of September 18, 2013) because "until the City completes its analysis [which is had not yet done] and completes its own actuarial valuation, neither the City nor its actuary [Milliman] nor I would be able to say what all the assumptions are that could be used to either overstate or understate the funded position [of the pensions]." *See* Charles Moore September 18, 2013 Transcript (the "**Moore 9/18 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit D), at 62:2-7; *see also* Moore 9/18 Transcript, at 63:10-12 (indicating that 7 percent rate of return figure used by Milliman in running certain calculations regarding pension underfunding "was used for illustrative purposes" only and was not recommended by any specific actuary).  Furthermore, in an e-mail dated July 9, 2013 from Treasurer Dillon to the Governor and others regarding a meeting Orr

would be having with the Detroit retirement systems on July 10, 2013, Treasurer Dillon indicated that "[b]ecause pensions have such a long life there are a lot of creative options we can explore to address how they [the pensions] will be treated in a restructuring."  *See* Supp. Kreisberg Declaration, Exhibit D.  Dillon further testified that from the period July 9, 2013 through the City's filing date, the City remained in the "informational stage" regarding the pension issue and what the underfunding status meant for retirees.  Dillon 10/10 Transcript, 119:1-25.  Dillon explained as follows:

> 1 Q. The last question is relating to Exhibit 5 which has
> 2 already been marked. It's the July 9th email.
> 3 The email states "Tomorrow's meeting could
> 4 lead to questions directed to you about your view on
> 5 this topic." It's relating to the pension issue.
> 6 Is that a fair characterization of the
> 7 email?
> 8 A. Right.
> 9 Q. "In my view, it's too early in the process to
> 10 respond to hypothetical questions. We remain in
> 11 many ways in the informational stage. I have some
> 12 thoughts as to how you could address some pointed
> 13 questions if you're interesting in hearing them."
> 14 What pointed questions were you expecting?
> 15 A. Anything from -- well, going back in time here, but
> 16 just obviously the whole gamut of questions
> 17 regarding what the underfunding status could mean to
> 18 retirees, and I thought that the situation was not
> 19 understood enough for the Governor to go on record
> 20 yet because **I couldn't even tell him with any degree**
> 21 **of confidence what level of funding these pension**
> 22 **funds had**, so why should he get in the middle of a
> 23 debate about this. It's obviously a very charged
> 24 and sensitive issue, and it was my free political
> 25 comments to him.
>
>         Page 120
>
>  Q. And this was really just over a week before the
> 2 filing. That was your stance?
> 3 A. Yeah. I don't -- yeah, obviously. But I don't -- I
> 4 think it was in the context of this meeting that

5 Kevyn was going to have with the committee that
6 drove this email.
7 Q. Did anything change between the ninth and the filing
8 on the 18th that changed your opinion regarding what
9 you, I believe, just stated was too early to tell
10 him with any degree of confidence what level of
11 funding the pension funds had I believe is what you
12 just stated.
13 A. Yeah, I have not -- my opinion is pretty much the
14 same.
15 Q. The last sentence of the email says "I have some
16 thoughts as to how you could address some pointed
17 questions if you're interesting in hearing them."
18 What were your ideas for how to answer the
19 questions?
20 A. I don't recall specifically at this point.
21 Q. Did you ever have a conversation with him regarding
22 your thoughts on how to answer the questions?
23 A. No.
24 Q. You mentioned in the email "Because pensions have
25 such a long life there are a lot of creative options

        Page 121

1 we can explore to address how they will be treated
2 in restructuring."
3 What were your creative options that you
4 had on the table?
5 A. There's dozens. I mean, I don't have one that I
6 would pick out. But pension funds do have a long
7 life and there's a lot of creative things that can
8 be done, so I -- I don't have one or two that I
9 would just throw out, but I do know that there's a
10 lot of ways to address that issue.
**11 Q. Have there been any formal reports or proposals**
**12 identifying and explaining what you consider to be**
**13 these creative options?**
**14 A. No.**
**15 Q. Were these creative options ever explored with the**
**16 pension systems directly --**
**17 A. Not to my knowledge**.

Dillon 10/10 Transcript, 119:1-121:17 (emphasis added).

58.     In fact, experts who reviewed the actuarial assumptions of Detroit's pension systems concludes that the current assumptions generally fall within industry standards. *See, e.g.*, *Detroit's Current Pension Assumptions Fall Within Standards: Morningstar*, *available at* http://www.mandatepipeline.com/news/detroits-current-pension-assumptions-fall-within-standards-morningstar-242817-1.html (last visited October 8, 2013).

59.     Furthermore, as discussed above, the Law Firm highlighted at the January 29, 2013 pitch that "Asset monetization outside of bankruptcy may implicate eligibility requirement that City be insolvent (e.g., measured by short-term cash)" (Pitch Presentation, p. 17), and the City accordingly chose not to monetize certain assets prior to the filing to limit the appearance of short-term cash on the books.  This is evidenced, in part, by the (i) recent announcement by the EM of the deal to lease Belle Isle to the Governor and (ii) Orr's strong hints that he is considering monetizing artwork at the Detroit Institute of Arts.[9]

60.     Additionally, the City's financial projections which serve, in part, as the City's basis for establishing insolvency (which themselves were built on various assumptions not established by any **expert** testimony) fail to consider the possibility of possible funding sources outside those included in the City's financial projections.  For example, Malhotra testified that the City's financial projections assume that the City will have no other funds beyond the City's general fund and that the water and sewer fund was not incorporated into the City's projections. *See* Malhotra 9/20 Transcript, at 44:21-45:17.  Yet, Orr testified that with respect to the pension underfunding (which is cited throughout the City's Eligibility Brief and included as one of the major factors in the City's insolvency in numerous documents and pleadings), of the estimated

---

[9] *See State Signs Deal To Lease Belle Isle*, *available at* http://detroit.cbslocal.com/2013/10/01/reports-state-signs-deal-to-lease-belle-isle/ (last visited October 8, 2013); *Orr tells DIA to earn money from its treasures; long-term leases of artworks next?*, *available at* http://www.freep.com/article/20131003/NEWS01/310030115/Kevyn-Orr-Economic-Club-Detroit (last visited October 8, 2013).

$644 million in underfunding (based on the pensions funds' 2012 calculations), the majority of that underfunding is attributable to the water and sewer fund which generates its own revenue and which "does have some capacity" to raise rates to generate more funds. *See* Kevyn Orr October 4, 2013 Transcript (the "**Orr 10/4 Transcript**", a copy of which is attached to the Artz Declaration, Exhibit E), at 377:1-380:13.

61.     Finally, it bears noting that on July 16, 2013, the City reached a deal with its swap counterparties, which provided for such parties to (i) forbear from pursuing remedies and (ii) allowed the City to redeem the swaps until October 31, 2013 which would result in the City saving between $70 and $85 million. *See* Supp. Kreisberg Declaration, Exhibit E (e-mail from Ken Buckfire dated July 17, 2013). Given these immediate savings and other possible avenues (noted above) for the City avoiding bankruptcy, it is clear that the City's filing had very little to do with any purported insolvency and everything to do with the City's plan to impair or modify its pension obligations.

## ARGUMENT

## I.     THE CITY'S PETITION VIOLATES THE UNITED STATES CONSTITUTION

62.     AFSCME notes for the Court's consideration at trial that under principles of constitutional avoidance, the Court should only consider AFSCME's constitutional challenge if the Court determines that the City is otherwise eligible for chapter 9. Thus, the constitutional challenge is only relevant if the City has proven, among other things, that it is insolvent. Without conceding that AFSCME is insolvent, should the Court reach such a determination, the Court would then necessarily have to consider and rule on AFSCME's argument that for a truly insolvent municipality, chapter 9 – specifically including the prohibition at 11 U.S.C. § 903(1) of state municipal debt adjustment statutes requiring less than 100% creditor consent, such as

that approved in *Asbury Park*[10] – represents an unconstitutional Hobson's choice that forces the state (and municipality) into a situation where the state essentially must allow for federal interference to achieve the necessary debt adjustments. Moreover, the mere possibility of a state statute which can be used to adjust debts consistent with the Contracts Clause obviates the perceived need for a federal municipal bankruptcy statute which formed the underpinning of the Court's decision in *Bekins*.[11]

63.     The Constitution does not simply disappear once a bankruptcy petition is filed, even for holders of unsecured claims. *See, e.g., City of New York v. New York, N. H. & H. R. Co.,* 344 U.S. 293 (1953) (unsecured creditors possess right to notice and hearing under Fifth Amendment before debts can be discharged). So too with the Contracts Clause found at Article I, Section 10 of the U.S. Constitution. Article I, Section 10 contains three clauses, the last two of which permit Congress to consent to a number of otherwise-unconstitutional state acts, for example the right to "enter into any Agreement or Compact with another State," an example of which was the contract at issue in *United States Trust.*[12] The Contracts Clause, however, is found in the first clause of Section 10, which grants Congress no right to consent to a violation thereof. Thus, assuming *arguendo* that the City is correct that the intent of chapter 9 and PA 436 are both to skirt the constraints of the Contracts Clause by means of Congressional consent, Congress lacks the authority under Article I to grant that consent, and the Contracts Clause further prevents the State from passing a law like PA 436 intending to end-run the Contracts Clause. The result would be equally unconstitutional, and absurd, if Congress were to pass a statute, under its Section 8 power to coin money, which set up Article I courts to approve

---

[10]  *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502 (1942).

[11]  *United States v. Bekins*, 304 U.S. 27 (1938).

[12]  *United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1 (1977).

applications from individual states to coin their own money despite the blanket prohibition in Article I, Section 10 against states doing so.

64.     Third, no state, as argued *supra,* can "consent" to "enlarge the powers of Congress; none can exist except those which are granted."   *Ashton v. Cameron County Water Improvement Dist. No. 1*, 298 U.S. 513, 531 (1936).   The City's attempt to distinguish the Court's line of federalism cases since *New York v. United States*[13] completely misses this point by insisting that chapter 9 does not violate the federalism principles articulated in those cases merely because "chapter 9 is 'administered' by the federal bankruptcy court, not the States." Debtor's Reply, at p. 16.   But these cases cannot be oversimplified and read in a vacuum as the City suggests.   The Court's new federalism stands not for the narrow proposition that Congress cannot force states to administer federal regulatory programs, but for a broader constitutional rule: "if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress," and  "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions" even with "the 'consent' of the governmental unit whose domain is thereby narrowed."  *New York,* 505 U.S. at 156, 162, 182.

65.     Chapter 9 does exactly that – if a state consents, a federal bankruptcy judge enforces a set of instructions from the Code, most notably the requirements for plan confirmation, and takes over municipal decision-making during the bankruptcy by controlling the municipality's right not to engage in discovery or mediation and by wielding the power to appoint a trustee to recover preferential transfers over the municipality's objection.   These elements of chapter 9 – which the City entirely ignores in its brief – violate the Supreme Court's clear direction that ""[t]he Constitution's division of power among the three branches is

---

[13]  *New York v. United States*, 505 U.S. 144 (1992).

violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment." *Id.* at 182. The City points to general language in section 903 of the Bankruptcy Code prohibiting interference with "political or governmental powers," (Debtor's Reply, at p. 18), but that language is belied by other provisions of the Code explicitly permitting interference by the bankruptcy judge.

66.     The City's related argument that "chapter 9 operates much like federal programs that extend the benefits of federal money to States that voluntarily submit to federal requirements," (Debtor's Reply, at pp. 16-17) is inapposite because the state does not obtain money in exchange for taking some action clearly within its power but desired by the federal government, rather the state *reacquires* its inherent power under *Asbury Park* to access a process for adjusting its debts. In exchange for a power it already would possess in the absence of chapter 9, the state is forced to give the federal government control over state sovereign functions not available to Congress under the Constitution.

67.     This aspect of chapter 9 – its nullification of all state laws for municipal debt adjustment in favor of an exclusive federal remedy which subjects state and local officials to federal rules – highlights the accountability problem of allowing state and local officials to represent to their constituents that the only way to escape financial catastrophe is to access chapter 9 and accept the rules therein, such as claim priorities in the Code, which voters in the state might wish to alter. For if a state declines Congress's offer of access to chapter 9, it has no recourse to adjust municipal debts *en masse* as a result of section 903. Yet if a municipality is as financially distressed as the City contends it is, it faces the problem which motivated the Court in *Asbury Park* to find that states can design their own debt adjustment statutes consistent

with the Contracts Clause: the City has no reasonable alternative.[14]  Under such circumstances, state and local government officials face an unconstitutional conundrum: accept federal interference with their sovereign fiscal self-management, or default on municipal debt in violation of the Contracts Clause.  If the former is chosen, the City accepts rules and instructions from a federal judge, which state and local officials can refer to when attempting to shift blame for the hard decisions of municipal reorganization instead of confronting a local debate over legislation at the state level about how to adjust municipal debt.

## II.     THE CITY IS NOT ELIGIBLE TO FILE FOR CHAPTER 9 PROTECTION UNDER SECTION 109(C) OF THE BANKRUPTCY CODE

68.     The City, as a purported municipal debtor, bears the burden of establishing it is eligible for relief under chapter 9, and for all of the reasons asserted previously (and as will be further demonstrated at trial), the City necessarily fails to carry its burden with respect to the following eligibility requirements: (i) valid authorization under Michigan state law (section 109(c)(2) of the Bankruptcy Code); and (ii) good faith negotiations or impracticability of such negotiations (section 109(c)(5) of the Bankruptcy Code).  Further, as has become apparent through discovery and as shown above and in the AFSCME Eligibility Objection (and AFSCME expects will be further shown at trial), the City's evidence regarding insolvency is woefully inadequate, supported by no expert testimony or other reliable evidence, and accordingly the City fails to satisfy the insolvency requirement under section 109(c)(3) of the Bankruptcy Code.

---

[14]    In *Asbury Park,* the Court observed that "the practical value of an unsecured claim against the city is inseparable from reliance upon the effectiveness of the city's taxing power."  316 U.S. at 509-10.  Where, as in *Asbury Park,* financial crisis has rendered "the effective taxing power of the municipality prostrate without state intervention to revive the famished finances of the city," *id.* at 516, the Court recognized that "what is needed is a temporary scheme of public receivership over a subdivision of the State" allowing for the "discharge[]" of municipal debt obligations, *id.* at 510-11.  The City, like the municipality in *Asbury Park,* has contended that its need for bankruptcy protection stems from it having exhausted its ability to raise revenue through taxation.  *See* Eligibility Brief, pp. 28-30.

69. Finally, the evidence reveals that the City's bankruptcy petition was filed in bad faith and not motivated by a proper purpose under chapter 9 and should be dismissed pursuant to section 921(c) of the Bankruptcy Code.

70. It bears noting that at Orr's original deposition on September 16, 2013 (and subsequent October 4, 2013 deposition) and at other State officials depositions, Orr and various State officials (including the Governor, Dillon, and Baird) continued to hide behind the common interest privilege to essentially cover up any discussions or communications between City and State government officials under an alleged common interest privilege.

71. While this Court determined the common interest privilege may apply to such communications, AFSCME believes that the discussions and deliberations between City and State officials leading up to the City's filing for chapter 9 in the period prior to July 18, 2013 – discussions which the City and State have clearly worked hard to keep secret – relate to the crux of AFSCME's (and other objectors') arguments that the City filed its chapter 9 petition in bad faith, without real negotiations with significant creditors, and that the authorization was tailored by City and State officials to circumvent the Michigan constitution's Pensions Clause. Given the presumption that government is supposed to be transparent (*e.g.*. FOIA statutes), and the fact that significant e-mails between the State, City and the Law Firm (including between the State and Orr) were already produced in this and other litigations, to the extent that the common interest ever applied, such privilege has been waived and AFSCME **asserts its continued objection to the City and State refusing to give deposition testimony or provide documents** (some of which may have been waived by prior documents produced and deposition testimony given by the State and City in this and other proceedings) subject to an asserted common interest privilege.

72.     AFSCME believes that it already has sufficient evidence to rebut the City's case regarding authorization, good faith negotiations, general bad faith filing, and insolvency, but notes that the City and State's continued reliance on a purported common interest should be reconsidered and AFSCME provided further testimony and documents so AFSCME can have proper due process.[15]

### A.     The City Is Not Authorized By Michigan State Law To Be A Debtor Under Chapter 9

73.     As set forth in the AFSCME Eligibility Objection and as will be further demonstrated at trial, the Governor's blanket grant of permission to file for bankruptcy under Section 18 of PA 436 violated the Michigan Constitution because it failed to explicitly prohibit the impairment or diminishment of vested pension rights, which the Governor was fully aware was the intention of the instant chapter 9 petition.   Moreover, the appointment of the Emergency Manager under PA 436 violates the "strong home rule" provisions of the Michigan Constitution.   Where, as here, a state constitution bars the purported state law authorization, a chapter 9 petition must be dismissed.   *See In re City of Harrisburg, PA*, 465 B.R. 744 (Bankr. M.D. Pa. 2011) (analyzing Pennsylvania Constitution to determine whether city was authorized to file under chapter 9).

74.     AFSCME notes that the arguments raised in the AFSCME Eligibility Objection (and raised or to be raised at oral argument) that (i) the Governor's authorization violated of Article IX, Section 24 of the Michigan State Constitution (the "**Pensions Clause Arguments**") and (ii) PA 436 offends the "strong home rule" of Detroit (and the Emergency Manager is not

---

[15] AFSCME did not appeal the Court's common interest ruling which was interlocutory, but reserves the right to argue on appeal that the City and State's failure to testify and produce documents on relevant subject matters, including regarding the EM and State's plans for the EM commencing the City's chapter 9 case, prevent AFSCME from a full and fair opportunity to litigate its objections to the City's eligibility.   Accordingly, AFSCME reserves all rights in this regard, including all appellate rights upon entry of a final appealable order regarding the City's eligibility.

lawfully authorized to file for bankruptcy on behalf of the City or to act as its representative during chapter 9 proceedings) (the "**Home Rule Arguments**") are, in part, **as applied** arguments (*i.e.* arguments that involve the establishment of certain facts), and have been established (to the extent necessary) based on the factual evidence discussed above and as will be further adduced at trial.

75.     Thus, for the Home Rule Arguments, the evidence discussed herein, in the AFSCME Eligibility Objection, and to be further adduced at trial demonstrates that the EM, an unelected contractor of the State, has and continues to make local laws for the City. Furthermore, regarding the Pensions Clause Arguments, the evidence already adduced reveals, and AFSCME will further establish at trial, that the intent of the City to reduce vested pension rights in chapter 9 was well known to the Governor when he granted the EM authorization to commence the chapter 9 filing, and to the EM when he requested that permission and when he ultimately filed the petition, and that therefore each of those acts violated the Pensions Clause.

**B.     The City Failed To Participate In Any Good Faith Negotiations With Creditors Prior To Filing For Bankruptcy As Required For Eligibility Under Chapter 9**

76.     The City cannot meet its burden under section 109(c)(5) of the Bankruptcy Code of proving that it conducted good faith negotiations with its creditors or that such negotiations were impracticable.

77.     Congress enacted the "negotiation" requirement of section 109(c) to prevent capricious filings of chapter 9 petitions, and Courts do not "view lightly the negotiation requirements of 11 U.S.C. § 109(c)(5)." *See In re Villages at Castle Rock Metro. Dist. No. 4,* 145 B.R. 76, 85 (Bankr. D. Colo. 1990); *In re Town of Westlake, Tex.*, 211 B.R. 860, 867-68 (Bankr. N.D. Tex. 1997) (suggesting that section 109(c)(5) requires that a municipality have an intent to negotiate with creditors it intends to impair). "The 'creditor protection' provided by

section 109(c)(5). . . insures that the creditors have an opportunity to negotiate concerning a plan on a level playing filed with the debtor before their rights are further impaired by the provisions of section 362 of the Code." *Sullivan County,* 165 B.R. at 78-79).

78.     In *Cottonwood Water*, the Court explained the good faith negotiation requirement under section 109(c)(5) of the Bankruptcy Code as follows:

> Congress consciously sought to limit accessibility to the bankruptcy court by municipalities [by requiring] . . . the municipal entity, before rushing to . . . Court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under section 941 of the [Bankruptcy] Code. . . . The 'creditor protection' provided by section 109(c)(5) . . . insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired by the provisions of section 362 of the [Bankruptcy] Code.

138 B.R. at 979.

79.     Accordingly, the burden is on the City to demonstrate (i) that it engaged in good faith negotiations with its creditors concerning the possible terms of a plan or (ii) why it was unable to engage in such negotiations.  ASFSCME respectfully submits that the City cannot demonstrate any negotiations with creditors such as AFSCME, let alone "good faith" negotiations, and further given that the City conducted no pre-petition negotiations with significant creditors such as AFSCME, the City should not be heard to argue that negotiations were impracticable.

### (i)     The City Failed To Negotiate With Creditors Such As AFSCME

80.     The City claims it satisfies the section 109(c)(5)(B) requirement for negotiating with its creditors prior to the bankruptcy filing by negotiating with creditors, including unions such as AFSCME, in a few meetings held with its unions where the City discussed its restructuring proposals and took certain questions.  *See* Eligibility Brief, pp. 53-61 (citing, *inter*

*alia*, Orr Declaration, ¶¶ 90-96).   What the City fails to mention is that, as discussed extensively above and as indicated by Orr himself prior to the scheduling of these meetings, it was made clear throughout these series of 3 or 4 relatively short meetings that the meetings were "discussions" and the City was not willing to conduct **any** negotiations.   The City argued that the EM "openly invited the City's creditors to contact the City and its advisors to begin negotiations."   Eligibility Brief, p. 55.   In fact, the City rebuffed negotiations, which require concessions from both sides and collaboration between the debtor and its significant creditors. The City (acting through Orr) simply was not interested in negotiations (and as Orr indicated regarding the predecessor to the ultimate Restructuring Plan, the EM's May 12, 2013 "Financial and Operating Plan", "[t]his isn't a plebiscite, we are not, like, negotiating the terms of the plan").

81.      *In re Ellicott School Building Authority* is directly on point.   There, the debtor held three public meetings with large creditors regarding its proposed restructuring, although creditors were advised that the economic provisions of the proposed plan were not negotiable. 150 B.R. 261, 266 (Bankr. D. Colo. 1992).   The court held that even though the debtor conducted three public meetings explaining its proposed plan of restructuring to bondholders, it did not negotiate in good faith because it indicated that the economic terms of its proposed plan were non-negotiable.   *Id.* (debtor must be open to negotiating the substantive terms of a proposed plan); *cf. Int'l Ass'n of Firefightes, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 289 (9th Cir. B.A.P. 2009) (finding that the city did not satisfy section 109(c)(5)(B) because it "never negotiated with Unions or any of its creditors over the possible terms of a plan of adjustment."); *Sullivan County*, 165 B.R. at 78-79 ("The 'creditor protection' provided by section 109(c)(5) . . . insures that the creditors have an opportunity to negotiate

concerning a plan on a level playing field with the debtor before their rights are further impaired . . . ." (citation omitted)).

82.     The City's a "take it or leave it" Restructuring Plan proposal that was not really open to any negotiations (good faith or otherwise) should be rejected as the court did in *Ellicott School*.  The City failed to engage in **any** negotiations with its significant creditors such as AFSCME regarding the Restructuring Plan.  Flatly refusing to conduct any negotiations (despite repeated requests by AFSCME both prior to and subsequent to the City's bankruptcy filing) falls far short of the standard required under section 109(c)(5) of the Bankruptcy Code.

83.     The City has publicly proclaimed its willingness to negotiate, yet it and its representatives' (i) statements that the meetings held to discuss the Restructuring Plan were not negotiations and (ii) continued bad faith refusal for a period of time post-petition (until required mediation began) to hold negotiations (despite requests from AFSCME to jump start negotiations) makes it more than clear that the City has conducted no good faith negotiations with AFSCME and similarly situated creditors.

84.     Moreover, as described extensively above and will be further demonstrated at trial, to the extent that the City held a series of pre-petition meetings with creditors to discuss its Restructuring Plan, such meetings were simply scheduled as part of the EM and City's plan to bolster the City's "record (i.e. for future litigation)" as suggested by the City's lead bankruptcy counsel in the Pitch Presentation back in January 2013.  In addition, the evidence further reveals that the City had planned on filing for chapter 9 as of early July 2013 by the specific date of Friday, July 19, 2013 – even as alleged creditor "negotiations" were ongoing – regardless of how the discussions were progressing.  *See* Supp. Kreisberg Declaration, Exhibit C (spreadsheet document dated July 4, 2013 attached to e-mail from EM's office to State

officials entitled "Chapter 9 Communications Rollout" indicated that Friday, July 19, 2013 was "FILING DAY"). This evidence further establishes that the City was not really interested in any serious negotiations.

<blockquote>
(a)     **Despite The City's Creative Arguments To The Contrary, The City Cannot Escape The Fact That It Refused To Negotiate In Good Faith**
</blockquote>

85.     In the City's reply brief and in recent deposition testimony provided by Orr on October 4, 2013, the City and Orr have now taken the position that while the City may have made statements that its pre-petition meetings with the unions regarding its Restructuring Plan were not a "negotiation", such characterizations were simply to avoid any argument that the City triggered obligations to collectively bargain, which obligations may be suspended by PA 436. *See* Debtor's Reply, at p. 55 n.49; *supra*, ¶ 44. The City now argues that it was flexible in its negotiations and willing to consider other proposals, but received no counter-proposals from creditors, despite requests for same. The City's statements in that regard, however, do not establish the good faith **_negotiations_** required by the Bankruptcy Code. Requesting "feedback" or "invitations for further information" simply does not satisfy the City's burden of proof.

86.     AFSCME (and other objectors) offered on more than one occasion to engage in good faith bargaining and negotiations which were continually rebuffed by the City, and indeed as of late June/early July 2013, the City did not even have any complete proposal with respect to the restructuring of pension and other retiree benefits. Rather, the City's proposal to its creditors was no more than an ultimatum, with the City showing no real intention of negotiating economic or substantive terms. As noted, the City was interested in and spent months mapping out its path to chapter 9, and never had any real intention of bargaining in good faith.

        **(ii)**        **Even Assuming That The City Engaged In Negotiations, Such Negotiations Did Not Relate To A Plan That Is In The Best Interests Of Creditors As Required By Section 109(c)(5)(B)**

87.     While AFSCME submits that the City did not engage in any good faith negotiations with creditors such as AFSCME prior to the City's chapter 9 filing, even assuming this Court were to find otherwise, the City also has not satisfied section 109(c)(5)(B) of the Bankruptcy Code because the plan or terms of a plan being negotiated must be a plan that can be effectuated in chapter 9. *See Sullivan County*, 165 B.R. at 78 (debtor failed to meet burden of showing that it negotiated in good faith because the plan that was proposed was not a plan that could be effectuated in chapter 9); *Cottonwood Water*., 138 B.R. at 979 (finding that "in order for this Debtor to be entitled to the entry of an order for relief, it must be prepared to show that it engaged in good faith negotiations with its creditors concerning the possible terms of a plan to be effected pursuant to section 941 of the Bankruptcy Code.").

88.     Here, the proposed Restructuring Plan is patently unconfirmable because it unconstitutionally looks to reduce or eliminate guaranteed vested pension benefits pursuant to a plan that would presumably be crammed down on creditors, including those City retirees and employees that participate in the various pension and other retirement benefit plans, without their consent. Given that creditors owed pension obligations have absolute rights to those vested pension benefits under Michigan law as set forth extensively above, and one of the main goals of this proceeding is to modify vested pension and other retiree benefits, the City has no ability to confirm any plan of adjustment modifying such rights. *See* 11 U.S.C. §943(b)(4) (stating that the Court shall confirm a chapter 9 plan only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan.").

89.     Additionally, the Restructuring Plan is not in the "best interests of creditors" and thus could not be confirmed pursuant to section 943(b)(7) of the Bankruptcy Code. The "best

interests of creditors" test in the context of a chapter 9 case does not compare treatment under a plan of liquidation, but rather to other alternatives to creditors to the plan. *See, e.g., In re Sanitary & Improvement Dist., #7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989); ("Section 943(b)(7) [with respect to the best interest of creditor's provision] ... simply requires the court to make a determination of whether or not the plan as proposed is better than the alternatives."); *In re Mount Carbon Metropolitan Dist.*, 242 B.R. 18, 34 n.50 (Bankr. D. Colo. 1999) ("The 'best interest' requirement of § 943(b)(7) is generally regarded as requiring that a proposed plan provide a better alternative for creditors than what they already have.") (citing 4 Collier on Bankruptcy, 943.03[7] (Lawrence P. King, ed., 15th ed.1999)).

90.     Had there been no chapter 9 filing by the City, pension creditors could not be impaired under the Michigan Constitution, and any impairment of those rights under a plan of adjustment would violate Michigan law and be patently non-confirmable. Accordingly, because the Restructuring Plan proposes to unconstitutionally wipe out guaranteed vested pension benefits, the proposal cannot satisfy the requirements of good faith negotiations over a plan that could be effectuated in chapter 9.

91.     Orr failed to consider before filing for bankruptcy protection or since the filing, an equitable argument for the pension fund beneficiaries that other creditors extending debt after funding concerns surfaced publically should be subject to equitable subordination/fraudulent conveyance under Bankruptcy Code sections 510(c) and 544(b)/548(a) and pension benefits should take priority over those claims.

92.     Further, under Bankruptcy Code section 928(b), Orr should be exploring whether certain other creditors should bear the burden of some of the City's operating expenses during bankruptcy process, before benefit cuts are implemented.

93.     The City in its reply brief (*see* Debtor's Reply, at p. 58 n.50) argues that AFSCME is incorrect that to satisfy the good faith negotiation requirement of section 109(c)(5)(B), negotiations must be conducted regarding the terms of a confirmable plan. The City cites no authority for rejecting AFSCME's arguments in this regard, and the weakness of the City's argument is belied by its relegation to a footnote. There can be no doubt that the reference to good faith negotiations of the terms of a plan in section 109(c)(5)(B) of the Bankruptcy Code is to negotiations of the terms of a plan that can be effectuated in chapter 9, *i.e.*, a confirmable plan, as argued above. It is illogical for the statute to reference negotiations regarding an unconfirmable plan. Were that the case, then the whole point of good-faith negotiations would be meaningless and rendered moot, or simply, be deemed bad faith. As one recent court has explained in the chapter 9 context:

> The structure of the sentence [*i.e.* section 109(c)(5)(B)] strongly implies that in the negotiations, municipalities are seeking the creditors' agreement *to a bankruptcy plan*. **What other agreements can they be seeking?**

*In re Mendocino Coast Recreation and Park District*, No. 12-cv-02591-JST, 2013 U.S. Dist. LEXIS 139697, at *19 (N.D. Cal. Sept. 27, 2013) (*emphasis* in original; **emphasis** added).

94.     The City attempts to rebut AFSCME's reliance on *Sullivan County* and *Cottonwood*, *supra*, with respect to the meaning of a plan in section 109(c)(5)(B) of the Bankruptcy Code. Debtor's Reply, at p. 58 n.50. Although *Sullivan* does acknowledge that a *formal* plan is not required, that court states that, to be in good faith, negotiations must "revolve around the negotiating of the terms of a plan that could be effectuated if resort is required to chapter 9 of the Bankruptcy Code." *Sullivan*, at 78. For a plan to be effectuated under chapter 9, it clearly must satisfy the parameters of and be confirmable under section 943(b) of the Bankruptcy Code and be in the best interests of creditors. The *Sullivan* court's statement

that the plan need not be a "formal plan", *id.*, at 78, is underscored by the language that follows (and conveniently omitted by the City):

> While the statutory requirement does not require a formal plan as such, some sort of comprehensive plan is required as one of the 'screening factors' to avoid a too early and rapid resort to the bankruptcy courts by municipalities.

*Sullivan*, 165 B.R. at 78 (emphasis added). This language is telling and clearly negates the City's position with respect to the nature of the "plan." Both the *Sullivan*, *supra*, and *Cottonwood*, *supra*, courts concluded that, even where the parties engaged in good-faith pre-petition negotiations, the municipality failed to satisfy section 109(c)(5)(B) because the negotiations did not include the terms of a plan under chapter 9 of the Bankruptcy Code. The City would further have this Court ignore the finding in *Ellicott*, adopting the well-reasoned analysis of *Cottonwood,* that a municipality must establish that "'it engaged in good faith negotiations with creditors *concerning the possible terms of a plan to be effected under section 941 of the Bankruptcy Code.'*" *Ellicott*, 150 B.R.at 266 (citing *Cottonwood*, 138 B.R at 138) (emphasis added). The City failed to negotiate in good faith as any purported negotiations were not related to a plan that could be effectuated under section 941 and 943(b) of the Bankruptcy Code. The City, therefore, does not satisfy section 109(c)(5)(B) of the Bankruptcy Code.

### (iii)     Negotiations With Certain Categories Of Creditors Such As AFSCME Were Not Impracticable

95.     The City alleges that it alternatively qualifies for eligibility under section 109(c)(5)(C) of the Bankruptcy Code because negotiations were impracticable.

96.     As with the other eligibility requirements, the burden of proving impracticability rests with the City. *See In re Pierce County Housing Authority,* 414 B.R. 702, 713 (Bankr. W.D. Wash. 2009); *Vallejo*, 408 B.R. at 289 (citing *Valley Health*, 383 B.R. at 161). Courts

considering section 109(c)(5)(C) define the ordinary meaning of "impracticable" as "'not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible.'" *See, e.g.*, *Vallejo*, 408 B.R. at 298 (citing Valley *Health*, 383 B.R. at 163). Whether negotiations were impracticable is fact specific and depends upon the circumstances of the case. *See Vallejo*, 408 B.R. at 298.

97. The City alleges that negotiations were impracticable because, in part, the City had (i) numerous series of bonds and indebtedness held by multiple holders and (ii) approximately 20,000 retirees not represented by any formal agent or committee and other potential involuntary creditors. Furthermore, the City claims that the refusal of certain creditor constituencies to engage in good faith negotiations rendered negotiations impracticable.

98. In fact, AFSCME believes that the exact opposite is true here. The City predetermined that its pre-bankruptcy negotiations (which, as discussed above, were not negotiations) would fail. As discussed extensively above, the Governor and his staff orchestrated for several months prior to the hiring of Orr as EM to bring in Orr, as an experienced bankruptcy attorney, to lead the City on a clear path towards a chapter 9 filing, and any negotiations were a façade – the City went through the motions of pre-petition meetings but, as is evident from its pre-petition conduct *vis a vis* AFSCME, never had any intention of negotiating outside of bankruptcy.

99. While the City alleges that it has over 100,000 creditors, it is clear that the main creditors the City had to negotiate with were the unions, its retirees, and the bond trustees.

100. Moreover, as discussed extensively *supra*, The City itself has in the past negotiated with its unions with respect to concessionary agreements which changes impacted retiree benefits outside of a chapter 9 proceeding (even where such unions were not explicitly

representing their retirees). Thus, it is a red herring to say that negotiating medical benefits or pensions is impractical *per se*.

101.    While courts have made clear that impracticability can be demonstrated by the volume of creditors to negotiate with, in no case AFSCME is aware of did a court find that negotiations were impracticable where the Debtor did not even attempt to negotiate pre-petition with its largest creditors such as AFSCME (and after repeated requests to do so). In *Ellicott School*, the court determined that the debtor holding "public meetings to which all bondholders were invited" showed that negotiations were practicable.

102.    AFSCME is not suggesting that pre-petition negotiations could have bound everyone or must have involved all of the City's thousands of creditors. Rather, some level of negotiation with principal creditors could have led the City to a non-bankruptcy solution. By way of analogy, section 109(c)(5)(B) of the Bankruptcy Code contemplates pre-bankruptcy negotiations with creditors that municipality intends to impair, not all creditors.[16]

103.    Given the City's lack of negotiations with creditors such as AFSCME and similar union representatives that could have negotiated regarding the largest portion of the City's unsecured debt, the City's arguments that negotiations were impracticable should be rejected.

104.    In reality, the City was not truly interested in negotiating in good faith (whether or not such negotiations were impractical) because the City strongly desired a swift landing in chapter 9.

---

[16] Importantly, the City describes in the Orr Declaration that of the City has nearly $12 billion in unsecured debt, but 75% of that (approximately $9.2 billion) relates to <u>accounting</u> liabilities for post-employment benefit or underfunded pension liabilities.

## C. The City's Petition Should Be Dismissed Under Section 921(c) As Filed In Bad Faith

105.     The City's bankruptcy petition is subject to dismissal pursuant to section 921(c) of the Bankruptcy Code because the filing was in bad faith. Section 921(c) of the Bankruptcy Code provides that "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title."

106.     "Good faith is not defined in the Bankruptcy Code." *In re McCurtain Mun. Auth.*, No. 07-80363, 2007 WL 4287604, at *4 (Bankr. E.D. Okla. Dec. 4, 2007). Courts have determined, however, that the primary function of the good faith requirement in chapter 9 is to "ensure the integrity of the reorganization process by limiting access to its protection to those situations for which it was intended." *Sullivan County*, 165 B.R. at 80 (citation omitted); *see also In re City of Stockton, California*, 493 B.R. 772, 794 (Bankr. E.D. Cal. 2013) ("Section 921(c) "good faith" serves a policy objective of assuring that the chapter 9 process is being used in a manner consistent with the reorganization purposes of the Bankruptcy Code"); *Villages at Castle Rock*, 145 B.R. at 81 (describing good faith as requirement that "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes") (internal quotation marks and citation omitted).

107.     While good faith in the chapter 9 context is not defined in the Bankruptcy Code, courts have looked to discussions of good faith in the chapter 11 context to determine whether a chapter 9 petition has been filed in good faith. *McCurtain Mun. Auth.*, 2007 WL 4287604, at *4 (referencing chapter 11 good faith standards to determine whether chapter 9 petition was filed in good faith) (quoting *Villages at Castle Rock*, 145 B.R. at 81); *County of Orange*, 183

B.R. at 608 (observing that "courts have ... applied to chapter 9 cases the judicial reasoning that developed in chapter 11 cases" regarding good faith); *Sullivan County*, 165 B.R. at 82 (examining and applying chapter 11 good faith requirements to chapter 9 petition)).

108.     In the chapter 11 context, courts explain that the requirement of good faith

> prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes.  Moreover, a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons . . . available only to those debtors and creditors with 'clean hands.'

*In re Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986).

109.     Relevant considerations regarding good faith under chapter 9 include "whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing are consistent with chapter 9, the extent of the City's pre-petition efforts to address the issues, the extent that alternatives to chapter 9 were considered, and whether the City's residents would be prejudiced by denying chapter 9 relief."  *Stockton*, 493 B.R. at 794.

110.     Here, a review of the various relevant factors considered by courts when analyzing good faith under section 921(c) lead to the inescapable conclusion (which will be further demonstrated at trial) that the City's chapter 9 case was filed in bad faith and with unclean hands.

111.     First, the City's filing came several minutes prior to a Michigan State Court issuing a TRO enjoining the Governor from authorizing the filing.  The State lawyers at the hearing on the TRO asked for a short delay when they realized that an adverse ruling was forthcoming with respect to the City's ability to authorize any chapter 9 authorization which did not proscribe the reduction of pension benefits violated the Michigan constitution.  During that recess, the City filed for chapter 9 protection.  Thus, the City commenced this proceeding

"in the dark of night" to avoid a ruling it viewed as not in its favor. Such a filing is the antithesis of the careful, deliberative decision to file required under chapter 9, as "[t]he legislative history indicates that the strict hurdles to filing Chapter 9 were implemented to ensure that it was considered by a municipality only as a last resort." *Pierce County*, 414 B.R. at 714 (citation omitted) (noting debtor decided to file a chapter 9 petition only after several years of failed negotiations and attempts at mediation); *cf. Valleo*, 408 B.R. at 295 ("The evidence needs to show that the 'purpose of the filing of the chapter 9 petition not simply be to buy time or evade creditors.'"). The City filed chapter 9 to evade what it viewed as an imminent negative state court ruling – enjoining this very filing.

112. Moreover, as discussed above, while the City was purporting to negotiate with its creditors in good faith by holding several meetings, such meetings were employed as a mere strategy to bolster the record and never truly given the chance to succeed. The City simply does not have "clean hands".

113. Additionally, as discussed extensively above, the City did not reasonably consider any alternatives to chapter 9, did not give negotiations any real chance to succeed, and was preparing for a chapter 9 filing months before any creditor meetings to discuss restructuring options even started (and indeed had finalized a decision to file as of early July 2013 well before significant creditor meetings were scheduled to take place), and refused to negotiate with major creditors such as AFSCME as required. Simply put, the predetermined filing was done in bad faith and should be dismissed.

114. The City argues in its reply brief that the reason for filing the chapter 9 petition was not the imminent entry of the State Court TRO, but rather "to adjust its debts and resolve its liquidity crises [consistent] with the rehabilitative purposes of Chapter 9." Debtor's Reply,

at p. 65.  The City states further that it was no secret that Chapter 9 was an option if negotiations with creditors proved impracticable (which, of course, AFSCME disputes as set forth *supra*).  *Id.* at 65-66.  However, the City has not and cannot establish that negotiations with its creditors were impracticable under Section 109(c)(5)(C).  Thus, any reliance by the City on the impracticability of negotiations with creditors to establish good faith is misplaced.

115.    Moreover, the City's attempts to lay blame on the movants in the state court TRO proceeding by suggesting that it was the City's preparation for bankruptcy that prompted the request for the TRO (*see* City Reply, at 66, n. 56), rather than the opposite (*i.e.* that the imminent entry of the TRO prompted the chapter 9 filing) is incorrect.  Indeed, as discussed above, Orr admitted that the filing was being driven by the state court litigations and that he was being "irresponsible" by not authorizing the filings when he did.

116.    The City relies on the *McCurtain Municipal Authority*, decision to support its position regarding the timing of its filing and the state court TRO hearing.  In *McMurtain*, a creditor filed an application for the appointment of a receiver the day before the trustees of the municipal authority met to discuss a chapter 9 filing.  Notice of the trustees' meeting was provided before the filing of the application for the receiver.  The municipal authority argued that the potential appointment of a receiver may have been a concern, but it was not the only reason for the authority to ultimately file its petition.  *McCurtain* at *5 (identifying other concerns considered by the authority trustees that precipitated the chapter 9 filing).

117.    Here, in contrast, the evidence show that the City very much sought to avoid the effects of the State Court litigation and a ruling that the Governor could not authorize a filing that did not place contingencies on the EM from changing pension benefits in a chapter 9.  The City likely would have considered giving creditors more time to negotiate (as was required for

any significant bargaining to take place), and there was no cash crisis and the City had actually as of July 17, 2013 inked a deal with its swap counterparties which helped the City's anticipated liquidity.  The City has simply not proceeded in good faith.

> **D.     The City Has Failed To Meet Its Burden Of Proving Its Insolvency, And Only Does So Based On Assumptions Used By The City To Show Its Insolvency**

118.     The Bankruptcy Code does not offer relief to a city simply because it is suffering economic difficulties.  *See, e.g.*, *In re City of Bridgeport*, 129 B.R. 332, 339 (Bankr. D. Conn. 1991) (although City projected $16 million budget deficit, it was not insolvent, and "financial difficulties short of insolvency are not a basis for chapter 9 relief"); *In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1386 (10th Cir. 1998) (debtor not eligible for relief simply because it was severely economically distressed).

119.     In order to carry its burden on insolvency, the City must prove either that it is "(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C). The test under the first prong requires current non-payment of obligations, but the test under the second prong is prospective, looking to the debtor's future inability to pay.  *Bridgeport*, 129 B.R. at 336-37.  Solvency is measured as of the petition date.  *See, e.g., In re Town of Westlake, Texas*, 211 B.R. 860, 866 (Bankr. N.D. Tex. 1997) (citing cases).

120.     The purposeful refusal to make a few payments comprising a relatively small part of the City's budget does not satisfy the definition of "insolvent" under 11 U.S.C. § 101(32)(C)(i). *See, e.g., Uecker & Assocs. v. Tenet Healthsystem Hosps., Inc. (In re West Contra Costa Healthcare Dist.)*, No. 06-41774 T, 2010 Bankr. LEXIS 994, at *8 (Bankr. N.D. Cal. Mar. 26, 2010) (failure to pay $1.3 million out of $10-$11 million total operating expenses did not mean the debtor was "generally not paying its debts")

121.    First, the City "deliberately budget[ed and] spen[t] itself into insolvency (so as to qualify under § 101(32)(C)(ii)), when other realistic avenues and scenarios [were] possible." *Town of Westlake*, 211 B.R. at 867.  Second, "[t]he mere fact that a municipality has adopted a budget that reflects a cash flow shortfall is not independently sufficient to meet the requirement of the 'unable to pay' test."  COLLIER ON BANKRUPTCY ¶ 900.02[2][c][i] (16th ed. 2011). A municipal budget "must be evaluated in light of past and current practices, the practices of similar municipalities, and the extant facts and circumstances." *Id.*

122.    The City puts forward three declarations from Orr, Malhotra and Moore which appear to provide a voluminous amount of data to "establish" the City's insolvency, including on the basis of budget and service delivery insolvency, negative cash flows and inability to increase revenues or reduce expenses.

123.    However, as discussed above and as will further be demonstrated at trial, when one digs into all of the "facts" cited by these three declarants, it becomes apparent that the City failed to provide this Court or the citizens of Detroit evidence to establish insolvency.

124.    It is telling (and should be shocking to all citizens of Detroit and Michigan) that despite spending millions of dollars of taxpayer funds on the City's chapter 9 cases to hire a multitude of bankruptcy and restructuring professionals, the City fails to offer even one person to stand up as an *expert* and testify to the City's insolvency.  Courts in the non-chapter 9 context note that "[i]t is generally accepted that whenever possible, a determination of insolvency should be based on . . .  expert testimony . . ." *Brandt v. Samuel, Son & Co., Ltd. (In re Longview Aluminum, L.L.C.)*, Case No. 03B12184, 2005 Bankr. LEXIS 1312, at *18-*19 (Bankr. N.D. Ill. July 14, 2005); *see also Lawson v. Ford Motor Co. (In re Roblin Indus.)*, 78 F.3d 30, 38 (2d Cir. 1996); *Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979) (stating

that "a finding on the issue of insolvency often depends upon the factual inferences and conclusions of expert witnesses").

125. Here, the insolvency "evidence" offered by the City focuses on the non-expert testimony of Orr, Malhotra, and Moore. This testimony relies on unaudited and unfounded assumptions, unsupported statements and a complete lack of expert opinion. For example, as purported evidence for the City's insolvency, Orr (*see* Orr Declaration, ¶¶ 52-57) cites to the June 14 Restructuring Plan prepared by the City and to conclusory statements by Malhotra, one of the City's restructuring advisors (who of course all had one goal in mind: demonstrating insolvency).

126. While the City alleges that it was forced to suspend certain payments to "conserve its dwindling cash", the main portion of the payments not made revolve around the City's pension obligations, and those obligations are subject to dispute as to the ultimate amount required to be paid, and indeed evidence (discussed above and to be further adduced at trial) shows that (i) the City may have funds (or be able to raise funds from other sources such as revenues generated from the water and sewer fund) not calculated as part of its financial projections to cover such shortfalls and (ii) the City apparently chose to not actually calculate through an expert report the correct underfunding liability with respect to the pension obligations (despite presenting "definitive" numbers of such underfunding in the Restructuring Plan and other documents produced by the EM and his staff). Treasurer Dillon admitted that as late as the filing date, the City had not calculated the correct underfunding liability with respect to the pension obligations. Thus, the City "deliberately budget[ed and] spen[t] itself into insolvency (so as to qualify under § 101(32)(C)(ii)), when other realistic avenues and scenarios [were] possible." *Town of Westlake*, 211 B.R. at 867.

127.    Second, "[t]he mere fact that a municipality [adopts] a budget that reflects a cash flow shortfall is not independently sufficient to meet the requirement of the 'unable to pay' test."  COLLIER ON BANKRUPTCY ¶ 900.02[2][c][i] (16th ed. 2011).  The City's budget "must be evaluated in light of past and current practices, the practices of similar municipalities, and the extant facts and circumstances." *Id.*

128.    Here, the City's past and current practices, as well as current facts and circumstances, not only show that the City has many available (but unexplored) options to enable it to pay its debts as they become due, but also that the City chose to deliberately not monetize certain assets (or explore the value of such assets) prior to the filing to limit the appearance of cash or revenue on its books.  It is telling that the City's prized artwork collection and potential deal to lease Bell Isle are only now on the table – if these assets and other possible increased tax revenue collection could have collectively solved all of the City's short term cash issues.  But, as indicated above, the City did not want such assets monetized because the City's goal and clear path was to end up in chapter 9, which the City believed provided the only means to attack its vested pension obligations.

129.    Thus, in light of all of the above, the information provided in the City's current budget provides at most only "insufficient credible proof" of insolvency.  *Town of Westlake*, 211 B.R. at 867; *see also Bridgeport*, 129 B.R. at 338 (requiring concrete proof "that [the city] will be unable to pay its debts as they become due in its current fiscal year or, based on an adopted budget, in its next fiscal year" and noting that "[o]bviously, it is necessary for cities to make informed financial projections").

130.    The City's current financial difficulties currently are actually less severe than in some prior years, the City entered into a deal prior to the chapter 9 filing with its swap

counterparties which potentially freed up significant cash and did not make the filing imminent, and AFSCME believes (and as will be further demonstrated at trial) that there are numerous means already shown to be available to solve the City's current financial difficulties and generate sufficient funds to pay its debts coming due in the coming fiscal year. AFSCME recognizes that all parties (including current and former employees) will be required to sacrifice, but reasonable concessions outside of bankruptcy – which is not necessary and which the City does not and cannot qualify for based on all the reasons discussed above – from all significant creditors would easily bring the City back to financial stability.

## CONCLUSION

For the reasons set forth herein, AFSCME respectfully requests that this Court

issue an order following the eligibility trial dismissing the City's chapter 9 petition and granting

such other and further relief as is just and proper under the circumstances.

Dated: October 17, 2013

**LOWENSTEIN SANDLER LLP**
By: /s/ *Sharon L. Levine*
Sharon L. Levine, Esq.
John K. Sherwood, Esq.
Philip J. Gross, Esq.
Ira M. Levee, Esq.
Keara M. Waldron, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-6247 (Facsimile)
slevine@lowenstein.com
wjung@lowenstein.com
pgross@lowenstein.com

-and-

Herbert A. Sanders, Esq.
THE SANDERS LAW FIRM PC
615 Griswold St., Suite 913
Detroit, MI 48226
(313) 962-0099 (Telephone)
(313) 962-0044 (Facsimile)
hsanders@miafscme.org

-and-

Richard G. Mack, Jr., Esq.
Miller Cohen, P.L.C.
600 West Lafayette Boulevard
4th Floor
Detroit, MI 48226-3191

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub-Chapter 98, City of Detroit Retirees*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 17, 2013, *The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees' Pretrial Brief Regarding the City of Detroit's Eligibility to Obtain Relief Under Chapter 9 of the Bankruptcy Code* was filed with the Clerk of the Court using the CM/ECF system, which provides electronic notification of such filing to all counsel of record.

Dated:   October 17, 2013

*/s/ Lisa M. Bonito*
Lisa M. Bonito
**LOWENSTEIN SANDLER LLP**
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
lbonito@lowenstein.com